# Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment

## Volume 9 of 29

## DA02852 - DA03186

**From:** Shefelbine, James
**Sent:** Wednesday, September 13, 2000 2:25 PM
**To:** Schoenleben, Tom ; McIntyre, Clyde Jr.
**Subject:** Fuel Surcharge Presentation

**Attachments:** Fuel Surcharge.ppt

Fuel Surcharge.ppt
(60 KB)

# Merchandise Marketing and Sales

## *Fuel Surcharge*

September 15, 2000

# Several class I carriers have implemented a fuel surcharge within the last six months. It may be advantageous for CSXT to follow suit.

- **Burlington Northern Santa Fe**
  - Imposed a 2% surcharge on base monthly price of $28/Barrel.
  - Fuel factor increase of .102 based on subsequent monthly averages using a WTI index of $23.50.
    *(WTI / ($23.50 - 1)* 0.102)*
  - *Currently at 3.4%*
- **Norfolk Southern**
  - Imposed a 2% surcharge when WTI price exceeded $28/barrel for 30 consecutive days.
  - Additional 2% for each $5/barrel increase above $28.
  - *Currently at 2% -- WTI > $33 For 10 days*
- **CSX Intermodal**
  - On March 6, 2000 CSX Intermodal announced a fuel surcharge calculated on the DOE calculated price of on-highway price of diesel fuel on the last Monday of the month.
  - August Formula Based on $1.536 DOE Calculated Price
    *($1.536 - $1.00) / 10 / 1.100 X 100 = 3.96%*

# Up to 85% of CSXT's merchandise business can be affected by implementing a general fuel surcharge in CSXT 8100.



# Each rate vehicle carries a different risk profile within the market place.




- ® Applying a surcharge to public prices and private price quotes carries little risk.
- ® Applying a surcharge to contracts without existing escalators has limited risk,
- ® We will not be able to apply a surcharge to contracts that are already tied to an escalation factor that includes fuel.

# Assuming a merchandise base of $3.2 billion, by applying the NS fuel surcharge model, CSXT will realize a $108 million annual revenue impact.

# In order to implement an effective fuel surcharge program we must do a number of things well.



CSX TRANSPORTATION

# By following an aggressive timeline we can implement a fuel surcharge by xx/xx/xx.



CSX TRANSPORTATION

**From:** McIntyre, Clyde Jr.
**Sent:** Thursday, July 13, 2000 1:39 AM
**To:** Howarth, Jim ; Lewis, Gary; Couch, John; Shefelbine, Kelly ; Hancock, Kyle Jr.; Sharp, Ray ; Owen, Tom Jr.; Schoenleben, Tom; Efford, Wayne
**Cc:** Flynn, Bill ; Jenkins, Chris ; Smith, Derrick ; Perry, Noel; Turra, Marco
**Subject:** Pricing team meeting July 14 - CSXT Merchandise Fuel Surcharge language discussion

**Attachments:** FUEL SURCHARGE VERBIAGE.doc; BNSF Fuel Surcharge 1st Revised Page 23a.doc; WTI lt 3375 July 00 Rev.xls

## Executive Summary: CSXT Merchandise Marketing Fuel Surcharge Language

**MISSION:** Implement CSXT pricing document language and process that allows quick recovery of increases in fuel costs.

**BACKGROUND:**

- NS and BNSF have implemented different fuel surcharge languages against their published pricing documents. Both are based on the price of West Texas Intermediate Crude Oil (WTI), as published daily in Section C, front page, of the Wall Street Journal.

  - NS applies a 2% fuel surcharge when the WTI price exceeds $28.00 per barrel for 30 consecutive days. NS applies an additional 2% for each bracket of $5.00 per barrel for 30 days above the $28.00 base, i.e., 4% for $33.00; 6% for $38.00, 8% for $43.00, etc. Today's NS fuel surcharge is 2% based on WTI exceeding $28.00 per barrel for 30 days. All NS public prices were made subject to the fuel surcharge, but contracts and private quotes are limited

  - When WTI exceeds $28.00 per barrel, BNSF applies a monthly formula calculated using a WTI base price of $23.50 and the avg. price of WTI for the immediate prior month. BN's formula: Step (1) June's avg. $31.86 divided by base of $23.50 equals 1.35574; Step (2) Subtract 1 for a result of 0.35574; Step (3) Multiply 0.35574 times a BN's fuel cost factor of .102 (.107 prior to May 1, 2000) to arrive at the July fuel surcharge of .03629, or 3.6%. BNSF minimum surcharge is 2%. BNSF advised their list of price authorities subject to their fuel surcharge was small because their leaders put the option in the hands of individual marketing personnel.

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | BNSF 2000 Fuel Surcharge |
|---|---|---|---|---|---|---|---|---|---|
| JAN | $19.08 | $15.00 | $17.97 | $18.08 | $25.17 | $16.71 | $12.47 | $27.27 | 1.18% |
| FEB | $20.05 | $14.78 | $18.54 | $19.07 | $22.21 | $16.06 | $12.01 | $29.35 | 1.72% |
| MAR | $20.35 | $14.65 | $18.53 | $21.36 | $20.99 | $15.02 | $14.66 | $29.89 | 2.67% |
| APR | $20.27 | $16.24 | $19.82 | $23.57 | $19.72 | $15.33 | $17.39 | $25.74 | 2.91% |
| MAY | $19.94 | $17.88 | $19.74 | $21.25 | $20.83 | $14.86 | $17.70 | $28.78 | 0.95% |
| JUNE | $19.07 | $19.02 | $18.42 | $20.45 | $19.17 | $13.66 | $17.89 | $31.86 | 2.29% |
| JULY | $17.87 | $19.64 | $17.30 | $21.32 | $19.63 | $14.08 | $20.07 | | 3.63% |
| AUG | $18.01 | $18.35 | $18.03 | $21.96 | $19.93 | $13.36 | $21.26 | | |
| SEPT | $17.55 | $17.46 | $18.22 | $23.99 | $19.79 | $14.95 | $23.88 | | |
| OCT | $18.15 | $17.77 | $17.44 | $24.90 | $21.26 | $14.34 | $22.64 | | |
| NOV | $16.70 | $18.11 | $17.99 | $23.71 | $20.17 | $12.94 | $24.86 | | |
| DEC | $14.50 | $17.16 | $19.04 | $25.39 | $18.32 | $11.28 | $26.08 | | |

**CSXT Alternatives:**

- Implement similar language as publicly published by NS, which keeps CSXT competitive:



FUEL SURCHARGE VERBIAGE.doc (1...

- Implement similar language as publicly published by BNSF, which eliminates the 30 day wait and the $5.00 per barrel increments:

BNSF Fuel
Surcharge ...

- Implement softer language that gives CSXT (1) the right to reopen contracts for renegotiations based on fuel escalation; (2) puts similar language in all public price documents that allows immediate mass price updates; and (3) make future private quotes and circulars reference to softer fuel surcharge "reopener" language item to be published in CSXT 8100 rules tariff.

**RECOMMENDATION:**

- For public prices and future private quotes and private circulars build a new CSXT fuel surcharge system using a simple formula similar to BNSF's monthly averages of WTI. Make all private non-contract deals subject to approved CSXT language and formula, which should take into account CSXT's current fuel cost recovery shortfalls in view of recent mass increases, i.e., what level to set the base WTI price for the formula in order to justify our current fuel cost recovery requirements.

- Before the system is built make prices subject to language that gives CSXT the right to mass increase its prices on 20 day's notice based on average WTI prices over a period of time. Attached is a system table of daily WTI prices and monthly averages that would need to be maintained:

  /NTI It 3375 July 00
  Rev.xls (2...

- For CSXT contracts, implement standard, but required, softer "reopener" language when impossible to achieve customer agreement on making the contract subject to actual fuel surcharge.

Clyde McIntyre
CSXT Marketing Services

---

SECTION 3
SPECIFIC RULES AND REGULATIONS - WITH CHARGES

---

(A) ITEM 3375
CHARGE - FUEL SURCHARGE

Shipments made under pricing documents referring hereto may be subject to a fuel surcharge, if applicable. When the monthly average price of West Texas Intermediate Crude Oil (WTI) equals or exceeds $28.00 per barrel, a surcharge may be applied to the total freight charges for each shipment waybill dated on or after the 1st of the following month. Such fuel surcharge shall be included on the bill for freight charges for each shipment. Miscellaneous and accessorial charges shall not be subject to the fuel surcharge.

Fuel Surcharge Rates (FSR) will be adjusted monthly.

FSR = ([WTI/BV]-1) X FI
Where FSR = Fuel Surcharge Rate.
WTI = previous month's average daily price of West Texas Intermediate Crude Oil.
BV = Benchmark Value of $23.50 per barrel.
FI = .102 or 10.2% (Fuel Intensity, fuel as a percent of total 1999 BNSF operating expenses).
Note: FSR shall be rounded to the nearest one-tenth(1/10)of one(1)percent.

Fuel Surcharge applies only when the FSR exceeds 2%.

The source for the closing spot price of WTI will be the Dow Jones International Petroleum Report, whose daily spot quote is published in the Wall Street Journal, and other daily media.

The FI shall be adjusted on May 1st of each year to reflect the percent that fuel is of BNSF's total operating expense as reported in BNSF's Annual Report for the previous year.

Example:

For a Fuel Surcharge applied for shipments in the month of January, assuming the December average daily price of WTI was $28.00 per bbl.

FSR = ([WTI/BV]-1) X FI
FSR = ([$28.23/$23.50]-1) X .102
FSR = .021 or 2.1%.

Thus, for each $10.00 of freight charges applicable to a shipment referring hereto the Fuel Surcharge would be $0.21.

---

For explanation of abbreviations / reference marks, see Item 100

---

ISSUED April 26, 2000 EFFECTIVE May 1, 2000

**PROPOSED MERCHANDISE FUEL SURCHARGE APPLICATION IN TARIFF CSXT 8100**

In the event the price of West Texas Intermediate Crude Oil, as published in the Wall Street Journal, exceeds $28.00 per barrel for thirty (30) consecutive days, CSXT retains the right to apply a fuel surcharge to the freight charge(s) contained in this authority in effect on the date the fuel surcharge is applied, herein after referred to as the "Base Freight Charge(s)". If this option is exercised, the fuel surcharge shall be applied according to the following schedule.

| Texas Intermediate Crude Oil (Price per barrel) | Cumulative Fuel Surcharge (Percentage) |
|---|---|
| $28 | 2% |
| $33 | 4% |
| $38 | 6% |
| $43 | 8% |
| Each $5.00 per barrel increase thereafter | An additional 2% |

The price of West Texas Intermediate Crude Oil must exceed a given bracket for thirty (30) consecutive days for the surcharge under that bracket to be applicable. If the price of West Texas Intermediate Crude Oil ceases to be available from the Wall Street Journal or some other readily accessible source, a substitute to measure will be utilized.

Customers will receive notice of any fuel surcharge not less than ten (10) days prior to its application. Any fuel surcharge applied to the freight charge(s) in this authority will be removed or reduced when the price of West Texas Intermediate Crude Oil remains below the price which triggers a specific surcharge bracket for thirty (30) consecutive days. Reductions will be made promptly after they become applicable. In no case will the freight charge(s) be reduced below the Base Freight Charge(s) nor will the application or removal of the fuel surcharge be retroactive.

| JUL | | Jul-99 | Aug-99 | Sep-99 |
|---|---|---|---|---|
| $21.53 | 1 | $19.40 | | $21.98 |
| $21.13 | 2 | $19.68 | $20.45 | $21.48 |
| $21.23 | 3 | | $20.30 | $22.00 |
| | 4 | | $20.43 | |
| | 5 | | $20.58 | |
| | 6 | $19.78 | $20.88 | |
| | 7 | $19.78 | | $22.63 |
| $21.28 | 8 | $19.73 | | $22.68 |
| $21.43 | 9 | $19.93 | $21.28 | $23.20 |
| $21.55 | 10 | | $21.30 | $23.55 |
| $21.95 | 11 | | $21.53 | |
| $21.90 | 12 | $19.93 | $21.48 | |
| | 13 | $20.18 | $21.68 | $24.23 |
| | 14 | $19.93 | | $23.88 |
| $22.48 | 15 | $20.18 | | $24.13 |
| $22.38 | 16 | $20.63 | $21.38 | $24.53 |
| $21.80 | 17 | | $21.73 | $24.73 |
| $21.68 | 18 | | $21.53 | |
| $21.00 | 19 | $20.43 | $21.78 | |
| | 20 | $19.38 | $21.65 | $24.28 |
| | 21 | $19.45 | | $24.48 |
| $21.40 | 22 | $19.68 | | $24.73 |
| $21.53 | 23 | $20.48 | $21.63 | $25.48 |
| $21.13 | 24 | | $21.23 | $25.38 |
| $21.08 | 25 | | $20.43 | |
| $20.13 | 26 | $20.53 | $20.95 | |
| | 27 | $20.38 | $21.28 | $24.63 |
| | 28 | $20.53 | | $24.33 |
| $20.28 | 29 | $20.98 | | $24.68 |
| $20.33 | 30 | $20.53 | $22.03 | $24.53 |
| $20.43 | 31 | | $22.13 | |
| | | | | |
| $21.32 | Avg. Price | $20.07 | $21.26 | $23.88 |
| | | | | |
| 1.42% | Surcharge % | -1.56% | -1.02% | 0.17% |
| | | AUG. | SEPT. | OCT. |
| | | | | |
| | | Fuel Surcharge Formula, ([WTI/BV]-1)*FI | | |

| |
|---|
| $18.82 |
| $19.00 |
| $18.92 |
| $20.25 |
| $20.95 |
| $21.76 |

BV = $23.50
FI May 1, 1999 - April 30, 2000 = 10.7%
Fuel Surcharge WTI Trigger Price $28.00 per bbl.

AVERAGE WEST TEXAS CRUDE PRICE

NEW CONTRACT AND RULES BOOK 6100, ITEM 3375 BASIS

| Oct-99 | Nov-99 | Dec-99 | Jan-00 | Feb-00 |
|---|---|---|---|---|
| $24.53 | $22.53 | $25.00 | | $28.23 |
| | $22.38 | $25.83 | | $27.55 |
| | $22.58 | $25.83 | | $28.03 |
| $23.78 | $23.13 | | $25.55 | $28.83 |
| $23.45 | $23.00 | | $24.93 | |
| $23.28 | | $26.66 | $24.78 | |
| $22.43 | | $26.23 | $24.23 | $28.45 |
| $20.90 | $23.28 | $26.53 | | $28.03 |
| | $24.03 | $26.18 | | $28.78 |
| | $24.48 | $25.23 | $24.68 | $29.43 |
| $21.28 | $24.33 | | $25.78 | $29.43 |
| $22.30 | $24.93 | | $26.28 | |
| $23.08 | | $25.38 | $26.68 | |
| $22.45 | | $25.73 | $28.03 | $30.25 |
| $22.83 | $25.13 | $26.38 | | $30.08 |
| | $25.70 | $26.83 | | $30.05 |
| | $26.60 | $26.73 | | $29.48 |
| $22.53 | $25.80 | | $28.85 | $29.53 |
| $22.23 | $26.58 | | $29.53 | |
| $22.20 | | $26.53 | $29.68 | |
| $22.33 | | $26.33 | $29.75 | |
| $23.18 | $27.98 | $25.43 | | $29.63 |
| | $26.83 | $25.63 | | $30.28 |
| | $27.28 | | $29.43 | $30.23 |
| $23.18 | | | $29.88 | $30.23 |
| $23.18 | | | $27.83 | |
| $22.93 | | $26.38 | $27.33 | |
| $21.68 | | $26.83 | $27.23 | $30.13 |
| $21.75 | $25.98 | $26.48 | | $30.43 |
| | $24.58 | $25.60 | | |
| | | | $27.63 | |
| | | | | |
| $22.64 | $24.86 | $26.08 | $27.27 | $29.35 |
| | | | | |
| -0.39% | 0.62% | 1.18% | 1.72% | 2.67% |
| NOV. | DEC. | JAN. | FEB. | MARCH |
| | | | | |
| | | | | |

BV = $23.50
FI May 1, 2000 - April 30, 2001 = 10.2%
Fuel Surcharge WTI Trigger Price $28.23 per bbl.

| Mar-00 | Apr-00 | May-00 | Jun-00 | Jul-00 |
|---|---|---|---|---|
| $31.78 | | $25.88 | $30.13 | |
| $31.68 | | $26.88 | $30.35 | |
| $31.53 | $26.43 | $26.75 | | |
| | $25.45 | $26.98 | | |
| | $25.85 | $27.28 | $29.70 | $30.68 |
| $32.18 | $25.68 | | $29.75 | $29.98 |
| $34.13 | $25.03 | | $29.95 | $30.28 |
| $31.28 | | $28.09 | $29.78 | |
| $31.68 | | $28.65 | $30.20 | |
| $31.78 | $23.85 | $28.10 | | $29.68 |
| | $24.13 | $29.13 | | $29.70 |
| | $25.43 | $29.62 | $31.73 | |
| $32.03 | $25.38 | | $32.58 | |
| $31.68 | $25.58 | | $32.85 | |
| $30.73 | | $29.93 | $32.95 | |
| $31.08 | | $29.73 | $32.33 | |
| $30.93 | $25.88 | $29.33 | | |
| | $26.13 | $30.33 | | |
| | $27.35 | $29.88 | $31.68 | |
| $29.43 | $27.00 | | $33.05 | |
| $28.00 | | | $33.83 | |
| $27.53 | | $28.63 | $34.55 | |
| $27.23 | | $28.53 | $34.65 | |
| $27.93 | $27.28 | $29.73 | | |
| | $26.75 | $30.33 | | |
| | $24.65 | $30.00 | $31.63 | |
| $27.78 | $25.40 | | $32.08 | |
| $27.08 | $25.73 | | $31.90 | |
| $26.45 | | | $32.73 | |
| $26.70 | | $30.35 | $32.50 | |
| $26.90 | | $29.03 | | |
| | | | | |
| $29.89 | $25.74 | $28.78 | $31.86 | $30.06 |
| | | | | |
| 2.91% | 0.95% | 2.29% | 3.63% | 2.85% |
| APRIL | MAY | JUNE | JULY | AUG. |
| | | | | |
| | | | | |

October 13, 2000

Notification of Fuel Cost Recovery Charge

CSX Transportation will implement a fuel cost recovery charge of 2% on October 25th. As outlined in Mike Giftos' letter of September 22, 2000, the charge will apply to all freight moving under tariffs, private price quotations and certain contracts.

The details of the fuel cost recovery program are explained in CSX Transportation Tariffs 8100 and 8200. Since the surcharge level is a function of the number of consecutive days that the price of oil remains within a specific range, the daily tracking of oil prices will be posted on CSX Transportation's Internet home page (www.csxt.com). Customers will be directly notified when the surcharge level changes.

Please contact your CSX Transportation sales representative if you have questions or require additional information.

**From:** Jacobowski, Thomas J [Thomas.Jacobowski@bnsf.com]
**Sent:** Friday, October 06, 2000 10:15 PM
**To:** McIntyre, Clyde Jr.
**Subject:** RE: SURCHARGE EXCEPTION PUB DATA ELEMENTS.

Clyde:
Sorry I haven't responded to you faster. We're still investigating this but the easier way looks like we can provide you with a monthly spreadsheet of those PA's that are subject to our Fuel S/C, since this will be a shorter list. I will get this list to you next week. Our Fuel S/C % is valid for a calendar month at a time so it's easier to manage than some other calculations. We'll be able to furnish the spreadsheet to you monthly BEFORE the beginning of the month, including the Fuel S/C % to use for the month.
Please ask if you have any questions.
Thanks!
Tom Jacobowski
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

-----Original Message-----
From: McIntyre, Clyde Jr. [mailto:Clyde_McIntyre@csx.com]
Sent: Friday, September 29, 2000 4:31 PM
To: 'Jacobowski, Thomas J'
Subject: RE: SURCHARGE EXCEPTION PUB DATA ELEMENTS.

September 29, 2000

Tom Jacobowski - BNSF,

CSXT is in the process of enhancing our systems to handle BNSF's fuel surcharge (Pre CSXT/BNSF REN implementation)...even on a BNSF-CSXT collect basis

The following message from CSXT's customer accounting group indicates we will need a listing of joint line BNSF price authorities with CSXT that are not subject to the BNSF fuel surcharge.

Please review the requirements and let me know if BNSF can furnish.

Clyde McIntyre
CSXT Marketing Services
904-633-5678
> -----Original Message-----
> From: Havey, Ray
> Sent: Friday, September 29, 2000 4:36 PM
> To: McIntyre, Clyde Jr.
> Cc: Trznadel, Emily ; Marksberry, Debbie ; Lancaster, Al ; Patterson,
> Rabon Jr. ; Charlie Taylor; Gary Coulliette; Tom A Roberts
> Subject: SURCHARGE EXCEPTION PUB DATA ELEMENTS.
> Importance: High
>
> Per our September 28 meeting about SURCHARGES.
>
> When obtaining / furnishing CUSTOMER ACCOUNTING with application or
> exception publications to the BNSF or any other Foreign Railroad's
> FUEL SURCHARGE, we will need the following data elements to add to our coding.
>
> As a general rule, we want to apply the FUEL SURCHARGE, based on the
> generic, i.e. BNSF (any number) T (tariffs) U (public) EFF/EXP DATES,

> and BNSF (publishing road). AND then code only the exceptions. Same would
> apply to private quotes and maybe contracts. However, if the publishing
> road only has several publications being surcharged, we could also
> handle the application specifically, without any exceptions for that
> publishing road.
>
> DATA ELEMENTS:
>
> * PRICE AUTHORITY AGENT (i.e. SCAC BNSF)
> * PRICE AUTHORITY NUMBER ( up to 10 positions)
> * PRICE AUTHORITY TYPE ( T = tariff, Q = priv. quote, C =
> contract)
> * PUBLIC / PRIVATE INDICATOR ( U = public or P = private, some
> quotes may be public)
> * EFFECTIVE DATE (YYYY-MM-DD) (date publication became subject to
> FUEL SURC)
> * EXPIRATION DATE (YYYY-MM-DD) (date publication was removed from
> FUEL SURC, generally will be infinity date)
> * PUBLISHING ROAD (needed, if agent is something other
> than SCAC, BNSFQ would be BNSF, to find the SURC)
>
> In addition to the above data, we would need
> * PUBLISHING ROAD IDENTITY
> * AMOUNT OF FUEL SURCHARGE. (percent 99.99)
> * EFFECTIVE DATE (YYYY-MM-DD) (effective date the above percentage
> became effective)
> * EXPIRATION DATE (YYYY-MM-DD) ( date the above percentage was
> changed, eliminated or is still effective.. i.e. infinity)
> *
> If there are exception publications created after the initial coding
> takes place, we would prefer the exception publications to bear the
> effective date they are added as exceptions, rather than back dating
> them to a time when billing has already been applied.
>
> Also, when we get notices of the FUEL SURCHARGE percentage changes, we
> would prefer an advance notice of when it becomes effective at some
> date in the future, rather than notice given the day it changes. Otherwise we
> will not capture the FUEL SURCHARGE change on a timely basis.

| | |
|---|---|
| **From:** | McIntyre, Clyde Jr. |
| **Sent:** | Monday, April 30, 2001 10:07 PM |
| **To:** | 'Jacobowski, Thomas J' |
| **Cc:** | Shefelbine, Kelly |
| **Subject:** | Changes to BNSF Carload Fuel Surcharge Calculation |
| **Attachments:** | BNSF Fuel Surcharge Concurrence |

McIntyre Letter
Head GOB.doc (...

CSX
TRANSPORTATION

Clyde V. McIntyre
Director, Marketing Services

500 Water Street – J865
Jacksonville, Florida 32202
FAX (904) 359-3472
(904) 359-3650

April 30, 2001

Tom Jacobowski
General Director, Price Management
Burlington Northern Santa Fe
3001 Lou Menk Drive
Ft. Worth, TX 76131

Dear Tom,

Please refer to your letter dated April 25, 2001 requesting CSX Transportation concurrence to changes to the BNSF carload fuel surcharge calculation.

CSX Transportation prefers the WTI formula and intends to keep it as an index for CSXT traffic moving under CSXT price authorities. However, if BNSF feels the need to go forward with changing to the Highway Diesel Fuel index for traffic moving under a BNSF price authority, we will reluctantly concur.

Sincerely,

Clyde McIntyre

# Redacted in Full

# DA02872 - DA02879

**From:** Jacobowski, Thomas J [Thomas.Jacobowski@bnsf.com]
**Sent:** Monday, August 07, 2000 7:17 PM
**To:** McIntyre, Clyde Jr.
**Subject:** RE: IMPORTANT/CSXT REFUSES OUR FUEL SURCHARGE

Clyde:
Thanks for your quick response. We're researching the price authorities to determine what to do about this. I will advise you ASAP.

Tom Jacobowski
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

-----Original Message-----
From: McIntyre, Clyde Jr. [mailto:Clyde_McIntyre@csx.com]
Sent: Saturday, August 05, 2000 2:52 PM
To: 'Jacobowski, Thomas J'
Subject: RE: IMPORTANT/CSXT REFUSES OUR FUEL SURCHARGE

Tom Jacobowski-BNSF,

CSXT has no automatic (or manual) way in our customer accounting and ISS systems to identify, calculate and apply the BNSF surcharge on BNSF originated shipments that are billed on a collect basis. Therefore CSXT can only concur to the BNSF surcharge on BNSF originated prices billed on a prepaid basis. Can you change the billing to a prepaid basis so that your system can apply, bill and collect the surcharge? If not, CSXT needs BNSF to turn off the surcharge on BNSF collect shipments to eliminate costly ISS challenges and messages.

Clyde McIntyre
CSXT Marketing Services
904-633-5678

-----Original Message-----
From: Jacobowski, Thomas J [mailto:Thomas.Jacobowski@bnsf.com]
Sent: Friday, August 04, 2000 5:02 PM
To: McIntyre, Clyde Jr.
Subject: FW: IMPORTANT/CSXT REFUSES OUR FUEL SURCHARGE
Importance: High

Clyde:
see attached. We would like CSXT concurrence to apply a BNSF Fuel Surcharge per BNSF Rules Book 6100 (on line at:
http://www.bnsf.com/business/html/fuel_surcharge.html ) This is being applied selectively in certain markets and is divisional per the freight charge's divisions. Other markets we are taking general increases with your concurrence.
Please advise. Thanks!
Tom Jacobowski
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

> -----Original Message-----
> From: Bryant, Steve L
> Sent: Friday, August 04, 2000 3:09 PM
> To: Jacobowski, Thomas J

> Cc: McCormick, Catherine L; Swan, H Martin
> Subject: FW: IMPORTANT/CSXT REFUSES OUR FUEL SURCHARGE
> Importance: High
>
> Tom,
>
> We have a shipment for [redacted] moving under a BNSF quote that moved
> collect (CSXT to collect) and the CSXT is refusing to collect the fuel
> surcharge. Have we experienced this problem or has the CSXT said that
> they cannot collect this? With [redacted] taking a fuel surcharge on
> their shipments, this could be a problem if they realize that when
> they ship collect they avoid the fuel surcharge. However, since the
> quote contains the language that a fuel surcharge applies I would
> think that the CSXT would still owe us for the fuel surcharge
> regardless of whether they want to collect it from the customer or
> not. I would like your thoughts on this issue.
>
> Thanks,
> Steve
>
> -----Original Message-----
> From: Swan, H Martin
> Sent: Friday, August 04, 2000 2:09 PM
> To: Bryant, Steve
> Subject: IMPORTANT/CSXT REFUSES OUR FUEL SURCHARGE
> Importance: High
>
> Please refer to BNSF [redacted] w/b [redacted] dated 6-07-00 Urrwin number
> [redacted]
>
> [redacted] routed BNSF-Chicago-CSXT
>
> rated as $2875 plus $66.13 fuel surcharge.
>
> Collect shipment (CSXT to collect).
>
> Under the ISS system CSXT kept sending the bill back changing the
> charges to just the basic freight charge.
>
> I called my counterpart Kay at 904 279 5140 and she told me that she was
> told that the CSXT had no way handling these charges on a
> interline forwarded collect move and that it was BNSF money and that
> they were not going to collect BNSF misc charge. I had already told
> her that it was dividable among the carries.
>
> Would you contact your counterpart to see if we can get this
> straighten out.
>
> Thanks
>
>
> H. Martin Swan
>

# FUEL SURCHARGE ANALYSIS

| | Feb | Mar | Apr | May | Jun | Jul | 6-Mo Total | Avg |
|---|---|---|---|---|---|---|---|---|
| Operating Revenue | $ 465.5 | $ 609.5 | $ 472.9 | $ 487.7 | $ 587.4 | $ 431.4 | $ 3,054.4 | $ 509.1 |
| Operating Expenses | $ 416.8 | $ 521.9 | $ 439.7 | $ 444.4 | $ 525.6 | $ 409.2 | $ 2,757.6 | $ 459.6 |
| Operating Income | $ 48.7 | $ 87.6 | $ 33.2 | $ 43.3 | $ 61.8 | $ 22.2 | $ 296.8 | $ 49.5 |
| Operating Ratio | 89.5% | 85.6% | 93.0% | 91.1% | 89.5% | 94.9% | 90.3% | 90.3% |
| Fuel | $ 36.8 | $ 44.7 | $ 34.9 | $ 34.0 | $ 44.0 | $ 34.3 | $ 228.7 | $ 38.1 |
| Fuel / Revenue | 7.9% | 7.3% | 7.4% | 7.0% | 7.5% | 8.0% | 7.5% | 7.5% |
| Fuel / Expense | 8.8% | 8.6% | 7.9% | 7.7% | 8.4% | 8.4% | 8.3% | 8.3% |
| Fuel / 80% Op Ratio | 9.0% | 11.0% | 8.6% | 8.3% | 10.8% | 8.4% | 56.2% | 9.4% |

Assume surcharge triggers at $30/barrel.

| | | | | Based on Average Rev | Based on Average Cost | 80% Op Ratio Cost |
|---|---|---|---|---|---|---|
| 30 to 31 | 2.6% | | | | | |
| 31 to 32 | 2.5% | 30 to 32 | 5.2% | 0.39% | 0.43% | 0.48% |
| 32 to 33 | 2.5% | 30 to 33 | 7.7% | 0.58% | 0.64% | 0.73% |
| 33 to 34 | 2.4% | 30 to 34 | 10.3% | 0.77% | 0.86% | 0.97% |
| 34 to 35 | 2.3% | 30 to 35 | 12.9% | 0.97% | 1.07% | 1.21% |
| 35 to 36 | 2.3% | 30 to 36 | 15.5% | 1.16% | 1.29% | 1.45% |
| 36 to 37 | 2.2% | 30 to 37 | 18.1% | 1.35% | 1.50% | 1.69% |
| 37 to 38 | 2.2% | 30 to 38 | 20.7% | 1.55% | 1.71% | 1.93% |
| 38 to 39 | 2.1% | 30 to 39 | 23.2% | 1.74% | 1.93% | 2.18% |
| 39 to 40 | 2.1% | 30 to 40 | 25.8% | 1.93% | 2.14% | 2.42% |
| Change attributed to $1/barrel increase in cost | | | 2.6% | 0.19% | 0.21% | 0.24% |

CSXT / Finance (EP)
August 31, 2000

# FUEL SURCHARGE ANALYSIS

| | Feb | Mar | Apr | May | Jun | Jul | 6-Mo Total | Avg |
|---|---|---|---|---|---|---|---|---|
| Operating Revenue | $ 465.5 | $ 609.5 | $ 472.9 | $ 487.7 | $ 587.4 | $ 431.4 | $ 3,054.4 | $ 509.1 |
| Operating Expenses | $ 416.8 | $ 521.9 | $ 439.7 | $ 444.4 | $ 525.6 | $ 409.2 | $ 2,757.6 | $ 459.6 |
| Operating Income | $ 48.7 | $ 87.6 | $ 33.2 | $ 43.3 | $ 61.8 | $ 22.2 | $ 296.8 | $ 49.5 |
| Operating Ratio | 89.5% | 85.6% | 93.0% | 91.1% | 89.5% | 94.9% | 90.3% | 90.3% |
| Fuel | $ 36.8 | $ 44.7 | $ 34.9 | $ 34.0 | $ 44.0 | $ 34.3 | $ 228.7 | $ 38.1 |
| Fuel / Revenue | 7.9% | 7.3% | 7.4% | 7.0% | 7.5% | 8.0% | 7.5% | 7.5% |
| Fuel / Expense | 8.8% | 8.6% | 7.9% | 7.7% | 8.4% | 8.4% | 8.3% | 8.3% |
| Fuel / 80% Op Ratio | 9.0% | 11.0% | 8.6% | 8.3% | 10.8% | 8.4% | 56.2% | 9.4% |

Assume surcharge triggers at $33/barrel.

| | | | | Based on Average Rev | Based on Average Cost | 80% Op Ratio Cost |
|---|---|---|---|---|---|---|
| 33 to 34 | 2.4% | | | | | |
| 34 to 35 | 2.3% | 33 to 35 | 4.8% | 0.36% | 0.40% | 0.45% |
| 35 to 36 | 2.3% | 33 to 36 | 7.2% | 0.54% | 0.60% | 0.67% |
| 36 to 37 | 2.2% | 33 to 37 | 9.6% | 0.72% | 0.80% | 0.90% |
| 37 to 38 | 2.2% | 33 to 38 | 12.0% | 0.90% | 0.99% | 1.12% |
| 38 to 39 | 2.1% | 33 to 39 | 14.4% | 1.08% | 1.19% | 1.35% |
| 39 to 40 | 2.1% | 33 to 40 | 16.8% | 1.26% | 1.39% | 1.57% |
| Change attributed to $1/barrel increase in cost | | | 2.4% | 0.18% | 0.20% | 0.22% |

CSXT / Finance (EP)
August 31, 2000

FUEL SURCHARGE ANALYSIS

| | Feb | Mar | Apr | May | Jun | Jul | 6-Mo Total | Avg |
|---|---|---|---|---|---|---|---|---|
| Operating Revenue | $ 465.5 | $ 609.5 | $ 472.9 | $ 487.7 | $ 587.4 | $ 431.4 | $ 3,054.4 | $ 509.1 |
| Operating Expenses | $ 416.8 | $ 521.9 | $ 439.7 | $ 444.4 | $ 525.6 | $ 409.2 | $ 2,757.6 | $ 459.6 |
| Operating Income | $ 48.7 | $ 87.6 | $ 33.2 | $ 43.3 | $ 61.8 | $ 22.2 | $ 296.8 | $ 49.5 |
| Operating Ratio | 89.5% | 85.6% | 93.0% | 91.1% | 89.5% | 94.9% | 90.3% | 90.3% |
| Fuel | $ 36.8 | $ 44.7 | $ 34.9 | $ 34.0 | $ 44.0 | $ 34.3 | $ 228.7 | $ 38.1 |
| | | | | | | | | |
| Fuel / Revenue | 7.9% | 7.3% | 7.4% | 7.0% | 7.5% | 8.0% | 7.5% | 7.5% |
| Fuel / Expense | 8.8% | 8.6% | 7.9% | 7.7% | 8.4% | 8.4% | 8.3% | 8.3% |
| Fuel / 80% Op Ratio | 9.0% | 11.0% | 8.6% | 8.3% | 10.8% | 8.4% | 56.2% | 9.4% |

Assume surcharge triggers at $34/barrel.

| | | | | Based on Average Rev | Based on Average Cost | 80% Op Ratio Cost |
|---|---|---|---|---|---|---|
| 34 to 35 | 2.3% | | | | | |
| 35 to 36 | 2.3% | 34 to 36 | 4.7% | 0.35% | 0.39% | 0.44% |
| 36 to 37 | 2.2% | 34 to 37 | 7.0% | 0.53% | 0.58% | 0.66% |
| 37 to 38 | 2.2% | 34 to 38 | 9.4% | 0.70% | 0.78% | 0.88% |
| 38 to 39 | 2.1% | 34 to 39 | 11.7% | 0.88% | 0.97% | 1.10% |
| 39 to 40 | 2.1% | 34 to 40 | 14.0% | 1.05% | 1.17% | 1.31% |
| 40 to 41 | 2.1% | 34 to 41 | 16.4% | 1.23% | 1.36% | 1.53% |
| Change attributed to $1/barrel increase in cost | | | 2.3% | 0.18% | 0.19% | 0.22% |

CSXT / Finance (EP)
August 31, 2000

| | |
|---|---|
| **Subject:** | Discussion w/BNSF re: Fuel Surcharge (+ Paul Hitchcock) |
| **Location:** | CWG Office |
| **Start:** | Fri 2/9/2007 6:30 PM |
| **End:** | Fri 2/9/2007 7:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Meeting organizer |
| **Required Attendees:** | Hitchcock, Paul |

**From:** Hollingsworth, Adam
**Sent:** Thursday, March 20, 2003 7:36 PM
**To:** Jarchower, Didi; Trescot, Leslie; Collins, Peggy ; Couch, John ; Hart, John ; McIntyre, Clyde Jr.; Hitchcock, Paul ; Shudtz, Pete ; Hoffmann, Mark ; Rogan, Lorie ; Jones, Sharon M; Eliasson, Fredrik ; Bryan, Sandi ; Alice Platt; Amber Rainwater; Amy Carrier; Dan Murphy; David Hall; Deborah Laird; Didi Jarchower; Gary Sease; Georgia Jefferson; Jane Covington; Karen Okie; Lynette Wisniewski; Misty Skipper; Robert Sullivan; susanswiles@msn.com; Susie Wiles; Al Crown; Alan P Blumenfeld; Andy Fogarty; Andy Strok; Arnie Havens; Asok Chaudhuri; Bob Bernard; Bob Haulter; Chris Jenkins; Chuck Wodehouse; Clarence Gooden; Ellen Fitzsimmons; Frank Pursley; Fred Favorite; Ganson Evans; Howard Levy; Jim Fallon; Ken Peifer; Les Passa; Leslie Michaelis; Michael Cantrell; Michael Ward; Mike Ruehling; P. Giftos; Paul Goodwin; Pete Carpenter; Randy Evans
**Subject:** CSXT Announces Modifications to Fuel Surcharge Program

**Attachments:** Fuel Surcharge Press Release.doc; Fuel Surcharge Q and As.doc; Fuel Surcharge Index Chart.ppt

Earlier today CSXT announced modifications to its fuel surcharge program. To assist in answering questions, please find attached there documents:

1. The press release announcing the changes

Fuel Surcharge Press Release.d...

2. Q and As for use with customers and others (please do not release this document publicly, it should be used as talking points only)

Fuel Surcharge Q and As.doc (3...

3. An index comparing the current surcharge and the surcharge as modified

Fuel Surcharge Index Chart.ppt...

# CSXT Modified Fuel Cost Recovery Program Index

| WTI $/Barrel | Old CSXT Surcharge | New CSXT Surcharge |
|---|---|---|
| $ 23 | | 0.0% |
| $ 24 | | 0.4% |
| $ 25 | | 0.8% |
| $ 26 | | 1.2% |
| $ 27 | | 1.6% |
| $ 28 | 2% | 2.0% |
| $ 29 | 2% | 2.4% |
| $ 30 | 2% | 2.8% |
| $ 31 | 2% | 3.2% |
| $ 32 | 2% | 3.6% |
| $ 33 | 4% | 4.0% |
| $ 34 | 4% | 4.4% |
| $ 35 | 4% | 4.8% |



CSX TRANSPORTATION

# NEWS

CSX TRANSPORTATION

Corporate Communications & Public Affairs 500 Water St., Jacksonville, FL 32202

Contact: Adam Hollingsworth
Dan Murphy
(904) 366-2949

## CSX TRANSPORTATION ANNOUNCES MODIFICATIONS TO ITS FUEL COST RECOVERY PROGRAM

**JACKSONVILLE, Fla., March 20, 2003** - In an effort to more quickly respond to changing market conditions and the continued volatility in fuel prices, CSX Transportation (CSXT) announced today modifications to its fuel cost recovery program.

After the transition to the new program, CSXT's fuel surcharges will be applied in smaller increments, on a more real-time basis, consistent with increases or decreases in fuel prices. With the changes, CSXT will no longer only adjust surcharges in 2% increments for every $5/barrel change in crude oil prices. Instead, the surcharge will be adjusted up or down 0.4% for every dollar increase or decrease in oil prices above $23/barrel. These charges will be determined monthly based on the thirty-day average price of West Texas Intermediate (WTI) crude oil. When fuel prices drop below $23/barrel, no fuel surcharge will apply.

Michael J. Ward, chairman and CEO of CSX Corporation and president of CSXT said, "Given the continued instability in oil prices we must, like most American companies, implement better ways to manage fuel price changes and market volatility. As a result of this new program, CSXT's fuel surcharges will more directly respond to fuel price changes in a real-time manner."

P. Michael Giftos, CSXT's executive vice president and chief commercial officer said, "These changes will allow CSXT's surcharge program to more accurately reflect fuel price fluctuations in a more timely fashion. In addition, the modified program provides two things our customers have asked for: smaller, more incremental changes in the fuel surcharge and easier administration since it is changed on a predictable, monthly basis."

CSXT will amend its 8100 and 8200 tariffs later this month and the new fuel surcharge program will take effect not less than 20 days after. Until the new surcharge becomes effective, the current program will remain in place. These tariff changes will not change the existing fuel cost recovery program at CSX Intermodal. Once the program is amended, additional details will be available on the company's website at www.csx.com.

- more -



CSXT and its 34,000 employees provide rail transportation and distribution services over a 23,000 route-mile network in 23 states, the District of Columbia and two Canadian provinces. CSXT is a business unit of CSX Corporation (NYSE: CSX), and both are headquartered in Jacksonville, Fla.

###

www.csx.com

***DO NOT DISTRIBUTE – FOR INTERNAL USE ONLY***

**CSXT's Modifications to Fuel Cost Recovery Program**
**Q and A's**

***Summary***

In an effort to more quickly respond to changing market conditions and the continued volatility in fuel prices, CSX Transportation (CSXT) announced today modifications to its fuel cost recovery program. The program's key elements are:

- fuel surcharges will be applied in smaller increments, on a more real-time basis, consistent with increases or decreases in fuel prices;
- CSXT will no longer adjust surcharges in 2% intervals for every $5/barrel increase in the price of West Texas Intermediate (WTI) crude oil;
- fuel surcharges will go up or down 0.4% for every dollar increase or decrease in fuel prices above $23/barrel
- while the fuel surcharge rate remains unchanged at $5/barrel intervals, the surcharge will be adjusted up or down in smaller increments on a more timely basis;
- these charges will be determined monthly based on the thirty-day average price of WTI crude oil. When fuel prices drop below $23/barrel, no fuel surcharge will apply.

*An index showing the effect of the old and new programs was e-mailed to each of you.*

***1. It seems to me that the old program didn't work, so now you're just changing the rules of the game. That's not right.***

The program we put in place in October 2000 was pretty sound, but it had a flaw in the trigger mechanism both on the upside and the downside. While the old program looked good in theory, in practice it simply did not track the petroleum market appropriately. Implementation of the surcharge lagged fuel price changes by a long time and the program was extremely vulnerable to even small, temporary price fluctuations. The new program will help CSXT recover a higher portion of fuel costs when prices increase and allows customers to see reduced surcharges more quickly when prices fall.

***2. Why doesn't your current program work?***

The program put in place in October, 2000 required that fuel prices stay above certain levels for 30 consecutive business days. If prices increase or decrease from trigger levels– even for one day – the clock starts and CSXT cannot appropriately respond to the dynamics of the market. That means that even if fuel prices are at high levels, CSXT cannot recover a portion of our costs because of an anomaly in how our program is structured. Likewise, if fuel prices begin to fall, but spike for one day, we continued to

charge our customers at the higher level. Put simply, it does not effectively respond in a timely manner to the volatility of fuel prices.

Instead, through the modifications we are now putting in place, CSXT will be able to recover a portion of our higher fuel costs more quickly and consistent with market changes. Conversely, we can take the fuel surcharge down more quickly as prices drop…we can be more responsive on the upside and the downside. The current program does not allow for that. As an example, crude oil prices have dropped almost 25% in the last week as the situation in the Middle East has become less uncertain.

In addition, through the modified program, we will be able to adjust the fuel surcharge on a smaller, more incremental basis and in a more predictable, monthly fashion.

3. ***I know that you did not hedge fuel in 2003. Why should I be held accountable for a bad business decision made by CSXT?***

Hedging isn't necessarily any better. It is true that hedging does reduce a company's vulnerability to wild swings in the market and price volatility…and it does provide a level of predictability. However, to hedge, you must pay a 1% to 2% premium on the price and you'll lose as many times as you'll win. By example, we did hedge a portion of our fuel buy last year. And in July, when comparing our hedged price against the market price, we were $8 million unfavorable to the market. By December, because of increased fuel prices, we were $5 million favorable to the market. So hedging may not be the answer – even though it makes for a good argument when prices are at the levels they're at now. Having said all that, we are looking at various hedging programs to determine if we can find a structure that works for us and our customers – consistent with all the sensitivities I've already discussed.

4. ***Recent reports said that railroads were actually making money on the fuel surcharge. It looks to me like you're gaming the system to do just that.***

No. Our goal is to recover a higher portion of significantly increased fuel prices and implement a program that more closely tracks fluctuations in the fuel market. What we collect from the modified fuel surcharge will still be less than what we're experiencing in terms of increased costs. Remember, we've seen dramatically increased fuel costs in the first quarter of 2003, but we've recovered less than 25% of that increase. Our goal is to get that recovery number higher…and there is a long way between where we are and where we'd have to be to collect more in surcharge than we're paying in costs. Conversely, this program allows us to more quickly reduce the fuel surcharge when prices drop.

5. ***As always, CSXT is pushing for higher prices and new surcharge programs. I'm not seeing such programs from my other transportation providers.***

That's not correct. Fuel surcharges are pervasive within the trucking industry. Every major American railroad has implemented a fuel surcharge program of one kind or

another. We've had one since 2000. All we're trying to do is better tailor our program to the realities of the fuel market.

***6. When will these changes take effect?***

We are preparing the changes to the tariffs now, and identifying any technology and administrative changes that may be required in order to implement this program effectively. We will be amending the 8100 and 8200 tariffs later this month and more details will be available then.

**From:** Bryan, Sandi
**Sent:** Tuesday, March 25, 2003 7:41 PM
**To:** Ward, Michael
**Cc:** Rogan, Lorie ; Gooden, Clarence ; Jenkins, Chris; Blumenfeld, Alan P ; Strok, Andy; Evans, Ganson ; Trescot, Leslie; Collins, Peggy ; Hart, John ; Thigpen, Rosemary ; Patterson, Rita; Bales, Lisa; Boley, Janet; Kirkland, Sandy
**Subject:** Memo from PMG

**Attachments:** memo fr pmg to mjw re 2Q outlook 032503.doc

Attached is a memo from Mike Giftos to Michael Ward regarding our second quarter outlook:

memo fr pmg to mjw re 2Q outlo...

CSX TRANSPORTATION

# MEMORANDUM

**TO:** Michael Ward

**FROM:** Mike Giftos

**DATE:** March 25, 2003

**RE:** Q2 Outlook

My groups have reassessed their revenue outlooks for Q2 and I want to share with you our latest thinking. Obviously, we remain in a sea of uncertainty with the Middle East situation and these revenue projections are based on the assumption that there is no precipitous drop in the economy and that the war in the Middle East is relatively brief.

Clarence increased his revenue outlook by $9.3 million to plan levels. This largely reflects additional military moves. The sensitivities in merchandise, however, are on the downside.

Chris increased the coal outlook by $3.5 million for a revised second quarter outlook that is $10 million ahead of plan. This is more in line, I believe, with the thinking you and I have shared.

The automotive group remains unchanged at $16.6 million below plan. This largely reflects announced production cuts of 500,000 units, which translates to $25 million; however, Andy is hopeful that they can offset a portion of this decline with some short term import movements and better than expected strength from [redacted].

Finally, the intermodal forecast remains unchanged at $4.9 million below plan. This represents growth of 6%. At the recent TTX board meeting, the consensus intermodal outlook for the second half was 4% growth. We are well above those numbers at this point. First quarter strength benefited from pent-up demand from the west coast strike and some pre-shipping ahead of the lunar new year. Of course, neither of these factors will be present in the second quarter. The intermodal area, which is largely moving consumer goods, will be largely impacted by the condition of the economy.

With these sensitivities, we expect second quarter linehaul revenue to be $11 million below plan, or $64.5 million above 2002. We have revised our CSXT fuel surcharge down to $9 million, based on a 2% charge for the entire second quarter. We will begin assessing charges under the revised fuel surcharge

program in the month of June and I am assuming that the 2% program will remain intact at least until then. Accordingly, the fuel surcharge will be about $9 million less than previously projected but this revenue reduction should be more than offset by declining fuel prices. We obviously continue to aggressively explore all other revenue opportunities.

On the cost side, Alan is optimistic that he will achieve additional reductions in a number of areas. Trucking costs have been materially affected in the first quarter by service issues as we had to resort to emergency trucking on numerous occasions. We don't expect that to reoccur in the second quarter. Andy's declining auto volumes will also result in some direct cost offsets of $700,000, which were already included in the last outlook.

cc:
Clarence Gooden
Chris Jenkins
Alan Blumenfeld
Andy Strok
Ganson Evans
Leslie Trescot
Peggy Collins
John Hart

# NEWS

CSX TRANSPORTATION

Corporate Communications & Public Affairs 500 Water St., Jacksonville, FL 32202

Contact: Adam Hollingsworth
Dan Murphy
(904) 366-2949

## CSXT ANNOUNCES MODIFICATIONS TO ITS FUEL COST RECOVERY PROGRAM

**JACKSONVILLE, Fla., March 20, 2003 -** In an effort to more quickly respond to changing market conditions and the continued volatility in fuel prices, CSX Transportation (CSXT) announced today modifications to its fuel cost recovery program.

Under CSXT's new program, fuel surcharges will be applied in smaller increments, on a more real-time basis, consistent with increases or decreases in fuel prices. With the changes, CSXT will no longer adjust surcharges in broad, $5 increments. Instead, fuel surcharges will go up or down 0.4% for every dollar increase or decrease in fuel prices above $23 -- or a total of 2% for every $5 increase. Like the current program, at $28, $33, $38 and equal increments thereafter, the fuel surcharge under the modified program will be the same as the surcharge that is charged under CSXT's current program. These charges will be determined monthly based on the thirty-day average price of West Texas Intermediate (WTI) crude oil. When fuel prices drop below $23 dollar, no fuel surcharge will apply.

Michael J. Ward, chairman and CEO of CSX Corporation and president of CSXT said, "These changes will allow CSXT's surcharge program to more accurately reflect fuel price fluctuations in a timely, more immediate fashion. In addition, the modified program provides two things our customers have asked for: smaller, more incremental changes in the fuel surcharge and easier administration since it is changed on a predictable, monthly basis."

P. Michael Giftos, CSXT's executive vice president and chief commercial officer, said, "Until oil prices stabilize we must, like most American companies, implement better ways to manage fuel price changes and market volatility. In the last week, fuel prices have dropped almost 20% as war with Iraq became more certain. Given the market's performance, our immediate implementation of this

- more -

new program will help CSXT more directly respond to changing fuel prices and adjust surcharges in a real-time manner."

These new fuel surcharge program will take effect 20 days after CSXT amends its 8100 and 8200 tariffs. Until the new surcharge becomes effective, the current program will remain in place. These tariff changes will not change the existing fuel cost recovery program at CSX Intermodal. Once the program is amended, additional details will be available on the company's website at www.csx.com.

CSXT and its 34,000 employees provide rail transportation and distribution services over a 23,000 route-mile network in 23 states, the District of Columbia and two Canadian provinces. CSXT is a business unit of CSX Corporation (NYSE: CSX), and both are headquartered in Jacksonville, Fla.

###

www.csx.com

**From:** Flynn, Wayne
**Sent:** Friday, July 28, 2006 8:53 PM
**To:** Hancock, Kyle
**Cc:** McNulty, Tim; Barth, Mike
**Subject:** FW: [redacted] Contracts coming up for renewal

Kyle

Mike's note below covers the two [redacted] contracts I mentioned to you that come up for renewal on 10/1. [redacted] perceives we made a deal with them on negotiated fuel S/C when we completed their [redacted] last month. You will recall we included a negotiated fuel s/c for this contract, which, according to [redacted], mirrors the agreement they have with NS and is currently about 10% or, half our public program. The [redacted] is the only [redacted] contract that has fuel included, all others have URCAF.

We have told [redacted] the [redacted] fuel s/c was a separate deal and did not cover all [redacted] business. [redacted] have told me personally on several occasions that we are the only Class 1 that they do not have a negotiated fuel program with on their business. They also feel they have at least partially compensated us for fuel on these and other contracts by paying full URCAF. Their position is sticking to our public program with them will cost us business head to head with NS if price is close since our fuel will double what they pay NS. Of the two contracts below one is NS competitive, the [redacted]. The [redacted] is somewhat NS competitive but, more source competitive as other players will capture [redacted] business if they do not remain competitive in that market.

We have two choices, stick with our program and definitely lose some of this business or, get the 13 and 14% increases we are proposing and add the modified fuel program we did on the [redacted]. They pay full fuel on any [redacted] we do with them, this only involves their contracts. Several major contracts come up next year with [redacted], having fuel agreed to and not a negotiation each time will keep us competitive and [redacted] signed up for fuel.

While we have a couple of moths before these contracts expire, [redacted] is pressing for an answer since they are trying to make [redacted] several months out. Again, we've told them our policy and they want to make sure all here (you and Clarence) know what's going on before we close the book on this one. I don't want this to happen but, feel certain Clarence will get a call from Craig if we continue with our public program.

I suggest you or you, Tim and I discuss with Clarence. Let me know.

-----Original Message-----
**From:** Barth, Mike
**Sent:** Tuesday, July 25, 2006 10:35 AM
**To:** Flynn, Wayne; McNulty, Tim
**Subject:** [redacted] Contracts coming up for renewal

Wayne and Tim:

Per our conversation, [redacted] has two contract that are coming up for renewal in September. Both of them cover [redacted]. [redacted] is insistent that they need to have a negotiated fuel surcharge (like the one on [redacted]) on these contracts as well.

The value of the contracts are as follows:

[redacted]

| | |
|---|---|
| Revenue | $821K |
| Cont. | $196K |
| CPCD-old | $12/day |
| CPCD-proposed | $19/day |
| Weighted increase | 13% |

[redacted]

| | |
|---|---|
| Revenue | $941K |
| Cont. | $106K |
| CPCD-old | $5/day |

9/19/2007

CPCD-proposed $11/day
Weighted increase 14%

In both contracts the figures are based before the application of fuel surcharge, which would be an increase in addition to the above numbers.

Please let me know where we land on the fuel issue. [redacted] believes they have a corporate fuel surcharge agreement.

Thanks,

Mike

**From:** Owen, Tom Jr.
**Sent:** Monday, May 22, 2000 1:01 PM
**To:** Neil Grossman; Tim McNulty; Clifford Arfman; Dwayne Taylor; Gwyn May; Jeff Goodrich; Joe Conner; Rob Watson; Ted Walker
**Cc:** Bob Grayson; Brent Pickering; Bruce Kuzma; David Kennedy; Eric Moffett; Harvey Free; Michael Barth; Pat Bond; Pedro Narvaez; Ron Kopp; Sharon McEntire; Tim Hart; Wayne Flynn
**Subject:** FW: Fuel Surcharge on NS - CSXT joint pricing in NS price authorities

fyi

-----Original Message-----
**From:** McIntyre, Clyde Jr.
**Sent:** Friday, May 19, 2000 2:57 PM
**To:** Schoenleben, Tom
**Cc:** Jenkins, Chris ; Howarth, Jim ; Sharp, Ray ; Smith, Derrick
**Subject:** FW: Fuel Surcharge on NS - CSXT joint pricing in NS price authorities

Tom,

Per your request, the following message to NS gives CSXT concurrence to implementing a fuel surcharge to joint NS - CSXT public, private (non-signature) and contract prices in NS pricing documents.

Bob Scharpf (NS) advised me the NS executives are currently working up a customer communication on their intent to move forward with the surcharge. It will be released in a few days and he will begin the process of updating the public documents. He also said NS went with the surcharge due to technical issues in mass updating their price database. The surcharge will be applied as an additional miscellaneous charge to the freight bill when a "surcharge shipment condition" is tied to the rate. CSXT will receive its portion of the surcharge based on the rate's divisional factor. CSXT will accept the additional charge through the ISS settlement process.

Clyde

-----Original Message-----
**From:** McIntyre, Clyde Jr.
**Sent:** Friday, May 19, 2000 2:22 PM
**To:** rcscharp@NSCORP.COM
**Subject:** Fuel Surcharge on NS - CSXT joint pricing in NS price authorities

May 19, 2000

Mr. Robert C. Scharpf
Director - Marketing Services
Norfolk Southern
110 Franklin Road, S.E.
Roanoke, VA 24042

Bob,

Per our discussion today, CSX Transportation concurs to publishing and applying the NS proposed fuel surcharge language to joint NS - CSXT public, private (non-signature) and contract prices contained in NS price authority documents.

It is understood the fuel surcharge will be published as a condition of the price and will be applied as a miscellaneous charge to the customer's freight bill. CSXT will receive it's portion of the fuel surcharge based on the divisions tied to the price used to calculate the freight charges.

Please keep me posted on progress. Thank you.

Clyde McIntyre

Director - Marketing Services
CSX Transportation
Clyde_McIntyre@CSX.COM
904-633-5678

# Redacted in Full

# DA02902 - DA02904

# Fuel Surcharge
# Merchandise 2003

# Fuel surcharge background

- The fuel surcharge was published effective 10/25/2000
- The formula was based on the price of WTI
- The price must remain above $28 for 30 business days
  - Must be above threshold for 6 weeks

| Oil Price | Recovery Charge |
|---|---|
| $23 - $27.99/Barrel | No recovery charge |
| $28 - $32.99/Barrel | 2% |
| $33 - $37.99/Barrel | 4% |
| $38 - $42.99/Barrel | 6% |



CSX TRANSPORTATION

# Fuel cost recovery is low

- Q1 recovery is **$ 7M**
- Negative fuel cost impact Vs. 2002
  - CSXT **-$50M**



CSX TRANSPORTATION

# History of fuel prices – normalized prices in the $13-$23 range






CSX TRANSPORTATION

# Changes to the program

- Start the program at $23/barrel
- Based on prior months average price – not 30 consecutive business days
- .4% increase for every dollar above $23
  - Maintains same 2% for every $5 dollar change
- No fuel surcharge in the "dead zone"
  - $13-23/barrel
- .4% discount for every dollar below $13



CSX TRANSPORTATION

# The new program

| Oil Barrel | BNSF Surcharge* | Old CSXT Surcharge | New CSXT Surcharge |
|---|---|---|---|
| $ 9 | | | -1.6% |
| $ 10 | | | -1.2% |
| $ 11 | | | -0.8% |
| $ 12 | | | -0.4% |
| $ 13 | | | 0.0% |
| $ 23 | 1.0% | | 0.0% |
| $ 24 | 1.0% | | 0.4% |
| $ 25 | 1.0% | | 0.8% |
| $ 26 | 1.5% | | 1.2% |
| $ 27 | 1.5% | | 1.6% |
| $ 28 | 2.0% | 2% | 2.0% |
| $ 29 | 2.0% | 2% | 2.4% |
| $ 30 | 2.0% | 2% | 2.8% |
| $ 31 | 2.5% | 2% | 3.2% |
| $ 32 | 2.5% | 2% | 3.6% |
| $ 33 | 3.0% | 4% | 4.0% |
| $ 34 | 3.0% | 4% | 4.4% |
| $ 35 | 3.0% | 4% | 4.8% |
| $ 36 | 3.5% | 4% | 5.2% |
| $ 37 | 3.5% | 4% | 5.6% |
| $ 38 | 4.0% | 6% | 6.0% |
| $ 39 | 4.0% | 6% | 6.4% |
| $ 40 | 4.5% | 6% | 6.8% |

* BNSF estimated - based on highway diesel not WTI



CSX TRANSPORTATION

# Contracts, Private Quotes & Competitive Pricing

## Document(s) Guidelines

**Contracts:**

First and foremost, we will continue to have competitive transportation contracts with our customers, particularly large volume related customers. We will strive to "tighten" the language and guidelines, both for contract renewals and new contracts, as we go forward. This includes:

- Commitments – volume and other.
- Competitive Rates – extract maximum value for CSXT services, but remain competitive.
- Escalation Provisions – preferably positive stated. Always include fuel escalation.
- Term(s) – multi-year is OK, but must have good sound reasoning and should usually be on rail competitive business, not truck.
- Removing OD's in contracts that are not actively being utilized.
- Convert to rates in Competitive Price Lists where applicable.
- For incrementally incented business, we will be moving towards a matrix level type discount or refund once the technology is in place on CSXT.

Last, always remember that contracts should be structured to protect CSXT, first and foremost, and at the same time incent the customer to do business with CSXT – a true partnership arrangement!

**Private Quotes:**

We should strive to reduce the number of contracts we have in place today – approximately 60% of our $3.5 billion Merchandise Market moves under some kind of Contract Authority number. Many of the smaller volume related customers should be directed away from contracts towards competitive pricing lists or private quote documents. If these customers insist on having (utilizing) Private Quote documents, then these rates should be taken from the Competitive Price Listing. I can assure you they will be competitive prices.

**Competitive Price List(s):**

As stated above, we must migrate away from the large number of contracts we have in place to private quotes or competitive price lists; at the same time we must reduce the overall number of private quotes. We must get away from the on-going special price creation for transactional moves. The competitive prices will be an enabler for sales that allows you to price to the market. These competitive prices will definitely streamline the existing rate request process. An example; by April 15th the large ($240m) plastics market (CH01) will have all local and interline competitive rates in place and published. Just think – this large highly transactional market will have competitive rates in place that are readily available to the customer.

**NS Competitive Business:**

In all instances, we will evaluate the CSXT economic viability for competing on NS/CSXT competitive business. If the competitive rates are such that allows CSXT to meet established hurdle rates and to re-invest in our infrastructure, then we definitely will provide the customer with our competitive offer.

Matrix level discounts and refunds off competitive rates, private quotes and/or contracts to gain volume commitments will be addressed on an account by account basis. In most instances, we should not be discounting or refunding based solely on a customer's verbal commitment. Again, this will be evaluated on a case-by-case basis. Also, we are actively pursuing with technology and finance to make this an automatic process rather than a manual one.

We all as an organization must spend our time understanding markets, customers, source competition, developing good tight contract language and negotiating strategies – rather than continually creating prices for transactional moves.

***Please do not contact customers or discuss the program until the charge is announced at 3:00 p.m. today. Refer ALL media inquiries about the charge to Dan Murphy, CSXT corporate communications, at (904) 359-1469.***

## Talking Points

## CSX Transportation Fuel Recovery Charge Program

- CSX Transportation will implement a 4 percent fuel recovery charge effective October 25 to recover costs from continuing sharp increases in fuel prices.

- The program will be announced today at 3:00 p.m. The recovery charge will apply to local as well as interline freight movements. The recovery charge will be effected by an amendment to appropriate tariffs of general applicability and will be applied to all traffic moving under tariffs, private price quotes and certain contracts that incorporate those general tariffs, except for contracts that contain a price escalator index published by a government entity, such as RCAF.

- The formula used to calculate the recovery charge is as follows:

  For every five dollars the price of West Texas Intermediate oil (the industry standard for tracking oil prices, also know as WTI) goes above $23 a barrel(for 30 consecutive days), a 2% recovery charge will be added.

| Oil Price | Recovery Charge |
|---|---|
| $23-$27/barrel | No recovery charge |
| $28-$32/barrel | 2% |
| $33-$37/barrel | 4% |
| $38-$42/barrel | 6% |

  Currently, the WTI price of oil is $37/barrel, which translates into a 4% recovery charge. Should the price reach $38/barrel, for 30 consecutive days, another 2% charge would be added to make 6%. On the other hand, the recovery charge can also be adjusted downward. For example, if the price of oil drops back to $28/barrel, the recovery charge would be lowered back to 2%. At $23/barrel, the charge would be zero. Remember, the price has to be at a new level for 30 consecutive days before the recovery charge changes (up or down). If the price of oil increases above $42/barrel, the recovery charge would continue to increase, as described above.

- Fuel prices have doubled during the past year. Recent price increases alone will cost CSXT an additional $30 million for the remainder of the year.

- CSXT's total fuel bill for 2000 will be $265 million more than it paid for fuel in 1999. In 1999, CSXT fuel expenditures totaled $320 million on 527 million gallons of fuel consumed. Fuel expenditures are expected to reach $585 million in 2000, on 611 million gallons of fuel.

- Unfortunately, we have no recourse but to offset these spiraling, unanticipated fuel cost increases.

- CSX will continue to urge Congress and the Administration to pursue actions to reduce the price of oil -- most importantly for us, the elimination of the 4.3 cent a gallon deficit reduction federal fuel surcharge that is applied to all railroad fuel purchases. The surcharge was originally imposed to help reduce the budge deficit, which is now in surplus. Continuation of the tax will cost CSXT and its customers $26 million this year alone.

- It is imperative that we protect the nation's transportation sector that is vital to a sound national economy. It is equally important that we eliminate this recovery charge from shipper's bills as soon as possible.

- CSXT is reluctant to take this action, but the costs we are incurring are extraordinary. We can not absorb all of the fuel cost increases. No business can.

- The price increase we took earlier this year reflected strong demand for rail transportation and is part of an on-going effort to achieve fair market value for our services. The cost of fuel was not then the principal issue; now it is.

- Every other sector of the transportation industry is taking similar cost recovery actions. Many companies are increasing surcharges previously imposed.

- The fuel charge will apply to most customers -- except for those whose contracts have specific language prohibiting a change in rates and those customers who already have prices escalators included in their contract, i.e., they are already paying for higher fuel costs.

- In discussing the fuel cost recovery charge, stress the significant gains CSXT has made in service reliability. The fuel cost recovery charge must be taken so we can continue to improve our railroad, make needed repairs and enhancements and continue to increase service reliability.

Velocity
We first began tracking velocity in early 1999. Our average system velocity has been about 20 mph for roughly the last month, the highest our system velocity has been since we began tracking that metric.

Terminal Dwell
In 1996, our terminal dwell was averaging approximately 32 hours. We have been averaging in the 26-28 hour range for the last month or so, the lowest our dwell has been since 1996.

Cars on Line
Cars on line are at their lowest since July 1999, shortly after the Conrail integration began.

**From:** Murphy, Dan
**Sent:** Friday, September 22, 2000 7:13 PM
**To:** Murphy, Dan; DL Tran S&M Agricultural Products; DL Tran S&M Chemicals/Cust Serv Mgt; DL Tran S&M Chemicals/SalesE; DL Tran S&M Chemicals/SalesW; DL Tran S&M Feederline; S&M Industrial; DL Tran S&M Interline Mkt; S&M Int'l & Ports; S&M Pricing Svcs; DL Tran S&M Metals Mkt; DL Tran S&M Metals Sales; DL TRAN S&M Mfg Prod/Cust Sat; DL Tran S&M MfgProd/CarMgt; DL Tran S&M MfgProd/Mktg; DL Tran S&M MfgProd/Sales; DL Tran S&M Mineral Sales; DL Tran S&M Minerals Mkt; S&M Marketing Strategy & Dev; DL Tran S&M Mktg/Chemicals; DL Tran S&M N/E Sales; DL Tran S&M Paper/Forest Sales1; DL Tran S&M Paper/Forest Sales2; DL Tran S&M RAM; S&M TransFlo
**Subject:** RE: Important Message from Mike Giftos

In dealing with customer's concern regarding the fuel cost recovery program, the following is an overview of recent media articles documenting the enormous effect of surging fuel prices on the entire transportation sector. Whether ground, sea or air, the entire transportation industry is being rabbit punched by fuel costs.

++++++++++++++++++++++++

+++++

**September 18, 2000**

# Rates Up at UP

**By John Gallagher**
Copyright 2000, Traffic World Magazine.
There wasn't much outcry in the rail industry when Union Pacific Railroad announced on Sept. 8 it would be raising rates in the fourth quarter as a result of high fuel prices. Even shippers didn't seem to mind. "It's pretty understandable," said National Industrial Transportation League Rail Director Ed Rastatter.
UP said the price increases will begin in early October and apply to local as well as interline business. Contract rates also will be affected. The increases will vary depending on commodity and corridor but will average roughly 3 percent. "A lot will depend on escalation provisions in contracts, so clearly it will have to be done on a customer-by-customer basis," said UP spokesman John Bromley.
In addition to higher fuel prices, the railroad faces "a convergence of other cost increases such as health and welfare and labor inflation that are confronting companies in almost every industry," stated UP President Ike Evans.
Bromley said the increase is not a response to rate increases at other railroads. "We were innocent at the time earlier this year when other rate increases were announced," he said, namely by Norfolk Southern and **CSX**. "We did an impressive amount of improvement in productivity over the years in taking costs out of the system. We just don't see much opportunity to go in that direction and that's what forces us into the corner on this fuel issue. Fuel has such a dramatic impact on us. You hesitate to do these things as long as you can because of the competitive issues out there, but we've reached the point where there's no choice. We can't cover it simply through productivity improvements and cost cutting."
Wall Street agrees. "Evans clearly understands the economic costs of capital and there's no 'white sale' left in the rail industry - and railroads don't have a free lunch," said Salomon Smith Barney analyst Scott Flower. "They have to prove the value of their services is worthwhile for shippers versus shippers' alternatives in the supply chain. It's required that they look at where they're providing value and not getting paid for it. Given fuel prices and the fact they have a more consistent service product, I think their view is they have to test the marketplace, and I don't disagree with that."
Flower added that the days of "wild amounts of excess head count and infrastructure" are over, and that shippers will have to be willing to pay for more consistent service. "Deregulation has worked its way through the pipeline;

there's not much more than skin and bones for shippers to reap. The time has come for them to pay for part of the upside," he said.
Transportation economist Harvey Levine also agrees that railroads are justified in raising rates as a result of higher fuel costs. "Every business that feels cost increases and is able to recapture that through the market is going to raise prices, even the highly competitive industries, because they all have to earn a return that keeps them in business," he said. "If they don't and they're better off investing the money elsewhere, they're going to do it."
Levine pointed out that up until the late 1980s, the railroads passed on costs resulting from fuel increases to shippers. "It's not a new thing," he said. "One of my theories is that everything revolves around revenue adequacy. And it's complicated for a lot of people, and as long as the railroad is declared to be revenue inadequate, they can rationalize any rate increase because it's under the philosophy that they have to earn adequate capital. And how can you deny a company the right to earn adequate capital?"
It's the captive shippers that are losing out, he says. "Take the utility industry. Utilities are allowed an increase based on capital needs, just like the railroads. But they're also required to show how rate increases are going to be spread among customers. In the railroad industry, if you're revenue inadequate you're allowed to raise rates, but there really is no proceeding to determine how those rates will be spread. The railroads determine that and they're going to do it on their captive traffic. That's where the squawk is; the captive shippers feel they pay a disproportionate share of the contribution

**+++**

# More air carriers announce surcharges

Updated 5:47 p.m. ET, Wed Sep 20, 2000

**JoC ONLINE**

The push by air cargo carriers to increase fuel surcharges appears to be taking hold.

Korean Air and Nippon Cargo Airlines announced plans on Wednesday to raise the surcharge to 15 cents a kilo from 10 cents on export shipments from North America. Their announcements followed similar moves by American, Northwest and United airlines.

Earlier attempts to raise the surcharge by American, Korean and Northwest failed when other carriers didn't follow suit.

"I think this time we definitely will move ahead," said Ken Choi, KAL's vice president for cargo in New York, where the carrier has 12 weekly trans-Pacific freighter flights.

KAL's increase is scheduled to take effect on Oct. 20.

Meanwhile, Nippon Cargo said it will raise prices on low-rated cargo exported from Japan by 10% to 15%, effective Oct. 1. Shipments with higher existing rates will get proportionately lower increases, the carrier said.

+++++

**Truckers Withstand Record-High Diesel With Surcharge** By Sonoko Setaishi 08/29/2000 Dow Jones News Service (Copyright (c) 2000, Dow Jones & Company, Inc.) NEW YORK -(Dow Jones)- Even as diesel prices hover near an all-time high, the nation's major trucking and package delivery companies so far are feeling little pain, having passed the added cost on to customers in the form of **fuel surcharge** . But a continued rally in diesel would eventually threaten to eat into shipping volume and pressure truckers' profits as the overall economy slows down. More immediately, the diesel spike reduces any chance of positive earnings surprises from transportation companies in the near term, analysts said. U.S. average retail diesel price rose 6.5 cents in the

week ended Monday from the prior week to $1.54 a gallon, according to the Department of Energy's Energy Information Administration. The monthly retail price for August looks poised to reach a record, surpassing a high of $1.43 hit during the Gulf War in October 1990. (Data for the latest five weeks of July 31 through Aug. 28 show an average price for the period of $1.45.) "We're always concerned about what this does to our customers," said Roadway Express Inc. (ROAD) spokesman John Hyre, noting that the recent rise in diesel prices reversed a period of a slight decline. But the Akron, OH-based company has been able to recover the cost of higher fuel prices through a variable surcharge, and hasn't felt any weakening in demand as a result of the surcharge, Hyre said. Customers Carry Costs Roadway's surcharge, adjusted weekly based on the IEA's national average diesel price, currently stands at 4.5% for less-than-truckload, or LTL, shipping, which consolidates several customers' shipments on one truck. But for a truckload shipment - where the entire truck is carrying only one shipper's freight - the charge climbs to 6.5%. However, the company mostly handles LTL shipments. In addition, fuel costs make up only about 3% of the company's total costs, lower than the industry average. At Yellow Corp. (YELL) of Overland Park, Kan., the holding company for Yellow Freight Systems Inc., the extra fee passed on to customers for higher fuel costs is "calculated to offset" the cost of diesel, and its impact on Yellow's business has been "neutral" because most of its competitors have similar surcharge in place, said spokesman Roger Dick. The surcharge is currently 4%, up from 1.5% at the beginning of the year. Yellow also provides LTL shipments. But smaller truckers may not be weathering the diesel storm so well. While fuel costs probably account for about 5% of the operating expense at large, publicly traded trucking companies, the ratio could be as high as 20% at smaller companies, according to Bob Costello, economist at American Trucking Associations, a trade group in Washington D.C. And "when diesel is 40% above levels a year ago, no matter what company you are it's going to have an impact on your bottom line," said Costello. At United Parcel Service Inc. (UPS), the Atlanta-based package-delivery giant, a hedging program designed to control fuel costs hasn't been enough to keep up with the "dramatically high level" of fuel prices, said spokesman Steve Holmes. UPS introduced a 1.25% surcharge earlier this month, its first in about 20 years. The surcharge will cover additional fuel expenses of $130 million in third and fourth quarters, Holmes said. At Federal Express Corp.'s (FDX) FedEx Ground unit, a small-package ground carrier, a 1.25% surcharge, also applied earlier this month, will be "sufficient to offset the additional cost," said spokeswoman Betsy Momich. Overall, "most transportation companies have been pretty successful in putting fuel surcharges," which will "probably enable them to get through this situation," said Peter Coleman, analyst at Banc of America Securities LLC. But "unfortunately, they probably eliminate any sort of major upside in their earnings near-term," Coleman said. James Valentine, analyst at Morgan Stanley Dean Witter & Co., said he will have to "lower some numbers" if the crude oil continues to hover around $32 a barrel, since his earnings estimates on trucking companies assume a price of $28 a barrel. -By Sonoko Setaishi, Dow Jones Newswires; 201-938-4148; sonoko.setaishi@.dowjones.com

++++++++++++

**Union Pacific plans three per cent rate hike because of high fuel costs** 09/08/2000 The Canadian Press Copyright (c) 2000 The Canadian Press. All rights reserved. OMAHA, Neb. (AP-CP) _ Facing high diesel fuel costs, Union Pacific Railroad said Friday it will charge about three per cent more for hauling materials starting next month. Other costs also are increasing, the U.S. railway said, including health benefits and higher wage costs. In Canada, the biggest railway, Canadian National, doesn't plan to impose a **fuel surcharge** , while smaller CP Rail has already raised rates to compensate for higher fuel costs. At Union Pacific, price increases will begin in early October and contract rates will increase in accordance with specific escalation provisions, the railway said. Diesel fuel prices have more than doubled over the last year, from about 18 cents US a litre to an average of nearly 30 cents US a litre, the railway said. ``Petroleum market analysts predict that prices may go higher yet and remain at levels far above where they have been for the past several years," said Union Pacific president Ike Evans. Union Pacific has about 58,000 kilometres of track across 23 states from the Midwest to the West and Gulf coasts. It operates the country's largest fleet of diesel locomotives, consuming about 4.8 billion litres of fuel each year. In Canada, Montreal-based CN Railway has no immediate intention of implementing a **fuel surcharge** , said spokesman Mark Hallman. ``We're in a situation where we'll clearly be watching the fuel prices and where they go from here," he said. ``We will be governed accordingly." Despite a 54

per cent increase in fuel prices for the first half of this year over 1999, CN managed to keep increases in operating cosst to less than one per cent. ``The efficiencies of running a scheduled railroad have enabled us to keep a handle on costs but obviously we will have to continue to assess market conditions going forward," said Hallman. Rival CP Rail of Calgary has already tacked on a **fuel surcharge** for shippers, said spokesman Paul Thurston, who wasn't sure whether it will be increased in light of the latest rise in fuel costs.

++++

**Airlines raise prices, blame fuel expenses**
Marilyn Adams; Michelle Kessler
09/11/2000
USA Today
FINAL
Page 03A
(Copyright 2000)

Airfares are rising again, pushed by stubborn high fuel prices.

Seven major airlines -- American, Continental, Delta, Northwest, TWA, United and US Airways -- say they'll raise ticket prices $20 per round trip, mainly on domestic tickets. The increase will be in the form of a surcharge. Some fares already include a $20 **fuel surcharge** that began in January. Low-fare carrier Southwest Airlines says it will not raise prices.

Continental, which led the increase, attributed it to fuel costs but wouldn't comment on the timing or amount.

The increase comes on the heels of a turbulent summer travel season of record crowds and record disruptions from delays and cancellations.

Despite having full flights, airline profits this year are reeling from a one-two punch of rising fuel and labor costs.

Hoping to stem rising prices, ministers of the Organization of Petroleum Exporting Countries pledged to increase oil production by 800,000 barrels a day to 26.2 million barrels. The move will not take effect until Oct. 1.

In a new economic-outlook report, the Air Transport Association, the airlines' trade group, predicts this year's net income for the top 48 airlines will plummet 57% from last year to $2.3 billion, despite fare increases earlier this year.

"I'm sure this is what lies behind this **fuel surcharge** ," says Dave Swierenga, ATA's chief economist. He estimates this year's fuel costs will exceed last year's by $5.5 billion. Labor and fuel are airlines' largest costs.

Friday, a gallon of jet fuel purchased in Los Angeles hit $1.13, up from 66.5 cents a year ago, according to the Oil Price Information Service.

Labor costs are almost sure to rise. United Airlines' pilots just negotiated a tentative contract that gives them at least 45% raises over four years. Already, pilots at American and Delta want to match that deal.

That's not airlines' only worry. Passenger growth, strong during the summer, appears to be softening, Swierenga says.

++++

**America West Files For An Increased Fuel Surcharge**
By Sonoko Setaishi
09/12/2000

Dow Jones News Service
(Copyright (c) 2000, Dow Jones & Company, Inc.)

NEW YORK -(Dow Jones)- Following moves last week by seven U.S. airlines, America West Holdings Corp.'s (AWA) America West Airlines late Monday filed to double its current $20 **fuel surcharge** on round-trip domestic flights, becoming the last major full-fare carrier to announce a fare increase this month.

The step taken by the nation's ninth-largest airline means the fourth industry-wide fare hike this year - designed to cover soaring fuel costs - is highly likely to stick.

"We have filed for an increased surcharge along with the rest of the industry," America West spokeswoman Patty Nowack said Tuesday.

Setting off a rush of fare increases, Continental Airlines Inc. (CAL), the nation's fifth-largest carrier, Thursday doubled its **fuel surcharge** to $40.

By Sunday, the three largest airlines - UAL Corp.'s (UAL) United Airlines, AMR Corp.'s (AMR) American Airlines and Delta Air Lines Inc. (DAL) - followed suit, as well as Northwest Airlines Corp. (NWAC), US Airways Group Inc. (U) and Trans World Airlines Inc. (TWA).

Although airlines are prohibited from coordinating a fare increase or cut, when one carrier announces a price change others typically follow. They often drop the change if competitors don't match it in order to retain price competitiveness.

Analysts have said that without a fare hike from America West, other carriers might have been forced to take back the increase on routes served by the Phoenix airline, limiting the number of flights affected by the hike.

++++

**Air Canada doubles surcharge on U.S. flights as oil prices soar**
09/14/2000
The Canadian Press
Copyright (c) 2000 The Canadian Press. All rights reserved.

TORONTO (CP) _ Air Canada has doubled its **fuel surcharge** to $54 per passenger on all tickets for U.S. flights.

The new increase, which was never formally announced, matches its U.S. competitors after they hiked their fares last week to counter the costs of soaring oil prices, which are the highest they've been sine the 1980s.

The airline also says domestic fares could soon take a hit if there's no relief from the current crude prices of $34 US a barrel.

``We believe most consumers are aware of the escalating fuel costs and are somewhat understanding," said Air Canada spokeswoman Laura Cooke. ``It's an issue everyone is seeing at the gas pumps.

``Under extenuating circumstances, we're left with little choice" but to pass the cost along to customers, she said.

``It's one of those uncontrollable costs for the carrier."

Tickets booked for a transborder flight as of Sept. 7 were hit with the new **fuel surcharge** .

Royal Airlines and Canada 3000 have also begun charging for fuel on all flights, based on the length of the trip.

Canada 3000 is charging between $25 and $150 extra for a ticket and from $15 to $60 on Royal.

Air Canada points out that chief executive Robert Milton isn't breaking any promises by imposing the unwelcome hike since all he's said is that he has ``no plans" to increase fares on flights within Canada.

``No, that (promise) was about domestic flights. This is on transborder," Cooke explained.

Industry analysts say the hike was necessary because profits are being hammered as fuel prices soar.

Every increase of $1 US a barrel in the price of oil adds about $20 million Cdn to Air Canada's yearly fuel bill.

After labour costs, fuel is the airline's biggest operating expense.

The other problem is that Air Canada has hedged or locked in at a lower price just 20 per cent of its jet fuel needs for the year at $17 US a barrel, and is forced to buy the remainder at current market prices of double that amount.

Last Friday, Continental Airlines was the first, followed by most other U.S. carriers, to add another $20 US to round-trip tickets.

(Toronto Star)

++++

**CHINA: JAL plans cargo rate increase - source.**
09/15/2000
Reuters English News Service
(C) Reuters Limited 2000.

HONG KONG, Sept 14 (Reuters) - Japan Airlines plans to increase its cargo rates next month in a bid to improve profitability, a source at JAL's Tokyo headquarters said.

It will be the second time since April that rates have been increased.

"There is no **fuel surcharge** , but a plan to raise market rates from next month if we can," the source said.

The guidelines being considered for rate increases are an average of five percent ex USA (on average an increase of 10-20 yen per kilogram), 10 percent from Europe (an average increase of 20-40 yen per kilogram) and five percent from Asia (an average increase of 5-15 yen per kilogram.)

Rates out of Japan have not yet been decided. However, JAL is keen to dissociate itself from suggestions that it would like to increase rates ex Japan especially for the cheaper rates by 5-10 percent or by between 20-40 yen per kilogram.

JAL has several reasons to be considering such a move. Its main aim is to restore profitability, which has been badly affected by intense competition. It also wishes to deal with the impact of fuel cost increases as well as acquire funds for reinvestment in new facilities for the booming cargo sector.

++++

**UK: Virgin Atlantic to raise fares 3 pct.**
09/15/2000
Reuters English News Service
(C) Reuters Limited 2000.

LONDON, Sept 15 (Reuters) - Virgin Atlantic airline said on Friday it would increase fares by three percent from Saturday because of high fuel prices.

The move by Virgin Atlantic, which is 49-percent owned by Singapore Airlines, follows a similar fare hike announced earlier by arch-rival British Airways.

Privately owned airline British Midland said it currently had no plans to raise fares but it was constantly reviewing the situation.

KLM Royal Dutch airlines is increasing fares by four percent and several U.S. airlines have introduced a **fuel surcharge** to battle surging fuel costs.

++++

*Article 17 of 200* Travel; Travel Desk **NEWS, TIPS & BARGAINS Airline Fuel Surcharges Looking Up--and Up** 09/17/2000 Los Angeles Times Home Edition Page L-3 Copyright 2000 / The Times Mirror Company The bad news: Airline "fuel surcharges" are doubling. The good news: More airlines are being upfront about them. Major airlines this month imposed a second round of so-called fuel surcharges on fares amid soaring petroleum prices. After pressure from the U.S. Department of Transportation (DOT), consumer advocates and travel agents, however, more appeared to be wrapping the charge into regular fares in advertisements and quotes to customers, instead of tacking it on separately as some did when the surcharges were introduced. The new charge, $10 one way or $20 round trip, is on top of an identical charge imposed by most of the majors in January, bringing the total to $20 one way, $40 round trip. A notable exception to the new charge was Southwest Airlines, which was holding off as of last week. The American Society of Travel Agents, which denounced the earlier airline surcharges when they were listed separately from fares, had a milder response this time. Ed Perkins, ASTA's consumer advocate, called the surcharges an "understandable move," explaining: "Look, nobody likes it, but we all have the experience of paying 20 to 25 cents more at the pump." He added that "any time they list it [the **fuel surcharge** ] as a separate item, as far as I'm concerned, it's deceptive." The DOT last week e-mailed airlines reminding them that fuel surcharges "must be included in the advertised base price" and in fares listed in computerized reservation systems. Northwest Airlines and US Airways, which as late as February said they were listing surcharges separately from fares, said last week that they no longer do so. A United Airlines spokesman, however, said a typical caller will "probably" find that reservations agents initially omit the surcharge in general inquiries, then notify the customer before final purchase. (United is not imposing the surcharge in its current round of sale fares.)

++++

**Is Another Energy Crisis Ahead?; For Va. Truck Firm, Diesel Price Increase Has 'Crippling Effect'**
Kenneth Bredemeier

09/17/2000
The Washington Post
FINAL
Page H01
Copyright 2000, The Washington Post Co. All Rights Reserved

The price of crude oil drilled from the depths of the earth is at a 10-year high. For Ronald Cooper, vice president of his brother's trash-hauling firm in Woodbridge, that has proved to be a major headache.

GDC Inc., owned by Gerald Cooper, has a fleet of 140 trucks, 90 tractor-trailers it uses to haul huge quantities of trash for BFI Waste Systems to large landfills in southern Virginia and 50 dump trucks it rents locally.

With such a collection of trucks, GDC consumes 7,500 gallons of diesel fuel a day and has watched with dismay as the price of crude has risen, driving up the cost of one of its derivative products, diesel fuel.

Ronald Cooper said the firm now pays $1.54 a gallon for diesel, 47 cents more than it was paying a year ago. That translated into a $232,917 fuel bill last month, up more than $70,000 from the $161,677 tab in August

1999.

"It tends to have a crippling effect," Cooper said. "If it goes to $1.70, we might be out of business and have to lay off 200 employees."

Cooper said GDC, under a contract with BFI that has three more years to run, is prohibited from adding a **fuel surcharge** to its bill for carting Washington and Baltimore area trash to downstate Virginia.

But GDC has implemented a surcharge--at the moment, 8 percent--to the $55-an-hour charge for renting its dump trucks, pushing the cost to $59.40.

"When you crunch the numbers," he said, "we're very, very concerned. People a lot smarter in the trucking business than my brother and I have lost their businesses."

So who does he blame for the rising cost of diesel?

"It's really clear to me there's no energy policy coming out of Washington," he said. "Now we have to go hat in hand to the Middle East to get more oil. There should have been somebody paying closer attention to what our fuel policy is. I can't tell them what went wrong. This country runs on fuel. Somebody has been asleep at the wheel."

He described himself as a reluctant supporter of Texas Republican Gov. George W. Bush for president. "I'm not wild about either [Vice President Gore or Bush]," he said, but added, "It's time to let the other guy steer for awhile."

++++

**USA: United to match Northwest fuel surcharge increase.** 09/18/2000 Reuters English News Service (C) Reuters Limited 2000. DENVER, Sept 18 (Reuters) - United Airlines will match Northwest Airlines planned five-cent increase in the current **fuel surcharge** for shipments from the U.S., Canada and Puerto Rico, said spokeswoman Kristina Vourax. The increase for both carriers is effective October 15, and will push the surcharge to 15 cents a kilogram from the current 10 cents. Since United also flies to Latin America, the increase also will apply to those lanes, said Vourax.

**++++**

**UK: BA Cargo says fuel surcharge was inevitable.**
09/18/2000
Reuters English News Service
(C) Reuters Limited 2000.

LONDON, Sept 18 (Reuters) - British Airways World Cargo said its decision to apply a 10 US cents per kg **fuel surcharge** from October 15 was inevitable due to sharply escalating fuel costs.

The surcharge on actual weight applies to all cargo consignments, BAWC said in a statement on Monday.

It added the carrier will "aim to remove this surcharge as soon as it is commercially viable to do so."

**++++**

**SWITZERLAND: Swisscargo fuel price index up in August.**
09/19/2000
Reuters English News Service
(C) Reuters Limited 2000.

ZURICH, Sept 19 (Reuters) - Swisscargo, a unit of SAir Logistics, said its fuel price index rose to 156.8 in August from 149.5 in July.

The figure is published on Swisscargo's website, www.swisscargo.com/network/fuelindex.htm.

The index is calculated from the actual fuel costs and consumption of the partner airlines within Swisscargo's worldwide airfreight network and is updated each month, the Swiss operator added.

It said actual fuel price figures cannot be disclosed due to anti-trust laws.

The publication of Swisscargo's own index followed an IATA decision to stop issuing an index to member airlines.

As was the case with the IATA index, the Swisscargo index is based on 100.0 points for June 1996.

A majority of airlines introduced a **fuel surcharge** of 0.10 cents per kg from February 1.

+++++
**FedEx Profit Up Despite Oil Costs**

09/20/2000
The New York Times
Page 2, Column 4
c. 2000 New York Times Company

MEMPHIS, Sept. 19 -- The FedEx Corporation said today that despite higher fuel prices, its income rose 6 percent in the most recent quarter, exceeding Wall Street analysts' forecasts, on increased growth in volume and reduced overall costs.

FedEx said it earned $169 million, or 58 cents a share, up from $159 million, or 52 cents a share, in the period a year earlier. The analysts' consensus earnings estimate was 54 cents a share, according to First Call/Thomson Financial.

Revenue rose 11 percent, to $4.8 billion, in the period ending on Aug. 31, the company's fiscal first quarter.

In trading on the New York Stock Exchange today, FedEx shares gained 71 cents, to close at $39.32.

The company posted "a very solid quarter that shows evidence of acceleration," said Greg Burns, an analyst with Lazard Freres.

FedEx said it expected earnings-per-share growth for the year to be at the high end of its target range of 10 to 15 percent.

It added that higher fuel prices, which increased costs in the quarter by $55 million, had been offset in part by hedging activity.

The company also added a 4 percent **fuel surcharge** to its prices earlier this year, but does not plan to increase the surcharge in the current quarter, despite even higher fuel costs, its chief financial officer, Alan Graf Jr., said.

**++++**

**USA: Alaska Airlines to up cargo rates 5 pct, Oct 1.**
09/20/2000
Reuters English News Service
(C) Reuters Limited 2000.

PORTLAND, Sept 20 (Reuters) - Alaska Airlines will raise its cargo rates about five percent from October 1, company spokesman Jack Walsh told Reuters on Tuesday.

"Effective October 1, we are raising rates about an average of five percent," he said.

Alaska does not have a **fuel surcharge** on cargo and has no plans to institute one, Walsh added.

The increase for Alaska's priority package service, called Goldstreak, will be higher than the five percent average, he said.

Alaska was ranked by the International Air Transport Association as the 25th largest domestic cargo carrier in the United States, hauling 61,000 tonnes of cargo in 1999.

**++++**

# American Airlines Cargo announces fuel surcharge increase

Updated 10:58 a.m. ET, Tue Sep 19, 2000

**JoC ONLINE**

FORT WORTH, Tex. - American Airlines Cargo said Tuesday it will increase fuel surcharges, effective Oct. 18, 2000. The addition of $0.05/kilo to the current fuel surcharge is designed to offset the continuing increase in fuel prices. It will apply from origin points in the United States to all international destinations, where permitted, the company said.

**++++**

# Matson raises fuel surcharge to 4.25%

Updated 3:41 p.m. ET, Tue Sep 19, 2000

**JoC ONLINE**

Matson Navigation Co. said it is raising its fuel surcharge by 1% in its Hawaii-Guam service.

The surcharge, implemented in October 1999 at a 1.75% rate, will increase to 4.25% on Oct. 15.

"We had hoped that another increase in the surcharge could be avoided," said Paul E. Stevens, Matson's senior vice president of marketing. "We continue to feel the impact of this unprecedented climb of fuel prices. While the cost of fuel has an adverse impact on many businesses, as well as consumers, transportation companies are especially hard hit."

He said Matson would continue to monitor fuel costs and adjust the surcharge accordingly.

Matson, a San Francisco-based subsidiary of Alexander & Baldwin Inc., operates a range of services in the Pacific, including service to Hawaii and Guam and a coastwise service between California ports and the Pacific Northwest ports of Seattle and Vancouver, British Columbia.

++++

# Northwest Airlines Cargo to increase fuel surcharge

Updated 4:11 p.m. ET, Tue Sep 12, 2000

**JoC ONLINE**

Northwest Airlines Cargo will increase its **fuel surcharge**, effective Oct. 15.

The current **fuel surcharge** of 10 cents a kilogram will be increased to 15 cents for all trans-Pacific and trans-Atlantic shipments originating in North America, Northwest announced today.

"No shipper can deny that the fuel cost increase is real, since fuel prices are front-page news around the world. Although this surcharge increase will raise their costs, shippers know that air freight rates are more than 30% lower than three years ago," said Don Cullis, vice president of global sales, Northwest Airlines Cargo.

Northwest has tried before to raise the **fuel surcharge** but had to retreat because other carriers did not follow its lead. The carrier is hoping that this time they will finally fall in line.
++++

# Airline fuel costs up 50% this year

Updated 9:36 a.m. ET, Wed Sep 6, 2000

**JoC ONLINE**

WASHINGTON -- Fuel costs for U.S. airlines will be about 50% higher this year than they were in 1999, according to the Air Transport Association.

The industry's fuel bill will total an estimated $15.5 billion, up from $10 billion in 1999, according to David A. Swierenga, chief economist for the Washington-based trade group, which represents most major U.S. carriers. Its members transport more than 95% of all cargo and passenger traffic in the United States.

Rising fuel costs have prompted many carriers to impose **fuel surcharges** on cargo. Most of the increases have been 10 cents per kilo on international shipments, or 4.5 cents a pound on domestic traffic. Attempts by several carriers to lift the surcharge to 15 cents a kilo have failed when other airlines failed to go along with the higher rates.
++++++

# UPS Looks Unstoppable

**By Kristin S. Krause**

Copyright 2000, Traffic World Magazine.

United Parcel Service, basking in the glow of record second-quarter profits, dealt shippers a blow by announcing a **fuel surcharge** of 1.25 percent on all packages beginning Aug. 7. While all of UPS's competitors have had **fuel surcharges** in place for months, UPS had steadfastly refused to boost prices to make up for rising fuel costs. Until now. This is the first time in almost 20 years UPS has imposed a temporary **fuel surcharge**.

Fuel is eating away at UPS's magnificent profits. The company made $695 million in profit for the second quarter and that was with an unplanned $100 million fuel expenditure. Revenue grew by 11 percent to $7.3 billion, thanks to volume growth across all segments of its business.

Domestic ground volume grew 5.4 percent in the quarter to 10.1 million packages a day, a huge number considering UPS's already-enormous customer base. Domestic package revenue jumped 8.4 percent to $5.9 billion with an operating profit of $1.02 billion, a 13.4 percent increase.

International revenue grew 12.7 percent to just more than $1 billion, with an operating profit of $85 million, a nearly 20 percent increase. Shipments to and from Asia and Europe both saw 30 percent gains.

Despite the strong gains, Wall Street analysts were looking for more on revenue-per-package gains, and sent the stock tumbling, albeit slightly.

While UPS Chief Financial Officer Robert Clanin called his company's results "excellent," he warned that this kind of growth can't continue forever. "The magnitude will lapse some as we lap last year's outstanding third and fourth quarters," he said.

UPS is facing real competition for the first time in the small-to-midsize shipper account base, a domain where it has been undisputed king for decades. FedEx, in its single-point-of-access sales initiative that began in June, is making a concerted effort to sell a bundling of services to the smaller shipper it may have ignored in years past.

UPS, while noting it takes great pains to monitor movement in its customer base, deflected analysts' concerns that FedEx will chip away at its bread-and-butter customer base or face a yield-pinching price war. "We are out for profitable growth. We only go for business that is good for the bottom line of United Parcel Service," said Clanin. "We have seen anecdotes of the competition out there, but no sign of change. We are extending our relationship with our customers, moving more of their business. That creates tremendous barriers to competition."

The sting of the **fuel surcharge** on top of UPS's annual price increase in February may prove to be the impetus some customers need to give FedEx Ground a try. However, FedEx Ground is tacking on its own **fuel surcharge** in one week.

"FedEx Ground is making some inroads and this (UPS **fuel surcharge**) could help," Dwight Sigworth, executive vice president of Portland-based shipper-consulting company Air Freight Management Services. "Here's UPS making incredible amounts of money - and slaps on a **fuel surcharge**. I would do the same thing if I could get away it. I'm not faulting UPS. I know they are not in the business of giving away stuff and it looks like they tried to keep it as low as possible. They do have shareholders they have to keep happy."

In its nonpackage division, excess value insurance raked in $57 million of the $61 million operating profit. UPS Logistics has tallied more than $1 billion in long-term contracts over the past 12 months, but has yet to start bringing in real cash from the deals struck with the likes of IBM, Dell, Ford Motor Co. and Compaq Computers. Money, in the form of operating profit, is expected to start appearing in the next 12 to 18 months, once startup expenses are out of the way.

+++++

**July 31, 2000**

# FedEx Ground adds fuel surcharge

**by Kristin S. Krause**

Copyright 2000, Traffic World Magazine.

FedEx Ground decided it too is paying too much for fuel. FedEx Ground announced July 25 it will impose a 1.25 percent **fuel surcharge** on all North American ground services, including FedEx Home Delivery, beginning Aug. 7. The surcharge amount and the start date are identical to United Parcel Service's announced **fuel surcharge** on July 20. UPS and FedEx Ground both opted to hit shippers with the increased costs just before the peak shipping season begins and they are assured of high volumes.

"Despite months of continually high fuel costs, we have avoided adding a **fuel surcharge** to our services," said Daniel J. Sullivan, president and CEO. "However, to continue providing our customers with FedEx Ground's unmatched service - particularly as we approach peak shipping season - the price of our services must reflect our increased costs."

Unlike UPS, FedEx Ground, formerly RPS, doesn't pay for the fuel that powers its delivery vehicles; its contract drivers foot the bill. However, FedEx Ground has been supplementing its contract drivers' pay with a **fuel surcharge** sum to cover the drivers' increased costs, per the drivers' contracts with the company.
"We have been reimbursing our drivers for some of their fuel costs for the better part of a year," said FedEx Ground spokesperson Betsy Momich. "Naturally, we would like to recover some of what we've contributed over the last year."
++++++

# That Hurts

**by Kristin S. Krause**
Copyright 2000, Traffic World Magazine.

Airborne Express showed some battle wounds in the second quarter, posting sharply lower operating profit and net income. Airborne Express is being pummeled from virtually all sides - United Parcel Service, FedEx Express and the U.S. Postal Service are doing their best to gouge Airborne's next-day and second-day envelope business while the international forwarders are making similar efforts to take market share away from Airborne's international freight business.
Airborne announced July 6 it would miss earnings targets, and it did. Earnings per share were 28 cents compared to 55 cents last year. Net income was nearly halved in the quarter to $13.7 million from $27 million in 1999. Operating income plunged to $25.3 million from $47.8 million last year. Revenue increased 4.1 percent in the quarter to $811 million.
Airborne continues to suffer at the hands of FedEx and UPS in the domestic express market. While UPS and FedEx switched to zone pricing several years ago, Airborne has held on to its single overnight rating structure. Many shippers have opted to give Airborne transcontinental business where the competitors' prices are higher and shift regional packages to UPS or FedEx where prices are cheaper. Obviously, it costs more to fly a package from New York to Los Angeles than it does to truck one to Boston, heaping on additional operating costs.
"The lack of domestic shipments is the primary reason for the weaker operating results," said Lanny Michael, senior vice president, finance. Fuel also hurt Airborne in the quarter, adding $15 million in additional costs over last year. The company has managed to recoup $19.9 million from its 3 percent **fuel surcharge**, helping overall yield per package.
Airborne saw little to no growth in all of its service offerings. Total shipments grew an anemic 0.6 percent to 80.7 million packages. Domestic overnight shipments declined slightly to 46.2 million from 46.4 million. Second-day afternoon also dipped to 13.7 million from 14.1 million last year. Second-day service saw a slight uptick in volume to 19.1 million from last year's 17.9 million thanks to the company's new residential service, Airborne@Home.
Despite the huge gains competitors are showing in the international arena, Airborne's international express volume fell to 1.5 million packages from 1.6 million last year. International freight**July 24, 2000**

# LTL Up, TL Down

**by John D. Schulz**

Copyright 2000, Traffic World Magazine.

Finally, the pendulum seems to be swinging in the favor of LTL carriers as some publicly held truckload carriers, beset by a 50 percent rise in diesel prices in the past year, hit some profit potholes in the second quarter.

USFreightways, Rosemont, Ill., a group of five regional LTL carriers, reported its 16th straight consecutive year-over-year quarterly earnings gain. USF reported net income for the 13 weeks ended July 1 of $27.5 million on $621.9 million revenue, compared with $26.3 million earnings on $548.8 million revenue in the 1999 second quarter. LTL revenue for the regional subsidiaries rose 8.1 percent, not including **fuel surcharges**.

USF's five regional units and their revenue and operating ratio (with year-ago quarterly revenue and ORs in italics):

* Holland (Midwest),

$248.9 million, 88.9 OR ($226.8 million, 87.9)

* Bestway (Southwest),

$37.6 million, 88.3 OR ($37.3 million, 87.7)

* Red Star (Northeast),

$67.6 million, 96.1 OR ($61.8 million, 96.9)

* Reddaway (Northwest), $69.1 million, 86.7 OR ($61.3 million, 92.9)

* Dugan (Plains, South), $49.9 million, 92.9 OR ($49.6 million, 94.3)

USF's good fortune comes on top of Roadway Express profits increasing 29 percent and American Freightways' rising 42.1 percent in the same period.

Yellow Freight System, Overland Park, Kan., reported second-quarter operating income of $43.3 million. Excluding a $14.2 million nonrecurring pretax net gain, Yellow Freight recorded operating income of $29.1 million, up 29 percent from $22.6 million in the 1999 second quarter.

Revenue for the second quarter was $696.7 million, up 9.1 percent from $638.8 million in the prior year's period. Excluding the nonrecurring net gain, the 2000 second-quarter operating ratio was 95.8, compared with 96.5 a year earlier.

CNF, Palo Alto, Calif., reported $43.9 million net income on $1.53 billion revenue, compared with $41 million earnings on $1.36 billion revenue in the year-ago quarter. The results were "strong and in line with expectations," said CNF President and CEO Gregory L. Quesnel.

Con-Way Transportation Services reported second-quarter operating income of $65.7 million, up 8 percent from $60.8 million in the year-ago period. That came on $528.6 million revenue, a 14 percent gain from the year-ago $463.5 million revenue.

"In addition to its record operating income, Con-Way achieved double-digit revenue growth, which was strong in all regions," Quesnel said. He noted that Con-Way Western reported improved performance and Con-Way Now had "significant" revenue and profit growth. CNF does not break out exact figures for its separate units within the Con-Way group.

On the truckload side, the best news might have been the prediction by Fred Leuffer, Bear Stearns senior managing director and oil analyst, that relief from high fuel prices is on the way. Leuffer is predicting oil prices could drop as low as $20 a barrel (it was over $30 a barrel at press time) because of dissension among OPEC nations.

If so, truckers can thank cash-strapped Saudi Arabia, which recently pledged to increase production by 500,000 barrels a year. Leuffer is predicting that will cause a chain reaction among oil-producing nations to send more oil to the West.

"The flood gates are now open," Leuffer said. "Saudi Arabia's decision to produce more oil means OPEC unity is out the window. The race is on to see which countries can capitalize on these high oil prices while they last." He believes every OPEC country except Nigeria has cheated on its production quotas in the past two months.

"Saudi Arabia plans on being in the oil game for many years to come," Leuffer said. "They do not want to risk their future prosperity on present-day greed." He said he believes Saudi Arabia would like oil to fall to around $25 a barrel but added, "It's difficult to engineer such a precise correction. Once oil prices start to fall, it will be

hard to stop them."
That would be relief for all truckers, which consume 30 billion gallons of diesel a year (on top of 15 billion gallons of gasoline for smaller trucks). The most recent spike in fuel prices has hit the truckload sector specifically where as much as 12 to 15 percent of a typical carrier's cost is fuel, compared to around 6 percent for the LTL sector.
In the meantime, several truckload carriers are reporting second-quarter dips in their profits.
Phoenix-based Swift Transportation said its quarterly earnings were $16.6 million on $316.6 million in revenue, compared with $17.5 million income on $262.5 million revenue in the year-ago quarter. Swift's first-half income is $27.2 million, compared with $27.2 million the first half of last year.
"We are pleased with our results," Swift Chairman and CEO Jerry Moyes said. "We continue to operate with sustained high fuel prices." He said fuel costs added 3 cents a share, or around $1.6 million, despite **fuel surcharges** in place.
+++++

**July 24, 2000**

# Rates Hikes Coming

**By Kristin S. Krause**

Copyright 2000, Traffic World Magazine.

Lufthansa Cargo jumped into the fray early, announcing significant price increases for air cargo shipments in most major markets beginning Oct. 1. Air France and British Airways are expected to announce similar rate hikes soon, driven not only by the strength of the European outbound market but also by the need to make up for the euro's weakness against the U.S. dollar.

While rates over the North Atlantic from the United States have been low for most of the last year, demand for outbound space from Europe to North America, South America and Asia has been strong. Lufthansa, like almost all airlines, traditionally raises rates early in the fall in anticipation of a strong peak-shipping crunch before the end of the year.

Lufthansa's increases range from 7 percent to 12 percent, depending on the market. For shipments from Germany to the United States rates will go up between 7 percent and 9 percent. To major South American countries, shippers can expect to pay 8 percent more. Freight bound for Asia will see the biggest price jumps due to Lufthansa's continuing battle with declining yields. Japan rates will increase 9 percent, China 7 percent and Korea rates will jump a full 12 percent.

Lufthansa is not raising the price of its premium guaranteed products that went through a series of rate increases last year. Shipments to the Middle East, India, Southeast Asia and Australia also remain constant.

"Everywhere in Europe to the U.S. is very strong," said Dal De Wolf, director of pricing for Northwest Airlines Cargo. Overall, Northwest Cargo's rates are about even with last year, including the **fuel surcharge** that has been in place for the last six months. Exchange rates and the euro's weakness play a big part in why the European carriers are trying to boost rates, said de Wolf.

That and making up for the month-long lull that occurs during August. "Lufthansa is probably just getting ahead of the curve," he said. U.S. carriers typically announce rate increases in late August or early September.

It's not the prices out of Europe that concern American Airlines Cargo's Mark Najarian, vice president of sales; it's the reverse - rates from the U.S. to Europe. "It costs more to go from JFK to San Juan or L.A. than it does to go JFK-London," said Najarian. Rates are at a 10 percent to 20 percent reduction over last year's prices and

many airlines are charging a **fuel surcharge** over the North Atlanta, making the pricing situation worse, he said.

"It really worries me. We are turning away business because it isn't worth flying at a loss. What's troubling is more capacity is going to be added in the fall," Najarian said.

While forwarders never like to see rate increases, it's an accepted part of doing business, said David Wirsing, executive director of the Airforwarders Association. "The problem is getting increases to stick. Shippers haven't seen rate increases in a long time but this is such a competitive business - if one company doesn't pass the increase on, the whole thing crashes."

+++++

**July 19, 2000** **J.B. Hunt results flat in second quarter** **JoC ONLINE** Motor carrier J. B. Hunt Transport Services said second quarter net earnings were $11.1 million, or $.31 cents perdiluted share, compared with 1999 second quarter net earnings of $10.8 million, or $.30 cents per diluted share. Total revenue increased 17 percent to $584 million in the second quarter versus $498 in the comparable period of 1999. Revenue grew 5 percent in both the truck and intermodal business segments, while dedicated contract services revenue increased 53 percent during the second quarter. Revenue in non-asset based logistics grew 37 percent. J.B. Hunt and six other national carriers in June became joint owners Web logistics provider Transplace.com. The company said second quarter earnings were boosted by higher consolidated revenue levels and truck rate increases, excluding **fuel surcharges**, while intermodal rates were essentially flat. Fuel costs remained high, but the carrier said it was able to recover the majority of these increased costs relative to the year-ago through **fuel surcharges**. Operating revenues for the six months ended June 30 increased 15 percent, to $1.117 billion from $967.8 million in 1999. Truck segment revenue was up 9 percent; intermodal revenue edged up 1 percent; dedicated contract business was up 47 percent, and logistics increased 36 percent. Net earnings were $16.1 million, or $.45 cents per diluted share, compared with $21.4 million, or $.59 cents per diluted share in 1999. Fuel excluding surcharge revenue hit earnings by a total of 15 cents per share.

+++++

# United Airlines to raise cargo rates

Updated 2:38 p.m. ET, Wed Jul 19, 2000

**JoC ONLINE**

United Airlines will raise freight rates on imports from Europe and Asia by 5-10%, effective Sept. 1, a spokeswoman said Wednesday.

In most cases the increase will be closer to 10% than 5%, but the exact amount will depend on the individual market.

The increase will take effect at the start of the annual peak season, which is expected to be very strong again this year due to the ongoing vitality of the U.S. economy.

Earlier this week, Lufthansa Cargo and Air France Cargo also announced freight rate increases on shipments into the United States. Other European carriers are expected to follow suit. United's increase will take effect first, with Air France's scheduled for Sept. 15 and Lufthansa's for Oct. 1.

Meanwhile, United also plans to increase its **fuel surcharge** on bulk-rated U.S. export cargo to $.15 per kilo, effective Aug. 15, said spokeswoman Dena Strauss.

-----Original Message-----
**From:** Murphy, Dan
**Sent:** Friday, September 22, 2000 12:05 PM
**To:** DL Tran S&M Agricultural Products; DL Tran S&M Chemicals/Cust Serv Mgt; DL Tran S&M Chemicals/SalesE; DL Tran S&M Chemicals/SalesW; DL Tran S&M Feederline; DL Tran S&M Industrial; DL Tran S&M Interline Mkt; DL Tran S&M Int'l Mkt; DL Tran S&M Marketing Svcs; DL Tran S&M Metals Mkt; DL Tran S&M Metals Sales; DL TRAN S&M Mfg Prod/Cust Sat; DL Tran S&M MfgProd/CarMgt; DL Tran S&M MfgProd/Mktg; DL Tran S&M MfgProd/Sales; DL Tran S&M Mineral Sales; DL Tran S&M Minerals Mkt; DL Tran S&M Mkt Strategy; DL Tran S&M Mktg/Chemicals; DL Tran S&M N/E Sales; DL Tran S&M Paper/Forest Sales1; DL Tran S&M Paper/Forest Sales2; DL Tran S&M RAM; DL Tran S&M TransFlo
**Subject:** Important Message from Mike Giftos

The following is an important message from Mike Giftos:

## MEMORANDUM

**TO:** CSXT Commercial Team

**FROM:** Mike Giftos

**DATE:** September 22, 2000

**SUBJECT:** Fuel Cost Recovery Charge Program to be Announced

---

Due to extraordinary increases in the cost of fuel, CSXT will announce at 3:00 p.m. today that it is implementing a fuel cost recovery charge on all local and interline freight moving on our system.

The charge will become effective October 25. Attached is a packet of information that summarizes the fuel cost recovery charge and talking points for discussing the program with customers. **Please do not contact customers or discuss the program until the charge is announced at 3:00 p.m. today and customers are notified via electronic "BLAST FAX." Also, refer ALL media inquiries about the charge to Dan Murphy, CSXT corporate communications, at (904) 359-1469.**

Our customers need to understand:

- Our fuel costs are extraordinary; fuel prices are going up almost on a daily basis and are expected to continue to rise into the 4th quarter. Prices now are double what they were in 1999.

- Last year we spent $320 million on fuel to run our railroad. This year our costs will be $585 million. The price increase we took earlier this year reflected strong demand for rail transportation and is part of an on-going effort to achieve fair market value for our services. The cost of fuel was not then the principal issue; now it is.

- We will continue to press members of Congress and the Administration for quick action to reduce fuel costs; we don't want to levy charges on our customers any longer than

absolutely necessary. We regret this action and are reluctant to take it. We simply cannot absorb all of these fuel costs. No business can.

- Every other sector of transportation is taking similar if not higher fuel recovery actions.

I appreciate your help in communicating with our customers and other key constituencies the necessity of this action, and our commitment to eliminating the fuel recovery charge as soon as possible.

Mike Giftos

<< File: fuel recovery charge FAQ.doc >> << File: Talking Points Fuel Recovery Program.doc >> << File: fuel recovery charge customer letter.doc >>

**From:** McIntyre, Clyde Jr.
**Sent:** Tuesday, March 04, 2003 3:06 PM
**To:** S&M Broadcast; S&M Coal; Automotive Service Group
**Cc:** Onimus, Frank S III ; Morrison, Dorothy ; Durbin, Kim ; Brown, Alison ; Gutman, Bob; McComb, Jim ; Poole, Ceceille; Smith, Steve P; Lancaster, Al; Taylor, Charlie; Havey, Ray; Snyder, Joan ; Taylor, Michael (T); Ritter, Scott; Balter, Lisa ; Schmitt, Connie ; Patterson, Rabon Jr.; Dragiff, Matthew ; Gupta, Sandip ; Varghese, Mathew
**Subject:** S&M Alert - CSXT Fuel Surcharge May Change from 2% to 4% March 20th Due to Higher Cost

**Attachments:** CSXT Fuel Cost Recovery Charge May Change to 4%

**S&M Alert- CSXT Fuel Surharge May Change from 2% to 4% March 20th Due to Higher Cost**

Yesterday's closing price for West Texas Intermediate (WTI) oil published in the March 4th Wall Street Journal was $35.88 per barrel. This is the 19th consecutive day above $33.00 per barrel. If the price of WTI oil closes above $33 for an additional 11consecutive days as published in the WSJ, the current 2% CSXT fuel surcharge will change to 4% effective March 20, 2003.

As provided in the CSXT 8100/8200 documents, customers will receive an advisory notice dated Friday, March 7th, of the possible change in the fuel surcharge. The customer advisory notice will be accomplished using five methods, namely:

- A blast fax of the advisory notice to customers on the S&M customer list.
- A short notice printed on CSXT customer freight bills.
- Posting of the advisory notice on the CSXT website.
- Mailing the advisory notice to all CSXT public price list subscribers...one notice per subscriber.
- Direct communication to customers by the entire S&M team as required. Direct communication will ensure that your key customer contacts are aware.

An advanced electronic copy of the advisory notice to be dated and released March 7th is attached for discussing/forwarding to customers:

CSXT Fuel Cost
Recovery Charge...

Clyde McIntyre
Director Pricing Services
RNX 322-3650

CSXT Fuel Cost Recovery Charge May Change from 2% to 4% March 20th Due to Rising Cost

March 7, 2003

Dear CSX Customer:

In September 2000, CSX Transportation announced it would join others in the transportation industry in implementing a fuel cost recovery charge. With recent higher fuel cost, the CSXT fuel surcharge has remained at 2% between January 29, 2003 and today.

As of March 7, 2003, the price of West Texas Intermediate (WTI) crude oil has been above $33 per barrel for 22 consecutive days. An additional 8 consecutive days above $33 will change the fuel surcharge to 4%, effective March 20, 2003. Under this circumstance, a March 18th closing price of $33 or above would be published in the March 19th Wall Street Journal. A 4% surcharge will be applied to shipments having bill of lading dates beginning March 20th.

CSXT is hopeful that WTI fuel costs stabilize at a lower price level. If the 4% fuel surcharge is implemented on March 20th, it will remain at 4% until WTI oil prices rise or fall below the threshold levels for 30 consecutive days as published in the Wall Street Journal.

The CSXT fuel surcharge was published effective October 25, 2000, in Tariffs CSXT 8100 http://www.csx.com/share/csx/assessorial/forms/docs/xii_misc_prov-REF10290.pdf and CSXT 8200 (Coal). The formula for calculating the recovery charge was based on the price of WTI Oil, an industry standard for tracking oil prices. For every $5 the price of WTI is $28, or above, per barrel, for 30 consecutive days as published in the Wall Street Journal, a 2% recovery charge is added.

| Oil Price | Recovery Charge |
|---|---|
| $23 - $27.99/Barrel | No recovery charge |
| $28 - $32.99/Barrel | 2% |
| $33 - $37.99/Barrel | 4% |
| $38 - $42.99/Barrel | 6% |

While the fuel recovery charge remains in effect, CSX will continue to provide daily updates on the price of WTI and status of the charge on the CSX Internet site, http://www.csx.com. Simply select "Find a Price" in the upper right corner of the "Quick Links" dropdown. The price look-up screen has a fuel surcharge icon to select. Questions may be directed to your CSXT Account Manager.

Clyde McIntyre
Director, Pricing Services
CSX Transportation
Jacksonville, FL

**From:** McIntyre, Clyde Jr.
**Sent:** Wednesday, March 19, 2003 1:09 PM
**To:** S&M Broadcast; S&M Coal; Automotive Service Group
**Cc:** Gooden, Clarence ; Jenkins, Chris; Onimus, Frank S III ; Strok, Andy; Morrison, Dorothy ; Durbin, Kim ; Brown, Alison ; Gutman, Bob; McComb, Jim ; Poole, Ceceille ; Smith, Steve P ; Lancaster, Al ; Taylor, Charlie ; Havey, Ray ; Snyder, Joan ; Jackson, Brian; Taylor, Michael (T); Ritter, Scott; Balter, Lisa ; Schmitt, Connie ; Patterson, Rabon Jr.; Dragiff, Matthew ; Gupta, Sandip ; Varghese, Mathew
**Subject:** S&M Alert - CSXT Fuel Surcharge Will Remain at 2% Due to Lower Fuel Price

**CSXT Fuel Surcharge Will Remain at 2% Due to Lower Fuel Price**

After 29 consecutive days above $33.00 per barrel, the closing price for West Texas Intermediate (WTI) oil published in the March 19, 2003 Wall Street Journal was $31.68. As a result, the CSXT fuel surcharge of 2%, which became effective January 29, 2003, will remain at 2%.

Clyde McIntyre
Director Pricing Services
RNX 322-3650



Highly Confidential

**From:** Muldrow, Louis III
**Sent:** Wednesday, February 19, 2003 9:08 PM
**To:** Damron, Dennis; Edenfield, Beth; Goodman, Bonnie; Saunier, Vic; Rupert, Henry; Sullivan, Mike; Bowen, Marshall; Bullock, Mike; Burgess, Jack; Carollo, Tom; Epting, Russ; Farrow, Ginny; Muldrow, Louis; Rice, Matt; Sheldon, Ben; Walters, Scott; Davis, Glen; Foy, Patti; Joswick, Jim; King, Tom M; Klein, Tom; Kopp, Ron; Stark, Larry; Thackeray, Jay; White, Bob; White, Stephanie
**Subject:** Wins and Losses vs NS

**Attachments:** Wins and Losses vs NS 2003-02-19.xls

All,

Completed summary of wins and losses in 2002 and 2003 versus NS.

Louis

Wins and Losses vs NS 2003-02-...

# 2002 CCIO Wins Losses vs. NS

***1) Losses to NS :***

| YEAR | LOB | Account | Dest | Carloads | Tons (MM) |
|---|---|---|---|---|---|
| 2002 | Export | [redacted] | Export piers | 2381 | 0.257 |
| 2002 | Lake | | Ashtabula & Conneaut, OH | 3,500 | 0.370 |
| 2002 | Lake | | Toledo Dock, OH | 1,442 | 0.150 |
| 2002 | Lake | | Toledo Dock, OH | 1,923 | 0.200 |
| 2002 | Lake | | Ashtabula, OH | 1,923 | 0.200 |
| 2002 | Met | | Gary, IN | 2,500 | 0.250 |
| 2002 | Met | | E. Chicago, IN | 2,000 | 0.200 |
| 2002 | Coke | | Indiana Harbor, IN | 600 | 0.045 |
| 2002 | Coke | | Sparrows Point, MD | 1,764 | 0.120 |
| 2002 | Coke | | Indiana Harbor, IN | 3,158 | 0.240 |
| 2002 | Util South | | Wansley / Yates, GA | 4,367 | 0.510 |
| 2002 | Util South | | Terrell, NC | 1,942 | 0.200 |
| 2002 | River | | Beaver Valley, PA | 3,000 | 0.300 |
| 2002 | River | | Federal 2 via Colona, PA | 5,000 | 0.500 |
| 2002 | Util North | | Merrimack, NH | 690 | 0.069 |
| ***2002 Losses - CCIO*** | | | | **36,190** | **3.611** |

***2) Incremental & Spot Business Captured from NS:***





Highly Confidential

## 2002 CCIO Wins Losses vs. NS

| YEAR | LOB | Account | Dest | Carloads | Tons (MM) |
|---|---|---|---|---|---|
| 2002 | Lake | [redacted] | Toledo Dock, OH | 3,250 | 0.325 |
| 2002 | Lake | | Toledo Dock, OH | 750 | 0.075 |
| 2002 | Coke | | Dearborn, MI | 4,605 | 0.350 |
| 2002 | Coke | | Sauget, IL & Ecorse, MI | 553 | 0.042 |
| ***2002 Gains - CCIO*** | | | | **9,158** | **0.792** |
| ***2002 Net Change vs. NS*** | | | | **(27,032)** | **(2.819)** |

# 2002 CCIO Wins Losses vs. NS

| Rev (MM) | Comments |
|---|---|
| $3.6 | NS provided unique commercial offer while CSXT tariffs applied |
| $2.8 | [redacted] due to NS aggressive pricing |
| $1.7 | [redacted] due to aggressive NS pricing |
| $2.4 | [redacted] due to aggressive NS pricing |
| $1.6 | [redacted] due to aggressive NS pricing |
| $3.0 | [redacted] via NS [redacted] |
| $2.5 | [redacted] tons via NS [redacted] |
| $0.8 | Lost tonnage from [redacted] due to aggressive NS pricing |
| $2.3 | NS captured previous CSXT spot traffic from [redacted] by substantially undercutting CSXT rate |
| $3.5 | NS substantially undercut CSXT previous [redacted] rate and reduced rates on their inbound coal |
| $3.2 | NS repricing to recover traffic lost from previous years |
| $2.5 | Rate case tariff dynamics and [redacted] positioning |
| $1.3 | NS aggressive pricing |
| $1.9 | NS aggressive pricing |
| $0.6 | Decision made in 2001 to withhold bid. NS secured traffic under new contract beginning 5/31/02 |
| **$33.7** | |

# 2002 CCIO Wins Losses vs. NS

| Rev (MM) | Comments |
|---|---|
| $3.3 | [redacted] won due to private car provisions |
| $0.8 | [redacted] primarily from coal pricing |
| $4.3 | [redacted] closure on NS (Chp 7). Captured incremental tons from [redacted] but forced to reduce rate on current CSXT tons due to aggressive NS pricing |
| $0.9 | Spot move due to cancellation of [redacted] |
| **$9.3** | |
| **($24.4)** | |

# 2003 CCIO Wins Losses vs. NS

***1) Losses to NS :***

| YEAR | LOB | Account | Dest | Carloads | Tons (MM) |
|---|---|---|---|---|---|
| 2003 | Export | | | 0 | 0.000 |
| 2003 | Lake | [redacted] | Conneaut, OH | 12,000 | 1.200 |
| 2003 | Lake | | Ashtabula, OH | 962 | 0.100 |
| 2003 | Met | | Gary, IN | 2,500 | 0.250 |
| 2003 | Coke | | Dearborn, MI | 0 | 0.000 |
| 2003 | Iron Ore | | Bessemer, PA | 2,000 | 0.200 |
| 2003 | Industrial | | Flint, MI | 1,000 | 0.100 |
| 2003 | Industrial | | Graniteville, SC | 100 | 0.010 |
| ***2003 Losses - CCIO*** | | | | **18,562** | **1.860** |

***2) Incremental & Spot Business Captured from NS:***

| YEAR | LOB | Account | Dest | Carloads | Tons (MM) |
|---|---|---|---|---|---|
| 2003 | Export | | | 0 | 0.000 |
| 2003 | Lake | [redacted] | Toledo Dock, OH | 2,750 | 0.275 |
| 2003 | River | | Huntington, WV | 3,000 | 0.300 |
| 2003 | Met | | East Chicago, IN | 6,560 | 0.656 |
| 2003 | Coke | | Lorain, OH | 6,600 | 0.500 |

# 2003 CCIO Wins Losses vs. NS

| | | | | | |
|---|---|---|---|---|---|
| 2003 | Industrial | [redacted] | Rochester, NY | 4,500 | 0.450 |
| 2003 | Util South | | Terrell, NC | 1,942 | 0.200 |
| ***2003 Gains - CCIO*** | | | | **23,410** | **2.181** |
| | | | | | |
| ***2003 Net Change vs. NS*** | | | | **4,848** | **0.322** |



Highly Confidential

# 2003 CCIO Wins Losses vs. NS

| Rev (MM) | Comments |
|---|---|
| $0.0 | None anticipated at this time |
| $5.2 | [redacted] lost to NS aggressive pricing (estimted at $0.75/NT below 2002 rates) |
| $0.8 | [redacted] lost to NS due to combined NS [redacted] volume incentive. |
| $3.0 | [redacted] tons via NS [redacted] |
| $1.6 | Gained 350K tons incremental business in '02 due to [redacted]. However, NS made a spoiler bid for all [redacted] tons forcing CSXT to reduce rate by $1.35/NT for '03 |
| $1.6 | [redacted] awarded Q1 spot traffic to NS although CSXT rate offer was lower |
| $2.6 | NS now moving via [redacted]. |
| $0.9 | Former CSX origin/NS destination now moving NS direct. |
| **$15.7** | |

| Rev (MM) | Comments |
|---|---|
| $0.0 | None anticipated at this time |
| $2.9 | [redacted] renewed due to private car provisions |
| $1.2 | [redacted] high vol to [redacted] replaces [redacted] |
| $8.4 | [redacted] blend changes resulted in CSXT capturing 356K tons of high vol & 300K tons of low vol previously moved via NS (pricing was not at issue) |
| $7.4 | Secured two year contract for traffic previously moved via NS |

## 2003 CCIO Wins Losses vs. NS

| | |
|---|---|
| $4.4 | Now CSXT direct vs. joint line NS move with the Rochester Southern. 1 year term. |
| $2.5 | [redacted] business recaptured in 2003 |
| **$24.3** | |

| | |
|---|---|
| **$8.5** | |

argus Media

# Rail Business

US RAIL BUSINESS NEWS, MARKETS AND ANALYSIS Volume 12, 01, 2 January 2006

## Rates, rail capacity to be key issues in 2006

*With demand for railroad services expected to increase in 2006, the nation's railroads are expected to push the rate envelope further to both meter demand for service and push away less profitable business lines.*

Many shippers have seen sharp rate hikes during the last two years but will likely see those continue, rail observers told *Argus*. Surging demand and tight capacity is making space on the rails so much more precious that even the largest companies could see price increases of 30 pct or more.

"We are looking at very large increases from the railroads," said Jay Roman, president of Escalation Consultants. "If you want to get your product moved, you do not want to be in the lower 50 pct of profitability."

Companies shipping products that do not make that much money for carriers, including single-carload shippers, are going to see some very large rate increases.

Making the situation more difficult for many shippers is the fact that a traditional alternative — long-distance trucking — has become a less viable alternative to rail service. A nationwide shortage of both trucks and drivers is keeping many productions on the rails despite high costs. Record fuel prices are also helping to drive up the cost of truck delivery."People generally do not feel they have the competition they had two years ago," Roman said.

Making shipping decisions harder is the limited capacity on the railroads and how the carriers allocate the available capacity. Intermodal shipments are expected to take up an increasing portion of railroad capacity.

For most of 2005, through the week ending Dec. 24, carload originations by the nation's major railroads grew only 0.5 pct, the Association of American Railroads reported. Driving the growth was a 3.3 pct increase in nonmetallic minerals and product shipments, as well as a 1.9 pct increase in agricultural products and a 1.5 pct increase in coal movements. Other commodities, primarily motor vehicles and chemicals, saw shipments fall slightly in 2005.

In contrast, intermodal originations on North America's major railroads set a new record as they continued to grow at a steady pace, increasing 5.9 pct through Dec. 24. Container traffic led the growth surge for both US and Canadian carriers. With China's GDP export-based growth continuing above 9 pct intermodal shipments will continue to grow, with West Coast ports handling the bulk of the increase.

The increase in traffic and rates opens up new questions for the railroad industry, such as how much capacity should be devoted to a single commodity, which commodities should see the highest rate increases and to what extent should carriers work together to adjust shipping patterns.

"We are in a little bit different world than we have been in and no one is quite sure what that means," said one long-time industry veteran.

The carriers may start examining the bigger picture regarding capacity and constraints, potentially impacting a variety of other decisions. Some carriers may abandon fewer unprofitable lines and instead seek to lease out or sell more shortlines

Continued on page 6

Tulsa Diesel vs UP & BNSF carloadings




### In this issue

1 2006 Preview: Rates, rail capacity to be key
2 2005 In Review: Struggles with traffic, weather
3 Rail Trends: Exiting STB chairman Nober
4 Timber line under fed scrutiny for derailments
5 OTDI: Chemical service slips in holiday season
6 Rails seek mediation release from unions
7 Statistical Review
8 Argus Diesel Fuel Prices

© Argus Media Inc. 2006 

Argus Rail Business is published by Argus Media Ltd.
www.argusmediagroup.com

**Main offices:**
**Washington:** 1012 14th Street NW, Suite 1500, Washington, DC 20005
Tel: +1 202 775 0240 Fax: +1 202 872 8045
**Houston:** 3040 Post Oak Boulevard, Suite 550, Houston, Texas 77056
Tel: +1 713 968 0000 Fax: +1 713 622 2991
**London (head office):** 175 St John Street, London EC1V 4LW. Tel: +44 20 7780 4200
Fax: +44 20 7780 4201
**Singapore:** 22 Malacca Street, #10-02 Royal Brothers Building, Singapore 048980z
Tel: +65 6533 3638 Fax: +65 6533 4181
**Moscow:** Suite 53, ul. Petrovka 17/4, Moscow 103031, Russia.
Tel: +7 095 933 7571
Fax: +7 095 933 7572

**Senior Editor:**
Abby Caplan
(abby.caplan@argusmediagroup.com)

**Editors:**
Christopher Newman
(chris.newman@argusmediagroup.com)
Marcin Skomial
(marcin.skomial@argusmediagroup.com)

**Production Editors:**
Andrew Sutton, Yuri German

**Contributing Editors:**
Ross Allen, Carli Flippen, Peter Gardett, Steve Campbell, Caroline Gentry, Michael Ball, Simon Lomax, Milena Yordanova, Carrie Sisto, Elizabeth Rosenberg, Funda Saygin

**Subscriptions:**
For information on multiple subscription rates or site licensing contact Robin Saikin at (713) 968-0000 x121 or email sales@argusmediagroup.com.

**Customer Service:**
For questions regarding subscriptions or circulation, please contact Zachary Rhonheimer at (202) 775-0240 x255.
1012 14th Street, NW, Suite 1500
Washington, DC 20005
email: support@argusmediagroup.com

**Washington Bureau Chief:**
Peter Rosenthal

**Business Development:**
Daniel Massey, Miles Weigel

**Publisher and CEO:**
Adrian Binks

© Copyright 2006 by Argus Media Ltd.
All rights reserved. (ISSN 0732-8397)
Reproduction, retransmission or storage of this publication in any form is forbidden without prior written permission from Argus Media.

# 2005: Struggles with traffic, weather

**The railroad industry was exciting in 2005, sparked by increasing rates, heavy demand and limited capacity in almost all sectors. Harsh weather all year long played a large part in many of the problems facing carriers and shippers last year.**

Price increases could be found at all railroads with some shippers seeing growth in triple digits. Carriers blamed an overall increase in volume, arguing they were forced to use rate growth to balance supply and demand.

Particularly hard hit were coal and grain shippers. The booming intermodal traffic business also saw increases, with carriers hiking some storage fees as much as 900 pct in an effort to force shippers into claiming their cargo more quickly and keep terminals from clogging up with container and trailers.

Even the Justice Department entered the fray, investigating whether UP and BNSF had committed antitrust violations after shippers complained about the public pricing system used for Powder River Basin coal shipments.

Congestion continued to hamper carriers, particularly in the West. Heavy demand for rail service caused some congestion, but weather-related problems throughout the year had a ripple effect still being felt in December.

Early in the year, record rain and snow caused mudslides and washouts along two UP mainlines in southern California and Nevada in January.

In May, heavy rains helped cause two derailments on the Joint Line in the PRB, taking out of service all three sections of track and backing up nearly 300 trains across the country before the Joint Line came back on line. Delays caused by the derailments and related maintenance continued for most of the year. Struggling to meet PRB coal demand, UP and BNSF in November put on hold continued maintenance, but a December blizzard again slowed traffic.

In late August, Hurricane Katrina lashed the US Gulf Coast, causing widespread devastation to transportation infrastructure. CSX was the most hard-hit, suffering some $250 million in damages with the rebuilding of its coastal route and bridges to last until this spring. Hurricane Rita soon followed, hitting Port Arthur, Texas, walloping Beaumont and delaying BNSF and UP aggregate and chemical shipments up and down the coast.

In early October, UP's network in Kansas was flooded, washing out two bridges and key lines between Topeka and Kansas City.

Equipment shortages also caused problems throughout the year, with many shipper groups lamenting shortages. Some turned to truck service to move cargo while other sought to purchase or lease private equipment.

With diesel fuel prices hitting record levels, all of the Class I carriers invoked fuel surcharge clauses in their contracts. But shippers have increasingly begun to complain about surcharges, claiming they have become a profit center for the railroads.

Some railroads have adjusted their programs in an attempt to satisfy shippers. CN in 2005 twice reduced its surcharge rate and switched from a quarterly to a monthly surcharge. BNSF also announced plans to switch to a mileage-based fuel surcharge, except for interline shipments. For coal and agricultural product shippers, the new surcharge went into effect Jan. 1.

The movement of hazardous materials continued to gain attention in 2005.

An NS accident in January spilled deadly chlorine gas, killing nine in Graniteville, S.C.; in August, a tankcar leaking styrene caused numerous evacuations in Cincinnati; and in October, a freight train derailed in Texarkana, Ark., causing a tankcar of propylene gas to explode, killing one woman.

The raft of incidents lead to congressional hearings and the Federal Railroad Administration issued an advisory in early October on handling hazardous materials.

# Nober: A conversation with departing STB chairman

*Larry Kaufman's Rail Trends column appears twice a month exclusively in* Argus Rail Business.

**The start of the new year means significant change at the Surface Transportation Board. This week is Roger Nober's last day as chairman of the STB.**

In the category of trivia, he has the distinction of being the only chairman of the last 25 years — including STB predecessor Interstate Commerce Commission — to leave of his own volition. Others either had their terms expire and were not reappointed, or left because of a party shift in control of the White House.

Even though he could have remained on the job for up to a year after the Dec. 31 expiration of his term, or until the President named a successor, Nober informed the White House a few months ago that he did not wish to be reappointed. More recently, he announced his intention to leave on Jan. 3.

Nober was only the second chairman of the three-member STB. He succeeded Linda Morgan, an appointee of Bill Clinton. Morgan was a Democrat and Nober a Republican, but transportation is a conspicuously nonpartisan area and it would be hard to find any differences in their respective styles that can be chalked up to their party affiliation.

In another bit of trivia, Nober was the sole member of the STB for the better part of a year after Morgan departed. The White House seems to be unaware of the STB's existence and didn't get around to nominating two other commissioners for some time. Nober said at the time that he really didn't want to be the sole determinant of some of the major cases that were becoming ripe for decision, but that he wouldn't hesitate to do so if that became necessary.

I had a lengthy conversation with Nober just before the holidays, at a time when he was reflecting on his contribution to transportation regulation.

"I worked to bring openness and process to even routine cases that came before the Board," he said, listing some of his principal accomplishments. "I think I've gone a long way toward fostering that, and that the board is much more transparent to the people who come before us. We gave people an opportunity to engage with us, and gave a lot of stakeholders more confidence in what we did."

There has been considerable speculation, none of it encouraged by Nober, that the outgoing chairman would be joining a Washington law firm that represents railroads, or that he would become a Washington lobbyist for a railroad company. Nober said he doesn't have a job lined up and hasn't looked for one before now.

"I did not feel comfortable looking for a job with any particular stakeholder while I was at the board," he said, but acknowledges that he is a lawyer and that he has rail experience from his time as a Congressional committee staffer and at the STB. "We'll see what comes down the pike."

His legacy may help determine what he does in the future.

"I'd like to be remembered as having been fair, that I listened [to those who came before the STB], and that I agreed with people when possible," Nober said. "Just because someone felt strongly didn't mean they were right; people who are right are not necessarily voluble."

"In the end, the biggest and most important case we had during my tenure — I don't think it was the rate cases — I think it was the DM&E," says. The effort of the small Dakota, Minnesota & Eastern Railroad to build a new line into the coal-rich Powder River Basin of Wyoming involved environmental issues and if it comes to pass, will be the first construction of a major rail infrastructure in several decades (actually since Burlington Northern built the original coal line into the PRB coalfields in the 1970s). Ironically, the first decision in the DM&E case came before Nober arrived at the STB, and the second decision will come after his departure.

Another key case Nober cited was the CSX case in which the city of Washington, D.C., tried to force the railroad to reroute hazardous materials shipments around the city. "The transport of hazardous material is going to be a bigger issue as we go forward," he said.

Other significant cases and issues the Board dealt with on Nober's watch included a possible directed service order to continue essential passenger services if Amtrak were to be shut down.

"In a freight line, if it ultimately takes two to three weeks to work out the kinks, it's not the end of the world," he said. "If you have a million commuters a day [stranded], it's a different matter."

This is not to say that rate cases are not important. "They've gotten a lot of attention,"

Nober said, "but I'm not sure they are significant other than to the parties involved." In an era of rapid change, a twenty-year contract may be at a rate higher than the shipper wanted or thought was fair, but can look pretty good in a period of sharply rising rates.

During the last two years, Nober called for the railroads to file their plans for handling fall peak seasonal demand. The plans were made public.

"We focused attention and provided an alternative to specific service orders," he said. "Service orders do not apply to capacity constrained circumstances. Improved and unexpected health of the railroads has been a unique development."

The transparency of the process gave every shipper in the country the opportunity to hear the railroads' plans and hear the same story. Nober and several hundred shippers all attended two forums during the last two years during which carriers publicly discussed fall service plans.

"It put everyone on a level playing field," he said. "I think

Continued on page 4

 © Argus Media Inc. 2006 

# Timber line under federal scrutiny for derailments

**Federal railroad regulators called on a RailAmerica subsidiary to improve the quality of its track after at least seven derailments on the line in the past two years.**

The Federal Railroad Administration said Dec. 12 that its investigation into derailments on the Central Oregon & Pacific Railroad showed that the railroad did not properly maintain its track. The railroad agreed to make repairs, including defective crossties, and improve training of track inspectors in order to comply with federal track safety regulations.

"It is important to point out that this is an agreement, not an order, and that we are actually happy that the federal regulators are looking into the matter," RailAmerica spokeswoman Susan Greenfield said.

She said difficult operating conditions, including heavy rains, are posing challenges to maintaining the track on the line that carries 3,000 to 4,000 carloads/month of timber and forest products.

The regulators said they will conduct inspections of the line over the next two years and may impose tougher measures if they find that the railroad failed to improve track conditions.

# Rail Trends: A conversation with Roger Nober

*Continued from page 3*

they were a good idea. Several customers told me they liked it because it told the carriers they were accountable."

As railroads achieve revenue adequacy, many shippers are increasingly vocal that high rates on captive traffic are no longer justified to offset low-rated traffic.

"In a world where railroads are earning a fair return, what are the proper contributions from the captive shippers," Nober asks rhetorically. "I struggled with that. Should [railroads] be able to charge everyone what they want as other businesses do?

"We also struggled with metering demand through pricing," he continued. "It's very difficult for railroads to price off traffic that relies on rail and has used rail for years. Yet, metering demand through price is something that every business does every day. On the other hand, customers may be captive and the [Staggers Act] was intended to provide protection." Although shippers are increasingly angry at railroad pricing policies designed to drive them from the rails, Nober points out that no one yet has tried to bring a complaint that a carrier is refusing to provide service.

"They still are treating it as rate issues," he said.

Many shippers believe the STB continues to favor carriers in carrier-shipper disputes. Nober has a different view.

"I hope I have [helped shippers]," he said. "We've helped individual shippers with individual problems. I do think that we have succeeded at holding the carriers accountable for what they do, although many feel that the railroads ultimately are not accountable to anybody."

One issue Nober will not have to deal with is the determination and effect of revenue adequacy for the railroads. "I don't know what to do about that. Our measurement and the carriers' own sometimes are at odds. At some point, you lose credibility that these measures are right," he noted, adding: "The closer railroads get to revenue adequacy and the closer they come to earning their cost of capital, the more attention those measures are going to get."

Fuel surcharges are another area the STB may be forced to deal with in the future. Shippers say they accept that carriers have a need to recover rapidly rising fuel costs through surcharges, but too often railroads are using fuel surcharges to generate additional income. "Customers want the agency to be involved," Nober said. "We didn't hold a hearing this fall because of Hurricane Katrina and the spike in fuel prices. People will focus on the method (of surcharging) at some point."

Railroad reinvestment in various market sectors is going to be a concern going forward, Nober believes. "Many carriers are not reinvesting in (grain) cars, for example, yet the market has got to govern those things. Carriers need to make a return." As railroads continue to put more and more pressure on their customers with rates, he said, "you're going to see more and more concern about rates and reinvestment. Carriers are investing more in certain sectors than others, and are putting pressure on all of their customers' supply chains." He also acknowledges that rail service variability makes it difficult to run an efficient manufacturing process.

Nober sees a shift in some of the things that need to be considered in the already expensive coal rate case litigation area. "Old coal rate cases [are based to a degree on long-term projections], but projections are simply projection. Sometimes they turn out to be wrong. At what point will litigants be able to come forward? It wouldn't surprise me if it becomes an issue as demand changes [in ways] totally unforeseen a few years ago."

Asked for his self-assessment of his tenure, Nober answered: "I like to think that I've left the agency in a good position, modernized by turning over a third of our employees and our new Web site, and made it a place where good people want to work. I worked hard to make Board decisions unanimous and appreciated the skill and collegiality of Linda Morgan, Frank Mulvey, Doug Buttrey and the Board staff. I hope that people on both sides of this industry think I did the best job that I could."

 © Argus Media Inc. 2006

# Chemical service slips as holiday season kicks in

**The Class I carriers' chemical service worsened in the weeks leading up to the holiday season as railroads struggled with congestion and crews went on vacation for the holidays.**

*Argus Rail Business' On-Time Delivery Index gives shippers of various commodities the opportunity to rank their rail carriers in terms of on-time delivery and customer service. Shippers rank carriers on a scale of 1-5, with 1 being the worst and 5 being the best.*

Shippers also noted that the service in the Gulf Coast region has yet to return to normal and the rerouting of shipments around the hurricane-affected areas continues to add stress to an already strained system throughout the north.

Overall, chemical shippers surveyed gave the Class Is an average score of 3.3 for on-time performance in *Argus'* quarterly index, a drop from the 3.4 recorded in the previous rating period. The industry-wide score for customer service also dropped from 3.7 to 3.5.

CN led the industry in on-time performance for the quarter, as shippers said the railroad is providing the most consistent service. The carrier garnered a score of 4.0 for on-time performance, a drop from the past quarter when it received a 4.4 average from shippers. NS placed second with a 3.6 average score, down from the 3.8 it received in the previous rating period. BNSF and CP tied for the third place, each earning a 3.4 score. BNSF's score was off from the 3.5 it logged in the previous quarter. For CP, the change represented an improvement from the 3.2 it received previously.

KCS and UP both received a score of 3.1. For KCS the score was lower from the 3.7 it received previously. For UP, it was an improvement over the 2.9 score from the last quarter.

OTDI — Chemicals: UP vs BNSF (1=worst, 5=best)




**On-Time Delivery: Chemicals**

| | BNSF | CN | CPR | CSX | KCS | NS | UP |
|---|---|---|---|---|---|---|---|
| On-Time Delivery | 3.4 | 4.0 | 3.4 | 2.7 | 3.1 | 3.6 | 3.1 |
| Customer Service | 3.5 | 4.1 | 3.6 | 3.3 | 3.1 | 3.8 | 3.4 |

CSX shippers gave the carrier a slightly higher score this quarter, but not enough to lift it out of the last place, which it occupied in the previous quarter. CSX received a score of 2.7, up from the 2.6 noted in the previous quarter.

Shippers said chemical service overall deteriorated in the past month, as carriers struggled to manage the holiday shipping rush and keep trains running as crews took off for the holidays.

"There are two kinds of problems. One is that it is taking [the railroads] longer to deliver from point A to point B. The other is that they are shipping to the wrong places," said a Texas-based shipper. "We have this kind of problems with CN, UP, CSX and BNSF."

Other shippers said they also have seen more instances of late deliveries and missing cars in the past month.

"Once they lose a car it can take them months to recover it because the yards are crowded with cars," added another Texas-based shipper. "The holiday rush is making things worse."

As chemical plants have reopened in the hurricane-stricken areas in recent months, shippers said they have had a difficult time securing consistent railroad service in the area. Shipments are still being re-routed through alternative cities such as Memphis and St. Louis, but that is making transit times longer and contributing to congestion.

"The railroads got better at handling traffic in the Gulf Coast but until they fix the tracks and bridges, there are going to be problems," said an Eastern shipper.

CSX, the carrier most hard-hit by Hurricane Katrina, said in December that it is hoping to have trains running along the Gulf Coast by mid-March, as it is rebuilding infrastructure.

Shippers also emphasized bottlenecks throughout the northern U.S. A Canadian shipper said most of CSX's yards are congested, adding that the railroad "can't even give you a good delivery estimate."

Shippers also said UP service continues to be a concern, with Houston and the West Coast suffering from congestion. Still, shippers said the railroad was making efforts to listen to their concerns, with one shipper calling UP "customer-friendly."

"If [UP] is stuck because of congestion, not once did they let us down," said the Canadian shipper. "They are more flexible and they make things happen."

 © Argus Media Inc. 2006 

# Railroads seek release from mediation with unions

**The major US railroads may be facing the threat of strikes this year, as railroad management is seeking a release from mediation with a major union delegation representing three quarters of the carriers' employees.**

The National Carriers' Conference Committee (NCCC) has asked the National Mediation Board (NMB) in December to release the railroads from mediation with the seven-member union coalition, led by the Teamsters union, citing lack of progress in negotiations. If released, the parties must observe a cooling off period that lasts at least 30 days and as long as 90 days if a Presidential Emergency Board is established. The rail industry has not reached that point since June 1992, when Congress imposed its own contract on the parties after a three-day strike.

"Vast differences between the parties still persist on virtually every significant issue," said Robert Allen, chairman of the NCCC, which represents the five US Class I railroads. "There is no reasonable expectation that further mediation will produce agreement with [the unions]."

Union officials said the railroads walked off negotiations too early.

"One would think the carriers' level of profits would provide them with some flexibility — at least the flexibility to stay at the table," said John Murphy, director of the Teamsters Rail Conference.

The railroads are still negotiating with the United Transportation Union and four other rail unions and are not asking for release from mediation with those groups at this time.

The NMB, which administers the seven-decades-old Railway Labor Act, tries to keep unions and management talking as long as possible to prevent strikes or lockouts that could cripple the national economy. Once carriers and unions enter NMB mediation, strikes or lockouts are illegal until the board finds further talks would be futile and releases the parties from mandatory talks.

The railroads said the release from mediation is necessary before negotiations can progress any further.

"If the NMB does release the parties, it will trigger the Railway Labor Act process that historically has led to voluntary agreements before or after the appointment of the Presidential Emergency Board," UP said in a statement. "We do not expect any disruptions to rail service and remain confident that we will resolve these issues."

Union officials said the railroads are looking for the Republican-controlled government to come up with an industry-friendly solution.

"The carriers are attempting to distort the bargaining process by manipulating and misconstruing the procedure under the Railway Labor Act to obtain a government-imposed resolution," said Don Hahs, president of the Brotherhood of Locomotive Engineers and Trainmen. "The carriers have not yet begun to negotiate in good faith to resolve any of the parties' issues."

The seven-member union coalition led by the Teamsters represents nearly 85,000 rail workers, or 65 pct of the carriers' employees.

# Rates, rail capacity to be key issues in 2006

*Continued from page 1*

or even significantly restructure traditional shipping routes to allow for additional traffic.

One potential barrier to improvements is funding, rail experts said. Despite significant talk about more carriers becoming "revenue adequate," the Class I railroads would likely need to consecutively earn their cost of capital for several years to be able to fund significant expansions.

At the same time, some railroads may turn to the federal government for some assistance. The Federal Railroad Administration's Railroad Rehabilitation and Improvement Financing (RRIF) program, once in danger of elimination, this summer saw its allotment expanded 10 fold from $3.5 billion to $35 billion. The Dakota, Minnesota and Eastern Railroad is expected to be one of the first applicants, seeking a $2.5 billion loan to fund its 900-mile build-in to the Powder River Basin as well as another 400 miles of upgrades for other commodities.

Both railroads and shippers will be watching the Surface Transportation Board closely for decisions, but most sources don't expect current commissioners Frank Mulvey and William Buttrey to make any controversial decisions until a third board member is appointed to replace Chairman Roger Nober. Given the many months it took the White House to fill two seats on the board during the last round of appointments, finding a new board member may take six to nine months.

Still, there are a few important cases still pending, particularly several coal rate cases. Also expected to come before the board this year is a decision on whether to allow NS and KCS' plan to form a joint venture to operate the Meridian Speedway.

Also in 2006, state and local rulemakings on hazardous materials are expected.

Several cities, such as Philadelphia, Baltimore and Chicago are trying to follow Washington, D.C.'s decision to ban railcars carrying hazmat from the city. That law has been frozen pending an appeal by CSX.

In addition, attempts continue to derail the federal government's plan to build a railroad to haul nuclear waste through Nevada to Yucca Mountain.

 © Argus Media Inc. 2006

Highly Confidential DA02950 CSXFSC000474671

## Intermodal Originations

| Carloads originated, tons | | Week ending Dec 24 2005 | Week ending Dec 25 2005 | Change | 4 week average 2005 | 4 week average 2004 | Change | % Change |
|---|---|---|---|---|---|---|---|---|
| BNSF | Trailers | 22,148 | 16,461 | +5,687 | 24,903 | 22,487 | +2,417 | 10.7% |
| | Containers | 62,233 | 49,114 | +13,119 | 64,103 | 58,521 | +5,582 | 9.5% |
| Union Pacific | Trailers | 5,513 | 3,429 | +2,084 | 6,117 | 5,136 | +982 | 19.1% |
| | Containers | 53,195 | 40,760 | +12,435 | 56,225 | 52,346 | +3,879 | 7.4% |
| CSX | Trailers | 6,301 | 5,347 | +954 | 7,006 | 7,436 | -429 | -5.8% |
| | Containers | 21,832 | 16,871 | +4,961 | 22,774 | 22,371 | +403 | 1.8% |
| Norfolk Southern | Trailers | 20,965 | 15,784 | +5,181 | 22,323 | 21,393 | +930 | 4.3% |
| | Containers | 23,911 | 15,465 | +8,446 | 24,613 | 20,744 | +3,869 | 18.7% |
| Canadian Pacific | Trailers | 1,168 | 881 | +287 | 1,234 | 1,181 | +53 | 4.4% |
| | Containers | 20,419 | 13,910 | +6,509 | 20,278 | 17,980 | +2,298 | 12.8% |
| Canadian National | Trailers | 997 | 899 | +98 | 1,160 | 1,256 | -97 | -7.7% |
| | Containers | 20,046 | 16,124 | +3,922 | 21,186 | 19,815 | +1,371 | 6.9% |
| | US East | 73,009 | 53,467 | +19,542 | 76,716 | 71,943 | +4,773 | 6.6% |
| | US West | 143,089 | 109,764 | +33,325 | 151,348 | 138,488 | +12,859 | 9.3% |
| | Canada | 42,630 | 31,814 | +10,816 | 43,857 | 40,233 | +3,624 | 9.0% |
| | Total US | 216,098 | 163,231 | +52,867 | 228,063 | 210,431 | +17,632 | 8.4% |
| | Total US & Canada | 258,728 | 195,045 | +63,683 | 271,921 | 250,664 | +21,256 | 8.5% |

## CSX vs NS 2005 Carloads

Source: AAR




## UP vs BNSF 2005 Carloads

Source: AAR




## CN vs CP 2005 Carloads

Source: AAR, CN




## Rail intermodal originations vs Port TEUs, US West




## Port Container Traffic

| | Oct-05 | Oct-04 | % change |
|---|---|---|---|
| Port of Los Angeles | 707,740 | 642,936 | 10.08% |
| Port of Long Beach | 600,940 | 557,665 | 7.76% |
| Port of NY/NJ | N/A | 284,240 | N/A |
| Port of Oakland | 205,558 | 190,902 | 7.68% |
| Port of Charleston | 169,034 | 175,402 | -3.63% |
| Port of Tacoma | 182,958 | 149,260 | 22.58% |
| Port of Vancouver | 166,248 | 145,795 | 14.03% |
| Port of Seattle | 193,205 | 191,918 | 0.67% |
| Port of Virginia | 188,539 | 166,194 | 13.45% |
| Port of Houston | 150,891 | 121,725 | 23.96% |
| Port of Savannah | 191,111 | 161,133 | 18.60% |

## Rail intermodal originations vs Port TEUs, US East




 © Argus Media Inc. 2006 

Highly Confidential DA02951 CSXFSC000474672

## Weekly Stock Price Update

| | | Change since: | | Change since: | |
|---|---|---|---|---|---|
| Dec 29 2005 | Close | last week | % | last year | % |
| BNSF | $70.97 | 0.47 | 0.7% | 24.03 | 51.2% |
| CN | 80.69 | 1.20 | 1.5% | 20.76 | 34.6% |
| CP | 42.26 | 0.76 | 1.8% | 8.51 | 25.2% |
| CSX | 51.09 | 0.51 | 1.0% | 11.51 | 29.1% |
| KCS | 24.70 | 0.01 | 0.0% | 7.04 | 39.9% |
| NS | 44.96 | 0.61 | 1.4% | 8.94 | 24.8% |
| UP | 81.00 | 0.64 | 0.8% | 15.06 | 22.8% |
| Dow Jones Transportation | 4,241.34 | -9.27 | -0.2% | 431.05 | 11.3% |
| Dow Jones Industrials | 10,784.82 | -104.62 | -1.0% | -44.37 | -0.4% |

## CP vs CN 2005 Chemical Carloads

Source: AAR




## Freight Cars On Line

Source: AAR, CN

| | | Week 23 Dec | 4-wk avg 23 Dec | 4-wk avg 25 Nov | Change | % Change |
|---|---|---|---|---|---|---|
| BNSF | System | 72,130 | 71,375 | 71,221 | +154 | +0.2% |
| | Private | 116,574 | 116,791 | 118,264 | -1,473 | -1.2% |
| | Foreign | 29,540 | 29,646 | 30,610 | -964 | -3.2% |
| | Total | 218,244 | 217,812 | 220,095 | -2,283 | -1.0% |
| CSX | System | 69,797 | 69,280 | 70,121 | -841 | -1.2% |
| | Private | 119,063 | 117,871 | 117,254 | +617 | +0.5% |
| | Foreign | 42,091 | 41,874 | 41,940 | -67 | -0.2% |
| | Total | 230,951 | 229,024 | 229,315 | -291 | -0.1% |
| KCS | System | 5,918 | 6,015 | 5,609 | +407 | +7.2% |
| | Private | 14,998 | 15,149 | 14,668 | +481 | +3.3% |
| | Foreign | 6,507 | 6,670 | 5,935 | +736 | +12.4% |
| | Total | 27,423 | 27,834 | 26,212 | +1,623 | +6.2% |
| NS | System | 78,224 | 77,619 | 76,840 | +780 | +1.0% |
| | Private | 89,812 | 87,969 | 85,941 | +2,029 | +2.4% |
| | Foreign | 37,606 | 37,573 | 36,726 | +847 | +2.3% |
| | Total | 205,642 | 203,162 | 199,507 | +3,655 | +1.8% |
| UP | System | 88,351 | 88,248 | 88,635 | -387 | -0.4% |
| | Private | 180,262 | 180,337 | 181,509 | -1,172 | -0.6% |
| | Foreign | 56,520 | 56,522 | 57,679 | -1,157 | -2.0% |
| | Total | 325,133 | 325,107 | 327,823 | -2,717 | -0.8% |
| CN | System | 47,222 | 46,909 | 47,381 | -472 | -1.0% |
| | Private | 51,653 | 50,512 | 49,903 | +610 | +1.2% |
| | Foreign | 11,625 | 11,684 | 11,994 | -310 | -2.6% |
| | Total | 110,500 | 109,105 | 109,277 | -172 | -0.2% |
| CP | System | 35,682 | 36,251 | 36,613 | -362 | -1.0% |
| | Private | 33,124 | 33,561 | 34,113 | -552 | -1.6% |
| | Foreign | 12,441 | 12,356 | 12,457 | -101 | -0.8% |
| | **Total** | **81,247** | **82,167** | **83,182** | **-1,015** | **-1.2%** |

## Average Train Speeds

Source: AAR, CN

| | | Week 23 Dec | 4-wk avg 23 Dec | 4-wk avg 25 Nov | Change | % Change |
|---|---|---|---|---|---|---|
| BNSF | Intermodal | 33.3 | 32.3 | 30.4 | 1.9 | +6.3% |
| | Manifest | 20.0 | 19.4 | 19.3 | 0.2 | +0.9% |
| | Mulitlevels | 25.8 | 26.1 | 25.1 | 1.0 | +4.0% |
| | Total | 22.6 | 22.2 | 22.1 | 0.1 | +0.3% |
| CSX | Intermodal | 27.0 | 28.1 | 27.6 | 0.4 | +1.5% |
| | Manifest | 17.6 | 18.6 | 18.4 | 0.2 | +0.8% |
| | Mulitlevels | 20.4 | 20.6 | 20.9 | -0.3 | -1.6% |
| | Total | 18.5 | 19.3 | 19.1 | 0.2 | +1.1% |
| KCS | Intermodal | N/A | N/A | 26.9 | N/A | N/A |
| | Manifest | N/A | N/A | 22.6 | N/A | N/A |
| | Mulitlevels | N/A | N/A | 26.9 | N/A | N/A |
| | Total | N/A | N/A | 22.5 | N/A | N/A |
| NS | Intermodal | 25.9 | 26.0 | 27.5 | -1.6 | -5.6% |
| | Manifest | 19.1 | 19.6 | 20.5 | -0.9 | -4.5% |
| | Mulitlevels | 21.0 | 21.2 | 22.5 | -1.3 | -5.7% |
| | Total | 20.4 | 20.6 | 21.5 | -0.9 | -4.2% |
| UP | Intermodal | 24.4 | 24.0 | 24.2 | -0.2 | -0.7% |
| | Manifest | 18.7 | 18.7 | 18.8 | -0.1 | -0.7% |
| | Mulitlevels | 21.4 | 21.0 | 21.3 | -0.3 | -1.3% |
| | Total | 20.8 | 20.3 | 20.7 | -0.4 | -1.8% |
| CN | Intermodal | 30.8 | 31.3 | 32.6 | -1.3 | -4.1% |
| | Manifest | 23.9 | 24.1 | 24.9 | -0.8 | -3.2% |
| | Mulitlevels | 23.7 | 25.3 | 26.6 | -1.3 | -4.7% |
| | Total | 24.6 | 25.2 | 26.0 | -0.8 | -3.1% |
| CP | Intermodal | 29.4 | 28.5 | 28.1 | 0.4 | +1.5% |
| | Manifest | 21.6 | 20.7 | 20.9 | -0.2 | -1.1% |
| | Mulitlevels | 26.3 | 26.3 | 28.6 | -2.3 | -8.1% |
| | **Total** | **23.7** | **23.2** | **23.0** | **0.2** | **+0.8%** |

## Argus Diesel Fuel Prices

¢/USG

| Location, sulfur content | Price | Change |
|---|---|---|
| New York, 0.05% | 169.25 | -5.98 |
| New York, 0.2% | 168.00 | -5.11 |
| Boston, 0.2% | 168.75 | -5.61 |
| US Gulf coast, 0.05% | 172.18 | -2.93 |
| US Gulf coast, 0.2% | 167.25 | -4.73 |
| Chicago, 0.05% | 170.75 | -4.98 |
| Tulsa, 0.05% | 170.50 | -6.73 |
| Los Angeles, 0.05% | 174.50 | -1.88 |
| San Francisco, 0.05% | 173.00 | -2.00 |
| Portland, 0.05% | 176.00 | -4.50 |

Source: Argus US Products Report.
Argus prices are suitable for use in any bulk spot market pricing contract, and can be used to replace any other existing index. Changes are vs prior week. The higher sulfur fuel typically used by railroads can be referred to as heating oil, off-road diesel or dyed fuel. For more information on the prices, their specifications, or other Argus oil product assessments, contact transport@argusmediagroup.com.

## Chicago Diesel vs CSX & NS Carloadings





© Argus Media Inc. 2006

argus
Media

# Argus Scrubber Report

## Updated for 2006, the Argus Scrubber Report

From the publishers of *Argus Air Daily*, *Argus Coal Daily*, and the *Argus $NO_X$/SCR Report*.

The *Argus Scrubber Report* is an invaluable analysis tool for everyone interested in the power, emissions and fuels markets. At this critical time, when sulfur dioxide emissions allowances have surged above $1,000/ton, the *Argus Scrubber Report* tracks current installations and future planning by generators to control their $SO_2$ emissions. The *Argus Scrubber Report* also provides insights into the future of fuel buying, as coal requirements will shift dramatically.

| Owner | Plant | ORISPL | Unit No. | County | State | Nerc | MW | Control | Status | Year |
|---|---|---|---|---|---|---|---|---|---|---|
| AES | AES Beaver Valley | 10676 | 1 | Beaver | PA | ECAR | 125 | FGD | I | |
| AES | AES Cayuga (Milliken) | 2535 | 2 | Tompkins | NY | NPCC | 167 | WLS | I | 1995 |
| AES | AES Cayuga (Milliken) | 2535 | 1 | Tompkins | NY | NPCC | 483 | WLS | I | 1995 |
| AES | Petersburg | 994 | 1 | Pike | IN | ECAR | 253 | WLS | I | 1996 |
| AES | Petersburg | 994 | 4 | Pike | IN | ECAR | 574 | WLS | I | 1986 |
| AES | Petersburg | [illegible] | [illegible] | Pike | IN | ECAR | 471 | WLS | I | 1996 |
| AES | Petersburg | 994 | 3 | Pike | IN | ECAR | 574 | WLS | I | 1977 |
| AES | Somerset (Kintigh) | 6082 | 1 | Niagara | NY | NPCC | 685 | WLS | I | 1984 |
| Alabama Electric Coop | Charles R Lowman | 56 | 2 | Washington | AL | SERC | 236 | WL | I | |
| Alabama Electric Coop | Charles R Lowman | 56 | 3 | Washington | AL | SERC | 236 | WL | I | |
| Allegheny Energy | Harrison | 3944 | 1 | Harrison | WV | ECAR | 684 | WL | I | |
| Allegheny Energy | Harrison | 3944 | 2 | Harrison | WV | ECAR | 684 | WL | I | |
| Allegheny Energy | Harrison | 3944 | 3 | Harrison | WV | ECAR | 684 | WL | I | |

SAMPLE

*The list details the type of scrubbers and includes such key data as county, state, MW capacity and the ORISPL # (a key government ID for tracking plants).*

## Argus Media contacted more than 1,000 plants or their owners and discovered:

- More than 30 new scrubbers are currently being built across the US, mostly in the Southeast and Midwest, including 20 on which construction began in 2005.
- More than 150 sulfur dioxide-cutting units are planned, being considered, or under construction in the US and Canada.
- This year's list includes more than two dozen installations not included in the prior year report, mostly due to a wave of construction in the Ohio Valley.

Major generators AEP, Duke, Cinergy, TVA and LG&E all have scrubbers being built.

- More than 115GW of capacity could be in line to get scrubbers or other $SO_2$ controls in the next decade, with more announcements coming since EPA finalized its Clean Air Interstate Rule last March.
- The data also includes not only plants which are installing scrubbers, but ones that have them already and those which are considering them in the future.

**Know the facts. Have the information at your fingertips. Order the Argus Scrubber Database TODAY!**

For pricing or other information,please contact:
Karen Johnson • 713-968-0022 • Karen.Johnson@argusmediagroup.com

© Argus Media Inc. 2005 3040 Post Oak Blvd., Suite 550, Houston, TX 77056 (713) 968-0000 www.argusmediagroup.com

**From:** Lube, Steve
**Sent:** Monday, December 18, 2006 2:59 AM
**To:** Piacente, Dean
**Subject:** Market Share

**Attachments:** Class Is CS54 Carloads 2005 - 2006.xls

Class Is CS54
Carloads 2005 - ...

Dean - Following up on Rich's comments from earlier this weekend, attached chart shows CS54 Chemicals carloads by major Class I RR. It appears that CSXT is behaving like most of the others. BNSF is doing very well, as Rich noted. The UP seems to be taking it on the chin a little more than the others, as we had heard as well. With respect to what the other RRs think Q1 holds for them, I had a call in to the CN but have not heard from them (Kim). Personally I don't like asking my competitor what they see for the future. Asking the BNSF or the UP is a little different because we don't compete head-to-head that often. Also, I am going to have to go back to the MMs and AMs for a better reading on wins and losses vs. the NS. I wanted this to be a joint marketing ands sales effort, but they do not all work for me, as you mentioned Friday morning, and we got limited responses. Both marketing and sales should be accountable for providing this data. I will have this data complete and finalized by the end of this coming week for your review. Steve

**From:** McNulty, Tim
**Sent:** Tuesday, November 19, 2002 2:31 PM
**To:** Lumpkin, Janis ; Goldbeck, Celeste; Lunn, Joan
**Cc:** Desai, Hema ; Lunn, Joan; Johnson, Bill; Patton, Sandy
**Subject:** RE: [redacted]

Janis:

Effective 11-20-02 we have agreed to a year extension with [redacted] on the contract subject to URCAF increase. The paperwork has been sent to [redacted] on this amendment and effective 11-20 these agreements [redacted] will not be subject to the fuel surcharge.

Part of the agreement is to write off any fuel surcharge bills from 10-1-02 through 11-20-02. If you can provide a total, I will handle the write off.

Thanks for your help on this and sorry for the confusion but this highly competitive business for CSX.

Tim

-----Original Message-----
**From:** Lumpkin, Janis
**Sent:** Friday, November 01, 2002 2:00 PM
**To:** Celeste Goldbeck; Joan Lunn; Pate, Emily
**Cc:** Desai, Hema ; McNulty, Tim; Lunn, Joan; Johnson, Bill; Patton, Sandy
**Subject:** RE: [redacted]

Rate master shows that fuel surcharges apply to [redacted]. Account Manager says not.
As soon as possible will you please resolve and advise.

We've already had to correct bills because rates weren't updated timely and bills hit tariff prices. Do we now need to make corrections to remove surcharges?

-----Original Message-----
**From:** Johnson, Bill
**Sent:** Friday, November 01, 2002 12:53 PM
**To:** Patton, Sandy
**Cc:** Lumpkin, Janis ; Desai, Hema ; McNulty, Tim; Lunn, Joan
**Subject:** [redacted]

Sandy

We are in the process of amending both of these [redacted] Contract's by extending the term from one year to two year's. These Contracts will have a URCAF factor for Year 2, and therefore not be subject to the fuel surcharges. I am not sure where we are in the paperwork for theses Contract extension's. Hope this answers your question. By the way, still have the [redacted] billing disputes to address, so I will call you on Monday to discuss this situation.

Bill Johnson

-----Original Message-----
**From:** Patton, Sandy
**Sent:** Wednesday, October 30, 2002 11:39 AM
**To:** Johnson, Bill
**Cc:** Lumpkin, Janis ; Desai, Hema
**Subject:** [redacted]

[redacted] CALLED AND SAID YOU HAD WAIVERED THE FUEL SURCHANGE IN THISCONTRACT. IS THIS CORRECT?
IF SO, YOU NEED TO LET [redacted] KNOW.
THANKS

SANDY

# Redacted in Full

# DA02957 - DA03003

**Hamilton, Julia**

---

**From:** Hart, John [John_Hart@csx.com]
**Sent:** Wednesday, September 01, 2004 9:15 AM
**To:** Duggan, Tammy
**Subject:** RE: CSXI Modifies its Fuel Surcharge Program - DRAFT

Yes - go ahead.

-----Original Message-----
**From:** Duggan, Tammy
**Sent:** Wednesday, September 01, 2004 9:15 AM
**To:** Hart, John
**Subject:** FW: CSXI Modifies its Fuel Surcharge Program - DRAFT
**Importance:** High

Are you ok with this?

-----Original Message-----
**From:** Duggan, Tammy
**Sent:** Tuesday, August 31, 2004 5:04 PM
**To:** Hart, John
**Cc:** Hertwig, Jim; Rand, Steve; Provow, Jeff; Parrotta, Mike; Feltel, Gil
**Subject:** CSXI Modifies its Fuel Surcharge Program - DRAFT
**Importance:** High

Please review and advise. With your ok, the Fast Facts will go to all customers.

Thanks,
Tammy

Printable Version

CSX INTERMODAL

*The Best Choice for Superior Intermodal Service*

**September 01, 2004**

For more information or to learn more about CSX Intermodal, visit us at: www.csxi.com

Contact a CSX Intermodal Customer Service Specialist at: 800-542-2754

E-mail: CSXI_Customer_Service@csx.com

Or contact your CSXI Sales Representative

## CSXI Modifies its Fuel Surcharge Program

Effective Monday October 4, 2004, CSX Intermodal will modify its Fuel Surcharge (FSC) program for linehaul and bundled drayage transportation services. This modified FSC methodology continues to utilize the National U.S. average diesel price index as published by the Department of Energy (DOE) but we will now use a calculation table to establish the percentage FSC on a monthly basis. Monthly FSC changes will continue to be calculated on the last Monday of each month and become effective on the following Monday. The October 4, 2004 FSC will be based on the DOE fuel price published on September 27, 2004. The table is as follows:

## Fuel Surcharge

| DOE HDF Price | Percent |
|---|---|
| $0.00-$1.239 | 0.0% |
| $1.24-$1.279 | 1.0% |
| $1.28-$1.319 | 1.5% |
| $1.32-$1.359 | 2.0% |

| | |
|---|---|
| $1.36-$1.399 | 2.5% |
| $1.40-$1.439 | 3.0% |
| $1.44-$1.479 | 3.5% |
| $1.48-$1.519 | 4.0% |
| $1.52-$1.559 | 4.5% |
| $1.56-$1.599 | 5.0% |
| $1.60-$1.639 | 5.5% |
| $1.64-$1.679 | 6.0% |
| $1.68-$1.719 | 6.5% |
| $1.72-$1.759 | 7.0% |
| $1.76-$1.799 | 7.5% |
| $1.80-$1.839 | 8.0% |
| $1.84-$1.879 | 8.5% |
| $1.88-$1.919 | 9.0% |
| $1.92-$1.959 | 9.5% |
| $1.96-$1.999 | 10.0% |

If the U.S. National Average Fuel Index equals or exceeds $1.99 per gallon, the fuel surcharge increases 0.5% for every 4-cent increase in fuel price.

If you have any questions regarding this announcement please contact your CSX Intermodal Sales representative.

The DOE index data can be accessed here.

**301 W. Bay Street**
**Jacksonville, FL 32202**

Printable Version

Proj. 1202



CSX TRANSPORTATION
Marketing Services – J865
BellSouth Tower – 28th Floor
301 West Bay Street
Jacksonville, FL 32202

September 29, 2000

Kurt H. Schroeder
Union Pacific Railroad Company

Subject: Proposed Fuel Surcharge

Dear Mr. Schroeder:

To enable recovery of increased fuel costs, CSXT requests your concurrence to implement a fuel surcharge on most joint-line rates between CSXT and your company effective October 25, 2000. These surcharges will be divided in the same proportion as in the joint-line rate.

Should the price of West Texas Intermediate Crude Oil reach $28 per barrel and remain at or above that level for thirty (30) consecutive days, a surcharge will be added to the freight charges on the joint-line movement with your company in accordance with publication CSXT 8100 Item 12000. The percentage will be applied to the gross freight revenue and added as a miscellaneous charge on the freight bill to be divided in the same proportion as the freight revenue.

The recovery charge will be published as an amendment to appropriate CSXT tariffs of general applicability and will be applied to all joint-line traffic moving under tariffs, public price lists, private price quotes and certain contracts that incorporate those general tariffs. Contracts that contain a price escalator index published by a government entity, such as RCAF, will not be included.

We appreciate a reply to our proposed fuel surcharge on traffic moving in connection with your company no later than close of business October 6, 2000. If we do not hear from you by that date, we will assume your concurrence. Your response may be forwarded to us via the internet to Pam_Grayson@csx.com, faxed to 904-633-5733 or mailed/expressed to the above address. Should you have any questions concerning this proposal, please contact me at the e-mail address or phone number below.

Yours truly,

Clyde V. McIntyre
Director-Marketing Services
Clyde_McIntyre@csx.com
904-633-5678

PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989
NO. 17

UPNJ-07-0000359
CONFIDENTIAL
UPFSC0000436

# CSX Intermodal Fuel Surcharge Chronology (from 2000 to May 14, 2007)

| Date Announced | Date Effective | Index | Trigger Point | % per Increment | Timing of Adjustments |
|---|---|---|---|---|---|
| 03/06/2000 | 04/01/2000 | Department of Energy's Retail Diesel Fuel Price Index | $1.10/ gallon | For each 1% change in the price of fuel above the baseline of $1.10, the surcharge would change 0.1%.<br><br>Formula = ((Price on last Monday of previous month - $1.10)/$1.10)*.10*100 | First Monday of Each Month |
| 12/03/2001 | 12/03/2001 | **FSC Discontinued** | | | |
| 4/04/2002 | 04/15/2002 | **Original FSC formula reinstated** | | | |
| 09/01/2004 | 10/04/2004 | Department of Energy's Retail Diesel Fuel Price Index | $1.24/ gallon | 1% @ $1.24, .5% increase every 4-cent per gallon increase | First Monday of each Month |

CSX 7/27/11
EXHIBIT
8

# Intentionally Omitted

## DA03008-DA03024

# In The Matter Of:

*IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION*

---

*GARIN, DAVID - Vol. 1*

*August 16, 2010*

---

*HIGHLY CONFIDENTIAL*

MERRILL CORPORATION
LegaLink, Inc.

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL )
SURCHARGE ANTITRUST )
LITIGATION ) MDL NO. 1869
) MISC. NO. 07-489
THIS DOCUMENT RELATES TO: ) (PLF/AK/JMF)
)
ALL DIRECT PURCHASER CASES )

-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
DAVID GARIN
AUGUST 16, 2010
*** HIGHLY CONFIDENTIAL ***
-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF DAVID GARIN, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on the 16th of August, 2010, from 1:16 p.m. to 8:47 p.m., before Tami Lewis, RPR, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Haynes and Boone, located at 201 Main Street, Suite 2200, Fort Worth, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



A P P E A R A N C E S

FOR THE PLAINTIFFS:
MR. SAMI H. RASHID
MR. KYLE R. TAYLOR
Quinn, Emanuel, Urquhart & Sullivan, LLP
51 Madison Avenue
22nd Floor
New York, New York 10010
212.849.7237
212.849.7100 (Fax)
samirashid@quinnemanuel.com

FOR THE DEFENDANT BNSF RAILWAY COMPANY:

MR. GARY A. WINTERS
Mayer Brown, LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
202.263.3273
202.263.5273 (Fax)
gwinters@mayerbrown.com

FOR THE DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY:
MR. SEAN M. TEPE (via telephone)
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, New York 10036
212.735.3000
212.735.2000 (Fax)
sean.tepe@skadden.com

ALSO PRESENT:
Carlos Garcia, Videographer
David Pryor, BNSF senior general attorney



INDEX

PAGE
Appearances.......................................... 2
DAVID GARIN
EXAMINATION BY MR. RASHID....................... 6

Changes and Signature............................... 274
Reporter's Certificate.............................. 275

EXHIBITS

NO. DESCRIPTION PAGE

1 Declaration of David Garin..................... 6
2 Industrial Products Overview Kevin Williams February 24, 2005............................. 28
3 E-mail with Attachments BNSF-0033234 through BNSF-0033242.................................. 58
4 E-mail with Attachments BNSF-0029497 through BNSF-0029515.................................. 90
5 E-mail with Attachments BNSF-0042771 through BNSF-0042788.................................. 105
6 Fuel Cost Recovery Analysis September 12, 2005.......................................... 115
7 E-mail with Attached Fuel Cost Recovery Analysis December 19, 2005 BNSF-0032575 through BNSF-0032589........................... 118
8 E-mail with Attachments BNSF-0048722 through BNSF-0048749.................................. 122
9 E-mail with Attachments BNSF-0049138 through BNSF-0049181.................................. 127
10 E-mail BNSF-0558305............................ 134
11 E-mail String BNSF-0391864 through BNSF-0391865.................................. 138
12 Letter to Musket Corporation from BNSF Dated April 28, 2004................................ 144
13 Price Authority: BNSF 304152................... 163
14 Transportation Service Agreement: BNSF 306367, Effective February 10, 2003............ 171
15 Transportation Service Agreement: BNSF 306367, Effective Date February 10, 2003....... 173
16 Transportation Service Agreement: BNSF 306367-Amendement 1, Effective July 19, 2005... 175
17 E-mail String BNSF-0073463 through BNSF-0073467.................................. 183



18 E-mail with Attachments BNSF-0544851 through BNSF-0544857.................................. 195
19 Fuel Surcharge History of BNSF Standard Fuel Surcharge Program.............................. 199
20 E-mail String BNSF-0071233 through BNSF-0071235.................................. 204
21 E-mail String BNSF-0071515 through 0071516..... 207
22 Bayport/LaPorte, TX Competitive Rail Proposal Requirements BNSF's Contract Proposal January 22, 2004i..................................... 212
23 E-mail with Attachment BNSF-0786311 through BNSF-0786313.................................. 213
24 E-mail with Attachment BNSF-0075436 through BNSF-0075438.................................. 219
25 E-mail String BNSF-0783858 through BNSF-0783860.................................. 222
26 E-mail String CSXFSC000162549.................. 233
27 E-mail with Attachment NS_010033205 through NS_010033210.................................. 247

PREVIOUSLY MARKED EXHIBITS

Lanigan 8 E-mail with Attached Meeting Agenda.. 237

Lanigan 11 E-mail String BNSF-0027935........... 247

Lanigan 21 E-mail with Attached Fuel Cost Recovery Analysis May 12, 2004 BNSF-0338133 through BNSF-0338136.... 161

Kyei 36 Fuel Cost Recovery Analysis March 14, 2005 BNSF-0031225 through BNSF-0031246......................... 155







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

Page 53

a break?
MR. RASHID: Yeah. Sure. Let's take a break.
THE VIDEOGRAPHER: Going off the record. The time now is 2:23 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the record. The time now is 2:35 p.m.
Q. (BY MR. RASHID) Mr. Garin, you understand you're still under oath?
A. I do.
Q. I'd just like to turn to Garin Exhibit 1, which is your declaration. And if we could just focus for a minute on paragraph 18.
In that first sentence you say, quote, I under -- There has generally been a period of increasing rates on BNSF's industrial products traffic. Do you see that?
MR. WINTERS: Objection. That's not the entirety of the sentence.
MR. RASHID: Okay.
Q. (BY MR. RASHID) Do you see paragraph 18 where it says, Until the recent recession --
A. I do.
Q. -- which began to affect BNSF seriously in the

Page 54

second half of 2008, the time period that encompasses what I understand plaintiffs to identify as the class period, has generally been a period of increasing rates on BNSF's industrial products traffic?
A. Yes.
Q. And does that mean that during the class period -- does that -- strike that.
Does that mean that the class period has generally been a period of increasing rates on BNSF's industrial products traffic?
A. Not necessarily. It implies that during this period of time, that BNSF's industrial products rates were generally increasing.
Q. Right. So I'm just -- what period of time are you using there?
A. Probably -- again, this is -- trying to recollect, but 2001, 2002 probably where we started recognizing that the economics weren't supporting the business, and we focused diligently on preserving economics in the business --
Q. Okay.
A. -- or up until recession, yes.
Q. Would you agree that during the class period -- strike that.
Would you agree that the class period has

Page 55

generally been a period of increasing rates for your group?
A. I would say that during the class period, rates were increasing.
Q. Okay. And by rates, do you mean base rates?
A. That -- that is what I meant --
Q. Okay.
A. -- yes.
Q. So just so we're clear, it's your testimony that during the class period -- strike that.
It's your testimony that the class period has generally been a period of increased -- increasing base rates on BNSF's industrial products' traffic?
A. Immediately preceding the class period and in addition to the class period leading up to the recent recession, that period of time, we had generally increasing rates --
Q. Right.
A. -- if that answers your question.
Q. That -- that does answer my question.
A. Okay.
Q. Thank you.
And then -- and then in the second to last sentence you write, Nevertheless, the general trend in pricing has been toward -- towards higher prices.

Page 56

Do you see that?
A. Including the sentence before that which says that it's not uniform that -- that there are customers, there are OD pairs, there are commodities where we did not see the same level of price increases that on average for all of industrial products, the trend has been towards higher prices.
Q. Okay. And are you -- sitting here today, are you aware of commodity groups where there was a -- sitting here today, are you aware of industrial products commodity groups where there was a decrease in base rates during the class period?
A. We have -- we have customers, commodities, and origin/destination pairs that have price decreases during this period. Can I give you all the examples? No, I can't, but I can tell you on oath that we have lots of prices going up and down.
Q. But generally, your declaration indicates that there was a general increase in prices in base rates during this -- during the class period, correct?
A. That the average of all of the ups and downs was positive is how I answered my question.
Q. Okay. Who's George Gillen?
A. George Gillen is the general director. I believe it's -- price administration, I think, is the







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

Page 57

title.
Q. And does Mr. Gillen -- he works in the marketing group?
A. He works in the industrial products group.
Q. Oh, he works in industrial products. So he reports directly or indirectly to you?
A. He reports to Dennis Smith, who reports to me. I want to caveat it with George also supports the other business units on the price administration. His direct report organization, though, is up through industrial products.
Q. And Mr. Gillen has worked in that position throughout the class period?
A. George just retired and left the position. I can't remember the exact date that Mr. Jacobowski and Mr. Gillen switched jobs because Mr. Jacobowski was in the position prior to Mr. Gillen. I don't remember the exact year.
Q. Okay.
A. Three, four, five, somewhere in there.
Q. And Mr. Gillen is now retired?
A. He is. And Mr. Jacobowski is back in the position.
Q. And did you find Mr. Gillen to be a reliable employee?

Page 58

A. How do you define reliable?
Q. Could you rely on the work he performed for you?
A. I rely on all my people to perform the work.
Q. Including Mr. Gillen?
A. Including Mr. Gillen.
MR. RASHID: Could I have tab 13, please. Mark as Garin Exhibit 3 a document with the first Bates stamp of BNSF-0033234.
(Exhibit Number 3 marked.)
Q. (BY MR. RASHID) And if I could just direct your attention -- you should feel free to look at any portion or the entire document, but I'd like to just direct your attention to the second page, and there's an e-mail in the middle from John Lanigan to a bunch of people copying you. Do you see that?
A. I do.
Q. And it's dated June 12th, 2006, correct?
A. Correct.
Q. And Mr. Lan -- who's Mr. Lanigan?
A. Mr. Lanigan is my boss. He's the chief marketing officer.
Q. Okay. And Mr. Lanigan writes in this e-mail, Are there other IP customers, particularly forest products, where we have accepted nonstandard program?

Page 59

Do you see that?
A. I see that.
Q. What was he asking?
A. He's --
MR. WINTERS: Objection. Other than the question that's in the e-mail?
Q. (BY MR. RASHID) What did you understand -- what did you understand Mr. Lanigan to be asking?
A. Well, I'm not exactly sure what he was asking for. I -- I don't know how John defined nonstandard program.
Q. Okay.
A. So --
Q. Well, if you turn to the previous page, you'll see at the bottom there starting an e-mail from yourself to Mr. Lanigan and others also dated June 12th. And you write back, quote, Denis, have George Gillen provide the list of non-STD FSCs for IP and the other BUs. Do you see that?
A. I do.
Q. And so by non-STD FSC, did you mean nonstandard fuel surcharges?
A. I would have asked George Gillen for any IP price authorities that -- that did not have a fuel surcharge formula applied, the standard fuel surcharge

Page 60

formula applied.
Q. Okay. And so when you're asking him -- and you agree that non-STD FSC means nonstandard fuel surcharge formula?
A. Well, I wrote it, so I would have asked him for any agreements or prices where we did not have a standard -- a fuel surcharge formula applied, a standard fuel surcharge formula applied, yes.
Q. Right. I'm just -- this is -- I just want to make sure that the record's clear that non-STD FSC means nonstandard fuel surcharge. It's an abbreviation of the -- of nonstandard fuel surcharge?
A. Well, I -- I don't know. I believe I might have asked for anything that had no fuel surcharge applied as well, but I don't remember.
Q. Right. But when you're asking him to provide this list, you're not asking him to provide a list of cases where BNSF applied the standard fuel surcharge and a base rate discount, correct?
A. Would I have asked for anything where we had a standard fuel surcharge formula and some kind of a -- of price decrease commensurate with that? I do not believe that's what I was asking for.
Q. Okay. So it's your recollection that when you wrote this, you were asking Mr. Gillen to provide a list







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

of price authorities where -- which included a nonstandard fuel surcharge provision and maybe authorities with no fuel surcharge?
A. Yes.
Q. Okay. And when you write, For IP and the other BUs, what does BUs mean in that sentence?
A. Business units.
Q. And what are the other business units?
A. Consumer, agricultural, and coal. We have four business units. And that's why when you asked me who George Gillen worked for, while he reports to me, he does support all of the business units.
Q. So he has access to this type of information that you're requesting for -- for the other business units?
A. He administers all, and because John Lanigan asks me and John Lanigan has responsibility for all four business units, which I do not, and since George Gillen reports to me, it looks like John would have asked me to facilitate receiving that information through George, to the best of my recollection.
Q. Okay. And then if I could just direct you to the first page in the first e-mail of this. It's an e-mail from George Gillen to yourself, John Lanigan, and others dated June 13th, 2006. Do you see that?



A. I do.
Q. And Mr. Gillen writes, John and Dave, attached are two spreadsheets containing the requested information. Do you see that?
A. I do.
Q. And then he writes, The first spreadsheet identifies active BNSF carload price authorities that have nonstandard fuel surcharges. Do you see that?
A. I do.
Q. And when he says "active," what did you -- what did you understand that to mean?
A. I would -- when George communicates with me using the word "active," it would be prices that are currently in effect where traffic is moving.
Q. Okay. And again, when he -- when he responds to you that he's providing a spreadsheet that identifies nonstandard fuel surcharges, did you understand that to mean just nonstandard fuel surcharges or something else?
A. I -- I really don't remember. I mean, John Lanigan made the request, and so I guess I would have been copied because George worked for me, but I really don't remember.
Q. But he's addressing it to you as well, isn't -- isn't he?
A. He is. He's addressing it to a lot of people,



yes.
Q. Okay. So if you could just turn to what's the fourth page of the -- of the document, and it's after the first blue slip sheet, which just for the record indicates that this is an attachment to the e-mail -- or an attachment to the e-mail follows the blue spread -- slip sheet.
And at the top, the title is called "Inventory of Active BNSF Carload Price Authorities with Nonstandard Fuel Surcharge as of June 1st, 2006."
A. I see that.
Q. What did you understand this spreadsheet to contain?
A. I -- I don't remember ever seeing this spreadsheet. Obviously, it was attached to the document. I don't open every document. I don't look at everything that's sent to me, especially if it was originally a request to John Lanigan. So I may not have -- I just don't remember this exact spreadsheet.
Q. Uh-huh. But you don't doubt receiving it, right? It was an e-mail to you?
A. Well, if -- if I got the attachment, then -- then I -- I would have received it --
Q. Okay.
A. -- yeah.



For the record, I travel a lot, and your ability to open attachments, to open spreadsheets is difficult or virtually impossible at times.
Q. Okay. Well, let's just focus then on the cover e-mail for a second --
A. Yes.
Q. -- where Mr. Gillen says in the second -- or second sentence of the second paragraph, There are approximately 30 price authorities with 19 of those tied to the WTI. Do you see that?
A. I do.
Q. And would you agree to me that it's -- it's -- that -- that it's reasonable to interpret that sentence to mean that there are approximately 30 price authorities with nonstandard fuel surcharges?
MR. WINTERS: Objection to the form.
A. Would you repeat the question?
Q. (BY MR. RASHID) Doesn't this e-mail from George Gillen identify that as of June 6th -- sorry, strike that -- as of June 2006, that there are approximately 30 price authorities that have nonstandard fuel surcharges?
A. He is saying that there are -- that attached are a list of 30 price authorities of which 19 have a W -- WTI formula applied to them.







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

Page 65

Q. Right. But there's 30 total that have nonstandard fuel surcharges and of those 30, 19 are tied to the West Texas Intermediate Index, correct?
A. George is providing a list of 30, yes.
Q. 30 not -- 30 price authorities with nonstandard fuel surcharges?
A. 30 price authorities of which 19 have WTI.
Q. And --
A. And -- yes, and he's using the word "nonstandard" fuel surcharge in the sentence before that, yes.
Q. Okay. So if we could just turn to the spreadsheet, on the left -- most left column of the spreadsheet, there's a list which includes ag products, dry boxcar, chemical and plastics, automotive, construction products, and petroleum products. Do you see that?
A. Yes, uh-huh.
Q. Which of those -- are those different groups within BNSF?
A. It's back to the four business units. Ag products falls within the ag business unit.
Q. Okay.
A. Dry boxcar fits into the category, as -- as I said earlier, where it -- it originally fell within

Page 66

industrial products, went over to consumer. I believe that on 6-1-06, beer was part of the consumer business unit.
Q. Okay.
A. Chemicals and plastics all fall within industrial products.
Q. Okay.
A. Automotive falls under consumer.
Q. Okay.
A. And construction products and petroleum products would have fallen under my responsibility.
Q. Okay. So would you agree to me that on this list, of the 30 authorities identified, 8 are associated with your group as of June 1st, 2006?
A. Yes, eight of these customers and authorities would have been under my responsibility as of this date.
Q. Well, it's -- eight -- it's eight authorities, right? It's not eight customers?
A. That is correct. I see [redacted] twice.
Q. So it's -- so covered on this list of 30, 8 price authorities and 7 customers are covered by your group?
A. Eight price authorities of which I don't know how many prices fell within that because there's multiple prices per authority.

Page 67

Q. Right. So there's eight price authorities associated with your group on the spreadsheet, and there a e seven customers associated with those eight authorities, correct?
A. Correct.
Q. Okay. So as of June 1st, 2006, doesn't this spreadsheet indicate that there are only eight authorities within IP that had a nonstandard fuel surcharge provision?
MR. WINTERS: Objection to the form. He's already testified about his familiarity or lack thereof with the spreadsheet and the information that's -- that's being conveyed here.
MR. RASHID: Let's keep the speaking objections to a minimum, Gary.
THE WITNESS: Okay. Would you repeat the question to me?
(Record read.)
A. According to the information George Gillen pulled, he would have indicated on this spreadsheet that there were eight of which we applied a nonstandard formula.
Q. (BY MR. RASHID) Okay. And according to the spreadsheet which Mr. Gillen prepared, it also indicates that there were only seven IP customers to which a

Page 68

nonstandard fuel surcharge formula was applied, correct?
A. The spreadsheet indicates seven customers for which something other than our nonstandard formula was applied.
Q. And out of industrial products' 4 to 6,000 customers, that's not many customers, is it?
MR. WINTERS: Objection to the form. It's argumentative.
A. Well, at the time, [redacted] was in my top five customers in terms of size; [redacted] one of my largest customers; [redacted] top 10 in terms of size; [redacted] top one, two, three in terms of size of customer; [redacted] big customer. So I would suggest this was a lot of volume and a considerable amount of my portfolio --
Q. (BY MR. RASHID) Okay.
A. -- still in terms of the amount of my business under a nonstandard fuel surcharge formula.
Q. Right. And -- and volume and revenue aside, would you agree to me that as of June 1st, 2006, according to this spreadsheet, only a fractional percentage of BNSF's IP customers were charged a standard -- a nonstandard fuel surcharge?
MR. WINTERS: Objection to the form. It's argumentative still.







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

Page 69

A. Well, I want to make sure I understand. Could --
Q. (BY MR. RASHID) I'm just talking about the number, just to be clear.
A. I understand. I understand. But what is important to me and what would have been important to John Lanigan --
Q. Yeah.
A. -- was the amount of business that was moving. So a customer could be a really, really small customer to us and --
Q. Right, but -- but Mr. Lanigan --
MR. WINTERS: Wait, wait. He's in the middle of an answer.
THE WITNESS: Yeah.
MR. WINTERS: Go ahead and finish your answer, Mr. Garin.
A. So I would consider this to be a significant portion of my business based on volume and based on revenue and the amount of -- of fuel cost that we were not recouping during this period of time, which is what is most important to me. It isn't about the number of customers. It's the amount of fuel cost during this period of time that was escalating billions of dollars and becoming a significant portion of my cost.

Page 70

Q. (BY MR. RASHID) Okay. But Ms. -- you'd agree on the cover e-mail to this attachment, neither you or Mr. Lanigan were asking for a list of customers based on either volume or revenue, correct?
A. Correct, because I would have looked at this and known based on the size of the customers. I can't speak for John Lanigan, but he knows who his big customers are as well.
Q. Right. But you would agree that this only represents that as of June 1st, 2006, there appear to be only seven customers out of industrial products' 4 to 6,000 customers that are being charged a nonstandard fuel surcharge?
MR. WINTERS: Objection to the form.
A. There are seven industrial products customers on this list that do not have a standard fuel surcharge formula applied.
Q. (BY MR. RASHID) Right. And of these seven, are you aware of any that did not pay the standard fuel surcharge on at least some portion of their traffic during the class period?
MR. WINTERS: I'm sorry. Could -- could you read the question back.
(Record read.)
MR. WINTERS: Did not pay?

Page 71

A. Well --
MR. RASHID: Did not pay the standard fuel surcharge. Sorry. You're right. Strike that. Thanks, Gary. I appreciate the correction.
MR. WINTERS: It was a very confusing question.
Q. (BY MR. RASHID) Of these seven, are you aware of any -- no, that was right. Sorry. Strike that again.
Of these seven customers, are you aware of any that did not pay -- strike that.
During the class period, did each of these seven customers pay the standard fuel surcharge on at least a portion of their traffic with your group?
A. Some of these, I wouldn't have enough knowledge to know. Some of them, I know paid a standard fuel surcharge formula in addition to a nonstandard formula, so [redacted] is an example of that.
Q. Okay.
A. I can say with almost a hundred percent certainty that [redacted] our entire deal with them was based on a nonstandard fuel surcharge formula.
Q. But that agreement wasn't entered into until sometime in 2005, correct?
A. I don't remember the exact date.

Page 72

Q. According to your declaration in paragraph 14, doesn't it say that, Our -- quote, Our fuel surcharge with [redacted] in a contract that became effective January 1st, 2005?
A. Oh, yep.
Q. And so do you know whether prior to that contract [redacted] paid the standard fuel surcharge?
A. Our -- our contract with [redacted] -- because this was a new agreement based on a new way of doing business. I -- I don't believe we were doing business with [redacted] prior to this contract --
Q. Okay.
A. -- in any material way, whatsoever.
Q. Okay.
A. So...
Q. So apart from [redacted] of these seven listed on Garin Exhibit 3, do you have any more specific knowledge about any of the other deals where the customer might have paid the standard fuel surcharge on some of their shipments?
A. I do not.
Q. Okay. And you requested that George Gillen run this report for Mr. Lanigan in June 2006, correct?
A. It looks as though I did.
Q. And could this type of report been run for each







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

Page 225

Q. And so it seems then that the customer did some sort of analysis of what the mileage-based program would be in comparison to the existing program, right?
A. I don't have the spreadsheet, but that's -- that's what he says.
Q. Okay.
A. Yeah.
Q. Okay. In paragraph 11 of your declaration, you state that a significant portion of the traffic we -- that we handle in BNSF's industrial products group moves under intensively negotiated rail transportation contracts. Do you see that?
A. I do.
Q. And what -- what percentage of your -- of your trans -- of your traffic moves under interline arrangements?
A. Under --
MR. WINTERS: Within industrial products?
MR. RASHID: Within industrial products, yes.
A. I believe it's around a quarter, but that's just --
Q. (BY MR. RASHID) Just based on your experience --
A. Yeah.

Page 226

Q. -- you think it's roughly a quarter of your traffic --
A. I believe it's --
Q. -- is interline? I just want to make the record clear. Based on your general business experience --
A. Yeah.
Q. -- you believe that the percentage of BNSF's industrial product group traffic that moves under interline is about 20 percent of its total traffic?
A. Correct.
Q. And in those cases, your interline partner are aware of the terms of the agreements reached with the customer, correct?
A. Our -- our interline partners are aware of the economic provisions contained within the contract.
Q. So when you say in paragraph 11, We do not disclose the terms of them to our rail or truck competitors, you're excluding from that, I take it, interline shipments?
A. If -- if the interline partner has to participate in the move to get it from origin/destination, he is party to the contract.
Q. Okay. So but that's not what you're referring to this in this paragraph then where there -- you're

Page 227

not -- this does not include interline shipments then, I take it, when you say, We don't disclose the terms of them to our -- our rail competitors?
A. Well, I lost track here. What --
Q. Well, in paragraph 11 you say --
A. I'm sorry.
Q. -- we do not disclose the terms of them to our rail or truck competitors, and those competitors do not disclose the terms of their confidential contracts to us, right?
A. Correct.
Q. And when you're talking about not disclosing the terms of confidential contracts to your rail competitors in that sentence, you're not including interline arrangements?
A. I'm not including those in which our interline partners are part of that move.
Q. Okay.
A. Yes.
Q. That's fine. And when you say "interline," what do you mean by interline?
A. Where we either originate the move, terminate the move, or are a bridge carrier in the move in which there are multiple railroads involved.
Q. And what do you mean by the move?

Page 228

A. A movement of goods from a customer to a destination under which there is a rate document in place to which there are multiple parties to that rate.
Q. So is it -- is it fair to say that an interline shipment involves -- it's limited to a -- a single price authority? Is it limited to a single OD pair, I guess?
A. I'm not sure I'm completely understanding what you're asking.
Q. Well, when you talk about interline shipments --
A. Right.
Q. -- with another carrier, are you discussing -- you're discussing the movement of a commodity from one good to another place, right, from one -- from one origin to a destination?
A. From our railroad to their railroad or their railroad to our railroad.
Q. And it's involving a specific shipment?
A. Involving a specific shipment.
Q. And your discussions with them don't talk about multiple shipments involving multiple customers?
A. We would have -- we will have discussions with any interline partner on any traffic that we originate or terminate unless the customer agrees to ship it as a Rule 11 Agreement, at which we would not discuss that







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

Page 229

with the interline carrier because the customer will negotiate separately with all the interline carriers involved. And we have a high proportion of our business that is actually Rule 11 business, which is interline business by that term that it operation -- it moves interline from carrier to carrier.
Q. Okay. But when you talk to your -- with another carrier about interline shipments, it's not like Dave Garin -- you don't talk about all your interline shipments in industrial products with -- with -- with somebody else at another railroad, right? You don't talk about them in the same discussion?
MR. WINTERS: Object -- objection to the form. I think it's vague and ambiguous.
MR. RASHID: Let me -- let me try to rephrase the question.
Q. (BY MR. RASHID) When you talk about -- when you have interline discussions with another carrier, are those limited to a single customer?
A. When we have an opportunity that comes up to move traffic and it will terminate on another railroad, giving you an example, my market manager will call their market manager who is responsible for that very specific commodity and talk about what the requirements are for each of the railroads in terms of the economics on the

Page 230

through rate if indeed the customer has asked for a through rate.
Q. So then is it -- is the discussion about -- with -- between carriers on a specific commodity for a specific customer on a -- on a specific route?
A. Yes.
Q. Okay. And did you yourself ever have meetings with executives at other railroads during the class period?
A. Yes, we -- we meet with all of our inter -- interline partners maybe once a year, twice a year.
Q. And what is the topic of discussion at those meetings?
A. Generally new business opportunities where we can take business off the highway, generate business for both railroads, administration issues, service issues, interchange issues, service problems, customer complaints, just those kinds of issues.
Q. When you're talking about business opportunities, is that -- are those discussions about specific customers where you think you can take a specific customer shipment, for example, off -- off the highway?
A. A lot of them are.
Q. But -- but are there discussions where it's

Page 231

more general than that?
A. It might be how we can move more steel business into a consuming area that -- that requires a lot of steel, and -- and we may have an origin -- a steel franchise that has steel that might want to move in that direction.
Q. And you mention that you might meet with your counterparts at another railroad carrier once or twice a year. Who -- sort of what level of the organization are those meetings? Who -- who from your organization are attending those meetings?
A. There are meetings where, for example, John Lanigan and his direct reports, which would be the business unit heads. It could be somebody from our service side. It could be somebody from our network development side to talk about all the -- the possible issues that we might want to talk about with the same respective group at the other railroad. There can be meetings between business groups, so industrial products business at BNSF with industrial products business at Eastern Carrier to work specifically on opportunities between the two railroads to -- to grow our industrial products business.
Q. Okay. And focusing on the meetings you discussed where it would be John Lanigan and his -- and

Page 232

his direct reports, that would include yourself, right?
A. Generally, it would, but not always.
Q. And so -- and then the -- whoever you're meeting with, the other railroad, it would be presumably their chief marketing officer and his direct reports?
A. Generally.
Q. And in preparation for those meetings, do you ever meet in advance with anyone to set the agenda or talk about what's going to be discussed at the meeting?
A. My counterpart could reach out to me or I could reach out to my counterpart and provide a list of agenda items back to -- specific opportunities that we want to work on, service issues, complaints to get those all on the agenda so they can be researched a little bit in advance so both companies can be prepared for the discussion.
Q. And did you ever -- did that actually ever happen where you reached out to your counterpart or your counterpart reached out to you in advance of one of these meetings?
A. Yes, standard process would be to set an agenda.
Q. And did you ever meet with -- do you know who Clarence Gooden is?
A. I know who Clarence Gooden is.







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

Page 233

Q. Who is Clarence Gooden?
A. Clarence Gooden is the chief marketing officer for CSX.
Q. And did you ever meet with Mr. Gooden in advance of this type of meeting we've been discussing to set the agenda and whatnot?
A. Clarence Gooden would not be my counterpart, and I would normally not meet with Clarence Gooden, not normally.
Q. Okay.
MR. RASHID: Mark as Garin 26 a document bearing the Bates stamp CSX FSC 000162549.
MR. PRYOR: Did you say 26?
MR. RASHID: That's right.
MR. PRYOR: Thank you.
(Exhibit Number 26 marked.)
Q. (BY MR. RASHID) And you'll see this is an e-mail chain between a John Couch and a Barry Russell in February of 2003.
A. Okay.
Q. And who's Barry Russell?
A. Barry Russell would have been a director in my organization on this date.
Q. And you'll see in the e-mail below, John -- do you know John Couch, actually?

Page 234

A. I know who John Couch is.
Q. And who's John Couch?
A. John Couch has a similar role to Barry Russell at the CSX around service product design.
Q. And -- and John Couch writes in the e-mail at the bottom, Also, will March 12 through 13 work for a face-to-face meeting with Gooden, slash, Garin? Do you see that?
A. Also, will March -- I see that.
Q. Do you -- does this refresh your recollection about a meeting that you had with Mr. Gooden around this time of March 2003?
A. It does not.
Q. Okay. But in the -- in the reply, Barry Russ writes back, March 12 through 13 work for Dave Garin. Do you see that?
A. Yes.
Q. Do you recall Mr. Russell checking in on your schedule to see your availability?
A. I don't, but he could have looked at my schedule without asking me.
Q. Okay. And he noted -- he goes on to write, quote, He noted he had promised Mike Gifts a Learning of our Approach to Market, in parentheses Public Pricing. Do you see that?

Page 235

A. I do.
Q. Do you -- what does that refer to?
MR. WINTERS: Objection to the form.
A. Yeah, I don't -- I don't know Mike Gifts.
Q. (BY MR. RASHID) Well, is it possible that that means Mike Giftos?
A. Oh, that's possible.
Q. Okay. But do you -- I'm actually asking just, do you know what the reference to, quote, Learning of Our Approach to Market, parenthesis Public Pricing, end parenthesis, end quote, do you know what that means?
A. I don't know what exactly Barry is referring to when he says, Approach to Market (Public Pricing).
Q. Okay. Does this generally refresh your recollection that you might have met with Mr. Gooden pertaining to an executive level meeting between CSX and BNSF around this time?
A. If I met with -- with Clarence Gooden, it would have been as part of an overall larger group. I -- I don't -- if this implies I had a one-on-one or private or personal meeting with Clarence Gooden, I do not remember that, but we were having meetings with CSX and -- which I would have been part of and -- and -- and Clarence Gooden would have been part of.
Q. Okay.

Page 236

A. So --
Q. I will mark as Garin -- oh, actually, I won't mark it. I'm going to hand you what's been previously marked as Lanigan 8. And if you look at the front e-mail here, this is an e-mail from Richard Stroot to Matt Rose, John Lanigan, yourself and -- and others. Do you see that?
A. I do.
Q. And the subject is CSX agenda for April 1st, 2003 and background news releases. Do you see that?
A. I do.
Q. And Mr. Stroot writes, Here is the final agenda for the April 1st, 2003, executive meeting with CSX, along with a condensed version of press releases.
A. Okay.
Q. And who is Mr. Stroot?
A. Mr. Stroot worked for Mr. Rickershauser, who was responsible for interline relationships --
Q. Okay.
A. -- as part of his network development job.
Q. And if you -- if you turn the page, you'll see the agenda that Mr. Stroot attaches.
A. I do.
Q. And it indicates a meeting in -- scheduled to occur in Jacksonville, Florida on April 1st, 2003?







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

A. Yes.
Q. And you're listed as a perspective attendee?
A. Correct.
Q. And do you recall attending this meeting?
A. I believe -- I believe so.
Q. And you'll see down at the bottom it says, Merchandise Update, or not -- towards the bottom there's a subheading called Merchandise Update?
A. I do.
Q. And your name and Mr. Gooden's name are listed next to that?
A. I see that.
Q. And does that refresh your recollection that you might have met with Mr. Gooden in advance of this meeting to prepare for this meeting?
A. No. What it implies was that John Couch and Barry Russell worked on an agenda. Richard Stroot was responsible for making sure this agenda was all pulled together and that I attended this meeting on this date of which Clarence Gooden was in attendance.
Q. That's your interpretation of the document?
A. That's my remembrance of the events.
Q. But -- so your remembrance of the events is that Mr. -- Mr. Russell and Mr. -- and Mr. Couch prepared the agenda for this meeting?



A. With Mr. Stroot, and I don't know who else was involved from CSX.
Q. Okay. And there's an item under merchandise update that says fuel surcharge.
A. Yes.
Q. Do you see that?
A. Uh-huh.
Q. Do you recall what the discussion was about fuel surcharge at this meeting?
A. Well, discussion was led by Mike Giftos and John Lanigan per the agenda, and my remembrance of it was how we're going to administer fuel surcharges on an interline basis.
Q. What do you mean by administer?
A. Given that their fuel surcharge on their pricing documents rolls on to us, our fuel surcharge documents rolls onto them, and how do we administer those -- those fuel surcharge in our pricing document -- in our administration of our documents.
Q. But -- but both BNSF and CSX had a -- had fuel surcharges prior to April 1st, 2003, correct?
A. Correct.
Q. So why was there a need to discuss the administration of fuel surcharges?
A. I -- I don't remember the exact context of it,



but to my recollection, it was discussion of systems issues and administration of pricing documents on interline movements across the railroads.
Q. And Mike Giftos was the chief marketing officer or chief commercial officer of CSX at that time?
A. That looks like, yep.
Q. And John Lanigan was BNSF's chief marketing officer?
A. Correct.
Q. And is it -- is it typical for chief marketing and chief commercial officers to discuss systems administrative issues?
A. Yes.
Q. So what -- what exactly were they discussing about systems administrative issues about fuel surcharges?
A. I'm not sure I can -- I can give the exact context to it, but again, pricing documents, for example, that originated on them that did not have a fuel surcharge. That could have been part of the discussion. As they priced the interline move, their pricing covers our fuel increases. To the extent that their document does not contain fuel coverage, it would be in John's interest on our fuel costs going up and us having no recovery for our fuel costs, to the same



extent if we had and same exceptions where we did not apply a fuel surcharge and their costs are also increases, they would be very interested in -- in recovering their own fuel costs. So the -- my recollection there would have been discussions around things like that. Ultimately the administration of those contracts and if there's any systems issues that go with our fuel surcharge and whether their systems can accommodate it or vice versa. Again, the -- the discussion that was going on then because fuel costs were rapidly increasing on our railroad, my guess is they were -- under the railroads was making sure that we're all seeing recovery of fuel costs on our specific railroad.
Q. But -- and -- but prior to April 1st, 2003, CSX had a fuel surcharge program, right?
A. I'm not exactly sure what they had.
Q. Okay. But prior to April 1st, 2003, BNSF had a fuel surcharge program, right?
A. We -- we were applying fuel surcharges on some portion of our moves.
Q. Right. And so prior to April 1st, 2003, there would be interline shipments with CSX where a fuel surcharge was applied, and there would be interline shipments where a fuel surcharge wasn't applied,







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

Page 241

correct?
A. Correct.
Q. So I'm just trying -- I'm trying to figure out what exactly the chief marketing officer of -- of BNSF and the chief commercial officer of CSX needed to discuss about that issue given that it is, you know, an existing state of the commercial relationship.
A. During that period of time, fuel prices were -- were rapidly escalating, so prior to yours it may not have been as important issue in terms of maintaining your profitability and the importance of recovering fuel costs as it became then.
Q. So does that mean that BNSF -- I don't -- I guess are you saying that BNSF was lax about applying its fuel surcharge prior to this period of rising fuel costs?
MR. WINTERS: Objection to the form. Mischaracterizes the testimony.
A. I -- I would not use the word "lax." We had fuel surcharges in place on similar business moving on an interline basis just as we did on business that was moving on BNSF.
Q. (BY MR. RASHID) Okay.
A. Okay. Fuel prices rose.
Q. Okay.

Page 242

A. Interline pricing documents that originated on another railroad would have to cover our fuel costs as well since they created the pricing onto our railroad, so there was an increased importance during this period of time as our fuel costs were increasing by close to $3 billion to -- to get fuel coverage on all of our moves, including interline documents. And so yes, it might have been discussion at the chief marketing officer level when you're seeing a 2 to $3 billion hit in the margins on your business over this period of time as we saw rapidly increasing fuel prices.
Q. Right. But the -- the system issues in applying a fuel surcharge across an interline shipment, those were already worked out prior to April 1st, 2003, because BNSF was applying fuel surcharges on at least some of its interline shipments, correct?
A. Correct.
Q. So there weren't any new systems issues because of rising fuel costs; there was just a greater need to apply the fuel surcharge to interline shipments, right?
MR. WINTERS: Objection to the form. To the extent you know.
A. In my recollection there was some discussion of systems.
Q. (BY MR. RASHID) Okay.

Page 243

A. That's all I can -- that's all I can say.
Q. And -- and your recollection is that there was some discussion on the systems issue and some discussion about the administrative issue and -- and a need to apply fuel surcharges to interline shipments given rising fuel costs?
A. There was a need to recover fuel costs on our railroad for pricing documents that originated on our interline partners.
Q. Apart from -- apart from what we've just discussed, is there anything else concerning the discussion of fuel surcharges at this meeting that you recall?
A. Not that I recall.
MR. RASHID: Could I get tab 89?
Q. (BY MR. RASHID) Are you familiar with the NFTA?
A. Yes, I am.
Q. And in the spring of 2003, were you a board -- on the board of directors of the NFTA?
A. Yes, I was.
Q. And do you recall attending the April 2003 spring business meeting at the NFTA?
A. In what location?
Q. At the Wigwam.

Page 244

A. I was there.
Q. And do you recall meeting Mr. Seale at that -- at the NFTA meeting?
A. I don't recall having a meeting with him. Do I remember seeing him? Possibly.
Q. And do you recall if Mr. Lanigan was at that meeting?
MR. WINTERS: At that --
A. Again, I --
Q. (BY MR. RASHID) The NFTA meeting.
MR. WINTERS: Oh.
A. The NFTA --
Q. (BY MR. RASHID) The NFTA meeting in the spring of 2003.
A. Spring of 2003. I'm trying to remember when John Lanigan started. It was around 2003, so probably, but I can't say for certain.
Q. Do you recall having any discussions with Mr. Gooden at the spring NFTA meeting?
A. I do not recall having any meetings with Clarence Gooden.
Q. Do you recall any discussions of fuel surcharges at the NFTA meeting?
A. I do not.
Q. Do you recall any discussions with Mr. Lanigan







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

concerning fuel surcharges at the NFTA meeting?
A. I'm sorry. Do I have any --
Q. Do you recall any -- sorry.
Do you recall any discussions with Mr. Lanigan at the spring 2003 NFTA meeting concerning fuel surcharges?
A. Do I recall any discussions with my own boss at National Freight in 2003? I don't.
Q. Do you recall that following the NFTA meeting, Mr. Lanigan changed the delegation of authority with respect to approving fuel surcharge exceptions?
A. I remember John Lanigan changing the delegation of authority on approving nonstandard fuel surcharge formulas. I don't recall the exact date.
Q. Did you discuss with Mr. Lanigan the change in the delegation of authority on fuel surcharge exceptions prior to Mr. Lanigan implementing that change?
A. Did I discuss the delegation of authority? John -- John made the change. John notified us of all the changes that were -- that were made, and we executed against that.
Q. I'll mark as Garin Exhibit -- oh, no, this is -- I'm going to hand you what's been previously marked as Lanigan Exhibit 11, and just want to focus your attention to an e-mail at the bottom from Denis



Smith. Do you see that?
A. I do.
Q. And who's Denis Smith again?
A. Denis Smith is my vice president of marketing.
Q. So he -- is he the guy directly below you?
A. He is directly below me, yes.
Q. Okay. And Mr. Smith writes to Mr. Obermiller, Mr. Lanigan, Mr. Hund and Mr. Kempker on April 9th, 2003. Do you see that?
A. Yep.
Q. And he says, Effectively immediately and urgently per John Lanigan, authority to admit FSC provision is granted to VPs only, who will also clear with John.
A. Okay.
Q. Do you see that?
A. I do.
Q. Does that refresh your recollection that Mr. Lanigan changed the delegation of authority on fuel surcharge exceptions around April 9th, 2003?
A. Again, I already stated I -- I knew that John changed it. I just didn't remember the exact date, but this does indicate that the date was April of 2003.
Q. Okay.
MR. RASHID: Could I get 96? I'm going to



hand you a document that has been marked -- or no, that is -- sorry. What exhibit number are we on, 27?
THE REPORTER: Yes.
MR. RASHID: I'm going to mark Garin exhibit 27 a document with a first Bates stamp of NS_010033205.
(Exhibit Number 27 marked.)
MR. TEPE: Sorry, Sami, what was that number again?
MR. RASHID: NS_0 -- this -- this -- Sean, just to clar -- to jump ahead, Mr. Garin is listed on this document as a recipient.
MR. TEPE: Okay. That's fine. Just what was the number again? I'm sorry.
MR. RASHID: Yeah, it's NS_010033205.
MR. TEPE: Okay. Thank you.
Q. (BY MR. RASHID) And you'll see at the top there's an e-mail from Don Seale to yourself and Mr. Lanigan dated September 11th, 2003.
A. I do.
Q. And then below there's an e-mail from yourself to Mr. Seale dated August 22nd, 2003. See that?
A. I do.
Q. And you say, Don, sorry for the delay, but here are the draft minutes of our -- from our meeting?



A. Yes.
Q. And how long have you known Don Seale?
A. Probably 10 years.
Q. And have you socialized with Mr. Seale?
A. And your definition of socialize?
Q. Meaning you've played golf with him, you've gone out to dinner with him, you've gone fishing with him.
A. He has participated in golf outings where I have also participated.
Q. And have you ever gone fishing with Mr. Seale?
A. Fishing with Mr. Seale? We have fished at the NS's fish camp. I can't ever recollect -- recollect fishing with Don Seale.
Q. Okay. And when you say you played golf with him in outings, would that be outings which included personnel from BNSF and personnel from N -- from -- from NS?
A. The -- the time I can remember would have been a customer outing where him and I were both invited guests of the customer.
Q. Do you recall any other instances where you went golfing with Mr. Seale?
A. I believe we may have played at Castle Pines following one of our meetings.







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

Page 249

Q. Just the two of you?
A. No.
Q. Who else attended? Who played?
A. Who else played golf? There would have been a customer or two that were members. I -- I -- this is a long time ago, but I -- I believe there was a coal customer that might even have been a member. Matt Rose may have played.
Q. Okay. Do you recall -- oh, I'm sorry.
A. I'm sorry. No.
Q. Do you recall any instances where you had dinner with Mr. Seale alone?
A. Mr. Seale alone? I do not recall having dinner with Mr. Seale alone.
Q. And you referred to NS's fish camp. Where is that?
A. It's in Palatka, Florida.
Q. And have you ever been to the Greenbriar?
A. Yes, I've been to the Greenbriar.
Q. And were you -- did you go there when it was owned by CSX?
A. Yes.
Q. And was that for a CSX-related function?
A. No, it was for National Freight, NFTA.
Q. Okay. Turning back to Exhibit 27, you write,

Page 250

Sorry for the delay, but here are the draft -- drafts of our minutes?
A. Yes.
Q. And if you turn to the page ending in 209, there's an agenda item that says -- well, first of all, if you turn to the first page of the meeting minutes, you're listed as an attendee, correct?
A. Correct.
Q. And you attended this meeting?
A. I believe I did.
Q. And it says fuel -- on the -- on the page ending in 209, it says -- there's an item called fuel surcharge. Do you see that?
A. I do.
Q. And it says, Action items. Quote, John Lanigan and Don Seale agreed to lead a discussion of a potential industry position on fuel surcharge provisions at the next NEMC meeting. Do you see that?
A. I see that.
Q. Do you recall that discussion?
A. I do not.
Q. But you wrote the minutes, correct?
A. I -- I summarized the minutes.
Q. So you don't doubt that that is an accurate entry for this -- for this agenda?

Page 251

A. I'm not doubting that there was an entry made. I just don't know exactly what it meant. I -- I -- I would not have drafted those specific words myself.
Q. But you sent it out and sent it to Don Seale saying, Here are the minutes from our meeting, right?
A. I -- I took all the feedback from all the people. I wrote the minutes. I sent them out. There could have been changes made to them as my role of taking minutes for the meeting.
Q. Okay. And if you look to the cover e-mail of the -- of the exhibit, Mr. Seale writes to you on September 11th, 2003 -- well, he writes to you and Mr. Lanigan. He says, Sorry for the delay in responding, but we have all reviewed, and these are concise minutes of our meeting.
A. Okay.
Q. Do you see that?
A. I do.
Q. So Mr. -- this indicates that Mr. Seale thought the minutes were accurate, correct?
A. I can't assume what he -- what he meant, but --
Q. What did you interpret -- I'm sorry. What did you interpret it to mean when -- when he wrote that?
A. I was just interested in -- in getting the minutes published.

Page 252

Q. Okay.
A. So this implies that -- that Don was okay with me sending out these as the final draft of the minutes.
Q. And you write -- and then Mr. Seale writes at the bottom of that top e-mail, quote, Enjoyed our visit at NEMC and look forward to seeing you again soon. Do you see that?
A. I do.
Q. And did you attend a NEMC meeting around this time?
A. I'd have to know when the NEMC meeting was because I was at the Hardware Advanced Management Program from September through first week of November of this year.
Q. Of 2003?
A. Of 2003, which is what he's saying here. He says, Dave, hope you're enjoying your stay at -- at -- in Cambridge.
Q. Okay. Okay.
A. Because the minutes were from July. Yeah.
Q. Did you ever meet with -- who's Jack Koraleski?
A. Jack Koraleski is the chief marketing officer for Union Pacific.
Q. Did you ever meet with Mr. Koraleski?
A. I have never met with Jack Koraleski.







Electronically signed by Tami Lewis (001-383-265-5056) 9753209c-b7d5-41d4-998d-91f3ca468d45

## CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 10 | 7 | "diesel at a $1.25" to "diesel at $1.25" | Correct transcription |
| 16 | 3 | "it's partly" to "it's partly a" | Correct transcription |
| 37 | 10 | "two-third" to "two-thirds" | Correct transcription |
| 38 | 11 | "earn adequate" to "earn an adequate" | Correct transcription |
| 38 | 12 | "return trying" to "return by trying" | Correct transcription |
| 38 | 14 | "what it was" to "what was" | Correct transcription |
| 45 | 16 | "includes" to "include" | Correct transcription |
| 45 | 25 | "nonfuel surcharge formula" to " no-fuel-surcharge provision" | Correct transcription |
| 54 | 12 | "products" to "product's" | Correct transcription |
| 57 | 7 | "Dennis" to "Denis" | Correct transcription |
| 57 | 20 | "Three" to "2003" | Correct transcription |
| 60 | 7 | Delete "a standard" | Correct transcription |
| 60 | 8 | Delete "fuel surcharge formula applied" | Correct transcription |
| 70 | 15 | "products" to "product's" | Correct transcription |
| 72 | 25 | "report been" to "report have been" | Correct transcription |
| 73 | 2 | "identify" to "identifying" | Correct transcription |
| 73 | 3 | "been" to "have been" | Correct transcription |
| 77 | 25 | "paragraphs" to "paragraph" | Correct transcription |
| 78 | 1 | "commodity" to "commodity that" | Correct transcription |
| 78 | 4 | "paragraph, 3" to "paragraph 3," | Correct transcription |
| 78 | 8 | "and" to "in" | Correct transcription |
| 79 | 16 | Delete "ca" | Correct transcription |
| 80 | 7 | "that that" to "that" | Correct transcription |

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 80 | 7 | "that that" to "that" | Correct transcription |
| 80 | 10 | "by" to "in" | Correct transcription |
| 80 | 15 | "there – there" to "their – their" | Correct transcription |
| 81 | 6 | "under the" to "on another" | Correct transcription |
| 82 | 11 | " we" to "we've" | Correct transcription |
| 85 | 7 | Delete "you" | Correct transcription |
| 85 | 19 | "employee" to "employed" | Correct transcription |
| 87 | 3 | "employment" to "employed in the" | Correct transcription |
| 87 | 13 | "in" to "on" | Correct transcription |
| 87 | 14 | "vested" to "invested" | Correct transcription |
| 87 | 25 | "Got" to "It got" | Correct transcription |
| 90 | 9 | "JPS" to "JPL" | Correct transcription |
| 94 | 23 | "asked" to "ask" | Correct transcription |
| 95 | 7 | "returns on" to "return on" | Correct transcription |
| 95 | 19 | "It" to "We" | Correct transcription |
| 96 | 19 | "attend" to "attended" | Correct transcription |
| 104 | 4 | "in" to "on" | Correct transcription |
| 106 | 21 | "railing" to "billing" | Correct transcription |
| 108 | 14 | "exploration" to "expiration" | Correct transcription |
| 109 | 10 | "equipments" to "equipment" | Correct transcription |
| 109 | 23 | "required" to "required us" | Correct transcription |
| 112 | 2 | "that" to "the" | Correct transcription |
| 113 | 17 | Delete "our" | Correct transcription |

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 114 | 11 | "that" to "that of" | Correct transcription |
| 114 | 12 | "agree" to "agreed" | Correct transcription |
| 119 | 22 | "That" to That's" | Correct transcription |
| 119 | 25 | "was to "were" | Correct transcription |
| 121 | 13 | Delete "With the exception" | Correct transcription |
| 121 | 15 | "competitive," to "competitive options," | Correct transcription |
| 131 | 15 | "responsible" to "responsible who" | Correct transcription |
| 133 | 21 | Delete "been" | Correct transcription |
| 139 | 7 | Delete "in" | Correct transcription |
| 149 | 4 | "in" to "on" | Correct transcription |
| 149 | 9 | "types" to times | Correct transcription |
| 149 | 11 | "Arb trucks" to "Arbitrage" | Correct transcription |
| 156 | 15 | "industrial" to "International Paper" | Correct transcription |
| 163 | 8 | "normally" to "normally not" | Correct transcription |
| 221 | 6 | "pearlite" to "perlite" | Correct transcription |
| 223 | 7 | "coast" to "cost" | Correct transcription |
| 223 | 8 | "coast" to "cost" | Correct transcription |
| 226 | 10 | "20%" to "25%" | Correct transcription |
| 226 | 12 | "partner" to "partners" | Correct transcription |
| 229 | 5 | "operation" to "operates" | Correct transcription |
| 230 | 16 | "administration" to "administrative" | Correct transcription |
| 241 | 9 | "so" to "so in" | Correct transcription |
| 241 | 9 | "to yours" to "years" | Correct transcription |

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 241 | 10 | "as" to "as an" | Correct transcription |
| 252 | 12 | "Hardware" to "Harvard" | Correct transcription |
| 252 | 13 | "September" to "September 1st" | Correct transcription |
| 258 | 16 | "want what" to "want" | Correct transcription |
| 265 | 24 | "LaPorte" to "the port" | Correct transcription |

CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

I, DAVID GARIN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

[signature]

DAVID GARIN

THE STATE OF TEXAS )

COUNTY OF TARRANT )

Before me, WINONA L. GARRETT, on this day personally appeared DAVID GARIN, known to me (or proved to me under oath or through DRIVERS LICENSE (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 27TH day of SEPTEMBER, 2010.

Winona L Garrett

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

WINONA L. GARRETT NOTARY PUBLIC STATE OF TEXAS EXPIRES 4-25-2013

# In The Matter Of:

*In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION*

---

*THOMAS JACOBOWSKI*
*August 12, 2010*

---

## *HIGHLY CONFIDENTIAL*

MERRILL CORPORATION
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL )
SURCHARGE ANTITRUST )
LITIGATION )
) MDL No. 1869
) Misc. No. 07-489
This Document Relates To: ) (PLF/AK/JMF)
)
ALL DIRECT PURCHASER )
CASES )

**************************************************
"HIGHLY CONFIDENTIAL"
ORAL AND VIDEOTAPED DEPOSITION OF
THOMAS JACOBOWSKI
AUGUST 12, 2010
**************************************************

ORAL AND VIDEOTAPED DEPOSITION OF THOMAS JACOBOWSKI, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause, on August 12, 2010, from 8:30 a.m. to 11:26 a.m., before Julie C. Brandt, RMR, CRR, and CSR in and for the State of Texas, reported by machine shorthand, at the offices of Haynes and Boone, 201 Main Street, Suite 2200, Fort Worth, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



APPEARANCES

FOR THE PLAINTIFFS:

Daniel L. Brockett
Kyle R. Taylor
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849-7345
212.849.7100 (fax)
danbrockett@quinnemanuel.com
kyletaylor@quinnemanuel.com

FOR THE DEFENDANT BNSF RAILWAY COMPANY:
Gary A. Winters
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
202.263.3273
202.263.5273 (fax)
gwinters@mayerbrown.com

ALSO PRESENT:

David M. Pryor - BNSF
Adam Weiskittel - BNSF

VIDEOGRAPHER:

Gary Bentley, CLVS - Merrill Corp.



INDEX


PAGE

Appearances.............................. 2
Proceedings.............................. 4
THOMAS JACOBOWSKI
Examination by MR. BROCKETT............ 5

Signature and Changes..................... 85
Reporter's Certificate.................... 87

DEPOSITION EXHIBITS IDENTIFIED

Exhibit 1 Declaration of Thomas J. Jacobowski.................. 10
Exhibit 2 E-mail string, Subject: Page - [redacted] Escalation, BNSF-0033234 to BNSF-0033242..... 52
Exhibit 3 E-mail string, Subject: Automotive Fuel Surcharge - August Update, BNSF-0388241 to BNSF-0388242.................. 54
Exhibit 4 E-mail string with attachment, Subject: Auto FSC for March, BNSF-0388273 to BNSF-0388293..... 55
Exhibit 5 E-mail string, Subject [redacted] PA's, BNSF-0391864 to 0391865.... 56

PREVIOUSLY-MARKED EXHIBITS

Kyei Exhibit 5.......................... 58
Kyei Exhibit 6.......................... 67




PROCEEDINGS

THE VIDEOGRAPHER: Good morning. This is August 12, 2010. The time is 8:30 a.m. This is videotape number 1 of the deposition of Thomas Jacobowski in the matter of in re: Rail Freight Surcharge Antitrust Litigation in the United States District Court for the District of Columbia, MDL No. 1869.

This deposition is located at 201 Main Street, Suite 2200, Fort Worth, Texas. My name is Gary Bentley with Merrill Corporation.

For the video record, counsel will now state their appearances, then the witness may be sworn in.

MR. BROCKETT: Dan Brockett from Quinn Emanuel on behalf of the Plaintiffs.

MR. TAYLOR: Kyle Taylor from Quinn Emanuel for the Plaintiffs.

MR. WINTERS: Gary Winters with Mayer Brown for BNSF Railway.

MR. PRYOR: David Pryor with BNSF Railway.

MR. WEISKITTEL: Adam Weiskittel, BNSF Railway.

THOMAS JACOBOWSKI,
having been first duly sworn, testified as follows:



Electronically signed by Julie Brandt (501-348-068-4183) caee7ab8-ece6-4c09-9de8-2ea3988d435d

how many multi-year contracts were signed during the period 2004 to 2008?
A. Well, you would go into RPMS and interrogate the database and determine, based on the price authority type, how many documents were out there, and then you would have to slice down and come up with a number.
Q. Okay. So as I understand your testimony, one would not expect to see an AIILF provision in a market based contract of less than one year. Correct?
MR. WINTERS: Objection to the form.
A. There aren't market based contracts. Market based are the public price authorities that we have. And, again, as I previously said, any price authority, contract or noncontract, that has a term of a year or less isn't going to have an escalation factor in it.
Q. Okay. What percentage of your business from '04 to '08 moved under multi-year contracts?
A. I don't know that.
Q. What percentage of the business was moving under market based pricing?
MR. WINTERS: The same time period?
MR. BROCKETT: Yeah.
A. Again, it's different by business unit. Coal has a limited amount of market based pricing. Ag is predominantly market based pricing. Industrial products



over that time period continued to escalate to higher percentages of market based pricing.
Q. Well, you've offered the opinion here that the 66 contracts containing the AIILF is an unreasonably low number of contracts, have you not, sir?
A. No, I haven't.
MR. WINTERS: Objection to the form.
A. I didn't say anything about unreasonable. Okay.
Q. Well, do you think it's a low number of contracts?
MR. WINTERS: Objection to the form.
Q. You're trying to convince the Court with this document that BNSF didn't use the AIILF very often, aren't you?
A. I'm not trying to convince anyone. I'm trying to give account of how many price authorities had that provision in it, and that's just a fact.
Q. Well, and I'm trying to understand, is that a substantial number relative to the overall number of multi-year contracts that came up for renewal? Or is it a small percentage of the multi-year contracts that came up for renewal during this period, '04 to '08?
A. I would say it's a small percentage.
Q. Okay. And why wasn't the AIILF included in



the other multi-year contracts, in your opinion, sir?
A. Multi-year deals, like I said, need to have an escalator in them. And your choices are RCAF all-inclusive less fuel, fixed percentage or some market based basket. And so you would use the appropriate index that you and the customer were able to agree to then. Our carload policy, which if I recall correctly was in 2004, the recommended index to use was all-inclusive less fuel.
Q. As you sit here today, can you tell us what percentage of BNSF's business was shipped under contracts that contained the AIILF?
A. I know for the industrial products business, there was ballpark 100 million in revenue that's under all-inclusive index out of a book of 3 billion annually. So that's, you know, what, 3 percent.
Q. What year was that, sir?
A. That's current.
Q. Current?
A. Yeah.
Q. Okay. That's for the year 2010?
A. 2010, yes. Or actually, that would have been 2009.
Q. Okay.
A. It would have been from the report here, so



that would have been 2009.
Q. But you can't give any statistics, as you sit here today, for any year of the class period. Isn't that correct?
A. That's correct.
Q. I'm going to show you some documents pertaining to some of the specific customers, shippers that are mentioned on your spreadsheet.
A. Okay.
Q. Let's start with [redacted] s one of the customers listed on your spreadsheet as having paid a nonstandard fuel surcharge. Isn't that correct, sir?
A. Correct.
Q. Let's mark as Exhibit 2 an e-mail produced by BNSF. It bears Bates 33234 all the way through 33242.
(Exhibit 2 marked.)
Q. Now Mr. Jacobowski, I realize that you're not an author or recipient of this e-mail, but I do want to direct your attention to it. It's an e-mail from George Gillen dated June 13 of 2006 to a number of people at BNSF. Do you see that?
A. Yes.
Q. And do you know George Gillen?
A. Yes, I do.







Electronically signed by Julie Brandt (501-348-068-4183) caee7ab8-ece6-4c09-9de8-2ea3988d435d

Q. Who was he?
A. My predecessor.
Q. Okay. And Mr. Gillen talks in the second paragraph of this e-mail about private price authorities with International Paper. Do you see that?
A. Yes.
Q. And he states -- and I'm going to quote it -- The second spreadsheet has two worksheets identifying private price authorities with [redacted] BNSF has seven documents that have our standard fuel surcharge and one coal contract without a fuel surcharge. Do you see that?
A. Yes.
Q. Now does that indicate that [redacted] [redacted] paid the standard fuel surcharge to BNSF under at least seven different price authorities as of this time in 2006?
Yeah, look at the spreadsheet if you need to to answer the question.
A. Correct.
Q. Okay. So in addition to having paid a nonstandard fuel surcharge for certain of its shipments, [redacted] paid a standard fuel surcharge for other of its shipments. Isn't that correct?
A. Correct.



Q. All right. Let's take a look at some other customers. [redacted] Let's look at BNSF 0388241 through 0388242. Exhibit 3.
(Exhibit 3 marked.)
Q. Now these are some e-mails referring to certain shippers, among others, [redacted] Do you see that?
A. Yes.
Q. Okay. If you'll look on the second page of the e-mail from Carla Barlett to numbers on August 3rd of 2006 -- are you with me?
A. Yes.
Q. Who is Carla Barlett?
A. Well, at the time she worked in automotive, but currently she's on my team.
Q. Okay. The second paragraph on the second page of this e-mail states, Effective 9/1/2006, all of [redacted] Rule 11 rates which are currently published in BNSF fuel surcharge 300096 will be moved to BNSFC 307191, which is subject to the BNSF standard fuel surcharge. Do you see that?
A. Yes.
Q. Now does this e-mail indicate then that [redacted] shipped cars on BNSF during the class period and paid BNSF standard carload fuel surcharge?



A. Yes.
Q. Let's mark as our next exhibit BNSF 0388273, one page e-mail. It pertains to [redacted]
(Exhibit 4 marked.)
MR. BROCKETT: Actually, I should state for the record, it's not one page. It bears Bates 0388273 all the way up to 0388293.
Q. Now do you recognize this as an e-mail from Carla Barlett to Paul M. Anderson?
A. Yes.
Q. Okay. And it's dated in February of 2007?
A. Correct.
Q. And that's during the class period. Correct?
A. Correct.
Q. In the first sentence of the e-mail Ms. Barlett writes, quote, Please note that there is another [redacted] quote, BNSFQ 112492, which also effective on 3/1/2007 to 4/15/2007, that is subject to the standard fuel surcharge.
Now my question to you is this: Does this e-mail indicate that [redacted] also paid BNSF standard carload fuel surcharge with respect to certain of its shipments during the class period?
A. It says there is another [redacted] quote subject to standard fuel surcharge.



Q. And [redacted] is one of the shippers on your spreadsheet reflected as having paid a nonstandard fuel surcharge. Correct?
A. I believe so. Yes.
Q. All right. Let's mark as the next exhibit a two-page e-mail bearing Bates number BNSF 0391864.
(Exhibit 5 marked.)
Q. Now I direct your attention to the e-mail in the middle of the page here from Keith A. Carney to Paul Anderson, among others. Do you see that?
A. Uh-huh.
Q. You have --
MR. WINTERS: You have to answer yes.
A. Yes.
Q. And in the body of the e-mail -- and by the way, this pertains to [redacted] Correct?
A. Yes.
Q. [redacted] is a shipper. Right?
A. Correct.
Q. And [redacted] is one of the shippers identified on your spreadsheet as having paid a nonstandard fuel surcharge. Correct?
A. I believe so, yes.
Q. Okay.
A. Yes.







Electronically signed by Julie Brandt (501-348-068-4183) caee7ab8-ece6-4c09-9de8-2ea3988d435d

Page 57

Q. And this e-mail -- I'm not going to quote it, but this e-mail indicates that on a renewal [redacted] is going to be paying the standard fuel surcharge, as set forth in the BNSF rules book 6100. Correct?
A. That is correct.
Q. Now we have talked about a number of shippers who, in addition to paying nonstandard fuel surcharges, as per your spreadsheet, also paid standard fuel surcharges during the class period. If I went through the names of the other shippers listed on your spreadsheet, would you be able to tell me which, if any, of them also paid standard fuel surcharges with respect to other shipments made during the class period?
A. No.
Q. Would the -- would your company have records --
A. Yes.
Q. -- that would show that?
A. Absolutely.
Q. All right. What was your position in early 2001?
A. Same, general director price management.
Q. Now in the first quarter of 2001, did you participate in discussions with other railroads about the concept of creating an industry standard fuel

Page 58

surcharge?
A. In the context of our industry committee for interline revenue management, whose charter was to take care of interline billing and make sure that we could handle it properly, yes.
Q. What committee are you referring to?
A. The industry's, if I recall the proper name now, Interline Revenue Management Committee.
Q. Is that the IRMC?
A. Yeah. Yes.
Q. Was that a committee of the AAR?
A. Yes.
Q. And were you on that committee?
A. I was BNSF's representative.
Q. Okay. And who else was on this committee?
A. Back in that time period, I'm not positive, but there were representatives from each of the Class 1's and then there was a short line rep, and then there was the overall short line rep as well.
Q. All right. Let me show you what was previously marked as Kyei Exhibit 5. Now this is an e-mail from a Lee -- no, from --
A. Renita Lee.
Q. -- Renita Lee on February 15th of 2001. Do you see that?

Page 59

A. Yes.
Q. And the e-mail is to a number of individuals within BNSF. Correct?
A. Correct.
Q. And it concerns fuel surcharge modifications. Correct?
A. That's the subject, yes.
Q. And it refers to rescheduling a meeting that was to be held on February 15th to March 1.
A. Correct.
Q. Correct? And that's 2001. Right?
A. Correct.
Q. And then it purports to summarize a few key meetings from a meeting that was held on January 30th of 2001. Do you see that?
A. Correct.
MR. WINTERS: It says a few key points from meeting.
MR. BROCKETT: Sorry.
Q. Okay. Few key points from the meeting.
And then there's a heading called, Fuel Surcharge. Correct?
A. Correct.
Q. And one of the bullet point here says Tom J. -- is that a reference to you?

Page 60

A. Yes.
Q. Tom J. will check at the industry meeting in February to see if the AAR would establish a fuel surcharge formula similar to RCAF. This would provide a consistent formula for all rail carriers and would probably be more accepting by customer as well. Do you see that?
A. Yes.
Q. Okay. So I take it that this was an internal discussion that was being held and it was decided that you, okay, would raise the subject of an industry standard fuel surcharge at a next meeting of this committee. Is that correct? Is that fair?
A. Because I was BNSF's rep on the committee, yes.
Q. And the committee -- strike that.
And the industry meeting in February that's being referred to here is the meeting of the IRMC committee?
A. I believe that was the name at that point in time.
Q. Okay. So am I correct that this is an internal discussion in which it was agreed that you would raise this concept of an industry standard fuel surcharge at the next -- at this next committee meeting?

Is that correct?
A. It was recommended that I would, yes.
Q. And you agreed to do that?
A. Yes.
Q. And what you were going to see is whether the AAR would establish a consistent fuel surcharge formula that could be used by all the railroads. Correct?
A. For interline shipments, yes.
Q. Well, you keep saying for interline shipments. This document here doesn't say anything about interline shipments, does it, sir?
A. No, but that's what our committee's purpose was.
Q. I understand, but there's nothing about limiting this to interline in the e-mail that Renita Lee writes. Correct?
A. That's correct, but it also doesn't say that we had customers requesting us to come up with a consistent measure so that they would only have to have one rate in their system rather than multiples.
Q. Okay. One or two more questions, then we've got to change the tape.
The note -- or Lee Renita says here --
MR. WINTERS: Renita Lee.
Q. Renita Lee. Sorry.



MR. WINTERS: Renita.
MR. BROCKETT: Renita Lee. I'm sorry.
Q. Is that a woman?
A. Yes, it is.
Q. Yeah. Ms. Lee states here that you're going to check at the industry meeting in February to see if the AAR would establish a fuel surcharge formula similar to RCAF. Now RCAF was never limited to interline shipments. Isn't that correct?
A. That's correct. Carriers were free to choose when and if they would use it for a specific price authority.
Q. Right. And the fuel surcharge formula that you were going to look at or raise at this committee meeting would not be a fuel surcharge formula that was limited only to interline shipments. Isn't that true, Mr. Jacobowski?
MR. WINTERS: Objection to the form.
A. Well, again, our committee's only purpose is to handle interline shipments.
Q. I understand that.
A. So --
Q. But the -- but the fuel surcharge formula that's being discussed here, okay, that would be similar to RCAF -- do you see that?



A. Yes.
Q. -- that's not a fuel surcharge formula that was going to be limited only to interline shipments. Isn't that fair, sir?
MR. WINTERS: Objection to the form.
A. Again, our committee only pertained to interline shipments, and so that's the only context that we would discuss that in.
MR. BROCKETT: Well, let's -- we need to change the tape.
THE VIDEOGRAPHER: We're going off the record. The time is 10:41 a.m. This is the end of tape number 1.
(Break from 10:41 a.m. to 10:43 a.m.)
THE VIDEOGRAPHER: We're back on the record. The time is 10:43 a.m. This is the beginning of tape number 3.
Q. (By Mr. Brockett) Mr. Jacobowski, did you attend an industry meeting in February of 2001 at which you discussed the concept of creating an industry standard fuel surcharge?
A. Yes.
MR. WINTERS: Objection to the form.
Q. And where was that meeting held?
A. I don't recall for sure.



Q. And your testimony is that this was a meeting of the IRMC committee?
A. Yes.
Q. And were there representatives from other railroads there?
A. Yes.
Q. Were there representatives from UP there?
A. I believe so.
Q. Who was there for the UP?
A. I believe Chuck Adams and Kurt Schroeder would have been there.
Q. And who was there from NS?
A. Probably Albie Pfeifer.
Q. How about from CSX?
A. I believe Clyde McIntyre and possibly Tom Roberts.
Q. And you don't remember where this meeting was held?
A. I'm guessing it was St. Louis, but I'm not sure.
Q. Where in St. Louis?
A. It would have been in the former MoP headquarters building, UP Missouri Pacific building in St. Louis.
Q. How often did this committee meet, the IRMC







Electronically signed by Julie Brandt (501-348-068-4183) caee7ab8-ece6-4c09-9de8-2ea3988d435d

Page 65

committee?
A. I believe in that time frame we had two face-to-face meetings a year and then two conference call meetings a year.
Q. So four meetings a year?
A. I believe so.
Q. How long were you on this committee?
A. I don't recall back in that time period, several years.
Q. Do you know when you first joined this committee?
A. No, because I had gone out of price management for a while, and then I came back. So when I came back in July '99, I probably would have rejoined at that period in time through December 2001.
Q. All right. Were there any written minutes kept of this meeting?
A. That was the general practice and policy, so I would assume so, yes.
Q. Okay. What was discussed at this meeting concerning the concept of an industry standard fuel surcharge?
A. Well, the whole purpose of the industry meetings is to figure out for interline shipments how to have error free rating, billing and collection and

Page 66

interline settlement. And so we would talk about the respective issues that we were having in that forum, and fuel surcharge billing, collection and divisioning was one such issue. And so I talked about the concept of having a -- making available an industry standard fuel surcharge to make it easier for our customers to figure out what fuel surcharge applied.
Q. Were you sponsoring the concept of an industry standard fuel surcharge at this meeting?
A. I was representing BNSF and sponsoring this, so I -- I brought up the concept.
Q. And was this something that you had been instructed to do by your superiors at BNSF, namely, go to this meeting and try to sell to the other railroads this concept of an industry standard fuel surcharge?
A. Yes.
Q. And who instructed you to do that?
A. Well, I was a member of the fuel surcharge committee that were the listed people on that e-mail, and that was being directed by management.
Q. And what was said by the other railroads on this concept at this meeting?
A. I -- I floated the concept, and I was unanimously shot down. They weren't interested in entertaining it. Each carrier felt that, if I recall

Page 67

correctly, that with each carrier's having their own fuel intensities, that they weren't interested in an industry fuel surcharge.
Q. How long did the discussion of this concept last?
A. If it was 15 minutes, I would be surprised.
Q. Do you remember what anyone said on the subject?
A. If I recall correctly, Clyde was the most vocal that the fuel intensity was different. The eastern carriers versus the western carriers fuel intensities are different due to length of haul considerations, and they always would have a different perspective than we would.
Q. Let's look at what we've marked as Kyei Exhibit 6. So this is a two-page -- three-page e-mail. I'm interested in the e-mail in the middle of the page from Herb Milton to a number of people within BNSF, including yourself. Do you see that?
A. Yes.
Q. And this is an e-mail that's dated in March 5th of 2001. Correct?
A. Yes.
Q. Now the people that are receiving this e-mail at the time, was this an internal BNSF committee set up

Page 68

to deal with fuel surcharges?
A. Yes.
Q. And so that committee was Sam Kyei. Right?
A. Yes.
Q. Yourself?
A. Yes.
Q. Tom Carlson?
A. No, Cheri Carlson.
Q. Cheri Carlson. Okay. Renita Lee?
A. Correct.
Q. Ken Holmes?
A. Yes.
Q. William Baum?
A. Bill Baum, yes.
Q. And Herb Milton?
A. Correct.
Q. Okay. Now at the bottom of the page there is an entry here that says, quote, New action items are in bold, unquote. And then it states, Tom J. provided feedback from rail carriers regarding the concept of establishing industry wide fuel surcharge formula. Rail carriers unanimously chose not to act on industry standard fuel surcharge. Do you see that?
A. Yes.
Q. Now does this reflect that you gave a report


Electronically signed by Julie Brandt (501-348-068-4183) caee7ab8-ece6-4c09-9de8-2ea3988d435d

to the BNSF internal fuel surcharge group following your meeting in St. Louis?
A. Yes.
Q. And what did you tell them?
A. I told them that I did present it and they unanimously -- the industry unanimously chose not to act on the industry standard fuel surcharge.
Q. Now these minutes don't mention anything that this industry standard fuel surcharge would be applicable only in the interline context, do they?
A. No.
Q. Have you had any further conversations about an industry standard fuel surcharge other than the meeting that you just spoke about?
A. You mean internally or externally or --
Q. Either.
A. Not that I recall.
Q. Have you ever had fuel surcharge discussions with any representative of any other railroad?
MR. WINTERS: You mean apart from -- from the documents that we're just talking about?
MR. BROCKETT: Uh-huh.
A. Sure.
Q. With whom have you had those discussions?
A. Well, when we launched our modified program,



which I believe was April 2001, where we switched from a WTI index to a Highway Diesel Fuel Index, I had to seek foreign line concurrence from all the other participating railroads to get them to concur to what we were doing for our joint line pricing. So I had to send that out to all my counterparts, if you will, from the other railroads. And then, of course, in the process of securing concurrence, they would want to understand our program, so I would have to explain them features or answer questions, et cetera, about it. And then as other fuel surcharge questions came up over time on respective joint line moves, I would have to have a discussion with people at times on how things worked.
Q. When BNSF changed its fuel surcharge -- its standard fuel surcharge as applicable to carload shipments --
A. Yes.
Q. -- in June of 2003, did you seek the concurrence of other carriers to the modified fuel surcharge?
A. Not that I recall.
Q. Did you have discussions with any representatives of any other railroads at that time about the new carload fuel surcharge that went in effect on June 1st of 2003?



MR. WINTERS: Objection to the form.
A. Can you repeat that question?
MR. BROCKETT: She can read it back, sure.
(Requested testimony read.)
MR. WINTERS: Objection.
A. Pertaining to this subject, I don't recall. We, per se, didn't change -- change the system; we just reduced the level that the fuel surcharge started applying, so I do not recall.
Q. Okay. From June 1 of 2003 to the present, have you had discussions with representatives of other railroads about BNSF's carload fuel surcharge?
A. I need to clarify. In 2003, I wasn't in the price management role. In 2002, I moved into sales. And so I wasn't having conversations with the other carriers on the program.
Q. Okay. Can you answer my question now?
A. Sorry. What was the question?
Q. I'll rephrase it. From June -- strike that.
From March of 2003 to the present, have you had discussions with other carriers about fuel surcharges?
A. Because we just launched a new fuel surcharge program recently, I've had to seek concurrence from all



our interline partners on that program. So I've reached out to most of them.
Q. What program is that?
A. We just launched where we're rebasing from $1.25 fuel to 2.50 fuel.
Q. When did that become effective?
A. If I recall correctly, we launched that with customers on July 26.
Q. Of this year?
A. Of this year.
Q. Okay.
A. And then, I believe, the following day -- if July 26th was a Monday, then the following day, July 27th, is when I seek concurrence from our interline partners.
Q. Have you had any other discussions with representatives of other carriers about fuel surcharges, other than the ones about the new program that went in effect in 2010?
A. I'm sure in relation to joint line moves that we had with another carrier, I had some discussions. Other than that, I don't recall any.
Q. Can you recall what specific carriers you had discussions with?
A. No. But, you know, in sales, a high







Electronically signed by Julie Brandt (501-348-068-4183) caee7ab8-ece6-4c09-9de8-2ea3988d435d

Page 73

percentage of our business was interline traffic, and so, you know, if we were the publishing carrier, then our fuel surcharge program would apply. If they were the publishing carrier, their fuel surcharge program would apply. And so you needed to know if their price authority was taking fuel, and if it was, then how I do build my revenue factor? So you needed to know how they were constructing their price so I knew how to construct my price.
Q. Apart from this Interline Revenue Management Committee, have you sat on any other AAR committees from 2000 to the present?
A. Well, when I came back into price management, then I rejoined the committee and in March they elected me chairman of the committee and it's now called the Interline Revenue Committee, IRC, so they've changed the labels over time. Then when I was in sales, I belonged to industry committees, but there it was really customer focused groups. So under the NARS umbrella, which is the North American Rail Shippers Association, my territory was Chicago and the northeast. So I would attend the Midwest Association of Rail Shippers meetings and the NEARS, the Northeast Association of Rail Shippers meetings, Philadelphia Traffic Club meetings, Pittsburgh Traffic Club meetings, New York Traffic Club

Page 74

meetings, Chicago Traffic Club meetings, Montreal Traffic Club meetings. And so I would belong and attend those meetings at various points in time.
Q. And those meetings were attended by representatives of other railroads?
A. As well as the shipping public, yes.
Q. Going back to the meeting in St. Louis in 2001, early 2001 about establishing the industry standard fuel surcharge, did you get advice from counsel before you went to that meeting to discuss that concept?
MR. WINTERS: I want to just be careful and instruct you not to reveal any advice you may have received from counsel, if you did. You can testify as to whether you had any communication with counsel about the subject on a factual matter, but do not reveal any advice that you may have received from any attorney within or outside of BNSF on the subject.
THE WITNESS: Okay.
A. I don't specifically recall, but I think it's very -- extremely safe to assume that I would have discussed it with one of our attorneys before presenting an issue on -- on that subject.
Q. Okay. But you don't have a memory, as you sit here today, of actually discussing this concept with a BNSF attorney before you went to that meeting?

Page 75

A. No. I mean, I talked to the attorneys on a constant basis on multiple issues, so, no, I don't specifically remember on this one.
Q. Did you have any responsibility to track fuel surcharge coverage in your department?
A. Yes.
Q. And what exactly were your responsibilities in that respect?
A. Well, we would produce reports. I should clarify that. I believe we did it, but it's possible Sam Kyei's team could have done it, too, but I believe we produced reports that showed the coverage of the fuel surcharge coverage for the respective business units.
Q. And were those reports prepared on a quarterly basis?
A. I believe so, yes.
Q. Do you know something called an adherence report?
A. That sounds familiar.
Q. Okay. And did the adherence report show how well you were doing in terms of having the standard fuel surcharge applied to as many customers as possible?
A. They showed the levels that we were getting fuel surcharge, yeah.
Q. And did you assist in preparing those reports?

Page 76

A. I think team members of mine prepared them.
Q. Did you supervise team members who prepared those reports?
A. Yes.
Q. And those reports were prepared for senior management, were they not?
A. Yes.
Q. And these reports began in a formal way in late '03, early '04. Is that correct, sir?
A. I think -- I'm sure we had reports before then, but -- so I can't quite say what the time frame was.
Q. Well, when do you remember first preparing a formal report that would show -- that would track your fuel surcharge coverage?
A. I believe we had reports at the end of 2000 that showed the coverage or in the first two months of 2001. And then I also need to clarify again, in 2002 I -- was when I moved to sales, so I was seeing the reports. So I don't exactly recall when they started, but I'm fairly certain that when I was in charge, we were producing them.
Q. Now you testified earlier that the goal as established by management was to apply the standard fuel surcharge to as many shipments and as many customers as







Electronically signed by Julie Brandt (501-348-068-4183) caee7ab8-ece6-4c09-9de8-2ea3988d435d

- HIGHLY CONFIDENTIAL -
THOMAS JACOBOWSKI – 8/12/10



CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 7 | 14 | “PMS” to “RPMS” | Correct transcription |
| 13 | 4 | “code” to “quote” | Correct transcription |
| 15 | 22 | Change to “our hand maintained overtime spreadsheet” | Correct transcription |
| 39 | 13 | “RPS” to “RPMS” | Correct transcription |
| 43 | 6 | “price” to “priced” | Correct transcription |
| 43 | 7 | “lines’ documents” | Correct transcription |
| 47 | 1 | “this” to “these” | Correct transcription |
| 50 | 17 | “account” to “a count” | Correct transcription |
| 51 | 3 | “CAF” to “RCAF,” | Correct transcription |
| 55 | 17 | “which also” to “which was also” | Correct transcription |
| 68 | 3 | “so that” to “so on that” | Correct transcription |
| 70 | 9 | “explain them” to “explain to them” | Correct transcription |
| 72 | 14 | “seek” to “seeked” | Correct transcription |

I, THOMAS JACOBOWSKI, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Thomas Jacobowski

THOMAS JACOBOWSKI

THE STATE OF TEXAS )
COUNTY OF TARRANT )

Before me, WINONA L. GARRETT, on this day personally appeared THOMAS JACOBOWSKI, known to me (or proved to me under oath or through DRIVERS LICENSE) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 27TH day of SEPTEMBER, 2010.

WINONA L. GARRETT NOTARY PUBLIC STATE OF TEXAS EXPIRES 4-25-2013

Winona L Garrett

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS
COMMISSION EXPIRES: 4-25-2013

# In the Matter of:

## *In re: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION*

---

## *SAMUEL KYEI*
## *March 4, 2010*

---

***HIGHLY CONFIDENTIAL***

***MERRILL CORPORATION***

*25 West 45th Street - Suite 900*

*New York, NY 10036*

*PH: 212-557-7400 / FAX: 212-692-9171*

**KYEI, SAMUEL - Vol. 1**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL )
SURCHARGE ANTITRUST )
LITIGATION )
) MDL No. 1869
) Misc. No. 07-489
This Document Relates To: ) (PLF/AK/JMF)
)
ALL DIRECT PURCHASER )
CASES )

*****************************************************

"HIGHLY CONFIDENTIAL"
ORAL AND VIDEOTAPED DEPOSITION OF
SAMUEL KYEI
MARCH 4, 2010

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF SAMUEL KYEI, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause March 4, 2010, from 8:31 a.m. to 5:16 p.m., before Julie C. Brandt, RMR, CRR, and CSR in and for the State of Texas, reported by machine shorthand, at the offices of Haynes and Boone, 201 Main Street, Suite 2200, Fort Worth, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

FOR THE PLAINTIFFS:

Daniel L. Brockett
Sami H. Rashid
Kyle R. Taylor
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849-7345
212.849.7100 (fax)
danbrockett@quinnemanuel.com
samirashid@quinnemanuel.com
kyletaylor@quinnemanuel.com

-and-

Paul M. Donovan
LaROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Ave., NW
Suite 200
Washington, D.C. 20036
202.298.8100
202.298.8200 (fax)
paul.donovan@laroelaw.com

FOR THE DEFENDANT BNSF RAILWAY COMPANY:

Gary A. Winters
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006-1101
202.263.3273
202.263.5273 (fax)
gwinters@mayerbrown.com

FOR THE DEFENDANT CSX TRANSPORTATION, INC.:
John L. Cuddihy
CROWELL MORING
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
202.624.2779
202.628.5116 (fax)
jcuddihy@crowell.com

Page 3

APPEARANCES
(CONTINUED)

FOR THE DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY:
Tara L. Reinhart
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
202.371.7630
202.661.0540 (fax)
tara.reinhart@skadden.com

FOR THE DEFENDANT UNION PACIFIC:

David G. Meyer
HOWREY LLP
550 South Hope Street
Suite 1100
Los Angeles, California 90071
213.892.1928
213.892.2300 (fax)
meyerd@howrey.com

ALSO PRESENT:

David M. Pryor - BNSF Senior General Attorney
Adam Weiskittel - BNSF General Attorney

VIDEOGRAPHER:

Carlos Garcia, CLVS - Merrill Corp.

Page 4

INDEX


| | PAGE |
|---|---|
| Appearances.................................. | 2 |
| Proceedings.................................. | 7 |
| Stipulations................................. | 220 |
| SAMUEL KYEI | |
| Examination by MR. BROCKETT............... | 8 |
| Examination by MR. WINTERS................ | 276 |
| Signature and Changes......................... | 278 |
| Reporter's Certificate........................ | 280 |

| DEPOSITION EXHIBITS | IDENTIFIED |
|---|---|
| Exhibit 1.................................... | 30 |
| Exhibit 2.................................... | 34 |
| Exhibit 3.................................... | 38 |
| Exhibit 4.................................... | 42 |
| Exhibit 5.................................... | 48 |
| Exhibit 6.................................... | 57 |
| Exhibit 7.................................... | 80 |
| Exhibit 8.................................... | 90 |
| Exhibit 9.................................... | 98 |
| Exhibit 10.................................. | 102 |
| Exhibit 11.................................. | 102 |
| Exhibit 12.................................. | 116 |
| Exhibit 13.................................. | 118 |
| Exhibit 14.................................. | 123 |
| Exhibit 15.................................. | 127 |
| Exhibit 16.................................. | 130 |

Page 13

**A. My first -- my first title was corporate management trainee.**
Q. And to whom did you report in that position?
**A. I reported to a gentleman called Patrick Krick.**
Q. What kinds of things were you doing for the BNSF? I mean, I know you've described generally regression analysis and data collection. Can you be a little bit more specific?
**A. Okay. BNSF has a lot -- we move a lot of commodities, and so my very first responsibility was to help the company build forecasting models using regression analysis for all the commodities that we move. So my initial role was first collecting the data and building the regressions to support the whole effort.**
Q. And is doing regression analysis, is that something you learned in university?
**A. Yes.**
Q. And is a regression analysis a common and accepted method of analysis used in economic forecasting?
**A. Yes.**
Q. Okay. What was the -- what position did you -- strike that.

Page 14

Did there come a time when you assumed a new position within BNSF?
**A. Yes. I've held a series of positions. One -- from there I was an economic analyst. I became a senior economic analyst. I moved into strategic studies and where I was -- I can't remember the title. I think it was some specialist. I know we were called specialist. And then eventually wound up as -- eventually wound up as director of merchandise -- merchandise planning.**
Q. What date did you assume that title?
**A. I can't recollect the exact date. But then just right about the time of the merger, which was in the 1996 time frame, I was appointed director of marketing support, so I went to work for a gentleman called Steve Branscum in intermodal.**
Q. How long were you the director of marketing support?
**A. I was director for marketing support under Branscum, merger time through -- I left that job 2002, November of 2002.**
Q. And then, as you previously had testified, in November of 2002 you became the chief economist at BNSF. Is that correct?
**A. Yes.**
Q. What were your duties and responsibilities as

Page 15

the director of marketing support?
**A. When I was in intermodal, one of my primary duties was to help the consumer products business unit with all their staffing analysis, so I will help them put together their plans, their revenue plans. I would also -- key part was when fuel started ramping up, to build a fuel surcharge program for them. But I did a lot of things when we -- also we have a new service come up. They wanted -- if they wanted to, say, put together service, I had -- I had to go in and do the profitability analysis for that service just to make sure that they would make money or it would be profitable. So I evaluated service -- new services. I also helped them with structuring different service levels, you know, and then I also helped them with a guarantee program where they could guarantee freight.**
Q. Can you give me the -- the years, the approximate years you held the position director of merchandise planning?
**A. Oh, I can give you the -- the exact years?**
Q. Approximately.
**A. Just before the merger I was in that role. I can give you the rough years, yes.**
Q. Well, you have to excuse us all, but maybe in Fort Worth the merger has some particular reference and

Page 16

meaning, but for many of us in this room --
**A. Oh, okay.**
Q. -- we're not sure what merger you're talking about.
**A. Okay. This is the --**
Q. So if you could please --
MR. WINTERS: Let him finish.
Q. -- just tell us what merger you're talking about and what year that occurred.
**A. Okay. BNSF and Santa Fe -- Burlington Northern, BNI, and Santa Fe merged somewhere around 1996 and became effective at that time, and some of my role shifted at that time.**
Q. So would it be fair to say that you held the position of director of merchandise planning from approximately 1996 through November of 2002, when you became a chief economist?
**A. Can you please rephrase the question?**
Q. Okay. Let me rephrase it.
You said that you became the director of marketing support sometime around the merger in 1996. Is that correct?
**A. Before the merger.**
Q. Before the merger?
**A. Before the merger.**

Page 17

Q. So what year are we talking approximately?
**A. Oh, I would say from roughly 1990 to, say, '96 time frame, yeah.**
Q. And during 1990 to 1996, you held what title?
**A. I think it was the director of merchandise.**
Q. Okay. So then in 1996 you became the director of marketing support. Is that correct?
**A. 1996, I was director -- first director of economics when they put the merger together and very shortly after that was hired into the consumer business unit. So the consumer -- the exact year I went into the consumer, I don't recall that, but somewhere after -- right after the merger. First working in the finance department right after the merger and then not very long after that going into the consumer group.**
Q. What is the -- what are your duties and responsibilities as the chief economist at BNSF?
**A. I have a number of duties. Let me start from the economic, microeconomic side. I am responsible for developing microeconomic assumptions that we use for forecasting. We work with a company called Global Insight, IHS Global Insight. So my responsibility is to collect the data, disseminate it to the business units so they can then start using those assumptions in their planning.**

Page 18

**As part of the economic analysis, the economics function, I also give briefing reports to the CEO when he has to meet with or have conference calls with, say, the Dallas Fed president. The Federal Reserve is interested in getting anecdotal evidences from the -- some CEOs. And this is part of anecdotal evidence, and so they will call and talk to the CEO. And my responsibility is to give the CEO a current-- current state of the way we think about the railroad. That is the economics function.**
**I'm also in charge of planning and forecasting. For planning and forecasting, what we do there is -- the business units are responsible for the plans, but then they -- when they put it together, they bring -- they give it to my group, and I support the chief marketing officer directly in terms of that function where we provide him those numbers for the plan, the revenue involving plans.**
**Then we also -- I'm also in charge of long range planning, strategic planning, long range forecasting. I am in charge of competitive analysis as to helping the company understand how our market share is doing, is it up or is it down, comparative landscape.**
**I'm also in charge of executive and matrix support. Our business units are all matrix. I've got**

Page 19

**five direct reports, four of whom are matrix to business units. So I am directly responsible for their support in the marketing group.**
**And one -- my last function there is systems, where we support the data that marketing uses. So we are basically the custodian. Even though TS will put the data together, we have to figure out, is the data right or is the data wrong then? So that's my --**
Q. Who are your five direct reports?
**A. Five direct reports, I've got Michael Wade, who is -- supports me in coal. I've got Bill Baum, B-A-U-M, who supports me with the ag group, agricultural products. I have Pete Schmitz, who supports me in the -- Pete Schmitz, who supports me with industrial products. And I've got John Tweet, who is my systems guy. And last but not the least, Mark Norton, and Mark Norton is responsible for consumer products.**
Q. In your position as the chief economist of BNSF, to whom do you report?
**A. I report to the vice president of marketing support, and his name is Paul B. Anderson.**
Q. Have you reported to Mr. Anderson since you assumed the position of chief economist in November of 2002?
**A. No. I first reported to an AVP, and at that**

Page 20

**time his title was AVP of -- called MDS&P AVP. MDS&P, which stands for marketing decisions support and planning.**
Q. What was his name?
**A. And his name was Nick Murray.**
Q. What's an AVP?
**A. Assistant vice president. And Paul is a vice president.**
Q. Have you reported to anyone else since you assumed the position of chief economist?
**A. No.**
Q. Now you have had responsibility for developing fuel surcharges for BNSF during your career, have you not, sir?
**A. Uh-huh.**
Q. Now when did you --
MR. WINTERS: You need to answer yes or no.
**A. Yes.**
MR. WINTERS: Verbal answer.
Q. When did you first assume any responsibility, any responsibility for developing fuel surcharges?
**A. My first encounter was in a support role in 1990 for Pat Krick, and I just work for him when we put the first fuel surcharge together. But my real on-hands**

**role actually developing one myself was sometime in 2000, the year 2000. Actually started a little earlier working on it, but we -- it became effective in March of 2000. And that is the intermodal fuel surcharge.**

Q. All right. You testified that you had a support role going back to 1990. What specifically did you do in that support role at that time relative to fuel surcharges?

**A. What -- what I did with Patrick was to do some research to find out fuel surcharge formulas, and so just pulled different information from public sources and basically came up with a formula. So it was more from the mathematical standpoint supporting Pat with that.**

Q. Did the BNSF have a fuel surcharge in 1990?

**A. Yes.**

Q. And what were the -- what were the terms of the fuel surcharge? How did it work?

**A. I think what they -- what they had there was very simply build a strike price. The formula really was the highway diesel fuel divided by a benchmark value and multiplied by the fuel intensity. And at that time what they decided to do was just use a strike price of 28 bucks. And the fuel surcharge, when it kicks in, the threshold was 2 percent, so every time it goes up about**



**2 percent with the surcharge. And I think at that time fuel wasn't up, so it never truly really surcharged a lot. But -- and so it was just the 2 percent. If fuel went above 28 bucks, then they surcharged 2 percent.**

Q. Okay. Now how widespread of application was this surcharge? Did it apply to all of BNSF's traffic, or was it limited in some way?

**A. This was limited -- I think it was just fuel commodities, maybe chemicals.**

Q. So would it be fair to say that this fuel surcharge back in 1990 wasn't widely applied to the company's fuel shipments?

**A. I wouldn't characterize it that way. I think it was -- it was applied, you know, in the chemicals department, but I can't give you the details of that. What I recall is that it was -- it was being paid by some chemical customers.**

Q. A few chemical customers. Is that correct?

**A. I can't -- I can't tell you the details.**

Q. Well, was it applied outside of the chemical shipments?

**A. I don't recall. I don't recall. I know we have the -- we had the -- the fuel program at that time, but I don't recall what -- how effective it was at that time.**



Q. Do you recall how much fuel surcharge revenue the BNSF derived from this program back in 1990?

**A. 1990?**

Q. Yeah.

MR. WINTERS: I just want to say, at this period of time we're talking about the BN, not the BNSF. Just for clarification. It was before the merger.

**A. The BN -- it was -- can you repeat the question?**

Q. Sure. And by the way, when I say the BNSF, I'm referring to the current company and its predecessors. Okay?

MR. WINTERS: Specifically, the Burlington Northern when you're talking about Mr. Kyei's involvement, not the Santa Fe. I just want to be clear about that.

Q. Yeah. I'm just trying to understand, you know, how widespread and how -- what -- the number of shipments, how much revenue. I mean, this fuel surcharge --

**A. I don't --**

Q. What can you tell us about it?

MR. WINTERS: Wait until he finishes his question.

**A. I don't recall -- I don't recall the details**



**of the program at that time. It's been a long time ago.**

Q. Okay. Now you said it was the HDF benchmark, is that correct or the WTI?

**A. It was the WTI. WTI.**

Q. And that's the West Texas Intermediate?

**A. West Texas Intermediate.**

Q. And the HDF is the Highway Diesel Fuel Index?

**A. Yes.**

Q. They're different indexes?

**A. Later on we employed the HDF.**

Q. We're going to come to that. But they're two different indices?

**A. Uh-huh.**

Q. Okay. Now you then said that you -- your first hands-on role was in 2000 with respect to intermodal?

**A. Uh-huh.**

Q. Tell us what you did in 2000 with respect to creating a fuel surcharge for the intermodal traffic?

**A. Okay. What I -- first thing I did when I got the assignment was to look at all the public sources of fuel surcharges, particularly for the trucks, because my first assignment was to research the trucks, what the trucks do. So we did that. We look at every truck fuel surcharge that was out there from public sources, and we**

Page 25

**compared them. And then we built one for our intermodal group. The formula was very similar to -- in terms of its design, very similar to the ones that are familiar with -- working for Pat Krick, which is basically -- in this case we used the highway diesel fuel, divide by the benchmark value times the fuel intensity. And the intermodal fuel intensity was 17 percent at the time. And so every time fuel spiked above a strike price of $1.10, then we surcharged. So -- and all the truck tables that we -- that I researched, all of them, the truckers tended to gravitate towards $1.10 strike price. So that's what we used, $1.10 strike price. And then any time fuel spiked above that, then we surcharged.**

Q. Did the BNSF implement a fuel surcharge for its intermodal traffic as a result of the work you did in 2000?

**A. Yes.**

Q. When was that that it became effective?

**A. I think the effective date was March of 2000.**

Q. Now in addition to the work on a fuel surcharge for the intermodal traffic, did you work on a fuel surcharge that was to be applied more generally to the BNSF's traffic in the year 2000?

**A. Can you please repeat the question?**

Q. Sure.

Page 26

MR. BROCKETT: Can you read it back?

(Requested portion was read.)

**A. In the year 2000, no.**

Q. Okay. Did it come to your attention that the BNSF announced and implemented a fuel surcharge on its nonintermodal traffic in the year 2000?

**A. I don't recall when the carload fuel surcharge also was announced, but --**

Q. Do you know, as you sit here today, that the BNSF announced a fuel surcharge with respect to its carload and other traffic, that is, not intermodal traffic, in the year 2000?

**A. I don't -- I don't recall.**

Q. Okay. Did there come a time that you had some responsibility for developing and implementing a BNSF fuel surcharge that had more general application beyond intermodal traffic?

**A. Can you repeat the question?**

Q. Yes.

Did there come a time when you, Mr. Kyei, were given some responsibility for developing and implementing a fuel surcharge for the BNSF that would apply beyond intermodal traffic?

**A. Yes. I was -- after I got into my new role, which was year 2002, I was asked to put a team together**

Page 27

**to review and implement fuel surcharges. So at this time I had developed the intermodal fuel surcharge. Someone had done some work on the carload fuel surcharge. And so the -- I was asked to -- I had been moved from my group into a new role. Someone had replaced me. And so the guy who was in charge of the intermodal and the guy who was in charge of the carload group all had to be part of this team, and I was made the team lead for that, and our task was to develop a mileage based fuel surcharge.**

**But even before that, in the 2002 time frame, I was also involved in -- 2001. 2001 time frame I was also involved in a team where I was on the intermodal side, there was a gentleman on the carload side to see if we could come to -- if we could synthesize the fuel surcharge programs in intermodal and with -- and in carload, because they were all very different, you know. And at that time, the chief marketing officer, whose name was Chuck Schultz, was interested in seeing if we could raise the strike prices. The elements of the carload fuel surcharge in 2001 and the intermodal fuel surcharge were so very different.**

Q. Okay. Now when you were -- let's talk about the time in 2002 when you were asked to put a team together. First of all, who asked you to put this team

Page 28

together?

**A. In 2003 is when John Lanigan asked me to look at the team to build mileage base fuel surcharge.**

Q. So you were asked by Mr. Lanigan in 2003 to put a team together to look at the surcharges?

**A. Uh-huh.**

Q. Is that correct?

**A. Uh-huh.**

Q. You've got to say yes or no.

**A. Yes, mileage based.**

Q. All right. And who is Mr. Lanigan at this time?

**A. Mr. Lanigan is the chief marketing officer.**

Q. And you understood that your role on this team was to be the team leader. Is that correct?

**A. Yes.**

Q. Now as the team leader of this team, did you take any steps to familiarize yourself with the fuel surcharge programs that BNSF already had in place at that time?

**A. I don't understand the question. What do you mean?**

Q. Well, when you became the team leader of this new team in 2003 --

**A. Uh-huh.**

Page 29

Q. -- okay, did the BNSF have a surcharge -- fuel surcharge that applied to its carload traffic at that time?
**A. Yes.**
Q. And did you as this team leader take steps to familiarize yourself with the program that the BNSF already had in place?
**A. For carload?**
Q. Yes.
**A. Yes.**
Q. And what did you learn?
**A. Well, what I learned was that our carload program at the time was percent of revenue based and the intermodal program was also percent of revenue based. The strike prices at that time had been sent up from the previous team effort that I mentioned in 2001. So the strike price was $1.25, and the fuel intensities for the carload was around 13 percent, and the fuel intensities for the intermodal was around 17 percent.**
Q. And when you say carload, what exactly are you referring to?
**A. Anything that will move in a boxcar. Typical commodities, at this time the coal business had its own fuel surcharge. I think we -- coal is carload. Chemicals, agricultural products were all considered**

Page 30

**carload.**
Q. Does carload essentially mean all of the company's business apart from intermodal?
**A. Basically, yes. Yeah.**
Q. Now did you learn when you became the team leader that the BNSF had a fuel surcharge that had been implemented on January 17th of 2001 involving the WTI index?
**A. Previously, yes, there was a WTI fuel surcharge in the carload area.**
Q. Okay. Am I correct that that was implemented, became effective in January of 2001?
**A. I don't recall the exact date, but --**
Q. Okay. Let's mark as the first exhibit a document produced by BNSF. It's the BNSF rules book 6100-A. Has Bates stamp 0509568 through 0509605.
(Exhibit 1 marked.)
THE VIDEOGRAPHER: Can you move up your microphone, please? It's hitting the table. Thank you.
Q. Are you generally familiar with this document, sir?
**A. No, I'm not.**
Q. Have you ever seen it before?
**A. No, I haven't seen it. I'm familiar with -- I've heard about it, but I've never really looked at it.**

Page 31

Q. Do you know what a BNSF tariff is?
**A. Yes.**
Q. Is this a BNSF tariff, sir?
**A. It looks like a BNSF rules book 6100, yeah.**
Q. In your job as the chief economist, you've never seen a BNSF rules book. Is that correct?
MR. WINTERS: Objection to the form.
Q. You can answer.
**A. I've never seen it.**
Q. Can you turn with me to page 20 of this document. Do you see, sir, that there -- this page describes a fuel surcharge which was issued on January 16th of 2001 and became effective on January 17th of 2001?
**A. Where -- where do -- where is that?**
Q. Top of the page.
**A. Top of the page.**
MR. WINTERS: We'll not make markings on the original exhibits.
**A. Yeah, I see here that it says fuel surcharge issued January 16, 2001, effective January 17, 2001.**
Q. And if I direct your attention to the first paragraph of this page, there's a reference there to a strike price of $28 per barrel based on the WTI. Do you see that, sir?

Page 32

**A. Yes.**
Q. And if we move down to the middle of the page, there's a fuel surcharge table. Do you see that?
**A. Uh-huh.**
MR. WINTERS: You need to answer yes.
**A. Yes.**
Q. And this fuel surcharge table set forth -- sets forth what the fuel surcharge percentage will be based on the price of the WTI index. Do you see that?
**A. Yes, I see that.**
Q. Okay. Now does this document refresh your recollection that the BNSF implemented a percentage based fuel surcharge based on the WTI with a strike price of $28 per barrel on or about January 17th of 2001?
MR. WINTERS: Object to the form.
**A. I think I told you that at this time I was in intermodal, and so I was not in charge of the carload. I did not develop it. And so yes, this may look like -- you just put the document in front of me, and this document says what it says, but I was not involved with it and I didn't know about it.**
Q. Okay. So this is not one of the documents that you reviewed when you became team leader and looked into the company's surcharges at the time. Is that

Page 33

correct?
**A. Not this document.**
Q. Okay.
**A. But I was generally familiar with the carload -- whether the carload guys had a fuel surcharge.**
Q. Okay. Does this document refresh your recollection that after you became team leader and began to investigate the company's fuel surcharge program that there, in fact, was such a program that became effective on January 17th of 2001? Did you learn that?
**A. I don't -- I don't recall the specific dates, and I think I told you that.**
Q. Do you recall this particular surcharge?
**A. I recall this surcharge, the 28 bucks and -- around that time, and I think I told you that.**
Q. Do you recall, sir, when you became team leader and did your investigation that in July of 2001, the BNSF changed its carload fuel surcharge from the WTI index to the HDF index?
**A. Yes. That was -- I was on a team to specifically -- remember I told you that when Chuck Schultz put the intermodal guy, me and Tom Jacobowski, who was the carload guy, together to review, that he was interested in syncing up those tables. So we went to**

Page 34

**highway diesel fuel. And so I was on the team, so I'm very familiar with that.**
Q. Okay. And do you remember when it was that the company went to the HDF index as opposed to the WTI index?
**A. Remember that I told you for intermodal, we were already on HDF. In 2000 we had an intermodal fuel surcharge that was HDF.**
Q. Okay. I'm not talking about intermodal right now. I'm talking about carload. Okay. Can you tell me, as you sit here today, do you have a memory of when with respect to the carload fuel surcharge the company changed from WTI to HDF?
**A. I think it was sometime in 2001, but I don't recall the exact date.**
MR. BROCKETT: Let's mark as Exhibit 2 a document, another rules book dated January 1, 2001. It bears a Bates stamp BNSF 0510974 through 0511016.
(Exhibit 2 marked.)
Q. Now Mr. Kyei, just take a quick look at the first page of this document, and my first question to you is whether you've ever seen it before.
**A. No, I have not.**
Q. Do you see that this is also a BNSF rules book 6100 -N?

Page 35

**A. Yes.**
Q. And this is not a document that you would have encountered in your positions in the company. Is that correct?
**A. No, there was -- as I told you before, there was a gentleman called Tom Jacobowski, and in all those meetings he is the guy who deals with that, not me.**
Q. Okay. Well, I'll ask you about this later.
Can you turn to page 24, please. Do you see here, sir, that there's a reference to a fuel surcharge becoming effective on July 1 of 2001?
**A. Uh-huh.**
MR. WINTERS: You need to answer yes.
**A. Yes.**
Q. And if you look in the first paragraph, there's a reference to the HDF index, the price of retail on highway diesel fuel index.
**A. Uh-huh.**
Q. You have to say yes or no, sir.
**A. Yes.**
Q. Okay. And then if we go to the middle of the page, there is a fuel surcharge table.
**A. Yes.**
Q. Do you see that?
**A. Yes.**

Page 36

Q. And the fuel surcharge table sets forth the applicable fuel surcharge that will be applicable depending on the price of the HDF index. Correct?
**A. Yes.**
Q. Now does this page describe the BNSF carload surcharge based on the HDF index that became effective on July 1 of 2001?
**A. Yes, it is.**
Q. And does this refresh your recollection that the BNSF switched from the WTI to the HDF index in July of 2001?
**A. I told you that I was on a team for us to do exactly that. The date is what I didn't recall, so this establishes the date for me. But I told you already that I was involved in a team to do exactly this.**
Q. Okay. Well, you told me that you were involved in a team in 2003. Is that correct?
**A. I was involved in two teams. There was a preteam before which Chuck Schultz put together.**
Q. Okay.
**A. That included me and Tom Jacobowski, and I think I mentioned that. And that was to sync up the carload program and the intermodal program. The intermodal was already on HDF and carload wasn't. And so this is the result of that where now carload goes to**

Page 37

**highway diesel fuel.**
Q. Okay. So am I hearing you correctly that the change from WTF (sic) to HDI (sic) for carload fuel surcharge was one made at the recommendation of the committee in which you participated. Is that correct?
**A. Yes.**
Q. And that was Mr. Chuck Schultz's committee?
**A. You bet.**
Q. And you were the one -- you participated on that committee as a representative of the intermodal business. Is that correct?
**A. Yes.**
Q. And Mr. Jacobowski, was he on the committee?
**A. He was, and he was --**
MR. WINTERS: I think he said team.
**A. Team.**
Q. Sorry. Okay. Team.
**A. Yeah. And Jacobowski was the carload -- on the team for the carload.**
Q. And your team recommended that the BNSF carload surcharge be synced up with the intermodal surcharge and use the HDF index?
**A. Yes.**
Q. Now the -- do you understand the term interline or joint rates?

Page 38

**A. Yes, I do.**
Q. Okay. What does that mean to you?
**A. Interline is where we interchange traffic to another railroad, and a joint rate is where there's one rate for that whole move, that whole interline move.**
Q. Now would you agree with me that the fuel surcharge program that's described in this document on page 24 applicable to carloads is a fuel surcharge program that governs shipments -- interline shipments, as well as local shipments?
**A. Yes, it does.**
Q. And the team that you were working on was working on a fuel surcharge that would be applicable to both interline rates and to local rates. Is that correct?
**A. Yes.**
MR. BROCKETT: Let's mark as Exhibit 3 some e-mails. The first page of the e-mail bears the Bates stamp BNSF 0033167 through BNSF 0033168.
(Exhibit 3 marked.)
Q. Now Mr. Kyei, I've handed you what we've marked Exhibit 3, which is a string of e-mails. I realize that you're not an author or recipient of these e-mails, but I want to ask you a question about it anyway. Do you know who Brian Large is?

Page 39

**A. Yes, I do.**
Q. Who is Brian Large?
**A. Brian Large works for -- for BNSF. He's now in the engineering team.**
Q. And who is Shawn Uphaus?
**A. Shawn Uphaus was in our finance department and I think is currently in the cost group.**
**(Reporter clarification.)**
Q. Now on the second page of these e-mails you'll see that there's a chain of e-mails between Brian Large and Shawn Uphaus in which Shawn asks Brian, When did the BNSF first put in a fuel surcharge? Do you see that at the bottom?
**A. Okay.**
Q. Do you see that question being posed, sir?
**A. Uh-huh.**
Q. You have to say yes.
MR. WINTERS: You have to say yes or no.
**A. Yes.**
Q. And Mr. Large answers, The generally accepted start date for the major program is 2001. Do you see that?
**A. Yes, I see that.**
Q. Now do you agree with that, sir? Is that the start date of the first major fuel surcharge program,

Page 40

2001?
MR. WINTERS: Objection to the form.
**A. I already told you that we had fuel surcharges in the '90s. This is saying a generally accepted date, and there is a context to that. And so unless you can tell me which context, I can't -- I disagree from the standpoint of the fact that we had fuel surcharges in the '90s. There might have been a context --**
Q. So you disagree with this statement here?
MR. WINTERS: Objection to the form.
**A. I told you we had fuel surcharges in the '90s.**
Q. Okay. Do you disagree with the statement that the generally accepted start date for the major program is 2001? Yes or no?
MR. WINTERS: Objection to the form. He's answered the question.
Q. You need to answer me yes or no.
**A. I told you -- I told you that we had fuel surcharges in the '90s.**
Q. Look on the first page of this e-mail. Who is George Gillen, sir?
**A. George Gillen is -- he's director for price management, so he replaced Tom Jacobowski, and Jacobowski moved from -- to carload fuel surcharge.**
Q. Now you see on the first page Mr. Gillen has

Page 41

an e-mail on which he weighs in on this question, and he says that there were fuel surcharges in the early 1990's, but it apparently had no real application until February of 2000. Do you see that?
**A. Uh-huh.**
Q. Yes?
MR. WINTERS: Yes?
**A. Yes, I do.**
Q. Do you agree with that statement, sir?
MR. WINTERS: Objection to the form.
Q. You have to answer me yes or no. Do you agree with the statement?
MR. WINTERS: Objection to the form.
**A. Can you rephrase?**
Q. Sure, I'll rephrase the question.
You see Mr. Gillen acknowledges that there were fuel surcharges in the early 1990s. Correct?
**A. Uh-huh. Yes.**
Q. And he goes on to say, Those early fuel charges apparently had no real application until February 2000. Do you see that, sir?
**A. Yes.**
Q. That's his statement. Right?
**A. That's his statement.**
Q. Now do you agree with that statement?

Page 42

MR. WINTERS: Objection to the form.
**A. I agree with the statement in the context -- if the context is that it did not collect a lot of money. Okay. That is my view of what he's attempting to say, but he has agreed that there were fuel surcharges in 2000.**
Q. And now you're testifying, you're saying that the fuel surcharges in the early 1990s didn't collect a lot of revenue for the company. Is that correct?
**A. You said it.**
Q. No, sir. I'm asking you if that's true.
MR. WINTERS: Well, objection. I think --
**A. I think I answered.**
MR. WINTERS: I think he already testified to it.
**A. I said that fuel surcharges that were put in place in 2000 weren't collecting a lot of money because fuel wasn't a big deal. Fuel wasn't rising a lot in those years.**
MR. BROCKETT: Mark as Exhibit 4 a two page document. It's a BNSF e-mail. It bears Bates stamp BNSF 0330723 through 724.
(Exhibit 4 marked.)
Q. Now Mr. Kyei, you see the first page of this

Page 43

is an e-mail that you wrote in January of 2001?
**A. I don't see the e-mail.**
Q. Well, on the first page there's an e-mail header at the top. It says from Sam Kyei to a number of people January 10, 2001. Do you see that?
**A. Yes, I see that.**
Q. All right.
**A. But I don't see an e-mail string.**
Q. Okay.
**A. I don't see an attachment.**
Q. No, you're correct. It's a blank page.
Now the people to whom you wrote this, Sam, Jacobowski, Tom Milton, Lee Herb, and somebody named Renita --
**A. Renita, yes.**
Q. Are those the members of the surcharge team on which you participated in 2001?
MR. WINTERS: Objection. I think you got the names wrong.
MR. BROCKETT: Did I?
MR. WINTERS: The last name and then the first name.
MR. BROCKETT: Okay.
Q. Okay. Are the addressees here --
MR. WINTERS: Clear up the record on

Page 44

that.
Q. -- the names of the people who were on the team, the 2001 team that addressed surcharges that you previously testified about?
**A. Yes.**
Q. Now this was not the team that you headed up. Is that correct, sir?
**A. Yes, I was not the lead on this.**
Q. Okay. On the second page, there is an e-mail from a Todd Olsen to you and Tom Jacobowski on January 4th of 2001. Do you see that?
**A. Yes, I do.**
Q. Okay. And there's a reference to Chuck's staff meeting of yesterday. Do you see that?
**A. Uh-huh. Chuck's staff meeting. Uh-huh.**
MR. WINTERS: Is that a yes?
**A. I see that.**
Q. And that's Chuck Schultz who at the time was the chief marketing officer. Is that correct?
**A. Yes.**
Q. Now this was the team that was looking at surcharges, and your participation was a representative of intermodal. Is that correct?
**A. Yes.**
Q. Okay. And this team, according to this

e-mail, was to refine and define BNSF's fuel surcharges policy going forward. Do you see that?
**A. Yes, I see that.**
Q. And it says that Mr. Schultz would like to see a plan presented at the end of the first quarter of 2001. Correct?
**A. That's what he says.**
Q. Okay. And this team was the team that recommended the switch from the WTI to the HDF. Is that correct?
**A. I think I already testified to the fact that at the end of -- end of our objectives, we -- the fuel surcharge program for carload also shifted to highway diesel.**
Q. And why did you make that recommendation?
**A. Well, as part of the team and some of the things we looked at was regression analysis where we regressed the WTI against BNSF's wholesale fuel prices. We regressed the HDF, which is the highway diesel, against BNSF diesel prices. And we looked at it every which way possible. And what we found was that the highway diesel fuel surcharge had about a 99 percent R-squared with our fuel prices, while the HD -- the WTI had a 93 percent R-squared roughly.**
Q. What does R-squared mean?



**A. R-squared is a statistical measurement that would tell you or measure how -- how good is the correlation between two things. So in this case, it was saying that any -- any change in trend of the highway diesel will correspond to a changing trend in the BNSF price.**
Q. And who was -- strike that.
Was Mr. Jacobowski the leader of this team?
**A. Well, because the two of us -- I was the general director. Jacobowski was a general director. They didn't appoint a leader for the team. They just said you two guys go work together and come up with some results.**
Q. So you did --
**A. And so we had a lot of people supporting us.**
Q. Okay. So you did a lot of regression analysis --
**A. Yes.**
Q. -- before you came up with this recommendation?
**A. Uh-huh.**
Q. Is that correct?
**A. Yes.**
Q. And you believe in the reliability of regression analysis, do you not?



**A. Yes, I do.**
Q. Now how many meetings did this team have?
**A. I don't --**
Q. Let's call this the 2001 team.
**A. I don't recall.**
Q. Can you give me a rough estimate?
**A. I don't recall. We had -- we had meetings regularly, but I don't recall how many.**
Q. And so as a result of the recommendations of this team, as of July of 2001 the BNSF fuel surcharge was the same for both carload and intermodal. Is that correct?
MR. WINTERS: Objection to the form.
**A. Can you rephrase the question?**
Q. Sure.
**A. I didn't understand the question.**
Q. We've established that the -- as a result of the recommendation of your team, the carload surcharge moved from the WTI index to the HDF index. Correct?
**A. Yes.**
Q. And at the time the intermodal fuel surcharge was already on the HDF index. Correct?
**A. Yes.**
Q. Okay. So am I correct in understanding that as a result of the recommendation you made, the BNSF



surcharge became the same for both carload and intermodal?
MR. WINTERS: Objection to the form.
**A. I did not say that.**
Q. Okay. Well, explain to me why that's wrong.
**A. Okay. What I said is the -- the fuel index became the same, but the fuel intensities weren't the same. I mean, our intermodal burns more fuel than carload, so why would -- why would we make the intensities the same?**
Q. Okay. So the indices were the same, but the formulas in the application of the indices were different. Is that correct?
**A. The formulas were different. The indexes were the same. The strike prices became the same, but the intensities were different.**
Q. Anything else, other than intensities different between the two programs?
**A. And because of that, the tables were a little different.**
Q. Okay. I'm going to show you a document produced by BNSF. It bears the Bates stamp BNSF LOG 0000054 through 56. Three page e-mail.
(Exhibit 5 marked.)
Q. All right. Mr. Kyei, do you recognize this as

Page 49

an e-mail from a Renita Lee? Is that correct?
**A. Yes.**
Q. And who was Renita Lee?
**A. Renita Lee works in intermodal, and at that time she reported to me.**
Q. And this e-mail is dated February 15th of 2001. Correct?
**A. Yes, that's what I see here.**
Q. And it's to you and Mr. Jacobowski and a number of other people. Do you see that?
**A. Yes.**
Q. Are the addressees here the members of the team that you referred to that was established in 2001 to look at fuel surcharges?
**A. Yes.**
Q. The subject of this e-mail is fuel surcharge modification. Do you see that?
**A. Yes, I do.**
Q. Okay. And it refers to a meeting that was held on January 30th of 2001. Do you see that?
**A. I don't. Where --**
Q. Right below the land?
**A. Yeah.**
Q. And it summarizes a few key points that were made at the January 30, 2001 meeting. Do you see that?

Page 50

**A. Yes.**
Q. Do you recall that meeting, sir?
**A. I recall one meeting at the time. I don't recall the specific meeting.**
Q. Do you recall whether this was the first meeting of this team?
**A. I don't recall.**
Q. And there's a reference here to a meeting being rescheduled from the next meeting being reschedule from March -- I'm sorry, from February 15th to March 1st. Do you see that?
**A. Yes.**
Q. Now under the heading, A few key points for meeting on January 30th, 2001, there are a number of bullet points. Do you see that, sir?
**A. Yes, I do.**
Q. And under -- strike that.
One of the bullet points says, Tom J. will check at the industry meeting in February to see if the AAR would establish a fuel surcharge formula similar to RCAF. Do you see that?
**A. Yes, I do.**
Q. Have I read that correctly?
**A. It says, Tom J. will check at the industry meeting in February to see if the AAR would establish a**

Page 51

**fuel surcharge formula similar to RCAF.**
Q. And then it goes on to state, This would provide a consistent formula for all rail carriers and would probably be more accepting by customer as well. Do you see that?
**A. Yes, I do.**
Q. Now who kept these -- strike that.
Were there minutes of these meetings that were kept?
**A. I -- I know that they kept some points. I don't know if they kept minutes everywhere. Renita was responsible for setting up the meeting, so --**
Q. Was Renita or anyone responsible for making any kind of written record of what was discussed at the meeting?
**A. I don't recall if -- if we made it her role. Sometimes we made -- she -- she had notes; sometimes she didn't. I don't recall if there was a specific assignment to always have minutes.**
Q. Do you know what industry meeting is being referred to here?
**A. I don't recall what that industry meeting was, but I think it was -- what it means here is simply to ask someone in the AAR whether they are going to produce a fuel surcharge.**

Page 52

Q. Do you remember this discussion of this topic at this meeting?
**A. I remember that, yeah.**
Q. And what was said?
**A. I remember -- I remember that the -- eventually after he came back, he said no, the AAR said no.**
Q. Okay. Well, I'm not asking about what he said when he came back. I'm asking about what was said at the meeting that's referred to here on January 30 of 2001.
**A. Okay.**
Q. Can you tell me what was said on this subject at that meeting?
**A. Whether there is going to be an industry wide fuel surcharge put out by the AAR. In other words, we should find out as a team, is the AAR thinking about putting a fuel surcharge in? If there is, then we -- probably that will be what everyone goes to and we don't have to waste our time developing all these fuel surcharges.**
Q. And who made those statements, sir?
**A. Say that again.**
Q. Who made those statements?
**A. I don't recall. I think it was -- it was --**

Page 53

**came out at the meeting. I remember it coming out at the meeting, but I don't recall specifically who -- who recommended or requested that Tom look at that.**
Q. Okay. Did you say anything on this subject at the meeting?
**A. I don't recall the specifics, but I was in the meeting. I remember the meeting, and I'm sure I -- I had different things to say in the meeting, but I'm not sure about this particular one. I don't recall it.**
Q. Who said that a consistent formula for all rail carriers would be more accepting by customer?
MR. WINTERS: Objection to the form.
Q. Who said that, sir?
MR. WINTERS: Objection. Form. Lack of foundation.
**A. I don't think anybody said in the meeting -- I don't recall anybody saying that in the meeting.**
Q. Okay. Well, somebody took -- Ms. Renita Lee recorded that that statement was said at the meeting here on this e-mail. Correct?
MR. WINTERS: Objection to the form. Lack of foundation.
**A. I don't recall.**
Q. Well, that's what she says here, isn't it?
MR. WINTERS: Objection.

Page 54

**A. I don't -- I don't recall, and -- and I don't -- I don't think -- what it means to me is this: We have a team. The team has to develop fuel surcharges. If the AAR is going to put one out, let's find out before we, you know -- that is all it means. That's what it means to me.**
Q. Did you believe at the time that an AAR establishing a common surcharge for the whole industry would be more accepting by your customers? Did you believe that?
**A. Can you rephrase the question?**
MR. BROCKETT: Do you want to read it back? I think it's very clear.
(Requested portion was read.)
**A. I have not thought about it that way. I don't have an opinion as to --**
Q. Did someone express that opinion at this meeting, sir?
**A. I don't recall.**
Q. Now if you look at the second page of this e-mail, down at the bottom there's a heading called, Marketing and Pricing. Do you see that?
**A. Yes.**
Q. And there's a statement here that says, quote, Only 19 percent of carload takes fuel surcharge.

Page 55

Forest, coal and ag don't apply a fuel surcharge. Chuck will have to address this. Do you see that?
**A. Uh-huh.**
Q. You have to say yes, sir.
**A. Yes.**
Q. Okay. Do you remember anyone stating this at this meeting?
**A. I don't recall the specifics.**
Q. Is this a true statement, sir, that at this time in February of 2001, only 19 percent of your carload traffic had a fuel surcharge attached to it?
MR. WINTERS: Objection to the form. That's not exactly what the document says.
**A. The document says only 19 percent of the carload takes fuel surcharge. Forest, coal, ag don't apply a fuel surcharge.**
Q. And as a member of this team, do you believe that to be a true statement, sir, at this time?
**A. I don't recall the details of what -- what the -- what the fuel participation rates were at that time.**
Q. Does this sound about right?
**A. But the document is just saying only 19 percent of carload takes fuel surcharge. Forest, coal and ag don't apply a fuel surcharge.**

Page 56

**Recommendation, Chuck has to address it.**
Q. My question to you is: As a member of this team, were these statements true as of the time they were made in February of 2001?
MR. WINTERS: Objection. He's answered the question.
Q. You can say yes, no or I don't know.
MR. WINTERS: Or provide more context.
**A. Here's your answer. The document says only 19 percent of carload takes fuel surcharge. Forest, coal and ag don't apply a fuel surcharge. The team -- add in context, the team suggest to Chuck, Chuck, please address it because your participation is low.**
Q. Do you have any facts, as you sit here today, to suggest that these statements were untrue as of the time they were made, February 2001?
MR. WINTERS: Objection to the form.
**A. The statement says --**
Q. Sir, do you have any facts to suggest or to establish that these statements are untrue?
MR. WINTERS: Objection to the form. I think he's answered the question.
**A. Our participation was low at that time.**
Q. And my question is: Do you have any facts that you can offer the jury as you sit here right now

today to suggest these statements were untrue?
MR. WINTERS: Objection to the form.
Q. Do you understand my question?
**A. The document itself is saying only 19 percent of carload takes a fuel surcharge. Forest, coal and ag don't apply a fuel surcharge. And so we were -- our recommendation was to Chuck that your participation was low.**
Q. Now --
MR. BROCKETT: Let's get the next e-mail. Let's mark as Exhibit 6 a document -- an e-mail. Bears Bates stamp BNSF 0121901 through BNSF 0121903.
(Exhibit 6 marked.)
Q. Okay. Now Mr. Kyei, do you recognize this as a string of e-mails, sir, among the members of the committee, the -- strike that -- the 2001 team that was established of which you were a part?
**A. Yes, I do.**
Q. Okay. And on the first page there's an e-mail from a Herb Milton to yourself, Tom Jacobowski and a number of others. Do you see that?
**A. Yes.**
Q. And it's dated March 5th of 2001?
**A. Uh-huh. Yes.**
Q. And then the content of the e-mail includes



the minutes from the meeting of 3/1 of 2000. Do you see that? I'm sorry, 2001.
**A. Uh-huh.**
MR. WINTERS: It actually says '00.
Q. It says '00. Do you believe that that should be 2001, sir?
**A. When you look at the when under the subject, says March 13, 2001. So --**
Q. Okay. So the prior e-mail talked about a meeting on January 30th. This e-mail talks about a meeting that occurred on March 1st of 2001, and it provides minutes of the March 1st meeting. Is that correct?
**A. I think that's -- that's how I interpret it.**
Q. And then it also refers to rescheduling the next meeting from March 6th to March 13th. Do you see that?
**A. I don't see the reschedule.**
Q. The first sentence in the e-mail, Due to conflict in schedules I would like to reschedule the March 6th meeting to March 13th. Do you see that?
MR. WINTERS: At the bottom.
THE WITNESS: Oh, okay.
**A. Okay. Yes, I do.**
Q. All right. Now it shows in the minutes of the



March 1st meeting that you were present. Correct?
**A. Yes.**
Q. And Mr. Jacobowski was present. Correct?
**A. That's what it says.**
Q. All right. And it has a number of bullet points that summarize the discussion at the March 1st meeting. Do you see that?
**A. Yes.**
Q. And the first bullet point says -- and I'll read it -- Tom J. provided feedback from rail carriers regarding the concept of establishing an industry wide fuel surcharge formula. Rail carriers unanimously chose not to act on an industry standard fuel surcharge. Do you see that, sir?
**A. That's what I read --**
Q. Now do you remember Mr. Jacobowski making a report to the team at this meeting on March 1st of 2001 on this subject?
**A. I remember him coming back and says the AAR will not do -- will not do an industry wide fuel surcharge.**
Q. Well, that's not what this says, is it, sir? That's not what the minutes state, is it?
**A. That's what it means.**
Q. That's not what the minutes state, is it, sir?



**A. Well, I'm telling you what it -- what it means is him coming back, go check with the AAR to see if there will be an industry wide fuel surcharge, and the answer was no.**
Q. Now, sir, you have to answer my question directly. Okay. Now it says in these minutes that Mr. Jacobowski discussed with other rail carriers providing an industry wide formula. Isn't that correct, sir?
MR. WINTERS: Objection to the form. The document speaks for itself, and that's not what it says.
MR. BROCKETT: You can limit your objections to objection to question -- objection to the form. I don't need speaking objections.
Q. Isn't that --
**A. I'm answering the question. This is what it means to first -- in your previous document you showed me, it says, go ask the AAR. Well, he came back, and he said the AAR says no. So how we go from -- I'm telling you what it means.**
Q. It says in the minutes of the meeting that Mr. Jacobowski reported at this meeting on his discussions with other rail carriers about establishing an industry wide fuel surcharge formula. Does this document state that or not, sir?

Page 61

MR. WINTERS: Objection to the form, lack of foundation. The question's been answered, and you're mischaracterizing the document.
**A. I'm telling you what that means.**
Q. You have to answer my question.
**A. I'm answering your question.**
Q. You have to answer it directly, sir. Can you do that for me?
**A. Directly, the answer is that Tom Jacobowski went to the AAR to -- where he was asked to ask the AAR if they will put a fuel surcharge formula industry wide. His answer came back, The AAR said no.**
Q. Okay. The minutes --
**A. That is to the best of my knowledge.**
Q. Okay. The minutes of this meeting state on the page 2 that rail carriers unanimously chose not to act on industry standard fuel surcharge. Do you see that, sir?
**A. I see that.**
Q. Have I read that correctly?
**A. I don't know -- I don't know --**
Q. Have I read that correctly, sir?
**A. That's what you read, and that's what I see in front of me.**
Q. Okay. It doesn't say the AAR unanimously

Page 62

chose not to act on industry standard fuel surcharge, does it?
MR. WINTERS: Objection to the form. This is badgering. The document says what it says.
MR. BROCKETT: Give me straight answers to the question, and we'll move on quicker.
MR. WINTERS: He can read the document. The document says what it is says. The words on the page we can all read.
Q. It doesn't say the AAR unanimously chose not to act on industry standard, does it, sir? Yes or no?
**A. I told you that -- you're putting two documents, one that specifically directs him to go to the AAR with some other document that says -- has this on it, and then you're making the -- and I'm telling you what it meant was for him to go ask the AAR at a meeting that he was going to -- I don't recall that meeting -- whether they would put together a fuel surcharge for the industry.**
Q. Who prepared these minutes?
**A. It looks like it's coming from Herb Milton.**
Q. And who was Herb Milton?
**A. Herb Milton worked for me in intermodal.**
Q. Okay. And do you know Herb Milton to be a person who would -- strike that.

Page 63

Do you know Herb Milton to be a careful person?
**A. I don't doubt that he wouldn't be.**
Q. Okay. Do you have any reason to believe Herb Milton wouldn't accurately record the minutes of what was discussed at this meeting, sir?
**A. I've told --**
Q. Do you have any reason to believe Mr. Milton wouldn't accurately record the minutes of this meeting, sir?
**A. I told you what I think Herb Milton's -- what this document says.**
Q. I just asked you a different question. You have to answer me. Do you have any reason to believe Mr. Milton wouldn't accurately record the conversations that occurred at this meeting?
**A. I -- I see what it means to me. And I don't know if you don't see it, but I think the trail of information that you've shown me seems to point to the fact that the -- the original AAR request that Tom Jacobowski was going to seek is not included here.**
MR. BROCKETT: Okay. We're going to be here a long time if I can't get straight answers to my questions. Gary, do you want to talk to your witness?
MR. WINTERS: No.

Page 64

MR. BROCKETT: My question is very simple.
MR. WINTERS: No, I think you've asked the question multiple times. The document says what it says. We can all read it. The words on the page say what the words on the page -- we'll stipulate that the words on the page say what they say. I don't think you need to keep pressing this.
Q. Do you have any reason to believe that Herb Milton wouldn't accurately record in these minutes what was discussed at this meeting?
MR. WINTERS: Just focus on that question and answer that question.
**A. Can -- can you rephrase the question?**
Q. Do you have any reason to believe that Herb Milton wouldn't accurately record in these minutes the conversations that occurred at this meeting?
**A. I -- from my knowledge, I believe that what this document means to say is that Tom Jacobowski -- we gave Tom Jacobowski an assignment to find out whether the AAR will put together an industry fuel surcharge, and Tom came back and reported no.**
Q. That's not my question, sir.
MR. WINTERS: Just focus on his question. Focus specifically on his question.

**A. Can you repeat the question then?**
Q. Do you have any reason to believe that Herb Milton would not accurately record in these minutes the conversations that occurred at this meeting?
**A. This particular comment, the way it's phrased was not accurate.**
Q. So you're saying that these minutes don't accurately reflect what was discussed at the meeting. Is that correct?
MR. WINTERS: Objection to the form.
**A. I am saying that particular sentence -- that particular first sentence, Tom Jacobowski's feedback from railcar is, et cetera, et cetera, was not accurate. It's mis -- it was supposed to -- it doesn't reflect the assignment he had. If you read -- the assignment was to ask the AAR at an industry meeting, so --**
Q. Do these statements --
MR. WINTERS: He's not finished with his answer.
MR. BROCKETT: Okay.
MR. WINTERS: Let him finish his answer.
MR. BROCKETT: Sure.
**A. And so that answer at the meeting, to the best of my recollection, was no, there wouldn't be an industry fuel surcharge put in place by the AAR.**



MR. WINTERS: I think you have your answer now.
Q. Do the first two sentences here of this bullet point accurately reflect what was stated at this meeting?
**A. I think I answered that.**
MR. WINTERS: Objection to the form. Mr. Brockett, I really think you're badgering him at this point. You've asked this question multiple times. The document says what it says. He asked your question -- he answered your question about whether Mr. Milton would accurately record it. He just gave you a complete answer to that question, and I just don't think there's any point in continuing to question on this.
Q. You need to answer my question, sir.
MR. WINTERS: I have objection to the form.
**A. Can you repeat your question?**
Q. Do these two statements -- excuse me. I'll rephrase it.
Do the following statements accurately reflect discussion at this meeting? The two statements are: Tom J. provided feedback from rail carriers regarding the concept of establishing an industry wide fuel



surcharge formula. Rail carriers unanimously chose not to act on an industry standard fuel surcharge. Do those two statements accurately reflect what was discussed at this meeting?
MR. WINTERS: Objection to the form. This has been asked and answered multiple times, and I think we're getting to the end of the point where you can continue to ask this question. At some point we're going to have to stop.
**A. I think I told you that those two statements weren't accurate.**
Q. They're inaccurate. Is that your testimony? They're inaccurate?
**A. It's your words, not mine.**
Q. Well, I'm asking: What is your words? Are they accurate --
**A. My words are these --**
MR. WINTERS: Objection. Objection. Objection. Sam has already answered -- Mr. Kyei has already answered your question.
Q. You've used a term "fuel intensity." What do you mean by fuel intensity?
**A. Fuel intensity is -- let me give you the -- my definition. It's just how much fuel expense we have to either the total cost or the total variable cost.**



**People use it differently depending on -- but it's mostly the ratio of fuel to total expenses.**
Q. Okay. Now you testified that as a result of the work you did with this committee, you discovered that the fuel intensity for carload was 13 percent and intermodal 17 percent. Is that correct?
**A. Intermodal 17 percent. The carload what they chose was 13 percent, which at that time was the overall corporate fuel to expense ratio.**
Q. Now to determine the fuel surcharge, how often do you measure the fuel intensity?
**A. Can you rephrase the question?**
Q. Yeah. How often is fuel intensity measured in this formula?
**A. It depends. If we are restating the formula, then we would go in and remeasure it. So I mean, once we put the formula together, fuel intensity is not remeasured until -- if the formula is going -- needs to be revised or if there is any need to relook at it.**
Q. Does fuel intensity change over time?
**A. Fuel intensity does change over time.**
Q. Okay. So, for example, do changes in fuel efficiency, do those change the fuel intensity calculus?
**A. Can you repeat the question?**

Page 77

**A. I know that railroads report some expense information in SEC filings, yes, but I don't have access to them. I don't go looking for them and --**

Q. So you know SEC filings are public information, don't you? You know that, sir, don't you?

**A. I do. I do, but --**

Q. So if you wanted to find the fuel cost of the UP or the NS or CSX, you, as a chief economist at BNSF, could easily obtain that information, couldn't you, sir?

**A. I could go to the outlines and things like that to get -- to get some cost information, yes. Some of it is public, but as I told you, I was not interested in looking at any other railroads' information as far as highway diesel fuel surcharge regressions would look like.**

Q. But you acknowledge, as you sit here today, that if you wanted to know UP's fuel cost, you could get that information. Isn't that true?

**A. I could get it in aggregate.**

Q. You could get UP's total fuel cost. Correct?

**A. The total, yes, but from -- as you probably have looked at BNSF's fuel surcharge programs, you would -- it does you no good if you are building a fuel surcharge table where the intensities are different by commodity, and so the aggregate really -- you can't**

Page 78

**apply it or use it for -- for surcharging fuels.**

Q. Would you expect that the BNSF -- strike that.

Would you expect that the fuel intensities applicable to the BNSF would be different than the fuel intensities applicable to the other class 1 railroads?

MR. MEYER: Objection. Lack of foundation.

**A. Can you repeat your question?**

Q. Sure.

I'm trying to understand if fuel intensity would be the same across railroads. Would you expect that the fuel intensity of your company, the BNSF, would be the same as the fuel intensities applicable to the other major class 1 railroads?

MR. MEYER: Same objection.

**A. I haven't thought about other railroads. That's not my function, and that's not what I worry about when I'm thinking about helping my company surcharge for fuel.**

Q. Okay. I understand you may not have thought about it, but I'm asking you: As you sit here today, would you expect that different railroads would have different fuel intensities?

MR. WINTERS: Object to form.

MR. MEYER: Object to the lack of

Page 79

foundation.

**A. I don't look at other railroads' fuel intensities to -- to be able to figure them out, so I haven't thought about it, and I am not interested in looking at it. So --**

Q. Could you calculate the fuel intensity of the UP if you wanted to?

**A. I doubt it. Why would I -- what type of fuel's intensity are you talking about?**

Q. I'm talking about the expression of fuel intensity, the same fuel intensity that you said was part of your fuel surcharge information?

**A. Well, remember what I told you is we have carload and we have intermodal fuel surcharges all that have different intensities.**

Q. I'm talking about the carload intensity.

**A. If -- how would I know UP's carload fuel cost? I've never seen anything like that anywhere.**

Q. And it's your testimony --

**A. I don't think they report anything, and I'm not interested in looking at other railroads' fuel surcharges.**

Q. Okay. Could you call up UP and ask them to share that information?

**A. Can you repeat the question?**

Page 80

Q. I said could you call UP, and would they share that information with you?

MR. WINTERS: Objection. Form, lack of foundation.

MR. MEYER: Objection. Lack of foundation.

**A. I'm not interested in any other railroads' costs as far as carload cost and expenses, so I wouldn't even go there.**

Q. Let's mark as the next exhibit, two page e-mail BNSF 0328865 through BNSF 0328866. I'm sorry it has actually a table attached to it. It goes all the way to 0328873.

(Exhibit 7 marked.)

Q. Now before we look at this exhibit, you mentioned that you were asked to lead a team in 2003 to look at a potential mileage base fuel surcharge?

**A. Uh-huh.**

Q. Do you recall that?

MR. WINTERS: You have to answer yes or no.

**A. Yes.**

Q. Who are the members of that team?

**A. It was a cross-functional team. A lot of people. Myself, Tom Jacobowski. I think eventually**

Page 81

**George Gillen replaced Jacobowski. We had -- I had moved on in '03, so there was Ed McNack who replaced me in intermodal. We had representatives from finance. We had representatives from accounting. We had representatives from TS, which is technology services. The technology services person I think at that time was Eldon Specht. So it was a multifunctional -- cut across several departments.**
Q. And what was your mandate, as described to you by Mr. Lanigan?
**A. We were to review the fuel surcharge programs to see if they were effective and implement -- see about implementing or reviewing -- reviewing mileage based program; if we were to do a mileage base fuel surcharge, what it would look like.**
Q. Do you know at this time -- strike that.
Approximately what time was it in 2003 that Mr. Lanigan asked you to form this team and to do this work?
**A. Oh, I don't recall the specific date. I don't recall the specific date.**
Q. Do you remember whether it was in the first six months of 2003 as opposed to the latter six months?
**A. I don't recall.**
Q. All right. Do you recall at the time whether

Page 82

BNSF was getting customer resistance to this fuel surcharge program that was then in existence based on the HDF index?
**A. Can you please rephrase your question?**
Q. Sure.
At the time Mr. Lanigan asked you to form this team, was the BNSF getting resistance from its customers to paying the fuel surcharge that was then in effect based on the HDF index?
**A. Can you -- can you please repeat one more time?**
Q. Sure. What is it that you're not understanding, sir?
**A. I'm not understanding the customer resistance that you phrased.**
Q. Okay. Well, were you getting pushback from customers in reaction to the fuel surcharge program that was then in effect?
**A. That was in place at the time?**
Q. Yes.
**A. One of the key things was that we had -- our participation rates were low.**
**(Reporter clarification.)**
**A. Our participation rates were low, and participation rate was something like 27 percent. So it**

Page 83

**wasn't exactly push back; it's just that a lot of these customers didn't have fuel surcharges.**
Q. Okay. Did you -- strike that.
Let's go to this exhibit, we'll do it this way. Do you recognize this as a memorandum from Chuck Schultz to Matt Rose?
**A. That's what it says.**
Q. Okay. And it's dated January 15th of 2003?
**A. That's what it says.**
Q. Okay. Now Matt Rose at this time was the chief executive officer of the BNSF. Is that correct?
**A. I believe so.**
Q. Okay. And Chuck Schultz was the chief marketing officer. Is that correct?
**A. I believe so.**
Q. And what was Mr. Lanigan's title at this time?
**A. He was going to replace Chuck Schultz. So if he's copied in, he was on the property at that time.**
Q. And what was Nick Murray -- what was his title?
**A. Nick Murray was my bosses. He was -- his title was assistant vice president of -- and at that time the MDS&P, marketing decision support and planning.**
Q. Now in this two-page memo, Mr. Schultz is reporting some information to Mr. Rose about this fuel

Page 84

surcharge program, among other things. Do you see that?
**A. Uh-huh.**
MR. WINTERS: You have to answer yes or no.
**A. Yes.**
Q. And one of the things that he reports on the first page is the percentage of the company's business that's subject to the fuel surcharge at the time. Do you see that?
**A. Yes.**
Q. And the date of this memo is January 15th of 2003. Correct?
**A. Yes.**
Q. And he has a table here on the first page which reports that the percentage of BNSF business that's subject to fuel surcharge at this time is 27.4 percent. Do you see that?
**A. Yes.**
Q. And that's consistent with the number that you just testified to. Right?
**A. Yes.**
Q. Okay. And did BNSF consider that percentage to be unacceptably low?
**A. Yes. Our goal was to improve our participation rates.**

Page 85

Q. Okay. Now did you discuss in your committee any of the reasons why the participation rate at this time in January of 2003 was low?
**A. Yes.**
Q. What were some of the reasons that you discussed?
**A. The biggest ones were long-term contracts, particularly in coal. If you look at the exhibit in front of you, you can see that coal had zero percent participation at the time. And they had a lot of long-term contracts. They also -- the long-term contracts also had RCAFs in them.**
Q. Any other reasons why?
**A. The other reasons -- the biggest -- the biggest reasons were the contractuals, the contractual nature of some of these businesses. It might be the contract that -- there was no fuel surcharge clause in the contract.**
Q. Look on page 2, if you can. One of the questions that Mr. Schultz addresses to Mr. Rose is question 4. Do you see that? Sir, do you see question 4?
**A. Yes, I do see question 4.**
Q. Okay. And question 4 asks, Why can't we get more fuel surcharges or RCAF escalation in each of the

Page 86

forecast groups? Do you see that?
**A. Yes, I do.**
Q. And then Mr. Schultz gives a number of reasons. Do you see that, sir?
**A. Yes.**
Q. And among the reasons he states is essentially competition from truck, rail and otherwise. Do you see that?
**A. Let me read it. The reasons limiting our ability to pass on fuel cost recovery charges vary - the source of competition (truck, rail or other), industry practices, contract negotiation power all play a role.**
Q. So Mr. Schultz is reporting to Mr. Rose that one of the reasons why you can't get greater participation are competitive factors in the industry. Is that fair?
**A. What I read here is that he mentions competition from truck, rail and other as a reason.**
Q. And did you discuss in your committee that those competitive factors in the industry were one reason why the BNSF had only a 27.4 participation rate as of this time?
**A. I don't recall discussions like that.**
Q. Okay. Well, as you sit here today, did you know at this time that competitive factors of the kind

Page 87

mentioned by Mr. Schultz were limiting the company's ability to get greater fuel surcharge coverage?
**A. Can you please repeat your question?**
Q. Sure.
I'm asking you whether you, Sam Kyei, head of this committee, knew at the time, okay, in January '03, that competitive factors in the industry were limiting or inhibiting BNSF's ability to get greater fuel surcharge coverage of its contracts?
**A. No, I don't know that.**
Q. You didn't know that?
**A. No.**
Q. Okay. Mr. Schultz was the chief marketing officer of the company at the time. Right?
MR. WINTERS: You have to answer yes or no.
**A. Yes.**
Q. And presumably Mr. Schultz would know more about competition in the industry than you would at this time. Is that fair?
MR. WINTERS: Objection to the form.
**A. I don't know the context of what Mr. Schultz was discussing. I don't know the specifics of what was in his head at the time. That is what I see here as to what he's written, so --**

Page 88

Q. He also writes, in agriculture, for instance, prices generally reflect -- fully reflect the market opportunities. Do you see that?
**A. Let me read it. Another reason for accessibility -- is that where?**
Q. The second sentence says, In ag, for instance.
**A. Okay.**
MR. WINTERS: He's right there.
THE WITNESS: Okay.
**A. In ag, for instance, prices generally reflect -- fully reflect the market opportunities. They are set as the spread/difference between the origin, destination prices of the commodities being shipped. Therefore, any increase in fuel surcharges will result in a decrease in prices of the same amount in order to remain competitive. Is that -- is that the extent of what you want --**
Q. Those were the words of the chief marketing officer of the company. Correct?
**A. I believe the document has Chuck's name as the from.**
Q. And these were the words of the chief marketing officer to the president of the company. Right?
**A. That is what I see from the document.**

Page 89

Q. Okay. In the last sentence here Mr. Schultz writes, By adding fuel surcharges to BNSF ag product moves, BNSF would ultimately lose business as farmers and these trucking companies shift their business to other locations. Do you see that?
**A. By adding fuel surcharges to BNSF ag products moved, BNSF will ultimately lose business as farmers and these trucking companies shift their business to other locations, yes.**
Q. Okay. And Mr. Schultz is offering this to Mr. Rose as a reason why the company hasn't achieved greater fuel surcharge coverage. Correct?
**A. That is what -- that is what it appears to be saying.**
Q. Okay. And, again, my question to you is: As the team leader of this team to look at fuel surcharges, was one of the things you were interested in is whether competitive factors in the industry were limiting the company's ability to achieve greater coverage in its fuel surcharge program?
**A. No.**
Q. Okay.
MR. BROCKETT: Let's mark as our next exhibit, a document -- it's a cover e-mail with an attachment. It's BNSF 0330836 through 0330851.

Page 90

(Exhibit 8 marked.)
MR. BROCKETT: These together are one exhibit. It will be Exhibit 8.
MR. WINTERS: We'll staple them together afterward.
MR. BROCKETT: Yeah.
MR. WINTERS: So it's clear it's one document.
MR. BROCKETT: If you have a clip, we can do it now.
MR. WINTERS: We can deal with it later.
Q. Mr. Kyei, if we can look at the cover e-mail here first. This is an e-mail from you to a number of people dated March 13th of 2003. Do you see that?
**A. Yes.**
Q. Okay. And in the first paragraph, you reference the fact that John Lanigan, the new chief marketing officer at BNSF has proposed some changes in the fuel surcharge programs. Do you see that?
**A. Yes, I do.**
Q. And you go on to state that the people who are recipients of this e-mail have been chosen as a team member to help finalize the study. Correct?
**A. Yes.**
Q. Now is -- is this an e-mail that related to

Page 91

the team that was formed in 2003 at the direction of Mr. Lanigan to research and study the fuel surcharge issue at that time?
**A. Yes.**
Q. And this is the committee of which you were the team leader. Is that correct?
**A. Yes.**
Q. And do the people, the addressees on this e-mail indicate the people that you had chosen to be on your team?
**A. Can you please rephrase the question?**
Q. Sure.
There are a number of addressees on your e-mail of March 13, 2003. Correct?
**A. Uh-huh. Yes.**
Q. Okay. Are the people to whom this e-mail was sent the people who you chose to be on your team?
**A. They were people who I chose to be on the team, but this was not all the members of the team.**
Q. Okay. These were some of the members of the team?
**A. Yes.**
Q. Okay. Can you think of anyone who participated as part of the team that's not mentioned in this e-mail?

Page 92

**A. A number of people. Nick Murray, my boss, participated from time to time as a mentor. Dave Burr participated. His name isn't here. At this time we didn't have in these -- in these names the IT person. Eldon Specht eventually joined the team, participated. There were a lot more people that joined later.**
Q. Okay. The third paragraph of the e-mail says that John needs our recommendations in about two to three weeks. Do you see that?
**A. Yes.**
Q. Due to the urgency of -- then you write, Due to the urgency of the project and spring break vacations, I am scheduling two back-to-back meetings. Do you see that?
**A. Uh-huh. Yes.**
Q. Now why -- why was this project urgent?
**A. One, John wanted some feedback in two to three weeks. So -- and with the timing of spring breaks, as I state here, that we will have to double back and kind of look at things, but he wanted our first -- our first recommendations in two to three weeks.**
Q. Did he tell you why he needed your recommendations in that time frame?
**A. No.**
Q. Did you ask?

Page 93

**A. No.**
Q. Do you have an understanding, as you sit here today, as to why this was an urgent project?
**A. No, I don't.**
Q. Now the second paragraph of your cover e-mail refers to documents that are attached. Do you see that?
**A. From the cover e-mail or the attached documents?**
Q. From the cover e-mail.
**A. Okay. Sure.**
Q. And then there are -- attached there are two, look to be -- can we call these PowerPoint studies, one dated February 24th of '03?
**A. Uh-huh.**
Q. And the other dated March 10th of 2003. Do you see that?
**A. Uh-huh.**
MR. WINTERS: PowerPoint presentations?
**A. Presentations.**
Q. Presentations. Okay.
MR. WINTERS: I'm not trying to testify, but --
Q. Is that what they are, PowerPoint presentations?
**A. These are PowerPoint presentations, yes.**

Page 94

Q. Right. And who prepared these?
**A. Let's see. These were prepared by me.**
Q. Now let's focus on the one dated March 24th of 2003. It's called BNSF fuel surcharge cost recovery improvements. Do you see that?
**A. Uh-huh.**
Q. You can't just say uh-huh --
MR. WINTERS: You have to say yes or no.
**A. Yes.**
Q. All right. And why did you prepare this?
**A. This was -- was prepared as a presentation, and you can see the very first -- second page is starting with some conclusions from a meeting on 2/24. I don't recall that meeting specifically, but you can see that that is -- that is a part. So to kind of get the team going, we already developed some of this material.**
Q. Okay. So if I understand your testimony, the attachment dated March 10th of 2003 was a PowerPoint presentation that, among other things, summarized some conclusions of the first PowerPoint presentation dated February 24th of 2003. Is that correct?
**A. Yes.**
Q. Now let's start with the February 24th one. Did you prepare this attachment?

Page 95

**A. I put it all together. A lot of them I did not personally prepare, but there are those that were fed by members of the team.**
Q. Okay. So how many people participated in creating this document?
**A. I put the whole thing, the actual document itself together, but there are pieces in the back here that has information from other members of the team. So it was a lot of team effort.**
Q. What was the purpose of preparing the February 24th, 2003 PowerPoint presentation?
**A. We were eventually getting ready to present to John Lanigan, and so these were part of the documentation that were in the presentations.**
Q. Was the February 24, 2003, was that a presentation that was made to your team at a meeting on this date or about this time?
**A. I don't recall. I don't recall whether the February 24th date was the presentation to the team itself. I believe that the team would have seen this, but I think this is all part of a presentation, series of presentations that we gave to John Lanigan eventually.**
Q. Okay. If you'll look at on the first exhibit, the February 24, 2003 presentation, on page 3 it's

Page 96

titled objectives. Do you see that?
**A. Uh-huh.**
Q. Now --
**A. Yes.**
Q. -- does this page accurately summarize the objectives of your team?
**A. The page says the revision of the fuel surcharge methodology. That was one of the things John requested that we look at, look at the cost per mile methodology. This is the fuel emphasis. Look at the reciprocal and simplicity and the mechanisms to recover the fuel cost, and then also be able to standardize across -- standardize the policies across the segments.**
Q. So these are -- these were the objectives of your team. Is that correct?
**A. Yes.**
Q. What does it mean to standardize the fuel surcharge policies and processes across segments?
**A. Part of the -- part of -- at the time, as you saw from the previous team, we had carload fuel surcharges that had gone from WTI to highway diesel. And we had carload fuel surcharges that had different strike prices and different thresholds. So, for example -- I'll give you an example. Intermodal initially did not have a threshold and then had gone to**

Page 97

**1 percent threshold, you know. So the thresholds were different, meaning the point at which you start charging fuel surcharge, okay. And so there was an interest in making sure that if we're going to do thresholds, then it's standardized across the company.**
Q. All right. Can you look at the second page of the PowerPoint presentation that's dated March 10th of 2003?
**A. Yeah.**
Q. Okay. And does this slide accurately summarize the conclusions that were reached at the meeting on February 24th of 2003?
**A. I believe so.**
Q. And one of those conclusions was in the first bullet point which mentions leaning towards a mileage based fuel surcharge. Is that correct?
**A. Yes.**
Q. And one of the conclusions was to continue to use the HDF as the benchmark. Is that correct?
**A. Yes.**
Q. And one of the conclusions was to reduce the strike price to $1.10. Do you see that?
**A. Yes.**
Q. And down the page there's a bullet point that one of the conclusions was to strife for 100 percent

Page 98

participation in the fuel surcharge program.
**A. Yes.**
Q. Do you see that?
**A. Yes.**
MR. WINTERS: Objection to the form.
Q. And those were the conclusions that you reached at your first meeting of this team. Is that correct?
**A. From the February 24th meeting, yes.**
Q. And I believe you indicated that at some point both of these PowerPoint presentations were given to Mr. Lanigan. Is that correct?
**A. I believe so.**
Q. All right. Let's mark as the next exhibit. It's BNSF 0343051 through 052. It's an e-mail with an attachment Exhibit 9.
(Exhibit 9 marked.)
Q. Now, Mr. Kyei, do you recognize this as an e-mail from David Burr to you dated March 28th of 2003?
**A. Yes.**
Q. Who is David Burr or who was he at the time?
**A. David Burr is an assistant vice president for fuel management. I think that's the title.**
Q. Is he in the finance department?
**A. Yes.**

Page 99

Q. And there's a cc to Matthew Feldman. Who at the time was Matthew Feldman?
**A. Matthew Feldman is a general director in the finance department also.**
Q. Now were Mr. Burr and Mr. Feldman part of your team examining fuel surcharges in March of 2003?
**A. Eventually Dave Burr attended meetings, but Matthew Feldman was not attending meetings. But occasionally provided support.**
Q. Now you write in this e-mail attached -- I'm sorry. Strike that.
Mr. Burr writes in the e-mail to you as follows: Attached is a slide that we would like included in the presentation for Monday. Do you see that?
**A. Yes, I do.**
Q. Okay. Do you recall him writing to you and asking you to include a slide in your presentation?
**A. Yes.**
Q. And this was a presentation that you were going to make to Lanigan. Is that correct?
**A. I can't recall the specific presentation.**
Q. Was this a presentation that was going to be made to the group that you had formed to investigate fuel surcharges?

Page 100

**A. Almost all the presentations that were made to executives were reviewed in the team meetings.**
Q. Okay. So I'm asking about this particular e-mail and the particular attachment. Was this sent to you by Mr. Burr so that you could include this attachment in a presentation that you were going to make to the fuel surcharge group of which you were the head?
**A. I believe so.**
Q. All right. Now if you look at the presentation or the proposed slide that's attached to this, it's called fuel expense management. Do you see that?
**A. Yes, I do.**
Q. And one of the things that Mr. Burr wanted included in your presentation was the notion that fuel surcharge programs have costs. Do you see that?
**A. Yes, I do.**
Q. And one of the things that he wanted included in the presentation was the notion that BNSF could lose market share as a result of adding a fuel surcharge. Do you see that?
MR. WINTERS: Objection to the form.
**A. Yes, I do.**
Q. Okay. And one of the things that Mr. Burr was also concerned about was the concept that customers may

Page 101

be willing to trade fuel surcharge for base rate increases. Do you see that?
MR. WINTERS: Objection to the form.
**A. Yes, I do read that base rates -- customers may be willing to trade fuel surcharges for base rate increases.**
Q. And did you include this slide in the presentation that -- to which Mr. Burr makes reference?
**A. I think we did, yes.**
Q. Okay. Did you disagree with these concepts?
**A. Can you rephrase the question?**
Q. Well, Mr. Burr is writing to you and saying, Mr. Kyei, you're the head of this group, you're doing a presentation, I want this slide included. Did you agree that this slide should be included?
**A. Yes, we did.**
Q. Okay. And did you agree that the points he makes here are valid points?
**A. I agree to put this in there so it could be reviewed so that the company can -- can decide which charge -- which direction they're going to follow.**
Q. Did you as the leader of this group disagree with any of these points?
**A. I didn't have an opinion one way or the other.**
Q. Okay. Let's mark as our next exhibits 10 and

Page 102

11. I'll give you these together. One is a document called a draft BNSF fuel surcharges team recommendations, dated April 14th of '03, and the other is a -- what I think is the final version entitled, fuel surcharge team recommendations. And it doesn't bear a date. The first one is -- has a Bates stamp 00411 through 00438, and the exhibit -- that's Exhibit 10. Exhibit 11 has Bates stamp 00047 through 00074. I'm sorry, yes. The Exhibit 11 is dated April 14th of 2003. Both dated April 14th of 2003.
(Exhibit 10 marked.)
(Exhibit 11 marked.)
MR. BROCKETT: So this is Exhibit 10, and this is Exhibit 11. Okay.
Q. Mr. Kyei, I would like you to just take a quick look at both of these documents, and my question to you first is going to be whether you can identify them for me.
**A. Aren't these the same thing?**
Q. Well, I don't know. One says draft and the other --
**A. Oh, okay.**
Q. -- doesn't say draft. Do you see that?
**A. Yeah, this -- okay.**
Q. So Exhibit -- Exhibit 10 is a draft of your

Page 103

team recommendations. Is that fair?
**A. Yes.**
Q. And Exhibit 11 --
**A. 11 --**
Q. -- is the final recommendations?
**A. Uh-huh.**
MR. WINTERS: You have to answer yes or no.
**A. Yes.**
Q. And did you put these together, sir?
**A. Yes, I did, but as usual, the team has many members, so there will be documents that came from different people.**
Q. Well, let's take a look at the final recommendations, which is Exhibit 11. Can you look at the second page, sir?
**A. Yes.**
Q. And by the way, these are both PowerPoint presentations, are they not?
**A. Yes.**
Q. Are these PowerPoint presentations that were given to Mr. Lanigan at some point?
**A. Yes. The final one definitely.**
Q. Now the second page of Exhibit 11 has a list of names.

Page 104

**A. Uh-huh.**
Q. Do you see that?
**A. Uh-huh. Yes, I do.**
Q. Does this list of names include all of the people who participated on your team at various times?
**A. This list included most of them, but in some cases other people brought support people with them.**
Q. The second page indicates that you are the leader of this team. Do you see that?
**A. Yes.**
Q. And that Mr. Murray is the mentor?
**A. Yes.**
Q. Now if you look at the sixth page of this document --
**A. Yes.**
Q. And this document is dated April 14th of 2003. Correct?
**A. Yes.**
Q. And on this document, this slide is entitled, Improving Participation Rates. Do you see that?
**A. Yes.**
Q. And it shows that the participation rates for 2002 were 26.7 percent. Correct?
**A. Yeah, that's what it shows.**
Q. And your team considered that unacceptably

Page 105

low. Isn't that fair?
**A. Our team's goal was to keep improving participation.**
Q. Did your team consider 26 percent to be unacceptably low?
**A. Our team, as you probably saw here in one of these you showed me, was a continual goal to improve participation to 100 percent at some point.**
Q. And 26.7 percent was unacceptably low, was it not, sir?
**A. Those are your words, not mine.**
Q. You don't agree with that?
**A. Our goal was to improve participation until we are close to 100 percent, so that was the key goal. And we attempted, you know, over time to continuously improve.**
Q. And, in fact, this slide reflects that your projected -- your estimated participation rates for 2003 were 36.1 percent. Correct?
**A. Yes.**
Q. And that's what you told Mr. Lanigan that the team thought you could achieve. Right?
**A. In terms of the -- can you rephrase the question, please?**
Q. Well, this -- this presentation was given to

Page 106

Mr. Lanigan. Right?
**A. Uh-huh. Eventually, yes.**
Q. Okay. And was page 6 included in the version that was given to Mr. Lanigan?
**A. Yes.**
Q. Okay.
**A. It was.**
Q. And page 6 says that your estimated participation rates for 2003 are 36.1 percent. Right?
**A. Yes, that's what it says.**
Q. Can you turn to the ninth page. Now on this page you summarize the current fuel surcharge rate methodology that was then in use by all of the class 1 railroads. Correct?
**A. That is what it says in terms of the information that is on here.**
Q. And who compiled this slide?
**A. Let's see. At this time whoever was representing the carload side. So if you go back to page 2, it would be these two guys, Gillen and Jim Arnett.**
Q. Now am I correct that according to this chart, that as of April of 2003, all the class 1 railroads had different fuel surcharge programs. Right, sir?
**A. Can you repeat the question, please.**

Page 107

Q. Sure.
This chart reflects that at this time of this PowerPoint, which is April 14th of 2003, all of the class 1 railroads had different fuel surcharge programs in place. Right?
**A. I don't know what you mean by different.**
Q. Well, I'm not asking you to compare them, you know, one feature against the next. I'm simply asking you to acknowledge that generally speaking, each railroad had its own fuel surcharge program that was different in some respect from the other railroad's program. Is that fair to say?
MR. WINTERS: Objection to form.
MR. MEYER: Objection to form.
Q. Can you answer that?
**A. Can you repeat that question?**
Q. Sure.
This chart summarizes the fuel surcharge programs that were then in effect at the U. S. railroads. Right?
**A. Yes.**
Q. And it summarized the BNSF fuel surcharge program. Right?
**A. Yes.**
Q. And it summarized the UP fuel surcharge

Page 108

program. Right?
**A. Summarized BNSF's carload.**
Q. Carload. Yeah, I'm talking about a carload.
**A. So you're specifically asking about carload?**
Q. Correct, Yes.
**A. Okay. Yeah, these are all carload programs the way we interpreted them at the time from public sources.**
Q. All right. And BNSF, its carload surcharge method is summarized here. Right?
**A. Yes.**
Q. And UP's is summarized, too. Right?
**A. Yes.**
Q. And at this time UP and BNSF had different fuel surcharge programs. Correct?
**A. We were using HDF; they were using WTI.**
Q. So they were different. Right?
**A. I don't know the strike prices. I don't know -- but from what I see, there are some aspects that are different.**
Q. And CSX, their fuel surcharge program is summarized here, is it not?
**A. Yes.**
Q. And the CSXT was using the WTI, were they not?
**A. That's what it appears on this document.**

MR. WINTERS: I'm sorry. Could you read the question back? I'm sorry.
(Requested testimony read.)
MR. WINTERS: Thank you.
**A. Based on HDF, eventually got revised to $1.25 for carload.**
Q. And you say here on the first page of your memo that the carload strike price will be $1.25 effective July 1, 2003. Right?
**A. The carload strike price will be $1.25 is what I say here, C.**
Q. And that -- you also say that the BNSF implemented this change in June. Right?
**A. Where do you see that? I don't see that.**
Q. Under item C on the first page.
**A. On item C it says, The carload strike price will be $1.25. This reflected the 23 WTI. BNSF implemented a change in June of the carload strike price. The UP carload program followed us.**
**So what's the question, please?**
Q. The question was and is: Am I correct that BNSF changed its strike price to $1.25 effective in June of 2003? I'm sorry. Strike that.
Am I correct that BNSF implemented a change in the strike price to $1.25 in June of 2003 effective



July 1, 2003?
**A. I don't recall the details, but I think what I'm telling Steve Bobb is that the carload strike price is going to go to $1.25. But in terms of the timing and the details, I don't recall the specifics.**
Q. All right. Can you describe the terms of the carload fuel surcharge as of the time July 1, 2003, as reflected in this memo?
MR. WINTERS: Objection to the form. You can answer.
**A. I was not in charge of the carload program.**
Q. Okay. But you describe it here in the memo.
**A. I describe it based off information people have given me as to --**
Q. Okay.
**A. So the carload person on my team would describe it, and so Steve Bobb was interested in me giving him status. So based on information people have given me, I put this document --**
Q. Okay.
**A. -- together to give him a snapshot of some of the things going on.**
Q. Can we agree as of July 1, 2003, the carload fuel surcharge was based on the HDF index. Right?
**A. I believe so.**



Q. Okay. And the strike price was $1.25. Right?
**A. I believe so, I think.**
Q. Okay. And when would the surcharge kick in?
**A. I -- I don't recall the details on -- on the specifics of the carload program.**
Q. Okay. You can't tell us from memory?
**A. I don't recall.**
Q. Now do you know that the BNSF carload fuel surcharge program as of July 1, 2003 was essentially the same as the UP program?
MR. MEYER: Objection as vague.
MR. WINTERS: Object to the form.
**A. I don't know.**
Q. Do you know what a concurrence letter is?
**A. No, I don't.**
Q. Have you ever seen a concurrence letter received from another railroad?
**A. No, I don't.**
Q. Have you ever seen a concurrence letter that BNSF sent to another railroad?
**A. I don't know what a concurrence letter is.**
Q. I'll mark as the next exhibit Exhibit 14. It's a two-page document bearing Bates 00572 to 00573.
(Exhibit 14 marked.)
Q. Have you ever seen this before?



**A. No.**
Q. Do you know who Kurt Schroeder is?
**A. Kurt Schroeder. I don't.**
Q. Do you see that this document refers to a -- first of all, do you see that this document was sent by Kurt Schroeder of the Union Pacific Railroad?
**A. That is what it seems to me.**
Q. Okay.
**A. That's his name.**
Q. And it's sent to Paul Anderson at BNSF. Right?
MR. WINTERS: Objection to the form.
**A. Paul Anderson is copied on it. I can see that.**
Q. And was Mr. Anderson your boss at the time?
**A. No. This is not the same Paul Anderson.**
Q. Who was this?
**A. This is Paul Anderson who works for Jim Arnett who works for George Gillen in price measurement department.**
Q. Okay. And is this e-mail dated April 4th of 2003?
**A. That's what it --**
MR. WINTERS: Which one? Which one?
MR. BROCKETT: The e-mail --

Page 125

MR. WINTERS: They both are.
MR. BROCKETT: Okay. I'm looking at the one sent from Mr. Schroeder to Paul Anderson and others.
Q. Okay. Are you with me?
MR. WINTERS: Look at the from line in the e-mail.
MR. BROCKETT: Yeah, that's his secretary. You can see that if you look on the second page.
MR. WINTERS: Okay.
MR. BROCKETT: Kathy Eymann.
MR. MEYER: Object. Lack of foundation.
MR. BROCKETT: Do you see that?
Q. Now Mr. Kyei, do you see that this letter is titled, Request for Joint Line Concurrence?
**A. It says request for joint line concurrence.**
Q. Okay.
**A. But the subject says modified UP fuel surcharge. It's what I read.**
Q. Do you know what a request for joint line concurrence is?
**A. No, I don't.**
Q. All right. Do you see this document concerns an announcement by UP that it's modifying its fuel surcharge recovery program?

Page 126

**A. The subject says modified UP fuel surcharge program. I haven't read the details.**
Q. Do you recall that in April of 2003, UP announced some changes to its fuel surcharge program which was then based on the WTI index?
**A. I don't recall specifics about the -- any changes like that.**
Q. Okay. Now you see at the top of the page there's an e-mail from Paul M. Anderson to George Gillen. Do you see that?
**A. Yes.**
Q. All right. And what Paul Anderson is that?
**A. That is the Paul Anderson who works for Jim Arnett who works for George Gillen.**
Q. Okay. And who is George Gillen?
**A. George Gillen is the general director of industrial products, and at the time I was building the intermodal fuel surcharges, he would have been my counterpart on the carload side. He replaced Tom Jacobowski.**
Q. And you see that Mr. Anderson writes to Mr. Gillen commenting on the UP announcement, This is sweet, just like CSXT. Do you see that?
**A. I just see just like CSXT.**
MR. WINTERS: I think he's pointing --

Page 127

**A. This is sweet. I see that.**
Q. All right. Did you have any discussions with anyone in the company in April of 2003 that the UP had announced modifications to its fuel surcharge program based on the WTI index?
**A. I don't recall any specific discussions.**
Q. Okay. Mark as Exhibit 15 a document, e-mails, Kyei 15, BNSF 0342448 through 0342450.
(Exhibit 15 marked.)
Q. Now Mr. Kyei, in this three pages, the first is an e-mail from Kurt Schroeder entitled, Revised Fuel Surcharge Program Effective June 1, 2003. Do you see that?
MR. WINTERS: Objection to the form, lack of foundation.
**A. I see on page 2 it says, Revised Fuel Surcharge Program Effective --**
Q. Effective June 1, 2003. And on the third page do you see that this was sent by Kurt Schroeder of Union Pacific Railroad?
**A. I see that Kurt Schroeder's name is at the bottom of it, yes.**
Q. And then on the first page, there's an e-mail from Paul Anderson to yourself, among others for awaiting the updated UP fuel surcharge effective 6/1/03.

Page 128

Do you see that?
**A. Yeah, I see that it's going to almost the entire department really because at consumer products, industrial products, so -- yeah, consumer products and industrial products side --**
MR. WINTERS: Keep your voice up.
THE WITNESS: Yeah. Okay. Thanks.
Q. And do you remember receiving this?
**A. I don't remember receiving it.**
Q. And do you see in the announcement, UP's announcement of its revised fuel surcharge program that UP is announcing that it's going to the HDF index?
**A. In the event the average price set below is the HDF price -- that's what it seems to suggest.**
Q. Do you recall learning at this time that the UP had changed its formula and was now going to the HDF index?
**A. I don't recall.**
Q. Now in the e-mail above on the first page, above the e-mail from Mr. Anderson to you, there's an e-mail from David Deaton to Matthew Feldman. Do you see that?
**A. Yes, I see that.**
Q. Who is David Deaton?
**A. David Deaton, I don't -- I don't recall him**

Page 129

**very well, but he was at one time in the marketing department. And I don't recall whether at this time he had moved into the finance department or was working for Feldman. I don't recall.**
Q. Well, Mr. Deaton writes, This is big news. Like I said, the ideal scenario is to have BNSF and UPRR have the same FSC methodology, but for them to copy us, as it appears they are doing. Do you see that?
**A. I see that -- I see that -- I see that, yeah.**
Q. Now did you have discussions with anyone at or about this time, okay, about the UP essentially adopting the same fuel surcharge methodology as the BNSF then had in effect?
**A. No.**
Q. That never came to your attention that that happened?
**A. Yes, never came to my attention. And I -- I really don't involve myself in some of that.**
Q. Do -- did you have discussions with anyone ever about the ideal scenario being to have the BNSF and the UPRR have the same fuel surcharge methodology?
**A. No.**
MR. WINTERS: Object to the form.
**A. The answer is no.**
Q. All right. Let's mark as Exhibit 16 a three

Page 130

page document, bears Bates BNSF 0028012 through BNSF 0028014.
(Exhibit 16 marked.)
THE WITNESS: Thank you.
Q. Okay. Mr. Kyei, do you see this is an e-mail from Paul Anderson to yourself dated October 1st of 2003?
**A. Yes, I see that.**
Q. And what was this attachment?
**A. This is an attachment that that team always put together to track different -- different rates. So this was in the price measurement or price management team.**
Q. Okay. Does this attachment compare the carload fuel surcharges then being charged by the various class 1 railroads?
**A. That's what it seems to -- the data shows, that it's looking at different -- tracking different railroads.**
Q. Okay. And do you recall receiving this?
**A. I recall receiving things like this occasionally.**
Q. Okay. And was it part of your job to study this information and know it?
**A. No. It wasn't my job to know it. My**

Page 131

**counterpart was George Gillen, and he's supposed to know all of this so he can bring it to the team if we have discussions. So --**
Q. Okay. Did you --
**A. -- it wasn't my job to track it.**
Q. Did you review this information when you got this attachment?
**A. This particular one I am -- I don't recall, but there have been times where we've put something like this from them -- remember they're constantly -- they usually look at this. So sometimes if we're making a presentation where it is required for us to look at it, then we'll take something like this and put it in the presentation.**
Q. Well, this summary here is dated as of October 1st of 2003. Correct?
**A. That's what it says.**
Q. Okay. Now did you know at this time that BNSF and the UP had essentially the same fuel surcharge formula?
**A. I don't. I don't know.**
Q. You didn't know that?
**A. No.**
Q. That never came to your attention?
**A. No.**

Page 132

Q. Has it come to your attention, sir, that since July 1st of 2003, the BNSF -- and for the next four years, to the middle of 2007, the BNSF and the UP had essentially the same carload fuel surcharge formula?
MR. WINTERS: Objection to the form.
**A. I don't know.**
Q. Okay. Can you explain how that came about, sir?
MR. MEYER: Objection. Lack of foundation.
**A. I don't know. If you are asking me based on this specific document, this specific document, is that the question? Can you repeat the question?**
Q. Let's take away the document for a moment.
**A. Okay.**
Q. Okay. Did it come to your attention that effective July 1, 2003, the BNSF and the UP had essentially the same fuel surcharge formula as applied to carload traffic?
MR. WINTERS: Objection to the form.
**A. It's not come to my attention that there's any carload formula. No. The answer is no.**
Q. And has it come to your attention that the BNSF and the UP have applied essentially the same fuel surcharge formula for carload shipments from July 1 of

Page 133

2003 to at least the middle of 2007? Do you know that as you sit here today?
**A. I don't.**
MR. WINTERS: Object to the form.
Q. And it's your testimony it's not part of your job to know this?
**A. It's part of my job to summarize information and provide -- provide it if -- if I'm asked to.**
Q. Mr. Kyei, when is the first time that you had a discussion with anyone about the AAR creating a new cost index that would not have fuel as a component?
**A. The first time I had any discussion with anyone at all?**
Q. Yes.
**A. Anyone -- well, we had a -- within my team we had discussions about how to remove fuel from RCAF. So we had discussions in 2003, and I remember a meeting where I told our executives that the AAR has all the data for rail cost. And so as we were trying to apply fuel surcharges, we were having a lot of participation issues with our coal contracts that had a lot of long-term contracts. So the short answer to your question is roughly 2003 discussed this.**
Q. Okay. And why did you -- why did the BNSF want to remove fuel from the RCAF?

Page 134

**A. One, the RCAF was not sufficient in recovering our fuel surcharges, and part of the reason was the index uses index rates. So we were interested in increasing our participation. So any contract that is tied up --**
Q. How could you increase your participation if you removed fuel from the RCAF?
**A. Well, remove the fuel from the RCAF, not only would it increase the participation, but it also increased the coverage, and so -- in terms of the coverage. And we were very interested in the coverage, as well as the participation.**
Q. So if fuel were removed from the RCAF, then you could attach a fuel surcharge to that contract. Is that correct?
**A. Yes.**
Q. Okay. And am I correct that the BNSF did not believe it could attach a fuel surcharge as long as the RCAF index was part of that contract?
**A. Can you please rephrase the question?**
Q. Sure.
Did the BNSF believe that it could not attach a fuel surcharge to a contract that had an RCAF escalator already in it?
**A. We had contracts in international that had**

Page 135

**RCAFs that the customers were willing to -- to have the RCAF with a fuel surcharge. In certain areas, in coal, for example, the contracts didn't have any fuel surcharge clause. Did not allow for any fuel surcharge clause. So it was -- depending on which sectors you're talking about, particularly in coal, we were limited in terms of being able to apply fuel surcharges.**
Q. Now so you discussed this in your team. Did there come a time then when the BNSF wanted to take some steps to have the AAR promulgate a new index, a new cost index that would not have fuel as a component?
**A. Yes.**
Q. And when did that occur?
**A. I was -- brought it up in a meeting, and I was asked to talk to Craig Rockey. I was asked to talk to the AAR basically to find out if they would do a study that removes the fuel component.**
Q. Who asked you to do this?
**A. Our senior executives.**
Q. Who?
**A. Matt Rose.**
Q. Matt Rose asked you to do this personally?
**A. Yeah.**
Q. Okay. And was this a face-to-face meeting with Mr. Rose where he asked you this or telephone call?

Page 136

**A. Yeah, we were in a face-to-face meeting talking about the -- some of the issues in terms of recovery. And what I mentioned was, Well, the AAR has all the data so if the AAR took that out, then we could see if we could apply fuel surcharges in addition to the all inclusive index.**
Q. Did the BNSF at this time view the RCAF as insufficient to capture the increases in your fuel cost?
**A. Yes.**
Q. Did BNSF view the RCAF has an impediment to greater coverage of its fuel surcharge program?
**A. Can you please rephrase the question?**
Q. Sure.
Did you have discussions with Mr. Rose and others about the fact that the RCAF, which didn't fully and accurately recover your fuel cost, was an impediment of sorts to the BNSF attaching fuel surcharges to those contracts?
**A. Yes.**
Q. Now after Mr. Rose asked you to contact the AAR, did you discuss this with any other railroad?
**A. No.**
Q. Have you at any point in time discussed with any other railroad the AIILF?
**A. No.**

Q. Do you know what I mean when I say the AIILF?
**A. Yes, I do.**
Q. What is the AIILF?
**A. It's the all inclusive index less fuel.**
Q. And is that the index that the AAR eventually promulgated?
**A. Yes.**
Q. Now after Matt Rose asked you to talk to the AAR, what did you do?
**A. I called up Craig Rockey, and I talked to him about that. I told him that the U. S. government -- Craig is an economist. So the first thing I told him was, well, we're looking for something similar to the coal CPI. And the coal CPI is a government index that doesn't have any fuel in it. It's just the CPI, and then fuel would be removed. And so to kind of get the concept across for the study that we wanted him to perform, I used -- characterized it in those terms.**
Q. What did Mr. Rockey say to you?
**A. His -- his first comment was that he understood what I was saying, but we have to have a formal request.**
Q. And what did you understand him to mean by that?
**A. He wanted a memo from a top executive at BNSF,**



**which is Matt Rose.**
Q. Do you recall approximately when it was that you had this conversation with Mr. Rockey?
**A. I think it was sometime in October of 2003.**
Q. Then after you had this conversation with Mr. Rockey, what did you do?
**A. He asked for a memo, so I passed that on to -- I passed that on to my boss, who was Nick Murray, and eventually we were asked to draft a memo to Ed Hamberger.**
Q. All right. And did you draft a memo?
**A. We did. We drafted -- yeah.**
Q. When you say "we," who do you mean by me?
**A. Barbara Haertling, who works for me, actually drafted it, gave it to me, and then I passed it on. And I was asked to pass it on to our counsel so they can take a look at it.**
Q. Okay. Let's mark as Exhibit 17 a three page e-mail chain. It bears Bates 00646 through 00648.
(Exhibit 17 marked.)
Q. All right. Do you recognize this e-mail chain, sir?
**A. Can you please repeat?**
Q. Sure. Do you recognize this e-mail chain?
**A. Yes, I do.**



Q. Let's go to the second page first. Is this an e-mail that you wrote to a Richard Weicher with a cc to Nick Murray on November 6th of 2003?
**A. As I told you, the e-mail is the one attached. I did not write it. Barbara Haertling wrote it and we refined it, but he wrote it under my direction.**
Q. Okay.
**A. And so I forwarded it.**
Q. Can we just focus on the second page, the cover letter.
**A. Okay.**
Q. Now is this cover e-mail an e-mail that you wrote to Richard Weicher and to Nick Murray?
**A. Yes. The cover memo, yeah.**
Q. Yeah, and that's dated November 6, 2003. Correct?
**A. Yes.**
Q. Who is Richard Weicher?
**A. He is a lawyer in our law department. The vice president, I think.**
Q. And the subject of this is the memo from Matt Rose to Ed Hamberger on RCAF less fuel. Right?
**A. Yes.**
Q. And in this e-mail you pass on to Mr. Weicher a draft of a memo for Mr. Rose's signature to Ed



Hamberger at the AAR. Correct?
**A. Yes.**
Q. Now who is Mr. Ed Hamberger?
**A. I don't know him -- I don't know him, but I know that he was head of the AAR at the time.**
Q. Now you say you did not draft the attachment personally?
**A. I -- the original attachment, this one right here, I did not. And it's drafted by Barbara Haertling.**
Q. Okay.
**A. But I give her input.**
Q. So you made some editing changes?
**A. I gave her input as to what to put in.**
Q. Okay. Did you make any edits to Barbara's --
**A. Eventually we made edits, yes.**
Q. Is this the final version of what was sent to Mr. Hamberger, or is this a preliminary draft?
**A. I think it is the very first draft of this.**
Q. Okay. And who else had comments on this?
**A. Can you please repeat the question?**
Q. Who else had comments on this letter?
**A. Tom Hund with Rick Weicher, who we sent it to. So it bounced around for a while.**
Q. Okay. And who is Tom Hund?
**A. Tom Hund is the chief financial officer.**

Page 141

Q. Okay. And Mr. Hund is -- he's reflected on the e-mail on the first page --
**A. Yes.**
Q. -- of this document?
**A. Uh-huh.**
Q. Okay. Now in the body of the e-mail it says in the first paragraph -- and I'm paraphrasing. You tell me if it's a fair paraphrasing or not. But essentially what you're saying is RCAF has not been adequate to capture increase in fuel at BNSF. Is that correct?
MR. WINTERS: Not the e-mail. You mean the draft?
MR. BROCKETT: The draft letter, yes.
**A. Can you repeat the question?**
Q. Yeah.
The first paragraph is talking about RCAF. Right?
**A. Yes.**
Q. And it says, in effect, that RCAF has not been effective in capturing increases in BNSF's fuel cost. Is that fair?
**A. Yes.**
Q. And at the last sentence of the draft letter has Mr. Rose asking Mr. Hamberger to perform an

Page 142

historical analysis of the RCAF index with fuel removed. Do you see that?
**A. Yes.**
Q. Okay. And the letter also has Mr. Rose asking Mr. Hamberger to know what it would take to start producing the same new index on a going forward basis. Correct?
**A. Yes.**
Q. So am I correct that the essential purpose of having Mr. Rose write this letter is to ask Mr. Hamberger to have the AAR prepare and promulgate this new index less fuel?
**A. To -- it says for the AAR to prepare the study, yes, for us.**
Q. To prepare the study and to have the AAR start producing this new index. Right?
**A. Yes.**
Q. Now did you speak to any other railroad before this letter was sent by Mr. Rose to Mr. Hamberger?
MR. WINTERS: Objection to the form, lack of foundation.
**A. No.**
Q. Do you know if anyone from the BNSF spoke to someone from any other railroad before this letter was sent?

Page 143

MR. WINTERS: Objection to the form, lack of foundation.
**A. No.**
MR. BROCKETT: Now -- do you need to change your tape?
THE VIDEOGRAPHER: Three minutes.
MR. BROCKETT: Okay. Let's mark as the next exhibit a one page document, BNSF 0069941. It's an e-mail -- it's a letter from Mr. Rose to Mr. Hamberger. It's two pages, actually.
(Exhibit 18 marked.)
Q. Do you recognize this, sir?
**A. Yes, this is probably a revised version of the drafts we put together.**
Q. Can you recognize this as the final letter that was sent to Mr. Hamberger by Mr. Rose?
MR. WINTERS: Objection to the form, lack of foundation.
**A. I don't know what was eventually sent.**
MR. BROCKETT: We don't have -- we have not had produced to us, I don't believe, the actual signed letter that was sent. This is all we have in the file. So one thing I would ask for you to do is to take another search and see if you can find for us the actual letter that was signed and sent. Okay. If this one is

Page 144

it, then confirm that. And if that's not the case, if you could produce the final letter we would make that request on the record. Okay.
MR. WINTERS: I hear your request.
MR. BROCKETT: Want to change your tape?
THE VIDEOGRAPHER: Sure. This marks the end of tape number 2 of the videotaped deposition of Samuel A. Kyei. We're going off the record. The time now is 12:24 p.m.
(Break from 12:24 p.m. to 12:27 p.m.)
THE VIDEOGRAPHER: Here begins tape number 3 of the videotaped deposition of Samuel A. Kyei. We're on the record. The time now is 12:27 p.m.
Q. (By Mr. Brockett) Okay. Back on the record. Mr. Kyei, showing you what we've marked as Exhibit 18, please, can you -- can you tell us whether this is the final letter that was sent from Mr. Rose to Mr. Hamberger or whether this is a draft?
MR. WINTERS: Objection to the form, lack of foundation.
**A. I don't know what was eventually sent, but all of these were drafts that we put together at the time.**
Q. Okay.
**A. And it went through several iterations.**
Q. Sure. And you personally participated in

Page 225

**to fuel expense recovery, all of which was -- was eventually presented to the executive team.**
Q. Let the record reflect that the witness was referring to Kyei Exhibit 33.
**A. Yeah. Thank you.**
Q. And you congratulated Mr. Rose in this letter for having personally intervened and achieved these results. Correct?
**A. Which result are you referring to?**
Q. The results that you referred to in the letter.
**A. Everything -- the -- congratulated him for the discipline, creating the discipline in the fuel surcharge programs, as well as the single-handedly getting the AAR to endorse an all inclusive index less fuel program.**
Q. Do you recall in -- as we move into 2005, that Mr. Rose became concerned with the pace of increase in your fuel surcharge participation?
**A. Can you please rephrase the question?**
Q. Let me just show you an exhibit. Exhibit 34 is BNSF 0479966. It's a one page e-mail.
(Exhibit 34 marked.)
Q. Now do you recognize this as an e-mail from a George Pacocha?

Page 226

**A. Pacocha.**
Q. Pacocha. Who is George Pacocha?
**A. George Pacocha is a gentleman who worked for me, and one of his responsibilities, he was a manager for our fuel surcharge.**
Q. Okay. And do you recognize this as an e-mail he wrote on July 13 of '05 to a number of individuals, including yourself?
**A. Yes.**
Q. And he says in this e-mail that Mr. Rose is concerned with the pace of increase in our fuel surcharge -- in a fuel surcharge participation in the 2006 to 2010 long-range planning. Do you see that?
**A. Yes, I do.**
Q. Do you remember Mr. Rose being concerned about that?
**A. I remember, to the best of my recollection, that we had put together a plan and there was some questions as to what the numbers meant.**
Q. Okay.
**A. So there are a series of e-mails out of which one of these could be George Pacocha's, but --**
Q. This e-mail also says that Mr. Rose wants customer specific details. Do you see that?
**A. Yes.**

Page 227

Q. Okay. Do you recall gathering for him customer specific details?
**A. As I testified earlier, we -- part of the team's responsibility was constantly gathering participation rates by customer.**
Q. So you had an ongoing responsibility --
**A. Yes.**
Q. -- of gathering information of this kind specifically for Mr. Rose. Correct?
**A. Not specifically for Mr. Rose, but the team put it together in all our presentations to executive team or whoever asked us to come for a presentation. So it was an ongoing exercise for the team.**
Q. And one of the things that Mr. Rose wanted on an ongoing basis was customer specific detail about fuel surcharge. Correct?
**A. Can you please repeat the question?**
Q. Yes.
One of the things that Mr. Rose wanted on an ongoing basis was customer specific detail about fuel surcharge coverage. Correct?
**A. I don't know that to be true. This is -- the team was working on an ongoing basis. Occasionally we would be asked to come and present to the executive team.**

Page 228

Q. Did Mr. Rose ask on an ongoing basis for information about the coverage percentages of other railroads?
**A. On an ongoing basis -- can you rephrase that?**
Q. Sure.
We saw earlier a study in which Mr. Rose had asked for and you had presented him with the fuel surcharge information from other railroads. My question is: Did he ask for that same information on an ongoing basis?
**A. No.**
Q. Okay. Did you give him one report on the fuel surcharge situation with other railroads and then gave him no other reports, or can you tell us how many reports you gave on that subject?
**A. I can't tell you how many specific reports we gave -- the fuel surcharge team was instituted, as I testified already -- the first team was in the '01 time frame. The second team was in the 2003 time frame. And there's a fuel surcharge team today, and we are constantly working. So if we are requested to make a presentation to the -- to whoever, then we will put those things together, but the team is constantly looking at things like this.**
Q. All right. Let's mark as the next exhibit a

Page 229

one page document, BNSF 0355358. It's actually two pages, 358 and 359.
(Exhibit 35 marked.)
Q. All right. Do you recognize this as an e-mail from a Mark Michaelis?
**A. I don't recall this e-mail.**
Q. Okay.
**A. But I can see Mark Michaelis' name on it.**
Q. Who is Mark Michaelis?
**A. Mark Michaelis at the time worked in the finance department.**
Q. What was his position? Do you know?
**A. I don't recall. And you asked if they were copied. I don't even recall. I think he might have been the -- I can't speculate. I don't recall.**
Q. Is this an e-mail that he sent to yourself and others on August 23rd of 2005?
**A. That is what the document says.**
Q. And the subject of it is BNSF versus UPRR fuel surcharge coverage participation question. Do you see that?
**A. BNSF -- I see. The first sentence?**
Q. The subject of the e-mail.
**A. Yes. Yes, I see that.**
Q. And in the first sentence, first paragraph,

Page 230

Mr. Michaelis writes that, I have continued to work through the BNSF versus UPRR fuel surcharge coverage question and have come up with what I believe is the source of the confusion. As I understand it, Matt wanted us to explore the differences between our reported fuel surcharge coverage of 65 percent versus the 72 percent fuel surcharge coverage reported by the UPRR. Do you see that?
**A. Yes.**
Q. Okay. Now am I correct that this -- according to this e-mail, Mr. Rose in August of '05 wanted information on the differences in fuel surcharge coverage participation between the BNSF and the UP?
**A. Can you please repeat the question?**
Q. Sure.
This e-mail reflects that in August of 2005, Matt Rose wanted information about the fuel surcharge coverage percentages of the BNSF versus the UP. Correct?
**A. That's what the document says.**
Q. Do you know what an adherence report is?
**A. We had our own -- it depends on the context. At the fuel surcharge team, we developed something called our own adherence report. That meant who is keeping pace with fuel surcharge participation.**

Page 231

Q. Okay. So what -- what was an adherence report?
**A. For us?**
Q. Yes.
**A. Okay. Who is adhering to the directives of -- of fuel surcharge? So if a contract doesn't have a fuel surcharge, then they're not adhering. So we put them on an adherence report so we could -- we could find out from their comments the reasons why, and then we could work it.**
Q. Okay. So the adherence reports were a means to monitor whether the business units were achieving the directives of the CEO. Is that fair?
**A. They were a means for us to see what -- who -- the participation rates, whether we're achieving the level of participation rates.**
Q. When you say "we," you mean the business units?
**A. The business units, yes.**
Q. And how often were adherence reports prepared?
**A. Oh, I believe occasionally when the marketing -- usually it was prepared for presentation to the chief marketing officer. And we were doing them quarterly, I think, but lately we've not been doing them as regularly as we used to.**

Page 232

Q. Okay. So at this time in the '04, '05, '06 time period, am I correct that you prepared these adherence reports quarterly and presented them to John Lanigan, the chief marketing officer?
**A. Yes.**
Q. And did these adherence reports contain information about the level of participation that you were achieving with respect to the fuel surcharge?
**A. I believe so.**
Q. And did they give information by specific customer account?
**A. Yes. The -- the goal of the adherence report was to review who is participation -- who is participating and who is not.**
Q. And would you agree that these adherence reports were in the nature of a -- of a scorecard, a grade card on how the business units were doing in implementing the CEO's directives?
**A. I will characterize it that it was simply a monitoring tool for fuel surcharge participation.**
Q. Were these adherence reports given to Mr. Rose himself?
**A. They were presented to John Lanigan. I don't know if he forwards them to Matt or not.**
Q. Was it your responsibility to prepare the

Page 233

adherence reports?
**A. It was my team's responsibility, so someone on my team was dedicated to do that.**
Q. And what happened if the adherence report showed that certain business units weren't achieving the goals? What happened?
**A. That wasn't my responsibility. My responsibility was to bean count on who is paying and who is not.**
Q. Okay.
**A. So whatever the group it is that was --**
Q. Do you know whether Lanigan was required to go speak to the particular business unit if a certain account showed up without fuel surcharges?
**A. Actually, the presentation has all the business units right there, the group VPs and the -- and John. So I don't know if there are any subsequent meetings after that from John to the other guys.**
Q. Did you have fuel surcharge adherence meetings?
**A. Not routinely. Usually we would have a meeting if -- to kind of get ready for a presentation to the chief marketing officer. So --**
Q. I'm going to give you what I think is an example of a fuel surcharge adherence report. I don't

Page 234

want to go through all of them. Let me see if I can get your testimony on this. It's BNSF 0031225 through BNSF 0031246. It's dated March 14, 2005. This will be Exhibit 36.
(Exhibit 36 marked.)
THE WITNESS: Thank you.
Q. Is this a fuel surcharge adherence report, sir?
**A. Yeah, this is typically the kind of information that would be in an adherence report.**
Q. All right.
**A. I don't know specifically whether this was a presentation for just adherence, but typically we would put things like this for adherence. And the reason why I say that is that the title says, Fuel Cost Recovery Analysis, but it includes adherence information. So I can't tell you whether this was an adherence update or not.**
Q. Now how did the company do in achieving its objectives of achieving 100 percent fuel surcharge coverage participation?
**A. Well, as far as participation, I think we're creeping towards the 90s, but if you are asking what is our participation levels, yeah, we're about -- about 90 percent.**

Page 235

Q. Okay. And was the company achieving its objectives in the time frame 2004 through 2007?
**A. I don't know what achieving the objectives means. Can you rephrase specifically what you're looking for?**
Q. Well, your -- your goal was to achieve 100 percent coverage. Correct?
**A. Yes.**
Q. And how well did you do in 2004 to 2007 in achieving that objective?
**A. Well, I'm telling you we are not at 100 percent today. We are not. We're still striving and working on it.**
Q. Would you agree that the business unit did an excellent job in achieving the objectives?
**A. We are not at 100 percent today, so I can't tell you. We're still working on achieving 100 percent.**
Q. Now the adherence report showed the fuel surcharge coverage on both local and interline movements. Correct?
**A. Can you please repeat the question?**
Q. Sure.
The adherence reports, they showed how the company was doing in achieving participation -- fuel surcharge participation for both interline and local

Page 236

rates. Correct?
**A. Yes.**
Q. So the fuel surcharge adherence reports were not limited to interline or any specific subset of the business. Correct?
**A. Yes.**
Q. Now did there come a time in 2004 when Mr. Lanigan asked you to reconstitute the fuel surcharge team to look at the option of a mileage based fuel surcharge?
**A. Mr. Lanigan from day one asked us to put together a mileage based team. So the whole fuel surcharge team starting from 2003 has been about mileage base.**
Q. Okay. Well, was there a time in August of 2004 when Mr. Lanigan suggested that you should reconstitute the team to take a second look at the mileage based option?
**A. Yes. We had to regroup, but it was basically the same team that was there before.**
Q. Okay. And what specifically did Mr. Lanigan ask you to do?
**A. To look at mileage base, the mileage base fuel surcharge program.**
Q. Did he tell you why he wanted you to look at

that?
**A. No.**
Q. Let's mark as Exhibit 37 a three page e-mail. It bears BNSF 0028686 through BNSF 0028688.
(Exhibit 37 marked.)
Q. Now these are a series of e-mails, sir. I want to focus your attention on the e-mail in the first page from George Gillen. Do you see that?
**A. Yes.**
Q. And it's dated September 1st of 2004. Do you see that?
**A. Uh-huh.**
Q. In the first paragraph --
MR. WINTERS: You have to answer yes.
**A. Yes. September 1, 2004.**
Q. In the first paragraph Mr. Gillen writes, There's been a lot of focus on the fuel surcharge recently with Matt Rose and John Lanigan wanting to know; one, the number of price authorities, PAs not subject to the FSC; two, new PAs in 2004 not subject to fuel surcharge; three, 2004 renewals not converted to fuel surcharge. Do you see that?
**A. Yes, I do.**
Q. Okay. And you remember Mr. Rose and Mr. Lanigan wanting to know this information. Right?



**A. Yes. And I think we provided information.**
Q. And, in fact, that's in part what the fuel surcharge adherence reports were to do, provide this information among other information. Correct?
**A. Per request.**
Q. Now the second paragraph of this e-mail says, Additionally, John Lanigan asked Nick Murray and Sam Kyei to revive last year's fuel surcharge review team to analyze and possibly implement a fuel surcharge program based on miles in lieu of the percentage formula currently used. Do you see that?
**A. Yes, I do.**
Q. Now does that refresh your recollection of what you were asked to do?
**A. As I told you the -- John Lanigan's goal was to do a mileage base from day one, which is 2003. So the team worked through it, made a recommendation. At the time, the short -- the short view was to keep rolling with percent of revenue, but the mileage base never died. And the mileage base is really what -- what we were shooting for to be fairer -- a fairer form of implementing fuel surcharge.**
Q. Okay. This e-mail also goes on to say that apparently high RPU customers are complaining that they paid more than their fair share. Do you see that?



**A. Yes, I see that.**
Q. What is an RPU customer?
**A. RPU customer. What I think he means here -- okay -- what I think he means here is that a percent of revenue is based on the rate. So a customer who -- who's revenue per unit on average is higher is likely to pay more.**
Q. Now am I correct that the mandate of your team with reference to a mileage base surcharge was to look at this concept for both interline and local rates?
**A. We've always -- the team was constituted to look at the entire portfolio. So we've always looked at everything.**
Q. Okay. Let's mark as Exhibit 38 a one page e-mail. It bears Bates stamp BNSF 0345996.
(Exhibit 38 marked.)
THE WITNESS: Thank you.
Q. Okay. Now this is an e-mail from David Burr dated October 18th of 2004. Do you see that?
**A. October 18, 2004. Yes, I do.**
Q. And Mr. Burr's position at the time was what?
**A. I believe he was the AVP of fuel management.**
Q. In the first sentence of this e-mail he says -- he refers to a presentation delivered at John Lanigan's staff meeting today regarding BNSF's fuel



surcharge program. Do you see that?
**A. Yes, I do.**
Q. And is that a meeting that you attended?
**A. I don't recall this particular -- give me a minute to read this to see if it -- I believe -- I believe, sir, this was a presentation that the team gave. And you remember Dave Burr was on the team.**
Q. Now the last sentence of this e-mail says that John advised that he will be meeting with his counterparts in the next few weeks and may explore the issues with them. Do you see that?
**A. Yes, I do.**
Q. Do you recall at this meeting John Lanigan saying to the -- to the participants in the meeting that he intended to meet with his counterparts at the other railroads and talk to them about a mileage base surcharge?
MR. WINTERS: Object to the form.
**A. Can you please repeat the question?**
Q. Sure.
Do you recall Mr. Lanigan stating at this meeting that he intended to meet with his counterparts at the other railroads and to explore with them the issue of a mileage based fuel surcharge?
MR. WINTERS: Objection to the form, lack

Page 241

of foundation.
**A. I don't recall the specifics of this.**
Q. The date of this e-mail is the 18th of October of 2004. Right?
**A. Yes.**
Q. Do you keep a calendar or any kind of appointment book that shows what meetings that you attend and what you don't?
**A. No, I don't.**
Q. Do you have any kind of electronic calendar that you record when your meetings are to occur?
**A. I have an Outlook appointment -- Outlook appointment, but I don't --**
Q. And do you -- do you record on that when you attend meetings?
**A. I record on it, and people put meetings on my calendar. That would be in that Outlook calendar, yeah.**
MR. BROCKETT: Has that been produced?
MR. WINTERS: Sure. I think that Mr. Kyei's calendars have been produced if they were requested and required to be produce.
MR. BROCKETT: All right. Well, we'll look and see. We didn't find one. It would have been nice to have one at this deposition.
MR. WINTERS: All documents that were

Page 242

requested at this point have been produced, and we've had a lot of back and forth about calendars and production and so forth. And sitting here today, I don't know off the top of my head, but I have to believe that they were produced.
MR. BROCKETT: Well, look and see.
Q. Let's mark as our next exhibit a document produced by BNSF. It's a one page e-mail with a report attached. It's BNSF 00725 through BNSF 00757. It's Exhibit 39.
(Exhibit 39 marked.)
Q. Okay. First of all, let me direct your attention to the attachment here. It's called, BNSF Fuel Surcharges Team Recommendations, dated October 18, 2004.
**A. Yes.**
Q. Do you see it?
**A. Yes, I do.**
Q. And on the second page of the exhibit, you are listed here as the team leader. Right?
**A. Yes, I --**
Q. And Mr. Burr is listed as a mentor. Right?
**A. Yes.**
Q. And Mr. Murray is listed as a mentor. Right?
**A. Yes.**

Page 243

Q. So this shows as of this time you were still the leader of this fuel surcharge review team?
**A. Yes.**
Q. And is this a document that your team created?
**A. Yes.**
Q. And was this presented at John Lanigan's staff meeting on October 18, 2004?
**A. That is what it says based on Gillen's e-mail.**
Q. And do you remember presenting this PowerPoint presentation at the staff meeting on October 18th?
**A. I remember the team presenting it, so different people presented different parts of it.**
Q. Okay.
**A. But yes.**
Q. Now in this e-mail which is by George Gillen -- and who is Mr. Gillen at this time, by the way?
**A. George Gillen was a general director, just like I was, and was the person responsible for the carload side. So he was responsible -- I think his title was general director revenue price -- of price management, something like that.**
Q. Now was he at this October 18th meeting as well?
**A. I don't recall specifically, but if he wasn't,**

Page 244

**one of his people would be there. I don't recall his -- the attendance list.**
Q. Now in this e-mail Mr. Gillen writes as follows: Nothing was decided. As John wants to consider all of the issues further and possibly discuss this with others, possibly including his industry peers as it pertains to joint line application, et cetera. Do you see that?
**A. Yes, I do.**
Q. Now I'm going to ask you again, do you recall Mr. Lanigan stating at this meeting that he needed to discuss the issue of the mileage based fuel surcharge with his peers at other railroads?
MR. WINTERS: Objection to the form, lack of foundation.
**A. I recall the issue of inline -- inline problems with a mileage based surcharge approach, and you will probably see that on page 24, which talks about all the issues involving the electronics systems, current REN standards and all of that, and all of the issues that Gillen's area, which is in charge of the price management administration, were raising. That I recall, and you can see that in the documents.**
Q. All right. Let's mark as our next exhibit a one page e-mail. It bears Bates number 00758. This is

Page 245

Exhibit 40.
(Exhibit 40 marked.)
Q. Now let me direct your attention first to the e-mail chain that begins in the middle of the page, the e-mail from David Burr to John Lanigan. Do you see that?
**A. Yes, I do.**
Q. And you're a recipient of that e-mail, are you not?
**A. Yes.**
Q. Okay. And this is dated October 21st of 2004. Right?
**A. Uh-huh. Yes.**
Q. And this is three days after the staff meeting that was referred to in the earlier e-mails. Correct?
**A. Yes.**
Q. Now in this e-mail Mr. Burr writes, As you can tell from our comments at Monday's meeting, we are concerned about the cost to implement and the potential impact to free cash flow due to a change in the fuel surcharge formula from a percentage of revenue to price per mile. Do you see that?
**A. Yes, I do.**
Q. Then Mr. Lanigan responds to the e-mail in the chain at the top. Do you see that?

Page 246

**A. Yes, I do.**
Q. And Mr. Lanigan writes on October 21st to Mr. Burr and to yourself and others. Correct?
**A. Yes.**
Q. And he says, I clearly understand the concerns and believe them to be important. I plan to talk to my counterparts at the next NEMC meeting in a couple of weeks to gauge the interline issues/interest. Do you see that?
**A. Yes.**
Q. Now does that refresh your recollection that you were told by Mr. Lanigan that he was going to have a discussion with his counterparts about a mileage based surcharge at the NEMC meeting in the fall of 2004?
MR. WINTERS: Objection to the form, lack of foundation.
**A. As I just testified, in the document the presentation raised issues about some problems with inline -- how you set up an inline agreement for mileage base, and I testified to that as it was a key part of the presentation, particularly from the price management guys that controlled the REN systems which are inline systems. And I think the document speaks for itself when it -- in context with that when it says to gauge the inline issues. So we had presented inline issues.**

Page 247

Q. All right. Exhibit 41 is a one page e-mail, bears the Bates stamp BNSF 0327644.
(Exhibit 41 marked.)
Q. Now this is an e-mail that you wrote on November 3rd of 2004, right, Mr. Kyei?
**A. Yes, I do.**
Q. And you wrote this to quite a number of people. Correct?
**A. Yes.**
Q. And are all the people who received this e-mail people who were participating on your fuel surcharge team?
**A. Let me check. Every -- everyone who was copied was at the team at one time or the other, in other words, members of the team.**
Q. Now in the body of the e-mail which is addressed to all, right?
**A. Uh-huh. Which line do you want me to look at?**
Q. The e-mail is addressed to all. Correct?
**A. Yes. Yes, to all members of the team.**
Q. And in the last sentence of the first paragraph, you state, As the next steps, I have summarized John's comments at and after the meeting below. Do you see that?
**A. Yes.**

Page 248

Q. And the meeting you're talking about is at the October 18, 2004 Lanigan and staff meeting. Right?
**A. Yes.**
Q. And in point one you say that he, John, will be visiting with his railroad counterparts at the upcoming NEMC/SOMC meeting in Kansas City to judge the appetite for a mileage base fuel surcharge program. Correct?
**A. Yes, and I just testified that we presented the documents of the presentation that you just showed me where we highlighted all the inline issues. And so what this means is John was going to clear up the inline issues before we proceeded.**
Q. Your e-mail here doesn't mention the word interline, does it, sir?
**A. The e-mail --**
Q. Does it mention interline, sir?
MR. WINTERS: He's answering the question.
**A. I'm answering.**
MR. BROCKETT: He has to answer me correctly.
MR. WINTERS: Do you want to have him just read what's on the page here?
Q. Sir, the document doesn't mention the word

interline, does it?
MR. WINTERS: Just answer the question directly, if you can.
**A. This document says he will be visiting with his counterparts. The previous document says he will be visiting with his counterparts to address the -- to gauge the inline issues, and this document links all three up to show what those inline issues are which we've listed with REN and itemized all those inline issues.**
Q. I'm only asking you about the exhibit before you, which is an e-mail you wrote. Can we concentrate on that, sir?
**A. Yes.**
Q. Okay. And you wrote that Mr. Lanigan is going to visit his counterparts at other railroads to judge their appetite for a mileage base surcharge program. Correct? That's what you wrote?
**A. With regards to inline, yes, that's what I -- that's what it means.**
Q. It doesn't say the word interline here anywhere, does it, sir, not in your e-mail?
MR. WINTERS: Objection to the form. We can all read the document.
MR. BROCKETT: Okay. Then I just need



him to answer me and stop dodging my question, and we'll move on.
MR. WINTERS: Can you answer the question directly?
**A. Let me answer the question. The document says he will be visiting with his interline counterparts in an upcoming NEMC meeting based on issues that we had presented and to clear them up so we can proceed.**
Q. Sir, does your e-mail mention the word interline anywhere? Yes or no? Does it or doesn't it?
**A. This -- this letter doesn't have inline in it.**
Q. Thank you.
**A. But I'm telling you what it means --**
Q. Thank you.
**A. -- because I wrote it.**
Q. Let's mark as our next exhibit a series of e-mails. It bears BNSF 00769 through 00770.
(Exhibit 42 marked.)
Q. Okay. So this is an e-mail chain, sir. I want to look at the e-mail on the second page. It's from Eldon Specht. Do you see that?
**A. Yes.**
Q. And Mr. Specht is -- he was one of the members of your surcharge team, was he not?
**A. Yes, he was.**



Q. Okay. And he writes on January 19th of 2005 regarding the per mile fuel surcharge project. Do you see that?
**A. Yes.**
Q. And he says in the body of the e-mail, Couple of things happening with fuel surcharge. John Lanigan shopped the concept with his counterparts from other roads at the NEMC meeting -- NEMC meeting (AAR group of chief marketing officers) and they pushed back as expected. Do you see that, sir?
**A. Yes.**
Q. Okay. Now it says also down here, Appears John Lanigan saw this coming. Do you see that?
**A. Yes, I see that.**
Q. Now did anyone ever tell you that Mr. Lanigan shopped the concept of a mileage base fuel surcharge at the NEMC meeting and got pushback from the executives of other railroads?
**A. No.**
MR. WINTERS: Objection to the form.
**A. No.**
Q. Did Mr. Lanigan ever report that at one of your group meetings?
**A. I don't recall.**
Q. Now if we look at the e-mail on the first



page, it's from a Harry Bognich.
**A. Bognich.**
Q. Who is Harry Bognich?
**A. A gentleman who worked for Eldon. He's an IT person.**
Q. Okay. And he sends this to George Gillen, James Arnett, a number of others, and then it says cc to all RPMS team. Do you see that?
**A. Yes.**
Q. Does that include you?
**A. No.**
Q. Okay. And Mr. Bognich says in this e-mail, it appears unfortunately from the e-mail below that the new proposal per mile fuel surcharge for carload might not be supported, at least initially, by the other carriers. Do you see that?
**A. Yes.**
Q. Okay. And I'm going to ask you again. You're the leader of the fuel surcharge team. Is it your testimony that nobody reported this information to you?
**A. What information?**
Q. The information I just read, namely that Mr. Lanigan talked with his counterparts at other railroads about a mileage base fuel surcharge and they told him they wouldn't support it.

Page 253

MR. WINTERS: Objection to the form, lack of foundation.
**A. No.**
Q. No one ever reported this to you. Right?
**A. No.**
Q. And as you sit here today, you didn't know these facts in January 2005. Is that correct?
MR. WINTERS: Objection to the form.
**A. Not in the way you characterize them.**
Q. Okay. Well, what facts do you know on the subject that's dealt with in this e-mail, sir?
**A. What it means to me was that there were still issues with the inline function, and so if the team proceeded to build fuel surcharges that linked to the inline function, there were all those issues that were raised by the team and different members of the team were still there.**
Q. Well, the second sentence says, To solve this issue, the proposal appears to be that BNSF will start with a per mile surcharge for local traffic and keep the percentage of revenue calculation for interline traffic. Do you see that?
**A. Yes, I do.**
Q. Okay. Now did you discuss that concept?
**A. That is what I just explained, that we had**

Page 254

**issues with the inline function to be able to build the inline -- based on all the team's work on all these issues that related to the inline function, and so the team was still focusing on the local piece at this time.**
Q. Okay. Well, this suggests to me that the team -- or at least it was proposed to the team, that you would create a mileage base surcharge program for local traffic and keep the percentage of revenue calculation for interline traffic. Is that correct?
**A. Those are your words, not mine.**
Q. Well, I'm asking you: Did that happen?
**A. We still -- we have mileage base in ag and coal and some local traffic, and then we also have the regulated piece based on STB stipulations for industrial products. But we're still working on mileage base now today. The team -- that's the team's work, so --**
Q. Well, what I'm asking you is what you did in January of 2005 after Mr. Lanigan came back and reported that the other carriers won't support a mileage base fuel surcharge program?
MR. WINTERS: Objection to the form.
Q. What did you do as team leader after you learned that information, sir?
MR. WINTERS: Objection to the form, lacks foundation.

Page 255

**A. Can you please repeat your question?**
Q. I'll have it read back.
**A. Okay. Thank you.**
**(Requested testimony read.)**
**A. Okay. The characterization of the way you characterize it is different from what I would characterize it. I characterize it that we still had huge problems from the inline function, but we should not stop our work. We should continue working. On the ones that we can get, we can work on. And so the team -- that's been the team's charge until today. It gets reconstituted from time to time. It ramps up and it goes down, and it ramps up and goes down. So we're working all the time.**
Q. Did Mr. Lanigan ever tell you that when he discussed the mileage based surcharge concept with his counterpart at other railroads, that he limited his discussion to interline rates? Did he ever tell you that?
MR. WINTERS: Objection to the form.
**A. I have not had any one-on-one conversation with John about anything on the agenda of the NEMC or any associations that he belongs to.**
Q. Did you attend any meetings of your group where Mr. Lanigan gave a report to the group on what he

Page 256

had discussed with his industry counterparts at the NEMC meeting in the fall of 2004?
**A. Typically, John doesn't attend the fuel surcharge meeting. Occasionally, he will come in and kind of slap our back and say, Keep going, guys, you know, kind of motivate us on the hard work. But I don't recall a specific time where he came in and spelled -- talked about all the agenda items on an NEMC program. I've never seen that he's done that.**
MR. WINTERS: Dan, do you want -- can we take a short break?
MR. BROCKETT: Sure.
MR. WINTERS: We've gone about an hour and 15.
THE VIDEOGRAPHER: Going off the record, the time now is 4:22 p.m.
(Break from 4:22 p.m. to 4:34 p.m.)
THE VIDEOGRAPHER: We're back on the record. The time now is 4:34 p.m.
Q. (By Mr. Brockett) All right. When we left off, we were talking about your group's evaluation of a mileage based surcharge. Do you recall that?
**A. Yes.**
Q. Now what, if anything, did your group eventually recommend with respect to the mileage base

Page 257

surcharge?
**A. We -- we recommended to John that we should -- it depended on which time. What time are you talking about specifically?**
Q. 2004, 2005.
**A. Okay. We were recommended certain tables, and we kept revising, tables need to be included depending on -- so, for example, we've gone from looking at different intermodal tables, some that include empty, some that doesn't include empty. So like I told you, we're always working on this. And we've eventually recommended the coal and ag implementation, which came later, I think in 2006. And then the team also worked on the STB mandated for industrial products on regulated traffic.**
Q. Let me see if I can get this chronology right. Did there come a time in 2005 when your team recommended that BNSF go to a fuel -- a mileage based fuel surcharge program?
**A. We've -- we've always been looking at mileage based program all the time from day one, is what I told you. From time to time -- the first -- the first run, our presentation there was more leaning towards percent of revenue continuing, but it's always mileage base. We're always thinking that's our ultimate goal.**

Page 258

Q. Well, did BNSF announce in March of 2005 that it was going to a mileage base fuel surcharge program?
**A. I believe so.**
Q. And am I correct that this announcement stated that the mileage based program would not take effect until January 1 of 2006?
**A. I believe so.**
Q. Why was there a nine-month period between the announcement and the effective date of the new program?
**A. It's a lot of work. It's a lot of systems that need to be in place. It's a lot of -- it's a lot of effort, and so just to give us time to get it right.**
Q. And did BNSF implement the mileage based surcharge program on January 1st of 2006?
**A. Yes, I believe so for coal and ag.**
Q. But am I correct that the fuel surcharge applicable to the general carload shipments remained the revenue based surcharge program. Right?
MR. WINTERS: Objection to the form.
**A. I already testified that it was implemented mostly for the bulk commodities.**
Q. My question is a little more specific. Am I correct that on January 1st of 2006, the BNSF surcharge program changed for coal and agriculture but remained the same with respect to general carload shipments?

Page 259

MR. WINTERS: Objection to the form.
**A. I believe that's -- that's -- that's what I said. In other words, we implement it for the bulk commodities.**
Q. And the mileage based program announced in January 1, 2006, did that apply to both local and interline movements?
**A. I believe we implemented it just for the local.**
Q. So the interline movements, the fuel surcharge program remained the percentage of revenue based, correct, the HDF -- HDF index and other features we've discussed?
**A. I believe so.**
Q. And did the mileage based surcharge that you announced that became effective on January 1st of 2006, did that apply to both regulated and unregulated traffic, coal and ag traffic?
**A. It applied to all coal and ag except inline.**
Q. And just so the record is clear, the percentage of revenue based surcharge remained applicable to all other carload traffic, including regulated and nonregulated carload local traffic. Correct?
**A. In 2006. In 2007 came the regulated carload,**

Page 260

**the regulated STB mandated.**
Q. Okay. And did the basic carload fuel surcharge, the percentage of revenue based program, did that remain for all carload traffic except coal and agriculture up through the middle of 2007?
**A. I believe so.**
Q. Now was it one of the goals of BNSF to have the mileage based fuel surcharge to be revenue neutral?
**A. It was one of the goals for join, yes.**
Q. And by revenue neutral, I mean that the mileage based fuel surcharge program would realize for the company essentially the same revenue as the percentage of rate based surcharge program would realize. Do you see that?
**A. Can you restate the question?**
Q. Okay. When I say revenue neutral -- strike that.
Was it Mr. Lanigan's goal that the mileage based surcharge program generate for the company the same revenue as the prior fuel surcharge program did?
**A. By revenue neutral, John -- John Lanigan's request from the team was to look into, to study what it would take, and by revenue neutral this is what he meant. What he meant was not what you said, but what he meant was reciprocal surcharges so that, for example, if**

**CHANGES AND SIGNATURE**

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 10 | 20 | '85 to **'87** | Correct Record |
| 14 | 18 | general to **General Director** | Correct Record |
| 14 | 19 & 20 | Delete starting at merger to November of 2002. Insert **from July 1999 to November 2002** | Correct Record |
| 17 | 2 | 1990 to **1998** and '96 to **'99** | Correct Record |
| 17 | 19 | microeconomic to **macroeconomic** | Incorrect Transcription |
| 17 | 20 | microeconomic to **macroeconomic** | Incorrect Transcription |
| 18 | 23 | comparative to **competitive** | Incorrect Transcription |
| 20 | 24 | work to **worked** | Incorrect Transcription |
| 24 | 24 | look to **looked** | Incorrect Transcription |
| 25 | 3 | that are familiar to **I was familiar** | Incorrect Transcription |
| 37 | 3 | WTF to **WTI** and HDI to **HDF** | Incorrect Transcription |
| 40 | 24 | carload fuel surcharge to **the carload team** | Correct Record |
| 45 | 12 | After we, delete (--) and insert **recommend that** | Correct Record |
| 45 | 13 | shifted to **shift** | Correct Record |
| 50 | 3 | one to **our** | Incorrect Transcription |
| 51 | 25 | After surcharge, insert **formula** | Correct Record |
| 73 | 22 & 24 | Krindle to **Crimmel** | Incorrect Transcription |
| 74 | 17 | Krindle to **Crimmel** | Incorrect Transcription |
| 75 | 16 | Krindle to **Crimmel** | Incorrect Transcription |
| 83 | 21 | bosses to **boss** | Incorrect Transcription |

HIGHLY CONFIDENTIAL
SAMUEL KYEI

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 132 | 21 | there's any to **there is the same** | Correct Record |
| 134 | 3 | index rates to **fixed weights** | Incorrect Transcription |
| 134 | 8 | remove to **removing** | Incorrect Transcription |
| 137 | 14 | coal CPI to **core CPI** | Incorrect Transcription |
| 139 | 6 | he wrote to **she wrote** | Incorrect Transcription |
| 146 | 9 & 11 | Clyde Krindle to **Clyde Crimmel** | Incorrect Transcription |
| 147 | 3 | Krick to **Craig** | Incorrect Transcription |
| 147 | 10 | coal CPI to **core CPI** | Incorrect Transcription |
| 147 | 11 | coal RCAF to **core RCAF** | Incorrect Transcription |
| 148 | 12 | Mike Feldman to **Matt Feldman** | Incorrect Transcription |
| 148 | 13 | Clyde Krindle to **Clyde Crimmel** | Incorrect Transcription |
| 151 | 1 | coal RCAF to **core RCAF** | Incorrect Transcription |
| 159 | 3 | coal RCAF to **core RCAF** | Incorrect Transcription |
| 159 | 9 | coal RCAF to **core RCAF** | Incorrect Transcription |
| 159 | 15 | coal RCAF to **core RCAF** | Incorrect Transcription |
| 159 | 19 | coal ratio to **core component** | Incorrect Transcription |
| 161 | 8 | Mr. Krindle to **Mr. Crimmel** | Incorrect Transcription |
| 162 | 7 | Mr. Krindle to **Mr. Crimmel** | Incorrect Transcription |
| 165 | 5 | early to **late** | Correct Record |
| 165 | 6 | Krindle to **Crimmel** | Incorrect Transcription |
| 165 | 19 | Clyde Krindle to **Clyde Crimmel** | Incorrect Transcription |
| 167 | 20 | Mr. Krindle to **Mr. Crimmel** | Incorrect Transcription |
| 178 | 11 | used to doing it, to **using the data,** | Incorrect Transcription |

**CHANGES AND SIGNATURE**

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 182 | 6 | bleeding ink to **bleeding red ink** insert **"or" before 60** | Incorrect Transcription |
| 182 | 9 | Delete second **"for"** | Incorrect Transcription |
| 183 | 16 | Delete **coal** | Incorrect Transcription |
| 187 | 1 | using to **used in** | Incorrect Transcription |
| 187 | 17 | contract to **contracts** | Incorrect Transcription |
| 188 | 25 | A11 to AII | Incorrect Transcription |
| 199 | 2,3,8,15,16 18,20 | inline to **interline** | Incorrect Transcription |
| 203 | 12 | escalate these to **escalate their contracts** | Correct Record |
| 209 | 17 & 19 | inline to **interline** | Incorrect Transcription |
| 213 | 6,7,18,21,24 | inline to **interline** | Incorrect Transcription |
| 214 | 3 | inline to **interline** | Incorrect Transcription |
| 215 | 4 | inline to **interline** | Incorrect Transcription |
| 219 | 12,22,24 | inline to **interline** | Incorrect Transcription |
| 239 | 6 | who's to **whose** | Incorrect Transcription |
| 244 | 16 | inline to **interline** | Incorrect Transcription |
| 246 | 19,22,25 | inline to **interline** | Incorrect Transcription |
| 248 | 11 &12 | inline to **interline** | Incorrect Transcription |
| 249 | 7,8,9,19 | inline to **interline** | Incorrect Transcription |
| 250 | 11 | inline to **interline** | Incorrect Transcription |
| 253 | 13 & 15 | inline to **interline** | Incorrect Transcription |
| 254 | 2 &3 | inline to **interline** | Incorrect Transcription |
| 255 | 8 | inline to **interline** | Incorrect Transcription |

HIGHLY CONFIDENTIAL
SAMUEL KYEI

## CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 257 | 10 | empty to **empties** | Incorrect Transcription |
| 259 | 19 | inline to **interline** | Incorrect Transcription |
| 260 | 9 | join to **John** | Incorrect Transcription |
| 262 | 2 & 16 | inline to **interline** | Incorrect Transcription |
| 263 | 11 | 250 to **$2.50** | Incorrect Transcription |
| 268 | 17 & 19 | inline to **interline** | Incorrect Transcription |
| 269 | 20 | inline to **interline** | Incorrect Transcription |
| 276 | 18 | inline to **interline** | Incorrect Transcription |

I, SAMUEL KYEI, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

SAMUEL KYEI

THE STATE OF Texas )
COUNTY OF Tarrant )

Before me, Vickie Popejoy, on this day personally appeared SAMUEL KYEI, known to me (or proved to me under oath or through personal knowledge) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 30th day of April, 2010.

Vickie Popejoy

NOTARY PUBLIC IN AND FOR
THE STATE OF Texas
COMMISSION EXPIRES: 9/8/10

VICKIE POPEJOY
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
September 8, 2010

# In The Matter Of:

*In Re: Rail Freight Fuel Surcharge Antitrust Litigation*

---

*JOHN LANIGAN*
*June 22, 2010*

---

## *HIGHLY CONFIDENTIAL*

MERRILL CORPORATION
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL )
SURCHARGE ANTITRUST )
LITIGATION )
) MDL No. 1869
) Misc. No. 07-489
This Document Relates To: ) (PLF/AK/JMF)
)
ALL DIRECT PURCHASER )
CASES )

*****************************************************
"HIGHLY CONFIDENTIAL"
ORAL AND VIDEOTAPED DEPOSITION OF
JOHN LANIGAN
JUNE 22, 2010
*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF JOHN LANIGAN, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause June 22, 2010, from 8:31 a.m. to 4:38 p.m., before Julie C. Brandt, RMR, CRR, and CSR in and for the State of Texas, reported by machine shorthand, at the offices of Haynes and Boone, 201 Main Street, Suite 2200, Fort Worth, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Daniel L. Brockett
Sami H. Rashid
Kyle R. Taylor
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849-7345
212.849.7100 (fax)
danbrockett@quinnemanuel.com
samirashid@quinnemanuel.com
kyletaylor@quinnemanuel.com

-and-

Paul M. Donovan
LaROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Ave., N.W.
Suite 200
Washington, D.C. 20036
202.298.8100
202.298.8200 (fax)
paul.donovan@laroelaw.com

FOR THE DEFENDANT BNSF RAILWAY COMPANY:

Richard J. Favretto
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
202.263.3250
202.263.5250 (fax)
rfavretto@mayerbrown.com

FOR THE DEFENDANT CSX TRANSPORTATION, INC.:
David D. Cross
CROWELL MORING
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
202.624.2774
202.628.5116 (fax)
dcross@crowell.com

Page 3

A P P E A R A N C E S
(CONTINUED)

FOR THE DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY:
Tara L. Reinhart
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
202.371.7630
202.661.0540 (fax)
tara.reinhart@skadden.com

FOR THE DEFENDANT UNION PACIFIC:

David G. Meyer
HOWREY LLP
550 South Hope Street
Suite 1100
Los Angeles, California 90071
213.892.1928
213.892.2300 (fax)
meyerd@howrey.com

ALSO PRESENT:

David M. Pryor - BNSF Senior General Attorney
Richard E. Weicher - BNSF Vice President and General Counsel - Regulatory

VIDEOGRAPHER:
Carlos Garcia, CLVS - Merrill Corp.

Page 4

INDEX


| | PAGE |
|---|---|
| Appearances.................................... | 2 |
| Proceedings.................................... | 9 |
| Stipulations.................................. | 287 |
| JOHN LANIGAN | |
| Examination by MR. BROCKETT............... | 10 |
| Signature and Changes.......................... | 289 |
| Reporter's Certificate......................... | 291 |

| DEPOSITION EXHIBITS | | IDENTIFIED |
|---|---|---|
| Exhibit 1 | Jan. 15, 2003 Memo to Matt Rose from Chuck Schultz, Subject: Fuel Surcharge Questions, BNSF-0328855 to BNSF-0328873.... | 27 |
| Exhibit 2 | 02/06/2003 John Lanigan 2003 Draft Goals, BNSF-0387501 to BNSF-0387503................... | 33 |
| Exhibit 3 | Fuel Surcharge Team, March 14, 2003 Meeting, BNSF-0328761 to BNSF-0328764................... | 39 |
| Exhibit 4 | BNSF-NS Senior Team Meeting Agenda, March 18, 2003, BNSF-FSC 000643 to 000645....... | 42 |
| Exhibit 5 | E-mail and attachment from Sam Kyei, March 18, 2003, Subject: Updated: Fuel Surcharge Review Team, BNSF-0330793 to 0330833... | 56 |
| Exhibit 6 | E-mail string, March 2003, Subject: Your Call, NS 001000225 | 59 |
| Exhibit 7 | NFTA Spring Business Meeting Flyer NS_015000208 - 015000211.. | 64 |
| Exhibit 8 | E-mail from Richard Stroot, March 27, 2003, Subject: CSX agenda for April 1, 2003 & background news releases, BNSF-0557167 to BNSF-0557181.... | 65 |






DA03100

Page 5

INDEX
CONTINUED

DEPOSITION EXHIBITS IDENTIFIED
Exhibit 9 E-mail string, March 28, 2003, Subject: Request for BNSF Concurrence, BNSF-0032321 to BNSF-0032325.................... 72
Exhibit 10 E-mail string, April 4, 2003, Subject: Modified UP Fuel Surcharge - Project 1773, BNSF-FSC 000572 to 000574....... 78
Exhibit 11 E-mail string, April 2003, Subj. DOA ON FSC, BNSF-0027935........ 87
Exhibit 12 E-mail, April 23, 2003, Subject: BNSF/CSX mtg - Board Room - Business casual BNSF_CAL-0007200 92
Exhibit 13 E-mail from Sam Kyei, April 30, 2003, Subject: Fuel Surcharge Program Changes (Updated w/Hedging Info), BNSF-0327012 and BNSF-0327011................ 95
Exhibit 14 BNSF Rules Book 6100-A, BNSF-0511809 to BNSF-0511853.... 102
Exhibit 15 E-mail string, May 2003, Subject: Updated UP FSC effective 6/1/03, BNSF-0342451 to BNSF-0342453................. 116
Exhibit 16 BNSF-Norfolk Southern Executive Team Review, May 17, 2003, NS_010034423 to NS_010034425.... 124
Exhibit 17 E-mail string, Sept. 11, 2003, Subject: BNSF-NS Minutes, and attachment, NS_010033205 to NS_010033210.................... 134
Exhibit 18 E-mail string, Sept. 26, 2003, Subject: SOMC and NEMC 9/11/2003 Minutes and Call for November Meetings, NS_013005655 to 5673.. 145

Page 6

INDEX
CONTINUED

DEPOSITION EXHIBITS IDENTIFIED
Exhibit 19 E-mail string, March 11, 2004, Subject: Fuel Analysis 3-11-04.ppt, BNSF-0329035....... 184
Exhibit 20 Interoffice Memo to Matt Rose from Sam Kyei, May 10, 2004, Subject: Fuel Cost Recovery Analysis, BNSF-0648196 to 198... 193
Exhibit 21 May 2004, E-mail String and Attachment, Subject: Fuel Cost Recovery Analysis, BNSF-0338133 to BNSF-0338158 (out of order).. 201
Exhibit 22 Sept. 10, 2004, E-mail from John Lanigan, Subject: 2004 authorities without Fuel Surcharge.xls, BNSF-0041487 to BNSF-0041490.................... 202
Exhibit 23 Oct. 2004, E-mail string, Subject: 10-11-04 JPL Staff Meeting Minutes, BNSF-0029497 to BNSF-0029515.................... 206
Exhibit 24 Fuel Surcharge Adherence, November 10, 2004, BNSF-0319605 to BNSF-0319606................. 209
Exhibit 25 E-mail string, October 2003, Subject: Fuel surcharge Overview Clarence 03.ppt, CSX000627 to CSX000628....................... 210
Exhibit 26 E-mail string, Oct./Nov. 2004, Subject: NS-BNSF Meeting Review NS 001000719 to NS 001000744.... 214
Exhibit 27 E-mail from Eldon Specht, Sept. 7, 2004, Subject: Fuel surcharge by mile meeting notes, BNSF-0028783 to BNSF-0028784.... 220

Page 7

INDEX
CONTINUED

DEPOSITION EXHIBITS IDENTIFIED
Exhibit 28 E-mail from David Burr, Oct. 18, 2004, Subject: Fuel Surcharge, and attachment, BNSF-0345959 to BNSF-0345991.................... 223
Exhibit 29 E-mail string, Oct. 21, 2004, Subject: FSC, BNSF-0041493 to BNSF-0041494.................... 225
Exhibit 30 E-mail string, Jan. 19 and 20, 2005, Subject: Per Mile Fuel Surcharge project, BNSF-0327645 to BNSF-0327646................. 231
Exhibit 31 E-mail from John Lanigan, March 28, 2005, Subject: New Fuel Surcharge Program, BNSF-0329108 to BNSF-0329114.... 240
Exhibit 32 Draft Communications Plan (Mileage-Based Fuel Surcharge Program Update July 2005), BNSF-0327878 to BNSF-0327890.... 251
Exhibit 33 E-mail string, June 2006, Subject: Potential MBFSC Test IP Customers, BNSF-0033275 to BNSF-0033280.................... 253
Exhibit 34 Aug. 5, 2008 BNSF News Release.. 260
Exhibit 35 Dec. 2, 2008 BNSF News Release.. 262
Exhibit 36 E-mail string, Jan. 2, 2004, Subject: (Larger) Marketing Staff Meeting, BNSF-0354471 to BNSF-0354472.................... 264
Exhibit 37 Collection of documents, first page - HDF table, BNSF-0325029 to BNSF-0325039................. 267

Page 8

INDEX
CONTINUED

DEPOSITION EXHIBITS IDENTIFIED
Exhibit 38 John Lanigan's Staff Meeting, April 11, 2006, BNSF-0048723 to BNSF-0048724.................... 269
Exhibit 39 E-mail string, May 5, 2006, Subject: AAR, BNSF-0479452...... 271
Exhibit 40 E-mail string, July 27, 2005, Subject: FSC, BNSF-0355372...... 274

PREVIOUSLY-MARKED EXHIBITS PAGE
Kyei Exhibit 26........................... 166
Kyei Exhibit 27........................... 181
Giftos Exhibit 38......................... 109

Page 9

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins volume 1, videotape number 1 in the deposition of John Lanigan in regards to Rail Freight Fuel Surcharge Antitrust Litigation in the United States District Court for the District of Columbia. Today's date is June 22, 2010. We're on the record. The time on the video monitor is 8:31 a.m. The video operator today is Carlos Garcia of Merrill Corporation. This video deposition is taking place at 201 Main Street, Suite 2200, Fort Worth, Texas. For the record, would counsel please voice identify yourselves and state whom you represent.

MR. BROCKETT: Dan Brockett, Quinn Emanuel, on behalf of the plaintiffs.

MR. TAYLOR: Kyle Taylor, Quinn Emanuel, for the plaintiffs.

MR. DONOVAN: Paul Donovan, LaRoe Donovan, for plaintiffs.

MR. RASHID: Sami Rashid, from Quinn Emanuel, for the plaintiffs.

MR. FAVRETTO: Dick Favretto for Mayer Brown on behalf of BNSF and the witness.

MR. WEICHER: Richard Weicher, BNSF, on behalf of the witness.

MR. PRYOR: David Pryor, BNSF.

Page 10

MR. CROSS: David Cross, Crowell Moring, on behalf of CSX Transportation.

MS. REINHART: Tara Reinhart from Skadden Arps on behalf of Norfolk Southern Railway Company.

MR. MEYER: David Meyer, Howrey, representing Union Pacific.

THE VIDEOGRAPHER: The court reporter today is Julie Brandt of Merrill Corporation. Would the reporter please swear in the witness.

JOHN PATRICK LANIGAN, JR.,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BROCKETT:

Q. Good morning, Mr. Lanigan.

**A. Good morning.**

Q. Can you state your full name for the record?

**A. John Patrick Lanigan, Jr.**

Q. And by whom are you currently employed?

**A. BNSF Railway Company.**

Q. What is your position at BNSF?

**A. Executive vice president and chief marketing officer.**

Q. Okay. Now you understand that you're under oath today, sir?

**A. I do.**

Page 11

Q. And you understand that I'm going to be asking you a series of questions?

**A. I do.**

Q. Okay. And you understand that you're obligated to answer my questions truthfully and to the best of your ability unless instructed otherwise by your counsel?

**A. I do.**

Q. Is there any reason why you can't give truthful testimony here today?

**A. No.**

Q. Are you under any kind of medication?

**A. No.**

Q. When did you first become employed by the BNSF?

**A. January 13, 2003.**

Q. Okay. And what was the position you held when you first became employed with BNSF on that date?

**A. My current position. I've been in the same position since I joined the company.**

Q. Where were you educated?

**A. I have an undergraduate degree from the United States Coast Guard Academy and a Master's of Business Administration degree from Baldwin-Wallace College in Ohio.**

Page 12

Q. Okay. When did you graduate from the Coast Guard?

**A. In 1977.**

Q. Okay. Did you go right into your MBA degree after that?

**A. No. I graduated in 1989 with my MBA.**

Q. Okay. What did you do between '77 and '89?

**A. I spent six and a half years on active duty in the U. S. Coast Guard, and when I left active duty, I joined a company called Schneider National, Incorporated, which is one of the largest trucking companies in the country.**

Q. When did you join Schneider National?

**A. In January of 1984.**

Q. And what was your position there?

**A. Dispatcher was my initial position.**

Q. How long did you work at Schneider National?

**A. Sixteen years.**

Q. When did you leave Schneider National?

**A. In February of 2000.**

Q. Okay. Can you tell me the various positions you held at Schneider National during the period of your employment there?

**A. I started as a dispatcher. I then became a regional customer service manager. Then I became an**

Page 13

**operations manager at a terminal. Then general manager at the terminal. Then I became vice president of dedicated operations. And then I became president of the trucking division at Schneider. And ultimately I became chief operating officer of the corporation.**
Q. Where was Schneider National located?
**A. Headquarters was in Green Bay, Wisconsin.**
Q. Is that where you were located?
**A. For 13 of the 16 years. Three years I spent in Ohio.**
Q. Where in Ohio?
**A. Near Cleveland.**
Q. Now Schneider National, could you describe a little bit more what was the nature of the business of Schneider National?
**A. They are a full truckload transportation provider. They provide trucking services. In essence, they will pick up a shipment at a customer's dock and take it direct to their customer's customer's dock. They don't stop in between and take the freight off and reshuffle it. They only haul in full truckload quantities from point to point. And they also, later in my career, started a third-party logistics -- nonasset based logistics company to help shippers manage their freight and arrange transportation.**

Page 14

Q. Was it a public company?
**A. No. It was a private company.**
Q. What did you do in February 2000 after you left Schneider National?
**A. I became president of a company called Logistics.com in a suburb of Boston. It was a startup software company involved in optimization and decision support software for the trucking industry.**
Q. Is that a company you helped start?
**A. No. The company was founded by a professor at MIT, and he recruited me to run the company.**
Q. And how long were you there?
**A. Almost three years.**
Q. And did you go from president of Logistics.com to your present job --
**A. I did.**
Q. -- with BNSF?
**A. That's correct.**
Q. You have to let me have a chance to finish my question. Then you can answer.
**A. (Witness nods head.)**
Q. All right. Now during the time of your employment with Schneider National, did you become familiar with fuel surcharges in the trucking industry?
**A. Yes, I did.**

Page 15

Q. Were fuel -- excuse me. Were fuel surcharges prevalent in the trucking industry during the time that you were at Schneider National?
**A. Yes, they were.**
Q. Could you describe the type of fuel surcharges that were used in the trucking industry during this period?
**A. Well, I can't speak for all companies, but my -- our company and my general understanding was that they were mileage based fuel surcharges.**
Q. Okay. Could you explain a little bit more what a mileage based fuel surcharge is?
**A. It basically involves having a surcharge factor based on the usage of fuel times the number of miles that the trip covers.**
Q. Did anyone in the trucking industry, to your knowledge, use a percentage based fuel surcharge? By that, I mean a surcharge that was calculated based on a percentage of the -- of the line haul rate?
**A. Yes, there were some companies that did.**
Q. Did Schneider National use that kind of fuel surcharge?
**A. No.**
Q. And what role did you have in the implementation or administration of fuel surcharges when

Page 16

you were at Schneider National?
**A. When I returned from Operation Desert Storm, I stayed in the reserves, and my unit was activated and went to Desert Storm. When I returned from Desert Storm, the CEO asked me to be involved in the start-up of a fuel surcharge program. So I was part of a team that put it together.**
Q. When was that?
**A. That was in 2001. I'm sorry. 1991.**
Q. And did you do that? Did you assist in the formulation of a fuel surcharge program --
**A. Yes.**
Q. -- for Schneider National?
**A. Yes.**
Q. And what kind of fuel surcharge program was it?
**A. It was a mileage based fuel surcharge program.**
Q. And was your role to lead the team that developed that?
**A. No. I was a member of the team. I didn't lead the team. The team was led by someone who was really doing the programming and that sort of thing. So I was one of the business inputs to the team.**
Q. Now when you were at Schneider National, did Snyder National's trucking business, did it compete with

Page 17

the railways?
**A. Yes.**
Q. When you were at Schneider National, did you meet often with your competitors, other trucking companies, to discuss issues of mutual interest?
MR. FAVRETTO: Objection to the form of the question.
**A. I'm not sure I understand what you're --**
Q. Well, when you were a senior executive of Schneider National, you were the VP of operations of the trucking division and eventually the chief operating officer of the company. In those positions, did you meet with your competitors at other trucking companies to discuss issues of mutual interest?
**A. Occasionally.**
Q. How frequently or how often did that occur?
**A. A couple times a year. Maybe a little bit more.**
Q. And did you ever meet with your competitors, senior executives of your competitors when you were at Schneider National to discuss fuel surcharges?
MR. FAVRETTO: Objection to the form of the question. You may answer.
**A. No, not to my recollection.**
Q. Did trucking companies compete with one

Page 18

another with respect to fuel surcharges?
**A. I don't know how other companies handle their fuel surcharges. I just know how we handled our fuel surcharge.**
Q. And did you -- did Schneider National consider its fuel surcharge to be a component of the price it charged the shipper?
**A. We considered the fuel surcharge to be a cost recovery mechanism.**
Q. Is that different than -- as a component of the price?
**A. Price was a separate line item that was charged to the customer.**
Q. And so when you say a cost recovery mechanism, do you mean that the fuel surcharge was designed to recover for the company increases in fuel cost?
**A. That's correct.**
Q. All right. Let's talk about now your employment at BNSF. I believe you said that you arrived at the company on January 13th of 2003. Is that correct?
**A. Yes.**
Q. And you held the same position since that time until today. Is that right?
**A. That's correct.**

Page 19

Q. Okay. What are your duties and responsibilities as executive vice president, chief marketing officer of BNSF?
**A. I'm responsible for sales, marketing, customer service, business development, and I'm responsible for the car equipment, not the locomotives, but the cars that the locomotives haul. I'm responsible for the procurement distribution of those cars on behalf of our customers, and I'm also responsible for the intermodal and automotive operations of the company, so all the terminals that are involved in intermodal and automotive operations and all the employees that work at those terminals.**
Q. Okay. Are you responsible for the company's pricing decisions?
**A. Yes, I am.**
Q. To whom do you report?
**A. To Matt Rose, our chairman, CEO and president.**
Q. Are you also on the board of directors of BNSF?
**A. We recently became a private company, wholly owned by Berkshire Hathaway, so we do not have a public board anymore. We have now a board of managers in the company, and I'm a member of the board of managers. I was not a member of the board of directors when we were**

Page 20

**a public company.**
Q. When was it that the Berkshire Hathaway acquisition was completed?
**A. February 12th of this year.**
Q. All right. How many people do you have working for you?
**A. Directly or indirectly?**
Q. Directly, first.
**A. Seven people report directly to me.**
Q. Can you state who they are?
**A. Steve Branscum, who is group vice president of consumer products. Steve Bobb, B-O-B-B, group vice president of coal. Kevin Kaufman, group vice president of ag. David Garin, G-A-R-I-N, group vice president of industrial products. Paul Anderson, vice president of marketing support. Fritz Draper, vice president of business unit operations. And Peggy Tuomey, T-U-O-M-E-Y, my administrative assistant. And I have one indirect report, a dual direct report who reports to myself and to the chief operations officer, and his name is Rollin Bredenberg, and he is vice president of service design.**
Q. How is it that you came to work at BNSF? Were you recruited or did you apply or how did it come about?
**A. I was recruited.**

Page 21

Q. By whom?
**A. By Matt Rose, our CEO, who was using a search firm at the time.**
Q. And what were the circumstances that caused the company to seek a new chief marketing officer at this time?
**A. My predecessor was retiring.**
Q. And your predecessor was Mr. Schultz. Is that correct?
**A. Yes.**
Q. Now when you got to the company in January of 2003, did you take steps to familiarize yourself with the BNSF -- BNSF's pricing decisions? Strike that.
At the time that you got to BNSF in January, did you take steps to familiarize yourself with how the company priced its products?
**A. I went through a fairly lengthy orientation process that involved a wide variety of activities, and the way that we priced our business was some of the activities that I became familiar with through various orientation programs and meetings.**
Q. How long did that orientation last?
**A. On a formal basis, probably three to four weeks.**
Q. And what exactly did it entail?

Page 22

**A. A range of things from one-on-one meetings to group presentations to reviewing documents, discussions, et cetera.**
Q. Okay. And did you take steps to familiarize yourself with the company business?
**A. I did.**
Q. Did you take steps to familiarize yourself with the fuel surcharge that the BNSF was -- had then -- was then charging customers for its rail freight transportation services?
**A. I did.**
Q. And can you tell us when you arrived, what was the surcharge program, the fuel surcharge program that was then in effect at BNSF?
**A. It was a percent of revenue fuel surcharge program.**
Q. Okay. And do you remember, was it tied to a particular index?
**A. As I recall, it was tied to, I believe, West Texas Intermediate Crude Index.**
Q. And was there a particular trigger point at which the fuel surcharge kicked in?
**A. I don't remember what that number was.**
Q. Was it $28 a barrel on the WTI index?
**A. It was in the 20s. I don't remember**

Page 23

**specifically what number.**
Q. And you did take steps to familiarize yourself with that surcharge program, did you not?
**A. I did.**
Q. Okay. And as the chief marketing officer of the company, it was your responsibility to administer the fuel surcharge program, was it not?
**A. To oversee it. Not to personally administer it.**
Q. Okay. Now at the time that you joined the company in January of 2003, did BNSF have a different surcharge for local rates as opposed to interline rates?
**A. I don't recall that we did.**
Q. I'll just ask you a couple of definitional questions here. What does the term local rates mean to you or local traffic?
**A. It's the traffic that originates and terminates on our network where we do not have to hand the freight off to another carrier.**
Q. And what is an interline rate or interline traffic?
**A. It's when we work with another railroad to achieve either the pickup or delivery of the product, because at either one end or the other we do not have direct access to the customer.**

Page 24

Q. And can you tell us at the time you joined BNSF in January of 2003, what percentage of the company's business was interline traffic as opposed to local traffic?
**A. As best as I can recall -- and this number is going to be an approximate -- I think about 40 percent or so was interline and 60 percent was local, plus or minus.**
Q. Is that still true today?
**A. I think it's pretty similar today.**
Q. Now when you -- when you got to the company, did you take any steps to familiarize yourself with the fuel surcharges that were then being posed by your competitors at other railroads?
**A. Not --**
MR. FAVRETTO: You may go ahead.
**A. Not initially.**
Q. Did there come a time later when you did that?
**A. Ultimately.**
Q. And when did you start familiarizing yourself with the fuel surcharges at other railroads?
**A. I don't remember specifically what date that would have been.**
Q. All right. At the time you arrived at the company in January of 2003, was there any other

Page 25

railroad, to your knowledge, using a different fuel surcharge for interline rates as opposed to local traffic?
**A. I don't know.**
Q. And just so the record is clear, to the best of your recollection at the time, BNSF was not charging different fuel surcharges for local as opposed to interline rates. Correct?
**A. To the best of my knowledge.**
MR. FAVRETTO: Dan, could I have a moment to confer with the witness just a second?
MR. BROCKETT: Yeah, sure.
THE VIDEOGRAPHER: Going off the record, the time now is 8:52 a.m.
(Break from 8:52 a.m. to 8:52 a.m.)
THE VIDEOGRAPHER: We are back on the record. The time now is 8:52 a.m.
MR. FAVRETTO: Dan, in the interest of accuracy, the witness -- I would like to offer a modest clarification on a response that he made to one of your questions a bit earlier.
**A. When you asked the question on what our fuel surcharge is based on, when I joined the company it was actually based on highway diesel fuel, which we correlated to WTI, the West Texas Intermediate, but it**

Page 26

**was highway diesel fuel.**
Q. (By Mr. Brockett) And do you remember the trigger point under the HDF index that the fuel surcharge kicked in?
**A. I believe at the time I joined, it was at $1.35, but I'm not -- I'm not exactly sure.**
Q. And do you recall at the time how the -- how the fuel surcharge was imposed as the price of HDF oil increased above $1.35 a gallon?
**A. It was on a percent of revenue basis.**
Q. Well, what I'm trying to get at, for example, is if the price of HDF went to $1.50 a barrel, what would be -- how would you calculate the percentage fuel surcharge that would be imposed?
**A. It was a penny for -- penny of surcharge per every -- I think it was $0.04 or $0.05 a gallon that the fuel price increased.**
Q. Okay. And when you arrived at the company, you took steps to familiarize yourself with this program. Correct?
**A. I did.**
Q. Now did you also learn in your effort to familiarize yourself with the fuel surcharge program that the coverage participation -- by that I mean the number of customers to which the surcharge was being

Page 27

applied -- was unacceptably low at the time?
MR. FAVRETTO: I object to the form of the question.
**A. I did review what the participation rate was when I joined the company.**
Q. Okay. Do you remember what that was, approximately?
**A. It was in the 25 to 30 percent range.**
Q. Okay. And did you consider that unacceptably low as the chief marketing officer?
**A. I felt it was low.**
Q. Did others in the company share that view?
**A. I don't recall.**
Q. Did anyone ever tell you, Mr. Lanigan, these participation rates on fuel surcharges are low, we've got to get these up?
**A. I don't recall having any discussions when I first joined the company along those lines.**
MR. BROCKETT: Let's mark as our first exhibit a document dated January 15, 2003. It's a memo from Chuck Schultz to Matt Rose with a cc to John Lanigan.
(Exhibit 1 marked.)
Q. Mr. Lanigan, do you recognize this as an internal BNSF memorandum from Chuck Schultz to Matt Rose

Page 28

dated January 15, 2003?
**A. Yes.**
Q. And it also indicates that you and Nick Murray received a copy?
**A. Yes.**
Q. Who was Nick Murray at this time?
**A. Nick Murray was responsible for profitability reporting and measurements.**
Q. Did he report to you?
**A. He reported to one of my direct reports.**
Q. And Mr. Schultz, as we already established, was the outgoing chief marketing officer at the time of this memo, January 15, 2003. Right?
**A. Correct.**
Q. Now Mr. Schultz in this memo in the first page has some tables there where he lists the -- for 2002 the participation rates of the company's fuel surcharge. Do you see that?
**A. Yes, I do.**
Q. Okay. And the total indicated for participation rates as of this time for effective at end of 2002 was 27.4 percent. Do you see that?
**A. I do.**
Q. Now does that refresh your recollection as to what the participation rates were at this time?

Page 29

**A. Yes.**
Q. And did you make it one of your goals as the new chief marketing officer to increase the participation rates of fuel surcharges?
**A. Yes, I did.**
Q. And in your investigation -- strike that.
Did you consider Mr. Schultz to be a very knowledgeable person about the -- about competition in the railway and railroad industry?
**A. I didn't know Mr. Schultz well when I joined the company.**
Q. Well, did you get to know him well at all?
**A. No, I did not.**
Q. Did you get to know him at all?
**A. Yes, I did.**
Q. Did you consider him a knowledgeable person?
**A. An experienced person.**
Q. Did you investigate the reasons why the participation rates for the company's fuel surcharge program was so low at the time?
**A. Not specifically, no.**
Q. Do you remember getting this memo?
**A. Yes, I do.**
Q. Can you turn to the second page. Directing your attention to item 4 where Mr. Schultz raises a

Page 30

question, do you see that?
**A. Yes, I do.**
Q. And the question he raises is why can't we get more fuel surcharges or RCAF escalation in each of the forecast group? Do you see that?
**A. I do.**
Q. Okay. And he gives a number of reasons in this paragraph, does he not?
**A. Give me a moment to read the paragraph.**
Q. Sure, of course.
**A. All right. I've read the paragraph.**
Q. Now am I correct that Mr. Schultz in this paragraph gives a number of reasons for why the participation rates of the company's fuel surcharges program were so low?
**A. It appears that he gives his opinions as to why.**
Q. Okay. And one of the reasons he states is that there's competition in the industry. Correct?
**A. Yes.**
Q. And he mentions competition from trucks. Correct?
**A. He does.**
Q. And you know that to be true from your experience in the trucking industry. Right?

Page 31

**A. That's correct.**
Q. And he also mentions competition from other railroads. Correct?
**A. Correct.**
Q. He mentions industry practices. Correct?
**A. Yes, he does.**
Q. Contract negotiating power. Correct?
**A. Yes.**
Q. And he says, all these play a role in the low participation rates the company had achieved as of this time for its fuel surcharge. Correct?
**A. That's the opinion that he expresses in this.**
Q. He goes on to give an example that in agricultural, prices generally reflect the market opportunities. Right?
**A. That's what he states.**
Q. He also states that any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive. Correct?
**A. That was his opinion as well.**
Q. Well, did you share that opinion at the time, sir?
**A. I don't know that I had an opinion at that point.**
Q. Okay. Well, do you have any -- any facts, as

Page 32

you sit here today, to suggest that Mr. Schultz's statements in this document were untrue?
**A. I can't refute his opinions.**
Q. And you didn't have your own opinions at the time?
**A. Not at the time.**
Q. Well, as you -- as you progressed in this role of the chief marketing officer, you did learn, did you not, that as of this time in early 2003, there was competition in the railway industry, did you not, wasn't there?
MR. FAVRETTO: Objection to the form of the question. It's vague.
**A. Yes, there's competition in all industries.**
Q. And did you learn that this competition was a factor in the company's inability to impose its fuel surcharge on a greater percentage of its customer base?
MR. FAVRETTO: I'm going to object to the form of that question as well. You may answer.
**A. Over time there's many factors that go into the relationship that we have with customers, the way that we price the business and any accessorial charges. And different market conditions and different competitive issues can influence those at a point in time or over a period of time.**

Page 33

Q. Well, when you began to do your investigation into -- to prepare yourself for your new role as chief marketing officer, did you learn that line haul rates in the railroad industry had been declining for a decade?
**A. Yes, I was aware of that.**
Q. And was it one of your goals as the chief marketing officer when you came in to generate more revenue for the company?
**A. Yes.**
Q. In fact, it's fair to say, is it not, that you thought the company's revenue was unacceptably low?
**A. I don't know that I had an opinion that it was unacceptably low. I knew a goal of mine was to increase revenue.**
Q. All right. Let's mark as our next exhibit a document that bears the Bates BNSF 0387501 through BNSF 0387503.
(Exhibit 2 marked.)
Q. Okay. Mr. Lanigan, do you recognize this document?
**A. Yes, I do.**
Q. What is it?
**A. It was draft goals that I put together for 2003 within the first month that I was with the company.**
Q. This document is dated in February 6, 2003.

Page 34

Do you see that?
**A. I do.**
Q. So you put this document together approximately three to four weeks after you had become the chief marketing officer. Is that correct?
**A. Correct.**
Q. And this document set forth your goals for 2003. Is that fair?
MR. FAVRETTO: Objection to the form of that question. The document is entitled 2003 Draft Goals, but --
MR. BROCKETT: Okay. Well, I'll rephrase the question. Sure.
Q. I mean, is it fair -- well, let me just ask you: What was the purpose of this document?
**A. The purpose of the document was for me to start to create a series of goals that I would attempt to achieve throughout my first year in the job.**
Q. And down in the middle of the page under item C, one of your goals was revenue growth. Correct?
**A. Yes.**
Q. And one of the things you wanted to do under revenue growth was to lead a team with Tom Hund that will lead to better understanding of our pricing decisions. Do you see that?

Page 35

**A. I do.**
Q. Okay. And that's what you wrote. Right?
**A. Yes.**
Q. Who is Tom Hund?
**A. Chief financial officer of the corporation.**
Q. And what team are you referring to here?
**A. I don't remember exactly who I had in mind at the time to be on the team, but members of the marketing team and members of the financial team.**
Q. Did you eventually put together a team that would meet to discuss ways to grow the company's revenues?
**A. Not on a formal basis, that I recall.**
Q. Now you go on to state on this document that pricing in this context will include rates, fuel surcharges, ancillary charges, detention, demurrage, et cetera. Did I read that correctly?
**A. Yes.**
Q. And it also mentions interest charges, escalators, RCAF, et cetera, among others. Right?
**A. Yes.**
Q. Okay. So am I correct that you considered at this time fuel surcharges to be part of pricing?
**A. Within the context of looking at the overall ways in which we charged our customers for services and**

Page 36

**costs.**
Q. Well, I'm correct, am I not, that on this document you said that fuel surcharges included rates, as well as -- strike that.
You indicate on this document that fuel surcharges are part of the pricing decisions the company makes. Correct?
MR. FAVRETTO: Objection to the form of the question. The document will speak for itself. But you may answer, Mr. Lanigan.
**A. What I specifically state in the document is that within this context, that pricing would include those items; and essentially, I believe my intent was to include all rates, charges, ancillary, you know, market basket of charges and activities that we would review.**
Q. Now shortly after you arrived at the company, did you attend meetings at which the company's fuel surcharge program was discussed?
**A. Yes.**
Q. How often, how regular did those meetings occur?
**A. I don't recall.**
Q. Was there something called the fuel surcharge review team?
**A. I don't recall that that was the name of it,**

**but there was a team that was assigned to look at our fuel surcharge programs.**
Q. Okay. And were you on that team?
**A. No, I was not.**
Q. Do you know who the team was?
**A. It was about a dozen people from various departments in the company.**
Q. And did you direct that that team be created?
**A. Yes, I did.**
Q. Why?
**A. To review our fuel surcharge programs.**
Q. Shortly after you arrived at the company, did you reach any determination or conclusion about whether you wanted to change the fuel surcharge program or at least conduct a review of a possible change of the program?
**A. I determined that I wanted to review our fuel surcharge programs.**
Q. Why?
**A. Because I was new to the company, and the way that we managed our fuel surcharge programs was different than I was used to in the trucking industry, and I wanted to understand more about them.**
Q. Okay. And did you discuss that with Matt Rose before you directed this team be created?



**A. I don't recall.**
Q. How often did you -- did you communicate with Matt Rose?
**A. Daily.**
Q. And did you discuss fuel surcharges with Mr. Rose during this period?
MR. FAVRETTO: At any particular time?
MR. BROCKETT: Yeah.
Q. Let's talk about the first three months that you were at the company.
**A. I don't specifically recall.**
Q. Do you recall having a discussion with Mr. Rose in which you discussed with him a need to -- to review the fuel surcharge program with an eye to determining whether changes should be made?
**A. I don't have a recollection of specifically talking about that.**
Q. All right. Let's mark as Exhibit 3, a two-page document bearing Bates BNSF 0328761 through 763 -- 764, three-page document.
MR. MEYER: Mr. Brockett, can we have the stipulation that we had in the prior deposition, that one objection goes for all?
MR. BROCKETT: We've had that stipulation before? Okay. Sure.



(Exhibit 3 marked.)
Q. Okay. Mr. Lanigan, you've had a chance to take a quick look at this, sir?
**A. Yes.**
Q. Now do you recognize this document?
**A. I don't specifically remember the document.**
Q. Well, you see it refers to a fuel surcharge review team meeting on March 14th of 2003?
**A. Yes, I see that.**
Q. And did you attend this meeting?
**A. I don't recall.**
Q. Who is Sam Kyei?
**A. Sam Kyei is the chief economist at BNSF.**
Q. Is he someone to whom you looked and relied upon in developing and administering the company's fuel surcharge programs?
MR. FAVRETTO: Objection to the form of the question. You can answer as best you can.
**A. Mr. Kyei does work on fuel surcharge programs.**
Q. Okay. And did you rely upon him?
**A. Among others.**
Q. The agenda here mentions a takeaway from JPL's speech. Do you see that?
**A. I do.**
Q. Is that -- JPL, is that your initials?



**A. They are.**
Q. Do you remember what speech is being referred to there?
**A. I do not.**
Q. Do you recall the fuel surcharge team making any reports or recommendations to you about changes, if any, in the fuel surcharge program?
**A. Over time they made several reports to me.**
Q. Okay. I'm talking about in the first three months of 2003 for now.
**A. I can't remember any specific dates.**
Q. All right. Well, look at the last page in this document. This is a bullet point page that's entitled, BNSF Fuel Surcharges, Conclusions From 2/24 meeting. Do you see that?
**A. I do.**
Q. And the first bullet point says that the team is leaning toward a cost per mile, CPM, fuel surcharge formula. Do you see that?
**A. I do.**
Q. Do you remember the fuel surcharge team reporting to you that it was leaning towards a cost per mile program?
**A. I don't remember the use of those words.**
Q. Did you have a preference for a mileage based

Page 41

program when you came to BNSF based on your experience with Schneider Trucking?
**A. The experience I had was only with a mileage based fuel surcharge program. It wasn't that I had a preference; it was just my experience base.**
Q. Well, based on your experience, did you have a bias towards a mileage based program as opposed to a percentage of revenue program?
MR. FAVRETTO: At the time he arrived at BNSF?
MR. BROCKETT: Uh-huh.
**A. I didn't know enough about a percentage of revenue program to make a judgment when I first arrived.**
Q. There's also a bullet point on this page called Fuel Neutrality. Do you see that?
**A. I do.**
Q. Do you know what's meant by that expression?
**A. I believe what was intended by that was that the program is designed to recover the cost, the additional cost of fuel.**
Q. What does the word "neutrality" mean there?
**A. Again, my belief is it means that it's intended to recover the cost of fuel.**
Q. Now do you recall attending a team -- senior team meeting between yourself and senior executives of

Page 42

BNSF and senior executive of the Norfolk Southern in March of 2003?
**A. Yes.**
Q. Do you remember going to Norfolk, Virginia for that meeting?
**A. Yes.**
Q. Now by the time of that meeting -- strike that.
Let's mark as Exhibit 4 a set of minutes -- or agenda, sorry. It bears Bates 00643 through 00645.
(Exhibit 4 marked.)
Q. Now if you look at the first page, Mr. Lanigan, this is titled, BNSF-NS, Senior Team Meeting Agendas, March 18, 2003. Do you see that?
**A. I do.**
Q. Okay. And it lists the participants in the meeting on the first page.
**A. I see that.**
Q. And Mr. Rose was there. Correct?
**A. Correct.**
Q. And you were there?
**A. Yes.**
Q. And Tom Hund was there?
**A. Yes.**
Q. Was Tom Hund the chief financial officer of

Page 43

the company at the time?
**A. Yes, he was.**
Q. And for Norfolk Southern, Don Seale was there?
**A. That's correct.**
Q. Is this the first time you met Don Seale?
**A. I believe I had met him earlier when I was employed by Schneider National.**
Q. When was it you first met Don Seale?
**A. I don't recall.**
Q. Any approximate time?
**A. In the late 1990s.**
Q. In what context did you meet Don Seale when you were employed by Schneider National?
**A. We -- we did business in intermodal with all of the big rail providers, and I believe I would have met him at some sort of a business meeting between our companies.**
Q. Did you feel you knew him well?
**A. No.**
Q. Have you ever played golf with him before this meeting on March 18, 2003?
MS. REINHART: Objection to the form.
**A. I don't play golf.**
Q. Did you ever socialize with Mr. Seale prior to March 18, 2003?

Page 44

**A. I don't recall.**
Q. Did you ever go to dinner with him?
MR. FAVRETTO: Prior to March 18, '03?
MR. BROCKETT: Uh-huh.
**A. I don't recall.**
Q. Okay. So when you went to this meeting on March 18, 2003, you already knew Mr. Seale. Correct?
**A. I had met Mr. Seale.**
Q. Okay. Did you know any of the other Norfolk Southern participants in this meeting prior to the time you went to Norfolk for this meeting?
**A. I don't believe I had met any of the other participants.**
Q. Do you understand what Mr. Seale's position was at the Norfolk Southern at the time of this meeting?
**A. Yes.**
Q. What was his position?
**A. I'm not sure exactly what the title was, but he was vice president in charge of their carload business at the time.**
Q. Was he your counterpart at Norfolk Southern?
**A. No, he was not.**
Q. Who was your counterpart?
**A. Ike Prillaman.**
Q. Mr. Prillaman was the chief marketing officer

Page 45

at Norfolk Southern at this time?
**A. Yes, he was.**
Q. Now is this the first meeting that you attended as chief marketing officer of the company with senior executives of other railroads?
**A. I'm not certain, but I believe it is.**
Q. Now by the time of this meeting had you taken steps to familiarize yourself with BNSF's fuel surcharge program?
**A. Yes.**
Q. Had you received a report on the fuel surcharge program from the fuel surcharge team that you directed be created?
**A. I don't specifically remember, but I imagine I probably did.**
Q. Now prior to this meeting did you have discussions internally about what, if anything, was going to be discussed at the meeting with the NS concerning fuel surcharges?
**A. I was not responsible for the agenda for the meeting. I don't recall specifically how the agenda would have been put together because I wasn't responsible for it.**
Q. All right. If I direct your attention to the middle of this document, it states that BNSF's fuel

Page 46

surcharge is structured differently than NS, CSX, and UP. Should BNSF's be synchronized with the other big players in the industry (John Lanigan/Don Seale). Do you see that?
**A. I do.**
Q. And that's one of the action items indicated on this agenda. Correct?
**A. Correct.**
Q. Okay. What's an action item, sir?
**A. Generally it means it's something for follow up.**
Q. Now did you participate in the discussion at this meeting about whether your company's fuel surcharge should be synchronized with the other big players in the industry?
MR. FAVRETTO: Objection to the form of the question. You may answer.
**A. Yes, I did.**
Q. And who participated in that discussion?
**A. I believe everybody that was on the attendee list was part of the discussion.**
Q. Where was the discussion? Where did it take place?
**A. In a conference room at Norfolk Southern.**
Q. Did Mr. Seale participate?

Page 47

**A. I believe he was present.**
Q. Did he participate?
**A. I don't recall.**
Q. Did Mr. Prillaman participate?
**A. I don't recall specifically.**
Q. Did you participate?
**A. Yes.**
Q. Did Matt Rose participate?
**A. I don't recall specifically.**
Q. Well, who do you recall speaking on this subject at this meeting?
**A. I spoke, and I don't recall who else spoke. This was a lengthy meeting. Lots of people were there speaking about different subjects. I just don't recall specifically who spoke.**
Q. Okay. Well, let's concentrate on this subjects for a moment. What did you say with respect to whether BNSF's fuel surcharge should be synchronized with the other big players in the industry?
**A. I don't remember specifically what I said.**
Q. Do you remember generally what you said?
**A. No, I don't.**
Q. Can you remember generally what anyone said?
**A. No.**
Q. But you do remember that there was a

Page 48

discussion on this topic?
**A. Yes.**
Q. And as you sit here today, you can't tell me anything further about what was said by anyone on this subject?
MR. FAVRETTO: Objection to the form of the question.
**A. I just don't remember specific dialogue from seven and a half years ago.**
Q. Okay. Well, I'm not asking you for the specific words, but I'm asking you, in general, can you tell me the substance of the discussion?
**A. I just don't recall.**
Q. Well, did someone make the statement that the BNSF's surcharge was structured differently than the NS, the CSX, and the UP?
**A. I don't recall.**
Q. Did someone make the statement that your fuel surcharge should be synchronized with the other big players in the industry?
**A. I don't recall the use of that word.**
MR. MEYER: Objection. Lack of foundation.
Q. What does the word "synchronize" mean to you?
**A. Somehow working in concert, together, aligned.**

Page 49

**It can have many connotations depending upon the listener and the writer.**
Q. Well, in this context, am I correct that it means that the BNSF's surcharge should be structured the same as your competitors?
MR. FAVRETTO: Objection to the form of the question. Lack of foundation. Go ahead.
**A. No, I don't believe it does.**
Q. Now am I correct that -- strike that.
This is an action item. Am I correct that it was left for you and Don Seale to explore this issue further following this meeting?
MR. FAVRETTO: Objection to the form of the question. Answer as best you can, Mr. Lanigan.
**A. According to the document, it looks like myself and Mr. Seale were assigned to this action item.**
Q. And what exactly is it that you and Mr. Seale were tasked with doing on this subject?
**A. My recollection was that it was nebulous. I don't recall specifically what we were going to work on.**
Q. Well, it says right here in this agenda what you were going to -- what you were going to work on, doesn't it, sir?
MR. FAVRETTO: Objection to the form of the question.

Page 50

**A. I didn't write the action item.**
Q. Well, am I correct that the question that you and Don Seale were to look into was whether your surcharge should be synchronized with the other big players in the industry?
MR. FAVRETTO: Objection to the form. Go ahead.
**A. That's what the writer of this action item wrote down.**
Q. Do you have any facts as you sit here today to suggest that that was not the question that you and Mr. Seale were to look into?
**A. I can't put my mind or myself in the mind of the writer of the action item.**
Q. Okay. Well, I'm just asking you directly, sir: Were you tasked with looking into this question? Yes or no?
MR. FAVRETTO: Objection to the form of the question.
**A. Again, I didn't write this question, so I can't put myself in the mind of the writer of the question.**
Q. I'm not asking you to put yourself in the mind of the writer, Mr. Lanigan. You were at this meeting. There's an action item here. It says that you and

Page 51

Mr. Seale are supposed to do something further after this meeting. Is that fair?
**A. Yes.**
Q. And you and Mr. Seale are to do something after this meeting regarding the specific question raised here about whether your company's fuel surcharge should be synchronized with other big players in the industry. Is that correct?
MR. FAVRETTO: Objection to the form of the question.
MS. REINHART: Objection to form.
**A. Again, I didn't write the question. So the word "synchronize" is not something -- not a word that I would have used, not a word I have used in regard to fuel surcharge, so --**
Q. Well, what is your understanding about what you and Mr. Seale were supposed to do on this subject after this meeting?
MR. MEYER: Objection. Lack of foundation.
**A. That Mr. Seale and I were to discuss interline fuel surcharges between BNSF and Norfolk Southern.**
Q. Did someone say that at the meeting?
**A. I don't recall.**
Q. Why would you be discussing interline fuel

Page 52

surcharges with the other major players in the industry?
MR. FAVRETTO: Objection to the form of that question. It assumes facts not in evidence. You may answer.
**A. Because we work with the other railroads in order to serve our customers and have to exchange freight in order to serve our customers.**
Q. Do you have interline business with the UP?
**A. Yes, we do.**
Q. What percentage of your business is that?
**A. I don't know.**
Q. Very, very small?
**A. I don't know the number.**
Q. At the time of this meeting, did the BNSF have a different fuel surcharge program for its interline traffic as opposed to its local traffic?
**A. No, I don't believe we did.**
Q. Did the NS have different fuel surcharges for its interline traffic as opposed to its local traffic?
**A. I don't know.**
Q. How about CSX, do you know for CSX?
**A. No.**
Q. How about for UP, do you know for UP?
**A. No.**
Q. Okay. So I want to know what was said at this

Page 53

meeting that gave rise to your understanding that you were to discuss interline business with Mr. Seale?
**A. The -- my recollection is that the purpose of these meetings were to discuss interline issues, opportunities, et cetera, with the railroads that we met with.**
Q. Okay. Well, we can agree that the writer of this agenda didn't mention anything about interline in this action item. Is that correct, sir?
MR. FAVRETTO: Objection to the form of the question.
**A. I can't -- again, I didn't write the item.**
Q. I'm asking you. You don't see the word "interline" written here anywhere, do you?
**A. I see it in the item above.**
Q. I'm asking under this action item that we're talking about, it doesn't say anything about limiting this discussion to interline traffic, does it?
MR. FAVRETTO: Objection to the form of the question. Distorting the document. Go ahead, Mr. Lanigan, answer as best you can.
**A. No, I don't see the word "interline" in that particular sentence.**
Q. Did you discuss at this meeting creating an industry standard fuel surcharge that would be adopted

Page 54

by all four major railroads?
**A. I don't recall.**
Q. When you say you don't recall, are you saying that it didn't happen or are you saying it could have happened but you just don't remember?
**A. I don't recall.**
Q. Let me try my question again.
When you answered my question by saying you don't recall, are you saying that you don't recall whether that discussion took place one way or another or are you saying it affirmatively didn't happen?
MR. CROSS: Objection. Lack of foundation.
MR. FAVRETTO: Yeah, I object to the form of the question. It seeks speculation. But answer as best you can, Mr. Lanigan.
**A. I don't recall having that discussion.**
Q. This action item mentions the -- mentions three other railroads, the NS, the CSX and the UP. Right?
**A. In the first sentence it does.**
Q. Now how is it that you and Mr. Seale were going to discuss interline business between UP and CSX?
MS. REINHART: Objection to the form.
MR. FAVRETTO: Objection to the form of

Page 55

the question. Lack of foundation.
**A. I don't know.**
Q. All right. Now after this meeting on March 18th of 2003, what, if anything, did you do with respect to following through on the action item mentioned in this agenda?
**A. I believe I may have had one or two conversations with Mr. Seale over a period of time.**
Q. Do you remember when the next conversation with Mr. Seale was?
**A. I don't specifically remember.**
Q. Do you remember how many conversations you had with Mr. Seale on the issue of fuel surcharges?
**A. I don't.**
Q. Did you have conversations with Mr. Seale over the next two, three months following this meeting --
**A. I believe so.**
Q. -- about fuel surcharges?
**A. I believe so.**
Q. How many?
**A. I don't know.**
Q. After this meeting with the Norfolk Southern -- and by the way, how long did the meeting last?
**A. I don't specifically remember, but I believe**

Page 56

**it was probably four or five hours, something like that.**
Q. Did you travel from Norfolk back to Fort Worth on the evening of March 18th?
**A. I believe so.**
Q. Now after this meeting, did you ask Sam Kyei to do anything with respect to fuel surcharges?
**A. I don't recall.**
Q. Let's mark as the next exhibit an e-mail with some attachments. The e-mail cover page is dated March 18, 2003, from Sam Kyei to a number of participants.
(Exhibit 5 marked.)
Q. All right. Mr. Lanigan, do you recognize this as an e-mail from Sam Kyei to a number of people at BNSF dated March 18, 2003?
**A. Yes. That's how it appears.**
Q. Okay. And in the first paragraph Mr. Kyei says, John Lanigan, the new chief marketing officer at BNSF, has proposed some changes in the current fuel surcharge programs. Do you see that?
**A. I do.**
Q. Now is that true? Did you propose changes in the new fuel surcharge program or the current fuel surcharge program?
**A. My recollection is that I asked them to look**

Page 57

**at various alternatives, not that I was proposing changes.**
Q. The last sentence of this paragraph says, quote, "John wants to implement a fuel surcharge program that is reciprocal, simple, results in significant cost recovery for BNSF." Do you see that?
**A. I do.**
Q. Okay. Do you know what he meant by the word "reciprocal"?
**A. That it would cover the cost of our increasing fuel costs.**
Q. The last paragraph says, John needs our recommendations in about two to three weeks. And the next sentence refers to the urgency of the project. Do you see that?
**A. I see that.**
Q. Okay. Why was this project urgent?
**A. I believe they were trying to please their new boss and pushing it along.**
Q. Did you tell Mr. Kyei that it was urgent?
**A. I don't recall if I gave him a specific due date or not.**
Q. Did you tell him that you needed their input in two to three weeks?
**A. I don't recall if I did or not.**

Page 58

Q. Were you planning to meet with Mr. Seale again in two to three weeks and that's why you needed their input?
MR. FAVRETTO: Objection to the form of the question.
**A. I don't recall, but based on the time on this document, it would have been before that meeting was completed --**
Q. Right.
**A. -- that you just referenced.**
Q. Well, you were planning to meet Mr. Seale at NFTA meeting in early April, were you not, sir?
**A. The NFTA meeting is attended by our customers and railroads and trucking companies. It's a broad based industry meeting.**
Q. Oh, I understand that, sir. But you know that the NFTA meeting was in early April at the Wigwam Resort in Arizona. Correct?
MR. FAVRETTO: Objection to the form. If you know, Mr. Lanigan.
**A. I don't recall any specific meeting set up with Mr. Seale for that event.**
Q. Okay. Now as you sit here today, you don't recall one way or another whether you gave Mr. Kyei a time frame of two to three weeks on this project?

Page 59

**A. I don't specifically recall, but I may have.**
Q. And do you recall, as you sit here today, that you gave him a two to three week window because you were planning to meet with Mr. Seale in early April?
MS. REINHART: Objection. Form.
MR. FAVRETTO: Object to form, lack of foundation.
**A. No, I don't know that.**
Q. Mark as the next exhibit a one-page e-mail. It's produced by NS. 001000225.
(Exhibit 6 marked.)
Q. All right. Do you recognize this e-mail, sir?
**A. Yes, I do.**
Q. Now the first e-mail in this chain is an e-mail that you wrote to Mr. Seale on March 25th of 2003. Correct?
**A. Correct.**
Q. And March 25th is exactly one week after your meeting with Mr. Seale in Norfolk on March 18th of 2003. Right?
**A. Correct.**
Q. And you mentioned in the first line of the e-mail that you've been playing phone tag. Right?
**A. I do.**
Q. And what do you mean by that?

Page 60

**A. Apparently I tried to call him, and he wasn't available.**
Q. Were you calling him to follow up on the action item mentioned at the March 18th, 2003 meeting?
**A. I'd say it likely was.**
Q. Okay. And what were you calling him to say on that subject?
**A. I don't recall.**
Q. You say in the body of the e-mail, unfortunately that you're committed to an Asian customer during the Lake Tahoe conference. Do you see that?
**A. I do.**
Q. Okay. Had Mr. Seale prior to this asked you to participate at a conference in Lake Tahoe?
**A. Yes, my recollection is that there was going to be -- it was a customer conference, and there was going to be a panel of some sort, and I was invited to be part of the panel, but I wasn't available because I was going to be out of the country.**
Q. And am I understanding correctly that in this e-mail you were getting back to Mr. Seale and telling him you couldn't attend the Tahoe conference?
**A. That's correct.**
Q. And you recommend to Mr. Seale that Dave Garin would be a good substitute for you at the Tahoe

conference. Right?
**A. Yes.**
Q. Who was David Garin at the time?
**A. He was group vice president of industrial products.**
Q. Then you say at the bottom, We could also certainly catch up next week at NFTA. Do you see that?
**A. I do.**
Q. Now does that refresh your recollection that there was a NFTA meeting to take place in early April of 2003?
**A. Yes. There -- at that time there are usually two meetings a year at NFTA.**
Q. And do you remember the one that occurred in the first week of April of 2003?
**A. I don't remember the specific date, but generally I recall that there was a meeting in early 2003.**
Q. Was that at the Wigwam Resort in Arizona?
**A. I believe so.**
Q. Do you remember going to the Wigwam Resort in Arizona?
**A. I've been there several times. The conference is held there frequently, so --**
Q. When you went to -- did you attend the NFTA



meeting in early April of 2003?
**A. Yes, I did.**
Q. Did you bring your wife?
**A. I don't recall. At that time my wife and daughter were still living in Massachusetts. My daughter was in high school, and I don't recall if I brought my wife to that one.**
Q. Did you play golf at that conference?
**A. I don't play golf.**
Q. All right. Now I just want to ask you one question. Does seeing this e-mail refresh your recollection that there was a NFTA conference to take place in early April 2003?
**A. Yes.**
Q. Okay. And having your recollection refreshed on the date of the NFTA meeting, does that also refresh your recollection that you gave Mr. Kyei a two to three week time frame on this assignment so that you could have the results of his team's review before the NFTA meeting in early April?
MS. REINHART: Objection.
MR. FAVRETTO: Objection to the form of the question, lack of foundation.
**A. No.**
Q. Now Mr. Seale writes back to you two days



later on March 27th, 2003. Do you see that?
**A. I do.**
Q. Now Mr. Seale refers in his e-mail to you that he would like to speak with you at NFTA about, among other things, the fuel surcharge issue that you discussed with him in Norfolk. Do you see that?
**A. I do.**
Q. Now is that a reference to the conversation that you had with Mr. Seale and others at the March 18, 2003 meeting?
**A. I believe it is.**
Q. All right. And that was the discussion about whether the BNSF's surcharge should be synchronized with other big players in the industry. Correct?
MR. MEYER: Objection.
**A. I don't remember that word being part of the conversation.**
Q. But this e-mail suggests that you did speak to Mr. Seale about fuel surcharges at the March 18, 2003 meeting. Correct?
**A. It does.**
Q. Okay. And it indicates that Mr. Seale wanted to discuss it again with you at the NFTA meeting. Right?
**A. It does.**



Q. Now did you have any conversations with Mr. Seale between the March 18th meeting and the time of the NFTA meeting in early April 2003?
**A. I don't recall.**
Q. All right. Let's mark as Exhibit 4 --
THE REPORTER: 7.
Q. -- Exhibit 7 a document produced by the Norfolk Southern. It's titled, NFTA Spring Business Meeting, the Wigwam, Litchfield Park, Arizona.
(Exhibit 7 marked.)
Q. Mr. Lanigan, I don't propose to show you any part of this document except the first page, which indicates that the Spring Business Meeting of NFTA was held at the Wigwam in Litchfield Park, Arizona, on April 2 through 6 of 2003. Do you see that?
**A. I do.**
Q. Okay. And do you have any -- do you have any memory of the NFTA meeting occurring on those dates?
**A. Yes.**
Q. Now from the documents, it appears that you had -- prior to the NFTA meeting in April, you had two -- at least two conversations with Mr. Seale, one at the March 18th meeting and the second in an exchange of e-mails on March 25th and March 27th. Isn't that correct?

MR. FAVRETTO: Objection to the form. You said two conversations?

MR. BROCKETT: Okay. Strike that. Fair enough.

Q. You had at least one in-person meeting with Mr. Seale on fuel surcharges prior to the NFTA conference. Correct?

**A. In a group setting with other members of the two companies.**

Q. With other senior executives of the two companies. Correct?

**A. Correct.**

Q. And you also had e-mail exchanges with Mr. Seale in late March of 2003, prior to the NFTA meeting. Correct?

**A. Yes.**

Q. Now had you discussed fuel surcharges with any representative of any other railroad prior to the NFTA meeting in early April 2003?

**A. Not that I recall.**

Q. Let me show you what's marked as BNSF 0557167, which is a one-page e-mail with some attachments. It goes up to BNSF 0557181.

(Exhibit 8 marked.)

Q. All right. Mr. Lanigan, let's turn to the



first page of this exhibit which appears to be an e-mail from a Richard Stroot to Matthew Rose, Carl Ice, yourself and others. Correct?

**A. I see that.**

Q. Who is Richard Stroot?

**A. At the time he was a manager in our network development group.**

Q. And he attaches to this e-mail, does he not, the agenda for a meeting on April 1, 2003 between CSX and BNSF. Correct?

**A. I see it.**

Q. And if you look to the first attachment, it's called BNSF, CSX Alliance Meeting, Jacksonville, Florida, April 1, 2003. Do you see that?

**A. I see it.**

Q. Now this meeting which occurred on April 1st of 2003 is one day before the NFTA meeting which began on April 2nd, 2003. Correct?

**A. I see that.**

Q. Correct?

**A. Yes.**

Q. Now do you recall going to Jacksonville to meet with CSX before you went on to the Wigwam resort in Phoenix on April 2nd?

**A. I hadn't, but apparently we did.**



Q. Well, looking at this document, does it show that you were present at the meeting on April 1st, 2003?

**A. It does.**

Q. Okay. And also present were other senior executives of BNSF. Correct?

**A. Correct.**

Q. Including Mr. Rose?

**A. Yes.**

Q. And for CSX, Mr. Ward, the CFO was there. Correct?

**A. Yes.**

Q. And Mr. Giftos, who was the executive vice president and chief commercial officer. Correct?

**A. Correct.**

MR. FAVRETTO: I would just like to note for the record that the agenda is a draft agenda, which for some reason lists participants, but I just want to note that it's not an agenda that -- a final agenda, if you will.

MR. BROCKETT: Well, I don't know if you want to testify or what point you're making, but if you're going to do that, I'm also going to point out that the e-mail attachment refers to the final agenda, although I do note your point that is says "draft" on the agenda itself.



MR. FAVRETTO: It's dated -- the agenda is dated 3/26, and it lists participants at a meeting on April 1. So that's my only point.

MR. CROSS: CSX joins in the objection to the extent it shows who participated in the meeting. If you want to ask the witness that, you can do that, but you're assuming.

Q. Do you have a memory of who --

**A. I don't.**

Q. -- participated in this, sir?

**A. I don't have a specific memory.**

Q. Do you have any facts, as you sit here today, to suggest that the people listed on this agenda did not attend this meeting?

**A. I don't have any knowledge to that effect.**

Q. Now was Mr. Giftos at the time your counterpart at CSX?

**A. Yes, he was.**

Q. Now this agenda shows that at this meeting, you and Mr. Giftos were to have a conversation about fuel surcharges. Correct?

MR. FAVRETTO: Objection to the form of that question, lack of foundation. Go ahead, Mr. Lanigan.

**A. I don't -- I don't recall having a discussion**

Page 69

**on fuel surcharges at that meeting.**
Q. Okay. Well, if you look down the page three-quarters of the way, there is an entry here that says fuel surcharge, and then if you look over to the right, it lists you and Mr. Giftos as the parties who are to participate in that discussion. Do you see that?
**A. I do.**
Q. Okay. Now does that refresh your recollection that you were to have a conversation with Mr. Giftos on fuel surcharges at this meeting?
MR. FAVRETTO: Objection to the form of the question.
MS. REINHART: Objection.
MR. FAVRETTO: It assumes facts. It's based on assumption. Lack of foundation. You may answer, Mr. Lanigan.
**A. I see it on the agenda. I don't recall the specific discussion.**
Q. Did you have a conversation with Mr. Giftos about fuel surcharges at this meeting on April 1, 2003?
**A. I don't recall.**
Q. You don't recall one way or another?
**A. I don't recall one way or the other.**
Q. Well, can we agree that according to this agenda, you were scheduled or listed to have a

Page 70

conversation with Mr. Giftos about fuel surcharges at this meeting?
MR. FAVRETTO: Objection to the form of that question. It distorts the document completely. You're -- answer the question, Mr. Lanigan, if you can recall.
**A. It's listed on this agenda. That's all I can tell you.**
Q. Okay. Do you have any memory of discussing anything with Mr. Giftos at this meeting?
**A. I don't recall any specific discussions with Mr. Giftos.**
Q. Do you remember meeting Mr. Giftos?
**A. I believe this would have been the first time I had ever met Mr. Giftos.**
Q. How many times did you meet Mr. Giftos?
**A. I don't know.**
Q. Can you give me an estimate?
**A. No clue.**
Q. More than ten?
**A. Less than ten.**
Q. More than five?
MR. FAVRETTO: Don't speculate, Mr. Lanigan, unless --
**A. I don't know.**

Page 71

Q. Do you recall ever having discussions about fuel surcharges with Mr. Giftos?
**A. I don't recall any specific fuel surcharges discussions with him.**
Q. Now were you aware as of April 1st, 2003 that CSX had made an announcement of a change in its fuel surcharge program?
**A. I don't recall that.**
MR. FAVRETTO: Dan, we're approaching 90 minutes, but whenever you --
MR. BROCKETT: We can take a break. Would you like to take a break?
THE WITNESS: Sure.
MR. FAVRETTO: Okay.
THE VIDEOGRAPHER: Going off the record, the time now is 9:51 a.m.
(Break from 9:51 a.m. to 10:02 a.m.)
THE VIDEOGRAPHER: Back on the record, the time now is 10:02 a.m.
Q. (By Mr. Brockett) Are you ready to resume your deposition, Mr. Lanigan?
**A. I am.**
Q. You understand you're still under oath?
**A. I do.**
Q. Now we were talking about the sequence of

Page 72

events in March and April of 2003 when we broke, and I want to show you another document now which we will mark as Lanigan Exhibit 9, which is an e-mail -- e-mail string regarding a CSX announcement of a change in its fuel surcharge program in late March of 2003.
(Exhibit 9 marked.)
Q. It has a Bates stamp BNSF 0032321 through 324. Now Mr. Lanigan, I would like you to turn in this document to the third and fourth page. Directing your attention to the top where it says request for BNSF concurrence effective June 1, 2003, CSXT fuel surcharge is modified to be more responsive to market conditions. Do you see that?
**A. I do.**
Q. And this is a letter from CSX to the BNSF asking you to concur with this fuel surcharge announcement. Correct?
**A. Correct.**
Q. And the modified program announced by CSX is based on the WTI index. Correct?
**A. That's what it states.**
Q. And the WTI index is the West Texas Intermediate Crude Index. Right?
**A. That's correct.**
Q. And it mentions that the trigger point will be

Page 81

**A. I don't know how major it was because I don't recall what their program might have been before this, so --**
Q. Well, can we agree that at least Paul M. Anderson thought that the UP announcement made the UP program just like CSX. Right?
MR. CROSS: Objection. Lack of foundation.
**A. I don't know what Paul Anderson meant when he wrote this.**
Q. Well, we can see what he wrote, can we not?
**A. I can read the words.**
Q. He said, This is sweet. Right?
**A. I don't know what was in his mind when he wrote that.**
Q. Do you agree it was sweet, sir?
MR. CROSS: Objection. Form.
**A. I don't know what was in his mind when he wrote it.**
Q. No, I'm asking you today. Do you think this was sweet?
MR. CROSS: Objection. Form, vague.
**A. I have no comment on that.**
Q. All right. So you go to the NFTA meeting. Now at the NFTA meeting what discussions, if any, did

Page 82

you have with Mr. Seale or anyone else about establishing an industry standard fuel surcharge for the railroad industry?
MR. FAVRETTO: Objection to the form.
**A. I don't recall the substance of discussions I had with Mr. Seale or anyone else at that meeting.**
Q. Well, if we go back to the March 18, 2003 minutes, the action item has you and Mr. Seale for following up on this question. Correct?
MS. REINHART: Objection to the form.
MR. FAVRETTO: Exhibit 4, Mr. Lanigan.
**A. There is an action item listed on this page.**
Q. And you're the one who's to carry out the action item. Correct?
**A. Along with Mr. Seale.**
Q. Right. And then you have e-mail communications with Mr. Seale on February -- on March 25th and 27th about discussing fuel surcharges at the NFTA meeting.
MS. REINHART: Objection to the form.
MR. FAVRETTO: Objection to the form of the question.
Q. Right, sir?
MR. FAVRETTO: Lack of foundation.
**A. In Mr. Seale's e-mail, he indicated a**

Page 83

**potential discussion about it at the NFTA meeting.**
Q. He said he wanted to discuss the fuel surcharge question with you at the NFTA meeting. Right?
MS. REINHART: Objection to the form.
MR. FAVRETTO: Objection to form.
**A. What he stated in the message, that he would like -- and I'll quote, I would like to talk to you about this during NFTA along with the fuel surcharge issue we discussed at Norfolk.**
Q. Now did you -- my question to you is: As you sit here today, what, if anything, do you recall about any discussions with Mr. Seale on fuel surcharges at the NFTA meeting in early April 2003?
**A. I don't remember a specific discussion about fuel surcharges at that meeting.**
Q. All right. Can you tell me any general discussions that were had about fuel surcharges at that meeting?
**A. I don't recall whether or not I ever even met with Mr. Seale at that meeting.**
Q. Did you have discussions about fuel surcharges with a representative of any other railroad at this meeting?
**A. Not that I recall.**
Q. Well, Mr. Lanigan, you were tasked with doing

Page 84

something about this question of an industry standard fuel surcharge. What can you tell the jury you did to follow up on that subject from March 18th, 2003 to the present?
MS. REINHART: Objection. Misstates --
MR. FAVRETTO: Objection to the form of the question, lack of foundation, misstates the record.
**A. We've continued to evolve our fuel surcharge programs over the last seven years since I've been at the company.**
Q. Well, the minutes of the March 18th meeting indicate that you and Mr. Seale are going to take action on exploring whether there could be an industry standard fuel surcharge. Now my question to you is: What have you done, okay, on that subject, from March 18th of 2003 to the present?
MS. REINHART: Objection to form.
MR. FAVRETTO: Objection to form.
MR. CROSS: That's a gross mischaracterization of the record. Those words do not appear.
MR. FAVRETTO: Go ahead, Mr. Lanigan.
**A. We've continued to evolve our programs at BNSF.**
Q. Have you discussed with any representative of

Page 85

any other railroad from March 18, 2003 to the present establishing an industry standard fuel surcharge?
MR. FAVRETTO: Objection to the form of the question.
**A. I don't recall specific discussions regarding an industry standard fuel surcharge program.**
Q. Do you recall any general discussions with any representative of any other railroad about an industry standard fuel surcharge program?
MR. FAVRETTO: Same objection. Go ahead.
**A. I don't recall specific discussions about an industry standard.**
Q. Do you recall any discussions at all on that subject with anyone?
**A. I've had discussions on fuel surcharges, but not -- I don't recall discussions on industry standards.**
Q. Okay. And as you sit here today, do you recall any discussions you had at the NFTA meeting in the first week of April 2003 about fuel surcharges?
**A. I don't recall any.**
Q. Did you meet with Mr. Koraleski at the NFTA meeting?
**A. I don't recall if I did or not.**
Q. Did you meet with Mr. Giftos?
**A. I don't recall.**

Page 86

Q. And did you meet with Mr. Seale at the NFTA meeting?
**A. I don't specifically recall that I did or did not.**
Q. Okay. Now after the NFTA meeting, did you issue a decree in the company that the authority to admit -- omit, O-M-I-T, a fuel surcharge provision from a customer's contract had to have your approval?
MR. FAVRETTO: Objection to the form of the question.
**A. Over time we evolved the approval process for fuel surcharge exceptions. I don't recall specifically the dates or times or what that escalation was at a point in time, but we did -- we did change the permission authorities over time.**
Q. Okay. Well, do you recall on April 9th of 2003 stating a new policy in the company that the only one who had authority to lead out with a fuel surcharge program from a customer contract was you or other vice presidents of the company?
**A. I remember evolving the program to have vice presidential authority. I don't remember exactly the date.**
Q. Let's mark as Exhibit 11 a one-page document that bears Bates BNSF 0027935.

Page 87

(Exhibit 11 marked.)
Q. Okay. Do you recognize this as the e-mail, sir, dated April 9, 2003 from Denis Smith in marketing to James Obermiller, yourself and others?
**A. Yes, I do.**
Q. Who is Denis Smith?
**A. He is vice president of marketing in the industrial products group.**
Q. He reports to you. Correct?
**A. He does not. He reports to Dave Garin.**
Q. And Dave Garin reports to you?
**A. That's correct.**
Q. Okay. Now the text of this e-mail says, Jim, Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John). Do you see that?
**A. I do.**
Q. Okay. Now did you tell someone after the NFTA meeting that -- that there was to be a change in policy as to who could approve contracts without fuel surcharge provisions?
MR. FAVRETTO: Objection to the form of that question. It implies that there was a connection between the two.
**A. I don't remember specifically the date, but**

Page 88

**apparently on April 9th, this message was passed along to Mr. Obermiller who maintains contracts for the company, physically maintains contracts.**
Q. All right. Did you tell anyone that -- that this new policy was going into effect on April 9th of 2003?
**A. I don't recall what date.**
Q. Well, April 9th is three days after the end of the NFTA meeting. Correct?
**A. If the meeting ended on the 6th, it would be three days later.**
Q. And according to this e-mail, you instructed that there be a change in a policy as to who could approve contracts without fuel surcharges. Correct?
MR. FAVRETTO: Objection to the form.
**A. I recall evolving our permission process. I don't recall exactly when we did that.**
Q. Okay. But this document says that you decreed it on or before April 9th of 2003. Right?
MR. FAVRETTO: Objection to the form of that question.
**A. The document doesn't state when I may have implemented that policy.**
Q. Now it also says that Mr. Smith says here that this is urgent, per John Lanigan. Do you see that?

Page 89

**A. I see that.**
Q. Okay. Was it urgent, sir?
**A. I don't know what was in Mr. Smith's mind when he wrote this.**
Q. Did you make this decree on an urgent basis?
MR. FAVRETTO: Objection to the form of the question and the use of the word "decree." Go ahead, Mr. Lanigan.
**A. I don't recall ever using the word "urgent" in formulating any policies.**
Q. So if Mr. Smith said that this policy was urgent he -- and attributed it to you, he was mistaken about that?
MR. CROSS: Objection. Form.
**A. I can't comment on his interpretation of my words or how he wrote this e-mail.**
Q. No, sir, I'm asking you a different question. Mr. Smith says here that this decree that's attributed to you was urgent. All right. Did you tell him it was urgent?
MR. FAVRETTO: Objection to the form. Go ahead, John.
**A. I don't recall telling him it was urgent.**
Q. The next line says, This needs to be communicated immediately as well. Do you see that?

Page 90

**A. I do.**
Q. Did you tell Mr. Smith or anyone else that this new policy had to be communicated immediately?
**A. I don't recall specifically saying that.**
Q. Now these e-mail -- this e-mail, referring to this change in authority, is three days after the end of the NFTA meeting on April 6th. My question to you is this: Was there anything that occurred at the NFTA meeting that prompted you to change the company's policy as to who could approve contracts without fuel surcharges?
**A. No.**
MR. FAVRETTO: Objection to the form of the question.
**A. I don't recall anything.**
Q. Why did you make a change in policy, sir?
**A. In an attempt to continue to improve our fuel surcharge coverage.**
Q. And what was the new policy?
**A. That any -- any omission or modification to our fuel surcharge programs that were going to go into any kind of a contract or pricing document had to be approved by a vice president or myself.**
Q. How many VPs were there who could approve this?

Page 91

**A. Four, the four group vice presidents.**
Q. Now before you made this change in policy with respect to who could approve, did you discuss it with Matt Rose?
**A. I don't recall specifically.**
Q. Did you give Mr. Rose a report as to what had happened at the NFTA meeting?
**A. Mr. Rose was at the NFTA meeting.**
Q. Did you discuss with Mr. Rose the need to change the policy as to who could approve contracts without fuel surcharge before you implemented this new policy?
**A. I don't specifically remember having the discussion.**
Q. Is that something you would have to get Mr. Rose's approval on?
**A. No.**
Q. Did this change in policy come about as a result of anything you discussed with Mr. Seale during March and April of 2003?
**A. Not that I recall.**
Q. Did the change in policy result from anything you discussed with Mr. Koraleski at the NFTA meeting or otherwise?
MR. MEYER: Objection. Lack of

Page 92

foundation.
**A. Not that I recall.**
Q. How would this change in policy as to who could approve contracts result in greater coverage of your fuel surcharges?
**A. Potentially the oversight by more senior personnel would highlight the importance of the program and create an approval process that would be more strictly adhered to.**
Q. Okay. Did you discuss with anyone at the NFTA meeting your coverage participation rates regarding fuel surcharges?
**A. Not that I recall.**
Q. Did you discuss that with Mr. Seale?
**A. Not that I recall.**
Q. Did you discuss it with Mr. Giftos?
**A. Not that I recall.**
Q. Did you discuss it with Mr. Koraleski?
**A. Not that I recall.**
Q. Did you discuss it with any representative of any other railroad?
**A. Not that I recall.**
Q. All right. Let's mark as Exhibit 12 a one-page document. It has BNSF 0007200.
(Exhibit 12 marked.)

Page 93

Q. All right, sir. Do you recognize this as an e-mail? It looks to be an e-mail from -- first of all, who is Barbara Turner?
**A. Matt Rose's executive assistant.**
Q. And this looks to be from Barbara Turner to no distributees, but it references a BNSF and a CSX meeting, and it's dated April 23, 2003. Do you see that?
**A. I see that.**
Q. And then refers to the BNSF attendees at the meeting and the CSX attendees at the meeting. Do you see that?
**A. I see that.**
Q. Now do you remember another meeting with CSX executives on or about April 23rd of 2003?
**A. I don't specifically recall a meeting.**
Q. Do you see this document indicates that you attended this meeting?
**A. My name is on the list.**
Q. And Mr. Rose is on the list. Correct?
**A. Those are his initials.**
Q. And Mr. Ward for CSX is on the list. Correct?
**A. Correct.**
Q. And Mr. Giftos is on the list. Correct?
**A. Correct.**

Page 94

Q. Now did you participate in a meeting, high level senior executive meeting between your company and CSX on or about April 23rd, 2003?
**A. I don't recall this meeting.**
Q. Can you tell us why the senior executives of BNSF would be meeting with senior executives of CSX on April 23rd of 2003 when you already had a meeting with the senior executives of CSX on April 1st of 2003?
**A. If I could recall a meeting, I potentially could tell you why we were meeting, but I don't recall a meeting.**
Q. Do you recall discussing fuel surcharges at this meeting?
**A. I don't recall the meeting.**
MR. BROCKETT: Need to change the tape.
THE VIDEOGRAPHER: This marks the end of tape number 1 of the videotaped deposition of John Lanigan. We're going off the record. The time now is 10:32 a.m.
(Break from 10:32 a.m. to 10:35 a.m.)
THE VIDEOGRAPHER: Here begins tape number 2 of the videotaped deposition of John Lanigan. We're on the record. The time now is 10:35 a.m.
Q. (By Mr. Brockett) Now after the NFTA meeting and after you had changed the authority as to who could

Page 95

approve fuel surcharge contracts, did BNSF announce any changes to its fuel surcharge program?
MR. FAVRETTO: Objection to the form of the question.
**A. We've made several changes to our fuel surcharge program over the last seven years. I can't remember the specific dates in which we announced changes.**
Q. Okay. Well, I'm talking about in the April, May time frame of 2003. Were there changes announced by BNSF at that time?
**A. I don't recall the specific dates of changes.**
Q. All right. Mark as Exhibit 13 an e-mail with an attachment, two pages, BNSF 0327012 through 011.
(Exhibit 13 marked.)
Q. All right. Mr. Lanigan, do you see this is an e-mail from Sam Kyei to a number of participants at BNSF?
**A. Yes.**
Q. And Mr. Kyei in the first sentence refers to notes that pertain to a fuel surcharge meeting on -- at 3:00 p.m. on April 29, 2003. Do you see that?
**A. I do.**
Q. And then he mentions that a number of people had attended this meeting. Do you see that?

Page 96

**A. I see the list of names.**
Q. And then the last line here says, Steve Bobb will be discussing the contents with John Lanigan and John's staff. Do you see that?
**A. I do.**
Q. Okay. Now did Mr. Bobb report to you as to what occurred at this meeting?
**A. I don't recall a meeting, specific meeting.**
Q. All right. Will you turn to the notes of the meeting, the second page?
MS. REINHART: Counsel, I would like to raise an objection to your calling these the notes of the meeting. The Bates numbers indicate that the second page came before the first page, and the top line of the -- what you call the notes of the meeting indicates that they were drafted sometime before the meeting referred to in the e-mail. I just want that on the record.
Q. Mr. Lanigan, if you see that there's a heading here called Carload Program.
**A. Yes.**
Q. Then if we move down, there's an entry that says the changes in the carload program going forward are as follows. Do you see that?
**A. Yes.**

Page 97

Q. Okay. And then if you go to the second bullet point, the carload strike price will be $1.25. Do you see that?
**A. I do.**
Q. And that's referring to $1.25 on the HDF index. Correct?
**A. That's correct.**
Q. And then the notation says, This reflects $23 WTI. Correct?
**A. That's what it states.**
Q. Okay. Now do you recall that BNSF changed its carload fuel surcharge program in April of 2003 to a strike price of $1.25 on the HDF index?
MR. FAVRETTO: Objection to the form of the question. Go ahead.
**A. I recall that we moved our strike price to $1.25.**
Q. Okay. And do you recall that the $1.25 strike price was equivalent to or roughly equivalent to $23 on the WTI index?
**A. Yes, it was roughly equivalent.**
Q. Okay. And at the time you did this, you knew that CSX had adopted a strike price of $23 on the WTI index. Correct?
**A. I don't recall the sequence of times, but if**

Page 98

**the CSX announcement was prior to this, then we were aware of it.**
Q. And you also knew that UP had announced that it was going to a $23 strike price on the WTI index prior to the time that you adopted this. Correct?
**A. If that was public information before then, then we did know.**
Q. Okay. And at the time you adopted a $1.25 strike price, you had had a meeting with Mr. Seale on fuel surcharges on March 18th of 2003. Correct?
MR. FAVRETTO: Objection to the form of that question. Mischaracterizes the record.
**A. We had a group meeting between executives from BNSF and Norfolk Southern on that date.**
Q. On the subject of fuel surcharges. Correct?
MR. FAVRETTO: Objection to the form of that question.
**A. That was not the sum total of that meeting.**
Q. Okay. But it was one of the items you discussed. We've established that, have we not, sir?
**A. It was an agenda item on that meeting.**
Q. Okay. And you also exchanged some e-mails with Mr. Seale. Correct?
**A. One e-mail each.**
Q. And you also attended the NFTA meeting with

Page 99

Mr. Seale --
MR. FAVRETTO: Object to form.
Q. -- in April 2003. Correct?
MR. FAVRETTO: Objection to the form of that question.
MR. BROCKETT: You have to let me finish my question, Counsel.
MR. FAVRETTO: I'm sorry. I apologize.
**A. I did not attend the meeting with Mr. Seale. Mr. Seale was likely in attendance, and I was in attendance as well.**
Q. Now -- and prior to the time that BNSF announced this strike price of $1.25 on the HDF index, you had also met on at least two occasions with Mr. Giftos. Right, sir?
MS. REINHART: Objection to the form.
**A. I don't recall the second meeting that you brought up, so I don't know if I met with Mr. Giftos that day or not.**
Q. Okay. But you certainly remember at least one meeting with Mr. Giftos. Correct?
**A. The group meeting in Jacksonville.**
Q. Okay. If we move down the bullet points here, there's an entry that says, The delegation of authority has been moved to the vice president level and carload

Page 100

business units. Do you see that?
**A. Yes, I do.**
Q. And that was the change in policy that you ordered. Correct?
**A. That's correct.**
Q. Now when you say carload program, what does carload program cover at BNSF?
**A. The --**
MR. FAVRETTO: Carload program is --
MR. BROCKETT: It's the heading at the top.
MR. FAVRETTO: Okay.
**A. Generally for us, that means our industrial products sector headed by Mr. Garin.**
Q. Does it also include coal?
**A. Generally we have -- we consider coal separately.**
Q. Does it include agriculture?
**A. Generally we consider ag separately.**
Q. When you announced this change in fuel surcharge, did you intend that this new change would apply to both interline and local traffic?
**A. I believe this was for all traffic.**
Q. And did you intend that this new fuel surcharge that you were announcing in April of 2003

Page 101

would cover coal and agriculture as well?
**A. I don't recall specifically if it included coal and agriculture. I just don't recall.**
Q. All right. Now this was a percentage of revenue based fuel surcharge. Right?
**A. That's correct.**
Q. Does the decision -- strike that.
Who made the decision to change your fuel surcharge from $1.35 on the HDF index to $1.25?
**A. Ultimately that would have been my decision.**
Q. And did you make that decision?
**A. As I recall, yes.**
Q. Why did you make that decision?
**A. To make it easier for our customers to have a fuel surcharge program that was easier to understand from an entry point perspective.**
Q. Did you make this change, sir, so that the industry would have a standard fuel surcharge program?
**A. No.**
Q. Do you deny that?
**A. I did not make it to have it be an industry standard. Our fuel surcharge program at that time and to this day is different from the rest of the industry.**
Q. Okay. Well, but prior to the time that you announced that -- your company announced the changes in

Page 102

this fuel surcharge program, did you discuss the fact that you were going to change with Mr. Seale at NS?
**A. Not that I recall.**
Q. Did you discuss it with Mr. Giftos?
**A. Not that I recall.**
Q. Did you discuss it with Mr. Koraleski?
**A. Not that I recall.**
Q. Did you discuss the fact that you were going to change the fuel surcharge program in April of 2003 with any representative of any other railroad prior to the time the announcement went out?
**A. Not that I recall.**
Q. Do you recall that in May of 2003 BNSF reduced the fuel surcharge percentage to 2 percent even though its formula would have required a higher percentage?
**A. I don't recall the specifics of that.**
Q. Do you recall anything about that?
**A. No, I don't remember.**
Q. All right. Let's mark as Exhibit 14 a document produced by BNSF. It bears Bates 0511809 through 0511853, and it's titled, The Burlington Northern and Santa Fe Railway Company Rules Book 6100-A.
(Exhibit 14 marked.)
Q. All right. Mr. Lanigan, can you tell us what this document is?

Page 103

**A. It's a general -- general rules book that covers a wide variety of rules, regulations, et cetera, pertaining to the freight that we haul.**
Q. And is this a document that's distributed to carriers?
**A. I don't -- I don't know how it's distributed.**
Q. But is it made available publicly to those who want to purchase your services?
**A. Yes. Certainly to customers.**
Q. Can you turn to page 25? Now on this page, do you see at the top, it says -- it talks about a fuel surcharge change effective June 1, 2003. Do you see that?
**A. I do.**
Q. And it was issued on May 7th of 2003?
**A. I see that.**
Q. Okay. And this then in the first paragraph refers to use of the HDF index at a strike price of $1.25 a gallon. Do you see that?
**A. I do.**
Q. Okay. And is that a reference to the fuel surcharge change that you testified to earlier?
**A. Yes, I believe it is.**
Q. Okay. And the change was a reduction of the strike price from $1.35 a gallon to $1.25 a gallon. Is

Page 104

that right?
MR. MEYER: Objection. Lack of foundation.
**A. I don't recall if it was $1.35 a gallon.**
Q. Okay.
**A. But it did implement this at $1.25 a gallon.**
Q. All right. And as we -- as you, I believe, said before, $1.25 a gallon is equivalent to $23 on the WTI index. Correct?
**A. It approximates it.**
Q. Now this section that describes the fuel surcharge program, I don't see anything here where it says it doesn't apply to coal, do you, sir?
**A. No, I don't.**
Q. I don't see anywhere here where it says it doesn't apply to agriculture. Correct?
**A. No, I don't see that either.**
Q. Okay. So does looking at this document refresh your recollection that, in fact, the program that you announced on May 7th of 2003 and which became effective on June 1 of 2003 was intended to apply to all of your carload traffic except intermodal?
MR. FAVRETTO: Objection to the form of the question. If you recall, Mr. Lanigan.
**A. Yeah, I don't recall. At that time generally**

Page 105

**all of our coal business was under contract and had different escalator programs within those contracts.**
Q. Okay.
**A. So from a practical standpoint, I don't know.**
Q. Was there a different fuel surcharge program in May and June of 2003 that applied to coal?
**A. On a customer by customer basis, I don't -- they could have been different.**
Q. Was there a different fuel surcharge program that you can identify, as you sit here today, right, that applied to coal contracts, as opposed to the program announced in this document that applied to carload shipments?
MR. FAVRETTO: Objection to the form of the question.
**A. If I were to think back to the contracts that we had in coal at the time, I just don't recall.**
Q. All right. Well, here's my question. You're the chief marketing officer. You've announced this new change in your fuel surcharge program. Right?
**A. Yes.**
Q. Yes. Was it the company's intention that this percentage base fuel surcharge would apply, okay, to shippers who shipped coal on your railroad?
**A. I don't recall that we intended for this to**

Page 106

**apply.**
Q. You don't recall one way or another?
**A. I don't.**
Q. If I wanted to know, if I wanted to find out whether this applied to coal, what document would I go to to find that out?
**A. You would have to look at the individual contracts for each one of our coal customers.**
Q. So it's your testimony there was no fuel surcharge program that applied to carload shipments other than what was in the contracts themselves?
**A. That applied to carload or coal --**
Q. Coal.
MR. FAVRETTO: Coal.
**A. What -- any fuel surcharge program would have been included within the framework of the coal -- the actual coal contract with each customer.**
Q. Okay. Let me try this again. I'm trying to understand whether this program you announced in May of 2003, fuel surcharge program, covered coal shipments or not?
MR. FAVRETTO: I think he's answered the question. Try again, Mr. Lanigan.
Q. What document would I go to to determine whether this program here, reflected in this document,

Page 107

Exhibit 14, applied to coal or not?
**A. You would have to look at each individual coal contract, confidential coal contract.**
Q. Okay. So it's your sworn testimony, Mr. Lanigan, that the fuel surcharge program that you announced on May 7th of 2003 was not intended to apply to coal shipments?
MR. CROSS: Objection.
**A. No, I'm not saying it wasn't intended to apply to coal shipments. All I'm stating is that we negotiated each individual coal contract separately, and fuel surcharge within those coal contracts would have been included within the body of those contracts.**
Q. Okay. Well, you -- you negotiated contracts separately and individually with industrial product shippers, too, did you not?
**A. Yes, we did.**
Q. Okay. And you certainly intended this fuel surcharge program to apply to as many of those contracts as you could. Correct?
MR. FAVRETTO: Objection to the form of the question.
**A. Again, for confidential contracts, there could be a variety of fuel surcharge mechanisms included in those contracts.**

Page 108

Q. All right. Is it your sworn testimony that this fuel surcharge program that was announced on May 7th of 2003 was not intended to apply to agricultural shipments?
**A. No, I'm not saying that.**
Q. Okay. Well, was it or was it not?
**A. Again, it may have been applied on a case by case basis. I don't know specifically how it was applied to the agricultural shipments.**
Q. Well, was it your intention as the chief marketing officer that this program would apply to agricultural shipments?
MR. FAVRETTO: Objection to the form of the question, asked and answered. Try again, Mr. Lanigan.
**A. Again, depending on the individual agricultural shipper, potentially this program could have been implemented or another program could have been implemented.**
Q. Well, it was your goal, was it not, to obtain 100 percent participation in all of your contracts?
MR. FAVRETTO: Objection to the form, lack of foundation.
**A. Our goal was to improve our recovery of fuel cost during this period.**

Page 109

Q. Well, your goal was to apply this fuel surcharge program, okay, the percentage based fuel surcharge program at $1.25 HDF, your intention and goal was to apply that to 100 percent of your shipments, was it not, sir?
MR. FAVRETTO: Objection to the form of the question. It misstates the record. Go ahead, Mr. Lanigan.
**A. Our intention was to achieve better fuel surcharge coverage across our customer base.**
Q. Well, in fact, it was Mr. Rose himself who mandated that we should -- you should strive for 100 percent coverage of this fuel surcharge program, $1.25 HDF. Isn't that correct, sir?
MR. FAVRETTO: Objection to the form of the question, lack of foundation.
**A. I don't recall having any discussions that this particular table was the only mechanism to be used for fuel surcharge recovery.**
Q. Mark as the next exhibit a document marked Exhibit 38 at Mr. Giftos' deposition.
MR. FAVRETTO: You don't remark it? You're not remarking it.
MR. BROCKETT: We don't need it marked.
Q. Now Mr. Lanigan, I'll represent to you that

Page 110

these are notes of a meeting that were produced by Norfolk Southern, and it reflects a meeting between Norfolk Southern and the Union Pacific on May 14th of 2003. Okay. And attending this meeting were Don Seale, among others. Do you see that, sir?
**A. I do.**
Q. Okay. And there's a reference in these meeting minutes in the middle here which says as follows, quote, Discussion followed on fuel surcharges and various application processes as used by different roads. Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customer. Do you see that?
**A. I do.**
Q. Do you agree with that statement, sir?
MR. MEYER: Objection. Lack of foundation.
**A. I wasn't part of this context.**
Q. I understand.
**A. I don't know the context.**
Q. Well, I'm asking you. Do you agree with the statement that it would be a positive outcome if all the railroads had the same fuel surcharges in the eyes of the customers?
MR. MEYER: Objection. Vague and lack of

Page 111

foundation.
**A. I don't even know how to answer the question. Each customer has a different opinion on fuel surcharge. I'm responsible for the fuel surcharge program at BNSF and working with our customers at BNSF in making it as easy as possible to do business with BNSF. That's my concern.**
Q. Did Mr. Seale ever state to you in words or substance that he believed that it was in the best interest of customers for all the railroads to have the same fuel surcharge program?
**A. I don't recall if he did or not.**
Q. Did you ever make that statement to anyone else?
**A. I don't recall that I did or not.**
Q. Did anyone from any railroad ever make that statement to you in words or substance?
**A. Not that I recall.**
Q. It goes on in these minutes to state, Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers. Do you see that?
**A. I do see that.**
Q. Now did Mr. Seale call you in May of 2003 and ask you -- discuss this subject with you?

Page 112

**A. Discuss fuel surcharge or that comment?**
Q. That comment.
**A. Not that I recall.**
Q. Did he call you to discuss fuel surcharge?
**A. I don't remember any specific phone discussions.**
Q. Do you remember any discussions of any kind, whether in phone or in person, with Mr. Seale at or about this time?
**A. I don't.**
Q. Did you have the view in the spring of 2003 as to whether it would be a positive outcome in the eyes of customers for all the railroads to have the same fuel surcharge?
**A. I didn't have a view that the same program would be positive. What I was trying to understand at that point in time, being new to the industry, was how all the interline relationships worked and how we could best make the interline experience for a customer more efficient, more effective and easier to do business with so that they would want to do more business with BNSF and our interline partners. And so my concern with pricing, fuel surcharge, et cetera, was all around being easier to do business with.**
Q. You do remember that. Right?

Page 113

MR. CROSS: Objection. Form.
**A. Yes, I do.**
Q. As you sit here today, can you tell -- can you remember any statement that you made to Mr. Seale or he made to you, okay, in words or substance, on the subjects of fuel surcharges from March 2003 to the present?
MR. FAVRETTO: Objection to the form of the question, overbroad.
**A. We've had discussions on fuel at various times in the last seven years.**
Q. Okay.
**A. I'm sure of that.**
Q. How many discussions have you had with Mr. Seale?
**A. I have no idea.**
Q. Would it be more than 12?
**A. I have no idea.**
Q. Well, would it be more than five?
**A. I don't recall.**
Q. Can you give me any kind of estimate of how many times you've discussed fuel surcharges with Mr. Seale?
MR. FAVRETTO: Objection to the form of the question.

Page 114

**A. No, I don't know how many times I have.**
Q. Okay.
**A. It's been infrequent.**
Q. All right. However many conversations or phone calls you had, can you tell us, as you sit here today, anything you said to Mr. Seale or anything he said to you on the subject of fuel surcharges --
MR. FAVRETTO: Objection.
Q. -- from March 18, 2003 to the present?
MR. FAVRETTO: Objection to the form of the question, overbroad, lack of foundation.
**A. In general, it would have had to do with our interline relationships and attempting to bring more business to the railroads as we did business with customers that would use both us and Norfolk Southern.**
Q. Well, I appreciate that, Mr. Lanigan, but my question is a little different. I want you to tell me, okay, anything you recall stating to Mr. Seale or anything you recall Mr. Seale stating to you about the subject of fuel surcharges in any of the conversations or meeting you had with him from March 2003 to the present.
MR. FAVRETTO: Objection to the form, asked and answered. You can try again, Mr. Lanigan.
**A. We've had discussions on customers. We've had**

Page 115

**discussions on how to win business. We've had discussions on the various components of the relationship as it relates to interline, the interline traffic and the interline business. And I'm sure that we talked about fuel and fuel surcharges within that context at various times, but there's nothing remarkable that stands out in my mind regarding specific discussions on fuel.**
Q. Okay. Well, my question is a little different. My question asks you to tell us what you remember about anything Mr. Seale said to you or anything you said to him.
MR. FAVRETTO: Objection. Asked and answered. We're belaboring the point at this point.
MR. CROSS: And overbroad.
**A. I have nothing -- any other specifics to add to my last couple of answers.**
THE WITNESS: Does this go in the pile?
Q. Do you remember in May of 2003 learning that the UP announced that it was moving back from the WTI index to the HDF index?
MR. MEYER: Objection. Lacking foundation.
**A. I -- I recall UP moving to an HDF base.**
Q. Okay. What do you recall about that?

Page 116

**A. That they announced it.**
Q. How did you learn about that?
**A. It was a public announcement.**
Q. Did someone inform you of this?
**A. I believe so.**
Q. Who?
**A. I don't recall.**
Q. And did you know at the time that only a month or two earlier UP had announced that it was going to the WTI index?
MR. MEYER: Objection. Lacking foundation.
**A. I recall when they had the WTI index. I didn't make a correlation. I don't remember making a correlation between the two.**
Q. Let's mark as Exhibit 15 -- Exhibit 15 an e-mail chain, BNSF 0342451 to 0342453.
(Exhibit 15 marked.)
Q. Okay. Take a moment. Just take a quick look through this, sir.
**A. All right.**
Q. Now do you recognize this, first of all, as an announcement by the UP that they were adopting the HDF index for their fuel surcharge program?
**A. It looks like the original message is asking**

Page 117

**for concurrence from Mr. Schroeder in the very last paragraph on the last page, so --**
Q. Right. Okay.
**A. -- but this is concurrence message.**
Q. Sure. Okay. But this document announces and describes what the new program is going to be. Correct?
**A. Yeah, they're asking for concurrence on the new program.**
Q. Right. They're asking concurrence from the BNSF. Correct?
**A. That's correct.**
Q. And in the concurrence letter from Mr. Schroeder, there's a description of what the new fuel surcharge program is going to be. Correct?
**A. Yes, that's correct.**
Q. And it's going to be effective of June 1, 2003. Correct?
**A. That's what it states.**
Q. And your new program was also effective June 1, 2003. Right, sir?
MR. FAVRETTO: Objection to the form of the question.
**A. I don't recall the effective date of our changes.**
Q. Well, if we'll go back to the pricing document

Page 118

we looked at before and we turn to page 25, you will see that the fuel surcharge program described there states that it's to be effective June 1st of 2003. Do you see that?
**A. I do.**
Q. So both your program and the UP program became effective June 1st of 2003. Correct?
MR. MEYER: Objection. Vague.
**A. According to these two documents, that's correct.**
Q. Now the program -- the UP program had a trigger point of $1.35 a gallon on the HDF index. Correct?
**A. That's what this document states.**
Q. Okay. And at $1.35 the fuel surcharge percentage is 1.5 percent. Correct?
**A. That's what it states.**
Q. Okay. And then it goes up one half of a percent for every $5 increase in the HDF increase. Correct?
**A. Every $0.05 increase.**
Q. Every $0.05 increase. Correct?
**A. That's what it -- how it's represented.**
Q. Okay. And that's exactly how BNSF new fuel surcharge program worked as well, isn't it?

Page 119

MR. MEYER: Objection. Lacking foundation.
**A. Ours moved on $0.05 increments of fuel price increases.**
Q. Right. So under both your fuel surcharge program announced on June 1 and the UP program announced on June 1 produced the same fuel surcharge percentage, as long as the HDF index was $1.35 a barrel or above. Correct?
MR. FAVRETTO: Objection to the form of the question. It misstates the record. Go ahead.
**A. The UP program started at $1.35. Ours started at $1.25.**
Q. But my question is a little different. My question is if the HDF price is $1.35 a barrel -- per gallon or above, then your program produced the same fuel surcharge percentage as the UP program. Correct?
**A. Yes, they appear to be similar.**
Q. They are identical, are they not, sir? At $1.35 a gallon above, they are identical, are they not?
**A. And different below.**
Q. Can you answer my question?
**A. At $1.35 and above, they appear to be identical.**
Q. Now if we go back to the first page of this

Page 120

exhibit, the -- the request for concurrence from Mr. Schroeder was forwarded to Paul M. Anderson. Do you see that?
**A. Yes, I do.**
Q. And that's not the guy who reports to you. Right?
**A. That's correct.**
Q. That's Paul B. Anderson. Correct?
**A. Paul B. reports to me.**
Q. Okay. And then it was sent from Dave Garin to you. Do you see that?
**A. I do.**
Q. Okay. Now after you received this, did you have any discussions with anyone about it?
**A. I probably did, but I don't remember the specific discussions.**
Q. Did you have any discussions with Mr. Koraleski at UP prior to the time that UP announced this change of the program?
**A. No.**
Q. Did you have any discussions with anyone else at UP prior -- about fuel surcharges prior to the time UP made this announcement in its program?
**A. No.**
Q. Did you ever discuss with UP why they had

Page 129

**its usefulness and in other cases were better served in another organization within the AAR structure. And it was decided to stand down the NEMC committee at that time.**
Q. When was the last NEMC committee meeting you attended?
**A. It was in 2009. Spring of 2009, I believe.**
Q. Where was that meeting?
**A. Washington, D.C.**
Q. Was it announced at that meeting that NEMC would disband?
**A. No. That action was taken at an AAR board meeting.**
Q. When was that?
**A. I don't remember which -- the date of that board meeting.**
Q. Was that sometime in 2009?
**A. Yes, it was.**
Q. And did anyone ever tell you that one of the reasons why the AAR board decided to disband NEMC was for antitrust reasons?
MR. FAVRETTO: Mr. Lanigan, don't testify -- testify to your personal knowledge or your understanding, but don't reveal any communications you may have had with counsel or the content of any

Page 130

communication respecting this subject.
**A. My understanding was what I told you before, that it was reviewed by the AAR.**
Q. Okay. But did anyone, any nonlawyer ever tell you that NEMC was disbanded because of antitrust concerns?
**A. I don't recall having a discussion about that with anyone.**
Q. And so you haven't attended any NEMC meeting since the spring of 2009. Is that correct?
**A. That's correct.**
Q. Have you sat on any other AAR committees?
**A. No.**
Q. Have you ever been on the AAR board?
**A. No.**
Q. Did you ever discuss why NEMC was disbanded with Matthew Rose?
MR. FAVRETTO: To the extent that any discussions you had with Mr. Rose involved the content -- involved information or content that was provided to you by counsel, don't -- don't disclose that, but otherwise, you can -- you can testify.
**A. We had at least one or two discussions that I recall.**
Q. When were those discussions?

Page 131

**A. In 2009.**
Q. What did you say to Mr. Rose and what did he say to you on this subject?
**A. It was just more conversation around the fact that the committee was standing down.**
Q. Well, again, my question is: What did Mr. Rose say to you and what did you say to him on this subject?
**A. In general, that the committee had gotten to a point where it was being reviewed by AAR, and I think we had one discussion before the board met about the subject, and then afterwards he told me that the board had voted to stand NEMC down.**
Q. Mr. Rose was on the board of the AAR, was he not?
**A. Yes.**
Q. Did Mr. Rose tell you the reasons why?
**A. For the reasons that I told you previously.**
Q. What did Mr. Rose tell you?
**A. That many of the functions of NEMC were better served in other committees and that NEMC had gotten to the point where a lot of the reasons that it was originally stood up, which were interline related, had been largely accomplished.**
Q. When you went to NEMC meetings, was Mr. Seale

Page 132

generally in attendance?
**A. Generally.**
Q. And was Mr. Koraleski for the UP generally in attendance?
**A. Yes.**
Q. And was Mr. Giftos or his replacement generally in attendance?
**A. Yes.**
Q. Who was Mr. Giftos' replacement?
**A. Clarence Gooden.**
Q. Mr. Gooden was generally in attendance?
**A. Yes.**
Q. And at NEMC meetings, did you have dinner often the night before?
**A. Yes.**
Q. And did you have dinner with your counterparts at other railroads the night before?
MR. FAVRETTO: Objection to the form of the question.
**A. The night before the meeting there are several standing committees at the AAR. They all meet at the same time, and all the committees have dinner together the night before. So it includes the operating officers, which are part of SOMC, another committee, the chief legal officers, which are part of another**

Page 133

**committee, policy committee. So it would be a large group dinner the night before the general meetings.**
Q. And the chief marketing officers from the other railroads would attend those dinners?
**A. Sometimes. Not -- not all the time would we -- or would I arrive in time for that dinner.**
Q. And did people bring their wives to the NEMC meetings?
**A. I don't recall anyone ever bringing their wives.**
Q. Did you ever bring your wife to a NEMC meeting?
**A. One -- I'm trying to think of the one time when we had a train trip. We had a train trip with the Canadian Pacific that preceded the committee meetings, and our spouses were invited to that event. So -- so I recall one time bringing my wife to events surrounding the NEMC meeting.**
Q. All right. Do you remember attending a NEMC meeting -- strike that.
Yeah, do you remember attending a NEMC meeting in the fall of 2003?
**A. Yes.**
Q. Do you know where that meeting was?
**A. I don't recall what city that meeting was in.**

Page 134

Q. All right. Let's take a look at another exhibit here. It's produced by the Norfolk Southern. It's an e-mail from Don Seale to John Lanigan dated September 11, 2003. It has a Bates stamp 010033205, and it has an attachment that goes through 33209. This is Exhibit 17.
(Exhibit No. 17 marked.)
Q. All right. Now do you see the first page is an e-mail from Don Seale to yourself and David Garin dated September 11, 2003?
**A. Yes.**
Q. And it is an e-mail that attaches minutes of a meeting which occurred between the BNSF and the NS on July 30th of 2003. Do you see that?
**A. I do.**
Q. Okay. And that was called a joint marketing meeting?
**A. Yes.**
Q. Okay. Now Mr. Seale writes to you and to Dave. He says, Sorry for our delay in responding, but we all have reviewed, and these are the concise minutes of our meeting. Do you see that?
**A. I do.**
Q. Okay. Now when you received this, did you review the minutes that were attached to the e-mail?

Page 135

**A. I probably did.**
Q. And do you recall telling Mr. Seale that the minutes were inaccurate in any respect?
**A. No, I don't recall making that statement to him.**
Q. And when you reviewed these minutes, did you believe that they were an accurate reflection of what was discussed at the time joint marketing meeting on July 30th, 2003?
MR. FAVRETTO: Objection to the form of the question. You may answer, John.
**A. I think generally I would have thought that they were accurate.**
Q. Now in the body of the e-mail, Mr. Seale refers to a meeting that occurred in Fort Worth. Do you see that?
**A. Yes. Again, I appreciate you hosting us in Fort Worth. I see that.**
Q. Is that a reference to the meeting that was referred to in a prior exhibit on May 17th of 2003?
**A. No. I believe it's this meeting of July 30th.**
Q. Okay. I see. Okay. So the meeting on July 30th was in Fort Worth?
**A. I believe so.**
Q. What is the joint marketing meeting? What is

Page 136

the purpose of that?
**A. It was generally for the marketing counterparts of the two railroads to get together to discuss interline business opportunities and issues.**
Q. Is a joint marketing meeting different than an alliance meeting?
**A. Yes.**
Q. What's the difference?
**A. Attendees are different. Content is different. This is much more, I would say, detail oriented around the specific business that we do with each other on an interline basis.**
Q. So the attendees are different. Am I correct that the joint marketing meeting, it involves yourself and people involved in marketing organization at BNSF and their counterparts at NS?
**A. In this case, that's correct.**
Q. And the CEOs of the two companies are not in attendance at the joint marketing meeting. Correct?
**A. Not at this meeting, no.**
Q. Okay. Now in Mr. Seale's e-mail on the first page, he refers to having enjoyed his visit at the NEMC meeting. Do you see that?
**A. Yes.**
Q. And that's written -- an e-mail written to

Page 137

yourself and to Dave Garin. Right?
A. Correct.
Q. And he says specifically that he enjoyed our visit at NEMC. Right?
A. Yes.
Q. Okay. Do you remember when the NEMC meeting took place that's being referred to here?
A. I don't recall specifically the most -- the one that preceded most closely to this meeting.
Q. Do you recall visiting with Mr. Seale at any NEMC meeting in the summer or fall of 2003?
A. Well, any -- any NEMC meeting that I would go to, I would certainly greet him and talk to him, at every meeting.
Q. Talk to him separately?
A. No, not necessarily. When I would see him, when we would come into the meeting or at the dinner the night before or -- it would vary by meeting.
Q. And would you two ever have a drink together, just the two of you?
A. I don't recall ever having a drink with Mr. Seale at the NEMC meeting.
Q. Do you recall having a drink with Mr. Koraleski ever, a one-on-one session with him?
A. No, I don't recall ever having one.

Page 138

Q. How about with Mr. Giftos?
A. No, I don't recall ever having one.
Q. Mr. Gooden?
A. No, I don't recall ever having one.
Q. Okay. Now if you turn to the minutes of the joint marketing meeting, on the third page there's an item here entitled, Fuel Surcharge. Do you see?
A. I do.
Q. And there's another action item. Correct?
A. There is.
Q. And the action item says, John Lanigan and Don Seale agreed to lead a discussion of a potential industry position on fuel surcharge provisions at the next NEMC meeting. Do you see that?
A. I do.
Q. Now what was discussed between you and Mr. Seale at the joint marketing meeting on July 30, 2003 regarding fuel surcharges?
MS. REINHART: Objection to form.
A. The discussion centered around potentially going to the NEMC meeting to talk about whether or not there could be an industry position, industry standard, standard methodology, whatever you would like to call it, for fuel surcharge because many customers over time, during my first six months in the company, indicated it

Page 139

was difficult for the -- for them to do business with the rail industry because there were so many variations of fuel surcharge by the various carriers. And so it prompted my thinking that maybe there was a different way of doing things. And being new to the industry, new to all the issues in the industry, I thought it was worth at least raising as a potential possibility.
Q. Okay. So am I hearing you correctly that it was you, John Lanigan, who raised the idea of a potential industry position on fuel surcharge?
A. I don't -- I don't know if it was specifically me in that meeting or not, but clearly it was something that was on my mind.
Q. Okay. Well, who was it that raised this idea at this meeting?
A. I just don't recall specifically who raised the idea.
Q. Well, what did Mr. Seale say on this subject?
A. My recollection is that he agreed that it was worthy of discussion at the NEMC meeting.
Q. Did he say anything else?
A. I don't recall any other.
Q. What did you say on the subject at the meeting?
A. That I thought it was worthy of discussion at

Page 140

the NEMC meeting.
Q. And what NEMC meeting are you talking about?
A. Whatever the next one was in sequence after this meeting.
Q. So that would be the one in the fall of 2003?
A. Yes.
Q. All right. I want you to tell me everything that was said by you and everything that was said by Mr. Seale in this meeting, this joint marketing meeting on -- on July 30th of 2003 on the subject of having an industry position on fuel surcharges.
MR. FAVRETTO: Objection to the form of the question.
A. Well, I don't recall everything that was said, but in general, it was discussion around customer feedback on ease or lack of ease of doing business with the industry with regard to fuel surcharges and whether or not it was a topic that we might be able to discuss at NEMC. That was the gist of the conversation.
Q. Did anyone else from BNSF make any statements on this subject at the meeting?
A. My recollection is that possibly one or two of my direct reports may have confirmed that customers had concerns over the complexity of fuel surcharge programs.
Q. Okay. And who made those statements?

Page 141

**A. I don't remember specifically who made them.**
Q. Did anyone else from the Norfolk Southern, other than Mr. Seale, make any statements on the subject of a potential industry position on fuel surcharges?
**A. I don't recall if they did or not.**
Q. Now did you agree at this meeting -- did you and Mr. Seale agree that you were going to lead a discussion of this subject, namely an industry position on fuel surcharges at the next NEMC meeting?
MR. FAVRETTO: Objection to the form of the question.
**A. I don't recall that we used those words or said we were going to lead a discussion. It was more along the lines of bringing it up at the next meeting as a potential topic of discussion.**
Q. Well, you read these minutes, did you not, sir?
**A. Yes.**
Q. You read the minutes. And the minutes say that you and Mr. Seale agreed to lead a discussion of a potential industry position on fuel surcharges. Right?
**A. That's what it says.**
Q. And when you read that, you didn't believe that that was inaccurate, did you?
**A. No, it didn't strike me at the time.**

Page 142

Q. So is this accurate to say that you and Mr. Seale reached an agreement at the meeting, the joint marketing meeting, that you were going to lead this discussion on this subject at the next NEMC meeting?
MR. FAVRETTO: Objection to the form of the question. It misstates his testimony and lacks foundation. Go ahead, Mr. Lanigan.
**A. Yeah, my recollection, it wasn't that formal. It was a discussion in which we said we should bring this up at the next NEMC meeting.**
Q. So would it be fair to say that you and Mr. Seale agreed that the two of you would bring up the subject of an industry position on fuel surcharges at the next NEMC meeting?
MR. FAVRETTO: Objection to the form of the question. Misstates his testimony.
**A. Yeah, I just don't think it was that formal of an agreement. There was a discussion and concurrence that it was a topic worthy of introducing at the next meeting.**
Q. Did Mr. Seale tell you at any point at this meeting or before that he favored having industry standard fuel surcharges?
**A. I don't recall that he ever took a position on it.**

Page 143

Q. Did you tell Mr. Seale that you believed that an industry standard fuel surcharge was warranted?
**A. My recollection of my discussion with him were -- or words regarding the subject were that I thought it was worthy of the discussion because of the complexity that customers were bringing up. I don't -- I don't recall having a position, and I never took a position that we should or shouldn't have it. I just felt it was worthy of discussion.**
Q. Now these customers that you referenced, that you say were complaining about the difference in fuel surcharges, I take it these were not limited to interline customers; these were interline and local customers. Is that correct, sir?
**A. Yeah. I don't know if I can distinguish, because there's customers that are local customers to us, interline customers, and there are customers that can be local to multiple railroads and interline customers of multiple railroads. So I didn't think of it in that context.**
Q. Okay. Well, when you and Mr. Seale discussed that this topic was worthy of bringing up at NEMC, namely an industry standard fuel surcharge, I take it you weren't discussing only an industry standard fuel surcharge on interline traffic, but you were talking

Page 144

about local traffic as well, all traffic. Isn't that right, sir?
MR. FAVRETTO: Objection to the form of the question.
**A. No. It wasn't that specific. It arose because of interline concerns because many customers had brought up, when I start a load on your railroad, I get one form of fuel surcharge. When I start a load on another railroad, on an interline movement -- we could have a customer that has two plants, one on our railroad, one on Norfolk Southern's. They could have freight that originates at the Norfolk Southern served plant. They could have freight that originates at the BNSF served plant. And so they could have movements going between the same two plants starting at opposite ends and have two fuel surcharge programs. So really the catalyst for all this was the interline movements. So when I say I didn't think of it in that context, it's because the discussions were all around interline and interline efficiencies and issues.**
Q. Okay. But when you and Mr. Seale agreed to lead a discussion at the next NEMC meeting on industry standard fuel surcharge, you were not talking only about interline traffic; you were talking about fuel surcharges in general. Isn't that true?

Page 145

MR. FAVRETTO: Objection to the form of the question.
**A. No, I don't think we had it in that context. We didn't specifically state it one way or the other. And I guess in my own mind, the catalyst was the interline discussion, so I don't -- I don't know where the discussion would have gone subsequent had we had a discussion of it at NEMC.**
Q. Okay. Well, we're going to come to that.
Now we'll mark as our next exhibit -- let's mark as Exhibit 18 a document produced by the Norfolk Southern. It's Bates stamped 013005655 through 5673.
(Exhibit 18 marked.)
MR. CROSS: Is this 18 or 19?
MR. BROCKETT: 18.
MR. FAVRETTO: 18.
Q. All right. Now Mr. Lanigan, I'm showing you this document. In the middle of the e-mail it says, Attached are minutes from the NEMC, SOMC and joint SOMC/NEMC meeting held on September 11, 2003. Do you see that?
**A. I do.**
Q. Okay. Now if you look back at the prior exhibit, the joint marketing meeting was on July 30th of 2003, and you had agreed with Mr. Seale to have this

Page 146

discussion of a potential industry position at the next NEMC meeting. Correct?
**A. Correct.**
MS. REINHART: Objection to form.
Q. And this document, Exhibit 18, seems to indicate that the next NEMC meeting was on September 11, 2003. Do you see that?
**A. Yes, I do.**
Q. Okay. And attached to this meeting -- attached to this e-mail are draft minutes of the NEMC meeting that occurred on September 11, 2003. Correct?
**A. Yes, they do appear to be the draft minutes.**
Q. All right. Now did you and Mr. -- strike that.
Who was in attendance at the September 11th, 2003 NEMC meeting? Do you recall?
**A. On page 4 it lists the attendance.**
Q. Okay.
**A. It lists the attendance at the joint session. I don't know if there's another page with attendance just at the NEMC meeting. There is on page -- well, there's not -- the page number is obliterated.**
Q. It's page number 013005663. Correct?
**A. Correct.**
Q. And in attendance at this meeting was

Page 147

yourself. Right?
**A. Yes.**
Q. And Mr. Seale was there. Right?
**A. Correct.**
Q. Mr. Prillaman from the NS was there. Right?
**A. Correct.**
Q. Mr. Koraleski from the UP. Correct?
**A. Correct.**
Q. Mr. Giftos from CSX. Correct?
**A. Correct.**
Q. Okay. And also Mr. Hamberger and others from the AAR. Correct?
**A. Correct.**
MR. FAVRETTO: Among others.
MR. BROCKETT: Among others, yeah.
Q. Now did you and Mr. Seale, in fact, lead a discussion of a potential industry standard fuel surcharge at this NEMC meeting?
**A. No, we did not.**
Q. Okay. Why not?
**A. Prior to the meeting, when they were calling for, asking for agenda items -- and I don't recall the specific sequence of events -- I had a discussion with Dan Saphire of the AAR, who is an attorney and who was generally the lead attorney at the NEMC meetings** [redacted]

Page 148

[redacted]
Q. Okay. When did you have this conversation with Mr. Saphire?
**A. Prior to the meeting, but I don't remember the date.**
Q. And how did this conversation come about?
**A. I proposed an agenda item for the meeting and in review of the agenda, I had the discussion with Mr. Saphire. Again, I don't recall if I called him, he called me. I don't recall the sequence, but I had a phone conversation with Mr. Saphire,** [redacted]
Q. Okay. Did he say anything else?
**A. I don't recall anything else of substance.**
Q. Did he confirm this in any kind of written memorandum or e-mail to you?
**A. Not that I recall.**

Page 149

Q. Did you ask him to do so?
**A. No, I did not, that I recall.**
Q. Did you take any notes of the meeting?
**A. No, I don't believe I did. It was a telephone conversation. It wasn't a meeting.**
Q. And after this discussion with Mr. Saphire, did you then call Mr. Seale and explain to him the contents of your conversation?
**A. I don't remember if I called Mr. Seale or if Mr. Saphire talked to him. I don't recall.**
Q. Well, do you recall talking to Mr. Seale prior to the NEMC meeting on September 11th about the fact that you weren't going to be able to lead this discussion?
**A. I don't specifically remember talking to him about it.**
Q. Did you talk to anyone else on this subject before the NEMC meeting?
**A. I don't specifically remember talking to anybody about it.**
Q. The document you said you created that proposed an agenda item, what -- what was the nature of that document?
**A. It wasn't a document that I recall. I think -- I'm trying to remember how I proposed it,**

Page 150

**whether it was via telephone. I don't recall how I proposed it.**
Q. Okay. Well, how is it that Mr. Saphire saw it then and called you about it?
**A. I believe then it became part of a draft or potentially Mr. Prillaman, who was the chairman of the committee at the time, may have communicated with Mr. Saphire that I had proposed this. I just don't remember the mechanics of how it happened, but I remember the phone call between myself and Mr. Saphire.**
Q. All right. Well, so I'm just trying to understand what documents were created. You believe there were draft minutes that listed this potential industry fuel surcharge as an agenda item?
**A. I never saw -- I never saw any draft that had it listed.**
Q. Okay. Did you circulate anything in writing to anyone that set forth this is an agenda item?
**A. I don't specifically remember putting anything in writing.**
Q. Okay. Well, then I'm a little confused. How is it that Mr. Saphire saw something and called you?
**A. Again, I'm not -- I'm not sure of the sequence of events, and I also believe I stated I don't remember if I called him or he called me. I just don't recall.**

Page 151

**But I do recall the conversation with Mr. Saphire.**
Q. Okay. Did you ever have conversations with any lawyer at BNSF about having an industry standard fuel surcharge?
MR. FAVRETTO: Objection to the form of the question. You can answer that question, but don't reveal any contents of any such conversation, if you had one.
**A. I may have, but I don't specifically remember.**
Q. Did you tell Mr. Saphire in your conversation that your discussions on an industry standard fuel surcharge would be limited to interline traffic?
**A. I don't think we got into that kind of detail.**
Q. All right. So I see the minutes of the NEMC meeting of September 11th do not record any discussion of an industry standard fuel surcharge. Is that correct, sir?
**A. That's correct.**
[redacted]
Q. And did you discuss with anyone else at any other railroad about the fact that this proposed discussion was not to take place?

Page 152

**A. I don't recall having that discussion with any of the other railroad members.**
Q. You didn't report what Mr. Saphire had told you to any of your counterparts?
**A. No, not that I recall.**
Q. Did Mr. Seale ever say to you, Hey, John, remember we're going to have that discussion? And you said to him, No. No, Don, we're not going to have it.
[redacted]
MR. FAVRETTO: Objection to the form of the question.
**A. I don't recall having a specific discussion with Mr. Seale about it.**
Q. Is there a reason that you can remember your conversation with Mr. Saphire but you can't remember the conversations you had with Mr. Seale and others about the industry standard fuel surcharge?
MR. FAVRETTO: Objection to the form of that question. It misstates his testimony. Go ahead. You can answer.
**A. It was a very important discussion that I had with Mr. Saphire, and so it stood out in my mind. I can't speak to why I don't recall having other discussions.**
Q. Okay. And the discussions you had with

Page 153

Mr. Seale on March 18th and again at the July 30th, 2003 joint marketing meeting about an industry standard fuel surcharge, you wouldn't consider those important discussions?
MR. FAVRETTO: Objection to the form of that question.
**A. Again, they were either unremarkable or I just don't recall the content.**
Q. But you do recall vividly the conversation with Mr. Saphire. Is that correct?
**A. Yes, I do.**
MR. BROCKETT: So we'll go to about 12:30 and then break for lunch.
MR. FAVRETTO: That would be fine.
Q. Now after your discussion with Mr. Saphire, did you have any further discussions with Don Seale about an industry standard fuel surcharge from any time you had the conversation with Mr. Saphire until today?
**A. Not that I recall.**
Q. Did you have any discussion with any other representative from any railroad about any industry standard fuel surcharge after you had your discussion with Mr. Saphire?
**A. No, I don't believe I did. After I had the discussion with Mr. Saphire, it was a dead issue, from**

Page 154

**my perspective.**
Q. Did there come a time in the summer or fall of 2003 when you learned about a request that your company had made to the AAR to publish a new index without fuel?
**A. Was I aware of it? Is that the question?**
Q. Uh-huh.
**A. Yes, I was aware of it.**
Q. And what is it that you learned about the subject and when?
**A. I don't remember specifically when, but I learned that we were going to make a request of the AAR to create a new index.**
Q. And who told you that?
**A. I don't recall specifically who told me.**
Q. And were you told why BNSF was going to make this request of the AAR?
**A. We had discussions about why we were making the request.**
Q. Okay. Who did you have those discussions with?
**A. A variety of people.**
Q. Can you name them, please?
**A. Sam Kyei, Matt Rose, counsel, some of the other members of the fuel surcharge team.**
Q. Is this something that -- strike that.

Page 155

Was it Matt Rose's idea to make this request to the AAR?
**A. I don't remember whose idea it was to make the request.**
Q. Well, leave out your conversations with counsel. What did you discuss with Mr. Kyei and with Mr. Rose about the reasons why BNSF wanted to make this request of the AAR?
**A. We felt that the fuel component of the RCAF index, the rail cost adjustment factor index, inadequately recovered rising fuel costs at BNSF.**
Q. And who made that statement?
**A. I don't recall who made the statement.**
Q. Did BNSF do any study before it reached that conclusion?
**A. Yes, we did our own internal analysis.**
Q. And that internal analysis showed what?
**A. That the fuel component of the RCAF index did not adequately recover rising fuel prices, fuel costs.**
Q. Why not? Why didn't it adequately recover?
**A. The -- for a few reasons. First, the RCAF index itself is a market basket of costs across the rail industry and do not reflect the individual costs of any single railroad. There are fairly large differences in the fuel consumption patterns of the eastern railroads**

Page 156

**and the western railroads. We're much more fuel intensive in the west because of the length of our trips in the west, and because of the averaging, we were not adequately recovering our fuel cost in the RCAF indicator.**
**Additionally, it was a period over period adjustment and not from a baseline period, which meant that it was -- it was a comparison of higher and higher rising prices versus the rise in price over an established base. So for all those reasons, it did not adequately reflect coverage of our fuel -- rising fuel costs.**
Q. And how is it that this new index that you were proposing to have the AAR create, how is it that that would assist you in dealing with this problem of the RCAF not adequately covering your rising fuel costs?
**A. Well, essentially the new index would have reflected all the factors of RCAF, less the fuel component of RCAF, and it was our desire to then apply our specific fuel surcharge program in addition to this new index so that we still had a general -- I'll call it an inflationary index for things like labor cost and steel cost and all the input cost to the industry but that we very specifically would be able to capture -- better capture the rising price of fuel. And during**

Page 169

Q. All right. One second.
MR. FAVRETTO: Okay.
Q. Now after your conversation with Dan Saphire of the AAR about the industry standard fuel surcharge, did you confirm or take any steps to confirm Mr. Saphire's advice with any lawyer representing the BNSF?
MR. FAVRETTO: I object to the form of the question. I believe you've answered that already, but go ahead.
**A. I don't recall having any specific discussions. I felt that Mr. Saphire -- my understanding was of his position and standing that as part of my training that it was adequate advice, and at that point, I basically dropped the subject.**
Q. Did you view Mr. Saphire as a lawyer providing legal advice to the BNSF railroad?
**A. I didn't think of it in that context.**
Q. Well, Mr. Saphire was a lawyer employed by the AAR. Correct?
**A. Correct.**
Q. He wasn't employed by the BNSF. Correct?
**A. No, not directly.**
Q. And he wasn't a lawyer who had been retained by the BNSF. Is that correct?

Page 170

**A. Well, I don't know what the -- how to characterize the relationship between an AAR lawyer and my company since we're a dues paying member of the association, et cetera, so I don't know how to characterize it.**
Q. Well, I'm just asking you: Did you view at the time that Mr. Saphire was providing confidential advice, okay, to you as the chief marketing officer of the BNSF?
MR. FAVRETTO: Okay. I'm going to instruct you, Mr. Lanigan, you are -- Mr. Saphire's communications with you as a NEMC member were in the context of providing you guidance on AAR related matters. To the extent that he provided you with any information in that context, you should not disclose the nature of that -- of those communications. I think you've testified up to now about the general nature of your discussions with him, but I just want to advise you of that sensitivity. That will be our position.
MR. BROCKETT: Okay. Mr. Favretto, I think that goes beyond placing an objection on the record. I think you're adding information to the record that's attempting to signal the witness on how to testify, and I would really appreciate it if you would not do that. You've been fine up until now, but I think

Page 171

what you just did crosses the line.
MR. FAVRETTO: Well, I think the record will demonstrate that the communications were in the context of what I described.
MR. BROCKETT: Well, I don't think it's appropriate --
MR. FAVRETTO: Okay.
MR. BROCKETT: -- for you to make those statements on the record. Okay.
MR. FAVRETTO: Well, with a lay witness --
MR. BROCKETT: Not when a question is pending.
MR. FAVRETTO: With a lay witness who is not sensitive to the relationships, as he has testified, I think it's appropriate for me to just advise him of those standards, of those guidelines.
MR. CROSS: It also bears mentioning that Judge Facciola has ruled on this issue, rejecting that claim.
Q. You can answer my question now.
**A. Could you repeat it, please?**
Q. Sure.
Did you believe that Mr. Saphire was providing confidential advice to you as the chief marketing

Page 172

officer of the BNSF?
**A. I didn't think of it in that term at all.**
MR. BROCKETT: Okay. Let's take a lunch break.
THE VIDEOGRAPHER: This marks the end of tape number 2 of the videotaped deposition of John Lanigan. Going off the record, the time now is 12:32 p.m.
(Break from 12:32 p.m. to 1:16 p.m.)
THE VIDEOGRAPHER: Here begins tape number 3 of the videotaped deposition of John Lanigan. We're on the record. The time now is 1:16 p.m.
Q. (By Mr. Brockett) Good afternoon, Mr. Lanigan. Are you ready to resume your deposition?
**A. I am, sir.**
Q. Do you understand that you're still under oath?
**A. I do.**
Q. Now you testified before lunch about a conversation that you had with Dan Saphire, a lawyer at the AAR I believe in late summer, early fall of 2003. Do you recall that, sir?
**A. Yes, I do.**
Q. Is that conversation the one and only conversation you've ever had with Mr. Saphire?

Page 173

**A. No. I've had conversations with him before and I think since.**
Q. Okay. Is that the only time you talked to Mr. Saphire about an industry standard fuel surcharge?
**A. Yes, I believe that was the only time I talked to him about fuel surcharge.**
Q. And had you spoke with Mr. Saphire on any other occasion about fuel surcharges generally?
**A. No, I don't believe I have.**
Q. What other subject matters did you discuss with Mr. Saphire?
**A. I don't remember specifically, but he attends these meetings, and if nothing else, you know, just idle chitchat during breaks and things like that to greet him and -- but I can't -- maybe state of the economy, state of the business, things like that. Just general -- general things.**
Q. Okay. So the record is clear, the one and only conversation you had with Mr. Saphire on the subject of fuel surcharges is the conversation about which you've testified?
MR. FAVRETTO: Objection to the form. You may answer.
**A. Yes, to the best of my recollection.**

[redacted]

MR. FAVRETTO: Mr. Lanigan, again, do not reveal the content of the discussion you may have had with Mr. Saphire in terms of the legal advice he may have given you. You can speak about the result of the conversation, but not the content of the conversation.
MR. BROCKETT: Well, I'm sorry, Mr. Favretto, at this point in time, I think the attorney/client privilege relating to this conversation has been waived.
MR. FAVRETTO: Well, the attorney/client privilege belongs to AAR, and they're not present in this -- in this deposition, so I'm preserving their position on this. And --
MR. BROCKETT: Well, you've allowed him to testify about the content of the conversation.
MR. FAVRETTO: The result of the conversation you can ask him about, but the content of the conversation to the extent that it involved legal advice provided by AAR's lawyer to an AAR member in connection with official AAR business is privileged.
MR. BROCKETT: Yeah, but, Dick, he's already testified about it. He's already told us the

Page 175

contents --
MR. FAVRETTO: Well, I don't think -- he's talked about -- he's testified about the results of the conversation --
MR. BROCKETT: Well, okay.
MR. FAVRETTO: -- but not the contents -- go ahead.
MR. BROCKETT: If you're going to rely on advice of counsel defense, you're going to have to let him testify about it. If you're not, okay, then you need to stop him from saying it. He's already let the cat out of the bag. I'm sorry.
MR. FAVRETTO: I don't know -- I don't know, Dan, the content of the conversation. As Mr. Hamberger has already testified in this proceeding, he pays his lawyers to screen suggested agenda items, and basically that's what we're talking about.
MR. BROCKETT: Well, I have a question pending. Are you instructing him not to answer it?
MR. FAVRETTO: Let me hear the question again.

[redacted]

MR. FAVRETTO: I'm going to instruct you not to -- not to answer that question, based upon attorney/client privilege.
Q. Well, can we get a yes or no answer as to whether he discussed it first?
MR. FAVRETTO: Let me hear the question again.
(Requested testimony read.)
Q. Yes or no?
MR. FAVRETTO: Hold on a second, Mr. Lanigan. That's asking him for the -- the content of advice that was given.
MR. BROCKETT: Which he's already discussed about. Listen, you can't disclose half the

conversation and try to preserve only the balance of the conversation. You can't use the privilege as a sword and a shield.

MR. FAVRETTO: Well, I'm not even sure that it's an advice of counsel defense so much as it's basically a reliance on a screening procedure for agenda items. Let me hear the question again.

MR. BROCKETT: I'll rephrase it if you would like.

MR. FAVRETTO: Okay. Good.

[redacted]

Q. Now when the record -- strike that.

When the question of an industry standard fuel surcharge first came up at the March 18th, 2003 meeting



with Mr. Seale and others from NS, why didn't you seek advice of counsel at that time about the appropriateness of having those discussions?

MR. FAVRETTO: Objection to the form of the question. Do you have the right meeting in mind? Was it the March 18 meeting?

MR. BROCKETT: Yes.

MR. FAVRETTO: All right.

**A. I don't recall that we discussed an industry standard at the March 18th meeting. As I was new to the industry and was learning what was going on, my concern as I recall it, early in my discussions were making sure that the fuel surcharge as it worked on an interline basis was working efficiently well, et cetera, for both sides.**

**My thinking revolved around potentially having a discussion about an industry standard as I became more comfortable in my job, as I started to meet with more customers and as customers started to express concerns about the complexity of fuel surcharge within the industry. So I can't -- I can't tell you when -- I don't recall when it kind of came together in my own mind that it was something that may be worthy of discussion.**

Q. Okay. Let me try it this way. Apart from



this conversation you had with Mr. Saphire, did you ever seek out legal advice at any point in the summer or fall of 2003 on the subject of whether you could have an industry standard fuel surcharge?

**A. I don't recall seeking any other legal advice.**

Q. And, again, I think you testified about this. I want to make sure the record is clear. It's not -- you did not seek out Mr. Saphire's advice on this question. Correct?

**A. That's where I'm having trouble remembering exactly the sequence of events. I don't recall if I called Mr. Saphire or if he called me on the agenda item.**

Q. Is it one of Mr. Saphire's duties to look at the agenda for NEMC meetings and advise as to whether the agenda item is appropriate?

**A. I believe that is part of his responsibility.**

Q. Okay. And is it your best recollection that Mr. Saphire saw an agenda item in a draft agenda and called you about it?

**A. I don't know if he saw it in writing in a draft agenda item. I don't -- I don't recall how he became aware of it.**

Q. But is it your best recollection that he called you rather than vice versa?



**A. I honestly don't remember.**

Q. And as you sit here today -- strike that.

Did Mr. Saphire tell you in this call that he was going to discuss this issue with the chief marketing officers of the other railroads as well?

**A. I don't recall that he made that comment.**

Q. Did you ask him to discuss the issue of an industry standard fuel surcharge with the other members of NEMC?

**A. I don't believe I asked him to.**

Q. Now after the BNSF announced a new fuel surcharge program effective June 1 of 2003, did you then set out to develop a fuel escalation general guidelines concerning the application of this new program that you had announced?

MR. FAVRETTO: I object to the form of the question, particularly as it characterizes the announcement as a new fuel surcharge program. But you may -- you may respond, Mr. Lanigan.

**A. Could you repeat the question, please?**

Q. Sure.

After the new fuel surcharge program went into effect January 1st, 2003 -- you've testified --

**A. July 1st.**

Q. I'm sorry, July 1st, 2003. You've testified

Page 181

about that program. Did you then as the chief marketing officer set out to create general guidelines concerning the application of that fuel surcharge to customers?
**A. In what regard? I'm not sure I follow the question.**
Q. Let's try it this way. Let me show you what we marked as Kyei Exhibit No. 27. Now this is a document. It's called Price and Fuel Escalation General Guidelines, and it's dated January 2004. Do you see that?
**A. I do.**
Q. And this is a document that's produced by your company. Okay? You have to say yes or no.
**A. Yes.**
Q. Do you remember this document?
**A. I don't specifically remember this document.**
Q. In the middle of the page under item 2, iv under the topic RCAF -- are you with me?
**A. I am with you.**
Q. It states, quote, It is strongly recommended that RCAF contracts migrate to the all-inclusive index less fuel (AII-LF) index or an RCAF index excluding fuel component and apply a fuel surcharge. Do you see that?
**A. I do.**

Page 182

Q. Now did that correctly articulate the policy of the BNSF as of January 2004?
**A. Yes, I would say it is.**
Q. Now if we look down under fuel escalation, it states that -- under item B, 1, i, quote, Every contract should include a fuel surcharge clause. Do you see that?
**A. I do.**
Q. Did that state correctly the policy of the BNSF?
**A. Yes.**
Q. It also states there, quote, All new and existing renewing contract negotiations should have a fuel surcharge clause as the goal. Do you see that?
**A. I do.**
Q. Okay. And now did that include coal contracts that were being renewed?
**A. Yes, it would have.**
Q. And would it include agricultural contracts that were being renewed?
**A. It would have.**
Q. Okay. And was it the intent of the company to apply the percentage based fuel surcharge based on the HDF index to coal and agricultural contracts that were being renewed at this time?

Page 183

MR. FAVRETTO: Objection to the form of the question. I believe it misstates the document. But go ahead, Mr. Lanigan.
**A. The intent was to get as much fuel cost recovery as possible across our customer base. And so that second sentence in B, 1, i, All new and renewing contracts should have a fuel surcharge as the goal -- so we were attempting to get additional recovery of fuel surcharge. That was our policy.**
Q. And the reference here to renewing contracts included coal contracts. Correct?
**A. It would have included all contracts across all of our businesses.**
Q. Including agricultural contracts?
**A. Certainly.**
Q. Okay. And the fuel surcharge that's being referred to here is the rate based fuel surcharge based on the HDF index at $1.25 a gallon. Correct?
**A. That was our published fuel surcharge, and over time we made -- we've made many exceptions to that particular table in individual negotiations with customers, but that was the base that was the goal.**
Q. You didn't have any other published fuel surcharges at this time applicable to your carload business. Correct?

Page 184

**A. Not that I can recall.**
Q. You had a separate one as applicable to intermodal. Right?
**A. We did have a separate intermodal table.**
Q. And then down under B, 5 it says, quote, All other exceptions such as discounted fuel surcharge programs need approval from the appropriate group vice president. Do you see that?
**A. Yes, I do.**
Q. And that's a reference to the policy that we talked about earlier that you mandated back in the spring of 2003. Correct?
**A. That's correct.**
Q. Let's mark as our next exhibit a one-page document produced by BNSF. It's an e-mail from Sam Kyei to John Lanigan dated March 11, 2004. It's Exhibit 19.
(Exhibit 19 marked.)
Q. Do you recognize this e-mail, sir?
**A. I do.**
Q. Is this an e-mail to you from Sam Kyei on March 11, 2004?
**A. It is.**
Q. And am I correct that in this e-mail Mr. Kyei is reporting to you on a meeting that he had with Mr. Rose?

Page 185

**A. Yes, I believe it is.**
Q. And the e-mail is also sent to Nick Murray. Correct?
**A. That's correct.**
Q. Now the e-mail states, John, please see attached, the presentation that we made to Matt today. Correct?
**A. It does.**
Q. And then it has, under here's a recap, six separate points, correct, A through F?
**A. Yes.**
Q. And these are all points that were -- that Mr. -- according to Mr. Kyei, were points that were Matt's expectations on the marketing fuel surcharge program. Right?
**A. That's what it states.**
Q. Okay. So do you understand that this is what the chairman of the company was mandating the policy should be with respect to your fuel surcharge?
MR. FAVRETTO: Objection to the form of the question.
**A. Yeah, the word expectations I think is more appropriate. It's the word that's in the document. Not --**
Q. Okay.

Page 186

**A. There's no word of mandate or anything like that in the document.**
Q. Well, when the CEO states he has an expectation in BNSF, is it generally the desire of those underneath the CEO to carry out and to fulfill those expectations?
**A. To the extent possible and practical.**
Q. Now the first item says the marketing team should strive for 100 percent fuel effectiveness by account. Correct?
**A. Yes.**
Q. And that refers to the fact that Matt Rose wanted the marketing group to achieve as close to 100 percent fuel surcharge provisions in every account, every customer account. Correct?
**A. Yes, I think that's accurate.**
Q. 1 A says, He likes to see fuel surcharges applied by every price authority. Have I read that correctly?
**A. You have.**
Q. What's a price authority?
**A. There are many different documents that we use for the purpose of establishing commercial relationships. There are classic contracts that are time based, volume based, whatever. There are also**

Page 187

**tariffs which are public documents that can be adjusted frequently, depending upon market conditions. So in this case, I believe what Mr. Kyei was referring to on a price authority is any kind of a pricing type of a document that would signify the commercial relationship between us and a customer.**
Q. All right. And did you understand from this that Mr. Rose expected that fuel surcharges would be applied to as many coal contracts as possible?
**A. Well, it was our goal over time, which I believe I testified earlier, that we were attempting to increase the participation rate of all customers.**
Q. And that included coal and agriculture?
**A. It did.**
Q. And am I correct that it was inconsistent with Matt's expectations for you to make an exception in a customer contract with respect to fuel surcharge?
MR. FAVRETTO: Objection to the form of the question.
**A. In management, we often set out goals knowing that there are going to be exceptions to the goals, and over time in 2004 and since we've made exceptions to the fuel surcharge goal on a case by case basis.**
Q. Do you have any documents in your company that would show how many of those exceptions were made, what

Page 188

the customer name was, what the exception was that was made?
**A. You know, I don't -- I don't have any copies of those documents. We've discussed them in the past internally.**
Q. Can you tell us, as you sit here today, from '03 to the end of '07 how many exceptions were made?
**A. I don't know how many.**
Q. Can you identify any customer who got an exception to the fuel surcharge provision that was mandated by the CEO?
**A. I can tell you several.**
Q. All right. Who?
MR. FAVRETTO: Go ahead. I just want to object to the form of the question. But go ahead. You're fine.
[redacted] **several of the steamship line companies that we do intermodal business with. And there's more, but that's a representative sampling.**
Q. Okay. And are there documents in the company that would show what, if any, exceptions were made for these customers relative to fuel surcharges?
**A. In some cases they would be part of the**

Page 217

**A. The way that I would read this would be that we would provide some fuel surcharge coverage information on our interline business because the whole lead in to that is all about interline, and interline is included in one of the bullet point, and the rate authorities and rate stats would be on an interline basis. So my interpretation of the document I've not seen before would be that this is all about our interline business.**
Q. Okay. So would you agree then that your company and the NS agreed to share on a quarterly basis the fuel surcharge coverage stats as pertained to the interline business?
MR. FAVRETTO: Objection to the form.
**A. I'm not sure, because I didn't review this document, I didn't have a discussion with anyone.**
Q. Well, can you agree with me that this document states that it would be beneficial for both companies to agree to do that?
MR. CROSS: Objection. Form.
**A. Again, I don't know what the intent of the writer was, and I don't know what the specific follow-up item was.**
Q. And as you sit here today as the chief marketing officer of the company, you don't know whether

Page 218

those statistics were shared with the NS or not?
**A. I don't know.**
Q. Okay. And as you sit here today, do you know whether those statistics were shared between your company and UP?
**A. I don't know.**
Q. And how about between your company and CSX?
MR. CROSS: Objection to the form.
**A. I don't know.**
Q. Who would know the answer to that?
**A. I'm not sure. I would have to go back and talk to some folks and find out who might know.**
Q. Well, if you have to pick the person in your company who would know this, who would you select?
MR. FAVRETTO: Don't speculate, Mr. Lanigan.
**A. I would have to go back and confer with several of my colleagues.**
Q. Would North -- strike that.
Would BNSF keep records of whatever information it shared with other railroads regarding fuel surcharge coverage statistics?
MR. FAVRETTO: Objection to the form of the question, lack of foundation. Go ahead.
**A. I don't know.**

Page 219

Q. Okay. Mr. Lanigan, did there come a time in 2004 when you asked that a team be formed to look at the possibility of creating a mileage based fuel surcharge?
**A. We looked at and did some evaluation of mileage based fuel surcharge in 2004. We also in 2003 did some as well.**
Q. Okay. So what did you do in 2003 with reference to creating a mileage based fuel surcharge?
**A. We just did some analysis of a potential program.**
Q. And when you say "we," who are you referring to?
**A. The fuel surcharge review team led by Sam Kyei and Nick Murray.**
Q. And I'm correct, am I not, that you did not adopt or announce any mileage based fuel surcharge program in 2003?
**A. No, we did not.**
Q. So whatever work you did did not result in the announcement or the publication of any mileage based fuel surcharge program?
**A. No, it did not.**
Q. Now did there come a time then in 2004 when you asked some people to revisit the question of a mileage based fuel surcharge?

Page 220

**A. I believe I did.**
Q. And who did you ask this of?
**A. I believe Sam Kyei and Nick Murray.**
Q. What specifically did you ask them to do?
**A. I don't recall specifically. I think in general terms I asked them to refresh the previous research.**
Q. Why did you ask them to do this in 2004?
**A. As I recall, I had a general interest in mileage based fuel surcharge because of my trucking background, and I thought that potentially it might be an option to use at BNSF.**
Q. But why in 2004 did you ask that the team revisit this question?
**A. I don't recall specifically.**
Q. Okay. Let's look at the e-mail here. It's a one page document, one page e-mail with Bates stamp 0028783. This will be Exhibit -- I'm sorry. Actually, it's two pages, 0028783 through 0028784, and it will be Lanigan 27.
(Exhibit 27 marked.)
Q. Now Mr. Lanigan, do you recognize this as an e-mail from an Eldon Specht to a number of people?
**A. Yes.**
Q. Who is Eldon Specht?

Page 221

**A. He was in our technology services group. So computer services.**
Q. Why would he be getting involved in fuel surcharge analysis?
**A. He would have been involved in helping to get data to support analysis.**
Q. Now in this e-mail, which is dated September 7th of 2004, he writes, quote, John Lanigan has asked the fuel surcharge team to reconvene and consider changing fuel surcharge calculations from percent of revenue to per miles basis. Do you see that?
**A. I do.**
Q. Is that an accurate statement of what you asked the team to do?
**A. Well, the team doesn't have the responsibility of changing our fuel surcharge program ultimately, so I think it's somewhat misworded, but I did ask them to basically dust off the data and update it.**
Q. Now the next sentence says that you would like to use the household goods mileage process used by trucking company, and you even invited to make contact with Schneider National if necessary. Do you see that?
**A. Yes.**
Q. And that's a reference to your prior employer. Right?

Page 222

**A. That's correct.**
Q. The third paragraph here says, This was first discussed in April 2003 for local traffic. Do you see that?
**A. I do.**
Q. What does that mean?
**A. I don't know. I don't recall having any discussions when we first started talking about mileage based fuel surcharge that it would only be for local traffic. So I don't know whose interpretation it was.**
Q. All right. He goes on to say, At that time it was determined not to change the process. Do you see that?
**A. I do.**
Q. Is that correct, that in April of 2003 a decision was made not to implement a mileage based surcharge program?
**A. I don't remember the date, but we didn't implement a mileage based fuel surcharge program in 2003.**
Q. Who made that decision? Did you?
**A. Yes.**
Q. Why?
**A. There were a number of reasons. I think among the reasons were that we did not have systems capability**

Page 223

**internally at BNSF to deal with a mileage based fuel surcharge program. We didn't have mileage based rating systems. So it would have been a very expensive proposition to implement that system. Additionally, we had talked to a sampling of customers, and at that point in time, the majority of the customers that we sampled were not in favor of moving to a mileage based fuel surcharge program.**
Q. All right. Let's mark as Exhibit 28 an e-mail with some attachments. It's an e-mail from David Burr dated October 18th of 2004.
(Exhibit 28 marked.)
Q. Now do you recognize this is an e-mail from David Burr to a number of CSX -- I'm sorry -- BNSF employees --
**A. Yes.**
Q. -- in October 2004?
**A. Yes.**
Q. Who is David Burr?
**A. He is in the finance department. At that time was responsible for risk management programs for the company.**
Q. Was he a senior executive of the company?
**A. No.**
Q. The last line of this e-mail says, John

Page 224

advised he will be meeting with his counterparts in the next few weeks and may explore the issues with them. Do you see that?
**A. I do.**
Q. Did you tell Mr. Burr that you were going to be meeting with your counterparts at the other railroads and that you would be discussing with them a mileage based fuel surcharge?
**A. I may have.**
Q. When did you say that to Mr. Burr?
**A. I don't recall.**
Q. Did you say that to anybody else?
**A. I don't recall.**
Q. Did you say that to Mr. Rose?
**A. I don't remember if I talked to Mr. Rose about it or not.**
Q. Was it your intention in October of 2004 to meet with your counterparts at other railroads and discuss with them a potential mileage based fuel surcharge?
**A. The intention that I had was to discuss whether or not individually with my counterparts whether or not they would be able to or willing to accept a mileage based fuel surcharge for interline business.**
Q. Did you seek the advice of Mr. Saphire, sir,

Page 225

before you formed this intention?
**A. No.**
Q. Did you seek the advice of counsel for BNSF before you formed this intention?
**A. I don't recall whether or not I talked to counsel or not.**
Q. Okay. Let me see the next exhibit, which is a one-page e-mail, BNSF 0041493 through 494. This is Exhibit 29.
(Exhibit 29 marked.)
Q. Mr. Lanigan, is this an e-mail that you wrote to David Burr and others on October 21st of 2004?
**A. Yes.**
Q. And you state, Dave, I clearly understand the concerns and believe them to be important. I plan to talk to my counterparts at the next NEMC meeting in a couple of weeks to gauge the interline interest/issues. Do you see that?
**A. I do.**
Q. Okay. Now are you talking here about the concept of a mileage based fuel surcharge?
**A. On an interline basis, one railroad to one railroad.**
Q. And you were going to do this at a NEMC meeting. Correct?

Page 226

**A. Yes. It looked -- it seemed to me it would be an opportunity for me to talk to the individuals one-on-one about the concept.**
Q. When you say "one-on-one," am I hearing you correctly that you weren't planning to bring this up in the general meeting but, rather, you would have one-on-one discussions with your counterparts at other railroads. Right?
**A. Right, because I looked at it as the relationship that we had with each individual railroad, and I wanted to talk to each of our interline partners to determine whether or not they could, from a technical perspective and a systems perspective, handle a mileage based fuel surcharge if we chose to move forward with that.**
Q. All right. Now did you, in fact, have those discussions at the next NEMC meeting?
**A. I believe I did.**
Q. Do you know when the next NEMC meeting was?
**A. I don't remember the date.**
Q. All right. Well, who did you talk to?
**A. I believe I talked to Norfolk Southern, CSX, Kansas City Southern, Canadian National, Canadian Pacific. I don't know if I talked to Union Pacific or not.**

Page 227

Q. Okay. Who did you talk to at the NS?
**A. I believe it would have been my counterparts. I think I talked to Don Seale.**
Q. And what did you say to Mr. Seale and what did he say to you at this NEMC meeting on the subject of a mileage based fuel surcharge?
**A. I don't remember the specific conversation, but I -- my recollection is I indicated that we were considering a mileage based fuel surcharge program and simply inquired as to whether or not for interline movements whether or not NS would be able to handle those or not from a systems perspective and from a payment perspective.**
Q. What did he say to you?
**A. I think he said he would have to take it back and do some research. And that was pretty much the same conversation I had with everybody that I talked to.**
Q. Do you remember anything else Mr. Seale said?
**A. I don't.**
Q. Did you tell him specifically that you were talking only about interline business?
**A. Yes.**
Q. Who did you speak with for the CSX?
**A. I don't know if it was -- I think Mr. Giftos was retired by then. It probably was Mr. Gooden.**

Page 228

Q. Referring back to your conversation with Mr. Seale, where did this conversation occur?
**A. I don't recall specifically.**
Q. Was it one-on-one over a drink outside of the formal meeting, formal NEMC meeting?
**A. No, I didn't do that. It was either during a break or before or after one of the sessions or something like that.**
Q. How long did your discussion with Mr. Seale last?
**A. Less than five minutes. All the discussions were very brief.**
Q. What did you say to Mr. Gooden on this subject?
**A. Same thing. Interline business between us and CSX and whether or not they would be willing to handle it.**
Q. And what did Mr. Gooden say to you?
**A. I believe he said I'll have to take it back and find out.**
Q. Do you recall anything else?
**A. I don't recall anything else.**
Q. Do you recall that this NEMC meeting took place in Kansas City?
**A. I don't specifically remember that.**

Q. Do you remember this was the same NEMC meeting that took place in November of 2003? I'm sorry, November of 2004.
**A. If that was the one that was closest to the October 21st date of this message, then that would have been the one I would have talked to them at.**
Q. Do you remember this was the same NEMC meeting in Kansas City where the NEMC committee approved publication of the AIILF on the AAR's website?
**A. Well, you showed me that document before, so yes, I do recall that.**
Q. No, I'm asking you is the -- is the NEMC meeting at which you had these sidebar discussions with Mr. Seale, Mr. Gooden, and others, is that the same meeting at which NEMC approved publication of the AIILF?
**A. I believe it was.**
Q. And that was in November of 2004 in Kansas City. Correct?
**A. I believe so.**
Q. All right. What did you discuss with the Kansas City Southern?
**A. The same concept, that they're an interline partner as well.**
Q. And who did you discuss this with at Kansas City Southern?



**A. I don't recall. If I saw the roster of who was at the meeting, I probably could pick out who it was.**
Q. How about the Canadian National? Who did you speak with from the Canadian National?
**A. I believe it would have been Jean Jacqes Ruest.**
Q. How is that spelled?
**A. R-U-E-S-T is the last name. Jean, J-E-A-N, J-A-C-Q-E-S.**
Q. Who did you speak with at the Canadian Pacific?
**A. I think it might have been Marcela Szel, but I don't recall.**
Q. How about at the UP? Did you speak with anyone at the UP?
**A. I don't recall if I did or not.**
Q. Was Mr. Koraleski at this meeting?
**A. I believe he was.**
Q. Is there a reason why you wouldn't have raised this with the UP?
**A. I'm not sure if I -- as I think back, I'm not sure if I got to every one of the railroads I wanted to talk to just because of time and the fact that the initial reaction I got from most of them was we've got**



**to go back and talk to somebody about it, find out if there would be a systems issue. My question was really around systems issues and payment reconciliation if we went to this type of a system, because to my knowledge, it wasn't being used in the industry, to the best of my knowledge.**
Q. Okay. Let's mark as the next exhibit a document -- two-page document BNSF 0327645 through 646. This is Exhibit 30.
(Exhibit 30 marked.)
Q. Now let's look at the e-mail. First of all, I believe it's on the second page from Eldon Specht to a number of people. Do you see that e-mail, sir?
**A. I do.**
Q. Okay. And in this e-mail -- which is dated January 19, 2005. Right?
**A. Yes.**
Q. Okay. Mr. Specht writes, Couple of things happening with fuel surcharge. John Lanigan shopped the concept with his counterparts from the other roads at the NEMC (AAR group of chief marketing officers) and they pushed back as expected. Do you see that?
**A. I do.**
Q. Now did you tell Mr. Specht that you shopped this concept of a mileage based surcharge with the other



railroads and they pushed back?
**A. I don't recall using those words. This message is about like two months after that NEMC meeting. So by then we probably got the feedback from the railroads that they would have difficulty doing it from a technology perspective. So I may have had a conversation with them saying that I talked to the -- my counterparts, and then the feedback that we got was that they couldn't do it or wouldn't be able to do it or something like that. So he may have connected too many dots based on the time.**
Q. Okay. Well, yeah, I appreciate your point. Let's go at it this way. After the NEMC meeting in November, did you have further discussions with Mr. Seale about whether NS would support a mileage based fuel surcharge?
**A. I don't remember having any further discussions with them directly.**
Q. Do you recall any further discussions with Mr. Gooden from CSX?
**A. No.**
Q. Do you recall any further discussions outside of the Kansas City NEMC meeting with any of the other railroads, the Kansas City Southern, the Canadian National or the Canadian Pacific?

**A. No, I don't recall any discussions personally, but I think that the way that this came back to us was through the normal channels of handling interline pricing matters, which is at a lower level than my level. And as their counterparts came back and said we can't handle it or we don't have the systems for it or whatever the case might be, I believe that's how we got the information.**

Q. Okay. Well, let me understand this now. You had conversations at a NEMC meeting with the chief marketing officers of a number of other railroads about this mileage based surcharge. Correct?

**A. Correct.**

Q. So I want to know what information came back to you from your counterparts at other railroads on this request.

**A. I don't recall any specific information coming to me directly from my counterparts on this.**

Q. Did anyone push back to you on this concept?

**A. I don't recall anybody pushing back. It was more along the lines of I'll take it back. We'll look at if we can handle it from a technology standpoint and a processing standpoint. It was more that kind of a response.**

Q. Now what information do you have that anyone



at other railroads contacted anyone other than you about a mileage based fuel surcharge program?

**A. I recall having some discussions over the ensuing month or so with members of our pricing team saying that they had heard back from their counterparts, but I don't remember the specific content.**

Q. Okay. Who on your pricing team told you this?

**A. George Gillen, I believe.**

Q. What did he tell you?

**A. That as the railroads were getting back to him, they were saying they couldn't handle it.**

Q. What railroads had gotten back to Mr. Gillen?

**A. I don't recall.**

Q. Okay. Well, am I correct that what Mr. Specht -- strike that.

Mr. Specht writes here that you shopped the concept and the other railroads pushed back. Is that true?

MR. FAVRETTO: Objection to the form, asked and answered. Go ahead. Go ahead, try again, John.

**A. I don't know what Mr. Specht -- this is his interpretation of discussions. Push back could mean that they said they couldn't do it. Doesn't mean that it's anything more than from a technology standpoint**



**they couldn't do it. That could be his interpretation of pushing back. I don't know. I don't know what was in his mind when he wrote this.**

Q. Now when you asked the team in 2004 to look at creating a mileage based fuel surcharge, was it your intention that that mileage based fuel surcharge would apply to both local and interline rates?

**A. Initially I was looking at it as an overall concept to the company.**

Q. By overall, you mean it would apply to all traffic, both interline and local?

**A. Yes.**

Q. So you wanted to create a mileage based fuel surcharge for both local, interline traffic that would replace the existing percentage of revenue fuel surcharge?

**A. My thinking had not gone that far yet to make that decision. I was merely exploring the possibility of doing it. I had not made any decisions at all to replace our existing programs.**

Q. Am I correct that you weren't asking them to look at creating a mileage based fuel surcharge program only for your interline traffic?

**A. No.**

Q. All right. Let's look at the first page of



this exhibit, Exhibit 30, an e-mail from a gentleman named Harry Bognich. Who is Harry Bognich?

**A. I believe he was -- I'm not sure he's with the company anymore. I think he was a front-line pricing clerk.**

Q. Well, he writes on January 20th of '05, It appears unfortunately from the e-mail below that the new proposed per mile fuel surcharge for carload might not be supported at least initially by the other carriers. Have I read that correctly?

**A. Yes, you read it word for word.**

Q. To solve this issue, the proposal appears to be that BNSF will start with a per mile surcharge for local traffic and keep the percent of revenue calculation for interline traffic. Do you see that?

**A. I do.**

Q. Now did you ever have discussions with anyone about that concept?

MS. REINHART: Objection to form, vague.

MR. FAVRETTO: Yeah. Could I have that question read back? I didn't --

(Requested testimony read.)

MR. FAVRETTO: With anyone. Okay.

**A. I don't specifically recall having any conversations on that concept.**

Page 237

Q. Do you know if anyone in the company proposed that you would first create a mileage based surcharge for local traffic and keep the percentage of revenue calculations for interline traffic?
**A. I don't remember any specific conversations about that.**
Q. Did the company ever implement such a proposal?
**A. No.**
MR. FAVRETTO: The proposal being what again?
MR. BROCKETT: The proposal being the one mentioned here, namely that BNSF would implement a per mile surcharge for local traffic and keep a percent of revenue surcharge for interline traffic.
MR. FAVRETTO: And did we ever -- did BNSF ever implement such a program?
MR. BROCKETT: Yes.
THE WITNESS: I don't believe we did.
MR. FAVRETTO: All right.
Q. Now what was the result of the discussions that the -- that the fuel surcharge team had concerning a mileage based fuel surcharge program?
**A. Results were that I decided to table it for the time being.**

Page 238

Q. And was one of the reasons you decided to table it because your counterparts at other railroads pushed back on the concept?
MR. CROSS: Objection. Lacking foundation.
**A. The reason why I decided to table it was several fold. One, as I discussed before, it was going to create a significant amount of expense for us to be able to handle a mileage based system. Secondly, the majority of customers that were sample sized and polled were not in favor of moving to a mileage based system at that point in time. And then finally, when our interline partners said that they would not be able to handle the reconciliation of a mileage based fuel surcharge, all those factors went into my decision to table it.**
Q. Well, I'm hearing you correctly then that the opinions or the pushback that you got from your interline partners was one factor in your decision to table the mileage based fuel surcharge program. Fair?
MR. FAVRETTO: Objection to the form, lack of foundation.
**A. Yeah, I wouldn't call it pushback. It was just their feedback that they would not be able to handle it from a systems perspective.**

Page 239

Q. When you talked to the -- your counterparts at the other railroads, did you tell them that BNSF was -- would be implementing a mileage based fuel surcharge program or proposing to implement a mileage based fuel surcharge program for local and interline traffic?
**A. I didn't have that discussion. The only discussion that I had with them was that we were considering a mileage based fuel surcharge program and that I was inquiring as to whether or not they would be able to handle it on an interline basis between ourselves and whichever railroad I was talking to individually.**
Q. Okay. And did you tell any of your counterparts that this program, this mileage based program would be limited only to interline traffic? Did you say that explicitly to them?
**A. I don't recall.**
Q. Did you say explicitly to them that it would include -- expressly include local traffic?
**A. I don't recall saying that.**
Q. Well, there did come a time, did there not, Mr. Lanigan, when BNSF announced that it was moving to a mileage based fuel surcharge program?
**A. Yes.**
Q. Do you recall when that was?

Page 240

**A. In 2005 we announced that we would move toward a mileage based program starting in 2006.**
Q. Well, how did you get from -- to the point where you tabled the discussion to the point where you put out a press release announcing -- announcing adoption of the program?
**A. Well, as with many programs with many companies, its takes a while to push forward with programs, to get broader support within your own company. And also fuel continued to be a bigger and bigger factor in the marketplace, and I felt that at that point in time that the market was starting to become more receptive. More and more customers were interested in it over time and felt that the timing was right to -- to implement.**
Q. Okay. Do you know when in '05 it was that you announced this program?
**A. I think it was in the April, May, June time frame, somewhere in there.**
Q. Let's mark as Exhibit 31 a document. It bears Bates stamp 0329108 through 0329114.
(Exhibit 31 marked.)
Q. Now Mr. Lanigan, the first page of this is an e-mail that you sent out on March 28th of 2005 to a whole bunch of people. Right?

Page 241

**A. Yes.**
Q. And in the body of the memo you say, Tomorrow BNSF will announce the railroad industry's first mileage based fuel surcharge program. Do you see that?
**A. I do.**
Q. And does this refresh your recollection that the announcement of this program was made in late March of 2005?
**A. Yes, it does.**
Q. Specifically on March 29th of 2005?
**A. Yes.**
Q. Now if you look at the attachment to this exhibit, it's the news release announcing the mileage based program. Correct?
**A. Correct.**
Q. And did you draft this press release?
**A. No, I did not.**
Q. Did you have input in its language?
**A. Yes, I did.**
Q. Now the title of this is "BNSF Announces First Mileage Based Surcharge Program in the Rail Industry." Was that true?
**A. I don't know if it was or not. It was marketing hype.**
Q. Now the first line of the announcement says

Page 242

it's not going to become effective until January 1 of 2006. Right?
**A. Correct.**
Q. Why was there such a long lead time between the announcement in late March and the time when this was proposed to become effective in January 2006?
**A. We needed the time to create the systems internally to manage a mileage based fuel surcharge program since we didn't have any such programs at the company. So that was one factor.**
**The second factor is we wanted to give our customers significant lead time for any changes they might have to make in their accounting systems or computer systems to accept the mileage based fuel surcharge program. So our whole intent was to give this as long -- as reasonable a time as possible for all parties to get prepared for it.**
Q. Okay. Now the third paragraph here says that the mileage based fuel surcharge will apply to movements that originate and terminate on BNSF. Correct?
**A. Yes.**
Q. And that refers to local traffic. Right?
**A. That's correct.**
Q. And it also states, quote, that it will apply to the BNSF portion of Rule 11 shipments. Correct?

Page 243

**A. That's correct.**
Q. What's a Rule 11 shipment?
**A. It's a -- it's a shipment that moves between two railroads, but each railroad bills separately for their portion of the movement versus a single rate for -- from the origin to destination. So it's a variation on an interline movement.**
Q. So Rule 11 shipments are a type of interline shipment?
**A. Yes, they are.**
Q. The final paragraph says, These movements account for about 75 percent of BNSF's volume. Right? Correct?
**A. Correct.**
Q. The remaining 25 percent represents joint rate interline movements with other class 1 railroads and will be continued to be covered by BNSF's existing percentage fuel surcharge due to current interline billing systems and practices. Do you see that?
**A. I do.**
Q. Okay. So if I understand this, as proposed or as announced, the mileage based fuel surcharge program was not going to be applied to all of your interline business, only the Rule 11 business. Is that right?
**A. That's correct.**

Page 244

Q. Okay. And the existing interline business that was not Rule 11 was going to be continued to be governed by the existing fuel surcharge program. Correct?
**A. That's correct.**
Q. Now did this mileage based program ever go into effect as announced?
**A. Not as announced, but it did go into effect.**
Q. Why not? What happened? Why didn't it go into effect as announced?
**A. As we went through the balance of the year, we continued to solicit and accept feedback from our customers on the process, and as the year went along, two of our major business units, the consumer products business unit and the industrial business products unit, came forward and recommended that we not move forward with mileage based fuel surcharge for those two business units because, as they did more and more polling of their customers, their customers were not in favor and were either unable or unwilling to make modifications to their accounting systems and computer systems to be able to deal with a mileage based fuel surcharge. So late -- late in the year we made a decision to modify the rollout, and we rolled out mileage based fuel surcharge only for coal and agricultural customers in 2006.**

Q. All right. So you applied the mileage based to coal and agricultural, and you kept the percentage of revenue based fuel surcharge to all other traffic?
**A. That's correct.**
Q. Both interline and local. Correct?
**A. That's correct.**
Q. And at this time in 2006 when this mileage based fuel surcharge became effective, what percentage of your business was coal and agriculture?
**A. About 40 percent.**
Q. Now before BNSF made this announcement that's reflected in Exhibit 31, did you -- did you tell your counterparts at other railroads that you were going to make this announcement?
**A. No, I don't believe I did.**
Q. So you went to the NEMC meeting and you discussed with them the concept of a mileage based fuel surcharge, and then you testified that you -- your people under you in your organization were getting feedback from other railroads that they couldn't do it, and then your testimony is that you made this announcement without telling anyone or consulting anyone that you're doing it?
MR. FAVRETTO: Objection to form of the question.



**A. I didn't feel a need to because, as was announced here, it wasn't going to apply to the interline traffic. We were going to maintain the current programs. We accepted the feedback from our interline partners and decided not to move forward with mileage based fuel surcharge on those interline movements. So I saw no reason to talk to them about this.**
Q. Did you continue to attend NEMC meetings after the -- this announcement went out on January -- I'm sorry -- on March 25, 2005?
**A. Yes.**
Q. And at NEMC meetings, did you have conversations with any of your counterparts at other railroads about this announcement of a mileage based fuel surcharge program?
**A. No, I don't believe I did.**
Q. Did you have telephone conversations with Don Seale or anyone else at another railroad about mileage based fuel surcharge after March 29, 2005?
**A. I don't believe I did.**
MR. BROCKETT: We'll take a break.
THE WITNESS: I'm ready for a break.
THE VIDEOGRAPHER: This marks the end of tape number 3 of the videotaped deposition of John



Lanigan. We're going off the record. The time now is 3:01 p.m.
(Break from 3:01 p.m. to 3:20 p.m.)
THE VIDEOGRAPHER: Here begins tape number 4 of the videotaped deposition of John Lanigan. We're on the record. The time now is 3:20 p.m.
Q. (By Mr. Brockett) Now Mr. Lanigan, before we broke, you were testifying about some conversations and meetings you had with the -- your counterparts at other railroads concerning a mileage based fuel surcharge. Do you recall that testimony?
**A. Yes.**
Q. And I believe you said that what you wanted to talk to your counterparts about was a systems issue, namely whether their systems could handle a mileage based fuel surcharge program. Is that correct?
**A. That's correct.**
Q. Okay. So why would you be asking the chief executive -- strike that.
Why would you be asking the chief marketing officers of the other railroads about a systems issue?
**A. Well, it was a big change. It wasn't -- it wasn't a trivial situation, so I felt it was in our best interest to have them be aware of it. I think I was concerned that if it just went between lower channels**



**and never saw the light of day, that there might be less support on the other side or something along those lines. It's easy for a clerk to say no because they don't do something. I was hoping to have them go back and say, take a hard look at this, see if we can do it, and have that kind of weight of their office, have it be reviewed as thoroughly as possible.**
Q. Would you agree with me, sir, that you don't generally discuss systems issues at the chief marketing officer level of the company?
**A. Well, this is more than systems. It's about getting paid and getting paid on time and having the revenue accounted for. So when you look at the size of the relationships that we have with the other railroads on an interline basis, the revenue component is very significant, so -- this had a direct impact on revenue, so I felt that that's why it was important to talk to them.**
Q. Now you indicated that the mileage based program that actually went into effect on January 1st of 2006 was one that was limited to coal customers and agricultural shippers. Is that correct?
**A. Initially, that's correct.**
Q. Now the coal customers would all have been under long-term contracts. Correct?

Page 249

**A. They would be under contracts of varying lengths of time.**
Q. So the only coal customers that got applied a mileage based fuel surcharge was those whose contracts expired sometime after January 1st of 2006. Correct?
**A. That's largely correct. We do have some small users of coal that are on a tariff based program versus a contract, so -- but it's a very, very small percentage of our coal business.**
Q. So the coal customers who actually were assessed -- strike that.
If we look at the time -- look at the years '06, '07 and '08, the coal customers who actually had a mileage based fuel surcharge imposed on them were only those coal customers whose contracts expired during those years. Is that correct?
**A. The -- well, I hate to use the word "imposed" when it comes to a customer, but the customers that were, I guess, available for conversion to the mileage based fuel surcharge were coal customers whose contracts were coming due after January 1st of 2004. So each year since then, more and more coal business has been converted to the mileage based fuel surcharge.**
Q. Okay. If we focus just on the years '06, '07 and '08, how many coal customers actually were converted

Page 250

to a mileage based fuel surcharge program?
**A. I don't know.**
Q. Is it a small percentage?
**A. No. It's a significant percentage, but I don't know what the number is.**
Q. Do you have documents in the company that would indicate how many coal customers actually were imposed a mileage based fuel surcharge program between January 1 of '06 and the end of '08?
**A. We would.**
Q. And can you give me an estimate of how many customers that would have been?
**A. I don't know.**
Q. Now am I correct that when you designed the mileage based fuel surcharge program, you intended it to be revenue neutral?
**A. Our intention on fuel surcharge is that it recovers the cost of fuel for us, the incremental cost of fuel above the strike price.**
Q. All right. And am I correct that your intention, John Lanigan's goal in implementing a mileage based fuel surcharge was to recover the same amount of money for BNSF as you recovered using the percentage of revenue fuel surcharge?
**A. I never thought of it in those terms. I**

Page 251

**thought of it in terms of recovering our fuel cost.**
Q. All right. Well, let's take a look at the document page BNSF 0327878 through BNSF 0327890. It would be Exhibit 32.
(Exhibit 32 marked.)
Q. Mr. Lanigan, do you recognize this as a draft communication plan on the mileage based fuel surcharge program as of July 2005?
**A. Yes.**
Q. Can you turn with me to the seventh page?
**A. The handwritten number 7?**
Q. Yes.
Directing your attention to the middle of the page where the question is asked, quote, What are your goals for the program? Are you with me?
**A. Yes.**
Q. This paragraph says, BNSF has three key goals for this program. And then item 3 states, Collects the same amount of fuel surcharge revenue across our overall customer base as the percentage based program it replaces. Do you see that?
**A. I do.**
Q. Now is that an accurate statement of one of the goals of the mileage based fuel surcharge program?
**A. Not -- not according to me.**

Page 252

Q. So you disagree that that's one of the goals of the program?
**A. The goal of the program -- and this was a draft. As it states, the goal of the program is to recover our fuel cost in a fuel surcharge program.**
Q. So you deny that one of your goals was to achieve revenue neutrality with this program?
**A. It --**
MR. MEYER: Objection as phrased. Vague.
**A. Revenue and fuel surcharge are not one and the same.**
Q. Can you answer my question, sir?
**A. Would you repeat your question, please?**
Q. Yes.
Do you deny what's stated here, namely that one of the goals of the program was to achieve the same revenue for the company under the mileage based program as you had been achieving under the percentage of revenue based program?
MR. FAVRETTO: Objection to the form of the question. You have given him an incomplete quotation from the document as well, but go ahead, Mr. Lanigan.
**A. The fuel surcharge revenue, as that paragraph goes on to talk about, includes a manual set of fuel**

Page 253

**intensity tables that recognizes differences in the fuel intensity of different groups of customers. So as we implemented our mileage based fuel surcharge programs, we had different fuel tables for the different types of business, like coal and ag and industrial and consumer. And so our goal was to recover our incremental cost of fuel with the mileage based fuel surcharge program.**

Q. It doesn't answer my question, Mr. Lanigan.

MR. FAVRETTO: I think he's given you an answer, but --

Q. Let's mark as Exhibit 33 an e-mail from George Gillen to a number of people dated June 23rd of 2006.

(Exhibit 33 marked.)

Q. Mr. Lanigan, I direct your attention here to the e-mail in the middle of the page from George Gillen to a number of people. Do you see that?

**A. I do.**

Q. And who is George Gillen, again?

**A. Supervisor of the -- at the time supervisor of the price management team.**

Q. Okay. And is he a person you talk to on a regular basis?

**A. No.**

Q. In the second paragraph of this e-mail he writes as follows: John Lanigan has told the mileage

Page 254

based fuel surcharge team that he wants this to be a revenue and neutral event for BNSF. Do you see that?

**A. I do.**

Q. Did you tell him that, sir?

**A. I don't recall saying that to him.**

Q. Okay. Do you deny telling him that?

**A. I don't recall saying it, no.**

Q. Okay. Is Mr. Gillen mistaken in what he writes here?

**A. I -- when he wrote this -- I don't know what was in his mind when he wrote this.**

Q. Is that a true statement, what he wrote here, namely that you expected the mileage based fuel surcharge to be a revenue neutral event for the company?

**A. As you roll out mileage based fuel surcharge, there were different factors associated with the different types of traffic. Some customers' actual fuel surcharge would go up. Some customers' fuel surcharge would go down depending upon what type of commodity we were hauling. And so what we were attempting to do was to make sure that customers were relatively neutral in the overall perspective of the business that we did with them from a rate and a fuel surcharge standpoint.**

Q. Mr. Lanigan, was it one of your goals of the mileage based program to collect the same revenue under

Page 255

that program as you had been collecting under the percentage of rate based fuel surcharge?

MR. FAVRETTO: Objection to form, asked and answered. And again, you're quoting from a portion of the document incompletely. Mr. Lanigan, you can try again.

Q. Can you answer that yes or no, sir?

**A. I'll try to -- I'll try to answer the question.**

Q. Can you answer it yes or no?

**A. It's not that simple.**

Q. You can't answer it yes or no?

**A. No, I can't.**

**There are some customers who were on a percent of revenue basis whose fuel surcharge under the mileage based fuel surcharge program, their fuel surcharges were actually larger than they were under a percent of revenue, and there were some customers whose fuel surcharges were smaller under percent of revenue. And what we wanted to work under a guideline is that when we looked at the combination of -- of price leading to revenue -- fuel surcharge -- leading to the collection of fuel surcharge, that we wanted to have the customers remain as neutral as possible.**

Q. Okay. Let's go back to the prior exhibit,

Page 256

this communication plan. Did you review a copy of this, sir?

**A. I don't recall if I did or not.**

Q. Do you recall reviewing a copy of this and saying to anyone that the goals for the program, as is stated on page 7, are incorrect?

**A. I don't recall having any conversations with anyone on this document.**

Q. Would it have been in the regular course of your business to review a draft communication of this kind that was to go out to customers on the new mileage based fuel surcharge program?

**A. If it ultimately went out to customers, I likely would have seen a draft at some point.**

Q. Okay. All right. Mr. Lanigan, you've testified that the mileage based program went into effect for coal and agricultural shippers on January 1 of 2006. Has that mileage based program been applied to any of the customers between January 1, 2006 and today?

**A. Yes.**

Q. Okay. To whom has it been applied?

**A. It's been applied to some industrial customers and some consumer customers.**

Q. All right. Which consumer, industrial customers has it been applied to?

Page 257

**A. I don't know the specific names. It's been done on an individual contract negotiation basis. There are still a number of customers that prefer the percent of revenue base. But over time, slowly but surely, more and more customers are interested in the mileage based fuel surcharge. So on an individual basis we've had customers in both of those businesses move to a mileage based fuel surcharge.**
Q. Okay. And when did you start offering industrial customers and other customers the opportunity to have a mileage based program?
**A. I think -- I'm not -- I'm not precise in this, but I think probably in 2007, somewhere in that range.**
Q. Well, do you recall that after -- strike that.
Do you recall announcing that you were going to apply the mileage based program to public regulated traffic effective April 25, 2007?
**A. If I'm not mistaken, I believe that was as a result of the STB --**
Q. Yes.
**A. -- ruling. Yes, I do recall that.**
Q. Okay. Is that what you're referring to when you say it's been applied to --
**A. No.**
Q. -- certain industrial customers?

Page 258

**A. No.**
Q. All right.
**A. No. We've actually, on a contractual basis for all the business that we do with specific customers in industrial and consumer, have included a mileage based fuel surcharge in their contracts.**
Q. All right. And you said you started doing that in 2007?
**A. I think it was 2007, but I can't be positive.**
Q. Could it have been 2008?
**A. It could have been.**
Q. Okay. And how many such customers, as you sit here today, have a mileage based program in their contracts?
**A. I don't know.**
Q. Okay. Do you have records in your company that would show us this?
**A. Yes.**
Q. Okay. Can you give me an estimate of how many --
**A. No.**
Q. -- customers would have had the option to have a mileage based fuel surcharge?
**A. No. I don't know.**
Q. Can you give me the names of any customers

Page 259

outside coal and agricultural who in 2007 or 2008 had a mileage based fuel surcharge inserted into their contract?
**A. I don't recall specifically customer names. I know just recently, which would have been -- I guess would have been 2010, all the customers in our steel business, which is an industrial customer, were moved to mileage based fuel surcharge on their tariff program.**
Q. Okay.
**A. So it's just evolved over time.**
Q. I'm not interested in 2010. I'm asking you about 2007 and --
**A. I don't know.**
Q. -- 2008.
**A. I don't know.**
Q. Can you identify a single customer by name, as you sit here today, outside of coal and ag, who has a mileage based fuel surcharge in its contract that was inserted there in the year 2007 or 2008?
**A. I don't -- I can't give you any names. None come to mind.**
Q. Did you announce an expansion of the mileage based fuel surcharge program in August of 2008 that would be effective January 15th of 2009?
**A. An expansion?**

Page 260

Q. Let's mark this exhibit. It's a BNSF news release dated August 5, 2008. This will be Exhibit 34.
(Exhibit 34 marked.)
Q. Okay. Looking at this exhibit, can you tell us what this is about?
**A. Well, this is what I talked about before. When you said "expansion," I wasn't sure what you meant about it. This was offering options for customers that weren't already on the program to move into the program.**
Q. Okay. But this didn't take effect until 2009. Correct?
**A. On a formal basis, that's correct.**
Q. All right. But this opportunity to pay a mileage based fuel surcharge wasn't announced until -- didn't become effective until January 15th of 2009. Right?
**A. On a formal basis, but we had on an ad hoc basis converted some customers prior to this.**
Q. How many?
**A. I don't know.**
Q. Was it a small number?
MR. FAVRETTO: Objection to the form.
**A. Again, I don't remember.**
Q. Can you tell us their names?
**A. No. I don't recall the names.**

Page 261

Q. When you testified previously that some customers had signed up in 2007, 2008, that was not because you had a formal program of a mileage based program for those customers during that time. Correct?
MR. FAVRETTO: Objection to the form.
**A. That is correct.**
Q. So if you signed up customers in 2007, 2008 who were nonag and noncoal to a mileage based fuel surcharge, that was the exception, not the rule. Correct?
MR. FAVRETTO: Objection to the form.
**A. It was done on an individual negotiated basis with individual customers.**
Q. Okay. And you had no formal mileage based fuel surcharge program in '07 and '08 that applied to nonagricultural and noncoal customers. Correct?
MR. FAVRETTO: Same objection. Go ahead.
**A. We did not have a generally announced program, that's correct.**
Q. Okay. And so, again, my question is: If you signed up individual customers to a mileage based program in '07 and '08, you did it as an exception to the rule. Fair?
MR. FAVRETTO: Objection to the form.
**A. I wouldn't say an exception to the rule.**

Page 262

**There wasn't a hard and fast rule against it. We just did it on a case by case basis.**
Q. Let's mark as Exhibit 35 another press release dated December 2, 2008.
(Exhibit 35 marked.)
Q. What's this document, sir?
**A. It's a document that postpones a rebasing of the strike price of fuel surcharge.**
Q. Okay. This is a press release?
**A. Yes, it is.**
Q. Okay. Can you explain the background of this rebasing, tell us what it's about?
**A. I think, as most people are aware, fuel got up to $150, $160 a barrel in the 2007, 2008 time frame. Because of how high fuel had gone, our fuel surcharge programs with $1.25 strike price, the fuel surcharge charges were getting quite large as the index continued to rise. We felt that it looked like it was going to be somewhat of a permanent change in where fuel would be from a historic basis. And so we made a decision that we were going to rebase to a $2.50 strike price from $1.25. However, during the fourth quarter of 2008, fuel plummeted and plummeted below the base level of $2.50 a gallon. So we decided to postpone it.**
Q. Do you have records in your company that would

Page 263

show for each of the years 2003 through 2008 what customers paid percentage based fuel surcharge and what customers paid mileage based fuel surcharge?
**A. I believe we would have those records.**
Q. And would those records be the contracts, the actual contracts that were entered into with the shippers?
**A. It would either be the contracts or other pricing authorities, like tariffs and quotes, individual rate quotes, things like that.**
Q. Could BNSF produce a spreadsheet that showed for all the customers what their fuel surcharge was during the years 2003 through the end of 2008?
**A. I believe we could, but I don't have my technical advice with me.**
Q. Okay. Who is David Burr?
**A. He is in the finance department. At the time he was responsible for risk management programs.**
Q. Was there a dispute within BNSF between the finance department and the marketing department over the purpose of the fuel surcharge program?
**A. No. I don't know what you mean by "dispute."**
Q. Okay. Was there differences of opinion about the goals of the fuel surcharge program?
**A. There may have been on an individual basis,**

Page 264

**but there was no change in our programs or direction.**
Q. Did BNSF view its fuel surcharge programs between '03 and '08 as revenue maximization programs?
**A. No, we did not.**
Q. And if someone said that, you wouldn't agree with that statement?
**A. I would not agree with that statement.**
Q. I mark as exhibit -- next exhibit a document BNSF 0354471. It's an e-mail, Exhibit 36.
(Exhibit 36 marked.)
Q. Mr. Lanigan, directing your attention to the e-mail by David Burr in the middle of the page dated January 2, 2004. Do you see that?
**A. I do.**
Q. The last two sentences Mr. Burr writes, I do not want John Lanigan indicating that we endorse the fuel surcharge program over hedging. We believe that the fuel surcharge program is a revenue maximization program, not protection against fuel prices. Do you see that?
**A. I do.**
Q. Okay. Now did you ever have a discussion with Mr. Burr in which he expressed that view to you?
**A. I don't recall that I did or not.**
Q. Okay. Are you aware that this view was

Page 265

expressed by others within the finance department of BNSF?

**A. No, I am not.**

Q. Do you agree with that statement as you sit here today, sir?

**A. I do not.**

Q. You disagree with it?

**A. I disagree with it.**

Q. Do you consider fuel surcharge revenue to be part of revenue?

**A. Well, it's counted as revenue because it's dollars coming into the organization that are billed dollars, but the purpose has been from the day I joined the company that fuel surcharge was designed to recover the fuel cost above the strike price.**

Q. Okay.

**A. So it -- it's listed as a revenue item on the income statement, but it's a cost abatement program in its spirit.**

Q. Did anyone ever do a study within BNSF to see whether you were actually recovering under the fuel surcharge program more revenue than the actual fuel cost above the strike price?

**A. We -- on -- we have never achieved 100 percent coverage of our fuel expense to this date.**

Page 266

Q. That's not my question. I didn't ask you whether you achieved 100 percent participation of customers.

**A. I didn't say participation. I said coverage of our fuel cost.**

Q. Okay. So it's your testimony that -- that the fuel surcharge program has never brought in enough dollars to cover the increased cost of fuel above the strike price?

**A. That's correct.**

Q. And so you believe that the fuel surcharge programs that you've had in effect from 2003 have all underrecovered each year?

**A. That's correct. And we reported that publicly.**

Q. Now when you say that statement, are you factoring into that any savings in fuel costs that have been achieved through fuel hedging?

**A. No, I'm not.**

Q. If you factor in fuel hedging, have you overrecovered or underrecovered?

MS. REINHART: Objection to the form, vague.

**A. We don't consider fuel hedging to be part of the revenue system or part of the fuel surcharge**

Page 267

**program.**

Q. No, I know that. If you factor in fuel hedging, has BNSF overrecovered or underrecovered?

MS. REINHART: Objection to form.

MR. FAVRETTO: If you know, Mr. Lanigan. Objection to the form. Go ahead.

**A. I don't know.**

Q. I'll mark as our next exhibit a collection of documents. It bears Bates stamp BNSF 0325029 through 039. It's Exhibit 37.

(Exhibit 37 marked.)

Q. Who is Matthew Feldman?

**A. He was a manager in the finance area.**

Q. And if you'll look on page 030, there's an e-mail from Mr. Feldman to David Burr about fuel surcharge.

**A. I see it.**

Q. Now Mr. Feldman states in the -- one of the early bullet points there, The combination of fuel surcharge and hedges should not equate to more than 100 percent of fuel expenses. Do you see that?

**A. I do.**

Q. Do you agree with that statement?

**A. I don't know how to agree or not. Fuel hedges are such a volatile instrument in and of themselves that**

Page 268

**I'm not sure how to answer that. Is that at a point in time? Is that over a ten-year period? I don't know how to answer that question.**

Q. Did anyone from the finance department ever complain to you that they weren't kept in the loop of what was going on with fuel surcharges?

**A. I don't recall anybody in finance complaining directly to me about our fuel surcharge programs.**

Q. Did you ever discuss with anyone the fact that the finance people were complaining they weren't in the loop on what was going on with fuel surcharges?

**A. To the best of my knowledge, we had finance people on our fuel surcharge teams at all times, so I'm not aware of any concerns from the finance department.**

Q. Did you ever have a discussion with Senator Lott about fuel surcharges?

**A. No.**

Q. Do you know of any conversation Senator Lott ever had with Matt Rose about fuel surcharges?

**A. No.**

Q. Did Matt Rose ever tell you that there was a perception in Congress that the railroads were making money on fuel surcharge?

**A. I don't recall any specific discussions about that.**

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 16 | 25 | "Snyder" to "Schneider" | Correct transcription |
| 19 | 8 | add "and" between "procurement" and "distribution" | Correct transcription |
| 21 | 19 | "some" to "one" | Correct transcription |
| 71 | 3 | "surcharges" to "surcharge" | Correct tense |
| 124 | 7 | "It does." to "It does not." | Correct Record: Exhibit 16 is misdated 2003. The correct date is 2004. See BNSF-0574114-24, BNSF-0338332-36. |
| 124 | 9 | "I was." to "I was present at a meeting on May 17, 2004." | Same as above. |
| 126 | 18 | "Yes." to "Yes, but the meeting was on May 17, 2004." | Same as above. |
| 145 | 7 | "subsequent" to "subsequently" | Correct grammar |
| 146 | 17 | "attendance" to "attendees" | Correct transcription |
| 147 through 148 | 25 5 | Strike "about" in line 25, and strike remainder. | Reveals content of a privileged communication. |
| 148 | 15-20 | Strike "and he explained to" in line 15, and strike remainder. | Reveals content of a privileged communication. |
| 151 | 19-22 | Strike testimony | Reveals content of a privileged communication. |
| 152 | 9 | Strike question | Reveals content of a privileged communication |
| 173 through 174 | 25 3 | Strike question | Reveals content of a privileged communication. |
| 175 through 176 | 23 11 | Strike testimony | Reveals content of a privileged communication. |
| 177 | 11-22 | Strike testimony | Relates to a privileged a communication |
| 227 | 2 | "counterparts" to "counterpart" | Correct record |
| 232 | 18 | "them" to "him" | Correct Record |
| 238 | 10 | Strike "sample sized and" | Correct record |

I, JOHN LANIGAN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

[signature]
JOHN LANIGAN

THE STATE OF Texas )
COUNTY OF Tarrant )

Before me, Maribeth Harnish, on this day personally appeared JOHN LANIGAN, known to me (or proved to me under oath or through ________________________) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and Seale of office this 27th day of July, 2010.

[signature]
NOTARY PUBLIC IN AND FOR
THE STATE OF Texas
COMMISSION EXPIRES: 8-13-11

MARIBETH HARNISH
Notary Public, State of Texas
My Commission Expires
August 13, 2011

# In The Matter Of:

*IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION*
*v.*

---

*ROSE, MATTHEW K. - Vol. 1*
*July 16, 2010*

---

## *HIGHLY CONFIDENTIAL*

MERRILL CORPORATION
LegaLink, Inc.
25 West 45th Street
9th Floor
New York, NY 10036
Phone: 212.557.7400
Fax: 212.692.9171

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL )
SURCHARGE ANTITRUST ) MDL NO. 1869
LITIGATION )
)
---------------------------) MISC. NO. 07-489
) (PLF/AK/JMF)
This Document Relates To: )
)
DIRECT PURCHASE CASES )

----------------------------------------

*** HIGHLY CONFIDENTIAL ***

ORAL AND VIDEOTAPED DEPOSITION OF

MICHAEL K. ROSE

JULY 16, 2010

----------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL K. ROSE, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 16th day of July, 2010, from 8:06 a.m. to 3:21 p.m., before Kimberly Byrns Buchanan, CSR in and for the State of Texas, reported by machine shorthand at the Hilton Southlake Town Square, 1400 Plaza Place, Southlake, Texas 76092, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



A P P E A R A N C E S

FOR THE PLAINTIFFS:
Mr. Richard I. Werder, Jr.
Mr. Joseph D. Hammond
QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
51 Madison Avenue
22nd Floor
New York, New York 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
E-mail: rickwerder@quinnemanuel.com
josephhammond@quinnemanuel.com

-- AND --

Mr. Paul M. Donovan
LAROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue NW
Suite 200
Washington, D.C. 20036
Tel: (202) 298-8100
Fax: (202) 298-8200
E-mail: paul.donovan@laroelaw.com

FOR THE DEFENDANT,
BNSF RAILWAY COMPANY AND THE WITNESS:

Mr. Richard J. Favretto
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
Tel: (202) 263-3250
Fax: (202) 263-5250
E-mail: rfavretto@mayerbrown.com



A P P E A R A N C E S
(CONTINUED)

FOR THE DEFENDANT, UNION PACIFIC:
Mr. Tyrone R. Childress
HOWREY LLP
550 South Hope Street
Suite 1100
Los Angeles, California 90071
Tel: (213) 892-1806
Fax: (213) 892-2300
E-mail: childresst@howrey.com

FOR THE DEFENDANT, NORFOLK SOUTHERN CORPORATION:

Ms. Krisha A. Cerilli
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 371-7839
Fax: (202) 661-8294
E-mail: krisha.cerilli@skadden.com

FOR THE DEFENDANT, CSX CORPORATION, INC.:

Mr. John L. Cuddihy
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
Tel: (202) 624-2779
Fax: (202) 628-5116
E-mail: jcuddihy@crowell.com

ALSO PRESENT:
Mr. Gary Bentley - Videographer
Mr. Roger Nober - BNSF - Executive VP Law & Secretary
Mr. David M. Pryor - BNSF - Senior General Attorney
Mr. Richard E. Weicher - BNSF - VP and General Counsel - Regulatory



INDEX


| | PAGE |
|---|---|
| Appearances................................. | 08 |
| Stipulations................................ | 09 |
| MICHAEL K. ROSE | |
| Examination by Mr. Werder................. | 09 |
| Examination by Mr. Favretto............... | 277 |
| Further Examination by Mr. Werder.......... | 279 |
| Further Examination by Mr. Favretto........ | 282 |
| Signature and Changes........................ | 283 |
| Reporter's Certificate....................... | 285 |


* * *

EXHIBITS


| EXHIBIT NO. | DESCRIPTION | MARKED |
|---|---|---|
| 1 | MINUTES - SURFACE TRANSPORTATION BOARD PUBLIC HEARING, MAY 11, 2006 | 58 |
| 2 | MEMO DATED JANUARY 15, 2003, SUBJECT: FUEL SURCHARGE QUESTIONS WITH RELATED TABLES ATTACHED | 108 |
| 3 | BNSF - NS SENIOR TEAM MEETING AGENDA, MARCH 18, 2003 - ACTION ITEMS RESULTING FROM MEETING | 137 |
| 4 | E-MAIL DATED MARCH 27, 2003, SUBJECT: CSX AGENDA FOR APRIL 1, 2003, & BACKGROUND NEWS RELEASES | 163 |
| 5 | E-MAIL DATED APRIL 23, 2003, SUBJECT: BNSF/CSX MTG - BOARD ROOM - BUSINESS CASUAL | 171 |

Page 17

respect to BNSF's fuel surcharge policy you would expect to be accurate and reliable?
**A. Certainly. He's our Chief Financial Officer. He and I have signed almost ten years of public documents.**
Q. And so to the extent that Mr. Hund has offered public testimony concerning BNSF's fuel surcharge policy, that testimony you would expect would be reliable testimony?
**A. Yes.**
Q. Can you tell me -- so from the marketing perspective, it's been Mr. Schultz and Mr. Lanigan who've had the primary responsibility. Is that correct?
**A. Correct.**
Q. And from the --
**A. As the Chief Marketing Officers.**
Q. -- and from the financial perspective, it's been Mr. Hund?
**A. Yes. I -- I would, again, just say Mr. Hund has provided policy advice and his shop, if you will, has provided a lot of analysis.**
Q. And is there anyone else in the financial area that you would identify particularly with the development of BNSF's fuel surcharge policies?
**A. No. I think it's been more developed within**

Page 18

**the Sales and Marketing arena, and Finance has reviewed the analysis and weighed in on the financial impacts and -- and -- and the reporting of it.**
Q. And other than Mr. Schultz and Mr. Lanigan in the Sales and Marketing area, are there any persons that you particularly identify with the development of BNSF's fuel surcharge policies?
**A. Outside of the Sales and Marketing Department, no.**
Q. No. With -- within Sales and Marketing, are there any persons other than Mr. Schultz and Mr. Lanigan who, to your knowledge, who have had particularly significant involvement?
**A. Well, sure. Each -- we have four business units, and so each of those Business Units have -- have looked at their fuel surcharge within their businesses and have had -- worked within the -- the various organizations to development policies and -- and weigh in on things.**
**And then also within John Lanigan's group, there's a Finance and Planning organization, if you will, that's led by an individual that has broad accountability for finance and planning.**
**And then our Chief Economist would have also had significant roles in terms of modeling fuel**

Page 19

**surcharges, fuel revenue, things of this nature.**
Q. And the Chief Economist has been Sam Kyei?
**A. Kyei. Yes --**
Q. Kyei.
**A. -- Sam Kyei.**
Q. Thank you. And the -- the other individual that you mentioned by description is who?
**A. Paul B. Anderson is now the Assistant Vice President of that. And, quite frankly, I'm not sure who -- he hasn't been there the entire ten years. I'm not sure who was -- the name of who was leading that before that period.**
Q. Thank you. You described your role with respect to operations as -- in -- as the CEO with respect to operations as kind of an overall role. Can you tell me in a -- in -- in more detail what involvement you have had in the development over time of BNSF's fuel surcharge policies?
**A. I think really from a -- from a policy standpoint at looking at what the recommendations were coming out of the Sales and Marketing arena in terms of how we will apply fuel surcharges, what type of mechanism that we would apply fuel surcharges, certain exceptions to our fuel surcharge policy, those types of issues.**

Page 20

Q. What -- what -- can -- can you characterize for me or describe for me the -- you used the phrase "policy standpoint." What has -- what has been BNSF's policy with respect to fuel surcharges in the period in which you've been the CEO?
**A. Well, it's changed quite a bit.**
Q. Okay. Can you describe -- just -- just kind of give me at a high level, then, the -- the -- the policy as you perceived it when you became CEO and how it changed quite a bit over time.
**A. Well, my --**
Q. And then I'll -- I'll -- do it at any level you want of detail, and I'll focus in if I want to get more detail from you. Okay?
**A. Okay. Well, tell me if I'm going too long.**
Q. Okay.
**A. Okay? When I first became CEO in 2000, fuel was hovering around $25 a barrel. And when you look at the operating cost of a railroad, fuel has always run about 10 percent of the railroad operating cost. Labor has always been our -- our largest cost, running about 40 percent. And so while we had fuel surcharges in that period of 2000, quite frankly, there was -- it never hit the strike price and -- and we never collect -- I don't -- I'm not sure we ever collected any fuel**

Page 21

surcharge revenue. Our fuel expense in 2000 for our entire company was about $780 million.

And so as you progress from 2000 on, you are certainly familiar with things like the Afghanistan war when we began that in 2001. We had 9/11. And then we had Gulf War 2 in 2003. And so fuel started going up almost sequentially each year. While there were a couple of -- of years it went down, if you look at -- fast-forward from 2000 to the year 2008, fuel went from $780 million in 2000 to $4.7 billion in 2008. And it went from 10 percent of our operating expense in 2000 to 33 percent of our operating expense in 2008. And at 33 percent of our operating expense, it became our largest single operating expense, overwhelming our labor cost not because our labor cost went down but because the fuel cost went up so significantly.

So obviously the -- the -- the necessity, the attention, the focus of fuel surcharges changed quite dramatically in that ten-year period.

We had a -- a -- an issue that we knew would overwhelm the company in terms of cost control, so we looked at various policies during various parts of that ten-year period, if you will, of how to most appropriately apply fuel surcharges.

During that period, we also had what I

Page 22

would call a major regulatory hearing by the STB to review the structure of fuel surcharges of how railroads would charge fuel to their customers.

Q. And that was the STB proceeding in 2006?

A. Correct.

Q. Okay. Did you finish?

A. Yeah.

Q. Very good. You -- you indicated towards the end of your answer -- and I -- I -- I appreciate the -- the perspective that you gave -- that you had various policies over time concerning how to most appropriately apply the fuel surcharge. Can you elaborate on that aspect of your answer, please?

A. Sure. So the railroads use a number of cost recovery efforts to offset inflation. One that is most widely used for what I would call our bulk businesses, which is our coal business and our ag business and to some degree our industrial products business, is called rail -- RCAF, Rail Cost Adjustment Factor.

And within RCAF, it's a -- it -- it's a basket of costs. It looks at labor costs. It looks at material costs. It looks at fuel costs of a railroad.

And so under normal times when fuel had been in that $25 range, 8, 9, 10, 11 percent of operating expense, the most -- the most widely used way

Page 23

to offset inflation through putting this mechanism onto a customer's rate was this RCAF. And so as fuel started running in 2002, 2003 -- and, again, it's all relative -- it -- it went from 12 to 13, 14 percent but it -- it wasn't -- it hasn't even begun to run as we knew it would later.

We started looking at our financials and felt like that we were not recovering through this index the level that we needed -- that we should have been recovering because our fuel cost was going up faster than our rate recovery was through this mechanism. And so we had a -- a group of people look at what was going on here.

And for the first time in -- in recent history, we really dove into the RCAF issues and really started to understand what drove RCAF and very quickly found that RCAF -- the fuel component of RCAF dealt with averages. And by that I mean that it looked at the average of fuel costs for the U.S. rail network. And when we look at the -- at the facts of the U.S. rail network, there is some difference. The eastern side of the Mississippi River, quite frankly, is different than the western side of the Mississippi River in terms of length of haul, terrain, markets, things like this. And so at BNSF, we burn significantly more fuel than either

Page 24

of our interline partners do within -- on the eastern side of the Mississippi. And so using this as an average fuel in this RCAF index, we knew that it was not properly compensating BNSF for fuel recovery.

And so we had also, during that period of time, begun applying fuel surcharges to various customers in various markets. And, quite frankly, we got a lot of push-back -- and I think rightly so -- that the marketplace was telling us, customers were telling us you -- you have a mechanism to recover fuel. It's called RCAF. So don't -- we don't want to pay a fuel surcharge on top of RCAF.

But we clearly knew that RCAF wasn't working for BNSF because of the amount of fuel that we burn and -- compared to other railroads.

And so our team -- and I -- I'm not exactly sure, I think it was led by Sam Kyei -- came up with an idea to have a different index published that we would publish RCAF, but we would take the fuel component out of RCAF, and then we would publish a fuel surcharge on top of that. And that -- the -- the objective of that was to prevent what customers would term as, quote, double-dipping, of paying both the RCAF as well as the fuel surcharge.

So we went through a -- a period of time

Page 25

08:26 of analysis, some changes to -- to our fuel surcharge, listening of customers. We have a Customer Board of Directors. We have a -- a lot of forums that we participate with customers. And through that period, we made a number of adjustments.

08:26 And then I would say that the -- the final major thrust that we had, we knew that coming out of the recession of 2001, 2002, the economy was growing, capacity was getting very tight, rates on BNSF were going up. And we were also getting push-back from the customers that putting a fuel surcharge on a percent of revenue was allowing the railroad to enjoy both the fuel surcharge as well as the rate increase -- the fuel surcharge on the rate increase.

08:27 And so we listened a lot to the -- the various markets and customers. And we began a -- a deliberate -- long, slow, deliberate process to go to what we now call mileage-based fuel surcharge. And we did this because at the end of the day we believe that fuel is best represented by tons and miles and not by the freight bill -- revenue side of the freight bill.

08:27 And this -- this, as is anything you do in -- in a big company like this, this was more difficult than we originally thought for a couple of reasons. One is that in the -- in the transportation

08:27

Page 26

08:28 industry, the -- the shippers are very familiar with paying a mileage-based fuel surcharge by the trucking industry. That's -- that's how -- I came out of the trucking industry, and that's always been the case within the trucking industry. On the other hand, no railroad had ever done a mileage-based fuel surcharge. And so it was a -- it was a -- quite a challenge from a system standpoint. And we got a lot of push-back from our customers that they weren't prepared to pay us a mileage-based fuel surcharge because their systems couldn't handled it. Systems such as SAP, which is a well-known financial system, had no mileage-based fuel surcharge that they could handle.

08:28 The second issue that -- that we ran into was that when you move away from a fuel surcharge based on a percent of revenue -- and the reason, again, we were doing that, because some customers were expressing concern that the higher-paying freight -- they were getting freight rate increases and those fuel surcharges were going on that as well. Within that basket, though, of customers, there were some on the lower end of -- of freight rates that would see their fuel surcharge go up because of the way the math would work and because, again, we would -- we would convert this to a -- a weight and distance. And it could -- you could have

08:29 08:29 08:29

Page 27

a -- a lower-value shipper actually paying a higher fuel surcharge and a higher-value shipper paying a lower fuel surcharge. And so there was a lot of what I would call consternation within the customer base of -- of some wanted us go to a mileage-based fuel surcharge; some didn't want us to. And, of course, you wouldn't be surprised to know that it was -- it was all about where -- what their value of their commodities were, if you will.

During this period also, then, we -- we participated, if you will, in the STB rule-making that began in -- I think it began in 2006, and I think the final rule was issued in 2007. And the STB looked at fuel surcharges, I think rather appropriately, wholistically of how the industry was doing; what the various practices were; were -- were railroads, quote, overcollecting on fuel surcharge or were they not; and what was the appropriate fuel surcharge that the railroad industry, if you will, should have to be put under from a rule-making that would come out of the STB.

We, throughout that period obviously, migrated into a strategy to -- to going to mileage-based fuel surcharge. What ended up coming out of the STB for regulated traffic only, which is about 40 percent of the traffic that's covered in the U.S. railroad network, is

Page 28

that -- that mileage-based fuel surcharge was a -- an appropriate surcharge to use. They didn't say it had to be the only surcharge but that generally railroads should only collect the revenue for the cost recovery to offset the costs that they were seeing. And we were already well down our -- the path on our regulated traffic. And -- and since then, we have implemented the rest of our regulated traffic. And we continue to look at our nonregulated traffic and listen to customers.

I -- we had a -- a large customer forum five miles from here last night where we had 300 customers. And -- and there was a lot of questions around, you know, what are we doing with fuel surcharge and the right fuel surcharge for these consumer good customers of what they wanted to see.

So it's changed quite a bit during the period. But I would go back to -- it's really been a incredible change, obviously, to the railroad industry but to the economy. And just for our little railroad, going from $780 million in 2000 to $4.7 billion in 2008, during that period, if you add 2009, I think you'll see that Tom Hund testified that we've had a cumulative undercollection of $2.2 billion during that same period.

So fuel surcharges are -- are very difficult. Nobody likes them. I don't like them when

Page 29

my Pizza Hut delivery guy shows up and has a dollar fuel surcharge on my pie. But the reality is that fuel has, I believe, forever changed. And what we've tried to stand for at BNSF is that over the long term we want to generally match our revenues with our expenses.

And when I use the word "generally" and "over the long term," I use those words because if I don't, this -- this sounds like a lot more science than it really is. There -- there is not a -- there is not exact science of how you measure fuel consumption on a railroad. You might find it hard to believe, but in a -- a 4,000-gallon tank, we don't even know how much fuel is in there on our older locomotives. And so when we think about fuel burn and various issues with routes, topography, mountain grade, flat, weather, types of train, length of trains, number of locomotives, all these things are -- change the -- the dynamics of fuel quite significantly.

But at the end of the day, we also do know in aggregate that we spent $780 million in the year 2000 and that we pent -- spent $4.7 billion in the year 2008. So in aggregate, we would want our revenues to parallel our costs.

Q. And you referred to Mr. Hund's testimony with respect to -- I believe your phrase was "cumulative

Page 30

undercollection?"

A. Correct.

Q. What -- what -- what is the measure of cumulative undercollection when -- when you say that that's $2.2 billion over some period of time? What -- what's being --

A. It's --

Q. -- compared to what?

A. -- over the nine-year -- it -- it was over the nine-year period of time.

Q. And what's -- what's being compared to what?

A. It -- it's really just fuel cost verse fuel surcharge revenue.

Q. Total fuel cost?

A. Total fuel -- total -- no. Total -- total increase in -- over the strike price verse total fuel surcharge revenue.

Q. So that would be total increase over 1.25 HDF?

A. Correct.

Q. And that's for the period 2000 to 2009?

A. It's not through 2009. I need to get you that because the testimony was in two -- it is in 2009. It is over that nine-year period.

Q. All right. And then you -- we're going to come back to this a little bit later, but I just wanted to

Page 31

follow up with a couple of your -- your statements concerning the RCAF index. And you said, first of all, that "we" had a group of people look at the RCAF. By "we," do you mean BNSF?

A. Yes, just BNSF.

Q. And then you -- you talked about how, quote, our team, closed quote, came up with the idea for a new index. Again, is that BNSF?

A. Just BNSF.

Q. And you said that, quote, we would publish the new index. The index was actually published by the AAR, correct?

A. Correct.

We -- we discussed whether or not we could publish it. And the way that these indexes and the way that railroad costs are actually translated into the marketplace, these are housed at the AAR, the trade group for the -- for the railroad association.

So when you look at the original RCAF, it is given to the STB, our regulator, and the AAR certified the -- the work that they do for the cumulation or the -- or the putting these costs together, things like what we call AAR car billing, which is the cost that we charge private car owners to repair a car. Again, those costs are housed at the AAR.

Page 32

And the reason why they're housed at the AAR is that if you go back just to -- you know, all -- I always talk about modern-day railroading as 1980. There were 37 Class I railroads. And you can imagine the frustration of the customers if each railroad would be publishing a car billing rate or each railroad would be publishing a RCAF adjustment rate.

So the process that then happened was that we asked the AAR to develop this new index that would be RCAF less fuel and to publish it just like they would publish the plethora of other indexes costs, labor costs, rates that they publish now.

Q. And that's called the All-Inclusive Index Less Fuel, correct?

A. Right.

Q. So if we just -- if -- just to -- just to summarize, I -- I want to make sure that I've got this right.

In -- in the 2000 -- in -- in the period prior to 2003, I think you said fuel wasn't that big an issue. You really weren't collecting a whole lot of fuel surcharge, correct?

MR. FAVRETTO: During that entire period, he said.

Q. (By Mr. Werder) In the -- in the --

Page 33

**A. Yes.**
Q. -- period prior to 2003.
**A. Yeah. I -- I -- I would -- I would say that prior to 2000 it was not a -- not an issue at all. It -- it had always run in that 10, 11 percent of rail -- of railroad operating cost.**
**In -- in 2001, when we started getting, you know, into these conflicts like the Afghan war, and then certainly in 2003, we started to see a lot of movement on the forward curve of fuel. It would go way up -- it would spike way up and then spike way down. And we started seeing fuel for the first time go 13, 14 percent of costs. And then in 2004, after the two -- 9/11 tragedy, it really then started the -- just the -- the slow climb of going from $25 a barrel to -- I think it -- it -- it peaked out at $143 a barrel.**
Q. Let -- let -- let me try it again then. There was a time in the late '90s and early 2000 period where -- which you described as, quote, normal times, closed quote, where fuel wasn't that big an issue for you and there wasn't an emphasis on fuel surcharge, correct?
**A. That's fair.**
Q. And by 2003, your policy had changed so that there was an emphasis on collecting fuel surcharge; is

Page 34

that right?
MR. FAVRETTO: I object to the form of the question. I think it misrepresent -- misstates his testimony. But go ahead.
MR. WERDER: He can tell me if it misstates.
**A. Yeah. I -- I would just say in 2001 when the Afghan war started, we started to see spikes in fuel. And during that period, we started noticing that the RCAF was not properly compensating BNSF, given our length of haul and the fuel burn that we use, like we thought it would have.**
**We -- we went into this thing thinking that RCAF -- we were covered. We had RCAF as our fuel index. And we started seeing in our financials that our fuel costs were going up faster than our RCAF revenue recovery was.**
Q. (By Mr. Werder) And -- and you, therefore, had a preference to collect a fuel surcharge rather than simply rely on the RCAF, correct?
MR. FAVRETTO: Objection to the form of the question.
**A. We knew that the RCAF was inadequate for BNSF.**
Q. (By Mr. Werder) And because you concluded that the RCAF was inadequate, you wanted to have some other

Page 35

method to recover what you perceived as your increase in fuel cost, correct?
MR. FAVRETTO: Objection to the form of that question.
You may answer, Mr. -- Mr. Rose.
**A. Again, once we started seeing the cost exceed the RCAF revenue side, we knew that we had to do something else, listening to customers, understanding that they didn't want a fuel surcharge on top of the RCAF, which they believed should recover the fuel costs.**
**And once we actually were able to come up with this construct by taking the fuel piece out of RCAF and then adding the fuel surcharge to that, quite frankly, the customers that we were dealing with became very satisfied that we wouldn't be collecting both RCAF and a fuel surcharge on top of that.**
Q. All right. Let -- let me just see if I can put it into bite-size pieces.
**A. Okay.**
Q. And the -- the analysis that you referred to with respect to the RCAF was an analysis that was actually done in 2003, was it not?
**A. I'm not -- I'm really not sure of the exact time. I think it was done before then.**
Q. The proposal to the --

Page 36

THE WITNESS: Excuse me just a second. I've lost my microphone.
MR. WERDER: Okay. You okay?
THE WITNESS: I'm good.
Q. (By Mr. Werder) The proposal to the AAR was made in late 2003, correct?
**A. I think that's correct but --**
Q. Okay.
**A. I wouldn't argue the date.**
Q. And -- and -- and prior to making the proposal to the AAR, BNSF concluded that, at least for BNSF, the RCAF was not an adequate fuel cost recovery mechanism, correct?
**A. Correct.**
Q. And BNSF concluded that, at least for BNSF, the preference would be to charge a fuel surcharge rather than rely on the RCAF cost escalation, correct?
**A. For --**
MR. FAVRETTO: Objection to the form of that question.
You may answer, Mr. Rose.
**A. For the regulated traffic that used RCAF, what we determined to be the most appropriate RCAF cost recovery plus a fuel surcharge was to charge RCAF less the fuel component plus the fuel surcharge on top of**

Page 41

**A. -- is we heard from several customers that they believed that we were being compensated for fuel by using the RCAF methodology and that to add a fuel surcharge on top of that, that we would be double-collecting.**

Q. And --

**A. That is why we then worked to be able to take the fuel component out of RCAF and then add to it the fuel surcharge, which we thought would most appropriately reflect the reality of ever-increasing fuel costs.**

Q. And -- and as -- as part of that process of analysis, you had a discussion internally at BNSF concerning whether BNSF itself could create that index on its own and publish it on its own, correct?

**A. We had -- we had that discussion of where it should properly be published.**

Q. And part of that discussion was whether BNSF itself could just announce that it was going to modify RCAF to have an RCAF without fuel, correct?

**A. I think the first discussion we had was could we even put together the RCAF basket. We don't have the processes, the people, the data in place to be able to do that. And so we very quickly got to the point where we would approach the AAR to create an additional index**

Page 42

**to be able to take this fuel cost out of RCAF and publish it for our customers.**

Q. And -- and -- and the -- the reason that you approached the AAR is that you ultimately concluded that that would be a more effective way to implement a new index, correct?

MR. FAVRETTO: Object -- objection to the form of the question.

**A. We approached the AAR because the AAR houses all the indexes now. And we did not believe that we had the capability to publish this. And, quite frankly, we felt like that the customers would, and the STB eventually, would rely on the AAR verse each railroad coming up with some different type of index. We wanted to make sure that ours was done by the exact people who do the RCAF index and so there wouldn't be any questions of whether or not the RCAF rates are different in the RCAF or the less-fuel RCAF.**

Q. (By Mr. Werder) Customers and the STB were more likely, you concluded, to accept a new index that was published by the AAR than one that was published by an individual railroad, right?

MR. FAVRETTO: Objection to the form of that question.

**A. I think customers would -- they were used to**

Page 43

**seeing the -- the indexes published by the AAR, and we felt like that was the most appropriate place to do it.**

Q. Okay. The question was a little bit different, though. You concluded that customers and the STB would be more likely to accept a new index if it was published by the AAR rather than by you as an individual railroad?

MR. FAVRETTO: Objection to the form of that question.

**A. It's not really whether they would accept it or not. It's -- it's the fact that the AAR has the department, has the resources, has the processes in place to publish this index. We felt like it was most appropriate for them to publish this additional index that we requested.**

Q. (By Mr. Werder) And -- and the -- and so -- and they did publish it at your request; is that right?

**A. They did.**

Q. The AAR Board ultimately approved that, didn't it?

MR. FAVRETTO: Objection to the form of that question.

**A. The AAR Board did not approve it. It was an informational item at one of the board meetings.**

Q. (By Mr. Werder) And -- and it -- was it discussed at that board meeting?

Page 44

**A. It -- it was discussed in the context of a committee report given by one of the AAR staff members as a -- very much of an informational item, probably lasted 30 seconds. There was no -- no discussion at the AAR Board. There was not a vote taken, to my recollection. And then they went forth to publish it.**

Q. And -- and we're going to go into a little bit more detail on this a bit later in the day.

But after -- is it true that it was first created and then at some point later in time it was published on the AAR Web site?

**A. I don't know the answer to that.**

Q. But you -- you do know that it was created following the AAR board meeting in December of 2003?

**A. I --**

MR. FAVRETTO: Objection to the form of the question.

If you know, Mr. Rose.

**A. I -- I don't know.**

**I know that the committee report was given. The -- Ed Hamberger, to my recollection, then directed his team to publish this index. And I don't know the mechanics of how they published it or -- or -- or anything like that. But -- but my understanding is that the -- the AAR staff that puts together the RCAF**

**then took out the fuel component of -- of this index.**
Q. And regardless of when it was created and published, did BNSF use the new index after it was created?
08:52 **A. Yes, we did.**
Q. Did it -- what -- what was -- did -- did -- was it part of BNSF's policy to use that new index?
MR. FAVRETTO: Objection to the form.
**A. I think it -- it was -- it was definitely one**
08:52 **of the -- one of the programs that we used. It -- it is what I would call our standard fuel surcharge, if you will.**
**And it was -- you know, again, while nobody likes to pay a fuel surcharge, I think most of**
08:53 **the people in the market believe that instead of getting charged both the RCAF that had a portion of fuel covered along with a fuel surcharge that they understood what we were doing, and it was received quite well.**
Q. (By Mr. Werder) And has the -- has the use of
08:53 that index been an important part of BNSF's implementation of its fuel surcharge policy?
MR. FAVRETTO: Objection to the form.
**A. It -- it has been the -- it has been, I would say, used more than the other fuel surcharges.**
08:53 **But, you know, we use a number of**



**different approaches to -- to collect fuel. Our largest customer for instance, we don't use this type of fuel surcharge on -- with them.**
**So, again, for -- for a large number of**
08:53 **customers, we do. We utilize this AA -- AALIF [sic] fuel surcharge along with a -- or AII-LF RCAF along with a fuel surcharge, but it -- it -- it's certainly not the only fuel surcharge we use.**
Q. (By Mr. Werder) And I think a -- a few minutes
08:53 ago you used the phrase "regulated" or "regulated traffic." Is -- was -- is the RCAF index used only in regulated -- in regulated movements?
**A. Not exclusively. But I would tell you that just history has more regulated traffic using the RCAF**
08:54 **than nonregulated traffic.**
Q. All right. Have you involved yourself in discussions with executives from other railroads concerning fuel surcharge-related issues?
**A. I've had -- I've been in meetings and -- where**
08:54 **fuel surcharge has been discussed at our alliance meetings and our interline partner meetings in terms of how we're going to apply fuel surch to our interline shipments.**
Q. Can you -- are -- are you able to give me a
08:54 list of the -- of -- of which other railroads you have



had such discussions with?
**A. It would be -- it would -- it would be our interline partners, which it's real easy to -- to narrow down who's not our interline partner, and that would be Union Pacific.**
Q. So you --
**A. So --**
Q. -- so you have had such conversations with CSX?
**A. Correct.**
Q. And you have had such conversations with Norfolk Southern?
**A. Correct.**
Q. And can -- can you -- can you tell me -- can -- can you give me any listing, to the best of your recollection, of the discussions of -- the -- the times at which you have discussed fuel surcharge-related issues with CSX?
MR. CUDDIHY: Objection to form.
MR. FAVRETTO: I -- yeah. I object to the form of that question.
**A. I -- I -- I can't give you the times. I'm sure you have that. There -- there -- we've had alliance meetings over the years where fuel surcharge or interline shipments has been an agenda item. And we -- we do that because we -- we have to do that.**



**We have about -- at BNSF, we have about 40 percent of our shipments are interline. Interline being defined as one railroad participating with another railroad. And it would -- it -- we have to have a -- an agreement on our interline shipments of how we're going to apply a fuel surcharge for the customers. Otherwise, you can imagine the complexity of the customers having one fuel surcharge on one railroad and another fuel surcharge on another railroad on a single bill of lading.**
**So that -- that -- those discussions have taken place over the years in the context of the interline arrangement.**
Q. (By Mr. Werder) Is it your testimony that all of the discussions that you've been involved in with CSX with respect to fuel surcharges have related to what fuel surcharges would be charged on interline shipments involving CSX and BNSF?
MR. FAVRETTO: I'm going to object to the form of that question. I think it may assume facts that are not in evidence.
But go ahead, Mr. Rose.
**A. Again, what I would tell you, the conversations, the meetings I attended for alliance meetings were solely around interline movements for BNSF**

Page 49

**and for other railroads, with the exception of Union Pacific.**
MR. WERDER: Can -- can you read that question back?
08:56 (Requested portion read)
MR. FAVRETTO: And there's an objection to that question. But -- okay.
Q. (By Mr. Werder) Can you answer that question?
MR. FAVRETTO: I thought he did but --
08:57 **A. I did.**
Q. (By Mr. Werder) Let me try it again then.
You -- you have various meetings -- there -- there are various meetings that occur between CSX and BNSF, correct?
08:57 **A. Correct.**
Q. And at --
**A. Alliance meetings.**
Q. -- at -- at -- at least at some of those meetings, I take it, it's your testimony that fuel
08:58 surcharge-related issues have been discussed, correct?
**A. For our interline shipments, correct.**
Q. And -- and my question is: Is it your testimony that all of the discussions that have occurred with respect to fuel surcharges involving CSX and BNSF
08:58 have involved what fuel surcharges would be charged on

Page 50

interline shipments involving CSX and BNSF?
MR. CUDDIHY: Objection to form.
MR. FAVRETTO: Discussions at the meetings he -- he references?
08:58 MR. WERDER: That's correct.
MR. FAVRETTO: All right.
**A. Again, when we have alliance meetings with CSX or any of our other interline partners and we had fuel surcharge on the agenda, it was in context of the**
08:58 **interline agreement. It was in context of the interline shipments that we operate with that interline partner.**
Q. (By Mr. Werder) And is that -- is that true for all the discussions that you've had with Norfolk Southern as well?
08:58 MR. FAVRETTO: Objection to the form of the question, lack of foundation.
MR. WERDER: I'll with -- withdraw the question.
Q. (By Mr. Werder) You've had various meetings
08:59 over time with executives from Norfolk Southern, correct?
**A. Correct. And with our alliance partners.**
Q. And at some of those meetings with Norfolk Southern, fuel surcharge-related issues have been
08:59 discussed, correct?

Page 51

**A. For interline shipments, correct.**
Q. And is it your testimony that all of the discussions of fuel surcharge-related issues that have occurred at meetings with Norfolk Southern have involved interline movements that were to take place involving Norfolk Southern and BNSF?
MR. FAVRETTO: Objection to the form of the question.
**A. The conversations that we had with our interline partners at these alliance meetings would have -- would have dealt with fuel surcharges on our interline shipments.**
Q. (By Mr. Werder) And -- and -- and in what -- what was -- what was done or said at these meetings that made clear to the participants in the meetings that the discussions related to interline shipments?
MR. FAVRETTO: Object to the form, vague.
**A. I think if you look at the agenda of the meetings, you'll see very quickly that it's all around the business that's flowing between the two railroads and how to expand that business and how to produce -- provide more rail transportation for the marketplace between these two partners, in this case, these -- what we term as these alliance relationships.**
Q. (By Mr. Werder) Would the agendas for these

Page 52

various meetings, to the extent that they exist, provide in your view, a -- a -- a -- a good indication of the context in which the discussions were occurring?
MR. FAVRETTO: Objection to the form.
MR. CUDDIHY: Objection to form.
MR. FAVRETTO: It's vague.
**A. Yeah. I -- I -- I mean, I -- I -- I can't answer that. I've seen some agenda items in -- in preparation for this deposition that seem very vague.**
**But I can assure you there's really no reason to get 10 or 20 people together in a room outside of the fact to talk about how to develop more business for our customers across a eastern or western railroad gateway.**
Q. (By Mr. Werder) That's the only reason for people to -- for top executives of your railroad and CSX to get together?
MR. FAVRETTO: Objection to the form --
MR. CUDDIHY: Objection to form.
MR. FAVRETTO: -- of the question.
**A. That's not what I said.**
Q. (By Mr. Werder) I thought you said there's really no reason to get 10 or 20 people together in a room --
**A. (Inaudible).**

Page 53

09:03
09:03
09:03
09:04
09:04

Q. -- other than to talk about how to develop joint business?
**A. Another reason would be under our NCCC -- our labor relations meetings where our labor relations vice presidents along with NCCC along with the CEOs will get -- will have meetings during labor rounds.**
Q. All right. In any -- in any event, I asked you about the agendas in response to some testimony that you gave about looking at the agendas.
And let me ask you again whether -- well, let me ask you first: Have you reviewed agendas for meetings between NF -- BNSF and other railroads in preparation for your deposition today?
MR. FAVRETTO: I'm going to object to the form of that question.
I'm going to instruct the witness not to describe the documents that he reviewed with respect to his preparation for the deposition. I think it's covered by the attorney work product privilege.
MR. WERDER: He's waived it --
MR. FAVRETTO: I will represent that -- I will represent that --
MR. WERDER: -- because he's already said he's -- he's already said he reviewed some agendas.
MR. FAVRETTO: I under -- I will represent

Page 54

09:04
09:04
09:04
09:05
09:05

to you that anything that he represented were -- involved materials that were produced in this litigation. If you have agendas, if you have documents that you want to show him --
MR. WERDER: I'm going to show him documents. Don't worry.
MR. FAVRETTO: -- to ask him questions about the agenda item and his recollection about any discussion that may have occurred, you're free to do that. But these general, open-ended questions about meetings are -- are --
MR. WERDER: I don't need the speaking objection. We don't have that much time today.
MR. FAVRETTO: -- well, are not -- are not -- you know, are not appropriate.
MR. WERDER: Fine. Thank you.
MR. FAVRETTO: And you have my objection to the form of the question. I --
MR. WERDER: Thank you. That's all you need to say, you object to the form of the question. And I -- I'll -- if I need more, I'll ask you for it. Okay?
Q. (By Mr. Werder) I'm asking you about the agendas that you referred to previously with respect to these -- those meetings between BNSF and other

Page 55

railroads. And -- and you -- you have reviewed some -- regardless of when you did it, you have reviewed some agendas for those meetings, have you not?
MR. FAVRETTO: I'm not going to -- I'm not going to permit the witness to talk about the documents that he reviewed in connection with his preparation with counsel for the deposition.
MR. WERDER: Didn't ask him about when he reviewed it. Just asked him if he's --
Q. (By Mr. Werder) Have you ever seen an agenda for one of those meetings?
MR. FAVRETTO: The -- if you -- if the only time you've seen the agenda in your recollection is in doing your preparation for the deposition, Mr. Rose, then don't -- don't respond to the question.
**A. That's the case.**
Q. Okay.
MR. WERDER: So you're instructing him not to answer my question?
MR. FAVRETTO: Yes.
Q. (By Mr. Werder) Has BNSF ever had a different fuel surcharge for interline shipments than for -- what's the opposite of interline? Is it local?
**A. Local.**
Q. Has -- have you ever had a different fuel

Page 56

surcharge for interline shipments than for local shipments?
**A. I'm not -- I don't think so.**
Q. To your knowledge, has CSX ever had a different fuel surcharge for interline shipments than for local shipments?
MR. CUDDIHY: Objection to form.
MR. FAVRETTO: To your knowledge, Mr. Rose, if you know.
**A. I don't know.**
Q. (By Mr. Werder) Have they ever told you that they had different fuel surcharge for local shipments than for interline shipments?
MR. CUDDIHY: Objection to form.
**A. I've never had any conversation with CSX on their local shipments on fuel surcharge.**
Q. (By Mr. Werder) One of the things that your staff has done periodically from time to time is to create spreadsheets or reports that summarize the fuel surcharge practices of the other railroads, correct?
MR. FAVRETTO: Objection to the form of that question.
**A. Our staff will look at public information of what the trucking industry does in terms of fuel surcharge recovery, as well as the other railroads, as**

Page 57

**well as BNSF.**
Q. (By Mr. Werder) All right. Has -- has your staff ever reported to you that CSX had a different fuel surcharge for local shipments than for interline shipments?
09:08
MR. CUDDIHY: Object to the form.
**A. I do not recall ever seeing that information.**
Q. (By Mr. Werder) All right. And -- and -- and if I ask you the same question with respect to Norfolk Southern, has your staff ever reported to you that
09:08
Norfolk Southern had a different fuel surcharge for local movements than it had for interline movements?
MS. CERILLI: Objection to form.
**A. I don't recall ever seeing anything like that, with one exception.**
09:08
**The originating carrier determines the fuel surcharge. The destination carrier is basically receiving that fuel surcharge. So if -- if our fuel surcharge is different and we're giving traffic to a alliance partner, an interchange partner, it's going to**
09:08
**be different than the local traffic by the very nature that we're the -- we're the originating carrier.**
**So without -- with -- with that exception and that explanation, I'm not familiar with any documents or any analysis that their local traffic is**
09:08

Page 58

**different than their originating traffic on their interline shipment.**
Q. (By Mr. Werder) And -- and how about for Union Pacific? Has anybody ever given you any information to suggest that they had a different fuel surcharge for
09:08
local traffic than for interline traffic?
MR. CHILDRESS: Object to form.
(Reporter clarification)
MR. FAVRETTO: Objection to the form by --
MR. CHILDRESS: Object to the form.
09:08
**A. I don't recall ever seeing any information on that.**
Q. (By Mr. Werder) By the way, does -- does BNSF have interline traffic with Union Pacific?
**A. Yes, we do.**
09:09
**(Sotto voce discussion between Mr. Werder and Mr. Hammond)**
**(Exhibit 1 marked)**
Q. Handing you what's been marked Rose Exhibit 1, which I'll identify for the record as an excerpt from a
09:10
Surface Transportation Board public hearing on May 11, 2006, containing the testimony of Tom Hunt [sic], the CFO of BNSF. Have you seen this document before, sir?
**A. Just a correction. It's Tom Hund.**
Q. It's -- they -- they -- they -- they misspelled
09:10

Page 59

it in the record, apparently. But it is -- it is --
**A. D.**
Q. -- it -- it is H-u-n-d, correct?
**A. Correct.**
Q. Okay. And have you seen this document before?
**A. No, I have not.**
Q. Were you aware that there was a hearing of the Surface Transportation Board with respect to fuel surcharge issues in May of 2006?
**A. Yes, I was.**
Q. Were you aware that Mr. Hund gave testimony --
**A. Yes.**
Q. -- at that hearing?
**A. I was.**
Q. And was Mr. Hund designated by BNSF to testify on BNSF's behalf --
**A. Yes.**
Q. -- at that hearing?
**A. Yes, he was.**
Q. Are you familiar with whatever process was gone through to -- to review or vet the testimony that Mr. Hund planned to give at that hearing?
MR. FAVRETTO: What was the question? May I have it read back?
MR. WERDER: Well, I'll just -- I'll --

Page 60

I'll rephrase the question.
Q. (By Mr. Werder) Do -- do -- do you know how Mr. Hund's testimony was prepared and reviewed?
**A. Generally. I'm not familiar with the details, but I know how we would prepare for any STB hearing.**
Q. How -- how would that -- just in general terms, how would that process work?
**A. Depends on the subject matter. In this case, I think the -- the question was the appropriate -- appropriateness of fuel surcharges and the question of whether or not railroads were collecting enough or overcollecting and the various fuel surcharges that people had used.**
**So in this case, the Marketing Department would have provided a lot of analysis, along with the Finance Department. Our -- our fuel team would have been involved in terms of -- of fuel expenses. That would have -- they would have worked with our regulatory counsel. And there would have been our communications vice president involved to -- to end up preparing this -- this testimony. And it would have been vetted with, you know, the various groups, the various departments that had a responsibility within BNSF.**
Q. And in advance of the hearing before the STB, did you involve yourself in any discussions with any of

Page 65

testimony starting on line 20 where he says, quote: Our fuel surcharge -- our surcharge program is the same for all customers and it's Highway Diesel Fuel and then it starts at $1.25 and ratchets up from there.
09:26 You see that?
**A. Yes, I see that.**
Q. Is -- is -- is that -- is that accurate, to your knowledge?
**A. I'd like to take a minute --**
09:26 Q. Yeah. Sure.
**A. -- and just get the context of everything.**
MR. FAVRETTO: Get -- get -- familiarize yourself with the testimony and place it in its proper -- the comment in its proper context, Mr. Rose.
09:26 **A. (Witness reading). Okay.**
Q. (By Mr. Werder) Have you had an opportunity the review what you wanted to review?
**A. Yes.**
Q. And so directing your attention to Mr. Hund's
09:29 statement that, quote, our fuel surcharge program is the same for all customers and it's highway diesel fuel and then it starts at $1.25 and ratchets up from there, closed quote. That was Mr. Hund's testimony, was it not?
09:29 **A. Yes. That's what I'm reading.**

Page 66

Q. And -- and do you have any reason to believe that that testimony was inaccurate when it was given?
MR. FAVRETTO: Objection to the form.
**A. No. I -- I think that there is a -- when he**
09:29 **says that it's the same for all customers, I would have characterized it to say that the strike price is the same for all customers, but our fuel surcharge program is different for some customers.**
Q. (By Mr. Werder) And can you explain that
09:29 answer, please?
**A. Well, because we have different fuel program -- fuel surcharge programs for different customers. As I said earlier, our largest customer, [redacted] which accounts for almost 7 percent of our revenue, has a**
09:29 **different fuel surcharge program than our standard program. Our third largest customer, [redacted] has a different fuel surcharge program. Customers such as [redacted] have different fuel surcharge programs.**
09:29 **So I just -- we have tried to maintain the same fuel strike price and use highway diesel, but -- but the actual construct of -- of -- to say that every surcharge program is exactly the same, I -- I don't -- I'm not sure he meant that. But I don't -- I don't know**
09:29 **what -- you know, the context of how he was answering.**

Page 67

Q. And so -- so you're differentiating between the strike price and what you say is the construct of the fuel surcharge; is that correct?
**A. Correct.**
Q. And -- and what are the types of differences that one would expect to see in looking at fuel surcharges that have been used with specific customers like a [redacted]
**A. It could be everything from no fuel surcharge at all to a different cost of increased as fuel goes up. So it's -- it's really all over the board.**
Q. And -- and to the extent that there -- well, withdrawn.
Is -- is -- are you familiar with the phrase "standard fuel surcharge?"
**A. I'm really not.**
Q. You haven't heard that phrase used within --
**A. Well, I've heard the word "standard" used, but I -- I -- I -- I would -- I don't -- it's just not a term that -- that I -- I hear a lot. I think it's -- I mean, if -- if your question is do we have a standard fuel surcharge that -- that applies to the most -- the majority of our marketplace, the answer is yes.**
Q. Okay. And -- and that standard fuel surcharge that -- that applies to the majority of your marketplace

Page 68

is the -- in -- in -- starting in June of 2003 was the $1.25 strike price HDF fuel surcharge, correct?
MR. FAVRETTO: Objection to the form of the question.
**A. I think when you use the word "majority," you know, you'd be surprised what percent of our customers actually didn't fall underneath that.**
Q. (By Mr. Werder) Well, you used the word "majority." I was just picking up on -- on your term, sir.
**A. That's -- that's why --**
MR. FAVRETTO: You may explain your answer, Mr. -- Mr. Rose.
**A. That's why I'm saying it depends on the word -- depends on the reference to majority.**
Q. (By Mr. Werder) All right. Well, you --
**A. I -- I would guess that at that time that 40 to 45 percent, 50 percent of our -- of our units didn't fall under the AALIF or the highway diesel at 1.25 and our -- and our normal standard tables. That has -- have -- as contracts have been renegotiated, that has probably shrunk down to 20 to 25 percent of our units in -- in current dollar -- in current days now that -- that still don't fall under that, quote, normal fuel surcharge.**

Page 69

09:26 Q. Just want to make sure that I got the direction of your percentages correct. We're talking -- you were -- the -- the -- the first number that you gave where you said 40 to 45 and then maybe 40 to 50 percent not falling under the standard, that was as of about June of 2003?

**A. That's way too precise for me. I -- I really don't know.**

Q. Okay.

09:26 **A. But in -- in -- in -- in those -- in the period of 2003 to 2006, 2007, that -- those numbers would not have surprised me, but I -- I do not have the data at my fingertips on that.**

09:27 Q. And -- and today, it would be 20 to 25 percent that aren't under the standard, which you called the AII-LF plus fuel surcharge methodology?

09:27 **A. For just the fuel surcharge with -- see, you have to remember, again, we have different markets. Different customers are going to have different fuel surcharges. Some don't use AALIF at all. In fact, I would guess that only about a third of our price authorities use the AALIF. That, again, was primarily the regulated traffic that moves on the railroad.**

09:27 **And so we have customers that use CPI plus the, quote, normal fuel surcharge of the highway diesel**

Page 70

**at $1.25. So there -- there's a -- there's -- and then within that, there's these exceptions. There's these number of customers and, quite frankly, very large customers that have differing fuel surcharge that we've**

09:28 **worked out over the years with them.**

Q. All right. We'll talk about some documents about that a little bit later.

But am -- am I correct that in or about -- that -- that effective on or about June 1st of 2003 BNSF

09:28 had a standard fuel surcharge based on the HDF index with a trigger of $1.25 per gallon?

MR. FAVRETTO: Objection to the form of the question.

**A. I really don't know the date of June. I -- it**

09:28 **was somewhere in that period of time.**

Q. (By Mr. Werder) All right.

**A. I'm sure you can produce a document.**

Q. Yeah. We don't need to be that -- we don't need to be that precise. But?

09:28 But it was BNSF's policy at that time, generally defined, to apply -- to seek to apply the standard fuel surcharge, correct?

MR. FAVRETTO: Objection to the form.

**A. I -- I would tell you that we gave our pricing**

09:28 **managers, which there are literally hundreds of them,**

Page 71

**guidance around these policies and that if -- if -- unless there was a significant business reason, we wanted the fuel surcharge of the highway diesel at $1.25 with the -- with that fuel surcharge to -- to be the -- the norm, if you will, or the standard.**

Q. (By Mr. Werder) And -- and you referred to hundreds of pricing managers. In -- in -- in -- in fact, around that time, the policy that was announced was that departures from the standard needed to be approved by Mr. Lanigan, correct?

MR. FAVRETTO: Objection to the form.

**A. I -- I -- I would refer to those as guidelines, not policies, because within the -- the -- the -- within the guidelines there -- it was always based to have exceptions to these various processes.**

Q. (By Mr. Werder) And -- and starting at some point in the first half of 2003, the discretion that the hundreds of pricing managers had previously been accorded was restricted so that departures from the -- I'll use the phrase "standard" HDF fuel surcharge needed to be approved by Mr. Lanigan, correct?

MR. FAVRETTO: Objection to the form and lack of foundation.

**A. Yeah. I think what we did, we gave people guidelines. We were -- we were definitely looking to --**

Page 72

**to give people more structure. We didn't want hundreds of pricing managers each out there coming up with differences in how you apply fuel surcharge. And I -- I think there's no doubt during this period of time we -- we narrowed down the flexibility of the pricing managers to apply fuel surcharges to get to a more consistent fuel surcharge so that we could properly assess whether or not we were going to be able to find a way to recover the billions of dollars of fuel expense that we knew we needed to.**

Q. (By Mr. Werder) And -- and the -- the consistency that you were seeking to obtain was a as-consistent-as-possible application of the fuel surcharge -- the -- the -- the fuel surcharge based on the HDF index with the $1.25 strike price, correct?

MR. FAVRETTO: Objection to the form.

**A. We were going to use -- we wanted the -- the -- the -- I don't know if it was a hundred percent or not, but we wanted, I believe, for all of our fuel surcharges to start with highway diesel, and we wanted them -- them to start with $1.25.**

**And the reason we did this was because the trucking industry, who has had fuel surcharges in place for decades, that was really the standard in the trucking industry and it was very well, again, not**

Page 73

received by customers, but it was very well understood by customers. Strike price, highway diesel, it's published every week in the back of the Transport Topics magazine and that customers would be very familiar with highway diesel. And we don't buy highway diesel. I'm sure you know that. And yet giving them direction around going to -- to these two areas. And then the third area would be the -- the amount of the fuel surcharge.

And -- and as I said, during that period, I would assume that, you know, up to 40 or 45 percent of our business had some sort of difference in terms of our normal or -- or standard fuel surcharge.

Q. And the normal or standard fuel surcharge included not only a strike price but a percentage of fuel surcharge that would be charged at levels above the strike price, correct?

A. A table, correct.

Q. A -- there was -- there was a table? So -- so the --

A. Yes.

Q. -- the -- the --

A. A formula.

Q. -- the -- the normal or standard fuel surcharge consisted of a -- a directive to use the HDF index.

Page 74

Correct?

MR. FAVRETTO: Objection to the form of that question.

Q. (By Mr. Werder) Well, it included the HDF -- was -- withdrawn.

The normal or standard fuel surcharge in the June 2003 time period and following was based on the HDF index, correct?

A. Correct.

MR. FAVRETTO: Objection to the form.

A. We -- we moved -- I'm not sure when we moved, but we used to base our fuel surcharges on WTI, or West Texas Intermediate. And we moved to highway diesel, again, after talking to a lot of customers and listening to be more truck-like, be more consistent with what our truck fuel surcharges are. And -- and that's why we made the change to HDF.

Q. (By Mr. Werder) And -- and so the -- the normal or standard fuel surcharge in the June 2003 time period and following was one that was based on the HDF index, correct?

MR. FAVRETTO: Object -- objection to the form.

A. That's -- that's what we would -- and I -- again, I don't know if all of our contracts used HDF or

Page 75

not. But for the -- for the -- for the average shipper price authority coming through, while we gave our people exceptions and exception policies, we wanted to be based on HDF at $1.25 strike price.

Q. (By Mr. Werder) And there was a table of what surcharge would be charged -- what percentage surcharge would be charged at -- for each level of increase above the strike price, correct?

A. Yeah.

There's -- there's really two approaches at that time because that was prior to us going to mileage-based. So there was a percent of revenue that would be applied to it. And then as we implemented the mileage-based fuel surcharge, there would have been a table for every -- I'm not sure what it was -- five or six cents a gallon increase off the high diesel that there would been a portion of -- of surcharge that would have been applied to that.

Q. All right. Unless I specifically ask you about mileage-based surcharges, you can assume that I'm going to ask you about the percentage of base rate surcharges. Okay?

A. Okay.

Q. And the mileage-based surcharges didn't start to be used until -- until significantly later than 2003,

Page 76

correct?

MR. FAVRETTO: Objection to the form of the question.

A. No. Actually, we used them earlier than that. Again, our larger customer [redacted] was a -- would have -- would -- would effectively be using a mileage-based fuel surcharge.

Q. (By Mr. Werder) All right. In terms of a standard fuel surcharge, the mileage-based fuel surcharge -- you, in fact, I think testified earlier today that you were the first railroad in the period of time following the STB ruling to announce a mileage-based fuel surcharge, correct?

A. No, I don't think I --

MR. FAVRETTO: That's -- I -- that misstates testimony.

A. If that's what I stated, that's not what I -- that's not what I meant. We announced mileage-based before the STB hearing.

Q. (By Mr. Werder) Shortly before the STB hearing, correct?

A. No, it wasn't shortly.

Q. When did you announce it?

A. I don't know. I'd have -- I'd want to get you exact dates if you --

Page 77

09:36 09:36 09:37 09:37 09:37

Q. Okay. Very good. Were there situations pursuant to your corporate guidelines where contracts had to be approved by you personally?

**A. Part of -- I'm not sure what the -- we changed what we called delegation authority. Where we used to have a pricing manager be allowed to do something, we went to an assistant vice president or then we went to a vice president. And eventually we went to John Lanigan.**

**And I think, if I recall, what happened was there are certain contracts that due to delegation of authority I have to sign. And by that delegation of authority, those -- those would be dependent on the number of years that the contract would be for and the amount of -- of revenue and the amount of capital required that would be involved in our -- in our commitment.**

**So there are certain contracts that I sign. It -- it is what I would call infrequent. I would say maybe once a month a -- somebody comes in to my office and tells me that, you know, this -- this contract needs my approval. And it's -- it's simply based on that delegation of authority.**

**So the nexus of that delegation of authority would have put me into having to sign a contract that had a fuel surcharge in it. But**

Page 78

09:35 09:35 09:36 09:36 09:36

**certainly, it was our marketing guidance as well as the spirit of what we were trying to do to apply fuel surcharges to every contract, every tariff item that was being published to recover the -- the enormous cost burden that the railroad was seeing in terms of the increase in price of fuel.**

Q. And can you identify in the period from 2003 to 2008 any contracts that you personally signed that did not contain a fuel surcharge?

**A. I don't recall signing any -- signing any contracts that didn't have a fuel surcharge.**

**I know of several contracts that I was aware of, involved with, had discussions with that did not contain fuel surcharges, but I probably didn't sign them because the -- it -- it -- it fell below the delegation of authority. But I'm -- if I signed any contracts without -- without fuel surcharge, I'm -- I'm just not aware of it.**

Q. Okay. And you say you -- even though you may not have signed them, you are aware of several contracts that didn't have a fuel surcharge?

**A. Didn't have a fuel surcharge or had a -- had a different fuel surcharge that we would want to have a discussion with in terms of a policy.**

Q. Very good. I want to -- I want to split this

Page 79

into two parts, then. One is -- the -- the first part is -- is contracts with no fuel surcharge at all.

And are you aware of any contracts, regardless of whether you signed them or not, negotiated in the 2003 to 2008 time period that didn't have a fuel surcharge at all?

**A. Yes.**

Q. What contracts?

**A.** [redacted]

Q. Any others?

**A. Not -- not that --**

MR. FAVRETTO: That you're aware of.

**A. -- not that I'm aware of, but I'm sure there are. I just -- again, these are some of our very large customers.**

Q. (By Mr. Werder) And the only two you can identify, though, are [redacted] And that's not saying that those are the only two that exist, but as far as what you can tell me sitting here?

**A. What I'm aware of, yes.**

Q. Okay. Now, focusing on contracts that did have a fuel surcharge --

**A. Uh-huh.**

Q. -- the -- you -- you talked about the marketing guidance given to your -- your -- your people and the --

Page 80

some of the limitations that came in over time. But is it fair to say that the marketing guidance in the 2003 and following time period was to apply the standard HDF-based --

MR. FAVRETTO: Okay.

Q. -- fuel surcharge to all contracts and tariffs?

**A. Not to all contracts because, again, we have to only look at our largest customer on the railroad. We knew we were never going to have the standard contract with them.**

**But -- but, again, I -- I would tell you that unless there was a -- an unusual need from a market standpoint, our -- our direction would be to use the standard, more normal contract with highway diesel and whatever that percent of revenue table was at that time and then eventually rolling into the mileage-based fuel surcharge.**

Q. (By Mr. Werder) Focusing on [redacted] for a moment, what -- what percentage of [redacted] business moved under contracts with no fuel surcharge? Do you know the answer to that?

**A. I don't -- I don't know.**

Q. Is it all of it or some of it?

**A. It's -- it's a portion of it. I don't know the total.**

Page 81

MR. FAVRETTO: Business with BNSF, is
that --
MR. WERDER: Correct.
MR. FAVRETTO: -- the question? Okay.
09:39 Q. (By Mr. Werder) So -- so -- so is -- is it fair
to say, then, that some of [redacted] business moved under
contracts with fuel surcharges and some moved under
contracts with no fuel surcharges?
**A. Contracts or tariffs. Yes, that's -- that's**
09:38 **fair.**
Q. And -- and -- and you don't know what
percentage of the business had a fuel surcharge versus
didn't have a fuel surcharge?
**A. I do not know.**
09:38 Q. Do you know whether it was more than half of
the business that didn't have a fuel surcharge?
**A. I don't know.**
Q. Do you know whether it was more than
25 percent?
09:39 MR. FAVRETTO: No.
**A. I don't know.**
Q. (By Mr. Werder) Okay. You just don't have any
idea?
**A. I don't have any idea.**
09:39 Q. All right. And how about for [redacted] Do you --

Page 82

do you -- was the -- did -- was it some or all of
[redacted] business that moved under a contract with no
fuel surcharge?
**A. I'm not familiar with the details. My**
09:39 **understanding is that the contract calls for no fuel**
**surcharge. But at some point in time, [redacted] voluntarily**
**put forth a -- a fuel reimbursement program. But I --**
**I -- that's about as much as I know on that.**
Q. Okay.
09:39 **A. I don't know how much, when, how, any of that**
**information. But --**
Q. All right.
**A. -- but I do believe that contract does not**
**contain a fuel surcharge.**
09:39 Q. Okay. So I circled back to [redacted] and -- and
[redacted] Let me -- let me just return to contracts that had
a fuel surcharge that wasn't the -- the standard fuel
surcharge. And -- and you've --
MR. FAVRETTO: And standard, you said you
09:40 mean the HDF?
MR. WERDER: I'm talking about -- unless I
say otherwise, from -- from here on out, I'm talking
about the period following June 2003 with the -- the
HDF-based $1.25 strike price and the table for the --
09:40 the percentage of the base rate that would be charged

Page 83

for particular levels above the strike price.
Q. (By Mr. Werder) Do you under -- do you
under -- can you -- can you keep that in your mind?
**A. But even though we started implementing**
**mileage-based during that period?**
MR. FAVRETTO: Before mileage-based became
also a standard fuel surcharge?
MR. WERDER: Unless I -- yes.
MR. FAVRETTO: Okay.
MR. WERDER: Correct.
**A. Okay.**
Q. (By Mr. Werder) What -- what --
**A. You may have to help me with that, but I'll --**
**I'll try.**
Q. Well, tell -- tell me when -- what -- what is
your best estimate of when you started implementing
mileage-based fuel surcharges other than with respect to
a one-off customer situation? In other words, when did
you start using mileage-based, to use Mr. Favretto's
term, as a standard?
**A. I really don't remember. I -- it was 2003 --**
**2004, 2005. But I would really rather get you an exact**
**date on that.**
Q. All right. Why -- why was it that [redacted] had no
fuel surcharge in the contract for certain of its

Page 84

shipments?
**A. I really don't know the reason why. I -- I --**
**I -- if I had to speculate -- and again, this is --**
MR. FAVRETTO: Don't -- don't speculate,
Mr. Rose.
**A. No, I won't speculate.**
Q. (By Mr. Werder) Yeah. Don't --
**A. I do not know the answer to that.**
Q. All right. Same question re [redacted] Do you
have -- do you know why it was that [redacted] had no fuel
surcharge in its contract for at least some period of
time?
**A. With [redacted] I do know. It was a legacy-old**
**contract that was no -- negotiated under a period where**
**nobody thought that fuel would rise from $25 a barrel to**
**$145 a barrel.**
Q. All right. And -- and at some point -- so --
and -- and -- and how -- what was the term of that
contract?
**A. I don't know.**
Q. Was it a long-term contract, though?
**A. It was a long-term contract.**
Q. All right. So -- so the -- the -- the [redacted]
situation is the result of the fact that you were
contractually precluded from having your standard fuel

Page 97

to the standard methodology for that fuel surcharge versus nonstandard, can you do that?
MR. FAVRETTO: Objection to the form.
Yeah.
**A. I really can't. Because in that period, we had -- we had mileage-based fuel surcharge coming in. And so I don't -- I -- I don't -- I mean, I -- I'm sure we could come up with that number, but I -- I don't know -- I don't really have any idea what that number would be.**
Q. (By Mr. Werder) And in -- I suppose a simpler way of asking the question would be: For that period of time, do you have an understanding about what percentage of your fuel surcharges -- fuel surcharge -- fuel surcharges that were based on percentage of base rates were the standard fuel surcharge versus nonstandard? Do you have any sense for that at all?
MR. FAVRETTO: Objection to the form.
Go ahead.
**A. I really don't. I -- I don't know what -- how those percentages changed. They changed quite a bit, I would guess, during that period of time.**
Q. (By Mr. Werder) Okay. Let me take you back to, if I could, the -- the beginning of 2003. And at that point in time, Mr. Schultz was the Chief Marketing

Page 98

Officer; is that correct?
**A. That's correct.**
Q. And -- and -- and is it fair to say, Mr. Rose, that in January of 2003 when you're looking at the overall situation confronting BNSF that profitability wasn't at the level that you wanted it to be at?
**A. I -- I wouldn't put it in terms of that. I -- I -- I can't remember back at that point in time.**
**I think that there's always a push for looking at your margins and contributions of the business. But I -- I don't remember that -- you know, where our profits were at that point in time. We had just come out of recession.**
**I -- I do remember that fuel was starting to move up, not anything like that it moved up later but that we were concerned about the fuel costs going from about 10 percent of our operating costs to, I think, about 13 to 14 percent in that 2003 time frame.**
Q. And was it part of your objective as the Chairman and CEO as of January of 2003 to increase the level of profitability of the BNSF?
**A. That would certainly be a -- an objective of any CEO, but mine specifically, yes.**
Q. That would be one of your major objectives, would it not?

Page 99

**A. Correct.**
Q. Probably the principal objective that you had as CEO, right?
**A. Well --**
MR. FAVRETTO: Objection to the form.
Go ahead.
**A. -- I would disagree with that. I -- I -- I --**
Q. (By Mr. Werder) Well, I know you're concerned about safety and having a -- having a -- having a very safe railroad and -- in terms of financial objectives?
**A. On financial objectives, improving the value of the company over the long term, that was my number one objective.**
Q. And -- and -- and one way to increase profitability is to increase price, correct?
**A. That is one of -- of several factors of improve -- improving profitability, you're correct.**
Q. And -- and -- and as you were looking at the situation confronting BNSF in January of 2003, were you viewing fuel surcharge -- surcharges as part of the price of transportation?
**A. We -- we report it. When it gets reported, it gets reported as a part of price.**
**But at BNSF, we've always believed that the revenue side of fuel surcharge was a cost recovery**

Page 100

**mechanism. So not to mince the words, but we -- we never believed that fuel surcharge would be a -- a profit. We believed that fuel surcharge would be a cost recovery.**
Q. Well, all of revenue is cost recovery until costs are recovered. Then it's profit. Correct?
**A. I understand your point, but that's not the way we looked at it.**
Q. So you looked at it as a -- as -- as -- well, withdrawn.
In terms of your -- your strategy or your -- your approach to fuel surcharges, what is the significance of the fact that you looked at it as a cost recovery mechanism as opposed to looking at it from some other perspective?
**A. Well, I think that, again, if you go back to -- there's several approaches, but -- but two major approaches to looking at fuel in terms of cost recovery or revenue -- or just focusing more on the revenue side.**
**You know, there's -- there's nothing illegal and nothing sinister about either way. We just chose that, given the amount of fuel that we consume and burn, that our customers would understand more if we made our fuel surcharge really reflective of our fuel cost increase.**

Page 101

**And that's why -- you know, we talked about the word "standard" a lot. And, of course, that word is always subject to people's interpretation.**
**Even on the percent of revenue under the what I would call the normal tables that you refer to standard, there were three different levels of -- of revenue fuel surcharges within those tables, different -- for different businesses.**
**So we -- we just went down the path with a principle that we said to our customers, that we said to the regulator, we said to politicians that over the long term we want our fuel costs -- our fuel revenue to mirror our fuel costs and not that -- we could have gone down another path to make it a -- more focused on a revenue enhancer. There's nothing wrong with that. There's nothing -- prior to the STB issuing new rules, there's nothing -- nothing wrong with that at all. We just chose to go down a path to make it a cost recovery. And that's been our philosophy in terms of -- of the evolution of implementing fuel -- fuel surcharges, RCAF less fuel, tables, eventually going to mileage-based fuel surcharge.**
Q. And when you referred to the three different levels of revenue within the tables for different businesses, are you referring to carload, intermodal,

Page 102

and coal?
**A. Yes.**
Q. And is it your testimony that the percentage fuel surcharges for fuel surcharges that were based on a percentage of base rates varied between carload, intermodal, and coal?
**A. That's my understanding.**
Q. Okay. Do you -- can -- can you tell me what the differences were?
**A. I do not know.**
Q. All right. Going back, again to the period at the beginning of 2003, you mentioned earlier in your testimony that there was a period of time that -- where I -- I think you said fuel -- you had some fuel surcharges in contracts but they were basically generating no revenue and the strike price wasn't being hit, etcetera. Do you recall that testimony?
**A. I think what I said was we've always had fuel surcharges in our rules tariff and that -- that the price of fuel had not exceeded the strike price, so there was no -- revenue was not being generated, nor was it needed to be because the cost was really quite -- quite in check during that period of time.**
Q. And -- and -- and taking you up to January of 2003, it's true, is it not, that the amount of fuel

Page 103

surcharge that had been collected in 2002 was a -- a relatively small amount in relationship to the entire economy of BNSF?
MR. FAVRETTO: Objection to the form.
**A. I don't know the numbers, so I can't speculate on that. But certainly, if I think about fuel costs and then the surrogate of fuel revenue, I -- I would assume that it was a -- a smaller piece when our fuel costs in 2000 were 780 million and our fuel costs in 2008 were 4.7 billion, that the fuel revenue of -- of the -- the cost recovery on fuel would have been smaller in those early years.**
Q. Did you have a view as of January of 2003 concerning whether the fuel surcharge revenue the BNSF was collecting was too high, too low, or just right?
**A. Again, I -- I -- I can't -- I don't know the specific time frames.**
**It was in that period of time where fuel was starting to run, and it got to the 12, 13, 14 percent of operating costs. And we were looking at this RCAF mechanism. And at that point in time, we knew that for BNSF, given the amount of fuel burn and the tons and the miles that we haul, that we weren't recovering enough to offset the increased cost of fuel.**
Q. And you wanted to see that recovery percentage

Page 104

increase, did you not?
MR. FAVRETTO: Objection to the form.
**A. We wanted to match our fuel cost by putting a -- with our fuel revenue collection.**
Q. (By Mr. Werder) And so you wanted to see more revenue generated by the fuel surcharge so that, to use your words, it would match the increase in the cost of fuel, correct?
MR. FAVRETTO: Objection to the form.
**A. We wanted to increase our collection of our fuel cost.**
Q. (By Mr. Werder) And that would mean that you would, in order to do that, generate more revenue from fuel surcharge, correct?
MR. FAVRETTO: Same objection.
**A. We don't look at it as revenue to the top line. We look at it as a cost recovery mechanism.**
Q. (By Mr. Werder) When you present your -- presented your financial statements and -- and -- and certified them pursuant to GAAP, did revenue generated from fuel surcharge show up on some line other than revenue?
**A. I don't know in the GAAP statements. But certainly in all of our analyst presentations, we broke out the fuel cost and the fuel surcharge amount of that**

Page 105

**of the total revenue very specifically.**
Q. And -- and my -- my question, I think, is not dependent on -- on -- on how you characterized, whether, you know, it was top line revenue or cost recovery.
As of January of 2003, one of your management objectives for your management team was to figure out how to have fuel surcharges applied to a greater percentage of customers and how to have a greater percentage of your fuel costs recouped through fuel surcharges, correct?
MR. FAVRETTO: Objection to the form.
You -- you may answer as best you can, Mr. Rose.
**A. Our objective was to recover the ever-increasing cost of fuel.**
Q. (By Mr. Werder) And -- and the way to do that was to have a fuel surcharge applied to more customers and have higher fuel surcharge -- higher cash generation from fuel surcharge, however you characterize that, flowing into your coffers, correct?
MR. FAVRETTO: Objection to the form. And that question has been asked and answered.
Try again, Mr. Rose.
**A. Again, it was not, quote, cash into coffers. It was to recover the ever-increasing cost of fuel.**

Page 106

Q. (By Mr. Werder) Okay. And -- and -- and because the cost of fuel was ever-increasing, the amount of fuel surcharge dollars needed to ever increase in order to match that increase, correct? That was your perception in January of 2003?
MR. FAVRETTO: Objection to the form.
**A. I think we can agree upon that the higher fuel costs went that we needed to recover more revenue through our fuel surcharge cost recovery to offset that ever-increasing cost of fuel.**
Q. (By Mr. Werder) Very good. And one of your directives to your management team was to figure how to do that, correct?
MR. FAVRETTO: Objection to the form.
**A. We -- through the Marketing Department, they worked on a number of issues on how to appropriately place more fuel surcharges on customers to reflect the ever-increasing cost of fuel.**
Q. (By Mr. Werder) And -- and in -- in the January 2003 time frame, I think we previously established that Mr. Schultz was the Chief Marketing Officer, correct?
**A. Correct.**
Q. And did you make some inquiry of Mr. Schultz to try to develop information concerning the reasons why --

Page 107

the -- the -- the barriers to obtaining more fuel surcharge revenue?
MR. FAVRETTO: Objection to the form.
**A. I don't remember specific inquiries. But in the normal course of business, I'm sure that there was discussions around why our fuel costs were increasing and how we were going to recover it in our fuel cost recovery mechanism.**
Q. (By Mr. Werder) And -- and -- and I want to focus on a specific aspect of that and -- and ask you whether you recall making some inquiry of Mr. Schultz that was directed to why can't we get more fuel surcharge?
**A. I don't remember any specific inquiry. But -- but I -- I will promise you that as fuel was running from $780 million to $4.7 billion, I was asking what our -- what prevents us from recovering more of our fuel surcharge --**
Q. And -- and --
**A. -- costs, rather.**
Q. -- do you -- do you recall having any discussion with Mr. Schultz concerning that issue?
**A. I don't remember any specific conversations. But in the normal course of business, he would have done updates at the Executive Team level where we update each**

Page 108

**other on processes, projects, business issues, financial updates, things like that.**
**(Exhibit 2 marked)**
Q. I'm going to hand you what I have marked as Rose Exhibit 2.
MR. FAVRETTO: Thank you.
Q. (By Mr. Werder) Ask you if you can identify that document as a January 15, 2003, memo from Mr. Schultz to you?
**A. Correct.**
Q. And the subject of the memo is "Fuel Surcharge Questions," is it not?
**A. Yes, it is.**
Q. Do you recall this memo as you sit here today?
**A. I do not.**
Q. Do you want to take a moment to review it?
**A. Great. Thank you.**
Q. I'm not going to ask any questions about the charts, just the -- just the memo itself.
**A. (Witness reading).**
MR. FAVRETTO: Rick, there's some highlighting or something on the document. If you're going to ask questions about that --
MR. WERDER: You mean like on page 1?
MR. FAVRETTO: Yeah.





DA03174

Page 109

MR. WERDER: I think that's how the document was produced.
MR. FAVRETTO: Is that right?
MR. WERDER: Yeah.
10:27 Is that correct, Joe?
MR. FAVRETTO: Because I -- I can't -- I can't make out the words but --
MR. HAMMOND: Yeah.
(Sotto voce discussion between Mr. Werder
10:27 and Mr. Hammond)
(Sotto voce discussion between Mr. Favretto and Mr. Nober)
MR. FAVRETTO: Go ahead.
MR. WERDER: Sorry. I may have a cleaner
10:27 copy of it.
Just for the record, I do have a -- I do have a cleaner copy of the document. That -- the -- the words under that -- the highlighting, which I think is how it was produced originally, but there's another
10:28 version of it that was produced, and it's RCAF fuel component.
MR. FAVRETTO: Right here (indicating).
THE WITNESS: RCAF fuel component?
MR. WERDER: Yes.
10:28 MR. FAVRETTO: Right, right.

Page 110

(Sotto voce discussion between Mr. Werder and Mr. Hammond)
**A. Yes.**
Q. (By Mr. Werder) "RCAF fuel component" are the
10:28 words under the highlighting there on the first page. Have you had an opportunity to review this document now?
**A. I have except for the last several pages which --**
Q. Correct.
10:28 **A. -- I can't read because a little too small print but --**
Q. You mean the chart pages?
**A. Right.**
Q. I'm not going to ask you about the chart pages.
10:28 **A. That's good.**
Q. So this is a memo from Mr. Schultz to you in January of 2003, correct?
**A. Correct.**
Q. And it -- it begins: Per your request, please
10:28 find the results of our analysis addressing the following questions. Do you see that?
**A. Yes.**
Q. And are these five questions that are addressed in Mr. Schultz's memo questions that you had put to
10:29 Mr. Schultz and his team?

Page 111

**A. I don't remember, but it -- it -- it appears to be so.**
Q. And -- and focusing your attention on Question Number 4, quote: Why can't we get more fuel surcharges or RCAF escalation in each of the forecast groups? Do you see that?
**A. Yes.**
Q. And Mr. Schultz set forth a -- a -- an explanation of the various reasons that -- responding to your question, did he not?
**A. Yes.**
Q. Did you have discussion with Mr. Schultz concerning this Question 4?
**A. I don't remember. But it -- typically, we would have had a discussion in Executive Team on -- he would have brought that up in terms of fuel recovery, things like that.**
Q. Is this a memo that would have been discussed with your Executive Team?
**A. Probably not the memo, but he would have done it in terms of just a general update.**
Q. Okay. And -- and -- and --
**A. And I'm not sure who else this memo went to.**
Q. Uh-huh. And would you expect that in -- in providing a general update on the question "why can't we

Page 112

get more fuel surcharges," the reasons that Mr. Schultz would have put forward would be the reasons that are stated in this memorandum?
MR. FAVRETTO: Objection to the form.
**A. I'm not sure I -- I'm not sure I understand the question.**
Q. (By Mr. Werder) Well, do you recall any presentation that Mr. Schultz made to your Executive Team concerning reasons why it's difficult to get more fuel surcharges?
**A. I don't recall any presentation. I'm sure that there was dialogue during this period of time when fuel was running like it was, but I -- I don't remember any presentations to the Executive Team.**
Q. And do you recall taking any issue with the reasons that Mr. Schultz set forward in Exhibit 2 -- Rose Exhibit 2 for why can't you get more fuel surcharges?
MR. FAVRETTO: I -- I'm going to object to the form.
And I just for the record, that's an incomplete description of the question that was -- that's included in this memorandum.
MR. WERDER: Well, in fairness --
MR. FAVRETTO: You may answer.

Page 113

MR. WERDER: -- in -- in fairness, the question was: Why can't we get more fuel surcharges or RCAF escalation in each of the forecast groups?
Q. (By Mr. Werder) Do you recall -- and -- and that's the question that Mr. Schultz answered, correct?
**A. Correct.**
Q. And do you recall taking issue with Mr. Schultz's answer to that question?
**A. I don't. I do not recall how I responded to it.**
Q. And -- and -- and you -- you had indicated earlier on that there came a point in time at which it was concluded internally at BNSF that the RCAF mechanism didn't provide for adequate recovery of fuel costs, correct?
**A. Correct.**
Q. And that -- that is -- that -- that's not an issue that Mr. Schultz is describing in this memorandum in January of 2003, is it?
**A. Not -- not that I see.**
Q. All right. But Mr. Schultz is setting forth reasons limiting your ability to pass on fuel cost recovery charges, is he not?
MR. FAVRETTO: Objection to the form of the question.

Page 114

**A. I think he's laying out how we're doing in some challenges with increasing our fuel surcharge recovery.**
Q. (By Mr. Werder) He sets forth what he calls the reasons limiting your ability to pass on fuel cost recovery charges, does he not?
**A. That's what he says in this memo.**
Q. And -- and -- and basically what he's doing is laying out various obstacles that he as the Chief Marketing Officer perceives to passing on fuel cost recovery charges, correct?
MR. FAVRETTO: Objection to the form of the question, lack of -- and lack of foundation.
**A. I think reading his answer, that's what he's answering, yes.**
Q. (By Mr. Werder) And -- and -- and so my question to you is: Do you recall taking issue with Mr. Schultz's explanation of what the obstacles were that stood in the way or limited your ability to pass on fuel cost recovery charges?
MR. FAVRETTO: Objection to the form. I think he's already answered that question but --
**A. I don't recall how I reacted to it or what came from that.**
Q. (By Mr. Werder) And Mr. Lanigan -- Mr. Lanigan

Page 115

is copied on this e-mail. Do you recall him taking issue with the reasons or the obstacles laid forth by Mr. Schultz?
**A. No, I do not.**
Q. And who's Nick Murray?
**A. He at the time would have been like Assistant Vice President of Marketing and Planning and would have been a combination of the now Sam Kyei and Paul B. Anderson job, but not an economist.**
Q. And do you recall Mr. Murray taking issue with the -- with the enumeration of the obstacles set forth by Mr. Schultz that limited your ability to pass on fuel cost recovery charges?
MR. FAVRETTO: Objection to the form. You may answer.
**A. I don't remember, but it would have been unusual for him in that position to weigh in on that issue. He wasn't -- he wasn't in a commercial or pricing job.**
Q. (By Mr. Werder) And do you recall any of your Executive Team taking issue with Mr. Schultz's list of the obstacles limiting your ability to pass on fuel cost recovery charges?
MR. FAVRETTO: Objection to the form and lack of foundation.

Page 116

**A. I don't remember any specific conversation by the Executive Team on this memo and -- but over the years, we've had many discussions, formally and informally, how best to recover the ever-increasing cost of fuel.**
Q. (By Mr. Werder) Were there any obstacles that you perceived limiting your ability to pass on fuel recovery charges that were not set forth in Mr. Schultz's memorandum?
MR. FAVRETTO: Objection to the form.
**A. Yeah. I -- I -- I thought the -- the biggest issue was that at that point in time fuel had become a -- a headache, not -- not a critical issue. It was -- it was going up, but it -- it -- it wasn't the crisis that it had -- it turned out and -- and -- and became involved with.**
**And so the -- while we were seeing our costs go up and even though it was hundreds of millions of dollars, when you looked at bigger -- bigger trends, the marketplace didn't feel like they needed to accept a cost recovery vehicle. And then you fast-forward to where fuel goes from $25 to $145, I -- I think it became quite accepted in our economy over every -- every piece because our shippers were seeing truckload prices go up significantly. They were -- everybody was experiencing**

Page 125

Q. Going back to Rose Exhibit 2, shortly after writing this document, did Mr. Schultz retire?
**A. I'm not sure when he retired. But I see that John Lanigan and -- and -- is on this as well. So there was a transition period where Chuck -- where John Lanigan came in and Chuck Schultz was still there. So it -- it -- I assume it would have been within this 12-month period.**
Q. When -- and -- and when -- is it fair to say that Mr. Lanigan took over the role of Chief Marketing Officer in the first quarter of 2003?
**A. I don't -- I don't remember.**
Q. When Mr. Lanigan became Chief Marketing Officer, were you involved in hiring him?
**A. Yes, I was.**
Q. Did you --
**A. I was the --**
Q. -- did -- did you interview him?
**A. Yes. I was the Chief Executive Officer.**
Q. So -- so -- and Chief Marketing Officer is a sufficiently important job, I assume, that the Chief Executive Officer would want to make sure he's completely comfortable with the Chief Marketing Officer?
**A. Absolutely.**
Q. All right. Is it the second most important job

Page 126

in the company?
**A. No. I mean, it's -- it's one of the big four jobs, if you will (inaudible).**
Q. What are the other -- other two?
**A. Chief Operations Officer --**
Q. Okay.
**A. -- Chief Marketing Officer, Chief Financial Officer --**
Q. Okay.
**A. -- and even Chief Legal Officer.**
Q. Don't want to -- don't want to underestimate his importance.
**A. No.**
Q. Especially when he's sitting here in the room?
**A. Never.**
MR. NOBER: Especially when (indiscernible).
Q. (By Mr. Werder) Okay. So -- but in any event, Chief Marketing Officer is an important position within the company?
**A. Very important position.**
Q. And -- and -- and so did you -- is it fair to say you personally selected --
**A. Yes.**
Q. -- Mr. Lanigan?

Page 127

**A. Along -- I -- I -- I ran -- I would have had -- had advice from the Comp Committee. But at the end of the day, I hired John Lanigan.**
Q. And when you hired Mr. Lanigan, did you -- did you have various meetings with him to tell him what you thought the job entailed and what you hoped he would accomplish?
**A. I -- I would say that we had interviews. I don't -- I wouldn't characterize them as meetings on what I hoped he would accomplish.**
**We -- we had a search firm that actually brought John to our company. And then we had -- I had, I would guess, two face-to-face meetings with him, as well as he came in to meet our other three or actually our other -- our top-level team to understand how -- the team dynamics of the Chief Operating Officer and the Chief Legal Officer and the Chief Financial Officer.**
**Then he met with -- I believe he met with our -- our chairman of our Compensation Committee.**
Q. And at some point in time, he was offered the job and he accepted the job?
**A. Yes.**
Q. And he had a first day or a first week?
**A. Yes.**
Q. And in -- in connection with Mr. Lanigan coming

Page 128

into the company and transitioning into the role of Chief Marketing Officer, did you meet with him and discuss the position with him and what you hoped he would accomplish?
**A. I would tell -- I -- I -- what I typically do is let them transition to get to know the company after, you know, six to eight weeks when they figure out where the -- you know, where the company cafeteria is and who is doing what to whom. Then we get together and we talk about longer-term strategy. But I -- the first week, I don't ever -- I don't ever try and do that.**
Q. Well, without regard to when in -- in his early time with the company you may have done this, did you have a discussion or discussions with Mr. Lanigan concerning your desire to see greater fuel cost recovery?
**A. I don't recall any of those -- any of those conversations, but it would certainly be a part of what the -- what the objectives that we were trying to be to -- to achieve.**
**But I would put that on the lower ring because he -- he certainly wasn't hired -- if your -- if you question is was he hired because of -- of his ability to implement a fuel surcharge program, that -- that's not the case at all.**

Page 129

Q. No, I wasn't implying that -- anything that -- that dramatic.
**A. Yeah. But, I mean, at -- at this point in time --**
Q. The -- but --
**A. -- we're probably running 10, $12 billion in revenue. And fuel, as I said, is -- you know, it's -- it's -- it's a couple-hundred-million-dollar issue.**
**But, you know, John was hired because of his vast truckload knowledge and his understanding of logistics.**
Q. Did -- after Mr. Lanigan was hired, did you come to learn that he had initiated a review of BNSF's fuel surcharge policy?
**A. I don't remember, but I -- I would certainly hope he would have.**
Q. Did you talk to him about that review and the objectives of the review?
**A. I don't remember any specific conversation, but I'm sure we did.**
Q. And you just don't recall any of the substance of it?
**A. No.**
Q. Did you understand, though, that in the first quarter of 2003 and into early in the second quarter of

Page 130

2003 that this review of fuel surcharge policy was ongoing at Mr. Lanigan's direction?
**A. I don't remember those time frames. I do know that there were various groups put together to review fuel surcharge and to come up with different options and when the transition happened between John Lanigan and Chuck Schultz, which I don't remember when that exactly happened, that John would have been the facilitator of -- of that -- of that effort.**
Q. And did you learn as part of that process that Mr. Lanigan was initially focused on the possibility of implementing a mileage-based fuel surcharge?
MR. FAVRETTO: Objection to the form.
**A. I don't remember that. I -- I -- I -- I -- I -- I will tell you we've had numerous conversations over the years about mileage-based fuel surcharge, and John's bias has always been that mileage-based fuel surcharges were more -- accurately reflected the cost of fuel and the use of fuel.**
Q. (By Mr. Werder) I don't think I'll even mark this one. I'm handing you what's been previously marked as Kyei Exhibit 8.
MR. FAVRETTO: It's not being remarked then?
MR. WERDER: Not going to remark it.

Page 131

MR. FAVRETTO: Yeah.
Q. (By Mr. Werder) You're not a recipient of -- of this document, but just take a moment to review it, if you would.
**A. (Witness reading).**
Q. Don't worry about the attachments. I'm just going to ask you about the cover.
**A. Okay.**
Q. Yeah. So the -- does this refresh your recollection that Mr. Lanigan had initiated a review and proposed some changes to the fuel surcharge program in the March 2003 time frame?
**A. I wasn't copied on this. But, again, I -- I believe that John led a team to look at fuel surcharge in aggregate, so this -- this doesn't surprise me at all.**
Q. And -- and if you look at the second paragraph of the document, there's a reference to -- in the second sentence to surcharge being applied on a mileage basis based on miles per gallon consumed. Do you see that?
MR. FAVRETTO: Objection to the form.
**A. I -- I see those words, yes.**
Q. (By Mr. Werder) And -- and does this refresh your recollection concerning whether Mr. Lanigan had under consideration in March of 2003 the possibility of

Page 132

implementing a mileage-based fuel surcharge?
**A. I don't remember the specifics of any date like that. But as I said earlier, John always had bias towards mileage-based fuel surcharges, which would more -- for a fuel recovery mechanism, which would more accurately match the ever-increasing cost of fuel and fuel surcharge offset.**
Q. And did you share that bias?
**A. I did.**
Q. Was it your view in March of 2003 that for BNSF a mileage-based fuel surcharge would be a better fuel cost recovery mechanism than a fuel surcharge based on a percentage of base rates?
MR. FAVRETTO: Objection to the form.
**A. I don't remember that period of time. But I -- I felt that as fuel surcharges, cost recovery offsets, that the percent of revenue would eventually not accurately reflect -- it would be hard to reflect the actual cost of fuel -- fuel over a number of years with percent of revenue. So we looked at a number of different ways to do it, including mileage-based fuel surcharge --**
Q. And --
**A. -- but it was not the only one.**
Q. -- so it -- it -- it -- it was your view

Page 133

that -- that a fuel surcharge based on a percentage of revenue over -- looked at over what you would consider to be a meaningful period of time would not accurately reflect the -- the -- the need for fuel cost recovery?

MR. FAVRETTO: Objection to the form.

**A. No. The current construct of the percent of revenue fuel surcharge wouldn't. But you could change and put forth a different type of fuel surcharge revenue on a revenue-percentage basis. And -- and through the mechanism of moving up and down on that percent of revenue, you could accurately reflect your fuel costs if that's what you were trying to do.**

**But, again, what -- our philosophy early on was to utilize fuel surcharge as a cost recovery. And we felt that the cleanest way to go to the markets -- market and explain it long-term would be mileage-based because it lines up so well with the actual cost of fuel verse revenue always has the challenge of a chlorine shipper who has a $10,000 carload bill verse an aggregate shipper that has a $1,000 carload bill.**

**And so our -- our -- given the fact that our philosophy was to match our fuel revenue with our fuel costs, we didn't -- we didn't think that a percent of revenue would get us where we needed to go.**

Page 134

MR. WERDER: Excuse me for one moment.

(Sotto voce discussion between Mr. Werder and Mr. Donovan).

MR. WERDER: I apologize.

THE WITNESS: Take all the time you want.

MR. WERDER: I usually talk a lot faster.

Q. (By Mr. Werder) We talked about this a little bit earlier in the morning, but as the CEO of BNSF, were you regularly involved in discussions with executives from other railroads?

MR. FAVRETTO: Objection to the form.

Answer as best you can, Mr. Rose.

**A. I -- I -- depends on the word "regular." I mean, we had AAR meetings probably quarterly. Depends if we were in a labor round or not. We would have labor meetings. When we -- when we're not in a labor round, we didn't meet. We would see people at -- at customer events.**

**So, certainly, my life is not around meeting with other railroad executives, but given the period of time that we're talking about and the desire for customers and other railroads to develop these alliances, which is quite a bit different than the decades prior, it -- it did involve having more structured meetings to -- to have with other -- other**

Page 135

**railroads to talk about how you weed through these alliance arrangements, grow our business, and provide more services for customers.**

Q. Do you recall ever participating, prior to March of 2003, in a discussion with executives from other railroads concerning fuel surcharge-related issues?

**A. I don't remember ever discussing fuel surcharge with any railroad except on interline agreements.**

Q. The -- I -- I -- I understand the interline issue, and I'm going to get to that in a moment.

But I -- what I'm really trying to ask you is -- we have some records of a meeting in -- that I'm going to show you in a moment that relate to a March 2003 meeting.

What I'm really trying to understand is: Do you have a recollection of, prior to that, prior to March of 2003, ever participating in any discussion with any executive from another railroad concerning fuel surcharge-related issues?

MR. FAVRETTO: Objection to the form.

You say the question is whether there were alliance meetings prior to or --

MR. WERDER: No.

MR. FAVRETTO: No? Okay.

Page 136

MR. WERDER: No.

Well, why don't you just -- Joe, why don't you give me the 10/15.

Q. (By Mr. Werder) I'm going to -- I'm going to ask you some questions about a meeting between Norfolk Southern and BNSF that occurred on March 19th of 2003, and I'm going to show you a document in a minute that relates to that meeting.

**A. Okay.**

Q. And one of the agenda items on that meeting is fuel surcharge-related. My question is: As you sit here today, do you have any recollection, prior to March of 2003, of sitting in any meeting where fuel surcharge-related issues were discussed between BNSF and some other railroad or being on a phone call or some other form of communication on that issue?

MR. FAVRETTO: Objection to the form.

I believe he's already answered.

But go ahead, Mr. Rose.

**A. I don't remember having any conversation with any other railroad concerning anything but joint line marketing agreements on fuel surcharge.**

Q. (By Mr. Werder) Okay. Without regard to whether it's a discussion that relates to joint line marketing agreements or anything else, prior to

Page 137

March 19th of 2003, do you recall having any discussion with anybody from any other railroad concerning fuel surcharges in the context of joint line marketing agreements?
**A. I just don't know how else I can answer your question --**
Q. Well --
**A. -- with respect.**
Q. -- I -- I'm -- I -- I don't think it's a complicated question. I -- we can --
**A. I don't think my answer is complicated either.**
Q. Well, your answer doesn't speak to the time.
**A. I don't remember the time.**
Q. All right. Let me -- I'm going to mark as Rose Exhibit 3 --
MR. FAVRETTO: Uh-huh.
Q. -- a document that is entitled "BNSF - Norfolk Southern Senior Team Meeting Agenda, March 18th of 2003." Have you seen that document before?
(Exhibit 3 marked)
**A. I believe I saw this document in -- in preparation for this deposition.**
Q. (By Mr. Werder) All right. And -- and if you look at the first action item, it refers to -- and -- and I'm going to ask you some questions about this in

Page 138

a -- in a moment. But it refers to fuel surcharge, does it not?
**A. Yes.**
Q. So -- and -- and -- and -- and I said March 19th. I guess it's actually March 18th.
**A. Uh-huh.**
Q. But my question is: Prior to March 18th of 2003, do you have any recollection of having any discussion of fuel surcharge-related issues with executives of any other railroads?
MR. FAVRETTO: Objection to the form, asked and answered.
Try again, Mr. Rose.
**A. I -- I don't remember the specific time frame, but I've never had conversations with another railroad that didn't have to do with -- with joint interline traffic on fuel surcharge.**
Q. (By Mr. Werder) All right. Do you recall this meeting with Norfolk Southern?
**A. I do not.**
Q. Do you -- without recalling this specific meeting, do you recall from time to time traveling to Norfolk to meet with executives of Norfolk Southern?
**A. Yes, I do.**
Q. And this document purports to be the BNSF

Page 139

Norfolk Southern Senior Team Meeting Agenda for a meeting between the two railroads in March of 2003, correct?
**A. Correct.**
Q. You have any reason to think that meeting didn't occur?
**A. Oh, no.**
Q. It did occur, did it not?
**A. I'm -- with -- as far as I know, it did.**
Q. Okay.
**A. Sure.**
Q. And the BNSF team that's included includes yourself, does it?
**A. Yes, it does.**
Q. Do you have any reason to think you didn't attend that meeting?
**A. No.**
Q. All right. And Mr. Lanigan and Mr. Hund are among the other BNSF attendees --
**A. Correct.**
Q. -- at this meeting, correct?
**A. Correct.**
Q. And -- and -- and so that's -- that's three of the top four that you mentioned a moment ago --
**A. And --**

Page 140

Q. -- in attendance at this meeting, correct?
**A. -- and, actually, Carl Ice is there too.**
Q. Was Carl Ice the -- the COO?
**A. Yes.**
Q. So four of the top four executives of BNSF attended a meeting in Norfolk in March 2003 with counterpart executives from Norfolk Southern; is that correct?
**A. Correct.**
Q. And can you identify the -- the -- the Norfolk Southern team members who are -- who are identified as participants there?
**A. David Goode is their Chairman/CEO.**
Q. Uh-huh.
**A. Steve Tobias was essentially their COO. Ike Prillaman was their Chief Marketing Officer. Hank Wolf was their Chief Financial Officer. Jim McClellan was their Vice President of Strategy. Mike McClellan was their Vice President of Intermodal. Mark Manion, I believe, was either Vice President of Mechanical or Vice President of Transportation. Don Seale, I'm not sure what his title was, but he would have been running the carload business unit. Kathryn McQuade was in the Finance Department. And Wick Moorman, I don't know if he was President yet or not. But David Goode is there,**

Page 141

and Wick Mormon -- Wick Moorman ended up succeeding David Goode.
Q. All right. And -- and do you recall anything about this meeting?
11:09 A. I really don't.
Q. Okay. So other than reading what's on this page --
A. Right.
Q. -- are you able to tell me anything about what
11:09 happened at the meeting?
A. No.
Q. The first action item says, quote: BNSF's fuel surcharge is structured differently than NS, CSX, and UP. Should BNSF's -- I guess it says "by," but it
11:10 should probably be "be" -- synchronized with the other big players in the industry, question mark, parenthetical, John Lanigan/Don Seale, closed paren.
Do you have any recollection at all about what discussion occurred on the issue of fuel surcharge
11:10 at this meeting?
A. I -- I don't -- I have a vague recollection, not necessarily whether it was this meeting or not. But there were periods of times with our interline partners where we were both expressing concern with each other
11:10 that our fuel surcharges weren't the same, and that was

Page 142

causing consternation and problems in the marketplace where customers were having to deal with -- with two different fuel surcharges. And I assume that that's what the context of this was, but I -- I do not remember
11:10 any specifics from this.
Q. All right. Do you -- how -- do you recall approximately how long this meeting lasted?
A. I don't. But I -- it would have -- probably three to four hours.
11:10 Q. And do you have any recollection concerning how long the discussion of fuel surcharges at the meeting consumed?
A. I do not.
MR. FAVRETTO: Object --
11:10 A. But if --
Q. (By Mr. Werder) All right.
A. -- if you look at it, it's a full agenda of, you know, several topics. This is all in -- again, in -- in respect to the alliance agreements, alliance
11:10 processes that we were trying to put forth.
Q. Well, the action item occurs under the heading "General Business Review Discussion," does it not?
A. I -- I don't know. I -- I don't -- I -- I really -- I didn't put together this agenda, and I'm not
11:10 sure how it was structured.

Page 143

Q. All right.
A. But, I mean, it is --
Q. Do you know -- do you know who did put -- put together this -- these -- the action items?
A. I do not know.
Q. Okay. And are you aware of any other document that summarizes the discussion of fuel surcharge-related issues that occurred at this meeting?
A. I am not familiar with any other documents.
Q. The -- the item that we're discussing is an action item that has Mr. Seale's name attached to it and Mr. Lanigan's name attached to it. Do -- do you -- do you recall some action item being given to those two gentlemen coming out of this meeting?
A. Other than what's on the paper, I don't remember any other action item.
Q. All right. And -- and are you aware of any followup that was done by Mr. Lanigan or Mr. Seale with respect to the action item?
A. I'm not -- I'm not -- I don't remember any followup. But, again, I was -- I would assume that they were trying to figure out how to get a consistent interline agreement. But I don't -- I'm not aware of it.
Q. Well, it doesn't say anything about interline

Page 144

agreement in this action item, does it, Mr. Rose?
MR. FAVRETTO: Objection to the form.
A. It doesn't. But the context of these meetings, again, are under alliance meetings. And you have to kind of go back in time to understand why these -- why these meetings even started taking place.
Q. (By Mr. Werder) I -- I -- I -- I really don't want to go back in the time to the context of the meeting.
MR. FAVRETTO: Yeah.
Q. I just want to discuss --
MR. FAVRETTO: Well, if you're asking him a question about the meeting, he's certainly entitled to complete his answer and give you the context. But you're -- you may conduct your --
MR. WERDER: Thank you.
MR. FAVRETTO: -- your examination.
Q. (By Mr. Werder) I'll -- I'll -- I'll -- I'll -- I'll -- let me put a slightly different question to you.
There isn't any reference in this action item to BNSF's interline fuel surcharge being structured differently than interline fuel surcharges of any other railroad, is there?
MR. FAVRETTO: Objection to the form.

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| All | Header | "Michael" to "Matthew" | Correct transcription |
| 1 | 11 | "Michael" to "Matthew" | Correct transcription |
| 8 | 24 | add "of" between "behalf" and "BNSF" | Correct transcription |
| 9 | 18 | "Michael" to "Matthew" | Correct transcription |
| 10 | 19 | "Brookshire" to "Berkshire" | Correct transcription |
| 11 | 5 | "Brookshire" to "Berkshire" | Correct transcription |
| 15 | 1 | "our" to "my" | Correct transcription |
| 16 | 25 | add "a" between "he" and "person" | Correct transcription |
| 18 | 18 | "development" to "develop" | Correct transcription |
| 19 | 8 | delete "Assistant" | Correct Record |
| 23 | 11 | add "of" between "rate" and "recovery" | Correct transcription |
| 25 | 21 | add "the" before "revenue" | Correct Record |
| 27 | 15 | "wholistically" to "holistically" | Correct transcription |
| 28 | 17 | "a" to "an" | Correct transcription |
| 29 | 21 | "pent" to "spent | Correct transcription |
| 30 | 12 | "verse" to "versus" | Correct transcription |
| 30 | 16 | "verse" to "versus" | Correct transcription |
| 32 | 11 | "indexes" to "indexes'" | Correct transcription |
| 42 | 13 | "verse" to "versus" | Correct transcription |
| 44 | 11 | "Web" to "web" | Correct transcription |
| 46 | 22 | "surch" to "surcharge" | Correct transcription |
| 52 | 13 | "a" to "an" | Correct transcription |
| 57 | 19 | "a" to "an" | Correct transcription |

| | | | |
|---|---|---|---|
| 64 | 21 | “verse” to “versus” | Correct transcription |
| 65 | 3 | “Highway Diesel Fuel” to “highway diesel fuel” | Correct transcription |
| 65 | 17 | “the” to “to” | Correct transcription |
| 67 | 10 | “increased” to “increase” | Correct transcription |
| 72 | 12 | “a” to “an” | Correct transcription |
| 90 | 19 | delete “a” | Correct transcription |
| 94 | 19 | delete “her” add “our” before customer | Correct transcription |
| 95 | 17 | “of” to “off” | Correct transcription |
| 101 | 4 | delete “the” after “under” | Correct transcription |
| 101 | 5 | add “as” after “to” | Correct transcription |
| 102 | 3 | add “of” after “percentage” | Correct transcription |
| 104 | 25 | delete “of that” | Correct transcription |
| 107 | 5 | “was” to “were” | Correct transcription |
| 112 | 21 | delete “I” | Correct transcription |
| 120 | 20 | “brings” to “bring” | Correct transcription |
| 121 | 1 | add comma after “team” | Correct transcription |
| 121 | 1 | delete comma after “the” | Correct transcription |
| 128 | 23 | “you” to “your” | Correct transcription |
| 133 | 18 | “verse” to “versus” | Correct transcription |
| 133 | 20 | “verse” to “versus” | Correct transcription |
| 141 | 1 | “Mormon” to “Moorman” | Correct transcription |
| 145 | 22 | “verse” to “versus” | Correct transcription |
| 148 | 20 | add “with” between “familiar” and “that” | Correct transcription |
| 155 | 3 | “e-mil” to “e-mail” | Correct transcription |
| 156 | 17 | “respond” to “response” | Correct transcription |

| | | | | |
|---|---|---|---|---|
| 1. | 166 | 13 | add "that" after "think" | Correct Record |
| 2. | 171 | 15 | "BNS" to "BNSF" | Correct transcription |
| 3. | 187 | 8 | delete "-- of" after "increasing" add "cost of" | Correct Record |
| 4. | 188 | 23 | "alls" to "all" | Correct Record |
| 5. | 206 | 8 | "a" to "an" | Correct transcription |
| 6. | 210 | 19 | "alls" to "all" | Correct Record |
| 7. | 222 | 11 | "a" to "an" | Correct transcription |
| 8. | 225 | 17 | add "do" between "don't" and "this" | Correct transcription |
| 9. | 227 | 7 | "o ur cap" to "RCAF" | Correct transcription |
| 10. | 227 | 9-10 | "our cap" to "RCAF" | Correct transcription |
| 11. | 227 | 14 | "our cap" to "RCAF" | Correct transcription |
| 12. | 227 | 15 | "our cap" to "RCAF" | Correct transcription |
| 13. | 228 | 2 | add "a" after "than" | Correct transcription |
| 14. | 230 | 15 | delete "as" | Correct transcription |
| 15. | 230 | 16 | "long" to "along" | Correct transcription |
| 16. | 233 | 6 | "we" to "he"; delete "a" after "for" | Correct transcription |
| 17. | 236 | 21 | "Plaintiff's" to "Plaintiffs'" | Correct transcription |
| 18. | 240 | 12 | delete "in that" | Correct transcription |
| 19. | 243 | 18 | "Hedging" to "hedging" | Correct transcription |
| 20. | 253 | 6 | "FCS" to "FSC" | Correct transcription |
| 21. | 255 | 4 | "verse" to "versus" | Correct transcription |
| 22. | 256 | 21 | "percentage" to "percentages" | Correct transcription |
| 23. | 256 | 25 | "verse" to "versus" | Correct transcription |
| 24. | 260 | 5 | "mileage based" to "mileage-based" | Correct transcription |
| 25. | 262 | 21 | delete "it" | Correct transcription |

| | | | | |
|---|---|---|---|---|
| 1. | 268 | 1 | "sumise [sic]" to "surmise" | Correct transcription |
| 2. | 268 | 8 | "sumise" to "surmise" | Correct transcription |
| 3. | 273 | 12 | add "request" between "simple" and "for" | Correct transcription |
| 4. | 274 | 11 | Matt said. to "Matt said." | Correct transcription |
| 5. | 277 | 23 | "verse" to "versus" | Correct transcription |
| 6. | 277 | 24 | "a" to "an" | Correct transcription |
| 7. | 279 | 7 | "natural" to "nature" | Correct transcription |
| 8. | 280 | 11 | "Tip" to "That" | Correct transcription |

(Signature of the witness)

THE STATE OF TEXAS

COUNTY OF TARRANT

Subscribed and sworn to before me by the said witness, MATTHEW K. ROSE, on this the 7th day of September, 2010.

Barbara R. Turner

Notary Public in and for the

State of TEXAS

County of TARRANT

BARBARA R. TURNER
MY COMMISSION EXPIRES
February 1, 2012

My commission expires:
2.01.12