# Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment

## Volume 10 of 29

## DA03187 - DA03559

# Intentionally Omitted

# DA03187 - DA03345

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE: RAIL FREIGHT FUEL | ) | |
| SURCHARGE | ) | |
| ANTITRUST LITIGATION | ) | MDL No. 1869 |
| | ) | Misc. No. 07-489 (PLF) |
| ________________________________ | ) | Hon. Paul L. Friedman |
| | ) | |
| This document relates to: | ) | |
| ALL DIRECT PURCHASER CASES | ) | |
| ______________________________________ | ) | |

**Expert Report of**
**Janusz A. Ordover, Ph.D.**

**On Behalf of Defendant BNSF Railway Company**

**January 22, 2013**

**TABLE OF CONTENTS**

**Executive Summary** ........ i
**I. Introduction** ........ 1
**A. Qualifications** ........ 1
**B. Background on the litigation** ........ 1
**C. Assignment** ........ 4
**D. Summary of Conclusions** ........ 5
**II. Background** ........ 9
**A. Overview** ........ 9
**B. Background on BNSF** ........ 9
**C. Mechanics of BNSF's Fuel Surcharge Formulas** ........ 20
**III. The alleged conspiracy to impose standardized fuel surcharges would not have facilitated anticompetitive increases in the price of rail service.** ........ 23
**A. Overview** ........ 23
**B. Economics of Cartels** ........ 24
**C. Professor Rausser's assertion that rail pricing – including BNSF's – is transparent and his resulting implication that the railroads would have the ability and incentive to directly conspire to raise prices is unsupported by the data.** ........ 26
**D. Even had the alleged conspiracy occurred, the alleged conspiracy mechanism would have been unlikely to result in increased all-in rates and supracompetitive profits because fuel surcharges are a single component of all-in rates, which are not easily observed by the alleged co-conspirators.** ........ 30
**E. The use of fuel surcharges tied to a commodity price over which railroads have no control as a conspiracy mechanism to increase the all-in prices of rail service is inconsistent with economic theory.** ........ 37
**F. BNSF had unilateral and non-conspiratorial incentives to introduce fuel surcharge formulas.** ........ 44
**IV. The history of BNSF's introduction and implementation of fuel surcharges is consistent with BNSF acting in its unilateral economic interest, and does not indicate that it participated in the alleged price fixing conspiracy.** ........ 52
**A. Overview** ........ 52
**B. BNSF's published carload fuel surcharges existed long before the start of the class period.** ........ 54
**C. BNSF's published carload fuel surcharge formulas that became effective in July 2001 and June 2003 resulted in identical fuel surcharge percentages during the class period as they would have during the pre-class period.** ........ 58
**D. BNSF's realized carload fuel surcharge percentages differed from those of UP.** ........ 60

E. BNSF's intermodal fuel surcharge formula was unchanged before and during the alleged conspiracy and differed from that of its primary rail competitor, UP. ... 62

F. During the class period, BNSF introduced separate fuel surcharges for coal shipments and these fuel surcharges differed from those of its primary rail competitor, UP. ... 66

G. Prior to the STB decision on fuel surcharges for regulated traffic, BNSF introduced mileage based fuel surcharges. ... 69

H. Some large shippers paid idiosyncratic fuel surcharges. ... 73

I. Contrary to Professor Rausser's claims, BNSF's fuel hedging programs are not evidence of collusive behavior. ... 75

V. Professor Rausser fails to provide any economic evidence that the increased use of fuel surcharges by BNSF was the result of a conspiracy. ... 79

A. Overview ... 79

B. BNSF used fuel surcharges prior to the start of the alleged conspiracy, and the growth in fuel surcharge coverage increased rapidly prior to the start of the conspiracy. ... 79

C. Professor Rausser's damages model implies that BNSF would have had very low levels of fuel surcharge coverage but for the alleged conspiracy. ... 83

VI. BNSF's competitive behavior and the empirical evidence are inconsistent with its participation in the alleged price fixing conspiracy. ... 84

A. Overview ... 84

B. The similarity in trends of all-in rates for "legacy" shippers and class members is inconsistent with the claim that BNSF raised all-in rates to class members. ... 85

C. Patterns of customer switching between BNSF and UP are inconsistent with BNSF's participation in the alleged price fixing conspiracy. ... 88

D. BNSF's increasing share of rail revenue at the expense of UP during the conspiracy is inconsistent with its participation in the alleged price fixing conspiracy, and is consistent with unilateral conduct. ... 89

E. Contrary to Professor Rausser's claims, the data he presents do not indicate that BNSF's profitability increased between the pre-class period and the class period. ... 91

VII. The information relied on by Professor Rausser does not indicate that BNSF reached a collusive agreement with other railroads to impose standardize fuel surcharges. ... 95

A. Overview ... 95

B. BNSF had no incentive to collude with the eastern railroads. ... 96

C. Documents cited by Professor Rausser as evidence of BNSF's participation in the alleged conspiracy appear to be consistent with competitive interactions among the railroads. ... 97

D. BNSF did not coordinate with other railroads in the development of the AIILF index. ... 101

**VIII. Professor Rausser's regression framework does not provide reliable estimates of damages.** ...... 103

**A. Overview** ...... 103

**B. Professor Rausser's damage framework presumes that all of the increase in fuel surcharge coverage during the class period is a result of the alleged conspiracy.** ...... 104

**C. Professor Rausser's damage framework finds damages only through his estimate of an implausibly large change in the sensitivity of all-in rates to fuel costs.** ...... 105

**D. Professor Rausser's damages regression implies that BNSF's rates would not have increased sufficiently to recover its incremental fuel costs.** ...... 110

**E. Professor Rausser' damages model finds damages on shipments that are likely unaffected by the alleged conspiracy.** ...... 112

## Executive Summary

Plaintiffs in this litigation allege that beginning in mid-2003, BNSF and the other defendant railroads collectively conspired to impose standardized fuel surcharges in order to raise the total prices shippers paid for rail transportation services.[1] Plaintiffs' expert, Professor Gordon Rausser, claims to provide economic evidence that supports plaintiffs' allegations. I have analyzed the claims of the plaintiffs and Professor Rausser. As described in more detail in my report, I have concluded that, contrary to plaintiffs' allegations, BNSF's fuel surcharges and their use during the class period were consistent with BNSF's unilateral economic interests, and were inconsistent with its participation in the alleged price fixing conspiracy. My conclusions are in part supported by my determination that the alleged conspiracy likely would not have been effective at raising all-in rates to shippers.

My principal findings are as follows:[2]

- Professor Rausser's analysis is deficient because it ignores BNSF's unilateral incentives to use and expand the use of fuel surcharges to recover incremental fuel costs during the class period, which was characterized by high fuel price volatility and sharply increasing fuel prices;
- Professor Rausser incorrectly characterizes the nature of the markets in which BNSF and the other defendant railroads compete and wrongly asserts that the defendant railroads could readily monitor each other's pricing behavior, effectively detect compliance, and therefore enforce the alleged conspiracy. To the contrary, the fact that the defendants lacked the ability to monitor each other's pricing and deployment of fuel surcharges in

---

1. A fuller description of plaintiffs' allegations is contained in Section I.B of my report. Unless otherwise specified, citations in the Executive Summary refer to the main body of my report.
2. A complete discussion of my opinions is found in Section I.D of my report, with the remainder of my report providing support for these conclusions.

confidential contracts indicates that the alleged conspiracy would not have been effective in raising BNSF's all-in rates to supracompetitive levels during the class period. As such, it was unlikely to have been implemented in the first place. Professor Rausser himself acknowledges that monitoring a conspiracy on rail base rates, the largest component of BNSF's and other railroads' all-in rates, would be virtually impossible. This is consistent with my view that the alleged conspiracy would be difficult to implement and enforce;

- The success of the conspiracy alleged by plaintiffs, as would have been reflected in materially higher all-in rates that exceeded non-conspiratorial increases in rail rates for BNSF, required significant increases in fuel prices. The relevant fuel prices were not predicted to increase significantly at the time that the alleged conspiracy was formulated. Moreover, the alleged co-conspirators could not influence fuel prices (which are set in global markets). As such, the proposed conspiracy was unlikely to be an effective mechanism to raise all-in prices to shippers and was unlikely to have occurred. Further, the alleged conspiratorial mechanism would have required that BNSF reduce the fuel surcharge in the event that the fuel price index fell from above the strike level. In sum, the posited mechanism for collusion on rail rates was a poor tool for permanently elevating prices above competitive levels;
- BNSF's actual use of fuel surcharges before and during the class period is inconsistent with the alleged conspiracy. BNSF introduced revenue based fuel surcharges as early as the 1990s, substantially before the start of the class period; it published essentially the same carload and intermodal fuel surcharge formulas before and during the class period; it did not change its fuel surcharge formulas during the class period to conform to those of other railroads; it employed mileage based fuel surcharges well before other

defendants on some shipments during the class period; it used fuel surcharge formulas that frequently differed from the fuel surcharge formulas of other railroads during the class period; it often included in shippers' contracts revenue based fuel surcharge formulas that differed from its published formulas; and many shippers during the class period paid no fuel surcharge at all;

- BNSF used fuel surcharges extensively prior to the start of the alleged conspiracy and its use of fuel surcharges was increasing prior to the beginning of the class period. Plaintiffs and Professor Rausser present no empirical analysis or evidence that BNSF's increasing reliance on fuel surcharges to recover its incremental fuel costs would have been any different in the but-for world than what actually occurred nor do they provide any empirical analysis of what BNSF's use of fuel surcharges would have been in the but-for world. If anything, Professor Rausser's damages model implies an implausibly low fuel surcharge coverage for BNSF in the absence of the alleged conspiracy;
- Marketplace outcomes indicate that competition, in particular between BNSF and UP, did not diminish during the class period, and are inconsistent with BNSF's participation in the alleged price fixing conspiracy;
- Professor Rausser ignores the basic economics of vertical relationships, such as those between BNSF and its main interline partners, CSX and NS. Economics clearly teaches that BNSF had no incentive to conspire with NS and CSX, its eastern rail partners, to raise railroad rates. If anything, it was in the unilateral interest of BNSF to ensure that the rates charged by its partners on their portions of the interlined moves were as low as possible; and
- Professor Rausser's damages model implies a but-for world that makes no economic sense because it predicts that BNSF would not be able to recover a large and increasing

portion of its incremental fuel costs. Professor Rausser's model also attributes large damages to classes of shippers that were unlikely to be harmed (assuming the alleged collusion took place).

The remainder of this executive summary briefly develops the bases for these main findings.

**1. BNSF had strong unilateral incentives to use and expand the use of fuel surcharges to recover incremental fuel costs during the class period, which was characterized by high fuel price volatility and sharply increasing fuel prices**

The rail freight transportation services provided by BNSF are highly fuel intensive. Between 2000 and 2008, BNSF's fuel costs almost tripled, increasing from 13 percent of total operating costs to 33 percent of total operating costs, due to skyrocketing fuel costs.[3] For example, between July 2003 and July 2008, HDF prices increased from $1.44 to $4.68 per gallon, an increase of 225 percent. At the same time, fuel prices became more volatile, with a measure of price volatility increasing nearly 300 percent between the period of 1994 through 1998 and the period of 2004 through 2008, the bulk of the class period.[4]

3. See Section II.B, Figure 7.
4. See Section III.E, Figure 14.

**Figure ES-1**




Source: EIA.

Note: Vertical reference line denotes start of the class period.

The significant share of BNSF's overall costs attributable to fuel costs and a sharp increase in fuel prices and volatility gave BNSF strong unilateral incentives to recover its incremental fuel costs.

**2. The defendants' lack of ability to monitor each other's pricing indicates that the alleged conspiracy would not have been effective at raising BNSF's all-in rates to supracompetitive levels during the class period, and thus the alleged conspiracy was unlikely to have occurred.**

It is well-established in the economics literature that absent the ability of cartel members to monitor competitors' prices, so as to detect cheating, price fixing conspiracies are unlikely to be successful.[5] Professor Rausser agrees.[6] However, he incorrectly concludes that pricing in the rail industry is transparent by claiming that, since rail transportation services are "well understood," the

5. See Section III.B.
6. See Section III.C.

defendants had the ability to monitor compliance with the alleged conspiracy. In fact, the vast majority of BNSF's unregulated revenues are associated with confidential pricing documents, with only 13 percent of its revenues during the class period being realized from traffic that moved under public tariffs.[7] The fact that the published fuel surcharge percentage may have been known to the industry does not provide the railroads with the ability to monitor each other's prices. Fuel surcharges are only one element of complex prices that largely are not transparent to rivals, since most of the traffic is subject to confidential terms. Professor Rausser himself acknowledges that monitoring of many components of price, such as base rates, would have been difficult, and that a conspiracy to fix base rates would have been "unmanageable."[8]

**3. The form of the conspiracy alleged by plaintiffs was unlikely to be an effective mechanism to raise prices, and therefore the conspiracy was unlikely to have occurred, because prices to shippers would not increase unless commodity fuel prices increased, which BNSF and the other defendants could not forecast or control.**

The alleged conspiracy mechanism, fuel surcharges based on the level and changes of a reference fuel price index, is unlikely to be an effective mechanism to raise prices. The alleged collusive mechanism is linked to the level and changes of fuel prices, which BNSF and the other railroads could neither forecast precisely nor control. The fuel surcharge formulas specified increases or decreases in fuel surcharge percentages based on the movements of fuel prices above the strike price, and thus would lead to declining fuel surcharges and all-in rates during periods in which fuel prices decreased but remained above the strike price. At the time the conspiracy was allegedly formulated, early 2003, fuel prices were predicted to be flat.[9] This indicates that at the time the conspiracy was allegedly entered into, BNSF could not have reasonably assumed that fuel surcharge formulas would result in materially higher prices for those shippers who had fuel surcharge provisions in their contracts with BNSF. Based

7. See Section III.C, Figure 9.
8. Rausser, p. 52, fn. 94.
9. See Section III.E, Figure 12.

on forecasts of fuel prices made by the US government in 2002, the fuel surcharge percentages that could reasonably have been expected at the beginning of the alleged conspiracy were very low, in a range of 0.4 percent to 2.4 percent of base rates.

**Figure ES-2**

**Expected FSC Percentages Based on Actual and Forecast Crude Oil Prices and CSX Published Carload FSC Formula**

| Year | Actual BNSF Fuel Surcharge Percentage | 2000 Projection | 2001 Projection | 2002 Projection | 2003 Projection | 2004 Projection | 2005 Projection | 2006 Projection |
|---|---|---|---|---|---|---|---|---|
| 2003 | 2.3% | 0.0% | 0.0% | 0.4% | | | | |
| 2004 | 4.8% | 0.0% | 0.4% | 0.8% | 1.2% | | | |
| 2005 | 11.0% | 0.4% | 0.4% | 1.2% | 1.2% | 0.8% | | |
| 2006 | 14.6% | 0.4% | 0.8% | 1.6% | 1.6% | 1.2% | 3.6% | |
| 2007 | 15.3% | 0.8% | 0.8% | 2.0% | 1.6% | 1.2% | 2.8% | 12.8% |
| 2008 | 27.0% | 1.2% | 1.2% | 2.4% | 2.0% | 1.6% | 2.4% | 12.4% |

Source: EIA; BNSF transaction data; CSXFSC152734.

Notes: FSC Formula assumed to have 0.4% surcharge at $23 strike price, and 0.4% surcharge for each $1 increment above strike price. Actual BNSF Fuel Surcharge percentage is simple average of published carload surcharges.

**4. BNSF's use of fuel surcharges before and during the class period is consistent with BNSF's self-interest and inconsistent with the alleged conspiracy.**

Plaintiffs and Professor Rausser mischaracterize BNSF's use of fuel surcharges, suggesting that all or nearly all class member traffic moved under published fuel surcharge rates that were standardized across the different railroads, and that the terms of these allegedly conspiratorial fuel surcharge formulas materially differed from the fuel surcharge formulas that were in place prior to the start of the class period. Professor Rausser acknowledges that the surcharge formulas deployed before the alleged class period were set and implemented unilaterally by BNSF and other railroads.[10] However, Professor Rausser fails to recognize that BNSF's published fuel surcharge formulas for carload and intermodal

10. Rausser, p. 55.

traffic in the class period did not materially differ from those in the non-conspiratorial pre-class period.[11] Additionally, Professor Rausser fails to acknowledge that the fuel surcharge formulas for BNSF's intermodal and coal shipments were different from those of UP, its principal rail competitor, and resulted in materially different fuel surcharge percentages. This is inconsistent with plaintiffs' and Professor Rausser's claims that the alleged conspiracy resulted in synchronized fuel surcharge percentages.[12] Figure ES-3 plots the difference between the intermodal fuel surcharge percentages for BNSF and UP. Additionally, Professor Rausser fails to recognize that BNSF used idiosyncratic revenue based fuel surcharges and mileage based fuel surcharges throughout the class period, and that many shippers did not pay any fuel surcharge during the class period.[13] Focusing on BNSF's price authorities that commenced after July 1, 2003, I find that only 50 percent of BNSF unregulated revenues during the class period were associated with shippers that paid the published fuel surcharge percentages. Revenues from shippers that paid the published carload fuel surcharge percentages that are at the center of plaintiffs' allegations, accounted for only 20 percent of the revenue from new price authorities during the class period.[14]

11. See Sections IV.C and IV.E.
12. Sections IV.E and IV.F
13. In my report I use the term idiosyncratic fuel surcharges to describe fuel surcharge percentages that differed from those calculated under the published fuel surcharge formulas.
14. See Section III.D, and Figure 10.

**Figure ES-3**

**Difference Between UP and BNSF Published Intermodal Surcharges**




Source: BNSF-FSC 001502-695; BNSF-FSC 00037513-527; BNSF website.
Note: Difference calculated as UP fuel surcharge percentage minus BNSF fuel surcharge percentage.

5. **BNSF had widespread and increasing use of fuel surcharges prior to the start of the alleged conspiracy, and Professor Rausser presents no empirical analysis or evidence that BNSF's increasing reliance on fuel surcharges to recover its incremental fuel costs would have been any different in the but-for world.**

BNSF's published fuel surcharge formulas for intermodal and carload traffic during the class period resulted in identical fuel surcharge percentages to those that were generated by the intermodal and carload formulas utilized during the pre-class, or non-conspiracy, period. Consequently, the only competitive harm that Professor Rausser could possibly attribute to the alleged collusion would stem from an alleged increase in the share of shippers paying fuel surcharges (i.e., an increase in the scope of fuel surcharge coverage). However, Professor Rausser provides no economic analysis of whether the scope of coverage increased relative to what it would have been absent the alleged conspiracy.

Professor Rausser does not acknowledge that the rate of inclusion of fuel surcharge provisions in new contracts was increasing rapidly during the alleged pre-conspiracy period.[15] For example, in January 2001, 30 percent of new BNSF price authorities paid revenue based fuel surcharges. This increased to 46 percent of new price authorities in January 2003, and to 74 percent of new price authorities in June 2003, all prior to the initial implementation of the alleged conspiracy.

**Figure ES-4**




Source: BNSF transaction data.
Note: Price authorities for which there is either no reported net revenue, reported FSC revenue exceeds gross revenue, reported FSC rate is not missing but FSC revenue is missing, or the revenue-based FSC percentage paid by a shipper exceeds 50% are excluded. Data also exclude revenue from codefendants and government entities and any price authorities identified as issued by other railroads.

Professor Rausser's damages model implausibly estimates that the damages from BNSF's participation in the alleged conspiracy are nearly 90 percent of the fuel surcharge revenue BNSF collected from class members. A reasonable interpretation of this finding is that only 10 percent of the

15. See Section V.B.

fuel surcharge revenues that BNSF actually collected would have been collected in the but-for world, i.e., in absence of the alleged conspiracy. Given that BNSF's non-collusive, pre-conspiracy fuel surcharge formulas yielded the same fuel surcharge percentages as the allegedly collusive fuel surcharges, it follows that these non-collusive fuel surcharges percentages would have been present in the absence of the alleged conspiracy. Consequently, Professor Rausser is implicitly positing that the preponderance of price authorities during the alleged post-collusion period would not have fuel surcharges. This is implausible on its face. First, BNSF was already increasing the use of fuel surcharges prior to start of the alleged conspiracy.[16] Second, the alleged conspiracy period was characterized by increasing and volatile fuel prices which made it more (and not less) important for BNSF to recover the incremental fuel costs. Surcharges were (and are) an efficient means for doing so.

**6. Marketplace outcomes indicate that competition between BNSF and UP, did not diminish during the class period, which is inconsistent with BNSF's participation in the alleged price fixing conspiracy**

Professor Rausser does not analyze whether the observed market outcomes are only consistent with the alleged collusion or whether, in the alternative, they are consistent with unilateral conduct by BNSF and other railroads. I compared BNSF's all-in rates that Professor Rausser asserts were the product of collusion with those he acknowledges were non-collusive. I find that there is little difference between these two sets of prices.[17] Furthermore, contrary to what one would expect in a collusive market, the alleged conspiracy did not materially reduce the frequency with which customers switched between BNSF and UP, and it also did not impede BNSF from gaining share from UP.[18] Additionally, Professor Rausser misinterprets the profit margin data he presents, which he incorrectly claims supports the view that BNSF earned supracompetitive profits during the class period.[19] In sum, these empirical analyses

---

16. See Section V.C.
17. See Section VI.B.
18. See Sections VI.C and VI.D.
19. See Section VI.E.

confirm that market outcomes are consistent with competition and BNSF acting in its unilateral interest, and inconsistent with alleged collusion.

**7. Professor Rausser ignores the basic economics of vertical relationships, which imply that BNSF had no incentive to conspire with NS and CSX, its eastern rail partners.**

Much of the supposed evidence that Professor Rausser presents as evidence of collusion relates to communications between an eastern railroad (CSX or NS) and a western railroad (BNSF or UP) that took place in connection with the provision of interline service. Professor Rausser claims such communications are evidence that BNSF conspired with NS and CSX to set common fuel surcharge formulas. However, Professor Rausser's claim is inconsistent with basic economics and ignores the central fact that eastern and western rail services are complements, and not substitutes. Generally speaking, suppliers of end-to-end products or services (such as interline rail service), are more likely to provide efficient service and earn a reasonable profit when there is vibrant competition among the suppliers of the complementary components (such as origination or termination of traffic) of the end-to-end product or service. For example, there is no benefit to the originating western railroads from fostering collusion among the terminating eastern railroads, nor do the originating eastern railroads benefit from collusion among western railroads.[20]

**8. Professor Rausser's damages model implies an implausible but-for world, and estimates large damages for classes of shippers that likely were not harmed by the alleged collusion.**

Professor Rausser does not provide credible economic evidence that BNSF participated in the alleged conspiracy, and thus provides no reliable basis to conclude that class members suffered any antitrust harm. In addition, Professor Rausser commits clear conceptual errors in his damages model and does not recognize the empirical implications of his damages model, which renders his approach unreliable for the purpose of estimating class wide damages. First, Professor Rausser's damages

20. See Section VII.B

framework finds that damages flow solely through the change in the estimated relationship between all-in rates and changes in fuel costs between the benchmark and class period. Put another way, he finds that the sole effect of the alleged collusion has been to change the pass-through rate from fuel prices into all-in rates. Professor Rausser's model finds that the pass-through sensitivity of all-in rates to changes in fuel costs increased from the pre-class period to the class period by a factor of 10, which is implausible. He has done no analysis to test the reliability of this estimate or provide an economic basis for his findings.[21] Second, Professor Rausser's damages model implies that, in the but-for world, BNSF would not have recovered a large share of its incremental fuel expenses during the class period. Thus, Professor Rausser's damages model is inconsistent with general economic theory and does not recognize BNSF's unilateral economic incentives to implement mechanisms for the recovery of its incremental fuel costs, especially given that the increase in fuel costs was a common industry event.[22]

---

21. See Section VIII.C.
22. See Section VIII.D.

**Figure ES-5**




Source: Rausser Figure 13; Rausser damage model.

Finally, Professor Rausser's damages model estimates large damages for shippers that were unlikely to be affected (or less affected) by the alleged conspiracy (had it occurred), further demonstrating the unreliability of his approach. For example, BNSF's intermodal and coal shippers paid different fuel surcharge percentages than those of UP, indicating that contrary to plaintiffs' allegations, these shippers did not face standardized fuel surcharges. Such shippers account for nearly 70 percent of the damages Professor Rausser estimates for BNSF.[23] Similarly, Professor Rausser's damage estimates erroneously

23. See Section VIII.E, Figure 35.

calculate damages for shippers, such as codefendants and government entities, which are excluded from the class definition.[24]

24. See Section VIII.E, Figure 36.

# I. Introduction

## A. Qualifications

1. My name is Janusz A. Ordover. I am a Professor of Economics and former Director of the Masters in Economics Program at New York University, where I have taught since 1973. From 1991-1992, I served as Deputy Assistant Attorney General for Economics at the Antitrust Division of the United States Department of Justice. As the chief economist for the Antitrust Division, I was responsible for formulating and implementing the economic aspects of antitrust policy and enforcement of the United States, including co-drafting the 1992 U.S. Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines*. I also had ultimate responsibility for all of the economic analyses conducted by the Department of Justice in connection with its antitrust investigations and litigation, including economic analyses of collusion and other anticompetitive industry practices. In addition, I am a Senior Consultant to Compass Lexecon, a leading economic consulting firm.

2. My curriculum vita, which includes a complete list of my academic publications, is attached as Appendix A. A list of the matters in which I have provided testimony as an expert in the past four years is attached as Appendix B. Compass Lexecon charges for my services in this matter at my current hourly rate of $950. Compass Lexecon staff that have assisted me in this matter are billed at their standard hourly rates, which range from $365 to $720, depending upon their qualifications.

## B. Background on the litigation

3. Plaintiffs allege that BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX")[25], Norfolk Southern Railway Company ("NS") and Union Pacific Railroad Company ("UP") collectively

25. I understand that CSX Transportation, Inc. is comprised of two separate entities, CSXT and CSXI, and that CSXI is not a named defendant in this litigation. For simplicity I refer to CSX Transportation, Inc. as CSX in my report and do not distinguish between the two entities.

conspired to impose standardized rail fuel surcharges beginning in mid-2003.[26] Plaintiffs allege that starting in July 2003, "BNSF and UP agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index")."[27] At his deposition, plaintiffs' economic expert, Professor Gordon Rausser, opined that the conspiratorial agreement was reached during the March 2003 through June 2003 period, and the first conspiratorial fuel surcharges were introduced on July 1, 2003.[28] Plaintiffs further allege that "BNSF, UP, CSX and NS maintained their conspiracy by uniformly computing the surcharges as a percentage of the rail freight transportation base rate."[29] Plaintiffs claim that "UP and BNSF fuel surcharges remained in synch notwithstanding that the two companies had different fuel costs during a period of large fuel cost increases, and improvements in their respective fuel efficiencies."[30]

4. Plaintiffs also claim that "[t]o facilitate the widespread, across-the-board application of their agreed, rate-based fuel surcharges, Defendants … jointly agreed to use the AAR to create a new index – the All Inclusive Index Less Fuel ("AIILF") – that removed the fuel-price escalation provision from the RCAF."[31]

5. Plaintiffs assert that in the but-for world, despite the very large increases in the level and volatility of fuel prices that occurred during the class period, BNSF and other railroads would not have relied upon fuel surcharges to recover their incremental fuel costs to the extent they actually did,

---

26. Second Consolidated Amended Class Action Complaint, MDL Docket no. 1869 (hereafter "Complaint"), ¶¶2, 7.
27. Complaint, ¶7.
28. Deposition of Gordon Rausser, Ph.D., December 11, 2012 (hereafter "Rausser Deposition 12/11/12"), pp. 19-20, 26.
29. Complaint, ¶14.
30. Direct Purchaser Plaintiffs' Consolidated Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs By: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railway Company ("Defendants") (hereafter "Plaintiffs' Interrogatory Responses, Narrative Factual Statement"), ¶42.
31. Plaintiffs' Interrogatory Responses, Narrative Factual Statement, ¶72.

claiming that "absent the conspiracy, the standard fuel-surcharge programs that Defendants actually imposed pursuant to the conspiracy would not have existed *at all* and that Defendants would not have succeeded in aggressively applying the fuel surcharges across the industry. Although there may have been some modest fuel surcharges absent a conspiracy, Defendants' unilateral fuel surcharge programs, to the extent they did not collapse, would not have resulted in a structural break in the historical relationship between fuel prices and freight rates."[32]

6. Importantly, plaintiffs do not allege that the railroads conspired to raise their base rates for rail transportation services, but do allege that the defendant railroads agreed not to discount base rates to offset fuel surcharge provisions, claiming that "Defendants also agreed that none of the conspirators would be undercutting agreed pricing … using their increasing revenues to subsidize discounting of underlying rates."[33] While Professor Rausser claims that the defendant railroads "created policies against discounting base rates that would otherwise serve to offset the application of Fuel Surcharges",[34] he also acknowledges that an agreement on base rates alone (rather than fuel surcharges) "would have been extremely complex, very costly, and effectively unmanageable."[35]

7. In June 2012, the Court certified a direct purchaser class consisting of

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing") ("Fuel Surcharge").

32. Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railroad Company ("Defendants") (hereafter "Plaintiffs' Supplemental Interrogatory Responses"), p. 9.
33. Complaint, ¶95.
34. Expert Report of Gordon Rausser, Ph.D., October 15, 2012 (hereafter "Rausser"), p. 7.
35. Rausser, p. 52, fn. 94.

> Excluded from this Class definition are (a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the Complaint, and all federal governmental entities, and (b) all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered into before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract.[36]

### C. Assignment

8. I have been asked by counsel for BNSF to analyze whether the economic evidence in this matter is consistent with BNSF's participation in the price fixing conspiracy alleged by plaintiffs, or whether it is consistent with BNSF pursuing its own independent economic interest. I have also been asked to review the Expert Report of Gordon Rausser[37] and to evaluate whether the analyses he presents are consistent with BNSF's participation in a price fixing conspiracy or whether they are consistent with unilateral conduct by BNSF, including the need to cooperate with its interline railroad partners. In addition, I have been asked to analyze the reliability of Professor Rausser's damages model.

9. In conducting my analysis, I have applied standard economic principles and methods in evaluating plaintiffs' and Professor Rausser's claims. I and my staff have reviewed a variety of materials relevant to this case, including: (1) court filings made by the plaintiffs and defendants in this case, including the Complaint, briefs related to class certification and other matters in this litigation, and interrogatory responses; (2) discovery documents produced by BNSF and other defendant railroads; (3) information related to the history of different fuel surcharge formulas adopted by BNSF before, during and after the class period; (4) depositions of BNSF executives and Professor Rausser; (5) publically available information on the financial performance of BNSF and other defendant railroads; (6) the transaction data produced by BNSF and other defendant railroads in this proceeding, which include shipment-specific data on revenues, fuel surcharge revenues, and shipment specific characteristics; and

---

36. Opinion In re Rail Freight Fuel Surcharge Antitrust Litigation, June 21, 2012 (hereafter "Class Cert Opinion"), pp. 6-7.
37. Expert Report of Gordon Rausser, Ph.D., October 15, 2012.

(7) the expert economic reports filed by plaintiffs and defendants in the class certification phase of this proceeding. I have also interviewed BNSF executives regarding its fuel surcharge formulas, pricing decisions, contract negotiations and overall competitive position. Additionally, I and my staff have reviewed the relevant data, programs and documents produced by Professor Rausser to support the claims made in his report. A complete list of the materials I have relied on in preparing this report is attached as Appendix C.

**D. Summary of Conclusions**

10. Based on my analysis, I conclude that BNSF's use of fuel surcharges was consistent with BNSF's unilateral economic incentives, and is inconsistent with its participation in the price fixing conspiracy alleged by plaintiffs. Moreover, I conclude that the alleged conspiracy would have been unlikely to have been effective in collusively raising prices. I find that:

- Professor Rausser's analysis is deficient because it ignores BNSF's unilateral incentives to use and expand the use of fuel surcharges to recover incremental fuel costs during the class period, which was characterized by high fuel price volatility and sharply increasing fuel prices;
- Professor Rausser incorrectly characterizes the nature of the markets in which BNSF and the other defendant railroads compete and wrongly asserts that the defendant railroads could readily monitor each other's pricing behavior, effectively detect compliance, and therefore enforce the alleged conspiracy. To the contrary, the fact that the defendants lacked the ability to monitor each other's pricing and deployment of fuel surcharges in confidential contracts indicates that the alleged conspiracy would not have been effective in raising BNSF's all-in rates to supracompetitive levels during the class period. As such, it was unlikely to have been implemented in the first place. Professor Rausser

himself acknowledges that monitoring a conspiracy on rail base rates, the largest component of BNSF's and other railroads' all-in rates, would be virtually impossible. This is consistent with my view that the alleged conspiracy would be difficult to implement and enforce;

- The success of the conspiracy alleged by plaintiffs, as would have been reflected in materially higher all-in rates that exceeded non-conspiratorial increases in rail rates for BNSF, required significant increases in fuel prices. The relevant fuel prices were not predicted to increase significantly at the time that the alleged conspiracy was formulated. Moreover, the alleged co-conspirators could not influence fuel prices (which are set in global markets). As such, the proposed conspiracy was unlikely to be an effective mechanism to raise all-in prices to shippers and was unlikely to have occurred. Further, the alleged conspiratorial mechanism would have required that BNSF reduce the fuel surcharge in the event that the fuel price index fell from above the strike level. In sum, the posited mechanism for collusion on rail rates was a poor tool for permanently elevating prices above competitive levels;
- BNSF's actual use of fuel surcharges before and during the class period is inconsistent with the alleged conspiracy. BNSF introduced revenue based fuel surcharges as early as the 1990s, substantially before the start of the class period; it published essentially the same carload and intermodal fuel surcharge formulas before and during the class period; it did not change its fuel surcharge formulas during the class period to conform to those of other railroads; it employed mileage based fuel surcharges well before other defendants on some shipments during the class period; it used fuel surcharge formulas that frequently differed from the fuel surcharge formulas of other railroads during the class period; it often included in shippers' contracts revenue based fuel surcharge

formulas that differed from its published formulas; and many shippers during the class period paid no fuel surcharge at all;

- Contrary to Professor Rausser's assertions, BNSF's fuel hedging program, which materially differed from that of other railroads both before and during the class period, is evidence that BNSF was acting unilaterally, and is inconsistent with the alleged conspiracy;
- BNSF used fuel surcharges extensively prior to the start of the alleged conspiracy and its use of fuel surcharges was increasing prior to the beginning of the class period. Plaintiffs and Professor Rausser present no empirical analysis or evidence that BNSF's increasing reliance on fuel surcharges to recover its incremental fuel costs would have been any different in the but-for world than what actually occurred nor do they provide any empirical analysis of what BNSF's use of fuel surcharges would have been in the but-for world. If anything, Professor Rausser's damages model implies an implausibly low fuel surcharge coverage for BNSF in the absence of the alleged conspiracy;
- Marketplace outcomes indicate that competition, in particular between BNSF and UP, did not diminish during the class period, and are inconsistent with BNSF's participation in the alleged price fixing conspiracy;
- Professor Rausser ignores the basic economics of vertical relationships, such as those between BNSF and its main interline partners, CSX and NS. Economics clearly teaches that BNSF had no incentive to conspire with NS and CSX, its eastern rail partners, to raise railroad rates. If anything, it was in the unilateral interest of BNSF to ensure that the rates charged by its partners on their portions of the interlined moves were as low as possible; and

- Professor Rausser's damages model implies a but-for world that makes no economic sense because it predicts that BNSF would not be able to recover a large and increasing portion of its incremental fuel costs. Professor Rausser's model also attributes large damages to classes of shippers that were unlikely to be harmed (assuming the alleged collusion took place).

11. My report is structured as follows:

- Section II provides background on BNSF, its role in the rail industry, and its fuel surcharge formulas, which plaintiffs allege are anticompetitive;
- Section III demonstrates that the alleged conspiracy to impose standardized fuel surcharges did not facilitate anticompetitive increases in rail rates;
- Section IV reviews the history of the various fuel surcharge formulas that BNSF implemented before and during the class period, and demonstrates that the pattern of adoption of these formulas is inconsistent with BNSF's participation in the alleged price fixing conspiracy;
- Section V reviews evidence of BNSF's fuel surcharge coverage before and during the class period, and shows that Professor Rausser's analysis fails to recognize that BNSF's use of fuel surcharges was spreading prior to the beginning of the class period, and shows that his damages model implies an implausibly low fuel surcharge for BNSF in the absence of the alleged conspiracy;
- Section VI shows that available evidence indicates that BNSF's competitive behavior during the class period is inconsistent with its participation in the alleged price fixing conspiracy;

- Section VII shows that the basic economics of vertical relationships indicates that BNSF had little or no incentive to conspire with NS and CSX. It additionally reviews the evidence that Professor Rausser asserts is proof of a conspiracy and shows that the documents he relies upon do not appear to support the finding that BNSF entered into a collusive agreement to impose standardized fuel surcharges; and
- Section VIII reviews Professor Rausser's damages model, and demonstrates that it implies an unrealistic but-for world, and thus is implausible. Additionally, it shows that a large share of the damages estimated for BNSF are for types of traffic, namely intermodal and coal, for which there is no evidence of common fuel surcharges across the different railroads, and that Professor Rausser's damage estimates improperly include certain shipments, such as those excluded from the class definition.

## II. Background

### A. Overview

12. This section provides a general background on BNSF and its competitive status in the rail industry. It also provides a basic introduction to the mechanics of BNSF's fuel surcharges, which are at the center of plaintiffs' allegations in this matter.

### B. Background on BNSF

13. BNSF was formed in September 1995 by the merger of the Burlington Northern Railroad and the Atchison, Topeka and Santa Fe Railway.[38] In 2010, BNSF was acquired by Berkshire Hathaway, Inc.[39] In 2011, BNSF had revenues of over $19 billion and a rail network of 32,000 route miles, and is and has been one of the two largest railroads in the US. BNSF and UP are comparable in size and both

---

38. The History of BNSF, p. 3, available at http://bnsf.com/about-bnsf/our-railroad/company-history/pdf/hist_overview.pdf.
39. BNSF website, available at http://bnsf.com/about-bnsf/financial-information/.

are significantly larger than the next largest US railroads, CSX and NS, each of which had 2011 revenues of roughly $11 billion and operate rail networks of less than 21,000 miles.

**Figure 1**

**Revenues and Route Miles**
**For Defendant Railroads**
**(Revenues in $MM)**

| Year | BNSF | UP | CSX | NS |
|---|---|---|---|---|
| 2000 | $9,205 | $10,731 | $8,191 | $6,159 |
| 2001 | $9,208 | $11,973 | $8,110 | $6,170 |
| 2002 | $8,979 | $12,491 | $8,152 | $6,270 |
| 2003 | $9,413 | $11,551 | $7,793 | $6,468 |
| 2004 | $10,946 | $12,215 | $8,020 | $7,312 |
| 2005 | $12,987 | $13,578 | $8,618 | $8,527 |
| 2006 | $14,985 | $15,578 | $9,566 | $9,407 |
| 2007 | $15,802 | $16,283 | $10,030 | $9,432 |
| 2008 | $18,018 | $17,970 | $11,255 | $10,661 |
| 2009 | $14,016 | $14,143 | $9,041 | $7,969 |
| 2010 | $16,850 | $16,965 | $10,636 | $9,516 |
| 2011 | $19,548 | $19,557 | $11,743 | $11,172 |
| Route Miles in 2011 | 32,000 | 31,898 | 20,998 | 20,141 |

Source: Company 10-Ks.

14. BNSF and UP operate primarily west of the Mississippi River, while CSX and NS operate primarily east of the Mississippi River.[40] Thus, while BNSF and UP are significant head-to-head competitors, BNSF competes with NS and CSX only to a very limited extent. Due to the geographic nature of its routes, BNSF's shipments travel longer distances than other railroads and over more

40. BNSF website, available at http://www.bnsf.com/about-bnsf/pdf/fact_sheet.pdf. UP website, available at http://www.up.com/aboutup/usguide/index.htm. CSX website, available at http://www.csx.com/index.cfm/about-csx/company-overview/network-and-operations/. NP website, available at http://www.nscorp.com/nscportal/nscorp/Investors/.

difficult terrain, such as the Rocky, Cascade, and Sierra Nevada Mountains. BNSF's average length of haul for unregulated traffic over the period 2000-2008 was 1,644 miles.[41] In comparison, UP's average length of haul for this type of traffic over this time period was 1,565 miles, CSX's was 871 miles and NS's was 655 miles.[42]

**Figure 2**

**BNSF and UP Rail Networks**




Source: NationalAtlas.gov

15. US freight railroads, including BNSF, are subject to common carrier obligations, and are regulated by the Surface Transportation Board (STB). The STB is a regulatory agency that Congress has charged with resolving railroad rate and service disputes in certain circumstances and reviewing

41. BNSF transaction data. Unless otherwise specified, I conduct my analyses of defendants' transactional data using datasets provided to my staff by Professor Kalt.

42. CSX transaction data; UP transaction data; and NS transaction data.

proposed railroad mergers.[43] However, while the STB has authority to regulate rail rates in certain circumstances, it has determined that substantial classes of rail traffic should not be subject to rate regulation because there is adequate competition for the transportation of such traffic. These include traffic shipped using certain types of equipment, such as boxcars, and shipments of certain types of commodities such as lumber, and intermodal traffic.[44] Over the class period, 76 percent of BNSF's revenues were not subject to rate regulation.[45] Since the plaintiffs' allegations in this matter are limited to the pricing for unregulated rail traffic, I exclude BNSF's regulated traffic from all of my subsequent analyses of its transaction data in this report.

16. As shown in Figure 3, roughly two thirds of BNSF's revenue is from local traffic, i.e., rail shipments that originate *and* terminate on BNSF's rail network. The remaining one third of its revenue is from traffic that is exchanged with other railroads, split roughly evenly between "interline" shipments, where two railroads jointly price and provide the move and a customer receives a single bill, and "Rule 11" shipments, where the two railroads separately price and bill the customer for their respective portions of the shipment.[46]

---

43. STB Overview, available at http://www.stb.dot.gov/stb/about/overview.html.
44. Code of Federal Regulations, Title 49 – Transportation (hereafter "49 CFR"): 49 CFR §1039.11; 49 CFR §1039.13; and 49 CFR §1039.14.
45. BNSF transaction data.
46. The distinction between local and interline traffic only refers to the rail portion of a shipment. For example, a container of merchandise that travels from China on a steamship, then is carried by BNSF from Los Angeles to Chicago on its own tracks, and then is trucked to its final destination in Indiana would be a local move for BNSF.

**Figure 3**

## BNSF Net Revenue from Unregulated Traffic by Type of Move

| Year | Total Revenue ($MM) | Local | Interline | Rule 11 |
|---|---|---|---|---|
| 2000 | $7,142 | 63.8% | 21.6% | 14.5% |
| 2001 | $6,853 | 64.0% | 21.2% | 14.8% |
| 2002 | $6,723 | 65.8% | 19.9% | 14.3% |
| 2003 | $7,230 | 65.7% | 18.7% | 15.6% |
| 2004 | $8,851 | 66.2% | 17.1% | 16.7% |
| 2005 | $9,972 | 66.0% | 16.9% | 17.1% |
| 2006 | $11,089 | 66.1% | 15.6% | 18.3% |
| 2007 | $11,337 | 68.8% | 14.7% | 16.5% |
| 2008 | $12,401 | 69.8% | 16.2% | 14.0% |
| 2000-2008 | $81,598 | 66.6% | 17.5% | 15.9% |

Source: BNSF transaction data.

Note: Excludes revenues from codefendants and government entities.

17. As shown in Figure 4, nearly two thirds of BNSF's interline and Rule 11 traffic by revenue is exchanged with NS and CSX, which serve the eastern portion of the United States. In particular, between 2000 and 2008, roughly 41 percent of BNSF's interline traffic was exchanged with NS and 24 percent was exchanged with CSX.[47] BNSF exchanges traffic with the eastern railroads primarily at rail terminals in Chicago, Memphis, New Orleans, and Kansas City.[48]

---

47. These calculations are limited to traffic that BNSF exchanges with other Class I railroads. Some of BNSF's non-local traffic originates or terminates on shortline railroads that serve specific local geographic areas.
48. BNSF website, available at http://www.bnsf.com/customers/where-can-i-ship/.

**Figure 4**

**Share of BNSF Interline and Rule 11 Net Revenue Originating or Terminating on Other Class I Railroads**

| | | Percentage Originating or Terminating on Railroad | | | | | |
|---|---|---|---|---|---|---|---|
| **Year** | **Interline and Rule 11 Net Revenue ($MM)** | **NS** | **CSX** | **CN** | **UP** | **CPRS** | **KCS** |
| 2000 | $2,084 | 33.9% | 26.4% | 10.5% | 14.5% | 7.3% | 7.4% |
| 2001 | $2,028 | 34.5% | 24.9% | 12.3% | 15.2% | 7.4% | 5.7% |
| 2002 | $1,905 | 37.2% | 26.2% | 11.0% | 13.5% | 6.9% | 5.1% |
| 2003 | $2,073 | 37.3% | 25.9% | 11.9% | 12.8% | 6.6% | 5.6% |
| 2004 | $2,543 | 42.0% | 22.0% | 11.8% | 11.3% | 6.3% | 6.6% |
| 2005 | $2,866 | 44.7% | 21.1% | 11.7% | 10.1% | 5.8% | 6.7% |
| 2006 | $3,129 | 45.2% | 23.4% | 10.4% | 9.2% | 5.5% | 6.2% |
| 2007 | $2,908 | 44.0% | 23.1% | 10.8% | 9.7% | 6.1% | 6.4% |
| 2008 | $3,004 | 42.2% | 24.3% | 11.7% | 9.4% | 6.4% | 5.9% |
| 2000-2008 | $22,539 | 40.8% | 23.9% | 11.3% | 11.4% | 6.4% | 6.2% |

Source: BNSF transaction data.

Note: Includes interline shipments with Class I Railroads only. Excludes revenue from codefendants and government entities.

18. Over 40 percent of BNSF's unregulated traffic between 2000 and 2008 consisted of intermodal shipments, which is the traffic that is shipped by multiple modes of transportation, including ships, rail and trucks.[49] BNSF's intermodal traffic consists of trailers on flat cars (or TOFC) or containers on flat cars (or COFC).[50] Intermodal trailers and containers are designed to be hauled by trucks, and thus BNSF views the trucking industry as a significant competitor to, as well as customer of, its intermodal traffic. For example, Paul Anderson, BNSF's Vice President of Marketing Support, testified that "trucks are our main competitor."[51] Additionally, BNSF has noted the competitive constraints imposed on it by the trucking industry in its SEC filings, explaining in its 2008 10-K that "the Company believes that high service truck lines, due to their ability to deliver non-bulk products on an expedited basis, have had and will continue to have an adverse effect on the Company's ability to compete for deliveries of non-bulk,

49. BNSF Glossary, available at http://www.bnsf.com/customers/pdf/glossary.pdf.
50. BNSF Intermodal Rules and Policies Guide, available at http://www.bnsf.com/customers/pdf/2008_Intermodal_R_and_PG.pdf, p. 19.
51. Deposition of Paul Anderson, May 26, 2011, (hereafter "Anderson Deposition"), pp. 36-37.

time-sensitive freight."[52] In its 2008 Annual Report, BNSF describes customers of its consumer products to include "full truckload carriers such as J.B. Hunt Transportation, Schneider National and Swift Transportation."[53]

19. Shipments that are not intermodal are typically referred to as "carload" traffic.[54] Coal, BNSF's largest carload commodity, accounted for over 20 percent of its revenues between 2000 and 2008. BNSF's other carload traffic between 2000 and 2008 included commodities such as chemicals, lumber, food products and transportation equipment, with each accounting for between 4.6 percent and 5.5 percent of BNSF's revenue from unregulated traffic, as shown in Figure 5. BNSF's traffic mix, and in particular the high proportion of its traffic that consists of intermodal or coal shipments, is especially pertinent to BNSF's implementation and use of fuel surcharges. This is because most of the plaintiffs' allegations and Professor Rausser's analyses focus on the role of allegedly common fuel surcharges for the pricing of carload traffic. As discussed in more detail in Section IV below, BNSF had a separate fuel surcharge formula for its intermodal traffic both before and during the class period, and introduced a separate fuel surcharge formula for coal traffic during the class period, both of which were substantially different from its published carload fuel surcharge formula. These intermodal and coal fuel surcharge formulas also differed from the fuel surcharge formulas of other railroads, particularly UP, BNSF's principal rail competitor.

52. BNSF Form 10-K for the period ending December 31, 2008, p. 1.
53. BNSF 2008 Annual Report and 10-K, p. 9.
54. BNSF is organized into four business units that handle different types of traffic: Consumer Products, which is responsible for domestic and international intermodal traffic, as well as automotive traffic; Agricultural Products, which is responsible for agricultural products, largely bulk shipments of grains such as corn, wheat and soy bean; Coal, which is responsible for coal traffic; and Industrial Products, which is responsible for the remainder of BNSF's traffic, including shipments of chemicals, lumber, food products, paper goods and metals. See BNSF 2007 Annual Report and 10K, pp. 7-9.

**Figure 5**

**BNSF Net Revenue from Unregulated Traffic**
**By Commodity**

| Year | Total Net Revenue ($MM) | Intermodal (00) | Coal (11) | Chemicals (28) | Lumber or Wood (24) | Food Products (20) | Transport-ation Equipment (37) | Primary Metals (33) | Pulp and Paper (26) | Stone, Clay, Glass (32) | Waste or Scrap (40) | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | $7,142 | 35.7% | 21.5% | 6.9% | 5.1% | 4.5% | 6.8% | 4.1% | 3.2% | 2.5% | 1.2% | 8.4% |
| 2001 | $6,853 | 36.1% | 20.0% | 6.9% | 5.0% | 5.6% | 6.2% | 3.7% | 3.2% | 2.5% | 1.3% | 9.6% |
| 2002 | $6,723 | 38.5% | 19.4% | 7.0% | 5.1% | 5.7% | 4.9% | 3.5% | 3.1% | 2.5% | 1.2% | 9.1% |
| 2003 | $7,230 | 41.0% | 19.2% | 6.7% | 5.1% | 5.4% | 4.3% | 3.5% | 3.1% | 2.5% | 1.2% | 8.0% |
| 2004 | $8,851 | 40.3% | 23.4% | 6.1% | 5.1% | 4.7% | 3.6% | 3.3% | 3.0% | 2.4% | 1.3% | 6.8% |
| 2005 | $9,972 | 42.5% | 21.7% | 5.2% | 5.8% | 4.6% | 3.9% | 3.2% | 3.1% | 2.4% | 1.3% | 6.3% |
| 2006 | $11,089 | 43.7% | 22.7% | 4.5% | 5.4% | 4.1% | 4.1% | 3.6% | 2.9% | 2.1% | 1.4% | 5.6% |
| 2007 | $11,337 | 43.7% | 23.3% | 4.6% | 4.3% | 4.2% | 4.4% | 4.0% | 2.7% | 2.0% | 1.4% | 5.5% |
| 2008 | $12,401 | 43.6% | 25.4% | 4.1% | 3.2% | 3.8% | 4.2% | 4.2% | 2.6% | 1.9% | 1.4% | 5.7% |
| 2000-2008 | $81,598 | 41.1% | 22.2% | 5.5% | 4.8% | 4.6% | 4.6% | 3.7% | 2.9% | 2.3% | 1.3% | 6.9% |

Source: BNSF transaction Data.

Note: Excludes revenue from codefendants and government entities.

20. While BNSF and UP serve many of the same regions in the western United States, as shown in Figure 2 above, substantial regions are served by only one of them. As shown in Figure 6 below, 22 percent of Bureau of Economic Analysis Regions (BEAs) in which BNSF originates traffic, accounting for roughly 9 percent of BNSF revenues, are not served by UP.[55] Furthermore, using a finer geographic area, the Standard Point Location Code (SPLC), indicates even less overlap between BNSF and UP. Of the SPLCs in which BNSF originates traffic, 55 percent are served only by BNSF, accounting for 18 percent of BNSF revenues.[56] Even this may overstate the level of geographic competition between BNSF and UP, as even within a SPLC there may be shippers that both railroads cannot serve.[57] Partly due to the presence of areas that are solely served by either BNSF or UP, the two railroads must interchange some traffic. The revenue from UP interchanged traffic is significantly less than what BNSF

55. BEAs are geographic areas defined by the US Department of Commerce, and are often used in analyses of the rail industry. For example, Professor Rausser uses these areas in his analysis. See Rausser, p. 15.
56. SPLCs are widely used in the rail industry to identify specific geographies. At the 4 digit level a SPLC is roughly equivalent to a county. See National Motor Freight Traffic Association website, available at http://www.nmfta.org/pages/splc.aspx.
57. This discussion focuses on geographic dimensions of competition and does not consider other potential sources of competition, such as product substitution.

exchanges with the eastern railroads.[58] Between 2000 and 2008, BNSF's traffic exchanged with UP accounted for approximately 11 percent of its interline and Rule 11 revenues, as shown in Figure 4 above. In contrast, BNSF exchanged traffic accounting for 41 percent of its interline and Rule 11 revenues with NS and 24 percent of such traffic with CSX.[59]

**Figure 6**

## Geographic Overlap of BNSF and UP Originated Traffic

| Geography | Type of Area | Number of Areas | Percent of BNSF Areas | Percent of UP Areas | BNSF Revenues ($MM) | Percent of BNSF Revenues | UP Revenues ($MM) | Percent of UP Revenues |
|---|---|---|---|---|---|---|---|---|
| BEA | 1: Overlap | 76 | 78.4% | 87.4% | $72,023 | 91.4% | $78,983 | 97.2% |
| | 2: BNSF Only | 21 | 21.6% | | $6,819 | 8.6% | | |
| | 3: UP Only | 11 | | 12.6% | | | $2,239 | 2.8% |
| SPLC | 1: Overlap | 371 | 45.4% | 46.0% | $64,686 | 82.0% | $63,447 | 78.1% |
| | 2: BNSF Only | 447 | 54.6% | | $14,155 | 18.0% | | |
| | 3: UP Only | 436 | | 54.0% | | | $17,775 | 21.9% |

Source: BNSF transaction data; UP transaction data.

Note: Excludes revenue from codefendants and government entities and transactions for which the originating BEA is missing. SPLC defined at the 4 digit level

21. Due to the nature of the geography it traverses and its traffic mix, BNSF incurs substantially higher fuel costs than the eastern railroads. As shown in Figure 7, between 2000 and 2008, the share of BNSF's operating costs accounted for by fuel costs was over 50 percent higher than that of CSX or NS. The fact that BNSF's fuel costs are much higher than the eastern railroads has important implications for the plausibility of Plaintiff's allegations and Professor Rausser's analysis. In particular, differences in marginal costs between BNSF and the eastern railroads reduce its ability and

58. This is in part due to the fact that the traffic BNSF exchanges with UP is often "last mile" exchanges, travelling relatively short distances, as compared to the traffic exchanged with NS and CSX.

59. Over the period 2000-2008, interline and Rule 11 traffic exchanged with NS accounted for 11 percent of BNSF's total unregulated revenue, 7 percent of total unregulated revenue for traffic exchanged with CSX, and 3 percent of total unregulated revenues for traffic exchanged with UP.

incentive to collude with NS and CSX. For example, the 2010 DOJ/FTC Horizontal Merger Guidelines recognize that differences in marginal costs between firms can make coordination less likely.[60] When incremental costs of the putative cartel members' costs differ, it may be difficult for them to reach an agreement on price and sustain this agreement in the face of cost and demand shocks. Of course, as I noted already, in the context of conspiracy alleged here, this difference in marginal costs is of secondary importance to the assessment of the incentives for "cartel" behavior as compared to the fact that the eastern rails provide *complementary* and not *substitute* products. In a vertical context, it is to be expected that firms will have different costs *and* that they will have the incentive and the ability to pro-competitively coordinate their activities.[61]

22. In addition to having relatively high fuel costs as a percentage of total operating costs, as compared to the eastern railroads, BNSF's fuel costs increased dramatically between 2000 and 2008. In particular, BNSF's fuel costs grew from 13 percent of its total operating costs to nearly one third of its total operating costs over this period. In 2008, BNSF's fuel costs as a share of total operating costs were greater than any of the other defendant railroads, as shown in Figure 7.

---

60. U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines, August 19, 2010 (hereafter "Horizontal Merger Guidelines"), Section 10.

61. See, e.g., Economides, Nicholas and Steven Salop. "Competition and Integration Among Complements, and Network Market Structure." *The Journal of Industrial Economics*, Vol XL (March 1992). p105-123.

**Figure 7**

## Fuel as a Percentage of Railroad Operating Costs

| Year | BNSF | UP | NS | CSX |
|---|---|---|---|---|
| 2000 | 13.1% | 14.5% | 8.7% | 8.8% |
| 2001 | 13.1% | 13.3% | 8.0% | 8.2% |
| 2002 | 11.4% | 11.1% | 6.7% | 7.3% |
| 2003 | 13.8% | 14.2% | 7.0% | 8.1% |
| 2004 | 14.4% | 16.6% | 8.0% | 9.3% |
| 2005 | 19.5% | 21.7% | 11.3% | 11.1% |
| 2006 | 23.8% | 23.7% | 14.3% | 15.0% |
| 2007 | 26.0% | 24.5% | 17.1% | 15.6% |
| 2008 | 32.9% | 28.7% | 21.6% | 21.4% |

Source: Company Annual Reports and 10-Ks.

23. BNSF's high fuel cost share is due in part to the fact that a large share of its revenue is from intermodal traffic, which is very fuel intensive due to the higher speed of intermodal traffic compared to other types of traffic. For example, during the class period 41 percent of BNSF's unregulated revenues were from intermodal traffic (see Figure 5). In contrast, UP's intermodal traffic accounted for 24 percent of its revenues, CSX's intermodal traffic accounted for 17 percent of its revenues, and NS received 14 percent of its revenues from intermodal traffic.[62] As explained by Paul Anderson, BNSF's Vice President of Marketing Support, intermodal traffic has higher incremental fuel costs than other types of rail traffic because it moves at a higher speed.

> … 85 percent of land transportation dollars are associated with trucks. They are the main [intermodal] competitor, and so they're – they're faster than we are, and so we have to run those trains at the highest possible speed. So the horsepower per trailing ton, the amount of horsepower that we're putting on our intermodal trains is much

62. UP transaction data; CSX transaction data; NS transaction data.

> higher than we put on our carload trains, and they burn much more fuel. It's an exponential curve, meaning fuel burn increases at an increasing rate with speed, no different than your automobile. And so there's a much higher fuel burn rate on intermodal because of the horsepower per trailing ton and the operating characteristics that I described to you than compared to carload.[63]

24. The difference in the amount of high-fuel intensity intermodal traffic handled by BNSF and the other defendant railroads provides additional evidence of cost differences that would make coordinated action difficult in this industry.

### C. Mechanics of BNSF's Fuel Surcharge Formulas

25. Due to the large share of its operating costs attributable to fuel, rising fuel prices, and increased volatility of fuel prices, BNSF began introducing fuel surcharges prior to the class period. As discussed in more detail in Section IV below, BNSF fuel surcharge formulas for intermodal and carload traffic during the class period were the same in structure and operation (or nearly so) to those introduced prior to the class period in 2001. BNSF's fuel surcharge formulas in effect both prior to and during the class period called for adjustments to shippers'[64] bills based on changes in the level of a benchmark fuel price (sometimes referred to as the "reference index") above the "strike price." In BNSF's fuel surcharge formulas, when the benchmark fuel price is below the strike price, there is no fuel surcharge and the costs of fuel together with other costs are recovered to the extent that the market allows from the "base rate."[65] If the fuel price exceeds the strike price, a fuel surcharge is applied. The amount of the surcharge is based on a schedule that is tied to the strike price of the reference index and a conversion of changes in the reference index into the appropriate surcharge. It is important to note that the fuel surcharge formulas are designed such that when the reference fuel index falls, the actual level of the surcharge also falls. For example, between May 2008 and May 2009 diesel fuel prices fell

---

63. Anderson Deposition, pp. 71-72.
64. In the rail industry, a customer purchasing transportation service from a railroad is referred to as a "shipper."
65. To the extent that a shipper's contract also includes an annual or quarterly escalator clause, the fuel surcharge is applied to the base rate after escalator clauses are applied.

from $4.43 to $2.23 per gallon, a decrease of 50 percent. In response, BNSF's published carload fuel surcharge declined from 26.5 percent of revenue to 8.5 percent, a decrease of 68 percent.

26. Beginning in 2000 and continuing throughout the class period, BNSF had separate fuel surcharge formulas for intermodal and carload traffic, and, during the class period in 2004, it introduced a published fuel surcharge formula specifically for coal traffic. Until January 2006, all of BNSF's published fuel surcharge formulas assessed a percentage of the shipping price, or base rate, that BNSF charged shippers. At the start of 2006, BNSF also introduced mileage based fuel surcharges, which largely applied to local and Rule 11 agricultural shipments and local and Rule 11 coal shipments. Although the mileage based fuel surcharges were still dependent upon the level of the HDF benchmark index, the total surcharge applied to a transaction was based on the distance of a shipper's move multiplied by a surcharge rate per mile. Figure 8 summarizes the parameters of the published fuel surcharge formulas that BNSF had in place during the class period. In addition to its published fuel surcharge formulas, BNSF also negotiated idiosyncratic fuel surcharges with shippers.

**Figure 8**

**BNSF Published Fuel Surcharge Formulas In Effect During the Class Period**

| Program | Base | Start Date | Benchmark Index | Strike Price | FSC Rate at Strike Price | Increment | Additional Incremental Charge | Index Price Calculation Method | Frequency |
|---|---|---|---|---|---|---|---|---|---|
| **Carload** | Revenue | June 2003[1] | HDF | $1.25/gallon | 0.5% | $0.05/gallon | 0.50% | Average HDF price from the second prior month. | Monthly |
| | Mileage | January 2006[2] | HDF | $1.25/gallon | $0.01/mile | $0.04/gallon | $0.01/mile | Average HDF price from the second prior month. | Monthly |
| **Intermodal** | Revenue | September 2001[3] | HDF | $1.24/gallon | 1.0% | $0.04/gallon | 0.50% | Average HDF price for the prior one-week period. | Weekly (Every Wednesday) |
| **Coal** | Revenue | July 2004[4] | HDF | $1.24/gallon | 0.5% | $0.04/gallon | 0.50% | Average HDF price from the second prior month. | Monthly |
| | Mileage | January 2006[5] | HDF | $1.25/gallon | $0.01/mile | $0.06/gallon | $0.01/mile | Average HDF price from the second prior month. | Monthly |

1 BNSF Rules Book 6100-A, Item 3375C (BNSF-0511811).
2 BNSF Rules Book 6100-A, Item 3375E (BNSF-0657373-375). Applies to local and Rule 11 agriculture movements only. Expanded to apply to regulated non-agricultural movements in April 2007. BNSF-0515779-781.
3 BNSF-FSC 001702-704, BNSF-0814151; Anderson Deposition, pp. 139-140.
4 BNSF Rules Book 6100-A, Item 3380 (BNSF-0031091)
5 BNSF Rules Book 6100-A, Item 3381 (BNSF-0482727). Applies to local and Rule 11 coal movements only.

27. BNSF posted the fuel surcharges that arose from its published fuel surcharge formulas on its website before and during the class period, and also reported the level of the underlying benchmark index that was used to calculate the fuel surcharge percentage. For example, in July 2004, BNSF calculated its published carload surcharge based on the average price of HDF in May 2004, which was $1.75 per gallon. Based on the published formula for carload traffic, BNSF assessed a surcharge of 5 percent of base revenue in July 2004 (and for the two subsequent months, as the fuel price index did not materially change).[66]

28. The evidence shows that during 2002 to mid-2003, that is prior to the start of the class period, BNSF increasingly focused on including fuel surcharges in its contracts because of the concern that existing cost escalators did not reflect the increasing volatility of fuel prices, and were not allowing

66. The difference between the strike price and the HDF price was $0.496, resulting in the addition of a 4.5% surcharge over the initial 0.5% surcharge triggered at $1.25.

it to fully recover its incremental fuel costs.[67] For example, a March 2003 internal BNSF memo noted that "John Lanigan is driving for a 'fuel neutral' rate structure. Passing through the volatility of fuel prices to the customers will make BNSF less vulnerable to the extreme peaks we have experienced over the past six years."[68] Historically, BNSF used the Rail Cost Adjustment Factor (RCAF), a measure of rail industry costs approved by the STB, which includes a fuel component, as an escalator in some of its long term contracts. For example, a January 15, 2003 BNSF memo reported that about a third of BNSF's 2002 revenues were associated with contracts that contained RCAF-based escalator clauses, as compared to 27 percent of revenues that were associated with contracts that contained fuel surcharge provisions. Over 60 percent of revenues that utilized RCAF-based escalator provisions came from BNSF's coal traffic.[69] As discussed in more detail in Section III below, BNSF became concerned that the use of RCAF, which is based on industry wide average fuel costs, as an escalator in long term contracts did not appropriately capture BNSF's higher than average fuel costs, the upward trend in fuel costs, as well as the volatility of fuel prices.

## III. The alleged conspiracy to impose standardized fuel surcharges would not have facilitated anticompetitive increases in the price of rail service.

### A. Overview

29. This section briefly discusses the economic theory of cartels and then reviews, within this framework, several characteristics of the rail industry and of the role of fuel surcharges in rail pricing. Economic theory and industry characteristics suggest that the conspiracy alleged by plaintiffs and Professor Rausser did not take place. The alleged conspiracy to impose common fuel surcharges (if it took place) would likely not have facilitated anticompetitive price increases because the fuel

67. BNSF-FSC 000047-074 at 050-052, 054; BNSF-FSC 000002-026; BNSF_LOG0000287-297 at 289, 292-293; BNSF-FSC 000363.
68. BNSF-FSC 000363.
69. BNSF-0328865-873 at 865.

surcharges depended on movements in diesel fuel prices, over which BNSF and other railroads have no economic influence and whose future course was not known with any degree of certainty at any moment in time. Thus, the alleged conspiracy would not necessarily be expected to have any effect on all-in prices. This section also demonstrates that BNSF had significant unilateral incentives to adopt fuel surcharges, and to seek to include such fuel surcharges in its contracts with shippers.

**B. Economics of Cartels**

30. The economic incentive for a firm to participate in a cartel is to earn profits above the competitive level. A leading industrial organization textbook identifies several factors that facilitate the formation of a price fixing cartel. These include:

- the ability to raise market price through a combination of inelastic customer demand for the product, the inability of firms which are not members of the price fixing cartel to enter the market, and the lack of close substitutes produced by other industries;
- low expectation of punishment, such as the absence of the threat of litigation from government agencies or private customers; and
- low costs of organizing the cartel, which can occur in industries with few firms, that operate in limited geographic areas, or which produce homogenous products.[70]

31. While an industry might have characteristics that potentially facilitate collusion, its members nonetheless may still be unable to implement a successful and durable price fixing conspiracy, because – absent being quickly and effectively "punished" for doing so – each cartel member has the incentive to "cheat" on the conspiracy by cutting prices to gain incremental business at the expense of

---

70. Dennis W. Carlton and Jeffery M. Perloff, Modern Industrial Organization, 4th Edition (2005), (hereafter "Carlton & Perloff") pp. 131-136.

its co-conspirators.[71] Thus, a key characteristic of successful price fixing conspiracies is that they have the ability to detect and punish cheating by their members. As George Stigler, a Nobel Laureate in Economics, noted in a seminal article, "… no conspiracy can neglect the problem of enforcement"[72] of a price fixing agreement. Stigler explains that "[e]nforcement consists basically of detecting significant deviations from the agreed-upon prices … If the enforcement is weak, however – if price cutting is detected only slowly and incompletely – the conspiracy must recognize its weakness: it must set prices not much above the competitive level so the inducements to price cutting are small, or it must restrict the conspiracy to areas in which enforcement can be made efficient."[73] Similarly, the 2010 Department of Justice/Federal Trade Commission Horizontal Merger Guidelines, in setting out the criteria for identifying whether an industry is susceptible to coordinated actions by its participants, notes that

> A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals. This is more likely to be the case if the terms offered to customers are relatively transparent. Price transparency can be greater for relatively homogeneous products. Even if terms of dealing are not transparent, transparency regarding the identities of the firms serving particular customers can give rise to coordination, e.g., through customer or territorial allocation. Regular monitoring by suppliers of one another's prices or customers can indicate that the terms offered to customers are relatively transparent.[74]

32. As shown in this section, Professor Rausser fails to demonstrate that the characteristics of the rail industry allow participants in the alleged conspiracy to successfully detect and punish cheating from the alleged collusive agreement.

---

71. Carlton & Perloff, p. 126.
72. George J. Stigler, "A Theory of Oligopoly," reprinted in The Organization of Industry, (hereafter, "Stigler") p. 42.
73. Stigler, p. 42.
74. Horizontal Merger Guidelines, p. 26.

**C. Professor Rausser's assertion that rail pricing – including BNSF's – is transparent and his resulting implication that the railroads would have the ability and incentive to directly conspire to raise prices is unsupported by the data.**

33. Professor Rausser endorses the Stiglerian framework for analyzing price fixing cartels. He correctly acknowledges that "[p]articipating in a cartel may well fail a rationality test if it is too costly to coordinate and monitor the pricing of other conspirators to ensure that they are not deviating from the price-fixing agreement."[75] However, he incorrectly asserts that defendants could readily monitor each other's pricing behavior, claiming that "a history of regulation and published price tariffs in the rail freight industry created an environment in which rail freight pricing is well defined and well understood and price monitoring is relatively easy."[76] Similarly, in the class phase of this litigation Professor Rausser argued that "[b]ecause the rail industry was previously heavily regulated, institutions and terminology exist that ensure market intelligence about pricing can readily be communicated … Intelligence on price quotes for this service can be exchanged and both parties in the exchange know exactly what they are talking about."[77] In other words, Professor Rausser is claiming that because railroads are required to make publically available upon request tariff prices for rate regulated traffic, which are not at issue in this litigation, these regulated prices are informative about the prices for the unregulated traffic that are at issue in this litigation. Additionally, he claims that the "well understood" nature of rail transportation services allowed the defendants to easily share and monitor each other's prices. However, even if Professor Rausser is correct that rail transportation services are "well understood," it does not then follow that the *pricing* of these highly differentiated services is either "well understood" or transparent.

34. Contrary to Professor Rausser's assertion, pricing of unregulated traffic is typically subject to confidential contracts and not publically available and, therefore by definition, is not

75. Rausser, p. 45.
76. Rausser, p. 45.
77. Expert Reply Report of Gordon Rausser, Ph.D., August 27, 2010 (hereafter "Rausser Class Cert Reply"), p. 29.

transparent. While railroads may share confidential pricing information in the context of interline traffic, as shown in Figure 3 above, only 18 percent of BNSF's revenue over the 2000 through 2008 time period came from interline traffic. This is true even if BNSF and other railroads made the level of the published fuel surcharge publically available, which is just a single element of a shipper's price. Railroads typically offer service under three different pricing mechanisms. They offer service to customers through publically available pricing tariffs (or "public tariffs"), many of which are subject to regulatory review by the STB.[78] Railroads also offer service, short term in nature and limited to a specific origin and destination, subject to private price quotes, which are non-public.[79] BNSF price quote documents during the class period typically were for a period of 1 month.[80] Finally, railroads offer service under confidential contracts, which can have very long durations. BNSF's transaction data indicate whether the pricing of its unregulated traffic was subject to confidential contract, confidential private price quote or public tariff. As shown in Figure 9, nearly 68 percent of BNSF unregulated revenues during the class period were covered by confidential contracts, and another 19 percent of revenues were subject to private price quotes, which are also confidential. Only 13 percent of BNSF unregulated revenues were based on public tariff pricing. Furthermore, the share of BNSF's unregulated revenues that are subject to confidential contracts, private price quotes or public tariff pricing varies by commodity, with all or nearly all of BNSF's intermodal and coal traffic moving under confidential contracts or private price quotes, while large fractions of its lumber, metals and stone traffic moves under public tariffs. The confidential nature of the pricing for much of BNSF's traffic means that other

78. STB FAQs, available at http://www.stb.dot.gov/stb/faqs.html. For example, the GAO, in a 2006 report on competition in the rail industry, notes that the Staggers "act anticipated that some shippers might not have competitive alternatives—commonly referred to as "captive shippers"—and gave the Interstate Commerce Commission (ICC), and later the Surface Transportation Board (STB), the authority to establish a process so that shippers could obtain relief from unreasonably high rates. However, only a rate that produces revenue equal to at least 180 percent of the variable cost of transporting the shipment can be challenged." GAO, "Freight Railroads – Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed", October 2006, p. 1.

79. BNSF-0552180-388 at 280.

80. This reflects the median duration of private price quotes in BNSF transaction data.

railroads would not know the all-in rate, the base rate, whether a fuel surcharge was assessed, or whether an included fuel surcharge was a published or an idiosyncratic fuel surcharge. In the absence of such information, it would be very difficult, if not impossible, for participants in the alleged price fixing conspiracy to detect whether BNSF or any other railroad was cheating on the alleged conspiratorial price fixing agreement, by means of reductions in base rates, discounts off published fuel surcharge rates, or failure to include any fuel surcharge in contracts with shippers. The variation in the types of pricing documents used across commodities shipped also complicates the ability of other railroads to monitor BNSF's compliance with the alleged conspiracy.

**Figure 9**

## BNSF Unregulated Revenues by Price Authority Type
## 03Q3-08Q4

| | | | Percent of Revenue Under | | |
|---|---|---|---|---|---|
| STCC | STCC Name | Total Net Revenues ($MM) | Confidential Contract | Private Price Quote | Public Tariff |
| 00 | Intermodal | $20,014 | 62.5% | 36.7% | 0.8% |
| 11 | Coal | $13,278 | 100.0% | 0.0% | 0.0% |
| 24 | Lumber Or Wood | $2,560 | 6.0% | 15.4% | 78.6% |
| 28 | Chemicals | $2,558 | 95.6% | 1.2% | 3.2% |
| 20 | Food Products | $2,414 | 62.7% | 17.2% | 20.1% |
| 37 | Transportation Equip | $1,848 | 89.4% | 8.3% | 2.3% |
| 33 | Primary Metals | $1,802 | 20.7% | 12.9% | 66.4% |
| 26 | Pulp & Paper | $1,390 | 8.5% | 64.1% | 27.3% |
| 32 | Stone, Clay, Glass | $1,145 | 29.1% | 10.5% | 60.4% |
| 40 | Waste Or Scrap | $720 | 8.5% | 1.6% | 89.9% |
| | Other | $3,331 | 67.3% | 5.8% | 26.9% |
| | Total | $51,058 | 67.9% | 19.2% | 12.9% |

Source: BNSF transaction data.

Notes: Excludes transactions with codefendant or government entity listed as customer and price authorities identified as issued by other railroads. Excludes observations with unknown price authority type.

35. Because of the confidential nature of much of BNSF's pricing, standard economic principles indicate that in order to implement a successful price fixing conspiracy BNSF would have to disclose the details of its confidential pricing, and potentially other non-price contractual terms, to other railroads. Professor Rausser claims that "coordination between railroads concerning joint rate shipments also facilitates coordination and price monitoring beyond the scope of particular rail shipments."[81] However, he fails to recognize the basic economics of vertical relationships, discussed in more detail in Section VII below, which imply that BNSF would have little incentive to conspire with NS

81. Rausser, pp. 46-47.

or CSX to raise rail rates, because there is only very limited competitive overlap between the rail networks of BNSF and the eastern railroads, and higher rates charged by NS and CSX can only harm BNSF. Furthermore, plaintiffs and Professor Rausser have provided no evidence (nor am I aware of any) that indicates that BNSF disclosed any of the terms of its confidential contracts for local traffic to its principal competitor, UP. Similarly, while Professor Rausser claims that the standardized nature of rail transportation services facilitates the exchange of pricing information among railroads, he has not identified any communications between BNSF and other railroads regarding either base or all-in rates for local traffic, nor am I aware of any such communications.

36. Furthermore, Professor Rausser's incorrect claims regarding the transparency of BNSF's pricing, if taken to their logical conclusion, indicate that railroads would not need to implement a price fixing conspiracy through the use of common fuel surcharge rates, as plaintiffs have claimed. If the pricing of rail service were sufficiently transparent to allow the railroads to monitor the alleged conspiracy, as Professor Rausser claims, it should also be sufficiently transparent to facilitate a more direct conspiracy designed to increase all-in rates. The evidence does not support Professor Rausser's claims that fuel surcharges would be a more stable and workable conspiracy mechanism than a conspiracy on all-in rates, further indicating that a conspiracy to establish standardized fuel surcharges would not be expected to successfully raise prices.

### D. Even had the alleged conspiracy occurred, the alleged conspiracy mechanism would have been unlikely to result in increased all-in rates and supracompetitive profits because fuel surcharges are a single component of all-in rates, which are not easily observed by the alleged co-conspirators.

37. As discussed above, plaintiffs and Professor Rausser assert that the defendant railroads allegedly conspired to set common fuel surcharges in order to increase all-in rates. For example, plaintiffs allege in the complaint that the defendant railroads "conspired to use rail fuel surcharges … as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the

United States."[82] Similarly, Professor Rausser asserts that "adding a percentage Fuel Surcharge on top of line-haul rates or base rates is by its very nature a general price increase."[83] As an initial matter, the objective of a price fixing conspiracy is not merely to increase prices, but to increase the net present value of profits.[84] Indeed, it is incorrect as a matter of economic logic to infer a conspiracy from a mere increase in prices since such an increase can be attributable to cost increases (and other normal economic forces). In the instant case, fuel costs were increasing rapidly during the latter portion of the class period and one would expect these increases to translate into higher prices under normal competitive circumstances. Additionally, increases in demand can result in price increases that are in no way conspiratorial. The rail industry had been experiencing an increase in demand for its services during the class period.[85]

38. Unregulated rail prices are generally the result of complex negotiations covering a variety of terms, including fuel surcharges. Given the opacity of rail freight pricing, which is largely subject to confidential contracts, members of a price fixing conspiracy would have the ability, and potentially increased incentives, to cheat on the alleged conspiracy, either through offering reductions in base rates relative to those expected but-for the alleged conspiracy, or reduction in fuel surcharge provisions or other accessorial revenues,[86] or through adjustment of other non-price contract terms. The complexity of BNSF's pricing provides it with additional ability and incentive to cheat on the alleged

82. Complaint, ¶2.
83. Rausser, p. 49.
84. Carlton & Perloff, p. 122.
85. See, for example, "BNSF Announces $2.4 Billion Capital Commitment Program for 2006; About $400 Million Again Slated for Track/Facilities Expansion," *PR Newswire,* January 24, 2006; "Rails try to keep up with Wyoming coal production," *Associated Press Newswires*, January 8, 2006; "Fitch Outlook: U.S. Freight Transports to Remain Healthy in 2006," *Business Wire,* December 6, 2005.
86. Accessorial revenues result from charges for a wide variety of services and privileges that are made available in connection with the transportation of goods. For example, accessorial charges may include charges for overloaded cars, rail car contamination surcharges, weighing charges or charges for turning cars to permit loading or unloading. See, for example, BNSF Glossary, available at http://www.bnsf.com/customers/pdf/glossary.pdf.

conspiracy. As Stigler notes, the "detection of secret price cutting will of course be as difficult as interested people can make it ... The price cut will often take the indirect form of modifying some non-price dimension of the transaction."[87] BNSF's contracts with shippers specify a variety of price and non-price terms, including:[88]

- the base rate of the shipment (which can be specific to given routes served and transportation of particular commodities);
- price adjustment provisions based on fuel and nonfuel cost factors;
- service quality requirements;
- demurrage fees, which reflect charges for storage of shipments by BNSF;
- insurance charges;
- indemnity provisions;
- volume commitments;
- traffic routing;
- transload fees, which are fees for moving containers from rail to truck;
- dray, which are fees for trucking containers from the rail terminal to the final destination;
- switching fees; and
- provisions regarding equipment, including terms related to ownership of rail cars, service of rail cars, and the type of rail cars covered by the contract.

87. Stigler, p. 44.
88. See, for example, BNSF contract with [redacted] dated January 1, 2007 (BNSF-0681709-720); BNSF contract with [redacted] dated April 1, 2002 (BNSF-0681536-581); and BNSFQ 111790 implementing agreement (BNSF-0814137-143); BNSF implementing agreement with [redacted] (BNSF-0679489-494).

39. While Professor Rausser acknowledges that a conspiracy in the rail industry to fix base rates alone (but not fuel surcharges) "would have been extremely complex, very costly, and effectively unmanageable,"[89] he fails to realize the full implications of this conclusion. The complexity and confidential nature of rail pricing that make a conspiracy on base rates "unmanageable" also imply that a conspiracy to fix fuel surcharges would also be unmanageable, due to the inability of cartel participants to monitor each other's all-in rates to ensure compliance with the price fixing agreement. The wide variation in observed price changes across commodities and over time for both all-in and base rates provides evidence that a base rate conspiracy would indeed be unmanageable. As demonstrated in Appendices D and E, changes in average all-in and base rates differed dramatically across commodities shipped by BNSF over the class period. Appendix D to this report shows changes in the all-in rates for BNSF's 30 largest commodities from the pre-class period through the class period, and Appendix E shows changes in the base rates for these commodities.

40. Defendant railroads can change the all-in rate of a shipment by adjusting the base rate or any accessorial charges (including fuel surcharges) of a contract. Evidence suggests that in negotiations with its customers, BNSF was willing to discount its base rates for some shippers when adding a fuel surcharge to its contracts, demonstrating that even if a shipper were willing to agree to pay a published fuel surcharge, it would not necessarily mean that shipper would see its all-in rate increased by that amount.[90] Additionally, large portions of BNSF's unregulated traffic were subject to idiosyncratic fuel surcharges, mileage based surcharges, or no surcharge at all. These facts suggest that BNSF often offered discounts on fuel surcharges to certain shippers, and indicate that such discounts could have been an easily available avenue for cheating on the alleged conspiracy. This variation also

---

89. Rausser, p. 52, fn. 94.

90. For example, during an October 2005 contract renegotiation with BNSF [redacted] indicated that it would not be willing to accept a 5 percent increase in base rates if a fuel surcharge was to be a part of the renegotiated contract. BNSF made a new offer for a 3 percent base rate increase plus a fuel surcharge and [redacted] accepted. (BNSF-0544851-853) During October 2003 contract negotiations with [redacted] BNSF indicated to [redacted] "a willingness to negotiate the base rate increase vis-à-vis the FSC threshold." (BNSF-0342819-820)

indicates that, contrary to Professor Rausser's and plaintiffs' claims, BNSF did not come close to "achiev[ing] universal coverage of rate-based Fuel Surcharges."[91] As shown in Figure 10, during the class period, on average, only 49 percent of BNSF's revenues were under the published revenue based fuel surcharges, while 23 percent paid no fuel surcharge at all, nearly 17 percent paid idiosyncratic revenue based fuel surcharges and 12 percent paid mileage based fuel surcharges. While idiosyncratic fuel surcharges resulted in shippers paying fuel surcharge percentages both above and below the rates specified by BNSF's published carload, intermodal and coal surcharges, the majority of shippers with idiosyncratic fuel surcharges paid less than the relevant fuel surcharge rate. For example, almost 12 percent of shippers paid fuel surcharges that were below the relevant published fuel surcharge, while 5 percent paid fuel surcharges that were above the relevant published fuel surcharge. Moreover, the incidence of the published fuel surcharges varied widely across different commodities, with only 29 percent of coal revenues paying the published revenue based fuel surcharges, 67 percent of intermodal revenues paying the published revenue based intermodal fuel surcharges and 56 percent of carload revenues paying the published revenue based carload fuel surcharges.[92]

---

91. Rausser, p. 127.
92. This analysis is limited to revenue earned from price authorities that were first began on July 1, 2003 or later. These calculations compare the fuel surcharge percentage reported in the BNSF transaction data to the published fuel surcharge rates from the relevant surcharge formula. Instances where the shipper's fuel surcharge percentage is more than 0.5 percentage points different than the published rate are classified as idiosyncratic. In instances where BNSF's data do not report a fuel surcharge percentage, I calculate these from the transaction data based on reported total and surcharge revenues. This approach may understate the share of revenues that are on idiosyncratic fuel surcharges as, in a given period, an idiosyncratic fuel surcharge may have a realized outcome similar to that of the published surcharge formulas

**Figure 10**

**Share of BNSF Unregulated Revenue From New Price Authorities**
**By Commodity Group and Type of Fuel Surcharge**
**03 Q3 - 08 Q4**

| Commodity Group | Year | Net Revenue ($MM) | No Surcharge | Published Surcharge | Idiosyncratic Surcharge (Higher) | Idiosyncratic Surcharge (Lower) | Mileage Based Surcharge |
|---|---|---|---|---|---|---|---|
| All Traffic | 2003 | $180 | 61.9% | 31.9% | 3.5% | 2.6% | |
| | 2004 | $1,374 | 60.4% | 29.7% | 4.6% | 5.3% | |
| | 2005 | $2,153 | 34.6% | 47.0% | 7.7% | 10.3% | 0.4% |
| | 2006 | $3,207 | 22.4% | 55.8% | 4.0% | 13.5% | 4.3% |
| | 2007 | $4,491 | 16.2% | 54.6% | 3.8% | 12.6% | 12.8% |
| | 2008 | $5,547 | 13.8% | 46.5% | 5.4% | 11.7% | 22.5% |
| | 2003-2008 | $16,953 | ***23.0%*** | ***49.0%*** | ***4.9%*** | ***11.5%*** | ***11.6%*** |
| Intermodal | 2003 | $23 | 15.5% | 65.6% | 3.0% | 15.8% | |
| | 2004 | $206 | 23.0% | 56.9% | 2.3% | 17.8% | |
| | 2005 | $368 | 3.5% | 65.2% | 10.6% | 20.8% | |
| | 2006 | $806 | 0.8% | 74.5% | 5.5% | 19.2% | |
| | 2007 | $1,423 | 0.2% | 73.3% | 3.6% | 22.9% | 0.0% |
| | 2008 | $1,731 | 0.1% | 59.8% | 10.3% | 29.8% | 0.0% |
| | 2003-2008 | $4,557 | 1.6% | ***66.9%*** | 7.0% | 24.4% | 0.0% |
| Carload | 2003 | $84 | 41.9% | 50.1% | 6.6% | 1.4% | |
| | 2004 | $542 | 36.2% | 49.4% | 10.5% | 3.9% | |
| | 2005 | $886 | 21.4% | 54.6% | 11.2% | 12.8% | |
| | 2006 | $1,247 | 13.3% | 54.9% | 5.8% | 19.0% | 7.0% |
| | 2007 | $1,565 | 10.9% | 56.5% | 6.0% | 13.2% | 13.4% |
| | 2008 | $1,736 | 8.3% | 59.2% | 6.2% | 5.0% | 21.3% |
| | 2003-2008 | $6,061 | 14.9% | ***55.9%*** | 7.2% | 11.0% | 11.0% |
| Coal | 2003 | $73 | 99.3% | 0.7% | | | |
| | 2004 | $626 | 93.6% | 3.8% | 0.3% | 2.3% | |
| | 2005 | $898 | 60.5% | 32.0% | 3.1% | 3.5% | 0.9% |
| | 2006 | $1,153 | 47.4% | 43.6% | 1.1% | 3.4% | 4.5% |
| | 2007 | $1,503 | 37.0% | 35.0% | 1.6% | 2.2% | 24.2% |
| | 2008 | $2,080 | 29.8% | 24.9% | 0.8% | 2.1% | 42.4% |
| | 2003-2008 | $6,334 | 46.2% | ***29.4%*** | 1.3% | 2.6% | 20.6% |

Source: BNSF transaction data.

Note:

**** Bolded and italicized numbers are discussed in the text of the report.***
FSC considered idiosyncratic if actual FSC percentage is more than 0.5 percentage points different than published FSC rate. Intermodal actual FSCs compared to any published rate in effect during that week. For revenue-based FSC shipments, FSC percentage paid by shipper is calculated as the reported percentage in BNSF data. If reported rate is missing, FSC percentage is calculated based on reported fsc revenue and gross revenue. Shipments for which there is either no reported net revenue, reported FSC revenue exceeds gross revenue, reported FSC rate is not missing but FSC revenue is missing, or a revenue-based FSC percentage paid by a shipper exceeds 50% are excluded. Data also exclude revenue from codefendants and government entities, shipments with net revenue that is either missing or equal to 0, and any price authorities identified as issued by other railroads. Data include only price authorities that first appear during the class period. 2003 percentages based on data from July 1 through December 31.

41. As discussed below in Section IV, plaintiffs and Professor Rausser improperly conflate BNSF's different fuel surcharge formulas with its published carload fuel surcharge formula. The share of BNSF's unregulated revenues during the class period paying the published carload fuel surcharges that are the focus of much of the allegations in this case is approximately only 20 percent.[93]

42. Professor Rausser, in his reply report in the class certification phase of this proceeding, presented data on fuel surcharge coverage, that is the share of traffic that was subject to fuel surcharge provisions, which he claims showed that "for each railroad 83% to 92% of its non-intermodal revenue and 92% to 100% of its intermodal revenue can be accounted for by a handful of [FSC] programs and a few identifiable exceptional programs."[94] This analysis is misleading for a number of reasons. First, his claim that 83 to 92 percent of non-intermodal traffic and 92 to 100 percent of intermodal traffic is covered by fuel surcharges are based on his analysis of defendants' transactional data for only a single week, March 5, 2007. Additionally, Professor Rausser excludes shipments that paid no fuel surcharge and shipments that paid mileage based fuel surcharges from his coverage calculations. In any event, Professor Rausser did not validate the results of his analysis against BNSF's published fuel surcharge rates. For example, Table 12 of his class certification reply report claims that 97.9 percent of BNSF's intermodal revenue for the week of March 5, 2007 paid fuel surcharge percentages between 14.0 percent and 15.0 percent. However, BNSF's published intermodal fuel surcharge for the seven days beginning on March 7, 2007 was 17 percent.[95]

93. Note, this does not include any coal traffic that may have paid the published carload fuel surcharges.
94. Rausser Class Cert Reply, p. 53.
95. BNSF-FSC 001685. The published fuel surcharge percentage for the seven days beginning February 28, 2007 was 16.5 percent.

### E. The use of fuel surcharges tied to a commodity price over which railroads have no control as a conspiracy mechanism to increase the all-in prices of rail service is inconsistent with economic theory.

43. The alleged conspiracy centers around fuel surcharges, which, as noted above, are based on formulas linked to observable market-wide measures of fuel costs, such as the HDF price index that was the basis of BNSF's published fuel surcharge formulas during the class period. A price fixing conspiracy of this nature could not materially enhance the likelihood that all-in rates for any railroad would increase by more than non-conspiratorial prices would have absent the alleged conspiracy. Indeed, as already noted, under the claimed conspiratorial mechanism, all-in rates may not have increased at all, at least for some possible changes in fuel prices. For example, had UP and BNSF agreed in 2003 to standardize their fuel surcharges, as plaintiffs allege, based on formulas that would assess a fuel surcharge if the price of HDF exceeded $1.25 per gallon, the conspiracy would result in no increase in prices or profits from the allegedly conspiratorial strategy, as long as the price of HDF was below $1.25 per gallon. Additionally, such a price fixing conspiracy would guarantee that – starting from the actual HDF price above $1.25 per gallon – prices to shippers would automatically fall with fuel prices, since fuel surcharges decline with fuel prices until fuel prices reach the strike price. That is, if the fuel prices exceeded at some point the strike price and then fall, these reductions in the fuel price would be automatically passed on to the shipper, at least until such time that the fuel price reaches the strike price again. These declines in price could in fact exceed price declines that might have existed in the absence of the alleged conspiracy.

44. During the beginning of the class period, fuel prices were rising, but fuel prices were not as volatile, nor were changes in fuel prices as dramatic, as in later years of the class period, as shown in Figure 11. Between July 2003 and June 2004, HDF prices increased from $1.44 to $1.71 per gallon, an increase of 19 percent. Between July 2004 and June 2005, HDF prices increased from $1.74 per gallon to $2.29 per gallon, an increase of 32 percent. By the summer of 2008 fuel prices peaked, with HDF

reaching $4.68 per gallon in June 2008, which reflected a 63 percent increase from the July 2007 HDF price of $2.87, and a 225 percent increase from HDF prices in July 2003. Several different reasons for this dramatic price increase have been given, including: unexpected rapid growth in worldwide demand for crude oil; inability of non-OPEC countries to keep pace with demand growth; production decisions made by OPEC countries; declining OECD member country inventories; concerns about peak oil; political events and conflicts in oil producing regions, including Iraq, Iran, Nigeria and Venezuela; changes to governmental policies, such as cuts in fuel subsidies in several countries; increased speculation in the oil futures market; and the declining value of the US dollar.[96] As explained below, none of these events were (or could have been) foreseen nor could they have been affected by the railroads, let alone BNSF.

96. Timo Behr, "The 2008 Oil Price Shock," Global Public Policy Institute Global Energy Governance Project, Policy Paper Series No. 1 (2009), pp. 10-21. EIA Short-Term Energy Outlook Supplement, "Why Are Oil Prices So High?" November 2007.

**Figure 11**




Source: EIA.

Note: Vertical reference line denotes start of the class period.

45. Because the revenue produced by fuel surcharges – if any – is linked to the strike price and changes in the price of fuel, the alleged conspiracy would not have been expected to result in increased prices for shippers in the absence of an anticipated increase in the price of fuel. Significantly, contemporaneous forecasts of fuel prices indicate that industry analysts did not anticipate the dramatic increase in fuel prices that ultimately occurred. One commonly cited source of fuel price forecasts is from the US Department of Energy's Energy Information Administration, which publishes in its Annual Energy Outlook long-term forecasts of energy prices, including for crude oil. The EIA did not forecast the dramatic increases in fuel prices that occurred in the mid to late 2000s. In 2002 the EIA forecasted that annual world crude oil prices would increase from $24 per barrel in 2003 to $28 per barrel in 2008, an increase of roughly 17 percent. In contrast, actual world crude oil prices increased over this time period

from $27 per barrel to $92 per barrel, an increase of over 230 percent.[97] The EIA compares its forecasts of energy prices to those of other entities, and it does not appear to forecast lower fuel prices than others. For example, in 2002, the EIA forecast that crude oil prices would be roughly $23 per barrel in 2005.[98] Other entities that publish such forecasts predicted that the price of WTI in 2005 would range from $19 per barrel to just under $23 per barrel.[99] None of these entities forecast the nearly $50 per barrel price actually realized that year. BNSF itself did not forecast the increase in fuel prices. Prior to the start of the class period BNSF publically stated that it did not expect a long term increase in fuel prices. In BNSF's fourth quarter 2002 earnings call Matt Rose, the CEO of BNSF, said "we don't subscribe to the fact that fuel is on some sort of upward trend."[100] Overall, as shown in Figure 12, in each year from 2000 to 2006 the EIA forecast relatively flat or declining fuel prices.

**Figure 12**

**EIA Forecasts of World Crude Oil Prices and Actual Crude Oil Prices**
**(Nominal $/Barrel)**

| Year | Actual | 2000 Projection | 2001 Projection | 2002 Projection | 2003 Projection | 2004 Projection | 2005 Projection | 2006 Projection |
|---|---|---|---|---|---|---|---|---|
| 2000 | $27.70 | | | | | | | |
| 2001 | $22.00 | $20.99 | | | | | | |
| 2002 | $23.71 | $21.52 | $22.82 | | | | | |
| 2003 | $27.71 | $22.05 | $22.36 | $24.00 | | | | |
| 2004 | $35.90 | $22.62 | $23.04 | $24.86 | $25.70 | | | |
| 2005 | $48.86 | $23.23 | $23.65 | $25.66 | $25.40 | $24.45 | | |
| 2006 | $59.02 | $23.85 | $24.25 | $26.50 | $26.10 | $25.14 | $31.78 | |
| 2007 | $67.04 | $24.51 | $24.85 | $27.36 | $26.75 | $25.87 | $29.52 | $54.75 |
| 2008 | $92.78 | $25.17 | $25.43 | $28.18 | $27.39 | $26.65 | $28.78 | $53.19 |

Source: EIA, Annual Energy Outlook Retrospective Review, 2009, Table 4.

97. These figures are in nominal dollars.
98. EIA, Annual Energy Outlook 2003, January 2003, p. 96, Table 15. Figures are in 2001 dollars.
99. EIA, Annual Energy Outlook 2003, p. 96, Table 15. Figures are in 2001 dollars.
100. BNSF Q4 2002 Earnings Conference Call, January 21, 2003.

46. Had actual fuel prices achieved the levels forecasted, the fuel surcharges that BNSF would have charged would have been very low, in a range of 0 to 2.4 percent. This indicates that if, as alleged by plaintiffs, the defendant railroads had in mid-2003 desired to enter into a price fixing conspiracy, they likely would not have viewed a conspiracy to impose fuel surcharges as an effective means of materially raising rail prices, given expectations for the foreseeable future. Direct estimation of BNSF's expected fuel surcharge percentage is complicated by the fact that BNSF's published fuel surcharge formulas during the class period were based on HDF, and I am unaware of any contemporaneous forecasts of HDF pricing. Professor Rausser claims that the fuel surcharges of the different railroads were similar, and claims that "[t]he BNSF-UP [fuel surcharge] percentage closely tracked the CSX-NS regime, only significantly diverging from each other momentarily when crude oil prices spiked in the summer of 2008."[101] It is therefore informative to proxy what BNSF's fuel surcharge percentages would have been had fuel prices met expectations using the CSX published carload fuel surcharge formulas. As shown in Figure 13, had fuel prices matched expectations, BNSF would have charged very low fuel surcharges to shippers, indicating that the alleged conspiracy to impose standard fuel surcharges would have been a poor method of raising rates for rail service. For example, had the EIA's 2002 forecast of fuel prices during the class period been met, this approach indicates that BNSF would have charged a 0.4 percent surcharge in 2003, a 0.8 percent surcharge in 2004, a 1.2 percent surcharge in 2005, a 1.6 percent surcharge in 2006, a 2.0 percent surcharge in 2007, and a 2.4 percent surcharge in 2008.[102] The fact that on the eve of the alleged conspiracy in 2003, industry observers did not forecast a dramatic rise in fuel prices in the late 2000s is especially relevant for the plausibility of plaintiffs' and Professor Rausser's claims. In particular, plaintiffs and Professor Rausser postulate a complicated conspiracy to fix one component of the all-in rate, when expectations were such that this

101. Rausser, p. 123
102. It is important to bear in mind that these fuel surcharges are not additive. That is, given the forecasts in 2002, the expected fuel surcharge would have been 2.4 percent in 2008.

alleged conspiracy could be reasonably expected to result in fuel surcharge percentages of 2.4 percent or less in every year of the class period. Indeed, Professor Rausser's own damage calculations indicate that 42 percent of the total damages from BNSF occurred in 2008 alone, and two thirds occurred in 2007 and 2008 combined. As shown above in Figure 12, world crude oil prices in 2008 exceeded expectations by 230 percent, and crude oil prices in 2007 exceeded expectations by nearly 150 percent. As such it is unreasonable to assume that the damages that Professor Rausser calculates for this period would have been anticipated at the time that the alleged conspiracy began.

**Figure 13**

**Expected FSC Percentages Based on Actual and Forecast Crude Oil Prices and CSX Published Carload FSC Formula**

| Year | Actual BNSF Fuel Surcharge Percentage | 2000 Projection | 2001 Projection | 2002 Projection | 2003 Projection | 2004 Projection | 2005 Projection | 2006 Projection |
|---|---|---|---|---|---|---|---|---|
| 2003 | 2.3% | 0.0% | 0.0% | 0.4% | | | | |
| 2004 | 4.8% | 0.0% | 0.4% | 0.8% | 1.2% | | | |
| 2005 | 11.0% | 0.4% | 0.4% | 1.2% | 1.2% | 0.8% | | |
| 2006 | 14.6% | 0.4% | 0.8% | 1.6% | 1.6% | 1.2% | 3.6% | |
| 2007 | 15.3% | 0.8% | 0.8% | 2.0% | 1.6% | 1.2% | 2.8% | 12.8% |
| 2008 | 27.0% | 1.2% | 1.2% | 2.4% | 2.0% | 1.6% | 2.4% | 12.4% |

Source: EIA; BNSF transaction data; CSXFSC152734.

Notes: FSC Formula assumed to have 0.4% surcharge at $23 strike price, and 0.4% surcharge for each $1 increment above strike price. Actual BNSF Fuel Surcharge percentage is simple average of published carload surcharges.

47. Professor Rausser acknowledges that BNSF and other railroads did not anticipate the extraordinary increases in fuel prices during the class period. As a result, Professor Rausser is forced to speculate that the purpose of the alleged conspiracy was to increase the ability of the railroads, including BNSF, to persuade shippers to accept fuel surcharges. Professor Rausser notes that "[t]his period of extensive discussions between Defendants' executives in early 2003 occurred before the precipitous rise in fuel prices was anticipated … There is nothing in these facts to suggest that

Defendants were either experiencing or anticipating a significant rise in fuel costs that motivated their adoption of the fuel surcharges."[103] What Professor Rausser fails to realize is that this lack of expectation that fuel prices would rise significantly is totally inconsistent with his claim that the fuel surcharges were an effective vehicle for implementing supracompetitive prices. If anything the observed facts indicate that at least BNSF had little if any economic basis to conclude that fuel surcharges would generate significant increases in net revenues from shippers whose contracts included fuel surcharge provisions at the time the conspiracy was allegedly formed.

48. While it is clear that the increase in the level of fuel prices after the mid-2000s was unanticipated, the price levels and variability of fuel prices during the four years immediately preceding the class period, 1999-2003, substantially exceeded the experience in the four prior years, 1994-1998, providing a unilateral incentive for BNSF to start to put in place a mechanism that would ensure that its increases in fuel costs on a forward-looking basis would be recovered. Available data indicates that the level and volatility of fuel prices increased between the late 1990s and the early 2000s, when BNSF adopted fuel surcharge formulas similar to those that plaintiffs in this litigation claim are anticompetitive. For example, as shown in Figure 14, the average prices of WTI crude oil and HDF increased substantially prior to the class period and also became more variable. Between 1994 and 1998, HDF prices averaged $1.14 per gallon, well below the strike price of BNSF's published carload fuel surcharge formula during the class period. Between 1999 and 2003, average HDF prices increased roughly 20 percent, but the variability of HDF prices increased even more, with the coefficient of variation increasing by nearly 80 percent.[104] This increase in the level and variability of fuel prices corresponds with BNSF's increased concerns discussed in Section III.F below that its historical pricing

103. Rausser, p. 61, fn 137.
104. The coefficient of variation is a normalized measure of the dispersion of a distribution, and is defined as the ratio of the standard deviation to the mean. Professor Rausser also uses this statistic. See Rausser, p. 144.

practices (for example, its use of RCAF) were not allowing it to adequately recover its incremental fuel costs.

**Figure 14**

**Average Price and Variability of Fuel Prices**
**1994-2008**

| | WTI | | | HDF | | |
|---|---|---|---|---|---|---|
| **Period** | **Average Price ($/bbl)** | **Standard Deviation** | **Coefficient of Variation** | **Average Price ($/gal)** | **Standard Deviation** | **Coefficient of Variation** |
| 1994-1998 | $18.53 | $3.16 | 0.170 | $1.14 | $0.08 | 0.071 |
| 1999-2003 | $26.53 | $5.38 | 0.203 | $1.37 | $0.17 | 0.127 |
| 2004-2008 | $67.41 | $24.27 | 0.360 | $2.72 | $0.76 | 0.279 |

Source: EIA.

**F. BNSF had unilateral and non-conspiratorial incentives to introduce fuel surcharge formulas.**

49. As discussed above, BNSF's fuel costs were an increasing component of its operating costs, prior to and during the class period, and were becoming more volatile. In light of these facts, BNSF had unilateral incentives to implement a mechanism that would enable it to recover incremental fuel costs. This is consistent with basic economics, which explains that, over the long run, firms must cover their flow of costs to remain in business.[105] For example, in May 2004, BNSF performed an analysis of whether it was adequately recovering its fuel costs on its coal shipments. The study concluded that during the 5 prior years, the incremental revenue from the fuel portion of RCAF that BNSF collected from coal shippers was approximately $300 million lower than its incremental fuel

105. Carlton & Perloff, p. 35.

expenses for these shipments.[106] BNSF attributed this shortfall to the reliance on RCAF for rate adjustments in coal contracts.[107]

50. Since at least the 1990s, BNSF, and its prior entities recovered some portion of changes in fuel costs through fuel surcharges, as well as by means of price escalators such as RCAF, the Consumer Price Index (CPI) and others.[108] RCAF was adopted by the Interstate Commerce Commission in the 1980s as a measure of industry cost trends.[109] RCAF measures changes in the prices of major components of the rail industry's operating expenses, including labor, fuel, materials, equipment rents, depreciation, interest and other expenses, and is calculated quarterly by the Association of American Railroads (AAR) based on data submitted by its members.[110] The AAR forecasts expected changes in different cost components and constructs RCAF as a fixed weight index, based on railroads' historical shares of these cost components. These weights are lagged by up to 33 months, so that, for example, the RCAF fuel weight for 2004 Q4 through 2005 Q3 indexes was based on fuel's share of total industry costs in 2002. RCAF is calculated based on the average costs of all Class I railroads, and thus is not reflective of fuel's higher weight in BNSF's cost structure stemming from factors such as BNSF's average length of haul and traffic mix. The combined effect of these lags and the use of industry averages resulted, as shown in Figure 15, in weights for the fuel component of RCAF that were substantially lower than BNSF's fuel cost share of its operating costs.

---

106. BNSF-FSC 000150-154.
107. Anderson Deposition, p. 113.
108. Price escalators are mechanisms used to increase a contracted rate at a specified interval, such as quarterly or annually. While BNSF sets its rates based on market conditions, rather than as a simple markup over costs, obviously a portion of these base rates are meant to recover fuel costs.
109. Surface Transportation Board description of RCAF, available at http://www.stb.dot.gov/stb/industry/rcaf.html.
110. Association of American Railroads' detailed description of RCAF, available at http://www.aar.org/StatisticsAndPublications/Rail-Cost-Indexes.aspx.

**Figure 15**

## Fuel as a Percentage of Railroad Operating Costs And RCAF Fuel Weight

| Year | BNSF Fuel Share of Operating Costs | RCAF Fuel Weight |
|---|---|---|
| 2000 | 13.1% | 7.0% |
| 2001 | 13.1% | 7.1% |
| 2002 | 11.4% | 10.7% |
| 2003 | 13.8% | 10.5% |
| 2004 | 14.4% | 9.0% |
| 2005 | 19.5% | 10.6% |
| 2006 | 23.8% | 12.1% |
| 2007 | 26.0% | 16.0% |
| 2008 | 32.9% | 19.2% |

Source: BNSF Annual Reports and 10-Ks; AAR.

51. In addition to RCAF underweighting fuel costs relative to BNSF's fuel costs, the lagged nature of the fuel weight of RCAF also fails to effectively account for volatility, especially when the volatility is increasing, which it did in the class period. When fuel prices increase, the fuel weight is based on a prior period when fuel prices were lower, which dampens the impact of the increase in fuel costs on the resulting index. Similarly, when fuel prices fall, the change in the fuel weight is based on fuel cost shares from a prior period of higher fuel prices, thus causing the fuel component to fall more than the percentage drop in actual costs, so then the index overstates the reduction in fuel costs. These effects become important in periods of high and increasing price volatility. BNSF was dissatisfied with RCAF because of the underweighting of fuel costs relative to BNSF's fuel costs and the lagged nature of the fuel weight. For example, Paul Anderson, BNSF's Vice President of Marketing Support testified that

> [A]ll indices suffer from substitution effect, which is when you have extreme volatility, the index does a very poor job of capturing that volatility. And RCAF has two problems.

> We decided to move away from it … for both reasons; one, the substitution effect and its inability to capture the extreme volatility associated with fuel particularly, and then the second item is that the RCAF is a basket of goods which comes out at the average … And so our fuel expense is much higher relative to our general expenses than any of the other class 1's. Even though we're only twice the length of haul of the eastern roads, CSX and NS, we burn almost three times as much fuel … And so it does not adequately compensate … BNSF for our true fuel expense. So the [index] is very inadequate.[111]

52. BNSF witnesses also testified that BNSF's increased emphasis on including fuel surcharges in contracts even prior to the class period was in part due to the widespread use of fuel surcharges in the trucking industry, which BNSF viewed as a competitor. For example, Matt Rose, the CEO of BNSF, testified that BNSF adopted fuel surcharges that used HDF as the reference index because "the trucking industry, who has had fuel surcharges in place for decades, that was really the standard in the trucking industry and it was very well, again, not received by customers, but it was very well understood by customers."[112] In BNSF's first quarter 2003 earnings call, Mr. Rose told analysts that BNSF was trying to "emulate the trucking industry" by implementing fuel surcharges in order to "keep [intermodal] rates within a reasonable distance" of BNSF's trucking competitors.[113] As mentioned earlier, BNSF views trucks as a competitor for a significant portion of its business, such as intermodal traffic. It was therefore consistent with BNSF's unilateral interests to follow its trucking competitors' approach to recovery of incremental fuel costs.

53. The expanded reliance on fuel surcharges was in BNSF's unilateral interest also because many of its contracts made it difficult to recover incremental and unanticipated fuel costs in a timely manner absent the use of fuel surcharges, which can adjust monthly or weekly. As shown in Figure 16, a large share of BNSF's revenue comes from long term contracts. For example, during the class period, 66 percent of BNSF's revenues moved under pricing documents (i.e., pricing authorities) that were in effect

---

111. Anderson Deposition, pp. 107-108. See also BNSF-0657515-516 at 516; BNSF-0643905-906;BNSF-FSC 0000662-663.
112. Deposition of Matthew K. Rose, July 16, 2010, (hereafter "Rose Deposition"), pp. 72-73.
113. BNSF Q1 2003 Earnings Conference Call, April 22, 2003.

for a total duration of at least 5 years, and only 4 percent of its revenues moved under pricing documents that were in effect for a total duration of less than 1 year.[114] The presence of long term contracts with shippers gives BNSF a unilateral incentive to include price adjustment mechanisms that track components of costs, such as fuel surcharges, and allow it to recover incremental changes in costs through automatic modification of prices. This reduces or eliminates the need for the costly negotiations and contract revisions that otherwise would be required, especially in an environment in which fuel costs are volatile. Shippers also benefit from transparent adjustment formulas that enable them optimally to respond to their assessment of the future evolution of the prices of fuel. From this perspective, then, fuel surcharges and adjustments can be seen as risk-sharing provisions (at least for fuel prices in excess of the strike price).

114. These calculations determine contract length based on the first and last time a given pricing document appears for a given shipper. I exclude pricing documents that originate with entities other than BNSF from this calculation. This approach may understate contract length, as contracts may be in force before the first occurrence of revenue or after the last occurrence of revenue. Additionally, the data is truncated, or "right censored", as data is unavailable after the end of the class period. For example, a 5 year contract entered into on January 1, 2008 would be classified as a 1 year contract.

**Figure 16**

## Duration of BNSF Price Authorities
## 03Q3-08Q4

| | | Percent with Duration of | | | |
|---|---|---|---|---|---|
| Year | Net Revenues | Less than 1 Year | 1-3 Years | 3-5 Years | 5+ Years |
| 2003 | $3,414 | 2.7% | 8.7% | 20.7% | 67.8% |
| 2004 | $8,042 | 3.0% | 8.0% | 17.3% | 71.7% |
| 2005 | $9,066 | 2.8% | 6.9% | 16.6% | 73.7% |
| 2006 | $10,142 | 1.6% | 9.0% | 19.0% | 70.5% |
| 2007 | $10,274 | 1.7% | 18.4% | 18.9% | 61.0% |
| 2008 | $11,225 | 8.9% | 17.6% | 17.2% | 56.3% |
| 2003-2008 | $52,163 | 3.7% | 12.2% | 18.0% | 66.1% |

Source: BNSF transaction data.

Note: Excludes revenue from codefendants and government entities, price authorities identified as issued by other railroads, and transactions with missing price authorities. Duration of price authority based on first and last occurrence of shipper-price authority combinations in transactions data.

54. Additionally, BNSF has thousands of prices for different customers, routes, and commodities that are a result of complex negotiations that reflect such considerations as overall market conditions, BNSF's costs, and relative bargaining power at any given point in time. For example, as shown in Figure 17, in 2005 BNSF had over 9,000 unique price authorities.[115] Each price authority can specify different prices for different commodities and routes, so the total number of unique prices that BNSF would have to adjust to reflect both anticipated and unanticipated changes in its costs would be in the tens of thousands. For example, in a contract BNSF executed with [redacted] in April 2002,

115. BNSF's data report variables that identify the issuer and ID number for each pricing document. I identify pricing documents by unique combinations of these variables. I understand that some of these identifiers do not refer to price authorities or contracts, but rather to specific implementing agreements to master contracts. For simplicity, I refer to all BNSF pricing documents as price authorities.

there are nearly 190 unique rates for [redacted] shipments, depending on shipping lane, equipment type, rate type, and the railroad interline partner.[116] Given the large number of prices BNSF has, it would be very costly and impractical to adjust all these prices (base rates) individually on a monthly or weekly basis even if BNSF's contracts allowed it to do so. Fuel surcharge formulas "automate" rate adjustments in response to the changes in an important component of the shipping costs in a manner that is transparent to the shipper and with lower transactions costs. Of course, the parties are always free to adjust these "automated" changes in price depending on market conditions and the specific circumstance of the shipper. Moreover, these thousands of unique, confidential prices also, as discussed above, make BNSF's cheating on the alleged price fixing conspiracy difficult or impossible to detect, thus undercutting plaintiffs' and Professor Rausser's theory of the conspiracy.

**Figure 17**

**Number of BNSF Price Authorities**
**03Q3-08Q4**

| | All Price Authorities | | | | New Price Authorities | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Total | Confidential Contract | Private Price Quote | Public Tariff | Total | Confidential Contract | Private Price Quote | Public Tariff |
| 2003 | 8,597 | 1,932 | 2,699 | 3,966 | 3,790 | 793 | 1,298 | 1,699 |
| 2004 | 12,582 | 2,690 | 4,010 | 5,882 | 6,509 | 1,454 | 2,150 | 2,905 |
| 2005 | 9,323 | 1,629 | 2,562 | 5,132 | 3,550 | 597 | 844 | 2,109 |
| 2006 | 7,751 | 1,210 | 1,843 | 4,698 | 2,899 | 416 | 628 | 1,855 |
| 2007 | 5,972 | 943 | 1,176 | 3,853 | 2,065 | 349 | 441 | 1,275 |
| 2008 | 5,526 | 939 | 988 | 3,599 | 1,924 | 412 | 372 | 1,140 |

Source: BNSF transaction data.

Note: Excludes transactions with codefendants and government entities, price authorities identified as issued by other railroads, and transactions with missing price authorities or price authority types. Duration of price authority based on first and last occurrence of shipper-price authority combinations in transactions data.

55. Fuel surcharges can be efficiency enhancing. The use of fuel surcharges can reduce the transactions costs of renegotiating long term contracts in the face of unpredictable fuel cost changes,

116. BNSF-0681536-81.

making it less risky for BNSF to enter into long term contracts with shippers, and providing shippers with a transparent and stable methodology for price adjustments in a volatile fuel cost environment.

56. Fuel surcharges are one of the tools that BNSF has used to facilitate the recovery of its incremental fuel costs and serve the same function as other cost indexes that are ubiquitous in the railroad industry. The only difference is that fuel surcharges are tied only to the change in the cost of one input as opposed to a basket of inputs. In addition to enhancing the efficiency with which BNSF recovers its incremental fuel costs, fuel surcharges can also inure to the benefit of the shippers as well. For example, standardized fuel surcharges can increase the ease with which shippers can compare confidential bids for service from BNSF and UP, by reducing an aspect of the complexity of the proposal.[117]

57. While Professor Rausser admitted that each railroad had the incentive to unilaterally increase fuel surcharge coverage,[118] his analysis implies that the increased coverage of fuel surcharges in shippers' contracts could not have occurred but-for the alleged collusion. He argues that "[o]nce the conspiracy was embarked upon, common evidence shows that widespread coverage was each Defendant's explicit policy."[119] As discussed above, the upward trend in increasingly volatile fuel prices, the insufficiency of alternative methods of fuel recovery, such as RCAF, and the transactional efficiency of fuel surcharges all gave BNSF a unilateral incentive to adopt fuel surcharges and include these in as many of its contracts as possible. As Matt Rose, the CEO of BNSF, testified "[i]t was our goal to have a fuel recovery mechanism in every contract and tariff to recover the cost of fuel."[120] And, as discussed in more detail in Section IV below, while BNSF's fuel surcharge coverage increased during the class period, there remained a substantial amount of traffic that did not pay fuel surcharges.

---

117. BNSF 0028053-055.
118. Rausser Deposition 12/11/12, pp. 272-273.
119. Rausser, pp. 62-63.
120. Rose Deposition, p. 184.

58. Given that even Professor Rausser considers some fuel surcharges not to be anticompetitive, there is no reason to assume, nor is there any evidence, that BNSF would have discontinued the use of fuel surcharges during the class period in the absence of the alleged conspiracy. Moreover, the plaintiffs' hypothesis that BNSF's class period fuel surcharges would not have existed "*at all*" is not supported by the available evidence.[121] Indeed, such claim is inconsistent not only with the evidence but also with economic logic.

## IV. The history of BNSF's introduction and implementation of fuel surcharges is consistent with BNSF acting in its unilateral economic interest, and does not indicate that it participated in the alleged price fixing conspiracy.

### A. Overview

59. In this section, I review the history of BNSF's fuel surcharge formulas, and show that this history is consistent with BNSF acting independently, and does not support Professor Rausser's inference that BNSF participated in the alleged price fixing conspiracy. Plaintiffs allege that, beginning in July 2003, BNSF and the defendant railroads implemented a conspiratorial agreement to charge common fuel surcharges. However, plaintiffs and Professor Rausser effectively ignore BNSF's fuel surcharge history prior to the start of the alleged conspiracy and the implications of these pre-conspiracy fuel surcharges for their claims. BNSF used fuel surcharges in its contracts, including revenue based FSCs, well before the beginning of the class period, consistent with its unilateral incentives to implement such fuel surcharges, quite independently of the alleged price fixing rationale put forth by the plaintiffs and their economic expert. Significantly, the BNSF pre-class period published carload fuel surcharges, which the plaintiffs and Professor Rausser regard as non-conspiratorial, would have resulted in identical fuel surcharge percentages as those implemented during the class period. Plaintiffs and Professor Rausser fail to recognize or consider that BNSF's intermodal fuel surcharge formula in place

121. Plaintiffs' Supplemental Interrogatory Responses, p. 9.

during the class period was implemented in 2001, long before the alleged conspiracy period and did not change during the class period. BNSF also introduced a mileage based carload fuel surcharge beginning in 2006, prior to the STB's decision that disallowed the use of revenue based fuel surcharges for rate regulated traffic. These mileage based carload fuel surcharges, implemented during the class period, differed from other rail companies' fuel surcharges. Contrary to plaintiffs' claims that the fuel surcharge formulas of BNSF and UP moved in "lockstep", BNSF's published fuel surcharge formulas covering intermodal and coal shipments, which accounted for over 60 percent of BNSF's revenues, were different from those applied by UP. Finally, although UP's and BNSF's published carload fuel surcharge formulas were similar, the actual carload fuel surcharges paid by BNSF shippers and UP shippers differed on average during the class period. These facts indicate that BNSF acted unilaterally in developing and implementing its fuel surcharge formulas, and are inconsistent with claims that BNSF coordinated with UP or other railroads regarding fuel surcharge formulas.

60. While Professor Rausser recognizes that BNSF had multiple published fuel surcharge formulas covering different types of traffic, he incorrectly claims that while "Defendants may have had slightly different formulas for carload, intermodal and coal … [this] does not negate the common impact of those formulas upon the Class."[122] He further asserts that "[s]o long as shippers subjected to the *least* aggressive of these programs … were consistently harmed, Class members subjected to the other formulas will have suffered injury as well, only [to] a greater degree."[123] However, here Professor Rausser merely assumes that the different intermodal, coal and carload fuel surcharges are anticompetitive, and does not investigate whether evidence supports the claim that these different fuel surcharge formulas were consistent with BNSF's unilateral economic interest, or whether they can only be explained in the context of a collusive agreement. Regardless, Professor Rausser's focus on the

122. Rausser, p. 124.
123. Rausser, p. 126.

spread of fuel surcharges during the class period is misplaced, as discussed above, as even Professor Rausser acknowledges that fuel surcharges themselves are not necessarily anticompetitive or collusively arrived at. Instead, a successful price fixing conspiracy would have the effect of ultimately raising all-in rates above non-conspiratorial levels which is not necessarily the same as implementing fuel surcharges.

61. Additionally, Professor Rausser claims that the fuel hedging programs that BNSF and other railroads participated in acted as insurance against shocks to fuel prices, and that "by adopting a Fuel Surcharge regime that did not account for the benefits of hedging, the Defendants ignored their unilateral self-interest, which is further evidence that a collusive agreement was in place."[124] In this section I also show that Professor Rausser's claims regarding BNSF's hedging program are flawed as a matter of economics and that BNSF's hedging activities actually provide further evidence that it acted unilaterally.

### B. BNSF's published carload fuel surcharges existed long before the start of the class period.

62. BNSF established published carload fuel surcharges long before the start of the alleged conspiracy. For example, BNSF's predecessor BN employed fuel surcharges as far back as the 1990s.[125] In April 2000, BNSF introduced a new published carload fuel surcharge, which, like its pre-existing surcharge, used WTI crude oil as its reference index with a strike price of $28 per barrel.[126] Unlike its previous published carload fuel surcharge formula that implemented a 2 percent surcharge to the base rate regardless of the extent to which fuel prices exceeded the strike price, the new fuel surcharge formula calculated the fuel surcharge based on a formula that included an adjustment for BNSF fuel intensity and was triggered based on the average price of WTI in the prior month.[127] In October 2000,

124. Rausser, p. 106.
125. BNERM 1 (BNSF-0657303-304).
126. BNSF Rules Book 6100-A Item 3375 (BNSF-0516245).
127. BNERM 1 (BNSF-0657303-304); BNSF Rules Book 6100-A 3375 (BNSF-0516245).

BNSF introduced a minor modification and changed the period for averaging the WTI price to a one month period prior to the 20th of each month, and made minor adjustments to the FSC percentages.[128] Effective July 2001, BNSF yet again changed its published carload fuel surcharge from WTI to the EIA's Retail On-Highway Diesel Fuel (HDF) index as the reference index, with a strike price of $1.30 per gallon.[129] At that strike price, the fuel surcharge percentage was 1 percent of the base rate, with further increases of 0.5 percent for every increase of $0.05 per gallon above the HDF strike price. As a onetime adjustment, in May 2003, BNSF lowered the published carload fuel surcharge from 5 percent down to 2 percent.[130] Finally, effective June 2003, BNSF modified its published carload fuel surcharge to implement a lower strike price of $1.25 per gallon and a starting fuel surcharge percentage of 0.5 percent, keeping all other parameters unchanged. BNSF posted the effective monthly carload fuel surcharge percentages on its public website before and during the class period. Figure 18 summarizes the history of BNSF's published fuel surcharges, before and during the class period.

---

128. BNSF Rules Book 6100-A Item 3375 (BNSF-0516609-10).
129. BNSF Rules Book 6100-A Item 3375A (BNSF-0510151).
130. BNSF Rules Book 6100-A Item 3375B (BNSF-0511744).

## Figure 18

### History of BNSF Published Fuel Surcharges in Effect Prior To and During the Class Period

| Program | Base | Date | Benchmark Index | Strike Price | FSC Rate at Strike Price | Increment | Additional Incremental Charge | Index Price Calculation Method | Frequency |
|---|---|---|---|---|---|---|---|---|---|
| **Carload** | Revenue | 1990s[1] | WTI | $28/barrel | 2% | n/a | n/a | 2% of the rate when the WTI price exceeded $28 for 10 consecutive business days; and continue to apply until the WTI price falls below $28 per barrel for 4 consecutive business days. | Per Formula |
| | Revenue | April 2000[2] | WTI | $28/barrel | 2.1% | Continuous based on formula | Continuous based on formula | FSC calculated as: ((WTI/$23.5) - 1 )* .107. WTI price calculated as previous month's average WTI prices. | Monthly |
| | Revenue | October 2000[3] | WTI | $28/barrel | 2% | $2.50/barrel | 1.00% | Average of WTI price for the one month period ending on the 20th of the prior month. | Monthly |
| | Revenue | July 2001[4,5] | HDF | $1.30/gallon | 1% | $0.05/gallon | 0.50% | Average HDF price from the second prior month. | Monthly |
| | Revenue | June 2003[6] | HDF | $1.25/gallon | 0.5% | $0.05/gallon | 0.50% | Average HDF price from the second prior month. | Monthly |
| | Mileage | January 2006[7] | HDF | $1.25/gallon | $0.01/mile | $0.04/gallon | $0.01/mile | Average HDF price from the second prior month. | Monthly |
| **Coal** | Revenue | July 2004[8] | HDF | $1.24/gallon | 0.5% | $0.04/gallon | 0.50% | Average HDF price for the month immediately before the prior month. | Monthly |
| | Mileage | January 2006[9] | HDF | $1.25/gallon | $0.01/mile | $0.06/gallon | $0.01/mile | Average HDF price from the second prior month. | Monthly |
| **Intermodal** | Revenue | March 2000[10] | HDF | $1.10/gallon | 0.5% | $0.05/gallon | 0.50% | Average HDF price for the prior one-week period. | Weekly (Every Wednesday |
| | Revenue | September 2001[11] | HDF | $1.24/gallon | 1.0% | $0.04/gallon | 0.50% | Average HDF price for the prior one-week period. | Weekly (Every Wednesday |

1 BNERM1 (BNSF - 0657303-304).
2 BNSF Rules Book 6100-A, Item 3375 (BNSF - 0516245).
3 BNSF Rules Book 6100-A, Item 3375 (BNSF - 0516609, BNSF - 0516610).
4 BNSF Rules Book 6100-A, Item 3375A (BNSF-0510151).
5 On April 28, 2003, BNSF issued Item 3375B, which set the May 2003 fuel surcharge equal to 2% (rather than 5%). This was a one-time departure from the fuel surcharge table. (BNSF -0511744).
6 BNSF Rules Book 6100-A, Item 3375C (BNSF-0511811).
7 BNSF Rules Book 6100-A, Item 3375E (BNSF-0657373-375). Applies to local and Rule 11 agriculture movements only. Expanded to apply to regulated non-agricultural movements in April 2007. BNSF-0515779-781.
8 BNSF Rules Book 6100-A, Item 3380 (BNSF-0031091).
9 BNSF Rules Book 6100-A, Item 3381 (BNSF-0482727). Applies to local and Rule 11 coal movements only.
10 Kyei Deposition, pp. 24-25, 34; ; BNSF-0657309-323.
11 BNSF-FSC 001702-704, BNSF-0814151; Anderson Deposition, pp. 139-140.

63. Figure 19 reports the amount of BNSF's carload traffic, excluding coal shipments, during the class period that paid revenue based fuel surcharges, mileage based fuel surcharges, or paid no fuel surcharge.[131] During the first six-months of the alleged conspiracy, 42 percent of BNSF's non-coal carload traffic was not subject to any fuel surcharge. During the same period, 30 percent of BNSF's customers shipped products with no fuel surcharges.[132] Over the class period, 15 percent of BNSF's non-coal carload revenue and 12 percent of its shippers did not pay a fuel surcharge. Notably, by 2008, BNSF's mileage based fuel surcharges covered approximately 21 percent of revenue and 26 percent of shippers.

131. All calculations of fuel surcharge coverage presented in this section are based on revenues earned under price authorities that became effective July 1, 2003 or later.
132. In this section, a shipper is identified as unique combinations of customer name and price authority.

**Figure 19**

## Percent of Unregulated Carload Traffic From New Price Authorities By Fuel Surcharge Type
## Excludes Coal Shipments
## 03Q3-08Q4

| | Percent of Revenue | | | Percent of Customer-Price Authorities | | |
|---|---|---|---|---|---|---|
| Year | No FSC | Revenue Based FSC | Mileage Based FSC | No FSC | Revenue Based FSC | Mileage Based FSC |
| 2003 | 41.9% | 58.1% | | 30.0% | 70.0% | |
| 2004 | 36.2% | 63.8% | | 21.0% | 79.0% | |
| 2005 | 21.4% | 78.6% | | 9.5% | 90.5% | |
| 2006 | 13.3% | 79.7% | 7.0% | 5.7% | 89.7% | 4.6% |
| 2007 | 10.9% | 75.7% | 13.4% | 5.0% | 79.7% | 15.2% |
| 2008 | 8.3% | 70.5% | 21.3% | 4.3% | 69.8% | 25.9% |
| 2003-2008 | 14.9% | 74.2% | 11.0% | 12.0% | 81.0% | 7.1% |

Source: BNSF transaction data.

Note: Shipments for which there is either no reported net revenue, reported FSC revenue exceeds gross revenue, reported FSC rate is not missing but FSC revenue is missing, or a revenue-based FSC percentage paid by a shipper exceeds 50% are excluded. Data also exclude revenue from codefendants and government entities, shipments with net revenue that is either missing or equal to 0, and any price authorities identified as issued by other railroads. Data include only price authorities that first appear during the class period. 2003 percentages based on data from July 1 through December 31.

### C. BNSF's published carload fuel surcharge formulas that became effective in July 2001 and June 2003 resulted in identical fuel surcharge percentages during the class period as they would have during the pre-class period.

64. Professor Rausser's assertion that the published fuel surcharge percentage levels implemented during the class period were a result of conspiratorial price-fixing is not supported by the data. For carload traffic, which is the focus of Professor Rausser's analysis, the fuel surcharge percentages that BNSF realized during the class period as a result of the allegedly conspiratorial fuel surcharge formula are identical to those that would have been generated by the non-conspiratorial July

2001 published carload fuel surcharge formula. Put another way, a continuation of what Professor Rausser concedes were non-conspiratorial published carload fuel surcharge formula would have resulted in surcharge levels that would be identical to those stemming from the allegedly conspiratorial published carload fuel surcharge formula.[133] As discussed above and summarized in Figure 18, BNSF's only change to its published carload fuel surcharge formula between July 2001 and June 2003 was to lower the strike price from $1.30 to $1.25 per gallon and lower the initial fuel surcharge percentage. Thus, at HDF prices of $1.30 per gallon and above, these modifications had no effect on the realized fuel surcharge percentage that resulted from the June 2003 fuel surcharge formula. Figure 20 below presents the realized fuel surcharge percentages calculated using the non-conspiratorial July 2001 carload fuel surcharge formula *and* the allegedly conspiratorial June 2003 carload fuel surcharge formula. As shown by the overlapping lines on Figure 20, these two formulas resulted in the exact same realized fuel surcharge percentages during the class period, which is inconsistent with Professor Rausser's view that the post-June 2003 formula as implemented can only be explained by collusion. Consequently, Professor Rausser cannot accurately claim that the harm from the alleged conspiracy derives from increases in the published carload fuel surcharge rates that BNSF charged. That is, Professor Rausser's assertion that the level of BNSF's published carload fuel surcharges during the period was the result of any alleged price fixing conspiracy is flawed as a matter of economics and inconsistent with empirical evidence. Thus, given the empirical evidence, the only harm that Professor Rausser could ascribe to the alleged collusion is an increase in the prevalence of fuel surcharges. As I discuss in more detail below, Professor Rausser fails to provide any economic evidence that the increased use of fuel surcharges for carload traffic by BNSF was the result of a conspiracy.

---

133. As noted earlier, Professor Rausser acknowledges that fuel surcharges from the pre-class period of July 2001 are non-conspiratorial. (Rausser, p. 55)

**Figure 20**




Source: BNSF website.

### D. BNSF's realized carload fuel surcharge percentages differed from those of UP.

65. While Professor Rausser is correct that during the class period, "BNSF and UP published exactly the same [fuel surcharge percentages] as each other"[134] for carload traffic, he fails to recognize that class members who shipped such traffic actually paid different fuel surcharge percentages on average to BNSF and UP. As shown in Figure 21 below, during the class period BNSF carload shippers and UP carload shippers paid, on average, different fuel surcharge percentages. Over the class period, BNSF shippers had fuel surcharge percentages that were on average 1.5 percentage points less than those of UP shippers, ranging from 1.5 percentage points above that of UP to 4.5 percentage points

134. Rausser, p. 123.

below that of UP.[135] These differences indicate that, despite the similarity of the published carload fuel surcharge percentages for BNSF and UP, shippers on these two railroads did not in fact pay the same fuel surcharge percentages during the class period, as alleged by plaintiffs and Professor Rausser. In other words, the empirical evidence shows that BNSF and UP did not uniformly charge their customers the allegedly conspiratorial published carload fuel surcharge percentages and one or both may have at times offered discounts from these published fuel surcharge percentages.

**Figure 21**




Source: BNSF and UP transaction data.
Note: Limited to shippers paying revenue based fuel surcharges. Data also exclude revenue from codefendants and government entities and legacy shippers. Difference calculated as UP fuel surcharge percentage minus BNSF fuel surcharge percentage.

135. These figures are based on the weighted average fuel surcharge percentages paid by shippers who paid revenue based fuel surcharges during the class period, and excludes legacy shippers.

### E. BNSF's intermodal fuel surcharge formula was unchanged before and during the alleged conspiracy and differed from that of its primary rail competitor, UP.

66. BNSF had before and during the class period a separate published fuel surcharge formula for its intermodal traffic. I understand that BNSF uses a different fuel surcharge formula for its intermodal traffic because, when compared to other traffic, intermodal traffic has a higher average fuel cost per ton-mile, due to the speed of intermodal trains.[136] BNSF developed a published fuel surcharge formula for its intermodal traffic as early as 2000. Unlike BNSF's published carload fuel surcharge formula, the intermodal fuel surcharge formula has always used HDF as the reference price and is adjusted on a weekly basis. In March 2000, the strike price was $1.10 per gallon, at which point the fuel surcharge was 0.5 percent, with an increase of 0.5 percent for every $0.05 increase in price of HDF.[137] Beginning in September 2001, prior to the start of the class period, the strike price increased to $1.24 per gallon with an increase of 0.5 percent for every $0.04 increase in the price of HDF.[138] Thus, all aspects of the intermodal fuel surcharge formula were unchanged from September 2001 through the class period. That is, the intermodal fuel surcharge formula employed by BNSF during the alleged conspiracy was established during the pre-class, or non-conspiratorial, period.

67. Figure 22 presents the percentage of BNSF's intermodal traffic that was subject to fuel surcharges during the alleged class period. At the time the alleged conspiracy purportedly began, 85 percent of BNSF's intermodal revenue was from shipments that paid a revenue based fuel surcharge. The evidence also shows that almost 30 percent of BNSF's intermodal shippers in the second-half of 2003, accounting for 16 percent of revenue, were not subject to any fuel surcharge.[139]

---

136. Anderson Deposition, pp. 71-72.
137. Kyei Deposition, pp. 24-25, 34; BNSF-0657309-323.
138. BNSF-FSC 001702-704; BNSF 0814151; Anderson Deposition, pp. 139-140.
139. BNSF's intermodal traffic was not subject to mileage based fuel surcharges.

**Figure 22**

## Percent of Unregulated Intermodal Traffic From New Price Authorities By Fuel Surcharge Type

## 03Q3-08Q4

| | Percent of Revenue | | | Percent of Customer-Price Authorities | | |
|---|---|---|---|---|---|---|
| Year | No FSC | Revenue Based FSC | Mileage Based FSC | No FSC | Revenue Based FSC | Mileage Based FSC |
| 2003 | 15.5% | 84.5% | | 29.1% | 70.9% | |
| 2004 | 23.0% | 77.0% | | 26.4% | 73.6% | |
| 2005 | 3.5% | 96.5% | | 17.8% | 82.2% | |
| 2006 | 0.8% | 99.2% | | 11.7% | 88.3% | |
| 2007 | 0.2% | 99.8% | 0.0% | 11.3% | 87.6% | 1.1% |
| 2008 | 0.1% | 99.9% | 0.0% | 4.9% | 93.8% | 1.3% |
| 2003-2008 | 1.6% | 98.4% | 0.0% | 19.1% | 80.7% | 0.2% |

Source: BNSF transaction data.

Note: Shipments for which there is either no reported net revenue, reported FSC revenue exceeds gross revenue, reported FSC rate is not missing but FSC revenue is missing, or a revenue-based FSC percentage paid by a shipper exceeds 50% are excluded. Data also exclude revenue from codefendants and government entities, shipments with net revenue that is either missing or equal to 0, and any price authorities identified as issued by other railroads. Data include only price authorities that first appear during the class period. 2003 percentages based on data from July 1 through December 31.

68. In addition, I understand that UP's published intermodal fuel surcharge formula differed in many respects from BNSF's and resulted in different fuel surcharge percentages than those realized by BNSF's intermodal surcharge formula throughout the class period. UP introduced its published intermodal surcharge in September 2000.[140] UP's published intermodal fuel surcharge formula calculated the fuel surcharge percentage as the percentage increase of the calculated HDF price to a

140. UPFSC 0078792-793.

strike HDF price of $1.253 multiplied by a fuel weight.[141] From September 2000 through March 2005, the fuel weight was equal to 20 percent and the HDF price was based on the prior month's average.[142] In April 2005, UP reduced the fuel weight to 18.5 percent.[143] In October 2006, UP again reduced the fuel weight to 16.5 percent and modified the calculated HDF strike price to be equal to the monthly average from two months prior rounded to the nearest $0.05.[144] Finally, from January 2007 through December 2008, UP modified its formula to be calculated on a weekly basis instead of monthly.[145] Figure 23 plots the percentage point difference between UP's and BNSF's realized intermodal fuel surcharge percentages. As shown in Figure 23, despite Professor Rausser's claim that UP and BNSF conspired to standardize their fuel surcharges, these intermodal surcharges were not identical during the class period, especially prior to UP's move to weekly fuel surcharges in January 2007.[146] For example, during the class period BNSF's published intermodal fuel surcharges were below UP's by as much as 11 percentage points, and were at times as much as 6 percentage points greater than those of UP.

141. ((HDF/1.253) -1)*fuel weight. See UPFSC 0078792-793; UPFSC 0362818. "Fuel Weight" refers to the amount of a railroad's costs that are accounted for by fuel.
142. UPFSC 0078792-93.
143. UPFSC 0078792-793.
144. UPFSC 0362818.
145. UPFSC 0362818 (example of calculation); Master Intermodal Transportation Agreement, Item 785-A.
146. This analysis is based on a time series of UP intermodal surcharge percentages that has been provided by Professor Carlton's staff.

**Figure 23**




Source: BNSF-FSC 001502-695; BNSF-FSC 00037513-527; BNSF website.
Note: Difference calculated as UP fuel surcharge percentage minus BNSF fuel surcharge percentage.

69. As discussed above, BNSF adopted a different published fuel surcharge formula for its intermodal traffic than its carload traffic and this published intermodal fuel surcharge formula was developed prior to the alleged conspiracy. Further, UP's published intermodal fuel surcharge formula differed from BNSF's, and changed several times during the class period, while BNSF's did not change. Notably, during the class period UP's published intermodal fuel surcharge percentage was frequently either above or below BNSF's intermodal fuel surcharge percentage. Therefore, this evidence is inconsistent with Professor Rausser's claim that BNSF's intermodal fuel surcharge formula was the result of a price-fixing conspiracy.

**F. During the class period, BNSF introduced separate fuel surcharges for coal shipments and these fuel surcharges differed from those of its primary rail competitor, UP.**

70. In July 2004, BNSF introduced fuel surcharges for coal shipments that were higher than the published carload fuel surcharges. In part, BNSF adopted a separate fuel surcharge formula for coal traffic because it is more fuel intensive. For example when BNSF announced a separate coal fuel surcharge formula in 2004, it explained that the "coal fuel surcharge is being implemented in recognition of fuel representing a greater proportion of operating expense for coal trainload or unit train service than for traditional carload train service."[147] This formula implemented a strike price of $1.24 per gallon with a starting fuel surcharge of 0.5 percent and incremental 0.5 percent increases in the fuel surcharge percentage with every $0.04 increase over the HDF strike price.[148]

71. Figure 24 presents the percentage of BNSF coal traffic that paid fuel surcharges during the alleged class period. As shown in the figure, six months into the start of the alleged conspiracy, less than 1 percent of BNSF's coal revenue included a revenue based surcharge. During the class period, despite its high fuel intensity, only 33 percent of BNSF's coal revenue had a revenue based fuel surcharge and only 21 percent had a mileage based fuel surcharge. Similarly, BNSF coal shippers paying a revenue based fuel surcharge accounted for 6 percent of all coal shippers in 2003 and less than 25 percent of all coal shippers in 2008. By 2008, BNSF's mileage based fuel surcharge program, implemented for coal shipments beginning in January 2006, already covered a larger percentage of coal revenue and shippers than the alleged conspiratorial revenue based fuel surcharge.

147. BNSF-FSC 000525. See also BNSF-FSC 000505-07.
148. BNSF Rules Book 6100-A Item 3380 (BNSF-0031091-92).

**Figure 24**

## Percent of Unregulated Coal Traffic From New Price Authorities By Fuel Surcharge Type 03Q3-08Q4

| | Percent of Revenue | | | Percent of Customer-Price Authorities | | |
|---|---|---|---|---|---|---|
| Year | No FSC | Revenue Based FSC | Mileage Based FSC | No FSC | Revenue Based FSC | Mileage Based FSC |
| 2003 | 99.3% | 0.7% | | 94.0% | 6.0% | |
| 2004 | 93.6% | 6.4% | | 77.4% | 22.6% | |
| 2005 | 60.5% | 38.6% | 0.9% | 52.9% | 45.9% | 1.2% |
| 2006 | 47.4% | 48.1% | 4.5% | 39.4% | 48.8% | 11.9% |
| 2007 | 37.0% | 38.8% | 24.2% | 38.1% | 40.0% | 21.9% |
| 2008 | 29.8% | 27.8% | 42.4% | 28.5% | 24.4% | 47.1% |
| 2003-2008 | 46.2% | 33.2% | 20.6% | 52.9% | 33.0% | 14.0% |

Source: BNSF transaction data.

Note: Shipments for which there is either no reported net revenue, reported FSC revenue exceeds gross revenue, reported FSC rate is not missing but FSC revenue is missing, or a revenue-based FSC percentage paid by a shipper exceeds 50% are excluded. Data also exclude revenue from codefendants and government entities, shipments with net revenue that is either missing or equal to 0, and any price authorities identified as issued by other railroads. Data include only price authorities that first appear during the class period. 2003 percentages based on data from July 1 through December 31.

72. I understand that UP introduced a separate fuel surcharge formula for coal shippers in November 2004 with different parameters than BNSF's, which resulted in different fuel surcharge percentages. Specifically, UP introduced a published coal fuel formula which employed a strike price of $1.60 per gallon HDF, as compared to the $1.24 per gallon strike price employed by BNSF, and had a starting fuel surcharge of 0.75 percent at this strike price. For every $0.05 increase in the HDF, the UP published coal fuel surcharge increased by 0.75 percent, while BNSF's coal fuel surcharges increased by

0.5% for every $0.04 increment.[149] Figure 25 plots the percentage point difference between UP's and BNSF's realized coal fuel surcharge percentages. Despite Professor Rausser's claim that these fuel surcharges were a result of collusion among UP and BNSF to standardize fuel surcharges, these coal fuel surcharge percentages differed materially during the class period. Between November 2004 and December 2008, UP's published coal fuel surcharge was always higher than that of BNSF, by as much as 7 percentage points.

**Figure 25**




Source: UP website; BNSF website.
Note: Difference calculated as UP fuel surcharge percentage minus BNSF fuel surcharge percentage.

149. UPFSC0001273.

73. Again, the implementation of a separate coal fuel surcharge formula that was different from UP's fuel surcharge formula for its coal shipments is inconsistent with BNSF's participation in the alleged price-fixing conspiracy.

**G. Prior to the STB decision on fuel surcharges for regulated traffic, BNSF introduced mileage based fuel surcharges.**

74. In 2007, the STB disallowed the use of revenue based fuel surcharges for rate regulated traffic but did not prohibit their use for rate unregulated traffic. However, even prior to the STB's decision, BNSF had introduced mileage based fuel surcharges for certain customers and strived to widen inclusion of mileage based fuel surcharges in shippers' contracts.

75. The STB opened a hearing process in May 2006 to consider and request comments regarding "rail carrier practices related to fuel surcharges".[150] As a result of this proceeding, the STB concluded that "[s]hippers acknowledged that railroads are entitled to recover the increased costs they incur from the rising price of fuel" but directed the railroads to use fuel surcharges other than revenue based fuel surcharges for rate regulated traffic.[151]

76. In March 2005, prior to the STB proceeding, BNSF announced that it was adopting mileage based fuel surcharges, to be implemented in January 2006.[152] In October 2005, BNSF announced that the mileage based fuel surcharge formulas for coal and agricultural products would become effective on January 1, 2006, as scheduled, but that an effective date for intermodal, automotive and other carload traffic would be announced later.[153] The new mileage based formula employed the same strike price as the published carload revenue based fuel surcharge formula, $1.25

150. Surface Transportation Board Decision, STB Ex Parte No. 661, Rail Fuel Surcharges, January 25, 2007, p. 1.
151. *Id*, pp. 1, 6, 9.
152. Deposition of John Lanigan, June 22, 2010, (hereafter "Lanigan Deposition"), pp. 239-241; BNSF-FSC000223-24.
153. BNSF-FSC 000280.

per gallon HDF. Fuel surcharges for local and Rule 11 carload traffic other than coal (initially agricultural products) were calculated as $0.01 per mile at the strike price with increases of $0.01 per mile with every increase of $0.04 per gallon in the HDF price.[154] Fuel surcharges for local and Rule 11 coal traffic also had a rate of $0.01 at the strike price of $1.25, but had increases of $0.01 per mile for every increase of $0.06 per gallon in the HDF price.[155] BNSF was unable to include these new fuel surcharge formulas in its rates for interline traffic due to implementation concerns raised by other Class I railroads.[156] Additionally, BNSF's original plan was to apply these new formulas to all local and Rule 11 traffic going forward.[157] However, due to objections from its customers BNSF adopted mileage based fuel surcharges only on coal and agricultural products in 2006.[158]

77. As seen above in Figures 19 and 24, BNSF's use of mileage based surcharges for coal and agricultural products has increased rapidly since their inception in 2006. During 2006, 5 percent of unregulated coal revenue included a mileage based surcharge. In 2008, that percentage increased dramatically, as over 42 percent of BNSF's unregulated coal revenue was covered by a mileage based fuel surcharge. This accounted for 47 percent of BNSF's coal shippers. Similarly, for the other unregulated carload traffic, 7 percent of BNSF's revenue included a mileage based fuel surcharge during 2006. By 2008, 21 percent of BNSF's other carload revenue and almost 26 percent of BNSF's other carload shippers were subject to a mileage based fuel surcharge.

78. Professor Rausser correctly notes that BNSF had considered implementing mileage based fuel surcharges even prior to the start of the class period, but improperly concludes that its failure

154. BNSF Rules Book 6100-A, Item 3375E (BNSF-0657373-75).
155. BNSF Rules Book 6100-A, Item 3381A (BNSF-0482727).
156. Lanigan Deposition, p. 238; BNSF-0031077-079. See also BNSF-0027658. ("I have spoken to the CN, UP, NS and CSXT, regarding the possibility of sending prices with fuel surcharges based on a per mile basis. They all agreed that: 1) Their rate application systems were not set up to handle a per mile fuel surcharge.")
157. Lanigan Deposition, pp. 242-244; BNSF-0031077-079; BNSF-FSC 000223-224.
158. Lanigan Deposition, pp. 238, 244-245; BNSF-0031077-079; BNSF-FSC 000280-281.

to do so is evidence of anticompetitive behavior. He argues that "[n]otwithstanding the advantages that a mileage based fuel surcharge could have brought (as recognized by its competitors) to BNSF and its customers, and despite the fact that, as BNSF's Lanigan told CSX's Gooden, BNSF could have unilaterally applied mileage based fuel surcharges to all of its traffic including interline shipments, BNSF declined to adopt any mileage based fuel surcharge for much of the Class Period."[159] However, the evidence indicates that at that time, BNSF did not implement mileage based fuel surcharges until 2006 primarily due to technical difficulties and costs associated with implementing such surcharges, as well as resistance from customers, who often preferred the administrative simplicity of revenue based fuel surcharges, and not in an attempt to charge the same fuel surcharges as other railroads.

79. First, adoption of mileage based fuel surcharges would have been costly to BNSF. John Lanigan, the Chief Marketing Officer of BNSF, testified that when BNSF considered implementing a mileage based fuel surcharge in early 2003, it "did not have systems capability internally … to deal with a mileage based fuel surcharge program. We didn't have mileage based rating systems. So it would have been a very expensive proposition to implement that system."[160]

80. Second, customer opposition to mileage based fuel surcharges was also of concern. As Mr. Lanigan testified, "we had talked to a sampling of customers, and at that point in time, the majority of the customers that we sampled were not in favor of moving to a mileage based fuel surcharge formula."[161] Certain shippers were opposed to a shift to mileage based fuel surcharge due to concerns that it would be difficult to modify their accounting systems to process mileage based surcharges, as well as the costliness of the bill auditing process.[162] Such a system change would require adding the

---

159. Rausser, p. 108.
160. Lanigan Deposition, pp. 222-223. See also BNSF-0326949-951.
161. Lanigan Deposition, p. 223; see also BNSF-0031077-079.
162. BNSF-0648777-89.

functionality to determine the mileage of each individual shipment, which was not previously an element of the billing process.

81. Third, implementing a mileage based fuel surcharge formula on interline traffic would have required BNSF's interline partners to substantially change their computer systems for purposes of billing, collection, and payment. Mr. Lanigan testified that other railroads' computer systems would not be able to accept a mileage based fuel surcharge on interline moves, stating that "our interline partners said that they would not be able to handle the reconciliation of a mileage based fuel surcharge."[163] Mr. Lanigan's testimony is confirmed by contemporaneous documents. An April 2003 email reports that its author had "spoken to the CN, UP, NS and CSXT, regarding the possibility of sending prices with fuel surcharges based on a per mile basis. They all agreed that: 1) Their rate application systems were not set up to handle a per mile fuel surcharge 2) Although the price could be sent via REN (EDI460), there is no way to send a mileage master reference that can be used to calculate the surcharge."[164]

82. In 2005, BNSF determined that it would introduce a mileage based fuel surcharge on its local traffic effective January 2006, that is on traffic that originates and terminates on BNSF's rail network. As explained above, customer preferences limited the initial application of a mileage based surcharge in January 2006 to just coal and agricultural products. Moreover, BNSF's design and implementation of a mileage based fuel surcharge formula during the class period contradicts Professor Rausser's claim that the Defendants conspired to apply the same fuel surcharge to all of their traffic. In his report, Professor Rausser asserts that "[t]he evidence likewise shows that Defendants sought to apply their Fuel Surcharges uniformly to shippers, regardless of how many railroads served the routes along which those shippers desired freight transportation, as well as to interline and single-line

---

163. Lanigan Deposition, p. 238.
164. BNSF-0329281.

routes."[165] That is, Professor Rausser claims that as part of the alleged conspiracy, BNSF and the other railroads agreed to establish common fuel surcharges for both local and interline traffic. However, he contradicts himself when he also acknowledges that BNSF actually applied different fuel surcharge formulas to some of its local traffic from its interline traffic during the class period by admitting that "the record evidence suggests that during the Class Period, BNSF applied mileage based fuel surcharges predominantly to local agriculture and coal traffic".[166]

### H. Some large shippers paid idiosyncratic fuel surcharges.

83. As discussed above and in Figure 10, 16 percent of BNSF's unregulated revenue moved under idiosyncratic fuel surcharges during the class period. Below I highlight some examples of shippers that had idiosyncratic fuel surcharge arrangements. My examples do not include contracts that included fuel surcharge provisions before the class period. For example,

- [redacted] BNSF's contract with [redacted] effective April 1, 2002, did not include a fuel surcharge.[167] However, in late 2003 [redacted] agreed to pay BNSF a voluntary fuel surcharge of its own design [redacted]

---

165. Rausser, p. 66. I note that Professor Rausser's statement here is inconsistent with basic economic logic. The prices a profit maximizing firm charges its customers depend in part on competitive conditions as well at the costs of serving those customers. For example, a shipper who faces many competitive alternatives will, all else equal, pay lower prices than a shipper who faces no competitive alternatives. However, Professor Rausser's focus on the fuel surcharge without regard to all-in rates obscures the fact that shippers with fewer competitive alternatives will generally pay higher all-in prices. Furthermore, the relationship between changes in costs and changes in prices (the so-called pass-through rate) is a complicated issue, and depends on considerations that go beyond the competitive conditions facing any given shipper. For example, pass through rates can be affected by the slope and curvature of the shipper's demand function, as well as the production function of the firm. (See, e.g., Fabinger, Michal and Glen Weyl, Pass-Through and Demand Forms (December 30, 2012). Available at SSRN: http://ssrn.com/abstract=2194855 or http://dx.doi.org/10.2139/ssrn.2194855)
166. Rausser, p. 108.
167. BNSF-0681536-81; BNSF-FSC 00337916-18 at 16.

[redacted][168] BNSF received over [redacted] in net revenue from its contract with [redacted] during the class period.[169]

- [redacted] From the start of the class period until January 2005, [redacted] paid no fuel surcharge under its contract with BNSF.[170] Effective January 2005, BNSF and [redacted] agreed that [redacted] would pay BNSF the fuel surcharge that [redacted] charged its customers [redacted][171] Effective July 2005, [redacted] had the option to adopt the BNSF published intermodal fuel surcharge instead of paying a [redacted] percent increase in its base rates.[172] [redacted] chose the [redacted] percent rate increase.[173] Effective January through December 2006, [redacted] paid the published BNSF intermodal fuel surcharge, which was again renegotiated effective January 2007.[174] The renegotiated fuel surcharge was a discount from the BNSF published intermodal rate such that [redacted] would never pay a fuel surcharge higher than what would have been calculated using the 2005 base rate.[175] BNSF received at least [redacted] in net revenue from its contract with [redacted] during the class period.[176]

- [redacted] Between November 1, 2004 and April 29, 2005, [redacted] that had a contract with BNSF, agreed to pay a flat fuel surcharge of [redacted] of revenue.[177] On May 1, 2005, the fuel surcharge paid by [redacted] was modified to be a [redacted] discount off

---

168. BNSF-0073919-922 at 921; BNSF-0368426-437 at 436. The average fuel surcharge over the class period was 9.3 percent. (BNSF transaction data: Price authority BNSFC 305832).
169. BNSF transaction data: Price authority BNSFC 305832.
170. BNSF-0368426-437 at 432.
171. BNSF-0577389 at 392; BNSF-0031225 at 235; BNSF-0627247 at 266.
172. BNSF-0577389 at 392; BNSF-0031225 at 235; BNSF-0627247 at 266.
173. BNSF-0627247 at 266.
174. BNSF-0612842 at 847.
175. BNSF-0581954; BNSF-0681709 at 716-718.
176. BNSF transaction data: Price authority QT 5777. I understand from BNSF that the FSC provisions in intermodal contracts may apply to more movements in BNSF's transaction data than those listing the transportation contract number as the price authority.
177. BNSF-0800349; BNSF-0800389.

of BNSF's published intermodal fuel surcharge.[178] BNSF received at least [redacted] in net revenue from this contract with [redacted] during the class period.[179]

- [redacted] Effective May 1, 2004, [redacted] shipments on BNSF were subject to BNSF's published fuel surcharge for [redacted] shipments less [redacted] percent.[180] BNSF received at least [redacted] in net revenue under this contract during the class period.[181]
- [redacted] Effective September 1, 2004, BNSF and [redacted] entered into a contract under which [redacted] paid a flat fuel surcharge of [redacted] percent.[182] BNSF received over [redacted] in net revenue under this contract during the class period.[183]

### I. Contrary to Professor Rausser's claims, BNSF's fuel hedging programs are not evidence of collusive behavior.

84. Professor Rausser claims that BNSF's and other railroads' fuel hedging strategies demonstrate that the defendants acted anticompetitively because "by adopting a Fuel Surcharge regime that did not account for the benefits of hedging, the Defendants ignored their unilateral self-interest, which is further evidence that a collusive agreement was in place."[184] He also suggests that the existence of fuel surcharges and hedging activities allowed BNSF and the other railroads to over-recover their fuel costs, claiming that "customers were paying for events such as the huge spike in oil prices in the summer of 2008, during which period the Fuel Surcharge percentage was close to 40%, even though

178. BNSF-0800349.
179. BNSF transaction data: Price authority MA 42.
180. BNSF-0800664-667; BNSF-0800666-672.
181. BNSF transaction data: Price authority MA 66.
182. BNSFC 306882 Regulated Transportation Contract, effective September 1, 2004, p. 1. BNSFC 306882 Transportation Contract Intercarrier Agreement, effective September 1, 2004, p. 1.
183. BNSF transaction data: Price authority BNSFC 306882.
184. Rausser, p. 106.

some of the Defendants could have been well insured against such events through their hedging strategies."[185] Review of BNSF's hedging activities indicates that neither of these claims is correct.

85. The evaluation of the impacts of a hedging program depends significantly on a firm's hedging objectives. More specifically, similar firms in the same industry may evaluate hedging from drastically divergent perspectives. For example, a railroad that wishes to hedge in order to ensure a minimum degree of profitability may implement a very different hedging program than, say a railroad whose principal concern is to use hedging as means of reducing the volatility of short-term cash flows in order to manage its working capital. Professor Rausser fails to address this important aspect of hedging in his unsubstantiated assertions about the implications of hedging on BNSF's alleged participation in collusive price fixing.

86. Depending on the reasons firms enter into hedges and their hedging strategies, hedging in fact may have absolutely no impact on pricing and output decisions. Hedging, moreover, is neither riskless nor costless.[186] In any event, a review of BNSF's hedging strategy indicates that it viewed both hedges and fuel surcharges as means of reducing the impact of fuel volatility on BNSF. Both fuel surcharges and fuel hedges are implemented to mitigate the risk of fluctuations in the price of fuel, with the main economic difference being whether BNSF or a shipper bears the risk of increased fuel price volatility. However, as is well recognized by both the academic finance literature and BNSF, hedging strategies cannot provide insurance against an increasing or decreasing trend in spot prices. If the market expects, for example next year's prices to be 5 percent higher than today's price, the expected price increase should be reflected in the prices of forward and options contracts. That is, hedgers

---

185. Rausser, p. 105.
186. See Christopher Culp, Risk Transfer: Derivatives in Theory and Practice, Chapter 13 for a fuller discussion of these issues.

cannot escape or avoid the costs of rising expected prices by hedging because those price expectations are reflected in the hedging costs.

87. By contrast, BNSF's fuel surcharge formulas provide insurance against both price volatility and price increases. This is because fuel surcharges rapidly adjust shipper's rates to changes in fuel prices above the strike price via the pass-through formula. Fuel surcharges thus can (unlike hedges) compensate firms like BNSF for expected price increases, whereas hedge transactions cannot. Thus, fuel surcharges and hedging not interchangeable tools. Put another way, non-speculative hedging cannot affect a long-run marginal cost of fuel to the railroad. It can, obviously, reduce volatility.

88. Contrary to Professor Rausser's speculation that railroads, including BNSF, were both actively hedging and expanding the use of fuel surcharges during 2008 when fuel prices reached their peak, by this point in time, BNSF had virtually ceased to hedge fuel, with its SEC filings indicating that it had hedged only 3 percent of its anticipated 2008 fuel consumption.[187]

89. Professor Rausser also claims that evidence of similarity between the defendants' hedging programs is further evidence of collusive behavior, claiming that evidence that NS shared information about its hedging program with CSX "reinforces this conclusion as it shows that the Defendants were interested in being on an equal footing with respect to factors driving fuel prices and its recovery."[188] First, there is no basis for this claim in economics. Indeed, insofar as a particular hedging strategy is adopted by a given railroad, it is plausible that a similar strategy will be adopted by other railroads with comparable risk management objectives. Railroads with different risk management objectives, however, may well adopt entirely different risk management and hedging strategies.[189]

---

187. BNSF 2007 10K, p. 48.
188. Rausser, p. 106.
189. See, e.g., Peter Tufano, "Who Manages Risk? An Empirical Examination of Risk Management Practices in the Gold Mining Industry," Journal of Finance, Vol. LI, No. 4 (September 1996).

Second, the evidence shows that before and during the class period, BNSF and UP used different hedging strategies and hedged to a substantially different degree. BNSF's SEC filings report that at different points in time it engaged in over-the-counter (OTC) swaps and "costless collars" linked to the prices of NYMEX traded futures on WTI crude oil or #2 heating oil.[190] The extent of BNSF's hedging activities varied before and during the class period: BNSF hedged 35 percent of its expected fuel consumption in 2002, 67 percent in 2004, and less than 10 percent in 2007 and 2008.[191] Like BNSF, UP hedged using swaps and collars, but unlike BNSF, also hedged using futures and forward contracts.[192] UP hedged 42 percent of its 2002 fuel consumption, and reduced its hedging activity to 13 percent of fuel consumption in 2003 and 9 percent in 2004, during the class period. After 2004, UP stopped hedging fuel purchases.[193] As of the end of 2003, when BNSF's hedging activities were peaking, UP hedging activities were declining and it had hedged only 9 percent of its expected fuel consumption for 2004. Thus, the evidence does not indicate that BNSF and UP had similar hedging strategies and, according to Professor Rausser's logic, the diversity of hedging strategies followed by BNSF and UP indicates that they were acting independently.

190. See, e.g., BNSF 2004 10K, p. 38. A swap is as an exchange of a fixed rate for a floating rate. In this instance BNSF pays a fixed price for fuel to a counterparty (referred to as a "hedge price") in return for receiving the average price of oil at some future period. A costless collar is created by selling call options against a security or index while using the proceeds to purchase an equivalent amount of put options.
191. BNSF 2001 10K, p. 15; BNSF 2003 10-K, p. 37; BNSF 2006 10-K, p. 27; BNSF 2007 10-K, p. 48.
192. See, e.g., UP 2003 10K, p. 33.
193. UP 2002 10K, p. 20; UP 2003 10K, p. 26; UP 2004 10K, p. 19; UP 2005 10K, p. 26; UP 2006 10K, p. 25; UP 2007 10K and UP 2008 10K.

## V. Professor Rausser fails to provide any economic evidence that the increased use of fuel surcharges by BNSF was the result of a conspiracy.

### A. Overview

90. As discussed in Section IV above, BNSF's 2001 published carload fuel surcharge formula, which Professor Rausser acknowledges is not the product of a conspiracy, and its 2003 published carload fuel surcharge formula, which he claims was collusively set, produced identical fuel surcharge percentages. Similarly, BNSF's published intermodal surcharge formula that was in effect during the class period had not changed since 2001. Therefore, in the absence of the alleged conspiracy, the fuel surcharge percentages that BNSF would have assessed to shippers whose contracts included published fuel surcharge provisions would have been identical to those that Professor Rausser claims are the product of a conspiracy. Therefore, the only competitive harm that Professor Rausser could attempt to attribute to the alleged collusion would be at most confined to an increase in the share of shippers paying fuel surcharges due to the alleged conspiracy relative to what that share would have been in the but-for world, absent of the alleged conspiracy. As discussed below, Professor Rausser performs no economic analysis of the extent to which BNSF would have used fuel surcharges in the absence of the alleged conspiracy, and ignores the fact that BNSF used fuel surcharges prior to the class period. He further fails to recognize that the fraction of new BNSF contracts that paid fuel surcharges rapidly increased in the second half of 2002, prior to any of the communications that Professor Rausser identifies as the first evidence of any conspiratorial activity between BNSF and the other defendant railroads.

### B. BNSF used fuel surcharges prior to the start of the alleged conspiracy, and the growth in fuel surcharge coverage increased rapidly prior to the start of the conspiracy.

91. Professor Rausser provides no analysis of the share of revenues or contracts that would have been subject to fuel surcharge provisions, that is fuel surcharge coverage, but-for the alleged conspiracy. Instead, Professor Rausser reviews documents produced in discovery in this matter, which

discuss BNSF's and other defendant railroads' objectives to include fuel surcharge provisions in their contracts with shippers. Professor Rausser claims that these documents indicate that "[o]nce the conspiracy was embarked upon, common evidence shows that widespread coverage was each Defendant's explicit policy."[194] That is, Professor Rausser improperly assumes that the increased fuel surcharge coverage observed during the class period is almost exclusively the product of the alleged conspiracy. However, he fails to demonstrate that BNSF's policies regarding fuel surcharge adoption were the product of collusive agreements with the other railroads. Importantly, Professor Rausser provides no methodology that would enable a fact finder to determine the level of fuel surcharge coverage that supposedly would have existed absent the alleged conspiracy, nor does he provide any methodology for determining which class members would have paid, or not paid, fuel surcharges absent the conspiracy.

92. Available evidence indicates that BNSF was employing fuel surcharges to recover its incremental fuel costs prior to any of the communications that Professor Rausser identifies to mark the start of the alleged price fixing conspiracy. For example, a BNSF internal analysis showed that 27 percent of its 2002 gross revenues were subject to fuel surcharge provisions.[195] However, this analysis is based on the *stock* of BNSF contracts. That is, a five year coal contract that was entered into in 1999 and included no fuel surcharge provision would be included in the denominator of the calculation. A more appropriate measure of BNSF's increasing fuel surcharge coverage is to look at the *flow* of contracts that contain fuel surcharge provisions. That is, BNSF's efforts to expand fuel surcharge coverage prior to the start of the alleged conspiracy are better measured by the share of new pricing

---

194. Rausser, pp. 62-63.

195. BNSF-0328868. This document indicates that the average fuel surcharge paid, conditional on having chargeable fuel surcharge revenue was 0.9 percent. This is consistent with the fact that, since fuel prices were low in 2002, BNSF's published fuel surcharge formulas resulting in low fuel surcharge percentages, or no fuel surcharge at all. For example, BNSF's published carload fuel surcharge assessed no fuel surcharge in April, May, August and September of 2002.

documents that contained fuel surcharge provisions. Professor Rausser fails to recognize that BNSF was already increasing its use of revenue based fuel surcharges prior to the alleged conspiracy. As shown in Figure 26 below, the share of new BNSF price authorities that had revenue based fuel surcharges was increasing prior to the class period.[196] For example, in January 2001, 30 percent of new BNSF price authorities had revenue based fuel surcharges.[197] This increased to 46 percent of new price authorities in January 2003, and to 74 percent of new price authorities in June 2003, all prior to the initial implementation of the alleged conspiracy.[198] Given this increased coverage prior to the alleged conspiracy, it makes economic sense to conclude that in the but-for world, BNSF would have continued increasingly use fuel surcharges at a level much greater than that assumed by Professor Rausser. In fact, on average during the class period, the percent of new price authorities with a revenue based fuel surcharge was approximately 80 percent, just 6 percentage points higher than in June 2003, the month before the alleged conspiracy. Professor Rausser offers no evidence that BNSF did not act in accord with its unilateral interests, nor does he provide any evidence that such increased coverage is only consistent with the alleged conspiracy. In fact, given that the railroads were all experiencing higher and more volatile fuel costs, it was in every railroad's unilateral interest to broaden the fuel surcharge coverage (or increase base rates) to cope with the rising fuel costs. Additionally, subsequent to BNSF's

196. New price authorities are those that occur in the data for the first time in a given month. That is, a price authority that occurs first in July 2003 is figured into the coverage measurement in July 2003 only.

197. This analysis is based on the number of price authorities under which BNSF's transaction data reports that fuel surcharge revenue was paid, and thus likely understates the share of price authorities that included revenue based fuel surcharge provisions in period of low fuel prices, when fuel surcharge provisions would not be triggered.

198. Professor Rausser presents data (at Figures 3 and 33-36 of his report) that purport to demonstrate that the incidence of fuel surcharges for BNSF and other railroads increased from very low levels in November 2002 to very high levels in November of 2007. These calculations are fundamentally flawed for two reasons: First, Professor Rausser improperly attempts to exclude legacy shipments from his analysis. While legacy shippers are excluded from the class definition, they are relevant for determining the extent to which BNSF and other railroads employed fuel surcharges prior to the start of the class period. Second, Professor Rausser's calculations look at the stock of existing price authorities at a point in time which paid fuel surcharge revenues, rather than the flow of new price authorities that did so. Thus, a 5 year contract executed in 1999 that did not include a fuel surcharge provision would be improperly included in Professor Rausser's analysis.

introduction of mileage based fuel surcharges in 2006, the share of new price authorities that contained revenue based fuel surcharge provisions declined, as shippers' contracts increasingly included mileage based, rather than revenue based fuel surcharges. By December 2008, the share of new price authorities that contained revenue based fuel surcharges declined to 57 percent, lower than the rate observed in June 2003, just prior to the start of the class period. Mileage based fuel surcharges are not regarded by Professor Rausser and plaintiffs as resulting from the alleged price fixing conspiracy.

**Figure 26**




Source: BNSF transaction data.
Note: Price authorities for which there is either no reported net revenue, reported FSC revenue exceeds gross revenue, reported FSC rate is not missing but FSC revenue is missing, or the revenue-based FSC percentage paid by a shipper exceeds 50% are excluded. Data also exclude revenue from codefendants and government entities and any price authorities identified as issued by other railroads.

### C. Professor Rausser's damages model implies that BNSF would have had very low levels of fuel surcharge coverage but for the alleged conspiracy.

93. While in his deposition in the class certification phase of this proceeding, Professor Rausser testified that "there would still have been some fuel surcharges",[199] his damage framework implicitly adopts plaintiffs' view that in the absence of the alleged conspiracy, BNSF's class period fuel surcharges would not have existed "*at all*."[200] This follows from the fact that Professor Rausser calculates damages that are close in value to the total fuel surcharge revenues that class members actually paid. As shown in Figure 27, Professor Rausser estimates damages for BNSF of roughly $2.7 billion dollars, while class members actually paid approximately $3.0 billion in revenue based fuel surcharges to BNSF during the class period.[201] That is, Professor Rausser's damage estimate is 89 percent of the revenue based fuel surcharge revenues that class members actually paid to BNSF. This implies that in the absence of the conspiracy, BNSF would have had a very low level of fuel surcharge provisions or other fuel recovery mechanisms in its contracts with shippers. This is so despite a very substantial increase in fuel costs: as such, Professor Rausser's conclusion regarding the magnitude of damages is simply untenable.

---

199. Deposition of Gordon Rausser, Ph.D., June 3, 2010, p. 94.
200. Plaintiffs' Supplemental Interrogatory Responses, p. 9.
201. This analysis applies Professor Rausser's estimated weekly overcharges to the BNSF transaction data, and is within 0.2 percent of the damages for BNSF that Professor Rausser provides in his expert report.

**Figure 27**

**BNSF Class Member Fuel Surcharge Payments and Rausser Damage Estimate For BNSF ($MM)**

| Year | Class Member Fuel Surcharge Payments | Rausser Damage Estimate | Damages as Percent of Fuel Surcharge Payments |
|---|---|---|---|
| 2003 | $5.0 | $0.3 | 6.7% |
| 2004 | $61.0 | $46.6 | 76.4% |
| 2005 | $284.0 | $295.9 | 104.2% |
| 2006 | $640.0 | $545.7 | 85.3% |
| 2007 | $739.0 | $656.8 | 88.9% |
| 2008 | $1,268.0 | $1,107.3 | 87.3% |
| Total | $2,997.0 | $2,652.6 | 88.5% |

Source: BNSF transaction data; Rausser work papers.

## VI. BNSF's competitive behavior and the empirical evidence are inconsistent with its participation in the alleged price fixing conspiracy.

### A. Overview

94. Professor Rausser claims that he has "investigated the extent to which the Defendants engaged in the type of conduct that economists expect in connection with a price fixing conspiracy."[202] However, much of Professor Rausser's "investigation" involves reviewing and interpreting documents that defendants have produced in discovery to determine whether, in his judgment, there is evidence of a collusive agreement. Aside from cursory references to industry aggregate prices and claims that the defendant railroads' profits increased over the class period, Professor Rausser performs no analysis of

202. Rausser, p. 52.

whether the market outcomes in the rail industry are only consistent with a collusive price fixing agreement or whether, in the alternative, they are consistent with unilateral conduct by the railroads, in particular BNSF. In this section, I show that comparisons of BNSF prices that Professor Rausser asserts were the product of collusion with those he acknowledges were non-collusive indicate there is little difference between the prices he claims were "collusive" and those he agrees were not. I also show that, contrary to what one would expect in a collusive market, the alleged conspiracy did not materially reduce the frequency with which customers switched between BNSF and UP, and that BNSF gained share at UP's expense. Additionally, I show that Professor Rausser misinterprets the profit margin data he presents, which he claims supports the view that BNSF earned supracompetitive profits during the class period.

### B. The similarity in trends of all-in rates for "legacy" shippers and class members is inconsistent with the claim that BNSF raised all-in rates to class members.

95. Plaintiffs exclude from their class definition "all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered into before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract."[203] Plaintiffs exclude these so-called "legacy" shippers from the class, as they take the view that the fuel surcharges introduced prior to the class period were not the product of a conspiracy. For example, Professor Rausser states that the pre-class period fuel surcharges formulas "were apparently designed and implemented by the individual Defendants without agreement or coordination."[204] Therefore, the rates paid by "legacy" shippers during the alleged period of collusion are an appropriate benchmark for non-conspiratorial prices. If the all-in rates, including both fuel surcharges and base rates, are comparable between those shippers that

203. Class Cert Opinion, p. 7.
204. Rausser, p. 55.

paid the allegedly conspiratorial surcharges and those paid by the legacy shippers under the non-conspiratorial fuel surcharges, it would indicate that class members' rates would have been no different in the absence of the alleged conspiracy.

96. Analysis of BNSF's transaction data shows that trends in all-in rates for legacy shippers and class members were similar during the class period, thus indicating that BNSF did not successfully raise prices paid by class members over the non-conspiratorial rate. To analyze whether all-in rates systematically differed during the class period for these different categories of shippers, I perform a multiple regression analysis of the all-in rates. The deployed multiple regression controls for the type of commodity, the type of car of the shipment, whether the shipment is interline, the route of the shipment and different controls for market trends. Specifically, I control for market trends in three different ways: first through use of annual indicator variables (or "dummies"); second through the inclusion of quarterly time trend variables; and third through the use of similar variables as those used by Professor Rausser in his damage regression, such as the weight of the shipment, the distance of the shipment, GDP in destination states, fuel costs and other railroad costs. Additionally, I have expressed the all-in rates in both level and logarithmic terms. The results of this analysis are presented in Figure 28, and show that the differences between class members' all-in rates and legacy shippers' all-in rates are small. The regression specification using the level of all-in prices estimates that class members paid all-in rates that were on average $0.71 to $1.10 per thousand ton-miles lower than legacy shippers during the class period, after controlling for all other factors that could affect all-in rates, and that this difference is statistically significant. The log specifications of my regression estimate that on average class members paid all-in rates that range from 0.68 percent lower to 1.2 percent higher than legacy shippers during the class period. Similarly, these regressions suggest that the comparison of total prices paid by class members during the class period to a benchmark population of unharmed shippers implies that class members paid prices on average that were very similar to shippers who are not part of the

class. Because the terms of the published carload and intermodal fuel surcharges that BNSF used before and during the class period were identical, as discussed earlier, and since Professor Rausser acknowledges that a base rate conspiracy would have "unmanageable", this result is not unsurprising.

**Figure 28**

**Regression Analysis of the Difference in BNSF All-In Rates for Class Members and Legacy Shippers**
**July 2003 - December 2008**

| | Dependant Variable | | | | | |
|---|---|---|---|---|---|---|
| **Parameter** | **Average All - In Rate (Per TTM)** | | | **Log Average All - In Rate (Per TTM)** | | |
| Price Difference for Class Members | -1.103 | -1.101 | -0.712 | -0.65% | -0.68% | 1.19% |
| | (-28.43) | (-28.39) | (-18.63) | (-12.02) | (-12.44) | (-24.36) |
| Interline Move | 2.123 | 2.129 | 1.984 | 0.018 | 0.019 | -0.024 |
| | (45.21) | (45.33) | (42.67) | (27.96) | (28.10) | (-41.38) |
| Mileage | | | -0.039 | | | -0.954 |
| | | | (-303.35) | | | (-568.01) |
| Net Weight | | | -0.002 | | | -0.161 |
| | | | (-84.16) | | | (-910.49) |
| All-LF | | | 0.713 | | | 0.820 |
| | | | (130.24) | | | (81.04) |
| National Diesel Price | | | 0.049 | | | 0.261 |
| | | | (145.72) | | | (192.08) |
| Terminating State GDP | | | 0.000 | | | 0.162 |
| | | | (-56.80) | | | (21.82) |
| Time Dummies | Yes | No | No | Yes | No | No |
| Quarterly Time Trend and Trend Squared | No | Yes | No | No | Yes | No |
| City Route Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Car Type Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Seasonal Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Seven-Digit STCC Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Mean Dependant Variable | $47.10 | $47.10 | $47.08 | 3.63 | 3.63 | 3.63 |
| Adjusted R Squared | 0.51 | 0.51 | 0.52 | 0.57 | 0.57 | 0.66 |
| Number of Observations | 4,580,430 | 4,580,430 | 4,553,331 | 4,580,430 | 4,580,430 | 4,553,331 |

Source: BNSF transaction data.

Notes: Coefficients and t-statistics reported.
Coefficient on Class Member flag in log specification adjusted to reflect the percentage price change.
Values of mileage, net weight, All-LF, diesel price, and GDP are expressed in logarithms in the log specification.
All reported coefficients are statistically significant at the 99% level.

97. All-in prices for traffic of class-member shippers, after controlling for the relevant factors affecting price identified by Professor Rausser, appear to have been similar to those charged to customers that were legacy shippers. This result is consistent with BNSF acting independently and not consistent with BNSF obtaining collusively high prices through its participation in an alleged price fixing conspiracy.

### C. Patterns of customer switching between BNSF and UP are inconsistent with BNSF's participation in the alleged price fixing conspiracy.

98. It is well recognized that one way in which price fixing conspiracies can be successful in raising prices is by allocating customers to participants of the cartel, and then refraining from bidding aggressively for each other's customers. For example, Stigler notes that an "efficient … method of eliminating secret price cutting is to assign each buyer to a single seller."[205] Professor Rausser, in arguing that rail service is a fungible commodity, claims that "the Defendants' transaction data reveal that rail freight customers routinely switch between railroads for shipments along the same routes, confirming that they see the railroads' services as interchangeable."[206] Therefore, if the alleged conspiracy reduced price competition between BNSF and UP, its primary rail rival, one might expect that there would be a marked reduction in the amount of customer switching from the pre-class period to the class period.

99. To test whether patterns of customer switching changed over time, I have analyzed incidents of customer switching identified in the BNSF and UP transaction data. I first identified a set of customers and routes (as identified by pairs of origin and destination BEAs) that use both BNSF and UP for transportation service over the 2000 to 2008 period. I then calculate the share of the combined BNSF and UP revenues accounted for by each railroad in each year, and calculate the year-on-year

205. Stigler, pp. 42-43.
206. Rausser, p. 33.

change in BNSF's and UP's shares. As shown in Figure 29, roughly 26 percent of customer routes experienced at least a 10 percentage point change in share between BNSF and UP in 2001 and 2002. Between 2004 and 2008, nearly 24 percent of customer routes experienced at least this level of switching between BNSF and UP. This similarity in the rates of customer switching prior to and during the class period is not consistent with the patterns of customer allocation that economists often associate with successful price fixing conspiracies.

**Figure 29**

**Summary of BNSF-UP Customer Switching Analysis**

| Year | Total Customer Routes | Percent of Customer-Routes with BNSF Share Change From Prior Year: More than 50% | 30% to 50% | 10% to 30% | 10% to -10% | -10% to -30% | -30% to -50% | Less than -50% | Percentage BNSF 10%+ Gain | Percentage UP 10%+ Gain |
|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | 3,554 | 1.9% | 3.0% | 8.1% | 74.4% | 8.1% | 2.9% | 1.7% | 12.9% | 12.7% |
| 2002 | 3,546 | 1.6% | 3.0% | 8.0% | 72.9% | 8.7% | 2.9% | 2.9% | 12.6% | 14.5% |
| 2003 | 3,552 | 2.2% | 2.3% | 7.1% | 74.7% | 9.2% | 2.7% | 1.9% | 11.5% | 13.7% |
| 2004 | 3,763 | 1.5% | 2.3% | 7.8% | 76.0% | 7.8% | 2.5% | 2.0% | 11.7% | 12.3% |
| 2005 | 3,895 | 2.0% | 2.2% | 7.8% | 75.2% | 8.5% | 2.4% | 1.8% | 12.0% | 12.8% |
| 2006 | 3,815 | 1.7% | 2.6% | 7.8% | 75.1% | 7.8% | 2.5% | 2.6% | 12.1% | 12.8% |
| 2007 | 3,540 | 2.9% | 2.5% | 6.7% | 75.5% | 7.5% | 3.1% | 1.9% | 12.0% | 12.5% |
| 2008 | 3,460 | 1.4% | 2.2% | 7.0% | 77.9% | 7.4% | 2.2% | 2.0% | 10.5% | 11.5% |
| 2001-2002 | 7,100 | 1.7% | 3.0% | 8.1% | 73.6% | 8.4% | 2.9% | 2.3% | 12.8% | 13.6% |
| 2004-2008 | 18,473 | 1.9% | 2.4% | 7.4% | 75.9% | 7.8% | 2.5% | 2.1% | 11.7% | 12.4% |

Source: BNSF and UP transaction data.

Note: Observations specific to a customer, year and BEA pair.
Limited to Customer-Routes served by both BNSF and UP over 2000-2008.
Limited to Customer-Routes with at least $75,000 in total revenue in year.
Excludes revenue from codefendants and government entities.

### D. BNSF's increasing share of rail revenue at the expense of UP during the conspiracy is inconsistent with its participation in the alleged price fixing conspiracy, and is consistent with unilateral conduct.

100. Similarly, if there were a reduction in competition due to the price fixing conspiracy, it would likely have the effect of stabilizing shares of rail traffic, as BNSF and UP would abstain from effective competition for each other's business. Plaintiffs in fact allege that "Defendants also agreed

that none of the conspirators would be undercutting agreed pricing or 'stealing' market share by using their increasing revenues to subsidize discounting of underlying rates … Defendants' market shares remained stable following the 2003 agreements."[207] Stigler notes that "[f]ixing market shares is probably the most efficient of all methods of combating secret price reductions."[208]

101. Available evidence indicates that BNSF has gained share at UP's expense over the course of the conspiracy. As shown in Figure 30, in 2002 BNSF accounted for roughly 45 percent of all rail cars moved in the western United States, while UP accounted for roughly 50 percent of rail cars. By 2009, these shares were essentially reversed. These patterns of changes in overall share are consistent with unilateral conduct, and not with BNSF's participation in the alleged price fixing conspiracy.

207. Complaint, ¶95.
208. Stigler, p. 42

**Figure 30**




### E. Contrary to Professor Rausser's claims, the data he presents do not indicate that BNSF's profitability increased between the pre-class period and the class period.

102. Professor Rausser claims that the railroads "achieved record revenues and increased profitability."[209] He states that increases in freight rates and revenues "constitutes economic evidence consistent with Plaintiffs' allegation that Defendants' conspired to raise freight rates."[210] However, increases in revenues alone do not allow one to conclude that anticompetitive behavior was occurring. If costs increased at a similar pace, increased revenues and costs could simply reflect higher volumes of freight. Or, in the alternative, higher costs could lead (via pass-through) to higher gross revenues. Professor Rausser implicitly recognizes these possibilities, which do not connote collusion, and presents

209. Rausser, p. 88.
210. Rausser, p. 89.

data on the operating margins of BNSF and other railroads, claiming that it shows that "Defendant's profit margin grew over the Class Period."[211] However, Professor Rausser's interpretation of these data is incorrect, as discussed below.

103. As an initial matter the use of accounting measures of profit to infer market power has been widely recognized as highly problematic by economists.[212] In the class phase of this proceeding, Professor Rausser even cites this literature.[213] In any event, the data which Professor Rausser reports, based on quarterly earnings filings railroads make to the STB, show that BNSF achieved virtually the same operating profit margin before and during the conspiracy which is inconsistent with his claim that the allegedly collusive agreement to implement fuel surcharges increased BNSF's profitability. BNSF's average quarterly operating margin percent was 13.7 percent between 00 Q1 and 03 Q2 and 13.1 percent between 03 Q3 and 08 Q4. The operating margins that BNSF earned during the class period were within the range of historical margins over the pre-class period from 00 Q1 – 03 Q2. For example, during the pre-class period starting in 2000, annual operating margins ranged from a low of 11.9 percent in 2002 to a high of 15.2 percent in 2000.[214] During the class period, BNSF's highest annual operating margin was 14.4 percent in 2006, well within the pre-class period range. Additionally, 2003 and 2004 average operating margins of 11.3 percent and 11.2 percent were less than the pre-class period minimum margin of 11.9 percent.

---

211. Rausser, p. 90. The operating margin is calculated from BNSF's quarterly earnings reports from the STB's website as net railway operating income divided by rail operating revenue. The STB defines net railway operating income as the difference between railway operating revenues and the total of railway operating expenses, railway tax accruals and net equipment and joint facility rents. (See, for, example http://www.stb.dot.gov/econdata.nsf/c1f494991e449221852566050060ff1e/472e22167a5059a38525757d0068147e/$FILE/08rrearn4q.pdf, p. 2).

212. See Franklin M. Fisher and John J. McGowan, "On the Misuse of Accounting Rates of Return to Infer Monopoly Profits," American Economic Review, Vol. 73, No. 1 (March 1983).

213. Rausser Class Cert Reply, p. 41, fn 99.

214. STB Quarterly Earnings Reports 1997-2008, available at http://www.stb.dot.gov/econdata.nsf/c1f494991e449221852566050060ff1e?OpenView.

**Figure 31**




Source: STB Quarterly Earnings Reports.
Note: Horizontal lines reflect simple averages of quarterly operating margins.

104. Thus, based on Professor Rausser's chosen data and metric, the fact that BNSF's operating margins did not materially differ between the pre-class period and the class period is inconsistent with his claim BNSF "[was] able to achieve significant increases in [its] revenue and profitability" due to its participation in a successful price fixing conspiracy.[215]

105. The fact that BNSF's margins did not materially change from the pre-class period to the class period is confirmed by data that BNSF reported in its earnings announcements. While BNSF's total revenues and total profits increased substantially in absolute terms between 1996-2002 and 2004-2008 (to a significant degree because of increased traffic), its operating margin percentage actually declined

215. Rausser, p. 58.

slightly. As shown in Figure 32 below, between 1996-2002 and 2004-2008 BNSF's average annual freight revenues increased from roughly $9 billion to $14 billion, an increase of 61 percent, and its operating income increased from roughly $1.9 billion to $2.7 billion, an increase of 47 percent. However, BNSF's operating margin percentage decreased slightly, from 21 percent to 19 percent. This is due in large part to BNSF's skyrocketing fuel costs. In 1996-2002, BNSF's fuel costs were $1.59 per thousand ton-miles of traffic, but in 2004-2008, BNSF's fuel costs were $4.50 per thousand ton-miles, an increase of 183 percent. BNSF's total revenue per ton-mile increased from $18.77 per thousand ton-miles in 1996-2002 to $22.55 per thousand ton-miles in 2004-2008, an increase of only 20 percent. Thus, abstracting from other increases in costs over that period, the less than $4 increase in revenues per thousand ton-miles was substantially erased by the increase in fuel costs based on the same metric. The large increase in BNSF's total dollars of revenues and profits is due in part to increases in its traffic. In 1996-2002, BNSF moved an average of 469 billion ton-miles of traffic, while in 2004-2008 it moved an average of 627 billion ton-miles of traffic, an increase of roughly 34 percent. Moreover, an increase in traffic is likely to improve both total dollars of profit and profit margins, given that a portion of BNSF's costs are traffic-insensitive.

**Figure 32**

**BNSF Revenues, Fuel Costs, and Operating Income**
**1996-2008**

| Year | Freight Revenues ($MM) [1] | Revenue Ton-Miles (MM) [2] | Fuel Expenditures ($MM) [3] | Other Operating Costs [4] | Operating Income ($MM) [5]=[1]-([3]+[4]) | Revenue per TTM [6]=[1]/([2]/ 1,000] | Fuel Expenditures per TTM [7]=[3]/([2]/ 1,000] | Fuel as Percentage of Revenue [8]=[7]/[6] | Operating Income per TTM [9]=[5]/([2]/ 1,000] | Operating Margin Percentage [10]=[9]/[6] |
|---|---|---|---|---|---|---|---|---|---|---|
| 1996 | $8,102 | 411,059 | $727 | $5,666 | $1,709 | $19.71 | $1.77 | 9.0% | $4.16 | 21.1% |
| 1997 | $8,410 | 424,588 | $747 | $5,809 | $1,854 | $19.81 | $1.76 | 8.9% | $4.37 | 22.0% |
| 1998 | $8,925 | 469,000 | $721 | $6,062 | $2,142 | $19.03 | $1.54 | 8.1% | $4.57 | 24.0% |
| 1999 | $9,074 | 493,200 | $700 | $6,164 | $2,210 | $18.40 | $1.42 | 7.7% | $4.48 | 24.4% |
| 2000 | $9,112 | 492,000 | $742 | $6,537 | $1,833 | $18.52 | $1.51 | 8.1% | $3.73 | 20.1% |
| 2001 | $9,090 | 501,800 | $740 | $6,713 | $1,637 | $18.11 | $1.47 | 8.1% | $3.26 | 18.0% |
| 2002 | $8,873 | 490,234 | $848 | $6,475 | $1,550 | $18.10 | $1.73 | 9.6% | $3.16 | 17.5% |
| 2003 | $9,285 | 508,200 | $1,093 | $6,655 | $1,537 | $18.27 | $2.15 | 11.8% | $3.02 | 16.6% |
| 2004 | $10,742 | 570,688 | $1,335 | $7,925 | $1,482 | $18.82 | $2.34 | 12.4% | $2.60 | 13.8% |
| 2005 | $12,606 | 596,575 | $1,959 | $8,106 | $2,541 | $21.13 | $3.28 | 15.5% | $4.26 | 20.2% |
| 2006 | $14,545 | 647,857 | $2,856 | $8,608 | $3,081 | $22.45 | $4.41 | 19.6% | $4.76 | 21.2% |
| 2007 | $15,349 | 657,572 | $3,327 | $8,989 | $3,033 | $23.34 | $5.06 | 21.7% | $4.61 | 19.8% |
| 2008 | $17,503 | 664,384 | $4,640 | $9,466 | $3,397 | $26.34 | $6.98 | 26.5% | $5.11 | 19.4% |
| Average for | | | | | | | | | | |
| 1996-2002 | $8,798 | 468,840 | $746 | $6,204 | $1,848 | $18.77 | $1.59 | 8.5% | $3.94 | 21.0% |
| 2004-2008 | $14,149 | 627,415 | $2,823 | $8,619 | $2,707 | $22.55 | $4.50 | 20.0% | $4.31 | 19.1% |
| Percentage Change | 60.8% | 33.8% | 278.3% | 38.9% | 46.5% | 20.2% | 182.7% | 135.2% | 9.5% | -8.9% |

Source: BNSF Q4 Earnings Announcements; BNSF 10-Ks.

## VII. The information relied on by Professor Rausser does not indicate that BNSF reached a collusive agreement with other railroads to impose standardize fuel surcharges.

### A. Overview

106. In his report, Professor Rausser claims that evidence common to the class shows that, in 2003, the Defendants' coordinated both the development and implementation of their fuel surcharge formulas and that these types of communications facilitated and furthered the alleged collusion among the defendant railroads.[216] Contrary to Professor Rausser's assertion, as a matter of basic economics, BNSF had little or no incentive to collude with the eastern railroads. Increases in the price of rail services of the eastern railroads would have raised the costs that BNSF faced, and hence decreased the profits it could have earned. BNSF's economic incentives would be to reduce these costs and not raise them through price collusion.

216. Rausser, pp. 58, 61.

107. I have reviewed the documents that Professor Rausser relies upon to demonstrate that BNSF's fuel surcharges were the result of a price conspiracy. While I do not rely upon these documents for my conclusions, I note that the BNSF communications that Professor Rausser points to as evidence of BNSF's participation in the alleged collusion appear to be primarily related to interline communications between BNSF and an interline partner, and none are with BNSF's primary competitor UP. Communications about vertical relationships, as I discuss further below, are often efficiency enhancing, such as the railroads' discussions related to interline movements. Finally, Professor Rausser's claim that the Defendant railroads conspired to create AIILF is incorrect and is not supported by the evidence.

### B. BNSF had no incentive to collude with the eastern railroads.

108. As seen above, BNSF largely does not operate in the same territory as the largest eastern railroads, CSX and NS. Because BNSF does not primarily compete with these railroads for local traffic, it would have little or no incentive to collude with them on prices for local shipments. When it comes to interline movements, BNSF benefits from competition among the eastern railroads, as such competition lowers its costs. Furthermore, as I explain below, the type of interline pricing agreements that BNSF negotiated with its eastern partners eliminate the incentives for BNSF to collude with these railroads on price.

109. BNSF does compete with UP, but not CSX or NS, for shipments originating or terminating in the western part of the United States. If customers require these shipments to travel east of BNSF's railroad network, BNSF can, on some movements, interchange with either CSX or NS. Similarly, if a customer of CSX or NS requires a shipment to move west, the originating network must interchange with another rail carrier, typically with either UP or BNSF to complete the shipment. Although this type of traffic uses the rail lines of two railroads, typically the originating railroad will charge the shipper a single price and fuel surcharge to move the shipment the entire route and will negotiate with its

interline partner on how to allocate the payment between the two railroads. Therefore, for these shipments, the price to be paid to the receiving railroad is a cost incurred by the originating railroad in completing the shipment for its customer. As a result, an originating railroad has no incentive to raise its own costs by colluding on price with the receiving railroad. Rather, the originating railroad has the incentive to reduce the total cost of the shipment by encouraging competition between the two terminating eastern carriers. Similarly, when the terminating railroad is a bottleneck to the ultimate customer – say to an electric utility – it has a strong incentive to foster competition among the originating railroads (provided, of course, the customer at the origin can be reached by more than one railroad). Generally speaking, suppliers of end-to-end products or services (such as interline rail traffic), are more likely to earn higher profits when there is vibrant competition among the suppliers of the complementary components of the end-to-end product or service. There is little benefit to originating western railroads from fostering collusion among the terminating eastern railroads, nor do originating eastern railroads benefit from collusion among western railroads. Or, put simply, Professor Rausser does not examine the incentives to collude in the context of the railroad industry in which an important share of traffic is interlined.

### C. Documents cited by Professor Rausser as evidence of BNSF's participation in the alleged conspiracy appear to be consistent with competitive interactions among the railroads.

110. Professor Rausser ignores the theoretical contradictions of his argument and instead relies upon documents as support that BNSF colluded with other defendant railroads with regards to their fuel surcharges.[217] Again, while I do not rely on these documents for my conclusions, I note that the documents cited by Professor Rausser appear to be inconsistent with his price fixing allegations and

217. See, e.g., Rausser, pp. 58-70.

instead are related to meetings between the railroads to discuss the joint offering of interline service or are internal BNSF documents that make no reference to collusion.

111. Meetings between interlining railroad partners are logical as a way to enhance efficiency, as they permit railroads serving different territories to jointly offer end-to-end service to shippers who require an interlined service. The consumer benefits of providing interline service are recognized by the Staggers Act, which directs railroads to "establish through routes … with each other" and recognizes that "communications between railroads concerning interline traffic are lawful and pro-competitive."[218]

112. Railroads providing through rates[219] must address a variety of operational, marketing and pricing topics when jointly developing through rates for the interline service. Not surprisingly, BNSF met with its two principal eastern partners, CSX and NS, in what it referred to as "Alliance Meetings" to discuss operational, accounting and systems issues necessary for interline operations, including discussions of the mechanics of fuel surcharges to be applied.[220] That an interline meeting has occurred is not in and of itself evidence that the railroads were colluding on fuel surcharges or on all-in rates.

113. The documents Professor Rausser relies on to infer that BNSF reached a collusive agreement with other railroads appear to be related to the pro-competitive interline Alliance Meetings that BNSF had with CSX and NS. I note that Professor Rausser provides no evidence from Alliance Meetings between BNSF and UP, because, as I noted above, such meetings did not occur.

218. Defendant BNSF Railway Company's Supplemental Responses and Objections to Direct Purchaser Plaintiffs' Second Set of Interrogatories to Defendant BNSF Railway Company, (hereafter "BNSF's Supplemental Responses to Plaintiffs' 2nd Interrogatories"), pp. 17-18. See also 49 CFR § 10703.

219. A through rate is a single jointly priced rate from origin to destination when the move uses two or more carriers.

220. BNSF's Supplemental Responses to Plaintiffs' 2nd Interrogatories, pp. 21-22.

- Professor Rausser cites a document that summarizes an interline meeting between BNSF and NS in March 2003 to support his conclusion that "On March 18, 2003, NS and BNSF senior executives met and discussed how the fuel surcharge programs of all four Defendants were structured, and then adopted an 'action item' for the BNSF and NS senior marketing officers to address 'synchroniz[ing]' BNSF's fuel surcharge program with the programs of the other Defendants."[221] Professor Rausser fails to acknowledge that this action item (one of many discussed at the meeting) directly follows a summary of a discussion that is specifically identified as related to interline business. Finally, Professor Rausser further ignores the fact that BNSF's fuel surcharge formulas were different from those used by the eastern railroads throughout the class period, nor did BNSF ever change its fuel surcharge formulas to conform to those of UP.
- Professor Rausser proffers as additional evidence of collusive communication the fact that "On April 1, 2003, BNSF and CSX senior executives also met to discuss fuel surcharges. In early May, BNSF changed its fuel surcharge program to make it more aggressive by decreasing the formula's trigger price, which was based on the per-gallon price of diesel fuel reflected in the HDF index, to $1.25, a number that 'reflected the $23 WTI crude price used by UP.'"[222] None of the documents cited by Professor Rausser reference the April meeting between BNSF and CSX, but a draft agenda for the meeting indicates that the meeting was intended to cover a number of topics in addition to fuel surcharges, including interline, traffic movements and gateway optimization.[223] Paul Anderson testified that he believes any discussion of fuel surcharges at this meeting would be in reference to interline movements only, as it was BNSF's policy that they

221. Rausser, p. 60.
222. Rausser, p. 60.
223. Lanigan Deposition, Exhibit 8 (BNSF-0557167-81).

only discuss interline business with BNSF's connecting partners.[224] Professor Rausser claims that "[t]he Defendants monitored each other's coverage … An email exchange between BNSF and NS reflected BNSF's concern that NS was not achieving broad enough Fuel Surcharge coverage for joint-line interline movements between the two railroads."[225] The email discussion in the document appears to be related to concerns with the accuracy of the Rate EDI Network's (REN)[226] data reporting on fuel surcharge coverage with respect to interline movements and not about monitoring fuel surcharge coverage in general.

- Professor Rausser claims "[c]overage discussions among the Defendants clearly extended to Defendants' generally applicable Fuel Surcharges."[227] To support his conclusion that "[t]he evidence in the record indicates that these interactions included generally applicable discussions of Fuel Surcharges," Professor Rausser proffers only a BNSF document summarizing the March 2003 alliance meeting between NS and BNSF discussed above.[228] Once again, Professor Rausser fails to acknowledge that the limited mention of fuel surcharges as an action item pertains to the discussion of interline movements.
- Professor Rausser continues his claim the defendant executives met to discuss "network performance, sales and marketing initiatives, and business development strategies. Here, again, the record evidence suggests that these interactions included substantive and generally applicable discussions of Fuel Surcharges."[229] However, the only

224. Anderson Deposition, p. 77.
225. Rausser, pp. 68-69.
226. REN is an electronic data exchange used to facilitate interline and Rule 11 movements.
227. Rausser, p. 69.
228. Rausser, p. 93.
229. Rausser, pp. 93-94.

document cited by Professor Rausser as support for this statement makes no mention of fuel surcharges.[230]

- Finally, as evidence that the railroads coordinated their fuel surcharges, Professor Rausser cites an internal BNSF email regarding UP's April 2003 modifications to its fuel surcharge formula, in which Paul M. Anderson wrote, "This is sweet. Just like the CSXT".[231] This statement does not appear to support Professor Rausser's position. First, this email is sent from one BNSF employee to another and is not indicative of communication between BNSF and any other defendant railroad. Secondly, the UP fuel surcharge formula described in the email was based on WTI prices, had a $23 per barrel strike price, and called for a 0.4 percent surcharge for each $1 above the strike price. In other words, UP was announcing a fuel surcharge formula that was different than that of BNSF, and similar to that of CSX. This email does not appear to show BNSF coordinating to set common fuel surcharges with UP, but the reverse.

114. In sum, the documents cited by Professor Rausser appear to be either consistent with competitive behavior on the part of BNSF, communication related to interline movements, or contradicted by additional evidence cited in his own report. Moreover, and more significant as a matter of economics, while Professor Rausser claims that these meetings facilitated the adoption of common fuel surcharges, in fact the eastern railroads did not adopt the same fuel surcharge formulas as BNSF, nor did BNSF ever change its fuel surcharge formulas to conform to those of UP.

### D. BNSF did not coordinate with other railroads in the development of the AIILF index.

115. Professor Rausser claims that Defendant railroads conspired to develop the AIILF index to facilitate their collusion across fuel surcharges. Professor Rausser claims that "the four Defendants

230. CSXFSC000238153-154.
231. Rausser, p. 120.

collaborated, through the AAR, to remove the fuel component from the AII and RCAF indices, creating the AIILF … By removing the fuel component from the AII and RCAF, the new AIILF index facilitated Defendants' ability to apply their new Fuel Surcharge program to contracts (and other shipments) that had previously being [sic] linked to the RCAF index."[232] However, the evidence suggests instead that BNSF acted unilaterally when encouraging the development of the AIILF index.

116. Professor Rausser acknowledges that BNSF was concerned about the recovery of fuel costs on contracts incorporating RCAF as a cost index.[233] BNSF concluded that employing a standard cost index excluding fuel coupled with BNSF's own fuel surcharge would be a more efficient method of recovering incremental fuel costs.[234] BNSF felt customers would be more amenable to accepting a cost index that was published by a third party.[235] As a result, Matt Rose contacted the AAR regarding the publication of the AIILF.[236] Similarly, Samuel Kyei, Chief Economist of BNSF, stated in an interoffice memo that "you [Mr. Rose] single-handedly got the A.A.R. to establish a non-fuel RCAF index, now called the All-Inclusive Index Less Fuel (or AII-LF)."[237] This evidence appears to be inconsistent with Professor Rausser's claim that the development of AIILF was the result of anticompetitive agreement among the railroads.

117. Additionally, the data does not support Professor Rausser's claim that the introduction of AIILF increased BNSF's ability to apply fuel surcharges more broadly. Available data from BNSF indicates that during the class period, only 51 BNSF price authorities accounting for $3.9 billion in

232. Rausser, p. 62.
233. Rausser, p. 95.
234. Deposition of Samuel Kyei, March 4, 2010, pp. 50-52, 133.
235. Anderson Deposition, pp. 104-105.
236. Rose Deposition, p. 204. See also BNSF-FSC 000662-663
237. BNSF-0070502.

revenue contained an AIILF based escalation clause.[238] This is less than 7 percent of total net revenues of $58 billion received by BNSF during the class period and 25 percent of net revenues of $15.5 billion from contracts that BNSF entered into after AIILF was introduced in December 2003.

## VIII. Professor Rausser's regression framework does not provide reliable estimates of damages.

### A. Overview

118. Professor Rausser estimates class wide damages through the use of a "regression model, to test whether the prices during the Class Period are significantly different than prices generated from an appropriate 'benchmark' period, after adjusting for differences in all relevant economic forces."[239] Professor Rausser's regression model is based on the view that the "effect of the conspiracy …change[s] with changes in fuel prices."[240] That is, according to Professor Rausser, the higher is the fuel price the higher is the conspiratorial overcharge. He claims that the finding of an increase in the response of all-in rates to changes in fuel prices during the class period "is consistent with evidence of the conspiracy itself. It is evidence of a structural break in the relationship between fuel prices and freight rates, coincidental with the start of the conspiracy. This structural break constitutes economic evidence that is consistent with the existence of a conspiracy, and it is also consistent with the Class-wide impact of that conspiracy."[241] Professor Rausser's regression framework yields an estimate of $11.6 billion dollars in damages to the class as a whole, including $2.6 billion from BNSF.

119. As discussed earlier, Professor Rausser does not provide credible economic evidence that BNSF participated in the alleged conspiracy, and thus provides no reliable basis to conclude that

238. Count of class period price authorities with an AIILF based escalation clause includes price authorities documented in BNSF-0682127-134 with an effective date of December 31, 2008 or earlier. (BNSF-0682127-134; BNSF transaction data; BNSF 0800501; BNSF-0800520; BNSF-0800523)
239. Rausser, p. 162.
240. Rausser, p. 170.
241. Rausser, p. 170.

class members suffered any antitrust harm. However, in this section I note several conceptual errors in Professor Rausser's analysis that render his approach unreliable for the purpose of estimating class wide damages.[242] Additionally, Professor Rausser fails to recognize the empirical implications of his damage framework, which imply that this model is unreliable for the purpose of estimating class wide damages. First, Professor Rausser's damage framework finds damages only through the estimated change in the relationship between all-in rates and changes in fuel costs between his benchmark period and the class period. However, the alleged change in the responsiveness of all-in rates to changes in fuel costs between the pre- and the post-conspiracy periods is implausible, and he has performed no analysis to test the reliability of his estimate of this difference. Second, Professor Rausser's damages model implies that, in the but-for world, BNSF would not have recovered a large share of its incremental fuel expenses during the class period. Thus, Professor Rausser's damages model is inconsistent with general economic theory and does not recognize BNSF's unilateral economic incentive to implement mechanisms for the recovery of its incremental fuel costs, especially given that the increase in fuel costs was a common industry event. Finally, Professor Rausser's damages model estimates large damages for shippers that were unlikely to be affected (or less affected) by the alleged conspiracy (had it occurred), further demonstrating the unreliability of his approach.

### B. Professor Rausser's damage framework presumes that all of the increase in fuel surcharge coverage during the class period is a result of the alleged conspiracy.

120. As discussed above in Section V, Professor Rausser fails to identify the fuel surcharge coverage that would have existed but-for the alleged conspiracy and ignores the empirical evidence that BNSF was already increasing its use of revenue based fuel surcharges prior to the alleged conspiracy. Similarly, Professor Rausser's damages model does not measure or predict what fuel surcharge coverage

242. I understand that other economic experts for the defendants have developed more extensive and more detailed criticisms of Professor Rausser's damage framework. My critique should not be interpreted as an endorsement of those aspects of his damage framework that I do not discuss.

would have been in the but-for world but merely assumes that the full increase in the use of fuel surcharges during the class period is only due to the alleged collusion and not due to other factors, such as the increase in fuel costs. As documented above, BNSF became increasingly concerned with rising fuel prices and fuel price volatility and began implementing revenue based fuel surcharges prior to the start of the alleged conspiracy. As a result, an economically sound method of estimating damages should measure by how much the use of surcharges increased due to the alleged conspiracy; i.e., net of (or "on top of") the increase in fuel surcharges that would have occurred but-for the alleged conspiracy as a result of the evolution of the fuel costs over time. Professor Rausser fails to analyze the level of fuel surcharge coverage that would have prevailed absent the conspiracy, and his damages framework merely assumes that most of the class members would have not have fuel surcharges in the absence of the alleged conspiracy. This failure to analyze the extent of fuel surcharge coverage in the but-for renders Professor Rausser's damage framework and estimation method unreliable.

### C. Professor Rausser's damage framework finds damages only through his estimate of an implausibly large change in the sensitivity of all-in rates to fuel costs.

121. Professor Rausser's damages model explains all-in rates by "supply and demand economic forces that determine freight rates and that may have changed from before the Class Period to the Class Period."[243] Each observation in his model is specific to a customer's shipments of a particular commodity, on a particular route, and in a particular week on a given railroad. His supply and demand explanatory variables included in his model are the net weight of the shipment, the distance of the shipment, the weekly diesel price in the region in which a shipment originates, the quarterly value of the AIILF index, the annual value of GDP in the destination region, an indicator variable for interline shipments, indicator variables for the commodity shipped, indicator variables for the route of the shipment, and indicator variables for the calendar quarter of the shipment. Professor Rausser measures

243. Rausser, p. 164.

the impact of the alleged conspiracy through two variables: an indicator variable, or dummy, that equals 1 during the class period, 03Q3-08Q4, and 0 during the benchmark period, 00Q1-03Q2, and an "interaction" of the class period dummy with the weekly fuel price. This approach allows for the estimation of the relationship between all-in rates and fuel prices to differ in the benchmark and class periods. Using the estimated coefficients on these two explanatory variables, Professor Rausser calculates a weekly overcharge percentage by multiplying each week's observed fuel price by the coefficient from the interaction term that measures the relationship between all-in rates and fuel prices during the class period, and then adds the coefficient on the class period dummy. Professor Rausser finds that changes in fuel prices had a much different impact on all-in rates in the benchmark and class periods, with a 100 percent increase in fuel costs leading to a 2.4 percent increase in all-in rates in the benchmark period,[244] and to a 36 percent increase in all-in rates in the class period.[245] Setting these estimates aside for a moment, it is important to note that BNSF's fuel surcharge formulas resulted in a lower impact of increases in fuel prices (pass-through) on all in rates as compared to Professor Rausser's estimates. For example, if fuel prices increased from $1.25 per gallon HDF to $2.50 per gallon HDF, BNSF's published carload fuel surcharge formula would assess a 12.5 percent fuel surcharge. Thus, for a shipper paying $100 in base rate revenue, the impact of a 100 percent increase in fuel costs would result in a 12.5 percent increase in all-in rates, rather than the 36 percent predicted by Professor Rausser's damages model.

122. Professor Rausser's estimate of damages depends critically on his estimate of the increased sensitivity of all-in rates to changes in fuel prices. This is because the coefficient for the class

244. Deposition of Gordon Rausser, Ph.D., December 18, 2012 (hereafter "Rausser Deposition 12/18/12"), p. 419 (Q: So if in a pre-class period, on average … fuel rates rose a hundred percent, then freight rates would rise 2.4 percent, correct? A: Yes, I think that's basically correct).

245. This reflects the sum of the class period incremental effect of fuel on all-in rates (0.28) and the estimated relationship between fuel and all-in rates (0.024), "antilogged" to express in percentage terms.

period dummy is itself negative which on its own indicates that the impact of the conspiracy was to lower the all-in rates, rather than to raise them. Consequently, all of the estimated damages stem from the estimated positive coefficient on the interaction term. However, Professor Rausser testified that all of the increase in sensitivity of all-in rates to fuel prices cannot be attributed to the alleged conspiracy:

> Q: And you said earlier that you saw a structural break, meaning an increase, in the relationship between freight rates and fuel costs in the class period relative to the pre-class period, correct?
>
> A: Yes.
>
> Q: Is it your position that the alleged conspiracy is responsible for 100 percent of that increase?
>
> A: No.
>
> Q: It's not?
>
> A: That's what I said. I said "no."
>
> Q: What were the other causes?
>
> A: The other causes were economic conditions that changes over the course of the class period, the levels of the fuel prices during the class period.[246]

123. Thus, according to Professor Rausser's own testimony, his estimate of damages is inflated insofar as the estimated increased sensitivity of all-in rates to changes in fuel prices reflects market factors other than the alleged conspiracy.

124. Professor Rausser, in his report and depositions, does not present any empirical tests as to the reasonableness and reliability of his estimates of the sensitivity of all-in rates to fuel prices, either in the class period or in the benchmark period. Since Professor Rausser's damages framework combines (or pools) the data for BNSF, UP, CSX and NS, the estimated relationship between fuel costs and all-in rates is effectively an average across the four railroads. One simple test of the reliability of his damage framework is to perform his regression model separately for each railroad, rather than for all railroads

246. Rausser Deposition 12/18/12, pp. 431-432.

combined. Professor Rausser asserts that the fuel surcharge formulas of the defendants were collusive in part because "the Fuel Surcharge program ignored improvements in fuel efficiency as well as differences in fuel efficiency across Defendants …"[247] This suggests that in Professor Rausser's view of the but-for world (and in his benchmark sample), each railroad would have passed-through increases in fuel prices differently due to posited differences in fuel efficiency among the railroads. I have re-run Professor Rausser's damages model using only BNSF shipment and price data. The results of this approach, as well as Professor Rausser's regression model, are presented below in Figure 33. As this figure shows, Professor Rausser's damage framework finds, when estimating the BNSF-specific relationship between all-in rates and fuel costs, that there would have been a *negative* relationship in the but-for world. That is, Professor Rausser's damage framework implies for BNSF that as fuel prices increase, all-in rates would *decrease* in the but-for world. This finding is implausible, and indicates that Professor Rausser's damages model is unreliable. I note that Professor Rausser in his report stated that the positive coefficient on fuel prices in his pooled regression conformed to economic expectations, thus indicating its reliability.[248]

247. Rausser, p. 99.
248. Rausser, p. 168.

**Figure 33**

## Professor Rausser's Damage Model Limited to BNSF Data Only

| | Rausser Damage Model | Rausser Damage Model - BNSF Only |
|---|---|---|
| Class Period | -1.371 | -1.490 |
| | (-284.68) | (-141.69) |
| Log Diesel Price | 0.024 | -0.004 |
| | (28.58) | (-2.34) |
| Class Period * Log Diesel Price | 0.280 | 0.303 |
| | (288.56) | (145.67) |
| Log AIILF | 0.728 | 0.686 |
| | (146.55) | (60.85) |
| Log GDP | 0.226 | 0.121 |
| | (104.31) | (23.24) |
| Log Mileage | -0.841 | -0.949 |
| | (-2002.03) | (-764.48) |
| Log Weight | -0.819 | -0.943 |
| | (-3933.24) | (-1894.82) |
| Interline Flag | -0.005 | 0.018 |
| | (-20.91) | (38.12) |
| Car Type Fixed Effects | Yes | Yes |
| Four Digit STCC Fixed Effects | Yes | Yes |
| Route Fixed Effects | Yes | Yes |
| Seasonal Fixed Effects | Yes | Yes |
| R Squared | 0.86 | 0.84 |
| Number of Observations | 15,435,877 | 3,067,612 |
| Dependent Mean | -3.34 | -3.54 |

Source: Rausser Work papers.

Note: T Statistic in parentheses.

**D. Professor Rausser's damages regression implies that BNSF's rates would not have increased sufficiently to recover its incremental fuel costs.**

125. Professor Rausser claims that the fuel surcharge formulas of BNSF and other railroads "increased revenues by more than the actual increase in fuel costs would justify."[249] He claims that this "over recovery" is part of the antitrust harm that class members suffered. However, while I do not endorse Professor Rausser's damage framework, I note that it implies that BNSF would not have recovered its incremental fuel costs in the but-for world. This fact indicates that Professor Rausser's but-for world is unrealistic, and thus his damages model is unreliable for the purpose of estimating class wide damages in this case.

126. As discussed above, Professor Rausser's damage regression estimates a coefficient on the log diesel variable equal to 0.024, which implies that in his but-for world, a 100 percent increase in fuel prices would result in only a 2.4 percent increase in all-in rates, holding all else equal. Professor Rausser testified in his deposition that this relationship would persist in his but-for world.[250] Professor Rausser also presents data in his Figure 13 on his estimates of BNSF's all-in rates and incremental fuel costs from January 2000 to December 2008. Figure 34, below, presents the percentage change in fuel prices and the implied percentage change in all-in rates that Professor Rausser's model predicts for BNSF in his but-for world, assuming all other factors are held equal. As is shown in this figure, throughout the class period, the change in all-in rates predicted by Professor Rausser's damages model is always below his estimate of BNSF's incremental fuel costs. By July 2008, the predicted change in all-in rates is only 50 percent of the incremental fuel costs. These calculations indicate that Professor Rausser's damages model implies that, in the but-for world, BNSF would adjust prices in response to the changes in fuel costs such that by the end of the class period they would fall $575 million short of his estimate of its

249. Rausser, p. 8.
250. Rausser Deposition 12/18/12, pp. 418-419.

incremental fuel costs. This is roughly 50 percent of the $1.1 billion in incremental fuel expenses that Professor Rausser's analysis implies BNSF incurred from transporting the traffic of class members.[251] This failure of Professor Rausser's damages model to substantially allow BNSF to recover its incremental fuel costs in the but-for world is further evidence of its unreliability and lack of economic plausibility especially in light of the fact that all railroads were simultaneously experiencing significant increases in fuel costs. Such simultaneous increases across all railroads are much more likely to be passed through into rates than increases that apply to only one industry participant. Further, Professor Rausser acknowledged this issue when he testified in his deposition that "no one would argue that the defendants wouldn't in the but-for world be able to recover their fuel costs" and that such a result would imply "a lower measure of class-wide damages."[252] The fact that Professor Rausser's model implies that BNSF would have significantly under recovered its incremental fuel cost absent the alleged conspiracy cannot be remedied by adjusting the ultimate damage estimate it produces. Rather, this feature of Professor Rausser's model indicates a fundamental flaw in his approach, and indicates that it is unreliable for the purpose of estimating damages.

---

251. These calculations evaluate the increment change in all-in rates per ton-mile and incremental fuel expenses per ton-mile by multiplying by the total BNSF ton-miles for class members in Professor Rausser's regression sample.

252. Rausser Deposition 12/18/12, pp. 425.

**Figure 34**




Source: Rausser Figure 13; Rausser damage model.

**E. Professor Rausser' damages model finds damages on shipments that are likely unaffected by the alleged conspiracy.**

127. As discussed above, while Professor Rausser asserts that the mechanism of the alleged conspiracy was common fuel surcharge formulas set by the railroads, he ignores the fact that BNSF's published intermodal and coal fuel surcharge formulas differed materially from those of UP. Similarly he ignores the fact that BNSF's published intermodal fuel surcharge formula in place throughout the class period was introduced in 2001, long before the alleged collusion occurred. It is reasonable to conclude that the alleged conspiracy had little or no impact on shipments of these commodities. However, a substantial share of the damages Professor Rausser estimates is from intermodal and coal shipments. As shown in Figure 35, roughly 50 percent of the class revenues, accounting for 51 percent of the BNSF

damages estimated by Professor Rausser are from intermodal shipments. Coal shipments account for nearly 17 percent of both class revenues and damages. Only 34 percent of class revenues, accounting for 32 percent of Professor Rausser's damage estimate are from carload traffic.[253]

**Figure 35**

**Professor Rausser's Class Revenues and Damage Estimate by Commodity Type ($ MM)**

| | | Percent of Revenues | | | | Percent of Damages | | |
|---|---|---|---|---|---|---|---|---|
| **Year** | **Total Revenues** | **Intermodal** | **Coal** | **Carload** | **Total Damages** | **Intermodal** | **Coal** | **Carload** |
| 2003 | $123.0 | 34.5% | 1.5% | 64.0% | $0.4 | 34.2% | 1.2% | 64.7% |
| 2004 | $855.6 | 42.5% | 5.3% | 52.2% | $46.6 | 45.9% | 6.0% | 48.1% |
| 2005 | $2,583.0 | 42.1% | 16.3% | 41.6% | $295.9 | 41.3% | 17.1% | 41.6% |
| 2006 | $3,990.8 | 44.8% | 19.9% | 35.2% | $545.7 | 44.9% | 19.9% | 35.2% |
| 2007 | $4,667.6 | 51.6% | 16.9% | 31.4% | $656.8 | 51.8% | 16.9% | 31.3% |
| 2008 | $5,388.7 | 56.7% | 16.0% | 27.3% | $1,107.3 | 56.9% | 15.8% | 27.3% |
| Total | $17,608.6 | 49.7% | 16.5% | 33.8% | $2,652.6 | 51.2% | 16.9% | 31.9% |

Source: BNSF transaction data; Rausser work papers.

128. As noted in Section I, the class certified by the Court explicitly excludes shipments where the shipper was either a codefendant or a government entity. However, Professor Rausser improperly includes transactions from both types of shippers in both his econometric estimate of overcharges and in his estimate of the class wide revenues to which he applies his overcharge estimate. As shown in Figure 36, shipments by governmental entities accounted for 2 percent of both class wide revenues and damages, and shipments by codefendants accounted for 0.1 percent of both class wide revenues and

253. The calculations in this section apply Professor Rausser's estimated weekly overcharges to BNSF's transaction data, as the data that Professor Rausser uses to estimate class wide damages do not preserve information regarding the commodity of the shipment. The use of these data results in damage estimates within 0.2 percent of those reported by Professor Rausser.

shipments. In total, Professor Rausser estimates damages of nearly $56 million from shippers that the Court has excluded from the class definition.

**Figure 36**

**Professor Rausser's Class Revenues and Damage Estimate For Class Exclusions**
**($ MM)**

| | | Percent of Revenues | | | | Percent of Damages | | |
|---|---|---|---|---|---|---|---|---|
| **Year** | **Total Revenues** | **Government** | **Codefendant** | **Other** | **Total Damages** | **Government** | **Codefendant** | **Other** |
| 2003 | $123.0 | 11.6% | 0.2% | 88.3% | $0.4 | 6.5% | 0.0% | 93.5% |
| 2004 | $855.6 | 2.0% | 0.1% | 97.8% | $46.6 | 1.2% | 0.1% | 98.6% |
| 2005 | $2,583.0 | 0.7% | 0.2% | 99.0% | $295.9 | 0.7% | 0.2% | 99.0% |
| 2006 | $3,990.8 | 2.6% | 0.2% | 97.3% | $545.7 | 2.6% | 0.2% | 97.3% |
| 2007 | $4,667.6 | 2.0% | 0.1% | 98.0% | $656.8 | 1.9% | 0.1% | 98.0% |
| 2008 | $5,388.7 | 2.2% | 0.1% | 97.8% | $1,107.3 | 2.1% | 0.1% | 97.8% |
| Total | $17,608.6 | 2.0% | 0.1% | 97.8% | $2,652.6 | 2.0% | 0.1% | 97.9% |

Source: BNSF transaction data; Rausser work papers.

129. Professor Rausser also fails to recognize that not all of the price authorities contained in the BNSF transaction data were issued by BNSF or the other defendants in this matter. For example, some of the price authorities contained in the BNSF transaction data were issued by Class I railroads, such as KCS, CN and CP, that the plaintiffs have not claimed are participants in the alleged conspiracy. Fuel surcharges that were set by these railroads are therefore presumably not collusive. As shown in Figure 37 below, roughly 2 percent of BNSF's class revenues, accounting for just under 2 percent of damages, were earned under price authorities set by other Class I railroads. The total damages from such shipments are roughly $44 million.

**Figure 37**

### Professor Rausser's Class Revenues and Damage Estimate For Price Authorities Issued by Non-Defendants ($ MM)

| | | Percent of Revenues | | | Percent of Damages | |
|---|---|---|---|---|---|---|
| Year | Total Revenues | Non-Defendant Price Authorities | Defendant Price Authorities | Total Damages | Non-Defendant Price Authorities | Defendant Price Authorities |
| 2003 | $123.0 | 11.8% | 88.2% | $0.4 | 10.8% | 89.2% |
| 2004 | $855.6 | 7.2% | 92.8% | $46.6 | 6.1% | 93.9% |
| 2005 | $2,583.0 | 3.1% | 96.9% | $295.9 | 3.0% | 97.0% |
| 2006 | $3,990.8 | 2.3% | 97.7% | $545.7 | 2.3% | 97.7% |
| 2007 | $4,667.6 | 2.1% | 97.9% | $656.8 | 2.0% | 98.0% |
| 2008 | $5,388.7 | 0.6% | 99.4% | $1,107.3 | 0.6% | 99.4% |
| Total | $17,608.6 | 2.1% | 97.9% | $2,652.6 | 1.7% | 98.3% |

Source: BNSF transaction data; Rausser work papers.

130. Professor Rausser calculates class wide damages by summing the total gross revenues, or revenues before any rebates and discounts, for each railroad and week, and applying his estimated weekly overcharge percentage to those revenues.[254] However, this is inconsistent with his damage regression, which calculates prices based on revenues less discounts and refunds.[255] Figure 38 compares the effect of applying Professor Rausser's overcharge estimates to BNSF's gross and net revenues. Professor Rausser' improper approach increases damages by roughly $44 million.

254. Rausser, p. 171, footnote 410.
255. Rausser, p. 168.

**Figure 38**

## Professor Rausser's Class Revenues and Damage Estimate Based on Gross Revenues and Net Revenues ($ MM)

| | Gross Revenues | | Net Revenues | |
|---|---|---|---|---|
| Year | Revenues | Damages | Revenues | Damages |
| 2003 | $123.0 | $0.4 | $118.6 | $0.3 |
| 2004 | $855.6 | $46.6 | $836.0 | $45.7 |
| 2005 | $2,583.0 | $295.9 | $2,528.5 | $289.5 |
| 2006 | $3,990.8 | $545.7 | $3,918.5 | $535.9 |
| 2007 | $4,667.6 | $656.8 | $4,587.3 | $645.7 |
| 2008 | $5,388.7 | $1,107.3 | $5,310.0 | $1,091.2 |
| Total | $17,608.6 | $2,652.6 | $17,298.9 | $2,608.4 |

Source: BNSF transaction data; Rausser work papers.

131. I understand from counsel that, as a legal matter, plaintiffs' may not be able to claim damages after the STB decision on revenue based fuel surcharges was issued in January 2007 or after the initial complaint in this case was filed in May 2007. Therefore, I have calculated the amount of damages using Professor Rausser's methodology that he claims accrue to the plaintiffs after the STB decision and the initial complaint was filed in this matter. As shown in Figure 39, 55 percent of class revenues were earned after the STB decision, accounting for 65 percent of the damages Professor Rausser estimates for BNSF. Similarly, 48 percent of class revenues, accounting for 59 percent of Professor Rausser's damage estimate occur after the first complaint filed in this matter. Even limited to price authorities that first started after the these events, 6 percent of class revenues, accounting for 8 percent of damages were from price authorities that began after the STB decision was released and 5

percent of class revenues, accounting for 7 percent of damages were from price authorities that began after the first complaint in this case was filed.

**Figure 39**

**Professor Rausser's Class Revenues and Damage Estimate Before and After The STB Decision and Initial Filing of Complaint ($ MM)**

| | | Percent of Revenues | | | Percent of Damages | |
|---|---|---|---|---|---|---|
| **Event** | **Total Revenues** | **Before** | **After** | **Total Damages** | **Before** | **After** |
| STB Decision | $17,608.6 | 44.6% | 55.4% | $2,652.6 | 35.0% | 65.0% |
| New Price Authorities | $17,608.6 | 93.9% | 6.1% | $2,652.6 | 92.2% | 7.8% |
| Complaint | $17,608.6 | 51.7% | 48.3% | $2,652.6 | 40.8% | 59.2% |
| New Price Authorities | $17,608.6 | 95.0% | 5.0% | $2,652.6 | 93.4% | 6.6% |

Source: BNSF transaction data; Rausser work papers.

January 22, 2013

Janusz A. Ordover

# Appendix A

January 2013

**JANUSZ ALEKSANDER ORDOVER**

Department of Economics
New York University
19 W 4th Street
New York, New York 10012

Office: (212) 998-8956
Fax: (212) 995-3932
Home: (203) 966-3788
Fax: (203) 972-3615
e-mail: jao@snet.net
janusz.ordover@nyu.edu

## EDUCATION

| | |
|---|---|
| 1968-1973 | Columbia University, New York, New York<br>Graduate Department of Economics and European Institute of the School of International Affairs<br>Doctoral Dissertation: Three Essays on Economic Theory (May 1973). Ph.D 1973. |
| 1967-1968 | McGill University, Montreal, Canada<br>Departments of Economics and Political Science |
| 1963-1966 | Warsaw University, Warsaw, Poland<br>Department of Political Economy. B.A. (equiv.), 1966. |

## HONORS

| | |
|---|---|
| 2011 | "The Economist of the Year 2010" voted by the Global Competition Review |
| 1973 | Columbia University: Highest distinction for the doctoral dissertation |
| 1971-1972 | Columbia University: Honorary President's Fellow |
| 1969-1971 | Columbia University: President's Fellow |
| 1967-1968 | McGill University: Honors Student |
| 1964, 1965 | Warsaw University: Award for Academic Achievement, Department of Political Economy |
| | Who's Who in the World<br>Who's Who in America<br>Who's Who in the East |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| June 1982 - present | Professor of Economics<br>Department of Economics, New York University, New York, New York |
| Sept. 1996 - | Director of Masters in Economics Program |

| | |
|---|---|
| Aug. 2001 | Department of Economics, New York University, New York, New York |
| Summer 1996-<br>2000 | Lecturer<br>International Program on Privatization and Reform<br>Institute for International Development, Harvard University, Cambridge, Massachusetts |
| Aug. 1991 -<br>Oct. 1992 | Deputy Assistant Attorney General for Economics<br>Antitrust Division<br>United States Department of Justice, Washington, D.C. |
| Sept. 1989 -<br>July 1990 | Visiting Professor of Economics<br>School of Management, Yale University, New Haven, Connecticut |
| | Lecturer in Law<br>Yale Law School |
| Mar. 1984 -<br>June 1988 | Visiting Professor of Economics<br>Universita Commerciale "Luigi Bocconi", Milan, Italy |
| June 1982 -<br>Feb. 1985 | Director of Graduate Studies<br>Department of Economics, New York University |
| Sept. 1982 -<br>June 1986 | Adjunct Professor of Law (part-time)<br>Columbia University Law School, New York, New York |
| Feb. 1982 -<br>June 1982 | Acting Director of Graduate Studies<br>Department of Economics, New York University |
| June 1978 -<br>June 1982 | Associate Professor of Economics<br>Department of Economics, New York University |
| Sept. 1979 -<br>May 1990 | Lecturer in Economics and Antitrust<br>New York University Law School |
| Sept. 1977 -<br>June 1978 | Member, Technical Staff<br>Bell Laboratories, Holmdel, New Jersey |
| | Associate Professor of Economics<br>Columbia University |
| | Visiting Research Scholar<br>Center for Law and Economics, University of Miami, Miami, Florida |
| Sept. 1973 -<br>Aug. 1977 | Assistant Professor of Economics<br>New York University |
| Summer 1976 | Fellow, Legal Institute for Economists,<br>Center for Law and Economics, University of Miami |
| Summer 1976 | Visiting Researcher Bell Laboratories, Holmdel, New Jersey |

**OTHER PROFESSIONAL ACTIVITIES**

| | |
|---|---|
| 2011 | Organizer, Session on the 2010 Agencies Horizontal Merger Guidelines, 2011 Spring Meetings, Antitrust Section, American Bar Association, Washington DC |
| 2010 – present | Member, ABA Section of Antitrust Law, Economics Task Force |
| 2006 - present | Special Consultant, Compass Lexecon (formerly Compass)/FTI Company, Washington, D.C. |
| 2003 - 2006 | Director, Competition Policy Associates, Inc. ("Compass"), Washington, D.C. |
| 1997 – 1999 | Consultant, Inter-American Development Bank, Washington, D.C. |
| 1997 – 2009 | Board of Editors, *Antitrust Report* |
| 1995 – 2001 | Consultant, The World Bank, Washington, D.C. |
| 1998 – 2004 | Senior Consultant<br>Applied Economic Solutions, Inc., San Francisco, California |
| 1995 - 2000 | Senior Affiliate<br>Cornerstone Research, Inc., Palo Alto, California |
| various | Testimony at Hearings of the Federal Trade Commission |
| 1994 - 1996 | Senior Affiliate<br>Law and Economics Consulting Group, Emoryville, California |
| 1994 - 2000 | Senior Affiliate<br>Consultants in Industry Economics, LLC, Princeton, New Jersey |
| 1993 - 1994 | Director<br>Consultants in Industry Economics, Inc., Princeton, New Jersey |
| 1992 - 1993 | Vice-Chair (*pro tempore*)<br>Economics Committee, American Bar Association, Chicago, Illinois |
| 1990 - 1991<br>1992 - 1995 | Senior Consultant<br>Organization for Economic Cooperation and Development, Paris, France |
| 1991 | Member<br>*Ad hoc* Working Group on Bulgaria's Draft Antitrust Law<br>The Central and East European Law Initiative<br>American Bar Association |
| 1990 - 1991 | Advisor<br>Polish Ministry of Finance and Anti-Monopoly Office<br>Warsaw, Poland |
| 1990 - 1991 | Member<br>Special Committee on Antitrust<br>Section of Antitrust Law, American Bar Association |

| | |
|---|---|
| 1990 - 1991 | Director and Senior Advisor<br>Putnam, Hayes & Bartlett, Inc., Washington, D.C. |
| 1990 - 1996 | Member<br>Predatory Pricing Monograph Task Force<br>Section of Antitrust Law, American Bar Association |
| 1989 | Hearings on Competitive Issues in the Cable TV Industry<br>Subcommittee on Monopolies and Business Rights of the Senate Judiciary Committee<br>Washington, D.C. |
| 1989 | Member<br>EEC Merger Control Task Force, American Bar Association |
| 1988 - present | Associate Member<br>American Bar Association |
| 1987 - 1989 | Adjunct Member<br>Antitrust and Trade Regulation Committee, The Association of the Bar of the City of New York |
| 1984 | Speaker, "Industrial and Intellectual Property: The Antitrust Interface"<br>National Institutes, American Bar Association, Philadelphia, Pennsylvania |
| 1983 - 1990 | Director<br>Consultants in Industry Economics, Inc |
| 1982 | Member<br>Organizing Committee<br>Tenth Annual Telecommunications Policy Research Conference, Annapolis, Maryland |
| 1981 | Member<br>Section 7 Clayton Act Committee, Project on Revising Merger Guidelines<br>American Bar Association |
| 1980 | Organizer<br>Invited Session on Law and Economics<br>American Economic Association Meetings, Denver, Colorado |
| 1978 - 1979 | Member<br>Department of Commerce Technical Advisory Board<br>Scientific and Technical Information Economics and Pricing Subgroup |
| 1978 – present | Referee for numerous scholarly journals, publishers, and the National Science Foundation |

## MEMBERSHIPS IN PROFESSIONAL SOCIETIES

American Economic Association
American Bar Association

## PUBLICATIONS

### A. Journal Articles

"Coordinated Effects in Merger Analysis: An Introduction," *Columbia Bus. Law Review*, No. 2, 2007, 411-36.

"Wholesale access in multi-firm markets: When is it profitable to supply a competitor?" with Greg Shaffer, *International Journal of Industrial Organization*, vol. 25 (5), October 2007, 1026-45.

"Merchant Benefits and Public Policy towards Interchange: An Economic Assessment," with M. Guerin-Calvert, *Review of Network Economics: Special Issue*, vol. 4 (4), December 2005, 381-414.

"All-Units Discounts in Retail Contracts," with S. Kolay and G. Shaffer, *J. of Economics and Management Strategy*, vol. 13 (3), September 2004, 429-59.

"Archimedean Leveraging and the GE/Honeywell Transaction," with R. J. Reynolds, *Antitrust Law Journal*, vol. 70, no. 1, 2002, 171-98.

"Entrepreneurship, Access Policy and Economic Development: Lessons from Industrial Organizations," with M. A. Dutz and R. D. Willig, *European Economic Review*, vol. 4, no. 4-6, May 2000.

"Parity Pricing and its Critics: Necessary Condition for Efficiency in Provision of Bottleneck Services to Competitors," with W. J. Baumol and R .D. Willig, *Yale Journal on Regulation*, vol. 14, Winter 1997, 146-63.

"Competition and Trade Law and the Case for a Modest Linkage," with E. Fox, *World Competition, Law and Economics Review*, vol. 19, December 1995, 5-34.

"On the Perils of Vertical Control by a Partial Owner of Downstream Enterprise," with W.J. Baumol, *Revue D'économie industrielle*, No. 69, 3e trimestre 1994, 7-20.

"Competition Policy for Natural Monopolies in Developing Market Economy," with R.W. Pittman and P. Clyde, *Economics of Transition*, vol. 2, no. 3, September 1994, 317-343. Reprinted in B. Clay (ed), *De-monopolization and Competition Policy in Post-Communist Economies*, Westview Press 1996, 159-193.

"The 1992 Agency Horizontal Merger Guidelines and the Department of Justice's Approach to Bank Merger Analysis," with M. Guerin-Calvert, *Antitrust Bulletin*, vol. 37, no. 3, 667-688. Reprinted in *Proceedings of the 1992 Conference on Bank Structure and Competition: Credit Markets in Transition*, Federal Reserve Bank of Chicago, 1992, 541-560.

"Entry Analysis Under the 1992 Horizontal Merger Guidelines," with Jonathan B. Baker, *Antitrust Law Journal*, vol. 61, no. 1, Summer 1992, 139-146.

"Economics and the 1992 Merger Guidelines: A Brief Survey," with Robert D. Willig, *Review of Industrial Organization*, vol. 8, 139-150, 1993. Reprinted in E. Fox and J. Halverson (eds.), *Collaborations Among Competitors: Antitrust Policy and Economics*, American Bar Association, 1992, 639-652.

"Equilibrium Vertical Foreclosure: A Reply," with G. Saloner and S.C. Salop, *American Economic Review*, vol. 82, no. 3, 1992, 698-703.

"A Patent System for Both Diffusion and Exclusion," *Journal of Economic Perspectives*, vol. 5, Winter 1991, 43-60.

"R&D Cooperation and Competition," with M. Katz, *Brookings Papers on Economic Activity: Microeconomics*, 1990, 137-203.

"Equilibrium Vertical Foreclosure," with G. Saloner and S. Salop, *American Economic Review*, vol. 80, March 1990, 127-142.

"Antitrust Policy for High-Technology Industries," with W.J. Baumol, *Oxford Review of Economic Policy*, vol. 4, Winter 1988, 13-34. Reprinted in E. Fox and J. Halverson (eds.), *Collaborations Among Competitors: Antitrust Policy and Economics*, American Bar Association, 1991, 949-984.

"Conflicts of Jurisdiction: Antitrust and Industrial Policy," *Law and Contemporary Problems*, vol. 50, Summer 1987, 165-178.

"Market Structure and Optimal Management Organization," with C. Bull, *Rand Journal of Economics*, vol. 18, no. 4, Winter 1987, 480-491.

"A Sequential Concession Game with Asymmetric Information," with A. Rubinstein, *Quarterly Journal of Economics*, vol. 101, no.4, November 1986, 879-888.

"The G.M.-Toyota Joint Venture: An Economic Assessment," with C. Shapiro, *Wayne Law Journal*, vol. 31, no. 4, 1985, 1167-1194.

"Economic Foundations and Considerations in Protecting Industrial and Intellectual Property: An Introduction," *ABA Antitrust Law Journal*, vol. 53, no. 3, 1985. 503-518, Comments, 523-532.

"Antitrust for High-Technology Industries: Assessing Research Joint Ventures and Mergers," with R.D. Willig, *Journal of Law and Economics*, vol. 28, May 1985, 311-334.

"Use of Antitrust to Subvert Competition," with W.J. Baumol, *Journal of Law and Economics*, vol. 28, May 1985, 247-266. Reprinted in *Journal of Reprints for Antitrust Law and Economics*, vol. 16, no. 2.

"Advances in Supervision Technology and Economic Welfare: A General Equilibrium Analysis," with C. Shapiro, *Journal of Public Economics*, vol. 25/3, 1985, 371-390.

"Predatory Systems Rivalry: A Reply," with A. O. Sykes and R. D. Willig, 83 *Columbia Law Review*, June 1983, 1150-1166. Reprinted in *Corporate Counsel*, Matthew Bender & Company, 1984, 433-450.

"The 1982 Department of Justice Merger Guidelines: An Economic Assessment," with R. D. Willig, 71 *California Law Review*, March 1983,535-574. Reprinted in *Antitrust Policy in Transition: The Convergence of Law and Economics*, E. Fox and J. Halverson (eds.), American Bar Association Press, 1984, 267-304.

"Unfair International Trade Practices," with A. O. Sykes and R. D. Willig, 15 *Journal of International Law and Politics*, Winter 1983, 323-338.

"On Non-linear Pricing of Inputs," with J. Panzar, *International Economic Review*, October 1982, 659-675.

"Herfindahl Concentration, Rivalry and Mergers," with A. O. Sykes and R. D. Willig, *Harvard Law Review*, vol. 95, June 1982, 1857-1875.

"A Reply to 'Journals as Shared Goods: Comment,'" with R. D. Willig, *American Economic Review*, June 1982, 603-607.

"Proposed Revisions to the Justice Department's Merger Guidelines," with S. Edwards, *et al.*, *Columbia Law Review*, vol. 81, December 1981, 1543-1591.

"An Economic Definition of Predation: Pricing and Product Innovation," with R.D. Willig, *Yale Law Journal*, vol. 91, November 1981, 8-53.

"On the Consequences of Costly Litigation in the Model of Single Activity Accidents: Some New Results," *Journal of Legal Studies*, June 1981, 269-291.

"On the Political Sustainability of Taxes," with A. Schotter, *American Economic Review Papers and Proceedings*, May 1981, 278-282.

"Information and the Law: Evaluating Legal Restrictions on Competitive Contracts," with A. Weiss, *American Economic Review Papers and Proceedings*, May 1981, 399-404.

"Redistributing Incomes: *Ex Ante* or *Ex Post*," *Economic Inquiry*, April 1981, 333-349.

"On the Nonexistence of *Pareto Superior* Outlay Schedules," with J. Panzar, *The Bell Journal of Economics*, Spring 1980, 351-354.

"The Role of Information in the Design of Public Policy Towards Externalities," with R. D. Willig, *Journal of Public Economics*, December 1979, 271-299.

"On the Concept of Optimal Taxation in the Overlapping-Generations Model of Efficient Growth," with E.S. Phelps, *Journal of Public Economics*, August 1979, 1-27.

"Products Liability in Markets With Heterogeneous Consumers," *Journal of Legal Studies*, June 1979, 505-525.

"Costly Litigation and the Tort Law: Single Activity Accidents," *Journal of Legal Studies*, June 1978, 243-261.

"On the Optimal Provision of Journals Qua Excludable Public Goods," with R. D. Willig, *American Economic Review*, June 1978, 324-338.

"Distortionary Wage Differentials in a Two-Sector Growth Model: Some Theorems on Factor Earnings," *International Economic Review*, June 1978, 321-333.

"On the Optimality of Public-Goods Pricing with Exclusion Devices," with W.J. Baumol, *Kyklos*, Fasc. 1, 1977, 5-21.

"Public Good Properties in Reality: The Case of Scientific Journals," with W.J. Baumol, *Proceedings of the ASIS Meetings*, San Francisco, October 1976.

"Merger Illusions and Externalities: A Note," with A. Schotter, *Eastern Economic Review*, November 1976, 19-21.

"Distributive Justice and Optimal Taxation of Wages and Interest in a Growing Economy," *Journal of Public Economics*, January 1976, 139-160.

"Linear Taxation of Wealth and Wages for Intragenerational Lifetime Justice: Some Steady-State Cases," with E.S. Phelps, *American Economic Review*, September 1975, 660-673.

**B. Books and Monographs**

*Proceedings of the Tenth Annual Telecommunications Policy Research Conference*, editor with O. Gandy and P. Espinosa, ABLEX Publishers, 1983.

*Obstacles to Trade and Competition*, with L. Goldberg, OECD, Paris, 1993.

*Predatory Pricing*, with William Green, *et al.*, American Bar Association, Section of Antitrust Law, Monograph 22, 1996.

**C. Book Chapters**

“Coordinated Effects,” chap. 27, in *Issues in Competition Law and Policy*, vol. 2, American Bar Association, 2008, 1359-1384.

“Practical Rules for Pricing Access in Telecommunications,” with R. D. Willig, Chap. 6, in *Second-Generations Reforms in Infrastructure Services*, F. Besanes and R. D. Willig (eds.), Inter-American Development Bank, Washington, D.C., April 2002, 149-76.

“Sustainable Privatization of Latin American Infrastructure: The Role of Law and Regulatory Institutions,” with Evamaria Uribe, Chap. 1 in F. Basanes, E. Uribe, R. D. Willig (eds.), *Can Privatization Deliver? Infrastructure for Latin America*, The Johns Hopkins U. P. for Inter-American Development Bank, 1999, 9-32.

“Access and Bundling in High-Technology Markets,” with R. D. Willig, Chap. 6, in J. A. Eisenach and T. M. Leonard, (eds.), *Competition, Innovation, and the Microsoft Monopoly: The Role of Antitrust in the Digital Marketplace*, Kluver Academic Press, 1999, 103-29.

"The Harmonization of Competition and Trade Law," with E. Fox, Chap. 15 in L. Waverman, *et al*. (eds.), *Competition Policy in the Global Economy*, Routledge, 1997, 407-439.

"Transition to a Market Economy: Some Industrial Organization Issues," with M. Iwanek, Chap. 7 in H. Kierzkowski, *et al.* (eds.), *Stabilization and Structural Adjustment in Poland*, Routledge, 1993, 133-170.

"Competition Policies for Natural Monopolies in a Developing Market Economy," with Russell Pittman, *Butterworth's Trade and Finance in Central and Eastern Europe*, Butterworth Law Publishers Ltd., 1993, 78-88, Reprinted in *Journal for Shareholders* (published by the Russian Union of Shareholder), Moscow, January 1993, 33-36; *Versenyfelugyeleti Ertesito* (Bulletin of Competition Supervision), Budapest, vol. 3, no. 1-2, January 1993, 30-41; *Narodni Hospodarstvi* (National Economy), Prague; *ICE: Revista de Economia*, No. 736 (December 1994) (in Spanish), 69-90.

"Antitrust: Source of Dynamic and Static Inefficiencies?" with W.J. Baumol, in T. Jorde and D. Teece (eds.), *Antitrust, Innovation, and Competitiveness*, Oxford University Press, 1992, 82-97. Reprinted in "The Journal of Reprints for Antitrust Law and Economics," vol. 26, no. 1, 1996.

"Economic Foundations of Competition Policy: A Review of Recent Contributions," in W. Comanor, et al., *Competition Policy in Europe and North America: Economic Issues and Institutions, Fundamentals of Pure and Applied Economics* (Vol. 43), Harwood Academic Publishers, 1990, 7-42.

"The Department of Justice 1988 Guidelines for International Operations: An Economic Assessment," with A.O. Sykes, in B. Hawk (ed.), *European/American Antitrust and Trade Laws*, Matthew Bender, 1989, 4.1-4.18.

"Predation, Monopolization, and Antitrust," with G. Saloner, in R. Schmalensee and R.D. Willig (eds.), *Handbook of Industrial Organization*, vol. 1, North Holland, 1989, 538-596.

"Supervision Technology, Firm Structure, and Employees' Welfare," in *Prices, Competition and Equilibrium*, M. Peston and R.E. Quandt (eds.), Philip Allan Publishers, Ltd., 1986, 142-163.

"Perspectives on Mergers and World Competition," with R.D. Willig, in *Antitrust and Regulation*, R. Grieson (ed.), Lexington Books, 1986, 201-218.

"Transnational Antitrust and Economics," in *Antitrust and Trade Policies in International Trade*, B. Hawk (ed.), Matthew Bender, 1985, 233-248.

"Pricing of Interexchange Access: Some Thoughts on the Third Report and Order in FCC Docket No. 78-72," in *Proceedings of the Eleventh Annual Telecommunications Policy Research Conference*, Vincent Mosco (ed.), ABLEX Publishers, 1984, 145-161.

"Non-Price Anticompetitive Behavior by Dominant Firms Toward the Producers of Complementary Products," with A.O. Sykes and R.D. Willig, in *Antitrust and Regulation: Essays in Memory of John McGowan*, F. Fisher (ed.), MIT Press, 1985, 315-330.

"Local Telephone Pricing in a Competitive Environment," with R.D. Willig, in *Regulating New Telecommunication Networks*, E. Noam (ed.), Harcourt Brace Jovanovich, 1983, 267-289.

"An Economic Definition of Predatory Product Innovation," with R.D. Willig, in *Strategy, Predation and Antitrust Analysis*, S. Salop (ed.), Federal Trade Commission, 1981, 301-396.

"Marginal Cost," in *Encyclopedia of Economics*, D. Greenwald (ed.), McGraw-Hill, 2nd ed. 1994, 627-630.

"Understanding Economic Justice: Some Recent Development in Pure and Applied Welfare Economics," in *Economic Perspectives*, M. Ballabon (ed.) Harwood Academic Publishers, vol. 1, 1979, 51-72.

"Problems of Political Equilibrium in the Soviet Proposals for a European Security Conference," in *Columbia Essays in International Affairs*, Andrew W. Cordier (ed.) Columbia University Press, New York, 1971, 1951-197

**D. Other Publications**

“Economics and Competition Policy: A Two-sided Market?” with Jith Jayaratne, *Antitrust Magazine*, vol. 27, No. 1, Fall 2012, pp. 78-80.

“Editorial: Thinking about coordinated effects,” with Jith Jayaratne, *Concurrences 3-2012*, September 2012,

“The 2010 Horizontal Merger Guidelines: A Static Compass in a Dynamic World,” with Jay Ezrielev, *Antitrust Source*, October 2010, available at www.antitrustsource.com

“The Economics of Price Discrimination,” with Doug Fontaine and Greg Shaffer, in *The Economics of the Internet, The Vodafone Policy Paper Series*, No. 11, April 11, 2010, 27-51.

“How Loyalty Discounts Can Perversely Discourage Discounting: Comment,” with Assaf Eilat, et al, *The CPI Antitrust Journal*, April 2010 (1).

“Economic Analysis in Antitrust Class Certification: *Hydrogen Peroxide*,” with Paul Godek, *Antitrust Magazine*, vol. 24, No. 1, Fall 2009, pp. 62-65.

“Comments on Evans & Schmalensee’s ‘The Industrial Organization of Markets with Two-Sided Platforms’, *Competition Policy International*, vol. 3(1), Spring 2007, 181-90.

"Safer Than A Known Way? A Critique of the FTC's Report on Competition and Patent Law and Policy," with I. Simmons and D. A. Applebaum, *Antitrust Magazine,* Spring 2004, 39-43.

"Predatory Pricing," in Peter Newman (ed.), *The New Palgrave Dictionary of Economics and the Law*, Grove Dictionaries, New York, 1999. Revised in *The New Palgrave Dictionary of Economics, 2nd edition,* S. Durlauf and L. Blume (editors) (forthcoming 2007).

Book review of L. Phlips, *Competition Policy: A Game Theoretic Perspective*, reviewed in *Journal of Economic Literature*, vol. 35, No.3, September 1997, 1408-9.

"The Role of Efficiencies in Merger Assessment: The 1997 Guidelines," *Antitrust Report*, September 1997, 10-17.

"Bingaman's Antitrust Era," *Regulation*, vol. 20, No. 2, Spring 1997, 21-26.

"Competition Policy for High-Technology Industries," *International Business Lawyer*, vol. 24, No. 10, November 1996, 479-82.

"Internationalizing Competition Law to Limit Parochial State and Private Action: Moving Towards the Vision of World Welfare," with E.M. Fox, *International Business Lawyer*, vol. 24, No. 10, November 1996, 458-62.

"Economists' View: The Department of Justice Draft for the Licensing and Acquisition of Intellectual Property," *Antitrust*, vol. 9, No. 2, Spring 1995, 29-36.

"Competition Policy During Transformation to a Centrally Planned Economy: A Comment," with R.W. Pittman, in B. Hawk (ed.), *1992 Fordham Corporate Law Institute*, 533-38.

"Poland: The First 1,000 Days and Beyond," E*conomic Times*, vol. 3, no. 9, October 1992, 6-7.

"Interview: Janusz A. Ordover: A Merger of Standards? The 1992 Merger Guidelines," *Antitrust*, vol. 6, no. 3, Summer 1992, 12-16.

"Interview: U.S. Justice Department's New Chief Economist: Janusz A. Ordover," *International Merger Law*, no. 14, October 1991.

"Poland: Economy in Transition," *Business Economics*, vol. 26, no. 1, January 1991, 25-30.

"Economic Analysis of Section 337: Protectionism versus Protection of Intellectual Property," with R.D. Willig, in *Technology, Trade and World Competition*, JEIDA Conference Proceedings, Washington, D.C., 1990, 199-232.

"Eastern Europe Needs Antitrust Now," with E. Fox, *New York Law Journal*, November 23, 1990, 1-4.

"Understanding Econometric Methods of Market Definition," with D. Wall, *Antitrust*, vol. 3, no. 3, Summer 1989, 20-25.

"Proving Entry Barriers: A Practical Guide to Economics of Entry," with D. Wall, *Antitrust*, vol. 2, no. 2, Winter 1988, 12-17.

"Proving Predation After Monfort and Matsushita: What the New 'New Learning' has to Offer," with D. Wall, *Antitrust*, vol. 1, no. 3, Summer 1987, 5-11.

"The Costs of the Tort System," with A. Schotter, Economic Policy Paper No. PP-42, New York University, March 1986. Reprinted in *Congressional Record*, U.S. Government Printing Office, Washington, D.C., 1987.

"An Economic Definition of Predation: Pricing and Product Innovation," with R.D. Willig, Report for the Federal Trade Commission, October 1982, 131 pp.

"Market Power and Market Definition," with R.D. Willig, Memorandum for ABA Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, May 1981.

"Herfindahl Concentration Index," with R.D. Willig, Memorandum for ABA Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, March 1981.

"Public Interest Pricing of Scientific and Technical Information," Report for the Department of Commerce Technical Advisory Board, September 1979.

"Economics of Property Rights as Applied to Computer Software and Databases," with Y.M. Braunstein, D.M. Fischer, W.J. Baumol, prepared for the National Commission on New Technological Uses of Copyrighted Works, June 1977, 140 pp. Reprinted in part in *Technology and Copyright*, R.H. Dreyfuss (ed.), Lemond Publications, 1978.

Book review of O. Morgenstern and G.L. Thompson, *Economic Theory of Expanding and Contracting Economies*, reviewed in *Southern Economic Journal*, September 1978.

"Manual of Pricing and Cost Determination for Organizations Engaged in Dissemination of Knowledge," with W.J. Baumol, Y.M. Braunstein, D.M. Fischer, prepared for the Division of Science Information, NSF April 1977, 150 pp.

**UNPUBLISHED PAPERS**

"Exclusionary Discounts," with Greg Shaffer, August 2006.

"Regulation of Credit Card Interchange Fees and Incentives for Network Investments," with Y. Wang, Competition Policy Associates WP, Washington D.C. September 2005.

"Economics, Antitrust and the Motion Picture Industry," C.V. Starr Center Policy Paper, July 1983.

"On Bargaining, Settling, and Litigating: A Problem in Multiperiod Games With Imperfect Information," with A. Rubinstein, C.V. Starr Working Paper, December 1982.

"Supervision and Social Welfare: An Expository Example," C.V. Starr Center Working Paper, January 1982.

"Should We Take Rights Seriously: Economic Analysis of the Family Education Rights Act," with M. Manove, November 1977.

"An Echo or a Choice: Product Variety Under Monopolistic Competition," with A. Weiss; presented at the Bell Laboratories Conference on Market Structures, February 1977.

**GRANTS RECEIVED**

Regulation and Policy Analysis Program, National Science Foundation, Collaborative Research on Antitrust Policy, Principal Investigator, July 15, 1985 - December 31, 1986.

Regulation of Economic Activity Program, National Science Foundation, Microeconomic Analysis of Antitrust Policy, Principal Investigator, April 1, 1983 - March 31, 1984.

Economics Division of the National Science Foundation, "Political Economy of Taxation," Principal Investigator, Summer 1982.

Sloan Workshop in Applied Microeconomics (coordinator), with W.J. Baumol (Principal Coordinator), September 1977 - August 1982.

Economics Division of the National Science Foundation, "Collaborative Research on the Theory of Optimal Taxation and Tax Reform," July 1979 to September 1980, with E.S. Phelps.

Division of Science Information of the National Science Foundation for Research on "Scale Economies and Public Goods Properties of Information," W.J. Baumol, Y.M. Braunstein, M.I. Nadiri, Fall 1974 to Fall 1977.

National Science Foundation Institutional Grant to New York University for Research on Taxation and Distribution of Income, Summer 1974.

# Appendix B

**January 2013**

**Expert Testimony of Dr. Janusz A. Ordover 2009-2013**

*FTC v. CCC Holdings, Inc., et al*, U.S. District Court for the District of Columbia, CA 08-2043 (deposition and trial testimony) [D]

*Rambus Inc. v. Micron Technology, Inc. et al.,* Superior Court of the State of California, County of San Francisco, Case No. 04-431105 (deposition testimony, jury trial testimony) [D]

*In The Matter of Herring Broadcasting, Inc. d/b/a Wealth TV vs. Bright House Networks, LLC and Cox Communications, Inc.,*Federal Communications Commission, Washington, DC, File Nos. CSR-7709-P, 7822-P, 7829-P, 7907-P. (deposition testimony, FCC hearing testimony) [D]

*In the matter of Rubber Chemicals Antitrust Litigation: Bridgestone Americas Holdings, Inc., et al v. Chemtura Corp., et al,* U.S. District Court, Northern District of California, Individual Case No. C 06-5700-MJJ (testimony in an arbitration hearing) [D]

*International Business Machines* v. *T3 Technologies, Inc.,* U.S. District Court, Southern District of New York, Civ. Action No. 06-cv-13565-LAK (deposition testimony) [P]

*In the matter of BP America Production Company v. Repsol YPF, S.A.,* Arbitration under the Uncitral Arbitration Rules (testimony in an arbitration hearing) [P]

*Tessera Technologies, Inc. v. Hynix Semiconductor, Inc.,* Case No. 106CV-07668, Sup. Ct. of the State of California, County of Santa Clara (deposition testimony) [D]

*In Re: TFT-LCD (Flat Panel) Antitrust Litigation,* U.S. Dist. Court, N.D. of California, No. M 07-1827 SI, MDL No. 1827 (deposition testimony) [D]

*Enron Coal Services Ltd. And English Welsh and Scottish Railway Ltd*., In the Competition Appeal Tribunal (London, U.K.), Case No. 1106/5/7/08 (testimony in the Hearing) [P]

*Geoffrey Pecover, et al* v. *Electronic Arts,* Case No. C08-02820VRW, US Dist. Court, N.D. of CA, San Francisco Div. (deposition testimony) [D]

*Darren Berry, et al* v. *Volkswagen of America, Inc.,* Case No. 0516-CV01171-01, Cir. Court of Jackson County, Missouri at Independence (deposition testimony) [D]

*Ekaterini Kotaras, et al* v. *Whole Foods Market,* U.S. Dist. Court, Dist. of Columbia, 1:08-cv-01832 -PLF (deposition testimony, Court hearing testimony) [D]

*In re Online DVD Rental Antitrust Litigation,* U.S. Dist. Court, M:09-cv-2029 PJH (deposition testimony) [D]

*John M. Dewey et al.,* v. *Volkswagen Aktiengesellschaft,* U.S. Dist. Court, Dist. of New Jersey, Civ. Action No. 07-2249 (FSH) (deposition testimony) [D]

*In re Digital Performance Right in Sound Recordings and Ephemeral Recordings,* Docket No. 2009-1, Copyright Royalty Board (Webcasting III) (deposition testimony, CRB testimony on behalf of the Sound Exchange)

*In re Volkswagen and Audi Warranty Extension Litigation,* U.S. District Court, District of Massachusetts, MDL Docket No. 1:07-md-01790 (deposition testimony) [D]

*King Drug Company of Florence, Inc., et al v. Cephalon, Inc. et al.,* U.S. District Court, E.D. of Pennsylvania, No. 06-CV-1791-MSG (deposition testimony) [D]

*T-Mobile USA, Inc.* v. *IDT Domestic Telecom, Inc.*, Superior Court of the State of Washington, No. 09-2-19475-1 (SEA) (deposition testimony) [P]

*In re Live Concert Antitrust Litigation,* U.S. District Court, Central District of California, Western Div., Case No.: 2:06-MDL-01745 SVW (VBKx) (deposition testimony) [D]

*In Re Florida Cement and Concrete Litigation,* U.S. District Court, S.D. of Fla., Miami Division, Master Docket No. 09-23493-Civ. (direct and indirect cases) (deposition testimony)[D]

*Sandisk Corp.* v. *Kingston Technology Co., Inc., et al.,* U.S. District Court, Western Dist. of Wisconsin, Civ. Action No. 10-cv-243 (deposition and trial testimony) [P]

*Jeld-Wen, Inc.* v. *AGC America, Inc., et al.,* U.S. District Court, Western Dist. of Pennsylvania, Civ. Action No. 11-658. (deposition testimony) [D]

*In Re Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Services,* Docket No. 2011-1 CRB PSS/Satellite II, Copyright Royalty Board (two depositions and two Tribunal testimonies on behalf of the Sound Exchange).

*Apple, Inc.* v. *Samsung Electronics Co. Ltd.* and *Samsung Electronics Co., Ltd.* v. *Apple, Inc.* U.S. District Court, N.D. of CA., San Jose Div., Civ. Action No., 11-CV-01846 (deposition and jury trial testimony) [P/D]

*Avery Dennison, Corp.* v. *3M Innovative Properties Co. and 3M Company*, U.S. Dist. Court for the District of Minnesota, Civ. Action 11-cv-0824 MJD/FLN

P= Plaintiff D=Defendant

# Appendix C

# MATERIALS RELIED UPON

**Court Documents:**

Second Consolidated Amended Class Action Complaint in re: Rail Freight Fuel Surcharge Antitrust Litigation (February 3, 2010)

Direct Purchaser Plaintiffs' Consolidated Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railway Company ("Defendants") in re: Rail Freight Fuel Surcharge Antitrust Litigation (November 30, 2010)

Defendant BNSF Railway Company's Supplemental Responses and Objections to Direct Purchaser Plaintiffs' Second Set of Interrogatories to Defendant BNSF Railway Company in re: Rail Freight Fuel Surcharge Antitrust Litigation (February 8, 2011)

Direct Purchaser Plaintiffs' Supplemental Consolidated Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railway Company ("Defendants") in re: Rail Freight Fuel Surcharge Antitrust Litigation (January 4, 2012)

Opinion in re: Rail Freight Fuel Surcharge Antitrust Litigation (June 21, 2012)

**Expert Reports:**

Expert Reply Report of Gordon Rausser, Ph.D., *In the matter of In Re: Rail Freight Fuel Surcharge Antitrust Litigation* (August 27, 2010)

Expert Report of Gordon Rausser, Ph.D., *In the matter of In Re: Rail Freight Fuel Surcharge Antitrust Litigation* (October 15, 2012)

**Depositions:**

Samuel Kyei (March 4, 2010)

Gordon Rausser, Ph.D. (June 3, 2010)

John Lanigan Deposition and Exhibits (June 22, 2010)

Matthew K. Rose (July 16, 2010)

Paul Anderson (May 26, 2011)

Gordon Rausser, Ph.D. (December 11, 2012)

Gordon Rausser, Ph.D. (December 18, 2012)

**Produced Data:**

BNSF transaction data

CSX transaction data

NS transaction data

UP transaction data

AAR CS54 data

**Bates Numbered and Produced Documents:**

BNSFC 306882 Regulated Transportation Contract, effective September 1, 2004

BNSFC 306882 Transportation Contract Intercarrier Agreement, effective September 1, 2004

00037513 – 527 – BNSF Pricing Updates

BNSF-0027658 – Email from James A Arnett re: Interline Fuel Surcharge – Per Mile alternative and reciprocal charge, dated April 3, 2003

BNSF-0028053 – 005 – Email from James C. Engstrom, Subject: RE: Carload FSC for January 2004, November 26, 2003

BNSF-0031077-079 – Email w/ attachments from Linda Wertz re: FW: BNSF Details Fuel-Surcharge Plan for Coal, Agricultural Products, October 20, 2005

BNSF-0031091 – BNSF Rules Book 6100-A, Item 3380

BNSF-0031225 – 246 - BNSF Railway Fuel Cost Recovery Analysis, dated March 14, 2005

BNSF-0070502 – 503 – BNSF Memo from Sam Kyei re: In Recognition of Your Great Leadership, March 15, 2005

BNSF-0073919 – 922 – Email from Bryan L Evans re: RE [redacted] Fuel Surcharge, dated November 11, 2003

BNSF-0326949 – 951 – Email from George Gillen, FW: Argus Rail Business Report, May 6, 2004

BNSF-0328865 – 873 - BNSF Interoffice Memo from Chuck Schultz re: Fuel Surcharge Questions, dated January 15, 2003

BNSF-0329281 – Email from James A Arnett re: Interline Fuel Surcharge – per Mile alternative and reciprocal charge, dated April 3, 2003

BNSF-0337916 – 918 – Email from Marc A Allen re: FW [redacted] Meeting, dated January 22, 2007

BNSF-0368426 - 437 – BNSF Fuel Surcharge Update, undated.

BNSF-0342819 – 820 – Email from Matthew W. Feldman, Subject: [redacted] Fuel hedging update, October 15, 2003

BNSF-0482727 – BNSF Rules Book 6100-A, Item 3381

BNSF-0510151 – BNSF Rules Book 6100-A, Item 3375A

BNSF-0511744 – BNSF Rules Book 6100-A, Item 3375B

BNSF-0511811 – BNSF Rules Book 6100-A, Item 3375C

BNSF-0515927 – BNSF Rules Book 6100-A, Item 3381A

BNSF-0515779 – 781 – Email from John G. Farr, Subject: FW: ATSF 20219052.xls, October 5, 2004

BNSF-0516609 – 610 – BNSF Rules Book 6100-A, Item 3375

BNSF-0516245 – BNSF Rules Book 6100-A, Item 3375

BNSF-0544851 – 853

BNSF-0552180-388 – AAR Rate EDI Network (REN) Rail Carrier Industry Guide to Electronic Interchange

BNSF-0557167 – 181 – Email w/ attachments from Richard E Stroot re: CSX agenda for April 1, 2003 & background news releases, dated March 27, 2003

BNSF-0577389 - 396 - BNSF Intermodal Fuel Surcharge Adherence Update for November 2004 - January 2005, dated March 10, 2005

BNSF-0581954 – Email from Edward G McNack re: FW: BNSF FSC, dated October 19, 2006

BNSF0612842 – 855 – BNSF Railway Quarterly Fuel Surcharge Update, April 24, 2008

BNSF-0627247 – 274 – BNSF Railway Fuel Cost Recovery Analysis, July 27, 2005

BNSF-0643905 – 906 – All-LF/Fuel Surcharge Negotiation Points

BNSF-0648777 – 789 – Letter from James W. Stewart, Subject: Mileage-Based Fuel Surcharge (FSC), August 23, 2005

BNSF-0657303 – 304 – BNERM1

BNSF-0657309 – 323 – Fuel Surcharge Review, March 2001

BNSF-0657373 – 375 – BNSF Rules Book 6100-A, Item 3375E

BNSF-0657515 – 516 – Memorandum from Sam Kyei, Subject: Potential RCAF Question for Analyst Meeting/Policy Implications

BNSF-0679489 – BNSF Implementing Agreement with [redacted]

BNSF-0681536 – 581 - BNSF Contract No. BF45982 – Railroad Transportation Contract

BNSF-0681709 - 720 - BNSF Contract No. BF-46271: Intermodal Transportation Contract - Contract No. L-54 (Effective January 1, 2007 through December 31, 2009), dated June 11, 2007

BNSF-0682127 – 134 – Contract summary documents which include: a summary of contract counts, Ag Products Contracts w/ All-lf Escalators and a High Level Overview of IP Contract Rate Adjustments

BNSF-0800349 – 353 – Email from Deanna B Brice re: RE: [redacted] uel Surcharge – Calculation of Monthly charge beginning May 1, 2005

BNSF-0800389 – 409 – International Transportation Agreement MA42 between Burlington Northern and Santa Fe Railway Company and [redacted] (Effective: August 1, 2002; Expires: July 31, 2007)

BNSF-0800501 – International Transportation Agreement MA55 between BNSF Railway Company and [redacted] (Effective: June 1, 2006; Expires: May 31, 2009)

BNSF-0800520 – 522 – International Transportation Agreement MA60 between BNSF Railway Company and [redacted]

BNSF-0800523 – 536 –International Transportation Agreement MA60 between BNSF Railway Company and [redacted]

BNSF-0800664 – 665 - Amendment 1 to International Transportation Agreement MA66, dated July 2003

BNSF-0800666 – 672 – Amendment 2 to International Transportation Agreement MA66, dated July 2004

BNSF-0814137 – 143 – BNSFQ 111790 Implementing Agreement

BNSF-0814151 – 152 - BNSF Intermodal Fuel Surcharge (Draft - Version 1)

BNSF-FSC 000002 – 026 - Team Meeting Notice re: Updated: Fuel Surcharge Review Team; BNSF Fuel Surcharges Cost Recovery Improvements, dated February 24, 2003

BNSF-FSC 000047 – 074 - BNSF Fuel Surcharges - Fuel Surcharge Review Team Recommendations, dated April 14, 2003

BNSF-FSC 0000662 – 663 – Email from Thomas Hund, Subject: FWD: RCAF, November 19, 2003

BNSF-FSC 000150 – 154 – Coal Fuel Expense Change and RCAF Recapture, 1999 – 2003

BNSF-FSC 000223 – 224 – BNSF Press Release, "BNSF Announces First Mileage-Based Fuel Surcharge Program In the Rail Industry," March 29, 2005

BNSF-FSC 000280 – 281 – Email from Linda L. Wertz, Subject: FW: BNSF Details Fuel-Surcharge Plan for Coal, Agricultural Products

BNSF-FSC 000363 – Memo from Cheri Carlson re: Fuel Surcharge, dated March 11, 2003

BNSF-FSC 000505 – 507 – Table data depicting fuel intensity

BNSF-FSC 000525 – BNSF Pricing Update to BNSF Coal Customers- BNSF Coal Fuel Surcharge (Effective July 1, 2004), dated June 8, 2004

BNSF-FSC 001702 – 704 - Email from Renita L Lee re: FW: Post Intermodal Fuel Surcharge to BNSF.com, dated July 25, 2001

BNSF-FSC 001502 – 695 – BNSF Pricing Updates

BNSF_LOG0000287 - 297 - Email w/ attachments from George F Gillen re: FW: Fuel Surcharge Program Changes (Updated w/ Hedging Info), dated May 2, 2003

CSXFSC000238153 - 154 - BNSF-CSX Executive Team Meeting - Jacksonville, FL, April 20, 2004

CSXFSC152734 – Tariff CSXT 8100 Section XII-B Miscellaneous Provisions

UPFSC00001273 – Letter from Lance Fritz, October 1, 2004

UPFSC 0078792 – 799 – Email from Nobu Terasaki re: Re: Comparison of Intermodal FSC Program to Standard HDF Program, October 18, 2005

UPFSC 0362818 – 819 – Email from Nobu Terasaki re: New weekly fuel surcharge program, October 30, 2006

**Non-Bates Numbered Documents:**

Burlington Northern Santa Fe Corporation 2001 Form 10-K

Burlington Northern Santa Fe Corporation 2003 Annual Report and Form 10-K

Union Pacific Corporation 2002 Form 10-K

Union Pacific Corporation 2003 Form 10-K

Burlington Northern Santa Fe Corporation 2004 Form 10-K

Union Pacific Corporation 2004 Form 10-K

Union Pacific Corporation 2005 Form 10-K

Union Pacific Corporation 2006 Form 10-K

Burlington Northern Santa Fe Corporation 2006 Form 10-K

Burlington Northern Santa Fe Corporation 2007 Annual Report and Form 10-K

Union Pacific Corporation 2007 Form 10-K

Burlington Northern Santa Fe Corporation 2008 Annual Report and Form 10-K

Burlington Northern Santa Fe Corporation 2008 Form 10-K

Union Pacific Corporation 2008 Form 10-K

Burlington Northern Santa Fe Corporation 2009 Form 10-K

Union Pacific Corporation 2009 Form 10-K

Burlington Northern Santa Fe Corporation 2010 Form 10-K

Union Pacific Corporation 2010 Form 10-K

Union Pacific Corporation 2011 Form 10-K

**Articles, Books and Reports:**

"Airline Companies Lose Following Losses From Fuel-Hedging," *iStockAnalyst.com*, October 20, 2011

Ivan Gale, "Emirates writes down Dh1.5bn in fuel hedge losses," *The National*, June 1, 2009.

"Rails Try to Keep Up with Wyoming Coal Production," *Associated Press Newswires* (January 8, 2006)

Behr, Timo, "The 2008 Oil Price Shock: Competing Explanations and Policy Implications," GPPi Global Energy Governance Project Policy Paper Series No. 1 (2009)

"Fitch Outlook: U.S. Freight Transports to Remain Healthy in 2006," *Business Wire* (December 6, 2005)

Carlton, Dennis and J. M. Perloff, *Modern Industrial Organization* (Prentice Hall: 2005)

Culp, Christopher, *Risk Transfer: Derivatives in Theory and Practice* (Wiley: 2004)

Economides, Nicholas and Steven Salop. "Competition and Integration Among Complements, and Network Market Structure." *The Journal of Industrial Economics*, Vol XL (March 1992)

Energy Information Administration, *Annual Energy Outlook 2003 with Projections to 2025* (January 2003)

Energy Information Administration, *Short-Term Energy Outlook Supplement: Why Are Oil Prices So High* (November 2007)

Fabinger, Michal and Glen Weyl, Pass-Through and Demand Forms (December 30, 2012)

"Q4 2002 Burlington Northern Santa Fe Corporation Earnings Conference Call – Final," *FD (Fair Disclosure) Wire* (January 21, 2003)

"Q1 2003 Burlington Northern Santa Fe Corporation Earnings Conference Call – Final," *FD (Fair Disclosure) Wire* (April 22, 2003)

Fisher, Franklin M. and J. J. McGowan, "On the Misuse of Accounting Rates of Return to Infer Monopoly Profits," *The American Economic Review* Vol. 73, No. 1 (1983)

"BNSF Announces $2.4 Billion Capital Commitment Program for 2006; About $400 Million Again Slated for Track/Facilities Expansion," *PR Newswire* (January 24, 2006)

Peter Tufano, "Who Manages Risk? An Empirical Examination of Risk Management Practices in the Gold Mining Industry," Journal of Finance, Vol. LI, No. 4 (September 1996)

Stigler, George, "A Theory of Oligopoly," in *The Organization of Industry* (Chicago: University of Chicago Press, 1983)

Surface Transportation Board Decision STB Ex Parte No. 661 (January 25, 2007)

Union Pacific Railroad Company, *Master Intermodal Transportation Agreement (MITA)* (Issued: March 26, 2008; Effective: April 1, 2008)

U.S. Code of Federal Regulations, 49 §1039.11, §1039.13, §1039.14, §10703and §11904

U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines* (August 19, 2010)

United States Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed* (October 2006)

**<u>Websites:</u>**

American Association of Railroads Detailed RCAF Description. http://www.aar.org/StatisticsAndPublications/Rail-Cost-Indexes.aspx

BNSF About Us. http://www.bnsf.com/about-bnsf/pdf/fact_sheet.pdf.

BNSF Customers. http://www.bnsf.com/customers/where-can-i-ship/

BNSF Glossary. http://www.bnsf.com/customers/pdf/glossary.pdf

BNSF Intermodal Rules and Policies Guide. http://www.bnsf.com/customers/pdf/2008_Intermodal_R_and_PG.pdf.

BNSF Financial Information. http://www.bnsf.com/about-bnsf/financial-information

The History of BNSF. http://www.bnsf.com/about-bnsf/our-railroad/company-history/pdf/hist_overview.pdf

CSX Company Overview of Network and Operations. http://www.csx.com/index.cfm/about-csx/company-overview/network-and-operations

EIA. http://www.eia.gov

Nation Atlas. http://www.nationalatlas.gov

National Motor Freight Traffic Association. http://www.nmfta.org/pages/splc.aspx

NSCORP Investors. http://www.nscorp.com/nscportal/nscorp/Investors

Surface Transportation Board Definition of Net Railway Operating Income. http://www.stb.dot.gov/econdata.nsf/c1f494991e44922185266050060ff1e/472e22167a5059a38525757d0068147e/$FILE/08rrearn4q.pdf

Surface Transportation Board Frequently Asked Questions. http://www.stb.dot.gov/stb/faqs.html

Surface Transportation Board Overview. http://www.stb.dot.gov/stb/about/overview.html

Surface Transportation Board Quarterly Earnings Reports 1997-2008. http://www.stb.dot.gov/econdata.nsf/c1f494991e449221852566050060ff1e?OpenView

Surface Transportation Board RCAF Description. http://www.stb.dot.gov/stb/industry/rcaf.html

Union Pacific U.S. Guide. http://www.up.com/aboutup/usguide/index.htm

# Appendix D

**Average Change in BNSF All-In Rates Per Ton Mile For Top 30 STCC3 Commodities From Pre-Class Period Levels**

| | | Average Change From Year Ending 6/30/03 to Year Ending | | | | |
|---|---|---|---|---|---|---|
| **STCC3** | **STCC3 Definition** | **6/30/2004** | **6/30/2005** | **6/30/2006** | **6/30/2007** | **6/30/2008** |
| 000 | INTERMODAL | -0.5% | 2.6% | 10.1% | 9.9% | 15.6% |
| 011 | FIELD CROPS | 6.8% | 10.8% | 35.7% | 47.4% | 45.4% |
| 101 | IRON ORES | -13.2% | -8.3% | -11.3% | -8.5% | -4.5% |
| 112 | BITUMINOUS COAL OR LIGNITE | -6.7% | -8.8% | -6.5% | -4.8% | 1.6% |
| 142 | CRUSHED OR BROKEN STONE OR RIPRAP | -2.9% | 7.4% | 14.0% | 12.0% | 4.2% |
| 147 | CHEMICAL OR FERTILIZER MINERALS | 0.5% | -1.8% | 5.4% | 9.4% | 28.1% |
| 201 | MEAT, POULTRY OR SMALL GAME, FRESH, CHILLED OR FROZEN | -5.1% | -8.1% | -5.8% | 3.0% | 12.0% |
| 203 | CANNED OR PRESERVED FRUITS, VEGETABLES OR SEAFOOD | -1.7% | 7.9% | 10.9% | 17.0% | 22.6% |
| 204 | GRAIN MILL PRODUCTS | -6.3% | -6.1% | -7.1% | -7.0% | -5.4% |
| 206 | SUGAR, BEET OR CANE | -2.7% | 1.3% | 2.8% | 5.6% | 20.7% |
| 208 | BEVERAGES OR FLAVORING EXTRACTS | -0.1% | -2.8% | 2.4% | 15.5% | 3.3% |
| 209 | MISCELLANEOUS FOOD RATIONS OR KINDRED PRODUCTS | -3.6% | 0.6% | 9.0% | 15.4% | 15.8% |
| 242 | SAWMILL OR PLANING MILL PRODUCTS EXC. BOX SHOOKS OR BOXES SEE 244, MILL-WORK, PLYWOOD OR VENEER SEE 243 OR TEXTILE MACHINERY WOOD SHAPES OR TURNINGS SEE 355 | -0.4% | 12.0% | 20.0% | 33.4% | 35.9% |
| 243 | MILLWORK OR WOOD PRODUCTS OR PLYWOOD OR VENEER | 1.2% | 14.4% | 23.3% | 32.1% | 32.0% |
| 249 | MISCELLANEOUS WOOD PROD | 1.6% | 14.2% | 29.3% | 48.2% | 61.0% |
| 261 | PULP OR PULP MILL PRODUCTS | 12.2% | 17.6% | 36.2% | 39.8% | 37.9% |
| 262 | PAPER EXC. BUILDING SEE 266 | -2.2% | 2.3% | 7.6% | 15.6% | 18.6% |
| 263 | FIBREBOARD, PAPERBOARD PULPBOARD EXC. BUILDING INSULATING BOARD SEE 266 | -1.8% | 8.2% | 19.7% | 16.7% | 18.5% |
| 281 | INDUSTRIAL INORGANIC OR ORGANIC CHEMICALS EXC. PESTICIDES SEE 287, DRUGS, MEDICINAL CHEMICALS OR MEDICINES SEE 283, NAVAL STORES OR DISTILLATION PRODUCTS see STCC 6001AA for full DESCRIPTION | -10.0% | -6.3% | -4.2% | -0.9% | 2.5% |
| 282 | PLASTIC MATERIALS OR SYNTHETIC FIBRES, RESINS OR RUBBER EXC. GLASS SEE 322, PLASTIC OR RUBBER PRODUCTS SEE 30 OR KNITTING, SPINNING, THROWING OR WEAVING FIBRES SEE 22 | -5.8% | -2.3% | 1.7% | 5.0% | 9.3% |
| 287 | AGRICULTURAL CHEMICALS | -3.5% | -0.9% | 3.2% | 7.7% | 9.3% |
| 291 | PRODUCTS OF PETROLEUM REFINING | -5.9% | -11.5% | -22.6% | -20.4% | -18.2% |
| 299 | MISCELLANEOUS COAL OR PETROLEUM PRODUCTS | -5.9% | 1.9% | 10.2% | 6.7% | 5.0% |
| 324 | HYDRAULIC CEMENT | 1.2% | 0.3% | 12.8% | 23.3% | 23.1% |
| 327 | CONCRETE, GYPSUM, OR PLASTER PRODUCTS | -1.0% | 6.5% | 16.0% | 21.9% | 11.7% |
| 329 | ABRASIVES, ASBESTOS UCTS OR MISCELLANEOUS NONMETALLIC MINERAL UCTS | -1.7% | 1.0% | 8.9% | 15.4% | 23.7% |
| 331 | STEEL WORKS, ROLLING MILL, OR OTHER REDUCTION PLANT PRODUCTS, GALVANIZED PRODUCTS EXC. COATING OR OTHER ALLIED PROCESSING SEE 34994 | -0.2% | 8.6% | 24.9% | 28.8% | 36.8% |
| 333 | NONFERROUS METAL PRIMARY SMELTER PRODUCT VIZ. SLAB, INGOT, PIG, ETC., OR RESIDUES | -2.0% | 3.0% | 11.3% | 22.9% | 23.7% |
| 371 | MOTOR VEHICLES OR EQUIPMENT | -2.7% | -6.3% | 0.1% | 3.1% | 10.1% |
| 402 | WASTE OR SCRAP EXC. SEE 401 | 0.0% | 3.7% | 16.7% | 22.2% | 34.2% |

Source: BNSF transaction data; CPI.

Notes:
[1] All-in rate per ton mile normalized to 2000 dollars before calculating percentage change.
[2] Top 30 STCC3 commodities defined by total ton miles over the period of 7/1/02 through 6/30/08.

# Appendix E

Highly Confidential

**Average Change in BNSF Base Rates Per Ton Mile For Top 30 STCC3 Commodities From Pre-Class Period Levels**

| | | Average Change From Year Ending 6/30/03 to Year Ending | | | | |
|---|---|---|---|---|---|---|
| **STCC3** | **STCC3 Definition** | **6/30/2004** | **6/30/2005** | **6/30/2006** | **6/30/2007** | **6/30/2008** |
| 000 | INTERMODAL | -1.5% | -3.2% | -2.8% | -4.9% | -7.4% |
| 011 | FIELD CROPS | 4.7% | 4.2% | 19.0% | 25.6% | 18.6% |
| 101 | IRON ORES | -13.2% | -8.5% | -11.6% | -9.6% | -7.4% |
| 112 | BITUMINOUS COAL OR LIGNITE | -6.7% | -9.5% | -10.0% | -9.7% | -6.9% |
| 142 | CRUSHED OR BROKEN STONE OR RIPRAP | -3.6% | 2.9% | 4.6% | -0.8% | -11.7% |
| 147 | CHEMICAL OR FERTILIZER MINERALS | -1.6% | -7.9% | -7.5% | -7.2% | 6.7% |
| 201 | MEAT, POULTRY OR SMALL GAME, FRESH, CHILLED OR FROZEN | -5.7% | -11.8% | -13.2% | -7.7% | -4.2% |
| 203 | CANNED OR PRESERVED FRUITS, VEGETABLES OR SEAFOOD | -2.6% | 2.2% | -0.2% | 3.7% | 4.2% |
| 204 | GRAIN MILL PRODUCTS | -6.9% | -8.7% | -11.4% | -11.5% | -12.4% |
| 206 | SUGAR, BEET OR CANE | -3.9% | -1.8% | -3.4% | 1.5% | 12.6% |
| 208 | BEVERAGES OR FLAVORING EXTRACTS | -1.5% | -9.1% | -9.2% | 1.0% | -14.3% |
| 209 | MISCELLANEOUS FOOD RATIONS OR KINDRED PRODUCTS | -4.2% | -3.5% | -1.4% | 4.4% | 2.9% |
| 242 | SAWMILL OR PLANING MILL PRODUCTS EXC. BOX SHOOKS OR BOXES SEE 244, MILL-WORK, PLYWOOD OR VENEER SEE 243 OR TEXTILE MACHINERY WOOD SHAPES OR TURNINGS SEE 355 | -1.9% | 5.0% | 6.8% | 17.0% | 14.4% |
| 243 | MILLWORK OR WOOD PRODUCTS OR PLYWOOD OR VENEER | -0.6% | 7.5% | 9.6% | 15.5% | 10.9% |
| 249 | MISCELLANEOUS WOOD PROD | 0.1% | 7.8% | 16.2% | 32.2% | 38.1% |
| 261 | PULP OR PULP MILL PRODUCTS | 11.2% | 11.6% | 23.2% | 25.1% | 18.4% |
| 262 | PAPER EXC. BUILDING SEE 266 | -2.9% | -3.4% | -4.0% | 1.9% | 1.0% |
| 263 | FIBREBOARD, PAPERBOARD PULPBOARD EXC. BUILDING INSULATING BOARD SEE 266 | -3.6% | 1.4% | 6.0% | 2.2% | 0.6% |
| 281 | INDUSTRIAL INORGANIC OR ORGANIC CHEMICALS EXC. PESTICIDES SEE 287, DRUGS, MEDICINAL CHEMICALS OR MEDICINES SEE 283, NAVAL STORES OR DISTILLATION PRODUCTS see STCC 6001AA for full DESCRIPTION | -10.6% | -9.9% | -11.4% | -9.2% | -9.1% |
| 282 | PLASTIC MATERIALS OR SYNTHETIC FIBRES, RESINS OR RUBBER EXC. GLASS SEE 322, PLASTIC OR RUBBER PRODUCTS SEE 30 OR KNITTING, SPINNING, THROWING OR WEAVING FIBRES SEE 22 | -6.1% | -4.3% | -3.7% | -4.0% | -4.5% |
| 287 | AGRICULTURAL CHEMICALS | -3.9% | -2.9% | -3.0% | -2.2% | -3.4% |
| 291 | PRODUCTS OF PETROLEUM REFINING | -6.5% | -14.7% | -27.6% | -24.5% | -24.9% |
| 299 | MISCELLANEOUS COAL OR PETROLEUM PRODUCTS | -6.7% | -3.1% | -1.1% | -5.5% | -11.5% |
| 324 | HYDRAULIC CEMENT | -0.2% | -5.0% | 1.2% | 8.5% | 3.8% |
| 327 | CONCRETE, GYPSUM, OR PLASTER PRODUCTS | -2.6% | 0.1% | 3.4% | 6.8% | -6.0% |
| 329 | ABRASIVES, ASBESTOS UCTS OR MISCELLANEOUS NONMETALLIC MINERAL UCTS | -2.7% | -4.1% | -1.6% | 2.5% | 4.6% |
| 331 | STEEL WORKS, ROLLING MILL, OR OTHER REDUCTION PLANT PRODUCTS, GALVANIZED PRODUCTS EXC. COATING OR OTHER ALLIED PROCESSING SEE 34994 | -0.8% | 4.7% | 13.2% | 15.6% | 17.9% |
| 333 | NONFERROUS METAL PRIMARY SMELTER PRODUCT VIZ. SLAB, INGOT, PIG, ETC., OR RESIDUES | -2.7% | -1.8% | 0.3% | 9.4% | 5.3% |
| 371 | MOTOR VEHICLES OR EQUIPMENT | -3.0% | -9.3% | -8.1% | -6.7% | -5.7% |
| 402 | WASTE OR SCRAP EXC. SEE 401 | -1.1% | -1.9% | 4.9% | 8.4% | 13.9% |

Source: BNSF transaction data; CPI.

Notes:
[1] All-in rate per ton mile normalized to 2000 dollars before calculating percentage change.
[2] Top 30 STCC3 commodities defined by total ton miles over the period of 7/1/02 through 6/30/08.

BNSF RAILWAY

# Fuel Surcharge Program Details & Table

*Intermodal – Percent of Revenue*

**BNSF Intermodal Rules and Policies Guide - Intermodal Fuel Surcharge**

BNSF may impose a percent of revenue fuel surcharge due to increasing fuel costs as stated in the BNSF Intermodal Rules and Policies Guide. All transportation services and intermodal shipments will be subject to any Intermodal Fuel Surcharges implemented by BNSF or imposed on BNSF, regardless of price authority (including all contracts and agreements).

The BNSF Intermodal Fuel Surcharge is applied to the freight bill based on the BNSF shipping instructions (waybill) date.

The Intermodal Fuel Surcharge is adjusted each Wednesday according to the previous week's Department of Energy's U.S. Average Retail On-Highway Diesel Fuel (HDF), which is updated late Monday afternoon. BNSF will not issue a credit or refund if the HDF price falls below $1.24. The surcharge is subject to change.

Fuel surcharge questions should be forwarded to your BNSF Intermodal Marketing Representative.

| Intermodal Percent of Revenue Fuel Surcharge Table | | | |
|---|---|---|---|
| **Average Highway Diesel Fuel Price (per gallon)** | **Fuel Surcharge Percentage** | **Average Highway Diesel Fuel Price (per gallon)** | **Fuel Surcharge Percentage** |
| $0.000 - $1.239 | 0.0% | $2.440 - $2.479 | 16.0% |
| $1.240 - $1.279 | 1.0% | $2.480 - $2.519 | 16.5% |
| $1.280 - $1.319 | 1.5% | $2.520 - $2.559 | 17.0% |
| $1.320 - $1.359 | 2.0% | $2.560 - $2.599 | 17.5% |
| $1.360 - $1.399 | 2.5% | $2.600 - $2.639 | 18.0% |
| $1.400 - $1.439 | 3.0% | $2.640 - $2.679 | 18.5% |
| $1.440 - $1.479 | 3.5% | $2.680 - $2.719 | 19.0% |
| $1.480 - $1.519 | 4.0% | $2.720 - $2.759 | 19.5% |
| $1.520 - $1.559 | 4.5% | $2.760 - $2.799 | 20.0% |
| $1.560 - $1.599 | 5.0% | $2.800 - $2.839 | 20.5% |
| $1.600 - $1.639 | 5.5% | $2.840 - $2.879 | 21.0% |
| $1.640 - $1.679 | 6.0% | $2.880 - $2.919 | 21.5% |
| $1.680 - $1.719 | 6.5% | $2.920 - $2.959 | 22.0% |
| $1.720 - $1.759 | 7.0% | $2.960 - $2.999 | 22.5% |
| $1.760 - $1.799 | 7.5% | $3.000 - $3.039 | 23.0% |
| $1.800 - $1.839 | 8.0% | $3.040 - $3.079 | 23.5% |
| $1.840 - $1.879 | 8.5% | $3.080 - $3.119 | 24.0% |
| $1.880 - $1.919 | 9.0% | $3.120 - $3.159 | 24.5% |
| $1.920 - $1.959 | 9.5% | $3.160 - $3.199 | 25.0% |
| $1.960 - $1.999 | 10.0% | $3.200 - $3.239 | 25.5% |
| $2.000 - $2.039 | 10.5% | $3.240 - $3.279 | 26.0% |
| $2.040 - $2.079 | 11.0% | $3.280 - $3.319 | 26.5% |
| $2.080 - $2.119 | 11.5% | $3.320 - $3.359 | 27.0% |
| $2.120 - $2.159 | 12.0% | $3.360 - $3.399 | 27.5% |
| $2.160 - $2.199 | 12.5% | $3.400 - $3.439 | 28.0% |
| $2.200 - $2.239 | 13.0% | $3.440 - $3.479 | 28.5% |
| $2.240 - $2.279 | 13.5% | $3.480 - $3.519 | 29.0% |
| $2.280 - $2.319 | 14.0% | $3.520 - $3.559 | 29.5% |
| $2.320 - $2.359 | 14.5% | $3.560 - $3.599 | 30.0% |
| $2.360 - $2.399 | 15.0% | $3.600 - $3.639 | 30.5% |
| $2.400 - $2.439 | 15.5% | Each $0.04 HDF per gallon increase | Additional .5% |



Duggan
EXHIBIT NO. 2
08-13-10
J. BRANDT, CSR-RMR-CRR

DA03514

# BNSF PRICE MANAGEMENT - MEMO

Burlington Northern Santa Fe Railway

Date: January 7, 2000

To: Bill Carter
Dave Hargrave
Katie Farmer
Larry Ruple
Merril Lieb

CC: George Duggan
Tom Jacobowski
Cris Hall
Bob Cherry
Ken Holmes
Sam Kyei

From: Jim Arnett

Subject: Fuel Surcharge

Attached is a spreadsheet summarizing Chemical price authorities containing fuel surcharge provisions (Source: RPMS) as well as the estimated 2000 revenue impact of a fuel surcharge increase.

Fuel surcharge provisions were developed almost 10 years ago to protect the railroad against possible future sharp increases in fuel prices. The average monthly West Texas Intermediate Crude Price (WTI) needed to trigger the application of the fuel surcharge is adjusted each October 1st.

Between October 1, 1998 and September 30, 1999, the WTI had to reach $20.30 per barrel before the fuel surcharge would be applied. During this time period the trigger price was exceeded once (Aug. 1999 - $21.26 bbl).

For the period October 1, 1999 through September 30, 2000, the average monthly WTI price must now reach $18.93 per barrel before a surcharge is applied. The WTI was $23.88 bbl Sept. 1999; $22.64 bbl Oct. 1999; $24.86 bbl Nov.1999 and $26.08 bbl Dec.1999. Utilizing the existing calculation method, these prices would equate to the following fuel surcharge adjustments:

| Shipments moving in: | Fuel Surcharge Adjustment |
|---|---|
| October 1999 | +3.8% |
| November 1999 | +3.4% |
| December 1999 | +4.2% |
| January 2000 | +4.6% |

Current standard fuel surcharge provisions state that adjustments will be made on a **monthly** basis. However, no adjustments were made for shipments moving in October, November or December. We recommend that these adjustments be ignored and that no billing corrections be made.

**However, based on the January 2000 calculation, a 4.6% increase is due. If you would like any price authorities containing fuel surcharge provisions to be adjusted based on this increase, please advise Price Management, and the base prices will be adjusted accordingly. In addition, we will insure that all price authorities are updated with the current fuel surcharge wording.**

The following background information is attached:

- Price Authorities containing fuel surcharge provisions and the revenue impact on a fuel surcharge increase of 4%. This number was arrived at by averaging the adjustments for Oct. thru Jan, and assuming that this average will remain constant through the rest of the year.
- A copy of the fuel surcharge provisions of each of the above price authorities
- The Fuel Surcharge Glossary of Terms
- The Fuel Surcharge calculation for Oct.1999 – January 2000
- The average West Texas Intermediate Crude (WTI) prices for 1999
- Chart depicting the average monthly West Texas Intermediate Crude prices as compared to BNSF Benchmark Value 1996 – 1999

In general, we advise Marketing of any fuel surcharge affects in late September. However, we have been analyzing our fuel surcharge calculation methods and have detected some inconsistencies which we are attempting to correct. When we have our analysis complete, we will advise you of the results. In the meantime, based on past calculation methods and provisions already locked into existing contracts, the attached should apply.

If you have any questions, please do not hesitate to call. Also, if you are aware of any price authorities not contained in the attached spreadsheet, please let us know.

Price Authorities Containing Fuel Surcharge Provisions
12/01/1999
Source: RPMS

CHEMICALS

| PA | NUMBER | ITEM/ IMP AGR | REV | PA TYPE | EFF DATE | EXP DATE | CUSTOMER | COMMODITY | ORIGINS | DESTINATIONS | UNITS (12/98 - 11/99) | EST.REV. (12/98 - 11/99) | Scenario 4.0% Fuel Surcharge Increase - EST.REV. (1/00 - 12/00) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BNSFC | 302886 | | 1 | SR | 12/18/1998 | 12/17/2001 | [redacted] | | | | | | |
| BNSFC | 301359 | | 2 | CR | 01/12/1999 | 12/31/2000 | | | | | | | |
| BNSFC | 301589 | 1 | 3 | CR | 02/12/1999 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 2 | 2 | CR | 06/01/1999 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 4 | 10 | CR | 08/02/1999 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 5 | 16 | CR | 11/16/1999 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 6 | 1 | CR | 06/01/1998 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 7 | 2 | CR | 04/20/1999 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 8 | 2 | CR | 06/01/1998 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 9 | 1 | CR | 02/28/1998 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 10 | 1 | CR | 05/21/1998 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 11 | 1 | CR | 06/01/1998 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 12 | 1 | CR | 06/01/1998 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 13 | 1 | CR | 06/01/1999 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 14 | 0 | CR | 06/01/1998 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 15 | 0 | CR | 06/01/1998 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 16 | 0 | CR | 06/01/1998 | 01/31/2001 | | | | | | | |
| BNSFC | 301589 | 17 | 1 | CR | 06/01/1999 | 01/31/2001 | | | | | | | |
| BNC | 60916 | | 3 | CR | 07/29/1999 | 06/15/2001 | | | | | | | |
| BNC | 300382 | | 1 | CR | 01/01/1999 | 12/31/2001 | | | | | | | |
| BNC | 68293 | | 2 | CR | 03/02/1997 | 03/02/2000 | | | | | | | |
| BNC | 68551 | | 3 | CR | 09/07/1999 | 09/05/2002 | | | | | | | |
| BNC | 68944 | | 0 | CR | 07/15/1996 | 12/31/2000 | | | | | | | |
| BNSFC | 302245 | | 0 | CR | 07/15/1998 | 07/14/2001 | | | | | | | |

Shipment Condition: SURC, Value: F

HIGHLY CONFIDENTIAL

DA03517

BNSF-0814155

## FUEL SURCHARGE

### GLOSSARY OF TERMS

**Benchmark or Benchmark Value (BV),** base value price of West Texas Intermediate Crude Oil. Derived from the average monthly cost of West Texas Intermediate Crude Oil for 1989 of $20.00 per barrel adjusted annually by the percentage change in the Producers Price Index for Crude Petroleum (domestic production), not seasonally adjusted. Currently $13.44 per barrel.

**Fuel Intensity Constant or Factor (FI),** Percent of BNSF fuel expense of total operating expense of 7.3% as reported to the ICC, now STB, in our R1 report for 1990 adjusted annually by the Producers Price Index for Crude Petroleum (domestic production), not seasonally adjusted. Currently 4.9%.

**Fuel Surcharge (FSR),** percent of adjustment applied to total freight charges. Recalculated monthly, applicable only if the adjustment exceeds two (2) percent.

**WTI,** average monthly price of West Texas Intermediate Crude Oil as reported in *The Wall Street Journal.*

**WPU0561NS Producers Price Index,** Bureau of Labor Statistics, Producers Price Index for Crude Petroleum (domestic production), not seasonally adjusted. Available from the Bureau of Labor Statistics web site at http://146.142.4.24/cgi-bin/surveymost?wp.

**({WTI/BV}-1)*FI,** Fuel Surcharge formula. Monthly average price of West Texas Intermediate Crude Oil divided by the Benchmark Value of West Texas Intermediate Crude Oil, minus one, multiplied by the Fuel Intensity Constant or Factor.

FUEL SURCHARGE COMPARISON OCTOBER 1999 - JANUARY 200C

BENCHMARK VALUE AND FUEL INTENSITY ADJUSTED BY PRODCERS PRICE INDEX

CALCULATION OF ADJUSTMENT BETWEEN 1998 & 1999

WPU0561NS Producer Price Index

| Month | 97 - 98 Index | 98 - 99 Index | % Change | New Values | N V Rounded |
|---|---|---|---|---|---|
| Sept | 0.533 | 0.36 | | | |
| Oct | 0.573 | 0.352 | | | |
| Nov | 0.564 | 0.327 | | | |
| Dec | 0.508 | 0.261 | | | |
| Jan | 0.434 | 0.302 | | | |
| Feb | 0.432 | 0.262 | | | |
| Mar | 0.358 | 0.333 | | | |
| Apr | 0.381 | 0.424 | | | |
| May | 0.383 | 0.472 | | | |
| June | 0.336 | 0.488 | | | |
| July | 0.361 | 0.537 | | | |
| Aug | 0.305 | 0.572 | | | |
| Total | 5.168 | 4.69 | | | |
| %Chg 98-99 vs 97-98 | | 0.907508 | | 99 - 00 | 99 - 00 |
| BV (Benchmark) | | 14.8109 | 0.907508 | 13.4410051 | $13.44 |
| FI (Fuel Intensity) | | 0.05369 | 0.907508 | 0.04872452 | 4.9% |

Fuel Surcharge = ((WTI/BV)-1)*FI

| | WTI | BV | WTI/BV | WTI/BV-1 | WTI/BV-1*FI | SURCHG |
|---|---|---|---|---|---|---|
| Oct. 99 | 23.88 | 13.44 | 1.776786 | 0.776786 | 3.80625 | 3.8% |
| Nov. 99 | 22.64 | 13.44 | 1.684524 | 0.684524 | 3.35416667 | 3.4% |
| Dec. 99 | 24.86 | 13.44 | 1.849702 | 0.849702 | 4.16354167 | 4.2% |
| Jan. 00 | 26.08 | 13.44 | 1.940476 | 0.940476 | 4.60833333 | 4.6% |

FI = 4.9 Percent (90.7508 Percent of Prior FI)

WTI, avg. mthly. West Texas Crude price for:
Sept., $23.88, Oct. $22.64, Nov. $24.86, and Dec. $26.08, 1999

## AVERAGE WEST TEXAS CRUDE PRICE

| | | Jan-99 | Feb-99 | Mar-99 | Apr-99 | May-99 | Jun-99 | Jul-99 | Aug-99 | Sep-99 | Oct-99 | Nov-99 | Dec-99 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | $12.38 | $12.23 | $16.63 | | $16.33 | $19.40 | | $21.98 | $24.53 | $22.53 | $25.00 |
| 2 | | | $12.30 | $12.53 | | | $16.65 | $19.68 | $20.45 | $21.48 | | $22.38 | $25.83 |
| 3 | | | $12.38 | $12.93 | | $18.85 | $16.75 | | $20.30 | $22.00 | | $22.58 | $25.83 |
| 4 | | $12.33 | $12.03 | $13.35 | | $18.93 | $17.33 | | $20.43 | | $23.78 | $23.13 | |
| 5 | | $11.98 | $11.80 | $13.30 | $16.95 | $18.98 | | | $20.58 | | $23.45 | $23.00 | |
| 6 | | $12.80 | | | $16.83 | $18.33 | | $19.78 | $20.88 | | $23.28 | | $26.66 |
| 7 | | $13.08 | | | $16.03 | $18.23 | $17.88 | $19.78 | | $22.63 | $22.43 | | $26.23 |
| 8 | | $13.08 | $11.68 | $13.63 | $15.83 | | $17.68 | $19.73 | | $22.68 | $20.90 | $23.28 | $26 53 |
| 9 | | | $11.68 | $13.85 | $16.58 | | $17.98 | $19.93 | $21.28 | $23.20 | | $24.03 | $26.18 |
| 10 | | | $11.75 | $14.68 | | $18.50 | $17.85 | | $21.30 | $23.55 | | $24.48 | $25.23 |
| 11 | | $13.43 | $11.85 | $14.33 | | $18.05 | $18.43 | | $21.53 | | $21.28 | $24.33 | |
| 12 | | $12.88 | $11.88 | $14.48 | $16.40 | $17.58 | | $19.93 | $21.48 | | $22.30 | $24.93 | |
| 13 | | $12.33 | | | $16.73 | $18.03 | | $20.18 | $21.68 | $24.23 | $23.08 | | $25 38 |
| 14 | | $12.15 | | | $16.48 | $18.03 | $18.33 | $19.93 | | $23.88 | $22.45 | | $25.73 |
| 15 | | $12.13 | | $14.45 | $16.88 | | $18.55 | $20.18 | | $24.13 | $22.83 | $25.13 | $26.38 |
| 16 | | | $11.38 | $14.48 | $17.33 | | $17.93 | $20.63 | $21.38 | $24.53 | | $25.70 | $26.83 |
| 17 | | | $11.53 | $15.05 | | $17.93 | $18.18 | | $21.73 | $24.73 | | $26.60 | $26.73 |
| 18 | | | $12.03 | $15.00 | | $16.13 | $17.98 | | $21.53 | | $22.53 | $25.80 | |
| 19 | | $12.08 | $11.78 | $15.23 | $17.80 | $16.88 | | $20.43 | $21.78 | | $22.23 | $26.58 | |
| 20 | | $11.83 | | | $17.78 | $17.03 | | $19.38 | $21.65 | $24.28 | $22.20 | | $26.53 |
| 21 | | $12.38 | | | $18.13 | $17.23 | $17.71 | $19.45 | | $24.48 | $22.33 | | $26 33 |
| 22 | | $12.65 | $11.98 | $15.50 | $18.43 | | $17.63 | $19.68 | | $24.73 | $23.18 | $27.98 | $25.43 |
| 23 | | | $12.38 | $15.38 | $18.23 | | $18.25 | $20.48 | $21.63 | $25.48 | | $26.83 | $25.63 |
| 24 | | | $12.53 | $15.13 | | $16.88 | $18.08 | | $21.23 | $25.38 | | $27.28 | |
| 25 | | $12.33 | $12.58 | $15.48 | | $17.03 | $18.08 | | $20.43 | | $23.18 | | |
| 26 | | $11.98 | $12.28 | $16.18 | $17.68 | $17.35 | | $20.53 | $20.95 | | $23.18 | | |
| 27 | | $12.33 | | | $18.83 | $17.18 | | $20.38 | $21.28 | $24.63 | $22.93 | | $26.38 |
| 28 | | $12.45 | | | $18.45 | $16.83 | $18.23 | $20.53 | | $24.33 | $21.68 | | $26.83 |
| 29 | | $12.75 | | $16.43 | $18.53 | | $18.45 | $20.98 | | $24.68 | $21.75 | $25.98 | $26.48 |
| 30 | | | | $16.80 | $18.68 | | $19.28 | $20.53 | $22.03 | $24.53 | | $24.58 | $25.60 |
| 31 | | | | $16.78 | | | | | $22.13 | | | | |
| | | | | | | | | | | | | | |
| | Avg. Price | $12.47 | $12.01 | $14.66 | $17.39 | $17.70 | $17.89 | $20.07 | $21.26 | $23.88 | $22.64 | $24.86 | $26.08 |
| | Surcharge % | -0.85% | -1.02% | -0.05% | 0.94% | 1.05% | 1.12% | 1.92% | 2.35% | 3.81% | 3.36% | 4.16% | 4.61% |

Fuel Surcharge Formula, ((WTI/BV)-1)*FI

BV January - August 1999 = $14.81
FI January - August 1999 = 5.4%

BV September - December 1999 = $13.44
FI September - December 1999 = 4.9%

| | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|
| JAN | $18.82 | $19.08 | $15.00 | $17.97 | $18.08 | $25.17 | $16.71 | $12.47 |
| FEB | $19.00 | $20.05 | $14.78 | $18.54 | $19.07 | $22.21 | $16.06 | $12.01 |
| MAR | $18.92 | $20.35 | $14.65 | $18.53 | $21.36 | $20.99 | $15.02 | $14.66 |
| APRIL | $20.25 | $20.27 | $16.24 | $19.82 | $23.57 | $19.72 | $15.33 | $17.39 |
| MAY | $20.95 | $19.94 | $17.88 | $19.74 | $21.25 | $20.83 | $14.86 | $17.70 |
| JUNE | $22.38 | $19.07 | $19.02 | $18.42 | $20.45 | $19.17 | $13.66 | $17.89 |
| JULY | $21.76 | $17.87 | $19.64 | $17.30 | $21.32 | $19.63 | $14.08 | $20.07 |
| AUG | $21.32 | $18.01 | $18.35 | $18.03 | $21.96 | $19.93 | $13.36 | $21.26 |
| SEPT | $21.81 | $17.55 | $17.46 | $18.22 | $23.99 | $19.79 | $14.95 | $23.88 |
| OCT | $21.69 | $18.15 | $17.77 | $17.44 | $24.90 | $21.26 | $14.34 | $22.64 |
| NOV | $20.34 | $16.70 | $18.11 | $17.99 | $23.71 | $20.17 | $12.94 | $24.86 |
| DEC | $19.40 | $14.50 | $17.16 | $19.04 | $25.39 | $18.32 | $11.28 | $26.08 |

# MONTHLY AVERAGE WEST TEXAS CRUDE PRICE

Source: Wall Street Journal



FUEL SURCHARGE:

All shipments tendered under the terms of this contract shall be subject to a fuel surcharge.

Fuel Surcharge Rates (FSR) will be adjusted monthly for the life of this contract. The Fuel Surcharge amount, in dollars per shipment, will be equal to the Fuel Surcharge Rate multiplied by the applicable rate or charge for the shipment. This amount will be added to the freight bill.

FI (Fuel Intensity Constant) reflects the intensity of fuel use for the freight to which this surcharge is applicable. FI as of the effective date for the contract/amendment shall be .054 (5.4%).

Calculation:

FSR = ((WTI/BV)-1) x FI

Where: FSR = Fuel Surcharge Rate

WTI = previous month's average daily price of West Texas Crude

BV = Benchmark Value ($14.81 through 9/30/99)

FI = .054 or 5.4% (Fuel Intensity Constant)

Notes: FSR shall be rounded to the nearest one-tenth (1/10) of one (1) percent.

EXAMPLE:

For a Fuel Surcharge applied as of September 1, 1999, assuming the August 1999 average daily price per barrel of West Texas Crude Oil is $20.30:

FSR = ((WTI/BV) - 1) x FI

FSR = (($20.30/$14.81) - 1) x .054

FSR = .02 (or 2.0%)

Thus, for each $1 of the freight charges applicable to a shipment under this agreement, the Fuel Surcharge would be $0.02.

Fuel surcharges will only be applied when the percentage increase of the FSR is 2% or above. At the current October, 1998, BV ($14.81) and FI (.054) levels, the WTI must equal or exceed $20.30 per barrel before the fuel surcharge would take effect.

The source for the daily closing spot prices used in the calculation of the WTI will be the Dow Jones International Petroleum Report, whose daily spot quote is published in the Wall Street Journal, and other daily media. BV is $14.81 between October 1, 1998 and September 30, 1999.

FI reflects the intensity of fuel use for the freight to which this surcharge is applicable. FI is .054 or 5.4% between October 1, 1998 and September 30, 1999.

BV and FI shall be adjusted on October 1st of each year by an amount equal to the Producers Price Index (PPI) for crude petroleum increase for the prior year. Results of the escalation calculations shall be rounded to the nearest one-tenth (1/10) of one (1) percent or to the nearest dollar as appropriate.

# BNSF Carload Price Change Summary Comparison

## (Fuel Surcharge & General Price Increases)

BNSF Fuel Surcharge

Since atleast the early 1990's, we had a fuel surcharge provision in effect that was a flat 2% when the price of fuel exceeded $28 per barrel for 10 consecutive days. In mid February 2000, it became effective. Effective 4/1/2000, we changed our fuel surcharge provision to a floating rate based upon the monthly average price of fuel. The formula was a simplified version of formulas we were applying in some private prices. The change in the fuel surcharge provision was done to maintain the $28 fuel price equals 2% fuel surcharge rate of the old item, allow for the surcharge to increase with the fuel price, and administratively simplify the process. When the price of fuel averages atleast $28 for a period, the fuel surcharge starts applying at a 2% rate for the following month. Effective 10/1/2000, we made 2 changes in our fuel surcharge based on Marketing/customer feedback. We modified the time period used to calculate the fuel surcharge, which allows about 10 days before the effective date of the new fuel surcharge. In addition, the fuel surcharge is now in easy to read table form in whole percentages.

BNSF General Pricing Action

Ag Products:

Ag Products primarily uses public prices. As market conditions change, they adjust prices accordingly. Rather than assessing a fuel surcharge, they adjust prices to what they feel the market will bear. The major exception is the Corn Products market, which uses private prices which contain price adjustment factors without fuel surcharges.

Coal:

Coal primarily uses long term contracts for their prices. Long term contracts have a variety of adjustment factors that may apply, primarily RCAF. However, their contracts are not subject to a fuel surcharge.

Chemicals:

Chemicals primarily uses private prices. Longer term prices usually have a specific or RCAF adjustment factor in them. Price increases have averaged 2% this year, where markets allowed. Since August, they have started taking the fuel surcharge on some prices.

Forest Products:

Forest Products primarily uses private prices but is shifting to using more public prices (e.g., LOGS). Most prices are short term prices (under a year), so they have the flexibility to adjust prices as market conditions allow. Lumber has taken general price increases of 3 to 5% this year. Paper has taken selective price increases of up to 15% this year. In December, Paper prices are subject to the fuel surcharge.

Metals:

Metals primarily uses private prices. Most prices do not have an adjustment factor in them. Metals has taken general price increases of 3 to 6% this year. Since August, they have started taking the fuel surcharge on some prices.

Minerals/Machinery:

Minerals primarily uses private prices, but not as much as the other Industrial Products Business Units. Most prices do not have an adjustment factor in them. Minerals has taken general price increases of 1 to 4% this year. Since August, they have started taking the fuel surcharge on some prices.

Automotive:

Automotive's large customers have private prices. Most have an adjustment factor of a specific or RCAF increase. In November, they have started implementing contract fuel surcharges.

Dry Boxcar:

Dry Boxcar primarily uses private prices. Most prices do not use adjustment factors. They have taken selective increases of 1 to 5%. In addition, they have been assessing the fuel surcharge since April and have been very successful in it's application.

Perishables:

Perishables uses private prices but is also using public prices a lot. Their prices usually don't use adjustment factors. General increases of 2 to 3% were taken in certain markets. Public prices have taken the fuel surcharge since March. Private prices have been phasing in the fuel surcharge and by year end, virtually all prices will be taking the fuel surcharge.

Jim

| | | |
|---|---|---|
| Date: | February 25, 2000 | |
| To: | Dale Tannahill | |
| Cc: | Mike Wood | Denis Smith |
| | Dave Garin | Russ Smitley |
| | George Duggan | Barb Haertling |
| | Dave Hallberg | Tom Packer |
| From: | Tom Jacobowski | |
| Subject: | Fuel Surcharge Proposal for carload shipments | |

As we discussed, you wanted to know if BNSF public carload prices were subject to a Fuel Surcharge. As we have worked on Fuel Surcharge provisions in contracts, we had only looked in BNSF Rules Book 6100, the general rule book referenced in most carload price authorities. We just realized that in BNERM1, in Items 41 and Item 513 (attached), there is a similar existing Fuel Surcharge provision. Item 41 has general application for any shipments making reference to BNERM1. Item 513, being in Section 5 of BNERM1, only has application for Lumber shipments. BNERM1 was the former BN's Exempt Rules Memorandum for deregulated carload shipments. Most new BNSF carload price authorities reference the general rule language in BNSF Rules Book 6100. For Consumer carload shipments, BNERM1 is generally used only when prices are created using the large geographic groups in this document. Also, most Perishable and Forest Products price authorities reference BNERM1. In the general provisions of these price authorities, a shipment condition states "Subject to BNERM1." Attached are examples of this in BNQ 103564 (cotton) and BNQ 105355 (lumber).

The Fuel Surcharge wording used in BNERM1, Items 41 and 513, has several issues with it. First, the wording says if the WTI Crude Oil price is $28 or more per barrel for 10 or more days, BNSF bills a 2% Fuel Surcharge. If the Crude Oil price falls below $28 for 4 or more days, then BNSF stops billing the surcharge. This would be extremely difficult for BNSF and our customers to administer in an automated billing environment. Second, the Fuel Surcharge is a flat 2%, regardless of how much Crude Oil prices go up above $28. The attached chart shows how Fuel prices have fluctuated over the years and why we haven't been billing for the Fuel Surcharge. **However, based on the existing wording in BNERM1, effective 2/17/2000, a 2% Fuel Surcharge is applicable for all shipments referencing this document.** Third, we feel this provision should be in BNSF Rules Book 6100 and have BNERM1 reference it. Finally, we have been working on rationalizing our existing contract Fuel Surcharge language. However we choose to word our Fuel Surcharge provisions, it's appropriate to use similar language in both our contracts and public documents.

To solve these problems, we propose the following:

First, a Fuel Surcharge provision should be placed in Rules Book 6100. This would make our public price rules consistent. This document is also available on the Internet for easier public access. Second, to simplify the administration of the Fuel Surcharge, we recommend that on a monthly basis, we determine if and how much of a Fuel Surcharge is applicable, similar to the process currently referenced in some contracts. Finally, we recommend allowing for a "floating" Fuel Surcharge, dependent on Crude Oil price fluctuations. To have continuity with the old Fuel Surcharge provision, an average monthly Crude Oil price of $28 would result in a Fuel Surcharge of 2.1%. See the attached Proposed Fuel Surcharge Item wording we recommend using. If we make this change, it would require 20 days notice, so it wouldn't have potential application until April 1, 2000 at the earliest. **In addition, please advise us if we should immediately begin billing for the 2% Fuel Surcharge under the existing BNERM1 provisions.** We will be issuing a report shortly that lists by Business Unit the price authorities that reference BNERM1 to assist in decision making. Finally, we propose this wording be used for any future contracts that have a Fuel Surcharge provision in them.

Please review this and let me know what you think about this proposal as soon as possible. We will be discussing this with other carload Business Units as well. Call me on 593-1131, if you have any questions.

ITEM 41

## WEST TEXAS INTERMEDIATE CRUDE OIL ("WTI") ADJUSTMENT

When the price of West Texas Intermediate Crude Oil ("WTI") is $28.00 or more per barrel for a period of ten (10) business trading days or more (does not include Saturdays, Sundays or Holidays) commencing with shipments with waybills dated on or after the eleventh (11th) business trading day, the total freight charge for each shipment made under terms of the Exempt rate quote, circular or memorandum referring to this item shall be subject to a fuel surcharge of two percent (2%). such fuel surcharge shall be included on the bill for freight charges for each shipment. Miscellaneous and accessorial charges shall not be subject to the fuel surcharge.

When the daily closing spot price of "WTI" is less than $28.00 per barrel (i.e., $27.99 or less) for a period of four (4) business trading days or more (does not include Saturdays, Sundays or Holidays), the fuel surcharge specified herein shall be suspended effective with shipments dated on or after the fifth (5) business trading day.

In the event the daily closing spot price of "WTI" subsequently increases to $28.00 per barrel or more for a period of ten (10) business trading days or more (does not include Saturdays, Sundays or Holidays), the fuel surcharge shall be reinstated effective with shipments dated on or after the eleventh (11) business trading day.

The source for the daily closing spot price of "WTI" will be the Dow Jones International Petroleum Report whose daily spot quote is published in the Wall Street Journal and other daily media.

ITEM 42 (Addition)

## SURCHARGE FOR FVW/WC

Rates on all carload traffic originating at Wisconsin stations on the Wisconsin Central Ltd. (WC) and Fox Valley & Western Ltd. (FVW) are subject to Tariff and ICC WC 9017.

ITEM 513

## FUEL SURCHARGE

When the price of West Texas Intermediate Crude Oil ("WTI") is $28.00 or more per barrel for a period of ten (10) business trading days or more (does not include Saturdays, Sundays or Holidays) commencing with shipments with waybills dated on or after the eleventh (11th) business trading day, the total freight charge for each shipment made under terms of pricing documents referring hereto, shall be subject to a fuel surcharge of two percent (2%). Such fuel surcharge shall be included on the bill for freight charges for each shipment. Miscellaneous and accessorial charges shall not be subject to the fuel surcharge.

When the daily closing spot price of "WTI" is less than $ 28.00 per barrel (i.e., $27.99 or less) for a period of four (4) Business trading days or more (does not include Saturdays, Sundays or Holidays), the fuel surcharge specified herein shall be suspended effective with shipments dated on or after the fifth (5) business trading day.

In the event the daily closing spot price of "WTI" subsequently increases to $28.00 per barrel or more for a period of ten (10) business trading days or more (does not include Saturdays, Sundays or Holidays), the fuel surcharge shall be reinstated effective with shipments dated on or after the eleventh (11) business trading day.

The source for the daily closing spot price of "WTI" will be the Dow Jones International Petroleum Report whose daily spot quote is published in the Wall Street Journal and other daily media.

ITEM 514

## NON-APPLICATION OF TRANSIT PRIVILEGES

Pricing documents referring to this Rules Memorandum will not apply on shipments accorded transit privileges of any kind, including stopping-in-transit for completion of loading or partially unloading.

ITEM 515

## ROUTING INSTRUCTIONS

Rates in pricing documents referring to this Rules Memorandum apply via BN direct or any combination of BN and other carriers shown as participating carriers in those pricing documents.

When rates are used with foreign rail carrier(s) rates to form through combination rates to destinations east of Centralia, Chicago or East St. Louis, IL; or Birmingham or Mobile, AL; or Pensacola, FL; or Paducah, KY; or St. Louis, MO; or Memphis, TN, rates apply only when shipments are routed BN direct to the applicable gateway named in this paragraph, giving BN the longest line haul.

When rates are used with foreign rail carrier(s) rates to form combination rates to destinations beyond stations in groups Alliance, Des Moines, Dubuque, Omaha, Sioux City and Sioux Falls, shipments may only be destined to stations not located on BN in the states of IA, IL, MN SD and NE.

Rates to destination groups Bismarck and Fargo apply only when shipments are completely unloaded at the original billed BN station in North Dakota or Minnesota.

When rates are used with foreign rail carrier(s) rates to form combination rates to destinations beyond stations in groups Duluth or Twin Cities, shipments may only be destined to stations not located on BN in the states of MN, WI, and the upper peninsula of MI.

# BNQ 103564-11

## General Rules

- Freight charges must be prepaid
- Price applies in U.S. funds.
- Prices in this open quote alternate with other Open Quotes
- The Price document number, correct address and patron code must be shown on the bill of lading to ensure accurate billing.
- Price authority is subject to change without notice
- Switching charges at origin will not be absorbed.
- Destination reciprocal switching charges will be absorbed up to $200 per car
- Prices are subject to BN Exempt Rules Memorandum 1.
- All origins and destinations except Tennessee may be used in proportion or in combination for furtherance beyond BNSF gateways.
- Except as otherwise provided, Tennessee destinations are final destinations only, and cannot be used in proportion or combination with any other rates published for furtherance beyond BNSF gate
- Tennessee destinations may be used in proportion or in combination with CSXT or NS rates published for furtherance beyond BNSF gateways.
- The rate of $2,580 from Slaton, TX to Pittsfield, MA expires 01-24-00 and the new rate of $2,735 will become effective 01-25-00 and will remain in effect till 7-31-00.

## Commodity Definitions for Matrix 1, Cotton & Cotton Linters

**STCC and Description**

| | | |
|---|---|---|
| 0112910 Cotton, nec | 0112930 Cotton, unginned (cotton in the seed) | 40221 Textile waste, scrap or sweepings |
| 0112915 Cotton bolls immature | 2091510 Cotton linters other than bleached or dyed | |
| 0112920 Cotton samples, unmanufactu | 2091515 Cottonseed hull fibre other than bleached or dyed | |

## Conditions:

Rates on XL and XP (AAR mechanical designation) boxcars received from foreign line requiring empty return on reverse routing under car service directive 145 will be accessed an additional $60

## Calculation Unit:

Per car

## Equipment:

50' and 60' equipped and unequipped boxcars (including mechanical designation RBL) as placed for railroad convenience.

## Origin and Destination Definitions:

**Origins:**

CA - N : BNSF stations in California north of and including Fresno
CA - S : BNSF stations in California south of Fresno
TX - W : All BNSF stations in Texas, excluding Dallas, Fort Worth, Houston, Galveston, Eagle Pass, El Paso, Corpus Christi, Laredo, Brownsville, and Harlingen

**Destinations:**

CA - N : BNSF stations in California north of and including Fresno
CA - S : BNSF stations in California south of Fresno
TX - W : All BNSF stations in Texas excluding Dallas, Fort Worth, Houston, Galveston, Eagle Pass, El Paso, Corpus Christi, Laredo, Brownsville, and Harlingen

## Routings:

BNSF Direct
Laredo specific routings: BNSF-CORPU-TM
Slaton, TX to Pittsfield, MA specific routing: BNSF-CHGO-CSXT

**BNSF**

*Exempt Quotation*

*OPEN QUOTE*

| | | | |
|---|---|---|---|
| QUOTATION NO.: | BNQ 105355 Revision I | CANCELS: BNQ 105355 Revision G | |
| EFFECTIVE DATE: | November 1, 1999 | EXPIRATION DATE: | April 30, 2000 |
| CUSTOMER: | OPEN TO ALL CUSTOMERS | | |
| STCC: NO.: | 24-211<br>24-913 | COMMODITY: | Lumber<br>Treated Lumber |
| GENERAL RULES: | *THIS QUOTATION IS SUBJECT TO CHANGE WITHOUT NOTICE. EXCEPT AS OTHERWISE PROVIDED HEREIN. WHILE ON BNSF, SHIPMENTS UNDER THIS QUOTATION ARE SUBJECT TO BN EXEMPT RATE MEMORANDUM ONE (BNERM1).*<br><br>Rates subject to this quotation include reciprocal switching charges of connecting carriers at both origin and destination, subject to a maximum amount of $300.00 per car.<br><br>Rate Quotation number must be shown on the bill of lading, as well as complete name, address and BNSF Patron Code to assure bill for correct charges is sent to the appropriate Customer location. Freight charges must be PREPAID by Customer to BNSF in U.S. Funds.<br><br>Customer is responsible to ensure loads do not exceed the load limit of the car and that it complies with AAR General Rules covering loading of lumber in closed and/or on open top cars. All shipments moving under this Quotation are subject to overloading charges in applicable tariffs and/or circulars in effect on the date of discovery of the overload condition.<br><br>Rates in this Quotation will be subject to increase by BNSF at any time upon no less than fifteen (15) calendar days notice to Customer. Notice of such Rate(s) increase will be effective upon receipt and may be presented to Customer by telephone, facsimile (FAX), verbally, U.S. Mail, or by any other reasonable means.<br><br>**Rates can no longer be used for furtherance over Portland, Eugene, or Klamath Falls.** | | |
| REMARKS: | For diversion and reconsignment information while on BNSF, contact BNSF National Customer Information Center at 1-800-289-2673 or fax number 1-800-793-2673. | | |

| AUTHORIZATION: | | Road: | | PHONE: | | Fax: | |
|---|---|---|---|---|---|---|---|
| | D'Andrae Larry | | BNSF | | (817) 352-4317 | | (817) 352-7152 |
| | Phil McKinzie | | | | (817) 352-6383 | | (817) 352-7152 |
| | Mike Gruenke | | | | (509) 536-2321 | | (509) 536-2215 |
| | Bob Krobetzky | | | | (360) 418-6230 | | (360) 418-6280 |
| | Dick Krase | | | | (360) 418-6405 | | (360) 418-6280 |
| | Cathrine Martin | | | | (206) 625-6602 | | (206) 625-6601 |



Highly Confidential DA03529 BNSF-0657306

## AVERAGE WEST TEXAS CRUDE PRICE

| | Mar-99 | Apr-99 | May-99 | Jun-99 | Jul-99 | Aug-99 | Sep-99 | Oct-99 | Nov-99 | Dec-99 | Jan-00 | Feb-00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $12.23 | $16.63 | | $16.33 | $19.40 | | $21.98 | $24.53 | $22.53 | $25.00 | | $28.23 |
| 2 | $12.53 | | | $16.65 | $19.68 | $20.45 | $21.48 | | $22.38 | $25.83 | | $27.55 |
| 3 | $12.93 | | $18.85 | $16.75 | | $20.30 | $22.00 | | $22.58 | $25.83 | | $28.03 |
| 4 | $13.35 | | $18.93 | $17.33 | | $20.43 | | $23.78 | $23.13 | | $25.55 | $28.83 |
| 5 | $13.30 | $16.95 | $18.98 | | | $20.58 | | $23.45 | $23.00 | | $24.93 | |
| 6 | | $16.83 | $18.33 | | $19.78 | $20.88 | | $23.28 | | $26.66 | $24.78 | |
| 7 | | $16.03 | $18.23 | $17.88 | $19.78 | | $22.63 | $22.43 | | $26.23 | $24.23 | $28.45 |
| 8 | $13.63 | $15.83 | | $17.68 | $19.73 | | $22.68 | $20.90 | $23.28 | $26.53 | | $28.03 |
| 9 | $13.85 | $16.58 | | $17.98 | $19.93 | $21.28 | $23.20 | | $24.03 | $26.18 | | $28.78 |
| 10 | $14.68 | | $18.50 | $17.85 | | $21.30 | $23.55 | | $24.48 | $25.23 | $24.68 | $29.43 |
| 11 | $14.33 | | $18.05 | $18.43 | | $21.53 | | $21.28 | $24.33 | | $25.78 | $29.43 |
| 12 | $14.48 | $16.40 | $17.58 | | $19.93 | $21.48 | | $22.30 | $24.93 | | $26.28 | |
| 13 | | $16.73 | $18.03 | | $20.18 | $21.68 | $24.23 | $23.08 | | $25.38 | $26.68 | |
| 14 | | $16.48 | $18.03 | $18.33 | $19.93 | | $23.88 | $22.45 | | $25.73 | $28.03 | $30.25 |
| 15 | $14.45 | $16.88 | | $18.55 | $20.18 | | $24.13 | $22.83 | $25.13 | $26.38 | | $30.08 |
| 16 | $14.48 | $17.33 | | $17.93 | $20.63 | $21.38 | $24.53 | | $25.70 | $26.83 | | $30.05 |
| 17 | $15.05 | | $17.93 | $18.18 | | $21.73 | $24.73 | | $26.60 | $26.73 | | $29.48 |
| 18 | $15.00 | | $16.13 | $17.98 | | $21.53 | | $22.53 | $25.80 | | $28.85 | $29.53 |
| 19 | $15.23 | $17.80 | $16.88 | | $20.43 | $21.78 | | $22.23 | $26.58 | | $29.53 | |
| 20 | | $17.78 | $17.03 | | $19.38 | $21.65 | $24.28 | $22.20 | | $26.53 | $29.68 | |
| 21 | | $18.13 | $17.23 | $17.71 | $19.45 | | $24.48 | $22.33 | | $26.33 | $29.75 | |
| 22 | $15.50 | $18.43 | | $17.63 | $19.68 | | $24.73 | $23.18 | $27.98 | $25.43 | | |
| 23 | $15.38 | $18.23 | | $18.25 | $20.48 | $21.63 | $25.48 | | $26.83 | $25.63 | | |
| 24 | $15.13 | | $16.88 | $18.08 | | $21.23 | $25.38 | | $27.28 | | $29.43 | |
| 25 | $15.48 | | $17.03 | $18.08 | | $20.43 | | $23.18 | | | $29.88 | |
| 26 | $16.18 | $17.68 | $17.35 | | $20.53 | $20.95 | | $23.18 | | | $27.83 | |
| 27 | | $18.83 | $17.18 | | $20.38 | $21.28 | $24.63 | $22.93 | | $26.38 | $27.33 | |
| 28 | | $18.45 | $16.83 | $18.23 | $20.53 | | $24.33 | $21.68 | | $26.83 | $27.23 | |
| 29 | $16.43 | $18.53 | | $18.45 | $20.98 | | $24.68 | $21.75 | $25.98 | $26.48 | | |
| 30 | $16.80 | $18.68 | | $19.28 | $20.53 | $22.03 | $24.53 | | $24.58 | $25.60 | | |
| 31 | $16.78 | | | | | $22.13 | | | | | $27.63 | |
| | | | | | | | | | | | | |
| Avg. Price | $14.66 | $17.39 | $17.70 | $17.89 | $20.07 | $21.26 | $23.88 | $22.64 | $24.86 | $26.08 | $27.27 | $29.01 |
| Surcharge % | -4.02% | -2.78% | -2.64% | -2.55% | -1.56% | -1.02% | 0.17% | -0.39% | 0.62% | 1.18% | 1.72% | 2.51% |

Fuel Surcharge Formula, ((WTI/BV)-1)*FI

BV = $23.50
FI May 1999 - April 2000 = 10.7%
WTI Surcharge Trigger Price $28.00

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|
| JAN | $19.08 | $15.00 | $17.97 | $18.08 | $25.17 | $16.71 | $12.47 | $27.27 |
| FEB | $20.05 | $14.78 | $18.54 | $19.07 | $22.21 | $16.06 | $12.01 | |
| MAR | $20.35 | $14.65 | $18.53 | $21.36 | $20.99 | $15.02 | $14.66 | |
| APRIL | $20.27 | $16.24 | $19.82 | $23.57 | $19.72 | $15.33 | $17.39 | |
| MAY | $19.94 | $17.88 | $19.74 | $21.25 | $20.83 | $14.86 | $17.70 | |
| JUNE | $19.07 | $19.02 | $18.42 | $20.45 | $19.17 | $13.66 | $17.89 | |
| JULY | $17.87 | $19.64 | $17.30 | $21.32 | $19.63 | $14.08 | $20.07 | |
| AUG | $18.01 | $18.35 | $18.03 | $21.96 | $19.93 | $13.36 | $21.26 | |
| SEPT | $17.55 | $17.46 | $18.22 | $23.99 | $19.79 | $14.95 | $23.88 | |
| OCT | $18.15 | $17.77 | $17.44 | $24.90 | $21.26 | $14.34 | $22.64 | |
| NOV | $16.70 | $18.11 | $17.99 | $23.71 | $20.17 | $12.94 | $24.86 | |
| DEC | $14.50 | $17.16 | $19.04 | $25.39 | $18.32 | $11.28 | $26.08 | |

**PROPOSED RULES BOOK FUEL SURCHARGE ITEM**

Fuel Surcharge

Shipments made under pricing documents referring hereto shall be subject to a fuel surcharge, if applicable. When the monthly average price of West Texas Intermediate Crude Oil (WTI) equals or exceeds $28.00 per barrel, a surcharge shall be applied to the total freight charges for each shipment waybill dated on or after the 1st of the following month. Such fuel surcharge shall be included on the bill for freight charges for each shipment. Miscellaneous and accessorial charges shall not be subject to the fuel surcharge.

Fuel Surcharge Rates (FSR) will be adjusted monthly.

FSR = ([WTI/BV]-1) X FI
Where FSR = Fuel Surcharge Rate.
WTI = previous month's average daily price of West Texas Intermediate Crude Oil.
BV = Benchmark Value of $23.50 per barrel.
FI = .107 or 10.7% (Fuel Intensity, fuel as a percent of total 1998 BNSF operating expenses).
Note: FSR shall be rounded to the nearest one-tenth (1/10) of one (1) percent.

Fuel Surcharge applies only when the FSR equals or exceeds 2%.

The source for the closing spot price of WTI will be the Dow Jones International Petroleum Report, whose daily spot quote is published in the Wall Street Journal, and other daily media.

The FI shall be adjusted on May 1st of each year to reflect the percent that fuel is of BNSF's total operating expense as reported in BNSF's Annual Report for the previous year.

Example:

For a Fuel Surcharge applied for shipments in the month of January, assuming the December average daily price of WTI was $28.00 per bbl.

FSR = ([WTI/BV]-1) X FI
FSR = ([$28.00/$23.50]-1) X .107
FSR = .021 or 2.1%.

Thus, for each $10.00 of freight charges applicable to a shipment referring hereto the Fuel Surcharge would be $0.21.

BNSF

# Marketing Advisory

## Fuel Surcharge Information on the Internet

**To: BNSF Industrial Products, Dry Boxcar and Perishables Customers**

**Date:**
**July 26, 2000**

**World Wide Web:**
**www.bnsf.com**

### Monthly Fuel Surcharge Percent for Carload Shipments to Appear on BNSF Website

As we advised you earlier, BNSF may assess a fuel surcharge for applicable shipments subject to the terms of BNSF Rules Book 6100. To communicate to you on a timely basis what the Fuel Surcharge Percent will be each month, we have created a new page on our Website. It can be located as follows:

- Access the BNSF Website at **www.bnsf.com**.
- Select "Customers."
- Go to the "Research Tools" section and select "Carload Fuel Surcharge."

If you would like to receive an email when the Carload Fuel Surcharge page is updated each month, please email us at **auxpricing@bnsf.com** and you will be added to our group Email list.

BNSF Rules Book 6100 may be found on the BNSF Website at **www.bnsf.com.** Select "Customers." Go to the "How Do I ......?" section and select "Get Miscellaneous Pricing Publications" from the list. Finally, select "BNSF Rules Book 6100."

BNSF is committed to providing you with a consistent, high level of service. Questions on the BNSF fuel surcharge may be addressed to your BNSF Marketing Account Representative.

NUMBER: XX-00

**Jacobowski, Thomas J**

| | |
|---|---|
| **From:** | Brogdon, Barbara |
| **Sent:** | Wednesday, July 26, 2000 9:48 AM |
| **To:** | MKT DL Ind Prod Contractor; MKT DL Ind Prod Exempt; MKT DL Ind Prod Scheduled |
| **Subject:** | FW: Fuel Surcharge Advisory |

*Barbara:*
*Please distribute the attached to all in Industrial Products Marketing & autofax the 7/26 Advisory to the Industrial Products customer list this evening.*

**Industrial Products Marketing** - As we previously advised you (7/10 Advisory attached), we will be implementing the Fuel Surcharge effective 8/1 for Industrial Products prices. The attached Advisory explains that we have created a web page to communicate the monthly Fuel Surcharge Rate (percent) as timely as possible to our customers. FYI, based on the average fuel price to date in July, the Fuel Surcharge would be 3.0% if the month ended today.

Spreadsheets have been sent to Price Makers listing the price authorities that are subject to BNSF Rules Book 6100 or BNERM1. These price authorities will be taking the Fuel Surcharge eff. 8/1 unless you have notified Ken Holmes via email with any exceptions. In addition, no Forest Product price authorities will be taking the Fuel Surcharge, due to the general price increases that have already been taken on these prices. If you have concerns about specific price authorities taking the increase, please discuss this with your leadership team.

Ken Holmes (593-1148) administers the Fuel Surcharge program, so if you have a specific question about the program, please call Ken.
Thank you.
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

Fuel Surcharge-All Carload FU....

Fuel Surcharge-Ind Products.do...



HIGHLY CONFIDENTIAL

## Jacobowski, Thomas J

**From:** Jacobowski, Thomas J
**Sent:** Wednesday, July 26, 2000 9:45 AM
**To:** Brogdon, Barbara
**Cc:** Garin, David L; Duggan, George T; Hallberg, David E; Smith, Denis J; Smitley, Russell W; Holmes, Ken L
**Subject:** Fuel Surcharge Advisory

*Barbara:*
*Please distribute the attached to all in Industrial Products Marketing & autofax the 7/26 Advisory to the Industrial Products customer list this evening.*

**Industrial Products Marketing** - As we previously advised you (7/10 Advisory attached), we will be implementing the Fuel Surcharge effective 8/1 for Industrial Products prices. The attached Advisory explains that we have created a web page to communicate the monthly Fuel Surcharge Rate (percent) as timely as possible to our customers. FYI, based on the average fuel price to date in July, the Fuel Surcharge would be 3.0% if the month ended today.

Spreadsheets have been sent to Price Makers listing the price authorities that are subject to BNSF Rules Book 6100 or BNERM1. These price authorities will be taking the Fuel Surcharge eff. 8/1 unless you have notified Ken Holmes via email with any exceptions. In addition, no Forest Product price authorities will be taking the Fuel Surcharge, due to the general price increases that have already been taken on these prices. If you have concerns about specific price authorities taking the increase, please discuss this with your leadership team.

Ken Holmes (593-1148) administers the Fuel Surcharge program, so if you have a specific question about the program, please call Ken.
Thank you.
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

Fuel Surcharge-All Carload FU....  Fuel Surcharge-Ind Products.do...



HIGHLY CONFIDENTIAL BNSF-0814187

DA03534

## Jacobowski, Thomas J

**From:** Wertz, Linda
**Sent:** Wednesday, July 26, 2000 3:55 PM
**To:** Allen, Marc; Bryant, Steve; Bullard, Michael; Carney, Keith; Halsey, Edward; Heard, Meldee; Lundsberg, Christian; Mathiesen, Bryan; McCormick, Catherine; Plowman, Thomas; Smith, Dean; Stock, Darrell; Tannahill, Dale; Wood, Michael
**Cc:** Jacobowski, Thomas J; Crockett, Kari A; Lee, Renita L; Wertz, Linda
**Subject:** Final Marketing Advisory - Carload Fuel Surcharge Website

The attached marketing advisory was sent this afternoon, Wednesday, July 26 to the following distribution lists:

List #152 - Dry Boxcar Only
List #153 - Perishable Dry Boxcar Only
List #154 - Dry Boxcar and Intermodal
List #155 - Perishable Dry Boxcar and Intermodal.

The fuel surcharge advisories **are not being posted on the Web site**; however, they can be found on the "N" Drive, under Intermodal Mkg and then Advimk2000, or I can provide copies.

Fuel Surcharge-All Carload Web...

Linda



HIGHLY CONFIDENTIAL
BNSF-0814188
DA03535

## Jacobowski, Thomas J

| | |
|---|---|
| **From:** | Jacobowski, Thomas J |
| **Sent:** | Wednesday, July 26, 2000 10:07 AM |
| **To:** | Packer, Thomas J; Thronsedt, Sara A; Pederson, Larry G |
| **Cc:** | Holmes, Ken L |
| **Subject:** | FW: Fuel Surcharge Advisory |

FYI. Also, Ken Holmes is updating the spreadsheet with the PA's that are taking the S/C & will provide a copy to you for your purposes.
Jake
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

-----Original Message-----

| | |
|---|---|
| **From:** | Brogdon, Barbara |
| **Sent:** | Wednesday, July 26, 2000 9:48 AM |
| **To:** | MKT DL Ind Prod Contractor; MKT DL Ind Prod Exempt; MKT DL Ind Prod Scheduled |
| **Subject:** | FW: Fuel Surcharge Advisory |

*Barbara:*
*Please distribute the attached to all in Industrial Products Marketing & autofax the 7/26 Advisory to the Industrial Products customer list this evening.*

**Industrial Products Marketing** - As we previously advised you (7/10 Advisory attached), we will be implementing the Fuel Surcharge effective 8/1 for Industrial Products prices. The attached Advisory explains that we have created a web page to communicate the monthly Fuel Surcharge Rate (percent) as timely as possible to our customers. FYI, based on the average fuel price to date in July, the Fuel Surcharge would be 3.0% if the month ended today.

Spreadsheets have been sent to Price Makers listing the price authorities that are subject to BNSF Rules Book 6100 or BNERM1. These price authorities will be taking the Fuel Surcharge eff. 8/1 unless you have notified Ken Holmes via email with any exceptions. In addition, no Forest Product price authorities will be taking the Fuel Surcharge, due to the general price increases that have already been taken on these prices. If you have concerns about specific price authorities taking the increase, please discuss this with your leadership team.

Ken Holmes (593-1148) administers the Fuel Surcharge program, so if you have a specific question about the program, please call Ken.
Thank you.
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

Fuel Surcharge-All Carload FU....　　Fuel Surcharge-Ind Products.do...

## Jacobowski, Thomas J

**From:** Jacobowski, Thomas J
**Sent:** Wednesday, July 26, 2000 8:47 AM
**To:** Wertz, Linda; Crockett, Kari A
**Cc:** Allen, Marc A; Lee, Renita L; Wood, Michael G
**Subject:** Fuel Surcharge Advisory

Linda/Kari:
Thanks for the updated document. The web page went up last night. I made 3 changes to the Advisory:
-added in today's date
-moved the "www" reference in the left margin up
-changed the first sentence from "...BNSF **will** assess..." to "...BNSF **may** assess..." In Dry Boxcar, Perishables & Industrial Products there are prices that are subject to Rules Book 6100 that the Price Makers have elected not to take the Fuel Surcharge. "May" is also how the Rules Book itself reads. Therefore, "may" is the appropriate word to use.

Linda-please get this out to Perishable & Dry Boxcar customers today & advise these Mktg groups that it's being sent. Kari-I will have Barbara Brogdon send an email to Ind Products Mktg advising them that this will be sent tonight. I'll also ask her to autofax this tonight to Ind Products customers.

Ask if questions.
THANKS SO MUCH FOR YOUR ASSISTANCE!
Jake
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

Fuel Surcharge-All Carload FU....

## AVERAGE WEST TEXAS CRUDE PRICE

| | Jul-99 | ###### | Sep-99 | Oct-99 | ###### | ###### | Jan-00 | Feb-00 | ###### | Apr-00 | ###### | Jun-00 | Jul-00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $19.40 | | $21.98 | $24.53 | $22.53 | $25.00 | | $28.23 | $31.78 | | $25.88 | $30.13 | |
| 2 | $19.68 | $20.45 | $21.48 | | $22.38 | $25.83 | | $27.55 | $31.68 | | $26.88 | $30.35 | |
| 3 | | $20.30 | $22.00 | | $22.58 | $25.83 | | $28.03 | $31.53 | $26.43 | $26.75 | | |
| 4 | | $20.43 | | $23.78 | $23.13 | | $25.55 | $28.83 | | $25.45 | $26.98 | | |
| 5 | | $20.58 | | $23.45 | $23.00 | | $24.93 | | | $25.85 | $27.28 | $29.70 | $30.68 |
| 6 | $19.78 | $20.88 | | $23.28 | | $26.66 | $24.78 | | $32.18 | $25.68 | | $29.75 | $29.98 |
| 7 | $19.78 | | $22.63 | $22.43 | | $26.23 | $24.23 | $28.45 | $34.13 | $25.03 | | $29.95 | $30.28 |
| 8 | $19.73 | | $22.68 | $20.90 | $23.28 | $26.53 | | $28.03 | $31.28 | | $28.09 | $29.78 | |
| 9 | $19.93 | $21.28 | $23.20 | | $24.03 | $26.18 | | $28.78 | $31.68 | | $28.65 | $30.20 | |
| 10 | | $21.30 | $23.55 | | $24.48 | $25.23 | $24.68 | $29.43 | $31.78 | $23.85 | $28.10 | | $29.68 |
| 11 | | $21.53 | | $21.28 | $24.33 | | $25.78 | $29.43 | | $24.13 | $29.13 | | $29.70 |
| 12 | $19.93 | $21.48 | | $22.30 | $24.93 | | $26.28 | | | $25.43 | $29.62 | $31.73 | $30.33 |
| 13 | $20.18 | $21.68 | $24.23 | $23.08 | | $25.38 | $26.68 | | $32.03 | $25.38 | | $32.58 | $31.48 |
| 14 | $19.93 | | $23.88 | $22.45 | | $25.73 | $28.03 | $30.25 | $31.68 | $25.58 | | $32.85 | $31.40 |
| 15 | $20.18 | | $24.13 | $22.83 | $25.13 | $26.38 | | $30.08 | $30.73 | | $29.93 | $32.95 | |
| 16 | $20.63 | $21.38 | $24.53 | | $25.70 | $26.83 | | $30.05 | $31.08 | | $29.73 | $32.33 | |
| 17 | | $21.73 | $24.73 | | $26.60 | $26.73 | | $29.48 | $30.93 | $25.88 | $29.33 | | $30.83 |
| 18 | | $21.53 | | $22.53 | $25.80 | | $28.85 | $29.53 | | $26.13 | $30.33 | | $31.93 |
| 19 | $20.43 | $21.78 | | $22.23 | $26.58 | | $29.53 | | | $27.35 | $29.88 | $31.68 | $31.43 |
| 20 | $19.38 | $21.65 | $24.28 | $22.20 | | $26.53 | $29.68 | | $29.43 | $27.00 | | $33.05 | $30.93 |
| 21 | $19.45 | | $24.48 | $22.33 | | $26.33 | $29.75 | | $28.00 | | | $33.83 | $28.53 |
| 22 | $19.68 | | $24.73 | $23.18 | $27.98 | $25.43 | | $29.63 | $27.53 | | $28.63 | $34.55 | |
| 23 | $20.48 | $21.63 | $25.48 | | $26.83 | $25.63 | | $30.28 | $27.23 | | $28.53 | $34.65 | |
| 24 | | $21.23 | $25.38 | | $27.28 | | $29.43 | $30.23 | $27.93 | $27.28 | $29.73 | | $28.18 |
| 25 | | $20.43 | | $23.18 | | | $29.88 | $30.23 | | $26.75 | $30.33 | | |
| 26 | $20.53 | $20.95 | | $23.18 | | | $27.83 | | | $24.65 | $30.00 | $31.63 | |
| 27 | $20.38 | $21.28 | $24.63 | $22.93 | | $26.38 | $27.33 | | $27.78 | $25.40 | | $32.08 | |
| 28 | $20.53 | | $24.33 | $21.68 | | $26.83 | $27.23 | $30.13 | $27.08 | $25.73 | | $31.90 | |
| 29 | $20.98 | | $24.68 | $21.75 | $25.98 | $26.48 | | $30.43 | $26.45 | | | $32.73 | |
| 30 | $20.53 | $22.03 | $24.53 | | $24.58 | $25.60 | | | $26.70 | | $30.35 | $32.50 | |
| 31 | | $22.13 | | | | | $27.63 | | $26.90 | | $29.03 | | |
| | | | | | | | | | | | | | |
| Avg | $20.07 | $21.26 | $23.88 | $22.64 | $24.86 | $26.08 | $27.27 | $29.35 | $29.89 | $25.74 | $28.78 | $31.86 | $30.38 |
| Surc | 1.92% | 2.35% | 3.81% | 3.36% | 4.16% | 4.61% | 5.04% | 5.80% | 6.00% | 4.48% | 2.29% | 3.63% | 2.99% |

Fuel Surcharge Formula, ((WTI/BV)-1)*FI

BV September 1998 - August 1999 = $14.81
FI September 1998 - August 1999 = 5.4%

BV September 1999 - August 2000 = $13.44
FI September 1999 - August 2000 = 4.9%

BV = $23.50
FI May 2000 - April 2001 = 10.2%
Surcharge Trigger Price $28.23.
Item 3375, BNSF Rules Book 6100

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|
| JAN | $19.08 | $15.00 | $17.97 | $18.08 | $25.17 | $16.71 | $12.47 | $27.27 |
| FEB | $20.05 | $14.78 | $18.54 | $19.07 | $22.21 | $16.06 | $12.01 | $29.35 |
| MAR | $20.35 | $14.65 | $18.53 | $21.36 | $20.99 | $15.02 | $14.66 | $29.89 |
| APRIL | $20.27 | $16.24 | $19.82 | $23.57 | $19.72 | $15.33 | $17.39 | $25.74 |
| MAY | $19.94 | $17.88 | $19.74 | $21.25 | $20.83 | $14.86 | $17.70 | $28.78 |
| JUNE | $19.07 | $19.02 | $18.42 | $20.45 | $19.17 | $13.66 | $17.89 | $31.86 |
| JULY | $17.87 | $19.64 | $17.30 | $21.32 | $19.63 | $14.08 | $20.07 | |
| AUG | $18.01 | $18.35 | $18.03 | $21.96 | $19.93 | $13.36 | $21.26 | |
| SEPT | $17.55 | $17.46 | $18.22 | $23.99 | $19.79 | $14.95 | $23.88 | |
| OCT | $18.15 | $17.77 | $17.44 | $24.90 | $21.26 | $14.34 | $22.64 | |
| NOV | $16.70 | $18.11 | $17.99 | $23.71 | $20.17 | $12.94 | $24.86 | |
| DEC | $14.50 | $17.16 | $19.04 | $25.39 | $18.32 | $11.28 | $26.08 | |

BNSF

# Marketing Advisory

## Fuel Surcharge Information on the Internet

**To: BNSF Industrial Products, Dry Boxcar and Perishables Customers**

**Date:**
**July XX, 2000**

### Monthly Fuel Surcharge Percent for Carload Shipments to Appear on BNSF Website

As we advised you earlier, BNSF will assess a fuel surcharge for applicable shipments subject to the terms of BNSF Rules Book 6100. To communicate to you on a timely basis what the Fuel Surcharge Percent will be each month, we have created a new page on our Website. It can be located as follows:

- Access the BNSF Website at www.bnsf.com.
- Select "Customers."
- Go to the "Research Tools" section and select "Carload Fuel Surcharge."

If you would like to receive an email when the Carload Fuel Surcharge page is updated each month, please email us at auxpricing@bnsf.com and you will be added to our group Email list.

BNSF Rules Book 6100 may be found on the BNSF Website at www.bnsf.com. Select "Customers." Go to the "How Do I ......?" section and select "Get Miscellaneous Pricing Publications" from the list. Finally, select "BNSF Rules Book 6100."

BNSF is committed to providing you with a consistent, high level of service. Questions on the BNSF fuel surcharge may be addressed to your BNSF Marketing Account Representative.

**World Wide Web:**
www.bnsf.com

**Jacobowski, Thomas J**

**From:** Wertz, Linda
**Sent:** Monday, July 24, 2000 3:28 PM
**To:** Allen, Marc A; Crockett, Kari A; Jacobowski, Thomas J; Lee, Renita L; Wood, Michael G
**Cc:** Wertz, Linda
**Subject:** RE: Fuel S/C Info

I made changes to the advisory based on input from Marc and Kari. Please see attachment below. As soon as the Website is ready and we have executive approvals, I can send out to Marc's customers. I presume IP will distribute as they normally do.

Linda

Fuel Surcharge-All Carload FU....

-----Original Message-----
**From:** Allen, Marc A
**Sent:** Monday, July 24, 2000 1:45 PM
**To:** Wertz, Linda; Crockett, Kari A; Jacobowski, Thomas J; Lee, Renita L
**Subject:** RE: Fuel S/C Info

I agree to consolidate if we can address three areas and have all sides agree:

1) Title: Needs to be generic enough to cover all areas, something like Kari suggested or BNSF Carload Customer Advisory. Additionally, I would further identify the advisory as "Fuel Surcharge Information on the Internet"
2) To: Agree with Kari as she stated
3) Date: The part where we reference effective August 1, must be removed or we need to do multiple advisories. I don't want my customers who were being assessed a fuel surcharge back in March, to feel like they were getting unfairly assessed a surcharge, when other customers did not have to pay until August.

Marc

-----Original Message-----
**From:** Wertz, Linda
**Sent:** Monday, July 24, 2000 9:57 AM
**To:** Allen, Marc A
**Subject:** FW: Fuel S/C Info

Marc, please see Kari's note below. Is this OK with you? Linda

-----Original Message-----
**From:** Crockett, Kari A
**Sent:** Monday, July 24, 2000 9:44 AM
**To:** Wertz, Linda
**Subject:** RE: Fuel S/C Info

Linda,

If we can consolidate them into one advisory, I would go ahead and do that. As far as the title, you may want to just call it " Marketing Advisory" and then underneath put "To: BNSF Industrial Products, Dry Boxcar and Perishable Customers. ( This is how the new templates will read. ) Talk to Marc Allen and see how he feels. Either way, I don't think it is a big deal, the new templates will roll out in August. Just let me know what you would like to do.

Thanks,
Kari

-----Original Message-----
**From:** Wertz, Linda
**Sent:** Monday, July 24, 2000 9:25 AM
**To:** Crockett, Kari A
**Cc:** Jacobowski, Thomas J; Allen, Marc A; Lee, Renita L; Wertz, Linda
**Subject:** FW: Fuel S/C Info

Kari, while I appreciate Tom's suggestion for combining the audiences for this advisory, the problem with this particular one is that we sent the initial CP fuel surcharge advisory out to our perishable and CP carload customers last March, and IP sent theirs out this month. If you want to combine them, I suppose we could change the first few words to "advised you earlier" or something like that. I would also add our toll free phone number to the last paragraph.

I know there's been talk of ultimately consolidating these notices, but not sure if you're ready to do it now. I would also want Marc Allen's approval on the suggested title, as we've struggled with a naming convention for his group. Let me know your thoughts. Thanks.

Linda

-----Original Message-----
**From:** Jacobowski, Thomas J
**Sent:** Friday, July 21, 2000 4:52 PM
**To:** Wertz, Linda
**Cc:** Crockett, Kari A
**Subject:** FW: Fuel S/C Info

Linda:
FYI, here's our **draft**. Let me know if it looks OK. DO NOT release until website ready. My opinion is we should send one ltr to all 3 customer lists (Ind. Products, Dry Boxcar, Perishables) titled "Carload Marketing Advisory", so we have consistency. In the ltr we can say for these 3 groups of customers. Maybe Kari & you can recommend how to handle that.
Thanks!
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

-----Original Message-----
**From:** Jacobowski, Thomas J
**Sent:** Friday, July 21, 2000 2:33 PM
**To:** Crockett, Kari A
**Subject:** Fuel S/C Info

Kari:
As we discussed, we'll be issuing this next wk, when the website is ready. Please review & advise if looks OK.
Thanks!
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com
<< File: Fuel Surcharge-Ind ProductsFU.doc >>



HIGHLY CONFIDENTIAL BNSF-0814194
DA03541

Paul - OK?

BNSF

# Industrial Products Marketing Advisory
## Fuel Surcharge Information

Date:
July XX, 2000

To: All Industrial Products Carload Customers

bold

**BNSF to Post the Monthly Fuel S/C Percent for Carload Shipments on website**

As we advised you earlier this month, **effective August 1, 2000**, BNSF may assess a fuel surcharge for applicable shipments subject to the terms of BNSF Rules Book 6100. To communicate to you on a timely basis what the Fuel Surcharge Percent will be each month, we have created a new page on our website. It can be located as follows:

- Access the BNSF website at www.bnsf.com
- Select "Customers".
- Go to the "Research Tools" section and select "Carload Fuel Surcharge".

If you would like to receive an Email when the Carload Fuel Surcharge page is updated each month, please Email us at auxpricing@bnsf.com and you will be added to our group Email list.

BNSF Rules Book 6100 may be found on the BNSF Web site at www.bnsf.com. Select "Customers." Go to the "How Do I ......?" section and select "Get Miscellaneous Pricing Publications" from the list. Finally, select "BNSF Rules Book 6100."

BNSF is committed to providing you with a consistent, high level of service. Questions on the BNSF surcharge may be addressed to your BNSF Marketing Account Representative.

REGARDING?

Who? BOTH (2) BACK-UP

World Wide Web:
www.bnsf.com

Rules - A REVISION EFF 8/1?

## Jacobowski, Thomas J

**From:** Jacobowski, Thomas J
**Sent:** Friday, July 21, 2000 4:52 PM
**To:** Wertz, Linda
**Cc:** Crockett, Kari A
**Subject:** FW: Fuel S/C Info

Linda:
FYI, here's our **draft**. Let me know if it looks OK. DO NOT release until website ready. My opinion is we should send one ltr to all 3 customer lists (Ind. Products, Dry Boxcar, Perishables) titled "Carload Marketing Advisory", so we have consistency. In the ltr we can say for these 3 groups of customers. Maybe Kari & you can recommend how to handle that.
Thanks!
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

-----Original Message-----
**From:** Jacobowski, Thomas J
**Sent:** Friday, July 21, 2000 2:33 PM
**To:** Crockett, Kari A
**Subject:** Fuel S/C Info

Kari:
As we discussed, we'll be issuing this next wk, when the website is ready. Please review & advise if looks OK.
Thanks!
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

Fuel Surcharge-Ind ProductsFU....



HIGHLY CONFIDENTIAL 

## Jacobowski, Thomas J

**From:** Anderson, Paul M
**Sent:** Thursday, July 13, 2000 1:33 PM
**To:** Holmes, Ken L
**Cc:** Engstrom, James C; Urrutia, Mary A; Jacobowski, Thomas J
**Subject:** RE: Fuel Surcharge on the internet

Ken,

Thanks for your suggestion. I have added this text, verbatim.

p

Carload Fuel Surcharge.rtf

-----Original Message-----
From: Holmes, Ken L
Sent: Thursday, July 13, 2000 11:03 AM
To: Anderson, Paul M; Jacobowski, Thomas J
Cc: Engstrom, James C; Urrutia, Mary A
Subject: RE: Fuel Surcharge on the internet

I believe we should add a line to define WTI as the 'Average monthly price of West Texas Intermediate Crude Oil as reported in the WALL STREET JOURNAL'

We should autofax the new rate/percentage to all BU customer lists taking the surcharge.

Ken

-----Original Message-----
From: Anderson, Paul M
Sent: Thursday, July 13, 2000 10:46 AM
To: Jacobowski, Thomas J
Cc: Engstrom, James C; Urrutia, Mary A; Holmes, Ken L; Anderson, Paul M
Subject: Fuel Surcharge on the internet

Next attached is the page announcing the Fuel Surcharge amounts that Mary will post on the BNSF public webpage. This page will be accessed via the internet, by going first to BNSF.com, then Doing Business with BNSF, then under Research tools, we'll have the heading/title of this page "Fuel Surcharge" listed directly under the title Carload Rate Retrieval.

Please note the URL shown at the top of this new page; http://wwwd.bnsf.com/website/demurrage.nsf/Demurrage, will be a hotlink directly to the Miscellaneous Pricing Publication page where we have the BNSF Rules Book, 6100.

Effective 8/1/00, Ken will verify the new effective rates/percentages for Mary's updating the website.

Comment, suggestions, etc., are welcome PRIOR to Mary's posting this out on the website. Our target date is July 24.

Also, once this has been updated with the new rates/percentages effective 8/1, should we autofax to the Industrial Products customer list?

<< File: Carload Fuel Surcharge.rtf >>

**Jacobowski, Thomas J**

**From:** Jacobowski, Thomas J
**Sent:** Wednesday, July 26, 2000 2:40 PM
**To:** Carney, Keith A; Wood, Michael G
**Cc:** Holmes, Ken L
**Subject:** RE: Fuel Surcharge Advisory

Keith:
Fair issue! Absolutely recommend having price authorities using 6100 Fuel S/C rather than their own S/C language. As they come up, I'd suggest converting them to 6100. As long as there are contracts with their own language, Ken Holmes has to separately calculate the S/C & separately notify those customers. This is exactly what you tell any customer that asks-their contract S/C has different provisions than the public S/C. If by putting the public notice of a S/C in the Advisory & posting the public S/C on the web causes the customer to ask why they have a different S/C in their contract & they'd like to change to the public S/C, then I'd sign them up immediately. The difference in the two calculations is pretty insignificant & it administratively simplifies things for us. When fuel goes back down & the S/C doesn't apply for a long period, we will probably further simplify the calculation.
Ask if questions.
Jake
Ken-please forward this response to the other Price Makers who have prices with their own S/C language. Thanks!
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

-----Original Message-----
**From:** Carney, Keith A
**Sent:** Wednesday, July 26, 2000 1:26 PM
**To:** Wood, Michael G; Jacobowski, Thomas J
**Subject:** RE: Fuel Surcharge Advisory

I like having this information on the web site...certainly makes it more accessible.

Want to raise one issue that this increased accessibility is likely to call attention to. The fuel surcharge formula and benchmarks are different for rates referring to the BNSF6100 than they are for contracts that embrace the old 'standard fuel surcharge' language. For example, during July contracts are subject to a 3.8% surcharge, quotes are only (only!) subject to 3.6%.

Tom-any guidance on how to explain the differences between the two numbers? Any inclination to make the contract language match the 6100 language (though this would mean giving up a few dollars)? Strongly suggest that we do this on new contracts and perhaps even consider amending old contracts to make them match. I hate to give up any money but, frankly, the FSC is unpopular enough as it is without having this kind of discrepancy.

I have two contracts (both [redacted] that are affected. I believe that there are a couple more out there as well for other managers.

Would appreciate your thoughts.

Keith

-----Original Message-----
**From:** Wood, Michael G
**Sent:** Wednesday, July 26, 2000 11:37 AM
**To:** Lundsberg, Christian S; Carney, Keith A; Mathiesen, Bryan J
**Subject:** FW: Fuel Surcharge Advisory

I was okay with the communication below. As information.

-----Original Message-----
**From:** Wertz, Linda
**Sent:** Wednesday, July 26, 2000 10:32 AM
**To:** Wood, Michael G
**Subject:** FW: Fuel Surcharge Advisory

## Jacobowski, Thomas J

**From:** Jacobowski, Thomas J
**Sent:** Wednesday, September 13, 2000 4:58 PM
**To:** Farmer, Katie M; Martin, Cathy A; Perkins, Teresa K; McCormick, Catherine L; Wood, Michael G
**Cc:** Duggan, George T; Hallberg, David E; Smitley, Russell W; Allen, Marc A; Fleenor, Dave; Garin, David L; Holmes, Ken L; Milton, Herb
**Subject:** Carload Fuel Surcharge calculation review mtg 9/15 10:30am, 2nd Floor Exec. Conf. Rm

All:
I'd like to get together with the BU's using the Fuel S/C to make this easier for our customers to use. You have been selected to represent your BU. Please plan on attending or send someone in your place. Attached is the Agenda for your review.
Thanks!
Jake

*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

BU Heads: FYI

Fuel Surcharge Review agenda 9...

# Carload Fuel Surcharge Review Meeting
# 9/15/00

700
3.1%

## Agenda:

Objectives:

- Simplify the calculation so it's easier to understand
- Give our customers more notification time before effective date so they have more time to update their files/systems

Rounding to nearest whole $? — won't do extra work in MAS/RAS

1) How the Fuel Surcharge is calculated:

Currently: FSR = (WTI/BV-1) times FI
WTI = monthly average price
Calculation rounded to nearest 1/10 of a percent

Recommend: Follow what NS did, created table:

| Avg Price | FSR |
|---|---|
| ~~$28~~ 30.50 | 2% |
| $33 35.50 | 4% |
| $38 40.50 | 6% |
| $43 42.50 | 8% |
| Each $5 inc. thereafter | An additional 2% |

2, 3, 4, 5, 6, 7, 8

2) Time period used in calculation

Currently: Prior Month's average price

Recommend: No change

7/21 – EOM
8/1 – 20

(10 days notification minimum except in February)

3) Time period FSR is effective

Currently: Next month (no time for notification, updating)

Recommend: 10th of the following month through the 9th of the month after that

Next Month

4) Customer notification

Currently: Monthly email distribution list (29 customers on the list)
Monthly website update

Recommend: No change

**To: All BNSF Carload Customers**

BNSF

Burlington Northern Santa Fe Railway

We Can Move Your World.™

# **Pricing**Update

September 21, 2000

## Changes to the Carload Fuel Surcharge Calculation

[T]his Pricing Update [i]s intended to notify BNSF [c]ustomers of changes [t]o existing rates [o]r price structures.

[I]f you have any questions, [p]lease contact your [M]arketing Representative [o]r send an e-mail to [c]ustomerinterface@bnsf.c[o]m.

[T]his Pricing Update [i]s posted on our Web site [a]t [w]ww.bnsf.com.

We have received feedback from our customers that the current way BNSF calculates the Fuel Surcharge Rate (FSR) is complicated and does not allow for adequate time to update systems.

To address these concerns, we are making the following changes effective October 1st, 2000. We have simplified the calculation by rounding the FSR to whole percentages, and putting it into a table form. To allow time between calculating the average West Texas Intermediate Crude Oil (WTI) Price, and when it is effective, we will compute the WTI rate by averaging the days from the 21st of the prior month through the 20th of the existing month. We will notify you of the new rate for the following month on the 21st. The average will then be associated with a FSR percentage rate as seen below.

| Average WTI Price | FSR |
|---|---|
| $28.00 - $30.49 | 2% |
| $30.50 - $32.99 | 3% |
| $33.00 - $35.49 | 4% |
| $35.50 - $37.99 | 5% |
| $38.00 - $40.49 | 6% |
| $40.50 - $42.99 | 7% |
| $43.00 - $45.49 | 8% |

Each $2.50 increase thereafter, an additional 1% increase

The new rate will then be effective on the 1st day of the following month. We hope that this will give you adequate time to make any necessary changes. The FSR for the month of October will be 4% based on the average WTI Price of $34.01 for the time period August 21st through September 20th. We will continue to post the monthly FSR on our website at www.bnsf.com/business/.

If you have any questions about this new calculation, please feel free to contact your Marketing Representative or send us an e-mail at CustomerInterface@BNSF.com.

# Carload Fuel Surcharge Meeting
# October 17, 2000

6724 Denis Smith
6209 Cathy Martin
~~6163~~ Greg Patient
6324 Minerals?
6112 Chemicals?
Perishable
Dry Boxes
Ag

## Agenda:

1. WTI Crude Oil Price

10/17 330p comments Garvin + his Bu Heads no action will be taken. Sent this packet to everyone.

2. BNSF Fuel Expense
3. BNSF Fuel Surcharge
4. Competitive Analysis
5. Adjustment Analysis for Carload Prices
6. Discussion Items:
   - Can we take the Fuel S/C on all prices we can?

     Feeling is we have mkt based P's

   - Prices that don't specifically reference the Rules Book, can we take the Fuel S/C?

Russ - taken S/C on all Public P's
Reviewing all P's for fixed v. S/C

   - Other ideas?

10/17 315p Doug gm. TCG what to do on Chemicals shipment condition

HIGHLY CONFIDENTIAL

BNSF-0814211

DA03549

## Jacobowski, Thomas J

**From:** Jacobowski, Thomas J
**Sent:** Monday, October 16, 2000 10:21 AM
**To:** Smith, Denis J; Allen, Marc A; Fleenor, Dave; Duggan, George T; Hallberg, David E; Smitley, Russell W; Bobb, Stevan B; Risolvato, John A
**Cc:** Garin, David L; Branscum, Steve G; Patient, Gregory M
**Subject:** RE: Applying Fuel Surcharge to more prices mtg 10/17, 1pm in Garin's office

Sorry about that. I've rescheduled the mtg to 10/17, **1pm** in Garin's office-I hope that works better!
Jake
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

-----Original Message-----
**From:** Smith, Denis J
**Sent:** Monday, October 16, 2000 9:58 AM
**To:** Jacobowski, Thomas J; Allen, Marc A; Fleenor, Dave; Duggan, George T; Hallberg, David E; Smitley, Russell W; Bobb, Stevan B; Risolvato, John A
**Cc:** Garin, David L; Branscum, Steve G; Patient, Gregory M
**Subject:** RE: Applying Fuel Surcharge to more prices mtg 10/17, 9am in Garin's office

we've got a conflict with id/network development meeting .

-----Original Message-----
**From:** Jacobowski, Thomas J
**Sent:** Friday, October 13, 2000 5:02 PM
**To:** Allen, Marc A; Fleenor, Dave; Duggan, George T; Hallberg, David E; Smith, Denis J; Smitley, Russell W; Bobb, Stevan B; Risolvato, John A
**Cc:** Garin, David L; Branscum, Steve G; Patient, Gregory M
**Subject:** Applying Fuel Surcharge to more prices mtg 10/17, 9am in Garin's office

As you all know, fuel prices continue to stay at extremely high levels, adversely affecting our profitability. Top mgmt has asked us to meet & review if we can make more prices subject to the Fuel S/C, to help recover our higher costs. Two topics will be discussed:
1) We are working on updating the attached spreadsheet to help us see what % of your business is taking a Fuel S/C & what additional revenue could be subject to the Fuel S/C but we're choosing not to take it. We need to ask ourselves if we can now start taking the Fuel S/C on these prices.
2) Discuss for prices that don't specifically state they are subject to Rules Book 6100 or BNERM1, could we take a Fuel S/C on these prices. Most prices have a general provision that say they are subject to tariffs, rules and regulations, etc. that would be in effect if the specific contract/quote wasn't in effect but may not specifically state they are subject to Rules Book 6100. We have not done this to date but have indications that other RR's may be doing this.
3) Other ideas?
Ask if questions. Thanks!
Jake
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com
<< File: PriceIncreasePotentialAug12000.xls >>



HIGHLY CONFIDENTIAL

BNSF-0814212

DA03550

## AVERAGE WEST TEXAS CRUDE PRICE

| | Oct-99 | Nov-99 | Dec-99 | Jan-00 | Feb-00 | Mar-00 | Apr-00 | May-00 | Jun-00 | Jul-00 | Aug-00 | Sep-00 | Oct-00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $24.53 | $22.53 | $25.00 | | $28.23 | $31.78 | | $25.88 | $30.13 | | $27.78 | $33.38 | |
| 2 | | $22.38 | $25.83 | | $27.55 | $31.68 | | $26.88 | $30.35 | | $28.28 | | $32.18 |
| 3 | | $22.58 | $25.83 | | $28.03 | $31.53 | $26.43 | $26.75 | | | $28.68 | | $32.08 |
| 4 | $23.78 | $23.13 | | $25.55 | $28.83 | | $25.45 | $26.98 | | | $29.98 | | $31.43 |
| 5 | $23.45 | $23.00 | | $24.93 | | | $25.85 | $27.28 | $29.70 | $30.68 | | $33.83 | $30.53 |
| 6 | $23.28 | | $26.66 | $24.78 | | $32.18 | $25.68 | | $29.75 | $29.98 | | $34.90 | $30.88 |
| 7 | $22.43 | | $26.23 | $24.23 | $28.45 | $34.13 | $25.03 | | $29.95 | $30.28 | $28.93 | $35.38 | |
| 8 | $20.90 | $23.28 | $26.53 | | $28.03 | $31.28 | | $28.09 | $29.78 | | $29.13 | $33.63 | |
| 9 | | $24.03 | $26.18 | | $28.78 | $31.68 | | $28.65 | $30.20 | | $30.35 | | $31.88 |
| 10 | | $24.48 | $25.23 | $24.68 | $29.43 | $31.78 | $23.85 | $28.10 | | $29.68 | $31.33 | | $33.18 |
| 11 | $21.28 | $24.33 | | $25.78 | $29.43 | | $24.13 | $29.13 | | $29.70 | $31.03 | $35.13 | $33.25 |
| 12 | $22.30 | $24.93 | | $26.28 | | | $25.43 | $29.62 | $31.73 | $30.33 | | $34.28 | $36.08 |
| 13 | $23.08 | | $25.38 | $26.68 | | $32.03 | $25.38 | | $32.58 | $31.48 | | $33.83 | $34.98 |
| 14 | $22.45 | | $25.73 | $28.03 | $30.25 | $31.68 | $25.58 | | $32.85 | $31.40 | $31.93 | $34.08 | |
| 15 | $22.83 | $25.13 | $26.38 | | $30.08 | $30.73 | | $29.93 | $32.95 | | $31.68 | $35.93 | |
| 16 | | $25.70 | $26.83 | | $30.05 | $31.08 | | $29.73 | $32.33 | | $31.80 | | $32.93 |
| 17 | | $26.60 | $26.73 | | $29.48 | $30.93 | $25.88 | $29.33 | | $30.83 | $31.93 | | |
| 18 | $22.53 | $25.80 | | $28.85 | $29.53 | | $26.13 | $30.33 | | $31.93 | $31.98 | $36.88 | |
| 19 | $22.23 | $26.58 | | $29.53 | | | $27.35 | $29.88 | $31.68 | $31.43 | | $36.53 | |
| 20 | $22.20 | | $26.53 | $29.68 | | $29.43 | $27.00 | | $33.05 | $30.93 | | $37.20 | |
| 21 | $22.33 | | $26.33 | $29.75 | | $28.00 | | | $33.83 | $28.53 | $32.48 | $34.40 | |
| 22 | $23.18 | $27.98 | $25.43 | | $29.63 | $27.53 | | $28.63 | $34.55 | | $31.23 | $32.73 | |
| 23 | | $26.83 | $25.63 | | $30.28 | $27.23 | | $28.53 | $34.65 | | $31.98 | | |
| 24 | | $27.28 | | $29.43 | $30.23 | $27.93 | $27.28 | $29.73 | | $28.18 | $32.63 | | |
| 25 | $23.18 | | | $29.88 | $30.23 | | $26.75 | $30.33 | | $27.83 | $32.83 | $31.43 | |
| 26 | $23.18 | | | $27.83 | | | $24.65 | $30.00 | $31.63 | $27.83 | | $31.50 | |
| 27 | $22.93 | | $26.38 | $27.33 | | $27.78 | $25.40 | | $32.08 | $28.03 | | $31.48 | |
| 28 | $21.68 | | $26.83 | $27.23 | $30.13 | $27.08 | $25.73 | | $31.90 | $28.18 | $32.88 | $30.33 | |
| 29 | $21.75 | $25.98 | $26.48 | | $30.43 | $26.45 | | | $32.73 | | $32.73 | $30.83 | |
| 30 | | $24.58 | $25.60 | | | $26.70 | | $30.35 | $32.50 | | $33.33 | | |
| 31 | | | | $27.63 | | $26.90 | | $29.03 | | $27.43 | $33.13 | | |
| | | | | | | | | | | | | | |
| Avg | $22.64 | $24.86 | $26.08 | $27.27 | $29.35 | $29.89 | $25.74 | $28.78 | $31.86 | $29.72 | $31.22 | $33.88 | $32.67 |
| Surc | 3.36% | 4.16% | 4.61% | 5.04% | 5.80% | 6.00% | 4.48% | 2.29% | 3.63% | 2.70% | 3.35% | 4.51% | 3.98% |

Fuel Surcharge Formula, ((WTI/BV)-1)*FI

BV September 1998 - August 1999 = $14.81
FI September 1998 - August 1999 = 5.4%

BV September 1999 - August 2000 = $13.44
FI September 1999 - August 2000 = 4.9%

BV = $23.50
FI May 2000 - April 2001 = 10.2%
Surcharge Trigger Price $28.23.
Item 3375, BNSF Rules Book 6100

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|
| JAN | $19.08 | $15.00 | $17.97 | $18.08 | $25.17 | $16.71 | $12.47 | $27.27 |
| FEB | $20.05 | $14.78 | $18.54 | $19.07 | $22.21 | $16.06 | $12.01 | $29.35 |
| MAR | $20.35 | $14.65 | $18.53 | $21.36 | $20.99 | $15.02 | $14.66 | $29.89 |
| APRIL | $20.27 | $16.24 | $19.82 | $23.57 | $19.72 | $15.33 | $17.39 | $25.74 |
| MAY | $19.94 | $17.88 | $19.74 | $21.25 | $20.83 | $14.86 | $17.70 | $28.78 |
| JUNE | $19.07 | $19.02 | $18.42 | $20.45 | $19.17 | $13.66 | $17.89 | $31.86 |
| JULY | $17.87 | $19.64 | $17.30 | $21.32 | $19.63 | $14.08 | $20.07 | $29.72 |
| AUG. | $18.01 | $18.35 | $18.03 | $21.96 | $19.93 | $13.36 | $21.26 | $31.22 |
| SEPT | $17.55 | $17.46 | $18.22 | $23.99 | $19.79 | $14.95 | $23.88 | $33.88 |
| OCT | $18.15 | $17.77 | $17.44 | $24.90 | $21.26 | $14.34 | $22.64 | |
| NOV | $16.70 | $18.11 | $17.99 | $23.71 | $20.17 | $12.94 | $24.86 | |
| DEC | $14.50 | $17.16 | $19.04 | $25.39 | $18.32 | $11.28 | $26.08 | |

HIGHLY CONFIDENTIAL

# TOTAL FUEL EXPENSE



Home Customers Investors Employees Media About BNSF Search

BNSF

We Can Move Your World.

# BNSF Rules Book 6100 - Carload Fuel Surcharge

A fuel surcharge may be applied to price authorities subject to BNSF Rules Bool 6100. The surcharge for the following month will be determined on the twenty-first of the current month based on the average price of West Texas Intermediate Crude Oil between the twenty-first of the prior month and the twentieth of the current month. The Fuel Surcharge Rate (FSR) is determined from the table found in item 3375 of BNSF Rules Book 6100 Series. The BNSF Rules Book 6100 can be found online at: http://wwwd.bnsf.com/website/demurrage.nsf/Demurrage

Fuel Surcharge Rate:

Expect 3%

| For the Month of: | Prior Period's WTI Average: |
|---|---|
| November 2000 (n/a until 10/21/00) | Sept. 21 - Oct. 20 (n/a until 10/21/00) |
| October 2000 4.0% | Aug. 21 - Sept. 20 $34.01 |
| September 2000 3.4% | August $31.22 |
| August 2000 2.7% | July $29.72 |
| July 2000 3.6% | June $31.86 |
| June 2000 2.3% | May $28.78 |
| May 2000 1.0% no fuel surcharge applied* | April $25.74 |
| April 2000 2.9% | March $29.89 |

WTI = Prior Period's average price of West Texas Intermediate Crude Oil as reported in the WALL STREET JOURNAL.

**FSR as of October 1, 2000 (see table below)**

**Fuel Surcharge Table**

| Prior Period's Avg. Price of WTI between: | Applicable Fuel Surcharge: |
|---|---|
| $28.00 to $30.49 | 2.0% |
| $30.50 to $32.99 | 3.0% |
| $33.00 to $35.49 | 4.0% |
| $35.50 to $37.99 | 5.0% |
| $38.00 to $40.49 | 6.0% |
| $40.50 to $42.99 | 7.0% |
| $43.00 to $45.49 | 8.0% |

Each $2.50 per barrel increase there after apply an additional 1.0%

*** Fuel Surcharge applies only when the FSR equals or exceeds 2%.**

For surcharge comments or questions, please email: auxpricing@bnsf.com



HIGHLY CONFIDENTIAL

# Carload Fuel Surcharge Summary Comparison by RR

(as of October 17, 2000)

| RR | Effective Date | $28 Fuel Price | $33 | $38 | Thereafter |
|---|---|---|---|---|---|
| BNSF | New Rule 4/1/00<br>Perishables 3/15<br>Dry Boxcar 4/1<br>Chemicals 8/1<br>Metals 8/1<br>Minerals/Mach 8/1<br>Ag n/a<br>Autos n/a<br>Forest n/a | 2% | 4% | 6% | 1% for ea $2.50 |
| CN | 11/1/00 | 4% | 4% | 4% | General increase. |
| CP | 5/1/00 | 3% | 3% | 3% | General increase. |
| CSXT | 10/25/00 | 2% | 4% | 6% | 2% for ea $5 |
| NS | 6/19/00 | 2% | 4% | 6% | 2% for ea $5 |
| UP | 10/5/00 | 3% | 3% | 3% | General increase. |

**Details:**

BNSF

Effective 4/1/2000, we changed our fuel surcharge provision from a flat 2% when the price of fuel exceeded $28 per barrel for 10 consecutive days, to a floating rate based upon the monthly average price of fuel. The formula was a simplified version of formulas we were applying in some private prices. The change in the fuel surcharge provision was done to maintain the $28 fuel price equals 2% fuel surcharge rate of the old item, allow for the surcharge to increase with the fuel price, and administratively simplify the process. When the price of fuel averages atleast $28 for a period, the fuel surcharge starts applying at a 2% rate for the following month. Effective 10/1/2000, we made 2 changes in our fuel surcharge based on Marketing/customer feedback. We modified the time period used to calculate the fuel surcharge, which allows about 10 days before the effective date of the new fuel surcharge. In addition, the fuel surcharge is only in whole percentages.

Canadian National

They had no plans to take fuel surcharges. In addition, they were reluctant to take general price increases because they were concerned customers would want prices decreased when fuel prices decreased. On 10/6/2000, they changed their position & announced a general increase of mainly 4% to their public prices effective 11/1/2000. Our analysis shows approximately 4% of CN originated BNSF shipments will be subject to the increases.

Canadian Pacific

CP imposed a 3% fuel surcharge on public prices effective on 5/1/00. CP was also going to attempt to get customer concurrence on the 3% fuel surcharge for private prices. Due to CP system constraints, it is our understanding that they applied the 3% fuel surcharge as a 3% general increase to the applicable prices.

CSXT

CSXT increased some of their public prices 3-8% effective 5/1/00. In June, CSXT they told us they were going through another program to review increasing non-contract prices and asked for our support. We told them that we supported their program and worked with them on taking price increases where possible. On 9/29/2000, CSXT announced a fuel surcharge effective 10/25/2000. Their fuel surcharge language basically copied the NS's language. CSXT plans to apply it to all public prices, most quotes, and some contracts. They expect about 50% of their business will be covered by the fuel surcharge.

Norfolk Southern

NS implemented a fuel surcharge effective 6/19/00 on their public prices. It can be selectively applied. It is currently 2%, based on the fuel price staying above $28 per barrel for 30 consecutive days. For each $5 increase in the cost per barrel, the surcharge increases 2%. We estimate that about 20% of their business is covered by the fuel surcharge.

Union Pacific

UP announced on 9/8/2000 general increases of between 1% and 5% on their public prices effective between October 5 and November 1, 2000. We estimate this will impact about 25% of UP originated BNSF business.

# Adjustment Analysis for Carload Prices

## Jan. - June 2000 Gross Revenue (000's)

## As of 10/1/00

| | | Private Prices | | | | | | | | Public Prices | | | | | | Totals | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Business Unit | BNSF Gross Revenue | Prices Specify Fixed Increase ($ or %) | Prices Subject to RCAF Increases | Prices Taking Fuel S/C | Prices State Fuel S/C Doesn't Apply | Prices Could Take Fuel S/C | Prices Don't Reference Fuel S/C or Increase Mechanism now but could be Negotiated in the Future | Private Gross Revenue Total | Private % Revenue | Prices Taking Fuel S/C | Prices State Fuel S/C Doesn't Apply | Prices Could Take Fuel S/C | Prices can be Changed at Any Time | Public Gross Revenue Total | Public % Revenue | BNSF Total Gross Revenue | Prices Taking Fuel S/C | Prices Taking Fuel S/C as a % Revenue | Estimated Additional 4% Rev. In Oct. Due to Prices Taking Fuel S/C | Prices Could Take Fuel S/C | Prices Could Take Fuel S/C as a % Revenue |
| AG PRODUCTS | 669,939 | 23,855 | 0 | 0 | 26,203 | 13,541 | 16,793 | 80,393 | 12% | 0 | 35,860 | 0 | 553,687 | 589,546 | 88% | 669,939 | 0 | 0% | 0 | 13,541 | 2% |
| | | | | | | | | | | | | | | | | | | | | | |
| COAL | 1,084,578 | 403,483 | 579,165 | 0 | 0 | 0 | 101,950 | 1,084,578 | 100% | 0 | 0 | 0 | 0 | 0 | 0% | 1,084,578 | 0 | 0% | 0 | 0 | 0% |
| | | | | | | | | | | | | | | | | | | | | | |
| CHEMICALS | 467,097 | 56,186 | 32,990 | 17,367 | 170,209 | 10,531 | 123,762 | 411,045 | 88% | 32,989 | 59 | 1,107 | 21,897 | 56,052 | 12% | 467,097 | 50,356 | 11% | 336 | 11,638 | 2% |
| FOREST PRODUCTS | 356,269 | 0 | 0 | 0 | 2,333 | 119,404 | 166,841 | 288,578 | 81% | 0 | 395 | 29,892 | 37,404 | 67,691 | 19% | 356,269 | 0 | 0% | 0 | 149,296 | 42% |
| METALS | 247,414 | 18,946 | 42,426 | 23,625 | 59,501 | 56,442 | 19,258 | 220,198 | 89% | 17,850 | 2,741 | 384 | 6,241 | 27,216 | 11% | 247,414 | 41,475 | 17% | 277 | 56,026 | 23% |
| MINERALS/MACHINERY | 262,010 | 31,843 | 10,031 | 14,947 | 13,102 | 82,129 | 44,456 | 196,508 | 75% | 23,167 | 609 | 3,909 | 37,818 | 65,503 | 25% | 262,010 | 38,114 | 15% | 254 | 86,038 | 33% |
| INDUSTRIAL PRODUCTS | 1,332,790 | 106,975 | 85,447 | 55,939 | 245,144 | 268,506 | 354,317 | 1,116,329 | 84% | 74,006 | 3,805 | 35,291 | 103,359 | 216,461 | 16% | 1,332,790 | 129,945 | 10% | 866 | 303,798 | 23% |
| | | | | | | | | | | | | | | | | | | | | | |
| AUTOMOTIVE | 266,115 | 87,345 | 124,995 | 0 | 7,277 | 22,767 | 23,731 | 266,115 | 100% | 0 | 0 | 0 | 0 | 0 | 0% | 266,115 | 0 | 0% | 0 | 22,767 | 9% |
| DRY BOXCAR | 82,941 | 2,649 | 0 | 15,440 | 3,210 | 32,631 | 21,121 | 75,052 | 90% | 3,255 | 0 | 87 | 4,548 | 7,889 | 10% | 82,941 | 18,695 | 23% | 125 | 32,718 | 39% |
| PERISHABLES | 55,239 | 0 | 0 | 4,047 | 2,798 | 3,082 | 25,978 | 35,905 | 65% | 5,693 | 0 | 0 | 13,641 | 19,334 | 35% | 55,239 | 9,740 | 18% | 65 | 3,082 | 6% |
| CONSUMER PRODUCTS | 404,295 | 89,994 | 124,995 | 19,488 | 13,285 | 58,480 | 70,831 | 377,072 | 93% | 8,947 | 0 | 87 | 18,189 | 27,223 | 7% | 404,295 | 28,435 | 7% | 190 | 58,507 | 14% |
| | | | | | | | | | | | | | | | | | | | | | |
| TOTALS | 3,491,602 | 624,288 | 789,607 | 75,427 | 284,632 | 340,528 | 543,891 | 2,658,372 | 76% | 82,953 | 39,665 | 35,378 | 675,235 | 833,230 | 24% | 3,491,602 | 158,379 | 5% | 1,056 | 375,905 | 11% |

## Jacobowski, Thomas J

**From:** Urrutia, Mary A
**Sent:** Wednesday, October 18, 2000 5:01 PM
**To:** Jacobowski, Thomas J; Allen, Marc A; McCormick, Catherine L
**Subject:** RE: Applying Fuel Surcharge to more prices mtg 10/17, 9am in Garin's office

I re-checked the numbers against Ken's most recent spreadsheet. I was missing one of the [redacted] contracts, BNSFQ 104650.1. I was also showing a few quotes as "No" that had been converted to "Yes" during the month of October.

This made a difference, particularly the [redacted] contract. Now the 6 month revenue for Dry Boxcar from prices taking fuel surcharge is 29,756,000 up from 18,695,000 or 36% instead of 23%. Total revenue from prices that could take fuel surcharge but aren't is 28,738,000 down from 32,718,000 or 35% instead of 39%.



PriceIncreasePotential Aug12000...

Mary
(817) 593-1164

-----Original Message-----
**From:** Jacobowski, Thomas J
**Sent:** Wednesday, October 18, 2000 8:12 AM
**To:** Allen, Marc A; McCormick, Catherine L
**Cc:** Urrutia, Mary A
**Subject:** RE: Applying Fuel Surcharge to more prices mtg 10/17, 9am in Garin's office

Marc:
We'll be happy to check the #'s. Katie can work with Mary Urrutia on this.
Jake
Mary: see attached. Please work with Katie to make sure we agree on the PA's taking the S/C & then make sure Ken's info. gets updated accordingly.
Thanks!
Jake
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

-----Original Message-----
**From:** Allen, Marc A
**Sent:** Tuesday, October 17, 2000 5:35 PM
**To:** Jacobowski, Thomas J; McCormick, Catherine L
**Cc:** Branscum, Steve G; Garin, David L
**Subject:** RE: Applying Fuel Surcharge to more prices mtg 10/17, 9am in Garin's office

Jake,

When you say 23%, what is that? Is that the percentage of the quotes, or percentage of units moved, or revenue, or ...? The reason I ask is [redacted] alone accounts for about 30% of my total revenue and we just added those guys in October. Additionally, we've added a number of smaller customers since August. I would expect the percentage of revenue within dry boxcar that is taking fuel surcharge to now be above 50%. If it isn't, we need to have your team and my team reconcile the numbers.

Katie, will you please provide Jake our view of the world (the spreadsheet we have that reflects customers taking the fuel surcharge). Jake, would you please pass this to the appropriate person in your group and have them work with Katie to reconcile things.

Thanks,

Marc

-----Original Message-----
**From:** Jacobowski, Thomas J
**Sent:** Tuesday, October 17, 2000 5:26 PM
**To:** Allen, Marc A
**Cc:** Branscum, Steve G; Garin, David L
**Subject:** RE: Applying Fuel Surcharge to more prices mtg 10/17, 9am in Garin's office

Marc:
I gave Barbara a copy of the presentation, which included an update on % of biz using the S/C. You're also correct, the rpt shows 23% of your biz using the S/C now vs. 12% on 8/1.
Jake
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com

-----Original Message-----
**From:** Allen, Marc A
**Sent:** Tuesday, October 17, 2000 4:44 PM
**To:** Jacobowski, Thomas J
**Cc:** Branscum, Steve G; Garin, David L
**Subject:** RE: Applying Fuel Surcharge to more prices mtg 10/17, 9am in Garin's office

Jake,

I did not get your message (I was out of the office Friday & in meetings all day Monday) & therefore I did not make the Tuesday afternoon meeting on this subject. For the dry boxcar segment, I would really like to see a recent cut of the spreadsheet you sent out (as of Aug 1). We have really turned up the heat on our commodities and should see a much greater percentage of our revenue being impacted by a fuel surcharge.

Marc

-----Original Message-----
**From:** Jacobowski, Thomas J
**Sent:** Friday, October 13, 2000 5:02 PM
**To:** Allen, Marc A; Fleenor, Dave; Duggan, George T; Hallberg, David E; Smith, Denis J; Smitley, Russell W; Bobb, Stevan B; Risolvato, John A
**Cc:** Garin, David L; Branscum, Steve G; Patient, Gregory M
**Subject:** Applying Fuel Surcharge to more prices mtg 10/17, 9am in Garin's office

As you all know, fuel prices continue to stay at extremely high levels, adversely affecting our profitability. Top mgmt has asked us to meet & review if we can make more prices subject to the Fuel S/C, to help recover our higher costs. Two topics will be discussed:
1) We are working on updating the attached spreadsheet to help us see what % of your business is taking a Fuel S/C & what additional revenue could be subject to the Fuel S/C but we're choosing not to take it. We need to ask ourselves if we can now start taking the Fuel S/C on these prices.
2) Discuss for prices that don't specifically state they are subject to Rules Book 6100 or BNERM1, could we take a Fuel S/C on these prices. Most prices have a general provision that say they are subject to tariffs, rules and regulations, etc. that would be in effect if the specific contract/quote wasn't in effect but may not specifically state they are subject to Rules Book 6100. We have not done this to date but have indications that other RR's may be doing this.
3) Other ideas?
Ask if questions. Thanks!
Jake
*Tom Jacobowski*
Phone: (817) 593-1131
Fax: (817) 593-2909
EMail: Thomas.Jacobowski@BNSF.com
<< File: PriceIncreasePotentialAug12000.xls >>

**BNSF**

PAUL B. ANDERSON

*General Director*
*Finance, Planning & Control*

**Burlington Northern Santa Fe**

P.O. Box 961051
Ft. Worth, TX 76161-0051

2650 Lou Menk Drive, 2nd Floor
Ft. Worth, TX 76131-2830
Phone: 817-352-6232
Fax: 817-352-7940

Date: 11/03/00

To: Matt Rose

Subject: Price Increases Compared to Fuel Expense Increases

Per your request, please find attached a table listing the year-over-year price improvements compared to fuel cost increases. In general, prices are not offsetting the rising fuel expenses.

In 2000, the projected increase in fuel cost is over $216mm with fuel surcharges forecasted to total only $24.5mm. Contract escalations are projected to come in around $95mm. However, only 10% or $9.5mm of the escalation total is estimated to be fuel related. (Assumption: Since 10% of the RCAF basket is associated with fuel expense, I used 10% of each escalator as a proxy for the fuel component associated with the different economic escalators and fixed increases.) Total price increases in 2000, included fuel surcharges and escalations, is expected to total around $133mm. The first table on page three shows the business unit break down of fuel expenses and prices. In 2000, the total price increases for the year amount to only 61% of the fuel cost increase and the "fuel related" component of the escalation items and surcharges covered only 16% of the fuel increase.

Since many of the general price increases were justified, at least in part, with rising fuel costs, it seems appropriate to compare the total price increases as well the specific fuel related price programs for this analysis. Obviously, it is understood that general price increases must cover all expense items and not just fuel.

The second table shows the fuel and price impacts associated with the 2001 plan. Despite expected minor year-over-year fuel expense increases, the total general price improvements are planned to capture only 40% of the fuel increase. The fuel related escalations and surcharges should capture 27% of the projected increases. As information, escalations in 2001 are much lower than this year due to RCAF being projected at +2.0% compared to +5.1% in 2000.

Also, the second table has an extra row at the bottom labeled Non Coal Total to reflect summarized figures without the offsetting effects of negative Coal yields associated with major contract renegotiations in 2001. The non-Coal general price improvements will exceed the non-Coal fuel increases by over 2.5 times. The fuel related items will cover only 25% of the expense increases.

{ FILENAME \p }

The bottom table shows the cumulative two-year results of prices compared to fuel expenses. General price increases will amount to only 58% of the fuel expense increases and the fuel related items will capture only 18%. The non-coal fuel expenses covered by general and fuel related price actions are estimated at 109% and 19% respectively.

Let me know if you would like to see some further analysis or if there are any questions.

.

Paul B. Anderson

Cc: Chuck Schultz
Tom Hund
Steve Bobb
Steve Branscum
Dave Garin
Tom Kraemer
Todd Olsen
Sherri Lacey

{ FILENAME \p }