# Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment

# Volume 23 of 29

# DA04951 - DA05279

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL ) MDL No. 1869
SURCHARGE ) Misc. No. 07-489
ANTITRUST LITIGATION, ) (PLF/AK/JMF)
This Document Relates To: )
ALL DIRECT PURCHASER CASES )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF FRED EHLERS
TAKEN ON BEHALF OF THE PLAINTIFFS
Norfolk, Virginia
June 22, 2011

"HIGHLY CONFIDENTIAL"



APPEARANCES:
On behalf of the Plaintiffs:
MARC GREENWALD, ESQUIRE
JOSEPH HAMMOND, ESQUIRE
Quinn Emanuel Urquhart Oliver &
Hodges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
On behalf of Fred Ehlers and the Defendant
Norfolk Southern Corporation:
JOHN M. NANNES, ESQUIRE
TARA L. REINHART, ESQUIRE
SEAN M. TEPE, ESQUIRE
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7500
DAVID COLEMAN, ESQUIRE
BILL GALANKO, ESQUIRE
General Solicitor
Norfolk Southern Corporation
Three Commercial Place
Norfolk, Virginia 23510
(757) 629-2831



Appearances: (Continued)
On behalf of the Defendant BNSF Railway Company:
GARY A. WINTERS, ESQUIRE
Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3273
On behalf of the Defendant Union Pacific:
CAROLYN WOODSON, ESQUIRE
Jones Day
555 South Flower Street, Fiftieth Floor
Los Angeles, California 90071-2300
(231) 489-3939
On behalf of the Defendant CSXT:
DAVID D. CROSS, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
(202) 624-2532

Also Present:
Rebecca Miller, Videographer



I N D E X

WITNESS


| On behalf of the Plaintiffs: | Examination by: | Page |
|---|---|---|
| Fred Ehlers | Mr. Greenwald | 6 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| Exhibit 1 | 5/14/03 NS/UP Alliance Meeting | 31 |
| Exhibit 2 | 9/8/04 BNSF/NS Meeting Agenda | 36 |
| Exhibit 3 | 9/15/04 E-mail from Ms. Strickland | 37 |
| Exhibit 4 | 9/17/03 E-mail from Mr. Ratcliffe | 40 |
| Exhibit 5 | 12/16/03 BNSF & NS Fall Meeting | 42 |

Page 13

Q. And did you ask him what he meant by customer concerns around a simpler fuel surcharge?
A. No. I did not.
Q. Did he specify any specific customers who had expressed these concerns?
A. No. He did not.
Q. Are you aware of any customers who expressed these concerns prior to March 18, 2003?
A. No.
MS. REINHART: Objection. That is beyond the scope.
BY MR. GREENWALD:
Q. And the -- were there any lawyers present at this meeting?
A. David Goode and Hank Wolf were both attorneys. On the Norfolk Southern side, that is all I am aware of.
Q. Okay. And what -- what were their roles at -- in Norfolk Southern's legal department?
A. They weren't. David Goode was CO, and Hank Wolf was chief financial officer.
Q. So neither was acting as a lawyer at the meeting?
A. Correct.
Q. And, now, the -- this meeting was between

Page 14

BNSF and NS, correct?
A. Correct.
Q. And so any interline discussions would have been related to interline business of BNSF and NS, correct?
A. Correct.
MS. REINHART: Objection. Beyond the scope to the extent you are talking generally about anything other than what happened at this meeting.
BY MR. GREENWALD:
Q. And so fuel surcharges charged by CSX and UP would not have had to do with the interline business between NS and BNSF, correct?
MS. REINHART: Sorry. Just want to make sure I understand you are talking about in terms of any discussion at this meeting or just more generally. I am just a little --
BY MR. GREENWALD:
Q. Any discussion at this meeting.
A. The discussions at this meeting --
MR. CROSS: Objection. Vague and overbroad.
THE WITNESS: The discussions at this meeting would have been on the fuel surcharges between NS -- the interline business between NS and BNSF.

Page 15

BY MR. GREENWALD:
Q. And how do you know that?
A. Because that is what the purpose of the meeting was.
Q. But no one remembers what the discussions were, right?
A. It is an interline meeting with BNSF. That is what we talk about. The folks that are in attendance are well aware of what is permissible. They have all had antitrust training. The meetings that I have -- I have had, while I wasn't in attendance at this one, the interline meetings have been focused from a commercial aspect on interline business.
Q. But you weren't at this meeting?
A. Correct.
Q. And no one at NS recalls the fuel surcharge discussion at the meeting?
MS. REINHART: Objection.
THE WITNESS: Correct.
BY MR. GREENWALD:
Q. And there are no contemporaneous notes from the meeting?
MS. REINHART: Objection. Asked and answered.

Page 16

THE WITNESS: I am sorry. The last question?
BY MR. GREENWALD:
Q. There are no contemporaneous notes from the meeting?
A. Not that I am aware of.
Q. And the action item doesn't refer to interline business, does it?
A. Again, I am going to go -- it was an interline discussion with our interline partner. I have every assumption -- I have every belief that it was an interline discussion.
Q. But no evidence that it was interline discussion?
MS. REINHART: Objection. Misstates his testimony.
MR. CROSS: Calls for a legal conclusion.
MS. REINHART: Sorry. Go ahead, David.
MR. CROSS: Calls for a legal conclusion.
THE WITNESS: It was an interline discussion between NS and BNSF interline traffic.
BY MR. GREENWALD:
Q. You are just assuming that?
MS. REINHART: Objection. Misstates his testimony.

THE WITNESS: It was the purpose of the meeting.

BY MR. GREENWALD:

Q. How do you know it was an interline discussion?

A. Because that is what we discuss at these meetings.

Q. But no one recalls what was discussed, correct?

MS. REINHART: Objection. Asked and answered.

THE WITNESS: It is -- the purpose of these meetings is to discuss the interline -- the interline business between us and the partner. As I have said, everyone knows that. Everyone has been through the antitrust training. My personal experience at these meetings is they are very confined to the interline business.

BY MR. GREENWALD:

Q. But you weren't at this meeting?

A. That is correct.

Q. And no one that you talked to can recall what took place regarding this fuel surcharge discussion, right?

MS. REINHART: Asked and answered.



THE WITNESS: Correct.

BY MR. GREENWALD:

Q. And now the -- does BNSF have a separate fuel surcharge for its interline -- or did BNSF, in the time before or after this meeting, have a different fuel surcharge for its interline traffic?

MS. REINHART: Objection. Beyond the scope.

THE WITNESS: I don't know.

BY MR. GREENWALD:

Q. Did NS have a different fuel surcharge for its interline traffic?

MS. REINHART: Objection. Beyond the scope.

THE WITNESS: I don't know.

BY MR. GREENWALD:

Q. If NS and BNSF are talking about aligning their or synchronizing their fuel surcharges, that is for their joint-line and single-line business, isn't that correct?

MS. REINHART: Objection. Calls for speculation.

THE WITNESS: It is an interline meeting. We would have been talking about the interline traffic with BNSF.



BY MR. GREENWALD:

Q. What -- BNSF did synchronize its fuel surcharge after this meeting, correct?

MS. REINHART: Objection. Beyond the scope.

THE WITNESS: I don't know the answer to that.

BY MR. GREENWALD:

Q. And did so for its single-line as well as joint-line business, right?

MS. REINHART: Objection. Beyond the scope.

THE WITNESS: I don't know the answer to that.

BY MR. GREENWALD:

Q. Did anyone at BNSF when reviewing these minutes say, Hey, this isn't accurate, we should be referring only to -- we only talked about interline business?

MS. REINHART: Objection. Calls for speculation.

THE WITNESS: BNSF, I am not aware of that.

BY MR. GREENWALD:

Q. Did anyone at NS when NS received these



minutes?

MS. REINHART: Objection. Beyond the scope.

THE WITNESS: I am not aware.

BY MR. GREENWALD:

Q. Because you would agree, wouldn't you, that the action item seems to refer to the fuel surcharge of the company and not fuel surcharge on specific interline business, correct?

MS. REINHART: Objection. Calls for speculation.

THE WITNESS: Again, I am going to go back and it was an interline meeting. We would have been talking about interline traffic.

BY MR. GREENWALD:

Q. But there is no evidence that there was -- that was the limitation of the discussion?

MS. REINHART: Objection. Calls for a legal conclusion. Also asked and answered.

THE WITNESS: Nothing that I have heard, nor was I there.

BY MR. GREENWALD:

Q. Now, it refers to a follow-up by Don Seale and John Lanigan, correct?

MS. REINHART: Objection. Misstates the

document.
THE WITNESS: I see John Lanigan and Don Seale's names in parentheses at the end. Yes.
BY MR. GREENWALD:
Q. Do you know what that refers to?
A. Again, I was not at the meeting. My assumption would be it would be -- it would be the -- the individuals that were tasked.
Q. Does anyone recall what Don Seale and John Lanigan were asked to do?
A. No.
Q. And you didn't talk to Mr. Seale about what, if any, follow-up he -- he had regarding this conversation?
A. No. I did not.
Q. And did you review any documents related to any follow-up to this action item at the March 18th meeting?
A. As far as I am aware, this is the only document that I have seen for that meeting.
Q. So you don't have -- you don't have any knowledge as to what, if any, follow-up was done from the action item listed in Smith Exhibit 4?
MS. REINHART: Objection. That is beyond the scope.



THE WITNESS: No. I am not aware.
MR. GREENWALD: It is already marked so I am going to use the previous marked one for that.
BY MR. GREENWALD:
Q. So showing you what was previously marked as Seale Exhibit 43.
A. Yes.
Q. And do you see in the e-mail from Don Seale to John Lanigan in the middle of his e-mail, Also, I see we are both on the list for the NIT league supplier advisory group and I would like to talk to you about this during NFTA along with the fuel surcharge issue we discussed at Norfolk?
MS. REINHART: I am going to object as beyond the scope but also this witness has already testified that he did not speak with Mr. Seale regarding this meeting or follow-up and Mr. Seale already was deposed and the order makes clear that information included in those depositions does not need to be regenerated here.
THE WITNESS: If you can give me a second just to read this real quick and refresh my memory.
BY MR. GREENWALD:
Q. Sure. Take your time.
A. Okay. I am sorry. Can you ask the



question again?
Q. My question is: Are you aware of whether there was a meeting between Mr. Seale, or anyone else from NS, and Mr. Lanigan, or anyone else from BNSF, regarding fuel surcharges at the NFTA meeting referred to in this Seale Exhibit 43?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I am not aware of any meeting.
BY MR. GREENWALD:
Q. What is the purpose of an NFTA meeting?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I don't know what an NFTA meeting is.
BY MR. GREENWALD:
Q. Why don't you take a look at Smith Exhibit 5. Do you recognize Smith Exhibit 5?
A. Yes. I do.
Q. And what is Smith Exhibit 5?
A. They are meeting minutes from the NS/UP alliance meeting in Omaha, on May 14, 2003.
Q. And, now, did you attend this meeting?
A. No. I did not.



Q. Did you speak to, in preparation for today's deposition, anyone from NS who attended the meeting?
A. In addition to the folks that have already been deposed -- I am sorry. Let me restate that.
I did not speak to the ones that have already been deposed. I spoke to Ike Prillaman, Jim McClellan, Steve Renken, Tony Ingram, Mark Manion and Mike McClellan.
Q. And, now, did any of those people recall the discussion on fuel surcharges and various application processes as used by different roads?
A. There is two that -- there is two that had a recollection. Jim McClellan. And, again, it was Ike Prillaman's in the previous meeting. It was a contextual. When I read this section about the fuel surcharge, I got the response -- and, again, I am going to paraphrase here -- oh, yeah, this was around the confusion that the customer base was experiencing and an ease of doing business thing.
Tony Ingram, when I spoke to him, while he didn't remember anything specific, he remembered a general discussion about concerns -- about the discussion going in terms of there was concerns in the

Page 25

customer base that each railroad was going to employ a different process. Those are the only two comments that were -- only two recollections on the fuel surcharge at this meeting.
Q. Now, Mr. McClellan, Jim McClellan, was at the March 18th meeting with BNSF, correct?
A. His name is on the agenda. Yes. Or the minutes.
Q. But he didn't remember the general context regarding the -- any discussion that took place at that BNSF alliance meeting, correct?
A. He didn't bring up the contextual item when we talked about the March 18th meeting. He did bring it up when we talked about the May 14th meeting with UP.
Q. And what was it about the May 14th meeting that reminded him or caused him to bring up the contextual comment?
A. I don't know.
Q. And he -- he didn't remember the actual conversation, is that correct?
A. Correct.
Q. And the contextual comment was that it had something to do with about the customer base?
A. Concerns in the -- and, again, I am

Page 26

paraphrasing here. Concerns in the customer base about the complexity of the fuel surcharge and he used the terms "ease of doing business" from a customer perspective.
Q. Were there -- did you ask him which customers had expressed these concerns?
A. No. I did not.
Q. Are you, sitting here -- sitting here today, are you aware of any customers who expressed these concerns prior to May 14, 2003?
A. No. I am not.
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: No. I am not aware of any.
BY MR. GREENWALD:
Q. Do you know if any specific customers who had expressed those concerns were discussed at this May 14, 2003 meeting in Omaha?
A. I am not aware of any.
Q. Do you know if those customers were interline customers of NS/UP interline movements?
MS. REINHART: Objection. Which customers? He just said he doesn't know of any. I am sorry. I am confused.
THE WITNESS: I am sorry. Can you repeat

Page 27

the question, please?
BY MR. GREENWALD:
Q. Yes. The contextual issue of customers having concerns, were those customers who were interline customers of NS/UP interline movements?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I am not aware of any. I mean, if -- if -- if there was any customers discussed and we are in an interline meeting so I am assuming that they were interline customers but Jim McClellan did not -- did not mention any.
BY MR. GREENWALD:
Q. And, now, what -- what did -- you said Mr. Ingram also had a -- had a recollection?
A. Correct.
Q. What was Mr. Ingram's recollection?
A. And, again, his was not -- his was not contextual. He -- while he didn't remember anything specific, he remembered that the conversation was generally around -- and, again, I am going to paraphrase here -- concerns in the customer base that we all -- "we" being the railroads -- were all going to do something different with regard to the fuel surcharge process.

Page 28

Q. And did he recall any specific customers who brought up these concerns?
A. No.
Q. And did he recall the conversation that took place regarding fuel surcharges in Omaha, May 14, 2003?
MS. REINHART: Asked and answered.
THE WITNESS: Nothing specific, just general.
BY MR. GREENWALD:
Q. Did anyone from NS recall the specific conversation that took place May 14, 2003?
A. None of the individuals I spoke to.
Q. Did anyone from NS take notes?
A. Not that I am aware of.
Q. And these minutes were sent to Mr. Seale for his approval by UP?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: It would appear from the e-mail. Yes.
BY MR. GREENWALD:
Q. And are you aware of whether anyone indicated that the description of the discussion regarding fuel surcharges contained in these minutes

Page 29

is inaccurate?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I am not aware of any. I am not aware of that. No.
BY MR. GREENWALD:
Q. Were any people from NS's law department present at this meeting?
A. Not on the Norfolk Southern side.
Q. Now, was -- are you aware of any follow-up from this meeting regarding the fuel surcharge discussion?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: No. I am not.
BY MR. GREENWALD:
Q. Do you know if any lawyers were involved in any follow-up to this fuel surcharge discussion?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I am sorry. Ask the question again.
BY MR. GREENWALD:
Q. Do you know if any lawyers were involved in the follow-up to the discussion?

Page 30

A. On a --
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: On another document that is this I have seen Greg Summy's name on the participants at the bottom in the follow-up section.
BY MR. GREENWALD:
Q. And what is Greg Summy's role?
A. He is an attorney for Norfolk Southern.
Q. And do you know if he had any role in any follow-up?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: No. I did not -- no. I did not talk to Greg.
BY MR. GREENWALD:
Q. And sitting here today, you don't know if Greg participated in any meeting either over the phone or in person with -- with UP regarding fuel surcharges?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: Correct. I do not know.
MS. REINHART: May I interrupt for a minute? Mr. Ehlers has not yet read and signed the

Page 31

protective order. Could we just take five minutes and do that?
MR. GREENWALD: Sure.
THE VIDEOGRAPHER: We are going off record at 2:29 p.m.
(Recess taken.)
(A document was marked as Ehlers Exhibit No. 1.)
THE VIDEOGRAPHER: Back on the record at 2:34 p.m.
BY MR. GREENWALD:
Q. Showing you what has been marked as Ehlers Exhibit 1. Have you seen this document before?
A. No. I have not.
Q. And do you know if anyone from NS took contemporaneous notes?
A. No. I do not.
Q. Do you know if anyone from NS reviewed handwritten notes at the time from anyone at UP?
A. No. I do not.
Q. In your preparation for this meeting, did you -- for this meeting. In your preparation for this deposition, did you ask the people you spoke to whether they took notes at the meeting?
A. No. I did not.

Page 32

Q. So it is possible that some of the people took notes?
MS. REINHART: Objection. Calls for speculation.
THE WITNESS: It is always possible.
BY MR. GREENWALD:
Q. But no one volunteered that they had notes?
A. Correct.
Q. And you didn't review any -- any notes of the meeting?
A. No.
Q. So showing you what was previously marked as Smith Exhibit 6. Do you recognize Smith Exhibit 6?
A. Yes. I do.
Q. And what is Smith Exhibit 6?
A. Minutes from the BNSF/NS joint marketing meeting on July 30, 2003.
Q. And were there any lawyers present at that meeting?
A. None from Norfolk Southern.
Q. And did you, in preparation for today's deposition, talk to anyone who attended that meeting about what they recollect?
A. I spoke to three of the NS attendees,

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL ) MDL No. 1869
SURCHARGE ) Misc. No. 07-489
ANTITRUST LITIGATION, ) (PLF/AK/JMF)
This Document Relates To: )
ALL DIRECT PURCHASER CASES )

DEPOSITION TRANSCRIPT
VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF PATRICK GLENNON
TAKEN ON BEHALF OF THE PLAINTIFFS
Roanoke, Virginia
July 20, 2010

"HIGHLY CONFIDENTIAL"



APPEARANCES:
On behalf of the Plaintiffs:
SAMI H. RASHID, ESQUIRE
RICHARD WERDER, JR.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

On behalf of Patrick Glennon and the Defendant
Norfolk Southern Corporation:

JOHN M. NANNES, ESQUIRE
TARA L. REINHART, ESQUIRE
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7500
JOHN SHEIB, ESQUIRE
Norfolk Southern Corporation
Three Commercial Place
Norfolk, Virginia 23510
(757) 629-2831



APPEARANCES: (Continued)
On behalf of the Defendant Union Pacific:
GRANT MANDSAGER, ESQUIRE
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
(202) 383-6638
On behalf of the Defendant CSXT:
SHARI ROSS LAHLOU, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
(202) 624-2532

Also Present:
Steve Oakes, Videographer



I N D E X
PATRICK GLENNON


| On behalf of the Plaintiffs: | Examination by: | Page |
|---|---|---|
| PATRICK GLENNON | Mr. Rashid | 7 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | Bates stamp NS_010072905 through 2906 | 20 |
| 2 | Bates stamp NS_019000315 through 0323 | 58 |
| 3 | Bates stamp NS_010072620 through 2624 | 60 |
| 4 | Bates stamp NS 001000194 through 0194 | 68 |
| 5 | Bates stamp NS_010072847 through 2852 | 78 |
| 6 | Bates stamp NS_010072769 through 2770 | 94 |
| 7 | Bates stamp NS_010076782 through 6796 | 97 |
| 8 | Bates stamp NS_010004522 through 4527 | 109 |
| 9 | Bates stamp NS_010073115 through 3121 | 118 |
| 10 | Bates stamp NS_010076080 through 6120 | 125 |
| 11 | Bates stamp NS_010073466 through 3469 | 132 |
| 12 | Bates stamp NS_010073635 through 3636 | 139 |
| 13 | Bates stamp NS_010073840 through 3847 | 148 |
| 14 | Bates stamp NS_010074227 | 158 |
| 15 | Bates stamp NS_007000489 through 0493 | 167 |
| 16 | Bates stamp NS_010026979 through 6980 | 193 |
| 17 | Bates stamp NS_008007078 through 7149 | 195 |
| 18 | Declaration of David T. Lawson | 204 |
| 19 | Bates stamp NS 001000799 through 0806 | 209 |
| 20 | Bates stamp NS_010049047 through 9056 | 214 |
| 21 | Bates stamp NS_010052639 through 2641 | 221 |
| 22 | Bates stamp NS_033000559 through 0561 | 224 |
| 23 | Bates stamp NS_010067325 through 7326 | 228 |
| 24 | Bates stamp NS_010047819 | 232 |
| 25 | Bates stamp NS_010155750 through 5751 | 234 |
| 26 | Bates stamp NS_010074231 through 4232 | 238 |
| 27 | Bates stamp NS_010075153 through 5154 | 239 |
| 28 | Bates stamp NS_010000395 through 0396 | 241 |
| 29 | Bates stamp NS_010049215 through 9217 | 242 |

Page 5

Videotaped deposition upon oral examination, taken on behalf of the Plaintiffs, before Dawn A. Pierce, CSR, RPR, CRR, a Notary Public for the Commonwealth of Virginia at Large, commencing at 8:33a.m., on the 20th day of July, 2010, at the law offices of Woods Rogers, 10 South Jefferson Street, Suite 1400, Roanoke, Virginia.

* * * * *

MR. RASHID: I'm Sami Rashid on behalf of Quinn Emanuel for the plaintiffs.
MR. WERDER: Rick Werder from Quinn Emanuel for the plaintiffs.
MR. NANNES: John Nannes with Skadden Arps Slate Meagher & Flom for Norfolk Southern.
MS. REINHART: Tara Reinhart from Skadden Arps for Norfolk Southern Railway Company and the witness.
MR. SCHEIB: John Scheib for Norfolk Southern.
MS. LAHLOU: Shari Ross Lahlou, Crowell Moring, CSX Transportation.
MR. MANSAGER: Grant Mandsager, Howrey for Union Pacific.

* * * * *

Page 6

EXAMINATION

BY MR. RASHID:
Q Good morning. Please state your name for the record.
A Patrick John Glennon.
Q What is your current home address?
A 6957 Malinda Road, Salem, Virginia, 24153.
Q And your counsel may have gone over some of the basics with you, but I just want to review. If you ever need to take a break during the course of the deposition, please let me know. I will ask that you let me finish my question before you start answering and I will try to let you finish answering before I proceed to my next question.
You understand that you are obligated to testify truthfully to the best of your recollection?
A I do.
Q Is there anything sitting here today that would prevent you from doing that?
A No.
MR. NANNES: Mr. Rashid, if I could just note, I think we should stipulate for the record that any objection made by any of the

Page 7

counsel here on behalf of the defendants will be reserved except as to form.
MR. RASHID: Noted.
BY MR. RASHID:
Q Are you currently employed, Mr. Glennon?
A No. I'm retired.
Q Did you retire from Norfolk Southern?
A Yes.
Q When did you retire?
A First quarter, 2008.
Q And was it a voluntary retirement?
A Yes.
Q What was your age at the time of retirement?
A Just over 60.
Q And what was your title when you retired?
A I don't recall the exact title. Manager of Pricing Systems, perhaps.
Q And do you recall how -- approximately how long you held that position?
A One year or nine months to 12 months.
Q And prior to holding that position, what was your position at Norfolk Southern?
A Director of Marketing Services.

Page 8

Q And how long did you hold that position approximately?
A Perhaps four years, five years.
Q So from approximately 2002 or 2003?
A That would be about right.
Q And when did you first become involved with Norfolk Southern's fuel surcharges?
A Probably 2002, 2003, when I assumed the position of Director of Marketing Services.
Q Prior to that, you didn't have any dealings with fuel surcharge programs?
A I probably did, but it was purely technical. I was in -- prior to that I was in charge of Marketing Services, which included computer systems, that might have involved fuel surcharges.
Q Beginning in 2003 what was your involvement, or 2002/2003, what was your involvement in fuel surcharges?
A I was a manager of Marketing Systems.
Q Okay. And so what was your responsibility with respect to fuel surcharges?
A I was responsible for pricing systems, the data collection and the application of those -- of that data. So the systems I was managing

Page 9

contained the fuel surcharge.
Q To be -- just so the record is clear, you are talking about the period when you were the Director of Marketing Services --
A No.
Q -- or the period prior to that?
A Prior to that.
Q Once you assumed the position of Director of Marketing Services, what were your responsibility with respect to fuel surcharges?
A Okay. From that point on I was in charge of tariff publishing; contract publishing; interline exchange of prices, including fuel surcharges; accessorial services, which some may have contained fuel surcharges; pricing systems, which involved the collection of prices; and E-commerce, which included the posting of prices on the web.
Q When you refer to tariff publishing, what do you mean?
A It was the compilation of tariffs, the distribution of tariffs, the maintenance of distribution lists and the actual mailing of tariffs. Initially it was the mailing. Later on it was the posting of tariffs on the web

Page 10

electronically. That process was essentially automated.
Q And by tariffs, is that synonymous with public authorities?
A Pretty much so.
Q What would be the difference?
A There were -- there was a subcategory of priv -- of regulated and deregulated and it included some accessorial charges. So for the most part I would say it was public, but there was some complexities underneath that.
Q Okay. And by public authorities and tariffs, you mean that would be covering shipments that are regulated by the STB?
A That is the complexity I was talking about. The tariffs include some regulated and some deregulated.
Q Okay. And in contrast to tariffs, you also said you were involved with contract publishing. What does that mean?
A It involved the group. I didn't actually do it myself, but the group that was responsible for it would receive the information that was negotiated with customers that would actually compile the draft contracts, get them

Page 11

approved. Once they were approved internally, they would be distributed to the customer and to the other railroads for signature. If there were any corrections or changes or any issues that had to be renegotiated, the drafts were changed and the drafts were sent out again for signature. After that, the contracts were filed away for safekeeping.
Q Do you know where they were filed away?
A For the most part, they were kept in our building.
Q Do you know if Norfolk Southern maintains a full record of all of its contracts?
A At the time -- at the time, all current contracts were kept -- there was a historical record, but I don't recall exactly how many years we kept them after they expired. I know at some point they were purged, the paper copies were purged.
Q And we have heard of contract publishing or contracts in general. Those are -- those would not be public authorities, correct?
A Yes, I would say that is a fair statement.
Q And is another way of referring to that

Page 12

as private authority?
A It is -- it would be categorized as a private authority.
Q So what specifically would be included under the rubric of private authority?
A Well, contracts, of course; but we also had private quotes, which were essentially contracts without signatures, at least the way I looked at them.
Q Is a price quote different from a signatureless contract or is it the same thing?
A Well, I don't know. That is a legal question that I just -- I just don't know. I have my personal opinions about it, but I don't know what the official answer would be on that from a legal perspective.
Q Just from your own perspective, what would be the answer?
A Well, from an administrator perspective in processing these things, I would say the signatureless contracts and private quotes were essentially the same. The text was slightly different. The signatureless contracts contained some additional verbiage; but from an administrative perspective, they were treating them

the same.
Q And do you know that the terminology you are using today, for example public versus private authorities, was that similar terminology used by other railroads?
A I -- I can't really say. All I -- I wouldn't remember. I know that when we talked about it, we would -- we would understand what the others were referring to, but I don't know if they were using the exact same descriptions.
Q And when you assumed the role of Director of Marketing Services or before then, did you come to understand what the features were of Norfolk Southern's fuel surcharge program?
A I became much more familiar with them once I became Director of Marketing Services. Prior to that I wasn't directly involved.
Q Sitting here today, do you recall when Norfolk Southern first instituted a fuel surcharge?
A My general recollection was 2000 -- in the year 2000.
Q Do you recall the features of that program?
A Roughly.
Q Can you tell me what your recollection



is?
A It was a -- it was a mechanism that was based on WTI, which refers to West Texas Intermediate. The strike price was $28, but the base was 23.
As I recall, if WTI went above 28, there would be a 2 percent increase and there would be a 2 percent increase for every 5-dollar increase beyond that, but the base price was essentially 23.
Q Okay. I would like to mark or I would like to hand the witness what was previously marked as Neikirk Exhibit 5. Just review that document.
A Okay.
Q And is this the original fuel surcharge program you just described?
A It looks like it.
Q And here it says that in the event though a price of West Texas Intermediate crude oil as published in the Wall Street Journal exceeds $28 per barrel for 30 consecutive days, NS retains the right to apply a fuel surcharge to the freight charges in effect on the date the fuel surcharge is applied. Do you see that?
A Which paragraph is that?
Q I'm sorry. That is at the very top.



A Very top. Okay. Yes.
Q Does that refresh your recollection that the strike price was actually $28?
A The strike price was 28, but the base was 23.
Q Okay. So the fuel surcharge wasn't triggered in the last -- the price of oil for some period of time was above the 28-dollar threshold?
A For 30 consecutive Wall Street publication days. I don't know if that is what it says here. It had to be published in the Wall Street Journal for it to actually count as a day.
Q And were you involved in efforts to track Norfolk Southern's implementation of the fuel surcharge?
A Yes.
Q And do you recall if those efforts were successful?
A Yes.
Q You recall that they were successful?
A They were successful.
Q You don't recall that you --
(Whereupon, a gentleman entered the room and Mr. Scheib and the gentleman left the room.)



BY MR. RASHID:
Q Do you recall any problems implementing the original fuel surcharge program?
A I wouldn't call them problems. There were -- the fuel surcharge program was new. There were technological issues. There were renegotiation issues, so there was a -- it took some time to ramp-up the program, but I wouldn't call it a problem.
Q Do you recall during this period of 2000, from when the fuel surcharge was first implemented, until late 2003 the price of oil was generally below $28?
A Well, this is ten years ago, so my recollection isn't the best, but as I recall, it was fluctuating around 28. Around 2002 it may have gone up to 30.
Q Do you recall how often the fuel surcharge was triggered in the period of 2000 to 2003?
A Not precisely. I remember it kicked in at 2 percent and then at some point, maybe 2001, it probably dropped off.
Q And is it your recollection that it was rarely applied during the period of 2000 to 2003?

Page 17

MR. NANNES: Objection as to form.
A It was -- no. As far as I know, it was applied. It was probably applied to all public authorities and it was probably applied to private authorities as they were renegotiating.
Q I appreciate that answer.
A As we could.
Q My question was not perfect. What I'm trying to understand is: Is it your recollection during the period of 2000 -- from 2000 to 2003 that the fuel surcharge implemented in 2000 was rarely triggered due to the price of oil.
A I just don't recall. I would have to have a graph in front of me that would show me the WTI, but I do remember it did kick in at 2 percent, stayed in for a period of time, dropped off and came back on. I don't remember the exact timeframes. I did not study any of those issues in preparation for this. I am just going strictly from recollection.
Q And did you come to be aware that during the period of 2000 to 2003 other railroads were not applying their fuel surcharges aggressively?
(Whereupon Mr. Scheib entered the room.)
A The fuel surcharge presented a lot of

Page 18

technical problems for the railroads in terms of auto-rating, distribution of the revenues through interline settlements. So some railroads had larger problems than others. I recall that some railroads may not have been actually applying a fuel surcharge at the very beginning. They may have instead opted to take general increases on a periodic basis, on a regular basis in lieu of trying to assess the fuel surcharge. As time went on, all of the railroads developed fuel surcharge programs that could be automated. So to answer your question, not all of them were successful initially, but they were later.
Q But did you ever come to an understanding from any of Norfolk Southern's customers that another railroad, for example, CSX, was not applying its fuel surcharge?
A Yes. There were probably some cases. And I'm not a marketing person, so I don't deal directly with the customers on it generally, but in discussions with our marketing people, I do recall there were cases where we were trying to assess a fuel surcharge. In negotiating with customers on private authorities, we were assessing fuel surcharges on competitive bids with other railroads

Page 19

where a fuel surcharge was not being applied and that created some concerns on our part.
Q What concerns were those?
A Well, it is just that when you are trying to negotiate a contract, if you have a fuel surcharge and the other -- and the competitive bid doesn't, it puts you at a disadvantage.
Q And so Norfolk Southern was suffering or possibly suffering loss of business due to competition over fuel surcharges?
MR. NANNES: Objection as to form.
A I would say not because as part of the negotiating process, what you can do is just simply lower the base price and add the fuel surcharge. There are a lot of ways of getting around these issues.
Q So during the period of 2000 to 2003, is it your testimony that Norfolk Southern lowered the base price to implement a fuel surcharge?
A I can't speak to that directly because I'm not a marketing person. I can just -- I can just comment on the information that I was receiving from marketing people.
Q Did you receive information from marketing people that they were discounting base

Page 20

rates to get a fuel surcharge in the period from 2000 to 2003?
A My recollection was that that was an issue, that there was some concern in management that product managers were in fact doing that in some cases and an effort was made to prevent that from happening; but when you are negotiating, all items are on the table.
MR. RASHID: Okay. I would like to mark as Glennon Exhibit 1 a document bearing the Bates stamp NS010072905 to 906.
(Whereupon, Plaintiff's Exhibit No. 1 was marked for identification.)
BY MR. RASHID:
Q If you would, review this document. I'm only going to ask you about a couple of bullet points, specifically on the first page?
A Okay.
Q Are you ready?
A Yeah.
Q I just want to direct your attention to -- well, first of all, is this an e-mail that you wrote on -- to at least Don Seale and potentially others?
A I don't recall writing it, but I'm sure

it is one of my e-mails.
Q At the bottom of the first page you see the initials PJG?
A Yes.
Q And those are your initials?
A Yes.
Q And then up at the top it says DWS?
A Yes.
Q And those are Don Seale's initials?
A Yes.
Q So in the fourth bullet point or fifth bullet point, asterisk of this e-mail, it says, "The raising costs of fuel is built into the price as they are renegotiated. The price of oil has been close to $28 for much of this year, even though the surcharge is first being applied in the fourth quarter." Do you see that?
A Yes.
Q Does that refresh your recollection that -- that during this period the fuel surcharge was not being applied?
MR. NANNES: Objection as to form.
A Well, I knew that the fuel surcharge was not being applied because WTI dropped below $28, so it doesn't refresh it any more than what I was



aware of before.
Q Just to be clear, if you look at the second page of this document, there is an e-mail from Don Seale to Alby Pfeifer, yourself and others dated September 20, 2002?
A Yes.
Q And does that refresh your recollection, that your e-mail was probably sent around September 2002?
A Yes.
Q And so what you are saying here is that for 2002, the surcharge hasn't been applied until the fourth quarter?
MR. NANNES: Objection as to form.
BY MR. RASHID:
Q You can answer.
A Okay. But it was applied in -- I assume it was applied in 2000 or 2001.
Q Right.
My question is: For the period of 2002 until the fourth quarter of 2002, the 28-dollar fuel surcharge was not being -- was not triggered?
A That's -- yes, I agree with that. It must have dropped off. Yeah.
Q When you wrote the raising cost of fuel



is built into the price as they are renegotiated, what did you mean?
A Well, first of all, I'm not a cost expert, so there is probably some assumptions on my part here; but, you know, I -- my assumption at the time was that the Cost Department would adjust cost to some extent to reflect what is going on in the cost of fuel.
Q So in addition to the fuel surcharge, base rates were being increased at the same time?
A Yes, but there are a lot of base -- there are a lot -- there was a lot of price activity going on. We were taking general rate increases at the same time. So whenever there was a general increase, the base rates were adjusted. So in addition to the fuel surcharge, we were taking other increases. So sometimes the line between the two got blurry.
Q So there would be a market base adjustment plus a fuel surcharge?
A Yes, market base adjustment that would probably take into consideration the fact that as fuel goes up, the cost of fuel goes up, the market competitive advantages go to the rail industry and we were able to take bigger increases. So I would



say that the general increases were a reflection of that competitive advantage.
Q Okay. And then in the third sentence of the bullet point we were just looking at it says, quote, Customers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause on newly negotiated private publication with a duration of one year or less. Do you see that?
A Is that the third one?
Q That is the last sentence of the fifth bullet point.
A Yes.
Q And was that accurate at the time it was written?
A Well, let me read it. Well, it indicated to me at the time that we were probably getting some pushback on trying to get the fuel surcharge applied.
Q And you were getting pushback because for the first time at least in 2002 the 28-dollar surcharge was being triggered or potentially triggered?
MR. NANNES: Objection as to form.
A Customers don't like any accessorial

Page 25

charges to begin with. If the fuel surcharge was kicking in at that time at 2 percent, you could expect to have some pushback.
Q So it would have been easier -- what do you mean by an accessorial charge?
A Miscellaneous charges. It is like when you fly on the airplane, they charge you -- they could charge you for your luggage, any kind of related charge that -- that goes in connection with the line haul charges. It could be switching charges, could be demurer charges. There is a long list of related charges.
Q And did you view fuel surcharges as an accessorial charge?
A I don't know. I never thought of it -- thought of it that way, but --
Q Are there any other accessorial charges that you are aware of that are applied as a percentage to the base rate?
A Not that I know of. Accessorial charges tend to be billed the same way, that is why I was considering it an accessorial charges; but most accessorial charges are published in a separate publication, not in the line haul rate publication.
Q So going back to the fifth bullet point

Page 26

in this last sentence, is it true that you are indicating that -- just so the record is clear, that because of the fuel surcharge, the 28-dollar fuel surcharge was first being triggered in 2002, you were getting some pushback on implementing a surcharge in new private authorities?
A Yes, but that is only to be expected. I mean we were taking general increases as well and we were getting pushback on those, too.
Q And in comparison, it was presumably easier in the period from 2001 to 2002, when the fuel surcharge wasn't being triggered, to get customers to agree to a fuel surcharge, right?
A Yes. At that point the fuel surcharge was theoretically billable, so I would say that yeah, customers might not resist it as much; but obviously when you are trying to add another charge on top of what they are already having, it is reasonable to expect some pushback. I --
Q Okay. If we just go down to the -- well, if we go down four bullet points from there to the one that starts "While CSXT," do you see that?
A Yes.
Q Can you read that one for me?

Page 27

A Read it to you?
Q No. You can just read it to yourself. Okay?
A Yes.
Q In the first sentence you write, "While CSXT has an identical surcharge clause, based on customer comments, they appear to be more lax in applying the surcharge to private authorities." Do you see that?
A Yes.
Q Is this the instance you were talking about earlier where you heard from customers that CSX wasn't applying its fuel surcharge?
A What I might have been hearing at the time from our product managers was that -- was that in some cases when they are bidding on traffic, that became the negotiating item.
Q Right.
So this would indicate that during this period CSXT was competing against Norfolk Southern for business on the basis of fuel surcharges, correct?
MR. NANNES: Objection to form.
A Certainly not. The fuel surcharge was just one item of a blend of issues that would be on

Page 28

the table when negotiating. Remember, we are taking general increases, market adjustments. We're changing liability provisions. We are doing -- there are a lot of issues in the blend of negotiating, so fuel surcharges is just one of them.
Q Okay. And then following through on the rest of that bullet point, it says, "This does have competitive implications for NS." Do you see that?
A Yes.
Q Was that accurate when it was written?
A Well, you have to put it in context. I would say it is accurate, but you have to put it in context with the fact that when negotiating, if you have a -- on a particular lane with a particular customer on a particular commodity, if -- when you are bidding, fuel surcharge, whether it is there or not, will have an affect on your competitive position, whether or not you are able to gain that business.
Q So it is accurate then to say that if CSXT was more lax in applying its fuel surcharge to private authorities, that would have competitive implications for NS?
A It would have implications in terms of

Page 41

A I probably did. I don't recall myself, but, you know, maybe somebody in my group might have. Remember, there were a lot of technology issues involved here and there were some -- there could have been some questions on how they were actually going to apply the fuel surcharge. So the answer is -- my answer to that would be I don't recall myself having any discussions with somebody, but maybe somebody in my group did in terms of REN, which is the EDI exchange of prices and how they would actually apply on contracts on joint-line business with CSX.

Q When you say, "I don't recall," do you mean that it didn't happen or there is still a possibility it did happen, but you just don't remember?

A I am pretty confident I personally did not have any discussion was CSX, but I can't say for sure.

Q If you or others in your group were to have a discussion with CSX about fuel surcharges in the 2003 to 2004 time period, who would your counterparts at CSX be?

MR. NANNES: Objection as to form.

A My counterpart -- well, I just don't

Page 42

remember -- I don't remember the gentleman's name. He is in some of the e-mails. I would have to look at the e-mails to get that; but the discussion would have been at a lower level and I don't remember those names.

Q What was -- what was your analysis of the CSX program?

A It definitely was more aggressive. It definitely yielded more revenue. It was quicker to respond to marketing conditions. It had a better notification mechanism for customers, more lead time. On the downside, it was more likely to go down quickly, too, if the WTI were to drop.

Q And sitting here today, do you recall the structure and methodology of the CSX program?

A Yes.

Q Can you tell me what that is?

A It is generally the same as the original, only the -- the -- the incremental increases were not 2 percent, but four-tenths of a percent for every dollar over 23 and there was a monthly averaging mechanism. They got away from the 30 consecutive Wall Street publication days. So there was a monthly average. The percentage increase was announced and then it was applied in

Page 43

the next month.

Q So in comparison to their prior program, under this new program, CSX would recover fuel surcharges above $23?

A Yes. Same base, but they do it actually -- the strike price was actually 23.

Q Right. So the strike price changed?

A Twenty-three to one, yes.

Q The strike price changed?

A The strike price changed, but the base was the same.

Q And you said it was more aggressive. What did you mean by that?

A It tended -- when WTI was on the increase, it tended to provide -- at that particular time, when WTI was going up, it provided a higher yield. Even though the percentages were essentially the same at 28 and 33, it provided incremental increases, which yielded higher revenues at that particular time. Now, conversely, once the WTI went down, it would -- it would -- could reduce quicker than the old standard, but at that time WTI was increasing.

Q And in your discussions with CSX -- skip that.

Page 44

So when CSX contacted you or when there were discussions with CSX about fuel surcharges, those were strictly on joint-line movements, is that your testimony?

A Yes. We are -- we're drilled every year on antitrust issues and we were well aware of what we can and can't talk about.

Q Were those just regulated shipments or also non-regulated shipments?

A They would be all shipments. Our -- the discussions within my area were all technology related. That would include public, private.

Q Okay. Did CSX ever indicate to you that it was its intention to apply a different set of fuel charge methodologies to joint-line traffic as opposed to local traffic?

A I wouldn't -- that would not have been part of the discussion. CSX did post on their web site, you know, what they were doing on public authority, so we could go to their web site to see that, but our discussions were limited to NS/CSX jointly.

Q So you understood then that the CSX fuel surcharge would apply to more than just public traffic; is that right?

Page 45

MR. NANNES: Objection as to form.
A More than just public? Yeah. As I recall, one of the concerns at that time was that we had heard from product managers or possibly -- well, we had heard that they were intending or thinking at least about applying the fuel surcharge on contracts. And since contracts were in my area, our -- my particular concern from an administrative perspective was that they would possibly apply the fuel surcharge on contracts without renegotiating them. So at that time, that was a significant administrative concern for me because I knew if they -- if they attempted to do that, that it would lead to billing problems, collection problems, customer relation issues, that kind of thing. So, you know, if we picked up that they were on joint-line business and on private authorities, just unilaterally change the fuel surcharge, that was a significant issue for me.
Q And when -- in the process of analyzing CSX's fuel surcharge, did you analyze adopting that program just with respect to Norfolk Southern's joint-line shipments?
A At that time we did an analysis. I don't know if we were actively considering a switch

Page 46

or not.
Q But my question is a little different. Was the analysis just limited to joint-line traffic or was it a broader analysis that covered all of NS's traffic?
A Okay. Rephrase it again, just the exact same one. I missed the punch line.
MR. RASHID: Just read it back.
(Whereupon, the last question was read back.)
A Okay. Our fuel surcharge analysis generally covered everything, not just CSX. I mean if we were to do an analysis of the CSX, if we were to do it, I can't speak for exactly what we did at the time, but if we were to do an analysis of the new CSX program at that time, we probably would have applied it to everything in the analysis just on a theoretical basis. I mean we probably -- well, yeah, that is it.
Q So you weren't -- so it is accurate to say that when you would analyze CSX's program in 2003, your analysis was not limited to just interline traffic?
A It probably broke it down. I suspect we had some reports that had it broken down by local

Page 47

interline. That would be my -- that would be my assumption, but I can't state it for sure. I would have to go back and look at some of the reports that we did.
Q Sitting here today, is it your recollection that the analysis that Norfolk Southern performed in deciding whether to adopt a CSX line fuel surcharge was limited to interline traffic?
MR. NANNES: Objection to form.
A My -- my recollection was that we conducted a lot of analyses that probably would have included joint-line and local traffic.
Q And was it your understanding that CSX was going to apply this new fuel surcharge to both local and interline traffic?
A My understanding was that they were going to do it on interline. What they did on local, I wasn't aware of; but my concern was private authorities, private interline authorities with CSX. I was afraid they were going to unilaterally change the surcharge provisions on negotiated agreements.
Q And how many private authorities does NS have with CSX or had at this time?

Page 48

A I -- I don't -- I really don't know.
Q Well, let me rephrase it this way: A proportion of Norfolk Southern's interline business, does Norfolk Southern have more price authorities with CSX or with UP?
A Probably with the UP. I would say that our connections with the western carriers probably produce more traffic than would CSX.
Q Significantly more traffic?
A I -- I can't give you a percentage. I just don't recall. We had those numbers at the time, but I just don't recall what they were.
Q And do you have a rough sense of -- I mean just a rough sense in 2003/2004 how many joint-line private authorities CSX had with NS?
A The problem is that at that time we were -- we were re -- we were restructuring our databases and we were consolidating our tariffs and contracts from numerous small publications into larger publications so that we wouldn't have as much of an administrative burden to reproduce all of these documents. So it is -- it is hard for me to really peg exactly what was going on in terms of the absolute numbers. All I can tell you is that we were significantly reducing the number of

documents out there.
At one point -- I don't know what year, but at one point we may have had as many as six to 7,000 contracts in effect at any one time. Then later on, in later years, it probably got to down under 1500. Now, what was in effect at any given time, I have no idea.
Q But you couldn't say, for example, in the later period, where there might have been 1500 contracts, how many approximately were with CSX?
A If I had to guess -- well, I shouldn't guess.
Q Was it more than a dozen?
A Oh, yeah, I would think so.
Q More than 100?
A Probably, but I don't know. There are people at NS that can probably answer that question better than I can.
Q Did you come to learn that CSX expected customer resistance to the new fuel surcharge program?
A Repeat your question.
Q Did you come to learn that CSX expected customer resistance to its new fuel surcharge program?



MS. LAHLOU: Object to the form.
A Just like we could expect to have resistance, we assumed that CSX would have resistance because their new program was more aggressive. And considering the fact that we did in fact have resistance, we would expect they would have resistance as well. By resistance on our part, I'm not talking about the implementation of the original fuel surcharge.
Q And in fact, it was likely that they would have more resistance because it was a more aggressive program; is that right?
MS. LAHLOU: Object to the form.
A That is a reasonable assumption, but I don't know specifically what was going on at CSX.
Q You testified earlier that in the fourth quarter of 2002, when fuel prices were rising, you were seeing resistance to the existing fuel surcharge program, right?
A Yes.
Q So it seems logical then that in an area of rising fuel charges with a more aggressive fuel surcharge, you would see more customer resistance, is that right?
A That is reasonable.



Q And did Norfolk Southern eventually adopt the same program that CSX adopted in 2003?
A Yes. I don't remember the exact lag, but it might have been as much as a year maybe. Later NS did in fact adopt a program similar to what CSX had.
Q And why was -- why did it take a year?
A We were just analyzing the issue a lot. There was constant analysis. There was some -- there was some concern what was happening in the industry as far as market competitive issues. We were taking gentle increases. We were changing some conditions of carriage that could produce some additional customer pushbacks. So with all of these things in the mix, I think the decision was not just to sit back and see what happened.
Q Wasn't the main reason that Norfolk Southern held off adopting a new fuel surcharge program is because you couldn't do it across the board all at once?
A No, that is certainly not true. We certainly could have implemented the new fuel surcharge on public authorities immediately and we could have started to apply the fuel surcharge on private authorities as they renegotiated. Since



the majority of them get renegotiated once a year, we could have had a pretty significant conversion pretty quickly.
Q And what percentage of Norfolk Southern's business is under public authorities?
A You know, I can only guess.
Q Just give me your general approximation?
A Thirty to -- 25 to 40 percent, maybe.
Q And when Norfolk Southern -- do you recall when the final decision was made to adopt a new fuel surcharge program?
A Yes, I do have some recollection of that.
Q When was that decision made?
A That decision was made in -- at the very end of 2003, early 2004.
Q Do you recall why the decision was made then?
A No. We were providing information to management and they advised us that we were going to switch.
Q So is it fair to say you weren't in the room when the decision was made?
A No, I definitely was not.
Q And you were never provided information

Page 53

after the fact of the reason why the decision was made at that time?
A No. I mean we were providing a lot of analyses with pro/con statements, but I was never given any specific reason.
Q And when Norfolk Southern adopted the new fuel surcharge program, what was it intended to be applied to?
A My -- I haven't really thought about it in those terms, but I am pretty confident that it was intended to eventually apply to everything.
Q And was it intended to apply to joint-line shipments?
A Let me rephrase -- let me correct one point. There were a lot of fuel surcharges out there that were nonstandard -- that were nonstandard. They weren't the normal fuel surcharges that we had been discussing that were negotiated and they were unique, so I had to take that off the table. So when I say we were going to apply it to everything, we were going to apply it to everything that wasn't specifically negotiated to be different.
Q And when you say you were going to apply it to everything, the intention was to apply it to

Page 54

all interline traffic?
A All interline --
MR. NANNES: Objection as to form given his prior response.
BY MR. RASHID:
Q Okay. It was your intention -- it was Norfolk Southern's intention to apply the new surcharge program to as much interline traffic as possible?
A Where there were unique terms already negotiated in place.
Q But when those unique terms -- when that contract came due, was it the intention to try to get this new fuel surcharge in place on those shipments?
A Not necessarily. You know, some of these contracts were rather large and they were heavily negotiated, so there was a possibility that they would negotiate those fuel surcharges on those agreements and then there is just as much a possibility they wouldn't.
Q But there wasn't a directive of any sort that you should apply the standard fuel surcharge program?
MR. NANNES: Objection as to form.

Page 55

A I don't recall anybody saying you can't -- there was -- I don't recall them saying you couldn't do a nonstandard fuel surcharge. I know there was pressure to apply a fuel surcharge, but that is about as far as it went as I recall.
Q And there wasn't a pressure to apply the standard fuel surcharge?
A I think the majority of the pressure was to make sure that a fuel surcharge was in place. And remember, at this time we did not have 100 percent coverage on fuel surcharges, so the primary focus was on getting a fuel surcharge on there. And when negotiating private agreements, private contracts, trying to get a fuel surcharge is difficult so that there is a -- there is a tendency to want to do nonstandard fuel surcharges or reduce the base price in lieu -- in return for getting a fuel surcharge, so there is a mix going on.
So I can't say that they said just use the standard and don't do anything else. I mean there was pressure not to reduce the base price, to get a fuel surcharge applied, and there was pressure to have a fuel surcharge on there.
Q Just so the record is clear, it is your

Page 56

testimony that there was no policy to apply the standard fuel surcharge to as many shipments as possible?
A There is a policy to have a fuel surcharge applied. That was my primary recollection. And we produced numerous reports to show what kind of -- to show what our coverage was in terms of fuel surcharges and there are reports as to tracking the collection of revenues and the success we were having and applying the fuel surcharge.
Q And NS never announced publicly or to its customers that it was -- its intention to apply this new surcharge to as much traffic as possible?
A I don't know if that was ever made a public announcement.
Q Why don't we -- I will hand out what has previously been marked as Neikirk 6. And I'm actually just going to ask you some questions on the first paragraph specifically. And I will ask you just to identify the document, but you are free to read it if you would like.
MR. NANNES: Can we go off the record for a second?
THE VIDEOGRAPHER: Going off the record

Page 57

at 9:40 a.m.
(Off the record)
THE VIDEOGRAPHER: On the record at 9:40 a.m.
BY MR. RASHID:
Q Have you had a chance to review the document?
A Yes.
Q And you recognize this as a printout from Norfolk Southern's web site?
A Yes.
Q And does this print out reflect the fuel surcharge program that Norfolk Southern adopted in 2004?
A Yes.
Q And this program that was adopted, it was the result of or it followed the analyses you did in 2003 about fuel surcharge programs?
A This program was part of the analysis, yes.
Q And this program reflected here, this is the same program that CSX had adopted in 2003; is that right?
A Yes.
Q And you see if the first paragraph, in

Page 58

the second sentence, it says the revised surcharge program applies to all local and joint-line traffic moving on NS issued price authorities, public and private.
A Right.
Q Does that refresh your recollection that it was the intent of Norfolk Southern to apply this program as broadly as possible to all traffic?
A Yes, but it doesn't -- yeah. Yes.
MR. RASHID: We can take a break.
THE VIDEOGRAPHER: Going off the record at 9:41 a.m.
(Whereupon, a short recess was taken.)
THE VIDEOGRAPHER: On the record at 9:52 a.m.
(Whereupon, Plaintiff's Exhibit No. 2 was marked for identification.)
BY MR. RASHID:
Q All right. Mr. Glennon, I would like to mark what -- a document bearing the Bates stamp NS019000315 to 323. And just so this is clear for all here, it appears that in printing these exhibits blue separator sheets were inserted between attachments to e-mails.
And I plan on only asking you about the

Page 59

first e-mail on the first page. If you want to look through the rest of the document, feel free to do that. I just have a couple of questions on the full paragraph.
A Okay.
Q You will see -- can you identify this as an e-mail from yourself to Don Seale and Charlie Brennan -- Brenner on March 24, 2003?
A Yes.
Q And do you recall if this is around the time when CSX announced it was going to be adopting a fuel surcharge?
A It appears to be, yes.
Q In the third paragraph of your e-mail you say, "If we were to adopt something like CSXT's," we could simply -- "we could not simply announce it and have it apply across the board."
A Yes, I see that.
Q What did you mean by across the board?
A Well, I was probably referring to the fact that we have a lot of contracts and we probably would not want to apply the fuel surcharge on negotiated -- on previous negotiated contracts.
Q And you weren't limiting -- when you say across the board, this would cover both interline

Page 60

contracts and other contracts?
A Yes. It would -- I think it was a general statement saying that regardless of the publication type, there would be some limitations and being able to apply it across the board.
Q Did you understand CSX was planning to apply their fuel surcharge across the board?
A We had picked up some indications that they were thinking about it, which would have been a problem with us on our joint contracts with CSX.
Q Where did you get those indications from?
A I don't recall.
Q And you communicated those indications to Don Seale and other executives at NS?
A I probably did.
MR. RASHID: Put that aside. I'm going to mark as Neikirk 3 -- I'm sorry -- Glennon 3 a document with Bates stamp NS010072620 to 624.
(Whereupon,Plaintiff's Exhibit No. 3 was marked for identification.)
BY MR. RASHID:
Q I direct your attention to the e-mail on the top of the first page.

Page 81

Q And then you list a number of reasons below about the case against adopting the CSXT standard. Do you see that?
A Yes. Yes, I do.
Q And do you recall at this time whether you were only analyzing adoption of the CSXT standard or were you considering other options as well?
A My general recollection is that we were looking at all options.
Q And the third bullet point under Ease of Doing Business on the first page, you write -- where it says Common FSC Standard, do you see that?
A Yes, I do.
Q And in the third line down you write, "CSXT has announced. The UP hasn't announced but it appears that it will." Do you see that?
A Yes.
Q Does this indicate that you had some sort of knowledge about UP's upcoming fuel surcharge announcement before it -- before it was actually announced?
A No. I -- once again, there is -- there are some discussions on a technical basis, but I have no basis for knowing that that occurred in

Page 82

this case or not. It is possible some concurrence requests have been issued. I don't know at this point.
Q And under the bullet point Common FSC Standard, at the bottom of it, the last two lines, you note that, That would leave only BNSF and the Canadians out of synch. This assumes the carriers are able to make the new standards stick." What did you mean by that?
A Well, at this particular point I -- it appeared that UP was moving toward the CSX standard, so that would have -- that would have created a -- more of a common standard within the rail industry. The more railroads you get, the more gravity it generates.
Q So you viewed it as something that would be useful if the Class I railroads all had the same fuel surcharge standard?
MR. NANNES: Objection as to form.
A I'm looking at it strictly from an administrative point of view. The more standards you have out there, the more problems you are going to have with billing, customer confusion, rate administration. If every railroad had a significantly different fuel surcharge, it would

Page 83

make the bidding process on contracts more complex for customers and for the railroads. So there are some inherent advantages to limiting the number of variations out there, but that is strictly my opinion and strictly administrative.
Q From an administrative standpoint, you would agree that you viewed the adoption of a single standard by all class of railroads to be a beneficial thing?
MR. NANNES: Objection as to form.
A It would have some advantages in price administration.
Q Under -- on the second page there is a heading called Revenue Issues at the top of the page. Do you see that?
A Yes.
Q There is a bullet point that says customer push back. And it reads, "Where we currently have customers on the FSC, we run the risk of losing the surcharge altogether." Do you see that?
A Yes.
Q Was that accurate when written?
A Given the fact that there is customer resistance to any rate increase or any price

Page 84

increase, yes, I would say that is accurate.
Q But your writing here, just because you have customers on the old fuel surcharge, doesn't mean you could get them on a more aggressive fuel surcharge; is that right?
A There could be some resistance.
Q And in the last sentence of that paragraph you write, quote, the loss of the FSC clause with just a few major customers could offset the gains derived from the new SFC -- from the new FSC. Excuse me.
A Yes.
Q And so what -- when you refer to the gains derived from the new FSC, what are you referring to?
A I'm referring to the incremental increase that we would derive from the fuel surcharge by switching fuel surcharge programs.
Q So you are -- essentially you mean the additional revenue that would be yielded by a more aggressive fuel surcharge program?
A Right. But what I don't really mention here is the fact that when you renegotiate with the fuel surcharge, we are also taking general increases, so you have to blend those revenues into

Page 85

the mix. So if we are taking aggressive increases, it would be a rate increase in addition to a fuel surcharge switch.
Q Right.
A It all fits into the blend.
Q But it is fair to say that in the first sentence you are talking about losing customers who are already on the 28-dollar fuel surcharge. And you are suggesting here that the loss of the fuel surcharge clause by trying to push a more aggressive fuel surcharge could offset any revenue gains from adopting any fuel surcharge program, is that correct?
A It is conceivable.
Q That is what you wrote, right?
A Yes.
Q And then the third point you write Technical Issues. And actually, if you could read these two bullet points under there, and I will just ask you some questions.
A Okay. Okay.
Q What are the technical issues that you are describing here?
A Well, NS initially put the full text fuel surcharge conditions in the publications

Page 86

and -- whether it be public or private. And if you want to make a wholesale change to your fuel surcharge program, you would have to change those conditions in the publications.
Q So, for example, if Norfolk Southern had a private local contract with a customer in the period from 2000 to 2003, the fuel surcharge language would be embedded in the contract itself?
A Yes.
Q And again, when we refer to contracts, that could mean private authorities or private publications as well? Are those terms synonymous?
A Private and --
Q Private authority -- is private authority the same as a contract?
A It is a -- it is a broader -- it is a broader definition. Under the private -- it would include private quotes, contracts, and signatureless contracts.
Q And the core issue here you are identifying is even if Norfolk Southern decided to adopt a CSXT-like fuel surcharge, it couldn't do it across the board for all of its business?
A Not in one fell swoop. Well, let me correct that. We technically could, but we would

Page 87

be violating the terms of the contracts in my opinion.
Q So there were contractual reasons against doing it across the board?
A I'm not an attorney, so -- but in my opinion, it would not have been advisable to do that from an administrative point of view, customer pushback.
Q And so in response to these technical issues, did Norfolk Southern take any actions?
MR. NANNES: Objection to the form.
A As far as at this point, no action was taken; but I don't know if that was because of the technical limitations or we just didn't want the change.
Q But did -- my question was a little unclear. Did Norfolk Southern take any actions to address these technical issues.
MR. MANSAGER: Objection to the form.
A Well, at some point a change, a new approach was initiated where the fuel surcharge was embedded in the conditions of carriage. In some cases the fuel surcharge was applied to a reference in the publications to the conditions of carriage, but only in some cases.

Page 88

Q When you say in some cases, do you have a rough sense of how many?
A I don't know the exact timeline as to when this actually occurred, but I suspect at some point we changed the public authorities, changed them fairly quickly, probably over the course of weeks or a couple of months, and contracts were probably done on a case by case basis.
Q So when you say contracts were done on a case by case basis, during the period from 2000 -- in 2003 until Norfolk Southern adopted its new program, Norfolk Southern would attempt to make -- just make a reference to the conditions of carriage in the contract rather than embedding the 28-dollar fuel surcharge in the contract itself?
MR. NANNES: Objection as to form.
A I don't remember the timelines, but I said at some point the use of the conditions of carriage is the way to apply the fuel surcharge once it is instituted.
Q Right.
So in 2003, if a customer's contract came up for renegotiation or during -- sorry. Strike that.
During this period when you were

implementing this process, if a customer's contract came up for renegotiation, an effort was made to have the contract refer to the conditions of carriage which contained the fuel surcharge; is that right?
MR. NANNES: Objection as to form.
A In some cases. In cases where the contract provided for no fuel surcharge or a modified fuel surcharge program or a -- some other form of escalator, then that approach was not taken.
Q There was a blanket policy within NS that if a customer did not have a fuel surcharge in its current contract, that when it came up for renegotiation, you would try to get a fuel surcharge in it?
A There was a marketing initiative to try to get a fuel surcharge applied. I know there was some management oversight on that issue.
Q So suffice it to say, during this period when you are doing this transition, if a customer didn't have a fuel surcharge in the contract, Norfolk Southern would try to get the contract to refer to the conditions of carriage that incorporated a fuel surcharge?



MR. NANNES: Objection as to form.
A Or a modified fuel surcharge was negotiated or an escalator was negotiated or a no fuel surcharge was negotiated into the contract.
For example, you could have customers that would take a general increase to the base rate of the fuel surcharge. In a few cases I think we did that.
Q My question was a little different. During this time of transition, was there an effort at NS to get -- if a contract didn't have a fuel surcharge provision in it, when it came up for renegotiation, did you have the renegotiated contract incorporate a reference, the conditions of carriage, which contained the fuel surcharge?
MR. NANNES: Objection, asked and answered.
A If you want a blanket-wide answer, it is no.
Q There was no effort to impose a fuel surcharge at this time?
A That wasn't your question. The issue here is -- my answer to that question is we attempted to put a fuel surcharge on there. You know, it could take various forms. It could even



take a form of surcharge none and we would have even considered that to be a form of fuel surcharge escalation because we probably took an increase to the base rate.
Q So you don't recall during this period of time that Norfolk Southern was laying the ground work for the potential implementation of a new fuel surcharge program by removing the fuel surcharge from private authorities and placing a reference in the conditions of carriage?
MR. NANNES: Objection as to form.
A There was -- at this point there was a -- there was a general shift in the way we were going to reference the fuel surcharge and apply the fuel surcharge, but it took many different -- you know, there are many exceptions to that.
Q Okay. Acknowledging your testimony that there are many exceptions to that, was there a general policy in place during this time of transition whereby NS would try to incorporate a reference to conditions of carriage in a private authority and that conditions of carriage would contain a fuel surcharge?
MR. NANNES: Objection as to form.
A Yes. There was an attempt to apply the



fuel surcharge or a have a fuel surcharge there. And if -- notwithstanding any other exceptions, if they were negotiated, then it would have involved a reference to the conditions of carriage.
Q And these technical issues that we have been discussing, they were a key reason why Norfolk Southern couldn't effectuate an across the board change to its fuel surcharge program for all customers at this time?
MR. NANNES: Objection to form.
A No. I mean this was -- the conditions of carriage change was a procedural thing, an administrative tool. We could have applied the new fuel surcharge right away, once the decision was made to all public authorities, and we could have started applying the change to contracts as they were renegotiated. The conditions of carriage wasn't an absolute requirement. As a matter of fact, I believe we -- that is the approach we ended up taking.
Q If you turn to the page with the Bates stamp 2851, which I believe is the next page, it is right -- do you see the paragraph which starts, "Since we have less latitude?"
A Yes.

Q And you write, "Since we have less latitude than the CSXT to make wholesale changes, my recommendation, if we opt to adopt CSXT's standard, would be to" -- and there are a number of bullet points listed there?
A Yes.
Q So was it your recommendations that -- well, describe to me what your recommendation was.
A Well, first of all we obviously hadn't made any decision as to whether or not to adopt it or not; but my recommendation was that -- for procedural reasons, to begin the switch to conditions of carriage just in case later we decided to use the approach we thought the CSX was going to be using.
Q Right.
And if you go back to the previous page at the bottom, above the section where it says Contracts in bold, you say, "We're visiting a key point made earlier." So you viewed this procedural issue as a key issue, is that right?
A Well, I personally did not; but in terms of ease of implementation, it was a consideration. It wasn't a limitation.
MR. RASHID: Okay. You can put that



aside. I would like to mark as Glennon Exhibit 6 a document with the Bates stamp NS010072769 to 770.
(Whereupon,Plaintiff's Exhibit 6 was marked for identification.)
BY MR. RASHID:
Q I would like to direct your attention to the second e-mail from the top on the first page. Can you identify that as an e-mail from yourself to Tom Bayrer and Charlie Brenner dated April 22nd, 2003?
A Yes.
Q And at the bottom -- last paragraph of the e-mail you say, "The sleeper issue here is that MDSE NS opted to insert, not just a reference, the FSC in all its publications." Do you see that?
A Which paragraph is that?
Q I'm sorry. The last paragraph of that.
A The sleeper issue, yes.
Q Then you actually write, "We have to rewrite every publication to change it."
A Yes.
Q And so during this period of transition, were you trying to republish each publication?
MR. NANNES: Objection as to form.



A My recollection was that we were probably republishing the public authorities. And as private authorities came up for renegotiation, we were probably at that point making the change; but I don't really know for -- I don't have any direct recollection of that.
Q Then you write, "After two years of head knocking to get customers to agree, 80 percent compliance by publication, it is not a forgone conclusion that could simply swap out in favor of a higher cost/maintenance formula." Do you see that?
A Yes.
Q Is that accurate when written?
A I would say that was a fair statement.
Q And is it also fair to say you meant to say that it would be generally more difficult to get customers to accept a fuel surcharge at a time of rising fuel prices?
MR. NANNES: Objection as to form.
A As with any price increase, you are going to run into some resistance. At this particular time, we were taking rather generous price increases as well.
Q Based on this statement and your previous testimony, is it fair to say that customer



resistance to fuel surcharges would increase as fuel prices exceeded the strike price of a given fuel surcharge program?
A Well, the fuel surcharge program had been in effect for three years at this point, so some of the -- some of the initial resistance might have given way; but if you are going to a more aggressive program, you could assume more resistance.
Q But even under the previous program, if it had not been triggered or rarely triggered as fuel prices increased and the surcharge was actually triggered, you would face increased customer resistance; isn't that right?
A My duties were strictly administrative, so I'm operating under the assumption that there would be some customer resistance, but the teams were the ones that actually had to deal with it and they would be able to answer that question better.
Q It would be more -- it would be reasonable to assume that there would be more customers'resistance to a more aggressive fuel surcharge than a less aggressive, correct?
MR. NANNES: Objection as to the form.
A That would be my assumption.

Page 97

MR. RASHID: We will mark as Glennon Exhibit 7 a document bearing the Bates stamp NS010026782 to 796.
(Whereupon,Plaintiff's Exhibit 7 was marked for identification.) I'm
BY MR. RASHID:
Q I'm just going to direct your attention to the first doc -- the first page of this. There was a number of pages to this. We just tried to produce the documents that were produced.
So can you identify Glennon Exhibit 7 as an e-mail from you to Charlie Brenner, David Lawson, others, dated April 25, 2003?
A Yes.
Q And it says that the FSC meeting is confirmed for -- you write that the FSC meeting is confirmed for 2:30 this afternoon?
A Yes.
Q Do you have any recollection of the discussions at this meeting?
A None whatsoever.
Q Do you have any recollections of whether you just were analyzing the CSXT fuel surcharge or some other variance fuel surcharges?
A None whatsoever.

Page 98

Q And down below there is an e-mail from yourself to Don Seale, Charlie Brenner and Alby Pfeifer dated April 7, 2003. Do you see that?
A Yes.
Q Again, you identify in the last paragraph, you say, quote, we cannot take the CSXT approach and announce a change across all publication types effective on a specific date. Do you see that?
A Yes.
Q Did you have an understanding that that was the desirable goal, to -- for NS to apply a new surcharge across all publication types on a specific date?
MR. NANNES: Objection as to form.
A I wouldn't categorize it as desirable. There was an issue that was on the table that we were reviewing.
Q Why was it an issue on the table?
A Well, it appeared at the time that CSX was going to employ a tool that would apply the fuel surcharge in a broader, quicker manner. We felt that, you know, we could not take that same approach because of some of the ways we had published.

Page 99

Q So Norfolk Southern was considering ways that it could apply a potential new fuel surcharge across all publication types?
MR. NANNES: Objection to the form.
A I don't think any decision had been made to apply the fuel surcharge. This just brought to light an issue -- an administrative issue in the way fuel surcharges are published.
Q But it is fair to say there was an administrative condition that prevented Norfolk Southern from adopting a new fuel surcharge if it chose to adopt one across the board at one time?
A I wouldn't characterize it as that. I would say the way NS published it, there would have to be a phased implementation. It certainly didn't prevent an implementation of a fuel surcharge. It just prevented the manner or the scope in which it was applied.
Q But was there any desirability to apply a new program all at once across the board?
A If WTI were spiking and you wanted to get a more aggressive fuel surcharge, there could be some advantages, but that wasn't really the issue.
Q What would those advantages be?

Page 100

A You -- if you were to take such an approach, assuming it would work, then you would be able to apply the fuel surcharge across the -- across all publication types. Now that is not to say that we -- that I personally felt that that was feasible or desirable.
Q Wouldn't it also decrease customer pushback if all customers were getting a new fuel surcharge around the same time?
MR. MANSAGER: Objection to the form.
A Some customers objected to any fuel surcharge, so I don't know how to answer your question really because any change in the fuel surcharge, any general increase is going -- it is logical that you could meet some resistance.
Q But if you are treating all of the customers -- all of NS's customers the same in one bump, fell swoop, applying a new fuel surcharge, you are likely to see less customer resistance because all customers are in the same boat?
MR. NANNES: Objection to form.
A Absolutely not.
Q Why not?
A Because if you -- if you do that to 100 percent of your customers, you are obviously

Page 101

going to get a higher percent of your resistance. It just doesn't make any sense because we had numerous exceptions to the fuel surcharge. NS would -- I don't -- at that time I didn't believe NS would actually apply the conditions of code -- conditions of carriage approach to private contracts. It was just a -- it was just an administrative exercise we were going through here looking at the pros and cons of what we thought CSX might be doing.
Q But it is true that eventually you did announce a fuel surcharge that was going to be applied to all of Norfolk Southern's traffic or as much traffic as possible; isn't that right?
A A -- eventually NS did announce a change in the fuel surcharge program and the approach that was taken was not the 100 percent conversion using the conditions of carriage approach. So --
Q But NS had taken efforts in a period prior to that announcement to attempt to get as many authorities under the new fuel surcharge as possible once it was announced; is that right?
MR. NANNES: Objection as to form.
A Since 2000 NS was attempting to get as many publications under some form of fuel

Page 102

surcharge, so it was an ongoing effort.
Q That wasn't my question. My question was: Faced with the technical issues that you have identified in the documents we have been looking at, from the period of identifying those issues to the period of announcing the fuel surcharge, Norfolk Southern did take steps to try and remedy those issues, isn't that right?
A The approach that NS eventually adopted and the rapidity or the speed in which the fuel surcharges were applied to new publications was identical or similar to what it would have been had this conditions of carriage issue never -- had never come up. This issue was purely an administrative exercise. The way NS ultimately did apply the fuel surcharge was on a case -- on a -- the way it would have been done had this condition of carrier issue not existed, we applied the fuel surcharge on public authorities right away and then we applied them on private authorities as they came up for renegotiation. That would have been the approach we would have taken had the condition of carriage issue never existed.
Q So Norfolk Southern didn't take any efforts to insert a reference, the conditions of

Page 103

carriage, in private authorities during this period?
A There was an effort, but it was -- it had no affect in the way it was actually -- in the way the fuel surcharges were actually billed or applied. I -- well --
Q So let's take an example. If in the middle of 2003 Norfolk Southern negotiates a new contract with a shipper and as a result that contract now contains a reference to the conditions of carriage, in mid 2003 that shipper is paying the 28-dollar fuel surcharge, right?
A Uh-huh.
Q And then once NS announced its new program that was made effective March 1st, 2004, that same shipper, without doing anything else, would be charged the new more aggressive fuel surcharge, right?
A (Nods head affirmatively).
Q And that was an effort within -- when asked to make that change?
A Yes, but the way the fuel surcharge was published is irrelevant in terms of an accounting perspective. There was no limit -- it offered no limitation compared to the way we actually did it.

Page 104

Q Well, taking this same example, are you aware of efforts within Norfolk Southern to apply a new 23-dollar strike price surcharge on shippers in mid 2003?
A No.
Q And so the mechanism we just described enabled Norfolk Southern to immediately apply a new fuel surcharge on a private price authority that had been previously incurring surcharges under the old program?
MR. NANNES: Objection as to form.
A Had NS decided to apply the new fuel surcharge back in 2003, then they could have used the conditions of carriage approach on public authorities.
As far as I'm aware, there was never any -- well, I'm just not a market person. I really don't know what the intentions, long-term intentions were.
MR. RASHID: I just would like you to answer my question.
Could you read back my question?
(Whereupon, the last question was read back.)
BY MR. RASHID:

Page 105

Q Yes or no?
A Did it allow us to? I think it is a legal question, whether you can apply the -- a fuel surcharge retroactively essentially to a private authority without renegotiation. I -- my personal opinion is you couldn't.
Q I'm sorry. I think we are talking past each other. My example is in mid 2003 a shipper negotiates a new contract, whereas -- and that shipper previously had a 28-dollar fuel surcharge written into the contract.
A Right.
Q As part of that renegotiation process, the shipper now has a reference to the conditions of carriage.
A Right.
Q And so on day one, when that contract is in effect in mid 2003, that shipper would be subject to the existing fuel surcharge program, correct?
A Yes.
Q And that is the 28-dollar fuel surcharge?
A Yes, no change to the terms of the fuel surcharge.

Page 106

Q And as a result of incorporating a reference to the conditions of carriage in that contract, when NS announced a new fuel surcharge program, that shipper was immediately subject to the new fuel surcharge program; isn't that right?
MR. NANNES: Objection as to form.
A On public authorities, yeah.
Q But my example is a private authority.
A To me, it is a theoretical argument. I'm not an attorney. I don't know if that was -- would be an appropriate way of handling it.
Q Sitting here today, you are not aware of -- on the date that Norfolk Southern made effective its new fuel surcharge program, for those private authorities that had incorporated or referenced the conditions of carriage, were they subject to the old or new program?
A This would be all the way -- this would be a year later almost.
Q Exactly.
A This here.
Q Right.
MR. NANNES: Objection as to form.
BY MR. RASHID:
Q Would they be subject to the new fuel

Page 107

surcharge program?
A If it was negotiated with the conditions of carriage containing the fuel surcharge at that particular time, I would say probably yes.
Q But if the negotiation occurred in mid 2003 and the contract in mid 2003 had a reference, the conditions of carriage, didn't have a fuel surcharge provision in the contract, as of March 1st, 2004, when Norfolk Southern's new program went into effect, would that shipper be charged the 23-dollar fuel surcharge or the 28-dollar fuel surcharge?
MR. NANNES: Object to the form again.
A My rec -- my recollection was that if -- in a situation like that, the -- when we changed the fuel surcharge in 2004, which was a year after this, that we did not assess the fuel surcharge that was in the conditions of carriage. I think we had an informal agreement to protect the provisions of the contracts that were in effect at that time that it was negotiated and only actually started billing the new fuel surcharge when it was renegotiated. That was my understanding, my recollection. I think there are some e-mails that will probably confirm that.

Page 108

Q And would one be able to tell from Norfolk Southern's transactional data what fuel surcharge was applied during that time, whether it was the 28-dollar fuel surcharge or the 23-dollar fuel surcharge in this hypothetical example?
A Our billing systems give us a realtime view of what is currently being billed at that time, what version of fuel surcharge is being billed at a particular time. There is some -- there is some technical limitations when you start looking at historical data.
Q And when you said that there was an informal agreement not to apply the fuel surcharge that would be covered by the conditions of carriage, where did that understanding come from?
A Management, I would have to say. It certainly didn't come from me.
Q And how did you track those -- how did you isolate those customers?
A We had a series of fuel surcharge notes which were essentially just computer language that would allow us to automatically bill fuel surcharges. So we had different notes in connection with different fuel surcharge types. So we began embedding specific fuel surcharge notes to

Page 109

tell us -- you know, tell us what to do with a particular customer. So, for example, in a case where we renegotiated a fuel surcharge -- we renegotiated the contract to reflect the new fuel surcharge, we would change the note at that point.

MR. RASHID: Okay. Put that document aside. I'm going to mark as Glennon 8 a document bearing the Bates stamp NS010004522 to 4527.

(Whereupon, Plaintiff's Exhibit 8 was marked for identification.)

BY MR. RASHID:

Q I would first like to direct your attention to the e-mail at the top of the first page. And this appears to be an e-mail from Tom Rappold. Oh, no. Can you identify this as an e-mail from Tom Bayrer to Tom Rappold, Ron Listwak, Mark Bower, Bill Fox and bcc'd to you?

A Yes. I don't know who it was from, but --

Q If you look at the bottom of the e-mail, there are the initials TEB?

A Yes.

Q Would that indicate that the e-mail came from Tom Bayrer?

Page 110

A Yes.

Q And in the second paragraph Mr. Bayrer writes, "Without a clear cost based reason, (See Heslep's attached" e-mail), attached in parentheses, "changes to the FSC will appear like a general rate increase and that may undercut the 'surcharge' mechanism." Do you see that?

A Yes.

Q And is that consistent with your prior testimony, that by adopting a more aggressive fuel surcharge, you might actually see slippage in your fuel surcharge coverage?

MR. NANNES: Objection as to form.

A I don't know for a fact what he was -- what he was referring to. Tom was in the coal department and we had slightly different responsibilities.

Q But you would agree then that a more aggressive fuel surcharge would have undercut Norfolk Southern's surcharge coverage?

MR. NANNES: Objection.

A Not necessarily. Keep in mind that during this period our fuel surcharge coverage was increasing steadily throughout this period and, not only that, we were renegotiating base prices, so

Page 111

some concessions could be made to get the fuel surcharge in there, there could be some general increases. There are a lot of other variables involved. So there could be some resistance, but on the other hand we were making steady progress.

Q Okay. If you look at the e-mail on the bottom half of the page, there is an e-mail from yourself to Don Seale and others dated April 29, 2003. Do you see that?

A Yes.

Q And on the fifth bullet -- sixth bullet -- fifth bullet point down you write, "Following a two year campaign to implement the current NS FSC, roughly 50 percent of NS Merchandise revenue and 80 percent of NS authorities current are subject to the current surcharge?

A Yes.

Q It said if we opted to change the FSC at this point, we could see slippage on these gains. Do you see that?

A Yes.

Q And is that an accurate statement when written?

A Yes, but I would write -- once again, it

Page 112

is -- there are a lot of other issues at play here. There could be -- there is always going to be some slippage and some resistance whenever you try to -- an increase or more aggressive charge.

Q But you are saying here that by applying a more aggressive fuel surcharge, it could lead to a decrease in the fuel surcharge revenue or authority coverage than NS currently had; isn't that right?

A One of the things I haven't mentioned so far is one of the concerns I had from an administrative point of view, the more often you change things, base prices or fuel surcharges or any related charges, is that you are going to end up getting billing problems and billing disputes with the customers and other railroads. So part of the revenue loss issue here is the fact that any variables that are introduced in the system are going to end up with technical problems, accounting problems, billing, data transfer issues with other railroads. Computer changes sometimes have to be made. So all of those -- all of those factors come into play when we talk about slippage or revenue loss. It is not just the fuel surcharge itself. Remember, I'm a technical person, I'm not a

Page 113

marketing person here, so my comments are really geared toward the technical side.
Q But in addition to the technical and administrative issues you just previously testified to, you previously testified to, that an increased more aggressive fuel surcharge could lead to slippage in coverage as a result of customer resistance, isn't that right?
MR. NANNES: Objection as to form.
A It is conceivable, but I -- I can't give you -- I can't quantify or tell you it is significant or not.
Q And then on the -- at the bottom of the last point, the last bullet point on the first page you write, "Probably the most important point: Even if we adopted the CSXT formula immediately, we would see very little revenue generated in the short term." Do you see that?
A Yes.
Q Is that an accurate statement at that time?
A I don't remember the conditions or the data behind that statement.
Q You have no recollection of why you would see very little revenue?

Page 114

A I would have to -- I would have to look at the underlying conditions. I don't know what was happening at WTI at that particular time.
Q Well, if you -- all right. Continue.
A Again, we have the issue of public versus private and so there were a lot of -- a lot of variables in there and I don't recall what the variables were without doing additional research.
Q Well, if you continue reading in that same bullet point, it says, "Due to the way NS hard codes the surcharge into publications, public and private, we would actually have to" -- sorry -- "we would have to actually republish each one before we could transition that publication to the new formula. Since each contract and private quote would have to be renegotiated, probably at renewal, the bulk of our traffic would not be subject to the new formula this year."
A Yes.
Q So are you identifying as the reason why immediate adoption of the CSX formula yielding very little revenue is because of this hard coding issue?
A Well, what I'm saying there is that public authorities could be done right away and

Page 115

private authorities would have to be phased in. And since the majority of our revenue came from private authorities, that was probably where the term came from.
Q And then if you look at the second to the last paragraph on this page, you write, "Once the majority of the publications are converted, we will be in a better position to implement a blanket adoption for publications that reference a revised FSC in the conditions of carriage."
A Yes.
Q And was that the -- that was the recommendation of you and the group vice-presidents on this issue?
MR. NANNES: Objection as to form.
A Well, that assumes that we wanted to have a blanket adoption. At this point I don't believe we made the decision to have a blanket adoption.
Q Right. My question was a little different.
Was it the recommendation that -- to adopt this approach to prepare Norfolk Southern for a blanket adoption.
A I just -- it just says that we would be

Page 116

better positioned to implement one if we were to actually do it. We never actually did.
Q Well, if you look at the paragraph above the bullet points, in the second sentence it says, "The group suggests the adoption of the following changes to better position NS to accommodate an FSC change if and when a decision is made."
A Yes.
Q So the group -- what is the group being referred to here?
A I'm assume -- I think it was a group of -- group vice-presidents. They would be the group leaders of the commodity teams.
Q And was there any discussion about whether this recommendation was -- was to be in fact adopted?
A There was -- there was probably some discussion, but the decision would be Don Seale's.
Q And do you recall what his decision was?
A No.
Q And the fifth bullet point down, the bottom says, "Issue instructions that no contract can negate or freeze the application of the NS conditions of carriage without prior approval of Don Seale." Do you see that?

Page 117

A Yes.
Q Do you know if that was adopted?
A I don't recall. I recall there was a lot of pressure to make sure the fuel surcharge -- a fuel surcharge of some kind was included in the publication, but I don't know -- I don't recall sending anything to Don Seale for personal approval, but it could have been done.
Q The second to the last bullet point says, "Develop a transition strategy, including 9255 and Accounting that will cover a dual FSC environment as we transition to a complete replacement of the FSC text with the FSC reference. This would include setting up a new NS surcharge note for 9255."
A Yes.
Q Do you know if that was adopted?
A I'm sure it was because that would have been the mechanism we would have used to track the conversion, regardless of whether the fuel surcharge was published.
Q Do you know when that -- when that proposal was adopted?
A No.
Q Was it sometime prior to NS adopting a

Page 118

new fuel surcharge program?
A I don't recall. Normal business practice would have had the note created about the time we would have applied it.
MR. RASHID: Okay. Glennon 9, I will mark a document bearing the Bates stamp NS010073115 to 121.
(Whereupon, Plaintiff's Exhibit 9 was marked for identification.)
BY MR. RASHID:
Q In just looking at the top, can you identify this as an e-mail from yourself to others dated July 3rd, 2003?
A Yes.
Q And you see in the first paragraph you write, "GVPs - Re July 10, 10 am, fuel surcharge meeting."
A Yes.
Q Does this refresh your recollection that there was a meeting concerning fuel surcharges on July 10, 2003?
A I don't recall the meeting, but I'm sure I was in attendance.
Q Do you recall what was discussed at the meeting?

Page 119

A No.
Q Do you recall if the people on this e-mail were attendees of the meeting?
A No.
Q Under -- towards the bottom of the page under the heading of CSXT on No. 6, you write that the CSXT is also attempting to apply the new FSC to all publications, public and private, effective June 1st. Do you see that?
A Yes.
Q We talked about that previously, right?
A Yes.
Q And then you write, "They may make exceptions for contracts taking RCAF escalation."
A Yes.
Q Do you have any recollection of where you got that understanding from?
A No, but it would probably involve our joint-line contracts with CSX.
Q Do you know how many joint-line contracts with CSX had an RCAF provision?
A None whatsoever.
Q Do you have any idea whether it was a small amount or large amount?
A Well, we had relatively few RCAF

Page 120

contract escalators, so the number wouldn't be that large.
Q Under BNSF at the bottom of the page, under No. 1, it says, "No policy change. Their FSC has been in effect for a long time, but only began aggressively applying within the last year." Do you see that?
A Yes.
Q Sitting here today, do you know where you got that understanding from?
A Well, we would have seen evidence of that in our electronic and paper communications with BNSF contracts and tariffs.
Q But do you know if -- when they started to apply their fuel surcharge aggressively on -- on private joint-line shipments, did they request Norfolk Southern's concurrence for doing that?
A On private, on a case by case basis, they would have had to.
Q And who would be the people responsible for getting those concurrences?
A Product managers.
Q And when you say product managers, where do they stand in relation to the group vice-presidents?

Page 121

A They -- below the group vice-president would be a director and below the director would be the product manager.
Q So on joint-line private shipments BNSF -- strike that.
On private joint-line shipments with another railroad, that railroad would have to seek Norfolk Southern's concurrence on a case by case basis for changing the fuel surcharge?
A Changing?
MR. NANNES: Object to the form.
A Well, any change to the contract would require NS concurrence.
Q So if there hadn't been a fuel surcharge before and the connecting carrier was going to apply one for the first time, they would have to seek a specific concurrence on that shipment or authority from NS?
A Yes, along with the price. I mean it is just -- it is just -- it is just part -- part of the conditions of the agreement.
Q And sitting here today, do you have any knowledge about whether or not the NSF in fact sought Norfolk Southern's concurrence on a case by case basis as they began to aggressively apply the

Page 122

fuel surcharge on joint-line private authorities?
A I have no -- no data to show that one way or the other.
Q If you turn the page under the heading No. 3, which reads, "If we opt to revise the NS FSC, the transition issues," and the last bullet point on the page reads, quote, Marketing Services is already in the process of preparing the new generic 9255 FSC note that simply refers to the C/C, without the full text. Do you see that?
A Which paragraph?
Q I'm sorry. The last bullet point on that --
A Okay. Yes, I do.
Q And does that refresh your recollection that Marketing Services had begun to prepare a new generic fuel surcharge note at least by the date of this e-mail, which is July 3rd, 2003?
A Well, by reading this, I would have to assume that a generic note referring to the conditions of carriage was in fact being put into contracts or into publications.
Q Right.
And then the first sub-bullet point you write, "It will position us to make the first

Page 123

universal change." Do you see that?
A Yes.
Q And does that refresh your recollection that NS was undertaking efforts to make a universal change to its fuel surcharge program possible?
A I don't recall it, but I see it in here in the e-mail.
Q And you have no reason, sitting here today, to doubt the accuracy of what you wrote in July 2003?
A No.
Q If you would just turn from the page we're on, you will see a page that says Produced As Native. Then there is a spreadsheet chart.
A I have two spreadsheets here.
Q The first page is the one I'm talking about.
A All right.
Q Do you recall putting this spreadsheet together?
A No. Somebody in my group might have.
Q And do you recall what the purpose of creating this spreadsheet was?
A This would have been an exercise to show what the various fuel surcharge types would have

Page 124

produced had they all been in effect at a given time.
Q And is it fair to say that the results of -- demonstrated on this spreadsheet show that under either a CSXT fuel surcharge or BNSF fuel surcharge or a UP fuel surcharge, Norfolk Souther would see increased surcharge revenues?
A Yes, for the most part.
Q And then if you look at the top of the chart, the heading -- there is a heading of Revenue From FSC (NS FSC)?
A Yes.
Q And you will see from January 2002 to September 2002 there is no fuel surcharge revenue?
A Yes.
Q And does that refresh your recollection that during that time period Norfolk Southern wasn't actually -- the standard Norfolk Southern fuel surcharge in place at the time did not in fact trigger a fuel surcharge?
A Yes.
Q And that as of -- for December 2002, the fuel surcharge revenue that the Norfolk Southern generated was only seven -- around $740,000?
A Yes.

Page 125

Q And it's -- in comparison to Norfolk Southern's total business at that time, is that a significant amount of revenue?
A In the context of all revenue, no.
Q Do you recall around this time of July 2003 whether a decision was made whether or not to adjust Norfolk Southern's fuel surcharge program?
A My recollection was that we were analyzing the various fuel surcharge programs but nothing was decided.
MR. RASHID: I would like to mark as Glennon 10 a document bearing the Bates stamp NS010076080 to 120.
(Whereupon, Plaintiff's Exhibit 10 was marked for identification.)
BY MR. RASHID:
Q And we can just focus on the first page of this document, which I realize is voluminous because it addresses a lot of different things.
MR. SCHEIB: If you can tell, are the attached exhibits with this particular document --
MR. RASHID: That we endeavored to just produce -- the exhibits that we are suing

Page 126

today are the documents as they were produced to us.
BY MR. RASHID:
Q Can you identify the e-mail at the top of the page as an e-mail from yourself to Marshall Sheets and Jim Nash dated July 16, 2003?
A Yes.
Q Who is Marshall Sheets?
A He -- I believe he was an AVP in accounting.
Q And who is Jim Nash?
A Jim Nash was the equivalent of one of my managers in the price application in the Accounting Department.
Q And in this -- in the -- you see there is a paragraph that begins, "We are reviewing it."
A Yes.
Q You write, "Due to turbulence from the conditions of carriage and S-919, we have delayed further consideration until late August." Do you see that?
A Yes.
Q Does that refresh your recollection that at the July 2003 meeting, which we have looked at a document about before, the decision was made to

Page 127

delay further consideration?
A Yes.
Q And the reasons for delaying consideration were the turbulence from the conditions of carriage? One of the reasons for delaying consideration was the turbulence on the conditions of carriage?
A I believe the reference in this case of conditions of carriage was the fact that we were making substantial other changes to the conditions of carrier. We were making liability changes, a lot of changes, a lot of significant changes to the boiler plate of our conditions of carriage, so there was a lot of customer interest in the conditions of carriage changes at that time. I don't believe that referred necessarily to fuel surcharge in there.
Q And does the meeting about the turbulence from the conditions of carriage refresh your recollection of what was discussed at a meeting in July 2003 concerning fuel surcharges?
A No. That was over seven years ago. I can't remember.
Q Then it also said -- identifies S-919 as a reason for delaying further consideration. Is

Page 128

that right?
A That is correct.
Q And what is S-919?
A That, I believe, was a -- was some legislation or proposed legislation to reregulate the railroads.
Q And why would a proposal to reregulate the railroads cause Norfolk Southern's delay of further consideration of changing the fuel surcharge?
MR. NANNES: Objection as to form.
A The condition of carriage changes along with the S-919 shows that we were concerned about customer reaction.
Q So I guess then what you are saying is by adopting a potentially more aggressive fuel surcharge program, Norfolk Southern was concerned it would be subject to reregulation?
MR. NANNES: Objection to as to form.
A No. We were concerned about customer relations.
Q But were you concerned about customer relations in the sense that it would generate more interest in this pending legislation concerning reregulation of the railroads?

A Look, I had absolutely no dealings with Norfolk in connection with S-919. All I know is that there is -- there is customer sensitivities to the changes that were made in the conditions of carriage that were an issue.
Q What does the reference to S-919 mean then?
A That means that is just another customer relations issue to take into consideration.
Q And have you heard that in other instances that the -- that pending -- pending legislation or the threat of reregulation would impact decisions that Norfolk Southern might take?
A I have no -- no specific knowledge of that.
Q But in this instance, it at least raises an issue with respect to fuel surcharges, correct?
A That is correct. I probably got that from internal discussions.
Q Okay. Internal discussions that might have occurred at the July 2003 meeting?
A I don't know.
Q Beyond this one instance of referencing S-919, do you have -- do you recall any other future discussions that related regulation or



legislation with respect to fuel surcharge decisions?
A Nothing specific.
Q Okay. Put that aside. Actually, if you could, turn back to that just for a second. If you turn to the -- to the fourth page in, which includes the blue slip sheet, there is a -- and it bears the Bates stamp ending in 082. Do you see that?
A Yes.
Q And you can identify this as an e-mail from yourself to a number of others on July 10, 2003?
A Yes.
Q And in the last -- in the paragraph -- second paragraph in the top e-mail in the last sentence you write, "Considering most RRs exempt a significant portion of their traffic from a FSC and that 40 percent or more of their traffic originates on another RR, the fractional FSC percentage would be insignificant for CSXT." Do you see that?
A Yes.
Q What did you mean by most -- by RRs, I assume you mean railroads?
A Correct.



Q So what did you mean by -- when you wrote that most railroads exempt a significant portion of their traffic from an FSC?
A Well, on interline joint traffic we receive information from those railroads electronically and we do have the ability to see what's coming in from -- so from a technical perspective, we do get some idea of what the other railroads are doing. Product areas in their commodity should have a better idea what is going on. I guess we could reasonably analyze the data in the situation to come up with a conclusion that some railroads were being less aggressive in applying a fuel surcharge.
Q Correct.
So as of July 10, 2003, the date of this e-mail, your general understanding was that most railroads exempt a significant portion of their traffic from the fuel surcharge based on information that NS had?
A Yes, but I don't -- I don't recall what that significant portion amounted to, to tell you the truth.
Q Okay.
MR. RASHID: Take a break.



THE VIDEOGRAPHER: Going off the record. The time 11:36 a.m. This marks the end of tape No. 1 in the Glennon deposition. Off the record.
(Whereupon, a short recess was taken.)
THE VIDEOGRAPHER: This is the beginning of tape No. 2 in the Glennon deposition. On the record at 11:48 a.m.
MR. RASHID: All right. I am going to mark as Glennon 10 a document bearing the Bates stamp --
MR. WERDER: Eleven.
THE REPORTER: Yes.
MR. RASHID: Sorry. I'm going to mark Glennon 11, a document bearing the Bates stamp NS010073466-3469.
(Whereupon, Plaintiff's Exhibit 11 was marked for identification.)
BY MR. RASHID:
Q And I would first like to direct your attention to the second page of the document and to the e-mail that begins roughly in the middle of the page. You can identify this as an e-mail from yourself to others dated November 4, 2003?
A Yes.

Q And in the first paragraph you write, "GVPs - Regarding the NS fuel surcharge DWS has requested that we take a fresh look at the case for and against NS adopting the new CSXT FSC standard." Do you see that?
A Yes.
Q And what did you mean by standard?
A Well, that is just a reference to the revised fuel surcharge program.
Q And in here it -- it indicates that Don Seale wanted a group of people to look into adopting the CSXT fuel surcharge; is that right?
A During this period we were analyzing all of the fuel surcharge programs, so this was just one of the many analyses that were requested.
Q But you don't recall a specific request from Don Seale around this time that you should analyze the CSXT fuel surcharge?
A He did ask us to analyze the CSXT fuel surcharge, but we also analyzed other fuel surcharges at the same time as well.
Q At this specific time were you only now analyzing the CSXT fuel surcharge?
A I don't believe so. We were -- there were various analyses and those analyses would have



included the other railroads.
Q I will just have you skim over the remainder of your e-mail and let me know if you see any indications of any other carrier or any sort of analysis of their program.
A In one of the preceding e-mails there, there are references to the UP and the BNSF.
Q Right; but if you turn to Bates stamp 3468, you will see two headings. One is pro for the adoption of the CSXT formula and con against the adoption of the CSXT formula. Do you see that?
A Yes.
Q Does that refresh your recollection?
MR. RASHID: What did you point out to the witness?
MR. NANNES: I pointed out a reference on the page.
MR. RASHID: I would ask that you refrained pointing things out to the witness during the context -- during the conduct of the deposition.
BY MR. RASHID:
Q Does this -- I will rephrase my question. Does this -- does this refresh your recollection that at this point in time you were



generally focused on whether or not to adapt the CSXT fuel surcharge?
A I can't say that. I just don't recall. At the time there were dozens or dozens of analyses of various fuel surcharges, the revenue impacts. The one you are referring to does focus on CSX, but it certainly isn't the only study that we had done.
Q Okay. And if you turn to the first page at the bottom, you will see an e-mail -- do you see an e-mail from yourself to Don Seale and others dated November 7, 2003?
A Yes.
Q And in the third paragraph, which it starts, "All teams endorsed the second option," do you see that?
A Yes.
Q It says, "That is, proceed with the program to remove the full text FSC from private NS authorities and position ourselves for a conversion, but delay further consideration until the second quarter of 2004."
A Yes.
Q Do you know if this -- this proposal was adopted? And let me -- do you know if the proposal for the delay for the consideration until the



second quarter of 2004 was adopted?
A I don't recall. My general recollection was that we made a decision to make a change around the first of the year.
Q Right. I think -- this is an e-mail dated November 2003, correct?
A Right.
Q So at this time, as indicated in the previous e-mail, Don Seale requested that you and a bunch of others examine potentially adopting another fuel surcharge program, correct?
A Right.
Q And so as a result of that process, isn't it accurate that that group recommended to delay further consideration until the second quarter of 2004?
A Adopting a new fuel surcharge program, yes, I would say that was the consensus opinion at that point.
Q And did Don Seale agree with that recommendation?
A As I recall, the decision was made to -- towards the end of the year or right after the first of the year, to make a change.
Q Right. I'm asking you at this point in

ERRATA SHEET FOR PATRICK GLENNON
IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION

I, the undersigned, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 25 | 11 | "demurer" to "demurrage" | spelling |
| 30 | 14 | "was an" to "were" | word usage |
| 33 | 2 | "higher" to "hire" | spelling |
| 43 | 8 | "twenty-three to one" to "23.1" | clarification |
| 51 | 12 | "gentle" to "general" | word usage |
| 95 | 22 | "generous" to "general" | word usage |
| 104 | 17 | "market" to "marketing" | word usage |
| 154 | 8 | "mustard" to "muster" | spelling |
| 191 | 18 | "approval" to "approve" | word usage |
| 223 | 6 | "files" to "miles" | word usage |
| 228 | 6 | "fee based" to "re-based" | word usage |
| 247 | 6 | delete "not" | clarification |

Patrick Glennon
PATRICK GLENNON

Subscribed and sworn to me
this 4th day of October, 2010
Raquel A. Smith, Notary Public

RAQUEL A. SMITH
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES APR. 30, 2012
COMMISSION # 7176148

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL ) MDL No. 1869
SURCHARGE ) Misc. No. 07-489
ANTITRUST LITIGATION, ) (PLF/AK/JMF)
This Document Relates To: )
ALL DIRECT PURCHASER CASES )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF DAVID R. GOODE
TAKEN ON BEHALF OF THE PLAINTIFFS
Norfolk, Virginia
January 13, 2011

"HIGHLY CONFIDENTIAL"



APPEARANCES:
On behalf of the Plaintiffs:
STEIG D. OLSON
Hausfeld LLP
11 Broadway, Suite 615
New York, New York 10004
(212) 830-9850
SATHYA GOSSELIN, ESQUIRE
Hausfeld LLP
1700 K Street, NW, Suite 650
Washington, D.C. 20006
(202) 540-7175
RICHARD I. WERDER, JUNIOR, ESQUIRE
Quinn Emanuel Urquhart Oliver &
Hodges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
JOSHUA D. SNYDER, ESQUIRE
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, Pennsylvania 19004
(610) 822-0203



Appearances: (Continued)
On behalf of David R. Goode and the Defendant
Norfolk Southern Corporation:
JOHN M. NANNES, ESQUIRE
TARA L. REINHART, ESQUIRE
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7500
JOHN SCHEIB, ESQUIRE
GEORGE ASPATORE, ESQUIRE
General Solicitor
Norfolk Southern Corporation
Three Commercial Place
Norfolk, Virginia 23510
(757) 629-2831

On behalf of the Defendant BNSF Railway Company:
LINDA S. STEIN, ESQUIRE
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-8185



Appearances: (Continued)
On behalf of the Defendant Union Pacific:
CAROLYN WOODSON, ESQUIRE
Howrey LLP
550 South Hope Street, Suite 1100
Los Angeles, California 90071-2627
(213) 892-1867

On behalf of the Defendant CSXT:
DAVID D. CROSS, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
(202) 624-2774

Also Present:
Rebecca Miller, Videographer

A. Yes. I believe that statement is true.
Q. Now, one consequence of the increased competition coming out of deregulation was rail rates decreased, correct?
A. As a result of original -- ask the question. I am sorry. I may not have heard the question right.
Q. Let me try it again. Coming out of the -- of deregulation and beginning, say, in the mid '80s --
A. The mid '80s. Yes.
Q. -- rail rates decreased, correct?
A. There was a long -- I recall there was a long period of rail rates decreasing.
Q. And part of the reason for that was the increased competition that was enabled by the Staggers Act and deregulation, correct?
A. I am not sure, not having been in the early days working with rates or that side of the rail operation, what all the factors working were but I do know that rates decreased over that period.
Q. And rates decreased over the period through the '90s including when you were president, correct?
A. To a certain point in the '90s. Yes,



sir. Been a long period.
Q. And, in fact, they continued to decrease into the early 2000s, correct?
A. I think that is correct.
Q. And during that period, there was price competition among the railroads, correct?
A. That is correct.
Q. Now, during this period, the '90s into the early 2000s, did NS have any alliances with other railroads?
A. During what period?
Q. The '90s extending into early 2000. I don't want to cut it off arbitrarily.
A. I am -- by alliances, I am not sure what you mean by alliances. Over that period, Norfolk Southern certainly worked with other railroads in providing service and worked with western -- with a variety of railroads in providing service.
Q. Well, did the term "alliance" have any special meaning to you during that period?
A. No.
Q. Did you hear the term used?
A. I don't remember. I have heard the term used. When I first heard it used, I don't remember.
Q. Do you recall any time -- let me try it a



different way.
Are you aware that during some period of time Norfolk Southern would gather up some senior executives and they would fly on the company plane to the headquarters of another Class I railroad and sit down and meet with executives there or vice versa, sometimes they would be visited by executives?
A. During the period that I was president and CEO, meetings of that kind would certainly be held. We might travel in other -- in other ways to get there but the joint meetings with railroads would be held.
Q. And just to finish --
A. And they would sometimes be called alliance meetings.
Q. And that is what I am getting to. Do you recall that sometimes those were called alliance meetings?
A. Yes.
Q. Now, do you recall when they were started to be called alliance meetings?
A. I don't recall that.
Q. Do you recall any discussions internally at NS about establishing alliance meetings?
A. No.



Q. Or do you recall any efforts to formally define what an alliance meeting would be?
A. No.
Q. Do you recall any discussions with your counterparts at any time about beginning meetings under this alliance umbrella?
A. By my counterparts you mean other CEOs --
Q. Yes.
A. -- or counterparts in the company?
Q. Outside of the company.
A. I don't recall any such.
Q. Do you recall ever --
A. There may have been. I just don't recall any.
Q. I appreciate that clarification. Do you recall talking to Matt Rose at any time and saying, We should hold alliance meetings?
A. Not specifically. I talked to Matt Rose many times but I don't recall a specific conversation like that.
Q. And just so the record is clear, you don't recall any conversation inside the company or outside the company about establishing in any way alliance meetings, is that right?
A. I don't recall any such conversation.

Page 45

Q. Do you recall a time when it became -- well, let me back up.
You took a little issue when I said that you would fly in the company plane.
A. I didn't take issue.
MS. REINHART: Objection to the characterization.
BY MR. OLSON:
Q. Not issue -- not issue in any confrontational way. I just -- you paused there. And it was my understanding that --
A. I thought you were needling me, Counsel. I apologize.
Q. No. No. I certainly wasn't. It was my understanding that all of your travel through the air was on the company plane. Is that -- is that not correct?
A. That is not correct.
Q. Okay. You -- I thought I had seen somewhere it was company policy that you always had to fly on the company plane. Is that not right?
A. There was a policy to that effect but occasionally that was not possible and it didn't happen.
Q. I see. Do you recall -- is your

Page 46

testimony that as far back as you can remember these meetings were generally a group of the highest, most senior executives at one of the Class I railroads would physically travel to the headquarters of another Class I railroad and sit down and discuss a variety of matters, is it your testimony that as far back as you can remember that always happened?
A. Meetings like that happened for a period of years. When they began or if there was a point in time in which they began, I simply don't remember. They may go back before my tenure. I don't remember a starting point but meetings like that have occurred.
Q. Is it possible that meetings like that began during your tenure?
MS. REINHART: Objection. He has already stated he doesn't recall.
THE WITNESS: It is possible but I just don't recall.
BY MR. OLSON:
Q. Thank you. Now, do you recall when Norfolk Southern first adopted a fuel surcharge program?
A. I recall it was somewhere around 2000.
Q. And what --
A. I don't recall specific dates.

Page 47

Q. What was your role in the establishment of that program at NS?
A. None I think is the best way to answer that.
Q. Did someone report to you that NS was taking that step?
A. It was reported to me.
Q. And do you recall how that occurred?
A. I don't recall.
Q. Just based on your experience, can you make an educated -- an educated estimation of how that process would have happened?
MS. REINHART: Objection. Calls for speculation.
THE WITNESS: I could speculate as to how it -- how it occurred but I don't have a recollection of it.
BY MR. OLSON:
Q. Was there a management committee at Norfolk Southern that would have looked at an issue like that?
A. We had a management committee at Norfolk Southern and it might have received a report of something like that. I don't know whether it did or not.

Page 48

Q. Now, when you say report of something like that, is it your testimony that this program was reported to you after the decision to adopt it had already occurred?
A. I believe so.
Q. And it would have been -- who would have made that decision?
Let me try it a different way. Was there someone within the organization who was delegated the authority to make a decision about adopting a fuel surcharge program at this time without requiring approval from you or the management committee?
A. The matters of pricing/customer relationships were delegated to the executive vice-president who was in charge of marketing and the decisions would have been made at that level and reported.
Q. Now, what was the purpose of reporting them to you?
A. Informational so that the -- that I or if it were to the management committee would be aware of events that were taking place. It was a matter of general business.
Q. Were you -- strike that.
Was it required that you approve a step

like that?
A. I don't -- no.
Q. Now, at this time in 2000 --
A. Excuse me. Let me make sure that my -- the way I answered that it is clear. No. It would not have been required that that be reported, that the decision be approved.
Q. By you?
A. By me.
Q. At this time, when Norfolk Southern adopted a fuel surcharge program, what was your understanding of what a fuel surcharge was?
A. My general understanding was that it was a mechanism for protecting the company against increases in price or volatility in price of, in this case, fuel costs.
Q. And was it your understanding that a fuel surcharge was a term of art in the rail industry?
A. I don't -- I didn't have that understanding.
Q. Where did you -- where do you think you gained your understanding of what a fuel surcharge was?
A. Must have been either from general knowledge of surcharges or perhaps in discussions.



Q. And you -- you mentioned it was a mechanism for protecting volatility -- protecting from volatility and increases in price, correct?
A. That is -- that is what I said. Yes. The environment, as I recall it, at that time was that there had been escalations in fuel prices.
Q. And so was it your understanding at that time that a fuel surcharge was directed at some increase in fuel prices that exceeded some base level?
MS. REINHART: Objection. Misstates his testimony.
THE WITNESS: Would you ask that again, please?
BY MR. OLSON:
Q. Well, when you refer to a mechanism for protecting from increases in price, does the increase portion refer to an increase above a certain base level of price?
A. The -- there is a -- a level of -- our company, like any company, in business needs to have revenues, which cover or hopefully exceed costs, and fuel is a cost. As such, the -- a rapid increase in that could have adverse effects on the -- on the company. And my understanding of a surcharge is it would be a way of protecting the company against an



imbalance in those two factors.
Q. So the fuel surcharge is directed at that increase in costs above a certain base level, is that right?
MS. REINHART: Objection. Misstates his testimony.
THE WITNESS: It is a -- I would say it is a piece of pricing, it is -- it is an element of pricing along with a lot of other elements of pricing that is directed towards addressing -- addressing that particular cost.
BY MR. OLSON:
Q. So, in other words, it is a -- it is directed at cost recovery, correct?
A. In the sense it is but that is not a full explanation of it.
Q. Well, you -- you described that Norfolk Southern, like other companies, need to find revenues that exceed costs, correct?
MS. REINHART: Misstates his testimony.
BY MR. OLSON:
Q. Is that not what you said?
A. I don't remember exactly what I said. I guess we could read it back.
Q. Well --



A. Let me have the question again. Perhaps I can help.
Q. I am just trying to be clear on -- on what your understanding of a fuel surcharge was at this time and you indicated that it was a mechanism for protecting the company from increases in the price of fuel, correct?
A. Yes. The -- it was a mechanism for adjusting price -- adjusting the price of service to reflect the at-that-time increase in the cost so that the cost of fuel could be properly reflected in the service.
Q. And it is -- in your original description you said, in this case, the cost in question is fuel and that is obvious because it is called a fuel surcharge, correct?
A. Yes. Yes.
Q. That name indicates it is going to fuel costs?
A. Yes. There may be other surcharges. I don't -- I am not aware of any. But in this case fuel.
Q. In this case, a fuel surcharge would be directed at fuel costs, correct?
A. It would. Yes.

Page 53

MR. OLSON: Should we take a quick break? Now might be a good time.
MS. REINHART: Sure.
THE VIDEOGRAPHER: We are going off record at 9:59 a.m.
(Recess taken.)
THE VIDEOGRAPHER: We are back on record. Here marks the beginning of Tape Number 2 in the deposition of David Goode. The time is 10:11 a.m.
BY MR. OLSON:
Q. Mr. Goode, we were discussing before the break the adoption by NS of a surcharge in 2000. Now, do you recall having any discussions about fuel surcharges at or around this time with your counterparts at other railroads?
A. I do not.
Q. Do you recall any time prior to 2003 having any discussions about fuel surcharges with your counterparts?
A. I do not recall any.
Q. Now, earlier you testified that the executive vice-president of marketing at Norfolk Southern was delegated the authority to make decisions about things like surcharges, correct?
A. About pricing generally and -- which

Page 54

would have included surcharges.
Q. Can we refer to that position as Norfolk Southern's CMO?
A. We could. I don't think we called it that. But that would -- that is fair.
Q. Because it is the chief marketing officer?
A. Yes. Chief marketing officer. That would be a -- I would understand that.
Q. Okay. I might do that just for ease.
A. Yes. I will understand that if you do.
Q. And who was Norfolk Southern's chief marketing officer at this time, 2000?
A. In 2000, I believe that would have been Mr. Prillaman.
Q. Do you recall when he was succeeded by Mr. Seale?
A. I do not. I mean, he was but I don't recall what date that was.
Q. Sometime around 2004, does that sound right?
A. I wouldn't argue with that.
Q. Now, did --
A. Subject to -- I mean, the record will show that. I just don't remember when it was.

Page 55

Q. Okay. Now, referring to this -- this original fuel surcharge program at NS, do you know whether your CMO Mr. Prillaman had any discussions with his counterparts at other railroads regarding fuel surcharges?
A. I do not know that.
Q. Did you -- were you -- let me try to -- let me start again.
Were you made aware by Mr. Prillaman or anyone else about the content of discussions that Mr. Prillaman had with his counterparts at this time?
MS. REINHART: Objection. Assumes facts.
THE WITNESS: I don't remember being advised of anything like that.
BY MR. OLSON:
Q. Was there any directive by you or others that the CMO at Norfolk Southern should report to you about conversations with counterparts at other railroads?
A. No. There was no such directive.
Q. Are you aware of whether Mr. Prillaman would from time to time speak with his counterparts on the phone?
A. I would expect he did. Yes.
Q. And that would happen outside of your

Page 56

presence, correct?
A. It might be outside of my presence or sometimes we were together.
Q. But you -- you are aware that he would talk to his counterparts outside of your presence on the telephone?
A. I am aware.
MS. REINHART: Asked and answered.
THE WITNESS: I am aware of that.
BY MR. OLSON:
Q. And are you aware that he would meet with his counterparts in person outside of your presence from time to time?
A. I would expect so. I was aware that meetings occurred. Yes.
Q. And are the answers the same for Mr. Seale?
A. Yes.
Q. You are aware Mr. Seale would speak to his counterparts outside of your presence, correct?
A. Yes.
Q. And you are aware that Mr. Seale would meet in person with his counterparts outside of your presence, correct?
A. Yes.

Page 57

Q. Do you -- do you recall Mr. Prillaman or Mr. Seale ever informing you that they were going to or that they had met in person with a group of CMOs in a social setting?
A. I don't recall -- I don't recall that. They may have done so but I don't recall it.
Q. Would you -- was there any directive that something like that would have to be reported to you?
A. No.
Q. Mr. Seale or Mr. Prillaman could take their own initiative in doing that, is that right?
A. That is correct. That is correct.
Q. And as part of this delegation of pricing authority, is it fair to say that Mr. Prillaman and Mr. Seale could engage in discussions about pricing with their counterparts if they judged that to be appropriate?
MS. REINHART: Objection to form. Ambiguous.
THE WITNESS: I think I would say that they -- that they certainly had the authority under my delegation to have discussions as appropriate and naturally within the legal bounds.
BY MR. OLSON:
Q. Including discussions with their

Page 58

counterparts, correct?
A. Correct.
Q. And were you ever made aware of the discussion by one of your CMOs about fuel surcharges with that person's counterparts prior to 2003?
MS. REINHART: Objection. Vague and overbroad.
THE WITNESS: I don't recall any -- any such report.
BY MR. OLSON:
Q. Do you recall it being reported that your CMO, or anyone in your marketing group, had discussed the desirability of a common industry position on fuel surcharges in the 2000 or 2001 time period?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: I don't recall that.
MS. REINHART: Counsel, while we are waiting, can we please just state for the record that the usual stipulations apply, that an objection for one is an objection for all, and also that this transcript will be designated highly confidential pending reading and signing by the witness.
MR. OLSON: Yes.
MS. REINHART: Thank you.

Page 59

(A document was marked as Goode Exhibit No. 3.)
BY MR. OLSON:
Q. Let me hand you what has been marked Goode Exhibit 3. It is a one-page e-mail. Why don't you briefly review it.
A. I have reviewed it.
Q. Okay. Now, I will point out to you this is a document that was attained from CSX's files.
A. I notice that I didn't recognize the e-mail distribution.
Q. And the subject says, "Message from David Goode to employees."
A. Right.
Q. Do you have a sense of where this statement came from?
A. You mean where Mr. Murphy obtained it?
Q. Yes.
A. No.
Q. Would this -- this was something that you -- these are your words, correct?
MS. REINHART: Objection. Please be specific as to which words you are referring to.
BY MR. OLSON:
Q. Okay. It starts off -- it is called

Page 60

Chairman's Challenge. Do you see that?
MR. CROSS: Object to form. That is not where it starts. There are words that precede that.
BY MR. OLSON:
Q. Do you see where it says, Chairman's Challenge?
A. I do see where it says, Chairman's Challenge.
Q. And after that, there is some language and at the end it has your name, do you see that?
A. Yes.
Q. And you were the chairman at this time, correct?
A. This was when? 2002. So, yes.
Q. And are those your words?
A. They -- they would appear to be. I don't remember the precise. I remember the 7 + 7 challenge. And this looks like a -- an internal document at Norfolk Southern. But I don't remember or can't identify it specifically but it looks like it was a document from Norfolk Southern.
Q. Now, where it says, Volume 2, Issue 4, April 2002, does that have any significance to you?
A. I am sorry?
Q. Above the chairman's challenge.

don't remember specifically.
Q. Are you aware -- well --
A. This period, I am not -- what period are we referring to?
Q. Just this period generally, 2005, 2004.
A. We were -- period when we were both CEOs we might very well have played golf together.
Q. Sitting here today, do you recall playing golf with Mr. Rose?
A. Well, I know I have played golf with Mr. Rose several times. I would have to think about any specific -- I would have to be reminded about a specific instance.
Q. How about Mr. Ward, did you play golf with Mr. Ward?
A. I have played golf with Mr. Ward.
Q. How about Mr. Davidson at UP?
A. I don't believe Mr. Davidson plays golf. I have not -- I have not played with him.
Q. Mr. Young at UP?
A. I may have played golf with Mr. Young. I think maybe I have once or twice.
Q. And would you also -- or how about Mr. Evans at UP?
A. I have played golf with Mr. Evans.



Q. And what was Mr. Evans' role at UP around this period, 2004, do you know?
A. My recollection may be wrong but I think he was president of the company then.
Q. And do you recall expressing to any of your or discussing with your counterparts this opportunity to raise prices in the market?
MS. REINHART: Objection to the form.
THE WITNESS: I didn't -- have no recollection of such conversations.
BY MR. OLSON:
Q. Is it -- is that a topic that could have come up?
MS. REINHART: Objection to the form.
THE WITNESS: I would have to speculate.
BY MR. OLSON:
Q. Would it be fair to say that you would discuss the state of the economy with your counterparts?
A. I don't remember specific conversations but that is possible.
Q. And would it be fair to say that you would discuss the state of the rail industry with your counterparts?
A. That is also possible. I just don't



recall specific conversations.
Q. And would it be fair to say that you would compare notes on what you saw happening in the industry --
MS. REINHART: Objection. Lacks foundation.
BY MR. OLSON:
Q. -- or the economy?
A. Compare notes?
Q. Share insights.
A. Literally or just generally talk about it?
Q. Generally talk about it.
MS. REINHART: Objection. Overbroad.
THE WITNESS: Yeah. It -- in a very -- in a very general sense, we might have talked about the industry and the economy and legislation, things like that.
BY MR. OLSON:
Q. And would those things include sharing insights into what you saw in the market?
MS. REINHART: Objection. Overbroad.
THE WITNESS: It could have in general ways. Yes.
BY MR. OLSON:



Q. And would those discussions happen in alliance meetings from time to time?
A. They might have.
Q. And would they also happen outside the context of alliance meetings?
A. That could also be.
Q. Would those discussions take place from time to time in one-on-one conversations?
A. It is possible.
Q. And you had one-on-one conversations with your counterparts during this period, correct?
A. Maybe. I don't remember specific conversations.
Q. Do you remember meeting in Matt Rose's office one on one from time to time?
A. I don't remember any specific meetings I may have in his office. I don't remember -- I just don't remember specifically meeting him in his office.
Q. Do you remember having meals with any of your counterparts one on one during this period?
A. I don't remember any specific meals. It would not be unusual for us to have a meal together if we were in the same city at the same time.
Q. Let's turn to Page 16 of exhibit --
A. What I am looking at?

Q. -- 6.
A. Is this Exhibit 6?
MS. REINHART: Yes.
THE WITNESS: Page 16.
BY MR. OLSON:
Q. I guess we should start at the bottom of 15 where there is the question from a Jason Sidel. Do you see that?
A. I see that.
Q. Do you recall that name?
A. I think Jason Sidel was an analyst that followed the industry.
Q. He says, "A number of the other rail carriers are reporting they're increasing the percentage of fuel surcharge that they're recovering." Do you see that?
A. I see that.
Q. Can you guys give us the percentage that you recovered in the first quarter? Do you see that?
A. I see that.
Q. And you respond, "I think we have consistently elected not to be specific with you on that." Do you see that?
A. I see that.
Q. Was there a policy or a practice at



Norfolk Southern not to discuss the percentage of recovery through fuel surcharges?
A. No. Not a policy or a practice.
Q. When you said, "We have consistently elected not to be specific with you on that," do you know what you were referring to?
A. I think we were just selective in what we discussed with the analysts and didn't.
Q. And in this regard --
A. In this regard, I am indicating that we generally did not break out our pricing in pieces, I think.
Q. Do you recall reaching that decision at some point?
MS. REINHART: Objection. Misstates his testimony.
THE WITNESS: I don't recall reaching that decision.
BY MR. OLSON:
Q. Do you see in your next response after Jim Hixon says, "We maintain that," you say, "We regard that as competitive information"?
A. Uh-huh. I see that.
Q. Do you know what you meant by that?
A. As of today, no, I don't know what I



meant by that. I could speculate.
Q. That is okay. In the next sentence you say, "And I think, you know our strategy, which we have stated is; through a combination of hedges and fuel surcharges we endeavor to come as close as we possibly can to recovering the higher cost of fuel." Do you see that?
A. I see that.
Q. Did you get reports from time to time on how Norfolk Southern was fairing with regard to fuel cost recovery?
MS. REINHART: Objection to the characterization.
THE WITNESS: I don't recall any -- any reports. I may have received reports from time to time on that.
BY MR. OLSON:
Q. But you don't recall?
A. I don't recall.
Q. Do you recall around this period, 2005, early 2005, any report to you about whether Norfolk Southern was recovering its higher costs of fuel?
A. I don't recall any reports. No.
Q. But your statement here is that the goal of the combination of hedges and fuel surcharges was



to come as close as possible to recovering the higher costs of fuel, correct?
MS. REINHART: Objection. Misstates the document.
THE WITNESS: Our strategy, "through a combination of hedges and fuel surcharges we endeavor to come as close as we possibly can to recovering the higher cost of fuel." That sounds like a general -- a good general -- a general statement of strategy. Yeah.
BY MR. OLSON:
Q. Do you recall giving any directives about the objective of fuel surcharges and fuel hedging should be to come as close as we possibly can to recovering the higher cost of fuel?
A. I wouldn't have had a directive of that.
Q. But that was your understanding of the strategy at the time?
MS. REINHART: Objection. Assumes facts.
THE WITNESS: As a -- I am not sure we had a formal strategy on this question at that time. As a general -- as a matter of a general -- general intention to recover, it seems to me that is a reasonable -- reasonable goal.
BY MR. OLSON:

Q. Well, whether it is a reasonable goal, what you are saying here was that it was our strategy, correct?
A. I am simply saying that I don't believe we had a formal strategy. I am stating here that this, in general terms in a response to an analyst's question, that this is our strategy.
Q. And that was true at the time?
A. It was true at the time, you know, in the context I said it.
Q. Now, do you recall meeting at any time with shipper groups to discuss fuel surcharges?
A. No.
Q. Do you -- are you saying that you --
A. I don't recall any.
Q. Do you recall meeting with a group called the NGFA?
MS. REINHART: Asked and answered.
THE WITNESS: I don't recall meeting with them.
BY MR. OLSON:
Q. Does the -- do you know who the NGFA is?
A. Is that the National Grain?
Q. And Fertilizer Association.
A. Okay. I don't remember meeting with



them.
Q. Are you aware of that group?
A. In a general way, I know that I am aware of that group.
Q. It is correct. It is the National Grain and Feed Association. I apologize. You are aware of that group, correct?
A. I am aware of that group.
(A document was marked as Goode Exhibit No. 7.)
BY MR. OLSON:
Q. Let me hand you what has been marked Goode 7. And this is a collection of letters that came out of Union Pacific's files. I will just note that the letters -- the first one is addressed to Mr. Rose. Okay. First one is to Mr. Rose.
A. Uh-huh.
Q. Correct?
A. I see that.
Q. The second one is to Mr. Davidson from Union Pacific.
A. I see that.
Q. And the third one is to a Mr. Ward from CSX. Do you see that?
A. I see that.



Q. Then to a Mr. Haverty of KCSR. Do you see that?
A. I see that.
Q. And then the last one is to you. Do you see that?
A. Let me get to it.
Q. Why don't you review it?
A. I see that.
MS. REINHART: Let me just object to the extent that these documents you just described are attachments to a parent document that has not been offered as part of the package. We will just put that objection on the record.
THE WITNESS: Let me take this apart.
BY MR. OLSON:
Q. Sure.
A. I have scanned the letter.
Q. Okay. I will direct you to a couple portions of it. Let's start by the last page, which shows who wrote the letter or who sent it. And it is sent on behalf of the National Grain and Feed Association, correct?
A. Correct.
Q. And what is -- what do you know about that association? How would you describe it?



A. It is a national organization of people in the grain and feed business. That is all I know.
Q. And then the next group is the Fertilizer Institute?
A. I am really not familiar with the Fertilizer Institute.
Q. The next one is the National Industry Transportation League. Are you familiar with them?
A. That is a very -- that is a large organization of a number of shippers.
Q. And then the Paper and Forest Industry Transportation Committee. Do you see them?
A. That is -- I don't remember that group but it obviously represents the paper and forest industry.
Q. So it would be fair to say that this collectively represents a large group of shippers from shipping different commodities?
MS. REINHART: Objection to the form.
THE WITNESS: Yeah. I don't know what -- I don't know how large or how -- what the representation would be. I couldn't speak to that. But they are four lines of business that are important.
BY MR. OLSON:

Page 133

Q. And you indicated that NITL is fairly substantial, correct?
A. It is a very large general group.
Q. Now, at the beginning --
A. It is a group of -- it is a group that has a very large membership, I believe.
Q. At the beginning of the letter, it refers to a meeting in December of 2002, between the NGFA and representatives from Norfolk Southern. Do you see that?
A. I see that.
Q. Does that refresh your recollection at all about meeting with the NGFA?
A. No.
Q. Does it -- do you recall anyone reporting to you that they had met with the NGFA at or around that time?
A. No.
Q. So sitting here today, do you know whether you were at that meeting?
A. No. I don't.
Q. And it indicates that the NGFA had raised concerns about Norfolk Southern's fuel surcharge, correct?
MS. REINHART: Objection to the

Page 134

characterization of the letter.
THE WITNESS: Yeah. Well, the letter says -- letter says what it said.
BY MR. OLSON:
Q. Well, it indicates --
A. I will be glad to go through it and see, if you want me to, to see if I can determine. I am not familiar with this letter until today.
Q. Well, let's -- let's introduce another exhibit.
(A document was marked as Goode Exhibit No. 8.)
BY MR. OLSON:
Q. You can keep that one, and I will hand you what has been marked Goode Exhibit 8. Why don't you briefly review that.
A. Yeah. Okay. I have scanned the letter.
Q. Goode Exhibit 8 is a letter that you wrote in response to the letter that is in Goode Exhibit 7, correct?
A. I am not sure whether I wrote it or not.
Q. Fair enough. But you signed?
A. It bears my -- it bears my signature, and it apparently came out of my office.
Q. It is on your letterhead and you signed

Page 135

it, correct?
A. Correct.
Q. And it is a -- it is a responsive letter to the -- the correspondence that is -- that we were just looking at in Goode Exhibit 7, correct?
A. Correct.
Q. Do you -- do you have any doubt that you would have reviewed Goode Exhibit 7 at or around the time you received it?
A. I don't remember one way or the other whether I reviewed this letter or saw it.
MS. REINHART: Let's just be clear. I am sorry. Mr. Olson, were you referring to Exhibit 7 or Exhibit 8 at that time? I didn't hear you clearly.
BY MR. OLSON:
Q. My question is whether seeing that a responsive letter went out under your signature on your letterhead refreshes your recollection about whether you would have seen the letter that was sent to you on April 22, 2003.
A. And my answer is, no, it does not refresh my recollection.
Q. Well, let's look back at Goode Exhibit 7, the letter to you.
A. Yeah.

Page 136

Q. And the third full paragraph refers to two primary concerns with Norfolk Southern's fuel surcharge, correct?
A. I see that.
Q. The first one is the structure of the fuel surcharge, correct?
A. I see that.
Q. And what is raised there about the structure is that it passes costs to the shipper when fuel prices increase above a fixed point but the rates do not go down if fuel prices drop below that same point, correct?
A. I am going to have to read this. I don't think I understand this paragraph --
Q. Okay.
A. -- not being familiar with the mechanism. I have read it again. What was the question?
Q. The concern about the structure of this fuel surcharge was that essentially it is designed so that the shipper's costs will increase when fuel prices increase above a fixed point but they don't decrease when the fuel prices drop below that point, correct?
MS. REINHART: Objection to the --
THE WITNESS: I will try to read it

again.
MS. REINHART: Objection to the statement to the extent that it mischaracterizes the letter. The letter speaks for itself.
THE WITNESS: Yeah. I don't see that in the letter but --
BY MR. OLSON:
Q. Well, what do you understand the concern about the structure of the fuel surcharge to be?
A. I thought it was that he was suggesting that the customer is not given the benefit -- is not given the opportunity to use the most efficient hedging mechanisms. What he means by that, I am not sure.
Q. Do you see where it says -- it is the second sentence.
A. What he says is that the structure does not allow the shipper to manage the fuel price risks through conventional hedging. I am not sure why that is true.
Q. And let's look at -- let's look at the sentence before that. Do you see where he says, "The NS fuel surcharge is designed to pass costs to the shipper when fuel prices increase above a fixed point, but rates do not drop if fuel prices drop below that



same fixed point"? Do you see that?
A. I see that. I don't know how the formula works.
Q. My question is going to be pretty straightforward. The question is: Do you know whether NS made any change to its fuel surcharge policy to address that concern?
A. No. I don't know that.
Q. Now, the second issue that they raised are administrative costs. Do you see that?
A. I see that suggestion, yes, in the next paragraph.
Q. Right.
A. Yes.
Q. And if you turn the page, it says, "We would ask that NS review its policy on the fuel surcharges, in consideration of ways that NS can reduce the frequency of rate variability."
A. Yes.
Q. And it continues. Do you see that?
A. Yes.
Q. Do you know whether NS made any changes to its fuel surcharges that would reduce the frequency of rate variability?
A. I do not know that.



Q. Do you know whether the change that Norfolk Southern made in March of 2004, increased or reduced the frequency of rate variability?
A. I don't -- I don't remember that.
Q. Now, let's look at your response in Goode 8. I take it you don't recall ever discussing with Mr. Rose or Mr. Davidson or Mr. Ward this -- these concerns raised by these shipper groups, correct?
A. I do not recall any such meetings, no, or discussions.
Q. Let's look at Goode 8. I want to concentrate on the third full paragraph. Do you see the sentence that says, "Our fuel surcharge was designed"? It is in the middle of that paragraph.
A. Yes.
Q. "To be fair and equitable with all our customers to share the cost of significant increases in crude oil and related diesel fuel prices."
A. I see that.
Q. And then the last sentence says, "This feature allows for a sharing of increased costs between NS and its customers."
A. I see that.
Q. And then if you look at the next paragraph, it begins, "In sum" --



A. Uh-huh.
Q. -- "we would prefer an environment where fuel surcharges are moot" --
A. Yes.
Q. -- "but at this time, we feel we have in place an equitable fuel cost recovery mechanism" --
A. Yes.
Q. -- "that spreads cost absorption between NS and our customers."
A. Yes.
Q. Now, in correspondence with shippers, did you take care to accurately describe Norfolk Southern's practices?
MS. REINHART: Objection. Lacks foundation.
THE WITNESS: I am -- I am sure I did take such care in correspondence. I don't recall this correspondence.
BY MR. OLSON:
Q. Okay. You can put that aside. Now, do you recall a period of time when other railroads announced modifications of their fuel surcharge programs?
A. No.
Q. Let me hand you what has been marked

ERRATA SHEET OF DAVID R. GOODE
IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION

I, the undersigned, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 11 | 3 | "company responsible" to "company is responsible" | omitted words |
| 18 | 11 | "is" to "does" | verb tense |
| 26 | 4 | "scc.gov" to "sec.gov" | clarification |
| 26 | 5 | "SCC" to "SEC" | clarification |
| 28 | 11 | "at the time I" to "at the time" | clarification |
| 35 | 12 | "I am not not sure what long haul and" to "I am not sure what long haul is" | word usage |
| 39 | 23 | "was" to "were" | verb tense |
| 84 | 17 | "of the price" to "the price" | word usage |
| 87 | 9 | "Numbered" to "numbered" | capitalization |
| 91 | 7 | add "The effect of" before "Higher fuel prices" | omitted words |
| 103 | 18 | "have been" to "have been." | punctuation |
| 127 | 10 | "fairing" to "faring" | spelling |
| 134 | 7 | "am" to "was" | verb tense |
| 154 | 7 | add "to" before "each other" | omitted words |
| 168 | 17 | "heads, authority" to "heads. Authority" | punctuation |
| 184 | 22 | "recover" to "recovery" | clarification |
| 204 | 8 | delete one "Some were." | added words |
| 207 | 22 | "A" to "An" | word usage |

______________________
DAVID R. GOODE

Subscribed and sworn to me
this 17 day of February, 2011
Diane Hogan, Notary Public

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL ) MDL No. 1869
SURCHARGE ) Misc. No. 07-489
ANTITRUST LITIGATION, ) (PLF/AK/JMF)
This Document Relates To: )
ALL DIRECT PURCHASER CASES )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF CHARLES WICKLIFF MOORMAN
TAKEN ON BEHALF OF THE PLAINTIFFS
Norfolk, Virginia
January 7, 2011

"HIGHLY CONFIDENTIAL"



APPEARANCES:
On behalf of the Plaintiffs:
RICHARD I. WERDER, JUNIOR, ESQUIRE
BEN M. HARRINGTON, ESQUIRE
Quinn Emanuel Urquhart Oliver &
Hodges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
STEIG D. OLSON, ESQUIRE
Hausfeld LLP
11 Broadway, Suite 615
New York, New York 10004
(212) 830-9850

On behalf of Charles Moorman and the Defendant
Norfolk Southern Corporation:
JOHN M. NANNES, ESQUIRE
TARA L. REINHART, ESQUIRE
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7500



Appearances: (Continued)
On behalf of Charles Moorman and the Defendant
Norfolk Southern Corporation: (Continued)
JOHN M. SCHEIB, ESQUIRE
General Solicitor
Norfolk Southern Corporation
Three Commercial Place
Norfolk, Virginia 23510
(757) 629-2831

On behalf of the Defendant BNSF Railway Company:
LINDA S. STEIN, ESQUIRE
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-8185

On behalf of the Defendant Union Pacific:
CAROLYN WOODSON, ESQUIRE
Howrey LLP
550 South Hope Street, Suite 1100
Los Angeles, California 90071-2627
(213) 892-1867



Appearances: (Continued)
On behalf of the Defendant CSXT:
DAVID D. CROSS, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
(202) 624-2774

Also Present:
Rebecca Miller, Videographer

A. Okay.

Q. And have you seen this chain of documents before?

A. As I -- as I apparently wrote an e-mail about them I must have. I don't recall them specifically.

Q. And then let's focus for initially on the -- Mr. Seale's January 18, 2007, e-mail to you concerning the [redacted] bid.

A. Yes.

Q. And he refers to [redacted] would not agree to rebasing at this juncture. Do you see that?

A. I do.

Q. And do you understand rebasing in that context to mean the fuel surcharge that was adopted in 2006 that had the $64 trigger?

A. That would -- that would be my assumption.

Q. And that was internally known as rebasing within Norfolk Southern, was it not?

A. I think that was a term that we used.

Q. Okay. And if you look at the e-mail that is below the e-mail to you, there is an e-mail also on January 18th of 2007, from Mr. Seale to Mr. Lawson. Do you see that one?



A. I do.

Q. And he refers to -- he says, "A good resolution and as discussed we have to be nimble on the FSC as long as we use the old FSC as a uniform last resort measure to protect our markets." Do you see that?

A. I do.

Q. And by the "old FSC" do you understand him to be referring to the $23 trigger FSC that was used immediately prior to the adoption of the $64 trigger FSC?

A. In this context to that would be my understanding.

Q. And when Norfolk Southern adopted the $64 trigger fuel surcharge in 2006, it is true, is it not, that that fuel surcharge was intended -- that change was intended to be revenue neutral for Norfolk Southern?

MR. NANNES: Objection as to overbreadth.

THE WITNESS: I think that is overly broad. It was -- it was our starting position in every negotiation that we would attempt to make the change revenue neutral.

BY MR. WERDER:

Q. And in terms -- regardless of whether you



were able to successfully negotiate for it, the intention in structuring the $64 trigger FSC was that it would be revenue neutral to the old $23 trigger FSC, correct?

A. Let me answer that, which I think is the answer to your question, as I have said before, in every negotiation we went into, if we were going to have the starting position with our new fuel surcharge trigger was $64, it was also our policy that we would include a base-rate increase that would effectively make that neutral from a revenue standpoint.

Q. Okay. And you have referred several times to -- to these individual negotiations with customers over fuel surcharge issues. Do you -- have you personally participated in negotiations with customers concerning fuel surcharges?

A. No.

Q. Never at any point in time?

A. Not to my recollection.

Q. So any knowledge that you would have -- any testimony that you would offer concerning the -- concerning the negotiation of fuel surcharges would be based upon secondhand knowledge relayed to you from someone else, is that true?

MR. NANNES: Objection to the



characterization.

THE WITNESS: I wouldn't characterize it as secondhand but it would certainly be in conversations or briefings that I received from someone else.

BY MR. WERDER:

Q. Right. And I think you used the phrase "starting point" or a similar phrase in connection with these negotiations, is that right?

A. I believe that I did.

Q. Okay. And from your perspective as the president, CEO and chairman of Norfolk Southern, did it make sense to -- for Norfolk Southern to have a common starting point for negotiating with customers over fuel surcharges?

A. I think that there was some value to be had in taking a consistent beginning position.

Q. Why is that?

A. Because while every negotiation is different and every outcome may differ, I think it is just good corporate practice that if you are going to enter into negotiations and there is a particular issue that is involved, there should be a clear and consistent position on that issue.

Q. Do you -- you referred to every outcome

being different. Do you have any information about during the period of time where the $23 trigger fuel surcharge was applicable what percentage of NS customers who paid a fuel surcharge did not pay that -- a fuel surcharge structured with that standard trigger?

A. I don't -- I don't know what any breakdown would have been. No.

Q. Do you know if there were any customers that didn't pay -- who paid a fuel surcharge during that period of time who didn't pay a fuel surcharge that was structured according to the standard carload mechanism?

A. Well, of course, the first thing is carload because clearly our substantial intermodal business is structured completely differently.

Q. Withdrawn. Withdrawn. I understand that you have -- we have seen from various documents that there was a -- that there was an intermodal fuel surcharge and there was a carload fuel surcharge, correct?

A. There are different surcharges in both but the two broad categories are correct. Yes.

Q. So let me just ask you for a moment about intermodal.



A. Okay.

Q. And let me ask you whether you are aware of intermodal customers who paid a fuel surcharge who didn't pay the standard intermodal fuel surcharge.

A. I am just not aware.

Q. Okay. And for -- how about for carload customers, can you identify any carload customers who during the period of time when the $23 trigger carload -- publicly announced carload fuel surcharge was in effect who paid a fuel surcharge but paid a different fuel surcharge than the standard $23 trigger charge?

A. You are talking about in private contracts, not public tariffs, right?

Q. I am talking about --

A. All public customers would have clearly paid the same. In terms of private contracts, I don't know. But I -- my guess would be that there were some that had different fuel surcharge arrangements in place. But I don't know specifics.

Q. Focusing on the private contract customers.

A. Good. Okay.

Q. That is a significant percentage of your business, correct?



A. It is.

Q. And can you identify any private contract carload customers who, nonintermodal customers, who paid a fuel surcharge during the period of time when the -- when the $23 trigger carload surcharge was in effect who didn't pay the standard fuel surcharge structured with the $23 trigger?

MR. NANNES: Asked and answered, I believe.

THE WITNESS: I will answer again. I am not really aware of the specifics of any of the contracts regardless of what kind of fuel surcharge was in place. So the answer is, I don't know.

BY MR. WERDER:

Q. Have you heard the phrase "captive shippers"?

A. I have.

Q. And has at any point in time Norfolk Southern had a different fuel surcharge applicable to what might be regarded as captive shippers than it had applicable at the same time period for noncaptive shippers?

A. I am not aware, going back to our conversation about starting point in negotiations with customers, of any time in which we had a different



starting point in our negotiations depending upon whether or not a customer was single-line served or not.

Q. And are you able, as you sit here, to identify any particular shipper who you might regard as a captive shipper?

MR. NANNES: How about single served?

BY MR. WERDER:

Q. Single served is fine.

A. Single served is fine? There are a lot of companies who have movements on us that are single-line movements and may also have interline movements, as well. I think if -- sitting here trying to think of all of the customers we have. An example would be there are quite a few coal mines in Western Virginia, which ship metallurgical coal to the port of -- Lambert's Point for export overseas. There are automobile companies -- Toyota is a good example -- which ships product from Georgetown, Kentucky, which is -- well, actually that is open to CSX. There are chemical routes in which we have single-line service. There is a fair amount of traffic out there of all kinds in which it is single-line service.

Q. And are you aware of any data developed within Norfolk Southern that suggests that

Page 193

single-served shippers, either on average or collectively, pay higher fuel surcharges than nonsingle-serve customers?

A. I am not aware of any such data. No.

Q. Is there any policy within Norfolk Southern that would be offended by having a single-serve shipper pay a higher fuel surcharge than a nonsingle-serve customer?

MR. NANNES: Objection. Overbreadth.

THE WITNESS: Yeah. I would -- I don't -- the word "offended" I don't understand. I think I have stated before, I am not aware of any time in which it wasn't our -- always our practice in negotiating with any shipper to have a starting point on a fuel surcharge program that was consistent with every other negotiation regardless.

BY MR. WERDER:

Q. Regardless of whether the shipper is single served or not?

A. Yes.

Q. And are you aware of any efforts on the part of Norfolk Southern to start at a higher negotiating point in terms of the fuel surcharge than the standard fuel surcharge for a single-served shipper?

Page 194

A. Wait. I thought your question was going someplace and then at the very end I thought it went another.

Q. We -- you have talked about this kind of the standard starting point for negotiations, right?

A. Yes.

Q. And with respect to the -- just focus the question on carload for the moment.

A. Okay.

Q. For the period from -- from the period of time from March of 2004 through June of 2006, the standard published carload starting point number would be the $23 trigger with the -- with the standard escalations, correct?

A. I think that is correct. Yes.

Q. Okay. So my question is: During that period of time when that $23 trigger fuel surcharge was in effect, are you aware of any negotiations that Norfolk Southern undertook with any shipper where it sought to start the negotiations with a fuel surcharge structure and formula that was more favorable to Norfolk Southern than that $23 published number?

A. I just have to say, I am not aware of any.

Q. Okay. And when -- are you familiar with

Page 195

marketing directives that have been issued from time to time by Norfolk Southern's CMO?

A. I know they exist. Yes.

Q. And are you aware of directives issued with respect to fuel surcharge coverage that sought to achieve the result of the broadest possible fuel surcharge coverage across all of Norfolk Southern's customer base?

A. I am not aware of a specific directive but --

Q. But that was the policy, was it not?

MR. NANNES: Objection on overbreadth grounds.

THE WITNESS: Well, it was -- it was certainly Norfolk Southern's intention to have very broad and hopefully complete coverage of all our -- of our traffic in terms of having some accountability or some recognition of the volatility of fuel in the marketplace.

BY MR. WERDER:

Q. And that was true for both intermodal and carload traffic, correct?

A. Within the confines of the marketplace, I think that is correct.

Q. And it was also true for both

Page 196

single -- single-option shippers and shippers that had other rail service available to them, correct?

A. As I have said, it is all negotiations but that we would have had a common starting point.

Q. And in addition to having a policy of trying to get the broadest possible coverage for the fuel surcharge, it was also Norfolk Southern's policy and marketing directive not to trade off base rate for fuel surcharge, correct?

MR. NANNES: Objection on overbreadth grounds.

THE WITNESS: I am not sure I heard exactly how you stated that. Would you do it one more time for me?

BY MR. WERDER:

Q. Yeah. Norfolk Southern had -- had as a general policy the policy that people negotiating with customers were not to trade off base rate for fuel surcharge.

A. I think that our policy was that we had a, as I have said, a position going in in that we very much wanted to hold to that position to the extent that we could. And you can go from there.

Q. Well, have you discussed that issue with Mr. Seale?

Page 197

A. I am sure I have in the past. I don't recall the specifics of any conversation.
Q. And you are aware, are you not, that Mr. Seale was quite adamant with the persons that work for him that they were not to engage in discounting of base rates in any way, shape or form in order to get a fuel surcharge in the contract, correct?
MR. NANNES: Objection. Lack of foundation with respect to what Mr. Seale was saying.
THE WITNESS: I am -- yeah. I am not --
BY MR. WERDER:
Q. Just, you don't know?
A. I wasn't aware of those -- any conversations Mr. Seale had.
Q. Mr. Seale didn't advise you from time to time that the marketing policy, the pricing policy of Norfolk Southern was, one, to have fuel surcharges in absolutely as many -- for absolutely as many customers as possible and, two, not to give up anything on base rate in order to get those fuel surcharges, he never told you that?
A. Mr. -- I am sure Mr. Seale told me that he was issuing instructions that within the confines of the market we wanted to make sure that we weren't giving up anything that we didn't have to to obtain

Page 198

the business be it in the fuel surcharge or be it in the base rate or be it wherever.
Q. Do you know who Ron Listwak is?
A. I do.
Q. Who is he?
A. He is an assistant vice-president in the coal group.
Q. And who is Doug Evans?
A. He works for Ron Listwak.
Q. All right. Handing you what has been previously marked as Listwak Exhibit 2.
A. Okay.
Q. Have you seen that document before?
A. I have not.
Q. You can put it aside.
A. Beg your pardon?
Q. You can put it aside.
A. Okay.
MR. NANNES: Do you want five minutes?
MR. WERDER: Pardon me?
MR. NANNES: Do you want a couple of minutes?
MR. WERDER: No. I will be fine. It is just a little cramped.
(A document was marked as Moorman Exhibit

Page 199

No. 15.)
BY MR. WERDER:
Q. I am going to hand you what I have marked as -- sorry to be kind of rifling through these document quickly but I do want to try to keep to my -- to my commitment to not keep you here all day.
A. Okay. I was going to give you five minutes with your hand and say we wouldn't even count it on the time but I knew that I might have been kicked.
Q. You wouldn't want to do that. I have handed you what has been marked as Moorman Exhibit 15.
A. Okay.
Q. Have you seen that document before?
A. I have not.
Q. Let me -- I want to ask you a question about --
A. Let me always say one thing, I have not --
Q. To your recollection.
A. To the best of my -- yeah.
Q. Well, that is inherent in any answer that you give.
A. Okay.
Q. I want to direct your attention to the

Page 200

page that -- well, let me ask you, first of all, go back to the first page, can you identify who Bob Huffman is?
A. Bob Huffman is our vice-president, as it says, of intermodal operations.
Q. And he was in that position as of March 2001?
A. He was.
Q. And is he still in that position?
A. He is.
Q. And Mike McClellan, is he vice-president of intermodal marketing?
A. He was and is.
Q. And do either of those gentlemen report to you today?
A. Not directly. No.
Q. Who do they report to?
A. They report to Mr. Seale.
Q. And are they -- are they the people who have principal responsibility for Norfolk Southern's intermodal business?
A. Yes.
Q. And you would expect that they would be knowledgeable concerning market conditions confronting Norfolk Southern in the intermodal business, would you

Page 201

not?
A. I would have that expectation.
Q. And if I direct your attention to the Bates numbered page that ends with 359.
A. Let me flip there very quickly, if you don't mind.
Q. Yes. Take your time. Take your time.
A. Okay.
Q. And on the page that I referred you to that ends with the Bates Number 359 --
A. Right.
Q. -- it is a continuation of a set of bullet points that list key external assumptions regarding the intermodal business, does it not?
A. It is.
Q. And there is a reference in the first bullet point on that page to CSX and the assumption, as of March of 2001, was increasing skirmishes on pricing with more desperate action if share continues to decline. Do you see that?
A. I do.
Q. And have you become aware at any point in time prior to today that that was an assumption made by Norfolk Southern's intermodal business with respect to CSX in the 2001 time frame?

Page 202

MR. NANNES: Objection. Calls for speculation.
THE WITNESS: Yes. I just don't recall the exact state of the world in 2001.
BY MR. WERDER:
Q. You can put that aside.
A. Okay. Thank you.
(A document was marked as Moorman Exhibit No. 16.)
BY MR. WERDER:
Q. I am going to hand you what I have marked as Moorman Exhibit 16. Ask you whether you have seen that document before.
A. I have not.
Q. Take your time to review it. What I am going to focus on is the third last bullet.
A. Okay.
Q. On the first page, I should say.
A. Okay.
Q. And the third last bullet says, "While CSXT has an identical surcharge clause, based on customer comments, they appear to be more lax in applying the surcharge to private authorities. This does have competitive implications for NS."
MR. NANNES: Counsel, may I just inquire,

Page 203

is there a date associated with this that you know of?
MR. WERDER: Well, I think the date associated with it presumably is in the September 2002 time frame, which is referenced on the back page of the document.
MR. NANNES: Just a point of information. So your best information is the document -- it is two pages of a single document.
MR. WERDER: Well, it was produced by you with Bates numbers 010072905 and 906. So they are consecutively Bates numbered but that is the only information that I have about it.
MR. NANNES: As to whether it is one or two documents. Thank you for the clarification.
THE WITNESS: Okay. You had read the bullet point, and I -- I think I agreed that you had read it correctly.
BY MR. WERDER:
Q. Okay. And -- and what I want to ask you is the -- what is being discussed in the bullet you would agree is the -- the policy or practice that CSX appears to have been applying with respect to fuel surcharges, correct?
MR. NANNES: Objection speculation grounds.

Page 204

THE WITNESS: The way I read this, customers were telling us that CSX, to use the words that are in here, was more lax in applying a fuel surcharge to private authorities.
BY MR. WERDER:
Q. And would you agree with the statement that what CSX is doing with respect to fuel surcharges has competitive implications for Norfolk Southern?
A. I don't know the context in which this statement was made.
Q. Okay. You can put that document aside. Well, without knowing the context within which that statement was made, are you unable to answer my question?
Let me ask it this way. Let me ask it this way.
A. Yes. Ask it -- ask it another way.
Q. Separate and apart from anything that is set forth in that document, does the -- the manner -- the manner and extent to which CSX is charging fuel surcharges as a general proposition have competitive implications for Norfolk Southern?
MR. NANNES: Objection on overbreadth grounds.
THE WITNESS: Let me answer it this way:

aware or I am not familiar with what this specifically referred to as AAR initiatives at this particular point in time.
Q. Okay. Following that there is a reference to KCS/TFM. Do you see that?
A. Yes.
Q. Do you know what is meant by that?
A. This is in reference to Kansas City Southern Railroads proposed to merge with TFM, which the "M" is Mexico. It is one of the two rail franchises -- two major rail franchises is Mexico.
Q. And do you have any understanding about why UP would be making concerns about that merger known to Norfolk Southern?
MS. WOODSON: Objection. May call for speculation.
THE WITNESS: Yeah. I mean, I can read the words but I don't recall the conversation in particular as to why they would have sought our support. Done with this? I mean, with this.
BY MR. WERDER:
Q. Yes. Other than this document, Seale Exhibit 44, are you aware of any other written record of that July 18, 2003, BNSF meeting?
A. The July 18th or March 18th?



Q. The one that we just put aside. That was the July.
MS. STEIN: March 18th.
THE WITNESS: Or was it -- we have a May 14th UP document and a May 18th -- March 18th BNSF document.
MS. STEIN: March 18th.
BY MR. WERDER:
Q. Is it May? I am sorry. I meant the May 14th document, Exhibit 44.
A. No. I am not.
Q. Just so the record is clear, you are not aware of any other written record of what transpired at the meeting, the minutes for which are contained within Seale Exhibit 44?
A. No. I am not.
Q. Was there anybody at Norfolk Southern who was assigned when these alliance or executive team meetings or whatever you want to refer to them as occurred to take notes, make a record of any kind of what had transpired at the meeting?
A. I don't recall any specific assignment of someone. I just don't recall.
Q. I take it that you were not the person responsible for taking notes or making any record of



those meetings?
A. I don't recall being responsible for taking notes. No.
Q. Very good. 17. I am handing you what has been previously marked as Lanigan Exhibit 16. Let me ask you -- for the record, that is a document labelled, BNSF-Norfolk Southern, Executive Team Review, at the BNSF Board Room on May 17th of 2003. Do you have any recollection of this meeting?
A. No. No. I don't of this particular meeting. No.
Q. You can put that document aside.
MR. NANNES: Counsel, I just want to note for the record that we have a question about the actual date of the meeting. Since you put the document aside, there is no need to pursue it. But I just wanted to raise that for the record.
MR. WERDER: What is the question that you have?
MR. NANNES: Well, the question is the year of the meeting.
MR. WERDER: Do you have some reason to think that the date that is reflected on the document does not reflect the year in which the meeting occurred?



MR. NANNES: Yes. We believe the meeting was held in 2004.
MR. WERDER: Is this the first time that we have been apprised of that?
MR. NANNES: I don't believe that to be the case.
MR. WERDER: Thank you.
(A document was marked as Moorman Exhibit No. 17.)
BY MR. WERDER:
Q. I am handing you what has been marked as Moorman Exhibit 17. This is one of your expense reports from December of 2003 reflecting a meeting that you apparently attended with CSX in Jacksonville, Florida, in November of 2003. Do you have any recollection of having attended such a meeting?
A. Not -- I don't recall this specific meeting.
Q. Did you routinely attend meetings with CSX?
A. I would have meetings with CSX from time to time. I am not -- I don't think routinely would be the word I would apply.
Q. And what -- what were the -- in the 2003 time frame, what were the kinds of issues that you

would have been involved in a meeting with CSX about?
A. It is -- at that time, I still had responsibility for a small telecommunications company that Norfolk Southern owns and we certainly would meet with CSX mostly in relationship to our joint ownership of CONRAIL and the telecom activities on the rights of way up there. I may have been meeting for some other number of purposes. I just don't recall this meeting.
Q. You can put it aside.
(A document was marked as Moorman Exhibit No. 18.)
BY MR. WERDER:
Q. I am handing you what has been marked Moorman Exhibit 18.
A. Yes.
Q. Which is a document that relates to a December 16, 2003, BNSF-NS fall meeting.
A. Yes.
Q. Held in Memphis and Chattanooga. Does that mean it is held on a train between --
A. It was actually held on the train between Memphis and Chattanooga.
Q. On November 16, 2003. Did you attend this meeting?
A. Yes. I believe I was on this trip.



Q. Do you recall anything about the meeting?
A. I don't recall any specifics. I recall we were -- we rode from Memphis to Chattanooga.
Q. In terms of the substance of what was discussed, do you recall anything about the meeting?
A. I don't recall anything in particular. No.
Q. If you look at the last page of the document under, Other Commercial Issues, there is a reference in the fourth bullet point to fuel surcharge. Do you see that?
A. I do.
Q. Do you -- does that -- does that refresh your recollection at all concerning any discussion of fuel surcharges that occurred in this meeting?
A. No. As I have stated before, it is my assumption and certainly would be of my assumption certainly consistent with the other items it is just about interline business.
Q. But that is an assumption not a recollection, is that correct?
A. As I have said, I don't recollect the substance of the meeting.
Q. Were there any lawyers in attendance at this meeting?



A. I don't recall. I don't see a list of who was there.
Q. When meetings of this kind were held, was there typically any sort of antitrust advice that was given at the outset of the meeting concerning what should and shouldn't be discussed?
A. I know that we were all aware and are continually aware of our antitrust guidelines. I don't recall any specific advice at the beginning of this meeting.
Q. And going from this meeting to more generally meetings that have occurred between Norfolk Southern and BNSF, to your knowledge, has there ever been a practice of at the outset of or at some point early in the agenda for these meetings to have somebody give a refresher on antitrust issues with respect to what should and should not be discussed?
A. I don't recall that being a specific agenda item. No.
Q. Okay. And if I ask you the same question with respect to the similar meetings that have occurred over time between Union Pacific and Norfolk Southern, do you -- do you have any recollection of as part of that series of meetings that it would be a general practice for somebody to get up at the



beginning of or early in or at any time during such a meeting and give advice on what topics should and should not be discussed?
A. I don't recall that. No.
Q. And how about on meetings that you had with CSX?
A. I don't -- there were obviously far fewer of those meetings but, again, the answer is, I don't recall.
Q. Okay. And in the meetings that you had with BNSF over time, was there ever a practice for somebody to get up and say, We are only here today to discuss interline issues and we are not to discuss -- or words to the effect -- we are not to discuss any issues other than interline issues?
A. Well, that would -- we are -- we would certainly in all of these meetings have broad discussions -- you mentioned one yourself, general economic conditions -- that were not limited to interline issues. So the meetings in that context weren't necessarily limited to interline issues, anyway.
Q. And is that true for the meetings that you had with Union Pacific, as well?
A. I think most of them, for example, would

begin with such a general discussion.

Q. Okay. So there wasn't any discussion -- there wasn't any general practice, was there, in connection with either the meetings with BNSF or the meetings with Union Pacific for someone to get up and say, We are only here today to discuss -- and, again, I am talking about using words to this effect as opposed to these particular words -- we are only here today to discuss interline issues?

A. Well, again, as I say, first of all, say clearly, there was an understanding on everyone's part that we could not discuss issues that would be in violation of the antitrust guidelines. But beyond that, there were issues that weren't necessarily interline in nature -- legislation being a good one, technology being one, benchmarking operational practices -- that weren't interline that were perfectly appropriate to discuss.

Q. Right. And I am not debating with you whether they were appropriate or not. I am really just trying to get a scope. And it is true, is it not, that the meetings that occurred over time between BNSF and Norfolk Southern, including the few meetings that we have shown the agendas for, there was no effort made to limit the scope of issues discussed at



those meetings to purely interline issues?

MR. NANNES: Objection to the overbreadth of the question.

THE WITNESS: I am not sure -- I think I have answered essentially what you are asking in terms of the types of issues that would arise at this meeting. So I am not -- help me out here.

BY MR. WERDER:

Q. Well, I am really asking -- I am asking a fairly limited question I think.

A. Okay.

Q. And that is: Do you recall ever at any one of these meetings between Norfolk Southern and BNSF or between Norfolk Southern and UP somebody standing up and saying, We are only here today to discuss interline issues and that is all that it is appropriate for us to discuss?

A. I don't recall that because I have -- as I have previously stated, there were items that were not specifically interline that were perfectly appropriate to discuss.

Q. And that were, in fact, discussed?

A. Legislation, technology, all kinds of issues, general business conditions.

Q. And -- well, withdrawn.



Other than the sets of minutes that we have looked at that in one way or another have the words "fuel surcharge" on them, do you have any recollection of any meetings during 2003 that you attended with any other railroad where fuel surcharge issues were discussed?

A. I don't have any recollection of such meeting or discussion.

Q. Okay. And when you say you don't have any recollection of any meeting or discussion, are you saying that no such discussion occurred on the one hand or are you saying I don't know whether such a discussion occurred or not because I just don't remember?

A. I am saying that I have no recollection of such a discussion.

Q. And that was true, in fact, for the documents for the meetings where fuel surcharge was listed on the agenda, correct, you had no recollection of the discussion?

A. I did not recollect those particular discussions.

Q. Okay. And so what I am asking you is: According to the agenda of some certain number of meetings, fuel surcharges were discussed in meetings



that occurred in 2003, and you don't have any recollection of the discussion despite the fact that it is on those agendas, correct?

A. That is correct.

Q. And what I am -- what I am trying to determine is whether, with respect to meetings or discussions that for which no agenda exists on which the word "fuel surcharge" occurs -- appears, can you say that there wasn't any such meeting at which fuel surcharges were discussed or can you only say, I just don't recall whether or not there was a meeting at which fuel surcharges were discussed?

A. All I can say is what I know and that is that I have no recollection of such meetings or discussions.

Q. Okay. And then if we turn to 2004.

A. Right.

Q. Do you have any recollection of being in any meeting or participating in any communication with any representative of any other railroad at which fuel surcharge issues were discussed?

MR. NANNES: Objection on overbreadth grounds.

THE WITNESS: I have no recollection.

BY MR. WERDER:

Q. One way or the other?
A. One way or the other.
Q. And 2005?
A. No. No recollection.
Q. One way or the other?
A. That is correct.
Q. May have happened but you -- or may not have happened, you just don't remember?
A. I just don't remember.
Q. In 2006? We talked already about the one -- the meeting about the STB.
A. That is my caveat.
Q. Yes.
A. The conversation that would have gone around the STB hearing. Other than that, I don't recollect any conversations in meetings.
Q. And you don't know whether they occurred one way or the other?
A. I don't recollect so I can't speculate.
Q. And how about in 2007?
A. That -- yes. That would be the same answer. I don't -- I don't recall.
Q. In the context of -- you gave some testimony earlier about what everybody -- what everybody understood could and couldn't be discussed



in these meetings with BNSF and UP in particular. Was it appropriate -- would it be consistent with your understanding of what could and couldn't be discussed in these meetings to discuss future pricing plans with respect to noninterline business?
A. I don't -- without knowing the context, it is impossible for me to answer exactly. It would -- I would have to understand the context before I would think it would be appropriate.
Q. Bear with me a moment.
A. Certainly.
(A document was marked as Moorman Exhibit No. 19.)
BY MR. WERDER:
Q. I am going to hand you what I have marked as Moorman Exhibit 19. Moorman Exhibit 19, for the record, includes minutes of a -- of an NS -- an NS/UP alliance team meeting on May 15th of 2006, in Omaha, Nebraska, and it indicates that you attended that meeting. Do you recall attending that meeting?
A. Again, I recall going to meetings with the UP in Omaha. I don't recall the specifics of any given meeting but I am sure I was there.
Q. Have you seen this document before today?
A. I recall -- I have seen it in



preparation. I did not recall it before that.
Q. All right. And if you will refer to the last page of the document. There is a heading labelled, Sales and Marketing Update. And Jack Koraleski, can you identify him as being associated with Union Pacific Railroad?
A. Yes.
Q. What is his position there?
A. He is the chief marketing officer.
Q. And according to these minutes, "Mr. Koraleski emphasized that UP's strategy is to bring all traffic up to today's Market prices."
A. I see that.
Q. And then it goes on to say, "Both carriers are employing a strategy of shorter-term contracts or public pricing." Do you see that?
A. I see that.
Q. And there is no indication in connection with Mr. Koraleski's reference to wanting to bring all traffic up to today's market prices that his statement was in any way limited to interline -- to interline traffic, is there?
A. Well, it is my assumption that it was because it is an interline meeting.
Q. So it is your assumption that when



Mr. Koraleski said that the strategy is to bring all traffic up to -- up to today's market prices he was intending to communicate that he intends to bring all interline traffic up to today's market prices and not the rest of his traffic?
A. I will say first that my assumption is that he was talking about interline traffic and --
Q. Well, let me just press you on that a little bit. And you say it is an interline meeting. And where -- is there someplace in the document that says this is an interline meeting and we are here today to discuss interline? Take a moment to review it, if you would.
A. Well, you know, it is a meeting between two carriers, a bilateral meeting; therefore, the topics of conversation within the context of the commercial area are about the traffic that the two carriers handle together.
Q. Well, let me get back to my specific question and ask you whether -- well, I won't belabor the point with asking you to read the document because the word "interline" doesn't appear in the document in any way, does it, sir?
A. The fact that it was a meeting between NS and UP it is implicit that it was an interline

Page 237

meeting.
Q. Why is it implicit that it was an interline meeting?
A. Because it was the two carriers.
Q. And why is it implicit that the only issues that two carriers could ever discuss are issues that are limited to interline issues?
MR. NANNES: Objection to the characterization of his testimony.
BY MR. WERDER:
Q. You have already testified that you discussed issues that weren't related to interline at certain of these meetings so what is implicit about it?
A. As I have also discussed, it was known by all of us, clear to us, based upon certainly the training in our guidelines, that when it came to commercial issues the discussion was limited to interline issues. The testimony I have previously had was about issues that are related to the rail industry and the network as a whole such as legislation.
Q. Well, do you have any reason to think that when Mr. Koraleski was talking about bringing all traffic up to today's market prices that UP, in pricing their traffic, priced -- intended to price

Page 238

interline traffic at market prices and noninterline traffic at nonmarket prices? Is that your assumption about what he was communicating to you?
MS. WOODSON: Objection as to speculation.
THE WITNESS: I mean, you are -- you have asked me what I -- what I read out of this. I read that Jack Koraleski was talking about NS/UP traffic and ensuring that it was being handled at market prices.
BY MR. WERDER:
Q. And when you provide that testimony, are you doing anything other than reading the document and inferring from the document what you think must have been the case? Do you have a recollection today as you sit here?
A. No. As you say, I am reading it in the context of the meeting. I don't recall the specific conversation.
Q. And would your assumption change if you were aware that Mr. Koraleski had testified that his statement was not limited to UP's interline traffic with NS?
MR. NANNES: Objection.
THE WITNESS: I haven't seen

Page 239

Mr. Koraleski's statement so I don't know what to --
BY MR. WERDER:
Q. I know you haven't seen it but -- but if you were to learn that, from an authoritative source, that Mr. Koraleski testified concerning this very document and he testified that his statement was not limited to interline traffic, would your assumption concerning the statement that you have made based upon reading the document and not based upon your recollection change?
MR. CROSS: Objection to form. Are you representing that, or is that a hypothetical? I am asking you.
MR. OLSON: Are we supposed to answer the questions?
MR. WERDER: No. That is what he testified.
MR. CROSS: Okay. If you are representing it, I just want the record to be clear.
BY MR. WERDER:
Q. You don't have to take my representation. It is kind of a hypothetical question as it is. My read of his transcript is that he so testified. But someone else can read it, too. And if Mr. Koraleski testified that he wasn't talking about interline

Page 240

traffic, he was talking about all traffic, you would have no reason to disagree with that, would you?
MR. NANNES: Objection. Speculation as to what he meant.
THE WITNESS: No. Let me ask -- I am sorry.
MR. NANNES: I have made the objection.
THE WITNESS: My assumption is that he was talking about interline traffic pricing -- traffic. If you tell me as a statement of fact that he says he wasn't, I will accept that. But my assumption in reading this document would be, if not given that statement of fact, that he was talking about interline pricing.
BY MR. WERDER:
Q. If we go back to the first page of the document, which where -- under, State of the Railroad, do you see that?
A. I do.
Q. Was a discussion of state of the railroad kind of a standard part of these meetings?
A. I believe typically it would have been.
Q. And when state of the railroad was discussed -- when the word "state of the railroad" appears in a document like this, I should say, is it

ERRATA SHEET FOR CHARLES WICKLIFFE MOORMAN
IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION

I, the undersigned, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 1 | 14 | "Wickliff" to "Wickliffe" | spelling |
| 5 | 4 | "Wickliff" to "Wickliffe" | spelling |
| 7 | 2 | "Wickliff" to "Wickliffe" | spelling |
| 8 | 17 | "Wickliff" to "Wickliffe" | spelling |
| 8 | 24 | "Wickliff" to "Wickliffe" | spelling |
| 9 | 12 | "I have. With" to "I have, with" | clarity |
| 15 | 5 | "process. And" to "process, and" | clarity |
| 101 | 10-11 | "That convoluted in your statement." to "The question was convoluted." | omitted words, clarity |
| 102 | 2 | "pricing. If -- any" to "pricing -- in any" | word usage, clarity |
| 183 | 15 | "I wouldn't." to "I would disagree." | clarifying intent |
| 186 | 12 | delete "to" | clarity |
| 221 | 9 | "Railroads proposed" to "Railroad's proposal" | word usage |
| 221 | 11 | "is" to "in" | word usage |

Charles Wickliffe Moorman
CHARLES WICKLIFFE MOORMAN

Subscribed and sworn to me
this 9th day of February, 2011
Lisa F. Ehle, Notary Public
#304163 My Commission Expires June 30, 2013
City of Norfolk
State of Virginia

LISA F. EHLE
COMMONWEALTH OF VIRGINIA
NOTARY PUBLIC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL ) MDL No. 1869
SURCHARGE ) Misc. No. 07-489
ANTITRUST LITIGATION, ) (PLF/AK/JMF)
This Document Relates To: )
ALL DIRECT PURCHASER CASES )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF DONALD W. SEALE
TAKEN ON BEHALF OF THE PLAINTIFFS
Norfolk, Virginia
February 26, 2010

"HIGHLY CONFIDENTIAL"



APPEARANCES:
On behalf of the Plaintiffs:
RICHARD I. WERDER, JUNIOR, ESQUIRE
JOSEPH HAMMOND, ESQUIRE
BEN HARRINGTON, ESQUIRE
Quinn Emanuel Urquhart Oliver &
Hodges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
PAUL M. DONOVAN, ESQUIRE
LaRoe, Winn, Moerman & Donovan
1250 Connecticut Avenue NW, Suite 200
Washington, D.C. 20036
(202) 298-8100

On behalf of Donald Seale and the Defendant
Norfolk Southern Corporation:
JOHN M. NANNES, ESQUIRE
TARA L. REINHART, ESQUIRE
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7500



Appearances: (Continued)
On behalf of Donald Seale and the Defendant
Norfolk Southern Corporation: (Continued)
JOHN SCHEIB, ESQUIRE
General Solicitor
Norfolk Southern Corporation
Three Commercial Place
Norfolk, Virginia 23510
(757) 629-2831

On behalf of the Defendant BNSF Railway Company:
GARY A. WINTERS, ESQUIRE
Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3273

On behalf of the Defendant Union Pacific:
ALAN M. WISEMAN, ESQUIRE
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
(202) 383- 6638



Appearances: (Continued)
On behalf of the Defendant CSXT:
KATHRYN D. KIRMAYER, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
(202) 624-2532

Also Present:
Josh Bridges, Videographer

MR. WERDER: Rick Werder from Quinn Emanuel for the plaintiffs. With me are my colleagues Joe Hammond and Ben Harrington.

MR. DONOVAN: Paul Donovan, LaRoe, Winn, Moerman & Donovan, for plaintiffs.

MR. HARRINGTON: I am Ben Harrington. I have already been spoken for.

MR. WISEMAN: Alan Wiseman with Howrey representing Union Pacific.

MS. KIRMAYER: Kathryn Kirmayer with Crowell Moring and I represent CSXT.

MR. WINTERS: Gary Winters with Mayer Brown for BNSF Railway.

MR. SCHEIB: John Scheib, Norfolk Southern.

MS. REINHART: Tara Reinhart for Norfolk Southern and the witness.

MR. NANNES: John Nannes of Skadden Arps for Norfolk Southern and the witness.

THE VIDEOGRAPHER: Thank you. Please swear in the witness.

DONALD W. SEALE, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION



BY MR. WERDER:

Q. Would you state your name for the record, please.

A. Donald W. Seale.

Q. By whom are you employed, Mr. Seale?

A. Norfolk Southern Corporation.

Q. And what is your position at Norfolk Southern?

A. Executive vice-president and chief marketing officer.

Q. How long have you held that position?

A. Since 2006.

Q. To whom do you report?

A. To Wick Moorman, who is our chair and CEO.

Q. Is it fair to say that you are one of the highest-level executives at Norfolk Southern?

A. Yes.

Q. What are your responsibility in your present position?

A. I have responsibility for our commercial activities, business development, industrial development, real estate, developing new business sources, new markets and pricing activity.

Q. What are your responsibilities with



respect to pricing activity?

A. We are charged with ensuring that we price to the market effectively, that we generate an adequate return for our investors in terms of our investments of capital and expensewise and that we maintain a competitive position in the marketplace so we can grow our business and grow our market share.

Q. And when you say priced to the market, what do you mean by that?

A. The -- recognizing the competitive forces in the marketplace, identifying trends in the marketplace, opportunities and challenges.

Q. Have you had pricing responsibility since you came into your present position in 2006?

A. Yes.

Q. Did you have pricing responsibility in prior positions that you held before you took your present position?

A. Yes.

Q. What was your immediate prior position to your current position?

A. Executive vice-president sales and marketing.

Q. How long did you hold that position?

A. From 2000 -- make sure I get the dates



right. Fall of 2004 to 2006.

Q. And did you have pricing responsibility for the entirety of the period of time that you held that position?

A. Had pricing oversight responsibility as I do today.

Q. And going back even further in time from the fall of 2004 period, did you have pricing responsibility in the position that you held at that point in time?

A. Yes.

Q. What was your position at that point in time?

A. Senior vice-president of marketing services.

Q. And what was the period of time in which you held that position?

A. About approximately 2003 until 2004.

Q. At all points in time from 2003 to the present, have you had pricing responsibility?

A. Yes.

Q. Did you have pricing responsibility prior to 2003?

A. Yes.

Q. In what position?

A. Senior vice-president merchandise marketing.
Q. And how long did you hold that position?
A. From about 2000 until 2003 or 2004, in that time range, approximately.
Q. At all points in time since 2000, in the various positions that you have held at Norfolk Southern, have you had pricing responsibility?
A. Yes.
Q. Is it part of your role today as executive vice-president to communicate with personnel from other railroads?
A. Yes.
Q. In what context is it your responsibility to have such communications?
A. To ensure that our interlined activities in terms of our pricing as well as identification of markets, our service, our equipment, in other words, all of the components of our product, is coordinated on an interline, bilateral basis with each of our connecting carriers because about half of our business involves other railroads.
Q. What is -- what do you mean by interline activities?
A. In terms of having a through service, a



through schedule, a through commitment to equipment, a through price for that interline movement from Point A to Point B, from our originations to a termination on another railroad and also the originations of that other railroad to Norfolk Southern.
Q. And do you have communications with personnel from other railroads that do not involve interline activities?
A. I don't understand that question.
Q. Well, you said that your responsibility with respect to communications with other railroad personnel involved interline activities, and the question is: Other than with respect to interline activities, do you have -- have you had communications with personnel from other railroads?
A. On a bilateral, interline basis to develop through service schedules, through prices, identifying markets, being able to participate in those markets on a bilateral basis, that is the extent of that communication. That is the communication that is required on my part.
Q. And when you say "bilateral," are you talking about communications that occur between Norfolk Southern and one other railroad?
A. One other railroad that would be in the



route for that particular opportunity.
Q. Okay. And so is it your testimony that your communications with other railroads are limited to communications that relate to particular -- with one other railroad that relate to particular routes?
MR. NANNES: Objection as to form.
THE WITNESS: Could you restate the question?
BY MR. WERDER:
Q. Well, you talked about bilateral communications, and you talked about specific routes for specific movements. You didn't use the word "movement." My question is: Other than bilateral communications relating to specific routes, is it your testimony that you -- your responsibilities do not include communicating with personnel from other railroads?
A. Not in entirely. We would have industry issues such as transborder security issues, customs clearance issues that are industry issues. Interline service technology that is used at the gateways for interchanging, physically interchanging, traffic. So those types of universal industry issues would also be discussed.
Q. And you mentioned a couple of specific



industry issues. Can you tell me in more general terms the types of issues that you would characterize as industry issues?
A. General technology, security, things that are required to ensure that the railroad industry can interchange traffic effectively, that we have commonality with respect to processes for interchanging traffic so we can effectively serve customers in the marketplace.
Q. And do industry issues include issues relating to pricing?
A. No.
Q. Do industry issues, as you define them, include issues relating to fuel surcharges?
A. No.
Q. Is it your testimony that your responsibilities do not include having discussions with personnel from other railroads concerning fuel surcharges?
MR. NANNES: Objection as to form.
THE WITNESS: On a bilateral basis on our interline business, we have had communications on fuel surcharge as a component of our price that is required in terms of us having a through price and including a through fuel surcharge. So on our public-regulated

prices, that type of discussion would take place. And then in the negotiation process with customers as we negotiate a contract proposal, as well, we would need to have that concurrence from the connecting carrier for that particular business moving between a Norfolk Southern origin, a destination on that other railroad or an origin from that other railroad back to a Norfolk Southern destination.

BY MR. WERDER:

Q. Have you now fully described all of the communications that your responsibilities at Norfolk Southern require you to engage in with other railroad personnel concerning fuel surcharges?

MR. NANNES: Objection as to form.

THE WITNESS: I don't have anything else to add to that.

BY MR. WERDER:

Q. All right. And, again, you used the phrase "bilateral basis" and the phrase "interline basis." Is it your testimony that all of the communications that you have had with personnel from other railroads from 2000 to date have involved bilateral-basis and interline-basis communications?

A. The discussions of fuel surcharge application from NS origins to another destination on



another railroad, those discussions have taken place in an interline, bilateral nature as part of the interline negotiation process to serve the marketplace.

Q. And I just want to make sure that I understand what you mean by interline and bilateral. When you are using that phrase, are you intending to use it in relation to a particular shipment on a particular route for a particular customer at a particular time or are you intending to use it in some broader context?

A. It could apply to both.

Q. What -- and when it applies to -- well, withdrawn.

I want to lay aside communications that relate to particular movement for a particular customer on a particular route at a particular time and ask you to describe to me the types of conversations that your responsibilities -- that you perceive your responsibilities to require you to have with other railroads concerning fuel surcharges.

MR. NANNES: Objection as to form.

BY MR. WERDER:

Q. You can answer.

A. With respect to public-regulated



commodity prices, as far as having a general application for fuel surcharge application from NS origins to another railroad's destination on our interline business, it is required that we have that communication, it is required that we have a concurrence with that other carrier on the format and methodology that we are placing into effect to serve customers under those public-regulated rates.

Q. Is it fair to say that from the period 2000 to 2006, you have met regularly with personnel from other railroads who have pricing authority?

MR. NANNES: Objection as to form.

THE WITNESS: I would say I have had meetings. I am not sure your definition of "regularly." But we certainly have an open communication with respect to our interline business, which we have to have to be able to serve the marketplace effectively.

BY MR. WERDER:

Q. So you have had -- without regard to the term "regularly," you have had open communication with personnel from other railroads from 2006 to date who have pricing responsibility for those other railroads, correct?

A. On a unilateral/bilateral basis on



interline traffic, that is correct.

Q. You just used the word "unilateral" in addition to bilateral. What did you you mean by that?

A. Bilateral, interline discussions.

Q. What did you mean by the word "unilateral," which you used in your prior answer?

A. Well, that refers to only Norfolk Southern talking to only one other carrier on a specific application.

Q. Specific application. By specific application do you mean a specific -- a specific movement on a specific route for a specific customer?

A. It could include that.

Q. What else does it include?

A. It could include a broader application on public-regulated prices where we have a fuel surcharge, for example, that applies to -- on those prices on that interline basis.

Q. Is the fuel surcharge that you have had for your public-regulated prices from 2000 to date different from the fuel surcharge that you have had on movements that aren't public regulated, that don't involve public-regulated prices?

A. We have had many variations of fuel surcharges through the negotiation process in the

marketplace. Oil prices have been volatile. Energy prices have been volatile. And the marketplace is a -- is a very complicated place and it is subject to negotiation. So we have had lots of negotiations, lots of variations of fuel surcharges through that negotiation process as we attempt to be competitive in the marketplace with other modes as well as grow our business.

Q. Well, is there any point in time between 2000 and today at which you would draw a distinction between the general fuel surcharge policy that Norfolk Southern had announced as between public-regulated prices, that environment, and nonpublic or nonregulated environment?

MR. NANNES: Objection as to form and lack of foundation.

BY MR. WERDER:

Q. You can answer.

A. I would like you to restate the question so I can completely understand what you just asked.

Q. Well, Norfolk Southern has, by way of example, announced various fuel surcharge policies at various points in time from 2000 to date, has it not?

A. We have had many different approaches trying to deal with the volatility of that issue.



Yes.

Q. Well, there was a policy announcement in 2000 of something that you referred to in prior testimony as your original fuel surcharge, correct?

A. It was the only fuel surcharge that we had had that I recall in many years.

Q. The question was a little different, though. There was a policy announcement of a generally applicable fuel surcharge that you have testified was your original fuel surcharge and that policy announcement occurred in about 2000, correct?

A. It was the original public price, regulated price fuel surcharge that we announced, and then we had many negotiations from that basis with -- in an attempt to increase coverage over time.

Q. And is it your testimony that that announcement related to public-regulated prices and not to a policy of more general application?

A. Yes.

Q. And is that true for the March 2004 revised fuel surcharge, as well?

A. Those announcements would have been related to the public-regulated commodities.

Q. And were they limited in their application as practiced by Norfolk Southern to



public-regulated commodities?

A. Well, as I have said previously, we negotiated many variations of fuel surcharge through the negotiation process for contracts, confidential quotes and other arrangements. So we had an initiative to try to apply a fuel surcharge on our business to the extent we could to offset unprecedented volatility.

Q. And that was true without regard to whether the movement in question involved a public-regulated movement versus a nonregulated movement, correct?

A. Yes. We were seeking general application.

Q. In your present position, do you have responsibility for Norfolk Southern's fuel surcharges?

A. I have several people, many people, that are involved in that process, which they would also be involved in the pricing process.

Q. Tell me, first of all, from 2000 to date, what has been your role, your responsibility with respect to Norfolk Southern's policies and practices with respect to fuel surcharges?

A. Oversight of the pricing process of which fuel surcharges are included as a component of the



market price.

Q. Has it been part of your responsibility to design and develop a fuel surcharge policy for Norfolk Southern?

A. I have no inherent expertise in designing fuel surcharge formulas. So I have had people that work for me look at formulas, look at the market, tell me what we could consider as a formula that might treat the volatility of oil prices and fuel prices and also still be competitive in a changing marketplace.

Q. And so is it fair to say, then, based on your prior answer that people working for you and reporting to you have been the ones who actually have designed the formulas?

A. They have designed iterations of formulas for us to look at and also provided input on the marketplace in terms of what would be required to compete with truck and to compete with the changing nature of the marketplace.

Q. And who has made the decision to implement particular fuel surcharge policies and practices at particular times from 2000 to date?

A. Generally, that has come up to me. And based on the myriad input and recommendations, we would make a decision based on that collective input.

Page 25

Q. But you are the -- have you been the key decision maker for Norfolk Southern with respect to fuel surcharge policies at all points in time since 2000?
MR. NANNES: Objection to form.
THE WITNESS: I would say I was one of several that considered options and that the decision would have come to me eventually for the final approval. Of course, also keeping other folks involved and communicated with within the company.
BY MR. WERDER:
Q. Are you the person who was responsible for giving final approval to whatever fuel surcharge policies and practices Norfolk Southern has had since 2000?
A. Generally, yes.
Q. And prior to coming to you for final approval, can you describe for me or indicate for me who are the personnel working for you who have made a decision or recommended a decision that was brought to you for final approval?
A. Over what period of time?
Q. 2000 to date.
A. Well, it has been numerous people. Assistant vice-presidents in 2000, group

Page 26

vice-presidents after 2000, directors of administration, price administration, our sales force with respect to market intelligence from our customers, input bilaterally on our interline basis from other railroads that would have to be considered in terms of what their view would be and what would be acceptable on an interline basis because it wasn't a decision that we could make unilaterally, it had to be made bilaterally.
Q. Who is the person from -- is there a person -- withdrawn.
Is there a single person who from 2000 to date in your organization has been the person closest to you in the organizational structure who has been responsible for bringing recommendations to you with respect to the adoption of fuel surcharge policies and procedures?
A. There is --
MR. NANNES: Objection to form.
THE WITNESS: There is no one person.
BY MR. WERDER:
Q. Is there -- at each point in time between 2000 and today, is there one person who has been your principal deputy for the development of fuel surcharge policies and procedures?

Page 27

A. Again, no one person involved in that.
Q. At any point in time?
A. Correct.
Q. Who are the principal -- who were the principal people in 2000?
A. I had two assistant vice-presidents at that time, one, I asked that assistant vice-president to look at the marketplace. And we had no fuel surcharge. And his name was Walt Trollinger. And he --
Q. Trollinger?
A. Trollinger.
Q. Can you spell that for me?
A. T-r-o-l-l-i-n-g-e-r.
Q. Okay. And there was another one?
A. No.
Q. And Mr. Trollinger you said you asked to look at the market?
A. To see what type of formula we could format and design to address unprecedented volatility that we were beginning to see in the oil market. We saw fuel prices go up some 90 percent in one year. And we had contracts and other commitments that we had to -- we did not have protection with respect to that volatility.

Page 28

Q. And you are talking about the year 2000 at this point in time?
A. '99 to 2000. Correct.
Q. And in -- did you task Mr. Trollinger with the responsibility to go out and look at the market?
A. Tasked Mr. Trollinger to look at a formula. And, obviously, in looking at a formula, we would want to understand what trucking was doing, what the marketplace had out on fuel surcharge applications so we could take that into account as we considered what an acceptable formula might be for our consideration.
Q. And you referred to trucking, and then you referred to the marketplace. By marketplace are you referring to what other railroads are doing?
A. What other modes are doing generally.
Q. But -- does that include what other railroads are doing?
A. It would include all modes.
Q. Was Mr. Trollinger tasked with the responsibility to communicate with other railroads concerning what they were doing with respect to fuel surcharges?
A. No.

Page 29

Q. Did he do that?
A. He -- he looked at the public filings on public-regulated prices and took that into account with respect to what had been published.
Q. Other than looking at public filings, to your knowledge, did Mr. Trollinger have communications with other railroads concerning what they were doing with respect to fuel surcharges?
A. No. I am not aware of that.
Q. Moving forward in time from 2000, was there -- did Mr. Trollinger continue to have that responsibility after 2000?
A. He retired after 2000.
Q. Okay. Did somebody replace him in the role in which he had been serving with respect --
A. We changed -- we changed the organization and instead of having two assistant vice-presidents we created five group vice-presidents that had integrated marketing and sales capacity.
Q. And that was done in 2000?
A. Yes.
Q. And did the responsibilities that Mr. Trollinger had with respect to fuel surcharges then devolve to five different group vice-presidents or was there one person who had principal

Page 30

responsibility in your organization?
A. We had five people with input, and we had a director of price administration with input, as well.
Q. Who was the director of price administration?
A. Initially, a gentleman named Bob Scharpf. And then he retired, and then a gentleman named Pat Glennon.
Q. And can you describe for me generally the roles that Mr. Scharpf and Mr. Glennon played as director of price administration in relation to the roles that the group vice-presidents played with respect to the formulation and implementation of fuel surcharge policies?
A. Mr. Scharpf and Mr. Glennon had the responsibilities of our -- being able to rate through a technology perspective, from accounting perspective our rates including interline prices that we published from our origins, which would include the fuel surcharge component of the price. So, therefore, they would act as a gathering point for information from the five group vice-presidents, assimilate that information and provide it to myself and others for review with respect to possible decisions.

Page 31

Q. Was it Mr. Scharpf's responsibility and then later Mr. Glennon's responsibility to develop a recommendation to -- that would be brought to you for approval?
A. They did not have that specific charge. It was more of a collective set of inputs coming from the five group vice-presidents of commodities plus the input from the director, either Scharpf or Glennon.
Q. And was it their responsibility to collect the input from the group vice-presidents and to bring you a package, for want of a better word, that included the recommendations of the five group vice-presidents plus themselves?
A. Not necessarily. I could ask for input directly from the GVPs or they may ask for input from the GVPs or the GVPs may ask for input from the director.
Q. You several minutes ago when you were talking -- withdrawn.
You testified that you had the final approval for the fuel surcharge. Did you have to go to anybody higher than you in the organization to seek concurrence in your -- in your whatever fuel surcharge policy you had decided to adopt?
A. I would keep my superiors informed of our

Page 32

deliberations and our review and let them know what the decision that we had reached, let them know of that decision, ask for comments. And if no comments were received, then that decision then would be implemented.
Q. Who were your superiors at the various points in time between 2000 and to date?
A. My superior was Ike Prillaman, who was vice-chairman and chief marketing officer, who, in turn, reported to David Goode, our chairman, president and CEO.
Q. And when you were describing, in your prior answer, the nature of the interaction between you and your superior, was it Mr. Prillaman that you were having that interaction with for the period of time when he was in -- prior to his retirement?
A. Yes.
Q. And was Mr. -- is it Mr. Goode?
A. Yes.
Q. Did you also have those communications with Mr. Goode or did your communications end with Mr. Prillaman prior to Mr. Prillaman's retirement?
A. I can't recall. I am sure that we could have had a discussion at the chairman's level but it -- generally that would not take place.

Page 33

Q. And after Mr. Prillaman's retirement, who was the person that you would be -- that would be your superior who would fall into the category of the interaction that you described a moment ago?
A. Well, after Mr. Prillaman retired, I became chief marketing officer. So unless I mentioned something along these lines to our new chairman and CEO, Wick Moorman, it would be -- it would culminate in my office and the decisions would be made.
Q. And it is Wick Moorman?
A. Yes.
Q. Did you have any conversations that you can recall concerning fuel surcharges with Mr. Moorman at any point in time?
A. I am sure we had some discussions. I can't recall any specific discussions that we had.
Q. Who was Mr. Moorman's predecessor, immediate predecessor?
A. David Goode.
Q. And was Mr. Goode the chairman in 2000?
A. Yes.
Q. Did you have any discussions with Mr. Goode, that you can recall, concerning Norfolk Southern's fuel surcharge policies and practices?
A. Well, as I just stated, I could have. I

Page 34

don't recall specific discussions. But that would not generally be what I would talk to the chairman about.
Q. All right. Now, several minutes ago in describing the information that would be collected, that was collected, in the process of formulating the fuel surcharge policy, you referred to input from other railroads on what would be acceptable to them. Do you recall that?
MR. NANNES: Objection as to form.
THE WITNESS: What I stated was input from a -- on a bilateral basis from another railroad when we were discussing our interline application of our price, which would include the fuel surcharge.
BY MR. WERDER:
Q. And I want to be very specific about this next question. Is it your testimony that the only input that Norfolk Southern received with respect to the formulation of its fuel surcharge policy at any point in time from 2000 to to date would always have been on a bilateral basis with respect to interline movements?
MR. NANNES: Objection as to form.
THE WITNESS: The discussions that we had were centered around bilateral, interline processes. And if any other discussions took place, it could have

Page 35

been with respect to a general form that could be relayed to attorneys for their review to see if the industry could address format that would -- that would address customers' ease of doing business.
BY MR. WERDER:
Q. What do you mean by format?
A. Methodology process. At the time, customers were telling us that the ease of doing business was something of a concern, and we were finding that our fuel surcharge and price from our origins to a destination on another railroad would have a different format for the fuel surcharge and price from that same railroad coming back to our destination.
Q. And by format do you mean to include such things as the trigger price for the -- at which the fuel surcharge would kick in and the percentage applicable to various increases in fuel price?
A. On an interline basis, those types of specifics would be discussed on specific interline application.
Q. And when you say specific interline applications, is it your intention to limit that response to particular movements for particular customers on particular routes at particular times or

Page 36

is your intention to be providing more broad -- more broadly based information?
A. On an interline basis, it would include both.
Q. So on an interline basis, on which you -- what you are testifying is an interline basis the communications that you had with respect to the format -- what you call the format of the fuel surcharge was not limited to particular customers on particular routes at particular times, correct?
A. It was -- if you -- if you identified all of the customers that would participate in a public-regulated price from Point A to Point B, from NS origin to a destination on another railroad, it could include a specific customer, it could include specific customers, plural, or a group of customers.
Q. The question -- thank you. Thank you for that. Let me just try to ask it a little more specifically. And the question is: In -- in having what you have called these interline-related discussions, is it fair to conclude that those discussions were broader than discussions that would discuss a particular movement for a particular customer on a particular route at a particular time?
A. Yes. By nature, they would have to be.

Q. Okay. And then you testified earlier -- well, withdrawn.
You referred to format and methodology and process. Can you tell me everything that you intend to have encompassed within your -- by your use of those three terms?
MR. NANNES: Objection. I just don't recall that he used those specific terms.
BY MR. WERDER:
Q. The record -- the record will reflect what he -- what he -- what he testified to.
Q. You did use the word "format," did you not?
A. I would have to look at the context that I used it in but I think I did.
Q. Okay. And I think you also used the word "methodology," correct?
A. I would -- again, would have to look at the context of how I used it.
Q. All right. Well, let me just ask you, without reference to your prior testimony, which will be reflected in the record, did -- were the discussions that occurred between Norfolk Southern and other -- and other railroads, did those discussions, I should say, include discussions of the "format" of the



fuel surcharges that the various railroads would impose?
A. On a bilateral basis, again, on interline traffic, we would have to have those discussions to be able to negotiate with the customer, put something in specifically or, on the public-regulated prices, put something in in general where it would have application for those customers out there using that book of prices.
Q. And let me ask you the same question with respect to the word "methodology." Did the discussions that Norfolk Southern had with other railroads concerning fuel surcharge policies and procedures include discussions of the "methodology" of the fuel surcharge?
MR. NANNES: Objection as to form.
THE WITNESS: On an interline basis, we would have to have discussion of that because as we -- as we worked on this, some of our connecting carriers on a bilateral basis preferred one format on mileage-based fuel surcharge or an on-highway diesel-fuel surcharge or a heating-oil based fuel surcharge. We had a West Texas Intermediate oil basis for us. So there were different interpretations, different positions by different railroads and by



nature of having different positions, those discussions on interline business would need to take place; although, I will tell you that the end product of those deliberations everybody generally stuck to what they thought was best.
BY MR. WERDER:
Q. We will get to some of the specific discussions a little bit later but for now what I would like to ask you is is what is encompassed by the word "format," the word "methodology" as those words relate to fuel surcharges?
A. Again, I think I just stated this. On an interline basis, it would include the structure of the fuel surcharge, the type of basis for it, oil versus diesel versus heating oil, thresholds, things that two carriers would have to talk about on an interline basis to be able to address a public-price application or to address a contract negotiation for a customer between those two railroads that involve the two railroads to be able to deliver the service to the customer.
Q. And the -- so such things as whether the fuel surcharge would be based on the price of West Texas Intermediate versus diesel fuel, that would be one of the topics that would be encompassed within



format and methodology?
A. Certainly between the two railroads on interline traffic, that is correct.
Q. And that is, in fact, a topic that you discussed with personnel from other railroads, correct?
A. Yes.
Q. And does it include the -- you said the thresholds. By thresholds do you mean the price at which the fuel surcharge would become applicable?
A. Yes.
Q. And the prices at which increased fuel surcharges would come into place as the price of the -- of the -- of the whatever index was being used increased?
A. Yes.
Q. And did you, in fact, have discussions with other railroads concerning those thresholds?
A. On an interline basis for both public-regulated prices and in negotiations that took place for on behalf of a customer for a contract, we would have had those discussions on a bilateral basis.
Q. And does it also include the percentage fuel surcharge that would be applicable at various threshold levels of whatever price index was being

used?
A. Yes.
Q. And you had those discussions, as well, correct?
A. I think I just answered that. Yes.
Q. And at any point in time when you were having these discussions, did you indicate to any of the personnel from other railroads that you were communicating with that you -- that Norfolk Southern was going to implement a different set of policies and procedures with respect to fuel surcharges on unregulated traffic than it was implementing pursuant to its public rate structure?
A. No. I don't recall that.
Q. Did any of the personnel from the other railroads that you had these discussions with ever indicate to you at any point in time that they intended to implement a different set of policies and procedures or a different set of methodologies and formats with respect to publically regulated -- public-regulated fuel surcharges than they intended to implement with respect to the rest of their business?
MR. NANNES: Objection as to form.
THE WITNESS: The wide variance of negotiation process on both our originated traffic as



well as originated traffic from an interline carrier back to NS, by virtue of having so many variations of confidential contract negotiations, applying fuel with different formats in those contracts, by nature of that, I would say that certainly we had those types of discussions bilaterally. I am not sure I would term it as a policy but certainly a byproduct of the negotiation process as we tried to address a very volatile, unpredictable oil market.
BY MR. WERDER:
Q. Let me ask the question a little bit differently. Did any of the personnel from the other railroads that you had discussions of fuel surcharges with ever indicate to you that it was their intention to apply a different set of methodologies with respect to the fuel surcharge on nonregulated business than they were applying with respect to the public-regulated business?
MR. NANNES: Objection as to form.
THE WITNESS: No.
BY MR. WERDER:
Q. Was it part of the -- we have talked about your responsibilities with respect to fuel surcharge policies and procedures within Norfolk Southern and the responsibilities of your organization



generally. Was it part of the responsibility of you and your group to design a fuel surcharge that you -- fuel surcharge policy that you believed would maximize revenue for Norfolk Southern?
A. We were trying to design something that would ensure the volatility that we were beginning to see in the fuel market, that it would give us some protection against that volatility. We started to see oil move upward at increments that none of us had seen in decades and that caused us great concern. So our first and foremost objective was trying to deal with that volatility that was hard to forecast and very, very unpredictable.
Q. Separate and apart -- withdrawn.
In addition to trying to design a fuel surcharge policy that would give some protection against volatility, was it also the responsibility of you and your group to design a fuel surcharge that would maximize revenue for Norfolk Southern?
A. Well, certainly we wanted to be competitive in the marketplace, and we wanted to convert traffic from motor carrier to rail. We wanted to grow our business. So the fuel surcharge as a component of our price, certainly, we wanted it to be effective, to collect revenue from it but at the same



time ensure that it was competitive in a changing marketplace so we could grow the business. And we did see the business grow.
Q. That is helpful, and I appreciate that. And I want to follow up on a couple of aspects on it in a moment. But let me just go back to the specific prior question that I asked you and that is: Was it part of the responsibility of you and your group to design and implement a fuel surcharge policy that would maximize revenue for Norfolk Southern?
A. No.
Q. Did you, in fact, without regard to whether it was your responsibility to do so, seek to design and implement a fuel surcharge that would maximize revenue for Norfolk Southern?
A. No.
Q. You testified that you wanted to be competitive in the marketplace and then you referred to highway transportation. When you testified about wanting to be competitive in the marketplace, did you intend to include within that a desire to be competitive with other railroads or were you talking about other modes of transportation?
A. All modes. And my reference to highway is that the highway market is so much larger than any

other transportation market in this country.
Q. And so your prior answer with respect to wanting to be competitive in the marketplace was intended to encompass being competitive with other railroads, correct?
A. With all modes.
Q. With other railroads, as well?
A. Railroads included.
Q. Have you, over the course of time since this litigation was filed, become familiar with this lawsuit?
A. I don't have any direct knowledge of this lawsuit.
Q. Have you read the complaint?
A. No.
Q. Have you read any memo or summary describing the complaint?
A. No.
Q. Have you -- and this is just a yes or no question. Have you had some summary given to you of what the allegations in the complaint are?
A. No summary. Just -- just in general what the -- what the complaint is.
Q. And do you have a general understanding about what the -- what the case is about?



A. Yes.
Q. Have you -- did you do anything to collect documents for production pursuant to document requests in this lawsuit?
A. I met with counsel and reviewed documents.
Q. And has there been an attempt made to your knowledge to produce all of the nonprivileged documents that you had that were responsive to the discovery requests?
A. Yes.
Q. Did you review the discovery requests?
A. I did not review the discovery requests.
Q. What exactly did you do?
A. Counsel advised us to retain all files of which I communicated with my assistant and others to ensure that we complied.
Q. What did you do to prepare for your deposition today?
A. Met with counsel and reviewed documents.
Q. How many times did you meet with counsel?
A. Two or three times.
Q. When was the most recent time?
A. Yesterday.
Q. How many hours did you meet?



A. A couple of hours, two to three hours.
Q. And on the prior occasions -- when was the next immediate prior occasion?
A. Probably the week before. Yeah. The week before.
Q. Last week?
A. Yes.
Q. And who did you meet with?
A. John Nannes, Tara Reinhart, John Scheib and David Coleman.
Q. Is he an internal --
A. Internal counsel. John Scheib is internal counsel. And we also had one other internal counsel, David Coleman.
Q. Was there anybody other than either inside or outside attorneys for Norfolk Southern present at any of those meetings?
A. No.
Q. And how long did the meeting last week last?
A. I would say -- I don't recall specifically -- but maybe five hours.
Q. And when was the -- you said there were two or three meetings. Was there another one prior to that?



A. Those were the two primary discussions. Yes.
Q. Was there another meeting that you had with counsel with respect to -- with respect to preparation for your deposition that you wouldn't characterize as a primary discussion?
A. John Scheib and I might have talked briefly but I wouldn't characterize that as primary preparation.
Q. Did you talk to any of your colleagues at Norfolk Southern with respect to the fact that you were going to be deposed and what the topics might be?
A. I mentioned to our CEO that I was being deposed.
Q. Did you have any substantive discussion with him about what the deposition was likely to be about or what your testimony might be?
A. No.
Q. Other than the CEO, have you -- have you had discussions concerning the deposition with any other personnel within Norfolk Southern?
A. Just legal counsel.
Q. Have you talked to Mr. Glennon about the deposition?
A. No.

Q. Is he still employed by Norfolk Southern?
A. He is retired.
Q. Is there somebody who has taken over the responsibilities that Mr. -- that Mr. Glennon had that he had taken over from Mr. Scharpf?
A. We have a lady. Her name is Carol Orndorf. And she has some of those responsibilities now along with a larger set of responsibilities.
Q. When did Mr. Glennon retire?
A. I don't recall specifically but I will guess 2003 to 2004.
Q. And at that point in time, was Ms. Ordorf -- did Ms. Ordorf assume whatever responsibilities Mr. Glennon previously had had as director of price administration with respect to the fuel surcharge?
A. Well, with respect to the fuel surcharge, she would have some of the same tabulation responsibility working with the group vice-presidents, the publication responsibility of publishing prices that Norfolk Southern publishes.
Q. By tabulation, is that what you mean, the publication?
A. No. The tabulation is gathering input from the group vice-presidents.



Q. So she took over -- she did take over the responsibility that Mr. Glennon had for soliciting input from other personnel within Norfolk Southern with respect to fuel surcharge pricing policies?
A. She had a -- she has a different set of responsibilities today. So she has not been as involved with that type of discussion.
Q. And is that -- did you fill that role directly yourself rather than have somebody replace Mr. Glennon in that capacity?
A. No. We have used the group vice-presidents and other vice-presidents as primary input for those types of things.
Q. Other than the group vice-presidents, what other vice-presidents -- what other areas of responsibilities of the vice-presidents have become involved?
A. We have a vice-president of coal and energy. And they would have been involved -- those officers would have been involved with some of the review process, as well.
Q. Have you talked to Mr. Glennon since this lawsuit was filed?
A. No.
Q. Have you talked to anybody about the



lawsuit within Norfolk Southern other than counsel?
A. No.
Q. Have you talked to any former Norfolk Southern people about the lawsuit other than counsel?
A. No.
Q. Have you talked to anybody from any other railroad concerning this lawsuit?
A. No.
Q. We talked a few moments ago about the -- about the fuel surcharge that came into effect in 2000. And I wanted to -- just wanted to kind of step back a little bit. First of all, was that the -- was the announcement in 2000 of the fuel surcharge the first time, to your knowledge, that Norfolk Southern had had a fuel surcharge?
A. Yes.
Q. And did you make the decision to implement that?
A. As I recall, yes.
Q. And tell me -- sometimes we ask questions in these depositions that seem a little silly especially given the prior discussions but just for the record can you tell me what -- as Norfolk Southern uses the phrase, what is a fuel surcharge?
A. Well, again, when we looked at it in



2000, we were seeing unprecedented volatility in a major component of our transportation service, which is fuel. And that volatility told us that we needed to have some protection, some type of protection, in our pricing to ensure against these spikes that we were beginning to see. We were hoping that the spikes would just be spikes but as it turned out they weren't. And oil went from $12 a barrel to, as we know, as high as $147 a barrel. So unprecedented volatility. So we -- we were trying to design something to address that volatility as a component of our overall price.
Q. And it is true, is it not, that prior to 2000, there were price-escalator formulas in various public -- in various rate authorities that or pricing authorities that Norfolk Southern had that would make the price responsive in some way to fuel price, correct?
MR. NANNES: Object to form.
THE WITNESS: Yes.
BY MR. WERDER:
Q. Describe those for me, please.
A. Well, we could have had a negotiated fixed-price escalator, which would only address what we knew at the time we negotiated the price. We could

Page 57

in -- in early 2004, for a revised policy that took place -- that took effect in March of 2004, correct?
A. Yes.
Q. And the fuel surcharges that were created and imposed with respect to those announcements were percentages of line haul rates, correct?
A. Yes.
Q. And is line haul rate the same as base rate as Norfolk Southern uses that term?
A. I wouldn't use base rate and line haul rate interchangeably. I don't know the context of base rate. The line haul rate would be the transportation rate for moving a commodity between Point A and Point B.
Q. Is the phrase "base rate" a phrase that you are not familiar with?
A. Well, I am familiar with it but I am not -- I wouldn't use base rate and line haul rate interchangeably and that was your question.
Q. What is the difference?
A. Well, a rate, it could -- you could use the term "base rate" to say that it is a -- it is the component of price before other components of price are added to that.
Q. Is that how the phrase is used within

Page 58

Norfolk Southern?
A. Well, generally, within Norfolk Southern, we don't walk around using base rate very often.
Q. Wasn't there -- weren't there directives that were issued by you to personnel working for you and other personnel in the Norfolk Southern organization to ensure that base rates were not -- that the negotiation of base rates wasn't affected by the fact that there was going to be a fuel surcharge imposed?
MR. NANNES: Objection as to form.
THE WITNESS: There could have been directions from me and others with respect to the negotiation process with customers, which was numerous, because the fuel surcharge application plus price is something we have negotiated over time was that we didn't take one and change one to get another, that we tried to maintain our price that was applicable plus the fuel surcharge that would apply as part of the total price.
BY MR. WERDER:
Q. And so it was, in fact, your directive, wasn't it, that the fact that a fuel surcharge was being imposed was not something that your people ought to -- ought to take into account in setting base

Page 59

rates?
MR. NANNES: Objection as to form.
THE WITNESS: We would have had that discussion. But, again, in the negotiations in the marketplace with customers, we would also ensure that, one, we tried not to lose the business; two, to gain more business; three, we wound up customizing many different fuel surcharges and agreements as part of the negotiation process to be competitive in the marketplace.
BY MR. WERDER:
Q. I appreciate that information. Let me just go back to the specific question for a moment and we are going to talk about some of these what you just talk about a little bit later. But it was, in fact, your direction to the Norfolk Southern pricing organization that base rates should not be sacrificed at the expense of imposing a fuel surcharge, correct?
MR. NANNES: Objection as to form.
THE WITNESS: My instructions would be that we were not going to automatically adjust one as we applied the other.
BY MR. WERDER:
Q. And your instructions, in fact, went beyond we were not going to automatically adjust base

Page 60

rate as we imposed a fuel surcharge, correct, they extended to we -- it is our policy not to adjust base rate as we impose the fuel surcharge, correct?
A. That is not totally correct because, obviously, we are trying to maintain our position in the marketplace. And while we -- we may try to maintain something, that doesn't mean that we were able to maintain it through the negotiation process and the competition.
Q. All right. Let me see if I can differentiate between the stated goal or policy and the implementation of the stated goal or policy. It was your intention, was it not -- and this intention was directly communicated to the Norfolk Southern pricing organization -- that we do not want to adjust base rates based on the fact that we are imposing a fuel surcharge, those are two independent components of our pricing, correct?
MR. NANNES: Objection.
THE WITNESS: I will restate what I just said as --
BY MR. WERDER:
Q. Can you answer it yes or no to that and then --
A. It is not a question that I can answer

Page 61

yes or no.
Q. Okay. So was it not your policy, then?
A. It -- our policy was to not trade one off against the other but to try to negotiate with the customer in the marketplace to attain fuel surcharge application along with our line haul pricing that might have been applicable.
Q. So the starting point or the policy was to avoid trading off one against the other to the maximum extent possible, correct?
A. Well, to the extent possible and be competitive in the marketplace.
Q. At all relevant times between 2000 and today, has Norfolk Southern published on its Web site the percentage of the -- the percentage fuel surcharge that is applicable at a particular point in time?
A. For our public-regulated commodities, those prices, we would have had that published on our Web site.
Q. And have you had commissioned or done any sort of analysis that at any point in time seeks to differentiate the fuel surcharge percentage that Norfolk Southern is charging on its public-regulated prices from the fuel surcharge that is being charged on nonregulated business?

Page 62

MR. NANNES: Objection to form.
THE WITNESS: I don't understand that question. If you would restate it, please.
BY MR. WERDER:
Q. Well, you referred to the Web site. And I think you said that what you published on the Web site were the percentages applicable to public-regulated business, correct?
A. Yes.
Q. Okay. And I take it that you are attempting to distinguish public-regulated business from other business, correct?
A. Well, no. What I am distinguishing is that there is a public regulated set of prices that would include a fuel surcharge applicable to those public prices, and then there are many, many other negotiated prices that are in confidential quotes, contracts, other confidential formats with customers that are negotiated. So there is not one single fuel surcharge but a multitude of applications negotiated in terms of being able to be competitive and what we can finally agree on with the customer and also, if it is interline business, with the interline railroad that is involved.
Q. Has Norfolk Southern, from 2000 to date,

Page 63

sought to apply the same percentages of fuel surcharge that are on its Web site associated with what you call public-regulated business to unregulated business?
A. We have had many variations of fuel surcharges as I just stated.
Q. The question is a little bit different, though. As a policy objective or a directive to your pricing teams, has it been the directive that the same percentage surcharge that is published on the Web site with respect to what you call public-regulated business should also be applied to the maximum extent possible to unregulated business?
A. Well, as a matter of policy, it would be the starting point of negotiation but not necessarily where we would wind up in a negotiation.
Q. So it was -- is it fair to say, then, that it was the directive that the same fuel surcharge that was published on the Web site with respect to what you call public-regulated business would also be attempted to be applied as broadly as possible to unregulated business?
A. To the extent that we could negotiate that with the customer on an interline railroad. And what we found that the interline railroads had different formats that they used from their origins to

Page 64

our destinations. We had a different format from our origins to their destinations.
Q. And that -- those differences were problematic for you, were they not?
MR. NANNES: Objection.
THE WITNESS: Problematic in what sense?
BY MR. WERDER:
Q. Well, they caused you concern.
A. Well, our customers told us it caused us concern because they would have a charge from one origin on us to a destination on another carrier and then have a separate formula and application and a different charge coming back over the same route from that origin on the other carrier coming back to the same destination origin point on Norfolk Southern.
Q. We talked a moment ago about line haul rate and base rate. Without regard to what phrase we use for that, is there -- is there one of those two phrases that you prefer to use?
A. I have no preference for this discussion but I would usually use line haul.
Q. And did the -- as of 2000, when the fuel surcharge was first imposed, were line haul rates set with the objective of recovering some certain range of fuel prices?

Page 65

A. The line haul prices that were in effect could have been in for a number of years, negotiated in the mid '90s, late '90s as we had many contracts in place. We had many confidential quotes in place that went beyond one year. And we might have rates in that had an assumption of oil being at $12 a barrel. We might have rates in that had an assumption of $15 a barrel.

Q. Without regard to what particular level of oil prices was assumed in a particular contract, was it the intention of Norfolk Southern in formulating its line haul rates as of 2000 to set those rates with an eye towards covering or recouping some certain level of fuel costs?

A. In 2000, at that time, we would not have had the focus on oil with respect to line haul pricing. We had not seen -- in fact, from '87 up through the '90s, we had not seen the volatility that we started to see in 1999 and 2000. So our focus would not have been what is the price of oil relationship to a line haul price. When we started to see the volatility is when we started to look at what type of component of price could we implement. And I don't agree with the word "impose," implement, because it was implementation in the marketplace to address

Page 66

that volatility.

Q. Well, I think I -- I think I understand what you are -- what you are telling me but let me ask you a little more specifically. In the absence of the fuel surcharge, prior to the time that the fuel surcharge was imposed, were your -- were your rates set with an eye towards covering some level of anticipated or assumed oil prices?

MR. NANNES: Objection to the use of the term "imposed" given his prior answer.

BY MR. WERDER:

Q. I am sorry. I will try to keep that phrase out.

A. The key -- the key component of your question is anticipated or assumed component. While we had a cost system, the cost system would have some component of that in but we had no way of assuming or anticipating the unprecedented volatility that we had already seen in 1999 going into 2000.

Q. Let me try it this way. When you set the fuel surcharge in 2000, the minimum price at which a fuel surcharge would be applicable was $28 a barrel for West Texas Intermediate, correct?

A. Yes.

Q. And then when you revised the fuel

Page 67

surcharge in 2004, the minimum price at which a fuel surcharge would be applicable was $23 a barrel for West Texas Intermediate oil, correct?

A. Yes.

Q. And my question is: Was there an intention, as of 2000, in setting your line haul rates to have those rates set at a level that would recoup the cost of oil at prices up to $28 a barrel for the WTI?

A. No. I have -- we had no methodology of changing a price that was set in 2000 that might apply to 2001, 2002 to have it relate to a certain cost of oil. There was no way of doing that.

Q. And maybe I am not asking my question clearly. But what I am trying to understand is what -- in an environment where you had a $28 strike price, what did you do in your pricing to -- to cover the oil price, an oil price environment, below $28?

A. The prices that we were implementing were negotiated in the marketplace for confidential and contracts, and then public prices were published at levels that we thought we could be competitive in the marketplace and handle the business.

Q. And prior to the implementation of your fuel surcharge, the first one in 2000, was it your

Page 68

conclusion that your base rates or your line haul rates were being set in a way that would adequately recoup fuel costs at levels up to $28 a barrel for WTI?

A. No. We did not feel that our rates were being constructed that could address the volatility that we were seeing.

Q. Didn't ask you about the volatility.

A. We had no methodology or process of being able to relate a rate, a line haul rate, directly to a future oil price. I think I've stated that previously.

Q. I didn't ask you about future oil prices, either. What I am asking you is: Was it -- was it your determination as of 2000 when you implemented the first fuel surcharge that your line haul rates ought to be set at a level that would be sufficient to recoup fuel costs so long as the fuel cost didn't exceed the price that would be associated with $28 a barrel for WTI?

A. No. And I am responding that we had no methodology or system to be able to make that determination. We were essentially and only trying to implement a formula that would address future volatility and it had no relationship to what we

Page 69

thought our current prices were or what the oil assumption was in those current prices.
Q. So when you set the $28 strike price in 2000, that had no relation to your then existing line haul rates, correct?
A. The formula the way -- the way -- we were trying to come up with something we had never had before and it was not a systematic, empirical review process. It was simply to have something in as a backstop to protect us against volatility that we were seeing that was beginning to worry us.
Q. And the backstop that you put in had no relation to your then existing line haul rates, correct?
A. That is what I am saying that we had no way of making that empirical correlation.
Q. And it had no relation, the backstop that you put in -- withdrawn.
The backstop that you put in in 2000, had no relationship to the then current prices of oil, correct?
MR. NANNES: Objection to form.
THE WITNESS: The current prices we were putting in were prices that were being negotiated in the marketplace.

Page 70

BY MR. WERDER:
Q. And but I am asking you about the -- I am asking you about the backstop methodology that you -- or the way you just described it that you put in in 2000 and that backstop methodology had no relation to the current price of oil, correct?
MR. NANNES: Objection as to form.
THE WITNESS: The backstop that we put in had a $28 oil threshold, West Texas Intermediate threshold.
BY MR. WERDER:
Q. I understand that. Did that -- was that $28 threshold set based upon any understanding that you had about what fuel price level you were intending to recover through your line haul rates without the application of the surcharge?
A. No.
Q. Thank you.
THE VIDEOGRAPHER: Excuse me for interrupting. There is about five minutes left on this tape.
MR. WERDER: Good. We will go for a couple more minutes and then we will take a break.
BY MR. WERDER:
Q. We can take a break at any time, by the

Page 71

way. It is convenient sometimes to take them corresponding to the tapes but whenever you need a break we can take a break.
Okay. So how did you decide on 28?
A. As I said, we had no systematic way of reviewing something that we had never had before. And we benchmarked the marketplace what was published out there publicly. And a recommendation came forth based on that benchmarking process.
Q. And by the recommendation coming forth, you are talking about a recommendation presented to you or are you talking about a recommendation that you developed and presented to someone else?
A. A recommendation presented to me.
Q. And this would have been presented to you by Mr. Scharpf at that time or Mr. Glennon or both of them?
A. No. Mr. Trollinger.
Q. I am sorry. I got ahead of myself. So Mr. Trollinger came to you with the $28 recommendation?
A. As I recall, he came to me with several variations and we eventually decided on the $28.
Q. And was the $28 level based upon benchmarking to what other railroads were doing at the

Page 72

time?
A. There was another railroad that had a $28 threshold.
Q. Who was that?
A. As I recall, the BN Santa Fe.
Q. And then the $23 threshold that was set in -- withdrawn.
Have you -- you talked about the recommendation that came forth on the basis of this benchmarking. Other than the benchmarking, are you aware of any other factors that went into setting the $28 threshold in 2000?
A. No. I am not. Again, we were looking for something that we thought would be protection against volatility and we hoped that this would only be a backstop and that oil would go back down to 15 to $18 or maybe even $12.
Q. Is it fair to say, then, that the $28 threshold that was set in 2000 was set on the basis of benchmarking?
A. I think that is a fair statement.
Q. And the $23 threshold that was set in 2003 -- in 2004, what were the factors that went into setting that threshold?
A. There was a fuel surcharge at that level

Page 73

in the marketplace. It had been in the marketplace. We were reviewing that in terms of how much additional business we may be able to secure from our customers because we thought we had a lower fuel surcharge in at the time and we thought we would be rewarded with additional business by maintaining a lower fuel surcharge versus the carrier that had put the higher fuel surcharge in at 23. So we looked at the marketplace for six, seven months. We also, during that same time frame, again, were projecting that oil prices would come back down, would recede somewhat. They didn't recede. This was in 2003, the summer of 2003, the fall of 2003. And so we -- that was the -- that was the review process.

Q. Have you now completely summarized the factors that went into setting the $23 threshold?

A. That we ultimately decided to meet the competition in the marketplace because we didn't see additional business coming from customers nor did we see oil prices going down.

Q. So you ultimately decided to join the competition rather than to try to get the market to reward you based upon your -- what you described as your lower threshold -- your lower fuel surcharge?

MR. NANNES: Objection as to form.

Page 74

THE WITNESS: We had tried for six, seven months to get the market to reward us.

MR. WERDER: Let's take a break.

THE VIDEOGRAPHER: This is the end of Tape Number 1. We are going off the record at 10:32 a.m.

(Recess taken.)

THE VIDEOGRAPHER: This is beginning of Tape Number 2. We are now back on the record at 10:45 a.m.

BY MR. WERDER:

Q. Mr. Seale, do you -- have you regularly participated in earnings calls, earnings conference calls, for Norfolk Southern?

A. I have over the last three years.

Q. And are you a presenter, have you been a presenter at those conferences?

A. Yes.

Q. Is it the intention of Norfolk Southern, in communicating with the analyst community in those conferences, to accurately communicate both the drivers of Norfolk Southern's financial results and Norfolk Southern's business philosophy and competitive positioning?

A. Certainly to outline the results, the

Page 75

business results, for the quarter.

Q. Is it not also Norfolk Southern's intention to accurately present Norfolk Southern's business philosophy to the extent it is presented?

A. Well, yes, to the extent that it is presented. We would be talking about our service delivery and that type of activity.

(A document referred was marked as Seale Exhibit No. 1.)

BY MR. WERDER:

Q. Hand you what has been marked as Seale one. For the record, Seale 1 is a transcript of the July 28, 2004, earnings conference call, Norfolk Southern Corporation's earnings conference call. Did you participate in that call, Mr. Seale?

A. I am reading the document briefly here.

Q. Okay.

MR. WISEMAN: Can I inquire, is this an NS-produced document? It has no production number on it.

MR. WERDER: It is taken off the Internet.

BY MR. WERDER:

Q. Tell me when you -- tell me when you have looked at it sufficiently to know whether you

Page 76

participated in the call.

A. Could you restate your question?

Q. Did you participate in this call?

A. No.

Q. Were you present for this call?

A. Not that I recall.

Q. Let me direct your attention, if I could, to the page that has got the Page 99 at the top right-hand corner. And Mr. Goode, you previously identified him as the -- as the chairman, correct?

A. Yes.

Q. All right. And Mr. Goode is asked a question here at -- on this page, "Can you maybe address the potential or the ability you guys had, listening to your term, to gain" -- "share relative to your eastern competitor who might be having more performance-related issues than yourselves?

"And then assuming that has been the case, the sustainability of it or the philosophy you have towards it, share a gain on a longer-term basis?"

And Mr. Goode says, "That is not our business philosophy. Our business philosophy is to go where the business is and the vast majority of the business is on highway."

Do you see that?

A. Yes.
Q. Does that accurately reflect Norfolk Southern's business philosophy towards CSXT as of July of 2004?
A. Well, I can't interpret what Mr. Goode was saying here but, as I have said previously in the testimony this morning, the vast majority of the business in transportation in North America is moving via the highway.
Q. Mr. Goode's statement appears to indicate that it is not Norfolk Southern's business philosophy to gain share at the expense of CSXT, correct?
MR. NANNES: Objection to the characterization.
BY MR. WERDER:
Q. Withdrawn. As of July of 2004, was it Norfolk Southern's business philosophy to seek to gain share at the expense of CSXT?
A. We looked at all of the market, all modes and prepared and delivered service that we hoped would be competitive with all modes, truck, rail, barge, as well as geographic and product competition in the marketplace.
Q. And was it your business philosophy as of July of 2004 to seek to gain share at the expense of



CSXT?
A. We would be seeking to gain share where we can serve the market, serve the customer and have the better product.
Q. Did you discuss at any point in time up to and including July 2004 Norfolk's -- Norfolk Southern's business philosophy with respect to CSXT with Mr. Goode?
A. At what point in time?
Q. At any point up to July 2004.
A. Certainly I don't recall specific conversations but I am sure that I've had discussions with him regarding our competitive posture with all components of the market including CSXT.
Q. Are you aware of -- well, withdrawn.
In the 2003 time frame, did Norfolk Southern have a hedging program with respect to fuel?
A. I am not recalling the specific time frame but we did have a hedging program.
Q. And are you aware of a meeting that occurred in April of 2003, where Norfolk Southern personnel educated CSX personnel with respect to the operation, economics, et cetera of Norfolk Southern's fuel hedging program?
MR. NANNES: Objection to the form.



THE WITNESS: No.
(A document was marked as Seale Exhibit No. 2.)
BY MR. WERDER:
Q. Hand you what has been marked exhibit Seale 2. Your name doesn't appear on this document. I just want to ask you about who some of these who some of these people might be. Do you know who Kathryn Sharpe is?
A. I do not.
Q. Do you know who David Baggs is?
A. I do not.
Q. Do you recognize any of the names under the "To" line at the top e-mail on the first page of the document?
A. No.
(A document was marked as Seale Exhibit No. 3.)
BY MR. WERDER:
Q. You can put that document aside. I will give you a document that I am sure you have seen before. Handed you what has been marked Exhibit Seale 3. Can you identify that document, please? Can you identify the document for me?
A. It is a copy of my written statement



before the Surface Transportation Board, document dated April 27, 2006.
Q. And did you -- did you go and present oral testimony that related to this written testimony?
A. Yes.
Q. And have you had an opportunity to review this document in connection with your preparation for your deposition?
A. Yes.
Q. So you don't -- do you need to review it at this point or is it something you are sufficiently -- I am going to direct you to specific parts of it. Is that going to be sufficient for you or do you need to take more time?
A. I think so.
Q. Great. So I want to first direct you to Page 2 of the document in the second full paragraph where you're providing an overview of the ways that you say that Norfolk Southern has tried to respond to the fuel market. And you talk about fuel surcharge programs, "Which we have always viewed as an energy surcharge." Do you see that?
A. Yes.
Q. What did you mean -- what were you intending to convey to the Surface Transportation

Page 81

Board in characterizing the fuel surcharge as an energy surcharge?

A. That the -- that fuel was one component of consumption related to volatility in oil. Gasoline for our wheeled fleet would be another component. Lubricants would be another component. So there was more than just diesel fuel that was related to oil volatility that we were seeing.

Q. Okay. Do you recall what steps in general you took to prepare yourself for this STB hearing?

A. I met with legal counsel.

Q. And was there anybody other than legal counsel involved in your preparation for the hearing?

A. No.

Q. And the written statement, there is something, like, seven lawyers listed on the cover of the statement. Were one or more of those lawyers involved in assisting you in preparing this written statement?

A. Yes.

Q. Was there anybody other than those seven lawyers involved or one or more of those seven lawyers involved in helping you prepare?

A. No.

Page 82

Q. And the same is true with respect to the preparation for your oral testimony?

A. Correct.

Q. Was the fuel surcharge intended, that you are describing here as an energy surcharge, intended to recoup some cost that Norfolk Southern was experiencing?

A. It was intended to deal with the volatility and unpredictability of oil and fuel as well as gasoline and lubricant costs and expenses.

Q. Was it intended to recoup some certain portion of fuel costs?

A. It certainly was intended to recoup or to be part of the overall price for the service that would help us deal with that volatility of fuel.

Q. My question is a slightly different one. I think -- that may be a partial response. But the question is: Was the energy surcharge that you are describing on Page 2 intended to recoup some or all of the fuel cost that Norfolk Southern incurred in providing its service?

A. Since we -- we had no way and we have no way of measuring fuel costs for individual shipments, as I have testified here, based on different weights of commodities in shipments in the same train, the

Page 83

number of locomotives, the age of locomotives, the terrain, the curvature of the track, we had no way of empirically linking fuel surcharge to recouping costs of fuel.

Q. With respect to a particular shipment?

A. Correct.

Q. Okay. Let me broaden the question out. In any given year during the period 2000 to date, Norfolk Southern incurred some amount of fuel expense, correct?

A. Yes.

Q. And in certain of the years, Norfolk Southern incurred more fuel expense in a current year than in the immediately prior year, correct?

A. Yes.

Q. Without regard to individual shipments, was the -- this overall -- this overall program that you are describing here intended to recoup some of the costs that Norfolk Southern incurred on an overall basis in providing its overall service to all of its customers?

A. Certainly it was intended to be part of the overall price as contained in this document.

Q. That is -- was it intended to recoup the fuel costs that Norfolk Southern was incurring on an

Page 84

annual basis for its entire service?

A. It was intended to be a component of the price in the marketplace specifically addressing fuel and oil volatility but an overall component of the price we were using to be competitive in the marketplace to grow the business.

Q. And I am sorry to keep repeating the question but was the surcharge -- withdrawn.

Approximately, do you know approximately how much in fuel cost, diesel fuel cost, Norfolk Southern incurred in, let's say, 2005?

A. I can't recall that number.

Q. All right. Whatever that number was, was the fuel surcharge that Norfolk Southern had in effect in 2005 intended to recoup either the entirety of or some portion of the overall fuel costs that Norfolk Southern incurred in 2005?

A. It was intended to be a component of the price that we had. We had no way of modulating the collection of the fuel as a component of the price with the overall consumption and costs of our fuel.

Q. So was it not intended, then, to recoup either all or some portion of the overall fuel cost that was incurred in 2005?

A. Certainly as a component of the overall

the 2005/2006 period not earlier?
A. Well, I think two things. One, price improvement starting in 2002 and a much stronger economy in 2005 and 2006 would have generated higher revenue.
Q. And so is it -- and, again, we can -- we can look at documents that show the actual numbers, I guess. But in terms of your understanding of Norfolk Southern's experience, is the -- the observation of a sharp increase in rates in 2005/2006 not consistent with your experience?
A. I think it is a combination for -- in our case, not the industry, but in Norfolk Southern's case, it is a combination of higher volumes, improved coverage in fuel surcharge, improved pricing as supply was constrained in the marketplace, both truckload, barge and rail.
Q. Without regard to the causes of what was observed, it is true, is it not, that what was observed was a sharp increase in your revenue per ton mile in 2005 and 2006?
A. I would have to look at the previous years before I could categorize our performance as a sharp increase.
Q. Is it -- is one of the things that you



attempt to do in carrying out your responsibilities at Norfolk Southern to -- to try to keep aware of information about trends in capacity utilization?
A. Certainly understanding the capacity on our system, on our railroad, we do that on a regular basis. And we try to gauge capacity on an interline basis where we are delivering interline service to customers where we have customer commitments on equipment utilization, hours of transit time, et cetera.
(A document was marked as Seale Exhibit No. 5.)
BY MR. WERDER:
Q. Handing you what has been marked as Seale 5. You can put that STB, the study one aside. Keep the testimony, if you would, Mr. Seale. Thank you.
MR. NANNES: Pardon me for a moment. Before you leave the document, I just want to note for the record that Mr. Seale indicated that he wasn't sure he had seen it previously. And there appear to be from skimming it some indications by the STB of certain limitations in its methodology. And we don't have to go into it but I certainly want to note them for the record.
MR. WERDER: Okay. Thank you.



BY MR. WERDER:
Q. Handed you what has been marked as Seale Exhibit 5. I am particularly interested in the -- not the redacted e-mail but the one below it.
A. (Witness nodding head.)
Q. Can you identify this -- the second e-mail here as an e-mail from Joseph -- is it Folk?
A. Joseph Folk.
Q. -- Joseph Folk to George Aspatore and a copy to yourself and Henry Wolf?
A. What is the question?
Q. Can you identify this e-mail as an e-mail that Mr. Folk sent to, among others, you in April of 2006?
A. Yes. I am shown as receiving a copy.
Q. Okay. Who is Mr. Folk?
A. He was assistant vice-president of planning. He has retired.
Q. Okay. And at the top of the second page of the document, there is a reference to CSX using 65 percent of its capacity. Do you see that?
A. Yes.
Q. And is that consistent with your understanding at the time?
MR. NANNES: Of CSX's?



BY MR. WERDER:
Q. Yes.
A. I don't have direct knowledge of what CSX's capacity was of that time. They had had some significant challenges with respect to service delivery. And their customers were interested in terms of how that service recovery was going and how it was improving. And when I read this, it seems to be a statement that addresses customers that their improved service plan is working and generating additional capacity.
Q. Is capacity -- is percent of capacity a measure that Norfolk Southern tracks for itself?
A. Not usually. But at this given time, as I mentioned previously, demand was strong for transportation. And many of the analysts -- and this seems to be a financial communication to analysts -- many of the analysts were inquiring about the remaining capacity on railroads that could handle additional business because the market was so strong.
Q. And just in terms of -- is percentage of capacity, is that -- is that a standard metric that you folks use?
A. I would -- I would say it is not a standard metric that we use because, unfortunately,

demand is not always strong enough in the marketplace. And today is a good example of that where percent of capacity is not a relevant measurement.

Q. And so if I were to ask you what the percentage of capacity was for Norfolk Southern in 2004, 2005, 2006, is that something that you would have received information on in the ordinary course of your business?

A. No.

Q. The statement -- looking just a little bit farther down on Page 2 of the document, CSX's chief executive officer Michael Ward is quoted as saying that it is -- that CSX's fuel surcharge policy, quote, in no way is this designed -- withdrawn. He is quoted as saying with respect to the fuel surcharge policy, quote, in no way is this designed to make us money. Do you see that?

A. I see that.

Q. Okay. And that is -- that is not consistent, is it, with Norfolk Southern's view of CSX's fuel surcharge policy?

MR. NANNES: Objection. No foundation for the question.

THE WITNESS: I can't speak to CSX's philosophy as stated here.



BY MR. WERDER:

Q. Isn't it true that when CSX came out with its fuel surcharge policy in about March of 2003, Norfolk Southern viewed it as a blatant general rate increase?

A. We might have had some of our people term it as that but I don't think that we could judge that as a blatant rate increase.

Q. And it was viewed within Norfolk Southern as just a money grab, wasn't it?

MR. NANNES: Objection.

THE WITNESS: As I just stated, we might have had some people speculate along those lines but I can't recall us coming to that conclusion as a general consensus of our company.

BY MR. WERDER:

Q. Did you disagree with it -- withdrawn.

You were aware, were you not, that there were people on your team who were looking at the CSX program who characterized it as a blatant general rate increase, correct?

A. We had people on our -- on my team that probably were talking to customers, which a marketing organization does every day. It is part of or jobs. And the customers were more than likely characterizing



that change in those terms.

Q. And is it -- so is it -- to the best of your recollection, was anyone on your team who was characterizing the CSX fuel surcharge program as a blatant general rate increase doing nothing more than passing on customer comments?

MR. NANNES: Objection.

THE WITNESS: I can't recall if they were just only passing along customer comments. But when collective information is being gathered, all views go into that collective gathering process and the customer view certainly is represented and personal opinions can be represented, as well.

BY MR. WERDER:

Q. And when you saw or heard your team members or certain members of your team, probably more accurate, describing the CSX program as a blatant general rate increase, did you disagree with them?

MR. NANNES: Objection. Lack of foundation. You haven't established that, in fact, he was so advised.

BY MR. WERDER:

Q. You were so advised, weren't you?

A. No. I just stated that personal opinions were expressed, some of which were formed through



dialogue with customers, some of which might have been a personal opinion independent, but I have no way of knowing that and didn't know at that time whether -- how those opinions might have been formed.

Q. But you did know that there were people on your team that when they saw the CSX program in March of '03, were of the opinion that it was a blatant general rate increase, correct?

A. I don't recall the specific people. I probably did get some input along those lines.

Q. And the question was -- so the question is: When you got that input, did you take issue with it?

A. Well, I took it into account with a lot of other information that was coming in from those people and the market -- through the market and tried to take in -- that into account along with a lot of other information.

Q. Let's direct your attention, if we could, to the -- what you called -- I am going to -- you can put that document aside. I am going to go back to Exhibit 3, which is your written testimony to the STB. And I want to start asking you a little bit about your -- about the modified fuel surcharge program and direct your attention to Page 9, 9 and 10, really, of

Page 121

the -- of Exhibit 3. Just for the record, the modified fuel surcharge program was announced in January of 2004, was it not?
A. I think that is correct.
Q. And it went into effect in March of 2004?
A. Yes.
Q. And you were the person who decided to announce and implement that modified policy, right?
A. Yes.
Q. Is the modified policy accurately described at Pages 9 and 10 of the -- of Exhibit 3?
A. Yes. I believe it is.
Q. And at the bottom of Page 9, there is a statement that says that the modified program "addressed many of the weaknesses in its original fuel surcharge." Do you see that?
A. I do.
Q. And then at Page 10, and running over to 11, there is a statement or a set of statements that summarize the "important benefits" of the modified program. Do you see that?
A. I do.
Q. Is that paragraph intending to describe the manner in which the modified program addressed the weaknesses of the original program?

Page 122

A. Yes. It is.
Q. Okay. Now, it is true, is it not, that prior to the time that you decided to implement the modified fuel surcharge program, you had had extensive discussions with executives of other railroads concerning fuel surcharge issues, right?
MR. NANNES: Objection as to form.
BY MR. WERDER:
Q. That is a true statement, is it not?
A. Restate the question.
Q. Prior to -- prior to early January of 2004, when you made the decision to implement the modified fuel surcharge program, you had had a series of discussions with executives from other railroads concerning fuel surcharge issues?
A. We would have had discussions regarding our interline application of fuel based on both the public-regulated prices and then any contract and confidential quote negotiations with customers in the marketplace.
Q. And regardless of the particular subject matter and any limitations that you want to -- that you might want to say were involved in those communications, it is true, is it not, that prior to the decision that you made in January of 2004, to

Page 123

implement the modified fuel surcharge program, you had discussed fuel surcharge-related issues with executives of a number of other railroads?
MR. WINTERS: Objection to form.
THE WITNESS: Just on an interline basis those discussion had taken place.
BY MR. WERDER:
Q. Okay. And in particular you had had discussions with CSX, had you not?
A. I don't recall specifically having a discussion with CSX.
Q. Okay. Did you have discussions with Union Pacific?
MR. WISEMAN: Objection to the form.
BY MR. WERDER:
Q. You can answer.
A. I -- and I am going on memory. I think that discussion probably did take place.
Q. Okay. And certainly with BNSF, correct?
MR. WINTERS: Objection to the form.
BY MR. WERDER:
Q. You had discussions -- withdraw the question.
Prior to the decision that you made in January of 2004, to announce and implement the

Page 124

modified fuel surcharge program, you had multiple discussions of fuel surcharge-related issues with executives from BNSF, right?
MR. WINTERS: Objection to the form.
BY MR. WERDER:
Q. You can answer.
A. As I -- as I testified previously, we had had discussions on an interline basis for our interline public-regulated prices as well as interline contract negotiations and private rate authorities. No communication had taken place on an interline basis with respect to the decision that was made on January 2004, to modify -- further modify our fuel surcharge.
Q. And you say that the discussions were on an interline basis. Withdrawn.
At the time that you implemented the modified fuel surcharge program, it was your intent, was it not, to have that modified program apply broadly to Norfolk Southern's business?
A. Restate the question. I didn't catch the --
Q. Yes. When you implemented the modified program, your intention was to have that program apply broadly to your business, was it not?

A. When we -- when we made the decision to modify the original program to the new program or to transition from the original to the modified, we planned to seek concurrences from our origins to destinations on other railroads for our public-regulated commodities and gain those concurrences so we could publish that fuel surcharge in our rate authorities.
Q. Thank you for that. I may have been a little unclear in my question; although, that would be -- that is responsive to a question I was just going to ask you. But the announcement -- the policy that you adopted in -- that you announced in January of '04, and adopted in March of '04, it wasn't limited to interline movements, was it, sir?
A. Well, we -- we would have taken a look at having that same format in place for our single line application so customers wouldn't have a separate formula on single line versus interline.
Q. And that was exactly your plan and your business direction, was it not, that the new fuel surcharge should be applied to absolutely as much of your business as possible?
A. We wanted coverage of a fuel surcharge of some fashion on as much of our business as possible.



Q. And, in fact, you wanted coverage with the new fuel surcharge on as much of your business as possible from the time that you announced the new fuel surcharge and thereafter, correct?
A. It was our objective to apply the new fuel surcharge taking into account that it is a negotiation process for most of our business and that we did not want to lose business trying to implement a new fuel surcharge because a new fuel surcharge on business that is lost doesn't generate anything.
Q. But it was your objective to apply it to 100 percent of your business, if possible, correct, the new fuel surcharge?
A. We were trying to have coverage, fuel surcharge coverage, at 100 percent of our business of some form or fashion, some variation and we had many, many different approaches with the fuel surcharge.
Q. We will talk about the various approaches as we get into some of the documents a little bit later but in terms of your strategy and your management directive to your sales personnel, your pricing personnel, it was your intention and your directive, was it not, to apply the new fuel surcharge to as much of your business as you could possibly apply it to?



A. Yes. To the extent that we could retain the business and be competitive in the marketplace.
Q. And, in fact, there were a number of months in 2003, where the decision to implement the new fuel surcharge was deferred while Norfolk Southern was preparing itself for broad application of the new fuel surcharge once it was announced, correct?
MR. NANNES: Objection. Lack of foundation.
THE WITNESS: That is -- that is incorrect.
BY MR. WERDER:
Q. Well, certainly throughout 2003, Norfolk Southern undertook a broad set of preparatory actions to allow it to apply a new fuel surcharge to as broad a spectrum of its business base as possible assuming such a decision were made, correct?
MR. NANNES: Objection as to form.
THE WITNESS: I think you are giving us way too much credit. We were -- we were trying to determine what would be the next best step, if any, of modifying the original fuel surcharge. As I had testified previously, we had two things in mind: One, we hoped that oil would come back down and it may become less of an issue and we would maintain the



original formula; Number 2, we had hoped that customers would award more business to us by having a lower fuel surcharge.
We did not see that taking place over the course of 2003. We did not see oil prices and the volatility make us anymore comfortable. It looked like it was getting worse. So, therefore, we were trying to make a determination of the best approach and the decision was made to match the competition in the marketplace. And that was the crux of the decision made in December and then for publication in March.
BY MR. WERDER:
Q. And while that process was -- withdrawn.
You actually were considering the CSX approach and other approaches through some number of months in 2003, were you not?
A. Yes.
Q. And one of the things that your staff pointed out to you was that you couldn't -- that Norfolk Southern couldn't necessarily, at that point in time, apply the -- apply a changed fuel surcharge program across the board in the manner that CSX did, correct?
A. As I recall, that is correct.

Q. And that is because of the way that Norfolk Southern had written the original fuel surcharge into various of its pricing authorities, correct?
MR. NANNES: Objection as to form.
THE WITNESS: Yes.
BY MR. WERDER:
Q. And throughout 2003, starting with the initial consideration of whether or not to modify it after CSX announced its program, one of the things that you and your team did was to try to alter your existing pricing authorities so that if you eventually decided to move to the CSX model or some other model you would be able to do that rapidly, correct?
A. That is an incorrect assumption. You can't modify pricing authorities over a period of six to seven months.
Q. Well, in fact, your team did exactly that, did they not, sir?
A. No.
Q. They certainly modified a great number of them by the end of 2003 to position Norfolk Southern for relatively rapid implementation of the new model in 2004, correct?
A. That is incorrect. The only authorities



we could modify are those authorities that were expiring.
Q. And there is authorities expiring all the time, correct?
A. Well, they do expire over time. But they don't all expire in six or seven months.
Q. Okay. I didn't say that you -- withdrawn.
The goal, the plan, the management strategy, was to change those that were expiring as they expired in 2003, so that you would have more flexibility on the eventual potential implementation of a new program if you decided to adopt one, correct?
A. That is incorrect. That was not in our thinking. Our thinking was, what I stated, was what is oil going to do, is it going to go back down and can we get more business in the marketplace by having a different formula in place.
Q. Isn't it true that throughout much of 2003, after March of 2003, that your team undertook considerable efforts to position Norfolk Southern to make a rapid change and to implement a rapid change in the fuel surcharge policy if a decision were to be made to adopt such a change?
A. I don't recall we made any different



effort than trying to get coverage from 2000 at the beginning. We knew it was going to take awhile to get coverage. It took a long time to get coverage. Because we had contracts that ran for multi years, and we had other rate authorities that ran for multiple years.
Q. And part of your planning process throughout 2003 was to change those pricing authorities that could be changed during 2003 so that should a decision be made at some subsequent time to adopt a new policy that new policy could become effective on a rapid basis, correct?
A. That is incorrect. We used the same approach in 2003, that we used in 2001 and 2002. As rate authorities expired, we tried to negotiate or to publish on a negotiated basis some form or variation of fuel surcharge.
(A document was marked as Seale Exhibit No. 6.)
BY MR. WERDER:
Q. Okay. Let me hand you what I have marked as Seale Exhibit 6. Your name doesn't appear on this document. Is it a document you have seen before?
A. I don't recall seeing this document.
Q. Can you identify Chris -- is it Neikirk?



A. Yes. He is a Norfolk Southern employee.
Q. What is his area of responsibility?
A. As I recall at this time, he was in finance.
Q. And this is a June 2004 e-mail from Mr. Neikirk to Mr. Glennon. And we have already identified Mr. Glennon as one of your -- one of the people who reports to you, correct?
A. He would have reported to an AVP or an assistant vice-president and then to me at this time.
Q. And at this point in time, in June of '04, was he a director of price administration?
A. I think he was.
Q. And you previously described some of the responsibilities that he had with respect to the fuel surcharge program. Would he have had those responsibilities at this point in time in June of 2004?
A. I think he would have.
Q. And if we look at the -- if we look at the two slides that are attached. There is one slide on the old fuel surcharge program. And I just want to direct your attention to the last bullet of that slide. It says, "Being phased out as contracts rollover." Do you see that?

A. I do.
Q. Okay. And then if we go to the next page. On the new fuel surcharge program, it says, "New" fuel "surcharge program generally replacing older" fuel "surcharge program as contracts rollover." Do you see that?
A. I do.
Q. Okay. Do you see any reference in this document to interline?
A. I do not.
Q. The new fuel surcharge program that was announced in January of '04, was not intended, was it, sir, to be a program that was limited to interline application?
A. As I testified previously, we would have no reason to have a new interline fuel surcharge and have something different for customers on a single-line basis other than what was negotiated.
Q. And the statements that are made in Exhibit 6, with respect to the phase out of the old program and the phase in of the new program, those are true statements, are they not?
A. The statements of what?
Q. The statements at the -- on the last bullet on both page -- both pages, the one that says,



on the first page, that the -- the old program is being phased out as the new one is being implemented. That is a true statement, is it not?
A. As contracts roll over. Yes.
Q. And the statement on the second page that the new surcharge program was generally replacing the old one, that was true, as well, correct?
A. As contracts roll over. Yes.
Q. And your goal and your management directive was to cause that replacement process to go as quickly as possible, wasn't it?
A. Well, as contracts and rate authorities expired and rolled over.
Q. And is there some -- can you estimate for me the percentage of contracts that had a term of more than one year?
A. No. I can't.
Q. Can you estimate -- is there a policy with respect to long-term contracts versus shorter-term contracts within Norfolk Southern or was there at the time?
A. We look -- we look at the merits of the contract is the governing activity. I don't recall whether we were changing -- we might have been trying to change the duration of some of these contracts so



they wouldn't be so long in nature at this time. But I don't remember the specifics of that.
MR. WERDER: Okay. We are going to have to break for the tape. Thank you.
THE VIDEOGRAPHER: This is the end of Tape Number 2. We are going off the record at 12:08 p.m.
(Recess taken.)
(A document was marked as Seale Exhibit No. 7.)
THE VIDEOGRAPHER: This is the beginning of Tape Number 3. We are now back on record at 12:20 p.m.
BY MR. WERDER:
Q. I am handing you what has been marked Seale Exhibit 7. If you can identify that as the July 16, 2004, e-mail from Mr. Glennon to yourself and Mr. Brenner.
A. Yes.
Q. And who is Mr. Brenner?
A. He is an assistant vice-president for the company.
Q. I want to direct your attention, if I could, to the attachment, the first attachment to the document, which is a memo labelled, Confidential,



Subject, FSC Strategies and Options, dated July 14, 2004. Do you see that?
A. I do.
Q. Have you seen this memo in the past?
A. Don't recall it completely but I think I have.
Q. Okay. And take a moment to review it, if you want to. I am going to focus on a couple of very specific statements in it.
A. Can I read it?
Q. I don't want you to feel like you are -- like I am rushing you. I am not going to have any questions after the end of Section A on the second page.
A. So first page to just short of Section B?
Q. Correct.
A. I have read it.
Q. Do you know who wrote this memo?
A. I do not.
Q. Was this memo presented in -- presented in a meeting in which you participated in the conclusions in this memo?
A. I don't recall this memo being the subject of a meeting.
Q. And direct your attention to the

statement of the issues on page -- on the first page of the July 14th memo. It says that the -- I am focusing on the -- let's focus first on the second bullet. It indicates "The NS FSC program is generating" 8.7 "million per month in the" merchandise "area and FSC revenues have been increasing at a rate in excess of 20% per month since March 2004." Do you see that?
A. I see that bullet.
Q. And was that -- does that comport with your recollection at the time?
A. I can't put that into context of a recollection because it is a very precise statement and I don't recall the precise numbers.
Q. Okay. The next bullet says --
MR. SCHEIB: I am sorry. I got lost. Can you give us the Bates number? There are two July 14th memos.
MR. WERDER: Yes. I am looking at the first one, the one that has 938 as the last three numbers.
MR. SCHEIB: Thank you very much.
MR. WERDER: Okay.
BY MR. WERDER:
Q. So the next bullet says, "The FSC



conversion (old to the new FSC on NS issued authorities) is roughly 50% complete in terms of billed revenue." Do you see that?
A. I do.
Q. And was that -- is that consistent with where you thought you stood at the time?
A. Again, I can't judge that in term -- I don't recall where we stood at the time so I can't take this and apply it to that context.
Q. Okay. There is -- in the part of the memo that you have looked at, there wasn't any distinction between interline business and other business in this memo, is there, sir?
A. I didn't look for that. But if you will give me a second, let me take another look.
Q. Yes. Okay.
A. No. I don't see that reference.
Q. All right. The fourth bullet on the first page of the July 14th memo says, "Current FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base." Do you see that?
A. I do.
Q. And was that true at the time, to your knowledge?
A. I don't know.



Q. You don't have any reason to think it wasn't true, do you?
A. I just don't know.
Q. And I guess you wouldn't also have any reason to know or not know about the last bullet under the issues where it says, "The FSC program does not provide 100% coverage in terms of traffic moving or billed revenue, but the traffic that is subject to the FSC covers over 100% of the relative increase in fuel costs compared to a $23 WTI or $0.73 a gallon base." Do you see that?
A. I see that sentence.
Q. And do you -- do you have any -- do you know whether that was true at the time or not?
A. Again, I have no way of putting this into context of knowledge from that statement -- from that time frame.
Q. Okay. There did come a point in time, did there not, when the new -- when the fuel surcharge program, after the implementation of the new fuel surcharge program, was generating more revenue -- was generating revenue more quickly than the fuel costs were rising?
A. Yes. I believe that is correct.
Q. Okay. And if we look at the top of the



second page of the document, there is a bullet that says, "The FSC program will meet or exceed the increasing cost" -- I guess that should say -- of "fuel purchases under most forecast scenarios." Do you see that?
A. Which bullet are you --
MR. WISEMAN: Did you just insert a word?
MR. WERDER: I inserted "of."
MR. WISEMAN: I object to you changing a document that the witness hasn't seen.
MR. WERDER: Fine. I said I was -- I said I was inserting it.
THE WITNESS: Which bullet are you --
BY MR. WERDER:
Q. The first bullet on the second page.
A. The first bullet?
Q. Yes. "The FSC" -- in deference to Mr. Wiseman, "The FSC program will meet or exceed the" -- you have the same copy I have?
A. Just a minute. Okay.
Q. Got it? Sorry. It says, "The FSC program will meet or exceed the increasing cost fuel purchases under most forecast scenarios." Do you see that?
A. I see the bullet.

A. I don't recall seeing reports on those segments. What I was looking at was the overall percentage of coverage. So I don't recall us breaking it out like you just described.
Q. All right. So just looking back again at the attachment to -- we were in I think the fourth page of the document, the first page of the attachment, the total authorities by -- at the section level by group. Are you unable to tell us one way or the other whether this was a document prepared in the ordinary course of business by someone working in your group at Mr. Glennon's direction or otherwise?
A. No. As I testified, I cannot because I did not see this level of detail.
(A document was marked as Seale Exhibit No. 10.)
BY MR. WERDER:
Q. Okay. Handing you what has been marked as Seale Exhibit 10, and focusing just on the -- on the e-mail from Mr. Glennon. Can you identify that as a November 2nd, 2004, e-mail from Mr. Glennon to yourself and others?
A. I do.
Q. And who is Mr. Wendorf?
A. One of the group vice-presidents.



Q. Okay. Is Mr. Brugman another one of the group vice-presidents?
A. Yes.
Q. Is that true for Mr. -- is it Mr. Julian?
A. Yes.
Q. David Julian. He is a group vice-president?
A. Yes.
Q. Okay. And John Kraemer?
A. Yes.
Q. David Lawson?
A. Yes.
Q. And Joe Osborne?
A. Yes.
Q. Those are all group vice-presidents?
A. Correct.
Q. So they, along with Mr. Glennon, would comprise the group that I think you testified earlier would advise you with respect to fuel surcharge issues and bring recommendations to you, correct?
A. Yes.
Q. All right. And there is a large list of other people on here that I don't think we -- I don't think we need to identify for the moment. I want to direct your attention to the first paragraph of the



e-mail. There is a statement there that says, GVPs. Are you with me? GVPs.
A. I am looking at that.
Q. Okay. "The attached e-mail and associated reports have already been sent to your BDMs by Jan Wooddy. The reports will provide your team with the following." Do you see that?
A. I do.
Q. Okay. And if you look over to -- just take a look at the first page of the attachment, if you would. It is kind of similar, I think, to the one we just looked at. And I assume your testimony will be --
A. Where does the --
Q. The fourth page. I am sorry.
MR. NANNES: I just want to note an objection. There is no numbering on the documents and no indication that it is a native format that was associated with the current e-mail.
MR. WERDER: Yes. Thanks. I do appreciate that limitation. I think we have -- I think we have undertaken to, based upon the metadata, attach the documents up with the right -- with the right e-mails but, obviously, we are subject to criticism on that. So it is a limitation of how the



documents were produced.
BY MR. WERDER:
Q. And this is a form of document, I take it, that you would not have focussed on in the -- in the ordinary course of your business, the level of detail is more detailed than what you would generally be looking at?
A. Yes. Me looking at this would not tell me much.
Q. Okay. So let's go back to the cover memo, then. I understand what you are saying about the -- about the information but it -- the cover memo says the information that is being provided includes, "A detailed" -- "A detailed list" -- I am on the first bullet -- "A detailed list of the authorities that are associated to specific FSC notes." Do you see that?
A. I see.
Q. And based upon having -- having now reviewed that, does that refresh your recollection that one of the things that your team sought to track was which authorities are subject to which particular types of fuel surcharge?
A. This tells me that detail is being provided to the GVPs who have product managers reporting to them that are responsible for certain

rate authorities so they can keep up with what they have entered into the database, what type of charge is there so we can properly account and bill.
Q. Okay. And then in the -- I am going to call it the second paragraph of the document, the one that begins with, "Some questions have been raised." Do you see that?
A. I do.
Q. So it says, "Some questions have been raised as to why the net FSC billed (as percentage of all NS line haul charges billed) is substantially below the FSC coverage percentages reported in 9255. Here as a recap." Do you see that?
A. I just read the sentence. Yes.
Q. What is your understanding of what issue is being discussed there?
A. Let me read this.
Q. Sure. Take your time.
A. Okay.
Q. Okay. Do you have an understanding of what issue it is that Mr. Glennon is addressing when he is discussing the questions that had been raised comparing net FSC billed to FSC coverage percentages reported in 9255?
A. I don't recall the crux of this



discussion but reading this, it appears that our 9255 rate database is showing a higher percentage coverage than actual percentage coverage. Mr. Glennon is explaining that that actual is being skewed by large volumes of business moving with no fuel surcharge, large volumes of business moving with some negotiated form of a different fuel surcharge that would bring the average down. So he is explaining -- trying to explain the delta between the 9255 rate database percentage and what the measurement shows is the actual percent of revenue coverage. I think that is what he is trying to do.
Q. Thank you very much. And can you tell me what the 9255 rate database is?
A. It is an accounting database where prices that are negotiated are agreed upon in the marketplace with customers are published in the database and from that database when a bill of lading is submitted and a weigh bill is cut, then the bill matches that rate in the database so the proper rate is applied to move a product from Point A to Point B.
Q. And it is -- is it fair to assume that it is the database that is not limited to interline movements?
A. It is a database that encompasses all of



the rates that Norfolk Southern would publish. If we originate traffic going to another carrier, we generally would be the publishing carrier. If they originate traffic on a connecting railroad and it comes to us, they would have the database.
Q. Okay. And if it is not connecting at all, if it is just -- is that what you call local?
A. The local would be in the 9255 database, as well.
Q. So the 9255 database would include interline where you generate the bill plus it would include local, is that correct?
A. Correct.
Q. And then -- so the -- Mr. Glennon is saying here that 9255 rate coverage exceeds 94 percent. Do you see that?
A. It says in excess of 94 percent.
Q. And is it your understanding of what he is communicating there that over 94 percent of the NS-issued authorities have some form of FSC associated with them?
A. That is how I would read this. I am not sure that is exactly what he meant but that is how I am interpreting this document.
Q. And that was an important issue from a



management perspective that you had wanting to track that, correct?
A. Well, that would be a component of the overall coverage that we were trying to keep up with.
Q. And it was important to you, as the person charged with managing and implementing the fuel surcharge, to have some understanding about what the coverage was of the fuel surcharge, correct?
A. That was --
MR. NANNES: Objection to form.
THE WITNESS: That was something that we were trying to understand. Yes.
BY MR. WERDER:
Q. And I see here that Mr. Glennon says that "this" -- we are still on the first bullet there -- "this number is rock solid." Do you see that?
A. I am trying to find that.
Q. It is the third line of the first bullet where -- under the 94 percent. MSD.
A. I see.
Q. You see it?
A. "This number is" -- okay.
Q. Okay. And do you have any reason to believe that Mr. Glennon's 94 percent coverage number was inaccurate as of November of '04?

Page 161

MR. NANNES: Objection. Lack of foundation.
THE WITNESS: I have no context to be able to judge that from.
BY MR. WERDER:
Q. Okay. And then I think as you explained before, Mr. Glennon was laying out some reasons why the yield from a build perspective differs from the coverage in the rate authorities. Is that your understanding of what Mr. Glennon is presenting here?
A. That is what I am interpreting here.
Q. Okay. And was that an issue that received management attention within Norfolk Southern in the November 2004 and other time periods?
A. I don't recall it receiving my attention. It could have received attention at the detail level in terms of managing the rate database.
Q. Was it one of the objectives in managing the fuel surcharge program to try to narrow the gap between the percentage coverage and the rate authorities on the one hand and the billed and received yield on the other hand?
A. Well, our objective was to have coverage as broad as possible across the book of revenue.
Q. And was it -- was it part of that

Page 162

objective -- well, withdrawn.
By the book of revenue, what do you mean?
A. Our revenues being derived from transportation services.
Q. Okay. And over -- to your knowledge, over time, did the gap that Mr. Glennon is describing here between the actual yield and the coverage percentage in the 9555 rate schedule narrow?
MR. NANNES: Objection. Lack of foundation.
MR. WERDER: I asked him to his knowledge.
THE WITNESS: If you would restate it, then I will respond.
BY MR. WERDER:
Q. Right. So Mr. Glennon is pointing out, as of November 2004, a delta between the rate schedule coverage and the actual yield and explaining that based on a number of factors. And my question is: To your knowledge, over time moving from November of 2004 forward, did the gap between the actual yield and the rate schedule coverage percentage narrow?
A. Having no direct knowledge of that, I would say based on this document, the answer would be, yes. If we had contracts with no fuel at all that

Page 163

represented a large volume of business, as those were renegotiated and they became part of the active application, I would think that that would naturally narrow the spread.
Q. And that happened, correct?
A. I would think it would over time. Yes.
Q. And over time the percentage of people who were on the new or modified fuel surcharge increased relative to the ones on the original one announced in 2000, correct?
MR. NANNES: Objection.
THE WITNESS: The amount of customers that changed with respect to many different variations of fuel continued to turn over and change, which when we went from having no fuel surcharge with a customer with lots of volume to a negotiated surcharge on lots of volume, that became part of our coverage in addition to the new fuel surcharge, wherever it might apply.
BY MR. WERDER:
Q. And I want to direct your attention to the -- to the -- I will call it -- I will call it an open bullet as opposed to a filled in, black bullet. You see where there is a series of one, two, three, four, five, six it looks like seven -- one, two,

Page 164

three, four, five, six, seven open circles there?
A. I do.
Q. Okay. And the second one says, "The old FSC generally reflects a lower percentage and still accounts for roughly" 25 to -- 25 to "30% of total NS FSC coverage." Do you see that?
A. I do.
Q. And is that percentage there consistent with your -- withdrawn.
First of all, by reference to the old FSC, would you understand Mr. Glennon to be referring to the FSC that was announced in 2000?
A. I would interpret that as the original fuel surcharge.
Q. And was it consistent with your understanding as of late 2000 that that original fuel surcharge was accounting for approximately 25 to 30 percent of your total FSC coverage?
A. If that was what he was -- if that is what he meant when he said old fuel surcharge he has a number of 25 to 30 percent. I don't recall if that was the number but that is what is stated here.
Q. And then he says in the same bullet that the old FSC generally reflects a lower percentage. Is it your understanding that that is a reference to the

fact that the new fuel surcharge generally had a -- was a higher percentage surcharge than the old one?
A. I think it was probably, in my view, a reference to the ineffectiveness of the old or original fuel surcharge, which was much less responsive to changing conditions in the market in terms of oil prices --
Q. And it -- I am sorry.
A. -- and also was less than effective in terms of customer planning because it could change in the middle of the month instead of the first of each month with a 60-day lag with the new one.
Q. Mr. Glennon's comments here are offered in the context of revenue generated by the fuel surcharge, correct? And he is addressing the differential between the revenue generated and the -- and the rate charge -- the rate chart coverage, right?
A. Well, what he specifically says is a lower percentage.
Q. So my question -- what I was really trying to get at is: Is it -- do you have an understanding about what he is saying when he is talking about the original or the old one reflecting a



lower percentage? Is he -- is he commenting on the fact that the, on a percentage basis in terms of the percentage of base rate being charged as a fuel surcharge, that the new fuel surcharge is a higher percentage than the old one?
MR. NANNES: Objection as to form.
THE WITNESS: He is not precisely saying that. What he is making a statement is that the old fuel surcharge reflects a lower percentage and it still accounts for 25 to 30 percent of total NS fuel surcharge coverage.
BY MR. WERDER:
Q. Let me ask you, without reference to Mr. Glennon's comments, is it true as a general proposition the new fuel surcharge was a higher fuel surcharge than the old one?
A. The older -- it is true the older fuel surcharge was less responsive to changes in oil prices and less effective in terms of the way it addressed those changes.
Q. And it is your --
A. The old charge had 30 consecutive business days as published in the Wall Street Journal, which could run for a long time without it changing up or down.



Q. And the old fuel surcharge, you used the phrase I think a moment ago, "less effective." The old fuel surcharge was less effective at generating revenue for Norfolk Southern than the new one, correct?
MR. NANNES: Objection.
THE WITNESS: What I said was less effective in responding to the changes in the oil volatility.
BY MR. WERDER:
Q. I understand that that is what you said. But in addition to being less effective in responding to the changes in oil volatility, the old surcharge was less effective in generating revenue than the new one, as well, wasn't it?
MR. NANNES: Objection.
THE WITNESS: By the -- by the nature of the old surcharge, it was less responsive to changes in the market, changes in oil prices and so, therefore, you could correlate that that it didn't change effectively to reflect changing oil prices and volatility.
BY MR. WERDER:
Q. You don't have any doubt, do you, that the new fuel surcharge announced in 2004 was more



effective in generating revenue for Norfolk Southern than the old surcharge announced in 2000?
A. It was certainly more responsive to the changing nature of the oil market and that is what it was designed to do.
Q. And it generated more revenue, too, didn't it?
A. It did, as it was more responsive to the volatility.
Q. Thank you. Then let me just direct you to the last of those clear bullets there, which says, "That actual yield percentage is trending upward as the 'no FSC' rate authorities are replaced, and the lower yielding old FSC is gradually phased out." Do you see that?
A. I do.
Q. Was that consistent with -- that statement consistent with your understanding as of November 2004?
A. I don't -- I don't have a recollection of my understanding in 2004, since that is a number of years ago. But, obviously, this bullet makes sense that if a fuel surcharge is applied to a rate authority with no fuel surcharge or a lower yielding fuel surcharge that the yield percentage will improve

as those are renegotiated.
Q. And is it consistent with your recollection and understanding that as of late 2004, one of the things that was happening was that no FSC rate authorities were being replaced with FSC rate authorities?
A. I don't understand that question. If you would restate it, please.
Q. Yeah. It was a little convoluted I think. But is it -- is it true that in late 2004, authorities, rate authorities, that had no FSC were being replaced with authorities that did?
A. Well, I am not sure I follow you with that. The rate authority that had no FSC could have been renegotiated to have a fuel surcharge. I am not sure if that rate authority was still in effect. But if it was renegotiated, it probably would have a -- some mechanism, some form or fashion of an FSC that has been agreed upon with the customer.
Q. And that was the -- that was the intention and management direction that you gave to your team, right, to replace -- as they could, to replace authorities that had no fuel surcharge with authorities that did?
A. As they could, yes.



Q. Okay. And so Mr. -- when Mr. Glennon is making the point here that the yield percentage is trending upwards as the no FSC rate authorities are replaced, what he is indicating, is he not, that the yield is getting better as authorities with outdated FSC are replaced by authorities with an FSC, correct?
A. Yes.
Q. And then he goes on to say the yield percentage is getting better, also, as the "lower yielding old FSC is gradually phased out." Do you see that?
A. I see that. Yes.
Q. Okay. And that is a reference to the -- to the replacement -- that is a reference, is it not, to the replacement of the original fuel surcharge, which is being phased out, with the new fuel surcharge, which is higher yielding?
A. I can't reach that conclusion from the way this is written because it could refer to the original fuel surcharge, to the new fuel surcharge or the modified one, or from a form of negotiated fuel surcharge that is in effect that has been replaced by another negotiated form.
Q. Okay. You can put that document aside.
MR. NANNES: Can we pause for one second?



MR. WERDER: Yeah. Sure. Do you want to break now?
MR. NANNES: I just want to ask something.
THE VIDEOGRAPHER: We are going off the record at 1:11.
(There was a pause in the proceedings.)
(A document was marked as Seale Exhibit No. 11.)
THE VIDEOGRAPHER: We are now back on the record at 1:11 p.m.
BY MR. WERDER:
Q. I am handing you what has been marked as Seale Exhibit 11. You are not -- you are not copied on this document, Mr. Seale. I just wanted to tell you -- ask you if you can tell me who Kitty Vollbrecht is.
A. She is our director of economics and market research.
Q. What is her area of responsibility? I think maybe it is obvious.
A. Forecasting and market research analysis.
Q. Okay. And who is Rob Martinez?
A. He is our vice-president of business development.



Q. Okay. Do you recall that in the 2004 time period some issue arose concerning splitting forecasts for fuel and other factors?
A. I do not. I haven't read this yet.
Q. Just take a moment. I think -- I think I am not being at all unfair in suggesting this, but if you want to read more, read more, I am going to ask you about the second paragraph, which has a reference to you.
A. Okay.
Q. Did there come a time in 2004, or otherwise, when there was a suggestion coming from your finance department that fuel be forecasted as a separate component of the revenue forecast?
A. No. I don't recall that.
Q. Okay. And then there is a -- there is a reference to your perspective here. Does that reflect any perspective that you had at the time or was Ms. Vollbrecht basically just speculating about what you might think about some particular issue?
A. I would have to think it was the latter because I don't recall having any discussion with Mr. Vollbrecht about this.
Q. The second-to-the-last sentence of the second paragraph says, "Pat Glennon told me today that

Page 173

based on the high level numbers from accounting it seems like all the Merchandise rev/car increases are coming from fuel surcharges." Do you see that?
A. I see that.
Q. Okay. What is your understanding about what is meant by "Merchandise rev/car increases"?
A. Well, merchandise revenue per car is the way I would read that, which is the total revenue per car for a shipment.
Q. And was it true, in or about May of 2004, that virtually all of the merchandise revenue per car increases at Norfolk Southern was experiencing were coming from fuel surcharges?
A. This is the first time I have ever seen that assertion.
Q. Was it part of Mr. Glennon's job responsibility to have some understanding about the drivers of merchandise revenue per car increases at Norfolk Southern?
A. It would not be his direct responsibility of understanding that. And the way this reads, he is passing along something he thinks he has heard from accounting.
Q. Do you know whether or not that statement was a true statement as of May of 2004?

Page 174

A. Well, as I just testified, this is the first time I have ever seen the assertion. So I can't judge it. But based on my knowledge, no.
Q. I am going to put that document aside. What is the basis of your -- of your knowledge of the source of revenue per car increases?
A. Restate that.
Q. Yeah. You said -- you said to your knowledge, virtually all of the revenue per car increases being experienced in or around May of 2004, were not coming from fuel surcharges. And I just want to follow up on that and ask you: Well, what do you -- what information do you have available to you on which you are making that statement?
MR. NANNES: I just want to object to the characterization of the statement. It is what it is in the record but you asked him about basis.
BY MR. WERDER:
Q. I am not looking at your exact words. But let me try it this way: Your testimony is, to your knowledge, no, as of May 2004, fuel surcharges were not -- not responsible for virtually all of the revenue per car increases, correct?
A. No. You were misquoting me. What I said was that, based on Paragraph 2, which you referred me

Page 175

to, there is an assertion here that I said that I have never seen.
Q. And you said you disagreed with it?
A. And based on my view, I can't see how that could be correct. But I don't have the basis of this --
Q. Right. So I am not asking you about the basis of that. I am really asking you about the basis of your view that this must be incorrect. So if I was unclear I apologize for that.
A. It was the quote that was throwing me, the quote.
Q. Sorry.
A. So what is your question?
Q. The question is: You just told me that you didn't agree with that statement in Exhibit 11, and based on the information available to you, and I am just asking you, Well, what is the information that was available to you that leads you to disagree?
A. Well, I think I stated that I don't recollect numbers from this time frame but -- and this is the first time I have seen that assertion. So I would have no means of agreeing or disagreeing but my intuitively it just doesn't -- since this is the first time I have ever seen it, it doesn't -- it doesn't

Page 176

read correctly to me.
Q. Got it. I think I -- so you are not -- you are not saying it is incorrect based upon some information that you presently have in mind, you are just kind of reacting to it on the spot?
A. Yeah. Having never seen it, that is all I can do.
Q. All right. Good. Do you still have Exhibit 3? I think you do there. That is your testimony to the STB.
A. I do.
Q. I want to direct your attention to Page 12 and, in particular, to Section III, which discusses the new fuel surcharge program. And that is a reference to the April 2006 announcement, correct?
A. You are looking at Section III, Page 12 starting on April 24th.
Q. Correct. Exactly right.
A. I am looking at that.
Q. Okay. And that -- Norfolk Southern made an announcement of a new fuel surcharge program shortly before this STB hearing, did it not?
A. Yes.
Q. And at the time that that announcement was made, was Norfolk Southern already aware that the

STB hearing had been scheduled?
A. I am sure we were.
Q. Was it Norfolk Southern's intention to have the new program announced in April become effective prior to the STB hearing?
A. As I recall, the timing was such that -- the timing was -- enabled us to place it in effect but prior to the hearing. I am not sure it was a planned activity to have it in before the hearing.
Q. Did somebody, to your knowledge, count out the days that would be needed in advance of the hearing for the announcement in order to cause that to happen?
A. No. I am not aware of that.
Q. Let me direct your attention to the top of Page 12, the paragraph right before Section III. Take a moment to review that paragraph, if you would, please.
A. Okay.
Q. And that -- there is a reference there to looking -- to looking "harder at what sustained higher oil prices would mean for Norfolk Southern and our customers." Do you see that? It is in the first sentence of that paragraph.
A. I do.



Q. Okay. The 2006 -- well, withdrawn.
What -- what was your understanding about what sustained higher oil prices would mean for Norfolk Southern given the fuel surcharge program that it had in effect prior to the April 2006 announcement?
A. I think we had seen increased volatility, higher oil prices, greater unpredictability and we continued to look at fuel surcharges as we had from 2000 on as we struggled to deal with the volatility.
Q. Isn't it a fact that the April 2006 program was implemented, at least in part, to reflect concerns that Norfolk Southern's revenue would decline if fuel prices declined?
A. I am sure we looked at the overall components of price in general and included the volatility as a component of that and looked across it in terms of where we were with the market and how to address volatility of oil prices, fuel expenses and still remain competitive in the marketplace. Those are the discussions we would normally have.
Q. All right. Well, I am not asking you about volatility. What my question was is: Isn't it true that one of the concerns that led you to announce and implement the April 2006 program was a concern that if oil prices were to decline under the



existing -- the pre-existing, the then existing, fuel surcharge program, your revenues would decline along with those fuel prices?
A. Certainly we would look at it and think about it in terms of what would drive revenues down. We would certainly look at that. But I think in a greater sense, what we were seeing is the realization in our minds of a new norm with respect to higher oil prices. Oil prices had continued to go up and stayed up. And while we had hoped, like many others, that it was temporary, it was proving not to be temporary. And our thinking was, How do we change to reflect a new norm for oil prices?
Q. Wasn't one of the concerns that motivated the adoption of the new program in April 2006, that if oil prices were to decline, your revenues would decline, as well?
A. I am sure that came into the thought process along with what I just mentioned. But I think the driving factor in the change, or the anticipation or the study of a change, was that in the minds of our customers and many, many others that tracked oil and energy prices was that we had reached a new plateau of energy prices that would more than likely be sustained for the long-term, a structural change.



Q. And one of the things that you were seeking to do was to build into your base rates the impact of the fuel surcharge -- the fuel surcharge price increase that had been experienced up to April of 2006, correct?
MR. NANNES: Objection as to form.
THE WITNESS: That is incorrect. What we were trying to do is to make sure, to ensure that we were competitive in our markets, that the combined price that we were charging for our services reflected the value of the services in the marketplace and that the current charge, which included fuel, would continue to be the current charge, which included fuel. And if we made some modification in the components of that price and the market changed later, we would change the price and those components.
BY MR. WERDER:
Q. Isn't the -- wasn't the effect of the April 2006 program to ensure that so long as that program remained in effect that the increase that you just referred to in the price that reflected fuel would continue in effect even if the fuel price declined?
MR. NANNES: Objection as to form.
THE WITNESS: I don't see that as being

relevant here because I am describing this as a component of price as I testified at the surface transportation board. And we were endeavoring to have our total price reflect the value of our service in a competitive marketplace where we grew volumes and we continued to grow share and total revenues. So if -- what I am saying is if the market changed later, we would certainly reflect that changing market up or down in our negotiations with customers.

BY MR. WERDER:

Q. And without regard to subsequent negotiations, my question was that under the fuel surcharge program that you announced in April of 2006, the effect of that would be, would it not, to cause the increased price that had been associated up to that time with fuel to continue to be in your price even if the fuel price subsequently declined?

A. The effect would be that the total price that was being paid at the time of the change continued after the change took place and should the transportation market change up or down, we would make adjustments accordingly in the competitive marketplace in the negotiation process.

Q. And so it is true, is it not, that as of April of 2006, before you announced this new program,



that the price that people were paying under the prior fuel surcharge program reflected the fact that fuel prices had increased, right?

A. With fuel surcharge being a component of the price, yes.

Q. And so the purpose and the effect of the new program was to ensure that those higher prices would continue into the future until you -- until you changed them but would continue into the future even if the price of fuel declined, correct?

A. The total price we had in the marketplace would continue to be the same price that would -- that the customer was paying at the time of the change and should market conditions change, we were more than ready and willing to adjust those prices based on those competitive changes.

MR. WISEMAN: May I inquire? It is 1:30.

MR. WERDER: Yeah. Let me just finish one -- one quick document and then we will be done if that is -- and then I will switch to another -- I am going to switch to another topic if that is all right with you folks.

MR. WISEMAN: I assume break at this point. It is 1:30.

MR. NANNES: Yeah. Let's break.



MR. WERDER: Fine. Break.

THE VIDEOGRAPHER: This is the end of Tape Number 3. We are going off record at 1:29 p.m.

(Luncheon recess taken.)

(A document was marked as Seale Exhibit No. 12.)

THE VIDEOGRAPHER: This is the beginning of Tape Number 4. We are now back on the record at 2:18 p.m.

BY MR. WERDER:

Q. Good afternoon.

A. Good afternoon.

Q. Handing you what I have marked as Exhibit Seale 12 and ask you whether you can identify -- the top document there is a February 1st, 2007, e-mail from yourself to Mr. Moorman and others.

A. Yes.

Q. Is that a document that you sent to Mr. Moorman on or about that date?

A. It indicates so. Yes.

Q. Thank you. You can put that document aside. Between the time in 2000, when Norfolk Southern announced its original fuel surcharge, and January of 2004, when it announced the modified fuel surcharge, did you participate in negotiations where a



fuel surcharge was included in a contract that was not the fuel surcharge that was announced in 2000?

A. I don't know if I completely understood your question so I will have you restate it, please.

Q. So I am in the time period between the announcement of the original fuel surcharge in 2000 and the announcement of the modified fuel surcharge in January of 2004.

A. Uh-huh.

Q. During that period of time, did you participate in negotiations with customers, the result of which was a fuel surcharge that was different than the one that was announced in 2000?

A. I normally wouldn't have been directly involved with negotiations with customers at that time. It could have happened. Certainly, could have happened. But I don't recall specific negotiations.

Q. Okay. The next few questions I am going to ask you concern that same time period, okay, the time period --

A. 2000 - 2004.

Q. -- 2000 to January 2004. Can you identify any customers with whom a fuel surcharge was negotiated in that period that differed from the fuel surcharge that was announced in 2000?

Page 185

A. Well, I am sure we had numerous examples of those.
Q. Can you identify any?
A. I would -- I would say that we had agricultural contracts. [redacted] comes to mind. Others, possibly.
Q. And what is your understanding of the situation with [redacted] in the period from 2000 to January of 2004?
A. Based on memory, going on recollection, initially having no fuel surcharge, then negotiating a -- some variation of a fuel surcharge that they agreed to and then probably having another negotiation but I can't recall the third one. But certainly dialogue going back and forth in a negotiation process with that customer.
Q. And which you personally participated?
A. I could have had some discussion at a high level with that company, not on the specifics but in a general sense.
Q. Any other customer that you can identify in this time period that we are talking about where you have personal knowledge of a variation from the standard fuel surcharge being negotiated?
A. Well, as I say, I think there are

Page 186

numerous cases on the automobile side. [redacted], we would have no fuel surcharge on vehicles. They negotiated fuel surcharge on auto parts eventually. I don't recall the time frame, whether it was 2000 to 2004. But those are examples of the kinds of negotiation that were taking place.
Q. Other than [redacted] and [redacted], can you identify any customer who, to your knowledge, as you sit here today, negotiated, in the period 2000 to January 2004, a fuel surcharge that was different than the standard one announced in 2000?
A. I can't -- I can't recollect additional names but there were many, many cases of that.
Q. What were the variations -- withdrawn.
Can you tell me what the variations were between the fuel surcharges that you say were negotiated with [redacted] and the standard fuel surcharge announced in 2000?
MR. NANNES: Objection to the use of the term "standard." I think you originally called it the original fuel surcharge.
BY MR. WERDER:
Q. Okay. That amendment to the question is fine.
A. The original fuel surcharge was on

Page 187

public-regulated prices. And the dialogue that we were having within [redacted] would have been on confidential contract negotiations.
Q. Okay. There is a protective order here so anything you tell me is going to be kept confidential. Can you tell me any variations that you are aware of that were negotiated with [redacted] that resulted in them having the fuel surcharge that differed in any way from the original one that was announced publicly in 2000?
A. Well, as I previously testified, based on my recollection, initially they would have had no fuel surcharge in the existing contract. Then through further negotiations, there was a customized surcharge that was agreed upon through those negotiations with that customer.
Q. What I want to know is what was the customization to your knowledge.
A. I have no recollection of what the customization of that.
Q. Would that also be true of [redacted]?
A. Correct.
Q. Now, moving from the -- have I exhausted your knowledge, by the way, of or your ability today, at least, to testify to specific customers with whom a

Page 188

variation on the original fuel surcharge was negotiated in the period from 2000 to January of '04?
MR. NANNES: Objection as to form.
THE WITNESS: As I stated, we had numerous negotiations. So I don't recall the specifics of each of those negotiations since other people would have been doing that, not me directly, anyway. So I don't recall customer names and the specifics.
BY MR. WERDER:
Q. So other than [redacted] and [redacted], you can't give me any customer names or specifics for the period from 2000 to January of 2004, correct?
A. That is what I just stated.
Q. Okay. Very good. Now, going to the period from the -- in January of '04, you announced the modified fuel surcharge, correct?
A. That is correct.
Q. And it took effect in March of '04, is that right?
A. As I recall, it did.
Q. Now, between January and March of '04, when new contracts were being entered into or contracts were being renewed, was the old surcharge still being used or would it have been your intention,

Q. Where would we -- where would you go if you wanted to find out what the -- how many there were that differed from the announced one?
A. I do not know a single source where you would go to get that information.
Q. Is there anybody within your organization that you would ask that question to?
A. No. I can't think of anyone that would have that type of information and also a reason for us to formulate that information.
(A document was marked as Seale Exhibit No. 13.)
BY MR. WERDER:
Q. Okay. Let me hand you what has been marked as Seale Exhibit 13. Ask you whether you can identify that as your testimony to the STB in 2006, your oral testimony.
A. It appears to include testimony from another party at the beginning and then transitions to my testimony --
Q. Okay.
A. -- on Page 3.
Q. Have you had the opportunity to review this in preparation for your testimony?
A. Yeah.



MR. WISEMAN: Can I inquire for the record if you can identify where this came from. It seems to be pieces of something. What is the source of this?
MR. WERDER: It is an excerpt from the transcript of the hearing.
MR. WISEMAN: But how did you get it? I mean, did you pull it off the Internet or is it from some other place and somebody just put this together?
MR. DONOVAN: It is on the STB Web site.
MR. WISEMAN: That is what we need to know for the record.
MR. WERDER: Now you know it.
BY MR. WERDER:
Q. Have you had an opportunity to review that testimony in preparation for your testimony here today?
A. I have looked through it. Yes.
Q. All right. So I want to direct your attention to Page 314. And the chairman puts a question to you about whether you can unequivocally state for the record that you are not over recovering your fuel costs. Do you see that?
A. I do.
Q. What was your understanding about what was being asked when you were asked whether you were over recovering for your fuel costs?
A. Well, just as it states, the question is were we over recovering on fuel costs.
Q. And what is the -- and you answered the question, correct?
A. My answer is stated here in the next excerpt.
Q. So when you answered the question, what was the measure of over recovery that you were using?
A. This was a measure of fuel surcharge revenue collected versus fuel expenses as well as total energy expenses comprised of fuel, diesel fuel, lubricants and gasoline.
Q. So the measure was on the one hand fuel surcharge revenue, on the other hand total expenditures on diesel, gasoline and lubricants?
A. Yes. Which we referred to as the energy surcharge.
Q. And I just want to make sure that I understand that the -- the statement -- when you make the statement that we have not over recovered, and for that period of time -- and you are talking about for the last six years, that was your answer, correct?
A. Yes.





Q. Okay. So when you say for the last six years that we have had a fuel surcharge we haven't over recovered for that period is what you are saying that if I total up my total fuel expenditures over that period and I total up my total fuel surcharge revenue over that period that the fuel surcharge revenue over that period is not greater than the total expenditures on fuel?
A. I am not sure it refers to the total expenditures on fuel. It refers to, in my view, the increased expense in fuel.
Q. Okay. That is what I was trying to understand. So it is -- is there -- what is the base from which you were measuring the increase for purposes of making that comparison?
A. I think that, as the testimony shows, we were showing from a base of $23 West Texas Intermediate oil and the corresponding diesel fuel price to that.
Q. So when you said that you hadn't over recovered over that six-year period, the measure that you were using wasn't your total fuel cost, rather, it was the amount of the fuel cost in excess that was paid because the fuel prices were in excess of 23?
A. Yes. That is my understanding.

Page 197

Q. Okay. And it was your testimony that over a six-year period, if I look at the portion of my total fuel costs that I have paid because the fuel price exceeded 23 and I compare that to my total revenues from the fuel surcharge that the fuel surcharge revenues did not exceed that portion of my total fuel cost, correct?
A. That incremental increase above that base. That is correct.
Q. Now I understand. Thank you. And when you -- when you gave that answer to the -- to Chairman Buttrey, did you incorporate in your answer the results of your hedging program?
A. I do not recall how hedging was treated in these numbers.
Q. How would -- is there some way you could go back and find that out? How would you do that?
A. I don't know how.
Q. Then you went on in your testimony to talk about the year 2000 in particular. And at pages -- at Page 315 you say -- first of all, you make this reference to diesel fuel expense starting at our $23 base, and that is consistent with what you just told me a moment ago, correct?
A. Yes.

Page 198

Q. All right. Then you say in 2000, it is 87 million. And is that -- what is -- what are you telling the STB there, that in 2000 your under recovery from the fuel surcharge program versus a $23 WTI base was 87 million, am I correct on that?
A. No. What this refers to -- excuse me -- is for the ensuing six-year period starting in the year 2000.
Q. So the 87 million -- when you say, yes, in 2000, it is 87 million, are you saying that the 87 million actually relates to the entirety of the period 2000 to 2006?
A. Yes.
Q. So your testimony was that for the entirety of 2000 to 2006 the under recovery versus a $23 WTI base was 87 million?
A. 87 million on fuel, and 233 million on fuel, gasoline and lubricants.
Q. And was your testimony transcribed incorrectly when it said, yes, in 2000, it is 87 million?
A. I don't know. The number is from 2000 to this period of time.
Q. And so if we focus on -- do you have any breakdown of that for any individual years?

Page 199

A. I do not.
Q. Do you know whether there was under recovery in 2000 using this measure of under recovery?
A. I don't know for sure which years were under recovered. I don't have that data.
Q. Do you have any information on it even though you don't know for sure?
A. No. I do not.
Q. So if I were to break out the periods between 2000 and 2003 and -- as one period and the period from 2004 to 2006 as a second period, can you tell me whether there was under recovery in both of those periods?
A. No. I cannot.
Q. Do you know whether, in fact, there was over recovery in the 2004/2005/2006 time frame?
A. I stated in the testimony that for the year snapshot 2005 that our fuel surcharge revenues had exceeded the increase in our fuel expenses. But that is the only year that I recall having that information for.
Q. Okay. At the time you testified, you didn't have that information for 2006?
A. Not that I recall.
Q. Do you know whether, in fact, it was true

Page 200

in 2006, that the fuel surcharge revenue was, in fact, greater than the increase in the cost of fuel in that year?
A. No. I don't.
Q. Okay. How about for 2004?
A. No.
Q. At Pages 316 and 317, you make reference here to the RCAF. Take a moment, if you would, to review that.
A. Uh-huh. Okay.
Q. There is a sentence here that says, "Of some fuel and with respect to RCAF, what we have generally been doing is take a percentage out of RCAF before we apply some variation of fuel." Can you explain that?
A. In contract negotiations and private quote negotiations with customers where there was RCAF application in the contract, we were removing a percentage, an agreed-upon percentage, of the RCAF before applying an agreed-upon negotiated fuel surcharge application for that particular contract agreement.
Q. And is that -- how does that relate -- withdrawn.
Are you familiar with the acronym AIILF?

A. I am today. Yes.
Q. When did you become familiar with that acronym?
A. Probably -- I don't recall the exact year but in more recent times. We did not use that index in our contract negotiations, as I stated here in the testimony, in 2005.
Q. Your testimony is that you didn't use -- withdrawn.
What is your understanding about when that metric was created?
A. I have no idea when it was created.
Q. And your testimony is that you didn't -- that Norfolk Southern didn't use the AIILF index as of your testimony here in 2006?
A. We were using a variation of RCAF negotiating a percentage off the RCAF and applying a fuel surcharge that was agreed upon through that negotiation process. It might have been 20 percent off the RCAF. It could have been 80 percent of RCAF. It could have been 85. Different formulas based on the negotiation.
(A document was marked as Seale Exhibit No. 14.)
BY MR. WERDER:



Q. You can put that document aside. Handing you what has been marked as Seale Exhibit 14.
A. I have read it.
Q. And can you identify this as a series of e-mails between yourself and Fred M. Ehlers in October and November of 2003?
A. Yes.
Q. Who is Mr. Ehlers?
A. Mr. Ehlers, at this time, as I recalled, was manager or AVP of administration.
Q. What is his job responsibility?
A. He would be in the chairman of CEO's office as an administrator, chief of staff.
Q. Okay. Did you ever respond to Mr. Ehlers' November 4, 2003, e-mail to your knowledge, the top one on the chain?
A. I don't recall further exchanges to that effect.
(Documents were marked as Seale Exhibits No. 15, 16 and 17.)
BY MR. WERDER:
Q. You can put that aside. I am going to hand you three documents, Seale Exhibit 15, Seale Exhibit 16, and Seale Exhibit 17.
A. All right.



Q. Can you tell me who Mr. Santangelo is?
A. I think he is -- he was and is in our accounting department.
Q. And how about Ms. Callaway, Karen Callaway?
A. I don't see a Karen Callaway.
Q. If you look at Exhibit 17.
A. Oh, 17.
Q. Yes.
A. I don't recognize Karen Callaway.
Q. And then I think we have identified several of these people before but if we just go down the list of -- not the e-mail address list but in the body of the e-mail, you see there is a list of names starting with H. C. Wolf?
A. I do.
Q. And who is Mr. Wolf?
A. He was the chief financial officer at that time.
Q. And Mr. Prillaman at this time?
A. He was the chief marketing officer.
Q. And was he a vice-chairman at that time?
A. I am looking at the dates.
Q. I will withdraw the question. Then there is yourself. Mr. Lawson, who is he? Group



vice-president?
A. I am -- again, I am looking at the dates.
Q. Okay.
A. Mr. Lawson would have been vice-president of industrial products in '06.
Q. How about Mr. McClellan?
A. Mr. McClellan is vice-president of intermodal and automotive.
Q. Mr. Smith?
A. Mr. Smith is senior vice-president of energy and properties.
Q. And Mr. Stewart?
A. Marta Stewart.
Q. Marta Stewart. Sorry about that.
A. She is -- at that time, I think she was vice-president and controller.
Q. And who is J. A. Squires? That is on Exhibit 17.
A. Again, I am looking at the date. I think at this time he was senior vice-president of finance. You are looking at Exhibit 17?
Q. Correct.
A. In 2007?
Q. Correct.
A. I think that is correct.

Q. So if we -- we don't need to go through these in detail but if we just take Exhibit 15 and look at the second page of it. The fuel surcharge tracking report, do you see that?
A. Which exhibit?
Q. It doesn't really matter. It could be any one of them, I think.
A. Okay. You are looking at the heading at the top of the page?
Q. Correct.
A. Correct. I see it.
Q. Is that a standard form of tracking report that was created within Norfolk Southern and circulated to various executives with respect to tracking of fuel surcharge billings and revenues?
A. Yes.
Q. And if we -- if we just look at the -- if we look at the various columns. Month is fairly self-explanatory. Billed. Is it your understanding that that represents the amount of fuel surcharge that is billed during the particular month or in the case of first two years the total years?
A. Yes.
Q. And paid is the -- that is pretty obvious, too, right? That is the amount that was



collected?
A. Yes.
Q. What is write-off?
A. Those charges that were billed that were not collected.
Q. Okay. And then settlement waiver, what does that mean?
A. Those are charges that are contested that were negotiated and settled or waived in a different manner.
Q. It is fair to say, is it not, that the settlement waiver amounts are -- and the write-off amounts, also -- are inconsequential in relation to the total billed and collected?
A. Yes. In relationship to the total bill and collected. But we wouldn't categorize $1.2 million in settlement waivers inconsequential.
Q. You are talking about the $1.2 million in 2003?
A. For 2003.
Q. How about the $672,000 compared to $212,000 in 2004?
A. In what regard?
Q. Would you characterize that as inconsequential?



A. No.
Q. And the $38,000 compared to 470 million billed in 2005?
A. It is certainly getting smaller.
Q. Is it your -- are you suggesting that -- withdrawn.
So you would characterize the 672,000 in 2004 relative to 212 million in billings as not inconsequential, correct?
A. Which number are you looking at now?
Q. I am looking at the -- I am looking at Exhibit 15, total for 2004, 672,000, settlement waiver, versus 212 million billed. Are you with me on the first page of the attachment there?
A. I hope I am looking at the same exhibit as you are. 2004 is what you are looking at.
Q. 2004. Is the first column that you have on that one $212 million billed?
A. Yes. I see that now.
Q. And then do you see the 672,000, 673,000, rounding up, in settlement waiver?
A. Yes. I see that.
Q. And your testimony was that that is not an inconsequential number, I take it, right?
A. Over a half million dollars is not



inconsequential in my mind.
Q. And just to make sure that we are clear, in 2005, the settlement waiver amount had declined to $38,000, had it not, according to this report?
A. Yes. I see that.
Q. And relative to the 470 million, is that number of consequence or inconsequence?
A. We had reduced the number of settlement waiver amount.
Q. You had reduced it very significantly, had you not?
A. Yes. The numbers show that.
Q. And is -- are these forms that were created in the ordinary course of business for purposes of advising management on the status of the fuel surcharge program?
MR. NANNES: Objection to the form.
THE WITNESS: The report, as it shows, was to show the amount of fuel surcharge billed and the amount collected.
BY MR. WERDER:
Q. And these were reports that were routinely created and prepared and circulated within Norfolk Southern, correct?
A. They were prepared and circulated to the

Page 209

recipients of this report.
Q. And what was the -- what was the purpose of this report?
A. So we would know what the amount was billed and how much was collected.
Q. In the time period 2004/2005/2006, or, really, in any time period, were the executives of Norfolk Southern being compensated on a performance basis?
A. Yes.
Q. And can you explain to me, in general terms, how the fuel surcharge revenue that was generated in 2004, '5, '6, '7 and thereafter affected the performance metrics that were used for executive compensation purposes?
A. No.
MR. NANNES: Objection for lack of foundation.
THE WITNESS: No. I cannot.
BY MR. WERDER:
Q. Did the fuel surcharge revenue that was obtained in the 2004/2005/2006 and subsequent periods affect the metrics that were used for compensation of Norfolk Southern's executives pursuant to the incentive compensation programs?

Page 210

A. As a component of our overall price, which would be taken into account on volume and total price charged, yes.
Q. All right. You can put that exhibit aside. Thank you.
(A document was marked as Seale Exhibit No. 18.)
BY MR. WERDER:
Q. Handing you what has been marked as Seale Exhibit 18.
A. Okay.
Q. Have you had an opportunity to review that document?
A. I have.
Q. Can you identify the first two e-mails on the top of the first page of it as an e-mail exchange between yourself and Mr. Brugman?
A. Yes. The e-mail was sent by my assistant, Brenda Quesenberry, to Tom Brugman.
Q. And what is the subject of the -- what is the subject that is being discussed there?
A. It is, as written below on this correspondence, a request from Mr. Brugman on guidance with respect to negotiation of line haul charges plus fuel surcharge as a total summary of our price with

Page 211

selected customers.
Q. And the customers at issue -- is there a particular customer at issue here?
A. It appears to be several agricultural customers.
Q. And is [redacted] one of them?
A. [redacted] is mentioned on Page 2.
Q. You can put that aside.
(A document was marked as Seale Exhibit No. 19.)
BY MR. WERDER:
Q. Handing you what has been marked as Exhibit Seale 19. You are not actually copied on these e-mails. I really just want to ask you about the first e-mail on the top of the page.
A. Page 1?
Q. Correct.
A. Okay.
Q. Did you -- do you recall having a discussion with [redacted] at an NFTA meeting in April of 2000?
A. I don't recall the specific meeting but it certainly could have taken place.
Q. And is this document consistent with your earlier recollection that [redacted], in 2000, resisted the

Page 212

incorporation of your fuel surcharge provision in its contracts?
MR. NANNES: Objection to the characterization of the prior testimony.
BY MR. WERDER:
Q. I will withdraw the question. Do you recall that in the 2000 time period, there was resistance from [redacted] to paying a fuel surcharge?
A. I recall in the year 2000, and on, we had resistance of all customers paying increased prices.
Q. Question was a little bit different, though, and the question was: Do you recall in 2000, [redacted] specifically resisting paying the fuel surcharge that you announced in 2000?
A. This memo would say, yes.
Q. But without reading the memo -- does the memo refresh your recollection so that sitting here today you can do more than just read the memo and say, I have a recollection of that occurring?
A. I don't have a recollection of the specifics of the discussion but as I previously testified [redacted] was a large-enough customer that it came to my attention that those negotiations were taking place and that resistance was taking place. But I was also being told by the GVPs and others that that

there was nobody at Norfolk Southern who was involved in communications of that kind with Mr. Jacobowski or somebody else at BNSF in the March 2000 time frame or earlier?
A. I am not aware of any such discussion.
Q. You can put that document aside. At some point in time, within Norfolk Southern, were you involved in any discussions of the concept of an industry-wide fuel surcharge?
MR. NANNES: Objection as to form.
THE WITNESS: Could you restate?
BY MR. WERDER:
Q. Yes. At any point in time, did you have any discussions within Norfolk Southern concerning the concept of an industry standard fuel surcharge?
A. And your question is within Norfolk Southern?
Q. Correct.
A. I don't recall a specific discussion but that certainly could have taken place.
Q. Okay. Tell me everything that you can recall on that subject matter.
MR. NANNES: Objection. Lack of foundation.
BY MR. WERDER:



Q. Is there anything that you can tell me about the -- about discussions on that issue beyond what you just told me?
A. Only what I just testified.
Q. That it may have taken place but you don't recall it at the moment?
A. Correct.
Q. If such discussions had occurred within Norfolk Southern, who would be the people that would likely to have been involved in them?
MR. NANNES: Objection as to form and foundation and speculation.
BY MR. WERDER:
Q. You can answer.
A. Since I don't recall specific discussions, I don't know who would have been discussing it.
Q. Broadening the question from discussions within Norfolk Southern to discussions with executives from other railroads, have you, at any point in time, been involved in any discussions with anyone from any other railroad concerning the concept of some sort of an industry standard fuel surcharge?
A. We could have had an interline discussion with respect to the interline application of our fuel



surcharge and had a discussion on the customer input regarding ease of doing business.
Q. Do you recall anything more specific than you could have had such a discussion?
A. No. I don't.
Q. Who would it have been with?
A. Well, it could have been with one of our connecting carriers.
Q. And who are your connecting carriers?
A. Union Pacific is a connecting carrier Burlington Northern Santa Fe is a connecting carrier. CSX is a connecting carrier. And others.
Q. So you don't rule out, then, the possibility that you had a discussion with one of them -- one or more of them concerning an industry standard fuel surcharge that may have happened?
MR. NANNES: Objection. Lack of foundation.
BY MR. WERDER:
Q. You can answer.
A. Any such discussion would have been on an interline basis with respect to NS origins and destinations or origins on an interline, bilateral carrier, which was taking place between the two roads.
Q. Is there some specific meeting or set of



communications that you are thinking about at which discussion of this topic may have occurred?
A. Well, we certainly had interline meetings with our primary connecting carriers where something along these lines could have been discussed.
Q. I am trying to press you just a little bit further on that. Are there any specific occasions on which you recall such meetings at which this topic may have been raised?
A. I don't recall the specific dates of the meetings or the specific meetings but that topic could have been discussed on an interline basis with a bilateral carrier.
Q. What is a bilateral carrier?
A. A carrier that is in the route with us where we are interchanging traffic between Norfolk Southern and that carrier to serve a customer or a group of customers on a through basis.
Q. And when you say on an interline basis with a bilateral carrier, are you using interline basis the way you were using it this morning, in other words, not necessarily tied to a particular shipment for a particular customer on a particular route at a particular time?
A. It could be tied to that type of

Page 229

specificity or it could be in a broader sense from our origins to destinations on that connecting carrier.
Q. Okay. Let me just try to be a little more specific, if I can. Leaving aside discussions about particular customers on particular routes for -- at particular times, have you had what you call interline discussions with bilateral carriers on issues relating to fuel surcharges generally?
A. Let's turn that wording around. Bilateral discussions on interline matters makes more sense.
Q. Okay.
A. I mean, it --
Q. That is fine.
A. Yeah. And those bilateral discussions on interline matters certainly could have encompassed fuel surcharge application between the two carriers.
Q. And could they also have encompassed the concept of an industry standard fuel surcharge?
A. It could have -- it could have encompassed that type of discussion on a hypothetical basis.
Q. All right. In March of 2003, do you recall that CSX revised its fuel surcharge program?
A. I think that is the correct date. Yes.

Page 230

Q. And when they made that revision, they moved, did they not, to a program that was anticipated to generate significantly more revenue than their prior program?
MR. NANNES: Objection.
BY MR. WERDER:
Q. You can answer.
MR. WISEMAN: Excuse me. Would you read the question back.
BY MR. WERDER:
Q. I will just restate it. The revised CSX program announced in March of 2003, was anticipated to generate more revenue than the prior CSX program that it replaced, correct?
MR. NANNES: Same objection.
THE WITNESS: I can't speak for CSX. They modified their program.
BY MR. WERDER:
Q. Well, you evaluated and your people evaluated their program, did you not?
A. We did. It was visible in the marketplace. Yes.
Q. And one of the things that you recognized and that your people recognized about the program was that it was a program that was anticipated and likely

Page 231

to generate significantly more revenue for CSX than the program that it replaced, correct?
A. It was deemed to be more responsive to volatility in oil prices.
Q. It was deemed, also, to be a program that was likely to generate significantly more revenue than the prior program, wasn't it?
A. Well, if it was deemed to be more responsive to volatility in oil prices, one would certainly reach that conclusion.
Q. So there is -- in terms of -- you have given a number of responses today that relate to responsiveness to volatility and you, in your mind, being more responsive to volatility in oil prices is -- equates to the potential to generate more revenue, does it not?
MR. NANNES: Depending on which way fuel prices go.
BY MR. WERDER:
Q. In the fuel price environment in which you were -- you thought you were dealing.
A. With it being a component of price, we were looking to have protection against that volatility for that component of the price.
Q. And when you saw the CSX program that was

Page 232

announced in March of 2003, you recognized that that was a program that would, as oil prices -- if oil prices were increasing, would generate significantly more revenue than the program that it replaced, correct?
A. We deemed it to be more responsive and more effective.
Q. And more aggressive than the prior program in terms of revenue generation?
A. I am not sure we saw it as more aggressive. We saw it as a more effective mechanism to truly reflect the changing nature of the oil market.
Q. Well, you thought -- your people thought that they were digging deeper for every dollar, did they not?
A. Customers probably were telling us that that was taking place.
Q. Okay. Well, your people were capable of evaluating it independently of what customers were telling them, correct?
A. We could read what was on the Web site.
Q. Did they say on their Web site that they were digging deeper for every dollar?
A. No.

Page 233

Q. But your people thought they were digging deeper for every dollar, did they not?
MR. NANNES: Objection to the characterization.
THE WITNESS: I am not sure that was the general consensus but I am sure that that could have been the opinions of some of our people.
BY MR. WERDER:
Q. Okay. Was it your opinion?
A. I don't recall that that was my specific opinion. I was looking at ensuring that we were competitive in the marketplace and that if there was a better mousetrap in the marketplace and we could be competitive with that, we would take a look at it.
(A document was marked as Seale Exhibit No. 32.)
BY MR. WERDER:
Q. Hand you what has been marked Seale Exhibit 32. Can you identify that as a March 24, 2003, e-mail from Mr. Glennon to you and others along with some attachments including some earlier e-mails?
A. I am reading the first page at the top, and it is a March 24, 2003, e-mail from Mr. Glennon to me.
Q. All right. After CSX came out with its

Page 234

program in March of 2003, is it fair to say that Norfolk Southern evaluated that program on a periodic basis during later months in 2003?
A. Yes.
Q. And was the initial evaluation carried out in March of 2003?
A. We were constantly evaluating what was in place because the market continued to change and it was dynamic.
Q. Okay. Let me -- let me direct your attention, if I could, to the second page of the document, which has an e-mail from Mr. Glennon to you and others dated March 20th of 2003. Do you see that? Starting right near the bottom of the page.
A. On the bottom. I see that. And I want to read it. Is that okay?
Q. Yes. Sure. Take your time. Have you had the opportunity to read that now?
A. I have read it.
Q. And so if we go to the third page of the document, there is a paragraph that begins, "Obviously." Do you see that?
A. I do.
Q. "Obviously. The CSXT is digging deeper for every dollar." Do you see that?

Page 235

A. I do.
Q. And that was an observation that Mr. Glennon made in March of 2003, correct?
A. That is Mr. Glennon's opinion. Yes.
Q. And is it your understanding that this -- that this e-mail simply reflects Mr. Glennon's opinion as opposed to the opinion of Mr. Glennon and the various team members who were also part of the evaluation process?
A. I have no way of being able to determine that based on this correspondence.
Q. All right. At the last paragraph of Mr. Glennon's e-mail, he says, "Now we have three major standards. That is not good." Do you see that?
A. I do.
Q. What is your understanding of his reference to the three major standards?
MR. NANNES: Lack of foundation.
BY MR. WERDER:
Q. Withdrawn. Do you have an understanding of his -- what he is referring to when he refers to we now have three major standards and that isn't good?
A. No. I do not. By reading this, I can't determine that.
Q. Okay. You can put that document aside.

Page 236

MS. REINHART: Counsel, I think that you actually attached a second document to this e-mail string that you separated. Page beginning NS 001000220 I believe is an entirely new document.
MR. WERDER: Why don't we break that out of the exhibit, then, guys. We will fix -- we will fix the official copy at the end of the deposition. Make sure you get, Ben.
BY MR. WERDER:
Q. In March of 2003, when Norfolk Southern first looked at the CSX program, is it fair to conclude that the decision was not to immediately adopt it?
A. We started to look at it. We didn't know what to do. We were trying to make up our minds.
Q. And you didn't decide to adopt it in March, correct?
A. Correct.
Q. Did the review process continue in April?
A. The process would have continued in April. But in the March question, we would have received through our channels a concurrence request from CSX on their public-regulated prices for our concurrence on traffic moving for those commodities from their origins to our destinations where they

Page 237

published the price. So we would have had a review of that and a response to CSX with respect to our concurrence.

Q. Is concurrence necessary for them to implement the -- their new plan?

A. Yes. In my view, it is.

Q. Is that true under all interline movements?

A. Generally, yes.

Q. Is there something called Rule 11, interline movements, that would not require concurrence?

A. Well, if it is Rule 11, it is not an interline price. It is two separate rate factors that are put together in combination.

Q. So is it your understanding that, other than through the Rule 11 process, your concurrence would be required?

A. That is my belief. Yes.

Q. And did you, in fact, provide that concurrence?

A. As I recall, we did concur.

Q. Is there any discussion between personnel from Norfolk Southern and personnel from CSX with regard to the concurrence request other than the

Page 238

receipt of a written request and a written response to that?

A. Yeah. I am not aware of any further communication.

(A document was marked as Seale Exhibit No. 33.)

BY MR. WERDER:

Q. Okay. Handing you what has been marked as Seale Exhibit 33. What I am really most interested in here, Mr. Seale, is the attachment to the document that -- that is an April 7, 2003, memo labelled, "Fuel Surcharge - CSXT vs. NS Comparison." Do you see that?

A. I do.

Q. Do you recall receiving this memo on or about April 7th of 2003?

A. I don't recall the document but I see that it was addressed to me April 7, 2003.

Q. You don't have any reason to think that you -- that you didn't receive it, correct?

A. I would have no way of knowing at this point.

Q. All right. At the middle of the first page of the document, there is a -- there is a discussion of common FSC standard. Do you see that?

A. Where are you?

Page 239

Q. I am in the middle of the first page, the third bullet, under, Ease of doing business, on the April 7, 2003, memo that is attached to --

A. The first page of the attachment?

Q. Correct. Do you see common FSC standard?

A. Yes.

Q. Why don't you take a moment to review that.

A. I have read it.

Q. What is your understanding, if you have one, about what Mr. Glennon is communicating when he says under that bullet, "The announced CSXT change undercuts what was the US standard"?

A. Let me find that.

Q. It is five lines down in the common FSC standard section.

A. I see the sentence. Yes.

Q. Do you understand what he is talking about when he says "undercuts what was the US standard"?

A. I don't -- I can't interpret exactly what he was meaning by U.S. standard but he is addressing the administrative burden of having multiple variations of fuel surcharges and customer input that he is receiving.

Page 240

Q. All right. If you look over -- and I have a very limited question about this. But if you look over on Page 3 of the attachment under contracts right at the bottom of the page. Do you see that?

A. Contracts at the bottom of the page?

Q. Yeah.

A. Can I read it?

Q. Sure. Take a moment to read it. Take as much time as you want to read it.

A. Just the contract section?

Q. Correct.

A. Yes. I have read it.

Q. And it says there, "Privately, they" -- "they" being CSXT -- "admit that this is a stretch and expect strong customer opposition." Do you see that?

A. The last sentence, I do.

Q. Yes. Okay. Would Mr. Glennon have been involved in private discussions with CSX concerning this issue?

MR. NANNES: Objection as to form.

BY MR. WERDER:

Q. Withdrawn. Do you know whether Mr. Glennon was involved in private discussions with CSX concerning this FSC announcement?

A. No. I do not.

Q. Did he ever tell you whether he was or he wasn't?
A. I can't recall that.
Q. Did you direct him to have communications, private communications, with CSX?
A. No.
Q. When he says privately they admit that this is a stretch and expect strong customer opposition, what is your -- do you have an understanding of what it is that he is communicating?
A. I do not based on this one paragraph.
Q. Okay. You can put that document aside.
(A document was marked as Seale Exhibit No. 34.)
BY MR. WERDER:
Q. Handed you what has been marked as Exhibit Seale 33.
MR. WISEMAN: You mean 34.
THE WITNESS: The last one was 33.
BY MR. WERDER:
Q. Hand me that back, then. I will have to fix that. Thank you. 34. Seale 34. Can you identify the first document on this chain as an April 17, 2003, e-mail from you to Kathryn McQuade?
A. Yes.



Q. And who is she?
A. At the time, I think she was then vice-president of finance or senior vice-president of finance.
Q. I want to direct your attention, if I could, to the third e-mail on the first page, which is the 11:44 a.m. e-mail from you to Ms. McQuade. Do you see that one?
A. April 17, 2003? Correct. I do.
Q. Okay. And that is an e-mail that you sent to her on that date?
A. Correct.
Q. And it says in the last sentence of the e-mail, "At this point, we do plan to modify our FSC - but we are analyzing further action."
A. Yes. I see that.
Q. Is that correct? Is that what you intended to send?
A. Well, what that was saying is that we continue to look at the fuel surcharge application.
(A document was marked as Seale Exhibit No. 35.)
BY MR. WERDER:
Q. You can put that document aside. Handed you Seale 35. Can you identify that as an April 29,



2003, e-mail from Mr. Glennon to yourself?
A. I can.
Q. And in the first bullet, Mr. Glennon says, "By dropping the base to $23 per barrel, raising the percentage yield and" taking "it sooner, the change is in fact a blatant general rate increase, and will appear so to customers." Do you see that?
A. I do.
Q. After you received this e-mail from Mr. Glennon, did you tell him that you disagreed with that?
A. I don't recall having a discussion with Mr. Glennon in which I would disagree with that.
Q. Did you discuss the issue of Norfolk Southern's fuel surcharge policy and whether to adopt the CSX approach with Mr. Glennon at any point in time after April 29, 2003?
A. I am sure -- I am sure I did along with all of these other people copied and many others.
Q. And at any point in time, did you tell him that, no, the CSX approach that has $23 a barrel raised in the percentage yield and taking it sooner was not a blatant general rate increase?
A. I never recall us talking about a blatant general rate increase.



Q. In fact, it was a blatant general rate increase, wasn't it?
MR. NANNES: Objection.
THE WITNESS: The way I read this, it was his opinion or it was so stated based on customer input or our perception of what customers might think.
BY MR. WERDER:
Q. Let me ask you about those last two points that you just made. First of all, is there any indication in Mr. Glennon's statement that that was based upon customer input as opposed to your impression about what customers might think?
A. Well, it says here "and will appear so to customers." And the group vice-presidents that are responsible with communicating directly to customers are copied on this document.
Q. So is it your understanding that Mr. Glennon, when he is describing the CSX approach as a blatant general increase is simply reporting what customers had reported to your group vice-presidents or to sales personnel who reported to the group vice-presidents?
A. I have no way of telling that for sure from this document, but with the date of the document being April 29th, this formula was already in the

Page 245

marketplace and I am sure customers were telling us what their opinion of it was.
(A document was marked as Seale Exhibit No. 36.)
BY MR. WERDER:
Q. You can put that document aside. Exhibit Seale 36. Can you identify that as a May 12, 2003, e-mail from you to Mr. Prillaman?
A. Yes.
Q. And on the first line, you say, "Regarding our conversation with UP this week." Do you see that?
A. I do.
Q. And is that a reference to Union Pacific?
A. It is.
Q. Did you have a discussion with Union Pacific concerning fuel surcharge issues in the week of May 12, 2003?
A. I can't tell from this whether it was a general interline discussion or specifically what it was but it is clear that we had a conversation with Union Pacific.
Q. And in connection -- your e-mail says, "Regarding our conversation with UP this week, note below that BNSF has now announced a rollback of its

Page 246

FSC to 2% from 5% even though their formula calls for 5%." Do you see that?
A. I do.
Q. Did you have a discussion in or about May of 2003 with Union Pacific concerning what BNSF had done with its fuel surcharge?
A. I don't recall such a conversation. This refers to a conversation with Union Pacific for interline business.
Q. And my question was that in discussing fuel surcharge with Union Pacific, did you discuss with them what BNSF had done?
A. No. I don't recall that.
Q. And the next sentence of the document says, "The industry is not looking good on this issue." Do you see that?
A. I do.
Q. And that was what you advised Mr. Prillaman in May of 2003, correct?
A. That is what this document says. Yes.
Q. And that is what you advised Mr. Prillaman?
A. Yes.
Q. The earlier -- the earlier-in-time e-mail on this chain is a May 7th, 2003, e-mail from Mr.

Page 247

Glennon to you and others, is it not?
A. It is addressed to Mr. Brenner with a copy to me. Yes.
Q. Okay. And it refers to a communication that Mr. Pfeifer had with BNSF, correct?
A. Let me read this.
Q. Sure.
A. Okay. I have read it.
Q. And that refers to a communication that Mr. Pfeifer had with BNSF, correct?
A. Yes.
(A document was marked as Seale Exhibit No. 37.)
BY MR. WERDER:
Q. You can put that document aside. Handed you what has been marked Exhibit Seale 37. Can you identify the first e-mail -- the first document in this chain as a July 3rd, 2003, e-mail from Mr. Glennon to you and others?
A. Yes. Addressed to the group vice-presidents and a copy to me along with others.
(A document was marked as Seale Exhibit No. 38.)
BY MR. WERDER:
Q. You can put that document aside. Handed

Page 248

you what has been marked Seale 38. The only question I want to ask you about this one is can you identify Mr. Sheets and Mr. Nash?
A. As I recall, at this time, Mr. Sheets was in accounting and Mr. Nash was also in accounting.
Q. And I said the only thing I wanted to ask about it, I actually wanted to ask you one more question about it. If you look in the second full paragraph, Mr. Glennon writes, in the fourth sentence, "The CSXT looks" much "too much like a money grab." Do you see that?
A. I see that.
Q. Did Mr. Glennon ever have any communication with you in which he described the CSX approach as a money grab?
A. I cannot recall him describing it that way.
(A document was marked as Seale Exhibit No. 39.)
BY MR. WERDER:
Q. Okay. You can put that document aside. Handed you Seale 39. Can you identify that as a July 23rd, 2003 e-mail from you to Mr. Prillaman?
A. Yes.
Q. And in this e-mail, it is fair to say, is

Page 249

it not, that you recommended against moving to the CSX approach?

A. Let me read the document, and then I will answer the question.

Q. Sure. Take your time.

MR. NANNES: While Mr. Seale is reading the document, let me just mention, for the record, that there is a reference on Page 2, to an attachment from Global Insight with respect to its outlook for crude oil prices and that was not attached to the version that was given to him.

MR. WERDER: Okay.

THE WITNESS: Okay. I have read the document.

BY MR. WERDER:

Q. And is it fair to say that you were recommending against implementing the CSX approach at that point in time?

A. As of July 23rd, 2003, that is correct.

Q. And was it also your recommendation at that point in time that the -- that you continue to take steps to prepare yourself to implement a change in the approach should that decision ultimately be taken?

A. I don't see anything in here that

Page 250

indicates prepare ourselves. What we are talking about is modifying possibly the original fuel surcharge that was published in 2000.

Q. You can put that document aside. During the period in 2003, when you were evaluating various approaches including the CSX approach, did you learn at some point in time that Union Pacific had adopted the CSX approach?

A. No. I don't recall knowing that or hearing that.

(A document was marked as Seale Exhibit No. 40.)

BY MR. WERDER:

Q. Handing you Seale 40. You're not copied on this document but let me see if this refreshes your recollection. If you take a look at the April 9, 2003, e-mail from Mr. Glennon to marketing NS merchandise. And in the first paragraph, he says, "The UP has adopted the Fuel Surcharge first proposed by the CSXT." Do you see that?

A. Yes. I do.

Q. Does that refresh your recollection?

A. It doesn't refresh my recollection but I can certainly read it here in the document.

Q. Okay. And in the course of the period of

Page 251

time in which you were evaluating a possible change to your program, did you get information from BNSF that it might match Union Pacific's program?

A. Not to my knowledge.

(A document was marked as Seale Exhibit No. 41.)

BY MR. WERDER:

Q. Hand you Seale 41. Can you identify that as a May 9, 2003, e-mail from you to Mr. Prillaman?

A. May 9, 2003. Correct.

Q. Okay. You can put that document aside. In addition -- withdrawn.

During the course of time in which you were evaluating whether to make a change, did you get information from CSX concerning how it might apply its fuel surcharge?

A. I don't quite understand your question. If you could restate it.

Q. Withdrawn. During the period of time when you were internally considering your fuel surcharge during 2003, it is true, is it not, that you were having various discussions with various other railroads concerning fuel surcharge-related issues?

A. On an interline basis for our public-regulated commodities, we would have been

Page 252

having interline discussions both for negotiations with customers on interline traffic that involved the two roads as well as the public-regulated commodities.

Q. And are you -- can you give me some sense of the number of times during 2003 when you communicated with personnel from other railroads concerning fuel surcharge-related issues?

A. No. I have no recollection of the frequency. It must have not been very frequent or I should be able to remember it.

Q. When you had those discussions, was there any effort made to create transcripts of the discussions?

A. Well, if we had a formal interline meeting, I am sure that there would have been minutes from the interline meeting that would show that such discussion took place.

Q. Do you understand the distinction between minutes and a transcript?

A. Well, it -- in the way you are posing it, no, I don't.

Q. Was there any effort to make a verbatim record of what was said at any of these meetings?

A. Well, there were minutes formulated from the meeting summarizing the discussion. But if you

are asking if we had a stenographer there taking down every word by word the question -- the answer would be no.

Q. Do you recall any particular -- I have got some documents I am going to show you momentarily but do you recall any particular discussions with personnel from other railroads during 2003 concerning fuel surcharge-related issues?

A. I don't recall the specific discussions but I am sure that those could have taken place during that year as they had in prior years.

Q. Okay. And you say that they related to interline issues. Was there -- in what way -- when you were having discussions with personnel from other railroads concerning fuel surcharge-related issues, what steps did you take, what measures did you implement to ensure that the information that was being exchanged related only to interline-related issues?

MR. NANNES: Objection as to form.

THE WITNESS: Will you restate the question now?

BY MR. WERDER:

Q. Yes. You said that the conversations that you recall related to interline-related



interactions with other railroads presumably on a bilateral basis. My question is: Well, what steps did you take to ensure that the information that was being exchanged had utility related only to interline-related movements?

MR. NANNES: Objection.

THE WITNESS: Well, I -- in formulating the agenda, I am sure that we would have legal counsel take a look at the agenda, legal counsel reviewing or participating in the follow-up actions from such meetings.

BY MR. WERDER:

Q. Anything other than that?

A. Well, and the nature of the discussion themselves were interline by nature of traffic that was flowing from our railroad to that connecting carrier and vice versa.

(A document was marked as Seale Exhibit No. 42.)

BY MR. WERDER:

Q. Let me hand you what has been marked Seale 42.

A. I have 42 and another document.

Q. Two copies of the same one. Okay.

MR. WINTERS: Counsel, I object to the



use of this document in this deposition. We were not notified in advance per the protective order.

MR. WERDER: We gave notice in advance.

MR. WINTERS: No. Not as to Mr. Seale. We were given notice that this document would be used in the deposition of Mr. Giftos but not Mr. Seale. So use of this document doesn't comport with the protective order. I have an e-mail from Mr. Hammond that indicates which documents would be used in the deposition of Mr. Seale and it does not identify this document.

MR. WERDER: Joe?

MR. HAMMOND: Mr. Seale is listed as being --

MR. WERDER: He is an attendee of the meeting. He can answer the question.

MR. WINTERS: In that case, go ahead.

MR. WISEMAN: Wait a minute. Wait a minute. This is a BNSF-produced document, and the protective order required you to give advance notice to BNSF as to this document as a precondition to its use. So just because Seale's name is on here doesn't waive the requirements of the protective order.

MR. HAMMOND: It does.

MS. REINHART: Not unless it is clear



that it actually went to Mr. Seale. There is no indication this was provided to Mr. Seale.

MR. WERDER: You can put the document aside. I will just ask you a couple of questions.

BY MR. WERDER:

Q. Did you attend a meeting with BNSF on or about March 18th of 2003?

A. I can't recall the meeting but looking at this document it says that such a meeting took place and I see the attendance list and my name is on it.

Q. And do you recall a discussion during the course of that meeting concerning the fact that BNSF's fuel surcharge was structured differently than NS, CSX and UP?

A. I don't recall that specific discussion but we could certainly have been talking about NS/BN application on a interline basis and what else was out there in the marketplace.

Q. And do you recall discussing with BNSF whether their fuel surcharge should be synchronized with the fuel surcharge of the other big players in the industry?

MR. NANNES: Objection to the term -- I am sorry. Withdrawn.

BY MR. WERDER:

Q. Do you recall that?
A. I don't recall having that discussion. What we more than likely would have been having a discussion on is customer input and customer concern about a fuel surcharge applying one format from our origins to their destinations and a different fuel surcharge applying from their origins back to our destinations.
Q. What is your best recollection of the discussion that you had with BNSF concerning the fact that their fuel surcharge was structured differently and concerning the potential issue of synchronization at this March 2003 meeting?
A. I don't recall the specifics of the March 18, 2003, meeting. But, for example, if they had modified unilaterally their application of fuel coming to us on interline traffic, it would cost us revenue in terms of the interline price as opposed to them getting a higher percentage of revenue coming off of our origins going to their destinations.
Q. Do you not recall the discussion at this point in time?
A. I don't recall the specific discussion that is referenced in this document.
Q. Did you take any notes at that meeting



with BNSF?
A. Not that I can recall.
Q. Are you aware of any -- of any notes that were created by anybody within Norfolk Southern with respect to the subjects that were discussed at that meeting?
A. If -- and I am a little confused here. If this is a BN document, I would be surprised if they didn't share -- or who was putting the minutes together didn't share the minutes with the two parties that were meeting.
Q. Who is John Lanigan?
A. He is my counterpart at the BN Santa Fe.
Q. Is he a person with whom you discussed fuel surcharge-related issues during the course of 2003?
A. He certainly could have been.
Q. Did you attend an NFTA meeting in April 2003?
A. I possibly could have.
Q. Did you have any discussion with Mr. Lanigan at that meeting?
A. I don't recall discussions with him at that meeting.
(A document was marked as Seale Exhibit



No. 43.)
BY MR. WERDER:
Q. Hand you what has been marked Seale 43. Does that refresh your recollection concerning whether you had any discussion with Mr. Lanigan at that meeting?
A. It still doesn't refresh my memory as to whether or not we actually met at NFTA. It says here we are going to try to.
Q. Do you recall -- and you don't recall whether or not you met with him or not?
A. No. I don't.
Q. So you don't recall whether or not you discussed fuel surcharge-related issues with him at that meeting?
A. I do not.
Q. Okay. Do you recall attending some form of chief marketing officer meeting or dinner in April of 2003 to toast or roast Chuck Scholtz?
A. I don't recall a meeting to roast or toast. I think he was retiring.
Q. And did you attend that meeting?
A. I would need to look at the specific date but I think that is correct.
Q. Okay. And did other -- did the chief



marketing officers of various other railroads also attend that meeting or that dinner?
A. I think that is correct.
Q. Did you have any discussion of fuel surcharge-related issues with any of them at that meeting?
A. No. None that I recall.
Q. Did you attend an NEMC meeting in late April, early May of 2003?
A. What was the acronym again?
Q. NEMC.
A. NEMC.
Q. NEMC?
A. Yes. I don't know about the date but that could be correct.
Q. Okay. What is the purpose of NEMC?
A. It was the Network Efficiency Management Committee at the Association of American Railroads in Washington. The chief marketing officer set on that committee, and we worked on a various set of interline activities, cross-border security, technology, interline service agreements to facilitate through movement of transportation service on an interline basis, technology issues, ease of doing business issues for customers, those types of activities.

Page 261

Q. Did you generally attend those meetings?
A. I did.
Q. Do you recall in the May -- the April/May meeting any discussion of fuel surcharge-related issues?
A. I do not.
Q. Did you -- did you attend an alliance meeting with Union Pacific in May 2003?
A. I don't remember the specific date but I certainly could have.
(A document was marked as Seale Exhibit No. 44.)
BY MR. WERDER:
Q. Let me hand you what has been marked as Exhibit Seale 44. Ask you whether you can identify the e-mail that begins on the middle of the first page as a June 5, 2003, e-mail from you to Mr. King.
A. June 5, 2003. I see that. Yes.
Q. Okay. And who is -- can you identify who B. King is?
A. As I recall, that is Brad King, who was a senior vice-president of transportation at UP.
Q. Who is W. F. Sutton?
A. Woody Sutton was also, I think, AVP transportation of UP.

Page 262

Q. All right. And your e-mail, your June 5 e-mail, states, among other things, "Please note NS representatives that will work with UP designees on the assigned topics." Do you see that?
A. Which page are you on now?
Q. I am on the first page.
A. The sentence also, "Please provide names of NS people assigned."
Q. Right.
A. I see that.
Q. Okay. So if we go over to the second page of the document, there is a minutes -- minutes of a NS/UP alliance meeting in Omaha, Nebraska, on May 14th of 2003, correct?
A. That is correct.
Q. Okay. And does this identify the complete list of the attendees at this meeting?
A. As far as I know, it does.
Q. Are any of the NS attendants attorneys for Norfolk Southern?
A. No. I don't think so.
Q. And, to your knowledge, are any of the UP attendants, Union Pacific attendants, attorneys at Union Pacific?
A. No. I do not think so.

Page 263

Q. All right. The only paragraph I want to ask you about is the first paragraph, if you want to take a moment to review that.
A. First paragraph. I have read it.
Q. You have read it. Does that accurately summarize the discussion that occurred at that meeting on May 14th?
A. I -- I didn't draft these minutes so I don't know if it completely describes the discussion but I can read this summary and it would appear, based on this description, that is what was discussed.
Q. And do you have any reason -- do you have any recollection of the discussion that is inconsistent with what is written on the second page of the exhibit, the minutes of the meeting?
A. Recollection of inconsistent?
Q. Do you have any recollection of a discussion that is inconsistent with what is set forth on this page?
A. No. I do not.
MR. NANNES: Objection.
BY MR. WERDER:
Q. Okay. And then there is a -- there is an assignment here for follow-up and from Union Pacific it is Jack Koraleski and Mike Hemmer. Do you see

Page 264

that?
A. I do.
Q. And are those gentlemen that you have worked with over time in your capacity with Norfolk Southern?
A. Yes. Jack Koraleski is chief marketing officer, and Mike Hemmer is chief legal officer.
Q. All right. And then there is the Norfolk Southern follow-up is you and Greg Summy?
A. Yes.
Q. And is Mr. Summy an attorney at Norfolk Southern?
A. He is.
Q. What steps did you take to follow up on this meeting?
A. I don't recall any specific follow-up, and I think that counsel must have consulted and pretty much said this is not something that can be progressed beyond the bilateral discussions we are having with the Union Pacific.
MR. WERDER: Why don't we take a five-minute break.
THE VIDEOGRAPHER: This is the end of Tape Number 5 in the deposition of Donald Seale. We are going off the record at 4:36.

(Recess taken.)
THE VIDEOGRAPHER: This is the beginning of Tape Number 6. We are now back on the record at 4:44 p.m.
BY MR. WERDER:
Q. I think we were talking about Exhibit 44 a moment ago. And your testimony was that there wasn't any follow-up. And I don't want to put words in your mouth but presumably because or possibly because the attorneys gave some advice. Was that -- was that kind of a summary of your testimony?
A. I don't recall the follow-up of this paragraph that you asked me to read.
Q. Okay.
A. I presume the attorneys talked. And this was an item that wanted no further action. But I don't I don't recall a follow-up discussion of it.
Q. And was it -- was it you that put in the names of the -- of the personnel for follow-up or was it someone else?
A. I don't recall the process that was used to assign the follow-up.
Q. In any event, you don't recall doing any follow-up of this after this meeting?
A. I don't.



(A document was marked as Seale Exhibit No. 45.)
BY MR. WERDER:
Q. Let me hand you what has been marked Exhibit Seale 46.
MR. WISEMAN: Is it 46 or 45? I have 45.
MR. WERDER: It must be 45. Thank you.
BY MR. WERDER:
Q. Seale 45. Did you attend a joint marketing meeting with BNSF on July 30th of 2003?
A. Yes. This document would indicate so I would say -- except it is calling me Dan Seale instead of Don Seale.
Q. Were any of the Norfolk Southern attendees there Norfolk Southern attorneys?
A. No. None that I see.
MR. WISEMAN: They have four copies. Can you give her one? Thanks.
BY MR. WERDER:
Q. Let me direct your attention to Page 3 and to XIV. There is a -- there is an indication of or a heading there that is entitled, Fuel Surcharge. Do you see that?
A. I do.
Q. What do you recall of the discussion of



fuel surcharges that occurred at this meeting on July 30th of 2003?
A. I don't recall specifics of the meeting but I am reading this and it indicates that John Lanigan and myself agreed to lead a discussion of a potential industry position on fuel surcharge provisions at the next NEMC meeting.
Q. Beyond that action item, that is -- that was listed as an action item, correct?
A. Yes.
Q. And was there some discussion at the meeting, without regard to whether you can recall the specifics of it, was there some discussion at the meeting that led to that action item?
A. I don't recall that discussion other than what is written here.
Q. Other than the action item that came out of the meeting, are you aware of any -- any written record of the topics that were discussed and the substance of the discussion that you had with BNSF concerning fuel surcharges at this July 30th meeting?
A. No. I do not.
Q. You are not aware of any document?
A. No.
Q. And then the action item that came out of



this meeting involved you and Mr. Lanigan doing something together with respect to a potential industry position, do you see that?
A. I do.
Q. What -- was there -- do you recall any discussion at the meeting, on July 30th, concerning the nature or substance of a potential industry position?
A. I do not. I am sure that, again, this was a discussion, I presume, of customer input for ease of doing business and whether or not there could be something put in place that was easier for our customers to use.
Q. Why do you presume that if you didn't have any -- you don't have any recollection of what the discussion was?
A. It was the general -- it was the general discussion that took place on this type of discussion.
Q. In any event, to your knowledge, there isn't any record of what it was exactly that you and Mr. Lanigan and the rest of the Norfolk Southern team and the rest of the BNSF team discussed at this July 20th meeting, correct?
A. That is correct.
Q. You don't have any notes of the meeting?

Page 269

A. No.
Q. The assignment that you were given with Mr. Lanigan, what did you do to carry out that assignment?
MR. WINTERS: Object to the form.
BY MR. WERDER:
Q. You can answer.
A. I don't specifically remember what we did. We are saying here that we will check to see if a potential industry position can be -- can be discussed at NEMC, and I don't recall any such discussion ever taking place at NEMC.
Q. It doesn't say you would check to see whether a discussion could occur at NEMC, it says you agreed to lead a discussion at the next NEMC meeting, correct?
A. It says that but I don't believe that it was that precise. But that is the way this document is written, and I don't know who wrote this.
Q. Did you receive a copy of these minutes at or about July 30th of 2003?
MR. WISEMAN: Objection to the form. It doesn't say this is minutes.
BY MR. WERDER:
Q. Did you -- withdrawn.

Page 270

Did you receive a copy of this memorandum with respect to the July 30th, 2003 meeting at or about the time that it was written?
A. If it were -- if it was distributed to the attendees, I received it. But I don't recall receiving it.
Q. Do you recall ever indicating that any correction needed to be made to the description of the action item that is listed under XIV, Fuel Surcharge?
MR. NANNES: Objection. Lack of foundation.
BY MR. WERDER:
Q. You can answer.
A. Again, since I don't recall receiving the document, I certainly can't respond to any specific action taken with respect to any of these items.
Q. Okay. And then after -- was there a NEMC meeting in September of 2003, to your recollection?
A. I don't recall.
Q. Did you and Mr. Lanigan have any subsequent discussions concerning this action item between July 30th of 2003 and September 11th of 2003?
A. I don't recall having any additional discussions with Mr. Lanigan.
Q. Are you saying that you didn't have any

Page 271

such discussions or you don't recall whether you did or didn't?
A. I don't -- can't recall that we did.
Q. And on any issues relating to -- withdrawn.
Are you saying that you don't recall having any discussions with Mr. Lanigan on any issues relating to fuel surcharges or you don't recall having any further discussions with him with respect to this particular action item?
A. Both would apply.
Q. Did you have any -- I think I asked you this, and I am not sure if your -- if your answer was you don't recall. But do you recall whether there was a NEMC meeting in September 2003?
A. I think I responded that I just don't recall that specific date. It could have been.
(A document was marked as Seale Exhibit No. 46.)
BY MR. WERDER:
Q. Handing you what has been marked exhibit Seale 46. Does that refresh your recollection that there -- withdrawn for one moment. Sorry.
Let me ask you if you can identify the first document on that page as a September 11, 2003,

Page 272

e-mail from you to Mr. Brenner and others.
A. That is correct.
Q. And in the top e-mail there is a statement that says, "Jim, John Lanigan and I had lunch today in Washington." Do you see that?
A. I do.
Q. Does that refresh your recollection about whether you were in Washington on September 11th, for a NEMC meeting?
A. Again, reading this I can't tell if it was a NEMC meeting but it could have been.
Q. Let me try one more thing to refresh your recollection. At the end of the second e-mail in the chain, it says, "Enjoyed our visit at NEMC, and look forward to seeing you again soon."
A. Where is this? Okay. The last sentence in the second paragraph?
Q. Yes.
A. Okay. I see that now.
Q. Okay. So you -- who is -- who is the reference to Jim where it says Jim, John Lanigan and I?
A. I do not know. And I am reading this again to see if I can help with that but --
Q. Okay. In any event, you met with

A. David Goode.
Q. And would Mr. Goode be voting on or approving issues relating to fuel surcharges at AAR meetings without consulting with you as the person principally responsible for Norfolk Southern's design and implementation of fuel surcharges?
MR. NANNES: Objection. Lack of foundation.
THE WITNESS: Not having the information about what the meeting entailed, I have no way of responding to that.
BY MR. WERDER:
Q. Did you discuss fuel surcharge-related issues at any point in time in 2003, with Mr. Goode?
A. Not that I can recall specifically.
Q. Did you have any discussions with Mr. Goode concerning the possibility that the AAR was going to take up at a December 2003 meeting the approval of a new index called the AIILF?
A. No. I wasn't even aware that that was on the docket.
Q. And when did you first become aware that that issue was on the docket?
MR. NANNES: Objection. Lack of foundation.



BY MR. WERDER:
Q. Did you at some point in time become aware that that issue had been on the docket and had been approved at that meeting?
A. I don't recall that information.
Q. You don't recall ever learning that?
A. I don't recall talking about the index or when it was approved.
Q. Do you know whether or not Mr. Goode voted in favor of the creation of a new index called the AIILF at the December 2003 meeting of the AAR?
A. No. I have no information on such vote.
Q. You have never discussed that issue with Mr. Goode?
A. No.
Q. Mr. Goode never told you that he voted in favor of that?
A. No.
Q. Do you have any understanding that a proposal to create the AIILF index was advanced by BNSF in advance of the December 2003 AAR meeting?
A. No. I would not have been aware of that. We were using the RCAF with a percentage deducted from the RCAF and applying our fuel surcharge at that time.
Q. Did you attend a joint Norfolk



Southern/BNSF train trip on December 16th of 2003?
A. I possibly could have. I don't recall it.
Q. Was it the practice of BNSF and Norfolk Southern to conduct meetings, marketing meetings, on train trips?
A. We would take train trips with interline partners across properties on somewhat of a regular basis.
Q. Were you involved in any way in the AAR's decision to publish the AIILF on its Web site in 2004?
A. I might have been asked if I was agreeable to publishing it. And if I were asked, I would have probably said, if it is public, publish it.
MR. WERDER: Excuse us for a moment.
MR. NANNES: You might want to take your microphone off.
(There was a pause in the proceedings.)
THE VIDEOGRAPHER: Thirty-five minutes.
MR. WERDER: Thank you.
(A document was marked as Seale Exhibit No. 51, and received into evidence.)
BY MR. WERDER:
Q. Handed you Seale 51. I think we have already identified most of the players on Exhibit 51



with the possible exception of Mr. Kiley. Can you identify Richard Kiley?
A. In 2004, I believe he was associated with the -- let me take a look here, and I will give you a better answer. He was involved in the automotive market.
Q. And take a moment and review Mr. Pfeifer's e-mail at the top of Exhibit 51, please.
A. Okay. I have read that.
Q. Did this analysis by your team come to your attention in or about February 2004?
A. No. It did not.
Q. Did you have any discussion that you can recall in the early 2004 -- the late 2003 or early 2004 time frame with Mr. Glennon, Mr. Kiley or anyone else concerning RCAF without fuel component and an evaluation of the impact of that?
A. Don't recall having any discussion along these lines with Mr. Glennon.
(A document was marked as Seale Exhibit No. 52.)
BY MR. WERDER:
Q. Okay. You can put that document aside. Handed you Seale 52. Take a moment to review the first e-mail on that page. That is the only one I am

Page 281

going to ask you about.
A. Okay. I have read it.
Q. Does that accurately summarize the conversation that you had with Mr. Lanigan?
A. I don't see this referring to a conversation that I have had with Mr. Lanigan. It refers to input from my vice-president of intermodal who has had discussions with the BN Santa Fe.
Q. Well, the e-mail says -- the e-mail is from you to Mr. Moorman, correct?
A. Yes.
Q. The first one. And it says, "Wick: Note below preliminary input from Mike on our concerns and issues with BNSF relative to the intermodal market. We do not have any outstanding issues in the other markets." Then it says, "I talked to John Lanigan yesterday, who" apparently -- "was apparently unaware that Matt has requested the Tuesday meeting." And then it goes on to summarize your conversation with Mr. Lanigan, does it not?
A. Well, I see that it references a conversation with Mr. Lanigan, but then it goes on to talk about several items, a contract arbitration issue, also BN Santa Fe's analysis of a mileage-based fuel surcharge. So I see that here.

Page 282

Q. Okay. But you have read this, right?
A. Yes.
Q. And is it your testimony that after the first -- after -- at the -- starting at the end of the second line where it says, "I talked to John Lanigan yesterday," and then it goes on to say, he indicated he also went on, et cetera, that that is not summarizing the conversation that you had with Mr. Lanigan?
A. Well, it certainly reflects that conversation with Mr. Lanigan but it encompasses several topics is the point I am making.
Q. Okay. To the extent that the e-mail relates to your conversation with Mr. Lanigan, does it accurately summarize your conversation with Mr. Lanigan?
A. Well, to the extent that I -- I am reading it here, I would assume so. But not recalling the entire conversation with Mr. Lanigan, I don't know if it would encompass everything but I would say that since it is summarized here, it should.
Q. Okay. And you certainly would have attempted to present to Mr. Moorman as accurate a description of your conversation with Mr. Lanigan with respect to the topics that you were describing as you

Page 283

possibly could, correct?
A. That is correct.
(A document was marked as Seale Exhibit No. 53.)
BY MR. WERDER:
Q. Put that document aside. Handed you Seale 53. Can you identify that as a January 8, 2004, e-mail from you to Mr. Goode and others?
A. Yes.
Q. You can put that document aside. Actually, one question about the document. The -- at the third-to-the-last line, says -- withdrawn.
This is describing the new fuel surcharge program or what we have been referring to as the modified program initiated at the beginning of '04, correct?
A. Let me read this since I haven't read it.
Q. Sure. Okay.
A. Okay. I have read it.
Q. Okay. And this is relating to the new fuel surcharge that was announced in January of '04, correct?
A. The modified fuel surcharge for public-regulated commodities, that is correct.
Q. And it says, on the third line from the

Page 284

bottom, "Additionally, our new formula essentially mirrors the fuel surcharge that CSX implemented in June 2003," correct?
A. That is what it says. Yes.
Q. And that was true, wasn't it?
A. Yes.
Q. You see in the middle of the page where it says, "Based on our current collection rate" -- "based on our current" -- "based on our current collection rate of the existing fuel surcharge and current pricing of crude oil, the new surcharge will have the potential of producing approximately" 30 "million annually in additional fuel" revenue, (88 "million annually vs. projected" 58 "million collected in 2003)." Do you see that?
A. I see that.
Q. Do those numbers relate just to regulated traffic or do they relate to all traffic?
A. Based on looking at this, I cannot tell. I would -- I just can't -- I really can't ascertain that by reading this e-mail.
Q. Okay. And you don't have -- is it because you don't have enough information in your head concerning the -- what the regulated traffic was generating in fuel surcharges in 2003?

Page 285

A. Yeah. I wouldn't have in my head what the total was or what the regulated commodities were from 2003. I wouldn't carry that kind of data around, not until 2010.

(A document was marked as Seale Exhibit No. 54.)

BY MR. WERDER:

Q. Hold off on those. Handed you Seale 54. Can you identify the top e-mail on that chain as a January 8, 2004, e-mail from you to Danny Smith and Marilyn Flottman?

A. I do. Yes.

Q. And have you had the occasion to review this e-mail chain in preparation for your testimony today?

A. Could I take a look?

Q. Sure.

A. Repeat your original question now. I have glanced through it.

MR. WERDER: Can you read my question back?

MR. NANNES: Is this a document you reviewed in preparation for your deposition.

BY MR. WERDER:

Q. Now I don't need that question. That is

Page 286

why I was confused. Does this document accurately summarize the rationale within Norfolk Southern for the adoption of the new modified fuel surcharge in January of '04?

A. I don't know if it covers all of the points. I have looked at, going down this list, ongoing price volatility and the energy market. I have mentioned that. The need for a formula that is more responsive to incremental cost fluctuations, I have mentioned that. A better notification process with more lead time for the customers, I have mentioned that today.

Q. How about standardization of FSC provisions in the east?

A. This is -- this is just a byproduct of us matching the competition in the marketplace.

Q. Well, it says, This action is taken for number of reasons. Bullet point, bullet point, bullet point, the three that you just mentioned. And then the fourth bullet is standardization of FSC provisions in the east. Are you saying that standardization of FSC provisions in the east is not one of the reasons for which the action was being taken?

A. Yes. We were matching the competition. And I will read a sentence in here. This

Page 287

fragmentation of fuel surcharges in the east has led to customer complaints about having to track multiple fuel surcharges and rate maintenance complexity.

Q. Standardization of fuel surcharge provisions in the east was one of the reasons for which Norfolk Southern adopted the modified program in January '04, correct?

A. It was one of the reasons we chose to meet the competition that was already in the marketplace.

Q. It was one of the reasons that you chose to adopt -- essentially adopt the CSX formula in January of '04, correct?

MR. NANNES: Objection.

MR. WINTERS: Objection as to the form.

MR. NANNES: Just paraphrasing.

MR. WINTERS: Asked and answered numerous times.

BY MR. WERDER:

Q. Well, the document says, "NS will essentially adopt the CSXT FSC formula. This is action is being taken for a number of reasons." And the fourth reason is standardization of FSC provisions in the east, correct?

MR. WINTERS: Objection to the form.

Page 288

THE WITNESS: I would -- I would categorize it as a net result of the action because as I testified earlier today we had looked at this over a period of months in the marketplace to see how customers -- whether customers would award us additional business as a result of having a different lower fuel surcharge. We had determined that we were not seeing customers reward us with more business. We were not seeing, on Part 2, any downward move in oil prices that, in fact, we were seeing an upward move of oil prices, just the opposite. So this fourth bullet, in my view -- and I didn't write it -- but the fourth bullet, in my view, is the net effect of matching the competition that was already in the marketplace after we had determined we were not gaining any additional business from customers nor were we seeing oil prices moderate.

(A document was marked as Seale Exhibit No. 55.)

BY MR. WERDER:

Q. You can put that document aside. Hand you Seale 55. Can you identify the top e-mail on that chain as a March 11, 2004, e-mail from you to Joe Osborne?

A. Yes. March 11, 2004. Yes.

Page 289

Q. And in this e-mail, did you give the -- did you confirm the directive that there was, in all cases, to be no deviation from Norfolk Southern's published fuel surcharge without your prior approval?
MR. NANNES: Objection as to form.
THE WITNESS: I am reading the entire document so I can see context.
BY MR. WERDER:
Q. Okay.
A. Now, would you restate your question.
Q. Yes. Were you, in this e-mail, confirming the management directive that there should be no deviation from Norfolk Southern's published fuel surcharge without your prior approval?
MR. NANNES: Objection as to form.
THE WITNESS: I am responding in this e-mail to a question from several people about the line haul charges and the fuel surcharge application and whether or not our people had the latitude to trade one off versus the other with customer -- specific customer negotiations. And I am responding here that they do not have that latitude.
BY MR. WERDER:
Q. And that was your management directive, correct?

Page 290

A. Yes.
(A document was marked as Seale Exhibit No. 56.)
BY MR. WERDER:
Q. Hand you what has been marked Seale 56. I am going to ask you specifically about the e-mail second from the bottom of the first page of the exhibit from Mr. McClellan to you dated February 28, 2006.
A. You are referring to the message from Mike McClellan to me?
Q. Correct.
A. February 28, 2006.
Q. Yes.
A. I see that.
Q. And Mr. McClellan is advising you among -- he is responding to a question that you have put to him with respect to customers who don't pay the full fuel surcharge, correct?
A. That is what this appears, yes, to be.
Q. And he is telling you that K-Line does not pay our full fuel surcharge. Do you see that?
A. I see that. And I must comment that this is a totally different line of business that Mr. McClellan is referring to, which is our intermodal

Page 291

business. It has no bearing or application on the carload business that we have been talking about.
Q. Well, the full fuel -- are you saying that that the full fuel surcharge here is referring to something other than the fuel surcharge that was announced in January of '04, and became effective in March of '04?
A. Yes. A totally different fuel surcharge formula applicable for this business for K-Line and for intermodal customers than existed for the application that was published or notification made on January 2004.
Q. Can you tell me what the program -- the fuel surcharge program was for intermodal and how it differed from the policy that was announced -- that was the modified fuel surcharge announced in January of '04?
A. As I recall, the intermodal fuel surcharge was based on on-highway diesel fuel, which mirrored the truckload fuel surcharge that was in application at that time.
(A document was marked as Seale Exhibit No. 57.)
BY MR. WERDER:
Q. Hand you what has been marked Seale 57.

Page 292

Can you identify Seale 57 as an e-mail exchange, an inquiry from you dated April 11, 2006, to Danny Smith and Mike McClellan with a response from Kathleen Smith on April 17th of 2006?
A. Yes. Let me read that. I see the correspondence on April 11, 2006, and I am reading the message.
Q. Thank you.
A. I see the message. Yes.
Q. Okay. When there is a reference there to the standard FSC, what is that referring to?
A. It is referring to our coal carload business only with respect to, at this time, the existing fuel surcharge that we had on public-regulated commodity traffic moving in carload service. And then the second part of this, I am asking Mike McClellan only for the number of origin destination point pairs present in our intermodal network, of which he responds there is 18,334 unique customer origin destination point pairs from the previous year.
Q. And is the standard FSC that is discussed in the e-mail from you to Mr. Smith and Mr. McClellan a different FSC than the modified FSC that we have been discussing as implemented in March of 2004?

Page 293

A. As I indicated, it was a totally different formula and application for all of our intermodal traffic.

MR. WERDER: Okay. We have about 10 or 12 minutes left. I want to take a 5-minute break and just look through my notes to figure out what I want to cover in the last 10 minutes.

THE VIDEOGRAPHER: We are going off the record at 5:32.

(Recess taken.)

(A document was marked as Seale Exhibit No. 58.)

THE VIDEOGRAPHER: We are back on record at 5:40 p.m.

BY MR. WERDER:

Q. I have handed you, Mr. Seale, Exhibit Seale 58. Take a moment to review as much of that as you want to review. I am focussed on your e-mail to Mr. Brugman.

A. Okay. I have read the document.

Q. In the -- first of all, can you identify the top document on the page as an April 14th, 2004, e-mail from you to Mr. Brugman?

A. Yes.

Q. And does that e-mail accurately set forth

Page 294

your directive with respect to the application of line haul price increases applying independently of the fuel surcharge?

A. I think it more accurately responds to a request to negotiate a specialized, customized fuel surcharge for [redacted] and follow-up discussions pertaining to that negotiation.

Q. Well, you say in the e-mail, among other things, that your concern -- "I am concerned that Pat feels." Is that Pat Glennon?

A. I would think so. Yes.

Q. "I am concerned that Pat feels we may be foregoing rate increases because we are applying a fuel surcharge." Then you go on to say, "I had previously addressed this issue with the GVPs but I will do so again. I expect market based price increases to be applied independent of the FSC, and we should absolutely not be deferring any rate increases because we are applying the FSC." Do you see that?

A. I do.

Q. And that was a general directive that you gave to your GVPs and not something that was tied to the negotiation of any specific contract with [redacted], correct?

A. Well, it is relating to the [redacted]

Page 295

discussion within the context of the information below. But as I have testified previously today, that was our objective not to use one to trade off to get the other.

Q. And that was, in fact, not only your objective but it was absolutely -- it was the directive that you gave to your GVPs in very absolute terms, was it not?

A. It was that they could not deviate but we deviated in many, many negotiations based on the dynamics of the marketplace.

Q. The directive to the GVPs was that, "We should absolutely not be deferring any rate increases because we are applying the FSC," correct?

A. That was a directive to them to come back to me to let me know if they were -- if they required some modification and what that modification was and why so we could take a look at the reason for that with respect to a market-driven reason.

Q. And can you identify specific situations in the 2004 time period where you did agree to defer rate increases because you were applying the FSC?

A. I can't recall specific cases but there is some indication even in this document that Pat feels we may be doing that.

Page 296

Q. And you were -- you were -- Pat felt they may be proposing to do that with respect to the [redacted] situation, correct?

A. That is the context that I read this. Yes.

Q. And you vetoed it, right?

A. I am saying, basically, I don't like the strike price of $33 versus 28 and that we are going to review the entire process of approval of meeting competition in the marketplace with respect to the fuel surcharge application where the GVPs can't have variability in the approach that they are using in the markets.

Q. Can you point me to any document that was created within your organization that summarized or listed situations in which rate increases were deferred because you were applying the FSC?

A. I cannot point you to any document. I am not aware of any document that would have that information.

Q. Has there been, to your knowledge at any point in time, any effort made to quantify, either in terms of number of situations or dollars at issue, the situations in which, in the 2004 and later time period, rate increases were deferred because you were

C E R T I F I C A T E

I, the undersigned, DONALD W. SEALE, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

| Page | Line | Correction |
|---|---|---|
| 15 | 18 | Delete "in" |
| 25 | 10 | Delete "with" |
| 25 | 10 | Change "communicated" to "communicating" |
| 26 | 4 | Change "our" to "an" |
| 97 | 17 | Add "with" before "which" |
| 107 | 15 | Change "wouldn't" to "cannot" |
| 111 | 22 | Delete "starting about" |
| 111 | 23 | Change "demands" to "demand" |
| 111 | 25 | Change "and" to "as" |
| 112 | 1 | Delete "supply was very -- or" |
| 113 | 12 | Delete "for" |
| 118 | 22 | Delete "on our --" |
| 118 | 24 | Change "or" to "our" |
| 120 | 4 | Delete "whether --" |
| 123 | 6 | Change "had" to "discussions would have" |

C E R T I F I C A T E (Continued)

| Page | Line | Correction |
|---|---|---|
| 131 | 4 | Change "multi" to "multiple" |
| 135 | 1 | Change "nature" to "duration" |
| 158 | 16 | Change second "are" to "and" |
| 187 | 19 | Delete "what" |

4/12/10 [signature]

Date Signature

STATE OF: Virginia )

CITY OF: Norfolk ) To wit:

Subscribed and sworn to before me this 12th day of April, 2010 at Norfolk, Virginia.

Sheryl D. Haymaker [signature]

Notary Public

My commission expires: Commission ID No. 7024206 My Commission Expires 07/31/2010

SHERYL D. HAYMAKER NOTARY PUBLIC COMMONWEALTH OF VIRGINIA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL ) MDL No. 1869
SURCHARGE ) Misc. No. 07-489
ANTITRUST LITIGATION, ) (PLF/AK/JMF)
This Document Relates To: )
ALL DIRECT PURCHASER CASES )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF KATHLEEN SMITH
TAKEN ON BEHALF OF THE PLAINTIFFS
Norfolk, Virginia
June 22, 2011

"HIGHLY CONFIDENTIAL"



APPEARANCES:
On behalf of the Plaintiffs:
MARC GREENWALD, ESQUIRE
JOSEPH HAMMOND, ESQUIRE
Quinn Emanuel Urquhart Oliver &
Hodges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
On behalf of Kathleen Smith and the Defendant
Norfolk Southern Corporation:
JOHN M. NANNES, ESQUIRE
TARA L. REINHART, ESQUIRE
SEAN M. TEPE, ESQUIRE
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7500
DAVID COLEMAN, ESQUIRE
BILL GALANKO, ESQUIRE
General Solicitor
Norfolk Southern Corporation
Three Commercial Place
Norfolk, Virginia 23510
(757) 629-2831



Appearances: (Continued)
On behalf of the Defendant BNSF Railway Company:
GARY A. WINTERS, ESQUIRE
Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3273
On behalf of the Defendant Union Pacific:
CAROLYN WOODSON, ESQUIRE
Jones Day
555 South Flower Street, Fiftieth Floor
Los Angeles, California 90071-2300
(213) 489-3939
On behalf of the Defendant CSXT:
DAVID D. CROSS, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
(202) 624-2532

Also Present:
Rebecca Miller, Videographer



I N D E X

WITNESS

| On behalf of the Plaintiffs: | Examination by: | Page |
|---|---|---|
| Kathleen Smith | Mr. Greenwald | 7 |
| | Ms. Reinhart | 154 |
| | Mr. Greenwald | 156 |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 5 |
| Exhibit 2 | Antitrust Compliance Guide | 17 |
| Exhibit 3 | 4/6/88 Letter from Mr. Shannon | 41 |
| Exhibit 4 | 3/18/03 NS Senior Team Meeting | 46 |
| Exhibit 5 | 5/19/03 E-mail from Peggy Ruiz | 53 |
| Exhibit 6 | 8/22/03 E-mail from Mr. Garin | 60 |
| Exhibit 7 | 6/11/04 E-mail from Mr. Bayrer | 98 |
| Exhibit 8 | 11/23/04 E-mail from Mr. Glennon | 116 |
| Exhibit 9 | 11/29/04 E-mail from Mr. Schaaf | 120 |
| Exhibit 10 | 8/8/06 E-mail from Mr. Julian | 125 |
| Exhibit 11 | Declaration of Jim Bolander | 135 |
| Exhibit 12 | 2/22/06 E-mail from Mr. Luebbers | 143 |
| Exhibit 13 | 9/29/04 BNSF/NS Meeting | 156 |

A. I am not aware that I saw any documents.
Q. Do you know whether, prior to this March 18, 2003 meeting, anyone from the law department was contacted pursuant to the guidelines set forth in Exhibit 2 or Exhibit 3?
A. Can you repeat the question?
MR. GREENWALD: Can you read it back, please.
(The record was read as requested.)
THE WITNESS: I do not know.
(A document was marked as Smith Exhibit No. 5.)
BY MR. GREENWALD:
Q. So showing you what has been marked as Exhibit 5.
A. Okay.
Q. Do you recognize Exhibit 5?
A. I do not recognize the e-mail.
Q. But the document attached to Exhibit 5 starting with Bates number ending 334 to 335 you do recognize?
A. I believe I have seen this document.
Q. And what is the second and third page of Exhibit 5?
A. These are minutes of a Norfolk Southern



and Union Pacific alliance meeting held on May 14, 2003, referencing the attendees and the updates.
Q. And now I am going to refer to the NS attendees. Do you see the list of NS attendees?
A. Yes.
Q. And can you just read the names and tell us whether that individual was within the marketing department or not?
A. Yes. Ike Prillaman was within the marketing department. Don Seale was within the marketing department. And Mike McClellan was in the marketing department. And I cannot recall who Steve Renken is.
Q. And the other individuals would have been outside of the marketing department?
A. That is my understanding at that time. Yes.
Q. And so for those individuals sitting here today, you don't know if they attended any formal antitrust compliance training in the period leading up to May 14, 2003, is that correct?
A. I know, through my conversation with George Aspatore, that Norfolk Southern executives were trained on antitrust and this is a list of Norfolk Southern executives at that time. Again, I don't



recognize one name but -- I recognize it. I am not sure what his title was.
Q. But my question is formal antitrust training. You don't know if they attended annual formal antitrust training in the period up until that time, correct?
A. I don't have a specific example of formal training for a specific individual.
Q. The -- it was Mr. Aspatore's job to make sure people were trained in antitrust compliance, right?
A. Correct. It is one of his areas of responsibility.
Q. And he is retired now, right?
A. Correct.
Q. But it would make sense he would -- it would be natural for him to say that everyone was well trained because that was his job, right?
MS. REINHART: Objection. Vague. Ambiguous.
THE WITNESS: I asked George directly regarding the training and he very clearly stated that -- the importance of antitrust compliance and that it has been a practice to train our executives and marketing employees, to provide them access to the



law department as needed and training and he referred to it as well trained.
BY MR. GREENWALD:
Q. But you didn't ask him specifically what he did with marketing -- nonmarketing executives, correct?
A. He did comment on executives being well trained. Yes.
Q. I mean, that is like saying, I did my job well, right?
MS. REINHART: Objection. Argumentative.
THE WITNESS: He commented that they were well trained.
BY MR. GREENWALD:
Q. You didn't ask specifically, Mr. Aspatore, what did you do with the nonmarketing executives to make sure they were well trained?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: My question to George was, What training did the law department have and offer to employees including executives.
BY MR. GREENWALD:
Q. And his answer was, They were trained?
MS. REINHART: Objection. Misstates her

Page 57

prior testimony.
THE WITNESS: They were well trained, and he referred to annual training and access to the law department through phone calls, one-on-one conversations as needed and reference to the guide.
BY MR. GREENWALD:
Q. But I thought you said you don't know if there was annual training for nonmarketing executives.
A. I believe I said that there was annual training offered and that he indicated there was training available. I don't know specifically of these attendees referenced on that list, if they received formal training during that time period on an annual basis.
Q. What does it mean annual training is offered?
A. I know that in the marketing department, annual training was conducted and could have been in large groups or small groups but employees went through antitrust compliance training on an annual basis.
Q. Was antitrust -- annual antitrust -- strike that.
Was formal annual antitrust training required of nonmarketing executives in the period 2002

Page 58

to 2004?
A. I don't have record that it is required.
Q. And there is no way to know if any of the NS nonmarketing executives listed on Exhibit 5 or -- Exhibit 4 or Exhibit 5, no way to know if those people had annual antitrust compliance training?
MS. REINHART: Objection. Speculative.
THE WITNESS: I know that he indicated they were well trained, they are executives that are well trained, they know what to do, they call if they have a question. And that is what I heard from him.
BY MR. GREENWALD:
Q. But my question specifically: You have no way to know whether these people attended any kind of formal antitrust compliance training in that period, correct?
MS. REINHART: Objection. Speculative.
THE WITNESS: I don't have record of specifically who attended training.
BY MR. GREENWALD:
Q. And it wasn't -- as far as you know, it wasn't mandatory for nonmarketing executives to have such training?
MS. REINHART: Objection. Asked and answered.

Page 59

THE WITNESS: It was expected that our executives understand our antitrust compliance guide and they contact the law department for any clarification on that and, yes, it is an expectation you understand our policy as an executive.
BY MR. GREENWALD:
Q. We are going to be here much less time if you listen to my question and try and answer the question I ask.
My question is: Was formal antitrust training required for nonmarketing executives in the period leading up to these meetings in 2003?
MS. REINHART: Asked and answered.
THE WITNESS: It was part of the expectation that they would have been trained and that he indicated they were trained on antitrust compliance.
BY MR. GREENWALD:
Q. So was it required?
A. I did not ask George specifically the word "required."
Q. So how was it an expectation -- how was there an expectation they be trained if training was not required?
A. Can you repeat the question?

Page 60

MR. CROSS: Objection. Assumes facts.
MS. REINHART: Yes.
THE WITNESS: Can you repeat the question?
(The record was read as requested.)
MR. CROSS: Misstates the facts.
THE WITNESS: It is an expectation that our executives and marketing employees know the right thing to do and what not to do and that is what the guide advises us on and that is an expectation. Yes.
BY MR. GREENWALD:
Q. I just want to make sure I am not assuming something -- getting something wrong. Was there formal antitrust compliance training on an annual basis required of marketing employees?
A. Yes. Marketing employees go through training for antitrust compliance. Yes.
Q. Every year?
A. Every year.
Q. And there is -- and you did that as a marketing employee during the 2002 to 2004 time frame?
A. Yes.
MR. GREENWALD: So one more.
(The document referred to was marked as Smith Exhibit No. 6.)

BY MR. GREENWALD:
Q. So showing you what has been marked as Exhibit 6. Do you recognize Exhibit 6?
A. Yes.
Q. What is Exhibit 6?
A. The first page is an e-mail from Dave Garin to Don Seale on August 22, 2003, with an attachment of BNSF/NS minutes, which were from a joint marketing meeting between BNSF and NS on July 30, 2003.
Q. And the NS attendees listed on Page 1 of the minutes, do you see that list?
A. Yes.
Q. And which of those NS attendees are not within the marketing department?
A. All of those NS attendees at that time were in the marketing department. And it is an incorrect spelling of Don Seale's name.
Q. But all the -- all of the attendees would have been within the marketing department at NS?
A. Correct.
Q. And do you see it refers to a general review of markets, opportunities and philosophies in the first bullet?
A. Yes.



Q. Now, you weren't at this meeting, correct?
A. Correct.
Q. And you are not testifying as to what happened at this meeting. But my question to you is: Do the antitrust guidelines permit discussion with a competitor of a general review of markets, opportunities and philosophies?
MS. REINHART: Objection. Calls for speculation.
THE WITNESS: Our antitrust compliance guidelines tell us what we are not allowed to do per the law.
BY MR. GREENWALD:
Q. And do the antitrust guidelines forbid a general discussion of markets, opportunities and philosophies with another railroad?
MS. REINHART: Objection. Calls for speculation.
THE WITNESS: We are allowed to participate with another railroad in a joint marketing meeting and in the context of that interline business we are allowed to have discussions. Our guide tells us what we cannot do per the law.
BY MR. GREENWALD:



Q. The guideline refers to specific joint interline rates, correct?
MS. REINHART: Objection. The document speaks for itself. Misstates the document.
THE WITNESS: That is what the document states.
BY MR. GREENWALD:
Q. And so how is a general review of markets, opportunities and philosophies permissible within the antitrust guidelines?
MS. REINHART: Objection. Calls for speculation.
THE WITNESS: Norfolk Southern would be participating in a joint marketing meeting to discuss our joint initiatives and issues with that other carrier. That would be the purpose of the meeting and the review and update items. That is the nature of those meetings.
BY MR. GREENWALD:
Q. But you don't know what actually happened at this meeting?
A. I did not attend this meeting.
Q. All right. I am going to move on to the next topic, the RCAF, AIILF.
A. Okay.



Q. And what is the RCAF?
A. The RCAF is an index -- index that is available through the AAR and it is, I believe, stands for Rail Cost Adjustment Factor, and it allows -- it is one mechanism that at Norfolk Southern in our prices we can use to adjust rates, to escalate rates in a contract.
Q. And did Norfolk Southern use the RCAF in the 2002 to 2004 time period in contracts with shippers?
A. Yes.
Q. And was there a policy regarding the use of the RCAF?
A. No.
MS. REINHART: Just objection. Beyond the scope to the extent you are talking about policies.
THE WITNESS: No.
BY MR. GREENWALD:
Q. Was there a preference within Norfolk Southern as to whether or not to use the RCAF in the 2002 to 2004 time period?
A. At Norfolk Southern, we have been phasing out use of the RCAF long before the period 2003 and instead of RCAF in many cases we are applying fixed

Page 65

increases in the contract, fixed rate increases.
Q. And there was a policy to phase out use of the RCAF in favor of -- strike that.
Was there a policy to phase out the use of the RCAF in favor of fixed rate increases in long-term contracts?
MS. REINHART: Objection. Beyond the scope as to policy.
THE WITNESS: I am not aware of any policy. No.
BY MR. GREENWALD:
Q. So what is your basis for the statement that NS was phasing out of the RCAF in favor of fixed rate increases?
A. It is related to two things, my personal knowledge at the time as well as my review of the business records that we have and my conversations with several individuals in the marketing department in prep for this deposition.
Q. Who did you speak to in the marketing department in preparation for this topic?
A. For RCAF? I spoke with -- I spoke with Ron Listwak in the coal marketing department. I spoke with Jim Bolander in the intermodal department. And I spoke with -- I spoke with Richard Kiley and Tim Butt

Page 66

in automotive marketing.
Q. Now, the -- in the 2002 to 2004 time period, NS did continue to agree to RCAF in contracts with shippers, correct?
A. NS utilized RCAF during that time period in contracts with shippers. Yes.
Q. But you said there was a -- was there a general preference to move away from RCAF?
A. We had been moving away from RCAF long before 2003 but there are examples of RCAF usage in the period you referenced.
Q. Why was NS moving away from RCAF?
A. Several primary reasons. One is the RCAF is an industry cost, rail industry cost indices -- index and it is not specific to Norfolk Southern's costs. Second, it had a lag effect in terms of time of give or take 18 months. Third, it was subject to fairly severe -- it was volatile in terms of severe declines that it was subject to. And those were the primary reasons.
Q. What do you mean by volatile subject to severe declines?
A. It could have had, you know, a quarter or several quarters where the adjustment that would be being applied in a contract might have taken, for

Page 67

example, a six or seven percent decrease and that -- at that time the market was bearing that we could take increases and in lieu of that we moved towards fixed increases to get what we believed the market would bear.
Q. Well, the RCAF was used in long-term contracts, correct?
A. Could you define "long-term contracts"?
Q. Well, tell me what kind of contracts RCAF is used in.
A. At Norfolk Southern, RCAF could be used during that time period in a contract that had on average more than one year term to it would be where you would most likely find that.
Q. There is little need for a price-adjustment factor for contracts of a year or less, correct?
A. Typically, if the contract is for one year or less, don't need a mechanism to adjust it obviously in an out year.
Q. It is just renegotiated at the end of the year, correct?
A. That would be the typical practice.
Q. So RCAF is one of the mechanisms available for contracts of greater than a year to

Page 68

reflect change in costs, is that right?
A. It is one of the mechanisms to adjust prices in a multi-year contract. That is correct.
Q. And you talked about the third reason you gave for moving away from RCAF was volatility and I don't recall precisely the words you used. What was the third reason?
A. It was subject to a severe decrease. Could be subject to a severe decrease.
Q. And what do you mean by could be subject to a severe decrease?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: I gave the example that as it was reported back out it could have indicated that the adjustment you would be applying would be, for example, a six percent decrease from the rate.
BY MR. GREENWALD:
Q. So if RCAF indicated a six percent decrease, that would be based on rail industry average costs decreasing by six percent, correct?
A. The RCAF is a rail-industry, cost-based index. Yes.
Q. So the decrease reflects the actual costs of the railroads at least in some kind of average?

Page 69

MS. REINHART: Objection. Vague. Ambiguous.
THE WITNESS: I am not intimately familiar with all of the details of how the RCAF is calculated but it is a cost index that is industry based and reflects the industry-level cost.
BY MR. GREENWALD:
Q. And what -- what was the problem with having a decrease, even a severe decrease, if costs were decreasing at the same time?
A. In the commercial world at Norfolk Southern, we price to the market and if the market allows us to adjust our prices, we try to achieve that in the marketplace. And we believed at that time that there were opportunities to achieve rate increases and that is what we would try to do.
Q. But when -- when Norfolk Southern is negotiating a multi-year contract, Norfolk Southern doesn't know what the market will bear in Years 2, 3 and beyond?
MS. REINHART: Let me just object to beyond the scope. You are getting a little bit outside the box.
THE WITNESS: In marketing, we make estimates. We do our best to estimate what we believe

Page 70

the market will bear for the term of the contract that we are negotiating with a customer on. The duration of a contract is one element of the negotiation process.
BY MR. GREENWALD:
Q. And how did NS determine what costs input the market would bear over a multi-year contract?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: What we look at is what we think the market will bear and that is related to competitive factors of other rail carriers, other modes of transportation. It is available to really to capacity, what we believe there might be in terms of those modes, their ability to have capacity to compete. And it is related to the market that we are participating in with a shipper in that particular industry that they participate in, it is related to what we believe that market will do.
BY MR. GREENWALD:
Q. And so there was -- rather than using any kind of adjustment factor, NS was moving towards just a contract that would have fixed rates through the long term?
A. We did not abandon the usage of available

Page 71

index published; for example, the RCAF through the AAR. We did not abandon the usage but we have examples where contracts take fixed increases, examples where they take RCAF, examples where they take other -- they use other indexes to adjust the prices in a multi-year contract.
Q. I am trying to understand why you said NS was moving away from RCAF prior to 2003.
A. Because of some of the examples of some of the problems we saw with RCAF that I mentioned related to the lag effect, the fact that it was subject to declines.
Q. The lag effect worked both ways, correct?
A. I don't understand the question.
Q. The lag effect could reflect -- could mean that the RCAF -- that the shipper was paying a higher percentage based on costs, average costs, the previous year even though costs had decreased for Norfolk Southern, correct?
A. That costs had decreased for the industry. It is an industry cost not a Norfolk Southern cost. But, yes, that would be correct.
Q. So the lag effect worked sometimes in the shipper's favor and sometimes in NS's favor, correct?
A. I would have to know the specific

Page 72

contract and at the time to know in terms of that.
Q. Well, what about the lag effect made Norfolk Southern want to move away from the RCAF?
A. Well, in the case of a fixed increase, you know what the increase is a year from now or two years from now. So it is a known piece of information. With RCAF you do not know what that will be. So that is -- that is one reason, again, that -- there are many reasons why we look at different ways to escalate rates through many things. It is one of the terms and conditions in a contract negotiation. So there is a lot of back and forth with the payer of freight before that is determined.
Q. Focusing on the lag effect, which you identified as one of the reasons why NS wanted to move away from the RCAF. What was it about the lag effect that made NS want to move away from the RCAF in the period up to 2003?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: Again, it is one of the drivers. It would have -- I would have to know specifically in a particular contract negotiation what was driving our marketing group negotiating that contract to make a determination about what type of

Page 73

escalator to include in it. But they have that discretion to determine what they think the best competitive option is for Norfolk Southern and it may have been that that was a factor in a particular contract negotiation.
BY MR. GREENWALD:
Q. But you had said that Norfolk Southern was moving away from the RCAF in this period, correct?
MS. REINHART: Objection. Misstates her testimony.
THE WITNESS: I said that Norfolk Southern uses RCAF as one of its means to escalate rates, that we had moved away from it prior, long before 2003, and in cases put fixed increases in. And I gave several examples of drivers as why it may have been in a particular contract negotiation -- renegotiation that marketing individuals would have moved away from it. But, again, it is contract specific. It is one of the terms and conditions.
BY MR. GREENWALD:
Q. So when you are using the phrase "moving away," there were certain contracts in which the -- NS was moving away from the use in that particular contract but was there a general moving away from RCAF across NS business units?

Page 74

MS. REINHART: Objection. Misstates her testimony.
THE WITNESS: In the -- my personal knowledge is in the marketing area that I participated in, there was -- there was movement away from RCAF as early as, you know -- I don't remember specifically the day but well before 2003.
BY MR. GREENWALD:
Q. Approximately, when did that moving away start?
A. I don't have a specific date.
Q. 1998?
A. I would say early 2000, 2001, that time period.
Q. And what -- was the lag effect one of the reasons for this moving away that you recall from 2000, 2001?
A. I believe the lag effect could have been a factor in a particular contract renegotiation. Yes. It is one of the drivers, not the only driver.
Q. And my question is: What is it about the lag effect that would cause NS to move away from the use of the RCAF?
MS. REINHART: Objection. Asked and answered.

Page 75

THE WITNESS: It is -- it is not the lag effect in and of itself. It is the issues associated with RCAF, of which that is one, relative to what we believed we could bear in the market at that time, which, for the reasons I mentioned, fixed increases give the stability of knowing what your price increase will be in a future period of time and in some cases that was the strategy that was best for Norfolk Southern for a particular contract.
BY MR. GREENWALD:
Q. So was the lag effect a reason for moving away or not a reason for moving away from the RCAF?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: I believe it was one of the reasons that it was -- that we were moving away from using it.
BY MR. GREENWALD:
Q. And what about the lag effect made it a reason for moving away?
MS. REINHART: Objection. Asked and answered multiple times.
THE WITNESS: The -- it is an uncertainty factor. It is not knowing.
BY MR. GREENWALD:

Page 76

Q. But the lag effect isn't uncertainty, it is not reflecting the present cost, correct, that is what lag means?
A. That is correct. But you don't know the costs in the future and that is not the only thing we look at.
Q. The lag effect refers to an adjustment factor that is lagging behind what is -- what the present costs are, correct?
MS. REINHART: Objection. Ambiguous.
THE WITNESS: Right. By the time that the indices is published it has looked back at costs that were available at the time to make that determination. That is my understanding of the lag effect.
BY MR. GREENWALD:
Q. And that is different than the uncertainty of revenue coming in from a contract, correct?
MS. REINHART: Objection. And we are now beyond the scope of your topic here.
THE WITNESS: When an RCAF is included in a contract, there is uncertainty in a future year of knowing what that cost adjustment will be to the rate. I associate that with an uncertainty.

Q. -- in your experience?
A. I would have to know more specifics to answer that question in the context.
Q. You are not aware of a requirement that a vice-president approve any contract that didn't have a standalone fuel surcharge?
MS. REINHART: Objection. Beyond the scope. Asked and answered.
THE WITNESS: I would have to know the context of the contract negotiation that they were reviewing.
BY MR. GREENWALD:
Q. I am asking about your knowledge and a policy. Do you recall that there was a policy that any contract that did not include a standalone fuel surcharge had to be approved by a vice-president?
MS. REINHART: Objection. Beyond the scope. Asked and answered.
THE WITNESS: I would have to look specifically at the different vice-presidents. And, to my knowledge, there was not a policy.
MR. GREENWALD: Why don't we take a short break.
THE VIDEOGRAPHER: We are going off the record at 11:05 a.m.



(Recess taken.)
(A document was marked as Smith Exhibit No. 7.)
THE VIDEOGRAPHER: We are back on the record at 11:18 a.m. This is the beginning of Tape Number 3 in the deposition of Kathleen Smith.
BY MR. GREENWALD:
Q. So showing you what has been marked as Exhibit 7. Do you see that is an e-mail exchange from June 2004 that actually starts May 2004 among NS personnel?
A. Okay.
Q. Have you -- have you seen Exhibit 7 before?
A. I do not recall seeing this.
Q. And if you look at the original e-mail dated May 12, 2004, it is from Tom Bayrer.
A. Bayrer.
Q. Bayrer. And who is Tom Bayrer?
A. Tom Bayrer is currently a director in the coal marketing group. I don't recall his title at the time of 2004 but he was in coal marketing.
Q. And he is sending the e-mail to Ron Listwak and Doug Evans?
A. Yes.



Q. Who were Ron Listwak and Doug Evans?
A. They are both in the coal marketing department.
Q. And the first paragraph refers to DWS. Who is that referring to?
A. Don Seale.
Q. And do you see that the sentence says, "DWS is OK with NO FSC"? Is that referring to a fuel surcharge?
A. I would suspect so. Yes.
Q. It says, If the deal has 80 percent of the RCAFU. Do you see that?
A. Yes.
Q. And it says, "I have also advised DDS of this." Who is DDS?
A. Danny Smith.
Q. And what was his position?
A. He was the head of the coal -- he is the head of the coal marketing department.
Q. And do you -- do you see in the parentheses it says, "The story is that 20% of the RCAF is Fuel related"?
A. Yes.
Q. And do you know if -- well, if you go forward, there is an e-mail back from Danny Smith



dated June 11th.
A. Yes.
Q. And the second -- or the second line has a sentence that says, "What Don said was that when with the FSC that he would allow contracts to be negotiated with 80% RCAF or above but in no instance would there not be the new FSC." Do you see that?
A. Yes.
Q. And does -- did that reflect a policy, as of June 11, 2004, that contracts had to have a fuel surcharge and could also have 80 percent RCAF or above?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: This e-mail exchange is not referring to a policy. It is an exchange regarding specific coal business within that market. They reference Utility North tonnage.
BY MR. GREENWALD:
Q. What is Utility North tonnage?
A. Utility North is one of the market areas within the coal -- Norfolk Southern's coal business.
Q. And there was a policy within the Utility North business that there be -- every contract have the standalone fuel surcharge?

MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I am not aware of a policy.
BY MR. GREENWALD:
Q. If you look at the e-mail from Ron Listwak dated June 11th.
A. Yes.
Q. In the second paragraph, he refers to the policy. Do you see that?
A. I see that he is advising Danny Smith that the Utility North segment of the coal business, that they had been informed that they are to use fuel surcharge in new contracts.
Q. And that there has been 100 percent compliance with the policy since he informed them, correct?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: It says since that date that, yes, the date of -- I guess that is the February 26th date he is referring to.
BY MR. GREENWALD:
Q. And that the policy has not changed between February 26th and June 11th, correct?
MS. REINHART: Objection. Beyond the



scope.
THE WITNESS: I don't know.
BY MR. GREENWALD:
Q. So was there a policy regarding fuel surcharges?
MS. REINHART: Objection. Beyond the scope. Asked and answered.
THE WITNESS: There was not a policy -- a marketing department policy regarding the use of fuel surcharges during this time period.
BY MR. GREENWALD:
Q. So Don Seale implemented a policy just for Utility North coal traffic?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I do not see that Don Seale implemented a policy related to fuel surcharge.
BY MR. GREENWALD:
Q. What does the sentence, What Don said was that when with the fuel surcharge that he would allow contracts to be negotiated with 80 percent RCAF or above but in no instance would there not be the new fuel surcharge?
MS. REINHART: What was the question about that line? I didn't hear the question.



BY MR. GREENWALD:
Q. What does that sentence mean?
MS. REINHART: Objection. Beyond the scope. Calls for speculation.
THE WITNESS: I don't know what Don said specifically to the coal department. That is not -- I am only reading what Danny wrote to Ron -- Ron is within Danny's department -- in reference to Don. But I do not know Don's policy or I am not aware of a policy.
BY MR. GREENWALD:
Q. You didn't -- during this time, you weren't negotiating contracts with customers, right?
A. I did not have direct responsibility for pricing in 2004.
Q. So going back to your testimony about phasing out RCAF, you said that that had started occurring prior to 2003, right?
A. That is correct.
Q. And did the people you talked to in preparation for this deposition tell you that it started being phased out prior to 2003?
A. Yes. We had that discussion.
Q. And who said that?
A. I talked with Ron Listwak in coal. I



talked with the automotive individuals, Tim Butt and Richard Kiley, briefly about it. And I talked with -- I am basing it on my personal knowledge in the industrial products group, which is several of the groups within merchandise.
Q. So starting with Ron Listwak, what did he say were the reasons for moving away from RCAF prior to 2003?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: We talked about the -- that RCAF is one of the mechanisms used to adjust rates and that in coal contracts they have application of RCAF at that time. They still have application of RCAF. And they have modified RCAFs and application of fuel surcharge with RCAF, as well, in contracts, it was contract specific. We talked about the fact that there were multiple ways they adjusted their rates.
BY MR. GREENWALD:
Q. I am focusing on the period earlier than 2003. Did Mr. Listwak say that there were specific reasons for phasing out RCAF earlier than 2003?
A. I recall that we discussed that it was being phased out and, yes, he concurred with that, that that -- he indicated that. Correction. He

indicated that.
Q. So he indicated that it was his experience that it had been phased out earlier than 2003?
A. Yes.
Q. And did he say why NS coal was phasing out RCAF earlier than 2003?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: On a contract-by-contract basis. He referred to the usage of fixed increases in the marketplace on certain contracts and he mentioned that.
BY MR. GREENWALD:
Q. And did he say why NS was moving from fixed increases to -- to fixed increases from RCAF in some period prior to 2003?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: He said they looked at the contracts on a case-by-case basis and determined what was the best method to make a price escalation as part of one of the terms and conditions he indicated that.
BY MR. GREENWALD:
Q. But you used the word "phasing out."



That means that in contracts, they are less likely to use RCAF than they were before, correct?
A. Correct.
Q. So why -- I understand it is a contract-by-contract basis. But why was it -- was RCAF being phased out earlier than 2003?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: The reasons I indicated RCAF was being phased out were related to our ability in the marketplace to secure fixed rate increases, that the market would allow us to bear that. And in multi-year contracts, that provided us certainty of a revenue stream.
BY MR. GREENWALD:
Q. And that is what Mr. Listwak said?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: I recall Mr. Listwak and I discussing coal contracts and declining usage of RCAF.
BY MR. GREENWALD:
Q. Now, for NS to get a fixed increase in a multi-year contract, the customer has to agree, correct?
A. The customer has to agree to the terms



and conditions of a contract in order for that contract to be executed. Yes.
Q. And customers, prior to 2003/2004, were generally more comfortable with RCAF because it would be reflective of actual cost increases, correct?
MS. REINHART: Objection. Beyond the scope. Assumes facts.
MS. WOODSON: Overbroad.
MR. CROSS: Speculation.
THE WITNESS: That is speculation. I have no idea what shippers one by one how they would have looked at it in the period 2003 or prior.
BY MR. GREENWALD:
Q. So the phasing out wasn't based on customer requests as far as you know?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: My knowledge of RCAF is that there were applications of it at that time. There had been a declining usage of it on a contract-by-contract basis. We will look at the terms and -- we look at the competitive reasons and determine how to adjust our prices accordingly and that is -- that is contract specific and it is influenced by many things going on with a particular



shipper in a particular market and in a particular competitive environment.
BY MR. GREENWALD:
Q. Sitting here as the witness for NS on the reasons that RCAF -- what is the phrase -- on the reasons why RCAF was abandoned, was requests from customers one of those reasons?
MS. REINHART: Objection. Misstates her testimony.
THE WITNESS: I would have to know the context of the specific customer concern as they raise concerns with number of issues as when we are negotiating and it would be contract specific and I would have to know the context.
BY MR. GREENWALD:
Q. My question is: Is it your testimony that one of the reasons RCAF was abandoned was a request from customers?
MS. REINHART: Objection. Misstates her testimony. You know what she testified on this and she did not say "abandoned."
THE WITNESS: We have usage of RCAF today and we had usage during that time period prior to '03, as well, and we have -- we were phasing out usage because we believe the market would allow us to get

Page 109

fixed increases.
BY MR. GREENWALD:
Q. Was one of the reasons RCAF was being phased out requests from customers?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: I would have to know the context if a customer asked for that because it is contract specific in the determination of what escalator to put into a contract.
BY MR. GREENWALD:
Q. When you are phasing out something, that is referring to a general practice at NS, right?
MS. REINHART: Objection. Calls for speculation.
THE WITNESS: We negotiate contracts one by one. That is the way they are managed. And there are just a number of variables considered during that time and that is just one of them.
BY MR. GREENWALD:
Q. What does -- what does the term "phasing out" mean?
A. It means that if you were to look at a period of time and compare it to another period of time there is less usage of it than there was before.

Page 110

So there was, obviously, a change is the way I look at that.
Q. Was there less usage or was there a conscious decision to phase out RCAF?
A. There were decisions made as contracts were reviewed that there were cases where it made more sense for us to take a fixed increase and, therefore, we did as one of the terms and conditions of a particular contract at that time.
Q. So a conscious decision to start phasing out RCAF in favor of fixed increases, correct?
A. It is a decision made as we look at each contract. Yes. That is how I would characterize it.
Q. What do you mean by a decision made as you look at each contract?
A. When we are deciding -- when we are negotiating with the payer of freight, we go back and forth about what the terms and conditions will be at the -- to execute that contract and how the price will adjust is one of the key things that gets discussed, the mechanism for adjustment and the adjustment level itself.
Q. And you said that NS was phasing out the use of the RCAF in contracts starting before 2003, correct?

Page 111

A. Correct.
Q. And was that a conscious, across-the-board decision or it just happened that each individual negotiation the net result ended up with fewer contracts with RCAF?
A. It is conscious from the standpoint that when you are negotiating if you believe you can secure a fixed increase and you thought that was the best thing to do at that time then, yes, that is what our marketing individuals were doing.
Q. So there was a collective decision that -- to use less RCAF and more fixed-rate increases?
A. Collective decision is -- I don't -- I wouldn't know how to define that, what that means.
Q. Well, that is what people in marketing at NS were doing at that time, is that your testimony?
MS. REINHART: Objection. This is confusing and vague. She said she doesn't understand your use of that term.
THE WITNESS: Collective decision means something different to me than what I think you just described, which you can repeat but --
BY MR. GREENWALD:
Q. Well, what was -- I am trying -- your

Page 112

testimony is that NS was phasing out RCAF earlier than 2003, correct?
A. Correct.
Q. And there were reasons -- were there reasons why NS was phasing out?
MS. REINHART: Asked and answered.
THE WITNESS: Yes. I had mentioned several of the reasons, that we were -- we found less usage and used RCAF less in contracts.
BY MR. GREENWALD:
Q. And the ability -- and then was one of those reasons because customers asked to use RCAF less?
MS. REINHART: Asked and answered.
THE WITNESS: I would have to know the context of a customer asking. I don't know.
BY MR. GREENWALD:
Q. Sitting here today, do you have any examples of a customer who requested, in the 2000 to 2001 time frame, not to use RCAF?
A. I can't recall a specific one. I may have seen one. I don't recall.
Q. And in -- after 2003, do you -- were customers requesting less use of RCAF?
A. I don't have record of collectively

customers requesting less usage of RCAF.
Q. Did -- in phasing out RCAF, was it in any way in response to requests from customers?
MS. REINHART: Objection. Asked and answered.
THE WITNESS: I believe I answered that, that I don't -- I would have to know the context of a specific customer and whether in a negotiation they requested that.
BY MR. GREENWALD:
Q. Are you aware of specific negotiations where customers said, If I am not -- if I am going to pay a fuel surcharge, I am not going to pay an escalator that includes fuel like RCAF?
A. I am aware from my personal knowledge that customers negotiate everything they can and want to pay the lowest amount possible so they bring up every term and condition. And, yes, that is my personal knowledge that could have occurred.
Q. And did occur, right?
A. I can't recall a specific example but, yes, they negotiate on the terms.
Q. And that is where the phrase "double dipping" on fuel comes from that very concern, correct?



A. I don't know where the phrase comes from, truthfully, I don't.
Q. But that is what the phrase is about, that concern about a standalone fuel surcharge and an escalator that includes fuel, correct?
A. My understanding of double dipping is that their concern is you are asking them to pay for a cost recovery in two mechanisms.
Q. Now, what -- what was the AIILF?
A. That is the all-inclusive index less fuel, which is an index published by the AAR.
Q. And did NS have any involvement in the creation of the AIILF?
A. No.
Q. Did NS start using the AIILF after it was created as an escalator in contracts with customers?
A. We have very little application usage of the all-inclusive less fuel as a way to escalate rates in contracts during that period of time.
Q. Now, NS had been using a percentage of RCAF at 80 percent of RCAF as a way to use an escalator that didn't account for fuel, correct?
MS. REINHART: Objection. Misstates her prior testimony.
THE WITNESS: The usage of a



discounted -- discounted RCAF, for example, 80 percent, is one of many different ways it could have been adjusted and may have been adjusted for a number of reasons related to that contract negotiation and what would be competitive in the marketplace. It is not -- it is not necessarily related to one thing.
BY MR. GREENWALD:
Q. But the 80 percent number comes from specifically the idea that 20 percent of the RCAF is fuel, right?
MS. REINHART: Objection. Misstates her prior testimony. Misstates the document that you are apparently relying on.
THE WITNESS: I am not aware of that being true. No.
BY MR. GREENWALD:
Q. Well, do you know -- if you look at the parenthetical in Exhibit 7, in Mr. Bayrer --
A. Tom Bayrer.
Q. -- Bayrer's e-mail.
A. What is the question?
Q. Do you know if that is accurate as to why 80 percent of the RCAF was used?
A. I do not know if this statement is accurate that Tom has put in parentheses there about



the story. No.
Q. And taking out the portion of RCAF that is fuel related would be one way to blunt the claim that NS was double dipping on fuel increases, correct?
MS. REINHART: Objection. Assumes facts. Calls for speculation.
THE WITNESS: When we are negotiating a contract and we are looking at the different components, it is looking at the all-in economics of that from the perspective of the shipper and from the perspective of the railroad. And I would be speculating on that statement.
(A document was marked as Smith Exhibit No. 8.)
BY MR. GREENWALD:
Q. Showing you what has been marked as Exhibit 8. Do you recognize this e-mail chain?
A. I recognize components of it.
Q. What do you recognize?
A. I recognize the e-mail from Craig Rockey to a number of individuals dated November 23rd, 2004. I recognize the e-mail from Don Seale to David Julian with others copied dated November 23rd, 2004. I do not recall -- I don't recognize the Pat Glennon/Alby Pfeifer e-mail at the top.

Page 117

Q. The e-mail from Don Seale dated Tuesday, November 23, 2004, do you see that? That goes to David Julian.
A. Yes.
Q. Who is David Julian?
A. At that time, David Julian was the head of the automotive marketing department.
Q. And the people CC'd are the other -- the vice-presidents of the other divisions, is that correct?
A. It is a combination. David Lawson, Gary Wendorf, Joe Osborne, Tom Brugman were group vice-presidents reporting to Don Seale in merchandise marketing. And Danny Smith and Mike McClellan were vice-presidents, Danny of coal and Mike of intermodal. Charlie Brenner was assistant vice-president of marketing systems and services. And Pat Glennon worked for him.
Q. And do you know what was discussed at the meeting referred to in the e-mail from Mr. Seale?
A. No. I do not.
Q. It appears to refer to the publication of the AIILF on the AAR website, correct?
A. I don't know what was discussed in the meeting he is referencing of the prior Friday but he

Page 118

is attaching the posting of that from the AAR website.
Q. And the publication of the AIILF tells shippers exactly what the RCAF is but without the fuel, is that correct?
MS. REINHART: Objection. Calls for speculation.
THE WITNESS: Can you repeat the question?
BY MR. GREENWALD:
Q. Well, why don't I rephrase it. What is your understanding of how the AIILF is calculated?
A. I don't -- I don't have an understanding of how it is calculated specifically.
Q. What is -- what is the AIILF's purpose as an index?
A. Norfolk Southern doesn't have much usage at all of the AIILF. So I don't -- I have never had a reason to understand how it was created, what its purpose is.
Q. Did the automotive group start to use the AIILF in its contracts?
A. The Norfolk Southern automotive group?
Q. Yes.
A. Yes. We have -- there were -- there was some usage of the AIILF but a small percent of their

Page 119

book of revenue.
Q. And why was the automotive group using the AIILF in its contracts?
A. The marketing departments within Norfolk Southern have, at their discretion, the ability to adjust contracts -- excuse me -- to establish the mechanisms for adjusting prices is one of the terms within their contracts and they have a book of business where they look at that on a case-by-case, contract-by-contract basis with those shippers.
Q. Now, the e-mail from Gary Wendorf, do you see that?
A. I do not.
Q. There is an e-mail dated Monday, November 29th, from someone named Gary Wendorf.
MS. REINHART: I think you have moved on. You have moved on.
BY MR. GREENWALD:
Q. Have I moved -- do you have Exhibit 8 in front of you?
A. I have 8.
MR. GREENWALD: Do they have a different 8 than I do? Why do I have a different 32? Can we go off the record for a minute?
THE VIDEOGRAPHER: We are going off the

Page 120

record at 11:50 a.m.
(Recess taken.)
(A document was marked as Smith Exhibit No. 9.)
THE VIDEOGRAPHER: We are back on the record at 11:58 a.m.
BY MR. GREENWALD:
Q. I am showing you what has been marked as Exhibit 9, which is what I thought was Exhibit 8. Do you see now an e-mail from Gary Wendorf dated November 29, 2004?
A. Yes.
Q. And do you see it is forwarding the e-mail from Don Seale, which forwarded the e-mail from Craig Rockey about publication of the AIILF?
A. Yes.
Q. What position did Gary Wendorf have in -- in November 2004?
A. Gary headed up the metals marketing department.
Q. And metals marketing, does that include automotive?
A. No.
Q. So what is metals marketing?
A. It is steel, iron and steel, coil steel,

Page 121

aluminum, metals products.
Q. And the -- do you see it says, The new all-inclusive index less fuel when compared to the URCAF will show customers the actual fuel double dip when our price increases are tied to the URCAF? Do you see that?
A. I see that.
Q. Do you have an understanding of what that means?
A. I would be speculating on what Gary was -- had looked at to make that statement.
Q. Was it a concern that -- for customers who are paying RCAF and a standalone fuel surcharge that -- that they would, with the publication of the AIILF, they would see exactly how much they were being double dipped for fuel?
MS. REINHART: Objection. Assumes facts.
THE WITNESS: I can't speculate on customers. Norfolk Southern didn't use AIILF in a number of its market so I wouldn't have knowledge.
BY MR. GREENWALD:
Q. But you said there were customers who had both a standalone fuel surcharge and either full or a percentage of RCAF, correct?
A. That is correct.

Page 122

Q. And the -- did the NS oppose the publication of the AIILF on the AAR website?
A. Not to my knowledge.
Q. The -- it is -- providing customers with more information about the actual fuel costs is not helpful to NS in its negotiations with customers, correct?
MS. REINHART: Objection. Ambiguous. Calls for speculation. Assumes facts.
THE WITNESS: I didn't follow the question. Can you repeat it?
BY MR. GREENWALD:
Q. Providing customers with more information about Norfolk Southern's actual costs is detrimental to Norfolk Southern in its contract negotiations with customers, correct?
MS. REINHART: Objection. Vague. Assumes facts. Calls for speculation.
THE WITNESS: I would have to know the contexts of the contract being discussed.
BY MR. GREENWALD:
Q. Customers generally want to pay less rather than more, correct?
A. That is fair.
Q. And in customers -- Norfolk Southern, in

Page 123

its negotiations with customers over including a fuel surcharge, base that inclusion on Norfolk Southern's fuel costs, correct?
MS. REINHART: Objection. Assumes facts.
THE WITNESS: Norfolk Southern, when we are negotiating a contract, we look at what the competitive factors are and what the market will bear for that all-in price and all the terms that go with that. That is part of the analysis is looking at all of those factors.
BY MR. GREENWALD:
Q. Norfolk Southern didn't explain to the market that its fuel surcharge was based on its fuel costs?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I don't understand the question "explain to the market."
BY MR. GREENWALD:
Q. In negotiating contracts and seeking the inclusion of fuel surcharges, didn't Norfolk Southern, as a policy, state that the reason for the inclusion of fuel surcharges was to recover Norfolk Southern's fuel costs?
MS. REINHART: Objection. Beyond the

Page 124

scope.
THE WITNESS: I would have to know the contract discussions to know whether that was disclosed or not.
BY MR. GREENWALD:
Q. Generally, in terms of marketing, was it your experience that Norfolk Southern stated that the reason for the imposition of fuel surcharges was to recover actual fuel costs?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: Again, I don't know the specific conversations and language used on that subject.
BY MR. GREENWALD:
Q. Even generally in marketing?
MS. REINHART: Objection. Same objections.
THE WITNESS: I would be speculating. There is hundreds of contracts and hundreds of negotiations.
BY MR. GREENWALD:
Q. Customers don't like to be double dipped for any costs, correct?
MS. REINHART: Objection. Vague and

Page 125

overbroad.
THE WITNESS: I would have to know what the customer was referring to and -- to answer that.
(A document was marked as Smith Exhibit No. 10.)
BY MR. GREENWALD:
Q. Showing you what has been marked as Exhibit 10. Do you recognize Exhibit 10? Do you recognize Exhibit 10?
A. I recognize the last page, the List of Automotive Contracts with Fuel Surcharge Provisions and Rate Escalators. And I don't recall this specifically that -- the e-mails on Page 1.
Q. And the last page, the List of Automotive Contracts with Fuel Surcharge Provisions and Rate Escalators, is it your understanding that that is an accurate list as of August 2006?
A. My understanding is it is a list that was compiled and sent in August 2006, by an individual in the automotive marketing.
Q. And the list indicates that the AIILF was used on a number of different -- with a number of different shippers, correct?
MS. REINHART: Objection. The list says what it says.

Page 126

THE WITNESS: The list lists out the shipper as well as some other information and out to the right lists the rate escalator that each of those shippers and lines of business associated with that shipper are taking at that time and their contracts.
BY MR. GREENWALD:
Q. And by 2006, the automotive group at least had moved its rate escalators from RCAF to the AIILF?
MS. REINHART: Objection. Misstates her prior testimony and misstates this document.
THE WITNESS: This document contains revenue associated with these contracts for the period 2005. And as you look at the different contracts, all-inclusive less fuel is used in some cases and other adjustment factors are used in other cases and there are some examples of public pricing.
BY MR. GREENWALD:
Q. The top e-mail from David Julian, in the middle sentence, says, There are no automotive contracts containing fuel surcharge that also have the fuel component included in the base-rate escalator. Do you see that?
A. The e-mail from David Julian to Mike McClellan, is that the e-mail you are referring to?

Page 127

Q. Yes.
A. Okay. Let me read that. Okay.
Q. And the -- there are no -- there are no automotive contracts containing fuel surcharge that also have the fuel component included in the base-rate escalator, correct, that is what it says?
A. That is correct.
Q. And the RCAF contains a fuel component in the base-rate escalator, right?
MS. REINHART: Objection. Vague. Overbroad.
THE WITNESS: RCAF contains a fuel component. Yes.
BY MR. GREENWALD:
Q. So this indicates that as of 2006, at least for the automotive group, to the extent they had used RCAF, they moved to AIILF as their escalator for any contract that included a fuel surcharge, correct?
MS. REINHART: Objection. Misstates her prior testimony and misstates this document.
THE WITNESS: As a percent of the automotive group's 2005 revenue, the all-inclusive less fuel, as reflected on this particular spreadsheet done at that time, it is a small percentage of the revenue for that group.

Page 128

BY MR. GREENWALD:
Q. But my question is: For contracts that included the fuel surcharge, the automotive group, at least, moved from RCAF to the AIILF?
MS. REINHART: Asked and answered. Misstates her prior testimony and misstates this document.
THE WITNESS: There are examples of using negotiated fixed increases on this document as well as using all-inclusive less fuel as well as using an unadjusted RCAF discounted or capped. It has a number of different rate escalators identified on here that the automotive group was using at that time.
BY MR. GREENWALD:
Q. My question is: For contracts with the fuel surcharge, the automotive group, by 2006, had moved from using the RCAF as an escalator to using the AIILF?
MS. REINHART: Objection. Asked and answered. Misstates the document. Misstates prior testimony.
THE WITNESS: The two largest revenue contracts identified on here in 2005, in terms of revenue, did not use all-inclusive less fuel. One was negotiated fixed and one -- and that had a fuel

THE WITNESS: I see that he is inquiring as to how much we plan to move it upward in 2006 and 2007.
BY MR. GREENWALD:
Q. And that means he wants it moved upward, correct?
MS. REINHART: Objection. Beyond the scope. Calls for speculation.
THE WITNESS: I read it as he is asking I would like to see how much we plan. I interpret that that he doesn't know necessarily.
BY MR. GREENWALD:
Q. And Mike McClellan asks two people in intermodal to coordinate a response, do you see that?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: Yes.
BY MR. GREENWALD:
Q. And who are the two people he sends the e-mail to?
A. Rob Legge was in the automotive group, which in 2006, that group reported up through the vice-president of intermodal/automotive, Mike McClellan. And Ann-Stewart Ege was a -- probably an analyst-level person at that time.



Q. And the response to Mr. McClellan comes from Chris Luebbers?
A. Luebbers.
Q. What was his position in February 2006?
A. I don't know Chris's title at that time but he was definitely in the intermodal marketing department.
Q. And he reports to Mr. McClellan that as of 2006 intermodal has only one contract not covered by the fuel surcharge application?
MS. REINHART: Objection. Beyond the scope.
BY MR. GREENWALD:
Q. Is that accurate?
A. His sentence says, We have one contract not covered by a fuel surcharge application, and he references Maersk.
Q. So is it accurate that as of February 2006 intermodal had only one contract that was not covered by a fuel surcharge application?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I would have to look at the data specifically and how that was determined or calculated. I am taking the words that Chris put on



the page as the only knowledge I have that I recall.
BY MR. GREENWALD:
Q. The -- sitting here today, do you have any reason to believe that intermodal, as of February 2006, had any other contracts besides the one with Maersk that was not covered by a fuel surcharge application?
MS. REINHART: Beyond the scope.
THE WITNESS: I have no reason to believe that.
BY MR. GREENWALD:
Q. And the goal, as of 2006, was to have a fuel surcharge apply on that business as soon as the contract could be renegotiated, correct?
MS. REINHART: Beyond the scope.
THE WITNESS: I don't have reference to a goal.
BY MR. GREENWALD:
Q. There is an expectation that the fuel surcharge will apply to that business after the contract is renegotiated?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: Again, I read Don's note to be requesting the information that would advise him of



what it would look like beyond -- in 2006 and beyond.
BY MR. GREENWALD:
Q. My question is based on Mr. Luebbers' e-mail that there was an expectation that the only remaining contract without a fuel surcharge application in the intermodal group would have a fuel surcharge as soon as the contract was renegotiated?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: He is referencing that they will be entering into a contract renegotiation, which means he does not know what the outcome of that contract renegotiation will be at the time he wrote this e-mail. That is a term, and contract renegotiations go back and forth between the shipper and the railroad.
BY MR. GREENWALD:
Q. Well, he certainly had an expectation as of the date he wrote this, didn't he?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: He indicates he has an expectation. That is his personal -- his personal expectation, I would -- I would say.
BY MR. GREENWALD:

Q. Well, as the -- do you know whether there was an expectation at -- strike that.
Do you know whether there was a policy at NS to have the fuel surcharge apply to as much of the intermodal business as possible by 2005?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I know from my conversation with Bolander and from his declaration that they were assessing in as many contracts as possible and as they came up for renewal they reviewed it and considered it as a term.
BY MR. GREENWALD:
Q. And did you discuss with Mr. Bolander their success at having every single contract except one included by 2005?
MS. REINHART: Beyond the scope.
THE WITNESS: I did not discuss with him the specific one contract not covered in 2005 -- I guess, in 2005.
BY MR. GREENWALD:
Q. The segment of traffic -- of intermodal traffic to which the fuel surcharge was applied by 2005 was every segment of intermodal traffic, correct?
MS. REINHART: Objection. Vague.



THE WITNESS: I need further information.
BY MR. GREENWALD:
Q. The goal of NS was to apply the fuel surcharge -- the intermodal fuel surcharge to every segment of intermodal traffic, correct?
MS. REINHART: Objection. Vague.
THE WITNESS: Not aware of a goal by segment. We look at it contract to contract with the shippers we are negotiating with.
BY MR. GREENWALD:
Q. So the goal was to include it in every contract with every shipper?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: The goal of a contract renegotiation is to cure a competitive -- to, in the end, get a contract that is favorable to Norfolk Southern that allows us to secure traffic with a customer and there is many things that we consider, fuel being one, fuel surcharge being one.
BY MR. GREENWALD:
Q. And, yet, by 2005 every single intermodal contract, save one, had a fuel surcharge application, correct?
MS. REINHART: Asked and answered.



THE WITNESS: As I stated, according to Chris Luebbers' note, he is referencing one contract not covered with fuel surcharge application.
THE VIDEOGRAPHER: Excuse me. We have five minutes left on the videotape.
MR. GREENWALD: Okay. Why don't you change it now.
THE VIDEOGRAPHER: This is the end of Tape Number 3 in the deposition of Kathleen Smith. We are going off record at 12:44 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the record at 12:53 p.m.
MR. GREENWALD: Tara, did you want to put something on the record?
MS. REINHART: Yes. Sorry.
MR. GREENWALD: We are on the record. Did you want to put something on the record?
MS. REINHART: No, sir. I am sorry. I am sorry. Yes. I did. I have two voices, one talking at me and one whispering to me. Yes. We have the usual stipulation that an objection for one is an objection for all.
MR. GREENWALD: That is understood.
BY MR. GREENWALD:



Q. The -- referring you back to Mr. Bolander's declaration, which is Exhibit 11, were there -- are you aware of whether there were changes in the formula for the intermodal fuel surcharge that are -- during the period 2000 to 2007 that are not reflected in this declaration?
A. If the question is: If there were changes in the scales that they utilized for domestic and international, I am not aware of any other than those in the declaration. I am aware of some of the customer-specific negotiated fuel surcharge programs in contracts.
Q. But the scales used by the intermodal department as the standard fuel surcharge during this period are all reflected in Mr. Bolander's declaration?
MS. REINHART: Objection. Misstates her testimony as to standard.
THE WITNESS: I am aware that the scales he referenced in the declaration are the ones they used.
BY MR. GREENWALD:
Q. And that there were no other scales used during this period by the intermodal group?
A. There could have been customer-specific

scales used. Yes.
Q. There could have been negotiated different fuel surcharges than the scale used by the intermodal group?
A. Correct.
Q. But the standard scale -- all of the standard scales used by the intermodal group are reflected in Mr. Bolander's declaration?
MS. REINHART: Objection to the term "standard" as vague.
THE WITNESS: The scales that intermodal used, to my knowledge, they are reflected in here.
BY MR. GREENWALD:
Q. Just going back to the question of whether NS had a policy during the period 2003 to 2006 to apply the fuel surcharge to as many contracts as possible. You testified that you weren't aware of any such policy or you don't recall any such policy, is that accurate?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: I am not aware of a policy.
BY MR. GREENWALD:
Q. And your boss is David Lawson, is that right?



A. At what period of time?
Q. Since 2004, is that right, he has been your supervisor?
A. He was my boss from 2004 until March 1st of this year.
Q. And he -- if there had been such a policy, he would have been aware of it, correct?
MS. REINHART: Objection. Beyond the scope.
THE WITNESS: If there had been such a policy such as? Can you give me an example of --
BY MR. GREENWALD:
Q. A policy to implement fuel surcharges in as many contracts as possible.
A. Yes. He would be aware.
MR. GREENWALD: I have nothing further on these topics at this time.
MS. REINHART: Okay. We have just a few questions.
EXAMINATION
BY MS. REINHART:
Q. Ms. Smith, you recall earlier when Mr. Greenwald was asking you about usage of the AIILF in NS contracts from the period 2003 to 2006?
A. Yes.



Q. Did -- during that period of time, '03 through '06, did the industrial products group include the AIILF in any of its contracts?
A. No.
Q. During the period of time 2003 through 2006, did the coal group include AIILF in any of its contracts?
A. No.
Q. During the period of 2003 through 2006, did the intermodal group include AIILF in any of its contracts?
A. No.
Q. So the automotive group was the only group within Norfolk Southern to make any use of the AIILF during the period '03 through '06?
A. Yes.
MS. REINHART: I have nothing further. He may have a few.
MR. GREENWALD: Sorry. I do have one more.
MS. REINHART: Within the scope of what we were just asking here?
MR. GREENWALD: No.
MS. REINHART: One more question?
MR. GREENWALD: One more question unless



I have a follow-up question. But since -- you can ask Mr. Tepe, he did this at the last deposition of Ms. Haynes.
MS. REINHART: We will give you a little leeway. That is fine.
MR. GREENWALD: Thank you.
(A document was marked as Smith Exhibit No. 13.)
FURTHER EXAMINATION
BY MR. GREENWALD:
Q. This is Exhibit 13. Showing you what has been marked as Exhibit 13. Do you see this reflects an agenda of a meeting between BNSF and NS September 2004?
A. Yes.
Q. And did you attend this meeting?
A. Yes.
Q. And do you see that there is a -- a reference to a fuel surcharge in the 8:00 a.m. session according to the agenda?
MS. REINHART: Can you just reference a page number for the record, please?
BY MR. GREENWALD:
Q. Yes. The first page, which is NS Bates number ending in 558.

A. 558, the first page?
Q. Yes.
A. What was the question?
Q. Do you see that the agenda reflects that discussion of fuel surcharge?
A. There is a bullet item for fuel surcharge. Yes.
Q. Do you recall any discussion of fuel surcharge at that meeting?
MS. REINHART: Objection. That is beyond the scope of her topics.
THE WITNESS: I don't recall.
BY MR. GREENWALD:
Q. You don't recall what, if anything, was said about fuel surcharges at that meeting in 2004, sitting here today?
MS. REINHART: Beyond the scope and asked and answered.
THE WITNESS: I don't recall.
MR. GREENWALD: Okay. All right. I have nothing further.
THE VIDEOGRAPHER: Going off record at 1:02 p.m.
(The proceedings were concluded at 1:01 p.m.)



C E R T I F I C A T E

I, the undersigned, KATHLEEN SMITH, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

Page Line Correction



C E R T I F I C A T E (Continued)

Page Line Correction

_______________ _____________________
Date Signature

STATE OF:______________________________)
CITY OF:______________________________) To wit:

Subscribed and sworn to before me this
_______________ day of ______________, 2011 at
______________________, ____________________.
__________________________
Notary Public

My commission expires: ___________________



COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Rebecca L. Banks, RMR, a Notary Public for the Commonwealth of Virginia at Large, of qualification in the Circuit Court of the City of Virginia Beach, Virginia, and whose commission expires April 30, 2015, do hereby certify that the within deponent, KATHLEEN SMITH, appeared before me at Norfolk, Virginia, as hereinbefore set forth; and after being first duly sworn by me, was thereupon examined upon her oath by counsel; that her examination was recorded in Stenotype by me and reduced to typescript under my direction; and that the foregoing transcript constitutes a true, accurate, and complete transcript.

I further certify that I am not related to nor otherwise associated with any party or counsel to this proceeding, nor otherwise interested in the event thereof.

Given under my hand and notarial seal at Norfolk, Virginia, this _____ day of ___________, 2011.

__________________________
Rebecca L. Banks, RMR
Notary Public, 7097551

ERRATA SHEET OF KATHLEEN SMITH
IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION

I, the undersigned, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 9 | 6 | "hirers" to "hires" | spelling |
| 12 | 12 | "withheld --" to "held in" | clarification |
| 14 | 8 | "hirers" to "hires" | spelling |
| 22 | 12 | "fines" to "fees" | clarification |
| 22 | 16 | "No. Correct." to "Correct." | clarification |
| 26 | 15 | "markets" to "market" | clarification |
| 28 | 20 | "claim" to "clay" | clarification |
| 29 | 5 | "claim" to "clay" | clarification |
| 29 | 18 | "claim" to "clay" | clarification |
| 41 | 23 | "that are not" to "that not" | word usage |
| 45 | 22 | "action specifically" to "action means specifically" | omitted word |
| 46 | 12 | "it is an action" to "it is action" | word usage |
| 64 | 23 | "we have been" to "we had been" | verb tense |
| 64 | 25 | "we are applying" to "we were applying" | verb tense |
| 66 | 24 | "would be being applied" to "would be applied" | word usage |
| 67 | 2 | "market was bearing that" to "market was bearing – that" | punctuation |
| 67 | 20 | "obviously in an out year" to "obviously within a year" | clarification |
| 70 | 13 | "is available to really to" to "is related really to" | clarification |
| 73 | 15 | "as why" to "as to why" | omitted word |
| 121 | 20 | "its market" to "its markets" | word usage |
| 124 | 20 | "There is hundreds" to "There are hundreds" | verb tense |
| 125 | 20 | "in the automotive" to "in automotive" | clarification |
| 150 | 16 | "cure" to "secure" | clarification |

KATHLEEN SMITH

TERREL M. WIGGINS NOTARY PUBLIC REG # 210392 MY COMMISSION EXPIRES 1/31/2014 COMMONWEALTH OF VIRGINIA

Subscribed and sworn to me
this 28th day of July, 2011
Terrel M. Wiggins, Notary Public

984434.01-D.C. Server 2A

MSW - Draft July 7, 2011 - 10:18 AM

DA05086

## Unknown

**From** Seale Don
**Sent** Tuesday April 22 2003 11 26 AM
**To** Prillaman Ike
**Subject** FW Fuel Surcharge basis change issue
**Attachments** Fuel Surcharge basis change issue

LIP So we will have the same information DWS

Original Message
**From** Osborne Joe
**Sent** Thursday April 17 2003 4 45 PM
**To** Brenner Charlie Lawson David Bayrer Tom Glennon, Pat
**Cc** Seale Don
**Subject** RE Fuel Surcharge basis change issue

My task was to advise a conversion formula to go from price per barrel of oil to price per to gallon of diesel

He e it is

(A Price per Barrel of Crude) + (B $4 02 to $5 65)
——————————————————— = Price per gallon of Diesel fuel
C 42 Gallons

A Price of West Texas Crude

B The estimates cost to convert oil to diesel (Does not include Taxes)

C Number of Gallons in one barrel

Joe

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000004

NS NJ 000004
CONFIDENTIAL
SUBMISSION

**Unknown**

| | |
|---|---|
| **From** | Brenner Charlie |
| **Sent** | Tuesday April 15 2003 10 38 AM |
| **To** | Osborne Joe Lawson David Bayrer Tom Glennon Pat |
| **Cc** | Seale Don |
| **Subject** | Fuel Surcharge basis change issue |
| **Attachments** | CSXT_NS_ SC DOC NS CSXT FSC compare xls |

All
Mr Seale has asked that each of you along with me participate on a team to look at the issue of if and when we should change our fuel surcharge process
Attached is PJG s recent write up Pat will lead the group We need a consensus recommendation to DWS by May 1st Pat please pole the member and see when we can have a phone conference
CJB

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000005

NS NJ 000005
CONFIDENTIAL
SUBMISSION

**Subject** Fuel Surcharge – CSXT vs NS Comparison
**Date** April 7 2003

**To** DWS CJB
**From** PJG

Until the recently announced CSXT Fuel Surcharge (FSC) policy change all Class One U S carriers except the BNSF observed the same Fuel Surcharge (FSC) standard The just announced CSXT policy change undercuts some of the ease of doing business and market competition assumptions supporting the current standard On the other hand the CSXT formula would have produced additional $7 083 472 in NS revenue in 2002 and YTD 2003 had it been in effect The following arguments for and against adopting the CSXT Fuel Surcharge are based on comments and opinions pressed customers other carriers and NS personnel since the inception of the first FSC in 2000

**The case against adopting the CSXT standard**

1 **Ease of doing business**

- **Customer administration** Many customers claim that price adjustments and surcharges are difficult to administer Analysis by CFIT and related billing analysis indicates that poor price admin stration by customers is responsible for a large percentage of our billing disputes
- **Frequency of administration** The 4% per $1 WTI increase will likely result in more frequent FSC changes The current 2%/$28/WTI standard is far less sensitive to small price fluctuations
- **Common FSC standard** At this moment we currently share the same FSC standard with all the major US carrier (except BNSF) but that will be changing The CSXT has announced The UP hasn t announced but it appears that it will The CN and CP maintain their own FSC standards That would leave 3 US groups 1) NS FEC and KCS 2) BNSF and CSXT and UP The announced CSXT change undercuts what was the US standard and places more of a maintenance burden (3 standards 5 if you include Canadian) on customers especially the larger customers served two or more originating RRs However if the UP opts to adopt the CSXT standard this ease of doing business argument actually becomes a point in favor of NS adopting the CSXT standard at least from a standards perspective The smaller carriers would more than likely adopt it after waiting for any fallout That would leave only the BNSF and the Canadians out of synch This assumes the carriers are able to make the new standard stick
- **CSXT increased the FSC %** Technically the CSXT formula provides the same 2% FSC at $28 00 WTI **However, as soon as the monthly average WTI goes to $28 01 the FSC increases to 2 4%** Not only does the FSC kick sooner in at $23 vs $28 the actual FSC is higher at $28 01 This opens us to the argument that we are not only taking the FSC sooner at higher costs to the customers but that we are raised the FSC from 2 0% to 2 4% at comparable WTI levels

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000006

NS NJ 000006
CONFIDENTIAL
SUBMISSION

**2 – Revenue issues**

- **Established NS base** The implementation of the original FSC generated intense customer opposition but many have since accepted the current standard Changing it to a lower threshold that results in more frequent changes and higher percentages will reopen the debate with customers and complicate routine price negotiations
- **Customer push back** Where we currently have customers on the FSC we run the risk of losing the surcharge altogether While 82% of out authorities have the FSC only 52% of our line haul revenue is subject to it The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC

**3 Technical issues**

- **Publication limitations** NS actually inserts the current SC in all publications If we adopt a new FSC to make it effective we will have to republish each authority subject to the new FSC
- **Unlike the approach the CSXT is attempting, NS must republish at the Price authority level** CSXT is taking the position that they are simply referring to the FSC clause in their T&C and that by changing the FSC clause in the T&C will implement that new FSC in all publications public and private That assumption is questionable for private authorities particularly contracts and they privately admit that On the other hand NS publishes the FSC clause in each price publication NS would have republish each rate authority in order to replace it Public authorities can be done at our convenience Private authorities would most likely have to be changed as part of the renegotiation process something CSXT may be facing on private authorities as well Replacing the FSC in NS publications require that we republish all authorities The logistics of publication would require that we stagger the implementation

<u>**The case in favor of adopting the CSXT standard**</u>

**1 Ease of doing business**

- **Better customer notification** The monthly average WTI standard (prior monthly WTI average announced in the current month to be effective in the following month) provides better lead time for systems changes The BNSF and CSXT standards both use this methodology The major difference is that BNSF is based on diesel prices a more volatile index
- **Consistent application** The FSC is applied by calendar month This removes variability as to when the FSC will be applied
- **Establish a new standard** If one or more other Class1 carriers switch to the CSXT standard we would have a better case of doing business case for adopting a new standard
- **Truck like** Despite some evidence to the contrary for smaller customers the larger customers that ship both rail and truck have billing systems that should be able to accommodate surcharges

2 **Revenue**

- **More revenue** The CSXT standard clearly produces significantly more compensation and it does it sooner and more consistently Assuming both FSC standards were in effect for all of last year they would each produce the following NS MDSE revenues (see attach spreadsheet)

  **2002 $3 8M NS vs $15 5M CSXT version Full year**
  **2003 $4 4 M NS vs $9 0M CSXT version YTD**

- **Quicker implementation** The lower threshold combined with the $1 WTI thresholds mean the CSXT kicks in sooner For example May 2002 (CSXT) vs October 2002 (NS)

3- **Technical issues**

- **NS billing systems can handle the CSXT standard** Marketing Services updates the FSC note in 9255 covering FSC formula The change is automatically applied to all prices subject to the involved FSC note By comparison the BNSF is forced to reis ue all FSC related prices i- RFN whenever there is a FSC update
- **Some Limitations** Tracking the WTI and loading the FSC percentage is a manual process for Marketing Services However once the percentage is loaded on the appropriate note in 9255 the rest is automatic What we cannot handle are numerous formulas producing different percentages on different dates for different durations The administration of multiple FSC becomes a problem and more importantly we are not able to maintain targeted FSC distribution lists for customer notification If we opt to change the FSC we can maintain two (old and new) but we cannot easily or accurately sustain a variety negotiated variations that customers will invariably what to negotiate

In a related note the BNSF made some inquiries regarding REN standards covering the passing of mileage in FSC condition codes (notes) They appear to be looking at the widely distributed report criticizing all carriers for the fact that the FSC are based on a percentage of revenue vs mileage In other words high value ladings tend to be billed higher fuel charges While this would address some of the customer complaints the rail industry lacks a good way to determine interline rail miles We have no reason to believe they are seriously considering a change to a mileage basis

Revisiting a key point made earlier If we adopt the new CSXT standard there are implementation issues

**Contracts** The FSC is actually included (printed) in NS contracts In order to remove it we would have to renegotiate and reissue each contract or allow it to expire and make the change in the next contract The CSXT did not imbed the FSC text in their authorities Their opening position that since their contracts simply refer to their T&C which will be changed the contracts are automatically subject to the new FSC Privately they admit that this is a stretch and expect strong customer opposition

**Private Quotes** – Again the FSC is printed in the NS private quote NS has traditionally honored terms printed in private quotes for the duration of the publication While there is a case to be made that we can change the terms this is not a position we should necessarily adopt Customers would lose trust in our private quotes and insist that we instead establish contracts Administratively this is not something we want

**Public Quotes and Tariffs** – Again we have the FSC included in each publication However in this case we are free to change the publications on 20 days notice Logistically we could not process them all at the same time We would have to stagger the implementation

Since we have less latitude than the CSXT to make wholesale changes my recommendation if we opt to adopt the CSXT standard would be to

- Not immediately announce a FSC policy change
- Wait for fuel costs to drop and stabilize preferably to drop off completely
- Announce that public authorities will transition to a new FSC beginning xx xx xx
- Make the changes on public prices over a relatively short period
- Handle private authorities on a case by cases basis

**Pre CSXT RR Comparison**

| RR | BASIS | SCHEDULE |
|---|---|---|
| NS | WTI 30 Day WSJ price | 2% increase @ $28 and each $5 increase thereafter |
| UP | WTI 30 Day WSJ price | 2% increase @ $28 and each $5 increase thereafter |
| KCS | WTI 30 Day WSJ price | 2% increase @ $28 and each $5 increase thereafter |
| BNSF | Monthly Highway Diesel Fuel average w/one month delay for announcement of % | 5% increments per $ 05 increments above $1 299 per gallon (1 / threshold) |
| CSXT | WTI – monthly average per barrel probably with one month delay from % announcement | 4 % increase for each dollar increase aver $23 |
| CN | WTI Average for previous QTR | 2 % $24 00 $26 99<br>4% $27 00 $31 99<br>6% $32 00 $36 99<br>8% $37 00 $41 99<br>Each $5 00 U S increase thereafter = additional 2% |

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000009

NS NJ 000009
CONFIDENTIAL SUBMISSION

| | | |
|---|---|---|
| **CPR** | WTI Average for previous QTR | 3% above $22 00<br>6% above $30 00 |

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000010

NS NJ 000010
CONFIDENTIAL
SUBMISSION

| Month | NS Merch Rev (L & F) (Yearly AVG/Month) | NS FSC (actual) | CSXT FSC (Pro Forma) | Revenue From FSC (NS FSC X 52 adj) See note below | Revenue From FSC (CSXT FSC X 52 adj) |
|---|---|---|---|---|---|
| January 2002 | $200 750 000 | 0 | 0 | | |
| February 2002 | $200 750 000 | 0 | 0 | | |
| March 2002 | $200 750 000 | 0 | 0 | | |
| April 2002 | $200 750 000 | 0 | 0 | | |
| May 2002 | $200 750 000 | 0 | 0 80 % | | $835 120 |
| June 2002 | $200 750 000 | 0 | 1 60 % | | $1 670 240 |
| July 2002 | $200 750 000 | 0 | 2 00 % | | $2 087 800 |
| August 2002 | $200 750 000 | 0 | 1 20 / | | $1 252 680 |
| September 2002 | $200 750 000 | 0 | 1 60 % | | $1 670 240 |
| October 2002 | $200 750 000 | 14 day @2 % | 2 40% | $942 877 | $2 505 360 |
| Navember 2002 | $200 750 000 | 2% | 2 80 % | $2 087 800 | $2 922 920 |
| December, 2002 | $200,750,000 | 11 day @2 % | 2 40 % | $740,832 | $2,505,360 |
| **Year 2002** | **$2 409 000,000** | | | **$3 771 509** | **$15,449,720** |
| January 2003 | $206 886 000 | 2 day @ 2 / | 1 60 / | $138 814 | $1 721 292 |
| February 2003 | $206 886 000 | 2 / | 2 80 / | $2 151 614 | $3 012 260 |
| March, 2003 | $206,886,000 | 2% | 4 00 / | $2,151,614 | $4,303,229 |
| **2003 ytd total** | | | | **$4,442,042** | **$9,036,781** |

**Note** Re 52 (52 %) FSC Ajustment 52 % of non Intermodal Line haul NS revenue is subject ti the NS FSC

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000011

NS NJ 000011
CONFIDENTIAL
SUBMISSION

File Fuel Hedging General

JUL RECEIVED Financial Planning

Subject Fuel Surcharge

Norfolk – July 23 2003
EQ GE Fuel

Mr L I Prillaman

As recently discussed Merchandise and Coal have again reviewed our fuel surcharge assessment and collection rate compared to the rest of the rail industry Our current fuel surcharge was triggered on January 29, 2003 when West Texas Intermediate Crude Oil prices hit $28 per barrel for 30 consecutive business days From January 29 through June 30, Merchandise FSC billings amounted to $14 8 million with $11 4 million collected Coal billings amounted to $5 5 million with $4 1 million collected During the first five months of 2003, NS diesel fuel costs rose 23% or $32 million above 2002 Merchandise, Coal, and Intermodal combined fuel surcharge billings equated to $28 million with $23 million collected during the five-month period from January 29 to June 30

Over the past few months, UP, BNSF, and CSX all adjusted their FSC programs to generate higher billings but despite those changes, they each announced that their June FSC would equate to 2%, the same as ours and for July CSX is reportedly billing at 2 4% and UP and BNSF at 2 5%

Maintaining our current program has resulted in greater acceptance in the market place and our payment to billing ratio for Merchandise and Coal is now 76% and rising Certainly, a realistic point here is that as more rail carriers adjust fuel surcharges upward and continue to modify them regularly as CSX UP, and BNSF have recently done customers increasingly see the surcharge as a revenue generator instead of a fuel recovery mechanism and will resist payment We also need to avoid complex FSC formulas based on weight of the shipment or related formulas as customer acceptance and payment will decline

In view of the above, Bill Fox and I agree that we do not recommend increasing our fuel surcharge at this time We do agree however that reducing the trigger from 30 consecutive <u>business</u> days to 15 <u>calendar</u> days would make our program more responsive to spikes, and we plan to modify our program to do so A challenge here however is customers whose contracts and rates have been established subject to our current Conditions of Carriage which contains the current FSC, will argue that we cannot change the terms of those rates by reissuing a modified FSC in a new provision of our Conditions of Carriage In short, they see this as breaking the contract' we made with them when the existing Conditions of Carriage and FSC were in place

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000024 NS NJ 000024

CONFIDENTIAL SUBMISSION

Also, attached is Global Insights June 2003 outlook for crude oil pricing You will note on page 25 that West Texas Intermediate Crude Oil prices are projected to dip to $26 per barrel by September and fall further to $24 per barrel by February 2004 If this forecast holds, CSX would be the only carrier to have a FSC in place as they have reduced their threshold to $23 per barrel It is unlikely they would apply it at all in that environment

Finally we estimate that because of current contractual commitments and large customers that reject payment of fuel surcharges such as General Motors, ADM, Cargill, etc we are billing and collecting fuel recovery with only about 50% of our Merchandise customer base Our focus ahead is to increase this percentage and to gain fuel recovery through higher rate increases where the customer flatly rejects the FSC mechanism

Your comments or further direction would be welcomed on this issue

D W Seale

Enclosure

cc H C Wolf
J W Fox
K B McQuade
M R McClellan

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000025 NS NJ 000025

CONFIDENTIAL SUBMISSION

# GLOBAL PETROLEUM MONTHLY

JUNE 2003

GLOBAL INSIGHT

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000026

NS NJ 000026
CONFIDENTIAL
SUBMISSION

As a valued client of Global Insight we would like to give you notice that the name for this publication has changed from *Oil Market Outlook* to *Global Petroleum Monthly* This is a name change only the substance of the publication will not change In the coming months there will be additional formatting changes to this publication Again these changes will not compromise the quality of the analysis rather any alteration is designed to improve the publication and is consistent with the company wide objective of continually improving Global Insight s products and services

Please address your questions to

Bruce Cavella 1 781 860-6162 e mail bruce cavella@globalinsight.com

*Published by Global Insight Inc 24 Ha twell Avenue, Lexington MA 02421 3158*

*C pyright ( ) 2003 by Global Insight I c Reproduction n whol or part by electronic or mech nical means is strictly prohibited except by permission And of course all rights are reserved.*

*Global Insight Inc provides forecasts that are intended for informational purposes only for the subscriber s internal use Global I ght I c does t p rp rt to g ve t adi g recomm ndations w th respect to the markets that it covers Neith r Global Insight Inc or any source of information used by Global Insight I c. guara tees the ccu acy dequacy o completeness of th fo ca ts and hist ri l d ta do they make any warranties express or impl d as to the esults to be obtained from its use N ither Global Ins ght Inc nor ts so rces sh ll be esponsible fo any erro s o omi si ns f results obtained from th use of Global Insight I for asts*

*Next issue July 9*

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000027 NS NJ 000027
CONFIDENTIAL
SUBMISSION

# TABLE OF CONTENTS


ON THE RADAR 2

FORECAST HIGHLIGHTS 3

MARKET REVIEW AND OUTLOOK 4

MARKET BALANCE 9

PRODUCT PRICES 13




HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000028

NS NJ 000028
CONFIDENTIAL
SUBMISSION

# ON THE RADAR

- *A relatively quick war in Iraq left the country s oil fields and infrastructure virtually unscathed looting has been a much larger problem Oil exports could start to flow again in June or July but a myriad of political and physical problems could slow ore even delay the return of Iraqi oil exports*
- *OPEC 10 (OPEC excluding Iraq) production probably peaked for the year in April as the cartel compensated for the production problems in Iraq Nigeria and Venezuela A quota cut was expected as a result of OPEC s June 11 meeting but with prices remaining stubbornly high and inventories chronically low chances are that OPEC quotas will not be altered*
- *Recent data support the view that a full fledged U S economic recovery will be slow to arrive Global Insight believes it will come late in the second half of 2003 then intensify in the beginning of 2004 Year over year growth is slated to be 2 4% this year and 4 3% next year*
- *A slow-in coming U S economic recovery war in Iraq the SARS epidemic and other factors have slowed global economic growth Nearly every month has seen a tenth of a percentage point shaved off of the global economic growth forecast Slow economic growth usually means slow oil demand growth Global oil demand growth in 2003 is expected to be around 900 000 barrels per day (b/d) rising to 1 4 million b/d in 2004*
- *Severe acute respiratory syndrome (SARS) has stifled air travel in Asia and to a lesser extent elsewhere The initial handling of the disease was problematic but steps are being taken to stop the spread of the disease and bring it under control Further uncontrolled outbreaks could lead to widespread disruption of travel which would then dent oil demand in the form of jet fuel*

TABLE 1
**Market Indicators**

| Indicator | Current Trend | Outlook | Likelihood | Impact |
|---|---|---|---|---|
| Iraqi Oil Exports | none | ↗ | Strong | Prices Fall |
| OPEC 10 Production | → | → | Strong | Prices Weaken |
| U S GDP | → | → | Moderate | Weak Oil Demand Growth |
| Global Economies | → | → | Moderate | Weak Oil Demand Growth |
| SARS | ? | ? | ? | Weakening Oil Demand if Disease Spreads |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000029

NS NJ 000029
CONFIDENTIAL SUBMISSION

DA05100

# FORECAST HIGHLIGHTS

- Prices rose in May as the market focused on very low oil inventories Prices will continue to be supported by low inventories until stock levels improve A slow return of Iraqi production will also add price support
- U S product fundamentals have improved somewhat but are still bullish refinery problems or an unexpected decrease in the flow of imports could send product and crude oil prices upward in the near term.
- OPEC was spurred into action by the recent price drop simultaneously raising quotas for June 1 while also promising an output cut OPEC meets again on July 31 an output decision will be based on the state of Iraqi production If Iraqi output is rising OPEC may trim quotas but if a ramp up of Iraqi production is not imminent, the rest of the cartel will have another month to produce at current levels
- Crude prices should remain relatively strong supported by rising third and fourth-quarter demand a slow return of Iraqi production and OPEC s output adjustments West Texas Intermediate (WTI) is now expected to average around $27/barrel for the rest of this year Fundamentals continue to shape up to be bearish for 2004 and we expect WTI to dip below $25/barrel in the first half of next year

TABLE 2
**Short Term Summary**

| | 2002 3 | 2002 4 | 2003 1 | 2003 2 | 2003 3 | 2003 4 | 2004 1 | 2004 2 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Spot Crude Oil Prices ($/barrel)** | | | | | | | | | | | |
| Average World | 25 63 | 25 31 | 29 61 | 24 17 | 25 02 | 23 52 | 21 89 | 21 00 | 23 74 | 25 58 | 21 72 |
| Dated Brent | 26 95 | 26 78 | 31 51 | 25 85 | 25 75 | 24 61 | 22 84 | 21 56 | 24 98 | 26 93 | 22 47 |
| WTI | 28 32 | 28 20 | 34 06 | 28 47 | 27 33 | 25 75 | 24 00 | 23 03 | 26 09 | 28 90 | 23 82 |
| **Market Balance (million b/d)** | | | | | | | | | | | |
| **Demand** | | | | | | | | | | | |
| OECD | 47 31 | 48 81 | 49 53 | 46 96 | 47 55 | 48 95 | 49 64 | 47 39 | 47 53 | 48 25 | 48 83 |
| Non OECD | 29 35 | 29 58 | 29 72 | 29 24 | 29 21 | 29 85 | 30 22 | 30 44 | 29 23 | 29 50 | 30 37 |
| TOTAL | 76 66 | 78 38 | 79 25 | 76 19 | 76 76 | 78 80 | 79 86 | 77 83 | 76 76 | 77 75 | 79 20 |
| **Supply*** | | | | | | | | | | | |
| OPEC | 28 90 | 29 38 | 29 97 | 29 78 | 30 18 | 29 92 | 29 02 | 28 50 | 28 56 | 29 96 | 29 33 |
| Non OPEC | 47 65 | 48 42 | 48 81 | 48 79 | 48 62 | 49 18 | 49 51 | 49 81 | 47 96 | 48 85 | 49 80 |
| TOTAL | 76 55 | 77 80 | 78 78 | 78 57 | 78 80 | 79 10 | 78 53 | 78 31 | 76 51 | 78 81 | 79 13 |
| **Stock Change** | 0 11 | 0 58 | -0 47 | 2 38 | 2 03 | 0 31 | 1 33 | 0 48 | -0 24 | 1 06 | 0 07 |

**Supply includes condensates ngls and non-conventional oil Non OPEC includes processing gains.*



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000030

NS NJ 000030

CONFIDENTIAL SUBMISSION

DA05101

# MARKET REVIEW AND OUTLOOK

## SUMMARY

Expectations that supply was well ahead of demand gave way to the realization that despite overproduction by OPEC inventories are still lean and markets are therefore tight Prices rose in May as a result

A relatively quick OPEC meeting on June 11 produced no change in quotas instead the cartel will keep an eye on Iraqi production and will meet again on July 31 to assess prices and market fundamentals Global Insight believes that Iraqi oil will be slow to return to global markets thus affording some time for OPEC to trim production and avoid flooding the market A slow return by Iraq and OPEC s production adjustments will keep prices supported for the rest of the year and WTI is seen averaging nearly $27/barrel through the rest of this year about $1 higher than our previous forecast.

Rising non-OPEC supply and sluggish demand growth will continue to pressure prices through the first half of 2004 with WTI expected to fall to $22/barrel but the expected economic recovery should be in full gear by mid 2004 and prices should recover somewhat in the back half of the year

EXHIBIT 1

**Dated Brent and WTI Price Outlooks Base Scenario**
(Monthly dollars per barrel)




## RECENT DEVELOPMENTS

### Bearish Sentiment Short Lived

The early May drop in prices fueled by expectations that supply was racing ahead of demand, proved to be short lived. Increased production from OPEC led most to believe that a wave of oil was on the way bringing much needed oil to restock low inventories However industry statistics show that stocks are still low particularly in the United States Anxiety over those low stock levels has started to build pressuring prices upward



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000031

NS NJ 000031
CONFIDENTIAL
SUBMISSION

Tight stock levels increases price volatility any additional uncertainty only increases the volatility Adding to the upward pressure in May were the suicide bombings in Riyadh and short lived refinery problems in the United States Furthermore the dawning realization that Iraqi crude exports were not going to start soon and ongoing production problems in Nigeria and Venezuela cemented the switch from a bearish toned market to a bullish toned market

**OPEC Meets No Changes For Now**

OPEC met again on June 11 to review market conditions Although supply/demand balances indicate the possibility of a 2 4 million barrel per day (b/d) overhang of crude in the second quarter inventories have not been building and prices have remained stubbornly high Indeed prices have remained higher than OPEC would like Because of the high price levels the low inventory levels and the uncertainty surrounding the resumption of Iraqi exports OPEC chose to take a wait and see approach at their meeting leaving quotas unchanged, and will meet again at the end of July to check market status

In our view doing nothing was OPEC s best—and perhaps only—option A production increase ahead of a possible glut in supply would have been risky for the exporters while a production cut in the midst of high prices and low inventories would have upset consuming nations. Thus OPEC chose the sensible option and in doing so have gained more time to gauge the return of Iraqi exports and global demand and supply trends

We still think that it will be necessary for the OPEC–10 to reduce quotas in order to avert two consecutive quarters of large stock builds However the group will have a little wiggle room in terms of constraining production while Iraq struggles to rebuild its oil productive capacity We do not expect Iraqi production to rise to the point where there is enough supply in excess of domestic demand to allow significant exports until August at the earliest This will give OPEC a little extra time to lower production while also allowing the group to put off the potentially contentious issue of integrating rising Iraq production into the quota system However once Iraq begins to export and its production starts to rise the OPEC 10 will need to adjust its output or risk lower prices Given the cartel s ongoing commitment to keep prices within a $22 28 range we believe that they will lower production to accommodate Iraq in order to maintain price support.

**Iraqi Oil Industry Slow Recovery**

It is well known that because of the sanctions that were imposed on Iraq for the last dozen years there has been little foreign investment in the country which has led to a deterioration of Iraq s oil infrastructure Iraq s oil infrastructure went relatively unscathed during the conflict looting has done far more damage since the war s end

Despite the dilapidated state of Iraq s oil workings some production has been restarted and the country may now be producing around 750 000 b/d However operations at domestic refineries have not been fully restored, leading to shortages of gasoline and LPG even as crude oil piles up in storage or is injected back into the ground Iraqi interim leaders are seeking deals to trade crude for products to relieve the bulging storage and alleviate the fuel shortages Even a proposed sale of 10 million barrels of oil stored prior to the war at Ceyhan and Mina al Bakr by Iraq s State Oil Marketing Organization (SOMO) was delayed because of communications limitations

The effects of the war looting and lack of security have hampered the restoration of Iraq s oil production and goals have often been revised downward Recently a pipeline was apparently sabotaged further hampering the recovery At the end of the war administrators talked of 3 million b/d of production by the end of the year but we think that may be optimistic We have adopted a conservative approach to view near term Iraqi production which we peg to reach 2 million b/d by the end of the year If Iraq exceeds expectations we expect that the rest of OPEC will adjust its production in order to keep total OPEC output relatively stable thus maintaining price support



HIGHLY CONFIDENTIAL Attorneys Eyes Only

NS 001000032

NS NJ 000032

CONFIDENTIAL SUBMISSION

EXHIBIT 2

**OPEC 10 Quotas and Monthly Production**

(Million barrels per day)

| | Feb 1 Quota | June 1 Quota | May Production | Difference from Old Quota | Difference from New Quota |
|---|---|---|---|---|---|
| Algeria | 0 782 | 0 811 | 1 100 | 0 318 | 0 289 |
| Indonesia | 1 270 | 1 317 | 1 030 | 0 240 | 0 287 |
| Iran | 3 597 | 3 729 | 3 700 | 0 103 | 0 029 |
| Kuwait | 1 966 | 2 038 | 2 300 | 0 334 | 0 262 |
| Libya | 1 312 | 1 360 | 1 430 | 0 118 | 0 070 |
| Nigeria | 2 018 | 2 092 | 2 000 | 0 018 | 0 092 |
| Qatar | 0 635 | 0 658 | 0 750 | 0 115 | 0 092 |
| Saudi Arabia | 7 964 | 8 256 | 9 100 | 1 136 | 0 844 |
| U A E | 2 139 | 2 217 | 2 290 | 0 151 | 0 073 |
| Venezuela | 2 818 | 2 922 | 2 250 | 0 568 | 0 672 |
| Total | 24 500 | 25 400 | 25 950 | 1 450 | 0 550 |

## THE NEAR TERM FORECAST

### OPEC in Control of Prices

Prior to the war OPEC had iterated its fear that once the war and/or the second quarter began, the market might become oversupplied because of the combination of the recent surge in OPEC production and the normal seasonal drop in second-quarter demand. The price drop in April reinforced those fears, and rightly so as the cartel ramped up production in order to avert a supply shortage because of the problems in Venezuela Nigeria, and the war in Iraq However the price reversal in May and stubbornly low stock levels have pushed back the fear of oversupply and market eyes will be on Iraq and the rest of OPEC to determine future price direction

Low stock levels a slow return of Iraq production, and OPEC s desire to keep its basket price within the $22 28 price band will keep prices supported over the coming months Global Insight expects WTI to average over $28/barrel through June July and August while inventories are replenished. As Iraq ramps up production it is likely that the rest of OPEC will adjust their production as necessary to keep prices supported

Although we expect the process of production adjustment by the OPEC 10 for price support to continue through the rest of this year we believe that prices are apt to decline somewhat in the last third of the year as rising Iraqi exports and non OPEC production counteracts OPEC s output adjustments and begin to



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000033

NS NJ 000033
CONFIDENTIAL SUBMISSION

weigh on prices Global Insight expects that prices will continue to be weighed down by ever rising supply in the face of weak demand through he first half of 2004

**Risks Are Split Between Bullish and Bearish**

Currently the market contains several variables that could lead prices higher or lower than our base price scenario Global Insight believes that the risks are nearly even for prices to move above or below our base projection

EXHIBIT 3

**WTI Price Outlook Scenarios**
(Quarterly dollars per barrel)




*High price scenario* The high price scenario is based on a slower than-expected return of Iraqi production, reduced OPEC 10 production and the reluctance of OPEC to increase production significantly later this year while Iraqi production growth remains sluggish In this case OPEC would be slow to raise production fearing that a production increase would coincide with the sudden startup of production in Iraq This type of behavior was seen when Iraq periodically stopped exports to protest a change in the oil for food program. Under this scenario inventories remain chronically low all year and markets tighten considerably as demand rises in the third and fourth quarters Prices rise in response until either Iraqi production returns or OPEC acts to fill the supply gap In addition the market would be more vulnerable to minor supply disruptions such as occurred this year with the problems in Nigeria and Venezuela

*Low price scenario* In this scenario it is assumed that Iraqi production returns sooner than expected and that larger export volumes are achieved This would catch the market—and OPEC—by surprise leading to a larger amount of oversupply and a more bearish sentiment. We believe that OPEC will be relatively slow to reduce supply in our base price scenario forecast but in the base scenario the market welcomes a short period of oversupply and excess oil is absorbed by inventories If Iraqi exports resume sooner than



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000034

NS NJ 000034
CONFIDENTIAL SUBMISSION

expected and OPEC takes the same amount of tıme to cut productıon then ınventorıes would contınue to buıld for the rest of thıs year or untıl OPEC made a sızable adjustment to ıts productıon



HIGHLY
CONFIDENTIAL
Attorneys Eyes Only
NS 001000035

NS NJ 000035
CONFIDENTIAL
SUBMISSION

# MARKET BALANCE

## SUMMARY

With oil supply not in jeopardy and with several months of high OPEC production we would have thought that market fundamentals would have improved significantly by now However this has not been the case and fundamentals might remain tight for several more months

TABLE 3
**Global Market Balance**

| | 2002.3 | 2002.4 | 2003 1 | 2003 2 | 2003 3 | 2003 4 | 2004 1 | 2004 2 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Global Demand | 76 66 | 78 38 | 79 25 | 76 19 | 76 76 | 78 80 | 79 86 | 77 83 | 76 76 | 77 75 | 79 20 |
| OECD | 47 31 | 48.81 | 49 53 | 46 96 | 47 55 | 48 95 | 49 64 | 47 39 | 47 53 | 48 25 | 48 83 |
| Non-OECD | 29 35 | 29 58 | 29 72 | 29 24 | 29 21 | 29 85 | 30 22 | 30 44 | 29 23 | 29 50 | 30 37 |
| Global Supply | 76 55 | 77 80 | 78 78 | 78 57 | 78 80 | 79 10 | 78 53 | 78 31 | 76 51 | 78 81 | 79 13 |
| Non-OPEC | 47 65 | 48 42 | 48 81 | 48 79 | 48.62 | 49 18 | 49 51 | 49 81 | 47 96 | 48 85 | 49 80 |
| OPEC Crude | 25 35 | 25 93 | 26 73 | 26 10 | 26 50 | 26 17 | 25 27 | 24 75 | 25 11 | 26 38 | 25 57 |
| OPEC NGLs Non-Conv | 3 55 | 3 45 | 3 24 | 3 68 | 3 68 | 3 75 | 3 75 | 3 75 | 3 45 | 3 59 | 3 76 |
| OPEC Total | 28 90 | 29 38 | 29 97 | 29 78 | 30 18 | 29 92 | 29 02 | 28 50 | 28 56 | 29 96 | 29 33 |
| *Call on OPEC** | *29 01* | *29 96* | *27 85* | *27 41* | *28 14* | *29 62* | *30 35* | *28 03* | *28 80* | *28 90* | *29 40* |
| Global Balance | -0 11 | 0 58 | -0 47 | 2.38 | 2.03 | 0 31 | 1 33 | 0 48 | -0 24 | 1 06 | -0 07 |
| OECD Stocks | 2 56 | 2.47 | 2.34 | 2 46 | 2.62 | 2 66 | 2 61 | 2 75 | 2 47 | 2.66 | 2.82 |
| OECD Forward Cover | 52.5 | 49 8 | 49 8 | 51 8 | 53 5 | 53 7 | 55 1 | 56 8 | 53 6 | 52.2 | 56 2 |

*Oil necessary to balance market*

*Units are million barrels per day except for stocks which are billion barrels and forward cover which is days.*

### U S Stocks Are Still Low

The crisis in Venezuela paralyzed the state-owned oil company s operations including exports Prior to the strike Venezuela exported around 2 4 million b/d of oil mostly crude The United States received most of those exports importing Venezuelan oil at an average rate of 1 5 million b/d. The near shutdown of PDVSA plus the temporary removal of Nigerian imports and then Iraqi imports has led to persistently low U S crude stocks At the end of May U S crude inventories were around 289 million barrels just 2 million barrels higher than the end April level and 37 million barrels below than the year-earlier level

The drop in crude stocks led to a tightening of market fundamentals in the last two quarters Our figures now indicate that OECD commercial inventories fell by 90 million barrels in the fourth quarter and an additional 70 million barrels in the first quarter Days of forward cover have fallen as well falling below 50 days supply in the fourth and first quarters perhaps rising only to 51 8 days in the second quarter (numbers are preliminary) These numbers indicate a tight market, as 55 days cover is considered normal in a balanced market

It is surprising that inventories have not been building more than what has been observed. Venezuelan output has been steadily building (although it may not rise very much higher this year) and Nigerian production has mostly returned, while the rest of OPEC have been producing above quota Global



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000036

NS NJ 000036
CONFIDENTIAL SUBMISSION

Insight s supply/demand balance shows a 2 4 million b/d supply overhang in the second quarter yet observed that OECD stocks have not yet shown large builds This could be due to either incorrect (as in overstated) production data, or crude may have been diverted to unreported inventory locations such as Saudi Arabia s inventory space in the Caribbean or some combination of both In any case the fact remains that inventories are low and prices have been supported as a result

EXHIBIT 4

OECD Commercial Stocks and Forward Supply




## Non OPEC Supply Growing OPEC Supply Strong

With prices strong nearly all producers are pumping out as much as possible Early indications are that non-OPEC production in the first quarter of this year was up more than 1 million b/d compared with the first quarter of 2002 Leading the non-OPEC charge has been Russia, whose output is estimated to have climbed to just over 8 million b/d in the first quarter a whopping 688 000 b/d gain over output in the first quarter of last year Canada had the second largest increase as production rose by 150 000 b/d to just over 3 million b/d Non OPEC supply is projected to increase by approximately 900 000 b/d this year and again in 2004

Despite the situations in Venezuela Nigeria, and of course Iraq OPEC production has been strong as well We estimate that OPEC 10 crude production which averaged 23 5 million b/d in the fourth quarter of 2002 averaged 24 6 million b/d in the first quarter of 2003 despite the problems that were present in Venezuela and Nigeria This indicates that the remaining nine members of the OPEC 10 more than compensated for the reduction in Venezuelan supply in the early part of this year

The jump in output has been crucial to keeping markets supplied, particularly since it now appears that there was a stock drawdown in the first quarter The stockdraw occurred because demand seems to have been much stronger than expected, averaging around 79 3 million b/d against supply of 78 8 million b/d. Anecdotal evidence suggests that many importers of Middle East oil stockpiled oil earlier this year in case supply was disrupted by a war in Iraq which would show up in the data as apparent demand



HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000037

NS NJ 000037

CONFIDENTIAL
SUBMISSION

A very large stockbuild is now expected in the second quarter as demand takes a seasonal dip A build is much needed in the OECD countries Last month Global Insight projected a global surplus of 2 4 million b/d and a 170 million barrel build in OECD stocks We still expect a surplus of 2 4 million b/d but our expectations of a stockbuild have shrunk to 120 million barrels due to the reasons listed previously This will push days of supply up to 51 8 days still indicative of a tight market

The build is expected since production should continue to be strong through May tapering off slightly in June Also demand will be dampened as those countries that stockpiled oil use up their surpluses Demand could be dampened further by the outbreak of severe acute respiratory syndrome (SARS) The SARS epidemic has dented demand for jet fuel in Asia as travel has slowed severely Early handling of the disease was problematic but efforts have been stepped up to control the disease The impact on future oil demand is not easy to foretell—much will depend on how the epidemic is handled going forward. Widespread media coverage should spur efforts to keep the epidemic under control thus the effect on oil demand may be regional rather than global Furthermore a decrease in jet fuel demand in Asia as a result of SARS could be offset by increased demand in Japan for fuel oil for electricity generation as Japan is still having problems with its nuclear reactors

TABLE 4
**World Oil Demand Summary**
(Million barrels per day)

| | 2002 3 | 2002 4 | 2003 1 | 2003 2 | 2003 3 | 2003 4 | 2004 1 | 2004 2 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **North America** | 24 07 | 24 13 | 24 54 | 24 22 | 24 42 | 24 48 | 24 60 | 24 53 | 23 91 | 24 42 | 24 76 |
| *% change year ago* | 0 63% | 2 21% | 3 79% | 1 74% | 1 46% | 1 45% | 0 24% | 1 25% | 0 26% | 2 11% | 1 41% |
| **Western Eur pe** | 14 42 | 14 59 | 14 67 | 13 95 | 14 29 | 14 74 | 14 67 | 14 06 | 14 37 | 14 41 | 14 53 |
| *% change year ag* | 2 21% | 1 46% | 1 13% | 0 06% | -0 95% | 1 04% | 0 01% | 0 81% | 1 09% | 0 29% | 0 84% |
| **Asia/Pacific** | 20 57 | 22 21 | 22 77 | 20 68 | 20 51 | 22 09 | 22 79 | 21 46 | 21 12 | 21 51 | 22 04 |
| *% change year ago* | 2 84% | 4 47% | 6 65% | 1 63% | 0 30% | 0 54% | 0 06% | 3 78% | 1 50% | 1 86% | 2 44% |
| **Africa** | 2 49 | 2 49 | 2 59 | 2 54 | 2 46 | 2 55 | 2 66 | 2 60 | 2 50 | 2 54 | 2 60 |
| *% change year ago* | 1 97% | -0 12% | 2 67% | 1 63% | 0 87% | 2 57% | 2 47% | 2 47% | 1 01% | 1 50% | 2 47% |
| **Middle East** | 5 19 | 4 80 | 4 87 | 5 01 | 5 22 | 4 92 | 5 07 | 5 21 | 4 93 | 5 01 | 5 21 |
| *% change year ago* | 2 43% | -0 06% | 2 58% | 0 49% | 0 49% | 2 58% | 4 01% | 4 01% | 1 81% | 1 50% | 4 01% |
| **Latin America** | 4 82 | 4 68 | 4 44 | 4 71 | 4 82 | 4 67 | 4 66 | 4 83 | 4 73 | 4 66 | 4 79 |
| *% change year ago* | 1 61% | 2 66% | 4 80% | 1 14% | 0 03% | 0 22% | 4 84% | 2 45% | 2 15% | 1 52% | 2 78% |
| **Eastern Europe** | 1 44 | 1 50 | 1 49 | 1 44 | 1 42 | 1 48 | 1 52 | 1 47 | 1 44 | 1 46 | 1 48 |
| *% change year ago* | 1 34% | 0 07% | 4 60% | 2 24% | 1 29% | 0 98% | 1 63% | 1 64% | 1 05% | 1 11% | 1 64% |
| **Former Soviet Union** | 3 66 | 3 98 | 3 86 | 3 63 | 3 63 | 3 85 | 3 90 | 3 67 | 3 74 | 3 74 | 3 78 |
| *% change year ago* | 2 35% | 5 54% | 5 04% | 0 60% | -0 91% | 3 27% | 1 05% | 1 05% | 1 57% | 0 00% | 1 05% |
| **Global Demand** | 76 66 | 78 38 | 79 25 | 76 19 | 76 76 | 78 80 | 79 86 | 77 83 | 76 76 | 77 75 | 79 20 |
| *% change year ago* | 0 77% | 1 73% | 3 52% | 1 01% | 0 14% | 0 53% | 0 77% | 2 15% | 0 35% | 1 29% | 1 86% |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000038

NS NJ 000038

CONFIDENTIAL SUBMISSION

**Weak Demand Growth This Year**

A data update indicates that global demand was 78 4 million b/d in the fourth quarter of 2002 a 1 7 million b/d rise from third-quarter demand Demand in the first quarter is now estimated to have breached 79 million b/d as a result of persistent cold weather and stockpiling ahead of the war Oil demand is amplified in the winter months as cold weather spurs demand for heating oil in cold climates It was about 6/ colder than normal in North America this past winter Furthermore natural gas prices have been much higher than normal which leads to some fuel switching and an increase in oil demand It is estimated that fuel switching may have added 400 00 600 000 b/d of demand in the United States in the first quarter

But now that the winter season is over demand will slow as well Demand in the second quarter of 2003 is projected to be around 76 2 million b/d down nearly 3 million b/d from the first quarter As the driving season and summer weather heats up demand should begin to rise as well Third-quarter demand is seen at 76 8 million b/d Demand for 2003 is expected to increase by nearly 1 million b/d as economic recovery slated for the second half of the year starts to take hold and boosts oil demand. Demand in 2004 is slated to rise by 1 4 million b/d as the economic recovery spreads around the globe Global GDP growth is expected to run at 3 6% in 2004 compared with an anemic 2 3% this year



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS NJ 000039

NS 001000039

CONFIDENTIAL SUBMISSION

# PRODUCT PRICES

## EUROPE

### Motor Gasolıne

The monthly average motor gasolıne (mogas) prıce spread over crude for May was down some $25/tonne on that of Aprıl but thıs was attrıbutable entırely to the ınflatıng effect of the prıce spıke ın early Aprıl After fallıng to around $70/tonne at the end of Aprıl the dıfferentıal tracked sıdeways for all of May Although New York Harbor prıces rose durıng the month thıs had only a partıal ımpact on European prıces fırm barge prıces ın Rotterdam kept the cargo prıce fırm as well and the arbıtrage (arb) was margınal Elsewhere ın Europe the rıse ın the Unıted States was suffıcıent to re-open the arb although only for some grades

Our earlıer forecasts of strong European mogas spreads thıs summer had been predıcated on the expectatıon of very hıgh U S prıces as stocks were very low Indeed we were fully expectıng the possıbılıty of a repeat of 2000 and 2001 It ıs not clear why U S prıces have not rısen as expected. Absolute stocks were slıghtly below the mıddle of the range at the end of May but ın days cover terms they were at a record low for the month even assumıng modest demand ın June The EIA has recently announced ıts expectatıon of 3 8% year-on year growth ın mogas consumptıon for the second half of the year so agaınst that profıle stocks look alarmıngly low Yet the U S ındustry seems unconcerned, mogas yıelds averaged only 54 5/ ın May vırtually three full percentage poınts down on 2002 More emphasıs ıs stıll beıng gıven to dıstıllate where yıelds are at the top of the hıstorıcal range for the tıme of year On the other hand, mogas ımports have been at record hıghs for the tıme of year every month sınce February and Aprıl and May both posted levels ın excess of any prevıous monthly fıgure accordıng to weekly data

In Europe ıtself stocks are low ın absolute terms but very hıgh ın days cover terms as demand contınues to declıne Yıeld levels as at March (latest data) were around the mıddle of the hıstorıcal range so could clearly be cranked up were the need present.

Now that the U S drıvıng season has arrıved we expect a greater focus on the mogas posıtıon Whıle prıces remaın modest and margıns unexcıtıng ıt seems that refıners may be holdıng back on mogas productıon purposely ın order to nudge prıces upwards If so ın order to meet prompt demand ıt wıll be necessary to maıntaın hıgh levels of ımports Venezuela ıs stıll havıng dıffıculty makıng reformulated gasolıne (RFG) on spec and even exports of conventıonal grades are stıll low We stıll belıeve that the fundamentals poınt to a further rıse ın U S mogas prıces whıch wıll pull the European prıce hıgher Therefore although at present ıt stıll looks rather hıgh, we are maıntaınıng our forecast except that wıth the slow start to the drıvıng season we have adjusted July upwards

### Naphtha

The drop ın the naphtha spread to only $20/tonne that we suggested last month would prove to be an over-correctıon ındeed proved to be so but not before prıces had fırst fallen even further suffıcıent to pull the average for the month down to $20/tonne A mıd month surge of arrıvals from Russıa weıghed heavıly on the prıce as petrochemıcal buyers were prepared to stand back, and some well supplıed, even released materıal back ın to the market Butane prıces have also been partıcularly weak, fallıng below crude and addıng more pressure on naphtha as petrochemıcal users swıtch feedstock After months ın backwardatıon the naphtha prıce has now moved ınto contango demonstratıng less pressure on prompt avaılabılıtıes Prıces recovered later ın May as the Russıan surplus was dıssıpated and as a scheduled shutdown at Skıkda tıghtened European supplıes slıghtly

Hıgh gas prıces ın the Unıted States are causıng U S petrochemıcal producers to turn to naphtha as a feedstock, thus tıghtenıng the Atlantıc basın naphtha posıtıon and Venezuelan supplıes although largely restored are stıll not fully back to pre strıke levels Cheap LPG wıll prevent naphtha from showıng much



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000040
NS NJ 000040
CONFIDENTIAL SUBMISSION

strength however in the absence of any clear signs of robust economic recovery Later in the autumn the seasonal rise in LPG prices will allow naphtha to rise a little but prices are expected to remain within seasonal norms

TABLE 5
**European Product Prices**
(Dollars per tonne)

| | 2003 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov |
| **Naphtha** | | | | | | | | | | |
| Rott FOB Barges | 333 2 | 307 6 | 223 0 | 212 3 | 231 1 | 230 8 | 213 3 | 208 8 | 217 7 | 217 3 |
| Med FOB Cargoes | 313 4 | 280 1 | 199 9 | 194 4 | 219 1 | 219 1 | 201 1 | 196 8 | 206 7 | 206 1 |
| NWE CIF Cargoes | 337 2 | 311 6 | 227 0 | 216 4 | 235 1 | 235 1 | 218 1 | 213 8 | 222 7 | 222 1 |
| *NWE Dated Brent* | *90* | *81* | *39* | *22* | *31* | *31* | *25* | *27* | *32* | *38* |
| **Premium Unleaded Gasoline** | | | | | | | | | | |
| Rott FOB Barges | 332 8 | 306 5 | 292 3 | 272 5 | 299 1 | 291 1 | 271 1 | 254 8 | 254 7 | 234 1 |
| Med FOB Cargoes | 323 4 | 286 9 | 252 4 | 246 3 | 274 1 | 269 1 | 266 1 | 254 5 | 254 7 | 232 6 |
| NWE CIF Cargoes | 337 4 | 315 4 | 283 9 | 266 5 | 294 1 | 284 1 | 273 1 | 256 8 | 255 7 | 239 1 |
| *NWE Dated Brent* | *90* | *85* | *96* | *72* | *90* | *80* | *80* | *70* | *65* | *55* |
| **Jet Kerosene** | | | | | | | | | | |
| Rott FOB Barges | 341 4 | 339 8 | 250 8 | 240 0 | 243 1 | 243 3 | 232 1 | 230 3 | 239 0 | 233 1 |
| Med FOB Cargoes | 316 0 | 288 6 | 210 0 | #N/A | 226 8 | 225 1 | 214 1 | 214 4 | 223 6 | 216 7 |
| NWE CIF Cargoes | 347 8 | 330 8 | 242 5 | 240 5 | 244 1 | 244 1 | 233 1 | 231 8 | 240 7 | 234 1 |
| *NWE Dated Brent* | *101* | *100* | *55* | *46* | *40* | *40* | *40* | *45* | *50* | *50* |
| **Gasoil** | | | | | | | | | | |
| Rott FOB Barges | 311 9 | 300 2 | 224 2 | 219 8 | 232 1 | 232 3 | 221 1 | 214 3 | 218 0 | 217 1 |
| Med FOB Cargoes | 303 9 | 297 6 | 205 5 | 202 5 | 222 8 | 221 1 | 210 1 | 205 4 | 209 6 | 207 7 |
| NWE CIF Cargoes | 316 1 | 316 4 | 226 0 | 222 5 | 234 1 | 234 1 | 223 1 | 216 8 | 220 7 | 219 1 |
| *NWE Dated Brent* | *69* | *86* | *38* | *28* | *30* | *30* | *30* | *30* | *30* | *35* |
| **Heavy Fuel Oil 1 0% Sulphur** | | | | | | | | | | |
| Rott FOB Barges | 203 7 | 177 8 | 153 0 | 143 6 | 139 2 | 149 7 | 133 2 | 128 9 | 137 3 | 128 9 |
| Med FOB Cargoes | 205 6 | 186 0 | 140 0 | 142 8 | 151 1 | 149 4 | 144 4 | 145 9 | 136 3 | 136 4 |
| NWE CIF Cargoes | 207 7 | 188 8 | 149 1 | 150 0 | 160 0 | 160 0 | 155 0 | 155 0 | 145 0 | 145 4 |
| *NWE Dated Brent* | *39* | *42* | *39* | *44* | *44* | *44* | *38* | *32* | *46* | *39* |
| **Heavy Fuel Oil 3 5% Sulphur** | | | | | | | | | | |
| Rott FOB Barges | 171 7 | 145 1 | 123 3 | 134 3 | 133 8 | 128 8 | 113 9 | 117 4 | 116 4 | 115 6 |
| Med FOB Cargoes | 163 2 | 138 2 | 120 4 | 122 1 | 123 6 | 116 8 | 101 8 | 108 4 | 104 4 | 103 9 |
| NWE CIF Cargoes | 166 6 | 142 3 | 121 0 | 130 5 | 130 0 | 125 0 | 110 0 | 115 0 | 110 6 | 110 5 |
| *NWE Dated Brent* | *80* | *89* | *67* | *64* | *74* | *79* | *83* | *72* | *80* | *74* |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000041

NS NJ 000041
CONFIDENTIAL SUBMISSION

## Jet Kerosene and Gasoil

To no one s surprise middle distillate prices all weakened albeit by a little more than was expected Kerosene and gasoil both attained during June the levels we had projected for July and both are now well within normal seasonal bands

Jet demand has been hit by reduced air travel both in the wake of the war in Iraq and as a result of the ongoing SARS problem in the Far East Consequently airlines are facing very hard times and some have been releasing forward supplies of jet back into the market In addition exports of jet from the Middle East no longer able to find a home in the East are being redirected westward and are expected to have a depressing effect on prices As we have commented before the volumes of jet reported to be moving west are almost always exaggerated they actually remain relatively small and have markedly less impact on prices than some gloomy pundits expect Nevertheless the SARS effect means such volumes are currently likely to be somewhat greater than usual and may already be having a depressing impact on prices As current supplies are adequate buyers can afford to hold off wait for new arrivals and anticipate lower prices In addition the abnormally high spreads enjoyed by diesel on the back of French buying which continued into early May have now collapsed, and diesel is back to more normal levels Support for jet looks weak till at least the autumn so we have reduced the spread through the summer

Gasoil prices are currently soft under the weight of plentiful supplies from Russia German buyers have returned to the market however encouraged by both relatively low absolute prices and a strong euro/dollar exchange rate Stocks left over from the previous mild winter were finally run down by this winter s cold weather also leading to this first sign of firm buying from Germany since August 2001

Extra supplies are expected out of Russia in June when exports duties fall but German buyers are expected to remain in the market for a while as they will want to rebuild stocks before next winter and may anticipate higher prices then We expect these two forces to keep prices reasonably balanced, with U S buyers ready to step in and import if prices fall further as U S distillate stocks remain very low and moving to gasoline maximization will make it even more difficult to rebuild stocks It has to be remarked, however that the year-on year trend of rising Russian exports continues All grades are again reaching new record levels and much will depend on how high these rise this summer It would not be difficult for the European market to be overwhelmed by available Russian supplies over the summer months in which case the spread could fall still further

## Residual Fuel Oil

Both grade of fuel oil moved upwards with crude during May but high sulfur fuel oil (HSFO) proved the stronger of the two holding its position with crude while low sulfur fuel oil (LSFO) lost out by a few dollars/tonne This was surprising since the balance looks tighter for LSFO than HSFO LSFO demand globally continues to be boosted by increased use in both Japan as Tokyo Electric Power Company faces ongoing problems with its nuclear stations and the United States as East Coast utilities turn to fuel oil in preference to high priced natural gas HSFO demand has been supported by arbitrage opportunities to the Far East but increased Russian exports have also increased the supply

Freighting continues to be critical to moving HSFO to the Far East The tighter regulations introduced following the sinking of the *Prestige* mean that it is difficult to find suitable double hulled ships in the 80-kiloton range Some traders have been making up large cargoes on very large crude carriers (VLCCs) as freight rates have permitted but the logistics of this are difficult to put together It is going to be more difficult to move surplus Russian material to the East especially as the increases in supply expected this year will mostly originate in the Baltic

The additional Japanese demand will shrink as the nuclear stations are progressively restarted but U S demand for LSFO is expected to remain relatively strong through the summer as gas prices are projected to remain high above $6/mmBtu. Environmental legislation and emission limits constrain the amount of fuel oil that can be used, however so the support will be modest Moreover high rainfall over the past



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000042

NS NJ 000042
CONFIDENTIAL SUBMISSION

winter in southern Europe means that reservoir levels are high and hydro generation of electricity will make a major contribution to power demands

If OPEC has to cut back output during the third quarter as we expect this will reduce the supply of HSFO in Europe and will support prices We are thus projecting narrower sulfur premia for this summer than at one stage seemed likely given the change in specifications on January 1

Nevertheless we continue to project greater demand for LSFO than HSFO especially following the change of specs and for a potential oversupply of HSFO as Russian supplies increase further subject to some amelioration from OPEC cuts The differential between the two grades is therefore expected to grow over coming months peaking in August when Russian exports normally peak, and then falling back a little in the fourth quarter as Russian supplies shrink seasonally while sources of exceptional demand for LSFO moderate

## UNITED STATES

### Gasoline

The Memorial Day weekend marked the start of the U S peak driving season And as expected we did see strengthened demand for motor gasoline in the United States With stocks still lingering around the edge of the lower end of the normal range the upcoming summer months will see a relatively tight gasoline market, and crude prices may well be driven by gasoline prices

U S gasoline stocks at the end of May remain almost the same as the end April level barely on the lower end of the normal range Both months are about 9 million barrels short of year-earlier levels In an effort to fill up the stocks before the peak driving season refiners have cranked up yields a little from April at 54 3% for the month of May but the yields are still lower than in the winter months at the beginning of this year Total gasoline imports dropped to below 800 000 b/d in the last week of May but the four week average still stands at more than 900 000 b/d, above the year-earlier level of 874 000 b/d On the demand side U S demand for finished motor gasoline in May was just below 9 million b/d, slightly above the year-earlier level If the low stocks condition is not eased and demand is stable in the coming months the United States will be vulnerable to price spikes should there be refinery problems or a sudden decrease in imports

Because of these market conditions Global Insight sees the gasoline market as relatively tight over the summer months Spot gasoline prices at New York Harbor averaged $0 80/gallon in April and $0 75/gallon in May Depressed crude prices as well as the delayed strength in gasoline demand leading to the summer driving season played a part in weakening the gasoline prices The average prices of the second and third quarters are both expected to be around $0 80/gallon before the winter months come and heating oil takes a more dominant role The spread between WTI and spot New York Harbor gasoline prices should average about $5 7/barrel over the second and third quarters almost $2 more than it was last year over the same time period

The risk to the forecast is if gasoline demand turns out to be less strong than expected because the economy s lukewarm rebound keeps some vacationers at home there will be downward pressure on prices

### Distillate

Demand for distillate has kept falling as milder temperatures start to take control A sharp drop in East Coast stocks in the first quarter has taken the nationwide stock of distillate to well below the normal range Even now that demand has eased stocks have barely been filled up into the normal range This could affect the distillate oil market later this year when the next heating season comes around. In the near



HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000043

NS NJ 000043
CONFIDENTIAL
SUBMISSION

DA05114

term slightly elevated crude prices in the next couple of months could bring distillate prices up by a few cents from its May level of $0 73/gallon

Stocks of distillate oil remained stable during April and increased by about 8 million barrels during May due to slightly increased production and checked demand although yields remain at 24 3% for both April and May

Imports of distillate increased 35% from a year earlier which also contributed to the buildup of stocks Nevertheless stocks by the end of May are still below the normal range and well below the year-earlier level of 127 5 million barrels Again with demand weakening the imports should find their way into stocks Whether the stocks will recover enough or quickly enough before the next heating season remains to be seen however

Now that refiners will be focused on gasoline production distillate production will be minimized. Distillate demand, in the form of heating oil will certainly weaken but demand for diesel should begin to perk up once the economy begins to recover in the second half of this year In addition distillate demand will pick up slightly if natural gas prices stay up this summer While we do not envision record demand for distillate any incremental increase in demand will limit a potential stock build

Spot distillate prices at New York Harbor averaged $0 73/gallon in May almost 40 cents below their peak February level Distillate prices in the near term will follow the slight upward turn of crude prices but dip at the end of the summer and before its next tighter market as the heating season comes along The spread between distillate at New York Harbor and WTI is expected to widen from $3 27/barrel in the second quarter to about $4 25/barrel in the third quarter and then close to $6/barrel in the winter months

**Residual Fuel**

Changes in resid prices have largely reflected the changes in crude prices Resid price has dropped from its peak of almost $35/barrel in February this year to $25/barrel in May following the weakening trend of crude oil from $36/barrel in February down to $28/barrel in May This reflected both the improving underlying fundamentals as well as a decrease in demand for residual fuel

February and March saw an uptick in demand for residual oil even as the natural gas market has strengthened giving more incentive for power generators to switch from natural gas into residual fuel Demand in the first quarter was about 25% higher than it was a year earlier Demand weakened in April and May May s average was about 600 000 b/d, lower than the year-earlier level of 700 000 b/d.

Resid stocks were well below the year-earlier level for the first quarter of this year Stocks built up in the second half of May owing to weaker demand By the end of May stocks for residual oil were close to 37 million barrels back to the normal range and about 9% above May 2002 level With the recent drop in demand and buildup in stocks forward cover has recovered to around 50 days—a level that has not been seen since October of last year Because natural gas prices are expected to remain relatively high during the summer months resid demand should rebound somewhat during the period. Global Insight expects a slightly stronger resid market in the near term.



HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000044

NS NJ 000044
CONFIDENTIAL
SUBMISSION

TABLE 6
**U S Product Prices**

| | 2003 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov |
| **Unleaded Gasoline (cts/gal)** | | | | | | | | | | |
| NY CIF Cargoes | 99 16 | 94 90 | 79 45 | 75 36 | 85 78 | 85 25 | 79 92 | 74 61 | 73 21 | 69 40 |
| GC FOB Waterborne | 101 45 | 96 74 | 81 53 | 79 05 | 85 68 | 85 14 | 79 72 | 74 32 | 72 89 | 69 02 |
| **Jet Fuel (cts/gal)** | | | | | | | | | | |
| NY Barges | 114 53 | 97 44 | 78 27 | 75 39 | 78 05 | 79 03 | 77 02 | 76 96 | 77 60 | 77 05 |
| GC FOB Waterborne | 106 06 | 89 69 | 74 78 | 71 78 | 75 24 | 76 14 | 74 20 | 74 12 | 74 69 | 74 15 |
| **Distillate (cts/gal)** | | | | | | | | | | |
| NY CIF Cargoes | 112 17 | 97 18 | 77 76 | 73 30 | 75 67 | 76 57 | 74 57 | 74 46 | 75 03 | 74 45 |
| GC FOB Waterborne | 105 65 | 88 40 | 72 54 | 70 60 | 73 16 | 74 04 | 72 08 | 71 97 | 72 53 | 71 96 |
| **Residual Fuel Oil 1% Sulfur ($/barrel)** | | | | | | | | | | |
| NY CIF Cargoes | 35 05 | 31 71 | 23 98 | 24 51 | 26 52 | 27 24 | 23 75 | 24 30 | 25 26 | 23 99 |
| GC FOB Waterborne | 34 68 | 33 16 | 24 72 | 25 81 | 25 32 | 26 02 | 22 64 | 23 17 | 24 10 | 22 87 |

TABLE 7
**GDP Growth Major Seven Economies**
(Year-over year percent change)

| | 2002 3 | 2002 4 | 2003 1 | 2003 2 | 2003 3 | 2003 4 | 2004 1 | 2004 2 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Canada | 4 2 | 3 9 | 2 9 | 2 5 | 2 5 | 3 2 | 3 6 | 3 8 | 3 4 | 2 8 | 3 6 |
| France | 1 2 | 1 7 | 1 1 | 0 9 | 1 2 | 1 7 | 2 1 | 2 2 | 1 2 | 1 2 | 2 1 |
| Germany | 0 4 | 0 7 | 0 5 | 0 5 | 0 4 | 0 8 | 1 2 | 1 5 | 0 2 | 0 5 | 1 6 |
| Italy | 0 4 | 1 0 | 1 0 | 1 0 | 1 0 | 0 9 | 1 4 | 1 7 | 0 4 | 1 0 | 1 9 |
| Japan | 1 7 | 2 8 | 2 6 | 1 1 | 0 6 | 0 3 | 0 9 | 1 4 | 0 3 | 1 1 | 1 5 |
| United Kingdom | 2 0 | 2 1 | 2 1 | 2 0 | 1 8 | 2 3 | 2 8 | 3 0 | 1 6 | 2 0 | 2 8 |
| United States | 3 3 | 2 9 | 2 1 | 2 2 | 2 2 | 2 9 | 3 8 | 4 4 | 2 4 | 2 4 | 4 3 |
| World | | | | | | | | | 2 1 | 2 3 | 3 4 |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000045

NS NJ 000045

CONFIDENTIAL SUBMISSION

TABLE 8

**Global Market Balance**

| | 2000 1 | 2000 2 | 2000 3 | 2000 4 | 2001 1 | 2001 2 | 2001 3 | 2001 4 | 2002 1 | 2002 2 | 2002 3 | 2002 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Global Demand | 76 06 | 74 55 | 76 73 | 77 49 | 77 31 | 75 53 | 76 07 | 77 05 | 76 55 | 75 44 | 76 66 | 78 38 |
| OECD | 48 10 | 46 46 | 47 89 | 48 56 | 48 81 | 46 45 | 47 47 | 47 98 | 47 89 | 46 11 | 47 31 | 48 81 |
| Non OECD | 27 96 | 28 08 | 28 84 | 28 93 | 28 50 | 29 08 | 28 60 | 29 07 | 28 66 | 29 32 | 29 35 | 29 58 |
| Global Supply | 75 24 | 76 21 | 77 07 | 78 17 | 77 47 | 75 87 | 76 87 | 76 57 | 76 00 | 75 72 | 76 55 | 77 80 |
| Non OPEC | 45 97 | 45 62 | 45 84 | 46 36 | 46 27 | 46 01 | 46 60 | 47 46 | 47 75 | 48 02 | 47 65 | 48 42 |
| OPEC Crude | 26 43 | 27 70 | 28 34 | 28 91 | 28 23 | 26 85 | 27 17 | 25 90 | 24 89 | 24 26 | 25 35 | 25 93 |
| OPEC NGLs Non Conv | 2 84 | 2 89 | 2 89 | 2 91 | 2 96 | 3 01 | 3 11 | 3 22 | 3 36 | 3 44 | 3 55 | 3 45 |
| OPEC | 29 27 | 30 59 | 31 23 | 31 81 | 31 19 | 29 86 | 30 27 | 29 12 | 28 25 | 27 70 | 28 90 | 29 38 |
| *Call on OPEC** | *30 09* | *28 93* | *30 89* | *31 13* | *31 04* | *29 52* | *29 47* | *29 59* | *28 80* | *27 42* | *29 01* | *29 96* |
| Global Balance | 0 83 | 1 66 | 0 34 | 0 68 | 0 16 | 0 34 | 0 80 | -0 48 | -0 56 | 0 28 | -0 11 | 0 58 |
| OECD Stocks | 2 42 | 2 51 | 2 54 | 2 53 | 2 52 | 2 60 | 2.66 | 2 62 | 2 60 | 2.64 | 2 56 | 2 47 |
| OECD Forward Cover | 52 1 | 52.4 | 52 3 | 51 8 | 54 3 | 54 7 | 55 4 | 54 7 | 56 4 | 55 9 | 52 5 | 49 8 |

**Oil necessary to balance market*

*Units are million barrels per day except for stcocks which are billion barrels and forward cover which is days*

| | 2003 1 | 2003 2 | 2003.3 | 2003.4 | 2004 1 | 2004 2 | 2004 3 | 2004 4 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Global Demand | 79 25 | 76.19 | 76.76 | 78.80 | 79 86 | 77 83 | 78 62 | 80 49 | 76.21 | 76.49 | 76.76 | 77 75 | 79 20 |
| OECD | 49 53 | 46.96 | 47 55 | 48 95 | 49 64 | 47 39 | 48.44 | 49 84 | 47 75 | 47 68 | 47 53 | 48.25 | 48 83 |
| Non-OECD | 29 72 | 29 24 | 29.21 | 29 85 | 30 22 | 30.44 | 30.18 | 30 65 | 28.46 | 28.81 | 29 23 | 29 50 | 30.37 |
| Global Supply | 78.78 | 78 57 | 78 80 | 79 10 | 78.53 | 78.31 | 79 30 | 80 37 | 76 67 | 76.70 | 76.51 | 78.81 | 79 13 |
| Non-OPEC | 48.81 | 48.79 | 48.62 | 49 18 | 49 51 | 49 81 | 49 86 | 50 02 | 45 95 | 46.58 | 47 96 | 48.85 | 49 80 |
| OPEC Crude | 26 73 | 26.10 | 26 50 | 26 17 | 25 27 | 24 75 | 25 67 | 26.58 | 27 84 | 27 04 | 25 11 | 26.38 | 25 57 |
| OPEC NGLs Non-Conv | 3 24 | 3 68 | 3 68 | 3 75 | 3 75 | 3 75 | 3 77 | 3 77 | 2 88 | 3 07 | 3.45 | 3.59 | 3.76 |
| OPEC | 29 97 | 29 78 | 30 18 | 29 92 | 29 02 | 28.50 | 29 44 | 30.36 | 30 72 | 30 11 | 28.56 | 29 96 | 29 33 |
| *Call on OPEC** | *30.44* | *27 41* | *28.14* | *29 62* | *30.35* | *28.03* | *28.76* | *30.47* | *30.26* | *29 90* | *28.80* | *28.90* | *29 40* |
| Global Balance | -0 47 | 2.38 | 2 03 | 0 31 | 1 33 | 0 48 | 0 68 | -0 11 | 0 46 | 0.21 | -0 24 | 1 06 | -0.07 |
| OECD Stocks | 2 34 | 2.46 | 2.62 | 2.66 | 2.61 | 2.75 | 2.82 | 2.82 | 2.53 | 2.62 | 2.47 | 2.66 | 2.82 |
| OECD Forward Cover | 49 8 | 51 8 | 53 5 | 53 7 | 55 1 | 56 8 | 56 6 | 56 4 | 52.2 | 54 8 | 53 6 | 52.2 | 56.2 |

**Oil necessary to balance market*

*Units are million barrels per day except for stoocks which are billion barrels and forward cover which is days.*



HIGHLY CONFIDENTIAL
Attorneys' Eyes Only

NS 001000046

NS NJ 000046
CONFIDENTIAL
SUBMISSION

TABLE 9
**World Oil Demand**
(Million barr ls per day)

| | 2002 3 | 2002 4 | 2003 1 | 2003 2 | 2003 3 | 2003 4 | 2004 1 | 2004 2 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| N rth America | 24 07 | 24 13 | 24 54 | 24 22 | 24 42 | 24 48 | 24 60 | 24 53 | 23 91 | 24 42 | 24 76 |
| Canada | 2 03 | 2 06 | 2 03 | 1 97 | 2 08 | 2 07 | 2 11 | 2 06 | 2 00 | 2 04 | 2 12 |
| Mexico | 1 93 | 1 94 | 1 99 | 1 95 | 1 94 | 1 97 | 2 08 | 2 04 | 1 93 | 1 96 | 2 05 |
| United States | 19 80 | 19 80 | 20 19 | 19 97 | 20 07 | 20 11 | 20 08 | 20 10 | 19 65 | 20 09 | 20 25 |
| Western Europe | 14 42 | 14 59 | 14 67 | 13 95 | 14 29 | 14 74 | 14 67 | 14 06 | 14 37 | 14 41 | 14 53 |
| France | 1 96 | 1 96 | 2 05 | 1 87 | 1 91 | 2 01 | 2 07 | 1 89 | 1 96 | 1 96 | 1 98 |
| Germany | 2 88 | 2 72 | 2 71 | 2 66 | 2 81 | 2 73 | 2 75 | 2 69 | 2 72 | 2 73 | 2 76 |
| Italy | 1 85 | 1 87 | 1 91 | 1 80 | 1 84 | 1 99 | 1 94 | 1 82 | 1 87 | 1 89 | 1 91 |
| Turkey | 1 49 | 1 52 | 1 53 | 1 47 | 1 48 | 1 55 | 1 54 | 1 48 | 1 50 | 1 51 | 1 52 |
| United Kingdom | 1 69 | 1 72 | 1 75 | 1 67 | 1 69 | 1 75 | 1 78 | 1 69 | 1 70 | 1 72 | 1 74 |
| Other W Europe | 4 56 | 4 80 | 4 72 | 4 49 | 4 55 | 4 71 | 4 59 | 4 49 | 4 62 | 4 62 | 4 62 |
| Asia/Pacific | 20 57 | 22.21 | 22.77 | 20 68 | 20 51 | 22.09 | 22.79 | 21 46 | 21 12 | 21 51 | 22.04 |
| China | 5 14 | 5 25 | 5 50 | 5 15 | 5 05 | 5 35 | 5 36 | 5 60 | 5 12 | 5 26 | 5 45 |
| Japan | 5 05 | 5 89 | 6 10 | 5 00 | 5 06 | 5 54 | 6 10 | 4 96 | 5 32 | 5 42 | 5 48 |
| South Korea | 2 01 | 2 36 | 2 49 | 2 03 | 2 02 | 2 38 | 2 52 | 2 06 | 2.18 | 2 23 | 2 26 |
| Australia/NZ | 1 00 | 1 06 | 1 03 | 1 05 | 1 03 | 1 07 | 1 04 | 1 06 | 1 03 | 1 05 | 1 06 |
| Other A/P | 7 38 | 7 64 | 7 65 | 7 45 | 7 35 | 7 75 | 7 76 | 7 78 | 7 47 | 7 55 | 7 79 |
| Africa | 2 49 | 2.49 | 2.59 | 2 54 | 2 46 | 2.55 | 2.66 | 2.60 | 2.50 | 2 54 | 2.60 |
| Egypt | 0 52 | 0 47 | 0 54 | 0 53 | 0 51 | 0 53 | 0 56 | 0 56 | 0 52 | 0 53 | 0 55 |
| South Africa | 0 45 | 0 46 | 0 46 | 0 46 | 0 44 | 0 46 | 0 47 | 0 47 | 0 44 | 0 45 | 0 47 |
| Other Africa | 1 52 | 1 56 | 1 60 | 1 54 | 1 52 | 1 57 | 1 62 | 1 57 | 1 54 | 1 56 | 1 58 |
| Middle East | 5 19 | 4 80 | 4 87 | 5 01 | 5 22 | 4 92 | 5 07 | 5 21 | 4 93 | 5 01 | 5 21 |
| Iran | 1 24 | 1 22 | 1 24 | 1 22 | 1 25 | 1 25 | 1 28 | 1 26 | 1 21 | 1 24 | 1 28 |
| Israel | 0 29 | 0 29 | 0 30 | 0 29 | 0 30 | 0 30 | 0 31 | 0 30 | 0 29 | 0 30 | 0 30 |
| Saudi Arabia | 1 59 | 1 45 | 1 41 | 1 56 | 1 64 | 1 42 | 1 45 | 1 59 | 1 47 | 1 51 | 1 54 |
| Other Middle East | 2 08 | 1 84 | 1 93 | 1 95 | 2 02 | 1 96 | 2 04 | 2 06 | 1 96 | 1 96 | 2 08 |
| Latin America | 4 82 | 4 68 | 4 44 | 4 71 | 4 82 | 4 67 | 4 66 | 4 83 | 4 73 | 4 66 | 4 79 |
| Argentina | 0 42 | 0 42 | 0 40 | 0 41 | 0 42 | 0 41 | 0 41 | 0 43 | 0 42 | 0 41 | 0 43 |
| Brazil | 2 19 | 2 11 | 2 13 | 2 19 | 2 24 | 2 15 | 2 20 | 2 27 | 2 14 | 2 18 | 2 25 |
| Venezuela | 0 49 | 0 46 | 0 30 | 0 42 | 0 45 | 0 44 | 0 39 | 0 41 | 0 49 | 0 40 | 0 41 |
| Other L America | 1 71 | 1 69 | 1 62 | 1 68 | 1 71 | 1 66 | 1 65 | 1 72 | 1 68 | 1 67 | 1 70 |
| Eastern Europe | 1 44 | 1 50 | 1 49 | 1 44 | 1 42 | 1 48 | 1 52 | 1 47 | 1 44 | 1 46 | 1 48 |
| Czech Republic | 0 19 | 0 18 | 0 17 | 0 17 | 0 17 | 0 17 | 0 17 | 0 17 | 0 17 | 0 17 | 0 17 |
| Hungary | 0 15 | 0 15 | 0 14 | 0 13 | 0 14 | 0 16 | 0 14 | 0 13 | 0 14 | 0 14 | 0 14 |
| Poland | 0 43 | 0 43 | 0 39 | 0 40 | 0 42 | 0 41 | 0 40 | 0 41 | 0 40 | 0 41 | 0 42 |
| Other E Europe | 0 68 | 0 73 | 0 80 | 0 74 | 0 69 | 0 74 | 0 81 | 0 75 | 0 73 | 0 74 | 0 75 |
| Former Soviet Union | 3 66 | 3 98 | 3 86 | 3 63 | 3 63 | 3 85 | 3 90 | 3 67 | 3 74 | 3 74 | 3 78 |
| World Consumption | 76 66 | 78 38 | 79 25 | 76 19 | 76 76 | 78 80 | 79 86 | 77 83 | 76 76 | 77 75 | 79 20 |

*North America includes U S territories*



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000047

NS NJ 000047
CONFIDENTIAL SUBMISSION

TABLE 10
**World Oil Supply**
(Million barrels per day)

| OPEC | 2002 3 | 2002 4 | 2003 1 | 2003 2 | 2003 3 | 2003 4 | 2004 1 | 2004 2 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Algeria | 0 89 | 0 94 | 1 04 | 1 10 | 1 05 | 1 00 | 0 96 | 0 94 | 0 85 | 1 05 | 0 96 |
| Indonesia | 1 10 | 1 10 | 1 04 | 1 03 | 1 05 | 1 07 | 1 03 | 1 00 | 1 11 | 1 05 | 1 03 |
| Iran | 3 47 | 3 55 | 3 69 | 3 70 | 3 62 | 3 50 | 3 41 | 3 34 | 3 42 | 3 63 | 3 43 |
| Iraq | 1 75 | 2 38 | 2 14 | 0 36 | 1 42 | 2 00 | 2 25 | 2 25 | 2 01 | 1 48 | 2 44 |
| Kuwait | 1 89 | 1 89 | 2 06 | 2 27 | 2 13 | 2 00 | 1 80 | 1 76 | 1 87 | 2 12 | 1 81 |
| Libya | 1 34 | 1 34 | 1 39 | 1 43 | 1 40 | 1 35 | 1 29 | 1 26 | 1 32 | 1 39 | 1 29 |
| Nigeria | 1 99 | 2 01 | 2 13 | 1 99 | 2 15 | 2 10 | 2 02 | 1 97 | 1 97 | 2 09 | 2 03 |
| Qatar | 0 65 | 0 71 | 0 74 | 0 75 | 0 72 | 0 70 | 0 67 | 0 66 | 0 64 | 0 73 | 0 68 |
| Saudi Arabia | 7 75 | 8 00 | 8 91 | 8 97 | 8 40 | 8 00 | 7 67 | 7 49 | 7 65 | 8 57 | 7 70 |
| United Arab Emirates | 1 99 | 2 00 | 2 28 | 2 29 | 2 26 | 2 10 | 1 92 | 1 87 | 1 99 | 2 23 | 1 92 |
| Venezuela | 2 53 | 2 00 | 1 30 | 2 21 | 2 30 | 2 35 | 2 26 | 2 21 | 2 29 | 2 04 | 2 27 |
| OPEC 10 Crude | 23 60 | 23 55 | 24 59 | 25 74 | 25 08 | 24 17 | 23 02 | 22 50 | 23 09 | 24 90 | 23 13 |
| OPEC Crude | 25 35 | 25 93 | 26 73 | 26 10 | 26 50 | 26 17 | 25 27 | 24 75 | 25 11 | 26 38 | 25 57 |
| OPEC NGLs | 3 00 | 2 99 | 3 02 | 3 13 | 3 15 | 3 19 | 3 19 | 3 19 | 2 96 | 3 12 | 3 19 |
| OPEC Non-Conventional | 0 55 | 0 46 | 0 22 | 0 55 | 0 53 | 0 56 | 0 56 | 0 56 | 0 48 | 0 47 | 0 57 |
| OPEC Total | 28 90 | 29 38 | 29 97 | 29 78 | 30 18 | 29 92 | 29 02 | 28 50 | 28 56 | 29 96 | 29 33 |
| Non-OPEC** | | | | | | | | | | | |
| Argentina | 0 80 | 0 79 | 0 80 | 0 80 | 0 79 | 0 80 | 0 80 | 0 80 | 0 80 | 0 80 | 0 80 |
| Brazil | 1 75 | 1 67 | 1 80 | 1 80 | 1 80 | 1 80 | 1 80 | 1 80 | 1 73 | 1 80 | 1 80 |
| Canada | 2 86 | 2 92 | 2 91 | 3 00 | 2 95 | 3 05 | 3 10 | 3 15 | 2.87 | 2 98 | 3 11 |
| China | 3 44 | 3 40 | 3 41 | 3 40 | 3 42 | 3 42 | 3 45 | 3 45 | 3 39 | 3 41 | 3 48 |
| India | 0 76 | 0 76 | 0 73 | 0 73 | 0 73 | 0 73 | 0 75 | 0 75 | 0 75 | 0 73 | 0 75 |
| Kazakhstan | 0 95 | 1 01 | 1 01 | 1 05 | 1 07 | 1 09 | 1 15 | 1 15 | 0 94 | 1 05 | 1 18 |
| Malaysia | 0 77 | 0 77 | 0 77 | 0 77 | 0 78 | 0 78 | 0 78 | 0 78 | 0 77 | 0 78 | 0 78 |
| Mexico | 3 58 | 3 60 | 3 74 | 3 71 | 3 72 | 3 75 | 3 80 | 3 85 | 3 58 | 3 73 | 3 84 |
| Norway | 3 21 | 3 39 | 3 37 | 3 32 | 3 18 | 3 30 | 3 30 | 3 30 | 3 33 | 3 29 | 3 30 |
| Russia | 7 80 | 7 99 | 8 10 | 8 15 | 8 20 | 8 25 | 8 30 | 8 40 | 7 66 | 8 18 | 8 41 |
| United Kingdom | 2 24 | 2 61 | 2 54 | 2 39 | 2 38 | 2 53 | 2 55 | 2 55 | 2 51 | 2 46 | 2 55 |
| United States | 8 01 | 8 05 | 8 12 | 8 09 | 8 02 | 8 10 | 8 10 | 8 10 | 8 11 | 8 08 | 8 10 |
| Rest of the World | 9 74 | 9 69 | 9 68 | 9 75 | 9 76 | 9 75 | 9 78 | 9 88 | 9 77 | 9 74 | 9 85 |
| Processing Gain | 1 74 | 1 78 | 1 82 | 1 82 | 1 82 | 1 82 | 1 85 | 1 85 | 1 76 | 1 82 | 1 85 |
| Non-OPEC | 47 65 | 48 42 | 48 81 | 48 79 | 48 62 | 49 18 | 49 51 | 49 81 | 47 96 | 48 85 | 49 80 |
| World Production | 76 55 | 77 80 | 78 78 | 78 57 | 78 80 | 79 10 | 78 53 | 78 31 | 76.51 | 78 81 | 79 13 |
| Stock Change | -0 11 | 0 58 | -0 47 | 2 38 | 2 03 | 0 31 | 1 33 | 0 48 | 0 24 | 1 06 | 0 07 |
| Total World Supply | 76 66 | 78 38 | 79 25 | 76 19 | 76 76 | 78 80 | 79 86 | 77 83 | 76 76 | 77 75 | 79 20 |

*OPEC supply by country is crude only*
***Non OPEC supply includes ngls and non-conventional oil*



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000048

NS NJ 000048
CONFIDENTIAL SUBMISSION

TABLE 11

| | Crude Oil | European Petroleum Product Spot Prices | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dated Brent | Naphtha | | | Gasoline | | | Jet Fuel | | |
| | | Rott FOB | Med FOB | NWE CIF | Rott FOB | Med FOB | NWE CIF | Rott FOB | Med FOB | NWE CIF |
| MONTHLY | $/bbl | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne |
| 2002 | | | | | | | | | | |
| Jan | 19.48 | 163.6 | 153.4 | 168.2 | 178.7 | 172.3 | 180.1 | 186.0 | 170.4 | 187.7 |
| Feb | 20.22 | 180.1 | 169.7 | 184.1 | 180.0 | 179.0 | 184.6 | 185.6 | 173.4 | 189.2 |
| Mar | 23.73 | 214.2 | 204.8 | 218.5 | 218.8 | 221.0 | 227.8 | 211.7 | 198.6 | 213.8 |
| Apr | 25.66 | 223.7 | 214.0 | 228.8 | 256.2 | 254.5 | 262.9 | 221.9 | 207.7 | 225.9 |
| May | 25.33 | 212.8 | 200.1 | 218.3 | 249.6 | 243.9 | 252.6 | 229.7 | 209.2 | 230.8 |
| Jun | 24.13 | 205.4 | 192.3 | 210.2 | 246.5 | 241.6 | 250.4 | 222.2 | 204.0 | 223.2 |
| Jul | 25.81 | 219.8 | 207.8 | 224.3 | 261.6 | 256.0 | 265.3 | 230.7 | 213.6 | 231.4 |
| Aug | 26.66 | 229.1 | 217.8 | 233.6 | 264.7 | 259.5 | 268.3 | 241.2 | 226.2 | 242.5 |
| Sep | 28.38 | 253.5 | 244.3 | 258.0 | 277.4 | 271.9 | 281.9 | 270.8 | 257.3 | 272.4 |
| Oct | 27.58 | 239.1 | 228.9 | 243.6 | 273.4 | 264.6 | 276.3 | 264.2 | 249.6 | 265.2 |
| Nov | 24.10 | 217.3 | 205.5 | 221.5 | 237.0 | 227.6 | 243.0 | 241.4 | 221.9 | 240.4 |
| Dec | 28.67 | 259.1 | 242.2 | 263.1 | 266.4 | 259.9 | 272.0 | 263.1 | 237.2 | 265.2 |
| 2003 | | | | | | | | | | |
| Jan | 31.32 | 305.8 | 288.6 | 309.8 | 300.1 | 290.7 | 300.9 | 290.4 | 262.3 | 288.4 |
| Feb | 32.67 | 333.2 | 313.4 | 337.2 | 332.8 | 323.4 | 337.4 | 341.4 | 316.0 | 347.8 |
| Mar | 30.54 | 307.6 | 280.1 | 311.6 | 306.5 | 286.9 | 315.4 | 339.8 | 288.6 | 330.8 |
| Apr | 24.85 | 223.0 | 199.9 | 227.0 | 292.3 | 252.4 | 283.9 | 250.8 | 210.0 | 242.5 |
| May | 25.72 | 212.3 | 194.4 | 216.4 | 272.5 | 246.3 | 266.5 | 240.0 | #N/A | 240.5 |
| Jun | 27.00 | 231.1 | 219.1 | 235.1 | 299.1 | 274.1 | 294.1 | 243.1 | 226.8 | 244.1 |
| Jul | 27.00 | 230.8 | 219.1 | 235.1 | 291.1 | 269.1 | 284.1 | 243.3 | 225.1 | 244.1 |
| Aug | 25.54 | 213.3 | 201.1 | 218.1 | 271.1 | 266.1 | 273.1 | 232.1 | 214.1 | 233.1 |
| Sep | 24.71 | 208.8 | 196.8 | 213.8 | 254.8 | 254.5 | 256.8 | 230.3 | 214.4 | 231.8 |
| Oct | 25.23 | 217.7 | 208.7 | 222.7 | 254.7 | 254.7 | 255.7 | 239.0 | 223.6 | 240.7 |
| Nov | 24.35 | 217.3 | 208.1 | 222.1 | 234.1 | 232.6 | 239.1 | 233.1 | 216.7 | 234.1 |
| Dec | 24.24 | 220.8 | 209.3 | 225.3 | 222.8 | 222.0 | 228.3 | 232.8 | 216.9 | 233.3 |
| 2004 | | | | | | | | | | |
| Jan | 23.99 | 217.5 | 208.2 | 221.2 | 228.1 | 227.6 | 231.3 | 229.6 | 215.4 | 231.3 |
| Feb | 22.86 | 207.6 | 195.8 | 210.8 | 218.8 | 218.3 | 222.8 | 219.3 | 206.3 | 222.8 |
| Mar | 21.68 | 196.7 | 186.0 | 200.0 | 207.9 | 207.5 | 213.9 | 209.8 | 195.9 | 211.9 |
| Apr | 20.61 | 186.8 | 176.0 | 190.0 | 214.0 | 213.3 | 220.8 | 200.8 | 188.8 | 204.8 |
| May | 22.05 | 200.1 | 189.3 | 203.3 | 233.9 | 233.6 | 241.7 | 215.6 | 200.5 | 216.7 |
| Jun | 22.03 | 199.4 | 188.2 | 203.2 | 230.0 | 229.7 | 236.5 | 216.5 | 200.3 | 217.5 |
| Jul | 22.15 | 200.3 | 188.3 | 204.3 | 225.5 | 225.3 | 232.5 | 217.7 | 199.5 | 218.5 |
| Aug | 21.85 | 197.0 | 185.5 | 201.5 | 223.7 | 223.2 | 230.2 | 214.2 | 196.2 | 215.2 |
| Sep | 22.73 | 205.1 | 193.6 | 209.6 | 234.8 | 234.4 | 236.8 | 219.3 | 203.3 | 220.8 |
| Oct | 23.11 | 208.7 | 196.2 | 213.2 | 226.7 | 226.7 | 227.7 | 226.0 | 210.6 | 227.7 |
| Nov | 23.32 | 210.6 | 199.1 | 215.1 | 221.3 | 219.8 | 226.3 | 230.3 | 213.9 | 231.3 |
| Dec | 23.27 | 210.1 | 198.6 | 214.6 | 220.4 | 219.6 | 225.9 | 232.4 | 216.5 | 232.9 |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000049

NS NJ 000049

CONFIDENTIAL SUBMISSION

TABLE 12

| | Crude Oil | European Petroleum Product Spot Prices | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dated Brent | Gasoil | | | No. 6 Resid 1 0% sulfur | | | No. 6 Resid 3.5% sulfur | | |
| | | Rott FOB | Med FOB | NWE CIF | Rott FOB | Med FOB | NWE CIF | Rott FOB | Med FOB | NWE CIF |
| MONTHLY | $/bbl | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne |
| 2002 | | | | | | | | | | |
| Jan | 19 48 | 163.6 | 169 5 | 166.6 | 107 3 | 114.3 | 124 8 | 101 0 | 93.9 | 97 9 |
| Feb | 20 22 | 164 3 | 161 4 | 166.2 | 97 3 | 101 8 | 110.0 | 102.8 | 97 8 | 99.0 |
| Mar | 23.73 | 189 8 | 182.8 | 191 6 | 114.2 | 119 1 | 129.2 | 118.3 | 108.1 | 115.2 |
| Apr | 25 66 | 201 1 | 193.6 | 203 6 | 129 6 | 134 5 | 143.4 | 132.5 | 121 7 | 128.5 |
| May | 25.33 | 201 3 | 192.3 | 204 0 | 132.0 | 132.4 | 143.3 | 139 3 | 127.2 | 135.1 |
| Jun | 24 13 | 197 0 | 192.0 | 200 3 | 127 7 | 134.0 | 144 8 | 132.0 | 123 0 | 128.0 |
| Jul | 25.81 | 210.7 | 204 1 | 212.5 | 140.2 | 135.3 | 145.6 | 139.2 | 127 6 | 135.3 |
| Aug | 26.66 | 219 4 | 213.9 | 223.7 | 142.4 | 141 9 | 150.7 | 143.5 | 132.6 | 138.6 |
| Sep | 28.38 | 239.0 | 231 7 | 241 1 | 161 1 | 166 0 | 170.9 | 159 0 | 149 2 | 155.1 |
| Oct | 27 58 | 236.6 | 226 3 | 241 9 | 180.1 | 160 7 | 165.8 | 148.6 | 136.2 | 143.6 |
| Nov | 24 10 | 216.1 | 211 5 | 221 9 | 156.2 | 140.7 | 149.2 | 121 8 | 112.5 | 119.1 |
| Dec | 28.67 | 247.2 | 242.6 | 252.6 | 172.9 | 159 4 | 164 9 | 132.4 | 121 3 | 127 8 |
| 2003 | | | | | | | | | | |
| Jan | 31 32 | 266.9 | 265 6 | 270 3 | 177 7 | 192.9 | 196.5 | 171 9 | 157 0 | 167 0 |
| Feb | 32.67 | 311 9 | 303 9 | 316.1 | 203.7 | 205.6 | 207 7 | 171 7 | 163.2 | 166.6 |
| Mar | 30 54 | 300.2 | 297 6 | 316.4 | 177 8 | 186.0 | 188.8 | 145.1 | 138.2 | 142.3 |
| Apr | 24 85 | 224.2 | 205.5 | 226.0 | 153.0 | 140 0 | 149 1 | 123.3 | 120.4 | 121 0 |
| May | 25.72 | 219 8 | 202.5 | 222.5 | 143.6 | 142.8 | 150 0 | 134 3 | 122.1 | 130.5 |
| Jun | 27 00 | 232.1 | 222.8 | 234 1 | 139.2 | 151 1 | 160 0 | 133.8 | 123.6 | 130 0 |
| Jul | 27 00 | 232.3 | 221 1 | 234 1 | 149.7 | 149 4 | 160.0 | 128 8 | 116.8 | 125 0 |
| Aug | 25.54 | 221 1 | 210.1 | 223.1 | 133.2 | 144 4 | 155.0 | 113 9 | 101 8 | 110.0 |
| Sep | 24 71 | 214 3 | 205.4 | 216 8 | 128.9 | 145.9 | 155.0 | 117 4 | 108.4 | 115 0 |
| Oct | 25 23 | 218.0 | 209 6 | 220.7 | 137 3 | 136.3 | 145.0 | 116.4 | 104 4 | 110.6 |
| Nov | 24 35 | 217 1 | 207 7 | 219.1 | 128 9 | 136.4 | 145.4 | 115 6 | 103.9 | 110.5 |
| Dec | 24 24 | 221 8 | 212.9 | 223.3 | 131 0 | 138.6 | 146.6 | 113.1 | 104 4 | 110.0 |
| 2004 | | | | | | | | | | |
| Jan | 23.99 | 213.6 | 206.4 | 216.3 | 129.7 | 137 5 | 145.1 | 110.1 | 101 9 | 107 0 |
| Feb | 22.86 | 203.3 | 197 3 | 207 8 | 123.6 | 137 1 | 145.3 | 105.7 | 96.3 | 102.0 |
| Mar | 21 68 | 195.8 | 188.9 | 198.9 | 117 2 | 126.4 | 134 0 | 99 8 | 91 5 | 96.7 |
| Apr | 20 61 | 180.8 | 175 8 | 185.8 | 111 4 | 116.0 | 123.6 | 95.9 | 86.7 | 91 9 |
| May | 22.05 | 189.6 | 181 5 | 191 7 | 119.2 | 120.8 | 128.6 | 100.0 | 90.5 | 95.8 |
| Jun | 22.03 | 194 5 | 185.3 | 196.5 | 119.1 | 119 3 | 128.2 | 99 7 | 89 3 | 95.8 |
| Jul | 22.15 | 195.7 | 184.5 | 197 5 | 119.8 | 121 7 | 132.3 | 100.1 | 88.1 | 96.3 |
| Aug | 21 85 | 193.2 | 182.2 | 195.2 | 118.1 | 121.5 | 132.1 | 98.8 | 86 8 | 95.0 |
| Sep | 22.73 | 204 3 | 195.3 | 206.8 | 122.8 | 135.2 | 144 3 | 101.2 | 92.2 | 98.8 |
| Oct | 23.11 | 209.0 | 200 6 | 211 7 | 124.9 | 131 1 | 139 8 | 106.2 | 94.2 | 100 5 |
| Nov | 23 32 | 211 3 | 201 9 | 213.3 | 126.1 | 130 3 | 139.3 | 106.5 | 94 8 | 101 4 |
| Dec | 23.27 | 211 4 | 202.5 | 212.9 | 125 8 | 132.7 | 140.7 | 104 3 | 95.6 | 101 1 |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000050

NS NJ 000050

CONFIDENTIAL SUBMISSION

TABLE 13

| | Crude Oil | European Petroleum Product Spot Prices | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dated Brent | Naphtha | | | Gasoline | | | Jet Fuel | | |
| | | Rott FOB | Med FOB | NWE CIF | Rott FOB | Med FOB | NWE CIF | Rott FOB | Med FOB | NWE CIF |
| QUARTERLY | $/bbl | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne |
| 2002 | | | | | | | | | | |
| Q1 | 21 14 | 186 0 | 176 0 | 190 3 | 192.5 | 190 7 | 197 5 | 194 5 | 180 8 | 196 9 |
| Q2 | 25 04 | 214 0 | 202.1 | 219 1 | 250 8 | 246.6 | 255 3 | 224 6 | 207 0 | 226 6 |
| Q3 | 26 95 | 234 2 | 223 3 | 238.7 | 267 9 | 262.5 | 271 8 | 247 6 | 232 4 | 248 8 |
| Q4 | 26.78 | 238.5 | 225 5 | 242.7 | 258.9 | 250.7 | 263 8 | 256 2 | 236.2 | 256 9 |
| 2003 | | | | | | | | | | |
| Q1 | 31 51 | 315 5 | 294 1 | 319 5 | 313 1 | 300 3 | 317 9 | 323 9 | 289 0 | 322.3 |
| Q2 | 25 85 | 222 1 | 204 5 | 226.2 | 287 9 | 257 6 | 281 5 | 244 6 | #N/A | 242 3 |
| Q3 | 25 75 | 217 7 | 205.7 | 222.3 | 272.3 | 263.2 | 271 3 | 235 2 | 217 9 | 236 3 |
| Q4 | 24 61 | 218 6 | 207 4 | 223.4 | 237 2 | 236.4 | 241 0 | 234 9 | 219 1 | 236 0 |
| 2004 | | | | | | | | | | |
| Q1 | 22.84 | 207 3 | 196 0 | 210 7 | 218.3 | 217 8 | 222.7 | 219 6 | 205 9 | 222.0 |
| Q2 | 21 56 | 195 4 | 184 5 | 198 8 | 226 0 | 225.5 | 233 0 | 211 0 | 198 5 | 213 0 |
| Q3 | 22 24 | 200 8 | 189 1 | 205 1 | 228 0 | 227 6 | 233 1 | 217 1 | 199 7 | 218 1 |
| Q4 | 23 23 | 209 8 | 198.0 | 214 3 | 222.8 | 222.1 | 226.6 | 229 6 | 213 7 | 230 6 |
| ANNUAL | | | | | | | | | | |
| 2002 | 24 98 | 218 1 | 206.7 | 222.7 | 242.5 | 237 6 | 247 1 | 230 7 | 214 1 | 232 3 |
| 2003 | 26 93 | 243 5 | 227 9 | 247 8 | 277 7 | 264.4 | 277 9 | 259 7 | #N/A | 259 3 |
| 2004 | 22.47 | 203 3 | 191 9 | 207 2 | 223 8 | 223.3 | 228.9 | 219 3 | 203 9 | 221 0 |
| 2005 | 23.46 | 211 9 | 200 4 | 216 4 | 231 3 | 230 8 | 236 4 | 227.2 | 211 9 | 228 9 |

TABLE 14

| | Crude Oil | European Petroleum Product Spot Prices | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dated Brent | Gasoil | | | No. 6 Resid 1 0% sulfur | | | No. 6 Resid 3.5% sulfur | | |
| | | Rott FOB | Med FOB | NWE CIF | Rott FOB | Med FOB | NWE CIF | Rott FOB | Med FOB | NWE CIF |
| QUARTERLY | $/bbl | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne |
| 2002 | | | | | | | | | | |
| Q1 | 21 14 | 172.6 | 171.2 | 174 8 | 106 3 | 111 7 | 121 3 | 107 4 | 99 9 | 104 0 |
| Q2 | 25 04 | 199 8 | 192.7 | 202.6 | 129 8 | 133.6 | 143.8 | 134 6 | 124 0 | 130 5 |
| Q3 | 26 95 | 223 0 | 216.6 | 225 8 | 147 9 | 147 7 | 155 7 | 147.2 | 136.5 | 143 0 |
| Q4 | 26 78 | 233.3 | 226.8 | 238 8 | 169 7 | 153.6 | 160 0 | 134 3 | 123 3 | 130 2 |
| 2003 | | | | | | | | | | |
| Q1 | 31 51 | 293.0 | 289.1 | 300 9 | 186 4 | 194 8 | 197 7 | 162.9 | 152.8 | 158.7 |
| Q2 | 25 85 | 225.4 | 210 3 | 227 5 | 145.3 | 144 6 | 153 0 | 130 5 | 122.0 | 127 2 |
| Q3 | 25 75 | 222.6 | 212.2 | 224 7 | 137 3 | 146.6 | 156.7 | 120 0 | 109.0 | 116.7 |
| Q4 | 24 61 | 218 9 | 210 1 | 221 0 | 132.4 | 137 1 | 145 7 | 115 0 | 104 2 | 110 3 |
| 2004 | | | | | | | | | | |
| Q1 | 22 84 | 204 2 | 197 6 | 207 7 | 123 5 | 133 7 | 141 5 | 105.2 | 96 6 | 101 9 |
| Q2 | 21 56 | 188.3 | 180 9 | 191 3 | 116 5 | 118 7 | 126 8 | 98 5 | 88.9 | 94 5 |
| Q3 | 22 24 | 197 7 | 187 3 | 199 8 | 120 2 | 126.1 | 136 2 | 100 0 | 89 0 | 96 7 |
| Q4 | 23 23 | 210 6 | 201 7 | 212.6 | 125 6 | 131 3 | 139 9 | 105 7 | 94 9 | 101 0 |
| ANNUAL | | | | | | | | | | |
| 2002 | 24 98 | 207 2 | 201 8 | 210 5 | 138.4 | 136 7 | 145 2 | 130 8 | 120 9 | 126 9 |
| 2003 | 26.93 | 240 0 | 230 4 | 243 5 | 150 3 | 155 8 | 163 3 | 132.1 | 122.0 | 128 2 |
| 2004 | 22.47 | 200 2 | 191 9 | 202 9 | 121 5 | 127 5 | 136 1 | 102.4 | 92.3 | 98.5 |
| 2005 | 23.46 | 207 7 | 199 4 | 210 4 | 126 8 | 133.5 | 142.1 | 105 9 | 95 8 | 102.0 |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000051

NS NJ 000051
CONFIDENTIAL SUBMISSION

TABLE 15

| | Crude Oil | | U.S. Petroleum Product Spot Prices | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | WTI | Ref Acq | Gasoline | | No. 2 Distillate | | Jet Fuel | | No. 6 Resid | 1 / sulfur |
| | | | New York | Gulf Coast | New York | Gulf Coast | New York | Gulf Coast | New York | Gulf Coast |
| MONTHLY | $/bbl | $/bbl | cts/gal | cts/gal | cts/gal | cts/gal | cts/gal | cts/gal | $/bbl | $/bbl |
| 2002 | | | | | | | | | | |
| Jan | 19 68 | 17 31 | 53.6 | 54 2 | 52.9 | 51 1 | 55.6 | 53.4 | 16 08 | 15 42 |
| Feb | 20 66 | 18.37 | 54 8 | 54 4 | 53.6 | 51 9 | 57 1 | 55.4 | 14 83 | 15.45 |
| Mar | 24 35 | 22.26 | 68.9 | 71 9 | 63.0 | 61 4 | 64 3 | 63.3 | 19 43 | 19 37 |
| Apr | 26.26 | 24 46 | 73.8 | 78.6 | 66.2 | 64.7 | 68.1 | 67 2 | 22.24 | 22.54 |
| May | 27 06 | 24 94 | 69.4 | 74 7 | 65.9 | 64 4 | 68.3 | 67 1 | 23.36 | 23.04 |
| Jun | 25 50 | 23 98 | 70.9 | 74 3 | 64.0 | 62.5 | 67 5 | 65.7 | 22.70 | 23 50 |
| Jul | 26.92 | 25.08 | 75.9 | 76.1 | 67 3 | 65.9 | 71 0 | 69 7 | 22.54 | 22.25 |
| Aug | 28.34 | 26.24 | 76.0 | 75.6 | 69.5 | 68.5 | 74.5 | 72.8 | 25.42 | 24.27 |
| Sep | 29 71 | 27 68 | 77 6 | 78.6 | 76.8 | 76.2 | 81.2 | 80.5 | 26.02 | 25.45 |
| Oct | 28.67 | 26 70 | 82.0 | 82.9 | 76.2 | 76.0 | 80.9 | 79 5 | 26.39 | 27 58 |
| Nov | 26.29 | 24 60 | 74.8 | 69.8 | 71 4 | 70.6 | 73.3 | 71 3 | 23.86 | 23.77 |
| Dec | 29.45 | 26.87 | 80.0 | 78.6 | 81 4 | 79.8 | 82.5 | 81.5 | 26.68 | 26.20 |
| 2003 | | | | | | | | | | |
| Jan | 32.99 | 30.42 | 87 1 | 88.3 | 89.9 | 88.0 | 90.9 | 89.2 | 31 53 | 30.96 |
| Feb | 35.75 | 33.23 | 99.2 | 101 5 | 112.2 | 105.7 | 114 5 | 106.1 | 35.05 | 34 68 |
| Mar | 33.43 | 32.34 | 94 9 | 96.7 | 97.2 | 88.4 | 97 4 | 89.7 | 31 71 | 33.16 |
| Apr | 28.26 | 27 07 | 79 4 | 81 5 | 77 8 | 72.5 | 78.3 | 74 8 | 23.98 | 24 72 |
| May | 28.14 | 25.92 | 75.4 | 79 1 | 73.3 | 70.6 | 75.4 | 71 8 | 24.51 | 25 81 |
| Jun | 29.00 | 26.97 | 85.8 | 85.7 | 75.7 | 73.2 | 78.1 | 75.2 | 26.52 | 25.32 |
| Jul | 29.00 | 26.97 | 85.3 | 85 1 | 76 6 | 74 0 | 79 0 | 76.1 | 27 24 | 26.02 |
| Aug | 27 00 | 25.14 | 79 9 | 79.7 | 74.6 | 72.1 | 77 0 | 74.2 | 23.75 | 22.64 |
| Sep | 26.00 | 24.27 | 74.6 | 74.3 | 74.5 | 72.0 | 77 0 | 74 1 | 24 30 | 23.17 |
| Oct | 26.50 | 24.76 | 73.2 | 72.9 | 75.0 | 72.5 | 77 6 | 74.7 | 25.26 | 24.10 |
| Nov | 25.50 | 23.86 | 69.4 | 69.0 | 74.5 | 72.0 | 77 1 | 74.2 | 23.99 | 22.87 |
| Dec | 25.25 | 23.68 | 67 1 | 66.6 | 75.6 | 73.1 | 78.3 | 75.3 | 24.24 | 23.11 |
| 2004 | | | | | | | | | | |
| Jan | 25.00 | 23.44 | 68.0 | 65.6 | 73.5 | 71 0 | 76.2 | 73.3 | 23.23 | 22.13 |
| Feb | 24 00 | 22.36 | 62.9 | 62.4 | 68.9 | 66.5 | 71 4 | 68.8 | 22.33 | 21.26 |
| Mar | 23.00 | 21 31 | 60.7 | 60.2 | 61 1 | 58.8 | 63.4 | 61 1 | 18.57 | 17 61 |
| Apr | 22.00 | 20.31 | 61 0 | 60.4 | 57 6 | 55.4 | 59.8 | 57 7 | 18.21 | 17.28 |
| May | 23.50 | 21 71 | 69.9 | 69.6 | 61.2 | 59 0 | 63.6 | 61 3 | 19.12 | 18.15 |
| Jun | 23.58 | 21 74 | 69.8 | 69 4 | 60.5 | 58.3 | 62.9 | 60 6 | 19.22 | 18.24 |
| Jul | 23.80 | 21 90 | 68.8 | 68.4 | 60.7 | 58.5 | 63.1 | 60 8 | 19.93 | 18.93 |
| Aug | 23.50 | 21 61 | 68.4 | 68.0 | 60.5 | 58.3 | 63.0 | 60.7 | 18.42 | 17 47 |
| Sep | 24.21 | 22.38 | 68.9 | 68.5 | 65.2 | 62.9 | 67 9 | 65.3 | 20.17 | 19.16 |
| Oct | 24.44 | 22.68 | 67 5 | 67 1 | 67 9 | 65.6 | 70.8 | 68.0 | 21 70 | 20.65 |
| Nov | 24 50 | 22.82 | 66.7 | 66.3 | 67 9 | 65.5 | 70.8 | 67 9 | 20.77 | 19 75 |
| Dec | 24 30 | 22.70 | 65.1 | 64 6 | 68.5 | 66.2 | 71 5 | 68 6 | 21 02 | 19.99 |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS NJ 000052

NS 001000052

CONFIDENTIAL SUBMISSION

TABLE 16

| | Crude Oil | | U.S. Petroleum Product Spot Prices | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | WTI | Ref Acq | Gasoline | | No. 2 Distillate | | Jet Fuel | | No. 6 Resid | 1% sulfur |
| | | | New York | Gulf Coast | New York | Gulf Coast | New York | Gulf Coast | New York | Gulf Coast |
| QUARTERLY | $/bbl | $/bbl | cts/gal | cts/gal | cts/gal | cts/gal | cts/gal | cts/gal | $/bbl | $/bbl |
| 2002 | | | | | | | | | | |
| Q1 | 21.56 | 19.31 | 59.10 | 60.18 | 56.53 | 54.78 | 58.98 | 57.37 | 16.78 | 16.75 |
| Q2 | 26.27 | 24.46 | 71.37 | 75.83 | 65.37 | 63.86 | 67.97 | 66.67 | 22.77 | 23.03 |
| Q3 | 28.32 | 26.33 | 76.49 | 76.77 | 71.18 | 70.19 | 75.59 | 74.33 | 24.66 | 23.99 |
| Q4 | 28.20 | 26.06 | 78.94 | 77.09 | 76.32 | 75.46 | 78.91 | 77.43 | 25.64 | 25.85 |
| 2003 | | | | | | | | | | |
| Q1 | 34.06 | 32.00 | 93.73 | 95.49 | 99.76 | 94.02 | 100.95 | 94.97 | 32.77 | 32.93 |
| Q2 | 28.47 | 26.65 | 80.20 | 82.09 | 75.58 | 72.10 | 77.24 | 73.93 | 25.00 | 25.28 |
| Q3 | 27.33 | 25.46 | 79.93 | 79.73 | 75.20 | 72.70 | 77.67 | 74.82 | 25.10 | 23.94 |
| Q4 | 25.75 | 24.10 | 69.89 | 69.52 | 75.03 | 72.53 | 77.65 | 74.71 | 24.50 | 23.36 |
| 2004 | | | | | | | | | | |
| Q1 | 24.00 | 22.37 | 63.21 | 62.73 | 67.81 | 65.46 | 70.32 | 67.72 | 21.38 | 20.33 |
| Q2 | 23.03 | 21.25 | 66.88 | 66.45 | 59.74 | 57.55 | 62.08 | 59.88 | 18.85 | 17.88 |
| Q3 | 23.84 | 21.96 | 68.70 | 68.30 | 62.12 | 59.88 | 64.68 | 62.25 | 19.51 | 18.52 |
| Q4 | 24.41 | 22.73 | 66.43 | 66.00 | 68.11 | 65.74 | 71.05 | 68.17 | 21.16 | 20.13 |
| ANNUAL | | | | | | | | | | |
| 2002 | 26.09 | 24.04 | 71.5 | 72.5 | 67.4 | 66.1 | 70.4 | 68.9 | 22.46 | 22.40 |
| 2003 | 28.90 | 27.05 | 80.9 | 81.7 | 81.4 | 77.8 | 83.4 | 79.6 | 26.84 | 26.38 |
| 2004 | 23.82 | 22.08 | 66.3 | 65.9 | 64.4 | 62.2 | 67.0 | 64.5 | 20.22 | 19.22 |
| 2005 | 24.79 | 23.04 | 68.8 | 68.4 | 66.6 | 64.3 | 69.8 | 66.8 | 20.34 | 19.33 |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000053

NS NJ 000053

CONFIDENTIAL SUBMISSION

## Unknown

| | |
|---|---|
| **From** | Glennon Pat |
| **Sent** | Tuesday November 04 2003 1 00 PM |
| **To** | Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat |
| **Cc** | Seale Don Pfeifer Alby |
| **Subject** | Fuel Surcharge Policy Review |
| **Importance** | High |
| **Follow Up Flag** | Follow up |
| **Flag Status** | Flagged |
| **Attachments** | NS CSXT FSC compare1 xls Global Petroleum Monthly pdf FW 7/10 Fuel Surcharge Meeting Background Info |

**GVPs** – Regarding the NS Fuel Surcharge DWS has requested that we take a fresh look at the case for and against NS adopting the new CSXT FSC standard He would like a recommendation for his consideration With that objective in mind I have provided several attachments and a recap (below) of the issues that you need to consider Attachments

- Energy forecast Page 22 covers WTI Current estimates call for WTI prices in the $22 to $25 range If accurate the CSXT formula in 2004 will produce nominal FSCs in the 0 4 / to 0 8% range while the NS FSC would drop to zero However earlier forecasts for 2003 called for a similar drop in second half 2003 and that hasn t materialized
- A hypothetical comparison of the CSXT UP and BNSF standards and the relative yields NS could have expected had NS adopted each of the standards The comparison is based on Merchandise traffic for 2002 and Y T D 2003 These are hypothetical figures for comparison purposes The totals are not projections of actual revenues The key point is that the CSXT formula produces 75% more revenue under similar conditions (2003 WTI) Results will obviously vary with market conditions
- Recap from July 2003 covering BNSF and UP comparisons covered here

Should NS adopt the CSXT FSC? **Please provide your feedback by Friday (11/ 7) on the options listed below** If we do not have a clear consensus on what direction NS should take on the FSC or if more options are submitted for consideration a meeting will be called to address the differences

- Retain the current NS standard (see Pro/Con below)
- Continue laying the groundwork for a conversion but delay a formal decision until 2QTR04 (See #1 below)
- Adopt the CSXT standard this year (see #2 and #3 below)
- Adopt the CSXT standard but raise the base to from $23 to $28 with 0 4% increases per $1 WTI increases starting at $28 01 This addresses the double dipping argument that NS has covered the fuel cost in our rates over the last several years yet we are still observing the old FSC WTI base level
- Adopt UP or BNSF standard
- Other options?

**If we adopted the CSXT FSC standard possible implementation scenarios**
**#1 The most conservative** and customer focused

- Delay any decision/action until the 2nd qtr 2004 Allows time for most of the full text FSC clauses to be removed
- If the decision is to adopt the CSXT standard publish a new FSC in the C/C and apply it to all public

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

CONFIDENTIAL SUBMISSION

NS NJ 000054

NS 001000054

authorities

- Convert private authorities from that point forward as rates are renegotiated Although most NS publications would refer to the new C/C FSC standard we would informally protect the old formula on private rates until the renegotiation of the prices We can do this through Note management in 9255

**#2 – More aggressive** Same plan only begin now

- Change C/C this year
- Covert all public prices that have the new C/C reference
- Convert private authorities as they roll over and are reissued Start now can carry over well into 2004

**#3 – Most aggressive** Same plan but force conversion of all public and private authorities with the new C/C reference don t wait for renegotiation

- Change the C/C this year
- Convert all public prices that have the new C/C reference
- Immediately convert any existing private authorities that have the new C/C reference and convert any new or reissued authority as the full text clause is replaced with the new C/C reference
- Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation

**Supporting background detail Pro/Con issues**
The more complete argument for and against a FSC change is included in the attachments However here are the core issues from the conservative perspective

Pro – For adoption of the CSXT formula

- The CSXT formula produces a higher yield
- The CSXT is our primary competition and they have already taken the heat for raising the bar
- The CSXT (and UP/BNSF) provide better lead times in announcing changes
- The FSC % applies for a calendar month
- There is no industry FSC standard to speak of It could be argued that adopting the CSXT standard may actually help provide some measure of consistency for customer at least for customers in the East
- Joint NS/CSXT customers may experience less maintenance issues
- The CSXT formula could be expected to generate roughly 75% more revenue (based on 2003 WTI patterns) assuming all other billing issues remain constant (no increase in disputes or drop in collections) Note this is hypothetical The actual increase in revenue would likely be somewhat less particularly in the short term
- WTI forecast for 2004 calls for prices in the $22 to $25 range If accurate that means the CSXT formula would be producing a FSC around 1 ½ for 2004 while the NS FSC would drop off Note that we had a similar low forecast for WTI for the second half of 2003 and prices have remained around $30

Con – Against adoption of the CSXT formula

- The NS formula is the most established of the RR formulas Customers are familiar with it and generally accept it We have a relatively high level of application (few exception)
- NS has relatively few billing disputes with the current NS FSC
- NS is currently seen as more reasonable compared to CSXT A change would be perceived as a revenue grab To many customers NS would replace CSXT as the unreasonable carrier
- Larger customers will argue that NS has had almost a year to incorporate higher fuel cost in the rate structure They argue that if anything the FSC should go down not up

CONFIDENTIAL SUBMISSION NS NJ 000055

HIGHLY CONFIDENTIAL Attorneys Eyes Only

NS 001000055

- Adopting the CSXT standard will reopen negotiating points for customers and rate negotiation will become more difficult
- Organizations like NGFA are very focused on the FSC and will publicly and politically ride the issue hard
- The CSXT s 0 4% per $1 WTI increment as opposed to the 2 0% per $5 increment for NS is more likely to change from month to month leading to more maintenance issues for customers and more billing problems for NS This is offset to some extent for joint CSXT/NS customers that may find a common Eastern FSC
- The net impact on FSC revenue collections would be difficult to gauge While the CSXT formula produces higher FSC percentages actual revenues might be less than expected or actually decline in the short term depending on customer reactions to the change
- Assuming we would not unilaterally change the FSC on private/contract rates until the renegotiation of the rates the conversion would take 12 to 18 months to fully implement Notwithstanding the added risk of increased customer resistance and billing disputes the actual benefits in terms of additional revenue would be further diluted in the short to mid term
- Technical issue Prior to June of this year NS inserted the full FSC text in each publication We are in the process of replacing the full text with reference to the Conditions of Carriage Have replaced the FSC in most public authorities and about half of the private authorities
- In addition once we remove the last of the Full text NS FSC I question if we would actually execute a FSC change (adopt the CSXT FSC) in the C/C and announce that that it immediately applies to all publications including private authorities This would generate an intense customer reaction The backlash would lead to calls for more signed contracts with specific FSC language to limit future changes I suspect we d instead take the more measured approach and informally advise customers that private authorities would not take the change until renegotiated regardless of the FSC text This approach would take 12 18 months for private authorities
- Any rollout will have downside issues

Too complicated? Call me

PJG

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000056

NS NJ 000056
CONFIDENTIAL
SUBMISSION

| Month | NS Merch Rev (L & F) (Yearly AVG/Month) | NS FSC (actual) | CSXT FSC (Pro Forma) | BNSF FSC (actual) | UP FSC (pro forma) | Revenue From FSC (NS FSC X 52 adj) See note below | Revenue From FSC (CSXT FSC X 52 adj) |
|---|---|---|---|---|---|---|---|
| January 2002 | $200 750 000 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2002 | $200 750 000 | 0 | 0 | 0 | 0 | 0 | 0 |
| March 2002 | $200 750 000 | 0 | 0 | 0 | 0 | 0 | 0 |
| April 2002 | $200 750 000 | 0 | 0 | 0 | 0 | 0 | 0 |
| May 2002 | $200 750 000 | 0 | 0 80 % | 0 | 0 | 0 | $835 120 |
| June 2002 | $200 750 000 | 0 | 1 60 % | 1 00 / | 0 | 0 | $1 670 240 |
| July 2002 | $200 750 000 | 0 | 2 00% | 1 00% | 0 | 0 | $2 087 800 |
| August 2002 | $200 750 000 | 0 | 1 20% | 0 00% | 0 | 0 | $1 252 680 |
| September 2002 | $200 750 000 | 0 | 1 60 / | 0 00 / | 0 | 0 | $1 670 240 |
| October 2002 | $200 750 000 | 14 day @2 / | 2 40 / | 1 00 / | 0 | $942 877 | $2 505 360 |
| November 2002 | $200 750 000 | 2 00 % | 2 80% | 2 00 % | 2 00% | $2 087 800 | $2 922 920 |
| December, 2002 | $200,750,000 | 11 day @2% | 2 40 % | 2 50% | 2 50 % | $740,832 | $2,505,360 |
| **Year 2002** | **$2,409,000,000** | | | | | **$3,771,509** | **$15,449,720** |
| January 2003 | $206 886 000 | 2 day @ 2 / | 1 60 / | 2 00 % | 2 00 / | $138 814 | $1 721 292 |
| February 2003 | $206 886 000 | 2 00% | 2 80 % | 2 00 / | 2 00 % | $2 151 614 | $3 012 260 |
| March 2003 | $206 886 000 | 2 00 / | 4 00 % | 2 50 / | 2 50 / | $2 151 614 | $4 303 229 |
| April 2003 | $206 886 000 | 2 00 / | 5 20 / | 4 50 / | 4 50 / | $2 151 614 | $5 594 197 |
| May 2003 (see Note) | $206 886 000 | 2 00 / | 4 40 % | **2 00 /** | **2 00 /** | $2 151 614 | $4 733 552 |
| June 2003 (see Note) | $206 886 000 | 2 00 % | 2 40 % | 3 00 / | **2 00 %** | $2 151 614 | $2 581 937 |
| July 2003 | $206 886 000 | 2 00 / | 2 40 / | 2 50 / | 2 50% | $2 151 614 | $2 581 937 |
| August 2003 | $206 886 000 | 2 00 / | 3 20 / | 2 00 / | 2 00 / | $2 151 614 | $3 442 583 |
| September 2003 | $206 886 000 | 2 00 / | 3 20 / | 2 00 % | 2 00 % | $2 151 614 | $3 442 583 |
| October 2003 | $206 886 000 | 2 00% | 3 60 % | 2 50 % | 2 50% | $2 151 614 | $3 872 906 |
| November, 2003 | $206 886 000 | 2 00 / | 2 40 / | 2 50 / | 2 50 / | $2 151 614 | $2 581 937 |
| December, 2003 | $206 886 000 | 2 00 / | 3 20 / | 2 50 / | 2 50 / | $2,151,614 | $3,442,583 |
| **2003 total** | | | | | | **$23,806,568** | **$41 310,996** |

**Note** Re 52 / FSC Ajustment 52 / of non Intermodal Line haul NS revenue is subject to the NS FSC

**Note** May 03 percentage reduced by BNSF from 5 % to 2 / to bring percentage in line with sharply declinino oil orices Assume UP would do the same

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000057

NS NJ 000057
CONFIDENTIAL
SUBMISSION

June percentage reduction announced by UP from 3 / to 2 ⁄₂ to reflect current market conditions

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000058

NS NJ 000058
CONFIDENTIAL
SUBMISSION

| Revenue From FSC (BNSF FSC X 52 adj) | Revenue From FSC UP FSC X 52 adj) |
|---|---|
| | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| $1 670 240 | 0 |
| $2 087 800 | 0 |
| 0 | 0 |
| 0 | 0 |
| $2 505 360 | 0 |
| $2 922 920 | $2 922 920 |
| $2,609,750 | $2,609,750 |
| **$11 796 070** | **$5 532 670** |
| $2 151 614 | $2 151 614 |
| $2 151 614 | $2 151 614 |
| $2 689 518 | $2 689 518 |
| $4 841 132 | $4 841 132 |
| $2 151 614 | $2 151 614 |
| $3 227 422 | $2 151 614 |
| $2 689 518 | $2 689 518 |
| $2 151 614 | $2 151 614 |
| $2 151 614 | $2 151 614 |
| $2 689 518 | $2 689 518 |
| $2 689 518 | $2 689 518 |
| $2,689,518 | $2,689,518 |
| **$32 274 214** | **$31 198 406** |

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000059

NS NJ 000059
CONFIDENTIAL
SUBMISSION

# Global Petroleum Monthly

GLOBALINSIGHT

OCTOBER 2003

## Forecast Highlights

With Iraqi output above expectations in September the forward global balance looks even more problematic for OPEC than a month ago Although OPEC ministers agreed on September 24 to cut production by 900 000 barrels per day (b/d) from November 1 and even assuming that compliance is 100% (which is most unlikely) global stocks still look set to build steadily through the end of the year Days cover figures would thus point to prices much lower than current levels Short term perceptions are currently of a tight market however and as long as U S crude stocks remain low this perception could remain Perceptions can change quickly however and if U S refinery runs in October and November remain relatively high for the time of year as is projected, product stocks could still be rebuilt to reasonable levels in advance of the winter allowing runs then to decline seasonally and crude stocks to rebuild By this time the focus of perceptions could move to the magnitude of the task that OPEC faces in cutting back production for the first quarter and prices could begin to fall rapidly in the latter part of the fourth quarter

Given current projections of demand, increases in non OPEC production and the more optimistic outlook for Iraqi exports that is beginning to emerge as the situation in the south of the country stabilises it appears that the OPEC 10 will have to make deep cuts in output in order to prevent global stocks from rising even further and prices falling towards $20/barrel in the second quarter of 2004 It seems certain that it will be necessary to cut to below 24 million b/d in the first quarter a level that OPEC stated it would not go to without support from non OPEC producers Such support can by no means be guaranteed Indeed, history suggests that there may be vocal support and even promises of cuts but that any actual reduction in output is likely to be minimal However history also suggests that such

**WTI Price Outlook Scenarios**
(Quarterly dollars per barrel)




promises can be sufficient of themselves to influence market perceptions

If OPEC is forced to cut to below 24 million b/d, it will pose particular problems for Saudi Arabia Our expectation is that for a variety of reasons a number of members (e g Venezuela Nigeria Algeria Libya Qatar) will feel they are special cases and despite weak and falling prices will still be reluctant to play their (full) part in sharing cuts The Saudis will thus be obliged either to allow prices to fall even further or to adopt a swing role and cut their own production back to levels that have not been seen since August 1990 It is difficult to envisage what the impact of such a scenario might be but it is what the numbers point towards presently

Although we believe that the fundamentals will ultimately drive prices perceptions of a tight market might persist long enough for OPEC to come to some agreement on how to reduce output corporately Combined perhaps with firmer demand and slower than expected increases in non OPEC output as a high case it might still prove possible to keep prices in the upper $20s/barrel

A rapid change of perceptions about stock levels and OPEC in disarray on the other hand, could see prices falling even

**Contacts**
Mary Novak 781 301 9011 mary novak@globalinsight com
Graham Loveland, 44 20 8544 7867 graham loveland@globalinsight com
Hongyan Lin 781 301 9065 hongyan lin@globalinsight com
**Global Insight Web Site http://www globalinsight.com**

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000060

NS NJ 000060
CONFIDENTIAL SUBMISSION

(C) Copyright 2003 ALL RIGHTS RESERVED

**Marker Crude Prices**
(Dollars per barrel)

| | J ly | A g t | S ptember |
|---|---|---|---|
| WTI | 30 70 | 31 59 | 28 26 |
| B t | 28 35 | 29 79 | 27 08 |
| D bai | 26 73 | 27 61 | 25 24 |
| OPEC b sk t | 27 43 | 28 63 | 26 16 |

more sharply and remaining low most of next year The pressures on OPEC to cobble together some form of agree ment would be immense but just as in 1998/99 it might take a period of low prices and we are not currently pro jecting prices anything like as low as those to instil a new awareness of reality

## Market Review and Outlook

### Recent Developments

Developments in September brought surprises to all market observers and as a result our crude price projections of a month ago proved too high Crude prices first fell sharply over the first three weeks of the month driven by an earli er and sharper fall in NYMEX gasoline prices than we had projected, but then moved sharply upwards following OPEC ministers surprise decision at the September 24 meeting to cut quotas Prices ended the month some $3/bar rel shy of the starting level

Average prices of the main markers all fell during September with WTI posting the largest fall at $3 34/ bar rel Brent fell by some 60 cents less and Dubai and the OPEC basket by less still This pattern of differential changes impacted the scope for inter regional arbitrage movements The narrowing of the WTI Brent differential made it more difficult to move North Sea and West African cargoes into the United States whilst the narrowing of the Brent Dubai differential was partly responsible for a sub stantial increase in movements of heavier West African crudes to the East In addition strengthening middle distil late prices in the Far East drove Malaysian Tapis prices sharply upwards thus opening the arb into the East for lighter West African crudes as well as the heavier grades

The progress of prices during September was directly relat ed to two events the passing of the September 1 Labour Day holiday in the United States and the OPEC ministerial meeting on September 24

August ended with WTI virtually at $32/barrel and Brent at $30/barrel Labour Day traditionally marks the end of the peak summer driving season in the United States With the realisation that despite low gasoline stocks and various sup ply disruptions earlier in the summer the season is ending without any major supply dislocations Also with the prospect of the change to easier to make winter grade spec ifications hedge fund managers turned bearish and began to liquidate forward NYMEX positions on unleaded gaso line NYMEX gasoline dropped sharply and WTI fell in line Within less than a week WTI lost more than $3/bar rel The sharp fall in gasoline prices ate into ref ning mar gins and refiners began to stand back and re evaluate their positions Steep backwardation in prices made buying crude for stock unprofitable and with further falls in mar gins in prospect and many refineries in turnaround in September prompt demand for crude lessened Meanwhile stocks data were showing a build in PADD2 crude stocks where WTI is priced, so prices continued to soften In the week before the OPEC meeting WTI averaged below $27/barrel During this time all the action was on WTI with other grades broadly following

The OPEC meeting brought a further surprise Throughout the first three weeks of the month OPEC ministers were publicly expressing their opinion that no change to quotas would be necessary at their meeting On September 3 the Saudi minister voiced the opinion that supply stocks and prices all indicate a market in balance For a couple of months there s no threat of making the market unbal anced Even in the days immediately prior to the meeting when it was apparent that prices had fallen sharply minis ters and market observers were still united in the expecta tion of no change This was possibly because the OPEC basket price was only marginally below $25/barrel the middle of its range—not previously a signal for output cuts In the event there was a last minute change of heart report edly orchestrated by the Saudis and a cut of 900 000 bar rels per day (b/d) to 24 5 million b/d for the OPEC 10 effective November 1 was announced, taking total and



HIGHLY
CONFIDENTIAL
Attorneys' Eyes Only
NS 001000061

NS NJ 000061
CONFIDENTIAL
SUBMISSION

ındıvıdual quotas back to where they had been ın February–May Thıs announcement took the market by sur prıse and prıces ımmedıately rose $1/barrel By the end of the month perceptıons of a tıghter market had added anoth cr $1//barrel takıng WTI back to just over $29/barrel

Mınısters dıd not seem too concerned that theır comments ın the wake of the meetıng ındıcated a fundamentally dıf ferent vıew of the market than what they were recently e pousıng The post meetıng communıque declared that stocks have been replenıshed and are rapıdly reachıng nor mal seasonal levels wıth the supply/demand balance for the fourth quarter 2003 and fırst quarter 2004 ındıcatıng a contra seasonal stock buıld up Thıs could have a destabıl ısıng effect on the market whıch requıres a reduction of supplıes from all producers to ensure stabılıty —so much for a market ın balance

What had hanged to produce such a *volte face*? In one sense nothıng at all Mındful of potentıal stocks buılds late ın the wınter and sprıng thıs ıs what OPEC would have wanted to do all along but could not contemplate earlıer whılst prıces were at the top of the prıce band Cuttıng out put then would only have drıven prıces even hıgher put the basket prıce well above the top of the $22–28/barrel band, and provoked calls for actıvatıon of the automatıc ıncrease of output by 500 000 b/d under the prıce band mechanısm Thıs was the dılemma we wrote about ın the July and August ıssues of GPM emphasızıng the problems of tımıng that the forward balance ındıcated the need for a cut but that ıt would be very dıffıcult to present a justıfıca tıon for a cut whılst stocks remaıned low and prıces hıgh The sharp fall ın prıces provıded OPEC wıth a golden opportunıty to do what they had wanted to do all along

The fall ın prıces plaınly took OPEC by surprıse just as ıt dıd others and whereas prevıously mınısters mıght have been prepared to waıt a lıttle longer before actıng there was now an element of urgency and a fear that the prıce fall mıght contınue It was always the case that the later they left ıt before makıng a cut the larger that cut would need to be Makıng the cut effectıve November 1 was vıewed as pre emptıve

Other factors however also contrıbuted to the decısıon

One off factors that swelled demand levels thıs year were expected to be absent next year

The seesaw of optımısm/pessımısm over Iraqı output prospects swung back ın favour of optımısm September exports rose strongly despıte contınuıng attacks on the pıpelıne to Ceyhan and the new Iraqı oıl mınıster attended he OPEC Conference and presented an up beat v ew f future growth

The vıew of the supply/demand balance presented ın the meetıng envısaged a substantıal stock buıld of 600 000 b/d ın the fourth quarter ıf productıon were maıntaıned at August s levels

Hıgh levels of U S ımports were seen as contrıbutıng to a rebuıldıng of stocks

Fınally but perhaps v y sıgnıfıc nt y one ındustry journal reports the vıew of an oıl major that a prıme motıvatıon alongsıde others was a desır to punısh the ınvestment funds for sellıng the market short and reducıng OPEC members revenues The move from a net long posıtıon ın early August to a posı ıon closer to balance movıng towards short by September had already contrıbuted to a loss of some $3/barrel ın NYMEX WTI quotes and forward curves were bear ısh

Mınısters decıded to meet agaın on December 4 to revıew developments although by that stage they wıll have no relıable ınformatıon on November s actual productıon and the extent of complıance wıth the reduced quota The con ference also expressed ıts expectatıon that non OPEC oıl producers wıll take concrete measure to restraın theır pro ductıon ıncreases thereby actıvely sharıng the burden of maıntaınıng prıce and market stabılıty ın 2004 and there after It ıs too early to determıne how much weıght to attach to thıs expectatıon It may be sıgnıfıcant that ıt merely refers to a restraınıng of ıncreases rather than to actual cuts However what ıs unclear ıs whether OPEC ıntends to convey the message as ın 2002 that ıt wıll not reduce ıts output wıthout at least some concomıtant contrı butıons from others If that ıs the case then ıt strengthens the case we have made for a major collapse ın prıces next year

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000062

CONFIDENTIAL SUBMISSION

Global Insight
NS NJ 000062

Much speculation in the industry press has suggested that this action constitutes a major change of strategy for OPEC from a reactive to a proactive and pre emptive approach to pricing and that defending the price band is now clearly a higher priority than defending market share It seems to us too early to draw any definite conclusions on this Undoubtedly the actual decision taken in isolation points in this direction but the circumstances of the decision reportedly the product of a last minute meeting among ministers scarcely points to a well thought out policy

## Demand and Supply Fundamentals

### Economics

With some regions of the global economy showing signs of life again there is a growing concern that restrictive policies in other regions could mean either that the recovery will not be broad based or that the rebound will falter again as it did in late 2002 and early 2003 The most pro growth macro policies can be found in the United States the United Kingdom and non Japan Asia At the same time extreme fiscal and monetary policies in the Eurozone have dragged this region back into recession Because of this the Global Insight baseline forecast for the world economy continues to predict lopsided growth for at least another couple of years

Since early 2001 macroeconomic policies in the **United States** have both prevented a deeper recession and have kept the economy from faltering As a result despite slower growth the United States remains the only locomotive of growth in the global economy with the possible exception

**Real GDP Growth World and Major Seven Economies**

(Year on year percent change)

| | 2003 | | 2004 | | | |
|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| US | 2 6 | 3 2 | 3 9 | 4 0 | 4 1 | 4 2 |
| C d | 1 5 | 2 1 | 2 3 | 3 3 | 3 8 | 3 7 |
| F e | 0 0 | 0 5 | 0 7 | 1 4 | 1 6 | 1 7 |
| G rm y | 0 2 | 0 1 | 0 6 | 1 1 | 1 3 | 1 6 |
| Italy | 0 3 | 0 2 | 0 7 | 1 3 | 1 6 | 1 8 |
| UK | 1 4 | 1 7 | 2 3 | 2 8 | 2 8 | 2 5 |
| J pan | 1 5 | 1 5 | 1 6 | 1 5 | 1 8 | 1 8 |
| World | 1 8 | 2 3 | 2 8 | 3 1 | 3 2 | 3 2 |

of non Japan Asia The aggressive application of macro policies does however raise concerns regarding when and by how much both fiscal and monetary policy will have to be tightened to prevent inflation from taking off and to move the U S budget deficit back towards balance

In the **Eurozone** both fiscal and monetary policies have hurt growth in turn being a serious drag on global growth The European Central Bank cut interest rates by only half as much as the Fed, even though growth in the Eurozone was weaker than in the United States the euro has appreciated, and some of the large economies in the region notably Germany and Italy are back in recession The Stability and Growth Pact has also kept fiscal policies much tighter than they should be in a ecession Recently however Germany and France have begun to take a much more flexible approach to both spending and taxes as th ir gr ıw ı has begun to weaken again

**Japan** the world s second largest individual economy has also been a drag on world growth throughout most of the recent downturn Fortunately recent data suggest that growth has begun to pick up Much of this is due to exports to both the rest of Asia and to the United States thanks to more robust growth in those economies and attempts by the Japanese government to prevent the yen from appreciating Domestic demand is showing signs of life but Japan still faces the biggest challenge among industrialised countries in getting its fiscal balances under control

In **Asia,** most governments have done everything they can to protect their economies from the negative impacts of the global downturn and a large number of recent shocks This has been accomplished through a combination of stimulative fiscal and monetary policies and aggressive attempts to keep their currencies from appreciating against the dollar As a result both domestic demand and net exports have shown strong growth However many of the governments in the region are coming under intense pressure to allow their currencies to appreciate Such a move may become more palatable to the Asian economies if the world recovery gains momentum

### Demand

Total global oil demand is estimated to grow by 1 1 million barrels per day (b/d) this year This estimate for the year is



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000063

NS NJ 000063
CONFIDENTIAL SUBMISSION

broadly unchanged from last month although some minor amendments have been made to the phasing of demand through the year to reflect latest data on actual consumption Growth in 2004 is estimated at 1 million b/d, similarly unchanged from last month

Largely as a result of the one off factors mentioned in previous reports (cold weather oil substitution for gas and nuclear) which were concentrated in the OECD economies unusually OECD accounts for the larger part (0 7 million b/d) of the growth in 2003 In 2004 however when normal weather is assumed, and when these other one off factors are assumed to be absent the position reverts to normal and non OECD again accounts for the larger part of the growth (0 7 million b/d) with Asia responsible for 0 4 million b/d China is not the sole contributor but continues to grow strongly adding another 0 2 m llion b/d s robust econ r ic growth of over 7% adds to jet demand recovery after the SARS epidemic and ever rising gasoline consumption as car ownership spreads

Reviewing the one off factors that caused the unusual pattern of growth in 2003 reveals some of the uncertainties in the current demand forecast

Regarding weather at this stage the United Kingdom s Meteorological Office is pointing to both a warmer and drier winter in the main consuming areas than the long term average By contrast in the United States an industry journal reports the widely followed *Old Farmers Almanac* as forecasting one of the coldest U S winters in memory We continue to base demand forecasts on long term average weather but exceptionally cold or warm weather can result in a difference in global demand of 1 million b/d Warmer than usual weather reduces oil consumption in heating applications and in power generation These reductions more than offset any increased use of transport fuels resulting from mild weather Drier than usual conditions however could have a partially offsetting effect as reduced rainfall especially after the very dry year of 2003 in Europe does not allow the refilling of reservoirs and thus reduces the availability of hydro power Whilst oil is not the only beneficiary of reduced hydro output in some countries in Europe notably Italy Spain and Portugal reduced hydro can tend to have a direct impact in terms of increased fuel oil use

In the United States natural gas prices have fallen and currently do not encourage wide scale substitution into oil though in specific circumstances that may be preferred Stocks have been rebuilt and the outlook for the winter is very much weather dependent Assuming normal weather however a repetition of last year s moves from gas to oil is not expected

In Japan Tokyo El ctric Power Company (TEPCO) still has to restart more than 10 of its 17 closed nuclear reactors Currently TEPCO is contracted for only slightly reduced volumes of fuel oil and crude for burning (CFB) over the winter quarters than last year Should it prove possible to restart the closed reactors more swiftly then fuel oil and CFB consumption will be further reduced In any event the problem is not expected to last for as long next year as if did this year In the fir t week of Octobe however TEPCO re closed two of the recently restarted r actors—not a good omen Total Japanese consumption next year is expected to still fall from this year but surprises in both directions are possible

Far East stock holdings remain difficult to read There are no reliable statistics for stock levels in most countries of the region Anecdotal reports however combined with analysis if the available statistics on trade suggest that China is still holding some of the stocks it built up early in the year as a precaution against disruption to supplies from the war in Iraq This will tend to depress current demand

### *Non OPEC Production*

Compared with the second quarter which showed year on year growth of only 0 1 million barrels per day (b/d) the third quarter of 2003 is estimated to show growth of around 1 6 million b/d Whilst once again the FSU is the single largest contributor with an increase of 1 0 million b/d, Europe and North America also contributes 0 7 million b/d In the case of Europe year on year growth of 0 3 million b/d is slightly misleading if taken in isolation as it merely reflects a different phasing of North Sea maintenance between the two years and total annual European production is actually expected to be slightly down this year on last year North American growth in the third quarter of 0 4 million b/d is real however as annual figures are expected

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000064

NS NJ 000064
CONFIDENTIAL SUBMISSION

to show growth of 0 3 mıllıon b/d, with both the Unıted States and Canada increasıng output

In the fourth quarter substantıal growth ıs expected relatıve to last year of around 1 6 mıllıon b/d Much of thıs leap ın output has already been achıeved ın the FSU and North Amerıca and thus the larger part of the growth can be con sıdered fırm FSU productıon growth ıs expected to slow down for a whıle over the wınter quarters before takıng off agaın ın the second quarter of next year However further growth relatıve to the thırd quarter of thıs year ıs stıll expected ın North Amerıca Latın Amerıca and Afrıca In North and Latın Amerıca thıs ıs largely a contınuatıon of the buıld up of productıon from new areas already on stream In Afrıca July saw the start up of productıon from the southern expansıon of Equatorıal Guınea s Zafıro fıeld, and from the Doba fıeld ın Chad Along wıth contınuıng growth of output ın Sudan these wıll contrıbute to growth ın Afrıcan output of 0 2 mıllıon b/d, compared wıth the thırd quarter Together these ıncrements wıll put total non OPEC fourth quarter output some 0 8 mıllıon b/d above the thırd quarter

OPEC NGLs are also expected to contınue theır steady growth addıng 0 2 mıllıon b/d over the wınter Sınce a large proportıon of these NGLS are from non assocıated gas the reductıon ın OPEC quotas ıs not expected to ımpact the rıse

Over the course of next year ıt wıll be the contınued steady buıldup of productıon from all areas that wıll be showıng growth ın the fourth quarter that wıll put pressure on OPEC OPEC s own NGL output wıll also grow more strongly next year than thıs year wıth ıncreases ın Saudı Arabıa Qatar Algerıa, Iran and Venezuela In total non OPEC output ıs expected to be 1 4 mıllıon b/d hıgher ın 2004 than ın 2003 and OPEC NGLs 0 4 mıllıon b/d hıgh er

### *OPEC Productıon*

All secondary sources agree that OPEC crude productıon rose ın August Estımates of the scale of ıncrease vary between 0 3 and 0 7 mıllıon barrels per day (b/d) wıth most sources around 0 3–0 4 mıllıon b/d We have followed the IEA estımate at a rıse of 420 000 b/d Sınce Iraq rose from around 0 7 mıllıon b/d ın July to around 1 0 mıllıon b/d on average ın August most of the ıncrease ıs accounted for by Iraq Total productıon from the 10 was thus perhaps mar gınally up on July but must be consıdered vırtually ın lıne wıth the 25 401 mıllıon b/d quota any dıfference beıng neglıgıble and wıthın the scope for error of the estımate As of last month thıs matchıng of the quota was the result of substantıal over quota output ın Saudı Arabıa (0 4 mıllıon b/d over quota) and Algerıa (0 3 mıllıon b/d over quota)

**OPEC Complıance ın August 2003**

| | Quota Jun Oct 2003 | Production Aug 2003 | Production vs Quota | Estimated Sustainable Capacity[1] (IEA Sept 03) | Spare Capacity |
|---|---|---|---|---|---|
| Algerıa | 0 811 | 1 13 | 0 32 | 1 20 | 0 07 |
| Indonesıa | 1 317 | 1 00 | 0 32 | 1 18 | 0 18 |
| Iran | 3 729 | 3 71 | 0 02 | 3 75 | 0 04 |
| Kuwait | 2 038 | 2 08 | 0 04 | 2 25 | 0 17 |
| Libya | 1 36 | 1 42 | 0 06 | 1 45 | 0 03 |
| Nıgeria | 2 092 | 2 18 | 0 09 | 2 50 | 0 32 |
| Qatar | 0 658 | 0 73 | 0 07 | 0 77 | 0 04 |
| Saudi Arabıa[2] | 8 256 | 8 63 | 0 37 | 9 50 | 0 87 |
| UAE | 2 217 | 2 34 | 0 12 | 2 40 | 0 06 |
| Venezuela | 2 923 | 2 25 | 0 67 | 2 35 | 0 10 |
| OPEC 10 | 25 401 | 25 47 | 0 069 | 27 35 | 1 88 |
| Iraq | | 1 05 | 1 05 | 1 05 | 0 00 |
| Total OPEC | | 26 52 | 1 12 | 28 40 | 1 88 |

1 Capacıty figures are levels achievable within 30 days and sustainbale for 90 days
2 Saudi Arabia can add a further 1 mb/d of capacity within 90 days

Wıthın the total Venezuela Indonesıa and Iran were agaın all unable to achıeve theır ındıvıdual quotas accordıng to IEA though the presıdent of PDVSA ıssued a rebuttal of IEA s estımated 2 25 mıllıon b/d, maıntaınıng that Venezuela ıs producıng over 3 mıllıon b/d Whılst some other secondary sources are not as sceptıcal of Venezuelan claıms to have ıncreased ıts output as the IEA no second ary source would estımate productıon as hıgh as 3 mıllıon b/d

Although Nıgerıa s productıon has been rısıng as a result of the tıe ın of new fıelds some 250 000 b/d of productıon from the Delta regıon remaıned shut ın ın August due to contınued communıty dısturbances Moreover threatened strıke actıon by oıl workers whıch would put at rısk 900 000 b/d of Shell s productıon although called off ın mıd September may stıll be renewed, and there ıs the added and separate threat of a general strıke ın protest at the deregulatıon of the downstream oıl sector



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000065

NS NJ 000065
CONFIDENTIAL SUBMISSION

**Iraq s crude production balance kb/d**

| | A g 03 | S p 03 | D c 03 | Mar 04 |
|---|---|---|---|---|
| G prod tio | 1400 | 1800 | | |
| Net p od ton ft r e- j cti ns | 1150 | 1550 | | |
| D m tc umpti | 450 | 550 | | |
| E p rts | 700 | 1000 | 1500 | 1800 |

At the time of writing no estimates of September production are yet available but two straws in the wind may indicate that September will show an increase Firstly and more as a matter of conjecture did the price fall despite being primarily a result of developments on NYMEX owe something to an increased feeling of easier supply in the market? Secondly and on the basis of harder evidence freight rates from the Arabian Gulf rose sharply during September Average rates for a VLCC from the Gulf to the West were 49 points of Worldscale in August but rose to 82 points in September Rates for VLCCs to the East rose by even more and more than doubled. Whilst some of this rise may have been due to increased loadings from Iraq it seems unlikely that an increase of 0 3 million b/d would provoke a near doubling of rates There are thus at the least indications that September output showed the rise in output above quota that we would have expected

In Iraq things are clearly improving in the south but seem little better in the north It is difficult to obtain reliable data but the table below shows one representation of the latest months actuals and the levels projected by the new minister of energy for end fourth quarter and end first quarter

The line to Ceyhan was bombed again during September and once again any prospect of Kirkuk exports has been put back by another month or more whilst repairs take place Achieving 1 5 million b/d of exports through the Arabian Gulf by December will probably require the addition of the use of the facilities at Khor al Amaya as well as those at Mina al Bakr

## Market Balance

### *Total OECD Commercial Inventories*

OECD commercial inventories fell by some 61 million barrels during the first quarter equivalent to a daily rate of around 675 000 barrels per day (b/d) slightly more than the

**OECD Commercial Stocks and Forward Supply**




estimated global stock draw of 0 5 million b/d, with a rise in government stocks accour g for h d ~ erce OECD commercial inventories on March 31 are estimated as equal to some 51 days cover This was up around a day from the end of the fourth quarter but still represents a very low level of commercial stock coverage It is the lowest end first quarter days cover number for many years

During the second quarter total OECD commercial stocks built by some 112 million barrels according to latest data a rate of build equivalent to 1 2 million b/d, out of a total global estimated stock build for the quarter of 1 7 million b/d Days cover rose to 53 days still low but not unprecedentedly so The rise was all in products crude stocks actually fell by 10 million barrels over the quarter As between the OECD regions Europe fell very slightly Asia Pacific ro e 40 million barrels and North America rose 78 million barrels some 20 million barrels more than estimated last month Movements in non OECD stocks appear to have followed the same path as for OECD—after falling in the first quarter they built up in the second quarter Whilst all the numbers are prone to post hoc adjustment and the distorting effect of assumed instantaneous supply the balance continues to look sensible

It seems likely that high levels of OPEC production over March–May contributed to this stock build in non OECD areas just as in OECD Some of this is undoubtedly crude held in Caribbean storage controlled by various OPEC members which will help to explain why such high levels

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000066

NS NJ 000066
CONFIDENTIAL SUBMISSION

Global Insight

of output did not result in lower prices Unfortunately much of the Caribbean storage is controlled by Saudi Arabia and no statistics are available on stock levels Strictly speaking deliveries into such storage do not count against OPEC quotas so independent observers views of OPEC compliance against quota will always differ from the view of the Saudis themselves to the extent that any deliveries are made into such storage facilities

### Atlantic Basin Inventories

Crude stocks in the **United States** tracked sideways yet again in September according to weekly DOE data stocks on September 26 were 281 million barrels up 2 million barrels from the end of August Although stocks are still low they have hovered around this level for most of the summer Comparing end third quarter levels with end first quarter shows a reduction of some 2 million barrels whereas the average reduction over that period for the previous five years was 27 million barrels For the first time since June 2002 when the rapid decline in crude stocks started, national crude stocks at the end of September show an increase on the year earlier figures however since September 2002 was extremely low this provides little grounds for comfort In days cover terms the end August position posted another record low for the time of year the tenth month in succession to do so With reduced runs in October due to seasonal maintenance however the days cover figure for the end of September may show a rise of around one day although it will still show a deficit on last year Crude imports in September averaged over 10 million b/d, for the third month in succession but fell to 9 5 million b/d for the week ending September 26 A fall in imports might only have been expected as refinery runs were also falling with the onset of maintenance However the fall in arrivals was greater than the fall in runs partly due to the continuing backwardation in the market (prompt prices above forward prices) that discourages stock building Mid West (PADD2) stocks crucial as being the region where WTI is priced, rose 6 million barrels during September

The recent pattern of relationships between the various regional price markers causes concern The current narrow WTI Brent spread undermines the economics for the United States of importing Brent related crudes whilst the wide open arbitrage to the East is resulting in the movement of large volumes of West African and other Brent related crudes to the East Since trade to the East tends to close up to a month earlier than trade to the West such volumes will not be available to the United States when maintenance activities draw to a close in November being already committed elsewhere

End September product stocks show rises on the end August position for both gasoline (up 7 million barrels) and distillate (up 5 million barrels) however there is no scope for complacency here Gasoline stocks are still lower than for the previous five years and are at a record low in days cover terms Whilst total distillate stocks are in the middle of the historic range and higher than the past three years this masks the fact that heating oil stocks are very low whilst high levels of road diesel that pull up the total figure

In **Europe** the picture is still mixed Mogas stocks are low although the days cover figure is high due to the ongoing demand decline which may limit the availability of European trade into the United States Gas oil stocks are around the middle of the historic range however since German consumers filled their tanks during the early summer raising tertiary stock levels they are thus unlikely to present any major demand on primary stocks A middle range position on primary stocks is thus in fact healthy unless the weather turns very cold Crude stocks are on the high side within the historic range

In summary therefore it is US crude stocks that remain the main point of concern although low distillate stocks could also soon become worrisome depending on the balance between refinery output and the weather over the late autumn

### Prospects for the Global Balance

Five factors will influence the development of the global balance over the winter and into next year

**Demand growth** Economic recovery is still finely balanced, and another increase in oil prices will not aid recovery as the IEA was quick to comment in the wake of the OPEC announcement Nevertheless Global Insight s projection of global average GDP growth is still higher than a month ago so for the time being we see grounds for encouragement on the economic front

HIGHLY CONFIDENTIAL Attorneys Eyes Only



NS 001000067

NS NJ 000067 CONFIDENTIAL SUBMISSION

**Iraqi production** The levels of production and exports in September were substantially better than we had assumed a month ago and SOMO is actively signing contracts with a wide range of buyers Whilst the line to Ceyhan remains unusable infrastructure will eventually present a ceiling to further increases The capacity of Mina al Bakr is nominally 1 6 million barrels per day (b/d) but it has never been operated at that rate Khor al Amaya has a capacity or around 0 4 million b/d In the most advantageous circumstances therefore and with no other changes to the infrastructure a ceiling to exports would be reached at around 2 million b/d, a level not likely to be reached before the second quarter of next year For the winter quarters therefore production can continue to increase without hindrance unless another major spurt occurs which seems unlikely given that even the Iraqi oil minister only expects 1 8 million b/d of exports by the end of March

**OPEC compliance** OPEC compliance was good over the first three months of the June–October 25 4 million b/d quota although the lack of spare capacity outside Saudi Arabia and the ongoing problems in Venezuela and Nigeria substantially reduced the scope for cheating It must be recalled, however that compliance in 2002 and in the first five months of 2003 was poor Although for part of this period the quota was effectively regarded as temporarily in abeyance to compensate for lost Venezuelan production it still provides a recent track record of poor compliance which is a habit that will have to be changed if OPEC wants to survive the potentially low prices hat could arise next year Moreover the outstanding claims from several members for increases in their quotas and the 2 5 million b/d of capacity additions due on stream next year will exacerbate the task of agreeing reductions

**Non OPEC support for OPEC** OPEC ministers indicated that they would be looking for support from non OPEC producers in maintaining prices next year A number of non OPEC countries were represented at the meeting as observers but none indicated any willingness to provide support Since the meeting the Qatari minister has gone much further than did the communique in saying that OPEC would not be willing to cut below 24 million b/d without non OPEC contributions Although in 2002 several non OPEC producers pledged support for OPEC notably Russia in reality and retrospect the extent of any actual cuts to output was negligible just as on previous occasions when support was promised This time President Putin said Russia *could* curb exports if prices fell to a level it considered unfair but that Russia also had other concer that limit its support for a strong oil price policy Whatever OPEC s aspirations and blandishments and whatever the promises from non OPEC producers it seems unlikely that there will be anything other than nominal support In the final analysis OPEC has this fundamental problem as much as it would like other producers to share the burden of supporting high prices from which they gain OPEC members as group are more dependent on oil revenues for both government and foreign exchange earnings than virtually any non OPEC producer The latter can thus always hold back knowing that OPEC will have to take action sooner or later with or without support because the loss of revenues will become insufferable for OPEC members before it does for others Thus whilst prices are declining non OPEC producers can maintain maximum output If they did join in with OPEC then undoubtedly price could be maintained higher but only at the cost of loss of output and no one wants to be the first to join OPEC knowing that few producers are large enough individually to make any difference once price are sliding One day perhaps some major producer(s) may consider making real cuts to output to be worthwhile in order to maximise revenue but that day has not yet arrived

**Non-OPEC output growth** As explained above most of the growth in non OPEC output over the winter quarters is due to come from the buildup of production from developments already in hand Thus it seems unlikely to become a major casualty of the over optimism that has sometimes beset forecasts of non OPEC production Some disappointments are possible but upside surprises should not be ruled out

HIGHLY CONFIDENTIAL Attorneys Eyes Only NS 001000068

NS NJ 000068 CONFIDENTIAL SUBMISSION

## Crude Pnce Forecast

### *Base Case*

In the short term pncus are recovenng from their fall in September Recognition of the tight balance in the short term with US stocks still stuck around 280 million bar rels is expected to support WTI at close to $30/barrel in October All the signs are for a weakening thereafter how er

OECD commercial inventones at the end of the second quarter represented 53 days cover Giving OPEC the bene fit of the doubt we have assumed that September and October production is unchanged from August at around 25 5 million barrels per day (b/d) for the 10 and then drops in conformity with the new quota to 24 5 million b/d for November and December Given the other elements of the bal nce that would imply a rise the days cove figure for the end of the third quarter to 54 days and then a further rise at the end of the fourth quarter to 55 days In reality it is most unlikely that OPEC will be so disciplined, and the end fourth quarter figure is more likely to be close to 56 days As the chart below shows 56 days cover has never been associated with a Brent pnce above about $24/barrel but is more commonly associated with a pnce closer to $20/barrel

Viewing global stocks in isolation therefore points towards sharply falling pnce Yet ten days into the fourth quarter with stocks already presumably at around 54 days prices are rising not falling A number of factors account for this situation

Crude pnces over reacted to the fall in gasoline pnces in September and some of the recent rise is a correc tion of that over reaction

OPEC s decision to announce a pre emptive cut of 900 000 b/d is creating expectations of a tight market regardless of whatever the global stock numbers say

High volumes of movements to the East are expected to leave the United States short of imports in late October and November

US crude stocks are still no higher than they have been all summer

**Total OECD Days Cover vs Brent Pnce**
(Based on Jan95-Feb03 data)




Days cover (X scale) Brent pnce (Y scale dollars per barrel)

Market pnce developments usually tend to be dnven more by immediate short term factors than by forward fundamentals prospects

Most recently renewed prospects of labour unrest in Nigena and increased political tensions in the Middle East following Israel s attack on a putative terronst training camp in Syna

Given these factors we do not expect in imminent sharp collapse in pnces even despite the apparent nsing global level of stocks

Looking forward in the fourth quarter however the under lying fundamentals will eventually begin to exert down ward pressure on pnces as the situation eases even with OPEC s cut OPEC members themselves are very con scious of this The fourth quarter and the first half of next year have been matters of concern to them for some while and they are acutely aware of the nsing global stock cover numbers Looking at this situation OPEC will undoubted ly see the need for further cuts but the meeting on December 4 is too late to influence loading before January 1 Cuts for the first quarter presumably effective January 1 therefore will need to be deep If the other elements of the estimated balance prove even close to correct then OPEC will need to contemplate cuts for the first two quarters that would take output for the 10 down from recent levels of around 25 5 million b/d to below 24 million b/d, the level below which they have said they will not go without non OPEC support If this support is slow to be forthcoming then pnces could be sliding all the time

HIGHLY CONFIDENTIAL
Attorneys Eyes Only



NS 001000069

NS NJ 000069
CONFIDENTIAL
SUBMISSION

We have maintained our working assumption of output from total OPEC of 24 7 million b/d in the first half of next year which—with rising output from Iraq—implies pro duction from the 10 of below 23 million b/d On that basis stocks are drawn (on an instantaneous supply basis) by only O 9 million b/d in the first quarter and then build by around 1 5 million b/d in the second quarter reaching 55 days at the end of the first quarter and 57 days at the end of the sec ond quarter If OPEC wants a larger draw in the first quar ter and a smaller build in the second, then they have to cut it by even more

Cutting total production for the 10 to these levels is going to be difficult Given the aspirations of those countries such as Algeria and Nigeria who are seeking increased quotas and are likely to produce close to capacity regardless of quotas and factoring in possible reduced levels for the other members Saudis could be left having to take the swing role and cut production back to 6 million b/d or lower This is a level not seen for 13 years since mid 1990 when output was increased to offset the loss of Iraqi and Kuwaiti output at the time of the invasion of Kuwait This would be extremely difficult and the economic and politi cal ramifications of such a necessity are difficult to antici pate

Facing this possibility the Saudis will be putting immense effort into getting other members of OPEC to comply with quotas and into seeking support from non OPEC produc ers On the evidence of 2002 in order to arrest a price decline it may be sufficient to secure promises of cuts from the likes of Russia since Russian statistics are so opaque that it will not be evident till some time later that no real cut has been forthcoming As prices fall towards the low 20s other non OPEC producers may be willing to contribute small cuts

The OPEC basket tends to run at around 50 cents to $1 below Brent The bottom of the OPEC band is therefore around $23/barrel for Brent and perhaps $24 50 for WTI Given the global balance as depicted above it is difficult to see prices not testing the bottom of the $22–28/barrel range and indeed possibly falling below the range at times In the base case we have allowed the basket price to fall below the band for a while in the second quarter but have

**Short Term Marker Crude Price Forecast**
(Dollars per barrel)

| | WTI | Brent |
|---|---|---|
| Sep | 28 25 | 27 08 |
| Oct | 30 00 | 28 75 |
| Nov | 29 00 | 27 75 |
| Dec | 27 25 | 26 00 |
| Jan | 26 00 | 24 50 |
| Feb | 24 75 | 23 00 |
| Mar | 23 00 | 21 00 |

modified the price profile slightly to indicate prices above the band for most of the year assuming that OPEC will find the shock of prices below the band sufficiently painful to take the draconian measures needed

### *Alternative Cases*

Although we have encapsulated in our base case those developments that we consider most likely based on the global supply/demand balance as currently foreseen there are features in the market that could result in prices higher or lower than our base price scenario Accordingly we pres ent two alternative cases postulating different combina tions of developments that could result in a higher or lower outcome respectively

***High price scenario*** The high price scenario could develop as a result of one or several of the key assumptions in the base case proving wrong including

- Disappointments in non OPEC production
- Renewed problems and sabotage in the south of Iraq as well as the north slowing the buildup of production
- Continued turmoil and production interruptions in Venezuela and Nigeria
- Stronger demand growth possibly through more robust economic recovery or a cold winter or special factors such as high gas prices in the United States or contin ued nuclear problems in Japan
- Greater OPEC discipline and greater willingness to make the deep cuts necessary including those mem bers with new capacity being prepared to defer start ups

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000070

NS NJ 000070

CONFIDENTIAL SUBMISSION

Global Insight

- Greater willingness on the part of non OPEC producers to cut output or restrain increases and share in supporting price

As we have emphasized several times over recent issues timing is crucial The global supply/demand balance assumes instantaneous supply i e production in a quarter goes to meet demand in that quarter and any surplus/deficit is reflected into stocks at the end of that quarter Real life is much more complicated because of journey times and cannot sensibly be modelled If despite the build up of global stocks perceptions remain those of tightness because attention is focused on the one component in stocks that is proving slow to build, U S crude then prices might remain high long enough for OPEC to take the necessary measures to bring supply and demand into better balance

***Low price scenario*** A low price scenario could result from

A rapid change in market perceptions probably as a result of lower refinery runs in the United States allowing crude stocks to build, and thereby allowing attention to move to the underlying buildup of global stocks

A change of heart on the part of the U S administration permitting a release of stock from the SPR or more likely a decision to halt the build temporarily

OPEC indiscipline and very public disagreements over quotas and unwillingness to make cuts without non OPEC support

Unwillingness on the part of non OPEC to provide the support OPEC seeks

**WTI Price Outlook Scenarios**
(quarterly dollars per barrel)

| | Base | High | Low |
|---|---|---|---|
| 3q03 | 30 18 | 30 18 | 30 18 |
| 4q03 | 28 76 | 31 00 | 26 00 |
| 1q04 | 24 58 | 29 00 | 23 00 |
| 2q04 | 23 60 | 27 00 | 20 00 |
| 3q04 | 24 33 | 27 00 | 21 00 |
| 4q04 | 24 83 | 27 00 | 22 00 |

In this situation prices could fall quite rapidly even during the latter part of the fourth quarter and could remain low through much of the first half of next year possibly even through all next year if global economic recovery stalls despite lower oil prices OPEC members would find such a time very painful but if they cannot gain the support of non OPEC producers their scope to change things will be very limited

## U S Product Prices

### *Gasoline*

Provisional (weekly) data indicate that September gasoline demand is at 8 93 million barrels per day (b/d) virtually 250 000 b/d up on 2002 the second strongest year on year growth this year after January s 280 000 b/d With kerosene consumption very low it seems that consumers made the most of the end of the holiday season by driving rather than flying

With refinery runs and gasoline yields both achieving new record high levels for the month at 15 5 million b/d and 56 2% respectively ex refinery production of gasoline achieved a new record high at 8 7 million b/d, a massive 0 4 million b/d above 2002 s output This left a deficit of only 0 2 million b/d to be covered by imports or stock changes the smallest monthly deficit since November 2002 Imports were well above this figure 0 8 million b/d per weekly data so stocks showed a rise of some 7 million barrels up to September 26 according to weekly data

A rise in stocks in September is in line with the normal seasonal pattern but the rise was still only just sufficient to keep the end September position from falling below the bottom of the range of at least the previous eight years In days cover terms however gasoline stocks continue to post record lows with the end of August at 21 5 days a full 2 days down on last year which itself set a new record low

This tight supply position meant that although prices initially fell away sharply from the very high levels of August they soon stabilised, as concerns about the low stock position increased, and averaged 89 3 c/AG over 10 c/AG off from August However it was still high relative to crude at $9 26/barrel over WTI compared with August s $10 33/bbl Delays in arrivals of imports due to the passage



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000071

NS NJ 000071
CONFIDENTIAL SUBMISSION

of hurricane Isabel and a call from the mid continent for pipeline supplies helped to support prices European prices however continued to fall keeping open the arbitrage window and allowing the healthy flow of imports

Quality considerations will play a part in the supply outlook The move to winter grade gasoline will aid manufacture as its less stringent vapour pressure specifications allow the use of more light ends and LPG in the blend, stretching supply On the other hand, the banning of the use of MTBE in gasoline blending in New York and Connecticut from January 1 will work in the opposite direction Replacing MTBE with more volatile ethanol will reduce the amount that can be added some estimates suggest as much as a 7 5% reduction in net gasoline production In addition the extra sources of supply for ethanol are not yet established for these East Coast states and the fact that neighbouring states have not introduced a ban gives little incentive to foreign suppliers to meet the new specifications Already before it has been introduced, the ban is having an impact on supply some refiners are already reducing output of MTBE and the tightened supply has been supporting higher prices for high octane grades in both New York Harbour and at the Gulf Coast

Looking forward, stocks are still extremely low given the strength of demand At this time of year refiners traditionally begin to move from gasoline maximisation to distillate maximisation and although total distillate stocks are in a much healthier state heating oil stocks are rather low Refiners will thus seek as far as possible to slant yields in the direction of both gasoline and distillate at the expense of other grades Kerosene demand has weakened again so kerosene yields can be sacrificed however resid yields are already low and probably offer little scope for further reductions

The main hopes for rebuilding stocks of both gasoline and distillate are thus a light autumn maintenance season and high imports Reports have suggested that refiners do indeed plan a light maintenance season this year but such reports are not always very reliable Imports may also be limited Gasoline exports from Europe will reportedly be limited during October due to low stocks even though the arbitrage window is open and Russian gas oil exports in August were lower than expected, although a full programme was expected for September Such reports can prove wide of the mark and if the economics support movements then European refiners will seek ways to move product trans Atlantic Provided that autumn maintenance schedules are light as expected, and thus runs can be kept high and that both distillate and gasoline imports can be maintained at moderately high levels then our projections of the U S balance indicate that should still be possible both to rebuild gasoline stocks and achieve a satisfactory build in distillate stocks before peak winter demand arrives Our forecast continues to be built on this assumption nevertheless we project gasoline prices to continue near the top end of the historic range relative to crude through the end of the year with spreads falling from around $5 50/barrel in October towards $3/barrel in December We will continue to watch the components of the balance carefully since there is clearly an upside sensitivity to gasoline prices if imports refinery runs or gasoline yields fall short of expectations

### *Distillate*

For the third month running distillate consumption showed a small year on year decline with demand at 3 68 million barrels per day (b/d) compared with last year s 3 73 million b/d Refinery yields were relatively high for the time of year however and combined with high refinery throughput this meant total production was also high In addition imports were at a record level for the month approaching 400 000 b/d, so total distillate stocks rose by some 5 million barrels to 131 million barrels above last year s level and in the middle of the five year range Total stocks however mask the difference between the low (road diesel) and high sulphur (heating oil) grades Although road diesel stocks are at a record high level heating oil stocks at the end of September were 11 million barrels below year earlier levels and are close to the bottom of the five year range

We anticipate that refiners will seek to maximise distillate yields in the next few months whilst also keeping gasoline yields high The continuing weak position of jet kerosene makes this easier and jet yields have recently been at record low levels Imports will still need to be kept high to build stocks to acceptable levels and for the higher sulphur heating oil grade Russian supplies are critical Russian exports have not risen as much this year as expected, and

August exports were sharply down on last year However August 2002 was exceptionally high so it is difficult to draw conclusions from that month Certainly fuel oil exports have been reduced in favour of crude due to better returns on exporting crude but it had not been evident that gas oil was being reduced in the same way September s fig ures may provide a clue Certainly reports have suggested that although a full programme of expo ts was expe ted for September Russian material has still been in tight supply in Europe

European imports of gas oil tend to rise seasonally in the winter so U S demand could be in competition with Europe for Russian availabilities Firm freight rates mean that netbacks are likely to be better in Europe so the lion s share will still end up in Europe but at the margin compe tition could support prices

U S distillate prices have been in fairly steep contango (forward prices above prompt) which makes it economical to build stocks and attracts imports however recently the contango has become less steep There are fears of a repeat of the winter of 1999/2000 when prices moved into back wardation deterring imports and stocking and a cold snap in the New Year drove prices very high Even without a rep etition of that scenario prices are still liable to spikes in the event of a bout of very cold weather or (possibly associat ed with a weather change) sharply rising natural gas prices

### *Residual Fuel*

After rising in July and August resid consumption slumped again in September virtually setting a new low for the month Consumption thus continues its erratic path but still remains 14% above last year at the end of September Refinery production settled at a low level over the third quarter with yields only just over 4% and imports fluctu ated Absolute stocks thus remain low but in days cover terms show extreme variability as demand fluctuates errat ically

Mild autumn weather has kept demand muted and prices relative to crude showed little movement in September compared with August—only the 0 3% grade showed any strength There were abundant supplies of higher sulphur grades due to a coker closure and reduced Mexican demand Natural gas prices are looking relatively firm but so far utility use of fuel oil appears limited

Prices through the winter are projected to be weaker than last year as 2002 was exceptionally influenced by the com bination of increased demand, as high gas prices resulted in substitution to fuel oil and reduced supply due to the loss of heavy crudes from Venezuela

Developments on the crude supply front will have an impact on relative price among the various fuel oil grades If producers of light low sulphur crudes notably Nigeria and Algeria continue to raise output regardless of quotas then much of that extra crude may find its way to the United States as both grades have high gasoli e and mid dle distillate yields Both however also produce low sul phur fuel oil albeit in limited quantities so could incr ase the supply of 0 3% material On he other hand, if OPEC implements further cuts to output and in particular if Saudi Arabia is forced to make large cuts then it may choose to let the cuts fall disproportionately in the heavier lower netback grades This could hit the supply both of feedstock to Gulf Coast cokers and of HSFO

At this stage because of all the uncertainty over possible manoeuvrings within OPEC we have not sought to reflect the potential impact of such developments into fuel oil prices

## European product prices

### *Gasoline*

European mogas prices relative to crude fell sharply in September and premium unleaded averaged $80/tonne over Brent compared with $99/tonne in August Monthly aver ages hide the real story however Prices peaked in mid August at $124/tonne over crude but then fell back to just over $100/tonne maintaining that level through the early part of September before falling sharply to as low as $61/tonne in late September before staging a small recov ery back to just over $70/tonne in early October

Developments in the United States were the primary driv ers of this roller coaster progress The sell off on NYMEX that occurred from early September took a while to influ ence European prices but then resulted in the sharp fall As prices stabilised in New York Harbour they continued to



HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000073

NS NJ 000073
CONFIDENTIAL SUBMISSION

fall in Europe opening the arbitrage window Stocks in Europe were already tight but the open arb resulted in more cargoes fixed for the United States which in turn resulted in growing awareness of local tightness putting a floor under the fall and ultimately causing some recovery

European stocks at the end of August were not as low as had be n expected, at least according to provisional figures fuiy mogas production in Europe was sharply up as crude input to refineries exceeded the level of the past two years albeit yields were still relatively modest as refiners contin ued to maximise gas oil make

A major issue for European exports to the United States over the late autumn will be European perceptions of local stock levels Due to the continuing decline of mogas con sumption in Europe in favour of the growing preference for d e el stocks in days cover te ms are really quite healthy certainly well within the range of historic levels and indeed towards the top of historic levels at the end of July In absolute terms however stocks remain close to the bottom of the historic range Given that mogas yields remain quite modest—July was over 1 percentage point below previous highs for the month—it should be possible to continue to export to the United States whilst not allow ing local stocks to fall unacceptably low by increasing yields especially as gasoline consumption in Europe declines seasonally in the winter even more than in the United States

In early October mogas versus crude is down close to $60/tonne However with prompt tightness we expect a recovery from this level and anticipate that the call from the United States should be sufficient to ensure that European prices relative to crude remain high albeit after the sharp fall of September not quite as high as we had projected last month but still mostly above previous years levels

### Naphtha

Naphtha prices relative to crude rose again in September despite the sharp fall in mogas Relative to Brent naphtha stood at $47/tonne near the top of the historic range for the time of year but due to the still high prices for mogas in the middle of the mogas/naphtha ratio range at 1 16 down from 1 23 in August

The problems with naphtha supply in Japan that supported prices during August continued to provide support into the earlier part of September However the differential between Japan and the Med fell through the month averaging only $19/tonne in September compared with $28/tonne in August and the N WE premium over the Med fell from over $14/tonne in July and August to $3/tonne in September indicating increased n essure on Med supplies Japanese naphtha consumption is highly seasonal and normally falls away sharply in September and October from a peak in August so this weakness might well have been expected anyway even regardless of supply difficulties

LPG prices resumed their normal seasonal upward path in September after butane unusually fell back in August Despite naphtha s strong showing butane is again above naphtha suggest i g petrochemical o sumers will n be preferring naphtha Nevertheless European naphtha demand has lost some of the strength it was showing late last year and earlier this year

Against this background of falling mogas price weakening local demand, and a weakening call from Jap n a price fall rather than rise might be expected It is not ntirely clear what lay behind the rise However it may be support from the United States where reformer grade naphtha has been very tight and prices have been firm and where gas prices are not low enough to ensure that gas has recovered the entire market share it lost to oil when gas prices were so high It is probable that some U S petrochemical users are still choosing naphtha in preference to gas

Assuming that it is indeed the U S market that is primarily supporting naphtha prices the ongoing tightness in the U S gasoline position means that European naphtha prices are likely to remain near the top of the normal range Extra demand next year if economic recovery proceeds as cur rently projected, will increase demand for petrochemical use but substantial additional NGL production from OPEC countries will help to meet this added demand and prevent naphtha prices from escalating

### Jet Kerosene and Gas Oil

European middle distillate prices relative to crude rose ever so slightly in September from August but kerosene and gas oil prices still remain in the middle of their respective his

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000074

NS NJ 000074
CONFIDENTIAL
SUBMISSION

toric ranges and are moving fairly much as forecast for some months

Kerosene supplies from the Middle East have been lower recently as normal seasonal refinery maintenance in Japan and South Korea has drawn kerosene supplies East and thus supported Middle East prices and closed the arbitrage window to Europe In some years demand from Sweden for kerosene for diesel blending can become a significant feature in autumn/early winter pricing but import statistics indicate that this phenomenon does not occur every year and that there is no readily apparent pattern

Underlying total European kerosene demand, however is continuing to recover unlike in the United States where September demand recorded a new low for recent years After falling year on year for 12 months after September 1 2001 European kerosene demand has registered year on year rises every month since October 2002 Refiners have not yet fully adjusted their output to this situation however and kerosene output remains low both in absolute and yield terms as gas oil output has been maximised Clearly there would be scope to re adjust yields in favour of jet at the expense of gas oil and diesel but with the current tight gas oil outlook refiners may wait a while longer before taking such action

Russian supplies are rather uncertain as mentioned above in the U S section and were reported as being tight in September However there are also reports of traders moving Russian material from the Baltic to South America and Africa Moreover although prices have risen a little in the first week of October they are still not conveying a message of tightness Rotterdam area stocks have not been as depleted for the time of year as would normally be expected, as Rhine water levels remain low which would have contributed to price stability in the Rotterdam area German consumers are believed to have built stocks earlier in the year however and are not expected to impose extra demands on Rotterdam area stocks when water levels rise in the Rhine

Against this background, we have maintained our forecast for jet and gas oil essentially unchanged in Europe An upside sensitivity however remains should Russian supplies fall away or U S refinery runs be lower than we have assumed In either of those eventualities competition between the United States and Europe for available Atlantic Basin gas oil supplies will probably drive European prices higher As refinery runs levels are rising in the East however and whilst there remains excess middle distillate production capacity in the East extra supplies could always be obtained from there The critical issue would be the speed of development of extra demand and higher prices

### *Fuel Oil*

Price of both grades of fuel oil fell during September as crude fell however LSFO fell more sharply than HSFO Relative to crude LSFO s discount rose whilst HSFO s contracted, but both grades are still broadly in line with the historic range

The relative weakness of LSFO was a result of weak demand from Mediterranean utilities and adequate supply from Med refineries with no need to pull in imports from NWE In addition mild weather on the U S East Coast has kept fuel oil prices there soft and the arb on that route is mostly closed HSFO was slightly stronger in the Med than in NWE as the arbitrage window to the East was open for part of the month albeit intermittently Chinese demand, the main driver of imports from the Med, however remains weak and the failure of the government to raise internal prices as expected in September suggests that demand may remain weak for a while longer Stocks in Singapore are currently high but should Chinese demand re emerge suddenly there are concerns that prices might spike if the arb from Europe remains mostly closed Such a spike would potentially open the arb and impact on Med prices depending on the regional supply position at the time

With reduced local European demand for HSFO since the change of specifications on January 1 HSFO prices are all the more open to the effect of fluctuations in supply primarily in terms of Russian exports and export demand, primarily the opportunity to export to China Currently reduced Russian exports and Chinese imports are keeping HSFO in an approximate balance whilst problems with achieving Iraqi crude exports into the Mediterranean are expected to prevent undue over supply of HSFO building up in that area The reduced scope for disposal of HSFO within Europe is expected to become a key influence into



HIGHLY CONFIDENTIAL Attorneys Eyes Only

NS NJ 000075

NS 001000075

CONFIDENTIAL SUBMISSION

the winter resulting in a wider sulphur premium whilst LSFO supplies should increase and the discount to crude widen slightly over coming months with the full return of North Sea crudes after summer maintenance

Generally speaking both grades of fuel oil are expected broadly to track crude downwards into next summer at which point LSFO is expected to be stronger with a call rr-n the United States for imports

Major uncertainties continue to surround the outlook for fuel oil which make the forecast even more than usually tentative

With the reported change in Russian export priorities what will the future pattern of fuel oil exports be?

What will Chinese import demand be and how much an b- upplied fror- vithin d e Far East?

What will happen between natural gas demand and fuel oil demand in the United States? To what extent is it feasible for fuel oil to be substituted for gas if fuel oil prices fall as expected in line with crude or will envi ronmental regulations so limit increased fuel oil use that little change will be seen?

If OPEC reduces output what will be the incidence of the cut as between producers of light sweets and heav ier sours?

What has been/will be the impact of the change in specifications on January 1 2003? Special factors this year have so complicated the picture that it has been impossible to separate this factor out

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000076

NS NJ 000076
CONFIDENTIAL
SUBMISSION

## Global Market Balance

| | 2002 3 | 2002 4 | 2003 1 | 2003 2 | 003 3 | 2003 4 | 2004 1 | 2004 2 | 2004 3 | 2004 4 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gl b l D ma d | 76 93 | 79 49 | 79 30 | 76 28 | 77 85 | 80 12 | 79 81 | 77 32 | 78 94 | 81 64 | 77 26 | 78 39 | 79 43 |
| OECD | 47 55 | 48 95 | 49 36 | 47 06 | 47 84 | 49 24 | 49 31 | 47 26 | 48 29 | 49 87 | 47 73 | 48 38 | 48 68 |
| N OECD | 29 38 | 30 54 | 29 94 | 29 21 | 30 01 | 30 88 | 30 50 | 30 06 | 30 65 | 31 78 | 29 53 | 30 01 | 30 75 |
| Glob l S pply | 76 65 | 78 02 | 78 80 | 77 96 | 79 64 | 80 61 | 78 90 | 78 78 | 79 62 | 81 02 | 76 61 | 79 25 | 79 58 |
| N n-OPEC | 47 66 | 48 51 | 48 70 | 48 12 | 49 33 | 50 13 | 50 20 | 50 08 | 50 38 | 51 27 | 47 99 | 49 07 | 50 48 |
| OPEC Crude | 25 42 | 26 04 | 26 84 | 26 18 | 26 53 | 26 53 | 24 70 | 24 70 | 25 20 | 25 50 | 25 15 | 26 52 | 25 03 |
| OPEC NGLs N n C | 3 56 | 3 47 | 3 26 | 3 65 | 3 78 | 3 94 | 4 01 | 4 00 | 4 04 | 4 26 | 3 47 | 3 66 | 4 07 |
| OPEC | 28 98 | 29 51 | 30 10 | 29 84 | 30 31 | 30 47 | 28 71 | 28 70 | 29 24 | 9 75 | 8 62 | 30 18 | 29 10 |
| Gl b l C l n e | -0 28 | 1 48 | -0 51 | 1 68 | 1 79 | 0 48 | -0 90 | 1 46 | 0 67 | 0 62 | -0 65 | 1 86 | 0 15 |
| C ll n OPEC | 29 26 | 30 98 | 30 61 | 28 16 | 28 52 | 29 99 | 29 61 | 27 23 | 28 56 | 30 37 | 29 27 | 29 32 | 28 94 |
| OECD Stocks | 2 57 | 2 47 | 2 41 | 2 52 | 2 67 | 2 70 | 2 61 | 2 73 | 2 78 | 2 71 | 2 47 | 2 70 | 2 71 |
| OECD Forwa d C r | 52 4 | 50 0 | 51 2 | 52 7 | 54 2 | 54 8 | 55 2 | 56 6 | 55 8 | 54 3 | 53 6 | 53 2 | 56 5 |

Oil ı ece s ry to balance m rk t
Not U its e m ll on b rr l p d y e ept for t cks whi h b llion barrels and forward co er whl h is neas d i d y

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000077

NS NJ 000077
CONFIDENTIAL SUBMISSION

## World Oil Demand

(Million barrels per day)

| | 2002 3 | 2002 4 | 2003 1 | 2003 2 | 2003 3 | 2003 4 | 2004 1 | 2004 2 | 2004 3 | 2004 4 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **N rth Amen** | **24 34** | **24 36** | **24 56** | **24 09** | **24 61** | **24 65** | **24 81** | **24 44** | **25 01** | **25 13** | **24 17** | **24 48** | **24 84** |
| C da | 2 13 | 2 16 | 2 17 | 2 11 | 2 15 | 2 17 | 2 12 | 2 10 | 2 16 | 2 18 | 2 10 | 2 15 | 2 14 |
| Me co | 1 97 | 1 98 | 2 02 | 2 07 | 2 05 | 2 04 | 2 02 | 2 05 | 2 06 | 2 08 | 1 98 | 2 05 | 2 05 |
| Un ted Stat | 19 92 | 19 87 | 20 01 | 19 60 | 20 09 | 20 09 | 20 30 | 19 97 | 20 45 | 20 52 | 19 76 | 19 95 | 20 31 |
| **W tern Europe** | **14 43** | **14 60** | **14 52** | **14 20** | **14 40** | **14 68** | **14 56** | **14 26** | **14 47** | **14 85** | **14 37** | **14 45** | **14 54** |
| F ce | 1 99 | 1 99 | 2 11 | 1 96 | 01 | 2 00 | 2 09 | 1 98 | 2 01 | 2 02 | 1 98 | 2 02 | 2 02 |
| G ma y | 2 88 | 2 72 | 2 52 | 2 72 | 2 77 | 2 74 | 2 66 | 2 64 | 2 76 | 2 77 | 2 7 | 2 69 | 2 71 |
| It ly | 1 83 | 1 84 | 1 86 | 1 80 | 81 | 1 85 | 1 82 | 1 78 | 1 76 | 1 84 | 1 85 | 1 83 | 1 80 |
| T key | 1 49 | 1 52 | 1 55 | 1 52 | 1 50 | 1 54 | 1 56 | 1 54 | 1 51 | 1 55 | 1 51 | 1 53 | 1 54 |
| U t d Ki gd m | 1 69 | 1 72 | 1 71 | 1 67 | 1 69 | 1 71 | 1 72 | 1 73 | 1 72 | 1 74 | 1 70 | 1 70 | 1 73 |
| Oth W E rope | 4 56 | 4 81 | 4 75 | 4 53 | 4 62 | 4 85 | 4 72 | 4 60 | 4 71 | 4 94 | 4 62 | 4 69 | 4 74 |
| **As a/Pacific** | **20 68** | **22 33** | **22 61** | **20 91** | **21 22** | **22 51** | **22 42** | **21 11** | **21 50** | **23 00** | **21 12** | **21 78** | **22 01** |
| Ch a | 4 94 | 5 20 | 5 21 | 5 20 | 5 42 | 5 33 | 5 33 | 5 39 | 5 55 | 5 65 | 4 95 | 5 29 | 5 48 |
| J p n | 5 03 | 5 87 | 6 19 | 5 00 | 5 02 | 5 71 | 5 83 | 4 72 | 4 91 | 5 64 | 5 30 | 5 48 | 5 27 |
| S uth Ko a | 2 01 | 2 37 | 2 41 | 2 03 | 2 02 | 2 39 | 2 36 | 2 05 | 2 07 | 2 38 | 2 18 | 2 21 | 2 22 |
| A st l a/NZ | 1 00 | 1 02 | 1 00 | 1 02 | 1 00 | 1 03 | 1 04 | 1 05 | 1 03 | 1 06 | 1 01 | 1 01 | 1 04 |
| Oth A/P | 7 61 | 7 87 | 7 69 | 7 67 | 7 75 | 8 06 | 7 86 | 7 90 | 7 95 | 8 28 | 7 68 | 7 79 | 7 49 |
| **Africa** | **2 61** | **2 60** | **2 63** | **2 63** | **2 56** | **2 64** | **2 68** | **2 68** | **2 59** | **2 69** | **2 57** | **2 61** | **2 66** |
| Egypt | 0 54 | 0 57 | 0 58 | 0 58 | 0 56 | 0 59 | 0 59 | 0 60 | 0 57 | 0 60 | 0 56 | 0 58 | 0 59 |
| So th Afr ca | 0 46 | 0 45 | 0 45 | 0 45 | 0 47 | 0 46 | 0 46 | 0 46 | 0 48 | 0 47 | 0 44 | 0 46 | 0 47 |
| Oth Af a | 1 51 | 1 59 | 1 61 | 1 60 | 1 52 | 1 60 | 1 63 | 1 62 | 1 54 | 1 62 | 1 57 | 1 58 | 1 60 |
| **M ddle E t** | **3** | **5 3** | **5 13** | **92** | **5 08** | **5 12** | **5 19** | **5 15** | **5 26** | **5 30** | **05** | **5 06** | **23** |
| Ira | 42 | 1 42 | 1 41 | 1 39 | 1 44 | 1 43 | 1 43 | 1 41 | 1 46 | 1 44 | 1 40 | 1 42 | 1 43 |
| I a I | 0 28 | 0 27 | 0 28 | 0 27 | 0 28 | 0 27 | 0 28 | 0 27 | 0 28 | 0 28 | 0 27 | 0 27 | 0 28 |
| S d A bi | 1 48 | 1 49 | 1 49 | 1 48 | 1 52 | 1 53 | 1 54 | 1 50 | 1 55 | 1 56 | 1 46 | 1 51 | 1 54 |
| Oth M ddl E t | 1 95 | 1 96 | 1 95 | 1 78 | 1 83 | 1 88 | 1 94 | 1 97 | 1 97 | 2 02 | 1 93 | 1 86 | 1 98 |
| **Latin Am a** | **4 86** | **4 72** | **4 46** | **4 63** | **4 77** | **4 68** | **4 50** | **4 69** | **4 83** | **4 76** | **4 77** | **4 64** | **4 69** |
| A g nt na | 0 41 | 0 40 | 0 41 | 0 43 | 0 41 | 0 41 | 0 42 | 0 44 | 0 42 | 0 42 | 0 41 | 0 41 | 0 42 |
| B I | 2 22 | 2 19 | 2 00 | 2 06 | 2 15 | 2 14 | 2 01 | 2 08 | 2 18 | 2 16 | 2 18 | 2 09 | 2 11 |
| V z la | 0 53 | 0 43 | 0 41 | 0 45 | 0 50 | 0 42 | 0 42 | 0 46 | 0 50 | 0 42 | 0 50 | 0 45 | 0 45 |
| Oth r L Am c | 1 69 | 1 70 | 1 64 | 1 69 | 1 71 | 1 72 | 1 66 | 1 72 | 1 74 | 1 75 | 1 68 | 1 69 | 1 72 |
| **E tern Eu pe** | **1 44** | **1 61** | **1 50** | **1 49** | **1 50** | **1 56** | **1 54** | **1 52** | **1 53** | **1 61** | **1 46** | **1 51** | **1 56** |
| Cz ch R p blic | 0 19 | 0 18 | 0 17 | 0 19 | 0 19 | 0 19 | 0 17 | 0 19 | 0 20 | 0 20 | 0 17 | 0 18 | 0 19 |
| Hungary | 0 14 | 0 15 | 0 13 | 0 13 | 0 15 | 0 16 | 0 13 | 0 13 | 0 15 | 0 16 | 0 14 | 0 14 | 0 14 |
| P I d | 0 41 | 0 41 | 0 38 | 0 41 | 0 44 | 0 45 | 0 41 | 0 42 | 0 45 | 0 46 | 0 38 | 0 42 | 0 43 |
| Oth r E E rope | 0 70 | 0 76 | 0 82 | 0 76 | 0 71 | 0 77 | 0 84 | 0 78 | 0 73 | 0 79 | 0 75 | 0 77 | 0 78 |
| **F rm r So I t U I n** | **3 65** | **4 26** | **4 00** | **3 41** | **3 73** | **4 28** | **4 11** | **3 47** | **3 74** | **4 31** | **3 76** | **3 86** | **3 91** |
| **World Con umption** | **76 93** | **79 49** | **79 30** | **76 28** | **77 86** | **80 12** | **79 81** | **77 32** | **78 94** | **81 64** | **77 26** | **78 39** | **79 43** |

N rth Am Ic clud s U S t itori

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000078

NS NJ 000078
CONFIDENTIAI
SUBMISSION

Case 1:07-mc-00489-BAH Document 1070-24 Filed 01/11/22 Page 201 of 330



## World Oil Supply
(M lli n ba ls per d y)

| | 2002 3 | 2002 4 | 2003 1 | 2003 2 | 2003 3 | 2003 4 | 2004 1 | 2004 2 | 2004 3 | 2004 4 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPEC** | | | | | | | | | | | | | |
| Algeria | 0 89 | 0 94 | 1 04 | 1 11 | | | | | | | | | |
| Indon sia | 1 10 | 1 10 | 1 04 | 1 01 | | | | | | | | | |
| I an | 3 54 | 3 66 | 3 80 | 3 71 | | | | | | | | | |
| K wait | 1 89 | 1 89 | 2 06 | 2 21 | | | | | | | | | |
| L b a | 1 34 | 1 34 | 1 39 | 1 43 | | | | | | | | | |
| N g r a | 1 99 | 2 01 | 2 13 | 2 03 | | | | | | | | | |
| ੧ tar | 0 65 | 0 71 | 0 74 | 0 74 | | | | | | | | | |
| d Arab | 75 | 8 00 | 8 91 | 9 07 | | | | | | | | | |
| UAE | 1 9 | 2 00 | 2 29 | 2 32 | | | | | | | | | |
| V n z l | 2 53 | 2 00 | 1 30 | 2 26 | | | | | | | | | |
| OPEC 10 Crude | 23 67 | 3 66 | 24 71 | 25 89 | 25 46 | 24 83 | 22 70 | 22 40 | 22 60 | 22 60 | 23 14 | 25 22 | 22 58 |
| I q | 1 75 | 2 38 | 2 14 | 0 29 | 1 07 | 1 70 | 2 00 | 2 30 | 2 60 | 2 90 | 2 01 | 1 30 | 2 45 |
| OPEC Crud | 25 42 | 26 04 | 26 84 | 26 18 | 26 53 | 26 53 | 24 70 | 24 70 | ?5 20 | 25 50 | 25 15 | 26 52 | 25 03 |
| O EC NGLs | 3 01 | 3 01 | 3 03 | 3 08 | 3 18 | 3 33 | 3 40 | 3 39 | 3 42 | 3 46 | 2 99 | 3 16 | 3 42 |
| OPEC N n-Co v | 0 55 | 0 46 | 0 22 | 0 57 | 0 60 | 0 61 | 0 61 | 0 61 | 0 62 | 0 80 | 0 48 | 0 50 | 0 66 |
| **OPEC Total** | **28 98** | **29 51** | **30 10** | **29 84** | **30 31** | **30 47** | **28 71** | **28 70** | **9 24** | **29 76** | **28 62** | **30 18** | **29 10** |
| **Non-OPEC**** | | | | | | | | | | | | | |
| Argent na | 0 80 | 0 79 | 0 78 | 0 79 | 0 79 | 0 79 | 0 78 | 0 78 | 0 77 | 0 77 | | | |
| B zil | 1 75 | 1 67 | 1 75 | 1 72 | 1 76 | 1 80 | 1 80 | 1 78 | 1 92 | 2 21 | 0 80 | 0 79 | 0 77 |
| Canada | 2 86 | 3 00 | 2 94 | 3 00 | 3 14 | 3 21 | 3 19 | 3 09 | 3 16 | 3 22 | 1 72 | 1 76 | 1 93 |
| Ch a | 3 44 | 3 40 | 3 41 | 3 44 | 3 41 | 3 40 | 3 43 | 3 43 | 3 42 | 3 43 | 2 88 | 3 07 | 3 16 |
| I d a | 0 76 | 0 76 | 0 76 | 0 73 | 0 76 | 0 76 | 0 76 | 0 75 | 0 4 | 0 74 | 3 39 | 3 42 | 3 42 |
| Kazak tan | 0 95 | 1 01 | 1 01 | 1 32 | 1 06 | 1 11 | 1 15 | 1 | 1 18 | 1 19 | 0 5 | 0 75 | 75 |
| M y | 0 76 | 0 76 | 0 77 | 0 78 | 0 78 | 0 82 | 0 82 | 0 81 | 0 80 | 0 79 | 0 4 | 1 06 | 1 1 |
| M x co | 3 58 | 3 60 | 3 74 | 3 74 | 3 79 | 3 80 | 3 78 | 3 75 | 3 70 | 3 67 | 0 76 | 0 79 | 0 81 |
| N rw y | 3 21 | 3 39 | 3 38 | 3 13 | 3 22 | 3 35 | 3 36 | 3 30 | 3 28 | 3 38 | 3 58 | 3 77 | 3 72 |
| R sia | 7 80 | 7 99 | 8 10 | 8 34 | 8 60 | 8 62 | 8 68 | 8 81 | 9 00 | 9 15 | 3 33 | 3 27 | 3 33 |
| U t d K gd m | 2 24 | 2 61 | 2 52 | 2 23 | 2 50 | 2 52 | 2 45 | 2 33 | 2 31 | 2 35 | 7 66 | 8 42 | 8 91 |
| U t d Stat s | 8 01 | 8 05 | 8 07 | 7 82 | 8 01 | 8 18 | 8 14 | 8 21 | 8 14 | 8 17 | 2 51 | 2 44 | 2 36 |
| **Rest f World** | **10** | **9 71** | **9 64** | **9 59** | **9 74** | **9 91** | **10 00** | **10 06** | **10 17** | **10 35** | 8 11 | 8 02 | 8 17 |
| **P ce ing Gai** | **1 74** | **1 78** | **1 82** | **1 78** | **1 78** | **1 82** | **1 86** | **1 81** | **1 81** | **1 86** | **9 79** | **( 87** | **7 91** |
| **No -OPEC** | **47 66** | **48 51** | **48 70** | **48 12** | **49 33** | **50 13** | **50 20** | **50 08** | **50 38** | **51 27** | **1 76** | **1 80** | **1 83** |
| **W rld P od cti** | **76 65** | **78 02** | **78 80** | **77 96** | **79 64** | **80 61** | **78 90** | **78 78** | **79 62** | **81 02** | **47 99** | **48 22** | **48 26** |
| | | | | | | | | | | | **76 61** | **78 40** | **77 36** |

**OPEC supply by co try i de nly**
**Non-OPEC supply i cludes gl nd on-co e tlo al oil**

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000079

NS NJ 000079
CONFIDENTIAL SUBMISSION

## US Petroleum Actıvıty

(Thousand barrels per day)

| | Ju 2003 | Jul 2003 | A g 2003 | S p-2003 | S p-2002 | Diff Y Ago |
|---|---|---|---|---|---|---|
| **U S Co sumpti** | | | | | | |
| D tll t | 3775 | 3678 | 3618 | 3679 | 3730 | 51 |
| M t G li e | 9165 | 9209 | 9375 | 8929 | 8687 | 242 |
| Re du l F l | 694 | 786 | 876 | 623 | 625 | 2 |
| **U S P d ct Imp rts** | | | | | | |
| D tll te | 337 | 91 | 306 | 364 | 196 | 168 |
| M t G l | 991 | r 6 | 807 | 806 | 813 | 7 |
| RFG | 253 | 240 | 241 | 271 | 224 | 47 |
| Res d al F l | 284 | 291 | 306 | 252 | 254 | 2 |
| **Crud Oil I put** | **15 618** | **15 498** | **15 588** | **15 501** | **14 861** | **640** |
| P d I | 1 664 | 1 648 | 1 616 | 1 639 | 1 529 | 110 |
| P d III | 7 21 | 7 312 | 7 442 | 7 421 | 7 002 | 419 |
| **Op rable Capa ity** | **16 757** | **16 757** | **16 757** | **16 757** | **16 764** | **7** |
| P nt Ut liz ti n | 94 5 | 93 3 | 93 7 | 93 3 | 90 4 | 2 9 |
| **P odu tion by Product** | | | | | | |
| D till te | 3728 | 3673 | 3684 | 3691 | 3536 | 155 |
| P d I | 489 | 483 | 430 | 460 | 409 | 51 |
| P d III | 1628 | 1643 | 1717 | 1753 | 1595 | 158 |
| M to G li e | 8694 | 8653 | 8763 | 8704 | 8320 | 8 |
| RFG | 2791 | 2755 | 2739 | 2723 | | 65 |
| R d l F el | 668 | 634 | 649 | 640 | 607 | 33 |
| P d I | 138 | 127 | 138 | 120 | 112 | 8 |
| P d III | 306 | 279 | 293 | 316 | 291 | 25 |
| **U S P duct I t l Million Bar ls** | | | | | | |
| D tll te | 111 8 | 118 0 | 126 0 | 131 3 | 126 9 | 4 4 |
| P d I | 39 0 | 43 9 | 49 6 | 55 7 | 55 8 | 0 1 |
| P d III | 27 3 | 30 2 | 30 5 | 31 3 | 27 1 | 4 2 |
| D ys f S pply | 29 6 | 32 1 | 34 8 | 35 7 | 34 0 | 1 7 |
| G l ne | 206 0 | 201 0 | 192 0 | 199 2 | 206 5 | 7 3 |
| RFG | 36 9 | 33 5 | 30 9 | 32 5 | 40 6 | 8 1 |
| D ys f S pply | 22 5 | 21 8 | 20 5 | 22 3 | 23 8 | 1 5 |
| R du l F l | 35 6 | 32 0 | 32 0 | 33 3 | 33 0 | 0 3 |
| P d I | 15 1 | 12 8 | 11 4 | 13 0 | 12 4 | 0 6 |
| P d III | 13 6 | 13 7 | 11 9 | 13 3 | 13 3 | 0 0 |
| Day of Supply | 51 3 | 40 7 | 36 5 | 53 5 | 52 8 | 0 7 |

**So We kly P trole m Stat s Rpt, Pet leum S pply Mo thly Early Release**

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000080

NS NJ 000080
CONFIDENTIAL
SUBMISSION

## Crude Oil Prices

| | Crude Oil Prices (US$/bbl) Dated Brent | WTI | Ref Acq Imported | Ref Acq Domestic | Ref Acq Composite | Crude Oil Prices (Euro/bbl) Dated Brent | WTI | Ref Acq Imported | Ref Acq Domestic | Ref Acq Composite |
|---|---|---|---|---|---|---|---|---|---|---|
| **2002** | | | | | | | | | | |
| Jan | 19 48 | 19 68 | 16 93 | 17 85 | 17 31 | 21 96 | 22 18 | 19 09 | 20 12 | 19 51 |
| Feb | 20 22 | 20 66 | 18 13 | 18 70 | 18 37 | 23 21 | 23 71 | 20 80 | 21 46 | 21 08 |
| Mar | 23 73 | 24 35 | 22 78 | 21 57 | 22 26 | 27 08 | 27 79 | 26 00 | 24 62 | 25 41 |
| Apr | 25 66 | 26 26 | 23 87 | 24 27 | 24 03 | 28 93 | 29 61 | 26 91 | 27 36 | 27 09 |
| May | 25 33 | 27 06 | 24 29 | 25 78 | 24 94 | 27 57 | 29 45 | 26 44 | 28 06 | 27 15 |
| Jun | 24 13 | 25 50 | 23 33 | 24 81 | 23 98 | 25 06 | 26 48 | 24 23 | 25 77 | 24 90 |
| Jul | 25 81 | 26 92 | 24 82 | 25 37 | 25 06 | 26 04 | 27 15 | 25 04 | 25 59 | 25 28 |
| Aug | 26 66 | 28 34 | 25 77 | 26 87 | 26 24 | 27 22 | 28 93 | 26 31 | 27 43 | 26 79 |
| Sep | 28 38 | 29 71 | 27 14 | 28 43 | 27 68 | 28 87 | 30 22 | 27 61 | 28 92 | 28 16 |
| Oct | 27 58 | 28 87 | 25 99 | 27 82 | 26 70 | 28 12 | 29 43 | 26 50 | 28 36 | 27 22 |
| Nov | 24 10 | 26 29 | 23 68 | 26 02 | 24 60 | 24 09 | 26 28 | 23 67 | 26 01 | 24 59 |
| Dec | 28 67 | 29 45 | 26 57 | 27 25 | 26 87 | 28 04 | 28 81 | 25 99 | 26 65 | 26 28 |
| **2003** | | | | | | | | | | |
| Jan | 31 32 | 32 99 | 30 32 | 30 47 | 30 38 | 29 42 | 30 99 | 28 48 | 28 62 | 28 54 |
| Feb | 32 67 | 35 75 | 32 42 | 33 98 | 33 08 | 30 23 | 33 08 | 30 00 | 31 44 | 30 61 |
| Mar | 30 54 | 33 43 | 29 31 | 32 68 | 30 68 | 28 37 | 31 06 | 27 23 | 30 36 | 28 50 |
| Apr | 24 85 | 28 26 | 24 52 | 28 54 | 26 03 | 22 90 | 26 05 | 22 60 | 26 30 | 23 99 |
| May | 25 72 | 28 14 | 25 15 | 26 75 | 25 74 | 22 21 | 24 30 | 21 72 | 23 10 | 22 23 |
| Jun | 27 51 | 30 66 | 27 22 | 29 07 | 27 92 | 23 62 | 26 32 | 23 37 | 24 95 | 23 97 |
| Jul | 28 35 | 30 70 | 27 92 | 29 60 | 28 55 | 24 88 | 26 95 | 24 51 | 25 98 | 25 06 |
| Aug | 29 79 | 31 59 | 28 78 | 30 17 | 29 47 | 26 74 | 28 36 | 25 83 | 27 08 | 26 45 |
| Sep | 27 08 | 28 25 | 26 32 | 26 78 | 26 53 | 24 80 | 25 88 | 24 11 | 24 53 | 24 30 |
| Oct | 28 75 | 30 00 | 27 95 | 28 44 | 28 17 | 26 26 | 27 40 | 25 52 | 25 97 | 25 73 |
| Nov | 27 75 | 29 00 | 26 97 | 27 49 | 27 21 | 25 11 | 26 25 | 24 41 | 24 88 | 24 62 |
| Dec | 26 00 | 27 25 | 25 25 | 25 83 | 25 51 | 23 32 | 24 44 | 22 64 | 23 17 | 22 88 |
| **2004** | | | | | | | | | | |
| Jan | 24 50 | 26 00 | 23 79 | 24 65 | 24 18 | 21 78 | 23 11 | 21 15 | 21 91 | 21 49 |
| Feb | 23 00 | 24 75 | 22 33 | 23 46 | 22 84 | 20 27 | 21 81 | 19 68 | 20 67 | 20 13 |
| Mar | 21 00 | 23 00 | 20 39 | 21 80 | 21 03 | 18 34 | 20 09 | 17 81 | 19 04 | 18 36 |
| Apr | 20 50 | 22 75 | 19 91 | 21 57 | 20 65 | 17 75 | 19 70 | 17 23 | 18 67 | 17 88 |
| May | 21 50 | 23 50 | 20 88 | 22 28 | 21 51 | 18 46 | 20 17 | 17 92 | 19 12 | 18 46 |
| Jun | 22 50 | 24 25 | 21 85 | 22 99 | 22 36 | 19 19 | 20 68 | 18 63 | 19 61 | 19 07 |
| Jul | 22 75 | 24 25 | 22 09 | 22 99 | 22 49 | 19 32 | 20 60 | 18 76 | 19 52 | 19 10 |
| Aug | 23 00 | 24 25 | 22 33 | 22 99 | 22 63 | 19 45 | 20 51 | 18 89 | 19 44 | 19 14 |
| Sep | 23 25 | 24 50 | 22 58 | 23 23 | 22 87 | 19 58 | 20 63 | 19 01 | 19 56 | 19 26 |
| Oct | 23 50 | 24 75 | 22 82 | 23 46 | 23 11 | 19 72 | 20 77 | 19 15 | 19 69 | 19 39 |
| Nov | 23 50 | 24 75 | 22 82 | 23 46 | 23 11 | 19 67 | 20 72 | 19 10 | 19 64 | 19 35 |
| Dec | 23 50 | 25 00 | 22 82 | 23 70 | 23 22 | 19 62 | 20 87 | 19 05 | 19 78 | 19 38 |
| **2005** | | | | | | | | | | |
| Jan | 23 40 | 24 92 | 22 72 | 23 62 | 23 12 | 19 48 | 20 75 | 18 92 | 19 67 | 19 25 |
| Feb | 23 32 | 24 83 | 22 64 | 23 54 | 23 05 | 19 38 | 20 64 | 18 82 | 19 57 | 19 16 |
| Mar | 23 24 | 24 75 | 22 57 | 23 46 | 22 97 | 19 29 | 20 54 | 18 73 | 19 47 | 19 06 |
| Apr | 23 16 | 24 67 | 22 49 | 23 38 | 22 89 | 19 19 | 20 44 | 18 63 | 19 37 | 18 97 |
| May | 23 08 | 24 58 | 22 41 | 23 31 | 22 82 | 19 09 | 20 33 | 18 54 | 19 28 | 18 87 |
| Jun | 23 01 | 24 50 | 22 34 | 23 23 | 22 74 | 19 01 | 20 25 | 18 46 | 19 19 | 18 79 |
| Jul | 23 08 | 24 58 | 22 41 | 23 31 | 22 82 | 19 06 | 20 30 | 18 51 | 19 25 | 18 84 |
| Aug | 23 16 | 24 67 | 22 49 | 23 38 | 22 89 | 19 09 | 20 34 | 18 54 | 19 28 | 18 87 |
| Sep | 23 24 | 24 75 | 22 57 | 23 46 | 22 97 | 19 14 | 20 38 | 18 58 | 19 32 | 18 91 |
| Oct | 23 32 | 24 83 | 22 64 | 23 54 | 23 05 | 19 20 | 20 45 | 18 64 | 19 38 | 18 98 |
| Nov | 23 40 | 24 92 | 22 72 | 23 62 | 23 12 | 19 26 | 20 52 | 18 71 | 19 45 | 19 04 |
| Dec | 23 48 | 25 00 | 22 79 | 23 70 | 23 20 | 19 33 | 20 59 | 18 77 | 19 51 | 19 10 |
| **2006** | | | | | | | | | | |
| Jan | 23 55 | 25 08 | 22 87 | 23 78 | 23 28 | 26 33 | 28 04 | 25 58 | 26 58 | 26 02 |
| Feb | 23 63 | 25 17 | 22 95 | 23 86 | 23 36 | 26 41 | 28 13 | 25 65 | 26 67 | 26 11 |
| Mar | 23 71 | 25 25 | 23 02 | 23 94 | 23 43 | 26 50 | 28 22 | 25 73 | 26 75 | 26 19 |
| Apr | 23 79 | 25 33 | 23 10 | 24 02 | 23 51 | 26 59 | 28 32 | 25 82 | 26 84 | 26 28 |
| May | 23 87 | 25 42 | 23 17 | 24 10 | 23 59 | 26 68 | 28 41 | 25 90 | 26 93 | 26 36 |
| Jun | 23 94 | 25 50 | 23 25 | 24 17 | 23 67 | 26 76 | 28 50 | 25 99 | 27 02 | 26 45 |
| Jul | 24 02 | 25 58 | 23 33 | 24 25 | 23 74 | 26 85 | 28 59 | 26 07 | 27 11 | 26 54 |
| Aug | 24 10 | 25 67 | 23 40 | 24 33 | 23 82 | 26 94 | 28 69 | 26 16 | 27 20 | 26 62 |
| Sep | 24 18 | 25 75 | 23 48 | 24 41 | 23 90 | 27 03 | 28 78 | 26 24 | 27 28 | 26 71 |
| Oct | 24 26 | 25 83 | 23 55 | 24 49 | 23 98 | 27 11 | 28 87 | 26 33 | 27 37 | 26 80 |
| Nov | 24 34 | 25 92 | 23 63 | 24 57 | 24 05 | 27 20 | 28 97 | 26 41 | 27 46 | 26 88 |
| Dec | 24 41 | 26 00 | 23 71 | 24 65 | 24 13 | 27 29 | 29 06 | 26 50 | 27 55 | 26 97 |
| 2002 | 24 98 | 26 09 | 23 61 | 24 56 | 24 00 | 26 35 | 27 50 | 24 88 | 25 86 | 25 29 |
| 2003 | 28 36 | 30 50 | 27 68 | 29 15 | 28 27 | 25 66 | 27 59 | 25 03 | 26 37 | 25 57 |
| 2004 | 22 71 | 24 31 | 22 05 | 23 05 | 22 50 | 19 43 | 20 80 | 18 87 | 19 72 | 19 25 |
| 2005 | 23 24 | 24 75 | 22 57 | 23 46 | 22 97 | 19 21 | 20 46 | 18 65 | 19 40 | 18 99 |
| 2006 | 23 98 | 25 54 | 23 29 | 24 21 | 23 70 | 26 81 | 28 55 | 26 03 | 27 06 | 26 49 |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000081

NS NJ 000081
CONFIDENTIAL SUBMISSION

## European Petroleum Product Spot Prices Rotterdam FOB

| | Naphtha $/tonne | Gasoline $/tonne | Jet Fuel $/tonne | Gasoil $/tonne | No 6 Resid 1 0% sulfur $/tonne | No 6 Res d 3 5% sulfur $/tonne |
|---|---|---|---|---|---|---|
| **2002** | | | | | | |
| Jan | 163 6 | 178 7 | 186 0 | 163 6 | 107 3 | 101 0 |
| Feb | 180 1 | 180 0 | 185 6 | 164 3 | 97 3 | 102 8 |
| Mar | 214 2 | 218 8 | 211 7 | 189 8 | 114 2 | 118 3 |
| Apr | 223 7 | 256 2 | 221 9 | 201 1 | 129 6 | 132 5 |
| May | 212 8 | 249 6 | 229 7 | 201 3 | 132 0 | 139 3 |
| Jun | 205 4 | 246 5 | 222 2 | 197 0 | 127 7 | 132 0 |
| Jul | 219 8 | 261 6 | 230 7 | 210 7 | 140 2 | 139 2 |
| Aug | 229 1 | 264 7 | 241 2 | 219 4 | 142 4 | 143 5 |
| Sep | 253 5 | 277 4 | 270 8 | 239 0 | 161 1 | 159 0 |
| Oct | 239 1 | 273 4 | 264 2 | 236 6 | 180 1 | 148 6 |
| Nov | 217 3 | 237 0 | 241 4 | 216 1 | 156 2 | 121 8 |
| Dec | 259 1 | 266 4 | 263 1 | 247 2 | 172 9 | 132 4 |
| **2003** | | | | | | |
| Jan | 305 8 | 300 1 | 290 4 | 266 9 | 177 7 | 171 9 |
| Feb | 333 2 | 332 8 | 341 4 | 311 9 | 203 7 | 171 7 |
| Mar | 307 6 | 306 5 | 339 8 | 300 2 | 177 8 | 145 1 |
| Apr | 223 0 | 292 3 | 250 8 | 224 2 | 153 0 | 123 3 |
| May | 211 6 | 272 5 | 240 0 | 219 8 | 143 6 | 134 3 |
| Jun | 244 4 | 281 8 | 251 3 | 231 7 | 166 4 | 142 8 |
| Jul | 248 6 | 300 5 | 261 2 | 235 5 | 169 2 | 159 9 |
| Aug | 264 8 | 323 4 | 273 4 | 246 1 | 171 2 | 157 1 |
| Sep | 247 5 | 286 5 | 255 3 | 226 1 | 157 6 | 143 3 |
| Oct | 260 5 | 289 4 | 271 0 | 248 6 | 168 9 | 152 1 |
| Nov | 249 3 | 277 0 | 263 5 | 241 1 | 161 7 | 139 1 |
| Dec | 233 0 | 258 9 | 250 3 | 228 1 | 149 1 | 125 4 |
| **2004** | | | | | | |
| Jan | 223 5 | 242 8 | 239 0 | 216 9 | 138 3 | 113 7 |
| Feb | 212 8 | 236 5 | 227 8 | 205 7 | 127 5 | 102 0 |
| Mar | 199 3 | 226 5 | 212 7 | 190 9 | 113 1 | 86 4 |
| Apr | 200 2 | 232 6 | 208 9 | 187 1 | 109 5 | 82 5 |
| May | 202 3 | 240 1 | 211 5 | 184 7 | 116 7 | 90 3 |
| Jun | 204 6 | 237 7 | 214 0 | 194 1 | 133 4 | 98 1 |
| Jul | 210 8 | 239 6 | 215 9 | 199 0 | 140 0 | 100 1 |
| Aug | 217 8 | 246 4 | 219 8 | 202 8 | 137 0 | 102 0 |
| Sep | 219 0 | 243 3 | 224 7 | 207 6 | 129 3 | 104 0 |
| Oct | 221 2 | 240 2 | 231 5 | 209 5 | 131 1 | 105 9 |
| Nov | 221 8 | 235 3 | 231 5 | 209 5 | 131 1 | 105 9 |
| Dec | 221 8 | 235 3 | 231 5 | 209 5 | 131 1 | 105 9 |
| **2005** | | | | | | |
| Jan | 216 8 | 225 3 | 228 4 | 202 9 | 132 7 | 113 5 |
| Feb | 218 9 | 231 0 | 225 7 | 201 5 | 125 3 | 111 2 |
| Mar | 222 7 | 245 7 | 234 0 | 207 3 | 126 8 | 112 5 |
| Apr | 215 2 | 267 7 | 247 0 | 204 6 | 126 1 | 110 5 |
| May | 204 8 | 255 1 | 225 0 | 191 2 | 120 7 | 108 1 |
| Jun | 202 6 | 245 6 | 224 1 | 191 5 | 126 2 | 110 2 |
| Jul | 201 9 | 240 0 | 225 8 | 199 0 | 128 7 | 112 1 |
| Aug | 200 5 | 237 8 | 225 4 | 200 4 | 123 6 | 111 2 |
| Sep | 207 0 | 236 0 | 231 4 | 207 2 | 125 9 | 116 1 |
| Oct | 210 1 | 233 9 | 238 9 | 215 4 | 132 0 | 119 8 |
| Nov | 205 6 | 224 6 | 233 6 | 212 4 | 128 7 | 112 9 |
| Dec | 211 2 | 223 7 | 237 8 | 214 2 | 134 5 | 113 5 |
| **2006** | | | | | | |
| Jan | 218 1 | 227 7 | 227 9 | 204 5 | 135 2 | 113 7 |
| Feb | 222 4 | 234 1 | 229 9 | 207 1 | 127 2 | 112 5 |
| Mar | 225 8 | 246 7 | 239 2 | 214 4 | 129 2 | 111 5 |
| Apr | 219 9 | 271 1 | 249 3 | 207 8 | 128 4 | 110 9 |
| May | 211 5 | 259 8 | 235 4 | 198 4 | 125 5 | 113 6 |
| Jun | 210 8 | 246 4 | 236 3 | 201 2 | 131 3 | 115 7 |
| Jul | 208 5 | 245 7 | 233 2 | 206 5 | 134 7 | 117 6 |
| Aug | 209 0 | 247 9 | 232 1 | 206 6 | 131 8 | 119 0 |
| Sep | 215 9 | 247 4 | 237 1 | 211 9 | 132 5 | 123 2 |
| Oct | 217 1 | 242 7 | 243 3 | 220 7 | 136 5 | 123 9 |
| Nov | 214 1 | 237 3 | 240 0 | 219 3 | 135 4 | 118 9 |
| Dec | 217 5 | 233 8 | 239 4 | 216 1 | 138 2 | 116 9 |
| 2002 | 218 1 | 242 5 | 230 7 | 207 2 | 138 4 | 130 8 |
| 2003 | 260 8 | 293 5 | 274 0 | 248 3 | 166 7 | 147 2 |
| 2004 | 212 9 | 238 0 | 222 4 | 201 4 | 128 2 | 99 8 |
| 2005 | 209 8 | 238 9 | 231 4 | 204 0 | 127 6 | 112 6 |
| 2006 | 215 9 | 245 0 | 236 9 | 209 5 | 132 2 | 116 5 |

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000082

NS NJ 000082
CONFIDENTIAL SUBMISSION

## European Petroleum Product Spot Prces Mediterranean FOB

| | Naphtha | Gasoline | Jet Fuel | Gasoil | No 6 Resid 1 0% sulfur | No 6 Res d 3 5% sulfur |
|---|---|---|---|---|---|---|
| | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne |
| **2002** | | | | | | |
| Jan | 153 4 | 172 3 | 170 4 | 169 5 | 114 3 | 93 9 |
| Feb | 169 7 | 179 0 | 173 4 | 161 4 | 101 8 | 97 8 |
| Mar | 204 8 | 221 0 | 198 6 | 182 8 | 119 1 | 108 1 |
| Apr | 214 0 | 254 5 | 207 7 | 193 6 | 134 5 | 121 7 |
| May | 200 1 | 243 9 | 209 2 | 192 3 | 132 4 | 127 2 |
| Jun | 192 3 | 241 6 | 204 0 | 192 0 | 134 0 | 123 0 |
| Jul | 207 8 | 256 0 | 213 6 | 204 1 | 135 3 | 127 6 |
| Aug | 217 8 | 259 5 | 226 2 | 213 9 | 141 9 | 132 6 |
| Sep | 244 3 | 271 9 | 257 3 | 231 7 | 166 0 | 149 2 |
| Oct | 228 9 | 264 6 | 249 6 | 226 3 | 160 7 | 136 2 |
| Nov | 205 5 | 227 6 | 221 9 | 211 5 | 140 7 | 112 5 |
| Dec | 242 2 | 259 9 | 237 2 | 242 6 | 159 4 | 121 3 |
| **2003** | | | | | | |
| Jan | 288 6 | 290 7 | 262 3 | 265 6 | 192 9 | 157 0 |
| Feb | 313 4 | 323 4 | 316 0 | 303 9 | 205 6 | 163 2 |
| Mar | 280 1 | 286 9 | 288 6 | 297 6 | 186 0 | 138 2 |
| Apr | 199 9 | 252 4 | 210 0 | 205 5 | 140 0 | 120 4 |
| May | 194 4 | 246 3 | 224 2 | 202 5 | 142 8 | 122 1 |
| Jun | 230 0 | 267 9 | 234 9 | 226 4 | 165 6 | 138 6 |
| Jul | 234 6 | 289 8 | 247 0 | 223 4 | 181 3 | 154 2 |
| Aug | 249 7 | 316 3 | 251 1 | 238 6 | 183 1 | 149 9 |
| Sep | 234 1 | 274 8 | 233 5 | 223 3 | 151 7 | 135 6 |
| Oct | 244 4 | 283 9 | 248 7 | 240 2 | 167 0 | 140 8 |
| Nov | 233 9 | 271 7 | 241 8 | 233 0 | 159 9 | 128 8 |
| Dec | 218 7 | 254 0 | 229 7 | 220 4 | 147 4 | 116 2 |
| **2004** | | | | | | |
| Jan | 209 8 | 238 1 | 219 3 | 209 6 | 136 7 | 105 3 |
| Feb | 199 7 | 232 0 | 209 0 | 198 9 | 126 1 | 94 5 |
| Mar | 187 0 | 222 2 | 195 2 | 184 5 | 111 8 | 80 1 |
| Apr | 187 9 | 228 2 | 191 7 | 180 9 | 108 3 | 76 4 |
| May | 189 8 | 235 5 | 194 0 | 178 5 | 115 4 | 83 7 |
| J n | 192 0 | 233 2 | 196 4 | 187 6 | 131 9 | 90 9 |
| Jul | 197 8 | 235 0 | 198 1 | 192 3 | 138 4 | 92 7 |
| Aug | 204 4 | 241 7 | 201 7 | 196 0 | 135 5 | 94 5 |
| Sep | 205 5 | 238 7 | 206 1 | 200 7 | 127 8 | 96 3 |
| Oct | 207 6 | 235 7 | 212 4 | 202 5 | 129 6 | 98 1 |
| Nov | 208 2 | 230 8 | 212 4 | 202 5 | 129 6 | 98 1 |
| Dec | 208 2 | 230 8 | 212 4 | 202 5 | 129 6 | 98 1 |
| **2005** | | | | | | |
| Jan | 203 5 | 221 0 | 209 6 | 196 1 | 131 2 | 105 1 |
| Feb | 205 5 | 226 6 | 207 1 | 194 8 | 123 9 | 103 0 |
| Mar | 209 0 | 241 0 | 214 7 | 200 3 | 125 4 | 104 2 |
| Apr | 201 9 | 262 6 | 226 6 | 197 8 | 124 6 | 102 3 |
| May | 192 2 | 250 2 | 206 4 | 184 8 | 119 4 | 100 2 |
| Jun | 190 2 | 241 0 | 205 6 | 185 1 | 124 8 | 102 1 |
| Jul | 189 5 | 235 4 | 207 2 | 192 3 | 127 2 | 103 8 |
| Aug | 188 2 | 233 3 | 206 8 | 193 7 | 122 2 | 103 0 |
| Sep | 194 3 | 231 5 | 212 3 | 200 3 | 124 5 | 107 6 |
| Oct | 197 2 | 229 5 | 219 2 | 208 2 | 130 5 | 111 0 |
| Nov | 193 0 | 220 3 | 214 3 | 205 3 | 127 2 | 104 6 |
| Dec | 198 2 | 219 4 | 218 2 | 207 0 | 133 0 | 105 1 |
| **2006** | | | | | | |
| Jan | 204 7 | 223 3 | 209 1 | 197 6 | 133 7 | 105 3 |
| Feb | 208 7 | 229 6 | 211 0 | 200 1 | 125 8 | 104 2 |
| Mar | 211 9 | 242 0 | 219 4 | 207 3 | 127 7 | 103 3 |
| Apr | 206 3 | 265 9 | 228 7 | 200 8 | 127 0 | 102 7 |
| May | 198 5 | 254 8 | 216 0 | 191 7 | 124 1 | 105 2 |
| Jun | 197 8 | 241 7 | 216 8 | 194 4 | 129 9 | 107 2 |
| Jul | 195 6 | 241 0 | 214 0 | 199 6 | 133 2 | 109 0 |
| Aug | 196 1 | 243 2 | 212 9 | 199 7 | 130 3 | 110 2 |
| Sep | 202 7 | 242 7 | 217 5 | 204 8 | 131 0 | 114 1 |
| Oct | 203 7 | 238 1 | 223 3 | 213 3 | 135 0 | 114 8 |
| Nov | 201 0 | 232 7 | 220 2 | 212 0 | 133 9 | 110 1 |
| Dec | 204 1 | 229 4 | 219 7 | 208 9 | 136 6 | 108 3 |
| 2002 | 206 7 | 237 6 | 214 1 | 201 8 | 136 7 | 120 9 |
| 2003 | 243 5 | 279 8 | 249 0 | 240 1 | 168 6 | 138 8 |
| 2004 | 199 8 | 233 5 | 204 1 | 194 7 | 126 7 | 92 4 |
| 2005 | 196 9 | 234 3 | 212 3 | 197 1 | 126 2 | 104 3 |
| 2006 | 202 6 | 240 4 | 217 4 | 202 5 | 130 7 | 107 9 |

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000083

NS NJ 000083

CONFIDENTIAL SUBMISSION



DA05154

## European Petroleum Product Spot Prices Northwest Europe CIF

| | Naphtha $/tonne | Gasoline $/tonne | Jet Fuel $/tonne | Gasoil $/tonne | No 6 Resid 1 0% sulfur $/tonne | No 6 Resid 3 5% sulfur $/tonne |
|---|---|---|---|---|---|---|
| **2002** | | | | | | |
| Jan | 168 2 | 180 1 | 187 7 | 166 8 | 124 8 | 97 9 |
| Feb | 184 1 | 184 6 | 189 2 | 166 2 | 110 0 | 99 0 |
| Mar | 218 5 | 227 8 | 213 8 | 191 6 | 129 2 | 115 2 |
| Apr | 228 8 | 262 9 | 225 9 | 203 6 | 143 4 | 128 5 |
| May | 218 3 | 252 6 | 230 8 | 204 0 | 143 3 | 135 1 |
| Jun | 210 2 | 250 4 | 223 2 | 200 3 | 144 8 | 128 0 |
| Jul | 224 3 | 265 3 | 231 4 | 212 5 | 145 6 | 135 3 |
| Aug | 233 6 | 268 3 | 242 5 | 223 7 | 150 7 | 138 6 |
| Sep | 258 0 | 281 9 | 272 4 | 241 1 | 170 9 | 155 1 |
| Oct | 243 6 | 276 3 | 265 2 | 241 9 | 165 8 | 143 6 |
| Nov | 221 5 | 243 0 | 240 4 | 221 9 | 149 2 | 119 1 |
| Dec | 263 1 | 272 0 | 265 2 | 252 6 | 164 9 | 127 8 |
| **2003** | | | | | | |
| Jan | 309 8 | 300 9 | 288 4 | 270 3 | 196 5 | 167 0 |
| Feb | 337 2 | 337 4 | 347 8 | 316 1 | 207 7 | 166 6 |
| Mar | 311 6 | 315 4 | 330 8 | 318 4 | 188 8 | 142 3 |
| Apr | 227 0 | 283 9 | 242 5 | 226 0 | 149 1 | 121 0 |
| May | 216 4 | 266 5 | 240 5 | 222 5 | 150 0 | 130 5 |
| Jun | 248 4 | 283 4 | 248 4 | 235 3 | 169 8 | 139 6 |
| Jul | 254 0 | 301 6 | 261 2 | 241 3 | 184 7 | 157 4 |
| Aug | 269 1 | 324 2 | 275 1 | 251 4 | 184 5 | 154 7 |
| Sep | 251 5 | 285 1 | 255 7 | 232 3 | 159 7 | 140 5 |
| Oct | 265 8 | 292 4 | 272 4 | 252 4 | 177 4 | 147 4 |
| Nov | 254 4 | 279 8 | 264 8 | 244 8 | 169 8 | 134 8 |
| Dec | 237 8 | 261 6 | 251 6 | 231 6 | 156 6 | 121 6 |
| **2004** | | | | | | |
| Jan | 228 1 | 245 2 | 240 2 | 220 2 | 145 2 | 110 2 |
| Feb | 217 2 | 238 9 | 228 9 | 208 9 | 133 9 | 98 9 |
| Mar | 203 3 | 228 8 | 213 8 | 193 8 | 118 8 | 83 8 |
| Apr | 204 3 | 235 0 | 210 0 | 190 0 | 115 0 | 80 0 |
| May | 206 4 | 242 5 | 212 5 | 187 5 | 122 5 | 87 5 |
| Jun | 208 8 | 240 1 | 215 1 | 197 1 | 140 1 | 95 1 |
| Jul | 215 1 | 242 0 | 217 0 | 202 0 | 147 0 | 97 0 |
| Aug | 222 2 | 248 9 | 220 9 | 205 9 | 143 9 | 98 9 |
| Sep | 223 4 | 245 8 | 225 8 | 210 8 | 135 8 | 100 8 |
| Oct | 225 7 | 242 7 | 232 7 | 212 7 | 137 7 | 102 7 |
| Nov | 226 3 | 237 7 | 232 7 | 212 7 | 137 7 | 102 7 |
| Dec | 226 3 | 237 7 | 232 7 | 212 7 | 137 7 | 102 7 |
| **2005** | | | | | | |
| Jan | 221 3 | 227 6 | 229 5 | 206 0 | 139 3 | 110 0 |
| Feb | 223 4 | 233 3 | 226 8 | 204 6 | 131 6 | 107 7 |
| Mar | 227 2 | 248 1 | 235 2 | 210 4 | 133 1 | 109 0 |
| Apr | 219 5 | 270 4 | 248 2 | 207 8 | 132 4 | 107 0 |
| May | 208 9 | 257 7 | 226 1 | 194 1 | 126 8 | 104 8 |
| Jun | 206 8 | 248 1 | 225 2 | 194 4 | 132 5 | 108 8 |
| Jul | 206 0 | 242 4 | 226 9 | 202 0 | 135 1 | 108 6 |
| Aug | 204 6 | 240 2 | 226 5 | 203 5 | 129 7 | 107 8 |
| Sep | 211 3 | 238 4 | 232 5 | 210 4 | 132 2 | 112 5 |
| Oct | 214 4 | 236 3 | 240 1 | 218 7 | 138 6 | 116 1 |
| Nov | 209 8 | 226 9 | 234 8 | 215 7 | 135 1 | 109 4 |
| Dec | 215 5 | 225 9 | 239 0 | 217 5 | 141 2 | 109 9 |
| **2006** | | | | | | |
| Jan | 222 6 | 230 0 | 229 0 | 207 6 | 141 9 | 110 2 |
| Feb | 226 9 | 236 4 | 231 1 | 210 2 | 133 6 | 109 1 |
| Mar | 230 4 | 249 2 | 240 4 | 217 7 | 135 6 | 108 0 |
| Apr | 224 4 | 273 8 | 250 5 | 210 9 | 134 9 | 107 5 |
| May | 215 8 | 262 4 | 236 6 | 201 4 | 131 8 | 110 1 |
| Jun | 215 1 | 248 9 | 237 5 | 204 2 | 137 8 | 112 1 |
| Jul | 212 7 | 248 2 | 234 4 | 209 7 | 141 5 | 114 0 |
| Aug | 213 2 | 250 4 | 233 2 | 209 7 | 138 4 | 115 3 |
| Sep | 220 4 | 249 9 | 238 3 | 215 2 | 139 1 | 119 3 |
| Oct | 221 5 | 245 1 | 244 5 | 224 1 | 143 3 | 120 1 |
| Nov | 218 5 | 239 7 | 241 2 | 222 6 | 142 2 | 115 2 |
| Dec | 221 9 | 236 2 | 240 6 | 219 4 | 145 1 | 113 3 |
| 2002 | 222 7 | 247 1 | 232 3 | 210 5 | 145 2 | 126 9 |
| 2003 | 265 2 | 294 3 | 273 3 | 253 4 | 174 5 | 143 6 |
| 2004 | 217 3 | 240 4 | 223 5 | 204 5 | 134 6 | 96 7 |
| 2005 | 214 1 | 241 3 | 232 6 | 207 1 | 134 0 | 109 1 |
| 2006 | 220 3 | 247 5 | 238 1 | 212 7 | 138 8 | 112 9 |

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000084

NS NJ 000084
CONFIDENTIAL
SUBMISSION

## U S Petroleum Product Spot Prices NY Harbor

| | No 2 Distillate cts/gal | No 2 Diesel cts/gal | Gasoline cts/gal | Jet Fuel cts/gal | No 6 Resid 0 3% sulfur $/bbl | No 6 Resid 0 7% sulfur $/bbl | No 6 Resid 1% sulfur $/bbl | No 6 Resid 2 2% sulfur $/bbl | No 6 Resid 3 0% sulfur $/bbl |
|---|---|---|---|---|---|---|---|---|---|
| **2002** | | | | | | | | | |
| Jan | 52 9 | 53 2 | 53 6 | 55 6 | 19 26 | 16 50 | 16 08 | 15 29 | 14 73 |
| Feb | 53 6 | 54 7 | 54 8 | 57 0 | 18 27 | 15 28 | 14 83 | 14 41 | 14 40 |
| Mar | 63 0 | 63 9 | 68 9 | 64 3 | 22 11 | 19 84 | 19 43 | 19 05 | 18 97 |
| Apr | 66 2 | 67 9 | 73 8 | 68 1 | 25 34 | 22 73 | 22 24 | 21 59 | 21 45 |
| May | 65 9 | 67 1 | 69 4 | 68 3 | 25 67 | 23 87 | 23 36 | 21 72 | 21 50 |
| Jun | 64 0 | 65 0 | 70 9 | 67 5 | 24 58 | 23 13 | 22 70 | 21 54 | 21 23 |
| Jul | 67 3 | 68 3 | 75 9 | 71 0 | 26 40 | 23 66 | 22 54 | 21 61 | 21 54 |
| Aug | 69 5 | 71 9 | 76 0 | 74 5 | 27 62 | 25 98 | 25 42 | 23 50 | 23 13 |
| Sep | 76 8 | 78 7 | 77 6 | 81 2 | 28 39 | 26 37 | 26 02 | 25 35 | 25 35 |
| Oct | 76 2 | 78 8 | 82 0 | 80 9 | 29 46 | 27 19 | 26 39 | 24 43 | 24 36 |
| Nov | 71 4 | 73 4 | 74 8 | 73 3 | 27 95 | 24 68 | 23 86 | 21 46 | 20 47 |
| Dec | 81 4 | 81 9 | 80 0 | 82 5 | 32 40 | 28 65 | 26 68 | 24 30 | 23 69 |
| **2003** | | | | | | | | | |
| Jan | 89 9 | 90 3 | 87 1 | 90 9 | 37 73 | 33 75 | 31 53 | 30 04 | 29 08 |
| Feb | 112 2 | 113 6 | 99 2 | 114 5 | 46 53 | 38 50 | 35 05 | 30 61 | 29 45 |
| Mar | 97 2 | 99 3 | 94 9 | 97 4 | 39 15 | 33 76 | 31 71 | 27 13 | 25 34 |
| Apr | 77 8 | 79 1 | 79 4 | 78 3 | 28 89 | 25 61 | 23 98 | 20 51 | 19 94 |
| May | 73 3 | 74 7 | 75 4 | 75 4 | 29 95 | 25 69 | 24 51 | 21 79 | 21 15 |
| Jun | 75 4 | 76 6 | 80 0 | 76 7 | 29 01 | 26 00 | 25 18 | 22 46 | 21 70 |
| Jul | 78 0 | 79 4 | 86 8 | 80 3 | 30 67 | 28 68 | 27 53 | 26 26 | 26 19 |
| Aug | 80 8 | 82 2 | 99 8 | 84 2 | 31 57 | 28 62 | 27 74 | 26 43 | 26 35 |
| Sep | 72 7 | 74 6 | 89 3 | 75 4 | 29 07 | 25 65 | 24 88 | 23 15 | 23 05 |
| Oct | 86 0 | 87 1 | 84 4 | 88 6 | 32 30 | 28 14 | 27 13 | 24 98 | 24 22 |
| Nov | 82 6 | 83 1 | 79 5 | 84 8 | 30 95 | 26 30 | 25 44 | 23 48 | 22 14 |
| Dec | 78 1 | 77 9 | 72 2 | 79 3 | 29 91 | 24 92 | 23 84 | 21 26 | 19 93 |
| **2004** | | | | | | | | | |
| Jan | 71 4 | 70 0 | 69 0 | 72 1 | 26 82 | 22 59 | 21 59 | 19 37 | 17 86 |
| Feb | 67 8 | 64 8 | 66 1 | 65 9 | 24 27 | 19 34 | 18 56 | 17 02 | 16 30 |
| Mar | 63 1 | 60 6 | 62 3 | 61 7 | 22 08 | 18 51 | 17 67 | 16 41 | 15 78 |
| Apr | 61 7 | 62 6 | 64 9 | 63 2 | 22 68 | 19 34 | 18 78 | 16 91 | 16 36 |
| May | 62 3 | 63 6 | 70 3 | 64 2 | 23 42 | 20 67 | 20 00 | 17 85 | 17 40 |
| Jun | 62 3 | 63 3 | 67 5 | 64 3 | 23 72 | 21 07 | 20 39 | 18 13 | 17 73 |
| Jul | 63 2 | 64 1 | 67 4 | 65 7 | 23 60 | 21 03 | 20 21 | 18 04 | 17 15 |
| Aug | 66 6 | 67 2 | 70 9 | 70 0 | 24 02 | 20 94 | 20 18 | 18 39 | 17 82 |
| Sep | 72 3 | 73 1 | 73 2 | 75 1 | 25 86 | 22 26 | 21 52 | 20 00 | 19 33 |
| Oct | 72 1 | 73 1 | 70 6 | 74 4 | 26 65 | 23 22 | 22 38 | 20 61 | 19 98 |
| Nov | 71 6 | 72 1 | 68 7 | 73 7 | 26 42 | 22 44 | 21 71 | 20 04 | 18 90 |
| Dec | 72 3 | 72 1 | 66 6 | 73 5 | 27 44 | 22 87 | 21 87 | 19 50 | 18 29 |
| **2005** | | | | | | | | | |
| Jan | 67 4 | 67 2 | 63 8 | 69 3 | 25 70 | 21 65 | 20 69 | 18 56 | 17 12 |
| Feb | 65 0 | 65 0 | 63 5 | 66 2 | 24 35 | 19 40 | 18 62 | 17 08 | 16 35 |
| Mar | 64 8 | 65 2 | 67 1 | 66 4 | 23 76 | 19 92 | 19 23 | 17 66 | 16 98 |
| Apr | 66 9 | 67 9 | 70 4 | 68 5 | 24 59 | 20 97 | 20 37 | 18 34 | 17 74 |
| May | 65 2 | 66 5 | 73 6 | 67 2 | 24 50 | 21 62 | 20 92 | 18 67 | 18 20 |
| Jun | 62 9 | 63 9 | 68 2 | 64 9 | 23 96 | 21 28 | 20 60 | 18 32 | 17 91 |
| Jul | 64 1 | 65 0 | 68 4 | 66 6 | 23 92 | 21 32 | 20 49 | 18 29 | 17 38 |
| Aug | 67 8 | 68 3 | 72 1 | 71 2 | 24 44 | 21 30 | 20 52 | 18 71 | 18 12 |
| Sep | 72 9 | 73 7 | 73 8 | 75 7 | 26 12 | 22 48 | 21 74 | 20 21 | 19 53 |
| Oct | 72 2 | 73 2 | 70 7 | 74 5 | 26 74 | 23 30 | 22 45 | 20 67 | 20 05 |
| Nov | 72 0 | 72 4 | 69 0 | 74 0 | 26 59 | 22 59 | 21 86 | 20 18 | 19 03 |
| Dec | 72 3 | 72 1 | 66 6 | 73 5 | 27 44 | 22 87 | 21 87 | 19 50 | 18 29 |
| **2006** | | | | | | | | | |
| Jan | 67 9 | 67 7 | 64 3 | 69 8 | 25 88 | 21 79 | 20 83 | 18 68 | 17 23 |
| Feb | 65 8 | 65 8 | 64 3 | 67 1 | 24 67 | 19 67 | 18 87 | 17 31 | 16 57 |
| Mar | 66 1 | 66 5 | 68 4 | 67 8 | 24 23 | 20 32 | 19 62 | 18 02 | 17 32 |
| Apr | 68 7 | 69 7 | 72 3 | 70 4 | 25 25 | 21 54 | 20 92 | 18 83 | 18 22 |
| May | 67 4 | 68 8 | 76 1 | 69 4 | 25 33 | 22 35 | 21 63 | 19 30 | 18 82 |
| Jun | 65 5 | 66 5 | 71 0 | 67 6 | 24 94 | 22 15 | 21 45 | 19 07 | 18 64 |
| Jul | 66 7 | 67 6 | 71 1 | 69 3 | 24 90 | 22 19 | 21 32 | 19 03 | 18 09 |
| Aug | 70 5 | 71 1 | 75 1 | 74 1 | 25 43 | 22 16 | 21 36 | 19 47 | 18 86 |
| Sep | 75 9 | 76 6 | 76 7 | 78 8 | 27 18 | 23 39 | 22 62 | 21 02 | 20 32 |
| Oct | 75 1 | 76 1 | 73 6 | 77 5 | 27 81 | 24 23 | 23 36 | 21 51 | 20 86 |
| Nov | 74 8 | 75 3 | 71 8 | 77 0 | 27 66 | 23 50 | 22 74 | 20 99 | 19 79 |
| Dec | 75 2 | 75 0 | 69 3 | 76 5 | 28 54 | 23 78 | 22 74 | 20 29 | 19 02 |
| 2002 | 67 4 | 68 7 | 71 5 | 70 4 | 25 62 | 23 16 | 22 46 | 21 19 | 20 90 |
| 2003 | 83 7 | 84 8 | 85 7 | 85 5 | 32 98 | 28 80 | 27 38 | 24 84 | 24 04 |
| 2004 | 67 2 | 67 2 | 68 1 | 68 7 | 24 75 | 21 19 | 20 42 | 18 52 | 17 74 |
| 2005 | 67 8 | 68 4 | 68 9 | 69 8 | 25 18 | 21 56 | 20 78 | 18 85 | 18 06 |
| 2006 | 70 0 | 70 6 | 71 2 | 72 1 | 25 98 | 22 26 | 21 45 | 19 46 | 18 64 |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000085

NS NJ 000085
CONFIDENTIAL SUBMISSION

## U S Petroleum Product Spot Prices Gulf Coast

| | No 2 Distillate cts/gal | No 2 Diesel cts/gal | Gasoline cts/gal | Jet Fuel cts/gal | No 6 Resid 1% sulfur $/bbl | No 6 Resid 3% sulfur $/bbl |
|---|---|---|---|---|---|---|
| **2002** | | | | | | |
| Jan | 51 1 | 51 7 | 54 2 | 53 4 | 15 42 | 14 82 |
| Feb | 51 9 | 53 5 | 54 4 | 55 4 | 15 45 | 15 24 |
| Mar | 61 4 | 63 2 | 71 9 | 63 3 | 19 37 | 19 20 |
| Apr | 64 7 | 67 0 | 78 6 | 67 2 | 22 54 | 21 93 |
| May | 64 4 | 65 9 | 74 7 | 67 1 | 23 04 | 21 94 |
| Jun | 62 5 | 63 5 | 74 2 | 65 7 | 23 50 | 21 38 |
| Jul | 65 9 | 67 1 | 76 1 | 69 7 | 22 25 | 21 86 |
| Aug | 68 5 | 71 5 | 75 6 | 72 8 | 24 27 | 22 80 |
| Sep | 76 2 | 79 6 | 78 6 | 80 5 | 25 45 | 24 81 |
| Oct | 76 0 | 79 6 | 82 9 | 79 5 | 27 58 | 23 19 |
| Nov | 70 6 | 71 5 | 69 8 | 71 3 | 23 77 | 18 76 |
| Dec | 79 8 | 80 8 | 78 6 | 81 5 | 26 20 | 22 41 |
| **2003** | | | | | | |
| Jan | 88 0 | 88 6 | 88 3 | 89 2 | 30 96 | 29 73 |
| Feb | 105 7 | 106 4 | 101 5 | 106 1 | 34 68 | 27 76 |
| Mar | 88 4 | 90 3 | 96 7 | 89 7 | 33 16 | 22 78 |
| Apr | 72 5 | 74 6 | 81 5 | 74 8 | 24 72 | 19 59 |
| May | 70 6 | 72 1 | 79 1 | 71 8 | 25 81 | 21 16 |
| Jun | 74 0 | 75 6 | 83 2 | 75 4 | 27 39 | 22 35 |
| Jul | 76 7 | 78 4 | 89 0 | 78 4 | 29 44 | 25 64 |
| Aug | 79 9 | 82 4 | 98 8 | 82 6 | 28 34 | 25 96 |
| Sep | 71 8 | 73 8 | 81 3 | 74 2 | 24 80 | 22 42 |
| Oct | 83 4 | 84 7 | 85 0 | 85 6 | 28 02 | 24 03 |
| Nov | 80 1 | 80 8 | 80 0 | 82 0 | 26 28 | 21 97 |
| Dec | 75 7 | 75 7 | 72 7 | 76 6 | 24 62 | 19 78 |
| **2004** | | | | | | |
| Jan | 69 2 | 68 1 | 69 4 | 69 7 | 22 30 | 17 72 |
| Feb | 65 8 | 63 0 | 66 5 | 63 7 | 19 17 | 16 17 |
| Mar | 61 2 | 58 9 | 62 8 | 59 6 | 18 46 | 15 66 |
| Apr | 59 8 | 60 9 | 65 4 | 61 1 | 19 40 | 16 23 |
| May | 60 4 | 61 8 | 70 8 | 62 0 | 20 66 | 17 26 |
| Jun | 60 3 | 61 5 | 68 0 | 62 1 | 21 07 | 17 59 |
| Jul | 61 3 | 62 3 | 67 9 | 63 5 | 20 86 | 17 01 |
| Aug | 64 6 | 65 3 | 71 4 | 67 6 | 20 84 | 17 68 |
| Sep | 70 1 | 71 1 | 73 7 | 72 6 | 22 23 | 19 18 |
| Oct | 69 9 | 71 0 | 71 1 | 71 9 | 23 12 | 19 83 |
| Nov | 69 4 | 70 1 | 69 1 | 71 2 | 22 43 | 18 75 |
| Dec | 70 1 | 70 1 | 67 1 | 71 0 | 22 59 | 18 14 |
| **2005** | | | | | | |
| Jan | 65 3 | 65 4 | 64 3 | 67 0 | 21 37 | 16 98 |
| Feb | 63 0 | 63 2 | 63 9 | 63 9 | 19 23 | 16 23 |
| Mar | 62 8 | 63 4 | 67 5 | 64 2 | 19 86 | 16 85 |
| Apr | 64 8 | 66 0 | 70 9 | 66 2 | 21 04 | 17 60 |
| May | 63 2 | 64 7 | 74 1 | 64 9 | 21 61 | 18 06 |
| Jun | 61 0 | 62 2 | 68 7 | 62 7 | 21 28 | 17 77 |
| Jul | 62 1 | 63 2 | 68 8 | 64 3 | 21 16 | 17 25 |
| Aug | 65 7 | 66 5 | 72 6 | 68 8 | 21 20 | 17 98 |
| Sep | 70 7 | 71 6 | 74 3 | 73 2 | 22 46 | 19 38 |
| Oct | 70 0 | 71 1 | 71 2 | 72 0 | 23 20 | 19 90 |
| Nov | 69 7 | 70 4 | 69 5 | 71 5 | 22 58 | 18 88 |
| Dec | 70 1 | 70 1 | 67 1 | 71 0 | 22 59 | 18 14 |
| **2006** | | | | | | |
| Jan | 65 8 | 65 8 | 64 7 | 67 4 | 21 52 | 17 10 |
| Feb | 63 8 | 64 0 | 64 8 | 64 8 | 19 49 | 16 45 |
| Mar | 64 0 | 64 7 | 68 9 | 65 5 | 20 26 | 17 19 |
| Apr | 66 6 | 67 8 | 72 8 | 68 0 | 21 61 | 18 08 |
| May | 65 3 | 66 9 | 76 6 | 67 1 | 22 35 | 18 67 |
| Jun | 63 5 | 64 7 | 71 5 | 65 3 | 22 15 | 18 50 |
| Jul | 64 6 | 65 7 | 71 6 | 66 9 | 22 02 | 17 95 |
| Aug | 68 3 | 69 1 | 75 6 | 71 6 | 22 06 | 18 71 |
| Sep | 73 5 | 74 5 | 77 3 | 76 1 | 23 37 | 20 16 |
| Oct | 72 8 | 74 0 | 74 1 | 74 8 | 24 13 | 20 70 |
| Nov | 72 5 | 73 2 | 72 3 | 74 4 | 23 49 | 19 64 |
| Dec | 72 9 | 72 9 | 69 8 | 73 9 | 23 49 | 18 87 |
| 2002 | 66 1 | 67 9 | 72 5 | 68 9 | 22 40 | 20 69 |
| 2003 | 80 6 | 81 9 | 86 4 | 82 2 | 28 19 | 23 60 |
| 2004 | 65 2 | 65 3 | 68 6 | 66 3 | 21 10 | 17 60 |
| 2005 | 65 7 | 66 5 | 69 4 | 67 5 | 21 47 | 17 92 |
| 2006 | 67 8 | 68 6 | 71 7 | 69 7 | 22 16 | 18 50 |

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000086

NS - NJ 000086
CONFIDENTIAL SUBMISSION

## U S Petroleum Product Spot Prices Boston Harbor

| | No 2 Distillate cts/gal | No 2 Diesel cts/gal | No 6 Resid 0 5% sulfur $/bbl | No 6 Resid 1 0% sulfur $/bbl | No 6 Resid 2 2% sulfur $/bbl |
|---|---|---|---|---|---|
| **2002** | | | | | |
| Jan | 56 9 | 61 0 | 32 69 | 28 44 | 24 75 |
| Feb | 54 4 | 61 7 | 32 03 | 27 78 | 24 75 |
| Mar | 66 6 | 70 2 | 33 06 | 29 06 | 26 55 |
| Apr | 70 2 | 74 9 | 35 60 | 31 85 | 28 66 |
| May | 70 3 | 74 7 | 35 88 | 32 13 | 29 00 |
| Jun | 67 1 | 71 2 | 35 88 | 32 13 | 29 00 |
| Jul | 70 7 | 74 2 | 35 88 | 32 13 | 29 00 |
| A g | 72 7 | 77 5 | 35 97 | 32 22 | 29 18 |
| Sep | 81 9 | 84 4 | 37 45 | 33 70 | 31 45 |
| Oct | 80 0 | 85 4 | 39 32 | 35 57 | 32 96 |
| Nov | 76 7 | 80 5 | 39 41 | 35 66 | 33 00 |
| Dec | 87 7 | 89 3 | 40 96 | 37 13 | 34 33 |
| **2003** | | | | | |
| Jan | 97 2 | 98 5 | 45 71 | 42 49 | 38 82 |
| Feb | 119 5 | 121 5 | 53 31 | 48 73 | 45 40 |
| Mar | 112 6 | 118 1 | 55 77 | 51 08 | 45 50 |
| Apr | 87 3 | 91 7 | 49 40 | 44 90 | 40 10 |
| May | 84 7 | 85 0 | 47 51 | 43 01 | 37 86 |
| Jun | 83 5 | 83 2 | 45 83 | 41 33 | 36 90 |
| Jul | 84 1 | 85 0 | 45 55 | 41 05 | 36 00 |
| Aug | 85 9 | 87 4 | 45 36 | 40 86 | 36 00 |
| Sep | 78 4 | 81 2 | 44 46 | 39 96 | 36 00 |
| Oct | 92 7 | 96 7 | 48 85 | 41 73 | 39 19 |
| Nov | 89 0 | 92 2 | 45 64 | 39 14 | 36 84 |
| Dec | 84 2 | 86 4 | 43 26 | 36 67 | 33 36 |
| **2004** | | | | | |
| Jan | 77 0 | 77 7 | 39 21 | 33 21 | 30 39 |
| Feb | 73 1 | 71 9 | 33 57 | 28 54 | 26 71 |
| Mar | 68 0 | 67 2 | 32 13 | 27 49 | 25 75 |
| Apr | 66 5 | 69 5 | 33 57 | 28 89 | 26 54 |
| May | 67 1 | 70 6 | 35 87 | 30 77 | 28 01 |
| Jun | 67 1 | 70 2 | 36 56 | 31 37 | 28 45 |
| Jul | 68 1 | 71 1 | 36 51 | 31 09 | 28 30 |
| Aug | 71 8 | 74 6 | 36 34 | 31 04 | 28 86 |
| Sep | 77 9 | 81 1 | 38 63 | 33 11 | 31 38 |
| Oct | 77 7 | 81 1 | 40 30 | 34 42 | 32 33 |
| Nov | 77 2 | 80 0 | 38 95 | 33 40 | 31 45 |
| Dec | 78 0 | 80 1 | 39 69 | 33 64 | 30 60 |
| **2005** | | | | | |
| Jan | 72 7 | 74 6 | 37 57 | 31 83 | 29 12 |
| Feb | 70 0 | 72 1 | 33 68 | 28 64 | 26 80 |
| Mar | 69 8 | 72 4 | 34 57 | 29 58 | 27 71 |
| Apr | 72 1 | 75 4 | 36 39 | 31 33 | 28 77 |
| May | 70 2 | 73 8 | 37 52 | 32 18 | 29 30 |
| Jun | 67 8 | 71 0 | 36 94 | 31 69 | 28 74 |
| Jul | 69 1 | 72 1 | 37 01 | 31 51 | 28 69 |
| Aug | 73 0 | 75 8 | 36 96 | 31 57 | 29 35 |
| Sep | 78 6 | 81 8 | 39 02 | 33 45 | 31 70 |
| Oct | 77 8 | 81 2 | 40 43 | 34 54 | 32 44 |
| Nov | 77 6 | 80 4 | 39 22 | 33 62 | 31 66 |
| Dec | 78 0 | 80 1 | 39 69 | 33 64 | 30 60 |
| **2006** | | | | | |
| Jan | 73 2 | 75 1 | 37 83 | 32 04 | 29 32 |
| Feb | 71 0 | 73 1 | 34 13 | 29 03 | 27 16 |
| Mar | 71 2 | 73 8 | 35 27 | 30 18 | 28 27 |
| Apr | 74 0 | 77 4 | 37 38 | 32 17 | 29 55 |
| May | 72 6 | 76 3 | 38 79 | 33 27 | 30 29 |
| Jun | 70 6 | 73 9 | 38 45 | 32 99 | 29 92 |
| Jul | 71 9 | 75 0 | 38 51 | 32 80 | 29 86 |
| A g | 76 0 | 78 9 | 38 46 | 32 85 | 30 54 |
| Sep | 81 8 | 85 1 | 40 60 | 34 80 | 32 99 |
| Oct | 80 9 | 84 5 | 42 06 | 35 93 | 33 74 |
| Nov | 80 7 | 83 6 | 40 79 | 34 97 | 32 93 |
| Dec | 81 1 | 83 3 | 41 27 | 34 99 | 31 83 |
| 2002 | 71 3 | 75 4 | 36 18 | 32 32 | 29 39 |
| 2003 | 91 6 | 93 9 | 47 55 | 42 58 | 38 50 |
| 2004 | 72 5 | 74 6 | 36 78 | 31 41 | 29 06 |
| 2005 | 73 1 | 75 9 | 37 42 | 31 97 | 29 57 |
| 2006 | 75 4 | 78 3 | 38 63 | 33 00 | 30 53 |



HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000087

NS NJ 000087
CONFIDENTIAL SUBMISSION

**U S Propane Prices**

| | Conway Kan as cts/gal | Mont Belvieu Texas cts/gal | Selkirk New York cts/gal |
|---|---|---|---|
| **2002** | | | |
| Jan | 26 7 | 29 1 | 40 9 |
| Feb | 28 0 | 31 3 | 41 8 |
| Mar | 36 0 | 38 0 | 47 2 |
| Apr | 40 1 | 41 3 | 51 8 |
| May | 38 1 | 40 7 | 51 8 |
| Jun | 35 3 | 37 5 | 48 6 |
| Jul | 35 5 | 37 1 | 47 4 |
| Aug | 41 6 | 41 5 | 50 3 |
| Sep | 45 9 | 47 1 | 56 4 |
| Oct | 47 1 | 47 9 | 57 5 |
| Nov | 47 9 | 47 2 | 57 6 |
| Dec | 52 4 | 52 4 | 62 8 |
| **2003** | | | |
| Jan | 57 8 | 59 2 | 70 2 |
| Feb | 70 2 | 71 2 | 86 8 |
| Mar | 56 6 | 61 4 | 78 9 |
| Apr | 50 3 | 50 1 | 60 6 |
| May | 55 5 | 54 1 | 62 3 |
| Jun | 59 8 | 55 7 | 65 5 |
| Jul | 58 9 | 52 9 | 63 3 |
| Aug | 63 7 | 54 8 | 63 4 |
| Sep | 59 4 | 52 0 | 63 3 |
| Oct | 64 7 | 56 2 | 68 3 |
| Nov | 61 5 | 53 9 | 66 6 |
| Dec | 57 5 | 51 0 | 62 9 |
| **2004** | | | |
| Jan | 52 1 | 46 6 | 57 6 |
| Feb | 48 6 | 44 3 | 54 7 |
| Mar | 44 6 | 41 2 | 50 9 |
| Apr | 42 7 | 40 3 | 49 7 |
| May | 42 1 | 40 7 | 50 2 |
| Jun | 41 1 | 40 7 | 50 2 |
| Jul | 41 7 | 41 3 | 51 0 |
| Aug | 44 0 | 43 5 | 53 7 |
| Sep | 47 7 | 47 2 | 58 3 |
| Oct | 47 6 | 47 1 | 58 1 |
| Nov | 47 2 | 46 8 | 57 7 |
| Dec | 47 7 | 47 2 | 58 3 |
| **2005** | | | |
| Jan | 44 5 | 44 0 | 54 3 |
| Feb | 42 9 | 42 4 | 52 4 |
| Mar | 42 7 | 42 3 | 52 2 |
| Apr | 44 1 | 43 7 | 53 9 |
| May | 43 0 | 42 5 | 52 5 |
| Jun | 41 5 | 41 1 | 50 7 |
| Jul | 42 3 | 41 9 | 51 7 |
| Aug | 44 7 | 44 3 | 54 6 |
| Sep | 48 1 | 47 6 | 58 8 |
| Oct | 47 6 | 47 1 | 58 2 |
| Nov | 47 5 | 47 0 | 58 0 |
| Dec | 47 7 | 47 2 | 58 3 |
| **2006** | | | |
| Jan | 44 8 | 44 3 | 54 7 |
| Feb | 43 4 | 43 0 | 53 1 |
| Mar | 43 6 | 43 2 | 53 3 |
| Apr | 45 3 | 44 8 | 55 3 |
| May | 44 4 | 44 0 | 54 3 |
| Jun | 43 2 | 42 8 | 52 8 |
| Jul | 44 0 | 43 6 | 53 8 |
| Aug | 46 5 | 46 0 | 56 8 |
| Sep | 50 0 | 49 5 | 61 1 |
| Oct | 49 5 | 49 0 | 60 5 |
| Nov | 49 4 | 48 9 | 60 3 |
| Dec | 49 6 | 49 1 | 60 6 |
| 2002 | 39 6 | 40 9 | 51 2 |
| 2003 | 59 7 | 56 0 | 67 7 |
| 2004 | 45 6 | 43 9 | 54 2 |
| 2005 | 44 7 | 44 3 | 54 6 |
| 2006 | 46 2 | 45 7 | 56 4 |

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000088

NS NJ 000088
CONFIDENTIAL SUBMISSION

Original Message
From Glennon Pat
Sent Thursday July 03 2003 10 22 AM
To Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe
Cc Seale Don Pfeifer Alby Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
Subject 7/10 Fuel Surcharge Meeting Background Info

GVPs T Re July 10 (10am) fuel surcharge meeting The analysis below provides supporting material if you feel you need it The subject is technical If you want to keep it short refer to the attached FSC comparison excel document (best viewed printed) and the ‖Recap¶ under each RR summary (below)

1 T Comparison study (attached)
The CSXT and UP adopt new Fuel Surcharge formulas effective June 1 The NS UP BNSF and CSXT each have unique formulas The attached spreadsheet is a hypothetical exercise that compares the various formulas and estimates NS revenues had NS implemented each formula in January 2002 This gives you a relative comparison of the FSC percentages that each standard would have produced had they been in effect It also provides a hypothetical NS revenue yield had the formulas been in effect for the account of NS This is for comparison purposes only and does not reflect the FSCs that were in effect at the time or the revenues that may have been collected Use this to gauge relative fuel cost compensation

I‡ve also attached an earlier pro/con analysis for adopting the CSXT standard (and UP at that time) While somewhat outdated it raises some points that are still valid The UP has since adopted a variation of the BNSF standard that addresses several of the CSXT shortcomings

2 T Current FSC status Based on the latest available information here is where the major U S carriers stand effective July 1
NS
1 The 2% NS FSC remains in effect
2 The price of WTI us running at about $30 midway between the $28 (2%) and $33 (4%) per barrel thresholds
3 The current FSC will remain at 2% at least through late August
4 Recap WTI $28 base 2% at $5 increments applied after 30 consecutive WSJ publication days

CSXT
1 The CSXT adopted a new formula effective June 1
2 The CSXT FSC for July is 2 4% and will go to 3 2% for the month of August
3 The new CSXT form uses the BNSF monthly average methodology but is based in WTI prices not diesel The price is based on a monthly average that is announced following close of the month to be effective for the month following the announcement For example the April average is announced in May and effective for June
4 The formula provides for 0 4% increments for every dollar off a WTI base of $23 per barrel compared to the $28/2% kick in threshold for NS This generally produces higher percentages
5 In addition it applies increases starting at $23 with a 0 4% increase instead of $28/2% As a result at $28 01 per barrel the new CSXT

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000089

NS NJ 000089
CONFIDENTIAL SUBMISSION

FSC produces a 2 4% compared to 2 0% provided for by the old CSXT and current NS formula

6 The CSXT is also attempting to apply the new FSC to all publications public and private effective June 1 They may make exceptions for contracts taking RCAF escalation We have not gotten feedback on customer acceptance

7 Bottom line this formula kicks in the sooner than the NS and UP formulas and produces the highest percentages by far

8 Recap WTI $23 base 0 4% at $1 increments monthly average 2 month lag

9

http //shipcsx com/ec shipcsxpublic Main?module_url=/ec pricingpublic/Status

BNSF

1 No policy change Their FSC has been in effect for a long time but only began aggressively applying within the last year

2 The BNSF FSC for July is 2 5% The announced FSC for August is ?% The BNSF opted to not take the full 3% allowed by the formula for the month of June

3 BNSF maintains a diesel based formula that provides for 0 5% increments for every 5 cent increase in diesel starting at $1 25 per gallon

4 The price is based on a monthly average that is announced following close of the month to be effective for the month following the announcement For example the April average is announced in May and effective for June

5 The methodology is similar to the CSXT formula but it is based on the price of diesel Historically it has produced lower percentages the new CSXT formula

6 Recap Diesel $1 25 base 0 5% at 24 cent increments Monthly average 2 month lag

7 http //domino bnsf com/website/updates nsf/updates?ReadForm&pricing

UP

1 A New UP formula is effective June 1

2 The UP FSC for July is 2 5% The UP opted to not take the full 3% allowed under the new formula for June

3 The UP initially adopted the new CSXT standard then revised their position and adopted a variation of the BNSF formula

4 The big difference compared to the BNSF is a higher kick in threshold of $1 35 per gallon ($1 25 base) Once the threshold is met the initial FSC is 1 5% with 0 5% increments starting at 1 5% Once it kicks in it is identical to the BNSF FSC

5 The practical affect is to suppress smaller increases until the $1 35 threshold is met and then suppressed increases are applied back to the $1 25 base There is no retroactive application The threshold concept is similar to the $28 WTI threshold used by NS The elimination of smaller increases below 1 5% has a stabilizing affect that helps in bill and collections

6 Like the CSXT and UP the price of diesel is based on a monthly average that is announced following the close of the month to be effective for the month following the announcement For example the April average is announced in May and effective for June

7 Recap $1 25 base 0 5% increments at 25 cent increments monthly average 2 month lag

8 http //www uprr com/customers/fuel_surcharge shtml

3 I If we opt to revise the NS FSC the transition issues

NS NJ 000090

CONFIDENTIAL SUBMISSION

HIGHLY CONFIDENTIAL Attorneys Eyes Only

NS 001000090

The NS fuel surcharge text has been inserted into each NS publication that is subject the NS FSC As a result we cannot simply change the FSC text in the NS Conditions of Carriage and expect a revised formula to take effect universally The specific text in the rate publication takes precedence A case can be make that the C/C applies but it would be a stretch and would antagonize many customers and lead to billing disputes

If we were to change the NS FSC the most likely approach would be to

Replace FSC text currently in each publication and replace it with a new note that simply refers to the Conditions of Carriage for the FCS text

Publish the new FSC in the C/C

Create a new 9?55 notes w/o the specific FSC ext that simply refers to he C/C

Transition one publication at a time by referring to the new note

* We could reissue public authorities on an accelerated basis
* New authorities would use the new note

Existing private authorities would more than likely have to be renegotiated and reissued on the anniversary date

Since a large percentage of our traffic moves on private authorities it would take up to a year to achieve good coverage In the case of long term contracts it will take longer

* As far as the maintenance of two FSC formulas (notes) it can be handled

Marketing services would calculate the percentage each month for both FSC versions and inert the resulting percentages in each note in 9255 The note change would be "issued¶ in 9255 9255 and REN would be automatically updated and the new FSC % applied

* The authorities associated to the FSC notes would not be reissued with each percentage change
* Marketing Services is already in the process of preparing the new generic 9255 FSC note that simply refers to the C/C w/o the full text Regardless of the decision on a FSC change we start the transition to swap out the note
* It will position us to make a universal change (w/o changing each rate publication) if we later decide to change the FCS
* The new note w/o the FSC text will be far shorter The current note takes a half page of text This will streamline our publications

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000091

NS NJ 000091

CONFIDENTIAL SUBMISSION

| Month | NS Merch Rev (L & F) (Yearly AVG/Month) | NS FSC (actual) | CSXT FSC (Pro Forma) | BNSF FSC (actual) | UP FSC (pro forma) | Revenue From FSC (NS FSC X 52 adj) See Note 1 below | Revenue From FSC (CSXT FSC X 52 adj) |
|---|---|---|---|---|---|---|---|
| January 2002 | $200 750 000 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2002 | $200 750 000 | 0 | 0 | 0 | 0 | 0 | 0 |
| March 2002 | $200 750 000 | 0 | 0 | 0 | 0 | 0 | 0 |
| April 2002 | $200 750 000 | 0 | 0 | 0 | 0 | 0 | 0 |
| May 2002 | $200 750 000 | 0 | 0 80% | 0 | 0 | 0 | $835 120 |
| June 2002 | $200 750 000 | 0 | 1 60% | 1 00% | 0 | 0 | $1 670 240 |
| July 2002 | $200 750 000 | 0 | 2 00% | 1 00% | 0 | 0 | $2 087 800 |
| August 2002 | $200 750 000 | 0 | 1 20% | 0 00% | 0 | 0 | $1 252 680 |
| September 2002 | $200 750 000 | 0 | 1 60% | 0 00% | 0 | 0 | $1 670 240 |
| October 2002 | $200 750 000 | 14 day @2% | 2 40% | 1 00% | 0 | $942 877 | $2 505 360 |
| November 2002 | $200 750 000 | 2 00% | 2 80% | 2 00% | 2 00% | $2 087 800 | $2 922 920 |
| December, 2002 | $200,750,000 | 11 day @2% | 2 40% | 2 50% | 2 50% | $740,832 | $2,505,360 |
| **Year 2002** | **$2 409 000 000** | | | | | **$3,771 509** | **$15,449 720** |
| January 2003 | $206 886 000 | 2 day @ 2% | 1 60% | 2 00% | 2 00% | $138 814 | $1 721 292 |
| February 2003 | $206 886 000 | 2 00% | 2 80% | 2 00% | 2 00% | $2 151 614 | $3 012 260 |
| March 2003 | $206 886 000 | 2 00% | 4 00% | 2 50% | 2 50% | $2 151 614 | $4 303 229 |
| April 2003 | $206 886 000 | 2 00% | 5 20% | 4 50% | 4 50% | $2 151 614 | $5 594 197 |
| May 2003 (see Note 2 | $206 886 000 | 2 00% | 4 40% | **2 00%** | **2 00%** | $2 151 614 | $4 733 552 |
| June 2003 (see Note) | $206 886 000 | 2 00% | 2 40% | 3 00% | **2 00%** | $2 151 614 | $2 581 937 |
| July, 2003 | $206 886 000 | 2 00% | 2 40% | 2 50% | 2 50% | $2,151,614 | $2,581,937 |
| **2003 ytd total** | | | | | | **$13 048 498** | **$24 528 404** |

**Note 1** Re 52% FSC Ajustment 52% of non Intermodal Line haul NS revenue is subject to the NS FSC

**Note 2** May percentage reduced by BNSF from 5% to 2% to bring percentage in line with sharply declining oil prices Assume UP would do the same
June percentage reduction announced by UP from 3% to 2% to reflect current market conditions

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only
NS 001000092

NS NJ 000092
CONFIDENTIAL
SUBMISSION

| Revenue From FSC (BNSF FSC X 52 adj) | Revenue From FSC UP FSC X 52 adj) |
|---|---|
| | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| $1 670 240 | 0 |
| $2 087 800 | 0 |
| 0 | 0 |
| 0 | 0 |
| $2 505 360 | 0 |
| $2 922 920 | $2 922 920 |
| $2,609,750 | $2,609,750 |
| **$11 796 070** | **$5 532 670** |
| $2 151 614 | $2 151 614 |
| $2 151 614 | $2 151 614 |
| $2 689 518 | $2 689 518 |
| $4 841 132 | $4 841 132 |
| $2 151 614 | $2 151 614 |
| $3 227 422 | $2 151 614 |
| $2,689,518 | $2,689,518 |
| **$19 902,432** | **$18 826 624** |

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000093

NS NJ 000093
CONFIDENTIAL
SUBMISSION

| Month | NS FSC (actual) | CSXT FSC (Pro Forma) | BNSF FSC (actual) | UP FSC (pro forma) |
|---|---|---|---|---|
| January 2002 | 0 | 0 | 0 | 0 |
| February 2002 | 0 | 0 | 0 | 0 |
| March 2002 | 0 | 0 | 0 | 0 |
| April 2002 | 0 | 0 | 0 | 0 |
| May 2002 | 0 | 0 80% | 0 | 0 |
| June 2002 | 0 | 1 60% | 1 00% | 0 |
| July 2002 | 0 | 2 00% | 1 00% | 0 |
| August 2002 | 0 | 1 20% | 0 00% | 0 |
| September 2002 | 0 | 1 60% | 0 00% | 0 |
| October 2002 | 14 day @2 / | 2 40% | 1 00 / | 0 |
| November 2002 | 2 00% | 2 80 / | 2 00 / | 2 00 / |
| December, 2002 | 11 day @2% | 2 40% | 2 50% | 2 50 / |
| **Year 2002** | | | | |
| January 2003 | 2 day @ 2 % | 1 60 / | 2 00 / | 2 00% |
| February 2003 | 2 00% | 2 80% | 2 00 / | 2 00 / |
| March 2003 | 2 00 % | 4 00% | 2 50 % | 2 50 % |
| April 2003 | 2 00 % | 5 20 % | 4 50 % | 4 50 % |
| May 2003 (see Note) | 2 00% | 4 40 / | **2 00 /** | **2 00 /** |
| June 2003 (see Note) | 2 00 / | 2 40 % | 3 00 % | **2 00 %** |
| July, 2003 | 2 00 / | 2 40 / | 2 50 % | 2 50% |
| **2003 ytd total** | | | | |

**Note** May percentage reduced by BNSF from 5 % to 2 / to bring percentage in line with sharply declining oil prices Assume UP would do the same
*June percentage reduction announced by UP from 3 / to 2 / to reflect current market condi ions*

**HIGHLY CONFIDENTIAL**
**Attorneys Eyes Only**
**NS 001000094**

**NS NJ 000094**
**CONFIDENTIAL SUBMISSION**

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000095

NS NJ 000095

CONFIDENTIAL
SUBMISSION

**Subject** Fuel Surcharge – CSXT vs NS Comparison
**Date** April 7 2003

**To** DWS CJB
**From** PJG

Until the recently announced CSXT Fuel Surcharge (FSC) policy change all Class One U S carriers except the BNSF observed the same Fuel Surcharge (FSC) standard The just announced CSXT policy change undercuts some of the ease of doing business and market competition assumptions supporting the current standard On the other hand the CSXT formula would have produced additional $7 083 472 in NS revenue in 2002 and YTD 2003 had it been in effect The following arguments for and against adopting the CSXT Fuel Surcharge are based on comments and opinions pressed customers other carriers and NS personnel since the inception of the first FSC in 2000

**The case against adopting the CSXT standard**

1 **Ease of doing business**

- **Customer administration** Many customers claim that price adjustments and surcharges are difficult to administer Analysis by CFIT and related billing analysis indicates that poor price administration by customers is responsible for a large percentage of our billing disputes
- **Frequency of administration** The 4% per $1 WTI increase will likely result in more frequent FSC changes The current 2%/$28/WTI standard is far less sensitive to small price fluctuations
- **Common FSC standard** At this moment we currently share the same FSC standard with all the major US carrier (except BNSF) but that will be changing The CSXT has announced The UP hasn t announced but it appears that it will The CN and CP maintain their own FSC standards That would leave 3 US groups 1) NS FEC and KCS 2) BNSF and CSXT and UP The announced CSXT change undercuts what was the US standard and places more of a maintenance burden (3 standards 5 if you include Canadian) on customers especially the larger customers served two or more originating RRs However if the UP opts to adopt the CSXT standard this ease of doing business argument actually becomes a point in favor of NS adopting the CSXT standard at least from a standards perspective The smaller carriers would more than likely adopt it after waiting for any fallout That would leave only the BNSF and the Canadians out of synch This assumes the carriers are able to make the new standard stick
- **CSXT increased the FSC %** Technically the CSXT formula provides the same 2% FSC at $28 00 WTI **However, as soon as the monthly average WTI goes to $28 01 the FSC increases to 2 4%** Not only does the FSC kick sooner in at $23 vs $28 the actual FSC is higher at $28 01 This opens us to the argument that we are not only taking the FSC sooner at higher costs to the customers but that we are raised the FSC from 2 0% to 2 4% at comparable WTI levels

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000096

NS NJ 000096

CONFIDENTIAL SUBMISSION

2 – **Revenue issues**

- **Established NS base** The implementation of the original FSC generated intense customer opposition but many have since accepted the current standard Changing it to a lower threshold that results in more frequent changes and higher percentages will reopen the debate with customers and complicate routine price negotiations
- **Customer push back** Where we currently have customers on the FSC we run the risk of losing the surcharge altogether While 82% of out authorities have the FSC only 52% of our line haul revenue is subject to it The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC

3 **Technical issues**

- **Publication limitations** NS actually inserts the current SC in all publications If we adopt a new FSC to make it effective we will have to republish each authority subject to the new FSC
- **Unlike the approach the CSXT is attempting, NS must republish at the Price authority level** CSXT is tak ng the position that they are simply referring to the FSC clause in their T&C and that by changing the FSC clause in the T&C will implement that new FSC in all publications public and private That assumption is questionable for private authorities particularly contracts and they privately admit that On the other hand NS publishes the FSC clause in each price publication NS would have republish each rate authority in order to replace it Public authorities can be done at our convenience Private authorities would most likely have to be changed as part of the renegotiation process something CSXT may be facing on private authorities as well Replacing the FSC in NS publications require that we republish all authorities The logistics of publication would require that we stagger the implementation

**<u>The case in favor of adopting the CSXT standard</u>**

1 **Ease of doing business**

- **Better customer notification** The monthly average WTI standard (prior monthly WTI average announced in the current month to be effective in the following month) provides better lead time for systems changes The BNSF and CSXT standards both use this methodology The major difference is that BNSF is based on diesel prices a more volatile index
- **Consistent application** The FSC is applied by calendar month This removes variability as to when the FSC will be applied
- **Establish a new standard** If one or more other Class I carriers switch to the CSXT standard we would have a better ease of doing business case for adopting a new standard
- **Truck like** Despite some evidence to the contrary for smaller customers the larger customers that ship both rail and truck have billing systems that should be able to accommodate surcharges

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000097

NS NJ 000097
CONFIDENTIAL SUBMISSION

2 **Revenue**

- **More revenue** The CSXT standard clearly produces significantly more compensation and it does it sooner and more consistently Assuming both FSC standards were in effect for all of last year they would each produce the following NS MDSE revenues (see attach spreadsheet)

  **2002 $3 8M NS vs $15 5M CSXT version Full year**
  **2003 $4 4 M NS vs $9 0M CSXT version YTD**

- **Quicker implementation** The lower threshold combined with the $1 WTI thresholds mean the CSXT kicks in sooner For example May 2002 (CSXT) vs October 2002 (NS)

3 **Technical issues**

- **NS billing systems can handle the CSXT standard** Marketing Services updates the FSC note in 9255 covering FSC formula The change is automatically applied to all prices subject to the involved FSC note By comparison the BNSF is forced to reissue all FSC related prices in REN whenever there is a FSC update
- **Some Limitations** Tracking the WTI and loading the FSC percentage is a manual process for Marketing Services However once the percentage is loaded on the appropriate note in 9255 the rest is automatic What we cannot handle are numerous formulas producing different percentages on different dates for different durations The administration of multiple FSC becomes a problem and more importantly we are not able to maintain targeted FSC distribution lists for customer notification If we opt to change the FSC we can maintain two (old and new) but we cannot easily or accurately sustain a variety negotiated variations that customers will invariably what to negotiate

In a related note the BNSF made some inquiries regarding REN standards covering the passing of mileage in FSC condition codes (notes) They appear to be looking at the widely distributed report criticizing all carriers for the fact that the FSC are based on a percentage of revenue vs mileage In other words high value ladings tend to be billed higher fuel charges While this would address some of the customer complaints the rail industry lacks a good way to determine interline rail miles We have no reason to believe they are seriously considering a change to a mileage basis

Revisiting a key point made earlier If we adopt the new CSXT standard there are implementation issues

**Contracts** The FSC is actually included (printed) in NS contracts In order to remove it we would have to renegotiate and reissue each contract or allow it to expire and make the change in the next contract The CSXT did not imbed the FSC text in their authorities Their opening position that since their contracts simply refer to their T&C which will be changed the contracts are automatically subject to the new FSC Privately they admit that this is a stretch and expect strong customer opposition

**Private Quotes** – Again the FSC is printed in the NS private quote NS has traditionally honored terms printed in private quotes for the duration of the publication While there is a case to be made that we can change the terms this is not a position we should necessarily adopt Customers would lose trust in our private quotes and insist that we instead establish contracts Administratively this is not something we want

**Public Quotes and Tariffs** – Again we have the FSC included in each publication However in this case we are free to change the publications on 20 days notice Logistically we could not process them all at the same time We would have to stagger the implementation

Since we have less latitude than the CSXT to make wholesale changes my recommendation if we opt to adopt the CSXT standard would be to

- Not immediately announce a FSC policy change
- Wait for fuel costs to drop and stabilize preferably to drop off completely
- Announce that public authorities will transition to a new FSC beginning xx xx xx
- Make the changes on public prices over a relatively short period
- Handle private authorities on a case by cases basis

**Pre CSXT RR Comparison**

| RR | BASIS | SCHEDULE |
|---|---|---|
| NS | WTI 30 Day WSJ price | 2% increase for $5 00 increments over $23 |
| UP | WTI 30 Day WSJ price | 2% increase for $5 00 increments over $23 |
| KCS | WTI 30 Day WSJ price | 2% increase for $5 00 increments over $23 |
| BNSF | Monthly Highway Diesel Fuel average w/one month delay for announcement of % | 5% increments per $ 05 increments above $1 299 per gallon (1% threshold) |
| CSXT | WTI – monthly average per barrel probably with one month delay from % announcement | 4 % increase for each dollar increase aver $23 |
| CN | WTI Average for previous QTR | 2% $24 00 $26 99<br>4% $27 00 $31 99<br>6 % $32 00 $36 99<br>8% $37 00 $41 99<br>Each $5 00 U S increase thereafter = additional 2% |
| CPR | WTI Average for previous QTR | 3% above $22 00<br>6% above $30 00 |

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000099

NS NJ 000099
CONFIDENTIAL SUBMISSION

## Unknown

**From** Lawson David
**Sent** Tuesday November 04 2003 3 01 PM
**To** Glennon Pat Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby Rhodes Joyce
**Subject** File AD Fuel Surcharge Policy Review

PJG

Modalgistics supports Option 2

DTL

Original Message
**From** Glennon Pat
**Sent** Tuesday November 04 2003 1 00 PM
**To** Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby
**Subject** Fuel Surcharge Policy Review
**Importance** High

**GVPs** – Regarding the NS Fuel Surcharge DWS has requested that we take a fresh look at the case for and against NS adopting the new CSXT FSC standard He would like a recommendation for his consideration With that objective in mind I have provided several attachments and a recap (below) of the issues that you need to consider Attachments

Energy forecast Page 22 covers WTI Current estimates call for WTI prices in the $22 to $25 range If accurate the CSXT formula in 2004 will produce nominal FSCs in the 0 4% to 0 8% range while the NS FSC would drop to zero However earlier forecasts for 2003 called for a similar drop in second half 2003 and that hasn t materialized

A hypothetical comparison of the CSXT UP and BNSF standards and the relative yields NS could have expected had NS adopted each of the standards The comparison is based on Merchandise traffic for 2002 and Y T D 2003 These are hypothetical figures for comparison purposes The totals are not projections of actual revenues The key point is that the CSXT formula produces 75% more revenue under similar conditions (2003 WTI) Results will obviously vary with market conditions

Recap from July 2003 covering BNSF and UP comparisons covered here

Should NS adopt the CSXT FSC? **Please provide your feedback by Friday (11/ 7) on the options listed below** If we do not have a clear consensus on what direction NS should take on the FSC or if more options are submitted for consideration a meeting will be called to address the differences

Retain the current NS standard (see Pro/Con below)

Continue laying the groundwork for a conversion but delay a formal decision until 2QTR04 (See #1 below)

Adopt the CSXT standard this year (see #2 and #3 below)

Adopt the CSXT standard but raise the base to from $23 to $28 with 0 4% increases per $1 WTI increases starting at $28 01 This addresses the double dipping argument that NS has covered the fuel cost in our rates over the last several years yet we are still observing the old FSC WTI base level

- Adopt UP or BNSF standard

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000100

NS NJ 000100
CONFIDENTIAL SUBMISSION

Other options?

**If we adopted the CSXT FSC standard possible implementation scenarios**
**#1 The most conservative** and customer focused
Delay any decision/action until the 2nd qtr 2004 Allows time for most of the full text FSC clauses to be removed
- If the decision is to adopt the CSXT standard publish a new FSC in the C/C and apply it to all public authorities

Convert private authorities from that point forward as rates are renegotiated Although most NS publications would refer to the new C/C FSC standard we would informally protect the old formula on private rates until the renegotiation of the prices We can do this through Note management in 9255

**#2 – More aggressive** Same plan only begin now
Change C/C this year
Covert all public prices that have the new C/C reference
Convert private authorities as they roll over and are reissued Start now can carry over well into 2004

**#3 – Most aggressive** Same plan but force conversion of all public and private authorities with the new C/C reference don t wait for renegotiation
Change the C/C this year
Convert all public prices that have the new C/C reference
Immediately convert any existing private authorities that have the new C/C reference and convert any new or reissued authority as the full text clause is replaced with the new C/C reference
Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation

**Supporting background detail Pro/Con issues**
The more complete argument for and against a FSC change is included in the attachments However here are the core issues from the conservative perspective

Pro – For adoption of the CSXT formula
- The CSXT formula produces a higher yield

The CSXT is our primary competition and they have already taken the heat for raising the bar
The CSXT (and UP/BNSF) provide better lead times in announcing changes
The FSC % applies for a calendar month
There is no industry FSC standard to speak of It could be argued that adopting the CSXT standard may actually help provide some measure of consistency for customer at least for customers in the East
Joint NS/CSXT customers may experience less maintenance issues
The CSXT formula could be expected to generate roughly 75 % more revenue (based on 2003 WTI patterns) assuming all other billing issues remain constant (no increase in disputes or drop in collections) Note this is hypothetical The actual increase in revenue would likely be somewhat less particularly in the short term
WTI forecast for 2004 calls for prices in the $22 to $25 range If accurate that means the CSXT formula would be producing a FSC around 1% for 2004 while the NS FSC would drop off Note that we had a similar low forecast for WTI for the second half of 2003 and prices have remained around $30

Con – Against adoption of the CSXT formula
The NS formula is the most established of the RR formulas Customers are familiar with it and generally accept it We have a relatively high level of application (few exception)
- NS has relatively few billing disputes with the current NS FSC

NS is currently seen as more reasonable compared to CSXT A change would be perceived as a

CONFIDENTIAL SUBMISSION NS NJ 000101

HIGHLY CONFIDENTIAL Attorneys Eyes Only

NS 001000101

revenue grab To many customers NS would replace CSXT as the unreasonable carrier

Larger customers will argue that NS has had almost a year to incorporate higher fuel cost in the rate structure They argue that if anything the FSC should go down not up

- Adopting the CSXT standard will reopen negotiating points for customers and rate negotiation will become more difficult

Organizations like NGFA are very focused on the FSC and will publicly and politically ride the issue hard

The CSXT s 0 4% per $1 WTI increment as opposed to the 2 0% per $5 increment for NS is more likely to change from month to month leading to more maintenance issues for customers and more billing problems for NS This is offset to some extent for joint CSXT/NS customers that may find a common Eastern FSC

The net impact on FSC revenue collections would be difficult to gauge While the CSXT formula produces higher FSC percentages actual revenues might be less than expected or actually decline in the short term depending on customer reactions to the change

Assuming we would not unilaterally change the FSC on private/contract rates until the renegotiation of the rates the conversion would take 12 to 18 months to fully implement Notwithstanding the added risk of increased customer resistance and billing disputes the actual benefits in terms of additional revenue would be further diluted in the short to mid term

Technical issue Prior to June of this year NS inserted the full FSC text in each publication We are in the process of replacing the full text with reference to the Conditions of Carriage Have replaced the FSC in most public authorities and about half of the private authorities

In addition once we remove the last of the Full text NS FSC I question if we would actually execute a FSC change (adopt the CSXT FSC) in the C/C and annou[illegible] that th[illegible] immediately applies to all publications including private authorities This would generate an intense customer reaction The backlash would lead to calls for more signed contracts with specific FSC language to limit future changes I suspect we d instead take the more measured approach and informally advise customers that private authorities would not take the change until renegotiated regardless of the FSC text This approach would take 12 18 months for private authorities

Any rollout will have downside issues

Too complicated? Call me

PJG

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000102

NS NJ 000102

CONFIDENTIAL
SUBMISSION

**Unknown**

**From** Wendorf Gary
**Sent** Tuesday November 04 2003 3 23 PM
**To** Glennon Pat Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby
**Subject** RE Fuel Surcharge Policy Review

Pat Glennon

MetCon supports option 2

Gary Wendorf

Original Message
**From** Glennon Pat
**Sent** Tuesday November 04 2003 1 00 PM
**To** Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe Yopp, Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby
**Subject** Fuel Surcharge Policy Review
**Importance** High

**GVPs** Regarding the NS Fuel Surcharge DWS has requested that we take a fresh look at the case for and against NS adopting the new CSXT FSC standard He would like a recommendation for his consideration With that objective in mind I have provided several attachments and a recap (below) of the issues that you need to consider Attachments

- Energy forecast Page 22 covers WTI Current estimates call for WTI prices in the $22 to $25 range If accurate the CSXT formula in 2004 will produce nominal FSCs in the 0 4% to 0 8% range while the NS FSC would drop to zero However earl er forecasts for 2003 called for a similar drop in second half 2003 and that hasn t materialized
- A hypothetical comparison of the CSXT UP and BNSF standards and the relative yields NS could have expected had NS adopted each of the standards The comparison is based on Merchandise traffic for 2002 and Y T D 2003 These are hypothetical figures for comparison purposes The totals are not projections of actual revenues The key point is that the CSXT formula produces 75% more revenue under similar conditions (2003 WTI) Results will obviously vary with market conditions
- Recap from July 2003 covering BNSF and UP comparisons covered here

Should NS adopt the CSXT FSC? **Please provide your feedback by Friday (11/ 7) on the options listed below** If we do not have a clear consensus on what direction NS should take on the FSC or if more options are submitted for consideration a meeting will be called to address the differences

- Retain the current NS standard (see Pro/Con below)
- Continue laying the groundwork for a conversion but delay a formal decision until 2QTR04 (See #1 below)
- Adopt the CSXT standard this year (see #2 and #3 below)
- Adopt the CSXT standard but raise the base to from $23 to $28 with 0 4% increases per $1 WTI increases starting at $28 01 This addresses the double dipping argument that NS has covered the fuel cost in our rates over the last several years yet we are still observing the old FSC WTI base

level
Adopt UP or BNSF standard
- Other options?

**If we adopted the CSXT FSC standard possible implementation scenarios**
**#1 The most conservative** and customer focused

- Delay any decision/action until the 2nd qtr 2004 Allows time for most of the full text FSC clauses to be removed
- If the decision is to adopt the CSXT standard publish a new FSC in the C/C and apply it to all public authorities
- Convert private authorities from that point forward as rates are renegotiated Although most NS publications would refer to the new C/C FSC standard we would informally protect the old formula on private rates until the renegotiation of the prices We can do this through Note management in 9255

**#2 More aggressive** Same plan only begin now

- Change C/C this year
- Covert all public prices that have the new C/C reference
- Convert private authorities as they roll over and are reissued Start now can carry ove well into 2004

**#3 Most aggressive** Same plan but force conversion of all public and private authorities with the new C/C reference don t wait for renegotiation

- Change the C/C this year
- Convert all public prices that have the new C/C reference
- Immediately convert any existing private authorities that have the new C/C reference and convert any new or reissued authority as the full text clause is replaced with the new C/C reference
- Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation

<u>Supporting background detail Pro/Con issues</u>
The more complete argument for and against a FSC change is included in the attachments However here are the core issues from the conservative perspective

<u>Pro For adoption of the CSXT formula</u>

- The CSXT formula produces a higher yield
- The CSXT is our primary competition and they have already taken the heat for raising the bar
- The CSXT (and UP/BNSF) provide better lead times in announcing changes
- The FSC % applies for a calendar month
- There is no industry FSC standard to speak of It could be argued that adopting the CSXT standard may actually help provide some measure of consistency for customer at least for customers in the East
- Joint NS/CSXT customers may experience less maintenance issues
- The CSXT formula could be expected to generate roughly 75% more revenue (based on 2003 WTI patterns) assuming all other billing issues remain constant (no increase in disputes or drop in collections) Note this is hypothetical The actual increase in revenue would likely be somewhat less particularly in the short term

- WTI forecast for 2004 calls for prices in the $22 to $25 range If accurate that means the CSXT formula would be producing a FSC around 1 % for 2004 while the NS FSC would drop off Note that we had a similar low forecast for WTI for the second half of 2003 and prices have remained around $30

Con Against adoption of the CSXT formula

- The NS formula is the most established of the RR formulas Customers are familiar with it and generally accept it We have a relatively high level of application (few exception)
- NS has relatively few billing disputes with the current NS FSC
- NS is currently seen as more reasonable compared to CSXT A change would be perceived as a revenue grab To many customers NS would replace CSXT as the unreasonable carrier
- Larger customers will argue that NS has had almost a year to incorporate higher fuel cost in the rate structure They argue that if anything the FSC should go down not up
- Adopting the CSXT standard will reopen negotiating points for customers and rate negotiation will become more difficult
- Organizations like NGFA are very focused on the FSC and will publicly and politically ride the issue hard
- The CSXT s 0 4% per $1 WTI increment as opposed to the 2 0% per $5 increment for NS is more likely to change from month to month leading to more maintenance issues for customers and more billing problems for NS This is offset to some extent for joint CSXT/NS customers that may find a common Eastern FSC
- The net impact on FSC revenue collections would be difficult to gauge While the CSXT formula produces higher FSC percentages actual revenues might be less than expected or actually decline in the short term depending on customer reactions to the change
- Assuming we would not unilaterally change the FSC on private/contract rates until the renegotiation of the rates the conversion would take 12 to 18 months to fully implement Notwithstanding the added risk of increased customer resistance and billing disputes the actual benefits in terms of additional revenue would be further diluted in the short to mid term
- Technical issue Prior to June of this year NS inserted the full FSC text in each publication We are in the process of replacing the full text with reference to the Conditions of Carriage Have replaced the FSC in most public authorities and about half of the private authorities
- In addition once we remove the last of the Full text NS FSC I question if we would actually execute a FSC change (adopt the CSXT FSC) in the C/C and announce that that it immediately applies to all publications including private authorities This would generate an intense customer reaction The backlash would lead to calls for more signed contracts with specific FSC language to limit future changes I suspect we d instead take the more measured approach and informally advise customers that private authorities would not take the change until renegotiated regardless of the FSC text This approach would take 12 18 months for private authorities
- Any rollout will have downside issues

Too complicated? Call me

PJG

**HIGHLY CONFIDENTIAL Attorneys Eyes Only**

**NS 001000105**

**NS NJ 000105**
**CONFIDENTIAL SUBMISSION**

## Unknown

**From** Brugman Thomas
**Sent** Tuesday November 04 2003 4 08 PM
**To** Glennon Pat Wendorf Gary Brenner Charlie Julian David Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby
**Subject** RE Fuel Surcharge Policy Review

AG opposes changes to the fuel surcharge policy Do not change strike price Do not adopt CSX or any other carrier s approach

Any change at all will be regarded as a revenue grab by the ag industry which will renew pressure for S 919 style legislation NGFA is only now beginning to accept the last round of changes to the CofC Do not want to do this again until mid 2004 at the very earliest Also more business opportunities are coming our way in part because CSX is viewed more and more as approaching BNSF in terms of rate inflexibility Don t want to undo this market advantage

Stay the course!

Tom Brugman

-Original Message
**From** Glennon Pat
**Sent** Tuesday November 04 2003 1 00 PM
**To** Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer, John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby
**Subject** Fuel Surcharge Policy Review
**Importance** High

**GVPs** Regarding the NS Fuel Surcharge DWS has requested that we take a fresh look at the case for and against NS adopting the new CSXT FSC standard He would like a recommendation for his consideration With that objective in mind I have provided several attachments and a recap (below) of the issues that you need to consider Attachments

Energy forecast Page 22 covers WTI Current estimates call for WTI prices in the $22 to $25 range If accurate the CSXT formula in 2004 will produce nominal FSCs in the 0 4 % to 0 8% range while the NS FSC would drop to zero However earlier forecasts for 2003 called for a similar drop in second half 2003 and that hasn t materialized

- A hypothetical comparison of the CSXT UP and BNSF standards and the relative yields NS could have expected had NS adopted each of the standards The comparison is based on Merchandise traffic for 2002 and Y T D 2003 These are hypothetical figures for comparison purposes The totals are not projections of actual revenues The key point is that the CSXT formula produces 75% more revenue under similar conditions (2003 WTI) Results will obviously vary with market conditions
- Recap from July 2003 covering BNSF and UP comparisons covered here

Should NS adopt the CSXT FSC? **Please provide your feedback by Friday (11/ 7) on the options listed below** If we do not have a clear consensus on what direction NS should take on the FSC or if more options are submitted for consideration a meeting will be called to address the differences

- Retain the current NS standard (see Pro/Con below)

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000106

NS NJ 000106
CONFIDENTIAL SUBMISSION

- Continue laying the groundwork for a conversion but delay a formal decision until 2QTR04 (See #1 below)
- Adopt the CSXT standard this year (see #2 and #3 below)
- Adopt the CSXT standard but raise the base to from $23 to $28 with 0 4% increases per $1 WTI increases starting at $28 01 This addresses the double dipping argument that NS has covered the fuel cost in our rates over the last several years yet we are still observing the old FSC WTI base level
- Adopt UP or BNSF standard
- Other options?

**If we adopted the CSXT FSC standard possible implementation scenarios**
**#1 The most conservative** and customer focused

- Delay any decision/action until the 2nd qtr 2004 Allows time for most of the full text FSC clauses to be removeo
- If the decision is to adopt the CSXT standard publish a new FSC in the C/C and apply it to all public authorities
- Convert private authorities from that point forward as rates are renegotiated Although most NS publications would refer to the new C/C FSC standard we would informally protect the old formula on private rates until the renegotiation of the prices We can do this through Note management in 9255

**#2 More aggressive** Same plan only begin now

- Change C/C this year
- Covert all public prices that have the new C/C reference
- Convert private authorities as they roll over and are reissued Start now can carry over well into 2004

**#3 Most aggressive** Same plan but force conversion of all public and private authorities with the new C/C reference don t wait for renegotiation

- Change the C/C this year
- Convert all public prices that have the new C/C reference
- Immediately convert any existing private authorities that have the new C/C reference and convert any new or reissued authority as the full text clause is replaced with the new C/C reference
- Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation

**Supporting background detail Pro/Con issues**
The more complete argument for and against a FSC change is included in the attachments However here are the core issues from the conservative perspective

Pro For adoption of the CSXT formula

- The CSXT formula produces a higher yield
- The CSXT is our primary competition and they have already taken the heat for raising the bar
  The CSXT (and UP/BNSF) provide better lead times in announcing changes
- The FSC % applies for a calendar month
- There is no industry FSC standard to speak of It could be argued that adopting the CSXT standard may actually help provide some measure of consistency for customer at least for customers in the East
- Joint NS/CSXT customers may experience less maintenance issues
- The CSXT formula could be expected to generate roughly 75% more revenue (based on 2003 WTI patterns) assuming all other billing issues remain constant (no increase in disputes or drop in collections)

Note this is hypothetical The actual increase in revenue would likely be somewhat less particularly in the short term

- WTI forecast for 2004 calls for prices in the $22 to $25 range If accurate that means the CSXT formula would be producing a FSC around 1 % for 2004 while the NS FSC would drop off Note that we had a similar low forecast for WTI for the second half of 2003 and prices have remained around $30

Con Against adoption of the CSXT formula

- The NS formula is the most established of the RR formulas Customers are familiar with it and generally accept it We have a relatively high level of application (few exception)
- NS has relatively few billing disputes with the current NS FSC
- NS is currently seen as more reasonable compared to CSXT A change would be perceived as a revenue grab To many customers NS would replace CSXT as the unreasonable carrier
- Larger customers will argue that NS has had almost a year to incorporate higher fuel cost in the rate structure They argue that if anything the FSC should go down not up
- Adopting the CSXT standard will reopen negotiating points for customers and rate negotiation will become more difficult
  Organizations like NGFA are very focused on the FSC and will publicly and politically ride the issue hard
  The CSXT s 0 4% per $1 WTI increment as opposed to the 2 0% per $5 increment for NS is more likely to change from month to month leading to more maintenance issues for customers and more billing problems for NS This is offset to some extent for joint CSXT/NS customers that may find a common Eastern FSC
- The net impact on FSC revenue collections would be difficult to gauge While the CSXT formula produces higher FSC percentages actual revenues might be less than expected or actually decline in the short term depending on customer reactions to the change
- Assuming we would not unilaterally change the FSC on private/contract rates until the renegotiation of the rates the conversion would take 12 to 18 months to fully implement Notwithstanding the added risk of increased customer resistance and billing disputes the actual benefits in terms of additional revenue would be further diluted in the short to mid term
- Technical issue Prior to June of this year NS inserted the full FSC text in each publication We are in the process of replacing the full text with reference to the Conditions of Carriage Have replaced the FSC in most public authorities and about half of the private authorities
- In addition once we remove the last of the Full text NS FSC I question if we would actually execute a FSC change (adopt the CSXT FSC) in the C/C and announce that that it immediately applies to all publications including private authorities This would generate an intense customer reaction The backlash would lead to calls for more signed contracts with specific FSC language to limit future changes I suspect we d instead take the more measured approach and informally advise customers that private authorities would not take the change until renegotiated regardless of the FSC text This approach would take 12 18 months for private authorities
- Any rollout will have downside issues

Too complicated? Call me

PJG

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000108

NS NJ 000108
CONFIDENTIAL SUBMISSION

**Unknown**

**From** Julian David
**Sent** Wednesday November 05 2003 4 43 PM
**To** Glennon Pat Wendorf Gary Brenner Charlie Brugman Thomas Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby
**Subject** RE Fuel Surcharge Policy Review

PJG

The Automotive Group continues to support the change to the more cost responsive fuel surcharge application that CSXT uses as previously recommended in our correspondence of April 2 and July 3 consistent with the Pros outlined below Option 2 is the recommended process with respect to timing

DFJ

Original Message
**From** Glennon, Pat
**Sent** Tuesday November 04 2003 1 00 PM
**To** Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby
**Subject** Fuel Surcharge Policy Review
**Importance** High

**GVPs** – Regarding the NS Fuel Surcharge DWS has requested that we take a fresh look at the case for and against NS adopting the new CSXT FSC standard He would like a recommendation for his consideration With that objective in mind I have provided several attachments and a recap (below) of the issues that you need to consider Attachments

- Energy forecast Page 22 covers WTI Current estimates call for WTI prices in the $22 to $25 range If accurate the CSXT formula in 2004 will produce nominal FSCs in the 0 4% to 0 8% range while the NS FSC would drop to zero However earlier forecasts for 2003 called for a similar drop in second half 2003 and that hasn t materialized
  A hypothetical comparison of the CSXT UP and BNSF standards and the relative yields NS could have expected had NS adopted each of the standards The comparison is based on Merchandise traffic for 2002 and Y T D 2003 These are hypothetical figures for comparison purposes The totals are not projections of actual revenues The key point is that the CSXT formula produces 75% more revenue under similar conditions (2003 WTI) Results will obviously vary with market conditions
  Recap from July 2003 covering BNSF and UP comparisons covered here

Should NS adopt the CSXT FSC? **Please provide your feedback by Friday (11/ 7) on the options listed below** If we do not have a clear consensus on what direction NS should take on the FSC or if more options are submitted for consideration a meeting will be called to address the differences

- Retain the current NS standard (see Pro/Con below)
  Continue laying the groundwork for a conversion but delay a formal decision until 2QTR04 (See #1 below)
  Adopt the CSXT standard this year (see #2 and #3 below)
  Adopt the CSXT standard but raise the base to from $23 to $28 with 0 4% increases per $1 WTI increases starting at $28 01 This addresses the double dipping argument that NS has covered the fuel cost in our rates over the last several years yet we are still observing the old FSC WTI

HIGHLY CONFIDENTIAL Attorneys Eyes Only NS 001000109 CONFIDENTIAL SUBMISSION NS NJ 000109

base level

Adopt UP or BNSF standard

Other options?

**If we adopted the CSXT FSC standard possible implementation scenarios**

**#1 The most conservative** and customer focused

Delay any decision/action until the 2nd qtr 2004 Allows time for most of the full text FSC clauses to be removed

- If the decision is to adopt the CSXT standard publish a new FSC in the C/C and apply it to all public authorities

Convert private authorities from that point forward as rates are renegotiated Although most NS publications would refer to the new C/C FSC standard we would informally protect the old formula on private rates until the renegotiation of the prices We can do this through Note management in 9255

**#2 – More aggressive** Same plan only begin now

Change C/C this year

- Covert all public prices that have the new C/C reference

Convert private authorities as they roll over and are reissued Start now can carry over well into 2004

**#3 – Most aggressive** Same plan but force conversion of all public and private authorities with the new C/C reference don t wait for renegotiation

Change the C/C this year

Convert all public prices that have the new C/C reference

Immediately convert any existing private authorities that have the new C/C reference and convert any new or reissued authority as the full text clause is replaced with the new C/C reference

Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation

**Supporting background detail Pro/Con issues**

The more complete argument for and against a FSC change is included in the attachments However here are the core issues from the conservative perspective

Pro – For adoption of the CSXT formula

- The CSXT formula produces a higher yield

The CSXT is our primary competition and they have already taken the heat for raising the bar

The CSXT (and UP/BNSF) provide better lead times in announcing changes

The FSC % applies for a calendar month

There is no industry FSC standard to speak of It could be argued that adopting the CSXT standard may actually help provide some measure of consistency for customer at least for customers in the East

Joint NS/CSXT customers may experience less maintenance issues

The CSXT formula could be expected to generate roughly 75 % more revenue (based on 2003 WTI patterns) assuming all other billing issues remain constant (no increase in disputes or drop in collections) Note this is hypothetical The actual increase in revenue would likely be somewhat less particularly in the short term

- WTI forecast for 2004 calls for prices in the $22 to $25 range If accurate that means the CSXT formula would be producing a FSC around 1% for 2004 while the NS FSC would drop off Note that we had a similar low forecast for WTI for the second half of 2003 and prices have remained around $30

Con – Against adoption of the CSXT formula

- The NS formula is the most established of the RR formulas Customers are familiar with it and generally accept it We have a relatively high level of application (few exception)

HIGHLY CONFIDENTIAL Attorneys Eyes Only



CONFIDENTIAL SUBMISSION NS NJ 000110

NS has relatively few billing disputes with the current NS FSC
NS is currently seen as more reasonable compared to CSXT A change would be perceived as a revenue grab To many customers NS would replace CSXT as the unreasonable carrier
Larger customers will argue that NS has had almost a year to incorporate higher fuel cost in the rate structure They argue that if anything the FSC should go down not up
Adopting the CSXT standard will reopen negotiating points for customers and rate negotiation will become more difficult
Organizations like NGFA are very focused on the FSC and will publicly and politically ride the issue hard
The CSXT s 0 4% per $1 WTI increment as opposed to the 2 0% per $5 increment for NS is more likely to change from month to month leading to more maintenance issues for customers and more billing problems for NS This is offset to some extent for joint CSXT/NS customers that may find a common Eastern FSC
The net impact on FSC revenue collections would be difficult to gauge While the CSXT formula produces higher FSC percentages actual revenues might be less than expected or actually decline in the short term depending on customer reactions to the change
Assuming we would not unilaterally change t ıe F'ЪC on private/contract rates until the renegotiation of the rates the conversion would take 12 to 18 months to fully implement Notwithstanding the added risk of increased customer resistance and billing disputes the actual benefits in terms of additional revenue would be further diluted in the short to mid term

- Technical issue Prior to June of this year NS inserted the full FSC text in each publication We are in the process of replacing the full text with reference to the Conditions of Carriage Have replaced the FSC in most public authorities and about half of the private autł orities
  In addition once we remove the last of the Full text NS FSC I question if we would actually execute a FSC change (adopt the CSXT FSC) in the C/C and announce that that it immediately applies to all publications including private authorities This would generate an intense customer reaction The backlash would lead to calls for more signed contracts with specific FSC language to limit future changes I suspect we d instead take the more measured approach and informally advise customers that private authorities would not take the change until renegotiated regardless of the FSC text This approach would take 12 18 months for private authorities
- Any rollout will have downside issues

Too complicated? Call me

PJG

**HIGHLY CONFIDENTIAL**
**Attorneys Eyes Only**

**NS 001000111** **NS NJ 000111**

**CONFIDENTIAL SUBMISSION**

## Unknown

**From** Osborne Joe
**Sent** Thursday November 06 2003 10 40 AM
**To** Glennon Pat Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby Williams Bill Julian Alan
**Subject** RE Fuel Surcharge Policy Review

Pat

1 With regard to your first bullet I think the actual WTI prices will be higher next year than Global Insight forecasts Elsewhere they state that U S demand next year will increase by 1 8% y o y whereas 2003 showed only a 0 9% y o y increase We have seen this year how WTI prices have remained high despite forecast
2 Further on this point today s WSJ futures show crude oil prices in 2004 running about $3 00/bbl higher than the attached forecast
3 So far I have seen no evidence that our customers are rewarding NS versus CSX for maintaining a more reasonable FSC program
4 We need the money
5 Therefore I support EITHER A) Option 2 below OR B) Adopting the UP program
6 My reasons for suggesting the UP program is that A) UP is slightly more accommodating to customers than BNSF B) we have the largest share of our interline Chemicals business with UP and C) I have an eye on our upcoming 2004 contract renegotiations for the Conrail business and NS might benefit from having a uniform FSC deal with UP

**Joseph C Osborne Jr**
**Group Vice President**
**Chemicals**
**540-985 6773**

-Original Message
**From** Glennon Pat
**Sent** Tuesday November 04 2003 1 00 PM
**To** Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David, Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby
**Subject** Fuel Surcharge Policy Review
**Importance** High

**GVPs** – Regarding the NS Fuel Surcharge DWS has requested that we take a fresh look at the case for and against NS adopting the new CSXT FSC standard He would like a recommendation for his consideration With that objective in mind I have provided several attachments and a recap (below) of the issues that you need to consider Attachments

- Energy forecast Page 22 covers WTI Current estimates call for WTI prices in the $22 to $25 range If accurate the CSXT formula in 2004 will produce nominal FSCs in the 0 4% to 0 8% range while the NS FSC would drop to zero However earlier forecasts for 2003 called for a similar drop in second half 2003 and that hasn t materialized

- A hypothetical comparison of the CSXT UP and BNSF standards and the relative yields NS could have expected had NS adopted each of the standards The comparison is based on Merchandise traffic for 2002 and Y T D 2003 These are hypothetical figures for comparison purposes The totals are not projections of actual revenues The key point is that the CSXT formula produces 75% more revenue under similar conditions (2003 WTI) Results will obviously vary with market conditions
- Recap from July 2003 covering BNSF and UP comparisons covered here

Should NS adopt the CSXT FSC? **Please provide your feedback by Friday (11/ 7) on the options listed below** If we do not have a clear consensus on what direction NS should take on the FSC or if more options are submitted for consideration a meeting will be called to address the differences

- Retain the current NS standard (see Pro/Con below)
- Continue laying the groundwork for a conversion but delay a formal decision until 2QTR04 (See #1 below)
- Adopt the CSXT standard this year (see #2 and #3 below)
- Adopt the CSXT standard but raise the base to from $23 to $28 with 0 4% increases per $1 WTI increases starting at $28 01 This addresses the double dipping argument that NS has covered the fuel cost in our rates over the last several years yet we are still observing the old FSC WTI base level
- Adopt UP or BNSF standard
- Other options?

**If we adopted the CSXT FSC standard possible implementation scenarios**
**#1 The most conservative** and customer focused

- Delay any decision/action until the 2nd qtr 2004 Allows time for most of the full text FSC clauses to be removed

  If the decision is to adopt the CSXT standard publish a new FSC in the C/C and apply it to all public authorities
- Convert private authorities from that point forward as rates are renegotiated Although most NS publications would refer to the new C/C FSC standard we would informally protect the old formula on private rates until the renegotiation of the prices We can do this through Note management in 9255

**#2 – More aggressive** Same plan only begin now

- Change C/C this year
- Covert all public prices that have the new C/C reference
- Convert private authorities as they roll over and are reissued Start now can carry over well into 2004

**#3 – Most aggressive** Same plan but force conversion of all public and private authorities with the new C/C reference don t wait for renegotiation

- Change the C/C this year
- Convert all public prices that have the new C/C reference

  Immediately convert any existing private authorities that have the new C/C reference and convert any new or reissued authority as the full text clause is replaced with the new C/C reference
- Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation

**<u>Supporting background detail Pro/Con issues</u>**
The more complete argument for and against a FSC change is included in the attachments However here are the core issues from the conservative perspective

<u>Pro – For adoption of the CSXT formula</u>

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000113

NS NJ 000113
CONFIDENTIAL SUBMISSION

- The CSXT formula produces a higher yield
  The CSXT is our primary competition and they have already taken the heat for raising the bar
  The CSXT (and UP/BNSF) provide better lead times in announcing changes
- The FSC / applies for a calendar month
- There is no industry FSC standard to speak of It could be argued that adopting the CSXT standard may actually help provide some measure of consistency for customer at least for customers in the East
- Joint NS/CSXT customers may experience less maintenance issues
- The CSXT formula could be expected to generate roughly 75% more revenue (based on 2003 WTI patterns) assuming all other billing issues remain constant (no increase in disputes or drop in collections) Note this is hypothetical The actual increase in revenue would likely be somewhat less particularly in the short term
- WTI forecast for 2004 calls for prices in the $22 to $25 range If accurate that means the CSXT formula would be producing a FSC around 1 % for 2004 while the NS FSC would drop off Note that we had a similar low forecast for WTI for the second half of 2003 and prices have remained around $30

<u>Con – Against adoption of the CSXT formula</u>

- The NS formula is the most established of the RR formulas Customers are familiar with it and generally accept it We have a relatively high level of application (few exception)
- NS has relatively few billing disputes with the current NS FSC
- NS is currently seen as more reasonable compared to CSXT A change would be perceived as a revenue grab To many customers NS would replace CSXT as the unreasonable carrier
- Larger customers will argue that NS has had almost a year to incorporate higher fuel cost in the rate structure They argue that if anything the FSC should go down not up
- Adopting the CSXT standard will reopen negotiating points for customers and rate negotiation will become more difficult
- Organizations like NGFA are very focused on the FSC and will publicly and politically ride the issue hard
- The CSXT s 0 4 % per $1 WTI increment as opposed to the 2 0 / per $5 increment for NS is more likely to change from month to month leading to more maintenance issues for customers and more billing problems for NS This is offset to some extent for joint CSXT/NS customers that may find a common Eastern FSC
- The net impact on FSC revenue collections would be difficult to gauge While the CSXT formula produces higher FSC percentages actual revenues might be less than expected or actually decline in the short term depending on customer reactions to the change
- Assuming we would not unilaterally change the FSC on private/contract rates until the renegotiation of the rates the conversion would take 12 to 18 months to fully implement Notwithstanding the added risk of increased customer resistance and billing disputes the actual benefits in terms of additional revenue would be further diluted in the short to mid term
- Technical issue Prior to June of this year NS inserted the full FSC text in each publication We are in the process of replacing the full text with reference to the Conditions of Carriage Have replaced the FSC in most public authorities and about half of the private authorities
- In addition once we remove the last of the Full text NS FSC I question if we would actually execute a FSC change (adopt the CSXT FSC) in the C/C and announce that that it immediately applies to all publications including private authorities This would generate an intense customer reaction The backlash would lead to calls for more signed contracts with specific FSC language to limit future changes I suspect we d instead take the more measured approach and informally advise customers that private authorities would not take the change until renegotiated regardless of the FSC text This approach would take 12 18 months for private authorities
- Any rollout will have downside issues

Too complicated? Call me

PJG

**HIGHLY CONFIDENTIAL Attorneys Eyes Only** **NS 001000114** **NS NJ 000114 CONFIDENTIAL SUBMISSION**

## Unknown

**From** Julian David
**Sent** Friday November 07 2003 6 22 PM
**To** Glennon Pat Seale Don
**Cc** Wendorf Gary Brenner Charlie Brugman Thomas Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat Pfeifer Alby
**Subject** RE Fuel Surcharge Policy Review

To clarify my response to the question relative to the summary below while we endorsed the second option equally important is that we endorsed the adoption of the terms of the CSXT fuel surcharge

DFJ

Original Message
**From** Glennon Pat
**Sent** Friday November 07 2003 5 49 PM
**To** Seale Don
**Cc** Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat Pfeifer Alby
**Subject** FW Fuel Surcharge Policy Review
**Importance** High

DWS – You requested a review of our current FSC policy and an assessment of possible alternatives Earlier this week I provided the GVPs with an outline of the issues (below) and requested their feedback

The consensus (unanimous) is that we should not implement a change at this time

All teams endorsed the second option That is proceed with the program to remove the full text FSC note from private NS authorities and position ourselves for a conversion but delay further consideration until 2nd Quarter 2004 The justifications ranged from a timing issue (roughly 50% of private publications still have the full text note) to the current political climate involving S 919 and the recent changes to the NS Conditions of Carriage such as the assessment of finance charges In addition the Chemicals team did express a desire to keep the UP FSC under consideration

This is a sound recommendation In the short term the downside issues clearly dilute any benefits

- 50% of NS publications still contain the full text note It will require another 6 months to convert the majority of the remaining publications on their rollover dates not counting the multi year contracts Private authorities still control the majority of our line haul revenues
  Any FSC change particularly to a more aggressive formula like the CSXT s has the potential to complicate rate negotiations and generate billing disputes with customers
  Both points would significantly reduce potential FSC yield if we were to swap out formulas in the short term It is even conceivable that we could experience a net decline in revenue if customers were to withhold line haul payments pending the resolution of FSC complaints/disputes

While there is a strong case for not acting immediately there is some risk If WTI drops below $28 within the next few months and we were to then react by implementing the CSXT formula to recoup a sub 2 % FSC the transition from a 0% formula to a higher yield formula would play into the extra revenue argument and complicate the transition more so than it might if we were going from a 2% FSC formula to a 2 8% FSC If we face that situation one possible countermeasure would be to implement a less aggressive formula such as the UP that would produce the very desirable fractional increases above 2% once it engaged That transition might likely take place while both are formulas are dormant (0%) thus masking the revenue impact during the transition and reducing customer resistance

If you wish to review the options as a group please let me know
PJG

Original Message
**From** Glennon Pat
**Sent** Tuesday November 04 2003 1 00 PM
**To** Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Pfeifer Alby
**Subject** Fuel Surcharge Policy Review
**Importance** High

**GVPs** – Regarding the NS Fuel Surcharge DWS has requested that we take a fresh look at the case for and against NS adopting the new CSXT FSC standard He would like a recommendation for his consideration With that objective in mind I have provided several attachments and a recap (below) of the issues that you need to consider Attachments

Energy forecast Page 22 covers WTI Current estimates call for WTI prices in the $22 to $25 range If accurate the CSXT formula in 2004 will produce nominal FSCs in the 0 4 ⁄ to 0 8% range while the NS FSC would drop to zero However earlier forecasts for 2003 called for a similar drop in second half 2003 and that hasn t materialized

A hypothetical comparison of the CSXT UP and BNSF standards and the relative yields NS could have expected had NS adopted each of the standards The comparison is based on Merchandise traffic for 2002 and Y T D 2003 These are hypothetical figures for comparison purposes The totals are not projections of actual revenues The key point is that the CSXT formula produces 75 ⁄ more revenue under similar conditions (2003 WTI) Results will obviously vary with market conditions

Recap from July 2003 covering BNSF and UP comparisons covered here

Should NS adopt the CSXT FSC? **Please provide your feedback by Friday (11/ 7) on the options listed below** If we do not have a clear consensus on what direction NS should take on the FSC or if more options are submitted for consideration a meeting will be called to address the differences

Retain the current NS standard (see Pro/Con below)

Continue laying the groundwork for a conversion but delay a formal decision until 2QTR04 (See #1 below)

Adopt the CSXT standard this year (see #2 and #3 below)

- Adopt the CSXT standard but raise the base to from $23 to $28 with 0 4% increases per $1 WTI increases starting at $28 01 This addresses the double dipping argument that NS has covered the fuel cost in our rates over the last several years yet we are still observing the old FSC WTI base level

Adopt UP or BNSF standard

Other options?

**If we adopted the CSXT FSC standard possible implementation scenarios**
**#1 The most conservative** and customer focused

Delay any decision/action until the 2 d qtr 2004 Allows time for most of the full text FSC clauses to be removed

- If the decision is to adopt the CSXT standard publish a new FSC in the C/C and apply it to all public authorities
- Convert private authorities from that point forward as rates are renegotiated Although most NS publications would refer to the new C/C FSC standard we would informally protect the old formula on private rates until the renegotiation of the prices We can do this through Note management in 9255

**#2 – More aggressive** Same plan only begin now

NS NJ 000116

HIGHLY CONFIDENTIAL Attorneys Eyes Only

NS 001000116

CONFIDENTIAL SUBMISSION

Change C/C this year
Covert all public prices that have the new C/C reference
Convert private authorities as they roll over and are reissued Start now can carry over well into 2004

**#3 – Most aggressive** Same plan but force conversion of all public and private authorities with the new C/C reference don t wait for renegotiation

- Change the C/C this year
Convert all public prices that have the new C/C reference
Immediately convert any existing private authorities that have the new C/C reference and convert any new or reissued authority as the full text clause is replaced with the new C/C reference
Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation

**Supporting background detail Pro/Con issues**
The more complete argument for and against a FSC change is included in the attachments However here are the core issues from the conservative perspective

Pro – For adoption of the CSXT formula
The CSXT formula produces a higher yield
The CSXT is our primary competition and they have already taken the heat for raising the bar
The CSXT (and UP/BNSF) provide better lead times in announcing changes
The FSC % applies for a calendar month
There is no industry FSC standard to speak of It could be argued that adopting the CSXT standard may actually help provide some measure of consistency for customer at least for customers in the East
Joint NS/CSXT customers may experience less maintenance issues
The CSXT formula could be expected to generate roughly 75% more revenue (based on 2003 WTI patterns) assuming all other billing issues remain constant (no increase in disputes or drop in collections) Note this is hypothetical The actual increase in revenue would likely be somewhat less particularly in the short term

- WTI forecast for 2004 calls for prices in the $22 to $25 range If accurate that means the CSXT formula would be producing a FSC around 1 % for 2004 while the NS FSC would drop off Note that we had a similar low forecast for WTI for the second half of 2003 and prices have remained around $30

Con – Against adoption of the CSXT formula
The NS formula is the most established of the RR formulas Customers are familiar with it and generally accept it We have a relatively high level of application (few exception)
NS has relatively few billing disputes with the current NS FSC
NS is currently seen as more reasonable compared to CSXT A change would be perceived as a revenue grab To many customers NS would replace CSXT as the unreasonable carrier
Larger customers will argue that NS has had almost a year to incorporate higher fuel cost in the rate structure They argue that if anything the FSC should go down not up
Adopting the CSXT standard will reopen negotiating points for customers and rate negotiation will become more difficult
Organizations like NGFA are very focused on the FSC and will publicly and politically ride the issue hard
The CSXT s 0 4 / per $1 WTI increment as opposed to the 2 0 % per $5 increment for NS is more likely to change from month to month leading to more maintenance issues for customers and more billing problems for NS This is offset to some extent for joint CSXT/NS customers that may find a common Eastern FSC
The net impact on FSC revenue collections would be difficult to gauge While the CSXT formula produces higher FSC percentages actual revenues might be less than expected or actually decline in the short term depending on customer reactions to the change

HIGHLY CONFIDENTIAL Attorneys' Eyes Only
NS 001000117
NS NJ 000117 CONFIDENTIAL SUBMISSION

Assuming we would not unilaterally change the FSC on private/contract rates until the renegotiation of the rates the conversion would take 12 to 18 months to fully implement Notwithstanding the added risk of increased customer resistance and billing disputes the actual benefits in terms of additional revenue would be further diluted in the short to mid term Technical issue Prior to June of this year NS inserted the full FSC text in each publication We are in the process of replacing the full text with reference to the Conditions of Carriage Have replaced the FSC in most public authorities and about half of the private authorities In addition once we remove the last of the Full text NS FSC I question if we would actually execute a FSC change (adopt the CSXT FSC) in the C/C and announce that that it immediately applies to all publications including private authorities This would generate an intense customer reaction The backlash would lead to calls for more signed contracts with specific FSC language to limit future changes I suspect we d instead take the more measured approach and informally advise customers that private authorities would not take the change until renegotiated regardless of the FSC text This app oach would take 12 18 months for private authorities Any rollout will have downside issues

Too complicated? Call me

PJG

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000118

NS NJ 000118
CONFIDENTIAL SUBMISSION

**Unknown**

**From** Seale Don

**Sent** Thursday January 08 2004 5 47 PM

**To** Goode David R Prillaman Ike Tobias Stephen Wolf Henry C (Hank) McQuade Kathryn B Hixon James A Smith Danny D Ehlers Fred M

**Cc** Legg Karen Carbaugh Ed Malbon Debbie A

**Subject** Modified Fuel Surcharge Coal and Merchandise

LIP We will be posting on our website tomorrow January 9 notice that effective March 1 we will apply a modified fuel surcharge to coal and merchandise shipments The new surcharge will continue to be based on the price of West Texas Crude Oil but at a minimum threshold of $23/barrel at a level of 0 4% of total freight bill charges The surcharge will adjust upward by 0 4% for each subsequent $1 increase in WTCO above the minimum threshold based on a 30 day monthly average using calendar days instead of business days As a result the new surcharge will be much more responsive to incremental increases in crude oil prices than our current surcharge which has a $28/barrel threshold with 2% charges applicable and no further change until WTCO reaches $33/barrel for 30 consecutive business days Based on our current collection rate of the existing fuel surcharge and current pricing of crude oil the new surcharge will have the potential of producing approximately $30 million annually in additional fuel recovery ($88 million annually vs projected $58 million collected in 2003) This additional fuel recovery however will phase in as existing contracts and private rates that contain the current surcharge expire and are renegotiated so the full amount will not be realized in 2003 Additionally, our new formula essentially mirrors the fuel surcharge that CSX implemented in June 2003 So even though we will undoubtedly experience some customer opposition to the change the formula is already in the market place and our customers in the east will have a uniform application DWS

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000124

NS NJ 000124

CONFIDENTIAL SUBMISSION

April 24 2006

# Norfolk Southern To Adjust Fuel Surcharge

NORFOLK VA Norfolk Southern Corporation (NYSE NSC) today announced that effective July 1 2006 Norfolk Southern will revise its fuel surcharge program for local and joint line non intermodal traffic originating and moving on Norfolk Southern issued tariff and public quotes issued on or after July 1 2006 The fuel surcharge is based on the monthly average price of West Texas Intermediate Crude Oil (WTI Average Price) an industry standard for tracking oil prices The traffic moving under these tariffs and quotes comprises approximately 6% of NS total revenue base

Fuel prices have reached a level that Norfolk Southern believes is likely to be sustained Tariff prices public quotes and the fuel surcharge are being adjusted to reflect this level

The new fuel surcharge for public price authorities will be 0 3 percent of the line haul freight charge for every $1 00 per barrel or portion thereof by which the WTI Average Price exceeds $64 00 starting at a WTI Average Price of $64 01

This will replace the current fuel surcharge of 0 4 percent of the line haul freight charge for every $1 00 or portion thereof by which the WTI Average Price exceeds $23 00 Additional information on the tariff prices public quotes and fuel surcharge will be posted at www nscorp com

Norfolk Southern Corporation is one of the nation s premier transportation companies Its Norfolk Southern Railway subsidiary operates approximately 21 200 route miles in 22 states the District f Columbia nd Ontario Canada serving every major conta ner port in the eastern United States and providing superior connections to western rail carriers NS operates the most extensive intermodal network in the East and is North America s la gest rail carrier of automotive parts and finished vehicles

###

**Norfolk Southern contacts**
(Media) Bob Fort 757 629 2710 (rcfort@nscorp com)
(Investors) Leanne Marilley 757 629 2861(leanne marilley@nscorp com )

NS 001000130

NS NJ 000130

CONFIDENTIAL SUBMISSION

**From** Glennon Pat
**Sent** Tuesday April 25 2006 12 43 PM
**To** Aspatore George A
**Cc** Pfeifer Alby
**Subject** RE NS Request NS CSXT Joint Line Pricing

**REDACTED**
**PRIVILEGED**

Original Message
F om Aspatore George A
Sent Tuesday April 25 2006 10 19 AM
To Glennon Pat
Subject RE NS Request NS CSXT Joint Line Pricing

**REDACTED --**
**PRIVILEGED**

Original Message
From Glennon Pat
Sent Tuesday April 25 2006 10 00 AM
To Aspatore George A Lawson David Smith Kathleen
Subject RE NS Request NS CSXT Joint Line Pricing

**REDACTED -**
**PRIVILEGED**

Pat

Original Message
From Aspatore George A
Sent Tuesday April 25 2006 9 32 AM
To Lawson David Glennon Pat Smith Kathleen
Subject RE NS Request NS CSXT Joint Line Pricing

**REDACTED**
**PRIVILEGED**

Original Message
From Lawson David
Sent Tuesday April 25 2006 8 42 AM
To Aspatore George A Glennon Pat Smith Kathleen
Subject NS Request NS CSXT Joint Line Pricing

Note

Original Message
From McIntyre Clyde Jr [mailto Clyde McIntyre@csx com]
Sent Thursday April 20 2006 1 43 PM
To Lawson David

**HIGHLY CONFIDENTIAL**
**Attorneys Eyes Only**

**NS 001000146**

**NS NJ 000145**
**CONFIDENTIAL SUBMISSION**

Subject RE NS Request NS CSXT Joint Line Pricing

David Lawson

This will serve as CSXT s concurrence to a 12 / increase on all NS CSXT interline rates published by NS in public pricing authorities on movements originating on NS Increase to be effective July 1 (Intermodal is excepted )

CSXT takes no position whatsoever on any NS independently established fuel surcharge to apply on this NS CSXT interline traffic

CSXT considers it premature to consider future changes to NS CSXT interline rates

Clyde McIn'yre
Director Commercial Administration
CSX Transportation
Jacksonville FL
Original Message
From Lawson David [mailto dtlawson@nscorp com]
Sent Wednesday April 19 2006 7 39 PM
To McIntyre Clyde Jr Pfeifer Alby
Subject NS Request NS CSXT Joint Line Pricing

Clyde McIntyre

Just to be clear the request for CSXT's concurrence was for the following

Effective July 1 2006

All NS originated and published joint line public authorities with CSXT for everything except Intermodal

Our fuel surcharge is re based from the current $23/barrel (WTI) to $64/barrel and the increment for every one dollar increase above $64 01 is 3 / vs the current 4 /

Our interline public rates excluding Intermodal are increased 12 / to reflect a market adjustment and we will seek another 6 8 / market adjustment by the end of 06

Please advise if CSXT concurs with this interline proposal effective July 1 2006

David T Lawson

Vice President Industrial Products

Norfolk Southern Corporation

Norfolk VA

HIGHLY CONFIDENTIAL Attorneys Eyes Only

NS 001000147

NS NJ 000146
CONFIDENTIAL
SUBMISSION

Original Message
From McIntyre Clyde Jr [mailto Clyde McIntyre@csx com]
Sent Wednesday April 19 2006 11 26 AM
To AMPfeife@nscorp com
Cc David Lawson@nscorp com
Subject NS Request NS CSXT Joint Line Pricing

April 19 2006

Alby Pfeifer NS

NS has asked CSXT for it s concurrence to a 12 / increase in all NS CSXT interline rates published by NS on regulated carload traffic

This will serve as CSXT s concurrence to the increased NS CSXT joint line rates published by NS at that level

Please confirm today via email that you received this message

Clyde McIntyre

Director Commercial Administration

CSX Transportation

Jacksonville FL

904 279 5550

This email transmission and any accompanying attachments may

contain CSX privileged and confidential information intended only

for the use of the intended addressee Any dissemination

HIGHLY CONFIDENTIAL
Attorneys Eyes Only



NS NJ 000147
CONFIDFN ΓIAI
SUBMISSION

distribution copying or action taken in reliance on the contents of this email by anyone other than the intended recipient is strictly prohibited If you have received this email in error please immediately delete it and notify sender at the above CSX email address Sender and CSX accept no liability for any damage caused directly or indirectly by receipt of this email

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000149

NS NJ 000148
CONFIDENTIAL
SUBMISSION

**From** Glennon Pat
**Sent** Friday March 28 2003 12 17 PM
**To** Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat
**Cc** Seale Don Sheets Marshall E Carroll Patti G Minton Stacia S Williams Bill Corcoran Virgil Giuliano Joe Rasche Larry Robinson Rob Smith Kathleen Dimond JoAnn Harkey Greg Manning Cheryl Norris Mary North Phil Thomasson Terry Aldenderfer Mike Edwards Suzanne Ferris Lynn Pfeifer Alby Wooddy Jan Ingram Peggy
**Subject** CSXT Surcharge Request for NS Concurrence

**Attachments** Modified CSXT Fuel Surchrg CSXT 8100 FUEL SURCHARGE Doc

GVPs

CSXT has asked for NS concurrence to the new CSXT Fuel Surcharge As is our practice with any public joint line blanket rate change we give the teams an opportunity to comment This change has received more attention than most

This request only covers CSXT issued prices with NS in the route While NS reserves the option to non concur to the new surcharge as it relates CSXT/NS joint line publications carriers generally defer to the issuing carrier

In cases where NS collects the CSXT issued prices we will create a new CSXT note to cover this formula We ll look for ways to populate or swap it out in 9255 It may require some PM intervention

As information CSXT is planning a one time 100 / switch effective April 1 on all publications currently subject to the SC This includes private publications They expect to get challenges particularly on the private publications

I recommend that we concur If I hear nothing by close of Business Monday March 28 2003 I ll assume I have your concurrence If you have any concerns with a blanket NS concurrence I can review the technicalities with you

PJG

Original Message
From McIntyre Clyde Jr [mailto Clyde McIntyre@csx com]
Sent Friday March 28 2003 11 16 AM
To Alby Pfeifer NS
Cc PJGlenno@NSCorp com Charlie Brenner@NSCorp com Grayson Pam
Subject Request for NS Concurrence Effective June 1 2003 CSXT Fuel Surc harge Is Modified To Be More Responsive To Market Conditions

> Request for NS concurrence Effective June 1 2003 CSXT Fuel Surcharge Is
> Modified To Be More Responsive To Market Conditions
>
> On March 20 2003 CSXT released News announcing modifications to the fuel
> cost recovery program
> http //www csx com/?fuseaction=company news detail&i=45428&news year= 1
>
> Please provide concurrence to the modified CSXT fuel surcharge
> program on joint line rates between CSXT and NS referencing or subject
> to Tariff CSXT 8100 or 8200 The surcharge will be divided in the same
> proportion as the joint line freight charges Please provide concurrence
> via Email to Pam_Grayson@CSX com
> <<Modified CSXT Fuel Surchrg >>
>

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000181

NS NJ 000180
CONFIDENTIAL SUBMISSION

> Attached is the revised Item 12000 A to Tariff CSXT 8100
> (Merchandise) to be issued March 31 2003 and effective June 1 2003
> Tariff CSXT 8200 (Coal) will be revised similarly
> <<CSXT 8100 FUEL SURCHARGE Doc >>
>
> Under current CSXT 8100/8200 provisions that expire May 31st the CSXT
> fuel surcharge remains at 2 /
>
> Please let me know if you have any questions
>
> Clyde McIntyre
> Director Pricing Services

CSXT Fuel Cost Recovery Charge    FUEL SURCHARGE ITEM 12000A doc

> 904 359 3650

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000182

NS NJ 000181
CONFIDENTIAL SUBMISSION

Request for NS Concurrence Effective June 1 2003 CSXT Fuel Surcharge Is Modified To Be More Responsive To Market Conditions

March 28 2003

CSXT Interline Partner

On March 20 2003 CSX Transportation announced modifications to its fuel cost recovery program (http //www csx com/ ?fuseaction=company news detail&i=45428&news year= 1) in an effort to more quickly respond to changing market conditions and the continued volatility in fuel prices

The modified program will begin June 1 2003 the date the revised fuel surcharge provisions in Tariffs CSXT 8100 (Merchandise) and CSXT 8200 (Coal) become effective The revised CSXT 8100/8200 documents will be issued March 31 2003

Under the modified program the formula for determining the fuel surcharge will be based on the monthly average price of West Texas Intermediate Crude Oil (WTI Average Price) an industry standard for tracking oil prices The WTI Average Price for a given calendar month will be determined by adding the daily WTI prices published in the Wall Street Journal during a calendar month and dividing the result by the number of days so published The result will be rounded to the nearest cent

The fuel surcharge will be 0 4% of the linehaul freight charge for every $1 00 per barrel or portion thereof by which the WTI Average Price exceeds $23 00 starting at a WTI Average Price of $23 01 The following schedule provides the new fuel surcharge within the noted WTI Average Price ranges

| WTI Average Price Per Barrel | | Fuel Surcharge |
|---|---|---|
| **Between** | **and** | **Percentage** |
| $23 00 | Below | No Surcharge |
| $23 01 | $24 00 | 0 4 / |
| $24 01 | $25 00 | 0 8 / |
| $25 01 | $26 00 | 1 2 / |
| $26 01 | $27 00 | 1 6 / |
| $27 01 | $28 00 | 2 0 / |
| $28 01 | $29 00 | 2 4 / |
| $29 01 | $30 00 | 2 8 / |
| $30 01 | $31 00 | 3 2 / |
| $31 01 | $32 00 | 3 6 / |
| $32 01 | $33 00 | 4 0 / |
| $33 01 | $34 00 | 4 4 / |
| $34 01 | $35 00 | 4 8 / |
| $35 01 | $36 00 | 5 2 / |

| WTI Average Price Per Barrel | | Fuel Surcharge |
|---|---|---|
| **Between** | **and** | **Percentage** |
| $36 01 | $37 00 | 5 6 / |
| $37 01 | $38 00 | 6 0 / |
| $38 01 | $39 00 | 6 4 / |
| $39 01 | $40 00 | 6 8 / |
| $40 01 | $41 00 | 7 2% |
| $41 01 | $42 00 | 7 6 / |
| $42 01 | $43 00 | 8 0 / |
| $43 01 | $44 00 | 8 4 / |
| $44 01 | $45 00 | 8 8 / |
| $45 01 | $46 00 | 9 2 / |
| $46 01 | $47 00 | 9 6 / |
| $47 01 | $48 00 | 10 0 / |
| $48 01 | $49 00 | 10 4 / |
| $49 01 | $50 00 | 10 8 / |

HIGHLY CONFIDENTIAL
1 Attorneys Eyes Only

NS 001000183

NS NJ 000182
CONFIDENTIAL
SUBMISSION

The fuel surcharge shall be applied to each shipment having a bill of lading dated on or after the 1st day of the second calendar month following the calendar month of a given WTI Average Price calculation For example the initial June 1 2003 fuel surcharge under the modified program will be a result of the April 2003 WTI Average Price calculation The fuel surcharge will change monthly per the table below

| Calendar Month of WTI Average Price | Fuel Surcharge Applied | Calendar Month of WTI Average Price | Fuel Surcharge Applied | Calendar Month of WTI Average Price | Fuel Surcharge Applied |
|---|---|---|---|---|---|
| January | March 1st | May | July 1st | September | November 1 |
| February | April 1 | June | August 1 | October | December 1 |
| March | May 1 | July | September 1st | November | January 1 |
| April | June 1 | August | October 1 | December | February 1 |

With transition to the modified program no less than 20 days notice will be provided on the CSXT Internet site or provided by electronic or facsimile notice of the application of or of any changes in the fuel surcharge

Until CSX s modified program becomes effective June 1 the original fuel surcharge provisions published effective October 25 2000 in Tariffs CSXT 8100 http //www csx com/share/csx/assessorial/forms/docs/xii misc prov REF10290 pdf and CSXT 8200 (Coal) will remain in effect The CSXT fuel surcharge as of March 28 2003 is 2% Under the original provisions that are scheduled to expire May 31 2003 the fuel surcharge will remain at 2% until WTI oil prices rise above or fall below the threshold levels for 30 consecutive days

While the fuel surcharge program remains in effect CSX will continue to provide daily updates on the price of WTI and the status of the charge on the CSX Internet site http //www csx com Simply select Find a Price in the upper right corner of the Quick Links dropdown The price look up screen has a fuel surcharge icon to select

Please provide concurrence to the modified CSXT fuel surcharge program on joint line rates between CSXT and your company referencing or subject to Tariff CSXT 8100 or 8200 With your concurrence the surcharge will be divided in the same proportion as the joint line freight charges

Clyde McIntyre
Director Pricing Services
CSX Transportation
Jacksonville FL

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000184

NS NJ 000183
CONFIDENTIAL
SUBMISSION

# CSX

TRANSPORTATION

TARIFF CSXT 8100
SECTION XII B
MISCELLANEOUS PROVISIONS

1st REVISED PAGE XII B 2
Cancels ORIGINAL PAGE XII B 2

**MERCHANDISE FUEL SURCHARGE – ITEM 12000 – A (Supersedes ITEM 12000 that expires May 31 2003)**

In the event that the average pnce of West Texas Intermediate Crude Oil (as set forth below the WTI Average Price ) calculated monthly based on pnces published in the Wall Street Journal exceeds $23 00 per barrel CSXT will have the nght to apply a fuel surcharge to linehaul freight charges referencing or subject to this Item or Tanff CSXT 8100 If this nght is exercised the fuel surcharge shall be applied to the linehaul freight charge for each shipment having a bill of lading dated on or after the 1st day of the second calendar month following the calendar month of a given WTI Average Price calculation

The fuel surcharge will be 0 4% of the linehaul freight charge for every $1 00 per barrel or portion thereof by which the WTI Average Price exceeds $23 00 The WTI Average Price for a given calendar month will be determined by adding the daily West Texas Intermediate Crude Oil pnces published in the Wall Street Journal dunng a calendar month and dividing the result by the number of days so published The result will be rounded to the nearest cent. If the Wall Street Journal ceases publication of the price of West Texas Intermediate Crude Oil CSXT will employ a suitable substitute source of pnce or measure The following schedule reflects the applicable fuel surcharges within the WTI Average Price ranges noted below

| WTI Average Price Per Barrel | | Fuel Surcharge |
|---|---|---|
| Between | and | Percentage |
| $23 00 | Below | No Surcharge |
| $23 01 | $24 00 | 0 4 / |
| $24 01 | $25 00 | 0 8 / |
| $25 01 | $26 00 | 1 2 / |
| $26 01 | $27 00 | 1 6 / |
| $27 01 | $28 00 | 2 0 / |
| $28 01 | $29 00 | 2 4 / |
| $29 01 | $30 00 | 2 8 / |
| $30 01 | $31 00 | 3 2% |
| $31 01 | $32 00 | 3 6 / |
| $32 01 | $33 00 | 4 0 / |
| $33 01 | $34 00 | 4 4 / |
| $34 01 | $35 00 | 4 8 / |
| $35 01 | $36 00 | 5 2 / |

| WTI Average Price Per Barrel | | Fuel Surcharge |
|---|---|---|
| Between | and | Percentage |
| $36 01 | $37 00 | 5 6 / |
| $37 01 | $38 00 | 6 0 / |
| $38 01 | $39 00 | 6 4 / |
| $39 01 | $40 00 | 6 8 / |
| $40 01 | $41 00 | 7 2 / |
| $41 01 | $42 00 | 7 6 / |
| $42 01 | $43 00 | 8 0 / |
| $43 01 | $44 00 | 8 4 / |
| $44 01 | $45 00 | 8 8 / |
| $45 01 | $46 00 | 9 2 / |
| $46 01 | $47 00 | 9 6 / |
| $47 01 | $48 00 | 10 0 / |
| $48 01 | $49 00 | 10 4 / |
| $49 01 | $50 00 | 10 8 / |

No less than 20 days prior notice will be provided of the application of or of any changes in the fuel surcharge Notice will be published on CSXT's web page at www csx com Upon wntten request, the foregoing notice will be provided by other appropnate electronic or facsimile means All such requests should be directed to Clyde_McIntyre@csx com In no case will a linehaul freight charge be reduced as a result of the application of this Item nor will the application of the fuel surcharge be retroactive

ISSUED MARCH 31 2003 EFFECTIVE JUNE 1 2003

CSX TRANSPORTATION
Marketing Services – Pnce Management
500 Water Street
Jacksonville FL 32202

HIGHLY CONFIDENTIAL Attorneys Eyes Only

NS 001000185

NS NJ 000184
CONFIDENTIAL SUBMISSION

# CSX
TRANSPORTATION

TARIFF CSXT 8100
SECTION XII B
MISCELLANEOUS PROVISIONS

1st REVISED PAGE XII B 2
Cancels ORIGINAL PAGE XII B 2

ISSUED MARCH 31 2003

EFFECTIVE JUNE 1 2003

CSX TRANSPORTATION
Marketing Services Price Management
500 Water Street
Jacksonville FL 32202

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000186

NS NJ 000185
CONFIDENTIAL
SUBMISSION

**From** Glennon Pat
**Sent** Tuesday April 01 2003 11 35 AM
**To** Seale Don Wendorf Gary Brenner Charlie Brugman Thomas Julian David Kraemer John Lawson David Osborne Joe
**Cc** Carroll Patti G Minton Stacia S Nash Jim P Yopp Ken Anderson Brady Fisher Donna Florian Fred Gentzel Robert Julian Alan Kiley Richard McNabb Jim Plain Bob Schaaf Jim Simonic Pat Thomasson Terry Aldenderfer Mike Edwards Suzanne Ferris Lynn Pfeifer Alby Wooddy Jan Ingram Peggy Williams Bill Corcoran Virgil Giuliano Joe Rasche Larry Robinson Rob
**Subject** FW Request for NS Concurrence Effective June 1 2003 CSXT Fuel Surc harge Is Modified To Be More Responsive To Market Conditions

Re CSXT surcharge NS concurrence issued PJG

Original Message
From Glennon Pat
Sent Tuesday April 01 2003 11 22 AM
To McIntyre Clyde Jr
Cc Brenner Charlie Grayson Pam Pfeifer Alby
Subject RE Request for NS Concurrence Effective June 1 2003 CSXT Fuel Surc harge Is Modified To Be More Responsive To Market Conditions

Norfolk Southern concurs to the modified CSXT Fuel Surcharge effective June 1 2003 This concurrence is limited to CSXT issued publications involving CSXT/NS joint line prices that specifically reference the CSXT Fuel Surcharge provision

P J Glennon
Director Mktg Services
Norfolk southern Corporation

Original Message
From McIntyre Clyde Jr [mailto Clyde McIntyre@csx com]
Sent Friday March 28 2003 11 16 AM
To Alby Pfeifer NS
Cc PJGlenno@NSCorp com Charlie Brenner@NSCorp com Grayson Pam
Subject Request for NS Concurrence Effective June 1 2003 CSXT Fuel Surc harge Is Modified To Be More Responsive To Market Conditions

> Request for NS concurrence Effective June 1 2003 CSXT Fuel Surcharge Is
> Modified To Be More Responsive To Market Conditions
>
> On March 20 2003 CSXT released News announcing modifications to the fuel
> cost recovery program
> http //www csx com/?fuseaction=company news detail&i=45428&news year= 1
>
> Please provide concurrence to the modified CSXT fuel surcharge
> program on joint line rates between CSXT and NS referencing or subject
> to Tariff CSXT 8100 or 8200 The surcharge will be divided in the same
> proportion as the joint line freight charges Please provide concurrence
> via Email to Pam_Grayson@CSX com
> <<Modified CSXT Fuel Surchrg >>
>
> Attached is the revised Item 12000 A to Tariff CSXT 8100
> (Merchandise) to be issued March 31 2003 and effective June 1 2003
> Tariff CSXT 8200 (Coal) will be revised similarly
> <<CSXT 8100 FUEL SURCHARGE Doc >>
>

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000190

NS NJ 000189
CONFIDENTIAL SUBMISSION

> Under current CSXT 8100/8200 provisions that expire May 31st the CSXT
> fuel surcharge remains at 2 /
>
> Please let me know if you have any questions
>
> Clyde McIntyre
> Director Pricing Services
> 904 359 3650

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000191

NS NJ 000190
CONFIDENTIAL
SUBMISSION

**From** Glennon Pat
**Sent** Monday March 24 2003 6 24 PM
**To** Seale Don Brenner Charlie
**Cc** Pfeifer Alby
**Subject** RE EXORBITANT Rail Fuel Cost Recovery

**Attachments** FW Fuel Surcharge Information

DWS The requested surcharge comparison is listed below The CSXT has not clarified exactly when they will announce the monthly SC nor how long the lag will be before they make it effective They might follow the lead of the BNSF The prior monthly average is calculated after the close of the month The percentage SC is announced mid month to be effective the first of the next month This reflects a 4 week delay from the close of the month

Regarding the ease of applying the SC for NS We can easily handle the actual application of any percentage That is controlled by Marketing Services by changing the percentage in the applicable surcharge note All authorities subject to the note automatically get the new / Accounting does not have to do anything The change is automatically passed to Accounting through 9255 What we cannot automatically handle are numerous non standard SC provisions with various percentages thresholds and effective dates We limit the proliferation of standards However we can handle two or three if you wish to transition from the current one to another as authorities are reissued

If we were to adopt something like CSXT s we could not simply announce it and have it apply across the board at least not on contracts and possibly not on customer specific quotes (open to debate) We are free to do whatever we want with tariffs and open quotes

Following up on an earlier concern I ve attached one customer s comments about the CSXT standard That standard is far more likely to change the percentage SC from month to month In the past some customers have pointed to this as a hardship due to system limitations In response we did offer the monthly billing option Some customers indicated that it would not work for them since they had to manually associate the SC back to individual cars and freight bills We also know that revenue changes lead to billing disputes Of the negatives this is the most serious On the other had the customer is probably given more lead time to implement the change
PJG

| RR | BASIS | SCHEDULE |
|---|---|---|
| NS | WTI 30 Day WSJ price | 2 / increase for $5 00 increments over $23 |
| UP | WTI 30 Day WSJ price | 2 / increase for $5 00 increments over $23 |
| KCS | WTI 30 Day WSJ price | 2 / increase for $5 00 increments over $23 |
| BNSF | Monthly Highway Diesel Fuel average eff w/6 week delay for / announcement | 5 / increments per $ 05 increments above $1 299 per gallon (1 / threshold) |
| CSXT | WTI monthly average probably with 6 week lag from / announcement | 4 / increase for each dollar increase aver $23 per barrel |
| CN | WTI Average for previous QTR | 2 / $24 00 $26 99<br>4 / $27 00 $31 99<br>6 / $32 00 $36 99 |

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000215

NS NJ 000213
CONFIDENTIAL
SUBMISSION

8 / $37 00 $41 99
Each $5 00 U S increase thereafter = additional 2 /

CPR WTI Average for previous QTR 3 / above $22 00
6 / above $30 00

Original Message
From Seale Don
Sent Monday March 24 2003 10 09 AM
To Brenner Charlie Glennon Pat
Subject RE EXORBITANT Rail Fuel Cost Recovery

CJB PJG I had asked John Rathbone to look at this to determine if Accounting/Billing for the CSX format would be doable Can you give me a comparison of all Class I FSC s in place including CN & CP? DWS 3/22

Original Message
From Glennon Pat
Sent Friday March 21 2003 11 47 AM
To Seale Don
Cc Brenner Charlie Pfeifer Alby
Subject FW EXORBITANT Rail Fuel Cost Recovery

DWS Rathbone and Sheets gave me a call They wanted to know the details behind the CSXT change and how we might implement handle something like it I advised them that the actual application of the SC would be fairly simple We d simply change the percentage in the working part of the SC note The revised note goes out via REN The rates are not reissued As long as we have one basic note w/o a lot of variations maintenance is simple for us

Regarding how changing the SC on a monthly basis can cause billing problems we do offer a billing service where we bill the SC separately on a monthly basis Not all customers can use that option but it could help some customers
PJG

Original Message
From Glennon Pat
Sent Thursday March 20 2003 6 43 PM
To Seale Don Brenner Charlie
Cc Lawson David Wendorf Gary Julian David Osborne Joe Brugman Thomas Pfeifer Alby
Subject RE EXORBITANT Rail Fuel Cost Recovery

DWS This is similar to the BN approach It is a mixed bag

Negatives
1 The surcharge is likely to change every month
2 Every rate or surcharge change is an opportunity for a dispute
3 With a base of $23 as opposed to $28 the surcharge will remain in effect for longer periods of time More customer friction and billing issues
4 The $28/2% is still the standard or the majority of the carriers

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000216

NS NJ 000214
CONFIDENTIAL SUBMISSION

5 I ll have to check this tomorrow Although the CSXT adopted some features from the BNSF SC I believe they did not choose use the base diesel bases formula used by the BNSF That creates yet another version that customers must watch and deal with on a monthly basis

Positives
1 The advance notice (monthly) is good Our current approach leaves us with little advance notice as demonstrated with the latest brush with the 4% surcharge
2 From a cost recovery perspective incremental recovery at a fraction of a percent starting at $23 may yield more revenue and possibly complaints
3 It is closer to the truck and BNSF norm

Frankly our current 30 WSJ day countdown as been a burden to us I was waiting for a sustained period with low oil prices to suggest a switch to a BNSF like (now CSXT) monthly posting On the other hand I like other aspects of our formula The $28/2% standard has been fairly customer friendly in that it has been stable and not quick to jump around Keep in mind that customer must maintain their rate systems

Obviously The CSXT is digging deeper for every dollar The $23 threshold could be a lightening rod issue for customers One positive thing in the CSXT announcement is that they stayed with WTI index WTI will tend to be more stable than a diesel standard which is easily affected by production issues and heating oil consumption Once gain stability and consistency are what customers want

Looking at it from a customer perspective the ideal formula for the CSXT to have adopted would have been the monthly standard (they did) keep the $28/2% standard (did not) or possibly 1% increments and possibly throw in a negative surcharge below a very low number like $15 per barrel This would provide stability easier application and allow for better universal acceptance

Now we have three major standards That is not good On the other hand if we opt to change the ice is broken For customer relations and technical reasons I d suggest that we not consider a switch until the SC drops off unless we have significant cost issue The current SC language is coded in all our publications Transitioning would take some thought

PJG

Original Message
From Seale Don
Sent Thursday March 20 2003 5 41 PM
To Brenner Charlie Glennon Pat
Cc Lawson David Wendorf Gary Julian David Osborne Joe Brugman Thomas
Subject FW EXORBITANT Rail Fuel Cost Recovery

CJB PJG see attached Please review and provide your comments will this be more complex or easier to administer as claimed for customers? DWS 3/20

Original Message
From Lawson David
Sent Monday March 10 2003 9 22 PM
To Seale Don

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000217

NS NJ 000215
CONFIDENTIAL SUBMISSION

Subject FW EXORBITANT Rail Fuel Cost Recovery

DWS

No sooner did I forward the earlier e mail that Jim Howarth sent me I just now got David Good s e mail below regarding the same information Apparently this consultant group is sending this out to a broad group Note [redacted] wants a discussion regarding our fuel surcharges Again I suggest we build an internal response for likely additional requests

DTL

Original Message
From Good David
Sent Monday March 10 2003 1 13 PM
To Lawson David Gentzel Robert Rasche Larry
Subject FW EXORBITANT Rail Fuel Cost Recovery

All

[redacted] would like to talk with us about fuel surcharges and the attached report by an outfit called Escalation Consultants Although he is approaching this as separate issue it inevitably becomes part of final National Contract negotiations Currently the fuel surcharge issue comes into play primarily on inbound fiber and chemical business and cross dock movements

Some thoughts for our internal discussion

1 The subject of refunds when the fuel price falls below some target to counter balance the surcharge when it is above a target has been raised several times by [redacted] over the past few years At one point we discussed including it in our latest contract proposal language but opted to wait and see if they brought the issue up again

2 I seem to recall in internal NS memo that detailed how our fuel surcharge receipts were not covering our increased fuel expenses Does anyone else remember seeing that and where?

3 [redacted] trucking example indicates they are looking for a relationship between fuel surcharge and length of haul Do we have any data that would show the relationship between mileage and where the surcharge breaks even with the fuel expense? We could then compare this with [redacted] average length of haul

4 The consultant s main point was differentiation between competitive and captive business We have data from the bid as to percentage of their business that is competitive

David A Good
National Account Manager Memphis TN
7 424 1885 or (901) 320 1885

Original Message
From [redacted]
Sent Monday March 10 2003 2 35 PM
To dagood@nscorp com

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001000218

NS NJ 000216
CONFIDENTIAL
SUBMISSION

Cc [redacted]
Subject EXORBITANT Rail Fuel Cost Recovery

David

I find myself in full agreement with the attached and need to ask that your firm present some details on actual fuel costs to support your fuel surcharge mechanism

We have worked out a very equitable mechanism with our motor carriers where we index fuel costs based on the weekly Department of Energy fuel survey for Retail On Highway Diesel Prices We have established a cost of fuel neutral zone where no surcharge applies When the index rises above that zone we pay the carrier a one cent per mile surcharge for every six cent per gallon change in the price of diesel for that week When the index falls below the neutral zone the carrier refunds to us one cent per mile for every six cent change in the price of diesel for that week

We are all for equitably handling your fuel surcharge needs and want to know when can we get together to work out the necessary details ?

FW Fuel Surcharge Information

(See attached file EC Alert 0303 pdf)

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only
NS 001000219

NS NJ 000217
CONFIDENTIAL
SUBMISSION

EXHIBIT
Seale 43

PENGAD 800-631-6989

**From:** Seale, Don
**Sent:** Thursday, March 27, 2003 6:16 PM
**To:** 'Lanigan, John P'
**Subject:** RE: Your Call

John, thanks for the message below and I too apologize for the phone tag. We had our Board Meeting here this week and I departed on a trip out of town right after its conclusion. I look forward to seeing you at NFTA, and in the interim I will call Dave about the panel at Tahoe. Also, I see we both are on the list for the NIT League Supplier Advisory group, and I would like to talk to you about this during NFTA along with the fuel surcharge issue we discussed in Norfolk. Also, we found some data discrepancies in the carload interchange statistics that we reviewed during our meeting and I will be sending you and Dave a corrected copy. Thanks again for your patience, and I look forward to seeing you next week. Don

-----Original Message-----
From: Lanigan, John P [mailto:John.Lanigan@BNSF.com]
Sent: Tuesday, March 25, 2003 12:25 PM
To: 'dwseale@nscorp.com'
Subject: Your Call

Don,
Sorry that we have been playing phone tag. I just tried to call you again. I was at an offsite meeting yesterday. I am in the office today but am traveling the rest of the week. Unfortunately I am committed to an Asian customer trip during the Lake Tahoe conference. We depart Dallas on Sunday morning the 22nd. I don't know Dave Garin's sked, but he would be a good sub for me. Feel free to contact him directly. I would have enjoyed being on the panel and thanks for thinking of me. Hopefully we will catch up live this week. We could also certainly catch up next week at NFTA. I enjoyed meeting you last week.
Thanks,
John

HIGHLY
CONFIDENTIAL -
Attorneys' Eyes Only



NS - NJ 000223
CONFIDENTIAL
SUBMISSION

From Seale Don
Sent Friday May 09 2003 5 01 PM
To Prillaman Ike
Subject FW Revised UP Fuel Surcharge Project 1786
LIP Please note regarding our discussion today on UP and BNSF fuel surcharges DWS

Original Message
From Seale Don
Sent Friday May 09 2003 4 58 PM
To Glennon Pat
Cc Brenner Charlie Pfeifer Alby
Subject RE Revised UP Fuel Surcharge Project 1786

Pat Lets concur with the UP application and maintain our current FSC for the time being DWS

Original Message
From Glennon Pat
Sent Friday May 09 2003 3 00 PM
To Seale Don
Cc Brenner Charlie Pfeifer Alby
Subject Revised UP Fuel Surcharge Project 1786

DWS We received the UP s revised FSC formula They are asking for our concurrence by May 15th This covers UP issued prices subject to the UP FSC

The revised UP FSC is very similar to the current BNSF formula It is based on the Retail On Highway Diesel Fuel index Like the BNSF it also provides for 5% increments for every 5 cent increment starting with 0% below $1 25 However the UP has inserted a $1 35 trigger that essentially caches the prior increments until the $1 35 threshold is met Once it is met the earlier increments are added to the FSC so the minimum FSC is 1 5 % at $1 35 See chart below Once it kicks in it exactly matches the BNSF FSC percentage progression including lag times and effective dates

The UP is also announcing that the June FSC will be reduced to 2 / in lieu of the 3 / that the formula calls for This is probably due the recent sharp drop in energy costs and the substantial lag built into the formula In a similar move the BNSF reduced the May FSC from 5 0 / to 2 0 % for the month of May

We are getting some indications that the BNSF might modify their FSC to include a similar $1 35/1 5 % trigger This somewhat address a complaint that the BNSF formula kicks in sooner and tends to change from month to month Of course once the price of diesel exceeds $1 35 the issue about frequent changes reappears In addition the price of diesel is affected by refinery issues heating oil production and regional variations As a result diesel will tend to be more volatile than WTI

I recommend that we concur and watch for a BNSF response If the BNSF adopts the same change the CSXT will be under pressure to modify their position Due to the way NS publishes the FSC if we were to adopt this need approach we would have to transition one publication at a time For this reason alone we should wait this out and review our position once things settle down

In the meantime we can concur to the UP proposal We can handle the formula with little manual effort on the part of Mktg Services and with no involvement by the PMs
PJG

Original Message
From KAEYMANN@up com [mailto KAEYMANN@up com]
Sent Friday May 09 2003 12 00 PM
To pjglenno@nscorp com ampfeife@nscorp com
Subject Project 1786

REVISED FUEL SURCHARGE PROGRAM EFFECTIVE JUNE 1 2003

HIGHLY CONFIDENTIAL
Attorneys' Eyes Only

NS 001000354

NS NJ 000352
CONFIDENTIAL
SUBMISSION

Union Pacific is revising its carload fuel cost recovery program which will amend/replace current provisions published in UP governing rules tariffs/circulars

In the event the average price of Retail On Highway Diesel Fuel (as set forth below the HDF Average Price ) calculated monthly based on prices reported on the U S Department of Energy Website (eia doe gov) equals or exceeds $1 35 per gallon UP will apply a fuel surcharge to linehaul freight charges The fuel surcharge shall be applied to the linehaul freight charge for each shipment having a bill of lading dated on or after the 1st day of the second calendar month following the calendar month of a given HDF Average Price (e g a fuel surcharge applied beginning July 1 would be based on May's HDF Average Price)

The HDF Average Price for a given calendar month will be determined by adding the weekly Retail On Highway Diesel Fuel prices reported on the U S Department of Energy Website (eia doe gov) and dividing the result by the number of weeks so reported The result will be rounded to the nearest cent If the Department of Energy ceases reporting of the price of Retail On Highway Diesel Fuel UP will employ a suitable substitute source of price or measure The following schedule reflects the applicable fuel surcharges within the HDF Average Price ranges noted below

| HDF Average Price (Per Gallon) | Fuel Surcharge (Percentage) |
|---|---|
| $0 00 to $1 349 | 0 0% |
| $1 35 to $1 399 | 1 5% |
| $1 40 to $1 449 | 2 0% |
| $1 45 to $1 499 | 2 5% |
| $1 50 to $1 549 | 3 0% |
| $1 55 to $1 599 | 3 5% |
| $1 60 to $1 649 | 4 0% |
| $1 65 to $1 699 | 4 5% |
| $1 70 to $1 749 | 5 0% |
| $1 75 to $1 799 | 5 5% |
| $1 80 to $1 849 | 6 0% |
| $1 85 to $1 899 | 6 5% |
| $1 90 to $1 949 | 7 0% |
| $1 95 to $1 999 | 7 5% |

HIGHLY CONFIDENTIAL
Attorneys' Eyes Only

NS 001000355

NS NJ 000353
CONFIDENTIAL
SUBMISSION

```
|$2 00 to $2 049 | |    8 0/     |
|          -   + +               |
| Each $0 05 per | |Additional 0 5/ |
| gallon increase| |             |
| thereafter    | |            |
|              + +               |
```

REDUCTION EXCEPTION June 2003 fuel surcharge is reduced from 3 0/ to 2 0%

In no case will freight charge(s) be reduced below the Base Freight Charge(s) as a result of the application of this Item nor will application or removal of the fuel surcharge be retroactive

Surcharge amounts will be shared on the same proportions as associated interline divisions for joint line prices

We would appreciate receiving your concurrence by May 15 2003 If you have any questions or if more convenient to telephone your response please feel free to call the undersigned at (402) 271 4595 or Kathy Eymann at (402) 271 4793

Kurt Schroeder
Sr Manager Revenue Management
Union Pacific Railroad
EMAIL KurtSchroeder@UP com
FAX (402) 271 4860

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000356

NS NJ 000354
CONFIDENTIAL
SUBMISSION

**From** McNeil Doug
**Sent** Monday June 30 2003 10 16 AM
**To** McClellan Mike R Julian David Brugman Thomas Lawson David Osborne J Wendorf Gary
**Cc** Heller Jeffrey S Kiley Richard Dimond JoAnn Fisher Donna Florian Fred Gentzel Robert McNabb James Plain Robert Schaaf James Harkey Greg Howard Melissa Manning Cheryl North Phil Anderson Brady Simonic Patrick Yopp Ken
**Subject** FW Draft Minutes of NS UP meeting of 5 14 03

**Attachments** Minutes NS UP Alliance 5 14 03 doc
More info

Doug

Original Message
From Quesenberry Brenda
Sent Monday June 30 2003 10 11 AM
To McNeil Doug
Subject FW Draft Minutes of NS UP meeting of 5 14 03

Minutes NS-UP Alliance 5-14

Ori inal Message
From Seale Don
Sent Thursday June 05 2003 12 00 PM
To bking@up com wfsutton@up com
Cc peggyruiz@up com
Subject FW Draft Minutes of NS UP meeting of 5 14 03

Brad & Woody
Sorry for the delay in returning this to you Please note NS representatives that will work with UP designees on the assigned topics We look forward to further progress in our alliance! Don Seale

Original Message
From PEGGYRUIZ@UP COM [mailto PEGGYRUIZ@UP COM]
Sent Monday May 19 2003 3 11 PM
To don seale@nscorp com mark manion@nscorp com
Cc BKING@up com WFSUTTON@up com bmquesen@nscorp com
Subject Draft Minutes of NS UP meeting of 5 14 03

Attached are draft minutes from the recent NS UP meeting in Omaha Please review and let us know of any changes Also please provide names of NS people assigned to the various follow ups where there are question marks Thank you
(See attached file Minutes NS UP Alliance 5 14 03 doc)

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000360

NS NJ 000358
CONFIDENTIAL SUBMISSION

**Minutes NS/UP Alliance Meeting**
**Omaha, Nebraska**
**May 14, 2003**

**Attendees**
**UP** Dick Davidson Ike Evans Dennis Duffy Jack Koraleski Brad King Jim Young Merill Bryan John Gray Woody Sutton Jeff Koch

**NS** David Goode Ike Prillaman Jim McClellan Don Seale Steve Renken Wick Moorman Tony Ingram Mark Manion Mike McClellan

General discussion held on state of the economy and how it was reflected in business volumes by various commodities While both roads are optimistic about coal volumes picking up both roads are equally concerned about the automotive business going forward Discussion followed on fuel surcharges and various application processes as used by different roads Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers There was some question as to whether or not the industry can work together on this opportunity probably through the AAR or do roads have to handle the opportunity on a bilateral basis **Follow up UP Jack Koraleski/Mike Hemmer, NS – Don Seale/Greg Summy**

**Operations Update** MultiRail proposal (previously endorsed by both roads) has begun implementation at the St Louis and Chicago Gateways Both Ike Evans and David Goode urged the group on an individual basis to get on with the process To that end it was agreed to implement Memphis and New Orleans next There was discussion of the North Platte/ Chattanooga Corridor It was agreed the commercial sides of the organizations need to deal with the Gateway shift quickly in order to implement **Follow up UP Woody Sutton/John Gray, NS Dale Schaub/Doug McNeil** In addition **Brad King** and **Mark Manion** are to reconvene the Working Team within the next several weeks to incept implementation

Brad King reviewed the Operating Metrics as furnished by both roads It was agreed both Train Performance and Trip Plan Compliance need to be addressed with an initial focus on the worst performing Gateway **Follow up UP King, NS Manion** in the next Working Team Meeting

**Sales and Marketing Update** Jack Koraleski Don Seale and Ike Prillaman reviewed the 1st Quarter level of activity which reflects 3 1% growth year over year In addition various projects and opportunities were reviewed Several are successfully implemented other are works in progress with

HIGHLY CONFIDENTIAL
Attorneys Eyes Only

NS 001000361

NS NJ 000359
CONFIDENTIAL
SUBMISSION

timelines established Follow up Both Marketing groups to have conference call review within thirty days to review progress **Jack Koraleski/Don Seale**

In addition several specific follow ups are required immediately to address service deficiencies or to bring closure to several projects Specifically

- Memphis/Laredo O/T performance Issue appears to be steel wheel connections at Marion making the proper connection **UP Tom Florence, NS Tim Heilig**
- de Mex Auto Flyer finalizing the Service Design on the Sidney to Salem leg **UP Tom Florence, NS – David Julian/Tim Heilig**
- Auto Fleet needs going forward Parts Cars and Multilevels including the Unilevel **UP Tom Florence, NS – David Julian/Debbie Butler**

**Transload discussion** NS expressed concern about the UP/Transflo relationship as Transflo is a CSX company UP assured NS the relationship precluded CSX or Transflo having any Sales and Marketing influence

**Salem Gateway** It was agreed a team should be put together quickly to make recommendations on the Gateway s continuance well prior to the October deadline when cancellation notices could be issued **UP Sutton/Gray, NS – Doug McNeil/Tim Heilig**

**IT discussion** Agreement that the opportunities for utilizing the AAR IT Standing Committee and Railinc as the forums to facilitate technology solutions was endorsed

**Re-regulation** Lengthy discussion that the current legislative efforts were the strongest yet Both roads already working together to support the AAR initiatives laid out to SOMC/NEMC in the May 1 2003 joint meeting Don Seale leads the effort for the industry

**KCS/TFM** UP made its concerns known to NS about the proposed merger UP is seeking NS support that the current position of equal access to the Laredo bridge and commercial relationships with the TFM be maintained

It was agreed the next meeting should be held no later than late August or early September **Follow up UP – King, NS – John Friedmann**

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001000362

NS NJ 000360
CONFIDENTIAL
SUBMISSION

From Lawson David
Sent Monday June 30 2003 8 44 PM
To Rhodes Joyce Self Don Howard Melissa Smith Kathleen Robinson Rob Florian Fred Gentzel Robert Miller Mike O Rasche Larry
Subject File RR UP Draft Minutes of NS UP meeting of 5 14 03

Attachments Minutes NS UP Alliance 5 14 03 doc
All

Note

DTL

Original Message
From McNeil Doug
Sent Monday June 30 2003 10 16 AM
To McClellan Mike R Julian David Brugman Thomas Lawson David Osborne J Wendorf Gary
Cc Heller Jeffrey S Kiley Richard Dimond JoAnn Fisher Donna Florian Fred Gentzel Robert McNabb James Plain Robert Schaaf James Harkey Greg Howard Melissa Manning Cheryl North Phil Anderson Brady Simonic Patrick Yopp Ken
Subject FW Draft Minutes of NS UP meeting of 5 14 03

More info

Doug

Original Message
From Quesenberry Brenda
Sent Monday June 30 2003 10 11 AM
To McNeil Doug
Subject FW Draft Minutes of NS UP meeting of 5 14 03

Original Message
From Seale Don
Sent Thursday June 05 2003 12 00 PM
To bking@up com wfsutton@up com
Cc peggyruiz@up com
Subject FW Draft Minutes of NS UP meeting of 5 14 03

Brad & Woody
Sorry for the delay in returning this to you Please note NS representatives that will work with UP designees on the assigned topics We look forward to further progress in our alliance! Don Seale
Original Message
From PEGGYRUIZ@UP COM [mailto PEGGYRUIZ@UP COM]
Sent Monday May 19 2003 3 11 PM
To don seale@nscorp com mark manion@nscorp com
Cc BKING@up com WFSUTTON@up com bmquesen@nscorp com
Subject Draft Minutes of NS UP meeting of 5 14 03

Attached are draft minutes from the recent NS UP meeting in Omaha Please review and let us know of any changes Also please provide names of NS people assigned to the various follow ups where there are question marks Thank you

HIGHLY CONFIDENTIAL
Attorneys' Eyes Only

NS 001000366

NS NJ 000364
CONFIDENTIAL SUBMISSION

Minutes NS-UP Alliance 5 14

(See attached file Minutes NS UP Alliance 5 14 03 doc)

HIGHLY CONFIDENTIAL Attorneys' Eyes Only



NS NJ 000365 CONFIDENTIAL SUBMISSION

**Minutes NS/UP Alliance Meeting**
**Omaha, Nebraska**
**May 14, 2003**

**Attendees**
**UP** Dick Davidson Ike Evans Dennis Duffy Jack Koraleski Brad King Jim Young Merill Bryan John Gray Woody Sutton Jeff Koch

**NS** David Goode Ike Prillaman Jim McClellan Don Seale Steve Renken Wick Moorman Tony Ingram Mark Manion Mike McClellan

General discussion held on state of the economy and how it was reflected in business volumes by various commodities While both roads are optimistic about coal volumes picking up both roads are equally concerned about the automotive business going forward Discussion followed on fuel surcharges and various application processes as used by different roads Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers There was some question as to whether or not the industry can work together on this opportunity probably through the AAR or do roads have to handle the opportunity on a bilateral basis **Follow up UP Jack Koraleski/Mike Hemmer, NS – Don Seale/Greg Summy**

**Operations Update** MultiRail proposal (previously endorsed by both roads) has begun implementation at the St Louis and Chicago Gateways Both Ike Evans and David Goode urged the group on an individual basis to get on with the process To that end it was agreed to implement Memphis and New Orleans next There was discussion of the North Platte/ Chattanooga Corridor It was agreed the commercial sides of the organizations need to deal with the Gateway shift quickly in order to implement **Follow up UP Woody Sutton/John Gray, NS - Dale Schaub/Doug McNeil** In addition **Brad King** and **Mark Manion** are to reconvene the Working Team within the next several weeks to incept implementation

Brad King reviewed the Operating Metrics as furnished by both roads It was agreed both Train Performance and Trip Plan Compliance need to be addressed with an initial focus on the worst performing Gateway **Follow up UP King, NS - Manion** in the next Working Team Meeting

**Sales and Marketing Update** Jack Koraleski Don Seale and Ike Prillaman reviewed the 1st Quarter level of activity which reflects 3 1% growth year over year In addition various projects and opportunities were reviewed Several are successfully implemented other are works in progress with

HIGHLY
CONFIDENTIAL
Attorneys' Eyes Only

NS 001000368

NS NJ 000366
CONFIDENTIAL
SUBMISSION

timelines established Follow up Both Marketing groups to have conference call review within thirty days to review progress **Jack Koraleski/Don Seale**

In addition several specific follow ups are required immediately to address service deficiencies or to bring closure to several projects Specifically

- Memphis/Laredo O/T performance Issue appears to be steel wheel connections at Marion making the proper connection **UP Tom Florence, NS Tim Heilig**

- de Mex Auto Flyer finalizing the Service Design on the Sidney to Salem leg **UP Tom Florence, NS – David Julian/Tim Heilig**

- Auto Fleet needs going forward Parts Cars and Multilevels including the Unilevel **UP Tom Florence, NS – David Julian/Debbie Butler**

**Transload discussion** NS expressed concern about the UP/Transflo relationship as Transflo is a CSX company UP assured NS the relationship precluded CSX or Transflo having any Sales and Marketing influence

**Salem Gateway** It was agreed a team should be put together quickly to make recommendations on the Gateway s continuance well prior to the October deadline when cancellation notices could be issued **UP Sutton/Gray, NS – Doug McNeil/Tim Heilig**

**IT discussion** Agreement that the opportunities for utilizing the AAR IT Standing Committee and Railinc as the forums to facilitate technology solutions was endorsed

**Re regulation** Lengthy discussion that the current legislative efforts were the strongest yet Both roads already working together to support the AAR initiatives laid out to SOMC/NEMC in the May 1 2003 joint meeting Don Seale leads the effort for the industry

**KCS/TFM** UP made its concerns known to NS about the proposed merger UP is seeking NS support that the current position of equal access to the Laredo bridge and commercial relationships with the TFM be maintained

It was agreed the next meeting should be held no later than late August or early September **Follow up UP – King, NS – John Friedmann**

HIGHLY CONFIDENTIAL
Attorneys' Eyes Only

NS 001000369

NS NJ 000367
CONFIDENTIAL SUBMISSION

**From** Lawson David
**Sent** Tuesday April 18 2006 10 43 PM
**To** Seale Don
**Subject** AAR Daily News Clips for Tuesday April 18 2006

**Attachments** Ecopy pdf
DWS

In case you didn t see it attached is the WSJ article by Dan Machalaba on fuel surcharges

UP has given their concurrence on our suggestion to re base fuel to $64 drop the increments to 3% and make a market base adjustment to the public rates of 12% effective 7/1/06 This is only for our NS originated shipments to the UP

Separately BNSF agreed to our suggestion for NS originated interline shipments to the BNSF

I am waiting to hear from CSX for our interline business with them Also I will need to reach out to CN CP FEC and Guilford for the bilateral discussions on our fuel surcharge I hope to have this wrapped up by Friday

Ecopy pdf (860 KB)

DTL

HIGHLY
CONFIDENTIAL
Attorneys' Eyes Only

NS 001001159

NS NJ 001157
CONFIDENTIAL
SUBMISSION

ASSOCIATION OF
AMERICAN RAILROADS

# DAILY NEWS CLIPS

Communications Department
Tuesday April 18, 2006
(202) 639 2555



## Today's Stories


| Title | Source | Page # |
|---|---|---|
| Tensions Mount Over Fuel Charges Set by Railroads | Wall Street Journal | 1 2 |
| Mississippi Senators Rail Plan Challenged *War Bill includes Millions to Move Just Rebuilt Line* | Washington Post | 2 4 |
| FMCSA Blocks Truck Hazmat Bar | Traffic World | 4 |
| The Ships Keep Coming In For Canadian Rail Company | Investor s Business Daily | 5 6 |
| Justices Weigh Whether Railroad Retaliated Against Worker | New York Times | 6 8 |
| State BNSF spar over cleanup site | Great Falls Mont Tribune | 8 9 |
| Wanted 100 new employees for the Union Pacific | North Platte Neb Telegraph | 9 10 |
| The little railroad that could (make a big difference) *Ability to connect with major rail carriers makes Blacklands an important part of local economic development strategy* | Sulphur Springs Tex News Telegram | 11 12 |


HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001001160

NS NJ 001158
CONFIDENTIAL
SUBMISSION

**WALL STREET JOURNAL April 18, 2006**

**Tensions Mount Over Fuel Charges Set by Railroads**
By DANIEL MACHALABA

Major railroads and their customers are on a collision course over fuel surcharges that have been climbing much faster than diesel fuel costs

We re getting gouged ' complains Angelo LaMantia director of North American logistics at UPM Kymmene Corp a Helsinki Finland paper manufacturer He estimates that the extra fee added to the basic cost of shipping a railcar loaded with paper to Wisconsin from Florida exceeds the shipment s fuel cost by about 40%

Railroads such as Union Pacific Corp and CSX Corp deny that fuel surcharges now nearing 16% of the shipping rate at some railroads are a profit center insisting that they only partly offset rising fuel expenses that typically are the second largest area of costs at a railroad, after employee pay and benefits

We apply the surcharge in a fair and consistent manner while simultaneously working to improve our fuel efficiency says Gary Sease a spokesman for CSX Jacksonville, Fla

The tension comes as transportation companies such as railroads and the retailers manufacturers and others who depend on them look for ways to defray rising fuel costs With U S consumers resistant to paying higher prices at the cash register many industries are seeking savings from their supply chains increasing tension between cargo companies and their customers

Burlington Northern Santa Fe Corp and Union Pacific collected a combined $2 12 billion in fuel surcharges last year compared with $680 million in 2004 according to securities filings The add on fees generated 8% of their total 2005 revenue compared with 2 9% a year earlier Fuel expense at the two railroads rose 44% to $4 35 billion

In response to growing customer anger the federal Surface Transportation Board which regulates the U S railroad industry plans to hold a hearing next month on fuel surcharge practices The agency could order changes in how railroads set surcharge levels W Douglas Buttrey STB chairman said last October that companies are complaining that railroads' fuel surcharge formulas don t make sense to them

Railroads began imposing fuel related fees about five years ago and have been aggressively expanding them to additional customers as contracts are signed or renewed Few customers can avoid the surcharges when they attempt to ship on the railroads because of tight capacity in the freight system and the railroad industry s appeal as a relatively low-cost transportation mode compared with trucks

The extra fees are on top of base freight rates which climbed an average of about 5% in 2005 Rail customers say fuel surcharges are trickling down to the prices of many commodities and consumer goods ranging from coal to cars to toys U S railroads carry about 41% of U S freight as measured in ton miles or one ton carried one mile and are major haulers of grain chemicals lumber and apparel

East Coast railroads CSX and Norfolk Southern of Norfolk Va tie their surcharges to the price of West Texas Intermediate crude oil which has doubled in the past two years Nymex

HIGHLY
CONFIDENTIAL
Attorneys' Eyes Only

NS 001001161

NS NJ 001158A
CONFIDENTIAL
SUBMISSION

crude oil set a nominal record close of $70 40 yesterday up $1 08 a barrel or 1 56% Union Pacific based in Omaha, Neb and the largest U S railroad by revenue and BNSF Fort Worth Texas use less volatile highway diesel fuel prices Union Pacific says it spent $1 38 billion more on fuel last year than it collected in fuel surcharge revenue partly because some long term contracts still lack surcharges

Still some frustrated customers claim they can prove railroads are overcharging Jay Roman president of Escalation Consultants Inc a Gaithersburg Md firm that advises rail shippers calculates that Norfolk Southern pays fuel costs of $113 per car to move a shipment with an average haul length of about 525 miles but collects $162 per car in surcharge revenue

Norfolk Southern declined to comment In a securities filing the company said fuel surcharges comprised a third of its overall $1 2 billion revenue increase in 2005

The widespread dissatisfaction could lead to changes in railroad fuel surcharges regardless of the outcome of next month's regulatory hearing In January BNSF the second largest U S railroad switched to a mileage based fuel surcharge for coal and agricultural shipments Canadian National Railway Co and Canadian Pacific Railway Ltd recently trimmed the percentage size of their extra fees by spreading them to more customers We re not out to make money on our fuel surcharges, ' says Leslie Pidcock a Canadian Pacific spokeswoman

*Write to Daniel Machalaba at daniel machalaba@wsj com*

**WASHINGTON POST April 18, 2006**

**Mississippi Senators' Rail Plan Challenged**

*War Bill Includes Millions to Move Just Rebuilt Line*

By Jonathan Weisman Washington Post Staff Writer

Mississippi s two U S senators included $700 million in an emergency war spending bill to relocate a Gulf Coast rail line that has already been rebuilt after Hurricane Katrina at a cost of at least $250 million

Republican Sens Trent Lott and Thad Cochran who have the backing of their state s economic development agencies and tourism industry say the CSX freight line must be moved to save it from the next hurricane and to protect Mississippi s growing coastal population from rail accidents But critics of the measure call it a gift to coastal developers and the casino industry that would be paid for with money carved out of tight Katrina relief funds and piggybacked onto funding for the wars in Iraq and Afghanistan

It is ludicrous for the Senate to spend $700 million to destroy and relocate a rail line that is in perfect working order particularly when it recently underwent a $250 million repair ' said Sen Tom Coburn (R Okla ) who is planning to challenge the funding when the $106 5 billion war spending bill reaches the Senate floor American taxpayers are generous and are happy to restore damaged property but it is wrong for senators to turn this tragedy into a giveaway for economic developers

Securing money for pet home state projects is nothing new for Lott a famous benefactor of the Mississippi coastline or for Cochran chairman of the Senate Appropriations Committee

HIGHLY
CONFIDENTIAL
Attorneys' Eyes Only
NS 001001162

NS NJ 001158B
CONFIDENTIAL
SUBMISSION

But the fight over the rail funding will come at a sensitive time when both houses of Congress have promised to rein in such "earmarks' as part of a larger effort to overhaul ethics rules and when a stubborn budget deficit has made spending of all kinds a sensitive political issue

At $106 5 billion the Senate Appropriation Committee s version of the emergency spending bill is already more than $14 billion larger than the version the House passed in March The Senate bill will probably reach the floor next week

A $223 million Bridge to Nowhere' linking Alaska's tiny Ketchikan to its airport on Gravina Island - in last year's highway bill turned into a political firestorm that some Republicans still fear has dampened the spirits of conservative voters Budget watchdogs are already tagging the Lott-Cochran provision the railroad to nowhere '

We have real needs that we have to meet for rebuilding in the Gulf Coast and with our tight budgets this is almost a zero sum game said Steve Ellis vice president of Taxpayers for Common Sense And now we re taking about moving a railroad that's been rebuilt already? That doesn't make sense

Writing yesterday in the Biloxi Sun Herald Lott called the railroad to nowhere' tag outrageous daring his critics to see this situation for themselves before passing judgment on the expendability of Mississippi lives '

Lott cited his father s death on a narrow two lane road' as a reason for his safety concerns

But even appropriations aides who are sympathetic to the earmark say the issue is more complicated than Lott s case for safety There are inherent safety issues when rail lines run through populated areas but those issues exist nationwide Mississippi s rail accident rate from 2001 to 2005 reached a 30 year low

Much of the rail line along the Gulf Coast would remain in hurricane danger and the proposed rerouting would affect only a small part

The real impetus appears to be economic For more than half a dozen years Mississippi officials development planners and tourism authorities have dreamed of the complex restructuring of Mississippi's coastal transportation system that Lott and Cochran now want to set in motion Under the plan the CSX line which runs a few blocks off the coast line would be scrapped CSX would move its freight traffic to existing tracks to the north owned by rival Norfolk Southern

Then U S 90 a wide federal highway that hugs Mississippi s beaches would be rebuilt along the CSX rail bed. The route of the federal thoroughfare would be turned into a smaller manicured beach boulevard through cities such as Biloxi where visitors could spend more time strolling among the casinos and taking in the views as the Governor s Commission on Recovery Rebuilding and Renewal put it

There's nothing wrong with this if Mississippi wants to do it Mississippi wanted to do it before the hurricane Coburn said But why is it a federal responsibility? Why should our grandchildren pay for it?

The $700 million in the emergency spending bill is just short of the price CSX set for selling its right of way buying into the Norfolk Southern line making capacity improvements on the main line and bolstering a short line railway to bypassed areas The high price was inevitable Appropriations Committee aides said CSX just spent as much as $300 million in insurance

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only
NS 001001163

NS NJ 001159
CONFIDENTIAL
SUBMISSION

payouts and its own money to rebuild the track that Lott and Cochran now want to destroy

And the cost would increase considerably if as expected Lott looks to annual appropriations bills to rebuild U S 90

When you re talking about a project this big you're probably talking about an effort that s multi year said Lott spokesman H Lee Youngblood

Susan Irby Lott s communications director said safety is the senator s biggest concern But she added Senator Lott makes no apologies for trying to develop one of the poorest states in the country

**TRAFFIC WORLD April 17, 2006**

**FMCSA Blocks Truck Hazmat Bar**
BY ANGELA GREILING KEANE

The District of Columbia has no more right to bar the transport of hazardous materials by truck than by train as far as the federal government is concerned

The Federal Motor Carrier Safety Administration ruled last month that two new District of Columbia laws that order hazmats carried in trucks to be rerouted are preempted by federal law

Federal hazardous material transportation law preempts all provisions of the D C act as it applies to motor carriers ' the FMCSA wrote in a statement published in the Federal Register

The decision came at the request of the American Trucking Associations which opposes the laws Railroads also are fighting a city law that would require rerouting of hazardous materials carried on trains and trucks within a 2 2 mile radius of the U S Capitol unless railroads obtain special permits

In its challenge ATA said the District of Columbia ignored existing federal hazmat laws Yellow Roadway the National Propane Gas Association and the National Tank Truck Carriers supported ATA s challenge Like the railroads in their challenge the truckers suggested the district s attempt to ban hazmat transport could lead to a patchwork of regulations around the country if other jurisdictions followed the capital city s lead

Yellow Transportation and Roadway Express together have over 700 terminal facilities across the country ' the company s Chemical Transportation Administrator Robert Maberry and Government Relations Director Ted Scott wrote in comments to the FMCSA last year

Having to adhere to different rules and routing requirements in these different communities would be confusing extremely costly administratively burdensome and would adversely impact the safe and secure transportation of these materials they said

Officials from the Virginia and Maryland transportation departments also wrote to FMCSA saying they had not received required notice from the District of Columbia telling them how they would be affected by the rerouting requirements

The district can appeal the agency's decision in federal court

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001001164

NS NJ 001160
CONFIDENTIAI
SUBMISSION

**INVESTOR'S BUSINESS DAILY April 18, 2006**

**The Ships Keep Coming In For Canadian Rail Company**
BY ALAN R ELLIOTT INVESTOR'S BUSINESS DAILY

Think your local Wal Mart (WMT) is crowded? Try squeezing in and out of the Los Angeles and Long Beach harbors

Combined the two ports handle nearly half of all U S imports — including most goods in transit from China to Wal Mart shelves

The rise of big box retailers has helped double U S port traffic in the past decade Bulk goods traveling more than 500 miles from the port generally get loaded directly on a train A single ship can load more than 10 trains with imported goods

When a container lands anywhere on the West Coast of the continent it typically wants to go very deep into the Canadian or U S market So it is a sweet spot for railroads said Claude Mongeau chief financial officer at Canadian National Railway (CNI)

Canadian National operates 15 000 miles of track traveling through eight Canadian provinces and 16 U S states from Vancouver to New Orleans

Once a flabby arm of the Canadian government the company runs one of the most efficient rail networks in the industry It s also gathering business as more Asian shippers sail to Vancouver and Prince Rupert British Columbia.

In November Canadian National announced plans to nail $7 8 billion in annual revenue by 2010 Revenue hit $6 31 billion last year up 11% from the year before

The plan also includes bolstering the bottom line by cutting annual costs $348 million to $435 million

To reach those goals Mongeau says the railway will focus on improving customer service and taking more market share from long haul truckers

Canadian National also looks to squeeze more profit from its underutilized western Canadian operations banking on continued growth at British Columbia s ports

*Price Conscious*

The entire North American railroad industry has benefited from recent price increases

For decades rail carriers were a dime a dozen and held little or no power to increase prices

That tide turned in 2000 as railroads consolidated and as shipping demand — driven by increased global trade — outgrew North American rail capacity

The change marked the first notable rise in railroad prices in decades

Railroads are coming out and hitting something on the order of 15% to 20% (price) increases sometimes every six months ' said Jay Roman president of Gaithersburg Md based Escalation Consultants an industry researcher In coal transport a lot of utilities out there expect to have their rates increase 80% or more '

His company recently conducted an informal survey of major bulk shipping companies It found Union Pacific (UNP) and Norfolk Southern (NSC) were the most aggressive rate hikers Canadian National rated near the middle of the pack

Many shippers contend the increases are unreasonable Others argue that it's only a matter

of market economics For a long time they say overcapacity in the rail industry meant shippers enjoyed unreasonably low rail carrier rates

The latter argument is supported by Carole Wink senior vice president at Ancon Transportation Services a Fontana Calif based shipper

(Shippers) are having to pay now what is their fair share " she said "On the other hand the attitude among railroads over price increases is very arrogant

Good or bad the hikes helped Canadian National grow 2005 earnings 37% to $2 29 a share First Call analysts expect earnings to rise 19% this year and 13% in 2007

The outlook for further price increases is uncertain however

You've got shippers considering more things than ever before in terms of how they structure their transportation department and how they prepare for and negotiate with railroads ' Roman said

Canadian National went public in 1995 Revenue and earnings wobbled through 1998 when Hunter Harrison joined the company as an executive vice president

In 1999 Harrison oversaw the acquisition of his previous employer the profitable Illinois Central He sold off 750 Canadian National locomotives He also extended the acquired railroad s scheduling and management strategy across the larger operation

Canadian National s annual earnings and revenue immediately jumped

The firm has since bought three more rail lines — two in the U S one in Canada Harrison now Canadian National s chief executive continues to work to improve efficiency

It s really blocking and tackling Mongeau said. 'It s a philosophy for how to run a railroad but it is also the disciplined execution of that model day in and day out

That discipline helped Canadian National reduce its operating ratio to 64% last year from 89% a decade earlier Operating ratio is the measure of operating costs to revenue Canadian National s near term target is 60% Mongeau says

Norfolk Southern reported a 75% ratio for 2005 Burlington Northern Santa Fe (BNI) came in above 76%

Analyst Donald Broughton of A G Edwards says Canadian National s operating ratio edge could dwindle quickly as excess capacity is tapped and as the firm finds itself needing to spend more to add new business

Other factors to watch in the coming year are currency issues tied to low interest rates in the U S and Canada, and the expiration of hedged fuel price contracts he says

**NEW YORK TIMES April 18, 2006**

**Justices Weigh Whether Railroad Retaliated Against Worker**
By LINDA GREENHOUSE

WASHINGTON April 17 — There was no disagreement in the Supreme Court on Monday about what happened to a railroad maintenance worker named Sheila White after she complained to a manager that she was being sexually harassed by her immediate supervisor

Ms White the only woman working in the maintenance department at the Tennessee

**HIGHLY CONFIDENTIAL Attorneys Eyes Only**
**NS 001001166**

NS NJ 001162
CONFIDENTIAL
SUBMISSION

Yard of the Burlington Northern and Santa Fe Railway in Memphis was reassigned from her job operating a forklift to the dirtier and less desirable job of repairing track Soon after that after she filed a complaint for retaliation with the Equal Employment Opportunity Commission, she was suspended for insubordination and went without pay for 37 days before a union grievance procedure led to her reinstatement with back pay

The question for the Supreme Court in a lively three way argument was whether that sequence of events amounted to retaliation by the railroad against Ms White in violation of the Civil Rights Act of 1964 Title VII of that law which protects workers against discrimination on the basis of race and sex also prohibits retaliation against those who complain about discrimination But neither the statute nor Supreme Court precedent offers a definition of retaliation

There is no more vexing set of issues in employment law than those presented by retaliation cases Carter G Phillips the lawyer for the railroad told the justices He noted that retaliation complaints filed with the E E O C have doubled in the last 10 years now accounting for some 30 percent of the agency s docket The definition of retaliation is plainly a fundamentally important question Mr Phillips said

The case found the players in unusual positions before the court

It was the railroad that brought the Supreme Court appeal after losing to Ms White in a jury trial and being ordered to pay her $43 500 in compensatory damages for retaliation Yet the railroad is embracing the definition of retaliation that the jury used and that the United States Court of Appeals for the Sixth Circuit invoked in affirming the verdict that to establish retaliation a worker must have suffered "a materially adverse change in the terms of employment. The railroad s argument was that the appeals court had misapplied the standard, and that Ms White suffered no such significant change

Ms White s lawyers while asserting that she could prevail under any standard are arguing that the appeals court set the threshold too high They say that any retaliatory action should be prohibited without having to rise to any particular level of significance

In giving employees protection against retaliation Ms White s lawyer Donald A Donati told the court Congress anticipated only that retaliation would be as varied as the human imagination '

'I worry about that Justice Antonin Scalia interjected 'That is the problem Juries can have wonderful imaginations ' He asked Mr Donati 'Is there no test that eliminates the trivial action like a hypothetical retaliation suit based on a manager s failure to say good morning to an employee who had made a discrimination complaint

Mr Donati said there should be a general test of common sense ' and context It was common sense he said to conclude that it was a change for the worse for Ms White to go from operating a forklift to pulling up railroad ties

Mr Donati urged the justices under whatever standard they adopt to refrain from announcing a 'bright line rule ' under which some retaliatory practices would be deemed automatically lawful That would give employers a safe harbor' and create serious harm to the underlying primary rights ' he said

At the time the case was litigated the E E O C applied an employee friendly standard of its own defining retaliation as ' any adverse treatment" that had a retaliatory motive and was

HIGHLY CONFIDENTIAL
Attorneys Eyes Only
NS 001001167

NS NJ 001163
CONFIDENTIAL
SUBMISSION

reasonably likely to deter ' employees from making complaints in the future

But in its brief in this case Burlington Northern and Santa Fe Railway Company v White No 05 259 the Bush administration repudiated that standard which the agency had adopted during the Clinton administration There must be a materially adverse change in the terms conditions or privileges of employment the solicitor general s office told the court

But while this appeared to be a position that favored the railroad the administration also argued that Ms White's case in fact met that standard and that she should prevail It appeared likely that she would one way or another but that whatever standard the court adopts may have a greater impact when applied in a future case

Mr Phillips the railroad s lawyer who was making his 50th argument before the court ran into resistance when he tried to argue that neither Ms White s reassignment nor her temporary suspension amounted to prohibited retaliation

She wasn t hired as a forklift operator he said making the point that both her old and new duties fell within the description of her job category and so should have offered no basis for complaint Ms White suffered no direct economic effect,' Mr Phillips observed

Justice David H. Souter was skeptical So any employer would be well advised to have one really nice job and one really rotten job within a category he said adding 'Isn t there a difference between sitting on a forklift and picking up steel rails with your bare hands? Do you agree that direct economic effect can t be the only criterion?'

Mr Phillips acknowledged that under the Supreme Court s precedents an atmosphere of harassment can be so pervasive and severe ' as to amount to a change in an employee s working conditions even in the absence of a tangible action by the employer But that was not this case he said

Justice Ruth Bader Ginsburg noted that Ms White suffered severe stress and had to seek medical help during her 37 day unpaid suspension Even though she eventually received back pay Justice Ginsburg said, nothing compensated her for that experience

Mr Phillips said Ms White's anxiety did not count as a tangible employment act The back pay cured the problem as a legal matter he said

While Title VII covers both discrimination and retaliation the two fall under separate provisions that are worded somewhat differently An underlying question in the case is whether Congress intended the same legal standard to apply to both as the railroad and the solicitor general argued or whether the retaliation provision was meant to be more open-ended as Ms White s lawyer argued.

**GREAT FALLS (Mont.) TRIBUNE April 18, 2006**

**State, BNSF spar over cleanup site**
By GWEN FLORIO Tribune Capitol Bureau

HELENA — The feud between BNSF Railway and the administration of Gov Brian Schweitzer continues with the railroad taking out full page ads in Montana newspapers to criticize the administration and Schweitzer taking umbrage at that criticism

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only
NS 001001168

NS NJ 001164
CONFIDENTIAL
SUBMISSION

At issue is the long delayed cleanup of a state Superfund site in Livingston Last month the state declared it would take over the cleanup and bill BNSF

On Thursday BNSF took out ads in newspapers around the state Those ads were headlined Montanans deserve the facts concerning BNSF s environmental actions" bannered atop three scenic photos of mountains a lake and a waterfall

Recent news stories reported that the State has accused BNSF of intentionally delaying environmental cleanup efforts in Montana The recent attacks on BNSF are unwarranted," the ad read.

'Deny delay, deceive That's what they ve been doing Schweitzer shot back Monday in a telephone call from San Diego where he is at a New Frontier Power Summit focused on projects that would connect Western power grids

In Livingston the railroad and state have been going round for nearly 20 years about the cleanup of contaminated groundwater and pollution from old rail yards Last month Schweitzer accused BNSF of dragging its feet

BNSF says any delays are the state s fault

We take this matter very seriously and wanted to ensure that the public recognizes the steps we have taken and our commitment toward environmental actions at Livingston There had been inaccurate information communicated (by the state) that required correction said BNSF spokesman Gus Melonas as to why the railroad ran the ads The ads appeared for a single day

Thursday's ad for which the railroad paid $4 540 80 in the Great Falls Tribune contains a timeline starting in 1988 It includes four years of state Department of Environmental Quality cleanup three years of DEQ preparation and more than a year of DEQ review

I don t really want to get into a blame game with these guys, said DEQ Director Richard Opper But I would think that the roughly $18 617 33 they spent on these ads across the state might have been better spent on cleaning up pollution '

Opper said he called the newspapers to determine the ads total cost

*Reach Tribune Capitol Bureau reporter Gwen Florio at (406) 442 9493 or gflorio@greatfal gannett com.*

**NORTH PLATTE (Neb ) TELEGRAPH April 18, 2006**

**Wanted 100 new employees for the Union Pacific**
By DIANE WETZEL The North Platte Telegraph

Union Pacific Railroad officials hope to hire up to 100 people at the third annual Hiring Fair this weekend, as part of an on going effort to maintain staffing

The fair will be held on Friday from 4 8 p m and Saturday from 10 a m to 4 p m at North Platte Community College s north campus at 1101 Halligan Drive

With a large percentage of current employees soon eligible for retirement and the steady growth in hauling coal from Wyoming s Powder River Basin the UP in North Platte needs more qualified people

Last year s event led to the hiring of 47 employees for the UP

HIGHLY
CONFIDENTIAL
Attorneys' Eyes Only



NS NJ 001165
CONFIDENTIAL
SUBMISSION

The UP is North Platte s biggest employer with 2 600 employees living in North Platte and a total of 3 500 in the North Platte service area according to UP Superintendent Cameron Scott

We have set a goal to hire 20 new employees in trains and engines every month until the end of the year Scott said We are hiring for replacement of retiring employees and expansion '

Since January 2006 new hires have averaged 11 a month Scott said

We are behind, Scott said We are hoping to hire 60 to 100 people through the job fair

For those interested in working on the railroad the UP has streamlined the hiring process

Interested potential employees are encouraged to apply ahead of time at www up com

Our human resource people will do screening Scott said. When applicants arrive at the job fair if they haven t already been contacted they will be directed to a general session where they can ask questions about the engine department the locomotive department the car department and transportation

Applicants could have a job offer by the end of the day Scott said after passing a reading comprehension test and a cursory background check

I believe that the young men and women who live here in North Platte are losing jobs to out of state applicants Scott said. We are seeing a lot of out of state people accepting these jobs

Work for the railroad takes dedication to the railroad way of life, Scott said

It takes a certain level of commitment to work for the railroad, he said It is an outdoor job and we operate 24/7 That can be a tough work environment for some people and there is often hesitation about making that commitment '

Scott sees a lot of the same faces at the hiring fair something he finds encouraging

They come back he said Our policy is a six month cooling off period before anyone can apply again but we do encourage people to try again Maybe they happened to have a bad interview the first time

The coal business drives the railroad, and the railroad drives employment in North Platte

'In 1987 we were loading five coal trains a day ' Scott said In 2006 we are loading 36 trains a day We are preparing for 50 trains a day by 2011 or 2012

'One of our biggest challenges is in the locomotive department for electricians and machinists he said Each coal train has three to four locomotives which need to be serviced and maintained here in North Platte

The UP does have an apprentice program

We will be looking for apprentices and anyone who has the right credentials Scott said

Computers will be available at the hiring fair for those who do not apply on line beforehand Scott said A full staff from Omaha s UP Human Resource department will be available to answer questions and assist with the application process

HIGHLY CONFIDENTIAL Attorneys Eyes Only

NS 001001170

NS NJ 001166 CONFIDENTIAL SUBMISSION

**SULPHUR SPRINGS (Tex) NEWS TELEGRAM April 16, 2006**

**The little railroad that could (make a big difference)**

*Ability to connect with major rail carriers makes Blacklands an important part of local economic development strategy*

Kerry Craig | News Telegram Assistant Editor

Think of it as the little railroad that could

As freight haulers go the shortline Blacklands Railroad looks tiny when compared to such rail giants as Kansas City Southern Union Pacific Burlington Northern Sante Fe and others

After all Blacklands tracks only extend from Mount Pleasant to Greenville compared to the big carriers' vast rail systems that criss cross the continent

Blacklands Railroad, however is one of the biggest assets in the local economic development corporation s marketing strategy for Sulphur Springs and Hopkins County

Blacklands has the ability to connect with the major players in rail transportation and that has become a significant factor in marketing Sulphur Springs and Hopkins County for economic growth and development

Roger Feagley executive vice president of the Sulphur Springs Hopkins County Economic Development Corporation said that most development projects now require close access to railroads and having two railroads in Sulphur Springs is a definite advantage And while Kansas City Southern continues to be a profitable far reaching freight carrier serving the area its tiny Blacklands that's attracting more attention from industries eyeing a home in Hopkins County

In most cases when a business builds along a railroad track they are more or less stuck with that carrier and have to use their rates Feagley said If you are located on the Blacklands and don t like the rates Union Pacific is charging go talk to KCS They do compete and Blacklands can connect with either railroad '

Having Blacklands' home office located in Sulphur Springs is another advantage for industries and shippers

"When a company wants to talk to the man in charge the man in charge is right down the street from them " Feagley said "So he is easy to find. '

Close access to Blacklands rail in the industrial development area near Raven Industries on the city s east side has put that location in the spotlight for several companies that are considering locating here

Another site of high interest is south of Interstate 30 near the WePack facility where rail service is available via a spur from the Kansas City Southern tracks

Feagley said he did not know if high fuel prices or other factors are the reason that most of the projects looking at locations in Hopkins County are requiring railroad access

But whatever the reason our sites along the railroads are the ones attracting the most attention " he said

The availability of two railroad companies and connections to other rail carriers is not the only transporation-related tool Feagley can use in marketing Sulphur Springs and Hopkins

County to industries and businesses looking for a place to relocate

Interstate 30 is another ready access for shippers and the announcement of plans for the proposed Trans Texas Corridor to cross I 30 between Greenville and Dallas could mean even greater transportation access for business and industry in Sulphur Springs

The designation of I-30 as a NAFTA corridor helps Feagley said That road coming on the east side of Dallas — of course the further east the more we like it — will help us drastically

Still another marketing tool for economic development is Sulphur Springs Airport which is already home to an aircraft manufacturer

I think that the larger companies those with private aircraft being able to come in and our of the airport here is advantageous to us ' he said We certainly see the airport as an asset and it is one of the things we like to tell companies about when they are considering us

HIGHLY
CONFIDENTIAL
Attorneys Eyes Only

NS 001001172

NS NJ 001168
CONFIDENTIAL
SUBMISSION

**NORFOLK SOUTHERN CORPORATION**

**CONFIDENTIAL TRANSMITTAL**

Date: January 20, 2006
File: C2A-REG-NS-C-17281

TO: Mr. Stephen A. Bahn
Manager Transportation and Logistics
Chlor Alkali Products
Olin Corporation
490 Stuart Road, N. E.
Cleveland, TN 37312-4819
FAX (423) 336-4819

FROM: Mrs. L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 981-4198

Attachment: Draft Contract and/or Amendment.

Contract No.: REG-NS-C-17281 Amendment No. 3

Customer: SAME

Number of: Copies _1_ Pages per copy _3_

Transmittal: _X_ FAX; __ Express; ___ Mail.

Ancillary: _X_ NO; __ YES - Intercarrier agreement-Railroad use only.

Instructions: The attached document is a draft. If no revisions are required you may:

- Make **_2_** copies of the FAXED draft, sign all copies made and return to **NS** at the address shown; or
- Make **1** copy of the FAXED draft, SIGN and FAX it back to **NS** at the number shown above; or
- Request that hard copies be mailed to you for signature.

Questions or revisions? Call Lynn Ferris at (540) 985-6119 or contact via the internet at lgferris@nscorp.com.

cc:

___ Roanoke - Box 0041 (R5E-X17281)

**CONFIDENTIAL**

AMENDMENT NO. 3 TO
CONTRACT REG-NS-C-17281

This Amendment is made by and between Olin Corporation (Customer), with business address at 490 Stuart Road, N. E., Cleveland, TN 37312; and Norfolk Southern Railway Company and Consolidated Subsidiaries (NS and/or Railroad), with business address at 110 Franklin Road, S. E., Roanoke, VA 24042-0041.

WITNESSETH:

WHEREAS, Customer and Railroad have entered a transportation agreement numbered Contract REG-NS-C-17281, as amended, covering the transportation of [redacted] and

WHEREAS, the parties desire to extend their Contract through December 31, 2006; and revise rates;

NOW THEREFORE, the parties agree as follows:

1. Effective Date. This Amendment shall become effective on January 1, 2006, and shall remain in effect until Contract REG-NS-C-17281 expires or is terminated as provided therein.

2. Amendment of Contract. On and after the Effective Date hereof, the Contract is amended as follows:

(a) Delete Section 1 thereof and substitute in lieu thereof the following new Section 1:

**SECTION 1 - TERM.** This Contract, made pursuant to 49 U.S.C. §10709, shall apply as follows:

| | |
|---|---|
| Effective Date: | June 1, 1999 (original Contract only) |
| Termination Date: | December 31, 2006 |
| Automatic Renewals: | NO |

(b) Delete Appendix A thereof and substitute in lieu thereof the attached new Appendix A.

3. Incorporation. Except as amended herein, all terms, conditions, and provisions of the Contract shall remain fully effective and in force among the parties hereto, and all such terms, conditions, and provisions are hereby incorporated by reference herein.

**IN WITNESS WHEREOF**, the parties have caused this Contract to be executed by their duly authorized respective representatives.

| OLIN CORPORATION | NORFOLK SOUTHERN RAILWAY COMPANY AND CONSOLIDATED SUBSIDIARIES |
|---|---|
| BY ______________________ | BY ______________________ |
| TITLE ______________________ | TITLE ______________________ |
| DATE ______________________ | DATE ______________________ |

C2A-lgf

Appendix A to
Contract REG-NS-C-17281
Amendment No. 3
Page 1 of 2

Commodity: Caustic Sodium (Sodium Hydroxide) (Soda) (STCC 28-122-20)

Origin: [redacted]

Destination: [redacted]

Rate: [redacted] - Expires 6/30/06
[redacted] - Effective 7/1/06

Minimum Weight: Subject to Rule 35 of Tariff UFC 6000-series, except as to minimum weight which shall be 190,000 pounds per car.

Route: NS direct

Equipment: Privately-owned or leased tank cars

Mileage Allowance: Customer and Railroad agree that Railroad shall not be liable for any Mileage Allowance payments on Equipment moving under the terms of this Contract. Customer will notify the car owner of leased Equipment regarding the Mileage Allowance restriction contained herein. If for any reason Railroad pays mileage allowances to the car owner, Railroad will seek reimbursement of overpayment from car owner. If Railroad is unable to collect the overpayment from the car owner, Customer agrees to reimburse Railroad for overpayment.

Restrictions: Transit will not apply, however, diversion and reconsignment will be permitted.

Volume Guarantee: [redacted]

Ancillary: NO

Fuel Surcharge: In the event the average monthly price of West Texas Intermediate Crude Oil exceeds $23.00 per barrel, calculated using the daily prices published in the Wall Street Journal, Norfolk Southern will assess a fuel surcharge on all linehaul freight charges (as set forth below, the "WTI Average Price").

The applicable fuel surcharge percentage shall be applied to each shipment having a bill of lading dated on or after the 1st day of the second calendar month following the calendar month of a given WTI Average Price Calculation. The fuel surcharge will change monthly per the table below:

Appendix A to
Contract REG-NS-C-17281
Amendment No. 3
Page 2 of 2

| Calendar Month of WTI Average Price | Fuel Surcharge Applied | Calendar Month of WTI Average Price | Fuel Surcharge Applied | Calendar Month of WTI Average Price | Fuel Surcharge Applied |
|---|---|---|---|---|---|
| January | March 1 | May | July 1 | September | November 1 |
| February | April 1 | June | August 1 | October | December 1 |
| March | May 1 | July | September 1 | November | January 1 |
| April | June 1 | August | October 1 | December | February 1 |

The fuel surcharge will be 0.4% of the linehaul freight charge for every $1.00 per barrel, or portion thereof, by which the WTI Average Price exceeds $23.00. The WTI Average Price for a given calendar month will be determined by adding the daily West Texas Intermediate Crude Oil prices published in the Wall Street Journal during a calendar month, and dividing the result by the number of days so published in that given month. The result will be rounded to the nearest cent. If the Wall Street Journal ceases publication of the price of West Texas Intermediate Crude Oil, NS will employ a suitable substitute source of price or measure. The following schedule reflects the applicable fuel surcharge (FSC) within the WTI Average Price ranges noted below.

| WTI Average Price Per Barrel | FSC (%) | WTI Average Price Per Barrel | FSC (%) | WTI Average Price Per Barrel | FSC (%) |
|---|---|---|---|---|---|
| $23.00 and below | None | $31.01 - $32.00 | 3.6% | $42.01 - $43.00 | 8.0% |
| | | $32.01 - $33.00 | 4.0% | $43.01 - $44.00 | 8.4% |
| | | $33.01 - $34.00 | 4.4% | $44.01 - $45.00 | 8.8% |
| $23.01 - $24.00 | 0.4% | $34.01 - $35.00 | 4.8% | $45.01 - $46.00 | 9.2% |
| $24.01 - $25.00 | 0.8% | $35.01 - $36.00 | 5.2% | $46.01 - $47.00 | 9.6% |
| $25.01 - $26.00 | 1.2% | $36.01 - $37.00 | 5.6% | $47.01 - $48.00 | 10.0% |
| $26.01 - $27.00 | 1.6% | $37.01 - $38.00 | 6.0% | $48.01 - $49.00 | 10.4% |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| | | | | | |
|---|---|---|---|---|---|
| $28.01 - $29.00 | 2.4% | $39.01 - $40.00 | 6.8% | $50.00 and above | * |
| $29.01 - $30.00 | 2.8% | $40.01 - $41.00 | 7.2% | | |
| $30.01 - $31.00 | 3.2% | $41.01 - $42.00 | 7.6% | | |

* The fuel surcharge will be 10.8%, plus an additional 0.4% of the linehaul freight charge for every $1.00 per barrel, or portion thereof, by which the WTI Average Price Per Barrel exceeds $50.00.

**NORFOLK SOUTHERN CORPORATION**

**CONFIDENTIAL TRANSMITTAL**

Date: July 25, 2006
File: C2A-REG-NS-C-17281

TO: Mr. Stephen A. Bahn
Manager Transportation and Logistics
Chlor Alkali Products
Olin Corporation
490 Stuart Road, N. E.
Cleveland, TN 37312-4819
FAX (423) 336-4819

FROM: Mrs. L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 981-4198

Attachment: Fully executed Contract/Amendment - final distribution.

Ancillary: _X_ NO; ___ YES - Intercarrier agreement - Railroad use only.

Contract No.: REG-NS-C-17281 Amendment No. 3

Customer: Same

___ Cancels ___ Replaces: N/A

Instructions: The attached fully executed Contract and/or Amendment should be retained for your records. If you received earlier drafts, please note if any revisions were made and replace those earlier drafts with this document.

Questions or revisions? Call Lynn Ferris at 540-985-6119 or contact via Internet e-mail at lgferris@nscorp.com.

cc :

___ Roanoke - Box 0037
___ Roanoke - Box 0041 (R5E-X-17281)
___ Roanoke - Box 0041 (C1)

# NORFOLK SOUTHERN CORPORATION

## CONFIDENTIAL TRANSMITTAL

Date: April 11, 2006
File: C2A-REG-SOU-C-0552

TO: Mr. Stephen A. Bahn
Mgr. of Transportation & Logistics
Chlor Alkali Products
Olin Corporation
490 Stuart Road, N.E.
Cleveland, TN 37312-4918
FAX (423) 336-4819

FROM: Mrs. L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 981-4198

Attachment: Draft Contract and/or Amendment.

Contract No.: REG-SOU-C-0552 Amendment No. 10

Customer: SAME

Number of: Copies ___ Pages per copy 4

Transmittal: _X_ FAX; __ Express; ___ Mail.

Ancillary: _X__ NO; __ YES - Intercarrier agreement-Railroad use only.

Instructions: The attached document is a draft. If no revisions are required you may:

- Make _2_ copies of the FAXED draft, sign all copies made and return to **NS** at the address shown; or
- Make **1** copy of the FAXED draft, SIGN and FAX it back to **NS** at the number shown above; or
- Request that hard copies be mailed to you for signature.

Questions or revisions? Call Lynn Ferris at (540) 985-6119 or contact via the internet at lgferris@nscorp.com.

cc:

___ Roanoke - Box 0041 (R5E-X-118437)

**CONFIDENTIAL**

AMENDMENT NO. 10 TO
CONTRACT REG-SOU-C-0552

This Amendment is made by and between Olin Corporation (Customer), with business address at 490 Stuart Road, N. E., Cleveland, TN 37312; and Norfolk Southern Railway Company and Consolidated Subsidiaries (NS and/or Railroad), with business address at 110 Franklin Road, S. E., Roanoke, VA 24042-0041.

WITNESSETH:

WHEREAS, Customer and Railroad have entered a transportation agreement numbered Contract REG-SOU-C-0552, as amended, covering the transportation of [redacted] and

WHEREAS, the parties desire to extend their Contract for a year and revise the rates;

NOW THEREFORE, the parties agree as follows:

1. Effective Date. This Amendment shall become effective on April 1, 2006, and shall remain in effect until Contract REG-SOU-C-0552 expires or is terminated as provided therein.

2. Amendment of Contract. On and after the Effective Date hereof, the Contract is amended as follows:

(a) Delete Section 1 thereof and substitute in lieu thereof the following new Section 1:

**SECTION 1 - TERM AND RENEWALS.** This Contract shall apply from the Amendment Effective Date through the Termination Date shown below.

| | |
|---|---|
| Effective Date: | September 25, 1985 (original Contract only) |
| Termination Date: | March 31, 2007 |
| Automatic Renewals: | NO |

(b) Delete Appendix A thereof and substitute in lieu thereof the attached new Appendix A.

3. Incorporation. Except as amended herein, all terms, conditions, and provisions of the Contract shall remain fully effective and in force among the parties hereto, and all such terms, conditions, and provisions are hereby incorporated by reference herein.

**IN WITNESS WHEREOF**, the parties have caused this Contract to be executed by their duly authorized respective representatives.

| **OLIN CORPORATION** | **NORFOLK SOUTHERN RAILWAY COMPANY AND CONSOLIDATED SUBSIDIARIES** |
|---|---|
| BY ____________________ | BY ____________________ |
| TITLE ____________________ | TITLE ____________________ |
| DATE ____________________ | DATE ____________________ |

(REG-SOU-C-0552-10)
C2A-LGF

Appendix A to
Contract REG-SOU-C-0552
Amendment No. 10
Page 1 of 2

| | |
|---|---|
| Commodity: | Salt, By-Product from manufacture of Caustic Soda (STCC 28-999-80) |
| Origin: | [redacted] |
| Destination: | [redacted] |
| Rate: | [redacted] - Expires 9/30/06<br>[redacted] - Effective 10/1/06<br><br>Rate not applicable as proportional rate when constructing all rail combinations. |
| Minimum Weight: | 190,000 lbs. per car |
| Route: | NS Direct |
| Equipment: | Privately-owned or leased covered hopper cars |
| Mileage Allowance: | Shipments moving under the terms of this Contract are not subject to mileage allowance payments by Railroad. If Railroad inadvertently pays mileage allowances to the car owner, Railroad will seek reimbursement of overpayment from car owner. If Railroad is unable to collect the overpayment from the car owner, Customer agrees to reimburse Railroad for overpayment. |
| Restrictions: | Transit will not apply, however, diversion and reconsignment will be permitted. |
| Volume Guarantee: | [redacted] |
| Ancillary: | NO |
| Escalation: | NONE |

Fuel Surcharge: In the event the average monthly price of West Texas Intermediate Crude Oil exceeds $23.00 per barrel, calculated using the daily prices published in the Wall Street Journal, Norfolk Southern will assess a fuel surcharge on all linehaul freight charges (as set forth below, the "WTI Average Price").

Appendix A to
Contract REG-SOU-C-0552
Amendment No. 10
Page 2 of 2

The applicable fuel surcharge percentage shall be applied to each shipment having a bill of lading dated on or after the 1st day of the second calendar month following the calendar month of a given WTI Average Price Calculation. The fuel surcharge will change monthly per the table below:

| Calendar Month of WTI Average Price | Fuel Surcharge Applied | Calendar Month of WTI Average Price | Fuel Surcharge Applied | Calendar Month of WTI Average Price | Fuel Surcharge Applied |
|---|---|---|---|---|---|
| January | March 1 | May | July 1 | September | November 1 |
| February | April 1 | June | August 1 | October | December 1 |
| March | May 1 | July | September 1 | November | January 1 |
| April | June 1 | August | October 1 | December | February 1 |

The fuel surcharge will be 0.4% of the linehaul freight charge for every $1.00 per barrel, or portion thereof, by which the WTI Average Price exceeds $23.00. The WTI Average Price for a given calendar month will be determined by adding the daily West Texas Intermediate Crude Oil prices published in the Wall Street Journal during a calendar month, and dividing the result by the number of days so published in that given month. The result will be rounded to the nearest cent. If the Wall Street Journal ceases publication of the price of West Texas Intermediate Crude Oil, NS will employ a suitable substitute source of price or measure. The following schedule reflects the applicable fuel surcharge (FSC) within the WTI Average Price ranges noted below.

| WTI Average Price Per Barrel | FSC (%) | WTI Average Price Per Barrel | FSC (%) | WTI Average Price Per Barrel | FSC (%) |
|---|---|---|---|---|---|
| $23.00 and below | None | $31.01 - $32.00 | 3.6% | $42.01 - $43.00 | 8.0% |
| | | $32.01 - $33.00 | 4.0% | $43.01 - $44.00 | 8.4% |
| | | $33.01 - $34.00 | 4.4% | $44.01 - $45.00 | 8.8% |
| $23.01 - $24.00 | 0.4% | $34.01 - $35.00 | 4.8% | $45.01 - $46.00 | 9.2% |
| $24.01 - $25.00 | 0.8% | $35.01 - $36.00 | 5.2% | $46.01 - $47.00 | 9.6% |
| $25.01 - $26.00 | 1.2% | $36.01 - $37.00 | 5.6% | $47.01 - $48.00 | 10.0% |
| $26.01 - $27.00 | 1.6% | $37.01 - $38.00 | 6.0% | $48.01 - $49.00 | 10.4% |
| $27.01 - $28.00 | 2.0% | $38.01 - $39.00 | 6.4% | $49.01 - $50.00 | 10.8% |
| $28.01 - $29.00 | 2.4% | $39.01 - $40.00 | 6.8% | $50.00 and above | * |
| $29.01 - $30.00 | 2.8% | $40.01 - $41.00 | 7.2% | | |

| | | | | | |
|---|---|---|---|---|---|
| $30.01 - $31.00 | 3.2% | $41.01 - $42.00 | 7.6% | | |

* The fuel surcharge will be 10.8%, plus an additional 0.4% of the linehaul freight charge for every $1.00 per barrel, or portion thereof, by which the WTI Average Price Per Barrel exceeds $50.00.

**NORFOLK SOUTHERN CORPORATION**

**CONFIDENTIAL TRANSMITTAL**

Date:
File: C2A-REG-SOU-C-0552

TO: Mr. Stephen A. Bahn
Mgr. of Transportation & Logistics
Chlor Alkali Products
Olin Corporation
490 Stuart Road, N.E.
Cleveland, TN 37312-4918

FROM: Mrs. L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 981-4198

Attachment: Fully executed Contract/Amendment - final distribution.

Ancillary: _X_ NO; ___ YES - Intercarrier agreement - Railroad use only.

Contract No.: REG-SOU-C-0552 Amendment No. 10

Customer: Same

___ Cancels ___ Replaces: N/A

Instructions: The attached fully executed Contract and/or Amendment should be retained for your records. If you received earlier drafts, please note if any revisions were made and replace those earlier drafts with this document.

Questions or revisions? Call Lynn Ferris at 540-985-6119 or contact via Internet e-mail at lgferris@nscorp.com.

cc:

___ Roanoke - Box 0037
___ Roanoke - Box 0041 (R5E-X-118437)
___ Roanoke - Box 0041 (C1)

NORFOLK SOUTHERN CORPORATION

CONFIDENTIAL TRANSMITTAL

Date: ~~September 17, 2003~~ September 29, 2003
File: C2E-REG-NS-C-REG-NS-C-18893

[redacted]

FROM: L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 985-6103

Attachment: **Revised** Draft Contract and/or Amendment. Revised to show absorbed switching.

Contract No.: REG-NS-C-REG-NS-C-18893 **APPENDIX A**

Customer: SAME
Number of: **Copies 1** Pages per copy 4

Transmittal: __ FAX; __ Express; _X_ **EMail**.
Ancillary: _X_ NO; __ YES - Intercarrier agreement (Railroad use only).

Instructions: The attached document is a draft. If no revisions are required, please sign all copies made and return to NS at the address shown.

Questions or revisions? Call Suzanne Edwards at (540) 985-6355 or contact via Internet e-mail at suzanne.edwards@nscorp.com.

cc:
___ Roanoke - Box 0041 (R9A-)
___ NAM - Chicago (FA Moczulewski)

## NORFOLK SOUTHERN CORPORATION

## CONFIDENTIAL TRANSMITTAL

Date: September 17, 2003
File: C2E-REG-NS-C-REG-NS-C-18893

[redacted]

FROM: L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 985-6103

Attachment: Draft Contract and/or Amendment.

Contract No.: REG-NS-C-REG-NS-C-18893 **APPENDIX A**

Customer: SAME
Number of: **Copies 2** Pages per copy

Transmittal: __ FAX; __ Express; _X_ **Mail**.
Ancillary: _X_ NO; __ YES - Intercarrier agreement (Railroad use only).

Instructions: The attached document is a draft. If no revisions are required, please sign all copies made and return to NS at the address shown.

Questions or revisions? Call Suzanne Edwards at (540) 985-6355 or contact via Internet e-mail at suzanne.edwards@nscorp.com.

cc:
___ Roanoke - Box 0041 (R9A-)
___ NAM - Chicago (FA Moczulewski)

CONFIDENTIAL

**APPENDIX A TO**
**MASTER TRANSPORTATION CONTRACT REG-NS-C-REG-NS-C-18893**

This Appendix is made by and between [redacted] and Norfolk Southern Railway Company and Consolidated Subsidiaries (NS and/or Railroad).

**SECTION 1 - DURATION.** This Appendix, made pursuant to (a) 49 U.S.C. §10709, if relating to transportation regulated under Subtitle IV, Part A of Title 49 U.S.C, or (b) 49 U.S.C. §10502, if relating to transportation which has been deregulated, shall apply as follows:

| | |
|---|---|
| Effective Date: | September 1, 2003 |
| Termination Date: | December 31, 2006 |
| Automatic Renewals: | NO |

**SECTION 2 - TRANSPORTATION.** Customer agrees to tender and Railroad agrees to provide the transportation services outlined in the attached Exhibit.

**SECTION 3 - NOTICES.** All notices and other communications shall be in writing and directed to the following (or such other office as directed):

NS: Manager Contract Publications, Norfolk Southern Corporation, 110 Franklin Road, S. E., Roanoke, VA 24042-0041

[redacted]

**IN WITNESS WHEREOF**, the parties have caused this Contract to be executed by their duly authorized respective representatives.

| [redacted] | **NORFOLK SOUTHERN RAILWAY COMPANY AND CONSOLIDATED SUBSIDIARIES** |
|---|---|
| BY ______________________ | BY ______________________ |
| TITLE ______________________ | TITLE ______________________ |
| DATE ______________________ | DATE ______________________ |

C2E-SSE

Exhibit to
Appendix A to
Contract REG- NS-C-18893
Page 1 of 3

## NS DIRECT RATE SCHEDULE

Commodity:

| | |
|---|---|
| Ethyl Alcohol -Ethanol, Or Grain Alcohol- | (STCC 28-184-45) |
| Ethyl Alcohol, Anhydrous, Denatured In Part With Petroleum Prd | (STCC 28-184-46) |
| Ethyl Alcohol, Anhydrous, Denatured With Petroleum Products | (STCC 28-184-47) |
| Alcohols, Nec, Other Than Alcoholic Liquors | (STCC 28-184-90) |

Origin/
Destination/
Rate:

| Origin | Destination | Rate ($ per car) | Notes |
|---|---|---|---|
| Chicago, IL (byd) | Louisville, KY | 1834 | 1 |
| | Shelbyville, KY | 1754 | 1 |
| | Baltimore, MD | 2498 | 1 |
| | Detroit, MI | 1221 | 1 |
| | Greensboro, NC | 2879 | 1 |
| | Raleigh, NC | 2987 | 1 |
| | Bayonne, NJ | 1840 | 1 |
| | Carteret, NJ | 2028 | 1 |
| | Linden, NJ | 1980 | 1 |
| | Newark, NJ | 1920 | 1 |
| | Perth Amboy, NJ | 2037 | 1 |
| | Sewaren, NJ | 1840 | 1 |
| | Buffalo, NY | 1638 | 1 |
| | Cincinnati, OH | 1556 | 1 |
| | Cleveland, OH | 1691 | 1 |
| | Toledo, OH | 1387 | 1 |
| | Marcus Hook, PA | 1969 | 1 |
| | Philadelphia, PA | 1870 | 1 |
| | Pittsburgh, PA | 1453 | 1 |
| | Richmond, VA | 2747 | 1 |
| Peoria, IL/ Pekin, IL | Louisville, KY | 2000 | |
| | Shelbyville, KY | 1941 | |
| | Baltimore, MD | 2700 | |
| | Detroit, MI | 1468 | |
| | Greensboro, NC | 3046 | |
| | Raleigh, NC | 3310 | |
| | Bayonne, NJ | 2290 | |
| | Carteret, NJ | 2260 | |
| | Linden, NJ | 2215 | |

| | |
|---|---|
| Newark, NJ | 2220 |
| Perth Amboy, NJ | 2260 |

Exhibit to
Appendix A to
Contract REG- NS-C-18893
Page 2 of 3

**NS DIRECT RATE SCHEDULE)**
**(CONTINUED**

Origin/
Destination/
Rate:

| Origin | Destination | Rate ($ per car) | Notes |
|---|---|---|---|
| Peoria, IL/ Pekin, IL | Sewaren, NJ | 2290 | |
| | Buffalo, NY | 1886 | |
| | Cincinnati, OH | 1786 | |
| | Cleveland, OH | 1879 | |
| | Toledo, OH | 1710 | |
| | Marcus Hook, PA | 2134 | |
| | Philadelphia, PA | 2049 | |
| | Pittsburgh, PA | 1696 | |
| | Richmond, VA | 2980 | |

Explanation of Notes:
1 - Proportional rate which applies only on traffic originating at points beyond this Origin

Route: NS direct

Equipment: Privately owned or leased tank cars, subject to Rule 35 of Tariff UFC 6000-Series.

Mileage Allowance: Shipments moving under the terms of this Contract are not subject to mileage payments by Railroad. If Railroad inadvertently pays mileage allowances to car owner, Railroad will seek reimbursement of overpayment from car owner. If Railroad is unable to collect the overpayment from the car owner, Customer agrees to reimburse Railroad for overpayment.

Escalation: The rates contained in this Contract are subject to a 2% increase on January 1, 2005. and a 3% increase on January 1, 2006.

Volume Guarantee: 95% of total rail shipments of Commodity to each Destination.

Restrictions: Transit will not apply, however, diversion and reconsignment will be permitted.

Ancillary: NO

Switching: Reciprocal switching, if any, at Origin and Destination will be absorbed.

Billing: Prepaid

Exhibit to
Appendix A to
Contract REG- NS-C-18893
Page 3 of 3

**NS DIRECT RATE SCHEDULE)**
**(CONTINUED**

Fuel Surcharge: In the event the price of West Texas Intermediate Crude Oil, as published in the Wall Street Journal, exceeds $34.00 per barrel for thirty (30) consecutive days, NS retains the right to apply a fuel surcharge to the freight charge(s) contained in this authority in effect on the date the fuel surcharge is applied, hereinafter referred to as the "Base Freight Charge(s)". If this option is exercised, the fuel surcharge shall be applied according to the following schedule:

| Texas Intermediate Crude Oil (Price per barrel) | Cumulative Fuel Surcharge (Percentage) |
|---|---|
| $34 | 2% |
| $39 | 4% |
| $44 | 6% |
| $49 | 8% |
| Each $5.00 per barrel increase thereafter | An additional 2% |

The price of West Texas Intermediate Crude Oil must exceed a given bracket for thirty (30) consecutive days for the surcharge under that bracket to be applicable. If the price of West Texas Intermediate Crude Oil ceases to be available from the Wall Street Journal or some other readily accessible source, a substitute to measure will be utilized.

Customers will receive notice of any fuel surcharge not less than ten (10) days prior to its application. Any fuel surcharge applied to the freight charge(s) in this authority will be removed or reduced when the price of West Texas Intermediate Crude Oil remains below the price which triggers a specific surcharge bracket for thirty (30) consecutive days. Reductions will be made promptly after they become applicable. In no case will the freight charge(s) be reduced below the Base Freight Charge(s) nor will the application or removal of the fuel surcharge be retroactive.

C2E-SSE

NORFOLK SOUTHERN CORPORATION

CONFIDENTIAL TRANSMITTAL

Date: March 30, 2004
File: C2E-REG-NS-C-REG-NS-C-18893

[redacted]

FROM: L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 985-6103

Attachment: Fully executed Contract/Amendment - final distribution.

Ancillary: X NO; ___ YES - Intercarrier agreement - Railroad use only.

Contract No. REG-NS-C-REG-NS-C-18893 **APPENDIX A**

Customer : SAME

___ Cancels ___ Replaces: N/A

Instructions: The attached fully executed Contract and/or Amendment should be retained for your records. If you received earlier drafts, please note if any revisions were made and replace those earlier drafts with this document.

Questions or revisions? Call Suzanne Edwards at (540) 985-6355 or contact via Internet e-mail at suzanne.edwards@nscorp.com.

cc :

___ Roanoke - Box 0037
___ Atlanta - 125 Spring St, SW (Box 183) (CC- Jeanne Wolf FAX: 404-582-3875)
___ Roanoke - Box 0041 (C1)
___ Roanoke - Box 0041 (R9A-)

___ NAM - Chicago (FA Moczulewski)

**NORFOLK SOUTHERN CORPORATION**

**CONFIDENTIAL TRANSMITTAL**

Date: August 8, 2005
File: C2E- DER-NS-C-16468

[redacted]

FROM: L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 981-4198

Attachment: Fully executed Contract/Amendment - final distribution.

Ancillary: _X_ NO; ___ YES - Intercarrier agreement - Railroad use only.

Contract No.: DER-NS-C-16468 Amendment No. 1

Customer: Same

___ Cancels ___ Replaces: N/A

Instructions: The attached fully executed Contract and/or Amendment should be retained for your records. If you received earlier drafts, please note if any revisions were made and replace those earlier drafts with this document.

Questions or revisions? Call **Lynn Ferris at 540.985.6119 or contact via internet e-mail at lynn.ferris@nscorp.com.**

cc :

___ Roanoke - Box 0037
___ Atlanta - 125 Spring St, SW (Box 183) (CC- Jeanne Wolf FAX: 404-582-3875)
___ Roanoke - Box 0041 (C1)
___ Roanoke - Box 0041 (R10D--X)
___ NAM – Westlake (Cleveland) Steve Salamon

CONFIDENTIAL

AMENDMENT NO. 1 TO
CONTRACT DER-NS-C-16468
**(Contains All Provisions)**

This Amendment to Transportation Contract DER-NS-C-16468 is made effective as of June 28, 2004, by and between [redacted] and Norfolk Southern Railway Company and Consolidated Subsidiaries (NS and/or Railroad), with business address at 110 Franklin Road, S. E., Roanoke, VA 24042-0041.

**WITNESSETH:**

**WHEREAS**, the Contract DER-NS-C-16468 was entered into as of June 1, 1998 (original date);

**WHEREAS**, it is the intention of the parties that this Amendment replace all aspects of the Contract,

**WHEREAS**, This Contract is made pursuant to 49 U.S.C. §10709 for transportation regulated under Subtitle IV, Part A of Title 49 U.S.C or to 49 U.S.C. §10502 for transportation which has been deregulated.

**NOW THEREFORE**, in consideration of the premises and the mutual agreements herein contained, the parties agree as follows:

**SECTION 1 - TERM AND RENEWALS.** This Contract shall apply from the Effective Date through the Termination Date shown below. In addition, if Auto Renewals are indicated, this Contract shall automatically be extended for additional successive 12-month periods unless any party notifies the other parties at least 30 days prior to the end of a renewal Contract Period of its intention to terminate the Contract. If such notification is given, the Contract shall terminate at the end of the 12-month period in which notification was given.

| | |
|---|---|
| Effective Date: | June 1, 1998 (original Contract only) |
| Termination Date: | May 31, 2007 |
| Automatic Renewals: | NO |

**SECTION 2 - TRANSPORTATION.** Railroad will transport "Commodity" from "Origin" to "Destination" via "Route" in accordance with the conditions described herein and in Appendices A, B, C and Addendum to Transportation Contract No. DER-NS-C-16468 (Maintenance of Coil Restraint Bars on NS Assigned Hi-Temp Coil Cars).

**SECTION 3 - MINIMUM VOLUME.** "Contract Period" is defined as the 12-month period beginning with the Effective Date of this Contract and, if the Contract provides for a multi-year term, any subsequent 12-month period thereafter during the life of this Contract. Bill of lading date shall govern in determining the period in which a shipment is made.

In each Contract Period, Customer shall satisfy Volume Guarantee, if any, specified in Appendix A of the Contract. Upon request by Railroad, Customer will certify to Manager Contract Compliance, Norfolk Southern Corporation, 125 Spring St, SW (Box 183), Atlanta, GA 30303, as to compliance with its volume commitment. Certification must refer to the contract number and must include the Commodity volume shipped in compliance with the volume commitment as well as the volume shipped that was not in compliance. Railroad will have the right to audit Customer records in conjunction with the volume commitment.

**SECTION 4 - LIQUIDATED DAMAGES.** Should Customer not meet the volume requirement for a Contract Period, within 60 days it shall pay Railroad as liquidated damages: 1) for carload deficits, the greater of $250 per deficit car or; 2) for tonnage deficits, the greater of $2.20 per deficit ton. For purposes of this section, a percentage of shipments volume requirement shall be calculated by determining the total number of carloads that could be shipped to arrive at 100%, determining the volume percentage requirement in terms of carloads, and comparing that amount with the amount of carloads actually shipped during the applicable Contract Period.

**SECTION 5 – WAIVER OF CHARGES.** NS agrees to waive all unpaid, as of June 28, 2004, (a) Short Train Charges; (b) Hold Charges; (c) Finance Charges; and (d) fuel surcharges (except for fuel surcharges applicable to Raw Material's contract); incurred by Customer as a result of activities occurring before June 28, 2004. Further, NS agrees to waive all unpaid Demurrage Charges incurred by Customer as a result of activities occurring before June 28, 2004. However, the waiver of such charges is expressly contingent upon the execution by Customer of Demurrage Contract REG-NS-C-19132.

**SECTION 6 – SWITCHING ALLOWANCES.** NS agrees to release Customer's switching allowances.

**SECTION 7 – SIGNING BONUS.** NS will pay Customer a signing bonus of $250,000, subject to the following. Customer agrees that, as a general condition of NS granting it credit with respect to payment for any transportation service and as specific consideration for NS entering into this Contract, Customer will be subject to NS's standard credit terms as set forth in the NS Conditions of Carriage No. 1 Series, or any supplements or reissues thereof, with respect to payment for all transportation services. In addition, the signing bonus will be payable when Customer makes payment for transportation services in an average of fifteen (15) days from the date of invoice, for three (3) consecutive calendar months.

**SECTION 8 - FORCE MAJEURE.** A party shall be excused from its contractual obligations to the extent it is prevented or delayed in such performance by any of the following conditions of force majeure: Act of God, act of the public enemy, act of terrorism, authority of law, fire or explosion, lockout, strike, war, insurrection, computer virus or sabotage, derailment or any like causes beyond their control. The party declaring force majeure shall promptly notify the other parties when the force majeure begins, the nature of the force majeure and when the condition is terminated.

**SECTION 9 - TENDER OF SHIPMENT.** Except as may be otherwise provided in this Contract, Railroad's duty as to transportation shall be subject to the terms and conditions of the Uniform Straight Bill of Lading as published in Uniform Freight Classification UFC 6000-Series or successor publication, which are hereby incorporated into this Contract by reference. Alternative Uniform Bills of Lading may be used with the prior consent of Railroad.

Except to the extent inconsistent with any provisions herein, shipments made under the terms of this Contract are subject to all classifications, tariffs (for regulated commodities only), exempt circulars and circulars of other railroads participating in the transportation involved, government, AAR and carriers rules, regulations, and provisions, including, but not limited to NS Conditions of Carriage No. 1-series or successor publication, and such rules and regulations covering limitation of action, weighing, freight loss and damage claims, demurrage and switching, loading, car service and interchange that would apply if this Contract were not in effect.

In order to protect the confidentiality of this Contract and to permit computerized application, Customer shall be responsible for having the contract number shown on the bill of lading in connection with shipments made under the terms of this Contract. While failure to so show the contract number shall not negate any terms of the contract, such failure will constitute sufficient reason for Railroad's refusal to bill the contract charges to any party other than Customer without prior consent of Railroad.

**SECTION 10 - ACCESS.** Any party to this Contract may terminate the Contract as to the Origin and Destination affected and any volume guarantee applicable to such Origin and Destination shall be considered fulfilled if: 1) any railroad ceases service to, abandons or disposes of a line of railroad or track over which shipments covered by this Contract would move; 2) any railroad cancels a route or switching service necessary to complete a rail movement under this Contract; or 3) any railroad increases its charges for such switching service by more than 10% per annum.

**SECTION 11 - ASSIGNMENT.** No party hereto may assign this Contract, in whole or in part, without the prior written consent of the other parties. Any assignment of this Contract, without such consent in writing, shall be absolutely void, and at the option of the party or parties whose written consent should have been obtained, this Contract may be terminated. Subject to this Section, this Contract shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

**SECTION 12 - CREDIT.** Charges under this Contract must be paid by Customer to NS within fifteen (15) days from invoice date of freight bill unless otherwise agreed to in a separate agreement between the Customer and billing carrier.

**SECTION 13 - APPLICABLE LAW.** Virginia law shall govern the interpretation and performance of this Contract, except to the extent otherwise provided herein.

**SECTION 14 - NOTICES.** All notices and other communications under this Contract shall be in writing and directed to the following (or such other office as directed):

NS: Manager Contract Publications, Norfolk Southern Corporation, 110 Franklin Road, S. E., Roanoke, VA 24042-0041

[redacted]

(DER-NS-C-16468-01)

**SECTION 15 - CONFIDENTIALITY.** No party may disclose the terms of this Contract to another party without the consent of the other party(ies) except as required by law or regulation.

**SECTION 16 - ARBITRATION.** If the continuation of this Contract will have a material adverse effect upon either Party hereto due to reasonably unforeseen causes beyond that Party's reasonable control or any dispute arises under this Contract including but not limited to service performance or equipment guarantee issues, the Parties agree to use their best efforts to amicably resolve any such material adverse effect or dispute. Any Party so affected or wishing to raise such a dispute shall request in writing that the issue be negotiated. If, after negotiating in good faith for twenty (20) days, the Parties are unable to agree upon satisfactory resolution, and the Parties wish to pursue the issue, resolution of same shall be by binding and final arbitration submitted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in Washington, DC. Such arbitration must be submitted within sixty (60) days from the expiration of the twenty day negotiation period set forth above.

**SECTION 17 - NO THIRD PARTY BENEFICIARIES.** This Contract is intended for the sole benefit of the signatories to this Contract. Nothing contained in this Contract is intended or may be construed to give any person, firm, corporation or other entity, other than the signatories hereto, or their permitted successors or assigns, any legal or equitable right, remedy or claim under this Contract.

**SECTION 18 - ENTIRE UNDERSTANDING.** This Contract constitutes the entire understanding between the parties relating to transportation and related services under this Contract, and no other representation, warranties, or agreements, either oral or written, will be binding upon the parties. Further, this Contract may be modified only by an instrument in writing, signed by an authorized officer of Customer and Railroad.

**IN WITNESS WHEREOF**, the parties have caused this Contract to be executed by their duly authorized respective representatives.

[redacted]

**NORFOLK SOUTHERN RAILWAY COMPANY AND CONSOLIDATED SUBSIDIARIES**

BY ____________________

TITLE Vice President Industrial Products

DATE 8·4·05

Received 7.25.05
Approved JPA
OK LEGAL

(DER-NS-C-16468-01)
C2E-SSE

Effective Date: June 28, 2004
Termination Date: May 31, 2007

Commodity: Iron or steel sheet in coils (STCC 33-123-32)
Origin: Middletown, OH
Destination: Rockport, IN
Rate/Minimum Weight/
Equipment:

| Rate ($ per car) | Minimum Weight (lbs. per car) | Equipment | Notes |
|---|---|---|---|
| 948 | N/A | (B) | (1, 3) |
| 1277 | N/A | (B) | (2, 3) |

Notes:

(1) The Rate is applicable if the average unit train shipment is 40 carloads or more for the measured three (3) month period ("the Measured Period"), which is defined as follows: the first Measured Period shall be July – September, 2004, and each subsequent three month period thereafter shall be a Measured Period. On a routine basis, Customer will be billed at the lower rate shown above. If, during a Measured Period, Customer does not achieve the 40 carload per unit train minimum, then Railroad will create a deficit bill for the Measured Period in which the 40 carload minimum was not achieved, which bill will be for the amount of the per carload rate described above, multiplied by the number of carloads that moved during the Measured Period, and Customer will pay such a bill in accordance with the credit terms described here.

(2) The Rate is applicable if the average unit train shipment is less than 40 carloads for the Measured Period ("short-train charge").

(3) The average train size will be calculated as follows:

Divide the total number of carloads shipped from Middletown, OH to Rockport, IN during the Measured Period by the number of days the unit train operated during the Measured Period.

i) if the unit train size averages less than 40 carloads for the Measured Period, a supplemental freight bill will be issued for the difference between the short-train per carload charge and the average 40-carload unit train charge for all cars shipped during the Measured Period.

For instance,
$1277/car = per carload rate if unit train averaged < 40 carloads
$948/car = per carload rate if unit train averaged 40+ carloads
$329/car = per carload short-train charge

ii) if the unit train size averages 40 carloads or more, no additional charges will to be assessed.

Commodity: Iron or steel sheet in coils (STCC 33-123-32)
Origin: Rockport, IN
Destination: Middletown, OH
Rate/Minimum Weight/
Equipment:

| Rate ($ per NT) | Minimum Weight (lbs. per car) | Equipment |
|---|---|---|
| 11.99 | 180,000 | (B) |
| 11.49 | 200,000 | (B) |

Commodity: Iron or steel scrap (STCC 40-211-25)
Origin: Rockport, IN
Destination: Middletown, OH
Rate/Minimum Weight/ Equipment:

| Rate ($ per car) | Minimum Weight (lbs. per car) | Equipment |
|---|---|---|
| 480 | N/A | (A) |
| 1067 | N/A | (C) |
| 802 | N/A | (D) |

Note: Rate in Equipment type (A) applicable only as backhaul for cars where immediate preceding move was inbound to Rockport, IN loading with iron or steel sheet in coils originating at Middletown, OH.

Equipment References:
(A) - Privately owned or leased coil cars and gondola cars
(B) - Covered or open coil cars bearing railroad reporting marks
(C) - Gondola cars bearing railroad reporting marks
(D) - Privately owned or leased gondola cars

Route: NS Direct

Mileage Allowance: No mileage allowance payments will be made by Railroad on privately owned or leased Equipment.

Switching: Railroad will absorb switching charges of connecting carriers at Origin or Destination.

Equipment: If Railroad fails to supply Equipment for transportation of Commodity from Origin to Destination, Railroad shall have the option to furnish comparable Equipment from its existing fleet. Should Railroad's failure to provide Equipment result in Customer transporting Commodity via any mode, the minimum tonnage requirement will be reduced and the resulting deficit charges will be waived, which will be Customer's sole remedy against NS for failure to supply Equipment.

Service:

Railroad agrees to provide transit time of between 19 and 23 hours for the movement of iron or steel sheet in coils from Middletown, OH to Rockport, IN. Transit time shall be measured from the time the loaded car is released by Customer to Railroad at Origin until loaded car is actually or constructively placed at Destination.

In determining compliance with the transit time, certain carloads shall be excluded from the transit time performance measurement as follows:

(a) cars which were placed in a hold status or were held, stored, diverted or otherwise delayed at Customer's or consignee's request;

(b) cars which were affected by force majeure events as described in this Contract; or

(c) cars which were not moved on a Uniform Straight Bill of Lading;

(d) cars which suffered casualty loss, theft, vandalism or damage resulting in delay, as indicated by initiation of procedures by Railroad or Customer to compensate Customer for loss or damage of lading, or

(e) cars which are bad ordered during transit.

Service Failure Exclusion:

If Customer believes in good faith that Railroad has not met the transit time goal described in the Service section set forth above on a consistent basis, then Customer shall notify Railroad promptly in writing of such a situation (the "Service Failure"), indicating when the Service Failure began, along with the nature of the Service Failure. The parties shall meet and discuss the Service Failure as soon as possible after such notice is received by NS, but in no event later than 5 days after receipt of such notice. After giving consideration to any service improvements suggested by Railroad, and taking into consideration any improvements in its own operations which could promote better service, Customer shall in good faith determine whether the improvements discussed by the parties meet its needs, and if such is the case, then the Service Failure shall be deemed to have ended, when Railroad performs according to the transit time specified above in a manner that is reasonably acceptable to Customer. During the period such Service Failure exists, Customer will be permitted to ship Commodity via another route or mode of transportation, which shall be Customer's exclusive and only remedy for any failure by NS to perform according to the transit time standard set forth above.

**Restrictions:**

1) No diversions, reconsignments, stopoffs or transit privileges of any kind will be permitted under this Contract.

2) Not subject to Rules 10, 13, 24 or 34 of Tariff UFC 6000-Series publication or exceptions thereto.

**Volume Guarantee:**

Effective June 28, 2004, Customer will tender to NS 90% of total shipments of Commodity (via all modes of transportation), from Origin to Destination, except for shipments of iron or steel scrap and sheet in coils from Rockport, IN to Middletown, OH, in which case the volume guarantee shall be 50% of [redacted] controlled tonnage.

**Escalation:**

The rates for Customer under this Contract will be adjusted January 1, 2005, by an amount equal to eighty percent (80%) of the percentage change in the Rail Cost Adjustment Factor unadjusted for productivity (Unadjusted RCAF) as published quarterly by the Surface Transportation Board (STB) of the Department of Transportation (DOT), but not less that one percent (1.0%) nor more than two percent (2.0%). The percentage change will be calculated by dividing the 4th quarter of 2004 of the Unadjusted RCAF by the 4th Quarter of 2003, rounded to the nearest 1/10th of 1% times eighty percent (80%).

The rates contained in this Contract are subject to a 4% increase on June 1, 2005 and each June 1 thereafter throughout the life of this Contract.

**Fuel Surcharge:**

In the event the price of West Texas Intermediate Crude Oil, as published in the Wall Street Journal, exceeds $35.00 per barrel for thirty (30) consecutive days, Norfolk Southern retains the right to apply a fuel surcharge to the freight charge(s) contained in this Authority in effect on the date the fuel surcharge is applied, if this option is exercised, the fuel surcharge shall be applied according to the following schedule:

| TEXAS INTERMEDIATE CRUDE OIL (PRICE PER BARREL) | CUMULATIVE FUEL SURCHARGE (PERCENTAGE) |
|---|---|
| $35 | 2% |
| $38 | 4% |
| $41 | 6% |
| $44 | 8% |
| $47 | 10% |
| $50 | 12% |
| $53 | 14% |
| $56 | 16% |
| Each $3.00 Per Barrel | Increase An Additional 2% |

The price of West Texas Intermediate Crude Oil must exceed a given bracket for thirty (30) consecutive days for the surcharge under that bracket to be applicable. Any fuel surcharge applied to the freight charge(s) in this Authority will be removed or reduced when the price of West Texas Intermediate Crude Oil remains below the price which triggers a specific surcharge bracket for thirty (30) consecutive days. Reductions will be made promptly after they become applicable. In no case will the freight charge(s) be reduced below the "base freight charge(s)" nor will the application or removal of the fuel surcharge be retroactive.

Appendix B to
Contract DER-NS-C-16468
Amendment No. 1
Page 1 of 3

## 75-CAR UNIT TRAINS

Commodity: Import I/S Slab (STCC 33-121-40)

Origin: Philadelphia, PA or Fairless, PA

Destination: Middletown, OH

Rate:

| Rate ($ per car) | Application |
|---|---|
| 1040 | Expires May 31, 2004 |
| 1063 | Effective June 1, 2004 thru May 31, 2005 |
| 1088 | Effective June 1, 2005 thru May 31, 2006 |
| 1113 | Effective June 1, 2006 thru May 31, 2007 |

Condition: Once Customer ships 20,000 cars of I/S slab to Middletown, OH, in which NS participates in the line-haul, regardless of origin, depending on the date that this volume is met, rates will reduce to the following:

| Rate ($ per car) | Application |
|---|---|
| 1040 | Effective June 1, 2004 thru May 31, 2005 |
| 1063 | Effective June 1, 2005 thru May 31, 2006 |
| 1088 | Effective June 1, 2006 thru May 31, 2007 |

Route: NS Direct

Billing: Prepaid

Volume Guarantee: Customer commits to ship the following tonnage [redacted] import I/S Slab via NS during each Contract Period:

a. 0 – 1,000,000 tons - 95% of this tonnage that is imported by water/vessel
b. 1,000,000 – 3,000,000 tons – 80% of this tonnage that is imported by water/vessel
c. if exceed 3,000,000 tons, NS and [redacted] will meet to negotiate

Special Condition: If [redacted] sources slab domestically in lieu of importing, NS will be given the opportunity to handle such slab. In the event [redacted] traffic patterns change so that [redacted] sources slab from locations other than via Philadelphia, [redacted] will agree to give NS notice of the new sourcing pattern, allow NS to bid for such traffic, and provide NS with the right to match any bona fide offer to transport slab to Middletown.

## 75-CAR UNIT TRAINS (Continued)

Equipment: Gondolas (except no pipe gondolas) – for short-term

NS and [redacted] will form a team to develop a flat/slab car for future handling of this traffic. Once a car-type is identified, rates and term will be developed and negotiated. The parties will:

1) look at modifying NS 113xxx series billet cars
2) look at utilizing / modifying NS 170xxx series open coil cars
3) look into other car types / concepts

Service Commitment: The scheduled transit time from the Philadelphia region to Middletown is 40 hours, plus or minus eight hours (the "Scheduled Transit Time"). If Customer reasonably believes that NS has consistently and repetitively failed to meet the Scheduled Transit Time (a "Service Failure"), Customer may notify NS in writing with specific details concerning the problem. NS will have 30 days following receipt of such notice to correct the Service Failure. During this 30-day "corrective" period, NS and Customer will discuss the slab "plan" on a daily conference call and NS will involve the necessary parties (CDU, Transportation, Mechanical, Conrail (SAA) in an effort to provide a prompt return to the delivery schedule. In the event NS is unable to correct the Service Failure to Customer's reasonable satisfaction within the 30 day corrective period, Customer may terminate the import slab portion of this Contract without penalty, which is Customer's sole remedy for a Service Failure.

As in the past, NS will attempt to react quickly to sudden (last minute) changes in the slab plan and will attempt to meet Customer's expectations when this occurs. Customer must provide NS with at least 5 days notification of significant schedule change for it to be part of the corrective process described in item 1.

NS will deliver unit trains to Middletown the evening prior to the date the train is needed by the Middletown Works. For example, a train is slated for a 04/03/XX spot, but it is understood the slabs should be delivered to the plant prior to 04/02/XX 2300 hours, and the Scheduled Transit Time will assume a delivery at 2300 hours the day before the date it is needed.

Unit trains moving ahead of schedule (i.e. pre-loads) are excluded from this measurement of the Scheduled Transit Time.

Restrictions: Transit will not apply, however, diversion and reconsignment will be permitted.

Ancillary: NO

Appendix B to
Contract DER-NS-C-16468
Amendment No. 1
Page 3 of 3

**75-CAR UNIT TRAINS (Continued)**

Escalation: None

Fuel Surcharge: In the event the price of West Texas Intermediate Crude Oil, as published in the Wall Street Journal, exceeds $35.00 per barrel for thirty (30) consecutive days, Norfolk Southern retains the right to apply a fuel surcharge to the freight charge(s) contained in this Authority in effect on the date the fuel surcharge is applied, if this option is exercised, the fuel surcharge shall be applied according to the following schedule:

| TEXAS INTERMEDIATE CRUDE OIL (PRICE PER BARREL) | CUMULATIVE FUEL SURCHARGE (PERCENTAGE) |
|---|---|
| $35 | 2% |
| $38 | 4% |
| $41 | 6% |
| $44 | 8% |
| $47 | 10% |
| $50 | 12% |
| $53 | 14% |
| $56 | 16% |
| Each $3.00 Per Barrel | Increase An Additional 2% |

The price of West Texas Intermediate Crude Oil must exceed a given bracket for thirty (30) consecutive days for the surcharge under that bracket to be applicable. Any fuel surcharge applied to the freight charge(s) in this Authority will be removed or reduced when the price of West Texas Intermediate Crude Oil remains below the price which triggers a specific surcharge bracket for thirty (30) consecutive days. Reductions will be made promptly after they become applicable. In no case will the freight charge(s) be reduced below the "base freight charge(s)" nor will the application or removal of the fuel surcharge be retroactive.

(C2E-SSE)

Appendix C to
Contract DER-NS-C-16468
Amendment No. 1
Page 1 of 2

Commodity: Steel Sheet, In Coils, Plain or Galvanized (STCC 33-123-32)

Origin:
Destination/Minimum
Weight/Route/Rate:

| Origin | Destination | Rate ($ per net ton) | Min. Weight (lbs per car) | Route | Notes |
|---|---|---|---|---|---|
| Middletown, OH | Ambridge, PA | 16.07 | 160,000 | A | |
| | | 15.02 | 180,000 | A | |
| Rockport, IN | Shenango, PA | 24.13 | 160,000 | B | 3 |
| | | 23.06 | 180,000 | B | 3 |
| Middletown, OH | Coshocton, OH | 12.50 | 160,000 | C | 1 |
| | | 11.88 | 180,000 | C | 1 |
| Middletown, OH | Cleveland, OH | 16.44 | 160,000 | D | 2,4 |
| | | 15.19 | 180,000 | D | 2,4 |

Explanation of Routes and Notes:

A NS Direct
B NS Direct (BLE Delivery)
C NS Direct (CUOH Delivery)
D NS Direct (CWRO Delivery)
1 Rate effective July 1, 2004
2 Rate effective January 1, 2006
3 Rate also applicable via reverse route.
4 NS will not be awarded business unless its proposal is superior. Customer will provide NS the opportunity to match or beat whatever competing rate that may be offered beyond the current expiration date of December 31, 2005. If NS is unable to match or beat competing rates, Customer will not be committed to award the traffic to NS.

Restrictions: Transit will not apply, however, diversion and reconsignment will be permitted.

Ancillary: NO

Escalation: The rates contained in this Contract are subject to a 2% increase on June 1, 2005 and each June 1 thereafter throughout the life of this Contract. The rates described in Note 2 above will not be subject to an escalation until after the effective date of those rates (January 1, 2006).

Billing: Prepaid

Equipment: Covered or open Coil Cars

Volume Guarantee: 85% of total tonnage of Commodity shipped from Origin to Destination.

Appendix C to

Fuel Surcharge:

In the event the price of West Texas Intermediate Crude Oil, as published in the Wall Street Journal, exceeds $35.00 per barrel for thirty (30) consecutive days, Norfolk Southern retains the right to apply a fuel surcharge to the freight charge(s) contained in this Authority in effect on the date the fuel surcharge is applied, if this option is exercised, the fuel surcharge shall be applied according to the following schedule:

| TEXAS INTERMEDIATE CRUDE OIL (PRICE PER BARREL) | CUMULATIVE FUEL SURCHARGE (PERCENTAGE) |
|---|---|
| $35 | 2% |
| $38 | 4% |
| $41 | 6% |
| $44 | 8% |
| $47 | 10% |
| $50 | 12% |
| $53 | 14% |
| $56 | 16% |
| Each $3.00 Per Barrel | Increase An Additional 2% |

The price of West Texas Intermediate Crude Oil must exceed a given bracket for thirty (30) consecutive days for the surcharge under that bracket to be applicable. Any fuel surcharge applied to the freight charge(s) in this Authority will be removed or reduced when the price of West Texas Intermediate Crude Oil remains below the price which triggers a specific surcharge bracket for thirty (30) consecutive days. Reductions will be made promptly after they become applicable. In no case will the freight charge(s) be reduced below the "base freight charge(s)" nor will the application or removal of the fuel surcharge be retroactive.

(C2E-SSE)

# ADDENDUM TO TRANSPORTATION CONTRACT NO. DER-NS-C-16468

## MAINTENANCE OF COIL RESTRAINT BARS ON NS ASSIGNED HI-TEMP COIL CARS

Norfolk Southern Corporation ("NS") has constructed certain modifications to its "sawtooth" hi-temp open coil cars for the specific purpose of handling [redacted] hot rolled steel coils in a manner different from that set forth in the AAR Open-Top Loading Rules. These modifications, hereafter known as "coil restraint bars" which have been made by NS after extensive discussions with and input from [redacted] should allow [redacted] to ship hot coils with one encircling band per coil. NS and [redacted] shall conduct 1,000 carload test shipments with the modified cars for the purpose of demonstrating whether shipments made with the modified cars present an increased risk to the safe operation of the unit train service from Middletown, Ohio to Rockport, Indiana. If the operation of the test does not result in demonstrable evidence that the use of the modified cars poses an increased safety risk, NS will grant [redacted] approval to use the modified cars in unit train service from Middletown, Ohio to Rockport, Indiana. NS reserves the right to withdraw approval and/or require further modifications to the coil restraint bars at [redacted] expense upon providing [redacted] with reasonable proof that the modified cars present increased risks to safety.

Because the work described herein was undertaken at [redacted] request, [redacted] agrees that for all such shipments received at Rockport, Indiana in sawtooth cars, [redacted] agrees to waive its right to reject coils and/or file damage claims if such damage is caused by the absence of sufficient banding as required in the AAR Open-Top Loading Rules. NS shall have no liability with respect to damage to shipments moving in sawtooth cars which is caused by insufficient banding.

NS is concerned that the design modification accepted by [redacted] could cause unusual wear and tear as well as occasional severe damage to the coil restraint bars, and as such, [redacted] agrees to be responsible for any, and all repairs to, or replacement of, the coil restraint bars not caused by the negligent or intentional acts or omissions of NS. These repairs may be made by either [redacted] or NS, subject to [redacted] direction. NS shall have the right to reject any repairs made by [redacted] which NS in the exercise of its reasonable judgment deems unacceptable.

Executed and delivered as of November 8, 1999, as an addendum to NSR Transportation Contract.

[redacted]

NORFOLK SOUTHERN CORPORATION

BY: [signature]

NAME: Donald W. Seale

TITLE: VP-Merchandise Mkting

FORM APPROVED TAC ATTORNEY

(3218) C-5815

# CONFIDENTIAL

## TRANSPORTATION CONTRACT

This Transportation Contract ("this Contract") is made pursuant to 49 U.S.C. Section 10709 this 28th day of January, 2004, by and between NORFOLK SOUTHERN RAILWAY COMPANY and its subsidiary railroads ("NS"), with business address at 110 Franklin Road, Roanoke, VA 24042-0026, and [redacted] ("Shipper"), with business address at [redacted]

1. Scope of Agreement. This Contract covers all rail transportation, as follows:

(a) Commodity: Bituminous Coal for metallurgical or coking purposes, STCC 11 212 10, and Bituminous Coal for fuel or steam purposes, STCC 11 212 90 (collectively "Commodity").

(b) Origins: As set forth in Appendix A ("Origins" and each individual loading point an "Origin").

(c) Destination: CNX Marine Terminal, Baltimore, MD ("Destination") (specifically for export).

(d) Route: NS-Direct.

2. Effective Date. This Contract shall take effect on February 15, 2004 (the "Effective Date").

3. Duration. The term of this Contract shall commence on the Effective Date and continue through December 31, 2004 (the "Initial Term") Thereafter, the Contract shall automatically be extended for 12-month periods (each such period an "Extension Term") until either party gives the other written notice not less than 30 days prior to the end of the Initial Term or the then-current Extension Term, as the case may be, that the Contract will not be extended. Payments due under the Contract at the time of termination shall remain due and payable.

4 Confidentiality. The parties shall use their best efforts to maintain the confidentiality of this Contract and shall not disclose its terms without the prior written consent of the other party. Notwithstanding the foregoing, this Contract may be disclosed when required by law, regulation or court order; provided, however, that in the event disclosure is so required, the disclosing party shall provide written notice to the other party prior to such disclosure, and the disclosing party will furnish only that portion of the Contract that is legally required and will exercise all reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Contract. Further notwithstanding the foregoing, either party may disclose to Relevant Third Parties those portions of the Contract related to operational requirements for

transportation services hereunder, including without limitation car loading and train length requirements. The term "Relevant Third Parties" shall mean any third parties involved in the supply of Commodity that is transported hereunder.

5. Governing Law. The laws of Virginia shall govern the interpretation and performance of this Contract without regard to any conflict of law provisions.

6. Notice. Any notices under this Contract shall be in writing and (i) if sent by first class mail, return receipt requested, notice shall be deemed received upon the date noted as received on the receipt; or (ii) if sent by overnight delivery by U. S. Mail, FedEx, UPS, or other private carrier, notice shall be deemed received on the next business day; or (iii) if sent by electronic mail, notice shall be deemed received on the date that electronic confirmation is sent; or (iv) if sent by facsimile, notice shall be deemed received on the date that confirmation is sent via facsimile. Any notice to NS shall be sent to:

Assistant Vice President Export and Metallurgical Coal Marketing
Norfolk Southern Corporation
110 Franklin Road
Roanoke, VA 24042-0026
Fax: 540.985.6398
E-mail: coalexport.cbg@nscorp com

Any notice to Shipper shall be sent to:

[redacted]

or to such other address or addresses as shall be furnished hereafter in writing.

7. Assignment. This Contract shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns. However, no such assignment to successors or other parties shall be made without the prior written consent of the other party. No partial assignment shall be made.

8. Cancellation. In the event that NS ceases service on any line or track used for Contract service, then this Contract shall no longer apply to the affected line or track, Origin or Destination. In the event of such cessation of service, Shipper shall be relieved of any further obligation hereunder between affected Origin and Destination pairs; provided, however, that NS shall retain the right to provide service between affected Origin and Destination pairs via alternative routes, and Shipper shall not be relieved of its obligations hereunder between affected Origin and Destination pairs in such event.

9. Incorporation. Shipments moving under the terms of this Contract are subject to all classifications, tariffs or successor documents, and government, AAR and carrier rules and regulations that would apply if this Contract were not in effect. This shall specifically include, but shall not be limited to, NS Conditions of Carriage No. 2-D, all NS Tariffs and

Conditions listed therein, and any supplements thereto or successor versions thereof. Notwithstanding the foregoing, neither Condition 55.2 of NS Conditions of Carriage No. 2D (Fuel Surcharge) nor any successor version thereof shall apply to this Contract. Where any incorporated provision conflicts with this Contract, the provisions of this Contract will control.

10. Service. Railroads shall have the same obligations with respect to rail service hereunder as if transportation service pursuant to this Contract were regulated under the Interstate Commerce Act.

11. Billing. Cars moving under the terms of this Contract must be loaded to full visible capacity not exceeding 286,000 pounds gross weight on rail. Billing shall be for each trainload shipment (not for each individual car), shall be under the terms of the Uniform Bill of Lading (as published in the UFC 6000-Series publication) and shall contain the number of this Contract.

12. Transportation Rate. The transportation rate for each net ton (2,000 pounds) of Commodity transported under this Contract shall be as set forth in Appendix A

13. Fuel Surcharge. In the event the price of West Texas intermediate crude oil, as published in *The Wall Street Journal*, exceeds $38.00 per barrel for thirty (30) consecutive days, a fuel surcharge (the "Fuel Surcharge") will be payable by Shipper hereunder and calculated for a given shipment based on the freight charges for such shipment. The Fuel Surcharge shall be determined according to the following schedule:

| **Texas Intermediate Crude Oil (Price Per Barrel)** | **Cumulative Fuel Surcharge (Percentage of Freight Charges)** |
|---|---|
| $38.00 | 2% |
| $43.00 | 4% |
| $48.00 | 6% |
| $53.00 | 8% |
| Each $5.00 per barrel increase | An additional 2% |

The price of West Texas intermediate crude oil must exceed a given bracket for thirty (30) consecutive days for the value of the Fuel Surcharge under such bracket to be applicable. If the price of West Texas intermediate crude oil ceases to be available from *The Wall Street Journal* or some other readily accessible source, a substitute to measure will be utilized.

Shipper will receive notice not less than ten (10) days prior to the initial application of the Fuel Surcharge and any increase in its value thereafter. In the event that the price of West Texas intermediate crude oil remains below the price which triggers a specific Fuel Surcharge bracket for thirty (30) consecutive days, the Fuel Surcharge will be reduced accordingly. Reductions in the Fuel Surcharge will be made promptly after they become applicable. In no case will the application, increase or removal of the Fuel Surcharge be retroactive.

14. Scheduling. For each Contract shipment moving to Destination, Shipper or its representative must obtain a trainload permit from NS's Manager Transportation Coal in Roanoke, VA at least seven (7) days in advance of shipment, unless a shorter advance notice is

acceptable to NS. Such request must specify the Origin, the requested date of shipment, this Contract number, and the Destination. NS does not guarantee strict observance of scheduled dates and times.

15. Volume Commitment. Shipper commits to arrange for shipments, pursuant to this Contract, of a minimum of: (i) 95% of Commodity shipped by or on behalf of Shipper to Destination from Origins during each calendar year (excluding Commodity transported to Destination by NS pursuant to transportation contract C-5801, effective as of June 1, 1999, for purchase FOB Destination by Shipper) and (ii) 95% of Commodity shipped by or on behalf of Shipper to Destination from any barge-to-rail transfer point during each calendar year (collectively, the "Volume Commitment"). In the event that Shipper shall satisfy the Volume Commitment for a given calendar year, Shipper shall provide NS with a certified statement to that effect within 60 days at the end of such calendar year. In the event that Shipper does not so provide a certified statement to NS for a given calendar year, NS shall have the right to audit the records of Shipper to the extent reasonably necessary to determine if the Volume Commitment has been satisfied for such calendar year.

16. Deficit Charge. In the event Shipper does not satisfy the Volume Commitment for a given calendar year, then Shipper will pay NS a deficit charge computed by multiplying the tonnage shortfall times $3.00 NT (the "Deficit Charge"). Shipper shall pay the Deficit Charge to NS within sixty (60) days after the end of such calendar year.

17. Non-Waiver. The failure of either party to demand strict performance of any or all of the terms of this Contract, or to exercise any or all rights conferred by this Contract, shall not be construed as a waiver or relinquishment of that party's right to assert or rely upon any such right in the future.

18. Entire Agreement. This Contract constitutes the entire understanding of the parties with respect to the subject matter hereof and may not be modified or changed except by written amendment signed by an authorized representative of both parties.

19. Limitation of Damages. In no case shall either party be liable hereunder for special, consequential or punitive damages.

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

IN WITNESS WHEREOF, the parties have executed this Contract by their duly authorized representatives as of the day and year first above written.

NORFOLK SOUTHERN RAILWAY COMPANY

By ____________________

Name W. Baird Spieuzza

Title Director Export Coal Marketing

[redacted]

# APPENDIX A TO CONTRACT C-5815

(Effective February 15, 2004)

| ORIGINS | Rate Per Net Ton (See Note 1) | |
|---|---|---|
| | Minimum Shipment Size (Except as otherwise provided) (See Note 2) | |
| | Column A | Column B |
| | 13,000 Tons (See Note 3) | 10,000 Tons (See Note 4) |
| [redacted] | $8.15 | $8.50 |
| | N/A | $11.50 |
| | | |
| | N/A | $10.50 |
| | | |
| | | |
| | N/A | $10.00 |
| | N/A | $10.50 |
| | N/A | $11.00 |
| | | |
| | $8 50 | $9.00 |
| | | |
| | N/A | $9.00 |
| | | |
| | | |
| | $9.75 | $10.25 |
| | $9 50 | $10.00 |
| | | |
| | | |
| | N/A | $15.67 |
| | N/A | $15.98 |
| | $20.00 | |

Note 1 Rates do NOT include terminal services, including without limitation vessel loading, at Destination.

Note 2 Where applicable, in the event that the actual weight of a given shipment is greater than 10,000 tons but less than 13,000 tons, freight charges shall be equal to the lesser of: (i) actual shipment weight multiplied by the applicable Column B rate or (ii) 13,000 tons multiplied by the applicable Column A rate; provided, however, that freight charges shall be equal to actual shipment weight multiplied by the applicable Column A rate in the event that the failure to satisfy the Minimum Shipment Size of 13,000 tons is due solely to NS failure to provide a sufficient number of railcars

Note 3 Train length lim ted to a maximum of 130 railcars

Note 4 In the event a given shipment does not satisfy the Minimum Shipment Size, freight charges shall be based on the Minimum Shipment Size, except that freight charges shall be based on the actual weight of such shipment in the event that the failure to satisfy the Minimum Shipment Size is due solely to NS failure to provide a sufficient number of railcars.

Note 5: This service shall be subject to the following restrictions:
(i) a maximum shipment size of 25 railcars loaded at one Origin on one day in one continuous block;
(ii) shipments shall be scheduled no more frequently than every three days