# Defendants’ Appendix in Support of Defendants’ Joint and Individual Motions for Summary Judgment

## Volume 26 of 29

## DA06013 - DA06519

**From:** Scharpf, Bob
**Sent:** Mon Sep 25 09:09:33 2000
**To:** Nash, Jim
**Subject:** FW: Notice of 4% fuel surcharge
**Importance:** Normal
**Attachments:** fourpercentfuelA.doc; fuelauthorities.xls

-----Original Message-----
**From:** Scharpf, Bob
**Sent:** Monday, September 25, 2000 9:19 AM
**To:** Brugman, Thomas; McNabb, Jim; Schaaf, Jim; Wendorf, Gary; Yopp, Ken; Simonic, Pat; Childers, Dave; Gentzel, Robert; Florian, Fred; Osborne, Joe; Plain, Bob; Julian, Alan; Julian, David; Kiley, Richard; Lawson, David; Rasche, Larry; Wilson, Troy; Porter, Gary; Fabas, Gil; Williams, Bill; Mason, Sam; Anderson, Brady; Corcoran, D.V.; Giuliano, Joe; Lewis, Greg
**Cc:** McNeil, Doug; Quesenberry, Brenda; Scales, John; Pfeifer, Alby; Turvey, John; Lewis, Pat; Wooddy, Jan; Nash, Jim; 'ssminton@nscorp.com'; 'pgcarrol@nscorp.com'; Brenner, Charlie; Glennon, Pat
**Subject:** FW: Notice of 4% fuel surcharge

All
Disregard this letter and attachments as the price of West Texas Crude fell below $33/bbl. at close of business Friday, Sept. 22 as the market reacted to President Clinton's release of reserves. The 2% fuel surcharge remains in effect.
Bob Scharpf

-----Original Message-----
**From:** Scharpf, Bob
**Sent:** Friday, September 22, 2000 4:05 PM
**To:** Brugman, Thomas; McNabb, Jim; Schaaf, Jim; Wendorf, Gary; Yopp, Ken; Simonic, Pat; Childers, Dave; Gentzel, Robert; Florian, Fred; Osborne, Joe; Plain, Bob; Julian, Alan; Julian, David; Kiley, Richard; Lawson, David; Rasche, Larry; Wilson, Troy; Porter, Gary; Fabas, Gil; Williams, Bill; Mason, Sam; Anderson, Brady; Corcoran, D.V.; Giuliano, Joe
**Cc:** McNeil, Doug; Quesenberry, Brenda; Scales, John; Pfeifer, Alby; Turvey, John; Lewis, Pat; Wooddy, Jan; Nash, Jim; 'ssminton@nscorp.com'; 'pgcarrol@nscorp.com'; Brenner, Charlie; Glennon, Pat
**Subject:** Notice of 4% fuel surcharge

Marketing Group Business Heads
Marketing Directors
Sales Directors

The attached letter and enclosure is being mailed today to all tariff subscribers who receive notification via U.S. Mail. The purpose is to serve notice that the fuel surcharge may be going from 2% to 4% effective October 16th unless the daily price of West Texas Crude closes below $33 per barrel on or before October 11.

This letter and enclosure will also be posted in the "Fuel News" segment of the NS Website. In addition, a similar letter will be e-mailed and faxed to customers preferring that method of communication. The e-mail and faxes will point to the specific authorities being subscribed to by that customer and will not contain the massive list appended here.

Please feel free to customize/personalize this letter as you see fit and send to your customer contacts. Those who subscribe to the rate authorities are often different people than those with whom you deal with directly. I would particularly urge that this letter be sent to individuals who were most vocal when we announced the 2% back in June.

It should be understood that new or amended rate authorities with the fuel surcharge provision effective

between now and October 15 will immediately be subject to the 2% fuel surcharge and, if the price of fuel remains above $33/bbl., will be levied a 4% fuel surcharge starting Oct. 16th.

Bob Scharpf

November 29, 2000

Dear Valued Customer

Due to the continued and sustained rise in fuel costs, in accordance with the provisions of NS Conditions of Carriage 1-B, NS will increase the level of its fuel surcharge on applicable traffic from 2% to 4% effective December 22, 2000 unless the daily price of West Texas Crude closes below $33 per barrel on or before December 19, 2000. To track the daily price of West Texas Crude check the Market Diary found on page C-1 of the daily Wall Street Journal or refer to the Fuel News section of the NS web site:
**http://www.nscorp.com/nscorp/html/marketing/pricing/fuel_news.html**
NS Conditions of Carriage 1-B is also available on the NS web site:
**http://www.nscorp.com/nscorp/html/pdf/NS1-B.pdf**

The currently effective version of each price authority listed in the enclosed notice is subject to the NS fuel surcharge. To the extent new authorities are issued or existing authorities are supplemented, amended or reissued they too may be subject to the fuel surcharge provision.

If the fuel surcharge moves to the 4% level, the charge will remain at this level until such time as the price of West Texas Crude closes below $33 per barrel for 30 consecutive days or until the price of fuel rises to a level at or above $38 per barrel thereby invoking a 6% fuel surcharge. In counting consecutive days we only count the days when the Wall Street Journal is published so weekends and some holidays are excluded. The consecutive day determination is the same whether counting days moving up to a higher surcharge or down to a lower surcharge. The easiest way to determine the number of consecutive days that have transpired toward a given hurdle is to check the fuel news section of the NS web site.

The fuel surcharge will continue to be displayed as a miscellaneous charge on the freight bill and added to the line-haul freight charge. Customers receiving a monthly fuel bill will continue to be accommodated. Additional requests for monthly fuel billing can be made by contacting your NS Account Manager or e-mailing the undersigned.

If you have questions on the application or mechanics of the fuel surcharge contact your NS Account Manager or e-mail Bob Scharpf: **bob.scharpf@nscorp.com**

Sincerely,

Robert C. Scharpf

PRODUCED AS NATIVE

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CR | 66 | NS | 10731 | NS | 14247 | NS | 17056 | NS | 17982 | NSQ | 4929 |
| CR | 100 | NS | 10814 | NS | 14328 | NS | 17089 | NS | 17995 | NSQ | 5332 |
| CR | 1976 | NS | 10834 | NS | 14371 | NS | 17111 | NS | 18023 | NSQ | 7834 |
| CR | 1991 | NS | 10861 | NS | 14403 | NS | 17137 | NS | 18028 | NSQ | 15718 |
| CR | 3151 | NS | 10880 | NS | 14547 | NS | 17147 | NS | 18033 | NSQ | 40241 |
| CR | 4000 | NS | 10913 | NS | 14562 | NS | 17153 | NS | 18034 | NSQ | 42625 |
| CR | 4026 | NS | 10924 | NS | 14653 | NS | 17156 | NS | 18038 | NSQ | 44512 |
| CR | 4030 | NS | 10941 | NS | 14954 | NS | 17226 | NS | 18041 | NSQ | 44789 |
| CR | 4031 | NS | 10955 | NS | 15015 | NS | 17235 | NS | 18048 | NSQ | 45456 |
| CR | 4032 | NS | 11042 | NS | 15025 | NS | 17263 | NS | 18054 | NSQ | 60054 |
| CR | 4036 | NS | 11156 | NS | 15079 | NS | 17268 | NS | 18061 | NSQ | 60059 |
| CR | 4038 | NS | 11341 | NS | 15100 | NS | 17272 | NS | 18068 | NSQ | 60068 |
| CR | 4281 | NS | 11419 | NS | 15128 | NS | 17290 | NS | 18069 | NSQ | 60078 |
| CR | 4319 | NS | 11561 | NS | 15159 | NS | 17298 | NS | 18070 | NSQ | 60097 |
| CR | 4445 | NS | 11652 | NS | 15166 | NS | 17301 | NS | 18072 | NSQ | 60112 |
| CR | 4494 | NS | 11690 | NS | 15216 | NS | 17308 | NS | 18082 | NSQ | 60154 |
| CR | 4496 | NS | 11693 | NS | 15230 | NS | 17322 | NS | 18103 | NSQ | 60177 |
| CR | 4610 | NS | 11802 | NS | 15236 | NS | 17422 | NS | 18127 | NSQ | 60184 |
| CR | 8010 | NS | 11896 | NS | 15350 | NS | 17448 | NS | 18131 | NSQ | 60216 |
| CR | 13518 | NS | 11901 | NS | 15607 | NS | 17454 | NS | 18137 | NSQ | 60217 |
| CR | 33710 | NS | 11905 | NS | 15611 | NS | 17477 | NS | 18141 | NSQ | 60292 |
| CR | 34067 | NS | 11919 | NS | 15675 | NS | 17506 | NS | 18143 | NSQ | 60300 |
| CR | 56780 | NS | 11939 | NS | 15764 | NS | 17515 | NS | 18144 | NSQ | 60409 |
| CR | 65440 | NS | 12007 | NS | 15782 | NS | 17526 | NS | 18145 | NSQ | 60411 |
| CR | 82811 | NS | 12124 | NS | 15803 | NS | 17531 | NS | 18147 | NSQ | 60422 |
| CR | 99801 | NS | 12158 | NS | 15899 | NS | 17552 | NS | 18148 | NSQ | 60438 |
| NS | 4002 | NS | 12235 | NS | 15932 | NS | 17559 | NS | 18150 | NSQ | 60457 |
| NS | 4004 | NS | 12267 | NS | 15938 | NS | 17563 | NS | 18152 | NSQ | 60487 |
| NS | 4007 | NS | 12284 | NS | 15984 | NS | 17583 | NS | 18168 | NSQ | 60496 |
| NS | 4008 | NS | 12397 | NS | 16010 | NS | 17586 | NS | 18170 | NSQ | 60504 |
| NS | 4091 | NS | 12403 | NS | 16065 | NS | 17609 | NS | 18178 | NSQ | 60527 |
| NS | 4119 | NS | 12406 | NS | 16139 | NS | 17610 | NS | 18180 | NSQ | 60562 |
| NS | 4125 | NS | 12408 | NS | 16209 | NS | 17618 | NS | 18189 | NSQ | 60592 |
| NS | 4157 | NS | 12422 | NS | 16222 | NS | 17635 | NS | 18192 | NSQ | 60674 |
| NS | 4203 | NS | 12430 | NS | 16344 | NS | 17642 | NS | 18193 | NSQ | 60686 |
| NS | 4206 | NS | 12464 | NS | 16385 | NS | 17652 | NSEC | 4303 | NSQ | 60695 |
| NS | 4216 | NS | 12679 | NS | 16395 | NS | 17658 | NSEC | 4321 | NSQ | 60837 |
| NS | 4219 | NS | 12703 | NS | 16446 | NS | 17659 | NSEC | 4325 | NSQ | 60860 |
| NS | 6103 | NS | 12709 | NS | 16530 | NS | 17684 | NSEC | 4366 | NSQ | 60861 |
| NS | 8211 | NS | 12753 | NS | 16548 | NS | 17688 | NSQ | 1 | NSQ | 60862 |
| NS | 8456 | NS | 12994 | NS | 16711 | NS | 17693 | NSQ | 2 | NSQ | 60886 |
| NS | 8859 | NS | 13105 | NS | 16798 | NS | 17696 | NSQ | 3 | NSQ | 60904 |
| NS | 8860 | NS | 13123 | NS | 16803 | NS | 17701 | NSQ | 66 | NSQ | 60947 |
| NS | 8880 | NS | 13339 | NS | 16814 | NS | 17704 | NSQ | 95 | NSQ | 60962 |
| NS | 8945 | NS | 13408 | NS | 16816 | NS | 17739 | NSQ | 101 | NSQ | 60964 |
| NS | 8952 | NS | 13496 | NS | 16817 | NS | 17762 | NSQ | 1850 | NSQ | 60967 |
| NS | 10123 | NS | 13545 | NS | 16865 | NS | 17764 | NSQ | 2849 | NSQ | 60971 |
| NS | 10246 | NS | 13566 | NS | 16866 | NS | 17865 | NSQ | 2862 | NSQ | 61006 |
| NS | 10397 | NS | 13754 | NS | 16875 | NS | 17903 | NSQ | 2867 | NSQ | 61009 |
| NS | 10451 | NS | 13848 | NS | 16898 | NS | 17904 | NSQ | 3380 | NSQ | 61045 |
| NS | 10673 | NS | 14065 | NS | 16901 | NS | 17916 | NSQ | 4334 | NSQ | 61063 |
| NS | 10711 | NS | 14164 | NS | 16946 | NS | 17975 | NSQ | 4373 | NSQ | 61077 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSQ | 61095 | NSQ | 61979 | NSQ | 62820 | NSQ | 64181 | NSQ | 66103 | NSQ | 67764 |
| NSQ | 61115 | NSQ | 62010 | NSQ | 62821 | NSQ | 64244 | NSQ | 66108 | NSQ | 67776 |
| NSQ | 61123 | NSQ | 62011 | NSQ | 62845 | NSQ | 64261 | NSQ | 66155 | NSQ | 67794 |
| NSQ | 61174 | NSQ | 62058 | NSQ | 62881 | NSQ | 64301 | NSQ | 66258 | NSQ | 67806 |
| NSQ | 61212 | NSQ | 62059 | NSQ | 62901 | NSQ | 64314 | NSQ | 66325 | NSQ | 67811 |
| NSQ | 61253 | NSQ | 62107 | NSQ | 62918 | NSQ | 64341 | NSQ | 66473 | NSQ | 67822 |
| NSQ | 61258 | NSQ | 62114 | NSQ | 62929 | NSQ | 64357 | NSQ | 66568 | NSQ | 67841 |
| NSQ | 61261 | NSQ | 62141 | NSQ | 62944 | NSQ | 64434 | NSQ | 66571 | NSQ | 67862 |
| NSQ | 61285 | NSQ | 62200 | NSQ | 62976 | NSQ | 64612 | NSQ | 66592 | NSQ | 67885 |
| NSQ | 61309 | NSQ | 62216 | NSQ | 62982 | NSQ | 64636 | NSQ | 66626 | NSQ | 67934 |
| NSQ | 61369 | NSQ | 62223 | NSQ | 62983 | NSQ | 64657 | NSQ | 66635 | NSQ | 67936 |
| NSQ | 61382 | NSQ | 62226 | NSQ | 63007 | NSQ | 64658 | NSQ | 66656 | NSQ | 67956 |
| NSQ | 61421 | NSQ | 62239 | NSQ | 63013 | NSQ | 64690 | NSQ | 66674 | NSQ | 68012 |
| NSQ | 61451 | NSQ | 62240 | NSQ | 63035 | NSQ | 64736 | NSQ | 66683 | NSQ | 68069 |
| NSQ | 61457 | NSQ | 62241 | NSQ | 63036 | NSQ | 64739 | NSQ | 66706 | NSQ | 68074 |
| NSQ | 61459 | NSQ | 62252 | NSQ | 63037 | NSQ | 64753 | NSQ | 66707 | NSQ | 68075 |
| NSQ | 61460 | NSQ | 62269 | NSQ | 63042 | NSQ | 64770 | NSQ | 66722 | NSQ | 68078 |
| NSQ | 61462 | NSQ | 62331 | NSQ | 63050 | NSQ | 64778 | NSQ | 66786 | NSQ | 68100 |
| NSQ | 61464 | NSQ | 62335 | NSQ | 63067 | NSQ | 64798 | NSQ | 66873 | NSQ | 68223 |
| NSQ | 61484 | NSQ | 62343 | NSQ | 63070 | NSQ | 64829 | NSQ | 66949 | NSQ | 68240 |
| NSQ | 61492 | NSQ | 62344 | NSQ | 63083 | NSQ | 64843 | NSQ | 66971 | NSQ | 68247 |
| NSQ | 61493 | NSQ | 62345 | NSQ | 63106 | NSQ | 64863 | NSQ | 67022 | NSQ | 68291 |
| NSQ | 61494 | NSQ | 62347 | NSQ | 63108 | NSQ | 64952 | NSQ | 67024 | NSQ | 68317 |
| NSQ | 61541 | NSQ | 62348 | NSQ | 63112 | NSQ | 64953 | NSQ | 67090 | NSQ | 68318 |
| NSQ | 61553 | NSQ | 62356 | NSQ | 63128 | NSQ | 64965 | NSQ | 67108 | NSQ | 68325 |
| NSQ | 61562 | NSQ | 62360 | NSQ | 63166 | NSQ | 65127 | NSQ | 67109 | NSQ | 68332 |
| NSQ | 61567 | NSQ | 62400 | NSQ | 63195 | NSQ | 65142 | NSQ | 67211 | NSQ | 68350 |
| NSQ | 61578 | NSQ | 62409 | NSQ | 63197 | NSQ | 65193 | NSQ | 67238 | NSQ | 68458 |
| NSQ | 61596 | NSQ | 62437 | NSQ | 63231 | NSQ | 65248 | NSQ | 67271 | NSQ | 68467 |
| NSQ | 61640 | NSQ | 62438 | NSQ | 63232 | NSQ | 65293 | NSQ | 67285 | NSQ | 68549 |
| NSQ | 61658 | NSQ | 62447 | NSQ | 63233 | NSQ | 65312 | NSQ | 67302 | NSQ | 68602 |
| NSQ | 61674 | NSQ | 62491 | NSQ | 63248 | NSQ | 65326 | NSQ | 67311 | NSQ | 68656 |
| NSQ | 61687 | NSQ | 62493 | NSQ | 63292 | NSQ | 65340 | NSQ | 67322 | NSQ | 68665 |
| NSQ | 61708 | NSQ | 62500 | NSQ | 63316 | NSQ | 65357 | NSQ | 67363 | NSQ | 68667 |
| NSQ | 61720 | NSQ | 62533 | NSQ | 63338 | NSQ | 65444 | NSQ | 67368 | NSQ | 68668 |
| NSQ | 61751 | NSQ | 62538 | NSQ | 63341 | NSQ | 65466 | NSQ | 67374 | NSQ | 68682 |
| NSQ | 61761 | NSQ | 62544 | NSQ | 63348 | NSQ | 65507 | NSQ | 67383 | NSQ | 68688 |
| NSQ | 61763 | NSQ | 62584 | NSQ | 63365 | NSQ | 65531 | NSQ | 67440 | NSQ | 68692 |
| NSQ | 61764 | NSQ | 62586 | NSQ | 63369 | NSQ | 65533 | NSQ | 67504 | NSQ | 68725 |
| NSQ | 61765 | NSQ | 62587 | NSQ | 63394 | NSQ | 65534 | NSQ | 67543 | NSQ | 68730 |
| NSQ | 61766 | NSQ | 62667 | NSQ | 63395 | NSQ | 65543 | NSQ | 67558 | NSQ | 68752 |
| NSQ | 61767 | NSQ | 62669 | NSQ | 63511 | NSQ | 65709 | NSQ | 67586 | NSQ | 68756 |
| NSQ | 61774 | NSQ | 62671 | NSQ | 63548 | NSQ | 65779 | NSQ | 67622 | NSQ | 68759 |
| NSQ | 61782 | NSQ | 62672 | NSQ | 63554 | NSQ | 65789 | NSQ | 67634 | NSQ | 68842 |
| NSQ | 61783 | NSQ | 62685 | NSQ | 63625 | NSQ | 65791 | NSQ | 67636 | NSQ | 68973 |
| NSQ | 61805 | NSQ | 62687 | NSQ | 63748 | NSQ | 65835 | NSQ | 67646 | NSQ | 68999 |
| NSQ | 61835 | NSQ | 62743 | NSQ | 63786 | NSQ | 65848 | NSQ | 67657 | NSQ | 69002 |
| NSQ | 61867 | NSQ | 62765 | NSQ | 63832 | NSQ | 65904 | NSQ | 67659 | NSQ | 69095 |
| NSQ | 61915 | NSQ | 62778 | NSQ | 64033 | NSQ | 65915 | NSQ | 67670 | NSQ | 69103 |
| NSQ | 61935 | NSQ | 62789 | NSQ | 64100 | NSQ | 66049 | NSQ | 67698 | NSQ | 69139 |
| NSQ | 61970 | NSQ | 62799 | NSQ | 64135 | NSQ | 66092 | NSQ | 67702 | NSQ | 69159 |
| NSQ | 61972 | NSQ | 62800 | NSQ | 64152 | NSQ | 66101 | NSQ | 67704 | NSQ | 69162 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSQ | 69179 | NSQ | 69896 | NSQ | 70330 | NSQ | 70951 | NSQ | 71440 | NSQ | 71978 |
| NSQ | 69294 | NSQ | 69897 | NSQ | 70357 | NSQ | 70952 | NSQ | 71441 | NSQ | 71996 |
| NSQ | 69310 | NSQ | 69898 | NSQ | 70358 | NSQ | 70964 | NSQ | 71445 | NSQ | 72001 |
| NSQ | 69320 | NSQ | 69899 | NSQ | 70361 | NSQ | 70984 | NSQ | 71446 | NSQ | 72018 |
| NSQ | 69432 | NSQ | 69900 | NSQ | 70364 | NSQ | 70986 | NSQ | 71448 | NSQ | 72039 |
| NSQ | 69490 | NSQ | 69903 | NSQ | 70374 | NSQ | 70997 | NSQ | 71458 | NSQ | 72057 |
| NSQ | 69528 | NSQ | 69904 | NSQ | 70405 | NSQ | 70998 | NSQ | 71461 | NSQ | 72059 |
| NSQ | 69545 | NSQ | 69921 | NSQ | 70406 | NSQ | 70999 | NSQ | 71475 | NSQ | 72072 |
| NSQ | 69556 | NSQ | 69939 | NSQ | 70408 | NSQ | 71000 | NSQ | 71480 | NSQ | 72100 |
| NSQ | 69616 | NSQ | 69941 | NSQ | 70418 | NSQ | 71026 | NSQ | 71495 | NSQ | 72101 |
| NSQ | 69635 | NSQ | 69945 | NSQ | 70419 | NSQ | 71027 | NSQ | 71509 | NSQ | 72104 |
| NSQ | 69657 | NSQ | 69946 | NSQ | 70420 | NSQ | 71029 | NSQ | 71529 | NSQ | 72115 |
| NSQ | 69665 | NSQ | 69948 | NSQ | 70430 | NSQ | 71030 | NSQ | 71539 | NSQ | 72199 |
| NSQ | 69683 | NSQ | 69961 | NSQ | 70444 | NSQ | 71053 | NSQ | 71558 | NSQ | 72227 |
| NSQ | 69697 | NSQ | 69963 | NSQ | 70445 | NSQ | 71059 | NSQ | 71560 | NSQ | 72231 |
| NSQ | 69710 | NSQ | 69964 | NSQ | 70450 | NSQ | 71078 | NSQ | 71562 | NSQ | 72233 |
| NSQ | 69716 | NSQ | 69967 | NSQ | 70483 | NSQ | 71090 | NSQ | 71565 | NSQ | 72264 |
| NSQ | 69717 | NSQ | 69968 | NSQ | 70487 | NSQ | 71094 | NSQ | 71566 | NSQ | 72266 |
| NSQ | 69720 | NSQ | 69971 | NSQ | 70499 | NSQ | 71104 | NSQ | 71578 | NSQ | 72268 |
| NSQ | 69722 | NSQ | 69975 | NSQ | 70508 | NSQ | 71106 | NSQ | 71609 | NSQ | 72272 |
| NSQ | 69734 | NSQ | 69984 | NSQ | 70536 | NSQ | 71108 | NSQ | 71618 | NSQ | 72275 |
| NSQ | 69735 | NSQ | 69985 | NSQ | 70537 | NSQ | 71110 | NSQ | 71664 | NSQ | 72309 |
| NSQ | 69737 | NSQ | 69986 | NSQ | 70540 | NSQ | 71113 | NSQ | 71667 | NSQ | 72310 |
| NSQ | 69740 | NSQ | 69987 | NSQ | 70544 | NSQ | 71118 | NSQ | 71669 | NSQ | 72405 |
| NSQ | 69743 | NSQ | 69992 | NSQ | 70545 | NSQ | 71122 | NSQ | 71675 | NSQ | 72411 |
| NSQ | 69750 | NSQ | 69994 | NSQ | 70546 | NSQ | 71136 | NSQ | 71676 | NSQ | 72425 |
| NSQ | 69753 | NSQ | 69995 | NSQ | 70549 | NSQ | 71149 | NSQ | 71677 | NSQ | 72442 |
| NSQ | 69781 | NSQ | 69996 | NSQ | 70556 | NSQ | 71163 | NSQ | 71682 | NSQ | 72466 |
| NSQ | 69802 | NSQ | 69999 | NSQ | 70601 | NSQ | 71170 | NSQ | 71687 | NSQ | 72471 |
| NSQ | 69804 | NSQ | 70012 | NSQ | 70605 | NSQ | 71198 | NSQ | 71692 | NSQ | 72480 |
| NSQ | 69805 | NSQ | 70052 | NSQ | 70662 | NSQ | 71208 | NSQ | 71694 | NSQ | 72513 |
| NSQ | 69828 | NSQ | 70076 | NSQ | 70723 | NSQ | 71222 | NSQ | 71722 | NSQ | 72523 |
| NSQ | 69829 | NSQ | 70087 | NSQ | 70726 | NSQ | 71228 | NSQ | 71760 | NSQ | 72563 |
| NSQ | 69830 | NSQ | 70111 | NSQ | 70768 | NSQ | 71231 | NSQ | 71761 | NSQ | 72575 |
| NSQ | 69833 | NSQ | 70115 | NSQ | 70778 | NSQ | 71232 | NSQ | 71762 | NSQ | 72597 |
| NSQ | 69834 | NSQ | 70131 | NSQ | 70789 | NSQ | 71237 | NSQ | 71788 | NSQ | 72600 |
| NSQ | 69838 | NSQ | 70139 | NSQ | 70790 | NSQ | 71250 | NSQ | 71791 | NSQ | 72633 |
| NSQ | 69840 | NSQ | 70141 | NSQ | 70791 | NSQ | 71279 | NSQ | 71793 | NSQ | 72637 |
| NSQ | 69841 | NSQ | 70156 | NSQ | 70794 | NSQ | 71294 | NSQ | 71805 | NSQ | 72645 |
| NSQ | 69845 | NSQ | 70158 | NSQ | 70795 | NSQ | 71297 | NSQ | 71813 | NSQ | 72653 |
| NSQ | 69846 | NSQ | 70176 | NSQ | 70812 | NSQ | 71301 | NSQ | 71823 | NSQ | 72663 |
| NSQ | 69848 | NSQ | 70182 | NSQ | 70856 | NSQ | 71307 | NSQ | 71837 | NSQ | 72668 |
| NSQ | 69853 | NSQ | 70201 | NSQ | 70876 | NSQ | 71325 | NSQ | 71867 | NSQ | 72674 |
| NSQ | 69859 | NSQ | 70233 | NSQ | 70889 | NSQ | 71330 | NSQ | 71877 | NSQ | 72679 |
| NSQ | 69860 | NSQ | 70244 | NSQ | 70922 | NSQ | 71355 | NSQ | 71878 | NSQ | 72694 |
| NSQ | 69870 | NSQ | 70253 | NSQ | 70924 | NSQ | 71360 | NSQ | 71884 | NSQ | 72718 |
| NSQ | 69874 | NSQ | 70259 | NSQ | 70925 | NSQ | 71362 | NSQ | 71920 | NSQ | 72732 |
| NSQ | 69877 | NSQ | 70274 | NSQ | 70935 | NSQ | 71366 | NSQ | 71935 | NSQ | 72773 |
| NSQ | 69879 | NSQ | 70276 | NSQ | 70939 | NSQ | 71378 | NSQ | 71946 | NSQ | 72789 |
| NSQ | 69885 | NSQ | 70279 | NSQ | 70940 | NSQ | 71389 | NSQ | 71961 | NSQ | 72820 |
| NSQ | 69886 | NSQ | 70280 | NSQ | 70942 | NSQ | 71406 | NSQ | 71965 | NSQ | 72821 |
| NSQ | 69889 | NSQ | 70315 | NSQ | 70947 | NSQ | 71419 | NSQ | 71966 | NSQ | 72850 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSQ | 72857 | NSQ | 74072 | NSQ | 75040 | NSQ | 75786 | NSQ | 76600 | NSQ | 77154 |
| NSQ | 72875 | NSQ | 74075 | NSQ | 75041 | NSQ | 75796 | NSQ | 76601 | NSQ | 77158 |
| NSQ | 72881 | NSQ | 74096 | NSQ | 75044 | NSQ | 75801 | NSQ | 76604 | NSQ | 77164 |
| NSQ | 72892 | NSQ | 74097 | NSQ | 75045 | NSQ | 75815 | NSQ | 76612 | NSQ | 77167 |
| NSQ | 72896 | NSQ | 74110 | NSQ | 75060 | NSQ | 75820 | NSQ | 76632 | NSQ | 77181 |
| NSQ | 72899 | NSQ | 74132 | NSQ | 75081 | NSQ | 75850 | NSQ | 76660 | NSQ | 77192 |
| NSQ | 72916 | NSQ | 74151 | NSQ | 75092 | NSQ | 75864 | NSQ | 76701 | NSQ | 77203 |
| NSQ | 72932 | NSQ | 74160 | NSQ | 75099 | NSQ | 75889 | NSQ | 76721 | NSQ | 77210 |
| NSQ | 72951 | NSQ | 74230 | NSQ | 75104 | NSQ | 75906 | NSQ | 76752 | NSQ | 77221 |
| NSQ | 72954 | NSQ | 74232 | NSQ | 75114 | NSQ | 75909 | NSQ | 76761 | NSQ | 77248 |
| NSQ | 72963 | NSQ | 74266 | NSQ | 75116 | NSQ | 75911 | NSQ | 76773 | NSQ | 77250 |
| NSQ | 72973 | NSQ | 74280 | NSQ | 75134 | NSQ | 75914 | NSQ | 76805 | NSQ | 77256 |
| NSQ | 73109 | NSQ | 74285 | NSQ | 75151 | NSQ | 75955 | NSQ | 76812 | NSQ | 77273 |
| NSQ | 73150 | NSQ | 74308 | NSQ | 75187 | NSQ | 75969 | NSQ | 76831 | NSQ | 77276 |
| NSQ | 73171 | NSQ | 74316 | NSQ | 75188 | NSQ | 75971 | NSQ | 76832 | NSQ | 77278 |
| NSQ | 73186 | NSQ | 74321 | NSQ | 75211 | NSQ | 75975 | NSQ | 76838 | NSQ | 77291 |
| NSQ | 73187 | NSQ | 74323 | NSQ | 75214 | NSQ | 75981 | NSQ | 76842 | NSQ | 77309 |
| NSQ | 73231 | NSQ | 74327 | NSQ | 75216 | NSQ | 76010 | NSQ | 76846 | NSQ | 77317 |
| NSQ | 73245 | NSQ | 74342 | NSQ | 75218 | NSQ | 76048 | NSQ | 76856 | NSQ | 77319 |
| NSQ | 73289 | NSQ | 74354 | NSQ | 75224 | NSQ | 76061 | NSQ | 76858 | NSQ | 77331 |
| NSQ | 73300 | NSQ | 74450 | NSQ | 75230 | NSQ | 76063 | NSQ | 76859 | NSQ | 77333 |
| NSQ | 73301 | NSQ | 74507 | NSQ | 75250 | NSQ | 76102 | NSQ | 76866 | NSQ | 77356 |
| NSQ | 73352 | NSQ | 74601 | NSQ | 75255 | NSQ | 76108 | NSQ | 76884 | NSQ | 77369 |
| NSQ | 73436 | NSQ | 74656 | NSQ | 75284 | NSQ | 76123 | NSQ | 76888 | NSQ | 77374 |
| NSQ | 73440 | NSQ | 74670 | NSQ | 75302 | NSQ | 76165 | NSQ | 76891 | NSQ | 77376 |
| NSQ | 73464 | NSQ | 74764 | NSQ | 75306 | NSQ | 76177 | NSQ | 76893 | NSQ | 77387 |
| NSQ | 73473 | NSQ | 74768 | NSQ | 75332 | NSQ | 76198 | NSQ | 76901 | NSQ | 77388 |
| NSQ | 73480 | NSQ | 74770 | NSQ | 75368 | NSQ | 76204 | NSQ | 76903 | NSQ | 77394 |
| NSQ | 73573 | NSQ | 74772 | NSQ | 75387 | NSQ | 76207 | NSQ | 76905 | NSQ | 77401 |
| NSQ | 73578 | NSQ | 74779 | NSQ | 75426 | NSQ | 76225 | NSQ | 76908 | NSQ | 77404 |
| NSQ | 73584 | NSQ | 74780 | NSQ | 75439 | NSQ | 76228 | NSQ | 76919 | NSQ | 77408 |
| NSQ | 73587 | NSQ | 74783 | NSQ | 75455 | NSQ | 76273 | NSQ | 76925 | NSQ | 77409 |
| NSQ | 73615 | NSQ | 74791 | NSQ | 75479 | NSQ | 76301 | NSQ | 76952 | NSQ | 77433 |
| NSQ | 73622 | NSQ | 74795 | NSQ | 75502 | NSQ | 76334 | NSQ | 76960 | NSQ | 77438 |
| NSQ | 73686 | NSQ | 74811 | NSQ | 75549 | NSQ | 76340 | NSQ | 76964 | NSQ | 77442 |
| NSQ | 73697 | NSQ | 74823 | NSQ | 75551 | NSQ | 76346 | NSQ | 76976 | NSQ | 77445 |
| NSQ | 73746 | NSQ | 74843 | NSQ | 75558 | NSQ | 76351 | NSQ | 76990 | NSQ | 77450 |
| NSQ | 73751 | NSQ | 74860 | NSQ | 75571 | NSQ | 76366 | NSQ | 76998 | NSQ | 77472 |
| NSQ | 73765 | NSQ | 74868 | NSQ | 75631 | NSQ | 76383 | NSQ | 77010 | NSQ | 77486 |
| NSQ | 73781 | NSQ | 74880 | NSQ | 75637 | NSQ | 76391 | NSQ | 77014 | NSQ | 77487 |
| NSQ | 73788 | NSQ | 74886 | NSQ | 75669 | NSQ | 76416 | NSQ | 77023 | NSQ | 77489 |
| NSQ | 73790 | NSQ | 74926 | NSQ | 75683 | NSQ | 76443 | NSQ | 77038 | NSQ | 77490 |
| NSQ | 73791 | NSQ | 74933 | NSQ | 75690 | NSQ | 76447 | NSQ | 77054 | NSQ | 77544 |
| NSQ | 73805 | NSQ | 74936 | NSQ | 75698 | NSQ | 76450 | NSQ | 77062 | NSQ | 77545 |
| NSQ | 73815 | NSQ | 74950 | NSQ | 75714 | NSQ | 76466 | NSQ | 77066 | NSQ | 77556 |
| NSQ | 73836 | NSQ | 74956 | NSQ | 75717 | NSQ | 76469 | NSQ | 77068 | NSQ | 77563 |
| NSQ | 73837 | NSQ | 74984 | NSQ | 75730 | NSQ | 76480 | NSQ | 77070 | NSQ | 77578 |
| NSQ | 73844 | NSQ | 74993 | NSQ | 75734 | NSQ | 76521 | NSQ | 77078 | NSQ | 77588 |
| NSQ | 73861 | NSQ | 74998 | NSQ | 75742 | NSQ | 76527 | NSQ | 77080 | NSQ | 77603 |
| NSQ | 73977 | NSQ | 75020 | NSQ | 75744 | NSQ | 76533 | NSQ | 77113 | NSQ | 77607 |
| NSQ | 73993 | NSQ | 75031 | NSQ | 75759 | NSQ | 76557 | NSQ | 77126 | NSQ | 77628 |
| NSQ | 74016 | NSQ | 75033 | NSQ | 75762 | NSQ | 76575 | NSQ | 77142 | NSQ | 77641 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSQ | 77646 | NSQ | 78061 | NSQ | 78231 | NSQ | 78412 | NSQ | 78599 | NSQ | 78748 |
| NSQ | 77647 | NSQ | 78075 | NSQ | 78236 | NSQ | 78414 | NSQ | 78613 | NSQ | 78752 |
| NSQ | 77664 | NSQ | 78078 | NSQ | 78248 | NSQ | 78419 | NSQ | 78614 | NSQ | 78757 |
| NSQ | 77667 | NSQ | 78079 | NSQ | 78249 | NSQ | 78420 | NSQ | 78620 | NSQ | 78758 |
| NSQ | 77672 | NSQ | 78085 | NSQ | 78252 | NSQ | 78423 | NSQ | 78624 | NSQ | 78759 |
| NSQ | 77675 | NSQ | 78088 | NSQ | 78269 | NSQ | 78429 | NSQ | 78626 | NSQ | 78760 |
| NSQ | 77680 | NSQ | 78097 | NSQ | 78270 | NSQ | 78433 | NSQ | 78627 | NSQ | 78761 |
| NSQ | 77689 | NSQ | 78102 | NSQ | 78271 | NSQ | 78441 | NSQ | 78629 | NSQ | 78762 |
| NSQ | 77695 | NSQ | 78103 | NSQ | 78272 | NSQ | 78442 | NSQ | 78631 | NSQ | 78764 |
| NSQ | 77697 | NSQ | 78106 | NSQ | 78274 | NSQ | 78444 | NSQ | 78633 | NSQ | 78770 |
| NSQ | 77701 | NSQ | 78107 | NSQ | 78276 | NSQ | 78445 | NSQ | 78634 | NSQ | 78775 |
| NSQ | 77714 | NSQ | 78113 | NSQ | 78289 | NSQ | 78450 | NSQ | 78635 | NSQ | 78777 |
| NSQ | 77719 | NSQ | 78115 | NSQ | 78290 | NSQ | 78451 | NSQ | 78641 | NSQ | 78780 |
| NSQ | 77724 | NSQ | 78117 | NSQ | 78292 | NSQ | 78462 | NSQ | 78645 | NSQ | 78783 |
| NSQ | 77725 | NSQ | 78118 | NSQ | 78293 | NSQ | 78463 | NSQ | 78650 | NSQ | 78786 |
| NSQ | 77728 | NSQ | 78131 | NSQ | 78295 | NSQ | 78465 | NSQ | 78651 | NSQ | 78787 |
| NSQ | 77739 | NSQ | 78132 | NSQ | 78296 | NSQ | 78478 | NSQ | 78654 | NSQ | 78788 |
| NSQ | 77746 | NSQ | 78133 | NSQ | 78297 | NSQ | 78484 | NSQ | 78655 | NSQ | 78791 |
| NSQ | 77765 | NSQ | 78138 | NSQ | 78300 | NSQ | 78486 | NSQ | 78657 | NSQ | 78792 |
| NSQ | 77767 | NSQ | 78140 | NSQ | 78305 | NSQ | 78491 | NSQ | 78660 | NSQ | 78794 |
| NSQ | 77781 | NSQ | 78141 | NSQ | 78309 | NSQ | 78496 | NSQ | 78661 | NSQ | 78796 |
| NSQ | 77786 | NSQ | 78148 | NSQ | 78317 | NSQ | 78499 | NSQ | 78663 | NSQ | 78798 |
| NSQ | 77797 | NSQ | 78149 | NSQ | 78320 | NSQ | 78504 | NSQ | 78666 | NSQ | 78801 |
| NSQ | 77800 | NSQ | 78150 | NSQ | 78322 | NSQ | 78515 | NSQ | 78667 | NSQ | 78803 |
| NSQ | 77815 | NSQ | 78157 | NSQ | 78324 | NSQ | 78518 | NSQ | 78676 | NSQ | 78809 |
| NSQ | 77825 | NSQ | 78164 | NSQ | 78327 | NSQ | 78520 | NSQ | 78677 | NSQ | 78811 |
| NSQ | 77827 | NSQ | 78167 | NSQ | 78331 | NSQ | 78525 | NSQ | 78680 | NSQ | 78813 |
| NSQ | 77830 | NSQ | 78169 | NSQ | 78332 | NSQ | 78526 | NSQ | 78683 | NSQ | 78814 |
| NSQ | 77837 | NSQ | 78171 | NSQ | 78334 | NSQ | 78527 | NSQ | 78686 | NSQ | 78822 |
| NSQ | 77849 | NSQ | 78175 | NSQ | 78338 | NSQ | 78529 | NSQ | 78687 | NSQ | 78825 |
| NSQ | 77856 | NSQ | 78178 | NSQ | 78342 | NSQ | 78533 | NSQ | 78689 | NSQ | 78827 |
| NSQ | 77873 | NSQ | 78180 | NSQ | 78343 | NSQ | 78534 | NSQ | 78693 | NSQ | 78828 |
| NSQ | 77881 | NSQ | 78186 | NSQ | 78344 | NSQ | 78536 | NSQ | 78697 | NSQ | 78830 |
| NSQ | 77890 | NSQ | 78187 | NSQ | 78346 | NSQ | 78541 | NSQ | 78699 | NSQ | 78832 |
| NSQ | 77892 | NSQ | 78191 | NSQ | 78347 | NSQ | 78551 | NSQ | 78702 | NSQ | 78837 |
| NSQ | 77911 | NSQ | 78193 | NSQ | 78352 | NSQ | 78553 | NSQ | 78705 | NSQ | 78838 |
| NSQ | 77936 | NSQ | 78197 | NSQ | 78362 | NSQ | 78554 | NSQ | 78706 | NSQ | 78841 |
| NSQ | 77939 | NSQ | 78203 | NSQ | 78363 | NSQ | 78556 | NSQ | 78708 | NSQ | 78845 |
| NSQ | 77940 | NSQ | 78205 | NSQ | 78366 | NSQ | 78561 | NSQ | 78710 | NSQ | 78846 |
| NSQ | 77947 | NSQ | 78208 | NSQ | 78374 | NSQ | 78562 | NSQ | 78713 | NSQ | 78847 |
| NSQ | 77950 | NSQ | 78210 | NSQ | 78379 | NSQ | 78563 | NSQ | 78714 | NSQ | 78848 |
| NSQ | 77958 | NSQ | 78213 | NSQ | 78386 | NSQ | 78564 | NSQ | 78715 | NSQ | 78849 |
| NSQ | 77962 | NSQ | 78215 | NSQ | 78387 | NSQ | 78565 | NSQ | 78718 | NSQ | 78854 |
| NSQ | 77964 | NSQ | 78216 | NSQ | 78389 | NSQ | 78566 | NSQ | 78722 | NSQ | 78859 |
| NSQ | 77970 | NSQ | 78219 | NSQ | 78390 | NSQ | 78576 | NSQ | 78726 | NSQ | 78862 |
| NSQ | 77984 | NSQ | 78220 | NSQ | 78392 | NSQ | 78583 | NSQ | 78730 | NSQ | 78865 |
| NSQ | 77989 | NSQ | 78221 | NSQ | 78393 | NSQ | 78584 | NSQ | 78735 | NSQ | 78867 |
| NSQ | 78010 | NSQ | 78222 | NSQ | 78397 | NSQ | 78590 | NSQ | 78736 | NSQ | 78868 |
| NSQ | 78014 | NSQ | 78223 | NSQ | 78400 | NSQ | 78591 | NSQ | 78739 | NSQ | 78870 |
| NSQ | 78018 | NSQ | 78224 | NSQ | 78406 | NSQ | 78594 | NSQ | 78741 | NSQ | 78872 |
| NSQ | 78020 | NSQ | 78225 | NSQ | 78407 | NSQ | 78595 | NSQ | 78742 | NSQ | 78879 |
| NSQ | 78036 | NSQ | 78228 | NSQ | 78408 | NSQ | 78598 | NSQ | 78747 | NSQ | 78882 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSQ | 78883 | NSQ | 79034 | NSQ | 79164 | NSRQ | 4936 | NSRQ | 10594 | NSRQ | 44815 |
| NSQ | 78884 | NSQ | 79036 | NSQ | 79165 | NSRQ | 4975 | NSRQ | 10595 | NSRQ | 44925 |
| NSQ | 78887 | NSQ | 79037 | NSQ | 79166 | NSRQ | 4976 | NSRQ | 10955 | NSRQ | 45181 |
| NSQ | 78888 | NSQ | 79039 | NSQ | 79169 | NSRQ | 4977 | NSRQ | 11008 | NSRQ | 45184 |
| NSQ | 78889 | NSQ | 79041 | NSQ | 83895 | NSRQ | 10005 | NSRQ | 11362 | NSRQ | 45396 |
| NSQ | 78890 | NSQ | 79044 | NSQ | 89700 | NSRQ | 10009 | NSRQ | 11635 | NSRQ | 45480 |
| NSQ | 78893 | NSQ | 79046 | NSQ | 95461 | NSRQ | 10012 | NSRQ | 11728 | NSRQ | 45543 |
| NSQ | 78902 | NSQ | 79056 | NSRQ | 1439 | NSRQ | 10020 | NSRQ | 11937 | NSRQ | 45644 |
| NSQ | 78904 | NSQ | 79057 | NSRQ | 2710 | NSRQ | 10034 | NSRQ | 12139 | NSRQ | 45905 |
| NSQ | 78905 | NSQ | 79058 | NSRQ | 3020 | NSRQ | 10035 | NSRQ | 12370 | NSRQ | 46063 |
| NSQ | 78906 | NSQ | 79059 | NSRQ | 4026 | NSRQ | 10060 | NSRQ | 12522 | NSRQ | 46141 |
| NSQ | 78912 | NSQ | 79061 | NSRQ | 4032 | NSRQ | 10065 | NSRQ | 12713 | NSRQ | 46161 |
| NSQ | 78913 | NSQ | 79062 | NSRQ | 4037 | NSRQ | 10102 | NSRQ | 13194 | NSRQ | 46320 |
| NSQ | 78919 | NSQ | 79065 | NSRQ | 4038 | NSRQ | 10119 | NSRQ | 13244 | NSRQ | 46348 |
| NSQ | 78920 | NSQ | 79069 | NSRQ | 4281 | NSRQ | 10121 | NSRQ | 13266 | NSRQ | 46384 |
| NSQ | 78921 | NSQ | 79070 | NSRQ | 4304 | NSRQ | 10145 | NSRQ | 13583 | NSRQ | 46428 |
| NSQ | 78922 | NSQ | 79081 | NSRQ | 4309 | NSRQ | 10150 | NSRQ | 13657 | NSRQ | 46611 |
| NSQ | 78929 | NSQ | 79088 | NSRQ | 4310 | NSRQ | 10154 | NSRQ | 13684 | NSRQ | 46761 |
| NSQ | 78930 | NSQ | 79093 | NSRQ | 4311 | NSRQ | 10161 | NSRQ | 13850 | NSRQ | 46810 |
| NSQ | 78932 | NSQ | 79095 | NSRQ | 4313 | NSRQ | 10174 | NSRQ | 13962 | NSRQ | 47016 |
| NSQ | 78938 | NSQ | 79096 | NSRQ | 4315 | NSRQ | 10177 | NSRQ | 14246 | NSRQ | 47057 |
| NSQ | 78941 | NSQ | 79101 | NSRQ | 4323 | NSRQ | 10198 | NSRQ | 14417 | NSRQ | 47086 |
| NSQ | 78943 | NSQ | 79103 | NSRQ | 4324 | NSRQ | 10208 | NSRQ | 14420 | NSRQ | 47106 |
| NSQ | 78944 | NSQ | 79106 | NSRQ | 4328 | NSRQ | 10223 | NSRQ | 14752 | NSRQ | 47255 |
| NSQ | 78945 | NSQ | 79107 | NSRQ | 4330 | NSRQ | 10232 | NSRQ | 15222 | NSRQ | 47267 |
| NSQ | 78946 | NSQ | 79108 | NSRQ | 4331 | NSRQ | 10235 | NSRQ | 15289 | NSRQ | 47347 |
| NSQ | 78947 | NSQ | 79112 | NSRQ | 4332 | NSRQ | 10276 | NSRQ | 15303 | NSRQ | 47499 |
| NSQ | 78952 | NSQ | 79113 | NSRQ | 4333 | NSRQ | 10304 | NSRQ | 15608 | NSRQ | 47554 |
| NSQ | 78953 | NSQ | 79116 | NSRQ | 4337 | NSRQ | 10326 | NSRQ | 15644 | NSRQ | 47602 |
| NSQ | 78956 | NSQ | 79117 | NSRQ | 4338 | NSRQ | 10352 | NSRQ | 15696 | NSRQ | 47691 |
| NSQ | 78960 | NSQ | 79123 | NSRQ | 4339 | NSRQ | 10357 | NSRQ | 15909 | NSRQ | 47726 |
| NSQ | 78963 | NSQ | 79125 | NSRQ | 4341 | NSRQ | 10371 | NSRQ | 16096 | NSRQ | 47762 |
| NSQ | 78965 | NSQ | 79126 | NSRQ | 4342 | NSRQ | 10382 | NSRQ | 16858 | NSRQ | 47812 |
| NSQ | 78968 | NSQ | 79129 | NSRQ | 4346 | NSRQ | 10402 | NSRQ | 29913 | NSRQ | 47820 |
| NSQ | 78972 | NSQ | 79130 | NSRQ | 4400 | NSRQ | 10417 | NSRQ | 29919 | NSRQ | 47883 |
| NSQ | 78973 | NSQ | 79133 | NSRQ | 4401 | NSRQ | 10429 | NSRQ | 40594 | NSRQ | 47923 |
| NSQ | 78979 | NSQ | 79137 | NSRQ | 4436 | NSRQ | 10432 | NSRQ | 40766 | NSRQ | 47951 |
| NSQ | 78980 | NSQ | 79140 | NSRQ | 4443 | NSRQ | 10433 | NSRQ | 41251 | NSRQ | 47955 |
| NSQ | 78981 | NSQ | 79142 | NSRQ | 4444 | NSRQ | 10434 | NSRQ | 41619 | NSRQ | 48265 |
| NSQ | 78985 | NSQ | 79143 | NSRQ | 4445 | NSRQ | 10444 | NSRQ | 41752 | NSRQ | 48271 |
| NSQ | 78986 | NSQ | 79146 | NSRQ | 4446 | NSRQ | 10452 | NSRQ | 41819 | NSRQ | 48340 |
| NSQ | 78987 | NSQ | 79148 | NSRQ | 4447 | NSRQ | 10460 | NSRQ | 41924 | NSRQ | 48604 |
| NSQ | 78990 | NSQ | 79149 | NSRQ | 4448 | NSRQ | 10465 | NSRQ | 42328 | NSRQ | 48920 |
| NSQ | 78992 | NSQ | 79150 | NSRQ | 4615 | NSRQ | 10484 | NSRQ | 42479 | NSRQ | 48921 |
| NSQ | 79005 | NSQ | 79151 | NSRQ | 4643 | NSRQ | 10515 | NSRQ | 42739 | NSRQ | 48930 |
| NSQ | 79007 | NSQ | 79152 | NSRQ | 4653 | NSRQ | 10516 | NSRQ | 43009 | NSRQ | 48938 |
| NSQ | 79022 | NSQ | 79155 | NSRQ | 4657 | NSRQ | 10532 | NSRQ | 43097 | NSRQ | 48974 |
| NSQ | 79025 | NSQ | 79156 | NSRQ | 4660 | NSRQ | 10533 | NSRQ | 43187 | NSRQ | 49094 |
| NSQ | 79029 | NSQ | 79157 | NSRQ | 4724 | NSRQ | 10537 | NSRQ | 43907 | NSRQ | 49234 |
| NSQ | 79030 | NSQ | 79158 | NSRQ | 4727 | NSRQ | 10564 | NSRQ | 43997 | NSRQ | 49272 |
| NSQ | 79032 | NSQ | 79162 | NSRQ | 4780 | NSRQ | 10575 | NSRQ | 44435 | NSRQ | 49581 |
| NSQ | 79033 | NSQ | 79163 | NSRQ | 4900 | NSRQ | 10588 | NSRQ | 44672 | NSRQ | 49603 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSRQ | 49849 | NSRQ | 50652 | NSRQ | 51168 | NSRQ | 51599 | NSRQ | 52214 | NSRQ | 52841 |
| NSRQ | 49891 | NSRQ | 50657 | NSRQ | 51172 | NSRQ | 51602 | NSRQ | 52216 | NSRQ | 52849 |
| NSRQ | 49923 | NSRQ | 50659 | NSRQ | 51182 | NSRQ | 51603 | NSRQ | 52273 | NSRQ | 52852 |
| NSRQ | 49925 | NSRQ | 50661 | NSRQ | 51195 | NSRQ | 51607 | NSRQ | 52275 | NSRQ | 52856 |
| NSRQ | 50018 | NSRQ | 50665 | NSRQ | 51196 | NSRQ | 51633 | NSRQ | 52302 | NSRQ | 52861 |
| NSRQ | 50030 | NSRQ | 50673 | NSRQ | 51203 | NSRQ | 51636 | NSRQ | 52313 | NSRQ | 52877 |
| NSRQ | 50034 | NSRQ | 50691 | NSRQ | 51209 | NSRQ | 51646 | NSRQ | 52314 | NSRQ | 52880 |
| NSRQ | 50047 | NSRQ | 50709 | NSRQ | 51216 | NSRQ | 51650 | NSRQ | 52321 | NSRQ | 52884 |
| NSRQ | 50067 | NSRQ | 50719 | NSRQ | 51228 | NSRQ | 51653 | NSRQ | 52326 | NSRQ | 52889 |
| NSRQ | 50085 | NSRQ | 50749 | NSRQ | 51232 | NSRQ | 51654 | NSRQ | 52335 | NSRQ | 52905 |
| NSRQ | 50090 | NSRQ | 50761 | NSRQ | 51241 | NSRQ | 51661 | NSRQ | 52350 | NSRQ | 52909 |
| NSRQ | 50114 | NSRQ | 50767 | NSRQ | 51243 | NSRQ | 51667 | NSRQ | 52351 | NSRQ | 52918 |
| NSRQ | 50128 | NSRQ | 50775 | NSRQ | 51249 | NSRQ | 51693 | NSRQ | 52358 | NSRQ | 52919 |
| NSRQ | 50131 | NSRQ | 50781 | NSRQ | 51268 | NSRQ | 51697 | NSRQ | 52366 | NSRQ | 52928 |
| NSRQ | 50142 | NSRQ | 50785 | NSRQ | 51269 | NSRQ | 51718 | NSRQ | 52384 | NSRQ | 52933 |
| NSRQ | 50159 | NSRQ | 50793 | NSRQ | 51273 | NSRQ | 51726 | NSRQ | 52406 | NSRQ | 52945 |
| NSRQ | 50221 | NSRQ | 50802 | NSRQ | 51284 | NSRQ | 51728 | NSRQ | 52425 | NSRQ | 52947 |
| NSRQ | 50240 | NSRQ | 50807 | NSRQ | 51291 | NSRQ | 51736 | NSRQ | 52450 | NSRQ | 52955 |
| NSRQ | 50248 | NSRQ | 50822 | NSRQ | 51296 | NSRQ | 51763 | NSRQ | 52468 | NSRQ | 52964 |
| NSRQ | 50252 | NSRQ | 50826 | NSRQ | 51302 | NSRQ | 51777 | NSRQ | 52477 | NSRQ | 52967 |
| NSRQ | 50259 | NSRQ | 50837 | NSRQ | 51303 | NSRQ | 51789 | NSRQ | 52506 | NSRQ | 52970 |
| NSRQ | 50267 | NSRQ | 50842 | NSRQ | 51304 | NSRQ | 51791 | NSRQ | 52513 | NSRQ | 52981 |
| NSRQ | 50269 | NSRQ | 50877 | NSRQ | 51305 | NSRQ | 51810 | NSRQ | 52515 | NSRQ | 52986 |
| NSRQ | 50271 | NSRQ | 50901 | NSRQ | 51312 | NSRQ | 51815 | NSRQ | 52517 | NSRQ | 52995 |
| NSRQ | 50272 | NSRQ | 50906 | NSRQ | 51324 | NSRQ | 51874 | NSRQ | 52542 | NSRQ | 53016 |
| NSRQ | 50277 | NSRQ | 50911 | NSRQ | 51330 | NSRQ | 51899 | NSRQ | 52548 | NSRQ | 53021 |
| NSRQ | 50280 | NSRQ | 50917 | NSRQ | 51332 | NSRQ | 51901 | NSRQ | 52549 | NSRQ | 53026 |
| NSRQ | 50283 | NSRQ | 50920 | NSRQ | 51336 | NSRQ | 51902 | NSRQ | 52553 | NSRQ | 53039 |
| NSRQ | 50365 | NSRQ | 50921 | NSRQ | 51337 | NSRQ | 51907 | NSRQ | 52585 | NSRQ | 53040 |
| NSRQ | 50377 | NSRQ | 50948 | NSRQ | 51398 | NSRQ | 51939 | NSRQ | 52587 | NSRQ | 53046 |
| NSRQ | 50380 | NSRQ | 50972 | NSRQ | 51401 | NSRQ | 51946 | NSRQ | 52610 | NSRQ | 53075 |
| NSRQ | 50401 | NSRQ | 50978 | NSRQ | 51412 | NSRQ | 51956 | NSRQ | 52613 | NSRQ | 53076 |
| NSRQ | 50441 | NSRQ | 50981 | NSRQ | 51414 | NSRQ | 51971 | NSRQ | 52638 | NSRQ | 53081 |
| NSRQ | 50449 | NSRQ | 50998 | NSRQ | 51415 | NSRQ | 51972 | NSRQ | 52653 | NSRQ | 53103 |
| NSRQ | 50454 | NSRQ | 51003 | NSRQ | 51427 | NSRQ | 51989 | NSRQ | 52666 | NSRQ | 53138 |
| NSRQ | 50457 | NSRQ | 51009 | NSRQ | 51431 | NSRQ | 52006 | NSRQ | 52690 | NSRQ | 53175 |
| NSRQ | 50479 | NSRQ | 51014 | NSRQ | 51432 | NSRQ | 52009 | NSRQ | 52695 | NSRQ | 53179 |
| NSRQ | 50505 | NSRQ | 51021 | NSRQ | 51443 | NSRQ | 52017 | NSRQ | 52698 | NSRQ | 53181 |
| NSRQ | 50523 | NSRQ | 51031 | NSRQ | 51444 | NSRQ | 52019 | NSRQ | 52700 | NSRQ | 53197 |
| NSRQ | 50540 | NSRQ | 51035 | NSRQ | 51445 | NSRQ | 52030 | NSRQ | 52746 | NSRQ | 53202 |
| NSRQ | 50541 | NSRQ | 51037 | NSRQ | 51455 | NSRQ | 52048 | NSRQ | 52747 | NSRQ | 53215 |
| NSRQ | 50556 | NSRQ | 51045 | NSRQ | 51464 | NSRQ | 52050 | NSRQ | 52767 | NSRQ | 53216 |
| NSRQ | 50562 | NSRQ | 51051 | NSRQ | 51467 | NSRQ | 52055 | NSRQ | 52768 | NSRQ | 53219 |
| NSRQ | 50568 | NSRQ | 51055 | NSRQ | 51507 | NSRQ | 52076 | NSRQ | 52775 | NSRQ | 53226 |
| NSRQ | 50613 | NSRQ | 51056 | NSRQ | 51514 | NSRQ | 52078 | NSRQ | 52778 | NSRQ | 53231 |
| NSRQ | 50614 | NSRQ | 51116 | NSRQ | 51518 | NSRQ | 52103 | NSRQ | 52779 | NSRQ | 53233 |
| NSRQ | 50617 | NSRQ | 51117 | NSRQ | 51521 | NSRQ | 52104 | NSRQ | 52783 | NSRQ | 53240 |
| NSRQ | 50624 | NSRQ | 51120 | NSRQ | 51529 | NSRQ | 52134 | NSRQ | 52792 | NSRQ | 53246 |
| NSRQ | 50632 | NSRQ | 51128 | NSRQ | 51533 | NSRQ | 52136 | NSRQ | 52811 | NSRQ | 53264 |
| NSRQ | 50641 | NSRQ | 51144 | NSRQ | 51543 | NSRQ | 52178 | NSRQ | 52816 | NSRQ | 53267 |
| NSRQ | 50646 | NSRQ | 51146 | NSRQ | 51560 | NSRQ | 52180 | NSRQ | 52829 | NSRQ | 53270 |
| NSRQ | 50648 | NSRQ | 51150 | NSRQ | 51562 | NSRQ | 52190 | NSRQ | 52836 | NSRQ | 53284 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSRQ | 53326 | NSRQ | 53760 | NSRQ | 54448 | NSRQ | 54798 | NSRQ | 55126 | NSRQ | 55329 |
| NSRQ | 53327 | NSRQ | 53771 | NSRQ | 54482 | NSRQ | 54818 | NSRQ | 55128 | NSRQ | 55332 |
| NSRQ | 53330 | NSRQ | 53774 | NSRQ | 54489 | NSRQ | 54829 | NSRQ | 55132 | NSRQ | 55338 |
| NSRQ | 53334 | NSRQ | 53790 | NSRQ | 54507 | NSRQ | 54830 | NSRQ | 55133 | NSRQ | 55341 |
| NSRQ | 53338 | NSRQ | 53814 | NSRQ | 54515 | NSRQ | 54834 | NSRQ | 55136 | NSRQ | 55343 |
| NSRQ | 53339 | NSRQ | 53845 | NSRQ | 54517 | NSRQ | 54847 | NSRQ | 55137 | NSRQ | 55347 |
| NSRQ | 53345 | NSRQ | 53853 | NSRQ | 54526 | NSRQ | 54854 | NSRQ | 55147 | NSRQ | 55362 |
| NSRQ | 53351 | NSRQ | 53865 | NSRQ | 54530 | NSRQ | 54855 | NSRQ | 55164 | NSRQ | 55365 |
| NSRQ | 53367 | NSRQ | 53871 | NSRQ | 54532 | NSRQ | 54862 | NSRQ | 55169 | NSRQ | 55366 |
| NSRQ | 53381 | NSRQ | 53875 | NSRQ | 54539 | NSRQ | 54870 | NSRQ | 55170 | NSRQ | 55367 |
| NSRQ | 53395 | NSRQ | 53903 | NSRQ | 54543 | NSRQ | 54875 | NSRQ | 55173 | NSRQ | 55368 |
| NSRQ | 53396 | NSRQ | 53911 | NSRQ | 54565 | NSRQ | 54882 | NSRQ | 55176 | NSRQ | 55371 |
| NSRQ | 53403 | NSRQ | 53917 | NSRQ | 54570 | NSRQ | 54886 | NSRQ | 55177 | NSRQ | 55372 |
| NSRQ | 53408 | NSRQ | 53930 | NSRQ | 54571 | NSRQ | 54908 | NSRQ | 55179 | NSRQ | 55376 |
| NSRQ | 53415 | NSRQ | 53943 | NSRQ | 54574 | NSRQ | 54910 | NSRQ | 55180 | NSRQ | 55384 |
| NSRQ | 53421 | NSRQ | 53970 | NSRQ | 54585 | NSRQ | 54915 | NSRQ | 55188 | NSRQ | 55388 |
| NSRQ | 53424 | NSRQ | 53994 | NSRQ | 54597 | NSRQ | 54919 | NSRQ | 55189 | NSRQ | 55389 |
| NSRQ | 53433 | NSRQ | 54024 | NSRQ | 54606 | NSRQ | 54931 | NSRQ | 55195 | NSRQ | 55393 |
| NSRQ | 53442 | NSRQ | 54031 | NSRQ | 54607 | NSRQ | 54932 | NSRQ | 55200 | NSRQ | 55395 |
| NSRQ | 53443 | NSRQ | 54052 | NSRQ | 54611 | NSRQ | 54939 | NSRQ | 55203 | NSRQ | 55397 |
| NSRQ | 53446 | NSRQ | 54061 | NSRQ | 54612 | NSRQ | 54940 | NSRQ | 55204 | NSRQ | 55403 |
| NSRQ | 53453 | NSRQ | 54066 | NSRQ | 54618 | NSRQ | 54967 | NSRQ | 55207 | NSRQ | 55404 |
| NSRQ | 53469 | NSRQ | 54072 | NSRQ | 54622 | NSRQ | 54968 | NSRQ | 55209 | NSRQ | 55406 |
| NSRQ | 53472 | NSRQ | 54085 | NSRQ | 54624 | NSRQ | 54979 | NSRQ | 55212 | NSRQ | 55419 |
| NSRQ | 53480 | NSRQ | 54105 | NSRQ | 54627 | NSRQ | 54981 | NSRQ | 55213 | NSRQ | 55428 |
| NSRQ | 53487 | NSRQ | 54106 | NSRQ | 54637 | NSRQ | 54987 | NSRQ | 55214 | NSRQ | 55432 |
| NSRQ | 53490 | NSRQ | 54129 | NSRQ | 54638 | NSRQ | 55002 | NSRQ | 55220 | NSRQ | 55438 |
| NSRQ | 53491 | NSRQ | 54145 | NSRQ | 54649 | NSRQ | 55003 | NSRQ | 55226 | NSRQ | 55444 |
| NSRQ | 53498 | NSRQ | 54159 | NSRQ | 54655 | NSRQ | 55005 | NSRQ | 55236 | NSRQ | 55447 |
| NSRQ | 53500 | NSRQ | 54168 | NSRQ | 54665 | NSRQ | 55014 | NSRQ | 55243 | NSRQ | 55449 |
| NSRQ | 53509 | NSRQ | 54177 | NSRQ | 54670 | NSRQ | 55018 | NSRQ | 55244 | NSRQ | 55452 |
| NSRQ | 53512 | NSRQ | 54194 | NSRQ | 54672 | NSRQ | 55021 | NSRQ | 55247 | NSRQ | 55459 |
| NSRQ | 53519 | NSRQ | 54259 | NSRQ | 54673 | NSRQ | 55025 | NSRQ | 55252 | NSRQ | 55465 |
| NSRQ | 53527 | NSRQ | 54281 | NSRQ | 54701 | NSRQ | 55029 | NSRQ | 55254 | NSRQ | 55476 |
| NSRQ | 53539 | NSRQ | 54288 | NSRQ | 54704 | NSRQ | 55039 | NSRQ | 55262 | NSRQ | 55486 |
| NSRQ | 53542 | NSRQ | 54323 | NSRQ | 54705 | NSRQ | 55042 | NSRQ | 55274 | NSRQ | 55495 |
| NSRQ | 53562 | NSRQ | 54340 | NSRQ | 54706 | NSRQ | 55046 | NSRQ | 55275 | NSRQ | 55496 |
| NSRQ | 53573 | NSRQ | 54346 | NSRQ | 54707 | NSRQ | 55048 | NSRQ | 55277 | NSRQ | 55502 |
| NSRQ | 53576 | NSRQ | 54355 | NSRQ | 54710 | NSRQ | 55055 | NSRQ | 55278 | NSRQ | 55507 |
| NSRQ | 53596 | NSRQ | 54370 | NSRQ | 54735 | NSRQ | 55060 | NSRQ | 55280 | NSRQ | 55509 |
| NSRQ | 53602 | NSRQ | 54371 | NSRQ | 54739 | NSRQ | 55065 | NSRQ | 55281 | NSRQ | 55511 |
| NSRQ | 53605 | NSRQ | 54377 | NSRQ | 54740 | NSRQ | 55071 | NSRQ | 55286 | NSRQ | 55512 |
| NSRQ | 53640 | NSRQ | 54386 | NSRQ | 54756 | NSRQ | 55088 | NSRQ | 55296 | NSRQ | 55515 |
| NSRQ | 53646 | NSRQ | 54387 | NSRQ | 54757 | NSRQ | 55089 | NSRQ | 55297 | NSRQ | 55521 |
| NSRQ | 53656 | NSRQ | 54389 | NSRQ | 54758 | NSRQ | 55096 | NSRQ | 55299 | NSRQ | 55523 |
| NSRQ | 53667 | NSRQ | 54397 | NSRQ | 54764 | NSRQ | 55099 | NSRQ | 55304 | NSRQ | 55525 |
| NSRQ | 53677 | NSRQ | 54408 | NSRQ | 54769 | NSRQ | 55102 | NSRQ | 55310 | NSRQ | 55527 |
| NSRQ | 53723 | NSRQ | 54413 | NSRQ | 54774 | NSRQ | 55103 | NSRQ | 55311 | NSRQ | 55528 |
| NSRQ | 53724 | NSRQ | 54428 | NSRQ | 54788 | NSRQ | 55118 | NSRQ | 55312 | NSRQ | 55529 |
| NSRQ | 53729 | NSRQ | 54430 | NSRQ | 54790 | NSRQ | 55119 | NSRQ | 55313 | NSRQ | 55531 |
| NSRQ | 53733 | NSRQ | 54434 | NSRQ | 54792 | NSRQ | 55123 | NSRQ | 55321 | NSRQ | 55532 |
| NSRQ | 53739 | NSRQ | 54441 | NSRQ | 54795 | NSRQ | 55124 | NSRQ | 55325 | NSRQ | 55536 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSRQ | 55543 | NSRQ | 55787 | NSRQ | 56029 | NSRQ | 56221 | NSRQ | 56403 | NSRQ | 56722 |
| NSRQ | 55549 | NSRQ | 55788 | NSRQ | 56030 | NSRQ | 56222 | NSRQ | 56409 | NSRQ | 56723 |
| NSRQ | 55560 | NSRQ | 55789 | NSRQ | 56032 | NSRQ | 56223 | NSRQ | 56423 | NSRQ | 56724 |
| NSRQ | 55562 | NSRQ | 55795 | NSRQ | 56033 | NSRQ | 56232 | NSRQ | 56431 | NSRQ | 56734 |
| NSRQ | 55572 | NSRQ | 55798 | NSRQ | 56034 | NSRQ | 56233 | NSRQ | 56434 | NSRQ | 56739 |
| NSRQ | 55574 | NSRQ | 55800 | NSRQ | 56035 | NSRQ | 56234 | NSRQ | 56437 | NSRQ | 56752 |
| NSRQ | 55576 | NSRQ | 55801 | NSRQ | 56074 | NSRQ | 56235 | NSRQ | 56448 | NSRQ | 56764 |
| NSRQ | 55577 | NSRQ | 55803 | NSRQ | 56076 | NSRQ | 56243 | NSRQ | 56454 | NSRQ | 56770 |
| NSRQ | 55579 | NSRQ | 55819 | NSRQ | 56077 | NSRQ | 56244 | NSRQ | 56456 | NSRQ | 56771 |
| NSRQ | 55588 | NSRQ | 55821 | NSRQ | 56078 | NSRQ | 56246 | NSRQ | 56457 | NSRQ | 56772 |
| NSRQ | 55591 | NSRQ | 55822 | NSRQ | 56081 | NSRQ | 56248 | NSRQ | 56459 | NSRQ | 56777 |
| NSRQ | 55594 | NSRQ | 55824 | NSRQ | 56083 | NSRQ | 56249 | NSRQ | 56472 | NSRQ | 56782 |
| NSRQ | 55595 | NSRQ | 55826 | NSRQ | 56084 | NSRQ | 56256 | NSRQ | 56473 | NSRQ | 56783 |
| NSRQ | 55597 | NSRQ | 55833 | NSRQ | 56087 | NSRQ | 56257 | NSRQ | 56490 | NSRQ | 56786 |
| NSRQ | 55601 | NSRQ | 55834 | NSRQ | 56101 | NSRQ | 56259 | NSRQ | 56493 | NSRQ | 56788 |
| NSRQ | 55605 | NSRQ | 55839 | NSRQ | 56102 | NSRQ | 56261 | NSRQ | 56509 | NSRQ | 56789 |
| NSRQ | 55619 | NSRQ | 55842 | NSRQ | 56103 | NSRQ | 56262 | NSRQ | 56517 | NSRQ | 56803 |
| NSRQ | 55620 | NSRQ | 55843 | NSRQ | 56105 | NSRQ | 56268 | NSRQ | 56521 | NSRQ | 56806 |
| NSRQ | 55624 | NSRQ | 55847 | NSRQ | 56113 | NSRQ | 56271 | NSRQ | 56535 | NSRQ | 56812 |
| NSRQ | 55626 | NSRQ | 55857 | NSRQ | 56114 | NSRQ | 56278 | NSRQ | 56538 | NSRQ | 56825 |
| NSRQ | 55630 | NSRQ | 55870 | NSRQ | 56118 | NSRQ | 56280 | NSRQ | 56540 | NSRQ | 56826 |
| NSRQ | 55636 | NSRQ | 55881 | NSRQ | 56121 | NSRQ | 56282 | NSRQ | 56545 | NSRQ | 56827 |
| NSRQ | 55637 | NSRQ | 55885 | NSRQ | 56129 | NSRQ | 56287 | NSRQ | 56547 | NSRQ | 56836 |
| NSRQ | 55641 | NSRQ | 55893 | NSRQ | 56131 | NSRQ | 56291 | NSRQ | 56551 | NSRQ | 56840 |
| NSRQ | 55647 | NSRQ | 55894 | NSRQ | 56135 | NSRQ | 56293 | NSRQ | 56552 | NSRQ | 56855 |
| NSRQ | 55654 | NSRQ | 55916 | NSRQ | 56136 | NSRQ | 56294 | NSRQ | 56569 | NSRQ | 56863 |
| NSRQ | 55661 | NSRQ | 55917 | NSRQ | 56142 | NSRQ | 56296 | NSRQ | 56572 | NSRQ | 56867 |
| NSRQ | 55669 | NSRQ | 55919 | NSRQ | 56150 | NSRQ | 56298 | NSRQ | 56573 | NSRQ | 56869 |
| NSRQ | 55677 | NSRQ | 55921 | NSRQ | 56153 | NSRQ | 56309 | NSRQ | 56582 | NSRQ | 56871 |
| NSRQ | 55684 | NSRQ | 55923 | NSRQ | 56164 | NSRQ | 56313 | NSRQ | 56587 | NSRQ | 56874 |
| NSRQ | 55685 | NSRQ | 55926 | NSRQ | 56165 | NSRQ | 56314 | NSRQ | 56591 | NSRQ | 56878 |
| NSRQ | 55694 | NSRQ | 55930 | NSRQ | 56171 | NSRQ | 56319 | NSRQ | 56592 | NSRQ | 56891 |
| NSRQ | 55698 | NSRQ | 55932 | NSRQ | 56172 | NSRQ | 56321 | NSRQ | 56594 | NSRQ | 56894 |
| NSRQ | 55701 | NSRQ | 55933 | NSRQ | 56173 | NSRQ | 56330 | NSRQ | 56601 | NSRQ | 56899 |
| NSRQ | 55702 | NSRQ | 55938 | NSRQ | 56182 | NSRQ | 56333 | NSRQ | 56605 | NSRQ | 56901 |
| NSRQ | 55715 | NSRQ | 55939 | NSRQ | 56185 | NSRQ | 56336 | NSRQ | 56618 | NSRQ | 56905 |
| NSRQ | 55716 | NSRQ | 55940 | NSRQ | 56189 | NSRQ | 56339 | NSRQ | 56624 | NSRQ | 56906 |
| NSRQ | 55722 | NSRQ | 55946 | NSRQ | 56193 | NSRQ | 56352 | NSRQ | 56625 | NSRQ | 56909 |
| NSRQ | 55725 | NSRQ | 55947 | NSRQ | 56195 | NSRQ | 56354 | NSRQ | 56634 | NSRQ | 56921 |
| NSRQ | 55739 | NSRQ | 55948 | NSRQ | 56196 | NSRQ | 56358 | NSRQ | 56635 | NSRQ | 56923 |
| NSRQ | 55740 | NSRQ | 55950 | NSRQ | 56197 | NSRQ | 56365 | NSRQ | 56640 | NSRQ | 56926 |
| NSRQ | 55742 | NSRQ | 55951 | NSRQ | 56199 | NSRQ | 56368 | NSRQ | 56642 | NSRQ | 56928 |
| NSRQ | 55744 | NSRQ | 55953 | NSRQ | 56200 | NSRQ | 56369 | NSRQ | 56647 | NSRQ | 56930 |
| NSRQ | 55746 | NSRQ | 55991 | NSRQ | 56202 | NSRQ | 56375 | NSRQ | 56651 | NSRQ | 56932 |
| NSRQ | 55751 | NSRQ | 55996 | NSRQ | 56205 | NSRQ | 56377 | NSRQ | 56656 | NSRQ | 56937 |
| NSRQ | 55755 | NSRQ | 55997 | NSRQ | 56207 | NSRQ | 56380 | NSRQ | 56661 | NSRQ | 56942 |
| NSRQ | 55757 | NSRQ | 55999 | NSRQ | 56209 | NSRQ | 56381 | NSRQ | 56673 | NSRQ | 56946 |
| NSRQ | 55758 | NSRQ | 56002 | NSRQ | 56210 | NSRQ | 56382 | NSRQ | 56676 | NSRQ | 56947 |
| NSRQ | 55769 | NSRQ | 56003 | NSRQ | 56213 | NSRQ | 56389 | NSRQ | 56678 | NSRQ | 56966 |
| NSRQ | 55773 | NSRQ | 56008 | NSRQ | 56216 | NSRQ | 56390 | NSRQ | 56686 | NSRQ | 56967 |
| NSRQ | 55776 | NSRQ | 56019 | NSRQ | 56219 | NSRQ | 56392 | NSRQ | 56702 | NSRQ | 56970 |
| NSRQ | 55783 | NSRQ | 56020 | NSRQ | 56220 | NSRQ | 56393 | NSRQ | 56711 | NSRQ | 56972 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSRQ | 56973 | NSRQ | 57304 | NSRQ | 57438 | NSRQ | 57555 | NSRQ | 57653 | NSRQ | 57782 |
| NSRQ | 56980 | NSRQ | 57313 | NSRQ | 57442 | NSRQ | 57556 | NSRQ | 57654 | NSRQ | 57785 |
| NSRQ | 56984 | NSRQ | 57314 | NSRQ | 57443 | NSRQ | 57565 | NSRQ | 57656 | NSRQ | 57786 |
| NSRQ | 56987 | NSRQ | 57325 | NSRQ | 57444 | NSRQ | 57567 | NSRQ | 57661 | NSRQ | 57787 |
| NSRQ | 56990 | NSRQ | 57329 | NSRQ | 57448 | NSRQ | 57569 | NSRQ | 57662 | NSRQ | 57788 |
| NSRQ | 57010 | NSRQ | 57330 | NSRQ | 57449 | NSRQ | 57571 | NSRQ | 57663 | NSRQ | 57793 |
| NSRQ | 57011 | NSRQ | 57331 | NSRQ | 57450 | NSRQ | 57572 | NSRQ | 57665 | NSRQ | 57796 |
| NSRQ | 57016 | NSRQ | 57332 | NSRQ | 57454 | NSRQ | 57577 | NSRQ | 57667 | NSRQ | 57797 |
| NSRQ | 57032 | NSRQ | 57335 | NSRQ | 57455 | NSRQ | 57578 | NSRQ | 57669 | NSRQ | 57798 |
| NSRQ | 57046 | NSRQ | 57337 | NSRQ | 57456 | NSRQ | 57580 | NSRQ | 57670 | NSRQ | 57799 |
| NSRQ | 57051 | NSRQ | 57341 | NSRQ | 57457 | NSRQ | 57581 | NSRQ | 57673 | NSRQ | 57802 |
| NSRQ | 57060 | NSRQ | 57347 | NSRQ | 57459 | NSRQ | 57582 | NSRQ | 57674 | NSRQ | 57805 |
| NSRQ | 57068 | NSRQ | 57353 | NSRQ | 57460 | NSRQ | 57583 | NSRQ | 57676 | NSRQ | 57812 |
| NSRQ | 57077 | NSRQ | 57354 | NSRQ | 57470 | NSRQ | 57585 | NSRQ | 57686 | NSRQ | 57814 |
| NSRQ | 57085 | NSRQ | 57355 | NSRQ | 57472 | NSRQ | 57589 | NSRQ | 57687 | NSRQ | 57819 |
| NSRQ | 57086 | NSRQ | 57356 | NSRQ | 57474 | NSRQ | 57591 | NSRQ | 57689 | NSRQ | 57820 |
| NSRQ | 57093 | NSRQ | 57357 | NSRQ | 57475 | NSRQ | 57593 | NSRQ | 57690 | NSRQ | 57825 |
| NSRQ | 57099 | NSRQ | 57358 | NSRQ | 57476 | NSRQ | 57594 | NSRQ | 57692 | NSRQ | 57826 |
| NSRQ | 57100 | NSRQ | 57362 | NSRQ | 57479 | NSRQ | 57595 | NSRQ | 57693 | NSRQ | 57828 |
| NSRQ | 57108 | NSRQ | 57363 | NSRQ | 57480 | NSRQ | 57596 | NSRQ | 57696 | NSRQ | 57829 |
| NSRQ | 57115 | NSRQ | 57364 | NSRQ | 57482 | NSRQ | 57597 | NSRQ | 57697 | NSRQ | 57830 |
| NSRQ | 57129 | NSRQ | 57365 | NSRQ | 57483 | NSRQ | 57598 | NSRQ | 57698 | NSRQ | 57831 |
| NSRQ | 57145 | NSRQ | 57366 | NSRQ | 57485 | NSRQ | 57599 | NSRQ | 57699 | NSRQ | 57833 |
| NSRQ | 57148 | NSRQ | 57370 | NSRQ | 57487 | NSRQ | 57604 | NSRQ | 57700 | NSRQ | 57834 |
| NSRQ | 57149 | NSRQ | 57373 | NSRQ | 57491 | NSRQ | 57606 | NSRQ | 57703 | NSRQ | 57835 |
| NSRQ | 57157 | NSRQ | 57374 | NSRQ | 57494 | NSRQ | 57607 | NSRQ | 57707 | NSRQ | 57837 |
| NSRQ | 57158 | NSRQ | 57375 | NSRQ | 57495 | NSRQ | 57611 | NSRQ | 57709 | NSRQ | 57838 |
| NSRQ | 57174 | NSRQ | 57376 | NSRQ | 57497 | NSRQ | 57612 | NSRQ | 57711 | NSRQ | 57841 |
| NSRQ | 57178 | NSRQ | 57384 | NSRQ | 57498 | NSRQ | 57613 | NSRQ | 57714 | NSRQ | 57842 |
| NSRQ | 57185 | NSRQ | 57385 | NSRQ | 57504 | NSRQ | 57614 | NSRQ | 57718 | NSRQ | 57844 |
| NSRQ | 57191 | NSRQ | 57388 | NSRQ | 57505 | NSRQ | 57615 | NSRQ | 57720 | NSRQ | 57847 |
| NSRQ | 57199 | NSRQ | 57389 | NSRQ | 57506 | NSRQ | 57617 | NSRQ | 57721 | NSRQ | 57848 |
| NSRQ | 57203 | NSRQ | 57390 | NSRQ | 57512 | NSRQ | 57619 | NSRQ | 57733 | NSRQ | 57849 |
| NSRQ | 57204 | NSRQ | 57391 | NSRQ | 57513 | NSRQ | 57623 | NSRQ | 57736 | NSRQ | 57852 |
| NSRQ | 57208 | NSRQ | 57395 | NSRQ | 57514 | NSRQ | 57624 | NSRQ | 57737 | NSRQ | 57853 |
| NSRQ | 57217 | NSRQ | 57397 | NSRQ | 57517 | NSRQ | 57625 | NSRQ | 57738 | NSRQ | 57854 |
| NSRQ | 57225 | NSRQ | 57398 | NSRQ | 57519 | NSRQ | 57627 | NSRQ | 57741 | NSRQ | 57856 |
| NSRQ | 57229 | NSRQ | 57401 | NSRQ | 57521 | NSRQ | 57628 | NSRQ | 57745 | NSRQ | 57861 |
| NSRQ | 57236 | NSRQ | 57403 | NSRQ | 57522 | NSRQ | 57629 | NSRQ | 57751 | NSRQ | 57864 |
| NSRQ | 57240 | NSRQ | 57404 | NSRQ | 57523 | NSRQ | 57630 | NSRQ | 57752 | NSRQ | 57865 |
| NSRQ | 57247 | NSRQ | 57406 | NSRQ | 57524 | NSRQ | 57633 | NSRQ | 57758 | NSRQ | 57866 |
| NSRQ | 57256 | NSRQ | 57408 | NSRQ | 57528 | NSRQ | 57634 | NSRQ | 57759 | NSRQ | 57868 |
| NSRQ | 57267 | NSRQ | 57412 | NSRQ | 57529 | NSRQ | 57637 | NSRQ | 57760 | NSRQ | 57869 |
| NSRQ | 57268 | NSRQ | 57415 | NSRQ | 57531 | NSRQ | 57639 | NSRQ | 57762 | NSRQ | 57873 |
| NSRQ | 57274 | NSRQ | 57416 | NSRQ | 57533 | NSRQ | 57640 | NSRQ | 57763 | NSRQ | 57875 |
| NSRQ | 57280 | NSRQ | 57418 | NSRQ | 57535 | NSRQ | 57641 | NSRQ | 57767 | NSRQ | 57876 |
| NSRQ | 57285 | NSRQ | 57420 | NSRQ | 57536 | NSRQ | 57642 | NSRQ | 57770 | NSRQ | 57877 |
| NSRQ | 57287 | NSRQ | 57422 | NSRQ | 57538 | NSRQ | 57646 | NSRQ | 57775 | NSRQ | 57883 |
| NSRQ | 57289 | NSRQ | 57424 | NSRQ | 57544 | NSRQ | 57647 | NSRQ | 57776 | NSRQ | 57884 |
| NSRQ | 57292 | NSRQ | 57425 | NSRQ | 57546 | NSRQ | 57648 | NSRQ | 57777 | NSRQ | 57885 |
| NSRQ | 57295 | NSRQ | 57426 | NSRQ | 57551 | NSRQ | 57649 | NSRQ | 57779 | NSRQ | 57886 |
| NSRQ | 57302 | NSRQ | 57432 | NSRQ | 57553 | NSRQ | 57652 | NSRQ | 57781 | NSRQ | 57887 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSRQ | 57890 | NSRQ | 58003 | NSRQ | 58124 | NSRQ | 58260 | NSRQ | 58400 | NSRQ | 58549 |
| NSRQ | 57891 | NSRQ | 58007 | NSRQ | 58125 | NSRQ | 58261 | NSRQ | 58402 | NSRQ | 58551 |
| NSRQ | 57892 | NSRQ | 58008 | NSRQ | 58128 | NSRQ | 58263 | NSRQ | 58403 | NSRQ | 58553 |
| NSRQ | 57894 | NSRQ | 58011 | NSRQ | 58133 | NSRQ | 58264 | NSRQ | 58405 | NSRQ | 58556 |
| NSRQ | 57895 | NSRQ | 58012 | NSRQ | 58138 | NSRQ | 58265 | NSRQ | 58406 | NSRQ | 58557 |
| NSRQ | 57901 | NSRQ | 58013 | NSRQ | 58143 | NSRQ | 58269 | NSRQ | 58409 | NSRQ | 58559 |
| NSRQ | 57906 | NSRQ | 58019 | NSRQ | 58144 | NSRQ | 58271 | NSRQ | 58411 | NSRQ | 58561 |
| NSRQ | 57908 | NSRQ | 58020 | NSRQ | 58147 | NSRQ | 58273 | NSRQ | 58418 | NSRQ | 58562 |
| NSRQ | 57909 | NSRQ | 58023 | NSRQ | 58148 | NSRQ | 58280 | NSRQ | 58419 | NSRQ | 58563 |
| NSRQ | 57912 | NSRQ | 58024 | NSRQ | 58151 | NSRQ | 58282 | NSRQ | 58425 | NSRQ | 58564 |
| NSRQ | 57915 | NSRQ | 58031 | NSRQ | 58153 | NSRQ | 58285 | NSRQ | 58432 | NSRQ | 58565 |
| NSRQ | 57916 | NSRQ | 58033 | NSRQ | 58154 | NSRQ | 58287 | NSRQ | 58433 | NSRQ | 58567 |
| NSRQ | 57917 | NSRQ | 58036 | NSRQ | 58156 | NSRQ | 58288 | NSRQ | 58434 | NSRQ | 58568 |
| NSRQ | 57918 | NSRQ | 58041 | NSRQ | 58158 | NSRQ | 58290 | NSRQ | 58435 | NSRQ | 58569 |
| NSRQ | 57920 | NSRQ | 58043 | NSRQ | 58159 | NSRQ | 58291 | NSRQ | 58443 | NSRQ | 58570 |
| NSRQ | 57921 | NSRQ | 58044 | NSRQ | 58160 | NSRQ | 58292 | NSRQ | 58447 | NSRQ | 58571 |
| NSRQ | 57924 | NSRQ | 58047 | NSRQ | 58162 | NSRQ | 58296 | NSRQ | 58448 | NSRQ | 58572 |
| NSRQ | 57925 | NSRQ | 58050 | NSRQ | 58163 | NSRQ | 58298 | NSRQ | 58451 | NSRQ | 58573 |
| NSRQ | 57926 | NSRQ | 58052 | NSRQ | 58166 | NSRQ | 58300 | NSRQ | 58453 | NSRQ | 58574 |
| NSRQ | 57927 | NSRQ | 58054 | NSRQ | 58170 | NSRQ | 58302 | NSRQ | 58454 | NSRQ | 58576 |
| NSRQ | 57930 | NSRQ | 58056 | NSRQ | 58176 | NSRQ | 58309 | NSRQ | 58458 | NSRQ | 58581 |
| NSRQ | 57935 | NSRQ | 58061 | NSRQ | 58182 | NSRQ | 58311 | NSRQ | 58461 | NSRQ | 58582 |
| NSRQ | 57936 | NSRQ | 58062 | NSRQ | 58189 | NSRQ | 58312 | NSRQ | 58462 | NSRQ | 58586 |
| NSRQ | 57939 | NSRQ | 58064 | NSRQ | 58192 | NSRQ | 58313 | NSRQ | 58464 | NSRQ | 58587 |
| NSRQ | 57943 | NSRQ | 58066 | NSRQ | 58193 | NSRQ | 58316 | NSRQ | 58465 | NSRQ | 58591 |
| NSRQ | 57947 | NSRQ | 58067 | NSRQ | 58194 | NSRQ | 58319 | NSRQ | 58467 | NSRQ | 58593 |
| NSRQ | 57948 | NSRQ | 58070 | NSRQ | 58195 | NSRQ | 58322 | NSRQ | 58468 | NSRQ | 58594 |
| NSRQ | 57950 | NSRQ | 58073 | NSRQ | 58196 | NSRQ | 58325 | NSRQ | 58473 | NSRQ | 58596 |
| NSRQ | 57951 | NSRQ | 58076 | NSRQ | 58198 | NSRQ | 58326 | NSRQ | 58476 | NSRQ | 58602 |
| NSRQ | 57952 | NSRQ | 58083 | NSRQ | 58200 | NSRQ | 58329 | NSRQ | 58477 | NSRQ | 58604 |
| NSRQ | 57954 | NSRQ | 58090 | NSRQ | 58203 | NSRQ | 58336 | NSRQ | 58480 | NSRQ | 58605 |
| NSRQ | 57956 | NSRQ | 58092 | NSRQ | 58205 | NSRQ | 58337 | NSRQ | 58481 | NSRQ | 58606 |
| NSRQ | 57957 | NSRQ | 58093 | NSRQ | 58207 | NSRQ | 58338 | NSRQ | 58483 | NSRQ | 58607 |
| NSRQ | 57958 | NSRQ | 58095 | NSRQ | 58216 | NSRQ | 58339 | NSRQ | 58484 | NSRQ | 58613 |
| NSRQ | 57959 | NSRQ | 58097 | NSRQ | 58218 | NSRQ | 58341 | NSRQ | 58486 | NSRQ | 58614 |
| NSRQ | 57962 | NSRQ | 58098 | NSRQ | 58222 | NSRQ | 58344 | NSRQ | 58491 | NSRQ | 58617 |
| NSRQ | 57969 | NSRQ | 58100 | NSRQ | 58225 | NSRQ | 58345 | NSRQ | 58492 | NSRQ | 58620 |
| NSRQ | 57973 | NSRQ | 58101 | NSRQ | 58232 | NSRQ | 58346 | NSRQ | 58498 | NSRQ | 58622 |
| NSRQ | 57978 | NSRQ | 58102 | NSRQ | 58234 | NSRQ | 58347 | NSRQ | 58499 | NSRQ | 58623 |
| NSRQ | 57981 | NSRQ | 58103 | NSRQ | 58235 | NSRQ | 58350 | NSRQ | 58500 | NSRQ | 58627 |
| NSRQ | 57982 | NSRQ | 58109 | NSRQ | 58236 | NSRQ | 58351 | NSRQ | 58502 | NSRQ | 58629 |
| NSRQ | 57983 | NSRQ | 58110 | NSRQ | 58241 | NSRQ | 58353 | NSRQ | 58507 | NSRQ | 58630 |
| NSRQ | 57984 | NSRQ | 58111 | NSRQ | 58242 | NSRQ | 58354 | NSRQ | 58509 | NSRQ | 58632 |
| NSRQ | 57985 | NSRQ | 58112 | NSRQ | 58243 | NSRQ | 58356 | NSRQ | 58510 | NSRQ | 58634 |
| NSRQ | 57987 | NSRQ | 58113 | NSRQ | 58245 | NSRQ | 58360 | NSRQ | 58512 | NSRQ | 58635 |
| NSRQ | 57988 | NSRQ | 58114 | NSRQ | 58246 | NSRQ | 58362 | NSRQ | 58513 | NSRQ | 58636 |
| NSRQ | 57989 | NSRQ | 58115 | NSRQ | 58247 | NSRQ | 58373 | NSRQ | 58515 | NSRQ | 58637 |
| NSRQ | 57990 | NSRQ | 58118 | NSRQ | 58251 | NSRQ | 58381 | NSRQ | 58520 | NSRQ | 58638 |
| NSRQ | 57994 | NSRQ | 58119 | NSRQ | 58252 | NSRQ | 58389 | NSRQ | 58522 | NSRQ | 58639 |
| NSRQ | 57995 | NSRQ | 58121 | NSRQ | 58257 | NSRQ | 58394 | NSRQ | 58525 | NSRQ | 58640 |
| NSRQ | 57997 | NSRQ | 58122 | NSRQ | 58258 | NSRQ | 58395 | NSRQ | 58528 | NSRQ | 58641 |
| NSRQ | 58000 | NSRQ | 58123 | NSRQ | 58259 | NSRQ | 58399 | NSRQ | 58547 | NSRQ | 58642 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSRQ | 58645 | NSRQ | 58746 | NSRQ | 58875 | NSRQ | 58987 | NSRQ | 59122 | NSRQ | 59246 |
| NSRQ | 58648 | NSRQ | 58749 | NSRQ | 58876 | NSRQ | 58988 | NSRQ | 59128 | NSRQ | 59250 |
| NSRQ | 58652 | NSRQ | 58756 | NSRQ | 58878 | NSRQ | 58989 | NSRQ | 59129 | NSRQ | 59252 |
| NSRQ | 58653 | NSRQ | 58759 | NSRQ | 58879 | NSRQ | 58990 | NSRQ | 59130 | NSRQ | 59255 |
| NSRQ | 58658 | NSRQ | 58763 | NSRQ | 58881 | NSRQ | 58996 | NSRQ | 59131 | NSRQ | 59262 |
| NSRQ | 58659 | NSRQ | 58764 | NSRQ | 58884 | NSRQ | 58997 | NSRQ | 59132 | NSRQ | 59264 |
| NSRQ | 58660 | NSRQ | 58766 | NSRQ | 58888 | NSRQ | 58998 | NSRQ | 59133 | NSRQ | 59266 |
| NSRQ | 58661 | NSRQ | 58767 | NSRQ | 58889 | NSRQ | 59001 | NSRQ | 59135 | NSRQ | 59267 |
| NSRQ | 58662 | NSRQ | 58769 | NSRQ | 58890 | NSRQ | 59003 | NSRQ | 59136 | NSRQ | 59270 |
| NSRQ | 58663 | NSRQ | 58771 | NSRQ | 58891 | NSRQ | 59004 | NSRQ | 59137 | NSRQ | 59272 |
| NSRQ | 58664 | NSRQ | 58772 | NSRQ | 58892 | NSRQ | 59006 | NSRQ | 59138 | NSRQ | 59273 |
| NSRQ | 58665 | NSRQ | 58773 | NSRQ | 58893 | NSRQ | 59009 | NSRQ | 59141 | NSRQ | 59275 |
| NSRQ | 58666 | NSRQ | 58774 | NSRQ | 58895 | NSRQ | 59010 | NSRQ | 59143 | NSRQ | 59276 |
| NSRQ | 58667 | NSRQ | 58775 | NSRQ | 58896 | NSRQ | 59012 | NSRQ | 59145 | NSRQ | 59281 |
| NSRQ | 58668 | NSRQ | 58777 | NSRQ | 58898 | NSRQ | 59013 | NSRQ | 59151 | NSRQ | 59284 |
| NSRQ | 58669 | NSRQ | 58779 | NSRQ | 58899 | NSRQ | 59014 | NSRQ | 59152 | NSRQ | 59285 |
| NSRQ | 58672 | NSRQ | 58780 | NSRQ | 58903 | NSRQ | 59017 | NSRQ | 59154 | NSRQ | 59288 |
| NSRQ | 58674 | NSRQ | 58782 | NSRQ | 58905 | NSRQ | 59019 | NSRQ | 59158 | NSRQ | 59289 |
| NSRQ | 58678 | NSRQ | 58785 | NSRQ | 58908 | NSRQ | 59020 | NSRQ | 59159 | NSRQ | 59290 |
| NSRQ | 58680 | NSRQ | 58792 | NSRQ | 58909 | NSRQ | 59021 | NSRQ | 59162 | NSRQ | 59292 |
| NSRQ | 58681 | NSRQ | 58793 | NSRQ | 58910 | NSRQ | 59022 | NSRQ | 59164 | NSRQ | 59295 |
| NSRQ | 58682 | NSRQ | 58794 | NSRQ | 58917 | NSRQ | 59023 | NSRQ | 59167 | NSRQ | 59296 |
| NSRQ | 58684 | NSRQ | 58799 | NSRQ | 58918 | NSRQ | 59026 | NSRQ | 59170 | NSRQ | 59302 |
| NSRQ | 58685 | NSRQ | 58800 | NSRQ | 58919 | NSRQ | 59030 | NSRQ | 59174 | NSRQ | 59320 |
| NSRQ | 58686 | NSRQ | 58802 | NSRQ | 58921 | NSRQ | 59031 | NSRQ | 59180 | NSRQ | 59321 |
| NSRQ | 58688 | NSRQ | 58804 | NSRQ | 58922 | NSRQ | 59032 | NSRQ | 59183 | NSRQ | 59324 |
| NSRQ | 58689 | NSRQ | 58805 | NSRQ | 58923 | NSRQ | 59033 | NSRQ | 59188 | NSRQ | 59325 |
| NSRQ | 58690 | NSRQ | 58806 | NSRQ | 58924 | NSRQ | 59042 | NSRQ | 59189 | NSRQ | 59328 |
| NSRQ | 58691 | NSRQ | 58807 | NSRQ | 58925 | NSRQ | 59051 | NSRQ | 59191 | NSRQ | 59329 |
| NSRQ | 58692 | NSRQ | 58814 | NSRQ | 58927 | NSRQ | 59055 | NSRQ | 59195 | NSRQ | 59330 |
| NSRQ | 58693 | NSRQ | 58817 | NSRQ | 58930 | NSRQ | 59056 | NSRQ | 59198 | NSRQ | 59332 |
| NSRQ | 58696 | NSRQ | 58818 | NSRQ | 58931 | NSRQ | 59058 | NSRQ | 59199 | NSRQ | 59333 |
| NSRQ | 58702 | NSRQ | 58819 | NSRQ | 58936 | NSRQ | 59059 | NSRQ | 59201 | NSRQ | 59344 |
| NSRQ | 58703 | NSRQ | 58820 | NSRQ | 58938 | NSRQ | 59062 | NSRQ | 59202 | NSRQ | 59346 |
| NSRQ | 58706 | NSRQ | 58821 | NSRQ | 58940 | NSRQ | 59063 | NSRQ | 59203 | NSRQ | 59355 |
| NSRQ | 58714 | NSRQ | 58823 | NSRQ | 58942 | NSRQ | 59064 | NSRQ | 59206 | NSRQ | 59358 |
| NSRQ | 58717 | NSRQ | 58826 | NSRQ | 58943 | NSRQ | 59065 | NSRQ | 59207 | NSRQ | 59363 |
| NSRQ | 58718 | NSRQ | 58827 | NSRQ | 58947 | NSRQ | 59068 | NSRQ | 59210 | NSRQ | 59364 |
| NSRQ | 58722 | NSRQ | 58829 | NSRQ | 58948 | NSRQ | 59070 | NSRQ | 59211 | NSRQ | 59365 |
| NSRQ | 58726 | NSRQ | 58830 | NSRQ | 58951 | NSRQ | 59071 | NSRQ | 59212 | NSRQ | 59366 |
| NSRQ | 58728 | NSRQ | 58835 | NSRQ | 58955 | NSRQ | 59082 | NSRQ | 59218 | NSRQ | 59367 |
| NSRQ | 58730 | NSRQ | 58837 | NSRQ | 58957 | NSRQ | 59083 | NSRQ | 59219 | NSRQ | 59379 |
| NSRQ | 58731 | NSRQ | 58838 | NSRQ | 58960 | NSRQ | 59084 | NSRQ | 59221 | NSRQ | 59381 |
| NSRQ | 58733 | NSRQ | 58839 | NSRQ | 58964 | NSRQ | 59089 | NSRQ | 59225 | NSRQ | 59385 |
| NSRQ | 58734 | NSRQ | 58842 | NSRQ | 58966 | NSRQ | 59090 | NSRQ | 59226 | NSRQ | 59386 |
| NSRQ | 58735 | NSRQ | 58848 | NSRQ | 58968 | NSRQ | 59093 | NSRQ | 59233 | NSRQ | 59395 |
| NSRQ | 58738 | NSRQ | 58850 | NSRQ | 58973 | NSRQ | 59099 | NSRQ | 59238 | NSRQ | 59396 |
| NSRQ | 58740 | NSRQ | 58851 | NSRQ | 58974 | NSRQ | 59106 | NSRQ | 59241 | NSRQ | 59397 |
| NSRQ | 58742 | NSRQ | 58856 | NSRQ | 58975 | NSRQ | 59109 | NSRQ | 59242 | NSRQ | 59398 |
| NSRQ | 58743 | NSRQ | 58860 | NSRQ | 58982 | NSRQ | 59111 | NSRQ | 59243 | NSRQ | 59399 |
| NSRQ | 58744 | NSRQ | 58864 | NSRQ | 58983 | NSRQ | 59116 | NSRQ | 59244 | NSRQ | 59400 |
| NSRQ | 58745 | NSRQ | 58872 | NSRQ | 58984 | NSRQ | 59118 | NSRQ | 59245 | NSRQ | 59402 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSRQ | 59403 | NSRQ | 59575 | NSRQ | 59726 | NSRQ | 59879 | NSRQ | 60005 | NSRQ | 60089 |
| NSRQ | 59405 | NSRQ | 59578 | NSRQ | 59727 | NSRQ | 59880 | NSRQ | 60006 | NSRQ | 60092 |
| NSRQ | 59407 | NSRQ | 59579 | NSRQ | 59731 | NSRQ | 59883 | NSRQ | 60008 | NSRQ | 60093 |
| NSRQ | 59412 | NSRQ | 59580 | NSRQ | 59734 | NSRQ | 59884 | NSRQ | 60009 | NSRQ | 60097 |
| NSRQ | 59416 | NSRQ | 59583 | NSRQ | 59735 | NSRQ | 59894 | NSRQ | 60010 | NSRQ | 60099 |
| NSRQ | 59418 | NSRQ | 59586 | NSRQ | 59736 | NSRQ | 59895 | NSRQ | 60012 | NSRQ | 60102 |
| NSRQ | 59419 | NSRQ | 59587 | NSRQ | 59742 | NSRQ | 59896 | NSRQ | 60014 | NSRQ | 60103 |
| NSRQ | 59420 | NSRQ | 59588 | NSRQ | 59744 | NSRQ | 59897 | NSRQ | 60015 | NSRQ | 60104 |
| NSRQ | 59421 | NSRQ | 59589 | NSRQ | 59747 | NSRQ | 59899 | NSRQ | 60019 | NSRQ | 60105 |
| NSRQ | 59422 | NSRQ | 59590 | NSRQ | 59748 | NSRQ | 59906 | NSRQ | 60020 | NSRQ | 60106 |
| NSRQ | 59425 | NSRQ | 59591 | NSRQ | 59749 | NSRQ | 59907 | NSRQ | 60021 | NSRQ | 60107 |
| NSRQ | 59427 | NSRQ | 59596 | NSRQ | 59751 | NSRQ | 59912 | NSRQ | 60022 | NSRQ | 60109 |
| NSRQ | 59432 | NSRQ | 59598 | NSRQ | 59754 | NSRQ | 59922 | NSRQ | 60023 | NSRQ | 60110 |
| NSRQ | 59433 | NSRQ | 59602 | NSRQ | 59755 | NSRQ | 59925 | NSRQ | 60024 | NSRQ | 60111 |
| NSRQ | 59434 | NSRQ | 59609 | NSRQ | 59757 | NSRQ | 59926 | NSRQ | 60025 | NSRQ | 60112 |
| NSRQ | 59435 | NSRQ | 59615 | NSRQ | 59760 | NSRQ | 59927 | NSRQ | 60026 | NSRQ | 60113 |
| NSRQ | 59442 | NSRQ | 59616 | NSRQ | 59765 | NSRQ | 59928 | NSRQ | 60029 | NSRQ | 60114 |
| NSRQ | 59443 | NSRQ | 59619 | NSRQ | 59772 | NSRQ | 59929 | NSRQ | 60030 | NSRQ | 60119 |
| NSRQ | 59445 | NSRQ | 59620 | NSRQ | 59775 | NSRQ | 59930 | NSRQ | 60031 | NSRQ | 60120 |
| NSRQ | 59447 | NSRQ | 59623 | NSRQ | 59786 | NSRQ | 59931 | NSRQ | 60033 | NSRQ | 60123 |
| NSRQ | 59450 | NSRQ | 59625 | NSRQ | 59793 | NSRQ | 59932 | NSRQ | 60034 | NSRQ | 60125 |
| NSRQ | 59456 | NSRQ | 59634 | NSRQ | 59794 | NSRQ | 59933 | NSRQ | 60037 | NSRQ | 60127 |
| NSRQ | 59460 | NSRQ | 59638 | NSRQ | 59796 | NSRQ | 59935 | NSRQ | 60041 | NSRQ | 60128 |
| NSRQ | 59464 | NSRQ | 59639 | NSRQ | 59800 | NSRQ | 59937 | NSRQ | 60042 | NSRQ | 60130 |
| NSRQ | 59470 | NSRQ | 59640 | NSRQ | 59803 | NSRQ | 59938 | NSRQ | 60043 | NSRQ | 60131 |
| NSRQ | 59471 | NSRQ | 59642 | NSRQ | 59804 | NSRQ | 59940 | NSRQ | 60044 | NSRQ | 60134 |
| NSRQ | 59473 | NSRQ | 59646 | NSRQ | 59805 | NSRQ | 59943 | NSRQ | 60046 | NSRQ | 73686 |
| NSRQ | 59474 | NSRQ | 59660 | NSRQ | 59807 | NSRQ | 59947 | NSRQ | 60048 | NSRQ | 75233 |
| NSRQ | 59475 | NSRQ | 59661 | NSRQ | 59809 | NSRQ | 59950 | NSRQ | 60051 | NSRQ | 78717 |
| NSRQ | 59477 | NSRQ | 59667 | NSRQ | 59811 | NSRQ | 59953 | NSRQ | 60052 | NSRQ | 94030 |
| NSRQ | 59487 | NSRQ | 59672 | NSRQ | 59814 | NSRQ | 59958 | NSRQ | 60053 | NSRQ | 94036 |
| NSRQ | 59496 | NSRQ | 59679 | NSRQ | 59818 | NSRQ | 59964 | NSRQ | 60054 | NSRQ | 97371 |
| NSRQ | 59503 | NSRQ | 59682 | NSRQ | 59822 | NSRQ | 59965 | NSRQ | 60055 | NSRT | 89 |
| NSRQ | 59510 | NSRQ | 59686 | NSRQ | 59827 | NSRQ | 59966 | NSRQ | 60056 | NSRT | 223 |
| NSRQ | 59511 | NSRQ | 59688 | NSRQ | 59829 | NSRQ | 59967 | NSRQ | 60059 | NSRT | 256 |
| NSRQ | 59512 | NSRQ | 59689 | NSRQ | 59833 | NSRQ | 59968 | NSRQ | 60064 | NSRT | 306 |
| NSRQ | 59521 | NSRQ | 59693 | NSRQ | 59846 | NSRQ | 59969 | NSRQ | 60065 | NSRT | 308 |
| NSRQ | 59525 | NSRQ | 59694 | NSRQ | 59852 | NSRQ | 59970 | NSRQ | 60066 | NSRT | 309 |
| NSRQ | 59530 | NSRQ | 59696 | NSRQ | 59854 | NSRQ | 59974 | NSRQ | 60067 | NSRT | 311 |
| NSRQ | 59532 | NSRQ | 59697 | NSRQ | 59856 | NSRQ | 59975 | NSRQ | 60068 | NSRT | 312 |
| NSRQ | 59533 | NSRQ | 59699 | NSRQ | 59858 | NSRQ | 59977 | NSRQ | 60069 | NSRT | 313 |
| NSRQ | 59544 | NSRQ | 59700 | NSRQ | 59860 | NSRQ | 59978 | NSRQ | 60070 | NSRT | 314 |
| NSRQ | 59550 | NSRQ | 59701 | NSRQ | 59862 | NSRQ | 59982 | NSRQ | 60072 | NSRT | 315 |
| NSRQ | 59551 | NSRQ | 59702 | NSRQ | 59863 | NSRQ | 59983 | NSRQ | 60073 | NSRT | 316 |
| NSRQ | 59553 | NSRQ | 59705 | NSRQ | 59864 | NSRQ | 59984 | NSRQ | 60077 | NSRT | 317 |
| NSRQ | 59554 | NSRQ | 59711 | NSRQ | 59865 | NSRQ | 59988 | NSRQ | 60078 | NSRT | 318 |
| NSRQ | 59561 | NSRQ | 59712 | NSRQ | 59868 | NSRQ | 59994 | NSRQ | 60081 | NSRT | 319 |
| NSRQ | 59564 | NSRQ | 59714 | NSRQ | 59870 | NSRQ | 59996 | NSRQ | 60082 | NSRT | 320 |
| NSRQ | 59565 | NSRQ | 59718 | NSRQ | 59871 | NSRQ | 59997 | NSRQ | 60084 | NSRT | 321 |
| NSRQ | 59570 | NSRQ | 59720 | NSRQ | 59873 | NSRQ | 59999 | NSRQ | 60085 | NSRT | 322 |
| NSRQ | 59573 | NSRQ | 59723 | NSRQ | 59875 | NSRQ | 60002 | NSRQ | 60086 | NSRT | 323 |
| NSRQ | 59574 | NSRQ | 59725 | NSRQ | 59878 | NSRQ | 60004 | NSRQ | 60088 | NSRT | 325 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSRT | 328 | NSSC | 80083 | NSSC | 80176 | NSSC | 80276 | NSSC | 80344 | NSSC | 80424 |
| NSRT | 331 | NSSC | 80084 | NSSC | 80177 | NSSC | 80277 | NSSC | 80345 | NSSC | 80425 |
| NSRT | 15724 | NSSC | 80086 | NSSC | 80178 | NSSC | 80279 | NSSC | 80346 | NSSC | 80426 |
| NSSC | 33337 | NSSC | 80087 | NSSC | 80179 | NSSC | 80280 | NSSC | 80347 | NSSC | 80427 |
| NSSC | 53278 | NSSC | 80090 | NSSC | 80180 | NSSC | 80281 | NSSC | 80348 | NSSC | 80429 |
| NSSC | 53409 | NSSC | 80092 | NSSC | 80181 | NSSC | 80282 | NSSC | 80350 | NSSC | 80430 |
| NSSC | 53699 | NSSC | 80093 | NSSC | 80182 | NSSC | 80283 | NSSC | 80351 | NSSC | 80431 |
| NSSC | 53702 | NSSC | 80094 | NSSC | 80183 | NSSC | 80287 | NSSC | 80352 | NSSC | 80434 |
| NSSC | 53705 | NSSC | 80096 | NSSC | 80184 | NSSC | 80289 | NSSC | 80353 | NSSC | 80436 |
| NSSC | 53707 | NSSC | 80097 | NSSC | 80185 | NSSC | 80290 | NSSC | 80354 | NSSC | 80438 |
| NSSC | 53713 | NSSC | 80098 | NSSC | 80189 | NSSC | 80291 | NSSC | 80356 | NSSC | 80440 |
| NSSC | 54352 | NSSC | 80102 | NSSC | 80194 | NSSC | 80292 | NSSC | 80358 | NSSC | 82157 |
| NSSC | 54535 | NSSC | 80104 | NSSC | 80195 | NSSC | 80293 | NSSC | 80361 | NSSQ | 3298 |
| NSSC | 54751 | NSSC | 80105 | NSSC | 80197 | NSSC | 80296 | NSSC | 80362 | NSSQ | 9736 |
| NSSC | 54828 | NSSC | 80106 | NSSC | 80198 | NSSC | 80297 | NSSC | 80364 | NSSQ | 10975 |
| NSSC | 55599 | NSSC | 80107 | NSSC | 80218 | NSSC | 80298 | NSSC | 80366 | NSSQ | 12005 |
| NSSC | 55602 | NSSC | 80109 | NSSC | 80220 | NSSC | 80300 | NSSC | 80367 | NSSQ | 12355 |
| NSSC | 55820 | NSSC | 80111 | NSSC | 80222 | NSSC | 80301 | NSSC | 80369 | NSSQ | 13088 |
| NSSC | 55967 | NSSC | 80113 | NSSC | 80223 | NSSC | 80302 | NSSC | 80370 | NSSQ | 17562 |
| NSSC | 57392 | NSSC | 80114 | NSSC | 80225 | NSSC | 80303 | NSSC | 80372 | NSSQ | 30045 |
| NSSC | 57609 | NSSC | 80115 | NSSC | 80227 | NSSC | 80304 | NSSC | 80373 | NSSQ | 30073 |
| NSSC | 58079 | NSSC | 80119 | NSSC | 80231 | NSSC | 80305 | NSSC | 80374 | NSSQ | 30102 |
| NSSC | 80012 | NSSC | 80120 | NSSC | 80233 | NSSC | 80306 | NSSC | 80375 | NSSQ | 30111 |
| NSSC | 80015 | NSSC | 80121 | NSSC | 80235 | NSSC | 80307 | NSSC | 80376 | NSSQ | 30126 |
| NSSC | 80017 | NSSC | 80123 | NSSC | 80236 | NSSC | 80308 | NSSC | 80378 | NSSQ | 30166 |
| NSSC | 80018 | NSSC | 80125 | NSSC | 80238 | NSSC | 80312 | NSSC | 80381 | NSSQ | 30170 |
| NSSC | 80024 | NSSC | 80126 | NSSC | 80239 | NSSC | 80314 | NSSC | 80383 | NSSQ | 30206 |
| NSSC | 80028 | NSSC | 80129 | NSSC | 80241 | NSSC | 80316 | NSSC | 80385 | NSSQ | 30209 |
| NSSC | 80030 | NSSC | 80131 | NSSC | 80242 | NSSC | 80317 | NSSC | 80386 | NSSQ | 30215 |
| NSSC | 80032 | NSSC | 80136 | NSSC | 80244 | NSSC | 80320 | NSSC | 80388 | NSSQ | 30373 |
| NSSC | 80035 | NSSC | 80137 | NSSC | 80245 | NSSC | 80321 | NSSC | 80389 | NSSQ | 30381 |
| NSSC | 80037 | NSSC | 80139 | NSSC | 80246 | NSSC | 80322 | NSSC | 80394 | NSSQ | 30384 |
| NSSC | 80038 | NSSC | 80140 | NSSC | 80247 | NSSC | 80323 | NSSC | 80395 | NSSQ | 30429 |
| NSSC | 80039 | NSSC | 80142 | NSSC | 80248 | NSSC | 80324 | NSSC | 80396 | NSSQ | 30447 |
| NSSC | 80047 | NSSC | 80143 | NSSC | 80249 | NSSC | 80325 | NSSC | 80399 | NSSQ | 30450 |
| NSSC | 80050 | NSSC | 80144 | NSSC | 80250 | NSSC | 80326 | NSSC | 80400 | NSSQ | 30507 |
| NSSC | 80052 | NSSC | 80150 | NSSC | 80251 | NSSC | 80327 | NSSC | 80401 | NSSQ | 30522 |
| NSSC | 80054 | NSSC | 80151 | NSSC | 80253 | NSSC | 80328 | NSSC | 80402 | NSSQ | 30549 |
| NSSC | 80055 | NSSC | 80153 | NSSC | 80254 | NSSC | 80329 | NSSC | 80404 | NSSQ | 30578 |
| NSSC | 80056 | NSSC | 80156 | NSSC | 80255 | NSSC | 80330 | NSSC | 80405 | NSSQ | 30693 |
| NSSC | 80059 | NSSC | 80157 | NSSC | 80256 | NSSC | 80331 | NSSC | 80411 | NSSQ | 30711 |
| NSSC | 80063 | NSSC | 80159 | NSSC | 80257 | NSSC | 80332 | NSSC | 80412 | NSSQ | 30717 |
| NSSC | 80064 | NSSC | 80160 | NSSC | 80259 | NSSC | 80333 | NSSC | 80413 | NSSQ | 30743 |
| NSSC | 80065 | NSSC | 80161 | NSSC | 80260 | NSSC | 80334 | NSSC | 80415 | NSSQ | 30786 |
| NSSC | 80066 | NSSC | 80162 | NSSC | 80261 | NSSC | 80335 | NSSC | 80416 | NSSQ | 30804 |
| NSSC | 80067 | NSSC | 80163 | NSSC | 80262 | NSSC | 80336 | NSSC | 80417 | NSSQ | 30817 |
| NSSC | 80069 | NSSC | 80165 | NSSC | 80264 | NSSC | 80338 | NSSC | 80418 | NSSQ | 30836 |
| NSSC | 80071 | NSSC | 80168 | NSSC | 80265 | NSSC | 80339 | NSSC | 80419 | NSSQ | 30844 |
| NSSC | 80074 | NSSC | 80170 | NSSC | 80267 | NSSC | 80340 | NSSC | 80420 | NSSQ | 30975 |
| NSSC | 80075 | NSSC | 80173 | NSSC | 80268 | NSSC | 80341 | NSSC | 80421 | NSSQ | 30985 |
| NSSC | 80079 | NSSC | 80174 | NSSC | 80270 | NSSC | 80342 | NSSC | 80422 | NSSQ | 31031 |
| NSSC | 80082 | NSSC | 80175 | NSSC | 80275 | NSSC | 80343 | NSSC | 80423 | NSSQ | 31073 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSSQ | 31075 | NSSQ | 32590 | NSSQ | 32771 | NSSQ | 32918 | NSSQ | 33080 | NSSQ | 33286 |
| NSSQ | 31076 | NSSQ | 32591 | NSSQ | 32772 | NSSQ | 32925 | NSSQ | 33081 | NSSQ | 33291 |
| NSSQ | 31115 | NSSQ | 32593 | NSSQ | 32778 | NSSQ | 32928 | NSSQ | 33089 | NSSQ | 33292 |
| NSSQ | 31122 | NSSQ | 32594 | NSSQ | 32786 | NSSQ | 32931 | NSSQ | 33095 | NSSQ | 33296 |
| NSSQ | 31151 | NSSQ | 32615 | NSSQ | 32787 | NSSQ | 32947 | NSSQ | 33101 | NSSQ | 33297 |
| NSSQ | 31152 | NSSQ | 32617 | NSSQ | 32795 | NSSQ | 32949 | NSSQ | 33105 | NSSQ | 33298 |
| NSSQ | 31205 | NSSQ | 32620 | NSSQ | 32798 | NSSQ | 32950 | NSSQ | 33151 | NSSQ | 33299 |
| NSSQ | 31209 | NSSQ | 32622 | NSSQ | 32802 | NSSQ | 32954 | NSSQ | 33154 | NSSQ | 33302 |
| NSSQ | 31279 | NSSQ | 32623 | NSSQ | 32804 | NSSQ | 32955 | NSSQ | 33155 | NSSQ | 33312 |
| NSSQ | 31280 | NSSQ | 32624 | NSSQ | 32805 | NSSQ | 32956 | NSSQ | 33156 | NSSQ | 33319 |
| NSSQ | 31293 | NSSQ | 32630 | NSSQ | 32809 | NSSQ | 32962 | NSSQ | 33158 | NSSQ | 33320 |
| NSSQ | 31294 | NSSQ | 32633 | NSSQ | 32811 | NSSQ | 32963 | NSSQ | 33159 | NSSQ | 33321 |
| NSSQ | 31310 | NSSQ | 32634 | NSSQ | 32812 | NSSQ | 32968 | NSSQ | 33161 | NSSQ | 33322 |
| NSSQ | 31321 | NSSQ | 32643 | NSSQ | 32814 | NSSQ | 32970 | NSSQ | 33162 | NSSQ | 33323 |
| NSSQ | 31327 | NSSQ | 32645 | NSSQ | 32816 | NSSQ | 32973 | NSSQ | 33164 | NSSQ | 33326 |
| NSSQ | 31330 | NSSQ | 32647 | NSSQ | 32818 | NSSQ | 32974 | NSSQ | 33167 | NSSQ | 33331 |
| NSSQ | 31331 | NSSQ | 32648 | NSSQ | 32819 | NSSQ | 32980 | NSSQ | 33172 | NSSQ | 33333 |
| NSSQ | 31391 | NSSQ | 32653 | NSSQ | 32822 | NSSQ | 32981 | NSSQ | 33175 | NSSQ | 33338 |
| NSSQ | 31437 | NSSQ | 32656 | NSSQ | 32824 | NSSQ | 32982 | NSSQ | 33176 | NSSQ | 33339 |
| NSSQ | 31451 | NSSQ | 32657 | NSSQ | 32825 | NSSQ | 32986 | NSSQ | 33184 | NSSQ | 33342 |
| NSSQ | 31532 | NSSQ | 32663 | NSSQ | 32826 | NSSQ | 32990 | NSSQ | 33191 | NSSQ | 33343 |
| NSSQ | 31564 | NSSQ | 32664 | NSSQ | 32828 | NSSQ | 32993 | NSSQ | 33199 | NSSQ | 33344 |
| NSSQ | 31621 | NSSQ | 32667 | NSSQ | 32831 | NSSQ | 32994 | NSSQ | 33200 | NSSQ | 33345 |
| NSSQ | 31773 | NSSQ | 32674 | NSSQ | 32834 | NSSQ | 32998 | NSSQ | 33206 | NSSQ | 33349 |
| NSSQ | 31788 | NSSQ | 32675 | NSSQ | 32836 | NSSQ | 32999 | NSSQ | 33210 | NSSQ | 33352 |
| NSSQ | 31910 | NSSQ | 32676 | NSSQ | 32839 | NSSQ | 33003 | NSSQ | 33212 | NSSQ | 33354 |
| NSSQ | 31919 | NSSQ | 32679 | NSSQ | 32841 | NSSQ | 33005 | NSSQ | 33217 | NSSQ | 33355 |
| NSSQ | 31943 | NSSQ | 32681 | NSSQ | 32843 | NSSQ | 33006 | NSSQ | 33220 | NSSQ | 33356 |
| NSSQ | 31957 | NSSQ | 32683 | NSSQ | 32847 | NSSQ | 33015 | NSSQ | 33221 | NSSQ | 33359 |
| NSSQ | 31969 | NSSQ | 32684 | NSSQ | 32848 | NSSQ | 33017 | NSSQ | 33223 | NSSQ | 33360 |
| NSSQ | 32320 | NSSQ | 32686 | NSSQ | 32849 | NSSQ | 33022 | NSSQ | 33229 | NSSQ | 33361 |
| NSSQ | 32325 | NSSQ | 32688 | NSSQ | 32850 | NSSQ | 33026 | NSSQ | 33230 | NSSQ | 33362 |
| NSSQ | 32329 | NSSQ | 32690 | NSSQ | 32854 | NSSQ | 33028 | NSSQ | 33231 | NSSQ | 33364 |
| NSSQ | 32332 | NSSQ | 32695 | NSSQ | 32859 | NSSQ | 33029 | NSSQ | 33234 | NSSQ | 33369 |
| NSSQ | 32349 | NSSQ | 32699 | NSSQ | 32860 | NSSQ | 33032 | NSSQ | 33236 | NSSQ | 33370 |
| NSSQ | 32374 | NSSQ | 32712 | NSSQ | 32865 | NSSQ | 33036 | NSSQ | 33239 | NSSQ | 33371 |
| NSSQ | 32456 | NSSQ | 32715 | NSSQ | 32867 | NSSQ | 33037 | NSSQ | 33242 | NSSQ | 33372 |
| NSSQ | 32493 | NSSQ | 32723 | NSSQ | 32869 | NSSQ | 33038 | NSSQ | 33245 | NSSQ | 33373 |
| NSSQ | 32501 | NSSQ | 32727 | NSSQ | 32871 | NSSQ | 33040 | NSSQ | 33247 | NSSQ | 33376 |
| NSSQ | 32530 | NSSQ | 32731 | NSSQ | 32880 | NSSQ | 33044 | NSSQ | 33248 | NSSQ | 33377 |
| NSSQ | 32531 | NSSQ | 32742 | NSSQ | 32883 | NSSQ | 33048 | NSSQ | 33249 | NSSQ | 33380 |
| NSSQ | 32540 | NSSQ | 32743 | NSSQ | 32884 | NSSQ | 33051 | NSSQ | 33250 | NSSQ | 33382 |
| NSSQ | 32541 | NSSQ | 32744 | NSSQ | 32893 | NSSQ | 33052 | NSSQ | 33252 | NSSQ | 33384 |
| NSSQ | 32551 | NSSQ | 32745 | NSSQ | 32900 | NSSQ | 33053 | NSSQ | 33255 | NSSQ | 33391 |
| NSSQ | 32553 | NSSQ | 32754 | NSSQ | 32902 | NSSQ | 33055 | NSSQ | 33256 | NSSQ | 33392 |
| NSSQ | 32561 | NSSQ | 32755 | NSSQ | 32904 | NSSQ | 33059 | NSSQ | 33260 | NSSQ | 33396 |
| NSSQ | 32567 | NSSQ | 32756 | NSSQ | 32905 | NSSQ | 33060 | NSSQ | 33262 | NSSQ | 33406 |
| NSSQ | 32572 | NSSQ | 32758 | NSSQ | 32906 | NSSQ | 33063 | NSSQ | 33264 | NSSQ | 33409 |
| NSSQ | 32574 | NSSQ | 32760 | NSSQ | 32909 | NSSQ | 33064 | NSSQ | 33267 | NSSQ | 33410 |
| NSSQ | 32578 | NSSQ | 32764 | NSSQ | 32913 | NSSQ | 33065 | NSSQ | 33271 | NSSQ | 33417 |
| NSSQ | 32582 | NSSQ | 32765 | NSSQ | 32916 | NSSQ | 33067 | NSSQ | 33275 | NSSQ | 33418 |
| NSSQ | 32586 | NSSQ | 32769 | NSSQ | 32917 | NSSQ | 33070 | NSSQ | 33279 | NSSQ | 33420 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NSSQ | 33423 | NSSQ | 33627 | NSSQ | 33771 | NSSQ | 65044 | NSSQ | 84905 | NSSQ | 88588 |
| NSSQ | 33427 | NSSQ | 33628 | NSSQ | 33773 | NSSQ | 79128 | NSSQ | 85021 | NSSQ | 88815 |
| NSSQ | 33431 | NSSQ | 33630 | NSSQ | 33780 | NSSQ | 80035 | NSSQ | 85025 | NSSQ | 88834 |
| NSSQ | 33444 | NSSQ | 33631 | NSSQ | 33781 | NSSQ | 80189 | NSSQ | 85089 | NSSQ | 88882 |
| NSSQ | 33445 | NSSQ | 33635 | NSSQ | 33784 | NSSQ | 80415 | NSSQ | 85090 | NSSQ | 89024 |
| NSSQ | 33447 | NSSQ | 33636 | NSSQ | 33786 | NSSQ | 80583 | NSSQ | 85101 | NSSQ | 89079 |
| NSSQ | 33448 | NSSQ | 33639 | NSSQ | 33787 | NSSQ | 80584 | NSSQ | 85176 | NSSQ | 89112 |
| NSSQ | 33449 | NSSQ | 33640 | NSSQ | 33788 | NSSQ | 80687 | NSSQ | 85177 | NSSQ | 89150 |
| NSSQ | 33453 | NSSQ | 33646 | NSSQ | 33789 | NSSQ | 80797 | NSSQ | 85301 | NSSQ | 89164 |
| NSSQ | 33454 | NSSQ | 33649 | NSSQ | 33793 | NSSQ | 81018 | NSSQ | 85379 | NSSQ | 89341 |
| NSSQ | 33457 | NSSQ | 33650 | NSSQ | 33794 | NSSQ | 81332 | NSSQ | 85573 | NSSQ | 89423 |
| NSSQ | 33460 | NSSQ | 33652 | NSSQ | 33795 | NSSQ | 81376 | NSSQ | 85605 | NSSQ | 89662 |
| NSSQ | 33463 | NSSQ | 33653 | NSSQ | 33805 | NSSQ | 81561 | NSSQ | 85640 | NSSQ | 89735 |
| NSSQ | 33465 | NSSQ | 33654 | NSSQ | 33812 | NSSQ | 81637 | NSSQ | 85785 | NSSQ | 89788 |
| NSSQ | 33466 | NSSQ | 33655 | NSSQ | 33815 | NSSQ | 81656 | NSSQ | 85799 | NSSQ | 89889 |
| NSSQ | 33472 | NSSQ | 33656 | NSSQ | 33817 | NSSQ | 81717 | NSSQ | 85821 | NSSQ | 90248 |
| NSSQ | 33476 | NSSQ | 33658 | NSSQ | 33819 | NSSQ | 81759 | NSSQ | 85826 | NSSQ | 90400 |
| NSSQ | 33494 | NSSQ | 33664 | NSSQ | 33820 | NSSQ | 81761 | NSSQ | 85863 | NSSQ | 90503 |
| NSSQ | 33495 | NSSQ | 33667 | NSSQ | 33822 | NSSQ | 81969 | NSSQ | 85965 | NSSQ | 90548 |
| NSSQ | 33497 | NSSQ | 33668 | NSSQ | 33826 | NSSQ | 81989 | NSSQ | 85991 | NSSQ | 90830 |
| NSSQ | 33499 | NSSQ | 33673 | NSSQ | 33827 | NSSQ | 82073 | NSSQ | 86071 | NSSQ | 90970 |
| NSSQ | 33507 | NSSQ | 33674 | NSSQ | 33831 | NSSQ | 82184 | NSSQ | 86143 | NSSQ | 91000 |
| NSSQ | 33513 | NSSQ | 33675 | NSSQ | 33832 | NSSQ | 82248 | NSSQ | 86154 | NSSQ | 91018 |
| NSSQ | 33514 | NSSQ | 33676 | NSSQ | 33834 | NSSQ | 82324 | NSSQ | 86219 | NSSQ | 91163 |
| NSSQ | 33516 | NSSQ | 33677 | NSSQ | 33835 | NSSQ | 82416 | NSSQ | 86301 | NSSQ | 91226 |
| NSSQ | 33518 | NSSQ | 33683 | NSSQ | 33836 | NSSQ | 82458 | NSSQ | 86321 | NSSQ | 91286 |
| NSSQ | 33520 | NSSQ | 33684 | NSSQ | 33837 | NSSQ | 82464 | NSSQ | 86379 | NSSQ | 91304 |
| NSSQ | 33523 | NSSQ | 33685 | NSSQ | 33845 | NSSQ | 82481 | NSSQ | 86380 | NSSQ | 91315 |
| NSSQ | 33524 | NSSQ | 33700 | NSSQ | 33847 | NSSQ | 82552 | NSSQ | 86390 | NSSQ | 91382 |
| NSSQ | 33525 | NSSQ | 33702 | NSSQ | 33849 | NSSQ | 82686 | NSSQ | 86400 | NSSQ | 91415 |
| NSSQ | 33533 | NSSQ | 33706 | NSSQ | 33850 | NSSQ | 82706 | NSSQ | 86496 | NSSQ | 91570 |
| NSSQ | 33541 | NSSQ | 33708 | NSSQ | 33853 | NSSQ | 82759 | NSSQ | 86548 | NSSQ | 91629 |
| NSSQ | 33543 | NSSQ | 33710 | NSSQ | 60630 | NSSQ | 82871 | NSSQ | 86564 | NSSQ | 91766 |
| NSSQ | 33544 | NSSQ | 33711 | NSSQ | 60789 | NSSQ | 82943 | NSSQ | 86692 | NSSQ | 91771 |
| NSSQ | 33547 | NSSQ | 33712 | NSSQ | 60805 | NSSQ | 83175 | NSSQ | 86924 | NSSQ | 91819 |
| NSSQ | 33551 | NSSQ | 33713 | NSSQ | 60823 | NSSQ | 83190 | NSSQ | 87298 | NSSQ | 91830 |
| NSSQ | 33557 | NSSQ | 33714 | NSSQ | 60903 | NSSQ | 83265 | NSSQ | 87361 | NSSQ | 91935 |
| NSSQ | 33562 | NSSQ | 33719 | NSSQ | 61173 | NSSQ | 83339 | NSSQ | 87689 | NSSQ | 91956 |
| NSSQ | 33576 | NSSQ | 33720 | NSSQ | 62715 | NSSQ | 83355 | NSSQ | 87722 | NSSQ | 91987 |
| NSSQ | 33581 | NSSQ | 33724 | NSSQ | 62881 | NSSQ | 83672 | NSSQ | 87766 | NSSQ | 92131 |
| NSSQ | 33582 | NSSQ | 33729 | NSSQ | 62912 | NSSQ | 83677 | NSSQ | 87944 | NSSQ | 92234 |
| NSSQ | 33584 | NSSQ | 33731 | NSSQ | 63143 | NSSQ | 83688 | NSSQ | 88023 | NSSQ | 92470 |
| NSSQ | 33585 | NSSQ | 33738 | NSSQ | 63202 | NSSQ | 83689 | NSSQ | 88048 | NSSQ | 92511 |
| NSSQ | 33587 | NSSQ | 33741 | NSSQ | 64193 | NSSQ | 83762 | NSSQ | 88055 | NSSQ | 92516 |
| NSSQ | 33591 | NSSQ | 33742 | NSSQ | 64292 | NSSQ | 84023 | NSSQ | 88076 | NSSQ | 92521 |
| NSSQ | 33592 | NSSQ | 33751 | NSSQ | 64419 | NSSQ | 84209 | NSSQ | 88169 | NSSQ | 92541 |
| NSSQ | 33605 | NSSQ | 33752 | NSSQ | 64651 | NSSQ | 84417 | NSSQ | 88179 | NSSQ | 92611 |
| NSSQ | 33606 | NSSQ | 33754 | NSSQ | 64675 | NSSQ | 84464 | NSSQ | 88263 | NSSQ | 92656 |
| NSSQ | 33609 | NSSQ | 33755 | NSSQ | 64741 | NSSQ | 84508 | NSSQ | 88368 | NSSQ | 92713 |
| NSSQ | 33611 | NSSQ | 33763 | NSSQ | 64848 | NSSQ | 84562 | NSSQ | 88389 | NSSQ | 92721 |
| NSSQ | 33613 | NSSQ | 33767 | NSSQ | 64915 | NSSQ | 84624 | NSSQ | 88397 | NSSQ | 92890 |
| NSSQ | 33619 | NSSQ | 33769 | NSSQ | 64940 | NSSQ | 84848 | NSSQ | 88441 | NSSQ | 93062 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NSSQ | 93176 | NSSQ | 95582 | NSSQ | 97308 | NSSQ | 98158 |
| NSSQ | 93309 | NSSQ | 95613 | NSSQ | 97310 | NSSQ | 98159 |
| NSSQ | 93311 | NSSQ | 95645 | NSSQ | 97321 | NSSQ | 98197 |
| NSSQ | 93317 | NSSQ | 95660 | NSSQ | 97352 | NSSQ | 98199 |
| NSSQ | 93321 | NSSQ | 95695 | NSSQ | 97360 | NSSQ | 98207 |
| NSSQ | 93398 | NSSQ | 95731 | NSSQ | 97363 | NSSQ | 98230 |
| NSSQ | 93403 | NSSQ | 95755 | NSSQ | 97365 | NSSQ | 98256 |
| NSSQ | 93474 | NSSQ | 95756 | NSSQ | 97394 | NSSQ | 98270 |
| NSSQ | 93532 | NSSQ | 95769 | NSSQ | 97403 | NSSQ | 98276 |
| NSSQ | 93579 | NSSQ | 95785 | NSSQ | 97413 | NSSQ | 98310 |
| NSSQ | 93594 | NSSQ | 95812 | NSSQ | 97441 | NSSQ | 98315 |
| NSSQ | 93595 | NSSQ | 95828 | NSSQ | 97442 | NSSQ | 98349 |
| NSSQ | 93666 | NSSQ | 95871 | NSSQ | 97444 | NSSQ | 98407 |
| NSSQ | 93681 | NSSQ | 95923 | NSSQ | 97458 | NSSQ | 98441 |
| NSSQ | 93689 | NSSQ | 95931 | NSSQ | 97460 | NSSQ | 98458 |
| NSSQ | 93693 | NSSQ | 95939 | NSSQ | 97463 | NSSQ | 98465 |
| NSSQ | 93717 | NSSQ | 96119 | NSSQ | 97495 | NSSQ | 98486 |
| NSSQ | 93766 | NSSQ | 96173 | NSSQ | 97500 | NSSQ | 98491 |
| NSSQ | 93775 | NSSQ | 96225 | NSSQ | 97769 | NSSQ | 98500 |
| NSSQ | 93789 | NSSQ | 96425 | NSSQ | 97777 | NSSQ | 98603 |
| NSSQ | 93791 | NSSQ | 96443 | NSSQ | 97778 | NSSQ | 98612 |
| NSSQ | 93842 | NSSQ | 96474 | NSSQ | 97784 | NSSQ | 98633 |
| NSSQ | 93843 | NSSQ | 96524 | NSSQ | 97806 | NSSQ | 98634 |
| NSSQ | 93862 | NSSQ | 96608 | NSSQ | 97807 | NSSQ | 98651 |
| NSSQ | 93905 | NSSQ | 96623 | NSSQ | 97811 | NSSQ | 98677 |
| NSSQ | 94017 | NSSQ | 96662 | NSSQ | 97834 | NSSQ | 98691 |
| NSSQ | 94489 | NSSQ | 96764 | NSSQ | 97845 | NSSQ | 98708 |
| NSSQ | 94547 | NSSQ | 96769 | NSSQ | 97851 | NSSQ | 98733 |
| NSSQ | 94567 | NSSQ | 96773 | NSSQ | 97866 | NSSQ | 98744 |
| NSSQ | 94598 | NSSQ | 96874 | NSSQ | 97883 | NSSQ | 98745 |
| NSSQ | 94632 | NSSQ | 96879 | NSSQ | 97885 | NW | 1888 |
| NSSQ | 94716 | NSSQ | 96923 | NSSQ | 97913 | NW | 2719 |
| NSSQ | 94743 | NSSQ | 96932 | NSSQ | 97924 | NW | 2747 |
| NSSQ | 94776 | NSSQ | 96933 | NSSQ | 97925 | NW | 2905 |
| NSSQ | 94859 | NSSQ | 96966 | NSSQ | 97926 | NW | 3048 |
| NSSQ | 94867 | NSSQ | 96984 | NSSQ | 97927 | SOU | 267 |
| NSSQ | 94920 | NSSQ | 97066 | NSSQ | 97929 | SOU | 1307 |
| NSSQ | 94928 | NSSQ | 97076 | NSSQ | 97955 | SOU | 1941 |
| NSSQ | 94935 | NSSQ | 97084 | NSSQ | 98006 | SOU | 2308 |
| NSSQ | 95054 | NSSQ | 97095 | NSSQ | 98023 | SOU | 2582 |
| NSSQ | 95237 | NSSQ | 97099 | NSSQ | 98060 | SOU | 3131 |
| NSSQ | 95270 | NSSQ | 97127 | NSSQ | 98067 | SOU | 3178 |
| NSSQ | 95279 | NSSQ | 97153 | NSSQ | 98094 | | |
| NSSQ | 95292 | NSSQ | 97176 | NSSQ | 98109 | | |
| NSSQ | 95332 | NSSQ | 97180 | NSSQ | 98112 | | |
| NSSQ | 95351 | NSSQ | 97194 | NSSQ | 98124 | | |
| NSSQ | 95365 | NSSQ | 97195 | NSSQ | 98128 | | |
| NSSQ | 95378 | NSSQ | 97211 | NSSQ | 98129 | | |
| NSSQ | 95402 | NSSQ | 97279 | NSSQ | 98132 | | |
| NSSQ | 95410 | NSSQ | 97281 | NSSQ | 98138 | | |
| NSSQ | 95444 | NSSQ | 97287 | NSSQ | 98140 | | |
| NSSQ | 95544 | NSSQ | 97299 | NSSQ | 98152 | | |

**From:** Brenner, Charlie
**Sent:** Wed Aug 15 09:24:45 2001
**To:** Glennon, Pat
**Cc:** Seale, Don
**Subject:** RE: Fuel Surcharge
**Importance:** Normal

DWS
Info.
CJB

-----Original Message-----
From: Glennon, Pat
To: Brenner, Charlie; Brugman, Thomas; Julian, David; Osborne, Joe; Wendorf, Gary; Anderson, Brady; Fisher, Donna; Florian, Fred; Gentzel, Robert; Julian, Alan; Kiley, Richard; McNabb, Jim; Plain, Bob; Schaaf, Jim; Simonic, Pat; Yopp, Ken

Cc: 'ssminton@nscorp.com'; Pfeifer, Alby
Sent: 8/14/2001 2:49 PM
Subject: Fuel Surcharge

The price of oil spiked over the $28 threshold yesterday following 24 consecutive days below the threshold. The surcharge will remain in effect. The earliest it can be rolled back will be late September. If customers have questions regarding updates, refer them to our Web site.
http://www.nscorp.com/nscorp/html/marketing/pricing/fuel_news.html

The price of oil has held below the $28 threshold for 35 of the last 37 days and the average price of oil (not used in the formula) has been below the threshold. With the cost of fuel gradually declining, customer awareness is becoming more of an issue. We have received a number of inquiries from customers regarding how we calculate the '30 consecutive days' requirement. Our position has consistently been that we count days as reported (published) in the WSJ. We do not include weekends or holidays where the WSJ does not publish the data.

When reviewing this with customers, you should point out that this standard is used for both applying the surcharge and removing it. There was no shortcut or preferential interpretation when the surcharge was first applied. If we later remove it, it will take '30 consecutive days' above $28 to reestablish the surcharge. Finally, while the price of oil is currently averaging less than $28 and slowly declining, it is still very close to the $28 threshold and not taking dramatic swings up or down.

PJ Glennon

**From**: Scharpf, Bob
**Sent**: Mon Oct 09 14:20:41 2000
**To**: Quesenberry, Brenda
**Cc**: Brenner, Charlie
**Subject**: FW: PRIVILEGED AND CONFIDENTIAL - NS - CSXT FUEL SURCHARGE
**Importance**: Normal
**Attachments**: CSXT Fuel Surcharge.doc

Don Seale
Attached is the CSXT concurrence letter regarding their upcoming fuel surcharge. I talked to Clyde McIntyre today regarding our joint line business and they have now decided that not only will RCAF-type contracts be excluded but also contracts that have a reference indicating that the rates will not be subject to adjustment. This leaves approximately 10% of existing contracts that may be subject to the fuel surcharge and this might be further diluted as they have referred this 10% to their commercial people for review. He indicated that they will furnish a list of applicable authorities to me in the next two weeks.

Bob Scharpf

cc: CJB

-----Original Message-----
**From:** Scharpf, Bob
**Sent:** Friday, September 29, 2000 11:43 AM
**To:** 'Pam_Grayson@csx.com'
**Subject:** FW: PRIVILEGED AND CONFIDENTIAL - NS - CSXT FUEL SURCHARGE

Clyde McIntyre
NS concurs in CSXT fuel surcharge that will become effective October 25, 2000 when involving joint line CSXT/NS prices.

Bob Scharpf
-----Original Message-----
**From:** Grayson, Pam [mailto:Pam_Grayson@csx.com]
**Sent:** Friday, September 29, 2000 11:26 AM
**To:** 'bob.scharpf@nscorp.com'
**Cc:** McIntyre, Clyde Jr.
**Subject:** PRIVILEGED AND CONFIDENTIAL - NS - CSXT FUEL SURCHARGE

<<...>>

**CSX TRANSPORTATION**
Marketing Services – J865
BellSouth Tower – 28th Floor
301 West Bay Street
Jacksonville, FL 32202

September 29, 2000

R. C. Scharpf
Norfolk Southern Railway Company

Subject: Proposed Fuel Surcharge

Dear Mr. Scharpf:

To enable recovery of increased fuel costs, CSXT requests your concurrence to implement a fuel surcharge on most joint-line rates between CSXT and your company effective October 25, 2000. These surcharges will be divided in the same proportion as in the joint-line rate.

Should the price of West Texas Intermediate Crude Oil reach $28 per barrel and remain at or above that level for thirty (30) consecutive days, a surcharge will be added to the freight charges on the joint-line movement with your company in accordance with publication CSXT 8100 Item 12000. The percentage will be applied to the gross freight revenue and added as a miscellaneous charge on the freight bill to be divided in the same proportion as the freight revenue.

The recovery charge will be published as an amendment to appropriate CSXT tariffs of general applicability and will be applied to all joint-line traffic moving under tariffs, public price lists, private price quotes and certain contracts that incorporate those general tariffs. Contracts that contain a price escalator index published by a government entity, such as RCAF, will not be included.

We appreciate a reply to our proposed fuel surcharge on traffic moving in connection with your company no later than close of business October 6, 2000. If we do not hear from you by that date, we will assume your concurrence. Your response may be forwarded to us via the internet to Pam_Grayson@csx.com, faxed to 904-633-5733 or mailed/expressed to the above address. Should you have any questions concerning this proposal, please contact me at the e-mail address or phone number below.

Yours truly,

Clyde V. McIntyre
Director-Marketing Services
Clyde_McIntyre@csx.com
904-633-5678

**From:** Scharpf, Bob
**Sent:** Fri Dec 01 14:37:36 2000
**To:** Quesenberry, Brenda
**Subject:** FW: Canadian Pacific Railway - Fuel Cost Adjustment
**Importance:** Normal

Don Seale
CPR indicates below they did not mean to imply that there would be a negative surcharge when they referred to a "downward fuel cost adjustment." As the letter below indicates, they would simply remove the immediate 3% should fuel fall below the hurdle for 90 consecutive days and remove the 3% applied in May if fuel keeps dropping. They would not go below the base. Now that this has been clarified, their surcharge is essentially the same as ours.

We should concur.
Bob Scharpf

-----Original Message-----
From: Mike_Minicola@cpr.ca [mailto:Mike_Minicola@cpr.ca]
Sent: Friday, December 01, 2000 2:40 PM
To: bob.scharpf@nscorp.com
Cc: Fred_Green@cpr.ca; Bob_Milloy@cpr.ca; Judy_Harrower@cpr.ca
Subject: Canadian Pacific Railway - Fuel Cost Adjustment

Dear Bob,

This note is further to our phone conversation earlier today re. CPR's recent announcement of a 3% Fuel Cost Adjustment effective 11 December 2000.

On 31 March this year, CPR announced its intention to commence issuing a 3% Fuel Cost Adjustment effective 1 May 2000. This Fuel Cost Adjustment would apply to all open tariffs as well as on all new and renegotiated business, and would be removed should the price of WTI crude go below $US22.00/bbl for a period of 90 consecutive days.

More recently, in light of the continued escalation of fuel costs, CPR announced its intention to issue a second Fuel Cost Adjustment of 3%. This surcharge would apply over the same portion of our business and would be removed should the price of WTI crude go below $US30.00/bbl for a period of 90 consecutive days.

The net result is a Fuel Cost Adjustment totaling 6% which would be removed only if fuel prices abate in the manner highlighted above. At no time, however, will freight rates descend below the original, pre-May 1 2000 base.

If you have any other questions, Bob, please do not hesitate to contact me at 403-319-3332.

I trust that this shall prove satisfactory and that, given this clarification, the NS is able to concur with CPR's Fuel Cost Adjustment initiatives.

Regards,

Mike Minicola

**From:** Glennon, Pat
**Sent:** Tue Aug 07 10:55:31 2001
**To:** Quesenberry, Brenda
**Cc:** Brenner, Charlie; Pfeifer, Alby
**Subject:** RCAF Yield Estimates - Merchandise (Response to 7/30 fax)
**Importance:** Normal

DW Seale - Re your fax dated 7/31 (LIP note dated 7/30) requesting a rough estimate for the revenue generated by RCAF escalators contained in Merchandise publications.

The conservative estimate for the 12 months ending June 30, 2001 is **$4,840,000**. That estimate is based on the latest available annualized unadjusted RCAF increase of 2.8% (3QTR00-3QTR01) applied against annualized NS revenue generated by contracts containing RCAF unadjusted escalators. Since few publications use the Adjusted RCAF and/or quarterly application of the increases, those factors where not taken into consideration. The revenue estimate was mechanically generated and may undercount the revenues by as much as 20% due to matching issues with the data received from Accounting. No attempt was made to adjust for the potential undercount.

As you are aware, incorporation of index based escalators in contracts has been declining over the past several years. There are less than 200 Merchandise contracts containing index based escalators of any type. Approximately half are foreign line maintained.

For a better perspective on the impact of fuel cost on the Unadjusted RCAF, I've added the **annualized** increases as reported for prior quarters.

3QTR00 - 3QTR01 = 2.8% (used in the estimate)
2QTR00 - 2QTR01 = 2.5%
1QTR00 - 1QTR01 = 4.0%
4QTR99 - 4QTR00 = 5.0%
3QTR99 - 3QTR00 = 4.8%

PJ Glennon

**From:** Quesenberry, Brenda
**Sent:** Thu Jun 07 16:24:06 2001
**To:** 'jtgray@up.com'
**Subject:** FW: Draft Minutes - NS-UP Meeting 6-4-01
**Importance:** Normal
**Attachments:** Draft Minutes NS-UP mtg 6-4-01.doc

Mr. Gray - confirming our conversation today, I am sending you the NS-UP minutes. I made the changes you suggested. Just let us know if you have others. Brenda Quesenberry for Don Seale 6/7/01

-----Original Message-----
From: Quesenberry, Brenda
Sent: Wednesday, June 06, 2001 8:07 AM
To: 'jackkoraleski@up.com'
Subject: FW: Draft Minutes - NS-UP Meeting 6-4-01

Mr. Koraleski - I received a "return to sender - address not recognized" -- hope this one works. bq

-----Original Message-----
From: Quesenberry, Brenda
Sent: Tuesday, June 05, 2001 5:55 PM
To: 'jjkorale@up.com'; 'john.gray@up.com'
Cc: McClellan, Mike R.; Prillaman, Ike; Wolf, Henry C. (Hank); Tobias, Stephen
Subject: Draft Minutes - NS-UP Meeting 6-4-01

Jack Koraleski
John Gray

Here are my draft notes from yesterday's meeting. Please review and provide your additions or corrections, and we will forward our consolidated minutes to all.

It was good to visit with you; I believe we are making good progress.

Don Seale 6/5/01

cc: Mike McClellan - Please review draft and provide any changes.
Ike Prillaman )
Hank Wolf ) Any changes or clarification?
Steve Tobias )

Draft Minutes
NS-UP Alliance Meeting
June 4, 2001

**I.** Intermodal

A.) Los Angeles/Kansas City/Columbus Service – not a priority until market opportunity is further defined. **Accountability: Mike McClellan-NS; Joe Leppert-UP**

B.) Memphis Gateway Service – NS Austell Ramp to open July 28 with consolidated UP-NS service between the Southwest and Southeast to begin in August. P&O Southeast traffic from Pacer to feed this start-up. UP and NS to jointly review the McKinsey study and truck traffic flows in the markets (NS has not yet received the study). **Accountability: Mike McClellan-NS; Joe Leppert-UP**

C.) Mexico – NS-UP to look to fold Mexico-Southeast traffic into the consolidated Southwest-Southeast service via Memphis to Austell. **Accountability: Mike McClellan-NS; Joe Leppert and Drew Collier-UP**

D.) UPS – Dallas to Atlanta – Review of service for 16-18 trailers per day underway—good base traffic for Southwest to Southeast (Austell) service. **Accountability: Mike McClellan-NS; Joe Leppert-UP**

E.) Southwest to Northeast Intermodal Service via Memphis – Shorter, more service-effective routing. Develop potential and UP-NS agreement. **Accountability: Mike McClellan-NS; Joe Leppert-UP**

**II.** ~~Overall UPS Strategy – Overall strategy to address UPS, UPS Autogistics, and emerging UPS Logistics potential involvement in other commodities. How to best manage this going forward? **Accountability: Don Seale-NS; Jack Koraleski-UP, Mike McClellan-NS; Joe Leppert-UP**~~

**III.** Mexico

A.) Auto – Review of joint UP-NS JIT Boxcar Rail Consolidation Center for Mexico auto parts at Laredo. **Accountability: David Julian-NS; Rob Knight-UP**

B.) Complete analysis of direct auto parts service at Ford's Hermosillio plant versus current offsite unloading. **Accountability: David Julian-NS; Rob Knight-UP**

C.) Review current flows of export beer (Corona) and other non-automotive commodities between Mexico and the Southeast, upper Midwest, and Northeast. **Accountability: Tom Brugman-NS; Dianne Knutson-UP**

**IV.** Auto

A.) Continued close coordination of joint focus on GM-OTD vehicle proposal.

**Accountability: David Julian-NS; Rob Knight-UP**

B.) Reconfirmation and coordination of proposal to Chrysler to commit haulaway vehicles to rail between Detroit-St. Louis utilizing NS-UP service and UP's Centerville, IL ramp. **Accountability: David Julian-NS; Rob Knight-UP**

C.) Review of joint NS-UP automotive service networks. Upon conclusion of GM-OTD, jointly update entire network. In the interim, NS-UP auto teams to review multi-level interchanges on vehicles from Roanoke, IL (Chicago vs. Salem); Moraine, OH (E. St. Louis vs. Salem) and Janesville (IHB at Chicago versus direct Proviso-Calumet). **Accountability: David Julian-NS; Rob Knight-UP**

D.) Review of NS-UP performance – Auto parts for GM via Salem interchange. **Accountability: David Julian-NS; Rob Knight-UP**

**V.** Merchandise

A.) Chemicals – Potential joint venture to provide storage-in-transit, supply chain management support, equipment utilization improvement for plastics and other chemical products. **Accountability: Joe Osborne-NS; Ed Sims-UP**

B.) Review joint service network for chemicals – St. Louis versus Salem gateway and further interest in New Orleans gateway. **Accountability: Joe Osborne-NS; Ed Sims-UP**

**VI.** Watershed Opportunities

A.) Paper traffic – equipment pools at UP and NS-served industries to handle traffic to the origin Road without price or other backhaul restrictions. Information exchange on traffic flows. **Accountability: David Lawson-NS; Greg Barbe-UP**

B.) Steel - LTV, Hennepin, IL – NS to review haulage to UP via Chicago – estimated 1,500 carloads via truck today going West. **Accountability: Gary Wendorf-NS; _______-UP**

**VI.** VIN Tracking/STARS Reporting – continued joint review. **Accountability: Don Seale-NS; Jack Koraleski-UP**

**VII.** Information Technology – Continue joint efforts on common data centers NS/UP/BNSF and common operating platforms at NS/UP and potentially CP. Follow up on demonstrations of TYES, CTMS, etc. **Accountability: Hank Wolf-NS; Steve Renken-NS; Ike Evans-UP, Merill Bryan-UP**

**VIII.** Arzoon – Continue to review Weyerhaeuser and Dow projects. Jointly review UP plans to load rates and potential interface/link with price management and Revenue Accounting at UP. **Accountability: Don Seale-NS; Steve Renken-NS; Jack Koraleski-UP; Merill Bryan-UP**

**From**: Pfeifer, Alby
**Sent**: Wed Mar 19 12:16:29 2003
**To**: Marketing,Sales&Coal - ALL
**Subject**: Fuel surcharge update
**Importance**: Normal

All Marketing and Sales:

The price of WTI crude oil dropped to $31.67 per barrell as reported in the Wall Street Journal today.

NS will **NOT** go to the 4% surcharge level as warned in our message to customers February 28.

The 2% level will remain in effect until a new threshold is crossed for 30 consecutive Wall street Journal Publication days.

Application of 4% Fuel Surcharge

Due to the continued and sustained rise in fuel costs, CN will be implementing a 4% fuel surcharge to all line-haul traffic, effective May 1, 2001.

While most of the transportation industry has already moved in this direction, we have held off on this decision for our carload customers in the hopes that the price trend would be reversed. Given that this has not occurred, and that oil prices could continue to rise even further, we are compelled to implement this surcharge.

We sincerely hope that these measures will be short-term and that relief from escalating oil prices will be forthcoming. We appreciate your understanding of our position on this difficult issue. Your Account Manager has been fully briefed on this policy and can address your concerns.

CANADIAN NATIONAL RAILWAY COMPANY
FREIGHT TARIFF CN 7400

APPLYING ON
APPLICATION OF SPECIAL SURCHARGES

ISSUED: OCTOBER 20, 2000
EFFECTIVE: OCTOBER 20, 2000

ITEM 1005

FUEL SURCHARGE

In the event that the price of West Texas Intermediate Crude Oil, as published on the Nymex (New York Mercantile Exchange), averages $24.00 U.S. or more, per barrel for a calendar quarter, CN retains the right to apply a Fuel Surcharge to the line haul freight charge(s) referencing this authority. The Fuel Surcharge shall be applied according to the following schedule.

FUEL PRICE RANGE

| SURCHARGE | WEST TEXAS INTERMEDIATE CRUDE OIL (PRICE PER BARREL $U.S.) |
|---|---|
| 2% | $24.00 - $26.99 |
| 4% | $27.00 - $31.99 |
| 6% | $32.00 - $36.99 |
| 8% | $37.00 - $41.99 |

Each $5.00 U.S. increase thereafter = additional 2%.

The average for each calendar quarter will be calculated within 15 days following the end of the quarter, and the above schedule will be used to determine the surcharge applicable.

Customers will receive notice of any Fuel Surcharge not less than twenty (20) days prior to its application. Any Fuel Surcharge applied to the line haul freight charge(s) will be removed or reduced when the quarterly average price of West Texas Intermediate Crude Oil falls into a lower price range. Reductions will be made promptly after they become applicable. In no case will the freight charge(s) be reduced, nor will the application or removal of Fuel Surcharge be retroactive.

Requests for CN Tariffs: 1-877-CNTARIFF (1-877-268-2743)
Issued by W.E. Hogbin, Director, Pricing Services, Canadian National Railway Company,

PO.

Box 8100, Montreal, P,Q, H3C 3N4

**From:** Glennon, Pat
**Sent:** Fri Oct 11 16:42:05 2002
**To:** Seale, Don
**Cc:** Brenner, Charlie
**Subject:** FW: Timing of NS fuel surcharge
**Importance:** Normal

DWS - We have received very few customer complaints or comments to-date and we have not received any requests for a lag or delayed implementation as suggested by [redacted] at least not in response to the last e-mail notification. We did receive a few last year.

**Background**
The BNSF surcharge does provide a lag, but they are the exception. For example they announced in mid August what the surcharge would be for the month of October. Their formula is based in the price of diesel, not WTI. While the lag is beneficial for systems admin, especially systems that require manual intervention, the disconnect between actual price of fuel and the application of the surcharge can be problematic in itself. For example, new publications get the surcharge applied will after the price drops.

CSXT adopted our surcharge provision. That is positive. The UP has a similar provision, but they adopted a higher threshold price and have never actually applied a surcharge that I can recall.

Changing our formula to allow for a lag would next to impossible for us to implement on short notice. We might be able to on public authorities, but you'll recall that we actually place the provision in our private authorities. We be forced to reissue contracts and quotes. Many customers are probably geared to handle it automatically, like we are. That might generate an even larger backlash. Some might actually refuse to accept the change and we'd be force to maintain two standards.

**Here are two suggestions:**

- **Option 1** - We offer [redacted] the opportunity to have the surcharges billed separately in the form of a single monthly bill. This might help address the issues raised in the letter.

  [redacted] is a broker so there may be some issues about who is shown as the bill to party. In other words, if it is not [redacted] we might have to set up each customer as a separate account. we can still handle it, but I'd have to review this option with them to confirm if it'd work for them. We may have offered this to them in the past, but this is our best customer friendly option. Accounting has a process worked out and we can easily handle it.

- **Option 2** - If there are a limited number of authorities, we could remove the surcharge note in 9255 for one month, with an agreement that we'd bill them for the suspended billing at a later time, probably in the form of a single bill. This would require manual calculation and billing by Accounting, but only for that one month. Provided we don't make this option widely available, I expect we could accommodate it. Once again, their role as a broker may cause a problem. However, as I recall they are generally shown as the "bill to" party and I expect this is a viable option.

There may well be other options. My major concern is that we not allow for numerous billing variations. Option 1 is completely set up and ready to implement. That's the best approach as far as we are concerned. Option 2 could work, but we need to confirm with Accounting and we do not what to offer this to more than a few customers.

PJ Glennon

-----Original Message-----
From: Seale, Don
Sent: Friday, October 11, 2002 4:31 PM
To: Glennon, Pat

Cc: Brenner, Charlie
Subject: FW: Timing of NS fuel surcharge

Pat: Are we receiving any other requests like this one? Let me know promptly. DWS

-----Original Message-----
From: [redacted]
Sent: Friday, October 11, 2002 1:55 PM
To: 'Don Seale'
Cc: 'Jim McNabb'; 'Tom Sellinger'; TRAF - Traffic/Transportation
Subject: Timing of NS fuel surcharge

Don,
I am emailing this request to you because I think it will take Senior Management approval to allow this change. My issue isn't the surcharge as much as it is the timing of it going into effect. A mass change in rates during the month, like a fuel surcharge, is very costly and time consuming for [redacted] to administer. Our business is fragmented and highly transactional by nature. The updating of thousands of open purchase contracts, with a fuel surcharge, causes tremendous aggravation not only for [redacted] but for Nucor, Ameristeel, Ford, etc as well. We pleaded a year ago, when fuel became an issue, to be sure to make any changes effective the first day of the month and it fell on deaf ears. I know we are not the only Company or Industry that made this request.
We also offered to pay the surcharge for an additional month beyond the expiration to compensate the RR for any missed revenue by waiting til the first day of the month. The administrative headache is that painful.
Don, the easy answer is to say no, you can't make an exception, the RR has to treat everyone the same. The NS prides itself in listening to its customers and I'm asking you to approve our request....a one page, blanket document, stating whenever a fuel surcharge goes into effect per NS tariffs, the surcharge will apply on the first day of the following month for the account of [redacted] and its affiliated Companies. Please help us Don.
Sincerely,
Tom

[redacted]
Sr. Director, Transportation Services
[redacted]

**From**: Glennon, Pat
**Sent**: Tue Apr 01 11:35:14 2003
**To**: Seale, Don; Wendorf, Gary; Brenner, Charlie; Brugman, Thomas; Julian, David; Kraemer, John; Lawson, David; Osborne, Joe
**Cc**: Carroll, Patti G.; Minton, Stacia S.; Nash, Jim P.; Yopp, Ken; Anderson, Brady; Fisher, Donna; Florian, Fred; Gentzel, Robert; Julian, Alan; Kiley, Richard; McNabb, Jim; Plain, Bob; Schaaf, Jim; Simonic, Pat; Thomasson, Terry; Aldenderfer, Mike; Edwards, Suzanne; Ferris, Lynn; Pfeifer, Alby; Wooddy, Jan; Ingram, Peggy; Williams, Bill; Corcoran, Virgil; Giuliano, Joe; Rasche, Larry; Robinson, Rob
**Subject**: FW: Request for NS Concurrence: Effective June 1, 2003 CSXT Fuel Surc harge Is Modified To Be More Responsive To Market Conditions
**Importance**: Normal

Re CSXT surcharge. NS concurrence issued. PJG

-----Original Message-----
From: Glennon, Pat
Sent: Tuesday, April 01, 2003 11:22 AM
To: 'McIntyre, Clyde Jr.'
Cc: Brenner, Charlie; Grayson, Pam ; Pfeifer, Alby
Subject: RE: Request for NS Concurrence: Effective June 1, 2003 CSXT Fuel Surc harge Is Modified To Be More Responsive To Market Conditions

Norfolk Southern concurs to the modified CSXT Fuel Surcharge effective June 1, 2003. This concurrence is limited to CSXT issued publications involving CSXT/NS joint line prices that specifically reference the CSXT Fuel Surcharge provision.

P J Glennon
Director Mktg Services
Norfolk southern Corporation

-----Original Message-----
From: McIntyre, Clyde Jr. [mailto:Clyde_McIntyre@csx.com]
Sent: Friday, March 28, 2003 11:16 AM
To: 'Alby Pfeifer, NS'
Cc: 'PJGlenno@NSCorp.com'; 'Charlie.Brenner@NSCorp.com'; Grayson, Pam
Subject: Request for NS Concurrence: Effective June 1, 2003 CSXT Fuel Surc harge Is Modified To Be More Responsive To Market Conditions

> Request for NS concurrence : Effective June 1, 2003 CSXT Fuel Surcharge Is
> Modified To Be More Responsive To Market Conditions
>
> On March 20, 2003 CSXT released News announcing modifications to the fuel
> cost recovery program
> http://www.csx.com/?fuseaction=company.news_detail&i=45428&news_year=-1.
>
> * Please provide concurrence to the modified CSXT fuel surcharge
> program on joint-line rates between CSXT and NS referencing, or subject
> to, Tariff CSXT 8100 or 8200. The surcharge will be divided in the same
> proportion as the joint-line freight charges. Please provide concurrence
> via Email to Pam_Grayson@CSX.com:
> <<Modified CSXT Fuel Surchrg >>
>
> * Attached is the revised Item 12000-A to Tariff CSXT 8100
> (Merchandise) to be issued March 31, 2003 and effective June 1, 2003.
> Tariff CSXT 8200 (Coal) will be revised similarly:

> <<CSXT 8100 FUEL SURCHARGE Doc.>>
>
> Under current CSXT 8100/8200 provisions that expire May 31st, the CSXT
> fuel surcharge remains at 2%.
>
> Please let me know if you have any questions.
>
> Clyde McIntyre
> Director Pricing Services
> 904-359-3650

**From:** Corcoran, D.V.
**Sent:** Wed Sep 27 15:56:54 2000
**To:** Corcoran, D.V.; Earl Pinkston; Gerre Goard (E-mail); Jim Crawford (E-mail); Joy Cross (E-mail); Katherine Bezold; Larry Morgan (E-mail); Patrick Coseglia (E-mail); R Adams (E-mail); Robert Hagen (E-mail); Shortall, Joan; Steve Forrester (E-mail); Steve Marshall (E-mail)
**Cc:** Schaaf, Jim; Wendorf, Gary
**Subject:** Fuel Surcharge - Hot!
**Importance:** Normal
**Attachments:** Metals West GRAB Report.xls

Met/Con West -

In conference call this morning with DWS, GGW and other GVP's and Directors we were given our charge to work with our customers and secure fuel surcharge increases all **ALL** business. This will require that everyone be very familiar with all aspects of our existing fuel surcharge language and be prepared to go see customers to sell this concept. We will be asking customers with existing contracts to embrace this effort. On major customers, either the Marketing Directors and/or I will likely accompany you to see customers and discuss these issues. GGW will be available if needed. On smaller customers you will be making this contact. More on this later. I will be providing further background information and we will discuss individually in groups of 2 or 3 on the phone. I plan on discussing with everyone available on Friday afternoon.

To initiate this process Don Seale will be sending a letter to each Sales Director's top 30 Control accounts. The letter will be directed to the top Traffic, Purchasing or Logistics Manager of each firm. We will be creating a list in our Outlook Contact base which Charlie Brenner will pull for the mailing list.

I am attaching the list of companies that I believe we will want to target on this initial letter and need for you to supply the proper contact's name and double check that person's information in the contact list. This needs to be done as soon as possible……Today if possible. Tomorrow at latest. We will create a new "category" in Outlook that will be used to send the letter and will submit this to Charlie Brenner tomorrow. If you disagree with companies selected, call me to discuss. If it is important that more than one person at a company receive a copy of the letter being sent, note that and add their name(s) and chek their information in the contact list. Fill in the contacts name and return to me with copy to Donna Butterworth.

Virgil Corcoran

| <u>CUSTOMER</u> | CONTACT NAME(S) |
|---|---|
| 1. [redacted] | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |
| 11. | |
| 12. | |
| 13. | |
| 14. | |

15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.
29.
30.
31.

[redacted]

**EXTRAS**

32.
33.
34.
35.
36.

[redacted]

P.S. A copy of our worksheet for top accounts from 1999 is also attached as information. If one of the companies I have shown should be contacted by our Cleveland office or other Group office quickly let me know. Steve Marshall I did not put your paper customer on our list. You may want to cover with Larry Rasche, but you will be responsible for the contact.

<<...>>

This file is produced natively

| | | Location | Control / | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| NAM | | | No Control / | Commodity | Dec. YTD (GRAB) | | Annualized | | Quarterly | |
| Initial | Account | | Shared | Group | Cars | Revenue | Cars | Revenue | Cars | Revenue |
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| RMH | Great Lakes Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| RMH | Midwest Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| RMH | SDI Beam Mill | Columbia City, IN | Control | Metals | 0 | $0 | **6,000** | **$5,400,000** | | |
| RMH | Mitsubishi | Chicago, IL | Control | Metals | 106 | $183,000 | **48** | **$65,000** | | |
| RMH | Vulcan Materials | Lombard, IL | Control | Construction | 722 | $228,568 | **828** | **$289,800** | | |
| RMH | Rea Magnet Wire | Ft. Wayne, IN | Control | Metals | 274 | $294,870 | **350** | **$350,000** | | |
| RMH | Sol Tick Company | Decatur, IL | Control | Metals | 551 | $366,043 | 551 | $366,043 | | |
| RMH | Dobrow Industries | Muncie, IN | Control | Metals | 336 | $388,000 | **400** | **$440,000** | | |
| RMH | Griffin Pipe | Chicago, IL | Control | Metals | 351 | $401,000 | **960** | **$1,124,000** | | |
| RMH | Hammond Lead | Hammond, IN | Control | Metals | 282 | $657,808 | 282 | $657,808 | | |
| RMH | Birmingham Bolt | Kankakee, IL | Control | Metals | 780 | $704,834 | **700** | **$7,064,000** | | |
| RMH | Behr Iron & Steel & Burns Baling | Rockford, IL | Control | Metals | 956 | $738,000 | **1,344** | **$1,128,000** | | |
| RMH | Keystone Steel & Wire | Peoria, IL | Control | Metals | 496 | $881,000 | **480** | **$1,032,000** | | |
| RMH | Griffin Wheel | Chicago, IL | Control | Metals | 806 | $1,021,000 | **840** | **$942,000** | | |
| RMH | Marblehead Lime | Chicago Heights, IL | Control | Construction | 749 | $1,090,153 | 749 | $1,090,153 | | |
| RMH | Northwestern Steel & Wire | Sterling, IL | Control | Metals | 1,162 | $1,549,000 | **1,368** | **$1,896,000** | | |
| RMH | Steel Warehouse | South Bend, IN | Control | Metals | 1,877 | $1,948,000 | **1,800** | **$1,464,000** | | |
| RMH | Essex Group | Ft. Wayne, IN | Control | Metals | 1,437 | $2,133,534 | **1,635** | **$2,455,978** | | |
| RMH | Omni Source | Ft. Wayne, IN | Control | Metals | 2,936 | $2,676,000 | **5,000** | **$4,500,000** | | |
| RMH | Ball Foster | Muncie, IN | Control | Construction | 2,357 | $2,787,631 | **4,608** | **$5,520,000** | | |
| RMH | Wedron Silica (Wexford/Techisand) | Wedron, IL | Control | Construction | 3,249 | $3,106,000 | **3,924** | **$3,996,000** | | |
| RMH | Azcon | Chicago, IL | Control | Metals | 52 | $3,200,000 | **1,800** | **$1,332,000** | | |
| RMH | US Gypsum/USG Interiors | Chicago, IL | Control | Construction | 6,300 | $4,100,000 | **13,164** | **$8,868,000** | | |
| RMH | Steel Dynamics | Butler, IN | Control | Metals | 6,375 | $5,498,000 | **8,712** | **$7,712,000** | | |
| RMH | National Steel | Mishawaka, IN | Control | Metals | 33,221 | $25,002,000 | **59,000** | **$34,500,000** | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | **TOTAL CONTROL ACCOUNTS** | | | **65,375** | **58,954,441** | **114,543** | **92,192,782** | | |
| | | | | | | | | | | |
| RMH | Phelps Dodge | Ft. Wayne, IN | **Shared** | Metals | **227** | **$234,404** | **175** | **$180,000** | | |
| RMH | Phelps Dodge | Ft. Wayne, IN | Shared | Metals | 806 | $983,109 | 806 | $983,109 | | |
| RMH | Tower Automotive | Milwaukee, WI | Shared | Metals | 6,237 | $8,608,857 | | | | |
| | | | | | | | | | | |
| | | **TOTAL SHARED ACCOUNTS** | | | 7,270 | 9,826,370 | 981 | 1,163,109 | | |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **72,645** | **68,780,811** | **115,524** | **93,355,891** | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| RLA | Trowbridge Steel | Sterling, Va | Control | Metals | 195 | $360,000 | 195 | $360,000 | | |
| RLA | Global Stone -Chemstone | Clearbrook, VA | Control | Construction | 306 | $419,000 | 306 | $419,000 | | |
| RLA | Adams Products Co. | Morrisville, NC | Control | Construction | 298 | $444,000 | 298 | $444,000 | | |
| RLA | United Materials Inc. | Manassas, Va | Control | Construction | 492 | $476,000 | 492 | $476,000 | | |
| RLA | Lynchburg Foundry | Lynchburg, VA | Control | Metals | 625 | $611,000 | 625 | $611,000 | | |
| RLA | Jacobson Metal | Cheasapeake, Va | Control | Metals | 785 | $635,000 | 785 | $635,000 | | |
| RLA | Newton Asphalt | Alexandra, VA | Control | Construction | 3,650 | $762,000 | 3,650 | $762,000 | | |
| RLA | Asphalt Roads & Materials | Virginia Beach, Va | Control | Construction | 1,626 | $813,000 | 1,626 | $813,000 | | |
| RLA | Tarmac America | Norfolk, VA | Control | Construction | 3,124 | $1,625,000 | 3,124 | $1,625,000 | | |
| RLA | New River Castings | Radford, VA | Control | Metals | 1,280 | $1,808,000 | 1,280 | $1,808,000 | | |
| RLA | Ready Mix Inc. | Raleigh, NC | Control | Construction | 1,437 | $1,969,000 | 1,437 | $1,969,000 | | |
| RLA | Owens Brockway | Kent, Va | Control | Construction | 1,704 | $2,498,000 | 1,704 | $2,498,000 | | |
| RLA | Roanoke Electric Steel | Roanoke, Va | Control | Metals | 4,255 | $3,655,000 | 4,255 | $3,655,000 | | |
| RLA | Global Stone - James River | Buchanan, Va | Control | Construction | 3,413 | $4,219,000 | 3,413 | $4,219,000 | | |
| RLA | Reynolds Metals | Richmond, Va | Control | Metals | 4,223 | $7,178,000 | 4,223 | $7,178,000 | | |
| RLA | Roanoke Cement Co. | Lonestar, VA | Control | Construction | 7,327 | $9,722,000 | 7,327 | $9,722,000 | | |
| RLA | M.Marietta Aggregates | Raleigh, NC | Control | Construction | 20,426 | $12,094,000 | 20,426 | $12,094,000 | | |
| | | | | | | | | | | |
| | | **Total Control Accounts** | | | **55,166** | **$49,288,000** | **55,166** | **$49,288,000** | | |
| | | | | | | | | | | |
| RLA | Tower Automotive | Hollins,VA | Shared | Metals | 238 | $406,000 | 238 | $406,000 | | |
| RLA | Chaparral Steel | Petersburg, Va | Shared | Metals | 845 | $928,000 | 845 | $928,000 | | |
| RLA | General Shale | Webster, Va | Shared | Construction | 1,075 | $1,237,000 | 1,075 | $1,237,000 | | |
| RLA | Chemical Lime Co. | Kimballton, Va | Shared | Construction | 1,839 | $2,815,000 | 1,839 | $2,815,000 | | |
| RLA | Vulcan Material | Manassas, Va | Shared | Construction | 14,456 | $2,997,000 | 14,456 | $2,997,000 | | |
| RLA | Certainteed Corp. | Oxford, NC | Shared | Construction | 3,777 | $6,173,000 | 3,777 | $6,173,000 | | |
| RLA | Vulcan Material | Lawrenceville, VA | Shared | Construction | 15,508 | $7,240,000 | 15,508 | $7,240,000 | | |
| | | | | | | | | | | |
| | TOTAL | **Total Shared Accounts** | | | **37,738** | **$21,796,000** | **37,738** | **$21,796,000** | | |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **92,904** | **$71,084,000** | **92,904** | **$71,084,000** | | |

| | | Location | Control / | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| NAM | | | No Control / | Commodity | Dec. YTD (GRAB) | | Annualized | | Quarterly | |
| Initial | Account | | Shared | Group | Cars | Revenue | Cars | Revenue | Cars | Revenue |
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| JDC | Tennessee Valley Recycling | Sheffield, AL | Control | Construction | 6 | $5,658 | 6 | $5,658 | | |
| JDC | O'Neal Steel | Houston, TX | Control | Metals | 14 | $14,873 | 14 | $14,873 | | |
| JDC | O'Neal Steel | Duluth, GA | Control | Metals | 15 | $17,828 | 15 | $17,828 | | |
| JDC | Birmingham Steel | Cartersville, GA | Control | Metals | 32 | $21,349 | 32 | $21,349 | | |
| JDC | American Cast Iron Pipe (ACIPCO) | Mobile, AL | Control | Metals | 23 | $21,850 | 23 | $21,850 | | |
| JDC | O'Neal Steel | Gribble ,TX | Control | Metals | 21 | $23,127 | 21 | $23,127 | | |
| JDC | O'Neal Steel | Hueytown, AL | Control | Metals | 25 | $30,595 | 25 | $30,595 | | |
| JDC | Empire Pipe | Trussville, AL | Control | Metals | 22 | $32,539 | 22 | $32,539 | | |
| JDC | O'Neal Steel | Ambridge, PA | Control | Metals | 30 | $37,619 | 30 | $37,619 | | |
| JDC | O'Neal Steel | Savannah, GA | Control | Metals | 30 | $43,865 | 30 | $43,865 | | |
| JDC | O'Neal Steel | Chickasaw, AL | Control | Metals | 34 | $44,480 | 34 | $44,480 | | |
| JDC | FMC Corp. | Anniston, AL | Control | Metals | 56 | $47,425 | 56 | $47,425 | | |
| JDC | McWane Cast Iron Pipe | East Birmingham, AL | Control | Metals | 78 | $78,494 | 78 | $78,494 | | |
| JDC | Hanna Steel | Northport, AL | Control | Metals | 152 | $110,670 | 152 | $110,670 | | |
| JDC | Birmingham Steel | Jackson, MS | Control | Metals | 131 | $123,439 | 131 | $123,439 | | |
| JDC | Wise Alloys | Sheffield, AL | Control | Metals | 290 | $127,430 | 290 | $127,430 | | |
| JDC | Tennessee Valley Recycling | Decatur, AL | Control | Construction | 164 | $146,581 | 164 | $146,581 | | |
| JDC | Southern Coil | Hueytown, AL | Control | Metals | 140 | $152,245 | 140 | $152,245 | | |
| JDC | Vulcan Materials | Cherokee, AL | Control | Construction | 667 | $197,123 | 667 | $197,123 | | |
| JDC | Jemison Steel | Bessemer, AL | Control | Metals | 324 | $249,322 | 324 | $249,322 | | |
| JDC | O'Neal Steel | East Birmingham, AL | Control | Metals | 184 | $267,049 | 184 | $267,049 | | |
| JDC | Southern Scrap & Metal | Meridian, MS | Control | Metals | 309 | 274,364 | 309 | 274,364 | | |
| JDC | Tennessee Valley Recycling | Huntsville, AL | Control | Construction | 228 | $287,383 | 228 | $287,383 | | |
| JDC | Hanna Steel | Fairfield, AL | Control | Metals | 307 | $362,770 | 307 | $362,770 | | |
| JDC | Southern Scrap Metal | Meridian, MS | Control | Metals | 209 | $374,264 | 209 | $374,264 | | |
| JDC | Mi-Tech | Decatur, AL | Control | Metals | 631 | $384,700 | 631 | $384,700 | | |
| JDC | Huron Valley Steel | Anniston, AL | Control | Construction | 229 | $440,059 | 229 | $440,059 | | |
| JDC | O'Neal Steel | Greensboro, NC | Control | Metals | 262 | $446,128 | 262 | $446,128 | | |
| JDC | Wise Alloys | Muscle Shoals, AL | Control | Metals | 369 | $458,139 | 369 | $458,139 | | |
| JDC | Bayou Steel | La Place, LA | Control | Metals | 537 | $ 460,159 | 537 | $ 460,159 | | |
| JDC | Huron Valley Steel | Belleville, MI | Control | Metals | 714 | $565,294 | 714 | $565,294 | | |
| JDC | U S Pipe & Foundry | Bessemer, AL | Control | Construction | 599 | $569,671 | 599 | $569,671 | | |
| JDC | U S Pipe & Foundry | North Birmingham, AL | Control | Construction | 550 | $601,737 | 550 | $601,737 | | |
| JDC | Regional Recycling | Birmingham, AL | Control | Construction | 1,145 | $651,291 | 1,145 | $651,291 | | |
| JDC | Sloss Industries | North Birmingham, AL | Control | Metals | 1,189 | $717,598 | 1,189 | $717,598 | | |
| JDC | Stupp Corp. | Baton Rouge, LA | Control | Metals | 452 | 760,756 | 452 | 760,756 | | |
| JDC | Southern Precision | Birmingham, AL | Control | Metals | 801 | $921,471 | 801 | $921,471 | | |
| JDC | APAC Mississippi | Meridian, MS | Control | Metals | 1,572 | $1,222,366 | 1,572 | $1,222,366 | | |
| JDC | Tuscaloosa Steel | Holt, AL | Control | Metals | 780 | $1,251,737 | 780 | $1,251,737 | | |
| JDC | Vulcraft | Fort Payne, AL | Control | Metals | 1,343 | $1,407,689 | 1,343 | $1,407,689 | | |
| JDC | Mississippi Materials | Meridian, MS | Control | Metals | 1,928 | $1,524,609 | 1,928 | $1,524,609 | | |
| JDC | ABC-Naco | Calera, AL | Control | Construction | 1,480 | $1,530,088 | 1,480 | $1,530,088 | | |
| JDC | American Cast Iron Pipe (ACIPCO) | North Birmingham, AL | Control | Metals | 1,526 | $1,530,820 | 1,526 | $1,530,820 | | |
| JDC | Trico Steel | Decatur, AL | Control | Metals | 2,898 | $2,697,130 | 2,898 | $2,697,130 | | |
| JDC | Vulcan Materials | Roberta, AL | Control | Construction | 4,748 | $3,887,802 | 4,748 | $3,887,802 | | |
| JDC | Gulf States Steel | Alabama City, AL | Control | Metals | 3,795 | $4,527,022 | 3,795 | $4,527,022 | | |
| JDC | Birmingham Steel | Memphis, TN | Control | Metals | 4,296 | $4,952,658 | 4,296 | $4,952,658 | | |
| JDC | Birmingham Steel (HQ) | North Birmingham, AL | Control | Metals | 6,174 | $6,833,863 | 6,174 | $6,833,863 | | |
| JDC | Ferraloy | Decatur, AL | Control | Met/Con | | | | | | |
| | | | | | | | | | | |
| | | **TOTAL CONTROL ACCOUNTS** | | | **41,509** | **$41,435,129** | **41,509** | **$41,435,129** | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| JDC | Vulcan Materials | Stockbridge, GA | Shared | Construction | 213 | $156,928 | 213 | $156,928 | | |
| JDC | Vulcan Materials | Saraland, AL | Shared | Construction | 254 | $182,862 | 254 | $182,862 | | |
| JDC | Birmingham Steel | Kankakee, IL | Shared | Metals | 436 | $361,412 | 436 | $361,412 | | |
| JDC | Alabama Freight | North Birmingham, AL | Shared | Metals | 237 | $382,882 | 237 | $382,882 | | |
| JDC | Phillip Metals | Birmingham, AL | Shared | Metals | 607 | $482,716 | 607 | $482,716 | | |
| JDC | Alabama State Docks | Mobile, AL | Shared | Metals | 1,041 | $1,055,201 | 1,041 | $1,055,201 | | |
| JDC | US Government | Bynum, AL | Shared | Ag & Cons | 1,229 | $1,852,690 | 1,229 | $1,852,690 | | |
| JDC | Birmingham Steel | Cleveland, OH | Shared | Metals | 1,864 | $2,560,057 | 1,864 | $2,560,057 | | |
| JDC | SMI Steel | Woodlawn, AL | Shared | Metals | 2,892 | $2,690,795 | 2,892 | $2,690,795 | | |
| JDC | Vulcan Materials | Barin, GA | Shared | Construction | 5,870 | $2,940,026 | 5,870 | $2,940,026 | | |
| JDC | Worthington Steel | Decatur, AL | Shared | Metals | 2,246 | $3,780,467 | 2,246 | $3,780,467 | | |
| JDC | Vulcan Materials | Balance of Locations | Shared | Construction | 31,302 | $10,630,798 | 31,302 | $10,630,798 | | |
| JDC | IPSCO | Lemoyne, AL | Shared | Met/Con | | | | | | |
| | | | | | | | | | | |
| | | **TOTAL SHARED ACCOUNTS** | | | **48,191** | **27,076,834** | **48,191** | **27,076,834** | | |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **89,700** | **$68,511,963** | **89,700** | **$68,511,963** | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| SRF | Kingsport Iron & Metal Co. | Kingsport, TN (HQ) | Control | Metals | 50 | $57,424 | 50 | $57,424 | | |
| SRF | Dayton Concrete Products | Dayton, TN | Control | Construction | 73 | $71,064 | 73 | $71,064 | | |
| SRF | Franklin Industrial Minerals | Lovell, FL | Control | Construction | 139 | $78,427 | 139 | $78,427 | | |
| SRF | Bradley Block | Cleveland, TN | Control | Construction | 113 | $94,447 | 113 | $94,447 | | |
| SRF | International Metals | Rockwood, TN | Control | Metals | 42 | $106,680 | 42 | $106,680 | | |
| SRF | General Shale Products | Knoxville, TN | Control | Construction | 142 | $168,948 | 142 | $168,948 | | |
| SRF | Franklin Industrial Minerals | Anderson, TN | Control | Construction | 226 | $213,061 | 226 | $213,061 | | |
| SRF | General Shale Products | Atlanta, GA | Control | Construction | 285 | $287,894 | 285 | $287,894 | | |
| SRF | American Limestone | Hodges, TN | Control | Construction | 2,904 | $388,087 | 2,904 | $388,087 | | |
| SRF | Southdown, Inc. | Wampsum, PA | Control | Construction | 336 | $390,295 | 336 | $390,295 | | |
| SRF | Basic Ready Mix Concrete | Dalton, GA (HQ) | Control | Construction | 350 | $393,523 | 350 | $393,523 | | |
| SRF | AFG | Kingsport, TN (HQ) | Control | Construction | 248 | $394,030 | 280 | $469,178 | | |
| SRF | Southern Alloy & Metals | Rockwood, TN (HQ) | Control | Metals | 550 | $424,625 | 550 | $424,625 | | |
| SRF | AFG | Greenland, TN | Control | Construction | 597 | $448,227 | 597 | $448,227 | | |
| SRF | Siskin Steel & Supply Co. | Chattanooga, TN (HQ) | Control | Metals | 450 | $457,293 | 450 | $457,293 | | |
| SRF | Signal Mountain Cement Co. | Chattanooga, TN (HQ) | Control | Construction | 438 | $500,886 | 438 | $500,886 | | |
| SRF | Minco, Inc. | Midway, TN (HQ) | Control | Construction | 350 | $550,811 | 350 | $550,811 | | |
| SRF | General Shale Products | Johnson City, TN (HQ) | Control | Construction | 540 | $565,517 | 540 | $565,517 | | |
| SRF | Franklin Industrial Minerals | Kings Mountain, NC | Control | Construction | 525 | $616,359 | 525 | $616,359 | | |
| SRF | General Shale Products | Roanoke, VA | Control | Construction | 724 | $784,070 | 724 | $784,070 | | |
| SRF | General Shale Products | Marion, VA | Control | Construction | 709 | $872,188 | 709 | $872,188 | | |
| SRF | Elizabethton Herb & Metal | Johnson City, TN (HQ) | Control | Metals | 977 | $958,697 | 977 | $958,697 | | |
| SRF | Franklin Brick | Nashville, TN (HQ) | Control | Construction | 1,513 | $1,454,287 | 1,513 | $1,454,287 | | |
| SRF | Wheland Foundry | Chattanooga, TN (HQ) | Control | Metals/Const | 2,250 | $2,649,460 | 2,250 | $2,649,460 | | |
| SRF | Southdown, Inc. | Knoxville, TN | Control | Construction | 2,678 | $3,090,211 | 2,678 | $3,090,211 | | |
| SRF | Southdown, Inc. | Demopolis, | Control | Construction | 3,738 | $3,946,851 | 3,738 | $3,946,851 | | |
| SRF | Southdown, Inc. | Clinchfield | Control | Construction | 3,873 | $4,243,900 | 3,873 | $4,243,900 | | |
| SRF | TN Valley Resources, Inc. | Jefferson City, TN (HQ) | Control | Construction | 3,192 | $4,265,706 | 3,192 | $4,265,706 | | |
| SRF | Franklin Industrial Minerals | Crab Orchard, TN | Control | Construction | 3,951 | $5,147,313 | 3,951 | $5,147,313 | | |
| SRF | Alcoa | Knoxville, TN (HQ) | Control | Metals | 21,289 | 25,595,467 | 21,289 | 25,595,467 | | |
| SRF | American Limestone | Knoxville, TN (HQ) | Control | Construction | | | | | | |
| SRF | Franklin Industrial Minerals | Nashville, TN (HQ) | Control | Construction | | | | | | |
| SRF | Freight Services, Inc. | Eugene, OR (HQ) | Control | Construction | | | | | | |
| SRF | Southdown, Inc. | Houston, TX (HQ) | Control | Construction | | | | | | |
| | | | | | | | | | | |
| | | **TOTAL CONTROL ACCOUNTS** | | | **53,202** | **$59,158,324** | **53,234** | **$59,233,472** | | |
| | | | | | | | | | | |
| SRF | Gibraltor Steel | Chattanooga, TN | Shared | Metals | 111 | $138,840 | 111 | $138,840 | | |
| SRF | Huntco Steel | Chattanooga, TN | Shared | Metals | 352 | $479,860 | 352 | $479,860 | | |
| SRF | JIT Terminal | Chattanooga, TN | Shared | Metals | 900 | $970,245 | 900 | $970,245 | | |
| SRF | Bayou Steel Corp | Harriman, TN | Shared | Metals | 2,095 | $1,779,762 | 2,095 | $1,779,762 | | |
| SRF | Florida Rock, Inc. | Rome, GA | Shared | Construction | 6,903 | $2,509,857 | 6,903 | $2,509,857 | | |
| SRF | Ameristeel | Knoxville, TN | Shared | Metals | 2,047 | $2,639,647 | 2,047 | $2,639,647 | | |
| | | | | | | | | | | |
| | | | **TOTAL SHARED ACCOUNTS** | | **12,408** | **$8,518,211** | **12,408** | **$8,518,211** | | |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **65,610** | **$67,676,535** | **65,642** | **$67,751,683** | | |

| | | Location | Control / | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| NAM | | | No Control / | Commodity | Dec. YTD (GRAB) | | Annualized | | Quarterly | |
| Initial | Account | | Shared | Group | Cars | Revenue | Cars | Revenue | Cars | Revenue |
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| LMM | STRICKLAND CONCRETE PRODUCTS | JESUP,GA | Control | Construction | 127 | $67,095 | 127 | $67,095 | | |
| LMM | METAL LINK | JACKSONVILLE,FL | Control | Metals | 137 | $119,390 | 137 | $119,390 | | |
| LMM | AMERICAN WELDING & Tank | JESUP,GA | Control | Construction | 89 | $168,120 | 89 | $168,120 | | |
| LMM | HARWOOD BRICK | GAINESVILLE,FL | Control | Construction | 270 | $240,174 | 270 | $240,174 | | |
| LMM | CHATHAM STEEL | SAVANNAH,GA | Control | Metals | 198 | $352,672 | 198 | $352,672 | | |
| LMM | CASH BUILDING PRODUCTS | JACKSONVILLE,FL | Control | Construction | 344 | $369,040 | 344 | $369,040 | | |
| LMM | MARCONA OCEAN INDUSTRIES | ORLANDO,FL | Control | Construction | 226 | $508,228 | 226 | $508,228 | | |
| LMM | YELVINGTON DISTRIBUTION | DAYTONA BEACH,FL | Control | Construction | 413 | $570,636 | 413 | $570,636 | | |
| LMM | ANDERSON COLUMBIA PAVING | LAKE CITY,FL | Control | Metals | 1,308 | $663,064 | 1,308 | $663,064 | | |
| LMM | PEACH STATE ASPHALT | SPRINGFIELD,GA | Control | Construction | 1,573 | $868,636 | 1,573 | $868,636 | | |
| LMM | CSR RINKER | WEST PALM BEACH,FL | Control | Construction | 1,218 | $872,938 | 1,218 | $872,938 | | |
| LMM | CELOTEX | TAMPA,FL | Control | Construction | 936 | $936,153 | 936 | $936,153 | | |
| LMM | COUCH PAVING | TAMPA,FL | Control | Construction | 2,154 | $1,397,326 | 2,154 | $1,397,326 | | |
| LMM | SEABOARD CONSTRUCTION | STERLING,GA | Control | Construction | 4,038 | $1,812,171 | 4,038 | $1,812,171 | | |
| LMM | CARROLL & CARROLL | SAVANNAH, GA | Control | Construction | 3,598 | $2,204,000 | 3,598 | $2,204,000 | | |
| LMM | NUCOR STEEL | BERKERLY,SC | Control | Metals | 2,791 | $3,472,000 | 2,791 | $3,472,000 | | |
| LMM | SOUTHERN AGGREGATES | AUGUSTA, GA | Control | Construction | 7,878 | $4,439,254 | 7,878 | $4,439,254 | | |
| LMM | FLORIDA ROCK INDUSTRIES | JACKSONVILLE,FL | Control | Construction | 13,268 | $5,596,444 | 13,268 | $5,596,444 | | |
| LMM | AMERISTEEL | TAMPA,FL | Control | Construction | 7,910 | $9,222,107 | 7,910 | $9,222,107 | | |
| | | | | | | | | | | |
| | | **TOTAL CONTROL ACCOUNTS** | | | **48,476** | **$33,879,448** | **48,476** | **$33,879,448** | | |
| | | | | | | | | | | |
| LMM | RESOURCE LOGISTICS *** | JACKSONVILLE,FL | Shared | Metals | 392 | $914,562 | 392 | $914,562 | | |
| LMM | GENERAL CHEMICAL ** | PT. WENTWORTH,GA | Shared | Construction | 658 | $1,211,918 | 658 | $1,211,918 | | |
| LMM | GAF CORPORATION * | PT. WENTWORTH,GA | Shared | Construction | 1,814 | $3,030,998 | 1,814 | $3,030,998 | | |
| LMM | OWENS CORNING * | PT. WENTWORTH,GA | Shared | Construction | 1,828 | $4,135,539 | 1,828 | $4,135,539 | | |
| | | | | | | | | | | |
| | | **TOTAL SHARED ACCOUNTS** | | | **4,692** | **$9,293,017** | **4,692** | **$9,293,017** | | |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **53,168** | **$43,172,465** | **53,168** | **$43,172,465** | | |
| | | | | | | | | | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| PTC | Levy Company | Portage, IN | Control | Construction | 0 | $0 | **600** | **$210,000** | | |
| PTC | Western Intermodal Services | Homewood, IL | Control | Metals | 5 | $7,222 | 5 | $7,222 | | |
| PTC | Leeco Steel | Chicago, IL | Control | Metals | 7 | $16,479 | **40** | **$50,000** | | |
| PTC | Welded Tube Company | Chicago, IL | Control | Metals | 14 | $20,677 | **12** | **$12,000** | | |
| PTC | Essex Trading | Northbrook, IL | Control | Metals | 17 | $22,166 | **40** | **$40,000** | | |
| PTC | Tyco International | Homewood, IL (HQ) | Control | Metals | 20 | $54,639 | 20 | $54,639 | | |
| PTC | Copperweld | Chicago, IL | Control | Metals | 101 | $115,913 | **375** | **$480,000** | | |
| PTC | Reserve Marine Terminal | Chicago, IL | Control | Metals | 127 | $178,331 | **100** | **$150,000** | | |
| PTC | Leavitt Tube | Chicago, IL | Control | Metals | 195 | $262,794 | **240** | **$288,000** | | |
| PTC | Cargill Steel & Wire | Minneapolis, MN | Control | Metals | 183 | $273,943 | 183 | $273,943 | | |
| PTC | Cozzi Iron & Metal | Chicago, Il (HQ) | Control | Metals | 307 | $377,724 | 307 | $377,724 | | |
| PTC | Ryerson Tull | Chicago, IL (HQ) | Control | Metals | 516 | $438,093 | **1,000** | **$1,000,000** | | |
| PTC | Trans Load Services | Chicago Heights, IL (HQ | Control | Metals | 265 | $441,479 | **100** | **$175,000** | | |
| PTC | Acme Steel | Riverdale, Il (HQ) | Control | Metals | 298 | $453,002 | **2,000** | **$3,303,000** | | |
| PTC | Central Steel & Wire | Chicago, IL (HQ) | Control | Metals | 338 | $528,839 | **500** | **$826,000** | | |
| PTC | I/N Kote | New Carlisle, IN | Control | Metals | 1,079 | $593,905 | **2,000** | **$1,000,000** | | |
| PTC | Beta Steel | Portage, IN | Control | Metals | 473 | $724,278 | **1,416** | **$2,407,200** | | |
| PTC | Keywell Corporation | Chicago, IL (HQ) | Control | Metals | 831 | $800,268 | **2,000** | **$2,000,000** | | |
| PTC | Allied Tube & Conduit | Harvey, IL | Control | Metals | 814 | $1,262,504 | **200** | **$400,000** | | |
| PTC | Feralloy Corporation | Chicago, IL | Control | Metals | 1,273 | $1,510,075 | **540** | **$1,020,000** | | |
| PTC | Nucor | Crawfordsville, IN | Control | Metals | 3,610 | $3,044,180 | **3,500** | **$3,500,000** | | |
| PTC | I/N Tek | New Carlisle, IN | Control | Metals | 10,608 | $4,203,645 | **500** | **$250,000** | | |
| PTC | Roll & Hold Warehouses | Various | Control | Metals | 2,016 | $4,483,365 | 2,016 | $4,483,365 | | |
| PTC | North Star Steel | Minneapolis, MN | Control | Metals | 5,784 | $6,231,266 | **4,000** | **$7,500,000** | | |
| PTC | Ispat Inland Steel | Indiana Harbor, IN (HQ) | Control | Metals | 17,583 | $11,049,695 | **20,000** | **$13,000,000** | | |
| PTC | Alternative Distribution Svcs (ADS) | Homewood, IL | Control | Metals | | | 0 | $0 | | |
| PTC | British Steel | Chicago, Il (HQ) | Control | Metals | | | 0 | $0 | | |
| PTC | Mitsui, USA | Chicago, IL | Control | Metals | | | 0 | $0 | | |
| PTC | Nat'l Material Trading | Chicago, IL | Control | Metals | | | 0 | $0 | | |
| PTC | Metro Steel | Portage, IN | Control | Metals | | | **60** | **$62,000** | | |
| PTC | IPSCO Steel, Inc | Regina, SK (HQ) | Control | Metals | | | **400** | **$480,000** | | |
| PTC | Central Coil Processing | Burns Harbor, IN | Control | Metals | | | | | | |
| PTC | Elgin, Joliet and Eastern RR | Joliet, IL (HQ) | Control | Shortline | | | | | | |
| PTC | Indiana Harbor Belt RR | Hammond, IN (HQ) | Control | Shortline | | | | | | |
| PTC | IPSCO Steel, Inc | Mountpelier, IA | Control | Metals | | | | | | |
| | | | | | | | | | | |
| | | **TOTAL CONTROL ACCOUNTS** | | | **46,464** | **37,094,482** | **42,154** | **43,350,093** | | |

| NAM | | Location | Control / No Control / | Commodity | Dec. YTD (GRAB) | | Annualized | | Quarterly | |
|---|---|---|---|---|---|---|---|---|---|---|
| Initial | Account | | Shared | Group | Cars | Revenue | Cars | Revenue | Cars | Revenue |
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| PTC | IPSCO Steel, Inc | Camanche, IA | Shared | Metals | 0 | $0 | 0 | $0 | | |
| PTC | IPSCO Tublars Inc. (Pipe Mills) | Blytheville, AR | Shared | Metals | 0 | $0 | 0 | $0 | | |
| PTC | CoilPlus | Plainfield, IL | Shared | Metals | 0 | $0 | **200** | **$200,000** | | |
| PTC | Allied Tube & Conduit | Philadelphia, Pa | Shared | Metals | 0 | $0 | **1,000** | **$1,400,000** | | |
| PTC | Roll & Hold Warehouse (R&H) | Gary, IN | Shared | Metals | 0 | $0 | **3,000** | **$3,000,000** | | |
| PTC | Acme Packaging | Bay Point, Ca | Shared | Metals | 0 | $0 | | | | |
| PTC | Acme Packaging | Leeds, Al | Shared | Metals | 0 | $0 | | | | |
| PTC | Acme Packaging | New Britian, CT | Shared | Metals | 0 | $0 | | | | |
| PTC | Acme Packaging | Riverdale, Il | Shared | Metals | 0 | $0 | | | | |
| PTC | AFCO Metals | Fort Smith, AR | Shared | Metals | 0 | $0 | | | | |
| PTC | AFCO Metals | Jackson, MS | Shared | Metals | 0 | $0 | | | | |
| PTC | AFCO Metals | Litllle Rock, AR | Shared | Metals | 0 | $0 | | | | |
| PTC | AFCO Metals | Oklahoma City, OK | Shared | Metals | 0 | $0 | | | | |
| PTC | AFCO Metals | Shreveport, LA | Shared | Metals | 0 | $0 | | | | |
| PTC | AFCO Metals | West Memphis, AR | Shared | Metals | 0 | $0 | | | | |
| PTC | AFCO Metals | Wichita, KS | Shared | Metals | 0 | $0 | | | | |
| PTC | AFCO Metals - HQ | Norcross, GA | Shared | Metals | 0 | $0 | | | | |
| PTC | Central Steel & Wire | Greensboro, NC | Shared | Metals | 0 | $0 | | | | |
| PTC | General Scrap Partnership (IPSCO) | Edmonton, Alberta | Shared | Metals | 0 | $0 | | | | |
| PTC | IPSCO Direct, Inc | Calgary, Alerta, | Shared | Metals | 0 | $0 | | | | |
| PTC | IPSCO Ontario, Inc | Toronto, Ontario | Shared | Metals | 0 | $0 | | | | |
| PTC | IPSCO Steel, Inc | LeMoyne, Al | Shared | Metals | 0 | $0 | | | | |
| PTC | IPSCO Steel, Inc | Muscatine, IA | Shared | Metals | 0 | $0 | | | | |
| PTC | IPSCO Steel, Inc | Regina, SK | Shared | Metals | 0 | $0 | | | | |
| PTC | IPSCO Steel, Inc (Coil Processing) | Regina, SK | Shared | Metals | 0 | $0 | | | | |
| PTC | IPSCO Steel, Inc (Coil Processing) | Surrey, BC | Shared | Metals | 0 | $0 | | | | |
| PTC | IPSCO Tublars Inc. | Camanche, IA | Shared | Metals | 0 | $0 | | | | |
| PTC | IPSCO Tublars Inc. (Pipe Mills) | Geneva, NE | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Atlanta, GA | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Baton Rouge, LA | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Charlotte, NC | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Columbia, SC | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Greensboro, NC | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Greenville, SC | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Jacksonville, FL | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Miami, FL | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | New Orleans, LA | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Pounding Mill, VA | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Richmond, VA | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals | Tampa, Fl | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals - HQ | Norcross, GA | Shared | Metals | 0 | $0 | | | | |
| PTC | J. M. Tull Metals - Tull Metal Processing | Norcross, GA | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Atlanta, GA | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Atlanta, GA | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Baltimore, MD | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Detroit, MI | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Elizabeth, NJ | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Frewsburg, NY | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Houston, TX | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Midland, PA | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Monroe, NC | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | Rohnert Park, CA | Shared | Metals | 0 | $0 | | | | |
| PTC | Keywell Corporation | West Mufflin, PA | Shared | Metals | 0 | $0 | | | | |
| PTC | North Star Steel | Beaumont, TX | Shared | Metals | 0 | $0 | | | | |
| PTC | North Star Steel | Calvert City, KY | Shared | Metals | 0 | $0 | | | | |
| PTC | North Star Steel | Kingman, AZ | Shared | Metals | 0 | $0 | | | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| PTC | North Star Steel | Monroe, MI | Shared | Metals | 0 | $0 | | | | |
| PTC | North Star Steel | Wilton, IA | Shared | Metals | 0 | $0 | | | | |
| PTC | North Star Steel | Youngstown, OH | Shared | Metals | 0 | $0 | | | | |
| PTC | North Star Steel | Monroe, MI | Shared | Metals | 0 | $0 | | | | |
| PTC | North Star Steel | St Paul, MN | Shared | Metals | 0 | $0 | | | | |
| PTC | Pittsburgh Logistics System (PLS) | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Brownsville, TX | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Burns Harbor, IN | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Charlotte, NC | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Davenport, IA | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Eldridge, IA | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Hammond, IN | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Indianapolis, IN | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Macedonia, Oh | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Pineville, NC | Shared | Metals | 0 | $0 | | | | |
| PTC | Roll & Hold Warehouse (R&H) | Portage, IN | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Cinncinnati, Oh | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Dallas, Tx | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Detroit, MI | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Houston, TX | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Indianapolis, IN | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Kansas City, Mo | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Milwaukee, Wi | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Minneapolis, Mn | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | St. Louis, Mo | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central | Tulsa, Ok | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central - Brite Line | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central - Grinding Division | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Central - Plastics Division | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Coil Processing | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Coil Processing - Coil Trading | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Coil Processing - HQ | New Hope, MN | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Coil Processing - Keelor Steel | Marshalltown, IA | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Coil Processing - Keelor Steel | New Hope, MN | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Coil Processing - Midwest Coil | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Coil Processing - Pickling | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Coil Processing - Ryerson Omni | Knoxville, TN | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson Coil Processing - Select Metals | Plymouth, MN | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson East | Buffalo, NY | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson East | Charlotte, NC | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson East | Chattanooga, TN | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson East | Cleveland, OH | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson East | Philadelphia, Pa | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson East | Pittsburgh, PA | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson East - HQ | West Chester, PA | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson West | Denver, CO | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson West | Los Angeles, CA | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson West | Phoenix, AZ | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson West | Portland, OR | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson West | Salt Lake City, UT | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson West | San Francisco, CA | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson West | Seattle, WA | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson West | Spokane, WA | Shared | Metals | 0 | $0 | | | | |
| PTC | Ryerson West - HQ | Seattle, WA | Shared | Metals | 0 | $0 | | | | |
| PTC | S.H. Bell | Chicago, IL | Shared | Metals | 0 | $0 | | | | |
| PTC | S.H. Bell | Portage, IN | Shared | Metals | 0 | $0 | | | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| PTC | Select Metals | Fridley, MN | Shared | Metals | 0 | $0 | | | | |
| PTC | Thypin Steel | Alabaster, AL | Shared | Metals | 0 | $0 | | | | |
| PTC | Thypin Steel | Cambridge, MA | Shared | Metals | 0 | $0 | | | | |
| PTC | Thypin Steel | Charlotte, NC | Shared | Metals | 0 | $0 | | | | |
| PTC | Thypin Steel | Easton, PA | Shared | Metals | 0 | $0 | | | | |
| PTC | Thypin Steel | Long Island City, NY | Shared | Metals | 0 | $0 | | | | |
| PTC | Thypin Steel | Morrisville, PA | Shared | Metals | 0 | $0 | | | | |
| PTC | Thypin Steel - HQ | Long Island, NY | Shared | Metals | 0 | $0 | | | | |
| PTC | Mueller (Tyco) | Various | Shared | Metals | 29 | $35,897 | 29 | $35,897 | | |
| PTC | North Star Steel KY | Calvert City, KY | Shared | Metals | 427 | $308,127 | 427 | $308,127 | | |
| PTC | Dietrich Industries | Hammond, IN | Shared | Metals | 279 | $369,157 | **400** | **$500,000** | | |
| PTC | Worthington Steel | Porter, IN | Shared | Metals | 610 | $525,781 | **250** | **$200,000** | | |
| PTC | Indiana Pickling & Processing (IPP) | Burns Harbor, IN | Shared | Metals | 103 | $637,499 | 103 | $637,499 | | |
| PTC | Hoogovens Steel | Amsterdam, Netherlands | Shared | Metals | 314 | $726,595 | **600** | **$1,080,000** | | |
| PTC | Grinnell (Tyco Int'l) | Various | Shared | Metals | 725 | $784,684 | 725 | $784,684 | | |
| PTC | Republic Technologies | Chicago, IL | Shared | Metals | 1,482 | $1,836,065 | 1,482 | $1,836,065 | | |
| PTC | LTV | Indiana Harbor, IN | Shared | Metals | 6,058 | $5,641,556 | 6,058 | $5,641,556 | | |
| PTC | Bethlehem Steel | Burns Harbor, IN | Shared | Metals | 8,635 | $10,694,217 | **14,004** | **$17,040,000** | | |
| PTC | LTV | Hennepin, IL | Shared | Metals | 10,771 | $12,916,409 | 10,771 | $12,916,409 | | |
| PTC | USX | Gary, IN | Shared | Metals | 13,473 | $13,053,656 | **10,163** | **$10,163,000** | | |
| PTC | J. M. Tull Metals | Birmingham, AL | Shared | Metals | 0 | | | | | |
| | | | | | | | | | | |
| | | **TOTAL SHARED ACCOUNTS** | | | **42,906** | **$47,529,643** | **49,212** | **$55,743,237** | | |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **89,370** | **$84,624,125** | **91,366** | **$99,093,330** | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| EWP | Green Metals, Inc. | Georgetown, KY | Control | Metals | 0 | $0 | 0 | $0 | | |
| EWP | Lee Masonary Products | Owensboro, KY | Control | Constructon | 3 | $2,000 | 3 | $2,000 | | |
| EWP | Lee Masonary Products | Bowling Green KY | Control | Constructon | 9 | $7,000 | 9 | $7,000 | | |
| EWP | Hausman Steel Corp. | Columbus, OH | Control | Metals | 12 | $11,000 | 12 | $11,000 | | |
| EWP | Columbus Scrap, Inc. | Columbus, OH | Control | Metals | 13 | $13,000 | 13 | $13,000 | | |
| EWP | Galvpro | Jeffersonville, IN | Control | Metals | 16 | $13,000 | 16 | $13,000 | | |
| EWP | Lee Brick & Block | Whitner, KY | Control | Constructon | 17 | $13,000 | 17 | $13,000 | | |
| EWP | Cohen Bros, Inc. | Middletown, OH | Control | Metals | 21 | $15,000 | 21 | $15,000 | | |
| EWP | Fligeltab, Inc | Evansville, IN | Control | Metals | 24 | $29,000 | 24 | $29,000 | | |
| EWP | Thorn-L | New Albany, IN | Control | Constructon | 34 | $34,000 | 34 | $34,000 | | |
| EWP | Louisville Scrap Material | Louisville, KY | Control | Metals | 70 | $53,000 | 70 | $53,000 | | |
| EWP | Lexington Scrap Metal Co. | Lexington, KY | Control | Metals | 56 | $54,000 | 56 | $54,000 | | |
| EWP | Snyder Brick & Block | Dayton, OH | Control | Constructon | 44 | $73,000 | 44 | $73,000 | | |
| EWP | Philips Lighting Company | Danville, KY | Control | Constructon | 57 | $76,000 | 57 | $76,000 | | |
| EWP | Steel Technologies | Louisville, KY | Control | Metals | 65 | $79,000 | 65 | $79,000 | | |
| EWP | Newport Steel Corporation | Newport, KY | Control | Metals | 107 | $131,000 | 107 | $131,000 | | |
| EWP | Somerset Scrap Metal Co. | Somerset, KY | Control | Metals | 122 | $134,000 | 122 | $134,000 | | |
| EWP | Clay Ingels Company | Lexington, KY | Control | Constructon | 130 | $169,000 | 130 | $169,000 | | |
| EWP | Southwestern Ohio Steel | Middletown, OH | Control | Metals | 178 | $173,000 | 178 | $173,000 | | |
| EWP | Schlezinger & Sons | Columbus, OH | Control | Metals | 204 | $205,000 | 204 | $205,000 | | |
| EWP | General Electric Co | Somerset, KY | Control | Constructon | 146 | $216,000 | 146 | $216,000 | | |
| EWP | Precision Strip, Inc. | Middletown, OH | Control | Metals | 131 | $224,000 | 131 | $224,000 | | |
| EWP | Voss Steel | Jeffersonville, IN | Control | Metals | 429 | $263,000 | 429 | $263,000 | | |
| EWP | Hill & Griffith | Cincinnati, OH | Control | Metals | 155 | $267,000 | 155 | $267,000 | | |
| EWP | Tate Builders Supply | | Control | Constructon | 248 | $335,000 | 248 | $335,000 | | |
| EWP | Dietrich Industries | Columbus, OH | Control | Metals | 352 | $465,000 | 352 | $465,000 | | |
| EWP | Adcom Metals Company | Nicholasville, KY | Control | Metals | 522 | $728,000 | 522 | $728,000 | | |
| EWP | Gallatin Steel Co. | Warsaw, KY | Control | Metals | 516 | $765,000 | 516 | $765,000 | | |
| EWP | Florida Tile, Industries | Lawrenceburg, KY | Control | Constructon | 606 | $769,000 | 606 | $769,000 | | |
| EWP | Toyota Tsusho | Georgetown, KY | Control | Metals | 457 | $959,000 | 457 | $959,000 | | |
| EWP | Osram Sylvania, Inc. | Versailles, KY | Control | Constructon | 880 | $1,102,000 | 880 | $1,102,000 | | |
| EWP | Meshberger Stone | | Control | Constructon | 906 | $1,145,000 | 906 | $1,145,000 | | |
| EWP | Worthington Steel | | Control | Metals | 7,776 | $9,536,000 | 7,776 | $9,536,000 | | |
| EWP | David J. Joseph Co. | Cincinnati, OH | Control | Metals | 12,165 | $13,345,000 | 12,165 | $13,345,000 | | |
| | | | | | | | | | | |
| | | | **TOTAL CONTROL ACCOUNTS** | | **26,471** | **31,403,000** | **26,471** | **31,403,000** | | |
| | | | | | | | | | | |
| EWP | Lee Masonary Products | Hopkinsville, KY | Shared | Constructon | 12 | $10,000 | 12 | $10,000 | | |
| EWP | Lee Masonary Products | Lexington, KY | Shared | Constructon | 25 | $21,000 | 25 | $21,000 | | |
| EWP | Alcoa, Inc | Lafayette, IN | Shared | Metals | 371 | $451,000 | 371 | $451,000 | | |
| EWP | Oxford Automotive | | Shared | Metals | 490 | $793,000 | 490 | $793,000 | | |
| EWP | Reynolds Metals, Inc. | Louisville, KY | Shared | Metals | 760 | $1,204,000 | 760 | $1,204,000 | | |
| EWP | Bayou Steel Corp. | Harriman, TN | Shared | Metals | 2,107 | $1,797,000 | 2,107 | $1,797,000 | | |
| EWP | Global Stone | Luttrell, TN | Shared | Constructon | 1,536 | $2,108,000 | 1,536 | $2,108,000 | | |
| EWP | Gerstenslager Company | Wooster, OH | Shared | Constructon | 1,500 | $2,475,000 | 1,500 | $2,475,000 | | |
| EWP | AmeriSteel Corp. | Knoxville, TN | Shared | Metals | 1,948 | $2,478,000 | 1,948 | $2,478,000 | | |
| EWP | Tower Automotive | | Shared | Metals | 2,214 | $2,560,000 | 2,214 | $2,560,000 | | |
| EWP | Alcoa, Inc | Warrick, IN | Shared | Metals | 2,979 | $3,759,000 | 2,979 | $3,759,000 | | |
| | | | | | | | | | | |
| | | | **TOTAL SHARED ACCOUNTS** | | **13,942** | **17,656,000** | **13,942** | **17,656,000** | **0** | **0** |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **40,413** | **49,059,000** | **40,413** | **49,059,000** | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| RTS | Tindall Corp. | Conley, GA | Control | Construction | 17 | $17,155 | **100** | **$100,000** | | |
| RTS | Big River Industries | Macon, GA | Control | Construction | 221 | $215,124 | 221 | $215,124 | | |
| RTS | Rock & Earth Technologies | Rockmart, GA | Control | Construction | 237 | $242,662 | **537** | **$442,662** | | |
| RTS | Albany Recycling Services | Albany, GA | Control | Metals | 241 | $284,565 | 241 | $284,565 | | |
| RTS | Mineral Resource Technologies | Atlanta, GA | Control | Construction | 286 | $318,711 | 286 | $318,711 | | |
| RTS | Metro Alloys | East Point, GA | Control | Metals | 342 | $354,463 | 342 | $354,463 | | |
| RTS | Dayton Steel Services | Rome, GA | Control | Metals | 347 | $495,563 | 347 | $495,563 | | |
| RTS | Tull Industries | Norcross, GA | Control | Metals | 350 | $535,894 | 350 | $535,894 | | |
| RTS | Macon Iron & Paperstock | Macon, GA | Control | Metals | 599 | $737,575 | 599 | $737,575 | | |
| RTS | Cherokee Brick and Tile | Macon, GA | Control | Construction | 1,061 | $1,181,375 | 1,061 | $1,181,375 | | |
| RTS | Newell Recycling | East Point, GA | Control | Metals | 1,544 | $1,409,079 | 1,544 | $1,409,079 | | |
| RTS | Regional Recycling | Atlanta, GA | Control | Metals | 2,060 | $1,588,708 | 2,060 | $1,588,708 | | |
| RTS | Big River Industries | Atlanta, GA | Control | Construction | 4,071 | $4,665,460 | 4,071 | $4,665,460 | | |
| RTS | Southwire Company | Carrollton, GA | Control | Metals | 3,304 | $6,271,419 | 3,304 | $6,271,419 | | |
| RTS | Boral Brick | Augusta, GA | Control | Construction | 7,118 | $7,068,955 | 7,118 | $7,068,955 | | |
| | | | | | | | | | | |
| | | **Total Control Accounts** | | | **21,798** | **$25,386,708** | **22,181** | **$25,669,553** | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| RTS | Whelan Foundry | E. Warrenton, GA | Shared | Metals | 708 | $970,627 | 708 | $970,627 | | |
| RTS | ISG Resources | Atlanta, GA | Shared | Construction | 1,099 | $1,227,408 | 1,099 | $1,227,408 | | |
| RTS | Marine Port Terminal | Brunswick, GA | Shared | Construction | 2,156 | $1,416,296 | 2,156 | $1,416,296 | | |
| RTS | Armstrong World | Armstrong, GA | Shared | Construction | 1,753 | $1,696,556 | 1,753 | $1,696,556 | | |
| RTS | Columbus Foundry | Columbus, GA | Shared | Metals | 1,204 | $1,783,406 | 1,204 | $1,783,406 | | |
| | | | | | | | | | | |
| | | **Total Shared Accounts** | | | **6,920** | **$7,094,293** | **6,920** | **$7,094,293** | | |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **28,718** | **$32,481,001** | **29,101** | **$32,763,846** | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Revenue | Quarterly Cars | Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| SBM | Allied Readymix | Decatur, GA | **Shared** | Construction | **675** | **$570,006** | **675** | **$570,006** | | |
| | | | | | | | | | | |
| SBM | N. Georgia Brick | Cumming, GA | Control | Construction | 109 | $73,660 | 109 | $73,660 | | |
| SBM | Simpson Brick | Commerce, GA | Control | Construction | 111 | $77,515 | 111 | $77,515 | | |
| SBM | Morgan Concrete | Toccoa, GA | Control | Construction | 82 | $78,789 | 82 | $78,789 | | |
| SBM | Hanson Aggregate | Bolingbroke, GA | Control | Construction | 115 | $81,570 | 115 | $81,570 | | |
| SBM | Athens Concrete | Athens, GA | Control | Construction | 127 | $124,526 | 127 | $124,526 | | |
| SBM | Scruggs Concrete | Valdosta, GA | Control | Construction | 368 | $284,754 | 368 | $284,754 | | |
| SBM | The Concrete Company | Columbus, GA | Control | Construction | 436 | $607,640 | 436 | $607,640 | | |
| SBM | Imex Intl | Elberton, GA | Control | Construction | 605 | $961,520 | 605 | $961,520 | | |
| SBM | Scruggs Inc | Valdosta, GA | Control | Construction | 2,122 | $1,113,989 | 2,122 | $1,113,989 | | |
| SBM | Williams Brothers | Marietta, GA | Control | Construction | 887 | $1,204,908 | 887 | $1,204,908 | | |
| SBM | Reams & Son Construction | Valdosta, GA | Control | Construction | 2,978 | $1,635,532 | 2,978 | $1,635,532 | | |
| SBM | Reeves Construction | Americus, GA | Control | Construction | 3,976 | $2,294,269 | 3,976 | $2,294,269 | | |
| SBM | Global Stone | Roswell, GA | Control | Construction | 5,692 | $7,331,343 | 5,692 | $7,331,343 | | |
| SBM | Blue Circle Cement | Marietta, GA | Control | Construction | 13,803 | $9,618,505 | 13,803 | $9,618,505 | | |
| SBM | Riverwood International Corp. | Atlanta, GA | Control | Paper | 9,993 | $10,537,745 | 9,993 | $10,537,745 | | |
| SBM | Martin Marietta | Augusta, GA | Control | Construction | 20,311 | $11,967,352 | 20,311 | $11,967,352 | | |
| | | | | | | | | | | |
| | | **TOTAL CONTROL ACCOUNTS** | | | **61,715** | **47,993,617** | **61,715** | **47,993,617** | | |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **62,390** | **$48,563,623** | **62,390** | **$48,563,623** | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| AGG | Cardinal FG | | Control | Construction | 91 | $104,000 | 91 | $104,000 | | |
| AGG | Queen Stee | | Control | Metals | 102 | $166,000 | 102 | $166,000 | | |
| AGG | Lee Bri&Ti | | Control | Construction | 248 | $307,000 | 248 | $307,000 | | |
| AGG | Char Pip&F | | Control | Construction | 203 | $325,000 | 203 | $325,000 | | |
| AGG | Georg Stee | | Control | Construction | 484 | $327,000 | 484 | $327,000 | | |
| AGG | Smit Met&I | | Control | Metals | 390 | $406,000 | 390 | $406,000 | | |
| AGG | Myers Bro | | Control | Metals | 454 | $481,000 | 454 | $481,000 | | |
| AGG | Griff Wrec | | Control | Metals | 552 | $494,000 | 552 | $494,000 | | |
| AGG | Bruce Iro&M | | Control | Metals | 684 | $687,000 | 684 | $687,000 | | |
| AGG | Carol Stal | | Control | Construction | 536 | $707,000 | 536 | $707,000 | | |
| AGG | Natl Gypsu | | Control | Construction | 283 | $736,000 | 283 | $736,000 | | |
| AGG | Carl Ste F | | Control | Metals | 451 | $763,000 | 451 | $763,000 | | |
| AGG | Edgec Meta | | Control | Construction | 525 | $850,000 | 525 | $850,000 | | |
| AGG | Char Pip&F | | Control | Metals | 827 | $969,000 | 827 | $969,000 | | |
| AGG | Metro Mate | | Control | Construction | 1,734 | $1,147,000 | 1,734 | $1,147,000 | | |
| AGG | Sou Conc M | | Control | Construction | 2,036 | $2,310,000 | 2,036 | $2,310,000 | | |
| AGG | Roll & Hold Warehouse | | Control | Metals | 1,176 | $3,201,000 | 1,176 | $3,201,000 | | |
| | | | | | | | | | | |
| | | Total Control Accounts | | | **10,776** | **$13,980,000** | **10,776** | **$13,980,000** | | |

| NAM Initial | Account | Location | Control / No Control / Shared | Commodity Group | Dec. YTD (GRAB) Cars | Revenue | Annualized Cars | Annualized Revenue | Quarterly Cars | Quarterly Revenue |
|---|---|---|---|---|---|---|---|---|---|---|
| RMH | Granite City Steel (Div. Of Natl Steel) | | Control | Metals | 0 | $0 | 0 | $0 | | |
| | | | | | | | | | | |
| AGG | GAF Corp | | Shared | Construction | 195 | $108,000 | 195 | $108,000 | | |
| AGG | Bore Cla P | | Shared | Construction | 288 | $315,000 | 288 | $315,000 | | |
| AGG | CAro Qua C | | Shared | Construction | 436 | $338,000 | 436 | $338,000 | | |
| AGG | Bren Iro&M | | Shared | Metals | 418 | $398,000 | 418 | $398,000 | | |
| AGG | Comme Meta | | Shared | Metals | 435 | $449,000 | 435 | $449,000 | | |
| AGG | Taly Cla P | | Shared | Construction | 337 | $496,000 | 337 | $496,000 | | |
| AGG | Pin Ha B&P | | Shared | Construction | 537 | $616,000 | 537 | $616,000 | | |
| AGG | Ctl Concre | | Shared | Construction | 612 | $676,000 | 612 | $676,000 | | |
| AGG | Pied Pla P | | Shared | Metals | 477 | $712,000 | 477 | $712,000 | | |
| AGG | Concr Sply | | Shared | Construction | 966 | $835,000 | 966 | $835,000 | | |
| AGG | Boral Bric | | Shared | Construction | 712 | $863,000 | 712 | $863,000 | | |
| AGG | Holnam Inc. | | Shared | Construction | 1,173 | $876,000 | 1,173 | $876,000 | | |
| AGG | Thyss Stee | | Shared | Metals | 552 | $885,000 | 552 | $885,000 | | |
| AGG | Untd Met R | | Shared | Metals | 1,084 | $930,000 | 1,084 | $930,000 | | |
| AGG | Guard Indu | | Shared | Construction | 821 | $998,000 | 821 | $998,000 | | |
| AGG | Beke Mine | | Shared | Construction | 1,463 | $1,236,000 | 1,463 | $1,236,000 | | |
| AGG | PPG Indust | | Shared | Construction | 1,380 | $1,360,000 | 1,380 | $1,360,000 | | |
| AGG | Cher San G | | Shared | Construction | 1,053 | $1,573,000 | 1,053 | $1,573,000 | | |
| AGG | Ameristeel | | Shared | Metals | 4,202 | $1,831,000 | 4,202 | $1,831,000 | | |
| AGG | Indu Miner | | Shared | Construction | 3,261 | $5,148,000 | 3,261 | $5,148,000 | | |
| | | | | | | | | | | |
| | | | **Total Shared Accounts** | | **20,402** | **$20,643,000** | **20,402** | **$20,643,000** | | |
| | | | | | | | | | | |
| | | | **GRAND TOTAL** | | **31,178** | **$34,623,000** | **31,178** | **$34,623,000** | | |
| | | | | | | | | | | |
| | **GRAND TOTAL METALS WEST ACCOUNTS** | | | | **626,096** | **$537,173,523** | **644,915** | **$576,575,801** | | |

**From:** Luebbers, Chris D.
**Sent:** Fri Jun 30 08:36:40 2006
**To:** Heller, Jeffrey S.
**Subject:** FW: NS Contract Proposal [Our Ref:WAL72062]
**Importance:** Normal

Running out of power at the moment, but in regards to #3, I am not immediately familiar with the all inclusive index without fuel and cannot offer a comparison at the moment. I'll see what I can find out.

-----Original Message-----
**From:** [redacted]
**Sent:** Friday, June 30, 2006 8:41 AM
**To:** Heller, Jeffrey S.; Leonardos, Lori A.; [redacted]
**Cc:** [redacted]; Luebbers, Chris D.; McClellan, Mike R.; Seale Don
**Subject:** RE: NS Contract Proposal [Our Ref:WAL72062]

Jeff,

Thank you for your revised offer. Before I come back with detailed comments, please could you clarify the following for me as I took notes during our call yesterday but dont find the same back in your email;

1. You stated that $3.3m reduction in costs to ML would be worked into the proposal which was to compensate for the 8% - 9.5% confusion and to take the sting out the "temporary" rates and the Jan 06 rates. We estimated that this would roughly equate to 2.5% but the offer stated was $3.3m which I dont see mentioned in your note. I assume that this is covered in point 1 but would like that point to reflect what was discussed i.e. $3.3m reduction to ML costs.

2. We talked about the EMT volumes being removed from the NS volume commitment and the 20% of all Newark business clause which I thought that we agreed should read all Atlantic Ocean port of entry or departure rather than stating a %.

3. Something that I did not bring up during our call yesterday but needs further clarity is your proposal to use RCR as the measure for annual increases. During our meeting in CNC we were led to believe that RCR did not include a fuel component which is important as the proposal already covers fuel by means of a fuel surcharge. Please could you confirm that this is the case. Also, the comparison that we requested was between RCR and ALL INCLUSIVE INDEX less FUEL not RCAF which already includes fuel so is therefore not relevant.

4. We also discussed the NFK - CHI interchange rate. To be clear, the rates at the start of the year were as follows;

| | | Interchange | | Local | Diffs |
|---|---|---|---|---|---|
| PONL | '20 | $365 | | $365 | $0 |
| ML | '20 | $562 | = 54% higher | $413 | $149 |
| PONL | '40 | $460 | | $460 | $0 |
| ML | '40 | $716 | = 56% higher | $516 | $200 |

From this it can be seen that not only were the ML rates higher than PONL rates but the IC rate was at a premium of $200 for no good reason that we can see. You stated that this would be corrected in ML favor at our meeting in CNC but say below that it will become an equal blended rate which we cannot support as it implies that the local rate will increase. Please can you confirm that the local rate will be left alone and that the IC rate will be brought in line. I raise this point as I am still confused about this issue and want to also ensure that my understanding that the $3.3m stated above does not form part of this rate correction which has cost ML millions of dollars in the past. Failing this, would appreciate if you could explain why a rate differential and level is justified between local and IC and if you intend to increase the CHI local rate, why this is justified given that the rate level is already higher by 12% than PONL who only had a fraction of the volume of ML.

Regards

[redacted]

This e-mail is intended exclusively for the addressee. If you are not the addressee you must not read, copy, use or disclose the e-mail nor the content; please notify us immediately [by clicking 'Reply'] and delete this e-mail.

---

**From:** Heller, Jeffrey S. [mailto:jeffrey.heller@nscorp.com]
**Sent:** Thursday, June 29, 2006 6:58 PM
**To:** Leonardos, Lori A.; [redacted]
**Cc:** [redacted] Luebbers, Chris D.; McClellan, Mike R.; Seale Don
**Subject:** RE: NS Contract Proposal

[redacted]

Thanks for the call this morning. As follow up to our discussion, we wanted to make some a further amendment to our (trailing) offer of June 28th, 2006:

1. We agree to provide [redacted] with a 2.5% decrease off the current rate offer by taking the January 1 rates and reducing overall revenue by 2.5% (overall revenue based on 2006 volumes provided in [redacted] RFP) to come up with a cost reduction amount. The rates will not be reduced across the board by 2.5%, but adjusted in a manner to reduce overall cost to [redacted] by that amount, based on NS's selection of lanes and rates. From there, these rates will increased by 4.5% effective January 1, 2007(except Norfolk rates).

2. On July 1, 2007 the January 1, 2007 rates will be increased by 4.5% (except Norfolk rates).

3. All rates will be applied an RCAF or RCR based increase on January 1, 2008. However, the following will apply to Norfolk rates:

    a. If during Q4 2007, Norfolk volumes in the lanes contained in the contract increase by 10% or more compared to Q4 2006, then those rates will not be increased on January 1, 2008. If the volumes grow less than 10%, then the Norfolk rates will be subject to 25% of the full January 1, 2008 rate increase.

    b. If during Q1 2008, Norfolk volumes in the lanes contained in the contract grow by more than 10% or more, then the Norfolk rates will not be increased on April 1, 2008. If the volumes grow less than 10%, then the Norfolk rates in place at that point will be subject to 25% of the full January 1, 2008 rate increase.

c. If during Q2 2008, Norfolk volumes in the lanes contained in the contract grow by more than 10% or more, then the Norfolk rates will not increase on increase on July 1, 2008. If the volumes grow less than 10%, then the Norfolk rates will be subject to 25% of the full January 1, 2008 rate increase.

d. If during Q3 2008, Norfolk volumes in the lanes contained in the contract grow by more than 10% or more, then the Norfolk rates will not be increased on October 1, 2008. If the volumes grow less than 10%, then the Norfolk rates will be subject to 25% of the full January 1, 2008 rate increase.

e. Beginning on January 1, 2009 all Norfolk rates will be subject to the normal annual rate increases.

4. Rate increases will be based on the year-over year change of the RCAF or RCR, capped at 5%. Whether the RCAF or RCR is used to be determined.

5. All of the above conditions are contingent upon [redacted] agreeing to include the current Fuel Surcharge structure contained in the current contract offer.

We believe this is a major concession and further evidence of our commitment to our partnership with [redacted] and hope that it will allow us to finalize the agreement. Please call me or Lori should you have any questions.

Best regards,

Jeff

-----Original Message-----
**From:** Leonardos, Lori A.
**Sent:** Wednesday, June 28, 2006 11:55 AM
**To:** [redacted]
**Cc:** [redacted] Heller, Jeffrey S.; Luebbers, Chris D.; McClellan, Mike R.
**Subject:** NS Proposal

Glenn,

Thank you for taking the time to meet with us yesterday. We found the meeting to be productive and hope you did as well.

Recapping our discussion, we offer the following revisions to our May 19th proposal:

1. The proposed new contract rate increases (from 1/1/06 rates) will be implemented in two phases, 50% of the overall increase on January 1, 2007 and the remaining 50% on July 1, 2007.

2. The proposed increase on Norfolk rates will be removed. Therefore, Norfolk rates in effect on 1/1/06 will be effective through 12/31/07.

3. Additionally, we will review the Norfolk to Chicago local and interchange rates and provide an equal, blended rate for both.

4. Elizabeth Marine Terminal traffic will be removed from the NS volume

commitment. These rates will be removed from the contract and the volumes will not be subject to the 90% NS volume commitment. However, Croxton business will still remain with NS and subject to the 90% commitment and EMT volumes will not exceed 20% of your overall Newark volume.

5. We will provide you an RCAF and RCR comparison and work with you to determine the best formula to use for annual cost adjustments.

6. We will review and develop a formula that may remove the rate escalation impact of the fuel surcharge.

7. We will continue to work with APM and Commonwealth to determine the operational structure and charges at the new terminal. Once completed, we will be able to quote rates for this business.

We are compiling a list of charges that we know Maersk currently does not pay (or does not pay at full value) and will forward those to you soon.

We look forward to your feedback as well as meeting again soon to resolve the outstanding details and finalize our new agreement.

***Lori Leonardos***
Norfolk Southern Corporation
Market Manager International
4600 Deer Path Road
Harrisburg, PA 17110
(717) 541-2232

**NORFOLK SOUTHERN CORPORATION**

**CONFIDENTIAL TRANSMITTAL**

Date: December 18, 2002
File: C3B-REG-NS-C-13496 TWT

TO: [redacted]

FROM: L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 981-4198

***Please review the status of this contract document as our records indicate it is not signed. Duplicate copies are attached for signature and return to NS. Thanks....***

***Terry Thomasson***
***NS Contract Publications***
***9/3/03***

Attachment: Draft Contract Amendment

Contract No.: REG-NS-C-13496 Amendment No. 16

Customer: [redacted]

Number of: Copies 2 Pages per copy 14

Transmittal: __ FAX; __ Express; X Mail.

Ancillary: X NO; __ YES - Intercarrier agreement-Railroad use only.

Instructions: The attached document is a draft. If no revisions are required you may:

- Sign two (2) copies of the draft and return to NS at the address shown above; or
- Fax one signed copy to NS at (540) 981-4198; or
- Request that hard copies be mailed to you for signature.

Questions or revisions? Contact Terry Thomasson at (540) 985-6735 or via the Internet at twthomas@nscorp.com.

cc:

___ Roanoke - Box 0041 (R9J-X-121107)
___ NAM - Indianapolis FAX (317) 805-4791

**CONFIDENTIAL**

AMENDMENT NO. 16 TO
CONTRACT REG-NS-C-13496

This Amendment is made by and between [redacted] (Customer), with business address at [redacted]; and Norfolk Southern Railway Company and Consolidated Subsidiaries (NS and/or Railroad), with business address at 110 Franklin Road, S. E., Roanoke, VA 24042-0041.

WITNESSETH:

WHEREAS, Customer and Railroad have entered a transportation agreement numbered Contract ICC-NS-C-13496, as amended, covering the transportation of various grains and grain screenings from various origins to Jacksonville, FL (for movement beyond); Lacymark, FL; Lake City, FL; Woodacre, GA; and New Haven, IN; and

WHEREAS, the parties desire to amend their Contract to extend the Contract term through August 31, 2003, revise existing rates, and add rates applicable from Sheldon, IL to Lacymayk, FL and Lake City, FL;

NOW THEREFORE, the parties agree as follows:

1. Effective Date. This Amendment shall become effective on September 1, 2002, and shall remain in effect until Contract REG-NS-C-13496 expires or is terminated as provided therein. However, until the summary to this Amendment is approved by the Surface Transportation Board (STB) of the Department of Transportation (DOT), it shall remain subject to the STB's jurisdiction in accordance with the standards of 49 U.S.C. §10709. In the event the STB disapproves the Summary to this Amendment, it shall be considered null and void and transportation or service hereunder shall be deemed to have been governed by applicable contract or tariff provisions.

2. Amendment of Contract. On and after the Effective Date hereof, the Contract is amended as follows:

(a) Delete Section 1 thereof and substitute in lieu thereof the following new Section 1:

**SECTION 1 - TERM.** This Contract, formerly made pursuant to 49 U.S.C. §10713 and 49 C.F.R. §1313.2/1313.3/1313.3(c), shall apply as follows:

| | |
|---|---|
| Application Date: | August 1, 1993 (original Contract only) |
| Termination Date: | August 31, 2003 |
| Renewals: | NO |

(b) Delete Section 2 thereof and substitute in lieu thereof the following new Section 2:

**SECTION 2 - TRANSPORTATION.** Railroad will transport "Commodity" from "Origin" to "Destination" via "Route" in accordance with the conditions described in applicable Appendices to this Contract.

(c) Delete Appendices A, B, and C thereto and substitute in lieu thereof the attached new Appendix A and Exhibits thereto.



3. Incorporation. Except as amended herein, all terms, conditions and provisions of the Contract shall remain fully effective and in force among the parties hereto, and all such terms, conditions and provisions are hereby incorporated by reference herein.

IN WITNESS WHEREOF, the parties have caused this Contract Amendment to be executed by their duly authorized respective representatives as of the day and year first above written.

| | |
|---|---|
| [redacted] | **NORFOLK SOUTHERN RAILWAY COMPANY AND CONSOLIDATED SUBSIDIARIES** |
| BY ______________________ | BY ______________________ |
| TITLE ______________________ | TITLE ______________________ |
| DATE ______________________ | DATE ______________________ |

(REG-NS-C-13496.16)
C3B-TWT
Form approved by NS Law

Appendix A to
Contract REG-NS-C-13496
Amendment No. 16
Page 1 of 3

| | | |
|---|---|---|
| Commodity: | Barley | (STCC 01-131-10/01-131-15/01-131-30) |
| | Corn | (STCC 01-132-10/01-132-15) |
| | Oats | (STCC 01-133-10) |
| | Rye | (STCC 01-135-10) |
| | Milo (Milo Maize) | (STCC 01-136-55) |
| | Sorghum Grain, NEC | (STCC 01-136-90) |
| | Wheat | (STCC 01-137-10/STCC 01-137-20) |
| | Buckwheat | (STCC 01-139-10) |
| | Millet | (STCC 01-139-25) |
| | Grain Screenings | (STCC 01-139-30) |
| | Grain, NEC | (STCC 01-139-90) |
| | Soybeans, dried | (STCC 01-144-10) |
| | Soybeans, fresh | (STCC 01-144-15) |
| | Soybean Screenings | (STCC 01-144-20) |
| | Sunflower Seeds | (STCC 01-149-40) |
| | Canola Seeds | (STCC 01-149-50) |
| | Grain Dust | (STCC 20-418-54) |

Origin/
Destination/
Rate: As provided in applicable Exhibits

Minimum Weight: 196,000 pounds per car; applicable to rates expressed in dollars per net ton.

Equipment: Covered hopper cars

Mileage
Allowance: Shipments moving under the terms of this contract in privately-owned or leased equipment are not subject to mileage payments by Railroad. If Railroad inadvertently pays mileage allowances to car owner, Railroad will seek reimbursement of overpayment from car owner. If Railroad is unable to collect the overpayment from the car owner, Customer agrees to reimburse Railroad for overpayment.

Route: NS direct

Restrictions:

1) Shipments moving under the terms of this contract will not be afforded transit privileges of any kind including the privileges of reconsigning, diversion and inspection.
2) Railroad will not absorb switching charges of connecting carriers at Origin or Destination. All switching charges will be paid to Railroad by Customer in addition to the line haul charges under this Contract.

Rejected Shipments:

When a shipment of Commodity, moving under the terms of this contract, has reached Destination but is not unloaded and is returned for reasons other than Railroad's error, to the station at which the Commodity originated, via a route that is the reverse of the route over which such shipments moved from such Origin point to Destination, the return movement will be subject to the Rate and Minimum Weight provided herein in effect on the date the shipment is tendered for return or to the rate normally applicable for such return movement, whichever is lower. Refused or returned shipments will not count towards fulfillment of Customer's annual volume commitment.

Volume Guarantee: A minimum of 100 carloads of Commodity from Origin to Destination.

Ancillary: NO

Escalation: NONE

Appendix A to
Contract REG-NS-C-13496
Amendment No. 16
Page 3 of 3

Fuel Surcharge:

In the event the price of West Texas Intermediate Crude Oil, as published in the Wall Street Journal, exceeds $28.00 per barrel for thirty (30) consecutive days, NS retains the right to apply a fuel surcharge to the freight charge(s) contained in this authority in effect on the date the fuel surcharge is applied, hereinafter referred to as the "Base Freight Charge(s)". If this option is exercised, the fuel surcharge shall be applied according to the following schedule:

| Texas Intermediate Crude Oil (Price per barrel) | Cumulative Fuel Surcharge (Percentage) |
|---|---|
| $28 | 2% |
| $33 | 4% |
| $38 | 6% |
| $43 | 8% |
| Each $5.00 per barrel increase thereafter | An additional 2% |

The price of West Texas Intermediate Crude Oil must exceed a given bracket for thirty (30) consecutive days for the surcharge under that bracket to be applicable. If the price of West Texas Intermediate Crude Oil ceases to be available from the Wall Street Journal or some other readily accessible source, a substitute to measure will be utilized.

Customers will receive notice of any fuel surcharge not less than ten (10) days prior to its application. Any fuel surcharge applied to the freight charge(s) in this authority will be removed or reduced when the price of West Texas Intermediate Crude Oil remains below the price which triggers a specific surcharge bracket for thirty (30) consecutive days. Reductions will be made promptly after they become applicable. In no case will the freight charge(s) be reduced below the Base Freight Charge(s) nor will the application or removal of the fuel surcharge be retroactive.

(C3B-TWT)

NORFOLK SOUTHERN CORPORATION

CONFIDENTIAL TRANSMITTAL

Date: September 11, 2003
File: C3B-REG-NS-C-13496 TWT

TO: [redacted]

FROM: L. G. Ferris
Manager Contract Publications
Norfolk Southern Corporation
110 Franklin Road, S. E.
Roanoke, VA 24042-0041
FAX (540) 985-5000

Attachment: Fully executed Contract Amendment - final distribution

Ancillary: X NO; ___ YES - Intercarrier agreement - Railroad use only.

Contract No. REG-NS-C-13496 Amendment No. 16

Customer : [redacted]

___ Cancels ___ Replaces: N/A

Instructions: The attached fully executed Contract Amendment should be retained for your records. If you received earlier drafts, please note if any revisions were made and replace those earlier drafts with this document.

**Questions? Call Lynn Ferris at (540) 985-6119.**

cc :

___ Roanoke - Box 0041 (R9J-X-121107)
___ Roanoke - Box 0037
___ Roanoke - Box 0041 (C1)
___ NAM - Indianapolis

(C3B-TWT)

STB-NS-C-00150
AMENDMENT NO. 16

# NORFOLK SOUTHERN RAILWAY COMPANY AND CONSOLIDATED SUBSIDIARIES

# AMENDED CONTRACT SUMMARY

ISSUED: September 11, 2003

EFFECTIVE: September 10, 2003

ISSUED BY
A. M. PFEIFER
MANAGER PRICING SERVICES
NORFOLK SOUTHERN CORPORATION
8TH FLOOR
110 FRANKLIN ROAD, S.E.
ROANOKE, VIRGINIA 24042-0041

## AMENDMENT NO. 16
## AMENDED CONTRACT SUMMARY STB-NS-C-00150

### RULES AND OTHER GOVERNING PROVISIONS

| ITEM | SUBJECT | | APPLICATION | |
|---|---|---|---|---|
| 10 | Carrier Names | | Norfolk Southern Railway Company and Consolidated Subsidiaries<br>110 Franklin Road, S.E., Roanoke, VA 24042 | |
| 20 | Commodity | | Barley; Corn; Oats; Rye; Milo (Milo Maize); Sorghum Grain, NEC; Wheat; Buckwheat; Millet; Grain Screenings; Grain, NEC; Soybeans, dried; Soybeans, fresh; Soybean Screenings; Sunflower Seeds; Canola Seeds; Grain Dust (Additions) | |
| 30 | Shipper | | [redacted] | |
| 40 | Contract Duration | (i)<br>(ii)<br>(iii) | Application Date:<br>Termination Date:<br>Optional Extension: | September 1, 2002<br>August 31, 2003 (Extension)<br>NO |
| 50 | Origins, Destinations, Transit Points and Other Shipper Facilities | (i)<br><br>(ii)<br>(iii)<br>(iv) | Origin(s):<br>Destination(s):<br>Ports(s):<br>Transit point(s):<br>Shipper Facility: | See attached Exhibit<br>See attached Exhibit<br>NA<br>NA<br>NA |
| 60 | Rail Car Data | (A)<br>(i)(A)<br>(ii)(A) | Number of Dedicated Cars<br>Available & Owned by Carrier:<br>Available & Leased by Carrier:<br>Average Number of Bad Order: | <br>NA<br>NA<br>NA |
| | | or<br>(i)(B) | Shipper will furnish the rail cars used for the transportation provided under the Contract, and those rail cars will not be leased from the Carrier. | |
| | | (iii)(B) | The cumulative equipment total for all contracts for the transportation of agricultural commodities (including forest products, but not including wood pulp, wood chips, pulpwood or paper) does not exceed 40% of the capacity of carrier-owned and -leased cars by applicable car types. | |
| 70 | Rates and Charges | (i)<br>(ii) | Base Rates and Charges: NSRQ 4400-Series Publication<br>Escalation: NONE | |
| 80 | Volume | (i)<br>(ii)<br>(iii) | Movement Type: Single-car<br>Minimum and Actual Volume: 100 Carloads (annually)<br>Volume Breakpoints: NA | |

| | | |
|---|---|---|
| 90 | Special Features | Change is in Confidential Matter (Rates) |

(C3B-TWT)

Exhibit to
Amended Contract Summary
STB-NS-C-00150
Amendment No. 16

ORIGINS-

Lake City, FL
Camilla, GA
Woodacre, GA
Des Moines, IA
Arrowsmith, IL
Chicago, IL
Chicago, IL (BYD)
Decatur, IL
Hooper, IL
Mt. Vernon, IL
Sheldon, IL (addition)
Wayne City, IL
Albany, IN
Alexandria, IN
Bluffton, IN
Boyleston, IN
Brems, IN
Buckeye, IN
Eaton, IN
Edgerton, IN
Elwood, IN
Forest, IN
Ft. Wayne, IN
Grabill, IN
Greentown, IN
Hartford City, IN
Hibbard, IN
Kempton, IN
Kokomo, IN
Leesburg, IN
Liberty Center, IN
Logansport, IN
Marion, IN
Millville, IN
Montpelier, IN
Muncie, IN
New Albany, IN
New Castle, IN
New Haven, IN
New Lisbon, IN
Oakville, IN
Peabody, IN
Peterson, IN
Poneto, IN
Princeton, IN
Raber, IN
Rich Valley, IN
Richmond, IN
Rochester, IN
Russiaville, IN
Scircleville, IN
Sharpsville, IN
Shidelers, IN
Silver Lake, IN
Sims, IN
South Milford, IN
South Whitley, IN
Speicher, IN
Summitville, IN
Swayzee, IN
Thomaston, IN
Tipton, IN
Treaty, IN
Warren, IN
Wheatfield, IN
Wolcottville, IN
Woodburn, IN
Yoder, IN
Louisville, KY
Coldwater, MI
Reading, MI
Antwerp, OH
Celina, OH
Cincinnati, OH
Coldwater, OH
Continential, OH
Delta, OH
Elgin, OH
Franklin Jct., OH
Ft. Recovery, OH
Huron, OH
Latty, OH
Liberty Center, OH
Lima, OH
McComb, OH
Montpelier, OH
Napoleon, OH
Oakwood, OH
Ohio City, OH
Okolona, OH
Payne, OH
Spencerville, OH
St. Marys, OH
Toledo, OH
Wauseon, OH

DESTINATIONS-

Jacksonville, FL (BYD)
Lacymark, FL
Lake City, FL
Woodacre, GA
New Haven, IN

**From:** Fletcher, Katie N
**Sent:** Thu May 08 15:31:50 2003
**To:** Burchette, Gary
**Cc:** Lawson, David; Gentzel, Robert; Rasche, Larry
**Subject:** Part 2 Bowater Bid
**Importance:** Normal
**Attachments:** Appendix I Conditions Of Carriage 1E.pdf; Appendix L Standard NS Contract.rtf; Appendix H Summary Sheet.doc; Appendix H Calhoun Pulp.xls; Appendix J.xls; Appendix K Bowater Transit & Variability Comparison.xls; Appendix M Equipment Supply Plan.doc

Too large for one email.

**Katheryn (Katie) Fletcher**
Product Manager
Norfolk Southern Corporation
Modalgistics
Phone (757) 823.5448
Fax (757) 823.5425
Email knfletch@nscorp.com

# NORFOLK SOUTHERN RAILWAY COMPANY

**VISION: BE THE SAFEST, MOST CUSTOMER-FOCUSED AND SUCCESSFUL TRANSPORTATION COMPANY IN THE WORLD**

## NS CONDITIONS OF CARRIAGE #1-E
## CANCELS
## NS CONDITIONS OF CARRIAGE #1-D

- TERMS AND CONDITIONS -
FOR
RAIL TRANSPORTATION OF COMMODITIES
MOVING IN INTERSTATE AND INTRASTATE COMMERCE
VIA
NORFOLK SOUTHERN RAILWAY AND ITS AFFILIATED LINES SHOWN HEREIN

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

NORFOLK SOUTHERN RAILWAY COMPANY

CHECK SHEET OF EFFECTIVE PAGES

ALL PAGES CONTAINED IN THIS DOCUMENT ARE LISTED CONSECUTIVELY BY PAGE NUMBER AND REVISION NUMBER.
"O" IN THE REVISION COLUMN INDICATES ORIGINAL PAGE
"1" IN THE REVISION COLUMN INDICATES FIRST REVISED PAGE

| PAGE | REVISION | PAGE | REVISION |
|---|---|---|---|
| TITLE | 0 | 11 | 0 |
| CHECK SHEET | 0 | 12 | 0 |
| 1 | 0 | 13 | 0 |
| 2 | 0 | 14 | 0 |
| 3 | 0 | 15 | 0 |
| 4 | 0 | 16 | 0 |
| 5 | 0 | 17 | 0 |
| 6 | 0 | | |
| 7 | 0 | | |
| 8 | 0 | | |
| 9 | 0 | | |
| 10 | 0 | | |

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

## TABLE OF CONTENTS


| RULE | SUBJECT<br>SECTION 1 | PAGE NO. |
|---|---|---|
| 100 | Definitions | 3 |
| 110 | Application of Referenced Tariff Publications | 4 |
| 120 | General Application | 4 |
| 130 | Routing via Norfolk Southern | 5 |
| 140 | Absorption of Connecting Line Switching | 5 |
| 150 | Bill of Lading | 5 |
| 200 | Transportation Services | 5-6 |
| 210 | Unloading and Release of Equipment at Destination | 6 |
| 230 | Transportation Charges to Apply | 6 |
| 240 | Transit, Diversion, Reconsignment | 6 |
| 250 | Payment of Transportation Charges | 7 |
| 255 | Fuel Surcharge | 7 |
| 280 | Overcharge, Over Collection or Duplicate Payment Claim Provisions | 8 |
| 290 | Carrier Liability - Loss and Damage to Lading | 8-11 |
| 300 | Extension of Credit | 12 |
| 310 | Mechanical Protective Service | 13 |
| 320 | Charges for Mechanical Protective Service | 13 |
| 330 | Mixed Carload Shipments | 13 |
| 420 | Aggregate Rule | 13 |
| 430 | Intermediate Rates | 14 |
| 440 | Alternation of Rates at Varying Minimum Weights | 14 |
| 470 | Return of Shipper's Racks, Crates, Trays or Bins used in Movements of Auto Parts | 14-15 |
| 480 | Indemnification | 15 |
| 500 | Change in Provision | 15 |
| 510 | Private Equipment | 16 |
| 520 | Security Seals | 16 |
| 530 | Non-Waiver | 16 |
| 540 | Governing Law | 16 |
| 550 | No Third Party Beneficiaries | 16 |
| 560 | Normal Rail Operations | 17 |
| 570 | Severability | 17 |
| 580 | Cargo Owners and Collateral Parties | 17 |


EFFECTIVE JUNE 1, 2003

---

---

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

REFERENCE TO "NS" OR "NORFOLK SOUTHERN RAILWAY COMPANY" HEREIN INCLUDES THE FOLLOWING SUBSIDIARIES AND AFFILIATED CARRIERS

Norfolk Southern Railway Company
Atlantic and East Carolina Railway Company
Camp Lejeune Railroad Company
Chesapeake Western Railway
Central of Georgia Railroad Company
Georgia Southern and Florida Railway Company
State University Railroad Company
The Alabama Great Southern Railroad Company
The Cincinnati New Orleans and Texas Pacific Railway Company
Tennessee, Alabama & Georgia Railway Company
Tennessee Railway Company

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 100 - DEFINITIONS**

**Held in Route**

Held in Route is defined as any car, moving on a through rate, that is held in route because of any condition attributable to the consignor, consignee, or owner, including but not limited to storage, partial unloading, to finish loading, or fabrication.

**Diversion / Reconsignment**

Diversion is defined as any order received by NS that requires a change in the billing/shipping document that changes the original destination of a shipment or empty car.

Reconsignment is defined as any order received by NS that requires a change in the party responsible for payment of transportation charges of a shipment or empty car.

**Private Equipment**

A rail car not bearing Railroad reporting marks.

**Shipper/Consignor**

Shipper and Consignor shall have the same meaning for the purposes of these Conditions of Carriage. The Shipper is the party that enters into the contract of carriage with NS or the originating rail carrier. The Shipper may be acting on its own behalf or on the behalf of another party; however, whether as principal or agent, the Shipper is bound in its own right to the terms and obligations of these Conditions of Carriage. The Shipper might or might not be the owner of the lading. When acting as a disclosed or undisclosed agent, the Shipper binds not only itself but also its principal to the terms and obligations of these Conditions of Carriage. The Shipper may file a claim with NS for loss or damage to lading under Rule 290 below.

**Consignee**

The Consignee is the party entitled to receive the lading under the bill of lading contract regardless of whether the lading is actually delivered to an "in care of" or other party pursuant to the directions of the Shipper or Consignee. The Consignee may file a claim with NS for loss or damage to lading under Rule 290 below. By accepting a shipment or by the acceptance of the shipment by a party on behalf of or by direction of the Consignee, the Consignee agrees to be bound by the terms and conditions of these Conditions of Carriage.

**Payor**

The Payor is the party primarily responsible for the payment of freight and other charges arising pursuant to these Conditions of Carriage. The Payor may be the Shipper, Consignee or some other party who has entered into a credit or payment arrangement with NS pursuant to Rule 300 below.

SECTION 1
RULES

## RULE 110 - APPLICATION OF REFERENCED PUBLICATIONS

Except where (i) inconsistent with a provision of this document or (ii) inconsistent with governing contractual terms specifically agreed to by NS or (iii) otherwise inapplicable under their own terms, the rules, regulations, charges and allowances of the following named publications shall, along with the terms of carriage specified herein, apply to all rail transportation undertakings of NS as specified in Rule 120 herein and as such are hereinafter incorporated by reference herein.

Municipal Solid Waste, Contaminated Soil, Hazardous Materials, and Related Articles NS 6306
Official Railroad Station List OPSL 6000 Series
Standard Transportation Commodity Code STCC 6001 Series
Official Railway Equipment Register RER 6412 Series
Mileage Allowance and Rules RIC 6007 Series
Uniform Freight Classification UFC 6000 Series
NS Switching NS 8001 Series (See Rule 130)
Rules and Charges on Accessorial Services NS 8002 Series
Demurrage Rules and Charges, NS 6004 Series
Handling Motor Vehicles NS 9459-Series
Hazardous Materials Shipping Descriptions (49-series STCC numbers)
Bureau of Explosives Rules BOE 6000
NS Currency Exchange Regulations on International Traffic NS 6316
NS Canadian Car Demurrage Tariff (for traffic within Canada) NS 6500
Heavy Duty Flat Car Charges RIC 6740
Rules for Export Declarations & Customs Manifests, etc. RPS 6571
AAR Loading Rules and/or Norfolk Southern Loading Rules

References to specific publications herein include successor publications.

## RULE 120 - GENERAL APPLICATION

(1) The provisions of this Document apply (a) to transportation when such transportation (i) originates on NS and (ii) moves under single line rates or single factor joint line through rates offered by NS itself or in conjunction with a connecting railroad as an exempt rate or as a regulated common carrier rate; and (b) to the NS portion of through movements under AAR Accounting Rule 11 or other combination or proportional exempt or common carrier rates. In the absence of a separate contract specifically covering the transportation, the terms and conditions of these Conditions of Carriage constitute a unilateral offering of such terms and conditions of a bilateral contract between NS and its connecting lines on the one hand, and the user of the transportation service on the other upon acceptance by such user. Subject to the qualifications set forth in subsection (2) below, tender of shipments to the originating carrier shall constitute acceptance of both the terms of service as set out in these Conditions of Carriage and the rate governing the shipment.

(2) When NS is not the originating carrier, but does participate in a movement under single factor or joint through rates, the Conditions of Carriage or comparable offering of the originating carrier shall, along with the exempt or common carrier rates, apply to such transportation performed by NS unless specified otherwise in the terms of a rate quotation or separate contract specifically covering the transportation involved. When such originating carrier does not issue or have in effect such an offering, the terms of carriage contained herein shall apply. Terms of these Conditions of Carriage not inconsistent with the origin's carrier's contract or offering shall also apply.

(3) The provisions of this Document are not applicable to shipments moving in TOFC or COFC intermodal service or to shipments of coal, coke and iron ore.

(4) If a shipment is tendered with different or additional terms and conditions submitted by Shipper, such different or additional terms and conditions shall be deemed rejected by NS unless electronically confirmed or agreed in a document executed on behalf of NS by a Marketing Group Vice-President of NS, regardless of whether the shipment is accepted or moved by NS



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

**RULE 130 - ROUTING VIA NORFOLK SOUTHERN**

(1) Except as otherwise specified, rates applicable via NS apply only over the most direct lines of NS, forming the shortest possible NS mileage, from the first point at which NS receives the shipment (from consignor or other railroad) to the last point at which NS delivers the shipment (to consignee or other railroad). NS reserves the right to actually handle shipments via any route over NS lines. If customer requests movement over NS lines where mileage exceeds the shortest possible NS distance, shipment will be subject to a combination of rates applying via the route requested by customer.

(2) When shipment is made in heavy duty flat cars, or in special train service, rates will be applicable via the actual route of movement.

**RULE 140 - ABSORPTION OF CONNECTING LINE SWITCHING**

Rates making reference to this document will include full absorption of connecting line reciprocal switching unless otherwise agreed to in separate contracts, tariffs, or stated in a rate quotation.

**RULE 150 - BILL OF LADING**

Services provided by NS and other rail carriers are subject to these Conditions of Carriage and shall also be subject to the terms of the Uniform Bill of Lading as contained in the Uniform Freight Classification UFC 6000 Series. Such services are subject to modifications as may from time to time be established under separate agreement or by changes to these Conditions of Carriage, and irrespective of whether a Bill of Lading is actually executed pursuant to Rule 200.

Except where in conflict with the terms and conditions of a written contract between NS and Shipper, the terms and conditions of these Conditions of Carriage shall govern all transportation services provided by NS to Shipper. In the event of a conflict between the terms and conditions of these Conditions of Carriage and the terms and conditions of a written contract between NS and User, the terms and conditions of the written contract shall take precedence over these Conditions of Carriage. The order of precedence for the application of terms and conditions for transportation services provided by NS shall be as follows:

(1) Written Contract
(2) NS Customer Specific Rate Quotation
(3) General Rate Tariffs and General NS Rate Quotations
(4) Conditions of Carriage
(5) Rule 110 Publications
(6) Uniform Bill of Lading

**RULE 200 - TRANSPORTATION SERVICES**

(1) Shipper will notify NS when loading of equipment is completed and ready for movement or when loaded equipment is made empty and ready for release to NS. Unless otherwise mutually agreed upon by Shipper and NS, Shipper shall prepare and both parties shall execute the transportation documents to cover the line haul transportation service requested by Shipper. Shipper will provide instructions for the transportation services requested for the shipment. NS will arrange for transportation and delivery in accordance with instructions shown on the bill of lading, which instructions shall be governed by these Conditions of Carriage.

(Continued on following page)



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

**RULE 200 - TRANSPORTATION SERVICES** (Concluded)

(2) Shipper will arrange separately with NS independent of the bill of lading for non-linehaul accessorial services such as weighing, and such other services as may be referenced in the publications listed in Rule 110. Unless specifically agreed to by NS, NS will not be liable for any loss, damage, cost or expense arising in connection with such services performed by parties other than NS.

**RULE 210 - UNLOADING AND RELEASE OF EQUIPMENT AT DESTINATION**

(1) Upon arrival and placement of equipment for unloading at destination, consignee will be responsible for unloading such equipment in a manner which does not damage the equipment, and for releasing equipment in a condition clean of debris and material not part of such equipment and suitable for reloading by another shipper. If consignee refuses or fails to remove all lading, dunnage, blocking, bracing, strapping, debris or other material that was part of the inbound shipment, secure interior loading devices, and close doors, hatches and gates, the railroad which discovers such failure may undertake to remedy such failure and the consignee will be responsible for reimbursing the railroad which performs such work for the cost thereof, including without limitation the cost of any switching associated with such work. Applicable demurrage, detention and storage charges shall apply until equipment is available for release to delivering carrier in clean condition or upon completion of any action by the delivering carrier to remedy the consignee's failure.

(2) Where NS is the delivering carrier, consignee must advise NS Central Yard Operations by telephone or facsimile or other such form as may be required by NS, that the equipment is unloaded and available for release. Information provided must include identity of consignee, name of person furnishing data, and car initial and number. Except as provided in (1) above, equipment will be considered released on the date and time such advice is received from the consignee.

**RULE 230 - TRANSPORTATION CHARGES TO APPLY**

(1) The charges applicable to the transportation from origin to destination will be those established by either the governing quotation, contract or tariff on the bill of lading date for the shipment in issue. Any change to the information of the bill of lading (including, but not limited to, the shipper, consignee, origin or destination) shall be invalid and without effect unless received and approved by Norfolk Southern Central Yard Operations. Any such change to the bill of lading must be transmitted to Norfolk Southern in such form as may be required by NS (including, but not limited to, telephone and facsimile) and may be subject to additional charges pursuant to NS 8002 Series.

(2) If it is ascertained that the commodity shipped is not as described on the bill of lading or other shipping document, NS at its option may (a) return such shipment to shipper at origin at a charge equal to the charge that would have applied had the commodity been properly described and transported to the destination named in the bill of lading; (b) choose to move said shipment to the destination named in the bill of lading or other shipping document at the transportation rate quoted; or (c) choose to move said shipment to the destination named in the bill of lading or other shipping document at a charge equal to the charge that would have applied had the commodity been properly described. plus an additional charge of $350.00.

**RULE 240 - TRANSIT, DIVERSION, RECONSIGNMENT**

Except as specifically agreed upon, NS will not provide transit or stop-off privileges but will provide diversion or reconsignment as provided for in the publications listed in Rule 110 . Provisions of Rules 29 and 24 of UFC 6000-Series will not apply. (see Item 100 for definition of transit, diversion, and reconsignment)



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 250 - PAYMENT OF TRANSPORTATION CHARGES**

Shipper or consignee shall be liable for payments of the transportation charges accruing on a shipment, and nothing herein shall limit the right of NS to require at time of shipment the prepayment or guarantee of charges. Shipper will pay NS if shipment is prepaid, or be responsible for payment if shipment is made collect, and pay immediately upon presentation of a bill therefor by NS. If shipper or consignee has entered into an agreement for credit with NS, the terms and conditions of the credit agreement will supersede any prepayment or payment upon demand requirement. If transportation charges have not been prepaid, or shipper or consignee has not entered into an agreement for credit with NS, NS shall not make delivery of the shipment without payment or guarantee by shipper or consignee of all charges. Placement of equipment by NS under credit agreement for unloading shall be deemed acceptance of shipment for the purpose of incurring freight charges under a credit agreement.

Acceptance of shipment by consignee or beneficial owner shall be deemed acceptance of responsibility for payment of all charges accruing on the shipment, including, but not limited to, demurrage and switching services performed at destination. Such payment shall be in U.S. money and cannot be reduced to offset claims, damages to property, or for other reasons.

Demurrage, switching and other accessorial and/or incidental charges are payable by Shipper and/or consignee as applicable pursuant to the publications set out in Rule 110 above.

**RULE 255 - FUEL SURCHARGE**

In the event the price of West Texas Intermediate Crude Oil, as published in the Wall Street Journal, exceeds $28.00 per barrel for thirty (30) consecutive days, NS retains the right to apply a fuel surcharge to the freight charge(s) in effect on the date the fuel surcharge is applied, herein after referred to as the “Base Freight Charge(s)”. If this option is exercised, the fuel surcharge shall be applied according to the following schedule.

| Texas Intermediate Crude Oil (Price per barrel) | Cumulative Fuel Surcharge (Percentage) |
|---|---|
| $28 | 2% |
| $33 | 4% |
| $38 | 6% |
| $43 | 8% |
| Each $5.00 per barrel increase thereafter | An additional 2% |

The price of West Texas Intermediate Crude Oil must exceed a given bracket for thirty (30) consecutive Wall Street Journal Publication Days for the surcharge under that bracket to be applicable. If the price of West Texas Intermediate Crude Oil ceases to be available from the Wall Street Journal or some other readily accessible source, a substitute to source will be utilized.

Customers will receive notice of any fuel surcharge not less than ten (10) days prior to its application. Any fuel surcharge applied to the freight charges(s) in this authority will be removed or reduced when the price of West Texas Intermediate Crude Oil remains below the price which triggers a specific surcharge bracket for thirty (30) consecutive Wall Street Journal Publication Days. In no case will the freight charges(s) be reduced below the Base Freight Charge(s) nor will the application or removal of the fuel surcharge be retroactive.

NOTE: Wall Street Journal Publication Day is defined as: A day on which the Wall Street Journal is published and the previous NYMEX WTI trading session’s closing price is reported.

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

**RULE 280 - OVERCHARGE, OVER COLLECTION OR DUPLICATE PAYMENT CLAIM PROVISIONS**

(1) Claim requirements, time limits. NS will accept a whole or partial claim for overcharge, over collection or duplicate payment only if the claim is in writing and contains sufficient information for NS to conduct an investigation, including the name of the claimant (which must be the payer); claim number, the amount of the claim; the freight bill; freight bill payment information and supporting documents, which show, among other things, that NS collected all of the charges at issue and, in the case of overcharges, the rate, weight, commodity description and supporting authority (quotation, etc.) claimed to be applicable. The claim must be filed within three (3) years of the date of delivery or tender of delivery by NS or delivering rail carrier of the subject shipment.

(2) Where the movement over NS form a segment of a through movement involving other carriers and time limitations for filing overcharge claims differ among the carriers involved in the through movement, the time limitation contained in the comparable offering of the origin carrier will apply for overcharge claims against NS if inconsistent with these Conditions of Carriage.

**RULE 290 – LOSS OF AND DAMAGE TO SHIPMENTS**

**(1) General**

(a) Unless modified in a transportation contract or a general or customer specific rate quotation, NS will assume liability for loss and damage under the terms of 49 USC 11706 and the terms of the Uniform Bill of Lading as specified in Rule 150 herein. Where provisions maintained by other railroad parties to the through route differ from those provided herein, the level of liability assumed by the origin carrier will apply; provided, however, that such level of liability shall not exceed the level of laibility assumed under the Carmack Amendment.

(b) As a condition precedent to any right to recovery for loss, damage, or delay to cargo, a written claim must be filed within nine (9) months after delivery of a shipment (or if delivery is not made, within nine (9) months after a reasonable time for delivery). A claim must include a demand for payment of a specific amount and information sufficient to identify the shipment, as described in this Rule. A claim may be filed by either the Shipper or the Consignee. Any other party who desires to file a claim with NS must secure first an assignment of claim from the Shipper or Consignee.

(c) NS does not guarantee delivery by a particular train or within a particular time and does not guarantee rail services on any schedules, published, projected or implied. NS will not be liable for failure to transport any shipment by any particular train or in time for any particular market.

(Continued on following page)

**RULE 290 – LOSS OF AND DAMAGE TO SHIPMENTS** (Continued)

(d) NS will not be liable for loss, damage, or delay caused by:
an act of God
a public enemy or terrorism
the authority of law
riots
strikes
acts of civil disobedience
an inherent quality or characteristic in the commodity
natural shrinkage
an act or default of Shipper, consignor, consignee, owner, or any contracting party, including but not limited to, the failure of the Shipper or any or party to properly block or brace the lading; or the stoppage and holding in transit of lading at the request of the shipper, consignor, consignee, owner, or any contracting party.

(e) NS'S liability will not extend beyond the actual physical loss or damage to the cargo itself, including any costs reasonably incurred in efforts to mitigate the loss or damage.

(f) Except where inconsistent with the liability assumed by the origin rail carrier on a through route as provided for in this Rule above, no party shall file with NS and NS shall have no responsibility for any claim for loss or damage lading having a value of less than two hundred and fifty dollars ($250.00) per car. Claims for loss or damage to shipments moving in different railcars, trailers or containers may not be aggregated or combined to satisfy the $250.00 minimum claim value. For a charge of two hundred and fifty dollars ($250) payable to NS in addition to all freight and other charges due for the shipment, shipments may be transported over NS not subject to the application of this Rule 290(1)(f).

(g) In no event shall NS be liable for any incidental, special, indirect or consequential damages whatsoever (including but not limited to lost profits, business interruption expenses and shipper or consignee's liability to their own customers for liquidated damages or other damages) arising out of or related to the services provided under these Conditions of Carriage, even if advised of the possibility of such damages.

(h) NS does not make any representations as to the suitability of cargo for rail transportation. The Shipper acknowledges also that there are significant forces exerted on the cargo in rail transportation that may require additional packing measures for the cargo to move safely.

(i) NS will not be liable for any loss, damage or delay arising from any defect in Private Equipment.

(Continued on following page)



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

**RULE 290 – LOSS OF AND DAMAGE TO SHIPMENTS** (Continued)

(j) NS will not be liable for damage arising from atmospheric conditions when such damage occurs to lading loaded in open-top or on flatbed rail cars. Protective covering sufficient to protect such lading must be furnished and installed by the Shipper. NS will not be liable for the durability and suitability of the protective covering.

(k) Failure of the destination railroad to inspect damaged cargo for any reason will not relieve the claimant from the requirement of establishing that cargo was delivered in a damaged condition and was properly blocked and braced. Failure of the destination railroad to inspect damaged cargo for any reason will not be considered an admission of liability by NS.

**(2) Filing of Claims**

(a) In any claim for loss, damage, or delay, claimant shall include:

(i) equipment initials and number, shipper's name, consignee's name, notify party's name, shipping date, shipment origin and destination location and commodity description and STCC code.

(ii) records (such as bill of lading, shipping manifest, or purchase or sales documents) or certification to establish:

(a) delivery to a NS carrier;
(b) the level of NS cargo claim coverage contracted for the shipment if other than Standard; and,
(c) condition and quantity of cargo at origin.

(iii) Supporting documentation for the amount claimed, such as weight and grade certificates, repair bills or certified invoices.

(b) Except where otherwise necessitated by wreck or derailment, claimant shall also include in any such claim:

(i) records verifying condition and quantity of the cargo when received at the destination stated in the shipping instructions

(ii) origin and destination seal records, if applied, and

(iii) evidence of disposition of any damaged cargo in compliance with requirements of this section.

(Continued on following page)



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

**RULE 290 – LOSS OF AND DAMAGE TO SHIPMENTS** (Concluded)

(c) Claimants must file any claims for loss, damage or delay to lading with:

Norfolk Southern Corporation
Freight Claim Settlement
Attn: Manager Freight Claim Settlement
185 Spring Street, SW, Box 153
Atlanta, GA 30303-0153

(d) A claim for loss or damage may only be submitted for the damage or loss to the lading for the respective railcar, trailer or container. Where loss or damage occurs to lading moving in more than one railcar, trailer or container in a movement, separate claims must be filed for the damage or loss to the lading in each railcar, trailer or container.

**(3) Lawsuits**

(a) As a condition precedent to any right of recovery, any lawsuit involving a claim for loss, damage or delay to cargo must be commenced within two (2) years and one (1) day of the date of delivery of the lading, or in the case of a failure to make delivery, two (2) years and one (1) day after delivery should have occurred.

(b)Lawsuits shall be filed only in a court of competent jurisdiction at the NS origin or NS destination of the Shipment on which the claim was made; or at any location on NS where the loss, damage or delay is known to have occurred.

(c) No party other than the Shipper or the Consignee shall have standing to bring a lawsuit regarding a shipment moving under these Conditions of Carriage.



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

**RULE 300 - EXTENSION OF CREDIT**

(1) Acceptance by NS of a tender of a shipment by Shipper does not constitute the extension of credit by NS to Shipper or to party responsible for payment of NS freight charges ("Payor"). Credit shall only be extended through the Credit Department of NS. If NS extends credit, it is granted only as a convenience to the Shipper or Payor and may be revoked by NS at any time as to any shipment (including those in transit) without notice by NS. In the event of a revocation of credit affecting any cars in transit, Shipper or Payor must either pay all charges for the cars in transit or make provisions for payment satisfactory to NS before the cars will be delivered. Any changes in Shipper's or Payor's ownership or financial condition which materially affects Shipper's financial standing must be reported to NS' Credit Department.

(2) Where credit has been extended to Shipper or Payor, payment must be received by NS within fifteen (15) days of the date of the freight bill or invoice.

(3) Where credit has not been extended to Shipper or Payor, payment of transportation charges must be made to NS in advance of the shipment in cash.

(4) In the event that Shipper or Payor shall dispute the amount of a bill, Shipper or Payor shall pay to NS within the credit period the undisputed amount of the bill. Shipper or Payor shall also notify NS within the credit period of the disputed amount and the basis for the dispute. Payment of bills, or any portion thereof, by Shipper or Payor which later are determined to be incorrect will not prejudice Shipper's or Payor's right to seek a refund within the statutory period.

(5) NS shall have the right to recover from Shipper or Payor all reasonable costs of collection, including but not limited to reasonable attorneys' fees, in the event of any violation of the credit terms of NS by Shipper or Payor.

(6) With regard to collect bills of lading, the existence of the Payor does not serve to relieve the Shipper and Consignee for their responsibility for the payment of freight and other charges as established by these Conditions of Carriage and law unless otherwise expressly stated by a written agreement. With regard to prepaid bills of lading, the existence of the Payor does not serve to relieve the Shipper for its responsibility for the payment of freight and other charges as established by these Conditions of Carriage and law unless otherwise expressly stated by a written agreement.

(7) Effective October 1, 2003, NS will assess a finance charge of one percent (1%) per month (twelve percent (12%) per annum) against unpaid linehaul freight bills beyond credit terms. Finance charges will be calculated using a daily rate of .0329% (12% / 365 days) which will be applied to unpaid linehaul freight bills that are not paid within the governing credit period. The finance charge will accrue daily until payment is received by NS.

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 310 - MECHANICAL PROTECTIVE SERVICE (MPS)**

(1) Shipments requiring protection from heat or cold will be handled in accordance with rules and provisions (other than charges for services) for protective services as set forth in Perishable Protective PPT 619 Series publication referred to in Rule 110 herein (or offerings of owners of the MPS equipment.) Mechanical protective services, including detention of equipment, are separate and distinct services, and charges therefore will be in addition to charges applicable for line haul and other transportation services. (See Rule 320)
EXCEPTION: NS will not provide portable heater service. To the extent cars are received from connections with heaters already installed, such heaters will be allowed to move through to destination without service by NS.

(2) Shipper shall specify on the bill of lading whether the commodities loaded in the equipment are perishable in nature requiring protection against heat or cold. If no such specification is made, NS shall not be responsible for any loss or damage arising from the lack or failure of such protection.

(3) Subject to the conditions of this rule for shipper owned or leased cars where mechanical protective service is required, NS will provide reasonable maintenance to mechanical protective service (MPS) units including minor repairs, fuel oil, lubrication and other supplies. The expense of operating the MPS units will be borne by the shipper, and the actual cost of labor for any maintenance, service or repairs, and for material (plus 15% material handling charge), fuel oil, lubricating oil and all other supplies furnished to such MPS units shall be billed against the shipper directly by the railroad incurring the cost of furnishing such services.

**RULE 320 - CHARGES FOR MECHANICAL PROTECTIVE SERVICES**

Unless specifically indicated in a rate quotation or contract price for line-haul transportation rates, carload shipments originating on NS do not include a protective service charge payable to third parties. To determine the charge applicable for mechanical-protective service for equipment not owned by NS, charges specified in service offerings by the owners or lessees of the MPS equipment will apply.

**RULE 330 - MIXED CARLOAD SHIPMENTS**

Except as otherwise provided in written contracts, quotes or tariffs, when two or more commodities for which the same or different rates apply are shipped in a single carload, and the weight of the predominant article is 95 per cent or more of the total weight of the shipment, the rate to be assessed on the entire shipment will be that applicable on the predominant article.

**RULE 420 - AGGREGATE RULE**

Unless specifically authorized in writing by NS, point-to-point rates may not be combined to provide a through rate. Example: Customer has a rate quote from Point A to Point C (the “A to C Rate”). Customer also has a rate quote form Point A to Point B (the “A to B Rate”) and from Point B to Point C (the “B to C Rate”). The A to C Rate applies, and Customer may not combine the A to B Rate with the B to C Rate unless specifically authorized in writing by NS.



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

**RULE 430 - INTERMEDIATE RATES**

Except as otherwise specifically provided in individual contracts or rate quotations, rates will not apply from or to points intermediate to the origins or destinations specified in such individual contracts or rate quotations.

**RULE 440 - ALTERNATION OF RATES**

(1) Customer-specific rates (contracts or specific quotes) will take precedence over open or non-customer-specific rates (general quotes). Within each of those two categories, point-to-point rates will apply regardless of any group or scale rates available, and group rates will be applied to the exclusion of any scale rates.

(2) Where a rate authority contains more than one carload rate at varying minimum weights for the same movement, the rate that produces the lowest charges for that authority will apply.

(3) Unless otherwise agreed upon by NS and the purchaser of transportation subject to this publication, where NS can serve both origin and destination (either directly or through switching by another carrier), NS single-line rates will apply to the exclusion of any joint-line rates.

**RULE 470 - RETURN OF SHIPPER'S RACKS, CRATES, TRAYS OR BINS USED IN MOVEMENTS OF AUTO PARTS**

(The Provisions of this Item will not apply on shipments in "Railbox" cars with reporting marks "ABOX" or "RBOX" in the Official Railway Equipment Register).

When shipments of Automobile Parts as described in Item 500 RPS 4924-Series publication, are made in shipper's racks, crates, trays or bins, or with braces, brackets, spacers, spacer-bars or protective shields or when shipper's racks, crates, trays or bins are used as restrainers or spacers or when necessary empty shipper-owned bins are placed in cars to handle the return of hold-down brackets or spacer-bars and loaded in cars owned by the origin road-haul carrier or carriers participating in the movement and/or cars assigned for return to the origin, they may be transported at the net weight of such shipments not including the weight of any shipping containers or devices. The rate applicable to said net weight shall include the return of said-shipping containers or devices, provided the cars (see Note 2) used on the inbound movement to the plant location and there unloaded are utilized for the return movement of such shipping containers or devices to the point of origin of loaded movement via a route which is the reverse of the route used in the loaded movement of such shipping containers or devices (see Note 1).

(Continued on following page)



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 470 - RETURN OF SHIPPER'S RACKS, CRATES, TRAYS OR BINS USED IN MOVEMENTS OF AUTO PARTS** (Concluded)

**EXPLANATION OF NOTES**

NOTE 1: If racks. crates, trays. bins, braces brackets, spacers, spacer bars or protective shields are removed from the car when placed at shipper' s siding upon completion of the return movement, and if the car is then released to the carrier empty to be held for future loading, a charge of $100.00 will be assessed for each of such cars placed and released empty to the carrier.

NOTE 2: Boxcars designated "XM" in the Official Railway Equipment Register publication and other non-assigned, free-running specially-equipped boxcars subject to AAR Car Service Directive 150 may also be used for the return transportation of empty shipping containers or devices, subject to the same conditions as apply to assigned boxcars, provided the shipper furnished shipping instructions prior to such car being pulled from the siding. Such instructions shall indicate that the car contains shipping containers or devices being returned to origin via the reverse route of the inbound loaded movement. Failure to provide such shipping instructions will result in the assessment of the otherwise applicable charges for the transportation of empty shipping containers or devices.

**RULE 480 – INDEMNIFICATION**

(1) The shipper agrees to and does hereby indemnify NS from and against any and all loss, cost, expense, claim or liability (including but not limited to reasonable attorneys' fees) resulting from the loss of life or personal injury to any person or the damage to or loss of any property arising from, incident to or occurring in connection with the breach by shipper of any of its obligations under these Conditions of Carriage.

(2) Notwithstanding any provision in this agreement to the contrary and regardless of the nature of the cause of action, whether in tort, contract or otherwise, in no event shall any party to these conditions of carriage be liable for any consequential, incidental, special, or indirect damages whatsoever (including but not limited to lost profits, cost of capital or interruption of business expenses) arising out of the services provided under these conditions of carriage, even if advised of the possibility of such damages.

**RULE 500 - CHANGE IN PROVISIONS**

NS reserves the right at any time to change the terms and conditions of these Conditions of Carriage; provided, however, any such change shall be effective only with regard to any transportation services provided under these Conditions of Carriage for freight tendered after the effective date of the charges. NS will make available on its web site these Conditions of Carriage in their latest amended form. Shipper should review these Conditions of Carriage before tendering freight to NS.

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 510 – PRIVATE EQUIPMENT**

(1) NS does not guarantee or promise that Private Equipment (rail cars not owned by NS or other rail carriers) will move by a particular train or by a particular time. NS does not guarantee or promise that Private Equipment will make or will be available to make any particular Cycle Time (round-trip between two or more points) or any particular number of movements within any specified time period; regardless of whether NS had actual knowledge, or should have reasonably known, of shipper's past or expected Cycle Times, the size of shipper's Private Equipment fleet, or shipper's and/or shipper's customers commercial business requirements.

(2) If private equipment (Rule 100) is used for transportation, such equipment shall comply with all applicable laws, rules and regulations, including, but not limited to, applicable hazardous materials regulations of the United States Department of Transportation as published in Title 49 of the Code of Federal Regulations, as amended, supplemented and revised from time to time, provided that such compliance shall not relieve User of other obligations and duties or the transportation of shipments covered by these Conditions of Carriage. Such Private Equipment shall be in serviceable condition for the safe transportation of shipments over rail lines. Shipper is responsible for determining the suitability of the Private Equipment for the movement of the shipment. Notwithstanding any other provisions in this Rule, Shipper shall indemnify and hold harmless NS for all losses, including, without limitation, attorneys' fees and other costs of litigation, damage or injury caused by failure, defect or unsuitability of such Private Equipment.

**RULE 520 – SECURITY SEALS**

NS neither inspects shipments for seals or security devices intended to prevent unauthorized access to a shipment nor determines when a security device is appropriate. In the event that a shipment requires special security measures (such as high security seals, shrink-wrap, paper coverings and the like), it is the duty of the Shipper to determine and take the appropriate security measures. Documentation of the application of security devices at shipment origin is the responsibility of the Shipper. In determining the extent, if any, of NS's responsibility as a common carrier for loss, damage or liability to a shipment, the absence of or damage to a seal without physical evidence of contamination, loss or theft does not establish injury, loss or damage to a shipment.

**RULE 530 – NON-WAIVER**

Any waiver on the part of NS of any term or condition of these Conditions of Carriage shall not constitute a precedent, nor require NS to continue waiving such term or condition or to waive any succeeding breach of the same or any other of the terms and conditions of these Conditions of Carriage. No waiver or purported waiver on the part of NS shall be deemed to bind NS unless made in writing and signed by an authorized NS Marketing Officer.

**RULE 540 – GOVERNING LAW**

To the extent not governed by Federal law, the laws of the Commonwealth of Virginia shall govern the construction and interpretation of these Conditions of Carriage and all rights and obligations of the parties under these Conditions of Carriage.

**RULE 550 – NO THIRD PARTY BENEFICIARIES**

The services provided by NS under these Conditions of Carriage are intended solely for the benefit of the shipper except to the extent expressly stated otherwise in these Conditions of Carriage and are not intended for the benefit of any third party. Any standards of service contained in these Contract of Terms of Carriage, any transportation contract or offering are solely for the benefit of the shipper or contracting party to the transportation contract or offering.

SECTION 1
RULES

**RULE 560 - NORMAL RAIL OPERATIONS-ORDER/NOTIFY SHIPMENTS**

(1) All services provided pursuant to these Conditions of Carriage will be provided by NS in accordance with any applicable FRA and AAR guidelines and regulations and routine NS practice (including but not limited to switching, coupling and humping). Specialized rail handling such as “do not hump”, speed restrictions and equipment size are special rail services and not routine rail services. Unless agreed to in writing by both NS and shipper, any restrictions on rail handling placed by shipper upon a particular car (including, but not limited to, “Do Not Hump” signs, notations as to speed or other restrictions on a bill of lading, EDI notations) shall have no effect and be void. Shippers desiring special handling must contact NS to arrange such special handling.

(2) NS does not provide Order/Notify service. Bills of lading or shipping instructions tendered to NS in the form of an order/notify bill of lading will be handled as straight bills of lading. Instructions to the effect of requiring NS to not complete delivery of a shipment until either securing authorization for delivery from the shipper or some other party, surrender of the bill of lading or notification by NS to the shipper or some other party shall have no effect and be void regardless of whether such instructions are contained in a straight or an order/notify bill of lading; and NS shall have no liability for delivering a shipment to the consignee listed in the bill of lading in such circumstances.

**RULE 570 -- SEVERABILITY**

If any provision of these Conditions of Carriage is held invalid by a court or governmental entity of competent jurisdiction, such provision shall be severed from these Conditions of Carriage and to the extent possible, these Conditions of Carriage shall continue with regard to the remaining provisions.

**RULE 580—CARGO OWNERS AND COLLATERAL PARTIES**

Shipments moving pursuant to these Conditions of Carriage represent the bargain struck between NS and the shipper or party arranging rail transportation and are contingent upon the rates, levels of liability and other terms and conditions agreed upon between NS and the shipper or party arranging the rail transportation for the movement. Frequently, the contract for the rail portion of a movement may be only one contract in a series of other contracts between other parties. Pursuant to Rule 550 none of these parties are the intended third party beneficiaries of the rail contract. Furthermore, any liability on the part of NS extends to the Shipper or party arranging the rail transportation and is limited to the terms and conditions set out by these Conditions of Carriage and the governing contract. The Shipper or the party arranging rail transportation acknowledges that the bargain with NS neither contemplates or creates liability on the part of NS towards any other party, whether in tort or contract, nor places upon NS any liability in excess of the liability assumed by NS under these Conditions of Carriage and the governing rail contract. Accordingly, the Shipper, or the party arranging transportation, warrants its authority to bind the cargo owner to this agreement and its authority to tender the cargo to NS. By tendering the cargo to NS, the Shipper or the party making arrangements for rail transportation on behalf of either the cargo owner or an agent of the cargo owner shall be bound by the terms of this contract and shall indemnify NS against any claim by the cargo owner or any person or agent, which is contrary to any provisions (including but not limited to any limitations of liability) in these Conditions of Carriage and the governing rail contract, for any amounts that exceed the liability assumed by NS under these Conditions of Carriage and the governing rail contract plus the reasonable cost of defense and attorneys’ fees for NS.



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

# Appendix L

**CONFIDENTIAL**

TRANSPORTATION CONTRACT
REG-NS-C-#

This Contract is made by and between (Customer), with business address at ; and Norfolk Southern Railway Company and Consolidated Subsidiaries (NS and/or Railroad), with business address at 110 Franklin Road, S. E., Roanoke, VA 24042-0041.

**WITNESSETH:**

**WHEREAS**, This Contract is made pursuant to (a) 49 U.S.C. §10709, if relating to transportation regulated under Subtitle IV, Part A of Title 49 U.S.C, or (b) 49 U.S.C. §10502, if relating to transportation which has been deregulated.

**NOW THEREFORE**, in consideration of the premises and the mutual agreements herein contained, the parties agree as follows:

**SECTION 1 - TERM AND RENEWALS.** This Contract shall apply from the Effective Date through the Termination Date shown below. In addition, if Auto Renewals are indicated, this Contract shall automatically be extended for additional successive 12-month periods unless any party notifies the other parties at least 30 days prior to the end of a renewal Contract Period of its intention to terminate the Contract. If such notification is given, the Contract shall terminate at the end of the 12-month period in which notification was given.

Effective Date:
Termination Date:
Automatic Renewals: NO/YES

**SECTION 2 - TRANSPORTATION.** Railroad will transport "Commodity" from "Origin" to "Destination" via "Route" in accordance with the conditions described herein and in Appendix A.

**SECTION 3 - MINIMUM VOLUME.** "Contract Period" is defined as the 12-month period beginning with the Effective Date of this Contract and, if the Contract provides for a multi-year term, any subsequent 12-month period thereafter during the life of this Contract. Bill of lading date shall govern in determining the period in which a shipment is made.

In each Contract Period, Customer shall satisfy Volume Guarantee, if any, specified in Appendix A of the Contract. Upon request by Railroad, Customer will certify to Manager Contract Compliance, Norfolk Southern Corporation, 110 Franklin Road, S. E., Roanoke, VA 24042-0009, as to compliance with its volume commitment. Certification must refer to the contract number and must include the Commodity volume shipped in compliance with the volume commitment as well as the volume shipped that was not in compliance. Railroad will have the right to audit Customer records in conjunction with the volume commitment.

**SECTION 4 - LIQUIDATED DAMAGES.** Should Customer not meet the volume requirement for a Contract Period, within 60 days it shall pay Railroad as liquidated damages: (1) for carload deficits, the greater of $200 per deficit car or $150 per deficit car multiplied by the number of line haul carriers in the Route or; (2) for tonnage deficits, the greater of $2.20 per deficit ton or $1.65 per deficit ton multiplied by the number of line haul carriers in the Route.
For purposes of this section, a percentage of shipments volume requirement shall be calculated by determining the total number of carloads that could be shipped to arrive at 100%, determining the volume percentage requirement in terms of carloads, and comparing that amount with the amount of carloads actually shipped during the applicable Contract Period.

**SECTION 5 - FORCE MAJEURE.** A party shall be excused from its contractual obligations to the extent it is prevented or delayed in such performance by any of the following conditions of force majeure: Act of God, act of the public enemy, authority of law, fire or explosion, lockout, strike, war, insurrection, derailment or any like causes beyond their control. The party declaring force majeure shall promptly notify the other parties when the force majeure begins, the nature of the force majeure and when the condition is terminated.

**SECTION 6 - TENDER OF SHIPMENT.** Except as may be otherwise provided in this Contract, Railroad's duty as to transportation shall be subject to the terms and conditions of the Uniform Straight Bill of Lading as published in Uniform Freight Classification UFC 6000-series or successor publication, which are hereby incorporated into this Contract by reference. Alternative Uniform Bills of Lading may be used with the prior consent of Railroad.

Except to the extent inconsistent with any provisions herein, shipments made under the terms of this Contract are subject to all classifications, tariffs (for regulated commodities only), exempt circulars and circulars of other railroads participating in the transportation involved, government, AAR and carriers rules, regulations, and provisions, including, but not limited to NS Conditions of Carriage No. 1-series or successor publication, and such rules and regulations covering limitation of action, weighing, freight loss and damage claims, demurrage and switching, loading, car service and interchange that would apply if this Contract were not in effect.

In order to protect the confidentiality of this Contract and to permit computerized application, Customer shall be responsible for having the contract number shown on the bill of lading in connection with shipments made under the terms of this Contract. While failure to so show the contract number shall not negate any terms of the contract, such failure will constitute sufficient reason for Railroad's refusal to bill the contract charges to any party other than Customer without prior consent of Railroad.

**SECTION 7 - ACCESS.** Any party to this Contract may terminate the Contract as to the Origin and Destination affected and any volume guarantee applicable to such Origin and Destination shall be considered fulfilled if: 1) any railroad ceases service to, abandons or disposes of a line of railroad or track over which shipments covered by this Contract would move; 2) any railroad cancels a route or switching service necessary to complete a rail movement under this Contract; or 3) any railroad increases its charges for such switching service by more than 10% per annum.

**SECTION 8 - ASSIGNMENT.** No party hereto may assign this Contract, in whole or in part, without the prior written consent of the other parties. Any assignment of this Contract, without such consent in writing, shall be absolutely void, and at the option of the party or parties whose written consent should have been obtained, this Contract may be terminated. Subject to this Section, this Contract shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

**SECTION 9 - CREDIT.** Charges under this Contract must be paid by Customer to NS within fifteen (15) days from invoice date of freight bill unless otherwise agreed to in a separate agreement between the Customer and billing carrier.

**SECTION 10 - APPLICABLE LAW.** Virginia law shall govern the interpretation and performance of this Contract, except to the extent otherwise provided herein.

**SECTION 11 - NOTICES.** All notices and other communications under this Contract shall be in writing and directed to the following (or such other office as directed):

NS: Manager Contract Publications, Norfolk Southern Corporation,
110 Franklin Road, S. E., Roanoke, VA 24042-0041.

Customer:

**SECTION 12 - CONFIDENTIALITY.** No party may disclose the terms of this Contract to another party without the consent of the other party(ies) except as required by law or regulation.

**SECTION 13 - NO THIRD PARTY BENEFICIARIES.** This Contract is intended for the sole benefit of the signatories to this Contract. Nothing contained in this Contract is intended or may be construed to give any person, firm, corporation or other entity, other than the signatories hereto, or their permitted successors or assigns, any legal or equitable right, remedy or claim under this Contract.

**SECTION 14 - ENTIRE UNDERSTANDING.** This Contract constitutes the entire understanding between the parties relating to transportation and related services under this Contract, and no other representation, warranties, or agreements, either oral or written, will be binding upon the parties. Further, this Contract may be modified only by an instrument in writing, signed by an authorized officer of Customer and Railroad.

**IN WITNESS WHEREOF**, the parties have caused this Contract to be executed by their duly authorized respective representatives.

| COMPANY | NORFOLK SOUTHERN RAILWAY AND CONSOLIDATED SUBSIDIARIES |
|---|---|
| BY ____________________ | BY ____________________ |

TITLE ______________________________ TITLE ______________________________

DATE ______________________________ DATE ______________________________

(REG-NS-C-#-00)
C2A-LGF

Appendix A to
Contract REG-NS-C-#
Page 1 of 2

Commodity:

Origin:

Destination:

Rate:

Min. Weight: lbs. per car

Route:

Billing: Prepaid

Equipment:

Restrictions: Transit will not apply, however, diversion and reconsignment will be permitted.

Volume
Guarantee: % of [total/rail] shipments of Commodity from Origin to Destination.

A minimum of [tons/carloads] of Commodity from Origin to Destination.

Ancillary: NO YES - For internal Railroad use only

Escalation: NONE

Fuel
Surcharge: In the event the price of West Texas Intermediate Crude Oil, as published in the Wall Street Journal, exceeds $28.00 per barrel for thirty (30) consecutive days, NS retains the right to apply a fuel surcharge to the freight charge(s) contained in this authority in effect on the date the fuel surcharge is applied, hereinafter referred to as the "Base Freight Charge(s)". If this option is exercised, the fuel surcharge shall be applied according to the following schedule:

| Texas Intermediate Crude Oil (Price per barrel) | Cumulative Fuel Surcharge (Percentage) |
|---|---|
| $28 | 2% |

| | |
|---|---|
| $33 | 4% |
| $38 | 6% |
| $43 | 8% |
| Each $5.00 per barrel increase thereafter | An additional 2% |



The price of West Texas Intermediate Crude Oil must exceed a given bracket for thirty (30) consecutive days for the surcharge under that bracket to be applicable. If the price of West Texas Intermediate Crude Oil ceases to be available from the Wall Street Journal or some other readily accessible source, a substitute to measure will be utilized.

Customers will receive notice of any fuel surcharge not less than ten (10) days prior to its application. Any fuel surcharge applied to the freight charge(s) in this authority will be removed or reduced when the price of West Texas Intermediate Crude Oil remains below the price which triggers a specific surcharge bracket for thirty (30) consecutive days. Reductions will be made promptly after they become applicable. In no case will the freight charge(s) be reduced below the Base Freight Charge(s) nor will the application or removal of the fuel surcharge be retroactive.

# Appendix H
## Summary Sheet
## Woodpulp
## Catawba, SC

- 150M AND 180M rates to apply in 50' 70 ton and 100 ton standard boxcars.
- Rates are inclusive of reciprocal switching at destination, and handling line charges, if applicable.

PRODUCED AS NATIVE

# Appendix H

## Rail Shipment Data: Bowater Catawba (2002 and Q1 2003)

### Woodpulp

| Date | Mill | Consignee State | Consignee City | Consignee Legal Name | Commodity | Carrier Bid (CWT/150M) | Carrier Bid (cwt/180M) | Route | Carrier Notes | Transit Time |
|---|---|---|---|---|---|---|---|---|---|---|
| 2002 | [redacted] | ALABAMA | MOBILE | [redacted] | Woodpulp | $1.04 | $0.97 | NS | | 7 |
| 2002 | [redacted] | GEORGIA | AUGUSTA | [redacted] | Woodpulp | $0.60 | $0.57 | NS | Rail station of Nixon, GA | 5 |
| 2002 | [redacted] | GEORGIA | BRUNSWICK | [redacted] | Woodpulp | $0.85 | $0.81 | NS | | 5 |
| 2002 | [redacted] | GEORGIA | SAVANNAH | [redacted] | Woodpulp | $0.63 | $0.60 | NS | | 5 |
| 2002 | [redacted] | MAINE | JAY | [redacted] | Woodpulp | $2.02 | $1.92 | NS-MCV-ST | Rail station of Livermore Falls, ME (instead of to S Paris, ME whse) | 11 |
| 2002 | [redacted] | MEXICO | APIZACO TLAXCALA | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | APIZACO, TLAXCALA | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | CHIHUAHUA | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | COL ARENAL DF | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | COL. LA VENTA C.P. | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | DELEGACION AZCAPOTZALCO | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | ECATEPEC, ESTADO DE MEXICO | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | IXTACZOQUITLAN VER | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | MORELIA, MICH. | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | NAUCALPAN | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | SAN JUAN DEL RIO | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | SAN RAFAEL | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MEXICO | URUAPAN MICHOACAN | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2002 | [redacted] | MISSISSIPPI | GRENADA | [redacted] | Woodpulp | $1.44 | $1.37 | NS-MEMPH-CN | | 9 |
| 2002 | [redacted] | MISSISSIPPI | WIGGINS | [redacted] | Woodpulp | | | | | |
| 2002 | [redacted] | ONTARIO | ESPANOLA | [redacted] | Woodpulp | $1.81 | $1.70 | NS-DET-CPRS | | 11 |
| 2002 | [redacted] | PENNSYLVANIA | SPRING GROVE | [redacted] | Woodpulp | $1.23 | $1.17 | NS | | 8 |
| 2002 | [redacted] | PROVINCE OF QUEBEC | QUEBEC CITY | [redacted] | Woodpulp | $1.77 | $1.65 | NS-BUFF-CN | | 11 |
| 2002 | [redacted] | SOUTH CAROLINA | CHARLESTON | [redacted] | Woodpulp | $0.59 | $0.56 | NS | | 3 |
| 2002 | [redacted] | WISCONSIN | RHINELANDER | [redacted] | Woodpulp | $1.81 | $1.68 | NS-CHGO-WC-TMHWK-TR | Rail station of Tomahawk, WI | 11 |
| 2002 | [redacted] | WISCONSIN | SHAWANO | [redacted] | Woodpulp | $1.61 | $1.50 | NS-CHGO-WC | | 10 |
| 2003 1Q | [redacted] | ALABAMA | MOBILE | [redacted] | Woodpulp | $1.04 | $0.97 | NS | | 7 |
| 2003 1Q | [redacted] | GEORGIA | AUGUSTA | [redacted] | Woodpulp | $0.60 | $0.57 | NS | Rail station of Nixon, GA | 5 |
| 2003 1Q | [redacted] | MAINE | JAY | [redacted] | Woodpulp | $2.02 | $1.92 | NS-MCV-ST | Rail station of Livermore Falls, ME (instead of to S Paris, ME whse) | 11 |
| 2003 1Q | [redacted] | MEXICO | APIZACO TLAXCALA | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | APIZACO, TLAXCALA | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | CHIHUAHUA | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | COL ARENAL DF | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | COL. LA VENTA C.P. | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | DELEGACION AZCAPOTZALCO | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | ECATEPEC, ESTADO DE MEXICO | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | IXTACZOQUITLAN VER | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | MORELIA, MICH. | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | NAUCALPAN | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | SAN JUAN DEL RIO | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | SAN RAFAEL | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | MEXICO | URUAPAN MICHOACAN | [redacted] | Woodpulp | $1.65 | $1.48 | NS-NEWOR-UP | | 10 |
| 2003 1Q | [redacted] | ONTARIO | ESPANOLA | [redacted] | Woodpulp | $1.81 | $1.70 | NS-DET-CPRS | | 11 |
| 2003 1Q | [redacted] | PENNSYLVANIA | SPRING GROVE | [redacted] | Woodpulp | $1.23 | $1.17 | NS | | 8 |
| 2003 1Q | [redacted] | PROVINCE OF QUEBEC | QUEBEC | [redacted] | Woodpulp | $1.77 | $1.65 | NS-BUFF-CN | | 11 |
| 2003 1Q | [redacted] | SOUTH CAROLINA | CHARLESTON | [redacted] | Woodpulp | $0.59 | $0.56 | NS-BUFF-CN | | 3 |
| 2003 1Q | [redacted] | WISCONSIN | GREEN BAY | [redacted] | Woodpulp | $1.84 | $1.73 | NS-CHGO-WC | | 9 |
| 2003 1Q | [redacted] | WISCONSIN | RHINELANDER | [redacted] | Woodpulp | $1.81 | $1.68 | NS-CHGO-WC-TMHWK-TR | Rail station of Tomahawk, WI | 11 |
| 2003 1Q | [redacted] | WISCONSIN | SHAWANO | [redacted] | Woodpulp | $1.61 | $1.50 | NS-CHGO-WC-TMHWK-TR | | 10 |

PRODUCED AS NATIVE

# Appendix J

## Rail Shipment Data: Nuway Benton Harbor (2002 and Q1 2003)

## Coated and Specialty Paper

| Date | Mill | Consignee State | Consignee City | Consignee Legal Name | Commodity | Count | Short Tons | Target Rate | Notes | Carrier Bid | Carrier Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2002 | [redacted] | ARKANSAS | JONESBORO | [redacted] | Coated/Specialty | 2 | 122.77 | **$31.73** | | | |
| 2002 | [redacted] | CALIFORNIA | MERCED | [redacted] | Coated/Specialty | 25 | 1,754.07 | **$62.68** | | | |
| 2002 | [redacted] | CALIFORNIA | SAN LEANDRO | [redacted] | Coated/Specialty | 4 | 276.67 | **$65.50** | | | |
| 2002 | [redacted] | ILLINOIS | EFFINGHAM | [redacted] | Coated/Specialty | 16 | 1,088.37 | **$14.99** | | | |
| 2002 | [redacted] | ILLINOIS | FOREST PARK | [redacted] | Coated/Specialty | 6 | 455.01 | **$16.20** | | | |
| 2002 | [redacted] | KANSAS | WICHITA | [redacted] | Coated/Specialty | 3 | 222.81 | **$36.33** | | | |
| 2002 | [redacted] | KENTUCKY | DANVILLE | [redacted] | Coated/Specialty | 2 | 109.96 | **$32.07** | | | **provided rate to CSXT** |
| 2002 | [redacted] | KENTUCKY | GLASGOW | [redacted] | Coated/Specialty | 3 | 207.08 | **$21.42** | | | |
| 2002 | [redacted] | KENTUCKY | LEBANON JCT | [redacted] | Coated/Specialty | 2 | 117.86 | **$18.06** | | | |
| 2002 | [redacted] | KENTUCKY | RICHWOOD | [redacted] | Coated/Specialty | 5 | 395.81 | **$20.82** | | | **provided rate to CSXT** |
| 2002 | [redacted] | MINNESOTA | WASECA | [redacted] | Coated/Specialty | 9 | 612.97 | **$27.67** | | | |
| 2002 | [redacted] | NORTH CAROLINA | CHARLOTTE | [redacted] | Coated/Specialty | 8 | 587.27 | **$34.08** | | | **provided rate to CSXT** |
| 2002 | [redacted] | NEW JERSEY | MT. LAUREL | [redacted] | Coated/Specialty | 3 | 222.36 | **$42.48** | | | |
| 2002 | [redacted] | NEW YORK | LACONA | [redacted] | Coated/Specialty | 37 | 2,797.04 | **$33.85** | | | |
| 2002 | [redacted] | NEW YORK | SARATOGA SPRGS. | [redacted] | Coated/Specialty | 12 | 801.98 | **$52.09** | | | |
| 2002 | [redacted] | OHIO | CINCINNATI | [redacted] | Coated/Specialty | 3 | 199.30 | **$18.34** | | | |
| 2002 | [redacted] | OHIO | COLUMBUS | [redacted] | Coated/Specialty | 2 | 150.43 | **$17.81** | | | **provided rate to CSXT** |
| 2002 | [redacted] | PENNSYLVANIA | EDDYSTONE | [redacted] | Coated/Specialty | 34 | 2,705.11 | **$28.40** | | | |
| 2002 | [redacted] | PENNSYLVANIA | LANCASTER | [redacted] | Coated/Specialty | 4 | 277.14 | **$36.71** | | | **provided rate to CSXT** |
| 2002 | [redacted] | PENNSYLVANIA | PHILADELPHIA | [redacted] | Coated/Specialty | 16 | 1,185.45 | **$39.27** | | | **provided rate to CSXT** |
| 2002 | [redacted] | PENNSYLVANIA | YORK | [redacted] | Coated/Specialty | 2 | 147.96 | **$34.54** | | | |
| 2002 | [redacted] | TENNESSEE | CLARKSVILLE | [redacted] | Coated/Specialty | 13 | 935.18 | **$22.50** | | | |
| 2002 | [redacted] | TENNESSEE | COVINGTON | [redacted] | Coated/Specialty | 2 | 117.82 | **$27.95** | | | |
| 2002 | [redacted] | TENNESSEE | DYERSBURG | [redacted] | Coated/Specialty | 3 | 243.48 | **$27.70** | | | |
| 2002 | [redacted] | WISCONSIN | WATERLOO | [redacted] | Coated/Specialty | 10 | 707.04 | **$19.91** | | | |
| 2003 1Q | [redacted] | CALIFORNIA | MERCED | [redacted] | Coated/Specialty | 32 | 2,279.37 | **$62.68** | | | |
| 2003 1Q | [redacted] | KENTUCKY | RICHWOOD | [redacted] | Coated/Specialty | 5 | 357.65 | **$20.82** | | | |
| 2003 1Q | [redacted] | MAINE | WELLS | [redacted] | Coated/Specialty | 4 | 298.52 | **$56.16** | | | |
| 2003 1Q | [redacted] | MINNESOTA | WASECA | [redacted] | Coated/Specialty | 24 | 1,575.00 | **$26.41** | | | |
| 2003 1Q | [redacted] | NORTH CAROLINA | CHARLOTTE | [redacted] | Coated/Specialty | 2 | 133.40 | **$34.08** | | | |
| 2003 1Q | [redacted] | NEW JERSEY | MT. LAUREL | [redacted] | Coated/Specialty | 4 | 276.23 | **$42.48** | | | |
| 2003 1Q | [redacted] | NEW YORK | LACONA | [redacted] | Coated/Specialty | 7 | 489.21 | **$33.85** | | | |
| 2003 1Q | [redacted] | NEW YORK | SARATOGA SPRGS. | [redacted] | Coated/Specialty | 10 | 722.24 | **$52.09** | | | |
| 2003 1Q | [redacted] | OKLAHOMA | TULSA | [redacted] | Coated/Specialty | 2 | 149.45 | **$37.26** | | | |
| 2003 1Q | [redacted] | PENNSYLVANIA | BUTLER | [redacted] | Coated/Specialty | 2 | 134.40 | **$23.85** | | | |
| 2003 1Q | [redacted] | PENNSYLVANIA | EDDYSTONE | [redacted] | Coated/Specialty | 10 | 681.08 | **$28.40** | | | |
| 2003 1Q | [redacted] | PENNSYLVANIA | YORK | [redacted] | Coated/Specialty | 3 | 202.59 | **$34.54** | | | |
| 2003 1Q | [redacted] | TEXAS | DALLAS | [redacted] | Coated/Specialty | 1 | 58.67 | **$50.49** | | | |

# Appendix J

## Rail Shipment Data: Nuway Covington (2002 andQ1 2003)

## Coated and Specialty Paper

| Date | Mill | Consignee State | Consignee City | Consignee Legal Name | Commodity | Count | Short Tons | Target Rate | Notes | Carrier Bid | Carrier Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2002 | [redacted] | CALIFORNIA | MERCED | [redacted] | Coated/Specialty | 1 | 79.96 | **$49.89** | | | |
| 2002 | [redacted] | ILLINOIS | WOODSTOCK | [redacted] | Coated/Specialty | 1 | 79.91 | **$27.93** | | | |
| 2002 | [redacted] | MICHIGAN | LIVONIA | [redacted] | Coated/Specialty | 2 | 144.22 | **$34.72** | | | |
| 2002 | [redacted] | NORTH CAROLINA | CHARLOTTE | [redacted] | Coated/Specialty | 5 | 376.12 | **$32.22** | | | |
| 2002 | [redacted] | NORTH CAROLINA | CHARLOTTE | [redacted] | Coated/Specialty | 4 | 261.59 | **$32.22** | | | **provided rate to CN** |
| 2002 | [redacted] | NEW JERSEY | MT. LAUREL | [redacted] | Coated/Specialty | 1 | 78.71 | **$44.09** | | | **provided rate to CN** |
| 2002 | [redacted] | OKLAHOMA | TULSA | [redacted] | Coated/Specialty | 2 | 149.24 | **$23.56** | | | |
| 2002 | [redacted] | PENNSYLVANIA | EDDYSTONE | [redacted] | Coated/Specialty | 11 | 800.05 | **$43.76** | | | **provided rate to CN** |
| 2002 | [redacted] | PENNSYLVANIA | PHILADELPHIA | [redacted] | Coated/Specialty | 32 | 2,368.81 | **$43.59** | | | **provided rate to CN** |
| 2002 | [redacted] | PENNSYLVANIA | YORK | [redacted] | Coated/Specialty | 1 | 63.89 | **$39.82** | | | **provided rate to CN** |
| 2002 | [redacted] | TENNESSEE | CHURCH HILL | [redacted] | Coated/Specialty | 4 | 264.05 | **$22.96** | | | |
| 2002 | [redacted] | WISCONSIN | HARTFORD | [redacted] | Coated/Specialty | 1 | 56.71 | **$31.06** | | | |
| 2003 1Q | [redacted] | ARIZONA | PHOENIX | [redacted] | Coated/Specialty | 1 | 76.40 | **$63.36** | | | |
| 2003 1Q | [redacted] | CALIFORNIA | MERCED | [redacted] | Coated/Specialty | 5 | 369.00 | **$49.89** | | | |
| 2003 1Q | [redacted] | CALIFORNIA | RANCHO DOMINGUE | [redacted] | Coated/Specialty | 3 | 229.83 | **$51.94** | | | |
| 2003 1Q | [redacted] | KENTUCKY | RICHWOOD | [redacted] | Coated/Specialty | 3 | 232.69 | **$22.50** | | | **provided rate to CN** |
| 2003 1Q | [redacted] | NEW YORK | LACONA | [redacted] | Coated/Specialty | 4 | 303.53 | **$53.41** | | | |
| 2003 1Q | [redacted] | OHIO | LEBANON | [redacted] | Coated/Specialty | 1 | 74.70 | **$26.71** | | | |
| 2003 1Q | [redacted] | PENNSYLVANIA | E. GREENVILLE | [redacted] | Coated/Specialty | 1 | 78.40 | **$43.90** | | | **provided rate to CN** |
| 2003 1Q | [redacted] | PENNSYLVANIA | EDDYSTONE | [redacted] | Coated/Specialty | 15 | 1,120.29 | **$43.76** | | | **provided rate to CN** |
| 2003 1Q | [redacted] | PENNSYLVANIA | MECHANICSBURG | [redacted] | Coated/Specialty | 2 | 146.79 | **$44.46** | | | **provided rate to CN** |
| 2003 1Q | [redacted] | PENNSYLVANIA | PHILADELPHIA | [redacted] | Coated/Specialty | 2 | 124.53 | **$43.59** | | | **provided rate to CN** |
| 2003 1Q | [redacted] | TEXAS | DALLAS | [redacted] | Coated/Specialty | 2 | 149.97 | **$27.07** | | | |
| 2003 1Q | [redacted] | VIRGINIA | WINCHESTER | [redacted] | Coated/Specialty | 1 | 75.99 | **$45.00** | | | **provided rate to CN** |

# Appendix J

## Rail Shipment Data: Bowater Gatineau (2002 and Q1 2003)

### Newsprint and Recovered Paper

| Date | Mill | Consignee State | Consignee City | Consignee/Warehouse | Count | Short Tons | US/mt TARGET | Carrier bid 100m | Carrier bid 120m | Carrier bid 140m | Carrier bid 160m | Carrier bid 180m | Product | Equipment Actual | Equipment Potential | Carrier Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [redacted] | ILLINOIS | MOUNT MORRIS | [redacted] | NA | NA | $46.00 | | | | X | X | Book Grade | | HC60-62 | |
| 2002 | [redacted] | INDIANA | BLOOMINGTON | [redacted] | 24 | 1,461.33 | $54.00 | X | | | | X | Newsprint | 50 Std | | |
| Q1 2003 | [redacted] | INDIANA | BLOOMINGTON | [redacted] | 5 | 289.72 | | X | | | | X | Newsprint | 50 Std | | |
| 2002 | [redacted] | INDIANA | SOUTH BEND | [redacted] | 4 | 233.59 | $33.00 | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| Q1 2003 | [redacted] | INDIANA | SOUTH BEND | [redacted] | 2 | 115.08 | | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| | [redacted] | MASSACHUSETTS | MONSON | [redacted] | | | | X | | | | X | Newsprint | 50 Std | | |
| 2002 | [redacted] | MASSACHUSETTS | PALMER | [redacted] | 102 | 6,756.99 | $25.00 | X | | | | X | Newsprint | 50 Std | | |
| Q1 2003 | [redacted] | MASSACHUSETTS | PALMER | [redacted] | 8 | 536.19 | | X | | | | X | Newsprint | 50 Std | | |
| 2002 | [redacted] | MASSACHUSETTS | PALMER | [redacted] | 169 | 11,558.07 | $25.00 | X | | | | | Newsprint | 50 Std | HC60-62 | |
| Q1 2003 | [redacted] | MASSACHUSETTS | PALMER | [redacted] | 20 | 1,371.24 | | X | | | | | Newsprint | 50 Std | HC60-62 | |
| 2002 | [redacted] | MARYLAND | COLLEGE PARK | [redacted] | 70 | 6,523.90 | $35.00 | X | | | | | Newsprint | HC 62' | | |
| 2002 | [redacted] | MARYLAND | JESSUP | [redacted] | 44 | 3,011.98 | $28.00 | X | | | | X | Newsprint | 50 Std | | |
| 2002 | [redacted] | MICHIGAN | DETROIT | [redacted] | 123 | 7,082.79 | $36.00 | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | MICHIGAN | FLINT | [redacted] | 131 | 9,484.58 | $29.00 | X | | | | | Newsprint | 50 Std | HC60-62 | |
| Q1 2003 | [redacted] | MICHIGAN | FLINT | [redacted] | 18 | 1,310.24 | | X | | | | | Newsprint | 50 Std | HC60-62 | |
| 2002 | [redacted] | MICHIGAN | GRAND RAPIDS | [redacted] | 242 | 17,441.37 | $31.00 | X | | | | | Newsprint | 50 Std | HC60-62 | |
| Q1 2003 | [redacted] | MICHIGAN | GRAND RAPIDS | [redacted] | 61 | 4,393.73 | | X | | | | | Newsprint | 50 Std | HC60-62 | |
| 2002 | [redacted] | MICHIGAN | KALAMAZOO | [redacted] | 64 | 4,705.87 | $36.00 | X | | | | | Newsprint | 50 Std | HC60-62 | provided rate to CPRS |
| Q1 2003 | [redacted] | MICHIGAN | KALAMAZOO | [redacted] | 20 | 1,460.20 | | X | | | | | Newsprint | 50 Std | HC60-62 | provided rate to CPRS |
| 2002 | [redacted] | MICHIGAN | SAGINAW | [redacted] | 77 | 5,563.24 | $33.00 | X | | | | | Newsprint | 50 Std | HC60-62 | |
| Q1 2003 | [redacted] | MICHIGAN | SAGINAW | [redacted] | 19 | 1,394.58 | | X | | | | | Newsprint | 50 Std | HC60-62 | |
| 2002 | [redacted] | MICHIGAN | STERLING HEIGHT/WARREN | [redacted] | 64 | 3,577.46 | $33.00 | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | NEW JERSEY | PORT NEWARK/PORT ELIZABE | [redacted] | 467 | 28,588.36 | $30.00 | X | | | | | Newsprint | HC | | provided rate to CPRS |
| Q1 2003 | [redacted] | NEW JERSEY | PORT NEWARK/PORT ELIZABE | [redacted] | 79 | 5,598.41 | | X | | | | | Newsprint | HC | | provided rate to CPRS |
| 2002 | [redacted] | NEW JERSEY | NEWARK/ELIZABETH | [redacted] | 3 | 182.75 | $30.00 | X | | | | X | Cull News | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | NEW JERSEY | PISCATAWAY/SOUTH BOUND | [redacted] | 354 | 22,055.60 | $30.00 | X | | | | | Newsprint | HC | | provided rate to CPRS |
| Q1 2003 | [redacted] | NEW JERSEY | PISCATAWAY/SOUTH BOUND | [redacted] | 81 | 5,846.58 | | X | | | | | Newsprint | HC | | provided rate to CPRS |
| 2002 | [redacted] | NEW JERSEY | PLEASANTVILLE | [redacted] | 7 | 435.59 | $30.00 | X | | | | | Newsprint | 50 Std | HC60-62 | provided rate to CPRS |
| Q1 2003 | [redacted] | NEW JERSEY | PLEASANTVILLE | [redacted] | 1 | 57.70 | | X | | | | | Newsprint | 50 Std | HC60-62 | provided rate to CPRS |
| 2002 | [redacted] | NEW JERSEY | TRENTON | [redacted] | 48 | 2,762.21 | $30.00 | X | | | | | Newsprint | 50 Std | HC60-62 | provided rate to CPRS |
| Q1 2003 | [redacted] | NEW JERSEY | TRENTON | [redacted] | 14 | 804.58 | | X | | | | | Newsprint | 50 Std | HC60-62 | provided rate to CPRS |
| 2002 | [redacted] | NEW YORK | BRONX | [redacted] | 384 | 26,370.59 | $28.00 | X | | | | | Newsprint | HC | | |
| Q1 2003 | [redacted] | NEW YORK | BRONX | [redacted] | 64 | 4,786.57 | | X | | | | | Newsprint | HC | | |
| NEW | [redacted] | NEW YORK | BUFFALO | [redacted] | NA | NA | $30.00 | | | | X | X | Book Grade | 50 Std | | |
| 2002 | [redacted] | NEW YORK | FLUSHING | [redacted] | 47 | 3,332.79 | $28.00 | X | | | | | Newsprint | HC | | |
| Q1 2003 | [redacted] | NEW YORK | FLUSHING | [redacted] | 88 | 6,107.69 | | X | | | | | Newsprint | HC | | |
| 2002 | [redacted] | NEW YORK | SYRACUSE | [redacted] | 11 | 1,002.34 | $20.00 | X | | | | | Newsprint | HC | HC60-62 | |
| 2002 | [redacted] | NEW YORK | WATERTOWN | [redacted] | 5 | 287.91 | $18.00 | X | | | | X | Cull News | 50 Std | | |
| Q1 2003 | [redacted] | NEW YORK | WATERTOWN | [redacted] | 2 | 123.94 | | X | | | | X | Cull News | 50 Std | | |
| 2002 | [redacted] | NORTH CAROLINA | GREENSBORO | [redacted] | 1 | 93.15 | $40.00 | X | | | | | Newsprint | 50 Std | HC60-62 | provided rate to CPRS |
| Q1 2003 | [redacted] | NORTH CAROLINA | GREENSBORO | [redacted] | 1 | 103.35 | | X | | | | | Newsprint | 50 Std | HC60-62 | provided rate to CPRS |
| 2002 | [redacted] | OHIO | CANTON | [redacted] | 18 | 1,086.15 | $25.00 | X | | | | X | Cull News | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | OHIO | CINCINNATI | [redacted] | 7 | 471.60 | $42.00 | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | OHIO | CLEVELAND | [redacted] | 19 | 1,163.01 | $25.00 | X | | | | X | Cull News | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | OHIO | TOLEDO | [redacted] | 86 | 5,321.76 | $25.00 | X | | | | | Newsprint | HC | | provided rate to CPRS |
| Q1 2003 | [redacted] | OHIO | TOLEDO | [redacted] | 17 | 1,482.01 | | X | | | | | Newsprint | HC | | provided rate to CPRS |
| 2002 | [redacted] | ONTARIO | ETOBICOKE | [redacted] | 12 | 708.63 | $15.00 | X | | | | X | Cull News | 50 Std | | |
| 2002 | [redacted] | ONTARIO | MISSISSAUGA | [redacted] | 8 | 463.48 | | X | | | | X | Cull News | 50 Std | | |
| 2002 | [redacted] | PENNSYLVANIA | BEAVER | [redacted] | 1 | 74.27 | $30.00 | X | | | | X | Newsprint | 50 Std | | |
| Q1 2003 | [redacted] | PENNSYLVANIA | BEAVER | [redacted] | 2 | 138.46 | | X | | | | X | Newsprint | 50 Std | | |
| 2002 | [redacted] | PENNSYLVANIA | BUTLER | [redacted] | 28 | 1,925.93 | $40.00 | X | | | | | Newsprint | 50 Std | HC60-62 | |
| 2002 | [redacted] | PENNSYLVANIA | BUTLER | [redacted] | 1 | 57.46 | | X | | | | | Newsprint | 50 Std | HC60-62 | |
| | [redacted] | PENNSYLVANIA | CHAMBERSBURG | [redacted] | NA | NA | $30.00 | | | | X | X | Book Grade | 50 Std | | |
| 2002 | [redacted] | PENNSYLVANIA | LANCASTER | [redacted] | 155 | 10,175.48 | $30.00 | X | | | | | Newsprint | HC50 | HC60-62 | provided rate to CPRS |
| Q1 2003 | [redacted] | PENNSYLVANIA | LANCASTER | [redacted] | 55 | 3,425.89 | | X | | | | | Newsprint | HC50 | HC60-62 | provided rate to CPRS |
| 2002 | [redacted] | PENNSYLVANIA | LEVITTOWN | [redacted] | 23 | 1,512.71 | $35.00 | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| Q1 2003 | [redacted] | PENNSYLVANIA | LEVITTOWN | [redacted] | 6 | 379.61 | | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | PENNSYLVANIA | MECHANICSBURG | [redacted] | 63 | 3,604.09 | $30.00 | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| Q1 2003 | [redacted] | PENNSYLVANIA | MECHANICSBURG | [redacted] | 8 | 525.43 | | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | PENNSYLVANIA | UNIONTOWN | [redacted] | 10 | 616.55 | $55.00 | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| Q1 2003 | [redacted] | PENNSYLVANIA | UNIONTOWN | [redacted] | 3 | 185.94 | | X | | | | X | Newsprint | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | PENNSYLVANIA | YORK | [redacted] | 1 | 57.51 | $35.00 | X | | | | X | Cull News | 50 Std | | provided rate to CPRS |
| 2002 | [redacted] | QUEBEC | MONTREAL | [redacted] | 10 | 595.91 | $10.00 | X | | | | X | Cull News | 50 Std | | |
| 2002 | [redacted] | VIRGINIA | SPRINGFIELD/ALEXANDRIA | [redacted] | 201 | 18,673.08 | $35.00 | X | | | | | Newsprint | HC 62' | | provided rate to CPRS |

| Date | Mill | Consignee State | Consignee City | Consignee/Warehouse | Count | Short Tons | US/mt TARGET | Carrier bid 100m | Carrier bid 120m | Carrier bid 140m | Carrier bid 160m | Carrier bid 180m | Product | Equipment Actual | Equipment Potential | Carrier Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q1 2003 | [redacted] | VIRGINIA | SPRINGFIELD/ALEXANDRIA | [redacted] | 97 | 9,037.81 | | X | | | | | Newsprint | HC 62' | | provided rate to CPRS |
| Q1 2003 | [redacted] | VIRGINIA | MECHANICSVILLE | [redacted] | 1 | 94.00 | $35.00 | X | | | | | Newsprint | HC 62' | | |
| 2002 | [redacted] | WISCONSIN | MILWAUKEE | [redacted] | 10 | 688.45 | $40.00 | X | | | | | Newsprint | 50 Std | HC60-62 | |

| Date | Mill | Consignee State | Consignee City | Consignee/Warehouse | Count | Short Tons | US/mt TARGET | Carrier bid 100m | Carrier bid 120m | Carrier bid 140m | Carrier bid 160m | Carrier bid 180m | Product | Equipment Actual | Equipment Potential |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [redacted] | CONNECTICUT | Kensington | [redacted] | | 1000 | | | | | X | X | ONP/OMG | | |
| 2002 | [redacted] | KENTUCKY | Danville | [redacted] | 4 | 252 | | | | | X | X | ONP/OMG | | |
| 2002 | [redacted] | PENNSYLVANIA | East Greenville | [redacted] | 1 | 72 | | | | | X | X | ONP/OMG | | |
| | [redacted] | PENNSYLVANIA | Lancaster | [redacted] | | 500 | | | | | X | X | ONP/OMG | | |
| | [redacted] | MASSACHUSSET | Charlestown | [redacted] | | 3000 | | | | | X | X | ONP/OMG | | |
| | [redacted] | NEW YORK | Hillburn | [redacted] | | 1000 | | | | | X | X | ONP/OMG | | |
| | [redacted] | NEW YORK | Rochester | [redacted] | | 2000 | | | | | X | X | ONP/OMG | | |
| | [redacted] | ONTARIO | Mississauga | [redacted] | | 1500 | | | | | X | X | ONP/OMG | | |
| 2002 | [redacted] | TENNESSEE | Calhoun | [redacted] | 48 | 2686 | | | | | X | X | ONP/OMG | | |
| 2002 | [redacted] | VIRGINIA | Strasburg | [redacted] | 22 | 1620 | | | | | X | X | ONP/OMG | | |
| 2002 | [redacted] | WEST VIRGINIA | Martinsburg | [redacted] | 2 | 147 | | | | | X | X | ONP/OMG | | |
| Q1 2003 | [redacted] | WISCONSIN | Hartford | | 3 | 203 | | | | | | | | | |

**Note:**
**NS provided rates also to the following three truck points out of Gatineau - Wellington, VA, to ALF Printing at Voorhees, NJ, and to Patriot News Company, Mechanicsburg, PA.**

# Appendix J

**Rail Shipment Data: Bowater Grenada (2002)**
**Newsprint**

| Mill | Consignee State | Consignee City | Consignee Legal Name | Count | Short Tons | Target Rate | Notes | Carrier Bid * | Carrier Notes |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | ALABAMA | MOBILE | [redacted] | 80 | 4,468 | $8.80 | 2 | | |
| | ALABAMA | MOBILE | | 25 | 1,611 | $9.20 | 2 | | |
| | ARKANSAS | LITTLE ROCK | | 201 | 10,941 | $12.85 | | | |
| | Florida | Miami Fl | | 1 | 72 | $41.40 | | | |
| | ARIZONA | GLENDALE | | 3 | 198 | $58.25 | 1 | | |
| | CALIFORNIA | POMONA | | 19 | 985 | $53.36 | | | |
| | COLORADO | COLORADO SPRINGS | | 15 | 949 | $46.25 | | | |
| | COLORADO | COLORADO SPRINGS | | 9 | 560 | $46.25 | | | |
| | MISSISSIPPI | Gulfport Ms | | 34 | 2,328 | $14.65 | | | |
| | Mississippi | Gulfport Ms | | 5 | 309 | $14.98 | | | |
| | ILLINOIS | CARBONDALE | | 3 | 194 | $14.83 | | | |
| | ILLINOIS | DECATUR | | 2 | 132 | $17.77 | | | |
| | KANSAS | HUTCHINSON | | 1 | 69 | $31.23 | | | |
| | KANSAS | LAWRENCE | | 26 | 1,681 | $28.62 | | | |
| | KANSAS | WICHITA | | 3 | 162 | $31.23 | | | |
| | LOUISIANA | Essen La | | 26 | 1,843 | $16.67 | | | |
| | LOUISIANA | NEW ORLEANS | | 1 | 63 | $11.18 | | | |
| | Texas | Laredo Tx | | 2 | 140 | $42.57 | | | |
| | MISSOURI | KANSAS CITY | | 18 | 1,263 | $28.67 | | | |
| | MISSISSIPPI | JACKSON | | 145 | 9,271 | $9.12 | | | |
| | MISSISSIPPI | JACKSON | | 22 | 1,407 | $9.32 | | | |
| | OHIO | CINCINNATI | | 6 | 357 | $31.94 | | | |
| | OKLAHOMA | OKLAHOMA CITY | | 2 | 128 | $25.64 | | | |
| | OKLAHOMA | OKLAHOMA CITY | | 121 | 7,186 | $24.53 | | | |
| | OKLAHOMA | OKLAHOMA CITY | | 48 | 2,839 | $28.62 | | | |
| | OKLAHOMA | TULSA | | 2 | 131 | $24.29 | | | |
| | OKLAHOMA | TULSA | | 3 | 183 | $21.51 | | | |
| | OKLAHOMA | TULSA | | 184 | 12,161 | $20.57 | | | |
| | Georgia | Savannah | | 1 | 63 | $28.66 | | | |
| | TENNESSEE | MEMPHIS | | 154 | 8,497 | $8.93 | | | |
| | TENNESSEE | MEMPHIS | | 63 | 3,434 | $8.93 | | | |
| | TENNESSEE | PORTLAND | | 6 | 353 | $18.74 | | | |
| | TEXAS | AUSTIN | | 27 | 1,478 | $28.08 | 3 | | |
| | TEXAS | AUSTIN | | 1 | 54 | $28.70 | 3 | | |
| | TEXAS | AUSTIN | | 6 | 332 | $28.70 | 3 | | |
| | TEXAS | CARROLLTON | | 2 | 128 | $24.63 | | | |
| | TEXAS | Irving Tx ??? | | 1 | 71 | $26.01 | | | |
| | TEXAS | Hale | | 5 | 296 | $28.85 | | | |
| | TEXAS | GAINESVILLE | | 1 | 65 | $24.84 | | | |
| | TEXAS | GAINESVILLE | | 1 | 64 | $24.84 | | | |
| | TEXAS | HOUSTON | | 479 | 31,733 | $23.01 | | | |
| | TEXAS | LUBBOCK | | 20 | 1,270 | $33.98 | | | |
| | TEXAS | LUBBOCK | | 2 | 130 | $34.74 | | | |
| | TEXAS | MCALLEN | | 31 | 1,958 | $45.88 | | | |
| | TEXAS | PLANO | | 134 | 7,442 | $22.26 | | | |
| | VIRGINIA | Diamond Springs Va | | 1 | 64 | $42.63 | | NS PROVIDED REQUIREMENTS TO CN | |

**Notes:**
1) includes whse.chg's+truck beyond
2)14.30 Aug 1 2003
3)includes whse.+truck beyond

* Minimum Weight 50'-130,000
60'-150,000

# Appendix J

**Rail Shipment Data: Bowater Grenada (Q1 2003)**

**Newsprint**

| Mill | Consignee State | Consignee City | Consignee Legal Name | Count | Short Tons | Target Rate | Notes | Carrier Bid * | Carrier Notes |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | ALABAMA | MOBILE | [redacted] | 18 | 998 | | | | |
| [redacted] | ARKANSAS | LITTLE ROCK | [redacted] | 76 | 4,104 | | | | |
| [redacted] | ILLINOIS | ELK GROVE VIL. | [redacted] | 3 | 169 | **$24.03** | | | |
| [redacted] | KANSAS | LAWRENCE | [redacted] | 8 | 509 | | | | |
| [redacted] | KENTUCKY | BOWLING GREEN | [redacted] | 19 | 1,037 | **$18.36** | | | |
| [redacted] | KENTUCKY | LOUISVILLE | [redacted] | 1 | 70 | **$18.76** | | | |
| [redacted] | LOUISIANA | Essen La | [redacted] | 6 | 423 | | | | |
| [redacted] | LOUISIANA | NEW ORLEANS | [redacted] | 19 | 1,540 | | | | |
| [redacted] | MISSISSIPPI | JACKSON | [redacted] | 41 | 2,553 | | | | |
| [redacted] | OHIO | COLUMBUS | [redacted] | 3 | 153 | **$33.41** | | | NS PROVIDED REQUIREMENTS TO THE CN |
| [redacted] | OKLAHOMA | OKLAHOMA CITY | [redacted] | 2 | 129 | | | | |
| [redacted] | OKLAHOMA | OKLAHOMA CITY | [redacted] | 42 | 2,492 | | | | |
| [redacted] | OKLAHOMA | TULSA | [redacted] | 2 | 130 | | | | |
| [redacted] | OKLAHOMA | TULSA | [redacted] | 11 | 707 | | | | |
| [redacted] | OKLAHOMA | TULSA | [redacted] | 33 | 2,114 | | | | |
| [redacted] | TENNESSEE | NASHVILLE | [redacted] | 18 | 1,295 | **$19.12** | | | |
| [redacted] | TEXAS | AUSTIN | [redacted] | 2 | 111 | | | | |
| [redacted] | TEXAS | DALLAS | [redacted] | 5 | 311 | | | | |
| [redacted] | TEXAS | FORT WORTH | [redacted] | 18 | 983 | **$24.09** | | | |
| [redacted] | TEXAS | HOUSTON | [redacted] | 74 | 4,702 | | | | |
| [redacted] | TEXAS | LUBBOCK | [redacted] | 3 | 183 | | | | |
| [redacted] | TEXAS | MCALLEN | [redacted] | 7 | 439 | | | | |
| [redacted] | TEXAS | PLANO | [redacted] | 11 | 608 | | | | |
| [redacted] | VIRGINIA | ASHLAND | [redacted] | 1 | 56 | **$18.36** | | | |

* Minimum Weight 50'-130,000
60'-150,000

# APPENDIX J

## *Rail Shipment Data: Bowater Thunder Bay (2002)*

### Pulp

| Consignee City | Consignee Legal Name | Count | Short Tons | Target Rate (Per Car) | Notes | Carrier Bid | Carrier Notes |
|---|---|---|---|---|---|---|---|
| COURTLAND | [redacted] | 24.00 | 2,313.21 | $ 4,250.00 | | | NS PROVIDED REQUIREMENTS TO CNAND CPRS |
| VANCOUVER | | | 23,173.34 | $ 3,200.00 | | | |
| ALBANY | | 9.00 | 871.51 | $ 4,810.00 | | | |
| BUCKSPORT | | 48.00 | 4,646.54 | $ 4,700.00 | | | |
| DETROIT | | 6.00 | 569.73 | $ 3,850.00 | | | |
| MENOMINEE | | 43.00 | 4,165.04 | $ 3,100.00 | | | |
| MUNISING | | 23.00 | 2,221.04 | $ 3,100.00 | | | |
| PORT HURON | | 34.00 | 3,296.07 | $ 2,900.00 | | | |
| DULUTH | | 47.00 | 4,544.75 | $ 1,500.00 | | | |
| GRAND RAPIDS | | 852.00 | 82,534.41 | $ 2,400.00 | | | |
| SARTELL | | 254.00 | 24,601.89 | $ 2,500.00 | | | |
| WIGGINS | | 58.00 | 5,592.69 | $ 3,600.00 | | | |
| GREENVILLE | | 61.00 | 5,906.85 | $ 4,200.00 | | | |
| PISGAH FOREST | | 1.00 | 96.98 | $ 4,700.00 | | | Mill is closed |
| BENNINGTON | | 33.00 | 3,202.76 | $ 2,400.00 | | | |
| MILFORD | | 10.00 | 969.81 | $ 6,500.00 | | | Mill to close 6/2003 |
| MILFORD | | 3.00 | 291.27 | $ 6,500.00 | Includes transfer and local cartage | | |
| GOUVERNEUR | | 40.00 | 3,870.00 | $ 3,500.00 | | | |
| DRYDEN | | 289.00 | 27,519.49 | $ 950.00 | | | |
| SAULT STE MARIE | | 9.00 | 872.63 | $ 2,500.00 | | | |
| ST. CATHARINES | | 189.00 | 16,707.96 | $ 1,900.00 | | | |
| THUNDER BAY | | 85.00 | 8,220.89 | $ 350.00 | | | |
| THUNDER BAY | | 30.00 | 2,907.24 | $ 350.00 | | | |
| THUNDER BAY | | 49.00 | 4,731.79 | $ 380.00 | | | |
| WEST LINN | | 452.00 | 43,754.46 | $ 4,600.00 | | | |
| MEHOOPANY | | 2,125.00 | 206,142.41 | $ 3,900.00 | | | NS PROVIDED REQUIREMENTS TO CN AND CPRS |
| DONNACONA | | 4.00 | 386.38 | $ 2,600.00 | | | |
| SEAWAY SPUR | | | 7,698.45 | $ 2,300.00 | | | |
| TROIS RIVIERES | | 13.00 | 1,261.30 | $ 2,400.00 | | | |
| KINGSPORT | | 48.00 | 4,642.47 | $ 4,300.00 | | | |
| EAGLE PASS | | 16.00 | 1,547.03 | $ 4,400.00 | Target of $3,600 per car for 75 ton equipment | | |
| EL PASO | | 66.00 | 6,364.13 | $ 4,800.00 | | | |
| LAREDO | | 566.00 | 52,635.74 | $ 3,800.00 | Target of $3,200 per car for 75 ton equipment | | |
| COMBINED LOCKS | | 117.00 | 11,324.50 | $ 3,300.00 | | | |
| GREEN BAY | | 166.00 | 16,074.32 | $ 2,600.00 | | | |
| MOSINEE | | 62.00 | 5,998.17 | $ 2,700.00 | | | |
| NEENAH | | 24.00 | 2,327.26 | $ 3,100.00 | | | |
| NEENAH | | 17.00 | 1,637.03 | $ 3,100.00 | | | |

# APPENDIX J

## Rail Shipment Data: Bowater Thunder Bay (Q1 2003)

## Pulp

| Mill | Consignee State | Consignee City | Consignee Legal Name | Count | Short Tons | Target Rate (Per Car) | Notes | Carrier Bid | Carrier Notes |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | ARKANSAS | CROSSETT | [redacted] | 12.00 | 1,158.29 | | | | |
| [redacted] | GEORGIA | AUGUSTA | [redacted] | 1.00 | 96.60 | | | | |
| [redacted] | MEXICO | CHIHUAHUA | [redacted] | 5.00 | 485.62 | | | | |
| [redacted] | MEXICO | COL ARENAL DF | [redacted] | 9.00 | 869.51 | | | | |
| [redacted] | MEXICO | DELEGACION AZCAPOTZALCO | [redacted] | 47.00 | 4,454.18 | | | | |
| [redacted] | MEXICO | IXTACZOQUITLAN VER | [redacted] | 18.00 | 1,384.02 | | | | |
| [redacted] | MEXICO | SAN JUAN DEL RIO | [redacted] | 52.00 | 5,045.27 | | | | |
| [redacted] | MEXICO | URUAPAN MICHOACAN | [redacted] | 30.00 | 2,912.92 | | | | |
| [redacted] | MICHIGAN | ESCANABA | [redacted] | 10.00 | 969.24 | $ **2,700.00** | | | |
| [redacted] | MICHIGAN | MENOMINEE | [redacted] | 24.00 | 2,319.19 | | | | |
| [redacted] | MICHIGAN | MUNISING | [redacted] | 1.00 | 97.56 | | | | |
| [redacted] | MICHIGAN | PORT HURON | [redacted] | 30.00 | 2,905.03 | | | | |
| [redacted] | MINNESOTA | GRAND RAPIDS | [redacted] | 115.00 | 11,150.25 | | | | |
| [redacted] | MINNESOTA | SARTELL | [redacted] | 38.00 | 3,686.88 | | | | |
| [redacted] | MISSISSIPPI | WIGGINS | [redacted] | 19.00 | 1,822.20 | | | | |
| [redacted] | NEW BRUNSWICK | BELLEDUNE | [redacted] | 12.00 | 1,133.30 | $ **3,800.00** | | | |
| [redacted] | NEW BRUNSWICK | NEWCASTLE | [redacted] | 12.00 | 1,164.01 | $ **4,000.00** | | | |
| [redacted] | NEW HAMPSHIRE | BENNINGTON | [redacted] | 11.00 | 1,068.36 | | | | |
| [redacted] | NEW JERSEY | MILFORD | [redacted] | 2.00 | 193.73 | | | | |
| [redacted] | NEW YORK | GOUVERNEUR | [redacted] | 12.00 | 1,164.41 | | | | |
| [redacted] | OKLAHOMA | MUSKOGEE | [redacted] | 21.00 | 2,036.00 | | | | |
| [redacted] | ONTARIO | DRYDEN | [redacted] | 167.00 | 15,950.93 | | | | |
| [redacted] | ONTARIO | ST. CATHARINES | [redacted] | 39.00 | 3,774.20 | | | | |
| [redacted] | ONTARIO | THUNDER BAY | [redacted] | 23.00 | 2,230.94 | | | | |
| [redacted] | ONTARIO | THUNDER BAY | [redacted] | 5.00 | 485.29 | | | | |
| [redacted] | OREGON | WEST LINN | [redacted] | 109.00 | 10,330.12 | | | | |
| [redacted] | PENNSYLVANIA | MEHOOPANY | [redacted] | 415.00 | 40,259.71 | | | | NS PROVIDED REQUIREMENTS TO CN AND CPRS |
| [redacted] | PENNSYLVANIA | SPRING GROVE | [redacted] | 1.00 | 97.15 | $ **3,900.00** | | | NS PROVIDED REQUIREMENTS TO CN AND CPRS |
| [redacted] | PROVINCE OF QUEBEC | QUEBEC | [redacted] | 3.00 | 290.36 | | | | |
| [redacted] | TEXAS | EAGLE PASS | [redacted] | 9.00 | 869.51 | | | | |
| [redacted] | TEXAS | EL PASO | [redacted] | 5.00 | 485.62 | | | | |
| [redacted] | TEXAS | LAREDO | [redacted] | 147.00 | 13,796.38 | | | | |
| [redacted] | VERMONT | BRATTLEBORO | [redacted] | 22.00 | 2,091.51 | $ **4,200.00** | | | |
| [redacted] | WASHINGTON | LONGVIEW | [redacted] | 15.00 | 1,454.62 | $ **5,000.00** | | | |
| [redacted] | WISCONSIN | COMBINED LOCKS | [redacted] | 30.00 | 2,897.60 | | | | |
| [redacted] | WISCONSIN | GREEN BAY | [redacted] | 176.00 | 16,903.23 | | | | |
| [redacted] | WISCONSIN | MOSINEE | [redacted] | 8.00 | 778.61 | | | | |
| [redacted] | WISCONSIN | NEENAH | [redacted] | 12.00 | 1,163.47 | | | | |
| [redacted] | WISCONSIN | NEENAH | [redacted] | 6.00 | 581.29 | | | | |

# Appendix J

## Rail Shipment Data: Bowater Thunder Bay (2002)

### Newsprint and Specialty Paper

| Mill | Consignee State | Consignee City | Consignee Legal Name | Count | Short Tons | Target Rates CDN$ cwt (@140 M unless noted) | Notes | Carrier bid 120M | Carrier bid 140M | Carrier bid 160M | Carrier bid 180M | Carrier bid 200M | Carrier Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | COLORADO | AURORA | [redacted] | 26.00 | 1,690.51 | $ 1.95 | | | | | | | |
| [redacted] | COLORADO | DENVER | [redacted] | 56.00 | 3,189.03 | $ 1.97 | | | | | | | |
| [redacted] | COLORADO | DENVER | [redacted] | 84.00 | 5,153.20 | $ 1.97 | | | | | | | |
| [redacted] | COLORADO | DENVER | [redacted] | 4.00 | 265.26 | $ 2.01 | | | | | | | |
| [redacted] | IOWA | BURLINGTON | [redacted] | 1.00 | 62.89 | $ 1.86 | | | | | | | |
| [redacted] | IOWA | CEDAR RAPIDS | [redacted] | 15.00 | 895.40 | $ 2.04 | | | | | | | |
| [redacted] | IOWA | SIOUX CITY | [redacted] | 27.00 | 1,657.83 | $ 1.80 | | | | | | | |
| [redacted] | ILLINOIS | ARLINGTON HTS. (Schaumburg) | [redacted] | 100.00 | 6,135.85 | $ 1.50 | Target at 180M. Require 100 ton, 60' - 62' Hi-cap car - quote 160M / 180M / 200M | | | | | | |
| [redacted] | ILLINOIS | CHICAGO | [redacted] | 239.00 | 13,697.28 | $ 1.40 | | | | | | | |
| [redacted] | ILLINOIS | DECATUR | [redacted] | 35.00 | 2,224.20 | $ 1.80 | | | | | | | |
| [redacted] | ILLINOIS | EFFINGHAM | [redacted] | 33.00 | 2,046.35 | $ 1.90 | | | | | | | |
| [redacted] | ILLINOIS | HIGHLAND | [redacted] | 21.00 | 1,499.22 | $ 1.95 | | | | | | | |
| [redacted] | ILLINOIS | MOUNT MORRIS | [redacted] | 166.00 | 10,141.78 | $ 1.55 | | | | | | | |
| [redacted] | INDIANA | WARSAW | [redacted] | 7.00 | 295.69 | $ 2.10 | | | | | | | |
| [redacted] | KANSAS | WICHITA | [redacted] | 124.00 | 7,525.40 | $ 2.05 | | | | | | | |
| [redacted] | MICHIGAN | BENTON HARBOR | [redacted] | 828.00 | 50,198.62 | $ 1.80 | | | | | | | |
| [redacted] | MICHIGAN | DETROIT | [redacted] | 115.00 | 7,040.40 | $ 1.60 | | | | | | | provided rate to CN/CPRS |
| [redacted] | MICHIGAN | KALAMAZOO | [redacted] | 10.00 | 592.62 | $ 2.00 | | | | | | | provided rate to CN/CPRS |
| [redacted] | MICHIGAN | STERLING HEIGHT/WARREN | [redacted] | 86.00 | 5,285.34 | $ 1.85 | | | | | | | provided rate to CN/CPRS |
| [redacted] | MINNESOTA | MINNEAPOLIS | [redacted] | 334.00 | 30,498.48 | $ 1.05 | Target is at 180M. Require 100 ton, 60' - 62' Hi-cap car - quote 160M / 180M / 200M | | | | | | |
| [redacted] | MISSOURI | KANSAS CITY | [redacted] | 383.00 | 25,508.61 | $ 1.60 | | | | | | | provided rate to CN/CPRS |
| [redacted] | MISSOURI | MARYLAND HGHTS/MADISON, IL | [redacted] | 132.00 | 8,197.55 | $ 1.65 | quote rates at 120M / 140M / 160M / 180M / 200M | | | | | | provided rate to CN/CPRS |
| [redacted] | MISSOURI | ST. LOUIS/BERKELEY | [redacted] | 2.00 | 121.82 | $ 1.70 | | | | | | | provided rate to CN/CPRS |
| [redacted] | MISSOURI | ST. LOUIS | [redacted] | 8.00 | 494.73 | $ 1.70 | | | | | | | provided rate to CN/CPRS |
| [redacted] | MISSOURI | ST. LOUIS | [redacted] | 6.00 | 370.08 | $ 1.70 | | | | | | | provided rate to CN/CPRS |
| [redacted] | NORTH DAKOTA | FARGO | [redacted] | 27.00 | 1,571.58 | $ 1.40 | | | | | | | |
| [redacted] | NEBRASKA | OMAHA | [redacted] | 92.00 | 5,802.14 | $ 1.55 | Require min. 9'3" wide by 50' car | | | | | | |
| [redacted] | NEVADA | RENO | [redacted] | 1.00 | 38.81 | $ 3.80 | | | | | | | |
| [redacted] | OHIO | BROOKLYN | [redacted] | 603.00 | 41,768.84 | $ 1.63 | Target is at 180M. Require 100 ton, 60' - 62' Hi-cap car - quote 160M / 180M / 200M | | | | | | |
| [redacted] | OHIO | CLEVELAND | [redacted] | 19.00 | 1,183.04 | $ 1.86 | | | | | | | |
| [redacted] | OHIO | COLUMBUS | [redacted] | 206.00 | 15,739.52 | $ 1.78 | Target is at 180M. Require 100 ton, 60' - 62' Hi-cap car - quote 160M / 180M / 200M | | | | | | provided rate to CN/CPRS |
| [redacted] | ONTARIO | THUNDER BAY | [redacted] | 47.00 | 2,767.03 | $ 0.35 | | | | | | | |
| [redacted] | PENNSYLVANIA | EDDYSTONE | [redacted] | 1.00 | 63.85 | $ 3.31 | | | | | | | provided rate to CN/CPRS |
| [redacted] | PENNSYLVANIA | LANCASTER | [redacted] | 5.00 | 269.29 | $ 2.35 | | | | | | | provided rate to CN/CPRS |
| [redacted] | PROVINCE OF QUEBEC | STE. CATHERINE | [redacted] | 2.00 | 129.78 | $ 1.80 | | | | | | | |
| [redacted] | TENNESSEE | COVINGTON | [redacted] | 458.00 | 27,870.84 | $ 1.65 | | | | | | | |
| [redacted] | TENNESSEE | GALLATIN | [redacted] | 48.00 | 2,255.83 | $ 2.90 | | | | | | | |
| [redacted] | TENNESSEE | NASHVILLE | [redacted] | 10.00 | 577.02 | $ 2.90 | | | | | | | |
| [redacted] | TEXAS | DALLAS (Irving) | [redacted] | 46.00 | 3,370.70 | $ 3.58 | Price to include transfer and local cartage to customer (truck served only) | | | | | | |
| [redacted] | TEXAS | DALLAS | [redacted] | 4.00 | 259.30 | $ 2.21 | | | | | | | |
| [redacted] | TEXAS | HOUSTON | [redacted] | 535.00 | 34,431.56 | $ 2.10 | | | | | | | |
| [redacted] | TEXAS | HOUSTON | [redacted] | 5.00 | 317.96 | $ 2.10 | | | | | | | |
| [redacted] | TEXAS | PLANO | [redacted] | 125.00 | 7,141.54 | $ 2.35 | quote rates at 120M / 140M / 160M / 180M / 200M | | | | | | |
| [redacted] | WISCONSIN | MADISON | [redacted] | 213.00 | 12,622.61 | $ 1.60 | | | | | | | |
| [redacted] | WISCONSIN | MAZOMANIE | [redacted] | 62.00 | 3,816.53 | $ 1.67 | | | | | | | |
| [redacted] | WISCONSIN | MILWAUKEE | [redacted] | 356.00 | 24,344.25 | $ 1.90 | Target is at 180M. Require 100 ton, 60' - 62' Hi-cap car - quote 160M / 180M / 200M | | | | | | |
| [redacted] | WISCONSIN | WATERLOO | [redacted] | 1.00 | 70.01 | $ 1.60 | | | | | | | |

PRODUCED AS NATIVE

# APPENDIX K

## [redacted] TRANSIT & VARIABILITY COMPARISON 2002 VS. 2001

### CALHOUN, TN

| | TRAFFIC | | TRANSIT | | STD DEV | | transit accum. | | std dev accum | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 |
| birmingham | 318 | 8 | 4.5 | 3.2 | 1.6 | 1.2 | 1431 | 1017.6 | 508.8 | 381.6 |
| new orleans | 1309 | 923 | 4.5 | 3.9 | 1.1 | 1.1 | 5890.5 | 5105.1 | 1439.9 | 1439.9 |
| louisville | 290 | 323 | 3.7 | 3.2 | 1.3 | 0.7 | 1073 | 928 | 377 | 203 |
| greensboro | 166 | 177 | 8.4 | 7.7 | 2.3 | 2.2 | 1394.4 | 1278.2 | 381.8 | 365.2 |
| col. Camp ch | 221 | 210 | 3.7 | 3.5 | 0.8 | 0.9 | 817.7 | 773.5 | 176.8 | 198.9 |
| Springfield | 339 | 315 | 9.1 | 7.9 | 2.3 | 2.0 | 3084.9 | 2678.1 | 779.7 | 678 |
| | 2643 | | | | | | 13691.5 | 11780.5 | 3664 | 3266.6 |
| | | | | | | CHANGE: | -14% | | -11% | |

### CATAWBA, SC

| | TRAFFIC | | TRANSIT | | STD DEV | | transit accum. | | std dev accum | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 |
| chicago | 883 | 835 | 6.1 | 5.5 | 1.6 | 1.3 | 5386.3 | 4856.5 | 1412.8 | 1147.9 |
| charleston, sc | 224 | 179 | 3.1 | 3.3 | 3.1 | 2.5 | 694.4 | 739.2 | 694.4 | 560 |
| corinth, ms | 122 | 99 | 3.9 | 3.6 | 1.3 | 0.8 | 475.8 | 439.2 | 158.6 | 97.6 |
| memphis | 646 | 677 | 3.9 | 3.5 | 1.6 | 1.1 | 2519.4 | 2261 | 1033.6 | 710.6 |
| new orleans | 578 | 1044 | 3.5 | 3.3 | 1.2 | 1.1 | 2023 | 1907.4 | 693.6 | 635.8 |
| alexandria | 60 | 32 | 5.4 | 4.6 | 2.8 | 1.1 | 324 | 276 | 168 | 66 |
| fayetteville | 75 | 62 | 4.5 | 4.0 | 2.2 | 1.5 | 337.5 | 300 | 165 | 112.5 |
| | 2588 | | | | | | 11760.4 | 10779.3 | 4326 | 3330.4 |
| | | | | | | CHANGE: | -8% | | -23% | |

### COOSA PINES, AL

| | TRAFFIC | | TRANSIT | | STD DEV | | transit accum. | | std dev accum | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 |
| new orleans | 71 | 236 | 3.1 | 3.1 | 1.1 | 2.0 | 220.1 | 220.1 | 78.1 | 142 |
| memphis | 1518 | 1251 | 4.0 | 3.8 | 1.5 | 1.6 | 6072 | 5768.4 | 2277 | 2428.8 |
| mobile | 351 | 162 | 3.0 | 3.1 | 1.2 | 1.7 | 1053 | 1088.1 | 421.2 | 596.7 |
| berkeley | 41 | 31 | 9.7 | 8.0 | 2.4 | 2.1 | 397.7 | 328 | 98.4 | 86.1 |
| canton | 48 | 5 | 10.0 | 8.6 | 2.4 | 0.1 | 480 | 412.8 | 115.2 | 4.8 |
| | 2029 | | | | | | 8222.8 | 7817.4 | 2989.9 | 3258.4 |
| | | | | | | CHANGE: | -5% | | 9% | |

### THUNDER BAY, ON

| | TRAFFIC | | TRANSIT | | STD DEV | | transit accum. | | std dev accum | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 |
| buff - mehoopany | 1577 | 2007 | 5.3 | 2.8 | 3.0 | 1.0 | 8358.1 | 4415.6 | 4731 | 1577 |
| chgo - columbus | 225 | 205 | 2.2 | 2.4 | 0.6 | 1.5 | 495 | 540 | 135 | 337.5 |
| chgo - kalamazoo | 46 | 58 | 4.3 | 3.5 | 2.5 | 1.3 | 197.8 | 161 | 115 | 59.8 |
| det - warren | 37 | 70 | 6.1 | 6.8 | 2.8 | 2.3 | 225.7 | 251.6 | 103.6 | 85.1 |
| | 1885 | | | | | | 9276.6 | 5368.2 | 5084.6 | 2059.4 |
| | | | | | | CHANGE: | -42% | | -59% | |

### GATINEAU, PQ

| | TRAFFIC | | TRANSIT | | STD DEV | | transit accum. | | std dev accum | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 | 2002 |
| altwn-pt newark eliz | 834 | 468 | 5.3 | 4.7 | 2.1 | 1.6 | 4420.2 | 3919.8 | 1751.4 | 1334.4 |
| altwn - s bound brk | 253 | 267 | 5.6 | 4.7 | 3.0 | 2.3 | 1416.8 | 1189.1 | 759 | 581.9 |
| det - kalamazoo | 81 | 64 | 5.8 | 5.0 | 2.4 | 1.7 | 469.8 | 405 | 194.4 | 137.7 |
| det - warren | 62 | 64 | 8.1 | 7.1 | 2.3 | 1.9 | 502.2 | 440.2 | 142.6 | 117.8 |
| | 1230 | | | | | | 6809 | 5954.1 | 2847.4 | 2171.8 |
| | | | | | | CHANGE: | -13% | | -24% | |

# Appendix M
## [redacted] Equipment Standardization Proposal

**Calhoun –**

- 60-Ft, 100-Ton, Std. Roof for Newsprint (Assigned)
- 60-FT, 100-Ton, High Roof for Newsprint (Assigned)
- 50-FT, 70-Ton, Plain Box for Woodpulp (Free Running Provided as Ordered)
  - High Capacity 70-Ton cars provided to the greatest extent possible to allow reloading by Coosa Pines.

    - 50-FT, 100-Ton, Cushioned, Std. Roof - To Catawba, Eliminate Pool
    - 50-FT, 70-Ton, Plain Box – Eliminate Pool
    - 50-FT, 100-Ton, Rigid, Std. Roof – Eliminate Pool

**Catawba –**

- 50-Ft, 100-Ton, Cushioned, Std. Roof for Coated Paper and Woodpulp (Assigned)
- 50-Ft, 100-Ton, Cushioned, High Roof for Coated Paper (Assigned)
- 50-Ft, 100-Ton, Rigid, Std. Roof for Woodpulp (Assigned)

    - 60-Ft, 100-Ton, Standard Roof – To Calhoun, Eliminate Pool
    - 50-FT, 70-Ton, Plain Box – Eliminate Pool

**Coosa Pines –**

- 60-Ft, 100-Ton, Std. Roof for Newsprint (Assigned)
- 50-FT, High Capacity 70-Ton, Plain Box for Woodpulp (Free Running Provided As Required In Addition To Inbound Cars)
- 50-FT, 70-Ton, Plain Box – Eliminate Pool
- 50-Ft, 100-Ton, Cushioned, Std. Roof – To Catawba, Eliminate Pool
- 50-Ft, 100-Ton, Cushioned, High Roof – Eliminate Pool

**From:** Kiley Richard
**Sent:** Fri Dec 03 07:28:36 2004
**To:** McGregor Scott <sdmcgreg@nscorp.com>
**Cc:** Parsons Rick <rlparson@nscorp.com>; Butt Tim <wtbutt@nscorp.com>
**Subject:** C of C 1E
**Importance:** Normal
**Attachments:** cofc-1E.pdf; COC1-D to 1-E.doc

SDM:

Here is the new C of C that will apply in 2005. Also attached is a document covering the changes from the 2002 version.

RLK

# NORFOLK SOUTHERN RAILWAY COMPANY

**VISION: BE THE SAFEST, MOST CUSTOMER-FOCUSED
AND SUCCESSFUL TRANSPORTATION COMPANY IN THE WORLD**

**NS CONDITIONS OF CARRIAGE #1-E
CANCELS
NS CONDITIONS OF CARRIAGE #1-D**

- TERMS AND CONDITIONS -
FOR
RAIL TRANSPORTATION OF COMMODITIES
MOVING IN INTERSTATE AND INTRASTATE COMMERCE
VIA
NORFOLK SOUTHERN RAILWAY AND ITS AFFILIATED LINES SHOWN HEREIN

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

2ND REVISED CHECK SHEET

NORFOLK SOUTHERN RAILWAY COMPANY

CHECK SHEET OF EFFECTIVE PAGES

ALL PAGES CONTAINED IN THIS DOCUMENT ARE LISTED
CONSECUTIVELY BY PAGE NUMBER AND REVISION NUMBER.
"O" IN THE REVISION COLUMN INDICATES ORIGINAL PAGE
"1" IN THE REVISION COLUMN INDICATES FIRST REVISED PAGE

| PAGE | REVISION | PAGE | REVISION |
|---|---|---|---|
| TITLE | 0 | # 11 | 2 |
| # CHECK SHEET | 2 | 12 | 1 |
| 1 | 0 | 13 | 0 |
| 2 | 0 | 14 | 0 |
| 3 | 0 | # 15 | 2 |
| 4 | 1 | # 16 | 2 |
| 5 | 0 | # 17 | 2 |
| # 6 | 1 | | |
| # 7 | 2 | | |
| + 7.2 | 0 | | |
| 8 | 0 | | |
| # 9 | 2 | | |
| # 10 | 1 | | |

# - Change
+ - Added

EFFECTIVE MARCH 1, 2004

---

---

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

## TABLE OF CONTENTS


| RULE | SUBJECT<br>SECTION 1 | PAGE NO. |
|---|---|---|
| 100 | Definitions | 3 |
| 110 | Application of Referenced Tariff Publications | 4 |
| 120 | General Application | 4 |
| 130 | Routing via Norfolk Southern | 5 |
| 140 | Absorption of Connecting Line Switching | 5 |
| 150 | Bill of Lading | 5 |
| 200 | Transportation Services | 5-6 |
| 210 | Unloading and Release of Equipment at Destination | 6 |
| 230 | Transportation Charges to Apply | 6 |
| 240 | Transit, Diversion, Reconsignment | 6 |
| 250 | Payment of Transportation Charges | 7 |
| 255 | Fuel Surcharge | 7 |
| 280 | Overcharge, Over Collection or Duplicate Payment Claim Provisions | 8 |
| 290 | Carrier Liability - Loss and Damage to Lading | 8-11 |
| 300 | Extension of Credit | 12 |
| 310 | Mechanical Protective Service | 13 |
| 320 | Charges for Mechanical Protective Service | 13 |
| 330 | Mixed Carload Shipments | 13 |
| 420 | Aggregate Rule | 13 |
| 430 | Intermediate Rates | 14 |
| 440 | Alternation of Rates at Varying Minimum Weights | 14 |
| 470 | Return of Shipper's Racks, Crates, Trays or Bins used in Movements of Auto Parts | 14-15 |
| 480 | Indemnification | 15 |
| 500 | Change in Provision | 15 |
| 510 | Private Equipment | 16 |
| 520 | Security Seals | 16 |
| 530 | Non-Waiver | 16 |
| 540 | Governing Law | 16 |
| 550 | No Third Party Beneficiaries | 16 |
| 560 | Normal Rail Operations | 17 |
| 570 | Severability | 17 |
| 580 | Cargo Owners and Collateral Parties | 17 |


EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

REFERENCE TO "NS" OR "NORFOLK SOUTHERN RAILWAY COMPANY" HEREIN INCLUDES THE FOLLOWING SUBSIDIARIES AND AFFILIATED CARRIERS

Norfolk Southern Railway Company
Atlantic and East Carolina Railway Company
Camp Lejeune Railroad Company
Chesapeake Western Railway
Central of Georgia Railroad Company
Georgia Southern and Florida Railway Company
State University Railroad Company
The Alabama Great Southern Railroad Company
The Cincinnati New Orleans and Texas Pacific Railway Company
Tennessee, Alabama & Georgia Railway Company
Tennessee Railway Company

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 100 - DEFINITIONS**

**Held in Route**

Held in Route is defined as any car, moving on a through rate, that is held in route because of any condition attributable to the consignor, consignee, or owner, including but not limited to storage, partial unloading, to finish loading, or fabrication.

**Diversion / Reconsignment**

Diversion is defined as any order received by NS that requires a change in the billing/shipping document that changes the original destination of a shipment or empty car.

Reconsignment is defined as any order received by NS that requires a change in the party responsible for payment of transportation charges of a shipment or empty car.

**Private Equipment**

A rail car not bearing Railroad reporting marks.

**Shipper/Consignor**

Shipper and Consignor shall have the same meaning for the purposes of these Conditions of Carriage. The Shipper is the party that enters into the contract of carriage with NS or the originating rail carrier. The Shipper may be acting on its own behalf or on the behalf of another party; however, whether as principal or agent, the Shipper is bound in its own right to the terms and obligations of these Conditions of Carriage. The Shipper might or might not be the owner of the lading. When acting as a disclosed or undisclosed agent, the Shipper binds not only itself but also its principal to the terms and obligations of these Conditions of Carriage. The Shipper may file a claim with NS for loss or damage to lading under Rule 290 below.

**Consignee**

The Consignee is the party entitled to receive the lading under the bill of lading contract regardless of whether the lading is actually delivered to an "in care of" or other party pursuant to the directions of the Shipper or Consignee. The Consignee may file a claim with NS for loss or damage to lading under Rule 290 below. By accepting a shipment or by the acceptance of the shipment by a party on behalf of or by direction of the Consignee, the Consignee agrees to be bound by the terms and conditions of these Conditions of Carriage.

**Payor**

The Payor is the party primarily responsible for the payment of freight and other charges arising pursuant to these Conditions of Carriage. The Payor may be the Shipper, Consignee or some other party who has entered into a credit or payment arrangement with NS pursuant to Rule 300 below.



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

## ▲ RULE 110 - APPLICATION OF REFERENCED PUBLICATIONS

Except where (i) inconsistent with a provision of this document or (ii) inconsistent with governing contractual terms specifically agreed to by NS or (iii) otherwise inapplicable under their own terms, the rules, regulations, charges and allowances of the following named publications shall, along with the terms of carriage specified herein, apply to all rail transportation undertakings of NS as specified in Rule 120 herein and as such are hereinafter incorporated by reference herein.

Municipal Solid Waste, Contaminated Soil, Hazardous Materials, and Related Articles NS 6306
Official Railroad Station List OPSL 6000 Series
Standard Transportation Commodity Code STCC 6001 Series
Official Railway Equipment Register RER 6412 Series
Mileage Allowance and Rules RIC 6007 Series
Uniform Freight Classification UFC 6000 Series
NS Switching NS 8001 Series (See Rule 130)
Rules and Charges on Accessorial Services NS 8002 Series
Demurrage Rules and Charges, NS 6004 Series
Handling Motor Vehicles NS 9459-Series
Hazardous Materials Shipping Descriptions (49-series STCC numbers)
Bureau of Explosives Rules BOE 6000
NS Currency Exchange Regulations on International Traffic NS 6316
NS Canadian Car Demurrage Tariff (for traffic within Canada) NS 6500
Heavy Duty Flat Car Charges RIC 6740
Rules for Export Declarations & Customs Manifests, etc.  RPS 6571
AAR Loading Rules and/or Norfolk Southern Loading Rules

References to specific publications herein include successor publications.

## ▲ RULE 120 - GENERAL APPLICATION

(1) The provisions of this Document apply (a) to transportation when such transportation (i) originates on NS and (ii) moves under single line rates or single factor joint line through rates offered by NS itself or in conjunction with a connecting railroad as an exempt rate or as a regulated common carrier rate; and (b) to the NS portion of through movements under AAR Accounting Rule 11 or other combination or proportional exempt or common carrier rates.  In the absence of a separate contract specifically covering the transportation, the terms and conditions of these Conditions of Carriage constitute a unilateral offering of such terms and conditions of a bilateral contract between NS and its connecting lines on the one hand, and the user of the transportation service on the other upon acceptance by such user. Subject to the qualifications set forth in subsection (2) below, tender of shipments to the originating carrier shall constitute acceptance of both the terms of service as set out in these Conditions of Carriage and the rate governing the shipment.

(2) When NS is not the originating carrier, but does participate in a movement under single factor or joint through rates, the Conditions of Carriage or comparable offering of the originating carrier shall, along with the exempt or common carrier rates, apply to such transportation performed by NS unless specified otherwise in the terms of a rate quotation or separate contract specifically covering the transportation involved.  When such originating carrier does not issue or have in effect such an offering, the terms of carriage contained herein shall apply.  Terms of these Conditions of Carriage not inconsistent with the origin carrier's contract or offering shall also apply.

(3) The provisions of this Document are not applicable to shipments moving in TOFC or COFC intermodal service or to shipments of coal, coke and iron ore.

(4) If a shipment is tendered with different or additional terms and conditions submitted by Shipper, such different or additional terms and conditions shall be deemed rejected by NS unless electronically confirmed, or agreed in a document executed on behalf of NS by a Marketing Group Vice-President of NS, regardless of whether the shipment is accepted or moved by NS

▲ - Change in wording which results in neither increase nor reduction in charges.

EFFECTIVE  JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA  24042-0047

SECTION 1
RULES

**RULE 130 - ROUTING VIA NORFOLK SOUTHERN**

(1) Except as otherwise specified, rates applicable via NS apply only over the most direct lines of NS, forming the shortest possible NS mileage, from the first point at which NS receives the shipment (from consignor or other railroad) to the last point at which NS delivers the shipment (to consignee or other railroad). NS reserves the right to actually handle shipments via any route over NS lines. If customer requests movement over NS lines where mileage exceeds the shortest possible NS distance, shipment will be subject to a combination of rates applying via the route requested by customer.

(2) When shipment is made in heavy duty flat cars, or in special train service, rates will be applicable via the actual route of movement.

**RULE 140 - ABSORPTION OF CONNECTING LINE SWITCHING**

Rates making reference to this document will include full absorption of connecting line reciprocal switching unless otherwise agreed to in separate contracts, tariffs, or stated in a rate quotation.

**RULE 150 - BILL OF LADING**

Services provided by NS and other rail carriers are subject to these Conditions of Carriage and shall also be subject to the terms of the Uniform Bill of Lading as contained in the Uniform Freight Classification UFC 6000 Series. Such services are subject to modifications as may from time to time be established under separate agreement or by changes to these Conditions of Carriage, and irrespective of whether a Bill of Lading is actually executed pursuant to Rule 200.

Except where in conflict with the terms and conditions of a written contract between NS and Shipper, the terms and conditions of these Conditions of Carriage shall govern all transportation services provided by NS to Shipper. In the event of a conflict between the terms and conditions of these Conditions of Carriage and the terms and conditions of a written contract between NS and User, the terms and conditions of the written contract shall take precedence over these Conditions of Carriage. The order of precedence for the application of terms and conditions for transportation services provided by NS shall be as follows:

(1) Written Contract
(2) NS Customer Specific Rate Quotation
(3) General Rate Tariffs and General NS Rate Quotations
(4) Conditions of Carriage
(5) Rule 110 Publications
(6) Uniform Bill of Lading

**RULE 200 - TRANSPORTATION SERVICES**

(1) Shipper will notify NS when loading of equipment is completed and ready for movement or when loaded equipment is made empty and ready for release to NS. Unless otherwise mutually agreed upon by Shipper and NS, Shipper shall prepare and both parties shall execute the transportation documents to cover the line haul transportation service requested by Shipper. Shipper will provide instructions for the transportation services requested for the shipment. NS will arrange for transportation and delivery in accordance with instructions shown on the bill of lading, which instructions shall be governed by these Conditions of Carriage.

(Continued on following page)



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 200 - TRANSPORTATION SERVICES** (Concluded)

(2) Shipper will arrange separately with NS independent of the bill of lading for non-linehaul accessorial services such as weighing, and such other services as may be referenced in the publications listed in Rule 110. Unless specifically agreed to by NS, NS will not be liable for any loss, damage, cost or expense arising in connection with such services performed by parties other than NS.

**RULE 210 - UNLOADING AND RELEASE OF EQUIPMENT AT DESTINATION**

(1) (a) Upon arrival and placement of equipment for unloading at destination, consignee will be responsible for unloading such equipment in a manner which does not damage the equipment, and for releasing equipment in a condition clean of debris and material not part of such equipment and suitable for reloading by another shipper.

(b) If consignee refuses or fails to remove all lading, dunnage, blocking, bracing, strapping, debris or other material that was part of the inbound shipment, secure interior loading devices, and close doors, hatches and gates, the railroad which discovers such failure may undertake to remedy such failure and the consignee will be responsible for reimbursing the railroad which performs such work for the cost thereof, including without limitation the cost of any switching associated with such work. Applicable demurrage, detention and storage charges shall apply until equipment is available for release to delivering carrier in clean condition or upon completion of any action by the delivering carrier to remedy the consignee's failure. ▲ This subsection (b) shall not apply to Private Equipment.

(2) Where NS is the delivering carrier, consignee must advise NS Central Yard Operations by telephone or facsimile or other such form as may be required by NS, that the equipment is unloaded and available for release. Information provided must include identity of consignee, name of person furnishing data, and car initial and number. Except as provided in (1) above, equipment will be considered released on the date and time such advice is received from the consignee.

**RULE 230 - TRANSPORTATION CHARGES TO APPLY**

(1) The charges applicable to the transportation from origin to destination will be those established by either the governing quotation, contract or tariff on the bill of lading date for the shipment in issue. Any change to the information of the bill of lading (including, but not limited to, the shipper, consignee, origin or destination) shall be invalid and without effect unless received and approved by Norfolk Southern Central Yard Operations. Any such change to the bill of lading must be transmitted to Norfolk Southern in such form as may be required by NS (including, but not limited to, telephone and facsimile) and may be subject to additional charges pursuant to NS 8002 Series.

(2) If it is ascertained that the commodity shipped is not as described on the bill of lading or other shipping document, NS at its option may (a) return such shipment to shipper at origin at a charge equal to the charge that would have applied had the commodity been properly described and transported to the destination named in the bill of lading; (b) choose to move said shipment to the destination named in the bill of lading or other shipping document at the transportation rate quoted; or (c) choose to move said shipment to the destination named in the bill of lading or other shipping document at a charge equal to the charge that would have applied had the commodity been properly described. plus an additional charge of $350.00.

**RULE 240 - TRANSIT, DIVERSION, RECONSIGNMENT**

Except as specifically agreed upon, NS will not provide transit or stop-off privileges but will provide diversion or reconsignment as provided for in the publications listed in Rule 110 . Provisions of Rules 29 and 24 of UFC 6000-Series will not apply. (see Item 100 for definition of transit, diversion, and reconsignment)

▲ - Change in wording which results in neither increase nor reduction in charges.

## RULE 250 - PAYMENT OF TRANSPORTATION CHARGES

Shipper or consignee shall be liable for payments of the transportation charges accruing on a shipment as established by law and these Conditions of Carriage, and nothing herein shall limit the right of NS to require at time of shipment the prepayment or guarantee of charges. Shipper will pay NS if shipment is prepaid, or be responsible for payment if shipment is made collect, and pay immediately upon presentation of a bill therefor by NS unless credit has been granted pursuant to Rule 300 of these Conditions of Carriage. If shipper or consignee has entered into an agreement for credit with NS, the terms and conditions of the credit agreement will supersede any prepayment or payment upon demand requirement. If transportation charges have not been prepaid, or shipper or consignee has not entered into an agreement for credit with NS, NS shall not make delivery of the shipment without payment or guarantee by shipper or consignee of all charges. Placement of equipment by NS under credit agreement for unloading shall be deemed acceptance of shipment for the purpose of incurring freight charges under a credit agreement.

Acceptance of shipment by consignee or beneficial owner shall be deemed acceptance of responsibility for payment of all charges accruing on the shipment, including, but not limited to, demurrage and switching services performed at destination. Such payment shall be in U.S. money and cannot be reduced to offset claims, damages to property, or for other reasons.

Demurrage, switching and other accessorial and/or incidental charges are payable by Shipper and/or consignee as applicable pursuant to the publications set out in Rule 110 above.

## ♦ RULE 255 - FUEL SURCHARGE

In the event the average monthly price of West Texas Intermediate Crude Oil exceeds $23.00 per barrel calculated using the daily prices published in the Wall Street Journal Norfolk Southern will assess a fuel surcharge on all linehaul freight charges (as set forth below, the “WTI Average Price”).

The applicable fuel surcharge percentage shall be applied to each shipment having a bill of lading dated on or after the 1st day of the second calendar month following the calendar month of a given WTI Average Price Calculation. The fuel surcharge will change monthly per the table below.

| Calendar Month of WTI Average Price | Fuel Surcharge Applied |
|---|---|
| January | March 1 |
| February | April 1 |
| March | May 1 |
| April | June 1 |
| May | July 1 |
| June | August 1 |

| Calendar Month of WTI Average Price | Fuel Surcharge Applied |
|---|---|
| July | September 1 |
| August | October 1 |
| September | November 1 |
| October | December 1 |
| November | January 1 |
| December | February 1 |

(Continued on following page)

♦ - Increase

EFFECTIVE MARCH 1, 2004

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

♦ **RULE 255 - FUEL SURCHARGE** (Concluded)

The fuel surcharge will be 0.4% of the linehaul freight chare for every $1.00 per barrel, or portion thereof, by which the WTI Average Price exceeds $23.00. The WTI Average Price for a given calendar month will be determined by adding the daily West Texas Intermediate Crude Oil prices published in the Wall Street Journal during a calendar month, and dividing the result by the number of days so published in that given month. The result will be rounded to the nearest cent. If the Wall Street Journal ceases publication of the price of West Texas Intermediate Crude Oil, NS will employ a suitable substitute source of price or measure. The following schedule reflects the applicable fuel surcharge within the WTI Average Price ranges noted below.

| WTI Average Price Per Barrel | Fuel Surcharge Percentage |
|---|---|
| $23.00 and below | No Surcharge |
| $23.01 - $24.00 | 0.4% |
| $24.01 - $25.00 | 0.8% |
| $25.01 - $26.00 | 1.2% |
| $26.01 - $27.00 | 1.6% |
| $27.01 - $28.00 | 2.0% |
| $28.01 - $29.00 | 2.4% |
| $29.01 - $30.00 | 2.8% |
| $30.01 - $31.00 | 3.2% |
| $31.01 - $32.00 | 3.6% |
| $32.01 - $33.00 | 4.0% |
| $33.01 - $34.00 | 4.4% |
| $34.01 - $35.00 | 4.8% |
| $35.01 - $36.00 | 5.2% |

| WTI Average Price Per Barrel | Fuel Surcharge Percentage |
|---|---|
| $36.01 - $37.00 | 5.6% |
| $37.01 - $38.00 | 6.0% |
| $38.01 - $39.00 | 6.4% |
| $39.01 - $40.00 | 6.8% |
| $40.01 - $41.00 | 7.2% |
| $41.01 - $42.00 | 7.6% |
| $42.01 - $43.00 | 8.0% |
| $43.01 - $44.00 | 8.4% |
| $44.01 - $45.00 | 8.8% |
| $45.01 - $46.00 | 9.2% |
| $46.01 - $47.00 | 9.6% |
| $47.01 - $48.00 | 10.0% |
| $48.01 - $49.00 | 10.4% |
| $49.01 - $50.00 | 10.8% |

Notice will be published on NS's web page at www.nscorp.com.

♦ - Increase

EFFECTIVE MARCH 1, 2004

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

**RULE 280 - OVERCHARGE, OVER COLLECTION OR DUPLICATE PAYMENT CLAIM PROVISIONS**

(1) Claim requirements, time limits. NS will accept a whole or partial claim for overcharge, over collection or duplicate payment only if the claim is in writing and contains sufficient information for NS to conduct an investigation, including the name of the claimant (which must be the payer); claim number, the amount of the claim; the freight bill; freight bill payment information and supporting documents, which show, among other things, that NS collected all of the charges at issue and, in the case of overcharges, the rate, weight, commodity description and supporting authority (quotation, etc.) claimed to be applicable. The claim must be filed within three (3) years of the date of delivery or tender of delivery by NS or delivering rail carrier of the subject shipment.

(2) Where the movement over NS form a segment of a through movement involving other carriers and time limitations for filing overcharge claims differ among the carriers involved in the through movement, the time limitation contained in the comparable offering of the origin carrier will apply for overcharge claims against NS if inconsistent with these Conditions of Carriage.

**RULE 290 – LOSS OF AND DAMAGE TO SHIPMENTS**

**(1) General**

(a) Unless modified in a transportation contract or a general or customer specific rate quotation, NS will assume liability for loss and damage under the terms of 49 USC 11706 and the terms of the Uniform Bill of Lading as specified in Rule 150 herein. Where provisions maintained by other railroad parties to the through route differ from those provided herein, the level of liability assumed by the origin carrier will apply; provided, however, that such level of liability shall not exceed the level of liaibility assumed under the Carmack Amendment.

(b) As a condition precedent to any right to recovery for loss, damage, or delay to cargo, a written claim must be filed within nine (9) months after delivery of a shipment (or if delivery is not made, within nine (9) months after a reasonable time for delivery). A claim must include a demand for payment of a specific amount and information sufficient to identify the shipment, as described in this Rule. A claim may be filed by either the Shipper or the Consignee. Any other party who desires to file a claim with NS must secure first an assignment of claim from the Shipper or Consignee.

(c) NS does not guarantee delivery by a particular train or within a particular time and does not guarantee rail services on any schedules, published, projected or implied. NS will not be liable for failure to transport any shipment by any particular train or in time for any particular market.

(Continued on following page)



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

▲ **RULE 290 – LOSS OF AND DAMAGE TO SHIPMENTS** (Continued)

(d) NS will not be liable for loss, damage, or delay caused by:

- an act of God
- a public enemy or terrorism
- the authority of law
- riots
- strikes
- acts of civil disobedience
- an inherent quality or characteristic in the commodity
- natural shrinkage
- an act or default of Shipper, consignor, consignee, owner, or any contracting party, including but not limited to, the failure of the Shipper or any other party to properly block or brace the lading; or the stoppage and holding in transit of lading at the request of the shipper, consignor, consignee, owner, or any contracting party.

(e) NS'S liability will not extend beyond the actual physical loss or damage to the cargo itself, including any costs reasonably incurred in efforts to mitigate the loss or damage.

(f) In no event shall NS be liable for any incidental, special, indirect or consequential damages whatsoever (including but not limited to lost profits, business interruption expenses and shipper or consignee's liability to their own customers for liquidated damages or other damages) arising out of or related to the services provided under these Conditions of Carriage, even if advised of the possibility of such damages.

(g) NS does not make any representations as to the suitability of cargo for rail transportation. The Shipper acknowledges also that there are significant forces exerted on the cargo in rail transportation that may require additional packing measures for the cargo to move safely.

(Continued on following page)

▲ - Change in wording which results in neither increase nor reduction in charges.

EFFECTIVE MARCH 1, 2004

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

▲ **RULE 290 – LOSS OF AND DAMAGE TO SHIPMENTS** (Continued)

(h) NS will not be liable for damage arising from atmospheric conditions when such damage occurs to lading loaded in open-top or on flatbed rail cars. Protective covering sufficient to protect such lading must be furnished and installed by the Shipper. NS will not be liable for the durability and suitability of the protective covering.

(i) Failure of the destination railroad to inspect damaged cargo for any reason will not relieve the claimant from the requirement of establishing that cargo was delivered in a damaged condition and was properly blocked and braced. Failure of the destination railroad to inspect damaged cargo for any reason will not be considered an admission of liability by NS.

**(2) Filing of Claims**
(a) In any claim for loss, damage, or delay, claimant shall include:

(i) equipment initials and number, shipper's name, consignee's name, notify party's name, shipping date, shipment origin and destination location and commodity description and STCC code.

(ii) records (such as bill of lading, shipping manifest, or purchase or sales documents) or certification to establish:

(a) delivery to a NS carrier;
(b) the level of NS cargo claim coverage contracted for the shipment if other than Standard; and,
(c) condition and quantity of cargo at origin.

(iii) Supporting documentation for the amount claimed, such as weight and grade certificates, repair bills or certified invoices.

(b) Except where otherwise necessitated by wreck or derailment, claimant shall also include in any such claim:

(i) records verifying condition and quantity of the cargo when received at the destination stated in the shipping instructions

(ii) origin and destination seal records, if applied, and

(iii) evidence of disposition of any damaged cargo in compliance with requirements of this section.

(Continued on following page)

EFFECTIVE MARCH 1, 2004

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 290 – LOSS OF AND DAMAGE TO SHIPMENTS** (Concluded)

(c) Claimants must file any claims for loss, damage or delay to lading with:

Norfolk Southern Corporation
Freight Claim Settlement
Attn: Manager Freight Claim Settlement
185 Spring Street, SW, Box 153
Atlanta, GA 30303-0153

▲ (d) Where a bill of lading covers only one railcar, a claim for loss or damage must be submitted for the lading moving in only that one railcar and may not be combined into a single claim with damage to lading moving in other railcars covered by other bills of lading. Where loss or damage occurs to lading moving in more than one railcar and the multi-car movement is covered by a single bill of lading, one claim can be filed to cover all damage to lading in railcars moving under that same bill of lading.

**(3) Lawsuits**

(a) As a condition precedent to any right of recovery, any lawsuit involving a claim for loss, damage or delay to cargo must be commenced within two (2) years and one (1) day from the date of declination of the claim.

(b) Lawsuits shall be filed only in courts of competent jurisdiction and venue as set out in 49 USC Section 11706.

(c) No party other than the Shipper or the Consignee shall have standing to bring a lawsuit regarding a shipment moving under these Conditions of Carriage.

▲ - Change in wording which results in neither increase nor reduction in charges.

EFFECTIVE MARCH 1, 2004

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 300 - EXTENSION OF CREDIT**

(1) Acceptance by NS of a tender of a shipment by Shipper does not constitute the extension of credit by NS to Shipper or to party responsible for payment of NS freight charges ("Payor"). Credit shall only be extended through the Credit Department of NS. If NS extends credit, it is granted only as a convenience to the Shipper or Payor and may be revoked by NS at any time as to any shipment (including those in transit) without notice by NS. In the event of a revocation of credit affecting any cars in transit, Shipper or Payor must either pay all charges for the cars in transit or make provisions for payment satisfactory to NS before the cars will be delivered. Any changes in Shipper's or Payor's ownership or financial condition which materially affects Shipper's financial standing must be reported to NS' Credit Department.

(2) Where credit has been extended to Shipper or Payor, payment must be received by NS within fifteen (15) days of the date of the freight bill or invoice.

(3) Where credit has not been extended to Shipper or Payor, payment of transportation charges must be made to NS in advance of the shipment in cash.

(4) In the event that Shipper or Payor shall dispute the amount of a bill, Shipper or Payor shall pay to NS within the credit period the undisputed amount of the bill. Shipper or Payor shall also notify NS within the credit period of the disputed amount and the basis for the dispute. Payment of bills, or any portion thereof, by Shipper or Payor which later are determined to be incorrect will not prejudice Shipper's or Payor's right to seek a refund within the statutory period.

(5) NS shall have the right to recover from Shipper or Payor all reasonable costs of collection, including but not limited to reasonable attorneys' fees, in the event of any violation of the credit terms of NS by Shipper or Payor.

▲ (6) With regard to collect bills of lading, the existence of the Payor does not serve to relieve the Shipper and Consignee for their responsibility for the payment of freight and other charges as established by these Conditions of Carriage and law unless otherwise expressly stated by a written agreement. The foregoing shall not affect the Shippers right to secure non-recourse pursuant to Section 7 of the bill of lading. With regard to prepaid bills of lading, the existence of the Payor does not serve to relieve the Shipper for its responsibility for the payment of freight and other charges as established by these Conditions of Carriage and law unless otherwise expressly stated by a written agreement.

(7) Effective October 1, 2003, NS will assess a finance charge of one percent (1%) per month (twelve percent (12%) per annum) against unpaid linehaul freight bills beyond credit terms. Finance charges will be calculated using a daily rate of .0329% (12% / 365 days) which will be applied to unpaid linehaul freight bills that are not paid within the governing credit period. The finance charge will accrue daily until payment is received by NS.

▲ - Change in wording which results in neither increase nor reduction in charges.

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 310 - MECHANICAL PROTECTIVE SERVICE (MPS)**

(1) Shipments requiring protection from heat or cold will be handled in accordance with rules and provisions (other than charges for services) for protective services as set forth in Perishable Protective PPT 619 Series publication referred to in Rule 110 herein (or offerings of owners of the MPS equipment.) Mechanical protective services, including detention of equipment, are separate and distinct services, and charges therefore will be in addition to charges applicable for line haul and other transportation services. (See Rule 320)
EXCEPTION: NS will not provide portable heater service. To the extent cars are received from connections with heaters already installed, such heaters will be allowed to move through to destination without service by NS.

(2) Shipper shall specify on the bill of lading whether the commodities loaded in the equipment are perishable in nature requiring protection against heat or cold. If no such specification is made, NS shall not be responsible for any loss or damage arising from the lack or failure of such protection.

(3) Subject to the conditions of this rule for shipper owned or leased cars where mechanical protective service is required, NS will provide reasonable maintenance to mechanical protective service (MPS) units including minor repairs, fuel oil, lubrication and other supplies. The expense of operating the MPS units will be borne by the shipper, and the actual cost of labor for any maintenance, service or repairs, and for material (plus 15% material handling charge), fuel oil, lubricating oil and all other supplies furnished to such MPS units shall be billed against the shipper directly by the railroad incurring the cost of furnishing such services.

**RULE 320 - CHARGES FOR MECHANICAL PROTECTIVE SERVICES**

Unless specifically indicated in a rate quotation or contract price for line-haul transportation rates, carload shipments originating on NS do not include a protective service charge payable to third parties. To determine the charge applicable for mechanical-protective service for equipment not owned by NS, charges specified in service offerings by the owners or lessees of the MPS equipment will apply.

**RULE 330 - MIXED CARLOAD SHIPMENTS**

Except as otherwise provided in written contracts, quotes or tariffs, when two or more commodities for which the same or different rates apply are shipped in a single carload, and the weight of the predominant article is 95 per cent or more of the total weight of the shipment, the rate to be assessed on the entire shipment will be that applicable on the predominant article.

**RULE 420 - AGGREGATE RULE**

Unless specifically authorized in writing by NS, point-to-point rates may not be combined to provide a through rate. Example: Customer has a rate quote from Point A to Point C (the “A to C Rate”). Customer also has a rate quote form Point A to Point B (the “A to B Rate”) and from Point B to Point C (the “B to C Rate”). The A to C Rate applies, and Customer may not combine the A to B Rate with the B to C Rate unless specifically authorized in writing by NS.



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 430 - INTERMEDIATE RATES**

Except as otherwise specifically provided in individual contracts or rate quotations, rates will not apply from or to points intermediate to the origins or destinations specified in such individual contracts or rate quotations.

**RULE 440 - ALTERNATION OF RATES**

(1) Customer-specific rates (contracts or specific quotes) will take precedence over open or non-customer-specific rates (general quotes). Within each of those two categories, point-to-point rates will apply regardless of any group or scale rates available, and group rates will be applied to the exclusion of any scale rates.

(2) Where a rate authority contains more than one carload rate at varying minimum weights for the same movement, the rate that produces the lowest charges for that authority will apply.

(3) Unless otherwise agreed upon by NS and the purchaser of transportation subject to this publication, where NS can serve both origin and destination (either directly or through switching by another carrier), NS single-line rates will apply to the exclusion of any joint-line rates.

**RULE 470 - RETURN OF SHIPPER'S RACKS, CRATES, TRAYS OR BINS USED IN MOVEMENTS OF AUTO PARTS**

(The Provisions of this Item will not apply on shipments in "Railbox" cars with reporting marks "ABOX" or "RBOX" in the Official Railway Equipment Register).

When shipments of Automobile Parts as described in Item 500 RPS 4924-Series publication, are made in shipper's racks, crates, trays or bins, or with braces, brackets, spacers, spacer-bars or protective shields or when shipper's racks, crates, trays or bins are used as restrainers or spacers or when necessary empty shipper-owned bins are placed in cars to handle the return of hold-down brackets or spacer-bars and loaded in cars owned by the origin road-haul carrier or carriers participating in the movement and/or cars assigned for return to the origin, they may be transported at the net weight of such shipments not including the weight of any shipping containers or devices. The rate applicable to said net weight shall include the return of said-shipping containers or devices, provided the cars (see Note 2) used on the inbound movement to the plant location and there unloaded are utilized for the return movement of such shipping containers or devices to the point of origin of loaded movement via a route which is the reverse of the route used in the loaded movement of such shipping containers or devices (see Note 1).

(Continued on following page)

EFFECTIVE JUNE 1, 2003

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

**RULE 470 - RETURN OF SHIPPER'S RACKS, CRATES, TRAYS OR BINS USED IN MOVEMENTS OF AUTO PARTS** (Concluded)

**EXPLANATION OF NOTES**

NOTE 1: If racks, crates, trays, bins, braces brackets, spacers, spacer bars or protective shields are removed from the car when placed at shipper' s siding upon completion of the return movement, and if the car is then released to the carrier empty to be held for future loading, a charge of $100.00 will be assessed for each of such cars placed and released empty to the carrier.

NOTE 2: Boxcars designated "XM" in the Official Railway Equipment Register publication and other non-assigned, free-running specially-equipped boxcars subject to AAR Car Service Directive 150 may also be used for the return transportation of empty shipping containers or devices, subject to the same conditions as apply to assigned boxcars, provided the shipper furnished shipping instructions prior to such car being pulled from the siding. Such instructions shall indicate that the car contains shipping containers or devices being returned to origin via the reverse route of the inbound loaded movement. Failure to provide such shipping instructions will result in the assessment of the otherwise applicable charges for the transportation of empty shipping containers or devices.

**RULE 480 – DISCLAIMER OF CONSEQUENTIAL AND SPECIAL DAMAGES**

Notwithstanding any provision in these Conditions of Carriage to the contrary and regardless of the nature of the cause of action, whether in tort, contract or otherwise, in no event shall any party to these conditions of carriage be liable for any consequential, incidental, special, or indirect damages whatsoever (including but not limited to lost profits, cost of capital or interruption of business expenses) arising out of the services provided under these conditions of carriage, even if advised of the possibility of such damages.

▲ **RULE 500 - CHANGE IN PROVISIONS**

Subject to all notice requirements established by law. NS reserves the right at any time to change the terms and conditions of these Conditions of Carriage; provided, however, any such change shall be effective only with regard to any transportation services provided under these Conditions of Carriage for freight tendered after the effective date of the changes. NS will make available on its web site these Conditions of Carriage in their latest amended form. Shipper should review these Conditions of Carriage before tendering freight to NS.

▲ - Change in wording which results in neither increase nor reduction in charges.

EFFECTIVE MARCH 1, 2004

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

♦ **RULE 510 – PRIVATE EQUIPMENT**

(1) Upon request, NS may from time to time assist its customers in developing the appropriate size and mix of the customer's fleet of Private Equipment. In giving such assistance, NS does not warrant or guarantee the accuracy and results of such assistance. All determinations of size and mix of the customer's fleet of Private Equipment are solely and ultimately the responsibility of the customer and are made at the sole risk and expense of customer.

(2) NS does not guarantee or promise that Private Equipment will make or will be available to make any particular Cycle Time (round-trip between two or more points) or any particular number of movements within any specified time period; regardless of whether NS had actual knowledge, or should have reasonably known, of shipper's past or expected Cycle Times, the size of shipper's Private Equipment fleet, or shipper's and/or shipper's customers commercial business.

(3) Shipper is solely responsible for determining the suitability of the Private Equipment to move the respective lading in issue. NS shall have no responsibility for the failure of Private Equipment to adequately protect the lading where the damage to the lading is not due to any act of NS but to the nature of the Private Equipment.

**RULE 520 – SECURITY SEALS**

NS neither inspects shipments for seals or security devices intended to prevent unauthorized access to a shipment nor determines when a security device is appropriate. In the event that a shipment requires special security measures (such as high security seals, shrink-wrap, paper coverings and the like), it is the duty of the Shipper to determine and take the appropriate security measures. Documentation of the application of security devices at shipment origin is the responsibility of the Shipper. In determining the extent, if any, of NS's responsibility as a common carrier for loss, damage or liability to a shipment, the absence of or damage to a seal without physical evidence of contamination, loss or theft does not establish injury, loss or damage to a shipment.

**RULE 530 – NON-WAIVER**

Any waiver on the part of NS of any term or condition of these Conditions of Carriage shall not constitute a precedent, nor require NS to continue waiving such term or condition or to waive any succeeding breach of the same or any other of the terms and conditions of these Conditions of Carriage. No waiver or purported waiver on the part of NS shall be deemed to bind NS unless made in writing and signed by an authorized NS Marketing Officer.

**RULE 540 – GOVERNING LAW**

To the extent not governed by Federal law, the laws of the Commonwealth of Virginia shall govern the construction and interpretation of these Conditions of Carriage and all rights and obligations of the parties under these Conditions of Carriage.

**RULE 550 – NO THIRD PARTY BENEFICIARIES**

The services provided by NS under these Conditions of Carriage are intended solely for the benefit of the shipper except to the extent expressly stated otherwise in these Conditions of Carriage and are not intended for the benefit of any third party. Any standards of service contained in these Contract of Terms of Carriage, any transportation contract or offering are solely for the benefit of the shipper or contracting party to the transportation contract or offering.

♦ - Increase



Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

SECTION 1
RULES

**RULE 560 - NORMAL RAIL OPERATIONS-ORDER/NOTIFY SHIPMENTS**

(1) All services provided pursuant to these Conditions of Carriage will be provided by NS in accordance with any applicable FRA and AAR guidelines and regulations and routine NS practice (including but not limited to switching, coupling and humping). Specialized rail handling such as "do not hump", speed restrictions and equipment size are special rail services and not routine rail services. Unless agreed to in writing by both NS and shipper, any restrictions on rail handling placed by shipper upon a particular car (including, but not limited to, "Do Not Hump" signs, notations as to speed or other restrictions on a bill of lading, EDI notations) shall have no effect and be void. Shippers desiring special handling must contact NS to arrange such special handling.

(2) NS does not provide Order/Notify service. Bills of lading or shipping instructions tendered to NS in the form of an order/notify bill of lading will be handled as straight bills of lading. Instructions to the effect of requiring NS to not complete delivery of a shipment until either securing authorization for delivery from the shipper or some other party, surrender of the bill of lading or notification by NS to the shipper or some other party shall have no effect and be void regardless of whether such instructions are contained in a straight or an order/notify bill of lading; and NS shall have no liability for delivering a shipment to the consignee listed in the bill of lading in such circumstances.

**RULE 570 -- SEVERABILITY**

If any provision of these Conditions of Carriage is held invalid by a court or governmental entity of competent jurisdiction, such provision shall be severed from these Conditions of Carriage and to the extent possible, these Conditions of Carriage shall continue with regard to the remaining provisions.

▲ **RULE 580—CARGO OWNERS AND COLLATERAL PARTIES**

With regard to shipments moving under some type of limitation of liability, the rates, levels of liability and other terms and conditions governing the rail transportation agreed upon between NS and the Shipper represents the essential consideration to the parties. Frequently, the contract for the rail portion of a movement may be only one contract in a series of other contracts between other parties. Pursuant to Rule 550 none of these other parties are the intended third party beneficiaries of the governing rail contract. Furthermore, any liability on the part of NS extends only to the Shipper and is limited to the terms and conditions set out by these Conditions of Carriage and the governing rail contract. The Shipper acknowledges that the bargain with NS neither contemplates or creates liability on the part of NS towards any other party, whether in tort or contract, nor places upon NS any liability in excess of the liability assumed by NS under these Conditions of Carriage and the governing rail contract. By tendering the cargo to NS, the Shipper agrees to indemnify NS against any claim by the cargo owner or any other person or agent for any amounts that exceed the limited liability assumed by NS under these Conditions of Carriage and the governing rail contract or loss of or damage to the lading plus the reasonable cost of defense and attorney's fees for NS.

▲ - Change in wording which results in neither increase nor reduction in charges.

EFFECTIVE MARCH 1, 2004

Issued By
P. J. GLENNON, DIRECTOR
MARKETING SERVICES - NORFOLK SOUTHERN CORPORATION
110 Franklin Road, S.E.
Roanoke, VA 24042-0047

REISSUE OF NS CONDITIONS OF CARRIAGE 1-D to 1-E

**Rule 100 DEFINITIONS**

Change This is a new item listing a few definitions

**Rule 110 APPLICATION OF REFERENCED PUBLICATIONS**

Change The publication names have been updated

**Rule 120 GENERAL APPLICATION**

Change Change in wording and the paragraphs were numbered

Rule 125 became item 130
**Rule 130 ROUTING VIA NORFOLK SOUTHERN**
Change Change in wording and the paragraphs were numbered
**Rule 130 Publication of Exempt Circulars**
Change This information is covered in Rule 110 thus was omitted in 1-E

**Rule 140 ABSORBPTION OF CONNECTION LINES SWITCHING**

Change Change in wording

**Rule 150 BILL OF LADING**

Change Change in wording and listed the hierarchy of terms of conditions

**Rule 200 TRANSPORTATION SERVICES**

Change Change in wording and numbered the paragraphs

**Rule 210 UNLOADING AND RELEASE OF EQUIPMENT AT DESTINATION**

Change Change in wording and numbered the paragraphs

**Rule 230 TRANSPORTATION CHARGES TO APPLY**

Change Change in wording; numbered the paragraphs; and increased charge

**Rule 240 TRANSIT, DIVERSION, RECONSIGNMENT**

Change change in wording

**Rule 250 PAYMENT OF TRANSPORTATION CHARGES**

Change Change in wording

**Rule 255 FUEL SURCHARGE**

Change Added reference to the Wall Street Journal Publication days

**Rule 258 NON-APPLICATION OF PCB'S**

Change item was eliminated

**Rule 280 OVERCHARGE, OVER COLLECTION OR DUPLICATE PAYMENT CLAIMS PROVISIONS**

Change numbered the paragraphs in lieu of A. and B.

**Rule 290 CARRIER LIABILITY-LOSS AND DAMAGE TO LADING**

Change **Major rewrite** including the name of the rule to be **LOSS OF AND DAMAGE TO SHIPMENT**

**Rule 300 EXTENSION OF CREDIT**

Change **Major rewrite** including adding a provision to **charge interest**

**Rule 310 MECHANICAL PROTECTIVE SERVICE (MPS)**

Change numbered the paragraphs

**Rule 320 CHARGES FOR MECHANICAL PROTECTIVE SERVICE**

Change Change in wording

**Rule 330 MIXED CARLOAD SHIPMENTS**

Change Change in wording

**Rule 420 AGGREGATE RULE**

Change Change in wording

**Rule 430 INTERMEDIATE RULE**

Change change in wording

**Rule 440 ALTERNATION OF RATES**

Change change in wording and numbered the paragraphs

**Rule 470 RETURN OF SHIPPER'S RACKS, CRATES, TRAYS OR BINS USED IN THE MOVEMENT OF AUTO PARTS**

Change Eliminated note 3

**Rule 480 INDEMNIFICATION**

Change change in wording reducing it down to 2 paragraphs

**Rule 500 CHANGE IN PROVISIONS**

Change change in wording

**Rule 510 PRIVATE EQUIPMENT**

Change New Rule

**Rule 520 SECURITY SEALES**

Change no change

**Rule 530 NON-WAIVER**

Change New Rule

**Rule 540 GOVERNING LAW**

Change New Rule

**Rule 560 NORMAL RAIL OPERATIONS-ORDER/NOTIFY SHIPMENTS**

Change New Rule…eliminates order notify

**Rule 570 SEVERABILITY**

Change New Rule

**Rule 580 CARGO OWNERS AND COLLATERAL PARTIES**

Change New Rule

**From:** Harkey, Greg
**Sent:** Wed Jun 11 11:01:17 2003
**To:** "Wendorf, Gary" <ggwendor@nscorp.com>; "Corcoran, Virgil" <dvcorcor@nscorp.com>; "Giuliano, Joe" <jfgiulia@nscorp.com>; "McNabb, Jim" <jmmcnabb@nscorp.com>; "Schaaf, Jim" <jrschaaf@nscorp.com>
**Subject:** Minor Group Business Plans
**Importance:** Normal
**Attachments:** Market Plan Construction 6-9-03.doc; Market Plan Metals.doc

All:

As information, attached are the consolidated Met-Con Product Manager's individual 2003 Marketing plans.

Greg

PRODUCED AS NATIVE


Aggregates Traffic, by year
Carloads, 000
180
160
140
120
100
80
60
40
20
0
81.6
95.2
99.5
119.7
145.6
152.5
142.9
153.1
1996
1997
1998
1999
2000
2001
2002
2003 (B)

| | Stone | S & G |
|---|---|---|
| Unk | 822 | 613 |
| Truck | 608 | 407 |
| Rail | 48 | 8 |
| Water | 34 | 18 |
| On-Site | 9 | 83 |
| | | |
| Total | 1520.7 | 1129.92 |

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 (B) |
|---|---|---|---|---|---|---|---|---|
| NS Carloads | 81.6 | 95.2 | 99.5 | 119.7 | 145.6 | 152.5 | 142.9 | 153.1 |







Source: USGS Mineral Industry Surveys (2001 Annual Review) Table 23.

**PRODUCED AS NATIVE**

# 2001 Aggregates by month



| | |
|---|---|
| JAN | 8,097 |
| FEB | 8,817 |
| MAR | 11,057 |
| APR | 12,109 |
| MAY | 14,169 |
| JUN | 13,833 |
| JUL | 14,339 |
| AUG | 15,796 |
| SEP | 14,207 |
| OCT | 16,453 |
| NOV | 13,971 |
| DEC | 9,686 |



**PRODUCED AS NATIVE**


2001 Aggregates, 48 States, by mode
MM Tons
900
800
700
600
500
400
300
200
100
0
Unk
Truck
Rail
Water
On-Site
Stone
S & G

# Construction Business Review

**Cement 2003**

| Annual (12 Mo.) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 34,096 | 38,510 |
| 2002 Actual | 33,789 | 37,333 |
| 2003 (Budget) | 34,550 | 38,460 |
| 2003 (Actual / Projection) | 34,383 | 38,654 |
| 2003 Projection versus Budget Abs. | (167) | 194 |
| 2003 Projection versus Budget % | -0.48% | 0.50% |

| Year-to-Date (Jan-May) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 13,842 | 15,552 |
| 2002 Actual | 13,672 | 15,366 |
| 2003 (Budget) | 13,543 | 15,035 |
| 2003 (Actual) | 13,376 | 15,229 |
| 2003 Actual versus Budget Abs. | (167) | 194 |
| 2003 Actual versus Budget % | -1.24% | 1.29% |

**Business Plan – Gypsum Wallboard 3275440 March 2003**

Norfolk Southern managed to grow our gypsum wallboard market significantly during 2002. A change in pricing philosophy enabled us to capture markets that had previously never been attainable. A concerted effort was made to work closely in tandem with not only the other rail carriers, but with the customers as well. In the past, pricing relied heavily on the wallboard tariff, and this caused Norfolk Southern to lose out on many voluminous opportunities throughout the Eastern United States. In moving away from the scale, we were able to work directly with the customer and tailor our rates to their needs, while at the same time creating a significant profit.

**CURRENT STATE:** In 2002, NS increased gross revenues in wallboard by over 12%, almost $1.2 million. Along with Frank Mayhew in Dallas Sales, we devised a system working together to manipulate the scale given warranted volumes. We give due consideration to each and every customer request, taking into account, competitive circumstances, and market conditions. Gypsum wallboard prices began to rebound in 3rd quarter of 2002, and have been slowly rising since their sharp decline late in the year 2000. This market rebound will give us the opportunity to haul even higher volumes this year.

+===== CARLOADS ======+

| 2001 | 2002 | 2003 |
|---|---|---|
| **4097** | **4913** | **918** |

+===== REVENUES(X1000) =====+

| 2001 | 2002 | 2003 |
|---|---|---|
| **5556** | **6753** | **1244** |

**STRATEGY / GOAL:** Given the market captured last year, and forecasts for the Southeastern markets for wallboard, our goal for 2003 will be a 6% increase in carloads

over 2002 (approximately 5208 carloads for the year). NS serves only one gypsum wallboard plant directly, and therefore the great majority of our traffic is received. We are subsequently reliant upon good pricing by the originating carriers as well. We will continue to work with our customers on core target markets (i.e. Florida), and work diligently to increase our overall volumes in 2003.

**COMPETITION:** Our true competition lies with truck. This past year we were able to capture Florida markets away from the trucks, all the way from wallboard producers West of the Mississippi. The Western carriers provide their requirements on a Rule 11 basis to the customers, who then come to NS separately for Rule 11 delivering rates. We work on a through rate basis with the CSXT, for all NS delivery points. Our sales force will continue to request any and all opportunities from our customers that are currently moving truck. We have proven ourselves successful with this strategy this past year, and will continue to do so in 2003.

Per one of our customer's websites, "A fleet of American Gypsum rail cars and an ever-expanding system of rail-served distribution centers located throughout the country give American Gypsum a widely extended service area." (www.americangypsum.com).

**MCON 2003 Business Plans…**

| **Annual (12 Mo.)** | **Carloads** | **Gross NS Rev.** |
|---|---|---|
| 2001 Actual | 97,346 | 126,607 |
| 2002 Actual | 94,185 | 124,432 |
| 2003 (Budget) | 101,007 | 133,099 |
| 2003 (Actual / Projection) | 97,225 | 128,407 |
| 2003 Projection versus Budget Abs. | (3,782) | (4,692) |
| 2003 Projection versus Budget % | -3.74% | -3.53% |
| **Year-to-Date (Jan-May)** | **Carloads** | **Gross NS Rev.** |
| 2001 Actual | 42,250 | 54,679 |
| 2002 Actual | 40,080 | 54,602 |
| 2003 (Budget) | 41,372 | 55,143 |
| 2003 (Actual) | 39,526 | 53,363 |
| 2003 Actual versus Budget Abs. | (1,846) | (1,779) |
| 2003 Actual versus Budget % | -4.46% | -3.23% |

**2003 Streator, IL Sand Business Plan (MCON)**

Background-Norfolk Southern and Illinois RailNet opened a rail interchange at Streator, IL on 1/31/03 enabling NS to offer single line rates and service to industrial sand shippers in the Ottawa, IL area. Norfolk Southern can now offer single line rates and service from the Ottawa, IL sand district. We are now competitive with CSXT and truck from Ottawa. This interchange represents an extension of our network into this important sand producing area.

Objective: Build industrial sand volume via Streator as quickly as possible. Our Year 1 goal is 750 carloads for $1.2 million dollars gross revenue.

Team Members: Bob Hagen, Dan Dileo, Jim Crawford, Bill McCloskey, Rudy Dowe and various Industrial Development Managers.

Steps/Timelines:

1. We recently secured business to Thompson, Circleville, OH that previously moved CSXT-Clmbo-NS. We anticipate $530,000 per year additional revenue from this conversion to NS direct routing. By 5/1/03, we plan to have commitments from the sand shippers for two additional pieces of new business.
2. NS Marketing and Sales will also target Prairie Transportation for truck business. They will transload and truck sand at destination for Wedron Silica. We will meet with Prairie by 4/15/03 to discuss opportunities. Our goal is to receive a commitment from Prairie for a new piece of business.
3. NS Sales and Marketing will also focus on sand end users. By June 2003 we will have bid on six pieces of business not previously bid. In addition we will follow up on prior quotes to sand shippers that have not materialized.

*Obstacles*

1. Strong CSXT competition. CSXT has and is lowering rates from Ottawa to gain business from BNSF.
2. IR handling line charge at U.S. Silica, Ottawa, IL. While competitive relative to average covered hopper handling line charges, it represents a $2.75 NT economic disadvantage vs. CSXT to competitive destinations from Ottawa, IL where CSXT serves U.S. Silica directly. NS yield on new business may be negatively impacted.
3. Prior Customer Commitment. Because the interchange was not completed in 2002, customers have committed much of the 2003 business to CSXT.

Norfolk Southern Sales and Marketing will focus efforts on securing sand business for this interchange.

Frank Elder
2003 Roofing Products Business Plan (MCON 2003)

**Background**: Norfolk Southern lost two major granules moves in 2002 totaling $2.4 million gross revenue due to market developments beyond our control: 1) 3M, Havelock, ON, to Certainteed, Oxford, NC due to plant closings and 2) 3M Wausau, WI to OCF, Avery, OH due to a new WC/CN connection with WE. To make up for these losses, we quoted very aggressively in 2002 on new granules opportunities but none materialized.

Metals & Construction assumed shingles responsibility 1/1/03. I am now responsible for roofing granules and shingles. Metals & Construction will be able to leverage pricing to our roofing customers.

Market conditions are optimal for an aggressive push for business. The housing market remains relatively strong due to low interest rates. NS remains aggressive in granules to make up for 2002 losses. We are also long boxcars due to an overall soft economy so we are poised to quote competitively on shingles.

**Objectives**: 1) with combined roofing granules and shingles responsibility, we will grow shingles business by $800,000 gross revenue to $3.5 million gross revenue in 2003. 2) Continuing last year's business plan on roofing granules, we will attempt to secure one or more large granules moves worth $1 million dollars gross revenue to compensate for the 2002 losses.

**Strategy**: We will quote below VPD on new shingles opportunities when competition dictates and equipment is available. Where possible, we will attempt to leverage low shingles pricing with higher increases on granules renewals. The reverse is possible if the new shingles volumes

bring in more revenue than granule pricing increases. We anticipate that competitive shingles pricing will create opportunities for granules business. We will build closer partnerships with our roofing customers.

**Team Members**: Virgil Corcoran, Rudy Dowe, Bill McCloskey, Dave Reitman, Bob Hagen, Edie Duffey, Fran Hennessy and Bill Flanagan.

**Time Line**:

1. By May 15, 2003, we will have personally visited our major roofing customers. They include Certainteed Products, Elk Roofing at Myerstown, PA and Tuscaloosa, AL, Tamko Roofing, Owens Corning and GAF. The purpose is to learn purchasing and marketing plans for these customers.
2. By August, 1, 2003, we will have developed and furnished comprehensive pricing on new shingles business and granules renewals.
3. The remainder of the year will entail follow up on proposals that have been made.

We will embark on this pricing strategy immediately and not wait for the customer visits.

**Obstacles**:

1. Scarcity of new granules opportunities. Purchasing plans for granules are set years in advance. Significant market changes are often required to allow opportunities to quote new business. Examples are plant openings/closings, and termination/creation of new supply partnerships.
2. Truck competition for shingles is intense despite high fuel costs and truck fuel surcharges. The market is accustomed to truck.

We want to make significant inroads against truck in our shingles markets.

Frank Elder

## MCON - Perlite Business Plan

### <u>Goals</u>

- ***Grow business from 1,760 carloads to 2,112 carloads (20% increase) within the next year.***

**Strategy**

**Long Term**

- Develop strong relationships with counterparts representing the western roads (BNSF, UP).
- Develop strong relationships with perlite shippers and receivers located on the East Coast.
- Gain a better knowledge of our key competitor, Greek import perlite (rate structure, ports of entry, etc.)

**Short Term**

- Capture approximately 450 carloads of inbound perlite, destined for Armstrong World Industries in Euclid, OH and Marietta, PA. Product is now moving adverse to NS via truck from an undisclosed port. Armstrong has invited NS to bid on this business in December of 2003.
- Capture approximately 200 carloads of outbound perlite moving from the Port of Brunswick to various destinations. Currently, Silver & Baryte has two facilities in Brunswick, GA. The first facility ships "fines" and is served by NS and CSXT. The second facility ships "coarse" material and is served by CSXT at a facility located 6 miles from the port. In July of 2003, Silver & Baryte plans to close the CSXT-served facility and ship both "fines" and "coarse" from the Port facility, served by NS and CSXT.

**Implementation**

- Aggressive pricing: This includes working closely with NS CDU to identify surplus car types and pricing these car types at or below VPD. This also includes utilizing all car types in the NS fleet. Pricing in Jumbo Covered Hoppers where 286 GOR is permitted. This will give the customer the ability to ship up to 110 tons per car.
- Work with Mike Webb and the NS TBT group to build all inclusive rates and solutions especially geared to the customers needs.
- Meeting scheduled with UP counterpart for the first week in April. Plan to meet with BNSF counterpart in late April/early May.
- Meeting scheduled with Bill Michalopoulos, VP Silver & Barytes, on March 19, 2003. Bill McCloskey will also be in attendance.

**Target Customers**

| Customer | Location | Railroad | Shipper/Receiver |
|---|---|---|---|
| [redacted] | Antonito,CO | UP | Shipper |
| | Antonito, CO | UP | Shipper |
| | Armstrong, GA | NS | Receiver |
| | Euclid, OH | NS | Receiver |
| | Marietta, PA | NS | Receiver |
| | Brunswick, GA | NS | Shipper |
| | Socorro, NM | BNSF | Shipper |
| | Chicago, IL | NS | Shipper |
| | Shoenersville, PA | NS | Receiver |

**Market Overview**

The industrial mineral Perlite is a hydrated rhyolitic volcanic glass that contains 2 to 5 percent of chemically combined water. When this mineral is heated to its softening point, it expands up to twenty times its original volume. This expansion process gives perlite its white color. There is very little demand for raw perlite, unless for expansion purposes. Perlite can be used in a variety of applications, including horticulture, construction, and manufacturing.

Construction uses:
Aggregate for portland cement and gypsum plaster
Fill insulation in masonry construction

Industrial uses:
Filler for plastics

Cements for petroleum
Filter media for pharmaceuticals, food products, chemicals and water

The principal end uses for perlite in the US are building construction products, 67%; horticultural aggregate, 12%; filter aid, 8%; fillers, 8%; and others, 5%.

**Obstacles**

The biggest obstacle NS faces is the import of Greek perlite. In 2002, the United States imported 210,000 metric tons of perlite, compared to 175,000 metric tons the year before. While imports are on an upswing, US production has dropped to 548,000 metric tons in 2002 compared to 588,000 metric tons in 2001. Penn Perlite in Shoenersville, PA stated that due to the transportation cost of American perlite, they would be moving to the use of foreign ore primarily.

**Scrap Metal Business Plan 2003**

| Annual (12 Mo.) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 83,579 | 82,181 |
| 2002 Actual | 95,307 | 92,465 |
| 2003 (Budget) | 94,994 | 95,010 |
| 2003 (Actual / Projection) | 95,793 | 97,042 |
| 2003 Projection versus Budget Abs. | 799 | 2,032 |
| 2003 Projection versus Budget % | 0.84% | 2.14% |
| **Year-to-Date (Jan-May)** | **Carloads** | **Gross NS Rev.** |
| 2001 Actual | 35,109 | 34,983 |
| 2002 Actual | 38,928 | 37,650 |
| 2003 (Budget) | 40,626 | 40,381 |
| 2003 (Actual) | 41,425 | 42,413 |
| 2003 Actual versus Budget Abs. | 799 | 2,032 |
| 2003 Actual versus Budget % | 1.97% | 5.03% |

**2003 Goals**

- To generate $100 million in revenues.
- To increase market share in the east by 1.5 points to 36.7%.
- To achieve a better understanding of our customers and our market: both scrap generators and scrap consumers.
- To increase our share of the market in terms of specific commodities: pig iron and ASR.

**2002 Results**

- Carloads moved: 95,307 (versus 83,579 in 2001)
- Revenues: $92,465,000 (versus 82,192,000 in 2001)
- Market Share (in the east) at year end: 35.2% (versus 33.8% at year-end 2001)

**Strategies: To generate $100 million in revenues.**

- Identify and target mills where we show room for improvement in NS's share of their inbound scrap purchases (See attached Electric Arc Furnace spreadsheet).
- Take reasonable increases on expiring authorities while remaining competitive in the market.

- Work with scrap generators/brokers to determine new opportunities for traffic currently moving competitively – via CSXT, truck, or barge.

**<u>Strategies: To increase market share in the east to 36.7%.</u>**

- Compete aggressively with CSXT in terms of price, service.
- Identify opportunities to use our assets, i.e. equipment, captive locations, market reach (bulk of Conrail Metals franchise) as a competitive advantage.

**<u>Strategies: To achieve a better understanding of our customers and our market.</u>**

- Update list of scrap shippers accessible by NS to reflect current potential customers.
- Become more involved in market study and less involved in rate responses and billing issues.
    - Move more customers into customer-specific scales: TubeCity, ProTrade.
    - Investigate making the public scale more accessible and user friendly thru the NS web site.
    - Sanity check both the public and private scales to determine how much traffic they are moving and where they are most effective and/or ineffective.
    - Maintain better contact with RACS and educate them on certain customers/issues to eliminate recurring questions and improve the scrap rating/billing process.
- Initiate/maintain contact with scrap shippers, particularly mid-level, to establish relationships with them in addition to the brokers we now deal with.
    - Plan territorial sweeps, in the vein of CSXT strategy, to visit, in particular, scrap yards and mid-level brokers.
    - Work with appropriate sales representatives to develop and nurture relationships with the scrap buyers at selected steel mills.

**<u>Strategies: To increase our share in the market for the specific commodities of Pig Iron and ASR.</u>**

- Pig Iron
    - Capitalize on our primary relationship in the pig iron market with Consolidated Grain & Barge.
    - Target other players/brokers in the pig iron business to diversify our opportunities to move this traffic, specifically:
        - National Material Trading – business ex Sparrows Pt, MD and Chicago, IL
        - Miller & Company – business ex. Portsmouth, OH and Baltimore, MD to various receivers in VA
        - PrimeTrade – business ex Decatur, AL
- Auto Shredder Residue
    - Provide our sales force with a listing of scrap shredders that the NS can either directly serve or access thru reciprocal switching or a handling line.
    - Continue to grow the business relationship with Tom Myles and Industrial Waste Group, with new transload site at Toledo, OH and potential new sites in Birmingham, AL and North Haven, CT.
    - Initiate a relationship with Ohio Rail & Transfer in Canton, OH to ensure business from Owego, NY to predecessor facility in Alliance, OH will be transferred to Canton, OH rather than disappearing.
    - Work in conjunction with Chemicals Marketing Group to develop business rapport with, and take advantage of, rail-accessible landfills.

- Meet with Huron Valley Steel to gain better understanding of the market for the metallic ASR (STCC: 4029176) as is inbound to HVS facilities in Anniston, AL and Belleville, MI. Investigate declining levels of business for cause and determine how to get it back on NS.

**Crushed Stone, Sand & Gravel Business Plan**

| Annual (12 Mo.) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 152,736 | 81,125 |
| 2002 Actual | 143,026 | 75,018 |
| 2003 (Budget) | 153,181 | 79,471 |
| 2003 (Actual / Projection) | 148,453 | 76,441 |
| 2003 Projection versus Budget Abs. | (4,728) | (3,030) |
| 2003 Projection versus Budget % | -3.09% | -3.81% |

| Year-to-Date (Jan-May) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 54,354 | 29,292 |
| 2002 Actual | 55,785 | 30,765 |
| 2003 (Budget) | 53,161 | 28,427 |
| 2003 (Actual) | 50,746 | 26,525 |
| 2003 Actual versus Budget Abs. | (2,415) | (1,902) |
| 2003 Actual versus Budget % | -4.54% | -6.69% |

**Contents**

**Long-term Goals & Strategic Objectives**
**Current Market Position – Summary**
**Market Segments, Background, Competition**
**Tactical Plans**
**Support Needs to Implement Strategy / Tactical Plans**

I. SNDG – Long-term Goals & Strategic Objectives (dovetails with Corporate Strategy)

**Goals**:
- Grow business from base of 150,000 annual carloads to 200,000 carloads (+33%), in 5 years.
- Improve VPD Contribution Per Carday from $4.00 in 2002 to $14.00 in 2008.[1]

**Strategy**:
- Aggressive pricing: fully utilize NS fleet and maximize revenue per carday. [2]
- Coordination with Sales and CDU: develop all opportunities and efficiently deploy NS fleet
- Develop appropriate service packages to match rail capabilities with market opportunities

---

[1] **VPD Contribution Per Carday target of $14.00 per carday is posited as the measure of profitability for aggregates.**

[2] Appropriate pricing strategy for new and renewed business, during both strong and weak market periods.

- Improve ease of business for existing / new customers – web site; information; how-to.

**Implementation -Tactical Plans**. Customer or market business plans to be developed as needed.

- Scrubber stone for coal-fired utilities (NC, VA; possibly OH, GA)
- By state - market development (e.g., Georgia highway projects)
- Seasonality initiatives (equipment utilization)
- Unit train development (larger urban markets)
- "NS Aggregates Committee" to work cross-functional issues and growth.

**II. Current Market Position - Summary** [3]

| | NS States | NS | CSXT | Remarks |
|---|---|---|---|---|
| Quarries & Pits 4,180 | 63 | Unknown | | |
| Tonnage | 1,458 mm | 14.9 mm | 23.1 mm | Revenue tonnage only[4] |
| ***Carloads*** | | ***143,000*** | ***227,000*** | ***2002*** |
| ***RPU*** | | ***$524*** | ***$515*** | ***2002*** |
| Average Haul | | 178 mi. 220 mi. | (estimated) | |
| Ownership (S, F, P: Pct of c/l's) | | 48% 2% 50% | | System, Foreign, |
| Private carloads | | | | |
| Fleet size (HA GB HB) | 2855 221 few | | | |

| **Trend** | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 (B) |
|---|---|---|---|---|---|---|---|---|
| NS Carloads | 81.6 | 95.2 | 99.5 | 119.7 | 145.6 | 152.5 | 142.9 | 153.1 |
| Tons (mm) | 85.2 | 98.6 | 101.0 | 122.2 | 150.5 | 158.2 | 148.4 | 159.2 |
| Revenue (mm) | 43.0 | 50.5 | 53.1 | 60.9 | 75.7 | 80.8 | 74.9 | 79.3 |




III. Market Segments, Background, Competition

---

[3] A more detailed market share spreadsheet is available on request.

[4] In 2002, NS purchased about 2.5 million tons of ballast for track work. This non-revenue traffic is reported to the USGS as shipped by rail, causing an overstatement of the apparent rail market share as shown Chart on Page 4.

**Segments**: Aggregates include crushed stone, sand and gravel, used in four main segments:

- Highway construction and repair. Funding is a mix of federal, state and local. Most large projects are administered by each state's DOT. This segment represents the majority of aggregates consumption.
- Commercial / public works. Includes airports, sewers, buildings, warehouses, parking lots, waterways, track ballast, and shoreline protection.
- Residential – foundations, sewers, driveways.
- Environmental applications – limestone used for remediating flue gas emissions at coal-fired power plants.

## Geology

The geology in the states served by NS is diverse, with four notable features. First, a band of granite runs from Columbus GA through SC, NC, VA, MD, PA, NJ and NY. In GA, the deposits are some 150 miles from the consuming cities on the coast. This distance lends itself to a natural rail market. However, in VA, MD, NY and up into New England, the deposits become closer to the coast, and many quarries have river or salt water access. Second, west of the granite, a band of limestone, featuring hi-calcium and dolomite deposits, runs from Birmingham along the Appalachians into New England. While aggregates are plentiful almost everywhere, some areas in the NS states have no natural stone. These areas use local gravel or stone transported from distant quarries. Regions include the southern portions of AL, MS and GA, northern FL, eastern OH, southwestern TN and southern MI. Some coastal areas also lack stone, including Tidewater VA, the Delmarva, southern NJ, and urban areas such as Charleston, Savannah, Baltimore and Philadelphia. Fourth, in some densely populated areas, such as Atlanta, Chicago, and northern NJ, quarries are plentiful, so that virtually all stone is trucked, despite local traffic congestion.

**Product Quality**

State DOT's specify the quality of aggregate used in various publicly-funded road projects. Aggregates are tested by various methods to see how well they resist loads, wear, freezing, rutting and polishing (skid resistance). DOT's will often take into account the quality of aggregate available in a region when developing road stone specifications. Each asphalt or concrete producer develops 'design mixes' using blends of stone and submits the mixes for testing and approval in various roadway applications. In general, granite performs better than limestone, but granite is a harder and heavier stone, meaning it is more expensive to produce and yields less volume of finished product for a given tonnage input. Local gravels, when crushed, may also be suitable.

**Prices and Economics**

Product prices average about $5.50 per ton for stone, and $5.00 for sand & gravel. Due to the low product value and wide dispersal of production sites, aggregates are usually a short haul commodity. A typical truck rate for a 30-mile haul is $2.50 per ton, compared to $5.00 for the average NS haul of 200 miles. The farther one travels from a quarry, the higher the delivered price becomes, and the more a given producer tends to encounter the 'economic radius' of other competing suppliers or distribution sales yards. Some road projects require higher quality aggregate, which, if not available locally, result in a longer-haul opportunity. An example is the use of granite in Florida for interstate highway paving.

***Commercial Relationships***

The industry is characterized by long-term relationships between buyers and sellers. Once a relationship is established, change is infrequent. Many receivers will purchase the majority of their stone from one supplier. Rail freight rates are usually negotiated with and paid by the

producers, for several reasons. A typical quarry ships to multiple receivers, making it easier for the shipper to handle the rates. The large aggregate producers offer the convenience of a "delivered price" that includes product and freight. The producers often extend payment terms of 30 or 60 days, compared to typical rail terms of 15 days. In addition, many large producers have fleets of private cars. Those cars can be better utilized by shippers, who can deploy cars into multiple lanes, dispatch them to other quarries or onto on other railroads, or assign them to other US regions, depending on demand. Large producers can more easily maintain a staff to manage the rail shipping process, as opposed to each receiver doing it separately. Sometimes, construction companies will pay the freight, since they are the in fact the end user of the product; examples are Douglas Asphalt and Reeves Construction. Competition is intense at the contractor bidding level, and the producers will compete to supply the stone for large jobs. Aggregate distributors that supply cars and operate stone yards, may also pay the freight; examples are Yelvington and Whitestone.

**Rail Advantages & Disadvantages**

Rail advantages include: handles large volumes between fixed points, stable pricing, fewer invoices for the same tonnage, longer time windows to load and unload versus truck, environmentally-friendly, and (with adequate planning) the ability to provide service and equipment designed for specific customer needs. Rail disadvantages include: large investment at origin and destination to accommodate rail; long lead times to develop rail sidings; slow cycle times on rail equipment (compared to truck); labor and other costs to unload railcars; trucking costs to move product from rail siding to job site; and difficulties when shipping in freezing weather. Some disadvantages can be overcome by using a natural "break point" in the logistics chain. Aggregates used in asphalt and concrete must be unloaded and stockpiled at the plant site, regardless of the transportation mode. If asphalt or concrete plants are located on directly on rail, or adjacent to rail-served distribution terminals, costly double handling can be eliminated or minimized.

## Competition

"Unknown" tonnage is mostly product used at on-site asphalt and ready-mix plants. Rail's market




share is overstated, due to the reporting of company track ballast as shipped by rail. NS bought 2.5 mm tons of ballast in 2001, compared to 15.8 mm revenue tons shipped.

**Truck** is the main competitor. It offers speed, flexibility, just-in-time job site delivery, and self-unloading capability. The vast majority of aggregates, 96%, moves off-site by truck or is transformed into asphalt or concrete at the quarry and then delivered by truck. Rail share is higher at quarries that actually have rail, but on average, rail and barge each move only 2% of total

production. (See graph). For truck, dwell times at quarries are measured in minutes, and cycle time in trips per day. Railcars spend 1 or 2 days loading, and utilization is measured in days per load. Weight limits can vary by state. Most states have an 80,000 lb gross weight limit, allowing for payloads of 23-24 tons. NY issues permits up to 100,000 or even 120,000 lbs depending on route and axle configuration, whereas CT has a 72,000 lb limit. MI allows tandem trailers with a payload of 46 tons. Backhauls of sand, coal, grain, scrap or solid waste often make truck rates hard to compete with. A truck is a flexible asset that can be used to haul stone for stockpiles when it is too wet or cold to pave. Some have heated bodies, making it possible to haul in freezing weather. Disadvantages of truck include the need for shippers/receivers to load/unload immediately upon arrival, normally during regular business hours, higher fuel costs per ton mile, and increasing costs for wages and insurance

**Rail.** CSXT competes where NS serves the same destination markets. Examples are Jacksonville, Savannah, Tidewater, and Ohio. CSXT serves more quarries than NS and has a major presence in Florida giving it a rail share advantage in the East. The CSXT fleet of coal hoppers and aggregate cars includes several hundred recently acquired 3-pocket manual Ortner-style cars. CSXT competes using pricing comparable to NS "VPD" levels, with lower rates for larger volume or unit train moves. The WE competes with NS in OH, and the CN (IC) in AL and MS.

**Barge and Vessel** are factors on inland waterways and coastal areas. The Ohio, Mississippi, James and Hudson rivers, the Chesapeake Bay, the Great Lakes and the Tenn-Tom waterway all carry major amounts of aggregate that either compete with NS or shut rail entirely out of market areas. Advantages of water are large quantities moved medium and long distances at low rates. Water-served quarries load directly production stockpiles. Disadvantages include longer ordering lead times, slow clamshell unloading methods, capital costs for dredging and building terminals, environmental restrictions, and local opposition to new facilities. High or low water levels, delays at locks, and user fees can impact barge rates. In addition, barge supply and freight rates are affected by demand for shipments of other commodities such as coal, grain and ore. In southeast and Gulf ports, imported granite (Nova Scotia) and limestone (Mexico, Bahamas) offer stiff competition in cities such as Brunswick, Savannah, Jacksonville and a 10-20 mile hinterland.

**Recycled** concrete and asphalt (millings) offer product competition with virgin material. This is especially true in older urban areas. Crushed concrete can be used as sub-base, and millings can be fed into new asphalt at various percentages (typically 10-30%, depending on the design mix). Some states are experimenting with resurfacing machines that mill up old asphalt, re-heat it, and relay it for rolling and quick return to service.

**Industry Trends**
Consolidation is an ongoing trend. Small, family-owned operators are often purchased by larger corporations. The larger producers are not as nimble as the small operators, but they have more capital backing and staff for research and longer-term development efforts. Quarries are occasionally swapped between large corporations for operational efficiency and market presence. Several large aggregate producers (Oldcastle, Hanson, and Lafarge) have foreign ownership.

Some urban or suburban quarries are beginning to play out. If there is no room to expand, or expansion costs are too high, those quarries close. When demand exceeds the supply available at other nearby quarries, and no new quarries can be permitted, opportunities for longer haul stone may arise. This "opportunity" has been "just around the corner" for 10 years or more, so it remains to be seen whether a significant shift towards rural stone sources occurs.

Another trend is the use of better quality materials and tighter specifications for heavily traveled roads. This could lead to more long-haul stone, in a gradual or localized process (by state). For example, crushed stone has replaced local gravel in many paving applications.

During economic slowdowns, fewer jobs for new construction are let and started. Instead, DOT budgets emphasize more repair and resurfacing work. Those jobs use less stone than new or widened roads. Furthermore, the scarcity of work puts downward pressure on contractor bid prices and freight rates. The result is lots of transportation capacity chasing fewer tons, making it difficult for rail to gain new business in a downturn.

### Challenges: NS Financial Position, Equipment and Growth

The manual aggie fleet is over 30 years old. The NS debt/equity ratio following the CR transaction, combined with depressed earnings and cash flow, make it difficult to internally finance new rail equipment. However, recent changes to AAR rules allow cars to be certified to 50 years. Other than repairs to maintain serviceability, there is no immediate cliff approaching in the NS aggie fleet. For the time being, traffic growth can be achieved via better equipment utilization.

**To reach longer-term growth goals, VPD-based rates may be needed in some markets**. **VPD contribution per carday** is posited as the yardstick for aggregates, based on 2002 traffic mix of 48% system, 2% foreign, and 50% private cars. The use of contribution per carday takes into account length of haul, car ownership, and the mix of other commodities shipped in aggies, such as earth, aglime, and ore. See section on NS Financial Position. **A suggested target of $14.00 per carday** represents a typical full-service monthly lease cost. While it is desirable to earn replacement cost where possible, this is difficult to achieve due to intense modal and carrier competition. In addition, shippers can lease a car for $400 per month, making it difficult for NS to charge rates based on a "replacement" cost of $690 per month. The seasonality of construction activity and aggregates traffic further increases the hurdle, as much of the car fleet (both system and private) is idled December through March

It would be worth evaluating whether the replacement cost model, which uses a 15-year economic life and a 50% residual, remains valid when aggregate cars can last up to 50 years. Should NS be unable to reinvest in aggregate equipment, the share of shipper-supplied equipment will continue to increase. This is not necessarily bad, nor difficult to accomplish. However, NS should strive to maintain at least ***some*** system cars long term. These cars would be used to attract new customers, who could use system cars for a few years, until they are comfortable with assuming the expense and risk of leasing or purchasing their own cars.

## IV. Tactical Plans (summaries are below, detailed plans to be developed as needed).

- **Scrubber stone** for coal-fired utilities. Driven by Clean Air Act regulations, utilities must reduce $SO_2$ emissions by scrubbing with high-calcium stone or by using lower sulfur coal. Depending on the number of units, coal firing rate, and percent sulfur, a generating station could use from 60,000 to 300,000 tons of limestone per year. Without a doubt, this market merits the highest priority for development. The potential is significant: several million tons per year by 2008, all new business. Rail is ideally suited for moving unit trains of limestone from quarry to power plant. Many power plants will be able to use local truck stone, or barge delivered stone. However, NS will have an edge to rail-served plants that are not on water and are distant from hi-calcium deposits. NS currently participates in 3 moves, totaling 3,000 carloads per year: Conneaut-Huff (Key-Con), Buchanan-Clover (VA Power), and Ryan-Richburg

(Southern MS Electric). The following receivers are actively investigating rail: Duke Power (4 plants, 3 on NS) Carolina Power (3 plants), Georgia Power (multiple locations). Other utilities in the NS territory may also opt to scrub; Virginia is working on a plan similar to North Carolina's. Another target will be the recapture of 800 carloads of stone from Huntington to Dunfermline for CILCO via NS-BNSF.

Key to taking advantage of these opportunities are:

- Identifying the most likely power plants for NS delivered stone.

- Efficient (unit train) rail access to suitable limestone reserves.

- Developing additional track and product-handling infrastructure at destination.

- Coordination with NS Coal Department. NS's Utility Managers handle both sales and marketing functions, and focus mainly on the coal shipments to their assigned utilities. At the same time, Merchandise Sales does not call on the power plants. Determining how to best handle the sales function, for non-coal commodities, will be helpful in developing these scrubber stone opportunities.

- **By state** - market development (for example, Georgia). Large construction jobs in the planning and bidding stages will be located and tracked using various sources. Data sources include Dodge Reports, state DOT websites, and trade journals. The search for new jobs represents an ongoing project for our co-ops. Jobs will be screened to determine potential for NS. Sales and Marketing will then pursue the opportunities with shippers, receivers, and the end-users (contractors bidding on the jobs). In some cases, track construction, unloading pit and new service will be needed. Real Estate and Industrial Development, Engineering and Service Design will be partners in this process. Opportunities on shortlines will also be pursued. Georgia is one state where numerous highway projects are being planned. For 2003, an I-75 widening near Adel and Valdosta GA represents 5000 carloads and $2.5 million revenue over a 2-year period.

- **Seasonality** initiatives (equipment utilization).

Stone margins are hampered by seasonality. Construction activity peaks in October, and slows in the winter months from mid-December to mid-March. (2001 is shown above as a typical year,



since 2002 experienced a severe fourth quarter drop due to economic conditions). Aggregates are subject to freezing when loaded in open top equipment, and rail's longer transit times increases the "rail disability" during cold weather. Some rail receivers take truck stone in winter, when truck rates are lower and rail shipments would be frozen. <u>Having an asset idle for 3 months makes it difficult to reach acceptable contribution margins</u>. NS may be able to make some progress as follows:

1. Ag Lime & Scrubber Stone. Ag Lime shipments from TVR at Hodges normally slow down from April – October, when crops are in the field. Ag Lime aggies normally sit idle during summer, due to the expense of cleaning cars that have been unloaded from the top. Until 2001, CILCO at Dunfermline IL received about 800 carloads of scrubber stone, from May through September. This traffic was lost to truck due to the fuel surcharge. 60 aggies from the 150-car Ag Lime pool could be deployed to the CILCO move. Since CILCO rotary dumps at destination, it is possible that only minor cleaning would be needed. The 2003 season has already been awarded to truck. However, aggressive pricing, using otherwise idle cars, will put this scrubber stone back on rail in 2004.

2. Seasonality will also be attacked geographically. One potential is Postell – City Point traffic, which moves about 800 carloads annually in 25-car blocks. Margins are low due to cycle times and competition with imported granite. Given appropriate incentives, this traffic could possibly priced during late fall through late spring. Then, during warmer weather months, the cars could be deployed to lanes in Ohio or Pennsylvania. For example, Hawbaker in central PA typically ships using 3, 25-car sets from mid-April to mid-November.

3. Currently, any rate adjustments to incent seasonal shipments must be administered manually for specific time periods and between specific points. NS does not have any way to administer seasonal prices in the same rate docket. Each rate adjustment needs to be in a separate section, series or supplement. This is somewhat cumbersome.

- **Unit train development**. Currently, NS traffic mix is as follows:

| | | |
|---|---|---|
| **True unit train** | **26%** | **Origin to destination as a solid train, both loads & empties.** |
| Split train / block | 57% | Custom service (multiple set-off/pick-up or expedited handling). |
| Regular service | 17% | No special handling. |

Unit trains are suited for high-volume permanent lanes that can support the capital expense needed for trainload facilities. Cycle times and margins tend to be more favorable in unit train than in regular service, even though per-car revenue is lower. Unit train also provides a competitive edge. In markets large enough to merit a unit train, there are likely to be other rail or water competitors vying for the same tonnage. Therefore, the lower rate and faster cycle time of a unit train can help NS gain market share, and still achieve a suitable margin. Unit train opportunities will be pursued aggressively where appropriate.

## V. Support Needs to Implement Strategy / Tactical Plans (lead is underlined).

- **NS 'Aggregates Committee'**: A cross-departmental team that works to advance the overall strategy and tactical implementation. Possible membership: representatives from Marketing, Sales, Finance, Equipment Marketing, Industrial Development, CDU and Service Design. Would need a "champion".
- Equipment analysis and planning (Equipment Marketing, Finance, Mechanical, Material Management, Marketing)
- Project opportunity analysis and development. (Marketing, MR&E, Sales, Co-op). Identification of upcoming construction projects amenable to delivery of aggregates by NS.
- Specific Lane Development (Sales, Marketing, Industrial Development, Real Estate, Service Design, Transportation, Equipment Marketing, CYO)
- Develop ways to reduce cost of using rail, such as A-gons, portable / temporary unloading stations. (Engineering, Equipment Marketing, Material Management, Modalgistics, customers or consultants)
- Unit train management support (CTMS adaptation) and dynamic train scheduler (Transportation, IT, CYO, Marketing)
- Develop a "How to ship aggregates on NS" guide for new prospects. (Marketing, Sales, CYO, NCSC, CDU, ID, RE)
- Enhance NS Website. (Marketing Services, Marketing, IT)

# Metals Business Review

**Coil Business Review 2003**

| Annual (12 Mo.) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 188,749 | 199,131 |
| 2002 Actual | 200,613 | 210,394 |
| 2003 (Budget) | 203,870 | 215,076 |
| 2003 (Actual / Projection) | 207,574 | 221,870 |
| 2003 Projection versus Budget Abs. | 3,704 | 6,794 |
| 2003 Projection versus Budget % | 1.82% | 3.16% |
| **Year-to-Date (Jan-May)** | **Carloads** | **Gross NS Rev.** |
| 2001 Actual | 79,293 | 84,348 |
| 2002 Actual | 78,708 | 81,775 |
| 2003 (Budget) | 83,335 | 86,877 |
| 2003 (Actual) | 87,040 | 93,671 |
| 2003 Actual versus Budget Abs. | 3,705 | 6,794 |
| 2003 Actual versus Budget % | 4.45% | 7.82% |

2001 Actual Carloads/Revenue = 189,658 carloads / $202,590,000
2002 Actual Carloads/Revenue = 201,244 carloads / $213,400,000
2003 Budget Carloads/Revenue = 204,572 carloads / $215,077,000

**Executive Summary**

GLOBALIZATION, CONSOLIDATION AND RATIONIALIZATION:

Globalization of the world steel industry will continue to be a driving force in shaping the future of the steel industry. ISG's purchase of the steel making assets of Bethlehem Steel and US Steel's purchase of National Steel will lead to the long predicted consolidation and rationalization of the domestic steel making industry. This rationalization will lead to resourcing of semi-finished inter-mill steel. This resourcing is expected to lead to shorter hauls (as the supply chain is shortened) and new lanes that will increase highway, barge, and rail competition. The remainder of the domestic steel industry will likely seek further consolidation to remain competitive.

**Market Analysis**

Our steel coil traffic has benefited greatly from a surge in export traffic (mostly going to China) earlier this year. This gave our steel coil traffic the boost it needed to allow us to be over budget for the first half of this year. However, we do not expect to see significant export demand for the remainder of this year.

The demand for domestic coil sheet steel is forecasted to be soft for the rest of this year as consumer demand for new motor vehicles and major appliance lessens. As a result, industrial demand is expected to remain at low levels limiting the need for sheet steel required for capital goods. Most of the major mills on our line are currently reporting soft order books.

Also, our steel coil traffic for the remainder of the year will depend greatly upon the resourcing decisions that ISG and USS make for their inter-mill traffic. The mills that may be impacted the most are:

USS:

- Granite City IL to Midwest Portage IN – Resourced from Gary IN
- Ecorse MI to Midwest Portage IN – Partially resourced from Gary IN

ISG:

- Cleveland OH to Hennepin IL – Resourced from Indiana Harbor and Burns Harbor IN - Barge competition
- Burns Harbor IN to Buffalo NY – Resourced from Cleveland OH - CSXT competition
- Sparrows Point to Burns Harbor IN – Resourced from Indiana Harbor IN – Barge competition

**Competitive Analysis**

Most of the mills NS serves are accessible by multiple rail providers and many have barge access. Truck competition is intense. In addition, there is a percentage of traffic the Mills are forced to truck in order to meet short delivery dates. This is often the result of production or scheduling problems by the mill or their customer.

After tight equipment supply in the 1st quarter, both NS and CSXT are surplus in coil cars. This has led to increased rail-to-rail competition, which has added to the challenge of increasing revenue and contribution. We expect this to be the case for the remainder of this year.

**<u>Marketing Strategy / Tactics</u>**

- Secure key inter-mill lanes for ISG and U. S. Steel in long term Contracts. This would include all existing and potential future lanes resulting from the rationalization and consolidation of the new ISG Steel Group and U. S. Steel.

- Foster close relationships with key decision makers within the corporate structure of our customer base. This has proven a major driver in our success with accounts like U. S. Steel, ISG Steel Group; as well as, with other key accounts.

- Work closely with NS Sales, NS Transportation Department, and our customer contacts to position ourselves to be able quickly react to changing market conditions.

- Continue to take rate increases when available, while being aware of the changing competitive nature of the coil steel transportation market.

- Work closely with CDU, Equipment Marketing, NS Sales and our customers to continue to improve the utilization of our existing coil car fleet, maximizing reload potential, and to improve the overall condition of our fleet. This would include development of a better car-cleaning program than what is currently in place.

- Work with Equipment Marketing, various equipment manufacturers, and our customers in the development of the next generation coil gondola. This has been a strong point on the NS in the past; however, we seem to have lost our focus in this area in recent years.

- Continue to develop and analyze both rail and truck data provided by our customers in an attempt to effect a routing change or a modal conversion to NS.

- Utilize Modalgistics to help analyze our customer's supply chain requirements and develop transportation packages that will extend NS's reach beyond the railhead, and meet our customer's overall supply chain needs.

**IRST 2003**

| Annual (12 Mo.) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 95,744 | 116,558 |
| 2002 Actual | 103,793 | 124,019 |
| 2003 (Budget) | 103,867 | 130,002 |
| 2003 (Actual / Projection) | 93,710 | 116,619 |
| 2003 Projection versus Budget Abs. | (10,157) | (13,383) |
| 2003 Projection versus Budget % | -9.78% | -10.29% |
| **Year-to-Date (Jan-May)** | **Carloads** | **Gross NS Rev.** |
| 2001 Actual | 40,834 | 49,863 |
| 2002 Actual | 46,332 | 55,352 |
| 2003 (Budget) | 45,603 | 57,051 |
| 2003 (Actual) | 35,544 | 43,861 |
| 2003 Actual versus Budget Abs. | (10,059) | (13,190) |
| 2003 Actual versus Budget % | -22.06% | -23.12% |

# *I/S Bar & Billet Mid-2003 Business Plan*

2002 Actual Carloads/Revenue = 23,766 carloads / $28,274,020
2003 Budget Carloads/Revenue =

## Executive Summary

Economic conditions for the 1st half of 2003 have been poor, and are not expected to improve significantly; however, the IRST market has improved compared to 2002. Nevertheless, NS' market share has declined due to the loss of the REP contract to CSXT. The IRST market has improved due to 1) weak U.S. dollar, 2) consolidation in steel industry, 3) bankruptcy/closing of unprofitable companies, 4) implementation of Section 201, 5) steel consumption in China, and 6) high oil prices. The U.S. has historically been a plagued by foreign countries "dumping" steel; however, during the 1st half of 2003, Section 201 deterred this from occurring. In fact, NS actually participated in multiple short-term export shipments, which was created by steel consumption in China and a weak U.S. dollar. Overall, the market should remain at its current level, provided Section 201 is not rescinded, narrowed in scope, or shortened in duration, and the economy doesn't slip further into recession.

## Market Analysis

NS' market share has declined due to the loss of the REP contract to CSXT. Through 06/01/03, NS has lost approximately 3,500 carloads of traffic due to the rail transportation contract being awarded to CSXT. On the positive side, NS' total year-over-year IRST carloads have decreased only 3,000 carloads; thus, NS has acquired additional traffic, most of which were spot export moves. They include: 1) 300 carloads for SMI – Woodlawn, AL to Mobile, AL/Brownsville, TX; 2) 200 carloads for RES – Roanoke, VA to Morehead City, NC; and 3) 70 carloads for GAS – Perth Amboy, NJ to New Orleans, LA. These export

opportunities were created by a weak U.S. dollar as well as a shortage of foreign steel due to the steel consumption in China, and they are not expected to continue.

Another contributing factor to the improvement of the IRST market is the higher price of fuel/oil. Higher fuel/oil prices improve railroads' competitiveness against truck, and increase demand for IRST product used in domestic oil drilling (mainly in Texas). In addition, the implementation of Section 201 has curtailed steel imports that historically were shipped to a port closest to consumption and barged and/or trucked to the market. As a result of Section 201, domestic producers are booking orders and, in turn, shipping a portion by rail.

Finally, the IRST market has seen its share of consolidation and bankruptcies/closings. In 2002, Gerdau AmeriSteel ("GAS") was created through the merger of AmeriSteel and Co-Steel; Nucor purchased Birmingham Steel; Charter Steel purchased American Steel & Wire; Republic Engineered Products ("REP") emerged from bankruptcy but closed its Massillon, OH plant; and, Sterling Steel (a subsidiary of Leggett & Platt) purchased Northwestern Steel & Wire. This consolidation has shifted the sourcing points to the consuming markets. In some instances, the railroads have lost carloads and revenue due to a decision to source from a closer mill and shift the transportation mode to truck. However, at the same time, the railroads have gained new opportunities due the larger companies' decisions to focus different mills on specific commodities. This results, in some instances, in greater distances the product has to move to reach its market, and creates an advantage for railroads. Moreover, with consolidations and closings, the amount of product available is diminished, and the surviving, better-organized and better-operated companies typically appreciate and understand the efficiencies and economics of shipping by rail.

It is anticipated that the 2nd half of 2003 should continue on the same cycle as the 1st half; and if the U.S. economy improves, the IRST market may actually improve.

## Competitive Analysis

Truck is the primary mode of transportation for the IRST commodities, except where there are significant volumes or when the product being shipped is moving to another mill/facility for further processing. In most instances the ultimate steel consumers are not rail served. Truck offers significant competition due to: 1) their flexibility, 2) less than railcar volumes, 3) rates, and 4) distances product is shipped. Railroads compete as best as possible but when the distance is less than 200 miles, it is difficult for railroads to be successful. If the consumer is not rail served, it becomes even more difficult for rail to overcome truck due to the additional cost of transloading and local delivery. This pushes the railroads' competitive range out to 400+ miles.

In terms of rail competition, CSXT is NS' main competitor. Both NS and CSXT have sufficient equipment available. NS has an equipment advantage over CSXT in 286k 52' gondolas and 286k 38' billet cars. CSXT has an equipment advantage over NS in 286k 65' gondolas. Both NS and CSXT serve basically the same East Coast ports, so there is not an advantage nor disadvantage. Furthermore, NS and CSXT interchange traffic with the Western and Canadian railroads and many of the same locations, so again there is not an advantage nor disadvantage.

## Marketing Strategy / Tactics

The following projects and initiatives will be used to increase business and maximize revenue for this commodity:

1. work closely with NAMs, AMs, and RAMs to become quickly aware of opportunities
2. collaborate with Car Distribution to understand NS equipment supply, in order to price accordingly
3. closely monitor CSXT's performance on the REP contract, and be in a position to respond if they begin to fail
4. proactively create dialogue with GAS, Nucor, SMI, etc… to become aware of opportunities

5. leverage NS TOP as a value added service
6. research covered gondola and markets for such
7. continue to develop transload partnerships and relationships
8. continue to strengthen relationship with UP for opportunities
9. keep vigilant watch on market to respond to furnace outages, EPA regulations/requirements, etc…

### Wilson 10A – Slab Review

| Annual (12 Mo.) | Carloads | Gross NS Rev.X000 |
|---|---|---|
| 2001 Actual | 62,090 | 70,368 |
| 2002 Actual | 73,657 | 81,563 |
| 2003 (Budget) | 68,629 | 78,226 |
| 2003 (Actual / Projection) | 59,624 | 68,024 |
| 2003 Projection versus Budget Abs. | (9,006) | (10,202) |
| 2003 Projection versus Budget % | -13.12% | -13.04% |
| **Year-to-Date (Jan-May)** | **Carloads** | **Gross NS Rev.X000** |
| 2001 Actual | 26,804 | 31,006 |
| 2002 Actual | 33,524 | 37,008 |
| 2003 (Budget) | 30,549 | 34,711 |
| 2003 (Actual) | 21,580 | 24,577 |
| 2003 Actual versus Budget Abs. | (8,969) | (10,134) |
| 2003 Actual versus Budget % | -29.36% | -29.20% |

# *I/S SLAB Mid-2003 Business Plan*

2002 Actual Carloads/Revenue = 46,498 carloads / $47,972,724
2003 Budget Carloads/Revenue =

## Executive Summary

Economic conditions for the 1st half of 2003 have been poor, and are not expected to improve significantly. Import slab for the 1st half of 2003 has been adversely affected due to 1) steel consumption in China, 2) low consumer confidence resulting in a slow U.S. economy, 3) weak U.S. dollar, 4) consolidation of integrated steel companies, and 5) increased steel production capability due the new entry of ISG. Consequently, domestic slab consumers are turning to domestic slab producers for spot purchases. In addition, 2002 import slab was abnormally high due to the anticipation of Section 201. Finally, slab tolling that took place in 2002 is non-existent in 2003 due to the increased price of slab. Overall steel production has decreased in 2003; thus, demand for both domestic and import slab is low.

## Market Analysis

Import slab is significantly down, but spot opportunities for domestic slab purchases remain available. NS' largest import slab consumer, Duferco-Farrell, started its second blast furnace in August 2002 and secured a fleet of 330 private gondolas under a multi-year lease arrangement. Duferco-Farrell in late 2002 increased its weekly 75-car unit slab train shipments from three to as many as five unit trains. However, in 2003, Duferco-Farrell has purchased slab domestically (primarily from AK Steel in Ashland, KY – a closed CSXT facility), and curtailed its weekly unit slab trains to one or two from Fairless, PA. NS has participated in the transportation of some of Duferco-Farrell's spot purchases (i.e. Weirton, WV; Bessemer, PA; Sparrows Point, MD; Indiana Harbor, IN, etc…) but Duferco-Farrell's main domestic

supplier is Ashland, KY. Moreover, NS overall per car revenue is significantly less due to the shorter line-haul moves. NS' second largest import slab consumer, AK Steel, has also resorted to purchasing a portion of its slab requirement from domestic sources due to increased slab price on import slab. Overall, once the price of import slab falls back to more historic price levels, NS is in a position to enjoy slab traffic more comparable to 2002 levels.

Domestic slab opportunities remain available; however, consolidation within the steel industry may threaten NS' inter-mill moves. In particular, the inter-mill moves of former Bethlehem Steel's facilities are subject to change. ISG's purchase of Bethlehem Steel and U.S. Steel's purchase of National Steel present both challenges and opportunities. It is too premature to know what are the actual plans of either of these two newly merged mega-integrated companies.

NS has the equipment capability to handle slab opportunities, both import and domestic. NS will leverage our equipment capacity, as well as our sales relationships, to secure opportunities as they arise.

## Competitive Analysis

Rail is the primary mode of transportation for this commodity, given the sheer volume of the orders; however, barge does present a viable alternative in some instances. CSXT is NS' main competitor. Given the overall depressed economy both NS and CSXT have the equipment available to participate in opportunities as they arise. Note: due to NS' ability to gain market share in I/S Scrap from CSXT, CSXT has even more available equipment and are pricing their services accordingly.

Improvements to the rail infrastructure at Novolog in Fairless, PA were completed in 2002; consequently, NS is positioned well to handle any resurgence in import slab as Novolog handles 55+% of the slab imported through the East Coast. Moreover, NS is working with SAA and Holt to improve the rail infrastructure at Holt, which handles 40+% of the slab imported through the East Coast. In addition, NS serves many other East Coast ports that are capable of handling import slab (i.e. Baltimore, MD; Morehead City, NC; etc…).

Finally, given NS' metals franchise, NS is in a strong position to compete for most inter-mill slab traffic, as well as spot purchases of domestic mills. In fact, during the 1st half of 2002, NS has enjoyed participating in slab shipments from eastern mills into Mexico through joint-line moves with UP.

## Marketing Strategy / Tactics

The following projects and initiatives will be used to increase business and maximize revenue for this commodity:

10. work closely with NAMs, AMs, and RAMs to become quickly aware of spot opportunities
11. upgrade Holt's facility to accommodate additional import slab
12. collaborate with Car Distribution to understand NS equipment supply, in order to price accordingly
13. work to secure renewal on current import slab contracts that don't expire until future dates
14. proactively create dialogue with ISG, U.S. Steel, AK Steel, Duferco-Farrell, etc… to become aware of spot purchase opportunities
15. execute contract with Global Steel Services for import slab to domestic slab processors, so that when import slab market rebounds NS is in position to handle competitive traffic
16. leverage NS' unit train group in Atlanta as a value added service
17. future slab car development for AK Steel
18. keep vigilant watch on market to respond to furnace outages, EPA regulations/requirements, etc…

**Business Plan: Dennis Vaughn Machinery 2003**

| Annual (12 Mo.) | Carloads | Gross NS Rev.X000 |
|---|---|---|
| 2001 Actual | 5,564 | 19,918 |
| 2002 Actual | 5,611 | 21,902 |
| 2003 (Budget) | 5,959 | 23,531 |
| 2003 (Actual / Projection) | 5,391 | 20,182 |
| 2003 Projection versus Budget Abs. | (568) | (3,349) |
| 2003 Projection versus Budget % | -9.53% | -14.23% |
| **Year-to-Date (Jan-May)** | **Carloads** | **Gross NS Rev.X000** |
| 2001 Actual | 2,546 | 8,647 |
| 2002 Actual | 2,384 | 9,702 |
| 2003 (Budget) | 2,390 | 9,002 |
| 2003 (Actual) | 2,101 | 6,548 |
| 2003 Actual versus Budget Abs. | (289) | (2,454) |
| 2003 Actual versus Budget % | -12.11% | -27.26% |

Market Overview:

- Electrical Machinery is down considerably this year after two years of high revenue moves.

- A lot of interest is being generated over the new windmill technology. I have quoted numerous rates for these units.

- Once our clearance is opened in and out of the Dundalk Marine Terminal, Baltimore, MD, work with Caterpillar, Deere, Case, etc. for import moves back to either Calumet Yard in Chicago, IL or the PPU in Peoria, IL for unloading and distribution to the midwest.

- Dominion Resources Project for pipe from NAPA Pipe in Rocktram, CA to four unloading sites on NS in West Virginia. This could amount to 1600 carloads.

- Appears we don't have anybody calling on Griffin Pipe in Lynchburg, VA, open to switch on the CSXT. Connie and I can make a call on them to see if we can capture some of their outbound pipe moves.

**Business Plan: Jim Eaton ALUMINUM 2003**

**2003 Goals (Revenue Budget):**

| Annual (12 Mo.) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 22,103 | 36,703 |
| 2002 Actual | 18,018 | 30,258 |
| 2003 (Budget) | 18,003 | 30,509 |
| 2003 (Actual / Projection) | 19,963 | 30,711 |
| 2003 Projection versus Budget Abs. | 1,960 | 202 |
| 2003 Projection versus Budget % | 10.88% | 0.66% |

| Year-to-Date (Jan-May) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 10,127 | 16,519 |
| 2002 Actual | 7,643 | 12,968 |
| 2003 (Budget) | 7,229 | 12,181 |
| 2003 (Actual) | 7,645 | 12,383 |
| 2003 Actual versus Budget Abs. | 416 | 202 |
| 2003 Actual versus Budget % | 5.75% | 1.66% |

**Performance Trends (2001-2003):**

2001 Actual Carloads/Revenue: 22,103/$36.7 million
2002 Actual Carloads/Revenue: 18,018/$30.2 million
2003 Year-to-date (06/09)Actual Carloads/Revenue: 7,997/$12.9 million (down 1.0% clds/5.6% rev)

**Market Overview**

Economic conditions for Aluminum are not expected to improve in 2003. Alcoa Inc reported losses for 3rd and 4th quarter 2002. The first such losses in over a decade. Intense scrutiny of costs will place marginal plants at risk for closing. Aluminum production appears to be moving out of the United States at a rapid pace. Canadian production is on the increase. (Alcoa will spend $1 billion in the next three years to refurbish its Deschambault, PQ smelter ) Imports, especially from Russia (aluminum) and Chile (copper) continue to rise at the expense of domestic production. As inventories remain high, aluminum prices are likely to remain low throughout 2003.

Aluminum sheet for the beverage can industry, STCC 33521, is the one bright spot in this otherwise weak market. Both Alcoa and Wise Alloys continue to place a strong emphasis on rail traffic in their respective operating strategies. Should Wise Alloys' and Alcoa's carload projections be realized we will struggle to supply cars. Bulkhead boxcars assigned to Alcoa continue to have a high bad-order rate. The Wise Alloys fleet is aging and inadequate. Also, damage persists in NS 469 series cars. CMU is working with NS Mechanical Dept to expedite repairs to bulkhead cars. In the meantime, a team has been formed to brainstorm a "car of the future" for aluminum canstock. The success of these efforts will determine whether we are able to increase this business in 2003. Failure in these efforts will have strong negative impact and risks. CSXT will take every advantage and opportunity to take this business away from NS.

NS carloads/revenue of copper cathode has declined considerably since the loss of the Essex Wire business at Arcola, IN and the Chapter 7 bankruptcy of Chemetco's Oldenburg, IL plant. Simultaneously, domestic production from the Southwestern U.S. has been slowed to a trickle. Imported cathode now dominates. The number of NS served plants receiving significant tonnage of copper has been reduced to Southwire's Carrollton, GA plant and Olin Corporation's Reuters, IL plant.

**Competitive Analysis**

Truck competition is intense for every commodity in this minor group. Since the majority of NS served customers in this market are producers of finished goods, we rely heavily on inbound raw material for revenue. Most of the raw material, i.e., ingot, t-bar, copper cathode, is either received from mines or smelters on the CN, BNSF, and UP are imported into Gulf or Atlantic ports. For example: Southwire Corporation is the largest manufacturer of copper wire, rod, and cable in the United States. Their plant in Carrollton, GA is served exclusively by NS. In 2002 Southwire began to source inbound copper cathode from the port of Panama City, FL. Cathode volumes from domestic producers such as Kennecott copper in Magna, UT and Asarco in Amarillo, TX decreased in proportion. Also, significant tonnage formerly imported through the port of New Orleans has been reduced proportionally. Since Panama City is a relatively short distance from Carrollton, truck competition is fierce. In summary, NS served producers of finished products are receiving imported raw material from ports located within short truck distance.

**Strategy/Tactics**

The following projects and initiatives will be used to increase business and maximize revenue in this minor group:

1. Work closely with NAMs, AMs, and RAMs to target non-ferrous customers and divert truck traffic to rail. Example: Hussey Copper in Leetsdale, PA; Cerro Copper in Belefonte, PA.
2. Aggressive Pricing targeting business currently moving via truck.
3. Improved equipment utilization at Alcoa.
4. Boxcar quality team working with CMU to expedite repairs to bulkhead boxcars
5. Universal boxcar development
6. Revitalize partnerships with UP, BNSF, CN and CPRS
7. Targeted advertising
8. Projects at Lancaster and Cressona, PA to increase rail sidings
9. Rate increases
10. Increase customer contacts through new territorial Sales reps

Jim Eaton, National Account Manager/Product Manager
**Business Plan: Jim Eaton Aluminum Ores**

**2003 Goals (Revenue Budget)**:

| Annual (12 Mo.) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 12,349 | 18,194 |
| 2002 Actual | 12,350 | 18,630 |
| 2003 (Budget) | 11,788 | 18,448 |
| 2003 (Actual / Projection) | 11,059 | 17,162 |
| 2003 Projection versus Budget Abs. | (729) | (1,286) |
| 2003 Projection versus Budget % | -7.00% | -6.91% |

| Year-to-Date (Jan-May) | Carloads | Gross NS Rev. |
|---|---|---|
| 2001 Actual | 4,988 | 7,146 |
| 2002 Actual | 5,622 | 8,296 |
| 2003 (Budget) | 4,974 | 7,740 |
| 2003 (Actual) | 4,620 | 7,048 |
| 2003 Actual versus Budget Abs. | -354 | -692 |
| 2003 Actual versus Budget % | -7.12% | -8.94% |

**Performance Trends (2000-2003)**: 2000 clds/rev – 12,384 /$17.2 mil; 2001 clds/rev – 12,349/$18.2 mil; 2002 clds/rev – 12,353/$18.64 mil; 2003 clds/rev (as of 06/09) – 4,880/$7.4 mil (down 17.0% clds/14% rev)

**Market Overview** There are two major commodities in this minor group: bauxite and alumina. Both are used in the manufacturing of aluminum as well as in the refractories industry. Alcoa is the largest shipper and consumer of alumina ore. However, the August 2002 closing of its Badin, NC smelter resulted in the loss of approximately 1,865 carloads and $2.3 million in system revenue. Also, in March 2003 Alcoa announced it would change the source of inbound alumina to its Alcoa, TN smelter from Charleston, SC to Point Comfort, TX. Though NS secured this business in a competitive bid, rate compression will produce significantly lower revenue than the NS Direct routing from Charleston, SC. Other major customers in this minor group are: C E Minerals,
General Chemical Corp, Kaiser Aluminum and Chemical, Bulk Materials Inc, and Sherwin Alumina.

As aluminum manufacturing continues to move from the US to Canada and overseas, this market will decline proportionately. NS's position is fragile.

**Competitive Overview** NS maintains almost 100% rail market share at plants jointly served by NS and CSXT. However, barge dominates several aluminum plants such as Alcoa's Warrick, IN plant and Wise Alloys' Listerhill, AL plant. C E Minerals' Andersonville, GA mine is a local station on NS, but truck competition for significant volume to the ports of Savannah and Mobile is an ever present threat. Product bagged in super sacks is most susceptible to truck competition due to damage issues and rail constraints in maximizing payload capacity of boxcars.

**Short-Term (2003) Strategies**

- Aggressive pricing to capture incremental business

- Target Sherwin Alumina to regain lost business
- Continue focus at C E Minerals' Andersonville plant
- Continue development of export business from port of Mobile to Mexico
- Work with Sales to target truck shipments; increase sales presence
- Market Bulk Transfer terminals

**Long-Term (2004-2006) Strategies**

- Build solid partnerships with CN, CPRS, BNSF, UP, KCS, TFM, FEC
- Team with Equipment Planning and Damage Prevention to market covered hopper fleet and boxcar option for bagged product
- Develop and execute sales campaign targeting Ore shippers/receivers
- Target Ormet Aluminum in Omal, Oh to divert barge to rail

# Intentionally Omitted

## DA06188-DA06193

# CORRECTED EXPERT REPORT
# OF
# GORDON RAUSSER, PH.D.

**In the matter of**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**USDC, District of Columbia, Case No. 1:07-mc-00489-PLF**

**Highly Confidential**
**Pursuant to Protective Order**

**May 27, 2010**

to the shipper. Switching charges may also be built into the rates the railroads charge to carry goods and therefore passed on to the affected shippers.[78]

There are several different types of business relationships that can exist between railroad carriers. In "joint-line" moves, one interline rate is applicable for the entire movement from rail origin to rail destination on two or more railroads, and the railroads agree among themselves as to what portion of the total revenue generated will go to each of the participants in the movement. This total revenue will include fuel surcharge revenue, which is also distributed between the railroads, usually in the same proportion as the base revenue.[79] The rate is published in a single tariff under concurrence of the participating railroads, and the rate includes all interchange charges unless otherwise noted.[80] In "Rule 11" interline shipments, the railroads each invoice the customer separately for their share of the interline move. The railroads regularly communicate with each other in order to achieve agreement on the rates and surcharges used in interline movements. These communications provided a platform for exchanging and monitoring pricing policies that involved shipments other than interline.

In sum, a history of regulation and the correspondence necessary for participants in the rail freight industry has built an institutional understanding and regimentation of pricing. This lowers the cost of collusion since the Defendants are well versed in the pricing of their service and can detect deviation from the conspiracy more easily.

### *G. Dramatic differences in behavior between the pre-Class Period and the Class Period*

The behavior of Defendants in the pre-conspiracy period was starkly different from that during the conspiracy. Prior to the Class Period, the Class I rail freight industry was *imperfectly*

---

[78] Consumers United for Rail Equity, "Glossary of Terms." http://www.railcure.org/resources/rail_glossary.asp.
[79] An interline shipment may be prepaid or collect. A prepaid shipment is one in which the amount of transportation and other charges are paid at the point of origin to the first rail carrier. A collect shipment is one in which the amount of transportation and other charges are paid at the point of termination to the final rail carrier.
[80] General Electric Company, GE Capital Rail Services, Glossary of Railroad Terminology, Definition for Joint-Line Move. http://www.ge.com/railservices/helpcenter/glossary.html.

competitive, but it *was* competitive. Economists use the term *perfect* competition to describe a market where there is such a multitude of firms that each firm is a price taker- i.e. they have no market power and must accept the going market price. Under these circumstances, each firm makes its production decision such that the cost of producing one more unit of output just equals the price that the firm will receive for that unit. Prices are equal to marginal cost. In the highly concentrated U.S. rail freight industry, *perfect* competition did not exist prior to the conspiracy. Instead each railroad had some influence over prices and could exert market power. The market was an interdependent oligopoly, and prices were above the perfect competition price, but below the monopoly price. Each railroad made its output and pricing decisions after trying to predict the decisions the other railroads would make (hence the oligopoly is said to be interdependent). The railroads were in competition with each other and each weighed the benefits of high prices with the costs of losing business to their competitors because of those high prices. Each railroad considered what price other railroads may be intending to charge, and acted according to this understanding.

However, without an actual agreement, the railroad oligopoly cannot turn itself into a monopoly and achieve the high monopoly prices the railroads may desire.[81] Each railroad has an economic incentive to undercut the others and win market share, and agreement and discipline are needed to overcome this incentive. Indeed, prior to the conspiracy the rail industry was highly competitive; as described by CSX's Mike Giftos there were "some very vicious historical price wars."[82] This uncoordinated and oligopolistic behavior typified the Defendants' pre-

[81] In BNSF's Risk Profile, from May 28, 2002, the executive team stated, "We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy." (BNSF-0574516-4624).
[82] Deposition of Mike Giftos, dated February 25, 2010 (hereafter "Giftos Deposition"), at 87:1-2.

conspiracy attitude to fuel surcharges, and stands in sharp contrast to their behavior during the Class Period.

### 1. During the pre-Class period, individual actions on fuel surcharges were not consistently implemented by all Defendants

Before 2000, fuel surcharges were virtually unheard of in the rail freight industry. Between 2000 and 2002, the Defendants independently implemented fuel surcharge programs. Effective October 25, 2000 the CSX started a limited fuel surcharge program.[83] NS also implemented its first fuel surcharge program in 2000.[84] The BNSF's original fuel surcharge program began in 2001 and on December 1, 2002, UP implemented its first standard fuel surcharge for carload business.[85] These original fuel surcharge programs were apparently designed and implemented by the individual Defendants without agreement or coordination. Indeed, the Defendants relied on a variety of fuel recovery programs, including fuel surcharge programs, in the period before July 2003.[86]

The Defendants' original fuel surcharges were applied inconsistently, in part because of the lack of coordination among the Defendants, and in part for other reasons, including the fact that the surcharges generally did not apply to contracts that incorporated the AAR's cost escalation index, the Unadjusted Rail Cost Adjustment Factor (RCAF-U) or some other cost-escalation index. As an alternative to fuel surcharges, many contracts included rate escalator provisions based on the RCAF or a similar index that captured the cost of escalating fuel bills, and the application of these indexes varied as well. CSX's Mike Giftos testified that during the

[83] The fuel surcharge was based on the WTI, with a trigger price of $28, and the index had to remain above $28 for 30 business days. CSXFSC000000358-363, at 359.
[84] Seale Deposition, at 51.
[85] The fuel surcharge was based on the WTI, with a trigger price of $28, and the index had to remain above $28 for 30 business days. The surcharge was applied in 2% increments for every $5 per barrel the WTI exceeded $28 per barrel.
[86] Seale Deposition, at 54-55.

pre-Class period, "it would not be unusual that our commercial organization would agree to exempt the first one percent increase or some small percent or agree to cap an increase irrespective of how RCAF may have performed."[87]

NS's Don Seale testified that in the months that NS's first fuel surcharge program was being implemented no discussions were held with other railroads about establishing an industry-wide fuel surcharge.[88] Mike Giftos, who was in charge of the fuel surcharge program at CSX, testified that he did not discuss his proposed fuel surcharge with any other railroads prior to implementation.[89] In seeking to impose their original surcharges, the Defendants encountered significant customer opposition, and in an environment in which there was no agreement among the Defendants with respect to fuel surcharges, the Defendants sought to compete with one another on the basis of their respective non-coordinated approaches to fuel surcharges.

In addition, fuel surcharges during the pre-Class period were not applied consistently to all contracts and were often modified or waived in favor of base rate increases. At BNSF, only a small number of price authorities were subject to the fuel surcharge because the "option" to apply the fuel surcharge was "put in the hands of individual marketing personnel."[90] Marketing personnel at NS were also given the authority to reduce or eliminate the fuel surcharge in contract negotiations.[91] In an email dated October 3, 2002, Bob M. Toy, a director at UP, states that the Industrial Products group's "strategy has been to avoid fuel surcharges and negotiate increases into our price."[92]

---

[87] Giftos Deposition, 49:16-20.
[88] Seale Deposition, 223.
[89] Giftos Deposition, 69-70.
[90] CSX000000270-271, 270.
[91] NS0010013399-400.
[92] UPFSC0042871-873.

The Defendants also waived fuel surcharge provisions to compete with one another. For example, in a bid for 2,800 carloads of business from a potential customer, BNSF and UP both offered as part of the incentive package contracts without fuel surcharge clauses.[93] In their attempt to apply their fuel surcharge, BNSF personnel noted that they faced difficulties and lost business because their competitor, "the UP [did] not use a fuel surcharge in the competitive marketplace."[94] Similarly, NS waived its fuel surcharge for certain customers in order to win business from CSX.[95]

**2. In the Class period, the use of fuel surcharges was coordinated and executed by all Defendants**

While the original fuel surcharge programs do not appear to have been preceded by substantive discussions among the Defendants, evidence common to the Class as a whole shows that, in 2003, the Defendants engaged in a series of discussions concerning revised fuel surcharge programs. These discussions apparently covered all aspects of fuel surcharge policy, and the Defendants explicitly discussed the desirability of an industry-standard approach to fuel surcharges – the very approach that they implemented as part of the conspiracy alleged in the Complaint. These discussions allowed the Defendants to implement coordinated fuel surcharges starting in the latter half of 2003, through which they were able to achieve significant increases in their revenue and profitability.

In March 2003, CSX announced a new fuel surcharge program that was based on the WTI. CSX initially faced such strong opposition to its program that Mike Giftos, the architect of the program, considered modifying it in various respects.[96] Shortly thereafter, in June 2003, UP

[93] UPFSC0033490-494.
[94] BNSF-0574516-4624.
[95] Giftos Deposition, 66-67.
[96] Giftos Deposition, 172:20-173.

began to use the same fuel surcharge program as the other western railroad (BNSF), with each railroad applying the same fuel surcharge percentages based on the HDF.[97] NS announced that it was adopting the CSX fuel surcharge program in January 2004, after preparing during the latter half of 2003.[98]

In December 2003, the four Defendants collaborated, through their industry trade group the AAR, to remove the fuel component from the AII and RCAF indices, creating the All Inclusive Index Less Fuel ("AIILF").[99] The RCAF had already accounted for fuel costs – although in a manner that the Defendants asserted was ineffective[100] – and thus made imposition of a fuel surcharge appear to be "double dipping." By removing the fuel component from the AII and RCAF, the new AIILF index facilitated Defendants' ability to apply their new fuel surcharge program to contracts (and other shipments) that had previously being linked to the RCAF index. Now the Defendants could apply the AIILF to escalate freight rates for non-fuel cost components,[101] while freely imposing the new (higher) fuel cost surcharges without subjecting themselves to customer complaints that the applicable price escalation formula already was designed to address rising fuel costs.

---

[97] Email correspondence re: Updated UP FSC effective 6/1/03, dated May 12, 2003 (BNSF_0342448-450, at 448); NS email correspondence re: Fuel Surcharge Update, dated May 16, 2003 (NS001000329-330); UP, "Carload Rate Based Standard HDF Fuel Surcharge." Available at: http://www.uprr.com/customers/surcharge/index_revenue.shtml.
[98] NS email correspondence re: Fuel Surcharge notes, dated July 23 through August 4, 2003 (NS010005138-142); NS email correspondence re: Fuel Surcharge Policy Review, dated November 4-9, 2003 (NS001000119-123); NS Email from Pat Glennon to NS personnel re: NS Fuel Surcharge Change 03/10/04, dated January 8, 2004 (NS013001654-1656).
[99] Meeting of AAR Board of Directors Agenda, dated December 11, 2003 (AAR-000164-166).
[100] From the evidence I have reviewed, it appears that Defendants' claim that the RCAF was ineffective to recover actual changes in fuel costs was merely a pretextual reason for adopting the AIILF and using fuel surcharges. Defendants' principal complaint appears to be the lag in adjusting the weighting of the cost inputs in the RCAF, but as UP's Mark Draper explained at his deposition, there were two solutions to this problem if the railroad genuinely wanted to address it: (1) the railroads could have worked with the STB to calculate the RCAF on a more frequent basis, or (2) any railroad could have calculated its own RCAF-like index and updated that as frequently as it wished. Draper Dep. at 119-127.
[101] "Started new railroad cost index, All-Inclusive Index less Fuel, in response to requests by railroads. (Makes it easier for railroads to use separate fuel-surcharges for rates.)" AAR-00370-388, at 380.

## VIII. CONCLUSION

I conclude, on the basis of evidence and economic analysis common to the class, that (a) the evidence and economic analysis applicable to the Class as a whole is consistent with Plaintiff's allegations that the Defendants engaged in a conspiracy to fix prices; (b) the Defendants' conduct had a common impact on the Class; and (c) a methodology utilizing accepted economic analysis can and does compute the damages sustained by the Class as a whole and by individual Class members. This analysis is, of course, subject to being refined and supplemented based on further discovery in the case.

May 27, 2010

Gordon Rausser

Gordon Rausser, Ph.D.

# EXPERT REPORT
# OF
# GORDON RAUSSER, PH.D.

**In the matter of**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**USDC, District of Columbia, Case No. 1:07-mc-00489-PLF**

**Highly Confidential**
**Pursuant to Protective Order**

**October 15, 2012**

## III. SUMMARY OF CONCLUSIONS

I have conducted many analyses, as presented in this report. The results of these analyses are distilled into four principal opinions. They are:

***Opinion #1—The U.S. rail freight industry is conducive to price fixing.***

- The rail freight industry in the U.S. is highly concentrated, with the four Defendants representing 94% of all rail freight revenue in the continental United States. This huge market share gave the Defendants' alleged cartel the ability to set prices in the market.

- The extremely high barriers to entry in the rail freight industry meant that the Defendants were not constrained by the threat of entry of new railroads or by network expansion from existing small railroads. Therefore, no such entry threat would operate to constrain price fixing actions taken by the Defendants.

- Defendants are engaged in the delivery of goods from origin to destination. This service is interchangeable across Defendants and, when choosing between railroads, customers based their choice on price, creating incentives for the railroads to fix those prices.

- Although there are undoubtedly different transport options for different shippers, depending on what they are shipping and where they are shipping it, the demand for the Defendants' rail freight service is in general inelastic. Therefore, high prices fixed through collusion could have benefited the Defendants.

- Defendants had many opportunities to communicate with one another on pricing issues and, particularly in light of the mechanism through which they allegedly conspired to raise prices, freight rates were well understood and the cartel members could

monitor each other's behavior easily. This eased the implementation and operation of the cartel.

- In sum, the features of the rail freight industry are such that the collusion was rational since the benefits outweighed the associated costs, unadjusted for the risk of antitrust liability. Defendants' own actions made price fixing easily implementable and effective, because the Fuel Surcharge was an especially effective mechanism for achieving and sustaining a conspiratorial rate increase in this industry.

***Opinion #2—The Defendants' behavior in the Class Period evidences collusion.***

- I understand that Plaintiffs contend that the documents produced by Defendants and others in this litigation and the deposition record show that Defendants entered into a collusive agreement beginning in 2003 to fix the prices of rail freight transportation services by coordinating the types of rail freight surcharges to be used, as well as the extent and nature of their application. Based on a review of the discovery record, I found that the evidence produced in discovery serves to support the allegations in the Complaint. My economic analysis, including but not limited to my analysis of Defendants' transactional data, supports the allegations that Defendants conspired to fix prices during the Class Period.

- The Defendants instigated a common rate increase, implementing Fuel Surcharges with identical or near identical features. Defendants each instigated Fuel Surcharges that: were applied as a percentage of the base freight rate; used one of two fuel indexes that are highly correlated with each other; had similar thresholds that determined for which values of those indexes Fuel Surcharges would be applied to customer shipments (the indexes remained above those thresholds throughout the Class

Period); and had effectively the same conversion rates. In furtherance of their agreement, Defendants: adopted policies to ensure their common goal of achieving 100% Fuel Surcharge coverage; created policies against negotiating Fuel Surcharges with customers; created policies against discounting base rates that would otherwise serve to offset the application of Fuel Surcharges; communicated with each other to coordinate the implementation of Fuel Surcharges; and engaged in other coordinated activities, such as the creation of a new non-fuel cost index (the AII-LF).

- There were dramatic differences in the behavior of the Defendants between the pre-Class Period and the Class Period, concerning the increased use of Fuel Surcharges and the Defendants' refusal to negotiate with shippers concerning those Fuel Surcharges. These differences are confirmed by my analysis of the Defendants' transaction data, which is consistent with the record evidence and which, in my opinion, supports Plaintiffs' allegations that Defendants conspired to raise prices through the mechanism of rate-based Fuel Surcharges.

- Defendants' transaction data reveal a structural break in the relationship between freight rates and fuel prices starting at the beginning of the Class Period. Such a break is consistent with the existence of collusive behavior in the Class Period, in contrast to prior non-collusive behavioral patterns. In the absence of an intervening event, such as an agreement among the Defendants as alleged by Plaintiffs, the historical relationship between freight rates and fuel prices would generally be expected to continue. It did not; the data instead show the existence of a statistically significant structural break in that relationship which is consistent with the record evidence of the alleged conspiracy.

- There was no economic correspondence between the Defendants' collusive Fuel Surcharges and actual fuel cost recovery. As Defendants themselves recognized, the features of Defendants' Fuel Surcharge programs increased revenues by more than the actual increase in fuel costs would justify. As disclosed by the discovery record, Defendants themselves viewed their agreed-upon Fuel Surcharges in the Class Period as a profit center. The imposition of Fuel Surcharges during the Class Period contributed to Defendants' reversal of a multi-year decline in rail freight rates.

- Instead of competing with each other, the Defendants ignored their own unilateral self-interest in order to pursue the common goals of the conspiracy.

***Opinion #3—Common evidence and economic analysis can be used to determine the impact of the Defendants' alleged conspiracy on Class Members.***

- Defendants' transaction data reveal that they effected a common rate increase across the Class through their use of Fuel Surcharges applied as a percentage of base rates. My analysis of the data supports the conclusion that Defendants conspired during the Class Period to increase overall freight rates through the mechanism of a rate-based Fuel Surcharge.

- Common factors such as shipment weight, distance, route and commodity type, among others, predominate over individual factors in the determination of freight rates. These common factors can be measured using the Defendants' transaction data and can be used in a common analysis to identify and quantify the harm experienced by the Class. I have performed the analysis necessary to measure these factors, and I have used them in analyses that are applicable to the Class as a whole and the individual named plaintiffs.

- Defendants' transaction data reveal that there was no material discounting of base rates to offset the Fuel Surcharges that were applied to shipments made by the Class. As a result, Class members commonly experienced overall price increases from the Defendants' actions irrespective of the commodity they were shipping or the route they were shipping along.

- The discovery record, the facts of the case, and my own industry analysis corroborate the findings of my investigation of the transaction data because:
  - The Defendants planned on and each implemented a program of Fuel Surcharges with the same key features.
  - The Defendants instigated coordinated Fuel Surcharge mechanisms well-suited for implementing a general price increase across their customers.
  - The Defendants intended that the Fuel Surcharge be applied to all customers and engaged in monitoring activities with the goal of achieving 100% coverage.
  - The Defendants' pretextual explanation of the Fuel Surcharge program – that it was intended to recover actual fuel costs – necessitated universal coverage and full application across all shippers, regardless of route and commodity shipped.
  - The industry regulator, the Surface Transportation Board ("STB"), ruled that the revenue based Fuel Surcharge program was unreasonable.

***Opinion #4—A common damage methodology works in this case and shows that freight rates were higher during the Class Period than could be explained by economic forces other than the alleged price-fixing conspiracy.***

- The Defendants' transaction data from the period before the start of the Class Period represent a reliable benchmark against which to compare the prices charged during the Class Period. During this benchmark period, Defendants, acting in a unilateral fashion and without the benefit of coordination, faced difficulties in forcing shippers to accept their original fuel surcharges due to competitive circumstances (and the existence of a prevalent and accepted cost escalation index) even though those fuel surcharges were triggered rarely and only at low levels. Defendants also recognized, in internal assessments, the competitive environment in which they operated in the pre-Class Period, and that their ability to successfully implement fuel surcharge policies that actually generated revenues was constrained.
- Defendant's transaction data and publicly available data sources are, together, sufficiently rich to account for the common factors that predominate in rail freight pricing and a regression model can therefore be used to quantify Class-wide damages.
- I have developed such a model using the transaction data as well as publicly available data sources, and the model results in an economically reasonable quantification of Class-wide damages.
- The damage analysis shows that Class members paid significantly higher prices to Defendants for rail freight transportation during the Class Period than before the Class Period and that these higher prices are not explainable by price determinants other than the conspiracy.

- The regression analysis on 100% of the relevant transactions yields a Class-wide overcharge of 13.6%, which can be applied to calculate Class-wide damages. Using this estimated overcharge, I find that Class-wide damages equal $11.6 billion.
- The same regression model can also be used to calculate damages suffered by individual Class members.

## IV. FACTORS CONDUCIVE TO PRICE FIXING IN THE U.S. RAIL FREIGHT INDUSTRY

The Plaintiffs allege that Defendants conspired to use coordinated and artificially high fuel surcharges as a means of raising railroad freight rates across the board, and thereby increasing their collective profits.[4] Rather than engage in competitive behavior, the Defendants are alleged to have collectively agreed to impose on their customers an industry-wide Fuel Surcharge program that set such charges at uniform levels and applied them as a percentage of the total base freight rate paid by each customer.[5]

Price-fixing is facilitated when the cartel and the industry in question have certain attributes, namely: (a) the cartel members have market power; (b) there is little threat of entry by non-cartel competitors; (c) their product or service is homogenous and interchangeable; (d) the demand for their product or service is relatively inelastic; and (e) the pricing of the product or service is well understood and easily communicated among industry participants. All of these factors are present in the rail freight industry in which the Defendants operate.

Beyond these economic factors that influence the ability to establish and maintain a price-fixing cartel, a cartel's success is enhanced by its selection of a mechanism for coordinated behavior that provides the ability to monitor, detect, and deter defections from agreed-upon

---

[4] Complaint, at ¶4.
[5] Complaint, at ¶88.

collusive strategies. The Defendants in this case chose a highly cost-efficient mechanism for collusion.

I have observed a number of characteristics of the U.S. rail freight industry that created a business environment conducive to price fixing. Similarly, I have analyzed the types of evidence potentially bearing on the particular suitability of a rate-based Fuel Surcharge as a means to pursue a generalized price increase in the rail freight industry and have observed a number of factors that make such a surcharge a particularly useful mechanism. The Class-wide evidence that I have reviewed and analyzed reveals the presence and operation of various economic forces and characteristics of the rail freight industry, as well as various actions of the Defendants themselves, that I find ensured the implementation and effectiveness of the alleged collusion.

### *A. Geographic and product scope of the inquiry*

At the outset of my analysis, it is important to identify the geographic and product scope that is relevant to this inquiry.

#### 1. Geographic

The Defendants collectively sold rail freight services throughout the United States. The four Defendants are responsible for the vast majority of shipments in every sizeable state in the U.S. as measured in ton-miles shipped. They have significant rail freight revenue in all states in the U.S., as shown in Table 1, which is based upon their own transaction data. Defendants shipped more than 91% of the 539 billion ton-miles reported shipped in Wyoming in 2007 by the U.S. Census.[6] Defendants shipped over 10 billion ton-miles originating in each of 31 states, between 2 and 10 billion ton-miles originating in each of the next 11 states. In fact, the Defendants' transaction dataset records slightly more ton-miles shipped in 2007 (1.54 trillion)

---

[6] Bureau of Transportation Statistics, 2007 Commodity Flow Survey, Geography Quick Reports: Wyoming, Table 3: Shipment Characteristics by Geography by Mode: 2007.

than the total ton-miles reported as shipped by all carriers in the U.S. Census statistics (1.344 trillion). This discrepancy is explained by the fact that the U.S. Census tends to under-report due to its reliance on survey data. The transaction dataset reveals that in every state in the U.S., except Hawaii and Alaska, there are at least two Defendants whose trains have departures from that state. Furthermore, through their interline shipments, all four Defendants are involved in shipments originating from every state, except Hawaii and Alaska.[7]

[7] Defendants' transaction data produced in this litigation.

**Table 1**

**Defendant Ton-Miles Shipped by Origin State from Transaction Data 2007**[8]

| Orig State Name | BNSF | CSX | NS | UP | Defendant Total |
|---|---|---|---|---|---|
| ALASKA | 2,557,451 | 180,287 | --- | 307,321 | 3,045,059 |
| ALABAMA | 5,337,522,760 | 9,435,813,218 | 6,888,802,079 | 547,560,457 | 22,209,698,515 |
| ARKANSAS | 3,672,515,427 | 676,738,408 | 813,686,451 | 9,660,598,261 | 14,823,538,547 |
| ARIZONA | 1,259,446,696 | 44,011,961 | 25,076,079 | 1,645,340,273 | 2,973,875,009 |
| CALIFORNIA | 60,297,788,727 | 1,363,507,342 | 4,478,167,107 | 51,909,378,806 | 118,048,841,982 |
| COLORADO | 5,448,257,431 | 1,897,769,128 | 924,802,414 | 29,072,937,867 | 37,343,766,840 |
| CONNECTICUT | 3,059,077 | 686,844,224 | 51,026,137 | 4,866,623 | 745,796,062 |
| DISTRICT OF COLUMBIA | --- | 145,725,251 | 1,110,846 | --- | 146,836,097 |
| DELAWARE | 82,176,747 | 121,958,440 | 559,387,422 | 143,301,287 | 906,823,895 |
| FLORIDA | 1,103,421,556 | 12,564,944,398 | 2,661,750,989 | 466,455,459 | 16,796,572,403 |
| GEORGIA | 2,562,797,885 | 6,431,411,258 | 7,705,524,219 | 2,264,253,895 | 18,963,987,257 |
| HAWAII | --- | --- | --- | --- | 0 |
| IOWA | 14,689,206,896 | 207,494,572 | 2,724,794,141 | 22,046,417,534 | 39,667,913,143 |
| IDAHO | 1,159,255,097 | 214,744,472 | 173,978,023 | 7,575,202,822 | 9,123,180,414 |
| ILLINOIS | 46,228,895,864 | 32,879,578,420 | 11,592,521,934 | 25,024,801,457 | 115,725,797,675 |
| INDIANA | 1,989,100,832 | 7,962,431,388 | 6,391,688,953 | 2,409,040,108 | 18,752,261,281 |
| KANSAS | 12,279,546,639 | 66,780,703 | 211,018,112 | 8,468,880,712 | 21,026,226,166 |
| KENTUCKY | 1,172,130,006 | 37,728,316,291 | 7,801,787,348 | 1,821,448,079 | 48,523,681,724 |
| LOUISIANA | 4,386,018,382 | 6,723,079,059 | 4,705,256,570 | 11,845,865,818 | 27,660,219,829 |
| MASSACHUSETTS | 366,533,415 | 1,713,096,271 | 325,295,660 | 407,586,272 | 2,812,511,618 |
| MARYLAND | 154,122,350 | 1,722,045,529 | 546,577,193 | 349,082,926 | 2,771,827,998 |
| MAINE | 156,295,114 | 666,324,697 | 346,222,454 | 13,325,239 | 1,182,167,505 |
| MICHIGAN | 1,563,941,635 | 5,295,845,915 | 3,522,884,210 | 4,041,773,118 | 14,424,444,879 |
| MINNESOTA | 31,299,483,435 | 359,871,247 | 1,190,382,776 | 11,042,856,342 | 43,892,593,800 |
| MISSOURI | 3,961,905,656 | 543,896,684 | 2,468,352,366 | 4,638,363,578 | 11,612,518,284 |
| MISSISSIPPI | 1,031,299,395 | 1,643,238,501 | 1,015,080,118 | 396,980,850 | 4,086,598,864 |
| MONTANA | 41,127,394,008 | 217,596,914 | 116,805,557 | 593,814,622 | 42,055,611,101 |
| NORTH CAROLINA | 657,746,935 | 5,250,940,871 | 2,207,265,030 | 900,962,847 | 9,016,915,684 |
| NORTH DAKOTA | 20,125,134,062 | 50,689,825 | 638,645,329 | 253,971,615 | 21,068,440,832 |
| NEBRASKA | 16,105,379,862 | 23,359,597 | 404,983,274 | 18,716,271,912 | 35,249,994,645 |
| NEW HAMPSHIRE | 723,123 | 6,207,083 | 311,609 | 38,976 | 7,280,791 |
| NEW JERSEY | 1,912,945,289 | 5,183,933,813 | 2,809,478,203 | 1,262,816,021 | 11,169,173,327 |
| NEW MEXICO | 4,893,820,374 | 242,341,148 | 56,996,241 | 104,144,163 | 5,297,301,926 |

| Orig State Name | BNSF | CSX | NS | UP | Defendant Total |
|---|---|---|---|---|---|
| NEVADA | 218,317,631 | 23,134,949 | 45,836,485 | 1,870,189,713 | 2,157,478,778 |
| NEW YORK | 322,678,401 | 3,568,242,861 | 972,569,632 | 423,667,141 | 5,287,158,034 |
| OHIO | 4,540,430,712 | 12,498,888,363 | 8,741,432,717 | 3,482,520,889 | 29,263,272,681 |
| OKLAHOMA | 7,330,384,956 | 419,107,578 | 307,956,168 | 2,094,520,147 | 10,151,968,849 |
| OREGON | 4,698,898,514 | 197,302,529 | 521,458,795 | 15,279,206,691 | 20,696,866,530 |
| PENNSYLVANIA | 2,120,406,249 | 9,049,271,188 | 12,362,377,687 | 591,968,585 | 24,124,023,709 |
| RHODE ISLAND | 1,708,884 | 91,619,771 | 668,282 | 92,984 | 94,089,921 |
| SOUTH CAROLINA | 466,291,037 | 5,590,043,865 | 2,233,848,606 | 98,510,140 | 8,388,693,649 |
| SOUTH DAKOTA | 14,689,000,871 | 207,790,260 | 517,456,503 | 307,324,534 | 15,721,572,168 |
| TENNESSEE | 4,513,903,481 | 5,417,398,257 | 2,961,510,453 | 1,319,140,155 | 14,211,952,346 |
| TEXAS | 33,895,376,797 | 4,772,982,754 | 5,753,875,681 | 45,761,655,194 | 90,183,890,425 |
| UTAH | 1,376,217,661 | 51,218,429 | 176,146,013 | 14,180,968,023 | 15,784,550,126 |
| VIRGINIA | 926,487,656 | 3,958,725,651 | 11,116,697,976 | 214,021,857 | 16,215,933,140 |
| VERMONT | 4,397,782 | 217,933,625 | 50,450,520 | 1,572,394 | 274,354,321 |
| WASHINGTON | 22,940,812,457 | 444,790,334 | 1,145,622,523 | 11,476,416,979 | 36,007,642,292 |
| WISCONSIN | 2,130,357,490 | 453,934,594 | 611,774,255 | 2,103,735,773 | 5,299,802,112 |
| WEST VIRGINIA | 107,845,255 | 30,425,564,161 | 13,690,221,477 | 116,296,475 | 44,339,927,368 |
| WYOMING | 253,068,641,434 | 3,022,238,906 | 13,055,348,168 | 219,389,028,563 | 488,535,257,071 |
| **ALL STATES** | **638,382,579,392** | **222,480,904,992** | **147,624,910,789** | **536,339,481,497** | **1,544,827,876,670** |

[8] Defendants' transaction data produced in this litigation.

The pervasiveness of Defendants' combined presence throughout the U.S. is clear from Figure 2, which shows the rail network for all Class I railroads in North America in 2006.[9] It is clear that the four Defendants (BNSF, UP, CSX, and NS) provided rail services throughout the U.S. It is also clear that there is much overlap of the Defendants' rail networks, which would ensure that, absent the conspiracy, railroad customers would benefit from competition between the railroads. The Defendants' network of railroads overlaps significantly. Of the 170 BEA regions in which the Defendants operate, 111 BEA regions have at least two Defendants who each account for more than 15% of gross revenue generated by traffic in the region. Only 8% of gross revenue generated by the four Defendants comes from BEA regions in which one Defendant represents the lion's share of the region's traffic (i.e. more than 90% of the region's traffic by revenue).

**Figure 2**
**Network Map – Class I Railroads 2006**




[9] Included in this figure are the seven Class I railroads in the U.S. – the four Defendants, plus Canadian Pacific's Soo Line, Kansas City S and Canadian National. Also included is the Mexican railroad Ferrocarril Mexicano.

There are remote regions through which the tracks of only one railroad run, particularly in regions in the Western half of the country. For example, as illustrated in Figure 2, the states Montana, North Dakota, and South Dakota have almost exclusively BNSF tracks (the green lines), whereas Nevada and Utah have almost exclusively UP tracks (the red lines). BNSF is responsible for the vast majority of the Defendants' ton-miles originating in Montana, North Dakota, and South Dakota.[10] UP is responsible for most of the Defendants' ton-miles originating in Nevada and Utah.

Any suggestion that customers in such regions might not have experienced the full benefits of competition between railroads even before the conspiracy misses the point of the alleged conspiracy, which was to apply Fuel Surcharges to all customers regardless of region. The evidence shows that this is what Defendants did. In addition, the extent to which prices differ across geographic regions is a factor accounted for in the analysis discussed in later portions of this report.

There are reasons specific to the Defendants' use of the Fuel Surcharge mechanism that would also have caused their anti-competitive conduct to impact both areas of the rail network where there were overlapping railroads, and areas of the rail network where there was only one railroad. Defendants had every incentive to present – and in fact did present – their Fuel Surcharge program as a cost-recovery mechanism, rather than as a mechanism for extracting higher prices.[11] Defendants' ability to present Fuel Surcharges in this manner would have been

---

[10] Defendants' transaction data produced in this litigation.

[11] *See, e.g.*, Ex Parte No. 661, Transcript of STB Hearing, dated May 11, 2006 ("STB Tr."), at 258, 261, 274 ("fuel surcharge is clearly not a profit center at BNSF"); *id*. at 301 (CSXT spokesman saying its fuel surcharge program "has not been a profit center for us"); *id.* at 314-317 (NS spokesman saying there had been no over-recovery through its fuel surcharge program during the last six years, assuring the STB that NS "continue[s] to work on that"); *id.* at 325-26 (UP spokesman: "[t]he bottom line, Union Pacific isn't in the business of trying to make money from its fuel surcharge program"); Written Statement of CSX, STB Ex Parte No. 661, Filing No. 216397, dated April 27, 2006, at 6-7 (discussing increase in fuel expenses paid by CSX and stating that CSX's "fuel surcharge program is designed to recover this astounding increase in its costs for fuel"); Comments of BNSF, STB Ex Parte No. 661, Filing No.

significantly undermined if they had charged different Fuel Surcharges in one part of the country than in other parts, or if they had charged certain customers higher Fuel Surcharges than other customers, based on some assessment of a professed absence of competitive factors. As a result, there is no evidence that, during the Class Period, Defendants sought to apply Fuel Surcharges discriminatorily in regions that lacked overlapping railroads or on customers that were served by only one railroad. To the contrary, there is considerable evidence from the transaction data (presented later in this section) that Defendants applied their Fuel Surcharges uniformly, without regard to whether there were overlapping railroads serving a particular region or a particular customer. The record evidences that they did so in line with policy decisions taken by Defendants' top management.

Moreover, there are four primary reasons that competition in areas of the rail network that have overlapping railroads affects prices paid in regions where there is only one railroad. The first is that customers have a choice over which routes to run shipments. A customer may choose between shipping along competitive routes and shipping along less competitive routes. Because customers will tend towards low price competitive routes, the effect of competition along those routes has a containing effect on prices in the less competitive regions. This overspill effect implies that no region is isolated from competition.

A second reason that competition is pervasive is the opportunity cost a railroad faces when investing in regions where prices are low relative to regions where prices are high. A railroad that operates in a remote region as well as in a region where other railroads drive prices down will have an incentive to divert its own resources (*i.e.*, locomotives and cars) from the

217709, dated Oct. 2, 2006, at 5 (providing that "BNSF is committed to recovering its increased costs of fuel through fuel surcharges and not to over-collect."); Comments of Union Pacific Railroads, STB Ex Parte No. 661, Filing No. 217707, dated Oct. 2, 2006, at 4 ("UP's [fuel surcharge] is NOT a profit center. It never has been a profit center. It was never intended to be a profit center. It was and is intended to be an efficient way of recouping rapidly changing fuel costs.").

**Figure 3**
**Percent of Revenue with a Fuel Surcharge for each Defendant by State[18]**




In sum, Defendants sold rail freight services throughout the U.S., and customers within that market commonly experienced the effects of competition between Defendants before the conspiracy. As a result, customers in all geographic regions would be exposed to paying supra-competitive prices due to the alleged conspiracy.

### 2. Product

The academic literature is unequivocal that the form of transport services purchased by shippers depends upon the particular commodity being shipped. This leads railroads to price differently across commodities, charging higher prices to shippers with less viable transport

---

[18] Defendants' transaction data produced in this litigation.

alternatives on offer. My analysis in Section VI.C.4 shows that this price discrimination was a natural characteristic of the rail freight industry that occurred similarly both before the conspiracy and during the conspiracy. As discussed later in this Report, a common Class-wide damage methodology can account for this price discrimination.

The fact that viable transport substitutes are different for different commodities is consistent with basic economic principles. Clearly, goods that are light weight and typically delivered in small quantities, such as farm produce, can be shipped by truck. By contrast, goods that are heavy and tend to be delivered in large quantities, such as coal deliveries to power plants, can only be economically delivered by rail. Furthermore, some goods can be delivered by water barge and there is significant transportation by this mode in regions that have large enough waterways, such as around the Mississippi River and around the Great Lakes.[19]

Every five years, the U.S. Census Bureau gathers data, through surveys, on the ton-miles shipped for different commodities. Figure 4 presents the proportion of ton-miles shipped in 2002 by different transport modes for each commodity.[20]

---

[19] The American Waterways Operators, "Facts About the American Tugboat, Towboat and Barge Industry." Available at http://www.americanwaterways.com/industry_stats/facts_about_ind/factsabout.pdf; Meyer, S., "Grain Transportation and Marketing Channels," Food and Agricultural Policy Research Institute, FAPRI-UMC Briefing Paper #04-04, dated June 2004. Available at http://www.fapri.missouri.edu/outreach/publications/2004/FAPRI_UMC_Briefing_Paper_04_04.pdf; Marathon, N., VanWechel, T., and Vachal, K., *Transportation of U.S. Grains: A Modal Share Analysis, 1978-2004,* United States Department of Agriculture, Transportation Services Branch, dated October 2006. Available at http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELDEV3020131.

[20] The U.S. Census uses the SCTG commodity grouping at the two-digit level. There is not a direct correspondence between the SCTG classification system and the STCC classification system used by the Defendants, although an approximate mapping is available.

**Figure 4**
**Commodity Shipments, by Mode of Transport 2002 – All Distances[21]**




The first bar shows the proportion of shipments transported by each of the different modes across all commodities. Blue represents rail, red represents truck, dark green represents water barge. There are categories for other transport modes including dual modes such as truck or rail and truck and water, although these dual modes represent a small proportion of shipments in terms of ton-miles shipped. As the first bar reveals, around 40% of all ton-miles shipped in 2002 were by rail, with a further 40% shipped by truck and just under 10% shipped by water barge.

The second bar shows the transport modes used for non-agglomerated bituminous coal (the Census records 686 billion ton-miles of this commodity shipped in 2002). Coal is a heavy

[21] Source: U.S. Department of Transportation, Research and Innovative Technology Administration, Bureau of Transportation Statistics and U.S. Census Bureau, 2002 Commodity Flow Survey.

commodity relative to its value and is shipped in bulk.[22] As expected, given these characteristics, it is shipped almost entirely by rail. The third bar shows the modes used to ship cereal grains. Again, this commodity is predominately shipped by rail, with its second choice transport mode being water barge, which is also suitable for bulk shipments.[23] Revising the various commodities in Figure 4, it becomes apparent that heavy, bulky, or hazardous commodities (*e.g.*, chemicals, minerals, wood products, waste and scrap, and fertilizer) are shipped much more by rail than lighter, high value commodities such as food products, textiles and furniture, which are shipped largely by truck.

This general pattern is confirmed in the academic literature. For instance, academic studies find that traffic for high-value, low-weight commodities such as vegetables and fruit is dominated by trucks, particularly for short distance movements. For these types of commodities, rail becomes more attractive for longer distance shipments and there is competition between rail and truck for medium- and long-haul distances. For low-value, high-weight commodities, such as coal and grain, truck is only viable for short-haul traffic; the medium- and long-haul traffic is dominated by rail.[24]

The literature finds that for commodities where transport represents a large part of the product cost process freight demand tends to be more elastic.[25,26] However, these commodities

[22] Bureau of Transportation Statistics, "Growth in the Nation's Freight Shipments – Highlights," Available at: http://www.bts.gov/publications/freight_shipments_in_america/html/entire.html.
[23] The American Waterways Operators, "Facts About the American Tugboat, Towboat and Barge Industry." Available at http://www.americanwaterways.com/industry_stats/facts_about_ind/factsabout.pdf; Meyer, S., "Grain Transportation and Marketing Channels," Food and Agricultural Policy Research Institute, FAPRI-UMC Briefing Paper #04-04, dated June 2004. Available at http://www.fapri.missouri.edu/outreach/publications/2004/FAPRI_UMC_Briefing_Paper_04_04.pdf; Pittman, R.W., "Railroads and Competition: The SantaFe/Southern Pacific Merger Proposal," *The Journal of Industrial Economics*, 39.1 (September 1990), at 25-46.
[24] Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," *The Bell Journal of Economics*, 10.2 (Autumn 1979): 463-482; Pittman, R.W., "Railroads and Competition: The Santa Fe/Southern Pacific Merger Proposal," *The Journal of Industrial Economics*, 39.1 (September 1990): 25-46.
[25] Elasticity of demand is the percentage change in quantity demanded in response to a change in price. When a one percent increase in price causes a less than one percent decline in quantity demanded and therefore total revenue

are more likely to be shipped by rail than truck, because rail is more cost efficient than truck. Studies that investigate both modes of transport find that for these commodities where the shipper is very sensitive to freight rates, such as chemicals and fuel oil, rail dominates for all shipment distances except short distances.[27] Because the relevant transport substitutes are different across commodity groupings, the railroads *price discriminate*. That is, they charge the shippers of different commodities different prices because some shippers have no option but to ship by rail, while others do have options. All else equal, shippers without other transport options will be charged higher rates than other shippers.[28]

The literature also finds that as distance increases the elasticity of demand for rail decreases, whereas that for truck increases.[29] Rail is generally more cost efficient than truck and, due to decreasing marginal costs with respect to distance in rail transport, this cost efficiency advantage becomes more pronounced with distance. This observation that rail is preferred over truck for greater distances is confirmed by the U.S. Census data which breaks down ton-miles shipped by the distance traveled. Across all commodities, the rail share of ton-miles shipped increases from 40% for all distances to approximately 45% for distances greater than 500 miles.[30]

---

rises, demand is said to be inelastic. When a one percent increase in price causes a more than one percent decrease in quantity demanded and therefore total revenue declines, demand is said to be elastic. *See* Posner, R.A., *Antitrust Law* (2nd ed. 2001), at 11-12.

[26] Winston, C., "A Disaggregate Model of the Demand for Intercity Freight Transportation," *Econometrica*, 49 (1981): 981-1006, at 996.

[27] Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," *The Bell Journal of Economics*, 10.2 (Autumn 1979): 463-482.

[28] United States Government Accountability Office, *Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed*, GAO-07-94, dated October 2006 (hereafter "GAO Report"), at p. 8; Garrod, P.W., and Miklius, W., "'Captive Shippers and the Success of Railroads in Capturing Monopoly Rent," *Journal of Law and Economics*, 30.2 (Oct., 1987): 423-442.

[29] Zlatoper, T. and Austrian, Z. "Freight Transportation Demand: A Survey of Recent Econometric Studies," *Transportation*, 16 (1989): 27-46.

[30] Source: U.S. Department of Transportation, Research and Innovative Technology Administration, Bureau of Transportation Statistics and U.S. Census Bureau, 2002 Commodity Flow Survey.

shipments also facilitates coordination and price monitoring beyond the scope of particular rail shipments. As participants in a network industry, railroad companies have long cooperated with one another to link their systems, coordinate operations, and standardize equipment and procedures in order to achieve efficiency.[81] Furthermore, because railroads are largely used for long-haul shipments, many rail shipments travel on multiple railroads in what are generally described as "interline" shipments. Such interline traffic involves collaboration between the railroads to develop joint-line rates and customer-servicing technology.[82]

Organizational issues can hinder cartel formation or undermine the stability of a cartel because it may be difficult to "set-up" a cartel and design effective monitoring mechanisms.[83] Such organizational costs for the railroad industry are low due to the institutional structure of the rail freight industry.

Class I railroads have obligations imposed by federal law and enforced by the STB to provide facilities for interchanging rail cars with connecting lines.[84] Shipments that traverse the U.S. are most often interlined between railroads and there are several major gateways linking the east to the west: for example, Chicago, St. Louis, Memphis, and New Orleans. Interline traffic represents roughly one-third of all rail freight revenue.[85] The Defendants' transaction data reveal that around 40% of BNSF unregulated shipments are interlined, just over 36% of CSX shipments

---

[81] Joskow, P.L., and Noll, R.G., "The Bell Doctrine: Applications in Telecommunications, Electricity, and Other Network Industries," *Stanford Law Review*, 51.5 (May, 1999): 1249-1315, at 1251.

[82] *See* CSXFSC000139170 ("The industry environment is more conducive to carrier cooperation . . . increased interline traffic mix and dependency.") BNSF News Release, "New Quicker Interline Pricing Method Available at BNSF.com," dated March 22, 2005. Available at https://www.bnsf.com/media/news/articles/2005/03/2005_03_22a.html; CSX News Release, "Interline Prices Now Available on CSX.com." Available at http://investors.csx.com/phoenix.zhtml?c=92932&p=irol-newsArticle&ID=1010843&highlight=.

[83] Levenstein and Suslow, at 44, 48.

[84] Whiteside, Terry, "Interchange Between Shortline and Major Carriers in U.S.," dated January 2009. Available at http://www.mdt.mt.gov/business/rscc/docs/shortline_interchange.pdf; Deposition of Michael Giftos, dated February 25, 2010 (hereafter "Giftos Deposition"), at 72:17-73:3.

[85] U.S. General Accounting Office, *Railroad Regulation: Changes in Railroad Rates and Service Quality Since 1990*, Report to Congressional Requesters, GAO/RCED-99-93 (April 1999), at p. 76.

are interlined and 34% of NS shipments are interlined. From 2000 through 2008, 48% of UP's traffic was interlined.[86]

The switching of cars from one Class I railroad to another is usually performed by the railroads themselves. Switching charges are usually absorbed by the railroad gaining access through the switch. However, that portion of the charge not absorbed may be explicitly charged to the shipper. Switching charges may also be built into the rates the railroads charge to carry goods and therefore passed on to the affected shippers.[87]

There are several different types of business relationships that can exist between railroad carriers. In "joint-line" interline moves, one joint-line rate is applicable for the entire movement from rail origin to rail destination on two or more railroads, and the railroads agree among themselves as to what portion of the total revenue generated will go to each of the participants in the movement. This total revenue will include Fuel Surcharge revenue, which is also distributed between the railroads, usually in the same proportion as the base revenue.[88] The joint-line rate is published in a single tariff or a joint-line rate contract with the concurrence of the participating railroads, and the joint-line rate includes all interchange charges unless otherwise noted.[89] In non-joint-line interline shipments, known as "Rule 11" interline shipments, the railroads each invoice the customer separately for their share of the interline move.

---

[86] Defendants' transaction data produced in this litigation.

[87] Consumers United for Rail Equity, "Glossary of Terms." Available at http://www.railcure.org/resources/rail_glossary.asp.

[88] A joint rate shipment may be prepaid or collect. A prepaid shipment is one in which the amount of transportation and other charges are paid at the point of origin to the first rail carrier. A collect shipment is one in which the amount of transportation and other charges are paid at the point of termination to the final rail carrier. In 2001 Defendants, through the AAR, adopted "Best Practices for Processing Fuel Surcharge." *See* Rule 30(b)(6) deposition of the AAR, February 2, 2011 ("AAR Deposition"), Ex. F (at UPFSC-A 0449396), Ex. M. Under the best practices, "it was agreed that fuel surcharges should be divided between the participating carriers at the same division of the line haul freight revenue proportions, in the absence of bilateral agreements" and established that a carrier could implement a "unilateral fuel surcharge" without seeking or receiving concurrence from the participating carrier on a joint line shipment. *Id.*, Ex. M; AAR Deposition at 176, 179-180.

[89] General Electric Company, GE Capital Rail Services, Glossary of Railroad Terminology, Definition for Joint-Line Move. Available at http://www.ge.com/railservices/helpcenter/glossary.html.

was pick up the Wall Street Journal, note that month's value for West Texas Intermediate crude or another underlying index and price freight accordingly, with the knowledge that the other railroads were doing the same. Furthermore, the resulting percentage increases were published on each Defendant's website, which provided a ready means to facilitate coordination and detect deviation from the collusive Fuel Surcharge agreement.

*Fourth*, using Fuel Surcharges ostensibly intended to offset fuel cost increases as a means to extract a price increase is much easier than raising prices across the board by adjusting base rates. This is because, among other reasons, there was a long history in the rail industry of price escalation based on cost increases, including fuel cost increases. Thus, before the Class Period, the Defendants had historically used price escalation indexes in an uncoordinated fashion. In past rail freight transportation agreements, these indexes typically included rate escalation provisions based on an index called the Railroad Cost Adjustment Factor ("RCAF"), which was based on the All Inclusive Index of Railroad Cost Inputs ("AII"), both of which were published by the AAR.[91] The RCAF was created in response to a requirement in the Staggers Act that a quarterly cost-recovery index be established as "a neutral and authoritative benchmark for inflation-based escalation of rates during the life of the contract."[92] This index played an important role in the contractual relationships between shippers and carriers – particularly long-term contracts – because the Staggers Act permitted railroads to change their rates without

---

cartels in industries with fuller reporting on prices are not statistically significantly higher than for cartels in other industries. *Id*. at 377.

[91] The RCAF comes in two versions. The first is the RCAF-Unadjusted ("RCAF-U"), which is calculated by the AAR each quarter and submitted to the STB for approval. The RCAF-U measures the rate of inflation of railroad inputs and is derived using the All-Inclusive Index ("AII"). The AII is comprised of seven component indexes that are based on freight operating expense data supplied by the Class I railroads in their annual reports: Labor, Fuel, Materials and Supplies, Equipment Rents, Depreciation, Interest, and Other Expenses. The second version of the RCAF is the RCAF-Adjusted ("RCAF-A") and is derived by modifying the RCAF to adjust for changes in railroad productivity.

[92] ICC Termination Act of 1995, House of Representatives, Conference Report, dated December 18, 1995, Section 10708, at 174. Available at www.gpo.gov/fdsys/pkg/CRPT-104hrpt422.pdf.

challenge in accordance with the RCAF.[93] The use of the RCAF index to increase prices in response to, for example, rising fuel costs was well understood by both the Defendants and their customers. Defendants had the ability to agree upon and implement a conspiracy around the use of the HDF and WTI indexes.[94] In addition, as discussed below, Defendants framed the use of Fuel Surcharges in terms of cost recovery - *See* Section VI.B.3.[95]

## V. DEFENDANTS' CLASS PERIOD BEHAVIOR EVIDENCES COLLUSION

I have investigated the extent to which the Defendants engaged in the type of conduct that economists expect in connection with a price-fixing conspiracy.

The Defendants' alleged Fuel Surcharge conspiracy was launched in the first half of 2003. There is common economic evidence that supports the alleged joint instigation by Defendants of very similar Fuel Surcharge programs using common indexes and thresholds. The four Defendants collectively removed the fuel component from the AII and RCAF indices, creating the All Inclusive Index Less Fuel ("AIILF") in December 2003. This new index enabled Defendants to apply more broadly their new Fuel Surcharge program to contracts that had previously being linked to the RCAF index, while the AIILF would escalate freight rates for non-fuel cost components.[96] These events were preceded by numerous and detailed discussions among Defendants concerning the adoption and application of new Fuel Surcharge programs. The record of these discussions is very revealing about the motivations behind the program, and

---

[93] United States General Accounting Office, *Railroad Regulation: Changes in Freight Railroad Rates from 1997 through 2000,* Report to the Chairman, Committee on Transportation and Infrastructure, House of Representatives (June 2002), at 4; AAR, "Rail Cost Indexes." Available at http://www.aar.org/Resources/RailCostIndexes.aspx; House of Representatives, Conference Report, dated December 18, 1995. Available at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=104_cong_reports&docid=f:hr422.104.pdf.

[94] Alternatively the Defendants could have sought to achieve the same objective by fixing each individual price separately. That would have been extremely complex, very costly, and effectively unmanageable.

[95] As described in the next section, the Defendants collectively created a new cost escalation index that reflected non-fuel costs, in order to facilitate the broad application of Fuel Surcharges as a stand-alone freight escalation item on shipments.

[96] "Started new railroad cost index, All-Inclusive Index less Fuel, in response to requests by railroads. (Makes it easier for railroads to use separate fuel-surcharges for rates. . . .)" AAR-00370-88, at 80.

the Defendants' concerns about how the program would be perceived by their customers. Moreover, the Fuel Surcharge mechanism by its design increased prices above those which would have been paid absent the conspiracy, and certainly did not proportionately reflect the effect of rising fuel prices on railroad costs, as Defendants claim. Furthermore, there is convincing evidence in the record that the Defendants ignored their own unilateral self-interest in pursuit of the goals of the conspiracy.

### *A. Dramatic differences in behavior between the pre-Class Period and the Class Period*

The behavior of Defendants in the pre-conspiracy period was starkly different from that during the conspiracy. Before the Class Period, the Class I rail freight industry was *imperfectly* competitive, but it *was* competitive. Economists use the term *perfect* competition to describe a market where there is such a multitude of firms that each firm is a price taker – *i.e.*, they have no market power and must accept the going market price. Under these circumstances, each firm makes its production decision such that the cost of producing one more unit of output just equals the price that the firm will receive for that unit. Prices are equal to marginal cost.[97] In the highly concentrated U.S. rail freight industry, *perfect* competition did not exist prior to the conspiracy. Instead each railroad had some influence over prices and could exert market power. The market was an interdependent oligopoly, and prices were above the perfect competition price, but generally below the monopoly price. Each railroad made its output and pricing decisions after trying to predict the decisions the other railroads would make (hence the oligopoly is said to be interdependent). The railroads were in competition with each other and each weighed the benefits of high prices with the costs of losing business to their competitors because of those

[97] With marginal costs that increase with units of quantity, a company will produce units until marginal costs just equal price and it can make no profit on further units, as costs increase further.

high prices. Each railroad considered what price other railroads may be intending to charge, and acted according to these expectations.

However, without an actual agreement, the railroad oligopoly cannot turn itself into a monopoly and achieve high monopoly prices. Depending on the residual demand it faces, each railroad generally has an economic incentive to undercut the others and win market share, and agreement and discipline are needed to overcome this incentive. Indeed, prior to the conspiracy the rail industry was highly competitive; as described by CSX's Mike Giftos there were "some very vicious historical price wars."[98] According to a study conducted by the STB of historical rates in the rail freight industry, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004."[99] As BNSF set forth in a 2002 risk assessment document:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy.[100]

This uncoordinated, oligopolistic behavior typified the Defendants' pre-conspiracy attitude to Fuel Surcharges, and stands in sharp contrast to their behavior during the Class Period.

---

[98] Giftos Deposition, at 87:1-2. *See also* CSXFSC000327518-19, at 18 (Feb. 22, 2000 CSX email noting that it "[d]oesn't look like a lot of opportunity to push our prices" due to competition); UPFSC 0016299, at 300 ("Steve works with Kreigh Valkenaar from the BNSF. Kreigh's exact words regarding our rates were, 'The BN is kicking the UP's ass'. He told Steve they are going after all of our business."); UPFSC 0277088 (discussing "the intense BNSF competition in several high volume market segments.")
[99] Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of Railroad Rates: 1985-2007* (Jan. 16, 2009).
[100] BNSF-0574516-24_018, at 531.

### 1. During the pre-Class Period, unilateral imposition of fuel surcharges failed – fuel surcharges were used sporadically and were not consistently implemented by the Defendants

Prior to the Class Period, Defendants, acting in a unilateral fashion and without benefit of coordination, faced difficulties in forcing shippers to accept their original fuel surcharges due to competitive circumstances (and the existence of a prevalent and accepted cost escalation index) even though those fuel surcharges were rarely triggered and, even then, only increased rates by small amounts.

Before 2000, fuel surcharges were virtually unheard of in the rail freight industry. Between 2000 and 2002, the Defendants independently implemented fuel surcharge programs. Effective October 25, 2000 CSX started a limited fuel surcharge program.[101] NS also implemented its first fuel surcharge program in 2000.[102] The BNSF's original fuel surcharge program began in 2001 and on December 1, 2002, UP implemented its first standard fuel surcharge for carload business.[103] These original fuel surcharge programs were apparently designed and implemented by the individual Defendants without agreement or coordination. Indeed, the Defendants relied on a variety of fuel cost recovery programs, including fuel surcharge programs, in the period before July 2003.[104]

In seeking to impose their original surcharges, the Defendants encountered significant customer opposition, and in an environment in which there was no agreement among the Defendants with respect to fuel surcharges, the Defendants sought to compete with one another

---

[101] The fuel surcharge was based on the WTI, with a trigger price of $28, and the index had to remain above $28 for 30 business days. CSXFSC000000357-363, at 359.

[102] Deposition of Donald Seale, dated February 26, 2010 (hereafter "Seale Deposition"), at 51.

[103] The fuel surcharge was based on the WTI, with a trigger price of $28, and the index had to remain above $28 for 30 business days. The surcharge was applied in 2% increments for every $5 per barrel the WTI exceeded $28 per barrel.

[104] Seale Deposition, at 54-55.

on the basis of their respective non-coordinated approaches to fuel surcharges.[105] NS's Don Seale testified that in the months that NS's first fuel surcharge program was being implemented no discussions were held with other railroads about NS's adoption of that surcharge or any type of industry-wide fuel surcharge.[106] Mike Giftos, who was in charge of the fuel surcharge program at CSX, testified that he did not discuss his proposed fuel surcharge with any other railroads prior to implementation.[107]

In addition, fuel surcharges during the pre-Class Period were not applied consistently to all contracts and were often modified or waived in favor of base rate increases. At BNSF, only a small number of price authorities were subject to the fuel surcharge because the "option" to apply the fuel surcharge was "put in the hands of individual marketing personnel."[108] Marketing personnel at NS were also given the authority to reduce or eliminate the fuel surcharge in contract negotiations.[109] In an email dated October 3, 2002, Bob M. Toy, a director at UP, states that the Industrial Products group's "strategy has been to avoid fuel surcharges and negotiate increases into our price."[110]

The Defendants also waived fuel surcharge provisions to compete with one another. For example, in a bid for 2,800 carloads of business from a potential customer, BNSF and UP both

---

[105] HD Ex. 24, at BNSF-0574531 (May 28, 2002 BNSF Enterprise Wide Risk Assessment stating, "We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy"); BNSF-0574531_011 ("We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."); RD Ex. 7, at CSXFSC000199147-49, at 49 ("Historical Challenges to Railroad Revenue Growth" include "Destructive Pricing for Rail Share"); Giftos Deposition, at 86:25-87:2 ("there have been a history of some very vicious historical price wars").
[106] Seale Deposition, at 13, 107-09, 223.
[107] Giftos Deposition, at 31, 69-70.
[108] CSX000000270-71, at 70; BNSF_0570919-20, at 19.
[109] NS0010013399-400; NS010013420-21("We shouldn't blindside a customer by unilaterally putting a fuel surcharge in a new or amended contract particularly one negotiated prior to the corporate policy decision regarding its implementation. The fuel surcharge should always be part of the contract negotiation process."); NS_010072905-06, at 05.
[110] UPFSC0042871-73, at 71.

offered as part of the incentive package contracts without fuel surcharge clauses.[111] In their attempt to apply their fuel surcharge, BNSF personnel noted that they faced difficulties and lost business because their competitor, "the UP [did] not use a fuel surcharge in the competitive marketplace."[112] Before the Class Period, NS noted that CSX appeared to be "more lax in applying the surcharge to private authorities," which carried "competitive implications for NS."[113] Similarly, NS waived its fuel surcharge for certain customers in order to win business from competitors.[114] In the words of NS's Pat Glennon, fuel surcharges were only "theoretically billable" – *i.e.*, rarely triggered and, even then, only in small amounts.[115]

The lack of consistency and success in the application of the original fuel surcharges before the Class Period was also due to the fact that the surcharges generally did not apply to contracts that incorporated the AAR's cost escalation index, the Unadjusted Rail Cost Adjustment Factor (RCAF-U) or some other cost-escalation index. Many contracts included rate escalator provisions based on the RCAF or a similar index that captured the cost of escalating fuel bills, and the application of these indexes varied as well. CSX's Mike Giftos testified that during the pre-Class Period, "it would not be unusual that our commercial organization would

---

[111] UPFSC0033490-94, at 91.
[112] BNSF-0574516-624.
[113] NS_010072905-06, at 05.
[114] Giftos Deposition, at 66-67; Deposition of Patrick Glennon, dated July 20, 2010 (hereafter "Glennon Deposition"), at 18-19; NS_010013399-400; NS_010072905-06, at 05 ("Customers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause on newly negotiated private publication with a duration of one year or less."); NS_010013795-98; NS_010076080-120, at 082 (in July 2003, NS noted that "most RRs exempt a significant portion of their traffic from a FSC. . . .").
[115] Glennon Deposition, at 26:15; Deposition of James Young, dated August 4, 2010 (hereafter "Young Deposition"), at 25:24-26:1 ("We had fuel surge [sic] programs in many contracts, but because fuel had not run up, they were never implemented"); *id.* at 28:21-25 ("any fuel surcharges that were triggered during the 2000 through 2002 time period never reached significant percentage levels"); Deposition of Matthew Rose, dated July 16, 2010 (hereafter "Rose Deposition"), at 20:17-24(fuel surcharges around the year 2000 "never hit the strike price and – and we never collected."); Deposition of Samuel Kyei, dated March 4, 2010 (hereafter "Kyei Deposition"), at 42:17-21 ("fuel surcharges that were put in place in 2000 weren't collecting a lot of money because fuel wasn't a big deal.").

On March 12 and 13, 2003, UP and CSX executives met to discuss "fuel surcharge methodology."[118] Just before the meeting, CSX had internally recommended changes to its original fuel surcharge program that would have lowered its strike price from $28 to $23 per barrel on the WTI index.[119] CSX would then impose a 1% surcharge when the $23 strike price was reached and an additional 0.5% surcharge for each $2.50 increase in the WTI thereafter.[120] This formula would allow CSX to impose a surcharge when the WTI ranged between $23 and $28, but was less onerous than the coordinated fuel surcharges that CSX ultimately adopted; above the $23 strike price, the proposed formula would have escalated at half the rate of the coordinated fuel surcharges that CSX ultimately implemented. Also before the March 12 meeting, UP had internally prepared a "Revised Surcharge proposal," which retained the $28 WTI strike price of UP's existing program but would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0% increase for every $5 increase in the WTI index.[121]

On March 19 and 20, 2003, within a week of that meeting, CSX announced a new standard fuel surcharge program. The program retained the lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal."[122] CSX initially faced such strong opposition to its program that Mike Giftos, the

[118] *See e.g.*, CSXFSC000165104-105; Deposition of John Koraleski, dated December 2, 2010 (hereafter "Koraleski Deposition"), Ex. 11; UPFSC_0365638-71.
[119] *See, e.g.*, CSXFSC000036491-96, at 93-94.
[120] *Id.*, at 495.
[121] *See, e.g.*, HD Ex. 17, at UPFSC0075385-87; Koraleski Deposition, at 92-93 (this proposal would yield "a more aggressive surcharge" because of the change in the "stairsteps."); *see also* UPFSC0000757-68 ("Union Pacific Fuel Surcharge Analysis Alternative Impacts").
[122] *See, e.g.*, CSXFSC000084489-90.

architect of the program, considered modifying it in various respects.[123] UP soon announced it would adopt the same program announced by CSX.[124]

On March 18, 2003, NS and BNSF senior executives met and discussed how the fuel surcharge programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's fuel surcharge program with the programs of the other Defendants.[125] This discussion point was assigned to NS's Seale and BNSF's Lanigan.[126] On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."[127] Following that trade association meeting, a new internal directive was issued at BNSF that "effective immediately and urgently per John Lanigan[:] Authority to omit FSC [fuel surcharge] provision is to be granted to VP's only (who will also clear with John)."[128]

On April 1, 2003, BNSF and CSX senior executives also met to discuss fuel surcharges. In early May, BNSF changed its fuel surcharge program to make it more aggressive by decreasing the formula's trigger price, which was based on the per-gallon price of diesel fuel reflected in the HDF index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."[129] UP then announced it would adopt the same type of HDF formula used by BNSF.[130] NS

[123] Giftos Deposition, at 172:20-173:20.
[124] *See, e.g.*, UPFSC0000839-41.
[125] BNSF-FSC 000643-45.
[126] *Id.*
[127] NS 001000225.
[128] HD Ex. 19, at BNSF-0027935.
[129] *See, e.g.*, BNSF-FSC000486-487, at 486 (July 1, 2003 memo summarizing status and recent changes to fuel surcharge program); BNSF-0028786-813, at 794; BNSF-0327011-12 (April 30, 2003 BNSF email discussing changes to carload and intermodal programs); BNSF-0511809-52, at 34 (May 7, 2003 rule effecting $1.25 trigger price); BNSF-0327011-12; Deposition of John Lanigan, dated June 22, 2010 (hereafter "Lanigan Deposition"), at 97 ($1.25 on the HDF is "roughly equivalent" to $23 on the WTI).
[130] *See, e.g.*, UPFSC 0183975-82; UPFSC0001035; BNSF_0342448-50, at 48 (email correspondence re: Updated UP FSC effective 6/1/03, dated May 12, 2003 ); NS001000329-30 (NS email correspondence re: Fuel Surcharge Update, dated May 16, 2003); UP, "Carload Rate Based Standard HDF Fuel Surcharge." Available at http://www.uprr.com/customers/surcharge/index_revenue.shtml.

announced that it was adopting the CSX fuel surcharge program in January 2004, after preparing to do so since early 2003.[131]

On May 14, 2003, NS and UP senior executives met and agreed that all four Defendants should have the same fuel surcharges "in the eyes of our customers."[132] These executives discussed how to "work together on this opportunity."[133] They discussed whether they could do so through the AAR.[134] Minutes from the meeting reflect that UP and NS executives agreed that "[u]niform application [of fuel surcharges] across the industry would be helpful."[135] On July 30, 2003, NS and BNSF senior executives discussed a "potential industry position" on fuel surcharges and jointly appointed a top executive from each company to lead a discussion on this topic at an AAR committee on which the Defendants' chief marketing officers were all members.[136] Generally accepted economic principles suggest that these types of communications facilitated and furthered any agreement among the Defendants with respect to the collusive design and implementation of rate-based Fuel Surcharges uniformly employed during the Class Period.[137]

---

[131] On April 17, 2003, NS's Don Seale relayed internally that NS "do[es] plan to modify our FSC." NS001000316-20, at 16. *See also* NS010005138-42 (NS email correspondence re: Fuel Surcharge notes, dated July 23 through August 4, 2003); NS001000119-23 (NS email correspondence re: Fuel Surcharge Policy Review, dated November 4-9, 2003); NS013001654-56 (NS Email from Pat Glennon to NS personnel re: NS Fuel Surcharge Change 03/10/04, dated January 8, 2004).
[132] RD. Ex. 204, at NS 001000361.
[133] *Id.*
[134] *Id.*
[135] UPFSC_0616651-62, at 52.
[136] *See, e.g.*, NS 001000422-25, at 24.
[137] This period of extensive discussions between Defendants' executives in early 2003 occurred before the precipitous rise in fuel prices was anticipated. In June 2003, for example, OPEC "Oil Outlook to 2020" stated that the "OPEC price band target of US $22-28 per barrel for its Reference Basket of seven crudes" is expected to "continue to operate successfully" through 2020. Adnan Shihab-Eldin, Mohamed Hamel and Garry Brennand, "Oil Outlook to 2020," Organization of the Petroleum Exporting Countries, 27.2 (June 2003): 79-128, at 81. There is nothing in these facts to suggest that Defendants were either experiencing or anticipating a significant rise in fuel costs that motivated their adoption of the fuel surcharges. As NS told the STB in 2006, "Norfolk Southern thought . . . that the oil price increases we began to see as 2003 progressed were temporary." NS_010275444-63, at 47 (NS's April 27, 2006 submission to the STB). *See also* NS 010218296-327, at 301 (Global Petroleum Monthly (July 2003): "West Texas Intermediate (WTI) is still expected to average around $27/barrel (bbl) for the rest of this year,

In December 2003, the four Defendants collaborated, through the AAR, to remove the fuel component from the AII and RCAF indices, creating the AIILF.[138] The RCAF had already accounted for fuel costs – although in a manner that the Defendants asserted was ineffective[139] – and thus made imposition of a Fuel Surcharge appear to be "double dipping." By removing the fuel component from the AII and RCAF, the new AIILF index facilitated Defendants' ability to apply their new Fuel Surcharge program to contracts (and other shipments) that had previously being linked to the RCAF index. Now the Defendants could apply the AIILF to escalate freight rates for non-fuel cost components,[140] while freely imposing the new (higher) Fuel Surcharges without subjecting themselves to customer complaints that the applicable price escalation formula was already designed to address rising fuel costs.

The adoption of this new index was viewed by some within the rail freight industry as a major accomplishment. As described by Sam Kyei, BNSF's Chief Economist, "the combination of sound price escalation using this index and a fuel surcharge should tremendously help our bottom-line for years to come. In fact - the entire rail industry should benefit from the escalation options the new index provides."[141]

In the Class Period, Defendants each adopted internal policies directing that Fuel Surcharges would be imposed whenever opportunities arose, including when legacy contracts expired and those contracts were renewed or replaced. Once the conspiracy was embarked upon,

---

though trending downwards from current levels as stocks rise and Iraq returns. Fundamentals continue to look bearish for 2004, and we expect WTI to dip below $25/bbl in the first half of next year.").

[138] AAR-000164-66 (meeting of AAR Board of Directors Agenda, dated December 11, 2003).

[139] From the evidence I have reviewed, it appears that Defendants' claim that the RCAF was ineffective to recover actual changes in fuel costs was merely a pretextual reason for adopting the AIILF and using fuel surcharges. Defendants' principal complaint appears to be the lag in adjusting the weighting of the cost inputs in the RCAF, but as UP's Mark Draper explained at his deposition, there were two solutions to this problem if the railroad genuinely wanted to address it: (1) the railroads could have worked with the STB to calculate the RCAF on a more frequent basis, or (2) any railroad could have calculated its own RCAF-like index and updated that as frequently as it wished. Deposition of Mark Draper, dated March 3, 2010 (hereafter "Draper Deposition"), at 119-127.

[140] "Started new railroad cost index, All-Inclusive Index less Fuel, in response to requests by railroads. (Makes it easier for railroads to use separate fuel-surcharges for rates.)" AAR-E-00116064-83, at 79.

[141] BNSF-0070502-503, at 502 (Mar. 15, 2005 memorandum from Sam Kyei to Matt Rose).

common evidence shows that widespread coverage was each Defendant's explicit policy. BNSF's CEO Matt Rose was clear on this in his instructions to his marketing team, presented in Figure 11.[142]

**Figure 11**
**Instructions for BNSF's Marketing Team**

BNSF **Report 1**

Burlington Northern Santa Fe Railway

**CEO's Mandate for Marketing's Fuel Surcharge Programs**

- **Marketing Team should strive for 100% fuel coverage by account**
  - **- Every price authority should have a fuel surcharge applied**
  - **- All contracts should have a fuel surcharge clause**
- ***All contracts requiring CEO's signature will not be signed without provisions for total fuel coverage***
- **Marketing Team should not discount a fuel surcharge to raise price**
- **Marketing Team should not consider the Hedging Program as an offset to their fuel expenses (i.e., programs should be self sufficient)**

Sam Kyei noted after a meeting with Rose that "[c]ontracts requiring [Rose's] signature but excluding full fuel surcharge provisions will not be signed," and that Rose "likes to see a list of big shippers not paying fuel surcharges," so that such a list can be reviewed in order to raise

[142] BNSF0354762-83, at 63 ("Fuel Cost Recovery Analysis," a BNSF Presentation dated May 12, 2004).

Fuel Surcharge coverage to 100%.[143] By April 2006, BNSF was reporting internally that it had "[v]irtually no exceptions" to its Fuel Surcharge program.[144]

NS also sought to apply the new Fuel Surcharge to all customers, as revealed by the following discussion of its policy. On June 10 and 11, 2004, NS's Director of Planning and Analysis, Tom Bayrer, suggested that NS's rate-based Fuel Surcharges could be waived if a contract contained "80%+ of the RCAF U" but that NS should "[t]ry to get both if you can."[145] When Bayrer's email was forwarded to NS's Senior VP for Energy and Properties, Danny Smith, Smith responded that "[t]his is not true. I had Tom [Bayrer] send an e-mail saying that all new contracts will have the new FSC, no exceptions. What Don [Seale] said was . . . that he would allow contracts to be negotiated with 80% RCAF or above but in no instance would there not be the new FSC. I have made this clear . . . and I am perplexed at your e-mail." Bayrer conceded: "Sorry—I got the message backwards as you note. *All deals must have the new FSC.*" (emphasis added).[146]

Defendants were prevented from immediately achieving their ambition of universal coverage by the existence of "legacy contracts" that either had no fuel surcharge provision or had an old fuel surcharge provision. This necessitated a phased implementation, as described by UP's CFO Robert Knight in 2006:

> UP does not have a fuel surcharge on 100% of its customers' shipments – although we would like to be able to recover from all

[143] BNSF-0345050-051; BNSF-0404221 ("Every contract should include a fuel surcharge clause."); UPFSC0001181-182, at 181 ("It is a BNSF marketing policy to include fuel surcharge in all price authorities that BNSF participates in."); BNSF-0325449-473, at 449 ("These reports reflect business unit strategy of re-signing all expiring contracts with full fuel surcharge provisions."); Lanigan Deposition,at 208-09 (confirming that BNSF's goal was to achieve "zero exception[s]" to its fuel surcharge policy).
[144] HD Ex. 20, at BNSF-0048723-24, at 23.
[145] NS_010007412–13 (internal NS email correspondence between Tom Bayrer and Danny D. Smith re: FSC, dated June 11, 2004).
[146] *Id.*, at 412; *see also* NS_010038138 (Don Seale requesting list of "largest remaining contracts . . . that do not have fuel surcharge application and the time lines [marketing personnel] are pursuing to modify the deals to include fuel").

> shippers …. Commercial agreements from the past preclude Union Pacific from applying fuel surcharge to all of its businesses. These limitations are being reduced over time …. Union Pacific is applying a fuel surcharge on every freight bill that it can.[147]

CSX had the same policy – "Everything is subject to fuel surcharge."[148] Internal CSX emails confirm that "NO ONE [was] authorized to approve a deal WITHOUT Fuel Surcharge."[149] Mike Giftos, the Chief Commercial Officer, recalls only *one* customer for which he made an exception to the Fuel Surcharge policy.[150] CSX sought to achieve 100% coverage for its new fuel surcharge, as CSX's Gooden revealed in an analyst interview. "[Gooden:] On new contracts since late 2003, all of our new contracts have been recovered either through surcharge or through other mechanisms. [Analyst:] What will it be a year from now? Can it get to 95-100%? [Gooden:] I don't know if it can get to 95 or 100% a year from now. As all of our contracts are renewed they will all have some type of fuel surcharge mechanism." And similarly: "We've renewed no contracts since the fourth quarter of '03 without some sort of fuel recovery mechanism."[151]

---

[147] Comments of Union Pacific Railroad Company, re: STB Ex Parte No. 661 – Rail Fuel Surcharges, presented by Robert M. Knight, Jr., Executive Vice President-Finance and Chief Financial Officer of Union Pacific Corporation and Union Pacific Railroad, dated April 27, 2006, at 4, 13-15. http://www.uprr.com/newsinfo/attachments/2006/stb_surcharge.pdf; RD Ex. 113, at UPFSC 0275003 (internal UP correspondence concerning UP's policy to apply its fuel surcharge "to all business as it becomes available for action (the expiration date of contracts, etc.)"); UPFSC_0215504 (Jan. 2006 Koraleski (UP) presentation: "Fuel surcharge will be a part of every deal we do."); UPFSC 0011248-53, at 250 (identifying implementation of policy requiring "100% fuel price recovery" in "all future contracts"); RD Ex. 126, at UPFSC 0066571-73, at 571 (Aug. 2, 2005 internal UP email concerning "mandate that all business should be subject" to a fuel surcharge); HD Ex. 149, at UPFSC0342883-84 (UP communication with customer concerning the "standard fuel surcharge program that [UP was] uniformly requiring of all of our customers").

[148] "Commercial Prices – Escalators," a CSX Presentation dated May 2004 (CSXFSC000000569-74, at 74); RD Ex. 27, at CSXFSC000153058 (internal CSX email concerning senior management's directive to "review the contracts that don't have a fuel surcharge and develop action plans to implement a fuel surcharge"); RD Ex. 124, at CSXFSC000090881 (July 27, 2005 internal CSX email referencing effort to increase coverage "of our traffic base to 100%").

[149] HD Ex. 22, at CSXFSC000108545.

[150] Giftos Deposition, at 142, 164-165.

[151] CSX, Analyst Meeting Q&A (CSXFSC000148017-37, at 30); CSXFSC000203553-595, at 76.

Defendants used the new AIILF index they had created at the AAR to facilitate fulfillment of their across-the-board fuel surcharge coverage goal.[152]

Defendants' policies requiring across-the-board Fuel Surcharge coverage applied with equal force to their intermodal lines of business. A UP presentation from the Class Period stated, for example, "[w]e have adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."[153] BNSF similarly sought "total FSC discipline" on all traffic, including intermodal.[154] CSX's intermodal policy required application of "[f]ull Fuel Surcharge on all customers – No Exceptions!"[155] Notably in this regard, the same chief marketing officers who oversaw Defendants' carload traffic – and participated in the relevant meetings identified above – were responsible for Defendants' intermodal businesses.[156]

The evidence likewise shows that Defendants sought to apply their Fuel Surcharges uniformly to shippers, regardless of how many railroads served the routes along which those shippers desired freight transportation, as well as to interline and single-line routes. Defendants

[152] RD Ex. 144, at 5 (Comments of BNSF, STB Ex Parte No. 661, Filing No. 217709, Oct. 2, 2006 stating that to avoid "'double-dipping'" BNSF "has used indices, since they have become available, that do not include a fuel component in its contracts that are subject to fuel surcharges."); Rose Deposition, at 45 (AIILF "is what I would call our standard"); RD Ex. 74, at BNSF-0404221 ("It is strongly recommended that RCAF contracts migrate to the [AIILF] . . . and apply a fuel surcharge."); Gooden Deposition, at 183-84 (CSX "directed all of the sales and marketing people that all contracts, to the extent possible, should have the AIILF plus the fuel surcharge"); HD 23, at NS_010155750 (observing that most automotive contracts use AIILF); NS_010047819 ("Better add this [the AIILF] to your list of options and be ready to track"); Adams Deposition, at 87 (AIILF became UP's "default" index); Draper Deposition, at 173 (UP was trying "to encourage our marketing folks to use AIILF in conjunction with a fuel surcharge"); Koraleski Deposition Ex. 35, at UPFSC 0274880 ("Jack, in a voice mail to your direct reports you indicated you wanted them to be using the All Inclusive Index Less Fuel (AIILF) coupled with the Highway Diesel Fuel Surcharge . . . .").

[153] UPFSC_0051559-60, at 60; *see* UPFSC_044823-5032, at 917.

[154] BNSF-0326595-96, at 95; BNSF-0031198-99, at 98 (BNSF internal November 10, 2004 Fuel Surcharge Adherence meeting agenda including topic "We need to add a 'BNSF Intermodal Interline Fuel Surcharge Participation' slide"); RD Ex. 74 (January 2004 Price and Fuel Escalation General Guidelines requiring that "intermodal shipments use the Intermodal Fuel Surcharge Table and apply a fuel surcharge on a weekly basis").

[155] CSXFSC000672465-78, at 71, 78.

[156] UPFSC_0527266 (CSX Intermodal ("CSXI")-UP Alliance Meeting Prep notes record "to do" list regarding Jack Koraleski, Clarence Gooden, and Mike Ward regarding intermodal matters); CSXFSC000273262 (referencing meeting between CSX and BNSF chief marketing officers regarding intermodal matters); CSXFSC000001106-15 (CSX organizational chart); NS_003001956-2126, at 2044 (NS organizational chart).

negotiable,' enacted by unilateral decree."[187] Other shippers stressed in statements to the Surface Transportation Board that Defendants' fuel surcharges had become non-negotiable.[188]

The experiences of the named Plaintiffs exemplify the transformation of Defendants' Fuel Surcharge program during the Class Period. In December 2002, US Magnesium was able to negotiate a contract with UP that did not include UP's fuel surcharge provisions then in effect.[189] By the time US Magnesium again negotiated with UP in December 2003, UP's Fuel Surcharges – now the agreed, conspiratorial Fuel Surcharges – had become non-negotiable.[190] As UP's sales representative (the same sales representative who had agreed to negotiate proposed fuel surcharges in 2002) explained in a 2003 email to US Magnesium: "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management. I have no choice."[191]

#### 4. During the Class Period, Defendants had a universal policy not to discount base rates in order to offset Fuel Surcharges

In addition to adopting policies requiring across-the-board application of Fuel Surcharges, Defendants instituted policies during the Class Period against discounting base rates. For example, NS's Don Seale directed his pricing officials as follows: "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play. Base rates are to be market based reflecting the

---

[187] Statement of The Alliance of Automobile Manufacturers Before the Surface Transportation Board, presented by George Telfer, Senior Manager of DaimlerChrysler, dated May 11, 2006 (AAR-E-00056544-47, at 47).
[188] HD Ex. 97, at 1, 3; HD Ex. 98, at 5; HD Ex. 99 (Transcript, May 11, 2006 STB Hearing) ("STB Tr."), at 242 ("[T]here's no negotiation on fuel surcharges today. It's a take it or leave it thing.").
[189] *See, e.g.*, RD Ex. 10 (Dec. 2002 master contract negotiation emails between UP and U.S. Magnesium); Deposition of Howard Kaplan, dated March 10, 2010 (hereafter "Kaplan Deposition"), at 38 ("In 2002, the final contract did not contain a fuel surcharge.").
[190] *See, e.g.*, Kaplan Deposition, at 38 ("In 2003, for contract year 2004, we were told that the fuel surcharge is mandated by [UP] management and it will be put on when you're done with your negotiations on price, and it was indeed put on for contract year 2004.").
[191] RD Ex. 72, at USM 005663; *see also* Kaplan Deposition, at 126.

most current conditions and fuel surcharge is to be applied to them."[192] Internal policies at CSX were likewise unambiguous: "NO ONE is authorized to approve a renewal with an increase of less than 10%. NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge."[193] BNSF's CEO similarly made clear that "[t]rading fuel surcharges for price will not be encouraged."[194] An 2004 BNSF presentation identifies as part of "CEO's Goals for Marketing's Fuel Surcharge Programs", that "[d]iscounted programs [were] unacceptable. CEO will not sign contracts not meeting the above criteria…. Minimize price/fuel surcharge tradeoffs."[195] BNSF's CEO Matt Rose was commended for his discipline by his own Chief Economist, Sam Kyei, who stated that:

> ***Creating discipline with our fuel surcharge programs is another one*** [of your achievements]. As I reviewed fuel surcharge guidelines with members of the leadership teams in the various departments including Marketing and Finance, it quickly became clear to me that members were on different sides of many of the proposals. For example, ***most wanted to discount the programs for price*** or disagreed that every contract should have a fuel surcharge clause. ***It was amazing for me to see how your leadership and vision helped steer the course***, align, inspire and focus the entire leadership team on the path of full fuel cost recovery.[196]

Defendants discussed their base-rate policies openly with one another. UP's chief marketing officer informed NS, for example, that "UP's strategy is to bring all traffic up to today's Market prices."[197] UP also informed each Defendant that "[i]n no case" would freight charges be reduced "below Base Freight Charge(s)" as a result of UP's decision to impose Fuel

[192] RD Ex. 82, at NS_010034040; *see also* RD Ex. 84, at NS_010034244; Seale Deposition, at 297-301; NS_007000883; NS_ 010021988-89, at 88; RD Ex. 94, at NS_010034936-41.
[193] HD Ex. 22, at CSXFSC0000108545; CSXFSC000317571 (requiring senior management sign-off for any "price renewals less than 8 percent").
[194] RD Ex. 81, at BNSF/NJAG 00488.
[195] BNSF-0368426-37, at 30.
[196] BNSF-0070502-03, at 02 (emphasis added); CSXFSC000251026-27, at 26.
[197] UPFSC 0004881-83, at 83.

Surcharges.[198] Defendant CSX was explicit about the policy against discounts in the base rate (also referred to as the line haul rate) in its announcement of the Fuel Surcharge program:

> ITEM 12000-A SUPERSEDES ITEM 12000 THAT EXPIRES MAY 31, 2003 … ***In no case will a linehaul freight charge be reduced as a result of the application of this Item***, nor will the application of the fuel surcharge be retroactive.[199]

## ***B. No economic correspondence between revenue-based fuel surcharges and any actual increase in fuel prices***

### 1. Revenue-based Fuel Surcharges did not recover only actual fuel costs

The record evidence shows that Defendants' jointly established Fuel Surcharge program did not accurately reflect the effect of rising fuel costs on the incremental costs of individual movements. That total railroad freight prices (inclusive of Fuel Surcharges) increased at a rate inconsistent with the effect of rising fuel costs is clear from a simple comparison of railroad freight rates and trucking rates. Figure 12 presents such a comparison.

[198] RD Ex. 48, at UPFSC 0001030; RD Ex. 49, at UPFSC 001031; RD Ex. 50, at NS 001000356.
[199] BNSF-0032325 (emphasis added).

**Figure 12**
**Railroad Freight Rates v. Long Distance Trucking Rates**[200]




Both railroad freight rates and long distance trucking rates followed the same trajectory up until the start of the alleged conspiracy in this case. At around January 2005, as the rail Fuel Surcharge program was well under way, a striking departure between the two rates occurred. Railroad freight rates rose drastically and increased much more than trucking rates. Such a pattern is inconsistent with the effect of higher fuel costs, especially because rail is much more fuel efficient than trucking. As a result, an economist would expect total trucking rates to have increased faster than rail rates. Indeed, UP's Jon Panzer, who carried out a study comparing railcar fuel efficiency to truck efficiency, noted that trucking is more sensitive to fuel costs than rail. She found, as reported in an email dated January 2006, that intermodal rail freight was at

---

[200] Bureau of Labor Statistics, Producer Price Industry Data, Series Id PCU482111482111: Line-haul railroads and Series Id PCU4841214841212: General freight trucking, long-distance, truckload. Available at http://www.bls.gov/data/.

least 3 times more fuel efficient on a miles per gallon basis than trucking.[201] Before the conspiracy started, UP noted that "[t]ruckers surcharge because their operations are so fuel intensive…."[202] Industry sources report that fuel represents between 57% and 62% of variable costs for trucking, whereas fuel represents closer to a 10% of variable costs in rail transport.[203] The Class-wide evidence that I have reviewed further shows that the Defendants' Fuel Surcharge program could not possibly be explained as a natural competitive reaction to increased fuel costs because of several key characteristics: the Fuel Surcharge was implemented as a percent of revenue as opposed to costs; it ignored the Defendants' active hedging programs; and it did not account for gains in fuel efficiency.

The base freight rates (also referred to as the line haul rates) in the rail road industry incorporate price components other than fuel costs. The base rate includes fixed cost (or overhead) elements, such as the cost of organizing a particular shipment. Furthermore, the railroads need to cover the large fixed costs of building and maintaining track, bridges and other structures to achieve long-run sustainability through the rates that they charge their customers. Also included in the base rate is the railroad's markup of price over costs, *i.e.*, the profitability element of pricing. If the Fuel Surcharge percentage were to accurately reflect the effect of fuel costs on railroads' variable costs, applying this percentage to the entire base rate increases the fixed cost elements and the profitability elements of pricing by that same percentage. Therefore, in order for the program to accurately recoup fuel expenses, the fuel surcharge percentage would have to increase in response to a movement in the fuel prices by *much less* than the elasticity of railroad variable costs with respect to fuel prices. Rather, the Defendants' Fuel Surcharge

[201] Email from Jon Panzer, dated January 10, 2006 (UPFSC 0011601).
[202] UP, "Fuel Surcharge FAQ" (UPFSC0001074-78, at 78).
[203] Berwick, M., "Truck Costs for Owners/Operators," Upper Great Plains Transportation Institute, North Dakota State University; Jensen, J., "Knowing Your Cost-Per-Mile," *Expediters Online*, January 9, 2006.

programs translated fuel price movements into increases in the Fuel Surcharge percentage that were *at least as great* as the percentage effect of the same fuel price movements on railroad variable costs. Hence, once applied to the base revenue of a shipment, the Fuel Surcharge program necessarily over-recovered fuel costs in almost all cases.

The fact that Defendants' gross freight rates per ton-mile increased by much more than that which could be due to rising fuel costs is clear from a comparison of those gross freight rates per ton-mile to the fuel costs per ton-mile experienced by BNSF. Using BNSF's own data on its fuel efficiency measured in ton-miles per gallon along with publicly available data on the price per gallon paid for diesel by commercial users makes it possible to calculate the change in fuel costs faced by BNSF from its January 2000 level, presented as the blue line in Figure 13. BNSF's fuel costs did increase into the Class Period to a peak of about 0.4 cents per ton-mile above its January 2000 level.

**Figure 13**
**BNSF's Gross Freight Rate versus Estimated Fuel Costs, 2000 to 2008**[204]




The increase in actual fuel costs is incompatible with the increase in the median gross rate per ton-mile paid by BNSF's customers who incurred a Fuel Surcharge, as obtained from BNSF's transaction data and presented as the red line in Figure 13. This red line increased to as much as 1.6 cents per ton-mile above its January 2000 level. By contrast, the differential between gross rates and fuel costs is on average strikingly steady in the pre-Class Period, hovering at around 0.2 cents per ton-mile, but that differential increases drastically from the start of the Class Period.[205]

---

[204] Source: NS_011000108-09; Burlington Northern Santa Fe Corporation Fuel Analysis (BNSF-0480491-543); Fuel Expense 2002 (BNSF-0382592-600); BNSF-0362037-2189; 2004 Fuel Expense Plan and Forecast (BNSF-0181235-97, at 35-40); 2005 Fuel Expense Plan and Forecast (BNSF-0382807-872, at 07-12); 2006 Fuel Expense Plan and Forecast (BNSF-0348271-336, at 271-276); 2007 Fuel Expense Plan and Forecast (BNSF-0348026-116, at 026-030); Department of Energy, Energy Information of Administration, "No. 2 Diesel Fuel Prices - Commercial/Institutional"; Burlington Northern Santa Fe Corporation 2009 Annual Investors Report Financial Information. Available at http://www.bnsf.com/assets2008/pdfs/2009_annual_investors_report_financial_info.pdf.

[205] A statistical test reveals that the increasing separation between the two lines presented in the chart is statistically significant, *i.e.* it is not simply due to random variation in the data. The same is true in the related charts that follow.

A similar picture is observed using BNSF's own data on its fuel costs per ton-mile net of hedging, which is available for the period up to 2008. These actual fuel costs are presented as the blue line in Figure 14, again as the change from the January 2000 level in dollars per ton-mile. Comparing again to BNSF's gross rate per ton-mile obtained from BNSF's transaction data confirms that BNSF's freight rates for those customers paying Fuel Surcharges increased in dollars per ton-mile far more than did actual fuel costs.

**Figure 14**
**BNSF's Gross Freight Rate versus Reported Fuel Costs, 2000 to 2008**[206]




I have compared CSX's gross rates per ton-mile to its actual fuel costs and once again find that CSX rates for those customers who paid the Fuel Surcharge increased much more in

[206] Sources: NS_011000108-09; Burlington Northern Santa Fe Corporation Fuel Analysis (BNSF-0480491-543); Fuel Expense 2002 (BNSF-0382592-600); BNSF-0362037-2189; 2004 Fuel Expense Plan and Forecast (BNSF-0181235-97, at 35-40); 2005 Fuel Expense Plan and Forecast (BNSF-0382807-872, at 07-12); 2006 Fuel Expense Plan and Forecast (BNSF-0348271-336, at 271-276); 2007 Fuel Expense Plan and Forecast (BNSF-0348026-116, at 026-030); Department of Energy, Energy Information of Administration, "No. 2 Diesel Fuel Prices - Commercial/Institutional"; Burlington Northern Santa Fe Corporation 2009 Annual Investors Report Financial Information. Available at http://www.bnsf.com/assets2008/pdfs/2009_annual_investors_report_financial_info.pdf. BNSF Quarterly Operating Statistics for 2007 to 2008.

dollars per ton-mile than did actual fuel costs in dollars per ton-miles. Figure 15 shows just this, by plotting CSX's gross rate per ton-mile as a change from its April 2001 level, and comparing that to the change in CSX's actual fuel cost per ton-mile over the same period (April 2001 was the first month for which CSX produced transaction data).

**Figure 15**
**CSX's Gross Freight Rate versus Reported Fuel Costs, 2000 to 2008**[207]




[207] Source: CSX Quarterly Financial Reports for 2001 through 2008. Available at http://investors.csx.com/phoenix.zhtml?c=92932&p=irol-reportsother.

Figure 16 shows a similar analysis for Defendant UP and once again confirms that its gross freight rates for shippers paying the Fuel Surcharge increased in dollars per ton-mile much more than its actual fuel costs did.

**Figure 16**
**UP's Gross Freight Rate versus Reported Fuel Costs, 2000 to 2008**[208]




[208] UP Form 10-Qs and Quarterly Operating and Financial Statistics filed with the SEC for 2000 through 2008.

Figure 17 shows a similar analysis for Defendant NS, confirming that the shippers of all Defendants affected by the Fuel Surcharge experienced the same striking departure in freight rates from actual fuel costs.

**Figure 17**
**NS's Gross Freight Rate versus Reported Fuel Costs, 2000 to 2008[209]**




Based on this evidence, Defendants' Fuel Surcharge programs were designed so that a percentage increase in actual fuel prices would lead the Defendants to increase base revenues by a percentage similar to the response of incremental costs to that percentage increase in fuel prices. But because the base revenue includes much more than just actual incremental costs – fixed cost elements plus the profitability element of pricing – shippers were charged an amount greater than that required to offset the actual rise in fuel prices.

---

[209] Source: Norfolk Southern Quarterly Financial Reviews for 2000 to 2009. Available at http://nscorp.com/nscportal/nscorp/Investors/Financial_Reports/Quarterly_Financial_Reviews/

### 2. As tools for cost recovery, revenue-based Fuel Surcharges were not superior to the existing escalation mechanisms, such as the RCAF

Defendants have previously argued that the use of Fuel Surcharges is superior to fuel escalation mechanisms available before the start of the Class Period – such as the RCAF index. In particular, Defendants have argued that because the weights used in the RCAF index were only adjusted annually, fuel surcharges were more effective cost recovery mechanisms. The RCAF used these weights to translate movements in underlying cost indexes, one for labor, one for fuel and so on, into percentage increases to be applied to freight rates. The Fuel Surcharge program also translated fuel price movements into percentage increases in freight rates, but the translation formula (the "slope") was *never* updated. As a result, the Fuel Surcharge program was clearly not superior to the RCAF in this respect. Furthermore, one variant of the RCAF, the RCAF-A, adjusted for productivity improvements over time, thus reflecting changes in fuel efficiency rates. The Fuel Surcharge program incorporated no such adjustments and was therefore less likely to properly reflect changes over time than the RCAF. Indeed, Defendants' own documents and testimony reflect that Defendants themselves believed that RCAF functioned as an effective cost escalation index.[210]

### 3. Revenue-based Fuel Surcharges resulted in a structural break between fuel costs and fuel prices, and over-recovery above what Defendants would have recovered absent the conspiracy

As discussed in Section VII.D of this report, the regression model that I use to estimate the percentage overcharge caused by the alleged conspiracy reveals that all-in freight rates were

[210] Giftos Deposition, at 48 (RCAF "did a pretty good job of capturing our costs and so presumably it did capture fuel prices"), 63, 139-40; Koraleski Deposition, at 262 (RCAF "was based on actual data submitted by the supply officers to the AAR"); Koraleski Deposition Ex. 37, at UPFSC 0195843 ("I believe that the existing RCAF process adequately provides for timely pass-through since it forecasts cost changes one quarter in advance."); UPFSC_0066427-30, at 27 ("using the RCAFU estimate (change in price of inputs) appears to be a reasonable way to estimate cost changes during the next few years"); RD Ex. 114, at BNSF-0481763 (UP 2004 earnings conference call) (UP President stating that the RCAF "looks at actual costs through the industry").

higher during the Class Period than could be explained by economic forces other than the alleged price-fixing conspiracy. Controlling for all significant determinants of freight rates, I apply my model to 100% of the relevant transactions. The results reveal a structural break in the traditional relationship of freight rates to fuel prices consistent with the Defendants' alleged implementation of their conspiratorial Fuel Surcharge programs. This break (and the facilitating Fuel Surcharge mechanism) resulted in massive over-recovery of actual fuel costs and an inflation of Defendants' profits, at the expense of Class members.

The significant widening of the gap between freight rates and costs can also be shown using industry indexes, namely the STB freight rate index and the RCAF-A cost index. Because the STB freight rate index is adjusted for general inflation, but the RCAF-A is not, I have adjusted the RCAF-A index for inflation, in order to make a meaningful comparison. Figure 18 presents this comparison between the inflation-adjusted RCAF-A (green line), and the STB freight rate index (blue line). This analysis further corroborates my finding that the gap between industry-wide costs and freight rates widened significantly during the Class Period.

The exception is UP, whose fuel surcharge program prior to December 2002 was based on such a high strike price that it was never triggered. Rather, UP applied fuel surcharge provisions to particular shipments that did not refer to any index. Therefore, comparing the incidence of fuel surcharges in November 2002, to the incidence of fuel surcharges in November 2007, provides a useful indication of the increase in Fuel Surcharge application in the Class Period. Such a comparison is presented in Figures 33 through 36, for each of the four Defendants, considering the top commodities each Defendant ships. Commodities are identified by their 3-digit STCC codes listed in the horizontal axis of the graph.[356] For each commodity the light blue bar indicates the percent of shipments assessed a fuel surcharge in November 2002 and the dark blue bar indicates the percent of shipments assessed a fuel surcharge in November 2007. From the figures, it is clear that the application of Fuel Surcharges on shipments increased in the Class Period. For nearly every commodity presented, the percentage of gross revenue with a fuel surcharge was very low in November 2002 and, in contrast, was high in November 2007, and often very close to 100%.

---

and NS's fuel surcharges were triggered in October 2002, when the WTI price exceeded $28 per barrel every day from September 4, 2002 through October 21, 2002. When the October 15th (the 30th consecutive day after September 4) closing price of $29.28 per barrel was published in the October 16th Wall Street Journal, a 2% surcharge was applied to shipments having bill of lading dates beginning October 17, 2002 (CSXFSC000129380-381; CSXFSC000129380-381). It was not until December 6, 2002 the the WTI price remained below $28 per barrel for 30 consecutive days. Therefore, CSX and NS's fuel surcharge program would have been in effect for all of November 2002. BNSF's pre-class period fuel surcharge program was implemented on July 1, 2001. It was based on the HDF, with a 1% surcharge applied when the average HDF for the prior month exceeded $1.30 per gallon (BNSF announcement to interline partners re: Changes to BNSF Carload Fuel Surcharge Calculation, CSXFSC000000274-275). BNSF's fuel surcharge was triggered in October 2002 as well, when the HDF price averaged $1.41 per gallon for the month of September 2002. Around September 2000, UP initiated a series of fuel surcharge provisions on intermodal traffic that was not under contracts. These early fuel surcharge provisions did not refer to any index (Comments of UP re Rail FSC). As of December 2001, many contracts referenced a provision that allows for a fuel surcharge if WTI prices stayed at $32 per barrel for 90 consecutive days, and there were variations to this provision; this fuel surcharge was not triggered in the pre-class period (UPFSC 00031335).

[355]In November 2007, the strike price for all four Defendants' fuel programs was exceeded. The HDF Index averaged at $3.40 per gallon. The strike price for the BNSF fuel surcharge program was $1.25 per gallon. The strike price for the UP fuel surcharge program was $1.35 per gallon. The WTI Index averaged at $94.77 per barrel. The strike price for the CSX and NS fuel surcharge programs was $23 per barrel.

[356] The definitions of these codes are provided in Appendix D.

**Figure 33**
**BNSF November 2002 & November 2007 Percent of Gross Revenue with a Fuel Surcharge**[357]




[357] Defendants' transaction data produced in this litigation. Chart excludes commodity group "STCC 422: Trailers, returned empty."

**Figure 34**
**NS November 2002 & November 2007 Percent of Gross Revenue with a Fuel Surcharge** [358]




[358] Defendants' transaction data produced in this litigation. Chart excludes commodity group "STCC 422: Trailers, returned empty."

**Figure 35**
**UP November 2002 & November 2007 Percent of Gross Revenue with a Fuel Surcharge**[359]




[359] Defendants' transaction data produced in this litigation. Chart excludes commodity group "STCC 422: Trailers, returned empty."

**Figure 36**
**CSX November 2002 & November 2007 Percent of Gross Revenue with a Fuel Surcharge** [360]




[360] Defendants' transaction data produced in this litigation. Chart excludes commodity group "STCC 422: Trailers, returned empty."

As presented in Figure 3 of this Report, a similar pattern is observed when considered geographic regions (States), rather than commodities. In sum, my analysis reveals that, irrespective of the commodity shipped or the geographic region of the shipment, shippers were assessed Fuel Surcharges much more often in the Class Period, than in the pre-Class Period.

Further support is found in the Defendants' data on customer contracts. As illustrated in Figure 37, the sudden increase in NS's customer contracts with Fuel Surcharge provisions in the second quarter of 2004 is coincidental with the effective date of changes to its program in March 2004.[361] Figure 37 is based on NS's "9255" rate authority database and shows the percentage of shipments that match to a rate authority with a fuel surcharge provision. The sudden increase in Fuel Surcharge usage in the Class period is confirmed.

**Figure 37**
**Percent of NS Shipments Linked to a Rate Authority with a Fuel Surcharge**[362]




[361] NS implemented the new Fuel Surcharges a little later than the other Defendants due to technical issues. Email from Pat Glennon re: Fuel Surcharge Review – April 25, dated April 29, 2003 (NS001000012-013).
[362] NS's 9255 database and revenue waybill data.

This clear trend of increased Fuel Surcharge application beginning at the onset of the Class Period occurred in tandem with Defendants' sudden reversal of a multi-year decline in rail freight rates, as presented in Section V.B.5. The increase in Fuel Surcharge imposition also occurred in tandem with growth in Defendants' profit margins discussed in Section V.B.5. These trends corroborate the Class-wide impact of the conspiracy.

### 2. Transaction data reveal that common price escalation from Fuel Surcharges occurred across the Defendants

Defendants' transaction data reveal that they applied very similar Fuel Surcharge programs in unison leading to materially higher overall prices during the Class Period. This result is based on the use of the transaction data to calculate the percentage Fuel Surcharge rate for each Defendant. The Fuel Surcharge percentage rate is calculated as the per car (or per waybill, depending on how the Defendants' data is organized) Fuel Surcharge amount divided by the per car (or per waybill) base revenue amount.

The median of this Fuel Surcharge percentage is a reliable indicator of the extent to which the shippers paying stand-alone Fuel Surcharges were experiencing a common Fuel Surcharge percentage. A graph of the median of the calculated Fuel Surcharge percentage is presented in Figure 38.[363]

[363] The figure is based on all unregulated shipments for each Defendant where a stand-alone Fuel Surcharge was applied. These shipments include stand-alone Fuel Surcharges during the Class Period that were based on legacy contracts from the pre-Class Period. To the extent that the effect of these legacy Fuel Surcharges is different across Defendants, this leads to slight differences across the Defendants in Figure 35. Nevertheless, the figure reveals that the Defendants did implement the common percentage Fuel Surcharge program as planned, and that the percentage Fuel Surcharges moved in a similar fashion across Defendants.

**Figure 45**
**Percentage of Shipments with Fuel Surcharge**
**for Nevada Power Coal Shipments by UP to power plant in Moapa Nevada[378]**




Figure 46 confirms that this resulted in an abrupt and sustained increase in the price per ton-mile that Nevada Power paid for its coal shipments starting with 2005, the year in which the Fuel Surcharges were fully applied to it.

378 UP transaction data. The percentage drops in 2008 because BNSF switched to using mileage based fuel surcharges.

**Figure 46**
**Median Gross Rate per Ton-Mile**
**for Nevada Power Coal Shipments by UP to power plant in Moapa Nevada**[379]




This finding from the data is confirmed by independent studies of possible captive regions, one of which found that "Montana shippers … pay excessive fuel surcharges on top of the highest rates in the country."[380] In Section V.B, I provide evidence that the Defendants' Fuel Surcharge program recovered revenues greater than that which were required to cover actual increasing fuel costs. The data analysis presented in this section, therefore, refutes any claims that allegedly captive shippers could not have suffered supra-competitive prices under the Defendants' Fuel Surcharge program because they were already paying monopoly prices. This

[379] Defendant UP's transaction data.

[380] Cutler, John, Andrew Goldstein, G.W. Fauth III, Thomas Crowley, Terry Whiteside, "Railroad Rates and Services Provided to Montana Shippers, a Report Prepared for the State of Montana," Attorney General Steve Bullock, Feb. 2009 ("Montana Railroad Report, at 2. The report on the possibly captive shippers of Montana goes on to state: "The older, rate-based surcharges obviously penalized captive shippers like those in Montana who pay elevated rates." (p. 14); "Total fuel cost recovery took two forms, fuel costs recovered in the freight rates themselves, and fuel costs recovered through fuel surcharges. [the practice known as "double-dipping" condemned by the STB (p. 15); and "As shown in Figure 12, the total amount of fuel recovery through rates and fuel surcharges combined was $3,252,000, while the actual cost of fuel used for these movements was $2,022,000, an over-recovery of 52 percent." (p. 15).

follows because: i) the Fuel Surcharge program demonstrably over-recovered fuel costs; ii) the program was applied universally, including to allegedly captive shippers; and, iii) their freight rates increased as a result.

### *F. Intermodal Shippers*

#### 1. Rail transport is much more cost efficient than truck transport for most haulage distances of even low-weight materials. Therefore, competition from trucking was not sufficient to constrain the cartel's objectives

Most of the Defendants' intermodal shipments travel great distances – half of all BNSF's intermodal shipments in 2005 traveled 2,168 miles or more.[381] Trucking is not competitive with rail over such distances, a fact confirmed in the academic literature.[382] Furthermore, due to lower fuel efficiency, trucking becomes even less competitive with rail as fuel prices increase, and the facilitating mechanism of this conspiracy – the Fuel Surcharge – took advantage of that fact. As described in Section IV.E, although trucks provide competition on higher-value shipments such as intermodal and finished vehicle transport, relative to rail, truck rates increase much more steeply with distance as a result of trucks' comparatively much lower fuel efficiency than rail. As a result, low-value, high weight commodities where the shipper is especially sensitive to freight rates, rail-truck competition exists only for short-haul traffic; the medium- and long-haul traffic is dominated by rail.[383] Of rail operators, the Defendants specialize in the long-haul market, as evidenced by the typical distances travelled by the Defendants, presented in

---

[381] Half of all UP's intermodal shipments travelled 2,015 miles or more, and the equivalent numbers for NS and CSX are 784 and 868 miles.

[382] In my Initial Report I also described the size (tonnage) of Defendants' shipments. Initial Report, at 29-32. Federal regulations restrict the weight that can be transported by trucks, imposing a gross vehicle weight limit of 80,000 pounds on Interstate highways. Federal Highway Administration, *Comprehensive Truck Size and Weight Study*, March 1995. Given that unloaded 18-wheeler trucks weigh 28k-36k lbs, the maximum cargo that trucks can transport ranges between 22 and 26 tons. Federal Highway Administration, Traffic Monitoring Guide, Section 5: Truck Weight Monitoring, May 1, 2001. This is less weight than the majority of individual car shipments transported by Defendants.

[383] Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," *The Bell Journal of Economics*, 10.2 (Autumn 1979), at 463-482; NCHRP Report, at 7.

Section IV.E. Also presented in that section is the fact that not only do the Defendants specialize in shipping *distances* that are largely uneconomical for trucks, they also specialize in shipping *quantities* that are largely uneconomical for trucks. The average weight of shipments reflected in the Defendants' transaction data typically far exceed the weights that are commonly shipped by truck. Simply put, although intermodal cargo carried in shipping containers can be *physically* transferred from trains to truck, for the distances and weights that the Defendants deal with trucking is not an *economically* viable option for intermodal shippers.

**2. The Fuel Surcharge program was applied to intermodal shippers**

As discussed above, Defendants' carload and intermodal lines of business were overseen by the same senior marketing officials. The evidence shows that these officials' directives requiring uniform application of Fuel Surcharges applied equally to intermodal and carload traffic, notwithstanding the fact that Defendants maintained slightly different Fuel Surcharge formulae for these lines of business.[384] An internal UP presentation from the Class Period observes, for example, that UP had "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."[385] BNSF likewise sought "total FSC discipline" on all traffic, including intermodal.[386] CSX's intermodal policy, indistinguishable from its carload policy, required application of "[f]ull Fuel Surcharge on all customers – No Exceptions!"[387]

The transaction data confirm that Defendants applied intermodal Fuel Surcharges uniformly, as presented in Figure 47, which shows the percentage of intermodal revenue that was assessed a Fuel Surcharge for each of the four Defendants.

384 *See supra* at Section VI.A.
385 UPFSC_0051559-560, at 560, slide 3.
386 BNSF-0326595-596, at 595
387 CSXFSC000672465-478, at 471.

**Figure 47. Percentage of Intermodal Revenue Assessed a Fuel Surcharge**[388]




### *G. Defendants' transaction data reveal that common economic factors predominate in rail freight pricing, as demonstrated by a "common factors" regression*

My analysis shows that the pricing of rail freight is highly standardized. Common economic factors such as distance, weight and commodity predominate as determinants of pricing. Information on these factors and much more is recorded by the Defendants in the regular course of their business. For the smooth running of the U.S. rail freight industry, it is essential that such information is recorded in accordance with a common standard used by all Class I railroads. CSX's Clyde McIntyre describes the importance of the industry reference files that are used by the Class I railroads to standardize locations, commodities and even customer names:

[388] Defendants' transaction data.

determined prices during the Class Period. The model is accurate, robust and reveals that during the Class Period freight rates significantly increased due to the Fuel Surcharge conspiracy.

The model quantifies the percentage increase in freight rates, or "overcharge," that Class members suffered. Because the Defendants' conspiratorial mechanism – the Fuel Surcharge – was linked to fuel prices which varied week-on-week, the overcharge is different for each week of the Class Period (it averages 13.6% over the Class Period). Applying the weekly percentage overcharges to the Class members' total freight rates in the corresponding weeks, enables me to compute class-wide damages. In so doing, I find that Class-wide damages in this case equal $11.6 billion.

### A. *Design of formulaic methodology*

Class-wide damages can be calculated using a regression model employing the conspiracy and pre-conspiracy transaction data. This model can control for factors that determine freight rates in order to measure the effect the conspiracy had on the prices paid by customers. A regression model enables an economist to calculate the effect on prices of various economic forces, beyond the control of the Defendants during both the benchmark period and Class Period. The regression identifies the magnitude of the effect of each of these economic forces and determines whether the effect is statistically significant, *i.e.*, not due to random variation in the data. The regression also reports the "R-Squared" which is described in Section VII.D. The R-Squared in the regression model that I have used here is highly satisfactory by professional standards and I have satisfied myself that the calculation of the effect of the alleged conspiracy is accurate.[402,403]

---

[402] This is one of the first regression statistics taught to students of econometrics. Johnson, J. and Dinardo, J. *Econometric Methods*, McGraw-Hill International Editions, at 21. It increases confidence that there is nothing missing from the model that could affect the estimate of damages.

The percentage overcharge due to the alleged conspiracy can be calculated using the regression model to compare freight rates in the Class Period to those in the pre-Class Period, while using the Defendants' transaction data and publicly available data to account for the other predominating common economic forces that determine prices. The transaction data can be used to account for the effect of shipment specific characteristics, such as weight, distance, route, car type, commodity type, and so on. As presented in Section VI.H, these common factors or characteristics of shipments predominate over individual factors as determinants of railcar freight rates and these factors are fully recorded in the Defendants' transaction dataset. The regression model can be used to "back out" the effect of these factors to isolate the effect of the alleged conspiracy on freight rates.

Publicly available data can be used to account for supply and demand economic forces that determine freight rates and that may have changed from before the Class Period to the Class Period. For example, freight traffic is determined in large part by general economic activity. Improving economic conditions in a particular city "attracts" increased freight traffic and this influences freight rates. Economic indicators such as state level GDP can be used to control for demand economic forces. Also, both fuel costs and non-fuel costs, such as wages and materials, have an effect on freight rates. The railroad industry maintains very rich data on these cost factors which should be incorporated into any class-wide damage analysis. In the analysis that I

---

[403] The R-squareds of many multivariate regressions cited in economic and litigation research are well below that of my regression models. For example, R-squareds range from 0.039 to 0.258 in the regressions testing hypotheses on market concentration cited by Carter, John R., "Collusion, Efficiency and Antitrust," *Journal of Law and Economics*, Vol.21, No.2 , Oct. 1978, at 435-444; another litigation research on examining employment discrimination reports a series of regressions with R-squared lower than 0.80, *see* Whiteside, M M. and A. Narayanan, "Reverse Regression, Collinearity, and Employment Discrimination," *Journal of Business & Economic Statistics*, July 1989, Vol.7, No.3, at 403-406. Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 2nd ed., 2000, at 179–227 (taking a regression with R-squared of 0.56 as an example explaining the utilization of multiple regressions in antitrust analysis)..

present in this section I have used both the Defendants' transaction data and publicly available data to control for other economic determinants of freight rates.

***B. Benchmark: price discriminating interdependent but non-collusive oligopoly***

Absent the alleged conspiracy, the railroads would have made supply and pricing decisions in competition with each other. Rising fuel costs would have had two effects on railroad freight rates. First, rising fuel costs would naturally increase rates as the railroads' costs increase. Second, rising fuel costs would increase the cost of transport substitutes to rail and most likely more so than they would increase the cost of rail itself. All else equal, this would lessen the competitive pressure on rail for commodities that can be shipped by other modes, which would enable the railroads to charge higher rates. Accordingly, for a given commodity travelling along a given route, fuel costs would be expected to be an important and uncontrollable economic force influencing the pricing and competition during the benchmark period and the Class Period.

The suitability of the pre-conspiracy period of 2000 to 2003 as a benchmark is supported by the facts that the substitutability between rail and other transport services and the market structure of the industry did not change over the relevant time period.

I have been supplied with Defendants' transaction data for the period from January 2000 to December 2008, thus giving three and half years of pre-Class Period data to use as a benchmark to estimate the prices that customers would have faced but-for the conspiracy. In this pre-conspiracy period, changes in fuel costs did affect freight rates. They did so both through their direct effect on railroad costs and on the effect they have on the prices of transport substitutes to rail. As rising fuel costs increased the costs of shipping by truck more so than by rail, railroads charged higher prices to their customers as trucking became a less viable option.

The importance of this effect depended on the elasticity of substitution between truck (or water barge) and rail, and this can be different for different commodities and routes.

The net effect of these factors on freight rates is contained in the transaction data for the pre-Class Period, and because of the proximity of the pre-Class Period to the Class Period the effects in the pre-Class Period are a good indication of what should have happened in the Class Period had the conspiracy not occurred. The extent to which truck and rail are substitutable for certain commodities is unlikely to have changed significantly from the period January 2000 to June 2003 relative to the period July 2003 to December 2008. On the other hand, we know that there were increases in fuel efficiency (ignored by the Defendants' Fuel Surcharge program). However, as fuel efficiency increased over time, an assumption that freight rates should have responded to fuel price rises in the Class Period as they did in the pre-Class Period leads to a slight overstatement of the "but-for" price in the Class Period and therefore a conservative estimate of the percentage overcharge.

### *C. Treatment of Legacy Contracts*

As described previously, there were in effect "legacy" contracts during the Class Period that tied customers to fuel surcharge provisions from prior to the conspiracy. Shipments with fuel surcharges covered by such contracts do not meet the Class defined by the Court (see Section II). A common method can feasibly remove legacy contracts from a Class-wide damage analysis. Each of the Defendants has produced information in order to identify legacy contracts and I have used that information to exclude legacy contracts from the Class designation in the model and in order to calculate Class-wide damages.

### *D. Computation of overcharges*

The most commonly used regression method to estimate class-wide damages is to use an indicator variable that is simply equal to one during the Class Period and zero before the Class Period. In the regression the coefficient on this variable represents the effect of the conspiracy. However, there exists a superior method that more closely corresponds to the facts of this case. The Defendants' facilitating mechanism – the Fuel Surcharge program – involved linking their coordinated percentage price increases to fuel price movements. This mechanism both served as a pretext and provided Defendants with a straight-forward way to communicate their price increases to each other. Because the Fuel Surcharge was applied as a percent of revenue it increased prices more than was necessary due to increased fuel costs and necessarily the amount of over-recovery was material. The result was that the damage to shippers was greater when fuel prices were high. Thus, it makes sound economic sense when calculating damages to specify the regression model so as to test whether the effect of the conspiracy is greater when fuel prices are higher. This is achieved by including in the regression model along with the Class Period indicator variable and a variable for diesel fuel prices, a variable that represents their potential interaction effect.

In order to calculate the Class-wide overcharge, I have implemented the regression analysis on a combined dataset that includes 100% of each Defendant's total rate-unregulated traffic over the period 2000 to 2008. In accordance with the Class definition in this case, shipments that did not pay a Fuel Surcharge in the Class Period have been removed, as have shipments that incurred a mileage-based fuel surcharge to the extent that mileage-based fuel

year and each Defendant. Class-wide damages for the period July 2003 through December 2008 equal $11.6 billion.

**Table 54**
**Class-Wide Damages[411]**

| Year | BNSF | CSX | NS | UP | *Total* |
|---|---|---|---|---|---|
| 2003 | $311,747 | $714,859 | $2,086,700 | $1,264,271 | $4,377,577 |
| 2004 | $45,698,585 | $53,752,614 | $169,361,124 | $122,719,010 | $391,531,334 |
| 2005 | $296,949,198 | $183,527,123 | $604,593,115 | $466,717,083 | $1,551,786,518 |
| 2006 | $543,701,554 | $308,577,451 | $911,074,701 | $746,452,839 | $2,509,806,544 |
| 2007 | $656,162,245 | $378,327,373 | $830,182,565 | $926,953,520 | $2,791,625,703 |
| 2008 | $1,103,198,819 | $324,771,617 | $1,704,825,298 | $1,247,918,869 | $4,380,714,603 |
| **Total** | **$2,646,022,147** | **$1,249,671,037** | **$4,222,123,503** | **$3,512,025,591** | **$11,629,842,279** |

## VIII. CONCLUSION

I conclude that evidence and economic analysis common to the Class (a) supports Plaintiff's allegations that the Defendants engaged in a conspiracy to fix prices; (b) confirms that the Defendants' conduct had a common impact on the Class; and (c) the Class-wide damages sustained by the Class amount to $11.6 billion.

October 15, 2012

Gordon Rausser

Gordon Rausser, Ph.D.

[411] Defendants' transaction data.

# EXPERT REPLY REPORT
# OF
# GORDON RAUSSER, PH.D.

**In the matter of**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**USDC, District of Columbia, Case No. 1:07-mc-00489-PLF**

**Highly Confidential**
**Pursuant to Protective Order**

**June 12, 2013**

the two programs, which occurred when oil prices spiked unexpectedly to unprecedented levels in 2008. Before that occurrence, the average difference between the two programs was 2%.[530] Dr. Carlton also compares UP and BNSF coal programs.[531] His analysis is based on a novel metric that Defendants' other consultants never employ, and which exaggerates the difference between BNSF's and UP's coal FSC formulas. Instead of presenting the FSC rates that each program produces, he presents the percentage difference in those FSC rates. So if, for example, BNSF's coal FSC formula produces an FSC rate of 20% and UP's coal FSC formula produces a FSC rate of 22%, Dr. Carlton reported this as a difference in the formulas of 10% (*i.e.*, 2÷20). This is misleading and exaggerates the extent of the difference between the two programs. I demonstrate this in Figure 65, where the blue line represents Dr. Carlton's original *percentage* difference in the two programs, and the green line represents the simple difference in the FSC rates (the metric that every other expert has been using to compare programs). This green schedule reveals that BNSF's and UP's coal formulas resulted in FSC rates generally separated by less than 2% up until June 2007, when oil prices began their unprecedented rise that peaked approximately one year later.

---

[530] Ordover Report, work papers.
[531] Carlton Report, at Figure 8.

**Figure 65.**
**Dr. Carlton's "Percentage Difference" (blue) in Coal Formulas, with the simple difference (green) included**




### C. *Evidence supports that the Defendants' shared policy in the Class Period was to increase FSC coverage across all traffic with the express goal of 100% coverage*

The evidence that Defendants implemented new policies mandating widespread application of the FSCs beginning in 2003 is well-documented.[532] For example, BNSF made public statements about the change in their FSC coverage policy. In its 2005 second quarter earnings call BNSF stated, "We have a zero tolerance policy. Any contract it comes due will be renewed with a fuel surcharge and *we have been in that mode for a year-and-a-half* and have been very successful in implementing fuel surcharge."[533]

[532] Rausser Merits Report, at Section V.A.
[533] BNSF Earnings Call, Q2/05:17-18.

In the face of this evidence, Dr. Johnson presents a table of deposition testimony that he contends demonstrates that CSX had the same policy in the pre-Class Period concerning FSC coverage as they did in the Class Period – *i.e.*, to increase coverage as much as possible.[534] On closer inspection, Dr. Johnson's table does not support his conclusion; it demonstrates the opposite. He has split the testimony up to reflect first the policy in the pre-Class Period and then the policy in the Class Period. His first example comes from CSX's Dean Piacente. Dr. Johnson quotes Mr. Piacente as testifying that in the pre-Class Period "our goal was to try and improve coverage. We had a standard fuel surcharge published, but at that time the goal ***was not to use necessarily that hard and fast***" (emphasis added). Mr. Piacente then describes a change in policy in the Class Period: "The goal didn't necessarily change***…[t]he application of fuel surcharges was impressed upon us even more*** for a couple of reasons," (emphasis added). Mr. Piacente stated that for reasons of escalating fuel costs achieving higher FSC coverage was "finally put into our goals. People took it much more seriously."

### 1. Dr. Kalt's Coverage Analysis

Dr. Kalt presents analysis of FSC coverage between the pre-Class Period and the Class Period that effectively rehashes analysis presented by Dr. Willig in his report on class certification. Dr. Kalt presents the percentage of all of the Defendants' unregulated transactions that were assessed revenue-based FSCs. Although he testified that weighting by revenue is not important[535] – and he did not weight by revenue for his so-called "new opportunity" analysis (addressed below) – Dr. Kalt does weight shipments by revenue for his analysis of FSC coverage. These charts are presented below. For comparison, I present the corrected version of similar

[534] Johnson Report, at ¶164 and Exhibit 30.
[535] Kalt Deposition, at 43:20-24.

charts presented by Dr. Willig at the class certification stage of this litigation. Dr. Willig argued that his charts demonstrated that FSC coverage growth in the Class Period was merely part of a trend that started in the pre-Class Period. His original charts were unweighted by revenue, and I corrected them in my class certification reply report for revenue weighting. Dr. Kalt has essentially presented the same charts again, and it is clear from Figures 66 through 69, that they more support a pattern of substantially increased FSC application in the Class Period relative to the pre-Class Period than the continuation of a pre-existing trend.

**Figure 66. BNSF Kalt vs. Willig (corrected)** [536]




**Figure 67. UP Kalt vs. Willig (corrected)**[537]




[536] Kalt Report, at Figure IV-9A.
[537] Kalt Report, at Figure IV-9D.

**Figure 68. CSX Kalt vs. Willig (corrected)**[538]




**Figure 69. NS Kalt vs. Willig (corrected)**[539]




Dr. Kalt also examines what he calls "new opportunities" and opines that coverage was increasing before the start of the alleged conspiracy.[540] Figure 70 reproduces Dr. Kalt's chart for BNSF, and Figure 71 reproduces Dr. Kalt's chart for UP.

[538] Kalt Report, at Figure IV-9B.
[539] Kalt Report, at Figure IV-9C.
[540] Kalt Report, at Figures IV-10A.

**Figure 70. BNSF – Kalt's Original New Opportunity Coverage Chart**




**Figure 71. UP – Kalt's Original New Opportunity Coverage Chart**



Dr. Kalt appears to have made a coding mistake that leads him to identify so-called “new opportunities” incorrectly, even by his own definition. Dr. Kalt defined a “new opportunity” as the first month a customer price authority appears in the Defendants’ transaction data. However, he has miscalculated this. For example, Dr. Kalt identifies all of the shippers in Table 72 as new opportunities.

**Table 72. Examples of Over-Counting Shipments as “New Opportunities”**

| Shipper | Price Authority | Month Shipped | Month of First Occurrence | "New Opportunity" |
|---|---|---|---|---|
| 21ST CENTURY TRANSPORT | BNSF 4023 | 1/1/2004 | 1/1/2004 | Yes |
| 21ST CENTURY TRANSPORT | BNSF 4023 | 6/1/2004 | 6/1/2004 | Yes |
| 21ST CENTURY TRANSPORT | BNSF 4023 | 2/1/2007 | 2/1/2007 | Yes |
| 21ST CENTURY TRANSPORT | BNSF 4023 | 4/1/2007 | 4/1/2007 | Yes |
| 21ST CENTURY TRANSPORT | BNSF 4023 | 9/1/2008 | 9/1/2008 | Yes |
| 84 LUMBER CO | BNSFQ 105355 | 1/1/2004 | 1/1/2004 | Yes |
| 84 LUMBER CO | BNSFQ 105355 | 3/1/2004 | 3/1/2004 | Yes |
| 84 LUMBER CO | BNSFQ 105355 | 4/1/2004 | 4/1/2004 | Yes |
| 84 LUMBER CO | BNSFQ 105355 | 8/1/2004 | 8/1/2004 | Yes |
| 84 LUMBER CO | BNSFQ 105355 | 1/1/2005 | 1/1/2005 | Yes |
| 84 LUMBER CO | BNSFQ 105355 | 5/1/2005 | 5/1/2005 | Yes |
| 84 LUMBER CO | BNSFQ 105355 | 4/1/2007 | 4/1/2007 | Yes |
| A B F FREIGHT SYSTEM INC | QTTABFCAN 9999999999 | 9/1/2006 | 9/1/2006 | Yes |
| A B F FREIGHT SYSTEM INC | QTTABFCAN 9999999999 | 12/1/2008 | 12/1/2008 | Yes |

Dr. Kalt may have, in fact, corrected his coding error but inadvertently not updated his figures. When I re-ran his code I received a different data output than what is shown in his charts.

It should be noted in advance of presenting those corrected figures that Dr. Kalt’s “new opportunities” do not really represent new business opportunities as such. Many correspond to business with the same customer, for the same commodity, and the same routes, just under a different contract number. This is presented in Table 73, which takes Dr. Kalt’s new opportunities in 2004 and 2005 and investigates if those “new” shippers bought rail freight services from the same railroad in 2002, for: i) the same commodity; *or* ii) the same origin State; *or* iii) the same destination State; *or* iv) the same commodity, same origin State and same

This figure can be directly compared to the class-wide damages figure I found in my Merits Report, which equaled $11.6 billion.[741]

**Table 105. Class-wide Damages Incorporating the STB Information**

| Year | BNSF | CSX | NS | UP | Total |
|---|---|---|---|---|---|
| 2003 | $57,629 | ($77,549) | $191,393 | ($9,121) | $162,351 |
| 2004 | $33,393,392 | $38,962,679 | $123,740,638 | $53,011,659 | $249,108,368 |
| 2005 | $217,049,748 | $134,703,753 | $446,474,658 | $210,420,233 | $1,008,648,392 |
| 2006 | $392,471,713 | $227,766,971 | $674,758,821 | $396,262,277 | $1,691,259,782 |
| 2007 | $477,664,482 | $281,170,365 | $617,965,437 | $537,757,229 | $1,914,557,512 |
| 2008 | $810,891,432 | $244,188,922 | $1,278,800,484 | $686,203,940 | $3,020,084,778 |
| Total | $1,931,528,395 | $926,715,141 | $3,141,931,430 | $1,883,646,217 | $7,883,821,183 |

June 12, 2013

Gordon Rausser

Gordon Rausser, Ph.D.

[741] I have made certain adjustments to the transaction data following points raised by Defendants' Consultants, where those points were appropriate. *See* my work papers. In addition, I have incorporated information on UP's legacy contracts that I received subsequent to filing my Merits Report. Those data adjustments and inclusion of that UP legacy information result in class-wide damages of $10,351,837,877.

# SUPPLEMENTAL REPLY EXPERT REPORT
# OF
# GORDON RAUSSER, PH.D.

**In the matter of**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**USDC, District of Columbia, Case No. 1:07-mc-00489-PLF**

**Highly Confidential**
**Pursuant to Protective Order**

**May 28, 2014**

to distinguish between whether a pattern in the data is the result of pure chance or a hypothesis that is relevant to the case, it becomes irrelevant that any results found are statistically significant, even though Dr. Kalt puts great store in that finding.[98]

## IV. MY THEORY OF THE CONSPIRACY AND HARM HAS NOT CHANGED

Dr. Kalt asserts that I have "now" put forward a "new" theory of the alleged conspiracy and that I have not modeled the "new" conspiracy in my regression analyses.[99] He is incorrect. I have investigated the conspiracy alleged in the complaint and supported by my evaluation of the discovery record – a conspiracy to coordinate on imposing, enforcing and collecting more aggressive FSCs as a pretextual means to raise all-in rates across the board. In fact, Dr. Kalt previously acknowledged, prior to the remand, that part of the alleged conspiracy was an agreement to strictly enforce FSCs to raise revenues and profits, and he acknowledged further that this was precisely the conspiracy I have modeled.[100]

following the population and we estimated the model once. Estimating models that are variants of our original model violates that assumption because we are using the same set of data in a *specification search*" (emphasis in the original).

[98] Kalt Declaration, at p. 26, n. 64.

[99] Kalt Declaration, at ¶¶15-16, 89-92, 108, 121-22.

[100] Kalt Merits Report, at ¶¶ 22-23 ("Similar to Plaintiffs, Prof. Rausser opines that although the Defendants revenue-based FSCs prior to the conspiracy were 'designed and implemented by the individual Defendants without agreement or coordination,' they were only 'used sporadically' and 'were often modified or waived' in the process of negotiating rates because of competition among Defendants. Prof. Rausser opines that, during the Class Period, Defendants' purportedly conspiratorial FSC 'program was applied universally"; and that Defendants employed a uniform, 'industry-standard' approach to fuel surcharges 'with identical or near identical features.'"); ¶364 ("…if there had not been effective monitoring and enforcement of the putative conspiratorial agreement by Defendants, there would have been 'cheating' on the conspiracy in the form of material discounting of base rates"); ¶377 ("the hypothesized conspiracy also entails a conspiracy to not discount base rates [to offset FSCs]"); ¶385 ("…within a single railroad and across railroads…there is not a single price…over which agreement would have to be reached, monitored and enforced."); ¶397 ("…Prof. Rausser acknowledges that a feasible conspiracy requires mechanisms of enforcement."); and, Kalt Merits Deposition, at 160:22 – 161:11: (Q: "Now, is it your understanding in this case that the defendants are being accused of trying to eliminate interfirm competition?" A: "Inter – interdefendent competition, yes." Q: "And do you believe that that's all they're being accused of?" A: "No. You say they tried to do it through conspiratorial means and you have very specific aspects of that conspiracy which you all have alleged." Q: "Right. Which includes an alleged collusive agreement to use fuel surcharges as a means to raise prices, correct? That's what's alleged, isn't it?" A: "That's certainly at the core of your complaint, yes."); 52:18-21: ("he [Dr. Rausser] thinks it was a well-enforced conspiracy…").

### A. *My Theory on Class Shipments, Which My Model Was Designed To Study, Has Not Changed*

Dr. Kalt makes a series of misrepresentations of my opinion in this case. He writes that: "Prof. Rausser's ***new theory*** is that, even if Class Period FSC formulas did not differ materially from pre-Class Period FSC formulas, the former would have been waived, breached, or otherwise not fully collected as they purportedly got out of step with putatively non-conspiratorial economic conditions."[101] He describes this supposed change in my theory as "a response to the reality that the central thesis of the original theory – that the supposedly conspiratorial FSCs were 'more aggressive' and 'onerous' than pre-'conspiracy' FSCs – has crumbled. In fact, at Class Period fuel prices, the incremental earning power of the allegedly conspiratorial FSCs was very close to, and often lower than, that of the earlier rate-based FSCs."[102] As Dr. Kalt has acknowledged in prior reports and at deposition, however, my theory has never been limited to the change in FSC formulas.[103] And he is incorrect that the FSC formulas were not made more aggressive.

As an initial point, the fact that the Defendants collectively changed their FSC formulas to be more aggressive has in no way "crumbled." Dr. Kalt cannot escape the fact that the Defendants lowered the thresholds of their formulas, and that the Defendants themselves were concerned that this would appear to their customers as a "money grab."[104] Defendants' Consultants Dr. Johnson and Dr. Willig argued that the Defendants amended their FSCs at the start of the Class Period in order to improve cost recovery – changes that necessarily would have been to their benefit.[105]

---

[101] Kalt Declaration, at ¶16 (emphasis added).
[102] Kalt Declaration, at ¶16.
[103] *See supra* note 100.
[104] NS001000373 (NS Email, dated July 16, 2003).
[105] Johnson Report, at §VII.D, §VII.G; Willig Report, at ¶¶66-71.

Dr. Kalt's point must be that, as it ultimately turned out, with fuel prices above both the new and old thresholds during much of the Class Period, changes like this did not make an incremental difference, in and of themselves, to the rates that shippers paid. But, even on its own terms, this "earning power" criticism is flawed. In his new Declaration, Dr. Kalt conducts an analysis that misrepresents the effect of the changes in the formulas. I reproduce Dr. Kalt's analysis in Table 1, which he reports as indicating that the "earning power of the purportedly conspiratorial FSC provisions was less than the earning power of the published pre-'conspiracy' provisions."[106]

**Table 1. Kalt's Original Figure 19**

| Railroad | Actual Class FSC Rate | Pre-"Conspiracy" FSC Rate | Difference (Actual - Pre-"Conspiracy") | Prof. Rausser's "Damages" |
|---|---|---|---|---|
| BNSF | 15.9% | 16.2% | -$4,287,689 | $84,637,793 |
| CSXT | 11.9% | 14.9% | -$54,856,110 | $160,269,709 |
| NS | 9.8% | 10.1% | -$8,349,801 | $100,706,374 |
| UP | 14.1% | 16.3% | -$66,007,315 | $229,477,247 |
| **Total** | **12.5%** | **14.1%** | **-$133,500,915** | **$575,091,122** |

However, Dr. Kalt has not made a formula-to-formula comparison in the manner he presents it. To construct his "Pre-'Conspiracy' FSC Rate" for each Defendant, he applies the standard carload FSC formulas in place just before the start of the Conspiracy Period to the base rates on carload shipments during the Class Period, not taking into account all of the "differentiated" pre-Class Period FSC formulas. He then applies a different approach when he calculates his "Actual Class FSC Rates" – that is, he does not simply apply the standard conspiratorial FSC formulas to the base rates in the Class Period. Instead, he uses all FSC payments that occurred in the Class Period to calculate the FSC rates. But, as is well known, not

106 Kalt Declaration, at ¶100.

all carload shipments in the Class Period traveled under the standard FSC formulas. A more accurate formula-to-formula comparison would apply the standard published Class Period FSC formulas to all of the base rates in the Class Period, in the same fashion as Dr. Kalt has done to calculate his "Pre-'Conspiracy' FSC Rates."

Nor is this the only error in Dr. Kalt's analysis. For UP, he has used their December 2002 WTI Carload formula, even though this was not their main pre-conspiracy period formula. Instead, UP most commonly used their FMC/FUEL formula, as Dr. Kalt agreed in his merits deposition (*i.e.*, before he conducted this analysis),[107] and again in his latest deposition.[108] Correcting his analysis to apply UP's FMC/FUEL formula as the pre-conspiracy period formula, changes Dr. Kalt's results further.

Correcting for both of the foregoing errors shows that the new formulas increased rates by $185 million more than the old formulas, across the four Defendants, as presented in Table 2. The results are markedly different to Dr. Kalt's, with the new formulas increasing freight rates by more than the old formulas overall across the four Defendants.[109]

**Table 2. Dr. Kalt's Figure 19 Corrected**

| Railroad | Standard Class Period Formula FSC Rate | Standard Pre-Class Period Formula FSC Rate | Difference (Class Period – Pre-Class Period Formula FSC Rates) | Prof. Rausser's "Damages" |
|---|---|---|---|---|
| BNSF | 16.2% | 16.2% | $0 | $84,637,793 |
| CSXT | 16.2% | 14.9% | $23,217,550 | $160,270,219 |
| NS | 11.2% | 10.1% | $30,568,253 | $100,696,569 |
| UP | 14.6% | 10.2% | $131,459,343 | $229,477,247 |
| **Total** | **14.1%** | **12.0%** | **$185,245,145** | **$575,081,828** |

[107] Kalt Merits Deposition, at 306:8-307:8.
[108] Kalt Class Deposition, at 112:16-21.
[109] The results are also conservative because they compare only Defendants' "standard" FSC formulas. They do not account for the extent to which Defendants, as part of the conspiracy, eliminated idiosyncratic pre-Class Period FSCs with diminished "earning power," as Dr. Kalt defines it, in favor of the standard Class Period formulas.

As the corrections to Dr. Kalt's analysis make clear, the theory that the Defendants changed their standard FSC formulas to be more onerous has far from "crumbled."

Similarly, Dr. Kalt's argument that my theory of increased FSC coverage and more uniform FSCs in the Class Period has "crumbled," is also unfounded.[110] Dr. Kalt merely presents the same analysis and opinions on FSC coverage and uniformity as he did in his Merits Report. I criticized that analysis in my Merits Reply Report, and he has not addressed those criticisms.[111] Further, Dr. Kalt's latest Declaration ignores the record evidence of the Defendants' policy goal of universal application of FSCs, their meetings and discussions regarding the formula changes they made just before the start of the Class Period, and, indeed, he ignores all of the many communications among the Defendants on coverage and FSC formulas.[112] Therefore, Dr. Kalt's analysis replicated above is fundamentally in error. This is because Dr. Kalt's test assumes that even without the conspiracy, pre-conspiracy formulas would have been applied throughout the Class Period in the same fashion as the conspiracy period formulas were applied during the Class Period – *i.e.*, without offsetting base rate discounts, with increased coverage, and with greater uniformity across the Defendants than before.

Dr. Kalt makes an additional error. Despite what he has declared, I have never been of the opinion that the alleged conspiracy was merely about changes to FSC formulas, and I do not recognize his concept of "earning power" as reliable, in the fashion that he has used it. Since my Initial Class Certification Report, submitted over four years ago, I have opined that important aspects of the conspiracy included: i) agreement among the Defendants not to compete on FSCs; ii) policies against negotiating FSCs with shippers; and, iii) policies not to discount base rates to offset FSCs.[113] Thus, Dr. Kalt's "earning power," which he now defines as "the percentage FSC

[110] Kalt Declaration, at ¶¶101-107.
[111] Rausser Merits Reply Report, at §V.
[112] Rausser Merits Report, at §VI.B.1.
[113] Rausser Initial Class Certification Report, at §IV.G.

rate for a given fuel price,"[114] has never been the full picture of the effect of the conspiracy on all-in freight rates. Dr. Kalt's tests regarding "earning power" are not valid tests of the effect of the conspiracy, which was through the collective application and enforcement of rate-based FSCs as a means to increase all-in rates.

Defendants themselves understood, at the outset of the alleged conspiracy, that turning FSCs into a profit center required not only aggressive FSC formulas but also stringent enforcement of FSCs across the board. As NS's chief marketing officer Don Seale put it, "[o]ur challenge is to bill and collect the FSC more than the formula of the surcharge."[115] Mr. Seale's exhortation, echoed by senior officials from all Defendant railroads,[116] responded to a report that NS had negotiated an FSC in Ford's "last contract renewal."[117] In challenging his staff to rigidly enforce FSCs irrespective of their formula, Mr. Seale recognized that getting FSCs into shippers' contracts would have little impact on NS's revenues if billings and collections remained as "anemic" as they had been in the pre-conspiracy period.[118] Characteristically, Dr. Kalt ignores this evidence.

Based on his incorrect assertions that I have changed my theory of the case, Dr. Kalt implies that my model is not capable of providing common evidence of injury for Class members because I modeled the effect on all-in rates in the Class Period of Defendants' changed conduct *vis-à-vis* FSCs. He suggests, at least by implication, that I should have studied, separately, (a) "earning power"[119] – *i.e.*, the mathematical effect of different FSC formulas (assuming they had been applied across the board, enforced by their terms, and not offset by discounts or other

---

[114] Kalt Declaration, at ¶36.
[115] NS_057005733 (emphasis in original).
[116] Rausser Supplemental Class Certification Report, at p. 14: "Indeed, the increased 'pressure' from these changes [to FSC formulas] led to customer 'outcry,' as noted in a joint meeting between CSX and UP," citing UPFSC0001088-090, at -088; *id.*, at p. 13: "Before the Class Period, BNSF announced that although its carload FSC formula mandated a 5% FSC rate for May 2003, the company had 'elected to amend Item 3375 of BNSF Rules Book 6100-A' to reduce the FSC rate for carload to 2%," citing BNSF-0495601-602, at -602.
[117] NS_057005733.
[118] *Id.*
[119] "[E]arning power—the percentage FSC rate for a given fuel price," Kalt Declaration, at ¶36.

May 28, 2014

Respectfully submitted,

Gordon Rausser

Gordon Rausser, Ph.D.

# Intentionally Omitted

## DA06286-DA06291

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To:<br>ALL DIRECT PURCHASER CASES | |

**PLAINTIFFS' FIRST AMENDED CONSOLIDATED OBJECTIONS AND RESPONSES TO DEFENDANTS' JOINT FIRST REQUESTS FOR ADMISSIONS**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, and the parties' agreement to serve amended discovery responses, Plaintiff Olin Corporation ("Olin"), Plaintiff Carter Distributing Company ("Carter Distributing"), Plaintiff Dakota Granite Company ("Dakota Granite"), Plaintiff Donnelly Commodities, Inc. ("Donnelly Commodities"), Plaintiff Dust Pro, Inc. ("Dust Pro"), Plaintiff Nyrstar-Taylor Chemicals, Inc. ("Nyrstar"), Plaintiff Strates Shows, Inc. ("Strates Shows"), and Plaintiff U.S. Magnesium LLC ("U.S. Magnesium") (collectively, "Plaintiff" or "Plaintiffs"), through their attorneys, collectively and individually, hereby submit this amended consolidated responses and objections to the Defendants' Joint First Requests for Admissions (the "Requests") directed to (1) Olin, (2) Carter Distributing, (3) Dakota Granite, (4) Donnelly Commodities, (5) Dust Pro, (6) Nyrstar, (7) Strates Shows, and (8) U.S. Magnesium.

Plaintiffs have consolidated their responses and objections to the Requests due to the overlap in the Requests themselves, as well as in Plaintiffs' objections and responses to them.

**REQUEST NO. 24**

Admit that, between January 1, 2000, and May 31, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 24**

Denied.

**REQUEST NO. 25**

Admit that, between January 1, 2000, and April 30, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 25**

Denied.

**REQUEST NO. 26**

Admit that, between January 1, 2000, and March 31, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 26**

Denied.

**REQUEST NO. 27**

Admit that, between January 1, 2000, and February 28, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 27**

Admitted to the extent Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003. More generally, if there was any such agreement prior to March 2003, it was ineffective in fixing prices during that period.

**REQUEST NO. 28**

Admit that, between January 1, 2000, and January 31, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 28**

Admitted to the extent Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003. More generally, if there was any such agreement prior to March 2003, it was ineffective in fixing prices during that period.

**REQUEST NO. 29**

Admit that, between January 1, 2000, and December 31, 2002, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 29**

Admitted to the extent Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003. More generally, if there was any such agreement prior to March 2003, it was ineffective in fixing prices during that period.

**OLIN'S RESPONSES TO REQUESTS SPECIFICALLY DIRECTED TO OLIN**

**OLIN REQUEST NO. 176**

Admit that Olin paid a Rate-Based Rail Fuel Surcharge for rail freight before January 1, 2003.

**OLIN RESPONSE TO REQUEST NO. 176**

Admitted that Olin paid a Rate-based Rail Fuel Surcharge for Rail Freight before January 1, 2003 on at least one shipment.

**OLIN REQUEST NO. 177**

Admit that, during the Class Period, Olin considered other factors besides price when deciding whether to use a Rail Carrier or Rail Carrier Alternative for particular shipments.

**OLIN RESPONSE TO REQUEST NO. 177**

Olin objects that the term "price" is vague and ambiguous in light of previous references in these Requests to the "all-in price." Olin also objects to this Request to the extent it seeks counterfactually to isolate some factor that purportedly may have influenced rate negotiations. The evidence shows that any such factors are reflected in the base rates for different shippers that demonstrated price discrimination by Defendants both before and during the conspiracy. The evidence also shows that what changed during the Class Period was the imposition of the agreed-upon non-negotiable Rail Fuel Surcharges on top of the base rates. The expert analysis demonstrates that during the Class Period, the base rates have not changed in any way that would reflect widespread, non-anomalous offsetting of Rail Fuel Surcharges.

Subject to and without waiving its general and specific objections, Olin admits that on certain occasions, Olin considered a factor other than price when deciding whether to use a Rail

**DONNELLY COMMODITIES' RESPONSES TO REQUESTS SPECIFICALLY <u>DIRECTED TO DONNELLY COMMODITIES</u>**

**<u>DONNELLY COMMODITIES REQUEST NO. 176</u>**

Admit that Donnelly Commodities paid a Rate-Based Fuel Surcharge for Rail Freight Transportation Services before January 1, 2003.

**<u>DONNELLY COMMODITIES RESPONSE TO REQUEST NO. 176</u>**

Donnelly Commodities admits that it paid a Rate-based Rail Fuel Surcharge for Rail Freight before January 1, 2003 on at least one shipment.

**<u>DONNELLY COMMODITIES REQUEST NO. 177</u>**

Admit that Donnelly Commodities originated all of its rail shipments during the Class Period using CSX or NS.

**<u>DONNELLY COMMODITIES RESPONSE TO REQUEST NO. 177</u>**

Donnelly Commodities objects that the phrase "originated" is vague and ambiguous. Denied.

**<u>DONNELLY COMMODITIES REQUEST NO. 178</u>**

Admit that, absent the alleged conspiracy, Donnelly Commodities would have paid a Rail Fuel Surcharge to CSX after July 1, 2003.

**<u>DONNELLY COMMODITIES RESPONSE TO REQUEST NO. 178</u>**

Donnelly Commodities objects to this Request for Admission on the grounds that it calls for speculation, posits an incomplete, counterfactual hypothetical, calls for expert analysis, and fails to provide sufficient information from which Donnelly Commodities can responsibly answer.

**<u>DONNELLY COMMODITIES REQUEST NO. 179</u>**

Admit that, absent the alleged conspiracy, Donnelly Commodities would have paid a Rail

**DUST PRO RESPONSE TO REQUEST NO. 179**

Dust Pro objects to this Request for Admission on the grounds that it is overly broad, unduly burdensome and oppressive. Dust Pro further objects that the Request seeks information that is already in the possession of Defendants or that is equally or readily accessible to Defendants. Dust Pro further objects to the Request on the ground that the burden of deriving or ascertaining the answer would be the same for Defendants as for Dust Pro and far outweighs the relevance of this information. Subject to, as limited by, and without prejudice to all applicable objections, Dust Pro admits that Dust Pro paid a Rate-Based Rail Fuel Surcharge in 2003, but, following a reasonable inquiry, is unable to determine whether such payments were made before March 1, 2003.

**DUST PRO REQUEST NO. 180**

Admit that Dust Pro paid a Rate-Based Rail Fuel Surcharge before July 1, 2003.

**DUST PRO RESPONSE TO REQUEST NO. 180**

Admitted that Dust Pro paid a Rate-Based Rail Fuel Surcharge before July 1, 2003 on at least one shipment.

**DUST PRO REQUEST NO. 181**

Admit that between January 1, 2000 and December 31, 2008, all freight shipments to and from Dust Pro's Phoenix, Arizona facility were shipped on rail (as opposed to using a Rail Carrier Alternative).

**DUST PRO RESPONSE TO REQUEST NO. 181**

Denied.

**STRATES SHOWS' RESPONSES TO REQUESTS SPECIFICALLY DIRECTED TO STRATES SHOWS**

**STRATES SHOWS REQUEST NO. 176**

Admit that Strates Shows paid a Rate-Based Rail Fuel Surcharge to NS for rail freight before March 1, 2003.

**STRATES SHOWS RESPONSE TO REQUEST NO. 176**

Subject to and without waiving its general objections, Strates Shows admits that Strates Shows paid a Rate-Based Rail Fuel Surcharge to NS for rail freight before March 1, 2003.

**STRATES SHOWS REQUEST NO. 177**

Admit that Strates Shows paid a Rate-Based Rail Fuel Surcharge to NS for rail freight before July 1, 2003.

**STRATES SHOWS RESPONSE TO REQUEST NO. 177**

Subject to and without waiving its general objections, Strates Shows admits that Strates Shows paid a Rate-Based Rail Fuel Surcharge to NS for rail freight before July 1, 2003.

**STRATES SHOWS REQUEST NO. 178**

Admit that Strates Shows did not pay a fuel surcharge to CSX for rail freight until after January 1, 2007.

**STRATES SHOWS RESPONSE TO REQUEST NO. 178**

Subject to and without waiving its general objections, Strates Shows admits that Strates Shows did not pay a separately-identified item labeled a "fuel surcharge" to CSX for rail freight until after January 1, 2007.

**STRATES SHOWS REQUEST NO. 179**

Admit that Strates Shows used Truck Carriers as an alternative to Rail Carriers for freight shipped during the Class Period.

## U.S. MAGNESIUM'S RESPONSES TO REQUESTS SPECIFICALLY DIRECTED TO U.S. MAGNESIUM

**U.S. MAGNESIUM REQUEST NO. 176**

Admit that U.S. Magnesium paid a Rate-Based Fuel Surcharge for rail freight before March 1, 2003.

**U.S. MAGNESIUM RESPONSE TO REQUEST NO. 176**

Admitted that U.S. Magnesium paid a Rate-based Rail Fuel Surcharge for Rail Freight before March 1, 2003 on at least one shipment.

**U.S. MAGNESIUM REQUEST NO. 177**

Admit that U.S. Magnesium paid a Rate-Based Fuel Surcharge for rail freight before July 1, 2003.

**U.S. MAGNESIUM RESPONSE TO REQUEST NO. 177**

Admitted that U.S. Magnesium paid a Rate-based Rail Fuel Surcharge for Rail Freight before July 1, 2003 on at least one shipment.

**U.S. MAGNESIUM REQUEST NO. 178**

Admit that between January 1, 2000 and December 31, 2008, U.S. Magnesium was a sole-served by UP – i.e., U.S. Magnesium could not have used any other Rail Carrier besides UP for rail freight shipments from its facilities.

**U.S. MAGNESIUM RESPONSE TO REQUEST NO. 178**

Admitted that UP was the only Rail Freight Carrier that directly served U.S. Magnesium's facilities.

**U.S. MAGNESIUM REQUEST NO. 179**

Admit that between January 1, 2000 and December 31, 2008, at least some shipments of chloride products produced by U.S. Magnesium during the Class Period were shipped by

Dated: February 8, 2011

Respectfully submitted:

/s/Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-9850
Facsimile: (212) 480-8560
Email: solson@hausfeldllp.com

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 8, 2010, a copy of the foregoing objections and responses to Defendants' joint first requests for admissions was served on counsel for Defendants by electronic mail.

/s/ Sami H. Rashid___________

# Intentionally Omitted

## DA06302-DA06362

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br><br>Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To:<br><br>ALL DIRECT PURCHASER CASES | |

**PLAINTIFFS' SECOND AMENDED CONSOLIDATED OBJECTIONS AND RESPONSES TO DEFENDANTS' JOINT FIRST REQUESTS FOR ADMISSIONS**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, and the parties' agreement to serve amended discovery responses, Plaintiff Olin Corporation ("Olin"), Plaintiff Carter Distributing Company ("Carter Distributing"), Plaintiff Dakota Granite Company ("Dakota Granite"), Plaintiff Donnelly Commodities, Inc. ("Donnelly Commodities"), Plaintiff Dust Pro, Inc. ("Dust Pro"), Plaintiff Nyrstar-Taylor Chemicals, Inc. ("Nyrstar"), Plaintiff Strates Shows, Inc. ("Strates Shows"), and Plaintiff U.S. Magnesium LLC ("U.S. Magnesium") (collectively, "Plaintiff" or "Plaintiffs"), through their attorneys, collectively and individually, hereby submit these second amended consolidated responses and objections to the Defendants' Joint First Requests for Admissions (the "Requests") directed to (1) Olin, (2) Carter Distributing, (3) Dakota Granite, (4) Donnelly Commodities, (5) Dust Pro, (6) Nyrstar, (7) Strates Shows, and (8) U.S. Magnesium.

Plaintiffs have consolidated their responses and objections to the Requests due to the overlap in the Requests themselves, as well as in Plaintiffs' objections and responses to them.

**REQUEST NO. 24**

Admit that, between January 1, 2000, and May 31, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 24**

Denied.

**REQUEST NO. 25**

Admit that, between January 1, 2000, and April 30, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 25**

Denied.

**REQUEST NO. 26**

Admit that, between January 1, 2000, and March 31, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 26**

Denied.

**REQUEST NO. 27**

Admit that, between January 1, 2000, and February 28, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 27**

Admitted to the extent Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003. More generally, if there was any such agreement prior to March 2003, it was ineffective in fixing prices during that period.

**REQUEST NO. 28**

Admit that, between January 1, 2000, and January 31, 2003, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 28**

Admitted to the extent Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003. More generally, if there was any such agreement prior to March 2003, it was ineffective in fixing prices during that period.

**REQUEST NO. 29**

Admit that, between January 1, 2000, and December 31, 2002, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 29**

Admitted to the extent Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003. More generally, if there was any such agreement prior to March 2003, it was ineffective in fixing prices during that period.

**REQUEST NO. 30**

Admit that, between January 1, 2000, and November 30, 2002, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 30**

Admitted to the extent Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003. More generally, if there was any such agreement prior to March 2003, it was ineffective in fixing prices during that period.

**REQUEST NO. 31**

Admit that, between January 1, 2000, and October 31, 2002, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

**RESPONSE TO REQUEST NO. 31**

Admitted to the extent Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003. More generally, if there was any such agreement prior to March 2003, it was ineffective in fixing prices during that period.

**REQUEST NO. 32**

Admit that, since January 31, 2007, Defendants did not agree unlawfully to use Rail Fuel Surcharges as a means to fix, raise, maintain and/or stabilize the price of Rail Freight Transportation Services.

Dated: May 11, 2011

Respectfully submitted:

/s/ Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel Brockett
Marc L. Greenwald
Steig D. Olson
Sami H. Rashid
Joseph D. Hammond
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on May 11, 2011, a copy of the foregoing objections and responses to Defendants' joint first requests for admissions was served on counsel for Defendants by electronic mail.

/s/ Sami H. Rashid__________

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 |
| This document relates to: | Misc. No. 07-489 (PLF/AK/JMF) |
| ALL DIRECT PURCHASER CASES | |

**DIRECT PURCHASER PLAINTIFFS' SECOND AMENDED CONSOLIDATED OBJECTIONS AND RESPONSES TO THE FIRST SET OF INTERROGATORIES DIRECTED TO ALL DIRECT PURCHASER PLAINTIFFS BY: (1) BNSF RAILWAY COMPANY; (2) CSX TRANSPORTATION, INC.; (3) NORFOLK SOUTHERN RAILWAY COMPANY; AND (4) UNION PACIFIC RAILWAY COMPANY ("DEFENDANTS")**

Direct Purchaser Plaintiffs ("Plaintiffs"), through their attorneys, hereby submit these amended consolidated responses and objections to the First Set of Interrogatories to all Direct Purchaser Plaintiffs by: (1) Defendant BNSF Railway Company ("BNSF"); (2) Defendant CSX Transportation, Inc. ("CSX"); (3) Defendant Norfolk Southern Railway Company ("NS"); and (4) Defendant Union Pacific Railway Company ("UP") (collectively, the "Interrogatories"). These amended responses are being served pursuant to the parties' agreement to serve amended discovery responses. They are being served without prejudice to Plaintiffs' rights to supplement further and to present all available evidence at trial.

Plaintiffs have consolidated their response to the Interrogatories separately served by Defendants due to the overlap in the Interrogatories themselves, as well as in Plaintiffs' objections and responses to them.

2. Between 2000 and 2003, each Defendant made efforts to increase its rail freight revenues and/or prices. These actions included, among other things, attempts to apply stand-alone fuel surcharges, intended as "revenue enhancement steps."[6]

3. Prior to 2003, Defendants did not impose stand-alone fuel surcharges widely, and the Defendants have acknowledged that any stand-alone fuel surcharges used during this period were not the result of coordination among Defendants' senior executives. Mike Giftos, then CSX's Chief Commercial Officer, testified that CSX's initial fuel surcharge program in 2000 resulted solely from internal CSX discussions.[7] Don Seale, then NS's Senior Vice President of Merchandise Marketing, testified that he was not aware of any communications with the other Defendants concerning NS's adoption of an initial fuel surcharge in 2000.[8]

4. In February 2001, Defendants discussed creating an "industry standard" fuel surcharge, but decided not to do so at that time.[9]

5. During this period prior to 2003, Defendants had limited success when trying to boost their revenues through use of fuel surcharges. During this period, stand-alone fuel surcharges were applied only sporadically at low levels to a limited volume of traffic for certain

[6] RD Ex. 163, at 6; *see also* UPFSC0000520-22 ("Any general marketplace increases will see major defections and little chance that others will follow. The fuel surcharge adjustment is the best way of realizing higher revenues without adverse market impact.")

[7] Giftos Dep. 31; *see also* Koraleski Dep. Ex. 25 ("Our [UP] price increase philosophy has been to take market adjustment changes in price and not tie them specifically to fuel."); Tr. of Dep. of Robert Knight ("Knight Dep.") 24 ("There were some isolated situations where there were surcharges, but I don't – there's no policy position.").

[8] Seale Dep. 13, 107-09; *see also* Goode Dep. 53; Tr. of Dep. of Charles Wickliff Moorman ("Moorman Dep.") 145-46.

[9] *See, e.g.*, RD Ex. 178, at BNSF-0121901-02 ("Tom J. [of BNSF] provided feedback from rail carriers regarding the concept of establishing an industry wide fuel surcharge formula. Rail carriers unanimously choose not to act on an industry standard fuel surcharge."); BNSF_LOG0000054-56. These discussions appear to go back to November 2000. *See, e.g.*, UPFSC_0003484-85 (industry meeting discussion was to cover "all aspects of FSC").

circulars, and exempted private shipments in its Industrial Products group (which accounted for 21% of UP's total commodity revenue in 2004) .[14]

6. Likewise, prior to 2003, Defendants applied stand-alone fuel surcharges only sporadically, and at low levels, to their intermodal business.[15] In many cases, Defendants did not collect fuel surcharges at all on major intermodal shippers.[16] Defendants struggled to "raise prices and profitability in Intermodal," just as they did on the rest of their business.[17]

7. During this period prior to 2003, Defendants, in considering whether to apply stand-alone fuel surcharges to particular shipments or customers, were concerned about losing business to other Defendants that would not apply fuel surcharges; Defendants faced customer resistance to imposition of fuel surcharges; and individual Defendants lost business as a result of

---

[14] *See, e.g.*, RD Ex. 8; RD Ex. 15; RD Ex. 13; RD Ex. 12; RD Ex. 14; RD Ex. 165, at 4. Earlier attempts to apply fuel surcharges resulted in waivers and discounts. *See, e.g.*, UPFSC_0308795; UPFSC_0437016; UPFSC_0438393-95 ("We are being pretty lenient on the fuel surcharge since we already have RCAF-U at 85% built in and knowing that fuel is a component of RCAF-U."); UPFSC_0047327-28 ("Our strategy remains to negotiate pure price upfront vs. a surcharge. It's more sustainable, easier to administer, and more effective with customers."); UPFSC_0117070-72; UPFSC_0029999 ("If you have business at risk because of a fuel based increase in 3229, Bob suggested you use a refund allowance to offset the price increase to shield the traffic from being lost.").

[15] *See, e.g.*, BNSF-0070536-42, at 42 (FSCs not applied to 60% of BNSF's "intermodal revenue base"); NS_026000029 (In April 2002, NS's intermodal fuel surcharge was at 1.5% and generating "[n]ot much incremental revenue"); UPFSC_0486003; UPFSC_0054914-15, at 14 (UP's intermodal fuel surcharge "rounded to 1.0% to apply September 1, 2002"); UPFSC_0347573-77, at 76 (Nov. 14, 2001 chart detailing differences in intermodal fuel surcharges among all four defendants; on October 15, 2001, for example, BNSF's intermodal fuel surcharge was 2.50%, CSX's was 3.40%, NS's was 3.0%, and UP's was 3.50%); UPFSC_0188750; NS_008005290 (shippers resisting intermodal fuel surcharge in April 2000 even though it was tracking at 3%); Koraleski Dep. 255.

[16] *See, e.g.*, UPFSC_0026805 (listing intermodal exceptions); NS_026002535-36, at 35 (NS "forced to acquiesce on some of the International contracts and stop charging an FSC"); Koraleski Dep. 256.

[17] *See, e.g.*, UPFSC_0133557-60, at 57; *see also* NS_013005343 (March 2001 NS analysis predicting "[i]ncreasing skirmishes on pricing" with CSX's intermodal division, which might respond with "more desperate action if share continues to decline").

9. Defendants recognized that widespread application of stand-alone fuel surcharges would not be feasible unless Defendants were jointly committed to this outcome. As BNSF later stated during the Class Period, while "reliance on fuel surcharge as a mechanism to control fuel prices … is working well now, it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."[22]

10. Likewise, in January 2003, BNSF noted that "the reasons limiting our ability to pass on fuel cost recovery charges vary – the source of competition (truck, rail, or other), industry practices, contract negotiating power all play a role. In Ag, for instance, prices generally fully reflect the market opportunities…. Therefore, any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive."[23]

11. Significantly, Defendants were recognizing such obstacles to widespread application of stand-alone fuel surcharges prior to 2003, when the Defendants' unilateral fuel surcharges, to the extent they were used at all, were only "theoretically billable," in that they often were not triggered or applied, and when they were, they were small.[24] Even under those

---

[22] HD Ex. 31, at BNSF_0574216; *see also* HD Ex. 32, at BNSF_0571517 (identifying as a top risk the "[risk] that competitors reverse course on using a fuel surcharge").

[23] HD Ex. 25, at BNSF-0328866.

[24] *See, e.g.*, Glennon Dep. 26; Young Dep. 25-26 ("We had fuel surge [sic] programs in many contracts, but because fuel had not run up, they were never implemented"); *id.* 28 ("any fuel surcharges that were triggered during the 2000 through 2002 time period never reached significant percentage levels"); *id.* at 169 (the fuel surcharge "wasn't a significant piece of [UP's] business" in 2000 and 2001 and it "didn't show up in terms of [UP's] financials, the impact."); Knight Dep. 23-24 (testimony by UP's CFO that, from 2000-2002, "[t]here was not a [FSC] policy. There were some isolated situations where there were surcharges, but I don't – there's no policy position"); Tr. of Dep. of John Lanigan ("Lanigan Dep.") 27, 29 (BNSF's fuel surcharge participation rates as of January 2003 were "in the 25 to 30 percent range," which John Lanigan found to be "low" and made it his goal to increase); Tr. of Dep. of Matthew Rose ("Rose Dep.") 20-21 (FSCs around 2000 "never hit the strike price and – and we never collected."); Kyei Dep. 42 ("[F]uel surcharges that were put in place in 2000 weren't collecting a lot of money"); Gooden Dep. 101 (agreeing that the "fuel surcharge revenue the company was generating prior to adoption of this new program in March of 2003 was" "[l]ow – relatively low

circumstances, Defendants were still hard pressed to apply fuel surcharges widely or generate significant revenue from them.[25] As expected, when fuel surcharges were applied during this period, they met strong customer opposition.[26]

---

to where it needed to be"); *id.* 226 (Gooden noting that he was "embarrassed" regarding fuel surcharge coverage, which in 2003 was "very low"); Tr. of Dep. of Tim McNulty ("McNulty Dep.") 118-19 (FSC implementation was "minimal" in 2001 and 2002 at CSX); NS_010073115-121 (BNSF "FSC has been in effect for a long time, but [BNSF] only began aggressively applying in last year.").

[25] *See supra* at ¶¶ 3, 5, 6, 8.

[26] *See infra* at ¶¶ 14, 64, 115; *see, e.g.,* HD Ex. 5, at NS_010076040 (Pat Glennon (NS) informs his colleagues in April 2003 about CSX's approach to fuel surcharges: "Informally they told me they intended to apply it to contracts, but admitted that it might not stick."); HD Ex. 3, at NS_0100073466-67 ("Any FSC change, particularly to a more aggressive formula like the CSXT's, has the potential to complicate rate negotiations and generate billing disputes with customers …. Both points would significantly reduce potential FSC yield if we were to swap out formulas in the short term. It is even conceivable that we could experience a net decline in revenue if customers were to withhold line-haul payments pending the resolution of FSC complaints/disputes."); RD Ex. 181 (OxyChem customer complaint); RD Ex. 182 (stating in response to OxyChem customer complaint that "Mike Giftos knew when he changed the program that we were changing the rules during the game. There will be many situations like this . . . ."); RD Ex. 183 (commenting in response to SP Newsprint customer complaint that CSX already had "about six like this"); RD Ex. 184 (responding to Gold Kist customer complaint by proposing a "'template' to respond to fuel surcharge complaints"); RD Ex. 185 (Unimin customer complaint "draw[ing] a line in the sand"); RD Ex.186 (Sunoco customer complaint); RD Ex.187 (DuPont customer complaint); Tr. Of Dep. of Clyde McIntyre ("McIntyre Dep.") 104-07 (testifying to customer pushback and competition with NS on fuel surcharges); RD Ex. 188 ("Customers may view a more aggressive CSXT fuel surcharge negatively, particularly on NS competitive business . . . ."); RD Ex. 189 (ADM customer complaint); RD Ex. 190 (agriculture customer complaint and concern over CSX's approach to fuel surcharges); RD Ex. 191 (Cargill customer complaint); RD Ex. 192 (PCS customer complaint); RD Ex. 193 ("Customers are picking up on the surcharge situation and are starting to get nasty."); RD Ex. 194 (Conagra customer complaint); RD Ex. 33 (Weyerhaeuser customer complaint); RD Ex. 21 (International Paper customer complaint); RD Ex. 29 (Smurfit Stone threatens to route around BNSF using UP); RD Ex. 18 (Sappi-Fine short pays every bill by the applicable fuel surcharge amount for certain paper shipments); RD Ex. 4 (circulating customer complaint with respect to BNSF's planned change to a new fuel index); NS 001000220-224 ("CSXT has changed their fuel surcharge. As you can see below, Gerdau AmeriSteel is not happy as it will cause a lot of manually keying on their part and quite frequently. This is probably the case for a lot of our customers."); UPFSC 0184903-05; UPFSC 0043779-81; Giftos Dep. 143 (OxyChem), 151 (SP Newsprint), 157 (Unimin), 162 (Sunoco), 164-65 (2% cap on Sunoco's fuel surcharges), 167 (Dupont), 172-73 (considered capping CSX's fuel surcharge program), 178-79 (considered raising trigger to $25 and setting fuel surcharge term at 90 days instead of 30); NS_010032689-

unless fuel surcharges were to be widely applied on a coordinated basis by all four Defendants. Absent coordination and industry-wide agreement, a railroad seeking to impose fuel surcharges more aggressively than its competitors would risk losing business to another railroad that imposed no fuel surcharge at all, applied a less onerous fuel surcharge, or had more flexible fuel surcharge policies. In addition, Defendants recognized it would be more difficult to justify fuel surcharges to customers as necessary if all Defendants were not imposing them in a coordinated manner.[31]

15. The characteristics of the rail freight industry made it highly conducive to collusion, particularly through use of a stand-alone fuel surcharge that could be added to freight bills.[32]

---

[31] *See, e.g.*, Gooden Dep. 49 (In early 2003 discussions in advance of new fuel surcharge program, CSX was "looking at ways that the fuel surcharge [] could generate more money for the company"); BNSF-0027276 (At a February 2003 meeting of the Pacific Northwest Association of Rail Shippers ("PNWARS"), CSX's Clarence Gooden informed other Defendants that CSX was "not making any profit" on its existing fuel surcharge.); HD Ex. 29, at BNSF-0387501 (BNSF CMO identified fuel surcharges as a source of "revenue growth" in February 2003); HD Ex. 30, at NS_010004522 (April 2003 NS analysis concluding that CSX's proposed new fuel surcharge program – which NS later adopted – is "in fact a blatant general rate increase, and will appear so to customers"); Glennon Dep. 42 (new CSX program "definitely was more aggressive" and "definitely yielded more revenue"); RD Ex. 202, at NS_001000217 (diverse approach to fuel surcharges "is not good"); CSXFSC000152645-47 (May 2003 complaint from shipper Sunoco stressing that, based on prevailing fuel cost projections, the $23 trigger of the coordinated fuel surcharge would be reached "100% of the time between 2003-2007," whereas CSX had applied an fuel surcharge only "16% of the time" in the preceding decade); *see also infra* at ¶¶ 64, 115; *supra* at ¶ 11.

[32] *See, e.g.*, The American Waterways Operators, "Facts About the Industry," *available at* http://www.americanwaterways.com/industry_stats/facts_about_ind/factsabout.pdf; Meyer, S., "Grain; Transportation and Marketing Channels," Food and Agricultural Policy Research Institute, FAPRI-UMC Briefing Paper #04-04, June 2004, *available at* http://www.fapri.missouri.edu/outreach/publications/2004/FAPRI_UMC_Briefing_Paper_04_04.pdf; Marathon, N.,VanWechel, T., & Vachal, K., Transportation of U.S. Grains: A Modal Share Analysis, 1978-2004, USDA, Transportation Services Branch, Oct. 2006, *available at* http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELDEV3020131; U.S. Department of Transportation, Research and Innovative Technology Administration, Bureau of Transportation Statistics and U.S. Census Bureau, 2002 Commodity Flow Survey; Bureau of

Transportation Statistics, "Growth in the Nation's Freight Shipments – Highlights," *available at*: http://www.bts.gov/publications/freight_shipments_in_america/html/entire.html; Pittman, R.W., "Railroads and Competition: The SantaFe/Southern Pacific Merger Proposal," The Journal of Industrial, Economics, 39.1 (Sept.1990); Winston, C., "A Disaggregate Model of the Demand for Intercity Freight Transportation," Econometrica, 49 (1981); Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," The Bell Journal of Economics, 10.2 (Autumn, 1979); U.S. Government Accountability Office, Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed, GAO-07-94, Oct. 2006; Garrod, P.W., & Miklius, W., "'Captive Shippers' and the Success of Railroads in Capturing Monopoly Rent," Journal of Law and Economics, 30.2 (Oct., 1987); Zlatoper, T. & Austrian, Z. "Freight Transportation Demand: A Survey of Recent Econometric Studies," Transportation, 16 (1989); U.S. Department of Transportation, Federal Highway Administration, "Western Uniformity Scenario Analysis: A Regional Truck Size and Weight Scenario Requested by the Western Governor's Association," *available at*: http://www.fhwa.dot.gov/policy/otps/truck/wusr/chap10.htm; "Freight Train Blues," Infrastructure US., *available at* http://www.americainfra.com/article/Freight-Train-Blues/; Congressional Budget Office, Freight Rail Transportation: Long Term Issues, A CBO Paper (Jan. 2006); Kessides, I.N., & Willig, R.D., "Restructuring Regulation of the Railroad Industry," Public Policy for the Private Sector, The World Bank (Oct. 1995); "North American Railcar Review," a presentation by Alan McDonald, Director of Equipment Data Systems at Railinc, dated Mar. 3, 2008, *available at* https://www.railinc.org/docs/2008_Rail_Finance_Conference_Railinc_Presentation.pdf; BNSF 2008 Annual Report and Form 10-K; UP 2005 Annual Report; UP 2006 Annual Report; UP 2007 Annual Report; UP 2008 Annual Report; Kunce, M., Hamilton, S., & Gerking, S., "Marketable Permits, Low-Sulfur Coal and the Behavior of Railroads," University of Wyoming, (2005); IRS, "Railroad Industry Overview Series – Information Systems and Industry Operating Procedure-October 2007," at http://www.irs.gov/businesses/article/0,,id=175293,00.html; U.S. Census Bureau, 2002 Vehicle Inventory and Use Survey: United States, EC02TV-US (Washington, DC: 2004), *available at* www.census.gov/prod/ec02/ec02tv-us.pdf as of April 13, 2009; U.S. Census Bureau, 1997 Truck Inventory and Use Survey: United States, TC92-T-52 (Washington, DC: 1995), *available at* www.census.gov/prod/ec97/97tv-us.pdf as of April 13, 2009; "Rail Common Carrier Obligation/Contracts," presented to the Southwest Association of Rail Shippers on Feb. 19, 2009, *available at* http://www.railshippers.com/regional/southwest/dimichael_presentation.pdf.; U.S. General Accounting Office, Railroad Regulation: Competitive Access and Its Effects on Selected Railroads and Shippers, Report to the Chairman, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives (June 1987), *available at* http://archive.gao.gov/d28t5/133518.pdf; U.S. Bureau of Labor Statistics, Sept. 25, 2005; Joskow, P.L., & Noll, R.G., "The Bell Doctrine: Applications in Telecommunications, Electricity, and Other Network Industries," Stanford Law Review (May, 1999).

and Chief Marketing Officers ("CMOs").[36] During the Class Period, Defendants' CMOs and CEOs engaged in numerous phone calls, emails, and in-person visits with each other.[37]

17. Many (but not all) of these senior-level discussions took place at in-person meetings that Defendants self-servingly designated as "Alliance" meetings – *i.e.*, meetings between two Defendants at a time. These meetings were purposefully conducted outside the presence of counsel and without other safeguards that are used in a many industries to prevent collusion when competitors meet.[38] For example, Defendants did not institute protocols to

---

[36] As used herein, "CMO" refers to persons holding the title Chief Marketing Officer or Chief Commercial Officer, as well as those holding equivalent positions as the most senior marketing officer at the company and those who, in fact, were delegated authority akin to the most senior marketing officer; specifically, it refers to: Chuck Schultz and John Lanigan (BNSF); Michael Giftos and Clarence Gooden (CSX); Isaac (Ike) Prillaman and Donald Seale (NS); and John (Jack) Koraleski (UP).

[37] *See, e.g.*, Lanigan Dep. 283-86, Koraleski Dep. 27-28, 50-51, 66-72, 147-48, 166, 285-88; Goode Dep. 57-58, 120-22, 168, 180-83, 201-07. *See also* Couch Dep. 22-28; *see also infra* ¶¶ 23-24, 29, 34-38, 40, 42, 44-50, 52-56, 60, 62, 74-76, 87, 89, 97-98, 101, 104, 107.

[38] Eisele Dep. 88 (testifying that there was no requirement that attorneys attend "Alliance" meetings and that that he could not recall a single time a lawyer from UP, CSX, or NS ever attended such a meeting); *see also* Young Dep. 252-54, 259, 286-87 (no indication of attorneys attending various meetings); Lanigan Dep. 122-23 (no lawyer was present at the "BNSF-NS Senior Team Meeting" on March 18, 2003). UP's Chairman, President, and CEO, testified that he could not recall the identity of a single lawyer who ever provided him any antitrust training at any time from 2003 to 2008, despite testifying that he relied on his training to know "what you can and can't talk about." Young Dep. 214-15; Koraleski Dep. 31-32; Moorman Dep. 29 (testifying that NS did not have a policy requiring attorney attendance at "Alliance" meetings); Moorman Dep. 227 (testifying that he could not recall a single meeting with BNSF, UP, or CSX at which an attorney or anyone else identified at the outset of the meeting the topics that could and could not be properly discussed).

Defendants' executives and employees have testified that, although they did interchange some freight traffic, they were in fact competitors in the marketplace and were expected to conduct their affairs as such. *See, e.g.,* Goode Dep. 22-23, 105 ("we compete with every railroad in some circumstances"), 106-07 ("Q: Would it be an accurate statement to say Norfolk Southern does not compete with Union Pacific? A: I think that would not be an accurate statement."); Koraleski Dep. 36, 44, 51-53 (the statement "Union Pacific does not compete with CSX and NS . . . would not be true"); Eisele Dep. 83-84; Knight Dep. 103, 222, 236 ("marketplace" includes BNSF, CSX, NS, and UP), 250-51, 269; Tr. of Dep. of Mark Draper ("Draper Dep.") 73 ("There's only four big railroads in the country. I mean, that -- that's the market."). Defendants

record or transcribe these meetings accurately.[39] As noted *infra*, the few notes that did survive show that the "minutes" that came out of these meetings were sanitized. Moreover, "[s]ide discussions took place all the time at these meetings, over breaks, over lunch, whatever the case might be."[40] These "Alliance" or other "bilateral" meetings included broad-ranging discussions about the industry, and expressly addressed coordination among *all* of the Defendants.[41] Moreover, Defendants were aware that they were all having "bilateral" discussions about coordinating fuel surcharges around the same time. For example, while UP was meeting with

---

have acknowledged that competitive constraints existed even when only one railroad serves a particular shipper facility. As NS's CEO, Charles Moorman, stated in written testimony before a Congressional committee, "Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lost the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real." Corrected HD Ex. 36, at 20-21; *see also* Young Dep. 172-201; Gooden Dep. 262-264. Similarly, the STB found: "[S]hippers that are served by a single carrier may nevertheless benefit from the indirect competition that results from having another carrier nearby. In this regard, they may have the possibility of constructing (or proposing to construct) a connection to a second carrier, or of transloading freight by truck to a second carrier. They also may benefit from the opportunity to negotiate a long-term contract before choosing to locate a new plant along either of two carriers' lines or to adjust production levels at plants already located along those lines. A quick glance at a rail map confirms that the eastern and western railroads do not simply meet end-to-end at Chicago and the Mississippi River crossings; there is a fair degree of overlap. . . .." 5 SURFACE TRANSPORTATION BOARD REPORTS 556, *available at* http://www.stb.dot.gov/boundvolumes5.nsf/38f502d6898daf3385256811004b5a12/71db6901b74ccfa385257085006d4711/$FILE/vol5-31.pdf.

[39] Eisele Dep. 89 ("There was no stated process by which that – what transpired in the meetings would be recorded."); *id.* at 100 (not aware of anyone being assigned to take notes); *id.* at 141 (not aware of any specific effort to "ensure that the minutes prepared from Alliance meetings accurately reflected what was actually discussed at the meetings"); Young Dep. 219-20, 291-92; Goode Dep. 157-58, 224-25, 227-28 (not aware of any "effort to ensure that what occurred at these meetings was accurately recorded in some way").

[40] Eisele Dep. 193.

[41] *See also infra* at ¶ 62.

NS and CSX on a "bilateral" basis, it knew that NS and CSX were likewise having such meetings with BNSF.[42]

18. Defendants' senior executives also gathered to discuss fuel surcharges at meetings of the Association of American Railroads ("AAR"), including AAR board meetings and meetings of the AAR's Network Efficiency Management Committee ("NEMC"), and other industry meetings.

19. The AAR is effectively controlled by Defendants, who contribute over 80% of the AAR's dues.[43] Edward Hamberger testified that during his term as the AAR's president (1998 to present), only one AAR board action – concerning asbestos legislation – was taken without approval of all four Defendants.[44] And Mr. Hamberger could not recall a single initiative supported by all four Defendants that was not approved by the AAR's board.[45] Separate from the regularly scheduled meetings of the AAR's board, an "executive committee" composed of the four Defendants' CEOs would regularly have discussions about matters of interest to the AAR.[46] Defendants' CEOs used these meetings as cover for collusive conversations as well.[47]

---

42 *See e.g.*, Young Dep. 224; UPFSC 0184812-23, at UPFSC_0184816 (CEO Young 2006 self-evaluation, confirming awareness of "alliances between BNSF and Eastern carriers"); Eisele Dep. 283; Koraleski Dep. 347-48; Koraleski Dep. Ex. 53.

43 *See, e.g.*, Tr. of Dep. of Edward Hamberger ("Hamberger Dep.") 91 (Defendants responsible for over 80% of the AARs member dues, which are based on freight revenues); Hamberger Dep. 83 (pursuant to AAR's bylaws, voting on the AAR's board of directors is controlled by "freight and revenue"); Rockey Dep. 36-37 (Defendants responsible for 80-85% of railroads revenues between 2003 and 2007; certain voting procedures within AAR take account of the revenue of the railroads participating in the vote; Defendants are members of the AAR's board of directors); *see also* Rockey Dep. 109 (creation of AIILF "required a consensus" of "at least the four defendants in this case"); AAR-E-00116414-32 (AAR bylaws); AAR-000001 (AAR directory 2007); AAR-E-00028627 (AAR directory 2004).

44 Hamberger Dep. 85.

45 *Id.*

46 *See, e.g.*, Hamberger Dep. 89-90; 92-94; Goode Dep. Ex. 11 (June 23, 2003 Davidson (UP) calendar entry featuring an "AAR CEO meeting" including Evans (UP), Rose (BNSF),

dissolved in September 2009 on the advice of counsel after this litigation brought to light some of Defendants' conduct in that forum.[60]

23. Prior to March 5, 2003, UP CMO Jack Koraleski had discussed "fuel surcharge methodology" with at least CSX's Clarence Gooden.[61] UP and CSX senior executives (including Mr. Koraleski and Mr. Gooden) had met for an "Alliance" meeting on December 16, 2002.[62] In addition, Defendants' CMOs met at a February 7, 2003 meeting of NEMC, and at a NEMC reception the previous evening.[63] At the February 6, 2003 NEMC reception, Defendants' CMOs discussed (among other topics) organizing a private weekend to spend time together.[64]

24. On March 12-13, 2003, UP and CSX executives planned to meet to discuss "fuel surcharge methodology," among other topics.[65] Golf and other social engagements, including dinner, were also contemplated.[66]

25. The day before the March 12 meeting, CSX had internally recommended changes to its standard fuel surcharge program that would have lowered its strike price from $28 to $23 per barrel on the West Texas Intermediate ("WTI") index.[67] Under the proposal, CSX would impose a 1% surcharge when the $23 strike price was reached, and an additional 0.5% surcharge

---

[60] *See, e.g.*, Adams Dep. 67; Hamberger Dep. 96-97; Rose Dep. 196-97; Lanigan Dep. 128-31; AAR NEMC-E00000007-08; AAR NEMC-P00000001-06.

[61] *See, e.g.*, RD Ex. 210. On March 6, 2003, BNSF's Group VP for Industrial Products, Dave Garin, held a call with CSX. *See, e.g.*, BNSF_CAL_0003470.

[62] *See, e.g.*, CSXFSC000110074; CSXFSC000240390-460; AAR-P-00001127-132.

[63] *See, e.g.*, AAR-P-00001127-132; Koraleski Dep. 66-72; Koraleski Dep. Ex. 3.

[64] *Id.* Defendants' CEOs met on January 6-7, 2003 and February 27, 2003 at gatherings of the AAR's board. *See* NS_016000133-154; NS_016000129-132.

[65] *See e.g.*, RD Ex 210; UPFSC_0365638-71; Couch Dep. 194; Koraleski Dep. Ex. 9 (expense report reflecting Koraleski's stay at Omni Jacksonville Hotel on March 12, 2003); Koraleski Dep. 121-22; Koraleski Dep. Ex. 11.

[66] *See, e.g.*, RD Ex 210.

[67] *See, e.g.*, HD Ex. 154.

27. Rather, the adoption of the $23 trigger was a calculated shift designed to raise revenues and expected to generate intense customer pushback, as CSX and the other Defendants realized.[73]

28. Also prior to the March 12 meeting, UP had internally prepared a "Revised Surcharge proposal," which retained the $28 WTI strike price of UP's existing program but contemplated a more finely calibrated escalation formula that would more aggressively convert into revenue incremental increases in the cost of fuel.[74] Specifically, the proposed surcharge would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for 2.0% increases for every $5 increase in the WTI index.[75] During this period, UP's finance team had been "pressuring" its CMO to change its fuel surcharge formula to make it more aggressive.[76]

29. On March 12 and 13, 2003, Jack Koraleski met in person with Clarence Gooden in Jacksonville, Florida and discussed fuel surcharge methodologies.[77] No lawyer attended the

---

Fundamentals continue to look bearish for 2004, and we expect WTI to dip below $25/bbl in the first half of next year."); NS_010275444-63 (NS's April 27, 2006 submission to the STB), at NS_010275447 ("NS thought … that the oil prices we began to see as 2003 progressed were temporary."), NS_010275449 ("In March 2003, EIA accurately forecasted a decline in the price of WTI to around $27 by the end of 2003."). Nonetheless, if CSX had adopted its internal fuel surcharge recommendation change (which was all but a formality as of March 12, 2003) rather than the program it later adopted, CSX's fuel surcharges would have been set at significantly lower levels through the Class Period due to the proposed formula's relaxed escalation schedule, and the other Defendants would have had to face and respond to that competitive situation.

[73] *See infra* at ¶¶ 64, 115; *supra* at ¶¶ 11, 14.

[74] *See, e.g.*, HD Ex. 17; Koraleski Dep. 92 (this proposal would yield "a more aggressive surcharge" because of the change in the "stairsteps."); *see also* Koraleski Dep. Ex. 6 ("Union Pacific Fuel Surcharge Analysis Alternative Impacts).

[75] *Id.*

[76] *See, e.g.*, Koraleski Dep, 76-78.

[77] *See, e.g.*, RD Ex 210.

meeting; no record of the discussion was prepared (or at least no record has been disclosed to Plaintiffs).

30. On March 19-20, 2003, within a week of that meeting, CSX announced a new standard fuel surcharge program. The program retained the lower $23 trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal."[78] This program applied to all of CSX's carload traffic.[79] Under CSX's new policy, CSX would assess a 0.4% surcharge when the price of oil on the WTI exceeded $23 per barrel, and an additional 0.4% for every $1 increase thereafter.[80] Unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month.[81] CSX obtained "concurrence" from each Defendant to the new program shortly after its formal announcement.[82]

31. CSX's decision to switch fuel surcharge programs was made by CSX's CEO and chief commercial officer,[83] and no internal records at CSX show that CSX had even considered the escalation formula that it adopted prior to the meetings with Mr. Koraleski.

---

[78] *See, e.g.*, RD Ex. 26.

[79] *See id.*

[80] *See, e.g.*, RD Ex. 26; *see also* RD Ex. 24, at CSXFSC000000363 (Powerpoint presentation comparing old and new surcharge formulas).

[81] *See id.*; *see also* RD Ex. 23 (Mar. 19, 2003 email from CSX's John Couch to various CSX officials comparing old and new fuel surcharge programs).

[82] *See, e.g.*, RD Ex. 34 (NS); RD Ex. 35 (BNSF); RD Ex. 38 (UP).

[83] *See, e.g.*, RD Ex. 23. CSX's chief commercial officer, Michael Giftos, also spoke with Clarence Gooden about the switch. *See* Gooden Dep. 97-98.

32. In the week after CSX's announcement, CSX and UP further discussed CSX's plan "to implement a new fuel surcharge formula."[84] Shortly after CSX's announcement, UP announced that it had abandoned its "revised" $28 strike price and had instead adopted "the same approach as the CSXT"—that is, UP announced its intention to use the $23 WTI strike price contemplated in the CSX internal proposal circulated shortly before Mr. Koraleski went to visit CSX (and the same escalation formula).[85] Mr. Koraleski testified that he did not recall any specific financial analysis at UP supporting its decision to adopt the CSX methodology.[86]

33. On April 4, 2003, UP informed the other Defendants that it would be applying this new standard fuel surcharge program to both local and interline traffic.[87] UP had no procompetitive or legitimate reason to inform the other Defendants of what it intended to do on its local traffic; rather, this communication was an anticompetitive signaling device in furtherance of the conspiracy.[88]

---

[84] RD Ex. 30; *see also* RD Ex. 31 (Mar. 24, 2003 internal email from UP's Kurt Schroeder referencing additional discussions with CSX's Clyde McIntyre regarding new CSX program).

[85] *See, e.g.*, RD Ex. 38; Koraleski Ex. 15 (April 2, 2003 Toy (UP) internal email to UP executives explaining that "UP has concurred to CSXT's new methodology . . . and will adopt similar wording for UP's primary fuel surcharge"). This was despite some internal recognition at UP that the new fuel surcharge would be "complex/confusing and … problematic to administer." *See, e.g.*, UPFSC_0069867.

[86] Koraleski Dep. 151-52; *see also* Koraleski Dep. Ex. 19 (in an email dated May 2, 2003, UP's head of purchasing for fuel and other goods concluded: "I don't think the historical information and analysis we have on our side will help to 'defend' the $23 threshold.").

[87] *See, e.g.*, RD Ex. 40 ("The modified surcharge will continue to apply to most Union Pacific pricing documents for local and interline freight movements."); *see also* UPFSC 0344321-23.

[88] Other documents show that UP (and the other Defendants) intentionally used so-called "concurrence" or other communications in order to signal each other about contemplated future pricing actions and to secure coordination. For example, Defendants would purposefully announce contemplated changes with "substantial lead time" so that the other Defendants could "follow," or provide other feedback. *See* UPFSC_0422458-60, at 0422458; *see also* Couch Dep.

34. On March 13, 2003, BNSF's CMO, John Lanigan, requested an urgent review of BNSF's fuel surcharge program to be completed "in about two to three weeks."[89] This review was designed to coincide with the Spring National Freight Transportation Association ("NFTA") meeting at the Wigwam resort in Arizona on April 2-6 (the "Spring 2003 NFTA meeting"), where Mr. Lanigan knew he would see senior marketing officers from UP, CSX, and NS.[90] During this period, Mr. Lanigan had phone conversations and other meetings with his marketing counterparts at the other Defendants.[91]

35. At a meeting at NS's headquarters in Norfolk, VA, on March 18, 2003, senior executives from NS and BNSF – including their respective CEOs, CMOs, and other senior marketing executives – met and discussed how the fuel surcharge programs of all four Defendants were structured. They then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's fuel surcharge program with the programs of the other Defendants.[92] John Lanigan (BNSF) and Don Seale (NS), senior marketing officers at those companies, were assigned responsibility for this issue.[93]

36. Following this March 18, 2003 meeting, Mr. Seale and Mr. Lanigan played "phone tag," before Mr. Seale emailed Mr. Lanigan on March 27, 2003, saying that at the

---

221-22 (testifying that "concurrences" were regularly requested in "an email that goes out from one carrier to all the other carriers"); *infra* ¶ 104.

[89] *See, e.g.*, BNSF_0456278; *see also* BNSF-0330793-0833; Lanigan Dep. 56-57.

[90] *See, e.g.*, NS_015000208-211.

[91] Lanigan Dep. 283-286. Also, on February 18, 2003, at least BNSF's Lanigan had "[d]inner w/NS." *See, e.g.*, BNSF_CAL_0005323.

[92] RD Ex. 208.

[93] *Id.*

upcoming Spring 2003 NFTA meeting, he wanted to talk to Mr. Lanigan about "the fuel surcharge issue we discussed in Norfolk."[94]

37. On April 1, 2003, the day before the Spring 2003 NFTA meeting, Mr. Lanigan and other BNSF senior executives met with CSX senior executives to discuss fuel surcharges.[95] Discussions in preparation of this meeting went back to at least March 26, 2003.[96] At the meeting, Mr. Lanigan discussed fuel surcharges with CSX CMO Mr. Giftos.[97] BNSF and CSX senior executives would meet again on or around April 23, 2003.[98]

38. The Spring 2003 NFTA meeting took place at the Wigwam resort in Arizona on April 2-6, 2003.[99] Mr. Seale and Mr. Lanigan both attended,[100] as did other senior marketing executives from all four Defendants, including NS's CMO Ike Prillaman, UP's CMO Jack Koraleski, and Clarence Gooden of CSX.[101] Mr. Koraleski flew to Arizona for the Spring 2003 NFTA meeting immediately following a UP revenue meeting where fuel surcharges were discussed (and where UP apparently made the formal decision to adopt the fuel surcharge methodology discussed with CSX).[102] Mr. Koraleski testified that it was his practice to discuss

---

[94] *See, e.g.*, RD Ex. 216; Lanigan Dep. 55-56, 59-63.

[95] *See, e.g.*, RD Ex. 215; Gooden Dep. 107-09.

[96] *See id.*; *see also* BNSF_0557167-68.

[97] *See, e.g.*, RD Ex. 215; Tr. of Dep. of David Garin ("Garin Dep.") 237-38; CSXFSC000243651-54.

[98] *See, e.g.*, BNSF_CAL-0007200.

[99] *See, e.g.*, NS_015000208-211.

[100] *See, e.g.*, Lanigan Dep. 64; Seale Dep. 258; NS_013002633; NS_010058958-960; NS_015000201-238, at NS_015000207. On April 5, 2003, at least BNSF's Garin, met with NS's Don Seale. *See, e.g.*, BNSF_CAL_0003465.

[101] *See, e.g.*, NS_015000201-238, at NS_015000201; UPFSC_0365638-671; NS_015000208-211; Gooden Dep. 120-123, 137; Garin Dep. 243-244; Rose Dep. 171-172; NS_008002991.

[102] Koraleski Dep. 161-65. *See also* Koraleski Dep. Ex. 15.

with his industry counterparts significant contemplated changes to UP's fuel surcharge program *before* they were announced outside of the company,[103] and Mr. Koraleski knew he would see and talk to his counterparts at the 2003 Spring NFTA meeting. NFTA meetings were typically a place where Defendants' CMOs would have discussions, including over drinks.[104]

39. Directly after the Spring 2003 NFTA meeting, Mr. Lanigan ordered internally at BNSF that "*effective immediately and urgently* per John Lanigan[:] Authority to omit FSC [fuel surcharge] provision is to be granted to VP's only (who will also clear with John)."[105] This policy action was taken as a result of Mr. Lanigan's discussions with the other Defendants at, and just prior to, the Spring 2003 NFTA meeting.

40. Prior to these meetings, BNSF had internally contemplated that it could gain a competitive advantage by using a mileage-based fuel surcharge, as opposed to the revenue-based fuel surcharge that it agreed to impose as a result of the conspiracy.[106] BNSF had previously tried to drum up support among the other Defendants for a mileage-based fuel surcharge rather than one based on a percentage of base rates.[107] However, as a result of discussions with the other Defendants, BNSF abandoned a mileage approach and continued to apply a fuel surcharge based on a percentage of base rates. This decision followed not only the two April meetings with

---

[103] Koraleski Dep. 119-120; 142; 154-55 ("[T]hat was the way we wanted to do it.").

[104] *See, e.g.*, Koraleski Dep. 165 ("We would … typically have discussions."); 166 ("Q: [I]f you wanted to talk to Mr. Seale about something, the NFTA meeting would be an opportunity to do that, correct. A: Yeah."); 169; Goode Dep. 159.

[105] HD Ex. 19 (emphasis added); Lanigan Dep. 86-88.

[106] *See, e.g.*, Kyei Dep. 97-98, 113-15; RD Ex. 19, at BNSF-0330838 (conclusion from Feb. 24, 2003 meeting is that BNSF is "[l]eaning toward Cost Per Mile (CPM) Fuel Surcharge Formula"); RD Ex. 211(BNSF presentation recommending mileage-based fuel surcharge); BNSF-0328761-64; BNSF-0330793-0833; *see also* Rose Dep. 132 (CEO and CMO of BNSF "always had bias toward mileage-based fuel surcharges").

[107] *See, e.g.*, RD Ex. 39 (Apr. 3, 2003 internal UP emails referencing discussions with BNSF in regards to a possible mileage-based formula).

CSX, but also the Spring 2003 NFTA meeting, a weekend gathering of Defendants' CMOs on April 15-17, 2003,[108] another gathering of Defendants' top marketing personnel at a NEMC meeting on April 30-May 1, 2003,[109] and a May 6, 2003 "AAR CEOs" conference call.[110]

41. In early May, BNSF, which considered its existing fuel surcharge program to be "more aggressive … than U.S. rail carload competition," changed its program to make it even more aggressive by decreasing the formula's trigger price, which was based on the per-gallon price of diesel fuel in the On-Highway Diesel Fuel ("HDF") index, to $1.25, a number that "reflected the $23 WTI crude price used by UP" (and CSX).[111] Under its new program, BNSF would apply a 0.5% surcharge when the HDF index reached $1.25, and an additional 0.5% for every $.05 that the index exceeded $1.25.[112]

42. At around the same time BNSF issued its new policy, UP suddenly adopted the BNSF fuel surcharge formula, bringing the two western carriers into direct lockstep.[113] UP

---

[108] *See, e.g.*, NS_015000201-238, at NS_015000220. This "social weekend" at UP's "Selma" facility involved golf and cocktails. While the weekend was purportedly a retirement party for BNSF's Chuck Schultz (hosted by BNSF's supposedly fiercest competitor, UP), it was used as an opportunity to strengthen relationships and commitment among the CMOs. *See id.*; Koraleski Dep. 172-73. No Defendant sent an attorney to this gathering. UP, the host of the party, purportedly did not have an in-house attorney "available" to supervise the meeting among competitors. *Id.*

[109] *See, e.g.*, AAR_P_00001095-1186.

[110] *See, e.g.*, BNSF_CAL_0007478.

[111] *See, e.g.*, RD Ex. 57, at BNSF-FSC000486 (July 1, 2003 memo summarizing status and recent changes to fuel surcharge program); HD Ex. 16, at BNSF_0028794; BNSF-0327012-13 (April 30, 2003 BNSF email discussing changes to carload and intermodal programs); RD Ex. 2, at BNSF-0511834 (May 7, 2003 rule effecting $1.25 trigger price); *see also* RD Ex. 3, at BNSF-0026751-53 (Apr. 30, 2001 announcement of $1.30 trigger price); BNSF-0327011-12; Lanigan Dep. 97 ($1.25 on the HDF is "roughly equivalent" to $23 on the WTI).

[112] *See, e.g.*, RD Ex. 2, at BNSF-0511834.

[113] *See, e.g.*, UPFSC0001035; RD Ex. 47, at UPFSC 0183975-81 (May 9, 2003, email from UP's Larry Nowakowski to various UP officials with a PowerPoint attachment); UPFSC_0070045-46 (May 7, 2003 internal planning regarding new program); *see also* Adams

immediately informed the other Defendants, including BNSF, of its decision.[114] UP and BNSF thereafter implemented fuel surcharges that were in synch, began setting and adjusting them at the same time and levels, and sought to apply them as broadly as possible.[115] UP and BNSF fuel surcharges remained in synch notwithstanding that the two companies had different fuel costs during a period of large fuel cost increases,[116] and improvements in their respective fuel efficiencies.[117] While this coordination was occurring, UP's and BNSF's chairmen and CEOs had one-on-one conversations, including by telephone,[118] as did their CMOs (*see supra*).

---

Dep. 240-242; RD Ex. 50, at NS001000354 (internal NS analysis of the new UP program observing that while UP program featured a higher trigger price than BNSF's ($1.35 compared to $1.25), the UP program "catches the prior increments until the $1.35 threshold is met" such that "[o]nce it kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates"); NS_0014001716-717; BNSF-0342448 ("[T]his is big news. The ideal scenario is to have BNSF and UPRR have the same FSC methodology…but for them to copy us – as it appears they are doing").

[114] *See, e.g.*, RD Ex. 48 (email to BNSF); RD Ex. 49 (email to CSX); RD Ex. 212 (email to NS). During 2003, BNSF and UP executives met and communicated regularly. *See, e.g.*, ; UPFSC_0343267-68 (Mar. 18, 2003 letter from BNSF's CEO to UP's CEO referencing "previous[] discuss[ions]" and suggesting future meetings).

[115] *See, e.g.*, RD Ex. 47; RD Ex. 50; Lanigan Dep. 119 (testifying that at $1.35 and above, BNSF's and UP's fuel surcharges "appear to be identical"). As discussed *infra*, this coordination included UP's and BNSF's intermodal and coal fuel surcharges.

[116] *See, e.g.*, Neikirk Ex. 4.

[117] *See, e.g.*, Rockey Dep. 248 ("Q . Was it a fact that over the period of 2003 through 2008 the railroads were increasing their fuel efficiency? A. Yes, hugely."); AAR, "Railroads: Green From the Start," (April 2010), *available at* http://www.aar.org/~/media/aar/backgroundpapers/railroadsgreenfromthestart.ashx ("In 2009, U.S. freight railroads moved one ton of freight an average of 480 miles per gallon (up from 457 in 2008). Rail fuel efficiency is up 104 percent since 1980."); Federal Rail Administration, "A Comparative Evaluation of Rail and Truck Fuel Efficiency on Competitive Corridors," *available at* http://www.fra.dot.gov/Downloads/Comparative_Evaluation_Rail_Truck_Fuel_Efficiency.pdf ("Between 1990 and 2006, rail fuel efficiency has improved by about 20%, or 1.1% per year."); BNSF_0567951-53 ("BNSF has improved fuel efficiency approximately 9 percent since 1995, primarily due to the acquisition of 2,700 new more fuel-efficient, higher-horsepower locomotives from 1995-2005, representing nearly 60 percent of its road fleet."); Kyei Dep. 68-69; BNSF_0355397 -98; BNSF website, available at http://www.bnsf.com/communities/bnsf-and-the-environment/fuel-efficiency/ ("BNSF's fuel efficiency has increased by 7.7 percent since 1999."); UP, "Innovation and Employee Education Save Fuel," available at

43. UP gave its customers (and later the STB) a pretextual reason for its adoption of the BNSF program. UP falsely stated that it had made the change from the WTI to the HDF index "because we concluded that the HDF is better aligned with the fluctuations in the diesel fuel price that UP pays."[119] However, UP had long known that the HDF was better aligned with its diesel fuel price fluctuations than the WTI.[120] In fact, UP had concluded in 2000 that the WTI index "[d]oes not accurately measure RR diesel fuel prices."[121] Internally, UP acknowledged that it switched fuel surcharge programs "[t]o match BNSF's 'standard' HDF based surcharge."[122]

44. During this same period, NS also agreed to implement an industry-standard fuel surcharge and discussed how to create and impose such a standard that would be "acceptable" to the other Defendants.[123] This included discussions with CSX about fuel surcharges[124] while NS

---

http://www.uprr.com/newsinfo/attachments/media_kit/conserv_facts.pdf ("Since 1998, Union Pacific has achieved a 20 percent improvement in fuel efficiency."); UPFSC_0593229-34 ("At UP, we are continually improving our fuel efficiency through better locomotive technology, engineer training and employee involvement. In 2006, we moved, on average, one ton of freight over 780 miles on a single gallon of diesel fuel – a nearly 30-mile improvement over the past two years. This improved fuel efficiency saved more than 50 million gallons of diesel in 2006.")

[118] *See, e.g.*, UPFSC_0466673; UPFSC_0466624; UPFSC_0466746; BNSF_CAL_0004878; *see also* UPFSC_04666545 (UP CEO Dick Davidson calendar entry: "Calls: David Goode [NS CEO]"); UPFSC_0466657 (Davidson: "Lunch with David Goode"); UPFSC_0466744 (Ward and Giftos (CSX) dine with Koraleski and Young (UP) following CSX/UP Strategy Meeting).

[119] *See, e.g.*, HD Ex. 1, at UPFSC0000309.

[120] *See, e.g.*, UPFSC 0043878-79; Adams Dep.198-201; Tr. of Dep. of Mark Draper ("Draper Dep.") 152-167.

[121] UPFSC_0057237-38.

[122] UPFSC_0075761-63.

[123] *See, e.g.*, Seale Dep. 226-29; *see also supra* at ¶¶ 35-39; *infra* at ¶¶ 45-56; RD Ex. 42, at NS001000283 (Apr. 7, 2003 NS memo discussing "ease of business argument" in support of a common fuel surcharge program); RD Ex. 55, at NS010042321 (May 12, 2003 email from NS's Don Seale to NS's Ike Prillaman, noting inconsistent fuel surcharge application and remarking that "[t]he industry is not looking good on this issue"); RD Ex. 77, at NS_013001654

was positioning itself to implement a fuel surcharge program in direct lockstep with CSX.[125] For example, on April 17, 2003, NS's Don Seale relayed internally that NS "do[es] plan to modify our FSC."[126]

45. In April 2003, CSX executives and other employees flew to NS for a meeting on fuel hedging practices.[127] NS had invited CSX – ostensibly NS's fiercest competitor – to visit so that NS could share with CSX its fuel hedging strategies and practices.[128] Testimony has confirmed that NS shared with CSX its knowledge and experience on fuel hedging, how NS's hedging program was structured and monitored, and alternatives to fuel hedging instruments.[129] Sharing this knowledge was not in NS's unilateral self interest. There was no procompetitive or legitimate basis for this discussion between NS and CSX executives; rather, it was an anticompetitive discussion that took place as part of the companies' agreement to conspire and

---

(Jan. 8, 2004 email from NS's Pat Glennon to Don Seale and other NS officials explaining that modified 2004 fuel surcharge formula adopted in part to effect "[s]tandardization of FSC provisions in the East"). At the same time, NS personnel recognized that a new fuel surcharge was unwarranted. *See, e.g.*, NS_014001720-22 ("NS is protected from [short term fuel risk] so why take action against customers who have no hope of recovering that incremental cost? …Our track record with the existing system is less than stellar and it requires far few notifications than the CSX proposal entails"); NS_009000161-164.

[124] *See, e.g.*, RD Ex. 41, RD Ex. 217; HD Ex. 3; HD Ex. 5; HD Ex. 14; Glennon Dep. 60; Glennon Dep. 77-81; *see also* at 13 n.26.

[125] *See, e.g.*, RD Ex. 213, at NS00100012 (Apr. 29, 2003 email from NS's Pat Glennon to Don Seale and other NS officials); RD Ex. 60, at NS_010005140-42 (July 21, 2003 internal email from NS's Alby Pfeifer announcing "a new note which will simply refer to the surcharge provisions as published in NS-1 Conditions of Carriage" and thereby "allow NS to more easily adopt and implement a revised FSC formula if we opt to do so in the future"); *see also infra* at ¶ 57.

[126] NS001000316-320.

[127] *See, e.g.*, RD Ex. 205.

[128] *Id.* at CSXFSC000000399; CSX Corp. 2003 Annual Report at 19 (discussing plans to expand hedging program).

[129] *See, e.g.*, Tr. of Dep. of Chris Neikirk ("Neikirk Dep."), at 24-25, 35-68.

not to compete with each other. This meeting took place despite NS's recognition that, to the extent it was able to achieve fuel cost efficiencies through hedging practices or otherwise, it could use those efficiencies to compete in the market.[130] Also in April 2003, prior to the fuel hedging meeting, CSX's and NS's CEOs met and resolved that their companies would work together and focus on "hav[ing] their priorities aligned."[131] As NS's CEO David Goode admitted in a 2004 earnings call, it was no longer NS's "philosophy" at this time to seek to gain market share from CSX,[132] although it had been prior to the conspiracy. That same year, at a time when NS was aware that CSX was facing significant operational issues, NS's CEO David Goode was asked by analysts whether NS saw an opportunity to approach CSX customers or take share; he responded: "on the contrary, we're working very closely with our friends from CSX."[133] Mr. Goode stressed that the companies "cooperate with each other" and "work very closely together."[134] In May 2005, Mr. Goode publicly stated that it was "important for the rails as an industry" to "keep up the momentum" on raising prices.[135] Yet, prior to the conspiracy, NS had publicly championed the importance of rail-to-rail competition, proclaimed its benefits to shippers, and repeatedly stressed NS's intention to compete vigorously with CSX.[136]

---

[130] *See, e.g.*, Goode Dep. 66-67 ("Q: [I]f Norfolk Southern could figure out ways to be more cost efficient that could … give it a competitive advantage over its competitors, correct? A: It could."); 72 (if done well, a fuel hedging program "could have a favorable impact on cost"); Moorman Dep. 161 ("Fuel certainly drives pricing and competition. It is one of the drivers of pricing competition in the marketplace."); Neikirk Dep. 24-25. *See also supra* at n. 168.

[131] *See, e.g.,* Goode Ex. 10.

[132] *See, e.g.*, RD Ex. 176; Goode Dep. 113; *see also* CSXFSC000246324-339 (CSX monitoring NS's public statements) .

[133] Goode Dep. 101.

[134] Goode Dep. 102.

[135] Goode Dep. 117-18.

[136] *See, e.g.,* Goode Dep. 16-32.

46. On May 12, 2003, NS's Don Seale complained to his boss that – in light of BNSF's "unilateral[]" discounting of its fuel surcharge in a particular month and in anticipation of an upcoming "conversation with UP" – "the industry is not looking good on this issue [fuel surcharges] and a stable approach has been the best approach."[137] That same day, BNSF CEO Matt Rose met with NS executive Jim McClellan.[138]

47. Two days later, on May 14, 2003, NS and UP senior executives met and agreed that all four Defendants should have the same fuel surcharges "in the eyes of our customers." These executives discussed how to "handle" this "opportunity." They discussed whether they could do so under the cover of the AAR, or whether they would have to use ostensible "bilateral" discussions. They assigned Mr. Seale and UP CMO Jack Koraleski to follow up on these issues.[139] Lawyers from the two companies were also purportedly assigned to work with Mr. Seale and Mr. Koraleski, but it is far from clear those lawyers did anything in this regard.

48. Three days later, NS executives met with BNSF executives.[140] On or around May 16, 2003, CSX's Clarence Gooden met with BNSF's John Lanigan in Chicago.[141]

---

[137] *See, e.g.*, RD Ex. 55, at NS_010042321; NS_010042306-07 (May 5, 2003 NS-UP meeting agenda for upcoming meeting); *see also* CSXFSC000000408-410 (May 11, 2003 emails expressing hope that "we can agree on what is best – and adopt a standard format among the class 1s").

[138] *See, e.g.*, BNSF_CAL_0007474.

[139] *See, e.g.*, RD Ex. 204; *see also* UPFSC 0014100 (May 6, 2003 conference call between Koraleski, Seale and others to devise agenda for May 14, 2003 "Alliance" meeting); NS 001000360360-362 (June 5, 2003 email from Don Seale to UP stating "please note NS representatives will work with UP designees on the assigned topics" from the May 14, 2003 meeting); UPFSC 0127235-236 (email reflecting that follow up conference calls to May 14, 2003 meeting took place between NS and UP executives on at least July 8, 2003, and August 15, 2003).

[140] *See, e.g.*, NS_010034423.

[141] *See, e.g.*, CSXFSC000219258; Couch Dep. 207-11.

49. On May 29-30, 2003, members of the AAR Board, including NS's Don Seale, met for dinner in Washington, D.C.[142]

50. On June 3, 2003, CSX and UP senior executives met and discussed fuel surcharges.[143] On the day of the meeting, at Mike Giftos's request, CSX's John Couch emailed CSX attendees Giftos and Clarence Gooden a chart comparing CSX's fuel surcharge program to the other Defendants' programs.[144] At the June 3 meeting, CSX and UP senior executives assessed the customer opposition the companies were receiving to their efforts to apply their conspiratorial fuel surcharges on shippers. CSX also shared its internal future plans regarding its fuel hedging program (which, as noted *supra*, it had previously discussed with NS). CSX and UP then discussed the trigger points that the companies were using for their fuel surcharge programs. They agreed that, if fuel prices stayed high, they might have to consider raising their trigger points.

51. Handwritten notes of the June 3, 2003 "Alliance" meeting show that the prepared "minutes" were sanitized in that they omitted key discussions on fuel surcharges.[145]

52. On June 23, 2003, Defendants' CEOs met under the auspices of the AAR at Chicago Midway International Airport.[146] The other members of the AAR board did not attend this meeting. The next day, after flying together to Washington D.C., Mr. Goode and Mr. Evans dined together.[147] AAR "CEO" meetings were an occasion for Defendants' CEOs to discuss

---

[142] *See, e.g.*, NS_013002675-688, at NS_013002682-84.

[143] *See* RD Exs. 209, 218.

[144] *See, e.g.*, CSXFSC000000414-15.

[145] *See, e.g.*, RD Ex. 209; RD Ex. 218.

[146] *See, e.g.*, UPFSC_0466514-15 (attendees: UP's Dick Davidson and Ike Evans, BNSF's Matt Rose, CSX's Mike Ward, NS's David Goode, and the AAR's Ed Hamberger).

[147] *See, e.g.*, NS_016000055-60.

"industry conditions," and dinners between CEOs were also occasions to have private discussions about "business" matters.[148]

53. On July 30, 2003, top marketing executives of NS and BNSF discussed a "potential industry position" on fuel surcharges and jointly appointed a top executive from each company to lead a discussion on this topic at the next NEMC meeting scheduled for September 11, 2003.[149] (Mr. Lanigan has admitted that the discussion on an "industry position" on fuel surcharges was not intended to be limited to interline traffic.[150]) While Defendants, by this time, had already agreed to coordinate their programs and apply fuel surcharges as uniformly as possible, to as many freight shipments as possible, with the express goal of 100% coverage, Defendants were still considering how to act jointly through the AAR to make the conspiracy more effective (as they later did: *see infra* at ¶¶ 65-78, 85-94). Defendants' executives met on several occasions leading up to the September 11, 2003 NEMC meeting. On August 12, 2003, Defendants' CEOs held a breakfast meeting at the New York Palace Hotel.[151] On August 29, 2003, BNSF CEO Matt Rose and NS CEO David Goode played golf together about 30 minutes north of Copenhagen, Denmark.[152] Defendants' executives also attended NFTA's Fall Business

---

[148] *See, e.g.*, Goode Dep. 182, 202.

[149] *See, e.g.*, RD Ex. 59, at NS001000424; *see also* Seale Dep. 226-29; Lanigan Dep. 138-143; BNSF_CAL_0003386.

[150] *See, e.g.*, Lanigan Dep. 143-45, 151 ("We didn't specifically state it one way or the other.").

[151] BNSF_CAL-0007136 (noting that the meeting was limited to "following CEOs only: MKR [Matt Rose of BNSF], Mike Ward [CSX], Ike Evans [UP], David Goode [NS].")

[152] *See, e.g.*, BNSF_CAL_0007289; Goode Dep. 197-198; Goode Ex. 12.

Dated: May 11, 2011

Respectfully submitted:

/s/ Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel Brockett
Marc L. Greenwald
Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on May 11, 2011, a copy of the foregoing consolidated objections and responses to Defendants' first set of interrogatories was served on counsel for Defendants by electronic mail.

/s/ Sami H. Rashid__________

I, Ben M. Harrington, am an attorney at Quinn Emanuel Urquhart & Sullivan LLP, one of the interim co-lead counsel for the Direct Purchaser Plaintiffs in this matter, and am authorized to execute this verification on behalf of named plaintiffs Carter Distributing Company, Dakota Granite Company, Donnelly Commodities, Inc., Dust Pro, Inc., U.S. Magnesium LLC, Nyrstar Taylor Chemicals, Inc., Olin Corporation, and Strates Shows, Inc. I have read the foregoing Direct Purchaser Plaintiffs' Second Amended Consolidated Objections and Responses to the First Set of Interrogatories Directed to All Direct Purchaser Plaintiffs by: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Norfolk Southern Railway Company; and (4) Union Pacific Railway Company.

Without waiver of the attorney-client privilege, the attorney work-product doctrine, and/or any other available privilege or immunity, and based upon reasonable review of information produced by the parties or otherwise obtained in this litigation, and, where applicable, publicly available information, I hereby declare under penalty of perjury that the foregoing answers to interrogatories are true and correct to the best of my knowledge, information, and belief at the present time; except to the extent they are not based on my personal knowledge, they have been assembled by authorized counsel for Direct Purchaser Plaintiffs from materials produced in this litigation or otherwise publicly available.

Executed on May 11, 2011

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 |
| This document relates to: ALL DIRECT PURCHASER CASES | Misc. No. 07-489 (PLF/AK/JMF) |

**DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL CONSOLIDATED OBJECTIONS AND RESPONSES TO THE FIRST SET OF INTERROGATORIES DIRECTED TO ALL DIRECT PURCHASER PLAINTIFFS BY: (1) BNSF RAILWAY COMPANY; (2) CSX TRANSPORTATION, INC.; (3) NORFOLK SOUTHERN RAILWAY COMPANY; AND (4) UNION PACIFIC RAILROAD COMPANY**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and the Court's order and opinion dated November 17, 2011 (Dkt. Nos. 533, 534), Direct Purchaser Plaintiffs ("Plaintiffs"), through their attorneys, hereby submit these supplemental consolidated responses and objections to the following of the First Set of Interrogatories to all Direct Purchaser Plaintiffs by Defendants[1] (collectively, the "Interrogatories"):

- CSX Interrogatory No. 4
- CSX Interrogatory No. 5
- CSX Interrogatory No. 7
- NS Interrogatory No. 1; and
- NS Interrogatory No. 2(a), (e), (f).

[1] BNSF Railway Company ("BNSF"), (2) Defendant CSX Transportation, Inc. ("CSX"), (3) Defendant Norfolk Southern Railway Company ("NS"), and (4) Defendant Union Pacific Railroad Company ("UP").

Defendants instituted policies against discounting base rates to offset the imposition of rail fuel surcharges and communicated those policies openly to one another.

Subject to, and without waiving, these objections and the General Objections, Plaintiffs contend, in response to the second part of Defendants' compound inquiry, that Defendants' unlawful agreement included an agreement not to offer any Rail Fuel Surcharge other than the alleged, coordinated fuel surcharge programs. The principal and material facts and evidence supporting these contentions, based on Plaintiffs' analysis of the record to date, are identified in the Narrative Factual Statement at ¶¶ 39, 64, 79-84, 100-103, 113. In addition, the conspiracy is also evidenced by a series of extraordinary meetings and events in early-to-mid 2003. *See id.*, at ¶¶ 16-55, 61-62; *see also* responses to CSX Interrogatory No. 5 & NS Interrogatory No. 2(e) & (f), *infra*.

**CSX INTERROGATORY NO. 5:**

Identify every Communication among or between any two or more Entities and Persons that you contend, standing alone, itself constitutes an unlawful agreement, and identify every Person whom you contend participated in these Communications. This excludes Communications that you contend merely evidence or reflect an agreement(s) reached in another Communication.

**RESPONSE:**

Plaintiffs object to this interrogatory on the ground that it is vague and ambiguous. Plaintiffs also object that this interrogatory improperly would require a disaggregation of the evidence and allegations concerning the alleged conspiracy. In the Narrative Factual Statement, Plaintiffs identify vast amounts of evidence probative of the price-fixing conspiracy alleged in this case.

Subject to, and without waiving, these objections and the General Objections, and, pursuant to the Court's opinion dated November 17, 2011 (Dkt. No. 534) and Defendants'

request for "direct" rather than "circumstantial" evidence in response to this Interrogatory (*see* Defendants' Motion to Compel, dated May 18, 2011, at 6), and with the understanding that Defendants have expressly requested that Plaintiffs not set forth herein much of the most probative evidence of Defendants' price-fixing conspiracy,[2] Plaintiffs contend that each of the following communications, "standing alone," directly constitutes an agreement that violates the antitrust laws:

March 18, 2003 BNSF-NS Meeting: At a meeting at NS's headquarters in Norfolk, VA on March 18, 2003, senior executives from NS and BNSF met, discussed the fact that "BNSF's fuel surcharge is structured differently than NS, CSX, and UP," and agreed on "synchroniz[ing]" BNSF's fuel surcharge program with the programs of the other Defendants. *See* RD Ex. 208. As reflected in the meeting minutes, the following people participated in the meeting for each Defendant: BNSF (Matt Rose, John Lanigan, Carl Ice, Tom Hund, Pete Rickerhauser, Steve Branscum, and Rollin Bredenberg), NS (David Goode, Steve Tobias, Ike Prillaman, Hank Wolf, Jim McClellan, Mike McClellan, Mark Manion, Don Seale, Kathryn McQuade, and Wick Moorman). Based on Plaintiffs' review of the evidentiary record to date, Plaintiffs contend that at least the following persons participated in reaching unlawful agreement: BNSF (Matt Rose, John Lanigan); NS (David Goode, Ike Prillaman, Don Seale, Wick Moorman).

May 14, 2003 NS-UP Meeting: At a meeting at UP's headquarters in Omaha, NE on May 14, 2003, NS and UP senior executives "reached" a "[c]onsensus" that "it would be a positive outcome" for all four Defendants to have the same fuel surcharges "in the eyes of our

[2] For example, in March 2003, senior marketing personnel of Defendants CSX and UP – Clarence Gooden and Jack Koraleski, respectively – met in person and discussed "fuel surcharge methodology," *see* RD Ex. 210, and thereafter CSX and UP announced similarly aggressive standard fuel surcharges. *See generally* Narrative Factual Statement ¶¶ 23-33. The weight of the evidence indicates that an unlawful agreement was reached at this meeting.

customers" and further discussed how to "work together on this opportunity." *See* RD Ex. 204. Handwritten notes from that meeting reflect that the NS and UP senior executives agreed that "[u]niform application [of fuel surcharges] across the industry would be helpful." *See* UPFSC_0616651-62, at UPFSC_0616652. As reflected in the meeting minutes, the following people participated in the meeting for each Defendant: NS (David Goode, Ike Prillaman, Jim McClellan, Don Seale, Steve Renken, Wick Moorman, Tony Ingram, Mark Manion, and Mike McClellan); UP (Richard Davidson, Ike Evans, Dennis Duffy, Jack Koraleski, Brad King, Jim Young, Merill Bryan, John Gray, Woody Sutton, and Jeff Koch). Based on Plaintiffs' review of the evidentiary record to date, Plaintiffs contend that at least the following persons participated in reaching unlawful agreement: NS (David Goode, Ike Prillaman, Don Seale, Wick Moorman); UP (Richard Davidson, Ike Evans, Jack Koraleski, Jim Young).

June 3, 2003 CSX-UP Meeting: At a meeting at UP's headquarters in Omaha, NE on June 3, 2003, CSX and UP senior executives discussed the trigger prices for their fuel surcharge programs and the customer reaction to their surcharge programs and agreed to coordinate their fuel surcharge methodologies, including by agreeing to "revisit" the trigger prices employed by their programs if fuel prices rose in the future. *See* RD Ex. 209; *see also* RD Ex. 218. As reflected in the meeting minutes, the following people participated in the meeting for each Defendant: CSX (Michael Ward, Al Crown, Mike Giftos, Frank Pursley, Clarence Gooden, Les Passa, and Alan Blumenfeld); UP (Richard Davidson, Ike Evans, Jack Koraleski, Charles Eisele, Dennis Duffy, Brad King, Merill Bryan, John Gray, Woody Sutton, and Tom Jacobi). Based on Plaintiffs' review of the evidentiary record to date, Plaintiffs contend that at least the following persons participated in reaching unlawful agreement: CSX (Michael Ward, Mike Giftos, Clarence Gooden); UP (Richard Davidson, Ike Evans, Jack Koraleski).

December 11-12, 2003 Creation of AIILF at AAR: At the December 11, 2003 board meeting of the Association of American Railroads ("AAR"), which Defendants effectively control, Defendants jointly agreed to direct the AAR to create a new index – the All Inclusive Index Less Fuel ("AIILF") – to facilitate their ability to impose fuel surcharges. *See* RD Ex. 69; AAR-000167-73. As reflected in the meeting minutes, the following people participated at the AAR Board meeting for each Defendant: BNSF (Matt Rose, Carl Ice, Jeffrey R. Moreland), CSX (Michael Ward), NS (James Hixon), UP (Ike Evans, Dennis J. Duffy, Michael A. Rock). Based on Plaintiffs' review of the evidentiary record to date, Plaintiffs contend that at least the following persons participated in reaching unlawful agreement: BNSF (Matt Rose, John Lanigan), CSX (Michael Ward, Mike Giftos, Clarence Gooden), NS (David Goode, Ike Prillaman, Don Seale, Wick Moorman), UP (Richard Davidson, Ike Evans, Jack Koraleski, Jim Young).

November 11, 2004 Agreement to Publish AIILF at NEMC: At the November 11, 2004 meeting of the AAR's Network Efficiency Management Committee ("NEMC"), which Defendants effectively control and which brought together Defendants' chief marketing officers, Defendants jointly agreed to direct NEMC to publish the AIILF on the AAR's website following UP's recommendation that doing so would "facilitate and support" Defendants' use of fuel surcharges. *See* RD Ex. 115; UPFSC 0396660-61 at UPFSC 0396661. As reflected in the meeting minutes, the following people participated at the NEMC meeting for each Defendant: UP (Jack Koraleski, Chuck Adams, Rick Turner); CSX (Steve Potter); NS (Don Seale, Ike Prillaman); BNSF (Kathy Hoffman). *See* RD Ex. 115. Although not reflected in the meeting minutes, John Lanigan of BNSF and Clarence Gooden of CSX each testified that they also attended the November 11, 2004 NEMC meeting. *See* Tr. of Dep. of Clarence Gooden at 181-

82; Tr. of Dep. of John Lanigan at 165-66. Based on Plaintiffs' review of the evidentiary record to date, Plaintiffs contend that at least the following persons participated in reaching unlawful agreement: BNSF (Matt Rose, John Lanigan), CSX (Michael Ward, Clarence Gooden), NS (David Goode, Ike Prillaman, Don Seale, Wick Moorman), UP (Richard Davidson, Ike Evans, Jack Koraleski, Jim Young).

November 11, 2004 Discussions at NEMC: Under the cover of the same November 11, 2004 NEMC meeting, BNSF's John Lanigan sought the other Defendants' agreement to deploy mileage-based fuel surcharges. As reflected in an internal BNSF document, following Mr. Lanigan's discussion with this "counterparts," the Defendants decided against jointly adopting mileage-based fuel surcharges and agreed to continue to use rate-based fuel surcharges for nearly all of their traffic: "John Lanigan shopped the concept [of a mileage-based fuel surcharge] with his counterparts from the other roads at the NEMC (AAR group of Chief Marketing Officers) and they pushed back as expected." *See* RD Ex. 120; *see also* Narrative Factual Statement ¶¶ 97-98 and additional evidence cited therein. Based on Plaintiffs' review of the evidentiary record to date, Plaintiffs contend that at least the following persons participated in reaching unlawful agreement: BNSF (Matt Rose, John Lanigan), CSX (Michael Ward, Clarence Gooden), NS (David Goode, Ike Prillaman, Don Seale, Wick Moorman), UP (Richard Davidson, Ike Evans, Jack Koraleski, Jim Young).

**CSX INTERROGATORY NO. 7:**

State whether you contend that the Rail Fuel Surcharge formulas that Defendants used before the start of the alleged unlawful agreement would not have resulted in Defendants receiving more revenue than the incremental fuel costs Defendants incurred during the Proposed Class Period, given the actual prices Defendants paid for fuel during the Proposed Class Period; if your response is anything other than an unqualified "no," identify all facts and evidence that forms the basis for such contention.

surcharge mechanisms in question during the Class Period and (ii) each fuel surcharge imposed during the Class Period that resulted from, or was affected by, Defendants' conspiratorial conduct. Plaintiffs further object that the term "standard" is undefined. Plaintiffs further object that this interrogatory is duplicative of the information requested by NS Interrogatories No. 2(e) and (f) – which were briefed by the parties and considered by the Court jointly with this NS Interrogatory No. 1. Subject to, and without waiving, these objections and the General Objections, Plaintiffs refer Defendants to their supplemental responses to NS Interrogatories 2(e) and (f), *infra*.

**NS INTERROGATORY NO. 2(e) and (f):**

As to any unlawful agreement you allege in this Litigation: … (e) state every alleged object or result of the alleged unlawful agreement, (f) state with particularity the precise terms of the alleged unlawful agreement. … For each subpart, identify with particularity all facts and evidence supporting your response.

**RESPONSE:**

Plaintiffs object that this interrogatory – and the identified subparts thereto – is overbroad and unduly burdensome to the extent it seeks to have Plaintiffs identify: (i) every alleged object or result of the conspiracy (Plaintiffs note, for example, that a description of every "result" of the conspiracy could encompass every transaction affected by the conspiracy); and (ii) the precise terms of the conspiracy. Plaintiffs further object that this interrogatory is overbroad and unduly burdensome to the extent it seeks identification of "all facts and evidence that forms the basis" for a contention. The Narrative Factual Statement identifies the principal and material facts and evidence demonstrating Defendants' unlawful agreement.

Subject to, and without waiving, these objections and the General Objections, Plaintiffs respond that the "object" of the conspiracy was to raise prices through rail fuel surcharges (by

making them similar and applying them to as many freight shipments as possible). The conspiracy included agreement on specific fuel-surcharge mechanisms. Defendants' conspiracy was reached over a series of meetings between Defendants' top executives in early 2003. *See* Narrative Factual Statement ¶¶ 16-51, 62. Although many (but not all) of these meetings occurred on a bilateral basis – that is, between two Defendants at a time – Defendants' conspiratorial discussions expressly addressed fuel surcharge coordination among all Defendants. *Id.*

By no later than May 14, 2003, as a result of this series of meetings, each Defendant understood that joint action was invited and each had jointly agreed and committed itself to the common goal or "object" of raising prices through the following means:

(1) Defendants reached agreement on the following similar "standard" fuel surcharge mechanisms applying to their carload business – which was the principal, but not exclusive, focus of Defendants' conspiracy:

- 0.4% surcharge when the price of oil on the West Texas Intermediate ("WTI") index exceeded $23 per barrel (based on a thirty-day average price of the WTI index), and an additional 0.4% for every $1 increase thereafter. Surcharge amounts would be adjusted the second month after the month in which there was a change in the WTI index average price calculation;
- 0.5% for every $.05 that the On-Highway Diesel Fuel ("HDF") index exceeded $1.25 or $1.35 (based on a thirty-day average price of the HDF index). At a thirty-day average price of $1.35 on the HDF index, both BNSF and UP would assess a 1.5% surcharge, and

an additional 0.5% for every $.05 increase thereafter.[3] Surcharge amounts would be adjusted the second month after the month in which there was a change in the HDF index average price calculation

These are the specific fuel surcharge mechanisms that Plaintiffs identified and described in detail in the operative complaint in this matter. *See* Dkt. No. 234, ¶¶ 60-61, 70-71, 80-82. As reflected in the operative complaint, these agreed-upon mechanisms (which Defendants published on their websites) resulted in fuel surcharges that were identical for the Western Defendants (BNSF and UP) and for the Eastern Defendants (CSX and NS) throughout the Class Period.

(2) Defendants agreed to increase revenues by applying rate-based rail fuel surcharges to as many freight shipments as possible, with the express goal of 100% coverage – to all shippers including shippers of all commodities and captive and non-captive shippers, irrespective of individual characteristics of the shipper, to interline and local shipments, and to carload and intermodal traffic. *See* Narrative Factual Statement ¶¶ 79-84, 100-103. As part of their agreement, Defendants adopted and enforced policies against granting exceptions to fuel surcharge application. *Id.* ¶ 81. Defendants also instituted policies against discounting base rates to offset the imposition of fuel surcharges. *Id.* Although Defendants understood that each Defendant would occasionally depart from the standard fuel surcharge mechanisms, the variations to the standard fuel surcharges that did exist were negotiated from the inflated baseline established by those mechanisms. *Id.* at ¶ 84. Due to this, and because Defendants would not have been able to aggressively impose fuel surcharges during the Class Period absent their

[3] The difference between the $1.25 strike price adopted by BNSF and the $1.35 strike price adopted by UP is meaningless, as Defendants recognized at the time of adoption. *See, e.g.*, RD Ex. 50, at NS001000354 (NS analysis observing that while UP program was triggered at $1.35 and BNSF's was triggered at $1.25, "[o]nce [the UP program] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates").

agreement, *see id*. ¶¶ 2-13, any deviations from the standard fuel surcharges also "result[ed]" from Defendants' conspiracy.[4]

By the summer of 2003, Defendants agreed to take additional actions to further their conspiracy. One major action undertaken by the Defendants to facilitate the widespread application of rail fuel surcharges was through the Association of American Railroads ("AAR"), which Defendants effectively control. On July 30, 2003, top marketing executives of NS and BNSF discussed a "potential industry position" on fuel surcharges and jointly appointed a top executive from each company to lead a discussion on this topic at the next meeting of the AAR's Network Efficiency Management Committee ("NEMC"), scheduled for September 11, 2003. *See* RD Ex. 59; *see generally* Narrative Factual Statement ¶ 53. The efforts reached fruition by the time of the AAR board meeting on December 11, 2003, at which Defendants jointly agreed to direct the AAR to create a new index – the All Inclusive Index Less Fuel ("AIILF") – to facilitate the imposition of fuel surcharges. *See* RD Ex. 69; AAR-000167-73. On November 11, 2004, Defendants further agreed to direct the NEMC to publish the AIILF on the AAR's website following UP's recommendation that doing so would "facilitate and support" the use of fuel surcharges. *See* RD Ex. 115; UPFSC 0396660-61 at UPFSC 0396661. *See generally* Narrative Factual Statement ¶¶ 63-78, 86-94.

In furtherance of the conspiracy, Defendants also later agreed that NS could impose (starting in 2006) a new "rebased" standard mechanism that applied a 0.3% surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3% for every dollar increase above $64 per barrel. NS adopted this new standard mechanism only after discussions with each Defendant. *See* Narrative Factual Statement ¶¶ 106-109. And, each Defendant

[4] Plaintiffs understand that this Interrogatory "does not demand that each surcharge be identified…". *See* Opinion (Dkt. No. 534), at 11.

recognized the adoption of this new mechanism was merely a cosmetic change that would not impact their bottom lines (and was, it appears, intended to mislead the Surface Transportation Board). *Id.*

Pursuant to the conspiracy, the western Defendants (BNSF and UP) both adopted programs applying to their coal shipment business in mid-2004, which were minor variations off the standard HDF carload programs and had the intended effect of making the fuel surcharges for coal traffic even more onerous. The details of those programs are set forth in the documents cited in the Narrative Factual Statement. *Id.* ¶ 95.

Defendants' top executives, who were responsible for both the carload and non-carload business segments, also directed coordination of fuel surcharges applying to non-carload business. *See* Narrative Factual Statement ¶ 61. In furtherance of the conspiracy, Defendants coordinated their intermodal fuel surcharges throughout the conspiracy period both by making manual ad hoc adjustments and by making programmatic changes to further bring them into lockstep. *See, e.g.*, *id.* ¶ 105. As reflected in the Narrative Factual Statement, *id.* ¶ 102, and the analysis performed by Dr. Rausser, once the conspiracy was underway, Defendants aggressively applied their intermodal surcharge programs (which differed only in slope from the carload programs (Corrected Expert Reply Report of Gordon Rausser at 22-23, 53-57)) across-the-board at onerous levels, achieving nearly universal coverage.

Defendants' conspiracy focused on rate-based (sometimes called "revenue-based") fuel surcharges – that is, fuel surcharges applied as a percentage of the base rate. Mileage-based fuel surcharges are not, and have never been, part of the alleged conspiracy.

**NS INTERROGATORY NO. 2(a):**

As to any unlawful agreement you allege in this Litigation: (a) identify every Entity and Person whom you believe participated in the alleged unlawful agreement . . . . For each subpart, identify with particularity all facts and evidence supporting your response.

**RESPONSE:**

Plaintiffs object that this interrogatory – and the identified subpart thereto – is overbroad and unduly burdensome to the extent it seeks to have Plaintiffs identify every Entity or Person that "participated in" the conspiracy (and Plaintiffs note that the term "participated" is ambiguous). Plaintiffs further object that this interrogatory is overbroad and unduly burdensome to the extent it seeks identification of "all facts and evidence that forms the basis" for a contention.

Subject to, and without waiving, these objections and the General Objections, pursuant to the Court's opinion dated November 17, 2011 (Dkt. No. 534) and pursuant to Defendants' request for "a simple list of natural persons" in response to this interrogatory (*see* Defendants' Motion to Compel, dated May 18, 2011, at 14), Plaintiffs respond that evidence in the record, as set forth in the Narrative Statement, shows that each Defendant knowingly participated in the conspiracy. Plaintiffs further respond that, based on Plaintiffs' review of the evidentiary record to date, at least the individuals listed below knowingly participated in the conspiracy at some point.

Defendants' conspiratorial meetings, beginning in early 2003, were conducted between and among Defendants' highest-ranking executives, including their CEOs and CMOs. Defendants' CEOs and CMOs discussed their fuel surcharge programs at these meetings, and agreed to coordinate those programs and apply them as widely as possible. The evidence indicates that at least the following of Defendants' CEOs and CMOs knowingly participated in

the conspiracy:

1. Matthew Rose (BNSF)
2. John Lanigan (BNSF)
3. Michael Ward (CSX)
4. Michael Giftos (CSX)
5. Clarence Gooden (CSX)
6. David Goode (NS)
7. Charles (Wick) Moorman (NS)
8. Isaac (Ike) Prillaman (NS)
9. Donald Seale (NS)
10. Richard (Dick) Davidson (UP)
11. Ivor (Ike) Evans (UP)
12. James (Jim) Young (UP)
13. John (Jack) Koraleski (UP)

Plaintiffs' review of the record, which is ongoing, further shows that at least the following individuals provided support to Defendants' CEOs and CMOs, assisting in the execution of and knowingly participating in the conspiracy:

1. David Garin (BNSF)
2. Sam Kyei (BNSF)
3. John Couch (CSX)
4. Patrick Glennon (NS)
5. Chuck Adams (UP)
6. Robert Knight (UP)

Dated: January 4, 2012

Respectfully submitted:

/s/ Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel Brockett
Marc L. Greenwald
Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 4, 2012, a copy of the foregoing consolidated objections and responses to Defendants' first set of interrogatories was served on counsel for Defendants by electronic mail.

/s/ Sami H. Rashid

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------X
In Re: Rail Freight Fuel :
Surcharge Antitrust Litigation,: Case No.
-------------------------------X 1:07-mc-00489-PLF

VIDEOTAPED DEPOSITION OF GORDON RAUSSER, PH.D.
Washington, D.C.
Thursday, June 3, 2010
9:08 A.M.

Reported by Marijane Simon, RDR, CLR

---------------------------------------------------

DIGITAL EVIDENCE GROUP
1299 Pennsylvania AVe NW, Suite 1130E
Washington, DC 20004
(202) 232-0646



Thursday, June 3, 2010
9:08 A.M.

Videotaped Deposition of GORDON RAUSSER, PH.D., held at the offices of Howrey LLP, 1299 Pennsylvania, Avenue, NW, Conference Room 2G, Washington, D.C., 20004, pursuant to notice, before Marijane Simon, a Registered Diplomate Reporter, Notary Public of the District of Columbia.

...



APPEARANCES:

For the Plaintiffs:
MICHAEL D. HAUSFELD, ESQ., and
SATHYA GOSSELIN, ESQ.
HAUSFELD LLP
1700 K Street, NW
Washington, DC 20006
(202) 540-7200
(202) 540-7201 (Fax)
mhausfeld@hausfeldllp.com
sgosselin@hausfeldllp.com
Also for the Plaintiffs:
STEPHEN R. NEUWIRTH, ESQ., and
RICHARD I. WERDER, JR., ESQ.
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
(212) 849-7111 (Fax)
stephenneuwirth@quinnemanuel.com
rickwerder@quinnemanuel.com



APPEARANCES (Continued):

Also for the Plaintiffs:
PAUL M. DONOVAN, ESQ.
LaROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue
Suite 200
Washington, DC 20036
(202) 298-8100
(202) 298-8200 (Fax)
paul.donovan@laroelaw.com

For Defendant UNION PACIFIC RAILROAD:
THOMAS A. ISAACSON, ESQ.
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
(202) 383-6558
(202) 383-6610 (Fax)
isaacsont@howrey.com

...

APPEARANCES (Continued):

For Defendant NORFOLK SOUTHERN RAILROAD:
SAUL P. MORGENSTERN, ESQ.
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
(212) 836-7210
(212) 836-6333 (Fax)
smorgenstern@kayescholer.com

For Defendant BNSF RAILWAY:
SAMUEL M. SIPE, JR., ESQ.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
(202) 429-6486
(202) 261-7542
ssipe@steptoe.com

...



APPEARANCES (Continued):

For Defendant CSX:
SHARI ROSS LAHLOU, ESQ., and
DAVID D. CROSS, ESQ.
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2500
(202) 628-5116 (Fax)
slahlou@crowell.com
dcross@crowell.com

ALSO PRESENT:
Gareth Macartney, OnPoint Analytics
Robert Willig, Consultant for the defendants
Christa Laser, Summer Associate, Howrey
Billy Fahnert, Videographer, Digital Evidence Group



I N D E X


EXAMINATION OF GORDON RAUSSER, PH.D. PAGE
BY MR. ISAACSON 11
BY MS. LAHLOU 266


RAUSSER EXHIBITS


No. Description Page Identified
1 Rausser Expert Report, 3/18/10 11
2 Rausser Corrected Report, 5/27/10 11
3 "Damage Regression Results" 71
4 Email, 5/16/03, Schroeder to Eymann, Osler, "IP Fuel Surcharge Policy - Project 1786," UPFSC 0073350 - 352, also numbered 13515484 - 486 110
5 Set of two contracts, Norfolk Southern and Olin, OLI109011 - 015 and OLI062533 - 535 130




I N D E X (Continued)

RAUSSER EXHIBITS


No. Description Page Identified
6 Rausser overcharge results, Categories 1, 2, and 3 damages regression models, corrected report 157
7 backup data, Rausser reports, fuel surcharges for each defendant 160
8 Email, 11/17/05, Draper to Toy UPFSC 0047717 - 718 193


...

Page 53

A. Yes. Now?
Q. Was there any limit on the defendants' freedom to adopt other fuel surcharge formulas?
A. With regard to what?
Q. As part of the --
A. Yeah.
Q. As part of the conspiracy.
A. Were there any limits?
With respect to the correspondence and communications among the defendants, they set out the objectives that they were attempting to achieve. Clearly, if one of the defendants went beyond that coordinated set of standards, that would not as I understand the coordination be a violation of the coordination.
Q. I'm not sure I got that, but let me give you a specific example --
A. Okay.
Q. -- and maybe this will nail it down.
If Union Pacific had a contract with a sizable customer that provided for a fuel surcharge equal to 65 percent of the standard carload fuel

Page 54

surcharge, would that be a breach of the conspiracy?
A. That would be a deviation of the agreement with regard to the coordination that the four defendants established.
Q. Okay. And if Union Pacific had a contract with a sizable customer that had a $38 WTI strike price, that would also be a deviation from the conspiracy?
A. Yes.
Q. Okay.
And are you aware of any evidence --
A. By the way --
Q. Oh.
A. -- I want to come back to that last statement. With -- When I said yes, it's with the proviso that the 38 strike is binding. If it's not binding and the effective response rates are the same with regard to the coordinated strike price, the answer would be no.
Q. I'm sorry. I didn't understand what you meant by "binding."
A. Is the underlying above the strike or is

Page 55

it below the strike?
Q. And that's viewed ex ante or ex post?
A. That would be viewed in terms of implementing the program ex post.
Q. Are you aware of any evidence that any defendant ever complained about another defendant's adoption of fuel surcharges other than the standard carload and standard intermodal fuel surcharges?
MR. HAUSFELD: Just for purposes of clarification, which -- which period?
MR. ISAACSON: The class period.
MR. HAUSFELD: Okay. Thank you.
THE WITNESS: "Complained." There was an event that took place with regard to an investigation of alternative programs, and there was communication among the parties. I'm not sure I would characterize that as a complaint, but, instead, looking at an alternative design for the implementation of the programs. My recollection is that BN, using your characterization rather than BNSF -- that there was a proposal to move in the direction of mileage-based. It was circulated among

Page 56

the defendants and turned down. I'm not so sure that would rise to the characterization of a complaint; but, certainly, people were looking at other programs and how the programs might -- might substitute for the existing programs.
MR. ISAACSON: Okay.
BY MR. ISAACSON:
Q. And apart from that one incident, are you aware of any other complaints that any defendant made about another defendant's failure to comply with the terms of the conspiracy?
A. Not that I recall.
Q. Now, am I correct that the fuel surcharge programs adopted by the defendants prior to the summer of 2003 were not conspiratorial?
I was trying to be sensitive to your concern about July 1 versus June, and I'm --
A. Specifying a broader range with regard to the --
Q. Yeah --
A. -- conversion?
Q. -- prior to June.

A. Not to my knowledge.
Q. Well, not just not to your knowledge, but you state in your report, for example, on page 42, that the -- between 2000 and 2002, the defendants independently implemented fuel surcharge programs; right?
A. Yes.
Q. Okay. And later on in that paragraph, you say, "implemented by the individual defendants without agreement or coordination"; right?
A. That's why I said, "Not to my knowledge."
Q. Right. And you -- Today, a few months after this report was written, you stand by those statements?
A. I do.
Q. Now, is there anything in your report that quantifies the use of fuel surcharges by the defendants in the first half of 2003?
A. That "quantifies" for the first six months of 2003?
Q. Yes.
A. No.



Q. Is there anything in your report that provides any data bearing on that question?
A. No.
Q. So if I wanted to know what percentage of defendants' shipments in April or May 2003 had fuel surcharges, your report would provide no answer to that question; right?
A. Yes.
Q. Okay. And the same would be true if I wanted to look at the data on a quarterly basis for the first two quarters of 2003; right?
A. Yes.
Q. Wouldn't make any difference if I wanted to slice the data quarterly, monthly, weekly; any way of slicing the data the first half of 2003, there's nothing in your report to indicate the extent to which defendants used full-surcharge programs?
A. In the first half of 2003?
Q. Right.
A. Yes.
Q. Now, immediately prior to the start of the



conspiracy, what percentage of defendants' nonregulated customers had fuel surcharges in their price authorities?
A. That's a calculable -- That's a computable number from the data that I have provided with my report. It's not a number that I've computed.
Q. And same question but this time on a percentage-of-shipments basis.
A. Same response.
Q. And same question on a percentage-of-revenue basis.
A. Same response.
Q. Now, which of those three is the best metric for measuring the coverage of a fuel-surcharge program: percentage of customers, percentage of shipments, percentage of revenues, or none of the above?
A. Depends on the purpose for which you're asking the question.
Q. If one's purpose is to determine whether there's been a significant increase in the use of fuel surcharges after the start of the conspiracy,



what would be the right metric?
A. Whether there's been a significant increase. And you want to look at the Delta between the first six months of 2003 or the entire class period, preclass period? What are we talking about?
Q. Does the correct metric depend upon the time period being used?
A. No, it depends on the purpose for which you're computing that metric.
Q. Well, let's say, hypothetically, you wanted to compare the six months before the start of the conspiracy to the first six months of the conspiracy. What would be the right metric?
A. Compare it for what purpose? I'm sorry.
Q. To determine whether there was a statistically significant increase in the use of fuel surcharges after the start of the conspiracy.
A. And the three choices you gave me were: look at the revenue scope of the fuel surcharges, look at the shipper scope -- And the third was?
Q. Shipments.

Page 277

BY MS. LAHLOU:
Q. Page 76 of your report discusses fuel efficiency; is that right?
A. Yes.
Q. And not productivity?
A. And, apparently, you have in mind the difference between fuel efficiency, because much of this case turns on whether and what the sharing arrangements are with regard to shippers versus the railroad companies with respect to changes in prices of fuel. And one measure of productivity is how much output you get with regard to a given amount of fuel. That is a measure of productivity, so -- my discussion here about fuel efficiency is a major component of productivity in this industry.
Q. How long have you been an economist?
A. How long?
Q. Yes.
A. Forty years, depending on --
Q. A long time?
A. A long time, but it depends on at what point. I mean: When I completed my Ph.D.?

Page 278

Q. Ph.D.?
A. Yes, thirty -- thirty-eight years. Thirty --
Q. So I imagine you've had the opportunity to examine a lot of different kinds of industries?
A. Yes.
Q. And understand the pricing dynamics in lots of different industries?
A. Yes.
Q. And have you had the opportunity to observe competitive industries in which they priced -- they did not price to incremental cost?
A. Certainly.
Q. And there's nothing wrong with that; right?
A. Depends.
Q. It depends on what?
A. On whether it's illegal or not.
Q. What makes it illegal?
A. Abusive monopoly power is illegal, and that's certainly an instance where -- where sellers in a market are not pricing at -- Their prices are

Page 279

not being set at marginal cost but, instead, there -- there is a gravitation towards setting prices where marginal or incremental revenues are equal to incremental costs. That's certainly one, one -- one instance.
All of the legislation and the existence of the Antitrust Division at the Department of Justice and the FTC is looking at instances where there is acquisition and rent-seeking associated with acquiring market power. In a number of industries, that's certainly not illegal. If you've got intellectual property and you have the monopoly for a product that is being produced, there's nothing illegal about exercising that market power.
Q. Okay.
What was, in your opinion, the primary goal of the conspiracy?
A. As stated by the defendants in their communications with one another, to implement pricing for the nonlegacy contracts in which they would extract higher prices than they could have achieved if they hadn't coordinated.

Page 280

Q. If I understood your report and your testimony, you -- your analysis has concluded that the defendants operated as a competitive -- competitive oligopoly prior to mid 2003, July 2003; is that right?
A. An "interdependent oligopoly" is, I think, the words that I used. Yes.
Q. They were imperfectly competitive?
A. Yes, uh-huh.
Q. And would you have expected the defendants during that period to maximize the prices that they could charge based on the state of competition and market forces?
A. Given the competitive landscape, yes.
Q. And I believe, again, that you've testified that -- and -- and your opinion is that each defendant unilaterally adopted a rate-based fuel surcharge and implemented that rate-based fuel surcharge prior to July of 2003; is that right?
A. With variable terms and conditions, yes --
Q. Okay.
A. -- and with different rates of coverage.

Q. And as an economist, would you have expected defendants to make every attempt to implement those fuel surcharge pro -- programs as broadly as possible absent a conspiracy?
A. "As broadly as possible"?
MR. HAUSFELD: Would you read back the question, please. Thank you.
THE REPORTER: (Reading) And as an economist, would you have expected defendants to make every attempt to implement those fuel surcharge programs as broadly as possible absent a conspiracy?
THE WITNESS: In their unilateral self-interest, yes, but what was possible was limited by the competitive, strategic interaction among other defendant railroads.
BY MS. LAHLOU:
Q. And I believe it's your opinion in your report, and tell me if you think differently -- Now, I'll refer you to page 6 of your report -- that what changed during the -- the class period is, you say, the increased use of fuel surcharges and defendants' refusal to negotiate with shippers concerning those



fuel surcharges. Do you see that?
A. Which bullet are you? In which opinion? I know you're on page 6.
Q. On page 6. I'm --
A. But I missed which opinion.
Q. Your Opinion One.
A. Opinion One.
Q. The next-to-last bullet in Opinion One.
A. Yes.
Q. Were there any other differences between the preclass period and the class period that you would look to to evidence the nature of the conspiracy?
A. Yes, there was other evidence I would look at in addition to the evidence that relates to this particular bullet; namely, their refusal to negotiate with shippers concerning fuel surcharges. There is a number of other actual events and evidence that I've described in my report that go beyond that one bit of evidence.
Q. Could you just categorize those without, obviously, listing them individually.



A. The coordinated restructuring of the all-inclusive index, the removal -- the joint, coordinated removal of the fuel component, the actual evidence with regard to the communications on monitoring, the implementation of the programs; the coordination with regard to alignment of the trigger prices and the use of two underlyings which are, as I indicated earlier today, co-integrated; the evidence that exists with regard to the similarity, one, the de -- among shippers within the defined class with regard to the coverage of the coordinated fuel-surcharge programs; the evidence with regard to the design of the program and the amount of the recovery that took place for members of the class vis-a-vis the actual change in the in -- incremental costs that took place with regard to each of the four defendants.
MR. HAUSFELD: For purposes of planning, there's approximately fifteen minutes left.
MS. LAHLOU: Thank you.
MR. HAUSFELD: Yes.



BY MS. LAHLOU:
Q. You cite a number of factors in the freight rail industry that you believe are conducive to price-fixing, and I think you've summarized some of those on pages 5 and 6 of your report. How did those factors change, if at all, between the preclass period and the class period?
A. The basic institutions and structure that existed during the preclass period, defined as 2000 through mid 2003, is economically equivalent to the structure that existed from mid 2003 to the end of 2008. So from the standpoint of fundamental economics, there was no major changes that took place.
Q. If a shipper received a fuel surcharge in 2001 pursuant to a one-year contract that -- so the contract was entered April of 2001 and expired in April of 2002, and then in April of 2002, it was renewed and the shipper received the same fuel surcharge, again for a one-year contract to April of 2003; and then in and of 2003, the contract was renewed, and the shipper again received the same

# Intentionally Omitted

## DA06418-DA06422

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - -X
In re RAIL FREIGHT FUEL : MDL Docket
SURCHARGE ANTITRUST : No. 1869
LITIGATION. : Misc. No.
- - - - - - - - - - - - - - - - - -X 07-489(PLF)

Washington, D.C.
Tuesday, December 11, 2012

Videotaped Deposition of GORDON RAUSSER, PH.D., a witness herein, called for examination by counsel for Defendants in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, CRR, RPR, a Notary Public in and for the District of Columbia, taken at the offices of Crowell & Moring, LLP, 1001 Pennsylvania Avenue, N.W., Washington, D.C., at 9:40 a.m.

Page 2

APPEARANCES:

On behalf of the Plaintiffs:
MICHAEL D. HAUSFELD, ESQ.
SETH R. GASSMAN, ESQ.
SATHYA GOSSELIN, ESQ.
Hausfeld, LLP
1700 K Street, N.W.
Suite 650
Washington, D.C. 20008
(202) 540-7175
mhausfeld@hausfeldllp.com
sgassman@hausfeldllp.com
sgosselin@hausfeldllp.com

RICHARD L. WERDER, JR., ESQ.
STEPHEN R. NEUWIRTH, ESQ.
SAMI RASHID, ESQ.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7231
rickwerder@quinnemanuel.com
stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com

PAUL M. DONOVAN, ESQ.
LaRoe, Winn, Moerman & Donovan
1250 Connecticut Avenue, N.W., Suite 200
Washington, D.C. 20036
(202) 298-8100
Paul.Donovan@laroelaw.com

Page 3

APPEARANCES CONTINUED:
On behalf of the Defendant CSX Transportation, Inc.:
DAVID D. CROSS, ESQ.
LUKE van HOUWELINGEN, ESQ.
SHARI LAHLOU, ESQ.
RACHEL L. TALBOT, ESQ.
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2679
dcross@crowell.com
lvanhouwelingen@crowell.com
slahlou@crowell.com
rtalbot@crowell.com
On behalf of the Defendant Union Pacific:
DANIEL M. WALL, ESQ.
TIM O'MARA, ESQ.
Latham & Watkins, LLP
505 Montgomery Street, Suite 1900
San Francisco, CA 84111-2562
(415) 391-0600
dan.wall@lw.com
tim.omara@lw.com
THOMAS A. ISAACSON, ESQ.
Covington & Burling, LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-5082
tisaacson@cov.com

On behalf of Defendant BNSF:
JOSHUA H. SOVEN, ESQ.
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
jsoven@gibsondunn.com

Page 4

APPEARANCES CONTINUED:

On behalf of Defendant Norfolk Southern:
TARA L. REINHART, ESQ.
JOHN M. NANNES, ESQ.
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7500
tara.reinhart@skadden.com
john.nannes@skadden.com

ALSO PRESENT:
DAN REIDY, Videographer
DANIEL FLETCHER, Union Pacific
JOSEPH KALT, Compass Lexecon
GARETH MACARTNEY, OnPoint Analytics, Inc.
DAVID PRYOR, BNSF
* * * *

Page 5

`

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| GORDON RAUSSER, PH.D. | CSX |
| By Mr. Cross | 11 |
| | UNION PACIFIC |
| By Mr. Wall | 165 |

Afternoon Session - 137

Certified questions - 57, 189, 191, 242, 244


E X H I B I T S


| RAUSSER EXHIBIT NO. | PAGE NO. |
|---|---|
| 15 - Errata to Expert report of Gordon Rausser, Ph.D. dated October 15, 2012 | 10 |
| 16 - Expert Report of Gordon Rausser, Ph.D. dated October 15, 2012 | 20 |
| 17 - Deposition Excerpt Michael Giftos 2/25/10, pages 124-125 | 139 |

Page 70

capture through interdependent oligopolistic behavior.
Q. So no -- no individual one of those attributes is essential for your opinion regarding the market being conducive to collusion, is that right?
A. I interpret your -- interpret your question, if I remove one of these factors, would it all fall?
Q. Would it change your opinion?
A. It may or may not. All of these conditions hold in the facts in this particular industry. And as a result, you can clearly and economically draw the conclusion that there is rational collusion, and there are gains to be had through rational collusion.
Q. Turn to page 15 of your report. You have a sentence in the middle of the paragraph at the top that reads, defendants' network of railroads overlap significantly. Do you see that?
A. Just a moment. At the top.
MR. HAUSFELD: Sixth line down from the

Page 71

top.
THE WITNESS: Thank you.
MR. HAUSFELD: You're welcome.
THE WITNESS: Yes.
BY MR. CROSS:
Q. Is it your opinion that in regions where there are what you refer to as overlapping railroads, that every shipper in that region enjoys the benefits of rail to rail competition?
A. Every, no, I haven't analyzed that question of whether each and every shipper within those overlapping enjoy -- what kind of competition are we talking about, pure competition? What kind of competition?
Q. Benefits of rail to rail competition, either directly or indirectly. Do they enjoy -- does rail to rail competition constrain their rail pricing in any way?
A. No. No. I haven't analyzed that question about each and every shipper.
Q. At the bottom of page 16, you write, the defendants' ability to present fuel surcharges in

Page 72

this manner would have been significant undermined if they had charged different fuel surcharges in one part of the country than in other parts, or if they had charged certain customers higher fuel surcharges than other customers. Do you see that?
MR. HAUSFELD: It's the last line on page 16 and the first lines on page 17.
BY MR. CROSS:
Q. Do you see that, Dr. Rausser?
A. I do.
Q. Would the same logic be true for charging different fuel surcharges between interline shippers and local shippers?
A. Charging the same, you said, or different?
Q. I guess it's different sides of the same coin, but I said different.
A. You said different. No. Not with respect to the design of the coordinated programs that were implemented by each of the four defendants.
Q. The conclusion that we just read, would it be undermined if a particular shipper paid different fuel surcharges on different routes or for different

Page 73

commodities at the same point in time?
A. Not with respect to this element of the coordinated implementation of the programs.
Q. Professor Rausser, you understand that BNSF adopted mileage-based fuel surcharges for its agricultural and coal traffic, 2006, right?
A. February 2006. Yes.
Q. Did that undermine the defendants' ability to present rate-based fuel charges -- or I'm sorry, to assess rate-based fuel surcharges on shippers throughout this market?
A. Did that undermine?
Q. Yes.
A. Their ability?
Q. Yes.
A. I need more precision in the question. Do you mean, qualitatively, did it undermine their ability? No. If you mean, did it change the magnitude or the effectiveness of their ability, it's a small segment. And it's no surprise that there would be some movements away from the coordinated understanding that emerged three years earlier.

Page 74

Q. Dr. Rausser, there is no allegation in this case that mileage-based fuel surcharges were the subject of any conspiracy among defendants, right?
A. Yes.
Q. Turn to figure 24 of page 112 of your report. If you look at the graph for the coal, do you see that at the bottom of figure 24?
A. I do.
Q. The red line is mileage-based fuel surcharge revenue and the blue line is non-mileage-based fuel surcharge revenue for BNSF, right?
A. Yes.
Q. And the mileage-based fuel surcharges gets as high as two to three times -- almost two to three times the amount of revenue for non-mileage-based fuel surcharges, right?
A. Yes.
Q. Does that have any impact on your opinions that rate-based fuel surcharges were over-recovering or were more aggressive or somehow inappropriate, given that there is no allegation that mileage-based

Page 75

surcharges were collusive?
A. No.
Q. Why wouldn't you expect to see BNSF customers switching to UP if your opinion is right that customers can choose routes and the service offered by the defendants is interchangeable, why wouldn't you expect to see BNSF customers using UP to avoid the higher mileage-based fuel surcharge that BNSF is offering, coal and agricultural customers?
A. There is a multitude of reasons. There is some adjustment blanks. Your -- I presume in your hypothetical that a shipper has the opportunity to turn to UP instead of BNSF, and even in the face of fuel surcharges, would end up paying a lower all in freight rate than they would have paid to BNSF, is that correct? Is that what you're presuming?
Q. Well, I was just taking your opinion as a given that customers have the -- they can choose any route they want. I thought that was your opinion in this case, among defendants?
A. They certainly can make choices. Yes.
Q. Is that true for any shipper for any

Page 76

route?
A. Depends. Depends on the shipper.
Q. So some shippers can choose and some shippers can't. Is that what you're saying?
A. Yes. At least with regard to freight rates. But now the question is, what are the other sources of competition that exist even for what has been referred to in the industry and in this matter of the alleged conspiracy on fuel surcharges, the question about captive shippers.
And I have provided a host of reasons for the sources of competition even for captive shippers, and although imperfect. And moreover, in my prior depositions, I've explained why it's in the interest of the coordinators of the conspiracy to still charge fuel surcharges to those captive shippers as well.
Q. You're not offering an opinion in this case that there are no captive shippers, meaning shippers that are -- can choose only one railroad for particular routes, right?
A. I'm not offering an opinion, you said?
Q. Yes.

Page 77

A. That there are no captive shippers?
Q. Yes.
A. I'm not -- are you, I'm sorry. Are you suggesting that I'm offering an opinion that there is no such thing as a captive shipper?
Q. I'm asking if you're offering that opinion.
A. No.
Q. If you look at page 17 of your report, you refer to an overspill effect.
A. Page 17.
Q. Yes.
A. Where on the page?
Q. Second paragraph from the bottom, the last sentence. Do you see that?
A. Yes, I do.
Q. Okay. When you say this overspill effect implies that no region is isolated from competition, are you referring specifically to rail competition or all competition?
A. All competition.
Q. Are there any regions, in your view, that

Page 142

the published fuel surcharges. My opinion goes directly to the mechanisms that were put in place, the communications that occurred, and the implementation and what the data shows about the implementation of the fuel surcharges.
Q. Okay.
A. The actual portion of the all in rates that shippers ended up bearing those incremental prices.
Q. So let me -- I didn't mean to get hung up on published. Let me ask it this way. Are you offering an opinion in this case that any fuel surcharge that was in place in 2003 that was being assessed by CSXI on any shipments in 2003, that any of those fuel surcharges were the product of an unlawful understanding or coordination among defendants, yes or no?
A. That any actual payments for fuel surcharges. Yes.
Q. Was it all the base rate fuel surcharges that were in place that were being assessed by CSXI in 2003, or was it only certain ones?

Page 143

A. All the ones in the class period that weren't -- obviously, there were legacy contracts that had that provision in it. No. They would be excluded.
Q. If you turn to page 58 of your report, there is a sentence in the middle -- in the middle of the page that reads, by way of example. Do you see that, sir?
A. I do.
Q. It reads, by way of example, the defendants' top executives engaged in a series of discussions concerning the joint implementation of a uniform fuel surcharge program across the industry. Do you see that?
A. I do.
Q. Do you recall any evidence of any CSX executive participating in any discussion with any other defendant regarding joint implementation of a uniform fuel surcharge program across the industry?
A. Well, I cite on the next page and the subsequent pages, correspondence and meetings that took place between, for example, UP and CSX. And I

Page 144

go through what is the details of the resulting understanding that emerged with regard to revised fuel surcharge proposals. I refer in the following paragraph with regard to the announcement of CSX which is consistent with the prior paragraph.
Q. Dr. Rausser, can I --
A. In addition, if I look over to page 60, there is references to meetings that took place with regard to fuel surcharges in early April of 2003 involving CSX top executives.
Q. Dr. Rausser, is it fair to say that any evidence that you're relying on for the claim that a CSX executive discussed joint implementation of a uniform fuel surcharge program across the industry, any evidence you're relying on, we can find in your report, it's cited here?
A. Yes.
Q. And is that also true for your claim in the next sentence that --
A. Back on page --
Q. On 58. Yes, sir.
A. 58.

Page 145

Q. Where you say, the defendants explicitly discussed the desirability of an industry standard approach to fuel surcharges, is it also true that any evidence you're relying on with respect to the CSX --
A. I'm sorry. Where are you?
Q. Page 58.
A. I know, but which line?
Q. The very next sentence that begins, among other things.
A. Okay, I'm with you.
Q. If you continue on after the first clause, it says, defendants explicitly discussed. Do you see that?
A. Yes.
Q. So is it also true that any evidence you're relying on as evidence of a CSX executive having the sort of explicit discussion that you describe here, that is also identified in your report?
A. Yes.
Q. If you turn to page 59, at the top, you refer to a discussion between UP and CSX executives

Page 146

on or about March 12th or 13th?
A. Yes.
Q. Of 2003. Are you offering an opinion that that discussion, that some sort of unlawful coordination or understanding was reached in that discussion?
A. First of all, you continue to put the characterization of unlawful. I'm not a legal expert. I'm here representing what the documents demonstrate with respect to coordination and what ultimately happened with regard to consequences on anticompetitive pricing above and beyond the imperfectly competitive pricing that existed but for the coordination that took place.
Q. I didn't mean to put words in your mouth, Dr. Rausser. I thought you testified earlier you're offering an opinion --
MR. HAUSFELD: Objection.
BY MR. CROSS:
Q. -- that conduct in this case violated the antitrust regulations, is what I thought you had said. So I'm just trying to pick up on that concept.

Page 147

To the extent you're offering an opinion in this case that some conduct violated the antitrust regulations, are you offering an opinion that the understanding or coordination that you've described throughout the day regarding fuel surcharges, that that was reached between UP and CSX at this March 12th or 13th, 2003 discussion?
A. As I indicated, that was an evolutionary process that began in 2003. And I've said that in my reply report, in my prior deposition testimony, and that the coordination and understanding solidified and was implemented in July of '03.
Q. So you're not offering any opinion that when the UP and CSX executives left the discussion that's described here at the top of page 59, you're not offering an opinion that as of that moment, they definitively had reached some sort of understanding with respect to fuel surcharges that would violate the antitrust regulations. Is that fair?
A. Yes. And I believe I've already answered that question in the prior deposition, but more importantly, this morning. You asked me the specific

Page 148

date. This is a specific date. And I think I testified that the only date I can be sure of that I've always been sure of is July of 2003.
Now, backing up prior to that, what is a specific date including this date, these are all the cumulative evidence that existed over the course of that period in which an understanding was being designed for subsequent execution.
Q. What's the basis for your claim that the meeting or the discussion identified at the top of page 59 between UP and CSX executives, what's the basis for your claim that that was part of the evolution of a coordination or understanding on fuel surcharges that violated the antitrust regulations?
MR. HAUSFELD: Objection.
BY MR. CROSS:
Q. Strike that. Let me ask a more concrete question. That will make it easier. What's the basis for your claim that CSX and UP executives discussed fuel surcharges in this discussion in any context other than applying them to joint interline business?

Page 149

MR. HAUSFELD: Objection. No foundation.
BY MR. CROSS:
Q. Or are you offering such a thing?
A. I'm offering an opinion that's based on the documents that I've cited and what those documents say.
Q. Let's take a look.
A. Okay.
(Rausser Exhibit No. 18 was marked for identification.)
BY MR. CROSS:
Q. Do you recognize Exhibit 18 that I've just handed you as a document that you relied on for the purpose of your report?
MR. HAUSFELD: Can we identify what Exhibit 18 is for the record, please?
MR. CROSS: Yes. We are going to get there.
MR. HAUSFELD: Well, it's normal that we identify what the exhibit is before we ask a question.
MR. CROSS: Michael, I know how to take a

Page 150

deposition. Just sit tight.
MR. HAUSFELD: It has nothing to do with sitting tight, David.
BY MR. CROSS:
Q. Can you answer the question, Dr. Rausser? Do you recognize it, yes or no?
A. Yes, I do.
Q. And it's a document that's Bates labelled CSX FSC 000165104 ending in 105. And is this one of the documents you relied on in your discussion of the March 2003 meeting between UP and CSX executives at page 59?
A. Yes. It's in my -- I cite that document in footnote 118, but it's not just that document stand alone. It's in combination with the other documents.
Q. Now, if you look down at the bottom, you'll see under -- there is an email from Mr. Toy of UP.
A. At the bottom.
Q. At the bottom of the first page of Exhibit 18?

Page 151

A. All right. I'm with you.
Q. So Mr. Toy of UP emails Mr. Couch at CSX, there is a list of agenda items for the discussion you're talking about in your report, do you see that?
A. Yes.
Q. And at the bottom the last one, it says, other pricing issues on CSX/UP interline business. Do you see that?
A. Yes.
Q. Below that, it reads, fuel surcharge methodology. Do you see that?
A. I do.
Q. This bullet point of fuel surcharge methodology, is that what you're relying on for the claim in your report that there was a discussion of fuel surcharge methodology at this meeting?
A. That plus the subsequent documents.
Q. Is there anything in this document or anything else you can recall from the record that suggests that the fuel surcharge methodology, assuming that discussion occurred, went beyond CSX/UP interline business as described in Exhibit 18?

Page 152

A. I'm going to have to decompose your question. When you specified the question, you said any documents beyond this document?
Q. Is there anything you see in Exhibit 18 or that you can recall from the record --
A. That's all other documents, when you say from the record.
Q. Whatever you can recall.
A. Okay. That -- that what? That there was communication across the four defendants, not just these two?
Q. That the discussion that occurred in this meeting included a discussion of fuel surcharge methodology that went beyond the application of that methodology to the interline business between CSX and UP?
A. Yes. I would cite all the documents that go -- you can have one-to-one discussions or meetings, and then a network of meetings in which there is communication from one of the former parties involved in the meeting having a subsequent meeting with others. And that's what the record shows.

Page 153

So with regard to UP having a discussion here and subsequently having a discussion with another defendant, for example, read on a few pages and you find NS communicating with UP, or previously you have UP communicating with CSX. So the evolution of the communications and the design common across all four parties. In terms of the initiation of their fuel surcharge program, de novo, even in an interdependent oligopoly, you wouldn't expect everybody reaching the same point in time with regard to that implementation.
MR. HAUSFELD: Dr. Rausser, can you please identify what you're referring to when you use the phrase, read on.
THE WITNESS: I'm referring specifically to pages 59 through --
MR. CROSS: You'll have an opportunity to redirect at the end. You don't ask questions now.
THE WITNESS: 72 in which there is all sorts of communications, sometimes one-on-one, sometimes --
BY MR. CROSS:

Page 154

Q. Dr. Rausser, I'm asking the questions. He can ask whatever questions he wants at the end. Now, let me ask you, looking just at Exhibit 18, is there anything in Exhibit 18 that you're relying on, just on this document alone, to offer an opinion that CSX and UP executives discussed anything other than fuel surcharge methodology applicable to their interline business at this meeting?
MR. HAUSFELD: Asked and answered.
THE WITNESS: In other words, so I properly interpret the question, if this is the only document that existed, and none of the other documents existed, could I form an opinion based on this document alone that they coordinated fuel surcharges? No.
BY MR. CROSS:
Q. That wasn't the question. Not whether they coordinated fuel surcharges. Whether this discussion in this meeting encompassed anything other than a discussion of their interline business?
MR. HAUSFELD: Asked and answered.
THE WITNESS: I suppose you're going to

Page 155

have to define precisely what you mean by interline business, so that there is -- we have a clear record about what we are talking about when you refer to interline business.
BY MR. CROSS:
Q. Well, I don't want to get into a debate about that.
MR. HAUSFELD: Then don't.
MR. CROSS: Let me ask a different question. Object or be quiet.
MR. HAUSFELD: Excuse me. Ask a question.
BY MR. CROSS:
Q. Dr. Rausser, let me ask you this.
MR. HAUSFELD: And I won't be so rude to say to you, or be quiet.
BY MR. CROSS:
Q. You understand that NS did not adopt the changes that CSX made to its published fuel surcharge in 2003, the CSXT fuel surcharge, NS didn't adopt those changes until 2004 where it adopted the same or similar --
A. No. I don't agree with that.

Page 156

Q. Implement. Implement.
A. Implement is the key word. Yes.
Q. Okay. Fair enough. If your opinion is accurate that shippers can choose between defendants on a variety of routes and price is what drives, and that the CSX modified published fuel surcharge was more aggressive than the prior fuel surcharge that NS still had in place, why don't we see NS shippers switching over to CSX in that time frame in droves? Why is NS picking up a single new contract under the old – I'm sorry. Why is CSX picking up a single new contract?
MR. HAUSFELD: Objection.
BY MR. CROSS:
Q. Why aren't the CSX shippers switching to NS?
MR. HAUSFELD: That's three questions now. One at a time, or do you want them all at once?
BY MR. CROSS:
Q. Let me try it again.
MR. HAUSFELD: Just answer yes or no.
THE WITNESS: I'm confused.

Page 157

MR. CROSS: I know, I'm sorry.
MR. HAUSFELD: You should be.
BY MR. CROSS:
Q. Okay. Why don't you see in the time frame between June of 2003 when CSXT modifies its published fuel surcharge, why don't we see CSXT shippers switching to NS in the time period between then and 2004, when NS implements the same fuel surcharge, if they can all switch, and price drives?
A. First of all, I never represented they can all switch. That's my first response. My second response is the discovery record specifies that NS had obstacles with regard to implementing their fuel surcharge program that was part of the understanding with the other three defendants.
In particular, they had a lumpy set of legacy contracts that have yet to expire. So given that lumpy set of legacy contracts, it was prudent for them to wait to implement. That's my second response.
My third response with regard to shippers for CNX, you're presuming that NC would accept them

Page 222

A. I'm -- structurally, no. I'm not saying structurally. They have different trigger prices. They have different mechanisms. But what I'm saying is that given where the underlying was that they were all, as I've already testified today and I've testified in prior depositions, they were all in the money and they were designed at the beginning of the class period to have the same result with regard to the injury suffered by class members.
Q. What was that same result?
A. The same result was that the fuel surcharge with regard to its relationship with the underlying was equivalent across the various mechanisms.
Q. You said its relationship with the underline?
A. Yes. Underlying.
Q. The underlying what? I'm sorry. I just don't understand.
A. Fuel prices. Fuel prices is the underlying.
Q. So you're saying that the same result was

Page 223

that the fuel surcharge with regard to its relationship with the underlying fuel prices was equivalent?
A. Yes.
Q. Of all the work that you've done in this case, what is the particular analysis that, in your view, most clearly proves that?
A. Most clearly proves that. The diagnostics with regard to the transaction database.
Q. Can you just identify for me anything specific in the report that, in your view, establishes that the fuel surcharges adopted during the class period produced the same result with respect to the underlying relationship with fuel prices?
A. First of all, the formulas themselves and where the fuel prices -- or where the West Texas Intermediate was, or where highway diesel prices were at the beginning of the period.
Q. Right.
A. And then looking at the initial conditions if you just look at the mathematics in terms of

Page 224

comparing, for example --
Q. Can I help you find something?
A. No. No. Things have gotten stacked on top of one another.
Q. What is that you have in your hand?
A. This is a document that goes to the distinguishing characteristics between the pre-class period and the class period, and it's the summarization of what's in my report.
Q. It's just some notes that you have for yourself.
A. Yes.
Q. Okay. Michael, can we get a copy of that at some point, please?
MR. CROSS: We asked earlier. Can we get that marked, so we know what he is looking at.
MR. WALL: Do you have copies of it?
MR. CROSS: We can get copies.
MR. WALL: Do you have any objection to us getting the notes that he is using during this deposition?
MR. HAUSFELD: No.

Page 225

MR. WALL: Do you have any extra copies or do you have just the one?
MR. NEUWIRTH: I assume this will be reciprocal.
MR. WALL: I think it's mandatory. I don't think we actually have a choice.
MR. HAUSFELD: Agreed.
THE WITNESS: For example, if you look at BNSF versus UP, and you look at the mechanism that they started, on the surface, you would see that BNSF strike price for carloads is $1.25 on HDF. In contrast, UP's strike price is $1.35. There must a difference there.
BY MR. WALL:
Q. Right.
A. There isn't a difference.
Q. Why?
A. Because, one, the actual initial conditions on UP is 1.5 percent right out of the box, and if you look at the slope, from that point forward versus the slope on BNSF, they are exactly the same. And -- and given that both the HDF at the beginning

Page 226

of the class period is in the money, they are both going to get the same payments with regard to their imposition of the fuel surcharge for non-legacy contracts for both of those two mechanisms that were put in place.

Q. Let's pick up on this example, because I agree it's a good example. BNSF already had this HDF fuel surcharge in place at the time that UP adopted its version of an HDF surcharge, right?

A. They had a different strike, but they did have a mechanism based on HDF, but it wasn't the same structure.

Q. My point is this. When you envisioned the counterfactual world where UP is going to establish unilaterally its fuel surcharge, you would agree with me, would you not, that it's going to take a careful look at any information it can find about BNSF's fuel surcharge?

A. Yes.

Q. Okay. And would you not expect that acting unilaterally, what UP will try to do is develop an alternative fuel surcharge that is more

Page 227

attractive to shippers and therefore increases the probability that they would choose UP over BNSF?

A. No.

Q. Why not?

A. Because it's incomplete.

Q. What's --

A. They are not going to look at something that is more attractive to their shippers. They are going to look at something that's more attractive to them.

Q. Okay. Let me just -- I won't try to state it myself. Let me put it to you this way. Under those conditions, when UP is trying to decide unilaterally what fuel surcharge to put in competition with BNSF, how would you expect it would differentiate its fuel surcharge from BNSF's?

A. It would depend on their assessment of the market conditions. They would look at what kind of profitability they could generate. They would take into account -- now, in terms of you've already specified that this is an interdependent world and a noncollusive world by your question. And I accept in

Page 228

your question that you're asking me to provide you with an answer for a world in which there is interdependent oligopolistic behavior, not collusion.

Q. Right.

A. Okay. So under those circumstances, you would expect them rationally to look at how much in the way of market value they could generate by having a unilateral specification of their fuel surcharges, and whether they would be able to effectively gain more value by some differentiation from BNSF.

And they would also go through the analysis of looking at the nonstrategic competitive interactions of how BNSF would respond to their unilateral self-interest. And they would go through that process and reach a conclusion, and now it would depend in terms of where they would end up would be a function of the strategic interactions between them and BNSF given your hypothetical.

Q. Okay. And accepting all of that, then, when you conducted your analysis and you're -- at a fundamental level, you're comparing what occurred during the class period with what you believe as an

Page 229

economist should have occurred in the absence of collusion, right?

A. No. I'm -- no, I'm looking at the data and what the data says with regard to the market forces. It's not what I believe. It's what's revealed by the data.

Q. And my question to you is, in the absence of collusion, how would you have expected UP to unilaterally implement a fuel surcharge given what the other defendants were doing? What would they have done differently?

A. Than what they actually did?

Q. Yes.

A. They would have found themselves in a world that is strikingly similar but for the changes in the economic conditions to what existed when they weren't colluding, namely, what happened during the period from 2000 through mid 2003, where there was no coordination. And yes, there were fuel surcharges, there were some differences among the four defendants, and I would expect the class period world to emerge in much the same fashion.

Page 270

features of the value that's being generated from the fuel surcharge remains in over-recovery, remains based on -- it's a percentage of base rates and has the same consequence with regard to the overall coordination. It turns out that the -- the coal shipped from western -- from the western -- with the western railroads versus the eastern railroads, there is some difference in terms of price sensitivity. There is still coordinating with regard to the basic functionality of the mechanisms themselves.

Q. But the mechanisms themselves predated the conspiracy, right?

A. Some of the mechanisms. Yes.

Q. Okay. So what did the eastern railroads do differently with respect to coal as a result of the conspiracy? That they hadn't already been doing beforehand?

A. That they hadn't already been doing beforehand? The eastern? That was eastern?

Q. Yes.

A. I think the simple explanation is coverage. The coverage is much more.

Page 271

Q. Coverage with respect to coal?

A. Yes.

Q. And where are you getting that?

A. I'm getting that from the contract database and from the transaction database.

Q. Do you present coal specific coverage information in your report?

A. When you say coverage -- how much coverage existed during the class period during -- versus the pre-class period?

Q. Pre and post for coal?

A. I don't -- that's certainly in the underlying documents that I produced with my report. I don't recall a table or a figure where I look at that specific question. But it's certainly computable.

Q. Before we break for the day, what evidence are you relying on that BNSF and UP coordinated their coal fuel surcharges?

A. The fact that they are both base rate driven. They are all structured in precisely the same way with the same consequences. And the

Page 272

communications that existed during the formative period of the understanding and the actual implementation that is reflected in the contract and transaction databases.

Q. Are you aware of any particular evidence or any evidence that reveals communications or direct coordination with respect to coal?

A. I'd have to go back and look with regard to specific instances of coal. I do recall communications that went directly to increasing the coverage, renewing legacy contracts and using the common mechanisms for fuel surcharges, avoiding any discounting. That's what I recall, as I sit here.

Q. I'm going to break my promise and ask you one more question. And then we'll let you go to your plane. I know you have to run to a plane. But before you go, I do want to ask you one just sort of question about coverage that then we can pick up with next week.

From the perspective of whether someone is pursuing conduct or behavior that they would pursue based upon unilateral self-interest, why wouldn't

Page 273

someone who has adopted a fuel surcharge program want it to be broadly -- why would they not want broad coverage? Do you understand? I mean, I kind of gobbled it a little bit.

A. No, I do understand. They would want broad coverage. Now, can they achieve it without the conspiracy.

Q. I get you. So you're not denying that there is unilateral self-interest to want broad coverage?

A. Certainly.

Q. So it's a question of whether you can achieve it through conspiracy?

A. Yes.

MR. WALL: I know you got to catch a plane. We will finish it next week on Tuesday.

MR. CROSS: Before we break, can we just get that marked.

MR. WALL: What's next in order here? So we'll mark as Exhibit 19, these are some of the notes that Dr. Rausser provided. This is the one that's called defendant pre-class versus class period

Page 274

behavior.

(Rausser Exhibit No. 19 was marked for identification.)

BY MR. WALL:

Q. And Dr. Rausser, can you just verify that that is indeed what has been marked?

A. It is.

Q. Thank you. Could you -- could I ask counsel and the witness to do whatever needs to be done to provide us with copies of the other notes that he was relying on in the course of the deposition, including whatever it was on the iPad that he referred to on a number of occasions and get us those before we resume next week?

MR. HAUSFELD: Okay.

MR. WALL: Thank you.

THE VIDEOGRAPHER: This concludes today's deposition of Dr. Gordon Rausser. The time on the video is 4:39 p.m. We are off the record.

(Whereupon, at 4:39 p.m., the deposition adjourned to be resumed on Tuesday, December 18, 2012.)

Page 275

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_________________________

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of ____________, 2012, and executed the above certificate in my presence.

_________________________

NOTARY PUBLIC IN AND FOR

_________________________

County Name

MY COMMISSION EXPIRES:

Page 276

CERTIFICATE OF NOTARY PUBLIC

I, SUSAN L. CIMINELLI, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by and of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

SUSAN L. CIMINELLI
Notary Public in and for the
District of Columbia

My commission expires:
November 30, 2016

**Errata Sheet for the Deposition of Gordon Rausser, Ph.D., taken on December 11, 2012 and December 18, 2012**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***

**Case No. 1:07-mc-00489-PLF**

| Page : Line | Correction | Reason |
|---|---|---|
| 22 : 4 | Remove "the oil." | Mistranscribed. |
| 22 : 5 | Remove "index and." | Mistranscribed. |
| 22 : 5 | Replace "RECAF" with "RCAF." | Mistranscribed. |
| 112 : 18 | Replace "HTF" with "HDF." | Mistranscribed. |
| 113 : 15 | Replace "underlines" with "underlyings." | Mistranscribed. |
| 157 : 17 | Replace "have" with "had." | Mistranscribed. |
| 157 : 22 | Replace "CNX" with "CSX." | Mistranscribed. |
| 157 : 22 | Replace "NC" with "NS." | Mistranscribed. |
| 182 : 14 | Replace "solution" with "collusion." | Mistranscribed. |
| 211 : 17 | Replace "Turrell's" with "Tirole's." | Mistranscribed. |
| 261 : 2 | Replace "group" with "curve." | Mistranscribed. |
| 264 : 19 | Replace "analysts" with "analyses." | Mistranscribed. |
| 293 : 17 | Replace "sparse" with "parse.' | Mistranscribed. |
| 294 : 22 | Replace "sparsed" with "parsed.' | Mistranscribed. |
| 333 : 15 | Replace "games-theoretic" with "game-theoretic." | Mistranscribed. |
| 369 : 17 | Replace "underlines" with "underlyings." | Mistranscribed. |
| 391 : 3 | Replace "non-regulated" with "non-legacy." | Clarification. |
| 401 : 12 | Replace "CNXT" with "CSXT." | Mistranscribed. |
| 402 : 19 | Replace "it merged" with "emerged." | Mistranscribed. |
| 434 : 23 | Replace "demandance" with "demand and." | Mistranscribed. |
| 441 : 5 | Replace "tone" with "term." | Mistranscribed. |

Signature: Gordon Rausser

Gordon C. Rausser Ph.D.

Date: January 21, 2013

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE RAIL FREIGHT FUEL | ) | MDL Docket No. 1869 |
| SURCHARGE ANTITRUST | ) | Misc. No. |
| LITIGATION. | ) | 07-489(PLF) |
| | ) | |

VIDEOTAPED DEPOSITION OF GORDON RAUSSER, Ph.D.

Tuesday, December 18, `2012

San Francisco, California

VOLUME II (Pages 277-460)

REPORTED BY:

JANIS JENNINGS, CSR 3942, CLR, CCRR

DEPOSITION OF GORDON RAUSSER, Ph.D., taken on behalf of the Defendants at Latham & Watkins, 505 Montgomery Street, Suite 2000, San Francisco, California, commencing at 1:34 p.m., Tuesday, December 18, 2012, before Janis L. Jennings, Certified Shorthand Reporter No. 3942, CLR, CCRR.



APPEARANCES:

For the Plaintiffs:
HAUSFELD LLP
BY: MICHAEL D. HAUSFELD, ESQ.
WILLIAM P. BUTTERFIELD, ESQ.
SETH R. GASSMAN, ESQ.
SATHYA S. GOSSELIN, ESQ.
1700 K Street, NW, Suite 650
Washington, D.C. 20006
202.540.7200
mhausfeld@hausfeldllp.com
wbutterfield@hausfeldllp.com
sgassman@hausfeldllp.com
sgosselin@hausfeldllp.com

QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
BY: RICHARD I. WERDER, JR., ESQ.
STEPHEN R. NEUWIRTH, ESQ.
51 Madison Avenue
22nd Floor
New York, New York 10010
212.849.7231
rickwerder@quinnemanuel.com
stephenneuwirth@quinnemanuel.com



APPEARANCES:

For the Defendant Union Pacific:
LATHAM & WATKINS, LLP
BY: DANIEL M. WALL, ESQ.
TIM O'MARA, ESQ.
505 Montgomery Street, Suite 2000
San Francisco, California
415.391.0600
dan.wall@lw.com
tim.omara@lw.com

COVINGTON & BURLING, LLP
BY: THOMAS A. ISAACSON, ESQ.
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
202.662.5082
tisaacson@cov.com



APPEARANCES:

For the Defendant CSX Transportation, Inc.:
CROWELL & MORING
BY: DAVID D. CROSS, ESQ.
LUKE VAN HOUWELINGEN, ESQ.
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
202.624.2583
dcross@crowell.com
lvanhouwelingen@crowell.com

For the Defendant BNSF:
GIBSON, DUNN & CRUTCHER, LLP
BY: JOSHUA H. SOVEN, ESQ.
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
202.955.8500
jsoven@gibsondunn.com

Page 282

APPEARANCES:

For the Defendant Norfolk Southern:
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: TARA L. REINHART, ESQ.
1440 New York Avenue, N.W.
Washington, D.C. 20005
202.371.7500
tara.reinhart@skadden.com

DANIEL J. FLETCHER, ESQ., Union Pacific
GARETH MACARTNEY, OnPoint Analytics, Inc.
DAVID REISHUS, Compass Lexecon
BENJAMIN GERALD, Videographer

Page 283

INDEX

WITNESS
GORDON RAUSSER, Ph.D.
Volume II

EXAMINATION


| | |
|---|---|
| By Mr. Wall (Resumed) | 287 |
| By Ms. Reinhart | 383 |
| By Mr. Soven | 404 |


RECORD REQUESTED TO BE MARKED

| PAGE | LINE |
|---|---|
| 301 | 21 |

Page 284

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 20 | Request for UP Concurrence; UPFSC0000846 - 848 | 303 |
| Exhibit 21 | Rail - Deposition Preparation; 3 pages | 388 |
| Exhibit 22 | Deposition testimony excerpt of Patrick Glennon; pages 51 and 52 | 399 |
| Exhibit 23 | Average Net Effect and Overcharge 10 13 2012.xlsx; 4 pages | 425 |

Page 285

`

San Francisco, California;
Tuesday, December 18, 2012; 1:34 p.m.
--o0o--

THE VIDEOGRAPHER: Good afternoon. We are on the video record, ladies and gentlemen, at 1:34 p.m.

My name is Benjamin Gerald from Alderson Court Reporting in Washington, D.C. Phone number is 202.289.2260.

This is a matter pending before the United States District Court for the District of Columbia in the case captioned In Re Rail Freight Fuel Surcharge Antitrust Litigation. MDL docket number is 1869.

This marks the beginning of disc No. 1, volume II of the videotaped deposition of Gordon Rausser, Ph.D., taken on December 18th, 2012. We are located at 505 Montgomery Street in the city of San Francisco, California.

This deposition is being taken on behalf of the defendants.

Counsel, would you please identify yourselves, starting with the questioning attorney.

MR. WALL: Dan Wall, Latham & Watkins.

MR. O'MARA: Tim O'Mara, Latham & Watkins.

MR. SOVEN: Josh Soven, Gibson Dunn.
MS. REINHART: Tara Reinhart from Skadden Arps for Norfolk Southern Railway Company.
MR. ISAACSON: Tom Isaacson, Covington & Burling, for Union Pacific.
MR. VAN HOUWELINGEN: Luke Van Houwelingen from Crowell & Moring on behalf of CSX Transportation.
MR. FLETCHER: Daniel Fletcher, Union Pacific.
MR. GASSMAN: Seth Gassman from Hausfeld LLP.
MR. MACARTNEY: Gareth Macartney, OnPoint Analytics.
MR. BUTTERFIELD: William Butterfield, Hausfeld LLP, for the plaintiffs.
MR. GOSSELIN: Sathya Gosselin, Hausfeld LLP, for the plaintiffs.
MR. NEUWIRTH: Stephen Neuwirth from Quinn Emanuel for the plaintiff class.
MR. WERDER: Rick Werder from Quinn Emanuel.
MR. HAUSFELD: Michael Hausfeld for the plaintiff class.
THE VIDEOGRAPHER: Thank you.



Will the reporter please swear the witness.

GORDON RAUSSER, Ph.D.,
the deponent herein, was sworn and identified as follows:

THE VIDEOGRAPHER: Thank you. Please proceed.
MR. WALL: Thank you.

EXAMINATION
BY MR. WALL:
Q. Good afternoon, Dr. Rausser. I want to pick up this afternoon first on a topic that just has to do with the fact that in this case we have as defendants two predominantly eastern railroads and two predominantly western railroads.
So focusing just for the moment on direct competition over the same origin/destination pairs, would you agree with me that NS and CSX tend to compete on routes in the eastern United States, while UP and BNSF tend to compete on routes in the western part of the United States?
A. At a very general level, fundamentally



that's where they are located, yes.
Q. Okay. And would you also agree that generally speaking, and albeit with some exceptions, the eastern railroads do not compete on the same routes as the western railroads?
A. You said "generally speaking"?
Q. Yes.
A. No. I don't agree.
Q. And why won't you agree with that?
A. Because it depends on the shippers with regard to the options that are available to them and the movement of their product from one point in the country to another. And it may turn out that based on their demand for those services that the separation that you're suggesting with regard to any individual shipper, depending on their destination, would involve evaluating across the eastern versus the western.
Q. Yes. And I was trying to account for that by acknowledging that there are some exceptions. My question was as a general matter, and perhaps that's the -- let me rephrase that.
Would you agree that the business of the eastern railroads predominantly occurs in a different part of the country than the business of



the western railroads?
A. Given where their tracks are located, as a general proposition, but it doesn't go to the question of competition with regard to individual shippers.
Q. Right. And that's not what I'm actually leading to, so thank you for that.
Would you agree with me that the dominant relationship between the eastern and western railroads is what as an economist you would call a vertical relationship on account of their interlining?
A. I don't understand your question.
Q. You understand -- do you understand the concept of a vertical relationship?
A. Certainly.
Q. Okay. And would you agree that -- take CSX and UP, for example -- that insofar as they are engaging in handling parts of a through route from one part of the country to another they have a vertical relationship?
A. In the sense that they are both combining their services to provide the ultimate service to their clients or some shipper? Is that your --
Q. Yes.

Page 290

A. Yes.
Q. Okay. So you do agree with that?
A. I do.
Q. Okay. And that would be true of any interline relationship; correct?
A. Yes. And let's be precise, because I don't think the discovery record is entirely clear in that respect. How are you defining an interline shipment in your question?
Q. Well, for purposes right now, just a through rate.
A. Just a through rate?
Q. Yes. Does that change your answer at all?
A. No.
Q. Okay. That's what you were assuming when you gave that answer?
A. Yes. Yes, sir.
Q. Is the answer different if it's a rule 11 rate?
A. Fundamentally with regard to the transaction between a shipper and a particular service provider, rail service provider, it's different in the sense of how the transaction is consummated.
Q. Understood.

Page 291

But does it change anything about whether that's appropriately characterized as a vertical relationship?
A. No.
Q. So does the existence of these vertical relationships between the defendants in this case have any implications for your analysis of whether there was conspiracy?
A. Does the existence?
Q. Yes. Does the fact that they have these vertical relationships -- does that have any implications for your analysis?
A. With regard to my opinion that there was collusion and the collusion was, in fact, implemented, does it change that, you said?
Q. Yeah. But I'm not just talking about the ultimate conclusion. I'm talking about the analysis that you undertake as an economist to come to that conclusion.
A. With regard to my overall analysis looking at all of the forms of ex ante communication, no.
Q. Does it matter at all to your analysis in this case that the western railroads are and have been since before the class period coordinating with the eastern railroads to the extent necessary to

Page 292

provide through rates across their territories?
A. The vertical relationship that you spoke about a moment ago?
Q. Yes.
A. Does it matter at all?
Q. Yes. Do you account for that in some way that you can identify in the course of your analysis?
A. Certainly. I've looked at all of the communications that are unrelated to the vertical interline services that are being provided, as specified in your question. And those particular communications stand above and apart with regard to their ex ante nature, and those are above and beyond any vertical relationships with regard to the western and eastern railroads in terms of the services provided.
Q. I'm not quite sure what you meant by that. Are you saying that to the extent that there were communications that had -- went above and beyond the vertical relationship, that you counted those as evidence of conspiracy? Is that what you were saying?
A. Certainly I did, yes.
Q. Okay. What about the ones that didn't go

Page 293

above and beyond the vertical relationship? Did you count those toward your conclusion of conspiracy?
A. Well, there is a host of different communications. And if you look at my report -- in particular, section 5 of my report and the subsequent section on common impact -- much of those communications that establish the foundation for the maintained hypothesis are above and beyond any potential interline communications with regard to vertical services being provided.
Q. But that wasn't my question. I got that from your previous answer. What I was asking you about is did you -- what about the communications that didn't go above and beyond the vertical relationship? Did you count those toward your conclusion that there was a conspiracy?
A. I didn't attempt to sparse those up. I think in my last deposition and in my prior depositions I have testified that I did look at the communications, made some differentiation with regard to the communications which were separable from interline communications, and my conclusion and my analysis goes to those communications.
Q. The ones you included in your report, you mean?

Page 354

that they decided to conspire?
A. That specific question, I have not -- you don't see that's a question anywhere in my report, do you? Because I certainly didn't write it.
Q. Okay. So that isn't your view, then, I can imagine.
A. No.
Q. Okay. That simplifies it.
Is it your contention that the defendants agreed on some desired level of fuel surcharge coverage?
A. That they have a target with regard to the --
Q. An agreed target, yeah. That was -- that's a term of the conspiracy, that we'll get coverage up to some level.
A. I don't recall any documents that refer specifically to a target.
Q. The reason I ask is I'm trying to understand how one is supposed to determine objectively whether the coverage that they achieve is indicative of conspiracy without knowing whether there was any kind of a target set.
A. It doesn't have to be a quantitative target with regard to a conspiracy. It can be a

Page 355

qualitative target. And the complication here is that there is a number of legacy contracts that have contractual commitments that must be honored or expected to be honored in commercial enterprises, and now they have to wait until those contracts expire.
So with regard to the communications, it wouldn't make any sense to me that they would sit there and say, "We have a target, and everybody must achieve a certain percentage of the total transaction database with regard to shipments being covered by our new coordinated fuel surcharge programs." It makes no sense to me.
Q. Are you drawing any inference about whether there is a conspiracy based upon the levels of coverage for each defendant that you have observed?
A. I am drawing the inference linked back to the maintained hypothesis with regard to what the communications reveal about achieving the maximum coverage that each of the defendants found in terms of their mix of legacy contracts and renewal of those contracts, maximizing the amount of that coverage and seeing that they, in fact, achieved material coverage and, moreover, were able to

Page 356

collect in fuel surcharge -- fuel surcharges rents that were dramatically higher than the actual change in fuel prices.
Q. And remind me again: Where is it that you have calculated the difference between the rents collected and the rise of fuel surcharges -- the rise of fuel costs? Excuse me.
A. Where?
Q. Yeah.
A. Okay. Well, it's certainly in my statistical analysis that appears in section 7 of my report. But in terms of descriptive graphical analysis, it appears earlier in my report with regard to the discussion that takes place on page 74 through page 83.
And if you look at the graphs that appear for each one of the defendants, you'll see in figure 13 the gross freight rates that exist and the change in those freight rates with regard to the change in fuel prices and the large gap between them. Likewise, in figure 14 for BNSF, in 15 with regard to CSX and then figure 16 with regard to UP, figure 17 with regard to NS. And there is some adjustment with regard to hedging activities there in those figures as well.

Page 357

But these go to gross rates. With regard to the fuel surcharges, there is an analysis that existed in my reply report where I had looked at the fuel surcharges and related those directly, which is a -- which is a component of the gross freight rates that are here and the fuel prices and the over-recovery.
And there is a discussion in my section of my report with respect to over-recovery, and it goes not only to my standalone analysis, but the analysis that was conducted by STB. And I cite a number of other governmental studies that looked at the over-recovery of fuel surcharge relative to fuel prices.
Q. Turn, if you would, to page --
A. Wait. Just to be precise, that begins with section --
Q. Dr. Rausser, with all due respect, I don't need the filibuster.
Can you turn to page 131 and 132 of your report.
MR. HAUSFELD: Had you finished, Dr. Rausser?
THE WITNESS: No, I didn't.
MR. HAUSFELD: Please finish.

THE WITNESS: What I was referring to specifically is giving you a particular cite, and it's in section 5B, and that's 5B.3 and 4.
BY MR. WALL:
Q. Dr. Rausser, if you will please turn to page 131 and 132 of your report. Actually, just, instead, why don't you go to 133 and 134.
A. 133 and 134?
Q. Right.
A. Unfortunately, you have a color version and I have a black-and-white version.
Q. There is one right there.
A. Thank you.
Q. These charts are your effort to track coverage; correct?
A. Correct.
Q. And so this is just whether the fuel surcharge is in the pricing document; right?
A. Yes.
Q. Okay. And would you agree with me that if you look at the charts for UP and CSX that are on pages 133 and 134, there are some pretty substantial differences in the level of coverage for these defendants over certain commodities across the two time periods that are covered?



A. Yes.
Q. Okay. How do you square that with the existence of collusion?
A. Once again, this is part and parcel of the overall analysis. The objective was to maximize the coverage and to do so in a coordinated way. This by itself has to be -- if one is going look at this specific descriptive data, it has got to be analyzed in the context of all of the other analysis that I've conducted.
Q. So this by itself would not support that conclusion that they are conspiring?
A. Not by itself, no.
Q. Okay. What does Figure 38 on page 137 prove with respect to conspiracy?
A. It goes to the distinction with regard to, once again, a metric that is consistent with the issue about coverage and how much the fuel surcharge as a percentage of revenues increased for each of the revenue -- each of the defendants over the periods reflected here, stretching from January 2000 through basically mid 2008.
Q. How is this consistent with the claim that CSX is a member of the conspiracy after, say, January '05?



A. It reveals a similar pattern.
Q. That looks similar to you?
A. Yes, it looks similar to me. Obviously, the percentages aren't as large as they are for BNSF or NS or UP, but there are other factors driving that process. But the pattern with regard to the evolution, it's not as quantitatively as large as it is for the others, but it still reflects the same pattern.
Q. Why isn't that an indication that CSX is undercutting NS and the others in order to gain share?
A. Once again, it depends on all of the other evidence with regard to my analysis of the section looking at behavior, looking at the communications involving CSX and, moreover, their coordinated implementation of the mechanisms.
Q. But you would agree with me that -- that if CSX had broken from the conspiracy or not participated in the conspiracy, you would expect them to be covering less fuel surcharge as a percentage of revenue, if not exactly as depicted here, in the same basic pattern that you see here; right?
A. No. I couldn't draw that inference



without looking. This is a simple univariate analysis. I would have to look at all the other factors that would drive that as well. You couldn't draw conclusions just based upon this graphical representation across time.
Q. Because just looking at it as you've depicted it, that could be consistent with CSX either participating or not participating in the conspiracy; correct?
A. Once again, you would have to look at all the evidence, not just this one descriptive graphical analysis.
Q. Because that -- this alone could be consistent with conspiracy or unilateral behavior; correct?
A. Without -- yes, without looking at all the other evidence.
Q. I want to ask you about the -- your testimony on page 101 of your report about -- you state at one point here that the fuel surcharge --
A. Where are we on this page? 101?
Q. Yes. At the bottom of the carryover paragraph, you talk about the formulas that the defendants had, and you say, "These formulas did not change throughout the class period, despite ongoing

Page 362

improvements in fuel efficiency."
Do you see that?
MR. HAUSFELD: There is no "ongoing" in there in what you just --
MR. WALL: Yes, there is.
MR. WERDER: Here. It's the carryover paragraph.
MR. HAUSFELD: Okay.
THE WITNESS: We are on page 102?
BY MR. WALL:
Q. 101.
A. Oh, I'm sorry. Thank you.
Yes, I did say that.
Q. Okay. So your understanding is that the fuel surcharge formulas that were agreed to at the beginning of the conspiracy did not change throughout the class period; correct?
A. Yes.
Q. Okay. Are you aware that BNSF adopted a different fuel surcharge formula for agricultural shipments in January 2006?
A. My recollection, it wasn't just agriculture. There were two products or two commodities that they did the adoption, the adjustment.

Page 363

Q. Okay. Well, regardless of whether it was one or two, do you regard that change as a deviation from the alleged conspiracy? And if not, why not?
A. My recollection is -- I have to go back and look at the actual data. My recollection is that wasn't a material change.
Q. Are you aware that BNSF changed the fuel surcharge formula for its non-agricultural carload shipments in April 2007?
A. BNSF, once again?
Q. Yes.
A. That's my recollection.
Q. Was that a deviation from the conspiracy? And if not, why not?
A. Because I remember the evaluation. I didn't regard it as material.
Q. What about it convinced you that it wasn't material?
A. That the actual change -- I would have to go back and look at the details, but my recollection is that the change was not a deviation from the core part of this fuel surcharge programs. But --
Q. Why?
A. If you have got a document here, let me see it.

Page 364

Q. I don't.
A. I don't recall the specifics. I do recall the two changes that took place. And I did look at them, but with regard to drawing the conclusion of whether they were a deviation or not a deviation, I remember making the assessment it wasn't a material change.
Q. But you don't remember why you made that assessment?
A. Not that I recall.
Q. You do recall that they changed the trigger price; right?
A. Yes.
Q. They changed the increment that caused there to be a change --
A. The slope.
Q. Well, not just the slope, but the size of the steps and then how much that the price changed as a result of the movement in fuel.
A. If you have the documents here, I'd like to see them to refresh my memory.
Q. You don't recall?
A. I don't have it memorized.
Q. Okay.
A. If you have got a document, I would

Page 365

appreciate looking at it.
Q. But your testimony is you looked at it and you decided it was not material?
A. That's my recollection.
Q. Okay. Are you aware that in April 2007 Union Pacific changed its carload FSC formula?
A. Yes.
Q. And was that a deviation from the conspiracy? And if not, why not?
A. I'd have to go back and look at the documents. I did evaluate the changes that were made along the way, and with regard to the actual implementation and what the effect was, I didn't regard any of those as deviations. But if you have got the documents, I can provide you with more in the way of substance about why I regarded them as not being deviations.
Q. Do you recall that last week we discussed how in 2006 NS changed its fuel surcharge?
A. Yes, I do.
Q. And it changed the trigger from 23 to $64; correct?
A. Yes.
Q. And it changed the slope from .4 percent to .3 percent; correct?

Page 406

Q. I asked a different question.
A. I'm sorry.
Q. I said: Did you perform any empirical analysis as to the effectiveness of the RCAF contracts for recovering fuel as the FSCs used during the class period?
A. My answer stands, the one I just gave you.
Q. And the answer is "no"?
A. No. The answer is I looked at adjusting the RCAF and making adjustments with regard to the weights, and that is a more efficient mechanism for capturing the -- a correspondence, a matching, between the fuel surcharges and fuel prices than the mechanisms that were put in place during the class period.
Q. Have you quantified the degree to which it's a more efficient mechanism?
A. I certainly looked at the question. I have done some straightforward analysis. It can be easily quantified, and if asked, then I'll quantify. If, in fact, if I have an opportunity to do so based on the defendants' expert report, I will do so in my reply report.
Q. All I'm asking right now is: To date, have you done the empirical work?

Page 407

A. I have done enough in the way of empirical work to justify that it would be more efficient as I defined "efficiency."
Q. How much more efficient would it be?
A. I haven't quantified the degree of greater efficiency.
Q. Have you calculated the amount of time in the pre-class period it took the defendants to recover increases in fuel cost?
A. During the pre-class period?
Q. Yes.
A. I looked at that question. I don't recall quantifying the actual time that was required. But, obviously, given that the weight doesn't change except for once per year, it would take some time.
Q. It would take some time?
A. Yes, certainly.
Q. Have you quantified the amount of time it took the defendants to recover incremental increases in fuel during the class period?
A. To recover?
Q. Yes.
A. I provided a lot of analysis to show that they over-recovered in a dramatic way, so I don't understand why I would do an analysis looking at the

Page 408

time to recover if, in fact, all the analysis I've done shows that they dramatically over-recovered.
Q. I understand that. All I'm asking is: Regardless of whether you think it's a good idea or not, have you calculated the amount of time it took the defendants to recover incremental increases in fuel during the class period?
A. Well, I have a problem with your question because they never recovered.
Q. But it's irrelevant that you have a problem with it. I am just asking if you have done the work.
MR. HAUSFELD: It's not if he can't answer it based on the question asked.
MR. SOVEN: I understand, Michael.
THE WITNESS: They over-recovered, so...
BY MR. SOVEN:
Q. How much time did it take them to over-recover?
A. Very little time.
Q. What is "very little"?
A. I didn't quantify how little is "little," but I can represent to you that they dramatically over-recovered.
Q. Then the fuel recovery mechanism during

Page 409

the class period was faster than it was in the pre-class period?
A. Yes, by construction.
Q. And would a railroad have a unilateral interest in recovering fuel faster if fuel costs were rising?
A. Fundamentally, yes.
Q. Can you turn to page 165, please, second full paragraph that begins, "The suitability of the pre-conspiracy period of" 2003 -- "2000 to 2003 as a benchmark is supported by the facts that the substitutability between rail and other transport services and the market structure of the industry did not change over the relevant time period."
Is that still your opinion?
A. Yes.
Q. "The substitutability between rail and other transport services," what are you referring to?
A. I am referring specifically to truck, barge.
Q. No. I mean what do you mean by "substitutability"?
A. I mean the common economic term with regard to substitutability. Can customers -- or, in

Page 410

this case, shippers -- can they substitute one type of service for another? And in this case I'm looking at different modes of transport.
Q. What empirical analysis did you do, if any, to determine if the substitutability between rail and other transport services pre-class and during the class changed or not?
A. One, I looked at all of the literature, the academic literature, and, moreover, did an analysis that is presented in section 4 of my merits report, in my prior reply report and in my initial class certification report looking at the specific substitutability across different modes of transport.
I also included in my earlier reports a discussion of instances and, in terms of the defendants' expert analysis, whether, in fact, the transport sourced with truck and/or barge would make any difference with regard to shippers being able to escape a price fix.
Q. The top of page 166, please. You wrote, "The importance of this effect depended on the elasticity of substitution between truck (or water barge) and rail."
Have you personally calculated that

Page 411

elasticity for the pre-class period?
A. Did I personally compute that myself?
Q. Yes.
A. No.
Q. Have you calculated that elasticity for the class period?
A. No.
Q. If rail became more competitive vis-à-vis truck or barge during the class period than it was in the pre-class period, how would your damages model account for that effect?
A. First of all, the evidence is that it did become more competitive.
Q. That's not my question.
A. No, but I'm giving you the foundation before I respond to your question.
And as a result, you would expect the substitutability to move in the direction of rails, everything else constant. Once you impose the fuel surcharges with regard to the over-recovery, however, that is a different matter.
I don't find any evidence that there is any dramatic difference between the pre-class period and the class period, aside from the greater efficiency with regard to productivity of transport

Page 412

services relative to fuel prices --
Q. Terrific answer, Dr. Rausser, but completely nonresponsive. If rail became more competitive --
MR. HAUSFELD: That's not a nice comment.
MR. SOVEN: It is completely nonresponsive.
MR. HAUSFELD: Well, that is not for you to say.
BY MR. SOVEN:
Q. If rail became more competitive vis-à-vis truck during your class period, how would your damages model account for that shift?
A. They would account for that shift through the specification --
Q. Which one?
A. Can I respond, please?
Q. Yeah.
A. Let me respond to the question.
If you look at the actual specification of the model, you'll see different forms of transport services, some of which face more in the way of truck transport than others. If you look, for example, at Table 53 and in my earlier reply report and my original class certification report, I spent

Page 413

a fair amount of time looking at this question of substitutability from a common-sense perspective.
Q. Can you identify --
A. Let me complete my response. I'm not finished with my -- please.
Q. I know you're not, but you're not responding.
A. Yes, I am. You are asking me where do I take that into account with regard to --
Q. No. I'm asking which specification here would account for that change on Table 53, page 170.
A. Each of the indicators that are listed with regard to the effects that are listed at the bottom of Table 53 -- in particular, the commodity indicators; the car type indicators; in addition, the root indicators. There's also some effect with regard to the substitutability with regard to seasonality.
Q. Would any of those indicators have anything to do with greater demand for truck services?
A. Certainly.
Q. I'm sorry.
A. Certainly. Certainly.
Q. All right.

Page 422

prices, yeah, it could make a difference, certainly.
And the collection of all of that information, that has come up in my prior depositions, my prior reply report. I specifically -- looking at this page 170, I direct your attention to footnote 406 where I speak specifically about using another source of information with regard to looking at that specific elasticity. And that elasticity really requires a mapping from fuel price changes to variable cost changes, from variable cost changes --
Q. I got it.
A. No. No, no, no, no. No, no.
Q. I withdraw the question.
A. No.
Q. Yes. Yes.
A. And if you look -- if you look at footnote 406, you will see the basis for some outside information which will, in fact, change the elasticity that appears in Table 53.
Q. Got it. Okay.
In the but-for world, you know, that you projected, would the defendants have fully recovered their fuel costs?
A. In the but-for world?

Page 423

Q. Yeah.
A. That is the same way of asking me the question that you asked five minutes ago.
Q. All I want to know do you feel they would have fully recovered their fuel costs but for the conspiracy?
A. I have already told you that is not an analysis I have done. It is easily computable.
Q. I am asking the question as a conceptual matter. In the but-for world do you think the defendants would have fully recovered their fuel costs absent the conspiracy?
A. In the but-for world?
Q. Yeah.
A. Using -- coming back to the RCAF, updating the RCAF on a frequent basis, yes, indeed they would have.
Q. The answer is yes. Okay.
If that point 2.4 percent elasticity is not an accurate projection of the but-for world, how, if at all, would that affect your damages analysis?
A. May I have the question back. "If it's not an accurate..."
(Record read as follows:

Page 424

"Q. If that point 2.4 percent elasticity is not an accurate projection of the but-for world, how, if at all, would that affect your damages analysis?")
THE WITNESS: Well, your question is incomplete. It's one thing to say it's inaccurate. In which direction --
MR. SOVEN: I'll withdraw the question and ask a better question. You are right. The direction could matter.
BY MR. SOVEN:
Q. If it's low --
A. If it's too low.
Q. If it's too low, how would that affect your damages analysis?
A. It would certainly affect my damage analysis.
Q. It would drive the number down a lot, wouldn't it?
A. No, it wouldn't drive it down a lot. It would drive it down, but -- well, let's be precise. What do you mean -- what's your measure of "a lot"?
Q. You're right.
Why do you think it would drive it down?

Page 425

A. Because in terms of no one would argue that the defendants wouldn't in the but-for world be able to recover their fuel costs. If the elasticity turns out to be higher, then what's going to happen is the computed overcharge is going to fall, and with the fall in the computed overcharge, there will be a lower measure of class-wide damages.
MR. SOVEN: Will you mark that.
DEPOSITION REPORTER: No. 23.
MR. SOVEN: Yeah.
(Exhibit 23 was marked for identification and attached hereto.)
THE WITNESS: Thank you.
BY MR. SOVEN:
Q. Dr. Rausser, I am handing you what's been marked for identification as document 23. This is one of your work papers.
Do you recognize it?
A. Yes.
Q. Okay. My understanding is that you calculated that, on average, the overcharge to the class members was 13.6 percent; is that correct?
A. Based on the data that was used at this point in time when this document was prepared, yes.
Q. Now, that 13.6 percent, it wasn't a

Page 426

constant overcharge during the class period. It's an average; correct?
A. Yes.
Q. Okay. Could you turn to the very last page of the document and look at the row "1 July 2008."
A. The row -- I'm sorry. I wasn't paying attention. I apologize.
Q. Sure. The third column is "Weekly Date."
A. Yes.
Q. And if you could look at the row -- I'm sorry -- the row "1-July-2008."
A. January 2008?
Q. July 1, 2008.
A. Oh, July 1. Yes, I'm there.
Q. If I understand this correctly -- I'm sure you'll tell me if I don't -- the defendants were, on average, overcharging the class members 32.6 percent at that point in time?
A. Yes.
Q. That's one year after the STB decision, correct, or more than one year?
A. Yes.
Q. Is it still your opinion that that's an accurate estimate of the overcharge of the

Page 427

defendants at -- of the overcharge of the class members at that time?
A. No.
Q. It's not?
A. No.
Q. How has your opinion changed?
A. There has been additional production with regard to legacy contracts. We have analyzed that data or are in the process of analyzing that data, and that percentage overcharge, based on the new production of data, is too high.
Q. By what order of magnitude?
A. I'll have -- you'll have to wait to see the order of magnitude when I complete my reply report, my next report.
Q. Mr. Cross asked you a week ago whether you had done any empirical analysis of the cost of the defendants adhering to the terms of the alleged conspiracy. Do you recall that?
A. In terms of rational collusion?
Q. Yes.
A. I just want to make sure I get the context right. Yes, I do recall that.
Q. And at that point in time you hadn't done any of that work?

Page 428

A. I'm sorry. I hadn't done any of that work? I don't think that's correct.
Q. I will ask a different question.
As the overcharge rises, do the incentives of the defendants to defect from the conspiracy go up?
(Clarification requested by Reporter.)
MR. SOVEN: Sure.
BY MR. SOVEN:
Q. As the amount of the overcharge rises, do the incentives of the defendants to defect from the conspiracy go up?
A. Everything else constant, yes.
Q. Have you -- have you performed any empirical analysis of the potential benefits of any defendant defecting from the conspiracy in July 1, 2008 with the 32.6 percent overcharge?
A. Looking at that specific week? No.
Q. Have you performed any empirical analysis of the potential economic benefits of defendant defecting from the conspiracy in 2008?
A. I want to make sure I understand your train of thought. These questions have nothing to do with your earlier statement about rational collusion.

Page 429

Q. Okay.
A. Nothing to do with it.
Q. Glad to hear it.
A. Okay. So have I done any analysis --
Q. Yeah.
A. -- looking at the incentives for defection?
Q. Yes.
A. I've done, certainly, qualitative analysis, and I reported that in my section 5.
Q. I'm asking --
A. I know. Not specifically, no.
Q. Have you -- you've mentioned the term "overcharge" a number of times in response to Mr. Wall's questions. What do you mean by "overcharge"? "Over-recovery" of the fuel costs?
A. Yeah. Your question is confusing --
Q. Yeah, you're right.
A. -- because how I've used -- I didn't use "overcharge" in my response --
Q. You're right.
A. -- to Mr. Wall.
Q. You used "over-recovery."
A. Yes. Thank you.
Q. What do you mean by that?

Page 430

A. What I mean by that is the pretextual representation of the defendants with regard to the entire marketplace and all their shippers; the representation was that this program was put in place and you shouldn't be -- you, the shipper, shouldn't be surprised by the commonness across all of the defendants' services provided to those shippers, because all we're doing is recovering our fuel cost.

And the over-recovery is that you -- "you," any particular defendant -- actually received much more in the way of rents and/or benefits from the fuel surcharge than what they had to pay for the fuel inputs that they were using to provide those services.

Q. Have you quantified that delta?

A. Do you have my reply report? I believe I provided that in my reply report --

Q. If you don't remember, I will withdraw the question.

A. No. I had quantified it. The question is -- I thought the next question would be, "Show me where it is." I have quantified it, yes.

Q. Okay. We earlier talked about the 2.4 percent elasticity in the pre-class period.

Page 431

Have you calculated the elasticity for the class period, meaning the elasticity of the relationship between freight rates and fuel costs? It's probably on that exhibit number, the exhibit you have in front of you, which is Exhibit --

A. By the way, just so the record is clear, you are measuring the elasticity with a hundred percent change in the prices. It's usually a 10 percent change.

Q. You're right.

A. So it's not 2.4. And I've let you go on this track, and I should clarify the record.

Q. All I'm asking is if you've done the math for the class period.

A. May I have the question back?

Q. I'll ask it again.

A. Yeah.

Q. Have you calculated the relationship between freight rates and fuel costs during the class period?

A. Between fuel prices and freight rates? Certainly.

Q. Okay.

A. Yes.

Q. And you said earlier that you saw a

Page 432

structural break, meaning an increase, in the relationship between freight rates and fuel costs in the class period relative to the pre-class period; correct?

A. Yes.

Q. Is it your position that the alleged conspiracy is responsible for 100 percent of that increase?

A. Of the increase in freight rates?

Q. The increase in the sensitivity of freight rates to changes in fuel costs.

A. No.

Q. It's not?

A. That's what I said. I said "no."

Q. What were the other causes?

A. The other causes were economic conditions that changed over the course of the class period, the levels of the fuel prices during the class period.

Q. Can you look at the second column on Exhibit 23.

MR. HAUSFELD: On page 1 of Exhibit 23?

MR. SOVEN: Yeah.

MR. HAUSFELD: Okay.

THE WITNESS: Okay. Second column?

Page 433

BY MR. SOVEN:

Q. Yes.

MR. HAUSFELD: Page 1. Keep going. First page. There you go.

THE WITNESS: Yes.

BY MR. SOVEN:

Q. What does that column represent?

A. That column represents, strictly speaking, the slope change in the effect of fuel prices with the class period.

Q. Okay.

A. It's referred to here as an "interaction effect," but all it is is a slope change.

Q. So how much during the class period, on average, did the elasticity grow from the 2.4 percent --

A. On average?

Q. Yes.

A. On average, it's specified by that particular number, 0.28.

Q. So by my math, it grew by more than a factor of 10; is that right?

A. Yes.

Q. And, to clarify, is it your position that the alleged conspiracy was entirely responsible for

**Errata Sheet for the Deposition of Gordon Rausser, Ph.D., taken on December 11, 2012 and December 18, 2012**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***

**Case No. 1:07-mc-00489-PLF**

| Page : Line | Correction | Reason |
|---|---|---|
| 22 : 4 | Remove "the oil." | Mistranscribed. |
| 22 : 5 | Remove "index and." | Mistranscribed. |
| 22 : 5 | Replace "RECAF" with "RCAF." | Mistranscribed. |
| 112 : 18 | Replace "HTF" with "HDF." | Mistranscribed. |
| 113 : 15 | Replace "underlines" with "underlyings." | Mistranscribed. |
| 157 : 17 | Replace "have" with "had." | Mistranscribed. |
| 157 : 22 | Replace "CNX" with "CSX." | Mistranscribed. |
| 157 : 22 | Replace "NC" with "NS." | Mistranscribed. |
| 182 : 14 | Replace "solution" with "collusion." | Mistranscribed. |
| 211 : 17 | Replace "Turrell's" with "Tirole's." | Mistranscribed. |
| 261 : 2 | Replace "group" with "curve." | Mistranscribed. |
| 264 : 19 | Replace "analysts" with "analyses." | Mistranscribed. |
| 293 : 17 | Replace "sparse" with "parse.' | Mistranscribed. |
| 294 : 22 | Replace "sparsed" with "parsed.' | Mistranscribed. |
| 333 : 15 | Replace "games-theoretic" with "game-theoretic." | Mistranscribed. |
| 369 : 17 | Replace "underlines" with "underlyings." | Mistranscribed. |
| 391 : 3 | Replace "non-regulated" with "non-legacy." | Clarification. |
| 401 : 12 | Replace "CNXT" with "CSXT." | Mistranscribed. |
| 402 : 19 | Replace "it merged" with "emerged." | Mistranscribed. |
| 434 : 23 | Replace "demandance" with "demand and." | Mistranscribed. |
| 441 : 5 | Replace "tone" with "term." | Mistranscribed. |

Signature: Gordon Rausser

Gordon C. Rausser Ph.D.

Date: January 21, 2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE ) MDL Docket No. 1869
ANTITRUST LITIGATION ) Misc. No.07-489(PLF)
This Document Relates To: )
DIRECT PURCHASER CASES )
)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF GORDON RAUSSER, Ph.D.
San Francisco, California
Tuesday, March 4, 2014
VOLUME I (Pages 1 - 309)

Reported by:
JANIS JENNINGS
CSR No. 3942, CLR, CCRR
Job No. 48894

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE ) MDL Docket No. 1869
ANTITRUST LITIGATION ) Misc. No.07-489(PLF)
This Document Relates To: )
DIRECT PURCHASER CASES )
)

VIDEOTAPED DEPOSITION OF GORDON RAUSSER, taken on behalf of the Defendants, at GIBSON, DUNN & CRUTCHER, LLP, 555 Mission Street, 30th Floor, San Francisco, California, beginning at 10:05 a.m. on Tuesday, March 4, 2014, before Janis Jennings, Certified Shorthand Reporter No. 3942, CLR, CCRR.



APPEARANCES:

For Plaintiffs:
QUINN EMANUEL URQUHART & SULLIVAN LLP
BY: RICHARD I. WERDER, JR., ESQ.
STEPHEN R. NEUWIRTH, ESQ.
KYLE R. TAYLOR, ESQ.
BEN M. HARRINGTON, ESQ.
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849.7000
rickwerder@quinnemanuel.com
stephenneuwirth@quinnemanuel.com
kyletaylor@quinnemanuel.com
benharrington@quinnemanuel.com

LaROE, WINN MOERMAN & DONOVAN
BY: PAUL M. DONOVAN, ESQ.
1250 Connecticut Avenue, NW
Suite 200
Washington, D.C. 20036
202.298.8100
paul.donovan@laroelaw.com



APPEARANCES:

For Class Plaintiffs:
HAUSFELD LLP
BY: MICHAEL P. LEHMANN, ESQ.
44 Montgomery Street, Suite 3400
San Francisco, California 94104
415.633.1908
mlehmann@hausfeldllp.com

HAUSFELD LLP
BY: SATHYA GOSSELIN, ESQ.
SETH R. GASSMAN, ESQ.
1700 K Street, NW
Suite 650
Washington, D.C. 20006
202.450.7175
sgosselin@hausfeldllp.com
sgassman@hausfeldllp.com



APPEARANCES:

For Defendant Union Pacific Railroad:
LATHAM & WATKINS LLP
BY: DANIEL M. WALL, ESQ.
TIM O'MARA, ESQ.
CONNIE D. SARDO, ESQ.
CHRISTOPHER B. CAMPBELL, ESQ.
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
415.391.0600
dan.wall@lw.com
tim.omara@lw.com
connie.sardo@lw.com
christopher.campbell@lw.com

For Defendant Norfolk Southern Railway:
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: SEAN M. TEPE, ESQ.
TARA L. REINHART, ESQ.
1440 New York Avenue, N.W.
Washington, D.C. 20005
202.371.7106
sean.tepe@skadden.com
tara.reinhart@skadden.com

APPEARANCES:

For Defendant BNSF Railway Company:
GIBSON, DUNN & CRUTCHER LLP
BY: JOSHUA H. SOVEN, ESQ.
SLOANE ROSENTHAL, ESQ.
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
jsoven@gibsondunn.com
srosenthal@gibsondunn.com

STEPTOE & JOHNSON LLP
BY: LINDA S. STEIN, ESQ.
1330 Connecticut Avenue, NW
Washington, D.C. 20036
202.429.8185
lstein@steptoe.com



APPEARANCES:

For Defendant CSX Transportation:
CROWELL & MORING LLP
BY: DAVID CROSS, ESQ.
SHARI ROSS LAHLOU, ESQ.
LUKE VAN HOUWELINGEN, ESQ.
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
202.628.5116
dcross@crowell.com
slahlou@crowell.com
lvanhouwelingen@crowell.com

For Defendant Norfolk Southern Railway:
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: SEAN M. TEPE, ESQ.
TARA L. REINHART, ESQ.
1440 New York Avenue, N.W.
Washington, D.C. 20005
202.371.7106
sean.tepe@skadden.com
tara.reinhart@skadden.com



APPEARANCES:

Also Present:
DAVID M. PRYOR, ESQ., BNSF Railway Company
DANIEL FLETCHER, ESQ., Union Pacific Railroad
DAVID REISHUS, Compass Lexecon
JOSEPH KALT, Compass Lexecon
GARETH MACARTNEY, OnPoint Analytics, Inc.
FRANK QUIRARTE, Videographer



I N D E X


| WITNESS | EXAMINATION |
|---|---|
| GORDON RAUSSER, Ph.D. VOLUME I | |
| BY MR. WALL | 14 |
| BY MR. CROSS | 269 |


INSTRUCTION NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 81 | 3 |
| 82 | 3 |
| 84 | 19 |
| 122 | 10 |

Page 34

the results of any analysis of the discrete economic effects of the change in the strike price for the purposes of considering injury or damages?
A. No, because it's not relevant to my assignment.
Q. No, you haven't done it; right?
A. That's what I said.
Q. You actually answered the question the opposite the way that I answered it. I just was wanting to be clear that we were communicating.
A. Okay.
Q. I want to ask you some questions about your -- it's really pages 152 to 159 of your reply report in which you are responding to some things that the defendants' consultants have said. And let me begin with -- it's on page 153, which is your Figure 50.
MR. WERDER: You're in the wrong report, I think, Gordon. He's in the merits reply brief.
Is that right, Dan?
THE WITNESS: I'm sorry. Yes.
MR. NEUWIRTH: It is page 153.
MR. WERDER: 152. -53. Now you're there.
THE WITNESS: Yes.
BY MR. WALL:

Page 35

Q. Do you see Figure 50?
A. Yes. Bear with me one second. Yes.
Q. Okay.
A. Figure 50 on page 153, yes.
Q. Okay. Now, am I correct that the point of Figure 50 is to show that if one accounts for the Norfolk Southern rebasing, then the earning power of the NS class period fuel surcharges on average over the class period is 0.89 percent greater than its legacy fuel surcharges?
MR. WERDER: Object to form.
THE WITNESS: For the period July '03 through June '06.
BY MR. WALL:
Q. That would be correct for that period?
A. Yes. Yes.
Q. Okay. Now -- and this is an ex post analysis; is that correct? Or is it ex ante?
A. It's after the fact.
Q. Ex post. Okay.
Now, would it be fair to say that what this means is that if a shipper converted from an NS legacy fuel surcharge to a class period fuel surcharge and was subject to that more onerous class period fuel surcharge throughout this entire study

Page 36

period, NS would have earned about 1 percent more revenue from that shipper?
MR. WERDER: Object to the form. Incomplete hypothetical.
THE WITNESS: Let's be precise. For the period July '03 to June '06, if the legacy contract had been either automatically adjusted or amended at the beginning of the period July '03, that -- the legacy contract would have been approximately the same as the class contract.
BY MR. WALL:
Q. It would have been approximately the same? What do you mean? I'm sorry.
A. The average -- this is -- the average here is the average -- as I understand your questioning -- you can correct me if I'm wrong, but as I understand it, you are asking me if the legacy contract converged at the beginning of the period and became a class FSC contract, then during that period there would be a bit less than a 1 percent increment in the collection of fuel surcharges by --
Isn't that -- isn't that the question you asked me?
Q. I think it is. I think -- I asked it as 0.89 percent, and then I think you used the phrase

Page 37

"approximately the same."
A. Yes.
Q. You're thinking that 0.89 percent is approximately the same?
A. Yes, yes.
Q. Okay. I got it. That was my only confusion.
All right. So for a shipper that underwent what you just described -- it was -- the fuel surcharge was converted on the first day of the class period to one of the conspiratorial surcharges -- why aren't damages capped at the same 0.89 percent average?
MR. WERDER: Objection. Calls for a legal conclusion.
THE WITNESS: Gee, I thought that was my entire rebuttal report. Why aren't they capped at what now? The 1 percent or --
BY MR. WALL:
Q. Whatever the difference. Whatever the actual differences of the earning power is.
A. So let me make sure I understand your question. In other words, if I use a contaminated benchmark, as the opposing experts have done, with regard to the legacy contracts -- if I used that,

Page 38

then why isn't my damage for at least that period simply 1 percent: is that your question?
Q. I wouldn't put it that way. Let me see if I can get all this contaminated benchmark stuff. I'm asking you to hypothesize that there is a shipper that has a fuel surcharge provision in the pre-class period. Okay?
And to take this idea of contamination and all of that out of it, let me ask you to assume that -- assume away the possibility of waivers or renegotiation or anything that might change the but-for world in which -- from one in which that shipper is subject to that legacy fuel surcharge and pays according to it. Okay? Do you understand that?
A. I do.
Q. Okay. In the case of such a shipper, when the new fuel surcharge has this 0.89 percent incremental earning power over the class period, why would --
A. The legacy contract?
Q. No. It's been converted to the new conspiratorial one --
A. Yes.
Q. -- that has the 0.89 percent incrementally

Page 39

greater earning power. Why isn't that the upper bounds of damages?
MR. WERDER: Objection. Calls for legal conclusion. Incomplete hypothetical. Misstates the record.
THE WITNESS: Because it would be wrong.
BY MR. WALL:
Q. Why is it wrong?
A. Wrong because it completely sweeps under the rug the fact that there is coordination among the four defendants. And if, for example, that shipper who you're arguing suddenly becomes part of the class period has a class contract, now it's the question is: What is the correct characterization of the counterfactual in which there is no wrongful conduct?
Within the period stretching from at least the class period -- forgetting about the conspiratorial period, but the class period going from July '03 going forward -- during that specific period, there is coordination going on. And that legacy contract that now has become a class contract, that cannot be the benchmark because that is being influenced and impacted by the overall coordination.

Page 40

Q. Are you saying that, in your view, the proper damages benchmark would be a price that is less than what the shipper would have paid had it simply maintained its legacy fuel surcharge provision?
MR. WERDER: Object to form.
THE WITNESS: It's a compound question. Let me see if I can restate your question.
BY MR. WALL:
Q. What's the extra part?
A. There's two steps in your representation. I want to make sure there is clarity in the record.
So I have got a legacy shipper who -- now, is that legacy shipper converting to the class contracts at the beginning of the period, or is -- am I to presume that this legacy shipper still has the same fuel surcharge that they did prior to that? Which is it?
Q. You asked -- when I asked you what Figure 50 meant, you told me to -- to assume that the shipper converted at day one of the class period --
A. I told you?
Q. Yes, you did, sir.
A. That was your hypothetical.
Q. I was asking you about your chart. I didn't

Page 41

do the chart. So you said that this analysis essentially presumes that the person converts over on day one and the fuel surcharge is richer by 0.89 percent.
I'm asking you now: Are you -- when you tell me that the damages could be greater than 0.89 percent, are you saying that you think that the competitive but-for price would be lower than what the person would have paid if they hadn't converted and just stayed on the same contract that they had entered into prior to the conspiracy?
MR. WERDER: Objection. Assumes facts not in evidence.
THE WITNESS: Thank you for the clarification. And the answer is: Yes, most definitely.
BY MR. WALL:
Q. Okay. And that's because you think that for some shippers the but-for world would have been better than what they had the day before the conspiracy started?
MR. WERDER: Object to form.
THE WITNESS: They would have been better the day before the conspiracy started... Certainly the economic environment would have been better for

Page 50

BY MR. WALL:
Q. Yes.
A. And what is in your question -- for me to answer it, there has got to be some basis for comparison if it's going to be the same kind of analysis for within the class period that is reported in Figures 52, 53 and -4 and -5.
Q. Well, obviously, to do Figures 52, 53 and 54, you had to set up some sort of a database that allowed you to estimate what the fuel surcharges are at different fuel prices; right?
A. That's correct.
Q. And you report those results for the pre-class period; correct?
A. Yes. And for the class period.
Q. With respect to the class period, there is Figure 50; correct? That's the one that corrects the rebasing point for NS?
A. Yes.
Q. Okay. Now, is Figure 55 an application of the class periods -- excuse me -- of the -- strike that.
Is Figure 55 purporting to show the incremental earning power of fuel surcharge formulas during the class period?

Page 51

MR. WERDER: Object to the form.
THE WITNESS: Purporting to look at a specific difference within the class period, yes.
BY MR. WALL:
Q. But it's comparing a particular fuel surcharge too? The class -- UP's class period formula compared to FMC fuel class period; right?
A. Yeah. It's simply looking at UP, the class period, compared for a particular program that existed -- namely, for FMC. And that is, once again, in direct response to Kalt.
Q. So what I want to ask you just, then, in a general sense: Other than what you did in Figures 50 with respect to NS and Figures 55 and 56 with respect to UP, have you yourself attempted to calculate the incremental earning power of the conspirat- -- of any of the conspiratorial fuel surcharges during the class period by, in a manner similar to these other charts, trying to apply the fuel surcharge formulas to the then-prevailing fuel prices?
MR. WERDER: Objection. Outside the scope of his report.
THE WITNESS: Yeah.
For what purpose?

Page 52

BY MR. WALL:
Q. For any purpose. Did you do it?
A. We have done a number of analysis along the way, but, once again, that purpose would not be embedded in my assignment.
Q. Well, you do understand that Professor Kalt reported results of an analysis of incremental fuel surcharge earning power for BNSF and CSX as well as UP and NS; right?
A. Yes.
Q. Okay. You chose not to respond to that; correct?
A. I chose not to respond to it?
Q. You didn't respond to that. You did not report any response to that; correct?
A. Because I don't think it's relevant.
Q. Okay. You thought it was relevant to respond with respect to NS and UP; right?
MR. WERDER: Object to form.
THE WITNESS: Because of a violation of facts that had been produced in discovery, yes.
BY MR. WALL:
Q. So then is it fair to assume, then, that you didn't respond to Professor Kalt's other charts about incremental earning power because you didn't

Page 53

have any issue with them?
A. No. I wouldn't draw that conclusion.
Q. Do you have any issue with them?
A. Yes, a fundamental issue. It's not relevant.
Q. Well, other than relevance, in terms of just accuracy -- lawyers will argue relevance some other day. But in terms of their accuracy, do you have any other criticism of Professor Kalt's analysis of the incremental earning power of the conspiratorial fuel surcharges?
MR. WERDER: Object to form.
THE WITNESS: From an economic standpoint, I don't believe it's relevant because --
BY MR. WALL:
Q. Other than relevance, I said.
A. Well, economic relevance. You said lawyers will argue relevance later. I presume that goes to legal --
Q. All forms. Take all forms of relevance off the table.
A. Okay. What matters to me and the reason that his particular analysis was not viewed as a basis for undermining my analysis is what I care about is what is the incremental impacts of the

Page 54

coordination, not whether there's more or less earnings power with regard to the overall coordination. And it's not -- let me explain why it's not relevant.
Q. I asked you not to tell me why it's not relevant to you.
A. Okay. I won't.
Q. Yeah.
A. Fair enough.
Q. I'm just asking you that from the standpoint of the -- whether there were any errors in the way that it was done or the calculations or the failure to consider some fact that would bear on incremental earning power. You obviously looked at this with respect to --
A. Rebasing.
Q. -- to rebasing and what was done with UP. Did you find anything else in just the mechanics of Dr. Kalt's analysis of incremental surcharge earning power with which you disagreed?
MR. WERDER: Objection. Outside the scope of his report.
THE WITNESS: Not that I recall.
BY MR. WALL:
Q. We mentioned earlier the issue of faster

Page 55

increments, you know, smaller steps of escalating a fuel surcharge. Did you -- have you attempted to quantify the discrete effects of the faster increments in the conspiratorial fuel surcharges on either surcharge earning power or damages?
MR. WERDER: Objection. Outside the scope of his report.
THE WITNESS: I presume you've read all my reports. I have made no attempt to separate and decompose the damages to each one of the specific elements of the overall coordination.
And if you're asking me if I, for example, during the class period look at something like the program that was put in place by UP and you look at their slope as you put it, it is certainly more dramatic than what existed in the pre-class period.
BY MR. WALL:
Q. What do you mean by that, "more dramatic"? A little vague.
A. A little vague. If you go back and look at -- with respect to the intermodal program for UP, the intermodal program specified that the HDF price, taking into account a fuel intensity factor, would end up triggering an increase which would be reflective of the slope. They also in their formula

Page 56

for the previous month used that same fuel intensity factor.
If you go to the class period, they specify for coal, for example, because coal in the original program or pre-class period was not specific. They did not have a specific program.
When they go to the new program, they specify their strike with a spline, which is a polynomial associated with a slope. The initial fuel surcharge is 1 percent, and then there is a fuel increment of 4 cents per gallon, an FSC increment that's associated with that of 5 percent, and then they specify the spline with regard to the slope. That didn't exist in the pre-class period.
Q. Okay. Great. Thank you.
Now, so let's follow up here with respect to UP, you mentioned a coal-specific fuel surcharge; right? That is one of the things you talked about?
A. Right.
Q. And that one you were able to look at and you were able to see that the slope, what you called the "spline," was, in fact, steeper; correct?
A. Yes.
Q. Okay. To the best of your knowledge, is there any other fuel surcharge that was adopted by

Page 57

UP or any other defendant during the class period that had an increased slope or spline?
A. That were adopted by any of the other defendants?
Q. Yep.
A. Yes. It turns out that BNSF, for example, for their carload program as we now moved from their former -- former trigger, which is the West Texas Intermediate, to the HDF, and they had a program in which there was for a fuel increment of 4 cents per gallon an increment of 1 cents per mile.
They later changed that in 2007 to -- it would be actually the same. They didn't actually change the slope. No, they did change the slope. The initial was -- for the fuel surcharge was 1 cent for a fuel increment of 4 cents per gallon.
With regard to NS --
Q. And it changed to what? I'm sorry. What was the before and after?
A. The after was for -- we are talking carloads now.
Q. Okay.
A. The fuel increment was 4 cents per gallon, and the new fuel surcharge increment was 1 cent.
Q. I thought that's the same as you just gave

me.
A. For the pre-class -- that's the same -- I said they didn't change it within the class period. I gave you the class period previously that was effective through April 25th, 2007. They didn't change the slope.
And if you go back and compare that to the pre-class period, it is a change.
Q. And what are you using as your pre-class-period reference point?
A. I'm looking at each one of their programs. There's one that was effective March 2000. There is a subsequent program that became effective March 15th in 2000. There was a mild change that took place in October of 2000 that became effective in July 2001. And that's what I'm comparing it to.
Q. So you're -- I just want to be clear we got this. Your belief is that the BNSF public carload surcharge during the class period had a steeper slope than the public carload surcharge that existed immediately prior to the class period?
A. When you say "immediately prior," let me make sure that immediately prior. Yes.
Q. And which -- what are you using as the reference point for immediately prior? Which



surcharge?
A. The most recent one for which there has been specified in the discovery record the program that BNSF had in place.
Q. Adopted when?
A. Let me see. Effective July 1. The one I'm comparing here is July 1, 2001.
Q. Okay. And you think that's the relevant preconspiracy fuel surcharge?
A. With regard to looking at their programs and what I have summarized here in terms of the change in the programs, yes.
Q. So then is it your belief that the BNSF carload -- public carload surcharge that was put in place as a result of the conspiracy had at any given fuel price level above the new and old -- or old triggers, so above -- I think it was in their case, let's say, $1.30 a gallon.
A. You're talking about the pre period?
Q. Yeah. Let me start over. Just I want to be sure. Is it your opinion that when BNSF implemented a new surcharge for public carload traffic as a result of the conspiracy, the earning power of that surcharge was greater than its immediately preceding public carload surcharge, putting the trigger prices



to the side?
MR. WERDER: Object to form.
BY MR. WALL:
Q. Not counting the trigger prices.
A. Not counting the trigger prices?
Q. Right.
A. The trigger prices are critical.
Q. Well, they obviously changed, so I'm holding -- that's not in dispute, so I'm actually -- I'm trying to focus on the other elements. And I'm asking you: Is it your view that, other than the trigger prices, there was greater earning power built into those new BNSF public carload formulas?
A. Aside from -- I can't do it from aside from the trigger price.
Q. Sure, you can. You're a smart guy.
MR. WERDER: Objection.
THE WITNESS: The original strike price was $1.30. It was dropped effectively for carloads in June of 2003 to a $1.25 a gallon. That's the first point.
The fuel increment in the two programs is 5 cents a mile, but there is a distinction between the initial fuel surcharge. In the prior program it is 1 percent. In the new program it is a half of a



percent.
BY MR. WALL:
Q. Wouldn't it be the same at $1.30? Won't the surcharge be the same at $1.30?
A. At $1.30 if the underlying trigger gets to that point?
Q. Yeah.
A. Yeah, sure.
Q. Okay. From that point on, it's got exactly the same earning power as the old surcharge; right?
MR. WERDER: Object to form.
THE WITNESS: No. And this comes back to the question of relevance with regard to Dr. Kalt's earnings power. The earnings power has to be conditioned on whether, in fact, all other competing suppliers are in alignment with your same program.
BY MR. WALL:
Q. But I'm just asking --
MR. WERDER: Don't interrupt. He didn't finish his answer, I don't think, Dan, so...
THE WITNESS: So when one looks at earnings power, you can't do it standalone independently of the fact that now there is a coordination along with the pretext, and the individual shippers have no way of escaping the actual over-recovery of fuel

Page 62

surcharges that's taking place during the class period.
So if one is going to look at earnings power, one has to look at it under first the presumption that there is unilateral competitive behavior among the four defendants and then look at earnings power with regard to coordination, knowing that they're not going to face competitive inroads on the part of the other major competitors offering the same services.
BY MR. WALL:
Q. Is it not a fact, Dr. Rausser, that above $1.30 the mathematical earning power of the BNSF carload public fuel surcharge is exactly the same as the immediately preceding pre conspiracy fuel surcharge?
MR. WERDER: Object to form.
THE WITNESS: No, because mathematically it depends on whether you are presuming in your analysis that that earnings power is standalone and --
BY MR. WALL:
Q. I am. I am assuming that.
A. Well, I'm sorry.
Q. If you assume that, they're the same, aren't

Page 63

they?
A. If you assume that they're still in a competitive world, yes.
Q. Yeah.
THE WITNESS: Can I take a brief briefly?
MR. WALL: Sure.
THE VIDEOGRAPHER: We are going off the record. The time is 11:19 a.m. This marks the end of disc No. 1 in the deposition of Dr. Gordon Rausser.
(Off the record.)
THE VIDEOGRAPHER: Back on the record. The time is 11:32 a.m. This marks the beginning of disc No. 2 in the deposition of Dr. Gordon Rausser.
BY MR. WALL:
Q. Dr. Rausser, before the break we were talking about the BNSF carload surcharges. Let me just ask you: Mathematically and on a standalone basis, were any of the other three defendants' public carload surcharges of a higher slope as a result of the conspiracy than they were before?
A. We've already talked about UP and BNSF, so you're asking about CSX and NS; is that correct?
Q. Okay. Sure.
A. The answer is "yes."

Page 64

Q. And what do you have in mind?
A. With regard to CSX, they had, as we know, a strike price of 28 which they changed to 23 -- to be precise, 28.01 to 23.01.
And with respect to your question about slopes, they had a program where the initial fuel surcharge was 2 percent. That was changed to 4/10 of a percent. The fuel increment was during the pre-class period $5 per barrel. It was changed to $1 per barrel. The fuel -- pardon me. The increment with regard to the fuel surcharge was 2 percent, and it was changed to 4/10 of a percent.
And, moreover, in terms of the look-back period, previously they had 30 consecutive days, and they turned to a monthly average, which certainly improved the triggering mechanism with regard to generating fuel surcharges.
With regard to NS --
Q. Why don't we hold on to NS, and I will come back to it in a second here. But take a look at your Table 49 on paragraph [sic] 151 of your merits reply report.
A. Table 49?
Q. Table 49, page 151.
A. Okay. I'm there.

Page 65

Q. You say at the top of the page, "So although when above both the $23 a barrel and the $28 a barrel thresholds, the old and new WTI formulas both yielded a 2 percent FSC rate for each $5 per barrel step." I will just stop there for that moment.
To that point that's a description of slope; correct?
A. No. You have to read on.
Q. I'm not reading on, though. I'm focusing on those words right now. The characteristic of how much additional FSC rate is generated for a certain step is the slope; correct?
A. Yes.
Q. Okay.
A. But it also depends upon the point at which you begin the slope --
Q. I understand that. I'm going to get to that. But I just want to try to isolate the issues here.
A. Okay.
Q. As I understand it, what you are saying here is that it's true as far as it goes that for every $5 increment in WTI price the slope is the same, but there is more surcharge generated within $5 increments in the WTI price; correct?

Page 250

reply to my class certification report, and I also explained it in my merits report.
And why didn't I go and look at all these contracts as I have done so in my supplemental report? Because I thought it was a matter of logic that any economic expert would realize that those contracts would be contaminated and, hence, they shouldn't be used as a benchmark. But I was wrong.
Q. Now, you found that --
MR. WERDER: That answer is a little unclear.
You were wrong that no expert would draw the counterinference?
MR. WALL: You don't get to ask questions.
MR. WERDER: Well, that question is left unclear, as you know it is.
MR. WALL: Oh, come on, Nick.
THE WITNESS: The fundamental -- fundamental -- the fundamental economic analysis is you don't use as a benchmark something that is subject to the same treatment that you are evaluating with regard to injury and damages. That is unacceptable.
And as a result, when I explained in my class certification report and in my deposition that

Page 251

I actually looked at the legacy contracts and specified we shouldn't be surprised that there is some overcharge there as well, because they too are contaminated. And even given your statement or your question that there's no change, that doesn't mean there is no contamination.
MR. CROSS: Move to strike everything after "wrong" as being overcoached.
THE WITNESS: "Coached," did you say?
(Simultaneous talking.)
MR. WALL: Oh, I think he's definitely serious.
MR. WERDER: I'm going to restrain myself.
MR. CROSS: I wish you had before you coached him.
MR. WERDER: Yeah. Okay.
MR. WALL: Come on, Rick.
MR. WERDER: I know you guys like sound bites and not clean answers.
MR. WALL: That was really clean.
MR. CROSS: There's a pot and kettle doing something here.
MR. WALL: Yeah.
MR. WERDER: Pardon me?
MR. WALL: Let's move on.

Page 252

BY MR. WALL:
Q. Dr. Rausser, you found that 88 percent of the BNSF legacy shipments that you analyzed for which you had the data fell into your Category 1 of contract with self-adjusting fuel surcharge provisions; correct?
A. Yes.
Q. And all of these were subject to the BNSF published carload fuel surcharge formula; right?
A. The 6100 --
Q. Right.
A. -- yes.
Q. Okay. Did the BNSF rules book 6100 formula change at any time from 2002 through the end of the class period?
A. I'd have to go back and look. I don't recall any changes, but I'd have to look.
Q. Well, the trigger price changed; right?
A. Yes. You said -- oh, you said the formula.
Q. Yes.
A. Yeah.
Q. So the trigger price --
A. Yes.
Q. -- changed from 1.30 -- $1.30 HDF to $1.25; correct?

Page 253

A. We are talking just about BNSF; right?
Q. Correct. Yep.
A. With regard to the class period, I'm sorry, I don't agree with what you just said. The class period for BNSF began with the 1.25, and I don't see a change in the 1.25 strike price.
MR. WERDER: He was asking you from 2002.
THE WITNESS: Well, that's not the class period.
BY MR. WALL:
Q. I know. That's why I specified 2002.
A. Oh, from 2002. Okay.
Q. I mean, I think actually we're saying the same thing, which it's a little muddled right now.
A. Okay.
Q. But let me just simplify it. As we discussed earlier, the difference in the old and new strike price wasn't relevant during the class period; right?
MR. WERDER: Objection.
BY MR. WALL:
Q. For purposes of injury and damages, looking retrospectively, the fuel prices were always above both the old and new triggers; correct?
A. I don't believe that that's correct with

Page 254

regard to every week. Shortly after the beginning of the conspiracy period in March of '03 or the class period, my recollection is there are a couple of weeks where it does matter.

Q. Okay. That's fine. For these purposes, let's just make it a hypothetical and assume that fuel prices during the class period were well above the thresholds of both the old and new BNSF programs.

Upon that assumption, would the self-adjustment that might have occurred to this particular fuel surcharge have in and of itself had any adverse impact on shippers subject to it?

MR. WERDER: Object to form. Counterfactual. Assumes facts not in evidence.

THE WITNESS: Can you read the question back, please.

(Record read as follows:

"Q. For these purposes, let's just make it a hypothetical and assume that fuel prices during the class period were well above the thresholds of both the old and new BNSF programs.

"Upon that assumption, would the self-adjustment that might have occurred

Page 255

to this particular fuel surcharge have in and of itself had any adverse impact on shippers subject to it?"

THE WITNESS: Well, there is a different step function that exists, and depending on when the underlying -- where the underlying is, yes, it could.

BY MR. WALL:

Q. What do you mean, "a different step function"? For BNSF?

A. For BNSF? You're just asking me about BNSF?

Q. Yes.

A. Oh, just BNSF. Okay. I think that's basically correct, yes.

Q. You also reference under the BNSF category a Cargill fuel surcharge called "Fuel NYMEX Cargill."

Do you see that one?

A. I do. It is the third entry on page 1.

Q. And this one, you say that the date created was just after October 2003. Why is that? Why don't you have a specific date as you do in the other instances?

A. I think I have already told you that.

Q. This is one of those instances where you didn't have a date on the contract, so you inferred

Page 256

when it went into effect from transaction data?

A. It is specific to BNSF, and, moreover, the contracts' start dates are not specified from their produced database, and as a result, I went to shipments. That's why.

Q. Okay. And is it your testimony that you did not have any other data that would allow you to determine when this was actually entered?

A. I don't recall any other data that would say when the contract start date was.

Q. Okay. Do you notice that this -- in your chart on Exhibit 1 you've written that it has a 62 cent strike price?

A. Yes.

Q. Is that really a strike price that was in this contract?

A. That's a different underlying.

Q. What do you mean by that?

A. It's the NYMEX average, which is a regulated exchange that generates a different price feed with regard to the triggers. So you're saying, "Does it make any sense?" It depends on what the underlying was for the contract.

Q. Do you know what the underlying was for the contract?

Page 257

A. Yes, I can certainly go back and look at the contract and see what it specifies, but the NYMEX refers specifically to a price feed that is different than either the West Texas Intermediate or the HDF.

Q. As you sit here, though, without looking it up, you don't know what it's for? You don't know what -- what --

A. What the underlying is?

Q. Yes.

A. I certainly did at one point, but I didn't memorize it.

Q. Okay. Does it ring a bell that it was heating oil?

A. I would have to go back and look. Given the level of the prices, that's very likely.

Q. Okay. Do you have any idea how recently in history heating oil prices were at 62 cents?

A. How recently in history?

Q. Yes.

A. Over the course of the last two months, it's, as I recall, close, if not above, its all-time highs because of what's going on in the Midwest and East with regard to the demand for heating oil and the supply disruptions that have taken place and the

Page 286

you, David?
BY MR. CROSS:
Q. Can you answer the question? If you don't know, you can say you don't know.
A. No, no, no. First of all, I would be very surprised if the actual start date would make any difference in the analysis, given that they were simply moving to a new computer system.
If it turns out that such errors took place in moving to the new computer system, which would ill serve them in their normal course of business, which I find surprising --
Q. Can you answer my question.
A. I am going to answer your question, but I want to give some foundation before I do.
Q. You don't get to filibuster. I just want a "yes" or "no." You don't know?
MR. WERDER: Move to strike.
BY MR. CROSS:
Q. You don't know?
MR. WERDER: He's answering your question. You just cut him off.
BY MR. CROSS:
Q. I don't want a speech. You don't know?
A. In regard to the "some cases," no, I don't

Page 287

know, because they've never produced it or it hasn't been produced in discovery. So how in the world would I, based on the discovery record, make a determination of what "some cases" means?
Q. You understand that the shipper and the payer for a particular shipment can be different entities; right?
A. Yes.
Q. And the payer is the one who actually pays the railroad for the service; is that your understanding, using the CSXT data?
A. Actually pays in sending funds to respond to an invoice? Yes.
Q. I just want to make sure I understand. For the analysis you have in your supplemental report with respect to CSXT, you used the shipper field in the information that's produced, not payer field, to identify the shipper and price authority combinations that you then remove as legacy; is that right?
A. Yes. If it has a shipper designation, certainly.
Q. And as you sit here today, if you were to instead use the payer field, you don't know what impact that would have on your analysis; is that

Page 288

right?
MR. WERDER: Objection.
THE WITNESS: I wouldn't expect it to have any impact.
BY MR. CROSS:
Q. You just don't know either way?
A. No. I just told you it makes no sense that it would have an impact with regard to the services that were being provided, regardless of who the counterparty is who sends funds in response to the invoice.
Q. Your Category 1 refers to contracts that you say were self-adjusting.
A. Yes.
Q. Did you review any specific contracts or transaction data to determine whether each of the contracts you've identified in Category 1 for CSXT actually self-adjusted?
A. I'm sorry. I missed the question.
MR. WERDER: Asked and answered by your colleague. I hope we are not going to have repetitions of all the questions that Mr. Wall asked.
DEPOSITION REPORTER: Should I read back the question?

Page 289

THE WITNESS: Please. If he wants me to answer, I suppose, yes.
(Record read as follows:
"Q. Did you review any specific contracts or transaction data to determine whether each of the contracts you identified in the category for CSXT actually self-adjusted?")
THE WITNESS: I certainly reviewed information. I reviewed not only the information that existed with regard to the pricing authorities, but as well the shipments and, moreover, had corresponding invoice data that was consistent with that price authority at the time the shipments were made.
BY MR. CROSS:
Q. You've not removed any shipments as legacy for CSX Intermodal; is that right?
A. Are you talking about legacy shipments?
Q. Yes.
MR. WERDER: I don't understand the question.
THE WITNESS: I don't either.
MR. WERDER: Object to form.
THE WITNESS: I don't understand your

Page 290

question.
BY MR. CROSS:
Q. You understand that during the relevant time period CSX Intermodal was a separate business from CSXT, which handled the carload business; right?
A. Right.
Q. So this common method that you've referred to for removing legacy contracts, among the legacy contracts that you removed, it doesn't include any contracts or any shipments for CSX Intermodal; isn't that right? Or are you aware?
A. I've already specified that I removed legacy contracts that were designated by CSX. That's the contracts that I've removed, and it's in response to Exhibit 2 and their production that goes directly to the specification in interrogatory No. 1.
Q. So if CSXT did not identify any intermodal shipments as legacy on behalf of CSX Intermodal, you didn't remove them; is that fair? "Yes" or "no."
A. Given their production, if they didn't produce any legacy contracts or designations, no, I didn't remove them.
Q. Turn to page 178 of your merits reply report.
A. 178?

Page 291

Q. Yes, please.
A. Merits reply. Yes. This is where Figure 68 is?
Q. Yes.
A. Yes.
Q. And Figure 68, we will just take that one as an example. On the left is -- on the left in Figure 68 is a chart produced by Professor Kalt; right?
A. Yes.
Q. And on the right under Figure 68 is a chart that you produced, that you prepared; right?
MR. WERDER: The document speaks for itself. Objection.
BY MR. CROSS:
Q. Is that right, Professor Rausser?
A. Just a moment. I want to make sure I have got this right. No, that's false.
Q. The chart on the right, isn't that a corrected version that you prepared of something that Dr. Willig had prepared in the case?
A. That's what Dr. Willig prepared. And, yes, it is his -- his analysis, but it is my correction of what he had done, yes.
Q. So it's your correction of Dr. Willig's

Page 292

analysis; right?
A. Yeah, but it's his analysis. You inferred that it was my analysis.
Q. You don't dispute the coverage calculations that are represented in these two figures as accurately representing the level of coverage for CSX in that time period; is that right?
MR. WERDER: Objection.
THE WITNESS: Yes, I certainly do dispute it. They're looking at this analysis as a basis for inferring that it's an evolving trend that was well in place before the class period.
BY MR. CROSS:
Q. I'm not talking about the inference that flows from it. I'm just talking about the level of coverage.
So just taking -- focusing on Figure 68 for a moment, you don't dispute anywhere in your report that the level of coverage, regardless of what inference you are going to draw from it, represented in Figure 68 in both Professor Kalt's figure and your corrected version of Willig, that that is an accurate calculation of coverage for CSX in the time period represented; right?
A. Not fundamentally, no. But in terms of

Page 293

inferring there is some evolutionary trend and all the class period is is an extension of that trend, yes.
Q. And that's true for all four of the figures in Figure 66 through 69: you don't dispute the coverage levels, the numbers?
But you do -- I understand you dispute whatever inference is going to be drawn from that. I just want to be clear. You don't dispute the calculations of the coverage levels for all four charts; right?
A. I think that's basically correct, yes.
Q. You state in your report that 100 percent FSC coverage was expressly mandated and enforced during the class period. My question is: If that's true, what's your explanation for why CSX achieved, at most, 68 percent coverage at the highest point during the class?
A. I think you are misinterpreting the statement that leads to your question. I said that was their objective.
Can we find the exact quote that you're using in your question?
Q. Page 16.
A. Thank you.

Page 294

Of the reply report?
Q. Yes.
A. Thank you.
Q. The first sentence in the third bullet.
A. Yes. I stand by that in terms of all the documents that were produced in discovery and the communication that went on among the defendants with regard to what their goal was.
Q. Well, my question isn't about the goal. You say that 100 percent efficacy coverage was expressly mandated and enforced. And you say numerous times throughout your report that during the class period fuel surcharges became nonnegotiable, no exceptions.
So my question to you is: If that was the economic circumstances during the class period, what is your explanation for why CSX never achieved coverage of higher than 60 percent during the class period? What explains that? Why did approximately 40 percent of their business escape fuel surcharges during the class period?
A. For lots of reasons. There were long-term contracts, and those contracts were enforced, and thus they couldn't achieve fuel surcharge coverage for those specific contracts and shippers, is certainly one explanation.

Page 295

Another is that, even though there may be some shorter-term contracts, there is certain anomalies that take place that do not allow them to move toward their objective.
This particular statement on page 16 goes to what they stated their objectives were, not what factually they would be able to achieve given the reality of what they faced in the way of initial conditions.
Q. Do you have any explanations as to why CSX achieved only 60 percent coverage in the class period beyond what you just identified, that there were long-term contracts in place and that anything else was an anomaly?
MR. WERDER: Objection. Asked and answered. And misstates his prior testimony.
THE WITNESS: Once again, it's an objective. And certainly they moved dramatically beyond -- CSX moved dramatically beyond its coverage with regard to fuel surcharges in the class period vis-à-vis the pre-class period. They didn't achieve what they had expressed as their intention with regard to achieving what coverage was feasible, what coverage could have, in fact, been achieved.
BY MR. CROSS:

Page 296

Q. Have you done any analysis to determine that among the at least 40 percent of CSX's business not under fuel surcharges in this period -- in the class period, what portion of that was under long-term contract throughout the period?
A. I did look at a length-of-contract analysis at the time of my class certification report, but I don't recall it being critical in any analysis that I had conducted at that point in time, and I don't recall revisiting it.
Q. So as you sit here, you have no idea how many of the contracts that are not under fuel surcharges in that 40-plus percent for CSX during the class period -- how many of those were long-term contracts that were not able to be changed or renewed or amended during the entire pendency of the class period? You just don't know; right?
A. Well, I'm also having problems with your 60 percent representation with regard to what's revealed here with to regard what we see corrected, Willig analysis. But aside from that, I don't recall. No, I don't.
Q. And so by the same token, you have under this Other category of anomalies that you say comprise this -- the white portion of Figure 68

Page 297

during the class period -- you also don't know how many of those there are either; right?
A. No. I haven't done an analysis of -- I don't find it surprising at all that they were not able to achieve what was their common objective with regard to coverage. I don't find that surprising. I never expected to analyze and make a determination of whether there was, in fact, coordination based on their stated objectives and whether they achieved their stated objectives.
Q. And the same is true for each of the four defendants represented in Figure 66 through 69?
A. Yes.
MR. WERDER: The same thing what is true?
THE WITNESS: With regard to analyzing the anomalies versus the long-term contracts and what portion of the complement of the coverage that actually took place was attributable to those two factors.
Is that correct?
BY MR. CROSS:
Q. That is. Thank you.
Now, at page 177, discussing these figures, you say at the end of the first -- the paragraph at the top, "They more support a pattern of

**Errata to the Deposition of Gordon C. Rausser, Ph.D., taken March 4-5, 2014**
***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**Case No. 1:07-mc-00489-PLF**

I, the undersigned, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate, with the exception of the following corrections listed below:

**March 4, 2014**

| Page:Line | Correction | Reason |
|---|---|---|
| 24:8 | Replace “damage injury” with “injury” | Clarification |
| 39:13 | Replace “now it’s the” with “now the” | Transcription Error |
| 43:6 | Replace “a” with “an” | Transcription Error |
| 44:5 | Replace “whose” with “who’s” | Transcription Error |
| 56:12 | Replace “5” with “0.5” | Transcription Error |
| 60:23 | Replace “mile” with “gallon” | Clarification |
| 63:5 | Replace “brief” with “break” | Transcription Error |
| 65:5 | Replace “that” with “the” | Transcription Error |
| 91:3 | Replace “rebuttal” with “supplemental” | Clarification |
| 99:24 | Remove “pre-conspiracy or” | Clarification |
| 99:25 | Replace “class” with “pre-conspiracy” | Clarification |
| 105:6 | Replace “contracts” with “shipments” | Clarification |
| 123:3 | Replace “played” with “paid” | Transcription Error |
| 123:3 | Remove “peak” | Transcription Error |
| 129:7 | Replace “in” with “compared to” | Clarification |
| 149:24 | Replace “contract” with “contrast” | Transcription Error |
| 155:6 | Remove “people” | Transcription Error |
| 164:13 | Replace “as” with “and” | Transcription Error |
| 180:11 | Insert “and” between “other” and “being” | Transcription Error |
| 181:7 | Replace “wasn’t” with “was” | Clarification |
| 277:17 | Replace “ask” with “asked” | Transcription Error |

**March 5, 2014**

| Page:Line | Correction | Reason |
|---|---|---|
| 330:18 | Replace “told my” with “told was my” | Transcription Error |
| 361:8 | Replace “interlying” with “interline” | Transcription Error |
| 390:15 | Replace “from” with “by” | Transcription Error |
| 436:23 | Replace “aware and” with “randomly” | Transcription Error |
| 441:5 | Replace “SPD” with “STB” | Transcription Error |
| 448:6 | Replace “STBE” with “STB” | Transcription Error |
| 456:13 | Replace “long” with “log” | Transcription Error |
| 482:10 | Replace “impacted” with “un-impacted” | Transcription Error |
| 486:6 | Replace “the air” with “there” | Transcription Error |
| 499:4 | Remove “full” | Transcription Error |

| | | |
|---|---|---|
| 525:4 | Replace "9255, that" with "9255, is that" | Transcription Error |
| 531:17 | Replace "analysis in" with "analysis of that in" | Clarification |

Date: April 4, 2014

Gordon Rausser

Gordon C. Rausser, Ph.D.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE ) MDL Docket No. 1869
ANTITRUST LITIGATION ) Misc. No.07-489(PLF)
This Document Relates To: )
DIRECT PURCHASER CASES )
)

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF GORDON RAUSSER, Ph.D.

San Francisco, California

Wednesday, March 5, 2014

VOLUME II (Pages 310 - 547)

Reported by:
JANIS JENNINGS
CSR No. 3942, CLR, CCRR
Job No. 48896

Page 311

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE ) MDL Docket No. 1869
ANTITRUST LITIGATION ) Misc. No.07-489(PLF)
This Document Relates To: )
DIRECT PURCHASER CASES )
)

VIDEOTAPED DEPOSITION OF GORDON RAUSSER, taken on behalf of the Defendants, at GIBSON, DUNN & CRUTCHER, LLP, 555 Mission Street, 30th Floor, San Francisco, California, beginning at 10:02 a.m. on Wednesday, March 5, 2014, before Janis Jennings, Certified Shorthand Reporter No. 3942, CLR, CCRR.

Page 312

APPEARANCES:

For Plaintiffs:
QUINN EMANUEL URQUHART & SULLIVAN LLP
BY: RICHARD I. WERDER, JR., ESQ.
STEPHEN R. NEUWIRTH, ESQ.
KYLE R. TAYLOR, ESQ.
BEN M. HARRINGTON, ESQ.
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849.7000
rickwerder@quinnemanuel.com
stephenneuwirth@quinnemanuel.com
kyletaylor@quinnemanuel.com
benharrington@quinnemanuel.com

LaROE, WINN MOERMAN & DONOVAN
BY: PAUL M. DONOVAN, ESQ.
1250 Connecticut Avenue, NW
Suite 200
Washington, D.C. 20036
202.298.8100
paul.donovan@laroelaw.com

Page 313

APPEARANCES:

For Class Plaintiffs:
HAUSFELD LLP
BY: MICHAEL P. LEHMANN, ESQ.
44 Montgomery Street, Suite 3400
San Francisco, California 94104
415.633.1908
mlehmann@hausfeldllp.com

HAUSFELD LLP
BY: SATHYA GOSSELIN, ESQ.
SETH R. GASSMAN, ESQ.
1700 K Street, NW
Suite 650
Washington, D.C. 20006
202.450.7175
sgosselin@hausfeldllp.com
sgassman@hausfeldllp.com

Page 314

APPEARANCES:

For Defendant Union Pacific Railroad:
LATHAM & WATKINS LLP
BY: DANIEL M. WALL, ESQ.
TIM O'MARA, ESQ.
CONNIE D. SARDO, ESQ.
CHRISTOPHER B. CAMPBELL, ESQ.
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
415.391.0600
dan.wall@lw.com
tim.omara@lw.com
connie.sardo@lw.com
christopher.campbell@lw.com

For Defendant Norfolk Southern Railway:
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: SEAN M. TEPE, ESQ.
TARA L. REINHART, ESQ.
1440 New York Avenue, N.W.
Washington, D.C. 20005
202.371.7106
sean.tepe@skadden.com
tara.reinhart@skadden.com

Page 315

APPEARANCES:

For Defendant BNSF Railway Company:
GIBSON, DUNN & CRUTCHER LLP
BY: JOSHUA H. SOVEN, ESQ.
SLOANE ROSENTHAL, ESQ.
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
jsoven@gibsondunn.com
srosenthal@gibsondunn.com

STEPTOE & JOHNSON LLP
BY: LINDA S. STEIN, ESQ.
1330 Connecticut Avenue, NW
Washington, D.C. 20036
202.429.8185
lstein@steptoe.com

Page 316

APPEARANCES:

For Defendant CSX Transportation:
CROWELL & MORING LLP
BY: DAVID CROSS, ESQ.
SHARI ROSS LAHLOU, ESQ.
LUKE VAN HOUWELINGEN, ESQ.
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
202.628.5116
dcross@crowell.com
slahlou@crowell.com
lvanhouwelingen@crowell.com

Also Present:
DAVID M. PRYOR, ESQ., BNSF Railway Company
DANIEL FLETCHER, ESQ., Union Pacific Railroad
DAVID REISHUS, Compass Lexecon
JOSEPH KALT, Compass Lexecon
GARETH MACARTNEY, OnPoint Analytics, Inc.
FRANK QUIRARTE, Videographer

Page 317

I N D E X


| WITNESS | EXAMINATION |
|---|---|
| GORDON RAUSSER, Ph.D. VOLUME II | |
| BY MR. CROSS (Resumed) | 320 |
| BY MR. SOVEN | 370 |
| BY MR. TEPE | 492 |


Page 318

E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | Handwritten notes | 366 |
| Exhibit 4 | Fuel Expenses bar graphs BNSF Final, CSX Final, UP Final, NX Final | 402 |
| Exhibit 5 | Orig_Mod_Reg_Merits and Damage Ratios | 414 |
| Exhibit 6 | Responses and Objections of Defendant Norfolk Southern Railway Co. to Direct Purchaser Plaintiffs' First Set of Interrogatories | 501 |
| Exhibit 7 | Letter dated 4/25/13 from Skadden Arps to Quinn Emmanuel w/attached Supplemental Responses and Objections to Direct Purchaser Plaintiffs' First Set of Interrogatories | 503 |

Page 391

the need to "drop" them from his model, as you put it?
MR. WERDER: Objection. Beyond the scope of his report.
THE WITNESS: I have already indicated to you I've done some preliminary work in that regard. And if I'm looking at shippers with less than 20 observations, you're going to be subject to prediction errors and getting zero or negative damages for those particular shippers that is sourced with prediction errors.
BY MR. SOVEN:
Q. When you run them through your regression model?
A. When I run them through a prediction from my model... I don't know what you mean by "run them through my...model." I don't run them through my model. I take my model and I use it to generate a prediction of a but-for price.
Q. You're right, you do. And we'll get back to that. All right. So -- and we'll get back to Dr. McClave.
Can you look again at the block quote on 223 of the merits report.
A. The block quote?

Page 392

Q. And, again, I just want to kind of get the contour of what we're talking about there.
A. I'm sorry. Can I read the prior page?
Q. Sure.
A. Okay. Thank you.
Q. And if you want, you're quoting your reply report --
A. Yes.
Q. -- so if you want to take a look at that, that's okay too.
A. Okay. I've got it.
Q. Yeah. The part I'd like clarified is you wrote, "In addition, all shippers, whether or not within the class, are affected by the restraint of competition that resulted from the conspiracy."
What's the universe of "all shippers" there? Is that all shippers who paid rate-based FSCs or is that every shipper who purchased shipment services from the defendants during the class period?
A. Well, certainly it's the former. With regard to the latter, it could well be. But I'm not -- I have not done an analysis with regard to the latter and/or reported any such analysis because I haven't conducted it. But certainly with regard to the former.

Page 393

Q. But what was your basis for writing that "all shippers...are affected by the restraint of competition"?
A. I'm speaking here about class contracts, class shipments versus legacy shipments. And when I say "all shippers," I'm talking about legacy shippers versus class shippers.
This has to be taken in the context of the response to Dr. Willig and the subsequent work that's been done on using legacy contracts as a benchmark.
Q. Right. I'm all about context.
So just -- and again, a little bit of repetition. So your position is that both the class shippers and the legacy shippers who paid rate-based FSCs were harmed by the alleged conspiracy?
MR. WERDER: This was all asked and answered yesterday, Josh. I mean, the fact that you guys have four parties doesn't mean that you get to ask the same questions four times.
MR. SOVEN: I will move with this batch.
THE WITNESS: I'm sorry --
MR. WERDER: Okay. Mr. Wall covered this in great detail and in a very skillful way.
MR. SOVEN: Got it. And I wouldn't

Page 394

presume -- okay. Be quiet. Okay. I got it. We're good.
BY MR. SOVEN:
Q. Can you go to page 225 --
A. Yes.
Q. -- of your -- actually, let's skip that.
Is it your position that the alleged conspiracy had any effects in the year 2001?
A. Where is this reference on 225?
Q. It's not.
A. Okay.
Q. I said "let's skip that."
A. Okay. Fine. Skip -- I'm sorry.
Q. Yeah. Is it your position that the alleged conspiracy had any effects in the year 2001?
A. No.
MR. WERDER: Asked and answered.
BY MR. SOVEN:
Q. No.
You understand that BNSF implemented a published intermodal FSC formula in September of 2001; correct?
A. You said "intermodal"; right?
Q. Uh-huh.
A. Yes, that's my recollection.

Page 395

Q. And do you understand to this day that formula remains identical and has never changed?
A. Yes.
Q. And the strike prices never changed, the slope has never changed, and the look-back period has never changed?
A. It is the same as in the pre-class period.
Q. And as I understand it, your position is that every shipper who paid the intermodal published FSC during the class period to BNSF was harmed by the alleged conspiracy?
A. During the class period?
Q. Correct.
A. Yes.
Q. In the absence of the alleged conspiracy, what would have been the published intermodal FSC formula that BNSF used?
MR. WERDER: Objection. Beyond the scope of his report.
BY MR. SOVEN:
Q. Do you know the answer?
A. That's not an analysis that I have conducted; and, no, I do not have an answer to the question.
Q. And none of the models you prepared could

Page 396

answer that question; correct?
A. None of the models... Certainly that's a counterfactual. The model is attempting to represent the facts, not some counterfactual.
With regard to could the model be used to simulate and look at robustness in terms of the changes that might take place with regard to the degree of over recovery? Certainly such a model could be designed, but that's not the purpose for my model.
Q. And it's also not the question I asked you.
A. Well --
Q. Do you have any opinion as to what the BNSF published intermodal FSC formula would have been in the absence of the --
A. That's not true. I did answer that question I said no.
Q. Okay.
A. And then I went on to explain. I did answer the question.
Q. All right. Now, for those shippers which entered into long-term contracts with BNSF for intermodal shipments in 2001, they were -- and, you know, those contracts continued through the class

Page 397

period, your position is they were harmed; correct?
A. In 2001?
Q. Well, they entered into a -- the shippers I'm asking you about are the ones that entered into contracts for intermodal shipments with BNSF in 2001. Those contracts ran through the class period. Your position is the FSC payments they paid to BNSF for those intermodal shipments during the class period were affected by the conspiracy?
A. Yes.
Q. In the absence of the conspiracy, how -- what would have happened to those shippers which would have allowed them to pay lower prices than they actually did?
A. What would have happened?
Q. How would they -- how would they have gotten out of those contracts?
A. What are you -- that's an incomplete question. What's the nature of the contract? How long term is the contract? Is it expiring at a certain point in time?
Q. You're right.
A. Is it a shipper that has other options that are available which are in this hypothetical but-for world that you're attempting to create in your

Page 398

questions --
Q. Oh, it's not a hypothetical. But let's --
A. It's not?
Q. To use a phrase that you like, which I agree with, let's be more precise.
A. Okay.
Q. Okay. For a shipper that entered into a 10-year intermodal contract with BNSF in 2001, how would they have avoided the FSC that was in that contract during the class period?
MR. WERDER: This was all discussed by Mr. Wall yesterday.
MR. SOVEN: Not for BNSF.
MR. WERDER: Well, I don't think you get to say, "For BNSF how would it have avoided it," "For CSX" -- I mean, each guy can't come up here separately and say, "Okay, I'm going to ask the same questions again but change the name of the client."
MR. SOVEN: It's a lot of cash, Rick. Let's go.
MR. WERDER: It's a lot of what?
MR. SOVEN: Cash.
MR. WERDER: That doesn't mean that you get to ask the same questions over and over again.
THE WITNESS: So I want to make sure I

# *In re* RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION

## GORDON RAUSSER, PH.D. - Vol. 3

*July 31, 2014*

## HIGHLY CONFIDENTIAL

MERRILL CORPORATION
LegaLink, Inc.
135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION,
This document relates to:
DIRECT PURCHASER CASES
______________________________/

MDL Docket No. 1869
Misc. No. 07-489(PLF)

-- HIGHLY CONFIDENTIAL --

Videotaped deposition of GORDON RAUSSER, PH.D., Volume 3, taken on behalf of the Defendants, at the offices of Latham & Watkins LLP, 505 Montgomery Street, 19th Floor, San Francisco, California, beginning at 10:04 A.M. and ending at 6:54 P.M. on Thursday, July 31, 2014, before Leslie Rockwood, RPR, Certified Shorthand Reporter No. 3462.

APPEARANCES:

FOR PLAINTIFFS:

QUINN EMANUEL URQUHART & SULLIVAN LLP
BY: RICHARD I. WERDER, JR., ESQ.
STEPHEN R. NEUWIRTH, ESQ.
KYLE R. TAYLOR, ESQ.
ALICIA COBB, ESQ.
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849.7000
rickwerder@quinnemanuel
stephenneuwirth@quinnemanuel
kyletaylor@quinnemanuel
aliciacobb.quinnemanuel

LaROE, WINN, MOERMAN & DONOVAN
BY: PAUL M. DONOVAN, ESQ.
1250 Connecticut Avenue, NW, Suite 200
Washington, DC 20036
202.298.8100
paul.donovan@laroelaw.com

APPEARANCES (Continued):

FOR PLAINTIFFS:

HAUSFELD LLP
BY: MICHAEL P. LEHMANN, ESQ.
44 Montgomery Street, Suite 3400
San Francisco, California 94104
415.633.1908
mlehmann@hausfeldllp.com

HAUSFELD LLP
BY: SETH R. GASSMAN, ESQ.
1700 K Street, NW, Suite 650
Washington, DC 20006
202.450.7175
sgassmann@hausfeldllp.com

APPEARANCES (Continued):

FOR DEFENDANT UNION PACIFIC RAILROAD:

LATHAM & WATKINS LLP
BY: DANIEL M. WALL, ESQ.
TIM O'MARA, ESQ.
CHRISTOPHER B. CAMPBELL, ESQ.
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
415.391.0600
dan.wall@lw.com
tim.omara@lw.com
christopher.campbell@lw.com

FOR DEFENDANT NORFOLK SOUTHERN RAILWAY:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: SEAN M. TEPE, ESQ.
TARA L. REINHART, ESQ.
1440 New York Avenue, NW
Washington, DC 20005
202.371.7106
sean.tepe@skadden.com
tara.reinhart@skadden.com

APPEARANCES (Continued):

FOR DEFENDANT BNSF RAILWAY COMPANY:

GIBSON, DUNN & CRUTCHER LLP
BY: JOSHUA H. SOVEN, ESQ.
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
202.955.8503
jsoven@gibsondunn.com

BY: VERONICA S. LEWIS, ESQ.
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201-6912
214.698.3320
vlewis@gibsondunn.com

FOR DEFENDANT CSX TRANSPORTATION:

CROWELL & MORING LLP
BY: DAVID CROSS, ESQ.
LUKE VAN HOUWELINGEN, ESQ.
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
202.624.2583
dcross@crowell.com
lvanhouwelingen@crowell.com

APPEARANCES (Continued):

Also Present:

Daniel J. Fletcher, Esq., Union Pacific Railroad

David M. Pryor, Esq., BNSF Railway Company

Joseph Kalt, Compass Lexecon

Gareth Macartney, OnPoint Analytics, Inc.

Jennifer McKay, Videographer

class period formula FSC rate, those aren't the actual average FSC rates that the class members paid on this traffic; right?

A. In terms of collections, you mean?

Q. No, I mean the rates. Those aren't the actual rates that applied; right? You have taken the actual rates that Professor Kalt used in Table 1 and replaced them with just the published rates. 18:28:34

A. I'm simply responding to Dr. Kalt's analysis, and I'm trying to be clear about what he analyzed and what were the errors in his analysis with regard to the arithmetic. 18:28:51

Q. I understand. I'm asking a different question.

A. Okay.

Q. What Professor Kalt includes in Column 1 of Table 1 are the actual average class period fuel surcharge rates for the carload traffic underlying Table 1; right? 18:29:06

A. I'd have to go back and look at his report to refresh my memory about what he actually did, but that certainly sounds reasonable. 18:29:24

Q. And what you did in your Column 1 was to simply include the average class period FSC rate using just the published --

A. I'm sorry, are we talking about Table 2 now or 18:29:43

Table 1?

Q. Yes, Table 2.

A. Okay.

Q. So in Column 1 of Table 2, what you did was use the average fuel surcharge rate for the published carload formulas for each of the four defendants; right? 18:29:53

A. Yes.

Q. What we see between Table 1 and Table 2 is that the actual fuel surcharge rates that were paid during the class period on average are less than the rates that resulted from the -- what you refer to as standard class period formula FSC rate; right? 18:30:05

A. Yes.

Q. CSXT, just taking an example, is 4.3 percent?

A. I'm on CSXT? 18:30:20

Q. Right. So CSXT, the actual fuel surcharge rates on average that the class members paid on the carload traffic was actually 4.3 percent than what you refer to as the standard class period FSC rate; right?

A. I don't recall the 4.3 percent. Where are you getting -- 18:30:42

Q. It's 16.2 minus 11.9 right. That's 4.3; right? I think my math's not that bad.

MR. WERDER: Objection.

THE WITNESS: 16.2 less 14.9? 18:30:54

Q. BY MR. CROSS: 16.2 minus 11.9 is 4.3; right?
A. Oh, I see. With regard to what the actual was versus the standard. Yes, yes.
Q. Thank you.
A. Exactly. 18:31:08
Q. So help me understand, if as you and plaintiffs claim, fuel surcharges during the class period were nonnegotiable, provided on a "take it or leave it" basis, and not subject to competition, why is it that the CSX shippers paid on average 4.3 percent less than the 18:31:26 standard class period formula, which is a 25-percent discount, approximately a 25-percent discount off what you call the standard class period formula?
MR. WERDER: Objection.
Q. BY MR. CROSS: Can you explain that to me? 18:31:44
A. The implementation of the conspiracy is not perfect.
Q. That's your answer?
A. That's my answer.
MR. WERDER: That's your question? 18:31:56
Q. BY MR. CROSS: Let me make sure I understand. So it's your -- it's your opinion that CSX shippers in the class got a 25-percent discount on average off of what you say was the standard class period formula, which was nonnegotiable, not subject to competition, because 18:32:15

the conspiracy isn't perfect. If that's your answer, it's fine. I just want to make sure.

A. No, no, no.

Q. Do you have another explanation?

A. No. In terms of this analysis here, this analysis goes directly to Dr. Kalt's representation about earnings power. The only purpose for this analysis is to look at what was the standard formulas and what were the four defendants moving toward with regard to their coordination of using fuel surcharges as a mechanism -- 18:32:26 18:32:49

Q. Mr. Rausser, that's not my question. I didn't ask you the purpose. My question is: What is your best explanation as to why Table 1 and Table 2 in your report shows -- show together that CSX shippers in the class on carload traffic received on average a 25-percent discount off of a standard class period formula FSC rate that you yourself calculated? If it's that the conspiracy isn't perfect, I'll it take it. But is that it? 18:33:10

MR. WERDER: Objection.

THE WITNESS: No. This is what the data reveals. I'm simply looking at certainly what Dr. Kalt has represented was the average rate for fuel surcharges by the various defendants. I'm looking at the formulas that they coordinated and were implementing during the class period, and I'm simply making a comparison between 18:33:26 18:33:49

**Errata to the Deposition of Gordon C. Rausser, Ph.D., taken July 31, 2014**
***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**Case No. 1:07-mc-00489-PLF**

I, the undersigned, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate, with the exception of the following corrections listed below:

| Page:Line | Correction | Reason |
|---|---|---|
| 565:8 | Replace “in” with “is” | Transcription Error |
| 565:8 | Insert “part” between “integrated” and “with” | Transcription Error |
| 566:24 | Replace “of” with “to” | Transcription Error |
| 571:20 | Insert “with” between “Bear” and “me” | Transcription Error |
| 586:19 | Insert “be” between “shouldn’t” and “any” | Transcription Error |
| 591:18 | Insert “or” between “period” and “to” | Transcription Error |
| 598:2 | Insert “that” after “find” | Transcription Error |
| 600:19 | Insert “response” between “empirical” and “in” | Transcription Error |
| 632:8 | Insert “he” between “because” and “hasn’t” | Transcription Error |
| 655:22 | Replace “net” with “results” | Transcription Error |
| 655:23 | Remove “analyses” | Transcription Error |
| 665:2 | Insert “with” before “fuel” | Transcription Error |
| 681:15 | Replace “McClay’s” with “McClave’s” | Transcription Error |
| 689:12 | Replace “disfrequency” with “frequency” | Transcription Error |
| 703:13 | Remove “do” | Transcription Error |
| 709:15 | Insert “be” between “won’t” and “wrong” | Transcription Error |
| 718:13 | Insert “with” between “Bear” and “me” | Transcription Error |
| 723:15 | Insert “with” before “regard” | Transcription Error |
| 724:4 | Remove “of” | Transcription Error |
| 724:5 | Insert “rate” between “freight” and “elasticity” | Transcription Error |
| 729:20 | Remove “of” | Transcription Error |
| 739:1 | Replace “background analysis” with “backup” | Transcription Error |
| 739:22 | Insert “with” between “Bear” and “me” | Transcription Error |
| 766:19 | Insert “no” between “there’s” and “need” | Transcription Error |
| 770:4 | Replace “mechanism” with “mechanisms” | Transcription Error |
| 770:4 | Replace “surcharge” with “surcharges” | Transcription Error |
| 771:17 | Replace “draw a” with “withdraw” | Transcription Error |
| 779:17 | Replace “gone” with “going” | Transcription Error |
| 798:19 | Insert “are” between “that” and “out” | Transcription Error |
| 803:3 | Insert “had” between “he” and “access” | Transcription Error |
| 803:12 | Replace “STBE” with “STB” | Transcription Error |
| 828:15 | Replace “Rigger” with “Rivers” | Transcription Error |
| 829:7 | Insert “, I don’t have an ownership or financial interest in Cascade Settlement Services as a company. I do, however, have the right to share in distributions from certain claims they manage, but those do not include claims in this case or any other case in which I am a | Clarification |

| | | |
|---|---|---|
| | testifying expert or OnPoint has performed any services" after "No" | |

Date: August 28, 2014

Gordon Rausser

Gordon C. Rausser, Ph.D.

# Intentionally Omitted

## DA06484-DA06493

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\- - - - - - - - - - - - - - - X
In re RAIL FREIGHT FUEL : MDL Docket
SURCHARGE ANTITRUST : No. 1869
LITIGATION. : Misc. No.
\- - - - - - - - - - - - - - - X 07-489(PLF)

Washington, D.C.
Friday, October 1, 2010

Videotaped deposition of MICHAEL D. GILLEY, a 30(b)(6) witness on behalf of Olin Corporation herein, called for examination, in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Crowell & Moring, 1001 Pennsylvania Avenue, N.W., Washington, D.C., at 8:30 a.m., Friday, October 1, 2010, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs:
MARC L. GREENWALD, ESQ.
AMOS E. FRIEDLAND, ESQ.
Quinn Emanuel Urquart Oliver & hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7165
and
PAUL M. DONOVAN, ESQ.
LaRoe, Winn, Moerman & Donovan
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 298-8100



APPEARANCES: (Continued)

On behalf of Defendant CSX Transportation, Inc.:
DAVID D. CROSS, ESQ.
LUKE van HOUWELINGEN, ESQ.
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2679

On behalf of the Defendant BNSF:
LINDA S. STEIN, ESQ.
Steptoe & Johnson
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-8185



APPEARANCES: (Continued)

On behalf of the Defendant Union Pacific:
PETER A. BARILE, III, ESQ.
Howrey
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402
(202) 383-6941

On behalf of the Defendant Norfolk Southern:
SEAN M. TEPE, ESQ.
DAVID CHRISTOPHER SHOCKLEY, ESQ.
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7954

APPEARANCES: (Continued)

On behalf of Olin Corporation:
GREGORY M. LEITNER, ESQ.
Husch Blackwell
736 Georgia Avenue, Suite 300
Chattanooga, Tennessee 37402
(423) 266-5500

ALSO PRESENT:
MERINDA EVANS, Videographer



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| MICHAEL D. GILLEY 30(b)(6) | DEFENDANT |
| By Mr. Tepe | 320, 367 |
| By Mr. Cross | 321 |
| By Ms. Stein | 457 |


E X H I B I T S


| OLIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 15 - 4/13/04 e-mail from Casteel to Asbill | 393 |
| 16 - 4/23/07 e-mail from Mattson to Steely | 407 |
| 17 - Slay Transportation Co., Inc. and Olin Chlor Alkali Products Fuel Surcharge Bulk Truck Guidelines | 418 |
| 18 - 1/2/03 letter to All L&B Value Customers from Jody Guillory | 426 |
| 19 - April 24, 2006 e-mail from Dina Bozeman to Brian Wilt | 427 |
| 20 - March 29, 2007 e-mail from Kirk Steely to Mike Gilley | 430 |




P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. Here begins videotape number 1 in the deposition of Michael Gilley, 30(b)(6) witness, Volume 2, regarding Rail Freight Fuel Surcharge Antitrust Litigation, in the United States District Court for the District of Columbia, Case Number MDL Docket Number 1869.

Today's date is October 1st, 2010, and the time is now 8:33 a.m. This deposition is being held at the request of Sean M. Tepe, Esquire, of Skadden, LLP and being taken at Crowell & Moring, 1001 Pennsylvania Avenue, Northwest, Washington, D.C. The court reporter today is Mary Grace Castleberry. The videographer is Merinda Evans representing Alderson Court Reporting.

Would all attorneys present please identify yourselves, the parties you represent and would the court reporter please swear in the witness.

MR. GREENWALD: Yes. Marc Greenwald and Amos Friedland on behalf of Plaintiffs and Olin Corporation and the witness.

MR. DONOVAN: Paul Donovan with LaRoe Winn



on behalf of Plaintiffs.

MR. LEITNER: Greg Leitner, Husch Blackwell, outside counsel for Olin. I'm not counsel in this case. I'm just here to observe the deposition.

MR. TEPE: Sean Tepe with Skadden, Arps, on behalf of Defendant Norfolk Southern.

MR. CROSS: David Cross of Crowell & Moring, on behalf of Defendant CSX Transportation.

MR. van HOUWELINGEN: Luke van Houwelingen of Crowell & Moring, on behalf of CSX Transportation.

MR. SHOCKLEY: David Shockley with Skadden, Arps, on behalf of Norfolk Southern.

MR. LIEBERMAN: Mike Lieberman with Crowell & Moring, on behalf of CSX Transportation.

MS. STEIN: Linda Stein, Steptoe & Johnson, representing BNSF Railway.

Whereupon,

MICHAEL D. GILLEY,

was called as a 30(b)(6) witness by counsel for Defendants, and having been duly sworn by the Notary Public, was examined and testified as follows:

Page 360

respect to some of the products that Olin ships, those truck options can carry some of the same commodities that you ship by rail, right?
A. Yes.
Q. You testified earlier that, until a couple of years ago, Olin was paying fuel surcharges to at least some of its truck companies as a percentage of line haul, is that right?
A. Yes.
Q. So even though Olin is not captive to its trucks, it goes through a bid process. The result of that bid process for a period of several years was still that Olin was paying fuel surcharges as a percent of line haul to truck companies, right?
MR. GREENWALD: Object to form.
BY MR. CROSS:
Q. Yes or no?
MR. GREENWALD: Object to form.
THE WITNESS: Can you explain?
BY MR. CROSS:
Q. Do you understand the question?
A. Repeat it, please.

Page 361

MR. CROSS: Can you read it back?
THE REPORTER: "Question: So even though Olin is not captive to its trucks, it goes through a bid process. The result of that bid process for a period of several years was still that Olin was paying fuel surcharges as a percent of line haul to truck companies, right?"
THE WITNESS: That can happen, yes.
BY MR. CROSS:
Q. It did happen, right?
A. Yes.
Q. You said earlier that, in the class period, diesel prices were -- fuel was going up. You understand that was happening, right?
A. Right.
Q. And you said it was logical that companies at that time would try to handle that in some fashion, right?
A. Yes.
Q. If CSX, for example, had offered Olin a mileage-based fuel surcharge during the class period, would Olin agree to that?

Page 362

MR. GREENWALD: Objection.
THE WITNESS: We would, again, as I testified earlier, object to overall cost just as we did with the truckers, yes.
BY MR. CROSS:
Q. So even a mileage-based fuel surcharge, Olin would not have agreed to that?
MR. GREENWALD: Objection, mischaracterized the testimony.
BY MR. CROSS:
Q. Let me ask it differently. Your objection to the percentage of line haul fuel surcharge that the railroads was using, your objection was it's a cost increase and you didn't think it was tied to actual fuel cost, is that fair?
MR. GREENWALD: Objection.
THE WITNESS: Yes.
BY MR. CROSS:
Q. So if the railroads had come to you with a mechanism for recovering just their actual fuel cost for moving Olin products, would Olin have paid that?
A. I don't know if it would have paid it.

Page 363

Circumstances, time -- I mean, even with the truck carriers, we had different parameters in their contracts and that was because we negotiated over them and argued about what we were able, willing, could, could not pay.
Q. You negotiated over them, you argued with them about what you could ask could not pay, but you ultimately paid a fuel surcharge as a percentage of line haul to truck companies?
A. Yes.
Q. Olin paid for rail freight transportation that [redacted]
A. Yes.
Q. [redacted]
MR. GREENWALD: Objection.
THE WITNESS: We had a negotiations process that occurred. [redacted]
BY MR. CROSS:
Q. [redacted] of contracts with its rail providers, right?

Page 420

A. Correct.
Q. In the first sentence here on this document, it says, "Olin Chlor Alkali Products will use a neutral range diesel price index per gallon to figure the appropriate fuel surcharges effective on the first Monday of each month."
And again, I understand you weren't prepared to testify about Slay transportation, but perhaps with your knowledge, you could help me understand the phrase, "Figure the appropriate fuel surcharges."
MR. GREENWALD: Objection, calls for speculation.
BY MR. TEPE:
Q. My question is, is this a fuel surcharge that Slay designed and charged to Olin or was this something that Olin designed and paid to Slay?
MR. GREENWALD: Objection, calls for speculation.
THE WITNESS: I wouldn't have a way of knowing.
BY MR. TEPE:

Page 421

Q. The next line refers to a DOE fuel survey. Is this the index which would determine whether or not a fuel surcharge would apply and at what level?
MR. GREENWALD: Objection, calls for speculation.
THE WITNESS: It's an index commonly used in the truck transportation business.
BY MR. TEPE:
Q. And this is a percentage of line haul fuel surcharge, right?
MR. GREENWALD: Objection.
THE WITNESS: Again, it appears to be.
BY MR. TEPE:
Q. You can put this aside. Earlier, you had testified that Olin objected to all fuel surcharges, is that right?
A. Yes.
Q. And the reason why Olin objected was because it was another cost that Olin would have to pay, is that right?
A. Yes.
Q. You had also testified earlier that

Page 422

trucking companies charged a percent of line haul, a fuel surcharge just like the railroads, is that right, or similar to?
A. In a similar fashion, yes.
Q. Did Olin have any objection to the way in which the percent of line haul charge from trucking companies was configured?
MR. GREENWALD: Objection, asked and answered.
THE WITNESS: Yes.
BY MR. TEPE:
Q. And what was that objection?
A. The same objection. An additional cost.
Q. But did Olin have an objection to the way in which those percentage of line haul fuel surcharges from the trucking companies is configured?
A. Yes.
Q. And what was that particular objection?
A. The fact that it was a percent of line haul.
Q. What about a percent of line haul surcharge was objectionable?

Page 423

A. That it's not representative of -- as representative as it could be if it were an actually mileage-based surcharge.
Q. And this was an objection that Olin had articulated to its trucking companies, is that right?
A. Yes, Olin has articulated that to their trucking companies and taken action to do something about it.
Q. What action?
A. We negotiated subsequently with those trucking firms and rebid business and changed out a trucking firm in order to eventually get all of our carriers, to my knowledge, on an actual knowledge based fuel surcharge.
Q. But before that occurred, Olin was indeed paying all of its trucking -- well, strike that. Most of Olin's trucking companies charged Olin a fuel surcharge based on a percentage of line that is all, isn't that right?
MR. GREENWALD: Objection, asked and answered like 12 times.
THE WITNESS: Yes.

Page 424

BY MR. TEPE:
Q. Was it the policy of these trucking companies to always apply a fuel surcharge?
MR. GREENWALD: Objection, calls for speculation as to the policy of other companies.
BY MR. TEPE:
Q. Did you understand that it was the policy of other trucking companies to charge a percent of line haul fuel surcharge?
A. What I can tell you is it was the competitive environment in that industry at the time.
Q. And when you say competitive environment, it was sort of the standard in the industry to charge a percent of line haul fuel surcharge, is that right?
A. And at that point in time, our ability to go get a carrier who wouldn't charge it was less opportunistic to Olin than in other time periods.
Q. Do you know of any instance in which Olin objected to a truck fuel surcharge and the trucking company removed the truck fuel surcharge?
A. I know of one -- I know of a situation where we have objected and we had, as I mentioned

Page 425

earlier, the $1 million returned to us in margin because of the move, the negotiation that went on between Olin and that carrier. I'm not as specific as to who the carrier is.
Q. When was this?
A. It would have been in the 2007 to 2009 time frame.
Q. But aside from that one instance, can you recall any other situations in which a trucking company withdrew its fuel surcharge?
A. I can't recall one, no.
Q. So Olin understood that it was the policy of these trucking companies to apply a fuel surcharge, isn't that right?
MR. GREENWALD: Objection.
THE WITNESS: We understood that it was the competitive environment at the time.
BY MR. TEPE:
Q. Have you ever heard that trucking companies were strictly enforcing the application of fuel surcharges to its customers?
MR. GREENWALD: Objection.

Page 426

THE WITNESS: Personally, no.
(Olin Exhibit No. 18 was marked for identification.)
BY MR. TEPE:
Q. I'm handing over to the witness what is being marked as Olin Exhibit 18. It is a document with the Bates OLI 063290. Can you identify this document?
A. [redacted]
Q. [redacted]
A. Yes.
Q. [redacted]
A. Yes.
Q. Do you know if it was one of Olin's top trucking companies?
A. I do not believe so. I believe it -- yes, it would have been in the top seven or eight.
Q. [redacted]

Page 427

MR. GREENWALD: Objection, calls for speculation. If you know.
THE WITNESS: I can recall articles and that being a contemporary issue during that period, yes.
BY MR. TEPE:
Q. And can you recall if at that time there was a belief that those fuel increases would still continue over the near term?
A. [redacted]
Q. [redacted]
A. [redacted]
Q. You can put that aside. Do you recall who the top trucking companies were for Owen?
A. Transwood would be the largest. Quality. L&B would have been in that group, but certainly superior was the bulk of that business. I'm sorry, Transwood was the bulk of that business.
(Olin Exhibit No. 19 was marked for identification.)

BY MR. TEPE:

Q. I'm handing to the witness what is being marked as Olin Exhibit 19. It is a document with the Bates Number OLI 133687. Mr. Gilley, if you could just take a look at that for a second.

A. Okay.

Q. Can you identify this document?

A. [redacted]

Q. [redacted]

A. Yes.

Q. [redacted]

A. Based on that, yes.

Q. You can put that aside. You had indicated earlier that Olin was able to get its trucking companies to start charging Olin a mileage based fuel surcharge, is that right?

A. Yes.

Q. Was this surcharge a surcharge that was



applicable to all of Olin's trucking companies?

A. What Olin did is, at a point in the period 2007 and '8 -- I don't know if it's applied to all trucking companies. The majority, yes.

Q. And was this a surcharge generated by Olin or something that came from the trucking companies?

A. It was Olin negotiating with carriers to begin to change and adjust the formula for fuel surcharge.

Q. And Olin asked all of its trucking companies or, excuse me, a majority of its trucking companies to charge Olin the exact same fuel surcharge, is that right?

A. What it asked them to do, in some cases we would actually go out in the trucking world, we can go out and do an RFQ or a request for a quote and we can take a piece of truck business and ask for quotes from multiple carriers.

And in that bidding process, we indicated that we needed a change in the way this is calculated as well as your ability to actually obtain business with Olin. I think by that point, the truck



transportation business had begin to felt the impact of a decline and was therefore in a better competitive position.

(Olin Exhibit No. 20 was marked for identification.)

BY MR. TEPE:

Q. I'm handing to the witness what is going to be marked as Olin Exhibit 20. It's a document with the Bates of OLI108610. There is one attachment about accessorial charges. You don't have to look at it. I'm not going to ask you about them.

A. Okay.

Q. On the second page, there appears to be an e-mail from Julia Saunders. Do you know Julia Saunders?

A. Julia is a rate manager for the truck transportation in Olin's logistics department.

Q. So is she responsible for Olin's relationship with its trucking carriers?

A. Yes.

Q. [redacted]



A. That's correct.

Q. [redacted]

A. Yes.

Q. [redacted]

A. Yes.

Q. [redacted]

MR. GREENWALD: Objection.

THE WITNESS: I'm sorry, let me read that -- I didn't read this. I'm sorry. Okay, I'm sorry.

BY MR. TEPE:

Q. [redacted]

A. [redacted]

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

Michael D. Gilley

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this 14th day of December, 2010, and executed the above certificate in my presence.

PEGGY A. DOVER STATE OF TENNESSEE NOTARY PUBLIC BRADLEY COUNTY

Peggy A. Dover

NOTARY PUBLIC IN AND FOR

Bradley County

County Name

MY COMMISSION EXPIRES: March 18, 2014

# Alderson
COURT REPORTING



Notice Date: December 8, 2010
Case Name: In re Rail Freight Fuel Surcharge Antitrust Litigation
Deponent: Michael D. Gilley 30(b)(6)
Deposition Date: 10/01/2010
Reference Number: 25310

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 313 | 6 | Oliver & Hedges | & Sullivan, LLP | Firm name change |
| 354 | 17 | objected | objecting | transcription error |
| 368 | 20 | assist | assistant | transcription error |
| 384 | 17 | but | But | capitalization |
| 405 | 14 | south | South | capitalization |
| 418 | 18 | slate transportation | Slay Transportation | capitalization/ transcription error |
| 419 | 5 | transportation | Transportation | capitalization |
| 420 | 8 | transportation | Transportation | capitalization |
| 423 | 13 | knowledge | mileage | transcription error |
| 423 | 18 | that is all | haul | transcription error |
| 424 | 16-17 | less opportunistic | less of an opportunity | transcription error |
| 427 | 19 | superior | Superior | transcription error |
| 433 | 1 | superior | Superior | transcription error |
| 445 | 1 | sets | stands | transcription error |
| 448 | 10 | files | miles | transcription error |
| 453 | 21 | breach | bleach | transcription error |

MG 12/14/10

Michael D. Gilley
Signature of Deponent

December 14, 2010
Date of Signature

03724.61402/3857599.1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

| | |
|---|---|
| In re RAILFREIGHT FUEL | : MDL Docket |
| SURCHARGE ANTITRUST | : No. 1869 |
| LITIGATION. | : Misc. No. |
| - - - - - - - - - - - - - - - X | 07-489(PLF) |

Washington, D.C.

Thursday, May 5, 2011

Videotaped deposition of WINDY L. HAMES 30(b)(6), a witness herein, called for examination by counsel for Defendants in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Skadden Arps Slate Meagher & Flom, 1440 New York Avenue, N.W., Washington, D.C., at 9:04 a.m., Thursday, May 5, 2011, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

Page 2

APPEARANCES:

On behalf of the Plaintiffs:
JOSEPH D. HAMMOND, ESQ.
MARC L. GREENWALD, ESQ.
Quinn Emanuel Urquart Oliver & Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7165
and
PAUL M. DONOVAN, ESQ.
LaRoe, Winn, Moerman & Donovan
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 298-8100

Page 3

APPEARANCES (Continued)

On behalf of Defendant CSX Transportation, Inc.:
MICHAEL W. LIEBERMAN, ESQ.
DAVID D. CROSS, ESQ.
LUKE van HOUWELINGEN, ESQ.
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2679

On behalf of the Defendant BNSF:
REBECCA VALENTINE, ESQ.
Mayer Brown
1999 K Street, N.W.
Washington, D.C. 20006
(202) 273-3208

Page 4

APPEARANCES (Continued)

On behalf of the Defendant Norfolk Southern:
SEAN M. TEPE, ESQ.
DAVID CHRISTOPHER SHOCKLEY, ESQ.
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7954

On behalf of Union Pacific:
CAROLYN A. WOODSON, ESQ.
Jones Day
555 South Flower Street
Los Angeles, California 90071-2300
(213) 489-3939

ALSO PRESENT:
MERINDA EVANS, Videographer

Page 5

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR |
| --- | --- |
| WINDY L. HAMES 30(b)(6) | DEFENDANT CSX TRANSPORTATION |
| By Mr. Lieberman | 9 |
| | DEFENDANT NORFOLK SOUTHERN |
| By Mr. Tepe | 49, 125, 262 |
| | DEFENDANT CSX TRANSPORTATION |
| By Mr. Cross | 230 |

Afternoon Session - Page 125


EXHIBITS


| HAMES EXHIBIT NO. | PAGE NO. |
| --- | --- |
| No. 1 - Notice of Deposition of Plaintiff Olin Corporation | 13 |
| No. 2 - March 6, 2006 e-mail from Amanda Davis to Windy Hames | 31 |
| No. 3 - October 7, 2003 from Jack Huh to Nancy Fugate | 51 |
| No. 4 - Document entitled (Rates), Point to Point | 55 |

Page 198

Q. And then after the invoice was received by Olin, the system would compare the fuel surcharge on the invoice with the fuel surcharge in Olin's system, is that right?
A. No. The system compares a total amount.
Q. Right. Which is calculated in part based on the fuel surcharge?
A. In part by the fuel surcharge and then the line haul.
Q. And if those total amounts match or are within the tolerance amount that you referred to earlier, the invoice gets paid?
A. That's correct.
Q. But if it's not, it gets blocked and then you or someone such as yourself would have to reconcile the discrepancy?
A. That's correct.
Q. And then once that discrepancy is reconciled, the invoice would be paid?
A. That's correct.
Q. And then --
A. Or not.

Page 199

Q. Or not. And the fuel surcharge that Olin is being charged, Olin would then try and recover that from its customers by billing them a surcharge if possible?
MR. HAMMOND: Objection to the form, beyond the scope.
THE WITNESS: Again, that is something that is negotiated with our sales department and our customers, and I'm not certain how they determined how or whom to charge the fuel surcharges back to.
BY MR. TEPE:
Q. Based on this, I guess, summary that I've just outlined, am I missing any steps that's involved for Olin to administer a rail fuel surcharge?
A. That would be for a rate-based fuel surcharge.
Q. So is that process different for mileage?
A. No, but just in the fact that the mileage is maintained for the others; the mileage is maintained for a mileage-based fuel surcharge.
Q. That's an extra aspect to it, you're saying?

Page 200

A. It's an extra piece of the puzzle.
Q. Right. Right. Are you aware of Olin ever talking to any railroad about, you know, problems or concerns it has about the administration of rail fuel surcharges?
MR. HAMMOND: Objection, beyond the scope.
THE WITNESS: I have never been involved in any discussions that have gone on between any of the railroads and anyone at Olin that I recall.
BY MR. TEPE:
Q. Have you -- aside from whether or not you were involved, have you heard of other people having such discussions with any of the railroads?
MR. HAMMOND: Same objection.
THE WITNESS: I'm not aware of anything in particular that I can recall, that -- other than the changes that have taken place already between the rate-based and the mileage-based fuel surcharges.
BY MR. TEPE:
Q. So are you saying that there was -- when there was a change from rate-based to mileage, that there was a communication between Olin and one of the

Page 201

railroads about that?
A. Well, I'm going to assume that there was some type of communication because we knew that the CSX was moving to the mileage-based fuel surcharge and we knew what software they were going to be using. [redacted] So I mean -- that type of communication. Other than that, I don't know.
Q. So there can be occasions such as this one in which Olin would discuss the administration aspects of a fuel surcharge mechanism with the railroads?
MR. HAMMOND: Objection to the form, beyond the scope.
THE WITNESS: Again, I mean, I'm not sure what communications happened but I do know that those types of things were discussed whenever the change was made from one type of fuel surcharge to another.
BY MR. TEPE:
Q. Going back to the list of job tasks which was Exhibit 2, I think, I just had a couple of

Page 202

questions on that.
A. Okay.
Q. [redacted]
A. [redacted]
Q. Is this -- what type -- is it a document? Is it a chart? Is it a map?
A. No. The routing guide is actually just another part of our system that -- it is master data that's entered, so that whenever our customer service group places an order for one of their customers, that Olin's system automatically pulls in the correct route.
Q. Okay. Underneath that, it says, "Maintain scale descriptions for rail." What is that in

Page 203

reference to?
A. Scale descriptions references the way that the rail rates and some of the truck rates were previously maintained, as -- based on a minimum and then an amount per ton over that minimum requirement. SAP has to have a scale for each minimum amount.
Q. So is that different from a flat rate?
A. Yes, that is different from a flat rate.
Q. And if I remember correctly, earlier you testified that the vast majority of the rates were flat rates for rail?
A. Over the last several years, they have migrated to the flat rate.
Q. A couple of bullets down refers to mileage allowance credits. What is that?
A. Actually, to correct my statement from before, this is not something that I currently do. I don't believe that that was actually ever transferred to me. But I believe it references the mileage credits that were given by the rail carriers. And I'm not sure -- I can't say any more on that because I'm not 100 percent sure. I don't even think that

Page 204

they do that at all anymore.
Q. Do you know what -- I mean, I'm unfamiliar with the terms so if you are, it would be great if you can enlighten me. But what does mileage allowance credit stand for, do you know?
A. Honestly, I don't know exactly what it stands for; but my understanding of what it is is a -- or what I have been told that it is is that a long time ago, whenever -- because of the fact that we used -- we ship chemicals and we have -- we purchase or lease our own cars, that we receive some sort of credit for that.
Q. For using your own railcars?
A. For using our own railcars.
Q. A couple more bullets down, it states, "Motor carrier rating." What is that in reference to?
A. It's just a -- it's a actually something that we kind of use to monitor issues or we -- I don't know that anybody maintains that any longer, but it was basically a system to try to monitor issues that we had with the different carriers.

Page 205

Q. You say issues, are you referring to anything specifically?
A. Railcars being shipped to one customer but being delivered to the wrong customer, or --
Q. I don't mean to interrupt. You said railcars. Are we talking about rail or truck?
A. Well, whenever we used it, it was -- or whenever I was a little bit familiar with it, it was more for both rail and truck; but in the case of the railroad, it was for issues along those lines.
Q. So are we talking about something to sort of track, you know, rail carrier performance?
A. Along those lines, that's correct.
Q. And what specific metrics were --
MR. HAMMOND: I'll just object as outside the scope.
THE WITNESS: Yeah, I'm really -- I really can't -- that's one of the things that I think they had intended for me to get, and I never actually maintained that myself. It was given to somebody else.
BY MR. TEPE:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------x
In Re: Rail Freight Fuel :
Surcharge Antitrust : MDL No. 1869
Litigation :
-----------------------------: Misc. No.
This Document Relates To: : 07-489 (PLF)
:
All Direct Purchaser Cases :
-----------------------------x

********HIGHLY CONFIDENTIAL*********

Washington, D.C.
Wednesday, March 10, 2010

Videotape Deposition of:

DR. HOWARD I. KAPLAN,

the witness, was called for examination by counsel for Defendant, pursuant to notice, commencing at 9:29 a.m., at the law offices of Howrey LLP, 1299 Pennsylvania Avenue, Northwest, Washington, D.C., before Dawn A. Jaques, CSR, CLR, and Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

---------------------------------------------------

DIGITAL EVIDENCE GROUP
1111 16th Street, NW Suite 410
Washington, DC 20036
(202) 232-0646



APPEARANCES:

On behalf of the Plaintiff:

STEPHEN R. NEUWIRTH, ESQ.
Quinn Emanuel Urquhart
Oliver & Hedges LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
PHONE: (212) 849-7165
FAX: (212) 849-7100
E-MAIL:
Stephenneuwirth@quinnemanuel.com

-AND-

PAUL M. DONOVAN, ESQ.
LaRoe, Winn, Moerman & Donovan
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
PHONE: (202) 298-8100
FAX: (202) 298-8200
E-MAIL: Paul.donovan@laroelaw.com



APPEARANCES (Continued):

On behalf of Defendant Union Pacific Railroad Company:

ALAN M. WISEMAN, ESQ.
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
PHONE: (202) 383-6638
FAX: (202) 383-6610
E-MAIL: WisemanA@Howrey.com

On behalf of Defendant Norfolk Southern Railway Company:

JENNIFER B. PATTERSON, ESQ.
Kaye Scholer LLP
425 Park Avenue
New York, New York 10022-3598
PHONE: (212) 836-8740
FAX: (212) 836-8689
E-MAIL: Jpatterson@kayescholer.com



APPEARANCES (Continued):

On behalf of Defendant CSX Transportation, Inc.:

SHARI ROSS LAHLOU, ESQ.
Crowell Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
PHONE: (202) 624-2679
FAX: (202) 628-5116
E-MAIL: Slahlou@crowell.com

On behalf of Defendant BNSF Railway Company:

LINDA S. STEIN, ESQ.
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
PHONE: (202) 429-8185
FAX: (202) 261-0518
E-MAIL: Lstein@steptoe.com

VIDEOGRAPHER: Billy Fahnert

Page 77

Q Okay. If you look at the first one, which is 4718, this is a shipment of acid, sulphuric acid, correct?
A Yes, that's correct.
Q And the shipper is US Magnesium from Rowley, Utah, and it's being shipped to California Steel Industries in Fontana, California, correct?
A Yes.
Q And the shipment date is May 23rd, 2003, correct?
A May 29th, 2003 is the statement date.
Q Look at shipment date, 5/28/03.
A I know it's here right in front of me. Right, okay. Yes, 5/28/03.
Q Did US Magnesium have an alternative railroad from Union Pacific to make this shipment?
A No.
Q And was a fuel surcharge charged US Magnesium on this shipment?
A It does not appear to have been charged.
Q If you turn to the next page, which is 4537, this is a shipment by US Magnesium, again to

Page 78

California Steel Industries in Fontana, with a shipment date of August 18th, 2003, correct?
A Yes.
Q And it's a shipment of chlorine; is that right?
A That is correct.
Q And on this invoice there's no fuel surcharge, is there?
A There does not appear to be any fuel surcharge on this.
Q If you turn to the next page, which is 4500, it's a shipment from US Magnesium to Thatcher Chemical Company, September 17th, 2003, of chlorine with no fuel surcharge, correct?
A I believe that's correct.
Q Could this have been shipped by truck?
A We have no capability and no equipment to be able to ship chlorine by truck.
Q Okay. If you turn to the next page, 4460, this is again a shipment by US Magnesium to Mojave, California, shipment date September 24th, 2003, of chlorine, correct?

Page 79

A September 24th, yes.
Q And there's no fuel surcharge on this shipment, correct?
A That appears to be correct.
Q And could US Magnesium have used an alternative railroad to Union Pacific for this shipment?
A No.
Q Look at the next page, 4465, which is dated shipment date September 29, 2003, a shipment by US Magnesium to Mojave, California, of chlorine, correct?
A That's correct.
Q And there's no fuel surcharge on this shipment, correct?
A That is correct.
Q And then if you go to 4424, it's a shipment date October 24th, 2003, shipment by US Magnesium to Fontana, California, of chlorine, correct?
A Yes.
Q And there's no fuel surcharge on that,

Page 80

correct?
A That is correct.
Q And could US Magnesium have used an alternative railroad to Fontana, California?
A No.
Q If you turn to 4353, which is a shipment dated November 24th, 2003, by US Magnesium to Fontana, California, of chlorine, correct?
A Yes.
Q Is there a fuel surcharge on this?
A No.
Q And if you look at 4313, it's a shipment date December 17th, 2003, US Magnesium, again to Mojave, California, of chlorine, correct?
A Yes.
Q Is there a fuel surcharge on this?
A I don't believe so.
Q Okay. You can put that aside.
(Dr. Kaplan Deposition Exhibit No. 3 was marked for identification.)
BY MR. WISEMAN:
Q I show you what's been marked as

Page 81

Deposition Exhibit 3, which are invoices from Union Pacific with the US Magnesium production numbers 4944, 4877, 4574, 4827, 4764, 4572, 4747, 4733, 4691, 4643, 4601, 4540, 4499, 4467, and these again are invoices that I've stapled together. They were produced individually.
Are these invoices that you received?
A They appear to be. I haven't had a chance to look at all of them, but --
Q Well, take a minute and look at them all.
A They all appear should be invoices sent to US Magnesium.
Q Okay, let's look at the first page. It's dated February 7, '03, and the shipper is USS Posco Industries in Pittsburgh, California, correct?
A That is correct.
Q And who is USS Posco Industries?
A A steel scrap -- a steel processing company.
Q And this is a shipment by them to

Page 82

US Magnesium in Rowley, Utah, correct?
A Yes.
Q And the shipment date is February 6th, 2003, right?
A Uh-huh.
Q You've got to be audible.
A Yes.
Q And the commodity is scrap iron?
A Yes.
Q And there is a fuel surcharge here, correct?
A There is.
Q And under the Rate column, is the fuel surcharge 2 percent?
A I believe that's what that stands for, yes.
Q Now, in connection with this transaction, was the process that US Magnesium called USS Posco to purchase scrap iron and US Magnesium arranged the transportation?
A I believe that USS Posco arranged the transportation, and the bill was sent to US Mag.

Page 83

Q So US Mag paid the transportation. It was shipped collect?
A Yes, it was.
Q Did you have any discussions with Union Pacific as to the rate that would be charged?
A I did not.
Q Look under Price Authority where it says UP 04021.
A Yes.
Q What does that refer to?
A That would refer to either a contract or a tariff rate code.
Q And so who would have arranged the transportation?
A I believe that USS Posco did.
Q Did they have discussions with US Mag as to which carrier to use?
A I do not know if this facility has an option of whom to ship through as the originating carrier, but certainly only UP would be able to deliver it to the plant, so it's natural for them

Page 84

to have chosen to ship it through the UP.
Q And did US Magnesium have any say in what it would be charged for the transportation, or is this something that you totally rely on USS Posco for?
A I believe it's something we would rely on US Posco.
Q Did USS Posco have any assignment that they were supposed to get the lowest possible rate?
A I don't know the answer to that.
Q Was there any discussion -- strike that.
Was there an alternative in using truck to ship scrap iron from Pittsburgh, California, to Rowley, Utah, of scrap iron?
A Yes.
Q Who would have investigated whether truck was a better alternative?
A Our purchasing people who placed the order would be responsible for that.
Q So your purchasing -- your purchasing people would direct USS Posco as to whether to use

next exhibit.
(Dr. Kaplan Deposition Exhibit No. 20 was marked for identification.)
BY MR. WISEMAN:
Q I show you what's been marked as Deposition Exhibit 20, which has the US Magnesium number 005667 and 5668, which appears to be an e-mail stream in November 2004 involving you and UP; is that correct?
A Yes, that's correct.
Q And can you tell me what this is about?
A As in virtually every year that we have been doing business with the UP under my tenure, we get together in one form or another in November or December to discuss our contract for the coming year, which were always at that time multiple year -- single-year contracts.
And, as always, we have a bit of a mating dance where they propose what they would like to see, and we propose what we'd like to have, and we eventually meet somewhere and resolve the base rate.



The exception is that with the beginning of this year, at the end of the usual negotiations, a fuel surcharge was added on without any recourse on the part of US Magnesium.
Q Did you complain to the STB?
MR. NEUWIRTH: Asked and answered.
THE WITNESS: We did not complain to the STB. This is unregulated traffic.
BY MR. WISEMAN:
Q Under a 10709 contract?
A I do not know what a 10709 contract means.
Q It was pursuant to a contract, right?
MR. NEUWIRTH: Objection to the form of the question.
THE WITNESS: I'm not sure I understand what you're asking.
MR. WISEMAN: Let's mark this as the next exhibit.
(Dr. Kaplan Deposition Exhibit No. 21 was marked for identification.)
BY MR. WISEMAN:



Q I show you what's been mark as Deposition Exhibit 21, which is an e-mail stream that has the US Magnesium production numbers 00673 --
A 6753.
Q -- 6754 -- I mean, 6753, 6754, and 6755. Is that right?
A That's correct.
Q And who is John Gutkowski?
A He is an employee of a company called Eaglebrook who is involved in the production and distribution of some water treatment chemicals, such as ferrous chloride and ferric chloride.
Q And what is this e-mail stream about?
A This relates to some freight costs, historic and forward looking, related to possible shipments of ferrous and ferric chloride and hydrochloric acid to various locations.
Q Were you being asked to get freight rates on this?
A No. During this time, US Magnesium was part of a joint venture with a company that was



known at the time as Kemiron, later Kemira Waters, and the joint venture was called Kem-Mag, and Kem-Mag was a production and distribution and sales company for iron salts throughout the Western United States.
US Magnesium was the production arm, Kemiron was the marketing and sales and distribution arm, and Kemiron negotiated all of the freight rates --
Q And how do you spell Kemiron?
A -- for the joint venture.
Q How do you spell --
A K-E-M-I-R-O-N.
Q And was there another name you mentioned?
A Later they became a company called -- became part of a company called Kemira Waters.
Q How do you spell that?
A K-E-M-I-R-A, new word, Waters.
Q Well, in this e-mail dated March 11, 2005, in the middle of the first page --
A Yes.

Page 157

Q -- John Gutkowski, that's G-U-T-K-O-W-S-K-I, it says, "At this time most of the class 1 carriers (NS, CSX, CN, UP) are pricing moves for SOME corridors at high rates due because their traffic volumes exceeding what the operations can handle. They are trading low margin traffic for high margin. The UP has been quite stubborn in this area."

Are you familiar with that?

A Am I familiar with the e-mail?

Q Are you familiar with the issue of traffic volumes exceeding what the operations can handle?

A There were periods in this time frame where we did see that. We were affected by the UP not adequately preparing for volumes and having problems with power and employees, but our relationship was primarily with the UP, not with the other railroads, as we didn't use them very much, so I can only speak for our relationship and knowledge with respect to the UP around that time frame.

Page 158

Q And UP was having traffic volumes that exceeded what their operations could handle about that time?

A The UP publicly admitted having tremendous issues around that time, as did the other railroads, with training of people and power during those time frames, and they were having problems with those issues affecting their service.

Q And you experienced those problems?

A We experienced service problems on a sporadic basis on and off during those times, yes.

Q And those times, you're referring to when?

A In the 2003 to 2006 time frame.

MR. WISEMAN: Let's mark this as the next exhibit.

(Dr. Kaplan Deposition Exhibit No. 22 was marked for identification.)

BY MR. WISEMAN:

Q I show you what's been marked as Deposition Exhibit 22, which is an e-mail dated

Page 159

May 4th, 2005, with the US Magnesium production number 005681; is that correct?

A Yes.

Q And what's this e-mail about?

A This was -- this was in response to a request for a rate for chlorine to go to Columbia Junction, Washington, and the response is from Mr. Massara, which I believe was a marketing/commercial fellow that worked above Bill Denker, giving us the rate for this movement.

Q But it included an HDF surcharge?

A Yes.

Q And did you accept this rate and surcharge?

A I believe that this is the rate that goes with one of the contracts we looked at earlier, and we had no choice but to accept the fuel surcharge, which was put on at the end.

Q And you didn't complain to the STB over it, right?

A We did not complain to the STB.

Q Did you read the complaint filed by

Page 160

US Magnesium before it was filed?

A Yes.

Q Did anyone who was an employee of US Magnesium read it?

A A copy was given to our president to review.

Q Did he review it?

A I cannot necessarily speak for whether he read every word or not.

Q Did you have any discussions with him?

A Yes.

Q Did US Magnesium ever have a long-term contract of three, four, five or more years?

A Through the entire period, no. It was always one year. Requests for multiple year contracts were always denied historically.

Q So you never had one?

MR. NEUWIRTH: Asked and answered.

MR. WISEMAN: All right. I believe I may just about be finished if you want to take a five-minute break.

MR. NEUWIRTH: Sure.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------X
In Re: Rail Freight Fuel :
Surcharge Antitrust Litigation,: Case No.
-------------------------------X 1:07-mc-00489-PLF

VIDEOTAPED 30(B)(6) DEPOSITION OF DUST PRO, INC.
THROUGH LOUIS SNOW

Washington, D.C.
Friday, June 4, 2010
9:07 A.M.
Reported by Marijane Simon, RDR, CLR

---------------------------------------------------

DIGITAL EVIDENCE GROUP
1299 Pennsylvania AVe NW, Suite 1130E
Washington, DC 20004
(202) 232-0646



Friday, June 4, 2010
9:07 A.M.

Videotaped 30(b)(6) Deposition of DUST PRO, INC., through LOUIS SNOW, held at the offices of Howrey LLP, 1299 Pennsylvania, Avenue, NW, Conference Room 2G, Washington, D.C., 20004, pursuant to notice, before Marijane Simon, a Registered Diplomate Reporter, Notary Public of the District of Columbia.



APPEARANCES:

For the Plaintiffs:
STEPHEN H. NEUWIRTH, ESQ., and
SAMI R. RASHID, JR., ESQ., and
JOSEPH D. HAMMOND, ESQ.
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
(212) 849-7111 (Fax)
stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com
josephhammond@quinnemanuel
Also for the Plaintiffs:
PAUL M. DONOVAN, ESQ.
LaROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue, Suite 200
Washington, DC 20036
(202) 298-8100
(202) 298-8200 (Fax)
paul.donovan@laroelaw.com



APPEARANCES (Continued):

For Defendant UNION PACIFIC RAILROAD:
THOMAS A. ISAACSON, ESQ.
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
(202) 383-6558
(202) 383-6610 (Fax)
isaacsont@howrey.com

For Defendant NORFOLK SOUTHERN RAILROAD:
JEFFREY SALTMAN, ESQ.
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005-2327
(202) 682-3507
(202) 414-0308 (Fax)
jsaltman@kayescholer.com

APPEARANCES (Continued):

For Defendant CSX:
MIKE LIEBERMAN, ESQ.
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2500
(202) 628-5116 (Fax)
mlieberman@crowell.com

ALSO PRESENT:
Billy Fahnert, Videographer, Digital Evidence Group



I N D E X


| EXAMINATION OF LOUIS SNOW | PAGE |
|---|---|
| BY MR. ISAACSON | 9 |


DUST PRO EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | "AMENDED NOTICE OF DEPOSITION TO PLAINTIFF DUST PRO, INC." | 8, 11 |
| 2 | Chronological compilation of invoices, not in Bates-number order | 21 |
| 3 | Google Earth map with enhancements | 32 |
| 4 | Letter, 8/23/05, J. Snow to Young | 37 |
| 5 | "Informal rate complaint and request for Mediation by Dust Pro regarding Union Pacific Railroad rate increases of 50 percent on magnesium chloride and Lignin Liquor," DUS000336 - 352 | 59 |




I N D E X (Continued)

DUST PRO EXHIBITS


| No. | Description | Page |
|---|---|---|
| 6 | Letter, 2/25/05, McBride to STB, DUS000334 - 335 | 62 |
| 7 | "SELECTIVE RATE INCREASE," DUS000363 | 63 |
| 8 | "TIMELINE," 4/25/05 DUS000574 - 575 | 65 |
| 9 | Letter, 1/5/06, Union Pacific to STB, DUS000295 - 297 | 72 |
| 10 | "SETTLEMENT AGREEMENT AND RELEASE," DUS000308 -310 | 74 |
| 11 | Excerpt, rough-draft transcript, Gordan Rausser, Ph.D., 6/3/10 | 82 |




P R O C E E D I N G S

* * * * *

(The reporter marked Exhibit 1.)

THE VIDEOGRAPHER: We are on the record. This is the 30(b)(6) deposition for Dust Pro, Inc. My name is Billy Fahnert. I am the videographer here today. The court reporter is Marijane Simon. We both represent Digital Evidence Group which is located in Washington, D.C.

This deposition is being recorded in the matter of Rail Freight Fuel Surcharge Antitrust Litigation in the United States District Court for the District of Columbia, Case No. 1:07-mc-00489-PLF. Today's date is June 4, 2010. The time on the video camera is 9:07 a.m.

Will counsel please identify yourselves for the record. Then the witness may be sworn in.

MR. NEUWIRTH: Stephen Neuwirth from Quinn Emanuel Urquhart & Sullivan representing plaintiffs.

MR. RASHID: Sami Rashid from Quinn Emanuel Urquhart & Sullivan representing the

Page 45

product from Conalco, Tennessee to Memphis where it was then switched to Union Pacific?
A. That's correct. I did not know.
Q. Now, Dust Pro would have known from the invoices that IP was using CSX; correct?
A. That's correct.
Q. Did you ever ask -- Did Dust Pro ever ask Union Pacific to see whether there was an alternative to using CSX for the eastern portion of the shipment?
A. No.
Q. Okay. Why not?
A. We didn't feel like it was our position. Our serving railroad was UP Railroad.
Q. Are either lignin sulfonate or magnesium chloride toxic?
A. Not to my knowledge.
Q. Are there any special-handling requirements for carrying those products by rail?
A. The lignin sulfonate is produced from a pulping process at high temperatures. And the lignin itself is very high in viscosity, so as

Page 46

temperatures drop, viscosity increases, so it was very important for us that once the railcar was loaded with lignin at a high temperature, that we receive that product as quickly as possible to avoid it increasing in viscosity to a point where we could not get it offloaded.
Q. In, sort of, layman's terms, if the product cooled too much, it would solidify to the point where you couldn't get it out of the railcar?
A. Yes.
Q. Okay. How quickly in time did the product need to get from Conalco, Tennessee, to Dust Pro's facility to avoid that problem?
A. Depends on the loading temperature, but best case, we could offload it. If it was -- If it was from the day it was loaded to the day it was offloaded within a week that, would have been great.
Q. Does it depend whether it's winter or summer?
A. Yes, it does.
Q. And were there any special-handling needs associated with magnesium chloride shipments?

Page 47

A. Not really.
Q. How did Dust Pro get its prices from Union Pacific?
A. Are you asking how did we receive the freight bills?
Q. No. I meant: How did you -- Did you call them up and ask for a price? Was it on a website? Did you negotiate it? What was the process by which the price was arrived at?
A. Well, as I mentioned earlier, the initial pricing was conveyed from the previous railroad that had served us which was Southern Pacific Railway, so we were working off of that pricing structure. If you're asking how that we -- if we wanted to try to get a shipment to another location or something, we would, I -- And I wasn't involved in that. My wife did most of that, but I think basically what she would do -- would -- would send a fax or pick up the phone and ask for a freight rate from UP to that specific destination.
Q. For shipments to Dust Pro's own location, the pricing structure that existed up until the time

Page 48

of Dust Pro's liquidation was the same pricing structure that had existed from the days when the rail freight was handled by Southern Pacific?
A. I believe so.
Q. Dust Pro never contacted Union Pacific to ask for a different pricing structure?
A. If we did, I -- I was not aware of that specific request.
Q. Who was Dust Pro's contact person at Union Pacific?
MR. NEUWIRTH: Object to the form of the question.
THE WITNESS: Regarding what?
MR. ISAACSON: Freight -- Rate issues. Excuse me.
MR. NEUWIRTH: Object to the form of the question.
THE WITNESS: Dust Pro had many contacts. Initially, we were assigned a marketing rep that worked for Union Pacific that was based in Phoenix. I do not recall her name. I think it's in your documents. She was our lead contact. As we got

Page 49

into these situations with the railroad, we had different individuals we talked to.

BY MR. ISAACSON:

Q. What was Dust Pro's understanding of the capacity situation facing Union Pacific in the Phoenix area?

MR. NEUWIRTH: Object to the form of the question. Lack of foundation.

THE WITNESS: Dust Pro had to run their business. And Dust Pro was concerned about getting loads on a timely basis. As far as what the market conditions were in that Phoenix area with other shippers, we paid attention to what we had to do, and we really didn't get involved in what their overload situation was for the railroad other than the fact is that we would many times not receive shipments timely. For what reason, we didn't know.

BY MR. ISAACSON:

Q. So whether UP was or was not facing tight capacity in the Phoenix area would not have been something that Dust Pro would -- would have known about?

Page 50

A. Well, I'm -- I'm -- I'm sure, on some occasions, there were conversations, probably from UP, to our people saying that they were short on power units. In one case, we had railcars setting within a hundred yards of our facility that were cooling down that were loaded -- we were trying to get offloaded. The railroad had no power units, no locomotives, and we were told -- I remember this conversation -- of which that UP had to bring a locomotive from Tucson so they could switch our car that was a hundred yards away. So that might have been one of those conversations that we had as far as them having issues.

Q. Approximately when did that event occur?

A. I don't recall.

Q. Is it in the 2003-to-2005 timeframe --

A. Yes.

Q. -- or earlier?

Did the service quality change with UP at some point during Dust Pro's history?

A. Service quality constantly changed.

Q. Sometime -- Sometimes better, sometimes

Page 51

worse?

A. Absolutely.

Q. Okay. It was not a steady improvement or steady deterioration?

A. Not at all.

Q. When did Dust Pro first pay a fuel surcharge to Union Pacific?

A. Your documents show -- I think it's in the year of 2004. It's in your documents. I -- I can't give you a specific date.

Q. Could you look at this stack of invoices that was marked as Exhibit 2.

A. Okay.

Q. Do you see the -- the first one?

A. Is it 122?

Q. Yes.

A. Okay.

Q. Yes, Bates number 122.

Now, is this an invoice from Union Pacific with a shipment date of June 27, 2003?

A. Correct.

Q. This is from Inland Paper to Dust Pro?

Page 52

A. Correct.

Q. And do you see that there's a fuel surcharge on this shipment?

A. I do.

Q. To Dust Pro's knowledge, did the price authority under which this fuel surcharge was calculated -- did that price authority change between June 27, 2003 and the last shipment received by Dust Pro --

MR. NEUWIRTH: Objection.

BY MR. ISAACSON:

Q. -- prior to its liquidation?

MR. NEUWIRTH: Objection to the form of the question and a lack of foundation as to "price authority."

THE WITNESS: We -- We had no -- I can't give you a response to that, no. We had no knowledge.

BY MR. ISAACSON:

Q. So -- So if you could look at the last page of this set --

A. Page number what? 323?

Q. 324 is the last page in mine; hopefully, also in yours.
A. Okay. Yeah.
Q. Do you see the reference -- It's on the left side of the page, two-thirds of the way down, to "CSXT 3000"? It's under "Additional Information" in the box.
A. Oh, I see it, yes. Yes.
Q. Okay. Do you see that reference to "CSXT 3000"?
A. Yes.
Q. And if you could go back to the first one that we were looking at, the June 27, 2003 invoice --
A. Okay.
Q. Okay. Do you also see the reference there to "CSXT 3000"?
A. Yes.
Q. Does Dust Pro have any basis to know one way or the other whether the fuel surcharge formula under CSXT 3000 that governed the June 27, 2003 shipment was different than the fuel surcharge



formula that was -- governed the March 17, 2005 shipment?
A. No.
Q. The fuel surcharge on the first page with Bates number 122 for the June 27, 2003 shipment -- do you see that?
A. Yes.
Q. Now, that surcharge was calculated as a percentage of the base rate; correct?
A. I have no idea how it was calculated.
Q. Do you see the -- under the column "Rate" -- it says "240"?
A. Okay.
Q. And do you see the abbreviation "PW"?
A. Yes.
Q. Okay. And do you know what the abbreviation "PW" stands for?
A. No.
Q. Okay. Could you look at -- It's -- I believe it's the seventh page of this set. It's got -- It has Bates number 223.
MR. NEUWIRTH: 223?



MR. ISAACSON: Yes.
THE WITNESS: Okay.
MR. NEUWIRTH: I don't have that document.
MR. ISAACSON: It should be after 0036.
MR. RASHID: It's out of order.
MR. NEUWIRTH: Oh, oh, oh, oh, oh.
(Mr. Rashid and Mr. Neuwirth conferred.)
MR. RASHID: Second page.
MR. NEUWIRTH: I'm sorry.
BY MR. ISAACSON:
Q. Do you see, about two-thirds of the way down this page, it says "RATE CODE" on the left-hand side.
A. Yes.
Q. Okay. And do you see where it says "PW = PER CENT"?
A. Yes.
Q. Okay. Now, going back to the first page, the shipment for June 27, 2003, you see it also says "PW"?
A. Yes.



Q. Okay. And -- I can certainly hand you a calculator or represent to you that $118.00 is 2.4 percent of 4912?
A. Okay. I believe you.
Q. Okay. So based on that, is it fair to say that the fuel surcharge on the June 27, 2003 shipment was 2.4 percent of the base rate?
A. If that calculation is correct, yes.
Q. Okay. Could you turn to -- Let's see -- one, two, three, four, five, six, seven -- I believe it's the ninth page. It has Bates number 178.
A. I'm there.
Q. Okay. And this is a shipment in June 2004. And do you see that Union Pacific's rate is 4.5 percent?
A. Yes.
Q. And the next page from CSX, do you see that the waybill date is June 15, 2004?
A. Wait. You say the next -- The next one is CSX? Is that what you're reading --
Q. Right. CSX.
A. -- referring to?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X
In re RAIL FREIGHT FUEL : MDL Docket
SURCHARGE ANTITRUST : No. 1869
LITIGATION. : Misc. No.
- - - - - - - - - - - - - - - X 07-489(PLF)

Washington, D.C.
Friday, April 16, 2010

Videotaped 30(b)(6) deposition of EFSTRATEOS JAY STRATES, a witness herein, called for examination by counsel for Defendant CSX Transportation, in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Crowell & Moring, 1001 Pennsylvania Avenue, N.W., Washington, D.C., at 9:45 a.m., Friday, April 16, 2010, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs:
JOSEPH D. HAMMOND, ESQ.
Quinn Emanuel Urquhart Oliver & Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7165
and
STEVEN A. KANNER, ESQ.
Freed Kanner London & Millen
2201 Waukegan Road, Suite 130
Bannockburn, Illinois 60015
(224) 632-4500
and
JOSHUA D. SNYDER, ESQ.
Boni & Zack
15 St. Asaphs Road
Bala Cynwyd, Pennsylvania 19004
(610) 822-0203



APPEARANCES:

On behalf of the Plaintiffs (cont.):
ROBERT G. EISLER, ESQ.
Hausfeld, LLC
1604 Locust Street
Philadelphia, Pennsylvania 19103
(215) 985-3278

On behalf of the Defendant Norfolk Southern:
MARGARET PRYSTOWSKY, ESQ.
Kaye Scholer
425 Park Avenue
New York, New York 10022-3598
(212) 836-8740



APPEARANCES:

On behalf of Defendant CSX Transportation, Inc.:
DAVID D. CROSS, ESQ.
MATTHEW F. SCARLATO, ESQ.
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2679

On behalf of the Defendant Union Pacific:
PETER A. BARILE, III, ESQ.
Howrey
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402
(202) 383-6941

ALSO PRESENT:
JASON LEVIN, Videographer

Page 169

agreed to by NS and the Show Company acknowledges a lower rate? Do you see that in the contract?
A. Where does that say that?
Q. "In consideration of the lower rate hereinafter named, the parties contract as follows." It's the paragraph just above Roman Numeral I. Do you see that?
A. Yes.
Q. Who at the company would know about that? Bill Alford again?
A. Possibly. I don't know.
Q. You don't know whether he knows or you don't know whether anyone else would know?
A. I doubt they'll have any information on it.
Q. Who is they?
A. Anyone. Bill Alford or anyone.
Q. If you turn to the page ending in Bates Number 1411, you'll see where it says "move segment." Do you see that column?
A. Yes.
Q. And the first move segment identified

Page 170

says -- and this is dated 9/5/2001 and it shows a number of cars, 53, and the move segment is from CSXT interchange at Buffalo, New York, to storage in Anderson, South Carolina. Do you see that?
A. Yes.
Q. So is this an example of the Strates Shows train moving on both the CSXT and the NS railroad on a particular route? It's moving from CSX to NS, right?
A. Well, it's where -- I guess my understanding would be they're picking it up from CSX and then delivering it down to Anderson, not -- that's where the handoff point is.
Q. Right. And they being NS. NS is picking up the train from CSXT at the handoff point, right?
A. Right.
Q. Did you have any understanding as to how CSXT and NS would work out the details of that exchange?
A. No. I'm aware that they do -- they each -- when they pick your train up, they do their own inspection of the train before they'll take it.

Page 171

Q. Do you have any understanding as to whether they have to communicate with one another as they handle that exchange?
A. I don't know the details of it.
Q. Would you expect them to have to talk to each other to figure out that exchange?
A. I would hope.
Q. If you turn to the last page of Exhibit 5, it says at the top, "Addendum to contract NS-C-18367." Do you see that? It's the very last page. Do you see that?
A. Yes.
Q. It begins, "In the event the price that West Texas Intermediate Crude Oil, as published in the Wall Street Journal, exceeds $28 per barrel for 30 executive days, NS retains the right to apply a fuel surcharge to the freight charges contained in this authority in effect on the date the fuel surcharge is applied, hereinafter referred to as the base freight charges." Do you see that?
A. Yes.
Q. And this is the contract that was entered

Page 172

into in August of 2001, right?
A. Yes.
Q. Does this refresh your recollection that at least as of August 2001, Strates Shows was paying NS a fuel surcharge?
MR. SNYDER: Objection to form.
THE WITNESS: It appears that way. I would have to see the actual invoice to verify it, but yes.
BY MR. CROSS:
Q. Well, does it refresh your recollection that as of this time, August of 2001, Strates Shows at least had agreed to pay NS a fuel surcharge for rail shipments?
MR. SNYDER: Object to form.
THE WITNESS: Yes.
BY MR. CROSS:
Q. Do you have any reason to believe that Strates Shows did not pay a fuel surcharge pursuant to this contract with NS?
A. No.
(Strates Exhibit No. 6 was

Page 173

marked for identification.)

BY MR. CROSS:

Q. Mr. Strates, you've been handed Exhibit 6 which has Bates Number beginning STR001455 and the last page is numbered 1458. It's a letter from E. James Strates to Mr. Ward of CSX dated July 1, 2002. Do you recognize Exhibit 6?

A. Vaguely, yes.

Q. What do you recognize it to be?

A. A letter that was related to insurance requirements that were imposed by CSX.

Q. You've seen this before?

A. Yes, a long time ago.

Q. Is it fair to say that this letter reflects negotiations between Strates Shows and CSX Transportation concerning the issues identified in the letter with respect to a contract?

MR. SNYDER: Objection to form, vague and ambiguous.

THE WITNESS: I believe it would be better to characterize it as a letter complaining about unrealistic requirements.

Page 174

BY MR. CROSS:

Q. What requirements did Strates Shows think were unrealistic at this time?

A. Let me go through the document because I don't remember the specifics.

Q. And while your reviewing it, just to make this easy, I'll ask you whether you see any complaints about or reference to the rate charged by CSXT for a fuel surcharge. You can take your time.

A. Okay. Question?

Q. Yes. So it looks like you just reviewed the document. Did you see any complaint from Strates Shows about the rate that CSX was charging Strates Shows to move its train?

A. No.

MR. SNYDER: Objection to form.

THE WITNESS: This is a letter about insurance requirements.

BY MR. CROSS:

Q. Did you see any complaint about a fuel surcharge?

A. No.

Page 175

Q. And is it fair to say that this letter concerned, as you just put it, insurance requirements, this complaint about insurance requirements that CSXT wanted in a contract with Strates Shows?

MR. SNYDER: Objection to form.

THE WITNESS: I think they had sent a contract with the requirements in it and this was the response to receiving that contract.

BY MR. CROSS:

Q. And the response was to attempt to negotiate with Strates Shows, so as not to have to agree to those terms, right?

MR. SNYDER: Object to the form, vague and ambiguous.

THE WITNESS: Especially on this issue, the term negotiate is just ridiculous. It even references in the letter -- basically it's always coercion, in my opinion. It comes down to we're not going to move your train unless you agree to whatever. That's our experience in a nutshell. So, I mean, that's just what it comes down to.

Page 176

BY MR. CROSS:

Q. Isn't it true that all the railroads that moved the Strates Shows train required a certain level of insurance?

A. Yes.

Q. So they weren't going to move the train, they weren't going to have a contract with Strates Shows without a certain amount of insurance, correct?

A. Yes.

Q. The railroads you guys used included short line railroads, correct?

A. Yes.

Q. If you turn to page 3 of Exhibit 6, do you see under term and termination in paragraph 9?

A. Yes.

Q. There is a sentence that reads -- the first sentence of the paragraph immediately under that heading reads, "We have, on many occasions, requested CSXT to agree to an annual contract term, rather than a contract based on the movement dates (our current contract term is February 2002 to December 2002)." Do you see that?

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

E Jay Strates

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this 8th day of June, 2010, and executed the above certificate in my presence.

Kathleen M Mauser

NOTARY PUBLIC IN AND FOR

Kathleen M. Mauser, Notary Public
☒ Personally Known (OR)
☐ Produced Identification

( Type of identification produced )

Orange County, Florida

County Name

MY COMMISSION EXPIRES:

NOTARY PUBLIC STATE OF FLORIDA
KATHLEEN M. MAUSER
MY COMMISSION # DD775622
EXPIRES: June 10, 2012
1-800-3-NOTARY Fl. Notary Discount Assoc. Co.