# Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment

# Volume 28 of 29

# DA06819 - DA07103

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE: | : | Miscellaneous No. 07-489 |
| | : | |
| RAIL FREIGHT SURCHARGE | : | October 7, 2010 |
| ANTITRUST LITIGATION | : | |
| MDL NO. 1869 | : | 9:11 a.m. |
| . . . . . . . . . . . . . . . . . | : | . . . . . . . . . . . . . . |

TRANSCRIPT OF CLASS CERTIFICATION HEARING
DAY 2
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs: | MICHAEL D. HAUSFELD<br>STEIG D. OLSON<br>HAUSFELD LLP<br>1700 K Street, NW<br>Suite 650<br>Washington, DC 20006<br>(202) 579-1089 |
| | STEPHEN R. NEUWIRTH<br>RICHARD I. WERDER, JR.<br>QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP<br>51 Madison Avenue<br>22nd Floor<br>New York, NY 10010<br>(212) 849-7000 |
| For Defendant BNSF Railway Company: | GARY A. WINTERS<br>RICHARD J. FAVRETTO<br>MAYER BROWN LLP<br>1999 K Street, NW<br>Washington, DC 20006<br>(202) 263-3273 |
| | SAMUEL M. SIPE , JR.<br>STEPTOE & JOHNSON, LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC 20036<br>(202) 429-6486 |

For Defendant
CSX Transportation, Inc.:

SHARI ROSS LAHLOU
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2679

For Defendant
Norfolk Southern Railway
Company:

SAUL P. MORGENSTERN
MARGARET A. PRYSTOWSKY
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000

JOHN MURRAY NANNES
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
1440 New York Avenue, NW
Washington, DC 20005-2111
(202) 371-7500

For Defendant
Union Pacific Railway
Company:

ALAN MITCHELL WISEMAN
THOMAS A. ISAACSON
HOWREY, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004 -2420
(202) 383-6638

Court Reporter:

REBECCA STONESTREET, RPR,CRR
Official Court Reporter
Room 6511, U.S. Courthouse
Washington, D.C. 20001
(202) 354-3249

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

incremental increase in the cost of fuel.

And then they go on to say: "Rail rates have increased rapidly since 2004." Rail rates have increased. If there was discounting for the fuel surcharge in the base rate, then the all-in rate, the one plus two, would still have equalled one or wouldn't have gone up. But rail rates went up, resulting in a surge of railroad profitability. "The increase reflects not only increased rail costs, but aggressive pricing and over-recovery of fuel costs. Fuel surcharges seemingly should reimburse railroads for the increase in fuel costs, not be sources of additional revenue." That is the object of this case, whether or not these coordinated, synchronized fuel surcharges were really pretexts for recovering additional revenue over and above actual fuel costs.

And in fact, as Mr. Neuwirth pointed out moments ago in Tab 18, the railroads themselves knew that. In Tab 18, the revenue car increases that they saw were coming from fuel surcharges. The fuel surcharge program drove the revenue per unit across all major markets: "Record revenue levels in 2006 in all our six commodity groups, primarily driven by better pricing and fuel surcharges." Well, if this was an imaginary world, then this was a world that the railroads imagined and made real. Because this is not what they intended, this is what they did and this is what the effect was.

And that gets me to what I call my three principles in

determining whether class certification is appropriate. The defendants had motive. They were, as pointed out yesterday by Mr. Neuwirth, facing declining revenues over a long period of time. They were also faced, beginning in 2003, with fuel costs gone wild. They couldn't eat those fuel costs. They needed to pass them on.

Well, that gets me to point two. They saw the opportunity. The opportunity was: There's not much choice; if we all stick together, the shippers will pay what we tell them they have to pay, and we can recover over and above our actual fuel costs, and we can increase our profitability. We can break the structural relationship between fuel costs and base rates; we separate it and we just charge them more and tell them it's non-negotiable.

And then the third leg, or the third principle: Mechanism. Motive, opportunity, and mechanism. The mechanism, as the defendants themselves noted, as the board noted, as the DOT and the USDA noted, was the coordinated, synchronized, standardized fuel surcharge formula. It was simple, it was easy: Charge it, they pay it, collect it.

The defendants state at page three and four of their brief that for purposes of class certification, the court may preliminarily inquire into the merits to, quote, "identify the nature of the issues that actually will be presented at trial, and test whether those issues are susceptible of class-wide

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 1 of 23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates To:<br><br>ALL DIRECT PURCHASER CASES | |

MEMORANDUM OPINION

Case 1:07-mc-00489-PLF-JMF Document 334 Filed 11/17/11 Page 3 of 23

## INTRODUCTION

Now pending before the Court is Defendants' Motion to Compel Answers to Defendants' Interrogatories and Requests for Admissions and Memoranda in Support Thereof [#506]. Defendants have moved to compel plaintiffs to rectify claimed deficiencies in the responses to seven interrogatories and nine requests for admissions. For the following reasons, the motion will be granted in part and denied in part.

## I. Procedural History

The parties were engaged in discovery for nearly two years and exchanged millions of pages of documents and deposed dozens of individuals. Near the end of discovery, on October 20, 2010, defendants served upon plaintiffs interrogatories and requests for admissions. [#506] at 3. Plaintiffs initially responded on November 30, 2010, referencing an "84-page Narrative Factual Statement" ("narrative") for a number of their responses. Id. Defendants objected to this form of response and, after consultations between the parties, plaintiffs supplemented their responses on February 8, and May 11, 2011. Id. Defendants still take issue with the form and substance of the responses and have filed this motion to compel to rectify these perceived deficiencies. Id. at 4.

## II. Defendants' Arguments

### A. Defendants' Specific Interrogatories and Plaintiffs' Responses

Defendants have moved the Court to compel plaintiffs to respond to nine of the interrogatories, arguing that the substance and form of the responses are either insufficient or do not conform to Rule 33 of the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 33 provides that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3). The answer must be "true,

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 4 of 23

explicit, responsive, complete, and candid." Equal Rights Ctr. v. Post Props., Inc., 246 F.R.D. 29, 32 (D.D.C. 2007) (quoting Hansel v. Shell Oil Corp., 169 F.R.D. 303, 305 (E. D. Pa. 1996)). As this Court has previously held, "interrogatories are not only an information gathering tool, but also an opportunity to require one's opponent to state its position on an issue in controversy in writing and under oath." Covad Comnc'ns Co. v. Revonet, Inc., 258 F.R.D. 7, 20 (D.D.C. 2009).

1. CSXT Interrogatory 5

In CSXT Interrogatory 5, defendants asked that plaintiffs identify "each communication among or between any two or more entities or persons that plaintiffs contend, 'standing alone, itself constitutes an unlawful agreement.'" [#506] at 6. Plaintiffs refused to answer this interrogatory "on the ground[s] that it calls for legal analysis by [p]laintiffs' counsel" and "impermissibly calls for attorney work product." [#506-8] at 99-100. In the motion to compel, defendants argue that under Rule 33 of the Federal Rules of Civil Procedure, such "contention interrogatories" are permitted. [#506] at 6. Plaintiffs insist, however, that during meet and confers held to resolve their differences it has become clear that defendants are demanding that plaintiffs sort their evidence into direct and circumstantial evidence and that the distinction between those two types of evidence is considered by courts to be meaningless. They rely on United States v. MD & Va. Milk Prod. Assoc., 22 F.R.D. 300, 301 (D.D.C. 1958) and Kendrick v. Sullivan 125 F.R.D. 1, 2 (D.D.C. 1989), rev'd on other grounds, 487 U.S. 589 (1988), which they insist hold that, while interrogatories may legitimately require a party to specify its contentions, they may not seek disclosure of their legal theories. Plaintiffs' Opposition to Defendants' Motion to Compel Answers to Interrogatories and Requests for Admission [#510] at 11. They further point to Kendrick's permitting a party to ask whether it contended certain

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 5 of 23

portions of governmental guidelines were unlawful and why, but not permitting a party to ask whether, if any portion of the guidelines were unconstitutional, the remaining portions of the regulatory scheme were severable. [#510] at 11-12.

Rule 33 permits interrogatories that "[ask] for an opinion or contention that relates to fact or the application of law to fact." Fed. R. Civ. P. 33(a)(2). "Contention interrogatories" that ask a party what it contends or to state all the facts upon which it bases a contention are perfectly legitimate. Barnes v. District of Columbia, 270 F.R.D. 21, 24 (D.D.C. 2010) (quoting Everett v. USAir Group, Inc., 165 F.R.D. 1, 3 (D.D.C. 1995)) (Facciola, J.). Indeed, the advisory committee note to Rule 33 indicates that contention interrogatories "can be most useful in narrowing and sharpening the issues, which is a major purpose of discovery." Barnes, 270 F.R.D. at 24 (quoting Fed. R. Civ. P 33 advisory committee's note (1970)).

In Barnes, I quoted the decision in King v. E.F. Hutton & Co., 117 F.R.D. 2, 5 n.3 (D.D.C. 1987), which also rejected the argument, made again here, that answering a contention interrogatory invades the work product privilege because it requires a party to confirm a contention or explain how certain facts support a contention. In King, Judge Burnett stated:

> [I]n answering contention interrogatories the party is only giving the factual specifics which the party contends supports a claim, and this in no way impinges on the attorney's impressions or analysis as to how the attorney will endeavor to apply the law to the facts. If this elementary principle were not applicable, contention interrogatories would not exist.

King, 117 F.R.D. at 5 n.3. See Oklahoma v. Tyson Foods, Inc., 262 F.R.D. 617, 630 (N.D. Okla. 2009) ("Rule 33 expressly permits contention interrogatories that delve into opinion work product."). Thus, any broad claim that an interrogatory is impermissible because it probes a

Case 1:07-mc-00489-PLF-JMF Document 334 Filed 11/17/11 Page 6 of 23

party's contentions as to how the law applies to the facts is wrong. Such probing is perfectly permissible and does not invade the work product privilege merely because the party's counsel must disclose the reasoning applying the law to the facts. Thus, and whatever may have happened during the meetings among counsel, I read defendants' interrogatory to be demanding to know whether these plaintiffs are going to contend that they have evidence that there occurred a moment or moments in time when certain specified persons agreed to fuel surcharges in a manner that in itself was a conspiracy that violated the antitrust laws. If plaintiffs so contend, they must say who those persons were and when those agreements occurred. On the other had, if plaintiffs do not so contend and intend instead to rely on evidence from which such an agreement can be inferred, they must say so in response and that will be the end of the matter.

As to the authorities upon which plaintiffs rely, I do not believe that the decision of the Court in 1958, United States v. Md & Va. Milk Prod. Ass'n, which held that asking a party on what grounds it relies to establish that a certain entity was not "a cooperative association of persons engaged in the production of milk"[1] was impermissible, survived the amendment of the Rule 33 that permits such an obviously legitimate contention inquiry.

As to Kendrick, I note that Judge Richey left open the possibility that the interrogatories he found impermissible might be legitimate once more discovery had taken place. Kendrick, 125 F.R.D. at 4. Moreover, with all due respect to the judge, I am afraid that I do not understand his conclusion that asking a party whether it contends that a certain provision is unconstitutional is legitimate while asking it whether it contends that the offending provision is severable is not. In my view, they are nearly identical and equally legitimate contention inquiries. While my view of

[1] United States v. Md & Va. Milk Prod. Ass'n, 22 F.R.D. at 301.

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 7 of 23

the legitimacy of contention interrogatories may be aggressive, I can find nothing in the wording of the rule or its interpretation that could possibly bar asking a party what it contends and why.

2. NS Interrogatories 1, 2(e) and 2(f)

Defendants take issue with the form that plaintiffs used to respond to their interrogatories, namely the narrative. [#506] at 1. Defendants argue that plaintiffs have failed to "separately and fully" answer the interrogatories as required by Rule 33 of the Federal Rules of Civil Procedure. Id. Defendants assert that plaintiffs' responses to the interrogatories, which incorporate the narrative by reference in answering each interrogatory, "direct defendants to sweeping portions (at times, more than 100 paragraphs) of it without regard to the specific question asked in the interrogatory." Id. at 4. Defendants argue that "[p]laintiffs' [n]arrative defeats the very purpose of contention interrogatories by making it impossible to identify plaintiffs' specific contentions and the evidence underlying each." Id. Defendants further argue that the method by which plaintiffs have responded to their interrogatories has "rendered [interrogatories] useless for the their purpose of 'narrowing and sharpening issues' and 'requir[ing] one's opponent to state its position on an issue in controversy.'" [#506] at 5 (quoting Banks v. Senate Sergeant at Arms, 222 F.R.D. 7, 13 (D.D.C. 2004)).

Specifically, NS Interrogatory 1 asks plaintiffs to identify "the 'precise Rail Fuel Surcharge Mechanisms that are the object' of the alleged unlawful conduct, including 'trigger price, surcharge percentage and increment, fuel price index, [and] whether the mechanism was rate-based or mileage-based and whether you contend that the mechanism was a "standard" Rail Fuel Surcharge." [#506] at 8. NS Interrogatory 2(e) asks plaintiffs to identify "'every alleged object or result of the unlawful agreement'", and NS Interrogatory 2(f) asks that plaintiffs

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 8 of 23

identify "the 'precise terms of the alleged unlawful agreement' into which plaintiffs allege that defendants entered." [#506] at 9.

In response to these three interrogatories[2], plaintiffs objected to it on the ground that it was vague, overbroad and unduly burdensome to the extent it seeks "(i) each surcharge percentage actually yielded by the fuel surcharge mechanism in question during the Class Period and (ii) each fuel surcharge imposed during the Class Period that resulted from, and was affected by, [d]efendant's conspiratorial conduct." [#506-8] at 104. They also objected to the word "standard" as being undefined. Id. Without waiving those objections and their General Objections, plaintiffs responded that the object of defendants' conspiracy was "to apply coordinated fuel surcharges as uniformly as possible, to as many freight shipments as possible with the express goal of 100% coverage." Id.

Plaintiffs indicate that the fuel surcharges that resulted from the conspiracy are "those recorded in [d]efendants' transactional databases that meet the criteria for inclusion in the Class specified in [p]laintiffs' class certification papers" and that the burden of identifying each of those fuel surcharges from those databases is "at best equivalent for [d]efendants as it is for [p]laintiffs, and is likely less burdensome for [d]efendants." Id.

Plaintiffs then directed defendants to paragraphs 16-109 and 113 of the narrative[3] because it explains how "[d]efendants' conspiracy involved coordination and broad application of [d]efendants' fuel surcharges applied to carload, intermodal and energy shipments." [#506-8]

[2] The responses to each interrogatory are substantially the same and the court will refer to just the response to NS Interrogatory 1.

[3] The narrative contains 127 total numbered paragraphs.

Case 1:07-mc-00489-PLF-JMF Document 334 Filed 11/17/11 Page 9 of 23

at 104, 106. They then direct defendants to paragraphs 25, 30, 32, 41-43, 57-58 , 95 and 101-105. Id. at 105.

Defendants argue in their motion to compel that the portions of the narrative they were directed to rarely address the specific details of the alleged unlawful agreement. [#506] at 9. For example, defendants note that while plaintiffs contend that the unlawful agreement began in March of 2003, the vast majority of the paragraphs cited to in the response concern conduct well after that time period. Id. While defendants concede that plaintiffs may rely on the conduct described in the narrative as evidence of acts done in furtherance of the alleged conspiracy, those acts are distinct from the conspiratorial agreement itself and they are entitled to know what defendants agreed to as opposed to only what plaintiffs contend the defendants did to carry out the alleged agreement once reached. Id.

They also contend that plaintiffs once excluded mileage based surcharges from the class definition and have so advised the presiding judge. Nevertheless, according to the defendants, plaintiffs now deny requests that they admit that mileage based surcharges were not part of the conspiracy. [#506] at 10-11. According to defendants, they are entitled to know what defendants are claimed to have agreed to at the inception of the conspiracy.

Finally, defendants argue that plaintiffs' pointing them to the transactional data each defendant produced is insufficient; according to defendants, "there are many fuel surcharges contained within the transactional data, and defendants would have to guess which ones meet plaintiffs' vague and (ever-evolving) class definition." [#506] at 13 n.9.

Plaintiffs, insisting that the use of a narrative statement is a legitimate manner of answering specific interrogatories, insist that the portions of the narrative to which they point

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 10 of 23

establish the nature of the defendants' agreement in 2003, to coordinate their fuel surcharge programs and "apply them as widely a[s] possible and, as uniformly as possible, to as many freight shipments as possible with the express goal of 100 % coverage." [#510] at 5 (quoting [#506-8] at ¶16). They insist that they have also identified every fuel surcharge that was the result of the conspiracy as NS Interrogatory 1 demanded because the narrative indicates that: "while [d]efendants on rare occasion imposed fuel-surcharge formulas from their standard mechanisms, these variations nonetheless 'resulted from the conspiracy because they were negotiated off the dominant, standard formulas and were applied more broadly and at more onerous levels due to the widespread application of [d]efendants' coordinated mechanisms." [#510] (quoting [#506-8] at 104). Thus, plaintiffs insist that they contend that "every fuel surcharge satisfying inclusion in the Class result[ed] from the conspiracy." Id.

Plaintiffs, relying on a declaration by Marc L. Greenwald, also claim that they would have to go through 260 gigabytes of data and 70 million qualifying shipments and that to "identify every fuel-surcharge variation, their terms, and the surcharges they generated throughout the Class Period, would be overly burdensome." [#510] at 8. They point out that such an effort "would be particularly unjustified since [p]laintiffs' expert at Class certification already analyzed [d]efendants' transaction data and the shipments in the Class to calculate overcharges suffered by Class members." Id. at 9.

Finally, they protest that the defendants have indicated that they are aware of the nature of the fuel surcharges at issue because they opposed class certification on the grounds that the Class definition embraced a variety of fuel surcharge formulas. Plaintiffs also indicate that they have made it clear that mileage based surcharges are not and never have been included in the Class

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 11 of 23

definition.

Defendants counter that plaintiffs' narrative evades the simple questions proposed: (1) what specific rule index, or indices, (if any) did defendants allegedly agree to?; (2) what specific trigger, price, slope and other particular characteristics did defendants agree to?; or do plaintiffs contend that defendants did not agree on any such details and instead each defendant determined the specific details for its respective fuel surcharges on its own?; (3) what do plaintiffs consider a "standard fuel-surcharge mechanism"?; (4) is it a fuel surcharge published on a defendant's website or something else, and what are its terms?; (5) what else do plaintiffs contend defendants specifically agreed to? [#506] at 12-13.

To begin, since plaintiffs answered the interrogatories, their objections to them are moot. In any event, I do not find these interrogatories vague. They clearly and specifically demand the information sought and plaintiffs' objection to the vagueness of the word "standard" is overcome by assigning to the word its dictionary meaning of "used or accepted as normal or average." Oxford Online English Dictionary. english.oxforddictionaries.com/ (last visited on Nov. 1, 2011).

Second, the question presented is not whether, as a matter of legal theory, a narrative statement is or is not in compliance with the obligation to answer an interrogatory separately and fully with an answer that is explicit, responsive, complete and candid. See Fed. R. Civ. P. 33(b)(3) and Equal Rights Ctr., 246 F.R.D. at 32. As the cases which the parties throw at each other like darts indicate, a narrative statement may or may not comply with this obligation depending on the question presented. If the question is how fast were you going when you hit the other car, a narrative answer that speaks of the accident but does not mention how fast the person

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 12 of 23

answering was driving would not comply that person's obligation to answer the question.

Finally, given the cost of discovery and the obligation imposed by Rule 1 of the Federal Rules of Civil Procedure to construe and administer the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action," having the opposing party and then the judge read many paragraphs of narrative when most of them are not even directed to the specific question presented is wasteful and not to be encouraged particularly when the answering party can isolate the portions of the narrative that truly speak to the question presented and provide the answer.

Judged by these criteria, plaintiffs' responses to the interrogatories fail. First, and to be blunt, while I cannot pretend the familiarity with the voluminous records that counsel have, I have read the sections of the narrative to which plaintiffs point and I cannot find the answers to defendants' interrogatories. Plaintiffs, in the narrative, certainly fulsomely describe how the defendants allegedly took concerted action against their customers, disguised their doing so and then attempted "to apply coordinated fuel surcharges as uniformly as possible, to as many freight shipments as possible with the express goal of 100% coverage." [#506-8] at 104. But, as defendants correctly point out in their reply submission, neither they nor I understand from the narrative whether plaintiffs claim that at the inception of the conspiracy defendants specifically agreed as to the precise mechanisms they would use to accomplish what plaintiffs complain they intended to do. Did they agree that some occurrence or event would trigger their universal adoption of a means of imposing on their customers the fuel surcharge? Did they instead simply agree that they would impose a fuel surcharge on all their customers but left open whether they would implement their agreement by each defendant being free to do so in its own manner?

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 13 of 23

While plaintiffs do specify that defendants on rare occasions imposed fuel-surcharge formulas that differed from their standard mechanisms, they insist that even these variations resulted from the conspiracy because "they were negotiated off the dominant, standard formulas and were applied more broadly and at more onerous levels due to the widespread application of [d]efendants' coordinated mechanisms." [#510] at 12. It therefore follows that every surcharge "satisfying the criteria for inclusion in the Class 'result[ed] from the conspiracy.'" Id. at 8.

While that indicates that plaintiffs are contending that all surcharges resulted from the conspiracy, it avoids the question of what was the agreement *ab initio* and whether the defendants agreed, again *ab initio*, to the mechanisms that would be used to bring about the results about which plaintiffs complain.

I also believe that plaintiffs' complaint that they are required to examine gigabytes of data to answer the interrogatories misinterprets the question. The question does not demand that each surcharge be identified but that plaintiffs state once and for all what the original agreement was with specific answers to the questions posed.

3. NS Interrogatory 2(a)

In NS Interrogatory 2(a), defendants asked that plaintiffs identify "the people that, according to plaintiffs, knowingly participated in the alleged unlawful agreement." [#506] at 13-14. In response to this interrogatory, plaintiffs directed defendants to paragraphs 16-109 of the narrative. [#506-8] at 106. Defendants argue that the citation to nearly 100 paragraphs from the narrative fails to identify which of "the more than 50 employees of defendants mentioned throughout these paragraphs knowingly participated in the alleged agreement, as opposed to unknowingly carried out certain aspects of the alleged agreement." [#506] at 14.

Case 1:07-mc-00489-PLF-JMF Document 534 Filed 11/17/11 Page 14 of 23

The same analysis used in the previous section is also applicable here. I therefore conclude that plaintiffs' answers are insufficient.

4. CSXT Interrogatory 4

In CSXT Interrogatory 4, defendants asked whether plaintiffs contend "that defendants agreed not to negotiate discounts on rail surcharges and not to offer any rail surcharge other than the specific fuel charge defendants allegedly agreed to." [#506] at 18. As just explained, plaintiffs answered this interrogatory by stating that they "contend that [d]efendants agreed to apply their coordinated fuel surcharge programs as uniformly as possible, and to as many freight shipments as possible, with the express goal of 100% coverage." [#506-8] at 99. Plaintiffs further stated that "[i]n furtherance of this conspiracy, [d]efendants adopted and enforced policies against negotiating discounts on fuel surcharges or otherwise deviating from the coordinated fuel surcharges." Id. In support of this contention, plaintiffs referred defendants to paragraphs 16-52, 62, 79-94 and 100-103 of the narrative. Id. In their motion, defendants argue that by using the phrase "in furtherance of a conspiracy," plaintiffs avoid answering the interrogatory. Defendants cite to Diamond Chemical Co. v. Atofina Chemicals, Inc., 268 F. Supp. 2d 1, 17 (D.D.C 2003), for the proposition that an act "in furtherance of a conspiracy is not necessarily the same as an act agreed to as part of the unlawful agreement underlying the conspiracy." [#506] at 19.

The point is well taken insofar as plaintiffs have not specifically stated whether they contend that their adopting of policies against negotiating discounts on fuel surcharges or otherwise deviating from the coordinated fuel surcharges was pursuant to an agreement among them. Their answers are, as just explained, insufficient. They shall supplement their answer by indicating whether they contend that defendants' adoption of such policies was pursuant to an

CN

2005 Annual Report



# A great run, a great future

2005 Annual Report

## 18 Major commitments and contingencies *(continued)*

The Company has entered into various indemnification contracts with third parties for which the maximum exposure for future payments cannot be determined with certainty. As a result, the Company was unable to determine the fair value of these guarantees and accordingly, no liability was recorded. As at December 31, 2005, the carrying value for guarantees for which the Company was able to determine the fair value, was $1 million. There are no recourse provisions to recover any amounts from third parties.

## 19 Financial instruments

### A. Risk management

The Company has limited involvement with derivative financial instruments in the management of its fuel, foreign currency and interest rate exposures, and does not use them for trading purposes.

*(i) Credit risk*

In the normal course of business, the Company monitors the financial condition of its customers and reviews the credit history of each new customer.

The Company is exposed to credit risk in the event of non-performance by counterparties to its derivative financial instruments. Although collateral or other security to support financial instruments subject to credit risk is usually not obtained, counterparties are of high credit quality and their credit standing or that of their guarantor is regularly monitored. As a result, losses due to counterparty non-performance are not anticipated. The total risk associated with the Company's counterparties was immaterial at December 31, 2005. The Company believes there are no significant concentrations of credit risk.

*(ii) Fuel*

To mitigate the effects of fuel price changes on its operating margins and overall profitability, the Company has a hedging program which calls for entering into swap positions on crude and heating oil to cover a target percentage of future fuel consumption up to two years in advance. However, with an increased application of fuel surcharge on revenues, no additional swap positions were entered into since September 2004 and the Company has now suspended this program. At December 31, 2005, the Company's remaining hedge positions covered approximately 17% of the estimated 2006 fuel consumption, representing approximately 69 million U.S. gallons at an average price of U.S.$0.89 per U.S. gallon.

The changes in the fair value of the swap positions are highly correlated to changes in the price of fuel and therefore, these fuel hedges are being accounted for as cash flow hedges, whereby the effective portion of the cumulative change in the market value of the derivative instruments has been recorded in Accumulated other comprehensive loss. The amounts in Accumulated other comprehensive loss will be reclassified into income upon the ultimate consumption of the hedged fuel. To the extent that the cumulative change in the fair value of the swap positions does not offset the cumulative change in the price of fuel, the ineffective portion of the hedge will be recognized into income immediately. In the event that the fuel hedge is discontinued and the forecasted purchase of fuel is not expected to occur, the amount in Accumulated other comprehensive loss would be reclassified into income immediately.

Realized gains from the Company's fuel hedging activities, which are recorded in fuel expense, were $177 million, $112 million, and $49 million for the years ended December 31, 2005, 2004, and 2003, respectively.

At December 31, 2005, Accumulated other comprehensive loss included unrealized gains of $57 million, $39 million after tax ($92 million, $62 million after tax at December 31, 2004), which relate to derivative instruments that will mature within the next year and are presented in Other current assets. The Company did not recognize any material gains or losses in 2005, 2004, and 2003 due to hedge ineffectiveness as the Company's derivative instruments have been highly effective in hedging the changes in cash flows associated with forecasted purchases of diesel fuel.

*(iii) Interest rate*

In the first quarter of 2004, in anticipation of future debt issuances, the Company had entered into treasury lock transactions for a notional amount of U.S.$380 million to fix the treasury component on these future debt issuances. The Company settled these treasury locks at a gain of U.S.$9 million (Cdn$12 million) upon the pricing of the U.S.$500 million 6.25% Debentures due 2034, subsequently issued on July 9, 2004. These derivatives were accounted for as cash flow hedges whereby the cumulative change in the market value of the derivative instruments was recorded in Other comprehensive loss. The realized gain of $12 million accumulated in other comprehensive income (loss) is being recorded into income, as a reduction of interest expense, over the term of the debt based on the interest payment schedule.

At December 31, 2005, Accumulated other comprehensive loss included an unamortized gain of $12 million, $8 million after tax ($12 million, $8 million after tax at December 31, 2004).

*(iv) Foreign currency*

Although the Company conducts its business and receives revenues primarily in Canadian dollars, a growing portion of its revenues, expenses, assets and debt is denominated in U.S. dollars. Thus, the Company's results are affected by fluctuations in the exchange rate between these currencies. Changes in the exchange rate between the Canadian dollar and other currencies (including the U.S. dollar) make the goods transported by the Company more or less competitive in the world marketplace and thereby further affect the Company's revenues and expenses.

2006 Annual Report

CANADIAN PACIFIC 2006 Annual Report

# SAFEST, MOST FLUID RAILWAY

Canadian Pacific's vision is to become the safest, most fluid railway in North America. We are achieving this through the ingenuity of our people and their relentless focus on Execution Excellence. Together, we are transforming this railway into a highly efficient business as we continue to build shareholder value.



CANADIAN PACIFIC

DA06838

## Revenues

Our revenues are derived primarily from transporting freight. Other revenues are generated mainly from leasing of certain assets, switching fees, land sales and income from business partnerships.

At December 31, 2006, one customer comprised 11.5 % of total revenues and 5.6 % of total accounts receivable. At December 31, 2005 and 2004, the same customer comprised 14.5 % and 11.7 % of total revenues and 8.0 % and 12.4 % of total accounts receivable, respectively.

| For the year ended December 31 (in millions) (unaudited) | 2006 | 2005[1] | 2004[1] |
|---|---|---|---|
| Grain | $ 904.6 | $ 754.5 | $ 668.2 |
| Coal | 592.0 | 728.8 | 530.3 |
| Sulphur and fertilizers | 439.3 | 447.1 | 460.0 |
| Forest products | 316.4 | 333.9 | 322.0 |
| Industrial and consumer products | 603.8 | 542.9 | 481.4 |
| Automotive | 314.4 | 298.0 | 288.5 |
| Intermodal | 1,256.8 | 1,161.1 | 1,034.7 |
| **Total freight revenues** | $ 4,427.3 | $ 4,266.3 | $ 3,785.1 |
| Other revenues | 155.9 | 125.3 | 117.8 |
| **Total revenues** | $ 4,583.2 | $ 4,391.6 | $ 3,902.9 |

[1] Certain prior period figures have been reclassified to conform with presentation adopted in 2006.

## Freight Revenues

Freight revenues are earned from transporting bulk, merchandise and intermodal goods, and include fuel surcharges billed to our customers. Freight revenues were $4,427.3 million in 2006, an increase of $161.0 million, or 4 %, from 2005. Freight revenues were $4,266.3 million in 2005, an increase of $481.2 million, or 13 %, from $3,785.1 million in 2004.

Revenue increase in grain, industrial and consumer products, automotive and intermodal more than offset reductions in coal, sulphur and fertilizers and forest products in 2006, compared with 2005.

Freight revenues in 2006, compared with 2005, increased mainly due to:

- higher freight rates, including fuel surcharges;
- strong growth in grain shipments; and
- strong growth in the Alberta economy.

This increase was partially offset by the negative impact on freight revenues of approximately $113 million due to the change in Foreign Exchange and reduced coal volume.

Freight revenues in 2005, compared with 2004, increased mainly due to:

- higher freight rates, including fuel surcharges;
- our initiatives to increase high-margin, long-haul traffic and reduce low-margin, short-haul traffic; and
- revenue recorded as a result of an agreement reached with EVC, which related to the prior year (discussed further in this section under the sub-heading "Coal").

These 2005 increases were partially offset by the negative impact on freight revenues of approximately $118 million due to the change in Foreign Exchange.

Fuel surcharge is adjusted to respond to fluctuations in fuel price for West Texas Intermediate ("WTI"), heating oil, and the retail and wholesale price of diesel for vehicles. Fuel surcharges contributed to revenue growth in 2006 and 2005 in a majority of our business lines. In 2006 and 2005, we recovered a significant portion of our fuel cost increase through fuel surcharge revenues, which are included in freight revenues.

### Grain

Canadian grain products, consisting mainly of durum, spring wheat, barley, canola, flax, rye and oats, are primarily transported to Canadian and U.S. markets for domestic consumption and to ports for export. U.S. grain products mainly include durum, spring wheat, corn, soybeans and barley and are shipped from the midwestern U.S. to other points in the Midwest, the Pacific Northwest and the northeastern U.S. Grain revenues in 2006 were $904.6 million, an increase of $150.1 million from 2005. Grain revenues of $754.5 million in 2005 were up $86.3 million from $668.2 million in 2004.



DA06839

PACER STACKTRAIN

STACK FACTS

**April 26, 2004**
**Electronic Bulletin No. 491**
**RE: Fuel Surcharge Announcement**

---

# Fuel Surcharge Announcement

Effective Monday May 3, 2004, Pacer Stacktrain will modify its Fuel Surcharge (FSC) program. This change reflects adjustments in how our underlying rail, trucking and other vendors are passing along fuel related costs during this recent and sustained run-up in oil prices.

This modified FSC methodology continues to utilize the National U.S. average diesel price index as published by the Department of Energy (DOE) but we will now use the simpler calculation table below to establish the percentage FSC on a monthly basis. The DOE index data can be accessed at http://tonto.eia.doe.gov/oog/info/wohdp/diesel.asp.

FSC changes will continue to be calculated on the last Monday of each month and become effective on the following Monday. Based on the Monday, April 26, 2004 index value of 1.718, effective May 3, 2004, the Pacer Stacktrain Fuel Surcharge will increase to 7.0%. The next FSC adjustment will be effective June 7, 2004 based on the fuel price index on the previous Monday, May 31, 2004.

| **Pacer Stacktrain Fuel Surcharge** | |
|---|---|
| U.S. National Average Highway Diesel Fuel Price Range (rounded to nearest cent) | Fuel Surcharge |
| $0.00 - $1.23 | 0.0% |
| $1.24 - $1.27 | 1.0% |
| $1.28 - $1.31 | 1.5% |
| $1.32 - $1.35 | 2.0% |
| $1.36 - $1.39 | 2.5% |
| $1.40 - $1.43 | 3.0% |
| $1.44 - $1.47 | 3.5% |
| $1.48 - $1.51 | 4.0% |
| $1.52 - $1.55 | 4.5% |
| $1.56 - $1.59 | 5.0% |

| | |
|---|---|
| $1.60 - $1.63 | 5.5% |
| $1.64 - $1.67 | 6.0% |
| $1.68 - $1.71 | 6.5% |
| $1.72 - $1.75 | 7.0% |
| $1.76 - $1.79 | 7.5% |
| $1.80 - $1.83 | 8.0% |
| $1.84 - $1.87 | 8.5% |
| $1.88 - $1.91 | 9.0% |
| $1.92 - $1.95 | 9.5% |
| $1.96 - $1.99 | 10.0% |
| If the U.S. National Average Fuel Index equals or exceeds $1.99 per gallon, the fuel surcharge increases 0.5% for every 4-cent increase in fuel price. | |

If you have any questions regarding this announcement please contact your Pacer Stacktrain Business Development Representative.

TESTIMONY OF

MR. JOHN B. FICKER

PRESIDENT

THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE

HEARING ON

ECONOMICS, SERVICE, AND CAPACITY IN THE FREIGHT RAILROAD INDUSTRY

BEFORE THE

COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

SUBCOMMITTEE ON SURFACE TRANSPORTATION AND MERCHANT MARINE

JUNE 21, 2006

TESTIMONY OF

MR. JOHN B. FICKER

PRESIDENT, THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE

The National Industrial Transportation League is pleased to have been invited to present testimony on economic, service, and capacity issues in the freight railroad industry. The League is the nation's oldest and largest association of companies interested in transportation. Its 600-plus members range from some of the largest companies in the nation to much smaller enterprises. Many members of the League ship via rail, and are vitally interested in the capacity, service, and competitiveness of the nation's rail industry. But League members also substantially ship via other modes, both domestically and internationally, and the problems of capacity must also be looked at in this broader context, as many modes are facing capacity constraints.

The League actively participated in the General Accountability Office (GAO) study which is in part the subject of this hearing. League staff and the incoming League Chairman met for several hours with GAO staff to discuss rail issues, and provided information developed by the League to assist GAO in its study. Much of the League’s discussion with GAO centered on the problem of the rail industry’s capacity constraints. Also, the League referred GAO staff to League members for additional information. Finally, in March 2006, the League and several of its members appeared before a panel organized by the GAO to consider the current state of the rail industry and to advise GAO on its study.

As requested by the Committee, the League has reviewed the draft testimony of the GAO, which describes that Office's ongoing work on the performance of the rail industry since the Staggers Act. The League compliments the GAO on its work to date, and concurs with a number of the tentative conclusions set forth in GAO's testimony. The GAO testimony discusses two areas that are particularly integral to further improvement for rail industry policymakers, both of which deserve comment.

First, GAO notes that, while the STB has broad legislative authority to investigate industry practices, there has been little assessment of competition nationally, including areas of inadequate competition. GAO notes that such an assessment of competition would allow decision makers to identify areas where competition is lacking and to assess the need for and merits of approaches to address it. The League agrees that a study of competition and areas of inadequate competition would be useful to policymakers, and urges the Committee to consider such a study. In that connection, the League notes that, in its experience, rail competition, in order to be effective, must be present at both the origin and the destination of a rail movement. For example, if an agricultural shipper at origin is served by a single rail carrier, the fact that the export grain elevator at destination might be served by more than one railroad does not create rail-to-rail competition under current law, since the shipper at origin cannot require its sole-served origin carrier to interchange with a competing rail carrier for the movement to destination.

Second, GAO indicates that the current rate relief process is expensive, time-consuming, complex, and largely inaccessible to most shippers. The League strongly agrees. The League has presented to the STB, along with 26 other industry organizations, numerous suggestions for improving the agency's small shipment rate complaint process. To date, however, the STB has not acted on these suggestions. In addition, the League concurs with GAO that alternative

approaches should be investigated, including (and especially) the use of expedited, mandatory arbitration for rail rate and service disputes. The League believes that such an arbitration process has great potential for effectively resolving disputes between shippers and carriers, both through expediting the dispute process and in encouraging settlements.

The rail industry is laboring under significant capacity constraints for the first time in over 50 years. Since 1980, demand for rail transportation has steadily increased while rail capacity has declined. We have reached a point where demand has exceeded the industry's capacity to haul all of this traffic. This has caused congestion over significant parts of the national rail system, resulting in a substantial deterioration in service levels. The AAR's own figures show that average train speed declined between 1993 and 2003, from about 23 miles per hour to a little over 20 miles per hour.[1] Monthly service statistics published by the AAR show that average train speed for the total U.S. shows a decline from 23 miles per hour in 2000 to less than 22 miles per hour in the twelve-month period ending in September 2005. Meaningful service provisions in contracts are virtually impossible to obtain. Some service-sensitive shippers such as UPS, who so stated in the recent GAO panel discussion, have shifted their traffic to truck, further exacerbating the congestion and wear on the nation's highways.

These capacity constrains have also substantially enhanced the pricing leverage of the rail industry, which is evident in substantial rate increases across all commodities and the de-marketing of less profitable traffic. As stated by GAO in its testimony, four large Class I carriers control almost 90% of the industry's revenue. Many shippers are facing double digit rate increases along with reduced or deteriorating service. Rate negotiations have become a "take it, or leave it" proposition for many shippers. We believe that the effects of these capacity

---

[1] AAR, "Railroad Ten-Year Trends 1993-2002," p. 132; and "Railroad Ten Year Trends, 1994-2003," p. 132.

constraints in the rail industry on prices is felt across modes. Just two days ago, the Council of Supply Chain Management Professionals released the 17th annual "State of Logistics Report." That report stated that, between 2004 and 2005, transportation costs jumped 14.1 percent – a staggering figure, and a "record high," according to the Council.[2]

The inability of the rail industry to meet current demand causes even greater concern for the future. Any projection of future economic growth indicates that the need for transportation will grow dramatically in the next 15 years. For example:

- The American Association of State Highway and Transportation Officials ["AASHTO Report"] projects that, with moderate economic growth, U.S domestic and international freight tonnage will grow by 67% between 2000 and 2020.[3]
- According to the AASHTO Report, rail tonnage is expected to grow by 44%, which is significantly less than the overall growth in freight tonnage.
- The Port of Los Angeles/Long Beach estimates that containerized imports through that port will grow by 44% from 2005 to 2010, by another 34% in 2015; and by another 34% in 2020 – in total more than doubling the traffic through this key facility in just 15 years.[4]

In order to meet current and future demand, the rail industry must expand existing capacity. This will require both the industry and the policymakers to shift radically from a mind-set of cost control and downsizing, to one of growth and expansion.

Rail users are vitally dependent upon a financially healthy rail system, as there is no way for many of them to efficiently transport their goods to market except via rail. Fortunately, the railroad industry is thriving financially for the first time since the Staggers Act, and well before.

---

2 "17th Annual State of Logistics Report," sponsored by the Council of Supply Chain Management Professionals, June 19, 2006, p. 4.

3 AASHTO Report, p. 50.

4 See, http://www.polb.com and http://www.portoflosangeles.org

Formatted: Default Paragraph Font

Formatted: Default Paragraph Font

The financial markets have been "bullish" on the rail industry for several years. In a recent Morgan Stanley report,[5] respected analyst James Valentine expressed:

> even greater conviction that the industry will consistently earn its cost of capital over the next few years (a feat not achieved in decades), led by secular upward pricing initiatives that should continue into 2006 and beyond.

This is strong evidence that the financial strength exhibited by railroads is not a temporary phenomenon, but a paradigm shift in rail transportation markets brought about in large part by capacity constraints.

Such statements also suggest that the STB's measure of revenue adequacy significantly overstates the financial returns needed for "real-world" revenue adequacy. For example, despite the financial success of the rail industry over the past several years and reflected in the previously quoted Wall Street assessment of the industry, the STB determined that only one Class I railroad (Norfolk Southern) was revenue adequate in 2004, and that is expected to be the case for 2005 as well. The balance intended in the Staggers Act between allowing competition to establish reasonable rates "to the maximum extent possible" and the policy of fostering a financially healthy rail industry, has been upset by the agency's over-reliance on a questionable methodology of calculating revenue adequacy.

Competition is at the heart of our nation's economic system. It creates a sense of urgency that enables companies to thrive. It spurs efficiency. It allocates resources in the most efficient manner. Competition, therefore, is essential to encourage the most efficient use of today's capacity constrained rail infrastructure and to spur investment in additional infrastructure. Competition encourages the most efficient use of limited capacity by ensuring that goods are moved over the most efficient route available. Competition also ensures that the capital for

---

[5] James Valentine and Michael Manelli, Morgan Stanley Equity Research, "All Aboard! Reiterating Bulling Vies Towards Freight Railroads," Sept. 20, 2005, p. 1 ("Valentine Report").

capacity expansion flows to the most economically beneficial projects for the rail transportation system. Indeed, increasing capacity would likely lead to increased competition, as rail carriers sought to attract valuable traffic to their system.

With the financial health of the rail industry no longer an immediate issue, and with the enhanced leverage of railroads in a capacity-constrained market at a time of deteriorating service levels, it is time for a more balanced approach. Direct government regulation seldom has been as effective as the marketplace at increasing efficiency. Emphasis must shift towards the creation of value to the shipping public. The creation of value will occur if railroads and shippers, spurred by the incentives of the market place, work together to identify sources of productivity gains and cost reductions in order to provide a consistent level of service that fully utilizes existing capacity to the maximum extent possible and encourages the addition of more capacity.

The League believes that solutions to these problems must come from the private sector, and the League has over the past year has initiated several efforts at private-sector solutions to various problems.

One set of discussions concerned rail fuel surcharges. This issue has become extremely important to our members, who believe that many of the carriers' fuel surcharge programs have significantly over-recovered the increased cost of fuel as applied to individual movements. Over the past nine months, the League met, along with the National Grain and Feed Association (NGFA), with representatives of each of the major Class I carriers, to present the results of a Fuel Surcharge Study which the League, NGFA and other groups sponsored, and to discuss areas where individual carriers might consider improving their fuel surcharge programs. Some carriers, specifically the BNSF, the Canadian National, and the Canadian Pacific, responded

positively to these discussions with changes in their individual fuel surcharge programs. Other carriers, especially the Eastern carriers, declined to respond.

Additionally, in 2005, the League chose to remain neutral on S.919, and instead entered into discussions with the AAR to identify ways that shippers and carriers can work together to find value through productivity gains and cost reductions that could address the issues and concerns between them. The League and the AAR have formed a number of task forces to examine and address issues connected with local rail service, capacity and infrastructure, and office administration. For about a year now, these task forces have met several times to identify issues and plan improvements. The League continues to pursue these discussions diligently, and remains hopeful that they will yield positive results. However, the League remains mindful that the status quo -- a trifecta of deteriorating service, double-digit rate increases, and serious questions as to whether there are sufficient means and incentives to meet future demand -- is unacceptable.

These are matters of significant importance to rail users and it is essential that solutions are found and that resolutions are reached between rail users and carriers. We believe that League membership will need to see some concrete results flowing from the League's discussions with the AAR within a reasonable time frame. If that does not occur, it is likely that the League's membership would insist that the League review its current position. We urge the Committee to insure that rail carriers and users are moving forward in a serious, focused and positive effort in the development of effective mutual solutions. We would urge the Committee to provide oversight to this process. We would be very pleased to report back to the Committee on the progress of the League's discussions with the AAR and its carriers.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/JMF/AK) |
| This document relates to:<br><br>ALL CASES | Publicly Filed Version |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Case 1:07-mc-00489-PLF-JMF Document 391-1 Filed 01/31/10 Page 3 of 75



## PRELIMINARY STATEMENT

Direct Purchaser Plaintiffs ("Plaintiffs") respectfully submit this memorandum in support of their motion, pursuant to Fed. R. Civ. P. 23(b)(3), for certification of a class of:

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing") ("Fuel Surcharge").[1]

The named Plaintiffs are eight companies – ranging from Donnelly Commodities (a small business) to U.S. Magnesium and Nyrstar (both mid-sized businesses) to Olin Corporation (a company with revenues exceeding $1 billion per year). Each named Plaintiff, during the Class Period, directly purchased from one or more Defendant rail freight services as to which a Fuel Surcharge was applied.

The four Defendants – BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") – are the dominant freight railroads in the continental United States. Plaintiffs allege that Defendants conspired to coordinate their Fuel Surcharge programs as a means to impose supra-competitive price increases on the Class. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*,

[1] Excluded from the Class definition are (a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the Complaint, and all federal governmental entities; and (b) all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract.

587 F. Supp. 2d 27, 30 (D.D.C. 2008). Plaintiffs seek to recover, for themselves and the Class, overcharge damages suffered as a result of Defendants' alleged anticompetitive conduct.[2]

Under Rule 23, the Court conducts a threshold inquiry to determine if the elements of Rule 23(a) are satisfied – namely, whether (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. These Rule 23(a) requirements are readily satisfied here: the Class of entities that paid Fuel Surcharges is very large; there are multiple questions of law and fact common to the Class, including whether Defendants conspired as alleged in the complaint; the named Plaintiffs, like all members of the Class, paid Fuel Surcharges imposed by Defendants during the Class Period; and the named Plaintiffs (and their counsel) have already shown that they can and will vigorously pursue and protect the interests of the Class.

Plaintiffs also satisfy Rule 23(b)(3), which requires that questions of law or fact common to the Class "predominate over any questions affecting only individual members," and that class treatment will be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

Here, there is an argument to be made that because liability turns on *Defendants'* conduct, and because all members of the Class by definition paid the Fuel Surcharges at issue, the predominance of common issues is straightforward. However, "predominance" here need not be

---

[2] "Overcharges, the 'difference between the actual price and the presumed competitive price multiplied by the quantity purchased,' provide what the Supreme Court has long recognized as the principal measure of damages for plaintiffs injured as customers, rather than as competitors." *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 344 (D. Mass. 2003) (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 309 (E.D. Mich. 2001)) (both citing *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 396 (1906)).

[redacted]

Between 2000 and early 2003, the three-year period preceding the Class Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts to apply stand-alone fuel surcharges, [redacted][12] These uncoordinated fuel surcharges were implemented by the individual Defendants unilaterally.[13] [redacted][14]

During this period, Defendants acting on their own had limited success when trying to boost revenues through fuel surcharges. These fuel surcharges were applied only sporadically to a limited numbers of shippers.[15] The reasons for this are clear: Defendants were concerned about

---

[10] [redacted]

[11] RD Ex. 9.

[12] RD Ex. 163, at 6.

[13] [redacted]

[14] [redacted]

[15] UP, for example, implemented a fuel surcharge program in December 2002. [redacted]

[redacted]

2. **The STB Decision**

The STB hearing culminated in a January 2007 decision which concluded that Defendants' fuel surcharge program constituted an "unreasonable practice."[205] The STB explained that "a fuel surcharge program that increases all rates by a set percentage *stands virtually no prospect of reflecting the actual increase in fuel costs* for handling the particular traffic to which the surcharge is applied."[206] The STB added that Defendants' fuel surcharge program was "a *misleading* and ultimately unreasonable practice," finding that "there is no real correlation between the rate increase and the increase in fuel costs for that to which the surcharge is applied."[207] While the Defendants had applied the same misleading fuel surcharge programs to the shipments at issue in this litigation, the STB decision applied only to rate-regulated rail freight traffic.[208] With respect to this rate-regulated rail freight traffic, the STB ruled that if a "carrier chooses to use a fuel surcharge program, it must be based upon attributes of a movement

---

[204] Exh. 135, at BNSF-0367622 [redacted]

[205] RD Ex. 147 at 6 (Surface Transportation Board Decision, *Rail Fuel Surcharges* (STB Ex Parte No. 661, Jan. 26, 2007).

[206] *Id.* at 6.

[207] *Id.* at 7 (emphasis added); *see also id.* ("*This sort of mislabeling* appears designed to avoid the type of response a carrier would likely receive *if it were to honestly inform* a shipper that a higher rate was being imposed to recover not only the increased fuel cost of serving that shipper, but also the increased cost of fuel for another shipper's traffic – which is what would often occur under rate-based fuel surcharges.") (emphasis added); *id.* at 9 ("*For carriers to continue to apply fuel surcharge programs* that are calculated as a percentage of the base rate – when practical alternatives are available – *would permit them to continue to mislead their customers and would be unfair.*") (emphasis added).

[208] *Id.* at 13 ("Under 49 U.S.C. 10709, we have no authority to regulate rail rates and services that are governed by a contract. Therefore, our findings and actions here apply only to regulated common carrier traffic.").

that directly affect the amount of fuel consumed. In other words, there must be a reasonable nexus to fuel consumption."[209]

## ARGUMENT

### I. STANDARDS FOR RULE 23(b)(3) CLASS CERTIFICATION

#### A. Elements of Rule 23(a) and (b)

A party moving for class certification must meet the threshold requirements of Rule 23(a) and, in addition, show that the action can be maintained under Rule 23(b)(1), (2), or (3). *See, e.g., In re Nifedipine Antitrust Litig.*, 246 F.R.D. at 368. The threshold requirements of Rule 23(a) are satisfied if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). The four Rule 23(a) elements are commonly referred to as "numerosity," "commonality," "typicality" and "adequacy." *See, e.g., Reese v. Bahash*, 248 F.R.D. 58, 62 (D.D.C. 2008).

Where, as here, a party seeks certification under subsection 23(b)(3), a class should be certified if questions of law or fact "predominate over any questions affecting only individual members," and class resolution will be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). These elements of Rule 23(b)(3) are commonly referred to as "predominance" and "superiority." *See, e.g., Barnes v. Dist. of Columbia*, 242 F.R.D. 113, 123 (D.D.C. 2007).

---

[209] *Id.* at 9.

## CONCLUSION

Plaintiffs respectfully submit that for the foregoing reasons, Class Certification pursuant to Fed. R. Civ. P. 23(b) should be granted; the named Plaintiffs should be designated Class Representatives; and Co-Lead Interim Class Counsel Quinn Emanuel Urquhart & Sullivan, LLP and Hausfeld LLP should be appointed as Co-Lead Class Counsel pursuant to Fed. R. Civ. P. 23(g).

Dated: March 18, 2010

Respectfully submitted:

/s/ Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-9850
Facsimile: (212) 480-8560
Email: solson@hausfeldllp.com

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

***Interim Co-Lead Counsel for Direct Purchaser Plaintiffs***

**CERTIFICATE OF SERVICE**

I, Sami H. Rashid, an attorney, certify that on March 18, 2010, I caused a true and correct copy of the foregoing memorandum to be served on counsel for Defendants.

/s/ Sami H. Rashid
Sami H. Rashid

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | ) | MDL Docket No. 1869<br>Miscellaneous No. 07-0489 (PLF) |
| This document relates to:<br><br>ALL DIRECT PURCHASER CASES | ) | |
| OXBOW CARBON & MINERALS LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNION PACIFIC RAILROAD CO., et al.,<br><br>Defendants. | ) | Civil Action No. 11-1049 (PLF) |

OPINION

Defendants in Rail Freight and defendants in Oxbow move pursuant to 49 U.S.C. § 10706 to exclude evidence of any discussion or agreement between or among rail carriers that concerned interline movements (and any rate or other action resulting from such discussion or agreement), and to enforce the statutory bar on inferring a conspiracy from specified evidence. Defendants' Motion and Memorandum of Law Regarding the Interpretation and Application of 49 U.S.C. § 10706 [Dkt. No. 927];[1] see also Defendants' Motion to Exclude Interline-Related Communications from Consideration for Class Certification or Any Other Purpose Prohibited

[1] All cites to docket entries, unless otherwise specified, will refer to the first above captioned matter, In re Rail Freight Fuel Surcharge Antitrust Litig., MDL No. 1869, Miscellaneous No. 07-0489.

enunciated, revealing its dominant procompetitive objectives."). "In regulating the railroad industry, it is the policy of the United States Government – (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail; [and] (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required." 49 U.S.C. § 10101 (listing fifteen separate goals).

To facilitate the ability of rail carriers to compete with other industries transporting goods, such as trucking, Congress authorized rail carriers to participate in interline traffic, or shared traffic, between or among two or more rail carriers. See 49 U.S.C. § 10703 (authorizing rail carriers to "establish through routes (including physical connections) with each other"); Def. Mot. at 1 (explaining that because "[n]o single railroad's tracks cover the entire country," independent rail carriers must cooperate with one another to ship freight cross-country).[10] Rail carriers generally are competitors with one another.[11] But when two or more rail carriers share an interline movement, they are not in competition as to that movement.

---

10 In contrast to an interline movement, which involves two or more rail carriers, a single-line movement is provided by a single rail carrier over its line only. See 49 U.S.C. § 10706(a)(1)(B). Defendants and the government also refer to single-line movements as "local" movements. See generally Def. Mot.; Gov't SOI.

11 See Def. Mot. at 1 (acknowledging that rail carriers are "sometimes direct competitors"); Def. Reply at 17 n.9 ("No one denies that CSXT and NS in the East and UP and BNSF in the West are vigorous competitors, nor that there is some competition between Eastern and Western railroads at the margins."); see also Gov't SOI at 12-13 (citing Russell Pittman, Options For Restructuring The State Owned Monopoly Railway, in RAILROAD ECONOMICS 182 (2007) (explaining that "source competition" "occurs when a shipper can send its product to an alternative destination using a different railroad")); Rail Freight IV, 292 F. Supp. 3d at 99-100 ("[C]aptive shippers[, shippers that are served by a single railroad,] are subject to competitive forces and therefore can suffer antitrust injury.").

See Def. Mot., Ex. 8 (Hearing on H.R. 4570 Before the Subcommittee on Transportation and Commerce Committee on Interstate and Foreign Commerce, House of Representatives, 96th Cong. 427 (Oct. 23, 1979) (statement of Donald L. Flexner)) (DOJ representative explaining that two or more carriers who "interline at a particular junction point and provide a through service" "do not compete with each other for the carriage of the interline traffic");[12] see also Def. Mot. at 7 (arguing that "interlining railroads act[] as joint ventures in a vertical supply relationship" and "communications necessary for partnering railroads to develop and optimize their joint service are therefore procompetitive, output enhancing, and present no antitrust concern").[13] To prevent rail carriers from facing antitrust exposure for lawful communications about interline traffic, Congress enacted Section 10706(a)(3)(B)(ii).

As noted above, the first sentence of Section 10706(a)(3)(B)(ii) bars certain inferences, while the second sentence provides that evidence meeting certain requirements shall not be admissible in any proceeding. 49 U.S.C. § 10706(a)(3)(B)(ii). Congress explained the purpose of the second sentence in providing for the exclusion of certain evidence as follows:

> Because of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements in which they interchange. That requirement could falsely lead to conclusions about rate agreements that were lawfully discussed. To prevent such a conclusion the Conference substitute provides procedural protections about lawful discussions and resulting rates. The Conferees intend that these protections be construed to insure

---

[12] Contra New Pl. Opp. at 23 (arguing that Mr. Flexner's testimony reflected grave concerns about (1) general rate increases and (2) discussion of single-line rates).

[13] On an interline movement, the shipper may work with each rail carrier individually to set a separate rate for each portion of the route under "Rule 11," Def. Mot. 8 at n.3, or it may work together with all of the carriers to set a single "joint rate." Def. Mot. at 7-8 (citing Balt. Gas & Elec. Co. v. United States, 817 F.2d 108, 110 (D.C. Cir. 1987) (defining joint rate)).

*B. Bar on Inferences*

Relying on the first sentence of subsection (a)(3)(B)(ii), defendants "request an order barring [p]laintiffs from seeking an inference of a conspiratorial agreement from the fact that the railroads engaged in bilateral, interline discussions, and then took [certain actions]." Def. Mot. at 45. Defendants also request an order barring plaintiffs from seeking an inference of a conspiratorial agreement from any evidence of a rail carrier evaluating whether it would or would not take "similar action" as something previously discussed with an interline partner. Id. at 44-45.

Section 10706(a)(3)(B)(ii), in relevant part, provides:

> In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section or of any similar State law, proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic.

49 U.S.C. § 10706(a)(3)(B)(ii). This sentence of the statute bars the court or jury from drawing any inferences from certain evidence, but it does not bar the admission of such evidence. If certain evidence is admitted at trial over the defendants' objection, the Court will, in accordance with ordinary practice, provide the jury with a suitable instruction concerning inferences. As such, defendants' motions seeking to bar inferences from the identified evidence is premature.

Given plaintiffs' and defendants' conflicting arguments as to the meaning of this sentence in the statute, the Court will provide the following guidance.

"In any proceeding" alleging an antitrust violation, the existence of an agreement, conspiracy, or combination may not be inferred from evidence that: (1) two or more rail carriers acted together with respect to an interline rate or related matter, and (2) a party to such action

took similar action with respect to a rate or related matter on another route or traffic. 49 U.S.C. § 10706(a)(3)(B)(ii). For the reasons discussed supra at Section IV(A)(2), this provision is applicable in this proceeding. For an inference to be barred under this provision, however, there must be an action and a similar action.

The first action, as described in the statute, must be of two or more rail carriers "act[ing] together with respect to an interline rate or related matter." 49 U.S.C. § 10706(a)(3)(B)(ii). This may include, for example, two or more rail carriers setting a rate for a shared interline movement. See 49 U.S.C. § 10706(a)(3)(B)(ii). Plaintiffs argue that all of the exhibits identified by the defendants evidence only a single action – "the single agreement to use coordinated fuel surcharges as a means to raise all-in rail freight rates across the board." Pl. Opp. at 34. Plaintiffs argue that because there is only a single action, there can be no separate similar action from which inferences are barred. Id. at 34-35. The Court disagrees with this assertion. Even if there was a single conspiratorial agreement to set rates, plaintiffs in fact allege numerous acts of rate setting by different rail carriers at different times to raise rates for both interline and single-line movements. There was not, therefore, just one concerted action. The Court rejects plaintiffs' argument that there is only a single action and therefore can be no "similar action."[33]

As for defendants' argument, they assert that an "action," as defined by the statute, may include a discussion or agreement to take action. See Def. Mot. at 43-44

[33] Plaintiffs also argue that for inferences to be barred, the action (or the similar action) must be with respect to a single, identifiable rate. See Pl. Opp. at 30 (arguing the term "an interline rate" indicates a single, identifiable rate). Plaintiffs' arguments mirror those made with respect to "an interline movement," and their argument is rejected for the reasons previously explained. See supra Section IV(A)(5)(a); see also Dictionary Act, 1 U.S.C. § 1; 49 U.S.C. § 10706(a)(3)(A)(ii)-(iii) (using "particular" to indicate the singular). For the reasons outlined supra at Section IV(A)(5)(c), "an interline rate" may be read to include the plural.

"similar action" may also not be a discussion or agreement under the statute. Thus, the statute does not bar inferences from such discussions or agreements about whether to take a particular action.

At the proper time, the Court will instruct the jury in accordance with the requirements of the statute.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion to Exclude Interline-Related Communications from Consideration for Class Certification or Any Other Purpose Prohibited by 49 U.S.C. § 10706 [Dkt. No. 417] and Defendants' Motion and Memorandum of Law Regarding the Interpretation and Application of 49 U.S.C. § 10706 [Dkt. No. 927]. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

Paul L. Friedman

PAUL L. FRIEDMAN
United States District Judge

DATE: February 19, 2021

# Communication and Concerted Action

*William H. Page*[*]

ABSTRACT

It is a familiar scenario in U.S. antitrust litigation: The plaintiffs allege that a pattern of identical pricing (or refusals to deal) is "concerted" and therefore per se illegal; the defendant responds that the practice is merely "consciously parallel" or "interdependent" and therefore legal. Under U.S. law, to avoid summary judgment or judgment as a matter of law, a plaintiff must produce a "plus factor," evidence that "tends to exclude the possibility" that the defendants' actions were merely interdependent. Courts have identified various plus factors—for example, evidence that the alleged conduct was against the defendant's interest unless it was pursuant to an agreement—but they have been notably vague about what exactly constitutes concerted action. Obviously, the Sherman Act does not require the plaintiff to prove that the defendants formed a legally enforceable contract—the Sherman Act, after all, makes agreements illegal and therefore unenforceable. But beyond that, the law tells us little. Courts still quote the Supreme Court's sixty-year-old formulation that a Sherman Act agreement requires only "a unity of purpose, a common design and understanding, or a meeting of the minds." Unfortunately, however, this language could easily be interpreted to condemn conscious parallelism.

In this article, I argue that concerted action should be defined to require communication among rivals. I begin by describing the development of the distinction in law and theory between consciously parallel and concerted action. I then show that the received definitions of concerted action leave courts and especially juries with inadequate guidance. Economic expert testimony does not fill the void, because

[*] Marshall M. Criser Eminent Scholar, University of Florida Levin College of Law. I would like to thank Oliver Black, Roger Blair, Tom Cotter, Michael Freed, Christine Klein, John Lopatka, Gregg Polsky, Mark McLaughlin, and Spencer Waller for helpful comments. I also benefited from comments at a workshop at the University of Florida Levin College of Law and at the Loyola University Chicago conference on the legacy of *Matsushita*.

that they had no motive for joint action.[33] During the late 1970s and early 1980s, the federal enforcement agencies relied on Posner's analysis of oligopoly to argue for extending the Sherman Act and the Federal Trade Commission Act to condemn interdependent conduct, but the courts were unreceptive.[34]

*Matsushita* clarified the law by holding that "to survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently."[35] The lower courts have interpreted *Matsushita* to require plaintiffs to produce evidence that "tend[s] to exclude the possibility that the defendants merely were engaged in lawful conscious parallelism."[36] To visualize what this requirement means: imagine two intersecting circles, one representing evidence consistent with independent action and one representing evidence consistent with concerted action.[37] Evidence of consciously parallel conduct is consistent both with independent action and with concerted action and thus lies in the intersection of these sets. That category of evidence is insufficient to carry the plaintiff's burden of production under *Matsushita*. The plaintiff must produce evidence consistent *only* with concerted action—evidence in the concerted action circle, but *not* the independent action circle.[38] The lower courts call this sort of evidence a plus factor.

33. First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968) ("Essentially all that the lower courts held in this case was that [FED. R. CIV. P.] 56(e) placed upon [plaintiff] the burden of producing evidence of the conspiracy he alleged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegation were not susceptible of the interpretation which he sought to give them. That holding was correct."). In that era, summary judgment (for defendants) was disfavored in antitrust litigation, including cases alleging concerted action. *See* William H. Page, *The Chicago School and the Evolution of Antitrust: Characterization, Antitrust Injury, and Evidentiary Sufficiency*, 75 VA. L. REV. 1221, 1284–85 (1989).

34. *See* Lopatka & Page, *supra* note 3, at 1718–19 (describing the Antitrust Division and the FTC's attempts to persuade courts of Posner's position).

35. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). For recent discussion, see Nickolai G. Levin, *The Nomos and Narrative of* Matsushita, 73 FORDHAM L. REV. 1627 (2005).

36. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 571 n.35 (11th Cir. 1998).

37. For a diagram illustrating this point, see 2 JOSEPH P. BAUER & WILLIAM H. PAGE, KINTER FEDERAL ANTITRUST LAW 59 (2d ed. 2002).

38. Some courts have suggested that evidence in "equipoise" does not create a jury issue. *Harcros*, 158 F.3d at 569 (holding that where "circumstantial documentary evidence is in equipoise . . . summary judgment against the plaintiffs would be in order"). Of course the plaintiff need only introduce evidence that *tends* to exclude the possibility of independent action. If the evidence actually excluded independent action, the plaintiff would be entitled to summary judgment.

# Redacted in Full

# DA06866 - DA06894

# QUALITY OF SERVICE
# PROVIDED TO RAIL SHIPPERS

***Federal Railroad Administration***

***Report Number: CR-2011-045***
***Date Issued: February 15, 2011***

***Figure 4: Revenue Ton Miles - Class I Railroads, January 2000 through December 2009***




Source: AAR data

The surge in demand in 2004 contributed significantly to poor service in the early years of the study period. Representatives from several railroads explained that railroads cannot respond quickly to unexpected, substantial growth in demand. They need a minimum of 6 to 9 months to train additional crews, a longer time to purchase rolling stock, and even longer to upgrade infrastructure.

None of the railroad personnel we interviewed anticipated the demand surge. One independent expert stated that railroads remained in cost-cutting mode well into 2004. Indeed, not until March 2004 did Class I railroad employment begin to reverse the downward trend it had exhibited since the late 1990s. An STB representative noted that during the early years of the surge, railroad crews were "timing out," meaning that they reached the limit of their legally-allowed hours of service before other crews became available to replace them. Representatives of one railroad noted that they normally plan for 2 to 4 percent in annual growth, but as early as 2003, demand increased by nearly 12 percent and continued to grow through 2007, forcing the railroad to catch up. The representative of another railroad informed us that the railroad used every switching terminal in its system to handle demand before it peaked. An independent rail expert concurred with these assessments, noting that from 2004 through 2007, the railroad network was "stressed due to excessive demand versus available capacity," and that this stress had a negative impact on service.

Both shippers and railroad representatives we spoke with cited a drop-off in demand as the reason that railroads could improve service quality in 2008 and 2009. None of the shippers we interviewed indicated that they had any service problems in 2008 or 2009. One railroad representative stated that it is "easy to run the railroad" under such low demand.









# Study of Rural Transportation Issues

The United States Department of Agriculture

The United States Department of Transportation

Published April 2010

Rural rail network lines have declined, and abandonments by Class I railroads, short lines, and regional companies continue. The push to trainload operations has increased overall capacity while making individual shippers and smaller elevator firms carry the cost of assembly of those unit train volumes. Guaranteed railcar ordering systems provide efficiency, but at increased cost. Determining effective capacity available to agriculture is complex and cannot be separated from service issues, rate levels, structure, and competition for traffic.

## Conclusions

Adequate rail capacity is necessary to move agricultural products to market in an efficient and cost-effective manner. Rail capacity constraints force traffic from rail to truck, increasing transportation costs and damage to highways.

Capacity constraints were common from 2003 through the first half of 2006. Weaker demand for rail freight transportation beginning in late 2006, and a recession that began in December 2007 resulted in adequate rail capacity for agricultural products during the harvest of 2006, and from 2007 through the first half of 2009. However, capacity constraints are expected to occur again when the economy recovers.

Increased use of the rail lines, which has benefited the railroads financially, has also contributed significantly to rail congestion. Each route mile during 2007 carried, on average, 171 percent more traffic in ton-miles—nearly three times the traffic—than in 1980.

By the end of 2007, short line and regional railroads operated nearly 46,000 main line miles of track, a little more than 30 percent of the U.S. railroad network. Short line and regional railroads often provide rail service to rural shippers on lines that otherwise would have been abandoned.

The capacity of the car fleet in tons has increased nearly 14 percent from 1976 to 2007, even though the number of railcars has decreased by more than 18 percent. The ton-miles increased nearly 93 percent from 1980 through 2007, indicating that railcars in 2007 were loaded more frequently than in 1976 due to shorter cycle times. The number of engines available to the Class I railroads has increased 34 percent since 1992. The aggregate horsepower of those locomotives also has steadily increased, up 71.5 percent since 1992.

Railroads are relying more and more on privately-owned cars to provide the capacity to handle shipper demands, shifting the investment burden from the carriers to the shippers. Since 1981, shippers and other investors have provided 88 percent of all new railcar acquisitions.

Rail capacity requirements need to be examined and considered in light of the characteristics of agricultural movements rather than aggregate models and investment strategies. Testimony, shipper complaints and economic analysis indicates the seasonal needs of agriculture and the density of those movements in specific corridors, as well as the perishable nature of the products being moved.

CONGRESS OF THE UNITED STATES
CONGRESSIONAL BUDGET OFFICE

# A CBO PAPER

MAY 2005

# Freight Rail Transportation: A Review of the 2004 Experience



TR002563/Photodisc/Getty Images

A CBO PAPER

# Freight Rail Transportation: A Review of the 2004 Experience

May 2005

The Congress of the United States ■ Congressional Budget Office

[redacted]

# Preface

In 2004, the freight rail industry in the United States faced a surge in demand for its services as the economy expanded, international trade increased, and farmers harvested bumper crops of grain. As demand for transport by freight rail heightened, policymakers, shippers, and transportation analysts expressed concern over whether the railroads would be able to meet shippers' needs.

This Congressional Budget Office (CBO) paper—prepared at the request of the House Committee on Transportation and Infrastructure—examines the confluence of events that led to last year's rise in demand for rail transport and analyzes measures taken both by the railroads and by shippers to accommodate that demand. The review suggests that although some shippers did experience delays and added costs, major disruptions to the overall economy were avoided. In keeping with CBO's mandate to provide objective, impartial analysis, the paper makes no recommendations.

Elizabeth Pinkston of CBO's Microeconomic and Financial Studies Division wrote the paper under the supervision of Roger Hitchner and David Moore. Several external reviewers offered valuable comments, including Michael Redisch and his colleagues at the Surface Transportation Board, Craig Rockey of the Association of American Railroads, Marvin Prater of the Department of Agriculture, and Francetta Willet of the Bureau of Labor Statistics. (The assistance of outside reviewers implies no responsibility for the final product, which rests solely with CBO.) Within CBO, Chad Chirico, Arlene Holen, and Tom Woodward provided helpful comments.

Loretta Lettner edited the paper, and Christine Bogusz proofread it. Maureen Costantino designed the cover and prepared the paper for publication. Lenny Skutnik produced the printed copies, and Annette Kalicki prepared the electronic version for CBO's Web site (www.cbo.gov).

Douglas Holtz-Eakin
Director

May 2005

# CONTENTS

**Summary and Introduction** *1*

**The Railroad Industry and the Economy** *3*

**Recent Increases in Rail Traffic** *5*

**Industry and Market Responses to Increased Demand** *7*
- Actions Taken by the Railroads *7*
- Actions Taken by Shippers *13*
- Events That Eased Demand Pressures *13*

**Policy Implications** *14*

[Railroad] and disrupt the economy if the bottlenecks aren't fixed."[2]

The Department of Agriculture reported concerns about the availability of rail service in light of the agency's forecast of record crops and strong export demand:

> "Agricultural producers will have unusually stiff competition for limited rail capacity because year-to-date rail traffic is up across nearly all of the major commodity groups. Furthermore, some railroads are contending with rail service delays caused by the early retirement of train crew members, rail line and switching terminal congestion, and lack of equipment to handle unexpected demand."[3]

In June 2004, Roger Nober, chairman of the Surface Transportation Board (STB), the federal agency charged with regulating the railroads and ensuring adequate service, wrote a letter to the heads of the seven major freight railroads asking how they intended to meet the unprecedented surge in demand.[4] In his correspondence, Nober expressed concern that the railroads' performance in recent months had faltered, as measured by several indicators. Those included factors such as the number of cars on-line, system train speed and yard dwell time, on-time performance, train- and engine-crew utilization, locomotive utilization, and infrastructure and capacity improvements.

Responding individually, the railroads indicated that they were indeed facing unprecedented demand but that they were taking action, such as adding more equipment and hiring greater numbers of new employees than previously planned. Some railroads also stated that they were planning to reroute traffic to avoid bottlenecks.[5]

In August 2004, the Association of American Railroads convened a meeting of representatives from its member railroads, the STB, shippers, and other interested parties to discuss potential problems arising from the surge in demand. At the STB's urging, the Union Pacific Railroad also held its own customer forum in San Francisco, and CSX Transportation held one in Atlanta.

Throughout 2004, the demand for rail transportation was strong, setting an annual record for traffic as measured in ton-miles and setting weekly records for intermodal service (truck trailers and containers transported on railcars) in 28 weeks of the year.[6] Even so, as of April 2005, the feared "meltdown" of service had not materialized. Actions taken by the railroads to increase capacity or manage demand apparently were successful at avoiding massive systemic problems. The railroads dramatically accelerated their hiring and training, acquired new equipment, and modified their operations in order to increase capacity. They also raised rates on some commodities and services and asked shippers to moderate their demands.

Shippers made accommodations in various ways to limitations in the availability of rail service. Some shippers combined into one shipment goods that might otherwise have been sent in several shipments. Some stockpiled materials in anticipation of delays, and some postponed making shipments at peak periods. Some sought alternative shipping methods, such as using less-congested rail routes, trucks, or air freight. As noted previously, as rail traffic continued to grow, railroads raised rates on certain commodities and services.[7] That market mechanism helped allocate the scarce capacity to shippers who valued it most, thus limiting potential damage to the economy.

Other factors helped moderate demand for rail transportation. For example, although 2004 marked the second year in a row of record grain harvests, grain prices were somewhat weaker than in 2003. That development may have reduced pressures to sell—and consequently transport—grain, which many farmers had reportedly felt the

2. James F. Peltz, "Struggling to Get Back on Track: Union Pacific Deals with Major Congestion as the Improving Economy Brings More Cargo Through Southern California," *Los Angeles Times*, Home Edition (May 14, 2004), p. C1.

3. Department of Agriculture, Agricultural Marketing Service, Transportation and Marketing Programs, Transportation Services Branch, "Grain Transportation Report" (August 26, 2004), available at www.ams.usda.gov/tmdtsb/grain.

4. Letter from Roger Nober, Chairman, Surface Transportation Board, to the heads of the seven Class I freight railroads, June 9, 2004, available at www.stb.dot.gov/stb/docs/fallpeakletter.pdf. As the successor to the Interstate Commerce Commission, the STB regulates certain economic aspects of the rail industry. The Federal Railroad Administration regulates rail safety.

5. For example, see the Union Pacific Railroad's response to the Surface Transportation Board, July 9, 2004, available at www.stb.dot.gov/stb/docs/upfallpeakletter.pdf.

6. A ton-mile is the measure of one ton of freight transported the distance of one mile.

7. Other factors, such as rising fuel prices, also played a role in the railroads' decision to increase rates.

# Financing Freight Improvements

January 2007

U.S. Department of Transportation
Federal Highway Administration








# Notice

This document is disseminated under the sponsorship of the U.S. Department of Transportation in the interest of information exchange. The U.S. Government assumes no liability for the use of the information contained in this document. This report does not constitute a standard, specification, or regulation.

The U.S. Government does not endorse products of manufacturers. Trademarks or manufacturers' names appear in this report only because they are considered essential to the objective of the document.

# Quality Assurance Statement

The Federal Highway Administration (FHWA) provides high-quality information to serve Government, industry, and the public in a manner that promotes public understanding. Standards and policies are used to ensure and maximize the quality, objectivity, utility, and integrity of its information. FHWA periodically reviews quality issues and adjusts its programs and processes to ensure continuous quality improvement.

# Table of Contents

**1.0 Introduction** ... **1**
Freight Transportation Needs ... 2
The Role of the Public Sector in Financing Freight Improvements ... 5

**2.0 Funding and Financing Tools for Freight Investments** ... **7**
The Federal-Aid Highway System and Federal-Aid Programs ... 8
Federal Highway Funding Programs ... 9
Federal Financing Tools ... 26
State Grant and Loan Programs for Freight Improvements ... 33
Other Funding Methods and Financing Tools ... 49

**3.0 Case Studies of Freight Financing** ... **59**
Arkansas ... 59
California ... 67
Colorado ... 72
Delaware ... 74
Florida ... 75
Illinois ... 76
Indiana ... 85
Iowa ... 87
Kansas ... 88
Kentucky ... 89
Louisiana ... 90
Maine ... 93
Michigan ... 97
Missouri-Kansas ... 98
North Carolina ... 100
Nevada ... 101
New York ... 103
New Jersey ... 108
Ohio ... 110
Oregon ... 113
Pennsylvania ... 116
Rhode Island ... 118
South Carolina ... 119
Tennessee ... 122
Texas ... 123
Virginia-West Virginia-Ohio ... 126
Washington ... 128
Wisconsin ... 133

**4.0 References** ... **137**
Federal Funding Programs ... 137
Federal Financing Tools ... 138
State Grant and Loan Programs for Freight Improvements ... 138
Case Studies ... 140
Other Resources ... 141

**Glossary of Terms** ... **143**

**Acronyms** ... **153**

# List of Tables


2.1 Federal Funding Programs .................................................... 23

2.2 Federal Financing Tools ........................................................ 31

2.3 Illustrative State Grant and Loan Programs .......................... 34

3.1 Case Studies by Project Type ................................................ 61

3.2 Case Studies by Funding Type/Project Size .......................... 63


# List of Figures


1.1 2020 Freight Shipments by Mode........................................... 2

2.1 Public-Private Partnership Options ....................................... 54

Railroads are currently serving record volumes, despite the fact that rail miles have continued to decline since their peak in the 1920s. Just a two-year comparison of statistics for the seven Class I railroads operating in the United States shows a decline in rail miles from 97,662 in 2004 to 95,830 in 2005, while tonnage increased from 1.84 billion in 2004 to 1.90 billion in 2005.[4] Volumes in 2006 are up 2.8 percent over 2005 through the first 29 weeks of the year.[5] Railroads have been reducing track through mergers and branchline rationalization in an effort to reduce costs. Increased volumes are resulting from higher densities on mainlines, which has so far offset traffic lost through the reduction in rail miles. The result is that railroads are currently operating at capacity in many parts of the country and have little ability to expand their role in freight transportation to more desirable levels.

The AASHTO Freight Rail Bottom Line Report[6] estimates that shifting all freight rail to trucks would add 92 billion truck VMT, creating the need for an additional $64 billion in highway improvements over the next 20 years. Clearly, it is in the nation's interest to keep the rail system operating effectively. Assuming rail maintains its current share of freight movements, annual capital for freight system needs were estimated between $5.3 to $11.2 billion.

The interface among major transportation modes (i.e., highway, rail, air and waterborne) is a critical junction point in the freight mobility and goods movement chain. Rail and highway access has been identified as one of the main infrastructure needs at major port and airport locations. In addition, the growth of goods moving through ports and airports has increased considerably in recent years, and is expected to continue growing at an increasing rate. Current and future growth projected in freight demand puts increasing pressure on ports' and airports' capacity, especially since demand for port and airport sector has outpaced the growth in capacity.[7]

---

[4] Association of American Railroads *Class I Railroad Statistics*. The seven Class I railroads are Burlington Northern Santa Fe, Canadian National, Canadian Pacific, CSX Transportation, Kansas City Southern, Norfolk Southern, and Union Pacific.

[5] Association of American Railroads, *Freight Traffic Up on U.S. Railroads*, July 27, 2006.

[6] American Association of State Highway and Transportation Officials. *Freight-Rail Bottom Line Report*. Washington, D.C., 2002.

[7] Hudson Institute. *2010 and Beyond: A Vision of America's Transportation Future*. Washington, D.C., 2004.

U.S. Department of Transportation
Federal Highway Administration

Office of Freight Management and Operations
Phone: 202-366-9210
Fax: 202-366-3302
Web site: http://ops.fhwa.dot.gov/freight

January 2007
FHWA-HOP-06-108
EDL 14295








Project 1754

TO: Jack Koraleski

FROM: Chuck Adams

COPY: Greg Sovey
Kurt Schroeder

SUBJ: CSXT / UP FUEL SURCHARGE

File KOY 3/12

I am attaching the following correspondence between our two roads concerning carrier concurrence to fuel surcharges. The documents are:

1. CSXT letter to UP, dated 9/29/2000 requesting our concurrence to participate in fuel surcharges where they publish the documents.
2. UP's response to the CSXT request of 9/29/2000 dated 10/4/2000.
3. UP's letter to CSXT and CSXT response to UP requesting their concurrence to participate in fuel surcharges where UP publishes the documents, dated 11/01/02 and 11/12/02.

Should you have any questions regarding this information, please contact myself on 271-5866 or Kurt Schroeder on 271-4595.

Proj. 1202

1

CSX TRANSPORTATION
Marketing Services – J865
BellSouth Tower – 28th Floor
301 West Bay Street
Jacksonville, FL 32202

September 29, 2000

Kurt H. Schroeder
Union Pacific Railroad Company

Subject: Proposed Fuel Surcharge

Dear Mr. Schroeder:

To enable recovery of increased fuel costs, CSXT requests your concurrence to implement a fuel surcharge on most joint-line rates between CSXT and your company effective October 25, 2000. These surcharges will be divided in the same proportion as in the joint-line rate.

Should the price of West Texas Intermediate Crude Oil reach $28 per barrel and remain at or above that level for thirty (30) consecutive days, a surcharge will be added to the freight charges on the joint-line movement with your company in accordance with publication CSXT 8100 Item 12000. The percentage will be applied to the gross freight revenue and added as a miscellaneous charge on the freight bill to be divided in the same proportion as the freight revenue.

The recovery charge will be published as an amendment to appropriate CSXT tariffs of general applicability and will be applied to all joint-line traffic moving under tariffs, public price lists, private price quotes and certain contracts that incorporate those general tariffs. Contracts that contain a price escalator index published by a government entity, such as RCAF, will not be included.

We appreciate a reply to our proposed fuel surcharge on traffic moving in connection with your company no later than close of business October 6, 2000. If we do not hear from you by that date, we will assume your concurrence. Your response may be forwarded to us via the internet to Pam_Grayson@csx.com, faxed to 904-633-5733 or mailed/expressed to the above address. Should you have any questions concerning this proposal, please contact me at the e-mail address or phone number below.

Yours truly,

Clyde V. McIntyre
Director-Marketing Services
Clyde_McIntyre@csx.com
904-633-5678

Kathy A. Eymann 10/04/2000 09:48 AM

To: "Grayson, Pam" <Pam_Grayson@csx.com> @ INTERNET
cc: Sharon A. Beschorner, Michael D. Boone, James F. Lusk, John M. Newman, Craig Piennett, Kelli K. Sears, Linda L. Sudduth, Nobu Terasaki, Linda S. Bowen, Dave A. Gramlich, Ann E. Schwabe

Subject: CSXT Fuel Surcharge Project 1202

Reference your letter dated September 29, 2000, requesting our concurrence to implement a fuel surcharge on most joint-line rates, effective October 25, 2000.

You may accept this letter as our concurrence to the above proposed fuel surcharge, based on the following conditions:

1) CSXT fuel surcharge to apply only on public price documents where CSXT is the publisher. CSXT private price documents may be "individually negotiated" at the time(s) of their establishment or their renewal.

2) CSXT has agreed to publish/maintain the FSC to facilitate automated downstream billing systems:

a) CSXT will capture/maintain the fuel surcharge in a Surcharge Condition Code (SURC) group docket with the fuel surcharge amount kept positively stated.

b) All price dockets (T/S 460) actually subject to the fuel surcharge will be pointed to the fuel surcharge group docket (T/S 490).

3) The fuel surcharge amounts will be divided/settled on the same basis as their associated individual price(s) interline divisions.

Proj 1106

3



"Lange, Jim" <James_Lange@csx.com>

11/12/02 09:23 AM

To: "KAEYMANN@up.com" <KAEYMANN@up.com>, "kurtschroeder@up.com" <kurtschroeder@up.com>
cc:
Subject: RE: UP Fuel Surcharge - CSXT concurrence

Resent due to initial delivery failure received on first e-mail reply.

> -----Original Message-----
> From: Lange, Jim
> Sent: Tuesday, November 12, 2002 10:17 AM
> To: 'KAEYMANN@up.com'
> Cc: McIntyre, Clyde Jr.; Grayson, Pam
> Subject: UP Fuel Surcharge - CSXT concurrence
>
> Kathy:
>
> This will confirm verbal concurrence to the request below which was given
> on Friday, November 8, 2002 to Kurt Schroeder from Clyde McIntyre of CSXT.
>
> Jim Lange
> Manager, CSXT Pricing Services
>
> cc: Clyde McIntyre
> Pam Grayson
>
> -----Original Message-----
> From: KAEYMANN@up.com [mailto:KAEYMANN@up.com]
> Sent: Friday, November 01, 2002 3:49 PM
> To: Grayson, Pam
> Subject: UP Fuel Surcharge - Project 1106
>
>
> Due to the rising cost of fuel, UP requests your concurrence to implement
> a
> joint line fuel surcharge effective December 1, 2002.
>
> The fuel surcharge will initially be two (2) percent and will be applied
> to
> carload freight movements with waybill date of 12/01/2002 or later. The
> fuel surcharge will apply to most UP pricing documents, with the exception
> of those which already have fuel surcharge provisions or specify
> otherwise.
>
> The fuel surcharge will be published in appropriate UP governing rules
> tariffs/circulars and shall be applied according to the following terms:
>
> 1. When the price of West Texas Intermediate Crude Oil (WTI) equals or
> exceeds $28.00 per barrel for 30 consecutive days, a fuel surcharge shall
> apply.
>
> 2. The fuel surcharge will be applicable to the line haul freight
> charge(s) that make reference to this fuel cost recovery charge in effect
> on the date the fuel surcharge is applied, hereinafter referred to as the
> "Base Freight Charge(s)." Surcharge amounts will be divided on the same
> proportion as in the joint-line rate.
>
> 3. The WTI price shall be published in the Wall Street Journal.
>
> 4. The fuel surcharge shall be applied according to the following
> schedule.
>
> West Texas Intermediate Cumulative Fuel

> | Crude Oil (Price per barrel) | Surcharge (Percentage) |
> |---|---|
> | $28.00 - $32.99 | 2% |
> | $33.00 - $37.99 | 4% |
> | $38.00 - $42.99 | 6% |
> | $43.00 - $47.99 | 8% |
> | Each $5.00 per barrel increase thereafter | An additional 2% |
>
> 5. The price of WTI must equal or exceed a given bracket for thirty (30)
> consecutive days for the surcharge under that bracket to be applicable.
>
> 6. If the price of WTI ceases to be available from the Wall Street
> Journal or some other readily accessible source, a substitute to measure
> will be utilized.
>
> 7. Any fuel surcharge applied to the line haul freight charge(s) that
> make reference to this fuel cost recovery charge will be removed or
> reduced
> when the price of WTI remains below the price which triggers a specific
> surcharge bracket for thirty (30) consecutive days.
>
> 8. In no case will the freight charge(s) be reduced below the Base
> Freight Charge(s) nor will the application or removal of the fuel
> surcharge
> be retroactive.
>
> 9. This UP Fuel Surcharge program is applicable only when shipments are
> moving on UP price documents. If a shipment is moving on joint line rates
> where UP is not the publisher, the publishing carrier's fuel surcharge
> provision, if any, will apply.
>
> 10. Lumber and lumber related articles as published in Exempt Circulars
> UP
> 24 and UP 2421 will NOT be included in the fuel surcharge.
>
> We would appreciate your concurrence to the above fuel surcharge no later
> than November 8, 2002. If you have any questions or if it is move
> convenient to phone in your decision, please feel free to call the
> undersigned at (402) 271-4595 or Kathy Eymann at (402) 271-4793.
>
> Kurt Schroeder
> Sr. Manager Revenue Management
> Union Pacific Railroad
> FAX: (402) 271-4860
>

**From:** Couch, John
**Sent:** Wednesday, March 19, 2003 8:54 PM
**To:** Couch, John ; Hancock, Kyle Jr.; Smith, Derrick ; Woodall, Mike ; Howarth, Jim ; Katz, Glenn ; Kenwell, Bill; Onimus, Frank S III
**Cc:** Gooden, Clarence ; Jenkins, Ed; Shefelbine, Kelly ; Lewis, Gary ; McIntyre, Clyde Jr.; Hollingsworth, Adam; Trescot, Leslie
**Subject:** RE: Fuel Surcharge Change

New update: This may be changed or delayed.

-----Original Message-----
**From:** Couch, John
**Sent:** Wednesday, March 19, 2003 1:10 PM
**To:** Hancock, Kyle Jr.; Smith, Derrick ; Woodall, Mike ; Howarth, Jim ; Katz, Glenn ; Kenwell, Bill; Onimus, Frank S III
**Cc:** Gooden, Clarence ; Jenkins, Ed; Shefelbine, Kelly ; Lewis, Gary ; McIntyre, Clyde Jr.; Hollingsworth, Adam; Trescot, Leslie
**Subject:** Fuel Surcharge Change

A Press Release will go out today stating that CSXT will be changing the Fuel Surcharge program to better capture the changes to our costs of fuel. Details of the new program will not be released until next week. The new program will be effective May 1.

The changes are:
1) based on prior months average - not 30 consecutive business days
2) starts at $23/barrel - for every $1 change, fuel surcharge goes up .4%. This equals the current 2% for every $5 change
3) no fuel surcharge for $13-$23
4) same .4% for every dollar below $13 as a discount.

There will be a conference call tomorrow with all of commercial hosted by Mike Giftos.

This decision was made by Giftos/Ward and is a result of our large increase in fuel costs. Attached is some more detailed information.

<< File: Fuel surcharge - New program.ppt >>
<< File: fuel surcharge.xls >>



Highly Confidential DA06915 CSXFSC000153146

CSXFSC000065811

CSX CORPORATION

# CSX Intermodal
# Fuel Surcharge Review

June 2004

Highly Confidential

CSXFSC000065812

# Two indices for establishing fuel surcharge amounts apply in the industry – WTI and DOE

CSX INTERMODAL

**West Texas Intermediate (WTI)**

- CSX Transportation
- Norfolk Southern
- Canadian Pacific
- Canadian National
- Kansas City Southern

**Per Barrel**

**Department of Energy (DOE)**

- CSX Intermodal
- Union Pacific
  - Separate program for IMDL
- Burlington Northern
  - Separate program for IMDL

**Per Gallon**



Highly Confidential

CSXFSC000065813

# Within the DOE-based group, different formulas apply

CSX INTERMODAL

- CSX Intermodal (Updated Monthly)
  - (Last Monday of previous month price - $1.10)/($1.10*0.10*100)

- Burlington Northern Intermodal (Updated Bi-Weekly)
  - Base of $1.24 equals 1%, 0.5% increase each $0.04 Δ
  - Publishes table for extrapolation

- Union Pacific (Updated Monthly)
  - Uses DOE multiplied by UP's unpublished fuel weight
  - Does not appear to be a linear equation



Highly Confidential

CSXFSC000065814

# DOE Highway diesel price history, by week

CSX INTERMODAL






Highly Confidential

CSXFSC000065815

# Estimated expected fuel surcharge amounts per $1M in revenue by month, by road from Jan-03






Highly Confidential

DA06920

CSXFSC000065816

# CSXI actual fuel coverage (2003) – excludes RCAF increases related to fuel price

CSX INTERMODAL

$M

| Period | LH Net Revenue | Fuel Surcharge | Full Coverage | Actual Amount | Variance | Actual Percent |
|---|---|---|---|---|---|---|
| Jan-03 | 86.1 | 2.8% | 2.4 | 1.5 | (0.9) | 1.7% |
| Feb-03 | 97.3 | 3.6% | 3.5 | 1.8 | (1.7) | 1.8% |
| Mar-03 | 123.1 | 5.5% | 6.8 | 3.4 | (3.4) | 2.8% |
| Apr-03 | 98.1 | 4.6% | 4.5 | 2.4 | (2.1) | 2.4% |
| May-03 | 100.0 | 3.7% | 3.7 | 2.2 | (1.5) | 2.2% |
| Jun-03 | 124.6 | 3.0% | 3.7 | 2.1 | (1.6) | 1.7% |
| Jul-03 | 101.6 | 2.9% | 2.9 | 1.5 | (1.4) | 1.5% |
| Aug-03 | 107.7 | 3.1% | 3.3 | 1.6 | (1.7) | 1.5% |
| Sep-03 | 139.8 | 3.7% | 5.2 | 2.4 | (2.8) | 1.7% |
| Oct-03 | 118.2 | 3.0% | 3.5 | 1.8 | (1.7) | 1.5% |
| Nov-03 | 107.7 | 3.6% | 3.9 | 2.1 | (1.8) | 1.9% |
| Dec-03 | 124.8 | 3.6% | 4.5 | 2.3 | (2.2) | 1.8% |
| Total/Average | 1,329.0 | 3.6% | 48.0 | 25.1 | (22.9) | 1.9% |



Highly Confidential

CSXFSC000065817

# Estimated expected fuel surcharge amounts using other road methodologies on revenue of $1M per month

CSX INTERMODAL

| Annual Fuel Surcharge per $12M (2003 Rates) | | | |
|---|---|---|---|
| | Amount | Var to CSXI | Percent |
| CSX IMDL | 431,000 | - | 0.0% |
| CSXT | 284,000 | (147,000) | -34.1% |
| UP IMDL | 470,000 | 39,000 | 9.0% |
| BN IMDL | 500,000 | 69,000 | 16.0% |

- Based on $1M per month
- Based on monthly spreads



Highly Confidential

CSXFSC000065818

# Estimated expected fuel surcharge amounts using other road methodologies

CSX INTERMODAL

| 2003 Comparison | CSXI Actual | BN Method | UP Method |
|---|---|---|---|
| Linehaul | 11.6 | 13.3 | 12.8 |
| Supplemental | 13.5 | 15.5 | 14.8 |
| Total | 25.1 | 28.8 | 27.6 |
| Vs. CSXI | | 3.7 | 2.5 |

- Assumes same base coverage
- Based on <u>monthly</u> spreads



Highly Confidential

CSXFSC000065819

# Recommendations???

CSX INTERMODAL

- Convert to modified BN methodology
  - Transparent
  - Begins standardization across industry
  - Most effective over last 18 months
  - Keep it monthly

- Publish table consistent with BN
  - Re-baseline at $1.24
  - Little chance of fuel going below $1.24 in short-term

- Alternatives
  - Maintain current program
  - Use BN program, CSXI base of $1.10



Highly Confidential

**From:** Price, Dwight
**Sent:** Monday, June 20, 2005 7:24 PM
**To:** Couch, John
**Subject:** IAP 2005 MidYear Review

**Attachments:** IAP 2005 MidYear Review-DLP-v3.0.ppt

John,
Per your request, here is the presentation we gave to Clarence during our strategic review earlier this month. Let me know if you have any questions about it. Thanks.

IAP 2005 MidYear Review-DLP-v3...

Dwight

June 1, 2005

# SHAPING THE FUTURE AT CSX

## Midyear Review, Second Half Outlook and Future Strategies

INDUSTRIAL AND AGRICULTURAL PRODUCTS

# Agenda


| PAGE | TOPIC |
|---|---|
| 2 | ***Overall Performance Year-to-Date*** |
| | Results through Period 5 on the major Commercial Goals |
| 13 | ***Fleet Reinvestment Results and Plans*** |
| | Progress towards reaching the reinvestment hurdles |
| 25 | ***Second Half Outlook*** |
| | Dealing with sensitivities, competitors and developing new responses |
| 35 | ***Long Term Market Outlook*** |
| | Market trends and the expected impact on '06 and '07 plans |
| 45 | **New *Strategic Thinking*** |
| | Beyond the Price Lever: Building new long term strategies |
| 60 | ***Appendix*** |
| | Commercial Processes & Procedures |
| | Upcoming Contract Renewals |

# MICP GOAL PROGRESS

## Results Through Period 5 on the Major Commercial Goals

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**CSX's current strategic direction is focused on the short-term strategic levers of franchise strength and price increases.** To date, we have achieved solid results.

## Short Term

| | |
|---|---|
| Competitive Advantages | Physical Network |
| Profit Drivers | Price |

CSXFSC000042133

**We have achieved these results through a straightforward Yield Management Price Strategy.** Actions have focused on achieving the maximum increases in price in order to exceed our 20th percentile as well as to achieve other strategic objectives.

- **Price to the Market.** Our objective is to establish the market price and set our price accordingly. Sometimes there is a discount applied versus truck due to service deficiencies or additional costs of rail (inventory, private cars, etc.). The market can differ from truck to other railroad to barge to source competition. We never cost-plus price.
- **Price to Exceed Reinvestment Hurdles.** After establishing the market and our price, we ensure that this price level will achieve the reinvestment hurdle for the equipment. The floor is $10 CPCD after car costs. This is the minimum and is exceeded by as much as the market will bear.
- **Limit Pricing Term.** As long as conditions are favorable toward sellers and there remains upward price sensitivity, we will limit contract terms in most cases to 1 year. Exceptions will be limited and internal policies will be followed.
- **Prefer Fixed Increases WITH Fuel Surcharge.** Consistent with the term issue above, in most cases we prefer fixed increases with Fuel Surcharge RCAF(U) is acceptable as an alternative.
- **Make Refunds the Exception.** When necessary to reimburse customer capital investment, refunds are considered an important strategic tool. Receiver strategies provide refunds as incentive to locate receivers on CSX [redacted], etc.) Receivers may not always pay freight. Also used for express load incentives
- **Equipment allocation against strong demand.** Efforts have focused on stratifying customer locations and allocating equipment against the business with the greatest financial return.



DA06930

Highly Confidential

**MICP GOALS.** Here is the Group's progress through P5. The contribution and fleet reinvestment numbers reflect settled data through P3.

**Midyear Progress on MICP Goals**
Source: IAP, Various Reports

| | Agricultural Products | Food & Consumer | Metals | Forest Products |
|---|---|---|---|---|
| Revenue of $2.05 billion | | | | |
| Price of $64.5 million | | | | |
| Improve contribution by 5% | / 9% | / 28% | / 33% | / 35% |
| Car types to 20th Percentile | | | / | |
| Three New Products | | | | |
| Other MICP Goals | | | | |

**Revenue results mid-year are on track to exceed the 2005 Plan.** Business Unit results thru P5 range from being at Plan (Ag), to exceeding Plan by 7% (F&C). These numbers also represent results that range from 4% (Ag) ahead to 12% (F&C) ahead of 2004.

**Industrial & Ag Products Revenue Results through Period 5.**
Source: CSX Loading Report



## MPA results mid-year are also on track to exceed the 2005 Plan.

Through P4 the Group has achieved MPA of $19.8 million which is $4.1 million, or 26%, ahead of the $15.7 million plan.

**Industrial & Ag Products MPA Results through Period 4 ($millions).**

Source: CSX Commercial Finance



**Contribution results through Q1 greatly exceed the 5% growth target.**
This is a direct result of our focused efforts on Yield Management and Pricing improvement.

**Industrial & Ag Products Contribution Improvement Q1 2005**
Source: CSX Commercial Finance



**Deficit traffic has been greatly reduced.** For the Group all deficit traffic has been reduced by 5% in the last 12 months, despite the higher cost factors that went into effect in 2005.

**Rolling 12 months deficit traffic by fiscal period through P3 2005**
Source: CSX Commercial Finance






Highly Confidential DA06935 CSXFSC000042138

**We continue to make excellent progress in raising the profitability profile of our traffic to go above the $10 CACC hurdle.** We will continue to raise profitability going forward.

**Industrial & Ag Products Profitability Snapshot Q1 2005**
Source: Data Warehouse

| Business Unit | Deficit Rev. ($M) | $0--$10 CACC ($M) | Rev below $10 threshold | % of Rev below threshold | >$10 CACC ($M) | Total BU Rev. ($M) |
|---|---|---|---|---|---|---|
| AG | $60.2 | $72.6 | $132.8 | 24% | $428.6 | $561.4 |
| F&C | $34.9 | $42.8 | $77.7 | 20% | $303.0 | $380.7 |
| MT | $43.7 | $86.6 | $130.3 | 25% | $394.9 | $525.2 |
| PA | $80.9 | $93.9 | $174.8 | 25% | $522.7 | $697.5 |
| **Ind. & Ag. Total:** | **$219.7** | **$295.9** | **$515.6** | **24%** | **$1,649.2** | **$2,164.8** |



Highly Confidential DA06936 CSXFSC000042139

**Today, with the exception of AG, the IAP business units lead the company in Fuel Surcharge coverage.** AG is currently using RCAF(U )as the main recovery vehicle to compete with the NS which does not charge Fuel Surcharge to its AG customers.

**Fuel Surcharge Percent Coverage in 2005**

Only Fuel Surcharge – Does not include impact from RCAF(U) SOURCE: CSX Finance

| | Percent Coverage | | | |
|---|---|---|---|---|
| | P1 | P2 | P3 | P4 |
| **AG** | **32%** | **37%** | **34%** | **35%** |
| Chemicals | 55% | 58% | 52% | 52% |
| EMU | 59% | 64% | 57% | 55% |
| **Food & Consumer** | **110%** | **90%** | **79%** | **87%** |
| **Forest Products** | **71%** | **69%** | **73%** | **78%** |
| **Metals** | **81%** | **84%** | **84%** | **87%** |
| Phos. & Fert | 60% | 58% | 67% | 53% |
| Coal | 28% | 35% | 21% | 29% |
| Auto | 14% | 12% | 13% | 38% |
| **Total** | **48%** | **49%** | **44%** | **50%** |

**The complete picture showing our protection against fuel price risk is more evident when revenue covered by the RCAF(U) is added to the revenue covered by Fuel Surcharge.** The data below covers Industrial & Ag Products revenue through Period 4.

**Total Coverage Against Fuel Risk in 2005**

Adds Fuel Surcharge plus impact from RCAF(U), through P4 SOURCE: CSX Finance, Business Units

| | % OF REVENUE COVERAGE | | |
|---|---|---|---|
| BUSINESS UNIT | FUEL SURCHARGE | RCAF(U) | TOTAL REVENUE COVERAGE |
| AG | 35% | 55% | 90% |
| Food & Consumer | 91% | 5% | 96% |
| Forest Products | 73% | 26% | 99% |
| Metals | 84% | 12% | 96% |



Highly Confidential DA06938 CSXFSC000042141

# FLEET REINVESTMENT RESULTS and PLANS

Progress toward reaching the reinvestment hurdles

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**We are making good progress toward achieving 2005 fleet reinvestment targets.** Our primary car types are featured below.

**Industrial & Ag Products Equipment Reinvestment Results through Q1 2005.**
Source: CSX Commercial Finance

NR = Not Reinvesting

| Planning Car Description | Fleet Size Apr. '05 | CBCC @ 20th Percentile Q1 2004 | CBCC @ 20th Percentile Q1 2005 | 2005 12% Reinvestment Hurdle | Q1 2005 Variance | Ann. % Change |
|---|---|---|---|---|---|---|
| 50' Insulated Box | 828 | $7.38 | $13.96 | NR | NR | 89% |
| 60' Insulated Box | 204 | ($4.49) | $19.20 | $23.23 | ($4.03) | 528% |
| 50' RUF | 6,218 | $7.38 | $12.78 | $20.14 | ($7.36) | 73% |
| 50' CUF | 2,522 | $7.92 | $14.01 | $20.14 | ($6.13) | 77% |
| 60' Autobox | 1,275 | $35.78 | $36.86 | $21.86 | $15.00 | 3% |
| 60' Plain Boxcar | 2,481 | $9.92 | $15.44 | $21.86 | ($6.42) | 56% |
| 86' Autobox | 1,835 | $33.79 | $36.42 | $31.40 | $5.02 | 8% |
| Small Cube Cvd. Hopper | 4,221 | $16.16 | $17.46 | $22.76 | ($5.30) | 8% |
| Jumbo Cvd. Hopper | 9,535 | $20.78 | $25.64 | $20.79 | $4.85 | 23% |
| 52' Plain Gondola | 8,775 | $9.60 | $13.88 | $22.52 | ($8.64) | 45% |
| 65' Gondola | 406 | $19.99 | $30.26 | $25.13 | $5.13 | 51% |
| Covered Coil Gondola | 4,314 | $23.39 | $31.23 | $30.53 | $0.70 | 34% |
| Open Coil Gondola | 923 | $18.34 | $19.07 | $20.51 | ($1.44) | 4% |
| Bathtub | 14,702 | $58.09 | $62.14 | $22.74 | $39.40 | 7% |
| Bottomdump | 10,716 | $36.75 | $40.67 | $18.62 | $22.05 | 11% |
| Special Service Rock | 3,487 | $19.38 | $24.21 | $20.54 | $3.67 | 25% |

**Today, 57% of the carloads in 52' Gons is above the reinvestment hurdle of $22.52.** The objective is to aggressively price up the business at a time of high demand in order to have more than 80% above this hurdle, thus achieving the target.

**Driving the 52' Gondola Market to Reinvestment Levels in 2005**

How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment




… the challenge is to capitalize on market conditions and take price increases on poor quality revenue sufficient enough to earn the right to reinvest in the equipment.

**Today, 43% of the carloads in 52' Gons does not meet the reinvestment hurdle of $22.52.** Several major contracts have restricted our ability to take the necessary increases to date. ALL of the remaining "below reinvestment" business will be increased this year.

**Driving the 52' Gondola Market to Reinvestment Levels in 2005**

How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment



**As new increases take effect in Q3, 80% of carloads will move above the reinvestment hurdle.** The only other outcome would be that the business leaves CSX which will have the same positive effect on CPCD.

**Driving the 52' Gondola Market to Reinvestment Levels in 2005**

How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment

… In fact, the size of the increases should ensure that the business as a whole is comfortably above the reinvestment hurdle. This graph represents the minimal impact and does not include the impact from other smaller deals represented below in brown which will be re-priced throughout the balance of the year.



**By year's end, over 84% will be above the hurdle, satisfying the 20% hurdle.** The only other outcome would be that the business leaves CSX which will have the same positive effect on CPCD.

**Driving the 52' Gondola Market to Reinvestment Levels in 2005**

How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment




... In fact, the size of the increases should ensure that the business as a whole is comfortably above the reinvestment hurdle. This graph represents the minimal impact and does not include the impact from other smaller deals represented below in brown.

... the remaining business will all have been increased sometime during 2005, with the last large block increasing in 2006, to impact Q1 2006 results.

**Open Coil cars will exceed the reinvestment hurdle by the end of Q2 with 93% of the traffic above the hurdle.** Monitoring and limiting idle car days will also be key to maintaining a high return profile on this relatively small fleet.

**Driving the Open Coil Market to Reinvestment Levels in 2005**

How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment

... In fact, the size of the increases should ensure that the business as a whole is comfortably above the reinvestment hurdle. This graph represents the minimal impact and does not include the impact from other smaller deals represented below in brown.




... the remaining business will all have been increased sometime during 2005, with the last large block increasing in 2006, to impact Q1 2006 results.

**With virtually all of F&C traffic meeting the small cube hurdle rate, our focus is on a shift to privatization where it is strategically supported.** Due to the shrinking fleet size from fallout of 40 year cars through 2007, a strategy for privatization is critical for our continued participation in these markets.

**Food & Consumer's fleet strategy to deal with fallout.**
How F&C will deal with shrinking car availability in this segment.

**...Although only a small percentage of the Industrial & Agricultural traffic falls under the 20th percentile, FC is still participating in the following programs to drive even better results.**

**...Price increases in other markets and a continued shift of equipment away from lower priority locations will be mandatory in order to increase the 20th percentile performance.**




...only 4% of the traffic below the reinvestment hurdle is in the FC business unit and is being re-priced to meet reinvestment.

CSXFSC000042150

**By year end, 86% of the 50' boxcar fleet will be above the hurdle based on PA and other business units' efforts.** Discussions with other business units indicate they are increasing their prices to meet the $20.14 reinvestment hurdle. The remaining 14% consists of three contracts that cannot be re-priced until late 2006.

**Driving the 50's Boxcar Market to Reinvestment Levels in 2005**

How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment

Results will also be impacted by cycle time, car prioritization and mix.

| |
|---|
| NON PA – 5% |
| MISC PA DEALS – 6 % |
| OCT – 1% |
| SEPTEMBER – 3 % |
| JULY – 3 % |
| MAR/APRIL – 5 % |
| MAY – 1 % |
| JUNE – 3 % |
| **Carloads ABOVE the $20.14 Equipment Reinvestment Hurdle** 59% |

FOURTH QUARTER IMPACT at least 86 %

THIRD QUARTER IMPACT AT LEAST 74 %

$20.14

14 % UNDER PA CONTRACT – 14 %

The [redacted] contracts will be re-priced in 2006 and will not impact CPCD numbers this year

DA06947



Highly Confidential

**Here is the plan for achieving the objective for 60 ft Boxcars. By year's end, over 79% will be above the hurdle, just short of the 20% hurdle.**
Several large PA contracts account for the major balance of what will remain below the hurdle by year end.

**Driving the 60' Boxcar Market to Reinvestment Levels in early 2006**
How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment

... More than half of the traffic in these cars is shipped by [redacted], and our pricing action has raised most of their traffic comfortably above the hurdle.

... Roughly 5% of the traffic below the hurdle will not be re-priced as these are cars that are in cotton seed and brick service that are not usable for other service.

**Miscellaneous 5% Q3**

**MAY – 7% [redacted] CSX direct**

**April – 6% [redacted] interline**

FOURTH QUARTER IMPACT
at least 79%

**Carloads ABOVE the $21.86 Equipment Reinvestment Hurdle**
**61%**

**THIRD** QUARTER IMPACT
at least 74%

$21.86

**39%**

**PA Under Contract – 2006 fix 15%**

**[redacted] fixed by end Q2 13%**

**Misc 11%**

.. [redacted] contracts will be negotiated in 2006 and pricing will not impact CPCD numbers this year.



CSXFSC000042151
DA06948
Highly Confidential

**The 80th percentile for centerbeams currently exceeds the $20.54 reinvestment hurdle at $23.10.** We continually miss loads of long-term, profitable traffic. Competition between markets for these cars is intense and rates continue to increase accordingly. Strategically, we need to invest in centerbeams.



CSXFSC000042153

**Today, 70% of the volume in Jumbo Covered Hoppers exceeds the purchase hurdle of $32.77.** This chart shows how we can reach the purchase hurdle for the 5200 cubic foot cars.

**Driving Jumbo Covered Hoppers to Purchase Levels in 2005**

How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment




DA06950



Highly Confidential

# SECOND HALF OUTLOOK

Dealing with sensitivities, competitors and developing new responses

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**MICP 2005 Year End Results.** Here is where IAP will end the year on the MICP goals.

## Projected End of Year Status of MICP Goals

| | Agricultural Products | Food & Consumer | Metals | Forest Products |
|---|---|---|---|---|
| Revenue of $2.05 billion | | | | |
| Price of $64.5 million | | | | |
| Improve contribution by 5% | / 9% | / 28% | / 33% | / 35% |
| Car types to 20th Percentile | | | | |
| Three New Products | | | | |
| Other MICP Goals | | | | |

CSXFSC000042156

**Second half sensitivities are minimal but could have an impact.** All things considered, all MICP plans should be achieved but there are some economic and internal impacts which need to be considered.

- **Service must improve**
  - Yield management / pricing efforts cannot totally overcome service issues
  - Operational issues continue to disrupt car supply, order fulfillment, and profitability
  - Erratic service is limiting desirable growth opportunities
  - Dwell time on unit grain trains is negatively impacting revenue and utilization
- **Some economic softening is occurring**
  - Box plant shipments have recently slowed
  - Import paper being affected by European labor disputes
  - U.S. newsprint shipments down 8% YTD
  - Flour production for first quarter was down 3% -- lowest level in the past 13 years
  - Weakness in vehicle production is negatively impacting sheet traffic
- **Some customers are beginning to make structural changes in supply chains**
  - [redacted]

DA06953



Highly Confidential

CSXFSC000042157

**The NS, as well as other rail competitors, are also taking price increases.**
Each Business Unit is seeing slightly different pricing behavior from our rail competitors.

- **Ag Products:** NS Ag carloads have increased 4% year to date, increasing their share by 1%. NS has been aggressive in adding business to their Ag portfolio. CSX has lost the following business due to price and service issues which NS is now handling:

| | | |
|---|---|---|
| – Sweetener, Morrisville, PA | 1230 Cars | $2,000,000 Rev. |
| – Wheat, Chattanooga, TN | 1000 Cars | $850,000 Rev. |
| – Beans, Gainesville | 950 Cars | $1,100,000 Rev |
| – Sweetener, Lakeville, NY | 500 Cars | $725,000 Rev. |
| – Wheat to Lowell, MI | 536 Cars | $260,000 Rev |
| – Oil to Gainesville, GA | 210 Cars | $205,000 Rev |

- **Food & Consumer:**
  - Union Pacific is taking 10-25% increases [redacted] )
  - Union Pacific is moving towards public pricing on all moves under 50 annual loads
  - Burlington Northern is taking 4-12% increases [redacted]
  - Norfolk Southern is taking 5-15% increases [redacted]
  - NS continues to compete strongly on new business opportunities in Food.
- **Forest Products:** NS pricing behavior is similar to CSX, however, they continue to gain share due to better car supply/operations. All other major carriers appear to be pricing similarly to CSX except KCS and CP, which have been more moderate on joint-line traffic.
- **Metals:** CSX has been the leader in Metals pricing and now it appears the NS has followed suit based on recent joint line renewal levels that range from 6-10% Business that CSX had priced away and the NS picked up is now "available" for bid. However, the NS is still aggressively pricing for large volume / unit train type business and like in other markets the NS has a competitive advantage due to greater car supply and better service



DA06954

Highly Confidential

CSXFSC000042158

**Truckers continue to suffer from a shortage of drivers, high fuel costs, and the other problems that have impacted them since last year.** Our pricing power against trucks continues to be greater than against rail.

- **Ag Products:**
  - Truck Market absorbing short haul grain movements as CSX eliminates rail participation in these lanes.
  - Water-Truck loading operations at Decatur, AL; Guntersville, AL; and Wilmington, NC are still viable threats.
- **Food & Consumer:**
  - Empty miles minimized with increased demand for backhaul business
  - $2.00 per mile head haul but with backhaul $1.25-$1.75 per mile
  - $2.50 per mile head haul for pneumatic trucks (Clay, Ore, Granules)
  - $6,000 - $7,000 per truck on perishables into Southeast and Northeast, respectively
  - However we are hearing of recent truck capacity loosening in CA (wine and food shippers)
- **Forest Products:** Some evidence that customers are shifting some re-priced lanes to truck; however, no clear pattern is emerging. Small and mid-size carriers appear to be adding capacity. We are attempting to direct shorter-haul traffic to truck through pricing actions [redacted].
- **Metals:** Truck capacity continues to be tight in most all market areas. We have yet to see any significant shift in business other than some short haul business that was intentionally priced away.

DA06955



Highly Confidential

# New Products: Forest Products

- **Newsprint Receiver Drive:** Grow CSX's newsprint traffic by targeting receivers (local newspapers). Receivers often have significant influence in the routing and mode selection of newsprint traffic. CSX will develop relationships with on-line receivers to influence shipper decisions. Most traffic originates in Canada using foreign-owned boxcars.
  - Status: Coordinating with sales and NBD to identify and pursue opportunities. Industry market intelligence identifying newsprint consumption are an integral part of this initiative.

- **Press Express:** Coordinated service with the CN and Guilford to promote run-through trains from eastern Canadian and New England paper mills to printers and publishers in the Midwest and Southern US.
  - Status: Service issues related to congestion and supply/demand imbalance have delayed immediate consideration of this product.

- **Boxcar Available Board:** A tool to match empty boxcars to the nearest scrap paper supplier to enhance car utilization, rail-sourcing options and competitive pricing. The board would utilize ShipCSX to allow customers to view empty car locations alongside known scrap suppliers and recycled paper mills.
  - Status: Presently compiling an updated database of shipper and receiver locations and investigating integration with CSX web page re-design process.

CSXFSC000042160

## New Products: Food & Consumer

- **Bullet Train** – concept for major future strategic development. Phase 1 (WA state to Guilderland Center) in last stages of development. Contract with lawyers for final read. Sites selected, service plan developed. Engineering drawings being finalized. Anticipated start date Dec 1. $5 million initial incremental revenue.

- **Sunshine Special** – new joint product with [redacted], we use backhaul capacity and [redacted] loading/unloading facilities to offer truck-like service to targeted customers.
  - [redacted] – citrus from CA is the primary target. Test loads done. Racking system tested to better use UP equipment in the CA lane.
  - [redacted] – [redacted] products were initial target, also moved test load of Aquafina bottled water last week.
  - [redacted] – [redacted] is primary target partner. Test loads complete

- [redacted] concept is future trend for [redacted] to maximize economics of more consolidated supply chains. We are working closely with [redacted] senior management to locate site for Central FL DC. Currently looking in Alachua county.

DA06957



Highly Confidential

CSXFSC000042161

# New Products: Metals

- **Ports and International:** Metals import and export growth opportunities have been a key focus in new product development as this segment of traffic generally requires a different set of transportation attributes than the traditional domestic business. This is also strategic in nature as the Metals market has become more global. It is through this effort that we are positioning ourselves for the future.
  - Import Russian slabs fo[redacted] ($3.5M)
  - Impor[redacted] and hotband coils via river ports ($2.5M)
  - Import pig iron fo[redacted] ($1.2M)
  - Export iron tailings: Copper Hill TN to Port at Newport News VA ($8.3M)

DA06958

- **Canstock:** Once an exit market due to product damage, a revitalized effort utilizing 60' T-box cars with web straps moving product fo[redacted] ($600K)

- **Equipment Utilization and Order Fill:** These are critical success factors in meeting customers' car supply needs and enhancing the return profile of the Metals fleets.
  - Established a national pool for BH Flats
  - Initiated a 65' gondola auction program
  - Develop additional unit train opportunities like the[redacted]



Highly Confidential

CSXFSC000042162

# New Products: Ag Products

- **Ethanol Terminal Distribution**
  - Albany Expansion-Increase terminal capacity to accommodate growth
  - Philadelphia, PA-Transflo facility adjacent to private terminal company
  - Baltimore, MD-Motiva terminal has capability for unit trains

- **Updated Express Programs**
  - New system car grain demand is in excess of 10,000 cars Q4 2005-2006
    - [redacted]
  - 33 Origins are currently Express Load elevators
    - Intend to increase percentage of compliance with Express program
  - Average Load Time 20.5 hrs vs. 26.5 system average
  - Average Release to Depart 32 hrs vs. 36.1 for unit grain trains system average
  - Major changes to the program:
    - Customers load in 15 hours
    - CSX needs to leave power with train

- **Unit Train Conversion Projects**
  - Calhoun, GA
  - Banks, AL
  - Fayetteville, NC

DA06959



Highly Confidential

CSXFSC000042163

**While most of the Group's capital needs are focused on equipment, we have other areas where capital will be needed to successfully grow our business.**

- **Ag- Ethanol**
  - $600,000 capital will be needed to upgrade the [redacted] terminal by putting an additional 166 Million barrels of capacity into service. This will effectively double the terminal capacity and position CSX to handle additional NE growth. We have secured a five year agreement with [redacted] for an additional 1000 cars per year.

- **Ag- Infrastructure**
  - Engineering and Service Design are currently evaluating the investment needed to upgrade the [redacted] sub to accommodate 286K cars.

- **Metals:**
  - Capital requirements beyond equipment needs are focused in two key areas. These are necessary to enable future growth. In most cases, we attempt to utilize the advance and refund process with customers :
    - Rail access projects for new customers ( [redacted] )
    - Rail infrastructure enhancements to efficiently handle profitable incremental business at existing customers [redacted]

DA06960



Highly Confidential

# LONG TERM MARKET OUTLOOK

Market trends and the expected impact on ‘06 and ‘07 plans

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**The metals industry 5 year outlook continues to be driven by strong expectations.** Industry projections calls for sustained growth potential for CSXT. Revenue, therefore, will be constrained only by service quality and velocity and availability of railcars.

| (Million Tons) | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| **Steel Consumption** | 120.4 | 139.4 | 146.0 | 143.5 | 145.7 | 145.3 | 146.4 |
| **Steel Production** | 100.7 | 109.5 | 116.7 | 120.0 | 121.6 | 122.4 | 124.1 |
| **BOF & OH** | 49.7 | 54.1 | 57.8 | 58.2 | 58.2 | 57.1 | 58.3 |
| **EAF** | 51.0 | 55.4 | 58.9 | 61.8 | 63.4 | 65.3 | 65.8 |
| **Total Steel Capacity** | 121.3 | 118.4 | 125.5 | 130.3 | 131.6 | 133.6 | 135.6 |
| **Mill Utilization** | 83.1 | 92.5 | 93.0 | 92.1 | 92.4 | 91.7 | 91.5 |
| **Imports** | 23.0 | 34.3 | 39.6 | 35.1 | 35.8 | 35.0 | 34.5 |
| **Exports** | 8.2 | 7.7 | 7.1 | 7.2 | 7.4 | 7.6 | 7.8 |
| **Shipments** | 105.6 | 112.8 | 113.4 | 115.6 | 117.2 | 117.9 | 119.6 |




- Global economic growth remains strong largely driven by the economies of the U.S and China but the pace will slow a bit.
- Global steel demand remains solid and still dominated by China with India and Russia also showing signs of stepped-up growth.
- Consolidations generate a positive impact with greater capacity adjustments relative to demand.
- There will be some bumps like the current auto weakness but overall most end markets continue to thrive.
- Raw material availability could become a limiting factor of furnace capacity.
- The weak U.S. dollar and stable product prices will continue to make imports unattractive

**Metals Five Year Revenue, Volume and RPC Projections.** These numbers are forecast based on the assumptions and factors discussed earlier.

**Metals Products Growth Forecast**

Developed by the sales & marketing team for the period 2005 through 2010

Commercial Strategy Phase II -- Metals




| | 2005P | 2006P | 2007P | 2008P | 2009P | 2010P | Avg Growth |
|---|---|---|---|---|---|---|---|
| Carloads (000) | 382 | 391 | 396 | 399 | 402 | 410 | 1% |
| Revenue ($M) | $511 | $544 | $569 | $586 | $608 | $639 | 5% |
| RPC | $1,339 | $1,392 | $1,438 | $1,468 | $1,512 | $1,558 | 3% |

| CURRENT OUTLOOK | | | |
|---|---|---|---|
| FY | C/L | REV | RPC |
| 2006 | ○ | ● | ● |
| 2007 | ○ | ● | ● |

**The F&C industry 5 year outlook is driven by a mix of factors.** Industry projections call for slow, stable growth potential for CSXT on the food side; however, a dip in housing construction is anticipated as well. Revenue will be constrained by service quality and reduction in demand for building products and appliances.

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| **U.S. population (millions)** | 291.4 | 294.1 | 296.8 | 299.5 | 302.1 | 304.8 | 307.5 |
| **Food Manufacturing (Index)** | 1.21 | 1.25 | 1.31 | 1.34 | 1.37 | 1.39 | 1.42 |
| Beverage Manufacturing (Index) | 1.18 | 1.24 | 1.29 | 1.32 | 1.35 | 1.38 | 1.40 |
| **Housing Starts on CSX (millions)*** | 1.00 | 1.03 | 1.05 | .94 | 1.01 | .96 | .86 |
| **Rail Equipment (Index)** | 1.25 | 1.33 | 1.38 | 1.39 | 1.43 | 1.50 | 1.57 |




- Demographic shifts into the Southeast will drive consumer consumption in this region
- Food consumption is tied closely to population growth, which is relatively stable.
- Consumer spending on food is forecasted to grow at 1.5% - 2% annually
- Housing starts are the single largest driver for building products and appliances.
  - The long term demand for housing is strong , but due to cyclical housing trends, there will be periods of weakness.
  - Interest rates, US economic strength, and personal income underpin the demand for housing starts.
  - The market will show some large swings in the next few years.

# Food & Consumer Five Year Revenue, Volume and RPC Projections.

These numbers are forecast based on the assumptions and factors discussed earlier.

**Food and Consumer Products Growth Forecast**

Developed by the sales & marketing team for the period 2005 through 2010

## Commercial Strategy Phase II -- Food & Consumer




| | 2005P | 2006P | 2007P | 2008P | 2009P | 2010P | Avg Growth |
|---|---|---|---|---|---|---|---|
| Carloads (000) | 242 | 246 | 252 | 259 | 266 | 269 | 2% |
| Revenue ($M) | $368 | $389 | $411 | $431 | $450 | $464 | 5% |
| RPC | $1,524 | $1,582 | $1,628 | $1,663 | $1,693 | $1,723 | 2% |

| CURRENT OUTLOOK | | | |
|---|---|---|---|
| FY | C/L | REV | RPC |
| 2006 | ○ | ● | ● |
| 2007 | ○ | ● | ● |

**The US Agricultural 5 year outlook calls for steady incremental growth in crop production.** On the demand side, total domestic meat consumption will increase gradually while ethanol production will increase 8% per year on average.

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|
| **Crop Production (Million bushels)** | 13.3 | 14.9 | 15.9 | 16.9 | 17.2 | 17.5 | 17.8 |
| **Corn** | 8.9 | 10.1 | 10.9 | 11.4 | 11.6 | 11.8 | 12.1 |
| **Beans** | 2.8 | 2.4 | 2.9 | 3.1 | 3.2 | 3.2 | 3.2 |
| **Wheat** | 1.6 | 2.4 | 2.1 | 2.4 | 2.4 | 2.5 | 2.5 |
| **Per Capita Meat Cons.(lb)** | 283 | 281 | 287 | 284 | 281 | 281 | 280 |
| Meat Exports (mt) | 4218 | 4417 | 3772 | 4379 | 5017 | 5278 | 5471 |
| **Tot. Meat Production (mt)** | 38,371 | 37,978 | 38,377 | 38,971 | 39,419 | 39,973 | 40,571 |
| **Ethanol Prod. (m gal)** | 2.6 | 3.1 | 3.5 | 3.8 | 4.1 | 4.4 | 4.8 |

Meat Production Numbers include Beef, Pork, and Poultry




- Corn Production continues to increase based on increased yields and planted acres
- Soybean and Wheat Production flatten as planted acres are reduced.
- Domestic Meat Consumption is basically flat.
- Protein exports should experience growth as discretionary income in developing countries increases.
- The US Meat Export market will maintain its current percentage share.
- Ethanol production will continue to grow as more states choose, or are mandated to blend a higher level of oxygenate in gasoline.

Source: The ProExporter Network 2004

**Ag Products Five Year Revenue, Volume and RPC Projections.** These numbers are forecast based on the assumptions and factors discussed earlier.

## Agricultural Products Growth Forecast

Developed by the sales & marketing team for the period 2005 through 2010

### Commercial Strategy Phase II -- Ag Products




| | 2005P | 2006P | 2007P | 2008P | 2009P | 2010P | Avg Growth |
|---|---|---|---|---|---|---|---|
| Carloads (000) | 346.2 | 355.3 | 359.7 | 364.6 | 367.7 | 372.1 | 1% |
| Revenue ($M) | $515 | $541 | $560 | $580 | $593 | $608 | 3% |
| RPC | $1,488 | $1,524 | $1,556 | $1,590 | $1,613 | $1,634 | 2% |

| CURRENT OUTLOOK | | | |
|---|---|---|---|
| FY | C/L | REV | RPC |
| 2006 | ● | ○ | ● |
| 2007 | ● | ○ | ● |

**Forest Products 5 Year Growth Outlook:** The Forest Products five year **paper** outlook forecasts sustained growth tempered by losses in the US industrial production base.

| (Million Tons) | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| **Linerboard Consumption** | 22.3 | 22.5 | 22.9 | 23.1 | 23.9 | 24.7 | 25.1 |
| **Linerboard Production** | 22.9 | 22.9 | 23.1 | 23.3 | 24.0 | 24.8 | 25.5 |
| **Total Linerboard Capacity** | 27.4 | 27.1 | 27.4 | 28.0 | 28.5 | 29.0 | 29.6 |
| **Mill Utilization %** | 91% | 92% | 92% | 91% | 92% | 94% | 94% |
| **Imports** | .67 | .79 | .80 | .86 | .93 | .95 | .93 |
| **Exports** | 3.0 | 3.0 | 2.9 | 2.9 | 3.0 | 3.1 | 3.3 |
| **Shipments** | 25.0 | 25.0 | 25.3 | 25.5 | 26.2 | 27.2 | 27.9 |

Source: RISI

**Linerboard 5 Year Outlook - Key Indicators**




- Global economic growth remains robust largely driven by the economies of the U.S and China.
- Competitive materials such as plastics will continue to affect end use markets
- Minimal excess capacity exists in any region or country
- Production is tied closely to the demand for manufactured goods and foodstuffs thereby creating some consistent demand
- The weak U.S. dollar sustains the domestic paper production markets
- Low commodity value is a hurdle to the US export market
- Sufficient capacity exists in the US market to meet demand
- China has embarked on a massive paper capacity expansion program to meet demand

**Forest Products 5 Year Growth Outlook:** The Forest Products five year **lumber** outlook forecasts mixed results as housing starts will have pronounced fluctuations with the most recent revision reflecting a decline in 2006 rather than 2005.

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Housing Starts on CSX (millions) | 1.00 | 1.03 | **1.05** | **0.94** | 1.01 | 0.96 | 0.86 |
| Lumber Demand (bbf) | 57.3 | 59.5 | **60.6** | **55.9** | 60.5 | 60.6 | 56.9 |
| Total Capacity (bbf) | 79.4 | 80.1 | 80.6 | 80.6 | 80.8 | 81.5 | 82.1 |
| Mill Utilization (bbf) | 88% | 91% | 82% | 85% | 90% | 90% | 84% |
| Imports (bbf) | 21.2 | 21.8 | **23.8** | **23.5** | 24.1 | 24.1 | 23.2 |
| Exports (bbf) | 0.9 | 0.9 | 1 | 0.9 | 0.8 | 0.8 | 0.9 |
| Shipments (bbf) | 36 | 37.9 | **39.8** | 36.1 | 37.9 | 37.2 | 34.4 |

Source: RISI




- Housing starts are the single largest driver for lumber and panel
- The market will show some large swings in the next few years
- Canadian imports will play a large role in meeting domestic demand
- There will be periods of weakness due to cyclical housing trends
- The long term demand for housing is strong
- Interest rates, US economic strength, and personal income underpin the demand for housing starts
- Modest commodity values allow international trade despite foreign exchange fluctuations

**Forest Products Five Year Revenue, Volume and RPC Projections.** These numbers are forecast based on the assumptions and factors discussed earlier.

**Forest Products Growth Forecast**

Developed by the sales & marketing team for the period 2005 through 2010

**Commercial Strategy Phase II -- Forest Products**




| | 2005P | 2006P | 2007P | 2008P | 2009P | 2010P | Avg Growth |
|---|---|---|---|---|---|---|---|
| Carloads (000) | 454 | 455 | 459 | 465 | 467 | 469 | 1% |
| Revenue ($M) | $665 | $684 | $706 | $732 | $744 | $753 | 3% |
| RPC | $1,465 | $1,505 | $1,537 | $1,573 | $1,592 | $1,607 | 2% |

| CURRENT OUTLOOK | | | |
|---|---|---|---|
| F Y | C/L | REV | RPC |
| 2006 | ● | ● | ● |
| 2007 | ● | ● | ● |

# NEW STRATEGIC THINKING?

## Beyond the Price Lever: Building New Long-Term Strategies

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**More complexity in our strategies is needed as we move forward.** The next stage is to incorporate more than just Price and Asset Utilization and include Physical Network considerations and Reliable Service impacts in our marketing efforts. Incorporating an emphasis on recession resilient markets is also key.






Highly Confidential
DA06972
CSXFSC000042175

# CSX's physical network is its key competitive advantage






**More complex strategies are required, involving the balancing of several key factors.** Factors like volume impact on the capacity of the physical network and the ability of Transportation to perform the work will be critical. Additionally, a strategic focus on markets that will be less impacted by the next economic downturn will increase in importance.

**The FIVE New Levers in Strategic Plan Development**

| | Agricultural Products | Food & Consumer | Metals | Forest Products |
|---|---|---|---|---|
| Contribution/Price (MPA) | ○ | ○ | ○ | ○ |
| Asset Utilization (CPCD) | ○ | ○ | ○ | ○ |
| Physical Network (Capacity) WL / 95 / SE | | | | |
| Reliable Service (Do-ability) UT / BL / SC | | | | |
| Recession Resilient (sustainable) | | | | |

KEY
WL = Waterlevel Route
95 = I-95 Corridor
SE = Southeast Express

KEY
UT = Unit Trains
BL = Blocks
SC = Single Cars
(an O/D less than 100 cars per year)

**This current snapshot reveals that care must be taken, as much of the IAP business could be impacted by these emerging strategies.** Factors like smaller shipment size and recession sensitivity incorporate large amounts of existing business, particularly in the Metals' and Forest Products' LOBs.

**The FIVE New Levers in Strategic Plan Development**

| | Agricultural Products | Food & Consumer | Metals | Forest Products |
|---|---|---|---|---|
| Contribution/Price (MPA) | ○ | ○ | ○ | ○ |
| Asset Utilization (CPCD) | ○ | ○ | ○ | ○ |
| Physical Network (Capacity) WL / 95 / SE | 25% / 0% / 75% | 35% / 25% / 40% | 10% / 55% / 35% | 30% / 50% / 20% |
| Reliable Service (Do-ability) UT / BL / SC | 33% / 27% / 40% | 8% / 59% / 33% | 12% / 64% / 25% | 0% / 58% / 42% |
| Recession Resilient (sustainable) | ○ | ○ | ○ | ○ |

**KEY**
**WL = Waterlevel Route**
**95 = I-95 Corridor**
**SE = Southeast Express**

**KEY**
**UT = Unit Trains**
**BL = Blocks**
**SC = Single Cars**
**(an O/D less than 100 cars per year)**

## Actions at each extreme are clear to distinguish and easy to execute.

The commercial challenge is to determine the specific thresholds and corresponding actions so that the company can move in unison toward these objectives.

**The FIVE New Levers in Strategic Plan Development**

| | New Unit Trains of Ethanol | Export Boxcars of Paper |
|---|---|---|
| Contribution/Price (MPA) | $1000 per car | $100 per car |
| Asset Utilization (CPCD) | Private cars | System Boxcars/Below $10 CPCDACC |
| Physical Network (Capacity)<br>WL / 95 / SE | Waterlevel Route | Southeast Express |
| Reliable Service (Do-ability)<br>UT / BL / SC | Unit Trains | Single Cars |
| Recession Resilient (sustainable) | Legislated by Government | Cyclical: Changes with World Markets |
| | Meets All! | Meets None! |

**New Corporate Strategic Levers will result in new commercial strategies and lead to new actions.** It will take time to shape the business to match the objectives outlined by these new strategies. We will also need to define a more specific strategic direction for each LOB.

**The FIVE New Levers in Strategic Plan Development**

| | Commercial Strategy | Commercial Actions |
|---|---|---|
| Contribution/Price (MPA) | Contribution, not Volume | Prioritize profitability; de-emphasize volume |
| Asset Utilization (CPCD) | Focus on greater Asset Utilization | Threshold of $10 CPCDACC |
| Physical Network (Capacity)<br>WL / 95 / SE | Manage Capacity; Avoid Chokepoints | Different CPCD Thresholds on different lanes |
| Reliable Service (Do-ability)<br>UT / BL / SC | Avoid Boutique or Difficult to Execute | Shedding business that creates operating challenges |
| Recession Resilient (sustainable) | Invest/Favor Sustainable Markets | Prioritize Capital to Preferred Markets |

CSXFSC000042181

**Initiatives in Ag Products have been identified for development.** These initiatives will capitalize on the market trends and secure growth for CSXT.

## Agricultural Products Growth Initiatives

Yield Management and New Business projects by revenue size, probability of success and time to implement




[redacted]

DA06978



Highly Confidential

CSXFSC000042182

**Food & Consumer initiatives have been identified for development.** Our short term focus is on capacity use and minimal service improvement. Longer term initiatives will require service recovery and new products to capture.

**Food & Consumer Products Growth Initiatives**

Yield Management and New Business projects by revenue size, probability of success and time to implement

PROBABILITY

110
90
70
50
30
10

[redacted]

0 3 6 TIME 9 12 15

DA06979



Highly Confidential

CSXFSC000042183

# Metals' initiatives are limited by the current fleet sizes and are focused on profitable growth targets.

**Metals Growth Initiatives**

Yield Management and New Business projects by revenue size, probability of success and time to implement




[redacted]

DA06980



Highly Confidential

**Initiatives in the Forest Products BU will be limited by a smaller fleet size and focused on long-term profitable growth targets.** The market is mature and industry consolidation will impact CSX's ability to grow.

○ = $100 K ◯ = $1 M

**Paper and Forest Products Growth Initiatives**

Yield Mana ement and New Business ro ects b revenue size robabilit of success and time to im lement




[redacted]



CSXFSC000042184
DA06981
Highly Confidential

CSXFSC000042185

**In summary, the Agricultural Business Unit will continue to focus on asset utilization, conversion to trains, addition of 286,000 equipment, and improving the profitability of our traffic mix.**

### Contribution/Price (MPA)

- The Norfolk Southern continues to absorb lanes which CSX sheds through price or service. Contribution gain for the balance of 2005 and 2006 will come by creating a better traffic mix by shedding deficit traffic and replacing with feed mill expansions and ethanol terminals.

### Asset Utilization (CPCD)

- Re-inventing our express programs will be critical to asset utilization improvements. CSX must reduce unit train dwell time at origin and destination and provide the speed and consistency to maximize our contribution gain

### Physical Network (Capacity)

- The Ag market's stable feed business is the Southeast route mostly utilizing the unit grain train network. Growth from existing franchises is expected in this area The Ag business will also look to capitalize on the capacity available on the Waterlevel route with ethanol and [redacted] export facilities.

### Reliable Service (Do-ability)

- With the conversion of [redacted] to unit trains, and widening [redacted] CSX will see continued increased demand for more unit train resources. Our processed products markets are larger blocks moving to consistent destinations.

### Recession Resilience

- Most of the Ag business is not dramatically impacted by the economy. Ag may see some minor impact in processed products if the economy cools such that travel or dining-out trends change.

DA06982



Highly Confidential

**In summary, the Food and Consumer Products BU will continue to focus on yield management and a very selective initiative management process.** We will target our growth initiatives in high volume, high capacity lanes through products like the bullet train and Express Lane. These will be the key themes for 2H 2005 and going forward into 2006.

## Contribution/Price

- We will continue to push the price lever throughout balance of 2005 and expect MPA results to reflect success through year end. Our opportunity to take similar increases next year will most likely be limited, due to the very significant gains made in 2005.

## Asset Utilization

- Roughly 80% of FC traffic moves in foreign and private equipment. Our efforts will drive business toward customers who maximize equipment turns. New products to exploit this equipment capacity will be a major focus (e.g., Sunshine Special). For the small percentage of traffic that moves in our equipment, we will work with Car Management to prioritize asset allocation in order to drive results.

## Physical Network (Capacity)

- Our initiative management process will prioritize opportunities that align with our network strengths. Current initiatives such as the bullet train project will focus our efforts on business development on the Waterlevel route. Short term focus on traffic into the SE will be on maximizing yield in this corridor.

## Reliable Service (Do-ability)

- High density, high profitability lanes with products like "Express Lane" will be our focus. For this type of product to succeed, consistency and proactive monitoring to maintain product integrity will be key to future success.

## Recession Resilience

- Food is recession resistant – the consumer/building products part of our market is somewhat exposed to the impacts of economic cycles.

**In summary, Metals thinks pricing dynamics will remain favorable and we will continue to push the equipment profitability profiles to exceed their reinvestment hurdles**. Even with a softening market, demand will continue to exceed available car supply. The focus is on profitability, not volume. The key themes for 2H 2005 and going forward into 2006:

### Contribution/Price (MPA)

- Market-based pricing actions will continue to drive results.
- Deficit traffic will be reduced to a historical low.
- Minimum thresholds utilized on traffic to "earn its right on the RR".
- All Metals equipment types will exceed their reinvestment hurdles.

### Asset Utilization (CPCD)

- Prioritize traffic, allocating assets to most profitable business
- Improve asset DPL via limiting idle dwell time
- Appropriate use of equipment pools to maximize return

### Physical Network (Capacity)

- Differentiate price based on available network capacity

### Reliable Service (Do-ability)

- Potential increase in unit train business in some markets
- Re-pricing effort on "single car" traffic to public documents
- Shed short haul and/or operations-challenged traffic

### Recession Resilience

- All Metals markets are cyclical driven by both global and domestic economic conditions.



Highly Confidential DA06984 CSXFSC000042187

CSXFSC000042188

**In summary, the Forest Products Business Unit will continue to focus on profitability improvement through price but with increased reliance on asset utilization and service improvements.** Volume growth will be limited and selective while largely determined by service, capacity, and network constraints.

## Contribution/Price (MPA)

- Yield will continue to improve despite potential revenue and volume declines as several large contracts renew in 2006 [redacted]

## Asset Utilization (CPCD)

- National pools for boxcars and centerbeams (planned) should favorably affect utilization along with existing customer prioritization efforts.

## Physical Network (Capacity)

- Capacity constraints point toward active marketing of printing paper along the Waterlevel Route.

## Reliable Service (Do-ability)

- Volume growth will be limited by the large percentage of single car traffic and related effect on profitability. There is a long-term shift toward longer-haul traffic.

## Recession Resilience

- Despite a significant amount of "base" business, Forest Products remains a cyclical industry and is very susceptible to changing economic conditions.

DA06985



Highly Confidential

# APPENDIX
## Supporting Data

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**The Industrial and Ag Products Group is also focused on improving CSX business processes.** We are working with many other groups in the company on ways to standardize our efforts, achieve internal goals and enhance profitability.

- The number of Marketing-related suspended waybills continues to fall.
  - Working in conjunction with Market Strategy and Development, Pricing Services, and Revenue Management, the weekly tally has dropped below 1,500 and is headed toward 1,000.
- The Sales force is working with the Supplemental Services Group to continue to reduce the open A/R with our major accounts.
  - Withholding refund payments to collect supplemental charges
- Have successfully standardized and quantified CSX's Refund Accrual procedure.
  - Under SOX, Marketing owns the process, with the Controller's Group monitoring payment levels.

CSXFSC000042191

**Upcoming Ag Major Price Authority Expirations.** These represent the significant renewals taking place in the next several months.

| Customer | Contract Number | Expiration Date | Anticipated Increase | Revenue | Annual Price Impact | 2005 Price Impact |
|---|---|---|---|---|---|---|
| [redacted] | [redacted] | 9/30/2005 | 30% | $695,936 | $208,781 | $52,195 |
| [redacted] | [redacted] | 9/30/2005 | 24% | $4,232,954 | $997,707 | $249,427 |
| [redacted] | [redacted] | 9/30/2005 | 20% | $1,152,240 | $225,839 | $56,460 |
| [redacted] | [redacted] | 9/30/2005 | 18% | $2,700,000 | $486,000 | $121,500 |
| [redacted] | [redacted] | 9/30/2005 | 16% | $3,157,636 | $508,379 | $127,095 |
| [redacted] | [redacted] | 9/30/2005 | 16% | $2,972,688 | $466,712 | $116,678 |
| [redacted] | [redacted] | 9/30/2005 | 15% | $5,800,000 | $870,000 | $217,500 |
| [redacted] | [redacted] | 9/30/2005 | 9% | $2,154,817 | $193,934 | $48,483 |
| [redacted] | [redacted] | 9/30/2005 | 8% | $6,190,929 | $495,274 | $165,091 |
| [redacted] | [redacted] | 9/30/2005 | 8% | $435,024 | $34,802 | $8,700 |
| [redacted] | [redacted] | 9/30/2005 | 7% | $31,053,049 | $2,204,766 | $551,192 |
| [redacted] | [redacted] | 9/30/2005 | 7% | $6,328,017 | $442,961 | $110,740 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $42,571,767 | $2,554,306 | $638,577 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $13,945,363 | $836,722 | $209,180 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $4,648,721 | $278,923 | $69,731 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $4,126,090 | $247,565 | $61,891 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $3,875,492 | $232,530 | $58,132 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $3,772,424 | $226,345 | $56,586 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $3,473,010 | $208,381 | $52,095 |
| [redacted] | [redacted] | 9/30/2005 | 8% | $3,379,546 | $270,364 | $67,591 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $3,001,632 | $180,098 | $45,024 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $1,838,242 | $110,295 | $27,574 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $636,716 | $38,203 | $9,551 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $563,607 | $33,816 | $8,454 |
| [redacted] | [redacted] | 9/30/2005 | 6% | $525,425 | $31,526 | $7,881 |
| [redacted] | [redacted] | 9/30/2005 | 5% | $7,699,182 | $384,959 | $96,240 |
| [redacted] | [redacted] | 9/30/2005 | 5% | $3,245,853 | $162,293 | $40,573 |
| [redacted] | [redacted] | 9/30/2005 | 10% | $1,700,715 | $170,072 | $42,518 |
| [redacted] | [redacted] | 9/30/2005 | 7% | $419,520 | $29,366 | $7,342 |



DA06988

Highly Confidential

CSXFSC000042192

**Upcoming Food & Consumer Major Contract Expirations.** These represent the significant contract negotiations taking place in the next several months.

| Month | Contract Owner | Contract # | Contract Value | Planned Inc. | 2005 Impact | Annual Impact |
|---|---|---|---|---|---|---|
| June | [redacted] | [redacted] | $13,600,000 | 8% | $550,000 | $1,100,000 |
| August | [redacted] | [redacted] | $11,000,000 | 5% | $185,000 | $550,000 |
| June | [redacted] | [redacted] | $2,500,000 | 8% | $100,000 | $200,000 |
| June | [redacted] | [redacted] | $2,000,000 | 5% | $50,000 | $100,000 |
| June | [redacted] | [redacted] | $2,000,000 | 10% | $100,000 | $200,000 |
| August | [redacted] | [redacted] | $2,000,000 | 5% | $35,000 | $100,000 |
| May | [redacted] | [redacted] | $2,000,000 | 6% | $70,000 | $120,000 |
| | | **Totals** | **$35,100,000** | **7%** | **$1,090,000** | **$2,370,000** |

[redacted] D ocument is INDEXED on RCAF-U - Expectations are 5-11%.

DA06989



Highly Confidential

CSXFSC000042193

**Upcoming Metals Major Price Authority Expirations.** These represent the significant renewals taking place in the next several months.

| Month | LOB | Rate Authority | Authority Descriptor | Inc Type | Base Revenue | Inc % | 2005 Impact | Annual Impact |
|---|---|---|---|---|---|---|---|---|
| Jun | MT01 | [redacted] | [redacted] | D | $28,262,042 | 10% | $1,413,102 | $2,826,204 |
| Jun | MT03 | [redacted] | [redacted] | D | $3,693,633 | 8% | $147,745 | $295,491 |
| Jul | MT01 | [redacted] | [redacted] | I | $3,528,961 | 2% | $35,290 | $70,579 |
| Jul | MT01 | [redacted] | [redacted] | D | $12,346,385 | 11% | $565,876 | $1,358,102 |
| Jul | MT03 | [redacted] | [redacted] | D | $4,749,058 | 5% | $98,939 | $237,453 |
| Jul | MT10 | [redacted] | [redacted] | D | $4,169,855 | 5% | $86,872 | $208,493 |
| Aug | MT03 | [redacted] | [redacted] | D | $8,170,296 | 9% | $245,109 | $735,327 |
| Aug | MT10 | [redacted] | [redacted] | D | $6,795,951 | 5% | $113,266 | $339,798 |
| Sept | MT10 | [redacted] | [redacted] | D | $2,924,307 | 5% | $36,554 | $146,215 |
| Oct | MT05 | [redacted] | [redacted] | D | $19,863,597 | 7% | $231,742 | $1,390,452 |
| Nov | MT03 | [redacted] | [redacted] | D | $4,164,048 | 8% | $27,760 | $333,124 |
| Dec | MT02 | [redacted] | [redacted] | I | $16,808,720 | 2% | $0 | $336,174 |
| Dec | MT06 | [redacted] | [redacted] | F | $7,113,308 | 3% | $0 | $213,399 |
| Dec | MT03 | [redacted] | [redacted] | D | $6,489,267 | 5% | $0 | $324,463 |
| Dec | MT02 | [redacted] | [redacted] | I | $5,380,930 | 12% | $0 | $645,712 |
| Dec | MT10 | [redacted] | [redacted] | I | $2,776,233 | 12% | $0 | $333,148 |
| Dec | MT01 | [redacted] | [redacted] | D | $4,820,573 | 6% | $0 | $289,234 |
| Dec | MT03 | [redacted] | [redacted] | D | $4,541,129 | 7% | $0 | $317,879 |



DA06990

Highly Confidential

CSXFSC000042194

**Upcoming Forest Products pricing expirations.** These represent the significant negotiations taking place in the next several months.

| MONTH | CUSTOMER | LOB | CONTRACT VALUE | PLANNED INC. | 2005 IMPACT | ANNUAL IMPACT |
|---|---|---|---|---|---|---|
| May-0 | [redacted] | PA06 | $5,729,000 | 13% | $350,000 | $745,000 |
| May-0 | [redacted] | PA10 | $1,900,000 | 12% | $153,000 | $230,000 |
| May-0 | [redacted] | PA11 | $1,600,000 | 6% | $56,000 | $96,000 |
| May-0 | [redacted] | PA12 | $2,480,000 | 22% | $366,000 | $549,000 |
| June-0 | [redacted] | PA01 | $10,450,000 | 21% | $1,268,000 | $2,195,000 |
| June-0 | [redacted] | PA03 | $1,665,000 | 6% | $55,000 | $100,000 |
| June-0 | [redacted] | PA03 | $966,000 | 8% | $45,000 | $77,000 |
| June-0 | [redacted] | PA08 | $1,800,000 | 14% | $125,000 | $250,000 |
| June-0 | [redacted] | PA08 | $2,400,000 | 15% | $175,000 | $350,000 |
| June-0 | [redacted] | PA12 | $1,780,000 | 6% | $52,000 | $103,000 |
| July-0 | [redacted] | PA01 | $1,335,000 | 24% | $161,000 | $320,000 |
| July-0 | [redacted] | PA08 | $4,600,000 | 17% | $395,000 | $790,000 |
| July-0 | [redacted] | PA08 | $12,400,000 | 15% | $900,000 | $1,800,000 |
| July-0 | [redacted] | PA08 | $9,700,000 | 6% | $295,000 | $590,000 |
| July-0 | [redacted] | PA08 | $1,900,000 | 63% | $600,000 | $1,200,000 |
| July-0 | [redacted] | PA08 | $6,300,000 | 17% | $550,000 | $1,100,000 |
| August-0 | [redacted] | PA03 | $915,000 | 7% | $27,000 | $64,000 |
| August-0 | [redacted] | PA08 | $3,900,000 | 6% | $98,000 | $235,000 |
| September-0 | [redacted] | PA03 | $880,000 | 6% | $18,000 | $53,000 |
| October-0 | [redacted] | PA06 | $6,200,000 | 8% | $83,000 | $496,000 |
| October-0 | [redacted] | PA08 | $7,200,000 | 6% | $108,000 | $430,000 |
| November-0 | [redacted] | PA07 | $2,800,000 | 8% | $19,000 | $224,000 |
| December-0 | [redacted] | PA03 | $915,000 | 6% | $4,600 | $55,000 |
| | | | | | $5,903,600 | $12,052,000 |

DA06991



Highly Confidential

June 1, 2005

**SHAPING THE FUTURE AT CSX**

Midyear Review, Second Half Outlook and Future Strategies

INDUSTRIAL AND AGRICULTURAL PRODUCTS

## Agenda


| PAGE | TOPIC |
|---|---|
| 2 | ***Overall Performance Year-to-Date*** |
| | Results through Period 5 on the major Commercial Goals |
| 13 | ***Fleet Reinvestment Results and Plans*** |
| | Progress towards reaching the reinvestment hurdles |
| 25 | ***Second Half Outlook*** |
| | Dealing with sensitivities, competitors and developing new responses |
| 35 | ***Long Term Market Outlook*** |
| | Market trends and the expected impact on '06 and '07 plans |
| 45 | **New *Strategic Thinking*** |
| | Beyond the Price Lever: Building new long term strategies |
| 60 | ***Appendix*** |
| | Commercial Processes & Procedures |
| | Upcoming Contract Renewals |

**MICP GOAL PROGRESS**
Results Through Period 5 on the Major Commercial Goals

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**CSX's current strategic direction is focused on the short-term strategic levers of franchise strength and price increases.** To date, we have achieved solid results.

## Short Term



**We have achieved these results through a straightforward Yield Management Price Strategy.** Actions have focused on achieving the maximum increases in price in order to exceed our 20th percentile as well as to achieve other strategic objectives.

- **Price to the Market.** Our objective is to establish the market price and set our price accordingly. Sometimes there is a discount applied versus truck due to service deficiencies or additional costs of rail (inventory, private cars, etc.). The market can differ from truck to other railroad to barge to source competition. We never cost-plus price.
- **Price to Exceed Reinvestment Hurdles.** After establishing the market and our price, we ensure that this price level will achieve the reinvestment hurdle for the equipment. The floor is $10 CPCD after car costs. This is the minimum and is exceeded by as much as the market will bear.
- **Limit Pricing Term.** As long as conditions are favorable toward sellers and there remains upward price sensitivity, we will limit contract terms in most cases to 1 year. Exceptions will be limited and internal policies will be followed.
- **Prefer Fixed Increases WITH Fuel Surcharge.** Consistent with the term issue above, in most cases we prefer fixed increases with Fuel Surcharge. RCAF(U) is acceptable as an alternative.
- **Make Refunds the Exception.** When necessary to reimburse customer capital investment, refunds are considered an important strategic tool. Receiver strategies provide refunds as incentive to locate receivers on CSX [redacted]. Receivers may not always pay freight. Also used for express load incentives.
- **Equipment allocation against strong demand**. Efforts have focused on stratifying customer locations and allocating equipment against the business with the greatest financial return.

**MICP GOALS.** Here is the Group's progress through P5. The contribution and fleet reinvestment numbers reflect settled data through P3.

**Midyear Progress on MICP Goals**
Source: IAP, Various Reports

| | Agricultural Products | Food & Consumer | Metals | Forest Products |
|---|---|---|---|---|
| Revenue of $2.05 billion | | | | |
| Price of $64.5 million | | | | |
| Improve contribution by 5% | 9% | 28% | 33% | 35% |
| Car types to 20th Percentile | | | | |
| Three New Products | | | | |
| Other MICP Goals | | | | |

**Revenue results mid-year are on track to exceed the 2005 Plan.** Business Unit results thru P5 range from being at Plan (Ag), to exceeding Plan by 7% (F&C). These numbers also represent results that range from 4% (Ag) ahead to 12% (F&C) ahead of 2004.

**Industrial & Ag Products Revenue Results through Period 5.**
Source: CSX Loading Report




Industrial and Agricultural Products – CSX Transportation 6

**MPA results mid-year are also on track to exceed the 2005 Plan.**
Through P4 the Group has achieved MPA of $19.8 million which is $4.1 million, or 26%, ahead of the $15.7 million plan.

**Industrial & Ag Products MPA Results through Period 4 ($millions).**
Source: CSX Commercial Finance



**Contribution results through Q1 greatly exceed the 5% growth target.**
This is a direct result of our focused efforts on Yield Management and Pricing improvement.

**Industrial & Ag Products Contribution Improvement Q1 2005**
Source: CSX Commercial Finance



**Deficit traffic has been greatly reduced.** For the Group all deficit traffic has been reduced by 5% in the last 12 months, despite the higher cost factors that went into effect in 2005.

**Rolling 12 months deficit traffic by fiscal period through P3 2005**
Source: CSX Commercial Finance



**We continue to make excellent progress in raising the profitability profile of our traffic to go above the $10 CACC hurdle.** We will continue to raise profitability going forward.

**Industrial & Ag Products Profitability Snapshot Q1 2005**
Source: Data Warehouse

| Business Unit | Deficit Rev. ($M) | $0--$10 CACC ($M) | Rev below $10 threshold | % of Rev below threshold | >$10 CACC ($M) | Total BU Rev. ($M) |
|---|---|---|---|---|---|---|
| AG | $60.2 | $72.6 | $132.8 | 24% | $428.6 | $561.4 |
| F&C | $34.9 | $42.8 | $77.7 | 20% | $303.0 | $380.7 |
| MT | $43.7 | $86.6 | $130.3 | 25% | $394.9 | $525.2 |
| PA | $80.9 | $93.9 | $174.8 | 25% | $522.7 | $697.5 |
| **Ind. & Ag. Total:** | **$219.7** | **$295.9** | **$515.6** | **24%** | **$1,649.2** | **$2,164.8** |

**Today, with the exception of AG, the IAP business units lead the company in Fuel Surcharge coverage.** AG is currently using RCAF(U )as the main recovery vehicle to compete with the NS which does not charge Fuel Surcharge to its AG customers.

**Fuel Surcharge Percent Coverage in 2005**
Only Fuel Surcharge – Does not include impact from RCAF(U) SOURCE: CSX Finance

| Percent Coverage | | | | |
|---|---|---|---|---|
| | P1 | P2 | P3 | P4 |
| **AG** | **32%** | **37%** | **34%** | **35%** |
| Chemicals | 55% | 58% | 52% | 52% |
| EMU | 59% | 64% | 57% | 55% |
| **Food & Consumer** | **110%** | **90%** | **79%** | **87%** |
| **Forest Products** | **71%** | **69%** | **73%** | **78%** |
| **Metals** | **81%** | **84%** | **84%** | **87%** |
| Phos. & Fert | 60% | 58% | 67% | 53% |
| Coal | 28% | 35% | 21% | 29% |
| Auto | 14% | 12% | 13% | 38% |
| **Total** | **48%** | **49%** | **44%** | **50%** |

**The complete picture showing our protection against fuel price risk is more evident when revenue covered by the RCAF(U) is added to the revenue covered by Fuel Surcharge.** The data below covers Industrial & Ag Products revenue through Period 4.

**Total Coverage Against Fuel Risk in 2005**
Adds Fuel Surcharge plus impact from RCAF(U), through P4 SOURCE: CSX Finance, Business Units

| | % OF REVENUE COVERAGE | | |
|---|---|---|---|
| BUSINESS UNIT | FUEL SURCHARGE | RCAF(U) | TOTAL REVENUE COVERAGE |
| AG | 35% | 55% | 90% |
| Food & Consumer | 91% | 5% | 96% |
| Forest Products | 73% | 26% | 99% |
| Metals | 84% | 12% | 96% |

**FLEET REINVESTMENT RESULTS and PLANS**
Progress toward reaching the reinvestment hurdles

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**We are making good progress toward achieving 2005 fleet reinvestment targets.** Our primary car types are featured below.

**Industrial & Ag Products Equipment Reinvestment Results through Q1 2005.**
Source: CSX Commercial Finance

NR = Not Reinvesting

| | | CBCC @ 20th Percentile | | | | |
|---|---|---|---|---|---|---|
| Planning Car Description | Fleet Size Apr. 05 | Q1 2004 | Q1 2005 | 2005 12% Reinvestment Hurdle | Q1 2005 Variance | Ann. % Change |
| 50' Insulated Box | 828 | $7.38 | $13.96 | NR | NR | 89% |
| 60' Insulated Box | 204 | ($4.49) | $19.20 | $23.23 | ($4.03) | 528% |
| 50' RUF | 6,218 | $7.38 | $12.78 | $20.14 | ($7.36) | 73% |
| 50' CUF | 2,522 | $7.92 | $14.01 | $20.14 | ($6.13) | 77% |
| 60' Autobox | 1,275 | $35.78 | $36.86 | $21.86 | $15.00 | 3% |
| 60' Plain Boxcar | 2,481 | $9.92 | $15.44 | $21.86 | ($6.42) | 56% |
| 86' Autobox | 1,835 | $33.79 | $36.42 | $31.40 | $5.02 | 8% |
| Small Cube Cvd. Hopper | 4,221 | $16.16 | $17.46 | $22.76 | ($5.30) | 8% |
| Jumbo Cvd. Hopper | 9,535 | $20.78 | $25.64 | $20.79 | $4.85 | 23% |
| 52' Plain Gondola | 8,775 | $9.60 | $13.88 | $22.52 | ($8.64) | 45% |
| 65' Gondola | 406 | $19.99 | $30.26 | $25.13 | $5.13 | 51% |
| Covered Coil Gondola | 4,314 | $23.39 | $31.23 | $30.53 | $0.70 | 34% |
| Open Coil Gondola | 923 | $18.34 | $19.07 | $20.51 | ($1.44) | 4% |
| Bathtub | 14,702 | $58.09 | $62.14 | $22.74 | $39.40 | 7% |
| Bottomdump | 10,716 | $36.75 | $40.67 | $18.62 | $22.05 | 11% |
| Special Service Rock | 3,487 | $19.38 | $24.21 | $20.54 | $3.67 | 25% |

**Today, 57% of the carloads in 52' Gons is above the reinvestment hurdle of $22.52.** The objective is to aggressively price up the business at a time of high demand in order to have more than 80% above this hurdle, thus achieving the target.

**Driving the 52' Gondola Market to Reinvestment Levels in 2005**

How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment




… the challenge is to capitalize on market conditions and take price increases on poor quality revenue sufficient enough to earn the right to reinvest in the equipment.

**Today, 43% of the carloads in 52' Gons does not meet the reinvestment hurdle of $22.52.** Several major contracts have restricted our ability to take the necessary increases to date. ALL of the remaining "below reinvestment" business will be increased this year.

**Driving the 52' Gondola Market to Reinvestment Levels in 2005**
How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment



**As new increases take effect in Q3, 80% of carloads will move above the reinvestment hurdle.** The only other outcome would be that the business leaves CSX which will have the same positive effect on CPCD.

**Driving the 52' Gondola Market to Reinvestment Levels in 2005**
How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment

... In fact, the size of the increases should ensure that the business as a whole is comfortably above the reinvestment hurdle. This graph represents the minimal impact and does not include the impact from other smaller deals represented below in brown which will be re-priced throughout the balance of the year.



**By year's end, over 84% will be above the hurdle, satisfying the 20% hurdle.** The only other outcome would be that the business leaves CSX which will have the same positive effect on CPCD.



**Open Coil cars will exceed the reinvestment hurdle by the end of Q2 with 93% of the traffic above the hurdle.** Monitoring and limiting idle car days will also be key to maintaining a high return profile on this relatively small fleet.




Industrial and Agricultural Products – CSX Transportation 19

**With virtually all of F&C traffic meeting the small cube hurdle rate, our focus is on a shift to privatization where it is strategically supported.** Due to the shrinking fleet size from fallout of 40 year cars through 2007, a strategy for privatization is critical for our continued participation in these markets.

**Food & Consumer's fleet strategy to deal with fallout.**
How F&C will deal with shrinking car availability in this segment.



**By year end, 86% of the 50' boxcar fleet will be above the hurdle based on PA and other business units' efforts.** Discussions with other business units indicate they are increasing their prices to meet the $20.14 reinvestment hurdle The remaining 14% consists of three contracts that cannot be re-priced until late 2006.




Industrial and Agricultural Products – CSX Transportation 21

**Here is the plan for achieving the objective for 60 ft Boxcars. By year's end, over 79% will be above the hurdle, just short of the 20% hurdle.**
Several large PA contracts account for the major balance of what will remain below the hurdle by year end.




Industrial and Agricultural Products – CSX Transportation 22

**The 80th percentile for centerbeams currently exceeds the $20.54 reinvestment hurdle at $23.10.** We continually miss loads of long-term, profitable traffic. Competition between markets for these cars is intense and rates continue to increase accordingly. Strategically, we need to invest in centerbeams.



**Today, 70% of the volume in Jumbo Covered Hoppers exceeds the purchase hurdle of $32.77.** This chart shows how we can reach the purchase hurdle for the 5200 cubic foot cars.

**Driving Jumbo Covered Hoppers to Purchase Levels in 2006**

How the impact of Specific Pricing Initiatives still to come will move the car type above reinvestment




Industrial and Agricultural Products – CSX Transportation

24

**SECOND HALF OUTLOOK**
Dealing with sensitivities, competitors and developing new responses

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**MICP 2005 Year End Results.** Here is where IAP will end the year on the MICP goals.

**Projected End of Year Status of MICP Goals**

| | Agricultural Products | Food & Consumer | Metals | Forest Products |
|---|---|---|---|---|
| Revenue of $2.05 billion | | | | |
| Price of $64.5 million | | | | |
| Improve contribution by 5% | 9% | 28% | 33% | 35% |
| Car types to 20th Percentile | | | | |
| Three New Products | | | | |
| Other MICP Goals | | | | |

**Second half sensitivities are minimal but could have an impact.** All things considered, all MICP plans should be achieved but there are some economic and internal impacts which need to be considered.

- **Service must improve**
  - Yield management / pricing efforts cannot totally overcome service issues
  - Operational issues continue to disrupt car supply, order fulfillment, and profitability
  - Erratic service is limiting desirable growth opportunities
  - Dwell time on unit grain trains is negatively impacting revenue and utilization
- **Some economic softening is occurring**
  - Box plant shipments have recently slowed
  - Import paper being affected by European labor disputes
  - U.S. newsprint shipments down 8% YTD
  - Flour production for first quarter was down 3% – lowest level in the past 13 years
  - Weakness in vehicle production is negatively impacting sheet traffic
- **Some customers are beginning to make structural changes in supply ch** [redacted]

**The NS, as well as other rail competitors, are also taking price increases.**

Each Business Unit is seeing slightly differen* pricing behavior from our rail competitors

- **Ag Products:** NS Ag carloads have increased 4% year to date, increasing their share by 1% NS has been aggressive in adding business to their Ag portfolio CSX has lost the following business due to price and service issues which NS is now handling

| | | |
|---|---|---|
| – Sweetener, Morrisville, PA | 1230 Cars | $2,000,000 Rev. |
| – Wheat, Chattanooga, TN | 1000 Cars | $850,000 Rev |
| – Beans, Gainesville | 950 Cars | $1,100,000 Rev |
| Sweetener, Lakeville, NY | 500 Cars | $725,000 Rev |
| – Wheat to Lowell, MI | 536 Cars | $260,000 Rev |
| – Oil to Gainesville, GA | 210 Cars | $205,000 Rev |

- **Food & Consumer:**
  - Union Pacific is taking 10-25% increases [redacted])
  - Union Pacific is moving towards public pricing on all moves under 50 annual loads
  - Burlington Northern is taking 4-12% increases [redacted]
  - Norfolk Southern is taking 5-15% increases [redacted]
  - NS continues to compete strongly on new business opportunities in Food
- **Forest Products:** NS pricing behavior is similar to CSX, however, they continue to gain share due to better car supply/operations. All other major carriers appear to be pricing similarly to CSX except KCS and CP, which have been more moderate on joint-line traffic
- **Metals:** CSX has been the leader in Metals pricing and now it appears the NS has followed suit based on recent joint line renewal levels that range from 6-10%. Business that CSX had priced away and the NS up is now "available" for bid. However, the NS is still aggressively pricing for large volume / unit train type business and like in other markets the NS has a competitive advantage due to greater car supply and better service

Industrial and Agricultural Products – CSX Transportation 28

**Truckers continue to suffer from a shortage of drivers, high fuel costs, and the other problems that have impacted them since last year.** Our pricing power against trucks continues to be greater than against rail

- **Ag Products:**
  - Truck Market absorbing short haul grain movements as CSX eliminates rail participation in these lanes.
  - Water-Truck loading operations at Decatur AL, Guntersville, AL, and Wilmington, NC are still viable threats.
- **Food & Consumer:**
  - Empty miles minimized with increased demand for backhaul business
  - $2.00 per mile head haul but with backhaul $1.25-$1.75 per mile
  - $2.50 per mile head haul for pneumatic trucks (Clay, Ore, Granules)
  - $6,000 - $7,000 per truck on perishables into Southeast and Northeast, respectively
  - However we are hearing of recent truck capacity loosening in CA (wine and food shippers)
- **Forest Products:** Some evidence that customers are shifting some re-priced lanes to truck; however, no clear pattern is emerging Small and mid-size carriers appear to be adding [redacted] are attempting to direct shorter-haul traffic to truck through pricing actions
- **Metals:** Truck capacity continues to be tight in most all market areas We have yet to see any significant shift in business other than some short haul business that was intentionally priced away.

## New Products: Forest Products

- **Newsprint Receiver Drive:** Grow CSX's newsprint traffic by targeting receivers (local newspapers). Receivers often have significant influence in the routing and mode selection of newsprint traffic. CSX will develop relationships with on-line receivers to influence shipper decisions. Most traffic originates in Canada using foreign-owned boxcars.
  - Status: Coordinating with sales and NBD to identify and pursue opportunities. Industry market intelligence identifying newsprint consumption are an integral part of this initiative.

- **Press Express:** Coordinated service with the CN and Guilford to promote run-through trains from eastern Canadian and New England paper mills to printers and publishers in the Midwest and Southern US.
  - Status: Service issues related to congestion and supply/demand imbalance have delayed immediate consideration of this product.

- **Boxcar Available Board:** A tool to match empty boxcars to the nearest scrap paper supplier to enhance car utilization, rail-sourcing options and competitive pricing. The board would utilize ShipCSX to allow customers to view empty car locations alongside known scrap suppliers and recycled paper mills.
  - Status: Presently compiling an updated database of shipper and receiver locations and investigating integration with CSX web page re-design process.

**New Products: Food & Consumer**

- **Bullet Train** – concept for major future strategic development Phase 1 (WA state to Guilderland Center) in last stages of development. Contract with lawyers for final read Sites selected, service plan developed. Engineering drawings being finalized. Anticipated start date Dec 1 $5 million initial incremental revenue.

- **Sunshine[redacted]ial** – new joint product with [redacted] we use backhaul capacity and [redacted] loading/unloading facilities to offer truck-like service to targeted cu[redacted]
  - [redacted] – citrus from CA is the primary target. Test loads [redacted]tter use UP equipment in the CA lane.
  - – [redacted] – products were initial target, also moved test [redacted]
  - – [redacted] – is primary target partner Test loads complete

- [redacted] concept is future trend for [redacted] t[redacted]mize economics of more consolidated supply chains. We are working closely with [redacted] senior management to locate site for Central FL DC Currently looking in Alachua county.

Industrial and Agricultural Products - CSX Transportation 31

## New Products: Metals

- **Ports and International:** Metals import and export growth opportunities have been a key focus in new product development as this segment of traffic generally requires a different set of transportation attributes than the traditional domestic business. This is also strategic in nature as the Metals market has become more global. It is through this effort that we are positioning ourselves for the future.
  - Import [redacted] slabs for [redacted]
  - Import [redacted] coils via river ports ($2.6M)
  - Import pig Iron for ($1.2M)
  - Export iron tailings: Copper Hill TN to Port at Newport News VA ($8.3M)

- **Canstock:** Once an exit marke[redacted]e, a revitalized effort utilizing 60' T-box cars with web straps moving product for ($600K)

- **Equipment Utilization and Order Fill:** These are critical success factors in meeting customers' car supply needs and enhancing the return profile of the Metals fleets.
  - Established a national pool for BH Flats
  - Initiated a 65' gondola auction program
  - Develop additional unit train opportunities like the [redacted]

Industrial and Agricultural Products – CSX Transportation

31

## New Products: Ag Products

- **Ethanol Terminal Distribution**
  - Albany Expansion-Increase terminal capacity to accommodate growth
  - Philadelphia, PA-Transflo facility adjacent to private terminal company
  - Baltimore, MD-Motiva terminal has capability for unit trains
- **Updated Express Programs**
  - Ne[redacted]
  - 33 Origins are currently Express Load elevators
    - Intend to increase percentage of compliance with Express program
  - Average Load Time 20.5 hrs vs. 28.5 system average
  - Average Release to Depart 32 hrs vs. 36 1 for unit grain trains system average
  - Major changes to the program:
    - Customers load in 15 hours
    - CSX needs to leave power with train
- **Unit Train Conversion Projects**
  - Calhoun, GA
  - Banks, AL
  - Fayetteville, NC

Industrial and Agricultural Products - CSX Transportation 33

**While most of the Group's capital needs are focused on equipment, we have other areas where capital will be needed to successfully grow our business.**

- **Ag- Ethanol**
  - $500,000 capital will be needed to upgrade the [redacted] terminal by putting an additional 166 Million barrels of capacity into service. This will effectively double the terminal capacity and position CS[redacted]ndle additional NE growth. We have secured a five year agreement with for an additional 1000 cars per year

- **Ag- Infrastructure**
  - Engine[redacted]Service Design are currently evaluating the investment needed to upgrade sub to accommodate 286K cars

- **Metals:**
  - Capital requirements beyond equipment needs are focused in two key areas. These are necessary to enable future growth. In most cases, we attempt to utilize the advance and refund process with custome[redacted]
    - Rail access projects for new customers
    - Rail infrastructure enhancem[redacted]al [redacted]ness at existing customers

## LONG TERM MARKET OUTLOOK

Market trends and the expected impact on '06 and '07 plans

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**The metals industry 5 year outlook continues to be driven by strong expectations.**
Industry projections calls for sustained growth potential for CSXT. Revenue, therefore, will be constrained only by service quality and velocity and availability of railcars.

| (Million Tons) | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Steel Consumption | 120.4 | 139.4 | 146.0 | 143.5 | 145.7 | 146.3 | 146.4 |
| Steel Production | 100.7 | 109.5 | 116.7 | 120.0 | 121.8 | 122.4 | 124.1 |
| BOF & OH | 49.7 | 54.1 | 57.8 | 58.2 | 58.2 | 57.1 | 58.3 |
| EAF | 51.3 | 55.4 | 58.9 | 61.8 | 63.4 | 65.3 | 65.8 |
| Total Steel Capacity | 121.3 | 118.4 | 125.5 | 130.3 | 131.6 | 133.8 | 135.6 |
| Mill Utilization | 83.1 | 92.5 | 93.0 | 92.1 | 92.4 | 91.7 | 91.5 |
| Imports | 23.3 | 34.3 | 39.8 | 35.1 | 35.8 | 36.0 | 34.5 |
| Exports | 8.2 | 7.7 | 7.1 | 7.2 | 7.4 | 7.6 | 7.8 |
| Shipments | 105.5 | 112.8 | 113.4 | 115.6 | 117.2 | 117.9 | 119.6 |




- Global economic growth remains strong largely driven by the economies of the U S and China but the pace will slow a bit
- Global steel demand remains solid and still dominated by China with India and Russia also showing signs of stepped-up growth
- Consolidations generate a positive impact with greater capacity adjustments relative to demand
- There will be some bumps like the current auto weakness but overall most end markets continue to thrive
- Raw material availability could become a limiting factor of furnace capacity
- The weak U.S. dollar and stable product prices will continue to make imports unattractive

Industrial and Agricultural Products - CSX Transportation 36

[redacted]

Looking at this list of initiatives, some have already begun to move traffic and the project could actually be a very LARGE win for us

**Metals Five Year Revenue, Volume and RPC Projections.** These numbers are forecast based on the assumptions and factors discussed earlier.

**Metals Products Growth Forecast**
Developed by the sales & marketing team for the period 2005 through 2010

Commercial Strategy Phase II – Metals




| | 2005P | 2006P | 2007P | 2008P | 2009P | 2010P | Avg Growth |
|---|---|---|---|---|---|---|---|
| Carloads (000) | 382 | 391 | 396 | 399 | 402 | 410 | 1% |
| Revenue ($M) | $511 | $544 | $569 | $586 | $608 | $639 | 5% |
| RPC | $1,339 | $1,392 | $1,438 | $1,468 | $1,512 | $1,558 | 3% |

| CURRENT OUTLOOK | | | |
|---|---|---|---|
| FY | C/L | REV | RPC |
| 2006 | ○ | ● | ● |
| 2007 | ○ | ● | ● |

**The F&C industry 5 year outlook is driven by a mix of factors.** Industry projections call for slow, stable growth potential for CSXT on the food side; however, a dip in housing construction is anticipated as well. Revenue will be constrained by service quality and reduction in demand for building products and appliances.

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| U.S. population (millions) | 291.4 | 294.1 | 296.8 | 299.5 | 302.1 | 304.8 | 307.5 |
| Food Manufacturing (Index) | 1.21 | 1.25 | 1.31 | 1.34 | 1.37 | 1.39 | 1.42 |
| Beverage Manufacturing (Index) | 1.18 | 1.24 | 1.29 | 1.32 | 1.35 | 1.38 | 1.40 |
| Housing Starts on CSX (millions)* | 1.00 | 1.03 | 1.05 | .94 | 1.01 | .96 | .86 |
| Rail Equipment (Index) | 1.25 | 1.33 | 1.38 | 1.39 | 1.43 | 1.50 | 1.57 |




- Demographic shifts into the Southeast will drive consumer consumption in this region
- Food consumption is tied closely to population growth, which is relatively stable.
- Consumer spending on food is forecasted to grow at 1.5% - 2% annually
- Housing starts are the single largest driver for building products and appliances.
  - The long term demand for housing is strong , but due to cyclical housing trends, there will be periods of weakness.
  - Interest rates, US economic strength, and personal income underpin the demand for housing starts.
  - The market will show some large swings in the next few years.

**Food & Consumer Five Year Revenue, Volume and RPC Projections.**
These numbers are forecast based on the assumptions and factors discussed earlier.

**Food and Consumer Products Growth Forecast**
Developed by the sales & marketing team for the period 2005 through 2010

Commercial Strategy Phase II – Food & Consumer




| | 2005P | 2006P | 2007P | 2008P | 2009P | 2010P | Avg Growth |
|---|---|---|---|---|---|---|---|
| Carloads (000) | 242 | 246 | 252 | 259 | 266 | 269 | 2% |
| Revenue ($M) | $368 | $389 | $411 | $431 | $450 | $464 | 5% |
| RPC | $1,524 | $1,582 | $1,628 | $1,663 | $1,693 | $1,723 | 2% |

| CURRENT OUTLOOK | | | |
|---|---|---|---|
| FY | C/L | REV | RPC |
| 2006 | ○ | ● | ● |
| 2007 | ○ | ● | ● |

**The US Agricultural 5 year outlook calls for steady incremental growth in crop production.** On the demand side, total domestic meat consumption will increase gradually while ethanol production will increase 8% per year on average

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|
| Crop Production (Million bushels) | 13.3 | 14.9 | 15.9 | 16.9 | 17.2 | 17.6 | 17.8 |
| Corn | 8.9 | 10.1 | 10.9 | 11.4 | 11.6 | 11.8 | 12.1 |
| Beans | 2.4 | 2.4 | 2.9 | 3.1 | 3.2 | 3.2 | 3.3 |
| Wheat | 1.6 | 2.4 | 2.1 | 2.4 | 2.4 | 2.5 | 2.5 |
| Per Capita Meat Cons.(lb) | 283 | 281 | 287 | 284 | 281 | 281 | 280 |
| Meat Exports (ml) | 4216 | 4417 | 3772 | 4379 | 5017 | 5278 | 5471 |
| Tot. Meat Production (ml) | 38,371 | 37,978 | 38,377 | 38,971 | 39,419 | 39,973 | 40,571 |
| Ethanol Prod. (in gal) | 2.8 | 3.1 | 3.5 | 3.8 | 4.1 | 4.4 | 4.8 |

Meat Production Numbers include Beef, Pork, and Poultry




- Corn Production continues to increase based on increased yields and planted acres
- Soybean and Wheat Production flatten as planted acres are reduced
- Domestic Meat Consumption is basically flat
- Protein exports should experience growth as discretionary income in developing countries increases.
- The US Meat Export market will maintain its current percentage share
- Ethanol production will continue to grow as more states choose or are mandated to blend a higher level of oxygenate in gasoline

Source: The ProExporter Network 2004

Industrial and Agricultural Products – CSX Transportation 40

Looking at this list of initiatives, some have already begun to move traffic and the [redacted] project could actually be a very LARGE win for us.

**Ag Products Five Year Revenue, Volume and RPC Projections.** These numbers are forecast based on the assumptions and factors discussed earlier.

**Agricultural Products Growth Forecast**
Developed by the sales & marketing team for the period 2005 through 2010

Commercial Strategy Phase II -- Ag Products




| | 2005P | 2006P | 2007P | 2008P | 2009P | 2010P | Avg Growth |
|---|---|---|---|---|---|---|---|
| Carloads (000) | 346.2 | 355.3 | 359.7 | 364.6 | 367.7 | 372.1 | 1% |
| Revenue ($M) | $515 | $541 | $560 | $580 | $593 | $608 | 3% |
| RPC | $1,488 | $1,524 | $1,556 | $1,590 | $1,613 | $1,634 | 2% |

| CURRENT OUTLOOK | | | |
|---|---|---|---|
| FY | C/L | REV | RPC |
| 2006 | ● | ○ | ● |
| 2007 | ● | ○ | ● |

Industrial and Agricultural Products – CSX Transportation 41

**Forest Products 5 Year Growth Outlook:** The Forest Products five year paper outlook forecasts sustained growth tempered by losses in the US industrial production base

| (Million Tons) | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Linerboard Consumption | 22.3 | 22.5 | 22.9 | 23.1 | 23.9 | 24.7 | 25.1 |
| Linerboard Production | 22.9 | 22.9 | 23.1 | 23.3 | 24.0 | 24.8 | 25.5 |
| Total Linerboard Capacity | 27.4 | 27.1 | 27.4 | 28.0 | 28.5 | 29.0 | 29.6 |
| Mill Utilization % | 91% | 92% | 92% | 91% | 92% | 94% | 94% |
| Imports | .67 | .79 | .80 | .86 | .93 | 3.1 | .93 |
| Exports | 3.0 | 3.0 | 2.9 | 2.9 | 3.0 | | 3.3 |
| Shipments | 25.9 | 26.0 | 26.3 | 26.6 | 26.2 | 27.2 | 27.9 |

Source: RISI




- Global economic growth remains robust largely driven by the economies of the U S and China
- Competitive materials such as plastics will continue to affect end use markets
- Minimal excess capacity exists in any region or country
- Production is tied closely to the demand for manufactured goods and foodstuffs thereby creating some consistent demand
- The weak U.S. dollar sustains the domestic paper production markets
- Low commodity value is a hurdle to the US export market
- Sufficient capacity exists in the US market to meet demand
- China has embarked on a massive paper capacity expansion program to meet demand

Industrial and Agricultural Products – CSX Transportation

42

Looking at this list of initiatives, some have already begun to move traffic and the [redacted] project could actually be a very LARGE win for us.

**Forest Products 5 Year Growth Outlook:** The Forest Products five year lumber outlook forecasts mixed results as housing starts will have pronounced fluctuations with the most recent revision reflecting a decline in 2006 rather than 2005.

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| Housing Starts on CSX (millions) | 1.00 | 1.03 | 1.05 | 0.94 | 1.01 | 0.96 | 0.86 |
| Lumber Demand (bbf) | 57.3 | 59.5 | 60.6 | 55.9 | 60.5 | 60.6 | 58.9 |
| Total Capacity (bbf) | 79.4 | 80.1 | 80.6 | 80.6 | 80.8 | 81.5 | 82.1 |
| Mill Utilization (bbf) | 88% | 91% | 82% | 85% | 90% | 90% | 84% |
| Imports (bbf) | 21.2 | 21.8 | 23.8 | 23.5 | 24.1 | 24.1 | 28.2 |
| Exports (bbf) | 0.9 | 0.9 | 1 | 0.9 | 0.8 | 0.8 | 0.9 |
| Shipments (bbf) | 36 | 37.9 | 39.8 | 36.1 | 37.9 | 37.2 | 34.4 |




- Housing starts are the single largest driver for lumber and panel
- The market will show some large swings in the next few years
- Canadian imports will play a large role in meeting domestic demand
- There will be periods of weakness due to cyclical housing trends
- The long term demand for housing is strong
- Interest rates, US economic strength, and personal income underpin the demand for housing starts
- Modest commodity values allow international trade despite foreign exchange fluctuations

Industrial and Agricultural Products – CSX Transportation 43

Looking at this list of initiatives, some have already begun to move traffic and the [redacted] project could actually be a very LARGE win for us

**Forest Products Five Year Revenue, Volume and RPC Projections.** These numbers are forecast based on the assumptions and factors discussed earlier.

**Forest Products Growth Forecast**
Developed by the sales & marketing team for the period 2005 through 2010

Commercial Strategy Phase II – Forest Products




| | 2005P | 2006P | 2007P | 2008P | 2009P | 2010P | Avg Growth |
|---|---|---|---|---|---|---|---|
| Carloads (000) | 454 | 455 | 459 | 465 | 467 | 469 | 1% |
| Revenue ($M) | $665 | $684 | $706 | $732 | $744 | $753 | 3% |
| RPC | $1,465 | $1,505 | $1,537 | $1,573 | $1,592 | $1,607 | 2% |

| CURRENT OUTLOOK | | | |
|---|---|---|---|
| FY | C/L | REV | RPC |
| 2006 | ● | ● | ● |
| 2007 | ● | ● | ● |





Highly Confidential DA07036 CSXFSC000042239

## NEW STRATEGIC THINKING?

Beyond the Price Lever: Building New Long-Term Strategies

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**More complexity in our strategies is needed as we move forward.** The next stage is to incorporate more than just Price and Asset Utilization and include Physical Network considerations and Reliable Service impacts in our marketing efforts. Incorporating an emphasis on recession resilient markets is also key.



**CSX's physical network is its key competitive advantage**






**More complex strategies are required, involving the balancing of several key factors.** Factors like volume impact on the capacity of the physical network and the ability of Transportation to perform the work will be critical. Additionally, a strategic focus on markets that will be less impacted by the next economic downturn will increase in importance.

**The FIVE New Levers in Strategic Plan Development**

| | Agricultural Products | Food & Consumer | Metals | Forest Products |
|---|---|---|---|---|
| Contribution/Price (MPA) | ○ | ○ | ○ | ○ |
| Asset Utilization (CPCD) | ○ | ○ | ○ | ○ |
| Physical Network (Capacity) WL / 95 / SE | | | | |
| Reliable Service (Do-ability) UT / BL / SC | | | | |
| Recession Resilient (sustainable) | | | | |

KEY
WL = Waterlevel Route
95 = I-95 Corridor
SE = Southeast Express

KEY
UT = Unit Trains
BL = Blocks
SC = Single Cars
(an O/D less than 100 cars per year)

**This current snapshot reveals that care must be taken, as much of the IAP business could be impacted by these emerging strategies.** Factors like smaller shipment size and recession sensitivity incorporate large amounts of existing business, particularly in the Metals' and Forest Products' LOBs.

**The FIVE New Levers in Strategic Plan Development**

| | Agricultural Products | Food & Consumer | Metals | Forest Products |
|---|---|---|---|---|
| Contribution/Price (MPA) | ○ | ○ | ○ | ○ |
| Asset Utilization (CPCD) | ○ | ○ | ○ | ○ |
| Physical Network (Capacity) WL / 95 / SE | 25% / 0% / 75% | 35% / 25% / 40% | 10% / 55% / 35% | 30% / 50% / 20% |
| Reliable Service (Do-ability) UT / BL / SC | 33% / 27% / 40% | 8% / 59% / 33% | 12% / 64% / 25% | 0% / 58% / 42% |
| Recession Resilient (sustainable) | ○ | ○ | ○ | ○ |

KEY
WL = Waterlevel Route
95 = I-95 Corridor
SE = Southeast Express

KEY
UT = Unit Trains
BL = Blocks
SC = Single Cars
(an O/D less than 100 cars per year)

Industrial and Agricultural Products – CSX Transportation

49

**Actions at each extreme are clear to distinguish and easy to execute.**
The commercial challenge is to determine the specific thresholds and corresponding actions so that the company can move in unison toward these objectives.

**The FIVE New Levers in Strategic Plan Development**

| | New Unit Trains of Ethanol | Export Boxcars of Paper |
|---|---|---|
| Contribution/Price (MPA) | $1000 per car | $100 per car |
| Asset Utilization (CPCD) | Private cars | System Boxcars/Below $10 CPCDACC |
| Physical Network (Capacity) WL / 95 / SE | Waterlevel Route | Southeast Express |
| Reliable Service (Do-ability) UT / BL / SC | Unit Trains | Single Cars |
| Recession Resilient (sustainable) | Legislated by Government | Cyclical: Changes with World Markets |
| | Meets All! | Meets None! |

Industrial and Agricultural Products – CSX Transportation 50

**New Corporate Strategic Levers will result in new commercial strategies and lead to new actions.** It will take time to shape the business to match the objectives outlined by these new strategies. We will also need to define a more specific strategic direction for each LOB.

**The FIVE New Levers in Strategic Plan Development**

| | Commercial Strategy | Commercial Actions |
|---|---|---|
| Contribution/Price (MPA) | Contribution, not Volume | Prioritize profitability; de-emphasize volume |
| Asset Utilization (CPCD) | Focus on greater Asset Utilization | Threshold of $10 CPCDACC |
| Physical Network (Capacity) WL / 95 / SE | Manage Capacity; Avoid Chokepoints | Different CPCD Thresholds on different lanes |
| Reliable Service (Do-ability) UT / BL / SC | Avoid Boutique or Difficult to Execute | Shedding business that creates operating challenges |
| Recession Resilient (sustainable) | Invest/Favor Sustainable Markets | Prioritize Capital to Preferred Markets |

**Initiatives in Ag Products have been identified for development.** These initiatives will capitalize on the market trends and secure growth for CSXT.

**Agricultural Products Growth Initiatives**

Yield Management and New Business projects by revenue size, probability of success and time to implement




[redacted]

52

**Food & Consumer initiatives have been identified for development.** Our short term focus is on capacity use and minimal service improvement Longer term initiatives will require service recovery and new products to capture.

**Food & Consumer Products Growth Initiatives**

Yield Management and New Business projects by revenue size, probability of success and time to implement




[redacted]

**Metals' initiatives are limited by the current fleet sizes and are focused on profitable growth targets.**

**Metals Growth Initiatives**
Yield Management and New Business projects by revenue size, probability of success and time to implement




54

**Initiatives in the Forest Products BU will be limited by a smaller fleet size and focused on long-term profitable growth targets.** The market is mature and industry consolidation will impact CSX's ability to grow








Highly Confidential

**In summary, the Agricultural Business Unit will continue to focus on asset utilization, conversion to trains, addition of 286,000 equipment, and improving the profitability of our traffic mix.**

**Contribution/Price (MPA)**

- The Norfolk Southern continues to absorb lanes which CSX sheds through price or service. Contribution gain for the balance of 2005 and 2006 will come by creating a better traffic mix by shedding deficit traffic and replacing with feed mill expansions and ethanol terminals.

**Asset Utilization (CPCD)**

- Re-inventing our express programs will be critical to asset utilization improvements. CSX must reduce unit train dwell time at origin and destination and provide the speed and consistency to maximize our contribution gain.

**Physical Network (Capacity)**

- The Ag market's stable feed business is the Southeast route mostly utilizing the unit grain train network. Growth from existing franchises is expected in this area. The Ag b[redacted] will also look to capitalize on the capacity available on the Waterlevel route with ethanol an export facilities.

**Reliable Service (Do-ab[redacted]**

- [redacted]he conversion of [redacted] to unit trains, and widening of [redacted], CSX will see continued increased demand for more unit train resources. Our processed products markets are larger blocks moving to consistent destinations

**Recession Resilience**

- Most of the Ag business is not dramatically impacted by the economy. Ag may see some minor impact in pr[illegible]d products if the economy cools such that travel or dining-out trends change



Highly Confidential

**In summary, the Food and Consumer Products BU will continue to focus on yield management and a very selective initiative management process.** We will target our growth initiatives in high volume, high capacity lanes through products like the bullet train and Express Lane. These will be the key themes for 2H 2005 and going forward into 2006.

**Contribution/Price**

- We will continue to push the price lever throughout balance of 2005 and expect MPA results to reflect success through year end. Our opportunity to take similar increases next year will most likely be limited, due to the very significant gains made in 2005.

**Asset Utilization**

- Roughly 80% of FC traffic moves in foreign and private equipment. Our efforts will drive business toward customers who maximize equipment turns. New products to exploit this equipment capacity will be a major focus (e.g., Sunshine Special). For the small percentage of traffic that moves in our equipment, we will work with Car Management to prioritize asset allocation in order to drive results.

**Physical Network (Capacity)**

- Our initiative management process will prioritize opportunities that align with our network strengths. Current initiatives such as the bullet train project will focus our efforts on business development on the Waterlevel route. Short term focus on traffic into the SE will be on maximizing yield in this corridor.

**Reliable Service (Do-ability)**

- High density, high profitability lanes with products like "Express Lane" will be our focus. For this type of product to succeed, consistency and proactive monitoring to maintain product integrity will be key to future success.

**Recession Resilience**

- Food is recession resistant – the consumer/building products part of our market is somewhat exposed to the impacts of economic cycles.

**In summary, Metals thinks pricing dynamics will remain favorable and we will continue to push the equipment profitability profiles to exceed their reinvestment hurdles**. Even with a softening market, demand will continue to exceed available car supply. The focus is on profitability, not volume. The key themes for 2H 2005 and going forward into 2006:

**Contribution/Price (MPA)**
- Market-based pricing actions will continue to drive results.
- Deficit traffic will be reduced to a historical low.
- Minimum thresholds utilized on traffic to "earn its right on the RR".
- All Metals equipment types will exceed their reinvestment hurdles.

**Asset Utilization (CPCD)**
- Prioritize traffic, allocating assets to most profitable business
- Improve asset DPL via limiting idle dwell time
- Appropriate use of equipment pools to maximize return

**Physical Network (Capacity)**
- Differentiate price based on available network capacity

**Reliable Service (Do-ability)**
- Potential increase in unit train business in some markets
- Re-pricing effort on "single car" traffic to public documents
- Shed short haul and/or operations-challenged traffic

**Recession Resilience**
- All Metals markets are cyclical driven by both global and domestic economic conditions.

**In summary, the Forest Products Business Unit will continue to focus on profitability improvement through price but with increased reliance on asset utilization and service improvements.** Volume growth will be limited and selective while largely determined by service, capacity and network constraints

**Contribution/Price (MPA)**

- Yield will continue to improve [redacted] several large contracts renew in 2006

**Asset Utilization (CPCD)**

- National pools for boxcars and centerbeams (planned) should favorably affect utilization along with existing customer prioritization efforts.

**Physical Network (Capacity)**

- Capacity constraints point toward active marketing of printing paper along the Waterlevel Route.

**Reliable Service (Do-ability)**

- Volume growth will be limited by the large percentage of single car traffic and related effect on profitability. There is a long-term shift toward longer-haul traffic.

**Recession Resilience**

- Despite a significant amount of "base" business, Forest Products remains a cyclical industry and is very susceptible to changing economic conditions.

# APPENDIX
Supporting Data

INDUSTRIAL AND AGRICULTURAL PRODUCTS

**The Industrial and Ag Products Group is also focused on improving CSX business processes.** We are working with many other groups in the company on ways to standardize our efforts, achieve internal goals and enhance profitability.

- The number of Marketing-related suspended waybills continues to fall.
  - Working in conjunction with Market Strategy and Development, Pricing Services, and Revenue Management, the weekly tally has dropped below 1,500 and is headed toward 1,000.

- The Sales force is working with the Supplemental Services Group to continue to reduce the open A/R with our major accounts.
  - Withholding refund payments to collect supplemental charges

- Have successfully standardized and quantified CSX's Refund Accrual procedure.
  - Under SOX, Marketing owns the process, with the Controller's Group monitoring payment levels.

**Upcoming Ag Major Price Authority Expirations.** These represent the significant renewals taking place in the next several months.

| Customer | Contract Number | Expiration Date | Anticipated Increase | Revenue | Annual Price Impact | 2005 Price Impact |
|---|---|---|---|---|---|---|
| [redacted] | [redacted] | 9/30/2005 | 30% | $635,936 | | $62,186 |
| | | 9/30/2005 | 24% | $4,232,994 | $208,781 | $249,427 |
| | | 9/30/2005 | 20% | $1,152,340 | $997,707 | $56,460 |
| | | | | | $225,839 | |
| | | | 18% | $2,700,000 | | |
| | | 9/30/2005 | 16% | $3,187,696 | $486,000 | $121,500 |
| | | 9/30/2005 | 16% | $2,972,690 | $608,379 | $127,095 |
| | | 9/30/2005 | 10% | $8,800,000 | $466,712 | $116,678 |
| | | 9/30/2005 | 8% | $2,104,817 | $870,000 | $217,600 |
| | | 9/30/2005 | 6% | $6,190,229 | $193,934 | $48,463 |
| | | 9/30/2005 | 8% | $435,934 | $495,274 | $168,091 |
| | | 9/30/2005 | 7% | $31,082,049 | $34,802 | $8,700 |
| | | 9/30/2005 | 7% | $6,328,017 | $2,204,766 | $561,192 |
| | | 9/30/2005 | 6% | $42,571,767 | $442,961 | $110,740 |
| | | 9/30/2005 | 6% | $13,[illegible]5,383 | $2,654,306 | $638,677 |
| | | 9/30/2005 | 6% | [illegible] | $836,722 | $209,160 |
| | | 9/30/2005 | 6% | $4 [illegible] | $278,923 | $69,731 |
| | | 9/30/2005 | 6% | $4 [illegible] | $247,565 | $61,891 |
| | | 9/30/2005 | 6% | $3 [illegible] | $ 32,530 | $58,132 |
| | | 9/30/2005 | 6% | $3 [illegible] | $ 26,345 | $56,586 |
| | | 9/30/2005 | 6% | [illegible] | $ 08,381 | $52,095 |
| | | 9/30/2005 | 6% | [illegible] | $ 70,364 | $67,691 |
| | | 9/30/2005 | 6% | [illegible] | $ 80,098 | $45,024 |
| | | 9/30/2005 | 6% | [illegible] | $ 10,295 | $27,574 |
| | | 9/30/2005 | 6% | [illegible] | $36,203 | $9,661 |
| | | 9/30/2005 | 6% | [illegible] | $33,816 | $8,454 |
| | | 9/30/2005 | | 5 | 31,526 | $7,881 |
| | | 9/30/2005 | 5% | $7,[illegible],182 | | |
| | | 9/30/2005 | 8% | $3,2[illegible] | $384,959 | $96,240 |
| | | 9/30/2005 | 10% | $1,7[illegible] | $162,293 | $40,573 |
| | | 9/30/2005 | 7% | $41[illegible] | $170,072 | $42,518 |
| | | | | 9 | $29,366 | $7,342 |

62

**Upcoming Food & Consumer Major Contract Expirations.** These represent the significant contract negotiations taking place in the next several months

| Month | Contract Owner | Contract # | Contract Value | Planned Inc. | 2005 Impact | Annual Impact |
|---|---|---|---|---|---|---|
| June | [redacted] | [redacted] | $13,600,000 | 8% | $550,000 | $1,100,000 |
| August | [redacted] | [redacted] | $11,000,000 | 5% | $185,000 | $550,000 |
| June | [redacted] | [redacted] | $2,600,000 | 8% | $100,000 | $200,000 |
| June | [redacted] | [redacted] | $2,000,000 | 5% | $50,000 | $100,000 |
| June | [redacted] | [redacted] | $2,000,000 | 10% | $100,000 | $200,000 |
| August | [redacted] | [redacted] | $2,000,000 | | $35,000 | $100,000 |
| May | | | $2,000,000 | 6% | $70,000 | $120,000 |
| | | Totals | $35,100,000 | 7% | $1,090,000 | $2,370,000 |

Document is INDEXED on RCAF-U - Expectations are 6-11%

Industrial and Agricultural Products – CSX Transportation 63

**Upcoming Metals Major Price Authority Expirations.** These represent the significant renewals taking place in the next several months

| Month | LOB | Rate Authority | Authority Descriptor | Inc Type | Base Revenue | Inc % | 2005 Impact | Annua Impact |
|---|---|---|---|---|---|---|---|---|
| Jun | MT01 | [redacted] | [redacted] | D | $28 262,042 | 10% | $1,413,102 | $2,826,204 |
| Jun | MT0 | [redacted] | [redacted] | D | $3 693,633 | 8% | $147 745 | $295,491 |
| Jul | MT01 | [redacted] | [redacted] | I | $3 528,961 | 2% | $35,290 | $70,579 |
| Jul | MT0 | [redacted] | [redacted] | D | $12 346,385 | 11% | $586,876 | $1,358,102 |
| Jul | MT0 | [redacted] | [redacted] | D | $4 749,058 | 5% | $98,939 | $237,453 |
| Jul | MT1 | [redacted] | [redacted] | D | $4 168,855 | 5% | $86,872 | $208,493 |
| Aug | MT0 | [redacted] | [redacted] | D | $8 170,298 | 9% | $245,109 | $735,327 |
| Aug | MT1 | [redacted] | [redacted] | D | $8 795,961 | 6% | $113,268 | $330,708 |
| Sept | MT1 | [redacted] | [redacted] | D | $2.924,307 | 5% | $36,554 | $146,215 |
| Oct | MT0 | [redacted] | [redacted] | D | $19 863,597 | 7% | $231,742 | $1,390,452 |
| Nov | MT0 | [redacted] | [redacted] | D | $4 164,048 | 8% | $27,760 | $333,124 |
| Dec | MT0 | [redacted] | [redacted] | I | $16 808,720 | 2% | $0 | $336,174 |
| Dec | MT0 | [redacted] | [redacted] | F | $7 113,308 | 3% | $0 | $213,399 |
| Dec | MT0 | [redacted] | [redacted] | D | $6 489,267 | 5% | $0 | $324,463 |
| Dec | MT0 | [redacted] | [redacted] | I | $5 380,930 | 12% | $0 | $645,712 |
| Dec | MT1 | [redacted] | [redacted] | I | $2 776,233 | 12% | $0 | $333,148 |
| Dec | MT0 | [redacted] | [redacted] | D | $4 820,573 | 6% | $0 | $289,234 |
| Dec | MT03 | | | D | $4 541,129 | 7% | $0 | $317,879 |

Industrial and Agricultural Products – CSX Transportation 64

**Upcoming Forest Products pricing expirations.** These represent the significant negotiations taking place in the next several months

| | | | | | | |
|---|---|---|---|---|---|---|
| May-05 | [redacted] | [illegible] | $5,720,000 | 12% | $350,000 | $145,300 |
| May-05 | | P3 | $1,800,000 | 12% | $152,000 | $338,300 |
| May-05 | | P1 | $1,600,000 | 6% | [illegible] | $90,000 |
| May-05 | | P3 | $2,440,000 | 22% | $500,000 | $548,300 |
| June-05 | | P1 | $10,450,000 | 21% | $1,290,000 | $2,160,000 |
| June-05 | | P3 | [illegible] | 6% | $50,000 | $108,300 |
| June-05 | | P3 | $880,000 | 8% | [illegible] | $77,000 |
| June-05 | | P8 | $1,800,000 | 14% | $125,000 | $258,300 |
| June-05 | | P8 | $2,400,000 | 12% | $175,000 | $298,300 |
| June-05 | | P2 | $1,796,000 | 6% | $62,000 | $103,300 |
| July-05 | | P1 | $1,335,000 | 24% | $141,000 | $329,300 |
| July-05 | | P8 | $4,000,000 | 17% | $395,000 | $700,300 |
| July-05 | | P8 | $12,450,000 | 15% | $900,000 | $1,850,000 |
| July-05 | | P8 | $8,700,000 | 6% | $288,000 | $500,300 |
| July-05 | | P8 | $1,500,000 | 80% | $800,000 | $1,200,000 |
| July-05 | | P8 | $8,300,000 | 17% | $850,000 | $1,190,000 |
| August-05 | | P3 | $815,000 | 7% | $27,000 | $64,000 |
| August-05 | | P8 | $3,000,000 | 6% | [illegible] | $238,300 |
| September-05 | | P3 | $880,000 | 6% | $18,000 | $53,000 |
| October-05 | | P8 | $6,200,000 | 6% | $81,000 | $400,300 |
| October-05 | | P8 | $7,300,000 | 6% | $106,000 | $430,000 |
| November-05 | | P1 | $2,000,000 | 5% | $18,000 | $104,300 |
| December-05 | | P3 | $815,000 | 6% | $4,000 | $51,000 |
| | | P | | | $4,883,400 | $11,882,800 |
| | | | | | | |
| | | | | | | |





Highly Confidential DA07057 CSXFSC000042260

CSX
CORPORATION

**Peter J. Shudtz**
Vice President-Federal Regulation and
Washington Counsel

Suite 560, National Place
1331 Pennsylvania Avenue, NW
Washington, DC 20004
Phone (202) 626-4929
Fax (202) 783-5929
Cell (804) 347-6492
Peter_Shudtz@csx.com

216397

APR 27 2006
RECEIVED

April 27, 2006

**HAND DELIVERY**

The Honorable Vernon A. Williams
Secretary
Surface Transportation Board
1925 K Street, N.W.
Washington, D.C. 20423-0001

Re: Ex Parte No. 661 - Railroad Fuel Surcharges

Dear Secretary Williams:

Enclosed for filing in the above-referenced proceeding are an original and ten copies of the Written Statement of CSX Transportation, Inc. A diskette containing an electronic version of the Written Statement is also enclosed.

Please acknowledge receipt of the enclosed Statement for filing by date-stamping the enclosed extra copies and returning them via our messenger. If you have any questions, please contact the undersigned counsel.

Sincerely,

Peter J. Shudtz

Enclosures

DA07058

216341

APR 27 2006
RECEIVED

BEFORE THE
SURFACE TRANSPORTATION BOARD

---

STB Ex Parte No. 661

RAIL FUEL SURCHARGES

---

**WRITTEN STATEMENT OF CSX TRANSPORTATION**

CSX Transportation, Inc. ("CSXT") submits this written statement in response to the Board's request for comment on the subject of rail fuel surcharges collected by railroads. *See* STB Ex Parte No. 661, *Rail Fuel Surcharges* (Mar. 14, 2006) ("Notice"). Christopher P. Jenkins, CSXT's Vice President - Coal and Automotive Service Group, will present oral testimony at the public hearing on May 11, 2006.

**INTRODUCTION**

CSXT welcomes the opportunity to explain further its fuel surcharge program to the Board and other interested entities. The fuel surcharge is an important part of our rate negotiations with our customers and is routinely addressed as part of those negotiations. The extraordinary rise in oil prices over the last several years has dramatically increased CSXT's fuel expenses. In an effort to recover those increased expenses and minimize threats to our ongoing efforts to achieve adequate earnings, CSXT has designed a program to adjust its freight rates in response to fuel price changes. Any concern by shippers that CSXT's fuel surcharge might be

over-recovering for increased fuel costs is unwarranted. In fact, CSXT has under-recovered its increased fuel expenses for each year since 2002—the cumulative under-recovery amounts to approximately $319 million. While CSXT anticipates that in future years its fuel surcharge program may enable it to recover a greater proportion of its total fuel expenses—up to and including full recovery—it is committed to using the fuel surcharge for recovery of its actual increased cost and cumulative loss from increased fuel prices to ensure adequate earnings. CSXT will continue to monitor its fuel surcharge program and will recalibrate it as necessary to ensure that it does so.

Section I of this statement describes the rising fuel costs that were the genesis of CSXT's fuel surcharge and outlines the mechanics of CSXT's fuel surcharge program. Section II sets forth the three key principles of CSXT's fuel surcharge program: (1) full recovery of CSXT's fuel costs; (2) an appropriate distribution of the burden of the fuel surcharge among CSXT's customers consistent with the differential pricing principles that govern all of CSXT's rates; and (3) responsiveness to changing market conditions. Section III addresses the Board's request for comment on the need for additional reporting requirements relating to fuel surcharges. CSXT believes that the existing reporting regime is sufficient, and that shippers' and the Board's need for information is satisfied by CSXT's existing disclosures to the Board about fuel costs and by the public availability of the details of its fuel surcharge program. Finally, section IV discusses the legal context of CSXT's fuel surcharge program. Commercially, economically, and legally CSXT's fuel surcharge is a part of the total freight rate paid by the customer, not a separate charge for some separate service, nor a "practice" that can be evaluated separate from the line haul freight charges.

# I. THE HISTORY OF CSXT'S FUEL SURCHARGE PROGRAM

## A. Higher Fuel Prices Have Affected A Number of Industries

Over the last several years the price of oil has skyrocketed. On April 26, 2006, the price of West Texas Intermediate Crude Oil ("WTI") stood at $71.94—a 71% increase from its $42.13 price at the beginning of 2005 and a 242% increase from its $21.03 price at the beginning of 2002. This extraordinary price increase has affected all transportation industries. Motor carriers, airlines, barges, and even taxi cabs have confronted unprecedented percentage increases in the cost of fuel. Non-transportation industries using oil as a feedstock or a fuel have also faced fuel cost increases. Auto manufacturers have noted marked changes in consumer demand for larger sport utility vehicles ("SUVs")—a trend that is severely affecting some manufacturers that have positioned their product lines towards SUVs and trucks. The high price of gasoline is a constant source of water-cooler conversation. The soaring price of crude oil in world markets is not a "railroad issue" but a fundamental macro-economic event that is rippling throughout the American economy. Every industry, every business, and every consumer must address and confront the problem in its own way.

Companies in the transportation sector and industries that rely heavily on hydrocarbons for fuel and/or feedstock have been particularly hard-hit by the rapid rise in energy costs, and individual companies in these industries have sought, and continue to seek, to pass through these higher costs to their customers in the form of higher prices for the goods and services produced. In some cases, these higher prices take the form of surcharges; in other cases they are

implemented by withdrawing an existing rate or rate table and publishing a higher rate or rate table.[1]

Motor carrier industry trade publications, for example, note that fuel surcharges imposed by trucking firms have grown from approximately 1 percent of a shipper's freight bill in 2001 to 25 percent or more of a typical trucking rate in the first quarter of this year. *Logistics Management*, March 1, 2006, at 34. Consistent with this statement, J.B. Hunt Transport Services, Inc., for example, reported that for the three months ended March 31, 2006, fuel surcharge revenues were $89.9 million, as compared to revenues from all other sources (*i.e.*, excluding fuel surcharges) of $690.0 million – a ratio of approximately 13 percent. Similarly, in its 10-K for 2005, YRC Worldwide Inc. (Yellow Transportation and Roadway Express) states that revenues improved year over year in part as the result of increased revenue from a fuel surcharge, which it describes as experiencing a high level of customer acceptance. YRC Worldwide Inc., Annual Report (Form 10-K), at 36 (Mar. 15, 2006). The company notes that:

> The fuel surcharge is common throughout our industry and represents an amount that we charge to customers that adjusts with changing fuel prices. We base our fuel surcharge on a published national index and adjust it weekly. Material changes in the index or our cost of fuel can positively or negatively impact our revenue and operating income. Fuel surcharge is an accepted and important component of the overall pricing of our services to our customers. Without an industry accepted fuel surcharge program, our base pricing for our transportation services would require changes. We believe the distinction between base rates and fuel surcharge has been blurring over time and in the pricing continuum it has become difficult to clearly separate all the different factors that influence the price that our customers are willing to pay. [*Id.* at 21.]

Similarly, last October the Transpacific Stabilization Agreement – a conglomerate of 12 major shipping lines that negotiates rates from Asian ports – advised shippers that because of

[1] *See, e.g.*, Janet Ginsburg, *The Pain of Fuel Surcharge Shock* in *Business Week Online* (April 28, 2005) (describing fuel surcharge and other price increases by a variety of industries to offset rising fuel costs).

rising costs of fuel, "TSA member lines are reviewing current calculation formulas and existing contracts, and will be approaching customers to discuss possible options." The TSA noted that "fuel prices have risen faster than quarterly adjusted surcharges" and, as a result, its members had concluded that "they could not wait until the next round of contract negotiations, which begin in March and typically close in May, to pursue the increases." *Shippers: Rising Fuel Prices Could Cause Rate Increases*, in *Business and Industry*, at 10.

Indeed, companies that are unable to readily pass higher fuel costs to their customers face adverse financial consequences. For example, in the electric utility sector, companies that have significant impediments to passing through higher fuel costs to their customers face increased scrutiny from rating agencies and, in some cases, adverse rating actions. *Electric Utility Week*, March 27, 2006, at 19.

In short, across the U.S. economy, companies that are significant consumers of energy are raising prices in order to recover higher energy costs. These price increases take the form of surcharges, list price increases, or combinations of the two; and these price increases cannot always be achieved uniformly, due to contractual restrictions and market factors including the ability of certain customers to absorb those increases. The position CSXT finds itself in, and the solutions it has adopted, are consistent with the experience of these other industries. Furthermore, the need CSXT has to recover its increased fuel costs is particularly acute now, when our shippers are asking us to improve our service and to invest significantly in additional rail capacity, and at a time when CSXT is making such investments at record levels. As the experience of certain electric utility companies makes clear, if the financial markets perceive that we will be constrained from recouping these costs, this will have an adverse effect on our ability to raise the funds necessary to undertake these investments.

### B. Higher Fuel Prices Have Caused CSXT's Fuel Expenses To Rise Sharply

CSXT used over 595 million gallons of diesel fuel in 2005, making it one of the largest fuel consumers in the United States.[2] Diesel fuel constitutes one of CSXT's most significant variable costs. Every $10 per barrel increase in the price of WTI increases CSXT's fuel expense by approximately $180 million. Indeed, the extraordinary increase in fuel costs over the last several years has more than doubled CSXT's fuel expense. Before the last few years of increased fuel prices, CSXT could expect to pay $0.70 per gallon for diesel fuel (which correlated to an approximate WTI price of $23.00 per barrel). Accounting for the impact of changes in traffic, CSXT's baseline fuel expense at this price would be $400 million in 2002, $417 million in 2003, $431 million in 2004, and $417 million in 2005. CSXT's actual fuel expense since 2002, however, is starkly higher than this baseline: $449 million in 2002 ($49 million over the baseline); $566 million in 2003 ($149 million over the baseline); $736 million in 2004 ($305 million over the baseline); and $1.031 billion in 2005 ($614 million over the baseline). The first quarter of 2006 continued this trend. CSXT spent $288 million on fuel during the first quarter of 2006, a 25% increase from its fuel expense in the first quarter of 2005. CSXT has worked to reduce its fuel expense by improving fuel efficiency—for example, through the use of auxiliary power units that reduce the amount of diesel fuel used while locomotives are idling. Through various initiatives, CSXT has reduced its fuel consumed per gross ton mile by 3.3% since 2003. But even with this improved efficiency, the increased price of fuel has drastically affected CSXT's total fuel cost. CSXT's cumulative fuel expenses over the last four years have been **$1.11 billion** higher than they would have been without the increased price of

---

[2] The fuel consumption and expense figures in this Statement include fuel expenses for CSX Intermodal, which uses a different cost recovery mechanism than CSX Transportation, and do not include hedging activities.

fuel. CSXT's fuel surcharge program is designed to recover this astounding increase in its costs for fuel.

**B. CSXT' s Fuel Surcharge Program**

CSXT's first post-Staggers Act fuel cost recovery program was implemented on October 25, 2000, and published as Item 12000 to each of CSXT's major terms and conditions tariffs, CSXT 8100 and CSXT 8200 (coal). On June 1, 2003, CSXT refined its fuel surcharge formula to reflect market conditions and replaced Item 12000 with Item 12000-A. Item 12000-A is intended to recoup CSXT's increased fuel costs by adjusting freight rates with the price of oil. Item 12000-A imposes a 0.4% surcharge for every $1.00 that the average price per barrel of WTI increases above a baseline of $23.00. For example, if the average price per barrel of WTI is between $23.01 and $24.00, the surcharge will be set at 0.4%, and if the average price of WTI is between $32.01 and $33.00, the surcharge will be set at 4%.

Under Item 12000-A, CSXT constantly revises its fuel surcharge to reflect current price data. The WTI average price for each month is used to set the fuel surcharge for the second calendar month following that month. For example, the fuel surcharge for May 2006 is a function of the WTI average price for March 2006. Moreover, Item 12000-A creates a simple formula that shippers can use to monitor future fuel surcharges. WTI is a standard measurement of fuel costs, and customers can access current WTI prices easily in the Wall Street Journal or on CSXT's website.[3] CSXT's website also includes a detailed matrix that illustrates which surcharges will be triggered by particular WTI prices.[4]

---

[3] *See* http://shipCSXT.com/public/ec.shipCSXTpublic/Main?module_url=/ec.pricingpublic/Wti.
[4] *See* http://shipCSXT.com/public/ec.shipCSXTpublic/Main?module_url=/ec.pricingpublic/Tariff.

## II. KEY PRINCIPLES OF CSXT'S FUEL SURCHARGE PROGRAM

CSXT's fuel surcharge program is designed around several key principles. First, fuel surcharges should enable CSXT to fully recover its fuel costs to ensure adequate earnings. Second, fuel surcharges should be fairly distributed among customers in an effective and administrable way. Third, fuel surcharges should be responsive to changing market conditions. Each of these principles is detailed below.

### A. CSXT's Fuel Surcharge Is Designed to Promote Full Recovery of Increased Fuel Costs to Ensure Adequate Earnings.

As discussed above, CSXT's cumulative increase in fuel expense since 2002 has exceeded $1.1 billion. The Board rightly recognizes that "railroads can reasonably be expected to devise methods to collect increases in those costs from their shippers." Notice at 1. This reflects a longstanding policy. As far back as 1975, the ICC recognized that fuel surcharges are an appropriate method for railroads to recover fuel expenses to ensure adequate earnings. *Cf. Fuel Related Increases*, X-305-A, 349 I.C.C. 173, 175 (1975) (describing fuel surcharges approved in response to spike in oil prices).[5]

CSXT's fuel expense for 2005 alone was $614 million higher than it would have been with baseline fuel prices. It is certainly appropriate for CSXT to pass this extraordinary

[5] During the early and late 1970's, prior to the enactment of the Staggers Rail Act of 1980, the ICC authorized railroads to collect surcharges based on freight revenues to recover increases in fuel costs. During the oil embargo of 1973-1974, in response to the rapidly increasing fuel costs being incurred by common carriers, the ICC issued Special Permission No. 74-1825, which authorized such carriers and freight forwarders to file, on short notice, surcharges based on fuel price increases. *See* Special Permission No. 74-1825, 38 Fed. Reg. 34771 (Dec. 18, 1973). Pursuant to that authority, the Nation's railroads filed a number of rail surcharges before Special Permission No. 74-1825 expired in September 1974. *See Fuel Related Increases*, X-305-A, 349 I.C.C. 173, 174-175 (1975).

Similarly, in response to dramatic increases in fuel costs during the 1978-1979 period, the ICC issued orders in June 1979 authorizing railroads and other carriers to use surcharges to recover such increases. *See* Ex Parte No. 311, *Expedited Procedures for Recovery of Fuel Costs*, Decisions served June 1, 1979, June 15, 1979, and June 19, 1979 (44 Fed. Reg. 37427 (1979)). The ICC found that the "emergency" situation that existed "dictate[d] that a fuel-based surcharge the appropriate method of implementing" future fuel-based rate increases. *Id.*, Decision served June 1, 1979, at 2. Consistent with those decisions, the nation's railroads filed various fuel-based surcharges. *See, e.g.*, *Coal, Colstrip, Kuehn, and Decker, MT, To Superior, WI*, 364 I.C.C. 152, 153-154 (1980) (noting that between June 5, 1979, and October 15, 1979, the ICC "approved a series of [fuel] surcharges totaling 4.7 percent for all the Nation's railroads," with the exception of coal traffic moving in unit-train rates subject to annual escalation).

additional expense on to shippers. Indeed, if CSXT were not permitted to recover this significant expense, its drive for sustained revenue adequacy and its ability to make necessary capital investments would be seriously hampered. The Board and our customers are well aware of the extraordinary capital expenditures CSXT is undertaking to increase the capacity of its network in the face of unprecedented demand for rail transportation. Forcing CSXT to absorb the entire cost of skyrocketing fuel prices would severely undercut its ability to afford capital investments, maintain its facilities, and improve our service.

The Board has noted that shippers have "voiced concerns that recent fuel surcharges collected by railroads are designed to recover amounts over and above increased fuel costs." Notice at 1. This concern is certainly not true for CSXT's fuel surcharge program. In fact, CSXT has under-recovered its excess fuel expenses for each year of its fuel surcharge program. This under-recovery is a function of the nature of CSXT's business. A very large proportion of CSXT's carloads are carried pursuant to contracts with its customers—not pursuant to common carrier rates. When Item 12000-A went into effect on June 1, 2003, CSXT could not apply it to many existing contracts. Since June 1, 2003, however, CSXT has sought to incorporate the fuel surcharge into new contracts and renewed contracts, and in the alternative has sought to include an RCAF provision to permit some recovery of increased fuel costs. As a result, nearly 80% of CSXT's traffic is now subject to fuel adjustments, and we anticipate that these will reach an ever-increasing amount of traffic in the coming years.

Because of CSXT's inability to apply the fuel surcharge immediately to all of its contract traffic, that surcharge has not recovered CSXT's fuel costs for any year since 2002. Since 2002, CSXT's cumulative under-recovery of fuel expense increases not recovered through the fuel surcharge program is approximately $319 million. This under-recovery belies any suggestion

that CSXT has profited from its fuel surcharge program. On the contrary, CSXT's fuel surcharge program is calibrated to recover increased fuel costs to ensure adequate earnings.

Although CSXT anticipates that future years of the fuel surcharge program will allow more complete recovery of excess fuel expenses, it is likely to be some time before it has recouped its cumulative loss from increased fuel prices. CSXT continually monitors both its increased fuel expenses and its fuel surcharge program, and as it approaches full recovery of its cumulative under-recovery of such costs, it will re-examine the program and make any adjustments necessary to promote that recovery to ensure adequate earnings.

**B. CSXT's Fuel Surcharges Are Fairly Distributed Among Our Customers**

The fuel surcharge that CSXT has designed is an appropriate way to allocate the burden of the fuel surcharge among our customer base. Development of a cost index that is applied across all rates—so that a percentage increase observed in the cost of providing rail service results in an identical percentage increase in rates—is common in the railroad industry. The Board's RCAF, RCAF-U and RCAF-5 are applied in precisely this fashion. Because the fuel surcharge is calculated as a percentage of the base rate, it incorporates all the competitive considerations that drive the parties' rate negotiations: value of commodity, value of service, length of haul, loading weight, operating considerations, available capacity, equipment availability and ownership, source and geographic competitive factors. Just as the cost of longer and heavier movements is typically reflected in the rates for those movements, so will the cost of increased fuel consumption.

To be sure, CSXT's base rates also reflect the relative market competitiveness of individual movements. This is entirely appropriate; the differential pricing principles that support setting rates based on competitive factors apply equally to base rates and to rate

surcharges. In this regard, it is worth noting that many carriers in the trucking industry, which is often CSXT's most significant competition, regularly assess fuel surcharges as a percentage of a base rate.

The reasonableness of CSXT's approach is highlighted by considering the alternative. To replace CSXT's understandable and readily-calculated percentage with an attempt to precisely assess "the increased cost of fuel for the particular movements to which the surcharge is applied" would invite an administrative nightmare. Taken literally, such an approach would necessitate the calculation (actually, the estimation) of the precise amount of fuel consumed to handle each shipment. Since fuel consumption is a route-specific function of factors like mileage, grade, speed, terrain, and train weight, requiring a separate approximation of fuel cost for each individual carload movement over CSXT's network would be an impossibly complex burden on both carriers and shippers. In 2005, CSX moved over 7.35 million units of traffic. Calculating the precise mileage traveled by each unit is simply not feasible. Indeed, any call for movement-specific cost additives will inevitably be, at best, a very imprecise approximation.

In its Notice, the Board notes that "shippers are complaining of the railroad practice of labeling a rate increase as a fuel surcharge when the increase is not directly and closely correlated to increases in the cost of fuel for the particular movement to which the surcharge is applied." Notice at 2. This complaint misunderstands the fundamentals of demand-based pricing. The economics of demand-based pricing tell us that even when the effect of an increased cost of fuel is identical for two movements, the net effect on the rates charged the two movements will not be identical if they do not have the same elasticities of demand.

Attachment 1 to this statement is a simple example of a railroad that handles two movements. Commodity A is more price inelastic, and Commodity B is more price elastic, each

with a marginal cost of $6.00 per ton. The top half of Attachment 1 calculates Ramsey prices required to recover the total cost of $45,000 hypothesized for the railroad. Attachment 1 then assumes that increased fuel costs cause marginal costs for both movements to increase from $6.00 per ton to $7.00 per ton.

The bottom half of Attachment 1 recalculates the Ramsey prices that would be required to fully recover the costs of increased fuel *and* fully recover the total costs of the railroad. Increases in rate levels cause volumes of both Commodity A and Commodity B to decline somewhat, but because Commodity B is more price sensitive than Commodity A, the same absolute increase in price would cause a disproportionate decline in Commodity B's volumes. The Ramsey pricing principles set forth in Attachment 1 reveal that the most efficient way to recover these increased fuel costs is to increase the price paid by Commodity B by $1.02 per ton, and to increase the price paid by Commodity A by $3.20 per ton. Any effort to further increase the fuel surcharge on Commodity B and decrease the surcharge on Commodity A would cause the fixed costs of $33,000 for the railroad to be spread over a smaller number of tons, increasing the average rate paid by the average shipper by more than would be the case under the Ramsey-based solution. In short, surcharges that are not necessarily "directly and closely correlated to increases in the cost of fuel" for each individual movement are precisely what one would expect under the demand-based Ramsey pricing paradigm that is the cornerstone of the Board's pricing regulations.

### C. CSXT's Fuel Surcharge Is Responsive To Changing Market Conditions

CSXT's fuel surcharge is frequently updated to reflect current fuel costs. Because CSXT recalculates the fuel surcharge every month, it is based on the most recent data that can be used while giving fair notice to customers. For example, the fuel surcharge rate for May 2006 was

publicized on April 3, 2006 and was based on the average WTI price for March 2006. This system ensures that the fuel surcharge rate can fall in response to declining fuel costs as readily as it can rise in response to rising fuel costs.

CSXT will continue to monitor the fuel surcharge program and is prepared to make appropriate adjustments so that the program recovers increased fuel costs to ensure adequate earnings.

## III. CURRENT REPORTING REQUIREMENTS ARE ADEQUATE FOR THE BOARD AND SHIPPERS TO MONITOR FUEL COSTS AND FUEL SURCHARGES

CSXT provides extensive information about its fuel costs and fuel surcharges in several forums, and this information is therefore readily available to our customers. CSXT is committed to thorough, timely and convenient communication with our customers about fuel surcharges. Our website, www.shipcsx.com offers easy navigation to a host of information for customers:

- A matrix that details the precise surcharge that will apply for each average WTI price
- Current and past WTI prices
- Current fuel surcharge
- Next month's fuel surcharge (once determined)
- Following month's fuel surcharge (projected based on WTI price month-to-date)
- The tariff items

And, for our customers who have subscribed, CSXT sends a monthly electronic letter actively advising of the upcoming month's fuel surcharge at no cost to the customers.

As a result, CSXT's fuel surcharge program is completely transparent to its customers and the general public. Indeed, because the fuel surcharge is calculated by applying a simple formula to a widely available measure of fuel prices, shippers can readily predict future

surcharge amounts before CSXT has announced them. Moreover, CSXT and its customers routinely discuss the details of and need for the fuel surcharge program during negotiations and on an informal basis. We will continue to have these discussions with our customers in the future as part of negotiations over rates.

In addition, CSXT already reports essential data on its fuel costs to the Board. CSXT's R-1 includes both an accounting of its consumption of diesel fuel and an account of its total fuel costs. *See* CSX Corporation, 2005 Annual Report (Form R-1), at 91. CSXT respectfully submits that this information is fully sufficient to assure the Board that CSXT's fuel surcharges are reasonable and to enable shippers to monitor their fuel costs. CSXT therefore does not believe that there is a need for any additional reporting. Nevertheless, should the Board wish to consider expanding railroads' reporting obligations in this area, CSXT is willing to participate in an appropriate rulemaking to consider changes to the information required by Form R-1. CSXT respectfully requests that any reporting obligation be prospective only and that the Board allow it a reasonable time to adjust its systems to comply with such a requirement.

## IV. CSXT'S FUEL SURCHARGE IS A MECHANISM THAT IS INTEGRAL TO THE TOTAL FREIGHT RATE AND CANNOT BE ADDRESSED SEPARATELY AS A "PRACTICE"

CSXT welcomes the opportunity to explain its fuel surcharge program at this public hearing, and believes that this discussion should fully satisfy any concern of the Board or shippers about whether CSXT's fuel surcharges are closely tied to our increased fuel costs. CSXT will be attentive to the comments of the Board and of its customers about its fuel surcharge program, and CSXT remains open to reexamining its program as necessary.

In addition, several points about the legal status of CSXT's fuel surcharges should be clarified. *First*, as the Board recognized in its Notice for this proceeding, rail fuel surcharges are

components of a railroad's rates. *See* Notice at 2 ("A surcharge is a separately identified component of the total rate that is charged for the transportation involved."). This recognition accords with the Board's and the ICC's past holdings that surcharges should be regarded as an integral part of the total freight charges paid by the shipper to the carrier.[6] Therefore, the level of any fuel surcharge rate cannot be examined independently from the total rate charged the customer.[7]

*Second*, because rail fuel surcharges are rates, the Board's jurisdiction to consider the reasonableness of the level of any particular rate is circumscribed. For example, the Board has consistently held that it has no jurisdiction over fuel surcharges that have been incorporated into contract rates. *See* 49 U.S.C. § 10709; *Wisconsin Central Ltd. – Petition for Declaratory Order*, STB Docket No. 41995, 2001 STB LEXIS 569, at *8 (June 15, 2001) ("[R]eferenced tariff terms became contract terms for purposes of transportation performed under contract."). Moreover, the Board has recognized that it does not have jurisdiction to determine that a challenged rate is unreasonably high unless it first determines that the railroad has market dominance – *i.e.,* that (1) there is an absence of effective competition from other rail carriers or modes of transportation for

---

[6] *See, e.g., Parrish & Heimbecker, Inc. – Petition for Declaratory Order*, 4 S.T.B. 866, 877 (2000) ("surcharges are assessed solely in connection with line-haul movements and form part of, or an addition to, the line-haul rate"); *Parrish & Heimbecker, Inc. – Petition for Declaratory Order*, Decision served May 25, 2001, at 3 (denying reconsideration) ("surcharges, which by their nature apply to line-haul service, are effectively indistinguishable from line-haul rates"); *Second Passengers in Sleeping Car Berths or Sections,* 182 I.C.C. 636, 639 (1925) ("The surcharge is, in fact, a part of the fare accruing to the railroad for the transportation of passengers conveyed by it, and any increase in the surcharge is equivalent to an increase in the rate of passenger fare per mile"); *In the Matter of Charges for Passengers Traveling in Sleeping and Parlor Cars*, 95 I.C.C. 469, 478 (1925) (surcharge for transportation of passengers in sleeping and parlor cars "ought not to be regarded as an independent third charge upon the passenger," but instead as a convenient method of computing an addition to the basic passenger fare).

[7] *See Great Northern Ry. Co. v. Sullivan*, 294 U.S. 458, 462-463 (1935) (although the ICC may determine whether a "proportional" part of a combination rate is just and reasonable without passing upon the validity of the combination rate as a whole, "the commission may not order or permit payment of damages by way of reparation without finding that the amount of the [combination] charge was unjust and unreasonable"); *Kansas City Power and Light Co. v. The Kansas City Southern Ry. Co.*, 361 I.C.C. 848, 853 (1979) ("*Great Northern* holds that we cannot find a *rate* unreasonable unless we find the *entire* rate unreasonable. That is, we cannot find a rate to exceed a reasonable maximum by examining only one of its components") (emphasis in original).

the transportation to which the challenged rate applies; and (2) the revenue-to-variable-cost percentage for such transportation exceeds 180 percent. *Id.* § 10707(a).

The Board has rightly recognized these limitations on its authority and has disavowed any intent "to address the level of surcharges." Notice at 2. Instead, the Board posited that the calculation of fuel surcharges might be addressed as a potentially unreasonable "practice." *Id.* However, the Board's authority to regulate fuel surcharges as a "practice," is limited by the principle that the agency cannot regulate rates using its jurisdiction over unreasonable practices. *Union Pacific Railroad v. ICC*, 867 F.2d 646, 649 (D.C. Cir. 1989). And, under *Union Pacific*, when determining whether an action addresses a "rate" or a "practice," "form must yield to substance." *Id.*

CSXT recognizes that at this stage the Board has called a public hearing so that it can fully inform itself of the views of the shipping public as well as hearing from the carriers, and CSXT appreciates the opportunity to participate in this proceeding. Unquestionably, however, the "substance" of CSXT's fuel surcharge program is that of a rate. Any determination by the Board that a particular fuel surcharge level might be "unwarranted" would amount to a determination about the reasonableness of a rate—not about a practice. The Board has made clear that a shipper's complaint about the "mechanism used to establish the rate levels" is a complaint about a rate—not about a practice. *National Grain and Feed Assn. v. Burlington Northern R.R. Co.*, Docket No. 40169, 8 I.C.C.2d 421, 432, *rev'd on other grounds sub nom. National Grain and Feed Assn. v. United States*, 5 F.3d 306 (8th Cir. 1993).

## V. CONCLUSION

CSXT's fuel surcharge program is eminently reasonable. CSXT's fuel surcharge program is designed to promote the recovery of its increased fuel expenses in a way that ensures

adequate earnings and allocates such increased expenses appropriately among all our customers, consistent with the differential pricing principles that govern all of CSXT's rates. CSXT will continue to monitor its fuel surcharge program and will make any appropriate adjustments to ensure that the program allows full recovery of increased fuel costs to ensure adequate earnings.

Respectfully submitted,

Peter J. Shudtz


Ellen M. Fitzsimmons
Peter J. Shudtz
Paul R. Hitchcock
CSX Transportation, Inc.
500 Water Street
Jacksonville, FL 32202

## ATTACHMENT 1

| | Commodity A | Commodity B | Total |
|---|---|---|---|
| **Starting Point Assumptions** | | | |
| Price | $34.766 | $10.234 | |
| Marginal Cost | $6.000 | $6.000 | |
| Volume | 1,000.00 | 1,000.00 | |
| Total Cost | | | $45,000 |
| Elasticity of demand | -0.6 | -1.2 | |
| | | | |
| Value of Constant | 0.4964511 | 0.4964511 | |
| | | | |
| Total Marginal Cost | $6,000.00 | $6,000.00 | $12,000 |
| | | | |
| Total Contribution to Fixed Costs | $28,766.183 | $4,233.830 | $33,000 |
| | | | |
| Total Revenues | $34,766.183 | $10,233.830 | $45,000 |
| | | | |
| **Assume Fuel Price adds $1 to Cost** | | | |
| Price | $37.967 | $11.250 | |
| Marginal Cost | $7.000 | $7.000 | |
| Volume | 944.8 | 880.9 | |
| Total Cost | | | $45,779 |
| Elasticity of demand | -0.6 | -1.2 | |
| | | | |
| Value of Constant | 0.4964511 | 0.4964511 | |
| | | | |
| Total Marginal Cost | $6,613.319 | $6,166.160 | $12,779 |
| | | | |
| Total Contribution to Fixed Costs | $29,256 | $3,744 | $33,000 |
| | | | |
| Total Revenues | $35,869 | $9,910 | $45,779 |

## CERTIFICATE OF SERVICE

I verify that on this day, April 27, 2006, I have caused copies of the Written Statement of CSX Transportation to be served upon all parties of record in this proceeding by first-class mail or more expeditious method of delivery.

Matthew J. Warren

**From:** McIntyre, Clyde Jr.
**Sent:** Monday, March 17, 2003 2:25 PM
**To:** Durbin, Kim ; Saunders, Anita ; Dragiff, Matthew
**Cc:** Morrison, Dorothy ; Snyder, Joan ; Pate, Emily ; Lancaster, Al ; McComb, Jim ; Saunders, Anita ; Havey, Ray ; Grayson, Pam
**Subject:** Communication: CSXT Fuel Surcharge Changes to 4% March 20th Due to Higher Fuel Cost

**Attachments:** CSXT Fuel Cost Recovery Charge Change to 4%

Kim, Anita and Matthew,

The attached CSXT fuel surcharge communication will need to be released on Wednesday, March 19th, to customers via blast fax (Kim), mailed to public price list subscribers (Anita) and for placement on the CSXT Internet site (Matthew). Please let me know if you see any problems with accomplishing.

Clyde McIntyre

CSXT Fuel Cost
Recovery Charge...

CSXT Fuel Surcharge Changes from 2% to 4% March 20th Due to Higher Cost

March 19, 2003

Dear CSX Customer:

In September 2000, CSX Transportation announced it would join others in the transportation industry in implementing a fuel cost recovery charge. With recent escalating fuel costs, the CSXT fuel surcharge remained at 2% between January 29, 2003 and March 19, 2003.

The March 18th closing price of West Texas Intermediate (WTI) crude oil as published in the March 19th Wall Street Journal is the 30th consecutive day the price of WTI oil has been $33 or higher per barrel. As a result, the surcharge will change from 2% to 4% effective on shipments having a bill of lading date on and after March 20, 2003.

CSXT is hopeful that WTI fuel costs stabilize at a price lower than $33. The fuel surcharge will remain at 4% until WTI oil prices rise above or fall below the threshold levels for 30 consecutive days.

The CSXT fuel surcharge was published effective October 25, 2000, in Tariffs CSXT 8100 http://www.csx.com/share/csx/assessorial/forms/docs/xii_misc_prov-REF10290.pdf and CSXT 8200 (Coal). The formula for calculating the recovery charge was based on the price of WTI Oil, an industry standard for tracking oil prices. For every $5 the price of WTI is $28, or above, per barrel, for 30 consecutive days as published in the Wall Street Journal, a 2% recovery charge is added.

| Oil Price | Recovery Charge |
|---|---|
| $23 - $27.99/Barrel | No recovery charge |
| $28 - $32.99/Barrel | 2% |
| $33 - $37.99/Barrel | 4% |
| $38 - $42.99/Barrel | 6% |

While the fuel recovery charge remains in effect, CSX will continue to provide daily updates on the price of WTI and status of the charge on the CSX Internet site, http://www.csx.com. Simply select "Find a Price" in the upper right corner of the "Quick Links" dropdown. The price look-up screen has a fuel surcharge icon to select. Questions may be directed to your CSXT Account Manager.

Clyde McIntyre
Director, Pricing Services
CSX Transportation
Jacksonville, FL

**From:** Murphy, Dan
**Sent:** Wednesday, March 19, 2003 1:35 PM
**To:** McIntyre, Clyde Jr.
**Subject:** FW: S&M Alert - CSXT Fuel Surcharge Will Remain at 2% Due to Lower Fuel Price

**Attachments:** CSXT Fuel Cost Recovery Remains at 2%

I made a couple of minor changes in the second paragraph.

-----Original Message-----
**From:** McIntyre, Clyde Jr.
**Sent:** Wednesday, March 19, 2003 8:32 AM
**To:** Murphy, Dan
**Subject:** FW: S&M Alert - CSXT Fuel Surcharge Will Remain at 2% Due to Lower Fuel Price

Dan,

Please review this draft for the web site. Your comments are appreciated to make this a clear communication to our customers. Thanks.

Clyde

CSXT Fuel Cost
Recovery Charge...

-----Original Message-----
**From:** McIntyre, Clyde Jr.
**Sent:** Wednesday, March 19, 2003 8:09 AM
**To:** S&M Broadcast; S&M Coal; Automotive Service Group
**Cc:** Gooden, Clarence ; Jenkins, Chris; Onimus, Frank S III ; Strok, Andy; Morrison, Dorothy ; Durbin, Kim ; Brown, Alison ; Gutman, Bob; McComb, Jim ; Poole, Ceceille ; Smith, Steve P ; Lancaster, Al ; Taylor, Charlie ; Havey, Ray ; Snyder, Joan ; Jackson, Brian; Taylor, Michael (T); Ritter, Scott; Balter, Lisa ; Schmitt, Connie ; Patterson, Rabon Jr.; Dragiff, Matthew ; Gupta, Sandip ; Varghese, Mathew
**Subject:** S&M Alert - CSXT Fuel Surcharge Will Remain at 2% Due to Lower Fuel Price

**CSXT Fuel Surcharge Will Remain at 2% Due to Lower Fuel Price**

After 29 consecutive days above $33.00 per barrel, the closing price for West Texas Intermediate (WTI) oil published in the March 19, 2003 Wall Street Journal was $31.68. As a result, the CSXT fuel surcharge of 2%, which became effective January 29, 2003, will remain at 2%.

Clyde McIntyre
Director Pricing Services
RNX 322-3650



Highly Confidential

CSXT Fuel Surcharge Will Remain at 2% Due to Lower Fuel Price

March 19, 2003

Dear CSX Customer:

In September 2000, CSX Transportation announced it would join others in the transportation industry in implementing a fuel cost recovery charge.

On March 7, 2003, we advised that the CSXT fuel surcharge may change from 2% to 4% due to higher fuel costs. However, today, after 29 consecutive days above $33.00 per barrel, the closing price for West Texas Intermediate (WTI) oil published in the March 19, 2003 Wall Street Journal was $31.68. As a result, the surcharge will remain at 2%, the percentage that became effective on shipments having a bill of lading date on and after January 29, 2003.

CSXT is hopeful that WTI fuel costs stabilize at a price lower than $28. The fuel surcharge will remain at 2% until WTI oil prices rise above or fall below the threshold levels for 30 consecutive days.

The CSXT fuel surcharge was published effective October 25, 2000, in Tariffs CSXT 8100 http://www.csx.com/share/csx/assessorial/forms/docs/xii_misc_prov-REF10290.pdf and CSXT 8200 (Coal). The formula for calculating the recovery charge was based on the price of WTI Oil, an industry standard for tracking oil prices. For every $5 the price of WTI is $28, or above, per barrel, for 30 consecutive days as published in the Wall Street Journal, a 2% recovery charge is added.

| Oil Price | Recovery Charge |
|---|---|
| $23 - $27.99/Barrel | No recovery charge |
| $28 - $32.99/Barrel | 2% |
| $33 - $37.99/Barrel | 4% |
| $38 - $42.99/Barrel | 6% |

While the fuel recovery charge remains in effect, CSX will continue to provide daily updates on the price of WTI and status of the charge on the CSX Internet site, http://www.csx.com. Simply select "Find a Price" in the upper right corner of the "Quick Links" dropdown. The price look-up screen has a fuel surcharge icon to select. Questions may be directed to your CSXT Account Manager.

Clyde McIntyre
Director, Pricing Services
CSX Transportation
Jacksonville, FL

# In The Matter Of:

*In re: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION*

---

*ANDERSON, PAUL - Vol. 1*
*May 26, 2011*

---

## *HIGHLY CONFIDENTIAL*

MERRILL CORPORATION
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL )
SURCHARGE ANTITRUST )
LITIGATION )
) MDL No. 1869
) Misc. No. 07-489
This Document Relates To: ) (PLF/AK/JMF)
)
ALL DIRECT PURCHASER )
CASES )

******************************************************
"HIGHLY CONFIDENTIAL"
ORAL AND VIDEOTAPED DEPOSITION OF
BNSF RAILWAY COMPANY 30(b)(6) REPRESENTATIVE
PAUL ANDERSON
MAY 26, 2011
******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF PAUL ANDERSON, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on May 26, 2011, from 8:08 a.m. to 1:55 p.m., before Julie C. Brandt, RMR, CRR, and CSR in and for the State of Texas, reported by machine shorthand, at the offices of Thompson & Knight, LLP, 801 Cherry Street, Suite 1600, Fort Worth, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Marc L. Greenwald
Kyle R. Taylor
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849-7140
212.849.7100 (fax)
marcgreenwald@quinnemanuel.com
kyletaylor@quinnemanuel.com

FOR THE DEFENDANT BNSF RAILWAY COMPANY:
Gary A. Winters
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006-1101
202.263.3273
202.263.5273 (fax)
gwinters@mayerbrown.com

FOR THE DEFENDANT CSX TRANSPORTATION, INC.:

Luke van Houwelingen
CROWELL MORING
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
202.624.2583
202.628.5116 (fax)
lvanhouwelingen@crowell.com

FOR THE DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY:
Sean M. Tepe
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
202.371.7106
202.661.9106 (fax)
sean.tepe@skadden.com

Page 3

A P P E A R A N C E S
(CONTINUED)

FOR THE DEFENDANT UNION PACIFIC:
David G. Meyer
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071-2300
213.489.3939
213.243.2539 (fax)
dmeyer@jonesday.com

ALSO PRESENT:
David M. Pryor - BNSF Senior General Attorney

VIDEOGRAPHER:

Sandra Bentley, CLVS - Merrill Corp.

Page 4

INDEX


PAGE

Appearances.................................. 2
Proceedings.................................. 5
Stipulations................................. 151

PAUL ANDERSON
Examination by MR. GREENWALD............. 7
Examination by MR. WINTERS............... 148
Further Examination by MR. GREENWALD...... 151
Signature and Changes......................... 152
Reporter's Certificate........................ 154

DEPOSITION EXHIBITS IDENTIFIED

Exhibit 1 Plaintiffs' Revised Notice of Deposition Under Rule 30(b)(6) to Defendant BNSF Railway Company........................ 7
Exhibit 2 Burlington Northern Railroad Company, The Atchison, Topeka and Santa Fe Railway Company Antitrust Policy and Compliance Manual, June 1996.............. 29
Exhibit 3 November 13, 2002, e-mail from Pete Rickershauser, Subject: "Alliances" Draft For Your Comments; attachment........... 45
Exhibit 4 Tentative Agenda, BNSF-CSX Alliance Meeting, Fort Worth, TX October 1, 2003................ 93
Exhibit 5 March 2003 e-mail string, Subject: Full Year Fuel Forecast 118
Exhibit 6 Fuel Surcharge Adherence, November 10, 2004.............. 146

PREVIOUSLY-MARKED EXHIBITS
Kyei Exhibit 18.......................... 123
Kyei Exhibit 24.......................... 131

Page 49

MR. VAN HOUWELINGEN: Vague.
**A. I don't know that I can even comment. I wasn't in any of the alliance meetings, so I really can't help with that.**
Q. I'm referring to the middle of this memo where it says, Alliances make the most sense, but are hardest to achieve with carrier partners which will never be merger partners. Do you see that?
**A. No. I'm sorry. Where is that?**
Q. In the middle, sort of the first arrow.
MR. WINTERS: There's no question pending. Wait until there's a question. He's just directed you to the portion of the document that he wants you to look at.
**A. I see what that is.**
Q. And was this BNSF policy regarding alliances at the time that this memo was created in or about 2002?
MR. WINTERS: Objection to the form. It's beyond the scope. Lacks foundation. He's testified that he doesn't even know who wrote the memo.
**A. I'll state again that BNSF policy was to not have -- specifically not have alliance meetings with the Union Pacific. So -- so no, I don't see this as stating anything about BNSF beliefs.**
Q. The BNSF did not view alliances as part of a

Page 50

continuum from competitors to merger in 2002?
MR. WINTERS: Objection to the form. It's beyond the scope. He's not called as a witness to testify on behalf of the corporation as to BNSF's general view on the desirability of alliances. You know this is well beyond the scope, Marc. The question also lacks foundation.
THE WITNESS: Could I have you read the question back again?
(Requested testimony read.)
**A. I'm sorry.**
MR. WINTERS: Objection as I stated before.
THE WITNESS: Could you read it one more time? I'm sorry. It's a complex question.
(Requested testimony read.)
**A. Could I ask you to rephrase the question? Would that be possible?**
Q. Sure. Why don't we just -- why don't we move on. I do want to go back one second to the antitrust --
**A. Okay.**
Q. -- policy, which is Exhibit 2. And were -- did BNSF's antitrust policy have any -- during the 2002 to 2004 time frame have any restrictions regarding rump meetings as part of -- as part of trade association

Page 51

meetings?
MR. WINTERS: Object to the form. It's vague.
**A. I'm not sure of the definition of the meeting. You said rump meeting. Could you give me the definition of what a rump meeting is?**
Q. You're not familiar with the term?
**A. I'm not familiar with the term "rump"?**
Q. Are there -- well, trade association meetings typically have agendas. Correct?
**A. I would assume that's generally correct.**
Q. And they list the participants and the topics to be discussed?
MR. WINTERS: Object to the form. It's beyond the scope.
**A. I don't know that it's -- it's an absolute, but I would assume that would be the practice in many cases, yes.**
Q. And is it acceptable for two high level employees from a railroad while present at the same meeting to engage in a separate meeting of just themselves without a formal agenda under the antitrust policies in place 2002 to 2004?
MR. WINTERS: And I object to the extent that it calls for a legal conclusion or a legal opinion.

Page 52

He can, again, state what BNSF's policy is with respect to interline communications relating to fuel surcharges.
MR. MEYER: It's also overbroad and outside the scope. Can we have the stipulation, as we've had in the prior depositions, that one objections applies to all?
MR. GREENWALD: Absolutely.
MR. WINTERS: And it's an incomplete hypothetical.
MR. VAN HOUWELINGEN: It's vague.
**A. BNSF's policy is that as long as they're discussing interchange business between the two entities that are in discussions, that is permissible.**
Q. But that would be the only thing that could be discussed between two class 1 railroads. Correct?
MR. WINTERS: Objection to the form.
**A. It's BNSF -- all I can tell you is it's BNSF policy that it's okay to have discussions associated with interchange business that's associated with the two parties that are in discussion.**
Q. Why don't you turn in Exhibit 2 to the page with Bates number that ends 741.
**A. 741.**
Q. And I'll draw your attention to section G, and you can obviously read any part you want. The trade

association section starts on the previous page and continues, but I'm asking specifically about section G.

MR. WINTERS: I think it's important to direct him to look at the page ending in 740 as well so he understands the full context for the section.

Q. You should look at anything you need to to understand the context and to answer the questions fully.

MR. PRYOR: Marc, after you get done with this line of discussion, can we take a break?

MR. GREENWALD: Of course.

MR. PRYOR: Of course.

MR. WINTERS: I don't remember the question, can you --

MR. GREENWALD: I'm not sure I've asked one yet.

**A. Okay.**

Q. So was it BNSF policy that there should not be secret or rump meetings held at the time of trade association meetings?

**A. The policy --**

MR. WINTERS: Objection to the form. Beyond the scope.

**A. Policy states that rump meetings that are secret should be avoided. Again, it's BNSF's policy**



**that it is okay to discuss interchange business with our eastern partners as long as it's associated with interchange business of the two parties.**

Q. But any discussion with another railroad regarding interchange business should have an agenda and minutes. Correct?

MR. WINTERS: Objection to the form. Lack of foundation.

**A. No. There's many discussions that take place between BNSF and an eastern connecting carrier that does not have an agenda.**

Q. Including discussions between high level officers of the two companies?

MR. WINTERS: Objection to the form.

**A. It is -- it is a generally accepted practice to -- as long as senior executives are discussing interchange business associated with the two parties discussing, they can have and do on a very regular basis have discussions.**

Q. So the antitrust policy is that secret or rump meetings should be avoided except if they deal with interchange discussions?

MR. WINTERS: Object to form. That is -- lack of foundation, and it's vague, and it's confusing, and it's overbroad. You're intentionally misleading the



witness.

**A. We don't -- we don't have secret meetings. We have discussions with our interchange partners on interchange traffic.**

MR. GREENWALD: Why don't we go off the record.

THE VIDEOGRAPHER: We are going off the record. The time is 9:34.

(Break from 9:34 a.m. to 9:46 a.m.)

THE VIDEOGRAPHER: We are on the record. The time is 9:46, and this is the beginning of tape 2.

Q. (By Mr. Greenwald) Regarding the antitrust guidelines that were applicable in 2002 to 2004, they were the same for carload and intermodal traffic. Correct?

**A. That is correct.**

Q. I'm going to turn now to the alliance meetings and focus specifically on the alliance meetings in 2003. The alliance meetings that BNSF engaged in in 2003, lawyers did not attend those meetings. Correct?

**A. Yeah, there's not a BNSF policy that requires a lawyer to attend interchange meetings.**

Q. You're calling them interchange meetings?

**A. Alliance is really not a term that -- I'm not familiar with alliance or interchange meetings.**



Q. And now the -- but the lawyers did not, in fact, attend any of those meetings. Correct?

MR. WINTERS: Well, I object to the form. Are you referring to the meetings that we agreed would be the subject of topic 2?

MR. GREENWALD: Yes.

MR. WINTERS: Okay.

**A. Yeah, to the best of my knowledge, the -- of the alliance meetings in the time period that we're looking at, attorneys weren't -- weren't present. As I stated, there's no policy that requires an attorney to be at an alliance or an interchange meeting.**

Q. And were antitrust policies distributed to the participants before these meetings occurred?

**A. I really don't know. I wasn't at any of the alliance meetings, so I couldn't speak if the policy was handed out or not.**

Q. As far as you know, there was no antitrust -- specific antitrust training prior to these meetings?

MR. WINTERS: Objection to the form.

**A. I wasn't there, but I have no knowledge that there was an antitrust distribution or training at the alliance meetings.**

Q. You know you're here testifying on behalf of BNSF. Correct?

Page 57

**A. Yes, sir.**
Q. And so you've gathered the collective knowledge of BNSF to testify?
**A. Yes, sir.**
Q. So even though you weren't at these meetings, you're prepared to testify about the meetings to the extent BNSF has knowledge?
**A. Yes, sir.**
MR. WINTERS: Well, he's here to testify about what's stated in topic 2, which is discussions pertaining to agreements reached or considered regarding fuel surcharges at those meetings. I just want that to be clear.
MR. GREENWALD: Of course.
Q. The -- and now so why don't we start with the March 18, 2003 BNSF/NS meeting. And I'll give you what's been previously marked as Seale 42. Do you recognize this document, Seale 42?
**A. Yes. In preparation for today, I've seen this document.**
Q. And what is Exhibit Seale 42?
**A. It -- it's a senior team meeting agenda and has participants listed.**
Q. Now this agenda refers to a discussion of BNSF's fuel surcharge. Correct?

Page 58

**A. I'm sorry. Could you say the question again, just to make sure I --**
Q. This agenda refers to say a discussion of BNSF's fuel surcharge. Correct?
**A. Yes. There were discussions associated with fuel surcharge.**
Q. Who led those discussions?
**A. I -- let me tell you how I prepared for these meetings to grab institutional knowledge. I talked to 11 people in total for all of the meetings. I talked to Tom Hund, who is the chief financial officer. I talked to Carl Ice, who's the president of our company now, but back then during this period, he was the chief operations officer. I talked to Dave Garin, group vice president. I talked to Steve Branscum, group vice president. I talked to Kevin Kaufman, who is a group vice president. I talked to Steve Bobb, who is a group vice president. I also talked to Dennis Smith, who is vice president of industrial products. I talked to Rollin Bredenberg, who is the vice president of service design. I talked to Tom Plowman, who works on the commercial side in consumer products at that time. He doesn't work there now. I also talked to Pete Rickershauser, and I talked with Tom Kraemer.**
**In those discussions I had asked what they**

Page 59

**remember about this meeting, those that were participating in this. The -- most people were very quick to say this was six, seven, eight years ago and they don't remember specific discussion. So I specifically asked, What specific discussions do you remember regarding fuel surcharge? Most were unable to remember specific discussions at all. However, in this particular -- in this particular meeting, Pete Rickershauser remembered that there was a discussion in the general session associated with fuel surcharge and it was an ease of doing business issue. He said that he remembered -- the only thing he remembered associated with fuel surcharge, that it was surface, that customers were complaining that there was a difference in the fuel surcharge that BNSF had being HDF and then WTI with the connecting partner, and that there was -- it was confusing and they were complaining about it.**
**I asked him if he knew anything -- if there was anything else as a result of that. He said he didn't remember anything else. I asked him -- so that was what the discussion was, was about complaints. And he said, yeah, that they had complained. He said it was more a case of -- the issue had been surfaced at the meeting that this is a problem for our customers because they can't validate their bills or they're having a very**

Page 60

**difficult time validating their bills because there were two different methodologies in which they were trying to calculate and understand, and so it was kicking out no bills for them.**
Q. Did anyone else you spoke to remember the fuel surcharge discussion at this meeting?
**A. Pete Rickershauser is the only one that remembered fuel surcharge as a topic for this meeting, just Pete Rickershauser.**
Q. So other than Pete Rickershauser's memory, the institutional knowledge of BNSF about what took place is what Pete Rickershauser remembers, as well as what's in the documents that came out of the meeting. Correct?
MR. WINTERS: Well, object to the form, as well as you've also asked Mr. Lanigan and Mr. Rose.
**A. Yeah, the institutional knowledge for the work that I had done, the only specific memory of discussions associated with fuel surcharge in this meeting was what Pete had remembered, which I had mentioned.**
Q. And did Mr. Rickershauser remember who led the discussion?
**A. He -- he did not. He said it was just -- he just remembered it being surfaced as an issue in a general discussion, but he didn't -- he didn't have any specific recollection on anything other than that, that**

Page 61

it was surfaced as an issue that customers are complaining and it's a problem.

Q. And what customers were complaining?

A. Yeah, I did ask him that question. He didn't have any shipper names, but he said it was carload customers specifically that, to the best of his recollection -- he didn't have a perfect recollection, but to the best of his recollection were -- the words I believe he used were carload customers were complaining.

Q. Now the action item listed on Seale Exhibit 42 refers to the fuel surcharge not only for BNSF and NS but also CSX and UP. Do you see that?

A. Under the action item BNSF -- yes, I see that.

Q. Now at this meeting were there any discussions of the fuel surcharges at CSX and UP?

A. Again, I canvassed the people that were at the meeting. There was no specific recollection of fuel surcharge discussions other than what Pete Rickershauser had recalled.

Q. And why was it a problem that BNSF -- to these shippers that BNSF had a different fuel surcharge?

A. Sure. The customers in the rail industry are typically -- we have small, medium and large shippers; but there are a lot of shippers that are large shippers, and they have not hundreds of bills but thousands of

Page 62

bills, and some have tens of thousands and some have hundreds of thousands of bills. So there's -- it requires that there's automation associated with their billing process. This is not something about a manual desk.

The automation of the process -- the automation process associated with billing customers set what they call are covenants, and so they have a certain expectation in which a bill between a certain origin and destination should come in at. And they program their systems to calculate with a fairly tight tolerance what that bill should come in at. If it does not hit that tolerance, then it will kick it out and say that there's a problem with it. Then it gets into a very expensive manual process where then the bill goes to people manually, and they try to understand why -- why this bill did not meet their preprogrammed covenants.

When you have multiple methodologies, it would take very, very sophisticated information systems to be able to calculate on the BNSF a certain methodology and estimate what that fuel surcharge should have been and then go out, use a different methodology -- I'll use an example -- the CSX and a different methodology to calculate what that fuel surcharge might be. And unless their programming is very, very tight and very, very

Page 63

sophisticated, it's probably going to run outside the covenants. Once it does that, then again, it goes manual, and it's very expensive because now you have people involved researching the bill, researching what methodology, hand calculating it and understanding if they've been billed improperly.

If they feel like they've been billed improperly, there is a dispute process in which they can say, I'm not going to pay this bill because you tried to charge me different than our agreement. The more sophisticated those agreements are, the more variance there is. Multiple methodologies, the harder it is for them to automate it. So the complaint is associated with complexity, and it costs them money once they can't do it automatically.

Q. So what part in the difference in structure causes this complexity or complaint?

A. Well, again, just if there's a methodology difference, one versus the other, then it requires different programming. So it is logical that if you have two different methodologies to arrive at a mathematical answer, that just causes significant effort to be able to program that tightly. And the more complicated that is and the more variance there is between multiple programs, the more work they'll have to

Page 64

do to try to figure that out.

Q. Was BNSF's -- BNSF's fuel surcharge structured differently at the time from the UP's, as of March 18, 2003?

MR. WINTERS: Objection. Objection to the form. It's beyond the scope.

A. I'm not familiar with what the UP had in place at that time.

Q. Does Pete Rickershauser or anyone recall the discussion about the UP's fuel surcharge at this alliance meeting?

MR. WINTERS: Objection to the form. It's asked and answered.

A. Yeah, I've given you pretty much everything that I -- that Pete Rickershauser could recall. He also, like the others, said, you know, we're talking, you know, seven plus years ago; I don't remember the specifics. And so I've given you everything that he could recall from the meeting.

Q. And to be clear, he recalls the reason why the topic came up, which was the customer complaints?

A. He -- that's right. He just remembered that -- when asked if he remembered any specific agreements or discussions associated with fuel surcharge, he said he didn't remember anything specific.

Page 65

**He did remember the topic did come up. He described it as it was surfaced as an issue that customers are complaining because they're too different, and they can't -- they can't validate their bills easily.**
Q. He doesn't remember who brought it up?
**A. He does not remember who brought it up.**
Q. He doesn't remember what customers had done the complaining, whether they were NS customers or BNSF customers?
**A. No. There wasn't a reference to which railroad -- you know, if it was an origin or destination customer that was complaining. In fact, he didn't even give any shipper names. He was only able -- I asked him that question about the customers, and his -- his answer was that he -- and he wasn't perfectly sure, but he said he thinks he remembered it to be carload customers, industrial products.**
Q. And he doesn't recall the discussion that then occurred?
**A. No. He just -- I asked him what else he had recalled, and he said he just remembers it being surfaced as an issue that there's complaints.**
Q. The -- the discussion wasn't limited to interline movement. Correct?
MR. WINTERS: Objection to the form.

Page 66

MR. PRYOR: Objection. Form.
MR. WINTERS: Lack of foundation.
**A. Since it's BNSF policy to only discuss interchange business, I have no reason to believe that it was anything other than an interchange discussion.**
Q. But BNSF has no record of the discussion that actually occurred. Correct?
MR. WINTERS: Objection to the form. What -- vague in terms of the use of record.
**A. What I did is I researched and asked people who were there and what their recollection was, and there wasn't any. So my work was to try to understand it, and I didn't -- they didn't have recollection or offer any records or anything like that.**
Q. So other than BNSF policy, you have no way to know whether this was limited to interline discussions?
MR. WINTERS: Objection to the form. That mischaracterizes the testimony.
**A. Since BNSF policy is to only discuss interchange business with -- with their connecting partners, I have no reason to believe it was anything other than exactly what policy does say.**
Q. But your belief is based only on the policy, not based on any other records or discussions with anyone. Correct?

Page 67

MR. WINTERS: Objection to the form.
**A. My -- what I'm stating is what BNSF policy, and that's what I would be -- I have no reason to believe it would be other than policy. So I'm -- basically my answer is associated with policy, correct.**
Q. So there was -- on this seal 42, this is listed as an action item. Correct?
**A. What is listed?**
Q. BNSF's fuel surcharge.
**A. It's under an item called action item, that's correct.**
Q. And what did -- what does that mean?
MR. MEYER: Objection. Form.
MR. WINTERS: Objection. Form.
**A. Typically an action item is an item that would have some discussion or potential activity or action around it.**
Q. So what action happened around this action item?
**A. Right, and --**
MR. WINTERS: Objection to the form. It's beyond the scope.
**A. I asked that question and that's where, again, of all of the -- not all of the 11 that I mentioned to you were at this particular meeting, but of those that**

Page 68

**were at this meeting, we -- there was no -- there was no memory of anything other than what I've already given you. They just didn't know the specifics from -- from, you know, seven years ago, eight years ago.**
Q. In 2003, BNSF didn't have a separate fuel surcharge for interchange business compared to local business. Correct?
**A. BNSF does not have a separate fuel surcharge for interchange versus local. That would make no sense. Fuel surcharge is associated with coverage of expense. And as I gave you the example before, you know, an interchange piece of business is going to have the same characteristics as a local piece of business, and so it's not going to have a different fuel burn. So this is associated with capturing or understanding our fuel expense and covering that with a fuel surcharge. And so there's not a difference.**
**We don't run interchange trains and we don't run local trains. They are the same train. So it would be the same unit. It's very possible that on a train, the second unit in the train is one that's going to be interchanged at Chicago. It's very possible that the third unit is a Chicago local delivery. They're going to have the same allocation of fuel burn. It's the same train. So there would be no reason to have a fuel**

Page 105

indice on which they have more trust in.
Q. And what do you mean by "a public indice"?
A. Something that is published, that they actually are able to see the results, audit the methodology associated, understand the basket, things of that nature.
Q. But --
A. Let me give you an example. Consumer Price Index is produced by the United States government, so that there is a comfort associated with the fact that the U. S. government is working the basket and the calculations.
Q. So if it comes from an individual railroad, your experience is that customers wouldn't trust it?
MR. WINTERS: Objection to the form.
A. I would have to use is my opinion, but my opinion associated with my years in marketing is that the customers would not trust an indice that was created by BNSF for the purpose of escalation. They would be much more comfortable with something that is a publicly produced indice by a third party, such as the U. S. government.
Q. And did there come a time that BNSF wanted to move away from the RCAF as an escalator in its contracts -- in its long-term contracts?

Page 106

A. Yes.
Q. When was that?
A. Well, I don't know that there was any one specific time. It evolved. You have to understand that RCAF is -- is a unique escalator associated with the rail industry. So let me demonstrate with an example.
Consumer Price Index is associated with a basket of goods that a typical consumer would consume, and so it may look like a sack of specific items in groceries, a tax return, a haircut and a gallon of gasoline. The indice then takes a snapshot of that basket. In the next period it takes a snapshot of the cost of those exact same items, measures the difference and says that is the inflation that has taken place with that basket.
RCAF is a unique railroad basket. We don't engage in haircuts and tax returns. So the RCAF is a basket of rail items, such as one unit of rail labor, ties, ballasts, rail equipment, diesel fuel, as opposed to gasoline in the CPI, things of that nature.
And it's the same way, which is the basket of goods, there is a snapshot of that basket of goods. In the next period they'll take the same snapshot and measure the price difference between the two. And that becomes the cost change and, thus, the emphasis for the

Page 107

escalation.
The -- all indices, all indices suffer from substitution effect, which is when you have extreme volatility, the index does a very poor job of capturing that volatility. And RCAF has two problems. We decided to move away from it for both - for both reasons; one, the substitution effect and its in ability to capture the extreme volatility associated with fuel particularly, and then the second item is that the RCAF is a basket of goods which comes out at the average. It's important to understand that BNSF, the length of haul at the BNSF is more than double what it is on the eastern roads. The RCAF is a basket of class 1 railroads. So you have CSX and the NS at less than half the length of haul as the BNSF.
And as I've already mentioned that we have a philosophy of putting more horsepower on our trains because we try to run faster. A higher proportion of our business is intermodal than any other railroad. So the faster trains burn more fuel. And so our fuel expense is much higher relative to our general expenses than any of the other class 1's. Even though we're only twice the length of haul of the eastern roads, CSX and NS, we burn almost three times as much fuel.
The basket does a very good job of -- of

Page 108

capturing what those expenses are from each of the groups, but again, the extreme volatility of fuel has a substitution effect problem, and most importantly is it comes in at an average. And so while it -- while it measures the average price from one period to the next, we are a very high consumer. And so it does not adequately -- it does not adequately compensate the BNSF for our true fuel expense. So the indice is very inadequate.
The example would be in that consumer that I -- consumer basket that I mentioned to you, let's say there were four consumers associated with gasoline. Okay. Two of the consumers have Suburbans; two of them have very fuel efficient Mazda Miatas. On the average, the Suburbans burn 10 miles to the gallon; the Mazda Miatas get 30 miles to the gallon. On the average, the basket may be right at 20 miles to the gallon, but the person with the Mazda Miata is actually getting an advantage because they're well below the average, and they're being compensated at the average. The Suburbans are not being adequately compensated because they're above the average in consumption. And that's exactly the scenario here in the railroads. BNSF is the high fuel consumer. Our expense for fuel is much higher relative to our total expenses than the other railroads.

Page 109

**So being compensated at the average is inadequate for BNSF. That was determined in -- you know, in the early 2000s.**

Q. Let me first focus on the substitution effect.

**A. Okay.**

Q. What do you mean by substitution effect?

**A. All indices when they're taking the snapshot from one basket to others have to weight their basket. And when you have extreme volatility, such as when in fuel, fuel prices double in a short period of time, the substitution effect doesn't have a proper weight on the expense relative to the basket. So fuel was -- in a hypothetical sense, let's say it was 10 percent of your basket of goods of expenses, which adds up to 100 when you actually take your snapshot of this basket. Now it's doubled in a short period of time, which has been happening, very high fuel expense. They measure the difference between the price on the prior and the current period. But they use the weight associated with the prior period as expense. And so you miss getting compensated for now it's a much higher percentage of your business. And so that is called substitution effect. It's not unique to RCAF. In fact, all baskets, including the CPI, have that.**

**There is a very specific reason why the U. S.**

Page 110

**government produces a core CPI. The U. S. government also recognizes substitution effect. They have CPI, Consumer Price Index, but they themselves build a basket without fuel. It's called core CPI. They have two problems. They have fuel volatility and the substitution effect associated with that, and they have food volatility. Obviously, railroads don't consume food, so we don't have that problem. They have built a separate indice which has everything in CPI except those two items pulled away because of that extreme volatility and because of the substitution effect. So they can measure what they're much more comfortable with, which is core CPI.**

Q. Now the substitution effect works in both directions. Right?

**A. No, sir. No, sir. That's a common misconception. That's not true. Just like it doesn't work on the way up because you've got too low of a weight relative to your expense, on the way down, you have the opposite effect. So now you have fuel expense at a very high weight, but it's on a very high -- and it's declining. And so now your expenses for fuel in a declining period are a much lower percentage, but they're weighted at the higher percentage, and then it's negative, so then you get hit on that. So that's a**

Page 111

**common fallacy. Substitution effect actually you do not get back on the way down because you're weighting the negative number at the higher weight, and so now you've been hit in the other direction. That's why extreme volatility is a problem with indexes. That's also why specifically the U. S. government measures CPI without fuel, without food, so they don't catch it on both sides.**

Q. So the substitution effect can be overcome by changing the weighting when you change the input of the whatever at that price?

**A. That is precisely correct. And RCAF weights only once per year. As I very carefully mentioned here today, it's about extremely volatility. An index does a reasonable job at capturing change over time, but extremes it cannot. And so when we're seeing these kinds of extremes in diesel fuel -- the U. S. government is seeing, of course, the same extremes on food and their fuel measures -- it does an inadequate job.**

Q. The substitution effect is different than a lag that comes from changing prices for an escalator. Correct?

**A. It's -- it's related, but there is a difference associated with lag.**

Q. So the lag does work on the other way; you get

Page 112

the benefit of the higher prices on the way down with the lag problem with an escalator. Correct?

**A. That's my understanding of lag, yeah.**

Q. So -- and now let me try and understand the average point.

**A. Uh-huh.**

Q. What input is used for fuel for RCAF, or was used for fuel for RCAF in the 2002 period?

**A. Yeah, I don't believe it's changed for quite some time, but the railroads actually submit their fuel expense and their fuel gallons burned. And then -- it's actually all on the dollar side, the way the AAR looks at it. We have to look at the gallons burned to get the total aggregate dollars. We put that in, and then they measure, like I said, the basket. So what percentage is associated with labor? What percent is associated with equipment, as an example? What percent is associated with fuel? And then -- then -- now you have your weights of the expenses. Then you get your change from period to period. And then it's your change in price times your weight becomes a weighted average, and then you come out with a total RCAF number of, you know, escalation of 2 or 3 percent made up of those weighted components.**

Q. So BNSF doesn't have a different average cost

Page 113

of fuel than the eastern railroads, does it?
**A. I would say it's -- you can't say that they're the same because there are some geographic differences. So I couldn't say they're the same. I could say they were similar most of the time, but not all of the time. Geographic differences in fuel cost can surprise you.**
Q. But the real problem with the average was how it affected the weighting of fuel within the RCAF?
**A. That is correct.**
Q. That fuel was a greater percentage of BNSF's cost than it was a percentage of the eastern railroad's cost?
**A. That is correct.**
Q. And so this was a weighting problem and the weighting was only adjusted once a year?
**A. That's correct.**
Q. If -- did BNSF study the recovery of fuel cost when it used the RCAF?
**A. Yeah. Yeah, there was a study conducted by Sam Kyei. It was in one area. It was coal. And his study showed in this time frame that over a five year period about $300 million was being lost as a result of using RCAF as opposed to an appropriate compensation for that fuel.**
Q. And so this point could be raised with BNSF's

Page 114

customers in negotiation. Correct?
MR. WINTERS: Objection to the form. What point?
Q. That BNSF thought that RCAF was under recovering for it.
**A. The -- in our discussions with customers, an explanation that we don't feel we're being adequately compensated could certainly take place.**
Q. And the all-in price can reflect what BNSF believes is an appropriate compensation for its costs. Correct?
MR. WINTERS: Objection to the form. Vague as to the use of "all-in." What do you mean by that?
Q. Do you understand the question?
**A. No. Could you repeat the question?**
Q. Sure.
The -- the all-in -- the overall price that a customer was charged, including any escalators, could reflect as part of a negotiation what BNSF believed its costs and appropriate compensation for its cost was?
**A. Yeah, BNSF -- BNSF pricing policy would -- would include what is a reasonable profit and cost coverage as part of the pricing methodology.**
Q. Now was BNSF aware in this period whether the

Page 115

UP faced similar underrecovery issues with the RCAF?
MR. WINTERS: Objection to the form. It's beyond the scope. Lack of foundation.
**A. I really don't know. I really don't know. We don't -- look, this is about cost recovery. We don't care, you know, what trucks are doing or --**
Q. Cost recovery is a component of revenue. Correct?
**A. Cost recovery can be a component of revenue, uh-huh.**
Q. And BNSF pursued a revenue growth strategy in 2003. Correct?
**A. As far as I know, we've always had a strategy of trying to increase our business levels.**
Q. You said trying to increase your business levels.
**A. Revenues, business levels. Revenues and business levels, I should say.**
Q. Okay. Because sometimes companies can pursue market share even at the short-term expense --
**A. Uh-huh.**
Q. -- of revenues. Correct?
**A. Yes, sir.**
Q. But in 2003, BNSF was pursuing revenue growth. Correct?

Page 116

MR. WINTERS: Objection to the form. It's vague and beyond the scope.
**A. I'll stay with my prior answer. I'm not familiar with one specific direction of the strategy. The strategy is to enhance our business levels and our revenue.**
Q. And so in -- so what did BNSF decide to do in or around 2002, 2003 regarding the RCAF?
**A. Sam Kyei, who you've -- who you've had an opportunity to speak with, is the chief economist, thinks like an economist, is very familiar with CPI and how the U. S. government handles substitution effect. And in getting ready for this case, my understanding, he -- while we recognized that we weren't properly being compensated for fuel, I believe he came up with the idea -- it was probably himself, plus Dr. Shoop that I mentioned; they were working for Nick Murray at the time -- you know, I think came up with the ideas that if we can't deal with the substitution effect associated with extreme volatility of fuel, we could have a basket similar to CPI core where you take the fuel component out, find a mechanism that appropriately compensates the BNSF for its fuel, and then use the remaining basket for all other expenses, which we didn't have a problem with, because we didn't have that same extreme volatility on**

Page 117

labor and things like that.
Q. And that was the genesis of the AIILF?
A. AIILF did come from -- from the thoughts of -- you know, we have a market basket produced by the AAR today. It doesn't work for us. It is inadequate compensation. On the fuel side, we were reasonably comfortable with the other elements. And so, yes, that was the next step, which is, okay, can we -- can we use some of the basket that we feel is working appropriately and remove the component that is not compensating BNSF so that we can put a more appropriate recovery method in place?
Q. And when you say "compensating BNSF," what do you mean by compensating?
A. Well, it's our cost, and so we're trying to cover those costs appropriately. Those costs are changing and extremely volatile in nature. We would need some sort of mechanism that could deal with that. The fuel surcharge program increases if fuel increases and the customers have to pay more, but it's a program that is designed that if the price of fuel goes back down, then the customer -- their -- the revenue that they pay us goes down because the fuel cost has gone down for us. So we're just trying to cover the cost.
MR. GREENWALD: Could you mark that?

Page 118

(Exhibit 5 marked.)
Q. So showing you what's been marked as Anderson Exhibit 5, do you recognize this e-mail chain?
A. I don't believe I've -- hang on just a second. I need to -- I don't believe I've seen this document. Sorry.
Q. So just draw your attention to the last e-mail in the chain, which is at the top -- but at the top of the page, the e-mail from Sam Kyei to Julie Piggott and others dated March 12, 2003.
A. Okay. Uh-huh.
Q. I'm going to ask you about the last sentence of the first paragraph, but you should take your time to read anything you want. But my question to you is: Did -- at least for the first quarter 2003, did the RCAF fuel component closely reflect the increase in BNSF's fuel costs for that quarter?
MR. WINTERS: I'm going to object to the form. This is not a document that he authored or received, as you can see. I'm sorry. He received, did not author it. But I think -- I think to question him on the meaning of particular sentences in particular documents that he didn't write is beyond the scope of the topic 3.
A. The -- remember there's the historical

Page 119

component, and there's the perspective component. My understanding is from this e-mail is that it's talking about did the perspective RCAF reflect closely to what happened? And in this case, it did. Remember the perspective piece can use, for instance, the forward curve that fuel costs are going up. So from a perspective basis and in this particular instance, it does appear that it was close.
MR. GREENWALD: Why don't we go off the record a second and talk about scheduling.
THE VIDEOGRAPHER: We are going off the record. The time is 11:59.
(Break from 11:59 a.m. to 12:53 p.m.)
THE VIDEOGRAPHER: We are on the record. The time is 12:53, and this is the beginning of tape 3.
Q. (By Mr. Greenwald) Mr. Anderson, before the break we were talking about the move from RCAF to AIILF, and it was -- AIILF was the internal idea of BNSF. Correct?
A. Yes, sir.
Q. And was there discussion within BNSF about simply using AIILF or an index created by BNSF alone without the AAR or other railroads?
A. As I chatted with the individuals Gary Shoop and Sam Kyei that were involved in this, to the best of

Page 120

my knowledge, that did not come up. As a practical matter, I -- I believe that they recognize that a public indice is what would be required to have acceptance from a customer. So to the best of my knowledge, an internal index wasn't considered as a practical possibility.
Q. What would have happened with customers if BNSF had its own index?
MR. WINTERS: Objection to the form to the extent it calls for speculation.
A. In my experience working with customers, they're -- they're not comfortable with something that they can't validate and usually has some independence associated with it, such as a third party producing index. So the CPI, they know the U. S. government is behind that measure. They are comfortable with that, that the government is doing a proper job on that index, building the index and the calculations. The customers, based on my experience, would not be comfortable with a black box or something that is calculated, you know, just internal to the BNSF. There's just not that level of customer trust.
Q. Were these indices black boxes?
A. Well, the index calculations themselves can be reasonably complex, and the customers -- not all customers would be sophisticated enough to

**mathematically validate these. Many of our customers, as I mentioned, are medium, small and large shippers; but many of them are really associated with all kinds of other different industries and do not necessarily have the expertise that they may need to -- to individually go in and validate. That's why they want an independent third party or public indice that somebody -- that they have confidence that somebody is already doing that so they don't have to go through the expense of trying to validate that it's been appropriately calculated inside of the BNSF.**

Q. In creating the AIILF, did BNSF want to help the other class 1 railroads?

MR. WINTERS: Objection to the form.

**A. The -- internal to the BNSF, we were worried about our own cost coverage, and we knew that RCAF and the fuel component specifically of RCAF was not working for us. So as we were putting this together, it's really about BNSF and a more appropriate compensation mechanism. So the answer is it was associated with BNSF, was our concern.**

Q. If RCAF wasn't working for BNSF because of the higher fuel -- overall fuel cost for BNSF, does that mean that it was a better escalator for CSX and NS at recovering their fuel cost?



MR. VAN HOUWELINGEN: Objection.

MR. WINTERS: Objection. Lack of foundation and calls for speculation.

MR. VAN HOUWELINGEN: Outside the scope.

**A. The -- by the very nature of the way the indice measures and averages, we would believe someone who has a smaller fuel -- fuel expense to their total expense than the average would have an advantage on the escalation.**

Q. So moving away, in your understanding of how the RCAF functioned for the east coast railroads, moving away from that wouldn't have been in their interest?

MR. VAN HOUWELINGEN: Same objection.

MR. WINTERS: Objection to the form.

**A. Yeah, I don't think I would be able to answer that just because I don't know what other alternatives they may have available, things like that. So I don't think I would be able to answer if it's in their interest or not.**

Q. But the reasons why BNSF wanted to move from RCAF to an index that did not include fuel in BNSF's mind wouldn't have applied to NS and CSX. Correct?

MR. WINTERS: Objection to the form. It calls for speculation. It's beyond the scope.

**A. The -- our view is anybody that was below the**



**average on fuel would -- would not have the same problem that we would have as a relation -- as a ratio of fuel to expense.**

Q. Showing you what's been marked as Kyei Exhibit 18, do you recognize Kyei Exhibit 18?

**A. Yes, sir, I've seen this.**

Q. What is Kyei Exhibit 18?

**A. It's a letter to Ed Hamberger from the AAR.**

Q. It's a letter --

**A. It's a letter to Ed Hamberger at the AAR.**

Q. And who is it from?

**A. It's from the BNSF, and I know the BNSF produced it.**

Q. Do you know if it was ever sent to Mr. Hamberger?

**A. To the best of my knowledge, this was not sent to Mr. Hamberger.**

Q. Do you know why not?

**A. In my discussions, trying to understand these issues, the decision was made that Matt would just pick up the phone and call Mr. Hamberger and request -- request the AIILF to be produced.**

Q. But this was a draft letter that would have been sent by Mr. Rose if he hadn't chosen to pick up the phone and call?



MR. WINTERS: Objection to the form. It's beyond the scope. Calls for speculation about what Mr. Rose would have done.

**A. I don't know who it would have come from.**

Q. Do you know who made the decision that a phone call would be made instead of sending the letter?

MR. WINTERS: Objection to the form. It's beyond the scope.

**A. I don't know where the ultimate decision was made. Sam Kyei told me that Matt had made the call, but I don't know what discussions led to that.**

Q. Now if you look at the draft letter, Kyei Exhibit 18, the paragraph below the numbered bullets on the first page that start when RCAF is used --

**A. Okay.**

Q. -- do you see that the second sentence says, I believe there is value to the rail industry in having the flexibility to cover fuel expense more fully and immediately in times when fuel expenses are high? Do you see that?

**A. Yes, sir.**

Q. And why was it important for BNSF to advocate for an index that created value to the entire rail industry?

MR. WINTERS: Objection to the form.

Page 129

**A. I don't know the history of RCAF. I'm sorry.**
MR. WINTERS: I just want to object that that's beyond the scope of the deposition topics.
Q. The -- you -- you talked about the importance of the index coming from an independent source. Right?
**A. Third party independent type source, yeah.**
Q. And for the AIILF, what was that third party independent source?
**A. Are you asking me who's producing the AIILF today?**
Q. Upon -- in the creation and the first use of the AIILF.
**A. The creation and the first use of the AIILF was AAR. The customers had accepted the AAR as a public third party to produce the RCAF, and we had no reason to believe that they would have any trouble with AAR producing AIILF. And, again, it's not -- it's not producing a different index; it's really the same index with one component removed. So relatively simple and perfectly logical for the AAR to be the one to remove the component and just produce an additional index.**
Q. So the AAR was needed for customer acceptance. Is that correct?
MR. WINTERS: Objection to the form.
**A. Our belief was that a third party independent**

Page 130

**type source was needed for customer acceptance, and our experience has been with the AAR and RCAF, the customers were -- some customers were accepting of that. Other customers weren't. This is complex negotiations, and some customers would not accept that, and negotiations went in a different direction, as an escalator. So in some cases, customers would accept it, we have found. In some cases, they would not.**
Q. The -- I'm going to show you what's been previously marked as Hamberger 27. Do you recognize Hamberger 27?
**A. No, sir, I don't believe I've seen this.**
Q. You can obviously read any part of it you want, but I'm going to focus my questions on the second page --
**A. The second page.**
Q. -- where it refers to all-inclusive index less fuel.
**A. Oh, okay.**
MR. WINTERS: I'm going to object to the questioning regarding this document as beyond the scope of topic 4.
**A. Okay.**
Q. All right. So do you have an understanding that it was UP that asked that the AIILF be published on

Page 131

the AAR website?
MR. WINTERS: Objection to the form. It's beyond the scope of topic 4, and this subject has been the subject of extensive discovery, deposition testimony, other documentation.
**A. No, sir, I was not aware of that.**
Q. And now I'm going to show you Kyei -- what's been previously marked as Kyei Exhibit 24. Do you recognize Kyei Exhibit 24?
**A. No, sir, I don't believe I've seen this before.**
Q. Do you see that it's entitled, BNSF Synopsis of NEMC Agenda?
**A. Yes, sir.**
MR. WINTERS: Object to questioning on this document as well as beyond the scope of topic 4.
Q. And it's the synopsis of the agenda that was Hamberger Exhibit 27. Correct?
**A. At the top it clearly states, BNSF Synopsis of NEMC Agenda. It does say November 11th, so I would presume -- I presume that's what this is.**
Q. And now turn -- if you turn to the second page of Kyei Exhibit 24, do you see item 8? Read that.
**A. Okay.**
Q. So did BNSF support UP's request that the

Page 132

AIILF be published on the website?
MR. WINTERS: Objection to the form. It's beyond the scope. It's been the subject of other discovery of BNSF.
**A. The bottom statement says we support.**
Q. Who is K. Hoffman?
**A. I forget her first name. That's Kathy Hoffman. And at this time I believe she was director of -- of industry practices or something similar to that.**
Q. The first part of this paragraph says, BNSF created AIILF. Do you see that?
**A. I do see that.**
Q. Do you agree with that statement?
**A. Well, Kathy Hoffman is an administrative person. She would not necessarily know the nuances of how an index -- I don't mean any disrespect to Kathy -- but how an index even works. She works on the administrative side. How an index works or where it's housed or anything like that.**
**So not knowing all the context around this, my sense is that she was aware that we wanted to produce an index with fuel -- we wanted to produce RCAF without a fuel component. So she probably used the word created knowing that we were thinking of that, but she would not**

Page 133

**have specific knowledge of where it's normally housed or produced. That would probably be beyond her level of expertise.**

Q. Now the second sentence says, Well, RCAF is STB approved. AIILF is not. Do you see that?

**A. I do see that.**

Q. What does that mean?

MR. WINTERS: Objection to the form. It's beyond the scope of topic 4.

**A. I'm having a hard time understanding the statement, having not seen it before, but AIILF is RCAF with one component missing. So there would be nothing in AIILF that has not been approved by the STB by definition. So I don't know that I can understand this statement.**

Q. Do you know -- strike that.

In considering a move from RCAF towards AIILF, was STB approval considered in that decision?

**A. Boy, in my discussions, I can't say that the topic has come up, so I really don't know on the STB side.**

MR. GREENWALD: Give me one second.

Q. Now the -- an escalator is only necessary in a long-term contract. Correct?

**A. I would -- I would say that an escalator is**

Page 134

**most typically used in a long-term contract.**

Q. Short-term contracts don't require escalators because they'll be renegotiated to reflect the costs when they're renegotiated. Correct?

**A. Typically, the shorter term items can -- can be renegotiated based on changing -- changing cost, so that is -- that is a fair statement.**

Q. And now --

**A. I should say more readily.**

Q. In or about the beginning of 2004, did BNSF have a policy that all new long-term contracts use AIILF and a fuel surcharge rather than RCAF?

**A. BNSF had a policy to try to negotiate into contracts AIILF with a fuel surcharge, but the keywords here is to try to negotiate that. There's no policy that it had to be that.**

Q. But the -- the negotiation starting point was going to be AIILF and a fuel surcharge rather than RCAF. Correct?

**A. In our -- in our negotiations with customers, it would -- in that time period, it was a desire to get AIILF plus a fuel surcharge, you know, into those contracts. Whether they started there or not, I don't know, because each negotiation is different and, you know, depending on which department and which negotiator**

Page 135

**we're using, they may try to start with other areas and use AIILF as a fall back. They may have started it as a starter. I really don't know. I would suspect it would be all of the above and lots in between.**

Q. And it was the policy starting in January 2004 that every new contract should include a fuel surcharge. Correct?

**A. It -- and I couldn't speak to the exact date, but in that time frame the policy was to try to get fuel surcharge onto contracts, you bet you.**

Q. And RCAF -- if the customer were going to use RCAF, then they would resist the fuel surcharge because they would be charged twice for escalation of fuel. Correct?

MR. WINTERS: Objection to the form. Calls for speculation. Lacks foundation.

**A. When you say "they," do you mean the customer?**

Q. Yes.

**A. Okay. Yeah, the customer -- customers are very smart, and they're very astute, and they would -- while they may not know all of the mathematical computations behind scenes, they would know what's being compensated for inside of these indices. Knowing that fuel would be RCAF, a customer may recognize that there's some fuel component inside of RCAF, as well as**

Page 136

**some fuel compensation associated with fuel surcharge. So some would recognize that as a potential conflict.**

Q. And as of January 2004, BNSF had a policy that any contract that didn't include a fuel surcharge would have to be -- the exception would have to be approved by a group vice president. Correct?

**A. There was a policy. And I don't know the exact dates, but in that time frame, there was a policy that if a contract did have an exception and did not have fuel surcharge on it that wanted approval, it did need to move to higher in the company, very similar to the president's rules on other expenditures and things like that.**

Q. So I'm going to move on to the intermodal topic.

**A. Intermodal?**

Q. Yes.

Now who is -- or during -- during the relevant time frame, who was the head of the intermodal part of BNSF?

MR. WINTERS: Just so we're clear, the time frame is May 1, 2001 through May 14, 2007?

MR. GREENWALD: Correct.

MR. WINTERS: Six-year time frame.

**A. The majority -- first of all, we call the**

Page 137

**business unit consumer products, which I believe is what you're referring to, which would be trailers and containers on flat cars, plus automotive. Is that a correct understanding?**
Q. Well, let's -- let's make sure we're on the same understanding. When -- BNSF has a business unit called consumer products?
**A. Correct.**
Q. And does that include intermodal, as well as carload shipments?
**A. No, sir. The consumer products business unit is involved with TOFC, trailers on flat cars, COFC, containers on flat cars, and automotive; bimodal or two modes of traffic. It does not include carload traffic. Steve Branscum was in charge, the group vice president of -- of the consumer products business unit for the majority of that time, I think all of the time, but all the way back in 2001. I can't remember exactly when he came into the job. But the vast majority of this time, he would be, if not all.**
Q. And the consumer products -- I'm sorry. Strike that.
There was no carload traffic that moved as part of the consumer products division?
**A. That's a little bit complicated. Inside of**

Page 138

**the automotive business unit, there is a small component of automotive that moves parts. Those parts can move either in trailers or containers, or it could move in a boxcar. The commodity and the revenue associated with that carload segment does report in to consumer products because it's the same customers as the automotive business unit, if that makes sense. So it would be GM, Chrysler, Ford, would be examples. If their parts moved in other than a trailer and container, say moved in a boxcar, that did report into the consumer products business unit. It's a relatively small exception.**
Q. And who was -- you said his name, but I didn't write it down.
**A. Steve Branscum --**
Q. Steve --
**A. -- was the group vice president of consumer products.**
Q. Now you said earlier that the percentage of freight that moves intermodal on BNSF is greater than the other class 1 railroads?
**A. That is a correct statement.**
Q. So intermodal is -- what percentage of freight at BNSF during the 2001 to 2007 time frame, approximately, was intermodal or consumer products?
**A. Right. And it did move in that time frame,**

Page 139

**but, you know, at -- let's say, at peak, about 38 percent. In that 2006, 2007 time frame, somewhere around upper 30 percents. It is the largest business unit.**
Q. And who did Mr. Branscum report to?
**A. Yeah, Steve Branscum reports to John Lanigan. During that time frame, there were two chief marketing officers. Today he reports to John Lanigan, as I mentioned. In the early part of this, the 2001 time frame, he would have -- let me say in the early 2000s time frame, he would have reported to Chuck Schultz, who was the CMO at that time, retired, and then John Lanigan took his position.**
Q. Now BNSF consumer products imposed a -- or strike that.
BNSF consumer products started a fuel surcharge program in March 2000. Is that correct?
**A. Yeah, in March 2000, approximately, is my understanding is when we -- there's a very, very long history on the prior predecessor railroad. So there were some rail surcharges many, many years prior. But in the context of what we're talking about here, March 2000 is what I remember as the beginning of, let's call it, this round of fuel surcharges.**
Q. And then that program was updated in --

Page 140

sometime in 2001?
**A. Yeah. I think around the August, September time frame of 2001 there was a change in the strike price.**
Q. And the -- as of that 2001, the strike price was $1.24 for highway diesel fuel?
**A. That is correct.**
Q. And it started at 1 percent?
**A. The -- the table starts at 1 percent and at $1.24, that is correct.**
Q. And the escalation was half a percent for every 4 cent increase in highway diesel fuel?
**A. One-half a percentage point for every 4 cents, correct.**
Q. And it was updated weekly?
**A. It is weekly, yes, sir.**
Q. And do you know how those numbers were chosen?
**A. Excuse me. Which numbers?**
Q. The numbers used, the fuel surcharge.
**A. The $1.25?**
Q. Yes.
**A. The $1.25 strike point or also the entry point is -- there was at the time an analysis that went back and looked at a five-year average. And the five-year average came in at, you know, the $1.24, $1.25 range.**

Page 141

**So it's based on a historical five-year average.**
Q. And was the -- and what about the escalation number?
**A. The escalation number is what we call our fuel intensity, and that -- did some analysis and understanding the intensity of fuel consumed and then the price change. The math was calculated that if we changed the percentage on the fuel surcharge that half a percent, for every 4 cents of movement associated with a change in highway diesel fuel, that would essentially cover our cost change. It's called fuel intensity.**
Q. Now the intermodal traffic by its very nature can move by truck, as well as rail. Correct?
**A. That is a correct statement. The -- let's talk about -- are you talking about trailers and containers specifically?**
Q. Well, why don't you separate them out.
**A. Okay. A trailer is a box unit just like you would see out on the highway with the wheels fixed. A container is the top box, but it doesn't have any wheels or a frame under it. So it technically -- the container can't move like a truck until it's attached to another piece of equipment that's not typically with the railroad. When it's married with the chassis, then, in fact, it can move like a truck.**

Page 142

Q. And so the consumer product division competes directly with trucking companies. Correct?
**A. You bet. Trucks have about 85 percent of the land transportation revenue out there, and so trucks are our competitors.**
Q. Although trucks become less competitive given the distance of a move. Is that correct?
**A. The cost curve associated with railroad, the cost curve advantage would be on the long side of length of haul.**
Q. Can you explain what that means, that the cost curve advantage would be on the long side?
**A. The railroads have very high fixed costs, such as the hub centers that I described to you before, and so the shorter haul -- shorter haul moves in which you have to allocate those high fixed costs on origin/destination side tend to leave a cost advantage to the trucks because they can just use a drop lot. If they want, they can drive over to Safeway and change -- change trailers and containers and they're moving. So they have very little cost on each end. So they have some advantages on the short haul because of not having a huge fixed investment like the rails do.**
**The longer the length of haul, those fixed investments can be spread out over the -- over the**

Page 143

**longer distance. And our sheer operating cost against the sheer operating cost of a truck is actually lower. So there's a point at which, as you go to longer haul, now we've got enough miles to spread our high fixed cost, that we have a more advantageous situation against the trucks. In the short haul, they have the advantage because they don't have the big fixed cost to allocate.**
Q. Is there a magic number that BNSF has calculated that -- that competitive --
**A. No, sir, it's not that simple because the variable costs move on you, and so there's no magic number. The higher the fuel cost, the lower that length of haul, the lower the fuel cost, as an example. The line moves to longer length of haul -- and it's the same thing with driver costs. And so as costs move, that line moves.**
Q. Now the consumer products fuel surcharge program that we described that started in 2001, that remained the same throughout the period through 2007. Is that correct?
**A. That is correct.**
Q. And did that apply to both domestic and international intermodal shipments?
**A. The fuel surcharge program for intermodal did cover both international and domestic, correct.**

Page 144

Q. Now take a look at Kyei 27, which is in front of you.
**A. I'm sorry. Which one?**
MR. WINTERS: That's it.
THE WITNESS: This one?
MR. GREENWALD: Oh, I'm sorry. Kyle is telling me that I --
MR. WINTERS: Hamberger 27?
MR. GREENWALD: No.
Q. I meant Kyei 27, but I never showed it to you.
**A. Oh, okay.**
Q. I'm going to show it to you now.
**A. Feeling better.**
Q. I was asking you questions, but I didn't show you the document.
MR. GREENWALD: Why don't you grab me -- it's tab 38.
Q. All right. Showing you what's been marked as Kyei -- previously marked as Kyei 27, do you recognize this document?
**A. Yes, sir, I've seen this one.**
Q. And what is this document?
**A. This is a price and fuel escalation general guidelines sheet.**
Q. And these general guidelines are promulgated

Page 145

in January 2004?

**A. I don't know what the word "promulgated" means.**

Q. These became the general guidelines effective January 24 -- January 2004?

**A. I'm sorry about that. Yes.**

Q. No. If I ask you any question where you don't understand what I'm saying, you should ask me to clarify.

The fuel escalation section -- do you see that at the bottom --

**A. Yes.**

Q. -- that applied to both carload as well as intermodal traffic. Correct?

**A. Yeah, I didn't -- I can't really tell just from the sentence.**

Q. Well, why don't you take a look at --

**A. It says every contract should include fuel surcharge clause.**

Q. And then if you look at entry number 3.

**A. Okay.**

Q. Do you see it says -- it refers the reader to what fuel surcharge table to use for carload shipments and then what table to use for intermodal shipments?

**A. Correct.**

Page 146

Q. So as of January 2004, there was a policy that every contract, intermodal or carload, should have a fuel surcharge clause and it should be whichever applied to that type of shipment?

**A. I think the keyword here is "should." I mean, as I mentioned, we were trying to negotiate fuel surcharge into our contracts. Some we were able to get in; some we were not. But it was policy to try to negotiate fuel surcharge in, yes.**

Q. And any exception would have to be approved for intermodal by Mr. Branscum. Correct?

**A. For intermodal, it would be Mr. Branscum.**

Q. And Mr. Lanigan was tracking the fuel surcharge -- was tracking the fuel surcharge adherence within BNSF. Correct?

MR. WINTERS: Objection to the form. This is going beyond the scope.

**A. The -- John Lanigan would be involved in analysis on all aspects of the business, certainly including fuel surcharge.**

MR. GREENWALD: Mark that.

(Exhibit 6 marked.)

Q. Showing you what's been marked as Anderson Exhibit 6, do you recognize this document?

**A. No, I don't believe I've seen this document**

Page 147

**before.**

Q. If you take a look at the -- well, why don't you take a look at the document. I'm going to ask you specifically about the fourth bullet, but --

**A. Okay.**

Q. And so BNSF was tracking, at least as of November 2004, the intermodal adherence to fuel surcharges?

MR. WINTERS: Object to the form. It's beyond the scope of topic 5.

**A. Yeah, BNSF did analysis on all aspects of fuel surcharge, including intermodal.**

Q. And if you look underneath that, three groups to provide information to create reports. What is marketing support?

**A. Marketing support is an administrative arm inside of -- inside of the marketing group, and that is my -- essentially my group today that I described to you earlier.**

MR. GREENWALD: Why don't we go off the record real briefly.

THE VIDEOGRAPHER: We are going off the record. The time is 1:44.

(Break from 1:44 p.m. to 1:50 p.m.)

THE VIDEOGRAPHER: We are on the record.

Page 148

The time is 1:50.

MR. GREENWALD: Mr. Anderson, I have no further questions at this time. Thank you for your time today.

THE WITNESS: Thank you.

EXAMINATION

BY MR. WINTERS:

Q. Mr. Anderson, just a couple of follow-up questions.

You testified this morning in response to Mr. Greenwald's questions that -- I believe that Rule 11 pricing does not require communication with an interline partner. Do you recall that testimony?

**A. Well, I thought it may not require, but it may require.**

Q. Okay. Are there situations where the decision to use Rule 11 pricing occurs only after there have been discussions with a potential interline partner?

**A. That is the typical situation. The typical situation is we try to get a joint line rate, because that's the easiest to do business with. That's what the customer typically would ask for, which is a single bill. Sometimes we just cannot agree with our connecting partners. If you cannot agree, then it can go to -- it could go to Rule 11 and still maybe get the**

Page 149

**business.**
Q. And so is it possible that when we see a Rule 11 move or a Rule 11 pricing situation, that previous to the establishment of the Rule 11 rates, there may have been discussions with the interline partner about a potential joint line rate on that movement which simply didn't work out? Is that what you're telling us?
MR. GREENWALD: Objection to the form of the question.
**A. Not only may -- may that happen; that would be the most likely scenario.**
Q. Okay. Thank you.
You mentioned that Kathy Hoffman was in an administrative position. Do you recall that?
**A. Yes, sir.**
Q. Do you happen to recall her specific title?
**A. I think it was -- I think it was director of industry, something like that, but I don't remember her exact title.**
Q. Okay. I want to direct your attention to Kyei Exhibit 27, which Mr. Greenwald showed you.
**A. Okay.**
Q. And specifically to the top portion of that exhibit. And do you recall that Mr. Greenwald asked you some questions about what BNSF's policy was with respect

Page 150

to the use or the attempt to obtain AIILF in contract after 2004? Do you recall that?
**A. Yes.**
Q. Okay. Were there escalation indices other than AIILF that were considered acceptable by BNSF after January of 2004?
**A. Almost definitely. In fact, on this document here in January 2004, it's titled, General Guidelines, and the top performing indice is the Consumer Price Index or CPI. So there's the CPI, RCAF, AIILF, GDP, IPD, which I had mentioned earlier, and a fixed rate, all of which are in the general guidelines. And the top performing indice historically was CPI.**
Q. Okay. And prior to 2004, did all of BNSF's long-term contracts that had a price escalator have RCAF as the escalator?
**A. I did ask some questions. That is a relatively difficult question to ascertain because our revenue systems don't -- they capture the amount that it's escalated, but not which escalator it is. I did find a manual study from 2006 that encompassed all of 2005 data. And 8 percent of BNSF's revenue in the year of 2005 had full RCAF. 22 percent had a portion of RCAF. So when I say a portion, it may have 50 percent RCAF or it may have 20 percent RCAF and 20 percent CPI,**

Page 151

**so a combination of baskets.**
MR. WINTERS: Okay. That's fine. Thank you. No further questions.
FURTHER EXAMINATION
BY MR. GREENWALD:
Q. The data you just referred to, that was after this January 4 guidelines memo Kyei 27 that stated, It is strongly recommended that RCAF contracts migrate to the all-inclusive index less fuel?
**A. The -- the only study that I could find, like I said, was full year 2005. It did have the all-inclusive index in it. And at that time, 3 percent of BNSF's revenue was -- had AIILF. So 3 percent in 2005.**
MR. GREENWALD: I have no further questions.
MR. WINTERS: Nothing further.
THE VIDEOGRAPHER: We are going off the record. The time is 1:55, and this is the end of tape 3 and concludes today's deposition.
(Discussion off the record.)
MR. GREENWALD: We designate this transcript highly confidential under the protective order.
(Proceedings ended at 1:55 p.m.)

Page 152

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |

Proposed Errata



CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 6 | 5 | “in” to “In” | Correct transcription |
| 6 | 5 | Add “Fuel” after “Freight” | Correct transcription |
| 9 | 18 | “have” to :has” | Correct transcription |
| 10 | 16 | Add “a” after “actually” | Correct transcription |
| 17 | 8 | Insert space between “hand” and “out” | Correct transcription |
| 17 | 22 | Replace question mark with period | Correct transcription |
| 18 | 20 | “mulligan” to “Mulligan” | Correct transcription |
| 20 | 22 | “partner” to “partners” | Correct transcription |
| 23 | 17 | “mulligan” to “Mulligan” | Correct transcription |
| 35 | 24 | Insert dash between “truck” and “like” | Correct transcription |
| 37 | 10 | “the” to “they” | Correct transcription |
| 51 | 8 | Delete “?” | Correct transcription |
| 51 | 8 | Insert “.” after “rump” | Correct transcription |
| 52 | 5 | “objection” to “objections” | Correct transcription |
| 59 | 21 | Replace period with question mark | Correct transcription |
| 67 | 6 | “seal” to “Seale” | Correct transcription |
| 70 | 22 | Insert dash between “center” and “related” | Correct transcription |
| 86 | 4 | Delete “from” | Correct transcription |
| 90 | 4 | “its” to “it’s” [*to match other instances in transcript*] | Correct transcription |
| 91 | 8 | “indice” to “index” | Correct word |
| 96 | 12 | “question” to “questions” | Correct transcription |
| 102 | 21 | Delete “to” | Correct transcription |
| 103 | 23 | “indice” to “index” | Correct word |

Proposed Errata

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 104 | 15 | "indice" to "index" | Correct word |
| 104 | 16 | "indice" to "index" | Correct word |
| 104 | 24 | "indice" to "index" | Correct word |
| 105 | 1 | "indice" to "index" | Correct word |
| 105 | 2 | "indice" to "index" | Correct word |
| 105 | 16 | Delete "is" | Correct transcription |
| 105 | 18 | "indice" to "index" | Correct word |
| 105 | 21 | "indice" to "index" | Correct word |
| 106 | 11 | "indice" to "index" | Correct word |
| 107 | 7 | Delete space between "in" and "ability" | Correct transcription |
| 107 | 16 | Delete "that" | Correct transcription |
| 108 | 8 | "indice" to "index" | Correct word |
| 110 | 9 | "indice" to "index" | Correct word |
| 111 | 14 | "extremely" to "extreme" | Correct transcription |
| 114 | 4 | Delete space between "under" and "recovering" | Correct transcription |
| 119 | 2 | Delete first "is" | Correct transcription |
| 119 | 3 | Delete "to" | Correct transcription |
| 119 | 24 | Insert comma after "individuals" | Correct transcription |
| 119 | 25 | Insert comma after "Kyei" | Correct transcription |
| 120 | 3 | "indice" to "index" | Correct word |
| 121 | 7 | "indice" to "index" | Correct word |
| 122 | 6 | "indice" to "index" | Correct word |
| 127 | 12 | Delete "of that" | Correct transcription |

Proposed Errata

## CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 127 | 14 | "indice" to "index" | Correct word |
| 127 | 24 | "is" to "did" | Correct transcription |
| 128 | 7 | Insert dash between "non" and "extremely" | Correct transcription |
| 134 | 14 | "keywords" to "keyword" | Correct transcription |
| 143 | 13 | Insert period after "haul"<br>capitalize "T" in "the"<br>add comma after "example"<br>change "T" in "The" to lower case | Correct transcription |
| 150 | 1 | "contract" to "contracts" | Correct transcription |
| 150 | 7 | Change "Almost" to "oh, most" | Correct transcription |
| 150 | 9 | "indice" to "index" | Correct word |
| 150 | 13 | "indice" to "index" | Correct word |

I, PAUL ANDERSON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

[signature]
PAUL ANDERSON

THE STATE OF Texas )
COUNTY OF Tarrant )

Before me, PAUL B. ANDERSON, on this day personally appeared PAUL ANDERSON, known to me (or proved to me under oath or through BNSF ) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 19th day of July, 2011.

[signature]
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS
COMMISSION EXPIRES: 10-14-2012

JOYCE K. MALMGREN
Notary Public State of Texas
Commission Expires
OCTOBER 14, 2012