# Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment

## Volume 29 of 29

## DA07104 - DA07584

From: Arnett, James A
Sent: Tue Dec 10 09:00:31 2002
To: Bognich, Harry W; Samuelson, Nannette
Cc: Engstrom, James C; Holmes, Ken L; Gillen, George F; Cook, Aaron E; Manning, Thaddeus M; Farr, Kathleen M; Wagemaker, William J; Arnett, James A
Subject: Carload Price Authorities to be changed thru mass maintenance adding new Fuel Surcharge templates
Importance: Normal

Ken Holmes is in the process of updating Price management's fuel surcharge spreadsheet, adding a column indicating which new fuel surcharge template should be added to which price authority. We should be able to use this spreadsheet for testing purposes.

Before we implement, however, we will have to specify which price authorities we can actually change. Many of these price authorities are contracts, so we will not be able to make wholesale changes through mass maintenance. Contracts will have to be amended and agreed to by the customer.

Price Management will be able to indicate which price authorities will be eligible for mass maintenance when the time comes for implementation.

Jim

-----Original Message-----
**From:** Arnett, James A
**Sent:** Wednesday, November 20, 2002 4:07 PM
**To:** Manning, Thaddeus M; Bognich, Harry W
**Cc:** Samuelson, Nannette; Engstrom, James C; Holmes, Ken L; Gillen, George F; Farr, Kathleen M; Arnett, James A; Wagemaker, William J; Cook, Aaron E

**Subject:** Carload Price Authorities - Fuel Surcharge templates

Further to our conference call today regarding the RPMS TS team assisting carload by updating price authorities with new fuel surcharge templates, we have created the following new fuel surcharge templates for carload:

***

RPMS - Capture and Maintenance

Fuel+No Surcharge (No Fuel Surcharges to apply - no % amount needed)
Fuel+6100 Standard (Fuel Surcharge to apply, per BNSF Rules Book 6100)
Fuel+[redacted] (Fuel Surcharge to apply on [redacted] price authorities only)
Fuel+PPI (Fuel Surcharge to apply factoring in the PPI)

Fuel+ [redacted] Fuel Surcharge to apply on [redacted] price authorities only)

All of the templates, except the 'No Surcharge' template, will contain a specific % that will be updated by Price Management monthly, or as needed, using RPMS Mass Maintenance.

***

PAS - Application

PAS has not been enhanced, however, to recognize the % within the SURC shipment condition, and use this % to add to or deduct from the freight charges when rating a waybill. (PAS Problem Log 9660). Once this enhancement is implemented, PAS will then be able to electronically apply the fuel surcharge where necessary. Until that time, however, Price Management must manually update every carload price authority using PAS Miscellaneous Prices application. Each price authority is updated with the appropriate Fuel Surcharge (ENS) in Miscellaneous Prices.

***

REN - Send

The correct method of capturing a fuel surcharge is by using the SURC shipment condition and including the specific % to apply. Until we can attach the newly created fuel surcharge templates with the correct % in each price authority, Price Management must maintain a spreadsheet of each BNSF price authority and it's fuel surcharge %. This spreadsheet must be sent to each REN partner who will then manually input the fuel surcharge applicable to each price authority, in their own application systems. Once we begin to insert the newly created fuel surcharge templates into BNSF price authorities, we can then send the correct SURC with the applicable %, electronically via REN. However, until we complete the transition, we must maintain two spreadsheets. The second spreadsheet will include all of the correct price authorities. We will send this spreadsheet to our REN partners who will then delete any manually created fuel surcharges for those price authorities.

***

REN - Receive

Most, if not all, REN partners are already sending the fuel surcharge correctly coded in their price authorities. Once PAS is enhanced to use the % contained in the SURC shipment condition (see PAS - Application above), we will then be able to electronically apply the fuel surcharge to foreign line prices received via REN. However, until that date, Price Management must manually update every foreign line carload price authority using PAS Miscellaneous Prices application. Each foreign line price authority is updated with the appropriate Fuel Surcharge (ENS) in Miscellaneous Prices.

***

Schedule

Due to time constraints and the amount of work still to be done before December 1st (see above manual PAS Miscellaneous Prices input), Price Management will not be able to begin the transition until early December. At that time, Price Management will send a spreadsheet to RPMS TS of all BNSF quotes and Tariffs and which templates should be used in each price authority. (Note: Contracts cannot be converted without an amendment.)

Thanks,

Jim

**From:** Smith, Denis J (Marketing)
**Sent:** Fri Mar 14 15:28:39 2003
**To:** MKT DL Ind Prod Marketing
**Subject:** FW: Fuel Surcharge
**Importance:** Normal
**Attachments:** Customers not paying fuel.xls

-----Original Message-----
**From:** Olsen, Todd A
**Sent:** Friday, March 14, 2003 8:08 AM
**To:** Smith, Denis J (Marketing)
**Cc:** Bates, Scot A; Unterbrink, Brandon J; Ortiz, Rebeca; Ray, Mike J (Mktg); Kalb, F E Skip; Littlejohn, Michelle R
**Subject:** FW: Fuel Surcharge

Re: the attached (Fuel surcharge provision for shipments that involve a transload):

1) I believe where a transload name is on the list, that transload operator is the shipper. Thus, they should be subject to a fuel surcharge to the extent that such provisions are part of their transportation contract with BNSF marketing.

2) Then generally, in either a bundled or unbundled move, BNSF marketing's transportation contracts should have a fuel surcharge provision that covers the total rate - bundled or unbundled.

3) If there's anything the transload team can do to facilitate ensuring that the transportation contracts involving transloads do have a fuel surcharge provision, please advise.

Thanks. Todd

-----Original Message-----
**From:** Regan, Kathleen A
**Sent:** Thursday, February 13, 2003 10:15 AM
**To:** Olsen, Todd A
**Subject:** FW: Fuel Surcharge

Focus on Fuel Cost Recovery will be immense in the coming months....We need strategy on Transload Partners/Customers....I spotted a few on this list....Can we/Do we influence this...

-----Original Message-----
**From:** Pacocha, George
**Sent:** Thursday, February 13, 2003 8:30 AM
**To:** Branscum, Steve G; Garin, David L; Kraemer, Thomas G; Bobb, Stevan B; Smith, Denis J (Marketing); Regan, Kathleen A; Shalah, Sami M; Duggan, George T

**Cc:** Kyei, Sam A; Patient, Gregory M; Haertling, Barbara T; Angle, Rex C

**Subject:** Fuel Surcharge

At the February 10th staff meeting, Mr. Duggan requested to see the list of customers who do not pay fuel surcharges before it went to Mr. Lanigan.

Mr. Kyei asked me to send you this data. We have previously provided this data to the Planning Directors.

<<...>>

<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>0001.txt
<DESCRIPTION>BNSF RAILWAY 10-K (FYE 12-31-2000)
<TEXT>

<PAGE>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

<TABLE>
<CAPTION>

<S> <C>
(MARK ONE)

|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2000

OR

| | TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ________ to ________ Commission file number 1-6324

</TABLE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 41-6034000 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| 2650 Lou Menk Drive<br>Fort Worth, Texas | 76131-2830 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:
(817) 333-2000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

The securities listed below are registered on the New York Stock Exchange.

<TABLE>
<CAPTION>

| | Title of each class |
|---|---|
| <S> | <C> |
| Burlington Northern Inc. (Now The Burlington Northern and Santa Fe Railway Company) | Northern Pacific Railway Company General Lien Railway and Land Grant 3% Bonds, due 2047 |

| | |
|---|---|
| Consolidated Mortgage Bonds | Great Northern Railway Company |
| 9.25%, Series H, due 2006 | General Mortgage Bonds |
| 6.55%, Series K, due 2020 | 2 5/8%, Series Q, due 2010 |
| 3.80%, Series L, due 2020 | |
| 3.20%, Series M, due 2045 | |
| 8.15%, Series N, due 2020 | |
| 6.55%, Series O, due 2020 | |
| 8.15%, Series P, due 2020 | St. Louis-San Francisco Railway Company |
| | Income Debentures, 5%, Series A, due 2006 |

</TABLE>
<PAGE>

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
----------------------------------------------------------

None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No

| Class | Outstanding |
|---|---|
| Common Stock, par value $1.00 as of January 31, 2001* | 1,000 shares |

* The Burlington Northern and Santa Fe Railway Company is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF); as a result there is no market data with respect to registrant's shares.

DOCUMENTS INCORPORATED BY REFERENCE
-----------------------------------

None

REGISTRANT MEETS THE CONDITIONS SET FORTH IN GENERAL INSTRUCTION I(1)(a) AND (b) OF FORM 10-K AND IS THEREFORE FILING THIS FORM 10-K WITH THE REDUCED DISCLOSURE FORMAT.
<PAGE>

TABLE OF CONTENTS

<TABLE>
<CAPTION>

Page

----
<S>
<C>
PART I

Items 1 and 2. Business and Properties
1

Item 3. Legal Proceedings
8

PART II

Item 5. Market for Registrant's Common Equity and Related Stockholder Matters
8

Item 7. Management's Narrative Analysis of Results of Operations
8

Item 7A. Quantitative and Qualitative Disclosures About Market Risk
11

Item 8. Financial Statements and Supplementary Data
13

Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
29

PART IV

Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K
29

SIGNATURES
S-1

SCHEDULE II - VALUATION AND QUALIFYING ACCOUNTS
F-1

EXHIBIT INDEX
E-1
</TABLE>
<PAGE>

PART I

Items 1 and 2. Business and Properties

The Burlington Northern and Santa Fe Railway Company (BNSF Railway or Company), formerly known as the Burlington Northern Railroad Company (BNRR), was incorporated in the State of Delaware on January 13, 1961 and is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF). On September 22, 1995, the stockholders of Burlington Northern Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the stockholders of BNSF pursuant to a business combination of the two companies. To effect the combination, BNSF was formed to act as the parent holding company of BNI and SFP. BNI and SFP each owned a large, Class I railroad: the BNRR and The Atchison, Topeka and Santa Fe Railway Company (ATSF), respectively.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, ATSF merged with and into BNRR, and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, BNSF Railway's parent, SFP, merged with and into BNSF Railway.

BNSF Railway operates one of the largest railroad systems in the United States. At December 31, 2000, BNSF Railway had approximately 39,600 employees.

On December 18, 1999, BNSF and Canadian National Railway Company (CN) entered into an agreement to combine their companies. Pursuant to the Amended and Restated Combination Agreement dated as of December 18, 1999 by and among BNSF, CN, North American Railways, Inc. (North American Railways) and Western Merger Sub, Inc. (the Combination Agreement), the combined enterprise was to consist of two public companies--North American Railways and CN--to comply with Canadian requirements prohibiting any person and that person's associates from owning more than 15 percent of the voting rights in CN and to ensure that the combination would be tax-efficient for each company's shareholders. Upon completion of the combination, BNSF was to be a wholly owned subsidiary of North

American Railways, and all shareholders were to have voting interests in both North American Railways and CN and economic interests in the combined companies. Completion of the combination required approval of the shareholders of BNSF and CN. The combination was also subject to approval of the U. S. Surface Transportation Board (STB), compliance with the Competition Act (Canada), and approval by the Quebec Superior Court.

On March 17, 2000, the STB served a Decision (STB Ex Parte No. 582) directing Class I railroads to suspend activity relating to any railroad transaction that would be deemed a "major transaction" under STB regulations, "pending development of new rules" by the STB governing merger transactions. The Decision followed a four-day hearing that ended March 10, 2000, which the STB held to discuss the impact of future rail consolidations on the present and future structure of the rail industry and what the evolving structure of the North American railroad industry should be. The Decision stated that no filings relating to a major railroad transaction would be accepted for 15 months. The Decision also suspended the Notice of Intent to File Railroad Control Application that had been filed by BNSF and CN on December 20, 1999, giving notice of their intent to file a joint application for STB approval of their proposed rail combination on or after March 20, 2000.

On March 17, 2000, BNSF, CN, and the Western Coal Traffic League filed petitions for review of the STB's March 17, 2000 Decision in the United States Court of Appeals for the District of Columbia Circuit. On March 29, 2000, BNSF filed a petition for stay of the STB's decision pending judicial review with the United States Court of Appeals for the District of Columbia Circuit.

On July 14, 2000, the United States Court of Appeals for the District of Columbia Circuit ruled and upheld the STB's authority to impose the moratorium that precluded BNSF and CN from filing their control application with the STB during the pendency of the moratorium. On July 20, 2000, BNSF and CN announced their mutual termination of the Combination Agreement with neither party paying any break-up fees.

1

<PAGE>

Track Configuration

BNSF Railway operates over a railroad system consisting of, at December 31, 2000, approximately 33,500 route miles of track (excluding second, third and fourth main tracks, yard tracks, and sidings), approximately 25,000 miles of which are owned route miles, including easements, through 28 states and two Canadian provinces. Approximately 7,500 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over another railroad's tracks. BNSF Railway operates over other trackage through lease or contractual arrangements.

As of December 31, 2000, the total BNSF Railway system, including first, second, third and fourth main tracks, yard tracks, and sidings, consisted of approximately 51,000 operated miles of track, all of which were owned by or held under easement by BNSF Railway except for approximately 8,200 miles operated under trackage rights agreements with other parties. At December 31, 2000, approximately 26,700 miles of BNSF Railway's track consisted of 112-pound per yard or heavier rail, including approximately 18,900 track miles of 131-pound per yard or heavier rail.

Equipment Configuration

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock as of the dates shown below:
<TABLE>
<CAPTION>
At

December 31,

<S> <C> <C> <C>

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Diesel Locomotives | 4,966 | 5,095 | 4,992 |
| Locomotives Under Power Purchase Agreements | 99 | 99 | 99 |
| Freight Cars: | | | |
| Box--general purpose | 896 | 913 | 948 |
| Box--specially equipped | 9,785 | 10,111 | 10,295 |
| Open Hopper | 9,984 | 10,287 | 10,772 |
| Covered Hopper | 44,632 | 45,463 | 44,643 |
| Gondola | 12,415 | 12,753 | 12,427 |
| Refrigerator | 6,111 | 6,236 | 6,476 |
| Autorack | 4,775 | 4,799 | 3,304 |
| Flat | 6,389 | 6,468 | 6,289 |
| Tank | 480 | 482 | 489 |
| Caboose | 305 | 319 | 351 |
| Other | 727 | 728 | 729 |
| Total Freight Cars | 96,499 | 98,559 | 96,723 |
| Domestic Containers | 10,999 | 11,019 | 9,849 |
| Trailers | 2,201 | 2,213 | 2,410 |
| Domestic Chassis | 9,405 | 9,406 | 9,409 |
| Company Service Cars | 4,334 | 4,399 | 4,685 |
| Commuter Passenger Cars | 141 | 141 | 141 |

</TABLE>

In addition to the chassis, containers, trailers, and freight cars shown above, BNSF Railway had under short-term leases 18,844 chassis, 13,692 containers, 2,675 trailers, and 2,270 freight cars at December 31, 2000. The average age from date of manufacture of the locomotive fleet at December 31, 2000 was 11.863 years; the average age from date of manufacture or remanufacture of the freight car fleet at December 31, 2000 was 17.24 years. These averages are not weighted

to reflect the greater capacities of the newer equipment.



<PAGE>

Capital Expenditures and Maintenance

BNSF Railway cash capital expenditures for the periods indicated were as follows:

<TABLE>
<CAPTION>

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| | (in millions) | | |
| <S> | <C> | <C> | <C> |
| Maintenance of Way | | | |
| Rail | $ 210 | $ 256 | $ 238 |
| Ties | 206 | 170 | 220 |
| Surfacing | 134 | 130 | 136 |
| Other | 285 | 254 | 205 |
| Total Maintenance of Way | 835 | 810 | 799 |
| Mechanical | 221 | 240 | 243 |
| Information services | 66 | 72 | 76 |
| Other | 144 | 151 | 185 |
| Total maintenance of business | 1,266 | 1,273 | 1,303 |
| New locomotives and freight cars | - | 261 | 340 |
| Terminal and line expansion | 99 | 233 | 487 |
| Other projects | 34 | 19 | 17 |
| Total capital expenditures | $1,399 | $1,786 | $2,147 |

</TABLE>

The above table does not include expenditures for equipment financed through operating leases (principally, locomotives and rolling stock). BNSF Railway's planned 2001 cash capital commitments approximate $1.5 billion. Approximately $1.3 billion of the total planned capital commitments will be for maintenance of

business activities, primarily consisting of expenditures to maintain BNSF Railway's track, signals, bridges and tunnels, as well as to overhaul locomotives and freight cars with the remaining to be spent on terminal and line expansions and other projects.

As of December 31, 2000, General Electric Company, the Electro-Motive Division of General Motors Corporation, and Boise Locomotive Corporation performed locomotive maintenance and overhauls for BNSF Railway under various maintenance agreements that covered approximately 3,000 locomotives. These agreements require the work to be done at BNSF Railway's facilities using BNSF Railway employees.

The majority of maintenance of way expenditures for track has been for rail and tie refurbishment and track resurfacing. The extent of the BNSF Railway track maintenance program is depicted in the following table:

<TABLE>
<CAPTION>

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| <S> | <C> | <C> | <C> |
| Track miles of rail laid (1) | 732 | 926 | 1,029 |
| Cross ties inserted (thousands) (1) | 2,527 | 2,365 | 2,452 |
| Track resurfaced (miles) (1) | 11,228 | 10,505 | 12,383 |

</TABLE>

(1) Includes expenditures for both maintenance of existing route system and expansion projects. These expenditures are primarily capitalized.

BNSF Railway planned 2001 track maintenance of way program, together with expansion projects, will result in the installation of approximately 816 track miles of rail, the replacement of about 2.6 million ties and the resurfacing of approximately 11,500 miles of track.

3

<PAGE>

Property and Facilities

BNSF Railway operates facilities and equipment to maintain its track, locomotives and freight cars. It also owns or leases other equipment to support rail operations, such as highway trailers, containers and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, computers, telecommunications equipment, signal systems, and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 37 major intermodal hubs located across the system and three intermodal hub centers off-line used in connection with haulage agreements with other railroads. BNSF Railway's largest intermodal facilities in terms of 2000 volume are:

Intermodal Facilities Units

| | |
|---|---|
| Hobart Yard (Los Angeles) | 1,057,000 |
| Corwith Yard (Chicago) | 755,000 |
| Willow Springs (Illinios) | 697,000 |
| Chicago Hub Center | 446,000 |
| Alliance (Texas) | 412,000 |
| San Bernardino (California) | 388,000 |
| Argentine (Kansas) | 249,000 |

BNSF Railway owns 27 automotive distribution facilities where automobiles are loaded or unloaded from multi-level rail cars and serves eight port facilities in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal and intermodal and coal cars) are shown below:

| Classification Yard | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas) | 2,046 |
| Galesburg (Illinois) | 1,553 |
| Pasco (Washington) | 1,443 |
| Barstow (California) | 1,281 |
| Memphis (Tennessee) | 1,242 |

Certain BNSF Railway properties and other assets are subject to liens securing, as of December 31, 2000, $467 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and leases, as referred to in Note 8 to the consolidated financial statements included in this filing.

Employees and Labor Relations

Productivity as measured by revenue ton miles per employee has risen steadily in the last three years, while compensation and benefits expense per revenue ton mile decreased over the same period, as shown in the table below.

<TABLE>
<CAPTION>

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| <S> | <C> | <C> | <C> |
| Thousand revenue ton miles divided by average number of employees | 12,342 | 11,564 | 10,576 |
| Compensation and benefits expense per thousand revenue ton miles | $ 5.55 | $ 5.62 | $ 6.00 |

</TABLE>



<PAGE>

Approximately 89 percent of BNSF Railway employees are union-represented. They work under collective bargaining agreements with 13 different labor organizations. The negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 1999. Wages, health and welfare benefits, work rules, and other issues have traditionally been addressed

through industry-wide negotiations. These negotiations have generally taken place over a number of months and have previously not resulted in any extended work stoppages. The existing agreements will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached. The National Carriers' Conference Committee, BNSF Railway's multi-employer collective bargaining representative, recently reached a tentative agreement with the United Transportation Union (UTU) covering wage and work rule issues through the year 2004 for conductors, brakemen, yardmen, yardmasters and firemen (approximately one third of BNSF Railway's unionized workforce). The agreement is subject to ratification by the UTU's membership. Health and welfare benefit issues were not resolved by this agreement, and will remain the subject of continuing negotiations.

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System are approximately triple those in industries covered by Social Security.

Railroad industry personnel are also covered by the Federal Employers' Liability Act (FELA) rather than by state workers' compensation systems. FELA is a fault-based system, with compensation for injuries settled by negotiation and litigation, not subject to specific statutory limitations on the amount of recovery. By contrast, most other industries are covered under state, no-fault workers' compensation plans with standard compensation schedules. BNSF Railway believes it has adequate recorded liabilities for its FELA claims. However, the ultimate costs of these FELA claims are uncertain and the actual costs could be significantly higher than anticipated.

Business Mix

In serving the Midwest, Pacific Northwest and the Western, Southwestern, and Southeastern regions and ports of the country, BNSF Railway transports, through one operating transportation services segment, a wide range of products and commodities derived from manufacturing, agricultural, and natural resource industries. Accordingly, its financial performance is influenced by, among other things, general and industry economic conditions at the international, national, and regional levels.

Major markets served directly by BNSF Railway include Albuquerque, Amarillo, Billings, Birmingham, Bismarck/Mandan, Cheyenne, Chicago, Corpus Christi, Council Bluffs, Dallas, Denver, Des Moines, Duluth/Superior, El Paso, Eugene/Salem, Fargo/Moorhead, Fort Worth, Fresno/Bakersfield, Galesburg, Galveston, Grand Forks, Helena, Houston, Kansas City, Lake Charles, Lincoln, Little Rock/Pine Bluff, Los Angeles, Lubbock, Memphis, Minot, Mobile, New Orleans, Oklahoma City, Olympia, Omaha, Peoria, Phoenix, Portland, the Quad Cities, Reno/Sparks, Sacramento, Salt Lake City/Ogden, San Antonio, San Diego, the San Francisco Bay area, the San Joaquin Valley area, St. Louis/East St. Louis, St. Paul/Minneapolis, Seattle, Sioux City, Sioux Falls, Spokane, Springfield (Missouri), Stockton, Tacoma, Topeka, Tulsa, Waco, Wichita, Vancouver (British Columbia), Wenatchee, Winnipeg (Manitoba) and Yakima. BNSF serves Cedar Rapids through a "Voluntary Coordination Agreement" with the Cedar Rapids and Iowa City Railway Company and Iowa Interstate Railroad, and through a haulage agreement with CN. Other major cities are served through Intermodal Market Extension terminals located at various off-line points. Major ports served include Beaumont, Bellingham, Brownsville, Corpus Christi, Everett, Galveston, Houston, Kalama, Long Beach, Longview, Los Angeles, Mobile, New Orleans, Portland, Richmond (Oakland), San Diego, Seattle, Duluth/Superior, Tacoma, Vancouver (Washington), and Vancouver (British Columbia). Canadian traffic is accessed through border crossings in Minnesota, North Dakota, Montana, and Washington, as well as through interchange with Canadian railroads at Chicago, Minneapolis/St. Paul, and other gateways. BNSF Railway also accesses markets in Mexico through United States/Mexico crossings at Brownsville, Eagle Pass and El Paso, Texas and San Diego, California and,

through an interline agreement with the Texas Mexican Railway Company, BNSF Railway reaches Laredo, Texas, a major rail gateway between the U.S. and Mexico.

Carload. The carload freight business provided approximately 28 percent of revenues in 2000. Carload revenue comes from five types of business:

- Chemicals. The chemicals business is composed of fertilizer, petroleum, plastics and chemical commodities. Industrial chemicals and plastics resins are used by the automotive, housing, and packaging industries, as well as for feedstocks to produce other chemical and plastic products. Agricultural chemicals and minerals include sulphur that generally moves to the Gulf Coast and from there via vessels to Florida and overseas markets for use in making phosphatic fertilizers. Potash is transported to domestic markets and to export points for markets in South America and Asia.

- Forest Products. The primary forest product commodities transported are lumber, plywood, oriented strand board, particle board, paper products, pulpmill feedstocks, wood pulp and sawlogs. This diverse commodities group primarily originates from the Pacific Northwest, Western Canada, upper Midwest, and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper, and industrial packaging.

5

<PAGE>

- Metals. The Metals business serves virtually all of the commodities included in or resulting from the production of steel. Taconite, an iron ore derivative produced in northern Minnesota, scrap steel, and coal coke are BNSF Railway's primary input products, while finished steel products range from structural beams and steel coils to wire and nails. BNSF Railway links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams, and coiled rod to the construction industry. Various non-ferrous products such as copper, lead, and aluminum are transported for the beverage, automotive, and telecommunications industries.

- Minerals and Machinery. Mineral commodities include clays, sands, cements, aggregates, sodium compounds, waste and other industrial minerals. Both the oil and the construction industries are served. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and for use in foundry and oil drilling applications. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. Machinery includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.

- Consumer Goods (Perishables and Dry Boxcar). Beverages, canned goods, and perishables are the principal food commodities moved by BNSF Railway. Other consumer goods handled include cotton, salt, rubber and tires, and miscellaneous boxcar shipments.

Intermodal. The intermodal freight business provided approximately 29 percent of revenues in 2000 and consists of the hauling of freight, usually in containers or truck trailers, through a combination of different modes of transportation such as rail, truck or water carriers. The intermodal business is highly service-driven, and in many cases truck carriers and railroads work jointly to provide intermodal service.

Intermodal 2000 results include revenue from four types of business:

- Direct Marketing. Direct marketing efforts resulted in approximately 32 percent of total intermodal revenue. These center around traffic contracted from United Parcel Service and the United States Postal Service, and service for nationwide LTL (Less-Than-Truckload) carriers including Yellow Freight, Roadway Express, and Consolidated Freightways.

- International. International business consists primarily of traffic from steamship companies and accounted for approximately 35 percent of intermodal revenues.

- Intermodal Marketing Companies. Approximately 17 percent of total intermodal revenue was generated through intermodal marketing companies, primarily shipper agents and consolidators.

- Truckload. Truckload traffic represented approximately 16 percent of total intermodal revenue. The joint service arrangement with J.B. Hunt, referred to as Quantum, represented the largest truckload component, while Schneider National was the next largest.

Coal. Based on carloadings and tons hauled, BNSF Railway is the largest transporter of western low-sulfur coal in the United States, and the transportation of coal contributed about 23 percent to 2000 revenues. Approximately 90 percent of BNSF Railway's coal traffic originated in the Powder River Basin of Wyoming and Montana during the three years ended December 31, 2000. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central and Mountain regions of the United States.

BNSF Railway also transports increasing amounts of low-sulfur coal from the Powder River Basin for delivery to markets in the eastern and southeastern portions of the United States. The low-sulfur coal from the Powder River Basin is abundant, inexpensive to mine, clean-burning, and has a low delivered-cost to power plants. Also, deregulation in the electric utility industry is expected to cause utilities to seek lower cost fuel sources and boost demand for Powder River Basin coal.

Other coal shipments originate principally in Colorado, Illinois, New Mexico, and North Dakota and are moved to electrical generating stations and industrial plants in the Mountain and North Central regions.

Agricultural Commodities. The transportation of agricultural commodities provided approximately 14 percent of 2000 revenues and includes wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, and malt. The BNSF Railway system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. In addition to serving most grain-producing areas, BNSF Railway serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF Railway has access to major export markets in the Pacific Northwest, western Great Lakes, and Texas Gulf regions, and in Mexico.

Automotive. The transportation of both assembled motor vehicles and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about five percent of 2000 revenues.



<PAGE>

Freight Statistics. The following tables set forth certain freight statistics relating to rail operations for the periods indicated. Certain amounts have been reclassified to reflect changes in the business groups for years prior to 2000 and to conform to current year presentation.

| | Year Ended December 31, 2000 | 1999 | 1998 |
|---|---|---|---|
| Revenue ton-miles (millions) | 491,959 | 493,207 | 469,045 |
| Freight revenue per thousand revenue ton-miles | $18.52 | $18.40 | $19.08 |
| Average haul per ton (miles) | 996 | 994 | 970 |

For revenue, cars/units and average revenue per unit information for the three years ended December 31, 2000, see the revenue table included as part of Item 7, Management's Narrative Analysis of Results of Operations in this filing.

Government Regulation and Legislation

Rail operations are subject to the regulatory jurisdiction of the STB of the United States Department of Transportation (DOT), the Federal Railroad Administration of DOT, the Occupational Safety and Health Administration (OSHA), and state regulatory agencies. The STB, which is the successor to the Interstate Commerce Commission (ICC), has jurisdiction over certain rates, routes, and services, the extension, sale, or abandonment of rail lines, and consolidation or merger with, or acquisition of control of, rail common carriers. On October 3, 2000, the STB issued a Notice of Proposed Rulemaking relating to standards to be used in evaluating applications for authority to engage in certain railroad mergers, consolidations, and changes in control that are deemed "major transactions" under STB regulations. The proposed new standards are designed to increase the burden on applicants to demonstrate that a proposed merger is in the public interest. The rulemaking is expected to be completed in June 2001.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. These laws cover discharges to waters, air emissions, toxic substances, and the generation, handling, storage, transportation, and disposal of waste and hazardous materials. This regulation has the effect of increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject and will from time to time continue to be subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the "Superfund" law, generally imposes joint and several liability for cleanup and enforcement costs, without regard to fault or the legality of the original conduct, on current and former owners and operators of a site. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to clean up sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. For further discussion, see Note 11 to the Consolidated Financial Statements included in this filing.

Competition

The business environment in which BNSF Railway operates remains highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time sensitive freight. The potential expansion of longer

combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads strive to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the western region of the United States is Union Pacific Railroad Company (UP). Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway. Coal, one of BNSF Railway's primary commodities, continues to be subject to various types of competitive pressures.



<PAGE>

As a condition to approval of the merger of rail carriers controlled by Union Pacific and Southern Pacific, the STB in its 1996 decision required the grant to BNSF Railway of trackage rights over approximately 4,000 miles of UP/SP track. BNSF Railway also purchased over 335 miles of track from UP/SP as a result of the STB's decision. BNSF Railway and Union Pacific compete head-to-head in Gulf Coast, Intermountain and West Coast markets served by these lines. In 1998, BNSF Railway and UP entered into an agreement to exchange half interests in the two pieces of the former Southern Pacific Transportation Company ("SP") rail line between Houston and New Orleans which are separately owned by the two railroads. Both railroads now have access to all customers, including chemical, steel, gas and other companies, along the entire line, including on former SP branch lines.

The STB approved the carve-up of Consolidated Rail Corporation (Conrail) between CSX Corporation and Norfolk Southern Corporation which was implemented in 1999. CSX and Norfolk Southern operate the two largest rail systems in the eastern United States. Also, in 1999, Canadian National Railway Company (CN) acquired Illinois Central Corporation (IC). CN is Canada's largest railroad and reaches the U.S. cities of Detroit and Chicago, while IC has operations extending from Chicago to the Gulf of Mexico, and west through Iowa. In January 2001, CN announced its intention to acquire the Wisconsin Central, a regional railroad with track and trackage rights in Illinois, Wisconsin, Minnesota, Michigan, and the province of Ontario.

Item 3. Legal Proceedings

BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters and personal injury claims. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available, it is the opinion of BNSF Railway management that none of these items, when finally resolved, will have a material adverse effect on the results of operations, financial position or liquidity of BNSF Railway, although an adverse resolution of a number of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Reference is made to Note 4 to the Consolidated Financial Statements included in this filing for information concerning certain pending administrative appeals with the Internal Revenue Service.

PART II

Item 5. Market For Registrant's Common Equity And Related Stockholder Matters

All of BNSF Railway's common stock is owned by BNSF and therefore is not traded on any market.

Item 7. Management's Narrative Analysis of Results of Operations

Management's narrative analysis relates to the results of operations of The Burlington Northern and Santa Fe Railway Company and its majority-owned subsidiaries (collectively, BNSF Railway or Company). BNSF Railway is a wholly owned subsidiary of BNSF. The following narrative analysis should be read in conjunction with the Consolidated Financial Statements and notes (beginning on page 15).

Revenue Table

The following table presents BNSF Railway's revenue information by commodity for the years ended December 31, 2000 and 1999 and includes certain reclassifications of prior year information to conform to current year presentation.

<TABLE>
<CAPTION>

| | Revenues | | Cars/Units | | Average Revenue Per Car/Unit | |
|---|---|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 | 2000 | 1999 |
| | (In Millions) | | (In Thousands) | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Intermodal | $2,654 | $2,507 | 3,441 | 3,203 | $ 771 | $ 783 |
| Carload | 2,572 | 2,555 | 1,771 | 1,770 | $1,452 | $1,444 |
| Coal | 2,131 | 2,226 | 2,023 | 2,123 | 1,053 | 1,049 |
| Agricultural Commodities | 1,257 | 1,337 | 680 | 715 | 1,849 | 1,870 |
| Automotive | 493 | 443 | 249 | 250 | 1,980 | 1,772 |
| Total Freight Revenues | 9,107 | 9,068 | 8,164 | 8,061 | $1,115 | $1,125 |
| Other Revenues | 93 | 115 | | | | |
| Total Revenues | $9,200 | $9,183 | | | | |

</TABLE>



<PAGE>

RESULTS OF OPERATIONS

Year Ended December 31, 2000 Compared With Year Ended December 31, 1999

Net income in 2000 was $1,118 million compared with $1,229 million for 1999. The decrease in net income is primarily due to the effect of a $232 million increase in fuel expenses and recognition in 1999 of a gain of $50 million (pre-tax) in connection with prior period line sales, less costs of $13 million (pre-tax) related to those sales.

REVENUES

Total revenues for 2000 were $9,200 million or $17 million higher than 1999 revenues of $9,183 million. The $17 million increase primarily reflects increases in the intermodal, carload and automotive sectors, partially offset by lower coal and agricultural revenues. Average revenue per car/unit decreased in 2000 to $1,115 from $1,125 in 1999. Volumes increased for the year but experienced a general slowing late in 2000 based on economic conditions which have continued in January 2001. During 2000, based on reporting to the Association of American Railroads (AAR), BNSF Railway's share of the Western United States rail traffic market decreased 0.4 points to 43.1 percent.

Intermodal revenues of $2,654 million improved $147 million, or 6 percent, compared with 1999 reflecting increases in the international and truckload sectors, partially offset by decreases in the intermodal marketing companies (IMC) and direct marketing sectors. International revenues were up due to high levels of Trans-Pacific trade as well as market share gains with Mitsui, Yang Ming and Hapag Lloyd. Truckload revenues benefited from strong Schneider National loadings. These revenue increases were partially offset by decreases in the direct marketing sector due to decreased loadings within the less than truckload (LTL) segment and in the IMC sector due to pricing pressures, and strong over the road competition.

Carload revenues, which include revenues from the chemicals, forest products, metals, minerals and machinery, perishable and dry boxcar sectors, of $2,572 million for 2000 were $17 million, or 1 percent, higher than 1999 due to increases from the metals, perishables, and minerals sectors, partially offset by decreased chemicals, forest products, and machinery revenues. The metals increases were a result of a strong market for steel; the growth in perishables was from the success of new service offerings and a partial recapture of the truck market, and increases in minerals were due to higher demand for clay and sand used in domestic oil production. These increases were partially offset by decreased shipments of industrial chemicals, softness in the forest products sector, and lower shipments of heavy machinery.

Coal revenues of $2,131 million for 2000 decreased $95 million, or 4 percent, as a result of volume decreases due to a decrease in demand as a result of milder weather and high customer inventories that affected shipments for most of the year, while 1999 benefited from an inventory build up in preparation for possible Year 2000 outages.

Agricultural commodities revenues of $1,257 million for 2000 were $80 million, or 6 percent, lower than 1999 due primarily to weaker corn export shipments to the Pacific Northwest and Mexico, and decreased shipments of Gulf and Pacific Northwest wheat, both caused by worldwide crop competition. Revenues were also lower as a result of decreased shipments of bulk foods due to an oversupply of sugar and supplier price competition in the syrup market which resulted in less traffic.

Automotive revenues of $493 million for 2000 were $50 million, or 11 percent, higher than 1999 reflecting increased industry-wide automobile production for most of the year and more profitable longer haul traffic despite essentially flat volumes year-over-year.

EXPENSES

Total operating expenses for 2000 were $7,096 million, an increase of $115 million or 2 percent, compared with operating expenses for 1999 of $6,981 million, despite a $232 million increase in fuel expenses.

Compensation and benefits expenses of $2,729 million were $41 million, or 1 percent, lower than 1999 primarily due to lower employment levels and reduced incentive expense partially offset by increased base wages.

Purchased services of $1,022 million for 2000 were $23 million, or 2 percent, lower than 1999 primarily as a result of decreased joint facility and contract

switching charges as well as recoveries related to prior periods. This decrease was partially offset by increased contract equipment maintenance costs due to an increase in the number of locomotives under maintenance contracts and volume-related increases in ramping expenses.

9

<PAGE>

Equipment rents expenses of $742 million were $10 million, or 1 percent, lower than 1999 as a result of lower lease rates on rail cars as well as a decrease in the number of leased agricultural commodity and coal cars, partially offset by increased locomotive rental expense.

Fuel expenses of $932 million for 2000 were $232 million, or 33 percent, higher than 1999, as a result of a 20 cent, or 35 percent, increase in the average all-in cost per gallon of diesel fuel, partially offset by a 1 percent decrease in consumption from 1,187 million gallons to 1,173 million gallons. The increase in the average all-in cost per gallon of diesel fuel includes a 34 cent increase in the average purchase price, partially offset by the favorable impact in 2000 from the Company's fuel hedging program of 13 cents per gallon compared with additional expense from hedging of 1 cent per gallon in 1999.

Materials and other expenses of $777 million for 2000 were $41 million, or 5 percent, lower than 1999 principally reflecting: (i) reorganization costs of $48 million incurred in the second quarter of 1999 for severance, pension, medical and other benefit costs for approximately 325 involuntarily terminated salaried employees (see Note 9 to the consolidated financial statements); (ii) lower current year environmental expenses and other materials costs compared with 1999; and (iii) higher current year gains from easement sales. Offsetting these decreases were: (i) $22 million of employee-related severance, medical and other benefit costs recorded in the second quarter of 2000 (see Note 9 to the consolidated financial statements) for approximately 150 involuntarily terminated employees, primarily material handlers in mechanical shops and trainmen reserve boards; (ii) $54 million credit for the reversal of certain liabilities associated with the consolidation of clerical functions in the second quarter 1999 (see Note 9 to the consolidated financial statements); (iii) the loss of previously earned state tax incentives in the second quarter 2000; and (iv) higher costs in 2000 related to the maintenance of leased equipment.

Interest expense with external parties was $184 million for both 2000 and 1999 reflecting no new external debt incurred in 2000.

Interest expense with related parties decreased $4 million to $103 million principally reflecting a lower net intercompany notes payable balance of $1,185 million at December 31, 2000 compared with $1,583 million at December 31, 1999. The decrease in net intercompany notes payable was due to the issuance of $487 of receivables, net of repayments,to BNSF throughout 2000, partially offset by additional BNSF Railway borrowings of $90 million during the year.

Other income (expense), net was unfavorable by $44 million compared with 1999 primarily due to a $50 million (pre-tax) deferred gain recognized during 1999 in connection with the sale of rail lines in Southern California in 1992 and 1993, (see Note 3 to the Company's consolidated financial statements).

OTHER MATTERS

FORWARD LOOKING INFORMATION

To the extent that the statements made by the Company in this annual report or otherwise relate to the Company's future economic performance or business outlook, predictions or expectations of financial or operational results, or refer to matters which are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. These forward-looking statements involve a number of risks and uncertainties, and actual results may differ materially. Factors that could cause actual results to

differ materially include, but are not limited to, economic and industry conditions: material adverse changes in economic or industry conditions, customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that produce and consume freight, changes in fuel prices, and labor difficulties including strikes; legal and regulatory factors: change in laws and regulations and the ultimate outcome of shipper claims, environmental investigations or proceedings and other types of claims and litigation; and operating factors: technical difficulties, changes in operating conditions and costs, competition and commodity concentrations as well as natural events such as severe weather, floods and earthquakes. The factors noted, individually or in combination could, among other things, limit demand and pricing, affect costs and the feasibility of certain operations, or affect traffic and pricing levels.

10

<PAGE>

Item 7A. Quantitative and Qualitative Disclosures About Market Risk

In the ordinary course of business, BNSF Railway utilizes various financial instruments, which inherently have some degree of market risk. The quantitative information presented below and the additional qualitative information presented in Notes 8 and 10 of the Consolidated Financial Statements describe significant aspects of BNSF Railway's financial instrument programs which have a material market risk.

INTEREST RATE SENSITIVITY

The tables below provide information about BNSF Railway's debt obligations that are sensitive to changes in interest rates as of December 31, 2000 and 1999. For debt obligations, the tables present principal cash flows and related weighted average interest rates by contractual maturity dates.

CURRENT AND LONG-TERM DEBT

<TABLE>
<CAPTION>

| | December 31, 2000 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2001 | 2002 | 2003 | 2004 | 2005 | Thereafter | Total | Fair Value |
| Fixed Rate Debt (in millions) | $ 232 | $ 288 | $ 145 | $ 244 | $ 140 | $1,591 | $2,640 | $2,661 |
| Average Interest Rate | 7.7% | 7.1% | 7.2% | 7.7% | 7.1% | 7.4% | 7.4% | - |

</TABLE>

<TABLE>
<CAPTION>

| | December 31, 1999 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2000 | 2001 | 2002 | 2003 | 2004 | Thereafter | | Fair |

| | | | | | | | Total | Value |
|---|---|---|---|---|---|---|---|---|
| Fixed Rate Debt (in millions) | $ 158 | $ 233 | $ 285 | $ 141 | $ 241 | $1,692 | $2,750 | $2,766 |
| Average Interest Rate | 6.5% | 7.7% | 7.1% | 7.2% | 7.7% | 7.4% | 7.4% | - |

</TABLE>

In April 2000, BNSF Railway issued $50 million of privately placed debt collateralized by locomotives that were acquired in 1999. This debt carries an interest rate of 7.77 percent and matures from April 2001 to 2015.

As described below, excluded from the 2000 and 1999 tables is $1,185 million and $1,583 million, respectively, of net intercompany notes payable to BNSF.

At December 31, 2000 and 1999, $1,579 million and $1,734 million, respectively, of intercompany notes payable to BNSF had a fixed interest rate of 6.9 percent. The remaining notes payable in both years had a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. During 2000, BNSF Railway made net payments of $155 million on its 6.9 percent fixed rate notes and incurred additional net borrowings of $245 million of variable rate notes. The proceeds were primarily used to fund capital expenditures and other investing activities. Interest is paid semi-annually on all intercompany notes payable. Interest expense on intercompany notes payable is reflected in interest expense, related parties in the consolidated income statement. The intercompany notes are due on demand; however, it is not anticipated that BNSF Railway will be required to pay these obligations in 2000.

At December 31, 2000 and 1999, BNSF Railway had $639 million and $765 million, respectively, of intercompany notes receivable with a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. In the consolidated balance sheet, the intercompany notes payable are presented net of the intercompany notes receivable discussed above. Interest income on intercompany notes receivable is reflected in interest expense, related parties in the consolidated income statement.

COMMODITY PRICE SENSITIVITY

Historically, fuel expenses have approximated 10 percent of total operating expenses; however, fuel costs during 2000 represent 13 percent of total operating expenses due to significantly higher fuel prices. Due to the significance of diesel fuel expenses to the operations of BNSF Railway and the historical volatility of fuel prices, the Company maintains a program to hedge against fluctuations in the price of its diesel fuel purchases. The intent of the program is to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. The fuel-hedging program includes the use of commodity swap transactions that are accounted for as hedges. Any gains or losses associated with changes in the market value of the fuel swaps are deferred and recognized as a component of fuel expense in the period in which the fuel is purchased and used.



<PAGE>

Swap transactions are typically based on the price of pipeline delivery of Gulf Coast #2 heating oil and require BNSF Railway to purchase a defined quantity at a defined price. Swap transactions are generally settled with the counterparty

in cash. Based on historical information, BNSF Railway believes there is a significant correlation between the market prices of diesel fuel and Gulf Coast #2 heating oil.

The tables below provide information about BNSF Railway's diesel fuel hedging instruments that are sensitive to changes in commodity prices. The tables present notional amounts in gallons and the weighted average contract price by contractual maturity date. The prices included in the tables do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur from time to time between the prices of commodities hedged and the purchase price of BNSF Railway's diesel fuel.

<TABLE>
<CAPTION>

| | December 31, 2000 | | | |
|---|---|---|---|---|
| | Maturity Date | | | |
| | 2001 | 2002 | Total | Fair Value (1) |
| Diesel Fuel Swaps: | | | | |
| Gallons (in millions) | 277 | 101 | 378 | $74 |
| Weighted average price per gallon | $0.49 | $0.50 | $0.50 | - |

</TABLE>

<TABLE>
<CAPTION>

| | December 31, 1999 | | | | |
|---|---|---|---|---|---|
| | Maturity Date | | | | |
| | 2000 | 2001 | 2002 | Total | Fair Value (1) |
| Diesel Fuel Swaps: | | | | | |
| Gallons (in millions) | 491 | 277 | 101 | 869 | $37 |
| Weighted average price per gallon | $0.50 | $0.49 | $0.50 | $0.50 | - |

</TABLE>

(1) Represents unrecognized gains (in millions) based on the price of Gulf Coast #2 heating oil.

Additionally, at December 31, 2000 and 1999, BNSF Railway maintained fuel inventories for use in normal operations which were not material to BNSF Railway's overall financial position and therefore represent no significant market exposure.



<PAGE>

Item 8. Financial Statements and Supplementary Data

The consolidated financial statements of BNSF Railway, together with the report

thereon, are included as part of this filing.

(a) The following documents are filed as a part of this report:
<TABLE>
<CAPTION>

Page

--------------
<S>
<C>
1. Consolidated Financial Statements:

Report of PricewaterhouseCoopers LLP
14
Consolidated Statement of Income for the three years ended December 31, 2000
15
Consolidated Balance Sheet at December 31, 2000 and 1999
16
Consolidated Statement of Cash Flows for the three years ended December 31, 2000
17
Consolidated Statement of Changes In Stockholder's Equity
for the three years ended December 31, 2000
18
Notes to Consolidated Financial Statements
19-29
</TABLE>

13

<PAGE>

REPORT OF INDEPENDENT ACCOUNTANTS

To the Stockholder and Board of Directors of
The Burlington Northern and Santa Fe Railway Company and Subsidiaries

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of The Burlington Northern and Santa Fe Railway Company and subsidiary companies at December 31, 2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2000 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule appearing under Item 14(a)(2) on page 29 presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and the financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and the financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP
------------------------------
PricewaterhouseCoopers LLP
Fort Worth, Texas
February 2, 2001

14

<PAGE>

CONSOLIDATED STATEMENT OF INCOME

The Burlington Northern and Santa Fe Railway Company and Subsidiaries
(Dollars in millions)

<TABLE>
<CAPTION>

| Year ended December 31, | 2000 | 1999 | 1998 |
|---|---|---|---|
| Revenues | $9,200 | $9,183 | $9,049 |
| Operating expenses: | | | |
| Compensation and benefits | 2,729 | 2,770 | 2,811 |
| Purchased services | 1,022 | 1,045 | 1,020 |
| Depreciation and amortization | 894 | 896 | 831 |
| Equipment rents | 742 | 752 | 804 |
| Fuel | 932 | 700 | 721 |
| Materials and other | 777 | 818 | 707 |
| Total operating expenses | 7,096 | 6,981 | 6,894 |
| Operating income | 2,104 | 2,202 | 2,155 |
| Interest expense | 184 | 184 | 178 |
| Interest expense, related parties | 103 | 107 | 115 |
| Other income (expense), net | (5) | 39 | 77 |
| Income before income taxes | 1,812 | 1,950 | 1,939 |
| Income tax expense | 694 | 721 | 733 |
| Net income | $1,118 | $1,229 | $1,206 |

</TABLE>

See accompanying notes to consolidated financial statements.

<PAGE>

CONSOLIDATED BALANCE SHEET
The Burlington Northern and Santa Fe Railway Company and Subsidiaries
(Dollars in millions)

<TABLE>

| | December 31, 2000 | 1999 |
|---|---|---|
| ASSETS | | |
| Current assets: | | |
| Cash and cash equivalents | $ 117 | $ 79 |
| Accounts receivable, net | 381 | 394 |
| Materials and supplies | 220 | 255 |
| Current portion of deferred income taxes | 299 | 326 |
| Other current assets | 125 | 63 |
| Total current assets | 1,142 | 1,117 |
| Property and equipment, net | 22,286 | 21,622 |
| Other assets | 1,008 | 898 |
| Total assets | $24,436 | $23,637 |
| LIABILITIES AND STOCKHOLDER'S EQUITY | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | $ 1,921 | $ 2,052 |
| Long-term debt due within one year | 232 | 158 |
| Total current liabilities | 2,153 | 2,210 |
| Long-term debt | 2,408 | 2,592 |
| Intercompany notes payable, net | 1,185 | 1,583 |
| Deferred income taxes | 6,398 | 6,063 |
| Casualty and environmental liabilities | 430 | 423 |
| Employee merger and separation costs | 262 | 302 |
| Other liabilities | 1,026 | 1,005 |

| | | |
|---|---|---|
| Total liabilities | 13,862 | 14,178 |
| Commitments and contingencies (see Notes 8, 10 and 11) | | |
| Stockholder's equity: | | |
| Common stock, $1 par value, (1,000 shares authorized, issued and outstanding) and paid-in capital | 4,706 | 4,706 |
| Retained earnings | 5,878 | 4,760 |
| Accumulated other comprehensive deficit | (10) | (7) |
| Total stockholder's equity | 10,574 | 9,459 |
| Total liabilities and stockholder's equity | $24,436 | $23,637 |

</TABLE>

See accompanying notes to consolidated financial statements.

16

<PAGE>

CONSOLIDATED STATEMENT OF CASH FLOWS
The Burlington Northern and Santa Fe Railway Company and Subsidiaries
(Dollars in millions)

<TABLE>
<CAPTION>

| Year ended December 31, | 2000 | 1999 | 1998 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| OPERATING ACTIVITIES | | | |
| Net income | $ 1,118 | $ 1,229 | $ 1,206 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 894 | 896 | 831 |
| Deferred income taxes | 362 | 438 | 461 |
| Employee merger and separation costs paid | (58) | (93) | (77) |
| Other, net | 21 | (128) | (218) |
| Changes in current assets and liabilities: | | | |
| Accounts receivable | 13 | 198 | (318) |
| Materials and supplies | 35 | (11) | (39) |

| | | | |
|---|---|---|---|
| Other current assets | (62) | (30) | 20 |
| Accounts payable and other current liabilities | (115) | 203 | 241 |
| Net cash provided by operating activities | 2,208 | 2,702 | 2,107 |
| INVESTING ACTIVITIES | | | |
| Capital expenditures | (1,399) | (1,786) | (2,147) |
| Other, net | (265) | (152) | (271) |
| Net cash used for investing activities | (1,664) | (1,938) | (2,418) |
| FINANCING ACTIVITIES | | | |
| Proceeds from issuance of long-term debt | 50 | 279 | 294 |
| Payments on long-term debt | (160) | (293) | (112) |
| Net increase (decrease) in intercompany notes payable | (397) | (705) | 225 |
| Other, net | 1 | (61) | (1) |
| Net cash provided by (used in) financing activities | (506) | (780) | 406 |
| Increase (decrease) in cash and cash equivalents | 38 | (16) | 95 |
| Cash and cash equivalents: | | | |
| Beginning of year | 79 | 95 | - |
| End of year | $ 117 | $ 79 | $ 95 |
| SUPPLEMENTAL CASH FLOW INFORMATION | | | |
| Interest paid, net of amounts capitalized | $ 309 | $ 312 | $ 329 |
| Income taxes paid, net of refunds | $ 408 | $ 144 | $ 113 |

</TABLE>

See accompanying notes to consolidated financial statements.



<PAGE>

CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDER'S EQUITY
The Burlington Northern and Santa Fe Railway Company and Subsidiaries

(Dollars in millions)

<TABLE>
<CAPTION>

| <S> | Common Stock and Paid-in Capital <C> | Retained Earnings <C> | Accumulated Other Comprehensive Deficit <C> | Total <C> |
|---|---|---|---|---|
| Balance at December 31, 1997 | $4,706 | $2,324 | $ (7) | $ 7,023 |
| Comprehensive income: | | | | |
| Net income | - | 1,206 | - | 1,206 |
| Minimum pension liability adjustment (net of tax benefit of $0.5) | - | - | (1) | (1) |
| Total comprehensive income | | | | 1,205 |
| Balance at December 31, 1998 | 4,706 | 3,530 | (8) | 8,228 |
| Comprehensive income: | | | | |
| Net income | - | 1,229 | - | 1,229 |
| Minimum pension liability adjustment (net of tax expense of $0.5) | - | | 1 | 1 |
| Total comprehensive income | | | | 1,230 |
| Other | - | 1 | - | 1 |
| Balance at December 31, 1999 | 4,706 | 4,760 | (7) | 9,459 |
| Comprehensive income: | | | | |
| Net income | - | 1,118 | - | 1,118 |
| Minimum pension liability adjustment (net of tax benefit of $1.5) | - | | (3) | (3) |
| Total comprehensive income | | | | 1,115 |

| | | | | |
|---|---|---|---|---|
| Balance at December 31, 2000 | $4,706 | $5,878 | $(10) | $10,574 |

</TABLE>

See accompanying notes to consolidated financial statements.



<PAGE>

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
AND SUBSIDIARIES

1. THE COMPANY

The Burlington Northern and Santa Fe Railway Company and its majority owned subsidiaries (BNSF Railway or Company) is a wholly owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF). BNSF Railway operates one of the largest railroad networks in the United States, with approximately 33,500 route miles covering 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of containers and trailers (intermodal), coal and agricultural commodities which constituted 29 percent, 23 percent and 14 percent, respectively, of total revenues for the year ended December 31, 2000. Other significant aspects of BNSF's business include the transportation of chemicals, forest products, consumer goods, metals, minerals, automobiles and automobile parts. Revenues derived from other sources are not significant.

BNSF Railway was formerly known as the Burlington Northern Railroad Company (BNRR). On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into Burlington Northern Railroad Company (BNRR) and the name of the surviving entity, BNRR, was changed to the Burlington Northern and Santa Fe Railway Company. Additionally, on January 2, 1998, BNSF Railway's parent, Santa Fe Pacific Corporation (SFP), merged with and into BNSF Railway.

2. ACCOUNTING POLICIES

PRINCIPLES OF CONSOLIDATION

The consolidated financial statements include the accounts of BNSF Railway. All significant intercompany accounts and transactions have been eliminated.

USE OF ESTIMATES

The preparation of financial statements in accordance with generally accepted accounting principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. Actual results could differ from those estimates.

RECLASSIFICATIONS

Certain comparative prior year amounts in the consolidated financial statements and accompanying notes have been reclassified to conform with the current year presentation. These reclassifications had no effect on previously reported operating income and net income.

CASH AND CASH EQUIVALENTS

All short-term investments with original maturities of less than 90 days are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

MATERIALS AND SUPPLIES

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

PROPERTY AND EQUIPMENT

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. Upon normal sale or retirement of depreciable railroad property, cost less net salvage value is charged to accumulated depreciation and no gain or loss is recognized. Significant premature retirements and the disposal of land and non-rail property are recorded as gains or losses at the time of their occurrence. Expenditures which significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

19

<PAGE>

REVENUE RECOGNITION

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed.

The Company adopted Emerging Issues Task Force Issue No. 99-19, Reporting Revenue Gross as a Principal Versus Net as an Agent, beginning in the fourth quarter of 2000. Accordingly, reclassifications were made between revenue and operating expense for all periods presented. These reclassifications had no effect on previously reported operating income and net income.

3. OTHER INCOME (EXPENSE), NET

Other income (expense), net includes the following (in millions):

| Year ended December 31, | 2000 | 1999 | 1998 |
|---|---|---|---|
| Gain on property dispositions | $ 29 | $ 26 | $ 48 |
| Deferred gain on prior period line sales | - | 50 | - |
| Gain on sale of Pipeline Partnership | - | - | 67 |
| Equity in earnings of Pipeline Partnership | - | - | 4 |
| Accounts receivable sale fees | (40) | (33) | (34) |
| Miscellaneous, net | 6 | (4) | (8) |
| Total | $ (5) | $ 39 | $ 77 |

BNSF Railway recognized a $50 million deferred gain in the third quarter of 1999 in connection with the sale of rail lines in Southern California in 1992 and 1993 that was partially offset by $13 million of costs related to those sales.

Santa Fe Pacific Pipelines, Inc. (SFP Pipelines), an indirect, wholly-owned subsidiary of BNSF Railway, served as the general partner of Santa Fe Pacific Pipeline Partners, L.P. (Pipeline Partnership) and of its operating partnership subsidiary, SFPP, L.P. SFP Pipelines owned a two percent interest as the Pipeline Partnership's and SFPP, L.P.'s general partner and an approximate 42 percent interest in partnership units of the Pipeline Partnership. SFP Pipeline Holdings, Inc., an indirect, wholly-owned subsidiary of BNSF Railway (SFP Holdings), had outstanding $219 million principal amount of Variable Rate Exchangeable Debentures due 2010 (VREDs) at December 31, 1997.

On March 6, 1998, Kinder Morgan Energy Partners, L.P. (Kinder Morgan) acquired substantially all of SFP Pipelines' interest in the Pipeline Partnership and SFPP, L.P. for approximately $84 million in cash. The Pipeline Partnership was liquidated as part of the transaction and SFP Pipelines' partnership units were converted into the right to receive Kinder Morgan common units. Consummation of the transaction caused an "Exchange Event" under the VRED agreement and in June 1998 all VRED holders received either partnership units of Kinder Morgan or cash equal to the par value of the VREDs. In addition, the agreement called for SFP Pipelines' interest in SFPP, L.P. to be partially redeemed for a cash distribution of $5.8 million, with SFP Pipelines retaining only a 0.5 percent special limited partnership interest in SFPP, L.P. As a result of the transaction, the Company recognized a $67 million gain and substantially all of the Company's investment in the Pipeline Partnership and SFPP, L.P. and the VREDs were removed from the consolidated balance sheet.

4. INCOME TAXES

Income tax expense was as follows (in millions):

| Year ended December 31, | 2000 | 1999 | 1998 |
|---|---|---|---|
| Current: | | | |
| Federal | $ 289 | $ 256 | $ 247 |
| State | 43 | 27 | 25 |
| | 332 | 283 | 272 |
| Deferred: | | | |
| Federal | 308 | 379 | 399 |
| State | 54 | 59 | 62 |
| | 362 | 438 | 461 |
| Total | $ 694 | $ 721 | $ 733 |



<PAGE>

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| Year ended December 31, | 2000 | 1999 | 1998 |
|---|---|---|---|
| Federal statutory income tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | 3.5 | 2.9 | 2.9 |
| Other, net | (0.2) | (0.9) | (0.1) |
| Effective tax rate | 38.3% | 37.0% | 37.8% |

The components of deferred tax assets and liabilities were as follows (in millions):

| December 31, | 2000 | 1999 |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation and amortization | $(6,382) | $(6,106) |
| Other | (440) | (395) |
| Total deferred tax liabilities | (6,822) | (6,501) |
| Deferred tax assets: | | |
| Casualty and environmental | 273 | 272 |
| Employee merger and separation costs | 119 | 137 |
| Postretirement benefits | 95 | 93 |
| Other | 236 | 262 |
| Total deferred tax assets | 723 | 764 |
| Net deferred tax liability | $(6,099) | $(5,737) |
| Noncurrent deferred income tax liability | $(6,398) | $(6,063) |
| Current deferred income tax asset | 299 | 326 |
| Net deferred tax liability | $(6,099) | $(5,737) |

In accordance with the income tax allocation agreement between BNSF and BNSF Railway, the Company makes payments to or receives refunds from BNSF based on its separate consolidated tax liabilities. The federal income tax returns of BNSF's predecessor companies, Burlington Northern, Inc. (BNI) and Santa Fe Pacific Corporation (SFP) have been examined through 1994 and the merger date in September 1995, respectively. All years prior to 1992 for BNI and 1993 for SFP are closed. Issues relating to the years 1992-1994 for BNI and for the years 1993 through the merger date in September, 1995 for SFP are being contested through various stages of administrative appeal. BNSF is currently under IRS examination for years 1995-1997. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Management believes that adequate provision has been made for any adjustment that might be assessed for open years through 2000.

5. ACCOUNTS RECEIVABLE, NET

BNSF Railway, through a special purpose subsidiary, has an account receivable sales agreement which allows it to sell up to $600 million of variable rate certificates that mature in 2002 and evidence undivided interests in an accounts receivable master trust. The master trust's assets include an ownership interest in a revolving portfolio of BNSF Railway's accounts receivable which are used to support the certificates.

At both December 31, 2000 and 1999, $600 million of certificates were outstanding. These certificates were supported by $882 million of receivables at December 31, 2000 and $972 million of receivables at December 31, 1999. When BNSF Railway sells these receivables to the master trust it retains an undivided interest in the receivables sold. Due to a relatively short collection cycle, the fair value of this undivided interest is calculated as the gross amount receivable less an allowance for uncollectible accounts. At December 31, 2000 and 1999, BNSF Railway's retained interest in these receivables totaled $282 million and $372 million, respectively, less the normal allowances for uncollectible accounts. The retained interest in both years reflects the total receivables sold less $600 million of receivables derecognized in connection with the sale of the certificates. The investors in the master trust have no recourse to BNSF Railway's other assets.

BNSF Railway has retained the collection responsibility with respect to the accounts receivable. The costs of the sales of receivables to the master trust vary monthly relative to certain interest rates. These costs are included in Other Income (Expense), Net. The costs of these sales in 2000 and 1999 were $40 million and $33 million, respectively. These costs were based on weighted average interest rates of 6.7% in 2000 and 5.5% in 1999. Proceeds from collections reinvested in the securitization were approximately $10 billion each year in 2000 and 1999.

BNSF Railway maintains an allowance for uncollectible accounts receivable. At December 31, 2000 and 1999, $45 million and $50 million, respectively, of such allowances had been recorded.

6. PROPERTY AND EQUIPMENT, NET

Property and equipment, net (in millions), and the weighted average annual depreciation rate percentages were as follows:

<TABLE>

| December 31, | 2000 | 1999 | 2000 Depreciation Rate |
|---|---|---|---|
| Land | $ 1,406 | $ 1,416 | - |
| Track structure | 11,879 | 11,301 | 4.0% |
| Other roadway | 9,117 | 8,864 | 2.5 |
| Locomotives | 2,798 | 2,601 | 5.0 |
| Freight cars and other equipment | 1,821 | 1,838 | 3.8 |
| Computer hardware and software | 331 | 446 | 14.7 |
| Total cost | 27,352 | 26,466 | |
| Less accumulated depreciation and amortization | (5,066) | (4,844) | |
| Property and equipment, net | $22,286 | $21,622 | |

</TABLE>

The consolidated balance sheet at December 31, 2000 and 1999 included $1,195 million and $1,218 million, respectively, for property and equipment under capital leases.

7. ACCOUNTS PAYABLE AND OTHER CURRENT LIABILITIES

Accounts payable and other current liabilities consisted of the following (in millions):

| December 31, | 2000 | 1999 |
|---|---|---|
| Compensation and benefits payable | $ 351 | $ 375 |
| Casualty and environmental liabilities | 229 | 255 |
| Tax liabilities | 257 | 337 |
| Accounts payable | 203 | 261 |
| Rents and leases | 142 | 160 |
| Contract allowances | 109 | 96 |
| Employee merger and separation costs | 49 | 54 |
| Other | 581 | 514 |
| Total | $1,921 | $2,052 |



<PAGE>

8. DEBT

Debt outstanding was as follows (in millions):

| December 31, | 2000 | 1999 |
|---|---|---|
| Capitalized lease obligations, weighted average rate of 6.6%, due 2001 to 2016 | $ 736 | $ 791 |
| Equipment and other obligations, weighted average rate of 7.3%, due 2001 to 2016 | 742 | 755 |
| Notes and debentures, weighted average rate of 7.9%, due 2001 to 2023 | 718 | 720 |
| Mortgage bonds, weighted average rate of 7.9%, due 2001 to 2047 | 467 | 503 |
| Unamortized discount and other, net | (23) | (19) |
| Total | 2,640 | 2,750 |
| Less current portion of long-term debt | (232) | (158) |
| Long-term debt | $2,408 | $2,592 |

Aggregate long-term debt scheduled maturities are $232 million, $288 million, $145 million, $244 million and $140 million for 2000 through 2005, respectively.

Most BNSF Railway properties and certain other assets are pledged as collateral to, or are otherwise restricted under, the various BNSF Railway long-term debt agreements. Equipment obligations and capital leases are secured by the underlying equipment. During 2000, BNSF Railway issued $50 million of privately placed debt collateralized by locomotives that were acquired in 1999. This debt carries an interest rate of 7.77 percent and matures from April 2001 to 2015.

SFP Pipelines, Inc. in connection with its remaining 0.5 percent special limited partner interest in SFPP, L.P., is contingently liable for $190 million certain Kinder Morgan debt pursuant to the sale discussed in Note 3: Other Income (Expense), Net. In addition, BNSF Railway and another major railroad jointly and severally guarantee $75 million of debt of KCT Intermodal Transportation Corporation, the proceeds of which are being used to finance the construction of a double track grade separation bridge in Kansas City, Missouri, to be operated and used by Kansas City Terminal Railway Company.

The carrying amounts of BNSF Railway's long-term debt at December 31, 2000 and 1999 were $2,640 million and $2,750 million, respectively, while the estimated fair values at December 31, 2000 and 1999 were $2,661 million and $2,766 million, respectively. The fair value of BNSF Railway's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF Railway for debt of the same remaining maturities.

9. EMPLOYEE MERGER AND SEPARATION COSTS

Employee merger and separation liabilities of $310 million and $356 million are included in the consolidated balance sheet at December 31, 2000 and 1999, respectively, and principally represent: (i) employee-related severance costs for the consolidation of clerical functions; (ii) deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; and (iii) certain non-union employee severance costs. Employee merger and separation expenses are recorded in Materials and Other in the Company's consolidated income statement.

CONSOLIDATION OF CLERICAL FUNCTIONS
Liabilities related to the consolidation of clerical functions were $96 million and $119 million at December 31, 2000 and 1999, respectively, and primarily provide for severance costs associated with the clerical consolidation plan adopted in 1995 upon consummation of the business combination of BNSF's predecessor companies Burlington Northern, Inc. and Santa Fe Pacific Corporation

(the Merger). The consolidation plan resulted in the elimination of approximately 1,500 permanent positions and was substantially completed during 1999.

In the fourth quarter of 2000 and the second quarter of 1999, the Company recorded a $10 million and $54 million, respectively, reversal of certain liabilities associated with the consolidation plan. These liabilities related to planned work-force reductions that are no longer required due to the Company's ability to place certain identified employees in alternate positions. The remaining liability balance at December 31, 2000 represents benefits to be paid to affected employees who did not receive lump-sum payments, but instead will be paid over five to ten years or in some cases through retirement.

In the second quarter of 2000, the Company recorded a charge of $17 million for severance, medical and other benefit costs related to approximately 140 material handlers in mechanical shops. Liabilities remaining at December 31, 2000 related to this program reflect elections to receive payments over the next several years, rather than lump sum payments.



<PAGE>

CONDUCTORS, TRAINMEN AND LOCOMOTIVE ENGINEERS
Liabilities related to deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were $183 million and $193 million at December 31, 2000 and 1999, respectively. These costs were primarily incurred in connection with labor agreements reached prior to the Merger which, among other things, reduced train crew sizes and allowed for more flexible work rules.

In the second quarter of 2000, the Company incurred $3 million of costs for severance, medical and other benefit costs for approximately 50 trainmen on reserve boards. The remaining reserve of less than $1 million will be paid over the next two years to severed employees who elected to receive their payments over time.

NON-UNION EMPLOYEE SEVERANCE
Liabilities principally related to certain remaining non-union employee severances resulting from the May 1999 reorganization and from the Merger were $30 million and $44 million at December 31, 2000 and 1999, respectively. These costs will be paid over the next several years based on deferral elections made by the employees.

In the second quarter of 2000, the Company incurred $2 million of costs for severance, medical and other benefit costs for ten involuntarily terminated non-union positions. All of these planned reductions were completed at December 31, 2000.

In the second quarter of 1999, the Company incurred $45 million of reorganization costs for severance, pension, medical and other benefit costs for approximately 325 involuntarily terminated non-union employees that were part of the program announced in May 1999 that sought to reduce operating expenses by eliminating approximately 400 non-union and 1,000 scheduled (union) positions through severances, normal attrition and the elimination of contractors. Components of the charge include approximately $29 million relating to severance costs for non-union employees, and approximately $16 million for special termination benefits to be received under the Company's retirement and medical plans. Substantially all of the planned reductions were made by September 30, 1999. No significant costs were incurred as a result of eliminating the 1,000 scheduled positions.

During 2000, 1999 and 1998, BNSF Railway made employee merger and separation payments of $58 million, $93 million and $77 million, respectively. At December 31, 2000, $49 million of the remaining liabilities are included within current liabilities for anticipated costs to be paid in 2001.

10. HEDGING ACTIVITIES

FUEL
Historically, fuel expenses have approximated 10 percent of total operating expenses; however, fuel costs during 2000 represent 13 percent of total operating expenses due to significantly higher than historical fuel prices. Due to the significance of diesel fuel expenses to the operations of BNSF Railway and the historical volatility of fuel prices, the Company maintains a program to hedge against fluctuations in the price of its diesel fuel purchases. The intent of the program is to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. The fuel-hedging program includes the use of commodity swap transactions that are accounted for as hedges. Any gains or losses associated with changes in the market value of the fuel swaps are deferred and recognized as a component of fuel expense in the period in which the fuel is purchased and used. Based on 2000 fuel consumption and excluding the impact of the hedging program, each one-cent increase in the price of fuel would result in approximately $12 million of additional fuel expense on an annual basis.

As of January 31, 2001, BNSF Railway had entered into fuel swaps for approximately 378 million gallons at an average price of approximately 50 cents per gallon. The above price does not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur from time to time between the prices of commodities hedged and the purchase price of BNSF Railway's diesel fuel. Currently, BNSF Railway's fuel hedging program covers approximately 24 percent and 8 percent of estimated annual fuel purchases for 2001 and 2002, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period. Unrecognized gains from BNSF Railway's fuel swap transactions were approximately $74 million as of December 31, 2000, of which $60 million relates to swap transactions that will expire in 2001. BNSF Railway also monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance. Receivables from fuel hedging activities of $50 million and $29 million at December 31, 2000 and 1999, respectively, are recorded in the Company's consolidated balance sheet as part of Other Current Assets and represent settled fuel hedging contracts.



<PAGE>

11. COMMITMENTS AND CONTINGENCIES

LEASE COMMITMENTS
BNSF Railway has substantial lease commitments for locomotives, freight cars, trailers, office buildings and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments (which reflect leases having non-cancelable lease terms in excess of one year) as of December 31, 2000 are summarized as follows (in millions):

| Year ended December 31 | Capital Leases | Operating Leases |
|---|---|---|
| 2001 | $ 112 | $ 345 |
| 2002 | 106 | 311 |
| 2003 | 106 | 299 |
| 2004 | 106 | 294 |
| 2005 | 97 | 275 |
| Thereafter | 434 | 3,082 |

| | | |
|---|---|---|
| Total | 961 | $4,606 |
| Less amount representing interest | 225 | |
| Present value of minimum lease payments | $ 736 | |

Lease rental expense for all operating leases was $424 million, $435 million and $466 million for the years ended December 31, 2000, 1999 and 1998, respectively. Contingent rentals and sublease rentals were not significant.

OTHER COMMITMENTS
BNSF Railway has entered into commitments to acquire 100 locomotives in 2001. The locomotives will be financed from one or a combination of sources including, but not limited to, cash from operations, capital or operating leases, and debt issuances. The decision on the method used will depend upon then current market conditions and other factors.

ENVIRONMENTAL
BNSF Railway's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF Railway's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is subject to environmental clean-up and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the "Superfund" law, as well as similar state laws generally impose joint and several liability for clean-up and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF Railway has been notified that it is a potentially responsible party (PRP) for study and clean-up costs at approximately 31 Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF Railway may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF Railway may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF Railway generally participates in the clean-up of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Environmental costs include initial site surveys and environmental studies of potentially contaminated sites as well as costs for remediation and restoration of sites determined to be contaminated. Liabilities for environmental clean-up costs are initially recorded when BNSF Railway's liability for environmental clean-up is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. BNSF Railway conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews, analysis of the likelihood of participation in and the ability of other PRPs to pay for clean-up, and historical trend analyses.

25

<PAGE>

BNSF Railway is involved in a number of administrative and judicial proceedings and other mandatory clean-up efforts at approximately 385 sites, including the Superfund sites, at which it is participating in the study or clean-up, or

both, of alleged environmental contamination. BNSF Railway paid approximately $49 million, $67 million and $64 million during 2000, 1999 and 1998, respectively, for mandatory and unasserted clean-up efforts, including amounts expended under federal and state voluntary clean-up programs. The Company had recorded liabilities for remediation and restoration of all known sites of approximately $223 million at December 31, 2000 compared to $232 million at December 31, 1999. BNSF Railway anticipates that the majority of the accrued costs at December 31, 2000 will be paid over the next five years. No individual site is considered to be material.

Liabilities recorded for environmental costs represent BNSF Railway's best estimates for remediation and restoration of these sites and include both asserted and unasserted claims. Unasserted claims are not considered to be a material component of the liability. Although recorded liabilities include BNSF Railway's best estimates of all costs, without reduction for anticipated recoveries from third parties, BNSF Railway's total clean-up costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in clean-up efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of potentially contaminated sites. As a result, future charges to income for environmental liabilities could have a significant effect on results of operations in a particular quarter or fiscal year as individual site studies and remediation and restoration efforts proceed or as new sites arise. However, management believes that it is unlikely that any identified matters, either individually or in the aggregate, will have a material adverse effect on BNSF Railway's consolidated results of operations, financial position or liquidity.

OTHER CLAIMS AND LITIGATION
BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters and personal injury claims. While the final outcome of these items cannot be predicted with certainty, considering among other things the meritorious legal defenses available, it is the opinion of management that none of these items, when finally resolved, will have a material adverse effect on the results of operations, financial position or liquidity of BNSF Railway, although an adverse resolution of a number of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

12. RETIREMENT PLANS AND OTHER POSTEMPLOYMENT BENEFIT PLANS

BNSF Railway is included with certain other BNSF Railway affiliates in the qualified BNSF Retirement Plan and the nonqualified BNSF Supplemental Retirement Plan.

BNSF sponsors two significant defined benefit pension plans: the noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees, and the nonqualified BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under BNSF's plans are based on years of credited service and the highest five year average compensation levels. BNSF Railway's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes.

Certain salaried employees of BNSF Railway that have met certain age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The life insurance plan is noncontributory and covers retirees only. BNSF Railway's policy is to fund benefits payable under the medical and life insurance plans as they come due.

Employees beginning salaried employment with BNSF Railway subsequent to September 22, 1995 are not eligible for benefits under these plans.

Components of the net benefit costs for these plans were as follows (in millions):

<TABLE>
<CAPTION>

| | Pension Benefits | | | Medical and Life Benefits | | |
|---|---|---|---|---|---|---|
| Year ended December 31, | 2000 | 1999 | 1998 | 2000 | 1999 | 1998 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Service cost | $ 13 | $ 15 | $ 15 | $ 4 | $ 5 | $ 4 |
| Interest cost | 100 | 100 | 101 | 18 | 17 | 16 |
| Expected return on plan assets | (129) | (126) | (117) | - | - | - |
| Special termination benefits | - | 10 | - | - | 6 | - |
| Net amortization and deferred amounts | 3 | 3 | 4 | 1 | 1 | - |
| Net benefit cost | $ (13) | $ 2 | $ 3 | $ 23 | $ 29 | $ 20 |

</TABLE>

26

<PAGE>

The following tables show the change in benefit obligation and plan assets of the plans (in millions):

<TABLE>
<CAPTION>

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| Change in benefit obligation | 2000 | 1999 | 2000 | 1999 |
| <S> | <C> | <C> | <C> | <C> |
| Benefit obligation at beginning of year | $1,387 | $1,487 | $ 244 | $ 249 |
| Service cost | 13 | 15 | 4 | 5 |
| Interest cost | 100 | 100 | 18 | 17 |
| Plan participants' contributions | - | - | 3 | 4 |
| Amendments | - | - | (7) | - |
| Actuarial (gain) loss | 39 | (115) | 7 | (17) |
| Special termination benefits | - | 10 | - | 6 |
| Curtailment loss | - | 7 | - | - |
| Benefits paid | (120) | (117) | (22) | (20) |
| Benefit obligation at end of year | $1,419 | $1,387 | $ | |

247 $ 244

</TABLE>

<TABLE>
<CAPTION>

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| Change in plan assets | 2000 | 1999 | 2000 | 1999 |
| <S> | <C> | <C> | <C> | <C> |
| Fair value of plan assets at beginning of year | $1,530 | $1,469 | $ - | $ - |
| Actual return on plan assets | 162 | 174 | - | - |
| Employer contribution | 5 | 4 | 19 | 16 |
| Plan participants' contributions | - | - | 3 | 4 |
| Benefits paid | (120) | (117) | (22) | (20) |
| Fair value of plan assets at end of year | $1,577 | $1,530 | $ - | $ - |

</TABLE>

The following table shows the reconciliation of the funded status of the plans with amounts recorded in the consolidated balance sheet (in millions):
<TABLE>
<CAPTION>

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| December 31, | 2000 | 1999 | 2000 | 1999 |
| <S> | <C> | <C> | <C> | <C> |
| Funded status | $ 158 | $ 143 | $(247) | $(244) |
| Unrecognized net (gain) loss | (146) | (151) | (1) | (7) |
| Unrecognized prior service cost | (6) | (7) | (1) | 7 |
| Unamortized net transition obligation | 5 | 9 | - | - |
| Net amount recognized | $ 11 | $ (6) | $(249) | $(244) |

</TABLE>

<TABLE>
<CAPTION>

| December 31, | Pension Benefits 2000 | Pension Benefits 1999 | Medical and Life Benefits 2000 | Medical and Life Benefits 1999 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Amounts recognized in the consolidated balance sheet consist of: | | | | |
| Prepaid benefit cost | $ 45 | $ 24 | $ - | $ - |
| Accrued benefit liability | (50) | (44) | (249) | (244) |
| Intangible asset | - | 2 | - | - |
| Accumulated other comprehensive deficit | 16 | 12 | - | - |
| Net amount recognized | $ 11 | $ (6) | $(249) | $(244) |

</TABLE>

27

<PAGE>

BNSF uses a September 30 measurement date. The assumptions used in accounting for the BNSF plans were as follows:

<TABLE>
<CAPTION>

| Assumptions | Pension Benefits 2000 | Pension Benefits 1999 | Medical and Life Benefits 2000 | Medical and Life Benefits 1999 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Discount rate | 7.5% | 7.5% | 7.5% | 7.5% |
| Rate of increase in compensation levels | 4.0% | 4.0% | N/A | N/A |
| Expected return on plan assets | 9.5% | 9.5% | N/A | N/A |

</TABLE>

For purposes of the medical and life benefits calculations for 2000, the assumed health care cost trend rate for both managed care and non-managed care medical costs is 9.5 percent and is assumed to decrease gradually to five percent by 2006 and remain constant thereafter. Increasing the assumed health care cost trend rates by one percentage point would increase the accumulated postretirement benefit obligation by $19 million and the combined service and interest components of net postretirement benefit cost recognized in 2000 by $2 million. Decreasing the assumed health care cost trend rates by one percentage point would decrease the accumulated postretirement benefit obligation by $16 million and the combined service and interest components of net postretirement benefit cost recognized in 2000 by $2 million.

OTHER PLANS
Under collective bargaining agreements, BNSF Railway participates in multi-employer benefit plans which provide certain postretirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $15 million, $14 million and $18 million, in 2000, 1999 and 1998, respectively.

DEFINED CONTRIBUTION PLANS
BNSF sponsors 401(k) thrift and profit sharing plans which cover substantially all non-union employees and certain union employees. BNSF matches 50 percent of the first six percent of non-union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Depending on BNSF's performance, an additional matching contribution of up to 30 percent of the first six percent can be made at the end of the year. Employer contributions for all non-union employees are subject to a five year length of service vesting schedule. BNSF Railways's 401(k) matching expense was $16 million, $18 million and $16 million in 2000, 1999 and 1998, respectively.

13. RELATED PARTY TRANSACTIONS

BNSF Railway is involved with BNSF and certain of its subsidiaries in related party transactions in the ordinary course of business, which include payments made on each other's behalf and performance of services. Under the terms of a tax allocation agreement with BNSF, BNSF Railway made federal and state income tax payments, net of refunds, of $408 million during 2000 and $144 million during 1999, which are reflected in changes in working capital in the consolidated statement of cash flows.

BNSF Railway had a net intercompany receivable balance at December 31, 2000 of $68 million and a net payable balance of $99 million at December 31, 1999, which are reflected in accounts receivable and accounts payable and other current liabilities, respectively, in the consolidated balance sheet. Net intercompany receivable or payable balances are settled in the ordinary course of business.

At December 31, 2000 and 1999, $1,579 and $1,734 million, respectively, of intercompany notes payable to BNSF had a fixed interest rate of 6.9 percent. The remaining notes payable in both years had a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. During the first six months of 2000, BNSF Railway and BNSF agreed to offset $614 million of the variable rate notes payable against $614 million of variable rate notes receivable. During 2000, BNSF Railway also had additional net borrowings of $245 million of variable rate notes and repaid $155 million of 6.9 percent fixed rate notes. Proceeds from borrowings are primarily used to fund capital expenditures and other investing activities. Interest is paid semi-annually on all intercompany notes payable. Interest expense on intercompany notes payable is reflected in interest expense, related parties in the consolidated income statement. The intercompany notes are due on demand; however, it is not anticipated that BNSF Railway will be required to pay these obligations in the next twelve months.

At December 31, 2000 and 1999, BNSF Railway had $639 million and $765 million, respectively, of intercompany notes receivable from BNSF with a variable

interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. The $126 million decrease in intercompany notes receivable is primarily due to the offsetting of the $614 million of variable rate notes receivable against the $614 million of variable rate notes payable, as discussed above. Additionally, BNSF had additional net borrowings of $487 million during 2000. Interest is collected semi-annually on all intercompany notes receivable. The 2000 and 1999 balances include a $130 million receivable due SFP Pipelines Holdings, Inc., a subsidiary of BNSF Railway, from BNSF. Interest Expense, Related Parties in the consolidated income statement is presented net of interest income from intercompany notes receivable.

28

<PAGE>

In the BNSF Railway consolidated balance sheet, the intercompany notes payable are presented net of the intercompany notes receivable discussed above. BNSF Railway had net intercompany notes payable balances of $1,185 million and $1,583 million at December 31, 2000 and 1999, respectively.

14. QUARTERLY FINANCIAL DATA - UNAUDITED

<TABLE>
<CAPTION>

| (Dollars in millions) | Fourth | Third | Second | First |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| 2000 | | | | |
| Revenues (1) | $2,338 | $2,341 | $2,259 | $2,262 |
| Operating income | $ 543 | $ 570 | $ 482 | $ 509 |
| Net income | $ 286 | $ 309 | $ 257 | $ 266 |
| 1999 | | | | |
| Revenues (1) | $2,388 | $2,365 | $2,218 | $2,212 |
| Operating income | $ 602 | $ 629 | $ 491 | $ 480 |
| Net income | $ 351 | $ 369 | $ 257 | $ 252 |

</TABLE>

(1) All periods have been reclassified to conform with the current year presentation (see Note 2 to these consolidated financial statements).

Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure

None.

PART IV

Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K

(a) The following documents are filed as a part of this report:

1. Consolidated Financial Statements - See Item 8

2. Consolidated Financial Statement :
   Schedule II - Valuation and Qualifying Accounts F-1

Schedules other than that listed above are omitted because they are not required

or applicable, or the required information is included in the consolidated financial statements or related notes.

3. Exhibits:

See Index of Exhibits on page E-1 for a description of the exhibits filed as a part of this Report.

(b) Reports on Form 8-K

None.

29

<PAGE>

SIGNATURES

The Burlington Northern and Santa Fe Railway Company, pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY

/s/ Matthew K. Rose
--------------------------------
Matthew K. Rose
President and Chief Executive Officer
(Principal Executive Officer) and Director

Dated: February 9, 2001

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of The Burlington Northern and Santa Fe Railway Company and in the capacities and on the date indicated.

| | |
|---|---|
| /s/ Matthew K. Rose<br>-----------------------------<br>Matthew K. Rose | President and Chief Executive Officer (Principal Executive Officer) and Director |
| /s/ Thomas N. Hund<br>-----------------------------<br>Thomas N. Hund | Executive Vice President and Chief Financial Officer (Principal Financial Officer) and Director |
| /s/ Dennis R. Johnson<br>-----------------------------<br>Dennis R. Johnson | Vice President and Controller (Principal Accounting Officer) |
| /s/ Carl R. Ice<br>-----------------------------<br>Carl R. Ice | Director |
| /s/ Jeffrey R. Moreland<br>-----------------------------<br>Jeffrey R. Moreland | Director |
| /s/ Charles S. Schultz<br>-----------------------------<br>Charles S. Schultz | Director |

Dated: February 9, 2001

S-1

<PAGE>

Schedule II

The Burlington Northern and Santa Fe Railway Company
Valuation and Qualifying Accounts
For the years ended December 31, 2000, 1999, and 1998
(In Millions)

<TABLE>
<CAPTION>

| Column A | Column B | Column C | Column D | Column E |
|---|---|---|---|---|
| Description (2) | Balance at Beginning of Period | Additions Charged to Income | Deductions (1) | Balance at End of Period |
| <S> | <C> | <C> | <C> | <C> |
| December 31, 2000: | | | | |
| Personal injury and environmental liabilities | $678 | $208 | $227 | $659 |
| December 31, 1999: | | | | |
| Personal injury and environmental liabilities | $635 | $295 | $252 | $678 |
| December 31, 1998: | | | | |
| Personal injury and environmental liabilities | $711 | $177 | $253 | $635 |

</TABLE>

Notes:

(1) Principally represents cash payments.

(2) Classified in the consolidated balance sheets as follows:

| | December 31, 2000 | December 31, 1999 | December 31, 1998 |
|---|---|---|---|
| Accounts payable and other current liabilities | $ 229 | $ 255 | $ 246 |
| Casualty and environmental liabilities | 430 | 423 | 389 |
| | $ 659 | $ 678 | $ 635 |

5/10/2021 https://www.sec.gov/Archives/edgar/data/0000015511/000093066101000297/0000930661-01-000297-0001.txt

F-1

<PAGE>

BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY
INDEX OF EXHIBITS

| Exhibit Number | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation of The Burlington Northern and Santa Fe Railway Company effective December 31, 1996. Incorporated by reference to The Burlington Northern and Santa Fe Railway Company's Report on Form 10-K for the fiscal year ended December 31, 1996. |
| 3.2 | By-Laws as amended through July 17, 1991. Incorporated by reference to Exhibit 3.2 to The Burlington Northern Railroad Company's Report on Form 10-K for the fiscal year ended December 31, 1991. |
| 4.1 | BNSF Railway is not filing any instruments evidencing indebtedness because the total amount of securities authorized under any single such instrument does not exceed ten percent of BNSF Railway's total assets. Copies of any such material instruments will be furnished to the Securities and Exchange Commission upon request. |
| 12.1 | Statement regarding the Computation of Ratio of Earnings to Fixed Charges. |

E-1

</TEXT>
</DOCUMENT>

<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>d10q.txt
<DESCRIPTION>FORM 10-Q
<TEXT>

<PAGE>

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-Q

(Mark One)
[X] QUARTERLY REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2001

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from                    to

Commission file number 1-6324

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 41-6034000 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| 2650 Lou Menk Drive<br>Fort Worth, Texas | 76131 |
| (Address of principal executive offices) | (Zip Code) |

(817) 333-2000
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Shares Outstanding at April 20, 2001 |
|---|---|
| Common stock, $1.00 par value | 1,000 shares |

. The Burlington Northern and Santa Fe Railway Company is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation; as a result there is no market data with respect to registrant's shares.

Registrant meets the conditions set forth in General Instruction H (1)(a) and (b) of Form 10-Q and is therefore filing this Form 10-Q with the reduced disclosure format permitted by General Instruction H (2).

1

<PAGE>

PART I FINANCIAL INFORMATION

Item 1. Financial Statements

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF INCOME
(Dollars in Millions)
(Unaudited)

<TABLE>
<CAPTION>

| <S> | Three Months Ended March 31, <C> 2001 | <C> 2000 |
|---|---|---|
| Revenues | $ 2,291 | $ 2,262 |
| Operating expenses: | | |
| Compensation and benefits | 729 | 697 |
| Purchased services | 261 | 258 |
| Depreciation and amortization | 228 | 222 |
| Equipment rents | 187 | 179 |
| Fuel | 257 | 211 |
| Materials and other | 211 | 186 |
| Total operating expenses | 1,873 | 1,753 |
| Operating income | 418 | 509 |
| Interest expense | 45 | 47 |
| Interest expense, related parties | 21 | 31 |

| | | |
|---|---|---|
| Other income (expense), net | (37) | (3) |
| Income before income taxes | 315 | 428 |
| Income tax expense | 120 | 162 |
| Net income | $ 195 | $ 266 |

</TABLE>

See accompanying notes to consolidated financial statements.

2

<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEET
(Dollars in Millions)
(Unaudited)

<TABLE>
<CAPTION>

| ASSETS | March 31, 2001 | December 31, 2000 |
|---|---|---|
| <S> | <C> | <C> |
| Current assets: | | |
| Cash and cash equivalents | $ 125 | $ 117 |
| Accounts receivable, net | 292 | 381 |
| Materials and supplies | 209 | 220 |
| Current portion of deferred income taxes | 296 | 299 |
| Other current assets | 121 | 125 |
| Total current assets | 1,043 | 1,142 |
| Property and equipment, net | 22,321 | 22,286 |
| Other assets | 1,061 | 1,008 |
| Total assets | $ 24,425 | $ |

| | | |
|---|---|---|
| | | 24,436 |
| LIABILITIES AND STOCKHOLDER'S EQUITY | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | $ 1,732 | $ 1,921 |
| Long-term debt due within one year | 235 | 232 |
| Total current liabilities | 1,967 | 2,153 |
| Long-term debt | 2,368 | 2,408 |
| Intercompany notes payable, net | 1,127 | 1,185 |
| Deferred income taxes | 6,472 | 6,398 |
| Casualty and environmental liabilities | 409 | 430 |
| Employee merger and separation costs | 247 | 262 |
| Other liabilities | 1,031 | 1,026 |
| Total liabilities | 13,621 | 13,862 |
| Commitments and contingencies (see notes 2 and 5) | | |
| Stockholder's equity: | | |
| Common stock, $1 par value (1,000 shares authorized, issued and outstanding) and paid-in capital | 4,706 | 4,706 |
| Retained earnings | 6,074 | 5,878 |
| Accumulated other comprehensive income (deficit) | 24 | (10) |
| Total stockholder's equity | 10,804 | 10,574 |
| Total liabilities and stockholder's equity | $ 24,425 | $ 24,436 |

</TABLE>

See accompanying notes to consolidated financial statements.

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF CASH FLOWS
(Dollars in Millions)
(Unaudited)

<TABLE>
<CAPTION>

| | Three Months Ended March 31, 2001 | 2000 |
|---|---|---|
| <S> | <C> | <C> |
| Operating Activities: | | |
| Net income | $ 195 | $ 266 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 228 | 222 |
| Deferred income taxes | 56 | 62 |
| Employee merger and separation costs paid | (17) | (20) |
| Other, net | 34 | 8 |
| Changes in current assets and liabilities: | | |
| Accounts receivable: | | |
| Sale of accounts receivable | 25 | - |
| Other changes | 64 | 65 |
| Materials and supplies | 11 | 27 |
| Other current assets | 5 | (23) |
| Accounts payable and other current liabilities | (208) | (156) |
| Net cash provided by operating activities | 393 | 451 |
| Investing Activities: | | |
| Capital expenditures | (234) | (252) |
| Other, net | (65) | (235) |
| Net cash used for investing activities | (299) | ( 487) |
| Financing Activities: | | |

| | | |
|---|---|---|
| Payments on long-term debt | (28) | (65) |
| Net increase (decrease) in intercompany notes payable, net | (58) | 125 |
| Other, net | - | (1) |
| Net cash provided by (used for) financing activities | (86) | 59 |
| Increase in cash and cash equivalents | 8 | 23 |
| Cash and cash equivalents: | | |
| Beginning of period | 117 | 79 |
| End of period | $ 125 | $ 102 |
| Supplemental cash flow information: | | |
| Interest paid, net of amounts capitalized | $ 48 | $ 54 |
| Income taxes paid, net of refunds | 84 | 165 |

</TABLE>

See accompanying notes to consolidated financial statements.



<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

1. Accounting policies and interim results

The consolidated financial statements should be read in conjunction with The Burlington Northern and Santa Fe Railway Company (BNSF Railway or Company) Annual Report on Form 10-K for the year ended December 31, 2000, including the financial statements and notes thereto. BNSF Railway is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF). The consolidated financial statements include the accounts of BNSF Railway and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated.

The results of operations for any interim period are not necessarily indicative of the results of operations to be expected for the entire year. In the opinion of management, all adjustments (consisting of only normal recurring adjustments, except as disclosed) necessary to present fairly BNSF Railway's consolidated financial position as of March 31, 2001 and the results of operations for the three-month periods ended March 31, 2001 and 2000 have been included. During the quarter ended March 31, 2001, BNSF Railway recorded $36 million of non-recurring losses related to non-rail investments in Other Income (Expense), net in the consolidated statement of income.

Certain comparative prior-year amounts in the consolidated financial statements have been reclassified to conform to the current year presentation.

2. Hedging activities

On January 1, 2001, BNSF Railway adopted Statement of Financial Accounting Standards (SFAS) No. 133, "Accounting for Derivative Instruments and Hedging Activities" and recorded a cumulative transition benefit of $56 million, net of tax, to Accumulated Other Comprehensive Income. The standard requires that all derivatives be recorded on the balance sheet at fair value and establishes criteria for documentation and measurement of hedging activities.

The Company currently uses derivatives to hedge against increases in diesel fuel prices. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments, or to forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in Accumulated Other Comprehensive Income as a separate component of Stockholder's Equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

FUEL

Historically, fuel expenses approximated 10 percent of total operating expenses; however, during the first quarter of 2001 and 2000, fuel costs represented 14 percent and 12 percent of total operating expenses, respectively, reflecting significantly higher than historical fuel prices, which have continued to date. Due to the significance of diesel fuel expenses to the operations of BNSF Railway and the historical volatility of fuel prices, the Company maintains a program to hedge against fluctuations in the price of its diesel fuel purchases. The intent of the program is to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on annualized fuel consumption during the first three months of 2001 and excluding the impact of the hedging program, each one-cent increase in the price of fuel would result in approximately $12 million of additional fuel expense on an annual basis.

The fuel-hedging program includes the use of derivatives that qualify and are accounted for as cash flow hedges. As of March 31, 2001, BNSF Railway had entered into derivatives for approximately 309 million gallons of diesel fuel at



an average price of approximately 50 cents per gallon. The above price does not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur from time to time between the prices of commodities hedged and the purchase price of BNSF Railway's diesel fuel. Currently, BNSF Railway's fuel-hedging program covers approximately 24 percent and 8 percent of estimated annual fuel purchases for 2001 and 2002, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period. BNSF Railway also monitors its hedging positions

and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance.

As a result of adopting SFAS 133, the Company recorded a cumulative transition benefit of $56 million, net of tax, to Accumulated Other Comprehensive Income related to deferred gains on fuel hedge transactions. For the three months ended March 31, 2001, the Company recognized approximately $1 million of income associated with the ineffective portion of derivatives in fuel expense. At March 31, 2001, Accumulated Other Comprehensive Income includes a pre-tax gain of $56 million of which $41 million relates to derivative transactions that will expire in 2001. Receivables of $19 million and $50 million at March 31, 2001 and December 31, 2000, respectively, are recorded in the Company's balance sheet as part of the Other Current Assets and represent amounts due on settled fuel-hedging contracts.

3. Comprehensive income

BNSF Railway's comprehensive income, net of tax, for the three months ended March 31, 2001 and 2000 was $229 million and $266 million, respectively. BNSF Railway's comprehensive income includes net income and adjustments to the minimum pension liability, as well as changes related to derivatives which qualify for cash flow hedge accounting.

The change in Accumulated Other Comprehensive Income, net of tax, for the three months ended March 31 was as follows:

<TABLE>
<CAPTION>

| | Three Months Ended March 31 | |
|---|---|---|
| | 2001 | 2000 |
| | (in millions) | |
| Balance at beginning of period........................................ | $(10) | $(7) |
| Cumulative effect of adoption of SFAS No.133..................... | 56 | - |
| Gain on derivative instruments, included in net income............ | (12) | - |
| Change in fair value of derivative instruments.................... | (10) | - |
| Balance at end of period.............................................. | $ 24 | $(7) |

</TABLE>

4. Employee merger and separation costs

Current and long-term employee merger and separation liabilities totaling $294 million are included in the consolidated balance sheet at March 31, 2001, and principally represent: (i) employee-related severance costs for the consolidation of clerical functions; (ii) deferred benefits payable upon

separation or retirement to certain active conductors, trainmen and locomotive engineers; and (iii) certain salaried employee severance costs. During the first three months of 2001, the Company made employee merger and separation payments of $17 million.

During the second quarter of 2000, the Company incurred $22 million of costs for severance, medical and other benefit costs for approximately 150 involuntarily terminated employees, primarily material handlers in mechanical shops and trainmen on reserve boards, as part of the Company's ongoing initiatives to reduce operating expense by improving its efficiency. The initiative sought to eliminate approximately 200 positions, with the remaining reductions through the elimination of contract services. As of March 31, 2001, substantially all reductions have taken place. The majority of these costs have not been paid as of March 31, 2001, primarily because most severed employees have elected to receive payments over the next several years, rather than lump-sum payments.

6

<PAGE>

Liabilities related to the consolidation of clerical functions are paid to affected employees in the form of a lump-sum payment or payments made over five to ten years, or in some cases, through retirement. Liabilities related to deferred benefits payable to certain active conductors, trainmen and locomotive engineers are paid upon the employees' separation or retirement. Liabilities principally related to certain remaining salaried employee severances will be paid in the form of a lump sum payment or over the next several years based on deferral elections made by affected employees. At March 31, 2001, $47 million of the remaining liabilities are included within current liabilities for anticipated costs to be paid over the next twelve months.

5. Commitments and contingencies

ENVIRONMENTAL

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF Railway's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is subject to environmental clean-up and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the "Superfund" law, as well as similar state laws generally impose joint and several liability for clean-up and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF Railway has been notified that it is a potentially responsible party (PRP) for study and clean-up costs at approximately 30 Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF Railway may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF Railway may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF Railway generally participates in the clean-up of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Environmental costs include initial site surveys and environmental studies of potentially contaminated sites as well as costs for remediation and restoration of sites determined to be contaminated. Liabilities for environmental clean-up costs are initially recorded when BNSF Railway's liability for environmental

clean-up is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. BNSF Railway conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews, analysis of the likelihood of participation in and the ability of other PRPs to pay for clean-up, and historical trend analyses.

BNSF Railway is involved in a number of administrative and judicial proceedings and other clean-up efforts at approximately 385 sites, including the Superfund sites, at which it is participating in the study or clean-up, or both, of alleged environmental contamination. BNSF Railway paid approximately $24 million during the first three months of 2001 for mandatory and unasserted clean-up efforts, including amounts expended under federal and state voluntary clean-up programs. BNSF Railway has recorded liabilities for remediation and restoration of all known sites of approximately $213 million. BNSF Railway anticipates that the majority of the accrued costs at March 31, 2001 will be paid over the next five years. No individual site is considered to be material.

Liabilities recorded for environmental costs represent BNSF Railway's best estimates for remediation and restoration of these sites and include both asserted and unasserted claims. Unasserted claims are not considered to be a material component of the liability. Although recorded liabilities include BNSF Railway's best estimates of all costs, without reduction for anticipated recoveries from third parties, BNSF Railway's total clean-up costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in clean-up efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of potentially contaminated sites. As a result, future charges to income for environmental liabilities could have a significant effect on results of operations in a particular quarter or fiscal year as individual site studies and remediation and restoration efforts proceed or as new sites arise. However, management believes that it is



<PAGE>

unlikely that any identified matters, either individually or in the aggregate, will have a material adverse effect on BNSF Railway's results of operations, financial position or liquidity.

OTHER CLAIMS AND LITIGATION

BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters and personal injury claims. While the final outcome of these items cannot be predicted with certainty, considering among other things the meritorious legal defenses available, it is the opinion of management that none of these items, when finally resolved, will have a material adverse effect on the results of operations, financial position or liquidity of BNSF Railway, although an adverse resolution of a number of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

6. Accounts Receivable, Net

In the first quarter of 2001, BNSF Railway, through a special purpose subsidiary, increased capacity to sell variable rate certificates that evidence undivided interests in an accounts receivable master trust and mature in 2002. The amount of variable rate certificates which can be sold under the accounts receivable sales agreement increased by $100 million to $700 million. The master trust's assets included an ownership interest in a revolving portfolio of BNSF Railway's accounts receivable which are used to support the certificates.

At March 31, 2001, $625 million of certificates were outstanding.

7. Related Party Transactions

BNSF Railway is involved with BNSF and certain of its subsidiaries in related party transactions in the ordinary course of business, which included payments made on each other's behalf and performance of services. Under the terms of a tax allocation agreement with BNSF, BNSF Railway made federal and state income tax payments, net of refunds of $84 million and $165 million, respectively, during the first three months of 2001 and 2000, which are reflected in changes in working capital in the consolidated statement of cash flows.

BNSF Railway had net intercompany receivable balances of $11 million and $68 million at March 31, 2001 and December 31, 2000, respectively, which are reflected in accounts receivable in the consolidated balance sheet. Net intercompany receivable or payable balances are settled in ordinary course of business.

At March 31, 2001 and December 31, 2000, BNSF Railway had $1,579 million of intercompany notes payable to BNSF at a fixed interest rate of 6.9 percent. At March 31, 2001 and December 31, 2000, BNSF Railway had $205 million and $245 million, respectively, of intercompany notes payable to BNSF that had variable interest rates of 1.0 percent above the monthly average of the daily effective Federal Funds rate. During the first quarter of 2001, BNSF Railway had additional borrowings of $3 million and repaid $43 million of the variable rate notes. Proceeds from borrowings are primarily used to fund capital expenditures and other investing activities. Interest is paid semi-annually on all intercompany notes payable. Interest expense on intercompany notes payable is reflected in interest expense, related parties in the consolidated income statement. The intercompany notes are due on demand; however, it is not anticipated that BNSF Railway will be required to pay these obligations in the next twelve months.

At March 31, 2001 and December 31, 2000, BNSF Railway had $657 million and $639 million, respectively, of intercompany notes receivable from BNSF with a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. The $18 million increase was due to repayments from BNSF of $152 million and additional borrowings by BNSF of $170 million during the first quarter of 2001. Interest is collected semi-annually on all intercompany notes receivable. The 2001 and 2000 balances include a $130 million receivable due to SFP Pipelines Holdings, Inc., a subsidiary of BNSF Railway, from BNSF. The receivable is due August 15, 2010 and interest is collected semi-annually. This receivable originated between SFP Pipelines Holdings, Inc. and Santa Fe Pacific Corporation (SFP). During 1997, BNSF assumed the note payable from SFP and SFP recognized the assumption as a capital contribution from BNSF. On January 2, 1998, SFP, which was then BNSF Railway's parent, merged with and into BNSF Railway. Interest income on intercompany notes receivable is reflected in interest expense, related parties in the consolidated income statement.



<PAGE>

In the BNSF Railway consolidated balance sheet, the intercompany notes payable are presented net of the intercompany notes receivable discussed above. BNSF Railway had net intercompany notes payable balances of $1,127 million and $1,185 million at March 31, 2001 and December 31, 2000, respectively, included in the BNSF Railway consolidated balance sheet.

Item 2. Management's Narrative Analysis of Results of Operations

Management's narrative analysis relates to the results of operations of The Burlington Northern and Santa Fe Railway Company and its majority-owned subsidiaries (collectively BNSF Railway, Registrant or Company).

## Results of Operations

Three months ended March 31, 2001 compared with three months ended March 31, 2000

BNSF Railway recorded net income for the first quarter of 2001 of $195 million, compared with first quarter 2000 net income of $266 million. The decrease in net income is due to a $91 million decrease in operating income primarily as a result of significantly higher fuel costs, the impact of more severe winter weather conditions, higher electricity and other energy costs and increased compensation and benefit costs principally due to wage rate increases and higher benefit rates, partially offset by slightly higher freight revenues in 2001. In addition, first quarter results were impacted by non-recurring losses of $22 million, net of tax, related to non-rail investments.

Revenues

The following table presents BNSF Railway's revenue information by commodity for the three months ended March 31, 2001 and 2000, and includes certain reclassifications of prior-year information to conform to current-year presentation:

<TABLE>
<CAPTION>

| | Revenues | | Cars/Units | | Average Revenue Per Car/Unit | |
|---|---|---|---|---|---|---|
| | 2001 | 2000 | 2001 | 2000 | 2001 | 2000 |
| | (In Millions) | | (In Thousands) | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Consumer | $ 806 | $ 799 | 899 | 901 | $ 897 | $ 887 |
| Industrial | 569 | 587 | 379 | 403 | 1,501 | 1,457 |
| Coal | 526 | 529 | 516 | 507 | 1,019 | 1,043 |
| Agricultural Commodities | 361 | 325 | 191 | 175 | 1,890 | 1,857 |
| Total Freight Revenues | 2,262 | 2,240 | 1,985 | 1,986 | $ 1,139 | $ 1,128 |
| Other Revenues | 29 | 22 | | | | |
| Total Operating Revenues | $ 2,291 | $ 2,262 | | | | |

</TABLE>

Freight revenues for first quarter of 2001 were $2.26 billion, up slightly on 4 percent higher ton miles compared with first quarter of 2000. The increase in freight revenues primarily reflects increases in consumer and agricultural commodities, partially offset by lower coal and industrial revenues. Average revenue per car/unit increased one percent in the first quarter of 2001 to $1,139 from $1,128 in the first quarter of 2000.

Consumer revenues of $806 million for the first quarter of 2001 were $7 million, or 1 percent, higher than the first quarter of 2000. Consumer revenues reflect increased international shipments from Yang Ming Lines and Maersk/Sealand for the intermodal sector and increased intermodal truckload-marketing shipments with Toyota Logistics and JB Hunt. These revenue increases were partially offset by reduced revenues in direct marketing as a result of decreased loadings with UPS, Roadway and Yellow Freight. In addition, automotive revenues decreased due to a loss of Chrysler business as well as sluggish industry-wide sales.

Industrial revenues of $569 million for the first quarter of 2001 fell $18 million, or 3 percent, despite increased revenue per unit reflecting increased length of haul and selected price increases. Revenues for the first quarter of 2001 fell due to production cutbacks affecting the chemicals, forest products, and metals sectors, partially offset by slight increases in the government and machinery sector. More specifically, these decreases were a result of a reduction in the production of fertilizer and industrial chemicals in the chemicals sector and aluminum and nonferrous in the metals sector caused by high natural gas prices and reductions in the forest products sector due to weak markets and high inventories. Offsetting these decreases were increases in



<PAGE>

the minerals and machinery sectors resulting from increased government shipments of machinery and increased demand for clay and sand in the drilling industry as a result of high import oil prices. Additionally, the chemicals sector benefited slightly from increases in petroleum products due to increased liquid petroleum gas moves and new fuel movements by tank car.

Coal revenues of $526 million for the first quarter of 2001 decreased $3 million, or 1 percent, as a result of lower revenue per unit on certain contract renewals; this was partially offset by increased demand for western coal due to colder weather, tight eastern coal supplies and high natural gas prices.

Agricultural commodities revenues of $361 million for the first quarter of 2001 were $36 million, or 11 percent, higher than revenues for the first quarter of 2000 due to increased demand for soybeans moving through the Pacific Northwest to China, increased northern spring wheat moving to the upper Midwest and eastern domestic markets, and increased corn syrup, sugar and molasses shipments.

Expenses

Total operating expenses for the first quarter of 2001 were $1,873 million, an increase of $120 million, or 7 percent, over 2000.

Compensation and benefits expenses of $729 million were $32 million, or 4 percent, higher than the first quarter of 2000 primarily due to increased wage and associated employer tax and benefit expense for both the salaried and scheduled workforce, primarily reflecting wage rate increases and higher benefit rates. Additionally, impacting the first quarter of 2001 were significant increases in scheduled wages due to more severe winter weather conditions resulting in higher maintenance and additional crews. These increases were partially offset by lower employment levels and lower incentive compensation expense.

Purchased services of $261 million for the first quarter of 2001 were $3 million, or 1 percent, higher than the first quarter of 2000 principally due to increased equipment maintenance costs reflecting increased number of locomotives under maintenance contracts and more severe winter weather conditions.

Depreciation and amortization expenses for the first quarter of 2001 were $6 million, or 3 percent, higher than the same period in 2000, primarily due to a higher capital base.

Equipment rents expenses for the first quarter of 2001 of $187 million were $8 million, or 4 percent, higher than the first quarter of 2000 reflecting increased locomotive rental expense due to more locomotives under lease.

Fuel expenses of $257 million for the first quarter of 2001 were $46 million, or 22 percent, higher than the first quarter of 2000, primarily as a result of a 14-cent, or 20 percent, increase in the average all-in cost per gallon of diesel fuel. Consumption increased slightly to 297 million gallons compared with 292 million gallons for the first quarter of 2000 due to an increase in ton-miles as a result of a change in commodity mix. The increase in the average all-in cost per gallon of diesel fuel reflects an 11-cent increase in the average purchase price per gallon as well as a decrease in the hedge benefit of 3 cents per gallon from a hedging benefit of 10 cents per gallon in the first quarter of 2000 compared with a 7-cent hedge benefit in the first quarter of 2001.

Materials and other expenses of $211 million for the first quarter of 2001 were $25 million, or 13 percent, higher than the first quarter of 2000 due to increased utilities as a result of higher rates and increased consumption due to more severe winter weather, settlement of an environmental matter, and lower income from easements. Additionally, more severe winter weather conditions increased expenses for locomotive servicing and freight car repair.

Interest expense with external and related parties of $66 million for the first quarter of 2001 was $12 million, or 15 percent, lower than the first quarter of 2000, principally reflecting lower intercompany debt levels. Total debt decreased to $3,730 million at March 31, 2001 from $3,825 million at December 31, 2000.

Other income (expense), net was $34 million higher than the first quarter of 2000, primarily due to $36 million ($22 million, net of tax) of non-recurring losses related to non-rail investments, principally: Pathnet, a telecommunications venture; and a portfolio of other non-core real estate investments.



<PAGE>

Other Matters
-------------

Other Claims and Litigation

BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters and personal injury claims. While the final outcome of these items cannot be predicted with certainty, considering among other things the meritorious legal defenses available, it is the opinion of management that none of these items, when finally resolved, will have a material adverse effect on the results of operations, financial position or liquidity of BNSF Railway, although an adverse resolution of a number of these items in a single period could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Labor

Labor unions represent approximately 88 percent of BNSF Railway's employees under collective bargaining agreements with 13 different labor organizations. The negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 1999. Wages, health and welfare benefits, work rules, and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over a number of months and have previously not resulted in any extended work stoppages. The

existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached. The National Carriers' Conference Committee (NCCC), BNSF Railway's multi-employer collective bargaining representative reached a tentative agreement with the Brotherhood of Maintenance of Way Employees (BMWE) in first quarter of 2001 resolving wage, work rule and benefit issues through 2004. This agreement is subject to BMWE membership ratification, a process which should be complete by the end of second quarter 2001. BMWE represents BNSF Railway's track, bridge and building maintenance employees, about one-fourth of BNSF Railway's unionized workforce. During the third quarter of 2000, the NCCC reached a tentative agreement with the United Transportation Union (UTU) covering wage and work rule issues through the year 2004 for conductors, brakemen, yardmen, yardmasters and firemen (approximately one third of BNSF Railway's unionized workforce). Additionally, this agreement is subject to ratification by the UTU's membership. Health and welfare benefit issues were not resolved by this agreement, and will remain the subject of continuing negotiations.

Forward-Looking Information

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, predictions or expectations of financial or operational results, or refer to matters which are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. Forward-looking statements involve a number of risks and uncertainties, and actual results may differ materially. Factors that could cause actual results to differ materially include, but are not limited to, economic and industry conditions: material adverse changes in economic or industry conditions, both within the United States and globally, customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that produce and consume freight, competition and consolidation within the transportation industry, changes in fuel prices, and changes in labor costs and labor difficulties including stoppages; legal and regulatory factors: developments and changes in laws and regulations and the ultimate outcome of shipper claims, environmental investigations or proceedings and other types of claims and litigation; and operating factors: technical difficulties, changes in operating conditions and costs, competition and commodity concentrations, the Company's ability to achieve its operational and financial objectives as well as natural events such as severe weather, floods and earthquakes. The factors noted, individually or in combination could, among other things, limit demand and pricing, affect costs and the feasibility of certain operations, or affect traffic and pricing levels.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in future events, changes in circumstances, or changes in beliefs.



<PAGE>

Item 3. Quantitative and Qualitative Disclosures About Market Risk

In the ordinary course of business, BNSF Railway utilizes various financial instruments which inherently have some degree of market risk. The qualitative and quantitative information presented in the Management's Narrative Analysis of Results of Operations section and in Item 7A of the Company's Annual Report on Form 10-K for the year ended December 31, 2000 describes significant aspects of BNSF Railway's financial instrument programs which have material market risk. Presented below is updated quantitative information for those programs that have

changed significantly from the information reported in BNSF Railway's Form 10-K for the year ended December 31, 2000.

COMMODITY PRICE SENSITIVITY

As discussed in Note 2 to the Company's consolidated financial statements, BNSF Railway has a program to hedge against fluctuations in the price of its diesel fuel purchases. The table below provides information about BNSF Railway's diesel fuel hedging instruments that are sensitive to changes in diesel fuel prices. The table presents notional amounts in gallons and the weighted average contract price by contractual maturity date as of March 31, 2001. The prices included in the table below do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur from time to time between the prices of commodities hedged and the purchase price of BNSF Railway's diesel fuel.

<TABLE>
<CAPTION>

| | March 31, 2001 | | | |
|---|---|---|---|---|
| | Maturity Date | | | |
| | 2001 | 2002 | Total | Fair Value (1) |
| <S> <C> | <C> | <C> | <C> | <C> |
| Diesel Fuel Swaps: | | | | |
| Gallons (in millions) | 208 | 101 | 309 | $56 |
| Weighted average price per gallon | $0.49 | $0.50 | $0.50 | - |

</TABLE>

(1) Represents gains (in millions) in Accumulated Other Comprehensive Income based on the price of Gulf Coast #2 heating oil.



<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES

PART II OTHER INFORMATION

Item 5. Exhibits and Reports on Form 8-K

A. Exhibits

See Index to Exhibits on page E-1 for a description of the exhibits filed as part of this report.



<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY
(Registrant)

Dated: May 7, 2001 By: /s/ Dennis R. Johnson

Dennis R. Johnson
Vice President and Controller
(On behalf of the Registrant and as principal accounting officer)



<PAGE>

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY

Exhibit Index

12.1 Computation of Ratio of Earnings to Fixed Charges.



</TEXT>
</DOCUMENT>

10-K 1 d10k.htm FORM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2002

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from to

Commission File Number: 1-6324

# THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **41-6034000** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**2650 Lou Menk Drive**
**Fort Worth, Texas 76131-2830**
**(Address of principal executive offices, including zip code)**

**(800) 795-2673**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

The securities listed below are registered on the New York Stock Exchange.

**Title of each class**

Burlington Northern, Inc.
(Now The Burlington Northern and Santa Fe Railway Company)
Consolidated Mortgage Bonds
9.25%, Series H, due 2006
6.55%, Series K, due 2020
3.80%, Series L, due 2020
3.20%, Series M, due 2045
8.15%, Series N, due 2020
6.55%, Series O, due 2020
8.15%, Series P, due 2020

Northern Pacific Railway Company
General Lien Railway and Land Grant 3% Bonds, due 2047

Great Northern Railway Company General Mortgage Bonds 2 5/8%, Series Q, due 2010

St. Louis-San Francisco Railway Company Income Debentures, 5%, Series A, due 2006

---

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. Yes ✓ No____

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: 1,000 shares of Outstanding Common Stock, $1.00 par value, as of January 31, 2003.

*The Burlington Northern and Santa Fe Railway Company is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF); as a result, there is no market data with respect to registrant's shares.

**DOCUMENTS INCORPORATED BY REFERENCE**

None

REGISTRANT MEETS THE CONDITIONS SET FORTH IN THE GENERAL INSTRUCTION (I)(1)(a) AND (b) OF FORM 10-K AND IS THEREFORE FILING THIS FORM WITH THE REDUCED DISCLOSURE FORMAT.

Table of Contents

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| | **PART I** | |
| Items 1 and 2. | Business and Properties | 1 |
| Item 3. | Legal Proceedings | 8 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 10 |
| Item 7. | Management's Narrative Analysis of Results of Operations | 10 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 12 |
| Item 8. | Financial Statements and Supplementary Data | 16 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 38 |
| | **PART III** | |
| Item 14. | Controls and Procedures | 39 |
| | **PART IV** | |
| Item 15. | Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 40 |
| Signatures | | S-1 |
| Certifications | | S-2 |
| Schedule II – Valuation and Qualifying Accounts | | F-1 |
| Exhibits | | E-1 |

Table of Contents

## PART I

### Items 1 and 2. Business and Properties

The Burlington Northern and Santa Fe Railway Company (BNSF Railway or Company), formerly known as the Burlington Northern Railroad Company (BNRR) was incorporated in the State of Delaware on January 13, 1961, and is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF). On September 22, 1995, the stockholders of Burlington Northern Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the stockholders of BNSF pursuant to a business combination of the two companies. To effect the combination, BNSF was formed to act as the parent holding company of BNI and SFP. BNI and SFP each owned a large, Class I railroad: the BNRR and The Atchison, Topeka and Santa Fe Railway Company (ATSF), respectively.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into BNRR, and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company. On January 2, 1998, BNSF Railway's parent, SFP, merged with and into BNSF Railway.

BNSF Railway operates one of the largest railroad systems in the United States. At December 31, 2002, BNSF Railway had approximately 36,000 employees.

BNSF Railway's Internet address is www.bnsf.com. Through this internet website (found in the "Investors" link) BNSF Railway makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K, and all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission.

### Track Configuration

As of December 31, 2002, BNSF Railway operates over a railroad system consisting of approximately 33,000 route miles of track (excluding second, third and fourth main tracks, yard tracks, and sidings), approximately 25,000 miles of which are owned route miles, including easements, through 28 states and two Canadian provinces. Approximately 8,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over another railroad's tracks. BNSF Railway operates over other trackage through lease or other contractual arrangements.

As of December 31, 2002, the total BNSF Railway system, including first, second, third and fourth main tracks, yard tracks, and sidings, consists of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 8,000 route miles operated under trackage rights. At December 31, 2002, approximately 27,000 miles of BNSF Railway's track consists of 112-pound per yard or heavier rail, including approximately 19,000 track miles of 131-pound per yard or heavier rail.

Table of Contents

**Equipment Configuration**

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock as of the dates shown below:

| | At December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Diesel Locomotives | 5,184 | 5,216 | 5,320 |
| Locomotives Under Power Purchase Agreements | — | 99 | 99 |
| Locomotive Auxiliary and Other Self Powered Units | 42 | 42 | 42 |
| Freight Cars: | | | |
| Box-general purpose | 559 | 581 | 625 |
| Box-specially equipped | 9,612 | 9,641 | 10,706 |
| Open Hopper | 10,848 | 11,094 | 11,622 |
| Covered Hopper | 37,609 | 38,007 | 40,951 |
| Gondola | 14,942 | 15,075 | 15,332 |
| Refrigerator | 5,588 | 5,554 | 5,900 |
| Autorack | 843 | 877 | 979 |
| Flat | 7,946 | 7,844 | 8,090 |
| Tank | 501 | 506 | 509 |
| Caboose | 291 | 315 | 333 |
| Other | 28 | 28 | 275 |
| Total Freight Cars | 88,767 | 89,522 | 95,322 |
| Domestic Containers | 8,197 | 8,259 | 7,845 |
| Trailers | 2,163 | 2,200 | 2,200 |
| Domestic Chassis | 8,180 | 8,205 | 9,721 |
| Company Service Cars | 4,035 | 4,132 | 4,175 |
| Commuter Passenger Cars | 160 | 160 | 160 |

The average age from date of manufacture of the locomotive fleet at December 31, 2002, was 15 years; the average age from date of manufacture or remanufacture of the freight car fleet at December 31, 2002, was 16 years. These averages are not weighted to reflect the greater capacities of the newer equipment.

**Capital Expenditures and Maintenance**

BNSF Railway cash capital expenditures for the periods indicated were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | (in millions) | | |
| Maintenance of way | | | |
| Rail | $ 193 | $ 233 | $ 210 |
| Ties | 222 | 254 | 206 |
| Surfacing | 161 | 146 | 134 |
| Other | 325 | 335 | 285 |
| Total maintenance of way | 901 | 968 | 835 |
| Mechanical | 168 | 183 | 221 |
| Information services | 79 | 69 | 66 |
| Other | 95 | 101 | 144 |

| | | | |
|---|---|---|---|
| Total maintenance of business | 1,243 | 1,321 | 1,266 |
| Terminal and line expansion | 103 | 126 | 99 |
| Capitalized interest and other | 12 | 12 | 34 |
| Total cash capital expenditures | $ 1,358 | $ 1,459 | $ 1,399 |

The above table does not include expenditures for equipment financed through operating leases (principally locomotives and rolling stock). BNSF Railway's planned 2003 cash capital expenditures approximate $1.4 billion. Approximately $1.2 billion of the total planned capital expenditures will be for maintenance of business activities, primarily consisting of expenditures to maintain BNSF Railway's track, signals, bridges and tunnels, as well as to overhaul locomotives and freight cars with the remainder to be spent on terminal and line expansions and other projects.

Table of Contents

As of December 31, 2002, General Electric Company and the Electro-Motive Division of General Motors Corporation performed locomotive maintenance and overhauls for BNSF Railway under various maintenance agreements that covered approximately 2,600 locomotives. These agreements require the work to be done at BNSF Railway's facilities using BNSF Railway employees. In addition, the Company entered into a locomotive maintenance contract with Alstom Transportation, Inc. (Alstom) in the fourth quarter of 2002. Alstom will begin performing maintenance on a portion of the Company's locomotives in 2003.

The majority of maintenance of way expenditures for track has been for rail and tie refurbishment and track resurfacing. The extent of the BNSF Railway track maintenance program is depicted in the following table:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Track miles of rail laid [a] | 685 | 891 | 738 |
| Cross ties inserted (thousands) [a] | 2,248 | 2,704 | 2,527 |
| Track resurfaced (miles) | 12,499 | 11,011 | 11,228 |

(a) Includes expenditures for both maintenance of existing route system and expansion projects. These expenditures are primarily capitalized.

BNSF Railway's planned 2003 track maintenance of way program will result in the installation of approximately 700 track miles of rail, the replacement of about 2.2 million ties, and the resurfacing of approximately 11,000 miles of track.

**Property and Facilities**

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as described above. It also owns or leases other equipment to support rail operations, including highway trailers, containers and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, computers, telecommunications equipment, signal systems, and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 36 major intermodal hubs located across the system and three intermodal hub centers off-line used in connection with haulage agreements with other railroads. BNSF Railway's largest intermodal facilities in terms of 2002 volume were:

| Intermodal Facilities | Lifts |
|---|---|
| Hobart Yard (California) | 1,086,000 |
| Corwith Yard (Illinois) | 713,000 |
| Willow Springs (Illinois) | 674,000 |
| Cicero (Illinois) | 455,000 |
| San Bernardino (California) | 450,000 |
| Alliance (Texas) | 438,000 |
| Argentine (Kansas) | 252,000 |

BNSF Railway owns 26 automotive distribution facilities where automobiles are loaded or unloaded from multi-level rail cars and serves eight port facilities in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal and intermodal and coal cars) are shown below:

| Classification Yard | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas) | 1,728 |
| Galesburg (Illinois) | 1,524 |
| Barstow (California) | 1,276 |
| Pasco (Washington) | 1,175 |
| Memphis (Tennessee) | 1,078 |

As of December 31, 2002, certain BNSF Railway properties and other assets are subject to liens securing $422 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and leases, as referred to in Notes 9 and 10 to the Consolidated Financial Statements.

Table of Contents

**Employees and Labor Relations**

Productivity, as measured by thousand revenue ton miles per employee, has risen steadily in the last three years as shown in the table below.

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| Thousand revenue ton miles divided by average number of employees | 13,117 | 12,796 | 12,342 |

Approximately 87 percent of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with 13 different labor organizations. The negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 1999. Wages, health and welfare benefits, work rules, and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over a number of months and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached.

The National Carriers' Conference Committee (NCCC), BNSF Railway's multi-employer collective bargaining representative, reached a final agreement in August 2002, with the United Transportation Union (UTU) covering wage, work rule, and locomotive remote control issues through the year 2004 for conductors, brakemen, yardmen, yardmasters and firemen, which represent approximately one-third of BNSF Railway's unionized workforce. The new agreement also creates a final and binding process for resolving health and welfare issues, mainly involving employees sharing in rising benefit costs. The agreement commits each side to participate in a study and negotiation period, during which the parties will examine alternative ways to control rising healthcare costs. The parties have scheduled meetings on this issue in the first quarter of 2003. Failing these efforts, either party could send unresolved health and welfare issues to final and binding arbitration.

The NCCC also reached a final agreement with the Transportation Communications Union (TCU) providing for final and binding arbitration of wage and benefit issues through 2004. This agreement averts the possibility of self help by the parties over bargaining round issues. The arbitrator conducted hearings in the case commencing January 20, 2003, and issued a final and binding decision on January 23, 2003. The arbitration result settles all wage, work rule and medical benefit issues between the parties through 2004. TCU represents BNSF Railway's clerks, carmen and patrolmen, who make up about 15 percent of BNSF Railway's unionized workforce.

In October 2002, the NCCC and International Brotherhood of Boilermakers and Blacksmiths (IBB) made a final agreement resolving wage and work rule issues through 2004, but leaving health and welfare benefit issues to be settled based on the outcome of the bargaining round process with other rail labor unions. IBB represents around 100 BNSF Railway employees, less than 1 percent of the unionized workforce.

In spring 2001, the NCCC and Brotherhood of Maintenance of Way Employes (BMWE) reached an agreement resolving wage, work rule and benefit issues through 2004, which was implemented in July 2001. BMWE represents BNSF Railway's track, bridge and building maintenance employees, or about one-fifth of BNSF Railway's unionized workforce.

In June 2001, the NCCC reached a tentative agreement with the International Brotherhood of Electrical Workers (IBEW), which represents approximately 5 percent of BNSF Railway's unionized workforce, addressing wage and work rule issues through 2004, but leaving health and welfare benefit issues for settlement in separate talks with other railroad unions. IBEW members failed to ratify the tentative agreement.

Along with four other major railroads, BNSF Railway reached agreement with the Brotherhood of Locomotive Engineers (BLE) and UTU to arbitrate labor agreement issues raised by BLE stemming from the railroads' implementation of locomotive remote control technology and assignment of remote control operations to employees represented by UTU. The arbitration board decided the case on January 13, 2003, sustaining the railroads' right to assign remote control locomotive operations in and around terminals to ground service employees represented solely by UTU. The decision is final and binding on all parties.

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been approximately triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and

Table of Contents

employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II), and other benefits. Investment of Tier II Railroad Retirement assets had, until 2001, been limited to special interest-bearing U. S. Treasury securities. The Railroad Retirement and Survivors' Improvement Act of 2001 (Act) creates a new National Railroad Retirement Investment Trust to hold Tier II Railroad Retirement assets and empowers the trustees to invest these assets in the same types of investments available to private sector retirement plans. In addition to liberalizing certain retirement benefit requirements for rail employees, the Act reduced Tier II Railroad Retirement tax rates on rail employers beginning in 2002 and eliminated a supplemental annuity tax. The Company realized savings of approximately $20 million in 2002 and expects to realize savings of $50 million in 2003. Future adjustments in the Tier II Railroad Retirement tax rates assessed will depend on Railroad Retirement fund levels, and annual savings could be as much as $80 million by 2004.

Railroad industry personnel are also covered by the Federal Employers' Liability Act (FELA) rather than by state workers' compensation systems. FELA is a fault-based system, with compensation for injuries settled by negotiation and litigation, not subject to specific statutory limitations on the amount of recovery. By contrast, most other industries are covered under state, no-fault workers' compensation plans with standard compensation schedules. BNSF Railway believes it has adequate recorded liabilities for its FELA claims. However, the ultimate costs of these FELA claims are uncertain and the actual costs could be significantly higher than anticipated.

**Business Mix**

In serving the Midwest, Pacific Northwest and the Western, Southwestern, and Southeastern regions and ports of the country, BNSF Railway transports, through one operating transportation services segment, a wide range of products and commodities derived from manufacturing, agricultural, and natural resource industries. Accordingly, its financial performance is influenced by, among other things, general and industry economic conditions at the international, national, and regional levels. See below for a graphical view of the Company's primary routes including trackage rights.




Major ports served include Beaumont, Bellingham, Brownsville, Corpus Christi, Everett, Galveston, Houston, Kalama, Long Beach, Longview, Los Angeles, Mobile, New Orleans, Portland, Richmond (Oakland), San Diego, Seattle, Duluth/Superior, Tacoma, Vancouver (Washington) and Vancouver (British Columbia). Canadian traffic is also accessed through interchange with Canadian railroads at Chicago, Minneapolis/St. Paul and other gateways. BNSF Railway also accesses markets in Mexico through United States/Mexico crossings at Brownsville, Eagle Pass and El Paso, Texas, and San Diego, California, and through an interline agreement with the Texas Mexican Railway Company, BNSF Railway reaches Laredo, Texas, a major rail gateway between the U.S. and Mexico. BNSF Railway works closely with its over 200 shortline partners to more efficiently serve many smaller markets. Also, in 2002 BNSF Railway entered into

Table of Contents

marketing agreements with Kansas City Southern Railway Company (KCS) and Canadian National Railway Company (CN) expanding the marketing reach for the organizations.

***Consumer Products:*** The consumer freight business provided approximately 38 percent of freight revenues in 2002 and consisted of the following business sectors:

- *International.* International business consists primarily of container traffic from steamship companies and accounted for approximately 32 percent of total Consumer Products revenues.
- *Direct Marketing.* Direct marketing generated approximately 23 percent of total Consumer Products revenue. This business centers around intermodal traffic contracted from parcel shippers such as United Parcel Service and service for nationwide and regional LTL (less-than-truckload) carriers including Yellow Freight and Roadway Express.
- *Truckload.* Truckload traffic represented approximately 16 percent of total Consumer Products revenue. This traffic is comprised of business through the joint service arrangement with J.B. Hunt, as well as business from Schneider National and other truckload carriers.
- *Intermodal Marketing Companies.* Approximately 12 percent of total Consumer Products revenue was generated through intermodal marketing companies, primarily shipper agents and consolidators.
- *Automotive.* The transportation of both assembled motor vehicles and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 9 percent of 2002 total Consumer Products revenue.
- *Perishables and Dry Boxcar.* Perishables and Dry Boxcar represented approximately 8 percent of total Consumer Products revenue. This group consists of beverages, canned goods and perishable food items. Other consumer goods handled include cotton, salt, rubber and tires, and miscellaneous boxcar shipments.

***Coal:*** Based on total carloadings and tons hauled since the passage of the Clean Air Act of 1970, BNSF Railway is the largest transporter of low-sulfur coal in the United States. The transportation of coal contributed about 23 percent of 2002 freight revenues. Approximately 90 percent of BNSF Railway's coal traffic originated in the Powder River Basin of Wyoming and Montana during the three years ended December 31, 2002. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central and Mountain regions of the United States. BNSF Railway also transports large amounts of low-sulfur coal from the Powder River Basin to markets in the eastern and southeastern portions of the United States. The low-sulfur coal from the Powder River Basin is abundant, inexpensive to mine, clean-burning, and has a low delivered-cost to power plants. Also, deregulation in the electric utility industry is causing power generators to seek lower cost fuel sources and this increases demand for Powder River Basin coal.

Other coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota and are moved to electrical generating stations and industrial plants in the Mountain and North Central regions.

***Industrial Products***: Industrial Products' freight business provided approximately 23 percent of BNSF Railway's freight revenues in 2002 and consists of the following four business areas:

- *Building Products.* This sector includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs, which resulted in approximately 35 percent of total 2002 Industrial Products revenue. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest, and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.
- *Construction Products.* The construction products sector represented approximately 35 percent of total Industrial Products revenue in 2002. This sector serves virtually all of the commodities included in or resulting from the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF Railway's primary input products

Table of Contents

transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF Railway links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and in foundry and oil drilling applications.

- *Chemicals and Plastics*. The chemicals and plastics sector represents approximately 17 percent of total 2002 Industrial Products revenue. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing, and packaging industries, as well as for feedstocks, to produce other chemical and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.
- *Petroleum*. Commodities included in the petroleum sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black, which made up 13 percent of total Industrial Products revenue for 2002. Product use varies based on commodity, and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery, and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF Railway network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

***Agricultural Products***: The transportation of Agricultural Products provided approximately 16 percent of 2002 total freight revenues and includes wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF Railway system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company is developing and operating a shuttle network for grain, grain products and fertilizer, which allows customers to buy freight transportation with guaranteed service commitments. In addition to serving most grain-producing areas, BNSF Railway serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF Railway has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

***Freight Statistics***: The following table sets forth certain freight statistics relating to rail operations for the periods indicated:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Revenue ton miles (millions) | 490,234 | 501,829 | 491,959 |
| Freight revenue per thousand revenue ton miles | $ 18.08 | $ 18.10 | $ 18.51 |
| Average length of haul (miles) | 992 | 992 | 996 |

For revenue, cars/units and average revenue per unit information for the two years ended December 31, 2002, see the revenue table included as part of Item 7, Management's Narrative Analysis of Results of Operations.

**Government Regulation and Legislation**

Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of DOT, the Occupational Safety and Health Administration (OSHA), and state regulatory agencies. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction, and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the costs and profitability of BNSF Railway's business.

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. These laws cover discharges to waters, air emissions, toxic substances, and the generation, handling, storage, transportation, and disposal of waste and hazardous materials. This regulation has the effect of

Table of Contents

increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject and will from time to time continue to be subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs, without regard to fault or the legality of the original conduct, on current and former owners and operators of a site. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to cleanup sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. For further discussion, see Note 10 to the Consolidated Financial Statements.

**Competition**

The business environment in which BNSF Railway operates remains highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads strive to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the western region of the United States is the Union Pacific Railroad Company (UP). Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on reporting to the Association of American Railroads, in 2002, BNSF Railway's share of the western United States rail traffic was approximately 43 percent.

**Item 3. Legal Proceedings**

*Ray Ridgeway, et al. v. Burlington Northern Santa Fe Corporation and The Burlington Northern and Santa Fe Railway Company*, No. 48-185170-00 (District Court of Tarrant County, Texas, 48th Judicial District) is a state court action filed on October 27, 2000. The plaintiffs' causes of action include alleged breach of contract, negligence, and breach of fiduciary duties with respect to a special dividend that was paid in 1988 by a Burlington Northern Santa Fe Corporation (BNSF) predecessor, Santa Fe Southern Pacific Corporation (SFSP). The complaint alleges that SFSP erroneously informed shareholders as to the tax treatment of the dividend—specifically, the apportionment of the dividend as either a distribution of earnings and profits or a return of capital—which allegedly caused some shareholders to overpay their income taxes. The plaintiffs assert through their expert's report, that SFSP had essentially no accumulated earnings and profits and that the entire dividend distribution should have been treated as a return of capital, rather than the approximately 34 percent that SFSP determined was a return of capital. Plaintiffs have a motion pending to certify a class of former SFSP shareholders which BNSF Railway has opposed, but a decision on class certification issues is not expected until the second quarter of 2003. BNSF Railway believes these claims lack merit and that it has substantial defenses on both the merits of these claims and the attempted class action, and it is defending these claims vigorously.

BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF Railway's management that none of these items, when finally resolved, will have a material adverse effect on the results of operations, financial position or liquidity of BNSF Railway, although an adverse resolution of a number of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Table of Contents

Reference is made to Note 5 to the Consolidated Financial Statements for information concerning certain pending tax related administrative or adjudicative state proceedings or appeals.

Table of Contents

PART II

**Item 5. Market for Registrant's Common Equity and Related Stockholder Matters**

BNSF Railway's common stock is owned by BNSF and therefore is not traded on any market.

**Item 7. Management's Narrative Analysis of Results of Operations**

Management's narrative analysis relates to the results of operations of The Burlington Northern and Santa Fe Railway Company and its majority-owned subsidiaries (collectively, BNSF Railway or Company). BNSF Railway is a wholly-owned subsidiary of BNSF. The following narrative analysis should be read in conjunction with the Consolidated Financial Statements and the accompanying notes (beginning on page 22).

***Results of Operations***

**Year Ended December 31, 2002 Compared with Year Ended December 31, 2001**

BNSF Railway recorded net income for 2002 of $961 million compared with net income for 2001 of $952 million. Operating income of $1,676 million in 2002 was $93 million lower than 2001.

**Revenue Table**

The following table presents BNSF Railway's revenue information by commodity for the years ended December 31, 2002 and 2001.

| | Revenues | | Cars/Units | | Average Revenue Per Car/Unit | |
|---|---|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 | 2002 | 2001 |
| | (in millions) | | (in thousands) | | | |
| Consumer Products | $3,345 | $3,350 | 3,880 | 3,752 | $ 862 | $ 893 |
| Coal | 2,071 | 2,123 | 2,097 | 2,133 | 988 | 995 |
| Industrial Products | 2,041 | 2,080 | 1,415 | 1,442 | 1,442 | 1,442 |
| Agricultural Products | 1,408 | 1,531 | 794 | 828 | 1,773 | 1,849 |
| Total Freight Revenues | 8,865 | 9,084 | 8,186 | 8,155 | $ 1,083 | $ 1,114 |
| Other Revenues | 98 | 117 | | | | |
| Total Operating Revenues | $8,963 | $9,201 | | | | |

**Revenues**

Total revenues of $8,963 million for 2002 were $238 million, or 3 percent, lower than 2001. In 2002, the combined effect of the soft economy, a mild winter, reduced foreign demand for agricultural products and the loss of an automotive contract in the third quarter of 2001 contributed to a decrease in BNSF Railway's revenues.

Based on reporting to the Association of American Railroads (AAR), in 2002, BNSF Railway's share of the western United States rail traffic was approximately 43 percent.

Consumer Products revenues of $3,345 million for 2002 were essentially flat compared with 2001. Excluding the automotive revenue contract settlement gain of $32 million in 2001, Consumer Products revenues for 2002 were $27 million, or 1 percent, higher than 2001 primarily due to increased intermodal volumes in the international and truckload businesses partially offset by decreased automotive revenues related to a contract loss in 2001. International increases were driven by favorable trans-Pacific trade and new contracts. Truckload revenues were up due to strong growth from the Company's primary accounts and modal conversion of highway traffic from new and existing shippers. The reduction in revenue per car/unit is related to a decrease in automotive traffic and an increase in international traffic, which primarily moves in containers and unit trains, and due to the lower cost structure, moves at lower rates per unit.

Coal revenues of $2,071 million for 2002 decreased $52 million, or 2 percent, versus 2001. Volume was lower than 2001 primarily as a result of reduced demand in the first half of 2002 caused by mild winter weather. Revenue per car/unit decreased as a result of modest price decreases related to the renewal of some contracts and rate adjustment factors in existing contracts that were negative in the first half of the year.

Industrial Products revenues of $2,041 million for 2002 were $39 million, or 2 percent, lower than 2001. An

Table of Contents

increase in the chemicals and plastics sector tied to strength in automotive and home construction along with a new contract was more than offset by general softness in the petroleum, building and construction product sectors. Petroleum was down due to higher heating fuel inventories as a result of the mild winter. Building and construction product sectors were down primarily due to weak paper and steel markets.

Agricultural Products revenues of $1,408 million for 2002 were $123 million, or 8 percent, lower than revenues for 2001 primarily due to decreased soybean, wheat and corn exports due to global market conditions. The decrease in export traffic resulted in lower revenue per unit due to a shorter length of haul. Domestic corn shipments to feedlots were also down from 2001 due to reduced feedlot demand, high inventory levels remaining from 2001 shipments and crop production conditions.

**Expenses**

| | Year Ended December 31, | |
|---|---|---|
| | **2002** | **2001** |
| | **(in millions)** | |
| Compensation and benefits | $ 2,878 | $ 2,850 |
| Purchased services | 1,132 | 1,088 |
| Depreciation and amortization | 930 | 908 |
| Equipment rents | 698 | 736 |
| Fuel | 833 | 973 |
| Materials and other | 816 | 877 |
| Total operating expenses | $ 7,287 | $ 7,432 |
| Interest expense | $ 153 | $ 170 |
| Other expense, net | $ 12 | $ 70 |

Total operating expenses for 2002 were $7,287 million, a decrease of $145 million, or 2 percent, over 2001 primarily due to a lower total cost per gallon of diesel fuel, lower equipment rents expense driven by an initiative to use less foreign equipment and increased gains on property dispositions.

Compensation and benefits expenses of $2,878 million were $28 million, or 1 percent, higher than 2001 primarily due to increases in health and welfare costs, principally due to an increase in rates, incentive compensation, and pension expense primarily reflecting a decrease in the long-term rate of return assumption for pension assets. These increases were partially offset by reduced labor expenses as a result of lower employment levels.

Purchased services of $1,132 million for 2002 were $44 million, or 4 percent, higher than 2001 due to a one-time flood related recovery and higher other recoveries in 2001, higher insurance expense in 2002, as well as higher service contracts expense related to an agreement to outsource the management of a large portion of BNSF Railway's information technology infrastructure.

Depreciation and amortization expenses of $930 million for 2002 were $22 million, or 2 percent, higher than 2001 primarily due to a higher capital base.

Equipment rents expenses for 2002 of $698 million were $38 million, or 5 percent, lower than 2001. The decrease is primarily due to lower carload equipment expense driven by an initiative to use less foreign equipment, short-term lease incentives and lower auto equipment expense as a result of the loss of an automotive contract in the third quarter of 2001.

Fuel expenses of $833 million for 2002 were $140 million, or 14 percent, lower than 2001. The decrease in fuel expense was primarily the result of a 10-cent decrease in the average all-in cost per gallon of diesel fuel. The decrease in the average all-in cost per gallon of diesel fuel includes a 10-cent decrease ($115 million) in the average purchase price and a hedge benefit of 4 cents ($50 million). The hedge benefit for the same period in 2001 was 4 cents per gallon ($48 million). Consumption in 2002 was 1,149 million gallons compared with 1,177 million gallons in 2001.

Materials and other expenses of $816 million for 2002 were $61 million, or 7 percent, lower than 2001 principally due to a $66 million charge for workforce reduction related costs in 2001, increased gains on property dispositions and lower costs on leased locomotives partially offset by higher personal injury expense in 2002.

Case 1:07-mc-00489-BAH Document 1070-30 Filed 01/11/22 Page 85 of 482

Interest expense of $153 million for 2002 was $17 million, or 10 percent, lower than 2001. This decrease was primarily the result of lower average debt levels.



DA07187

Table of Contents

Other expense was $12 million or $58 million lower compared with 2001 primarily due to $47 million of losses recognized in 2001 related to non-rail investments. The non-rail investments consisted of Pathnet Telecommunications, Inc., a telecommunications venture; a portfolio of other non-core investments; and a decline in the cash surrender value of company owned life insurance policies. In addition, there was a decrease in accounts receivable sale fees in 2002 compared with 2001.

*Other Matters*

**Forward-Looking Information**

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. Forward-looking statements involve a number of risks and uncertainties, and actual results may differ materially. Important factors that could cause actual results to differ materially include, but are not limited to, *economic and industry conditions*: material adverse changes in economic or industry conditions, both in the United States and globally, customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that produce and consume freight, competition and consolidation within the transportation industry, the extent to which BNSF Railway is successful in gaining new long-term relationships with customers or retaining existing ones, changes in fuel prices, changes in the securities and capital markets, and changes in labor costs and labor difficulties, including stoppages affecting either BNSF Railway's operations or our customers' abilities to deliver goods to BNSF Railway for shipment; *legal and regulatory factors*: developments and changes in laws and regulations and the ultimate outcome of shipper and rate claims subject to adjudication, environmental investigations or proceedings and other types of claims and litigation; and *operating factors*: technical difficulties, changes in operating conditions and costs, competition, and commodity concentrations, the Company's ability to achieve its operational and financial initiatives and to contain costs, as well as natural events such as severe weather, floods and earthquakes or other disruptions of BNSF Railway's operating systems, structures, or equipment.

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions may appear in the Company's public filings with the Securities and Exchange Commission, which are accessible at www.sec.gov and on the Company's website at www.bnsf.com, and which investors are advised to consult.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

In the ordinary course of business, BNSF Railway utilizes various financial instruments that inherently have some degree of market risk. The qualitative and quantitative information presented in the Management's Narrative Analysis of Results of Operations section and Notes 3 and 9 of the Consolidated Financial Statements describe significant aspects of BNSF Railway's financial instrument programs which have a material market risk.

*Commodity Price Sensitivity*

BNSF Railway has a program to hedge against fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2002, are based on the front month settlement price of West Texas Intermediate crude oil (WTI). The hedge prices do not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur between the prices of WTI and the purchase price of BNSF Railway's diesel fuel, including refining costs. The sum of all such costs typically ranges between 12 and 30 cents per gallon. For swaps, BNSF Railway either pays or receives the difference between the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. For costless collars, if the average hedge commodity price for a specified determination period is greater than the cap price, BNSF Railway receives the difference for a specified number of gallons. If the average commodity price is less than the floor price, BNSF Railway pays the difference for a specified number of gallons. If the commodity price is between the floor price and the cap price, BNSF Railway neither makes nor receives a payment. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF Railway believes there is a significant correlation between the market prices for diesel fuel and WTI. See Note 3 to the Company's Consolidated Financial Statements.

Table of Contents

The tables below provide fuel hedge data for the WTI fuel hedges outstanding at December 31, 2002.

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| **2003** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 600 | 600 | 600 | 600 | 2,400 |
| Equivalent gallons hedged (in millions) | 25.20 | 25.20 | 25.20 | 25.20 | 100.80 |
| Average swap price (per barrel) | $ 20.41 | $ 20.52 | $ 20.59 | $ 20.67 | $ 20.55 |
| Fair value (in millions) | $ 4 | $ 3 | $ 2 | $ 2 | $ 11 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 3,450 | 3,450 | 2,100 | 2,100 | 11,100 |
| Equivalent gallons hedged (in millions) | 144.90 | 144.90 | 88.20 | 88.20 | 466.20 |
| Average cap price (per barrel) | $ 29.16 | $ 27.89 | $ 26.63 | $ 26.05 | $ 27.70 |
| Average floor price (per barrel) | $ 24.92 | $ 23.50 | $ 22.24 | $ 21.65 | $ 23.35 |
| Fair value (in millions) | $ 7 | $ 4 | $ 1 | $ 1 | $ 13 |

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| **2004** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 525 | 525 | 525 | 525 | 2,100 |
| Equivalent gallons hedged (in millions) | 22.05 | 22.05 | 22.05 | 22.05 | 88.20 |
| Average swap price (per barrel) | $ 20.68 | $ 20.64 | $ 20.61 | $ 20.58 | $ 20.63 |
| Fair value (in millions) | $ 2 | $ 2 | $ 1 | $ 1 | $ 6 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 900 | 900 | 900 | 900 | 3,600 |
| Equivalent gallons hedged (in millions) | 37.80 | 37.80 | 37.80 | 37.80 | 151.20 |
| Average cap price (per barrel) | $ 25.10 | $ 24.96 | $ 24.90 | $ 24.88 | $ 24.96 |
| Average floor price (per barrel) | $ 20.69 | $ 20.51 | $ 20.38 | $ 20.35 | $ 20.48 |
| Fair value (in millions) | $ 1 | $ — | $ — | $ — | $ 1 |

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| **2005** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 750 | 750 | 750 | 750 | 3,000 |
| Equivalent gallons hedged (in millions) | 31.50 | 31.50 | 31.50 | 31.50 | 126.00 |
| Average cap price (per barrel) | $ 24.89 | $ 24.88 | $ 24.88 | $ 24.88 | $ 24.88 |
| Average floor price (per barrel) | $ 20.41 | $ 20.40 | $ 20.37 | $ 20.35 | $ 20.38 |
| Fair value (in millions) | $ — | $ — | $ — | $ — | $ — |

The table below provides summarized comparative information for hedge transactions as of December 31, 2001, which were based on the price of pipeline delivery of Gulf Coast #2 heating oil.

| | December 31, 2001 | |
|---|---|---|
| | **2002 Maturity Date** | **Fair Value** |
| Diesel Fuel Swaps: | | |
| Gallons (in millions) | 296 | $ (1) |

| | | | |
|---|---|---|---|
| Weighted average price per gallon | $ 0.57 | | |
| Diesel Fuel Costless Collars: | | | |
| Gallons (in millions) | 50 | $ | (3) |
| Weighted average price per gallon – calls | $ 0.65 | | |
| Weighted average price per gallon – puts | $ 0.57 | | |

At December 31, 2002, BNSF Railway maintained fuel inventories for use in normal operations which were not material to BNSF Railway's overall financial position and, therefore, represent no significant market exposure.

Table of Contents

*Interest Rate Sensitivity*

From time to time, BNSF Railway enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt to manage its ratio of fixed-rate debt to floating-rate debt. BNSF Railway's measurement of fair value of interest rate swaps is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

As discussed in Note 3 in the Consolidated Financial Statements, the Company uses an interest rate swap to minimize exposure to risk. This swap is accounted for as a fair value hedge as required under SFAS No. 133.

The swap transaction outstanding with an interest rate component is reflected in the tables below.

| | December 31, 2002 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2003 | 2004 | 2005 | 2006 | 2007 | There-after | Total | Fair Value |
| **Fair value hedge** | | | | | | | | |
| Fixed to variable swap (in millions) | — | $ 100 | — | — | — | — | $ 100 | $ 5 |
| Average fixed rate | — | 8.63% | — | — | — | — | 8.63% | — |
| Average floating rate | — | 5.98% | — | — | — | — | 5.98% | — |

| | December 31, 2001 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | There-after | Total | Fair Value |
| **Fair value hedge** | | | | | | | | |
| Fixed to variable swap (in millions) | — | — | $ 100 | — | — | — | $ 100 | $ — |
| Average fixed rate | — | — | 8.63% | — | — | — | 8.63% | — |
| Average floating rate | — | — | 6.18% | — | — | — | 6.18% | — |

The tables below provide fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2002. The fair values presented in the table below do not include the fair value of the swap.

| | December 31, 2002 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2003 | 2004 | 2005 | 2006 | 2007 | There-after | Total | Fair Value |
| Fixed-Rate Debt (in millions) | $ 173 | $ 145 | $ 146 | $ 433 | $ 136 | $ 1,119 | $2,152 | $2,198 |
| Average Interest Rate | 6.42% | 7.06% | 7.10% | 8.41% | 6.90% | 7.14% | 7.32% | |
| Variable-Rate Debt (in millions) | — | $ 104 | — | — | — | — | $ 104 | $ 119 |
| Average Interest Rate | — | 6.08% | — | — | — | — | 6.08% | |

December 31, 2001

| | Maturity Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | There-after | Total | Fair Value |
| Fixed-Rate Debt (in millions) | $ 288 | $ 144 | $ 144 | $ 144 | $ 430 | $ 1,114 | $2,264 | $2,351 |
| Average Interest Rate | 7.09% | 7.19% | 7.08% | 7.12% | 8.43% | 7.04% | 7.33% | |
| Variable-Rate Debt (in millions) | — | — | $ 100 | — | — | — | $ 100 | $ 109 |
| Average Interest Rate | — | — | 8.47% | — | — | — | 8.47% | |

Table of Contents

The fair value of BNSF Railway's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF Railway for debt of the same remaining maturities.

As described below, excluded from the 2002 and 2001 tables are $67 million and $117 million, respectively, of intercompany notes payable to BNSF.

At December 31, 2002 and 2001, BNSF Railway had $67 million and $117 million, respectively, of intercompany notes payable to BNSF at a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. During 2002, BNSF Railway had additional net repayments of $50 million of variable rate notes. Interest is paid semi-annually on all intercompany notes payable. Interest expense on intercompany notes payable is reflected in Interest income, related parties in the Consolidated Income Statements. The intercompany notes are due on demand.

At December 31, 2002 and 2001, BNSF Railway had $1,256 million and $825 million, respectively, of intercompany notes receivable from BNSF with a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. The increase of $431 million in intercompany notes receivable is due to net borrowings by BNSF during 2002. Interest is collected semi-annually on all intercompany notes receivable.

In BNSF Railway's Consolidated Balance Sheets, the intercompany notes receivable are presented net of the intercompany notes payable discussed above. BNSF Railway had a net intercompany notes receivable balance of $1,189 and $708 million at December 31, 2002 and 2001, respectively.

Table of Contents

## Item 8. Financial Statements and Supplementary Data

The Consolidated Financial Statements of BNSF Railway, together with the report of independent accountants, are included as part of this filing.

The following documents are filed as a part of this report:


| | Page |
|---|---|
| **1. Consolidated Financial Statements** | |
| Report of Independent Accountants | 17 |
| Consolidated Statements of Income for the three years ended December 31, 2002 | 18 |
| Consolidated Balance Sheets as of December 31, 2002 and 2001 | 19 |
| Consolidated Statements of Cash Flows for the three years ended December 31, 2002 | 20 |
| Consolidated Statements of Changes in Stockholder's Equity for the three years ended December 31, 2002 | 21 |
| Notes to Consolidated Financial Statements | 22-37 |

Table of Contents

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Stockholders and Board
of Directors of The Burlington
Northern and Santa Fe Railway Company
and Subsidiaries

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of The Burlington Northern and Santa Fe Railway Company and subsidiary companies at December 31, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule appearing under Item 15 (a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and the financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and the financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP

Fort Worth, Texas
February 6, 2003

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**(Dollars in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| Revenues | $ 8,963 | $ 9,201 | $ 9,202 |
| Operating expenses: | | | |
| Compensation and benefits | 2,878 | 2,850 | 2,729 |
| Purchased services | 1,132 | 1,088 | 1,025 |
| Depreciation and amortization | 930 | 908 | 894 |
| Equipment rents | 698 | 736 | 740 |
| Fuel | 833 | 973 | 932 |
| Materials and other | 816 | 877 | 747 |
| Total operating expenses | 7,287 | 7,432 | 7,067 |
| Operating income | 1,676 | 1,769 | 2,135 |
| Interest expense | 153 | 170 | 184 |
| Interest income, related parties | (20) | (21) | (20) |
| Other expense, net | 12 | 70 | 35 |
| Income before income taxes | 1,531 | 1,550 | 1,936 |
| Income tax expense | 570 | 598 | 737 |
| Net income | $ 961 | $ 952 | $ 1,199 |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

## THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS
**(Dollars in millions, shares in thousands)**

| | December 31, | |
|---|---|---|
| | 2002 | 2001 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 28 | $ 78 |
| Accounts receivable, net | 138 | 227 |
| Materials and supplies | 226 | 191 |
| Current portion of deferred income taxes | 302 | 306 |
| Other current assets | 73 | 21 |
| Total current assets | 767 | 823 |
| Property and equipment, net | 23,968 | 23,056 |
| Other assets | 849 | 853 |
| Intercompany notes receivable, net | 1,189 | 708 |
| Total assets | $26,773 | $25,440 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | $ 1,875 | $ 1,857 |
| Long-term debt due within one year | 173 | 288 |
| Total current liabilities | 2,048 | 2,145 |
| Long-term debt | 2,083 | 2,076 |
| Deferred income taxes | 6,966 | 6,723 |
| Casualty and environmental liabilities | 352 | 423 |
| Minimum pension liability | 368 | 12 |
| Employee merger and separation costs | 170 | 216 |
| Other liabilities | 1,198 | 1,020 |
| Total liabilities | 13,185 | 12,615 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholder's equity: | | |
| Common stock, $1 par value 1,000 shares authorized; issued and outstanding and paid-in capital | 6,286 | 6,286 |
| Retained earnings | 7,510 | 6,549 |
| Accumulated other comprehensive loss | (208) | (10) |
| Total stockholder's equity | 13,588 | 12,825 |
| Total liabilities and stockholder's equity | $26,773 | $25,440 |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Dollars in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| **OPERATING ACTIVITIES** | | | |
| Net income | $ 961 | $ 952 | $ 1,199 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 930 | 908 | 894 |
| Deferred income taxes | 441 | 318 | 362 |
| Employee merger and separation costs paid | (55) | (55) | (58) |
| Other, net | (147) | 50 | 20 |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | 89 | 126 | 41 |
| Materials and supplies | (25) | 29 | 35 |
| Other current assets | (24) | 103 | (62) |
| Accounts payable and other current liabilities | 68 | (97) | (94) |
| Net cash provided by operating activities | 2,238 | 2,334 | 2,337 |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | (1,358) | (1,459) | (1,399) |
| Other, net | (161) | (106) | (265) |
| Net cash used for investing activities | (1,519) | (1,565) | (1,664) |
| **FINANCING ACTIVITIES** | | | |
| Proceeds from issuance of long-term debt | — | — | 50 |
| Payments on long-term debt | (290) | (277) | (160) |
| Net change in intercompany notes receivable and payable | (481) | (183) | (373) |
| Dividends paid | — | (358) | (150) |
| Other, net | 2 | 4 | 1 |
| Net cash used for financing activities | (769) | (814) | (632) |
| (Decrease) increase in cash and cash equivalents | (50) | (45) | 41 |
| Cash and cash equivalents: | | | |
| Beginning of year | 78 | 123 | 82 |
| End of year | $ 28 | $ 78 | $ 123 |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | | |
| Interest paid, net of amounts capitalized | $ 174 | $ 212 | $ 197 |
| Income taxes paid, net of refunds | $ 178 | $ 278 | $ 448 |
| Non-cash facilities financing | $ 138 | $ — | $ — |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDER'S EQUITY
(Dollars in millions)

| | Common Stock and Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Stockholder's Equity |
|---|---|---|---|---|
| Balance at December 31, 1999 | $ 6,286 | $ 4,906 | $ (7) | $ 11,185 |
| Comprehensive income: | | | | |
| Net income | — | 1,199 | — | 1,199 |
| Minimum pension liability adjustment, net of tax benefit of $2 | — | — | (3) | (3) |
| Total comprehensive income | — | 1,199 | (3) | 1,196 |
| Dividends paid | — | (150) | — | (150) |
| Balance at December 31, 2000 | 6,286 | 5,955 | (10) | 12,231 |
| Comprehensive income: | | | | |
| Net income | — | 952 | — | 952 |
| Cumulative effect of adoption of SFAS No. 133, net of tax expense of $35 | — | — | 56 | 56 |
| Gain on derivative instruments, included in net income, net of tax expense of $18 | — | — | (30) | (30) |
| Change in fair value of derivative instruments, net of tax benefit of $18 | — | — | (28) | (28) |
| Minimum pension liability adjustment, net of tax expense of $1 | — | — | 2 | 2 |
| Total comprehensive income | — | 952 | — | 952 |
| Dividends paid | — | (358) | — | (358) |
| Balance at December 31, 2001 | 6,286 | 6,549 | (10) | 12,825 |
| Comprehensive income: | | | | |
| Net income | — | 961 | — | 961 |
| Gain on derivative instruments, included in net income, net of tax expense of $19 | — | — | (31) | (31) |
| Change in fair value of derivative instruments, net of tax expense of $32 | — | — | 53 | 53 |
| Minimum pension liability adjustment, net of tax benefit of $136 | — | — | (220) | (220) |
| Total comprehensive income | | 961 | (198) | 763 |
| Balance at December 31, 2002 | $ 6,286 | $ 7,510 | $ (208) | $ 13,588 |

See accompanying Notes to Consolidated Financial Statements

Table of Contents

### THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1. The Company**

The Burlington Northern and Santa Fe Railway Company and its majority-owned subsidiaries (collectively, BNSF Railway or Company) is a wholly-owned subsidiary of Burlington Northern Santa Fe Corporation (BNSF). BNSF Railway operates one of the largest railroad networks in North America with approximately 33,000 route miles covering 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Coal, Industrial Products and Agricultural Products, derived from manufacturing, agricultural and natural resource industries, which constituted 38 percent, 23 percent, 23 percent and 16 percent, respectively, of total freight revenues for the year ended December 31, 2002.

BNSF Railway was formerly known as the Burlington Northern Railroad Company (BNRR). On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into BNRR and the name of the surviving entity, BNRR, was changed to The Burlington Northern and Santa Fe Railway Company. Additionally, on January 2, 1998, BNSF Railway's parent, Santa Fe Pacific Corporation (SFP), merged with and into BNSF Railway.

**2. Significant Accounting Policies**

*Principles of Consolidation*

The Consolidated Financial Statements include the accounts of BNSF Railway. All significant intercompany accounts and transactions have been eliminated.

*Use of Estimates*

The preparation of financial statements in accordance with generally accepted accounting principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. Actual results could differ from those estimates.

*Revenue Recognition*

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed.

*Cash and Cash Equivalents*

All short-term investments with original maturities of less than 90 days are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

*Materials and Supplies*

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

*Property and Equipment, net*

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. Upon normal sale or retirement of depreciable railroad property, cost less net salvage value is charged to accumulated depreciation and no gain or loss is recognized. Significant premature retirements and the disposal of land and non-rail property are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures which significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

*Environmental Liabilities*

Liabilities for environmental cleanup costs are initially recorded when BNSF Railway's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

*Personal Injury Claims*

Personal injury liabilities are estimated on an actuarial basis. Incurred but not reported liabilities are included in the estimates based on historical experience. Estimates for these liabilities are undiscounted.

*Income Taxes*

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized.

*Pension and Other Post-Employment Benefits*

Annual pension and other post-employment benefits (OPEB) expenses are calculated by third party actuaries using standard actuarial methodologies. The actuaries assist the Company in making estimates based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of pension and OPEB include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

*Reclassifications*

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications effected previously reported Operating income but had no effect on previously reported Net income.

The change to previously reported Operating income is due to the reclassification of gains on property dispositions from Other expense, net to Operating expenses. These reclassifications increased previously reported annual Operating income by $20 million and $30 million for the years ended December 31, 2001 and 2000, respectively.

**3. Hedging Activities**

On January 1, 2001, BNSF Railway adopted SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, and recorded a cumulative transition benefit of $56 million, net of tax, to Accumulated Other Comprehensive Income (AOCI). The standard requires that all derivatives be recorded on the balance sheet at fair value and establishes criteria for documentation and measurement of hedging activities.

The Company currently uses derivatives to hedge against increases in diesel fuel prices and to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133,

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in AOCI as a separate component of stockholder's equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

BNSF Railway monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance.

*Fuel*

Fuel costs represented 11, 13 and 13 percent of total operating expenses during 2002, 2001 and 2000, respectively. Due to the significance of diesel fuel expenses to the operations of BNSF Railway and the historical volatility of fuel prices, the Company maintains a program to hedge against fluctuations in the price of its diesel fuel purchases. The intent of the program is to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on fuel consumption during 2002 and excluding the impact of the hedging program, each one-cent increase in the price of fuel would result in approximately $11 million of additional fuel expense on an annual basis.

The fuel hedging program includes the use of derivatives that are accounted for as cash flow hedges. As of December 31, 2002, BNSF Railway had entered into fuel swap and costless collar agreements utilizing West Texas Intermediate crude oil (WTI). The hedge prices do not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur between the prices of WTI and the purchase price of BNSF Railway's diesel fuel, including refining costs. The sum of all such costs typically ranges between 12 and 30 cents per gallon. The tables below provide fuel hedge data for the WTI fuel hedges outstanding at December 31, 2002.

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| **2003** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 600 | 600 | 600 | 600 | 2,400 |
| Equivalent gallons hedged (in millions) | 25.20 | 25.20 | 25.20 | 25.20 | 100.80 |
| Average swap price (per barrel) | $ 20.41 | $ 20.52 | $ 20.59 | $ 20.67 | $ 20.55 |
| Fair value (in millions) | $ 4 | $ 3 | $ 2 | $ 2 | $ 11 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 3,450 | 3,450 | 2,100 | 2,100 | 11,100 |
| Equivalent gallons hedged (in millions) | 144.90 | 144.90 | 88.20 | 88.20 | 466.20 |
| Average cap price (per barrel) | $ 29.16 | $ 27.89 | $ 26.63 | $ 26.05 | $ 27.70 |
| Average floor price (per barrel) | $ 24.92 | $ 23.50 | $ 22.24 | $ 21.65 | $ 23.35 |
| Fair value (in millions) | $ 7 | $ 4 | $ 1 | $ 1 | $ 13 |

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| **2004** | **March 31,** | **June 30,** | **September 30,** | **December 31,** | **Annual** |
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 525 | 525 | 525 | 525 | 2,100 |
| Equivalent gallons hedged (in millions) | 22.05 | 22.05 | 22.05 | 22.05 | 88.20 |
| Average swap price (per barrel) | $ 20.68 | $ 20.64 | $ 20.61 | $ 20.58 | $ 20.63 |
| Fair value (in millions) | $ 2 | $ 2 | $ 1 | $ 1 | $ 6 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 900 | 900 | 900 | 900 | 3,600 |
| Equivalent gallons hedged (in millions) | 37.80 | 37.80 | 37.80 | 37.80 | 151.20 |
| Average cap price (per barrel) | $ 25.10 | $ 24.96 | $ 24.90 | $ 24.88 | $ 24.96 |
| Average floor price (per barrel) | $ 20.69 | $ 20.51 | $ 20.38 | $ 20.35 | $ 20.48 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Fair value (in millions) | $ | 1 | $ | — | $ | — | $ | — | $ | 1 |

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| 2005 | Quarter Ended March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 750 | 750 | 750 | 750 | 3,000 |
| Equivalent gallons hedged (in millions) | 31.50 | 31.50 | 31.50 | 31.50 | 126.00 |
| Average cap price (per barrel) | $ 24.89 | $ 24.88 | $ 24.88 | $ 24.88 | $ 24.88 |
| Average floor price (per barrel) | $ 20.41 | $ 20.40 | $ 20.37 | $ 20.35 | $ 20.38 |
| Fair value (in millions) | $ — | $ — | $ — | $ — | $ — |

As of December 31, 2002, BNSF Railway's total fuel hedging program covered approximately 49 percent, 20 percent and 10 percent of estimated fuel purchases for 2003, 2004 and 2005, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

As a result of adopting SFAS No. 133, the Company recorded a cumulative transition benefit of $56 million, net of tax, to AOCI related to fuel hedging transactions as of January 1, 2001. Subsequent changes in fair value for the effective portion of derivatives qualifying as hedges are recognized in Other Comprehensive Income (OCI) until the purchase of the related hedged item is recognized in earnings, at which time changes in fair value previously recorded in OCI are reclassified to earnings and recognized in fuel expense.

The amounts recorded in the Consolidated Statements of Income since the adoption of SFAS No. 133 for fuel hedge transactions were as follows (in millions):

| | Year Ended December 31, 2002 | 2001 |
|---|---|---|
| Hedge benefit | $ 50 | $ 48 |
| Tax effect | 19 | 18 |
| Hedge benefit, net of tax | $ 31 | $ 30 |

Since the adoption of SFAS No. 133, the ineffective portion of fuel hedge transactions has been de minimis.

The amounts recorded in the Consolidated Balance Sheets for fuel hedge transactions were as follows (in millions):

| | December 31, 2002 | 2001 |
|---|---|---|
| Fuel hedging asset (liability) | $ 31 | $ (4) |
| Tax effect | 12 | (2) |
| Amount included in AOCI, net of tax | $ 19 | $ (2) |
| Settled fuel hedging contracts receivable (payable) | $ 29 | $ (3) |

Amounts recorded in AOCI represent the fair value less the ineffective portion of unexpired hedges.

BNSF Railway measures the fair value of hedges from data provided by various external counterparties. To value a swap, the Company uses a three-month average of forward commodity prices for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties.

*Interest Rate*

From time to time, BNSF Railway enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses an interest rate swap as part of its interest rate risk management strategy.

As of December 31, 2002, BNSF Railway had entered into one swap on a notional amount of $100 million in which it pays a floating rate, which fluctuates quarterly, based on LIBOR. The floating rate to be paid by BNSF Railway as of December 31, 2002, was 5.98 percent and the fixed rate BNSF Railway is to receive is 8.63 percent. This swap will expire in 2004.

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The amounts recorded in the Consolidated Statements of Income since the adoption of SFAS No. 133 for the interest rate fair value hedge transaction was as follows (in millions):

| | Year Ended December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Hedge benefit | $ 2 | $ — |
| Tax effect | 1 | — |
| Hedge benefit, net of tax | $ 1 | $ — |

The amounts recorded in other assets with a corresponding increase to debt on the Consolidated Balance Sheets for the interest rate fair value hedge transaction, which represents the fair value of the unexpired hedge, was as follows (in millions):

| | December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Short-term interest rate hedging asset | $ 1 | $ — |
| Long-term interest rate hedging asset | $ 4 | $ — |

**4. Other Expense, Net**

Other expense, net includes the following (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Accounts receivable sale fees | $ 12 | $ 30 | $ 40 |
| Write-down of non-rail investments | — | 47 | — |
| Miscellaneous, net | — | (7) | (5) |
| Total | $ 12 | $ 70 | $ 35 |

Losses recognized in 2001 related to non-rail investments consisted primarily of Pathnet Telecommunications, Inc., a telecommunications venture; a decline in the cash surrender value of company owned life insurance policies; and a portfolio of other non-core investments.

**5. Income Taxes**

Income tax expense was as follows (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Current: | | | |
| Federal | $ 115 | $ 250 | $ 332 |

| | | | |
|---|---|---|---|
| State | 14 | 30 | 43 |
| Total current | 129 | 280 | 375 |
| Deferred: | | | |
| Federal | 386 | 274 | 308 |
| State | 55 | 44 | 54 |
| Total deferred | 441 | 318 | 362 |
| Total | $ 570 | $ 598 | $ 737 |

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Federal statutory income tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | 3.0 | 3.1 | 3.5 |
| Other, net | (0.8) | 0.5 | (0.4) |
| Effective tax rate | 37.2% | 38.6% | 38.1% |

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The components of deferred tax assets and liabilities were as follows (in millions):

| | December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Deferred tax liabilities: | | |
| Depreciation and amortization | $(7,148) | $(6,671) |
| Other | (403) | (422) |
| Total deferred tax liabilities | (7,551) | (7,093) |
| Deferred tax assets: | | |
| Casualty and environmental | 218 | 253 |
| Employee merger and separation costs | 80 | 105 |
| Pension and post-retirement benefits | 237 | 99 |
| Other | 352 | 219 |
| Total deferred tax assets | 887 | 676 |
| Net deferred tax liability | $(6,664) | $(6,417) |
| Noncurrent deferred income tax liability | $(6,966) | $(6,723) |
| Current deferred income tax asset | 302 | 306 |
| Net deferred tax liability | $(6,664) | $(6,417) |

In accordance with the income allocation agreement between BNSF and BNSF Railway, the Company makes payments to or receives refunds from BNSF based on its separate consolidated tax liabilities. All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation are closed through 1994 and the business combination date September 1995, respectively. BNSF Railway is currently under Internal Revenue Service examination for years 1995 through 1999. In addition, BNSF Railway and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. Management believes that adequate provision has been made for any adjustment that might be assessed for open years through 2002.

**6. Accounts Receivable, Net**

BNSF Railway transfers most of its accounts receivable to Santa Fe Receivables Corporation (SFRC) a special purpose subsidiary. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust, and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests.

In 2001, SFRC increased capacity to sell undivided interests to investors under the A/R sales program by $100 million to $700 million. Outstanding undivided interests held by investors under the A/R sales program were $594 million, net of $8 million of excess cash held in the trust, and $625 million at December 31, 2002 and 2001, respectively. These receivables were derecognized by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. The undivided interests were supported by $771 million and $844 million of receivables transferred by SFRC to the master trust at December 31, 2002 and 2001, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold. This retained interest is included in accounts receivable in the Company's financial statements. SFRC's retained interest in these receivables of $177 million and $219 million at December 31, 2002 and 2001, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivables transferred by SFRC to the master trust less $594 million and $625 million, in 2002 and 2001, respectively, of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value and there was no gain or loss from the transaction.

The Company retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $9.5 billion in 2002 and $9.8 billion in 2001. No servicing asset or liability has been recorded since the fees the

Company receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in Other expense, net and were $12 million and $30 million in 2002 and 2001, respectively. These costs fluctuate monthly with changes in prevailing interest rates, and were based on weighted average interest rates of 2.0 percent in 2002 and 4.8 percent in 2001. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs, and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. BNSF Railway has historically experienced very low levels of default or dilution. If dilution or delinquency percentages were to increase one percentage point, the value of BNSF Railway's retained interest would increase by approximately $8 million.

Receivables funded under the A/R sales program may not include amounts over ninety days past due or concentrations over certain limits with any one customer. At December 31, 2002 and 2001, $77 million and $72 million, respectively, of accounts receivable were greater than ninety days old. The Company maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category. At December 31, 2002 and 2001, $82 million and $65 million, respectively, of such allowances had been recorded. During the year ended December 31, 2002, 2001 and 2000, $7 million, $8 million and $4 million, respectively, of accounts receivable were written off.

The investors in the master trust have no recourse to BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes provisions that, if triggered, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2002, BNSF Railway was in compliance with these provisions.

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

## 7. Property and Equipment, Net

Property and equipment, net (in millions), and the weighted average annual depreciation rate (%) were as follows:

| | December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2002 Depreciation Rate |
| Land | $ 1,481 | $ 1,416 | — % |
| Track structure | 13,003 | 12,434 | 4.0 |
| Other roadway | 9,713 | 9,407 | 2.5 |
| Locomotives | 2,721 | 2,759 | 5.6 |
| Freight cars and other equipment | 1,678 | 1,719 | 4.8 |
| Computer hardware and software | 254 | 266 | 16.9 |
| Total cost | 28,850 | 28,001 | |
| Less accumulated depreciation and amortization | (4,882) | (4,945) | |
| Property and equipment, net | $23,968 | $23,056 | |

The Consolidated Balance Sheets at December 31, 2002 and 2001, included $972 million, net of $249 million of amortization, and $949 million, net of $253 million of amortization, respectively, for property and equipment under capital leases, primarily for locomotives.

## 8. Accounts Payable and Other Current Liabilities

Accounts payable and other current liabilities consisted of the following (in millions):

| | December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Compensation and benefits payable | $ 409 | $ 353 |
| Casualty and environmental liabilities | 217 | 237 |
| Tax liabilities | 260 | 293 |
| Rents and leases | 150 | 166 |
| Accounts payable | 201 | 155 |
| Contract allowances | 124 | 127 |
| Accrued interest | 42 | 47 |
| Employee merger and separation costs | 40 | 58 |
| Other | 432 | 421 |
| Total | $1,875 | $1,857 |

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

## 9. Debt

Debt outstanding was as follows (in millions):

| | December 31, | |
|---|---|---|
| | 2002 | 2001 |
| Capitalized lease obligations, weighted average rate of 6.5 percent, due 2003 to 2023 | $ 646 | $ 672 |
| Equipment obligations, weighted average rate of 7.2 percent, due 2003 to 2016 | 611 | 677 |
| Notes and debentures, weighted average rate of 7.6 percent, due 2003 to 2023 | 467 | 616 |
| Mortgage bonds, weighted average rate of 7.9 percent, due 2003 to 2047 | 422 | 425 |
| Financing obligations, weighted average rate of 7.0 percent, due 2012 to 2022 | 138 | — |
| Unamortized discount and other, net | (28) | (26) |
| Total | 2,256 | 2,364 |
| Less current portion of long-term debt | (173) | (288) |
| Long-term debt | $2,083 | $2,076 |

Notes and debentures include fair value adjustments for hedges of $4 million and $0 million at December 31, 2002 and 2001, respectively.

Certain BNSF Railway properties and other assets are subject to liens securing $422 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and capital leases.

Aggregate long-term debt scheduled maturities for 2003 through 2007 are $173 million, $249 million, $146 million, $433 million and $136 million, respectively.

The carrying amounts of BNSF Railway's long-term debt at December 31, 2002 and 2001, were $2,256 million and $2,364 million, respectively, while the estimated fair values at December 31, 2002 and 2001, were $2,317 million and $2,460 million, respectively. The fair value of BNSF Railway's long-term debt is primarily based on quoted market prices for the same or similar issues or on the current rates that would be offered to BNSF Railway for debt of the same remaining maturities.

*Mortgage Bonds*

*2003*

In January, the Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

*Notes and Debentures*

*2001*

BNSF Railway entered into an interest rate swap to convert $100 million of fixed-rate debt to floating-rate debt. The floating rate that BNSF Railway pays on the swap is 5.98 percent and the fixed rate BNSF Railway receives is 8.63 percent. The floating rate fluctuates quarterly based on LIBOR. The swap expires in 2004.

*Financing Obligations*

*2002*

The Company financed the construction of an intermodal facility by a third party and entered into an agreement to lease the intermodal facility for 20 years. This lease transaction is accounted for as a financing and has a purchase option. The Company recorded an asset in Property and equipment, net and a liability in Long-term debt of $138 million which represents the fair market value at lease inception.

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Guarantees*

Debt guaranteed by the Company is as follows:

| | Guarantees | | | | |
|---|---|---|---|---|---|
| | BNSF Railway Ownership Percentage | Principal Amount Guaranteed | Maximum Future Payments | Maximum Recourse Amount (a) | Remaining Term (in years) |
| **Counterparty** | | | | | |
| Kinder Morgan Energy Partners LP | 0.5% | $ 190 | $ 190 | $ — | Termination of Ownership |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $ 70 | $ 118 | $ 118 | 16 |
| The Unified Government of Wyandotte County/Kansas City, Kansas | 0.0% | $ 14 | $ 24 | $ — | 20 |
| Westside Intermodal Transportation Corporation | 0.0% | $ 45 | $ 78 | $ — | 20 |
| San Jacinto Partnership | 49.0% | $ — | $ — | $ — | N/A |
| All other | 0.0% | $ 19 | $ 23 | $ 7 | Various |

(a) – Reflects the maximum amount the Company could recover from a third party other than the counterparty.

Kinder Morgan Energy Partners LP

Santa Fe Pacific Pipelines, Inc (SFPP), an indirect, wholly-owned subsidiary of BNSF Railway, has a guarantee in connection with its remaining special limited partnership interest in SFPP, L.P. All obligations with respect to the guarantee will cease upon termination of ownership rights which would occur upon a put notice issued by BNSF Railway or the exercise of the call rights by the general partners of SFPP, L.P.

Kansas City Terminal Intermodal Transportation Corporation

BNSF Railway and another major railroad jointly and severally guarantee $70 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF Railway has a 25 percent ownership in KCTRC and accounts for its interest using the equity method of accounting.

The Unified Government of Wyandotte County/Kansas City, Kansas and Westside Intermodal Transportation Corporation

Proceeds of guaranteed debt are being used to finance construction of a bridge that will connect BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge will be operated by KCTRC.

San Jacinto Partnership

BNSF Railway has agreed to guarantee approximately $85 million of debt, none of which was issued as of December 31, 2002. The proceeds from the debt are to be used to construct and operate a 13-mile railroad which will service several chemical and plastics manufacturing facilities in the Houston, Texas area. In addition, BNSF Railway has advanced the San Jacinto Partnership $16 million in interim construction financing which is expected to be repaid in 2003 when the debt is expected to be issued.

All other

BNSF Railway guarantees $19 million of other debt and leases including the guarantee of the residual value of certain leased assets totaling approximately $6 million. BNSF holds a performance bond and has the option to sub-lease property to recover up to $7 million of the $19 million of guarantees. These guarantees expire between 2006 and 2014.

Other than the performance bond discussed above, there is no collateral held by a third party which BNSF Railway could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than amounts recorded for capitalized leases, none of the guarantees above are recorded in the Consolidated Financial Statements of the Company. BNSF Railway does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

Table of Contents

### THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

## 10. Commitments and Contingencies

*Lease Commitments*

BNSF Railway has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments (which reflect leases having non-cancelable lease terms in excess of one year) as of December 31, 2002, are summarized as follows (in millions):

| | December 31, | |
|---|---|---|
| | Capital Leases | Operating Leases |
| 2003 | $ 109 | $ 425 |
| 2004 | 109 | 428 |
| 2005 | 109 | 398 |
| 2006 | 108 | 367 |
| 2007 | 96 | 334 |
| Thereafter | 272 | 3,585 |
| Total | 803 | $ 5,537 |
| Less amount representing interest | 157 | |
| Present value of minimum lease payments | $ 646 | |

Lease rental expense for all operating leases was $448 million, $443 million and $428 million for the years ended December 31, 2002, 2001 and 2000, respectively. Contingent rentals and sublease rentals were not significant.

*Other Commitments*

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

*Casualty and Environmental*

Personal injury claims, including work-related injuries to employees, are a significant expense for the railroad industry. Employees of BNSF Railway are compensated for work-related injuries according to the provisions of the Federal Employers' Liability Act (FELA). FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to significant increases in expense in past years. BNSF Railway has implemented a number of safety programs to reduce the number of personal injuries as well as the associated claims and personal injury expense.

BNSF formed a wholly-owned subsidiary, Burlington Northern Santa Fe Insurance Company, Ltd. (BNSF IC), in the second quarter of 2002. BNSF IC provides insurance coverage for certain punitive damage risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims incurred after January 1, 2002, and certain other claims which are subject to reinsurance. During the year ended December 31, 2002, BNSF Railway had paid premiums of $133 million to BNSF IC for such coverage. At December 31, 2002, there was no unamortized premium remaining in the Consolidated Balance Sheets.

The Company recognized personal injury expenses of approximately $94 million, $195 million and $168 million during 2002, 2001 and 2000, respectively for claims not insured by BNSF IC. BNSF Railway made payments for personal injuries of approximately $179 million, $173 million and $178 million in 2002, 2001 and 2000, respectively. At December 31, 2002 and 2001, the Company had recorded liabilities of $373 million and $458 million, respectively, related to both asserted and unasserted personal injury claims. Of these amounts, $166 million and $184 million,

respectively, are included in current liabilities. BNSF Railway's liabilities for both asserted and unasserted personal injury claims are undiscounted.

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF Railway's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF Railway has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at approximately 30 Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF Railway may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF Railway may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF Railway generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Environmental costs include initial site surveys and environmental studies of potentially contaminated sites as well as costs for remediation and restoration of sites determined to be contaminated. Liabilities for environmental cleanup costs are initially recorded when BNSF Railway's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. BNSF Railway conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews, analysis of the likelihood of participation in and the ability of other PRPs to pay for cleanup, and historical trend analyses.

BNSF Railway is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts at approximately 415 sites, including the Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination. The Company recognized environmental expenses of approximately $43 million, $51 million and $40 million during 2002, 2001 and 2000, respectively. BNSF Railway paid approximately $49 million, $72 million and $49 million during 2002, 2001 and 2000, respectively, for mandatory and unasserted cleanup efforts, including amounts expended under federal and state voluntary cleanup programs. BNSF Railway has recorded liabilities for remediation and restoration of all known sites of $196 million at December 31, 2002, compared with $202 million at December 31, 2001. Of these amounts, $51 million and $53 million, respectively, are included in current liabilities. BNSF Railway's environmental liabilities are not discounted. BNSF Railway anticipates that the majority of the accrued costs at December 31, 2002, will be paid over the next five years and no individual site is considered to be material.

Liabilities recorded for environmental costs represent BNSF Railway's best estimates for remediation and restoration of these sites and include both asserted and unasserted claims. Unasserted claims are not considered to be a material component of the liability. Although recorded liabilities include BNSF Railway's best estimates of all costs, without reduction for anticipated recoveries from third parties, BNSF Railway's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of potentially contaminated sites. As a result, future charges to income for environmental liabilities could have a significant effect on results of operations in a particular quarter or fiscal year as individual site studies and remediation and restoration efforts proceed or as new sites arise. However, management believes it is unlikely any identified matters, either individually or in the aggregate, will have a material adverse effect on BNSF Railway's results of operations, financial position or liquidity.

*Other Claims and Litigation*

BNSF Railway and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF Railway's management that none of these items, when finally resolved, will have a material adverse effect on the results

Table of Contents

## THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

of operations, financial position or liquidity of BNSF Railway, although an adverse resolution of a number of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

### 11. Employee Merger and Separation Costs

Employee merger and separation costs activity was as follows (in millions):

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Beginning balance at January 1, | $274 | $310 | $356 |
| Accruals | 1 | 30 | 22 |
| Payments | (55) | (55) | (58) |
| Other | (10) | (11) | (10) |
| Ending balance at December 31, | $210 | $274 | $310 |

Employee merger and separation liabilities of $210 million and $274 million are included in the Consolidated Balance Sheets at December 31, 2002 and 2001, respectively, and principally represent: (i) employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; (ii) deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; and (iii) certain non-union employee severance costs. Employee merger and separation expenses are recorded in Materials and other in the Consolidated Income Statements. At December 31, 2002, $40 million of the remaining liabilities are included in current liabilities for anticipated costs to be paid in 2003.

During the fourth quarter of 2001, the Company recorded a $66 million charge for workforce reduction related costs which resulted in $30 million being recorded in Employee merger and separation costs.

*Conductors, Trainmen and Locomotive Engineers*

Liabilities related to deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were $163 million and $170 million at December 31, 2002 and 2001, respectively. These costs were primarily incurred in connection with labor agreements reached prior to the consummation of the business combination of BNSF's predecessor companies Burlington Northern Inc. and Santa Fe Pacific Corporation (the Merger) which, among other things, reduced train crew sizes and allowed for more flexible work rules. In 2001, the Company recorded a $5 million reversal of certain deferred benefits payable to reflect a change in estimates.

In the second quarter of 2000, the Company incurred $3 million of costs for severance, medical and other benefit costs for approximately 50 trainmen on reserve boards. All remaining payments were made in 2002.

*Consolidation of Clerical Functions*

Liabilities related to the consolidation of clerical functions were $25 million and $69 million at December 31, 2002 and 2001, respectively, and primarily provide for severance costs associated with the clerical consolidation plan adopted in 1995 upon the Merger. The consolidation plan resulted in the elimination of approximately 1,500 permanent positions and was substantially completed during 1999.

In the fourth quarter of 2001, the Company recorded a charge of $9 million of costs related to the reduction of approximately 40 material handlers and other clerical positions. In the second quarter of 2000, the Company recorded a charge of $17 million for severance, medical and other benefit costs related to approximately 140 material handlers in mechanical shops.

In 2002, 2001 and 2000, the Company recorded $10 million, $6 million and $10 million, respectively, of reversals for certain liabilities associated with the consolidation of clerical functions. These reversals primarily reflect accrued payments related to workforce reductions for positions under collective bargaining agreements where the Company was able to place affected individuals in alternate positions. The remaining liability balance at December 31, 2002, represents benefits to be paid to affected employees who did not receive lump-sum payments, but instead will be paid over five to ten years or in some cases through retirement.

*Non-Union Employee Severance*

Liabilities principally related to certain remaining non-union employee severances resulting from the fourth quarter 2001 workforce reduction, the second quarter 1999 reorganization, and the Merger were $22 million and $35 million at

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

December 31, 2002 and 2001, respectively. These costs will be paid over the next several years based on deferral elections made by the employees.

During the fourth quarter of 2001, the Company reduced 400 positions through severance, normal attrition and the elimination of contractors. The Company recorded $21 million of expenses for severance, medical and other benefits associated with the costs of terminating 360 employees and approximately $31 million for benefits to be received under the Company's retirement and medical plans. During the fourth quarter of 2002, the Company recorded a charge of $1 million related to this program as a result of higher costs than originally estimated. Substantially all of these planned reductions were completed at December 31, 2001.

In the second quarter of 2000, the Company incurred $2 million of costs for severance, medical and other benefit costs for ten involuntarily terminated non-union positions. These planned reductions were completed at December 31, 2000.

### 12. Retirement Plans and Other Postemployment Benefit Plans

BNSF Railway sponsors a funded, noncontributory qualified BNSF Railway Retirement Plan, which covers substantially all non-union employees and an unfunded, nonqualified BNSF Railway Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these BNSF Railway plans are based on years of credited service and the highest five-year average compensation levels. BNSF Railway's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF Railway that have met certain age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF Railway's policy is to fund benefits payable under the medical and life insurance plans as they come due. Employees beginning salaried employment with BNSF Railway subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

Components of the net (benefit) cost for these plans were as follows (in millions):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | Pension Benefits | | | Medical and Life Benefits | | |
| | 2002 | 2001 | 2000 | 2002 | 2001 | 2000 |
| Service cost | $ 15 | $ 13 | $ 13 | $ 6 | $ 4 | $ 4 |
| Interest cost | 100 | 102 | 100 | 21 | 18 | 18 |
| Expected return on plan assets | (127) | (136) | (129) | — | — | — |
| Curtailments/settlements | — | 10 | — | — | 3 | — |
| Special termination benefits | 2 | 18 | — | — | — | — |
| Actuarial loss | 1 | 1 | — | 3 | — | — |
| Net amortization and deferred amounts | 2 | 2 | 3 | — | — | 1 |
| Net (benefit) cost | $ (7) | $ 10 | $ (13) | $ 30 | $ 25 | $ 23 |

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following tables show the change in benefit obligation and plan assets of the plans based on a September 30 measurement date (in millions):

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| **Change in Benefit Obligation** | | | | |
| Benefit obligation at beginning of period | $1,507 | $1,419 | $ 314 | $ 247 |
| Service cost | 15 | 13 | 6 | 4 |
| Interest cost | 100 | 102 | 21 | 18 |
| Plan participants' contributions | — | — | 5 | 4 |
| Amendments | 2 | — | (12) | — |
| Actuarial loss | 117 | 68 | 54 | 61 |
| Curtailments/settlements | (13) | 8 | — | 3 |
| Special termination benefits | 2 | 18 | — | — |
| Benefits paid | (119) | (121) | (25) | (23) |
| Benefit obligation at end of period | $1,611 | $1,507 | $ 363 | $ 314 |

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| **Change in Plan Assets** | | | | |
| Fair value of plan assets at beginning of period | $ 1,345 | $ 1,577 | $ — | $ — |
| Actual return on plan assets | (67) | (115) | — | — |
| Settlements | (13) | — | — | — |
| Employer contribution | 5 | 4 | 20 | 19 |
| Plan participants' contributions | — | — | 5 | 4 |
| Benefits paid | (119) | (121) | (25) | (23) |
| Fair value of plan assets at end of period | $ 1,151 | $ 1,345 | $ — | $ — |

The following tables show the reconciliation of the funded status of the plans with amounts recorded in the Consolidated Balance Sheets (in millions):

| | December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Medical and Life Benefits | |
| | 2002 | 2001 | 2002 | 2001 |
| Funded status | $(460) | $(162) | $(363) | $(314) |
| Unrecognized net loss | 479 | 169 | 111 | 60 |
| Unrecognized prior service cost | (3) | (6) | (12) | (1) |
| Unamortized net transition obligation | — | 3 | — | — |

| | | | | |
|---|---|---|---|---|
| Net amount recognized | $ 16 | $ 4 | $(264) | $(255) |

| | December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Medical and Life Benefits | |
| | 2002 | 2001 | 2002 | 2001 |
| Amounts recognized in the consolidated balance sheets consist of: | | | | |
| Prepaid benefit cost | $ — | $ 42 | $ — | $ — |
| Accrued benefit liability | (352) | (50) | (264) | (255) |
| Accumulated other comprehensive loss | 368 | 12 | — | — |
| Net amount recognized | $ 16 | $ 4 | $(264) | $(255) |

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The assumptions used in accounting for the BNSF Railway plans were as follows:

| | Pension Benefits | | Medical and Life Benefits | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| **Assumptions** | | | | |
| Discount rate | 6.5% | 7.0% | 6.5% | 7.0% |
| Rate of increase in compensation levels | 3.9% | 4.0% | — | — |
| Expected return on plan assets | 8.5% | 9.5% | — | — |

For purposes of the medical and life benefits calculations for 2002, the assumed health care cost trend rate for both managed care and non-managed care medical costs is 11 percent and is assumed to decrease one percent for each future year until the ultimate rate of five percent is reached in 2009 and remain constant thereafter. Increasing the assumed health care cost trend rates by one percentage point would increase the accumulated post-retirement benefit obligation by $36 million and the combined service and interest components of net post-retirement benefit cost recognized in 2002 by $3 million. Decreasing the assumed health care cost trend rates by one percentage point would decrease the accumulated post-retirement benefit obligation by $30 million and the combined service and interest components of net post-retirement benefit cost recognized in 2002 by $3 million.

*Defined Contribution Plans*

BNSF Railway sponsors 401(k) plans which cover substantially all employees. BNSF Railway matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Depending on BNSF Railway's performance, non-union employees can receive an additional matching contribution of up to 30 percent of the first six percent at the end of the year. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF Railway's 401(k) matching expense was $15 million, $14 million and $16 million in 2002, 2001 and 2000, respectively.

*Other*

Under collective bargaining agreements, BNSF Railway participates in multi-employer benefit plans which provide certain post-retirement health care and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $20 million, $18 million and $15 million, in 2002, 2001 and 2000, respectively.

## 13. Related Party Transactions

BNSF Railway is involved with BNSF and certain of its subsidiaries in related party transactions in the ordinary course of business, which include payments made on each other's behalf and performance of services. Under the terms of a tax allocation agreement with BNSF, BNSF Railway made federal and state income tax payments, net of refunds, of $178 million, $278 million and $448 million during 2002, 2001 and 2000, respectively, which are reflected in changes in working capital in the consolidated statement of cash flows.

BNSF Railway had a net intercompany payable balance of $7 million and a net intercompany receivable balance of $55 million at December 31, 2002 and 2001, respectively, which are reflected in accounts payable and accounts receivable in the Consolidated Balance Sheets. Net intercompany receivable or payable balances are settled in the ordinary course of business.

At December 31, 2002 and 2001, BNSF Railway had $67 million and $117 million, respectively, of intercompany notes payable to BNSF at a variable interest rate of 1.0 percent above the monthly average of the daily effective Federal Funds rate. During 2002, BNSF Railway had additional borrowings of $35 million of variable rate notes and made repayments of $85 million. Proceeds from borrowings are primarily used to fund capital expenditures and other investing activities. Interest is paid semi-annually on all intercompany notes payable. Interest expense on intercompany notes payable is reflected in Interest income, related parties in the Consolidated Income Statements. The intercompany notes are due on demand.

At December 31, 2002 and 2001, BNSF Railway had $1,256 million and $825 million, respectively, of intercompany notes receivable from BNSF with a variable interest rate of 1.0 percent above the monthly average of the

Table of Contents

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

daily effective Federal Funds rate. The $431 million increase in intercompany notes receivable is primarily due to additional borrowings of $798 million offset by $367 million of repayments from BNSF during 2002. Interest is collected semi-annually on all intercompany notes receivable. The intercompany notes receivable are presented net of the intercompany notes payable discussed above in the Consolidated Balance Sheets. Interest income from intercompany notes receivable is presented in Interest income, related parties in the Consolidated Income Statements.

During 2001 and 2000, BNSF Railway paid dividends of $358 million and $150 million, respectively. BNSF Railway did not pay any dividends during 2002.

Under various plans, BNSF has granted options to employees to purchase its common stock at a price not less than the fair market value at the date of grant. Certain employees of BNSF Railway participate in these plans. In addition, BNSF has other long-term incentive plans administered separately on behalf of employees that are participated in by certain BNSF Railway employees. These plans include, among other things, incentive compensation, issuance of restricted stock and a discounted stock purchase program. Compensation expense, net of tax, recorded for stock incentive plans in accordance with Accounting Principles Board Opinion 25 was $10 million, $8 million and $0 million for the years ended 2002, 2001 and 2000, respectively.

**14. Accounting Pronouncements**

The Financial Accounting Standards Board (FASB) issued SFAS No. 143, *Accounting for Asset Retirement Obligations*, which is effective for fiscal years beginning after June 15, 2002. SFAS No. 143 addresses financial accounting and reporting for obligations associated with the retirement of tangible long-lived assets and the associated asset retirement costs, which will affect the Company's accounting for track structure removal costs. While the standard will have no effect on the Company's liquidity, it will result in a cumulative effect adjustment in the first quarter of 2003 which the Company is currently quantifying along with the ongoing impact it will have on results of operations. The Company does not believe the standard will have a material adverse effect on the Company's financial position.

The FASB issued Interpretation No. 46 (FIN 46), *Consolidation of Variable Interest Entities*, which is effective immediately to variable interest entities created after January 31, 2003, and applies in the first interim period beginning after June 15, 2003 to variable interest entities created before February 1, 2003. FIN 46 addresses the consolidation of variable interest entities through identification of a primary beneficiary. The Company has not yet determined the impact of FIN 46. The Company's accounts receivable sales program will be unaffected by this new pronouncement.

**15. Quarterly Financial Data—Unaudited**

| | Fourth | Third | Second | First |
|---|---|---|---|---|
| | (In millions) | | | |
| **2002** | | | | |
| Revenues | $ 2,293 | $2,304 | $ 2,206 | $2,160 |
| Operating income | $ 443 | $ 423 | $ 427 | $ 383 |
| Net income | $ 258 | $ 245 | $ 240 | $ 218 |
| **2001** | (a) | (b) | | (c) |
| Revenues | $ 2,300 | $2,341 | $ 2,269 | $2,291 |
| Operating income | $ 406 | $ 505 | $ 433 | $ 425 |
| Net income | $ 209 | $ 281 | $ 248 | $ 214 |

(a) Includes a $66 million charge for work force reduction related costs.
(b) Includes $32 million related to an automotive revenue contract settlement gain partially offset by an $11 million loss on non-rail investments.
(c) Includes a $36 million loss on non-rail investments.

Certain amounts in the table above have been reclassified to conform to the current presentation which is different than previously reported on Form 10-Q due to the reclassification of gains on property dispositions from Other expense, net to Operating expenses.

Net adjustments to previously reported 2002 quarterly Operating income include increases of $4 million, $23 million and $18 million for the third, second and first quarters, respectively. Adjustments to previously reported 2001 quarterly Operating income include increases of $1 million, $5 million, $7 million and $7 million for the fourth, third, second and first quarters, respectively.

Table of Contents

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

Table of Contents

## PART III

### Item 14. Controls and Procedures

Based on their evaluation as of a date within 90 days of the filing date of this annual report on Form 10-K, BNSF Railway's principal executive officer and principal financial officer have concluded that BNSF Railway's disclosure controls and procedures (as defined in Rules 13a-14(c) and 15d-14(c) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF Railway in its filings under the Securities Exchange Act of 1934 is processed, recorded, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. There have been no significant changes in the Company's internal controls, or in other factors that could significantly affect its internal controls, since the date of their most recent evaluation.

Table of Contents

## PART IV

### Item 15. Exhibits, Financial Statement Schedules, and Reports on Form 8-K

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements—See Item 8

2. Consolidated Financial Statement Schedules:
   Schedule II—Valuation and Qualifying Accounts—See page F-1

Schedules other than those listed above are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

3. Exhibits:
   See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

(b) Reports on Form 8-K
   None.

Table of Contents

## SIGNATURES

**Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, The Burlington Northern and Santa Fe Railway Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.**

THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY

By: /s/ Matthew K. Rose

**Matthew K. Rose**
**Chairman, President and Chief Executive Officer**

Dated: February 14, 2003

**Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of The Burlington Northern and Santa Fe Railway Company and in the capacities and on the date indicated.**

| Signature | Title |
|---|---|
| /s/ Matthew K. Rose* <br> **Matthew K. Rose** | President and Chief Executive Officer (Principal Executive Officer) and Director |
| /s/ Thomas N. Hund* <br> **Thomas N. Hund** | Executive Vice President and Chief Financial Officer (Principal Financial Officer) and Director |
| /s/ Dennis R. Johnson* <br> **Dennis R. Johnson** | Vice President and Controller (Principal Accounting Officer) |
| /s/ Carl R. Ice* <br> **Carl R. Ice** | Director |
| /s/ Jeffrey R. Moreland* <br> **Jeffrey R. Moreland** | Director |
| /s/ Charles S. Schultz* <br> **Charles S. Schultz** | Director |

Dated: February 14, 2003

*By: /s/ Jeffrey R. Moreland

**Jeffrey R. Moreland**
*Executive Vice President Law & Government Affairs and Secretary*

Table of Contents

## CERTIFICATIONS PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Matthew K. Rose, certify that:

1. I have reviewed this annual report on Form 10-K of The Burlington Northern and Santa Fe Railway Company;
2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:
   a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
   b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and
   c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):
   a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and
   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and
6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: February 14, 2003

/s/ MATTHEW K. ROSE

**Matthew K. Rose**
**Chairman, President and**
**Chief Executive Officer**

Table of Contents

I, Thomas N. Hund, certify that:

1. I have reviewed this annual report on Form 10-K of The Burlington Northern and Santa Fe Railway Company;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

   a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

   c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: February 14, 2003

/s/ THOMAS N. HUND

**Thomas N. Hund**
**Executive Vice President and**
**Chief Financial Officer**

Table of Contents

**SCHEDULE II**
**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**
**VALUATION AND QUALIFYING ACCOUNTS**
**For the Years Ended December 31, 2002, 2001 and 2000**
**(in millions)**

| Description | Balance at Beginning of Period | Additions Charged to Income | Deductions | Balance at End of Period |
|---|---|---|---|---|
| | | | (a) | (b) |
| December 31, 2002 | | | | |
| Personal injury and environmental liabilities | $ 660 | $ 137 | $ 228 | $ 569 |
| December 31, 2001 | | | | |
| Personal injury and environmental liabilities | $ 659 | $ 246 | $ 245 | $ 660 |
| December 31, 2000 | | | | |
| Personal injury and environmental liabilities | $ 678 | $ 208 | $ 227 | $ 659 |

(a) Represents cash payments, net of recoveries
(b) Classified in the Consolidated Balance Sheets as follows:

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Accounts payable and other current liabilities | $ 217 | $ 237 | $ 229 |
| Casualty and environmental liabilities | 352 | 423 | 430 |
| | $ 569 | $ 660 | $ 659 |

Table of Contents

**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY AND SUBSIDIARIES**

**INDEX OF EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation of The Burlington Northern and Santa Fe Railway Company effective December 31, 1996. Incorporated by reference to The Burlington Northern and Santa Fe Railway Company's Report on Form 10-K for the fiscal year ended December 31, 1996. |
| 3.2 | By-Laws of BNSF Railway as amended through July 17, 1991. Incorporated by reference to Exhibit 3.2 to The Burlington Northern and Santa Fe Railway Company Report on Form 10-K for the fiscal year ended December 31, 1991. |
| 4.1 | BNSF Railway is not filing any instruments evidencing indebtedness because the total amount of securities authorized under any single such instrument does not exceed ten percent of BNSF Railway's total assets. Copies of any such material instruments will be furnished to the Securities and Exchange Commission upon request. |
| 12.1 | Statement regarding the Computation of Ratio of Earnings to Fixed Charges. |
| 99.1 | Certification pursuant to 18 U.S.C. §1350 (Section 906 of Sarbanes-Oxley Act of 2002). |

10-K 1 d10k.htm FORM 10-K

**Table of Contents**

**Index to Financial Statements**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2003

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from to

Commission File Number: 1-11535

# BURLINGTON NORTHERN SANTA FE CORPORATION
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **41-1804964** |
| **(State of Incorporation)** | **(I.R.S. Employer Identification No.)** |

**2650 Lou Menk Drive**
**Fort Worth, Texas 76131-2830**
**(Address of principal executive offices, including zip code)**

**(800) 795-2673**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange<br>Chicago Stock Exchange<br>Pacific Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. Yes ✓ No ____

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ____

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ✓ No ____

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $10.520 billion on June 30, 2003. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date:

Common Stock, $0.01 par value, 372,258,486 shares outstanding as of February 2, 2004.

**DOCUMENTS INCORPORATED BY REFERENCE**

List hereunder the documents from which parts thereof have been incorporated by reference and the part of the Form 10-K into which such information is incorporated:

| | |
|---|---|
| Burlington Northern Santa Fe Corporation's definitive Proxy Statement, to be filed not later than 120 days after the end of the fiscal year covered by this report | PART III |

Table of Contents

Index to Financial Statements

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| | **PART I** | |
| Items 1 and 2. | Business and Properties | 1 |
| Item 3. | Legal Proceedings | 7 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 8 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 10 |
| Item 6. | Selected Financial Data | 10 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 10 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 26 |
| Item 8. | Financial Statements and Supplementary Data | 27 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 59 |
| Item 9A. | Controls and Procedures | 59 |
| | **PART III** | |
| Item 10. | Directors and Executive Officers of the Registrant | 60 |
| Item 11. | Executive Compensation | 60 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 60 |
| Item 13. | Certain Relationships and Related Transactions | 61 |
| Item 14. | Principal Accountant Fees and Services | 61 |
| | **PART IV** | |
| Item 15. | Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 62 |
| Signatures | | S-1 |
| Exhibits | | E-1 |

Table of Contents

Index to Financial Statements

## PART I

### Items 1 and 2. Business and Properties

Burlington Northern Santa Fe Corporation (BNSF or Company) was incorporated in the State of Delaware on December 16, 1994. On September 22, 1995, the stockholders of Burlington Northern, Inc. (BNI) and Santa Fe Pacific Corporation (SFP) became the stockholders of BNSF pursuant to a business combination of the two companies.

On December 30, 1996, BNI merged with and into SFP. On December 31, 1996, The Atchison, Topeka and Santa Fe Railway Company (ATSF) merged with and into Burlington Northern Railroad Company (BNRR), and BNRR changed its name to The Burlington Northern and Santa Fe Railway Company (BNSF Railway). On January 2, 1998, SFP merged with and into BNSF Railway.

Through its subsidiaries, BNSF is engaged primarily in the rail transportation business. At December 31, 2003, BNSF and its subsidiaries had approximately 36,500 employees. The rail operations of BNSF Railway, BNSF's principal operating subsidiary, comprise one of the largest railroad systems in North America. BNSF Railway's business and operations are described below.

BNSF's Internet address is www.bnsf.com. Through this internet website (under the "Investors" link), BNSF makes available, free of charge, its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K, and all amendments to those reports, as soon as reasonably practicable after these reports are electronically filed with or furnished to the Securities and Exchange Commission. The following documents are also made available on the Company's website and a copy will be mailed, without charge, upon request to Investor Relations:

- Code of Business Conduct and Ethics for Directors
- Code of Ethics for the Chief Executive Officer and Senior Financial Officers
- Code of Conduct
- Corporate Governance Guidelines
- Charters of the Audit, Compensation and Development, and Directors and Corporate Governance Committees

### Track Configuration

As of December 31, 2003, BNSF Railway operates over a railroad system consisting of approximately 32,500 route miles of track (excluding second, third and fourth main tracks, yard tracks, and sidings), approximately 24,500 miles of which are owned route miles, including easements, through 28 states and two Canadian provinces. Approximately 8,000 route miles of BNSF Railway's system consist of trackage rights that permit BNSF Railway to operate its trains with its crews over another railroad's tracks. BNSF Railway operates over other trackage through lease or other contractual arrangements.

As of December 31, 2003, the total BNSF Railway system, including first, second, third and fourth main tracks, yard tracks, and sidings, consists of approximately 50,000 operated miles of track, all of which are owned by or held under easement by BNSF Railway except for approximately 8,500 route miles operated under trackage rights. At December 31, 2003, approximately 26,500 miles of BNSF Railway's track consists of 112-pound per yard or heavier rail, including approximately 19,500 track miles of 131-pound per yard or heavier rail.

Table of Contents

Index to Financial Statements

**Equipment Configuration**

BNSF Railway owned or had under non-cancelable leases exceeding one year the following units of railroad rolling stock as of the dates shown below:

| | At December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Locomotives | 5,377 | 5,226 | 5,357 |
| Freight Cars: | | | |
| Covered Hopper | 36,255 | 37,609 | 38,007 |
| Gondola | 15,327 | 14,942 | 15,075 |
| Box-specially equipped | 10,021 | 9,612 | 9,641 |
| Open Hopper | 10,866 | 10,848 | 11,094 |
| Flat | 7,854 | 7,946 | 7,844 |
| Refrigerator | 5,427 | 5,588 | 5,554 |
| Autorack | 827 | 843 | 877 |
| Tank | 639 | 501 | 506 |
| Box-general purpose | 31 | 559 | 581 |
| Other | 302 | 319 | 343 |
| Total Freight Cars | 87,549 | 88,767 | 89,522 |
| Domestic Containers | 10,627 | 8,197 | 8,259 |
| Domestic Chassis | 9,864 | 8,180 | 8,205 |
| Company Service Cars | 4,028 | 4,035 | 4,132 |
| Trailers | 2,152 | 2,163 | 2,200 |
| Commuter Passenger Cars | 163 | 160 | 160 |

The average age from date of manufacture of the locomotive fleet at December 31, 2003, was 15 years; the average age from date of manufacture or remanufacture of the freight car fleet at December 31, 2003, was 16 years. These averages are not weighted to reflect the greater capacities of the newer equipment.

**Capital Expenditures and Maintenance**

**Capital Expenditures**

A breakdown of the Company's cash capital expenditures for the three years ended December 31, 2003, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the headings "Liquidity and Capital Resources, Investing Activities."

BNSF's planned 2004 cash capital expenditures are incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations under the heading "Introduction."

**Maintenance**

As of December 31, 2003, General Electric Company, Alstom Transportation Inc., OmniTRAX Locomotive Services, LLC and the Electro-Motive Division of General Motors Corporation performed locomotive maintenance and overhauls for BNSF Railway at its facilities under various maintenance agreements that covered approximately 3,200 locomotives.

Table of Contents

Index to Financial Statements

The extent of the BNSF Railway's track maintenance program is outlined in the following table:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Track miles of rail laid [(a)] | 749 | 685 | 891 |
| Cross ties inserted (thousands) [(a)] | 2,353 | 2,248 | 2,704 |
| Track resurfaced (miles) | 12,399 | 12,499 | 11,011 |

(a) Includes expenditures for both maintenance of existing route system and expansion projects. These expenditures are primarily capitalized.

BNSF Railway's planned 2004 track maintenance of way program will result in the installation of approximately 570 track miles of rail, the replacement of about 2.4 million ties, and the resurfacing of approximately 12,000 miles of track.

**Property and Facilities**

BNSF Railway operates various facilities and equipment to support its transportation system, including its infrastructure and locomotives and freight cars as previously described. It also owns or leases other equipment to support rail operations, including highway trailers, containers and vehicles. Support facilities for rail operations include yards and terminals throughout its rail network, system locomotive shops to perform locomotive servicing and maintenance, a centralized network operations center for train dispatching and network operations monitoring and management in Fort Worth, Texas, regional dispatching centers, computers, telecommunications equipment, signal systems, and other support systems. Transfer facilities are maintained for rail-to-rail as well as intermodal transfer of containers, trailers and other freight traffic. These facilities include 36 major intermodal hubs located across the system as well as 1 intermodal hub center located off-line used in connection with haulage agreements with other railroads. BNSF Railway's largest intermodal facilities in terms of 2003 volume were:

| Intermodal Facilities | Lifts |
|---|---|
| Hobart Yard (Los Angeles, California) | 1,217,000 |
| Corwith Yard (Chicago, Illinois) | 697,000 |
| Willow Springs (Illinois) | 658,000 |
| San Bernardino (California) | 497,000 |
| Alliance (Fort Worth, Texas) | 476,000 |
| Cicero (Illinois) | 454,000 |
| Argentine (Kansas City, Kansas) | 273,000 |

BNSF Railway owns 25 automotive distribution facilities where automobiles are loaded or unloaded from multi-level rail cars and serves eight port facilities in the United States and Canada.

BNSF Railway's largest freight car classification yards based on the average daily number of cars processed (excluding cars that do not change trains at the terminal and intermodal and coal cars) are shown below:

| Classification Yard | Daily Average Cars Processed |
|---|---|
| Argentine (Kansas City, Kansas) | 1,814 |
| Galesburg (Illinois) | 1,590 |
| Barstow (California) | 1,323 |
| Pasco (Washington) | 1,210 |
| Memphis (Tennessee) | 938 |

As of December 31, 2003, certain BNSF Railway properties and other assets are subject to liens securing $391 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and leases, as referred to in Notes 9 and 10 to the Consolidated Financial Statements.

Table of Contents

Index to Financial Statements

**Productivity**

Productivity, as measured by thousand gross ton miles per employee, has risen steadily in the last three years as shown in the table below.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Thousand gross ton miles divided by average number of employees | 24,875 | 23,368 | 22,862 |

A discussion of Employees and Labor Relations is incorporated by reference from Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the headings "Other Matters; Employee and Labor Relations."

**Business Mix**

In serving the Midwest, Pacific Northwest and the Western, Southwestern, and Southeastern regions and ports of the country, BNSF Railway transports, through one operating transportation services segment, a range of products and commodities derived from manufacturing, agricultural, and natural resource industries. Accordingly, its financial performance is influenced by, among other things, general and industry economic conditions at the international, national, and regional levels. The map below illustrates the Company's primary routes, including trackage rights, which allow BNSF Railway to access major cities and ports in the western United States as well as Canadian and Mexican traffic. In addition to major cities and ports, BNSF Railway efficiently serves many smaller markets by working closely with the Company's more than 200 shortline partners. BNSF has also entered into marketing agreements with Canadian National Railway Company and Kansas City Southern Railway Company expanding the marketing reach for the organizations.



Table of Contents

Index to Financial Statements

***Consumer Products:***

The Consumer Products' freight business provided approximately 39 percent of freight revenues in 2003 and consisted of the following business sectors:

- *International.* International business consists primarily of container traffic from steamship companies and accounted for approximately 37 percent of total Consumer Products revenues.
- *Direct Marketing.* Direct marketing generated approximately 20 percent of total Consumer Products revenues. This business centers around intermodal traffic contracted from parcel shippers such as United Parcel Service and service for nationwide and regional LTL (less-than-truckload) carriers such as Yellow-Roadway Corporation.
- *Truckload.* Truckload traffic represented approximately 17 percent of total Consumer Products revenues. This traffic is comprised of business through a joint service arrangement with J.B. Hunt, as well as business from Schneider National and other truckload carriers.
- *Intermodal Marketing Companies.* Approximately 10 percent of total Consumer Products revenues was generated through intermodal marketing companies, primarily shipper agents and consolidators.
- *Automotive.* The transportation of both assembled motor vehicles and shipments of vehicle parts to numerous destinations throughout the Midwest, Southwest, West and Pacific Northwest provided about 8 percent of 2003 total Consumer Products revenue.
- *Perishables and Dry Boxcar.* Perishables and Dry Boxcar represented approximately 8 percent of total Consumer Products revenue. This group consists of beverages, canned goods and perishable food items. Other consumer goods handled include cotton, salt, rubber and tires, and miscellaneous boxcar shipments.

***Industrial Products:***

Industrial Products' freight business provided approximately 23 percent of BNSF's freight revenues in 2003 and consisted of the following four business areas:

- *Construction Products.* The construction products sector represented approximately 36 percent of total Industrial Products revenue in 2003. This sector serves virtually all of the commodities included in or resulting from the production of steel along with mineral commodities such as clays, sands, cements, aggregates, sodium compounds and other industrial minerals. Industrial taconite, an iron ore derivative produced in northern Minnesota, scrap steel and coal coke are BNSF Railway's primary input products transported. Finished steel products range from structural beams and steel coils to wire and nails. BNSF Railway links the integrated steel mills in the East with fabricators in the West and Southwest. Service is also provided to various mini-mills in the Southwest that produce rebar, beams and coiled rod for the construction industry. Industrial minerals include various mined and processed commodities such as cement and aggregates (construction sand, gravel and crushed stone) that generally move to domestic markets for use in general construction and public work projects, including highways. Borates and clays move to domestic points as well as to export markets primarily through West Coast ports. Sodium compounds, primarily soda ash, are moved to domestic markets for use in the manufacturing of glass and other industrial products. Sand is utilized in the manufacturing of glass and in foundry and oil drilling applications.
- *Building Products.* This sector generated approximately 35 percent of total 2003 Industrial Products revenues and includes primary forest product commodities such as lumber, plywood, oriented strand board, particleboard, paper products, pulpmill feedstocks, wood pulp and sawlogs. Also included in this sector are government, machinery and waste traffic. Commodities from this diverse group primarily originate from the Pacific Northwest, Western Canada, upper Midwest, and the Southeast for shipment mainly into domestic markets. Industries served include construction, furniture, photography, publishing, newspaper and industrial packaging. Shipments of waste, ranging from municipal waste to contaminated soil, are transported to landfills and reclamation centers across the country. The government and machinery business includes aircraft parts, agricultural and construction machinery, military equipment and large industrial machinery.
- *Chemicals and Plastics.* The chemicals and plastics sector represents approximately 16 percent of total 2003 Industrial Products revenues. This group is composed of industrial chemicals and plastics commodities. These commodities include caustic soda, chlorine, industrial gases, acids, polyethylene, polypropylene and polyvinyl chloride. Industrial chemicals and plastics resins are used by the automotive, housing, and packaging industries, as well as for feedstocks, to produce other chemical and plastic products. These commodities originate primarily in the Gulf Coast region for shipment mainly into domestic markets.

Table of Contents

Index to Financial Statements

- *Petroleum.* Commodities included in the petroleum sector are liquefied petroleum gas (LPG), diesel fuels, asphalt, alcohol, solvents, petroleum coke, lubes, oils, waxes and carbon black, which made up 13 percent of total Industrial Products revenues for 2003. Product use varies based on commodity, and includes the use of LPG for heating purposes, diesel fuel and lubes to run heavy machinery, and asphalt for road projects and roofing. Products within this group originate and terminate throughout the BNSF network, with the largest areas of activities being the Texas Gulf, Pacific Northwest, California, Montana and Illinois.

*Coal:*

As one of the largest transporters of low-sulfur coal in the United States, BNSF Railway hauls enough coal to generate about ten percent of the electricity produced in this country. In 2003, the transportation of coal contributed about 22 percent of freight revenues. BNSF Railway is the largest transporter of low-sulfur coal originating from the Powder River Basin of Wyoming and Montana, which accounted for approximately 90 percent of all BNSF Railway's coal tons during the three years ending in December 31, 2003. These coal shipments were destined for coal-fired electric generating stations located primarily in the North Central, South Central, Southeast and Mountain regions of the United States. BNSF Railway also transports coal from the Powder River Basin to markets in the eastern United States. Demand for Powder River Basin coal has increased substantially over the past 20 years due to environmental compliance issues, abundant reserves, relatively inexpensive mine production and competitive delivered cost to power plants. Continued deregulation within the electric utility industry may positively impact future demand for Powder River Basin coal.

Other BNSF coal shipments originate principally in Colorado, Illinois, New Mexico and North Dakota. These shipments move to electrical generating stations and industrial plants in the Mountain and North Central regions of the United States and Mexico.

*Agricultural Products:*

The transportation of Agricultural Products provided approximately 16 percent of 2003 total freight revenues and includes wheat, corn, bulk foods, soybeans, oil seeds and meals, feeds, barley, oats and rye, flour and mill products, milo, oils, specialty grains, malt, ethanol and fertilizer. The BNSF Railway system is strategically located to serve the grain-producing regions of the Midwest and Great Plains. The Company is developing and operating a shuttle network for grain, grain products and fertilizer, which allows more efficient use of equipment and improved cycle times as a result of the shuttle process. In addition to serving most grain-producing areas, BNSF Railway serves most major terminal, storage, feeding and food-processing locations. Furthermore, BNSF Railway has access to major export markets in the Pacific Northwest, western Great Lakes, Texas Gulf and Mexico.

*Freight Statistics:*

The following table sets forth certain freight statistics relating to rail operations for the periods indicated:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| Revenue ton miles (millions) | **508,200** | 490,234 | 501,829 |
| Freight revenue per thousand revenue ton miles | **$ 18.27** | $ 18.10 | $ 18.11 |
| Average length of haul (miles) | **1,014** | 992 | 992 |

Revenue, cars/units and average revenue per car/unit information for the three years ended December 31, 2003, is incorporated by reference from a table in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, under the headings "Results of Operations; Revenue Table."

**Government Regulation And Legislation**

Rail operations are subject to the regulatory jurisdiction of the Surface Transportation Board (STB) of the United States Department of Transportation (DOT), the Federal Railroad Administration of DOT, the Occupational Safety and Health Administration (OSHA) as well as state regulatory agencies. The STB has jurisdiction over disputes and complaints involving certain rates, routes and services, the sale or abandonment of rail lines, applications for line extensions and construction, and consolidation or merger with, or acquisition of control of, rail common carriers. The outcome of STB proceedings can affect the costs and profitability of BNSF's business.

Table of Contents

Index to Financial Statements

DOT and OSHA have jurisdiction under several federal statutes over a number of safety and health aspects of rail operations. State agencies regulate some aspects of rail operations with respect to health and safety in areas not otherwise preempted by federal law.

BNSF Railway's rail operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. These laws cover discharges to water, air emissions, toxic substances, and the generation, handling, storage, transportation and disposal of waste and hazardous materials. This regulation has the effect of increasing the cost and liabilities associated with rail operations. Environmental risks are also inherent in rail operations, which frequently involve transporting chemicals and other hazardous materials.

Many of BNSF Railway's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF Railway is now subject and will from time to time continue to be subject to environmental cleanup and enforcement actions. In particular, the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as the Superfund law, generally imposes joint and several liability for cleanup and enforcement costs, without regard to fault or the legality of the original conduct, on current and former owners and operators of a site. Accordingly, BNSF Railway may be responsible under CERCLA and other federal and state statutes for all or part of the costs to cleanup sites at which certain substances may have been released by BNSF Railway, its current lessees, former owners or lessees of properties, or other third parties. Further discussion is incorporated by reference from Note 10 to the Consolidated Financial Statements.

**Competition**

The business environment in which BNSF Railway operates remains highly competitive. Depending on the specific market, deregulated motor carriers, other railroads and river barges may exert pressure on price and service levels. The presence of advanced, high service truck lines with expedited delivery, subsidized infrastructure and minimal empty mileage continues to affect the market for non-bulk, time sensitive freight. The potential expansion of longer combination vehicles could further encroach upon markets traditionally served by railroads. In order to remain competitive, BNSF Railway and other railroads continue to develop and implement operating efficiencies to improve productivity.

As railroads streamline, rationalize and otherwise enhance their franchises, competition among rail carriers intensifies. BNSF Railway's primary rail competitor in the western region of the United States is the Union Pacific Railroad Company (UP). Other Class I railroads and numerous regional railroads and motor carriers also operate in parts of the same territories served by BNSF Railway.

Based on weekly reporting to the Association of American Railroads, in 2003, BNSF's share of the western United States rail traffic was approximately 45 percent.

**Item 3. Legal Proceedings**

*Ray Ridgeway, et al. v. Burlington Northern Santa Fe Corporation and The Burlington Northern and Santa Fe Railway Company*, No. 48-185170-00 (District Court of Tarrant County, Texas, 48th Judicial District) is a state court action filed on October 27, 2000. The plaintiffs' causes of action include alleged breach of contract, negligence, and breach of fiduciary duties with respect to a special dividend that was paid in 1988 by a Burlington Northern Santa Fe Corporation (BNSF) predecessor, Santa Fe Southern Pacific Corporation (SFSP). The complaint alleges that SFSP erroneously informed shareholders as to the tax treatment of the dividend—specifically, the apportionment of the dividend as either a distribution of earnings and profits or a return of capital—which allegedly caused some shareholders to overpay their income taxes. The plaintiffs assert through their expert's report, that SFSP had essentially no accumulated earnings and profits and that the entire dividend distribution should have been treated as a return of capital, rather than the approximately 34 percent that SFSP determined was a return of capital. BNSF believes these claims lack merit and that it has substantial defenses on both the merits of these claims and the attempted class action, and it is defending these claims vigorously.

Table of Contents

Index to Financial Statements

In 2002, BNSF Railway was sued by the North Dakota Department of Health (DOH), and a number of private intervenors, including the City of Mandan, regarding the scope of BNSF's obligation to remediate all or part of a diesel plume or plumes in Mandan, North Dakota. Proceedings were brought in state court, *North Dakota Department of Health, et al. v. The Burlington Northern and Santa Fe Railway Company*; District Court, State of North Dakota, County of Morton, South Central Judicial District Civil No. 02-C-1174, and in an administrative proceeding (Case No. 84-400 WPC). In both proceedings, DOH is seeking injunctive relief and compensatory damages as well as unspecified penalties that could exceed $100,000 due to alleged, historic spills of fuel. The intervenors are seeking injunctive relief and personal injury and property damages. In August 2002, the administrative law judge recommended granting the plaintiffs' Motion for Partial Summary Judgment but that penalties were inappropriate against BNSF Railway. The subsequent administrative order issued on February 5, 2003, granted Partial Summary Judgment on liability and denied BNSF's Motion to Stay the Administrative Proceeding but did not include the administrative law judge's recommendation regarding penalties. BNSF appealed the order in May 2003. On October 21, 2003, the state court reversed the order and the administrative proceeding was stayed pending outcome of the state court lawsuit.

BNSF and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF's management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of BNSF. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

Reference is made to Note 5 to the Consolidated Financial Statements for information concerning certain pending tax related administrative or adjudicative state proceedings or appeals.

**Item 4. Submission of Matters to a Vote of Security Holders**

No matters were submitted by BNSF to a vote of its securities holders during the fourth quarter of 2003.

**Executive Officers of the Registrant**

Listed below are the names, ages, and positions of all executive officers of BNSF and their business experience during the past five years. Executive officers hold office until their successors are elected or appointed, or until their earlier death, retirement, resignation, or removal.

*Matthew K. Rose, 44*

Chairman, President and Chief Executive Officer of BNSF since March 2002. Previously President and Chief Executive Officer of BNSF from December 2000. Also, Chairman, President and Chief Executive Officer of BNSF Railway from December 2000. Previously, President and Chief Operating Officer of BNSF from June 1999 to December 2000, Senior Vice President and Chief Operations Officer from August 1997 to June 1999.

*Thomas N. Hund, 50*

Executive Vice President and Chief Financial Officer since January 2001. Prior to that, Senior Vice President and Chief Financial Officer and Treasurer from August 1999, and Vice President and Controller from January 1996.

*Carl R. Ice, 47*

Executive Vice President and Chief Operations Officer since January 2001. Prior to that, Senior Vice President-Operations from June 1999, Vice President-Operations North from January 1999, and Vice President-Chief Mechanical Officer from December 1996.

*Dennis R. Johnson, 42*

Vice President and Controller since August 1999. Prior to that, Assistant Vice President and Assistant Controller from January 1996.

**Table of Contents**

**Index to Financial Statements**

*John P. Lanigan, Jr., 48*

Executive Vice President and Chief Marketing Officer since January 2003. Prior to that, President and Chief Executive Officer of Logistics.com, Inc. (provider of ASP-based transportation procurement services to shippers and carriers) from May 2000, and President and Chief Operating Officer from March 2000; Chief Operating Officer of Schneider National, Inc. (truckload freight hauler) from 1999 to 2000, and President, Transportation Sector from 1995 to 1999.

*Jeffrey R. Moreland, 59*

Executive Vice President Law & Government Affairs and Secretary since December 2001. Prior to that, Executive Vice President-Law and Chief of Staff since January 2001, and Senior Vice President-Law and Chief of Staff since February 1998.

*Peter J. Rickershauser, 55*

Vice President-Network Development since May 1999. Prior to that, Vice President-Business Development, Merchandise Marketing from December 1998.

Table of Contents

Index to Financial Statements

## PART II

### Item 5. Market for Registrant's Common Equity and Related Stockholder Matters

BNSF's common stock is listed on the New York Stock Exchange under the symbol "BNI." The common stock is also listed on the Chicago Stock Exchange and Pacific Exchange. Information as to the high and low sales prices of such stock for the two years ending December 31, 2003, and the frequency and amount of dividends declared on such stock during such periods, is set forth in Note 17 to the Consolidated Financial Statements. The approximate number of holders of record of the common stock at February 2, 2004, was 40,000.

### Item 6. Selected Financial Data

The following table presents, as of and for the dates indicated, selected historical financial information for the Company (dollars in millions except per share data):

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2000 | 1999 |
| **FOR THE YEAR ENDED:** | | | | | |
| Revenues | $ 9,413 | $ 8,979 | $ 9,208 | $ 9,207 | $ 9,195 |
| Operating income | $ 1,665 | $ 1,656 | $ 1,750 | $ 2,113 | $ 2,209 |
| Income before cumulative effect of accounting change | $ 777(a) | $ 760 | $ 731 | $ 980 | $ 1,137 |
| Basic earnings per share (before cumulative effect of accounting change) | $ 2.10(a) | $ 2.01 | $ 1.89 | $ 2.38 | $ 2.46 |
| Average basic shares (in millions) | 369.1 | 378.0 | 387.3 | 412.1 | 463.2 |
| Diluted earnings per share (before cumulative effect of accounting change) | $ 2.09(a) | $ 2.00 | $ 1.87 | $ 2.36 | $ 2.44 |
| Average diluted shares (in millions) | 372.3 | 380.8 | 390.7 | 415.2 | 466.8 |
| Dividends declared per common share | $ 0.54 | $ 0.48 | $ 0.48 | $ 0.48 | $ 0.48 |
| **AT YEAR END:** | | | | | |
| Total assets | $26,939 | $25,767 | $24,721 | $24,375 | $23,700 |
| Long-term debt and commercial paper, including current portion | $ 6,684 | $ 6,814 | $ 6,651 | $ 6,846 | $ 5,813 |
| Stockholders' equity | $ 8,495 | $ 7,932 | $ 7,849 | $ 7,480 | $ 8,172 |
| Net debt to total capitalization(b) | 44.0% | 46.1% | 45.8% | 47.7% | 41.5% |
| **FOR THE YEAR ENDED:** | | | | | |
| Total capital expenditures | $ 1,726 | $ 1,358 | $ 1,459 | $ 1,399 | $ 1,788 |
| Depreciation and amortization | $ 910 | $ 931 | $ 909 | $ 895 | $ 897 |

(a) 2003 income before cumulative effect of accounting change excludes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.11 per basic share and $0.10 per diluted share, as described in Note 2 to the Consolidated Financial Statements.

(b) Net debt is calculated as total debt less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity.

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

Management's discussion and analysis relates to the financial condition and results of operations of Burlington Northern Santa Fe Corporation and its majority-owned subsidiaries, all of which are separate legal entities (collectively, BNSF or Company). The principal subsidiary of BNSF is The Burlington Northern and Santa Fe Railway Company (BNSF Railway). All earnings per share information is stated on a diluted basis.

Table of Contents

Index to Financial Statements

*Introduction*

BNSF Railway continues to be one of the primary rail transporters in North America. Based on weekly reporting to the Association of American Railroads, for 2003, BNSF's share of the western United States rail traffic was approximately 45 percent, a 1 point market share gain compared with 2002. The increase in market share was primarily driven by the Company's strong growth in intermodal traffic.

Strong growth in international and truckload business, along with increased export demand for grain and continued heavy demand for construction and building products enabled BNSF to achieve 5-percent revenue growth in 2003 compared with 2002. Three of BNSF's four business groups experienced year-over-year revenue growth; however, coal revenues were down slightly. For 2004, the Company anticipates continued revenue growth as both the global and U.S economies continue to expand.

In 2003, high fuel costs again impacted BNSF's operating income, accounting for half of the 6 percent increase in operating expenses. BNSF mitigated some of the fuel price increases through the Company's fuel hedging program as well as through fuel surcharges added to a majority of BNSF's transportation rates.

Each year capital expenditures are a significant use of cash for BNSF. In 2003, BNSF increased its capital expenditures by approximately $350 million, over the prior year, to approximately $1.7 billion to purchase, instead of lease, locomotives as well as to advance construction of double track on a portion of BNSF Railway's transcontinental route. The Company plans to incur approximately $1.9 billion in capital expenditures in 2004. Approximately $1.2 billion of the total 2004 planned capital expenditures will be for maintenance of business activities, primarily consisting of expenditures to maintain BNSF's track, signals, bridges and tunnels. The Company plans to spend approximately $0.5 billion on the acquisition of locomotives. The remaining $0.2 billion is planned for terminal and line expansions, as well as other strategic projects.

*Results Of Operations*

**Revenue Table**

The following table presents BNSF's revenue information by commodity for the years ended December 31, 2003, 2002 and 2001:

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Revenues | | | Cars / Units | | | Average Revenue Per Car / Unit | | |
| | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
| | | (in millions) | | | (in thousands) | | | | |
| Consumer Products | $3,657 | $3,353 | $3,356 | 4,336 | 3,880 | 3,752 | $ 843 | $ 864 | $ 894 |
| Industrial Products | 2,138 | 2,041 | 2,080 | 1,428 | 1,415 | 1,442 | 1,497 | 1,442 | 1,442 |
| Coal | 2,025 | 2,071 | 2,123 | 2,048 | 2,097 | 2,133 | 989 | 988 | 995 |
| Agricultural Products | 1,465 | 1,408 | 1,531 | 834 | 794 | 828 | 1,757 | 1,773 | 1,849 |
| Total Freight Revenues | 9,285 | 8,873 | 9,090 | 8,646 | 8,186 | 8,155 | $1,074 | $1,084 | $1,115 |
| Other Revenues | 128 | 106 | 118 | | | | | | |
| Total Operating Revenues | $9,413 | $8,979 | $9,208 | | | | | | |

Table of Contents

Index to Financial Statements

**Expense Table**

The following table presents BNSF's expense information for the years ended December 31, 2003, 2002, and 2001. (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Compensation and benefits | $2,964 | $2,894 | $2,861 |
| Purchased services | 1,253 | 1,146 | 1,090 |
| Depreciation and amortization | 910 | 931 | 909 |
| Equipment rents | 705 | 698 | 736 |
| Fuel | 1,073 | 833 | 973 |
| Materials and other | 843 | 821 | 889 |
| Total operating expenses | $7,748 | $7,323 | $7,458 |
| Interest expense | $ 420 | $ 428 | $ 463 |
| Other expense, net | $ 14 | $ 12 | $ 114 |
| Income tax expense | $ 454 | $ 456 | $ 442 |

**Year Ended December 31, 2003 Compared with Year Ended December 31, 2002**

BNSF recorded net income for 2003 of $816 million, or $2.19 per share, which includes the favorable cumulative effect of an accounting change of $39 million, net of tax, or $0.10 per share, (See Note 2 to the Consolidated Financial Statements) compared with net income for 2002 of $760 million, or $2.00 per share. Operating income of $1,665 million in 2003 was $9 million higher than 2002.

**Revenues**

Freight revenues of $9,285 million for 2003 were $412 million, or 5 percent, higher than 2002. Freight revenues in 2003 included fuel surcharges of $110 million compared with $26 million in the prior year. Average revenue per car/unit decreased 1 percent in 2003 to $1,074 from $1,084 in 2002.

Consumer Products revenues of $3,657 million for 2003 were $304 million, or 9 percent, greater than 2002. The increase in Consumer Products revenue is primarily due to increased volumes in the international, truckload and perishable sectors. The reduction in average revenue per unit of 2 percent is primarily related to the strong growth in the international sector, which has lower average revenue per unit.

Industrial Products revenues increased $97 million, or 5 percent, to $2,138 million for 2003. The revenue increase is primarily due to increased business in steel, taconite, clay and minerals in the construction products sector and increased military, lumber, plywood, particle board and paper traffic in the building products sector, which were somewhat offset by lower plastics traffic. Rate increases along with increased fuel surcharges contributed to a 4 percent increase in average revenue per car.

Coal revenues of $2,025 million for 2003 decreased $46 million, or 2 percent, versus a year ago. The decrease is primarily a result of lower volumes from the first quarter draw-down of utility stockpiles, weaker demand due to milder weather, utility plant shutdowns and the conversion of a utility plant from coal to natural gas. The average revenue per car grew slightly.

Agricultural Products revenues of $1,465 million for 2003 were $57 million, or 4 percent, higher than revenues for 2002. This increase is primarily due to more ethanol shipments from plants in the Midwest to California and higher shipments of ethanol by-products. Increased export shipments of soybeans also contributed to growth. The average revenue per car was down slightly due to a change in traffic mix partially offset by increased fuel surcharges.

Table of Contents

Index to Financial Statements

**Expenses**

Total operating expenses for 2003 were $7,748 million, an increase of $425 million, or 6 percent, over 2002 primarily due to higher fuel expenses and greater volumes handled.

Fuel expenses of $1,073 million for 2003 were $240 million, or 29 percent, higher than 2002. The increase in fuel expense was primarily the result of a 16-cent, or $194 million, increase in the average all-in cost per gallon of diesel fuel. The increase in the average all-in cost per gallon of diesel fuel is comprised of a 17-cent, or $212 million, increase in the average purchase price which is partially offset by an increase in the hedge benefit of 1-cent, or $18 million (2003 benefit of $68 million less 2002 benefit of $50 million). Consumption in 2003 was 1,213 million gallons compared with 1,149 million gallons in 2002.

Compensation and benefits expenses of $2,964 million were $70 million, or 2 percent, higher than 2002 primarily due to higher volumes and the implementation of Statement of Financial Accounting Standards (SFAS) No. 143, *Accounting for Asset Retirement Obligations,* as described in Note 2 to the Consolidated Financial Statements, as well as wage inflation, higher pension costs and new hire crew training, partially offset by lower head counts and the favorable impact of railroad retirement reform (See further discussion under the headings "Other Matters; Railroad Retirement Reform").

Purchased services expenses of $1,253 million for 2003 were $107 million, or 9 percent, higher than 2002 primarily due to volume-related intermodal ramp and drayage costs and increased locomotive maintenance costs associated with maintaining more locomotives as well as higher service contracts expense related to an agreement to outsource the management of a large portion of BNSF's information technology infrastructure entered into during the third quarter of 2002 and the implementation of SFAS No. 143.

Depreciation and amortization expenses of $910 million for 2003 were $21 million, or 2 percent, lower than 2002 primarily due to the implementation of SFAS No. 143, as well as new lower depreciation rates for locomotives partially offset by normal increases for capital expenditures. Additionally, at the time of the merger of Burlington Northern Railroad Company and The Atchison, Topeka and Santa Fe Railway Company (ATSF), the Company recorded a decrease in the fair market value of former ATSF locomotives. The decrease was amortized over the remaining useful life of the locomotives and resulted in an annual decrease to depreciation expense. The amortization period expired at the end of 2003; accordingly, this will cause 2004 and future years' depreciation expense to increase by approximately $40 million. In addition, 2004 depreciation expense will increase from capital expenditure activity.

Equipment rents expenses for 2003 of $705 million were $7 million, or 1 percent, higher than 2002 primarily due to volume growth partially offset by decreases in intermodal and carload equipment rent expenses. Decreases in intermodal and carload equipment rent expenses are a result of greater use of private trailers and containers, as well as favorable lease renegotiations and short term lease rate incentives.

Materials and other expenses of $843 million for 2003 were $22 million, or 3 percent, higher than 2002 principally due to the implementation of SFAS No. 143, employee severance costs and lower gains from property sales substantially offset by decreased material costs and bad debt expense.

Interest expense of $420 million for 2003 was $8 million, or 2 percent, lower than 2002. This decrease was primarily the result of lower average interest rates and an increased benefit from interest rate hedges, partially offset by higher average debt outstanding.

Other expense of $14 million for 2003 was $2 million higher than in 2002.

The effective tax rate in 2003 was 36.9 percent compared with 37.5 percent for the prior-year period. The decrease in the effective tax rate primarily reflects a tax settlement attributable to prior years that was settled favorably in the second quarter of 2003.

**Year Ended December 31, 2002 Compared with Year Ended December 31, 2001**

BNSF recorded net income for 2002 of $760 million, or $2.00 per share, compared with net income for 2001 of $731 million, or $1.87 per share. Operating income of $1,656 million in 2002 was $94 million lower than 2001.

**Revenues**

Freight revenues of $8,873 million for 2002 were $217 million, or 2 percent, lower than 2001. In 2002, the combined effect of the soft economy, a mild winter, reduced foreign demand for agricultural products and the loss of an automotive contact in the third quarter of 2001 contributed to a decrease in BNSF's revenues.

Table of Contents

Index to Financial Statements

Consumer Products revenues of $3,353 million for 2002 were essentially flat compared with 2001. Decreased automotive revenues related to an automobile contract loss in 2001 offset increased intermodal volumes in the international and truckload businesses. Additionally, 2001 Consumer Products revenues includes an automotive revenue contract settlement gain of $32 million. International increases were driven by favorable trans-Pacific trade and new contracts. Truckload revenues were up due to strong growth from the Company's primary accounts and modal conversion of highway traffic from new and existing shippers. The reduction in revenue per car/unit is related to a decrease in automotive traffic and an increase in international traffic, which primarily moves in containers and unit trains, and due to the lower cost structure, moves at lower rates per unit.

Industrial Products revenues of $2,041 million for 2002 were $39 million, or 2 percent, lower than 2001. An increase in the chemicals and plastics sector tied to strength in automotive and home construction along with a new contract was more than offset by general softness in the petroleum, building and construction product sectors. Petroleum was down due to higher heating fuel inventories as a result of the mild winter. Building and construction product sectors were down primarily due to weak paper and steel markets.

Coal revenues of $2,071 million for 2002 decreased $52 million, or 2 percent, versus 2001. Volume was lower than 2001 primarily as a result of reduced demand in the first half of 2002 caused by mild winter weather. Revenue per car/unit decreased as a result of modest price decreases related to the renewal of some contracts and rate adjustment factors in existing contracts that were negative in the first half of the year.

Agricultural Products revenues of $1,408 million for 2002 were $123 million, or 8 percent, lower than revenues for 2001 primarily due to decreased soybean, wheat and corn exports due to global market conditions. The decrease in export traffic resulted in lower revenue per unit because of a shorter length of haul. Domestic corn shipments to feedlots were also down from 2001 as a result of reduced feedlot demand, high inventory levels remaining from 2001 shipments and crop production conditions.

**Expenses**

Total operating expenses for 2002 were $7,323 million, a decrease of $135 million, or 2 percent, over 2001 primarily due to a lower total cost per gallon of diesel fuel, lower equipment rents expense driven by an initiative to use less foreign equipment and increased gains on property dispositions.

Compensation and benefits expenses of $2,894 million were $33 million, or 1 percent, higher than 2001 primarily due to increases in health and welfare costs, principally as a result of an increase in rates, incentive compensation, and pension expense primarily reflecting a decrease in the long-term rate of return assumption for pension assets. These increases were partially offset by reduced labor expenses as a result of lower employment levels.

Purchased services of $1,146 million for 2002 were $56 million, or 5 percent, higher than 2001 because of a one-time flood related recovery and higher other recoveries in 2001, higher insurance expense in 2002, as well as higher service contracts expense related to an agreement to outsource the management of a large portion of BNSF's information technology infrastructure entered into during the third quarter of 2002.

Depreciation and amortization expenses of $931 million for 2002 were $22 million, or 2 percent, higher than 2001 primarily due to a higher capital base.

Equipment rents expenses for 2002 of $698 million were $38 million, or 5 percent, lower than 2001. The decrease is primarily related to lower carload equipment expense driven by an initiative to use less foreign equipment, short-term lease incentives and lower auto equipment expense as a result of the loss of an automotive contract in the third quarter of 2001.

Fuel expenses of $833 million for 2002 were $140 million, or 14 percent, lower than 2001. The decrease in fuel expense was primarily the result of a 10-cent, or $117 million, decrease in the average all-in cost per gallon of diesel fuel. The decrease in the average all-in cost per gallon of diesel fuel is comprised of the combination of a 10-cent, or $115 million, decrease in the average purchase price and a slight increase in the hedge benefit of less than 1-cent, or $2 million (2002 benefit of $50 million less 2001 benefit of $48 million). Consumption in 2002 was 1,149 million gallons compared with 1,177 million gallons in 2001.

[Table of Contents](#)

[Index to Financial Statements](#)

Materials and other expenses of $821 million for 2002 were $68 million, or 8 percent, lower than 2001 principally due to a $66-million charge for workforce reduction related costs in 2001, and increased gains on property dispositions and lower costs on leased locomotives partially offset by higher personal injury expense in 2002.

Interest expense of $428 million for 2002 was $35 million, or 8 percent, lower than 2001. This decrease was primarily the result of a higher net interest rate hedge benefit and lower average interest rates. The net interest rate hedge benefit in 2002 was $24 million. There was no interest rate hedge benefit or loss in 2001.

Other expense was $12 million or $102 million lower compared with 2001 primarily due to $75 million of losses recognized in 2001 related to non-rail investments. The non-rail investments consisted of FreightWise, Inc., an Internet transportation exchange; Pathnet Telecommunications, Inc., a telecommunications venture; a portfolio of other non-core investments; and a decline in the cash surrender value of company owned life insurance policies. In addition, there was a decrease in accounts receivable sale fees in 2002 compared with 2001.

*Liquidity and Capital Resources*

Cash generated from operations is BNSF's principal source of liquidity. BNSF generally funds any additional liquidity requirements through debt issuance including commercial paper, the leasing of assets and the sale of a portion of its accounts receivable.

**Operating Activities**

Net cash provided by operating activities was $2,285 million during 2003 compared with $2,106 million during 2002. The increase was primarily the result of changes in working capital and the Seattle Sound Transit transaction (See further discussion under the headings "Other Matters; Seattle Sound Transit").

**Investing Activities**

Net cash used for investing activities was $1,806 million during 2003 compared with $1,517 million during 2002. The increase in cash capital expenditures primarily relates to the purchase, instead of lease, of locomotives as well as the advance construction of double track on a portion of BNSF Railway's transcontinental route. The decrease in cash used for other investing activities primarily reflects a classification change resulting from the implementation of SFAS No. 143, which reduced expenditures capitalized for retired track structure removal.

A breakdown of cash capital expenditures during 2003, 2002 and 2001 is set forth in the following table (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Maintenance of way: | | | |
| Rail | $ 202 | $ 193 | $ 233 |
| Ties | 227 | 222 | 254 |
| Surfacing | 160 | 161 | 146 |
| Other | 337 | 325 | 335 |
| Total maintenance of way | $ 926 | $ 901 | $ 968 |
| Mechanical | 133 | 168 | 183 |
| Information services | 63 | 79 | 69 |
| Other | 116 | 107 | 113 |
| Total maintenance of business | $1,238 | $1,255 | $1,333 |
| New locomotive acquisitions | 270 | — | — |
| Terminal and line expansion | 218 | 103 | 126 |
| Total | $1,726 | $1,358 | $1,459 |

Table of Contents

Index to Financial Statements

BNSF has agreed to acquire 915 locomotives by 2008. Through December 31, 2003, BNSF has taken delivery of 281 of the 915 locomotives. Most of the locomotives were financed through a combination of cash from operations and operating leases. The remaining locomotives under these agreements will be financed from one or a combination of sources including, but not limited to, cash from operations, capital or operating leases and debt issuances. The decision on the method used for a particular acquisition financing will depend on market conditions and other factors at the time.

**Financing Activities**

Net cash used for financing activities during 2003 was $489 million primarily related to common stock repurchases of $217 million, dividend payments of $191 million and net repayments of $151 million partially offset by proceeds from stock options exercised of $68 million.

Aggregate debt to mature in 2004 is $244 million. BNSF's ratio of net debt to total capitalization (net debt is calculated as total debt less cash and cash equivalents, and total capitalization is calculated as the sum of net debt and total stockholders' equity) was 44.0 percent at December 31, 2003, compared with 46.1 percent at December 31, 2002, and 45.8 percent at December 31, 2001.

*2003*

The Company exercised an option to call $150 million of 7.50 percent bonds due July 2023. The bonds were called at a price of 103.02 percent of par and commercial paper was used to fund the call.

BNSF issued $250 million of 4.30 percent notes due July 1, 2013. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

The Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

BNSF had $750 million of debt capacity available under its shelf registration at December 31, 2003.

*2002*

The Company financed the construction of an intermodal facility by a third party and entered into an agreement to lease the intermodal facility for 20 years. This lease transaction is accounted for as a financing and has a purchase option. The Company recorded an asset in property and equipment, net and a liability in long-term debt and commercial paper of $138 million which represents the fair market value at lease inception.

BNSF issued $300 million of 5.90 percent notes due July 1, 2012. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

**Dividends**

Common stock dividends declared were $0.54 per share annually for 2003 and $0.48 per share annually for 2002 and 2001. Dividends paid on common stock were $191 million, $183 million and $190 million during 2003, 2002 and 2001, respectively.

**Common Stock Repurchase Program**

In July 1997, the Board authorized the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. In December 1999, April 2000, September 2000 and January 2003, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date to the total shares previously authorized bringing BNSF's share repurchase program to 150 million shares. During 2003, 2002 and 2001, the Company repurchased approximately 8 million, 13 million, and 11 million shares, respectively, of its common stock at average prices of $27.25 per share, $27.85 per share, and $27.76 per share, respectively. Total repurchases through December 31, 2003, were 124 million shares at a total average cost of $26.05 per share, leaving 26 million shares available for repurchase out of the 150 million shares presently authorized.

Table of Contents

Index to Financial Statements

### Long-term Debt And Other Obligations

The Company's business is capital intensive. BNSF has historically generated a significant amount of cash from operating activities which it uses to fund capital additions, service debt, repurchase shares and pay dividends. Additionally, the Company relies on access to the debt and leasing markets to finance a portion of capital additions on a long-term basis.

The Company utilizes a commercial paper program backed by bank revolving credit agreements to manage liquidity needs. The information below summarizes the more significant obligations of the Company at December 31, 2003. For 2004 and the foreseeable future, the Company expects that cash from operating activities, access to capital markets and bank revolving credit agreements will be sufficient to enable the Company to meet its obligations when due. The Company believes these sources of funds will also be sufficient to fund capital additions that are necessary to maintain its competitiveness and position the Company for future revenue growth.

The Company's ratio of earnings to fixed charges was 3.00 and 2.93 times for the years ended December 31, 2003 and 2002, respectively. Additionally, the Company's ratio of net cash provided by operating activities divided by total average debt was 33 percent and 31 percent for the years ended December 31, 2003 and 2002, respectively.

The following table summarizes the Company's obligations under long-term debt and other contractual commitments at December 31, 2003 (in millions):

| | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| Contractual Obligations | Total | Less Than 1 Year | 1–3 Years | 3–5 Years | More Than 5 Years |
| Long-term debt [(a)] | $ 6,072 | $ 167 | $ 728 | $ 679 | $ 4,498 |
| Capital lease obligations | 612 | 77 | 166 | 155 | 214 |
| Operating lease [(b)] | 5,346 | 437 | 851 | 732 | 3,326 |
| Purchase obligations [(c)] | 6,321 | 1,054 | 843 | 837 | 3,587 |
| Other long-term liabilities reflected on the balance sheet under GAAP [(d)] | 221 | 77 | 53 | 34 | 57 |
| Total Contractual Obligations | $18,572 | $1,812 | $2,641 | $2,437 | $11,682 |

(a) Excludes capital lease obligations.

(b) Gross payments due which include an interest component.

(c) Includes short-line minimum usage commitments, asset maintenance and other purchase commitments.

(d) Consists of employee merger and separation payments as discussed in Note 11 to the Consolidated Financial Statements, required pension plan contributions as discussed under the heading "Pension Funding" and actuarially estimated payments expected to be made for other post-retirement benefit plans as discussed in Note 13 to the Consolidated Financial Statements.

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

### Credit Agreements

Commercial paper and the revolving credit agreements are discussed in Note 9 to the Consolidated Financial Statements. The revolving credit agreements include covenants and events of default typical for this type of facility, including a minimum consolidated tangible net worth test, a maximum debt-to-capital test, and a $75 million cross-default provision. At December 31, 2003, the Company was in compliance with its debt covenants. BNSF's tangible net worth is $2.9 billion greater than the minimum consolidated tangible net worth required under the agreement, and the maximum debt-to-capital test provides approximately $5.4 billion of debt capacity above BNSF's outstanding debt as of December 31, 2003, before an event of default would occur under these covenants. With the exception of a voluntary bankruptcy or insolvency, any event of default has either or both a cure period or notice requirement before termination of the agreements. A voluntary bankruptcy or insolvency would be considered an immediate termination event.

Table of Contents

Index to Financial Statements

### Off-Balance Sheet Arrangements

#### Sale of Accounts Receivable

The accounts receivable sales program of Santa Fe Receivables Corporation (SFRC), as described in Note 6 of the Consolidated Financial Statements, includes various provisions that, if triggered, would allow the investors participating in this program, at their option, to cancel the program. These provisions include a minimum consolidated tangible net worth test and a maximum debt-to-capital test which are the same as in the BNSF revolving credit agreements. At December 31, 2003, investor interests of $625 million, were outstanding under the $700 million accounts receivable facility. SFRC renewed $350 million of the $700 million accounts receivables facility, effective in June 2003, for an additional 364 days. In addition, SFRC entered into a separate $350 million accounts receivables facility, effective June 2003, with a five-year term. The commitment of the investors to purchase undivided interests under the accounts receivable sales program is currently scheduled to expire in June 2004 and June 2008, respectively. Management expects to be able to either extend the commitment of the current investors under the accounts receivable sales program past June 2004 or to find additional investors in the accounts receivable sales program who will be committed to purchase undivided interests after June 2004.

The accounts receivable sales program provides efficient financing at a competitive interest rate to traditional borrowing arrangements. Since the funding is collateralized by BNSF receivables, the risk of exposure is only as great as the risk of default on these receivables. See Note 6 to the Consolidated Financial Statements.

#### Guarantees

BNSF agreed to guarantee approximately $85 million of debt, of which $50 million was outstanding as of December 31, 2003. The proceeds from the debt are being used to construct and operate a 13-mile railroad, which will service several chemical and plastics manufacturing facilities in the Houston, Texas area. Due to evolving circumstances, the timeline of completion for this railroad line is uncertain. As discussed in Note 16 to the Consolidated Financial Statements, the San Jacinto Partnership will likely be consolidated on March 31, 2004.

The Company acts as guarantor for certain other debt and lease obligations of others. During the year ended December 31, 2003, the Company has primarily utilized guarantees to allow third-party entities to obtain favorable terms to finance the construction of assets that will benefit the Company. Additionally, in the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. The Company does not expect performance under these guarantees or indemnities to have a material adverse effect on the Company's liquidity in the foreseeable future. See Note 9 of the Consolidated Financial Statements.

### Pension Funding

The Company will make required contributions of approximately $20 million to the qualified BNSF Retirement Plan in 2004.

#### Inflation

Due to the capital-intensive nature of BNSF's business, the full effect of inflation is not reflected in operating expenses because depreciation is based on historical cost. An assumption that all operating assets were depreciated at current price levels would result in substantially greater expense than historically reported amounts.

*Other Matters*

### Hedging Activities

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities,* as amended, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in Accumulated Other Comprehensive Income (AOCI) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

**Table of Contents**

**Index to Financial Statements**

*Fuel*

BNSF measures the fair value of fuel hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity price for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties. BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance. See Note 3 to the Consolidated Financial Statements.

*Interest Rate*

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy. BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements. See Note 3 to the Consolidated Financial Statements.

## Employee and Labor Relations

Approximately 87 percent of BNSF Railway's employees are union-represented. BNSF Railway's union employees work under collective bargaining agreements with various different labor organizations. The negotiating process for new, major collective bargaining agreements covering all of BNSF Railway's union employees has been underway since the bargaining round was initiated November 1, 1999. Wages, health and welfare benefits, work rules, and other issues have traditionally been addressed through industry-wide negotiations. These negotiations have generally taken place over a number of months and have previously not resulted in any extended work stoppages. The existing agreements have remained in effect and will continue to remain in effect until new agreements are reached or the Railway Labor Act's procedures (which include mediation, cooling-off periods, and the possibility of Presidential intervention) are exhausted. The current agreements provide for periodic wage increases until new agreements are reached.

*Brotherhood of Locomotive Engineers*

In October 2003, the NCCC and Brotherhood of Locomotive Engineers (BLE) settled wage, work rule and benefit issues through 2004, subject to union membership ratification. That process was concluded successfully in December 2003. The "national" agreement covers approximately 20 percent of BNSF's unionized workforce. BNSF and BLE concurrently finalized a separate "local" agreement substituting a new profit sharing bonus arrangement for a portion of the wage increases otherwise provided for by the "national" agreement.

*Brotherhood of Railroad Signalmen*

In September 2003, the NCCC reached an agreement with the Brotherhood of Railroad Signalmen (BRS) settling wage, work rule and benefit issues though 2004. The agreement was ratified by the union's members in September 2003. BRS represents BNSF's signal system maintenance employees, who comprise approximately 5 percent of the unionized workforce.

Table of Contents

Index to Financial Statements

*Transportation Communications Union*

In late 2002, the NCCC reached a final agreement with the Transportation Communications Union (TCU) providing for final and binding arbitration of wage and benefit issues through 2004. This agreement averted the possibility of self help by the parties over bargaining round issues. The arbitration decision was issued in January 2003 and settled all wage, work rule and medical benefit issues between the parties through 2004. TCU represents BNSF's clerks, carmen and patrolmen, who make up about 15 percent of BNSF's unionized workforce.

*United Transportation Union*

The NCCC reached a "national" agreement in August 2002, with the United Transportation Union (UTU) covering wage, work rule, and locomotive remote control issues through the year 2004 for conductors, brakemen, yardmen, yardmasters and firemen. The "national" agreement also created a final and binding process for resolving health and welfare issues, mainly involving employees sharing in rising benefit costs. The "national" agreement committed each side to participate in a study and negotiation period, during which the parties were to examine alternate ways to control rising healthcare costs. The parties met extensively on this issue though the third quarter of 2003, and reached a tentative contract resolving the health and welfare related issues. The contract was ratified by the UTU's members in November 2003.

When the bargaining round began in 1999, two of the nine BNSF UTU general chairmen contested what BNSF has believed from the outset was their obligation to address wage, work rule and benefits issues in industry-wide bargaining. This matter became the subject of litigation in federal court in the District of Columbia. The court of appeals there sustained BNSF's position on the key legal principle, remanding the matter to a lower court for application of the law to the particular facts presented in the case. While the litigation was pending, BNSF did not effectuate the "national" agreement's terms in connection with employees represented by the two general chairmen involved. The lower court issued its decision in November 2003, in BNSF's favor. As the Company requested, the court ordered application of the "national" agreement in the case of all employees represented by the two general chairmen above, as a full and final settlement of the bargaining round. No appeal was made, and, thus, the litigation has brought the bargaining round to a formal close with all of BNSF's UTU-represented employees, who represent approximately 25 percent of the Company's unionized workforce.

*Other Unions*

The Brotherhood of Maintenance of Way Employes (representing approximately 20 percent of BNSF's unionized workforce) reached an agreement with BNSF in the spring of 2001.

Through the NCCC, BNSF is continuing efforts to settle the bargaining with the International Brotherhood Of Electrical Workers, International Association of Machinists, Sheet Metal Workers' International Association, National Conference of Firemen and Oilers, and American Train Dispatchers Association, which together represent approximately 15 percent of the Company's unionized workforce.

**Railroad Retirement Reform**

Railroad industry personnel are covered by the Railroad Retirement System instead of Social Security. BNSF Railway's contributions under the Railroad Retirement System have been approximately triple those in industries covered by Social Security. The Railroad Retirement System, funded primarily by payroll taxes on covered employers and employees, includes a benefit roughly equivalent to Social Security (Tier I), an additional benefit similar to that allowed in some private defined-benefit plans (Tier II), and other benefits. Investment of Tier II Railroad Retirement assets had, until 2001, been limited to special interest-bearing U. S. Treasury securities. The Railroad Retirement and Survivors' Improvement Act of 2001 (Act) creates a new National Railroad Retirement Investment Trust to hold Tier II Railroad Retirement assets and empowers the trustees to invest these assets in the same types of investments available to private sector retirement plans. In addition to liberalizing certain retirement benefit requirements for rail employees, the Act reduced Tier II Railroad Retirement tax rates on rail employers beginning in 2002 and eliminated a supplemental annuity tax. In 2002, the Company realized a savings of approximately $20 million. Additionally, the Company realized incremental savings of approximately $30 million in 2003. The Company expects to realize further savings in 2004 of approximately $20 million for a total ongoing savings of approximately $70 million. Future adjustments in the Tier II Railroad Retirement tax rates assessed will depend on Railroad Retirement fund levels.

Table of Contents

Index to Financial Statements

**Seattle Sound Transit**

In December 2003, the Company entered into several agreements with Central Puget Sound Regional Transit Authority (Sound Transit), a government authority, established by King, Pierce and Snohomish counties within the state of Washington. BNSF has agreed to sell to Sound Transit under the threat of condemnation a combination of (a) four easements enabling Sound Transit to offer commuter rail service over the existing BNSF track from Seattle to Everett and (b) 18 miles of railroad line from south of Tacoma to Nisqually, Washington.

Sound Transit will pay BNSF approximately $260 million for four commuter easements to operate trains on the segment between Seattle and Everett, and entered into agreements for service on the commuter easements, and joint use of track for commuter and freight purposes. The Company received approximately $80 million of cash in 2003 upon the closing of the first easement, which will be recognized in income over the use of the associated track structure (approximately 30 years). Over the next four years, upon the subsequent closings subject to conditions in the sale agreement, BNSF will receive an additional $180 million for the remaining three easements, including approximately $80 million expected to be paid in 2004.

Sound Transit will also pay BNSF to convey the 18 miles of railroad line and associated real estate from south of Tacoma to Nisqually in three separate sell transactions. The Company received approximately $8 million of cash in 2003 and reported a gain in income of approximately $2 million, net of tax, as a result of the real estate sale for station related parcels to Sound Transit. Additionally, the Company expects to receive approximately $24 million for the remaining railroad line and real estate sales associated with these agreements over the next four years, including approximately $6 million expected to be paid in 2004. The Company expects total related gains of about $25 million to be recognized in future periods, the majority of which is currently anticipated to be recognized in the next two years.

***Critical Accounting Estimates***

In the ordinary course of business, the Company makes a number of estimates and assumptions related to the reporting of results of operations and financial position in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America. Actual results could differ significantly from those estimates under different assumptions and conditions. The following discussion addresses the Company's most critical accounting estimates.

Management has discussed the development and selection of the critical accounting estimates described below with the Audit Committee of the Board of Directors and the Audit Committee has reviewed the Company's disclosure relating to it in this Management's Discussion and Analysis of Financial Condition and Results of Operations.

**Legal**

BNSF and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF's management that none of these items will have a material adverse effect on the results of operations, financial position or liquidity of BNSF. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

BNSF's most significant claims relate to personal injury and environmental matters. These claims are discussed in more detail below.

Table of Contents

Index to Financial Statements

Personal Injury

Personal injury claims, including work-related injuries to employees, are a significant expense for the railroad industry. Employees of BNSF are compensated for work-related injuries according to the provisions of the Federal Employers' Liability Act (FELA). FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to significant increases in expense in past years. BNSF has implemented a number of safety programs to reduce the number of personal injuries as well as the associated claims and personal injury expense. The Company recognized personal injury expenses of approximately $215 million, $228 million and $195 million in 2003, 2002 and 2001, respectively. BNSF made payments for personal injuries of approximately $198 million, $190 million and $173 million in 2003, 2002 and 2001, respectively. At December 31, 2003 and 2002, the Company had recorded liabilities of $513 million and $496 million, respectively, related to personal injury claims. Of these amounts, $200 million and $197 million are included in current liabilities in 2003 and 2002, respectively. BNSF's liabilities for personal injury claims are undiscounted.

*Critical Estimate*

The Company uses a third party actuarial firm that performs actuarial reviews to assist the Company in estimating its personal injury claims. These estimates are based on the covered population, activity levels and trends in the frequency, and the costs of covered injuries. Personal injury liability and ultimate expense projections are estimated using standard actuarial methodologies. These actuarial method procedures include unasserted claims, except for certain occupational illnesses, which, due to their unpredictability, are accrued on an as reported basis.

The Company has not materially changed its methodology for calculating personal injury liabilities in the three years presented. There are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above.

Environmental

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at approximately 20 Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Environmental costs include initial site surveys and environmental studies of potentially contaminated sites as well as costs for remediation and restoration of sites determined to be contaminated. Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. BNSF conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews, analysis of the likelihood of participation in and the ability of other PRPs to pay for cleanup, and historical trend analyses.

Table of Contents

Index to Financial Statements

Environmental related expenses are a significant expense for BNSF and the railroad industry. BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts at approximately 430 sites, including the Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination. The Company recognized environmental expenses of approximately $59 million, $43 million and $51 million during 2003, 2002 and 2001, respectively. BNSF paid approximately $56 million, $49 million and $72 million during 2003, 2002 and 2001, respectively, for mandatory and unasserted claims cleanup efforts, including amounts expended under federal and state voluntary cleanup programs. BNSF has recorded liabilities for remediation and restoration of all known sites of $199 million at December 31, 2003, compared with $196 million at December 31, 2002. Of these amounts, $50 million and $51 million, respectively, are included in current liabilities. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2003, will be paid over the next five years and no individual site is considered to be material.

*Critical Estimate*

Liabilities recorded for environmental costs represent BNSF's best estimates for remediation and restoration of these sites and include both asserted and unasserted claims. Unasserted claims are not considered to be a material component of the liability. Although recorded liabilities include BNSF's best estimates of all costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of potentially contaminated sites. As a result, future charges to income for environmental liabilities could have a significant effect on results of operations in a particular quarter or fiscal year as individual site studies and remediation and restoration efforts proceed or as new sites arise. However, the Company believes it is unlikely any identified matters, either individually or in the aggregate, will have a material adverse effect on BNSF's results of operations, financial position or liquidity.

The Company has not materially changed its methodology for identifying and calculating environmental liabilities in the three years presented. There are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above.

**Income Taxes**

BNSF is subject to various federal, state and local income taxes in the taxing jurisdictions where the Company operates. BNSF accounts for income taxes by providing for taxes payable or refundable in the current year and for deferred tax assets and liabilities for future tax consequences of events that have been recognized in financial statements or tax returns.

BNSF recorded total income tax expense, including federal, state and other income taxes, of $454 million, $456 million, and $442 million for the years ended December 31, 2003, 2002 and 2001, respectively. BNSF's Consolidated Balance Sheets reflect $292 million and $314 million of net current deferred tax assets at December 31, 2003 and 2002, respectively. Also included in BNSF's Consolidated Balance Sheets are $7,481 million and $6,975 million of net non-current deferred tax liabilities at December 31, 2003 and 2002, respectively. Classification of deferred tax assets and liabilities as current or non-current is determined by the financial statement classification of the asset or liability to which the temporary difference is related. If a temporary difference is not related to an asset or liability for financial reporting, it is classified according to the expected reversal date of the temporary difference.

Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized. BNSF has not recorded a valuation allowance, as it believes that the deferred tax assets will be fully realized in the future.

The federal income tax returns of BNSF's predecessor companies, Burlington Northern, Inc. and Santa Fe Pacific Corporation are closed through 1994 and the business combination date of September 1995, respectively. BNSF is currently under Internal Revenue Service examination for years 1995 through 1999. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. The Company believes that adequate provision has been made for any adjustments that might be assessed for open years through 2003.

Table of Contents

Index to Financial Statements

*Critical Estimate*

BNSF makes estimates of the potential liability based on its assessment of all potential tax exposures. In addition, the Company uses factors such as applicable law, current information, and past experience with similar issues to make these judgements.

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Changes in the Company's estimates regarding the statutory tax rate to be applied to the reversal of deferred tax assets and liabilities could materially affect the effective tax rate.

The Company has not materially changed its methodology for calculating income tax expense for the years presented and there are currently no known trends, demands, commitments, events or uncertainties that are reasonably likely to occur and materially affect the methodology or assumptions described above.

**Pensions and Other Post-Employment Benefits**

BNSF sponsors a noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees and a nonqualified BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these plans are based on years of credited service and the highest five-year average compensation levels. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

The Company expects to record a net pension cost of approximately $15 million in 2004 as opposed to net pension benefits of $3 million and $7 million recorded in 2003 and 2002, respectively. In addition, the Company recorded a net pension cost of $10 million in 2001. At December 31, 2003 and 2002, the Company reported pension benefit obligations of $1,678 million and $1,611 million, respectively. The Company recorded a net other post-employment benefits (OPEB) cost of $32 million, $30 million and $25 million for the years ended December 31, 2003, 2002 and 2001, respectively. At December 31, 2003 and 2002 the Company reported OPEB obligations of $366 million and $363 million, respectively.

*Critical Estimate*

Annual pension and OPEB expenses are calculated by third party actuaries using standard actuarial methodologies. The actuaries assist the Company in making estimates based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of pension and OPEB include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate. These assumptions are critical to the Company's estimate of expenses and liabilities, and changes to these estimates could have a material impact on the Company's results of operations and financial position.

The discount rate is a component estimate of both pensions and OPEB. The expected return on plan assets is a factor that only influences the funded pension plans. Health care cost trend rates only affect OPEB costs. BNSF uses a discount rate that reflects the current bond market and an expected rate of return on assets that reflects the expected long-term rates of return on plan assets.

Table of Contents

Index to Financial Statements

From time to time, the Company will change pension and OPEB assumptions to better approximate current conditions and expected future experience. General softness in the economy and the decline in the investment markets during 2001 and 2000 prompted BNSF to decrease the rate of return on plan assets used in the net cost calculation from 9.5 percent in 2001 to 8.5 percent for 2002 and 2003. The discount rate has also been changed within the past three years. Discount rates of 6.5 percent, 7.0 percent and 7.0 percent were used to calculate net benefit costs for years ending December 31, 2003, 2002 and 2001, respectively. The associated discount rate was lowered to 6.0 percent for the 2004 calculation of net benefit cost. Unforeseen changes in the investment markets or other external factors could prompt changes in these estimates in future years. A fifty basis point change in the rate of return on plan assets assumption would effect future annual pension expense by approximately $7 million.

**Depreciation**

Due to the capital-intensive nature of the railroad industry, depreciation expense is a significant component of the Company's operating expense. The Company recorded depreciation and amortization expense of $910 million, $931 million and $909 million for the years ended December 31, 2003, 2002 and 2001, respectively. At December 31, 2003 and 2002, the Company had Property and equipment, net balances of $25,068 million and $24,022 million, which include $6,006 million and $4,883 million, respectively, of accumulated depreciation.

*Critical Estimate*

The Company uses the group method of depreciation under which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. As required by the Federal Surface Transportation Board (STB), the Company conducts studies of depreciation rates and the required accumulated depreciation balance at least every three years for equipment property and at least every six years for track structure and other roadway property. The Company uses external consultants to conduct these studies. The consultants rely on statistical analysis, historical retirement data, industry knowledge and discussions with management to assess the impact of new technologies and maintenance practices. Changes in the estimated service lives of the assets and their related depreciation rates are implemented prospectively and the difference between the calculated accumulated depreciation and the amount recorded is amortized over the average service lives of the assets.

A study conducted in 2003 resulted in the Company adopting new depreciation rates for hardware and software, other road assets and locomotives that resulted in a net decrease in annual depreciation expense of $9 million.

***Accounting Pronouncements***

See Note 16 to the Consolidated Financial Statements for information about recent accounting pronouncements.

***Forward-Looking Information***

To the extent that statements made by the Company relate to the Company's future economic performance or business outlook, projections or expectations of financial or operational results, or refer to matters that are not historical facts, such statements are "forward-looking" statements within the meaning of the federal securities laws. Forward-looking statements involve a number of risks and uncertainties, and actual results may differ materially. Important factors that could cause actual results to differ materially include, but are not limited to, *economic and industry conditions*: material adverse changes in economic or industry conditions, both in the United States and globally, customer demand, effects of adverse economic conditions affecting shippers, adverse economic conditions in the industries and geographic areas that produce and consume freight, competition and consolidation within the transportation industry, the extent to which BNSF is successful in gaining new long-term relationships with customers or retaining existing ones, changes in fuel prices, changes in the securities and capital markets, and changes in labor costs and labor difficulties, including stoppages affecting either BNSF's operations or our customers' abilities to deliver goods to BNSF for shipment; *legal and regulatory factors*: developments and changes in laws and regulations and the ultimate outcome of shipper and rate claims subject to adjudication, environmental investigations or proceedings and other types of claims and litigation; and *operating factors*: technical difficulties, changes in operating conditions and costs, competition, and commodity concentrations, the Company's ability to achieve its operational and financial initiatives and to contain costs, as well as natural events such as severe weather, floods and earthquakes or other disruptions of BNSF Railway's operating systems, structures, or equipment.

Table of Contents

Index to Financial Statements

The Company cautions against placing undue reliance on forward-looking statements, which reflect its current beliefs and are based on information currently available to it as of the date a forward-looking statement is made. The Company undertakes no obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event the Company does update any forward-looking statement, no inference should be made that the Company will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions may appear in the Company's public filings with the Securities and Exchange Commission, which are accessible at www.sec.gov and on the Company's website at www.bnsf.com, and which investors are advised to consult.

**Item 7a. Quantitative and Qualitative Disclosures About Market Risk**

In the ordinary course of business, BNSF utilizes various financial instruments that inherently have some degree of market risk. The information presented in the Management's Discussion and Analysis of Financial Condition and Results of Operations section and Notes 3 and 9 of the Consolidated Financial Statements describe significant aspects of BNSF's financial instrument programs which have a material market risk.

*Commodity Price Sensitivity*

BNSF has a program to hedge against fluctuations in the price of its diesel fuel purchases. Existing hedge transactions as of December 31, 2003, are based on the front month settlement prices of NYMEX #2 heating oil (HO), West Texas Intermediate crude oil (WTI), or the HO refining spread (HO-WTI) which is defined as the difference between HO and WTI. A WTI hedge combined with a HO-WTI hedge will result in the equivalent of a HO hedge. For swaps, BNSF either pays or receives the difference between the hedge price and the actual average price of the hedge commodity during a specified determination period for a specified number of gallons. For costless collars, if the average hedge commodity price for a specified determination period is greater than the cap price, BNSF receives the difference for a specified number of gallons. If the average commodity price is less than the floor price, BNSF pays the difference for a specified number of gallons. If the commodity price is between the floor price and the cap price, BNSF neither makes nor receives a payment. Hedge transactions are generally settled with the counterparty in cash. Based on historical information, BNSF believes there is a significant correlation between the market prices for diesel fuel, WTI, and HO. Further information on fuel hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements.

At December 31, 2003, BNSF maintained fuel inventories for use in normal operations which were not material to BNSF's overall financial position and, therefore, represent no significant market exposure.

*Interest Rate Sensitivity*

From time to time, BNSF enters into various interest rate hedging transactions for purposes of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. These interest rate hedges are accounted for either as cash flow or fair value hedges. BNSF's measurement of fair value of these hedges are based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements. Further information on interest rate hedges is incorporated by reference from Note 3 to the Consolidated Financial Statements.

Information on the Company's debt which may be sensitive to interest rate fluctuations is incorporated by reference from Note 9 to the Consolidated Financial Statements.

Table of Contents

Index to Financial Statements

**Item 8. Financial Statements and Supplementary Data**

The Consolidated Financial Statements of BNSF and subsidiary companies, together with the report of independent auditors, are included as part of this filing.

The following documents are filed as a part of this report:


| | Page |
|---|---|
| **Consolidated Financial Statements** | |
| Report of Independent Auditors | 28 |
| Consolidated Statements of Income for the three years ended December 31, 2003 | 29 |
| Consolidated Balance Sheets as of December 31, 2003 and 2002 | 30 |
| Consolidated Statements of Cash Flows for the three years ended December 31, 2003 | 31 |
| Consolidated Statements of Changes in Stockholders' Equity for the three years ended December 31, 2003 | 32 |
| Notes to Consolidated Financial Statements | 33-58 |






https://www.sec.gov/Archives/edgar/data/934612/000119312504023301/d10k.htm[4/19/2021 1:44:50 PM]

[Table of Contents](#)

[Index to Financial Statements](#)

**REPORT OF INDEPENDENT AUDITORS**

To the Shareholders and Board
of Directors of Burlington
Northern Santa Fe Corporation
and Subsidiaries

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Burlington Northern Santa Fe Corporation and subsidiary companies at December 31, 2003 and 2002, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2003, the Company changed the manner in which it accounts for asset retirement costs that are not legal obligations.

/s/ PricewaterhouseCoopers LLP
Fort Worth, Texas
February 11, 2004

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**(Dollars in millions, except per share data)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Revenues | $9,413 | $8,979 | $9,208 |
| Operating expenses: | | | |
| Compensation and benefits | 2,964 | 2,894 | 2,861 |
| Purchased services | 1,253 | 1,146 | 1,090 |
| Depreciation and amortization | 910 | 931 | 909 |
| Equipment rents | 705 | 698 | 736 |
| Fuel | 1,073 | 833 | 973 |
| Materials and other | 843 | 821 | 889 |
| Total operating expenses | 7,748 | 7,323 | 7,458 |
| Operating income | 1,665 | 1,656 | 1,750 |
| Interest expense | 420 | 428 | 463 |
| Other expense, net | 14 | 12 | 114 |
| Income before income taxes and cumulative effect of accounting change | 1,231 | 1,216 | 1,173 |
| Income tax expense | 454 | 456 | 442 |
| Income before cumulative effect of accounting change | $ 777 | $ 760 | $ 731 |
| Cumulative effect of accounting change, net of tax | 39 | — | — |
| Net income | $ 816 | $ 760 | $ 731 |
| Earnings per share: | | | |
| Basic earnings per share (before cumulative effect of accounting change) | $ 2.10 | $ 2.01 | $ 1.89 |
| Basic earnings per share (after cumulative effect of accounting change) | $ 2.21 | $ 2.01 | $ 1.89 |
| Diluted earnings per share (before cumulative effect of accounting change) | $ 2.09 | $ 2.00 | $ 1.87 |
| Diluted earnings per share (after cumulative effect of accounting change) | $ 2.19 | $ 2.00 | $ 1.87 |
| Average shares (in millions): | | | |
| Basic | 369.1 | 378.0 | 387.3 |
| Dilutive effect of stock awards | 3.2 | 2.8 | 3.4 |
| Diluted | 372.3 | 380.8 | 390.7 |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(Dollars in millions, shares in thousands)**

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ **18** | $ 28 |
| Accounts receivable, net | **129** | 141 |
| Materials and supplies | **266** | 226 |
| Current portion of deferred income taxes | **292** | 314 |
| Other current assets | **157** | 82 |
| Total current assets | **862** | 791 |
| Property and equipment, net | **25,068** | 24,022 |
| Other assets | **1,009** | 954 |
| Total assets | **$26,939** | $25,767 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and other current liabilities | **$ 2,102** | $ 1,918 |
| Long-term debt due within one year | **244** | 173 |
| Total current liabilities | **2,346** | 2,091 |
| Long-term debt and commercial paper | **6,440** | 6,641 |
| Deferred income taxes | **7,481** | 6,975 |
| Casualty and environmental liabilities | **462** | 444 |
| Minimum pension liability | **359** | 368 |
| Employee merger and separation costs | **144** | 170 |
| Other liabilities | **1,212** | 1,146 |
| Total liabilities | **18,444** | 17,835 |
| Commitments and contingencies (see Notes 3, 9 and 10) | | |
| Stockholders' equity: | | |
| Common stock, $0.01 par value 600,000 shares authorized; 500,685 shares and 496,683 shares issued, respectively | **5** | 5 |
| Additional paid-in-capital | **5,766** | 5,664 |
| Retained earnings | **6,240** | 5,625 |
| Treasury stock, at cost, 129,225 shares and 120,905 shares, respectively | **(3,340)** | (3,114) |
| Unearned compensation | **(36)** | (39) |
| Accumulated other comprehensive loss | **(140)** | (209) |
| Total stockholders' equity | **8,495** | 7,932 |
| Total liabilities and stockholders' equity | **$26,939** | $25,767 |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Dollars in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| **OPERATING ACTIVITIES** | | | |
| Net income | **$ 816** | 760 | $ 731 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | **910** | 931 | 909 |
| Deferred income taxes | **460** | 432 | 302 |
| Employee merger and separation costs paid | **(43)** | (55) | (55) |
| Cumulative effect of accounting change, net of tax | **(39)** | — | — |
| Other, net | **48** | (9) | 91 |
| Changes in current assets and liabilities: | | | |
| Accounts receivable, net | **12** | 31 | 142 |
| Materials and supplies | **(39)** | (25) | 29 |
| Other current assets | 5 | (28) | 103 |
| Accounts payable and other current liabilities | **155** | 69 | (55) |
| Net cash provided by operating activities | 2,285 | 2,106 | 2,197 |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | **(1,726)** | (1,358) | (1,459) |
| Other, net | **(80)** | (159) | (105) |
| Net cash used for investing activities | **(1,806)** | (1,517) | (1,564) |
| **FINANCING ACTIVITIES** | | | |
| Net decrease in commercial paper and bank borrowings | **(77)** | (96) | (226) |
| Proceeds from issuance of long-term debt | **265** | 300 | 400 |
| Payments on long-term debt | **(339)** | (294) | (380) |
| Dividends paid | **(191)** | (183) | (190) |
| Proceeds from stock options exercised | **68** | 40 | 113 |
| Purchase of BNSF common stock | **(217)** | (353) | (317) |
| Other, net | **2** | (1) | (18) |
| Net cash used for financing activities | **(489)** | (587) | (618) |
| (Decrease) increase in cash and cash equivalents | **(10)** | 2 | 15 |
| Cash and cash equivalents: | | | |
| Beginning of year | **28** | 26 | 11 |
| End of year | **$ 18** | $ 28 | $ 26 |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | | |
| Interest paid, net of amounts capitalized | **$ 458** | $ 463 | $ 494 |
| Income taxes paid, net of refunds | **$ 26** | $ 55 | $ 102 |
| Non-cash facilities financing | **$ —** | $ 138 | $ — |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(Shares in thousands, dollars in millions, except per share data)**

| | Common Shares | Treasury Shares | Common Stock and Paid-in Capital | Retained Earnings | Treasury Stock | Unearned Compensation | Accumulated other Comprehensive Income (loss) | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2000 | 486,637 | (95,045) | $ 5,433 | $ 4,505 | $(2,413) | $ (35) | $ (10) | $ 7,480 |
| Comprehensive income: | | | | | | | | |
| Net income | | | — | 731 | — | — | — | 731 |
| Minimum pension liability adjustment, net of tax expense of $1 | | | — | — | — | — | 2 | 2 |
| Cumulative effect of adoption of SFAS No. 133, net of tax expense of $36 | | | — | — | — | — | 58 | 58 |
| Other, net of tax benefit of $36 | | | — | — | — | — | (59) | (59) |
| Total comprehensive income | | | — | 731 | — | — | 1 | 732 |
| Common stock dividends, $0.48 per share | — | — | — | (188) | — | — | — | (188) |
| Adjustments associated with unearned compensation, restricted stock | 899 | (86) | 15 | — | — | 1 | — | 16 |
| Exercise of stock options and related tax benefit of $17 | 5,282 | (478) | 141 | — | (15) | — | — | 126 |
| Purchase of BNSF common stock | — | (11,432) | — | — | (317) | — | — | (317) |
| Balance at December 31, 2001 | 492,818 | (107,041) | $ 5,589 | $ 5,048 | $(2,745) | $ (34) | $ (9) | $ 7,849 |
| Comprehensive income: | | | | | | | | |
| Net income | | | — | 760 | — | — | — | 760 |
| Minimum pension liability adjustment, net of tax benefit of $136 | | | — | — | — | — | (220) | (220) |
| Other, net of tax expense of $12 | | | — | — | — | — | 20 | 20 |
| Total comprehensive income | | | — | 760 | — | — | (200) | 560 |
| Common stock dividends, $0.48 per share | — | — | — | (183) | — | — | — | (183) |
| Adjustments associated with unearned compensation, restricted stock | 1,527 | (634) | 25 | — | — | (5) | — | 20 |
| Exercise of stock options and related tax benefit of $6 | 2,338 | (555) | 55 | — | (16) | — | — | 39 |
| Purchase of BNSF common stock | — | (12,675) | — | — | (353) | — | — | (353) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2002 | 496,683 | (120,905) | $ 5,669 | $ 5,625 | $(3,114) | $ (39) | $ (209) | $ 7,932 |
| Comprehensive income: | | | | | | | | |
| Net income | | | — | 816 | — | — | — | 816 |
| Minimum pension liability adjustment, net of tax expense of $3 | | | — | — | — | — | 6 | 6 |
| Other, net of tax expense of $38 | | | — | — | — | — | 63 | 63 |
| Total comprehensive income | | | — | 816 | — | — | 69 | 885 |
| Common stock dividends, $0.54 per share | — | — | — | (201) | — | — | — | (201) |
| Adjustments associated with unearned compensation, restricted stock | 781 | (54) | 22 | — | — | 3 | — | 25 |
| Exercise of stock options and related tax benefit of $7 | 3,221 | (316) | 80 | — | (9) | — | — | 71 |
| Purchase of BNSF common stock | — | (7,950) | — | — | (217) | — | — | (217) |
| Balance at December 31, 2003 | 500,685 | (129,225) | $ 5,771 | $ 6,240 | $(3,340) | $ (36) | $ (140) | $ 8,495 |

See accompanying Notes to Consolidated Financial Statements

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. The Company

Burlington Northern Santa Fe Corporation and its majority-owned subsidiaries, (collectively, BNSF or the Company), is engaged primarily in management of its investment in its principal and wholly-owned subsidiary, The Burlington Northern and Santa Fe Railway Company (BNSF Railway), which operates one of the largest railroad networks in North America with approximately 32,500 route miles covering 28 states and two Canadian provinces. Through one operating transportation services segment, BNSF Railway transports a wide range of products and commodities including the transportation of Consumer Products, Industrial Products, Coal and Agricultural Products, derived from manufacturing, agricultural and natural resource industries, which constituted 39 percent, 23 percent, 22 percent and 16 percent, respectively, of total freight revenues for the year ended December 31, 2003.

## 2. Significant Accounting Policies

*Principles of Consolidation*

The Consolidated Financial Statements include the accounts of BNSF, including its principal subsidiary BNSF Railway. All significant intercompany accounts and transactions have been eliminated.

*Cumulative Effect of Accounting Change, Net of Tax*

The Company adopted Statement of Financial Accounting Standards (SFAS) No. 143, *Accounting for Asset Retirement Obligations*, on January 1, 2003. This statement requires BNSF to recognize a liability for legally obligated asset retirement costs associated with tangible long-lived assets. SFAS No. 143 also disallows the accrual of retirement costs that are not legal obligations. As a result, BNSF and other railroads were required to change their accounting policies for certain track structure assets to exclude removal costs as a component of depreciation expense where the inclusion of such costs would result in accumulated depreciation balances exceeding the historical basis of the assets. This change results in lower depreciation and amortization expense primarily offset by higher compensation and benefits, purchased services and materials and other expenses in the period in which removal costs are incurred.

The following table presents the pro forma net income and earnings per share if SFAS No. 143 would have been applied retroactively (in millions, except per share data):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| Net income as reported | **$ 816** | $ 760 | $ 731 |
| Pro forma net income | **$ 777** | $ 749 | $ 713 |
| Earnings per share | | | |
| Basic—as reported | **$2.21** | $2.01 | $1.89 |
| Basic—pro forma | **$2.10** | $1.98 | $1.84 |
| Diluted—as reported | **$2.19** | $2.00 | $1.87 |
| Diluted—pro forma | **$2.09** | $1.97 | $1.82 |

*Use of Estimates*

The preparation of financial statements in accordance with generally accepted accounting principles (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods presented. Actual results could differ from those estimates.

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Revenue Recognition*

Transportation revenues are recognized based upon the proportion of service provided as of the balance sheet date. Revenues from ancillary services are recognized when performed.

*Cash and Cash Equivalents*

All short-term investments with original maturities of less than 90 days are considered cash equivalents. Cash equivalents are stated at cost, which approximates market value because of the short maturity of these instruments.

*Materials and Supplies*

Materials and supplies, which consist mainly of rail, ties and other items for construction and maintenance of property and equipment, as well as diesel fuel, are valued at the lower of average cost or market.

*Property and Equipment, Net*

Property and equipment are depreciated and amortized on a straight-line basis over their estimated useful lives. The Company uses the group method of depreciation in which a single depreciation rate is applied to the gross investment in a particular class of property, despite differences in the service life or salvage value of individual property units within the same class. Upon normal sale or retirement of depreciable railroad property, cost less net salvage value is charged to accumulated depreciation and no gain or loss is recognized. Significant premature retirements and the disposal of land and non-rail property are recorded as gains or losses at the time of their occurrence.

The Company self-constructs portions of its track structure and rebuilds certain classes of rolling stock. In addition to direct labor and material, certain indirect costs are capitalized. Expenditures which significantly increase asset values or extend useful lives are capitalized. Repair and maintenance expenditures are charged to operating expense when the work is performed. Property and equipment are stated at cost.

The Company incurs certain direct labor, contract service and other costs associated with the development and installation of internal-use computer software. Costs for newly developed software or significant enhancements to existing software are typically capitalized. Research, preliminary project, operations, maintenance and training costs are charged to operating expense when the work is performed.

Long-lived assets are reviewed for impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If impairment indicators are present and the estimated future undiscounted cash flows are less than the carrying value of the long-lived assets, the carrying value is reduced to the estimated fair value as measured by the discounted cash flows.

*Environmental Liabilities*

Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. Estimates for these liabilities are undiscounted.

*Personal Injury Claims*

Personal injury liability and ultimate expense projections are estimated using standard actuarial methodologies. These actuarial method procedures include unasserted claims, except for certain occupational illnesses, which, due to their unpredictability, are accrued on an as reported basis. BNSF's liabilities for personal injury claims are undiscounted.

*Income Taxes*

Deferred tax assets and liabilities are measured using the tax rates that apply to taxable income in the period in which the deferred tax asset or liability is expected to be realized or paid. Valuation allowances are established to reduce deferred tax assets if it is more likely than not that some or all of the deferred tax asset will not be realized.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Stock-based Compensation*

At December 31, 2003, the Company had stock-based employee compensation plans. The Company applies Accounting Principles Board (APB) Opinion 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for its stock based plans. In accordance with APB Opinion 25, the Company records the intrinsic value of stock based compensation as expense. Accordingly, no compensation expense has been recognized for its fixed stock option plans as the exercise price equals the stock price on the date of grant. Stock-based compensation expense related to restricted stock has been recognized as compensation expense. The table below illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation*, to stock-based employee compensation (in millions, except per share data):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| Net income, as reported | **$ 816** | $ 760 | $ 731 |
| Stock-based employee compensation expense included in reported net income, net of related tax effects | **11** | 10 | 8 |
| Total stock-based compensation expense determined under fair value method for all awards, net of related tax effects | **(36)** | (32) | (23) |
| Pro forma net income | **$ 791** | $ 738 | $ 716 |
| Earnings per share: | | | |
| Basic—as reported | **$2.21** | $2.01 | $1.89 |
| Basic—pro forma | **$2.14** | $1.95 | $1.85 |
| Diluted—as reported | **$2.19** | $2.00 | $1.87 |
| Diluted—pro forma | **$2.13** | $1.94 | $1.83 |

The pro forma amounts were estimated using the Black-Scholes option-pricing model with the following assumptions:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| Weighted average expected life (years) | **4.0** | 4.0 | 4.0 |
| Expected volatility | **35.0%** | 35.0% | 35.0% |
| Weighted average dividend per share | **$0.49** | $0.48 | $0.48 |
| Weighted average risk free interest rate | **2.17%** | 3.89% | 4.21% |
| Weighted average fair value of options granted per share | **$7.20** | $7.84 | $8.44 |

*Pension and other Post-employment Benefits*

Annual pension and other post-employment benefits (OPEB) expenses are calculated by third party actuaries using standard actuarial methodologies. The actuaries assist the Company in making estimates based on historical information, current information and estimates about future events and circumstances. Significant assumptions used in the valuation of pension and OPEB include expected return on plan assets, discount rate, rate of increase in compensation levels and the health care cost trend rate.

*Reclassifications*

Certain comparative prior year amounts in the Consolidated Financial Statements and accompanying notes have been reclassified to conform to the current year presentation. These reclassifications had no effect on previously reported operating income and net income.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

## 3. Hedging Activities

The Company uses derivatives to hedge against increases in diesel fuel prices and interest rates as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company formally documents the relationship between the hedging instrument and the hedged item, as well as the risk management objective and strategy for the use of the hedging instrument. This documentation includes linking the derivatives that are designated as fair value or cash flow hedges to specific assets or liabilities on the balance sheet, commitments or forecasted transactions. The Company assesses at the time a derivative contract is entered into, and at least quarterly, whether the derivative item is effective in offsetting the changes in fair value or cash flows. Any change in fair value resulting from ineffectiveness, as defined by SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended, is recognized in current period earnings. For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative instrument is recorded in Accumulated Other Comprehensive Income (AOCI) as a separate component of stockholders' equity and reclassified into earnings in the period during which the hedge transaction affects earnings.

BNSF monitors its hedging positions and credit ratings of its counterparties and does not anticipate losses due to counterparty nonperformance.

Fuel

Fuel costs represented 14, 11 and 13 percent of total operating expenses during 2003, 2002 and 2001, respectively. Due to the significance of diesel fuel expenses to the operations of BNSF and the historical volatility of fuel prices, the Company maintains a program to hedge against fluctuations in the price of its diesel fuel purchases. The fuel-hedging program includes the use of derivatives that are accounted for as cash flow hedges. The intent of the program is to protect the Company's operating margins and overall profitability from adverse fuel price changes by entering into fuel-hedge instruments based on management's evaluation of current and expected diesel fuel price trends. However, to the extent the Company hedges portions of its fuel purchases, it may not realize the impact of decreases in fuel prices. Conversely, to the extent the Company does not hedge portions of its fuel purchases, it may be adversely affected by increases in fuel prices. Based on fuel consumption during 2003 and excluding the impact of the hedging program, each one-cent increase in the price of fuel would result in approximately $12 million of additional fuel expense on an annual basis.

*Total Fuel Hedging Program*

As of December 31, 2003, BNSF's total fuel hedging program covered approximately 67 percent, 46 percent and 14 percent of estimated fuel purchases for 2004, 2005 and 2006, respectively. Hedge positions are closely monitored to ensure that they will not exceed actual fuel requirements in any period.

The amounts recorded in the Consolidated Statements of Income for fuel hedge transactions were as follows (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| Hedge benefit | **$ 65** | $ 50 | $ 48 |
| Ineffective portion of unexpired hedges | **3** | — | — |
| Tax effect | **26** | 19 | 18 |
| Hedge benefit, net of tax | **$ 42** | $ 31 | $ 30 |

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The amounts recorded in the Consolidated Balance Sheets for fuel hedge transactions were as follows (in millions):

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Fuel hedging asset | **$145** | $ 31 |
| Ineffective portion of unexpired hedges | **3** | — |
| Tax effect | **55** | 12 |
| Amount included in AOCI, net of tax | **$ 87** | $ 19 |
| Settled fuel hedging contracts receivable | **$ 21** | $ 29 |

Amounts recorded in AOCI represent the fair value less the ineffective portion of unexpired hedges.

BNSF measures the fair value of hedges from data provided by various external counterparties. To value a swap, the Company uses the forward commodity prices for the period hedged. The fair values of costless collars are calculated and provided by the corresponding counterparties.

*NYMEX #2 Heating Oil Hedges*

As of December 31, 2003, BNSF had entered into fuel swap and costless collar agreements utilizing NYMEX #2 heating oil (HO). The hedge prices do not include taxes, transportation costs, certain other fuel handling costs and any differences which may occur between the prices of HO and the purchase price of BNSF's diesel fuel. The sum of all such costs typically ranges between 7 and 17 cents per gallon.

During 2003, the Company entered into fuel swap agreements utilizing HO to hedge the equivalent of 233 million gallons of fuel at an average price of approximately $0.74 per gallon, and costless collar agreements utilizing HO to hedge the equivalent of approximately 284 million gallons of fuel with an average cap price of $0.87 per gallon and an average floor price of $0.76 per gallon. In addition, the Company converted approximately 44 million gallons of West Texas Intermediate crude oil (WTI) collars into HO collars. These HO collars had an average cap price of $0.74 per gallon and an average floor price of $0.67 per gallon. The Company also converted approximately 413 million gallons of WTI collars and 50 million gallons of HO collars into HO swaps. These HO swaps had an average price of $0.70 per gallon. The Company also terminated 25 million gallons of HO collars for a gain of less than $1 million. As of December 31, 2003, there are no HO collars outstanding. The following table provides fuel hedge data based upon the quarter being hedged for all HO fuel hedges outstanding at December 31, 2003.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| 2004 | March 31, | June 30, | September 30, | December 31, | Annual |
| **HO Swaps** | | | | | |
| Gallons hedged (in millions) | 226.80 | 179.55 | 151.20 | 138.60 | 696.15 |
| Average swap price (per gallon) | $ 0.75 | $ 0.69 | $ 0.69 | $ 0.70 | $ 0.71 |
| Fair value (in millions) | $ 33 | $ 19 | $ 14 | $ 13 | $ 79 |

*West Texas Intermediate Crude Oil Hedges*

In addition, BNSF had entered into fuel swap and costless collar agreements utilizing WTI. The hedge prices do not include taxes, transportation costs, certain other fuel handling costs, and any differences which may occur between the prices of WTI and the purchase price of BNSF's diesel fuel, including refining costs. The sum of all such costs typically ranges between 12 and 30 cents per gallon.

During 2003, the Company entered into fuel swap agreements utilizing WTI to hedge the equivalent of approximately 265 million gallons of fuel at an average price of approximately $24.63 per barrel. Also, during 2003, the Company entered into costless collar agreements utilizing WTI to hedge the equivalent of approximately 684 million gallons of fuel with an average cap price of $27.10 per barrel and an average floor price of $22.49 per barrel. The following tables provide fuel hedge data based upon the quarter being hedged for all WTI fuel hedges outstanding at December 31, 2003.

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| 2004 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 525 | 525 | 525 | 675 | 2,250 |
| Equivalent gallons hedged (in millions) | 22.05 | 22.05 | 22.05 | 28.35 | 94.50 |
| Average swap price (per barrel) | $ 20.68 | $ 20.64 | $ 20.61 | $ 21.34 | $ 20.85 |
| Fair value (in millions) | $ 6 | $ 5 | $ 5 | $ 5 | $ 21 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | — | 300 | 300 | 375 | 975 |
| Equivalent gallons hedged (in millions) | — | 12.60 | 12.60 | 15.75 | 40.95 |
| Average cap price (per barrel) | $ — | $ 29.40 | $ 28.60 | $ 27.76 | $ 28.52 |
| Average floor price (per barrel) | $ — | $ 25.00 | $ 24.20 | $ 23.30 | $ 24.10 |
| Fair value (in millions) | $ — | $ 1 | $ — | $ 1 | $ 2 |

| 2005 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 600 | 675 | 1,125 | 1,350 | 3,750 |
| Equivalent gallons hedged (in millions) | 25.20 | 28.35 | 47.25 | 56.70 | 157.50 |
| Average swap price (per barrel) | $ 24.26 | $ 24.67 | $ 24.55 | $ 24.54 | $ 24.52 |
| Fair value (in millions) | $ 2 | $ 2 | $ 3 | $ 3 | $ 10 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 3,600 | 3,000 | 2,025 | 1,275 | 9,900 |
| Equivalent gallons hedged (in millions) | 151.20 | 126.00 | 85.05 | 53.55 | 415.80 |
| Average cap price (per barrel) | $ 26.45 | $ 25.98 | $ 25.79 | $ 25.61 | $ 26.06 |
| Average floor price (per barrel) | $ 21.82 | $ 21.39 | $ 21.19 | $ 21.05 | $ 21.46 |
| Fair value (in millions) | $ 10 | $ 8 | $ 5 | $ 4 | $ 27 |

| 2006 | Quarter Ending March 31, | June 30, | September 30, | December 31, | Annual |
|---|---|---|---|---|---|
| **WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 1,350 | 675 | 375 | — | 2,400 |
| Equivalent gallons hedged (in millions) | 56.70 | 28.35 | 15.75 | — | 100.80 |
| Average swap price (per barrel) | $ 24.43 | $ 25.16 | $ 25.69 | $ — | $ 24.83 |
| Fair value (in millions) | $ 3 | $ 1 | $ — | $ — | $ 4 |
| **WTI Collars** | | | | | |
| Barrels hedged (in thousands) | 825 | 750 | 300 | — | 1,875 |
| Equivalent gallons hedged (in millions) | 34.65 | 31.50 | 12.60 | — | 78.75 |
| Average cap price (per barrel) | $ 27.45 | $ 27.66 | $ 28.44 | $ — | $ 27.69 |
| Average floor price (per barrel) | $ 22.85 | $ 23.05 | $ 23.70 | $ — | $ 23.06 |
| Fair value (in millions) | $ 1 | $ 1 | $ — | $ — | $ 2 |

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Nymex #2 Heating Oil Refining Spread Hedges*

In addition, during 2003 the Company entered into fuel swap agreements utilizing the HO refining spread (HO-WTI) to hedge the equivalent of approximately 95 million gallons of fuel with an average swap price of $4.16 per barrel. HO-WTI is the difference in price between HO and WTI; therefore a HO-WTI swap in combination with a WTI swap is equivalent to a HO swap. The following tables provide fuel hedge data based upon the quarter being hedged for all HO-WTI fuel hedges outstanding at December 31, 2003.

| | Quarter Ending | | | | |
|---|---|---|---|---|---|
| 2004 | March 31, | June 30, | September 30, | December 31, | Annual |
| **HO-WTI Swaps** | | | | | |
| Barrels hedged (in thousands) | 525 | 525 | 525 | 675 | 2,250 |
| Equivalent gallons hedged (in millions) | 22.05 | 22.05 | 22.05 | 28.35 | 94.50 |
| Average swap price (per barrel) | $ 4.55 | $ 3.17 | $ 3.81 | $ 4.90 | $ 4.16 |
| Fair value (in millions) | $ — | $ — | $ — | $ — | $ — |

*Summarized Comparative Prior Year Information*

The following table provides summarized comparative information for hedge transactions as of December 31, 2002.

| | Year Ending December 31, 2002 | | |
|---|---|---|---|
| | 2003 | 2004 | 2005 |
| **WTI Swaps** | | | |
| Barrels hedged (in thousands) | 2,400 | 2,100 | — |
| Equivalent gallons hedged (in millions) | 100.80 | 88.20 | — |
| Weighted average swap price | $ 20.55 | $ 20.63 | $ — |
| Fair value (in millions) | $ 11 | $ 6 | $ — |
| **WTI Collars** | | | |
| Barrels hedged (in thousands) | 11,100 | 3,600 | 3,000 |
| Equivalent gallons hedged (in millions) | 466.20 | 151.20 | 126.00 |
| Weighted average cap price | $ 27.70 | $ 24.96 | $ 24.88 |
| Weighted average floor price | $ 23.35 | $ 20.48 | $ 20.38 |
| Fair value (in millions) | $ 13 | $ 1 | $ — |

*Interest Rate*

From time to time, the Company enters into various interest rate hedging transactions for the purpose of managing exposure to fluctuations in interest rates and establishing rates in anticipation of future debt issuances as well as to convert a portion of its fixed-rate long-term debt to floating-rate debt. The Company uses interest rate swaps and treasury locks as part of its interest rate risk management strategy.

Table of Contents

Index to Financial Statements

*Total Interest Rate Hedging Program*

All swap and treasury lock transactions outstanding with an interest rate component are reflected in the tables below.

| | December 31, 2003 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2004 | 2005 | 2006 | 2007 | 2008 | Thereafter | Total | Fair Value |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | $ 100 | $ 300 | — | $ 300 | — | $ 200 | $ 900 | $ 65 |
| Average fixed rate | 8.63% | 6.38% | — | 7.88% | — | 6.13% | 7.07% | |
| Average floating rate | 5.44% | 2.63% | — | 3.75% | — | 1.65% | 3.10% | |

BNSF's measurement of the fair value of interest rate swaps and treasury locks is based on estimates of the mid-market values for the transactions provided by the counterparties to these agreements.

*Summarized Comparative Prior Year Information*

| | December 31, 2002 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2003 | 2004 | 2005 | 2006 | 2007 | Thereafter | Total | Fair Value |
| **Fair Value Hedges** | | | | | | | | |
| Fixed to variable swaps (in millions) | — | $ 100 | $ 300 | — | $ 300 | $ 200 | $ 900 | $ 82 |
| Average fixed rate | — | 8.63% | 6.38% | — | 7.88% | 6.13% | 7.07% | |
| Average floating rate | — | 5.98% | 2.87% | — | 4.38% | 1.89% | 3.50% | |
| **Cash Flow Hedges** | | | | | | | | |
| Variable to fixed LIBOR swaps (in millions) | $ 100 | — | — | — | — | — | $ 100 | $ — |
| Average fixed rate | 3.14% | — | — | — | — | — | 3.14% | |
| Average floating rate | 1.43% | — | — | — | — | — | 1.43% | |
| Treasury locks (in millions) | $ 150 | — | — | — | — | — | $ 150 | $ (3) |
| Average locked-in rate | 4.38% | — | — | — | — | — | 4.38% | |

*Fair Value Interest Rate Hedges*

The Company enters into interest rate swaps to convert fixed-rate debt to floating-rate debt. These swaps are accounted for as fair value hedges under SFAS No. 133. These fair value hedges qualify for the short cut method of recognition; therefore, no portion of these swaps is treated as ineffective. As of December 31, 2003 and 2002, BNSF had entered into nine separate swaps on a notional amount of $900 million in which it pays an average floating rate, which fluctuates quarterly, based on LIBOR. The average floating rate to be paid by BNSF as of December 31, 2003, was 3.10 percent and the average fixed rate BNSF is to receive is 7.07 percent. These swaps will expire between 2004 and 2009.

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The amounts recorded in the Consolidated Statements of Income for interest rate fair value hedge transactions were as follows (in millions):

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Hedge benefit | $35 | $26 | $— |
| Tax effect | 13 | 10 | — |
| Hedge benefit, net of tax | $22 | $16 | $— |

The amounts recorded on the Consolidated Balance Sheets for interest rate fair value hedge transactions, which represent the fair value of unexpired hedges, were as follows (in millions):

| | DECEMBER 31, | |
|---|---|---|
| | 2003 | 2002 |
| Short-term interest rate hedging asset | $ 9 | $ 5 |
| Long-term interest rate hedging asset | $ 56 | $ 77 |

*Cash Flow Interest Rate Hedges*

The Company occasionally uses interest rate swaps to fix the LIBOR component of commercial paper. These swaps are accounted for as cash flow hedges under SFAS No. 133 and qualify for the short cut method of recognition and, therefore, no portion of these swaps is treated as ineffective. As of December 31, 2003, BNSF had no interest rate swaps outstanding to fix the LIBOR component of commercial paper but had $100 million outstanding at December 31, 2002. These swaps expired in 2003.

In anticipation of future debt issuances, BNSF entered into three treasury lock transactions in 2002 totaling $150 million to fix the treasury component on a future 10-year debt issuance. The average locked-in rate was 4.38 percent. These treasury locks were closed in May 2003 in connection with the issuance of $250 million of 4.30 percent notes due July 1, 2013. BNSF paid the counterparties $10 million on the closing date and this payment will be amortized over the life of the related notes.

The amounts recorded in the Consolidated Statements of Income for interest rate cash flow hedge transactions were as follows (in millions):

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Hedge loss | $— | $ (2) | $— |
| Tax effect | — | (1) | — |
| Hedge loss, net of tax | $— | $ (1) | $— |

The amounts recorded in the Consolidated Balance Sheets for interest rate cash flow hedge transactions, which represent the fair value of unexpired cash flow hedges, were as follows (in millions):

| | DECEMBER 31, | |
|---|---|---|
| | 2003 | 2002 |
| Interest rate hedging liability | $ — | $ (3) |

| | | |
|---|---|---|
| Tax effect | — | (1) |
| Interest rate hedging liability included in AOCI, net of tax | $ — | $ (2) |

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

## 4. Other Expense, Net

Other expense, net includes the following (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Accounts receivable sale fees | $ 9 | $ 12 | $ 30 |
| Write-down of non-rail investments | — | — | 75 |
| Miscellaneous, net | 5 | — | 9 |
| Total | $ 14 | $ 12 | $114 |

Losses recognized in 2001 related to non-rail investments consisted primarily of FreightWise, Inc., an Internet transportation exchange; Pathnet Telecommunications, Inc., a telecommunications venture; a decline in the cash surrender value of company owned life insurance policies; and a portfolio of other non-core investments.

## 5. Income Taxes

Income tax expense (benefit) was as follows (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Current: | | | |
| Federal | $ (12) | $ 21 | $129 |
| State | 6 | 3 | 11 |
| Total current | (6) | 24 | 140 |
| Deferred: | | | |
| Federal | 408 | 378 | 258 |
| State | 52 | 54 | 44 |
| Total deferred | 460 | 432 | 302 |
| Total | $454 | $456 | $442 |

Reconciliation of the federal statutory income tax rate to the effective tax rate was as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Federal statutory income tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | 3.0 | 3.1 | 3.0 |
| Tax settlement | (1.0) | — | — |
| Other, net | (0.1) | (0.6) | (0.3) |

| | | | |
|---|---|---|---|
| Effective tax rate | 36.9% | 37.5% | 37.7% |

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The components of deferred tax assets and liabilities were as follows (in millions):

| | December 31, | |
|---|---|---|
| | 2003 | 2002 |
| Deferred tax liabilities: | | |
| Depreciation and amortization | $(7,596) | $(7,148) |
| Other | (537) | (445) |
| Total deferred tax liabilities | (8,133) | (7,593) |
| Deferred tax assets: | | |
| Casualty and environmental | 273 | 265 |
| Employee merger and separation costs | 69 | 80 |
| Pension and post-retirement benefits | 238 | 237 |
| Other | 364 | 350 |
| Total deferred tax assets | 944 | 932 |
| Net deferred tax liability | $(7,189) | $(6,661) |
| Non-current deferred income tax liability | $(7,481) | $(6,975) |
| Current deferred income tax asset | 292 | 314 |
| Net deferred tax liability | $(7,189) | $(6,661) |

All federal income tax returns of BNSF's predecessor companies, Burlington Northern Inc. and Santa Fe Pacific Corporation are closed through 1994 and the business combination date of September 1995, respectively. BNSF is currently under Internal Revenue Service examination for years 1995 through 1999. In addition, BNSF and its subsidiaries have various state income tax returns in the process of examination, administrative appeal or litigation. The Company believes that adequate provision has been made for any adjustment that might be assessed for open years through 2003.

## 6. Accounts Receivable, Net

BNSF Railway transfers most of its accounts receivable to Santa Fe Receivables Corporation (SFRC), a special purpose subsidiary. SFRC transfers an undivided interest in such receivables, with limited exceptions, to a master trust, and causes the trust to issue an undivided interest in the receivables to investors (the A/R sales program). The undivided interests in the master trust may be in the form of certificates or purchased interests.

SFRC renewed $350 million of its $700 million accounts receivable facility, effective June 2003, for an additional 364 days. In addition, SFRC entered into a separate $350 million accounts receivable facility with a five year term in June 2003. The Company's total capacity to sell undivided interests to investors under the A/R sales program was $700 million at December 31, 2003. Outstanding undivided interests held by investors under the A/R sales program were $625 million at December 31, 2003, and $594 million, net of $8 million of excess cash held in the trust, at December 31, 2002. These receivables were derecognized by BNSF Railway in connection with the sale of undivided interests under the A/R sales program. The undivided interests were supported by $808 million and $771 million of receivables transferred by SFRC to the master trust at December 31, 2003 and December 31, 2002, respectively. When SFRC transfers these receivables to the master trust, it retains an undivided interest in the receivables sold. This retained interest is included in accounts receivable in the Company's financial statements. SFRC's retained interest in these receivables of $183 million and $177 million at December 31, 2003 and 2002, respectively, less an allowance for uncollectible accounts, reflected the total accounts receivables transferred by SFRC to the master trust less $625 million and $594 million, at December 31, 2003 and 2002, respectively, of outstanding undivided interests held by investors. Due to a relatively short collection cycle, the fair value of the undivided interest transferred to investors in the A/R sales program approximated book value and there was no gain or loss from the transaction.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company retains the collection responsibility with respect to the accounts receivable. Proceeds from collections reinvested in the A/R sales program were approximately $9.8 billion in 2003 and $9.5 billion in 2002. No servicing asset or liability has been recorded since the fees the Company receives for servicing the receivables approximate the related costs. SFRC's costs of the sale of receivables are included in other expense, net and were $9 million and $12 million for the year ended December 31, 2003 and 2002, respectively. These costs fluctuate monthly with changes in prevailing interest rates, and were based on weighted average interest rates of 1.1 percent and 2.0 percent for the years ended December 31, 2003 and 2002, respectively. These costs include interest, discounts associated with transferring the receivables under the A/R sales program to SFRC, program fees paid to banks, incidental commercial paper issuing costs, and fees for unused commitment availability.

The amount of accounts receivable transferred by BNSF Railway to SFRC fluctuates based upon the availability of receivables and is directly affected by changing business volumes and credit risks, including dilution and delinquencies. BNSF Railway has historically experienced very low levels of default or dilution. If dilution or delinquency percentages were to increase by one percentage point, the value of BNSF Railway's retained interest would increase by approximately $8 million.

Receivables funded under the A/R sales program may not include amounts over 90 days past due or concentrations over certain limits with any one customer. At December 31, 2003 and December 31, 2002, $78 million and $77 million, respectively, of accounts receivable were greater than 90 days old. The Company maintains an allowance for bill adjustments and uncollectible accounts based upon the expected collectibility of accounts receivable, including receivables transferred to the master trust. Credit losses are based on specific identification of uncollectible accounts and application of historical collection percentages by aging category. At December 31, 2003 and December 31, 2002, $85 million and $82 million, respectively, of such allowances had been recorded. During the year ended December 31, 2003, 2002 and 2001, $7 million, $7 million and $8 million, respectively, of accounts receivable were written off.

The investors in the master trust have no recourse to BNSF Railway's other assets except for customary warranty and indemnity claims. Creditors of BNSF Railway have no recourse to the assets of the master trust or SFRC unless and until all claims of their respective creditors have been paid. The A/R sales program includes provisions that, if triggered, allow the investors participating in this program, at their option, to cancel the program. At December 31, 2003, BNSF Railway was in compliance with these provisions.

**7. Property And Equipment, Net**

Property and equipment, net (in millions), and the weighted average annual depreciation rate (%) were as follows:

| | December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2003 Depreciation Rate** |
| Land | **$ 1,519** | $ 1,495 | — % |
| Track structure | **13,818** | 13,024 | 3.6 |
| Other roadway | **10,199** | 9,733 | 2.5 |
| Locomotives | **3,468** | 2,721 | 3.7 |
| Freight cars and other equipment | **1,757** | 1,678 | 4.6 |
| Computer hardware and software | **313** | 254 | 11.1 |
| Total cost | **31,074** | 28,905 | |
| Less accumulated depreciation and amortization | **(6,006)** | (4,883) | |
| Property and equipment, net | **$25,068** | $24,022 | |

The Consolidated Balance Sheets at December 31, 2003 and 2002, included $940 million, net of $281 million of amortization, and $972 million, net of $249 million of amortization, respectively, for property and equipment under capital leases, primarily for locomotives.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

## 8. Accounts Payable And Other Current Liabilities

Accounts payable and other current liabilities consisted of the following (in millions):

| | December 31, | |
|---|---|---|
| | **2003** | **2002** |
| Compensation and benefits payable | **$ 418** | $ 410 |
| Casualty and environmental liabilities | **250** | 248 |
| Accounts payable | **214** | 177 |
| Tax liabilities | **174** | 175 |
| Contract allowances | **129** | 124 |
| Rents and leases | **121** | 150 |
| Equipment purchases | **114** | — |
| Accrued interest | **111** | 118 |
| Employee merger and separation costs | **35** | 40 |
| Other | **536** | 476 |
| Total | **$2,102** | $1,918 |

## 9. Debt

Debt outstanding was as follows (in millions):

| | December 31, | |
|---|---|---|
| | **2003** | **2002** |
| Notes and debentures, weighted average rate of 6.2 percent, due 2004 to 2097 | **$4,790** | $4,719 |
| Equipment obligations, weighted average rate of 7.1 percent, due 2004 to 2016 | **537** | 611 |
| Capitalized lease obligations, weighted average rate of 6.4 percent, due 2004 to 2023 | **612** | 646 |
| Mortgage bonds, weighted average rate of 8.3 percent, due 2004 to 2047 | **391** | 422 |
| Financing obligations, weighted average rate of 6.3 percent, due 2012 to 2028 | **153** | 138 |
| Commercial paper, 1.2 percent, variable | **242** | 320 |
| Unamortized discount and other, net | **(41)** | (42) |
| Total | **6,684** | 6,814 |
| Less current portion of long-term debt | **(244)** | (173) |
| Long-term debt | **$6,440** | $6,641 |

Notes and debentures include increases related to fair value adjustments for hedges of $59 million and $77 million at December 31, 2003 and 2002, respectively.

Certain BNSF Railway properties and other assets are subject to liens securing $391 million of mortgage debt. Certain locomotives and rolling stock of BNSF Railway are subject to equipment obligations and capital leases.

The following tables provide fair value information for the Company's debt obligations including principal cash flows and related weighted average interest rates by contractual maturity dates. Weighted average variable rates are based on implied forward rates in the yield curve at December 31, 2003.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The fair values presented in the following table do not include the fair value of the swaps and treasury locks.

| | December 31, 2003 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2004 | 2005 | 2006 | 2007 | 2008 | There After | Total | Fair Value |
| Fixed-Rate Debt (in millions) | $142 | $146 | $432 | $135 | $135 | $4,493 | $5,483 | $5,839 |
| Average Interest Rate | 7.1% | 7.1% | 8.4% | 6.9% | 6.9% | 6.8% | 7.0% | |
| Variable-Rate Debt (in millions) | $102 | $316 | — | $322 | $242 | $ 219 | $1,201 | $1,276 |
| Average Interest Rate | 5.6% | 3.6% | — | 5.5% | 3.5% | 4.3% | 4.4% | |

Maturities in 2008 in the 2003 table above exclude $200 million of 7.29 percent debentures which mature in 2036 but are redeemable in 2008 at the option of the debt holders. In addition, BNSF has included in 2008 maturities $242 million of commercial paper in the 2003 table above. A one-half percent change in interest rates would cause interest expense related to commercial paper to fluctuate by approximately $1 million.

| | December 31, 2002 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maturity Date | | | | | | | |
| | 2003 | 2004 | 2005 | 2006 | 2007 | There After | Total | Fair Value |
| Fixed-Rate Debt (in millions) | $173 | $149 | $146 | $433 | $136 | $4,480 | $5,517 | $6,028 |
| Average Interest Rate | 6.4% | 7.0% | 7.1% | 8.4% | 6.9% | 7.0% | 7.1% | |
| Variable-Rate Debt (in millions) | — | $104 | $641 | — | $328 | $ 224 | $1,297 | $1,343 |
| Average Interest Rate | — | 6.1% | 3.1% | — | 5.5% | 4.1% | 4.1% | |

BNSF has included in 2005 maturities $320 million of commercial paper in the 2002 table above. In addition, maturities in 2003 included in the 2002 table exclude $175 million of 6.53 percent notes due 2037 which were redeemable in 2003 at the option of the holder.

The fair value of BNSF's long-term debt is primarily based on quoted market prices for the same or similar issues, or on the current rates that would be offered to BNSF for debt of the same remaining maturities. The carrying amount of commercial paper and bank debt approximates fair value because of the short maturity of these instruments.

*Mortgage Bonds*

*2003*

The Company exercised an option to call $29 million of 2.63 percent mortgage bonds issued by a predecessor company and due January 1, 2010. Cash generated from operations was used to fund the call.

*Notes and Debentures*

*2003*

BNSF issued $250 million of 4.30 percent notes due July 1, 2013. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

The Company exercised an option to call $150 million of 7.50 percent bonds due July 2023 at a price of 103.02 percent of par. Commercial paper was used to fund the call.

As of December 31, 2003, the Company had $750 million of debt capacity available under its shelf registration.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*2002*

BNSF issued $300 million of 5.90 percent notes due July 1, 2012. The net proceeds of the debt issuance were used for general corporate purposes including the repayment of outstanding commercial paper.

*Commercial Paper*

BNSF issues commercial paper from time to time that is supported by bank revolving credit agreements. At December 31, 2003, there were no bank borrowings against the revolving credit agreements. Outstanding commercial paper balances are considered as reducing the amount of borrowings available under these agreements. In June 2003, the Company reduced its $750 million short-term facility to $700 million and extended its expiration date to June 2004. The Company has the ability to have any amounts then outstanding mature as late as June 2005. Also, in June 2003, the Company reduced its $750 million long-term facility to $500 million and extended its expiration date to June 2008. As of December 31, 2003, as a result of these amendments, the bank revolving credit agreements allow borrowings of up to $1.2 billion. Annual facility fees are currently 0.10 percent and 0.15 percent for the short-term and long-term facilities, respectively. Both rates are subject to change based upon changes in BNSF's senior unsecured debt ratings. Borrowing rates are based upon: i) LIBOR plus a spread determined by BNSF's senior unsecured debt ratings, ii) money market rates offered at the option of the lenders, or iii) an alternate base rate. The Company classifies commercial paper as long-term to the extent of its borrowing capacity under these facilities. BNSF must maintain compliance with certain financial covenants under its revolving credit agreements. At December 31, 2003, the Company was in compliance.

The maturity value of commercial paper outstanding as of December 31, 2003 was $494 million, reducing the total capacity available under the revolving credit agreements to approximately $706 million. Included in the $494 million maturity value of commercial paper is $251 million issued to a consolidated subsidiary of BNSF that is eliminated upon consolidation.

*Financing Obligations*

*2002*

The Company financed the construction of an intermodal facility by a third party and entered into an agreement to lease the intermodal facility for 20 years. This lease transaction is accounted for as a financing and has a purchase option. The Company recorded an asset in property and equipment, net and a liability in long-term debt and commercial paper of $138 million which represents the fair market value at lease inception.

*Guarantees*

Debt guaranteed by the Company as of December 31, 2003 is as follows (dollar amounts in millions):

| | GUARANTEES | | | | |
|---|---|---|---|---|---|
| | BNSF Ownership Percentage | Principal Amount Guaranteed | Maximum Future Payments | Maximum Recourse Amount (a) | Remaining Term (In Years) |
| **Counterparty** | | | | | |
| Kinder Morgan Energy Partners, L.P. | 0.5% | $ 190 | $ 190 | $ — | Termination of Ownership |
| Kansas City Terminal Intermodal Transportation Corporation | 0.0% | $ 68 | $ 111 | $ 111 | 15 |
| The Unified Government of Wyandotte County/Kansas City, Kansas | 0.0% | $ 14 | $ 23 | $ — | 19 |
| Westside Intermodal Transportation Corporation | 0.0% | $ 45 | $ 76 | $ — | 19 |
| San Jacinto Partnership | 49.0% | $ 50 | $ 51 | $ — | Less than 1 |
| All other | 0.0% | $ 11 | $ 15 | $ 6 | Various |

(a) Reflects the maximum amount the Company could recover from a third party other than the counterparty.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Kinder Morgan Energy Partners, L.P.

Santa Fe Pacific Pipelines, Inc (SFPP), an indirect, wholly-owned subsidiary of BNSF, has a guarantee in connection with its remaining special limited partnership interest in SFPP, L.P. All obligations with respect to the guarantee will cease upon termination of ownership rights which would occur upon a put notice issued by BNSF or the exercise of the call rights by the general partners of SFPP, L.P.

Kansas City Terminal Intermodal Transportation Corporation

BNSF Railway and another major railroad jointly and severally guarantee $68 million of debt of Kansas City Terminal Intermodal Transportation Corporation, the proceeds of which were used to finance construction of a double track grade separation bridge in Kansas City, Missouri, which is operated and used by Kansas City Terminal Railway Company (KCTRC). BNSF has a 25 percent ownership in KCTRC and accounts for its interest using the equity method of accounting.

The Unified Government of Wyandotte County/Kansas City, Kansas and Westside Intermodal Transportation Corporation

Proceeds of guaranteed debt are being used to finance construction of a bridge that will connect BNSF Railway's Argentine Yard in Kansas City, Kansas, with the KCTRC mainline tracks in Kansas City, Missouri. The bridge will be operated by KCTRC.

San Jacinto Partnership

BNSF agreed to guarantee approximately $85 million of debt, of which $50 million was outstanding as of December 31, 2003. The proceeds from the debt are being used to construct and operate a 13-mile railroad, which will service several chemical and plastics manufacturing facilities in the Houston, Texas area. In addition, the San Jacinto Partnership used $22 million of the proceeds to repay all of the interim construction advances previously made by BNSF. As discussed in Note 16 to the Consolidated Financial Statements, the San Jacinto Partnership will likely be consolidated on March 31, 2004.

All Other

BNSF Railway guarantees $11 million of other debt and leases. BNSF holds a performance bond and has the option to sub-lease property to recover up to $6 million of the $11 million of guarantees. These guarantees expire between 2005 and 2014.

Other than the performance bond discussed above, there is no collateral held by a third party which BNSF could obtain and liquidate to recover any amounts paid under the above guarantees.

Other than amounts recorded for capitalized obligations, none of the guarantees above are recorded in the Consolidated Financial Statements of the Company. BNSF does not expect performance under these guarantees to have a material effect on the Company in the foreseeable future.

Indemnities

In the ordinary course of business, BNSF enters into agreements with third parties that include indemnification clauses. In general, these clauses are customary for the types of agreements in which they are included. At times, these clauses may involve indemnification for the acts of the Company, its employees and/or agents, indemnification for another party's acts, indemnification for future events, indemnification based upon a certain standard of performance, indemnification for liabilities arising out of the Company's use of leased equipment or other property, or other types of indemnification. Due to the uncertainty of whether the events which would trigger the indemnification obligations will ever occur and, if they did, the extent of the liability which would thereby result, the exposure for future indemnification payments cannot be estimated with any amount of certainty. However, the Company does not believe, based on information available, that these indemnity agreements will have a material adverse effect on the Company's results of operation, financial position or liquidity.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

## 10. Commitments and Contingencies

*Lease Commitments*

BNSF has substantial lease commitments for locomotives, freight cars, trailers and containers, office buildings and other property, and many of these leases provide the option to purchase the leased item at fair market value at the end of the lease. However, some provide fixed price purchase options. Future minimum lease payments (which reflect leases having non-cancelable lease terms in excess of one year) as of December 31, 2003, are summarized as follows (in millions):

| | December 31, | |
|---|---|---|
| | Capital Leases | Operating Leases |
| 2004 | $ 110 | $ 437 |
| 2005 | 109 | 442 |
| 2006 | 108 | 409 |
| 2007 | 96 | 366 |
| 2008 | 90 | 366 |
| Thereafter | 234 | 3,326 |
| Total | 747 | $ 5,346 |
| Less amount representing interest | 135 | |
| Present value of minimum lease payments | $ 612 | |

Lease rental expense for all operating leases was $462 million, $448 million and $443 million for the years ended December 31, 2003, 2002 and 2001, respectively. Contingent rentals and sublease rentals were not significant.

*Other Commitments*

In the normal course of business, the Company enters into long-term contractual requirements for future goods and services needed for the operations of the business. Such commitments are not in excess of expected requirements and are not reasonably likely to result in performance penalties or payments that would have a material adverse effect on the Company's liquidity.

*Casualty and Environmental*

Personal injury claims, including work-related injuries to employees, are a significant expense for the railroad industry. Employees of BNSF are compensated for work-related injuries according to the provisions of the Federal Employers' Liability Act (FELA). FELA's system of requiring the finding of fault, coupled with unscheduled awards and reliance on the jury system, contributed to significant increases in expense in past years. BNSF has implemented a number of safety programs to reduce the number of personal injuries as well as the associated claims and personal injury expense.

The Company formed a consolidated wholly-owned subsidiary, Burlington Northern Santa Fe Insurance Company, Ltd. (BNSF IC), in the second quarter of 2002. BNSF IC provides insurance coverage for certain punitive damage risks incurred after April 1, 1998, FELA claims, railroad protective and force account insurance claims incurred after January 1, 2002, and certain other claims which are subject to reinsurance. At December 31, 2003, BNSF IC had invested in commercial paper issued by BNSF and third party time deposits and money market accounts. The Company's accounting policies related to personal injury, as disclosed in Note 2 to the Consolidated Financial Statements, did not change as a result of the formation of this subsidiary.

The Company recognized personal injury expenses of approximately $215 million, $228 million and $195 million in 2003, 2002 and 2001, respectively. BNSF made payments for personal injuries of approximately $198 million, $190 million and $173 million in 2003, 2002 and 2001, respectively. At December 31, 2003 and 2002, the Company had recorded liabilities of $513 million and $496 million, respectively, related to

personal injury claims. Of these amounts, $200 million and $197 million were included in current liabilities in 2003 and 2002, respectively. BNSF's liabilities for personal injury claims are undiscounted.

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The Company's operations, as well as those of its competitors, are subject to extensive federal, state and local environmental regulation. BNSF's operating procedures include practices to protect the environment from the risks inherent in railroad operations, which frequently involve transporting chemicals and other hazardous materials. Additionally, many of BNSF's land holdings are and have been used for industrial or transportation-related purposes or leased to commercial or industrial companies whose activities may have resulted in discharges onto the property. As a result, BNSF is subject to environmental cleanup and enforcement actions. In particular, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), also known as the Superfund law, as well as similar state laws generally impose joint and several liability for cleanup and enforcement costs on current and former owners and operators of a site without regard to fault or the legality of the original conduct. BNSF has been notified that it is a potentially responsible party (PRP) for study and cleanup costs at approximately 20 Superfund sites for which investigation and remediation payments are or will be made or are yet to be determined (the Superfund sites) and, in many instances, is one of several PRPs. In addition, BNSF may be considered a PRP under certain other laws. Accordingly, under CERCLA and other federal and state statutes, BNSF may be held jointly and severally liable for all environmental costs associated with a particular site. If there are other PRPs, BNSF generally participates in the cleanup of these sites through cost-sharing agreements with terms that vary from site to site. Costs are typically allocated based on relative volumetric contribution of material, the amount of time the site was owned or operated, and/or the portion of the total site owned or operated by each PRP.

Environmental costs include initial site surveys and environmental studies of potentially contaminated sites as well as costs for remediation and restoration of sites determined to be contaminated. Liabilities for environmental cleanup costs are initially recorded when BNSF's liability for environmental cleanup is both probable and a reasonable estimate of associated costs can be made. Adjustments to initial estimates are recorded as necessary based upon additional information developed in subsequent periods. BNSF conducts an ongoing environmental contingency analysis, which considers a combination of factors including independent consulting reports, site visits, legal reviews, analysis of the likelihood of participation in and the ability of other PRPs to pay for cleanup, and historical trend analyses.

BNSF is involved in a number of administrative and judicial proceedings and other mandatory cleanup efforts at approximately 430 sites, including the Superfund sites, at which it is participating in the study or cleanup, or both, of alleged environmental contamination. The Company recognized environmental expenses of approximately $59 million, $43 million and $51 million during 2003, 2002 and 2001, respectively. BNSF paid approximately $56 million, $49 million and $72 million during 2003, 2002 and 2001, respectively, for mandatory and unasserted cleanup efforts, including amounts expended under federal and state voluntary cleanup programs. BNSF has recorded liabilities for remediation and restoration of all known sites of $199 million at December 31, 2003, compared with $196 million at December 31, 2002. Of these amounts, $50 million and $51 million, respectively, are included in current liabilities. BNSF's environmental liabilities are not discounted. BNSF anticipates that the majority of the accrued costs at December 31, 2003, will be paid over the next five years and no individual site is considered to be material.

Liabilities recorded for environmental costs represent BNSF's best estimates for remediation and restoration of these sites and include both asserted and unasserted claims. Unasserted claims are not considered to be a material component of the liability. Although recorded liabilities include BNSF's best estimates of all costs, without reduction for anticipated recoveries from third parties, BNSF's total cleanup costs at these sites cannot be predicted with certainty due to various factors such as the extent of corrective actions that may be required, evolving environmental laws and regulations, advances in environmental technology, the extent of other parties' participation in cleanup efforts, developments in ongoing environmental analyses related to sites determined to be contaminated, and developments in environmental surveys and studies of potentially contaminated sites. As a result, future charges to income for environmental liabilities could have a significant effect on results of operations in a particular quarter or fiscal year as individual site studies and remediation and restoration efforts proceed or as new sites arise. However, management believes it is unlikely any identified matters, either individually or in the aggregate, will have a material adverse effect on BNSF's results of operations, financial position or liquidity.

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Other Claims and Litigation*

BNSF and its subsidiaries are parties to a number of legal actions and claims, various governmental proceedings and private civil suits arising in the ordinary course of business, including those related to environmental matters, Federal Employers' Liability Act claims by BNSF Railway employees, other personal injury claims, and disputes and complaints involving certain transportation rates and charges (including complaints seeking refunds of prior charges paid for coal transportation and the prescription of future rates for such movements). Some of the legal proceedings include claims for punitive as well as compensatory damages, and a few proceedings purport to be class actions. While the final outcome of these matters cannot be predicted with certainty, considering among other things the meritorious legal defenses available and liabilities that have been recorded along with applicable insurance, it is the opinion of BNSF's management that none of these items, will have a material adverse effect on the results of operations, financial position or liquidity of BNSF. However, an unexpected adverse resolution of one or more of these items could have a material adverse effect on the results of operations in a particular quarter or fiscal year.

## 11. Employee Merger and Separation Costs

Employee merger and separation costs activity was as follows (in millions):

| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Beginning balance at January 1, | **$210** | $274 | $310 |
| Accruals | **15** | 1 | 30 |
| Payments | **(43)** | (55) | (55) |
| Other | **(3)** | (10) | (11) |
| Ending balance at December 31, | **$179** | $210 | $274 |

Employee merger and separation liabilities of $179 million and $210 million are included in the Consolidated Balance Sheets at December 31, 2003 and 2002, respectively, and principally represent: (i) employee-related severance costs for the consolidation of clerical functions, material handlers in mechanical shops and trainmen on reserve boards; (ii) deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers; and (iii) certain non-union employee severance costs. Employee merger and separation expenses are recorded in materials and other in the Consolidated Income Statements. At December 31, 2003, $35 million of the remaining liabilities are included in current liabilities for anticipated costs to be paid in 2004.

*Conductors, Trainmen and Locomotive Engineers*

Liabilities related to deferred benefits payable upon separation or retirement to certain active conductors, trainmen and locomotive engineers were $144 million and $163 million at December 31, 2003 and 2002, respectively. These costs were primarily incurred in connection with labor agreements reached prior to the consummation of the business combination of BNSF's predecessor companies Burlington Northern, Inc. and Santa Fe Pacific Corporation (the Merger) which, among other things, reduced train crew sizes and allowed for more flexible work rules. In 2003, the Company updated its estimates and accrued $3 million of additional expenses related to deferred benefits. In 2001, the Company recorded a $5 million reversal of certain deferred benefits payable to reflect a change in estimates.

*Consolidation of Clerical Functions*

Liabilities related to the consolidation of clerical functions were $20 million and $25 million at December 31, 2003 and 2002, respectively, and primarily provide for severance costs associated with the clerical consolidation plan adopted in 1995 upon the Merger and a separation program announced in July 2003. The 1995 consolidation plan resulted in the elimination of approximately 1,500 permanent positions and was substantially completed during 1999. The July 2003 separation program resulted in accrued severance costs of approximately $12 million and will affect approximately 150 employees. Reductions related to the July 2003 separation program were completed in the fourth quarter of 2003. In the fourth quarter of 2001, the Company recorded a charge of $9 million of costs related to the reduction of approximately 40 material handlers and other clerical positions. This liability balance also includes remaining costs related to the reduction of approximately 140 material handlers in 2000.

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

In 2003, 2002 and 2001, the Company recorded $1 million, $10 million and $6 million, respectively, of reversals for certain liabilities associated with the consolidation of clerical functions. These reversals primarily reflect accrued payments related to workforce reductions for positions under collective bargaining agreements where the Company was able to place affected individuals in alternate positions. The remaining liability balance at December 31, 2003, represents benefits to be paid to employees affected by the clerical consolidation and the separation program for employees being paid up to ten years or in some cases through retirement versus receiving a lump-sum payment.

*Non-union Employee Severance*

Liabilities principally related to certain remaining non-union employee severances resulting from the fourth quarter 2001 workforce reduction and the Merger were $15 million and $22 million at December 31, 2003 and 2002, respectively. These costs will be paid over the next several years based on deferral elections made by the affected employees.

During the fourth quarter of 2001, the Company reduced 400 positions through severance, normal attrition and the elimination of contractors. The Company recorded $21 million of expenses for severance, medical and other benefits associated with the costs of terminating 360 employees and approximately $31 million for benefits to be received under the Company's retirement and medical plans. During the fourth quarter of 2003 and 2002, the Company recorded a $2 million reduction to its liability balance and accrued additional expenses of $1 million, respectively, due to changes in certain estimates. Substantially all of these planned reductions were completed at December 31, 2001.

### 12. Earnings Per Share

Basic earnings per share is based on the weighted average number of common shares outstanding. Diluted earnings per share is based on basic earnings per share adjusted for the effect of potential common shares outstanding that were dilutive during the period, arising from employee stock awards and incremental shares calculated using the treasury stock method.

Weighted average stock options totaling 23.6 million, 26.3 million and 18.6 million for 2003, 2002 and 2001, respectively, were not included in the computation of diluted earnings per share, because the options' exercise price exceeded the average market price of the Company's stock for those periods.

### 13. Retirement Plans and Other Post-employment Benefit Plans

BNSF sponsors a funded, noncontributory qualified BNSF Retirement Plan, which covers substantially all non-union employees and an unfunded, nonqualified BNSF Supplemental Retirement Plan, which covers certain officers and other employees. The benefits under these BNSF plans are based on years of credited service and the highest five-year average compensation levels. BNSF's funding policy is to contribute annually not less than the regulatory minimum and not more than the maximum amount deductible for income tax purposes with respect to the funded plan.

Certain salaried employees of BNSF that have met certain age and years of service requirements are eligible for medical benefits and life insurance coverage during retirement. The retiree medical plan is contributory and provides benefits to retirees, their covered dependents and beneficiaries. Retiree contributions are adjusted annually. The plan also contains fixed deductibles, coinsurance and out-of-pocket limitations. The basic life insurance plan is noncontributory and covers retirees only. Optional life insurance coverage is available for some retirees; however, the retiree is responsible for the full cost. BNSF's policy is to fund benefits payable under the medical and life insurance plans as they come due. Employees beginning salaried employment with BNSF subsequent to September 22, 1995, are not eligible for medical benefits during retirement.

BNSF's accumulated post retirement benefit obligation (APBO) and net cost recognized for other post employment benefits (OPEB) do not reflect the effects of the recent Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Act). The provisions of the Act provide for a federal subsidy for plans that provide prescription drug benefits and meet certain qualifications. Specific authoritative guidance on the accounting for the federal subsidy is pending and when that guidance is issued, it could require BNSF to change information related to its actuarially determined APBO and net cost for OPEB.

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Components of the net (benefit) cost for these plans were as follows (in millions):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | Pension Benefits | | | Health and Welfare Benefits | | |
| | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
| Service cost | **$ 17** | $ 15 | $ 13 | **$ 4** | $ 6 | $ 4 |
| Interest cost | **100** | 100 | 102 | **22** | 21 | 18 |
| Expected return on plan assets | **(123)** | (127) | (136) | **—** | — | — |
| Curtailments/settlements | **—** | — | 10 | **—** | — | 3 |
| Special termination benefits | **—** | 2 | 18 | **—** | — | — |
| Actuarial loss | **3** | 1 | 1 | **8** | 3 | — |
| Net amortization and deferred amounts | **—** | 2 | 2 | **(2)** | — | — |
| Net (benefit) cost recognized | **$ (3)** | $ (7) | $ 10 | **$ 32** | $ 30 | $ 25 |

The following table shows the change in benefit obligation based on the September 30 measurement date (in millions):

| | Pension Benefits | | Health and Welfare Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| **Change in Benefit Obligation** | | | | |
| Benefit obligation at beginning of period | **$1,611** | $1,507 | $ 363 | $ 314 |
| Service cost | **17** | 15 | 4 | 6 |
| Interest cost | **100** | 100 | 22 | 21 |
| Plan participants' contributions | **—** | — | **6** | 5 |
| Amendments | **—** | 2 | **(9)** | (12) |
| Actuarial loss | **75** | 117 | **7** | 54 |
| Curtailments/settlements | **—** | (13) | **—** | — |
| Special termination benefits | **—** | 2 | **—** | — |
| Benefits paid | **(125)** | (119) | **(27)** | (25) |
| Benefit obligation at end of period | **$1,678** | $1,611 | **$ 366** | $ 363 |

The accumulated benefit obligation for all defined benefit pension plans was $1,559 million and $1,503 million at September 30, 2003, and 2002, respectively. Both the BNSF Retirement Plan and the BNSF Supplemental Retirement Plan had an accumulated benefit obligation in excess of plan assets at September 30, 2003 and 2002.

The following table shows the change in plan assets of the plans based on the September 30 measurement date (in millions):

| | Pension Benefits | | Health and Welfare Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| **Change in Plan Assets** | | | | |
| Fair value of plan assets at beginning of period | **$1,151** | $1,345 | **$ —** | $ — |

| | | | | |
|---|---|---|---|---|
| Actual return on plan assets | **193** | (67) | **—** | — |
| Settlements | **—** | (13) | **—** | — |
| Employer contribution | **5** | 5 | **21** | 20 |
| Plan participants' contributions | **—** | — | **6** | 5 |
| Benefits paid | **(125)** | (119) | **(27)** | (25) |
| Fair value of plan assets at end of period | **$1,224** | $1,151 | **$ —** | $ — |

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table shows the reconciliation of the funded status of the plans with amounts recorded in the Consolidated Balance Sheets (in millions):

| | December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Health and Welfare Benefits | |
| | 2003 | 2002 | 2003 | 2002 |
| Fair value of plan assets as of September 30 | **$1,224** | $1,151 | $ — | $ — |
| Benefit obligations as of September 30 | **1,678** | 1,611 | **366** | 363 |
| Funded status (plan assets less benefit obligations) | **(454)** | (460) | **(366)** | (363) |
| Amounts not recognized: | | | | |
| Unrecognized net loss | **480** | 479 | **111** | 111 |
| Unrecognized prior service cost | **(2)** | (3) | **(20)** | (12) |
| Net amount recognized as of December 31 | **$ 24** | $ 16 | **$(275)** | $(264) |

The following table shows the amounts recognized in the Consolidated Balance Sheets (in millions):

| | December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Health and Welfare Benefits | |
| | 2003 | 2002 | 2003 | 2002 |
| Prepaid benefit cost | **$ —** | $ — | $ — | $ — |
| Accrued benefit cost | **(335)** | (352) | (275) | (264) |
| Intangible assets | **—** | — | — | — |
| Accumulated other comprehensive income | **359** | 368 | — | — |
| Net amount recognized | **$ 24** | $ 16 | **$(275)** | $(264) |

| | December 31, | | | |
|---|---|---|---|---|
| | Pension Benefits | | Health and Welfare Benefits | |
| | 2003 | 2002 | 2003 | 2002 |
| (Decrease) increase in minimum liability included in other comprehensive income | **$ (9)** | $356 | **$—** | $— |

The expected long-term rate of return is the return to be earned, net of plan expenses, over the period that benefits are paid. It reflects the rate of return on present investments and on expected contributions. In determining the expected long-term rate of return, BNSF considered: 1) forward looking capital market forecasts, 2) historical returns for individual asset classes and 3) the impact of active portfolio management.

The assumptions used in accounting for the BNSF plans were as follows:

Health and

| | Pension Benefits | | Welfare Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| **Assumptions Used to Determine Net (Benefit) Cost for Fiscal Years Ended December 31,** | | | | |
| Discount rate | **6.5%** | 7.0% | **6.5%** | 7.0% |
| Expected long-term rate of return on plan assets | **8.5%** | 8.5% | **—** | — |
| Rate of compensation increase | **3.9%** | 4.0% | **3.9%** | 4.0% |

| | Pension Benefits | | Health and Welfare Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| **Assumptions Used to Determine Benefit Obligations at September 30,** | | | | |
| Discount rate | **6.0%** | 6.5% | **6.0%** | 6.5% |
| Rate of compensation increase | **3.9%** | 3.9% | **3.9%** | 3.9% |

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table shows the expected health care rate increase and the future rate and time at which it is expected to remain constant.

| | December 31, | |
|---|---|---|
| | **2003** | **2002** |
| Assumed health care cost trend rate | **11%** | 11% |
| Rate to which health care cost trend rate is expected to decline and remain | **5%** | 5% |
| Year that the rate reaches the ultimate trend rate | **2010** | 2009 |

Assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

| | One Percentage-Point Increase | One Percentage-Point Decrease |
|---|---|---|
| Effect on total service and interest cost | $ 3 | $ (2) |
| Effect on post retirement benefit obligation | $ 36 | $ (30) |

The qualified BNSF Retirement Plan asset allocation at September 30, 2003, and 2002 and the target allocation for 2004 by asset category are as follows:

| | Target Allocation | Percentage Of Pension Plan Assets at September 30, | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| **Plan Asset Allocation** | | | |
| Equity Securities | 45-75% | 57% | 51% |
| Debt Securities | 25-45 | 33 | 39 |
| Real Estate | 0-10 | 10 | 10 |
| Other | 0-5 | — | — |
| Total | 100% | 100% | 100% |

The general investment objective of the BNSF Retirement Plan is to grow the Plan assets in relation to the Plan liabilities while prudently managing the risk of a decrease in the Plan's assets relative to those liabilities. To meet this objective the Employee Benefits Committee has adopted the above asset allocation ranges. The target for each asset class is the mid-point of the range. Ranges allow flexibility to accommodate market changes in the asset class when those changes occur on a temporary basis because of the cost in transitioning assets.

The Company expects to contribute approximately $20 million to its defined benefit pension plans and approximately $20 million to its OPEB plans in 2004.

*Defined Contribution Plans*

BNSF sponsors 401(k) plans which cover substantially all employees. BNSF matches 50 percent of the first six percent of non-union employees' contributions and matches 25 percent on the first four percent of a limited number of union employees' contributions, which are subject to certain percentage limits of the employees' earnings, at each pay period. Depending on BNSF's performance, non-union employees can receive an additional matching contribution of up to 30 percent of the first six percent at the end of the year. Employer contributions for all non-union employees are subject to a five-year length of service vesting schedule. BNSF's 401(k) matching expense was $16 million, $15 million and $14 million in 2003, 2002 and 2001, respectively.

*Other*

Under collective bargaining agreements, BNSF participates in multi-employer benefit plans which provide certain post-retirement health care

and life insurance benefits for eligible union employees. Insurance premiums paid attributable to retirees, which are generally expensed as incurred, were $31 million, $20 million and $18 million, in 2003, 2002 and 2001, respectively. See Note 11 to the Consolidated Financial Statements for other deferred benefits payable to certain conductors, trainmen and locomotive engineers.

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

## 14. Stock Options and other Incentive Plans

On April 15, 1999, BNSF shareholders approved the BNSF 1999 Stock Incentive Plan and authorized 20 million shares of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. On April 18, 2001 and April 17, 2002, BNSF shareholders approved the amended BNSF 1999 Stock Incentive Plan, which authorized additional awards not to exceed 29 million and 35 million shares, respectively of BNSF common stock to be issued in connection with stock options, restricted stock, restricted stock units and performance stock. Approximately three million common shares were available for future grant at December 31, 2003.

Additionally, on April 18, 1996, BNSF shareholders approved the non-employee director's stock plan and authorized 900 thousand shares of BNSF common stock to be issued in connection with this plan. Approximately 600 thousand common shares were available for future grant at December 31, 2003.

*Stock Options*

Under BNSF's stock option plans, options may be granted to officers and salaried employees at the fair market value of the Company's common stock on the date of grant. Stock option grants awarded after April 2001 generally vest ratably over three years and expire within ten years after the date of grant. Shares issued upon exercise of options may be issued from treasury shares or from authorized but unissued shares.

The Company applies APB Opinion 25 and related interpretations in accounting for its stock option plans. See Note 2 to the Consolidated Financial Statements for the Company's pro forma net income and earnings per share determined based on the fair value at grant dates consistent with SFAS No. 123.

A summary of the status of the stock option plans as of December 31, 2003, 2002 and 2001, and changes during the years then ended, is presented below (options in thousands):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | | 2002 | | 2001 | |
| | Options | Weighted Average Exercise Prices | Options | Weighted Average Exercise Prices | Options | Weighted Average Exercise Prices |
| Balance at beginning of year | **39,323** | **$ 28.31** | 39,839 | $ 28.02 | 38,423 | $ 27.22 |
| Granted | **2,957** | **$ 27.88** | 2,867 | $ 27.76 | 7,424 | $ 29.02 |
| Exercised | **(3,222)** | **$ 22.68** | (2,338) | $ 21.58 | (5,282) | $ 23.31 |
| Cancelled | **(738)** | **$ 30.16** | (1,045) | $ 30.57 | (726) | $ 30.29 |
| Balance at end of year | **38,320** | **$ 28.72** | 39,323 | $ 28.31 | 39,839 | $ 28.02 |
| Options exercisable at year end | **31,465** | **$ 28.83** | 32,068 | $ 28.30 | 32,893 | $ 27.80 |

The following table summarizes information regarding stock options outstanding at December 31, 2003 (options in thousands):

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range Of Exercise Prices | Number Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Prices | Number Exercisable | Weighted Average Exercise Prices |
| $18.04 to $24.83 | 2,625 | 2.6 Years | $ 22.91 | 2,611 | $ 22.90 |
| $25.66 to $28.73 | 11,685 | 7.1 Years | $ 26.65 | 7,212 | $ 25.99 |
| $28.76 to $30.98 | 16,466 | 5.1 Years | $ 29.17 | 14,101 | $ 29.19 |
| $31.00 to $36.74 | 7,544 | 5.0 Years | $ 32.95 | 7,541 | $ 32.95 |

| | | | | | |
|---|---|---|---|---|---|
| $18.04 to $36.74 | 38,320 | 5.5 Years | $ 28.72 | 31,465 | $ 28.83 |

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Other Incentive Plans*

BNSF has other long-term incentive programs in addition to stock options as shown in the following table:

| Other Incentive Plans | Vested | Shares Outstanding as of December 31, 2003 | Shares Granted for Year Ended December 31, 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| (in thousands except for vested) | (in years) | | | | |
| Restricted shares | | | | | |
| Time-based | 3-5 | **2,133** | 558 | 999 | 725 |
| Performance-based | 3 | **321** | — | 340 | — |
| BNSF Incentive Bonus Stock Program[(a)] | 3 | **646** | 329 | 176 | 162 |
| BNSF Discounted Stock Purchase Program[(b)] | N/A | **38** | 19 | 12 | 7 |

(a) Certain eligible employees may defer through the BNSF Incentive Bonus Stock Program (IBSP) the cash payment of their bonus for restricted stock.

(b) Salaried employees not eligible to participate in the IBSP may use their bonus to purchase BNSF common stock at a discount from the market price. These shares are restricted for a three-year period.

Shares awarded under the plans may not be sold or used as collateral, and are generally not transferable, by the holder until the shares awarded become free of restrictions. Compensation expense, net of tax, recorded under the BNSF Stock Incentive Plans in accordance with APB Opinion 25 was $11 million, $10 million and $8 million for the years ended 2003, 2002 and 2001, respectively.

## 15. Common Stock and Preferred Capital Stock

*Common Stock*

BNSF is authorized to issue 600 million shares of common stock, $0.01 par value. At December 31, 2003, there were 371 million shares of common stock outstanding. Each holder of common stock is entitled to one vote per share in the election of directors and on all matters submitted to a vote of stockholders. Subject to the rights and preferences of any future issuances of preferred stock, each share of common stock is entitled to receive dividends as may be declared by the Board of Directors (the Board) out of funds legally available and to share ratably in all assets available for distribution to stockholders upon dissolution or liquidation. No holder of common stock has any preemptive right to subscribe for any securities of BNSF.

*Preferred Capital Stock*

At December 31, 2003, BNSF had 50 million shares of Class A Preferred Stock, $0.01 par value and 25 million shares of Preferred Stock, $0.01 par value available for issuance. The Board has the authority to issue such stock in one or more series, to fix the number of shares and to fix the designations and the powers, rights, and qualifications and restrictions of each series.

*Share Repurchase Program*

In July 1997, the Board authorized the repurchase of up to 30 million shares of the Company's common stock from time to time in the open market. In December 1999, April 2000, September 2000 and January 2003, the Board authorized extensions of the BNSF share repurchase program, adding 30 million shares at each date to the total shares previously authorized bringing BNSF's share repurchase program to 150 million shares. During 2003, 2002 and 2001, the Company repurchased approximately 8 million, 13 million, and 11 million shares, respectively, of its common stock at average prices of $27.25 per share, $27.85 per share, and $27.76 per share, respectively. Total repurchases through December 31, 2003, were 124 million shares at a total average cost of $26.05 per share, leaving 26 million shares available for repurchase out of the 150 million shares presently authorized.

Table of Contents

Index to Financial Statements

BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

### 16. Accounting Pronouncements

In 2001, the Company entered into a partnership (the Partnership) with subsidiaries of three chemical manufacturing companies that ship their products on the BNSF Railway to form San Jacinto Rail Limited. The purpose of the Partnership is to construct and operate a 13-mile railroad, which will service several chemical and plastics manufacturing facilities in the Houston, Texas, area. BNSF owns a 48 percent limited partnership interest and a one percent general partnership interest in the Partnership and acts as the general partner and operator of this facility. San Jacinto Rail Limited, an unconsolidated subsidiary, will likely be required to be consolidated by the Company pursuant to Financial Accounting Standards Board (FASB) Interpretation No. 46R (FIN 46), Consolidation of Variable Interest Entities, on March 31, 2004. If consolidation is required, it will have a minimal impact to the Company's financial statements primarily due to the fact that the Company accounted for this investment prior to the adoption of FIN 46 under the equity method of accounting and recorded all losses incurred by the Partnership from inception to date as required by the partnership agreement.

BNSF has agreed to guarantee debt incurred by the Partnership, which is expected to be $85 million in connection with the construction of this rail line, of which $50 million was outstanding as of December 31, 2003. See Note 9 to the Consolidated Financial Statements for information about BNSF's guarantee of the Partnership's debt.

### 17. Quarterly Financial Data—Unaudited

| | Fourth | Third | Second | First |
|---|---|---|---|---|
| | (dollars in millions, except per share data) | | | |
| **2003** | | | | |
| Revenues | **$2,492** | **$2,395** | **$2,294** | **$2,232** |
| Operating income | **$ 477** | **$ 430** | **$ 412** | **$ 346** |
| Income before cumulative effect of accounting change | **$ 226** | **$ 203** | **$ 200** | **$ 148** |
| Net income | **$ 226** | **$ 203** | **$ 200** | **$ 187**(a) |
| Basic earnings per share (before cumulative effect of accounting change) | **$ 0.61** | **$ 0.55** | **$ 0.54** | **$ 0.40** |
| Basic earnings per share (after cumulative effect of accounting change) | **$ 0.61** | **$ 0.55** | **$ 0.54** | **$ 0.50** |
| Diluted earnings per share (before cumulative effect of accounting change) | **$ 0.61** | **$ 0.55** | **$ 0.54** | **$ 0.40** |
| Diluted earnings per share (after cumulative effect of accounting change) | **$ 0.61** | **$ 0.55** | **$ 0.54** | **$ 0.50** |
| Dividends declared per share | **$ 0.15** | **$ 0.15** | **$ 0.12** | **$ 0.12** |
| Common stock price: | | | | |
| High | **$32.31** | **$29.47** | **$29.80** | **$27.05** |
| Low | **$27.65** | **$26.78** | **$24.89** | **$23.48** |
| **2002** | | | | |
| Revenues | $2,301 | $2,308 | $2,207 | $2,163 |
| Operating income | $ 436 | $ 419 | $ 421 | $ 380 |
| Net income | $ 202 | $ 192 | $ 194 | $ 172 |
| Basic earnings per share | $ 0.54 | $ 0.51 | $ 0.51 | $ 0.45 |
| Diluted earnings per share | $ 0.54 | $ 0.51 | $ 0.51 | $ 0.45 |
| Dividends declared per share | $ 0.12 | $ 0.12 | $ 0.12 | $ 0.12 |
| Common stock price: | | | | |
| High | $27.07 | $30.48 | $30.44 | $31.48 |
| Low | $24.13 | $23.74 | $27.54 | $26.85 |

(a) 2003 Net income includes the favorable cumulative effect of an accounting change of $39 million, net of tax, as described in Note 2 to the Consolidated Financial Statements.

Table of Contents

Index to Financial Statements

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

Based on their evaluation as of the end of the period covered by this annual report on Form 10-K, BNSF's principal executive officer and principal financial officer have concluded that BNSF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to ensure that information required to be disclosed by BNSF in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to BNSF's management, including its principal executive and principal financial officers as appropriate to allow timely decisions regarding required disclosure.

Table of Contents

Index to Financial Statements

## PART III

### Item 10. Directors and Executive Officers of the Registrant

Information concerning the directors of BNSF will be provided under the heading "Nominees for Directors" in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Information under the heading "Audit Committee" in BNSF's proxy statement for its 2004 annual meeting of shareholders, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, is hereby incorporated by reference into the Form 10-K.

Information concerning the executive officers of BNSF is included in Part I of this Report on Form 10-K.

Information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 will be under the heading "Section 16(a) Beneficial Ownership Reporting Compliance" in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

In 2003, the Company adopted a Code of Ethics for the Chief Executive Officer and Senior Financial Officers (Code of Ethics) applicable to the Chief Executive Officer, Chief Financial Officer, and Controller. A copy of the Code of Ethics is available on the Company's website at www.bnsf.com. Any waiver of this Code of Ethics may be granted only by the Directors and Corporate Governance Committee of the Board of Directors or by the full Board. Any such waiver granted will be timely disclosed on the Company's website under the "Investors" link as will amendments to the Code of Ethics.

### Item 11. Executive Compensation

Information concerning the compensation of directors and executive officers of BNSF will be provided under the heading "Directors' Compensation" and under the headings "Summary Compensation Table," "Stock Option Grants in 2003," "Aggregated 2003 Stock Option Exercises and Year-End Option Values," "Pension Plans," "Employment Contracts and Other Arrangements," and "Trust Agreements," in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Information concerning the ownership of BNSF equity securities by certain beneficial owners and by management will be provided under the headings "Certain Beneficial Owners" and "Ownership of Management" in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under those headings is hereby incorporated by reference.

Certain information about BNSF's equity compensation plans will be provided under the heading "Equity Compensation Plan Information" in BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under such heading is hereby incorporated by reference.

Table of Contents

Index to Financial Statements

### Item 13. Certain Relationships and Related Transactions

Information concerning certain relationships and related transactions will be provided under the heading "Certain Relationships" of BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

### Item 14. Principal Accountant Fees and Services

Information concerning principal accounting fees and services will be provided under the heading "Independent Auditor" of BNSF's proxy statement for its 2004 annual meeting of shareholders which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the fiscal year, and the information under that heading is hereby incorporated by reference.

Table of Contents

Index to Financial Statements

## PART IV

### Item 15. Exhibits, Financial Statement Schedules, and Reports on Form 8-K

(a) The following documents are filed as part of this report:

1. Consolidated Financial Statements—See Item 8

Schedules are omitted because they are not required or applicable, or the required information is included in the Consolidated Financial Statements or related notes.

2. Exhibits:

See Index to Exhibits beginning on page E-1 for a description of the exhibits filed as a part of this Report on Form 10-K.

(b) Reports on Form 8-K

Registrant furnished a report on Form 8-K on October 21, 2003 reporting under Item 12 a press release announcing third-quarter 2003 operating results.

Table of Contents

Index to Financial Statements

## SIGNATURES

**Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Burlington Northern Santa Fe Corporation has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.**

BURLINGTON NORTHERN SANTA FE CORPORATION

By: /s/ Matthew K. Rose

**Matthew K. Rose**
**Chairman, President and Chief Executive Officer**

Dated: February 12, 2004

**Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Burlington Northern Santa Fe Corporation and in the capacities and on the date indicated.**

| Signature | Title |
|---|---|
| /s/ Matthew K. Rose<br>**Matthew K. Rose** | Chairman, President and Chief Executive Officer (Principal Executive Officer), and Director |
| /s/ Thomas N. Hund<br>**Thomas N. Hund** | Executive Vice President and Chief Financial Officer (Principal Financial Officer) |
| /s/ Dennis R. Johnson<br>**Dennis R. Johnson** | Vice President and Controller (Principal Accounting Officer) |
| /s/ Alan L. Boeckmann*<br>**Alan L. Boeckmann** | Director |
| /s/ John J. Burns, Jr.*<br>**John J. Burns, Jr.** | Director |
| /s/ Vilma S. Martinez*<br>**Vilma S. Martinez** | Director |
| /s/ Marc F. Racicot*<br>**Marc F. Racicot** | Director |
| /s/ Roy S. Roberts*<br>**Roy S. Roberts** | Director |
| /s/ Marc J. Shapiro*<br>**Marc J. Shapiro** | Director |

Table of Contents

Index to Financial Statements

| Signature | Title |
|---|---|
| /s/ J.C. Watts, Jr.*<br>**J.C. Watts, Jr.** | Director |
| /s/ Robert H. West*<br>**Robert H. West** | Director |
| /s/ J. Steven Whisler*<br>**J. Steven Whisler** | Director |
| /s/ Edward E. Whitacre Jr.*<br>**Edward E. Whitacre, Jr.** | Director |
| /s/ Michael B. Yanney*<br>**Michael B. Yanney** | Director |

Dated: February 12, 2004

*By: /s/ Jeffrey R. Moreland

**Jeffrey R. Moreland**
***Executive Vice President Law & Government Affairs and Secretary***

Table of Contents

Index to Financial Statements

**BURLINGTON NORTHERN SANTA FE CORPORATION AND SUBSIDIARIES**

| Exhibit Number | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of BNSF (amended as of April 21, 1998). Incorporated by reference to Exhibit 3.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 1998. Certificate of Elimination of the Designation of the 6 1/4% Cumulative, Convertible Preferred Stock, Series A, $0.02 Par Value. Certificate of Designation, Preferences and Rights of Junior Participating Preferred Stock, Series B, $0.01 Par Value. Incorporated by reference to Exhibit 4.1 of BNSF's Form 8-A 12B filed December 23, 1999. Certificate of Increase in the Number of Authorized Shares of Junior Participating Preferred Stock, Series B, $0.01 Par Value. Incorporated by reference to Exhibit 3.1 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 3.2 | By-Laws of BNSF as amended September 20, 2001. Incorporated by reference to Exhibit 3.1 of BNSF's Form 10-Q for the period ended September 30, 2001. |
| 4.1 | Indenture, dated as of December 1, 1995, between BNSF and The First National Bank of Chicago, as Trustee. Incorporated by reference to Exhibit 4 to BNSF's Registration Statement on Form S-3 (No. 333-72013). |
| 4.2 | Form of BNSF's 6 1/8% Notes Due 2009. Incorporated by reference to Exhibit 4.2 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 4.3 | Form of BNSF's 6 3/4% Debentures Due 2029. Incorporated by reference to Exhibit 4.3 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 4.4 | Form of BNSF' 6.70% Debenture Due August 1, 2028. Incorporated by reference to Exhibit 4.4 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 4.5 | Form of BNSF's 7.875% Note Due April 15, 2007. Incorporated by reference to Exhibit 4.5 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.6 | Form of BNSF's 8.125% Debenture Due April 15, 2020. Incorporated by reference to Exhibit 4.6 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.7 | Form of BNSF's 7.95% Debenture Due August 15, 2030. Incorporated by reference to Exhibit 4.7 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.8 | Form of BNSF's 6.75% Note due July 15, 2011. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 2001. |
| 4.9 | Form of BNSF's 5.90% Note Due July 1, 2012. Incorporated by reference to Exhibit 4.1 to BNSF's Report on Form 10-Q for the quarter ended June 30, 2002. |
| 4.10 | Certain instruments evidencing long-term indebtedness of BNSF are not being filed as exhibits to this Report because the total amount of securities authorized under any single such instrument does not exceed 10% of BNSF's total assets. BNSF will furnish copies of any material instruments upon request of the Securities and Exchange Commission. |
| 10.1* | Burlington Northern Santa Fe Non-Employee Directors' Stock Plan as amended July 17, 2003. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 10-Q for the period ended June 30, 2003. |
| 10.2* | The Burlington Northern and Santa Fe Railway Company Incentive Compensation Plan as amended effective January 1, 2003. |

Table of Contents

Index to Financial Statements

| Exhibit Number | Description |
|---|---|
| 10.3* | Burlington Northern Santa Fe Corporation Deferred Compensation Plan, as amended and restated effective September 16, 1998. Incorporated by reference to Exhibit 10.1 to BNSF's Report on Form 10-Q for the quarter ended September 30, 1998 (formerly, Burlington Northern Inc. Deferred Compensation Plan). |
| 10.4* | Burlington Northern Inc. Senior Executive Survivor Benefit Plan as of April 1, 1986. Incorporated by reference to Amendment No. 1 to BNI's Report on Form 10-K for the fiscal year ended December 31, 1987. |
| 10.5* | Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan. Incorporated by reference to Exhibit 10.37 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999. Amendment of the Burlington Northern Santa Fe Corporation Senior Management Stock Deferral Plan dated November 19, 2001 is incorporated by reference to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.6* | Burlington Northern Santa Fe Long Term Incentive Stock Plan. Incorporated by reference to Exhibit 4(c) to BNSF's Registration Statement on Form S-8 (File No. 33-63247). |
| 10.7* | Burlington Northern Santa Fe Corporation 1990 Directors Stock Option Plan. Incorporated by reference to BNSF's Registration Statement on Form S-8 (File No. 33-62825). |
| 10.8* | Burlington Northern Santa Fe Incentive Bonus Stock Program, as amended and restated January 20, 1999. Incorporated by reference to Exhibit 10.11 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999. |
| 10.9* | Burlington Northern Santa Fe Corporation 1992 Stock Option Incentive Plan. Incorporated by reference to BNSF's Registration Statement on Form S-8 (File No. 33-62839). |
| 10.10* | Burlington Northern Santa Fe 1996 Stock Incentive Plan. Incorporated by reference to Appendix B to BNSF's Proxy Statement dated March 5, 1996. Amendment of Burlington Northern Santa Fe 1996 Stock Incentive Plan dated January 15, 1998 is incorporated by reference to Exhibit 10.13 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1997. Amendment dated December 3, 1998. Incorporated by reference to Exhibit 10.13 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999. |
| 10.11* | Burlington Northern Santa Fe Supplemental Retirement Plan. Incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 10-Q for the quarter ended September 30, 1996. |
| 10.12* | Burlington Northern Santa Fe Estate Enhancement Program, as amended and restated effective October 1, 1996. Incorporated by reference to Exhibit 10.15 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1996. Amendment to Burlington Northern Santa Fe Estate Enhancement Program is incorporated by reference to Exhibit 10.2 to BNSF's Form 10-Q for the quarter ended June 30, 1999. |
| 10.13* | Form of BNSF Change-in-Control Agreement (applicable to Messrs. Ice, Hund, Moreland, and Lanigan, and two other executive officers). Incorporated by reference to Exhibit 10.17 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1996. Amendment dated December 17, 1998. Incorporated by reference to Exhibit 10.15 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.14* | Burlington Northern Santa Fe Deferred Compensation Plan for Directors as amended and restated January 16, 2003. Incorporated by reference to Exhibit 10.14 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2002. |

Table of Contents

Index to Financial Statements

| Exhibit Number | Description |
|---|---|
| 10.15* | Burlington Northern Santa Fe Corporation Supplemental Investment and Retirement Plan. Incorporated by reference to Exhibit 10.20 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 10.16* | Burlington Northern Inc. Form of Severance Agreement and amendments through September 18, 1995 (applicable to Mr. Rose). Incorporated by reference to Exhibit 10.21 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. Amendment to Form of Severance Agreement dated December 3, 1997 is incorporated by reference to Exhibit 10.21 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1997. Amendment dated January 6, 1999 is incorporated by reference to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.17* | Burlington Northern Inc. Director's Charitable Award Program. Incorporated by reference to Exhibit 10.22 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.18* | Burlington Northern Santa Fe Salary Exchange Option Program. Incorporated by reference to Exhibit 10.23 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1999. |
| 10.19* | Santa Fe Pacific Corporation Supplemental Retirement Plan (Supplemental Plan). Incorporated by reference to Exhibit 10(d) to SFP's Report on Form 10-K for the fiscal year ended December 31, 1984. Supplemental Plan as amended October 1, 1989, and Amendment to Supplemental Plan dated February 27, 1990, are incorporated by reference to Exhibit 10(d) to SFP's Report on Form 10-K for the fiscal year ended December 31, 1989. Amendment to Supplemental Plan dated March 22, 1994, and effective January 1, 1994, is incorporated by reference to Exhibit 10.24 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.20* | The Burlington Northern and Santa Fe Railway Company Severance Plan as amended and restated October 16, 2001. Incorporated by reference to Exhibit 10.22 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 2001. |
| 10.21* | Burlington Northern Santa Fe 1999 Stock Incentive Plan as amended effective April 18, 2002. Incorporated by reference to Exhibit 10.1 to BNSF's Form 10-Q for the quarter ended June 30, 2002. |
| 10.22* | Amended and Restated Trust Agreement dated as of April 1, 1994 by and between SFP and The Bank of New York. Incorporated by reference to Exhibit 10.30 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.23* | Trust Agreement dated as of July 26, 1994 by and between SFP and The Bank of New York. Incorporated by reference to Exhibit 10.31 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1995. |
| 10.24* | Form of indemnification agreement dated as of September 17, 1998 between BNSF and directors. Incorporated by reference to Exhibit 10.37 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 10.25* | Form of indemnification agreement dated as of September 17, 1998 between BNSF and certain officers. Incorporated by reference to Exhibit 10.38 to BNSF's Report on Form 10-K for the fiscal year ended December 31, 1998. |
| 10.26* | Amendment to Burlington Northern Santa Fe Supplemental Retirement Plan (Matthew K. Rose) dated April 18, 2002. Incorporated by reference to Exhibit 10.2 to BNSF's Report on Form 10-Q for the period ended June 30, 2002. |
| 10.27* | Retirement Benefit Agreement dated April 19, 2002 between BNSF and Matthew K. Rose. Incorporated by reference to Exhibit 10.3 to BNSF's Report on Form 10-Q for the period ended June 30, 2002. |

Table of Contents

Index to Financial Statements

| Exhibit Number | Description |
|---|---|
| 10.28* | Achievement Award Program of The Burlington Northern and Santa Fe Railway Company as amended and restated April 17, 2003. Incorporated by reference to Exhibit 10.4 to BNSF's Report on Form 10-Q for the period ended June 30, 2003. |
| 10.29* | Retirement Benefit Agreement dated January 16, 2003 between BNSF and John P. Lanigan. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 21.1 | Subsidiaries of BNSF. |
| 23.1 | Consent of PricewaterhouseCoopers LLP. |
| 24.1 | Powers of Attorney. |
| 31.1 | Principal Executive Officer's Certification Pursuant to 18 U.S.C. § 1350 (Section 302 of Sarbanes-Oxley Act of 2002). |
| 31.2 | Principal Financial Officer's Certification Pursuant to 18 U.S.C. § 1350 (Section 302 of Sarbanes-Oxley Act of 2002). |
| 32.1 | Certification Pursuant to 18 U.S.C. § 1350 (Section 906 of Sarbanes-Oxley Act of 2002). |
| * | Management contract or compensatory plan or arrangement. |

# EXPERT REPLY REPORT
# OF
# GORDON RAUSSER, PH.D.

**In the matter of**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**USDC, District of Columbia, Case No. 1:07-mc-00489-PLF**

**Highly Confidential**
**Pursuant to Protective Order**

**June 12, 2013**

these trends, because he starts his initial trend period too early, before the launch of UP's first standard FSC program in September 20, 2000, and because he includes a lagged coverage variable, which will serve to control away any change in the trend. When this lagged coverage variable is removed, his regression does find a statistically significant difference in the July 2003 to Match 2007 trend relative to the pre-December 2002 trend.[553] Dr. Carlton's analysis has a deeper flaw; he inexplicably investigates *ton-miles* covered by FSCs and not *revenue*. Reproducing his chart using revenue (which is what Dr. Kalt investigated) reveals that the growth in UP's FSCs was much more rapid in the period July 2003 to March 2007 than it was in the period before December 2002, as shown in Figure 76.

[553] *See* my workpapers.

**Figure 76. Dr. Carlton's Figure 6 using Revenue with Trend Lines**



Source: Transaction data processed by Compass Lexecon

I have conducted Dr. Carlton's regression analysis on the trends using revenue, rather than ton-miles; in doing so, I have again removed the unnecessary lagged coverage variable, but retained his early start date. This analysis demonstrates that the growth in the period July 2003 to March 2007 was statistically significantly higher than growth in the period January 2000 to December 2002. Finally, the charts presented above demonstrate that Dr. Carlton's analysis ignored the increase in coverage in the first half of 2003, a period when the evidence records meetings between the Defendants on FSCs.

This figure can be directly compared to the class-wide damages figure I found in my Merits Report, which equaled $11.6 billion.[741]

**Table 105. Class-wide Damages Incorporating the STB Information**

| Year | BNSF | CSX | NS | UP | Total |
|---|---|---|---|---|---|
| **2003** | $57,629 | ($77,549) | $191,393 | ($9,121) | $162,351 |
| **2004** | $33,393,392 | $38,962,679 | $123,740,638 | $53,011,659 | $249,108,368 |
| **2005** | $217,049,748 | $134,703,753 | $446,474,658 | $210,420,233 | $1,008,648,392 |
| **2006** | $392,471,713 | $227,766,971 | $674,758,821 | $396,262,277 | $1,691,259,782 |
| **2007** | $477,664,482 | $281,170,365 | $617,965,437 | $537,757,229 | $1,914,557,512 |
| **2008** | $810,891,432 | $244,188,922 | $1,278,800,484 | $686,203,940 | $3,020,084,778 |
| **Total** | $1,931,528,395 | $926,715,141 | $3,141,931,430 | $1,883,646,217 | $7,883,821,183 |

June 12, 2013

Gordon Rausser

Gordon Rausser, Ph.D.

741 I have made certain adjustments to the transaction data following points raised by Defendants' Consultants, where those points were appropriate. *See* my work papers. In addition, I have incorporated information on UP's legacy contracts that I received subsequent to filing my Merits Report. Those data adjustments and inclusion of that UP legacy information result in class-wide damages of $10,351,837,877.

HIGHLY CONFIDENTIAL --
ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF)<br>Hon. Paul L. Friedman |
| This document relates to:<br><br>ALL CASES | |

**DECLARATION OF GEORGE T. DUGGAN**

I, George T. Duggan, declare as follows:

1. As of the date of this declaration, I am Vice President Domestic Intermodal in BNSF Railway Company's Consumer Products Marketing Department. I have personal knowledge of the matters set forth herein.

2. I have held my current position since December 2005. My responsibilities in this position include the oversight and management of BNSF's marketing and sales of rail transportation services to domestic intermodal customers. Prior to taking on my current position, I was Vice President Chemicals in BNSF's Industrial Products Marketing Department from 1998 to 2000 and Vice President, Industrial Products Sales from 2000 until December 2005.

3. Intermodal transportation is a distinct form of rail transportation featuring the movement of containers or trailers loaded onto rail flatcars. Intermodal containers and trailers can be placed on a truck chassis and typically begin or end their journey on a truck chassis. It is

the joint provision of service by more than one transportation mode that qualifies the service as intermodal.

4. Intermodal transportation is a very large segment of BNSF's rail business. During the alleged class period, BNSF revenues from intermodal shipments varied from about 29 to 38 percent of BNSF's total revenues. BNSF's intermodal business is divided into two parts, domestic intermodal and international intermodal. Domestic intermodal traffic encompasses movements of trailers that originate and terminate at locations in the United States. There are usually three distinct phases of the move: a "dray" (a truck move) from the origin to a railroad terminal; a movement on train between terminals; and dray from the destination rail terminal to the final destination (often a retail establishment or a warehouse). International intermodal traffic originates or terminates overseas and encompasses movements of containers that either have been unloaded from an international steamship at a port or will be loaded on an international steamship at a port. International intermodal movements also involve an interchange between a railroad and a truck move from the port to a railroad terminal and from the destination rail terminal to the final destination. Some international shippers have on-dock facilities, so containers may move directly from/to the steamship to/from the train; so there is not always a truck move between the port and rail terminal.

5. BNSF's domestic intermodal business is further broken down into three traffic segments. The expedited segment includes the movement of parcels for customers such as UPS and the movement of less-than-truckload freight lots. The expedited domestic intermodal traffic moves on faster schedules than other domestic intermodal traffic. A separate segment is the movement of traffic in temperature controlled equipment, i.e. refrigerated trailers. Expedited and temperature controlled traffic together accounted for almost 50 percent of BNSF's domestic

intermodal revenues during the class period. The remaining domestic intermodal revenues were generated by truckload intermodal, which consists of traffic interchanged with dry van motor carriers. For the truckload segment, BNSF provides premium service, but it is not as fast as expedited service and the rates for movements of truckload traffic between the same points are generally lower than rates on expedited movements. Our domestic intermodal rates are market based, and faster or slower service is one determinant of market rates. Faster service is more competitive with truck and accordingly the market will accept a higher rate.

6. Rail intermodal service is inherently truck competitive because the trailers or containers being transported can be transported for the full length of their movement by truck. Rail usually has a cost advantage over truck for longer hauls and that advantage usually increases as the length of haul increases. But truck has an efficiency and flexibility advantage over rail that persists over all lengths of haul because trucks can go places that railroads do not go and they get to those places faster than movements by rail and generally with better delivery predictability. Depending on the customer's needs, there is always the possibility that traffic that is well suited to rail intermodal service might move by truck instead.

7. The truck-competitive nature of the domestic intermodal business means that a primary driver of the price that BNSF can obtain for its services is what the trucking companies are charging. (In fact, in some shipping lanes truck price is virtually the only price driver.) During the class period trucking prices trended upward for a variety of reasons: the disproportionate effect fuel price has on the trucking cost structure (since trucking is far less fuel efficient than rail); hours-of-service laws that limited driving hours for truck drivers; and an overall truck driver shortage resulting from an aging driver workforce and attractive alternative careers in a growing economy.

8. Apart from involving two or more transport modes, which distinguishes it from BNSF's other rail transportation services, our intermodal business is fundamentally different from the rest of our business in that it is a wholesale business. In all our other business units, such as Industrial Products where I worked prior to December 2005 as Vice President, Industrial Products Sales, our business is retail in that we market transportation services directly to the owners of the freight being shipped. In intermodal, we market rail transportation to a party such as a domestic trucking company or an international steamship company that is in turn selling transportation services to the beneficial owner of the freight. For example, we will sell what is referred to as "ramp-to-ramp" rail transportation from a Los Angeles rail intermodal terminal to a Chicago rail intermodal terminal to [redacted] a prominent truckload motor carrier. [redacted] in turn will sell "door-to-door" transportation service, including the rail piece that it buys from us, to the beneficial owner of the freight (such as Target or Wal-Mart) that wants to get the product from a port or distribution facility in southern California to a distribution facility in the greater Chicago area. [redacted] determines the through price that the beneficial owner of the freight will pay for the door-to-door movement, including any fuel surcharge that [redacted] decides to assess on that through movement.

9. From the early 2000s forward, BNSF has had a separate fuel surcharge that was applied specifically to its intermodal traffic. What we refer to as the standard intermodal fuel surcharge has always been different from the standard carload fuel surcharge that BNSF applies to its industrial products traffic and other carload traffic. I understand that BNSF's intermodal fuel surcharge was adopted in 2000 after a review of truck fuel surcharges then in place. Because many of our intermodal shippers are trucking companies or do business with trucking companies, BNSF believed that it would be useful to adopt an intermodal fuel surcharge with

features like trucking companies use because shippers would be familiar with them. BNSF's standard intermodal fuel surcharge formula has remained unchanged since January 2001. The level of fuel surcharges in percentage terms has varied depending on the price of fuel.

10. BNSF's standard intermodal fuel surcharge differs from our standard carload fuel surcharge in several respects. The strike prices for the two fuel surcharges differ somewhat. The intermodal fuel surcharge has a higher fuel intensity factor than the carload fuel surcharge, reflecting the higher level of fuel consumption of locomotives used in intermodal service which operate at higher speeds than locomotives in carload service. The intermodal fuel surcharge is adjusted on a weekly rather than monthly basis.

11. I know based on market intelligence from shippers that Union Pacific has confidential contracts with some of its domestic intermodal customers. I am not privy to the terms of those contracts and do not know whether they provide for fuel surcharges or, if so, what the terms of such fuel surcharges might be.

12. Both domestic and international intermodal shipments are dominated by a few very large shippers with only 12 Domestic shippers and 12 International shippers accounting for approximately 90% of the revenues in each segment. Moreover, the contracts tend to be relatively long term (usually about three to five years) and cover a high volume of movements.

13. Although BNSF publishes a standard intermodal fuel surcharge, those few very large contracts with our large domestic intermodal customers during the period July 2003 through 2008 were intensively negotiated agreements some of which ended up including non-standard fuel surcharge provisions.

14. Fuel surcharge is just one component of the total value of a transportation package. Our customers, like BNSF itself, are primarily focused on the all-in rate or bottom line,

although other factors such as speed of service come into play. In contract negotiations, some domestic intermodal customers will focus more intensively on the fuel surcharge provision of an agreement than others. Generally, in circumstances where it was important to the customer to achieve a particular objective regarding the methodology of the fuel surcharge provision or the level of recovery vis-à-vis the standard amount, we would reach an accommodation with the customer that reflected a trade-off between the fuel surcharge provision and other elements of the agreement.

15. [redacted] is an example of a domestic intermodal customer that had a non-standard fuel surcharge that varied over time and that at various times represented a discount for [redacted] versus the standard BNSF intermodal fuel surcharge. Prior to January 2005 we had no fuel surcharge on [redacted] business. In January 2005 we started charging [redacted] their own fuel surcharge (i.e. the same one they charged their customers) in lieu of BNSF's fuel surcharge. Because this fuel surcharge mechanism was not sufficient to cover incremental fuel costs, we increased the base rate of [redacted] business in 2005. Under a new agreement which took effect in January 2006, [redacted] shifted to the BNSF intermodal fuel surcharge program. However, [redacted] was dissatisfied with paying our full intermodal fuel surcharge and persuaded us to make a change in the new three-year contract that became effective in January 2007. [redacted] did not want to pay a fuel surcharge that would be calculated as a percentage of increasing base rates over the life of the three-year contract. We ended up agreeing on a discounted fuel surcharge application. Specifically, we agreed to limit fuel recovery to a percentage of the base rate at the 2005 base rate level and not to apply the fuel recovery percentage to higher base rate levels in subsequent years of the contract.

16. [redacted] is a truckload carrier that purchases intermodal transportation from BNSF and has paid several different versions of a non-standard fuel surcharge that provide a discount off the standard BNSF fuel surcharge. [redacted] and BNSF negotiated a fuel surcharge agreement in March 2000 that was effective from March 15, 2000 through August 2004, the end date of the then current BNSF [redacted] contract. Under this agreement, [redacted] agreed to pay a "self assessed" fuel surcharge based on the same formula that [redacted] used for fuel recovery for trucking services that [redacted] provided to its customers. This equated to about 60 percent of the BNSF standard intermodal fuel surcharge. Under a new contract effective September 1, 2004, BNSF and [redacted] extended the self assessed fuel surcharge through March 1, 2005 (and until May 16, 2005 for traffic moving for the benefit of one particular [redacted] customer). After March 1, 2005 [redacted] paid the standard BNSF fuel surcharge. In June/July 2006, [redacted] formally presented BNSF with their concerns about BNSF's fuel surcharge program. Their main concern was that the revenue based fuel surcharge program created a compounding effect. BNSF addressed [redacted] concern by constructing a divisor which would back their fuel surcharge down by the same percentage that the base rate increased. This divisor approach was implemented in an agreement that became effective on September 1, 2006 and continued in effect under a new agreement that became effective on December 1, 2007.

17. [redacted] is a non-asset based intermodal marketing company. It has a contract with BNSF that goes back over ten years and that has been amended several times. [redacted] pays BNSF the standard intermodal percent of rate fuel surcharge, but that fuel surcharge is applied to a base rate [redacted]

[redacted]

18. Many intermodal shippers paid the same or very similar fuel surcharges both before and after the start of the proposed class period (which I understand is July 1, 2003)([redacted] paid the full, standard intermodal fuel surcharge both before July 1, 2003 and after it. [redacted] was able to negotiate a discount off of the standard fuel surcharge as of May 2008 for a portion of their business (getting a compounding correction similar to the one [redacted] gets). The rest of [redacted] traffic stayed at full, standard intermodal fuel surcharge.

19. [redacted] also had the standard intermodal fuel surcharge both before and after July 1, 2003. The only exception was that [redacted] used a monthly rather than the standard weekly adjustment period for calculating the fuel surcharge. But otherwise, it had the standard intermodal fuel-surcharge strike price and escalation percentage both before and after July 1, 2003.

20. ([redacted] both had a 1 percentage-point discount off of the standard intermodal fuel surcharge program.[1] Those fuel-surcharge discounted programs were the same for each company both before and immediately after July 1, 2003. The [redacted] discount was discontinued in January 2008. The [redacted] discount was discontinued in December 2005 for certain traffic out of the Pacific North West, but the discount remained for other [redacted] traffic through July, 2007.

[1] For example, if a particular month's standard fuel surcharge would be 5% these shippers would pay a 4% fuel surcharge.

21. Finally, any intermodal traffic that traveled under two of the rate authorities (QTTSSLC or QTBULKAG) were assessed full intermodal fuel surcharge regardless of whether the shipper generally has some form of discounted fuel surcharge program in place.

I declare under penalty of perjury that the foregoing is true and correct.

Signed the 29 day of June, 2010.

George T. Duggan

**From:** Brugman, Thomas
**Sent:** Wed Feb 09 13:19:26 2000
**To:** Manning, Cheryl
**Subject:** FW: Diversion Scorecard
**Importance:** Normal
**Attachments:** Jun-DecDiversions.xls; MDSE Diversion Recovery.xls

Cheryl: Will you have time to look at this? Tom Brugman

-----Original Message-----
**From:** Deas, Denise
**Sent:** Wednesday, February 09, 2000 2:10 PM
**To:** Brugman, Thomas
**Subject:** FW: Diversion Scorecard

-----Original Message-----
**From:** Deas, Denise
**Sent:** Wednesday, February 09, 2000 2:08 PM
**To:** Fisher, Donna; Manning, Cheryl; Harkey, Greg; Taylor, Ted; Dimond, JoAnn; North, Phil
**Cc:** Vollbrecht, Kitty; Louderback, Robyn; Eilers, Andy; Kain, Joe; Barner, Kristen; Norris, Mary
**Subject:** Diversion Scorecard

Don Seale has requested that MR&E create a Diversion Scorecard in order to track how we are doing in our efforts to recover diverted traffic. We are in the process of creating the 'scorecard' and its anticipated that the recovered amounts will be updated on a weekly basis. There are two files attached for you to review. The file titled 'Jun-DecDiversions' shows specific diverted traffic lanes, carloads and revenues for the months June through December 1999.

The second file titled 'MDSE Diversion Recovery' has 2 parts to it. The top section is simply a synopsis of the Jun-DecDiversion file, and illustrates total diverted carloads and revenues for the months June through December. The second section shows June diverted traffic on an annualized basis. We have subtracted January annualized diversions from the June total to come up with an amount of diversions that we have recovered, or permanently lost since June 1. We estimate this amount to be $214 million out of an annualized total of $363 million since June 1.

We would like for you to review these numbers let us know if you agree that we have recovered traffic at this rate. In addition, please indicate the amount of diversions that you feel are permanent. In total, we estimate that we still need to recover approximately $149 million on an annualized basis.

If any questions, please conact Robyn Louderback at 629-2744 or Denise Deas at 629-2746. We would like to get a response from each team by tomorrow afternoon. Thanks for your assistance.

<<...>> <<...>>

PRODUCED AS NATIVE

| Sales Group | Commodity | Origin State | Origin City | Origin Consignor | Destination State | Destination City | Destination Consignee | Commodity (description) | Short/Long Term | Diversion Information: Duration (if short term) | Mode | Carrier (if rail) | Estimate NS Loss: Jun 99 Carloads | Jun 99 Revenue | Jul 99 Carloads | Jul 99 Revenue | Aug 99 Carloads | Aug 99 Revenue | Sept 99 Carloads | Sept 99 Revenue | Oct 99 Carloads | Oct 99 Revenue | Nov 99 Carloads | Nov 99 Revenue | Dec 99 Carloads | Dec 99 Revenue | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cleveland | AG | | Various | [redacted] | | Various | [redacted] | Grain | Unknown | | Truck | | 350 | $428,750 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | Unable to receive mty hoppers for loading outbound grain. Delays in grain trains to SE Processors. |
| Cleveland | AG | | Various | [redacted] | | Various | [redacted] | Can Goods | Unknown | | Truck | | 200 | $232,000 | 125 | $145,000 | 125 | $145,000 | 150 | $174,000 | 140 | $162,400 | 130 | $150,800 | 75 | $75,400 | Can not receive mtys for loading. (Transit Delays) |
| Cleveland | AG | OH | Toledo | [redacted] | | Various | [redacted] | Flour | Unknown | | Truck | | 75 | $114,900 | 80 | $122,560 | 80 | $122,500 | 110 | $170,000 | 50 | $77,270 | 30 | $46,365 | 35 | $54,090 | Transit delays for loads & mtys & shelf life of commodity |
| Cleveland | AG | | Various | [redacted] | NY | Buffalo | [redacted] | Grain & Feed | Long | | Rail | CSXT | 61 | $51,000 | 28 | $25,532 | 40 | $50,600 | 41 | $51,780 | 40 | $50,600 | | | | | Move to CSX Transflo |
| Cleveland | AG | | Various | [redacted] | | Various | [redacted] | Agriculture Products | Long | | Rail | CSXT | 0 | $0 | 0 | $0 | 0 | $0 | 75 | $56,250 | 75 | $56,250 | | | | | |
| Cleveland | AG | | Various | [redacted] | | Various | [redacted] | Agriculture Product | Long | | Truck | | 33 | $24,750 | 65 | $48,750 | 100 | $75,000 | 150 | $112,500 | 100 | $75,000 | | | | | Can't move loads or empties |
| Cleveland | AG | | Various | [redacted] | NY | Arcade | [redacted] | Soybean Meal | Short | Until Service improves | Truck | | 28 | $34,776 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | |
| Cleveland | AG | OH | Martins Ferry | [redacted] | MA | Hatfield | [redacted] | Urea | Long | | Truck | | 25 | $75,000 | 10 | $30,000 | 10 | $30,000 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | |
| Cleveland | AG | | Various | [redacted] | NY | Buffalo | [redacted] | Wine | Short | 90 Days | Truck | | 5 | $7,500 | 5 | $7,500 | 3 | $4,500 | 10 | $15,000 | 10 | $15,000 | | | | | Service problems |
| Cleveland | AG | | Various | [redacted] | | Various | [redacted] | Toys | Unknown | | Truck | | 0 | $0 | 175 | $155,000 | 250 | $225,000 | 200 | $180,000 | 200 | $180,000 | 200 | $180,000 | 50 | $45,000 | |
| Cleveland | AG | | Various | [redacted] | NY | Lakeville | [redacted] | Sugar & Syrup | Short | 30 Days | Truck | | 0 | $0 | 58 | $102,660 | 15 | $26,550 | 0 | $0 | 30 | $45,900 | | | | | NS at risk of losing traffic to CSXT permanently |
| Cleveland | AG | OH | Toledo | [redacted] | NJ | Fairlawn | [redacted] | Flour | Short | Unkown at this time | Truck | | 0 | $0 | 10 | $15,320 | 30 | $45,960 | 0 | $0 | 25 | $38,300 | 30 | $45,960 | 20 | $30,640 | Service delays between Conway & Croxton. |
| Cleveland | AG | PA | Berwick | [redacted] | PQ | New Richmond | [redacted] | Starch | Short | 15 Days | Truck | | 0 | $0 | 0 | $0 | 0 | $0 | 8 | $26,800 | 8 | $26,800 | | | | | Due to service |
| Cleveland | AG | PA | Berwick | [redacted] | ME | Rileys | [redacted] | Starch | Short | 90 Days | Rail | NSHR/CPRS | | | | | | | 5 | $8,000 | 5 | $8,000 | | | | | Due to lack of service |
| Cleveland | AG | OH | Huron | [redacted] | PA | Milton | [redacted] | Flour | Short | 30 Days | Truck | | | | 6 | $8,592 | 7 | $10,024 | 7 | $10,024 | 7 | $10,024 | | | | | |
| Philadelphia | AG | OH | HUDSON | [redacted] | PA | HARRISBURG | [redacted] | FLOUR | SHORT | 3 MOS. | TRUCK | | | | 10 | $25,000 | 10 | $25,000 | 10 | $25,000 | 3 | $8,000 | 4 | $8,000 | 4 | $8,000 | CJC |
| Philadelphia | AG | NC | EDEN | [redacted] | PA | PHILADELPHI | [redacted] | BEER | SHORT | 5 MOS. | TRUCK | | 76 | $106,020 | 76 | $106,020 | 76 | $106,020 | 76 | $106,020 | 76 | $106,020 | 76 | $106,020 | 76 | $106,020 | CJC |
| Philadelphia | AG | PA | CHAPMAN | [redacted] | NY | MILLS | [redacted] | BEER | SHORT | 4 MOS. | TRUCK | | 20 | $48,000 | 20 | $48,000 | 20 | $4,800 | 20 | $48,000 | 20 | $48,000 | 10 | $24,000 | 10 | $24,000 | CJC |
| Philadelphia | AG | ND | WHAPETON | [redacted] | PA | LEOLA | [redacted] | SUGAR | SHORT | 1 MO. | TRUCK | | 10 | $29,000 | 0 | $0 | 0 | $0 | 10 | $29,000 | 10 | $25,000 | 5 | $12,000 | 5 | $12,000 | CJC |
| Philadelphia | AG | VAR | VARIOUS | [redacted] | NJ | CARLSTAD | [redacted] | FROZEN POTATO | SHORT | 2 MOS. | TRUCK | | | | | | 30 | $50,500 | 30 | $50,500 | 30 | $50,000 | 15 | $25,000 | 15 | $25,000 | CJC--Delay in Cryo car shipments cause food spoilage and claims. |
| Philadelphia | AG | ND | WHAPETON | [redacted] | PA | HERSHEY | [redacted] | SUGAR | SHORT | 4 MOS. | TRUCK | | 40 | $81,000 | 30 | $61,000 | 40 | $81,000 | 40 | $81,000 | 40 | $81,000 | 0 | $0 | 0 | $0 | CJC--Diverted sugar moving to L&S, NS served. |
| Philadelphia | AG | ONT | THUNDER BAY | [redacted] | PA | CHAPMAN | [redacted] | MALT | SHORT | 4 MOS. | TRUCK | | 6 | $35,000 | 6 | $35,000 | 8 | $47,000 | 8 | $47,000 | 8 | $47,000 | 8 | $47,000 | 8 | $47,000 | CJC--Strohs represents the lost inbound malt. |
| Philadelphia | AG | VAR | VARIOUS | [redacted] | PA | SINKING SPR | [redacted] | SEED | SHORT | 4 MOS. | TRUCK | | 5 | $5,000 | 0 | $0 | 5 | $5,000 | 5 | $5,000 | 5 | $5,000 | 0 | $0 | 0 | $0 | FT--Returned to rail. |
| Philadelphia | AG | VAR | VARIOUS | [redacted] | PA | ELIZABETHTO | [redacted] | SOYBEAN MEAL | SHORT | UNKNOWN | TRUCK | | | | 17 | $30,000 | 17 | $30,000 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | FT--Returned to rail. |
| Philadelphia | AG | NY | SARATOGA SP | [redacted] | NC | EDEN | [redacted] | BEER | SHORT | 4 MOS. | TRUCK | | | | | | 10 | $20,000 | 10 | $20,000 | 10 | $20,000 | 10 | $20,000 | 10 | $20,000 | GWB--Beer arrived late, due to svc failure, beer on date expired. |
| Philadelphia | AG | IL | DECATUR | [redacted] | PA | BLOOMSBURG | [redacted] | VEG OIL | SHORT | 5 MOS. | TRUCK | | 16 | $15,376 | 16 | $15,376 | 12 | $11,532 | 12 | $11,532 | 12 | $11,532 | 11 | $10,571 | 11 | $10,571 | PMF |
| Philadelphia | AG | IL | DECATUR | [redacted] | PA | SHAMOKIN | [redacted] | GRAIN PRODUCTS | SHORT | 5 MOS. | TRUCK | | 3 | $3,579 | 3 | $3,579 | 3 | $3,579 | 3 | $3,579 | 3 | $3,579 | 5 | $5,965 | 5 | $5,965 | PMF |
| Philadelphia | AG | OH | DAYTON | [redacted] | PA | WELLSBORO | [redacted] | SUGAR | SHORT | 5 MOS. | TRUCK | | 2 | $1,496 | 2 | $1,496 | 2 | $1,496 | 2 | $1,496 | 2 | $1,496 | 2 | $1,496 | 2 | $1,496 | PMF |
| Philadelphia | AG | OH | HURON | [redacted] | PA | MILTON | [redacted] | FLOUR | SHORT | 5 MOS. | TRUCK | | 12 | $11,736 | 12 | $11,736 | 10 | $9,780 | 10 | $9,780 | 10 | $9,780 | 13 | $12,714 | 13 | $12,714 | PMF |
| Philadelphia | AG | PA | MT HOLLY SPR | [redacted] | TX | DALLAS | [redacted] | FOOD STUFFS | LONG | UNKNOWN | RAIL | CSXT | | | | | | | 5 | $5,640 | 5 | $5,640 | 8 | $9,024 | 8 | $9,024 | PMF |
| Philadelphia | AG | IL | DANVILLE | [redacted] | PA | WILLIAMSPOR | [redacted] | CORN | SHORT | 5 MOS. | TRUCK | | 14 | $12,488 | 14 | $12,488 | 14 | $12,488 | 14 | $12,488 | 14 | $12,488 | 14 | $14,560 | 14 | $14,560 | PMF |
| Philadelphia | AG | FL | CORONET | [redacted] | MD | SNOW HILL | [redacted] | PHOSPHATE FEED | SHORT | 4 MOS. | TRUCK | | | | 2 | $2,010 | 2 | $2,010 | 2 | $2,010 | 2 | $2,010 | 6 | $6,030 | 6 | $6,030 | PMF--Diversion possibly thru August. |
| Philadelphia | AG | CA | CORCORAN | [redacted] | MD | CAMBRIDGE | [redacted] | TOMATO PASTE | SHORT | UNKNOWN | TRUCK | | | | 6 | $10,596 | 6 | $10,596 | 6 | $10,596 | 6 | $10,596 | 4 | $3,064 | 4 | $3,064 | PMF--This will equate to a loss for the MD & DE RR as well they may also seek damages. |
| Philadelphia | AG | PA | LEWISTON | [redacted] | PA | JOHNSTOWN | [redacted] | RAIL CAR WHEELS | LONG | UNKNOWN | TRUCK | | 11 | $21,384 | 11 | $21,384 | 10 | $19,440 | 10 | $19,440 | 10 | $19,440 | 4 | $3,776 | 4 | $3,776 | PMF--Will never ship via rail again!!!! |
| Philadelphia | AG | NC | EDEN | [redacted] | MA | AUBURN | [redacted] | BEER | SHORT | UNKNOWN | TRUCK | | | | 6 | $12,000 | 7 | $14,000 | 7 | $14,000 | 7 | $14,000 | 7 | $14,000 | 7 | $14,000 | RCS |
| Philadelphia | AG | NC | EDEN | [redacted] | MA | DANVERS | [redacted] | BEER | SHORT | 5 MOS. | TRUCK | | 30 | $60,000 | 15 | $30,000 | 10 | $20,000 | 10 | $20,000 | 10 | $20,000 | 10 | $20,000 | 10 | $20,000 | RCS--By truck for most of July. |
| Philadelphia | AG | VA | COORS CROSS | [redacted] | CT | WEST HAVEN | [redacted] | BEER | SHORT | 4 MOS. | TRUCK | | | | 12 | $7,200 | 12 | $7,200 | 12 | $7,200 | 12 | $7,200 | 12 | $7,200 | 12 | $7,200 | RCS--Could be filing big claims for spoiled beer. |
| Philadelphia | AG | NC | EDEN | [redacted] | CT | WEST HAVEN | [redacted] | BEER | SHORT | 4 MOS. | TRUCK | | | | 15 | $17,000 | 12 | $14,000 | 14 | $18,000 | 14 | $18,000 | 14 | $18,000 | 14 | $18,000 | RCS--Could be filing big claims for spoiled beer. |
| Philadelphia | AG | PA | CHAPMAN | [redacted] | CT | WEST HAVEN | [redacted] | BEER | SHORT | 5 MOS. | TRUCK | | 6 | $14,400 | 6 | $14,400 | 5 | $12,000 | 5 | $12,000 | 5 | $12,000 | 5 | $12,000 | 5 | $12,000 | RCS--Could be filing big claims for spoiled beer. |
| Philadelphia | AG | VAR | VARIOUS | [redacted] | VAR | VARIOUS | [redacted] | GRSY/FEED | UNKNOWN | UNKNOWN | TRUCK | | 8 | $ 10,000 | 17 | $22,000 | 30 | $35,000 | 40 | $48,000 | 10 | $12,000 | 0 | $0 | 0 | $0 | RCS--Resumed most NS shipments. |
| Philadelphia | AG | IN | INDIANAPOLIS | [redacted] | VAR | VARIOUS | [redacted] | STARCH | SHORT | 4 MOS. | TRUCK | | 50 | $75,000 | 60 | $90,000 | 60 | $90,000 | 60 | $90,000 | 50 | $50,000 | 20 | 20000 | 20 | 20000 | WHM |
| Atlanta | AG | IN | Wayne City | [redacted] | GA | Oakwood | [redacted] | Corn | Short | 1 time move | Truck | | | | | | | | | | 18 | $34,200 | | | | | Trucked account unable to get cars to load at origin |
| Atlanta | AG | GA | Dalton | [redacted] | Various | | [redacted] | Feed | Short | Unknown | Truck | | 9 | $12,100 | | | | | | | | | | | | | |
| Atlanta | AG | GA | Dalton/Forsyth | [redacted] | Various | | [redacted] | Feed | Short | 8-1 thru 8-13 | Truck | | | | | | 4 | $5,376 | | | | | | | | | |
| Charlotte | AG | NC | S Winston-Salem | [redacted] | NY | Albany | [redacted] | Corn Syrup | Short | 2 weeks | T | | | | 4 | $8,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Traffic diverted to truck, regained Aug |
| Charlotte | AG | NC | S Winston-Salem | [redacted] | PA | Leola | [redacted] | Corn Syrup | Short | 2 weeks | T | | | | 4 | $7,800 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Traffic diverted to truck, regained Aug |
| Charlotte | AG | | Various | [redacted] | NC | Roaring River | [redacted] | Corn | Short | June | R | CSXT | 100 | $190,000 | 50 | $90,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Lost to CSXT, regained Aug. |
| Charlotte | AG | | Various | [redacted] | NC | Bonlee | [redacted] | Corn | Short | June | T | | 160 | $288,000 | 40 | $72,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Traffic diverted to truck, regained Aug |
| Charlotte | AG | | Various | [redacted] | NC | S. Winston-Salem | [redacted] | Corn | Short | June | R | CSXT | 75 | $105,000 | 0 | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Lost to CSXT, regained Aug. |
| Charlotte | AG | | Various | [redacted] | NC | Morganton | [redacted] | Corn | Short | June | T | | 40 | $80,000 | 0 | $0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Traffic diverted to truck; regained Aug |
| Charlotte | AG | | Various | [redacted] | NC | Candor | [redacted] | Corn | Short | June | R | CSXT | 25 | $45,000 | 0 | $0 | 100 | $185,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Traffic diverted to CSXT |
| Charlotte | AG | | Various | [redacted] | NC | Burch | [redacted] | Soybean Meal | Short | June | R/T | CSXT | 20 | $25,620 | 0 | 0 | 35 | $67,750 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Lost to CSXT and truck |
| Charlotte | AG | | Various | [redacted] | NC | Morganton | [redacted] | Corn | Short | 1 month | T | | | | 15 | $30,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Due to poor service, regained Aug. |
| Charlotte | AG | | Various | [redacted] | NC | Morganton | [redacted] | Soybean Meal | Short | 1 month | T | | | | 5 | $7,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Due to poor service, regained Aug. |
| Cincinnati | AG | IL | Decatur | [redacted] | OH | Columbus | [redacted] | Ethyl | Short | Until rail service consists | Truck | | 40 | $41,320 | 25 | $25,825 | | | | | | | | | | | Trucking as safety valve. |
| Cincinnati | AG | MO | Kansas City | [redacted] | OH | Columbus | [redacted] | Flour | Short | Until RR lds arrive | Truck | | 11 | $19,800 | | | | | | | | | 11 | $19,250 | | | Kroger filed claim for 31 trucks to date (6/28) 11/99 this business now lost to truck! Vol 17 c/l mo. |
| Cincinnati | AG | IN | Indianapolis | [redacted] | OH | Columbus | [redacted] | Flour | Short | Until rail service consists | Truck | | 6 | $4,800 | | | | | | | | | | | | | 4 trucks per day |
| Cincinnati | AG | OH | Fostoria | [redacted] | OH | Ivorydale | [redacted] | Food oils | Short | As needed to suppl rail | Truck | | | | 10 | $6,000 | 20 | $12,000 | | | 100 | $70,000 | | | | | Due svc & price changd to supplier on CSXT. |
| Cincinnati | AG | IN | Milville | [redacted] | Var. | Ga, TN, SC | [redacted] | Corn | long | | Truck | | 41 | $75,645 | | | | | 10 | $18,510 | 38 | $70,100 | 40 | $73,789 | | | Customer will continue trucking throughout harvest season! |
| Cincinnati | AG | LA | St. Gabriel | [redacted] | KY | Whitner | [redacted] | Feed | Short | Till railcars arrive | Truck | | 6 | $7,800 | 6 | $7,800 | | | | | | | | | | | Trucking as necessary to coordinate rail arrivals |
| Cincinnati | AG | NJ | Camden | [redacted] | CA | Buena Park | [redacted] | Tomato Sauce | Short | Until rail service consists | Truck | | | | 7 | $5,600 | | | 1 | $800 | | | | | | | |
| Cincinnati | AG | OH | Dayton | [redacted] | Various | NC;PA;NJ | [redacted] | Clear Brew Liquid | Short | Until rail service consists | Truck | | | | | | | | 8 | $14,720 | 40 | $79,920 | 22 | $43,956 | | | |
| Cincinnati | AG | OH | Dayton | [redacted] | NC | Eden | [redacted] | Clear Brew Liquid | Short | Until rail service consists | Truck | | 15 | $26,700 | | | | | 3 | $5,520 | 23 | $38,381 | 15 | $25,031 | | | STCC 20-461-15 |
| Cincinnati | AG | LA | Gramercy | [redacted] | KY | Ludlow | [redacted] | Sugar | Short | Until rail service consists | Truck | | 6 | $9,168 | | | | | | | | | | | | | |
| Cincinnati | AG | Md | Baltimore | [redacted] | PA | Wellsboro | [redacted] | Sugar | Short | Until RR lds arrive | Truck | | 2 | $1,400 | | | | | 1 | $700 | | | | | | | Have trucked 4 lds due delay inbound RR loads |
| Cincinnati | AG | IN | Hagerstown | [redacted] | | GA, NC, SC, T | [redacted] | Corn | long | | Truck | | 48 | $67,728 | | | | | 9 | $15,687 | 38 | $54,416 | 44 | $63,008 | | | Customer will continue trucking throughout harvest season! |
| Cincinnati | AG | IN | Richmond | [redacted] | GA | Gainesville | [redacted] | Corn | Short | Until rail service consists | Truck | | | | | | | | 7 | $7,847 | 46 | $78,200 | 21 | $35,700 | | | |
| Cincinnati | AG | IN | Richmond | [redacted] | GA | Gainesville | [redacted] | Corn | long | | Truck | | 39 | $66,300 | | | | | | | | | | | | | Customer will continue trucking throughout harvest season! |
| Cincinnati | AG | IN | Indianapolis | [redacted] | PA | Lancaster | [redacted] | Grits & corn flour | Short | Until rail service consists | Truck | | 82 | $56,000 | 48 | $66,581 | 64 | $94,629 | 48 | $84,144 | 32 | $51,200 | | | | | 6 trucks per day, 6 days week. |
| Cincinnati | AG | IN | Indianapolis | [redacted] | MI | Battle Creek | [redacted] | Corn flour | Short | As needed to suppl rail | Truck | | | | | | 13 | $12,958 | 30 | $29,340 | | | | | | | Temp diversion |
| Cincinnati | AG | IN | Indianapolis | [redacted] | OH | Sharonville | [redacted] | Grits | Short | Until rail service consists | Truck | | 32 | $31,000 | | | 8 | $6,600 | 24 | $19,800 | 24 | $19,872 | | | | | 4 trucks per day |
| Cincinnati | AG | IN | Indianapolis | [redacted] | NY | Buffalo | [redacted] | Flour | Short | Until rail service consists | Truck | | 32 | $31,600 | | | | | | | | | | | | | 4 trucks per day |
| Cincinnati | AG | IN | Indianapolis | [redacted] | ON | Collinswood | [redacted] | Corn | Short | Spot move only | Truck | | | | | | 15 | $16,125 | | | 15 | $16,125 | | | | | Diverted to truck week of 8-9-99. One time only. |
| Cincinnati | AG | GA | Port Wentworth | [redacted] | KY | Ludlow | [redacted] | Sugar | Short | Until rail service consists | Truck | | 11 | $35,544 | | | | | | | | | | | | | |
| Cincinnati | AG | GA/A | Various GA & A | [redacted] | KY | Lexington | [redacted] | Peanuts | Short | Until rail service consists | Truck & Rail | CSXT | 30 | $21,000 | 30 | $21,000 | 4 | $2,800 | | | 20 | $14,000 | | | | | Truck'g due delay of mty & loads-2 mo. switch to CSXT. |
| Cincinnati | AG | Ne/Ks | Various | [redacted] | IN | Indianapolis | [redacted] | Wheat | Long | | Rail | CSXT | | | | | | | | | 242 | $238,370 | | | | | |
| Cincinnati | AG | IN | Indianapolis | [redacted] | PA | Shelmantown | [redacted] | Corn flour | Short | Until rail service consists | Truck | | | | | | | | | | 4 | $6,400 | | | | | |
| St Louis | AG | IL | Decatur | [redacted] | PA | Lock Haven | [redacted] | Starch | Short | Until service improves. | Truck | | | | | | | | | | | | | | | | Trucking to meet production. |
| St Louis | AG | TN | Memphis | [redacted] | NY | Kirkwood | [redacted] | Oil | Short | Until service improves. | Truck | CSXT | | | | | | | | | | | | | | | Trucking to meet production. |
| St Louis | AG | IL | Chicago | [redacted] | PA | Morrisville | [redacted] | Corn Syrup | Short | Until service improves. | Rail | CSXT | | | | | | | | | | | | | | | Trying CSXT route for improved service. |
| St Louis | AG | IL | Sidney | [redacted] | Various | Various | [redacted] | Corn | Short | Until service improves. | Truck | | | | | | | | | | 20 | $20,760 | 20 | $20,760 | 20 | $20,760 | Trucking to protect production. |
| St Louis | AG | IN | Lafayette | [redacted] | OH | Lafayette | [redacted] | Corn Syrup | Short | Until service improves. | Truck | | | | | | | | | | | | | | | | Trucking to meet production. |
| St Louis | AG | IL | Decatur | [redacted] | PA | Morrisville | [redacted] | Corn Syrup | Short | Until service improves. | Rail | CSXT | | | | | | | | | | | | | | | Trying CSXT route for improved service. |
| St Louis | AG | IN | Lafayette | [redacted] | DE | Dover | [redacted] | Corn Sugar | Short | Until service improves. | Truck | | | | | | | | | | | | | | | | Trucking to meet production. |
| St Louis | AG | IN | Lafayette | [redacted] | DE | Dover | [redacted] | Corn Sugar | Short | Until service improves. | Truck | | | | | | | | | | | | | | | | Trucking to protect production. |

| Sales Group | Commodity Team | Origin | | | Destination | | | Commodity | Diversion Information | | | | Estimate NS Loss | | | | | | | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | Jun 99 | | Jul 99 | | Aug 99 | | Sept 99 | | Oct 99 | | Nov 99 | | Dec 99 | | |
| | | State | City | Consignor | State | City | Consignee | (description) | Short/Long Term | Duration (if short term) | Mode | Carrier (if rail) | Carloads | Revenue | Carloads | Revenue | Carloads | Revenue | Carloads | Revenue | Carloads | Revenue | Carloads | Revenue | Carloads | Revenue | |
| St Louis | AG | IL | Mansfield | [redacted] | PA | Bath | [redacted] | Corn | Short | Until service improves. | Truck | | | | | | | | | | 2 | $3,900 | | | | | Trucking to protect production. |
| St Louis | AG | IL | Mansfield | [redacted] | PA | York | [redacted] | Corn | Short | Until service improves. | Truck | | | | | | | | | | 2 | $2,800 | | | | | Trucking to protect production. |
| St Louis | AG | IL | Decatur | [redacted] | PA | Lock Haven | [redacted] | Starch | Short | Until service improves. | Truck | | | | | | | | | | | | | | | | Trucking to meet production. |
| St Louis | AG | IN | Lafayette | [redacted] | PA | Morrisville | [redacted] | Corn Syrup | Short | Until service improves. | Truck | | | | | | | | | | | | | | | | Trucking to Just Born, Bethlehem, PA Normally moves to Morrisville for transfer/truck. |
| St Louis | AG | IN | Lafayette | [redacted] | MN | Grand Rapids | [redacted] | Starch | Short | Until service improves. | Truck | | | | | | | | | | | | | | | | Trucking to meet production. |
| St Louis | AG | IN | Lafayette | [redacted] | NJ | Seabrook | [redacted] | Corn Syrup | Short | 1 time move | Truck | | | | | | | | | | | | | | | | Trucking to meet production. |
| St Louis | AG | IN | Frankfort | [redacted] | NJ | Bayonne | [redacted] | Oil | Short | Until service improves. | Rail | CSXT | | | | | | | | | 16 | $30,000 | 16 | $30,000 | 16 | $30,000 | Trying CSXT route for improved service. |
| St Louis | AG | IL | Chicago | [redacted] | VA | Franklin | [redacted] | Starch | Short | Until service improves. | Rail | CSXT | | | | | | | | | | | | | | | Trying CSXT route for improved service. |
| St Louis | AG | IL | Decatur | [redacted] | NY | Buffalo | [redacted] | CO2 | Short | Until service improves. | Rail | CSXT | | | | | | | | | 8 | $8,920 | 4 | $4,460 | 4 | $4,460 | Trying CSXT route for improved service. |
| St Louis | AG | TN | Memphis | [redacted] | NY | Buffalo | [redacted] | Cottonseed oil | Long | Lost business | Rail | IC/CN | | | | | | | | | | | | | | | Established transfer station on CN @ Hamilton, ON. |

PRODUCED AS NATIVE

## General Merchandise Diversion Trend

| (Revenue in Millions) | June (A) | | July (A) | | August (A) | | September (A) | | October (A) | | November (A) | | December (A) | | January (A) | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cars | Rev | Cars | Rev | Cars | Rev | Cars | Rev | Cars | Rev | Cars | Rev | Cars | Rev | Cars | Rev | Cars | Rev |
| Agriculture | 2,631 | $4.1 | 1,666 | $ 2.7 | 1,842 | $ 2.9 | 1,862 | $ 2.9 | 2,780 | $4.1 | 1,685 | $2.3 | 1,325 | $1.8 | 527 | $0.7 | 14,318 | **$21.5** |
| Metals | 7,245 | $7.7 | 4,686 | $ 4.9 | 4,196 | $ 4.3 | 4,091 | $ 4.4 | 3,593 | $4.0 | 2,543 | $2.7 | 2,362 | $2.5 | 1,348 | $1.7 | 30,064 | **$32.2** |
| Construction | 3,408 | $2.3 | 1,842 | $ 1.1 | 698 | $ 0.5 | 615 | $ 0.5 | 729 | $0.5 | 385 | $0.2 | 344 | $0.2 | 10 | $0.01 | 8,031 | **$5.4** |
| Paper | 1,407 | $2.4 | 1,606 | $ 2.5 | 1,608 | $ 2.6 | 1,404 | $ 2.3 | 1,792 | $2.6 | 1,492 | $2.7 | 1,196 | $1.8 | 533 | $0.9 | 11,038 | **$17.8** |
| Chemicals | 2,039 | $3.0 | 2,428 | $ 4.0 | 2,379 | $ 3.3 | 2,054 | $ 2.7 | 2,519 | $3.1 | 1,914 | $1.8 | 1,664 | $1.4 | 1,085 | $1.0 | 16,082 | **$20.3** |
| Automotive | 6,546 | $10.8 | 1,128 | $ 1.8 | 9,113 | $ 10.9 | 9,089 | $ 11.2 | 9,190 | $11.4 | 8,386 | $10.5 | 7,473 | $9.3 | 6,503 | $8.1 | 57,428 | **$74.0** |
| **Merchandise** | 23,276 | $30.3 | 13,356 | $ 17.0 | 19,836 | $ 24.5 | 19,115 | $ 24.0 | 20,603 | $25.7 | 16,405 | $20.2 | 14,364 | $17.0 | 10,006 | $12.4 | 136,961 | **$171.1** |

## *Defining the Universe:* Components of Total Diversions

| | | | Cars | | Rev | |
|---|---|---|---|---|---|---|
| **Maximum Diversions:** | | | | | | |
| (as of June 1999) | | Agriculture | 31,572 | | $49.2 | |
| | | Metals | 86,940 | | $92.4 | |
| | | Construction | 40,896 | | $27.6 | |
| | | Paper | 16,884 | | $28.8 | |
| | | Chemicals | 24,468 | | $36.0 | |
| | | Automotive | 78,552 | | $129.6 | |
| **LESS** | | **Merchandise** | | **279,312** | | **$363.6** |
| **Latest Diversions:** | | | | | | |
| (as of January 2000) | | Agriculture | 6,324 | | $8.4 | |
| | | Metals | 16,176 | | $20.4 | |
| | | Construction | 120 | | $0.1 | |
| | | Paper | 6,396 | | $10.8 | |
| | | Chemicals | 13,020 | | $12.0 | |
| | | Automotive | 78,036 | | $97.2 | |
| | | **Merchandise** | | **120,072** | | **$148.9** |
| **Recovered Diversions:** | | | | | | |
| (as of January 2000) | | Agriculture | 25,248 | | $40.8 | |
| | | Metals | 70,764 | | $72.0 | |
| | | Construction | 40,776 | | $27.5 | |
| | | Paper | 10,488 | | $18.0 | |
| | | Chemicals | 11,448 | | $24.0 | |
| | | Automotive | 516 | | $32.4 | |
| | | **Merchandise** | | **159,240** | | **$214.7** |
| | | | | | | |
| **Recovered Diversions** | | | | | | |
| **Component I:** | **Targeted** | | | | | |
| | Group 1 | **Top Ten** | | | | |
| | | Agriculture | 246 | | $0.5 | |
| | | Metals | 1,225 | | $1.5 | |
| | | Construction | 2,911 | | 3.1 | |
| | | Paper | 3,576 | | $6.7 | |
| | | Chemicals | 940 | | $1.3 | |
| | | Automotive | 753 | | $2.1 | |
| | | **Merchandise** | | **9,651** | | **$15.2** |
| | Group 2 | **Operations** | | | | |
| | | Agriculture | 0 | | $0.0 | |
| | | Metals | 0 | | $0.0 | |
| | | Construction | 0 | | $0.0 | |
| | | Paper | 0 | | $0.0 | |
| | | Chemicals | 0 | | $0.0 | |
| | | Automotive | 0 | | $0.0 | |
| | | **Merchandise** | | **0** | | **$0.0** |
| **Component II:** | **June - December Service Recovery** | | | | | |
| | | Agriculture | 25,002 | | $40.3 | |
| | | Metals | 69,539 | | $70.5 | |
| | | Construction | 37,865 | | $24.4 | |
| | | Paper | 6,912 | | $11.3 | |
| | | Chemicals | 10,508 | | $22.7 | |
| | | Automotive | (237) | | $30.3 | |
| | | **Merchandise** | | **149,589** | | **$199.5** |

From: Seale, Don
Sent: Thu Jul 31 12:59:32 2003
To: "Brugman, Thomas" <tjbrugma@nscorp.com>
Subject: RE: Renewal of NSSC 82990 [redacted] Veg Oil
Importance: Normal

Tom: The message below from Ty is awfully vague relative to CSXT's position of the FSC—am not sure we can conclude that they are trading it away based on this message. I plan to talk to Craig this afternoon or tomorrow. DWS

-----Original Message-----
**From:** Brugman, Thomas
**Sent:** Thursday, July 31, 2003 11:48 AM
**To:** Seale, Don
**Subject:** FW: Renewal of NSSC 82990 [redacted] Veg Oil

Don:

Forwarding this message chain to illustrate CSX activity on fuel surcharge for [redacted] and possibly other large AG shippers. Will you be discussing the FSC issue with [redacted] in the near future?

Tom

-----Original Message-----
**From:** Simonic, Pat
**Sent:** Wednesday, July 30, 2003 11:01 AM
**To:** Ross, Dave
**Cc:** Hildum, Ty; Brugman, Thomas
**Subject:** RE: Renewal of NSSC 82990 [redacted] Veg Oil

Dave,

Agree. Don't lose this business. PJSimonic

TJB-Reference our continued conversations concerning CSXT willingness to forgo FSC in exchange for business. I also have heard that they have removed their FSC provision from all contracts tied to UnAdj RCAF Index. We are still taking the FSC and the UnAdj.

-----Original Message-----
**From:** Ross, Dave
**Sent:** Wednesday, July 30, 2003 7:35 AM
**To:** Simonic, Pat
**Cc:** Hildum, Ty
**Subject:** RE: Renewal of NSSC 82990 [redacted] Veg Oil

Pat,
Another case of CSXT multi- year contract endangering our business- this is the best [redacted] business that I have 1.4 VPD- one in which we could easily make a longer term commitment. There is approx 200 cls yr moving on this NSSC- CSXT seems to be getting the upper hand with non FSC multi-year contracts. I plan on accepting [redacted] offer to keep this profitable business, unless FEC has major objections.

DER

-----Original Message-----
**From:** Hildum, Ty
**Sent:** Tuesday, July 29, 2003 6:04 PM
**To:** Ross, Dave
**Cc:** Ormsby, Cathy
**Subject:** RE: Renewal of NSSC 82990 [redacted] Veg Oil

Dave,

[redacted] has some legitimate reasons for not being able to take an increase. Besides the entire oil market being down, we are competing against CSXT from UP origins via KC and ESTL. Dana claims to have a multi year contract with the CSXT/FEC on their traffic into Florida which would make those rates more attractive when compared to NS increased rates. In addition to the competitive nature of this lane, [redacted] recently acquired lease track space on the CSXT which will reduce the number of carloads they ship via NS. Previously they were shipping product to a hold track in Medley, FL on the FEC to have available for both their FEC and CSXT customers (credit issues). It would cost [redacted] $600 to switch cars from the FEC hold track to the CSXT customer. Now that they have located space on CSXT, they have eliminated the need to store cars for CSXT customers on the FEC and eliminated the $600 charge.

Dana has proposed a 1% increase on Valdosta and Kansas City traffic and a 2% on the Quincy traffic. No fuel surcharge, no volume requirement (do your records indicate a volume commitment? I have nothing on file).

Dana indicated he is confident he could get CSXT to ship from Valdosta for $1,400 compared to our current $1,500 rate, but he prefers not to give CSXT all the business. He does like NS service, but indicated this product is not time sensitive enough for service to have value. Do your files indicate CSXT service had anything to do with us gaining this business?

Let me know if the [redacted] proposed increases are acceptable. Like you said, this is good business.

Ty

From: Seale, Don
Sent: Fri Aug 08 11:16:37 2003
To: "Brugman, Thomas" <tjbrugma@nscorp.com>
Subject: RE: [redacted]
Importance: Normal

Tom: No problem. DWS

-----Original Message-----
**From:** Brugman, Thomas
**Sent:** Friday, August 08, 2003 10:35 AM
**To:** Seale, Don
**Subject:** RE: [redacted]

Don:

Note slight change below. Is this OK?

Also can we offer this to the other major "objectors" [redacted] etc.

Tom

-----Original Message-----
**From:** Landrum, Tom
**Sent:** Friday, August 08, 2003 10:23 AM
**To:** Brugman, Thomas
**Cc:** Yopp, Ken
**Subject:** RE: [redacted]

Tom B:
I've discussed with the customer and I believe [redacted] will accept this modified surcharge. One question: Alby Pfeifer has a note already published that provides a 2% at 34%, but the 4% doesn't hit until $39 rather than the $38 that Don Seale has requested below. OK to go with Alby's already published note?? Tom

-----Original Message-----
**From:** Brugman, Thomas
**Sent:** Wednesday, August 06, 2003 2:01 PM
**To:** Landrum, Tom
**Cc:** Yopp, Ken
**Subject:** FW: [redacted]

Tom Landrum:

Give this approach a shot. It should make the chances of a fuel surcharge remote.

TJB

-----Original Message-----
**From:** Seale, Don
**Sent:** Wednesday, August 06, 2003 4:54 PM
**To:** Brugman, Thomas
**Subject:** RE: [redacted]

Tom: See if you can sell a confidential contract catastrophic fuel provision that would not trigger unless WTI crude oil hits $34/barrel with a 2% provision up to $38 where 4% would apply. DWS

-----Original Message-----
**From:** Brugman, Thomas
**Sent:** Wednesday, August 06, 2003 10:11 AM
**To:** Seale, Don

**Subject:** FW: [redacted]

Don:

See competitive CSX/CN ethanol proposal below. The competition has exempted [redacted] from their fuel surcharge and we need to respond in kind. I recommend granting the fuel surcharge waiver.

Tom

-----Original Message-----
**From:** Landrum, Tom
**Sent:** Wednesday, August 06, 2003 9:56 AM
**To:** Brugman, Thomas; Yopp, Ken
**Cc:** Moczulewski, Frank
**Subject:** RE: [redacted]

Tom Brugman:
This is our estimate at this time:

For 2004:
**Peoria to Sewaren, NJ** **850 clds; $1.913 million revenue**
No traffic to Newark until 2005

For 2005 & beyond:
**Peoria to Newark, NJ** **1,470* clds; $3.407 million revenue**
Sewaren traffic should be moving to Newark.

* This based on the current estimate of ethanol demand in the NY Harbor for 2005.

- 30,000 barrels/day; 75% expected to move via rail = 22,500 / 750 (barrels per railcar) = 30 clds per day.
- [redacted] represents about 14% of the total ethanol market.
- 30 clds * 14% = 4.2 clds per day * 350 = 1,470 clds per year.

Tom Landrum

-----Original Message-----
**From:** Brugman, Thomas
**Sent:** Wednesday, August 06, 2003 6:16 AM
**To:** Yopp, Ken; Landrum, Tom
**Cc:** Moczulewski, Frank
**Subject:** RE: [redacted]

Need a volume and total gross revenue for the proposed lanes. TJB
-----Original Message-----
**From:** Yopp, Ken
**Sent:** Wednesday, August 06, 2003 8:55 AM
**To:** Landrum, Tom; Brugman, Thomas
**Cc:** Moczulewski, Frank
**Subject:** RE: [redacted]

TJB
This is another strategic move to position NS favorably in the Ethanol Market which I support. We need your approval as the proposal exempts [redacted] from Norfolk Southern's FSC for 3 years.
KWY
Cc: Tom
Frank

-----Original Message-----
**From:** Landrum, Tom

**Sent:** Thursday, July 31, 2003 1:56 PM
**To:** Yopp, Ken
**Cc:** Moczulewski, Frank
**Subject:** [redacted]
**Importance:** High

Ken:
Need your concurrence to the following proposal I've prepared for [redacted]

Proposal:
Three year contract
Effective - Upon acceptance (traffic would not begin to new destinations until late 2003 at the earliest)
Expires - December 31, 2006

- Extends current rates in NSSC 80642 (121 clds YTD; 1.52 r/c ratio; $601 avg margin/car)
- Adds the following competitive lanes:
  - Peoria, IL to Newark, NJ — $2,220/car; $500/car net; 1.26 r/c
  - Peoria, IL to Sewaren, NJ — $2,290/car; $533/car net; 1.30 r/c
  - Chgo(byd) to Newark, NJ — $1,920/car; $490/car net; 1.34 r/c
  - Chgo(byd) to Sewaren, NJ — $1,840/car; $471/car net; 1.34 r/c

Conditions:
- Rates subject to 95% total rail volume in each lane
- Annual escalation of 3% in year 2 and again in year 3
- *No Fuel Surcharge*
- First and Last Right of Refusal Clause to ANY market served or accessed by NS during contract period.
- Contract will also include a clause to prevent this contract from being cancelled should [redacted] be taken over by another principle. [redacted]

**CSXT/CN proposal provides an exemption from their fuel surcharge policy.**

Ken, as you know this contract will position NS well for the upcoming year on the expected ethanol to the NY harbor. If accepted, NS will have secured two of the top three ethanol producers into the SAA area for three years - a significant accomplishment.

Tom Landrum
Product Manager - Sweeteners & Ethanol
Norfolk Southern Corporation
110 Franklin Road, S.E.
Roanoke, VA 24042-0041
Ph 540-985-6022
Fx 540-985-6755

**From**: Glennon, Pat
**Sent**: Tue Nov 04 11:59:37 2003
**To**: Wendorf, Gary; Brenner, Charlie; Brugman, Thomas; Julian, David; Kraemer, John; Lawson, David; Osborne, Joe; Yopp, Ken; Anderson, Brady; Fisher, Donna; Florian, Fred; Gentzel, Robert; Julian, Alan; Kiley, Richard; McNabb, Jim; Plain, Bob; Schaaf, Jim; Simonic, Pat
**Cc**: Seale, Don; Pfeifer, Alby
**Subject**: Fuel Surcharge Policy Review
**Importance**: High
**Attachments**: NS CSXT FSC compare1.xls; Global Petroleum Monthly.pdf; FW: 7/10 Fuel Surcharge Meeting - Background Info

**GVPs** – Regarding the NS Fuel Surcharge. DWS has requested that we take a fresh look at the case for and against NS adopting the new CSXT FSC standard. He would like a recommendation for his consideration. With that objective in mind, I have provided several attachments and a recap (below) of the issues that you need to consider. Attachments:

- Energy forecast. Page 22 covers WTI. Current estimates call for WTI prices in the $22 to $25 range. If accurate, the CSXT formula in 2004 will produce nominal FSCs in the 0.4% to 0.8% range while the NS FSC would drop to zero. However, earlier forecasts for 2003 called for a similar drop in second half 2003 and that hasn't materialized.
- A hypothetical comparison of the CSXT, UP and BNSF standards and the relative yields NS could have expected had NS adopted each of the standards. The comparison is based on Merchandise traffic for 2002 and Y-T-D 2003. These are hypothetical figures for comparison purposes. The totals are not projections of actual revenues. The key point is that the CSXT formula produces 75% more revenue under similar conditions (2003 WTI). Results will obviously vary with market conditions.
- Recap from July 2003 covering BNSF and UP comparisons covered here.

Should NS adopt the CSXT FSC? **Please provide your feedback by Friday (11/ 7) on the options listed below**. If we do not have a clear consensus on what direction NS should take on the FSC, or if more options are submitted for consideration, a meeting will be called to address the differences:

- Retain the current NS standard (see Pro/Con below)
- Continue laying the groundwork for a conversion, but delay a formal decision until 2QTR04 (See #1 below)
- Adopt the CSXT standard this year (see #2 and #3 below)
- Adopt the CSXT standard, but raise the base to from $23 to $28 with 0.4% increases per $1 WTI increases starting at $28.01. This addresses the double dipping argument that NS has covered the fuel cost in our rates over the last several years, yet we are still observing the old FSC WTI base level
- Adopt UP or BNSF standard
- Other options?

**If we adopted the CSXT FSC standard, possible implementation scenarios:**
**#1 - The most conservative** and customer focused

- Delay any decision/action until the 2nd qtr 2004. Allows time for most of the full text FSC clauses to be removed
- If the decision is to adopt the CSXT standard, publish a new FSC in the C/C and apply it to all public authorities
- Convert private authorities from that point forward as rates are renegotiated. Although most NS publications would refer to the new C/C FSC standard, we would informally protect the old formula on private rates until the renegotiation of the prices. We can do this through Note management in 9255

**#2 – More aggressive**. Same plan, only begin now.

- Change C/C this year.
- Covert all public prices that have the new C/C reference.
- Convert private authorities as they roll over and are reissued. Start now can carry over well into 2004

**#3 – Most aggressive**. Same plan but force conversion of all public and private authorities with the new C/C reference, don't wait for renegotiation

- Change the C/C this year.
- Convert all public prices that have the new C/C reference
- Immediately convert any existing private authorities that have the new C/C reference and convert any new or reissued authority as the full text clause is replaced with the new C/C reference.
- Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation.

-
-
-
-
-

**Supporting background detail - Pro/Con issues**

The more complete argument for and against a FSC change is included in the attachments. However, here are the core issues from the conservative perspective:

Pro – For adoption of the CSXT formula

- The CSXT formula produces a higher yield
- The CSXT is our primary competition and they have already taken the heat for raising the bar
- The CSXT (and UP/BNSF) provide better lead times in announcing changes
- The FSC % applies for a calendar month
- There is no industry FSC standard to speak of. It could be argued that adopting the CSXT standard may actually help provide some measure of consistency for customer, at least for customers in the East
- Joint NS/CSXT customers may experience less maintenance issues
- The CSXT formula could be expected to generate roughly 75% more revenue (based on 2003 WTI patterns), assuming all other billing issues remain constant (no increase in disputes or drop in collections). Note, this is hypothetical. The actual increase in revenue would likely be somewhat less, particularly in the short term.
- WTI forecast for 2004 calls for prices in the $22 to $25 range. If accurate, that means the CSXT formula would be producing a FSC around 1% for 2004, while the NS FSC would drop off. Note that we had a similar low forecast for WTI for the second half of 2003 and prices have remained around $30.

-

Con – Against adoption of the CSXT formula

- The NS formula is the most established of the RR formulas. Customers are familiar with it and generally accept it. We have a relatively high level of application (few exception)
- NS has relatively few billing disputes with the current NS FSC
- NS is currently seen as more reasonable compared to CSXT. A change would be perceived as a revenue grab. To many customers, NS would replace CSXT as the "unreasonable" carrier
- Larger customers will argue that NS has had almost a year to incorporate higher fuel cost in the rate structure. They argue that, if anything, the FSC should go down, not up.
- Adopting the CSXT standard will reopen negotiating points for customers and rate negotiation will become more difficult
- Organizations like NGFA are very focused on the FSC and will publicly and politically ride the issue hard
- The CSXT's 0.4% per $1 WTI increment, as opposed to the 2.0% per $5 increment for NS, is more likely to change from month to month, leading to more maintenance issues for customers and more billing problems for NS. This is offset to some extent for joint CSXT/NS customers that may find a common Eastern FSC
- The net impact on FSC revenue collections would be difficult to gauge. While the CSXT formula produces higher FSC percentages actual revenues might be less than expected or actually decline in the short term depending on customer reactions to the change.
- Assuming we would not unilaterally change the FSC on private/contract rates until the renegotiation of the rates, the conversion would take 12 to 18 months to fully implement. Notwithstanding the added risk of increased customer resistance and billing disputes, the actual benefits in terms of additional revenue would be further diluted in the short to mid term.
- Technical issue. Prior to June of this year, NS inserted the full FSC text in each publication. We are in the process of replacing the full text with reference to the Conditions of Carriage. Have replaced the FSC in most public authorities and about half of the private authorities.
- In addition, once we remove the last of the Full text NS FSC, I question if we would actually execute a FSC change (adopt the CSXT FSC) in the C/C and announce that that it immediately applies to all publications, including private

authorities. This would generate an intense customer reaction. The backlash would lead to calls for more signed contracts with specific FSC language to limit future changes. I suspect we'd instead take the more measured approach and informally advise customers that private authorities would not take the change until renegotiated, regardless of the FSC text. This approach would take 12-18 months for private authorities

- Any rollout will have downside issues.

Too complicated? Call me.

PJG

This file is produced natively

| Month | NS Merch Rev (L & F) (Yearly AVG/Month) | NS FSC (actual) | CSXT FSC (Pro Forma) | BNSF FSC (actual) | UP FSC (pro forma) | Revenue From FSC (NS FSC X .52 adj) See note below | Revenue From FSC (CSXT FSC X .52 adj) | Revenue From FSC (BNSF FSC X .52 adj) | Revenue From FSC UP FSC X .52 adj) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 0 |
| January, 2002 | $200,750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February, 2002 | $200,750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| March, 2002 | $200,750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| April, 2002 | $200,750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| May, 2002 | $200,750,000 | 0 | 0.80% | 0 | 0 | 0 | $835,120 | 0 | 0 |
| June, 2002 | $200,750,000 | 0 | 1.60% | 1.00% | 0 | 0 | $1,670,240 | $1,670,240 | 0 |
| July, 2002 | $200,750,000 | 0 | 2.00% | 1.00% | 0 | 0 | $2,087,800 | $2,087,800 | 0 |
| August, 2002 | $200,750,000 | 0 | 1.20% | 0.00% | 0 | 0 | $1,252,680 | 0 | 0 |
| September, 2002 | $200,750,000 | 0 | 1.60% | 0.00% | 0 | 0 | $1,670,240 | 0 | 0 |
| October, 2002 | $200,750,000 | 14 day @2% | 2.40% | 1.00% | 0 | $942,877 | $2,505,360 | $2,505,360 | 0 |
| November, 2002 | $200,750,000 | 2.00% | 2.80% | 2.00% | 2.00% | $2,087,800 | $2,922,920 | $2,922,920 | $2,922,920 |
| December, 2002 | $200,750,000 | 11 day @2% | 2.40% | 2.50% | 2.50% | $740,832 | $2,505,360 | $2,609,750 | $2,609,750 |
| **Year 2002** | **$2,409,000,000** | | | | | **$3,771,509** | **$15,449,720** | **$11,796,070** | **$5,532,670** |
| January, 2003 | $206,886,000 | 2 day @ 2% | 1.60% | 2.00% | 2.00% | $138,814 | $1,721,292 | $2,151,614 | $2,151,614 |
| February, 2003 | $206,886,000 | 2.00% | 2.80% | 2.00% | 2.00% | $2,151,614 | $3,012,260 | $2,151,614 | $2,151,614 |
| March, 2003 | $206,886,000 | 2.00% | 4.00% | 2.50% | 2.50% | $2,151,614 | $4,303,229 | $2,689,518 | $2,689,518 |
| April, 2003 | $206,886,000 | 2.00% | 5.20% | 4.50% | 4.50% | $2,151,614 | $5,594,197 | $4,841,132 | $4,841,132 |
| May, 2003 (see Note) | $206,886,000 | 2.00% | 4.40% | **2.00%** | **2.00%** | $2,151,614 | $4,733,552 | $2,151,614 | $2,151,614 |
| June, 2003 (see Note) | $206,886,000 | 2.00% | 2.40% | 3.00% | **2.00%** | $2,151,614 | $2,581,937 | $3,227,422 | $2,151,614 |
| July, 2003 | $206,886,000 | 2.00% | 2.40% | 2.50% | 2.50% | $2,151,614 | $2,581,937 | $2,689,518 | $2,689,518 |
| August, 2003 | $206,886,000 | 2.00% | 3.20% | 2.00% | 2.00% | $2,151,614 | $3,442,583 | $2,151,614 | $2,151,614 |
| September, 2003 | $206,886,000 | 2.00% | 3.20% | 2.00% | 2.00% | $2,151,614 | $3,442,583 | $2,151,614 | $2,151,614 |
| October, 2003 | $206,886,000 | 2.00% | 3.60% | 2.50% | 2.50% | $2,151,614 | $3,872,906 | $2,689,518 | $2,689,518 |
| November, 2003 | $206,886,000 | 2.00% | 2.40% | 2.50% | 2.50% | $2,151,614 | $2,581,937 | $2,689,518 | $2,689,518 |
| December, 2003 | $206,886,000 | 2.00% | 3.20% | 2.50% | 2.50% | $2,151,614 | $3,442,583 | $2,689,518 | $2,689,518 |
| **2003 total** | | | | | | **$23,806,568** | **$41,310,996** | **$32,274,214** | **$31,198,406** |

**Note:** Re 52% FSC Ajustment. 52% of non-Intermodal Line-haul NS revenue is subject to the NS FSC.

**Note:** May '03 percentage reduced by BNSF from 5% to 2% to bring percentage in line with sharply declining oil prices. Assume UP would do the same.
June percentage reduction announced by UP from 3% to 2% to reflect current market conditions

# Global Petroleum Monthly

GLOBAL INSIGHT

OCTOBER 2003

## Forecast Highlights

With Iraqi output above expectations in September, the forward global balance looks even more problematic for OPEC than a month ago. Although OPEC ministers agreed on September 24 to cut production by 900,000 barrels per day (b/d) from November 1, and even assuming that compliance is 100% (which is most unlikely), global stocks still look set to build steadily through the end of the year. Days cover figures would thus point to prices much lower than current levels. Short-term perceptions are currently of a tight market, however, and as long as U.S. crude stocks remain low, this perception could remain. Perceptions can change quickly, however, and if U.S. refinery runs in October and November remain relatively high for the time of year, as is projected, product stocks could still be rebuilt to reasonable levels in advance of the winter, allowing runs then to decline seasonally and crude stocks to rebuild. By this time, the focus of perceptions could move to the magnitude of the task that OPEC faces in cutting back production for the first quarter, and prices could begin to fall rapidly in the latter part of the fourth quarter.

Given current projections of demand, increases in non-OPEC production, and the more optimistic outlook for Iraqi exports that is beginning to emerge as the situation in the south of the country stabilises, it appears that the OPEC 10 will have to make deep cuts in output in order to prevent global stocks from rising even further and prices falling towards $20/barrel in the second quarter of 2004. It seems certain that it will be necessary to cut to below 24 million b/d in the first quarter, a level that OPEC stated it would not go to without support from non-OPEC producers. Such support can by no means be guaranteed. Indeed, history suggests that there may be vocal support and even promises of cuts, but that any actual reduction in output is likely to be minimal. However, history also suggests that such promises can be sufficient of themselves to influence market perceptions.

**WTI Price Outlook Scenarios**
(Quarterly, dollars per barrel)




If OPEC is forced to cut to below 24 million b/d, it will pose particular problems for Saudi Arabia. Our expectation is that for a variety of reasons, a number of members (e.g., Venezuela, Nigeria, Algeria, Libya, Qatar) will feel they are special cases, and despite weak and falling prices, will still be reluctant to play their (full) part in sharing cuts. The Saudis will thus be obliged either to allow prices to fall even further or to adopt a swing role and cut their own production back to levels that have not been seen since August 1990. It is difficult to envisage what the impact of such a scenario might be, but it is what the numbers point towards presently.

Although we believe that the fundamentals will ultimately drive prices, perceptions of a tight market might persist long enough for OPEC to come to some agreement on how to reduce output corporately. Combined perhaps with firmer demand and slower-than-expected increases in non-OPEC output, as a high case, it might still prove possible to keep prices in the upper $20s/barrel.

A rapid change of perceptions about stock levels and OPEC in disarray, on the other hand, could see prices falling even

**Contacts:**
Mary Novak, 781-301-9011, mary.novak@globalinsight.com
Graham Loveland, 44-20-8544-7867, graham.loveland@globalinsight.com
Hongyan Lin, 781-301-9065, hongyan.lin@globalinsight.com
**Global Insight Web Site, htpp://www.globalinsight.com**

(C) Copyright 2003. ALL RIGHTS RESERVED

Highly Confidential
NS_057005770
DA07348

**Marker Crude Prices**
(Dollars per barrel)

| | July | August | September |
|---|---|---|---|
| WTI | 30.70 | 31.59 | 28.25 |
| Brent | 28.35 | 29.79 | 27.08 |
| Dubai | 26.73 | 27.61 | 25.24 |
| OPEC basket | 27.43 | 28.63 | 26.15 |

more sharply and remaining low most of next year. The pressures on OPEC to cobble together some form of agreement would be immense, but just as in 1998/99, it might take a period of low prices, and we are not currently projecting prices anything like as low as those, to instil a new awareness of reality.

## Market Review and Outlook

### Recent Developments

Developments in September brought surprises to all market observers, and as a result, our crude price projections of a month ago proved too high. Crude prices first fell sharply over the first three weeks of the month, driven by an earlier and sharper fall in NYMEX gasoline prices than we had projected, but then moved sharply upwards following OPEC ministers' surprise decision at the September 24 meeting to cut quotas. Prices ended the month some $3/barrel shy of the starting level.

Average prices of the main markers all fell during September, with WTI posting the largest fall, at $3.34/ barrel. Brent fell by some 60 cents less, and Dubai and the OPEC basket by less still. This pattern of differential changes impacted the scope for inter-regional arbitrage movements. The narrowing of the WTI-Brent differential made it more difficult to move North Sea and West African cargoes into the United States, whilst the narrowing of the Brent-Dubai differential was partly responsible for a substantial increase in movements of heavier West African crudes to the East. In addition, strengthening middle distillate prices in the Far East drove Malaysian Tapis prices sharply upwards, thus opening the arb into the East for lighter West African crudes as well as the heavier grades.

The progress of prices during September was directly related to two events, the passing of the September 1 Labour Day holiday in the United States and the OPEC ministerial meeting on September 24.

August ended with WTI virtually at $32/barrel and Brent at $30/barrel. Labour Day traditionally marks the end of the peak summer driving season in the United States. With the realisation that despite low gasoline stocks and various supply disruptions earlier in the summer, the season is ending without any major supply dislocations. Also, with the prospect of the change to easier-to-make winter grade specifications, hedge-fund managers turned bearish and began to liquidate forward NYMEX positions on unleaded gasoline. NYMEX gasoline dropped sharply and WTI fell in line. Within less than a week, WTI lost more than $3/barrel. The sharp fall in gasoline prices ate into refining margins, and refiners began to stand back and re-evaluate their positions. Steep backwardation in prices made buying crude for stock unprofitable, and with further falls in margins in prospect, and many refineries in turnaround in September, prompt demand for crude lessened. Meanwhile, stocks data were showing a build in PADD2 crude stocks, where WTI is priced, so prices continued to soften. In the week before the OPEC meeting, WTI averaged below $27/barrel. During this time, all the action was on WTI, with other grades broadly following.

The OPEC meeting brought a further surprise. Throughout the first three weeks of the month, OPEC ministers were publicly expressing their opinion that no change to quotas would be necessary at their meeting. On September 3, the Saudi minister voiced the opinion that "supply, stocks, and prices all indicate a market in balance. For a couple of months, there's no threat of making the market unbalanced." Even in the days immediately prior to the meeting, when it was apparent that prices had fallen sharply, ministers and market observers were still united in the expectation of no-change. This was possibly because the OPEC basket price was only marginally below $25/barrel, the middle of its range—not previously a signal for output cuts. In the event there was a last minute change of heart, reportedly orchestrated by the Saudis, and a cut of 900,000 barrels per day (b/d), to 24.5 million b/d for the OPEC 10, effective November 1, was announced, taking total and



Highly Confidential NS_057005771
DA07349

individual quotas back to where they had been in February–May. This announcement took the market by surprise and prices immediately rose $1/barrel. By the end of the month, perceptions of a tighter market had added another $1//barrel, taking WTI back to just over $29/barrel.

Ministers did not seem too concerned that their comments in the wake of the meeting indicated a fundamentally different view of the market than what they were recently espousing. The post-meeting communiqué declared that "stocks have been replenished and are rapidly reaching normal seasonal levels, with the supply/demand balance for the fourth-quarter 2003 and first-quarter 2004 indicating a contra-seasonal stock build-up. This could have a destabilising effect on the market, which requires a reduction of supplies from all producers to ensure stability"—so much for "a market in balance."

What had changed to produce such a *volte-face*? In one sense, nothing at all. Mindful of potential stocks builds late in the winter and spring, this is what OPEC would have wanted to do all along, but could not contemplate earlier, whilst prices were at the top of the price band. Cutting output then would only have driven prices even higher, put the basket price well above the top of the $22–28/barrel band, and provoked calls for activation of the "automatic" increase of output by 500,000 b/d under the price band mechanism. This was the dilemma we wrote about in the July and August issues of GPM, emphasizing the problems of timing, that the forward balance indicated the need for a cut but that it would be very difficult to present a justification for a cut whilst stocks remained low and prices high. The sharp fall in prices provided OPEC with a golden opportunity to do what they had wanted to do all along.

The fall in prices plainly took OPEC by surprise, just as it did others, and whereas previously ministers might have been prepared to wait a little longer before acting, there was now an element of urgency, and a fear that the price fall might continue. It was always the case that the later they left it before making a cut, the larger that cut would need to be. Making the cut effective November 1 was viewed as pre-emptive.

Other factors, however, also contributed to the decision:

- One-off factors that swelled demand levels this year were expected to be absent next year.
- The seesaw of optimism/pessimism over Iraqi output prospects swung back in favour of optimism. September exports rose strongly, despite continuing attacks on the pipeline to Ceyhan, and the new Iraqi oil minister attended the OPEC Conference and presented an up-beat view of future growth.
- The view of the supply/demand balance presented in the meeting envisaged a substantial stock build of 600,000 b/d in the fourth quarter, if production were maintained at August's levels.
- High levels of U.S. imports were seen as contributing to a rebuilding of stocks.
- Finally, but perhaps very significantly, one industry journal reports the view of an oil major that a prime motivation, alongside others, was a desire to punish the investment funds for selling the market short, and reducing OPEC members' revenues. The move from a net long position in early August to a position closer to balance, moving towards short, by September had already contributed to a loss of some $3/barrel in NYMEX WTI quotes, and forward curves were bearish.

Ministers decided to meet again on December 4 to review developments, although by that stage, they will have no reliable information on November's actual production and the extent of compliance with the reduced quota. The conference also "expressed its expectation that non-OPEC oil producers will take concrete measure to restrain their production increases, thereby actively sharing...the burden of maintaining price and market stability in 2004 and thereafter." It is too early to determine how much weight to attach to this "expectation." It may be significant that it merely refers to a restraining of increases rather than to actual cuts. However, what is unclear is whether OPEC intends to convey the message, as in 2002, that it will not reduce its output without at least some concomitant contributions from others. If that is the case, then it strengthens the case we have made for a major collapse in prices next year.



Highly Confidential NS_057005772
DA07350

Much speculation in the industry press has suggested that this action constitutes a major change of strategy for OPEC, from a reactive to a proactive and pre-emptive approach to pricing, and that defending the price band is now clearly a higher priority than defending market share. It seems to us too early to draw any definite conclusions on this. Undoubtedly the actual decision, taken in isolation, points in this direction, but the circumstances of the decision, reportedly the product of a last-minute meeting among ministers, scarcely points to a well thought-out policy.

## Demand and Supply Fundamentals

### *Economics*

With some regions of the global economy showing signs of life again, there is a growing concern that restrictive policies in other regions could mean either that the recovery will not be broad based or that the rebound will falter again, as it did in late 2002 and early 2003. The most pro-growth macro policies can be found in the United States, the United Kingdom, and non-Japan Asia. At the same time, extreme fiscal and monetary policies in the Eurozone have dragged this region back into recession. Because of this, the Global Insight baseline forecast for the world economy continues to predict lopsided growth for at least another couple of years.

Since early 2001, macroeconomic policies in the **United States** have both prevented a deeper recession and have kept the economy from faltering. As a result, despite slower growth, the United States remains the only locomotive of growth in the global economy, with the possible exception of non-Japan Asia. The aggressive application of macro policies does, however, raise concerns regarding when and by how much both fiscal and monetary policy will have to be tightened to prevent inflation from taking off and to move the U.S. budget deficit back towards balance.

**Real GDP Growth, World and Major Seven Economies**
(Year-on-year percent change)

| | 2003 | | 2004 | | | |
|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| US | 2.6 | 3.2 | 3.9 | 4.0 | 4.1 | 4.2 |
| Canada | 1.5 | 2.1 | 2.3 | 3.3 | 3.8 | 3.7 |
| France | 0.0 | 0.5 | 0.7 | 1.4 | 1.6 | 1.7 |
| Germany | -0.2 | 0.1 | 0.6 | 1.1 | 1.3 | 1.6 |
| Italy | 0.3 | 0.2 | 0.7 | 1.3 | 1.6 | 1.8 |
| UK | 1.4 | 1.7 | 2.3 | 2.8 | 2.8 | 2.5 |
| Japan | 1.5 | 1.5 | 1.6 | 1.5 | 1.8 | 1.8 |
| World | 1.8 | 2.3 | 2.8 | 3.1 | 3.2 | 3.2 |

In the **Eurozone,** both fiscal and monetary policies have hurt growth, in turn being a serious drag on global growth. The European Central Bank cut interest rates by only half as much as the Fed, even though growth in the Eurozone was weaker than in the United States, the euro has appreciated, and some of the large economies in the region, notably Germany and Italy, are back in recession. The Stability and Growth Pact has also kept fiscal policies much tighter than they should be in a recession. Recently, however, Germany and France have begun to take a much more flexible approach to both spending and taxes, as their growth has begun to weaken again.

**Japan**, the world's second largest individual economy, has also been a drag on world growth throughout most of the recent downturn. Fortunately, recent data suggest that growth has begun to pick up. Much of this is due to exports to both the rest of Asia and to the United States, thanks to more robust growth in those economies and attempts by the Japanese government to prevent the yen from appreciating. Domestic demand is showing signs of life, but Japan still faces the biggest challenge among industrialised countries in getting its fiscal balances under control.

In **Asia,** most governments have done everything they can to protect their economies from the negative impacts of the global downturn and a large number of recent shocks. This has been accomplished through a combination of stimulative fiscal and monetary policies and aggressive attempts to keep their currencies from appreciating against the dollar. As a result, both domestic demand and net exports have shown strong growth. However, many of the governments in the region are coming under intense pressure to allow their currencies to appreciate. Such a move may become more palatable to the Asian economies if the world recovery gains momentum.

### *Demand*

Total global oil demand is estimated to grow by 1.1 million barrels per day (b/d) this year. This estimate for the year is



Highly Confidential NS_057005773
DA07351

broadly unchanged from last month, although some minor amendments have been made to the phasing of demand through the year to reflect latest data on actual consumption. Growth in 2004 is estimated at 1 million b/d, similarly unchanged from last month.

Largely as a result of the one-off factors mentioned in previous reports (cold weather, oil substitution for gas, and nuclear), which were concentrated in the OECD economies, unusually OECD accounts for the larger part (0.7 million b/d) of the growth in 2003. In 2004, however, when normal weather is assumed, and when these other one-off factors are assumed to be absent, the position reverts to normal and non-OECD again accounts for the larger part of the growth (0.7 million b/d), with Asia responsible for 0.4 million b/d. China is not the sole contributor, but continues to grow strongly, adding another 0.2 million b/d, as robust economic growth of over 7% adds to jet demand recovery after the SARS epidemic and ever-rising gasoline consumption, as car ownership spreads.

Reviewing the one-off factors that caused the unusual pattern of growth in 2003 reveals some of the uncertainties in the current demand forecast.

Regarding weather, at this stage, the United Kingdom's Meteorological Office is pointing to both a warmer and drier winter in the main consuming areas than the long-term average. By contrast, in the United States, an industry journal reports the "widely followed" *Old Farmers Almanac* as forecasting "one of the coldest U.S. winters in memory." We continue to base demand forecasts on long-term average weather, but exceptionally cold or warm weather can result in a difference in global demand of 1 million b/d. Warmer-than-usual weather reduces oil consumption in heating applications and in power generation. These reductions more than offset any increased use of transport fuels resulting from mild weather. Drier-than-usual conditions, however, could have a partially offsetting effect, as reduced rainfall, especially after the very dry year of 2003 in Europe, does not allow the refilling of reservoirs and thus reduces the availability of hydro power. Whilst oil is not the only beneficiary of reduced hydro output, in some countries in Europe, notably Italy, Spain, and Portugal, reduced hydro can tend to have a direct impact in terms of increased fuel oil use.

In the United States, natural gas prices have fallen and currently do not encourage wide scale substitution into oil, though in specific circumstances, that may be preferred. Stocks have been rebuilt and the outlook for the winter is very much weather dependent. Assuming normal weather, however, a repetition of last year's moves from gas to oil is not expected.

In Japan, Tokyo Electric Power Company (TEPCO) still has to restart more than 10 of its 17 closed nuclear reactors. Currently, TEPCO is contracted for only slightly reduced volumes of fuel oil and crude-for-burning (CFB) over the winter quarters than last year. Should it prove possible to restart the closed reactors more swiftly, then fuel oil and CFB consumption will be further reduced. In any event, the problem is not expected to last for as long next year as if did this year. In the first week of October, however, TEPCO re-closed two of the recently restarted reactors—not a good omen. Total Japanese consumption next year is expected to still fall from this year, but surprises in both directions are possible.

Far East stock holdings remain difficult to read. There are no reliable statistics for stock levels in most countries of the region. Anecdotal reports, however, combined with analysis if the available statistics on trade, suggest that China is still holding some of the stocks it built up early in the year as a precaution against disruption to supplies from the war in Iraq. This will tend to depress current demand.

### *Non-OPEC Production*

Compared with the second quarter, which showed year-on-year growth of only 0.1 million barrels per day (b/d), the third quarter of 2003 is estimated to show growth of around 1.6 million b/d. Whilst once again the FSU is the single largest contributor, with an increase of 1.0 million b/d, Europe and North America also contributes 0.7 million b/d. In the case of Europe, year-on-year growth of 0.3 million b/d is slightly misleading if taken in isolation, as it merely reflects a different phasing of North Sea maintenance between the two years, and total annual European production is actually expected to be slightly down this year on last year. North American growth in the third quarter of 0.4 million b/d is real, however, as annual figures are expected



Highly Confidential NS_057005774
DA07352

to show growth of 0.3 million b/d, with both the United States and Canada increasing output.

In the fourth quarter, substantial growth is expected relative to last year, of around 1.6 million b/d. Much of this leap in output has already been achieved in the FSU and North America, and thus the larger part of the growth can be considered firm. FSU production growth is expected to slow down for a while over the winter quarters, before taking off again in the second quarter of next year. However further growth relative to the third quarter of this year is still expected in North America, Latin America, and Africa. In North and Latin America, this is largely a continuation of the build-up of production from new areas already on stream. In Africa, July saw the start up of production from the southern expansion of Equatorial Guinea's Zafiro field, and from the Doba field in Chad. Along with continuing growth of output in Sudan, these will contribute to growth in African output of 0.2 million b/d, compared with the third quarter. Together, these increments will put total non-OPEC fourth-quarter output some 0.8 million b/d above the third quarter.

OPEC NGLs are also expected to continue their steady growth, adding 0.2 million b/d over the winter. Since a large proportion of these NGLS are from non-associated gas, the reduction in OPEC quotas is not expected to impact the rise.

Over the course of next year, it will be the continued steady buildup of production from all areas that will be showing growth in the fourth quarter that will put pressure on OPEC. OPEC's own NGL output will also grow more strongly next year than this year, with increases in Saudi Arabia, Qatar, Algeria, Iran, and Venezuela. In total, non-OPEC output is expected to be 1.4 million b/d higher in 2004 than in 2003, and OPEC NGLs 0.4 million b/d higher.

### *OPEC Production*

All secondary sources agree that OPEC crude production rose in August. Estimates of the scale of increase vary between 0.3 and 0.7 million barrels per day (b/d), with most sources around 0.3–0.4 million b/d. We have followed the IEA estimate, at a rise of 420,000 b/d. Since Iraq rose from around 0.7 million b/d in July to around 1.0 million b/d on average in August, most of the increase is accounted for by Iraq. Total production from the 10 was thus perhaps marginally up on July, but must be considered virtually in line with the 25.401-million-b/d quota, any difference being negligible and within the scope for error of the estimate. As of last month, this matching of the quota was the result of substantial over-quota output in Saudi Arabia (0.4 million b/d over quota) and Algeria (0.3 million b/d over quota).

**OPEC Compliance in August 2003**

| | Quota Jun-Oct. 2003 | Production Aug. 2003 | Production vs. Quota | Estimated Sustainable Capacity[1] (IEA, Sept. 03) | Spare Capacity |
|---|---|---|---|---|---|
| Algeria | 0.811 | 1.13 | 0.32 | 1.20 | 0.07 |
| Indonesia | 1.317 | 1.00 | -0.32 | 1.18 | 0.18 |
| Iran | 3.729 | 3.71 | -0.02 | 3.75 | 0.04 |
| Kuwait | 2.038 | 2.08 | 0.04 | 2.25 | 0.17 |
| Libya | 1.36 | 1.42 | 0.06 | 1.45 | 0.03 |
| Nigeria | 2.092 | 2.18 | 0.09 | 2.50 | 0.32 |
| Qatar | 0.658 | 0.73 | 0.07 | 0.77 | 0.04 |
| Saudi Arabia[2] | 8.256 | 8.63 | 0.37 | 9.50 | 0.87 |
| UAE | 2.217 | 2.34 | 0.12 | 2.40 | 0.06 |
| Venezuela | 2.923 | 2.25 | -0.67 | 2.35 | 0.10 |
| OPEC 10 | 25.401 | 25.47 | 0.069 | 27.35 | 1.88 |
| Iraq | | 1.05 | 1.05 | 1.05 | 0.00 |
| Total OPEC | | 26.52 | 1.12 | 28.40 | 1.88 |

1 Capacity figures are levels achievable within 30 days and sustainbale for 90 days.
**2 Saudi Arabia can add a further 1 mb/d of capacity within 90 days**

Within the total, Venezuela, Indonesia, and Iran were again all unable to achieve their individual quotas, according to IEA, though the president of PDVSA issued a rebuttal of IEA's estimated 2.25 million b/d, maintaining that Venezuela is producing over 3 million b/d. Whilst some other secondary sources are not as sceptical of Venezuelan claims to have increased its output as the IEA, no secondary source would estimate production as high as 3 million b/d.

Although Nigeria's production has been rising, as a result of the tie-in of new fields, some 250,000 b/d of production from the Delta region remained shut-in in August due to continued community disturbances. Moreover, threatened strike action by oil workers, which would put at risk 900,000 b/d of Shell's production, although called off in mid-September, may still be renewed, and there is the added and separate threat of a general strike in protest at the deregulation of the downstream oil sector.



Highly Confidential NS_057005775
DA07353

**Iraq's crude production balance kb/d**

| | Aug-03 | Sep-03 | Dec-03 | Mar-04 |
|---|---|---|---|---|
| Gross production | 1400 | 1800 | | |
| Net production after re-injections | 1150 | 1550 | | |
| Domestic consumption | 450 | 550 | | |
| Exports | 700 | 1000 | 1500 | 1800 |

At the time of writing, no estimates of September production are yet available, but two straws in the wind may indicate that September will show an increase. Firstly, and more as a matter of conjecture, did the price fall despite being primarily a result of developments on NYMEX, owe something to an increased feeling of easier supply in the market? Secondly, and on the basis of harder evidence, freight rates from the Arabian Gulf rose sharply during September. Average rates for a VLCC from the Gulf to the West were 49 points of Worldscale in August, but rose to 82 points in September. Rates for VLCCs to the East rose by even more, and more than doubled. Whilst some of this rise may have been due to increased loadings from Iraq, it seems unlikely that an increase of 0.3 million b/d would provoke a near doubling of rates. There are thus, at the least, indications that September output showed the rise in output above quota that we would have expected.

In Iraq, things are clearly improving in the south, but seem little better in the north. It is difficult to obtain reliable data, but the table below shows one representation of the latest months' actuals and the levels projected by the new minister of energy for end-fourth quarter and end-first quarter.

The line to Ceyhan was bombed again during September, and once again any prospect of Kirkuk exports has been put back by another month or more whilst repairs take place. Achieving 1.5 million b/d of exports through the Arabian Gulf by December will probably require the addition of the use of the facilities at Khor al Amaya, as well as those at Mina al Bakr.

## Market Balance

### *Total OECD Commercial Inventories*

OECD commercial inventories fell by some 61 million barrels during the first quarter, equivalent to a daily rate of around 675,000 barrels per day (b/d), slightly more than the estimated global stock draw of 0.5 million b/d, with a rise in government stocks accounting for the difference. OECD commercial inventories on March 31 are estimated as equal to some 51 days cover. This was up around a day from the end of the fourth quarter, but still represents a very low level of commercial stock coverage. It is the lowest end-first-quarter days cover number for many years.

**OECD Commercial Stocks and Forward Supply**




During the second quarter, total OECD commercial stocks built by some 112 million barrels, according to latest data, a rate of build equivalent to 1.2 million b/d, out of a total global estimated stock build for the quarter of 1.7 million b/d. Days cover rose to 53 days, still low, but not unprecendentedly so. The rise was all in products; crude stocks actually fell by 10 million barrels over the quarter. As between the OECD regions, Europe fell very slightly, Asia Pacific rose 40 million barrels, and North America rose 78 million barrels, some 20 million barrels more than estimated last month. Movements in non-OECD stocks appear to have followed the same path as for OECD—after falling in the first quarter, they built up in the second quarter. Whilst all the numbers are prone to post-hoc adjustment and the distorting effect of assumed "instantaneous supply," the balance continues to look sensible.

It seems likely that high levels of OPEC production over March–May contributed to this stock build in non-OECD areas just as in OECD. Some of this is undoubtedly crude held in Caribbean storage controlled by various OPEC members, which will help to explain why such high levels



Highly Confidential NS_057005776
DA07354

of output did not result in lower prices. Unfortunately, much of the Caribbean storage is controlled by Saudi Arabia, and no statistics are available on stock levels. Strictly speaking, deliveries into such storage do not count against OPEC quotas, so independent observers' views of OPEC compliance against quota will always differ from the view of the Saudis themselves to the extent that any deliveries are made into such storage facilities.

### *Atlantic Basin Inventories*

Crude stocks in the **United States** tracked sideways yet again in September: according to weekly DOE data, stocks on September 26 were 281 million barrels, up 2 million barrels from the end of August. Although stocks are still low, they have hovered around this level for most of the summer. Comparing end-third-quarter levels with end-first-quarter shows a reduction of some 2 million barrels, whereas the average reduction over that period for the previous five years was 27 million barrels. For the first time since June 2002, when the rapid decline in crude stocks started, national crude stocks at the end of September show an increase on the year-earlier figures; however, since September 2002 was extremely low, this provides little grounds for comfort. In days cover terms, the end-August position posted another record low for the time of year, the tenth month in succession to do so. With reduced runs in October due to seasonal maintenance, however, the days cover figure for the end of September may show a rise of around one day, although it will still show a deficit on last year. Crude imports in September averaged over 10 million b/d, for the third month in succession, but fell to 9.5 million b/d for the week ending September 26. A fall in imports might only have been expected as refinery runs were also falling with the onset of maintenance. However, the fall in arrivals was greater than the fall in runs, partly due to the continuing backwardation in the market (prompt prices above forward prices) that discourages stock building. Mid West (PADD2) stocks, crucial as being the region where WTI is priced, rose 6 million barrels during September.

The recent pattern of relationships between the various regional price markers causes concern. The current narrow WTI-Brent spread undermines the economics for the United States of importing Brent-related crudes, whilst the wide-open arbitrage to the East is resulting in the movement of large volumes of West African and other Brent-related crudes to the East. Since trade to the East tends to close up to a month earlier than trade to the West, such volumes will not be available to the United States, when maintenance activities draw to a close in November, being already committed elsewhere.

End-September product stocks show rises on the end-August position for both gasoline (up 7 million barrels) and distillate (up 5 million barrels); however, there is no scope for complacency here. Gasoline stocks are still lower than for the previous five years and are at a record low in days cover terms. Whilst total distillate stocks are in the middle of the historic range, and higher than the past three years, this masks the fact that heating oil stocks are very low, whilst high levels of road diesel that pull up the total figure.

In **Europe** the picture is still mixed. Mogas stocks are low, although the days cover figure is high due to the ongoing demand decline, which may limit the availability of European trade into the United States. Gas oil stocks are around the middle of the historic range; however, since German consumers filled their tanks during the early summer raising tertiary stock levels, they are thus unlikely to present any major demand on primary stocks. A middle range position on primary stocks is thus in fact healthy, unless the weather turns very cold. Crude stocks are on the high side within the historic range.

In summary therefore, it is U.S. crude stocks that remain the main point of concern, although low distillate stocks could also soon become worrisome, depending on the balance between refinery output and the weather over the late autumn.

### *Prospects for the Global Balance*

Five factors will influence the development of the global balance over the winter, and into next year.

- **Demand growth**. Economic recovery is still finely balanced, and another increase in oil prices will not aid recovery, as the IEA was quick to comment in the wake of the OPEC announcement. Nevertheless, Global Insight's projection of global average GDP growth is still higher than a month ago, so for the time being, we see grounds for encouragement on the economic front.



Highly Confidential NS_057005777

DA07355

- **Iraqi production**. The levels of production and exports in September were substantially better than we had assumed a month ago, and SOMO is actively signing contracts with a wide range of buyers. Whilst the line to Ceyhan remains unusable, infrastructure will eventually present a ceiling to further increases. The capacity of Mina al Bakr is nominally 1.6 million barrels per day (b/d), but it has never been operated at that rate. Khor al Amaya has a capacity or around 0.4 million b/d. In the most advantageous circumstances, therefore, and with no other changes to the infrastructure, a ceiling to exports would be reached at around 2 million b/d, a level not likely to be reached before the second quarter of next year. For the winter quarters, therefore, production can continue to increase without hindrance, unless another major spurt occurs, which seems unlikely, given that even the Iraqi oil minister only expects 1.8 million b/d of exports by the end of March.
- **OPEC compliance**. OPEC compliance was good over the first three months of the June–October 25.4-million-b/d quota, although the lack of spare capacity outside Saudi Arabia and the ongoing problems in Venezuela and Nigeria substantially reduced the scope for cheating. It must be recalled, however, that compliance in 2002 and in the first five months of 2003 was poor. Although for part of this period the quota was effectively regarded as temporarily in abeyance to compensate for lost Venezuelan production, it still provides a recent track record of poor compliance, which is a habit that will have to be changed if OPEC wants to survive the potentially low prices that could arise next year. Moreover, the outstanding claims from several members for increases in their quotas and the 2.5 million b/d of capacity additions due on stream next year will exacerbate the task of agreeing reductions.
- **Non-OPEC support for OPEC**. OPEC ministers indicated that they would be looking for support from non-OPEC producers in maintaining prices next year. A number of non-OPEC countries were represented at the meeting as observers, but none indicated any willingness to provide support. Since the meeting, the Qatari minister has gone much further than did the communiqué in saying that OPEC would not be willing to cut below 24 million b/d without non-OPEC contributions. Although in 2002, several non-OPEC producers pledged support for OPEC, notably Russia, in reality and retrospect, the extent of any actual cuts to output was negligible, just as on previous occasions when support was promised. This time, President Putin said Russia *could* curb exports if prices fell to a level it considered unfair, but that Russia also had other concerns that limit its support for a strong oil price policy. Whatever OPEC's aspirations, and blandishments, and whatever the promises from non-OPEC producers, it seems unlikely that there will be anything other than nominal support. In the final analysis, OPEC has this fundamental problem: as much as it would like other producers to share the burden of supporting high prices, from which they gain, OPEC members as a group are more dependent on oil revenues for both government and foreign exchange earnings than virtually any non-OPEC producer. The latter can thus always hold back, knowing that OPEC will have to take action sooner or later, with or without support, because the loss of revenues will become insufferable for OPEC members before it does for others. Thus, whilst prices are declining, non-OPEC producers can maintain maximum output. If they did join in with OPEC, then undoubtedly price could be maintained higher, but only at the cost of loss of output, and no one wants to be the first to join OPEC, knowing that few producers are large enough individually to make any difference once price are sliding. One day perhaps some major producer(s) may consider making real cuts to output to be worthwhile in order to maximise revenue, but that day has not yet arrived.
- **Non-OPEC output growth**. As explained above, most of the growth in non-OPEC output over the winter quarters is due to come from the buildup of production from developments already in hand. Thus, it seems unlikely to become a major casualty of the over-optimism that has sometimes beset forecasts of non-OPEC production. Some disappointments are possible, but upside surprises should not be ruled out.



Highly Confidential NS_057005778
DA07356

## Crude Price Forecast

### *Base Case*

In the short term, prices are recovering from their fall in September. Recognition of the tight balance in the short term, with U.S. stocks still stuck around 280 million barrels, is expected to support WTI at close to $30/barrel in October. All the signs are for a weakening thereafter, however.

OECD commercial inventories at the end of the second quarter represented 53 days cover. Giving OPEC the benefit of the doubt, we have assumed that September and October production is unchanged from August, at around 25.5 million barrels per day (b/d) for the 10, and then drops in conformity with the new quota to 24.5 million b/d for November and December. Given the other elements of the balance, that would imply a rise in the days cover figure for the end of the third quarter to 54 days, and then a further rise at the end of the fourth quarter to 55 days. In reality, it is most unlikely that OPEC will be so disciplined, and the end-fourth-quarter figure is more likely to be close to 56 days. As the chart below shows, 56 days cover has never been associated with a Brent price above about $24/barrel, but is more commonly associated with a price closer to $20/barrel.

Viewing global stocks in isolation, therefore, points towards sharply falling price. Yet, ten days into the fourth quarter, with stocks already presumably at around 54 days, prices are rising, not falling. A number of factors account for this situation:

- Crude prices over-reacted to the fall in gasoline prices in September, and some of the recent rise is a correction of that over-reaction.
- OPEC's decision to announce a pre-emptive cut of 900,000 b/d is creating expectations of a tight market regardless of whatever the global stock numbers say.
- High volumes of movements to the East are expected to leave the United States short of imports in late October and November.
- U.S. crude stocks are still no higher than they have been all summer.

**Total OECD Days-Cover vs. Brent Price**
(Based on Jan95-Feb03 data)



Days cover (X scale) Brent price (Y scale, dollars per barrel)

- Market price developments usually tend to be driven more by immediate short-term factors than by forward fundamentals prospects.
- Most recently, renewed prospects of labour unrest in Nigeria and increased political tensions in the Middle East, following Israel's attack on a putative terrorist training camp in Syria.

Given these factors, we do not expect an imminent sharp collapse in prices, even despite the apparent rising global level of stocks.

Looking forward in the fourth quarter, however, the underlying fundamentals will eventually begin to exert downward pressure on prices as the situation eases, even with OPEC's cut. OPEC members themselves are very conscious of this. The fourth quarter and the first half of next year have been matters of concern to them for some while, and they are acutely aware of the rising global stock cover numbers. Looking at this situation, OPEC will undoubtedly see the need for further cuts, but the meeting on December 4 is too late to influence loading before January 1. Cuts for the first quarter, presumably effective January 1, therefore will need to be deep. If the other elements of the estimated balance prove even close to correct, then OPEC will need to contemplate cuts for the first two quarters that would take output for the 10 down from recent levels of around 25.5 million b/d to below 24 million b/d, the level below which they have said they will not go without non-OPEC support. If this support is slow to be forthcoming, then prices could be sliding all the time.



Highly Confidential NS_057005779
DA07357

We have maintained our working assumption of output from total OPEC of 24.7 million b/d in the first half of next year, which—with rising output from Iraq—implies production from the 10 of below 23 million b/d. On that basis, stocks are drawn (on an instantaneous supply basis) by only 0.9 million b/d in the first quarter and then build by around 1.5 million b/d in the second quarter, reaching 55 days at the end of the first quarter and 57 days at the end of the second quarter. If OPEC wants a larger draw in the first quarter and a smaller build in the second, then they have to cut it by even more.

Cutting total production for the 10 to these levels is going to be difficult. Given the aspirations of those countries such as Algeria and Nigeria, who are seeking increased quotas and are likely to produce close to capacity regardless of quotas, and factoring in possible reduced levels for the other members, Saudis could be left having to take the swing role and cut production back to 6 million b/d or lower. This is a level not seen for 13 years, since mid-1990, when output was increased to offset the loss of Iraqi and Kuwaiti output at the time of the invasion of Kuwait. This would be extremely difficult, and the economic and political ramifications of such a necessity are difficult to anticipate.

Facing this possibility, the Saudis will be putting immense effort into getting other members of OPEC to comply with quotas and into seeking support from non-OPEC producers. On the evidence of 2002, in order to arrest a price decline, it may be sufficient to secure promises of cuts from the likes of Russia, since Russian statistics are so opaque that it will not be evident till some time later that no real cut has been forthcoming. As prices fall towards the low 20s, other non-OPEC producers may be willing to contribute small cuts.

The OPEC basket tends to run at around 50 cents to $1 below Brent. The bottom of the OPEC band is therefore around $23/barrel for Brent and perhaps $24.50 for WTI. Given the global balance, as depicted above, it is difficult to see prices not testing the bottom of the $22–28/barrel range and indeed possibly falling below the range at times. In the base case, we have allowed the basket price to fall below the band for a while in the second quarter, but have modified the price profile slightly to indicate prices above the band for most of the year, assuming that OPEC will find the shock of prices below the band sufficiently painful to take the draconian measures needed.

**Short-Term Marker Crude Price Forecast**
(Dollars per barrel)

| | WTI | Brent |
|---|---|---|
| Sep | 28.25 | 27.08 |
| Oct | 30.00 | 28.75 |
| Nov | 29.00 | 27.75 |
| Dec | 27.25 | 26.00 |
| Jan | 26.00 | 24.50 |
| Feb | 24.75 | 23.00 |
| Mar | 23.00 | 21.00 |

### *Alternative Cases*

Although we have encapsulated in our base case those developments that we consider "most likely," based on the global supply/demand balance as currently foreseen, there are features in the market that could result in prices higher or lower than our base price scenario. Accordingly, we present two alternative cases, postulating different combinations of developments that could result in a higher or lower outcome, respectively.

***High-price scenario***: The high-price scenario could develop as a result of one or several of the key assumptions in the base case proving wrong, including:

- Disappointments in non-OPEC production.
- Renewed problems and sabotage in the south of Iraq, as well as the north, slowing the buildup of production.
- Continued turmoil and production interruptions in Venezuela and Nigeria.
- Stronger demand growth, possibly through more robust economic recovery, or a cold winter, or special factors such as high gas prices in the United States or continued nuclear problems in Japan.
- Greater OPEC discipline and greater willingness to make the deep cuts necessary, including those members with new capacity being prepared to defer startups.



Highly Confidential NS_057005780

DA07358

- Greater willingness on the part of non-OPEC producers to cut output or restrain increases and share in supporting price.

As we have emphasized several times over recent issues, timing is crucial. The global supply/demand balance assumes instantaneous supply, i.e., production in a quarter goes to meet demand in that quarter and any surplus/deficit is reflected into stocks at the end of that quarter. Real life is much more complicated because of journey times and cannot sensibly be modelled. If, despite the build up of global stocks, perceptions remain those of tightness because attention is focused on the one component in stocks that is proving slow to build, U.S. crude, then prices might remain high long enough for OPEC to take the necessary measures to bring supply and demand into better balance.

***Low-price scenario***: A low price scenario could result from:

- A rapid change in market perceptions, probably as a result of lower refinery runs in the United States, allowing crude stocks to build, and thereby allowing attention to move to the underlying buildup of global stocks.
- A change of heart on the part of the U.S. administration, permitting a release of stock from the SPR, or more likely a decision to halt the build temporarily.
- OPEC indiscipline and very public disagreements over quotas, and unwillingness to make cuts without non-OPEC support.
- Unwillingness on the part of non-OPEC to provide the support OPEC seeks.

**WTI Price Outlook Scenarios**
(quarterly, dollars per barrel)

| | Base | High | Low |
|---|---|---|---|
| **3q03** | **30.18** | **30.18** | **30.18** |
| **4q03** | **28.75** | **31.00** | **26.00** |
| **1q04** | **24.58** | **29.00** | **23.00** |
| **2q04** | **23.50** | **27.00** | **20.00** |
| **3q04** | **24.33** | **27.00** | **21.00** |
| **4q04** | **24.83** | **27.00** | **22.00** |

In this situation, prices could fall quite rapidly, even during the latter part of the fourth quarter, and could remain low through much of the first half of next year, possibly even through all next year if global economic recovery stalls, despite lower oil prices. OPEC members would find such a time very painful, but if they cannot gain the support of non-OPEC producers, their scope to change things will be very limited.

## U.S. Product Prices

### *Gasoline*

Provisional (weekly) data indicate that September gasoline demand is at 8.93 million barrels per day (b/d), virtually 250,000 b/d up on 2002, the second strongest year-on-year growth this year, after January's 280,000 b/d. With kerosene consumption very low, it seems that consumers made the most of the end of the holiday season by driving rather than flying.

With refinery runs and gasoline yields both achieving new record high levels for the month at 15.5 million b/d and 56.2%, respectively, ex-refinery production of gasoline achieved a new record high at 8.7 million b/d, a massive 0.4 million b/d above 2002's output. This left a deficit of only 0.2 million b/d to be covered by imports or stock changes, the smallest monthly deficit since November 2002. Imports were well above this figure, 0.8 million b/d per weekly data, so stocks showed a rise of some 7 million barrels, up to September 26, according to weekly data.

A rise in stocks in September is in line with the normal seasonal pattern, but the rise was still only just sufficient to keep the end-September position from falling below the bottom of the range of at least the previous eight years. In days cover terms, however, gasoline stocks continue to post record lows, with the end of August at 21.5 days, a full 2 days down on last year, which itself set a new record low.

This tight supply position meant that although prices initially fell away sharply from the very high levels of August, they soon stabilised, as concerns about the low stock position increased, and averaged 89.3 c/AG, over 10 c/AG off from August. However, it was still high relative to crude, at $9.26/barrel over WTI, compared with August's $10.33/bbl. Delays in arrivals of imports due to the passage



Highly Confidential NS_057005781
DA07359

of hurricane Isabel and a call from the mid continent for pipeline supplies helped to support prices. European prices, however, continued to fall, keeping open the arbitrage window and allowing the healthy flow of imports.

Quality considerations will play a part in the supply outlook. The move to winter grade gasoline will aid manufacture, as its less stringent vapour pressure specifications allow the use of more light ends and LPG in the blend, stretching supply. On the other hand, the banning of the use of MTBE in gasoline blending in New York and Connecticut from January 1 will work in the opposite direction. Replacing MTBE with more volatile ethanol will reduce the amount that can be added; some estimates suggest as much as a 7.5% reduction in net gasoline production. In addition, the extra sources of supply for ethanol are not yet established for these East Coast states, and the fact that neighbouring states have not introduced a ban gives little incentive to foreign suppliers to meet the new specifications. Already, before it has been introduced, the ban is having an impact on supply: some refiners are already reducing output of MTBE and the tightened supply has been supporting higher prices for high octane grades in both New York Harbour and at the Gulf Coast.

Looking forward, stocks are still extremely low, given the strength of demand. At this time of year, refiners traditionally begin to move from gasoline maximisation to distillate maximisation, and although total distillate stocks are in a much healthier state, heating oil stocks are rather low. Refiners will thus seek as far as possible to slant yields in the direction of both gasoline and distillate, at the expense of other grades. Kerosene demand has weakened again, so kerosene yields can be sacrificed; however, resid yields are already low and probably offer little scope for further reductions.

The main hopes for rebuilding stocks of both gasoline and distillate are thus a light autumn maintenance season and high imports. Reports have suggested that refiners do indeed plan a light maintenance season this year, but such reports are not always very reliable. Imports may also be limited. Gasoline exports from Europe will reportedly be limited during October due to low stocks, even though the arbitrage window is open and Russian gas oil exports in August were lower than expected, although a full programme was expected for September. Such reports can prove wide of the mark and if the economics support movements, then European refiners will seek ways to move product trans-Atlantic. Provided that autumn maintenance schedules are light, as expected, and thus runs can be kept high, and that both distillate and gasoline imports can be maintained at moderately high levels, then our projections of the U.S. balance indicate it should still be possible both to rebuild gasoline stocks and achieve a satisfactory build in distillate stocks before peak winter demand arrives. Our forecast continues to be built on this assumption; nevertheless, we project gasoline prices to continue near the top end of the historic range relative to crude through the end of the year, with spreads falling from around $5.50/barrel in October towards $3/barrel in December. We will continue to watch the components of the balance carefully, since there is clearly an upside sensitivity to gasoline prices if imports, refinery runs, or gasoline yields fall short of expectations.

### *Distillate*

For the third month running, distillate consumption showed a small year-on-year decline, with demand at 3.68 million barrels per day (b/d), compared with last year's 3.73 million b/d. Refinery yields were relatively high for the time of year, however, and combined with high refinery throughput, this meant total production was also high. In addition, imports were at a record level for the month, approaching 400,000 b/d, so total distillate stocks rose by some 5 million barrels, to 131 million barrels, above last year's level and in the middle of the five-year range. Total stocks, however, mask the difference between the low- (road diesel) and high-sulphur (heating oil) grades. Although road diesel stocks are at a record high level, heating oil stocks at the end of September were 11 million barrels below year-earlier levels and are close to the bottom of the five-year range.

We anticipate that refiners will seek to maximise distillate yields in the next few months, whilst also keeping gasoline yields high. The continuing weak position of jet kerosene makes this easier, and jet yields have recently been at record low levels. Imports will still need to be kept high to build stocks to acceptable levels, and for the higher sulphur heating oil grade, Russian supplies are critical. Russian exports have not risen as much this year as expected, and



Highly Confidential NS_057005782

DA07360

August exports were sharply down on last year. However, August 2002 was exceptionally high, so it is difficult to draw conclusions from that month. Certainly fuel oil exports have been reduced in favour of crude due to better returns on exporting crude, but it had not been evident that gas oil was being reduced in the same way. September's figures may provide a clue. Certainly reports have suggested that although a full programme of exports was expected for September, Russian material has still been in tight supply in Europe.

European imports of gas oil tend to rise seasonally in the winter, so U.S. demand could be in competition with Europe for Russian availabilities. Firm freight rates mean that netbacks are likely to be better in Europe, so the lion's share will still end up in Europe, but at the margin, competition could support prices.

U.S. distillate prices have been in fairly steep contango (forward prices above prompt), which makes it economical to build stocks and attracts imports; however, recently, the contango has become less steep. There are fears of a repeat of the winter of 1999/2000, when prices moved into backwardation, deterring imports and stocking, and a cold snap in the New Year drove prices very high. Even without a repetition of that scenario, prices are still liable to spikes in the event of a bout of very cold weather or (possibly associated with a weather change) sharply rising natural gas prices.

### *Residual Fuel*

After rising in July and August, resid consumption slumped again in September, virtually setting a new low for the month. Consumption thus continues its erratic path, but still remains 14% above last year at the end of September. Refinery production settled at a low level over the third quarter, with yields only just over 4%, and imports fluctuated. Absolute stocks thus remain low, but in days cover terms show extreme variability, as demand fluctuates erratically.

Mild autumn weather has kept demand muted and prices relative to crude showed little movement in September, compared with August—only the 0.3% grade showed any strength. There were abundant supplies of higher sulphur grades due to a coker closure and reduced Mexican demand. Natural gas prices are looking relatively firm, but so far, utility use of fuel oil appears limited.

Prices through the winter are projected to be weaker than last year, as 2002 was exceptionally influenced by the combination of increased demand, as high gas prices resulted in substitution to fuel oil and reduced supply due to the loss of heavy crudes from Venezuela.

Developments on the crude supply front will have an impact on relative price among the various fuel oil grades. If producers of light low sulphur crudes, notably Nigeria and Algeria, continue to raise output, regardless of quotas, then much of that extra crude may find its way to the United States, as both grades have high gasoline and middle distillate yields. Both, however, also produce low sulphur fuel oil, albeit in limited quantities, so could increase the supply of 0.3% material. On the other hand, if OPEC implements further cuts to output, and in particular, if Saudi Arabia is forced to make large cuts, then it may choose to let the cuts fall disproportionately in the heavier, lower netback grades. This could hit the supply both of feedstock to Gulf Coast cokers and of HSFO.

At this stage, because of all the uncertainty over possible manoeuvrings within OPEC, we have not sought to reflect the potential impact of such developments into fuel oil prices.

## European product prices

### *Gasoline*

European mogas prices relative to crude fell sharply in September and premium unleaded averaged $80/tonne over Brent, compared with $99/tonne in August. Monthly averages hide the real story, however. Prices peaked in mid-August at $124/tonne over crude, but then fell back to just over $100/tonne, maintaining that level through the early part of September before falling sharply to as low as $61/tonne in late September before staging a small recovery back to just over $70/tonne in early October.

Developments in the United States were the primary drivers of this roller coaster progress. The sell off on NYMEX that occurred from early September took a while to influence European prices, but then resulted in the sharp fall. As prices stabilised in New York Harbour, they continued to



Highly Confidential NS_057005783

DA07361

fall in Europe, opening the arbitrage window. Stocks in Europe were already tight, but the open arb resulted in more cargoes fixed for the United States, which in turn, resulted in growing awareness of local tightness putting a floor under the fall and ultimately causing some recovery.

European stocks at the end of August were not as low as had been expected, at least according to provisional figures. July mogas production in Europe was sharply up, as crude input to refineries exceeded the level of the past two years, albeit yields were still relatively modest, as refiners continued to maximise gas oil make.

A major issue for European exports to the United States over the late autumn will be European perceptions of local stock levels. Due to the continuing decline of mogas consumption in Europe, in favour of the growing preference for diesel, stocks in days cover terms are really quite healthy, certainly well within the range of historic levels, and indeed towards the top of historic levels at the end of July. In absolute terms, however, stocks remain close to the bottom of the historic range. Given that mogas yields remain quite modest—July was over 1 percentage point below previous highs for the month—it should be possible to continue to export to the United States whilst not allowing local stocks to fall unacceptably low by increasing yields, especially as gasoline consumption in Europe declines seasonally in the winter, even more than in the United States.

In early October, mogas versus crude is down close to $60/tonne. However, with prompt tightness, we expect a recovery from this level and anticipate that the call from the United States should be sufficient to ensure that European prices relative to crude remain high, albeit after the sharp fall of September, not quite as high as we had projected last month, but still mostly above previous years' levels.

### *Naphtha*

Naphtha prices relative to crude rose again in September, despite the sharp fall in mogas. Relative to Brent, naphtha stood at $47/tonne, near the top of the historic range for the time of year, but due to the still high prices for mogas, in the middle of the mogas/naphtha ratio range, at 1.16, down from 1.23 in August.

The problems with naphtha supply in Japan that supported prices during August continued to provide support into the earlier part of September. However, the differential between Japan and the Med fell through the month, averaging only $19/tonne in September, compared with $28/tonne in August, and the NWE premium over the Med fell from over $14/tonne in July and August to $3/tonne in September, indicating increased pressure on Med supplies. Japanese naphtha consumption is highly seasonal and normally falls away sharply in September and October from a peak in August, so this weakness might well have been expected anyway, even regardless of supply difficulties.

LPG prices resumed their normal seasonal upward path in September, after butane unusually fell back in August. Despite naphtha's strong showing, butane is again above naphtha, suggesting petrochemical consumers will now be preferring naphtha. Nevertheless, European naphtha demand has lost some of the strength it was showing late last year and earlier this year.

Against this background of falling mogas price, weakening local demand, and a weakening call from Japan, a price fall rather than rise might be expected. It is not entirely clear what lay behind the rise. However, it may be support from the United States where reformer grade naphtha has been very tight and prices have been firm, and where gas prices are not low enough to ensure that gas has recovered the entire market share it lost to oil when gas prices were so high. It is probable that some U.S. petrochemical users are still choosing naphtha in preference to gas.

Assuming that it is indeed the U.S. market that is primarily supporting naphtha prices, the ongoing tightness in the U.S. gasoline position means that European naphtha prices are likely to remain near the top of the normal range. Extra demand next year, if economic recovery proceeds as currently projected, will increase demand for petrochemical use, but substantial additional NGL production from OPEC countries will help to meet this added demand and prevent naphtha prices from escalating.

### *Jet Kerosene and Gas Oil*

European middle distillate prices relative to crude rose ever so slightly in September from August, but kerosene and gas oil prices still remain in the middle of their respective his-



Highly Confidential NS_057005784
DA07362

toric ranges and are moving fairly much as forecast for some months.

Kerosene supplies from the Middle East have been lower recently, as normal seasonal refinery maintenance in Japan and South Korea has drawn kerosene supplies East and thus supported Middle East prices and closed the arbitrage window to Europe. In some years, demand from Sweden for kerosene for diesel blending can become a significant feature in autumn/early winter pricing, but import statistics indicate that this phenomenon does not occur every year, and that there is no readily apparent pattern.

Underlying total European kerosene demand, however, is continuing to recover, unlike in the United States, where September demand recorded a new low for recent years. After falling year on year for 12 months after September 11, 2001, European kerosene demand has registered year-on-year rises every month since October 2002. Refiners have not yet fully adjusted their output to this situation, however, and kerosene output remains low both in absolute and yield terms, as gas oil output has been maximised. Clearly there would be scope to re-adjust yields in favour of jet at the expense of gas oil and diesel, but with the current tight gas oil outlook, refiners may wait a while longer before taking such action.

Russian supplies are rather uncertain as mentioned above in the U.S. section, and were reported as being tight in September. However, there are also reports of traders moving Russian material from the Baltic to South America and Africa. Moreover, although prices have risen a little in the first week of October, they are still not conveying a message of tightness. Rotterdam area stocks have not been as depleted for the time of year as would normally be expected, as Rhine water levels remain low, which would have contributed to price stability in the Rotterdam area. German consumers are believed to have built stocks earlier in the year, however, and are not expected to impose extra demands on Rotterdam area stocks when water levels rise in the Rhine.

Against this background, we have maintained our forecast for jet and gas oil essentially unchanged in Europe. An upside sensitivity, however, remains, should Russian supplies fall away or U.S. refinery runs be lower than we have assumed. In either of those eventualities, competition between the United States and Europe for available Atlantic Basin gas oil supplies will probably drive European prices higher. As refinery runs levels are rising in the East, however, and whilst there remains excess middle distillate production capacity in the East, extra supplies could always be obtained from there. The critical issue would be the speed of development of extra demand and higher prices.

### *Fuel Oil*

Price of both grades of fuel oil fell during September, as crude fell; however, LSFO fell more sharply than HSFO. Relative to crude, LSFO's discount rose whilst HSFO's contracted, but both grades are still broadly in line with the historic range.

The relative weakness of LSFO was a result of weak demand from Mediterranean utilities, and adequate supply from Med refineries, with no need to pull in imports from NWE. In addition, mild weather on the U.S. East Coast has kept fuel oil prices there soft, and the arb on that route is mostly closed. HSFO was slightly stronger in the Med than in NWE, as the arbitrage window to the East was open for part of the month, albeit intermittently. Chinese demand, the main driver of imports from the Med, however, remains weak, and the failure of the government to raise internal prices as expected in September suggests that demand may remain weak for a while longer. Stocks in Singapore are currently high, but should Chinese demand re-emerge suddenly, there are concerns that prices might spike if the arb from Europe remains mostly closed. Such a spike would potentially open the arb and impact on Med prices, depending on the regional supply position at the time.

With reduced local European demand for HSFO since the change of specifications on January 1, HSFO prices are all the more open to the effect of fluctuations in supply, primarily in terms of Russian exports, and export demand, primarily the opportunity to export to China. Currently, reduced Russian exports and Chinese imports are keeping HSFO in an approximate balance, whilst problems with achieving Iraqi crude exports into the Mediterranean are expected to prevent undue over-supply of HSFO building up in that area. The reduced scope for disposal of HSFO within Europe is expected to become a key influence into



Highly Confidential NS_057005785
DA07363

the winter, resulting in a wider sulphur premium whilst LSFO supplies should increase and the discount to crude widen slightly over coming months with the full return of North Sea crudes after summer maintenance.

Generally speaking, both grades of fuel oil are expected broadly to track crude downwards into next summer, at which point LSFO is expected to be stronger with a call from the United States for imports.

Major uncertainties continue to surround the outlook for fuel oil, which make the forecast even more than usually tentative:

- With the reported change in Russian export priorities, what will the future pattern of fuel oil exports be?
- What will Chinese import demand be, and how much can be supplied from within the Far East?
- What will happen between natural gas demand and fuel oil demand in the United States? To what extent is it feasible for fuel oil to be substituted for gas if fuel oil prices fall as expected in line with crude, or will environmental regulations so limit increased fuel oil use that little change will be seen?
- If OPEC reduces output, what will be the incidence of the cut as between producers of light sweets and heavier sours?
- What has been/will be the impact of the change in specifications on January 1, 2003? Special factors this year have so complicated the picture that it has been impossible to separate this factor out.



Highly Confidential NS_057005786
DA07364

**Global Market Balance**

| | 2002:3 | 2002:4 | 2003:1 | 2003:2 | 2003:3 | 2003:4 | 2004:1 | 2004:2 | 2004:3 | 2004:4 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Global Demand** | **76.93** | **79.49** | **79.30** | **76.28** | **77.85** | **80.12** | **79.81** | **77.32** | **78.94** | **81.64** | **77.26** | **78.39** | **79.43** |
| OECD | 47.55 | 48.95 | 49.36 | 47.06 | 47.84 | 49.24 | 49.31 | 47.26 | 48.29 | 49.87 | 47.73 | 48.38 | 48.68 |
| Non-OECD | 29.38 | 30.54 | 29.94 | 29.21 | 30.01 | 30.88 | 30.50 | 30.06 | 30.65 | 31.78 | 29.53 | 30.01 | 30.75 |
| **Global Supply** | **76.65** | **78.02** | **78.80** | **77.96** | **79.64** | **80.61** | **78.90** | **78.78** | **79.62** | **81.02** | **76.61** | **79.25** | **79.58** |
| Non-OPEC | 47.66 | 48.51 | 48.70 | 48.12 | 49.33 | 50.13 | 50.20 | 50.08 | 50.38 | 51.27 | 47.99 | 49.07 | 50.48 |
| OPEC Crude | 25.42 | 26.04 | 26.84 | 26.18 | 26.53 | 26.53 | 24.70 | 24.70 | 25.20 | 25.50 | 25.15 | 26.52 | 25.03 |
| OPEC NGLs + Non-Conv. | 3.56 | 3.47 | 3.26 | 3.65 | 3.78 | 3.94 | 4.01 | 4.00 | 4.04 | 4.26 | 3.47 | 3.66 | 4.07 |
| OPEC | 28.98 | 29.51 | 30.10 | 29.84 | 30.31 | 30.47 | 28.71 | 28.70 | 29.24 | 29.76 | 28.62 | 30.18 | 29.10 |
| **Global Balance** | **-0.28** | **-1.48** | **-0.51** | **1.68** | **1.79** | **0.48** | **-0.90** | **1.46** | **0.67** | **-0.62** | **-0.65** | **0.86** | **0.15** |
| **Call on OPEC*** | **29.26** | **30.98** | **30.61** | **28.16** | **28.52** | **29.99** | **29.61** | **27.23** | **28.56** | **30.37** | **29.27** | **29.32** | **28.94** |
| **OECD Stocks** | **2.57** | **2.47** | **2.41** | **2.52** | **2.67** | **2.70** | **2.61** | **2.73** | **2.78** | **2.71** | **2.47** | **2.70** | **2.71** |
| **OECD Forward Cover** | **52.4** | **50.0** | **51.2** | **52.7** | **54.2** | **54.8** | **55.2** | **56.6** | **55.8** | **54.3** | **53.5** | **53.2** | **55.5** |

***Oil necessary to balance market**
**Note: Units are million barrels per day except for stocks, which are billion barrels, and forward cover, which is measured in days.**



Highly Confidential NS_057005787
**DA07365**

## World Oil Demand

(Million barrels per day)

| | 2002:3 | 2002:4 | 2003:1 | 2003:2 | 2003:3 | 2003:4 | 2004:1 | 2004:2 | 2004:3 | 2004:4 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **North America*** | **24.34** | **24.35** | **24.56** | **24.09** | **24.61** | **24.65** | **24.81** | **24.44** | **25.01** | **25.13** | **24.17** | **24.48** | **24.84** |
| Canada | 2.13 | 2.16 | 2.17 | 2.11 | 2.15 | 2.17 | 2.12 | 2.10 | 2.16 | 2.18 | 2.10 | 2.15 | 2.14 |
| Mexico | 1.97 | 1.98 | 2.02 | 2.07 | 2.05 | 2.04 | 2.02 | 2.05 | 2.06 | 2.08 | 1.98 | 2.05 | 2.05 |
| United States | 19.92 | 19.87 | 20.01 | 19.60 | 20.09 | 20.09 | 20.30 | 19.97 | 20.45 | 20.52 | 19.76 | 19.95 | 20.31 |
| **Western Europe** | **14.43** | **14.60** | **14.52** | **14.20** | **14.40** | **14.68** | **14.56** | **14.26** | **14.47** | **14.85** | **14.37** | **14.45** | **14.54** |
| France | 1.99 | 1.99 | 2.11 | 1.96 | 2.01 | 2.00 | 2.09 | 1.98 | 2.01 | 2.02 | 1.98 | 2.02 | 2.02 |
| Germany | 2.88 | 2.72 | 2.52 | 2.72 | 2.77 | 2.74 | 2.66 | 2.64 | 2.76 | 2.77 | 2.72 | 2.69 | 2.71 |
| Italy | 1.83 | 1.84 | 1.86 | 1.80 | 1.81 | 1.85 | 1.82 | 1.78 | 1.76 | 1.84 | 1.85 | 1.83 | 1.80 |
| Turkey | 1.49 | 1.52 | 1.55 | 1.52 | 1.50 | 1.54 | 1.56 | 1.54 | 1.51 | 1.55 | 1.51 | 1.53 | 1.54 |
| United Kingdom | 1.69 | 1.72 | 1.71 | 1.67 | 1.69 | 1.71 | 1.72 | 1.73 | 1.72 | 1.74 | 1.70 | 1.70 | 1.73 |
| Other W. Europe | 4.56 | 4.81 | 4.75 | 4.53 | 4.62 | 4.85 | 4.72 | 4.60 | 4.71 | 4.94 | 4.62 | 4.69 | 4.74 |
| **Asia/Pacific** | **20.58** | **22.33** | **22.51** | **20.91** | **21.22** | **22.51** | **22.42** | **21.11** | **21.50** | **23.00** | **21.12** | **21.78** | **22.01** |
| China | 4.94 | 5.20 | 5.21 | 5.20 | 5.42 | 5.33 | 5.33 | 5.39 | 5.55 | 5.65 | 4.95 | 5.29 | 5.48 |
| Japan | 5.03 | 5.87 | 6.19 | 5.00 | 5.02 | 5.71 | 5.83 | 4.72 | 4.91 | 5.64 | 5.30 | 5.48 | 5.27 |
| South Korea | 2.01 | 2.37 | 2.41 | 2.03 | 2.02 | 2.39 | 2.36 | 2.05 | 2.07 | 2.38 | 2.18 | 2.21 | 2.22 |
| Australia/NZ | 1.00 | 1.02 | 1.00 | 1.02 | 1.00 | 1.03 | 1.04 | 1.05 | 1.03 | 1.06 | 1.01 | 1.01 | 1.04 |
| Other A/P | 7.61 | 7.87 | 7.69 | 7.67 | 7.75 | 8.06 | 7.86 | 7.90 | 7.95 | 8.28 | 7.68 | 7.79 | 7.99 |
| **Africa** | **2.51** | **2.60** | **2.63** | **2.63** | **2.55** | **2.64** | **2.68** | **2.68** | **2.59** | **2.69** | **2.57** | **2.61** | **2.66** |
| Egypt | 0.54 | 0.57 | 0.58 | 0.58 | 0.56 | 0.59 | 0.59 | 0.60 | 0.57 | 0.60 | 0.56 | 0.58 | 0.59 |
| South Africa | 0.46 | 0.45 | 0.45 | 0.45 | 0.47 | 0.46 | 0.46 | 0.46 | 0.48 | 0.47 | 0.44 | 0.46 | 0.47 |
| Other Africa | 1.51 | 1.59 | 1.61 | 1.60 | 1.52 | 1.60 | 1.63 | 1.62 | 1.54 | 1.62 | 1.57 | 1.58 | 1.60 |
| **Middle East** | **5.13** | **5.13** | **5.13** | **4.92** | **5.08** | **5.12** | **5.19** | **5.15** | **5.26** | **5.30** | **5.05** | **5.06** | **5.23** |
| Iran | 1.42 | 1.42 | 1.41 | 1.39 | 1.44 | 1.43 | 1.43 | 1.41 | 1.46 | 1.44 | 1.40 | 1.42 | 1.43 |
| Israel | 0.28 | 0.27 | 0.28 | 0.27 | 0.28 | 0.27 | 0.28 | 0.27 | 0.28 | 0.28 | 0.27 | 0.27 | 0.28 |
| Saudi Arabia | 1.48 | 1.49 | 1.49 | 1.48 | 1.52 | 1.53 | 1.54 | 1.50 | 1.55 | 1.56 | 1.46 | 1.51 | 1.54 |
| Other Middle East | 1.95 | 1.96 | 1.95 | 1.78 | 1.83 | 1.88 | 1.94 | 1.97 | 1.97 | 2.02 | 1.93 | 1.86 | 1.98 |
| **Latin America** | **4.86** | **4.72** | **4.46** | **4.63** | **4.77** | **4.68** | **4.50** | **4.69** | **4.83** | **4.75** | **4.77** | **4.64** | **4.69** |
| Argentina | 0.41 | 0.40 | 0.41 | 0.43 | 0.41 | 0.41 | 0.42 | 0.44 | 0.42 | 0.42 | 0.41 | 0.41 | 0.42 |
| Brazil | 2.22 | 2.19 | 2.00 | 2.06 | 2.15 | 2.14 | 2.01 | 2.08 | 2.18 | 2.16 | 2.18 | 2.09 | 2.11 |
| Venezuela | 0.53 | 0.43 | 0.41 | 0.45 | 0.50 | 0.42 | 0.42 | 0.46 | 0.50 | 0.42 | 0.50 | 0.45 | 0.45 |
| Other L. America | 1.69 | 1.70 | 1.64 | 1.69 | 1.71 | 1.72 | 1.66 | 1.72 | 1.74 | 1.75 | 1.68 | 1.69 | 1.72 |
| **Eastern Europe** | **1.44** | **1.51** | **1.50** | **1.49** | **1.50** | **1.56** | **1.54** | **1.52** | **1.53** | **1.61** | **1.45** | **1.51** | **1.55** |
| Czech Republic | 0.19 | 0.18 | 0.17 | 0.19 | 0.19 | 0.19 | 0.17 | 0.19 | 0.20 | 0.20 | 0.17 | 0.18 | 0.19 |
| Hungary | 0.14 | 0.15 | 0.13 | 0.13 | 0.15 | 0.16 | 0.13 | 0.13 | 0.15 | 0.16 | 0.14 | 0.14 | 0.14 |
| Poland | 0.41 | 0.41 | 0.38 | 0.41 | 0.44 | 0.45 | 0.41 | 0.42 | 0.45 | 0.46 | 0.38 | 0.42 | 0.43 |
| Other E. Europe | 0.70 | 0.76 | 0.82 | 0.76 | 0.71 | 0.77 | 0.84 | 0.78 | 0.73 | 0.79 | 0.75 | 0.77 | 0.78 |
| **Former Soviet Union** | **3.65** | **4.26** | **4.00** | **3.41** | **3.73** | **4.28** | **4.11** | **3.47** | **3.74** | **4.31** | **3.76** | **3.85** | **3.91** |
| **World Consumption** | **76.93** | **79.49** | **79.30** | **76.28** | **77.85** | **80.12** | **79.81** | **77.32** | **78.94** | **81.64** | **77.26** | **78.39** | **79.43** |

***North America includes U.S. territories.**



Highly Confidential NS_057005788

DA07366

## World Oil Supply
**(Million barrels per day)**

| | 2002:3 | 2002:4 | 2003:1 | 2003:2 | 2003:3 | 2003:4 | 2004:1 | 2004:2 | 2004:3 | 2004:4 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPEC*** | | | | | | | | | | | | | |
| Algeria | 0.89 | 0.94 | 1.04 | 1.11 | | | | | | | | | |
| Indonesia | 1.10 | 1.10 | 1.04 | 1.01 | | | | | | | | | |
| Iran | 3.54 | 3.66 | 3.80 | 3.71 | | | | | | | | | |
| Kuwait | 1.89 | 1.89 | 2.06 | 2.21 | | | | | | | | | |
| Libya | 1.34 | 1.34 | 1.39 | 1.43 | | | | | | | | | |
| Nigeria | 1.99 | 2.01 | 2.13 | 2.03 | | | | | | | | | |
| Qatar | 0.65 | 0.71 | 0.74 | 0.74 | | | | | | | | | |
| Saudi Arabia | 7.75 | 8.00 | 8.91 | 9.07 | | | | | | | | | |
| UAE | 1.99 | 2.00 | 2.29 | 2.32 | | | | | | | | | |
| Venezuela | 2.53 | 2.00 | 1.30 | 2.26 | | | | | | | | | |
| OPEC-10 Crude | 23.67 | 23.66 | 24.71 | 25.89 | 25.46 | 24.83 | 22.70 | 22.40 | 22.60 | 22.60 | 23.14 | 25.22 | 22.58 |
| Iraq | 1.75 | 2.38 | 2.14 | 0.29 | 1.07 | 1.70 | 2.00 | 2.30 | 2.60 | 2.90 | 2.01 | 1.30 | 2.45 |
| OPEC Crude | 25.42 | 26.04 | 26.84 | 26.18 | 26.53 | 26.53 | 24.70 | 24.70 | 25.20 | 25.50 | 25.15 | 26.52 | 25.03 |
| OPEC NGLs | 3.01 | 3.01 | 3.03 | 3.08 | 3.18 | 3.33 | 3.40 | 3.39 | 3.42 | 3.46 | 2.99 | 3.16 | 3.42 |
| OPEC Non-Conv. | 0.55 | 0.46 | 0.22 | 0.57 | 0.60 | 0.61 | 0.61 | 0.61 | 0.62 | 0.80 | 0.48 | 0.50 | 0.66 |
| **OPEC Total** | **28.98** | **29.51** | **30.10** | **29.84** | **30.31** | **30.47** | **28.71** | **28.70** | **29.24** | **29.76** | **28.62** | **30.18** | **29.10** |
| **Non-OPEC**** | | | | | | | | | | | | | |
| Argentina | 0.80 | 0.79 | 0.78 | 0.79 | 0.79 | 0.79 | 0.78 | 0.78 | 0.77 | 0.77 | 0.80 | 0.79 | 0.77 |
| Brazil | 1.75 | 1.67 | 1.75 | 1.72 | 1.76 | 1.80 | 1.80 | 1.78 | 1.92 | 2.21 | 1.72 | 1.76 | 1.93 |
| Canada | 2.86 | 3.00 | 2.94 | 3.00 | 3.14 | 3.21 | 3.19 | 3.09 | 3.16 | 3.22 | 2.88 | 3.07 | 3.16 |
| China | 3.44 | 3.40 | 3.41 | 3.44 | 3.41 | 3.40 | 3.43 | 3.43 | 3.42 | 3.43 | 3.39 | 3.42 | 3.42 |
| India | 0.76 | 0.76 | 0.76 | 0.73 | 0.76 | 0.76 | 0.76 | 0.75 | 0.74 | 0.74 | 0.75 | 0.75 | 0.75 |
| Kazakhstan | 0.95 | 1.01 | 1.01 | 1.02 | 1.06 | 1.14 | 1.15 | 1.17 | 1.18 | 1.19 | 0.94 | 1.06 | 1.17 |
| Malaysia | 0.76 | 0.76 | 0.77 | 0.78 | 0.78 | 0.82 | 0.82 | 0.81 | 0.80 | 0.79 | 0.76 | 0.79 | 0.81 |
| Mexico | 3.58 | 3.60 | 3.74 | 3.74 | 3.79 | 3.80 | 3.78 | 3.75 | 3.70 | 3.67 | 3.58 | 3.77 | 3.72 |
| Norway | 3.21 | 3.39 | 3.38 | 3.13 | 3.22 | 3.35 | 3.36 | 3.30 | 3.28 | 3.38 | 3.33 | 3.27 | 3.33 |
| Russia | 7.80 | 7.99 | 8.10 | 8.34 | 8.60 | 8.62 | 8.68 | 8.81 | 9.00 | 9.15 | 7.66 | 8.42 | 8.91 |
| United Kingdom | 2.24 | 2.61 | 2.52 | 2.23 | 2.50 | 2.52 | 2.45 | 2.33 | 2.31 | 2.35 | 2.51 | 2.44 | 2.36 |
| United States | 8.01 | 8.05 | 8.07 | 7.82 | 8.01 | 8.18 | 8.14 | 8.21 | 8.14 | 8.17 | 8.11 | 8.02 | 8.17 |
| **Rest of World** | **10** | **9.71** | **9.64** | **9.59** | **9.74** | **9.91** | **10.00** | **10.06** | **10.17** | **10.35** | **9.79** | **8.87** | **7.91** |
| **Processing Gain** | **1.74** | **1.78** | **1.82** | **1.78** | **1.78** | **1.82** | **1.85** | **1.81** | **1.81** | **1.85** | **1.76** | **1.80** | **1.83** |
| **Non-OPEC** | **47.66** | **48.51** | **48.70** | **48.12** | **49.33** | **50.13** | **50.20** | **50.08** | **50.38** | **51.27** | **47.99** | **48.22** | **48.25** |
| **World Production** | **76.65** | **78.02** | **78.80** | **77.96** | **79.64** | **80.61** | **78.90** | **78.78** | **79.62** | **81.02** | **76.61** | **78.40** | **77.35** |

***OPEC supply by country is crude only.**
****Non-OPEC supply includes ngls and non-conventional oil.**



Highly Confidential NS_057005789
DA07367

## US Petroleum Activity

(Thousand barrels per day)

| | Jun-2003 | Jul-2003 | Aug-2003 | Sep-2003 | Sep-2002 | Diff Yr Ago |
|---|---|---|---|---|---|---|
| **U.S. Consumption** | | | | | | |
| Distillate | 3775 | 3678 | 3618 | 3679 | 3730 | -51 |
| Motor Gasoline | 9165 | 9209 | 9375 | 8929 | 8687 | 242 |
| Residual Fuel | 694 | 786 | 876 | 623 | 625 | -2 |
| **U.S. Product Imports** | | | | | | |
| Distillate | 337 | 291 | 306 | 364 | 196 | 168 |
| Motor Gasoline | 991 | 896 | 807 | 806 | 813 | -7 |
| RFG | 253 | 240 | 241 | 271 | 224 | 47 |
| Residual Fuel | 284 | 291 | 306 | 252 | 254 | -2 |
| **Crude Oil Input** | **15,618** | **15,498** | **15,588** | **15,501** | **14,861** | **640** |
| Pad I | 1,664 | 1,648 | 1,616 | 1,639 | 1,529 | 110 |
| Pad III | 7,321 | 7,312 | 7,442 | 7,421 | 7,002 | 419 |
| **Operable Capacity** | **16,757** | **16,757** | **16,757** | **16,757** | **16,764** | **-7** |
| Percent Utilization | 94.5 | 93.3 | 93.7 | 93.3 | 90.4 | 2.9 |
| **Production by Product** | | | | | | |
| Distillate | 3728 | 3673 | 3684 | 3691 | 3536 | 155 |
| Pad I | 489 | 483 | 430 | 460 | 409 | 51 |
| Pad III | 1628 | 1643 | 1717 | 1753 | 1595 | 158 |
| Motor Gasoline | 8694 | 8653 | 8763 | 8704 | 8320 | 384 |
| RFG | 2791 | 2755 | 2739 | 2723 | 2658 | 65 |
| Residual Fuel | 668 | 634 | 649 | 640 | 607 | 33 |
| Pad I | 138 | 127 | 138 | 120 | 112 | 8 |
| Pad III | 306 | 279 | 293 | 316 | 291 | 25 |
| **U.S. Product Inventories, Million Barrels** | | | | | | |
| Distillate | 111.8 | 118.0 | 126.0 | 131.3 | 126.9 | 4.4 |
| Pad I | 39.0 | 43.9 | 49.6 | 55.7 | 55.8 | -0.1 |
| Pad III | 27.3 | 30.2 | 30.5 | 31.3 | 27.1 | 4.2 |
| Days of Supply | 29.6 | 32.1 | 34.8 | 35.7 | 34.0 | 1.7 |
| Gasoline | 206.0 | 201.0 | 192.0 | 199.2 | 206.5 | -7.3 |
| RFG | 36.9 | 33.5 | 30.9 | 32.5 | 40.6 | -8.1 |
| Days of Supply | 22.5 | 21.8 | 20.5 | 22.3 | 23.8 | -1.5 |
| Residual Fuel | 35.6 | 32.0 | 32.0 | 33.3 | 33.0 | 0.3 |
| Pad I | 15.1 | 12.8 | 11.4 | 13.0 | 12.4 | 0.6 |
| Pad III | 13.6 | 13.7 | 11.9 | 13.3 | 13.3 | 0.0 |
| Days of Supply | 51.3 | 40.7 | 36.5 | 53.5 | 52.8 | 0.7 |

**Source: Weekly Petroleum Status Rpt, Petroleum Supply Monthly Early Release**



Highly Confidential

DA07368

NS_057005790

## Crude Oil Prices

| | Crude Oil Prices (US$/bbl | | | | | Crude Oil Prices (Euro/bbl) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dated Brent | WTI | Ref Acq Imported | Ref Acq Domestic | Ref Acq Composite | Dated Brent | WTI | Ref Acq Imported | Ref Acq Domestic | Ref Acq Composite |
| **2002** | | | | | | | | | | |
| Jan | 19.48 | 19.68 | 16.93 | 17.85 | 17.31 | 21.96 | 22.18 | 19.09 | 20.12 | 19.51 |
| Feb | 20.22 | 20.66 | 18.13 | 18.70 | 18.37 | 23.21 | 23.71 | 20.80 | 21.46 | 21.08 |
| Mar | 23.73 | 24.35 | 22.78 | 21.57 | 22.26 | 27.08 | 27.79 | 26.00 | 24.62 | 25.41 |
| Apr | 25.66 | 26.26 | 23.87 | 24.27 | 24.03 | 28.93 | 29.61 | 26.91 | 27.36 | 27.09 |
| May | 25.33 | 27.06 | 24.29 | 25.78 | 24.94 | 27.57 | 29.45 | 26.44 | 28.06 | 27.15 |
| Jun | 24.13 | 25.50 | 23.33 | 24.81 | 23.98 | 25.06 | 26.48 | 24.23 | 25.77 | 24.90 |
| Jul | 25.81 | 26.92 | 24.82 | 25.37 | 25.06 | 26.04 | 27.15 | 25.04 | 25.59 | 25.28 |
| Aug | 26.66 | 28.34 | 25.77 | 26.87 | 26.24 | 27.22 | 28.93 | 26.31 | 27.43 | 26.79 |
| Sep | 28.38 | 29.71 | 27.14 | 28.43 | 27.68 | 28.87 | 30.22 | 27.61 | 28.92 | 28.16 |
| Oct | 27.58 | 28.87 | 25.99 | 27.82 | 26.70 | 28.12 | 29.43 | 26.50 | 28.36 | 27.22 |
| Nov | 24.10 | 26.29 | 23.68 | 26.02 | 24.60 | 24.09 | 26.28 | 23.67 | 26.01 | 24.59 |
| Dec | 28.67 | 29.45 | 26.57 | 27.25 | 26.87 | 28.04 | 28.81 | 25.99 | 26.65 | 26.28 |
| **2003** | | | | | | | | | | |
| Jan | 31.32 | 32.99 | 30.32 | 30.47 | 30.38 | 29.42 | 30.99 | 28.48 | 28.62 | 28.54 |
| Feb | 32.67 | 35.75 | 32.42 | 33.98 | 33.08 | 30.23 | 33.08 | 30.00 | 31.44 | 30.61 |
| Mar | 30.54 | 33.43 | 29.31 | 32.68 | 30.68 | 28.37 | 31.06 | 27.23 | 30.36 | 28.50 |
| Apr | 24.85 | 28.26 | 24.52 | 28.54 | 26.03 | 22.90 | 26.05 | 22.60 | 26.30 | 23.99 |
| May | 25.72 | 28.14 | 25.15 | 26.75 | 25.74 | 22.21 | 24.30 | 21.72 | 23.10 | 22.23 |
| Jun | 27.51 | 30.66 | 27.22 | 29.07 | 27.92 | 23.62 | 26.32 | 23.37 | 24.95 | 23.97 |
| Jul | 28.35 | 30.70 | 27.92 | 29.60 | 28.55 | 24.88 | 26.95 | 24.51 | 25.98 | 25.06 |
| Aug | 29.79 | 31.59 | 28.78 | 30.17 | 29.47 | 26.74 | 28.36 | 25.83 | 27.08 | 26.45 |
| Sep | 27.08 | 28.25 | 26.32 | 26.78 | 26.53 | 24.80 | 25.88 | 24.11 | 24.53 | 24.30 |
| Oct | 28.75 | 30.00 | 27.95 | 28.44 | 28.17 | 26.26 | 27.40 | 25.52 | 25.97 | 25.73 |
| Nov | 27.75 | 29.00 | 26.97 | 27.49 | 27.21 | 25.11 | 26.25 | 24.41 | 24.88 | 24.62 |
| Dec | 26.00 | 27.25 | 25.25 | 25.83 | 25.51 | 23.32 | 24.44 | 22.64 | 23.17 | 22.88 |
| **2004** | | | | | | | | | | |
| Jan | 24.50 | 26.00 | 23.79 | 24.65 | 24.18 | 21.78 | 23.11 | 21.15 | 21.91 | 21.49 |
| Feb | 23.00 | 24.75 | 22.33 | 23.46 | 22.84 | 20.27 | 21.81 | 19.68 | 20.67 | 20.13 |
| Mar | 21.00 | 23.00 | 20.39 | 21.80 | 21.03 | 18.34 | 20.09 | 17.81 | 19.04 | 18.36 |
| Apr | 20.50 | 22.75 | 19.91 | 21.57 | 20.65 | 17.75 | 19.70 | 17.23 | 18.67 | 17.88 |
| May | 21.50 | 23.50 | 20.88 | 22.28 | 21.51 | 18.46 | 20.17 | 17.92 | 19.12 | 18.46 |
| Jun | 22.50 | 24.25 | 21.85 | 22.99 | 22.36 | 19.19 | 20.68 | 18.63 | 19.61 | 19.07 |
| Jul | 22.75 | 24.25 | 22.09 | 22.99 | 22.49 | 19.32 | 20.60 | 18.76 | 19.52 | 19.10 |
| Aug | 23.00 | 24.25 | 22.33 | 22.99 | 22.63 | 19.45 | 20.51 | 18.89 | 19.44 | 19.14 |
| Sep | 23.25 | 24.50 | 22.58 | 23.23 | 22.87 | 19.58 | 20.63 | 19.01 | 19.56 | 19.26 |
| Oct | 23.50 | 24.75 | 22.82 | 23.46 | 23.11 | 19.72 | 20.77 | 19.15 | 19.69 | 19.39 |
| Nov | 23.50 | 24.75 | 22.82 | 23.46 | 23.11 | 19.67 | 20.72 | 19.10 | 19.64 | 19.35 |
| Dec | 23.50 | 25.00 | 22.82 | 23.70 | 23.22 | 19.62 | 20.87 | 19.05 | 19.78 | 19.38 |
| **2005** | | | | | | | | | | |
| Jan | 23.40 | 24.92 | 22.72 | 23.62 | 23.12 | 19.48 | 20.75 | 18.92 | 19.67 | 19.25 |
| Feb | 23.32 | 24.83 | 22.64 | 23.54 | 23.05 | 19.38 | 20.64 | 18.82 | 19.57 | 19.16 |
| Mar | 23.24 | 24.75 | 22.57 | 23.46 | 22.97 | 19.29 | 20.54 | 18.73 | 19.47 | 19.06 |
| Apr | 23.16 | 24.67 | 22.49 | 23.38 | 22.89 | 19.19 | 20.44 | 18.63 | 19.37 | 18.97 |
| May | 23.08 | 24.58 | 22.41 | 23.31 | 22.82 | 19.09 | 20.33 | 18.54 | 19.28 | 18.87 |
| Jun | 23.01 | 24.50 | 22.34 | 23.23 | 22.74 | 19.01 | 20.25 | 18.46 | 19.19 | 18.79 |
| Jul | 23.08 | 24.58 | 22.41 | 23.31 | 22.82 | 19.06 | 20.30 | 18.51 | 19.25 | 18.84 |
| Aug | 23.16 | 24.67 | 22.49 | 23.38 | 22.89 | 19.09 | 20.34 | 18.54 | 19.28 | 18.87 |
| Sep | 23.24 | 24.75 | 22.57 | 23.46 | 22.97 | 19.14 | 20.38 | 18.58 | 19.32 | 18.91 |
| Oct | 23.32 | 24.83 | 22.64 | 23.54 | 23.05 | 19.20 | 20.45 | 18.64 | 19.38 | 18.98 |
| Nov | 23.40 | 24.92 | 22.72 | 23.62 | 23.12 | 19.26 | 20.52 | 18.71 | 19.45 | 19.04 |
| Dec | 23.48 | 25.00 | 22.79 | 23.70 | 23.20 | 19.33 | 20.59 | 18.77 | 19.51 | 19.10 |
| **2006** | | | | | | | | | | |
| Jan | 23.55 | 25.08 | 22.87 | 23.78 | 23.28 | 26.33 | 28.04 | 25.56 | 26.58 | 26.02 |
| Feb | 23.63 | 25.17 | 22.95 | 23.86 | 23.36 | 26.41 | 28.13 | 25.65 | 26.67 | 26.11 |
| Mar | 23.71 | 25.25 | 23.02 | 23.94 | 23.43 | 26.50 | 28.22 | 25.73 | 26.75 | 26.19 |
| Apr | 23.79 | 25.33 | 23.10 | 24.02 | 23.51 | 26.59 | 28.32 | 25.82 | 26.84 | 26.28 |
| May | 23.87 | 25.42 | 23.17 | 24.10 | 23.59 | 26.68 | 28.41 | 25.90 | 26.93 | 26.36 |
| Jun | 23.94 | 25.50 | 23.25 | 24.17 | 23.67 | 26.76 | 28.50 | 25.99 | 27.02 | 26.45 |
| Jul | 24.02 | 25.58 | 23.33 | 24.25 | 23.74 | 26.85 | 28.59 | 26.07 | 27.11 | 26.54 |
| Aug | 24.10 | 25.67 | 23.40 | 24.33 | 23.82 | 26.94 | 28.69 | 26.16 | 27.20 | 26.62 |
| Sep | 24.18 | 25.75 | 23.48 | 24.41 | 23.90 | 27.03 | 28.78 | 26.24 | 27.28 | 26.71 |
| Oct | 24.26 | 25.83 | 23.55 | 24.49 | 23.98 | 27.11 | 28.87 | 26.33 | 27.37 | 26.80 |
| Nov | 24.34 | 25.92 | 23.63 | 24.57 | 24.05 | 27.20 | 28.97 | 26.41 | 27.46 | 26.88 |
| Dec | 24.41 | 26.00 | 23.71 | 24.65 | 24.13 | 27.29 | 29.06 | 26.50 | 27.55 | 26.97 |
| | | | | | | | | | | |
| 2002 | 24.98 | 26.09 | 23.61 | 24.56 | 24.00 | 26.35 | 27.50 | 24.88 | 25.86 | 25.29 |
| 2003 | 28.36 | 30.50 | 27.68 | 29.15 | 28.27 | 25.66 | 27.59 | 25.03 | 26.37 | 25.57 |
| 2004 | 22.71 | 24.31 | 22.05 | 23.05 | 22.50 | 19.43 | 20.80 | 18.87 | 19.72 | 19.25 |
| 2005 | 23.24 | 24.75 | 22.57 | 23.46 | 22.97 | 19.21 | 20.46 | 18.65 | 19.40 | 18.99 |
| 2006 | 23.98 | 25.54 | 23.29 | 24.21 | 23.70 | 26.81 | 28.55 | 26.03 | 27.06 | 26.49 |



Highly Confidential NS_057005791
DA07369

## European Petroleum Product Spot Prices - Rotterdam FOB

| | Naphtha $/tonne | Gasoline $/tonne | Jet Fuel $/tonne | Gasoil $/tonne | No. 6 Resid 1.0% sulfur $/tonne | No. 6 Resid 3.5% sulfur $/tonne |
|---|---|---|---|---|---|---|
| **2002** | | | | | | |
| Jan | 163.6 | 178.7 | 186.0 | 163.6 | 107.3 | 101.0 |
| Feb | 180.1 | 180.0 | 185.6 | 164.3 | 97.3 | 102.8 |
| Mar | 214.2 | 218.8 | 211.7 | 189.8 | 114.2 | 118.3 |
| Apr | 223.7 | 256.2 | 221.9 | 201.1 | 129.6 | 132.5 |
| May | 212.8 | 249.6 | 229.7 | 201.3 | 132.0 | 139.3 |
| Jun | 205.4 | 246.5 | 222.2 | 197.0 | 127.7 | 132.0 |
| Jul | 219.8 | 261.6 | 230.7 | 210.7 | 140.2 | 139.2 |
| Aug | 229.1 | 264.7 | 241.2 | 219.4 | 142.4 | 143.5 |
| Sep | 253.5 | 277.4 | 270.8 | 239.0 | 161.1 | 159.0 |
| Oct | 239.1 | 273.4 | 264.2 | 236.6 | 180.1 | 148.6 |
| Nov | 217.3 | 237.0 | 241.4 | 216.1 | 156.2 | 121.8 |
| Dec | 259.1 | 266.4 | 263.1 | 247.2 | 172.9 | 132.4 |
| **2003** | | | | | | |
| Jan | 305.8 | 300.1 | 290.4 | 266.9 | 177.7 | 171.9 |
| Feb | 333.2 | 332.8 | 341.4 | 311.9 | 203.7 | 171.7 |
| Mar | 307.6 | 306.5 | 339.8 | 300.2 | 177.8 | 145.1 |
| Apr | 223.0 | 292.3 | 250.8 | 224.2 | 153.0 | 123.3 |
| May | 211.6 | 272.5 | 240.0 | 219.8 | 143.6 | 134.3 |
| Jun | 244.4 | 281.8 | 251.3 | 231.7 | 166.4 | 142.8 |
| Jul | 248.6 | 300.5 | 261.2 | 235.5 | 169.2 | 159.9 |
| Aug | 264.8 | 323.4 | 273.4 | 246.1 | 171.2 | 157.1 |
| Sep | 247.5 | 286.5 | 255.3 | 226.1 | 157.6 | 143.3 |
| Oct | 260.5 | 289.4 | 271.0 | 248.6 | 168.9 | 152.1 |
| Nov | 249.3 | 277.0 | 263.5 | 241.1 | 161.7 | 139.1 |
| Dec | 233.0 | 258.9 | 250.3 | 228.1 | 149.1 | 125.4 |
| **2004** | | | | | | |
| Jan | 223.5 | 242.8 | 239.0 | 216.9 | 138.3 | 113.7 |
| Feb | 212.8 | 236.5 | 227.8 | 205.7 | 127.5 | 102.0 |
| Mar | 199.3 | 226.5 | 212.7 | 190.9 | 113.1 | 86.4 |
| Apr | 200.2 | 232.6 | 208.9 | 187.1 | 109.5 | 82.5 |
| May | 202.3 | 240.1 | 211.5 | 184.7 | 116.7 | 90.3 |
| Jun | 204.6 | 237.7 | 214.0 | 194.1 | 133.4 | 98.1 |
| Jul | 210.8 | 239.6 | 215.9 | 199.0 | 140.0 | 100.1 |
| Aug | 217.8 | 246.4 | 219.8 | 202.8 | 137.0 | 102.0 |
| Sep | 219.0 | 243.3 | 224.7 | 207.6 | 129.3 | 104.0 |
| Oct | 221.2 | 240.2 | 231.5 | 209.5 | 131.1 | 105.9 |
| Nov | 221.8 | 235.3 | 231.5 | 209.5 | 131.1 | 105.9 |
| Dec | 221.8 | 235.3 | 231.5 | 209.5 | 131.1 | 105.9 |
| **2005** | | | | | | |
| Jan | 216.8 | 225.3 | 228.4 | 202.9 | 132.7 | 113.5 |
| Feb | 218.9 | 231.0 | 225.7 | 201.5 | 125.3 | 111.2 |
| Mar | 222.7 | 245.7 | 234.0 | 207.3 | 126.8 | 112.5 |
| Apr | 215.2 | 267.7 | 247.0 | 204.6 | 126.1 | 110.5 |
| May | 204.8 | 255.1 | 225.0 | 191.2 | 120.7 | 108.1 |
| Jun | 202.6 | 245.6 | 224.1 | 191.5 | 126.2 | 110.2 |
| Jul | 201.9 | 240.0 | 225.8 | 199.0 | 128.7 | 112.1 |
| Aug | 200.5 | 237.8 | 225.4 | 200.4 | 123.6 | 111.2 |
| Sep | 207.0 | 236.0 | 231.4 | 207.2 | 125.9 | 116.1 |
| Oct | 210.1 | 233.9 | 238.9 | 215.4 | 132.0 | 119.8 |
| Nov | 205.6 | 224.6 | 233.6 | 212.4 | 128.7 | 112.9 |
| Dec | 211.2 | 223.7 | 237.8 | 214.2 | 134.5 | 113.5 |
| **2006** | | | | | | |
| Jan | 218.1 | 227.7 | 227.9 | 204.5 | 135.2 | 113.7 |
| Feb | 222.4 | 234.1 | 229.9 | 207.1 | 127.2 | 112.5 |
| Mar | 225.8 | 246.7 | 239.2 | 214.4 | 129.2 | 111.5 |
| Apr | 219.9 | 271.1 | 249.3 | 207.8 | 128.4 | 110.9 |
| May | 211.5 | 259.8 | 235.4 | 198.4 | 125.5 | 113.6 |
| Jun | 210.8 | 246.4 | 236.3 | 201.2 | 131.3 | 115.7 |
| Jul | 208.5 | 245.7 | 233.2 | 206.5 | 134.7 | 117.6 |
| Aug | 209.0 | 247.9 | 232.1 | 206.6 | 131.8 | 119.0 |
| Sep | 215.9 | 247.4 | 237.1 | 211.9 | 132.5 | 123.2 |
| Oct | 217.1 | 242.7 | 243.3 | 220.7 | 136.5 | 123.9 |
| Nov | 214.1 | 237.3 | 240.0 | 219.3 | 135.4 | 118.9 |
| Dec | 217.5 | 233.8 | 239.4 | 216.1 | 138.2 | 116.9 |
| 2002 | 218.1 | 242.5 | 230.7 | 207.2 | 138.4 | 130.8 |
| 2003 | 260.8 | 293.5 | 274.0 | 248.3 | 166.7 | 147.2 |
| 2004 | 212.9 | 238.0 | 222.4 | 201.4 | 128.2 | 99.8 |
| 2005 | 209.8 | 238.9 | 231.4 | 204.0 | 127.6 | 112.6 |
| 2006 | 215.9 | 245.0 | 236.9 | 209.5 | 132.2 | 116.5 |



Highly Confidential NS_057005792
DA07370

**European Petroleum Product Spot Prices - Mediterranean FOB**

| | Naphtha | Gasoline | Jet Fuel | Gasoil | No. 6 Resid 1.0% sulfur | No. 6 Resid 3.5% sulfur |
|---|---|---|---|---|---|---|
| | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne | $/tonne |
| **2002** | | | | | | |
| Jan | 153.4 | 172.3 | 170.4 | 169.5 | 114.3 | 93.9 |
| Feb | 169.7 | 179.0 | 173.4 | 161.4 | 101.8 | 97.8 |
| Mar | 204.8 | 221.0 | 198.6 | 182.8 | 119.1 | 108.1 |
| Apr | 214.0 | 254.5 | 207.7 | 193.6 | 134.5 | 121.7 |
| May | 200.1 | 243.9 | 209.2 | 192.3 | 132.4 | 127.2 |
| Jun | 192.3 | 241.6 | 204.0 | 192.0 | 134.0 | 123.0 |
| Jul | 207.8 | 256.0 | 213.6 | 204.1 | 135.3 | 127.6 |
| Aug | 217.8 | 259.5 | 226.2 | 213.9 | 141.9 | 132.6 |
| Sep | 244.3 | 271.9 | 257.3 | 231.7 | 166.0 | 149.2 |
| Oct | 228.9 | 264.6 | 249.6 | 226.3 | 160.7 | 136.2 |
| Nov | 205.5 | 227.6 | 221.9 | 211.5 | 140.7 | 112.5 |
| Dec | 242.2 | 259.9 | 237.2 | 242.6 | 159.4 | 121.3 |
| **2003** | | | | | | |
| Jan | 288.6 | 290.7 | 262.3 | 265.6 | 192.9 | 157.0 |
| Feb | 313.4 | 323.4 | 316.0 | 303.9 | 205.6 | 163.2 |
| Mar | 280.1 | 286.9 | 288.6 | 297.6 | 186.0 | 138.2 |
| Apr | 199.9 | 252.4 | 210.0 | 205.5 | 140.0 | 120.4 |
| May | 194.4 | 246.3 | 224.2 | 202.5 | 142.8 | 122.1 |
| Jun | 230.0 | 267.9 | 234.9 | 226.4 | 165.6 | 138.6 |
| Jul | 234.6 | 289.8 | 247.0 | 223.4 | 181.3 | 154.2 |
| Aug | 249.7 | 316.3 | 251.1 | 238.6 | 183.1 | 149.9 |
| Sep | 234.1 | 274.8 | 233.5 | 223.3 | 151.7 | 135.6 |
| Oct | 244.4 | 283.9 | 248.7 | 240.2 | 167.0 | 140.8 |
| Nov | 233.9 | 271.7 | 241.8 | 233.0 | 159.9 | 128.8 |
| Dec | 218.7 | 254.0 | 229.7 | 220.4 | 147.4 | 116.2 |
| **2004** | | | | | | |
| Jan | 209.8 | 238.1 | 219.3 | 209.6 | 136.7 | 105.3 |
| Feb | 199.7 | 232.0 | 209.0 | 198.9 | 126.1 | 94.5 |
| Mar | 187.0 | 222.2 | 195.2 | 184.5 | 111.8 | 80.1 |
| Apr | 187.9 | 228.2 | 191.7 | 180.9 | 108.3 | 76.4 |
| May | 189.8 | 235.5 | 194.0 | 178.5 | 115.4 | 83.7 |
| Jun | 192.0 | 233.2 | 196.4 | 187.6 | 131.9 | 90.9 |
| Jul | 197.8 | 235.0 | 198.1 | 192.3 | 138.4 | 92.7 |
| Aug | 204.4 | 241.7 | 201.7 | 196.0 | 135.5 | 94.5 |
| Sep | 205.5 | 238.7 | 206.1 | 200.7 | 127.8 | 96.3 |
| Oct | 207.6 | 235.7 | 212.4 | 202.5 | 129.6 | 98.1 |
| Nov | 208.2 | 230.8 | 212.4 | 202.5 | 129.6 | 98.1 |
| Dec | 208.2 | 230.8 | 212.4 | 202.5 | 129.6 | 98.1 |
| **2005** | | | | | | |
| Jan | 203.5 | 221.0 | 209.6 | 196.1 | 131.2 | 105.1 |
| Feb | 205.5 | 226.6 | 207.1 | 194.8 | 123.9 | 103.0 |
| Mar | 209.0 | 241.0 | 214.7 | 200.3 | 125.4 | 104.2 |
| Apr | 201.9 | 262.6 | 226.6 | 197.8 | 124.6 | 102.3 |
| May | 192.2 | 250.2 | 206.4 | 184.8 | 119.4 | 100.2 |
| Jun | 190.2 | 241.0 | 205.6 | 185.1 | 124.8 | 102.1 |
| Jul | 189.5 | 235.4 | 207.2 | 192.3 | 127.2 | 103.8 |
| Aug | 188.2 | 233.3 | 206.8 | 193.7 | 122.2 | 103.0 |
| Sep | 194.3 | 231.5 | 212.3 | 200.3 | 124.5 | 107.6 |
| Oct | 197.2 | 229.5 | 219.2 | 208.2 | 130.5 | 111.0 |
| Nov | 193.0 | 220.3 | 214.3 | 205.3 | 127.2 | 104.6 |
| Dec | 198.2 | 219.4 | 218.2 | 207.0 | 133.0 | 105.1 |
| **2006** | | | | | | |
| Jan | 204.7 | 223.3 | 209.1 | 197.6 | 133.7 | 105.3 |
| Feb | 208.7 | 229.6 | 211.0 | 200.1 | 125.8 | 104.2 |
| Mar | 211.9 | 242.0 | 219.4 | 207.3 | 127.7 | 103.3 |
| Apr | 206.3 | 265.9 | 228.7 | 200.8 | 127.0 | 102.7 |
| May | 198.5 | 254.8 | 216.0 | 191.7 | 124.1 | 105.2 |
| Jun | 197.8 | 241.7 | 216.8 | 194.4 | 129.9 | 107.2 |
| Jul | 195.6 | 241.0 | 214.0 | 199.6 | 133.2 | 109.0 |
| Aug | 196.1 | 243.2 | 212.9 | 199.7 | 130.3 | 110.2 |
| Sep | 202.7 | 242.7 | 217.5 | 204.8 | 131.0 | 114.1 |
| Oct | 203.7 | 238.1 | 223.3 | 213.3 | 135.0 | 114.8 |
| Nov | 201.0 | 232.7 | 220.2 | 212.0 | 133.9 | 110.1 |
| Dec | 204.1 | 229.4 | 219.7 | 208.9 | 136.6 | 108.3 |
| 2002 | 206.7 | 237.6 | 214.1 | 201.8 | 136.7 | 120.9 |
| 2003 | 243.5 | 279.8 | 249.0 | 240.1 | 168.6 | 138.8 |
| 2004 | 199.8 | 233.5 | 204.1 | 194.7 | 126.7 | 92.4 |
| 2005 | 196.9 | 234.3 | 212.3 | 197.1 | 126.2 | 104.3 |
| 2006 | 202.6 | 240.4 | 217.4 | 202.5 | 130.7 | 107.9 |



Highly Confidential NS_057005793

DA07371

**European Petroleum Product Spot Prices - Northwest Europe CIF**

| | Naphtha $/tonne | Gasoline $/tonne | Jet Fuel $/tonne | Gasoil $/tonne | No. 6 Resid 1.0% sulfur $/tonne | No. 6 Resid 3.5% sulfur $/tonne |
|---|---|---|---|---|---|---|
| **2002** | | | | | | |
| Jan | 168.2 | 180.1 | 187.7 | 166.6 | 124.8 | 97.9 |
| Feb | 184.1 | 184.6 | 189.2 | 166.2 | 110.0 | 99.0 |
| Mar | 218.5 | 227.8 | 213.8 | 191.6 | 129.2 | 115.2 |
| Apr | 228.8 | 262.9 | 225.9 | 203.6 | 143.4 | 128.5 |
| May | 218.3 | 252.6 | 230.8 | 204.0 | 143.3 | 135.1 |
| Jun | 210.2 | 250.4 | 223.2 | 200.3 | 144.8 | 128.0 |
| Jul | 224.3 | 265.3 | 231.4 | 212.5 | 145.6 | 135.3 |
| Aug | 233.6 | 268.3 | 242.5 | 223.7 | 150.7 | 138.6 |
| Sep | 258.0 | 281.9 | 272.4 | 241.1 | 170.9 | 155.1 |
| Oct | 243.6 | 276.3 | 265.2 | 241.9 | 165.8 | 143.6 |
| Nov | 221.5 | 243.0 | 240.4 | 221.9 | 149.2 | 119.1 |
| Dec | 263.1 | 272.0 | 265.2 | 252.6 | 164.9 | 127.8 |
| **2003** | | | | | | |
| Jan | 309.8 | 300.9 | 288.4 | 270.3 | 196.5 | 167.0 |
| Feb | 337.2 | 337.4 | 347.8 | 316.1 | 207.7 | 166.6 |
| Mar | 311.6 | 315.4 | 330.8 | 316.4 | 188.8 | 142.3 |
| Apr | 227.0 | 283.9 | 242.5 | 226.0 | 149.1 | 121.0 |
| May | 216.4 | 266.5 | 240.5 | 222.5 | 150.0 | 130.5 |
| Jun | 248.4 | 283.4 | 248.4 | 235.3 | 169.8 | 139.6 |
| Jul | 254.0 | 301.6 | 261.2 | 241.3 | 184.7 | 157.4 |
| Aug | 269.1 | 324.2 | 275.1 | 251.4 | 184.5 | 154.7 |
| Sep | 251.5 | 285.1 | 255.7 | 232.3 | 159.7 | 140.5 |
| Oct | 265.8 | 292.4 | 272.4 | 252.4 | 177.4 | 147.4 |
| Nov | 254.4 | 279.8 | 264.8 | 244.8 | 169.8 | 134.8 |
| Dec | 237.8 | 261.6 | 251.6 | 231.6 | 156.6 | 121.6 |
| **2004** | | | | | | |
| Jan | 228.1 | 245.2 | 240.2 | 220.2 | 145.2 | 110.2 |
| Feb | 217.2 | 238.9 | 228.9 | 208.9 | 133.9 | 98.9 |
| Mar | 203.3 | 228.8 | 213.8 | 193.8 | 118.8 | 83.8 |
| Apr | 204.3 | 235.0 | 210.0 | 190.0 | 115.0 | 80.0 |
| May | 206.4 | 242.5 | 212.5 | 187.5 | 122.5 | 87.5 |
| Jun | 208.8 | 240.1 | 215.1 | 197.1 | 140.1 | 95.1 |
| Jul | 215.1 | 242.0 | 217.0 | 202.0 | 147.0 | 97.0 |
| Aug | 222.2 | 248.9 | 220.9 | 205.9 | 143.9 | 98.9 |
| Sep | 223.4 | 245.8 | 225.8 | 210.8 | 135.8 | 100.8 |
| Oct | 225.7 | 242.7 | 232.7 | 212.7 | 137.7 | 102.7 |
| Nov | 226.3 | 237.7 | 232.7 | 212.7 | 137.7 | 102.7 |
| Dec | 226.3 | 237.7 | 232.7 | 212.7 | 137.7 | 102.7 |
| **2005** | | | | | | |
| Jan | 221.3 | 227.6 | 229.5 | 206.0 | 139.3 | 110.0 |
| Feb | 223.4 | 233.3 | 226.8 | 204.6 | 131.6 | 107.7 |
| Mar | 227.2 | 248.1 | 235.2 | 210.4 | 133.1 | 109.0 |
| Apr | 219.5 | 270.4 | 248.2 | 207.8 | 132.4 | 107.0 |
| May | 208.9 | 257.7 | 226.1 | 194.1 | 126.8 | 104.8 |
| Jun | 206.8 | 248.1 | 225.2 | 194.4 | 132.5 | 106.8 |
| Jul | 206.0 | 242.4 | 226.9 | 202.0 | 135.1 | 108.6 |
| Aug | 204.6 | 240.2 | 226.5 | 203.5 | 129.7 | 107.8 |
| Sep | 211.3 | 238.4 | 232.5 | 210.4 | 132.2 | 112.5 |
| Oct | 214.4 | 236.3 | 240.1 | 218.7 | 138.6 | 116.1 |
| Nov | 209.8 | 226.9 | 234.8 | 215.7 | 135.1 | 109.4 |
| Dec | 215.5 | 225.9 | 239.0 | 217.5 | 141.2 | 109.9 |
| **2006** | | | | | | |
| Jan | 222.6 | 230.0 | 229.0 | 207.6 | 141.9 | 110.2 |
| Feb | 226.9 | 236.4 | 231.1 | 210.2 | 133.6 | 109.1 |
| Mar | 230.4 | 249.2 | 240.4 | 217.7 | 135.6 | 108.0 |
| Apr | 224.4 | 273.8 | 250.5 | 210.9 | 134.9 | 107.5 |
| May | 215.8 | 262.4 | 236.6 | 201.4 | 131.8 | 110.1 |
| Jun | 215.1 | 248.9 | 237.5 | 204.2 | 137.9 | 112.1 |
| Jul | 212.7 | 248.2 | 234.4 | 209.7 | 141.5 | 114.0 |
| Aug | 213.2 | 250.4 | 233.2 | 209.7 | 138.4 | 115.3 |
| Sep | 220.4 | 249.9 | 238.3 | 215.2 | 139.1 | 119.3 |
| Oct | 221.5 | 245.1 | 244.5 | 224.1 | 143.3 | 120.1 |
| Nov | 218.5 | 239.7 | 241.2 | 222.6 | 142.2 | 115.2 |
| Dec | 221.9 | 236.2 | 240.6 | 219.4 | 145.1 | 113.3 |
| 2002 | 222.7 | 247.1 | 232.3 | 210.5 | 145.2 | 126.9 |
| 2003 | 265.2 | 294.3 | 273.3 | 253.4 | 174.5 | 143.6 |
| 2004 | 217.3 | 240.4 | 223.5 | 204.5 | 134.6 | 96.7 |
| 2005 | 214.1 | 241.3 | 232.6 | 207.1 | 134.0 | 109.1 |
| 2006 | 220.3 | 247.5 | 238.1 | 212.7 | 138.8 | 112.9 |



Highly Confidential NS_057005794

DA07372

## U.S. Petroleum Product Spot Prices - NY Harbor

| | No. 2 Distillate cts/gal | No. 2 Diesel cts/gal | Gasoline cts/gal | Jet Fuel cts/gal | No. 6 Resid 0.3% sulfur $/bbl | No. 6 Resid 0.7% sulfur $/bbl | No. 6 Resid 1% sulfur $/bbl | No. 6 Resid 2.2% sulfur $/bbl | No. 6 Resid 3.0% sulfur $/bbl |
|---|---|---|---|---|---|---|---|---|---|
| **2002** | | | | | | | | | |
| Jan | 52.9 | 53.2 | 53.6 | 55.6 | 19.26 | 16.50 | 16.08 | 15.29 | 14.73 |
| Feb | 53.6 | 54.7 | 54.8 | 57.0 | 18.27 | 15.28 | 14.83 | 14.41 | 14.40 |
| Mar | 63.0 | 63.9 | 68.9 | 64.3 | 22.11 | 19.84 | 19.43 | 19.05 | 18.97 |
| Apr | 66.2 | 67.9 | 73.8 | 68.1 | 25.34 | 22.73 | 22.24 | 21.59 | 21.45 |
| May | 65.9 | 67.1 | 69.4 | 68.3 | 25.67 | 23.87 | 23.36 | 21.72 | 21.50 |
| Jun | 64.0 | 65.0 | 70.9 | 67.5 | 24.58 | 23.13 | 22.70 | 21.54 | 21.23 |
| Jul | 67.3 | 68.3 | 75.9 | 71.0 | 26.40 | 23.66 | 22.54 | 21.61 | 21.54 |
| Aug | 69.5 | 71.9 | 76.0 | 74.5 | 27.62 | 25.98 | 25.42 | 23.50 | 23.13 |
| Sep | 76.8 | 78.7 | 77.6 | 81.2 | 28.39 | 26.37 | 26.02 | 25.35 | 25.35 |
| Oct | 76.2 | 78.8 | 82.0 | 80.9 | 29.46 | 27.19 | 26.39 | 24.43 | 24.36 |
| Nov | 71.4 | 73.4 | 74.8 | 73.3 | 27.95 | 24.68 | 23.86 | 21.46 | 20.47 |
| Dec | 81.4 | 81.9 | 80.0 | 82.5 | 32.40 | 28.65 | 26.68 | 24.30 | 23.69 |
| **2003** | | | | | | | | | |
| Jan | 89.9 | 90.3 | 87.1 | 90.9 | 37.73 | 33.75 | 31.53 | 30.04 | 29.08 |
| Feb | 112.2 | 113.6 | 99.2 | 114.5 | 46.53 | 38.50 | 35.05 | 30.61 | 29.45 |
| Mar | 97.2 | 99.3 | 94.9 | 97.4 | 39.15 | 33.76 | 31.71 | 27.13 | 25.34 |
| Apr | 77.8 | 79.1 | 79.4 | 78.3 | 28.89 | 25.61 | 23.98 | 20.51 | 19.94 |
| May | 73.3 | 74.7 | 75.4 | 75.4 | 29.95 | 25.69 | 24.51 | 21.79 | 21.15 |
| Jun | 75.4 | 76.6 | 80.0 | 76.7 | 29.01 | 26.00 | 25.18 | 22.46 | 21.70 |
| Jul | 78.0 | 79.4 | 86.8 | 80.3 | 30.67 | 28.68 | 27.53 | 26.26 | 26.19 |
| Aug | 80.8 | 82.2 | 99.8 | 84.2 | 31.57 | 28.62 | 27.74 | 26.43 | 26.35 |
| Sep | 72.7 | 74.6 | 89.3 | 75.4 | 29.07 | 25.65 | 24.88 | 23.15 | 23.05 |
| Oct | 86.0 | 87.1 | 84.4 | 88.6 | 32.30 | 28.14 | 27.13 | 24.98 | 24.22 |
| Nov | 82.6 | 83.1 | 79.5 | 84.8 | 30.95 | 26.30 | 25.44 | 23.48 | 22.14 |
| Dec | 78.1 | 77.9 | 72.2 | 79.3 | 29.91 | 24.92 | 23.84 | 21.26 | 19.93 |
| **2004** | | | | | | | | | |
| Jan | 71.4 | 70.0 | 69.0 | 72.1 | 26.82 | 22.59 | 21.59 | 19.37 | 17.86 |
| Feb | 67.8 | 64.8 | 66.1 | 65.9 | 24.27 | 19.34 | 18.56 | 17.02 | 16.30 |
| Mar | 63.1 | 60.6 | 62.3 | 61.7 | 22.08 | 18.51 | 17.87 | 16.41 | 15.78 |
| Apr | 61.7 | 62.6 | 64.9 | 63.2 | 22.68 | 19.34 | 18.78 | 16.91 | 16.36 |
| May | 62.3 | 63.6 | 70.3 | 64.2 | 23.42 | 20.67 | 20.00 | 17.85 | 17.40 |
| Jun | 62.3 | 63.3 | 67.5 | 64.3 | 23.72 | 21.07 | 20.39 | 18.13 | 17.73 |
| Jul | 63.2 | 64.1 | 67.4 | 65.7 | 23.60 | 21.03 | 20.21 | 18.04 | 17.15 |
| Aug | 66.6 | 67.2 | 70.9 | 70.0 | 24.02 | 20.94 | 20.18 | 18.39 | 17.82 |
| Sep | 72.3 | 73.1 | 73.2 | 75.1 | 25.86 | 22.26 | 21.52 | 20.00 | 19.33 |
| Oct | 72.1 | 73.1 | 70.6 | 74.4 | 26.65 | 23.22 | 22.38 | 20.61 | 19.98 |
| Nov | 71.6 | 72.1 | 68.7 | 73.7 | 26.42 | 22.44 | 21.71 | 20.04 | 18.90 |
| Dec | 72.3 | 72.1 | 66.6 | 73.5 | 27.44 | 22.87 | 21.87 | 19.50 | 18.29 |
| **2005** | | | | | | | | | |
| Jan | 67.4 | 67.2 | 63.8 | 69.3 | 25.70 | 21.65 | 20.69 | 18.56 | 17.12 |
| Feb | 65.0 | 65.0 | 63.5 | 66.2 | 24.35 | 19.40 | 18.62 | 17.08 | 16.35 |
| Mar | 64.8 | 65.2 | 67.1 | 66.4 | 23.76 | 19.92 | 19.23 | 17.66 | 16.98 |
| Apr | 66.9 | 67.9 | 70.4 | 68.5 | 24.59 | 20.97 | 20.37 | 18.34 | 17.74 |
| May | 65.2 | 66.5 | 73.6 | 67.2 | 24.50 | 21.62 | 20.92 | 18.67 | 18.20 |
| Jun | 62.9 | 63.9 | 68.2 | 64.9 | 23.96 | 21.28 | 20.60 | 18.32 | 17.91 |
| Jul | 64.1 | 65.0 | 68.4 | 66.6 | 23.92 | 21.32 | 20.49 | 18.29 | 17.38 |
| Aug | 67.8 | 68.3 | 72.1 | 71.2 | 24.44 | 21.30 | 20.52 | 18.71 | 18.12 |
| Sep | 72.9 | 73.7 | 73.8 | 75.7 | 26.12 | 22.48 | 21.74 | 20.21 | 19.53 |
| Oct | 72.2 | 73.2 | 70.7 | 74.5 | 26.74 | 23.30 | 22.45 | 20.67 | 20.05 |
| Nov | 72.0 | 72.4 | 69.0 | 74.0 | 26.59 | 22.59 | 21.86 | 20.18 | 19.03 |
| Dec | 72.3 | 72.1 | 66.6 | 73.5 | 27.44 | 22.87 | 21.87 | 19.50 | 18.29 |
| **2006** | | | | | | | | | |
| Jan | 67.9 | 67.7 | 64.3 | 69.8 | 25.88 | 21.79 | 20.83 | 18.68 | 17.23 |
| Feb | 65.8 | 65.8 | 64.3 | 67.1 | 24.67 | 19.67 | 18.87 | 17.31 | 16.57 |
| Mar | 66.1 | 66.5 | 68.4 | 67.8 | 24.23 | 20.32 | 19.62 | 18.02 | 17.32 |
| Apr | 68.7 | 69.7 | 72.3 | 70.4 | 25.25 | 21.54 | 20.92 | 18.83 | 18.22 |
| May | 67.4 | 68.8 | 76.1 | 69.4 | 25.33 | 22.35 | 21.63 | 19.30 | 18.82 |
| Jun | 65.5 | 66.5 | 71.0 | 67.6 | 24.94 | 22.15 | 21.45 | 19.07 | 18.64 |
| Jul | 66.7 | 67.6 | 71.1 | 69.3 | 24.90 | 22.19 | 21.32 | 19.03 | 18.09 |
| Aug | 70.5 | 71.1 | 75.1 | 74.1 | 25.43 | 22.16 | 21.36 | 19.47 | 18.86 |
| Sep | 75.9 | 76.6 | 76.7 | 78.8 | 27.18 | 23.39 | 22.62 | 21.02 | 20.32 |
| Oct | 75.1 | 76.1 | 73.6 | 77.5 | 27.81 | 24.23 | 23.36 | 21.51 | 20.86 |
| Nov | 74.8 | 75.3 | 71.8 | 77.0 | 27.66 | 23.50 | 22.74 | 20.99 | 19.79 |
| Dec | 75.2 | 75.0 | 69.3 | 76.5 | 28.54 | 23.78 | 22.74 | 20.29 | 19.02 |
| 2002 | 67.4 | 68.7 | 71.5 | 70.4 | 25.62 | 23.16 | 22.46 | 21.19 | 20.90 |
| 2003 | 83.7 | 84.8 | 85.7 | 85.5 | 32.98 | 28.80 | 27.38 | 24.84 | 24.04 |
| 2004 | 67.2 | 67.2 | 68.1 | 68.7 | 24.75 | 21.19 | 20.42 | 18.52 | 17.74 |
| 2005 | 67.8 | 68.4 | 68.9 | 69.8 | 25.18 | 21.56 | 20.78 | 18.85 | 18.06 |
| 2006 | 70.0 | 70.6 | 71.2 | 72.1 | 25.98 | 22.26 | 21.45 | 19.46 | 18.64 |



Highly Confidential NS_057005795

DA07373

## U.S. Petroleum Product Spot Prices - Gulf Coast

| | No. 2 Distillate cts/gal | No. 2 Diesel cts/gal | Gasoline cts/gal | Jet Fuel cts/gal | No. 6 Resid 1% sulfur $/bbl | No. 6 Resid 3% sulfur $/bbl |
|---|---|---|---|---|---|---|
| **2002** | | | | | | |
| Jan | 51.1 | 51.7 | 54.2 | 53.4 | 15.42 | 14.82 |
| Feb | 51.9 | 53.5 | 54.4 | 55.4 | 15.45 | 15.24 |
| Mar | 61.4 | 63.2 | 71.9 | 63.3 | 19.37 | 19.20 |
| Apr | 64.7 | 67.0 | 78.6 | 67.2 | 22.54 | 21.93 |
| May | 64.4 | 65.9 | 74.7 | 67.1 | 23.04 | 21.94 |
| Jun | 62.5 | 63.5 | 74.2 | 65.7 | 23.50 | 21.38 |
| Jul | 65.9 | 67.1 | 76.1 | 69.7 | 22.25 | 21.86 |
| Aug | 68.5 | 71.5 | 75.6 | 72.8 | 24.27 | 22.80 |
| Sep | 76.2 | 79.6 | 78.6 | 80.5 | 25.45 | 24.81 |
| Oct | 76.0 | 79.6 | 82.9 | 79.5 | 27.58 | 23.19 |
| Nov | 70.6 | 71.5 | 69.8 | 71.3 | 23.77 | 18.76 |
| Dec | 79.8 | 80.8 | 78.6 | 81.5 | 26.20 | 22.41 |
| **2003** | | | | | | |
| Jan | 88.0 | 88.6 | 88.3 | 89.2 | 30.96 | 29.73 |
| Feb | 105.7 | 106.4 | 101.5 | 106.1 | 34.68 | 27.76 |
| Mar | 88.4 | 90.3 | 96.7 | 89.7 | 33.16 | 22.78 |
| Apr | 72.5 | 74.6 | 81.5 | 74.8 | 24.72 | 19.59 |
| May | 70.6 | 72.1 | 79.1 | 71.8 | 25.81 | 21.16 |
| Jun | 74.0 | 75.6 | 83.2 | 75.4 | 27.39 | 22.35 |
| Jul | 76.7 | 78.4 | 89.0 | 78.4 | 29.44 | 25.64 |
| Aug | 79.9 | 82.4 | 98.8 | 82.6 | 28.34 | 25.96 |
| Sep | 71.8 | 73.8 | 81.3 | 74.2 | 24.80 | 22.42 |
| Oct | 83.4 | 84.7 | 85.0 | 85.6 | 28.02 | 24.03 |
| Nov | 80.1 | 80.8 | 80.0 | 82.0 | 26.28 | 21.97 |
| Dec | 75.7 | 75.7 | 72.7 | 76.6 | 24.62 | 19.78 |
| **2004** | | | | | | |
| Jan | 69.2 | 68.1 | 69.4 | 69.7 | 22.30 | 17.72 |
| Feb | 65.8 | 63.0 | 66.5 | 63.7 | 19.17 | 16.17 |
| Mar | 61.2 | 58.9 | 62.8 | 59.6 | 18.46 | 15.66 |
| Apr | 59.8 | 60.9 | 65.4 | 61.1 | 19.40 | 16.23 |
| May | 60.4 | 61.8 | 70.8 | 62.0 | 20.66 | 17.26 |
| Jun | 60.3 | 61.5 | 68.0 | 62.1 | 21.07 | 17.59 |
| Jul | 61.3 | 62.3 | 67.9 | 63.5 | 20.88 | 17.01 |
| Aug | 64.6 | 65.3 | 71.4 | 67.6 | 20.84 | 17.68 |
| Sep | 70.1 | 71.1 | 73.7 | 72.6 | 22.23 | 19.18 |
| Oct | 69.9 | 71.0 | 71.1 | 71.9 | 23.12 | 19.83 |
| Nov | 69.4 | 70.1 | 69.1 | 71.2 | 22.43 | 18.75 |
| Dec | 70.1 | 70.1 | 67.1 | 71.0 | 22.59 | 18.14 |
| **2005** | | | | | | |
| Jan | 65.3 | 65.4 | 64.3 | 67.0 | 21.37 | 16.98 |
| Feb | 63.0 | 63.2 | 63.9 | 63.9 | 19.23 | 16.23 |
| Mar | 62.8 | 63.4 | 67.5 | 64.2 | 19.86 | 16.85 |
| Apr | 64.8 | 66.0 | 70.9 | 66.2 | 21.04 | 17.60 |
| May | 63.2 | 64.7 | 74.1 | 64.9 | 21.61 | 18.06 |
| Jun | 61.0 | 62.2 | 68.7 | 62.7 | 21.28 | 17.77 |
| Jul | 62.1 | 63.2 | 68.8 | 64.3 | 21.16 | 17.25 |
| Aug | 65.7 | 66.5 | 72.6 | 68.8 | 21.20 | 17.98 |
| Sep | 70.7 | 71.6 | 74.3 | 73.2 | 22.46 | 19.38 |
| Oct | 70.0 | 71.1 | 71.2 | 72.0 | 23.20 | 19.90 |
| Nov | 69.7 | 70.4 | 69.5 | 71.5 | 22.58 | 18.88 |
| Dec | 70.1 | 70.1 | 67.1 | 71.0 | 22.59 | 18.14 |
| **2006** | | | | | | |
| Jan | 65.8 | 65.8 | 64.7 | 67.4 | 21.52 | 17.10 |
| Feb | 63.8 | 64.0 | 64.8 | 64.8 | 19.49 | 16.45 |
| Mar | 64.0 | 64.7 | 68.9 | 65.5 | 20.26 | 17.19 |
| Apr | 66.6 | 67.8 | 72.8 | 68.0 | 21.61 | 18.08 |
| May | 65.3 | 66.9 | 76.6 | 67.1 | 22.35 | 18.67 |
| Jun | 63.5 | 64.7 | 71.5 | 65.3 | 22.15 | 18.50 |
| Jul | 64.6 | 65.7 | 71.6 | 66.9 | 22.02 | 17.95 |
| Aug | 68.3 | 69.1 | 75.6 | 71.6 | 22.06 | 18.71 |
| Sep | 73.5 | 74.5 | 77.3 | 76.1 | 23.37 | 20.16 |
| Oct | 72.8 | 74.0 | 74.1 | 74.8 | 24.13 | 20.70 |
| Nov | 72.5 | 73.2 | 72.3 | 74.4 | 23.49 | 19.64 |
| Dec | 72.9 | 72.9 | 69.8 | 73.9 | 23.49 | 18.87 |
| 2002 | 66.1 | 67.9 | 72.5 | 68.9 | 22.40 | 20.69 |
| 2003 | 80.6 | 81.9 | 86.4 | 82.2 | 28.19 | 23.60 |
| 2004 | 65.2 | 65.3 | 68.6 | 66.3 | 21.10 | 17.60 |
| 2005 | 65.7 | 66.5 | 69.4 | 67.5 | 21.47 | 17.92 |
| 2006 | 67.8 | 68.6 | 71.7 | 69.7 | 22.16 | 18.50 |



Highly Confidential NS_057005796
DA07374

**U.S. Petroleum Product Spot Prices - Boston Harbor**

| | No. 2 Distillate cts/gal | No. 2 Diesel cts/gal | No. 6 Resid 0.5% sulfur $/bbl | No. 6 Resid 1.0% sulfur $/bbl | No. 6 Resid 2.2% sulfur $/bbl |
|---|---|---|---|---|---|
| **2002** | | | | | |
| Jan | 56.9 | 61.0 | 32.69 | 28.44 | 24.75 |
| Feb | 54.4 | 61.7 | 32.03 | 27.78 | 24.75 |
| Mar | 66.6 | 70.2 | 33.06 | 29.06 | 26.55 |
| Apr | 70.2 | 74.9 | 35.60 | 31.85 | 28.66 |
| May | 70.3 | 74.7 | 35.88 | 32.13 | 29.00 |
| Jun | 67.1 | 71.2 | 35.88 | 32.13 | 29.00 |
| Jul | 70.7 | 74.2 | 35.88 | 32.13 | 29.00 |
| Aug | 72.7 | 77.5 | 35.97 | 32.22 | 29.18 |
| Sep | 81.9 | 84.4 | 37.45 | 33.70 | 31.45 |
| Oct | 80.0 | 85.4 | 39.32 | 35.57 | 32.96 |
| Nov | 76.7 | 80.5 | 39.41 | 35.66 | 33.00 |
| Dec | 87.7 | 89.3 | 40.96 | 37.13 | 34.33 |
| **2003** | | | | | |
| Jan | 97.2 | 98.5 | 45.71 | 42.49 | 38.82 |
| Feb | 119.5 | 121.5 | 53.31 | 48.73 | 45.40 |
| Mar | 112.6 | 118.1 | 55.77 | 51.08 | 45.50 |
| Apr | 87.3 | 91.7 | 49.40 | 44.90 | 40.10 |
| May | 84.7 | 85.0 | 47.51 | 43.01 | 37.86 |
| Jun | 83.5 | 83.2 | 45.83 | 41.33 | 36.90 |
| Jul | 84.1 | 85.0 | 45.55 | 41.05 | 36.00 |
| Aug | 85.9 | 87.4 | 45.36 | 40.86 | 36.00 |
| Sep | 78.4 | 81.2 | 44.46 | 39.96 | 36.00 |
| Oct | 92.7 | 96.7 | 48.85 | 41.73 | 39.19 |
| Nov | 89.0 | 92.2 | 45.64 | 39.14 | 36.84 |
| Dec | 84.2 | 86.4 | 43.26 | 36.67 | 33.36 |
| **2004** | | | | | |
| Jan | 77.0 | 77.7 | 39.21 | 33.21 | 30.39 |
| Feb | 73.1 | 71.9 | 33.57 | 28.54 | 26.71 |
| Mar | 68.0 | 67.2 | 32.13 | 27.49 | 25.75 |
| Apr | 66.5 | 69.5 | 33.57 | 28.89 | 26.54 |
| May | 67.1 | 70.6 | 35.87 | 30.77 | 28.01 |
| Jun | 67.1 | 70.2 | 36.56 | 31.37 | 28.45 |
| Jul | 68.1 | 71.1 | 36.51 | 31.09 | 28.30 |
| Aug | 71.8 | 74.6 | 36.34 | 31.04 | 28.86 |
| Sep | 77.9 | 81.1 | 38.63 | 33.11 | 31.38 |
| Oct | 77.7 | 81.1 | 40.30 | 34.42 | 32.33 |
| Nov | 77.2 | 80.0 | 38.95 | 33.40 | 31.45 |
| Dec | 78.0 | 80.1 | 39.69 | 33.64 | 30.60 |
| **2005** | | | | | |
| Jan | 72.7 | 74.6 | 37.57 | 31.83 | 29.12 |
| Feb | 70.0 | 72.1 | 33.68 | 28.64 | 26.80 |
| Mar | 69.8 | 72.4 | 34.57 | 29.58 | 27.71 |
| Apr | 72.1 | 75.4 | 36.39 | 31.33 | 28.77 |
| May | 70.2 | 73.8 | 37.52 | 32.18 | 29.30 |
| Jun | 67.8 | 71.0 | 36.94 | 31.69 | 28.74 |
| Jul | 69.1 | 72.1 | 37.01 | 31.51 | 28.69 |
| Aug | 73.0 | 75.8 | 36.96 | 31.57 | 29.35 |
| Sep | 78.6 | 81.8 | 39.02 | 33.45 | 31.70 |
| Oct | 77.8 | 81.2 | 40.43 | 34.54 | 32.44 |
| Nov | 77.6 | 80.4 | 39.22 | 33.62 | 31.66 |
| Dec | 78.0 | 80.1 | 39.69 | 33.64 | 30.60 |
| **2006** | | | | | |
| Jan | 73.2 | 75.1 | 37.83 | 32.04 | 29.32 |
| Feb | 71.0 | 73.1 | 34.13 | 29.03 | 27.16 |
| Mar | 71.2 | 73.8 | 35.27 | 30.18 | 28.27 |
| Apr | 74.0 | 77.4 | 37.38 | 32.17 | 29.55 |
| May | 72.6 | 76.3 | 38.79 | 33.27 | 30.29 |
| Jun | 70.6 | 73.9 | 38.45 | 32.99 | 29.92 |
| Jul | 71.9 | 75.0 | 38.51 | 32.80 | 29.86 |
| Aug | 76.0 | 78.9 | 38.46 | 32.85 | 30.54 |
| Sep | 81.8 | 85.1 | 40.60 | 34.80 | 32.99 |
| Oct | 80.9 | 84.5 | 42.06 | 35.93 | 33.74 |
| Nov | 80.7 | 83.6 | 40.79 | 34.97 | 32.93 |
| Dec | 81.1 | 83.3 | 41.27 | 34.99 | 31.83 |
| 2002 | 71.3 | 75.4 | 36.18 | 32.32 | 29.39 |
| 2003 | 91.6 | 93.9 | 47.55 | 42.58 | 38.50 |
| 2004 | 72.5 | 74.6 | 36.78 | 31.41 | 29.06 |
| 2005 | 73.1 | 75.9 | 37.42 | 31.97 | 29.57 |
| 2006 | 75.4 | 78.3 | 38.63 | 33.00 | 30.53 |



Highly Confidential NS_057005797

DA07375

## U.S. Propane Prices

| | Conway Kansas cts/gal | Mont Belvieu Texas cts/gal | Selkirk New York cts/gal |
|---|---|---|---|
| **2002** | | | |
| Jan | 26.7 | 29.1 | 40.9 |
| Feb | 28.0 | 31.3 | 41.8 |
| Mar | 36.0 | 38.0 | 47.2 |
| Apr | 40.1 | 41.3 | 51.8 |
| May | 38.1 | 40.7 | 51.8 |
| Jun | 35.3 | 37.5 | 48.6 |
| Jul | 35.5 | 37.1 | 47.4 |
| Aug | 41.6 | 41.5 | 50.3 |
| Sep | 45.9 | 47.1 | 56.4 |
| Oct | 47.1 | 47.9 | 57.5 |
| Nov | 47.9 | 47.2 | 57.6 |
| Dec | 52.4 | 52.4 | 62.8 |
| **2003** | | | |
| Jan | 57.8 | 59.2 | 70.2 |
| Feb | 70.2 | 71.2 | 86.8 |
| Mar | 56.6 | 61.4 | 78.9 |
| Apr | 50.3 | 50.1 | 60.6 |
| May | 55.5 | 54.1 | 62.3 |
| Jun | 59.8 | 55.7 | 65.5 |
| Jul | 58.9 | 52.9 | 63.3 |
| Aug | 63.7 | 54.8 | 63.4 |
| Sep | 59.4 | 52.0 | 63.3 |
| Oct | 64.7 | 56.2 | 68.3 |
| Nov | 61.5 | 53.9 | 66.6 |
| Dec | 57.5 | 51.0 | 62.9 |
| **2004** | | | |
| Jan | 52.1 | 46.6 | 57.6 |
| Feb | 48.8 | 44.3 | 54.7 |
| Mar | 44.6 | 41.2 | 50.9 |
| Apr | 42.7 | 40.3 | 49.7 |
| May | 42.1 | 40.7 | 50.2 |
| Jun | 41.1 | 40.7 | 50.2 |
| Jul | 41.7 | 41.3 | 51.0 |
| Aug | 44.0 | 43.5 | 53.7 |
| Sep | 47.7 | 47.2 | 58.3 |
| Oct | 47.6 | 47.1 | 58.1 |
| Nov | 47.2 | 46.8 | 57.7 |
| Dec | 47.7 | 47.2 | 58.3 |
| **2005** | | | |
| Jan | 44.5 | 44.0 | 54.3 |
| Feb | 42.9 | 42.4 | 52.4 |
| Mar | 42.7 | 42.3 | 52.2 |
| Apr | 44.1 | 43.7 | 53.9 |
| May | 43.0 | 42.5 | 52.5 |
| Jun | 41.5 | 41.1 | 50.7 |
| Jul | 42.3 | 41.9 | 51.7 |
| Aug | 44.7 | 44.3 | 54.6 |
| Sep | 48.1 | 47.6 | 58.8 |
| Oct | 47.6 | 47.1 | 58.2 |
| Nov | 47.5 | 47.0 | 58.0 |
| Dec | 47.7 | 47.2 | 58.3 |
| **2006** | | | |
| Jan | 44.8 | 44.3 | 54.7 |
| Feb | 43.4 | 43.0 | 53.1 |
| Mar | 43.6 | 43.2 | 53.3 |
| Apr | 45.3 | 44.8 | 55.3 |
| May | 44.4 | 44.0 | 54.3 |
| Jun | 43.2 | 42.8 | 52.8 |
| Jul | 44.0 | 43.6 | 53.8 |
| Aug | 46.5 | 46.0 | 56.8 |
| Sep | 50.0 | 49.5 | 61.1 |
| Oct | 49.5 | 49.0 | 60.5 |
| Nov | 49.4 | 48.9 | 60.3 |
| Dec | 49.6 | 49.1 | 60.6 |
| 2002 | 39.6 | 40.9 | 51.2 |
| 2003 | 59.7 | 56.0 | 67.7 |
| 2004 | 45.6 | 43.9 | 54.2 |
| 2005 | 44.7 | 44.3 | 54.6 |
| 2006 | 46.2 | 45.7 | 56.4 |



Highly Confidential NS_057005798
DA07376

**Subject**: FW: 7/10 Fuel Surcharge Meeting - Background Info
**Importance**: Normal
**Attachments**: FSC comparison1.xls; CSXT_NS_ SC.DOC

-----Original Message-----
**From:** Glennon, Pat
**Sent:** Thursday, July 03, 2003 10:22 AM
**To:** Wendorf, Gary; Brenner, Charlie; Brugman, Thomas; Julian, David; Kraemer, John; Lawson, David; Osborne, Joe
**Cc:** Seale, Don; Pfeifer, Alby; Yopp, Ken; Anderson, Brady; Fisher, Donna; Florian, Fred; Gentzel, Robert; Julian, Alan; Kiley, Richard; McNabb, Jim; Plain, Bob; Schaaf, Jim; Simonic, Pat
**Subject:** 7/10 Fuel Surcharge Meeting - Background Info

**GVPs –** Re July 10 (10am) fuel surcharge meeting. The analysis below provides supporting material if you feel you need it. The subject is technical. If you want to keep it short, refer to the attached FSC comparison excel document (best viewed printed) and the "Recap" under each RR summary (below).

**1 – Comparison study (attached).**
The CSXT and UP adopt new Fuel Surcharge formulas effective June 1. The NS, UP, BNSF and CSXT each have unique formulas. The attached spreadsheet is a hypothetical exercise that compares the various formulas and estimates NS revenues had NS implemented each formula in January 2002. This gives you a relative comparison of the FSC percentages that each standard would have produced had they been in effect. It also provides a hypothetical NS revenue yield had the formulas been in effect for the account of NS. This is for comparison purposes only and does not reflect the FSCs that were in effect at the time or the revenues that may have been collected. Use this to gauge relative fuel cost compensation.

I've also attached an earlier pro/con analysis for adopting the CSXT standard (and UP at that time). While somewhat outdated, it raises some points that are still valid. The UP has since adopted a variation of the BNSF standard that addresses several of the CSXT shortcomings.

**2 – Current FSC status. Based on the latest available information, here is where the major U.S. carriers stand effective July 1:**

NS

1. **The 2% NS FSC remains in effect**.
2. The price of WTI us running at about $30, midway between the $28 (2%) and $33 (4%) per barrel thresholds.
3. The current FSC will remain at 2% at least through late August.
4. **Recap**. WTI; $28 base, 2% at $5 increments, applied after 30 consecutive WSJ publication days.

CSXT

1. The CSXT adopted a new formula effective June 1.
2. **The CSXT FSC for July is 2.4% and will go to 3.2% for the month of August**.
3. The new CSXT form uses the BNSF monthly average methodology, but is based in WTI prices, not diesel. The price is based on a monthly average that is announced following close of the month, to be effective for the month following the announcement. For example, the April average is announced in May and effective for June
4. The formula provides for 0.4% increments for every dollar off a WTI base of **$23 per barrel, compared to the $28/2% kick in threshold for NS**. This generally produces higher percentages.
5. In addition, it applies increases starting at $23 with a 0.4% increase instead of $28/2%. As a result, at $28.01 per barrel, the new CSXT FSC produces a 2.4% compared to 2.0% provided for by the old CSXT and current NS formula.
6. The CSXT is also attempting to apply the new FSC to all publications, public and private, effective June 1. They may make exceptions for contracts taking RCAF escalation. We have not gotten feedback on customer acceptance.
7. Bottom line, this formula kicks in the sooner than the NS and UP formulas and produces the highest percentages, by far.
8. **Recap**: WTI; $23 base; 0.4% at $1 increments; monthly average; 2 month lag
9. http://shipcsx.com/ec.shipcsxpublic/Main?module_url=/ec.pricingpublic/Status

BNSF

1. No policy change. Their FSC has been in effect for a long time, but only began aggressively applying within the last year. .
2. **The BNSF FSC for July is 2.5%.** The announced FSC for August is 2%. The BNSF opted to not take the full 3% allowed by the formula for the month of June.

3. BNSF maintains a diesel based formula that provides for 0.5% increments for every 5 cent increase in diesel starting at $1.25 per gallon.
4. The price is based on a monthly average that is announced following close of the month, to be effective for the month following the announcement. For example, the April average is announced in May and effective for June.
5. The methodology is similar to the CSXT formula, but it is based on the price of diesel. Historically, it has produced lower percentages the new CSXT formula.
6. **Recap:** Diesel; $1.25 base; 0.5% at 24 cent increments; Monthly average; 2 month lag
7. http://domino.bnsf.com/website/updates.nsf/updates?ReadForm&pricing

**UP**

1. A New UP formula is effective June 1.
2. **The UP FSC for July is 2.5%.** The UP opted to not take the full 3% allowed under the new formula for June.
3. The UP initially adopted the new CSXT standard, then revised their position and adopted a variation of the BNSF formula.
4. **The big difference compared to the BNSF is a higher kick in threshold of $1.35 per gallon ($1.25 base**). Once the threshold is met, the initial FSC is 1.5% with 0.5% increments starting at 1.5%. Once it kicks in, it is identical to the BNSF FSC.
5. The practical affect is to suppress smaller increases until the $1.35 threshold is met, and then suppressed increases are applied back to the $1.25 base. There is no retroactive application. The threshold concept is similar to the $28 WTI threshold used by NS. The elimination of smaller increases below 1.5% has a stabilizing affect that helps in bill and collections.
6. Like the CSXT and UP, the price of diesel is based on a monthly average that is announced following the close of the month, to be effective for the month following the announcement. For example, the April average is announced in May and effective for June.
7. **Recap:** $1.25 base; 0.5% increments at 25 cent increments; monthly average; 2 month lag.
8. http://www.uprr.com/customers/fuel_surcharge.shtml

**3 – If we opt to revise the NS FSC, the transition issues:**

- The NS fuel surcharge text has been inserted into each NS publication that is subject the NS FSC. As a result, we cannot simply change the FSC text in the NS Conditions of Carriage and expect a revised formula to take effect universally. The specific text in the rate publication takes precedence. A case can be make that the C/C applies, but it would be a stretch and would antagonize many customers, and lead to billing disputes.
- If we were to change the NS FSC, the most likely approach would be to:
  - Replace FSC text currently in each publication and replace it with a new note that simply refers to the Conditions of Carriage for the FCS text.
  - Publish the new FSC in the C/C.
  - Create a new 9255 notes, w/o the specific FSC text, that simply refers to the C/C.
  - Transition one publication at a time by referring to the new note.
  - We could reissue public authorities on an accelerated basis.
  - New authorities would use the new note.
  - Existing private authorities would more than likely have to be renegotiated and reissued on the anniversary date.
  - Since a large percentage of our traffic moves on private authorities, it would take up to a year to achieve good coverage. In the case of long term contracts, it will take longer.
- As far as the maintenance of two FSC formulas (notes), it can be handled:
  - Marketing services would calculate the percentage each month for both FSC versions and inert the resulting percentages in each note in 9255. The note change would be "issued" in 9255. 9255 and REN would be automatically updated and the new FSC % applied.
  - The authorities associated to the FSC notes would not be reissued with each percentage change.
- Marketing Services is already in the process of preparing the new generic 9255 FSC note that simply refers to the C/C, w/o the full text. Regardless of the decision on a FSC change, we start the transition to swap out the note::
  - It will position us to make a universal change (w/o changing each rate publication) if we later decide to change the FCS.
  - The new note w/o the FSC text will be far shorter. The current note takes a half page of text. This

will streamline our publications.

This file is produced natively

| Month | NS Merch Rev (L & F) (Yearly AVG/Month) | NS FSC (actual) | CSXT FSC (Pro Forma) | BNSF FSC (actual) | UP FSC (pro forma) | Revenue From FSC (NS FSC X .52 adj) | Revenue From FSC (CSXT FSC X .52 adj) | Revenue From FSC (BNSF FSC X .52 adj) | Revenue From FSC UP FSC X .52 adj) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **See Note 1 below** | | | 0 |
| January, 2002 | $200,750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February, 2002 | $200,750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| March, 2002 | $200,750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| April, 2002 | $200,750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| May, 2002 | $200,750,000 | 0 | 0.80% | 0 | 0 | 0 | $835,120 | 0 | 0 |
| June, 2002 | $200,750,000 | 0 | 1.60% | 1.00% | 0 | 0 | $1,670,240 | $1,670,240 | 0 |
| July, 2002 | $200,750,000 | 0 | 2.00% | 1.00% | 0 | 0 | $2,087,800 | $2,087,800 | 0 |
| August, 2002 | $200,750,000 | 0 | 1.20% | 0.00% | 0 | 0 | $1,252,680 | 0 | 0 |
| September, 2002 | $200,750,000 | 0 | 1.60% | 0.00% | 0 | 0 | $1,670,240 | 0 | 0 |
| October, 2002 | $200,750,000 | 14 day @2% | 2.40% | 1.00% | 0 | $942,877 | $2,505,360 | $2,505,360 | 0 |
| November, 2002 | $200,750,000 | 2.00% | 2.80% | 2.00% | 2.00% | $2,087,800 | $2,922,920 | $2,922,920 | $2,922,920 |
| December, 2002 | $200,750,000 | 11 day @2% | 2.40% | 2.50% | 2.50% | $740,832 | $2,505,360 | $2,609,750 | $2,609,750 |
| **Year 2002** | **$2,409,000,000** | | | | | **$3,771,509** | **$15,449,720** | **$11,796,070** | **$5,532,670** |
| January, 2003 | $206,886,000 | 2 day @ 2% | 1.60% | 2.00% | 2.00% | $138,814 | $1,721,292 | $2,151,614 | $2,151,614 |
| February, 2003 | $206,886,000 | 2.00% | 2.80% | 2.00% | 2.00% | $2,151,614 | $3,012,260 | $2,151,614 | $2,151,614 |
| March, 2003 | $206,886,000 | 2.00% | 4.00% | 2.50% | 2.50% | $2,151,614 | $4,303,229 | $2,689,518 | $2,689,518 |
| April, 2003 | $206,886,000 | 2.00% | 5.20% | 4.50% | 4.50% | $2,151,614 | $5,594,197 | $4,841,132 | $4,841,132 |
| May, 2003 (see Note 2) | $206,886,000 | 2.00% | 4.40% | **2.00%** | **2.00%** | $2,151,614 | $4,733,552 | $2,151,614 | $2,151,614 |
| June, 2003 (see Note) | $206,886,000 | 2.00% | 2.40% | 3.00% | **2.00%** | $2,151,614 | $2,581,937 | $3,227,422 | $2,151,614 |
| July, 2003 | $206,886,000 | 2.00% | 2.40% | 2.50% | 2.50% | $2,151,614 | $2,581,937 | $2,689,518 | $2,689,518 |
| **2003 ytd total** | | | | | | **$13,048,498** | **$24,528,404** | **$19,902,432** | **$18,826,624** |

**Note 1:** Re 52% FSC Ajustment. 52% of non-Intermodal Line-haul NS revenue is subject to the NS FSC.

**Note 2:** May percentage reduced by BNSF from 5% to 2% to bring percentage in line with sharply declining oil prices. Assume UP would do the same.
June percentage reduction announced by UP from 3% to 2% to reflect current market conditions

| Month | NS FSC (actual) | CSXT FSC (Pro Forma) | BNSF FSC (actual) | UP FSC (pro forma) |
|---|---|---|---|---|
| January, 2002 | 0 | 0 | 0 | 0 |
| February, 2002 | 0 | 0 | 0 | 0 |
| March, 2002 | 0 | 0 | 0 | 0 |
| April, 2002 | 0 | 0 | 0 | 0 |
| May, 2002 | 0 | 0.80% | 0 | 0 |
| June, 2002 | 0 | 1.60% | 1.00% | 0 |
| July, 2002 | 0 | 2.00% | 1.00% | 0 |
| August, 2002 | 0 | 1.20% | 0.00% | 0 |
| September, 2002 | 0 | 1.60% | 0.00% | 0 |
| October, 2002 | 14 day @2% | 2.40% | 1.00% | 0 |
| November, 2002 | 2.00% | 2.80% | 2.00% | 2.00% |
| December, 2002 | 11 day @2% | 2.40% | 2.50% | 2.50% |
| **Year 2002** | | | | |
| January, 2003 | 2 day @ 2% | 1.60% | 2.00% | 2.00% |
| February, 2003 | 2.00% | 2.80% | 2.00% | 2.00% |
| March, 2003 | 2.00% | 4.00% | 2.50% | 2.50% |
| April, 2003 | 2.00% | 5.20% | 4.50% | 4.50% |
| May, 2003 (see Note) | 2.00% | 4.40% | **2.00%** | **2.00%** |
| June, 2003 (see Note) | 2.00% | 2.40% | 3.00% | **2.00%** |
| July, 2003 | 2.00% | 2.40% | 2.50% | 2.50% |
| **2003 ytd total** | | | | |

**Note:** May percentage reduced by BNSF from 5% to 2% to bring percentage in line with sharply declining oil prices. Assume UP would do the same.
June percentage reduction announced by UP from 3% to 2% to reflect current market conditions

**Subject:** Fuel Surcharge – CSXT vs. NS Comparison
**Date**: April 7 2003

**To**: DWS; CJB
**From:** PJG

Until the recently announced CSXT Fuel Surcharge (FSC) policy change, all Class One U.S. carriers, except the BNSF, observed the same Fuel Surcharge (FSC) standard. The just announced CSXT policy change undercuts some of the ease-of-doing-business and market competition assumptions supporting the current standard. On the other hand, the CSXT formula would have produced additional $7,083,472 in NS revenue in 2002 and YTD 2003 had it been in effect. The following arguments for and against adopting the CSXT Fuel Surcharge are based on comments and opinions pressed customers, other carriers and NS personnel since the inception of the first FSC in 2000

**<u>The case against adopting the CSXT standard:</u>**

**1 - Ease of doing business.**

- **Customer administration**. Many customers claim that price adjustments and surcharges are difficult to administer. Analysis by CFIT and related billing analysis indicates that poor price administration by customers is responsible for a large percentage of our billing disputes.
- **Frequency of administration**. The .4% per $1 WTI increase will likely result in more frequent FSC changes. The current 2%/$28/WTI standard is far less sensitive to small price fluctuations.
- **Common FSC standard**. At this moment we currently share the same FSC standard with all the major US carrier (except BNSF), but that will be changing. The CSXT has announced. The UP hasn't announced but it appears that it will. The CN and CP maintain their own FSC standards. That would leave 3 US groups: 1) NS, FEC and KCS; 2) BNSF; and CSXT and UP. The announced CSXT change undercuts what was the US standard and places more of a maintenance burden (3 standards, 5 if you include Canadian) on customers, especially the larger customers served two or more originating RRs. However, if the UP opts to adopt the CSXT standard, this ease of doing business argument actually becomes a point in favor of NS adopting the CSXT standard, at least from a standards perspective. The smaller carriers would more than likely adopt it after waiting for any fallout. That would leave only the BNSF and the Canadians out of synch. This assumes the carriers are able to make the new standard stick.
- **CSXT increased the FSC %.** Technically, the CSXT formula provides the same 2% FSC at $28.00 WTI. **However, as soon as the monthly average WTI goes to $28.01, the FSC increases to 2.4%.** Not only does the FSC kick sooner in at $23 vs $28, the actual FSC is higher at $28.01. This opens us to the argument that we are not only taking the FSC sooner, at higher costs to the customers, but that we are raised the FSC from 2.0% to 2.4% at comparable WTI levels.

**2 – Revenue issues**

- **Established NS base**. The implementation of the original FSC generated intense customer opposition, but many have since accepted the current standard. Changing it to a lower threshold that results in more frequent changes and higher percentages will reopen the debate with customers and complicate routine price negotiations
- **Customer push back**. Where we currently have customers on the FSC, we run the risk of losing the surcharge altogether. While 82% of out authorities have the FSC, only 52% of our line-haul revenue is subject to it. The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC.

**3 - Technical issues:**

- **Publication limitations**. NS actually inserts the current SC in all publications. If we adopt a new FSC, to make it effective, we will have to republish each authority subject to the new FSC.
- **Unlike the approach the CSXT is attempting, NS must republish at the Price authority level**. CSXT is taking the position that they are simply referring to the FSC clause in their T&C and that by changing the FSC clause in the T&C will implement that new FSC in all publications, public and private. That assumption is questionable for private authorities, particularly contracts, and they privately admit that. On the other hand, NS publishes the FSC clause in each price publication. NS would have republish each rate authority in order to replace it. Public authorities can be done at our convenience. Private authorities would most likely have to be changed as part of the renegotiation process, something CSXT may be facing on private authorities as well. Replacing the FSC in NS publications require that we republish all authorities. The logistics of publication would require that we stagger the implementation.

.

**<u>The case in favor of adopting the CSXT standard</u>**

**1 - Ease of doing business**

- **Better customer notification**. The monthly average WTI standard (prior monthly WTI average announced in the current month to be effective in the following month) provides better lead time for systems changes. The BNSF and CSXT standards both use this methodology. The major difference is that BNSF is based on diesel prices, a more volatile index.
- **Consistent application.** The FSC is applied by calendar month. This removes variability as to when the FSC will be applied.
- **Establish a new standard**. If one or more other Class1 carriers switch to the CSXT standard, we would have a better "ease of doing business" case for adopting a new standard
- **Truck like**. Despite some evidence to the contrary for smaller customers, the larger customers that ship both rail and truck have billing systems that should be able to accommodate surcharges.

**2- Revenue**

- **More revenue**. The CSXT standard clearly produces significantly more compensation, and it does it sooner and more consistently. Assuming both FSC standards were in effect for all of last year, they would each produce the following NS MDSE revenues (see attach spreadsheet):

  **2002 $3.8M NS vs $15.5M CSXT version. Full year**.
  **2003 $4.4.M NS vs $9.0M CSXT version. YTD**.

- **Quicker implementation**. The lower threshold combined with the $1 WTI thresholds mean the CSXT kicks in sooner. For example, May 2002 (CSXT) vs. October 2002 (NS).

**3- Technical issues:**

- **NS billing systems can handle the CSXT standard**. Marketing Services updates the FSC note in 9255 covering FSC formula. The change is automatically applied to all prices subject to the involved FSC note. By comparison, the BNSF is forced to reissue all FSC related prices in REN whenever there is a FSC update.
- **Some Limitations.** Tracking the WTI and loading the FSC percentage is a manual process for Marketing Services. However, once the percentage is loaded on the appropriate note in 9255, the rest is automatic. What we cannot handle are numerous formulas producing different percentages, on different dates for different durations. The administration of multiple FSC becomes a problem and, more importantly, we are not able to maintain targeted FSC distribution lists for customer notification. If we opt to change the FSC, we can maintain two (old and new), but we cannot easily or accurately sustain a variety negotiated variations that customers will invariably what to negotiate.

In a related note, the BNSF made some inquiries regarding REN standards covering the passing of mileage in FSC condition codes (notes). They appear to be looking at the widely distributed report criticizing all carriers for the fact that the FSC are based on a percentage of revenue vs. mileage. In other words, high value ladings tend to be billed higher fuel charges. While this would address some of the customer complaints, the rail industry lacks a good way to determine interline rail miles. We have no reason to believe they are seriously considering a change to a mileage basis.

Revisiting a key point made earlier…..If we adopt the new CSXT standard, there are implementation issues:

**Contracts** - The FSC is actually included (printed) in NS contracts. In order to remove it we would have to renegotiate and reissue each contract or allow it to expire and make the change in the next contract. The CSXT did not imbed the FSC text in their authorities. Their opening position that since their contracts simply refer to their T&C, which will be changed, the contracts are automatically subject to the new FSC. Privately, they admit that this is a stretch and expect strong customer opposition.

**Private Quotes** – Again, the FSC is printed in the NS private quote. NS has traditionally honored terms printed in private quotes for the duration of the publication. While there is a case to be made that we can change the terms, this is not a position we should necessarily adopt. Customers would lose trust in our private quotes and insist that we instead establish contracts. Administratively this is not something we want.

**Public Quotes and Tariffs** – Again, we have the FSC included in each publication. However, in this case we are free to change the publications on 20 days notice. Logistically, we could not process them all at the same time. We would have to stagger the implementation.

Since we have less latitude than the CSXT to make wholesale changes, my recommendation, if we opt to adopt the CSXT standard, would be to:

- Not immediately announce a FSC policy change
- Wait for fuel costs to drop and stabilize, preferably to drop off completely
- Announce that public authorities will "transition" to a new FSC beginning xx-xx-xx.
- Make the changes on public prices over a relatively short period
- Handle private authorities on a case by cases basis

**Pre-CSXT RR Comparison**

| RR | BASIS | SCHEDULE , |
|---|---|---|
| NS | WTI - 30 Day WSJ price | 2% increase for $5.00 increments over $23 |
| UP | WTI - 30 Day WSJ price | 2% increase for $5.00 increments over $23 |
| KCS | WTI - 30 Day WSJ price | 2% increase for $5.00 increments over $23 |
| BNSF | Monthly Highway Diesel Fuel average w/one month delay for announcement of % | .5% increments per $.05 increments above $1.299 per gallon (1% threshold) |
| CSXT | WTI – monthly average per barrel, probably with one month delay from % announcement | .4 % increase for each dollar increase aver $23 |
| CN | WTI - Average for previous QTR | 2% $24.00 - $26.99<br>4% $27.00 - $31.99<br>6% $32.00 - $36.99<br>8% $37.00 - $41.99<br>Each $5.00 U.S. increase thereafter = additional 2%. |
| CPR | WTI - Average for previous QTR | 3% above $22.00<br>6% above $30.00 |

**From:** Luebbers, Chris D.
**Sent:** Tue Apr 02 11:27:11 2002
**To:** Kirchhoff, Russ E.; Traubel, Christine G.; Sadoti, Steve P.; Wakefield, Tod A.; Reese, Tom G.
**Cc:** Heller, Jeffrey S.; Elkins, Ed
**Subject:** Fuel Surcharge for International
**Importance:** Normal
**Attachments:** fuelcalculations.xls

All:

As was announced today, NS Intermodal is re-implementing the fuel surcharge based upon the DOE's weekly Deisle Index.

As we did during the last FSC application, International accounts will follow a predetermined scale for charging the FSC:

If the DOE Index is
1.300 - 1.399 - 1.0%
1.400 - 1.499 - 2.0%
1.500 - 1.599 - 3.0%
1.600 - 1.699 - 4.0%
etc.

Using the scale makes the FSC less arbitrary and somewhat more fair in the eyes of the International shippers. In order to maintain as much consistency across the International business as possible, it is our intention to inform RACS to apply the International scale to any account with a LOB based on international. I have attached a list of such accounts, several of which are assigned to you. There is a space for comments if there is anything we need to know regarding an account and the FSC.

Please look this over an let me know if you have any questions. We will update this list each Tuesday so you can inform your accounts how much they should expect to pay beginning the following Monday.

Regards,
Chris

<<...>>

| Shipper | LOB | Mkt Mgr | 4/9/2002<br>FSC Applicable? | 4/9/2002<br>Amount | Comments |
|---|---|---|---|---|---|
| [redacted] | I RETAIL | KIRCHHOFF | No | | |
| [redacted] | I OCN CARR | LEONARDOS | No | | |
| [redacted] | I RETAIL | TRAUBEL | No | | |
| [redacted] | I OCN CARR | STASULIS | No | | |
| [redacted] | I OCN CARR | LEONARDOS | No | | FSC included in rates in NSPQ, % based upon CP |
| [redacted] | I OCN CARR | LEONARDOS | No | | FSC included in rates in NSPQ, % based upon CP |
| [redacted] | I RETAIL | TRAUBEL | No | | |
| [redacted] | I OCN CARR | ECKHARDT | No | | |
| [redacted] | I OCN CARR | STASULIS | No | | |
| [redacted] | I OCN CARR | LEONARDOS | No | | |
| [redacted] | I OCN CARR | DODD | No | | |
| [redacted] | I OCN CARR | STASULIS | No | | FSC included in rates in NSPQ |
| [redacted] | I OCN CARR | STASULIS | No | | |
| [redacted] | I OCN CARR | ECKHARDT | No | | |
| [redacted] | I RETAIL | KIRCHHOFF | No | | |
| [redacted] | I 3RD PRTY | REESE | No | | |
| [redacted] | I OCN CARR | DODD | No | | On hold pending negotiations |
| [redacted] | I OCN CARR | BAYLES | No | | % amount changed in monthly increments based upon the last posting of the previous month |
| [redacted] | I RETAIL | LEONARDOS | No | | |
| [redacted] | I OCN CARR | DODD | No | | On hold pending negotiations |
| [redacted] | I 3RD PRTY | DODD | No | | |
| [redacted] | I 3RD PRTY | KIRCHHOFF | No | | |
| [redacted] | I OCN CARR | STASULIS | No | | |
| [redacted] | I OCN CARR | ECKHARDT | No | | Based on a formuula in contract, changes once per month, based upon last posting of the previous month |
| [redacted] | I OCN CARR | STASULIS | No | | FSC included in rates in NSPQ |
| [redacted] | I 3RD PRTY | KIRCHHOFF | No | | |
| [redacted] | I OCN CARR | LEONARDOS | No | | FSC included in rates in NSPQ |
| [redacted] | I OCN CARR | LEONARDOS | No | | On hold pending negotiations |
| [redacted] | I 3RD PRTY | STASULIS | No | | |
| [redacted] | I OCN CARR | BAYLES | No | | |
| [redacted] | I 3RD PRTY | KIRCHHOFF | No | | |
| [redacted] | I OCN CARR | BAYLES | No | | |
| [redacted] | I OCN CARR | LEONARDOS | No | | |
| [redacted] | I OCN CARR | ECKHARDT | No | | On hold pending negotiations |
| [redacted] | I OCN CARR | BAYLES | No | | On hold pending negotiations |
| [redacted] | I OCN CARR | BAYLES | No | | % amount changed in monthly increments based upon the last posting of the previous month |
| [redacted] | I 3RD PRTY | BAYLES | No | | % amount changed in monthly increments based upon the last posting of the previous month |
| [redacted] | I 3RD PRTY | DODD | No | | |
| [redacted] | I 3RD PRTY | SADOTI | No | | |
| [redacted] | I OCN CARR | STASULIS | No | | |
| [redacted] | I OCN CARR | LEONARDOS | No | | |
| [redacted] | I 3RD PRTY | ECKHARDT | No | | |
| [redacted] | I OCN CARR | WAKEFIELD | No | | |
| [redacted] | I OCN CARR | STASULIS | No | | |
| [redacted] | I OCN CARR | ECKHARDT | No | | Contract exempt from FSC through 8/31/02 |
| [redacted] | I OCN CARR | BAYLES | No | | |

**From:** Eckhardt, Augie
**Sent:** Thu Nov 16 15:53:36 2006
**To:** 'Randolph, Robert'; 'greg.friede@coors.com'
**Cc:** Heller, Jeffrey S.; Bayles, Randy O.; Eckhardt, Augie; Luebbers, Chris D.
**Subject:** RE: NS Front Royal Rates
**Importance:** Normal

Rob,

We used the rates we quoted you for all the business in the most recent proposal so there will be no downward reduction if/when we get the additional traffic.

The NS Intermodal FSC is based on the Department of Energy's Weekly On-highway Diesel Fuel Price Index (National), and the scale below. We put this scale into place for International traffic back in August. Prior to that we did have a different International scale, but now all of our Intermodal traffic is consolidated under this same scale. As of November 11th our FSC is 17% and will be reviewed again next Monday.

The D.O.E.'s Index can be found at: www.eia.doe.gov. At the top of the home page, click on "Petroleum". From the Petroleum page, click on "Heating Oil, Diesel, Distillate". Finally, click on "Weekly On-Highway Diesel Prices" listed under "Most Recent Weekly Data".

| DOE On-Hwy Diesel Price | Percent | DOE On-Hwy Diesel Price | Percent |
|---|---|---|---|
| $0.00-$1.239 | 0.00% | $2.32-$2.359 | 14.50% |
| $1.24-$1.279 | 1.00% | $2.36-$2.399 | 15.00% |
| $1.28-$1.319 | 1.50% | $2.40-$2.439 | 15.50% |
| $1.32-$1.359 | 2.00% | $2.44-$2.479 | 16.00% |
| $1.36-$1.399 | 2.50% | $2.48-$2.519 | 16.50% |
| $1.40-$1.439 | 3.00% | $2.52-$2.559 | 17.00% |
| $1.44-$1.479 | 3.50% | $2.56-$2.599 | 17.50% |
| $1.48-$1.519 | 4.00% | $2.60-$2.639 | 18.00% |
| $1.52-$1.559 | 4.50% | $2.64-$2.679 | 18.50% |
| $1.56-$1.599 | 5.00% | $2.68-$2.719 | 19.00% |
| $1.60-$1.639 | 5.50% | $2.72-$2.759 | 19.50% |
| $1.64-$1.679 | 6.00% | $2.76-$2.799 | 20.00% |
| $1.68-$1.719 | 6.50% | $2.80-$2.839 | 20.50% |
| $1.72-$1.759 | 7.00% | $2.84-$2.879 | 21.00% |
| $1.76-$1.799 | 7.50% | $2.88-$2.919 | 21.50% |
| $1.80-$1.839 | 8.00% | $2.92-$2.959 | 22.00% |
| $1.84-$1.879 | 8.50% | $2.96-$2.999 | 22.50% |
| $1.88-$1.919 | 9.00% | $3.00-$3.039 | 23.00% |
| $1.92-$1.959 | 9.50% | $3.04-$3.079 | 23.50% |
| $1.96-$1.999 | 10.00% | $3.08-$3.119 | 24.00% |
| $2.00-$2.039 | 10.50% | $3.12-$3.159 | 24.50% |
| $2.04-$2.079 | 11.00% | $3.16-$3.199 | 25.00% |
| $2.08-$2.119 | 11.50% | $3.20-$3.239 | 25.50% |
| $2.12-$2.159 | 12.00% | $3.24-$3.279 | 26.00% |
| $2.16-$2.199 | 12.50% | $3.28-$3.319 | 26.50% |
| $2.20-$2.239 | 13.00% | $3.32-$3.359 | 27.00% |
| $2.24-$2.279 | 13.50% | $3.36-$3.399 | 27.50% |
| $2.28-$2.319 | 14.00% | $3.40-$3.439 | 28.00% |

```
If the DOE On-Highway Diesel Price Average equals
or exceeds $3.44 per gallon, the fuel surcharge
increases 0.5% for every 4-cent increase in diesel
price
```

Rob, if you have any questions regarding the above please feel free to give me or Chris Luebbers a call as both of us are in the office this week. Also, if you or Greg fell it would be of benefit for us to come to Elkton or Golden, or even Porto Rico to make a presentation on the proposal we would be happy to do so. Time is slipping away but we may be able to put a trip together during the first couple weeks of December if it makes sense to the two of you. Please let us know if you think a trip would be helpful so we can work on a date agreeable to all.

Regards,

Augie

-----Original Message-----
**From:** Randolph, Robert [mailto:Robert.Randolph@coors.com]
**Sent:** Wednesday, November 15, 2006 6:23 PM
**To:** Eckhardt, Augie
**Subject:** NS Front Royal Rates

Augie,
As I am reviewing our options to transport containers to JAX, the delta is very small between a number of options. One question I have is what fuel surcharge program will be used on the rates you quoted me? I understand there is an old and a new program and I think fuel is going to be a very important factor in determining an option. Also, provided volume rises to the level we originally discussed (5-6000 containers per year) do the rates drop to the level you provided a while back?

Thanks,
Rob

**Robert W. Randolph**
**Supply Chain Manager, International Logistics**
Phone: 303-277-7151
Fax: 303-277-2574
Cell: 303-359-4365
robert.randolph@coors.com

**From:** Heller,Jeffrey
**Sent:** Tue Mar 07 22:17:06 2000
**To:** Bolander,Jim
**Cc:** Parker,Dick
**Subject:** FW: IM News Vol. 2000-24: NS Intermodal Fuel Surcharges
**Importance:** Normal
**Attachments:** 0307-24.doc

Jim/Dick:

I thought we agreed that the general statement would be held for one week. Also , what happened to 3% on international?

This was not the plan!!

Jeff

-----Original Message-----
**From:** Ralph,Courtney
**Sent:** Tuesday, March 07, 2000 4:34 PM
**To:** Intermodal Marketing
**Cc:** 'swnetter@nscorp.com'
**Subject:** IM News Vol. 2000-24: NS Intermodal Fuel Surcharges

All:

Attached is the IM News Volume 2000-24: NS Intermodal Fuel Surcharges.

<<...>>

Courtney Ralph
cjralph@nscorp.com
Phone: (757) 823-5216
Fax: (757) 823-5716

NORFOLK SOUTHERN

# Intermodal News

March 7, 2000
Volume 2000-24

World Wide Web:
www.nscorp.com

For rate requests, please contact your local NS Intermodal Account Manager or email:
imprice@nscorp.com

Requests for matrix pages:
eprice@nscorp.com

NS EMP/NACS reservations, rates, and service:
www.rez1systems.com

If you have any questions, please contact your local NS Intermodal Account Manager.

## NS Intermodal Fuel Surcharge

Effective March 20, 2000 NS will begin to access a general Fuel Surcharge of 4% on all Intermodal Rule 11, Local and Forwarded traffic.

NS will assess this charge on a weekly basis starting with freight bills dated on and after March 20, 2000. This fuel surcharge will be adjusted to reflect changes in the Department of Energy Retail On-Highway Diesel Prices (National U.S. Average) index. This index is updated every Monday and can be accessed on the Internet at www.eia.doe.gov.

Your NS Corporate Account Manager or your Local Intermodal Account Manager will contact you regarding specifics on how this charge affects your account.

**From:** Stasulis, Steve S.
**Sent:** Tue Nov 15 14:55:28 2005
**To:** Trisha Stephenson; Augie Eckhardt; Brooks, Nancy H.; Chris Luebbers; Damon Deese; Dennis Meadows; Hugh Dodd; Jeff Heller; Lori Leonardos; Mary Frances Crowe; Randy Bayles; Ryan Nickerson
**Subject:** NS International Fuel Surcharge 11-14-2005
**Importance:** Normal
**Attachments:** Fuel Surcharge Internal 11-14-2005.doc; International FSC Application 11-14-2005.xls

Steve Stasulis
Assistant Market Manager
Norfolk Southern Corporation
Three Commercial Place
Norfolk, VA 23510-9208
757-629-2654 phone
ssstasul@nscorp.com

All:

The reading on the DOE Diesel Fuel Index stayed below $2.70 at $2.602. The Index decreased from the previous week, where it had been $2.698, and provides for the Fuel Surcharge to decrease to 16%. We will reduce the International FSC to 16.0% effective November 22, 2005. This FSC will be effective November 22 through November 28, 2005.

The Index will again be updated on Monday, November 21, 2005. The reading on that date will be applied for the period from November 29 through December 5, 2005. International Weekly general FSC has a three week lag prior to change. This kept the increase in check going up and holds the decrease in the same way. The decrease may result in next week's announced FSC to decline to as low as 14%.

The attached list contains how the FSC will be applied to each account.

MMs - Please advise your accounts accordingly of the FSC. --**DO NOT FORWARD THIS MESSAGE.**

Regards,

Steven S. Stasulis
Assistant Market Manager – International
Norfolk, VA 23510-9208
757-629-2654

| MONTH | LOB | Shipper | 03 Rev | 03 Vol | FSC Amount | |
|---|---|---|---|---|---|---|
| 1 | I 3RD PRTY | [redacted] | $315,407 | 935 | $9,462.21 | |
| 1 | I 3RD PRTY | [redacted] | $903,143 | 2,034 | $27,094.29 | |
| 1 | I 3RD PRTY | [redacted] | $4,807 | 9 | $144.21 | |
| 1 | I 3RD PRTY | [redacted] | $134,455 | 241 | $4,033.65 | |
| 1 | I 3RD PRTY | [redacted] | $624,506 | 1,159 | $18,735.18 | |
| 1 | I 3RD PRTY | [redacted] | $177,441 | 361 | $5,323.22 | |
| 1 | I 3RD PRTY | [redacted] | $67,546 | 119 | $2,026.38 | |
| 1 | I 3RD PRTY | [redacted] | $124,587 | 1,084 | $3,737.61 | |
| 1 | I OCN CARR | [redacted] | $3,427 | 23 | $102.81 | |
| 1 | I OCN CARR | [redacted] | $1,083,919 | 2,297 | $32,517.57 | |
| 1 | I OCN CARR | [redacted] | $89,920 | 190 | $2,697.60 | |
| 1 | I OCN CARR | [redacted] | $132,844 | 322 | $3,985.32 | |
| 1 | I OCN CARR | [redacted] | $95,188 | 230 | $2,855.64 | |
| 1 | I OCN CARR | [redacted] | $43,458 | 105 | $1,303.74 | |
| 1 | I OCN CARR | [redacted] | $1,472,384 | 4,903 | $0.00 | |
| 1 | I OCN CARR | [redacted] | $194,404 | 449 | $5,832.13 | |
| 1 | I OCN CARR | [redacted] | $118,737 | 235 | $3,562.10 | |
| 1 | I OCN CARR | [redacted] | $30,840 | 41 | $925.20 | |
| 1 | I OCN CARR | [redacted] | $2,525,153 | 7,122 | $25,251.53 | |
| 1 | I OCN CARR | [redacted] | $4,409,128 | 12,262 | $0.00 | $132,273.84 |
| 1 | I OCN CARR | [redacted] | $689,797 | 1,260 | $20,693.91 | |
| 1 | I OCN CARR | [redacted] | $3,427,400 | 9,956 | $0.00 | $102,822.00 |
| 1 | I OCN CARR | [redacted] | $2,812,713 | 8,281 | $42,190.70 | |
| 1 | I OCN CARR | [redacted] | $368,414 | 674 | $11,052.43 | |
| 1 | I OCN CARR | [redacted] | $6,202,591 | 15,357 | $0.00 | $186,077.73 |
| 1 | I OCN CARR | [redacted] | $217,416 | 459 | $6,522.48 | |
| 1 | I OCN CARR | [redacted] | $1,831,723 | 5,126 | $0.00 | $54,951.69 |
| 1 | I OCN CARR | [redacted] | $2,250,129 | 6,432 | $0.00 | $67,503.87 |
| 1 | I OCN CARR | [redacted] | $1,337,777 | 3,898 | $40,133.31 | |
| 1 | I OCN CARR | [redacted] | $7,935 | 30 | $238.05 | |
| 1 | I OCN CARR | [redacted] | $123,639 | 249 | $3,709.17 | |
| 1 | I OCN CARR | [redacted] | $128,920 | 374 | $3,867.60 | |
| 1 | I OCN CARR | [redacted] | $15,013 | 25 | $450.39 | |
| 1 | I OCN CARR | [redacted] | $882,356 | 2,571 | $26,470.67 | |
| 1 | I OCN CARR | [redacted] | $374,469 | 819 | $11,234.07 | |
| 1 | I RETAIL | [redacted] | $183,480 | 321 | $5,504.40 | |
| 1 | I RETAIL | [redacted] | $76,564 | 130 | $2,296.92 | |
| 1 | I RETAIL | [redacted] | $7,430 | 18 | $0.00 | |
| | | | $33,489,061 | | $323,954.50 | $3,887,454.03 |

| | | | 4/9/2002-4/22/02 | | 4/23/2002-5/6/02 | | 5/7/2002-10/7/02 | | 10/8/02-2/24/03 | | 2/25/03 - 3/3/03 | 3/4/03 - 3/10/03 | 3/11/03 - 4/14/03 | 4/15/03 - 5/5/03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shipper | LOB | Mkt Mgr | FSC Applicable? | Amount | FSC Applicable? | Amount | FSC Applicable? | Amount | fsc applicable? | Amount | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable |
| [redacted] | I RETAIL | KIRCHHOFF | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | | LEONARDOS | | | | | | | | | 3% | 4% | 5% | 4% |
| [redacted] | I RETAIL | TRAUBEL | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | BAYLES | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I RETAIL | TRAUBEL | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | ECKHARDT | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | | | | | | | | | | | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | BAYLES | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | LEONARDOS | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | | | | | | | | | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | MCMAHON | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | | | | | | | | | | | 3% | 4% | 5% | 4% |
| [redacted] | I 3RD PRTY | REESE | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I RETAIL | LEONARDOS | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I 3RD PRTY | DODD | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | | | | | | | | | | | 3% | 4% | 5% | 4% |
| [redacted] | I 3RD PRTY | KIRCHHOFF | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | STASULIS | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I 3RD PRTY | KIRCHHOFF | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | | LEONARDOS | | | | | | | | | 3% | 4% | 5% | 4% |
| [redacted] | I 3RD PRTY | DODD | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | BAYLES | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I 3RD PRTY | KIRCHHOFF | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | BAYLES | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | LEONARDOS | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I 3RD PRTY | SADOTI | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | MACFARLAND | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | LEONARDOS | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I 3RD PRTY | ECKHARDT | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |
| [redacted] | I OCN CARR | REESE | No | | Yes | 1% | Yes | 1% | yes | 2% | 3% | 4% | 5% | 4% |

| 5/06/03 - 5/26/03 | 5/27/03 - 1/12/03 | 1/13/04 3/22/04 | 3/23/04 5/10/04 | 5/11/04 8/30/04 | 8/31/04 10/11/04 | 10/12/04 10/18/04 | 10/19/04 11/8/04 | 11/9/04 12/27/04 | 12/28/04 1/3/05 | 1/4/05 3/14/05 | 3/15/05 3/21/05 | 3/22/05 4/11/05 | 4/12/05 6/6/05 | 6/7/05 6/27/05 | 6/28/05 7/11/05 | 7/12/05 8/29/05 | 8/30/05 9/5/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | xxxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxx | xxxxxx | xxxxxx | xxxxxx |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | xxxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxx | xxxxxx | xxxxxx | xxxxxx |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | xxxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxx | xxxxxx | xxxxxx | xxxxxx |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | | | xxxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxxx | xxxxxxx | xxxxxx | xxxxxx | xxxxxx |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |
| 3% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 8% | 7% | 8% | 9% | 10% | 9% | 10% | 11% | 12% |

| 9/6/05<br>9/26/05 | 9/27/05<br>10/24/05 | 10/25/05<br>11/21/05 | 11/22/05<br>11/28/05 | How billed FSC by RACS?<br>I=per individual FB |
|---|---|---|---|---|
| **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | S=per summary statement<br>separate invoice |
| 13% | 15% | 19% | 16% | merchandise traffic--not added to the table |
| xxxxxx | xxxxxx | xxxxxx | xxxxxx | changed to special agreement 1/4/05 |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | S (monthly summary) |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| xxxxxx | xxxxxx | xxxxxx | xxxxxx | S (monthly summary) (change to special agreement customers 1/4/2005) |
| 13% | 15% | 19% | 16% | S (weekly summary) |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | no waybill accrued since 11/21/01--not added to table at this time |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| xxxxxx | xxxxxx | xxxxxx | xxxxxx | I (changed to special agreement 1/4/05) |
| 13% | 15% | 19% | 16% | I |
| xxxxxx | xxxxxx | xxxxxx | xxxxxx | S (monthly summary)(changed to special agreement 1/4/05) |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | no waybill accrued since 7/31/01--not added to table at this time |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |
| 13% | 15% | 19% | 16% | I |



Highly Confidential

**Cell:** A13
**Comment:** it:
Formerly Americana and Contship

| **% amount changed in monthly increments based upon the last posting of the previous month** | | | 4/9/2002-4/22/02 | | 4/23/2002-5/6/02 | | 5/7/2002-10/7/02 | | 10/8/02-2/24/03 | | 2/1/2003 2/28/2003 | 3/1/2003- 4/30/2004 | 5/1/2003 5/31/2003 | 6/1/2003 8/31/2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shipper | LOB | Mkt Mgr | FSC Applicable? | Amount | FSC Applicable? | Amount | FSC Applicable? | Amount | fsc applicable? | Amount | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable |
| APL | I OCN CARR | BAYLES | | | | | | | | | | | | |
| CROWLEY LINER SERVICE | I OCN CARR | LEONARDOS | | | | | | | | | | | | |
| HAPAG LLOYD | I OCN CARR | BAYLES | No | | No See Note | | No See Note | | Yes see note | 2% | 2% | 4% | 3% | 2% |
| P&O NED LLOYD | I OCN CARR | BAYLES | No | | No See Note | | No See Note | | Yes see note | 2% | 2% | 4% | 3% | 2% |
| PACER STACKTRAIN | I 3RD PRTY | BAYLES | No | | No See Note | | No See Note | | Yes see note | 2% | 2% | 4% | 3% | 2% |
| WESTWOOD SHIPPING | I OCN CARR | BAYLES | No | | Yes | 1% | Yes | 1% | yes | 2% | 2% | 4% | 3% | 2% |
| YANG MING LINES | I OCN CARR | ECKHARDT | | | | | | | | | | | | 2% |
| ZIM LINES | I OCN CARR | BAYLES | No | | No See Note | | Yes | 1% | Yes | 2% | 2% | 4% | 3% | 2% |

| 9/1/2003 9/30/2003 | 10/1/2003 12/31/2003 | 1/1/2004 3/31/2004 | 4/1/2004 4/30/2004 | 5/1/2004 5/31/2004 | 6/1/2004 8/31/2004 | 9/1/2004 9/30/2004 | 10/1/2004 10/31/2004 | 11/1/2004 11/30/2004 | 12/1/2004 12/31/2004 | 1/1/2005 2/28/2005 | 3/1/2005 3/31/2005 | 4/1/2005 4/30/2005 | 5/1/2005 5/31/2005 | 6/1/2005 6/30/2005 | 7/1/2005 8/31/2005 | 9/1/2005 9/30/2005 | 10/1/2005 10/31/2005 | 11/1/2005 11/30/2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable |
| | | | | | | | | | | | | | | | | | | 19% |
| | | | | 5% | 5% | 6% | 8% | 10% | 9% | 7% | 9% | 10% | 10% | 9% | 11% | 13% | 15% | 19% |
| 3% | 2% | 3% | 4% | 5% | 5% | 6% | 8% | 10% | 9% | 7% | 9% | 10% | 10% | 9% | 11% | 13% | 15% | 19% |
| 3% | 2% | 3% | 4% | 5% | 5% | 6% | 8% | 8% | 8% | 6% | 7% | 9% | xxx | xxx | xxx | xxx | xxx | xxx |
| 3% | 2% | 3% | 4% | 5% | 5% | 6% | 8% | 10% | 9% | 7% | 9% | 10% | 10% | 9% | 11% | 13% | 15% | 19% |
| 3% | 2% | 3% | 4% | 5% | 5% | 6% | 8% | 10% | 9% | 7% | 9% | 10% | 10% | 9% | 11% | 13% | 15% | 19% |
| 3% | 2% | 3% | 4% | 5% | 5% | 5% | 5% | 10% | 9% | 7% | 9% | 10% | xxx | xxx | xxx | xxx | xxx | xxx |
| 3% | 2% | 3% | 4% | 5% | 5% | 6% | 8% | 10% | 9% | 7% | 9% | 10% | 10% | 9% | 11% | 13% | 15% | 19% |

| How billed FSC by RACS?<br>I=per individual FB<br>S=per summary statement<br>separate invoice | |
|---|---|
| | |
| I (Effective 6/1/04) | |
| I | |
| Special Agreement eff 11/1/04 | change to special agreement 11/1/2004 |
| S (Monthly) eff. 9/1/03 | |
| I | |
| I (Special Agreement ) | CHANGE TO SPECIAL AGREEMENT 8/31/2004 |
| I (effective 5/29/03) | |

| | | | 4/9/2002-4/22/02 | | 4/23/2002-5/6/02 | | 5/7/2002-10/7/02 | | 10/8/02-2/24/03 | 2/25/03 - 3/3/2003 | 3/4/03 - 3/10/2003 | 3/11/03 - 4/14/2003 | 4/15/03 - 5/5/2003 | 5/06/03 - 5/26/2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shipper | LOB | Mkt Mgr | FSC Applicable? | Amount | FSC Applicable? | Amount | FSC Applicable? | Amount | fsc applicable? | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable |
| [redacted] | I OCN CARR | BAYLES | No | | No See Note | | No See Note | | No see note | No | No | No | No | No |
| | I OCN CARR | DODD | No | | No See Note | | No See Note | | No see note | No see note | No see note | No see note | No see note | No see note |
| | I OCN CARR | LEONARDOS | No | | No See Note | | No See Note | | No see note | No | No | No | No | No |
| | I OCN CARR | BAYLES | No | | No See Note | | No See Note | | No see note | No see note | No see note | No see note | No see note | No see note |

| | | | 4/9/2002-4/22/02 | | 4/23/2002-5/6/02 | | 5/7/2002-10/7/02 | | 10/8/02-2/24/03 | | 12/1/2002 1/12/2003 | | 1/13/2003 3/3/2003 | 3/4/03 - 5/5/2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shipper | LOB | Mkt Mgr | FSC Applicable? | Amount | FSC Applicable? | Amount | FSC Applicable? | Amount | fsc applicable? | Amount | FSC Applicable | Amount | FSC Applicable | FSC Applicable |
| [redacted] | I OCN CARR | LEONARDOS | No | | No See Note | | No See Note | | No see note | 1.50% | Yes | 1.0% | 1.5% | 3.0% |

| | | | 4/9/2002-4/22/02 | | 4/23/2002-5/6/02 | | 5/7/2002-10/7/02 | | 10/8/02-2/24/03 | 2/1/2003 2/28/2003 | 3/1/2003- 3/31/2003 | 4/1/03 - 4/30/2003 | 5/1/2003 5/31/2003 | 6/1/2003 6/31/2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shipper | LOB | Mkt Mgr | FSC Applicable? | Amount | FSC Applicable? | Amount | FSC Applicable? | Amount | fsc applicable? | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable |
| [redacted] | OCN CARR | LEONARDOS | | | | | | | | | | | | |
| | I OCN CARR | ECKHARDT | No | | No See Note | | No See Note | | No see note | | | | | 2% |
| | OCN CARR | ECKHARDT | | | | | | | | | | | | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | I OCN CARR | ECKHARDT | No | | Yes | 1% | Yes | 1% | yes | 1% | 1% | 1.3% | 1.3% | 1.0% |
| | I OCN CARR | ECKHARDT | No | | No See Note | | No See Note | | No see note | No see note | No see note | No see note | No see note | No see note |
| | I OCN CARR | DODD | No | | No See Note | | No See Note | | No see note | No see note | No see note | No see note | No see note | No see note |

| 5/27/03 - 3/22/2004 | 3/23/2004 5/10/2004 | 5/11/2004 8/30/2004 | 8/31/2004 10/11/2004 | 10/12/2004 10/18/2004 | 10/19/2004 11/8/2004 | 11/9/2004 12/27/2004 | 12/28/2004 1/3/2005 | 1/4/2005 3/14/2005 | 3/15/2005 3/21/2005 | 3/22/2005 4/11/2005 | 4/12/2005 4/25/2005 | 4/26/2005 5/23/2005 | 5/1/2005 5/31/2005 | 6/1/2005 6/30/2005 | 7/1/2005 8/31/2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** |
| No | No | No | No | No | No | No | | | | | | | **0%** | **0.0%** | **0.0%** |
| No see note | No see note | No see note | No see note | No see note | No see note | No see note | | | | | | | **10%** | **0.0%** | **11.0%** |
| No | No | No | No | No | No | No see note | | | | | | | **0%** | **0.0%** | **0.0%** |
| No see note | No see note | No see note | No see note | No see note | No see note | No see note | | | | | | | **8%** | **8.0%** | **8.0%** |

| 5/6/2003 5/31/2003 | 6/1/2003 6/30/2003 | 7/1/2003 4/30/2004 | 5/1/2004 5/31/2004 | 6/1/2004 6/30/2004 | 7/1/2004 7/31/2004 | 8/1/2004 9/30/2004 | 10/1/2004 10/31/2004 | 11/1/2004 12/31/2004 | 1/1/2005 2/28/2005 | 3/1/2005 7/31/2005 | 8/1/2005 8/31/2005 | 9/1/2005 9/30/2005 | 10/1/2005 11/30/2005 | | How billed FSC by RACS? I=per individual FB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **FSC Applicable** | **Comments** | S=per summary statement separate invoice |
| **2%** | **0.5%** | **0%** | **2%** | **2.5%** | **1.5%** | **0.0%** | **2.0%** | **3.0%** | **1.5%** | **3.0%** | **0.0%** | **1.5%** | **3.0%** | Based on a formula in contract, changes monthly, based upon last posting of the previous month | S (monthly summary) |

| 9/1/2003 9/30/2003 | 10/1/2003 12/31/2003 | 1/1/2004 3/31/2004 | 4/1/2004 4/30/2004 | 5/1/2004 7/19/2004 | 7/20/2004 10/31/2004 | 8/31/2004 10/31/2004 | 11/1/2004 11/30/2004 | 12/1/2004 12/31/2004 | 1/1/2005 1/31/2005 | 2/1/2005 2/28/2005 | 3/1/2005 3/31/2005 | 4/1/2005 4/30/2005 | 5/1/2005 5/31/2005 | 6/1/2005 6/30/2005 | 7/1/2005 8/31/2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable | FSC Applicable |
| | | | | | | | | | **4%** | | **4%** | **4%** | **4%** | **4%** | **4%** |
| 3% | 2% | 3% | 4% | 5% | **4%** | | **10%** | **4%** | **4%** | **4%** | **4%** | **10%** | **10%** | **4%** | **11%** |
| | | | | | | | **8%** | **8%** | **6%** | **6%** | **7%** | **9%** | **9%** | **8%** | **10%** |
| | | | | | | 5% | **10%** | **5%** | **5%** | **5%** | **5%** | **10%** | **10%** | **5%** | **11%** |
| | | | | | | RACS notified 7/27/04 | | | | | | | | | |
| | | | | | | RACS notified 9/8/04 | | | | | | | | | |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | 4/12/2005 | 4/26/2005 | 5/17/2005 | 6/7/2005 | 6/21/2005 |
| | | | | | | | | | | | 4/25/2005 | 5/16/2005 | 6/6/2005 | 6/20/2005 | 6/27/2005 |
| **1.0%** | **1.3%** | **2.3%** | **3.3%** | **4.3%** | **5.3%** | **6.3%** | **5.3%** | **4.3%** | **5.3%** | **6.3%** | **7.3%** | **7.3%** | **7.3%** | **6.3%** | **6.3%** |
| No see note | No see note | No see note | No see note | No see note | No see note | No see note | | | | | 4% | 3% | 0% | 0% | 3% |
| | | | | | | | 6/1/2005 | 6/14/2005 | 6/28/2005 | 7/19/2005 | **7/26/2005** | **8/16/2005** | **8/23/2005** | **9/13/2005** | **9/27/2005** |
| | | | | | | | 6/13/2005 | 6/27/2005 | 7/18/2005 | 7/25/2005 | **8/15/2005** | **8/22/2005** | **9/12/2005** | **9/26/2005** | **10/10/2005** |
| No see note | No see note | No see note | No see note | No see note | No see note | No see note | **6%** | **6.5%** | **7.0%** | **7.5%** | **7.0%** | **7.5%** | **8.0%** | **9.5%** | **9.0%** |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/1/2005<br>9/30/2005 | 10/1/2005<br>10/31/2005 | 11/1/2005<br>11/30/2005 | | | | How billed FSC by RACS?<br>I=per individual FB |
| **FSC Applicable** | **FSC Applicable** | | | | **Comments** | S=per summary statement<br>separate invoice |
| **0.0%** | **12.0%** | **12.0%** | | | Only applies when have catestrophic | N/A |
| **13.0%** | **15.0%** | **19.0%** | | | Only applies when have catestrophic | N/A |
| **0.0%** | **0.0%** | **0.0%** | | | On hold pending negotiations | N/A |
| **12.0%** | **14.0%** | **18.0%** | | | May 1 based on last Monday of the previ | N/A |

| | | | | |
|---|---|---|---|---|
| 9/1/2005<br>9/30/2005 | 10/1/2005<br>10/31/2005 | 11/1/2005<br>11/30/2005 | | How billed FSC by RACS?<br>I=per individual FB |
| FSC<br>Applicable | FSC<br>Applicable | | **Comments** | S=per summary statement<br>separate invoice |
| **4%** | **4%** | **4%** | Capped at 4%. | Individual invoice effective 1/1/05 |
| **13%** | **15%** | **19%** | Capped at 4% to 10% 10% & above = NSC general fsc | I (Individual Invoice) effective 6/9/03 |
| **12%** | **14%** | **18%** | One % point below general # appl 3rd Monday of prev month | becomes effective Nov 1 2004 |
| **13%** | **15%** | **19%** | Capped at 5% to 9.9% at 5%; above 9.9% then equals NS general FSC | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/28/2005 | 7/12/2005 | 7/19/2005 | 7/26/2005 | 8/16/2005 | 8/23/2005 | 8/30/2005 | 9/6/2005 | 9/13/2005 | 9/27/2005 | 10/11/2005 | 10/25/2005 | 11/8/2005 | 11/15/2005 | 11/22/2005 |
| 7/11/2005 | 7/18/2005 | 7/25/2005 | 8/15/2005 | 8/22/2005 | 8/29/2005 | 9/5/2005 | 9/12/2005 | 9/26/2005 | 10/10/2005 | 10/24/2005 | 11/7/2005 | 11/14/2005 | 11/21/2005 | 11/28/2005 |
| **7.3%** | **8.3%** | **8.3%** | **8.3%** | **8.3%** | **8.3%** | **9.3%** | **10.3%** | **10.3%** | **12.3%** | **12.3%** | **16.3%** | **16.3%** | **16.3%** | **13.3%** |
| **4.0%** | **4.0%** | **5.0%** | **4.0%** | **5.0%** | **6.0%** | **6.0%** | **6.0%** | **9.0%** | **8.0%** | **12.0%** | **12.0%** | **9.0%** | **7.0%** | **7.0%** |
| 10/11/2005 | 11/8/2005 | 11/15/2005 | | | | | | | | | | | | |
| 11/7/2005 | 11/14/2005 | 11/28/2005 | | | | | | | | | | | | |
| **11.0%** | **9.5%** | **8.5%** | add 6/1/2005 | Special contract terms @$1.50 and up eff 6/1/05 | | | N/A | | | | | | | |

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | Special contract terms | | I |
| | | Only applies when catestrophic fuel prices occ | N/A | |

| Shipper | LOB | Mkt Mgr | 4/9/2002-4/22/02 FSC Applicable? | Amount | 4/23/2002-5/6/02 FSC Applicable? | Amount | 5/7/2002-10/7/02 FSC Applicable? | Amount | 10/8/02-2/24/03 fsc applicable? | Amount | 2/25/03 - 3/3/2003 FSC Applicable | 3/4/03 - 3/10/2003 FSC Applicable | 3/11/03 - 4/14/2003 FSC Applicable |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | I OCN CARR | LEONARDOS | No | | No See Note | | No See Note | | No see note | | No | No | No |
| | I OCN CARR | LEONARDOS | No | | No See Note | | No See Note | | No see note | | No | No | No |
| | I OCN CARR | LEONARDOS | No | | No See Note | | No See Note | | No see note | | No | No | No |
| | I OCN CARR | STASULIS | No | | No See Note | | No See Note | | No see note | | No see note | No see note | No see note |
| | I OCN CARR | ECKHARDT | | | | | | | | | | | |
| | I OCN CARR | ECKHARDT | | | | | | | | | No see note | No see note | No see note |
| | | | No | | No See Note | | No See Note | | No see note | | | | |

| 4/15/03 - 5/5/2003 FSC Applicable | 5/06/03 - 5/26/2003 FSC Applicable | 5/27/03 - 5/31/2004 FSC Applicable | Comments | How billed FSC by RACS? I=per individual FB S=per summary statement separate invoice | |
|---|---|---|---|---|---|
| No | No | No | FSC included in rates in NSPQ, % based upon CP | N/A | |
| No | No | No | FSC included in rates in NSPQ, % based upon CP | N/A | |
| No | No | No | FSC included in rates in NSPQ effective 9/1/2002 Prior had been excluded in contract. FSC now billed monthly basis 6/2/03. Added to monthly customer list 6/1/04. | Added to Monthly customer 6/1/2004 | |
| No see note | No see note | No see note | FSC included in rates in NSPQ | I | |
| | | Effective 6/9/03 FSC billed on monthly basis. | FSC included in rates in NSPQ. FSC now billed monthly basis 6/9/03. | I | |
| No see note | No see note | Effective 6/2/03 FSC billed on monthly basis. | FSC included in rates in NSPQ effective 9/1/2002 Prior had been excluded in contract. FSC now billed monthly basis 6/2/03. | N/A | |

**Cell:** A5
**Comment:** it:
Formerly CP Ships

**Cell:** A6
**Comment:** it:
Formerly CP Ships

| Shipper | LOB | Mkt Mgr | Diesel Price Range | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | 6/7/05 | 6/28/05 | 7/5/05 | 8/30/05 | 9/6/05 | | 9/27/05 | 11/22/05 | |
| | | | | | | | | | | | | 6/27/05 | 7/4/05 | 8/29/05 | 9/5/05 | 9/26/05 | | 10/24/05 | 11/28/05 | |
| | | | $0.000 | $1.300 | $1.400 | $1.500 | $1.600 | $1.700 | $1.800 | $1.900 | $2.000 | $2.100 | $2.200 | $2.300 | $2.400 | $2.500 | $2.600 | $2.700 | $2.800 | $2.900 |
| Shipper | LOB | Mkt Mgr | $1.299 | $1.399 | $1.499 | $1.599 | $1.699 | $1.799 | $1.899 | $1.999 | $2.099 | $2.199 | $2.299 | $2.399 | $2.499 | $2.599 | $2.699 | $2.799 | $2.899 | $2.999 |
| [redacted] | RETAIL | KIRCHHOFF | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | | LEONARDOS | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx |
| [redacted] | RETAIL | TRAUBEL | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | BAYLES | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | RETAIL | TRAUBEL | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | ECKHARDT | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | | | | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | BAYLES | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | LEONARDOS | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx |
| [redacted] | | | | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | MCMAHON | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | | | | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | 3RD PRTY | REESE | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | RETAIL | LEONARDOS | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | 3RD PRTY | DODD | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | | | | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | 3RD PRTY | KIRCHHOFF | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | STASULIS | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | XXX | xxx |
| [redacted] | 3RD PRTY | KIRCHHOFF | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | | LEONARDOS | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | xxx | XXX | xxx |
| [redacted] | 3RD PRTY | DODD | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | BAYLES | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | 3RD PRTY | KIRCHHOFF | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | BAYLES | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | LEONARDOS | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | 3RD PRTY | SADOTI | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | MACFARLAND | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | LEONARDOS | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | 3RD PRTY | ECKHARDT | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |
| [redacted] | OCN CARR | REESE | 0 | 1% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% | 11% | 12% | 13% | 14% | 15% | 16% | 17% |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | OCN CARR | ECKHARDT | 0.0% | 0.5% | 1.0% | 1.0% | 1.3% | 2.3% | 3.3% | 4.3% | 5.3% | 6.3% | 7.3% | 8.3% | 9.3% | 10.3% | 11.3% | 12.3% | 13.3% | 14.3% |
| [redacted] | | | | | | | | | | | | | | 7/26 - | 7/19 - | 08/23/05 | 11/15/05 | 09/27/05 | 11/08/05 | |
| [redacted] | | | | | | | | | | | | | | 08/15/05 | 07/25/05 | 09/12/05 | 11/28/05 | 10/10/05 | 11/14/05 | |
| [redacted] | OCN CARR | DODD | 0.0% | 0.0% | 0.0% | 100.0% | 2.0% | 3.0% | 4.0% | 5.0% | 5.5% | 6.0% | 6.5% | 7.0% | 7.5% | 8.0% | 8.5% | 9.0% | 9.5% | 10.0% |
| [redacted] | | | | | | | | | | | | 6/7/05- 6/13/05 | 5/17- 6/6/05 | 6/14- 6/27/05 | 7/26 - 8/15/05 | 8/15- 8/22/05 | 8/23- 9/12/05 | 11/15/05- 11/28/05 | 9/27/05 - 10/10/05 | 11/08/05 - 11/14/05 |
| [redacted] | | | $0.000 | $1.300 | $1.400 | $1.500 | $1.600 | $1.700 | $1.800 | $1.900 | $2.000 | $2.100 | $2.200 | $2.25 | $2.300 | $2.400 | $2.500 | $2.600 | $2.700 | $2.800 |
| [redacted] | | | $1.299 | $1.399 | $1.499 | $1.599 | $1.699 | $1.799 | $1.899 | $1.999 | $2.099 | $2.199 | $2.25 | $2.30 | $2.399 | $2.499 | $2.599 | $2.699 | $2.799 | $2.899 |
| [redacted] | OCN CARR | ECKHARDT | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 3% | 4% | 5% | 6% | 7% | 8% | 9% |

| | | | |
|---|---|---|---|
| | 10/25/05 | | How billed FSC by RACS? |
| | 11/21/05 | | I=per individual FB |
| **$3.000** | **$3.100** | **$3.200** | S=per summary statement |
| **$3.099** | **$3.199** | **$3.299** | separate invoice |
| 18% | **19%** | 20% | merchandise traffic--not added to the table |
| xxx | **xxx** | xxx | changed to special agreement 1/4/05 |
| 18% | **19%** | 20% | I |
| 18% | **19%** | 20% | S (monthly summary) |
| 18% | **19%** | 20% | I |
| 18% | **19%** | 20% | I |
| 18% | **19%** | 20% | I |
| 18% | **19%** | 20% | I |
| xxx | **xxx** | xxx | S (monthly summary) (change to special agreement customers 1/4/2005) |
| 18% | **19%** | 20% | S (weekly summary) |
| 18% | **19%** | 20% | I |
| 18% | **19%** | 20% | I |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | no waybill accrued since 11/21/01--not added to table at this time |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | I |
| xxx | xxx | xxx | I (changed to special agreement 1/4/05) |
| 18% | 19% | 20% | I |
| xxx | xxx | xxx | S (monthly summary)(changed to special agreement 1/4/05) |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | no waybill accrued since 7/31/01--not added to table at this time |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | I |
| 18% | 19% | 20% | I |

| | | | | |
|---|---|---|---|---|
| 15.3% | 16.3% | 17.3% | I | |
| | **10/11/05-** | | | |
| | **11/07/05** | | | |
| 10.5% | 11.0% | 11.5% | ? | Special contract terms @$1.50 and up eff 6/1/ |
| | | **10/11/05-11/7/05** | | |
| **$2.900** | **$3.000** | **$3.100** | | |
| **$2.999** | **$3.099** | **$3.199** | | |
| 10% | 11% | 12% | ? | |

**DA07411**

**Cell:** A13
**Comment:** it:
Formerly Americana and Contship


Highly Confidential

| % amount changed in monthly increments based upon the last posting of the previous month | | | Diesel Price Range | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Shipper | LOB | Mkt Mgr | $0.000<br>$1.299 | $1.300<br>$1.399 | $1.400<br>$1.499 | $1.500<br>$1.599 | $1.600<br>$1.699 | $1.700<br>$1.799 | $1.800<br>$1.899 | $1.900<br>$1.999 |
| [redacted] | OCN CARR | LEONARDOS | 0.0% | 1.0% | 2.0% | 3.0% | 4.0% | 5.0% | 6.0% | 7.0% |
| | I OCN CARR | BAYLES | 0.0% | 1.0% | 2.0% | 3.0% | 4.0% | 5.0% | 6.0% | 7.0% |
| | I OCN CARR | BAYLES | special agreement customer effective 11/1/2004 | | | | | | | |
| | I 3RD PRTY | BAYLES | 0.0% | 1.0% | 2.0% | 3.0% | 4.0% | 5.0% | 6.0% | 7.0% |
| | I OCN CARR | BAYLES | 0.0% | 1.0% | 2.0% | 3.0% | 4.0% | 5.0% | 6.0% | 7.0% |
| | I OCN CARR | ECKHARDT | special agreement customer | | | | | | | |
| | I OCN CARR | BAYLES | 0.0% | 1.0% | 2.0% | 3.0% | 4.0% | 5.0% | 6.0% | 7.0% |
| | | | | | | | | | | |
| | I OCN CARR | BAYLES | NO FSC PER CONTRACT | | | | | | | |
| | OCN CARR | LEONARDOS | 0.0% | 1.0% | 2.0% | 3.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| | I OCN CARR | DODD | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | I OCN CARR | LEONARDOS | CONTRACT FORMULA, SEE K LINE SPREADSHEET | | | | | | | |
| | I OCN CARR | LEONARDOS | NO FSC PER CONTRACT | | | | | | | |
| | I OCN CARR | ECKHARDT | 0.0% | 1.0% | 2.0% | 3.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| | I OCN CARR | BAYLES | 0.0% | 0.0% | NOTE: FSC BETWEEN $1.43 AND $1.50 = 1%; ELSE 0 | 2.0% | 3.0% | 4.0% | 5.0% | 6.0% |
| | OCN CARR | BAYLES | 0.0% | 0.0% | NOTE: FSC BETWEEN $1.43 AND $1.50 = 1%; ELSE 0 | 2.0% | 3.0% | 4.0% | 5.0% | 6.0% |
| | OCN CARR | ECKHARDT | 0.0% | 1.0% | 2.0% | 3.0% | 4.0% | 5.0% | 5.0% | 5.0% |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6/1/05 | | 7/1/05 | | 9/1/05 | | 10/1/05 | | | | 11/1/05 | |
| | 6/30/05 | | 8/31/05 | | 9/30/05 | | 10/31/05 | | | | 11/30/05 | |
| **$2.000** | **$2.100** | **$2.200** | **$2.300** | **$2.400** | **$2.500** | **$2.600** | **$2.700** | **$2.800** | **$2.900** | **$3.000** | **$3.100** | **$3.200** |
| **$2.099** | **$2.199** | **$2.299** | **$2.399** | **$2.499** | **$2.599** | **$2.699** | **$2.799** | **$2.899** | **$2.999** | **$3.099** | **$3.199** | **$3.299** |
| 8.0% | 9.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | 18.0% | **19.0%** | 20.0% |
| 8.0% | 9.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | 18.0% | **19.0%** | 20.0% |
| | | | | | | | | | | | | |
| 8.0% | 9.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | 18.0% | **19.0%** | 20.0% |
| 8.0% | 9.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | 18.0% | **19.0%** | 20.0% |
| | | | | | | | | | | | | |
| 8.0% | 9.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | 18.0% | **19.0%** | 20.0% |
| | | | | | | | | | | | | |
| | 0.0% | | | | 0.0% | | 12.0% | | | | **12.0%** | |
| 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | **4.0%** | 4.0% |
| 0.0% | 0.0% | NOTE: FULL FSC WHEN PRICE EXCEEDS $2.25 10% OTHERWISE 0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | 18.0% | **19.0%** | 20.0% |
| | 3.0% | | 0.0% | | 1.5% | | 3.0% | | | | **3.0%** | |
| | 0.0% | | 0.0% | | 0.0% | | 0.0% | | | | | |
| 4.0% | 4.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | 18.0% | **19.0%** | 20.0% |
| 7.0% | 8.0% | 8.0% | 8.0% | NOTE: $2.10-2.43 FSC=8%; $2.431-2.499=11% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | **18.0%** | 19.0% |
| 7.0% | 8.0% | 9.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | **18.0%** | 19.0% |
| 5.0% | 5.0% | 10.0% | 11.0% | 12.0% | 13.0% | 14.0% | 15.0% | 16.0% | 17.0% | 18.0% | **19.0%** | 20.0% |

| How billed FSC by RACS?<br>I=per individual FB<br>S=per summary statement<br>separate invoice | |
|---|---|
| I (Effective 6/1/04) | |
| I | |
| Special Agreement eff 11/1/04 | change to special agreement 11/1/2004 |
| S (Monthly) eff. 9/1/03 | |
| I | |
| I (Special Agreement ) | CHANGE TO SPECIAL AGREEMENT 8/31/2004 |
| I (effective 5/29/03) | |

# CORRECTED EXPERT REPORT
# OF
# GORDON RAUSSER, PH.D.

**In the matter of**

***In Re: Rail Freight Fuel Surcharge Antitrust Litigation***
**USDC, District of Columbia, Case No. 1:07-mc-00489-PLF**

**Highly Confidential**
**Pursuant to Protective Order**

**May 27, 2010**

such as the creation of a new non-fuel cost index, to facilitate their fuel surcharge conspiracy.

- Instead of competing, with each other the Defendants ignored their own unilateral self-interest in order to pursue the common goals of the conspiracy.

***Opinion #3—Common evidence and economic analysis can be used to determine the impact of the Defendants' alleged conspiracy on Class Members***

- Defendants' transaction data reveals that they did implement a common rate increase across the Class through their use of the fuel surcharge applied as a percentage of base rates.

- Common factors such as shipment weight, distance, route and commodity type, among others, predominate over individual factors in the determination of freight rates. These common factors can be measured using the Defendants' transaction data and used in a common analysis to identify and quantify the harm experienced by the Class.

- Defendants' transaction data reveals that there was no material discounting of base rates to offset the fuel surcharges that were applied to shipments made by the Class. As a result, Class members commonly experienced price increases from the Defendants' actions irrespective of the commodity they were shipping.

- Defendants' document production, the facts of the case and my own industry analysis corroborate the findings of my investigation of the transaction data since:
    - The Defendants instigated a mechanism well-suited for implementing a general price increase across their customers.

- Defendants intended that the fuel surcharge be applied to all customers and engaged in monitoring activities with the goal of achieving 100% coverage.
- Defendants planned on and each implemented a fuel surcharge program with the same key features across Defendants.
- The pretext of the program – to recover fuel costs – necessitated universal coverage and full application.
- The industry regulator, the Surface Transportation Board, ruled that the revenue based fuel surcharge program was unreasonable.

***Opinion #4—A common damage methodology works in this case***

- The Defendants' transaction data from period prior to the start of the Class Period represents a reliable benchmark against which to compare the prices charged during the Class Period.
- Defendant's transaction data and publicly available data sources are, together, sufficiently rich to account for the common factors that predominate in rail freight pricing and a regression model can be used to quantify Class-wide damages.
- I have specified and estimated such a model using the transaction data as well as publicly available data sources, and the model results in an economically reasonable quantification of Class-wide damages.
- The damage analysis shows that Class members paid significantly higher prices to Defendants for rail freight transportation during the Class Period than before and that these higher prices are not explainable by price determinants other than the conspiracy.

## IV. FACTORS CONDUCIVE TO PRICE FIXING IN THE U.S. RAIL FREIGHT INDUSTRY

The Plaintiffs allege that Defendants conspired to use coordinated and artificially high fuel surcharges as a means of raising railroad freight rates across the board, and thereby increasing their collective profits.[2] Rather than engage in competitive behavior, the Defendants are alleged to have collectively agreed to impose on their customers an industry-wide fuel surcharge program that set such charges at uniform levels and applied them as a percentage of the total base freight rate paid by each customer.[3] In my experience, allegations of this kind are generally subject to proof by generalized evidence and common economic analysis.

Price-fixing is facilitated when the cartel and the industry in question have certain attributes, namely, (a) the cartel members have market power, (b) there is little threat of entry by non-cartel competitors, (c) their product or service is homogenous and interchangeable; (d) the demand for their product or service is relatively inelastic; and (e) the pricing of the product or service is well understood and easily communicated between industry participants. All of these factors are present in the rail freight industry.

Beyond these economic factors that influence the ability to establish and maintain a price-fixing cartel, its success is enhanced by the cartel's selection of a mechanism for coordinated behavior that provides the ability to monitor, detect, and deter defections from agreed-upon collusive strategies. The Defendants in this case chose a highly cost efficient mechanism for collusion.

I have observed a number of characteristics of the U.S. rail freight industry that created a business environment conducive to price fixing. Similarly, I have analyzed the types of evidence

---

[2] Complaint, ¶ 4.
[3] Complaint, ¶ 88.

potentially bearing on the particular suitability of a fuel surcharge as a means to pursue a generalized price increase in the rail freight industry and have observed a number of factors that make such a surcharge a particularly useful mechanism. The Class-wide evidence that I have reviewed and analyzed to date demonstrates the presence and operation of various economic forces and characteristics of the rail freight industry, as well as various actions of the Defendants themselves, that I find ensured the implementation and effectiveness of the alleged collusion.

### *A. Geographic and product scope of the inquiry*

At the outset of my analysis, it is important to identify the geographic and product scope that is relevant to this inquiry.

#### 1. Geographic

The Defendants sold rail services throughout the United States. Prior to the conspiracy the effect of competition among the railroads may have varied in different parts of the country, with less competition in remote regions that are served by fewer railroads. Some may argue that customers in such regions would not have experienced the full benefits of competition between railroads even prior to the conspiracy, but the whole point of the alleged conspiracy was to apply fuel surcharges to all customers irrespective regardless of region, and the evidence shows that this is what Defendants in fact did.

In addition, the extent to which prices differ across geographic regions is a factor reflected in the analysis discussed in later portions of this Report. The four Defendants are responsible for the vast majority of shipments in every sizeable state in the U.S. as measured in ton-miles shipped. They have significant rail freight revenue in all states in the U.S., as shown in Table 1 which is based upon their own transaction data. Defendants shipped more than 91% of

the 539 billion ton-miles reported shipped in Wyoming in 2007 by the U.S. Census.[4] Defendants shipped over 10 billion ton-miles originating in each of 31 states, between 2 and 10 billion ton-miles originating in each of the next 11 states. In fact the Defendants' transaction dataset records slightly more ton-miles shipped in 2007 (1.54 trillion) than the total ton-miles reported as shipped by all carriers in the U.S. Census statistics (1.344 trillion). This discrepancy is explained by the fact that the U.S. census tends to under report due to its reliance on survey data. The transaction dataset reveals that in every state in the U.S., except Hawaii and Alaska, there are at least two Defendants whose trains have departures from that state. Furthermore, through their interline shipments, all four Defendants are involved in shipments originating from every state, except Hawaii and Alaska.[5]

[4] Bureau of Transportation Statistics, 2007 Commodity Flow Survey, Geography Quick Reports: Wyoming, Table 3: Shipment Characteristics by Geography by Mode: 2007.
[5] Defendants' transaction data produced in this litigation.

from primarily two sources – barges and trucks. All else equal, the railroads charge lower prices to shippers when there is competition from other transport modes, *i.e.*, the railroads *price discriminate*.

Barges compete on the more traditional low value goods such as wheat and corn. Barge competition is essentially limited to commodities moving in the Central portions of the U.S. where there are navigable waterways, such as the Mississippi, Ohio, and Missouri Rivers.[54]

Trucks provide competition on higher-value shipments such as intermodal and finished vehicle transport. Relative to trucks, rail carloads must have rates that are low enough to offset the added logistics costs associated with the slower, less reliable service and the requirement for larger shipment size. Relative to rail, truck rates increase much more steeply with distance as a result of trucks' comparatively much lower fuel efficiency than rail. As a result, short-haul shipments, particularly for high-value, low-weight commodities such as vegetables and fruits, are dominated by trucks. For low-value, high weight commodities where the shipper is especially sensitive to freight rates, rail-truck competition exists only for short-haul traffic; the medium- and long-haul traffic is dominated by rail.[55] There is no bright-line distance that demarcates rail and trucking zones. However, the average rail shipment is more than 500 miles, whereas the average truck shipment is fewer than 300 miles.[56] Of rail operators, the Defendants specialize in the long-haul market, for example BNSF's average unregulated shipment between 2000 and 2008 travelled 1,505 miles and only 10% of its shipments were less than 315 miles.[57] UP's average unregulated shipment in the same period travelled 1,303 miles.[58] The eastern railroads

[54] IRS, "Railroad Industry Overview Series – Information Systems and Industry Operating Procedure – October 2007." Available at: http://www.irs.gov/businesses/article/0,,id=175293,00.html.
[55] Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," *The Bell Journal of Economics*, 10.2 (Autumn, 1979): 463-482; NCHRP Report, at p. 7.
[56] NCHRP Report, at p. 7.
[57] BNSF's transaction data produced in this litigation.
[58] UP's transaction data produced in this litigation.

(CSX and NS) tend to cover slightly shorter journeys than the western railroads (BNSF and UP), because of the geography of the country. Nevertheless, NS's average unregulated shipment between 2000 and 2008 travelled 626 miles and CSX's average shipments travelled 624 miles.[59,60]

Not only do the Defendants specialize in distances that are largely uneconomical for trucks, they also specialize in shipping quantities that are uneconomical for trucks. The average weight of the contents of a car shipped by BNSF was 50 tons and the average weight of the contents of a car shipped by CSX was 54 tons.[61] The average for NS was 50 tons and the average for UP was 58 tons. According to the U.S. Department of Commerce only 1.3% of truck traffic in 2002 as measured by vehicle miles travelled was for weights greater than 50 tons.[62] Furthermore, in markets consisting of movements between large cities as original and destination pairs such as intermodal movements between Chicago and New York, for example, economies of scale may dictate the use of rail rather than truck even for relatively high-value commodities over relatively shorter distances.[63]

In short, an analysis of the industry demonstrates that the Defendants' businesses are concentrated in commodities and distances over which rail is the most cost efficient transport

---

[59] NS's transaction data produced in this litigation.
[60] CSX's transaction data produced in this litigation.
[61] BNSF's and CSX's transaction data produced in this litigation. These figures are for unregulated shipments. The exact figures are 52.01 and 50.59 tons respectively.
[62] Sources: U.S. Census Bureau, 2002 Vehicle Inventory and Use Survey: United States, EC02TV-US (Washington, DC: 2004), available at www.census.gov/prod/ec02/ec02tv-us.pdf as of April 13, 2009; U.S. Census Bureau, 1997 Truck Inventory and Use Survey: United States, TC92-T-52 (Washington, DC: 1995), available at www.census.gov/prod/ec97/97tv-us.pdf as of April 13, 2009. The categories for deliveries of 100,001 to 130,000 pounds and 130,001 or more correspond to deliveries of weights greater than 50 tons (50 tons=100,000 pounds, as one short ton equals 2000 pounds).
[63] "The generalization that trucks are more efficient for short-haul freight than railcars does not pertain where shipment size and complementary traffic levels are sufficiently large … Truck is superior for low-density moves, but rail is superior for short hauls where density (lot size and complementary volume) is sufficient. That sufficiency can usually be met in urban areas." Erickson, T.F., "Urban Freight Economics: A New Rail Paradigm For Large Lots," *Transportation Journal*, 40.3 (Spring 2001): 5-15.

option and therefore the demand that they faced was in general inelastic. This is another factor that facilitated collusion during the Class Period.

If demand were significantly more elastic in some commodities compared to others, a change in the commodity mix shipped by Defendants would be observed as a result of price increases (or fuel surcharge), so that there would be less transport of commodities for which truck-rail competition exists. Defendants' transaction data shows that no such change occurred. In fact, the commodity mix of the Defendants' business remained stable throughout the Class Period despite the Defendants' price hikes. This is shown in the pie charts for Defendant BNSF in Figure 7, based on the proportion of cars shipped for different commodities in the years 2002, 2004 and 2006. Similar pie charts are shown for CSX, NS and UP, in Figure 8, Figure 9, and Figure 10 respectively.

Inspection of these charts reveals that there was very little shift in the commodity mix of the Defendants, and statistical tests reveal that although there are statistically significant changes, the changes are small in economic magnitude and inconsistent with wide-scale substitution away from rail for commodities where truck is a viable transport option. For example the proportion of shipments that are "Freight All Kinds" increase for BNSF between 2002 and 2004 in the pie charts shown, and increases for NS and UP throughout the period, and remains static for CSX. "Freight All Kind" shipments are largely intermodal, and thus this lack of change indicates that even shippers for whom truck was a viable option appeared to have no choice but to suffer the Defendants' high prices. For all Defendants, "Freight All Kinds" as a proportion of total shipments is remarkably static across time.

The ultimate captive shipper is a shipper of Coal. If there was substitution occurring by the Defendants "non-captive" shippers then this should drive up the proportion of total shipments

that are for Coal. Again no such pattern is observed, in fact as a share of total shipments, coal shipments actually decrease or remain the same for the Defendants.

**Figure 7:**
**Commodity Mix for BNSF 2002, 2004 and 2006[64]**




[64] Defendants' transaction data produced in this litigation.

**Figure 8:**
**Commodity Mix for CSX 2002, 2004 and 2006[65]**




[65] Defendants' transaction data produced in this litigation.

**Figure 9:**
**Commodity Mix for NS 2002, 2004 and 2006**[66]




[66] Defendants' transaction data produced in this litigation.

**Figure 10:**
**Commodity Mix for UP 2002, 2004 and 2006[67]**




[67] Defendants' transaction data produced in this litigation.

When these route indicator variables are removed, as in the regression in column (2), the coefficient on the log of mileage now picks up the distance effect and is positive as expected. The proportion of variation in per car revenues explained once these route variables are removed reduces to 82% because there are non-distance route specific effects that affect price such as congestion or gradient that are controlled for in column (1) but not in column (2). Different prices for interline shipments are also controlled for in the regression, and the commodity indicator variables based on three digit STCC codes (for example 011 for Field Crops) are included to capture price discrimination across commodities and the extent to which there are different cost factors in shipping different commodities (for example the cost of handling hazardous commodities). Car indicator variables are based on the AAR car type codes and are included to capture differences in prices for different cars used. As illustrated in Figure 27, BNSF quotes different prices for the shipment of Barley for boxcars and for hoppers.

Table 29 presents the same regression results for destinations Chicago (columns 3 and 4) and Los Angeles (columns 5 and 6). Again, a high proportion of the variation in per car revenues is explained despite these different distinctions: 85% in the case of Chicago (with controls for route, in column 3) and 76% in the case of Los Angeles (with controls for route, in column 5).

In conclusion, the common, predominating factors in rail freight pricing can be controlled for in an economic analysis of both impact and damages caused by the alleged conspiracy.

### *C. Defendants' transaction data reveals that discounting was not used to offset the fuel surcharge*

As discussed in Section IV, some commodities are subject to more truck-rail competition than others, although the extent of such competition decreases with shipment distance and shipment weight, and is lower for hazardous materials. There are, at least theoretically,

incentives for the Defendants to restrict price increases in those commodities where there is competition from truck. These are the commodities where customers would have most-vigorously resisted the fuel surcharge.. Defendants could have attempted to restrict price increases in these commodities through discounts in the base rates in order to get customers to accept the fuel surcharge. However, a systematic discounting program for selected commodities would have been as difficult to coordinate as a conspiracy that imposed different price increases for different commodities. Furthermore, any attempts by individuals to grant customers shipping certain commodities discounts in the base rate in exchange for accepting the fuel surcharge would have been seen by other Defendants as deviation and would have jeopardized the conspiracy. Defendants' general policy was that no such discounts would be offered and their own transaction data reveals that none, or very few, were given.[204]

An analysis of the transaction data reveals that there is no evidence of widespread discounting of base rates. Instead, base rates across the main commodities shipped by defendants remained largely constant in real terms from the years before the Class Period to the years during the Class Period. This is evident from Figure 30 which shows the base rates per ton-mile for BNSF's thirty most commonly shipped commodities. These thirty commodity class codes represent approximately 87% of BNSF's shipments.[205] The definition of each commodity number is given in the Appendix D. This figure reveals the extent of BNSF's price discrimination. The shippers of different commodities are charged different prices. This price discrimination appears to have been systematically implemented over time.

[204] As with many price-fixing conspiracies there may of course have been some instances of deviation.
[205] The exact number is 87.43%.

**Figure 30:**
**BNSF's Base Rates per Ton-Mile for the Top Thirty 3-digit Commodity Codes**[206]




In fact, Figure 30 shows that BNSF's rates for its main commodities did not change from 2002, the last full year before the class period, to the years 2004 and 2006 which are in the class period. There is some movement in base rates but nothing systematic. Most revealing is the price of the first category. The code 461 corresponds to "Freight All Kinds," which is defined on BNSF's website as "General rate levels offered to various types of customers (domestic, international, contract/non-contract holders) for transporting intermodal shipments."[207] A typical "Freight All Kinds" shipment is shown in Figure 31. The containers shown in Figure 31 are

[206] Defendant transaction data produced in this litigation. excluding STCC 422: trailers, returned empty
[207] BNSF Railway Company, "Glossary of Railroad Terminology and Jargon." http://www.bnsf.com/tools/glossary.html. The definition also includes "Freight in mixed shipments. Commodities representing 2 or more major STCC groups, where it is impossible to determine the predominant group."

those that can be transferred to trucks, and it would be expected that these intermodal shipments are those that would face competition from trucking. Figure 30 reveals that BNSF's base rate for "Freight All Kinds" shipments did not substantially change going into the class period.

**Figure 31:**
**A "Freight All Kinds" Shipment[208]**




A similar picture is revealed by looking at the base rates of the top thirty commodities shipped by CSX in the years 2002, 2004 and 2006.[209] This is presented in Figure 32. Again, there is no widespread discounting of base rates or discounting in base rates for certain commodities. In fact, for nearly all commodities presented in Figure 32 base rates decrease a little from 2002 to 2004 and then increase again from 2004 to 2006.

[208] A shipment with STCC 3-digit code equal to 461 was selected from the transaction dataset and its AAR car type was recorded. The AAR car type was looked up on the website http://www.hiddenimages.ca/, a Canadian website that shows pictures of different railroad car types.
[209] These thirty commodities represent 85.24% of CSX's shipments.

**Figure 32:**
**CSX's Base Rates per Ton-Mile for the Top Thirty 3-digit Commodity Codes**[210]




Figure 33 and Figure 34 show a similar static pattern for Defendants UP and NS.[211] There is not extensive evidence of decreases for commodities that can viably be shipped by truck, although there is some movement in certain commodities. Again, the rates for "Freight All Kind" (461) are very static or increase. UP's rates for Canned or Preserve Fruits and Vegetables (203), which can be shipped by truck, actually increase slightly.

[210] Defendant transaction data produced in this litigation, excluding STCC 422: trailer, returned empty
[211] The top thirty commodities represent 89.31% of UP's shipments and 77.25% of NS's shipments.

## VIII. CONCLUSION

I conclude, on the basis of evidence and economic analysis common to the class, that (a) the evidence and economic analysis applicable to the Class as a whole is consistent with Plaintiff's allegations that the Defendants engaged in a conspiracy to fix prices; (b) the Defendants' conduct had a common impact on the Class; and (c) a methodology utilizing accepted economic analysis can and does compute the damages sustained by the Class as a whole and by individual Class members. This analysis is, of course, subject to being refined and supplemented based on further discovery in the case.

May 27, 2010

Gordon Rausser

Gordon Rausser, Ph.D.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 |
| This document relates to: ALL DIRECT PURCHASER CASES | Misc. No. 07-489 (PLF/AK/JMF) |

**DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED OBJECTIONS AND RESPONSES TO THE FIRST SET OF INTERROGATORIES DIRECTED TO ALL DIRECT PURCHASER PLAINTIFFS BY: (1) BNSF RAILWAY COMPANY; (2) CSX TRANSPORTATION, INC.; (3) NORFOLK SOUTHERN RAILWAY COMPANY; AND (4) UNION PACIFIC RAILWAY COMPANY ("DEFENDANTS")**

Direct Purchaser Plaintiffs ("Plaintiffs"), through their attorneys, hereby submit this consolidated response to the First Set of Interrogatories to all Direct Purchaser Plaintiffs by: (1) Defendant BNSF Railway Company ("BNSF"); (2) Defendant CSX Transportation, Inc. ("CSX"); (3) Defendant Norfolk Southern Railway Company ("NS"); and (4) Defendant Union Pacific Railway Company ("UP") (collectively, the "Interrogatories").

Plaintiffs have consolidated their response to the Interrogatories separately served by Defendants due to the overlap in the Interrogatories themselves, as well as in Plaintiffs' objections and responses to them.

**GENERAL OBJECTIONS**

Plaintiffs generally object to the Interrogatories, and to each individual interrogatory, on the following grounds, each of which is incorporated by reference in the responses to the individual interrogatories below. Each response set forth below incorporates, is subject to, and does not waive any of these general objections.

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy.[5]

2. Between 2000 and 2003, each Defendant made efforts to increase its rail freight revenues and/or prices. These actions included, among other things, attempts to apply stand-alone fuel surcharges, intended as "revenue enhancement steps."[6]

3. Prior to 2003, Defendants did not impose stand-alone fuel surcharges widely, and the Defendants have acknowledged that any stand-alone fuel surcharges used during this period were not the result of coordination among Defendants' senior executives. Mike Giftos, then

---

potential revenue gain of an additional 3% across-the-board price increase . . . because of the intense BNSF competition in several high volume market segments"); UPFSC_0016299-300 ("'The BN is kicking the UP's ass' … they are going after all of our business."); Surface Transportation Board, Rail Rates Continue Multi-Year Decline, Office of Economics, Environmental Analysis, and Administration, Dec. 2000, *available at* http://www.stb.dot.gov/stb/docs/RI.pdf.; Association of American Railroads, "U.S. Freight Railroad Productivity," Feb. 2009, *available at* http://www.aar.org/~/media/AAR/BackgroundPapers/146.ashx; Pettus. M.L., "Growth within the deregulated U.S. railroad industry," Advances in Competitiveness Research, 2009, *available at* http://www.entrepreneur.com/tradejournals/article/204480538_2.html.; Federal Railroad Administration, Office of Policy and Communication, "Freight Railroads Background," Mar. 2009, *available at* http://www.fra.dot.gov/downloads/policy/freight2007revised.pdf; Bryan, J., Weisbrod, G.E., & Martland, C.D., Rail Freight Solutions to Roadway Congestion; Final Report and Guidebook, National Cooperative Highway Research Program, NCHRP Report 586; The Aluminum Association, "Rail Cars: Durability with a High Pay Load, *available at* http://www.aluminum.org/Content/NavigationMenu/TheIndustry/TransportationMarket/Rail/default.htm.; "CSXT to Speed Up Work on its National Gate Project," Railway Track and Structures, Dec. 21, 2009, *available at* http://www.rtands.com/newsflash/csxt-to-speed-up-work-on-its-national-gatewayproject.html.

[5] RD Ex. 5 (May 28, 2002 Enterprise Wide Risk Assessment); RD Ex. 6, at 17 (metadata to May 28, 2002 Enterprise Wide Risk Assessment); Declaration of Joseph D. Hammond (Docket Nos. 406-411) (Aug. 27, 2010) ("HD") Ex. 24.

[6] RD Ex. 163, at 6; *see also* UPFSC0000520-22 ("Any general marketplace increases will see major defections and little chance that others will follow. The fuel surcharge adjustment is the best way of realizing higher revenues without adverse market impact.")

CSX's Chief Commercial Officer, testified that CSX's initial fuel surcharge program in 2000 resulted solely from internal CSX discussions.[7] Don Seale, then NS's Senior Vice President of Merchandise Marketing, testified that he was not aware of any communications with the other Defendants concerning NS's adoption of an initial fuel surcharge in 2000.[8]

4. In February 2001, Defendants discussed creating an "industry standard" fuel surcharge, but decided not to do so at that time.[9]

5. During this period prior to 2003, Defendants had limited success when trying to boost their revenues through use of fuel surcharges. During this period, stand-alone fuel surcharges were applied only sporadically at low levels to a limited volume of traffic for certain shippers. For example, CSX implemented a fuel surcharge program in 2000,[10] but would not apply the fuel surcharge at all if, among other things, the shipment was already covered by a cost escalation formula, if a fuel surcharge was not otherwise permitted under an applicable contract, or if the fuel surcharges was otherwise waived by CSX.[11] Both NS and BNSF gave

---

[7] Giftos Dep. 31; *see also* Tr. of Dep. of Robert Knight ("Knight Dep.") 24 ("There were some isolated situations where there were surcharges, but I don't – there's no policy position.").

[8] Seale Dep. 13, 107-09.

[9] *See, e.g.*, RD Ex. 178, at BNSF-0121901-02 ("Tom J. [of BNSF] provided feedback from rail carriers regarding the concept of establishing an industry wide fuel surcharge formula. Rail carriers unanimously choose not to act on an industry standard fuel surcharge."); BNSF_LOG0000054-56. These discussions appear to go back to November 2000. *See, e.g.*, UPFSC_0003484-85 (industry meeting discussion was to cover "all aspects of FSC").

[10] *See, e.g.*, CSXFSC000247060; CSXFSC000000060.

[11] *See, e.g.*, RD Ex. 179; CSXFSC000000061-63; Giftos Dep. 45-46, 54-55; Gooden Dep. 28-29; *see also id.* at 26 (pre-2003 fuel surcharge program was "a flawed program"); *id.* at 101 (revenue from pre-2003 program was "relatively low to where it needed to be"); CSXFSC000516528-65 (rates "will not be subject to 8200 Tariff Fuel Surcharge provision"); CSXFSC000499039-40 ("Any Fuel Surcharge balance due prior to January 1, 2002 will be waived. No Fuel Surcharge will be incurred during the Term."); CSXFSC000385664-66.

their marketing personnel express authority to waive fuel surcharges,[12] and UP applied stand-alone fuel surcharges only in isolated situations.[13] UP announced a new fuel surcharge program in December 2002, but even that program was initially limited only to certain tariffs and circulars, and exempted private shipments in its Industrial Products group (which accounted for 21% of UP's total commodity revenue in 2004) .[14]

---

[12] *See, e.g.*, OLI109143-47, at 46 (2000 NS contract: NS "retains the right to apply a fuel surcharge … if this option is exercised"); OLI056231-35, at 35 (2004 NS contract: "[s]ubject to the fuel surcharge provisions in NS Conditions of Carriage No. 1"); NS_010078971-90 (March 1, 2004 NS Conditions of Carriage: "In the event the average monthly price of West Texas Intermediate Crude Oil exceeds $23.00 per barrel … [NS] will assess a fuel surcharge on all linehaul freight charges."); NS_010013722-27; RD Ex. 180, at NS_010013399; NS_010013420-21("We shouldn't blindside a customer by unilaterally putting a fuel surcharge in a new or amended contract particularily one negotiated prior to the corporate policy decision regarding its implementation. The fuel surcharge should always be part of the contract negotiation process."); HD Ex. 27, at NS_010072620 (noting that, as of March 2003, "[m]any" NS customers have "negotiate[d] out of the SC"); RD Ex. 17; BNSF_0570919-20; Tr. of Dep. of Sam Kyei ("Kyei Dep.") 56 (BNSF "participation was low" in 2001); Kyei Dep. 82-84; RD Ex. 211, at BNSF-FSC 000052; NS_010253161-165 ("Our offer would be exactly as stated below except we would raise the fuel surcharge 'trigger' rate to $38. This provides Dofasco up to 4% relief on the fuel surcharge."); BNSF_0026922-7017; BNSF_0391760.

[13] *See, e.g.*, Tr. of Dep. or James Young ("Young Dep.") 55 ("Before 2003 . . . it [would] be fair to say that the impact of fuel surcharge was somewhat minimal."); Young Dep. 28 ("[A]ny fuel surcharges that were triggered during the 2000 through 2002 time period never reached significant percentage levels."); Young Dep. 169 (In the 2000, 2001 timeframe, fuel surcharges were not "a significant piece of our business and . . . didn't show up in terms of our financials, the impact."); Tr. of Dep. of Charles Eisele ("Eisele Dep.") 77; Knight Dep. 23-24; UPFSC_0042871-73 ("strategy has been to avoid fuel surcharges and negotiate increases into our price").

[14] *See, e.g.*, RD Ex. 8; RD Ex. 15; RD Ex. 13; RD Ex. 12; RD Ex. 14; RD Ex. 165, at 4. Earlier attempts to apply fuel surcharges resulted in waivers and discounts. *See, e.g.*, UPFSC_0308795; UPFSC_0437016; UPFSC_0438393-95 ("We are being pretty lenient on the fuel surcharge since we already have RCAF-U at 85% built in and knowing that fuel is a component of RCAF-U."); UPFSC_0047327-28 ("Our strategy remains to negotiate pure price upfront vs. a surcharge. It's more sustainable, easier to administer, and more effective with customers."); UPFSC_0117070-72; UPFSC_0029999 ("If you have business at risk because of a fuel based increase in 3229, Bob suggested you use a refund allowance to offset the price increase to shield the traffic from being lost.").

announced that it had abandoned its "revised" $28 strike price and had instead adopted "the same approach as the CSXT"—that is, UP announced its intention to use the $23 WTI strike price contemplated in the CSX internal proposal circulated shortly before Mr. Koraleski went to visit CSX (and the same escalation formula).[74]

33. On April 4, 2004, UP informed the other Defendants that it would be applying this new standard fuel surcharge program to both local and interline traffic.[75] UP had no procompetitive or legitimate reason to inform the other Defendants of what it intended to do on its local traffic; rather, this communication was an anticompetitive signaling device in furtherance of the conspiracy.[76]

34. On March 13, 2003, BNSF's CMO, John Lanigan, requested an urgent review of BNSF's fuel surcharge program to be completed "in about two to three weeks."[77] This review was designed to coincide with the Spring National Freight Transportation Association ("NFTA") meeting at the Wigwam resort in Arizona on April 2-6 (the "Spring 2003 NFTA meeting"), where Mr. Lanigan knew he would see senior marketing officers from UP, CSX, and NS.[78]

---

[74] *See, e.g.*, RD Ex. 38. This was despite some internal recognition at UP that the new fuel surcharge would be "complex/confusing and … problematic to administer." *See, e.g.*, UPFSC_0069867.

[75] *See, e.g.*, RD Ex. 40 ("The modified surcharge will continue to apply to most Union Pacific pricing documents for local and interline freight movements."); *see also* UPFSC 0344321-23.

[76] Other documents show that UP (and the other Defendants) intentionally used so-called "concurrence" or other communications in order to signal each other about contemplated future pricing actions and to secure coordination. For example, Defendants would purposefully announce contemplated changes with "substantial lead time" so that the other Defendants could "follow," or provide other feedback. *See* UPFSC_0422458-60, at 0422458; *see also* Couch Dep. 221-22 (testifying that "concurrences" were regularly requested in "an email that goes out from one carrier to all the other carriers"); *infra* ¶ 104.

[77] *See, e.g.*, BNSF_0456278; *see also* BNSF-0330793-0833; Lanigan Lanigan Dep. 56-57.

[78] *See, e.g.*, NS_015000208-211.

Dated: November 30, 2010

Respectfully submitted:

/s/Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-9850
Facsimile: (212) 480-8560
Email: solson@hausfeldllp.com

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Daniel Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on November 30, 2010, a copy of the foregoing consolidated objections and responses to Defendants' first set of interrogatories was served on counsel for Defendants by electronic mail.

/s/ Sami H. Rashid__________

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869 |
| This document relates to: ALL DIRECT PURCHASER CASES | Misc. No. 07-489 (PLF/AK/JMF) |

**DIRECT PURCHASER PLAINTIFFS' FIRST AMENDED CONSOLIDATED OBJECTIONS AND RESPONSES TO THE FIRST SET OF INTERROGATORIES DIRECTED TO ALL DIRECT PURCHASER PLAINTIFFS BY: (1) BNSF RAILWAY COMPANY; (2) CSX TRANSPORTATION, INC.; (3) NORFOLK SOUTHERN RAILWAY COMPANY; AND (4) UNION PACIFIC RAILWAY COMPANY ("DEFENDANTS")**

Direct Purchaser Plaintiffs ("Plaintiffs"), through their attorneys, hereby submit this amended consolidated responses and objections to the First Set of Interrogatories to all Direct Purchaser Plaintiffs by: (1) Defendant BNSF Railway Company ("BNSF"); (2) Defendant CSX Transportation, Inc. ("CSX"); (3) Defendant Norfolk Southern Railway Company ("NS"); and (4) Defendant Union Pacific Railway Company ("UP") (collectively, the "Interrogatories"). These amended responses are being served pursuant to the parties' agreement to serve amended discovery responses, and reflect additional discovery which has occurred since the date of the filing of the initial responses and objections to the Interrogatories. They are being served without prejudice to Plaintiffs' rights to further supplement and to present all available evidence at trial.

Plaintiffs have consolidated their response to the Interrogatories separately served by Defendants due to the overlap in the Interrogatories themselves, as well as in Plaintiffs' objections and responses to them.

## THE CONSPIRACY

### MEETINGS OVERVIEW

---

Transportation Statistics, "Growth in the Nation's Freight Shipments – Highlights," *available at*: http://www.bts.gov/publications/freight_shipments_in_america/html/entire.html; Pittman, R.W., "Railroads and Competition: The SantaFe/Southern Pacific Merger Proposal," The Journal of Industrial, Economics, 39.1 (Sept.1990); Winston, C., "A Disaggregate Model of the Demand for Intercity Freight Transportation," Econometrica, 49 (1981); Oum, T.H., "A Cross Sectional Study of Freight Transport Demand and Rail-Truck Competition in Canada," The Bell Journal of Economics, 10.2 (Autumn, 1979); U.S. Government Accountability Office, Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should be Addressed, GAO-07-94, Oct. 2006; Garrod, P.W., & Miklius, W., "'Captive Shippers' and the Success of Railroads in Capturing Monopoly Rent," Journal of Law and Economics, 30.2 (Oct., 1987); Zlatoper, T. & Austrian, Z. "Freight Transportation Demand: A Survey of Recent Econometric Studies," Transportation, 16 (1989); U.S. Department of Transportation, Federal Highway Administration, "Western Uniformity Scenario Analysis: A Regional Truck Size and Weight Scenario Requested by the Western Governor's Association," *available at*: http://www.fhwa.dot.gov/policy/otps/truck/wusr/chap10.htm; "Freight Train Blues," Infrastructure US., *available at* http://www.americainfra.com/article/Freight-Train-Blues/; Congressional Budget Office, Freight Rail Transportation: Long Term Issues, A CBO Paper (Jan. 2006); Kessides, I.N., & Willig, R.D., "Restructuring Regulation of the Railroad Industry," Public Policy for the Private Sector, The World Bank (Oct. 1995); "North American Railcar Review," a presentation by Alan McDonald, Director of Equipment Data Systems at Railinc, dated Mar. 3, 2008, *available at* https://www.railinc.org/docs/2008_Rail_Finance_Conference_Railinc_Presentation.pdf; BNSF 2008 Annual Report and Form 10-K; UP 2005 Annual Report; UP 2006 Annual Report; UP 2007 Annual Report; UP 2008 Annual Report; Kunce, M., Hamilton, S., & Gerking, S., "Marketable Permits, Low-Sulfur Coal and the Behavior of Railroads," University of Wyoming, (2005); IRS, "Railroad Industry Overview Series – Information Systems and Industry Operating Procedure-October 2007," at http://www.irs.gov/businesses/article/0,,id=175293,00.html; U.S. Census Bureau, 2002 Vehicle Inventory and Use Survey: United States, EC02TV-US (Washington, DC: 2004), *available at* www.census.gov/prod/ec02/ec02tv-us.pdf as of April 13, 2009; U.S. Census Bureau, 1997 Truck Inventory and Use Survey: United States, TC92-T-52 (Washington, DC: 1995), *available at* www.census.gov/prod/ec97/97tv-us.pdf as of April 13, 2009; "Rail Common Carrier Obligation/Contracts," presented to the Southwest Association of Rail Shippers on Feb. 19, 2009, *available at* http://www.railshippers.com/regional/southwest/dimichael_presentation.pdf.; U.S. General Accounting Office, Railroad Regulation: Competitive Access and Its Effects on Selected Railroads and Shippers, Report to the Chairman, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives (June 1987), *available at* http://archive.gao.gov/d28t5/133518.pdf; U.S. Bureau of Labor Statistics, Sept. 25, 2005; Joskow, P.L., & Noll, R.G., "The Bell Doctrine: Applications in Telecommunications, Electricity, and Other Network Industries," Stanford Law Review (May, 1999).

16. By early 2003, Defendants' highest ranking executives began a series of extraordinary meetings about the coordination of their fuel surcharge programs. Such high-level meetings were, at best, very rare prior to 2003.[33] At these meetings, Defendants discussed their fuel surcharge programs and agreed to coordinate those programs and apply them as widely a possible and, as uniformly as possible, and to as many freight shipments as possible, with the express goal of 100% coverage.[34] These meetings were conducted between and among Defendants' highest-ranking executives, including their Chief Executive Officers ("CEOs")[35] and Chief Marketing Officers ("CMOs").[36] During the Class Period, Defendants' CMOs and CEOs engaged in numerous phone calls, emails, and in-person visits with each other.[37]

---

[33] CSX's former chief executive officer (Mike Giftos) testified, for example, that prior to 2003 the only discussion he could recall with an executive of another railroad about fuel surcharges was with UP's CMO (Jack Koraleski) in 2001 or 2002, and that, during that call, "Mr. Koraleski was surprised to learn that we had a fuel surcharge program. . . . [H]e apparently didn't know about it." Giftos Dep. 194-98; *see also* Seale Dep. 109; Tr. of Dep. of John Couch ("Couch Dep.") 22-28 (testifying that Alliance meetings with other Defendants began in 2003 and that CSX had "a lot of meetings," including with each Defendant, between 2003 and 2007). During the Class Period, the CMOs of the Defendants engaged in multiple phone calls, emails, and personal visits with each other. *See, e.g.*, Lanigan Dep. 283-86.

[34] *See infra* ¶¶ 23-109.

[35] As used herein, "CEO" refers to the persons holding the official title Chief Executive Officer, as well as those holding the titles President, Chairman, and Vice-Chairman (these related titles shifted somewhat during the relevant period); specifically, it refers to: Matthew Rose (BNSF); Michael Ward (CSX); David Goode and Wick Moorman (NS); and Richard (Dick) Davidson, Ivor (Ike) Evans, and James (Jim) Young (UP).

[36] As used herein, "CMO" refers to persons holding the title Chief Marketing Officer or Chief Commercial Officer, as well as those holding equivalent positions as the most senior marketing officer at the company and those who, in fact, were delegated authority akin to the most senior marketing officer; specifically, it refers to: Chuck Schultz and John Lanigan (BNSF); Michael Giftos and Clarence Gooden (CSX); Isaac (Ike) Prillaman and Donald Seale (NS); and John (Jack) Koraleski (UP).

[37] *See, e.g.*, Lanigan Dep. 283-86, Koraleski Dep. 27-28, 50-51, 66-72, 147-48, 166, 285-88; Goode Dep. 57-58, 120-22, 168, 180-83, 201-07. *See also* Couch Dep. 22-28; *see also infra* ¶¶ 23-24, 29, 34-38, 40, 42, 44-50, 52-56, 60, 62, 74-76, 87, 89, 97-98, 101, 104, 107.

17. Many (but not all) of these senior-level discussions took place at in-person meetings that Defendants self-servingly designated as "Alliance" meetings – *i.e.*, meetings between two Defendants at a time. These meetings were purposefully conducted outside the presence of counsel and without other safeguards that are used in a many industries to prevent collusion when competitors meet.[38] For example, Defendants did not institute protocols to

---

[38] Eisele Dep. 88 (testifying that there was no requirement that attorneys attend "Alliance" meetings and that that he could not recall a single time a lawyer from UP, CSX, or NS ever attended such a meeting); *see also* Young Dep. 252-54, 259, 286-87 (no indication of attorneys attending various meetings); Lanigan Dep. 122-23 (no lawyer was present at the "BNSF-NS Senior Team Meeting" on March 18, 2003). UP's Chairman, President, and CEO, testified that he could not recall the identity of a single lawyer who ever provided him any antitrust training at any time from 2003 to 2008, despite testifying that he relied on his training to know "what you can and can't talk about." Young Dep. 214-15; Koraleski Dep. 31-32; Moorman Dep. 29 (testifying that NS did not have a policy requiring attorney attendance at "Alliance" meetings); Moorman Dep. 227 (testifying that he could not recall a single meeting with BNSF, UP, or CSX at which an attorney or anyone else identified at the outset of the meeting the topics that could and could not be properly discussed).

Defendants' executives and employees have testified that, although they did interchange some freight traffic, they were in fact competitors in the marketplace and were expected to conduct their affairs as such. *See, e.g.*, Goode Dep. 22-23, 105 ("we compete with every railroad in some circumstances"), 106-07 ("Q: Would it be an accurate statement to say Norfolk Southern does not compete with Union Pacific? A: I think that would not be an accurate statement."); Koraleski Dep. 36, 44, 51-53 (the statement "Union Pacific does not compete with CSX and NS . . . would not be true"); Eisele Dep. 83-84; Knight Dep. 103, 222, 236 ("marketplace" includes BNSF, CSX, NS, and UP), 250-51, 269; Tr. of Dep. of Mark Draper ("Draper Dep.") 73 ("There's only four big railroads in the country. I mean, that -- that's the market."). Defendants have acknowledged that competitive constraints existed even when only one railroad serves a particular shipper facility. As NS's CEO, Charles Moorman, stated in written testimony before a Congressional committee, "Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lost the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real." Corrected HD Ex. 36, at 20-21; *see also* Young Dep. 172-201; Gooden Dep. 262-264. Similarly, the STB found: "[S]hippers that are served by a single carrier may nevertheless benefit from the indirect competition that results from having another carrier

record or transcribe these meetings accurately.[39] As noted *infra*, the few notes that did survive show that the "minutes" that came out of these meetings were sanitized. Moreover, "[s]ide discussions took place all the time at these meetings, over breaks, over lunch, whatever the case might be."[40] These "Alliance" or other "bilateral" meetings included broad-ranging discussions about the industry, and expressly addressed coordination among *all* of the Defendants.[41] Moreover, Defendants were aware that they were all having "bilateral" discussions about coordinating fuel surcharges around the same time. For example, while UP was meeting with NS and CSX on a "bilateral" basis, it knew that NS and CSX were likewise having such meetings with BNSF.[42]

18. Defendants' senior executives also gathered to discuss fuel surcharges at meetings of the Association of American Railroads ("AAR"), including AAR board meetings and

---

nearby. In this regard, they may have the possibility of constructing (or proposing to construct) a connection to a second carrier, or of transloading freight by truck to a second carrier. They also may benefit from the opportunity to negotiate a long-term contract before choosing to locate a new plant along either of two carriers' lines or to adjust production levels at plants already located along those lines. A quick glance at a rail map confirms that the eastern and western railroads do not simply meet end-to-end at Chicago and the Mississippi River crossings; there is a fair degree of overlap. . . .." 5 SURFACE TRANSPORTATION BOARD REPORTS 556, *available at* http://www.stb.dot.gov/boundvolumes5.nsf/38f502d6898daf3385256811004b5a12/71db6901b74ccfa385257085006d4711/$FILE/vol5-31.pdf.

[39] Eisele Dep. 89 ("There was no stated process by which that – what transpired in the meetings would be recorded."); *id.* at 100 (not aware of anyone being assigned to take notes); *id.* at 141 (not aware of any specific effort to "ensure that the minutes prepared from Alliance meetings accurately reflected what was actually discussed at the meetings"); Young Dep. 219-20, 291-92; Goode Dep. 157-58, 224-25, 227-28 (not aware of any "effort to ensure that what occurred at these meetings was accurately recorded in some way").

[40] Eisele Dep. 193.

[41] *See also infra* at ¶ 62.

[42] *See e.g.*, Young Dep. 224; UPFSC 0184812-23, at UPFSC_0184816 (CEO Young 2006 self-evaluation, confirming awareness of "alliances between BNSF and Eastern carriers"); Eisele Dep. 283; Koraleski Dep. 347-48; Koraleski Dep. Ex. 53.

meetings of the AAR's Network Efficiency Management Committee ("NEMC"), and other industry meetings.

19. The AAR is effectively controlled by Defendants, who contribute over 80% of the AAR's dues.[43] Edward Hamberger testified that during his term as the AAR's president (1998 to present), only one AAR board action – concerning asbestos legislation – was taken without approval of all four Defendants.[44] And Mr. Hamberger could not recall a single initiative supported by all four Defendants that was not approved by the AAR's board.[45] Separate from the regularly scheduled meetings of the AAR's board, an "executive committee" composed of the four Defendants' CEOs would regularly have discussions about matters of interest to the AAR.[46] Defendants' CEOs used these meetings as cover for collusive conversations as well.[47]

---

[43] *See, e.g.*, Tr. of Dep. of Edward Hamberger ("Hamberger Dep.") 91 (Defendants responsible for over 80% of the AARs member dues, which are based on freight revenues); Hamberger Dep. 83 (pursuant to AAR's bylaws, voting on the AAR's board of directors is controlled by "freight and revenue"); Rockey Dep. 36-37 (Defendants responsible for 80-85% of railroads revenues between 2003 and 2007; certain voting procedures within AAR take account of the revenue of the railroads participating in the vote; Defendants are members of the AAR's board of directors); *see also* Rockey Dep. 109 (creation of AIILF "required a consensus" of "at least the four defendants in this case"); AAR-E-00116414-32 (AAR bylaws); AAR-000001 (AAR directory 2007); AAR-E-00028627 (AAR directory 2004).

[44] Hamberger Dep. 85.

[45] *Id.*

[46] *See, e.g.*, Hamberger Dep. 89-90; 92-94; Goode Dep. Ex. 11 (June 23, 2003 Davidson (UP) calendar entry featuring an "AAR CEO meeting" including Evans (UP), Rose (BNSF), Ward (CSX), Goode (NS), and Hamberger (AAR)); Goode Dep. Ex. 16 (August 12, 2003 meeting).

[47] Defendants would jointly discuss fuel cost avoidance strategies such as "the mechanics of hedging" at AAR meetings. Tr. of Dep. of Craig Rockey ("Rockey Dep.") 220-24; Rockey Dep. Ex. 31. One such meeting at which Defendants shared strategies for using hedges to cut fuel costs was a November 14, 2004 meeting of the AAR's Treasury/Finance Division, in which "cross fertilization discussions were held among the railroad representatives as to the extent and methods employed for fuel hedging." CSXFSC000372050-52; *see also* AAR-P-00003356 (notes on hedging presentations of each Defendant); Neikirk Dep. 152-162, 184-190; Neikirk Dep. Exs. 17, 22, 23.

20. NEMC, one of the three "management committees" of the AAR,[48] functioned as another means by which Defendants' top marketing officers held conspiratorial discussions.[49] NEMC, which was formerly known as the "Committee on Compensation,"[50] brought together Defendants' CMOs,[51] purportedly to talk about "network efficiency" and "information technology" issues, a fiction underscored by Defendants' later dissolution of NEMC after the commencement of this litigation – a dissolution that, as discussed *infra*, was on the advice of counsel after this litigation brought to light some of Defendants' conduct in that forum.[52] AAR officials endeavored to apply protocols to discourage (or at least appear to discourage) collusion – protocols that Defendants blatantly disregarded. For example, NEMC meetings would be attended by lawyers, who would purportedly review proposed agendas beforehand for antitrust issues.[53] The AAR's employee handbook, moreover, purports to proscribe "rump" sessions held outside formal meetings of AAR committees.[54] However, Defendants' CMOs evaded these procedures by simply getting up and walking out of the NEMC meetings before, after, or even during meetings to have secretive conversations (including about pricing issues) outside the

[48] Rockey Dep. 25; s*ee also* AAR-E-00028627-687 (AAR and NEMC directories); AAR-E-00114501-05 (2005 NEMC Governance Rules); Exhibit 16 to Rockey Dep. (AAR organizational summary).

[49] *See, e.g.*, *infra* at ¶¶ 53-54, 86-94.

[50] AAR-E-00114501-05.

[51] Rockey Dep. 72 (CMOs of all four Defendants sat on NEMC); Hamberger Dep. 96 (same); Rose Dep. 195 (same).

[52] *See, e.g.*, Hamberger Dep. 102-04; *see also infra* ¶ 22.

[53] Rockey Dep. 60-65; Lanigan Dep. 147-48.

[54] AAR-P-00002934-40; *see also* AAR-P-00002941-50 (AAR antitrust policy).

presence of the lawyers and lower-level employees attending the formal meetings.[55] Defendants' CEOs also conducted prohibited side or rump conversations at AAR meetings.[56]

21. No one stopped the CMOs from having these conversations, although it was apparent that they were occurring. Nor did anyone monitor or transcribe what was discussed in these secret discussions.[57] Today, there is no equivalent AAR committee that brings together Defendants' CMOs.[58]

22. Defendants apparently ceased holding high-level "Alliance" meetings some time in 2006, after the STB began inquiring into their fuel surcharge practices.[59] And NEMC was dissolved in September 2009 on the advice of counsel after this litigation brought to light some of Defendants' conduct in that forum.[60]

---

[55] *See, e.g.*, UPFSC_0002667-68; Rockey Dep. 76-81 (Defendants' CMOs conducted side talks at meetings of NEMC.); *id.* at 188-89 (AAR would host dinners before NEMC meetings at which CMOs would typically sit together and converse.); Koraleski Dep. Ex. 3 (NEMC agenda noting a reception hosted by CSX the evening before NEMC meeting); Adams Dep. 68-72 (At NEMC meetings, senior officials would "go off and have a conversation," including on "pricing."); Koraleski Dep. 239-40 ("[NEMC] just happened to be a place where several people – where you could meet individually with several people at – at the same time."), 60-61 (CMOs would sit together at NEMC dinner receptions to cultivate relationships), 232 (side meetings between CMOs during NEMC events could be held "at the hotel, it could be at the AAR headquarters, it could be at the Union Pacific [Washington, D.C.] headquarters office"); Koraleski Dep. Ex. 28; Hamberger Dep. 195-97 ("[R]ump sessions" occurring outside AAR meetings were not policed by AAR officials.).

[56] *See, e.g.*, Goode Dep. 203.

[57] *See, e.g.*, Rockey Dep. 76-81, 188-89; Adams Dep. 68-72; Hamberger Dep. 195-97.

[58] *See, e.g.*, Koraleski Dep. 54.

[59] *See, e.g.*, Eisele Dep. 169-71, 253; Knight Dep. 280-81; Lanigan Dep. 279. If they continue at all (a matter about which Defendants have given contradictory testimony), they are at least less frequent, and lawyers now attend at least some of them. *See, e.g.*, Moorman Dep. 26-27, 208-10.

[60] *See, e.g.*, Adams Dep. 67; Hamberger Dep. 96-97; Rose Dep. 196-97; Lanigan Dep. 128-31; AAR NEMC-E00000007-08; AAR NEMC-P00000001-06.

23. Prior to March 5, 2003, UP CMO Jack Koraleski had discussed "fuel surcharge methodology" with at least CSX's Clarence Gooden.[61] UP and CSX senior executives (including Mr. Koraleski and Mr. Gooden) had met for an "Alliance" meeting on December 16, 2002.[62] In addition, Defendants' CMOs met at a February 7, 2003 meeting of NEMC, and at a NEMC reception the previous evening.[63] At the February 6, 2003 NEMC reception, Defendants' CMOs discussed (among other topics) organizing a private weekend to spend time together.[64]

24. On March 12-13, 2003, UP and CSX executives planned to meet to discuss "fuel surcharge methodology," among other topics.[65] Golf and other social engagements, including dinner, were also contemplated.[66]

25. The day before the March 12 meeting, CSX had internally recommended changes to its standard fuel surcharge program that would have lowered its strike price from $28 to $23 per barrel on the West Texas Intermediate ("WTI") index.[67] Under the proposal, CSX would impose a 1% surcharge when the $23 strike price was reached, and an additional 0.5% surcharge for each $2.50 increase in the WTI thereafter.[68] This formula would allow CSX to impose a surcharge when the WTI ranged between $23 and $28, but the formula's relaxed escalation

---

[61] *See, e.g.*, RD Ex. 210. On March 6, 2003, BNSF's Group VP for Industrial Products, Dave Garin, held a call with CSX. *See, e.g.*, BNSF_CAL_0003470.

[62] *See, e.g.*, CSXFSC000110074; CSXFSC000240390-460; AAR-P-00001127-132.

[63] *See, e.g.*, AAR-P-00001127-132; Koraleski Dep. 66-72; Koraleski Dep. Ex. 3.

[64] *Id.* Defendants' CEOs met on January 6-7, 2003 and February 27, 2003 at gatherings of the AAR's board. *See* NS_016000133-154; NS_016000129-132.

[65] *See e.g.*, RD Ex 210; UPFSC_0365638-71; Couch Dep. 194; Koraleski Dep. Ex. 9 (expense report reflecting Koraleski's stay at Omni Jacksonville Hotel on March 12, 2003); Koraleski Dep. 121-22; Koraleski Dep. Ex. 11.

[66] *See, e.g.*, RD Ex 210.

[67] *See, e.g.*, HD Ex. 154.

[68] *Id.*; *see also* CSXFSC000153185.

schedule would have resulted in a decrease in CSX's fuel surcharge percentages (compared to CSX's existing fuel surcharge program) as WTI prices reached $33 per barrel.[69] The proposed formula was less onerous than the coordinated fuel surcharges that CSX ultimately adopted; above the $23 strike price, the proposed formula would have escalated at half the rate of the coordinated fuel surcharges that CSX ultimately implemented.[70]

26. As Defendants and their customers recognized, the adoption of a more aggressive $23 strike price was not in response to rising fuel prices. As one shipper later complained to UP: "The purpose of the fuel surcharge is to share the risk of significant increases in the price of fuel between the carrier and the shipper. Obviously, prices below $28 cannot be considered unusually high."[71] Similarly, in May 2003, Sunoco – which was "very familiar with the volatility and price of crude oil and the impact of higher crude prices on both of our businesses and bottom lines" – complained that, based on prevailing fuel cost projections, the $23 trigger of the coordinated fuel surcharge would be reached "100% of the time between 2003-2007," whereas CSX had applied a fuel surcharge only "16% of the time" in the preceding decade.[72]

---

[69] *Id.*

[70] *See id.*; RD Ex. 26.

[71] *See* UPFSC_0248970-72. *See also* Koraleski Dep. Ex. 17 (UP internal email citing anticipated concern among shippers in response to $23 strike price: "Has there been a fundamental change in the fuel market that really suggests that $23/barrel is the normal or average price going forward based upon the last several years? If so, are we therefore institutionalizing the fuel surcharge?").

[72] *See* CSXFSC000152645-47. At this time, fuel prices were also not forecasted to significantly rise. *See, e.g.*, NS_010218296-327 at 301 (Global Petroleum Monthly (July 2003): "West Texas Intermediate (WTI) is still expected to average around $27/barrel (bbl) for the rest of this year, though trending downwards from current levels as stocks rise and Iraq returns. Fundamentals continue to look bearish for 2004, and we expect WTI to dip below $25/bbl in the first half of next year."); NS_010275444-63 (NS's April 27, 2006 submission to the STB), at NS_010275447 ("NS thought … that the oil prices we began to see as 2003 progressed were temporary."), NS_010275449 ("In March 2003, EIA accurately forecasted a decline in the price of WTI to around $27 by the end of 2003."). Nonetheless, if CSX had adopted its internal fuel

27. Rather, the adoption of the $23 trigger was a calculated shift designed to raise revenues and expected to generate intense customer pushback, as CSX and the other Defendants realized.[73]

28. Also prior to the March 12 meeting, UP had internally prepared a "Revised Surcharge proposal," which retained the $28 WTI strike price of UP's existing program but contemplated a more finely calibrated escalation formula that would more aggressively convert into revenue incremental increases in the cost of fuel.[74] Specifically, the proposed surcharge would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for 2.0% increases for every $5 increase in the WTI index.[75] During this period, UP's finance team had been "pressuring" its CMO to change its fuel surcharge formula to make it more aggressive.[76]

29. On March 12 and 13, 2003, Jack Koraleski met in person with Clarence Gooden in Jacksonville, Florida and discussed fuel surcharge methodologies.[77] No lawyer attended the meeting; no record of the discussion was prepared (or at least no record has been disclosed to Plaintiffs).

---

surcharge recommendation change (which was all but a formality as of March 12, 2003) rather than the program it later adopted, CSX's fuel surcharges would have been set at significantly lower levels through the Class Period due to the proposed formula's relaxed escalation schedule, and the other Defendants would have had to face and respond to that competitive situation.

[73] *See infra* at ¶¶ 64, 115; *supra* at ¶¶ 11, 14.

[74] *See, e.g.*, HD Ex. 17; Koraleski Dep. 92 (this proposal would yield "a more aggressive surcharge" because of the change in the "stairsteps."); *see also* Koraleski Dep. Ex. 6 ("Union Pacific Fuel Surcharge Analysis Alternative Impacts).

[75] *Id*.

[76] *See, e.g.*, Koraleski Dep, 76-78.

[77] *See, e.g.*, RD Ex 210.

30. On March 19-20, 2003, within a week of that meeting, CSX announced a new standard fuel surcharge program. The program retained the lower $23 trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal."[78] This program applied to all of CSX's carload traffic.[79] Under CSX's new policy, CSX would assess a 0.4% surcharge when the price of oil on the WTI exceeded $23 per barrel, and an additional 0.4% for every $1 increase thereafter.[80] Unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month.[81] CSX obtained "concurrence" from each Defendant to the new program shortly after its formal announcement.[82]

31. CSX's decision to switch fuel surcharge programs was made by CSX's CEO and chief commercial officer,[83] and no internal records at CSX show that CSX had even considered the escalation formula that it adopted prior to the meetings with Mr. Koraleski.

32. In the week after CSX's announcement, CSX and UP further discussed CSX's plan "to implement a new fuel surcharge formula."[84] Shortly after CSX's announcement, UP

---

78 *See, e.g.*, RD Ex. 26.

79 *See id.*

80 *See, e.g.*, RD Ex. 26; *see also* RD Ex. 24, at CSXFSC000000363 (Powerpoint presentation comparing old and new surcharge formulas).

81 *See id.*; *see also* RD Ex. 23 (Mar. 19, 2003 email from CSX's John Couch to various CSX officials comparing old and new fuel surcharge programs).

82 *See, e.g.*, RD Ex. 34 (NS); RD Ex. 35 (BNSF); RD Ex. 38 (UP).

83 *See, e.g.*, RD Ex. 23. CSX's chief commercial officer, Michael Giftos, also spoke with Clarence Gooden about the switch. *See* Gooden Dep. 97-98.

announced that it had abandoned its "revised" $28 strike price and had instead adopted "the same approach as the CSXT"—that is, UP announced its intention to use the $23 WTI strike price contemplated in the CSX internal proposal circulated shortly before Mr. Koraleski went to visit CSX (and the same escalation formula).[85] Mr. Koraleski testified that he did not recall any specific financial analysis at UP supporting its decision to adopt the CSX methodology.[86]

33. On April 4, 2003, UP informed the other Defendants that it would be applying this new standard fuel surcharge program to both local and interline traffic.[87] UP had no procompetitive or legitimate reason to inform the other Defendants of what it intended to do on its local traffic; rather, this communication was an anticompetitive signaling device in furtherance of the conspiracy.[88]

---

[84] RD Ex. 30; *see also* RD Ex. 31 (Mar. 24, 2003 internal email from UP's Kurt Schroeder referencing additional discussions with CSX's Clyde McIntyre regarding new CSX program).

[85] *See, e.g.*, RD Ex. 38; Koraleski Ex. 15 (April 2, 2003 Toy (UP) internal email to UP executives explaining that "UP has concurred to CSXT's new methodology . . . and will adopt similar wording for UP's primary fuel surcharge"). This was despite some internal recognition at UP that the new fuel surcharge would be "complex/confusing and … problematic to administer." *See, e.g.*, UPFSC_0069867.

[86] Koraleski Dep. 151-52; *see also* Koraleski Dep. Ex. 19 (in an email dated May 2, 2003, UP's head of purchasing for fuel and other goods concluded: "I don't think the historical information and analysis we have on our side will help to 'defend' the $23 threshold.").

[87] *See, e.g.*, RD Ex. 40 ("The modified surcharge will continue to apply to most Union Pacific pricing documents for local and interline freight movements."); *see also* UPFSC 0344321-23.

[88] Other documents show that UP (and the other Defendants) intentionally used so-called "concurrence" or other communications in order to signal each other about contemplated future pricing actions and to secure coordination. For example, Defendants would purposefully announce contemplated changes with "substantial lead time" so that the other Defendants could "follow," or provide other feedback. *See* UPFSC_0422458-60, at 0422458; *see also* Couch Dep. 221-22 (testifying that "concurrences" were regularly requested in "an email that goes out from one carrier to all the other carriers"); *infra* ¶ 104.

34. On March 13, 2003, BNSF's CMO, John Lanigan, requested an urgent review of BNSF's fuel surcharge program to be completed "in about two to three weeks."[89] This review was designed to coincide with the Spring National Freight Transportation Association ("NFTA") meeting at the Wigwam resort in Arizona on April 2-6 (the "Spring 2003 NFTA meeting"), where Mr. Lanigan knew he would see senior marketing officers from UP, CSX, and NS.[90] During this period, Mr. Lanigan had phone conversations and other meetings with his marketing counterparts at the other Defendants.[91]

35. At a meeting at NS's headquarters in Norfolk, VA, on March 18, 2003, senior executives from NS and BNSF – including their respective CEOs, CMOs, and other senior marketing executives – met and discussed how the fuel surcharge programs of all four Defendants were structured. They then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's fuel surcharge program with the programs of the other Defendants.[92] John Lanigan (BNSF) and Don Seale (NS), senior marketing officers at those companies, were assigned responsibility for this issue.[93]

36. Following this March 18, 2003 meeting, Mr. Seale and Mr. Lanigan played "phone tag," before Mr. Seale emailed Mr. Lanigan on March 27, 2003, saying that at the upcoming Spring 2003 NFTA meeting, he wanted to talk to Mr. Lanigan about "the fuel surcharge issue we discussed in Norfolk."[94]

---

[89] *See, e.g.*, BNSF_0456278; *see also* BNSF-0330793-0833; Lanigan Dep. 56-57.

[90] *See, e.g.*, NS_015000208-211.

[91] Lanigan Dep. 283-286. Also, on February 18, 2003, at least BNSF's Lanigan had "[d]inner w/NS." *See, e.g.*, BNSF_CAL_0005323.

[92] RD Ex. 208.

[93] *Id.*

[94] *See, e.g.*, RD Ex. 216; Lanigan Dep. 55-56, 59-63.

37. On April 1, 2003, the day before the Spring 2003 NFTA meeting, Mr. Lanigan and other BNSF senior executives met with CSX senior executives to discuss fuel surcharges.[95] Discussions in preparation of this meeting went back to at least March 26, 2003.[96] At the meeting, Mr. Lanigan discussed fuel surcharges with CSX CMO Mr. Giftos.[97] BNSF and CSX senior executives would meet again on or around April 23, 2003.[98]

38. The Spring 2003 NFTA meeting took place at the Wigwam resort in Arizona on April 2-6, 2003.[99] Mr. Seale and Mr. Lanigan both attended,[100] as did other senior marketing executives from all four Defendants, including NS's CMO Ike Prillaman, UP's CMO Jack Koraleski, and Clarence Gooden of CSX.[101] Mr. Koraleski flew to Arizona for the Spring 2003 NFTA meeting immediately following a UP revenue meeting where fuel surcharges were discussed (and where UP apparently made the formal decision to adopt the fuel surcharge methodology discussed with CSX).[102] Mr. Koraleski testified that it was his practice to discuss with his industry counterparts significant contemplated changes to UP's fuel surcharge program *before* they were announced outside of the company,[103] and Mr. Koraleski knew he would see

---

[95] *See, e.g.*, RD Ex. 215; Gooden Dep. 107-09.

[96] *See id.*; *see also* BNSF_0557167-68.

[97] *See, e.g.*, RD Ex. 215; Tr. of Dep. of David Garin ("Garin Dep.") 237-38; CSXFSC000243651-54.

[98] *See, e.g.*, BNSF_CAL-0007200.

[99] *See, e.g.*, NS_015000208-211.

[100] *See, e.g.*, Lanigan Dep. 64; Seale Dep. 258; NS_013002633; NS_010058958-960; NS_015000201-238, at NS_015000207. On April 5, 2003, at least BNSF's Garin, met with NS's Don Seale. *See, e.g.*, BNSF_CAL_0003465.

[101] *See, e.g.*, NS_015000201-238, at NS_015000201; UPFSC_0365638-671; NS_015000208-211; Gooden Dep. 120-123, 137; Garin Dep. 243-244; Rose Dep. 171-172; NS_008002991.

[102] Koraleski Dep. 161-65. *See also* Koraleski Dep. Ex. 15.

[103] Koraleski Dep. 119-120; 142; 154-55 ("[T]hat was the way we wanted to do it.").

and talk to his counterparts at the 2003 Spring NFTA meeting. NFTA meetings were typically a place where Defendants' CMOs would have discussions, including over drinks.[104]

39. Directly after the Spring 2003 NFTA meeting, Mr. Lanigan ordered internally at BNSF that "*effective immediately and urgently* per John Lanigan[:] Authority to omit FSC [fuel surcharge] provision is to be granted to VP's only (who will also clear with John)."[105] This policy action was taken as a result of Mr. Lanigan's discussions with the other Defendants at, and just prior to, the Spring 2003 NFTA meeting.

40. Prior to these meetings, BNSF had internally contemplated that it could gain a competitive advantage by using a mileage-based fuel surcharge, as opposed to the revenue-based fuel surcharge that it agreed to impose as a result of the conspiracy.[106] BNSF had previously tried to drum up support among the other Defendants for a mileage-based fuel surcharge rather than one based on a percentage of base rates.[107] However, as a result of discussions with the other Defendants, BNSF abandoned a mileage approach and continued to apply a fuel surcharge based on a percentage of base rates. This decision followed not only the two April meetings with CSX, but also the Spring 2003 NFTA meeting, a weekend gathering of Defendants' CMOs on

---

[104] *See, e.g.*, Koraleski Dep. 165 ("We would … typically have discussions."); 166 ("Q: [I]f you wanted to talk to Mr. Seale about something, the NFTA meeting would be an opportunity to do that, correct. A: Yeah."); 169; Goode Dep. 159.

[105] HD Ex. 19 (emphasis added); Lanigan Dep. 86-88.

[106] *See, e.g.*, Kyei Dep. 97-98, 113-15; RD Ex. 19, at BNSF-0330838 (conclusion from Feb. 24, 2003 meeting is that BNSF is "[l]eaning toward Cost Per Mile (CPM) Fuel Surcharge Formula"); RD Ex. 211(BNSF presentation recommending mileage-based fuel surcharge); BNSF-0328761-64; BNSF-0330793-0833; *see also* Rose Dep. 132 (CEO and CMO of BNSF "always had bias toward mileage-based fuel surcharges").

[107] *See, e.g.*, RD Ex. 39 (Apr. 3, 2003 internal UP emails referencing discussions with BNSF in regards to a possible mileage-based formula).

April 15-17, 2003,[108] another gathering of Defendants' top marketing personnel at a NEMC meeting on April 30-May 1, 2003,[109] and a May 6, 2003 "AAR CEOs" conference call.[110]

41. In early May, BNSF, which considered its existing fuel surcharge program to be "more aggressive … than U.S. rail carload competition," changed its program to make it even more aggressive by decreasing the formula's trigger price, which was based on the per-gallon price of diesel fuel in the On-Highway Diesel Fuel ("HDF") index, to $1.25, a number that "reflected the $23 WTI crude price used by UP" (and CSX).[111] Under its new program, BNSF would apply a 0.5% surcharge when the HDF index reached $1.25, and an additional 0.5% for every $.05 that the index exceeded $1.25.[112]

42. At around the same time BNSF issued its new policy, UP suddenly adopted the BNSF fuel surcharge formula, bringing the two western carriers into direct lockstep.[113] UP

---

[108] *See, e.g.*, NS_015000201-238, at NS_015000220. This "social weekend" at UP's "Selma" facility involved golf and cocktails. While the weekend was purportedly a retirement party for BNSF's Chuck Schultz (hosted by BNSF's supposedly fiercest competitor, UP), it was used as an opportunity to strengthen relationships and commitment among the CMOs. *See id.*; Koraleski Dep. 172-73. No Defendant sent an attorney to this gathering. UP, the host of the party, purportedly did not have an in-house attorney "available" to supervise the meeting among competitors. *Id.*

[109] *See, e.g.*, AAR_P_00001095-1186.

[110] *See, e.g.*, BNSF_CAL_0007478.

[111] *See, e.g.*, RD Ex. 57, at BNSF-FSC000486 (July 1, 2003 memo summarizing status and recent changes to fuel surcharge program); HD Ex. 16, at BNSF_0028794; BNSF-0327012-13 (April 30, 2003 BNSF email discussing changes to carload and intermodal programs); RD Ex. 2, at BNSF-0511834 (May 7, 2003 rule effecting $1.25 trigger price); *see also* RD Ex. 3, at BNSF-0026751-53 (Apr. 30, 2001 announcement of $1.30 trigger price); BNSF-0327011-12; Lanigan Dep. 97 ($1.25 on the HDF is "roughly equivalent" to $23 on the WTI).

[112] *See, e.g.*, RD Ex. 2, at BNSF-0511834.

[113] *See, e.g.*, UPFSC0001035; RD Ex. 47, at UPFSC 0183975-81 (May 9, 2003, email from UP's Larry Nowakowski to various UP officials with a PowerPoint attachment); UPFSC_0070045-46 (May 7, 2003 internal planning regarding new program); *see also* Adams Dep. 240-242; RD Ex. 50, at NS001000354 (internal NS analysis of the new UP program observing that while UP program featured a higher trigger price than BNSF's ($1.35 compared

immediately informed the other Defendants, including BNSF, of its decision.[114] UP and BNSF thereafter implemented fuel surcharges that were in synch, began setting and adjusting them at the same time and levels, and sought to apply them as broadly as possible.[115] UP and BNSF fuel surcharges remained in synch notwithstanding that the two companies had different fuel costs during a period of large fuel cost increases,[116] and improvements in their respective fuel efficiencies.[117] While this coordination was occurring, UP's and BNSF's chairmen and CEOs had one-on-one conversations, including by telephone,[118] as did their CMOs (*see supra*).

---

to $1.25), the UP program "catches the prior increments until the $1.35 threshold is met" such that "[o]nce it kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates"); NS_0014001716-717; BNSF-0342448 ("[T]his is big news. The ideal scenario is to have BNSF and UPRR have the same FSC methodology…but for them to copy us – as it appears they are doing").

[114] *See, e.g.*, RD Ex. 48 (email to BNSF); RD Ex. 49 (email to CSX); RD Ex. 212 (email to NS). During 2003, BNSF and UP executives met and communicated regularly. *See, e.g.*, ; UPFSC_0343267-68 (Mar. 18, 2003 letter from BNSF's CEO to UP's CEO referencing "previous[] discuss[ions]" and suggesting future meetings).

[115] *See, e.g.*, RD Ex. 47; RD Ex. 50; Lanigan Dep. 119 (testifying that at $1.35 and above, BNSF's and UP's fuel surcharges "appear to be identical"). As discussed *infra*, this coordination included UP's and BNSF's intermodal and coal fuel surcharges.

[116] *See, e.g.*, Neikirk Ex. 4.

[117] *See, e.g.*, Rockey Dep. 248 ("Q . Was it a fact that over the period of 2003 through 2008 the railroads were increasing their fuel efficiency? A. Yes, hugely."); AAR, "Railroads: Green From the Start," (April 2010), *available at* http://www.aar.org/~/media/aar/backgroundpapers/railroadsgreenfromthestart.ashx ("In 2009, U.S. freight railroads moved one ton of freight an average of 480 miles per gallon (up from 457 in 2008). Rail fuel efficiency is up 104 percent since 1980."); Federal Rail Administration, "A Comparative Evaluation of Rail and Truck Fuel Efficiency on Competitive Corridors," *available at* http://www.fra.dot.gov/Downloads/Comparative_Evaluation_Rail_Truck_Fuel_Efficiency.pdf ("Between 1990 and 2006, rail fuel efficiency has improved by about 20%, or 1.1% per year."); BNSF_0567951-53 ("BNSF has improved fuel efficiency approximately 9 percent since 1995, primarily due to the acquisition of 2,700 new more fuel-efficient, higher-horsepower locomotives from 1995-2005, representing nearly 60 percent of its road fleet."); Kyei Dep. 68-69; BNSF_0355397 -98; BNSF website, available at http://www.bnsf.com/communities/bnsf-and-the-environment/fuel-efficiency/ ("BNSF's fuel efficiency has increased by 7.7 percent since 1999."); UP, "Innovation and Employee Education Save Fuel," available at http://www.uprr.com/newsinfo/attachments/media_kit/conserv_facts.pdf ("Since 1998, Union Pacific has achieved a 20 percent improvement in fuel efficiency."); UPFSC_0593229-34 ("At

43. UP gave its customers (and later the STB) a pretextual reason for its adoption of the BNSF program. UP falsely stated that it had made the change from the WTI to the HDF index "because we concluded that the HDF is better aligned with the fluctuations in the diesel fuel price that UP pays."[119] However, UP had long known that the HDF was better aligned with its diesel fuel price fluctuations than the WTI.[120] In fact, UP had concluded in 2000 that the WTI index "[d]oes not accurately measure RR diesel fuel prices."[121] Internally, UP acknowledged that it switched fuel surcharge programs "[t]o match BNSF's 'standard' HDF based surcharge."[122]

44. During this same period, NS also agreed to implement an industry-standard fuel surcharge and discussed how to create and impose such a standard that would be "acceptable" to the other Defendants.[123] This included discussions with CSX about fuel surcharges[124] while NS

---

UP, we are continually improving our fuel efficiency through better locomotive technology, engineer training and employee involvement. In 2006, we moved, on average, one ton of freight over 780 miles on a single gallon of diesel fuel – a nearly 30-mile improvement over the past two years. This improved fuel efficiency saved more than 50 million gallons of diesel in 2006.")

118 *See, e.g.*, UPFSC_0466673; UPFSC_0466624; UPFSC_0466746; BNSF_CAL_0004878; *see also* UPFSC_04666545 (UP CEO Dick Davidson calendar entry: "Calls: David Goode [NS CEO]"); UPFSC_0466657 (Davidson: "Lunch with David Goode"); UPFSC_0466744 (Ward and Giftos (CSX) dine with Koraleski and Young (UP) following CSX/UP Strategy Meeting).

119 *See, e.g.*, HD Ex. 1, at UPFSC0000309.

120 *See, e.g.*, UPFSC 0043878-79; Adams Dep.198-201; Tr. of Dep. of Mark Draper ("Draper Dep.") 152-167.

121 UPFSC_0057237-38.

122 UPFSC_0075761-63.

123 *See, e.g.*, Seale Dep. 226-29; *see also supra* at ¶¶ 35-39; *infra* at ¶¶ 45-56; RD Ex. 42, at NS001000283 (Apr. 7, 2003 NS memo discussing "ease of business argument" in support of a common fuel surcharge program); RD Ex. 55, at NS010042321 (May 12, 2003 email from NS's Don Seale to NS's Ike Prillaman, noting inconsistent fuel surcharge application and remarking that "[t]he industry is not looking good on this issue"); RD Ex. 77, at NS_013001654 (Jan. 8, 2004 email from NS's Pat Glennon to Don Seale and other NS officials explaining that modified 2004 fuel surcharge formula adopted in part to effect "[s]tandardization of FSC

was positioning itself to implement a fuel surcharge program in direct lockstep with CSX.[125] For example, on April 17, 2003, NS's Don Seale relayed internally that NS "do[es] plan to modify our FSC."[126]

45. In April 2003, CSX executives and other employees flew to NS for a meeting on fuel hedging practices.[127] NS had invited CSX – ostensibly NS's fiercest competitor – to visit so that NS could share with CSX its fuel hedging strategies and practices.[128] Testimony has confirmed that NS shared with CSX its knowledge and experience on fuel hedging, how NS's hedging program was structured and monitored, and alternatives to fuel hedging instruments.[129] Sharing this knowledge was not in NS's unilateral self interest. There was no procompetitive or legitimate basis for this discussion between NS and CSX executives; rather, it was an anticompetitive discussion that took place as part of the companies' agreement to conspire and not to compete with each other. This meeting took place despite NS's recognition that, to the

---

provisions in the East"). At the same time, NS personnel recognized that a new fuel surcharge was unwarranted. *See, e.g.*, NS_014001720-22 ("NS is protected from [short term fuel risk] so why take action against customers who have no hope of recovering that incremental cost? …Our track record with the existing system is less than stellar and it requires far few notifications than the CSX proposal entails"); NS_009000161-164.

[124] *See, e.g.*, RD Ex. 41, RD Ex. 217; HD Ex. 3; HD Ex. 5; HD Ex. 14; Glennon Dep. 60; Glennon Dep. 77-81; *see also* at 13 n.26.

[125] *See, e.g.*, RD Ex. 213, at NS00100012 (Apr. 29, 2003 email from NS's Pat Glennon to Don Seale and other NS officials); RD Ex. 60, at NS_010005140-42 (July 21, 2003 internal email from NS's Alby Pfeifer announcing "a new note which will simply refer to the surcharge provisions as published in NS-1 Conditions of Carriage" and thereby "allow NS to more easily adopt and implement a revised FSC formula if we opt to do so in the future"); *see also infra* at ¶ 57.

[126] NS001000316-320.

[127] *See, e.g.*, RD Ex. 205.

[128] *Id.* at CSXFSC000000399; CSX Corp. 2003 Annual Report at 19 (discussing plans to expand hedging program).

[129] *See, e.g.*, Tr. of Dep. of Chris Neikirk ("Neikirk Dep."), at 24-25, 35-68.

extent it was able to achieve fuel cost efficiencies through hedging practices or otherwise, it could use those efficiencies to compete in the market.[130] Also in April 2003, prior to the fuel hedging meeting, CSX's and NS's CEOs met and resolved that their companies would work together and focus on "hav[ing] their priorities aligned."[131] As NS's CEO David Goode admitted in a 2004 earnings call, it was no longer NS's "philosophy" at this time to seek to gain market share from CSX,[132] although it had been prior to the conspiracy. That same year, at a time when NS was aware that CSX was facing significant operational issues, NS's CEO David Goode was asked by analysts whether NS saw an opportunity to approach CSX customers or take share; he responded: "on the contrary, we're working very closely with our friends from CSX."[133] Mr. Goode stressed that the companies "cooperate with each other" and "work very closely together."[134] In May 2005, Mr. Goode publicly stated that it was "important for the rails as an industry" to "keep up the momentum" on raising prices.[135] Yet, prior to the conspiracy, NS had publicly championed the importance of rail-to-rail competition, proclaimed its benefits to shippers, and repeatedly stressed NS's intention to compete vigorously with CSX.[136]

---

[130] *See, e.g.*, Goode Dep. 66-67 ("Q: [I]f Norfolk Southern could figure out ways to be more cost efficient that could … give it a competitive advantage over its competitors, correct? A: It could."); 72 (if done well, a fuel hedging program "could have a favorable impact on cost"); Moorman Dep. 161 ("Fuel certainly drives pricing and competition. It is one of the drivers of pricing competition in the marketplace."); Neikirk Dep. 24-25. *See also supra* at n. 168.

[131] *See, e.g.*, Goode Ex. 10.

[132] *See, e.g.*, RD Ex. 176; Goode Dep. 113; *see also* CSXFSC000246324-339 (CSX monitoring NS's public statements) .

[133] Goode Dep. 101.

[134] Goode Dep. 102.

[135] Goode Dep. 117-18.

[136] *See, e.g.*, Goode Dep. 16-32.

46. On May 12, 2003, NS's Don Seale complained to his boss that – in light of BNSF's "unilateral[]" discounting of its fuel surcharge in a particular month and in anticipation of an upcoming "conversation with UP" – "the industry is not looking good on this issue [fuel surcharges] and a stable approach has been the best approach."[137] That same day, BNSF CEO Matt Rose met with NS executive Jim McClellan.[138]

47. Two days later, on May 14, 2003, NS and UP senior executives met and agreed that all four Defendants should have the same fuel surcharges "in the eyes of our customers." These executives discussed how to "handle" this "opportunity." They discussed whether they could do so under the cover of the AAR, or whether they would have to use ostensible "bilateral" discussions. They assigned Mr. Seale and UP CMO Jack Koraleski to follow up on these issues.[139] Lawyers from the two companies were also purportedly assigned to work with Mr. Seale and Mr. Koraleski, but it is far from clear those lawyers did anything in this regard.

48. Three days later, NS executives met with BNSF executives.[140] On or around May 16, 2003, CSX's Clarence Gooden met with BNSF's John Lanigan in Chicago.[141]

---

137 *See, e.g.*, RD Ex. 55, at NS_010042321; NS_010042306-07 (May 5, 2003 NS-UP meeting agenda for upcoming meeting); *see also* CSXFSC000000408-410 (May 11, 2003 emails expressing hope that "we can agree on what is best – and adopt a standard format among the class 1s").

138 *See, e.g.*, BNSF_CAL_0007474.

139 *See, e.g.*, RD Ex. 204; *see also* UPFSC 0014100 (May 6, 2003 conference call between Koraleski, Seale and others to devise agenda for May 14, 2003 "Alliance" meeting); NS 001000360360-362 (June 5, 2003 email from Don Seale to UP stating "please note NS representatives will work with UP designees on the assigned topics" from the May 14, 2003 meeting); UPFSC 0127235-236 (email reflecting that follow up conference calls to May 14, 2003 meeting took place between NS and UP executives on at least July 8, 2003, and August 15, 2003).

140 *See, e.g.*, NS_010034423.

141 *See, e.g.*, CSXFSC000219258; Couch Dep. 207-11.

49. On May 29-30, 2003, members of the AAR Board, including NS's Don Seale, met for dinner in Washington, D.C.[142]

50. On June 3, 2003, CSX and UP senior executives met and discussed fuel surcharges.[143] On the day of the meeting, at Mike Giftos's request, CSX's John Couch emailed CSX attendees Giftos and Clarence Gooden a chart comparing CSX's fuel surcharge program to the other Defendants' programs.[144] At the June 3 meeting, CSX and UP senior executives assessed the customer opposition the companies were receiving to their efforts to apply their conspiratorial fuel surcharges on shippers. CSX also shared its internal future plans regarding its fuel hedging program (which, as noted *supra*, it had previously discussed with NS). CSX and UP then discussed the trigger points that the companies were using for their fuel surcharge programs. They agreed that, if fuel prices stayed high, they might have to consider raising their trigger points.

51. Handwritten notes of the June 3, 2003 "Alliance" meeting show that the prepared "minutes" were sanitized in that they omitted key discussions on fuel surcharges.[145]

52. On June 23, 2003, Defendants' CEOs met under the auspices of the AAR at Chicago Midway International Airport.[146] The other members of the AAR board did not attend this meeting. The next day, after flying together to Washington D.C., Mr. Goode and Mr. Evans dined together.[147] AAR "CEO" meetings were an occasion for Defendants' CEOs to discuss

[142] *See, e.g.*, NS_013002675-688, at NS_013002682-84.

[143] *See* RD Exs. 209, 218.

[144] *See, e.g.*, CSXFSC000000414-15.

[145] *See, e.g.*, RD Ex. 209; RD Ex. 218.

[146] *See, e.g.*, UPFSC_0466514-15 (attendees: UP's Dick Davidson and Ike Evans, BNSF's Matt Rose, CSX's Mike Ward, NS's David Goode, and the AAR's Ed Hamberger).

[147] *See, e.g.*, NS_016000055-60.

"industry conditions," and dinners between CEOs were also occasions to have private discussions about "business" matters.[148]

53. On July 30, 2003, top marketing executives of NS and BNSF discussed a "potential industry position" on fuel surcharges and jointly appointed a top executive from each company to lead a discussion on this topic at the next NEMC meeting scheduled for September 11, 2003.[149] (Mr. Lanigan has admitted that the discussion on an "industry position" on fuel surcharges was not intended to be limited to interline traffic.[150]) While Defendants, by this time, had already agreed to coordinate their programs and apply fuel surcharges as uniformly as possible, to as many freight shipments as possible, with the express goal of 100% coverage, Defendants were still considering how to act jointly through the AAR to make the conspiracy more effective (as they later did: *see infra* at ¶¶ 65-78, 85-94). Defendants' executives met on several occasions leading up to the September 11, 2003 NEMC meeting. On August 12, 2003, Defendants' CEOs held a breakfast meeting at the New York Palace Hotel.[151] On August 29, 2003, BNSF CEO Matt Rose and NS CEO David Goode played golf together about 30 minutes north of Copenhagen, Denmark.[152] Defendants' executives also attended NFTA's Fall Business

---

148 *See, e.g.,* Goode Dep. 182, 202.

149 *See, e.g.*, RD Ex. 59, at NS001000424; *see also* Seale Dep. 226-29; Lanigan Dep. 138-143; BNSF_CAL_0003386.

150 *See, e.g.*, Lanigan Dep. 143-45, 151 ("We didn't specifically state it one way or the other.").

151 BNSF_CAL-0007136 (noting that the meeting was limited to "following CEOs only: MKR [Matt Rose of BNSF], Mike Ward [CSX], Ike Evans [UP], David Goode [NS].")

152 *See, e.g.*, BNSF_CAL_0007289; Goode Dep. 197-198; Goode Ex. 12.

Meeting, which was held September 4-7, 2003 at the Kingsmill Resort in Williamsburg Virginia.[153]

54. The formal minutes of the September 11, 2003 NEMC meeting do not reflect any discussion of an industry position on fuel surcharges that was discussed at the July 30, 2003 NS-BNSF meeting.[154] Following the September 11, 2003 NEMC meeting, Mr. Seale emailed Mr. Lanigan that he "[e]njoyed our visit at NEMC, and look[ed] forward to seeing [Lanigan] again soon."[155] Mr. Seale also confirmed that NS had reviewed the meeting minutes of the July 30, 2003 meeting – where NS and BNSF discussed a potential industry position" on fuel surcharges – and determined that the minutes are "concise minutes of our meeting."[156] Finally, Mr. Seale informed BNSF that its executives "will work with their counterparts at BNSF to advance each of the identified projects and action items" that they had agreed to on July 30, 2003.[157]

55. That same day, NS and CSX CEOs held an "Alliance" meeting and planned future meetings. An email reflects that, at this meeting, NS's David Goode and CSX's Michael Ward agreed to meet "more frequently – every 90-120 days rather than every 6 months."[158] Also that same day, the CEOs of the four Defendants held a conference call under the auspices of the AAR.[159] The other members of the AAR Board did not attend this meeting.

---

[153] NS_015000482-0511; NS_01600081-96; NS_010033053-54. Defendants' CEOs would have discussions about business topics at NFTA meetings. *See, e.g.*, Goode Dep. 159.

[154] *See, e.g.*, RD Ex. 61.

[155] RD Ex. 220.

[156] *Id.*

[157] *See, e.g.*, RD Ex. 220, at NS001000431.

[158] *See* CSXFSC0000000467-475, at CSXFSC0000000467.

[159] *See, e.g.*, UPFSC_0466737 (attendees: UP's Dick Davidson and Ike Evans, BNSF's Matt Rose, CSX's Mike Ward, NS's David Goode, and the AAR's Ed Hamberger).

56. Four days later, on September 15, 2003, NS executives (including Mr. Seale) met with their counterparts from UP at NS's headquarters in Norfolk.[160] Defendants' executives continued to meet through the end of the year. [161]

57. NS moved somewhat more slowly than the other Defendants in announcing to its customers a new fuel surcharge program, because NS had encoded its original uncoordinated fuel surcharge in 2000 directly into contracts, which hampered its ability to make a rapid change to the new agreed fuel surcharges and prohibited immediate adoption of the new fuel surcharge program.[162] But, as it had planned and prepared from at least March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, the new fuel surcharge program, which was identical to the program announced by CSX in March 2003 and was intended to "standardize" NS's fuel surcharge program with that of the other Defendants.[163] NS

---

[160] *See, e.g.*, NS_010033217-220; UPFSC_0186625-626.

[161] On September 5, 2003, the "AAR CEOs" spoke by telephone. *See, e.g.*, BNSF_CAL_0007244. On November 4, 2003, NS officials including its current CEO, Wick Moorman, met with CSX officials in Jacksonville. NS_011001321-344. On November 18, 2003, BNSF's Matt Rose and CSX's Mike Ward held a meeting. *See, e.g.*, BNSF_CAL_0007127. On November 20, 2003, the "AAR CEOs" held a breakfast meeting in New York City. *See, e.g.*, BNSF_CAL_0007136 ("mtg. includes following CEOs only: MKR [BNSF CEO Matt Rose], Mike Ward [CSX CEO], Ike Evans [UP CEO], David Goode [NS CEO]").

[162] *See, e.g.*, RD Ex. 213, at NS00100012 (Apr. 29, 2003 email from NS's Pat Glennon to Don Seale and other NS officials); RD Ex. 58, at NS 001000373 (July 16, 2003 email from NS's Pat Glennon to NS colleagues Marshall Sheets and Jim Nash); HD Ex. 27 ("[I]f we were to adopt something like CSXT's, we could not simply announce it and have it apply across the board, at least not on contracts and possibly not on customer specific quotes (open to debate)."); HD Ex 217 ("Problem is that we included the FSC text in our publications. We have to actually reissue them….NS actually inserts the current SC in all publications. If we adopt a new FSC, to make it effective, we will have to republish each authority subject to the new FSC."); NS_010072769; NS010026782 -796; NS_010004522-527; NS_010073115-121 (detailing "transition issues"); NS_010027051; NS010073466-3469; NS_010073840-47; NS 00100253-266; NS_010073194195; NS_013001765.

[163] *See, e.g.*, RD Ex. 77, at NS_013001654-56; Listwak Dep. 34-35; NS_014002901-919; Neikirk Ex. 6.

moved to the same WTI-based fuel surcharge as CSX, notwithstanding that NS had internally determined that the heating oil index more closely tracked NS's actual fuel costs[164] – a fact that NS had shared with CSX in April 2003.[165]

58. As with CSX's program, NS would assess a 0.4% fuel surcharge when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase thereafter—thus using the escalation formula originally developed within UP.[166] Also like CSX (and now BNSF and UP), NS's program would be based on the average price for the preceding month.[167]

59. NS made this change despite internal recognition that "the facts seem to support the notion that NS's current fuel hedging and surcharge collections are effective at protecting NS exposure to fuel price increases. As such, adoption of the new CSX fuel surcharge regimen is a marketing decision which does not appear to have much support from our account execs."[168]

60. NS's January 2004 announcement came just two weeks after a 10-hour meeting between top executives of NS and BNSF concerning, among other things, fuel surcharge-related

---

[164] *See, e.g.*, Neikirk Dep. 92-94, 99-100.

[165] *See e.g.*, *id.* at 63-64; RD Ex. 205; *see also* NS_013003157-58 (September 2, 2005 letter from NS's Don Seale to presidents of the National Industrial Transportation League and National Grain and Feed Association, acknowledging that NS would maintain its "current formula despite data that suggests that the price of WTI crude oil is not increasing as rapidly as diesel fuel.").

[166] *See, e.g.*, RD Ex. 214.

[167] *Id.*

[168] NS_009000161-164; *see also* Neikirk Dep. 123-126; NS_009000250-263; NS 2003 Annual Report and Form 10-K, at 5 (discussing success of hedging program); Moorman Dep. 161 (NS's hedging program was "effective in carrying out the intention we had for it," which was to "protect, if you will, ourselves and our budget against unforeseen changes in the cost of fuel").

issues[169] – a meeting at which BNSF provided NS with information on the extent to which BNSF was applying the new agreed fuel surcharge program, information that BSNF later characterized as having "encouraged" NS.[170] This meeting also took place on the heels of the creation of the AIILF at the AAR, discussed below. NS then told other Defendants it intended to apply the agreed fuel surcharges to public and private prices.[171] NS and CSX thereafter implemented fuel surcharges that were in synch with one another and began setting and adjusting them at the same time and levels.[172] CSX and NS remained in synch even though they had different costs of fuel during a period of significant price increases, [173] and notwithstanding improvements in their respective fuel efficiencies.[174]

61. Defendants' conspiratorial discussions to coordinate their fuel surcharges and apply them as broadly as possible included Defendants' fuel surcharges applied to intermodal freight traffic. These discussions involved marketing personnel with authority over intermodal,

---

169 *See, e.g.*, RD Ex. 68. The announcement also came on the heels of an "AAR CEOs" dinner on January 7, 2004 in Scottsdale, Arizona. *See, e.g.*, BNSF_CAL_0007084.

170 *See, e.g.*, RD Ex. 88, at BNSF-0535033.

171 *See, e.g.*, RD Ex. 79; BNSF_0028106; UPFSC_0044647-48.

172 *See, e.g.*, HD Ex. 2; RD Ex. 214; *see also* NS_033000559-561 (NS/CSX formula also in virtual lockstep with UP/BNSF formula).

173 *See, e.g.*, Neikirk Ex. 4; NS_010074231-32.

174 *See, e.g.*, *supra* at 28 n.102; Neikirk Dep. 138-140; NS_010067715 ("you may want to prepare [Don Seale] on how to reconcile the NS 'fuel efficient' ad in today's WSJ (see the clips) with our fuel surcharge."); NS_013004813-15; RD Ex. 137, at 6 (Written Statement of CSX, STB Ex Parte 661, Apr. 27, 2006) ("Through various initiatives, CSXT has reduced its fuel consumed per gross ton mile by 3.3% since 2003."); CSXFSC000198607-08; CSX website, *available at* http://www.csx.com/?fuseaction=about.environment ("Over the last 30 years, we have made a 90% increase in fuel efficiency."); CSXFSC000350473-477; CSXFSC000237694-704; CSXFSC000279958.

including Defendants' CMOs and CEOs.[175] In addition, Defendants' senior intermodal executives frequently participated in "Alliance" and other conspiratorial meetings.[176]

62. Many, but certainly not all, of the meetings at which Defendants discussed coordination of their fuel surcharges occurred on a bilateral basis – that is, between two carriers. These discussions, however, expressly addressed coordination among *all* of the Defendants; nor were the discussions limited to the interline business of the respective carriers,[177] as Defendants recognized they must be.[178] Nor were the discussions limited to particular movements, or

---

[175] *See, e.g.*, UPFSC_0527266 (CSX Intermodal ("CSXI")-UP Alliance Prep notes record "to do" list regarding Jack Koraleski, Clarence Gooden, and Mike Ward regarding intermodal matters); CSXFSC000273262; CSXFSC000137245; NS_010033487-88. During the Class Period, for example, the president of CSX's intermodal division, CSXI, reported directly to Clarence Gooden, CSXT's EVP & Chief Commercial Officer, who oversaw both carload and intermodal fuel surcharges. *See, e.g.*, CSXFSC000001106-15 (CSX organizational chart); CSXFSC000000476-CSXFSC000000477; CSXFSC000150230; CSXFSC000510500-CSXFSC000510503, at CSXFSC000510501 (CSXT and CSXI comprise CSX Corporation's "core transportation businesses."); *see also* NS_003001970, at NS_003002044 (NS organizational chart).

[176] *See, e.g.*, RD Ex. 208; NS_010258032-33; RD 215; CSXFSC000168520-21, at 20; UPFSC_0004882-83; UPFSC_0155801-02; RD Ex. 62; RD Ex. 68; RD Ex. 96; RD Ex. 204; NS_010033218-19; NS_010034423-25; BNSF_CAL_0007474; UPFSC_0592456-61.

[177] *See e.g.*, Eisele Dep. 182-83 (Alliance discussions of "broad issues related to the industry, the economy or the government in general, yes, those were not limited to the concept of interline business together. They were, by definition, broad-based, affecting not just our company, but others as well."); *id*. at 238; Young Dep. 281-82, 298-99; *see also* Giftos 230-34 (NEMC meetings also had discussion extending beyond "interline matters"); *id.* at 240 testifying that one topic discussed at alliance meetings was how to "work together to grow our respective businesses"); Lanigan Dep. 223 ("normal channels" of handling interline matters "is at a lower level than" CMO); Giftos Dep. 125-26 (same); Glennon Dep. 35, 38, 41, 236; Moorman Dep. 214-215 (acknowledging that discussions at inter-Defendant meetings were not "limited to the interline aspects of Norfolk Southern's business" and covered topics "in the nature of sharing best practices and benchmarking"); *id*. 229-230 (discussions with other Defendants would cover a number of non-interline topics, including "[l]egislation, technology, all kinds of issues, general business conditions"); *id*. (meetings with other Defendants were not commenced with any warning that only interline topics should be discussed).

[178] *See, e.g.*, NS_010109519-521 ("Discussions with other RRs should likewise focus on specific publications and prices directly involving that RR"); CSFSC000001040-49 (CSX directive that in discussing a rate with another railroad, sales personnel should "[l]imit [their]

between rail carriers who could practicably participate in the particular movement being discussed. Moreover, as noted above, Defendants were aware, and intended, that bilateral

---

discussion to that joint line rate"); Tr. of Dep. of Ronald Listwak ("Listwak Dep.") 8-9; Garin Dep. 227-230 (agreeing that an interline discussion is a discussion "between carriers on a specific commodity for a specific customer…on a specific route"); Adams Dep. 37-38; UPFSC_0081986-87 ("No one should contact or communicate BNSF (or any competitor for that matter) regarding any prices (other than joint line prices pertaining to shipments in which UP and the railroad being contacted both participate), the information below, or anticipated price actions."); Glennon Dep. 70; Koraleski Dep. 21 (proper interline agreements "would be tailored by a commodity business segment").

Any claim that Defendants' executive-level bilateral discussions were limited to interline matters rings hollow given the participants' asserted inability to recall the substance of the discussion. *See, e.g.*, (1) ***March 12-13, 2003 UP-CSX Meeting***: Jack Koraleski could not remember whether he had a discussion of "fuel surcharge methodology" with Clarence Gooden. *See* Koraleski Dep. 125-26; (2) ***March 18, 2003 BNSF-NS Senior Team Meeting:*** Matt Rose, John Lanigan, and Don Seale could not recall what was discussed. *See* Rose Dep. 142 ("I do not remember any specifics from this."); Lanigan Dep. 47-48 (Lanigan recalled that there was a discussion on the topic of synchronizing BNSF's fuel surcharge with the other railroads, but claimed not to recall "generally" what he or anyone else said on the topic); Seale Dep. 257-58 ("I don't recall the specifics of the March 18, 2003, meeting."); Goode Dep. 146 ("I don't recall that meeting."); (3) ***March 27, 2003 Seale and Lanigan Plan to Discuss Fuel Surcharges at NFTA*****:** Lanigan and Seale could not recall what was discussed. *See* Lanigan Dep. 82 ("I don't recall the substance of discussions I had with Mr. Seale or anyone else at that [NFTA] meeting."); Seale Dep. 258-59 (not recalling whether he met with Lanigan at April 2003 NFTA meeting); (4) ***April 1, 2003 BNSF-CSX Alliance Meeting*****:** Rose, Lanigan, and Mike Giftos could not recall what was discussed. *See* Rose Dep. 166-70 ("I don't remember the meeting from 2003."); Lanigan Dep. 69-70 ("I don't recall any specific discussions with Mr. Giftos."); Giftos Dep. 241-42 ("I don't actually remember this meeting . . . ."); (5) ***April 2-6, 2003 NFTA Wigwam Meeting*****:** Lanigan could not recall whether he had discussions about fuel surcharges with Seale or a representatives of other railroads, despite prior plans between Seale and Lanigan demonstrating their intent to do so. *See* Lanigan Dep. 83-86; (6) ***May 14, 2003 NS/UP Alliance Meeting*****:** Jim Young could not recall what was discussed. *See* Young Dep. 229 ("I don't recall much."); Goode Dep. 170 ("I don't recall this meeting."); Koraleski Dep. 198 (Q: "Do you recall this meeting?" A: "No, not particularly."); (7) ***June 3, 2003 CSX-UP Alliance Meeting*****:** Giftos, Clarence Gooden, and Charles Eisele could not recall what was discussed. *See* Giftos Dep. 253-56; Gooden Dep. 139-43 ("I do not remember being at this meeting and having a discussion of fuel surcharges."); Eisele Dep. 130, 135 (Eisele could not recall attending or the discussion on customer reaction to fuel surcharges); Koraleski Dep. 214-16 ("No, I don't specifically recall that discussion . . . ."); (8) ***October 1, 2003 BNSF-CSX Alliance Meeting***: Gooden and Giftos could not recall specifics of the meeting. *See* Gooden Dep. 233-34 (Q: "Do you recall meeting with BNSF in October of 2003?" A: "I don't recall it."; Giftos Dep. 270 (claiming not to remember any discussion of fuel surcharges at this meeting); (9) ***December 16, 2003 BNSF-NS Fall Meeting***: Seale asserted that he had no recollection of the meeting. *See* Seale Dep. 279 ("I don't recall it."); *see also* Goode Dep. 211 ("I don't recall this specific meeting.").

discussions were occurring at the same time between the other Defendants.[179] Defendants' CEOs were given latitude to discuss whatever they wanted under the guise of a "state of the industry" or "state of the economy" discussion.[180] Defendants simply used the "Alliance" label as cover for their discussions; but in fact this label (like other similar labels given to such meetings) had no formal or informal definition and was effectively meaningless; "Alliance" was just a term used by Defendants when senior executives of the railroads got together.[181]

**AAR/AIILF**

63. With the four Defendants committed to the common goal of applying coordinated, across-the-board fuel surcharges based on a percentage of base rates, Defendants set about applying those agreed fuel surcharges as uniformly as possible, to as many freight shipments as possible, with the express goal of 100% coverage. Defendants could not immediately apply the

---

[179] *See, e.g., supra* at ¶¶ 16-17.

[180] *See, e.g.,* Goode Dep. 156, 230-32 ("Q: But you don't recall anyone telling you things that you couldn't say at alliance meetings, correct? A: No."); Goode Dep. Ex. 23 (May 14, 2004 email from Sutton (UP) to Ehlers (NS) and other NS executives: "Of course, I guess we'll let Mr. Goode and Mr. Davidson speak about whatever they like [at the upcoming "Alliance" meeting]."); *see also* Koraleski Dep. 202-03 ("state of the economy . . . was pretty much a standard beginning for the CEOs to discuss"); Moorman Dep. 228 ("Well, that would – we are – we would certainly in all of these meetings have broad discussions – you mentioned one yourself, general economic conditions – that were not limited to interline issues. So the meetings in that context weren't necessarily limited to interline issues, anyway.").

[181] Goode Dep. 42 (the term "Alliance" has no special meaning); 44 (not aware of any effort to formally define what an "Alliance" meeting would be); 105 ("I don't know what it means"); 106 (not aware of any industry document or internal NS document spelling out what an "Alliance" is); Moorman Dep. 27 ("There is certainly no formal definition of what an alliance meeting is and I am not sure that every carrier even uses the term."); *id.* at 25-26 (testifying that term "alliance meeting" "was applied to meetings of senior management of two rail companies, multi-functional management not just one division and at least my definition of those meetings was that it also would involve the chief executive officers"); Eisele Dep. 33-34 (Q: "[W]hat does it mean to call something an Alliance meeting? A: Simply that we intended to get together and together work on problems and issues, and we relied in that purpose, I guess.").

fuel surcharges to all their business because of the existence of so-called "legacy" contracts entered into before the conspiracy period.[182]

64. Defendants had anticipated increased customer resistance[183] to more aggressive fuel surcharges,[184] and agreed that uniformity of application was essential to the conspiracy's

---

[182] *See, e.g.*, Gooden Dep. 204-05; Koraleski Dep. 255-59 (testifying that legacy contracts were a barrier to widespread imposition of fuel surcharges in intermodal and other business groups).

[183] *See supra* at ¶¶ 11, 14; *see, e.g.*, RD Ex 43; RD Ex. 159; HD Ex. 2; HD Ex. 3; HD Ex. 4, at NS_010072905 ("customers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause on a newly negotiated private publication"); HD Ex. 5, at NS_010076040 (Pat Glennon (NS) informs his colleagues in April 2003 about CSX's approach to fuel surcharges: "Informally they told me they intended to apply it to contracts, but admitted that it might not stick."); HD Ex. 6; HD Ex. 14; HD Ex. 27, at NS_010072620 (noting that, as of March 2003, "[m]any" NS customers have "negotiate[d] out of the SC"); HD Ex. 30; *see also* Glennon Dep. 62-66, 83-84, 95-96; Knight Dep. 58-59, 61; Young Dep. 28, 55; NS 00100194 (CSX "expect[s] to get challenges, particularly on the private publications.").

[184] *See supra* at ¶¶11, 14, 26; *see, e.g*., RD Ex. 57, at BNSF-FSC000486 (July 1, 2003 memo summarizing status and recent changes to fuel surcharge program); RD Ex. 93; RD Ex. 94; HD Ex. 2; HD Ex. 3, at NS_0100073466-67 ("Any FSC change, particularly to a more aggressive formula like the CSXT's, has the potential to complicate rate negotiations and generate billing disputes with customers …. Both points would significantly reduce potential FSC yield if we were to swap out formulas in the short term. It is even conceivable that we could experience a net decline in revenue if customers were to withhold line-haul payments pending the resolution of FSC complaints/disputes."); HD Ex. 6; HD Ex. 14, at NS_010026785; HD Ex. 15, at UPFSC_0102504 ("the new CSXT fuel surcharge is more aggressive than its existing form"); HD Ex. 16, at BNSF_0028794; HD Ex. 26 (noting that the new fuel surcharge adopted by CSX "looks more too much like a money grab"); HD Ex. 30, at NS_010004522 (April 2003 NS analysis concluding that CSX's proposed new fuel surcharge program – which NS later adopted – is "in fact a blatant general rate increase, and will appear so to customers"); CSXFSC000000351 ("I realize that we will meet some customer resistance" to new fuel surcharge program); CSXFSC000070200-0369; BNSF-0387501-02; UPFSC 0184817-823; *see also* Glennon Dep. 26, 42; Neikirk Dep. 89-92 (NS's new fuel surcharge program always yielded higher fuel surcharge percentages than the old program); Young Dep. 25-26, 28, 169; Knight Dep. 23-24; Lanigan Dep. 27, 29; Gooden Dep. 49, 101; *id.* 226; McNulty Dep. 118-19; UPFSC_0061536-38 ("I'm sure you are aware of the fact that there appears to be a lot of interset [sic]/push back coming form [sic] customers/consultants"); UPFSC_0046052 ("a growing number of customers that have begun to share their resentment to our planned fuel surcharge language (and that of CSX)"); UPFSC_0002822-23; UPFSC_002349; UPFSC_0185066-67; CSXFSC000128907; UPFSC_0044926-27 ("These groups expressed concern with the base fuel price of $23, the small increments which cause the rates to vary more frequently and the fact that we are escalating rates based upon input costs but do not provide any relief with these same

success.[185] Defendants understood that, with the agreed fuel surcharges now set at onerous levels and effectively institutionalized by Defendants as a permanent revenue-enhancement measure on each customer's bill, fuel surcharges were bound to face significant customer resistance if not uniformly applied,[186] meaning that Defendants had to apply them on all shippers, virtually without exception, for the conspiracy's objectives to be achieved.[187] In addition, if some shippers (or categories of shippers) were able to avoid fuel surcharges, this would give the lie to Defendants' pretextual claim that the agreed fuel surcharges were necessary cost-recovery measures (rather than revenue-enhancement vehicles).[188]

65. Defendants further recognized, however, that there was a significant, historical impediment to across-the-board application of the agreed fuel surcharges: specifically, the Rail Cost Adjustment Factor, or "RCAF," which had long been used in the industry. The RCAF was

---

prices drop. From their perspective, this forces a risk onto the shipper that is very expensive to hedge").

[185] *See, e.g.*, RD Ex. 55, at NS010042321 ("stable approach has been the best approach"); RD Ex. 137, at 11 (Written Statement of CSX, STB Ex Parte 661, Apr. 27, 2006); RD Ex. 139, at 14 (Written Statement of NS, STB Ex Parte 661, Apr. 27, 2006); RD Ex. 204 (May 14, 2003 NS-UP Alliance meeting minutes); HD Ex. 2; HD Ex. 3; HD Ex. 4; HD Ex. 14; HD Ex. 24, at BNSF0574531 ("We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy."); HD Ex. 30; HD Ex. 31, at BNSF_0574216; HD Ex. 32, at BNSF_0571517 (identifying as a top risk the "[risk] that competitors reverse course on using a fuel surcharge"); *see also* Draper Dep. 322.

[186] *See, e.g.*, UPFSC0043779; NS001000316-20 ("It is less likely that WTI will fall below $23 any time soon, so if we adopt this approach it is highly likely fuel surcharge will be a constant companion to our freight bills."); NS_010035994-36012 ("As the FSCs escalate to record highs, there is increased pressure from customers for relief.").

[187] *See infra* at ¶¶ 79-94, 100-103.

[188] *See, e.g.*, UPFSC_0031472 ("we want to be careful in not giving the customers the idea that we are willing to accept anything but our standard HDF"); CSXFSC000326611 (lower-level CSX employee observing in February 2004 that "NS' adoption of our fuel surcharge program doesn't help us if they opt out of it for select customers"); *see infra* at ¶ 115.

historically utilized in many multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.[189]

66. The RCAF is a weighted index that uses Defendants' own cost data to account for changes in all significant input costs, including fuel.[190] The RCAF was based on an index known as the All-Inclusive Index, or "AII," published by the AAR.[191] It is a "robust" index, refined over the years, which could utilize a forecast-error adjustment to efficiently address any unexpected changes in fuel costs.[192] As UP's President stated in a 2004 earnings call, "the RCAF . . . looks at actual costs through the industry."[193] Mike Giftos, CSX's chief commercial officer, testified that the RCAF "did a pretty good job of capturing our costs and so presumably it did capture fuel prices."[194]

67. Internally, Defendants relied on the RCAF to estimate cost changes. For example, in 2005, UP's Mark Draper noted that "using the RCAFU estimate (change in price of inputs) appears to be a reasonable way to estimate cost changes during the next few years."[195] In short, the RCAF was a mechanism available to Defendants to deal with any inflationary fuel

---

[189] *See, e.g.*, Couch Dep. 168 (noting that "[i]n multiple year contracts, we would always have an escalator in there that would recapture our inflationary costs ...."); UPFSC_0181674-75 (in preparing for rollout of new fuel surcharge, UP internally noted that "Dow frequently asks why RCAFU doesn't recover fuel costs over time. I believe that it does over a year or so. I don't see a question regarding the need for a surcharge even if we are using RCAFU.")

[190] *See, e.g.*, Rockey Dep. 84-90; Koraleski Dep. 262.

[191] *See, e.g.*, RD Ex. 11 (AAR Rail Cost Indexes, December 2002).

[192] *See, e.g.*, Rockey Dep. 90; Koraleski Dep. 262.

[193] RD Ex. 114, at 763 (Q3 2004 UP Earnings Conference Call). *See also* Koraleski Dep. Ex. 37 (March 3, 2000 draft letter from Evans (UP) to Hamberger (AAR) explaining that "the existing RCAF process adequately provides for timely pass-through since it forecasts cost changes one quarter in advance").

[194] Giftos Dep. 48, 63 ("It was acceptable to me at that time . . . ."), 139-40 ("I thought about it as an alternative, an acceptable alternative.").

[195] UPFSC_0066427-29, at 0066427.

costs, and its existence, industry acceptance, and use posed an impediment to Defendants' use of the agreed fuel surcharges as revenue-enhancement vehicles.

68. Defendants recognized that imposing a stand-alone fuel surcharge where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping." Double-dipping "can occur when a carrier both escalates a base rate using an index (such as the RCAF) that includes changes in the cost of fuel and applies a fuel surcharge to the same movement covering the same time period."[196]

69. Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC [fuel surcharge] and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."[197] This concern extended to Defendants' intermodal business, as Defendants had encountered difficulty imposing fuel surcharges on intermodal shipments already covered by a cost escalation index.[198]

---

[196] *See* RD Ex. 147, at 10 (Surface Transportation Board Decision, *Rail Fuel Surcharges* (STB Ex Parte No. 661, Jan. 26, 2007)); *see also* UPFSC_0354399-400, at 399 ("calculating RCAFU w/o Fuel . . . allows us to couple a fuel surcharge with a rate adjustment that does not contain fuel. It avoids the 'double dipping' complaint we hear from customers."); RD Ex. 85, at NS-010074364 (April 20, 2004 complaint to NS that imposing a fuel surcharge in conjunction with the RCAF results in "double dipping"); RD Ex. 143 (September 19, 2006 internal NS email acknowledging "all the questions we get on 'double dipping'"); RD Ex. 44 (April 10, 2003 internal UP email relaying customer's view that "if eastern RR's tried to put a fuel adjuster on top of an RCAFU adjuster that would be double dipping and he is not willing to be double dipped"); RD Ex. 145, at 3, 9 (Comments of UP, Oct. 2, 2006); Rose Dep. 40; Listwak Dep. 58-59; UPFSC_0498640-42.

[197] RD Ex. 200.

[198] *E.g.*, NS_026002535-36, at 35 (NS intermodal employee noting to Don Seale and others in January 2001 that "we have finally been forced to acquiesce on some of the International contracts and stop charging an FSC where there is an RCR. Even our attorney's [sic] said we were on shakey [sic] ground, and after a year of assessing and collecting this from a few carriers, we have terminated it").

70. BNSF's Chief Economist, Sam Kyei, testified that the widely-used RCAF impeded broad application of fuel surcharges:

> **Q.** So if fuel were removed from the RCAF, then you could attach a fuel surcharge to that contract. Is that correct?
> **A.** Yes.
> ***
> **Q.** RCAF was basically an impediment to increasing the coverage of the fuel surcharge. Correct?
> **A.** The RCAF fuel component, yes.[199]

71. Defendants knew that their coordinated fuel surcharges would generate substantially more revenue than the RCAF fuel price escalator, at the expense of customers. As explained by NS's Alby Pfeifer:

> If the choice to a customer is to have an increase based on RCAF-U including the fuel factor and no fuel surcharge vs. RCAF-U without fuel and a fuel surcharge the answer clearly is that the customer is better off with the RCAF including fuel and no surcharge. Conversely the railroad stands to collect considerably more under the current fuel surcharge program.[200]

72. To facilitate the widespread, across-the-board application of their agreed, rate-based fuel surcharges, Defendants therefore jointly agreed to use the AAR to create a new index – the All Inclusive Index Less Fuel ("AIILF") – that removed the fuel-price escalation provision from the RCAF.[201]

73. In March 2003, CSX requested that the AAR create an "RCAF with fuel held constant" [202] or "RCAF with Frozen Fuel."[203] CSX made this request to gain "customer

---

[199] Kyei Dep 134, 205; *see also* Rose Dep. 23-24 (customers did not "want to pay a fuel surcharge on top of RCAF" and complained, "rightly so," that the RCAF was an existing "mechanism to recover fuel"); Koraleski Dep. 161.

[200] RD Ex. 200, at NS 010073903.

[201] *See, e.g.*, Rose Dep. 24 (removing fuel component from RCAF would permit railroads to impose fuel surcharge without being accused of "double-dipping").

[202] *See, e.g.*, RD Ex. 37 (Mar. 2003 email chain between John Couch of CSX and Clyde Crimmel of the AAR).

acceptance"[204] for a new approach under which contracts with fuel escalation provisions based on RCAF would be replaced with higher revenue-producing contracts that eliminated that escalation provision and replaced it with the new percentage-based fuel surcharge. The AAR resisted, however, because it was concerned "about the AAR publishing a version of the RCAF that was not calculated the way the law says the RCAF should be calculated."[205]

74. Defendants jointly revisited this issue in the fall of 2003, following their executive-level discussions about how they could use the AAR to coordinate their fuel surcharge programs.[206] Matthew Rose, BNSF's CEO, led discussions with the AAR in support of the creation of what became the AIILF, but what the AAR then referred to as the "renegade" index.[207]

75. At an AAR board meeting on December 11, 2003, Defendants jointly agreed to direct the AAR to create the AIILF, *i.e.*, an index that was identical to the AII, but removed fuel

---

203 *See, e.g.*, RD Ex. 22 (March 2003 email from John Couch of CSX to Clyde Crimmel of the AAR) ("I want to make sure it is viewed as being customer friendly").

204 *See, e.g.*, RD Ex. 37.

205 *Id.*

206 On September 5, 2003, the "AAR CEOs" spoke by telephone. *See, e.g.*, BNSF_CAL_0007244. On November 18, 2003, BNSF's Matt Rose and CSX's Mike Ward held a meeting. *See, e.g.*, BNSF_CAL_0007127. On November 20, 2003, the "AAR CEOs" held a breakfast meeting in New York City. *See, e.g.*, BNSF_CAL_0007136 ("mtg. includes following CEOs only: MKR [BNSF CEO Matt Rose], Mike Ward [CSX CEO], Ike Evans [UP CEO], David Goode [NS CEO]").

207 *See, e.g.*, Kyei Dep. 133, 135-137; RD Ex. 65 (draft letter from Matt Rose to AAR); RD Ex. 221 (November 24, 2003 e-mail from Craig Rockey of the AAR to Sam Kyei of BNSF); BNSF-0545130 (BNSF staff meeting re "Proposed Answers to Craig Rockey's Memo"); Lanigan Dep. 158-161; RD Ex. 69 (AAR Board meeting minutes, December 11, 2003); BNSF-FSC 000075-77 (October 2003 earnings call where Lanigan indicated intention to "carv[e]" fuel out of RCAF to "insert[] a pure fuel surcharge"); AAR-000403 ("BNSF's idea, although the other railroads had made inquiries").

as a component.[208] Defendants recognized that this was an extraordinary step that would benefit the "bottom line" of all Defendants and facilitate their ability to impose fuel surcharges.[209] As described by Sam Kyei, BNSF's Chief Economist:

> In December 2003, [Matt Rose] … got the A.A.R. to establish a non-fuel RCAF index, now called the All-Inclusive Index Less Fuel (or AII-LF). In my 18-year railroad career, no one had ever succeeded in steering the A.A.R. to do this. . . . [T]he combination of sound price escalation using this index and a fuel surcharge should tremendously help our bottom-line for years to come. In fact, . . . the entire rail industry should benefit from the escalation options the new index provides.[210]

76. The official agenda for and minutes of the board meeting omit any reference to this action, and in fact seemed to disguise it as something else.[211] Handwritten notes by AAR personnel, however, reflect Defendants' joint instruction that the AAR set up the new index "by [the] end of [the] month."[212] At Defendants' direction, the AAR met this deadline.[213]

77. The AAR's Craig Rockey acknowledged that the creation of the AIILF "required a consensus" of "at least the four defendants in this case."[214]

78. It was in no way necessary or procompetitive for Defendants to act jointly in creating the AIILF. Rather, Defendants acted jointly to create the AIILF in furtherance of their

---

[208] *See, e.g.*, RD Ex. 69, at AAR-000166 (AAR Board meeting minutes, December 11, 2003).

[209] *See, e.g.*, Rockey Dep. 45-50.

[210] RD Ex. 122, at BNSF-0070502 (Mar. 15, 2005 memorandum from Sam Kyei to Matt Rose); *see also* Lanigan Dep. 157-58.

[211] RD Ex. 69, at AAR-000166.

[212] *Id.*

[213] *See, e.g.*, RD Ex. 222, at AAR-000207 (AAR Railroad Cost Indexes, Dec. 2003) ("This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel."); AAR-E-0002372123 (AAR "Accomplishments" for 2004, included "start[ed] new railroad cost index, All-Inclusive Index Less Fuel, in response to request by railroads. (makes it easier for railroads to use separate fuel-surcharge for rates.)").

[214] Rockey Dep. 109, 112; *see also* Gooden Dep. 178; *supra* at ¶¶ 19-21.

conspiracy. If one Defendant, acting unilaterally, had wished to create an index that would function like the AIILF (*i.e.*, by removing fuel from a cost-escalation index), options were available for that railroad to achieve this objective on its own, such as by creating its own cost escalation index.[215]

79. Following the creation of the AIILF, each Defendant continued to pursue the agreed goal of applying the agreed, coordinated fuel surcharges to 100% of freight shipments, including to both new and renewed contracts.[216]

---

[215] *See, e.g.*, CSXFSC000040599-0605; Rockey Dep. 97-103.

[216] *See infra* at ¶¶ 80-94, 100-103; *see, e.g.*, RD Ex. 27, at CSXFSC000153058; RD Ex. 74 (Jan. 2004 Price and Fuel Escalation General Guidelines stating that "[a]ll other exceptions such as Discounted Fuel Surcharge programs need approval from appropriate Group Vice-President."); RD Ex. 57; RD Ex. 76, at UPFSC 0276597 (Jan. 2-5, 2004 UP emails discussing need for manager sign-off to assess "a surcharge other than HDF"); RD Ex. 78, at UPFSC-0276428; RD Ex. 80, UPFSC-0032168; RD Ex. 81 (Mar. 11, 2004 e-mail from Sam Kyei to John Lanigan and Nick Murray providing that "contracts requiring [CEO's] signature but excluding full fuel surcharge provisions will not be signed"); RD Ex. 82, at NS_010034040 (Mar. 11, 2004 internal email from NS's Don Seale confirming that "in all cases there is to be no deviation from NS's published FSC without [his] prior approval"); NS_010073840-47 ("there will be pressure to compromise on the new FSC standard. We should resist attempts to create FSC variations."); RD Ex. 83; RD Ex. 84, at NS_0100034244 (Apr. 14, 2004 e-mail from Don Seale to Thomas Brugman and others); RD Ex. 86, at CSX000170 (May 14, 2004 CSX fuel surcharge policy summary stating that "[e]verything is subject to fuel surcharge"); RD Ex. 87, at CSXFSC000000579 (May 11, 2004 internal CSX e-mail from John Couch to others, referencing policy change to "All Inclusive Index (less fuel) + fuel surcharge"); RD Ex. 91, at BNSF-0325453 (May 28, 2004 memorandum and presentation from Sam Kyei to Matt Rose and others); RD Ex. 93; RD Ex. 94; RD Ex. 106, at UPFSC 0274881 (Oct. 14, 2004 internal UP email announcing policy that any contract issued without UP's fuel surcharge would be subject to review process); RD Ex. 108, at BNSF-0029497; RD Ex. 113, at UPFSC 0275003 (Nov. 4, 2004 internal UP email discussing plan to implement the new HDF-based surcharge "to all business as it becomes available for action (the expiration date of contracts, etc.)"); UPFSC_0195683 (UP presentation detailing 2005 goal of further fuel surcharge implementation in all new and expiring contracts); UPFSC_0217870-94, at 71 (Oct. 27, 2005 UP earnings conference call with analysts: "With high diesel fuel prices continu[ing] to . . . impact our earnings, we have an absolute mandate with our fuel surcharge program to take that higher cost out of the equation as existing contracts are renewed."); UPFSC_0011961-62, at 61 (May 9, 2006 email from Draper (UP) to Chandra Henley (UP): "We get numerous requests from Marketing to determine whether the fuel surcharge revenue obtained from specific customers is greater than the incremental fuel expense assigned to the customers' movements. This flys [sic]

80. Pursuant to their agreement, Defendants applied their agreed, coordinated fuel surcharges uniformly across-the-board – that is, to all shippers and commodities, to both captive

---

in the face of the effort to move all customers to the standard program and to keep application of the fuel surcharge program as simple and understandable as possible."); UPFSC_0215504 (Jan. 2006 Koraleski (UP) presentation: "Fuel surcharge will be a part of every deal we do."); UPFSC_0183975-80, at 76 ("[UP Industrial Product's] sole surcharge moving forward is the Highway Diesel Fuel (name TBD) surcharge. It applies to all public documents . . . and new or renewed private documents."); RD Ex. 119; RD Ex. 121(Mar. 14, 2005 Fuel Cost Recovery Analysis); RD Ex. 123, at UPFSC-0042030; RD Ex. 124, at CSXFSC000090881 (July 27, 2005 internal CSX email referencing effort to increase coverage "of our traffic base to 100%"); RD Ex. 126, at UPFSC 0066571 (Aug. 2, 2005 internal UP email concerning "mandate that all business should be subject" to a fuel surcharge); RD Ex. 130; RD Ex. 131, at NS_10038148 (Feb. 28, 2006 e-mail from Mike McClellan to Don Seale); RD Ex. 141, at CSXFSC000086200 (June 5, 2006 internal CSX e-mail from Dean Piacente to others); RD Ex. 146 (Dec. 4, 2006 Fuel Cost Recovery Analysis); RD Ex. 223, at BNSF-0404221 (Jan. 2004 pricing guidelines providing that "[e]very Contract should include a fuel surcharge clause"); RD Ex. 224, at BNSF-FSC 000488 (Mar. 11, 2004 internal BNSF email summarizing CEO Matt Rose's instructions that "[a]ll contracts should have a fuel surcharge clause"); UPFSC 0050501-02; UPFSC 0011248-53 (identifying implementation of policy requiring "100% fuel price recovery" in "all future contracts"); Eisele Dep. 260 (UP uses "fuel cost recovery" and "fuel surcharge mechanism" interchangeably); HD Ex. 1, at UPFSC0000315-16; HD Ex. 2 (NS adopted new fuel surcharge which led to "standardization of FSC provisions in the East"); HD Ex. 8; HD 16, at BNSF_0028794; HD Ex. 20, at BNSF-0048723 ("In summary business units have done an excellent job in [FSC] adherence. Virtually no exceptions."); HD Ex. 21, at NS_007000489 (noting that at NS, "[t]here are relatively few publications with no FSC, nonstandard FSC or blends of FSCs"); HD Ex. 22, at CSXFSC000108545 (email marked "high" importance, delineating CSX's "firm" pricing policies: "NO ONE is authorized to approve a renewal with an increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge"); HD Ex. 40; HD Ex. 130; HD Ex. 149, at UPFSC_0342883; *see also* Giftos Dep. 126, 159-60, 264-65, 288-89; Draper Dep. 80-85; Seale Dep. 126-27, 299-301; Kyei Dep. 210-217, 231-32, 235-36; McIntyre Dep. 248-49, 254; Glennon Dep. 56-58; Lanigan Dep. 182-90, 208-09; Gooden Dep. 50, 188-96, 262-63; Young Dep. 71-75, 120; Tr. of Dep. of Thomas Jacobowski ("Jacobowski Dep.") 23; Rose Dep. 77-78, 183-84; Tr. of Dep. of Marc Allen ("Allen Dep.") 23-24; Tr. of Dep. of David Lawson ("Lawson Dep.") 37-38; Knight Dep. 34-42; Tr. of Dep. of Joseph Osborne ("Osborne Dep.") 38-41, 48-49; Listwak Dep. 29-31; Tr. of Dep. of Donna Cerwonka ("Cerwonka Dep.") 7-8; Tr. of Dep. of Dean Piacente ("Piacente Dep.") 7-10; Knight Dep. 38; NS_010007412-413 ("[A]ll new contracts with have the new FSC, no exceptions."); Exhibit 25 to Knight Dep.; Q2 2005 BNSF Earnings Conference Call at 18 ("We have a zero tolerance policy. Any contract it comes due will be renewed with a fuel surcharge and we have been in that mode for a year-and-a-half and have been very successful at implementing fuel surcharge."); Q3 2006 CSX Earnings Conference Call at 13 ("I probably told you this before, but since we implemented our fuel surcharge, we do not renew contracts without our fuel surcharge coverage in those contracts. So as contracts come up for renewal this year, they will all be renewed with the fuel surcharge provisions in them.").

and non-captive shippers, to both interline and local shipments, to both carload and intermodal, and irrespective of individual characteristics of the shipper, including whether the shipper had access to other transportation modes.[217]

81. As part of their agreement to apply their coordinated fuel surcharges uniformly across-the-board, each Defendant instituted a strict policy against granting exceptions to the fuel surcharges, including a policy requiring senior management approval to discount, waive, or otherwise not apply the coordinated fuel surcharge.[218] Furthermore, pursuant to their agreement,

---

[217] *See supra* at ¶ 79; *infra* at ¶¶ 81-94, 100-103; *see, e.g.*, RD Ex. 83; RD Ex. 86; RD Ex. 91; RD Ex. 119; RD Ex. 121; RD Ex. 126; RD Ex. 129; RD Ex. 223; RD Ex. 224; HD Ex. 1; HD Ex. 8; HD Ex. 9, at 272; HD Ex. 11 (NS website page announcing that "[t]he revised surcharge program applies to all local and joint line traffic moving on NS issued price authorities (public and private) that" reference NS's conditions of carriage); HD Ex. 15; HD 16; HD 20; HD Ex. 36, at 14; HD Ex. 37, at CSXFSC000153187 ("Studies have shown that, in aggregate, captive shippers don't pay higher prices than non-captive shippers."); HD Ex. 149; HD Ex. 151 at 6; HD Ex. 152, at 2; Exhibit 6 to Neikirk Dep.; *see also* Young Dep. 201; Draper Dep. 322; Garin Dep. 111-14, 117-18, 120-21, 126-29; Listwak Dep.74-76, 93-101; Glennon Dep. 56-58; Seale Dep. 23 ("We were seeking general application"), 56; Knight Dep. 64; Rose Dep. 232 (BNSF never had a "different fuel surcharge for captive customers," as that would "violate[] our principle"); Lanigan Dep. 183, 87; UPFSC_0444823-0445032, at UPFSC_0444941 ("we are incorporating fuel surcharge provisions in all of our agreements"); Moorman Dep. 22 (NS's published or "preferred" FSC was "applicable across all lines of business"); *id.* 195-96 (NS's policy of having "very broad and hopefully complete" FSC coverage applied to carload and intermodal traffic, as well as to both captive and non-captive shippers); Koraleski Dep. 254-55, 277 ("Q: The question is, as of April 2005, was Union Pacific uniformly requiring its standard fuel surcharge program of its customers? A: We were asking all customers for that…").

[218] *See supra* at ¶ 79; *see, e.g.*, RD Ex. 27; RD Ex. 74; RD Ex. 76; RD Ex. 78; RD Ex. 81; RD Ex. 82; RD Ex. 83; RD Ex. 84; RD 86; RD Ex. 87; RD Ex. 91; RD Ex. 106; RD Ex. 108; RD Ex. 113; RD Ex. 119; RD Ex. 121; RD Ex. 124; RD Ex. 126; RD Ex. 129; RD Ex. 141; RD Ex. 223; RD Ex. 224; HD Ex. 8; HD Ex. 16; HD 20; HD Ex. 22; HD Ex. 130; HD Ex. 149; Exhibit 7 to Young Dep.; BNSF_0035777-780; NS_010007412-13; BNSF-0326832; *see also* Kyei Dep. 197; Rose Dep. 71-72 (around the first half of 2003, "there's no doubt" that BNSF "narrowed down the flexibility of the pricing managers to apply fuel surcharges"), 77-78, 192-93; Lanigan Dep. 187-90; Gooden Dep. 50, 65-66, 113, 188-196; Young Dep. 120; Seale Dep. 299-301; Cerwonka Dep. 7-8; NS_010075115-116 ("We have a stated fuel surcharge program and you are aware of it. There are no exceptions."); CSXFSC000036491-96 ("Need a written policy that Fuel Surcharge will apply on all new moves – even those with RCAF(u) – Exceptions to SVP."); Giftos Dep. 141-42.

Defendants instituted policies against discounting base rates to offset the coordinated fuel surcharges[219] and communicated those policies openly to one another.[220]

82. Named Plaintiff US Magnesium's experience illustrates the effect of the conspiracy. In December 2002, US Magnesium was able to negotiate a contract with UP that did not include UP's fuel surcharge provisions then in effect.[221] By the time US Magnesium again negotiated with UP in December 2003, UP's fuel surcharges – now the agreed, conspiratorial fuel surcharges – had become non-negotiable.[222] As UP's sales representative (the same sales representative who had agreed to negotiate proposed fuel surcharges in 2002) explained in a 2003 email to US Magnesium, "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management. I have no choice."[223] UP imposed the agreed, coordinated fuel surcharges on the US Magnesium traffic that was the

[219] *See, e.g.*, RD Ex. 81; RD Ex. 82, at NS_010034040; RD Ex. 84, at NS_0100034244 (Apr. 14, 2004 e-mail from Don Seale to Thomas Brugman and others); RD Ex. 94; HD Ex. 22; Seale Dep. 297-301; NS_007000883; NS_010021988-89; CSXFSC00014705-06; NS_010074352; RD Ex. 50; Gooden Dep. 187; CSXFSC000317571 (requiring senior management sign-off for any "price renewals less than 8 percent"); Rose Dep. 192-93; *see also* Garin Dep. 56.

[220] *See, e.g.*, UPFSC_0004881-83, at UPFSC_0004883 ("Jack Koraleski emphasized in meeting with NS that UP's strategy is to bring all traffic up to today's Market prices"); CSXFSC_000204375 (In April 2006, NS had informed CSX that it was increasing all of its "interline public rates, excluding intermodal" by 12% "to reflect a market adjustment" *and* that it was going to raise rates again by 6-8% at some unspecified time later in 2006); RD Exs. 48-50 (May 9, 2003 UP emails informing each Defendant that "[i]n no case will freight charge(s) be reduced below the Base Freight Charge(s) as a result of the application of [FSC]").

[221] *See, e.g.*, RD Ex. 10 (Dec. 2002 master contract negotiation emails between UP and U.S. Magnesium); Tr. of Dep. of Howard Kaplan ("Kaplan Dep.") 38 ("In 2002, the final contract did not contain a fuel surcharge.").

[222] *See, e.g.*, Kaplan Dep. 38 ("In 2003, for contract year 2004, we were told that the fuel surcharge is mandated by [UP] management and it will be put on when you're done with your negotiations on price, and it was indeed put on for contract year 2004.").

[223] RD Ex. 72; *see also* Kaplan Dep. 126.

subject of that discussion,[224] and on other of US Magnesium's shipments. In 2005, for example, US Magnesium complained about the fuel surcharge, but "the fuel surcharge was put on without any recourse by US Magnesium."[225]

83. Similarly, during the Class Period, Named Plaintiff Olin repeatedly asked NS for alternative fuel surcharge arrangements, but was consistently rebuffed.[226] The same is true of Donnelly Commodities.[227] The other Named Plaintiffs also faced Defendants' unyielding application of the agreed, coordinated fuel surcharges during the Class Period.[228]

84. Whereas shippers had some success negotiating away fuel surcharges in the pre-conspiracy period,[229] Defendants' coordinated fuel surcharges were non-negotiable.[230]

---

224 *See, e.g.*, RD Ex. 73 (Dec. 23, 2003 US Magnesium email explaining result of contract negotiations with UP); Kaplan Dep. 124-25 ("it appears uniformly that amended signed contracts refer to WTI, but that every new contract…is based upon the HDF.").

225 *See, e.g.*, Kaplan Dep. 39-40.

226 *See, e.g.*, OL1059721-722; OLI059670-671; OL1059540; OLI137541; OL1043963; *see also* Tr. of Dep. of Steve Bahn ("Bahn Dep.") 67-68; *id.* at 156 (Olin "asked for multiple different concessions on the fuel surcharge. . . . And all of these requests were – were rejected."); *id.* at 132 ("[I]t appeared to me that it was just about increasing profits."); NS_010228392-93 ("I see no reason to offer [Olin] anything but standard FSC."); Tr. of Dep. of Michael Gilley, dated May 5, 2010 ("Gilley Dep.") 186-188, 196-200, 208-209.

227 *See e.g.*, Tr. of Dep. of Michael Donnelly ("Donnelly Dep.") 167 (Donnelly Commodities "tried to get lower fuel surcharges many times and…was never able to get one."), 125-27.

228 *See, e.g.*, Tr. of Dep. of Efstrateos Jay Strates ("Strates Dep.") 132 (Plaintiff Strates recalled an fuel surcharge addendum that CSX imposed "the day before the train had to move" under the "ultimatum, sign – you know, agree to it or don't move your train"); STR0001351-52; NS_008004939-42; STR000641 (Strates Shows complaint regarding 36.4% rate increase NS imposed during the Class Period); *see also* Tr. of Dep. of William Ruoff ("Ruoff Dep.") 134-35 ("there's really no negotiation" of fuel surcharges); DUS000263; DUS000277; DUS000325; DUS000211.

229 *See, e.g.*, *supra* at ¶¶ 5-6, 82; *see, e.g.*, HD Ex. 26; HD Ex. 27; BNSF-0328866.

230 *See, e.g.*, *supra* at ¶¶ 79-83; *see, e.g.*, RD Ex. 159; HD Ex. 8; HD Ex. 94, at 14 (Comments, April 27, 2006); HD Ex. 95, at 3 (Comments, April 27, 2006); HD Ex. 96, at 3 (Comments, April 2, 2007); HD Ex. 97, at 1, 3 (Comments, May 11, 2006); HD Ex. 98, at 5 (Comments, April 27, 2006); HD Ex. 99 (Transcript, May 11, 2006 STB Hearing) ("STB Tr.");

Variations from the coordinated fuel surcharges were infrequent and anomalous.[231] And the rare variations that did exist were negotiated from the inflated baseline set by the coordinated fuel surcharge.[232] Declarations submitted by Defendants' employees purporting to show widespread deviation from the coordinated fuel surcharge program have proven to be misleading[233] and wholly unreliable.[234]

---

HD Ex. 100, at 22 (Comments, April 27, 2006); *id.* 121 ("[T]he requests for supporting documentation basically are rebuffed and the surcharges have become non-negotiable."); NS_010019516-518; UPFSC_0170773-74; CSXFSC000149573-74; HD Ex. 149; STB Tr. 242.

[231] *See, e.g., supra* at ¶¶ 79-83; *infra* at ¶ 100; *see, e.g.*, RD Ex. 82; Ex. 84; RD Ex. 126; RD Ex. 129; HD Ex. 8; HD Ex. 20; HD Ex. 21; HD Ex. 33; HD Ex. 34; HD Ex. 35; HD Ex. 40; HD Ex. 107; HD Ex. 113; HD Ex. 114; HD Ex. 123; HD Ex. 124; HD Ex. 126; HD Ex. 128; HD Ex. 129; HD Ex. 135; HD Ex. 143; BNSF-0049138-181; BNSF-0631688-1705; BNSF-0032575-589; BNSF-0042771-788; BNSF-0033234-42; Lanigan Dep. 182-86, 208-09; Glennon Dep. 178-90; Rose Dep. 77-78, 192-93; Giftos Dep. 164-65; Jacobowski Dep. 23; Tr. of Dep. of John Kraemer ("Kraemer Dep.") 30; Cerwonka Dep. 19-20; Garin Dep. at 66-68 (as of June 1, 2006, only seven of BNSF's 4,000 to 6,000 IP customers paid a nonstandard fuel surcharge), 111-14, 117-18, 120-21, 126-29; Pagan Decl. ¶¶ 1-12; Krehbiel Decl. ¶ 5; Gehl Decl. ¶¶ 2-10; CSXFSC000153248 (CSX agrees to "short term deal with Sunoco" that caps Sunoco's fuel surcharge at 2% in June 2003); CSXFSC000153235 (internal CSX correspondence from December 2003 observing that Sunoco had by that time "agreed to pay our standard fuel surcharge"); Moorman Dep. 244 (Q: "If I were to look at any point . . . between 2003 and today and I were to look at the fuel surcharge provisions that any of your customers are paying, I am going to find, am I not, that those customers are paying fuel surcharges pursuant to a very small handful of generally applicable formulas at any point in time?" A: "I think that is a true statement.").

[232] *See supra* at ¶¶ 79-83; *infra* at ¶ 100; *see, e.g.*, RD Ex. 82; RD Ex. 84; *see also* Young Dep. 71-75; Allen Dep. 24-27; Lawson Dep. 38-39; Listwak Dep. 23, 129; Tr. of Dep. of Richard Pagan ("Pagan Dep.") 53-56, 75-76; Tr. of Dep of Thomas Gehl ("Gehl Dep.") 55-56 (standard fuel surcharge influenced negotiations); Garin Dep. 104, 143-47; Moorman Dep. 23 (NS's published FSC served as a "common starting point, if you will, in every negotiation"); *id.* 188 ("[T]here was some value to be had in taking a consistent beginning position."); Koraleski Dep. 93-95; 271; 277-78.

[233] *See, e.g.,* HD Ex. 38; HD Ex. 39; HD Ex. 40; HD Ex. 115; HD Ex. 116; HD Ex. 117; HD Ex. 141; HD Ex. 142; HD Ex. 143; HD Ex. 150; *see also* Jacobowski Dep. at 23, 24-25, 32-43, 79-82; Lawson Dep. 16, 33-34; Adams Dep. 114-16; Allen Dep. 23-24; Lawson Dep. 37-38; Osborne Dep. 38-41, 48-49; HD Ex. 40; Listwak Dep. 29-31; Cerwonka Dep. 7-8; Piacente Dep. 7-10; Garin Dep. 104, 143-47; Pagan Dep. 53-56, 75-76; Lawson Dep. 79, 83, 87; Cerwonka Dep. 104-05, 113; Pagan Dep. 12-13, 18-20, 76-78; Piacente Dep. 74-75, 80; Listwak Dep. 125-26; Garin Dep. 14-15, 38-40, 44-46, 48-50; Allen Dep. 48-49, 53-54, 55-56, 64-65, 69-72; Tr. of

85. Having jointly created the AIILF, each Defendant used it to facilitate its widespread imposition of the coordinated fuel surcharges. Defendants adopted policies regarding use of the AIILF in conjunction with fuel surcharges.[235]

---

Dep. of George Duggan ("Duggan Dep.") 22-25, 30-32, 34-35, 37; Cerwonka Dep. 51, 88-89, 104-05, 112, 118; Tr. of Dep. of Christopher Jenkins ("Jenkins Dep.") 72-93, 97-103; Piacente Dep. 48, 67. 87, 92-93; Tr. of Dep. of Tim McNulty ("McNulty Dep.") 132, 167-68; Lawson Dep. 78, 119-20; Kraemer Dep. 104-05, 113, 141-42; Listwak Dep. 41, 43, 46-49, 51, 75-76, 94-97, 108-11, 117-119, 124, 138-39, 155, 175-77; Osborne Dep. 53, 71-74, 81-82, 87; Krebhiel Dep. 35, 87, 104, 128; Gehl Dep. 80-81; Garin Dep. 157-58, 167, 179, 181, 183, 185, 190; Duggan Dep. 25-27; *compare*: Duggan Decl. ¶ 10 and Duggan Dep. 9-11, HD Ex. 106; Garin Decl. ¶¶ 5, 12 and Garin Dep. 110, 194, 196-99, HD Exs. 118-19; Garin Decl. ¶ 14 and Garin Dep. 134, 137-40, HD Exs. 107, 113-14; Garin Decl. ¶ 15 and Garin Dep. 33, 149-51, 155-56, HD Ex. 107; Garin Decl. ¶ 17 and Garin Dep. 220; Jacobowski Decl. ¶ 6 and Jacobowski Dep. 53-57, HD Exs. 123-26; Jacobowski Decl. ¶ 7 and Jacobowski Dep. 46-47; McNulty Decl. ¶¶ 12, 14, 16 and McNulty Dep. 15, 121-24, 164-66, HD Ex. 128; Piacente Decl. ¶ 7 and Piacente Dep. 44, 45, 61, 74-75, 78, 80, HD Exs. 129-30, 140; D. Br. 49, n. 62 and Piacente Dep. 108-09; Lawson Decl. ¶¶ 13-14 and Lawson Dep. 47; Listwak Decl. ¶ 35 and Listwak Dep. 122, 133-34, 153, 178; Listwak Decl. ¶ 28 and Listwak Dep. 155, 160, HD Ex. 139; Listwak Decl. ¶ 24 and Listwak Dep. 100-01, 123-26, 130, HD Ex. 137; Listwak Decl. ¶ 31 and Listwak Dep. 177, 182-85; Listwak Decl. ¶ 12 and Listwak Dep. 80-84; Listwak Decl. ¶ 5(a) and Listwak Dep. 69, 74-76, HD Ex. 135; Listwak Decl. ¶ 5(b) and Listwak Dep. 84-85, 97, 101-02, 103, HD Exs. 136-37; Listwak Decl. ¶ 7 and Listwak Dep. 58-59, 63-64, HD Ex. 134; Osborne Decl. ¶ 10 and Osborne Dep. 100-10, HD Ex. 143; Adams Decl. ¶ 3 and Young Dep. 148, (Adams was deposed before his declaration was submitted. *See* Young Dep. 13-17, 146-62); D. Br. 29 (citing Adams Decl. Attachment 2) and Young Dep. 159; D. Br. 9, n. 5 (citing Adams Decl. ¶ 6) and Adams Dep. 87, 114-15; Gehl Decl. ¶¶ 3-4 and Gehl Dep. 25; Gehl Decl. ¶ 7, 9 and Gehl Dep. 44, 47, 49-50, 55; D. Br. 29 (citing Gehl Decl.¶¶ 3-4, Krehbiel Decl. ¶ 5(A)) and Gehl Dep. 87, Krehbiel Dep. 123-24; Pagan Decl. ¶ 2 and Pagan Dep. 25-29; Lawson Dep. 105, 112-13, 116, 121-26, 127-33 (regarding Schaaf and McGregor declarations).

[234] *See, e.g.*, Duggan Dep. 5-6; Garin Dep. 129-34, 165-66, 180, 202; Listwak Dep. 104, 152-53, 179; Kraemer Dep. 12-18; Lawson Dep. 27-28, 83- 84.

[235] *See, e.g.*, Adams Dep. 87 (AIILF became UP's "default" index); Draper Dep. 173; Lanigan Dep. 181-82; Rose Dep. 45 (AIILF "is what I would call our standard"); Young Dep. 71-75; Kyei Dep. 189-90; Gooden Dep. 183-84; HD Ex. 23, at NS_010155750; NS_010047819 ("better add this [the AIILF] to your list of options and be ready to track"); RD Ex. 74 ("It is strongly recommended that RCAF contracts migrate to the [AIILF]…and apply a fuel surcharge."); BNSF-0028110 ("Lanigan and the VP's have agreed to start escalating contracts with this new index"); Kyei Dep. 187-188; CSXFSC000000569-574 ("Changes to the policy: Everything is subject to fuel surcharge…long term contracts can have RCAF(u), AII LF, or fixed increases of at least 5%/year – plus fuel surcharge"); CSXFSC000000577-578 ("I think you may want to consider using the [AIILF] plus fuel surcharge…unlike the RCAF(u), when fuel prices come down the AII LF + fuel surcharge will not go negative."); UPFSC_0056669 ("Jack

86. Defendants found that their efforts would be facilitated by having the AAR publish the new index (originally it resided in a publication requiring payment).[236] Defendants viewed the AAR website as a "'neutral' but authoritative location" for information affecting the industry.[237] Defendants concluded publication there would lend the AIILF credibility and make it seem that its use (and accompanying application of fuel surcharges) was sanctioned by the AAR and not driven by Defendants.[238]

87. In mid-2004, UP proposed that Defendants discuss at an upcoming November 2004 NEMC meeting the publication of the AIILF on the AAR's website.[239]

88. The publication of the AIILF on the AAR website had nothing to do with NEMC's designated functions.[240] Rather, UP proposed this venue because it provided cover for

---

[Koraleski] is wanting marketing to use the AIILF and then add the HDF (Highway Diesel Fuel) to cover our fuel surcharge."); Koraleski Dep. Ex. 35, at UPFSC_0274780 (Oct. 14, 2004 email from Adams (UP) to Koraleski (UP): "Jack, in a voice mail to your direct reports you indicated you wanted them to be using the All Inclusive Index Less Fuel (AIILF) coupled with the Highway Diesel Fuel Surcharge . . . ."); UPFSC0001902-04 ("UPRR is now endorsing the use of the [AIILF] as an acceptable standard rate adjustment in our pricing documents."); UPFSC 0274789; CSXFSC000036522-29 ("The conclusion is that All Inclusive ex Fuel with the fuel surcharge is superior to the RCAFU stand alone."); UPFSC 0151957-59; UPFSC0001304-05; UPFSC_0067005-07, at 5 (Sept. 26, 2005 email from UP to customer DAS Auto refusing to negotiate AIILF implementation and explaining "this is now considered 'standard boilerplate' language that is contained in all of our agreements"); RD Ex. 106; CSXFSC000317571 (CSX directive that all contracts "include fuel, or AIILF, plus fuel"); CSXFSC000213619-20.

[236] RD Ex. 110, at CSXFSC000000643 (Oct. 29, 2004 internal CSX email from Fredrik Eliasson).

[237] RD Ex. 116, at 6 (Nov. 11, 2004 UP presentation to NEMC).

[238] *See, e.g.*, Couch Dep. 176-177 ("[AIILF], whatever you want to call it, we were looking for the AAR to post it for customers …. [Post] the index. Almost like a third party, here's an analysis of railroad cost increases less fuel."); UPFSC_0488760-61 (recommending that customer be told that "AIILF calculations [are] performed by the AAR" in order to facilitate acceptance of UP's standard HDF surcharge and the AIILF).

[239] *See, e.g.*, RD Ex. 116, at 6 (Nov. 11, 2004 UP presentation to NEMC).

[240] *See, e.g.*, Rockey Dep. 126-27; UPFSC 0238067-68.

joint action by the Defendants' CMOs, who were spearheading Defendants' coordinated drive to impose the agreed, coordinated fuel surcharges industry-wide.

89. UP circulated an "agenda item" for the November 2004 meeting, recommending that the AIILF be published on the AAR website expressly because it would "facilitate and support" Defendants' use of fuel surcharges.[241]

90. CSX internally recognized that "it would likely be an anti-trust violation to discuss/suggest setting an AIILF industry fuel surcharge formula program at NEMC."[242] CSX's current chief commercial officer – Clarence Gooden – testified that prior to attending the NEMC meeting, he was informed by lawyers that AIILF publication should not be discussed at NEMC.[243]

91. The AAR itself resisted online publication of the AIILF, in part because it would cause a financial loss to the AAR (by making free what was previously paid for). But because the AAR was effectively controlled by the Defendants, it acquiesced after UP expended "political capital."[244]

92. On November 11, 2004, UP made a presentation to the other Defendants at the NEMC meeting, stressing that they would all benefit from AIILF publication on the AAR website.[245]

---

[241] *See, e.g.*, BNSF-FSC 000766-67; Koraleski Dep. 269..

[242] *See, e.g.*, RD Ex. 110, at CSXFSC000000643 (Nov. 1, 2004 internal CSX email from Clyde McIntyre).

[243] *See, e.g.*, Gooden Dep. 181-83.

[244] *See, e.g.*, UPFSC_0274880-921, at 0274880; Adams Dep. 112-13; *see supra* at ¶¶ 19-21.

[245] *See, e.g.*, UPFSC 0279097.

93. Following the presentation, Defendants agreed to direct the AAR to publish the AIILF.[246] Defendants then further agreed to keep this action "low key" and directed the AAR not to take any action that would bring attention to their joint conduct.[247]

94. The AAR again did Defendants' bidding.[248] It circulated the proposed layout for the AIILF web page to UP, which forwarded it to the other Defendants, who responded with their avowed "support."[249] UP recognized this as "an important step in promoting the AIILF index."[250]

95. During this same period, in November 2004, UP announced a fuel surcharge for coal shipments based on the HDF – a slight variation from UP's and BNSF's standard HDF program but one that, like BNSF's coal program announced a few months prior,[251] led to slightly higher fuel surcharges.[252]

96. Prior to the November 11, 2004 NEMC meeting, in the summer of 2004, BNSF had internally begun to reconsider whether it could convince the other Defendants to adopt a

---

[246] *See, e.g.*, RD Ex. 115, at AAR-000262 (Nov. 11, 2004 NEMC minutes) ("The committee agreed and directed Craig Rockey to add the AIILF to the web site."); Adams Dep. 126-29.

[247] *See, e.g.*, UPFSC_0062891-94, at 0062891 (Adams (UP) provides detailed instructions to Rockey (AAR) concerning web site layout); UPFSC_0364655-57 (Rockey (AAR) responds); UPFSC_0364660-62.

[248] *See, e.g.*, RD Ex. 118 (Nov. 23, 2004 email from Craig Rockey of AAR to executives of the Defendants, including Seale, Lanigan, and Koraleski) ("The publication of an All-Inclusive Index Less Fuel, directed by NEMC at its November 11 meeting In Kansas City, has been accomplished. The index resides on the AAR web site"); RD Ex. 117 (Nov. 17, 2004 email from Craig Rockey to Chuck Adams).

[249] *See, e.g.*, RD Ex. 117; BNSF-FSC 000764-65 ("Obviously, we support"); AAR-000266, AAR-000269; AAR-0000347.

[250] *See, e.g.*, UPFSC_0062891-94; *see also* BNSF-FSC 00764-765.

[251] BNSF_FSC00530-531.

[252] UPFSC_0000301-21, at 11; *see, e.g.*, UPFSC_0363391-94, at 91; BNSF_0328151-68, at 64.

mileage-based fuel surcharge program.[253] Lower-level BNSF employees analyzing such a program noted that mileage-based fuel surcharges were "more fair and equitable" than the standard rate-based fuel surcharges,[254] which "tend[] to amplify disparities in rates … unrelated to the additional cost of fuel."[255]

97. BNSF sought an agreement on mileage-based fuel surcharges at the November 11, 2004 NEMC meeting, where BNSF CMO John Lanigan "shopped the concept [of a mileage-based fuel surcharge] with his counterparts from other roads … and they pushed back as expected."[256] This discussion was not part of the formal NEMC agenda, but was held under the cover of the AAR. Nor was there any procompetitive or legitimate self-interested basis for Mr. Lanigan to "shop" a mileage-based fuel surcharge program. As Mr. Lanigan himself admitted in a subsequent conversation with CSX's Clarence Gooden, BNSF was free to unilaterally assess a mileage-based fuel surcharge, even on interline movements.[257]

---

[253] *See, e.g.*, Lanigan Dep. 22; BNSF-0345532; BNSF-0028783-84 (BNSF internal meeting on mileage-based fuel surcharge held on September 3, 2003).

[254] *See, e.g.*, BNSF-0375600.

[255] *See, e.g.*, BNSF-FSC 00218; BNSF-0026690.

[256] *See, e.g.*, RD Ex. 120; RD Ex. 107, at BNSF-0345996 (Oct. 18, 2004 internal BNSF email noting, *inter alia*, shippers' resistance to fuel surcharge program and that John Lanigan, BNSF's CMO, would "be meeting with his counterparts in the next few weeks and may explore the issues with them."); RD Ex. 109, at BNSF-FSC 000758 (Oct. 21, 2004 email from John Lanigan to BNSF colleagues confirming intent "to talk to my counterparts at the next NEMC meeting in a couple of weeks…"); RD Ex. 112, at BNSF-0327644 (Nov. 3, 2004 internal BNSF email noting that John Lanigan would be "visiting with his railroad counterparts at the upcoming NEMC/SOMC meeting in Kansas City to judge the appetite for a mileage-based FSC program"); RD Ex. 119, at UPFSC0001432 (email from BNSF to UP reconfirming BNSF's management directive to apply an fuel surcharge to "essentially everything"); RD Ex. 109; Lanigan Dep. 226-31; BNSF-0345959-91; BNSF-0480574; BNSF-0041491. Mr. Lanigan admitted that BNSF's mileage-based fuel surcharge program was originally designed to apply "to all traffic, both interline and local." Lanigan Dep. 235.

[257] Gooden Dep. 221-24. Less than one week following to this meeting, top executives of the four Defendants – BNSF's Matt Rose, CSX's Mike Ward, UP's Ike Evans, and NS's David Goode and Wick Moorman – held a conference call. *See, e.g.*, BNSF_CAL_0017719.

98. As a result of the other Defendants' opposition, BNSF retreated from its reconsideration of mileage-based fuel surcharges, even though it had judged that implementing a mileage-based fuel surcharge program would be in its self-interest. For example, following a conversation with BNSF CMO John Lanigan, NS CMO Don Seale reported to his boss that "it is clear that BNSF sees an advantage in a mileage based fuel surcharge due to its greater length of haul, and a corresponding disadvantage for us due to our shorter hauls."[258] NS concluded that "BN's 'mileage' based *proposal*" could be "less equitable to eastern carriers … ."[259] CSX recognized this as well and "declined" the "BNSF proposal to put fuel surcharges on a mileage basis," reasoning that because the "eastern railroads have shorter hauls than do western railroads, . . . BNSF would collect a larger proportion of that fuel surcharge."[260]

99. Despite announcing since 2005 plans to apply mileage-based fuel surcharges on all types of traffic,[261] BNSF has consistently declined to do so.[262] To this day, BNSF has only applied mileage-based fuel surcharges on some agriculture and coal traffic, and only to the

---

[258] RD Ex. 125; *see also* Rose Dep. 25.

[259] NS_010049047-55; *see also id.* ("for the most part we are in a good position to handle a mileage based FSC in marketing."); NS_010049761-763; NS_010052639-641; NS_033000559-561; NS_010053814-822; Glennon Dep. 213-216. 225-226; *see also* BNSF_0572245-248; BNSF_0001325 ("The customer support for our fsc mileage application was overwhelming. The eastern rr and cn are nervous."); RD Ex. 156 ("Current methodology divides the FSC by revenue percent. Therefore, the East refuses to go to mileage based FSC splits because they will no longer be able to collect their FSC premium."); CSXFSC000000850-882 ("A mileage based fuel surcharge would reduce our competitive position on lower [revenue per car] traffic."); UPFSC_0394743-45 (acknowledging Chevron Texaco requested a mileage-based fuel surcharge, and noting that "BNSF is proposing a new fuel surcharge.").

[260] Gooden Dep. 77-79; *see also* CSXFSC000675380-85 (CSX "negatively impacted" by a mileage-based fuel surcharge "due to the higher density and more developed highway network in the East").

[261] *See, e.g.*, BNSF-0329108-114; BNSF-0327878-890; *see also* Exhibit 34 to Lanigan Dep. (BNSF News Release, dated Aug. 5, 2008).

[262] *See, e.g.*, BNSF News Release, dated Dec. 2, 2008; BNSF-0031077.

extent that the mileage-based fuel surcharges are "revenue neutral" for BNSF in comparison to BNSF's rate-based fuel surcharges.[263]

100. Throughout the Class Period, each Defendant tracked its success toward the goal of 100% coverage of the agreed conspiratorial fuel surcharges.[264] BNSF, for example, saw the "effective" amount of its revenue covered by the standard fuel surcharges (and fuel surcharge-derived revenues) expand from 54.2% by the end of 2004 ($357m in revenues), to 67.7% in 2005 ($1.1b), and to 78% in 2006 ($1.7b).[265] As of March 2003, NS could confirm that only 41.6% of its traffic by revenue was covered by a fuel surcharge.[266] By January 2006, however, 85.5% of NS's revenues were covered by fuel surcharges.[267] CSX increased its coverage from 41% in 2004 to 54% in 2006, and was projecting further increases in coming years: 65% by 2007, 75%

---

[263] *See, e.g.*, BNSF-0033275-280; Lanigan Dep. 254-55.

[264] *See, e.g.*, RD Ex. 11; RD Ex. 27; RD Ex. 57; RD Ex. 62; RD Ex. 63; RD Ex. 78; RD Ex. 80; RD Ex. 86; RD Ex. 95; RD Ex. 96; RD Ex. 97; RD Ex. 98; RD Ex. 100; RD Ex. 101; RD Ex. 102; RD Ex. 104; RD Ex. 105; NS 001000719-744; RD Ex. 106; RD Ex. 108; RD Ex. 111; RD Ex. 113; RD Ex. 121; RD Ex. 123; RD Ex. 124; RD Ex. 129; RD Ex. 130; RD Ex. 131; RD Ex. 141; RD Ex. 146; RD Ex. 159; RD Ex. 224; HD Ex. 2; HD Ex. 16; HD Ex. 27; HD Ex. 21; HD Ex. 30; HD Ex. 33; HD Ex. 34; HD Ex. 35; HD Ex. 107; HD Ex. 123; HD Ex. 125; HD Ex. 129; HD Ex. 130; HD Ex. 143; BNSF-0319605-06; BNSF-0041487-490; BNSF-0028669-671; BNSF-0031198-99; HD Ex. 20; BNSF-0326595; BNSF-0031225-246; BNSF-0042771-788; BNSF-0631688-705; BNSF-0032575-589; BNSF-0048722-749; BNSF-0049138-181; BNSF-0022474-491 (BNSF reporting that it had moved fuel surcharge coverage "up 20 to 25 basis points" over 2003); BNSF-0320766-67; CSXFSC0002000200614; Koraleski Dep. Ex. 33 (January 2004 email from Koraleski (UP) to Adams (UP): "I've asked each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004.").

[265] *See, e.g.*, BNSF_LOG0006542-589; NS 010072605; BNSF_0355735, at BNSF_0057053; BNSF_0057053-138; BNSF 2004 Form 10-K; BNSF 2005 Form 10-K; BNSF 2006 Form 10-K; BNSF-0048728; NS_010052923-927; NS_010049215-17; NS_010050041; BNSF-000385139.

[266] *See, e.g.*, NS_0102584313-14.

[267] *See, e.g.*, NS_010037907-09.

by 2008, 83% by 2009, 84% by 2010, and 85% by 2011.[268] Internal UP documents indicate that UP's fuel surcharge coverage by revenue increased from 42% in August 2003, to 65% by the end of 2004, to 74% by October 2005, to 85% by March 2007.[269]

101. Defendants exchanged coverage statistics regularly, including statistics that were not limited to interline traffic,[270] and that applied both to carload and intermodal traffic.[271] Discipline within the conspiracy was maintained by the exchange of these coverage data and regular inter-Defendant discussions concerning fuel surcharges and their uniform application.[272]

---

[268] *See, e.g.*, CSXFSC000326207-08; *see also* CSXFSC000006857-894; CSXFSC000350617-18.

[269] *See, e.g.*, RD Ex. 78; RD Ex. 123; UPFSC 0076935-36; UPFSC_0099019; *see also* UPFSC0001656-63, at 61; UPFSC_0433046-70, at 50 (Koraleski (UP) presentation acknowledging "record fuel surcharge coverage" achieved in 2006).

[270] *See, e.g.*, RD Ex. 62 (Oct. 1, 2003 BNSF-CSX meeting minutes); CSXFSC000346837-896; RD Ex. 63, CSXFSC000000476 (Oct. 6-9, 2003 internal CSX e-mail chain reflecting high-level discussion of fuel surcharge coverage rates in context where record indicates discussion was not limited to interline movements); RD Ex. 78, at UPFSC 0276429-30 (Jan. 15, 2004 internal UP email assessing BNSF's claim "'that UP has 40-45% of our business covered with a fuel surcharge'"); RD Ex. 86; RD Ex. 98, at NS001000778 (Sept. 10. 2004 email from BNSF's David Garin to NS's Don Seale attaching fuel surcharge data concerning "all traffic (not solely with NS) that moved under the price authority in the past twelve months"); RD Exs. 95, 96, 97, 100, 101, 102, 104, 105 (exchange of NS-BNSF communications concerning discrepancy in shared fuel surcharge coverage data); BNSF-0355372 (internal BNSF email noting that UP had "reported higher FSC coverage" than had BNSF for that quarter); CSXFSC000211280-81 (August 2005 exchange of coverage data between UP and CSX); CSXFSC000096276.

[271] CSXFSC000000476-77, at 77.

[272] *See, e.g.*, HD Ex. 8. (NS reminding UP that "[w]e have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."); *see also* RD Ex. 55; RD Ex. 79, at UPFSC0001161 (email from NS's Alby Pfeifer to UP's Kurt Schroeder confirming that UP correctly understood NS's new fuel surcharge program); RD Ex. 83, at UPFSC0001181 (email from BNSF's James Arnett to Kurt Schroeder and others at UP conveying BNSF's "marketing policy to include fuel surcharge in all price authorities that BNSF participates in"); RD Ex. 89, at BNFSC-FSC00664; RD Ex.105, at NS 001000573; RD Ex. 107, at BNSF-0345996; RD Ex. 109, at BNSF-FSC 000758; RD Ex. 112, at BNSF-0327644; RD Ex. 119, at UPFSC0001432; RD Ex. 120, at BNSF-FSC 000770; RD Ex. 125, at NS001001082 (July 1, 2005 email from NS's Don Seale to several NS officials reporting on discussions with BNSF").

102. Defendants' agreement to apply their agreed, conspiratorial fuel surcharges across-the-board, to all contracts, and without exceptions included Defendants' intermodal business.[273] In furtherance of this agreement, Defendants monitored expiring intermodal legacy contracts to ensure that the agreed fuel surcharges were imposed on renewal,[274] and they tracked their intermodal fuel surcharge coverage as part of their business-wide goal of achieving 100% fuel surcharge coverage.[275]

---

[273] *See, e.g., supra* at ¶¶ 79-84; UPFSC_0051559-60, at 60 (2005 UP presentation providing that "[w]e have adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."); UPFSC_0444917; UPFSC_0002805 (2005 intermodal marketing strategy included re-pricing all contracts, with two exceptions, over three-and-a-half-year-period, to market rates that included 100% fuel cost recovery); CSXFSC000672465 (May 2005 presentation summarizing CSX's intermodal policy of applying "[f]ull Fuel Surcharge on all customers – No Exceptions!"); CSXFSC000086200-CSX000086202; UPFSC_0027623-24, at 23; BNSF-0326595 ("[I]nclusion of the [intermodal] interline view in the adherence report by senior management was made not from the standpoint of whether the FSC is shared or not. The interest was primarily to verify whether there was *total FSC discipline* on all our traffic, local and interline.") (emphasis added); BNSF-0031198 (BNSF internal November 10, 2004 Fuel Surcharge Adherence meeting agenda including topic "We need to add a 'BNSF Intermodal Interline Fuel Surcharge Participation' slide"); RD Ex. 74 (January 2004 Price and Fuel Escalation General Guidelines requiring that "intermodal shipments use the Intermodal Fuel Surcharge Table and apply a fuel surcharge on a weekly basis"); BNSF 20091015. Defendants recognized that, although some limited fuel surcharges had been applied on Defendants' intermodal business prior to the conspiracy, application during the conspiracy period was to be more widespread and aggressive. *See, e.g.,* Koraleski Dep. 255-59.

[274] *See, e.g.*, BNSF-0345355-56, at 55; NS_010038138 (In February 2006, Don Seale asked NS's intermodal VP and other division heads to "tabulate and provide a list of the largest remaining contracts (include annual revenue involved) that do not have fuel surcharge application and the time lines you are pursuing to modify the deals to include fuel."); RD Ex. 131; NS_010255961-62 (intermodal VP acknowledging that NS "Seniors are going to continue to push us aggressively" to avoid fuel surcharge exceptions); UPFSC_0048079; CSXFSC000320100-06 (2006 CSX analysis projecting increased coverage of intermodal fuel surcharge on presumption that "100% of contracts that come due will be renewed with full fuel surcharge").

[275] *See, e.g.*, BNSF-0042771-788; BNSF-0631688-705; BNSF-0032575-589; BNSF-0048722-749; BNSF-0049138-181; BNSF-0355734-35; CSXFSC000091338-39; NS_010055869-70 (showing NS intermodal fuel surcharge coverage rising from 71% in January 2005 to 87% in January 2006); NS_010037907-09 (NS intermodal coverage 90% by January 2006); *see also* NS_010044279-283 (2004 NS analysis attributing 30% of NS's annual

103. Exceptions to Defendants' standard intermodal fuel surcharges were extremely rare. BNSF's vice president of domestic intermodal operations testified, for example, that he could not recall a single intermodal shipper (that was not party to a legacy contract) that paid nonstandard fuel surcharges on all of its shipments during the Class Period.[276] In February 2006, NS's vice president of intermodal marketing reported there were only "a handful" of intermodal customers not paying the standard fuel surcharge and that efforts were being made to bring these customers onto the standard program.[277] At this time NS had only one intermodal customer not paying a fuel surcharge, but this was pursuant to an agreement predating "the implementation of [NS's] FSC policy,"[278] and NS expected to apply the fuel surcharge when the agreement was renewed in 2007.[279]

104. Coordination among Defendants was facilitated by formal meetings and other gatherings held regularly during the Class Period.[280] Defendants' CEOs and CMOs worked to

---

intermodal revenue growth to fuel surcharges); CSXFSC00026220-21 (CSX intermodal fuel surcharge carload coverage increasing steadily in 2004 and into 2005); CSXFSC000007444-45; CSXFSX000085972-73; BNSF-0496997, at BNSF-049700, 02 (October 8, 2004 Bear Stearns' analyst report stating that "[i]n the intermodal business, tight capacity and an acceleration in fuel surcharge recovery have been clear drivers of the rise in yields," and, "we believe that [BNSF] is realizing significant fuel surcharge revenue in its intermodal segment.").

276 Duggan Dep. 16, 20, 24, 25, 30, 31, 34-35, 35-36.

277 *See, e.g.*, RD Ex. 131; NS_062094220-244 (summary of the "handful" of NS intermodal contracts lacking the standard fuel surcharge); *see also* NS_036026274-6301.

278 *See, e.g.*, NS_062094220-244, at 240.

279 *See, e.g.*, NS_010138499.

280 *See, e.g.*, RD Ex. 89 (BNSF and NS executive discussion on "[f]uel surcharge implementation/execution across roads," as well as "[i]ndustry issues that affect both BNSF and NS."); RD Ex. 100 (BNSF and NS executives discuss "the segmentation of market opportunities that will benefit us both."); UPFSC_0155801-02 (Oct. 18, 2006 internal UP email from Koraleski: "Jim Young is going to call Wick Moorman to discuss the possibility of a senior alliance meeting to discuss opportunities for us to work together – not just in Intermodal, but across our business spectrum."); UPFSC_0126702-03 (reflecting UP's plans in 2006 to have an "open discussion" with senior NS officials about "where we need their … help and where do

maintain positive relationships to ensure their continued commitment to their common objectives. During this period, for example, Defendants' executives would often travel to each other's headquarters for "Alliance" or other meetings a day in advance, "for social interaction … just to have some time together."[281] Defendants' CEOs golfed together on numerous occasions.[282] And, in 2005, Defendants' CMOs reconvened in Selma for another private "get-together."[283] At some such meetings, Defendants expressly reaffirmed their commitment to

---

they need ours. The objective would be the mutual benefit of both Companies."); CSXFSC000000467-475; NS_010033411-2; CSXFSC000140293-404; BNSF_CAL_0006995; BNSF_0101058-63; BNSF_0338332-336; UPFSC_0126055-57; NS_010034471-472; NS001001039; NS_010035278-80; UPFSC_0002425-427; NS_013002307-332, at NS_013002318-332; CSXFSC000243477-479; CSXFSC000238152; BNSF_CAL-0006435; NS_010044717-419; CSXFSC000140406-408; UPFSC_0246769-771; UPFSC_0248426- 431; UPFSC_0246769-770; NS_010037058-61; NS_013002395-401; NS_013002616-632, at NS_013002617; NS_013002616 -632, at NS_013002631; CSXFSC000140611-613; UPFSC_0011155-157; UPFSC_0004881-883; NS_010038486-487; NS_010028224 -227; NS_013002572-587, at NS_013002572; NS_010038207; NS_010062827; BNSF_CAL-0014787; BNSF_CAL-0005637; BNSF_CAL-0012714; NS_010034240; BNSF_CAL-0018257; BNSF_CAL-0005727; BNSF_CAL-0004878; BNSF_CAL-0000410; NS_010034051; BNSF_CAL-0010406; CSXFSC0001546185; UPFSC_0132478-80; CSXFSC000156296-97; Giftos Dep. 268-69; CSXFSC000211280-81; CSXFSC000231951-961; Gooden Dep. 81-82; BNSF_CAL_0006867; BNSF_CAL_0012722; BNSF_CAL_0012723; BNSF_CAL_0017991; BNSF_CAL_0012973; BNSF_CAL_0012876; BNSF_CAL_0012483; BNSF_CAL_0012317; BNSF_CAL_0011884; BNSF_CAL_0017550; BNSF_CAL_0007733; CSXFSC000258395; BNSF_CAL_0018248 ("CSX/NS party"); BNSF_CAL_0006917; BNSF_CAL_0017834; BNSF_CAL_0007946; CSXFSC000258371; BNSF_CAL_0018257; BNSF_CAL_0018256; CSXFSC000258399; CSXFSC000256133; BNSF_CAL_0011604; BNSF_CAL_0007732; BNSF_CAL_0018045; BNSF_CAL_0018326 (BNSF's Matt Rose has "golf outing" with NS's David Goode); BNSF_CAL_0017672; BNSF_CAL_0017465; BNSF_CAL_0017864; BNSF_CAL_0003199-200; BNSF_CAL_0003234-235; BNSF_CAL_0003187; BNSF_CAL_0004618; BNSF_CAL_0012030; BNSF_CAL_0017736; NS_010082702; AAR-P-00004089-092;NS_011001728-733; NS_016000164-176; NS_016000061-080; NS_01003410; NS_014005935-36; BNSF-0457077; NS_013006718.

[281] Koraleski Dep. 241; *see also id.* at 50-51 (describing socializing with counterparts at other railroads).

[282] *See, e.g.*, Goode Dep. 120, 121, 197-98; Goode Dep. Ex. 15 (Evans (UP) monthly calendar for October 2003 reflecting "Goode's to H[ilton ]H[ead]").

[283] *See, e.g.*, Koraleski Dep. 284-87; Koraleski Dep. Exs. 40-41.

achieving their common objectives;[284] at times, they jointly worked to present a united front on fuel surcharge issues to their customers. In 2006, for example, Mr. Gooden, Mr. Seale, and Mr. Koraleski jointly traveled to Washington, D.C. to meet with a large shipper trade group (the National Industrial Transportation League, or "NITL") to present their "common view" about concerns NITL had raised with Defendants' fuel surcharge programs, and threatened to withdraw from NITL if it did not stop voicing such concerns.[285] Prior to this joint meeting, Mr. Koraleski had already expressed *UP*'s views on this topic to NITL.[286] But even without these meetings, Defendants still signaled or informed each other about their intentions to facilitate ongoing coordination of their fuel surcharges applied to carload and intermodal freight traffic.[287] Defendants discussed, for example, how they would respond to the STB ruling (discussed *infra*). A February 2007 internal UP email shows that NS and CSX had "suggested" that the Defendants "stay with the current revenue-based program for intermodal at least for now."[288]

---

[284] *See, e.g.*, UPFSC_0004881-83, at UPFSC_0004883 ("Jack Koraleski emphasized that UP's strategy is to bring all traffic up to today's Market prices"); Goode Dep. Ex. 22 (Minutes from May 21, 2004 NS/UP Alliance Meeting: "David Goode stated that NS will support and assist UP in any way possible.")

[285] *See, e.g.*, Koraleski Dep. 321-24. These CMOs dined together in Washington, D.C. and discussed their plan for presenting a common position. *Id.*

[286] *See id.* at 325.

[287] *See, e.g.*, *supra* at ¶ 33; *see also* CSXFSC000186645; CSXFSC000264222; CSXFSC000186844; UPFSC_0048135 (extracted text). CSX regularly sent the other Defendants "Carrier Alert[s]" informing them, in a single email (in no way limited to interline traffic), what its fuel surcharge program would be in the next month and reporting its year-to-date fuel surcharge percentages. *See, e.g.*, UPFSC_0153826-27; *see also* BNSF_PRIV_AUTO0003241-42 (BNSF emails concerning an "NS FSC Update").

[288] UPFSC_0422458-60, at 0422458; *see also* UPFSC_0165409 (UP somehow knew that "NS is planning to do away with the fuel surcharge altogether an[d] just change rates when they need to."); *see also* Adams Dep. 311-13; CSXFSC000258350 (Feb. 2, 2007 discussion between CSX and BNSF "re: Fuel Surcharge."); RD Ex. 156.

105. Throughout the conspiracy, Defendants coordinated their intermodal fuel surcharges through manual, ad hoc adjustments[289] and by making programmatic changes to further bring them into lockstep. On September 1, 2004, CSX formally announced a new intermodal fuel surcharge program that was essentially identical to BNSF's (though calculated on a monthly rather than weekly basis),[290] consistent with CSX's goal of "standardization across the industry."[291] UP would adjust the fuel weight used in its intermodal FSC calculation, as UP did in March 2005 when it directed its intermodal group to "try and lower the variance between

---

[289] *See, e.g.*, UPFSC_0023510 (BNSF, NS and UP all imposing a 3.5% intermodal fuel surcharge as of August 2003); CSXFSC000213850-53, at 50 (CSX imposed 3.1% intermodal fuel surcharge in August 2003); UPFSC_0103447-51, at 47 (CSX (and NS) "basically follow[ed] UP and BNSF's" intermodal fuel surcharges); UPFSC_0163122 ("NS just eyeballs competition"); UPFSC_0078792-95, at 92 (UP would "manually adjust the formula-driven amounts" for its intermodal fuel surcharges, in order to keep them in "synch" with BNSF (and the other Defendants); UPFSC_0089424-26, at 24 (noting that BNSF and UP "surcharges follow very closely each other"); UPFSC_0254370 (showing similarity between BNSF and UP intermodal fuel surcharges in 2004); UPFSC_0165317-18; UPFSC_0019886 (extracted text) (UP intermodal personnel observing that NS "ha[s]been following what ever BNSF has been doing. CSXI had been doing the same, but lately adopted a BNSF table (exact replica of BNSF's) and publish accordingly. In other words, both companies have followed the path of BNSF fuel surcharge as well as UP's.").

[290] *See, e.g.*, UPFSC_0079776 ("CSXI announced a new fuel surcharge program today. It is the same as BNSF's intermodal program."); BNSF_0377493-94, at 93; BNSF_0657453-72, at 71; BNSF-0328151-68, at 64.

[291] CSXFSC000065811-19, at 19; *see, e.g.*, CSXFSC000279634-39, at 39 (acknowledging that change would amount to a price increase and that program was not "a true price recovery program"); CSXFSC000044580 (CSXT's fuel surcharge "program is very similar to other RR's …and Intermodal"); CSXFSC000000850-CSXFSC000000882, at CSXFSC000000882 (showing similar intermodal fuel surcharge percentages during Class Period).

UPRR's Intermodal surcharge and the comparable BNSF program," [292] and as UP did again in September 2006.[293]

**REBASING**

106. On April 24, 2006, just two days before NS filed a written submission to the STB on its fuel surcharge program,[294] NS announced that it would "revise its fuel surcharge program," assessing a 0.3% surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3% for every dollar increase above $64 per barrel.[295] While NS characterized this change in its written STB submission as reflecting a "decision to reduce its fuel surcharge percentage,"[296] internally NS recognized this was merely a cosmetic change, having engaged in an analysis to determine what base rate increase would be needed "to bake in FSC [fuel surcharges] to [base] rate."[297] NS determined that a 16.4% base rate increase would allow it a

---

[292] UPFSC_0049042; *see, e.g.*, UPFSC_0055388-89. UP Marketing still thought UP's intermodal fuel surcharge "was to[o] high compared to BNSF's" and directed the intermodal group to reduce the fuel surcharge on nearly a monthly basis. UPFSC_0049042.

[293] *See, e.g.*, UPFSC_0418186-87, at 86; UPFSC_0082277-81, at 77; UPFSC_0237104-05, at 104-05.

[294] *See, e.g.*, RD Ex. 139 (Written Statement of NS, STB Ex. Parte 661, Apr. 27, 2006); *see also* NS_010132100 (March 23, 2006 internal NS email noting that there was a "fire-drill going on with regards to FSC and the application there-of" and that, in anticipation of the upcoming STB proceedings, CEO Wick Moorman had called a meeting to review the FSC program).

[295] *See, e.g.*, RD Ex. 136.

[296] *See, e.g.*, RD Ex. 139, at 13 (Written Statement of NS, STB Ex. Parte 661, Apr. 27, 2006).

[297] *See, e.g.*, RD Ex. 158 (Mar. 21, 2006 spreadsheet analysis); *see also* CSXFSC000002658-679 (CSX analysis recognizing that rebased fuel surcharge would "'lock in' the fuel surcharge between $23 and $64").

**SPECIFIC RESPONSES AND OBJECTIONS**

## I. BNSF

**BNSF INTERROGATORY NO. 1:**

State whether you contend that, during the Proposed Class Period, the use of a mileage based Rail Fuel Surcharge by any Defendant was a breach of the terms of the Defendants' alleged unlawful agreement; if your answer is anything other than an unqualified "no," state: (a) the time period when a Defendant's use of a mileage-based Rail Fuel Surcharge was a breach of the terms of the Defendants' alleged unlawful agreement, (b) what limits, if any, the Defendants agreed to with respect to their ability to charge Shippers a mileage-based Rail Fuel Surcharge during the Proposed Class Period, and (c) what steps, if any, Defendants took to enforce or punish a Defendant that breached the terms of the alleged unlawful agreement by charging Shippers a mileage based Rail Fuel Surcharge during the Proposed Class Period.

**RESPONSE:**

Plaintiffs object on the ground that this interrogatory is vague and ambiguous, including for failing to define "breach." To the extent the interrogatory seeks Plaintiffs' legal analysis of whether certain facts or evidence constitute a "breach," Plaintiffs object on the ground that this impermissibly calls for work-product analysis.

Plaintiffs further object to this interrogatory to the extent that it seeks information that is not relevant to any claim or defense in the litigation. Plaintiffs reserve the right to make all appropriate arguments on this point, and to introduce all relevant facts and evidence relating to such arguments, should Defendants at any stage of this proceeding put this at issue.

Subject to, and without waiving, these objections and the General Objections, Plaintiffs respond that Plaintiffs have not made the affirmative contention that "the use of a mileage based Rail Fuel Surcharge by any Defendant was a breach of the terms of the Defendants' alleged unlawful agreement." Plaintiffs further respond that certain discussions among Defendants about

the use of a mileage-based fuel surcharge were conspiratorial (*see, e.g.*, Narrative Factual Statement, *supra* at ¶¶ 40, 96-97) and that BNSF's decision to retreat from a mileage-based fuel surcharge program that it saw as advantageous to it (and that other Defendants recognized was advantageous to BNSF) is probative of the fact that Defendants were engaged in a price-fixing conspiracy (*see, e.g.*, Narrative Factual Statement, *supra* at ¶¶ 98-99). In addition, Defendants continued to engage in anticompetitive discussions about what fuel surcharges to adopt following the STB's ruling (*see, e.g.*, Narrative Factual Statement, *supra* at ¶¶ 104).

**BNSF INTERROGATORY NO. 2:**

State whether you contend that the alleged unlawful agreement included a specific agreement regarding the percentage (or other quantitative measure) of transactions, revenues, or Shippers that were to be subject to a rate-based Rail Fuel Surcharge during the Proposed Class Period, and identify all facts and evidence that forms the basis for your contention, including identifying (a) the percentages (or other quantitative measures) that Defendants agreed upon, and (b) all actions Defendants took to monitor and/or enforce compliance with the agreed-upon percentages (or other quantitative measures).

**RESPONSE:**

Plaintiffs object that this interrogatory is overbroad and unduly burdensome to the extent it seeks identification of "all facts and evidence that forms the basis" for a contention.

Subject to, and without waiving, this objection and the General Objections, Plaintiffs contend that Defendants agreed to apply their coordinated fuel surcharge programs as uniformly as possible, and to as many freight shipments as possible, with the express goal of 100% coverage. As detailed in the Narrative Factual Statement, this agreement is evidenced by a series of extraordinary meetings and events in early-to-mid 2003, *see* Narrative Factual Statement, *supra* at ¶¶ 16-51, 62, and by actions Defendants took to facilitate, monitor and/or enforce compliance with the conspiracy, *see* Narrative Factual Statement, *supra* at ¶¶ 52-122.

Dated: February 8, 2011

Respectfully submitted:

/s/Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-9850
Facsimile: (212) 480-8560
Email: solson@hausfeldllp.com

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on February 8, 2011, a copy of the foregoing consolidated objections and responses to Defendants' first set of interrogatories was served on counsel for Defendants by electronic mail.

/s/ Sami H. Rashid__________

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------------X

In re Rail Freight Fuel : MDL Docket No. 1869

Surcharge Antitrust : Misc. No. 07-489 (PLF)

Litigation :

---------------------------------X

Washington, D.C.

Friday, September 24, 2010

Videotaped deposition of Gordon Rausser, a witness herein, called for examination by counsel for Defendants in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Crowell & Moring LLP, 1001 Pennsylvania Avenue, N.W., Washington, D.C. at 9:16 a.m., Friday, September 24, 2010, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.



APPEARANCES:

On behalf of the Plaintiffs:

MICHAEL D. HAUSFELD, ESQ.
Hausfeld LLP
1700 K Street, N.W.
Washington, DC 20006
202-540-7200

and

STEIG D. OLSON, ESQ.
Hausfeld LLP
11 Broadway
New York, NY 10004
212-830-9850

and

RICHARD I. WERDER, JR., ESQ.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 20010
212-849-7165



APPEARANCES:

On behalf of the Plaintiffs (cont.):

PAUL M. DONOVAN, ESQ.
LaRoe, Winn, Moerman & Donovan
1250 Connecticut Avenue, N.W.
Washington, DC 20036
202-298-8100

On behalf of the Defendant Norfolk Southern:

SAUL P. MORGENSTERN, ESQ.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
212-836-8740



APPEARANCES:

On behalf of the Defendant CSX Transportation, Inc.:

SHARI ROSS LAHLOU, ESQ.
LUKE VAN HOUWELINGEN, ESQ.
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-624-2500

On behalf of the Defendant Union Pacific:

THOMAS A. ISAACSON, ESQ.
Howrey, LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-783-0800

APPEARANCES:

On behalf of the Defendant BNSF:
SAMUEL M. SIPE, JR., ESQ.
LINDA S. STEIN, ESQ.
Steptoe & Johnson
1330 Connecticut Avenue, N.W.
Washington, DC 20036
202-429-3000

Also Present:
DAN REIDY, Videographer
ROBERT WILLIG, Compass-Lexecon
GARETH MACARTNEY, OnPoint Analytics



CONTENTS


| WITNESS | PAGE |
|---|---|
| GORDON RAUSSER | |
| EXAMINATION BY COUNSEL FOR DEFENDANT BNSF RAILWAY | 9 |
| EXAMINATION BY COUNSEL FOR DEFENDANT CSX | 76 |
| EXAMINATION BY COUNSEL FOR DEFENDANT UNION PACIFIC | 287 |
| AFTERNOON SESSION | 152 |


EXHIBITS


| RAUSSER EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 10 | Corrected expert reply report of Gordon Rausser, Ph.D. | 14 |
| 11 | Declaration of George T. Duggan | 20 |
| 12 | Transportation service agreement | 59 |
| 13 | BNSF rules book 6100-A | 62 |

Question marked at request of counsel 190




PROCEEDINGS

THE VIDEOGRAPHER: This begins tape number 1 in the video deposition of Dr. Gordon Rausser taken by the defendant in regards to the rail freight fuel surcharge antitrust litigation.

This is filed in the United States District Court for the District of Columbia, MDL docket number 1869.

Today's deposition is being held at the law offices of Crowell & Moring LLP, 1001 Pennsylvania Avenue, Northwest, Washington, D.C., 20004.

For identification purposes, I am Dan Reidy, the video operator. The stenographer is Dennis Dinkel, and we are both from Alderson Court Reporting.

Today's date is September 24, 2010. The time on the video is 9:16 a.m. We are on the record.

At this time, will all counsel please introduce yourself and whom you represent, starting with the defendants' counsel.

MR. SIPE: Sam Sipe, Steptoe & Johnson for



defendant BNSF Railway.

MS. LAHLOU: Shari Ross Lahlou, Crowell & Moring, on behalf of CSX Transportation.

MR. VAN HOUWELINGEN: Luke van Houwelingen of Crowell & Moring for defendant CSXT.

MR. ISAACSON: Tom Isaacson of Howrey, LLP for Union Pacific Railroad.

MR. MORGENSTERN: Saul Morgenstern from Kaye Scholer for Norfolk Southern.

MS. STEIN: Linda Stein from Steptoe & Johnson representing BNSF Railway Company.

MR. WILLIG: I'm not a counsel. My name is Robert Willig, I'm an economist. I work for Compass-Lexecon.

MR. HAUSFELD: Michael Hausfeld, Hausfeld LLP for the class action plaintiffs.

MR. OLSON: Steve Olson, Hausfeld, LLP, representing plaintiffs.

MR. WERDER: Richard Werder from Quinn Emanuel for the plaintiffs.

MR. DONOVAN: Paul Donovan, LaRoe Donovan, for the plaintiffs.

Page 114

question.
MS. LAHLOU: Are you going to accept Mr. Hausfeld's instruction to you not to answer the question based upon the Court's guidance as he interprets it?
THE WITNESS: I'm going to do my best to be responsive to your questions.
I did not, as I've already indicated, do any analysis with regard to the common factor regression model, aside from evaluating that common factor regression model with regard to the fallacy and incorrect implementation of Dr. Willig's false positive analysis.
I went back and looked at that common factor regression model, because he used it in constructing a tautological analysis with regard to false positives.
BY MS. LAHLOU:
Q. Could you turn to page 6 of Exhibit 10, please?
Under criticism 2, you state that Dr. Willig disagrees with my construction of the

Page 115

but-for world.
What is your construction of the but-for world?
A. My construction of the but-for world is the pre-class period in which the defendants were not conspiring and pursuing different mechanisms for reflecting changes in their costs, including their cost of fuel. So my construction is based on that world which covers the actual performance and conduct of freight pricing from the period 2000 through July 2003.
But moreover, I'm also here analyzing what he offers as a substitute for the but-for world; and that substitute makes no sense to me whatsoever, because it presumes that the merits don't hold. And he's asked in his analysis to assume the merits hold, and evaluate whether there is common impact, whether there is formulaic methodologies for measuring damages.
Instead, he offers a but-for world in which, unilaterally, the defendants would gravitate towards the same coordinated standardized fuel

Page 116

surcharges that the discovery record demonstrates that they decided they had to conspire to be able to implement.
Q. What does the discovery record demonstrate about the defendants' conclusion that they had to conspire to implement fuel surcharges?
A. Now you're taking me back to my original report. That's not a discussion or analysis that I've conducted in Exhibit 10.
MR. HAUSFELD: 10.
THE WITNESS: Thank you.
In the original report, I specified exactly what the documents were that were provided through discovery, and officials of the various defendants spoke directly about the inability to effectively implement and sustain their standardized fuel surcharges.
BY MS. LAHLOU:
Q. Do any fuel surcharges exist in your but-for world?
A. Certainly.
Q. What kind?

Page 117

A. All kinds. All the kinds that existed during the pre-class period. We just saw in today's deposition an actual fuel surcharge that was formulaic that was implemented during the pre-class period.
Q. In your but-for world, would any shippers that didn't have a fuel surcharge prior to the class period have a fuel surcharge?
A. Sorry? May I have that read back, please?
THE REPORTER: "Question: In your but-for world, would any shippers that didn't have a fuel surcharge prior to the class period have a fuel surcharge?"
THE WITNESS: I'm sorry. I don't understand the question. If they didn't have a fuel surcharge, they would have a fuel surcharge? I'm sorry.
BY MS. LAHLOU:
Q. So if I understand your testimony, you have constructed a but-for world that would have existed during the class period, but for the conspiracy, right? You've hypothesized what the

Page 118

world would have looked like during the class period if there were no conspiracy?
A. Yes. But I've used actual data and actual discovery record to do so.
Q. Okay.
A. Yes.
Q. Fair enough.
And in your but-for world, you just testified, if I understood you correctly, that fuel surcharges would exist in that world?
A. Yes. They did exist in that world. They did exist in that world.
Q. Okay. But just to be clear, temporally, we are talking about the but-for world occurring during the class period, right? That's the whole point of the but-for world, what would have happened during the class period if there was no conspiracy?
A. Yes. But the benchmark for that is the pre-class period.
Q. I appreciate that.
A. Adjusted for the difference in economic conditions that emerged during the class period

Page 119

relative to those conditions during the pre-class period.
Q. Okay. And so as I understand your testimony, your hypothesis is that certain fuel surcharges would have been charged by the defendants during the class period absent a conspiracy; is that right?
A. Yes.
Q. Okay. And I asked you what kinds of fuel surcharges. As I understood your testimony, you said the same kinds of fuel surcharges that were charged prior to the class period?
A. I used that as an illustration. Other types, but that would certainly be one type, yes.
Q. Okay. What other types might have been charged during the class period but for the conspiracy?
A. The ones that were charged before the conspiracy was formed and implemented or before the coordination began.
And those would include standardized fuel surcharges as well.

Page 120

Q. And rate based fuel surcharges?
A. Certainly.
Q. And my question to you is, would, in your but-for world, a shipper that had not paid one of the defendants a fuel surcharge prior to the class period have nonetheless paid one during the class period if there were no conspiracy?
A. In other words -- I want to make sure I've got the hypothetical correct -- during the pre-class period, they did not pay a fuel surcharge; but as we moved into the class period, is it possible that during the class period, in the non-conspiratorial world, would they have paid a fuel surcharge?
Q. Much better stated than I did. Thank you. Yes.
A. That's certainly possible.
Q. Would you expect it? For some population of shippers?
A. For some population, I would expect the competitive interaction in a non-conspiratorial world to reveal itself in the same fashion it revealed itself from 2000 to 2003. And if we go back to

Page 121

pre-2000, there were certainly shippers that weren't subject to a fuel surcharge that within the period 2000 through 2003 became subject to fuel surcharges. Not necessarily standardized formulaic fuel surcharges, but certainly fuel charges. And I would expect the same during the class period.
Q. Dr. Rausser, how much work have you done in the antitrust area?
A. How much work?
Q. Yes.
MR. HAUSFELD: Beyond the scope.
MS. LAHLOU: I believe his credentials are part of Exhibit 10.
MR. HAUSFELD: Only as they reiterate his credentials in Exhibit 1.
THE WITNESS: Over the course of the last 30 years, I did perhaps five or six antitrust cases prior to the formation of LECG. Once LECG formed, during the 1990s, after I returned from Washington, D.C., in the '90s, I probably did 20 to 25 antitrust cases, the largest of which was the branded pharmaceutical antitrust case in which I was engaged

by defendants as the damage expert; and that case went on for 10 years. So that takes us through the 1990s.

In the 2000s, while I was at Charles River, I probably did 10 antitrust cases, which covered a five-year period of time. At least 10.

And subsequently, with OnPoint Analytics, I have probably done on both the plaintiff's side and the defendant's side over the course of the last five years, upwards toward 10.

BY MS. LAHLOU:

Q. Okay. And when you say you've done these cases, does that mean you've acted as an expert witness in those cases?

A. Yes.

Q. Okay. And how many times have you acted as an expert on class certification issues, approximately?

A. I don't understand --

MR. HAUSFELD: Can we specify? Both sides? One side? Either side?

BY MS. LAHLOU:



Q. Either side?

A. Either side? It is approximately 50-50, on the plaintiff's side versus the defendant's side.

On class certification, I may have done over the course of my professional career, as many as 40 class certification cases, if not more.

MR. HAUSFELD: We can certify that to the Court.

BY MS. LAHLOU:

Q. And so why is it important to establish a but-for world for purposes of class certification analysis in an antitrust case?

MR. HAUSFELD: Beyond the scope of the direct -- beyond the scope of the report.

BY MS. LAHLOU:

Q. You may answer.

A. I'm sorry. May I have the question back, please?

THE REPORTER: "Question: And so why is it important to establish a but-for world for purposes of class certification analysis in an antitrust case?"



MR. WERDER: Objection. Calls for a legal conclusion.

MR. HAUSFELD: We're not going to go into the entire history of why courts have accepted economic explanations of but-for for purposes of antitrust analysis. So if you could give us a summary, Doctor, from an economic point of view of why that type of analysis was relevant to your work here.

MS. LAHLOU: I'll echo Mr. Hausfeld's instruction.

MR. HAUSFELD: Thank you.

MS. LAHLOU: You're welcome.

THE WITNESS: Now may I have the question back?

THE REPORTER: "Question: And so why is it important to establish a but-for world for purposes of class certification analysis in an antitrust case?"

MR. HAUSFELD: Take my refinement.

THE WITNESS: There are a number of reasons; the most important of which is to



demonstrate that you can develop a manageable formulaic methodology for estimating class-wide damages. That is not possible unless you can embed in that analysis what would have been the but-for world relative to the actual world.

BY MS. LAHLOU:

Q. Have you proposed any methodology by which to determine which shippers would have paid a fuel surcharge in the but-for world and which ones would not?

MR. HAUSFELD: Any fuel surcharge? Is that the question?

MS. LAHLOU: That's the question.

THE WITNESS: I'm sorry. Any shippers that would have paid -- separated the shippers into those -- in the but-for world, the counterfactual world to the actual world, those that would have paid the but-for price versus those who wouldn't?

Is that what you said?

BY MS. LAHLOU:

Q. My question --

A. In the but-for world, they could all pay

Page 217

percent of the transaction population with, of course, the defendants' definition of the legacy contracts removed.

BY MS. LAHLOU:

Q. And your expansion of your damages regression returned some different results than those represented in your original report, right?

A. By you say different results, you mean different numbers?

Q. Yes.

A. They are slightly different, yes.

Q. Okay. And so what does the damages regression that's reflected in Exhibit 10 tell you about the relationship between fuel and rail rates in the pre-class period that you've used as a benchmark?

A. What does it tell you?

It tells you that fuel prices -- the cost of energy has a significant and positive effect on gross rates that are charged to shippers.

Q. During the pre-class period, an increase in the fuel price leads to a relatively small increase in rail rates; is that right?

Page 218

A. A relatively small? Where do you get relatively small? What's your basis for inferring that it is relatively small? Where do you see any analysis in my original report or in the reply report where I say in the pre-class period, it is relatively small? The impact. The effect of a fuel price change. Where do you see that?

Q. How would you characterize the -- how an increase in fuel costs affected rail rates in the benchmark period that you've used in your damages regression?

A. I've already responded to that question.

I said it has a positive and statistically significant effect.

Q. Okay. And what would you have expected to happen between the relationship of fuel cost and rail rates in the class period absent the conspiracy?

A. What would I expect to happen?

Q. Uh-huh.

A. What the model reflects happens. Namely if there wasn't coordination among the defendants in setting standalone fuel surcharges tied to the base

Page 219

rate, that there would have been no distinguishable effect of the conspiracy on setting gross rates.

Q. Okay. If in the benchmark period fuel costs for much of the period -- I believe you said this in your report -- were lower than the trigger prices of the fuel surcharges; is that right?

MR. HAUSFELD: Could we have the question read back? And could you please put a timeframe in it?

THE REPORTER: "Question: Okay. If in the benchmark period fuel costs for much of the period -- I believe you said this in your report -- were lower than the trigger prices of the fuel surcharges; is that right?"

MR. HAUSFELD: You mean the fuel surcharges when?

MS. LAHLOU: In the benchmark period.

THE WITNESS: In the pre-class. I presume you're talking about in the pre-class period?

MS. LAHLOU: That's correct.

THE WITNESS: For much of the period, you say.

Page 220

BY MS. LAHLOU:

Q. Yes.

A. Well, first of all, I have two responses.

One, subsequent to that pre-class period and in the implementation of the coordinated strategy among the four defendants, they lowered that strike price or that triggering mechanism. But with regard to the triggering price during the class period for those contracts where they specified fuel surcharges, generally speaking, the underlying prices were below during the pre-class period.

Q. The basic point is that the cost of fuel is a lot higher than during the class period than it was during the pre-class period, right?

A. All the better to over-recover.

Q. Right. The fuel surcharges would have returned more revenue?

A. Yes.

Q. And, in fact, did?

A. Yes.

Q. And absent the conspiracy with the much higher fuel prices during the class period, would you

Page 221

have expected the relationship between fuel prices and rail rates to be any different than it was in your benchmark period?
A. May I have the question back, please?
THE REPORTER: "Question: And absent the conspiracy with the much higher fuel prices during the class period, would you have expected the relationship between fuel prices and rail rates to be any different than it was in your benchmark period?"
THE WITNESS: In other words, if there's no conspiracy, would you have expected the gross prices to be driven by the same forces that were driving the gross prices on freight rates? I meant gross prices on freight rates. Any different than the determination of gross rates -- no, you would not.
BY MS. LAHLOU:
Q. Okay. That was not my question.
My question was, would you have expected the relationship between fuel prices and ultimate rail rates to be any different during the class period given the much higher price of fuel than that

Page 222

relationship was in your benchmark period?
A. Absent a conspiracy.
Q. Yes.
A. In your restated question, did you say absent a conspiracy?
Q. I didn't, but thank you for completing it.
A. Absent the conspiracy, you would have expected the fuel prices to have a positive and significant effect on the gross prices or all-in prices that were charged to shippers in the class period, if there was not a conspiracy.
Q. Okay.
A. As they did in the benchmark or pre-class period from 2000 through mid-2003.
Q. And would you expect that significant effect to be more significant in the class period absent a conspiracy?
A. It's hard to imagine it would be more significant. It is highly significant. It is significant at the 99 percent level of confidence. No. I wouldn't expect it to be more.
Q. So you wouldn't expect that as fuel prices

Page 223

rose that rail rates would rise proportionately higher during the class period absent the conspiracy?
A. I certainly would. And that's what the model says.
Q. Now, you took issue with some data analysis that Dr. Willig did to demonstrate or support the notion of trade-offs between fuel surcharges and base rates.
And I'll refer your attention specifically to page 63 of your report?
A. Yes.
Q. Okay. And you say here that there was no systematic base rate decrease in sectors likely to have been more sensitive to non-rail competition such as the intermodal sector.
Do you see that at the top of page 63?
Do you see that, Dr. Rausser?
A. At the top of page 63, yes.
Q. And my question is why that is significant.
A. Why that is -- what's the that.
Q. What importance are you placing on your

Page 224

conclusion that there isn't systematic base rate decreases in intermodal sector?
A. That all of the evidence, the discovery record evidence and independent academic peer-reviewed studies have certainly isolated that as one instance with regard to the services offered by railroads that would be expected to have greater responsiveness than, for example, coal shipments.
Q. Greater responsiveness to what?
A. To competition.
Q. Okay. And the reason being that trucks are highly competitive in the intermodal sector?
A. They're potentially competitive.
Q. What was happening to truck prices during this time period, the class period?
A. That prices for truck transport services during which period. You say this period.
Q. The class period?
A. The class period.
That generally there was an upward trend in those prices.
Q. Okay. Now, you take on Dr. Willig's

**Errata Sheet for the Deposition of Gordon Rausser, Ph.D., taken on September 24, 2010**
*In Re: Rail Freight Fuel Surcharge Antitrust Litigation*
Case No. 1:07-mc-00489-PLF

| Page : Line | Correction | Reason |
|---|---|---|
| 30 : 12 | Remove "are." | Mistranscribed. |
| 210 : 3 | Replace "multi-varied" with "mutivariate." | Mistranscribed. |
| 211 : 16 | Replace "competent" with "statistically confident." | Mistranscribed/Clarification. |
| 237 : 11 | Replace "common factor regression model" with "damage regression model." | Clarification. |
| 241 : 6 | Replace "nigh" with "my." | Mistranscribed. |

Signature: Gordon Rausser
Gordon C. Rausser Ph.D.

Date: October 21, 2010

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - X

In re: RAIL FREIGHT FUEL : MDL DOCKET
SURCHARGE ANTITRUST : No. 1869
LITIGATION : Misc. No.
- - - - - - - - - - - - - - -: 07-489(PLF)

Chattanooga, Tennessee
Wednesday, May 5, 2010

HIGHLY CONFIDENTIAL

Videotaped 30(b)(6) deposition of MICHAEL GILLEY, called for examination by counsel for Defendants in the above-entitled matter, pursuant to notice, the witness being sworn by MARILYN MORGAN, a Notary public in and for the State of Tennessee, taken at the offices of Husch, Blackwell & Sanders, Dome Building, 736 Georgia Avenue, Suite 300, Chattanooga, Tennessee, at 8:39 a.m. on Wednesday, May 5, 2010, and the proceedings being taken down by Stenotype by Marilyn Morgan, Tennessee Certified Court Reporter, and transcribed under her direction.



APPEARANCES:
On behalf of the Plaintiffs:
STEPHEN R. NEUWIRTH, ESQ.
SAMI H. RASHID, ESQ.
AMOS E. FRIEDLAND, ESQ.
Quinn, Emanuel, Urquhart, Oliver, Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7165
and
PAUL M. DONOVAN, ESQ.
LaRoe, Winn, Moerman & Doovan
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036

On behalf of the Witness:
GREGORY LEITNER, ESQ.
Husch, Blackwell & Sanders
736 Georgia Avenue
Suite 300
Chattanooga, TN 37402
(423) 755-2650



APPEARANCES (continued)
On behalf of the Defendant CSX Transportation, Inc.
SHARI ROSS LAHLOU, ESQ.
DAVID K. OSEI, ESQ.
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2679

On behalf of the Defendant Norfolk Southern:
SEAN M. TEPE, ESQ.
Skadden, Arps, Slate, Meagher & Flom
Four Times Square
New York, New York 10036
(212) 735-2718

On behalf of the Defendant BNSF:
KRISTEN M. SMITH, ESQ.
Thompson & Knight
801 Cherry Street, Unit #1
Burnett Plaza, Suite 1600
Fort Worth, TX 76102
(817) 347-1731



APPEARANCES (continued)
On behalf of the Defendant Union Pacific:
GRANT MANDSAGER, ESQ.
Howrey
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-7014

foundation.
Q. (By Ms. Lahlou) From your perspective.
MR. NEUWIRTH: Objection: Lack of foundation.
A. From the period that we have talked about, '03 to '07, the rates did, in fact, go up as well as down.
Q. (By Ms. Lahlou) And railroads obviously use fuel; right?
A. Yes.
Q. So -- and they pay for fuel?
A. Yes.
Q. And so it's a cost to them?
A. Uh-huh.
Q. And my question is, did Olin have any objection with the railroads instituting a mechanism to recoup the cost of fuel during the 2003 to 2008 time period?
MR. NEUWIRTH: Object to the form of the question.
A. I'm sorry?
MR. NEUWIRTH: I just objected to the form of the question. You can answer if you understand it.
Q. (By Ms. Lahlou) You may answer.



A. Repeat it, please.
MS. LAHLOU: Could you read it back?
(Question read by the court reporter.)
A. What we objected to was the lack of transparency around the actual cost of it and the manner in which they were rolling it into our base freight rate. And, again, assuming that is revenue for the railroad as opposed to far and above what the actual cost could have been.
Q. (By Ms. Lahlou) If it were the case that the railroads only charged you precisely their fuel costs for Olin movements during the 2003 to 2008 time period, Olin would not have objected to that?
MR. NEUWIRTH: Objection: Lack of foundation, calls for speculation.
A. It's a commercial negotiation. And if it truly is a negotiation, we would talk about all the elements associated with that negotiation.
Q. (By Ms. Lahlou) Okay. In fact, you were paying fuel surcharges during that period, 2003 to 2008, to other carriers as well; right?
A. Yes.



Q. [redacted]
A. Yes.
Q. Were you paying them to other service providers?
A. Not to my knowledge, no.
Q. Do you ever order pizza?
A. Yes.
Q. At your home?
A. Yes.
Q. Were you ever charged a fuel surcharge on pizza delivery?
A. I paid for a pizza. I don't know the negotiation that went on between the driver and the deliverer.
Q. You just paid to get your food. Fair enough.
If the railroads had during this time period, 2003 to 2008, been charging a mileage-based fuel surcharge, would Olin have joined this lawsuit?
MR. NEUWIRTH: Objection: Lack of foundation, calls for speculation.



A. Impossible to say.
Q. (By Ms. Lahlou) What was Olin's primary objection to the fuel surcharges that it was charged by the railroads in the 2003 to 2008 period?
MR. NEUWIRTH: Objection to form and objection to the extent it was already asked and answered.
A. I think I did answer this.
Q. (By Ms. Lahlou) Can you remind me what your answer was?
MR. NEUWIRTH: The way to do that is by just asking the court reporter to read it back.
MS. LAHLOU: I doubt she'll be able to find it.
Q. (By Ms. Lahlou) Mr. Gilley, if you would indulge me, please.
A. Would you repeat the question, please?
Q. Sure. What was Olin's primary objection to the fuel surcharges that the railroads charged in the 2003 to 2008 time period?
A. I think I have answered. I think the objections were the fact that it was uniform.

It was forced upon us with no -- no negotiation. It was done at the same time. The rate was non-representative of the actual cost of fuel. And it was put into the direct freight rate of our business where it was totally untransparent and had, at some point, become totally disassociated with the cost of fuel.

Q. When you say it was put into the freight rate of your business, what railroads do you believe did that?

A. CSX and Norfolk Southern.

Q. What is the basis for that answer?

A. Because I personally experienced at least the net result, or listened to people who worked for me describe situations where, in fact, when the formula got reclicked, there was a meeting where they would just come in and tell them that the formula had been reclicked to a different rate. And that, oh, by the way, your new set point is $64. And all of that difference between there and the former set point was rolled into the freight rate. And, oh, by the way, if it exceeded that, it would be a certain percent surcharge.



So, in effect, what it did is it added a substantial amount just to our freight bill and then began to reclick again, totally devoid of any apparent attachment to the cost of fuel.

In fact, during that period, I believe the fuel -- actual fuel went down in price, but yet we were still paying that accelerated rate built into our freight rate.

Q. And so if you have a cost recovery mechanism that's actually built in the base rate, it doesn't have the flexibility to react as the costs go up or down; is that right?

A. It's a false representation. You don't know what you're paying.

Q. But the base rate, unless and until it's renegotiated, doesn't actually change as the costs change; right?

A. I'm sorry. Again, not to be flippant, I wouldn't call it a negotiation because we were told what the rate would be. And we attempted to talk about it, and we could get no dialogue back and forth on that.

Q. Okay.

A. I'm sorry. I feel like I missed your



question.

Q. Just my question is, if I understand your testimony correctly, you're saying at some point some part of the fuel surcharge was incorporated into the base rate. Is that a fair understanding of your testimony?

A. Yes.

Q. Okay. And what I further understood your testimony to be, but I want to confirm, is that that was problematic in your view because, if the cost of fuel came down, as it did -- if I again understood your testimony correctly -- you weren't given any break, if you will, because it was already cooked into your base rate?

A. It wasn't that we weren't given a break; again, we would be told. We would either get a phone call or a visit from a representative that would tell us what our new formula is, despite what the contract said, and that they would reset and reclick the rate.

Again, I'm not sure I'm answering your question.

Q. All I'm asking is, when it's incorporated into the base rate, it doesn't



move up and down with the cost of fuel; is that right?

MR. NEUWIRTH: Objection: Lack of foundation.

A. It would be built into your freight rate as a cost in your business unrelated to the actual cost.

Q. (By Ms. Lahlou) Okay. And if I understood your testimony correctly, you're saying that there was no visibility into that process, so you wouldn't necessarily know if it was put into your base rate or not?

A. No. We were told it was put in our base rate.

Q. Olin was?

A. Yes.

Q. By whom?

A. Norfolk Southern and CSX.

Q. And it's your testimony that CSX did that as well?

A. Yes.

Q. Do you recall when that was?

A. The period 2003, as we would renegotiate the contract and the RCAF disappeared.

And as you pointed out earlier, when the price of fuel started going up, again, we would just receive phone calls to say, I know what it says but here's your new rate, from the two railroads.
Q. When you say "new rate," are you referring again to the base rate or to the fuel surcharge rate?
A. To the fuel surcharge rate, and the threshold that would be in that rate and any surcharge that would go on top of that.
And there was a point where you would ask for a rate, and they would just give you a percent that your fuel surcharge would be.
Q. Okay. So they would say, just simple math, your rate for this movement of this commodity from Point A to Point B is a hundred dollars plus 5 percent fuel surcharge? Is that what you're referring to?
A. Yes.
Q. Something like that?
A. But it was a number more like 10 to 20 percent.
Q. Okay. During what time period did that occur?



A. 2003 to 2007.
Q. And how is that different in your view than what happened prior to 2003?
MR. NEUWIRTH: Objection: Asked and answered.
A. I'm sorry. Say that again.
Q. (By Ms. Lahlou) How was the fact that you were given a percent of what the fuel surcharge would be in 2003 to 2007 different than what occurred in 2000 to 2003?
MR. NEUWIRTH: Objection: Asked and answered.
A. Yes. I believe I've answered.
MR. NEUWIRTH: This is 4, right?
MS. LAHLOU: 5.
(Exhibit 5 was marked.)
Q. (By Ms. Lahlou) Mr. Gilley, I'm handing you Exhibit 5. And if you could, again, just take your time to look at that and let me know when you're done.
A. Okay.
Q. What is Exhibit 5?
A. [redacted],
[redacted]



Q. And do you see on the second page of Exhibit 5 the fuel surcharge provision?
A. Yes.
Q. Have you had a chance to review that?
A. Yes.
Q. And does that help refresh -- on the cover page of Exhibit 5, what is the effective date of this contract?
A. July of '04.
Q. And having now reviewed Exhibit 5, including the fuel surcharge provision, does that help refresh your recollection as to the nature of the fuel surcharge that Norfolk Southern assessed on Olin with respect to the movements outlined on Exhibit 5 during this time period?
A. Yes.
Q. Is that the same type of fuel surcharge that Norfolk Southern had assessed on Olin with respect to the lease on movements prior to 2004?
MR. NEUWIRTH: Objection: Calls for the witness to opine about how this contract compares to previous contracts.
If you're just asking him generally,



there's not a problem. If you're asking him what this contract says, we object.
Q. (By Ms. Lahlou) To avoid any ambiguity, I'm asking whether, based on your review of Exhibit 5, the fuel surcharge provision that's reflected in Exhibit 5 is consistent with the kinds of fuel surcharges that Norfolk Southern generally, at least with respect to some movements, assessed on Olin prior to 2004.
A. It appears to be similar, this one obviously representing 2004.
MS. LAHLOU: Could we take like a five-minute break?
MR. NEUWIRTH: Uh-huh.
THE WITNESS: Yes.
VIDEOGRAPHER: The time is 2:11 p.m. We're temporarily going off the record.
(A break was taken.)
MR. NEUWIRTH: I just wanted to let you know that I'm turning the microphone over to Mr. Rashid, Sami Rashid. So from this point forward, the objections are going to come from him not from me, if there are any objections for the rest of the day.

Page 233

MR. RASHID: Objection to form. Objection: Compound question. And objection to the extent it calls for a legal conclusion.
You can answer to the extent it doesn't --
Q. (By Ms. Lahlou) I'm just trying to understand Olin's relationship with NS with respect to this issue.
A. I think that it had developed over time in that relationship. And rather than renegotiate a whole new contract, they would do an amendment and attach it to it.
Q. Is it fair to say that SOU541 was one of the main contracts that addressed the relationship between Olin and Norfolk Southern?
MR. RASHID: Objection to form.
A. It would be a major contract or a big part of the business. However, there were a whole series of contract negotiations that went on in this sort of time frame and longer that realigned or restructured all of that.
Q. (By Ms. Lahlou) Okay. When you say "all of that," are you referring specifically to what's covered by SOU541?

Page 234

A. Our freight with Norfolk Southern, yes.
Q. Just generally, you mean?
A. Yes.
Q. And Exhibit 8 is an e-mail from Alan Julian; is that right? Who is that?
A. Sales manager for Norfolk Southern.
Q. To Steve Bahn?
A. Yes.
Q. That's the same Steve Bahn that you testified about earlier?
A. Yes.
Q. And as I understand it from this e-mail, Mr. Julian is relaying that Norfolk Southern made an offer to -- I'm sorry, Mr. Julian is from Norfolk Southern. Pardon me. Is that your understanding as well?
A. I'm sorry?
Q. That Mr. Julian is from Norfolk Southern?
A. Yes.
Q. Okay. I'm sorry. That Norfolk Southern was offering Olin a three-year term for the renewal of SOU541. Do you see that?
MR. RASHID: Objection to the form; assumes facts not in evidence; and to the

Page 235

extent it calls for a legal conclusion.
You can answer.
Q. (By Ms. Lahlou) Do you see that in Exhibit 8?
MR. RASHID: Same objection.
A. Can you clarify, please?
Q. (By Ms. Lahlou) I'm just asking whether it's your understanding that Norfolk Southern in August of 2004 offered to renew SOU541 for a three-year term?
MR. RASHID: Same objection.
A. There are always discussions that go on during the contract opening period. And we will have discussions at a manager level or what have you, as this seems to indicate.
This looks like a discussion that went on between Alan Julian at NS and Steve Bahn at Olin discussing an option as to how to deal with that contract.
Q. (By Ms. Lahlou) From Olin's perspective, would it prefer to have longer or shorter-term contracts with railroads?
A. It depends.
Q. What does it depend on?
A. The economy our business, your freight

Page 236

rate behavior.
Q. How does the economy affect Olin's view on whether a short-term or long-term contract is more advantageous to it?
A. I talked earlier this morning about our business, and we've made these appeals to the railroads.
Ours is very much a cyclical business. And if you fix a freight rate and don't change that freight rate, then if our business has taken a nose dive, then that's basically a tax we're going to keep paying until that cycle terms back around.
That's an extreme volatility in the Chlor Alkali industry. And the cycles have been seven years in length historically. They've reduced to five years. They've reduced to three years. Today, they're sort of ill defined.
So there's lots of volatility to our business, is my point, which limits our vision and changes our vision on what is a good contract term.
Q. Is it the case that when there's more volatility, that shorter-term contracts are

Page 237

generally more advantageous?
MR. RASHID: Object to the form of the question.
A. Generally, a longer-term contract is better depending on the conditions of that contract. The first CSX contract --
Q. If you have a good rate?
A. Exactly. If you have a good rate, it's a good contract.
Q. Right. Right. Okay. And Mr. Julian is indicating in this e-mail that Norfolk Southern is willing to offer the three-year renewal with [redacted] And that with respect to fuel surcharges, that Norfolk Southern would be willing to offer a [redacted] in lieu of the fuel surcharge.
Do you see that?
MR. RASHID: Objection to form.
A. Yes.
Q. (By Ms. Lahlou) Is that consistent with the negotiation that Olin had with Norfolk Southern during this time period of August 2004?
MR. RASHID: Objection to the form.

Page 238

You can answer.
A. As I said earlier, I think this was a discussion that went on between the two individuals. They made that known to, I believe, Kirk Steely and to myself.
But to my knowledge, it was never brought to Olin at a senior level as a serious consideration.
Q. (By Ms. Lahlou) But it was certainly brought to Mr. Bahn's attention; is that right?
A. Yes.
Q. I believe you testified earlier that Mr. Bahn had responsibility for negotiating transportation services for Olin?
MR. RASHID: Objection to form.
Q. (By Ms. Lahlou) Is that right?
A. He has the same -- roughly the same authority as a marketing representative in the railroad. They all come with limitations, grants of authorities, etc.
Q. But he certainly was aware of this offer?
A. Yes.
Q. Did Olin accept or reject this offer? By "this offer," just to clarify, I'm referring

Page 239

to Norfolk Southern's offer to charge a [redacted] in lieu of a fuel surcharge?
MR. RASHID: Object to the form and lack of foundation.
You can answer.
A. We discussed the issue, the nature of the offer, his decision to not do it.
Q. (By Ms. Lahlou) What was that decision based on?
A. The fact that it was at that point a discussion between the two, and it hadn't come in a more formal or higher level in the organization. And, frankly, it was -- it's a gamble.
Q. How is it a gamble?
A. You're going to build this into your rate from now on and compound your rate forever.
Q. So if fuel prices were to precipitously drop, then you wouldn't get the benefit of the falling fuel prices; is that right?
MR. RASHID: Object to the form.
A. This would have been in your freight rate in perpetuity.

Page 240

Q. (By Ms. Lahlou) Whereas, the fuel surcharge moves with the volatility of the price of fuel; is that right?
MR. RASHID: Objection: Asked and answered.
A. It used to.
Q. (By Ms. Lahlou) You testified earlier about Olin's concern that, in its view, the fuel surcharges being charged by the railroads didn't accurately reflect the fuel costs. Is that a fair characterization of your testimony?
A. Yes.
Q. In Olin's view, was there a way that the railroads could have recouped their fuel costs more accurately?
MR. RASHID: Objection to the form; assumes facts not in evidence.
A. Can you help me with your question, please?
Q. (By Ms. Lahlou) I was just asking whether Olin had a position on a different method by which the railroads would be able to recoup their fuel costs more accurately?
A. We would never propose adding to our cost. We didn't see it as our burden to

A. Yes.
Q. Okay. If you look starting in April, the row listed for April, it looks like Olin's calculation was [redacted] and CSX's fuel surcharge is assessed at [redacted] Do you see that?
A. I see that. I also see the one that says 47 versus 83.
Q. So, again, in some instances, what Olin was charging according to this chart was more than the fuel surcharge that the railroads charge in some instances, it was less?
A. Yes.
Q. So there wasn't a precise method to pass on the exact cost that Olin incurred with respect to the fuel surcharges?
MR. RASHID: Objection to form.
You can answer.
A. Restate the question if you would, please.
Q. (By Ms. Lahlou) Olin wasn't charging its customers a fuel surcharge that reflected the precise cost that Olin incurred with respect to fuel surcharges?
MR. RASHID: Objection to form; assumes facts not in evidence.



You can answer.
A. I don't know the basis -- if I could try it this way: The basis of this calculated column are the -- the actual column. I don't know the basis of the calculation. I would guess they could have used a rolling average to calculate the number.
Q. (By Ms. Lahlou) Uh-huh.
A. I don't know. It could also have been a function of negotiations with a customer. I mean, it's possible that a customer would say, I'll take fuel surcharge and not take a rate increase.
Or we also had many customers that would say, I'm not paying anything, and didn't pay anything.
Q. With respect to a fuel surcharge?
A. Yes.
MS. LAHLOU: Okay. And I'll just ask your lawyer, I have a few other documents that address Olin's fuel surcharge. And in the interest of everybody's time, I just want to confirm that you would make the same objections to my eliciting testimony from Mr. Gilley with respect to the fuel



surcharge that Olin would charge.
MR. RASHID: I mean, I think the last few questions you've asked, we haven't objected to, and they've been answered. So if you want to ask questions along those lines, you're free to do so.
MS. LAHLOU: Okay.
(Exhibit 11 was marked.)
Q. (By Ms. Lahlou) Mr. Gilley, the court reporter has just handed you what's been marked as Exhibit 11. If you can take a moment to look at that, and let me know when you're ready, please.
A. Okay.
Q. Exhibit 11 is dated August 17th, 2004. Do you see that?
A. Yes.
Q. And this appears to be another letter from Mr. Casteel to customers with regard to the subject of fuel costs and fuel surcharges; is that fair?
MR. RASHID: Objection to form.
You can answer.
A. It appears to be a letter -- I mean, he signed it. I don't know. I couldn't tell you



precisely who it went to. But yes, it appears that we're advising customers of a fuel surcharge.
Q. (By Ms. Lahlou) Okay. And Mr. Casteel is indicating in this letter that's dated August 17, 2004, that world and U.S. energy prices including oil have continued to increase dramatically. Do you see that?
A. Yes.
Q. Is that consistent with your understanding as to what was happening during this time frame?
MR. RASHID: Objection to form.
You can answer.
A. What was happening in this period was us attempting to recoup charges that we were getting from carriers.
Q. (By Ms. Lahlou) Okay.
A. The conditions and the ability frankly was not a very successful effort on our part to collect these charges. In fact, we had customers that would refuse to pay and did not pay. I'll leave it at that.
Q. Okay. But it was Olin's intent to have all of its customers pay the fuel surcharge?

MR. RASHID: Objection to the form. I'm going to instruct the witness not to answer.
MS. LAHLOU: On what basis?
MR. RASHID: The same one we've been talking about.
MS. LAHLOU: Okay.
Q. (By Ms. Lahlou) And I assume you're accepting your counsel's instruction?
A. Yes.
Q. Do you see the second line in Exhibit 17 [sic] where Mr. Casteel is relaying that Olin's logistics carriers have imposed significant increased fuel surcharges as a result of this market condition?
A. I do, yes.
Q. Is it your understanding that his reference to logistics carriers includes trucks and barges as well as rail cars?
A. Yes, as he outlines below.
Q. Okay. And so Olin's fuel surcharge costs from all of its transportation providers were escalating during this time period; is that fair?
A. We were seeing the cost go up, yes.



Q. Okay. And Olin undertook efforts to recoup that cost where it could?
A. Our costs were going up, as we've talked about all through the day. We did attempt to recoup some, but the business model we have prevents us from being successful at that.
This letter here indicates the charge. We attempted to make charge. But some of the people frankly that you're charging this to were competing with caustic coming from Europe and from South America and from China ending in the Gulf of Mexico, Savannah port.
And your ability to pass a fuel surcharge on to them, they'll look at you and laugh, when they can turn around and say, I can buy a barge from Germany or wherever and it doesn't have a fuel surcharge on it.
Point being we were less than successful at this. As we had done in the past, we had to eat the fuel costs.
Q. So there were instances in which to maintain the business you wouldn't assess a fuel surcharge?
A. There were not only instances. We also



know that we were at a less than competitive position because we had no other way to subsidize our business. Other competitors do and did.
Q. I'm not sure I understand what you mean by that.
A. One of our competitors is in the petroleum business. If the petroleum business is doing exceedingly well, they can take a lot of fuel surcharges in the Chlor Alkali business and just throw them away like they're loose dollars.
Q. The diversity of the business?
A. The petroleum business will subsidize the chemical business.
Q. I see what you're saying. But for Olin, its margins were much more affected by the rising cost of fuel surcharges; is that fair?
MR. RASHID: Objection to the form. You can answer.
A. Say again. I'm sorry.
Q. (By Ms. Lahlou) I said, Olin -- if I understood your testimony correctly, Olin's margins were more impacted by the rising cost



of fuel surcharges than at least the competitor that you were just referring to. Is that fair?
A. We've testified or I have about that today. It's the issue of the fact that the fuel surcharges in our view got rolled into our base rates, making us less competitive. And the fact that it was done at the same time, reset, put into the base freight rate, and then reset again.
So it just continued to pyramid our noncompetitive position.
Q. Which competitor were you just referring to in your testimony?
A. Am I allowed to say?
Q. Sure.
A. [redacted]
Q. It's your understanding that [redacted] uses rail carriers to ship its products as well?
A. Yes.
Q. An[redacted]?
A. Yes.
(Exhibit 12 was marked.)
Q. (By Ms. Lahlou) Mr. Gilley, you've

Page 281

before then?
A. Frank Crumble.
Q. And during what time period was Mr. Crumble responsible for it?
A. Again, guessing, somewhere between June of '07, July of '07, August, somewhere in there, to whenever Chris took it.
Q. Okay. And prior to Mr. Crumble, who had that responsibility?
A. I did.
Q. Okay. And then that changed when you -- the nature of your position changed to just having human resources functions; is that fair?
A. That was a piece of it. The other part of it was supply chain. We put procurement as well as logistics together.
Q. Okay. And so those are all under Chris Cusick's umbrella today?
A. Yes.
Q. You testified earlier -- we've talked a lot today about the Chlor Alkali products that have been shipped by rail as well as other modes.
And Olin also produces ammunition, I

Page 282

believe, you testified earlier; is that correct?
A. Correct.
Q. Olin does use transportation services to ship ammunition as well?
A. Correct.
Q. Does Olin use rail to ship ammunition?
A. I think I testified earlier that we use truck, and it's predominantly less than truckload because of the nature of the quantity of delivery. Or it's customer pickup.
We only negotiate with the LTL driver, as I understand. And then the truck decides or negotiates with the railroad if there's a subsequent rail delivery.
Q. Okay. So with respect to ammunition, Olin doesn't procure or pay for rail transportation?
A. That is my understanding, yes.
MS. LAHLOU: I want to mark this, please.
(Exhibit 14 was marked.)
Q. (By Ms. Lahlou) Mr. Gilley, I'm going to show you what's been marked as Exhibit 14. If you could, take a gander through that and

Page 283

let me know when you're ready, please.
A. Okay.
Q. Okay. What is Exhibit 14?
A. It's a fairly high-level summary, it appears, for the entire freight cost issue for either a strategy presentation or for a senior management discussion.
Q. Okay. Have you seen Exhibit 14 before?
A. Yes.
Q. When have you seen Exhibit 14?
A. I've seen it in the last three or four weeks. I may have actually helped prepare part of it.
Q. That was my next question, whether you participated in preparing it.
A. Yes.
Q. Actually, do you know what the date or approximate date of Exhibit 14 is?
A. No. It would be a guess.
Q. Uh-huh. What's your guess?
A. It would be inaccurate. It shows '06 budget. So we generally do budgeting by August of the previous year, but we don't know conclusions until December.
So it could be anywhere from, say,

Page 284

August or September of '05 through early '06.
Q. And if I could refer your attention to page 6, Bates 992, of Exhibit 14.
A. 992?
Q. Yes, sir. It's page 6.
A. Okay.
Q. And in that slide under Norfolk Southern, it says, In June of 2006, Norfolk Southern unilaterally modified its fuel surcharges.
Do you see that?
A. Yes.
Q. So this presentation would have been prepared sometime after June of 2006?
A. I would assume so, yes.
Q. And that would have been a time in which you had logistics responsibilities?
A. Yes.
Q. Okay. Turning your attention to the second page of Exhibit 14 --
A. Second page?
Q. Yes, sir. Bates 988.
A. Okay.
Q. The slide here is entitled, Freight HAZMAT shipping trends. And you see the first

bullet there, it says, Distribution increase of [redacted] primarily due to higher railcar requirements resulting from expansions and increasing transit times.

What is that referring to?

A. That's referring to the service issues. And there was probably new business, which is the expansions piece. And also the transit times is the increased timing, turnaround time that we saw on our railcars. It was taking longer. Hold times had gone up in rail yards, etc.

Q. What was your understanding for the reason that transit times on railcars were increasing during this period?

MR. RASHID: Object to the form.

A. It's hard to say. I mean, you would hear things from the railroad about they didn't have enough locomotives, enough employees, trackage, that sort of thing.

Q. (By Ms. Lahlou) Did you hear some other things from the motor carriers that you dealt with?

A. Certainly not to the extent -- I mean, there was a period for a long time where truck



drivers were short.

Q. And so during the '05, '06, '07 time frame, there were certain capacity issues in the transportation market?

MR. RASHID: Object to the form.

A. Please help.

MS. LAHLOU: Could you read the question back, please?

(Question read by the court reporter.)

MR. RASHID: Objection to form.

A. There were transportation issues, certainly, that some affected business more than others affected. Yes.

Q. (By Ms. Lahlou) Okay. So capacity constraints would affect some parts of the business more so than other parts of the business?

MR. RASHID: Object to the form.

Q. (By Ms. Lahlou) Is that fair?

A. Let me think about that a second. Could you be more specific?

Q. Actually, I thought I was just restating your testimony that capacity constraints in the transportation market during the '05 to '07 time frame would affect some



parts of the business more than other parts of the business.

MR. RASHID: Objection to the form. Objection: Assumes facts not in evidence.

Q. (By Ms. Lahlou) Is that your understanding?

A. There were rail performance issues, yes, that would be related to us as the items that I mentioned before. Yes.

Q. (By Ms. Lahlou) Being certain capacity constraints?

MR. RASHID: Objection to form.

A. Again, no locomotive -- not enough locomotive carriage and so forth, yes.

Q. (By Ms. Lahlou) In the second bullet of that same page 2 of Exhibit 14, it says, Freight increase due to fuel surcharges and aggressive market pricing by captive railroads particularly on TIH chemicals.

What is that referring to?

A. It was attempting to express the whole series of issues. This entire presentation was trying to capsulize all of the issues that we were being affected with on a compound basis.

Listening to arguments from railroads,



listening to the fuel issue, the freight rate issue, all of those, contract lents, all in effect culminating in the kind of prices or costs that we indicate here.

Q. And this presentation isn't limited just to railroads, is it?

A. No.

Q. It's all transportation services?

A. Yes.

Q. Okay. If you look at the third page of that exhibit, Bates 989, at the slide entitled "fuel surcharge application," the first bullet states, With very few exceptions, all carriers for all shipping modes apply a fuel cost recovery methodology to the freight bills referred to as a fuel surcharge.

Is that reflecting what I believe to be your earlier testimony that Olin was being assessed a fuel surcharge by all modes of transportation that it employed to ship its products?

MR. RASHID: Objection to form.

You can answer.

A. As it says, with few exceptions.

Q. (By Ms. Lahlou) Okay. And is it your

Alderson®
COURT REPORTING

PAGE ___ of ___

Notice Date: May 10, 2010
Case Name: In re Rail Freight Fuel Surcharge Antitrust Litigation
Deponent: Michael Gilley
Deposition Date: 05/05/2010
Reference Number: 21699

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 2 | 12 | Doovan | Donovan | spelling |
| 11 | 1 | eitLahlouxhibil | Exhibit | spelling |
| 24 | 13, 14, 17 | Hugh | Huh | spelling |
| 25 | 8, 13, 19 | Hugh | Huh | spelling |
| 26 | 13, 15 | Hugh | Huh | spelling |
| 29 | 5 | orifice | artifice | misunderstood word |
| 115 | 13 | suggestion | objection | misunderstood word |
| 164 | 5, 6, 10 | Hugh | Huh | spelling |
| 267 | 15 | charges | charging | misunderstood word |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Michael D. Gilley
Signature of Deponent

6/17/10
Date of Signature

1155 Connecticut Avenue NW, Suite 200
Washington, DC 20036

P 202.289.2260
F 202.289.2221

800 FOR DEPO (367.3376)
ALDERSONREPORTING.COM

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

Michael D. Gilley

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this 17th day of June, 2010, and executed the above certificate in my presence.

PEGGY A. DOVER STATE OF TENNESSEE NOTARY PUBLIC BRADLEY COUNTY

Peggy A Dover

NOTARY PUBLIC IN AND FOR

Bradley County

County Name

MY COMMISSION EXPIRES: March 18, 2014

From: Lecomte, Doug A MCIN
Sent: Tuesday, February 18, 2003 10:40:15 AM
To: MCIN Customer Support Team
Cc: Bolick, Gene CLEV; Mark Winstel (MarkWinstel); A. Mulkey (A.Mulkey); Gary Burrows (GaryBurrows)
Subject: FW: Surcharge letter & Chlorine Re-seal letter

Team - Please make a copy of the attached letters and have them handy in case your customers ask you questions. If you have any questions after reading them, please get with me.
Gene– Can you send out to each of the CST'S the method that was used to come to the surcharge. I believe that will be the first thing our customers will ask and each team member will need to understand this. I don't believe we want to transfer all the calls to Alan or Mary.
Doug
Doug

-----Original Message-----
From: Bolick, Gene CLEV
Sent: Tuesday, February 18, 2003 9:42 AM
To: Burrows, Gary CHAS; Lecomte, Doug A MCIN; Mulkey, Arthur AUGA; Winstel, Mark J NIAG
Subject: FW: Surcharge letter & Chlorine Re-seal letter

Guys,
These letters will go out to our customers this week. Please review them with your team so that they will be prepared to answer any questions that might come their way from customers.

Thanks,
Gene

-----Original Message-----
From: Osborne, Marvin CLEV
Sent: Tuesday, February 18, 2003 10:12 AM
To: Bolick, Gene CLEV
Subject: FW: Surcharge letter & Chlorine Re-seal letter

FYI

-----Original Message-----
From: Osborne, Marvin CLEV
Sent: Tuesday, February 18, 2003 9:48 AM
To: McLaurine, Olivia CHAS
Subject: Surcharge letter & Chlorine Re-seal letter

Olivia:

Attached are the two letters we discussed.

A) The surcharge letter needs to go to all of our customers.
B) The Chlorine Re-seal letter needs to go only to our chlorine and SO2 customers.

When you get them sent, please send a copy to each of the Marketing Directors, Account Managers, Gene Bolick, John Howard, Larry Casteel.

Thanks.

Marvin

<AUTODATE>

Dear Valued Customer,

The events of September 11 certainly have caused permanent changes for all of us. For those of us that handle certain hazardous chemicals, safeguarding our employees, communities and the environment against terrorist acts is a significant endeavor.

As part of that endeavor, Olin applies a seal to each outbound Chlorine and Sulfur Dioxide railcar so that, upon receipt, our customers can easily determine whether the cars were tampered with during transit. Olin provides a seal in the dome area of each chlorine and Sulfur Dioxide railcar so our customers can re-seal the cars before returning them to Olin. Use of the seal on returning cars safeguards our employees by assuring them that the cars have not been tampered with during the return trip.

Our inspection of returning Chlorine and Sulfur Dioxide railcars indicates that a significant number of these cars are being returned to Olin without application of the seal. Olin believes that use of the seal is an important safety measure and we strongly urge all our customers to apply the seal on cars before returning them to Olin.

Please contact your sales representative if you have questions about this important safety issue.

Sincerely,

Larry Casteel
V.P. Marketing & Sales
Olin Chlor Alkali Products

# Redacted in Full

# DA07526

V.P. Marketing and Sales
Olin Chlor Alkali Products

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

MDL Docket No. 1869

Misc. No. 07-489 (PLF)

-------------------------------x

In re: RAIL FREIGHT FUEL

SURCHARGE ANTITRUST LITIGATION

-------------------------------x

9:00 a.m.

July 8, 2010

Four Times Square

New York, New York

******HIGHLY CONFIDENTIAL*******

VIDEOTAPED DEPOSITION of AMANDA DAVIS testifying on behalf of Plaintiff OLIN Corporation, in the above entitled matter, taken pursuant to Notice, by Defendants, before Danielle Grant, a Professional Reporter and Notary Public of the State of New York.

---------------------------------------------------

DIGITAL EVIDENCE GROUP

1299 Pennsylvania AVe NW, Suite 1130E

Washington, DC 20004

(202) 232-0646

A P P E A R A N C E S:

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue - 22nd Floor
New York, New York 10010
BY: SAMI RASHID, ESQ.

- and -

LAROE, WINN, MOERMAN & DONOVAN
1250 cONNECTICUT Avenue NW
Washington, D.C. 20036
BY: PAUL M. DONOVAN, ESQ.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
BY: SEAN M. TEPE, ESQ.

-and-

MARISSA TROIANO, ESQ.

CROWELL & MORING LLP
Attorneys for Defendant CSX Transportation
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
BY: SHARI ROSS LAHLOU, ESQ.

A I do not recall.
Q Do you recall asking them for a justification?
A I do not recall.
Q You list here some of the impacts from a Rule 11 shipment, one is increase in the volume of invoices, right?
MR. RASHID: Objection; lack of foundation. Objection; form.
A Correct.
Q And one of the other bullets you wrote here is increase in number of rates maintained in SAP?
MR. RASHID: I'm just going to interpose the same objection for every sub-bullet you want to discuss, but go ahead.
A Correct.
Q And increase the number of freight bills processed?
A Correct.
Q So these Rule 11 shipments were

having some administrative impact on Olin, yes?

MR. RASHID: Objection to the form.

A Correct.

Q So even though there is -- even though there is this impact on Olin administratively, you don't recall asking the railroads why they wanted to have Rule 11 shipments?

A I do not recall.

Q But at the very least, they wanted it on these hazardous TIH shipments, right?

A Correct.

Q If you go back a couple of pages to slide No. 9, this slide is referring to rail fuel surcharges, right?

A Correct.

Q And it refers to how CSX is -- CSX contract rates would be subject to a mileage based fuel surcharge method as they renewed?

A That's what the document says.

Q Is this a document -- did you

prepare this slide?

A I do not recall if I put this together or not.

Q Norfolk Southern rates it says here: "Contract rates will be subject to the current fuel surcharge method, which is a percent of Line Hall."

That's what it says here, right?

A Correct.

Q Beneath the slide in what I believe is referred to as speaker notes, it states: "Method changes and different method choices makes it impossible to keep score."

Do you know what that's referring to?

A I can't speculate as that's not my statement, so I can't speculate for what somebody else's intent was on that comment.

Q Well, you said you don't recall creating this slide, are you now certain did you not create this slide?

A Well, you are assuming that the

same person created the slide and the statement at the bottom.

Q Okay. Well, the page then, did you create any part of this page?

A I do not recall. But I do know I didn't create this statement at the bottom.

Q Do you know who did?

A I do not.

Q What would be your interpretation of what that statement means?

MR. RASHID: Objection; calls for speculation. You can answer.

A I mean, I would take it to mean that you've got so many different methods to keep up with that, you know, you -- from a systems standpoint, trying to keep up with different contracts on different methods.

Q On different fuel surcharge methods?

A Different -- correct.

Q That creates a -- more administrative work; is that right?

MR. RASHID: Objection to form.

A Correct.

Q Did you ever discuss in your negotiations with railroads any concerns that you may have had regarding shipping hazardous materials?

MR. RASHID: Objection to form.

A Concerns that the railroads had? I mean, I've had many conversations with the railroad, and they have mentioned their concerns on hauling TIH.

Q Do you recall specifically what they've said?

A I do not recall.

Q Have they told you that their insurance costs were escalating as a result of shipping Olin products?

MR. RASHID: Objection to form.

A They have stated that their insurance costs have gone up, but however, we have never seen anything to -- to prove that.

Q So they haven't shown you their

insurance bills, essentially?
A No.
Q If you go -- have the railroads requested of Olin an indemnification for shipping Olin products?
MR. RASHID: Objection to form.
A What railroad are you referring to?
Q Well, first let's say, do you recall any railroads making that request?
A I mean, yeah, they do make requests to be indemnified of certain things.
Q Do you recall which railroads have made that request?
A We have indemnification clauses in -- in our contracts.
Q Have -- which -- which -- which railroads, do you recall, have these clauses?
A I can't speak for all railroads as I don't deal with all of the railroads, but the Norfolk Southern and the Union Pacific.
Q Have the railroads expressed to

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------X

In Re: Rail Freight Fuel :

Surcharge Antitrust Litigation,: Case No.

-------------------------------X 1:07-mc-00489-PLF

VIDEOTAPED DEPOSITION OF GORDON RAUSSER, PH.D.

Washington, D.C.

Thursday, June 3, 2010

9:08 A.M.

Reported by Marijane Simon, RDR, CLR

---------------------------------------------------

DIGITAL EVIDENCE GROUP
1299 Pennsylvania AVe NW, Suite 1130E
Washington, DC 20004
(202) 232-0646

Thursday, June 3, 2010

9:08 A.M.

Videotaped Deposition of GORDON RAUSSER, PH.D., held at the offices of Howrey LLP, 1299 Pennsylvania, Avenue, NW, Conference Room 2G, Washington, D.C., 20004, pursuant to notice, before Marijane Simon, a Registered Diplomate Reporter, Notary Public of the District of Columbia.

. . .

APPEARANCES:

For the Plaintiffs:

MICHAEL D. HAUSFELD, ESQ., and
SATHYA GOSSELIN, ESQ.
HAUSFELD LLP
1700 K Street, NW
Washington, DC 20006
(202) 540-7200
(202) 540-7201 (Fax)
mhausfeld@hausfeldllp.com
sgosselin@hausfeldllp.com

Also for the Plaintiffs:

STEPHEN R. NEUWIRTH, ESQ., and
RICHARD I. WERDER, JR., ESQ.
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
(212) 849-7111 (Fax)
stephenneuwirth@quinnemanuel.com
rickwerder@quinnemanuel.com

APPEARANCES (Continued):

Also for the Plaintiffs:

PAUL M. DONOVAN, ESQ.
LaROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue
Suite 200
Washington, DC 20036
(202) 298-8100
(202) 298-8200 (Fax)
paul.donovan@laroelaw.com

For Defendant UNION PACIFIC RAILROAD:

THOMAS A. ISAACSON, ESQ.
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
(202) 383-6558
(202) 383-6610 (Fax)
isaacsont@howrey.com

. . .

APPEARANCES (Continued):

For Defendant NORFOLK SOUTHERN RAILROAD:

SAUL P. MORGENSTERN, ESQ.
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
(212) 836-7210
(212) 836-6333 (Fax)
smorgenstern@kayescholer.com

For Defendant BNSF RAILWAY:

SAMUEL M. SIPE, JR., ESQ.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
(202) 429-6486
(202) 261-7542
ssipe@steptoe.com

. . .

APPEARANCES (Continued):

For Defendant CSX:

SHARI ROSS LAHLOU, ESQ., and
DAVID D. CROSS, ESQ.
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
(202) 624-2500
(202) 628-5116 (Fax)
slahlou@crowell.com
dcross@crowell.com

ALSO PRESENT:

Gareth Macartney, OnPoint Analytics
Robert Willig, Consultant for the defendants
Christa Laser, Summer Associate, Howrey
Billy Fahnert, Videographer, Digital Evidence Group

defendants were having one employee responsible for monitoring this conspiracy, two part-time or one employee -- is there any indication of the resources they were devoting to monitoring what -- whether their fellow alleged conspirators were doing?

A. Not specifically, no.

Q. So you're saying that the railroads are -- wasn't your exact word -- but brazen enough to perhaps keep conspiring after the STB decision, after the private lawsuits were filed, and after the New Jersey Attorney General started investigating them, but they can't get it together to conspire efficiently to avoid losing business to truck competition?

A. I'm sorry. I -- I don't understand your question. What -- You are -- That question, did that come from my prior testimony from other questions? Because I don't see the link between what I've already told you versus your testimony that you've just offered on the record. I don't understand.

Q. Okay. Am I correct that you have not

investigated the extent to which a but-for world would involve mileage-based rates in lieu of rate-based fuel surcharges -- Excuse me -- mileage-based fuel surcharges in lieu of rate-based fuel surcharges?

A. You are correct.

Q. Now -- Okay.

Is that because it's irrelevant to your analysis or because you just haven't done it yet?

A. Certainly, I haven't done it because I've already asked that question -- answered that question. That was your prior question.

With respect to the other part of your question; namely, whether it's relevant or not; I haven't thought about it before, so I'm thinking it through realtime. Ultimately, as we discussed earlier today, to the extent that a cost item that is a major part of their variable cost changes, you would expect in the but-for world for those costs to justify a change in the base rates or -- forget about the base rates -- the prices that are actually charged to the shippers. And, moreover, given that

the structure is an interdependent oligopoly, one could look to using mileage-based surcharges and/or simply changing the prices to reflect the change in the incremental cost associated with the fuel prices. Either way, yes, it could have some relevance.

Q. And the fact that there was some movement to mileage-based fuel surcharges after the STB decision on regulated traffic suggests that's a plausible but-for world for at least some portion of the class?

A. Yes, but that move -- movement was slow, and initially it was very immaterial. And then it began to pick up as you moved to the latter part of the period. And for some of the codefendants, it became a material proportion, more than 20 percent, but for a number of them, it was less than 20 percent.

Q. But on the regulated side of the business, the move to mileage-based fuel surcharges --

A. I'm not talking about that. I'm talking about the nonregulated.

Q. I understand.

A. I'm talking about the class. My analysis is focused on the class, not the nonclass.

Q. But the fact is that on the nonreg -- on the regulated side in response to a determination that rate -- rate-based fuel surcharges were unreasonable -- a substantial portion of the defendants' regulated traffic was switched to mileage-based fuel surcharges?

A. Yes.

Q. Okay. And that says something about the, sort of, feasibility of mileage-based fuel surcharges from the defendants' perspective as an alternative to rate-based fuel surcharges?

A. For regulated shipments --

Q. Right.

A. -- yes.

Q. But it takes certain administrative systems to set up fuel surcharges to work with the defendants' accounting systems and the customers' systems, and they were apparently able to make it work; right?

A. For the regulated shipments, and to a much smaller degree, for the nonregulated.

Q. And would you agree that mileage-based fuel surcharges have uneven effects among class members: Some do better under other things equal?

A. Relative to what?

Q. Relative to a rate-based fuel surcharge.

A. Let me see if I can restate your question a little different way. Are you suggesting that in a but-for world, some of the shippers are going to be better off than they are in the actual world?

Q. Ultimately, that's where I was going.

A. That's where I -- That's where I thought you were going.

Q. That's where we're always going.

A. I'm not going to take you there because it's wrong.

Q. Why?

A. It's wrong.

Q. I was just asking the question whether some shippers -- I -- Strike that.

Would you agree with the proposition that

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION,
This document relates to:
DIRECT PURCHASER CASES
______________________________/

MDL Docket No. 1869
Misc. No. 07-489(PLF)

-- HIGHLY CONFIDENTIAL --

VIDEOTAPED DEPOSITION OF GORDON RAUSSER, PH.D.
Volume 3

San Francisco, California

Thursday, July 31, 2014

REPORTED BY:

LESLIE ROCKWOOD, RPR, CSR 3462

Pages 548 - 832 Job No. SF003426

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION,
This document relates to:
DIRECT PURCHASER CASES
_____________________________/

MDL Docket No. 1869
Misc. No. 07-489(PLF)

-- HIGHLY CONFIDENTIAL --

Videotaped deposition of GORDON RAUSSER, PH.D., Volume 3, taken on behalf of the Defendants, at the offices of Latham & Watkins LLP, 505 Montgomery Street, 19th Floor, San Francisco, California, beginning at 10:04 A.M. and ending at 6:54 P.M. on Thursday, July 31, 2014, before Leslie Rockwood, RPR, Certified Shorthand Reporter No. 3462.

APPEARANCES:

FOR PLAINTIFFS:

QUINN EMANUEL URQUHART & SULLIVAN LLP

BY: RICHARD I. WERDER, JR., ESQ.

STEPHEN R. NEUWIRTH, ESQ.

KYLE R. TAYLOR, ESQ.

ALICIA COBB, ESQ.

51 Madison Avenue, 22nd Floor

New York, New York 10010

212.849.7000

rickwerder@quinnemanuel

stephenneuwirth@quinnemanuel

kyletaylor@quinnemanuel

aliciacobb.quinnemanuel

LaROE, WINN, MOERMAN & DONOVAN

BY: PAUL M. DONOVAN, ESQ.

1250 Connecticut Avenue, NW, Suite 200

Washington, DC 20036

202.298.8100

paul.donovan@laroelaw.com

APPEARANCES (Continued):

FOR PLAINTIFFS:

HAUSFELD LLP
BY: MICHAEL P. LEHMANN, ESQ.
44 Montgomery Street, Suite 3400
San Francisco, California 94104
415.633.1908
mlehmann@hausfeldllp.com

HAUSFELD LLP
BY: SETH R. GASSMAN, ESQ.
1700 K Street, NW, Suite 650
Washington, DC 20006
202.450.7175
sgassmann@hausfeldllp.com

APPEARANCES (Continued):

FOR DEFENDANT UNION PACIFIC RAILROAD:

LATHAM & WATKINS LLP
BY: DANIEL M. WALL, ESQ.
TIM O'MARA, ESQ.
CHRISTOPHER B. CAMPBELL, ESQ.
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
415.391.0600
dan.wall@lw.com
tim.omara@lw.com
christopher.campbell@lw.com

FOR DEFENDANT NORFOLK SOUTHERN RAILWAY:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: SEAN M. TEPE, ESQ.
TARA L. REINHART, ESQ.
1440 New York Avenue, NW
Washington, DC 20005
202.371.7106
sean.tepe@skadden.com
tara.reinhart@skadden.com

APPEARANCES (Continued):

FOR DEFENDANT BNSF RAILWAY COMPANY:

GIBSON, DUNN & CRUTCHER LLP
BY: JOSHUA H. SOVEN, ESQ.
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
202.955.8503
jsoven@gibsondunn.com

BY: VERONICA S. LEWIS, ESQ.
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201-6912
214.698.3320
vlewis@gibsondunn.com

FOR DEFENDANT CSX TRANSPORTATION:

CROWELL & MORING LLP
BY: DAVID CROSS, ESQ.
LUKE VAN HOUWELINGEN, ESQ.
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
202.624.2583
dcross@crowell.com
lvanhouwelingen@crowell.com

APPEARANCES (Continued):

Also Present:

Daniel J. Fletcher, Esq., Union Pacific Railroad

David M. Pryor, Esq., BNSF Railway Company

Joseph Kalt, Compass Lexecon

Gareth Macartney, OnPoint Analytics, Inc.

Jennifer McKay, Videographer

intermodal?
MR. WERDER: Objection. Beyond the scope of his work and report.
THE WITNESS: No.
Q. BY MR. SOVEN: So you haven't done it for intermodal, carload, ag, or coal; correct?
A. Not regard to elasticities, but with regard to generating the but-for prices, I certainly have.
Q. You're right. You've done that. But I'm asking at the moment, you haven't done that work by traffic type -- I'll do it again.
You haven't calculated the elasticity of freight rates with respect to fuel prices for specific types of traffic.
A. With regard to fuel prices?
Q. Correct.
A. No.
Q. You haven't done that one?
A. No.
Q. So you don't know what the range of the elasticity of freight rates with respect to fuel prices is across the different types of traffic the defendants carry?
MR. WERDER: Objection.
THE WITNESS: When you say I don't know, I

haven't estimated it so I don't know what the actual numbers are.

Q. BY MR. SOVEN: Right.

A. And I do know that with regard to accuracy and reliability, the only source that I have for doing that from the available data is the STB data.

Q. Would the STB data allow you to use your model to calculate the elasticity of freight rates with respect to fuel prices for intermodal traffic?

MR. WERDER: Asked and answered.

Q. BY MR. SOVEN: Accurately.

MR. WERDER: Asked and answered.

THE WITNESS: I don't know about the accurate part. I've already told you that. With respect to is it possible, yes, because you certainly can decompose the data and look at a different sensitivity or responsiveness of variable costs, and then if you, in fact, impose that there is a direct passthrough of variable costs to all-in rates which would not be supported by facts or empirical evidence, you could do so. But those are a number of big leaps that one would have to make to do so.

Q. BY MR. SOVEN: Right. So as of now, you've never calculated the elasticity of freight rates with respect to fuel prices for a specific type of traffic,

and you don't know whether you have the data to do it accurately; correct?

MR. WERDER: Objection.

Q. BY MR. SOVEN: Page 10.

A. Page 10 of the most recent report?

Q. Yeah. And this, I think, gets to a point you were just mentioning. Last sentence at the bottom, which carries over.

"Dr. Kalt's analysis presumes that defendants would be able to translate incremental fuel cost increases for percent inter-rate increases."

So let's start with some definitions. What are incremental fuel cost increases? Take your time to read it.

I don't mean to quibble, but do you need that notebook to answer that question?

A. Yes. Because I have a direct citation to that particular statement that you've just read into the record.

I'm sorry. And the question is?

Q. All I'm asking is -- and I think I know the answer -- I probably shouldn't have asked it -- what do you mean by "incremental fuel cost increases"?

A. What I mean by that is the marginal costs. That's the incremental -- at least with regard to the

contribution of fuel costs.

Q. Right. So it's the additional fuel expense that incurred, you know, at various times in the class period; right?

A. Yes. Or for any period.

Q. For any period.

A. It doesn't have to be the class period.

Q. All right. So --

A. And what I'm doing is citing evidence, certainly a -- a pure economic analysis would --

Q. Big, open-ended question is coming.

A. Okay.

Q. In your opinion, in the absence of the alleged conspiracy, would the defendant railroads have been able to pass through to their customers their incremental fuel cost increases on a percent -- on a percent-for-percent basis?

A. No, on the contrary. I have, in my class certification analysis, represented that the industry is at its core an interdependent oligopoly, and as a result, I wouldn't expect a direct passthrough. Instead I would expect a larger percentage change with regard to all-in rates to the extent that it's not perfectly competitive.

And I spent a lot of time looking at that question in terms of my initial class certification

report and once again in my reply report to Dr. Willig.

And in a perfectly competitive market, certainly I would expect your question to hold, namely, when you have a change in incremental cost. But now we're just talking about fuel costs. So --

Q. You're right.

A. So no, I wouldn't necessarily expect a one-to-one passthrough for fuel costs because it depends with regard to the elasticity of substitution with regard to other inputs. And I -- in my analysis, one of my analysis, with respect to the STB data inclusion, I have looked at and imposed a co-efficient, a parameter that presumes that there is a direct passthrough.

Q. Okay. But I'm asking something different.

A. What is it?

Q. Fuel prices went up during the class period; correct?

A. Yes.

Q. They went up by an order of magnitude of about 300 percent; correct?

MR. WERDER: Objection.

THE WITNESS: At their maximum point, early 2008? What are you --

Q. BY MR. SOVEN: Yeah.

A. Yeah. Okay.

Q. So in the absence of the alleged conspiracy, would the defendants have been able to recover those incremental fuel costs through higher prices to their customers?

A. Yes, and I've said just that many times on many occasions, and it goes to the question about fuel cost recovery.

Q. A hundred percent, they'd be able to do it?

A. No, I'm not saying it's a hundred percent. I'm saying that my model allows them to capture the full -- full cost -- fuel costs increases.

Q. Thank you. Different question. Forgot the model. All I'm asking is: During class period, in the absence of the alleged conspiracy, would they have been able to recover their higher fuel costs through higher prices entirely?

A. Entirely?

Q. Yes.

A. What do you mean -- I don't know what "entirely" means.

Q. If fuel costs go up by $100, would a railroad be able to raise its prices by $100 to recover the additional expense in the absence of the alleged conspiracy?

A. I don't know what that means, $100. We're

talking about a specific ton mile being moved, and that increases by $100 because of the fuel costs for that one ton mile?

Q. Assume fuel costs went up by $100 for the industry during the class period. Would the industry collectively have been able to raise prices by $100 to recover the incremental fuel expense?

MR. WERDER: Objection.

THE WITNESS: If you've got a direct match between the increase in fuel costs and that that led to an increase in variable costs, it depends. It depends on where were their all-in rates at the beginning of that process. What were the initial conditions? If they were already setting abnormally high prices, not necessarily, no.

Q. BY MR. SOVEN: Would the ability to recover the incremental fuel costs occur to the same degree for each shipper or would it vary by shipper?

MR. WERDER: Objection. Beyond the scope of his work and report.

THE WITNESS: Now you're asking me a question about price sensitivity and willingness to pay on part of the different shippers.

Q. BY MR. SOVEN: You're right.

A. We went into that set of issues with regard to

From: Crowe, Andrew
Sent: Mon May 15 08:06:19 2006
To: Heller, Jeffrey S.
Cc: Bolander, Jim A.; Tureman, Shawn I.; Luebbers, Chris D.; Nickerson, Ryan L.; Parker, Richard P.
Subject: RE: Fuel Surcharge for Intermodal
Importance: Normal
Attachments: NS Fuel Matrix.doc

Jeff: As info - here is the scale that we follow for domestic. It's only been released to a few customers.

Andy

---

**From:** Heller, Jeffrey S.
**Sent:** Sunday, May 14, 2006 9:47 PM
**To:** McClellan, Mike R.; Crowe, Andrew
**Cc:** Bolander, Jim A.; Tureman, Shawn I.; Luebbers, Chris D.
**Subject:** RE: Fuel Surcharge for Intermodal

Mike:

I am still of the belief that sticking with a little science and economics by using an index or formula gives us more credibility than just following a market level which we know(understand) is not applied to the majority. This is especially relevant since none of the fsc levels are public.

That having been said, I don't have a problem with transitioning over to the higher level for non-contract deals as long as we have a mechanism for taking the volatility out of this change. We will work on a formula and will advise. Jeff

-----Original Message-----
**From:** McClellan, Mike R.
**Sent:** Wednesday, May 10, 2006 4:39 PM
**To:** Crowe, Andrew
**Cc:** Bolander, Jim A.; Heller, Jeffrey S.; Tureman, Shawn I.; Luebbers, Chris D.
**Subject:** RE: Fuel Surcharge for Intermodal

Jim and Jeff,
Does it still make sense to have a separate Int'l and Domestic FSC level? I know originally they were different because the Int'l contracts had an RCAF in them, but should we be moving in a different direction here? How do the other railroads do it.

Andy, does the Domestic FSC apply to published (tariff) Int'l rates?

Mike.

---

**From:** Crowe, Andrew
**Sent:** Wednesday, May 10, 2006 12:03 PM
**To:** Legg Karen
**Cc:** McClellan, Mike R.; Bolander, Jim A.; Heller, Jeffrey S.; Tureman, Shawn I.; Luebbers, Chris D.; Sewell, Karen C.
**Subject:** RE: Fuel Surcharge for Intermodal

Karen: Per conversation, the fuel surcharge scales for Intermodal have not been made public. Attached are the historical percentages for both domestic and international, which are based on the weekly retail on-highway diesel price published on the DOE web-site. We notify customers through a weekly email newsletter that does not get posted on our web-site. The current domestic surcharge is 21% and the current International charge is 15% going to 16% next week.

Also attached is the international scale which reflects a percentage based on the on-highway diesel price. The charge is changed if it stays above or below a threshold for three weeks. This helps to smooth out volatility in fuel

prices.

Andy

---

**From:** Bolander, Jim A.
**Sent:** Wednesday, May 10, 2006 11:35 AM
**To:** Legg Karen; McClellan, Mike R.; Crowe, Andrew; Luebbers, Chris D.; Tureman, Shawn I.
**Cc:** Sewell, Karen C.
**Subject:** RE: Fuel Surcharge for Intermodal

Andy, Chris,
Pls get this for Don.

---

**From:** Legg Karen
**Sent:** Wednesday, May 10, 2006 8:28 AM
**To:** McClellan, Mike R.; Bolander, Jim A.
**Cc:** Sewell, Karen C.
**Subject:** Fuel Surcharge for Intermodal

MRM & JAB:

As you know, DWS is going to Washington tomorrow for the STB Fuel Surcharge hearing. He needs to have with him information regarding Intermodal's fuel surcharge pricing. He went on the NS website to get this information and could not locate it. Can you provide this information to him ASAP?

Thanks.

KL 5/10

Assistant to Executive Vice President and CMO
Norfolk Southern Corporation
Ph 757-629-2833
Fx 757-664-5117

# Norfolk Southern Intermodal Fuel Surcharge Scale

| DOE On-Hwy Diesel Price | Percent | DOE On-Hwy Diesel Price | Percent |
|---|---|---|---|
| $0.00-$1.239 | 0.00% | $2.32-$2.359 | 14.50% |
| $1.24-$1.279 | 1.00% | $2.36-$2.399 | 15.00% |
| $1.28-$1.319 | 1.50% | $2.40-$2.439 | 15.50% |
| $1.32-$1.359 | 2.00% | $2.44-$2.479 | 16.00% |
| $1.36-$1.399 | 2.50% | $2.48-$2.519 | 16.50% |
| $1.40-$1.439 | 3.00% | $2.52-$2.559 | 17.00% |
| $1.44-$1.479 | 3.50% | $2.56-$2.599 | 17.50% |
| $1.48-$1.519 | 4.00% | $2.60-$2.639 | 18.00% |
| $1.52-$1.559 | 4.50% | $2.64-$2.679 | 18.50% |
| $1.56-$1.599 | 5.00% | $2.68-$2.719 | 19.00% |
| $1.60-$1.639 | 5.50% | $2.72-$2.759 | 19.50% |
| $1.64-$1.679 | 6.00% | $2.76-$2.799 | 20.00% |
| $1.68-$1.719 | 6.50% | $2.80-$2.839 | 20.50% |
| $1.72-$1.759 | 7.00% | $2.84-$2.879 | 21.00% |
| $1.76-$1.799 | 7.50% | $2.88-$2.919 | 21.50% |
| $1.80-$1.839 | 8.00% | $2.92-$2.959 | 22.00% |
| $1.84-$1.879 | 8.50% | $2.96-$2.999 | 22.50% |
| $1.88-$1.919 | 9.00% | $3.00-$3.039 | 23.00% |
| $1.92-$1.959 | 9.50% | $3.04-$3.079 | 23.50% |
| $1.96-$1.999 | 10.00% | $3.08-$3.119 | 24.00% |
| $2.00-$2.039 | 10.50% | $3.12-$3.159 | 24.50% |
| $2.04-$2.079 | 11.00% | $3.16-$3.199 | 25.00% |
| $2.08-$2.119 | 11.50% | $3.20-$3.239 | 25.50% |
| $2.12-$2.159 | 12.00% | $3.24-$3.279 | 26.00% |
| $2.16-$2.199 | 12.50% | $3.28-$3.319 | 26.50% |
| $2.20-$2.239 | 13.00% | $3.32-$3.359 | 27.00% |
| $2.24-$2.279 | 13.50% | $3.36-$3.399 | 27.50% |
| $2.28-$2.319 | 14.00% | $3.40-$3.439 | 28.00% |

If the DOE On-Highway Diesel Price Average equals or exceeds $3.44 per gallon, the fuel surcharge increases 0.5% for every 4-cent increase in diesel price

**From**: Santangelo, Will P.
**Sent**: Thu Nov 13 16:01:20 2003
**To**: Minton, Stacia S.; Rathbone, John P.; Seale, Don; Fox, Bill; McClellan, Mike R.; Santangelo, Will P.
**Cc**: Sheets, Marshall E.; Carroll, Patti G.; Brenner, Charlie; Glennon, Pat; Folk, Joseph; Alexander, Wes B.; Seay, Shela G.; Bolander, Jim A.; Thompson, Kimberly C.; Heslep, Jay M.; Brune, Alan; Dennis, Christine W.; Smith, Crandall; Deese, Damon M.; Russell, Jan C.; Holland, Karla Y.; Brooks, Nancy H.; Bell, Rita L.; Marks, Simon .; Jones, Vivian T; Orndorff, Carol; Nickerson, Ryan L.; Crowe, Andrew; Pfeifer, Alby; Santangelo, Will P.; Stewart, Marta R.; Hurlbut, Thomas E.; Barton, Colin M.; Heller, Jeffrey S.; Nash, Jim P.
**Subject**: Fuel Surcharge Status thru October 2003
**Importance**: Normal
**Attachments**: Customers with Large Fuel Balances 11-01-03.xls; 11-01-03 Fuel Surcharge Summaries.xls

John Rathbone:
Don Seale:
Bill Fox:
Mike McClellan:

The attached reports provide the status of the fuel surcharge billing to our customers for January 2002 thru October 2003. The first report contains cumulative monthly summary information for the amount billed, corrected, paid for all commodities. Subsequent sheets display the billing information for merchandise, intermodal & coal separately. The second report details customers with large fuel surcharge balances.

Net fuel surcharge billed for 2003 is $51.3M. Total collected during the same period is $45.9M or 89% of the net amount billed.

NS resumed billing a 2% fuel surcharge for merchandise and coal traffic on January 29, 2003. Intermodal has been billing a fuel surcharge since April 2002 and is currently assessing a 3.5% for domestic traffic and 2% for international.

Please advise if you need additional information.

Will Santangelo

cy: Marshall Sheets - info.

Will Santangelo
Assistant Manager - Automotive Group
Revenue Accounting Customer Service
Norfolk Southern Corporation
404/527-1031
wpsantan@nscorp.com

**Manage your Account online at http://accessNS.nscorp.com**

## Customers With Large Fuel Surcharge Balances

**Adjusted Billed Amount > $50K With < 50% Paid or Adjusted Billed Amount > $25K With**

**Totals are for 1/01/02 through 10/31/03**

**Source PA.TAT1.XX.G0109V00**

| Customer Name | Billed Amount | Correction Amount | Paid Amount | Balance | % Paid of Corrected Amount |
|---|---|---|---|---|---|
| [redacted] | $424,623 | ($204) | $0 | $424,419 | 0% |
| Totals | $424,623 | ($204) | $0 | $424,419 | 0% |

**Amounts above include any outstanding fuel surcharge balances from 2002.**

**$0 Paid**

| Comments |
|---|
| Marketing advises that if the customer will agree to a two year extension of the slab train contract, fuel surcharge bills will be waived. [redacted] has never paid the fuel surcharge. FSC from 2001 totaling over $500,000 was waived by Marketing. |
| |

## Fuel Surcharge Tracking Report

**Combined Totals from Merchandise, Coal, and Intermodal**
**Totals are for 1/01/02 through 10/31/03**
**Source PA.TAT1.XX.G0109V00**

| Month | Billed | Correction | Billed | Paid | Write-off | Settlement/ Waiver | Bankruptcy | A/R Balance |
|---|---|---|---|---|---|---|---|---|
| January-02 | $136,165 | ($13,082) | $123,083 | ($122,706) | ($376) | $0 | $0 | $0 |
| February-02 | $50,249 | ($6,655) | $43,594 | ($42,676) | ($193) | $0 | $0 | $725 |
| March-02 | $7,593 | ($2,358) | $5,235 | ($4,942) | ($233) | $0 | $0 | $60 |
| April-02 | $245,578 | ($6,874) | $238,704 | ($238,312) | ($392) | $0 | $0 | $0 |
| May-02 | $458,697 | ($4,658) | $454,039 | ($453,911) | ($128) | $0 | $0 | $0 |
| June-02 | $463,336 | ($3,423) | $459,914 | ($459,799) | ($114) | $0 | $0 | $0 |
| July-02 | $492,236 | ($3,703) | $488,532 | ($474,945) | ($258) | $0 | ($13,329) | $0 |
| August-02 | $580,339 | ($4,253) | $576,086 | ($560,832) | ($194) | $0 | ($14,190) | $870 |
| September-02 | $771,020 | ($17,481) | $753,539 | ($706,771) | ($262) | $0 | ($46,255) | $251 |
| October-02 | $1,705,531 | ($44,738) | $1,660,792 | ($1,584,191) | ($7,267) | ($65,335) | ($135) | $3,864 |
| November-02 | $3,715,742 | ($99,844) | $3,615,898 | ($3,537,857) | ($26,383) | ($32,009) | ($1,523) | $18,126 |
| December-02 | $3,301,887 | ($136,465) | $3,165,422 | ($3,073,785) | ($20,848) | ($38,235) | ($2,818) | $29,736 |
| **Totals for 2002** | **$11,928,372** | **($343,534)** | **$11,584,837** | **($11,260,728)** | **($56,648)** | **($135,579)** | **($78,250)** | **$53,634** |
| January-03 | $1,298,071 | ($58,894) | $1,239,176 | ($1,184,472) | ($2,767) | ($21,804) | ($50) | $30,084 |
| February-03 | $3,839,158 | ($120,265) | $3,718,893 | ($3,690,588) | ($22,565) | ($1,295) | ($1,000) | $3,445 |
| March-03 | $5,761,390 | ($136,231) | $5,625,159 | ($5,518,659) | ($17,767) | ($53,981) | ($343) | $34,408 |
| April-03 | $6,251,901 | ($113,742) | $6,138,159 | ($5,989,169) | ($21,301) | ($71,979) | ($6,839) | $48,871 |
| May-03 | $5,786,396 | $5,957 | $5,792,352 | ($5,615,823) | ($14,392) | ($71,765) | ($9,859) | $80,514 |
| June-03 | $5,791,606 | ($159,638) | $5,631,968 | ($5,375,858) | ($9,512) | ($148,953) | ($1,410) | $96,235 |
| July-03 | $5,630,468 | ($154,128) | $5,476,341 | ($5,140,760) | ($13,032) | ($205,038) | ($931) | $116,579 |
| August-03 | $5,195,358 | $72,870 | $5,268,227 | ($4,884,129) | ($6,124) | ($92,244) | ($4,379) | $281,352 |
| September-03 | $6,390,101 | ($139,438) | $6,250,663 | ($5,793,025) | ($8,930) | ($60,932) | ($11,019) | $376,757 |
| October-03 | $6,217,273 | ($38,017) | $6,179,256 | ($2,668,522) | ($1,294) | ($245) | ($1,536) | $3,507,659 |
| **Totals for 2003** | **$52,161,721** | **($841,527)** | **$51,320,194** | **($45,861,005)** | **($117,684)** | **($728,236)** | **($37,365)** | **$4,575,904** |

| | | | | |
|---|---|---|---|---|
| **2003 Billed as of 10/31/03** | **$52,161,721** | **YTD** | **$51,320,194** | **YTD** |
| **2002 Billed as of 10/31/02** | **$4,910,742** | **YTD** | **$4,803,518** | **YTD** |

**DA07567**

## *Merchandise Fuel Surcharge Tracking Report*

**Combined Totals for Per Unit, Monthly and Quarterly Billings**

**Totals are for 1/01/02 through 10/31/03**

**Source PA.TAT1.XX.G0109V00**

| Month | Billed | Correction | Billed | Paid | Write-off | Settlement/ Waiver | Bankruptcy | A/R Balance |
|---|---|---|---|---|---|---|---|---|
| January-02 | $44,975 | ($12,678) | $32,297 | ($31,921) | ($376) | $0 | $0 | $0 |
| February-02 | $9,729 | ($6,655) | $3,074 | ($2,156) | ($193) | $0 | $0 | $725 |
| March-02 | $7,405 | ($2,354) | $5,050 | ($4,757) | ($233) | $0 | $0 | $60 |
| April-02 | $2,685 | ($1,820) | $866 | ($866) | $0 | $0 | $0 | $0 |
| May-02 | $4,578 | ($1,495) | $3,083 | ($3,082) | $0 | $0 | $0 | $0 |
| June-02 | $5,744 | ($964) | $4,780 | ($4,780) | $0 | $0 | $0 | $0 |
| July-02 | $3,717 | ($136) | $3,581 | ($3,581) | $0 | $0 | $0 | $0 |
| August-02 | $4,019 | ($111) | $3,908 | ($3,908) | $0 | $0 | $0 | $0 |
| September-02 | $6,974 | ($2,051) | $4,923 | ($4,923) | $0 | $0 | $0 | $0 |
| October-02 | $437,328 | ($9,259) | $428,069 | ($421,555) | ($6,379) | $0 | ($135) | $0 |
| November-02 | $2,032,847 | ($76,088) | $1,956,759 | ($1,902,675) | ($25,184) | ($15,493) | ($1,523) | $11,885 |
| December-02 | $1,739,398 | ($117,437) | $1,621,962 | ($1,532,421) | ($19,566) | ($37,792) | ($2,782) | $29,401 |
| **Totals for 2002** | **$4,299,400** | **($231,047)** | **$4,068,353** | **($3,916,626)** | **($51,931)** | **($53,285)** | **($4,440)** | **$42,072** |
| January-03 | $300,979 | ($29,597) | $271,383 | ($217,643) | ($2,316) | ($21,804) | ($50) | $29,571 |
| February-03 | $1,839,715 | ($44,779) | $1,794,937 | ($1,771,274) | ($21,658) | ($1,050) | ($955) | $0 |
| March-03 | $2,801,419 | ($108,810) | $2,692,609 | ($2,590,623) | ($17,174) | ($52,488) | ($343) | $31,981 |
| April-03 | $3,049,834 | ($147,076) | $2,902,758 | ($2,776,653) | ($20,839) | ($53,927) | ($6,130) | $45,209 |
| May-03 | $2,890,686 | ($96,881) | $2,793,805 | ($2,648,537) | ($13,762) | ($44,878) | ($9,480) | $77,147 |
| June-03 | $2,950,215 | ($105,494) | $2,844,722 | ($2,700,777) | ($8,829) | ($41,963) | ($1,410) | $91,744 |
| July-03 | $2,846,701 | ($103,382) | $2,743,319 | ($2,574,788) | ($9,308) | ($53,651) | ($744) | $104,828 |
| August-03 | $2,816,702 | ($86,079) | $2,730,623 | ($2,512,491) | ($5,800) | ($37,400) | ($26) | $174,906 |
| September-03 | $3,224,515 | ($85,017) | $3,139,498 | ($2,809,403) | ($8,303) | ($32,554) | ($1,189) | $288,049 |
| October-03 | $3,181,776 | ($30,865) | $3,150,912 | ($1,103,964) | ($1,709) | ($245) | ($1,056) | $2,043,938 |
| **Totals for 2003** | **$25,902,543** | **($837,977)** | **$25,064,566** | **($21,706,152)** | **($109,699)** | **($339,960)** | **($21,382)** | **$2,887,373** |
| **2003 Billed as of 10/31/03** | **$25,902,543** | **YTD** | **$25,064,566** | **YTD** | | | | |
| **2002 Billed as of 10/31/02** | **$527,154** | **YTD** | **$489,631** | **YTD** | | | | |

### Top 10 Merchandise Customers Sorted by Descending Cumulative Fuel Surcharge Billed Amount

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| FORD MOTOR CO | $2,493,068 | ($4,704) | $2,488,364 | ($2,212,747) | ($158) | $0 | $0 | $ 275,459 |
| SUNOCO INC (R&M) | $611,979 | ($10,751) | $601,227 | ($563,249) | ($1,249) | ($143) | $0 | $ 36,586 |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| INTERNATIONAL PAPER CO | $552,318 | ($10,247) | $542,072 | ($420,706) | ($11,287) | $0 | $0 | $ 110,078 |
| ARCHER DANIELS MIDLAND CO | $432,307 | ($27,268) | $405,039 | ($353,697) | ($1,241) | ($8) | $0 | $ 50,092 |
| A K STEEL | $415,704 | ($68) | $415,636 | $0 | ($68) | $0 | $0 | $ 415,568 |
| ISG SPARROWS POINT INC | $398,406 | ($5,155) | $393,250 | ($352,041) | ($2,592) | $0 | ($160) | $ 38,458 |
| WEYERHAEUSER CO | $391,135 | ($5,792) | $385,344 | ($354,942) | ($3,065) | ($133) | $0 | $ 27,203 |
| DAIMLER CHRYSLER CORP | $388,242 | ($4,470) | $383,772 | $0 | ($66) | ($380,835) | $0 | $ 2,871 |
| MEADWESTVACO CORP | $384,171 | ($4,110) | $380,061 | ($324,178) | ($4,418) | $0 | $0 | $ 51,465 |
| **Total** | $6,665,904 | ($87,132) | $6,578,772 | ($5,112,619) | ($24,285) | ($381,121) | ($160) | $ 1,060,587 |

## Intermodal Fuel Surcharge Tracking Report

**Combined Totals for Per Unit and Weekly Billings**
**Totals are for 1/01/02 through 10/31/03**
**Source PA.TAT1.XX.G0109V00**

| Month | Billed | Correction | Billed | Paid | Write-off | Settlement/ Waiver | Bankruptcy | A/R Balance |
|---|---|---|---|---|---|---|---|---|
| January-02 | $90,527 | ($349) | $90,177 | ($90,177) | $0 | $0 | $0 | $0 |
| February-02 | $40,520 | $0 | $40,520 | ($40,520) | $0 | $0 | $0 | $0 |
| March-02 | $188 | ($4) | $184 | ($184) | $0 | $0 | $0 | $0 |
| April-02 | $242,862 | ($5,047) | $237,815 | ($237,424) | ($392) | $0 | $0 | $0 |
| May-02 | $453,767 | ($3,136) | $450,631 | ($450,503) | ($128) | $0 | $0 | $0 |
| June-02 | $457,593 | ($2,459) | $455,134 | ($455,020) | ($114) | $0 | $0 | $0 |
| July-02 | $488,519 | ($3,568) | $484,951 | ($471,364) | ($258) | $0 | ($13,329) | $0 |
| August-02 | $576,320 | ($4,142) | $572,178 | ($556,924) | ($194) | $0 | ($14,190) | $870 |
| September-02 | $764,045 | ($15,430) | $748,616 | ($701,848) | ($262) | $0 | ($46,255) | $251 |
| October-02 | $1,064,222 | ($9,348) | $1,054,874 | ($1,051,283) | ($761) | $0 | $0 | $2,829 |
| November-02 | $985,348 | ($5,909) | $979,439 | ($978,404) | ($317) | $0 | $0 | $718 |
| December-02 | $1,081,160 | ($5,521) | $1,075,639 | ($1,074,736) | ($568) | $0 | $0 | $334 |
| **Totals for 2002** | **$6,245,070** | **($54,912)** | **$6,190,158** | **($6,108,387)** | **($2,993)** | **$0** | **($73,774)** | **$5,004** |
| January-03 | $988,423 | ($27,944) | $960,479 | ($959,515) | ($452) | $0 | $0 | $513 |
| February-03 | $1,281,990 | ($74,468) | $1,207,522 | ($1,205,771) | ($689) | ($245) | $0 | $817 |
| March-03 | $1,756,186 | ($6,789) | $1,749,397 | ($1,748,545) | ($521) | ($8) | $0 | $323 |
| April-03 | $1,695,383 | $74,481 | $1,769,864 | ($1,769,110) | ($380) | $0 | $0 | $373 |
| May-03 | $1,407,021 | $140,156 | $1,547,177 | ($1,546,361) | ($255) | $0 | $0 | $561 |
| June-03 | $1,274,267 | ($4,522) | $1,269,745 | ($1,268,151) | ($210) | $0 | $0 | $1,384 |
| July-03 | $1,172,786 | ($4,175) | $1,168,610 | ($1,166,556) | ($435) | $0 | $0 | $1,620 |
| August-03 | $1,189,229 | ($4,440) | $1,184,789 | ($1,180,717) | ($202) | $0 | $0 | $3,869 |
| September-03 | $1,626,735 | ($12,359) | $1,614,377 | ($1,588,957) | ($570) | $0 | $0 | $24,850 |
| October-03 | $1,464,063 | ($5,627) | $1,458,436 | ($723,575) | ($9) | $0 | $0 | $734,852 |
| **Totals for 2003** | **$13,856,082** | **$74,314** | **$13,930,396** | **($13,157,258)** | **($3,724)** | **($253)** | **$0** | **$769,161** |
| **2003 Billed as of 10/31/03** | **$13,856,082** YTD | | **$13,930,396** YTD | | | | | |
| **2002 Billed as of 10/31/02** | **$4,178,562** YTD | | **$4,135,080** YTD | | | | | |

## Top 10 Intermodal Customers Sorted by Descending Cumulative Fuel Surcharge Billed Amount

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [redacted] | $3,294,865 | $0 | $3,294,865 | ($3,294,865) | $0 | $0 | $0 | $0 |
| | $2,706,277 | ($16,837) | $2,689,440 | ($2,598,695) | ($112) | $0 | $0 | $90,632 |
| | $1,307,921 | ($7,432) | $1,300,488 | ($1,228,758) | ($218) | $0 | $0 | $71,512 |
| | $908,222 | ($2,414) | $905,808 | ($872,499) | ($161) | ($253) | $0 | $32,895 |
| | $770,210 | ($8,296) | $761,914 | ($726,649) | ($347) | $0 | $0 | $34,917 |
| | $693,722 | ($2,352) | $691,370 | ($643,800) | ($398) | $0 | $0 | $47,172 |
| | $678,228 | ($1,307) | $676,921 | ($648,540) | ($188) | $0 | $0 | $28,193 |
| | $620,726 | ($5,830) | $614,895 | ($589,056) | ($420) | $0 | $0 | $25,420 |
| | $591,140 | ($3,006) | $588,133 | ($566,197) | ($3) | $0 | $0 | $21,933 |
| | $524,290 | ($52,310) | $471,979 | ($423,401) | ($225) | $0 | $0 | $48,354 |
| Total | $12,095,599 | ($99,785) | $11,995,813 | ($11,592,460) | ($2,073) | ($253) | $0 | $ 401,028 |

* Customer pays fuel s/c based on their own records

# Coal Fuel Surcharge Tracking Report

**Combined Totals for Per Unit and Monthly Billings**

**Totals are for 1/01/02 through 10/31/03**

Source PA.TAT1.XX.G0109V00

| Month | Billed | Correction | Billed | Paid | Write-off | Settlement/ Waiver | Bankruptcy | A/R Balance |
|---|---|---|---|---|---|---|---|---|
| January-02 | $663 | ($55) | $608 | ($608) | $0 | $0 | $0 | $0 |
| February-02 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| March-02 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| April-02 | $31 | ($8) | $23 | ($23) | $0 | $0 | $0 | $0 |
| May-02 | $352 | ($27) | $325 | ($325) | $0 | $0 | $0 | $0 |
| June-02 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| July-02 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| August-02 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| September-02 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| October-02 | $203,981 | ($26,131) | $177,850 | ($111,353) | ($127) | ($65,335) | $0 | $1,035 |
| November-02 | $697,547 | ($17,848) | $679,699 | ($656,778) | ($883) | ($16,516) | $0 | $5,523 |
| December-02 | $481,329 | ($13,507) | $467,822 | ($466,628) | ($714) | ($443) | ($36) | $0 |
| **Totals for 2002** | **$1,383,903** | **($57,575)** | **$1,326,327** | **($1,235,715)** | **($1,724)** | **($82,294)** | **($36)** | **$6,558** |
| January-03 | $8,669 | ($1,354) | $7,315 | ($7,315) | $0 | $0 | $0 | $0 |
| February-03 | $717,453 | ($1,019) | $716,434 | ($713,543) | ($218) | $0 | ($45) | $2,628 |
| March-03 | $1,203,784 | ($20,632) | $1,183,152 | ($1,179,490) | ($72) | ($1,486) | $0 | $2,104 |
| April-03 | $1,506,684 | ($41,147) | $1,465,537 | ($1,443,406) | ($81) | ($18,052) | ($709) | $3,289 |
| May-03 | $1,488,689 | ($37,319) | $1,451,370 | ($1,420,925) | ($375) | ($26,887) | ($378) | $2,805 |
| June-03 | $1,567,124 | ($49,623) | $1,517,501 | ($1,406,930) | ($473) | ($106,990) | $0 | $3,108 |
| July-03 | $1,610,982 | ($46,570) | $1,564,411 | ($1,399,416) | ($3,289) | ($151,387) | ($187) | $10,132 |
| August-03 | $1,189,427 | $163,388 | $1,352,816 | ($1,190,921) | ($121) | ($54,844) | ($4,354) | $102,577 |
| September-03 | $1,538,850 | ($42,062) | $1,496,788 | ($1,394,666) | ($57) | ($28,378) | ($9,830) | $63,857 |
| October-03 | $1,571,434 | ($1,525) | $1,569,908 | ($840,983) | $424 | $0 | ($480) | $728,870 |
| **Totals for 2003** | **$12,403,096** | **($77,864)** | **$12,325,232** | **($10,997,595)** | **($4,261)** | **($388,023)** | **($15,983)** | **$919,370** |
| **2003 Billed as of 10/31/03** | **$12,403,096** | **YTD** | **$12,325,232** | **YTD** | | | | |
| **2002 Billed as of 10/31/02** | **$205,026** | **YTD** | **$178,806** | **YTD** | | | | |

## Top 10 Coal Customers Sorted by Descending Cumulative Fuel Surcharge Billed Amount

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [redacted] | $3,021,796 | $71,219 | $3,093,014 | ($2,997,339) | ($2,693) | $0 | $0 | $92,982 |
| | $2,778,867 | $161,104 | $2,939,971 | ($2,740,895) | ($111) | ($81,394) | $0 | $117,571 |
| | $2,547,898 | $157,869 | $2,705,768 | ($2,301,001) | ($1,203) | $0 | $0 | $403,564 |
| | $503,619 | $3,648 | $507,267 | ($443,425) | ($30) | $0 | $0 | $63,812 |
| | $353,984 | ($7,291) | $346,693 | ($328,885) | ($514) | $0 | $0 | $17,294 |
| | $317,411 | $11,321 | $328,732 | ($262,064) | $0 | ($59,603) | $0 | $7,066 |
| | $315,657 | ($118,600) | $197,057 | ($124,099) | ($144) | $0 | $0 | $72,814 |
| | $257,654 | $7,707 | $265,362 | ($243,043) | $0 | ($218) | $0 | $22,101 |
| | $200,888 | $1,290 | $202,177 | ($188,586) | $6 | $0 | $0 | $13,598 |
| | $189,448 | ($2,044) | $187,404 | ($166,786) | $0 | $0 | $0 | $20,618 |
| **Total** | $10,487,223 | $286,223 | $10,773,445 | ($9,796,122) | ($4,687) | ($141,214) | $0 | $831,422 |

**From**: Thompson, Kimberly C.
**Sent**: Mon Nov 04 16:12:46 2002
**To**: McClellan, Mike R.
**Cc**: Bolander, Jim A.; Houfek, Ryan D.; Crowe, Andrew; Nickerson, Ryan L.; Anderson, Larry D.
**Subject**: 2003 Fuel Comparison.xls
**Importance**: Normal
**Attachments**: Fuel Comparison.xls

2003 Conventional Intermodal Fuel Surcharge Projection.

| Date | US AVG | NS AVG | FS % | |
|---|---|---|---|---|
| 10/28/2002 | $1.456 | | | |
| 10/21/2002 | $1.469 | $0.877 | 3.5% | |
| 10/14/2002 | $1.461 | $0.872 | 3.5% | |
| 10/7/2002 | $1.460 | $0.864 | 3.5% | To be effective October 14, 2002 |
| 9/30/2002 | $1.438 | $0.847 | 3.0% | |
| 9/23/2002 | $1.417 | $0.812 | 3.0% | To be effective September 30, 2002 |
| 9/16/2002 | $1.414 | $0.809 | 2.5% | |
| 9/9/2002 | $1.396 | $0.811 | 2.5% | |
| 9/2/2002 | $1.388 | $0.794 | 2.5% | To be effective September 9, 2002 |
| 8/26/2002 | $1.370 | $0.749 | 2.0% | |
| 8/19/2002 | $1.333 | $0.744 | 2.0% | To be effective August 26, 2002 |
| 8/12/2002 | $1.303 | $0.741 | 1.8% | |
| 8/5/2002 | $1.304 | $0.740 | 1.8% | |
| 7/29/2002 | $1.303 | $0.715 | 1.8% | |
| 7/22/2002 | $1.311 | $0.721 | 1.8% | To be effective July 28, 2002 |
| 7/15/2002 | $1.300 | $0.715 | 1.5% | |
| 7/8/2002 | $1.294 | $0.712 | 1.5% | |
| 7/1/2002 | $1.289 | $0.704 | 1.5% | |
| 6/24/2002 | $1.281 | $0.704 | 1.5% | |
| 6/17/2002 | $1.275 | $0.708 | 1.5% | |
| 6/10/2002 | $1.286 | $0.714 | 1.5% | |
| 6/3/2002 | $1.300 | $0.721 | 1.5% | |
| 5/27/2002 | $1.308 | $0.702 | 1.5% | |
| 5/20/2002 | $1.309 | $0.699 | 1.5% | |
| 5/13/2002 | $1.299 | $0.703 | 1.5% | |
| 5/6/2002 | $1.305 | $0.704 | 1.5% | |
| 4/29/2002 | $1.302 | $0.708 | 1.5% | |
| 4/22/2002 | $1.304 | $0.713 | 1.5% | |
| 4/15/2002 | $1.320 | $0.722 | 1.5% | |
| 4/8/2002 | $1.323 | $0.723 | 1.5% | |
| 4/1/2002 | $1.295 | $0.699 | 1.5% | To be effective April 9, 2002 |
| 3/25/2002 | $1.281 | $0.638 | 0% | |
| 3/18/2002 | $1.251 | $0.622 | 0% | |
| 3/11/2002 | $1.216 | $0.617 | 0% | |
| 3/4/2002 | $1.173 | $0.615 | 0% | |
| 2/25/2002 | $1.154 | $0.614 | 0% | |
| 2/18/2002 | $1.156 | $0.615 | 0% | |
| 2/11/2002 | $1.153 | $0.616 | 0% | |
| 2/4/2002 | $1.144 | $0.617 | 0% | |
| 1/28/2002 | $1.144 | $0.632 | 0% | |
| 1/21/2002 | $1.140 | $0.636 | 0% | |
| 1/14/2002 | $1.159 | $0.641 | 0% | |
| 1/7/2002 | $1.168 | $0.643 | 0% | |
| 12/31/2001 | $1.169 | $0.643 | 0% | |
| 12/24/2001 | $1.154 | $0.662 | 0% | |
| 12/17/2001 | $1.143 | $0.669 | 0% | |
| 12/10/2001 | $1.173 | $0.674 | 0% | |
| 12/3/2001 | $1.194 | $0.677 | 0% | |
| 11/26/2001 | $1.223 | $0.730 | 2% | Announced 0% - Effective Dec. 1, 2001 |
| 11/19/2001 | $1.252 | $0.735 | 2% | |
| 11/12/2001 | $1.269 | $0.741 | 2% | |
| 11/5/2001 | $1.291 | $0.750 | 2% | |

| Date | US AVG | NS AVG | AVG FS % | Conv. FSC Collected | |
|---|---|---|---|---|---|
| Jan-02 | $1.153 | **$0.638** | 0.0% | $0 | |
| Feb-02 | $1.152 | **$0.615** | 0.0% | $0 | |
| Mar-02 | $1.230 | **$0.623** | 0.0% | $0 | |
| Apr-02 | $1.309 | **$0.713** | 1.5% | $252,885* | *Began 2002 FSC Billing - 04/09/02 |
| May-02 | $1.305 | **$0.702** | 1.5% | $455,356 | |
| Jun-02 | $1.286 | **$0.712** | 1.5% | $486,240 | |
| Jul-02 | $1.299 | **$0.713** | 1.6% | $480,277 | ***YTD 2002*** |
| Aug-02 | $1.328 | **$0.744** | 1.9% | $427,545 | *$3,239,834* |
| Sep-02 | $1.411 | **$0.814** | 2.7% | $551,838 | ***2001 full year*** |
| Oct-02 | $1.462 | **$0.871** | 3.5% | $838,578 | *$11,356,216* |

| 2003 | Nynex | Avg Diff | NS Diesel | Est. Conv. FSC % | EST. FUEL SURCHARGE |
|---|---|---|---|---|---|
| Jan-03 | 0.8145 | 0.0830 | **$0.8975** | 3.5% | *$770,000* |
| Feb-03 | 0.7995 | 0.0830 | **$0.8825** | 3.5% | *$770,000* |
| Mar-03 | 0.7720 | 0.0830 | **$0.8550** | 3.5% | *$770,000* |
| Apr-03 | 0.7420 | 0.0830 | **$0.8250** | 3.0% | *$660,000* |
| May-03 | 0.7115 | 0.0830 | **$0.7945** | 2.5% | *$550,000* |
| Jun-03 | 0.6965 | 0.0830 | **$0.7795** | 2.5% | *$550,000* |
| Jul-03 | 0.6895 | 0.0830 | **$0.7725** | 2.5% | *$550,000* |
| Aug-03 | 0.6890 | 0.0830 | **$0.7720** | 2.5% | *$550,000* |
| Sep-03 | 0.6930 | 0.0830 | **$0.7760** | 2.5% | *$550,000* |
| Oct-03 | 0.6965 | 0.0830 | **$0.7795** | 2.5% | *$550,000* |
| Nov-03 | 0.7000 | 0.0830 | **$0.7830** | 2.5% | *$550,000* |
| Dec-03 | 0.7032 | 0.0830 | **$0.7862** | 2.5% | *$550,000* |
| | | | | TOTAL EST. | $7,370,000 |

**DA07573**

NS_036014717

| | | | | |
|---|---|---|---|---|
| 10/29/2001 | $1.310 | $0.799 | 2% | |
| 10/22/2001 | $1.318 | $0.812 | 3% | Announced 2% - Effective October 30 |
| 10/15/2001 | $1.353 | $0.830 | 3% | |
| 10/8/2001 | $1.371 | $0.856 | 3% | |
| 10/1/2001 | $1.390 | $0.902 | 3% | |
| 9/24/2001 | $1.473 | $0.931 | 3% | |
| 9/17/2001 | $1.527 | $0.919 | 3% | |
| 9/10/2001 | $1.492 | $0.908 | 3% | |
| 9/3/2001 | $1.488 | $0.883 | 3% | |
| 8/27/2001 | $1.452 | $0.825 | 3% | |
| 8/20/2001 | $1.394 | $0.803 | 2% | |
| 8/13/2001 | $1.367 | $0.782 | 2% | |
| 8/6/2001 | $1.345 | $0.781 | 2% | |
| 7/30/2001 | $1.347 | $0.778 | 3% | |
| 7/23/2001 | $1.348 | $0.802 | 3% | |
| 7/16/2001 | $1.380 | $0.825 | 3% | |
| 7/9/2001 | $1.392 | $0.851 | 3% | |
| 7/2/2001 | $1.407 | $0.875 | 3% | |
| 6/25/2001 | $1.447 | $0.896 | 4% | |
| 6/18/2001 | $1.480 | $0.908 | 4% | |
| 6/11/2001 | $1.486 | $0.923 | 4% | |
| 6/4/2001 | $1.514 | $0.923 | 4% | |
| 5/28/2001 | $1.529 | $0.899 | 4% | |
| 5/21/2001 | $1.494 | $0.895 | 4% | |
| 5/14/2001 | $1.487 | $0.883 | 3% | |
| 5/7/2001 | $1.470 | $0.873 | 3% | |
| 4/30/2001 | $1.442 | $0.874 | 3% | |
| 4/23/2001 | $1.443 | $0.855 | 3% | |
| 4/16/2001 | $1.437 | $0.816 | 3% | |
| 4/9/2001 | $1.397 | $0.812 | 3% | |
| 4/2/2001 | $1.391 | $0.804 | 3% | |
| 3/26/2001 | $1.379 | $0.805 | 3% | |
| 3/19/2001 | $1.392 | $0.820 | 3% | |
| 3/12/2001 | $1.406 | $0.829 | 3% | |
| 3/5/2001 | $1.420 | $0.853 | 3% | |
| 2/26/2001 | $1.451 | $0.915 | 4% | |
| 2/19/2001 | $1.480 | $0.963 | 4% | |
| 2/12/2001 | $1.518 | $0.981 | 4% | |
| 2/5/2001 | $1.520 | $0.997 | 4% | |
| 1/29/2001 | $1.539 | $0.982 | 4% | |
| 1/22/2001 | $1.528 | $0.958 | 4% | |
| 1/15/2001 | $1.509 | $0.939 | 4% | |
| 1/8/2001 | $1.520 | $0.947 | 4% | |
| 1/1/2001 | $1.522 | $0.983 | 4% | |
| 12/25/2000 | $1.515 | $1.034 | 4% | |
| 12/18/2000 | $1.545 | $1.073 | 5% | |
| 12/11/2000 | $1.577 | $1.085 | 5% | |
| 12/4/2000 | $1.622 | $1.084 | 5% | |
| 11/27/2000 | $1.645 | $1.059 | 5% | |
| 11/20/2000 | $1.627 | $1.048 | 5% | |
| 11/13/2000 | $1.603 | $1.051 | 5% | |
| 11/6/2000 | $1.610 | $1.069 | 5% | |
| 10/30/2000 | $1.629 | $1.074 | 5% | |
| 10/23/2000 | $1.648 | $1.065 | 5% | |
| 10/16/2000 | $1.670 | $1.043 | 5% | |

| | | | |
|---|---|---|---|
| 10/9/2000 | $1.614 | $1.077 | 5% |
| 10/2/2000 | $1.625 | $1.084 | 4% |
| 9/25/2000 | $1.657 | $1.090 | 4% |
| 9/18/2000 | $1.653 | $1.068 | 4% |
| 9/11/2000 | $1.629 | $1.018 | 4% |
| 9/4/2000 | $1.609 | $0.988 | 4% |
| 8/28/2000 | $1.536 | $0.921 | 3% |
| 8/21/2000 | $1.471 | $0.879 | 3% |
| 8/14/2000 | $1.447 | $0.858 | 3% |
| 8/7/2000 | $1.410 | $0.863 | 3% |
| 7/31/2000 | $1.408 | $0.872 | 3% |
| 7/24/2000 | $1.424 | $0.886 | 3% |
| 7/17/2000 | $1.435 | $0.891 | 3% |
| 7/10/2000 | $1.449 | $0.882 | 3% |
| 7/3/2000 | $1.453 | $0.867 | 3% |
| 6/26/2000 | $1.432 | $0.853 | 3% |
| 6/19/2000 | $1.423 | $0.855 | 3% |
| 6/12/2000 | $1.411 | $0.856 | 3% |
| 6/5/2000 | $1.419 | $0.853 | 3% |
| 5/29/2000 | $1.431 | $0.851 | 3% |
| 5/22/2000 | $1.432 | $0.840 | 3% |
| 5/15/2000 | $1.415 | $0.831 | 3% |
| 5/8/2000 | $1.402 | $0.821 | 3% |
| 5/1/2000 | $1.418 | $0.810 | 3% |
| 4/24/2000 | $1.428 | $0.792 | 3% |
| 4/17/2000 | $1.398 | $0.794 | 3% |
| 4/10/2000 | $1.419 | $0.809 | 3% |
| 4/3/2000 | $1.442 | $0.838 | 3% |
| 3/27/2000 | $1.451 | $0.861 | 3% |
| 3/20/2000 | $1.480 | $0.909 | 3% |
| 3/13/2000 | $1.500 | $0.922 | 3% |
| 3/6/2000 | $1.490 | $0.914 | 3% |
| 2/28/2000 | $1.460 | $0.915 | |
| 2/21/2000 | $1.460 | $0.907 | |
| 2/14/2000 | $1.460 | $0.881 | |
| 2/7/2000 | $1.470 | $0.827 | |
| 1/31/2000 | $1.440 | $0.810 | |
| 1/24/2000 | $1.420 | $0.764 | |
| 1/17/2000 | $1.310 | $0.754 | |
| 1/10/2000 | $1.310 | $0.754 | |
| 1/3/2000 | $1.310 | $0.748 | |

| | |
|---|---|
| :ORRELATION COEFFICIENT: | 0.957 |

**Cell:** C97
**Comment:** 1/2 NS Price (1/1 Holiday)

**Cell:** C142
**Comment:** 2/22 NS Price (02/21 Holiday).

| Date | US AVG | NS AVG | AVG FS % | Conv. FSC Collected | |
|---|---|---|---|---|---|
| Jan-02 | $1.153 | **$0.638** | 0.0% | $0 | |
| Feb-02 | $1.152 | **$0.615** | 0.0% | $0 | |
| Mar-02 | $1.230 | **$0.623** | 0.0% | $0 | |
| Apr-02 | $1.309 | **$0.713** | 1.5% | $252,885* | *Began 2002 FSC Billing - 04/09/02 |
| May-02 | $1.305 | **$0.702** | 1.5% | $455,356 | |
| Jun-02 | $1.286 | **$0.712** | 1.5% | $486,240 | |
| Jul-02 | $1.299 | **$0.713** | 1.6% | $480,277 | ***YTD 2002*** |
| Aug-02 | $1.328 | **$0.744** | 1.9% | $579,237 | *$3,836,652* |
| Sep-02 | $1.411 | **$0.814** | 2.7% | $793,087 | ***2001 full year*** |
| Oct-02 | $1.462 | **$0.871** | 3.5% | $1,042,455 | *$11,356,216* |

| 2003 | DOE Est. US Avg | Nymex* | Avg Diff | NS Diesel | Est. Conv. FSC % | EST. FUEL SURCHARGE |
|---|---|---|---|---|---|---|
| Jan-03 | $1.554 | 0.8145 | 0.0830 | **$0.8975** | 3.5% | $770,000 |
| Feb-03 | $1.528 | 0.7995 | 0.0830 | **$0.8825** | 3.5% | $770,000 |
| Mar-03 | $1.481 | 0.7720 | 0.0830 | **$0.8550** | 3.5% | $770,000 |
| Apr-03 | $1.429 | 0.7420 | 0.0830 | **$0.8250** | 3.0% | $660,000 |
| May-03 | $1.376 | 0.7115 | 0.0830 | **$0.7945** | 2.5% | $550,000 |
| Jun-03 | $1.350 | 0.6965 | 0.0830 | **$0.7795** | 2.5% | $550,000 |
| Jul-03 | $1.338 | 0.6895 | 0.0830 | **$0.7725** | 2.5% | $550,000 |
| Aug-03 | $1.337 | 0.6890 | 0.0830 | **$0.7720** | 2.5% | $550,000 |
| Sep-03 | $1.344 | 0.6930 | 0.0830 | **$0.7760** | 2.5% | $550,000 |
| Oct-03 | $1.350 | 0.6965 | 0.0830 | **$0.7795** | 2.5% | $550,000 |
| Nov-03 | $1.356 | 0.7000 | 0.0830 | **$0.7830** | 2.5% | $550,000 |
| Dec-03 | $1.362 | 0.7032 | 0.0830 | **$0.7862** | 2.5% | $550,000 |
| | | | | | **TOTAL** | **$7,370,000** |

**Nymex - New York Mercantile Exchange (#2 Heating Oil Traded)*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: ) MDL NO. 1869
)
RAIL FREIGHT FUEL SURCHARGE ) HIGHLY CONFIDENTIAL
)
ANTITRUST LITIGATION )
)
- - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF RICHARD DAVIDSON, taken before Kristin M. Teel, Registered Professional Reporter, General Notary Public within and for the State of Nebraska, beginning at 8:19 a.m., on February 24, 2011, at the Law Offices of Kutak Rock, 1650 Farnam Street, Omaha, Nebraska, pursuant to the within stipulations.



A P P E A R A N C E S


FOR THE DIRECT PURCHASER PLAINTIFFS:
MR. STEIG D. OLSON
HAUSFELD, LLP
111 Broadway, Suite 615
New York, New York 10004
(212)830-0950 FAX 480-8560
solson@hausfeldllp.com
MR. JOSHUA D. SNYDER
BONI & ZACK, LLC
15 St. Asaphs Road
Bala Cynwyd, Pennsylvania 19004
(610)822-0203 FAX 822-0206
jsnyder@bonizack.com

FOR THE DEFENDANT UNION PACIFIC:
MR. TYRONE R. CHILDRESS
HOWREY, LLP
550 South Hope Street, Suite 1100
Los Angeles, California 90071
(213)892-1806 FAX 892-2300
childresst@howrey.com

MR. LAWRENCE E. WZOREK
UNION PACIFIC RAILROAD
1400 Douglas Street, STOP 1580
Omaha, Nebraska 68179
(402)544-3897 FAX 501-0129
lewzorek@up.com
FOR THE DEFENDANT CSXT:
MR. DAVID D. CROSS
CROWELL MORING
1001 Pennsylvania Avenue, NW
Washington, District of Columbia 20004
(202)624-2774 FAX 628-5116
dcross@crowell.com
FOR THE DEFENDANT NORFOLK SOUTHERN:
MS. KRISHA A. CERILLI
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
1440 New York Avenue, N.W.
Washington, District of Columbia 20005
(202)371-7839 FAX 661-8294
krisha.cerilli@skadden.com





FOR THE DEFENDANT BNSF:
MS. LINDA S. STEIN
STEPTOE & JOHNSON
1330 Connecticut Avenue, NW
Washington, District of Columbia 20036
(202)429-8185 261-0518
lstein@steptoe.com


A L S O P R E S E N T

JAY ROLLINS, VIDEOGRAPHER



I N D E X


CASE CAPTION .......................... Page 1
APPEARANCES ........................... Page 2
INDEX ................................. Page 4
STIPULATIONS .......................... Page 5
TESTIMONY ............................. Page 9
REPORTER CERTIFICATE .................. Page 277

DIRECT EXAMINATION:
By Mr. Snyder ..................... Page 9
CONTINUED DIRECT EXAMINATION:
By Mr. Olson ...................... Page 55

do you know that?
A Well, they never came to me. You said did they ever come to you and say this, and the answer is no.
Q Okay. But putting aside the part about coming to you, you don't know whether that -- those --
A I don't know. I have -- obviously I have no idea, you know, what was going on down in the organization. I had no way of monitoring that. And besides that, they didn't report directly to me, as I explained. They -- they reported to the president of the company.
Q So sitting here today, you don't know whether -- whether the type of conversation I just described ever happened or not?
A I don't. I -- I doubt it, but it -- it could have.
Q Now -- now what if your chief marketing officer came and said, I want to sit down with another Class 1 railroad and tell them what our fuel surcharge program is going to be and -- and the -- the mechanism we're going to impose on -- on our customers in the coming year --
MR. CHILDRESS: Objection --



BY MR. OLSON:
Q -- not limited to interline, but to all of our customers. Would that be okay?
MR. CHILDRESS: Objection, incomplete hypothetical, may call for a legal conclusion.
MR. CROSS: I hope at some point we're going to talk about what actually happened in the case, but objection.
MR. OLSON: Well, we really don't need that type of comment at the deposition.
MR. CROSS: Spend your time the way you want.
MR. OLSON: We're only going to waste time if we get those types of comments, which are completely inappropriate.
MR. CROSS: You're the one talking.
MR. OLSON: Excuse me?
MR. CROSS: You're the one talking, Steig.
MR. OLSON: No, you're the one who made a completely inappropriate statement at the deposition.
MR. CROSS: It's an objection.
MR. OLSON: I -- I told the lawyers here today we'd try to get Mr. Davidson to a flight.



We try --
MR. CROSS: It's an objection.
MR. OLSON: Let me finish. I said we'd try to get Mr. Davidson to a flight, we'd try to wrap up quickly, and we don't need those type of snide statements that are not proper objections, so I'd ask you to refrain from doing it in the future.
MR. CROSS: I'd ask you to ask proper questions and move things along.
MR. OLSON: What was the pending question, please?
MR. CROSS: It was a hypothetical.
MR. OLSON: You're going to continue to make these types of statements?
MR. CROSS: I'm sorry, I thought you were asking me.
MR. OLSON: No, I'm asking the reporter.
MR. CROSS: Sorry, I didn't understand that.

(The requested portion of the transcript was read back by the court reporter.)



BY MR. OLSON:
Q Let me try it again.
In your view, was it appropriate to sit down with executives of other railroads and say, This is our fuel surcharge program. Here's how it works. Here are the levels, and this is what we are going to impose on our shippers?
MR. CHILDRESS: Incomplete hypothetical, may call for speculation. You can answer. May call for a legal conclusion, but you can answer.
THE WITNESS: I agree, it does seem to be a hypothetical, and I -- it never happened, but -- that I can recollect.
I -- I do think it's appropriate to tell a connecting line railroad what our fuel surcharge is, but I don't know that it's appropriate to sit down and discuss it with a competitor. I -- I don't know that it ever happened.
BY MR. OLSON:
Q Now, did you view CSX and NS as -- as competitors at all?
A No.
Q Those --
A Not really. They -- they were friendly

connections for us.
Q And you -- when you had conversations with your counterparts at CSX and NS, you just viewed them as friendly business partners, correct?
A Absolutely. We did an immense amount of business with both of them.
Q And you didn't -- you didn't believe that there were any concerns about collusion in those conversations, correct?
MR. CHILDRESS: In the conversations that he had?
MR. OLSON: Yes.
THE WITNESS: Well, there was no collusion. I mean, there was nothing to collude about. We were trying to provide better service to our customers.
BY MR. OLSON:
Q You weren't -- you weren't competitors in any sense, correct, with CSX and NS?
MR. CHILDRESS: Vague and overbroad.
THE WITNESS: Not really. There might have been -- there's a little bit of mileage overlap with the NS between St. Louis and Kansas City, but that's the -- that's the only one I can think of.



BY MR. OLSON:
Q And was there any way in which there was any indirect competition between these railroads?
MR. CHILDRESS: Vague as to indirect competition, but you can answer.
THE WITNESS: I don't know. Can you be more specific about that and kind of -- kind of talk about what indirect would mean? I don't -- I'm --
BY MR. OLSON:
Q Are -- are you familiar with the concept of indirect competition in the railroad industry?
A I don't know that I've really ever had a discussion about that, indirect competition.
Q So your view was that -- when you had conversations with the CSX and NS, there were no limitations on the type of discussions you could have; is that right?
MR. CHILDRESS: Vague, overbroad.
THE WITNESS: You know, I really never did think about that. I'm -- I'm telling you, what we focused on was customer service, better interline connections, greater dependability. And in that regard, no, we -- we worked hard to try to come up with positive outcomes.



BY MR. OLSON:
Q Now, at times, you also talked about fuel surcharges, correct, with CSX and NS?
MS. CERILLI: Objection.
THE WITNESS: Well, not that I remember. Maybe our marketing guys did. It's possible.
BY MR. OLSON:
Q You don't recall ever discussing fuel surcharges with -- with people at CSX and NS?
MR. CHILDRESS: You're talking about Mr. Davidson personally, Steig?
BY MR. OLSON:
Q Do you understand the question?
A I don't --
MR. CHILDRESS: Okay. You want to play that game, fine. Objection, vague and ambiguous. I'm just trying to clarify.
THE WITNESS: I don't remember it specifically, no.
BY MR. OLSON:
Q Do you remember it generally?
A No. Doesn't mean it didn't happen, but I don't remember it.
Q Let me hand you what was previously marked



Koraleski Exhibit 23. There's a cover e-mail from -- from Peggy Ruiz dated June 5, 2003, to you and others. Do you see that?
A I do.
Q And she says, Attached are minutes from the above meeting held in Omaha May 14, 2003?
A I see that.
Q Okay. Now let's turn to the attachment. It's titled, Minutes, NS/UP Alliance Meeting. Do you see that?
A Yes.
Q Have you seen this document before?
A I don't recollect it. I well could have. Probably did, but I don't recollect it.
Q Did you see it in preparation for this deposition?
A I don't believe so.
Q Okay. Do you see, Attendees, your name is listed?
A Yes, I do, uh-huh.
Q Do you see at the top it says, General discussion held on state of the economy and how it was reflected in business volumes by various commodities?
A I see that.

Q Now, this -- this discussion on the state of the economy, that's -- that's generally where you would talk, correct?
A Yes.
Q And those are the discussions that you testified earlier you didn't script in advance, and you would just talk about what was on your mind, correct?
A To the best of my recollection.
Q And I take it you didn't limit that general discussion to discussions of specific interline movements, did you?
MR. CHILDRESS: Vague and ambiguous.
THE WITNESS: I mean, if I told you I recollected specific discussions, I'd be lying to you, because I don't. I -- my memory just isn't that -- that good.
BY MR. OLSON:
Q Well, my question is, do you -- do you recall making an effort to limit this general discussion, which -- which typically started these meetings, to discussions of particular interline movements?
MR. CHILDRESS: Vague and ambiguous.
THE WITNESS: Well, no, I don't.



I -- I mean, it -- I think we were just talking about general business conditions.
BY MR. OLSON:
Q Okay. Now, do you see the third sentence where it says, Discussion followed on fuel surcharges and various application processes as used by different roads?
A I do see that.
Q Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers.
Do you see that?
A I do see that.
Q Do you recall that discussion?
A I don't.
Q Do you recall this meeting?
A Not specifically.
Q Do you recall it generally?
A Nope.
Q But it appears to reflect that during this discussion, there was a discussion between these two railroads on fuel surcharges, correct?
MS. CERILLI: Objection to form.
THE WITNESS: I mean, it speaks for itself, yes.



MR. OLSON: What's the objection?
MS. CERILLI: Lacks foundation.
THE WITNESS: That's what it says, yes, sir.
BY MR. OLSON:
Q Okay. And -- and it refers to a discussion about various application processes as used by different roads. Do you see that?
A I do, yes.
Q And it refers to a consensus being reached that it would be a positive outcome if all roads had the same process, correct?
A I see that.
Q Now --
A In the eyes of our customers. You know, I just assume that just meant it would be more customer-friendly if there was one uniform way of doing it.
Q Right. So what this appears to reflect is -- what this appears to reflect is a discussion at this meeting about having a uniform way of -- of doing fuel surcharges, correct?
A Would you repeat that?
Q What this language we just read appears to reflect is a discussion about having a uniform way



of doing fuel surcharges, correct?
MR. CHILDRESS: The document speaks for itself.
THE WITNESS: It -- it seems to be a hypothetical conversation that, you know, it would be an easier -- what I take from this -- and I don't remember it at all with specificity -- that it would be a -- easy for our -- easier for our customers, you know, if there was just a uniform process.
BY MR. OLSON:
Q A uniform fuel surcharge process, correct?
A That's what I take from this, yes.
Q And this appears to reflect --
A Hypothetically.
Q This appears to reflect a discussion, hypothetical or not, about the railroads having a uniform way of doing fuel surcharges, correct?
MR. CHILDRESS: Objection, asked and answered.
THE WITNESS: That's -- you know, I can only reflect what it says here, and -- and that's -- you know, it's saying it would be a desirable thing if it can be done.
BY MR. OLSON:
Q And it re -- it appears to reflect a

Page 161

discussion about the various application processes used by the different roads, correct?
A Well, let's see. It says, Discussion followed on fuel surcharges and various application processes as used by different roads.
If that was your question, that's what -- that's what it says.
Q Now, we started this dialogue because you said normally you wouldn't know what the other railroads were doing with their fuel surcharges. Do you recall saying that?
A Well, I think I also said that -- that I believe there were public comments by various railroads as they implemented fuel surcharges over the years.
Q And this -- but this isn't a public discussion, is it?
A No. But your question was is it -- wasn't specifically aimed at this -- this document. You just said that -- that we didn't talk about it. And -- but I do think that -- I do think that as railroads implemented fuel surcharges, it was a -- it became public.
Q Well, put -- putting aside public statements, this -- this is a private conversation

Page 162

that happened at a private meeting, right?
A Yes.
Q And there were no lawyers at this meeting, right?
A I don't know. Does it have a list of attendees?
Q It does at the top, yes, of the minutes. The other page.
A The front page?
Q Yep -- no, the -- the page of the minutes.
A Oh, yeah, I'm sorry.
No, I don't see any -- any lawyers.
Q Did -- who made the decision that lawyers wouldn't attend?
MR. CHILDRESS: Objection.
MS. STEIN: Objection, lacks foundation.
THE WITNESS: I don't know that that decision was made. I mean, I'm sure if they wanted to come, they would have been welcome.
BY MR. OLSON:
Q So how -- how did it happen that no lawyers attended?
MR. CHILDRESS: Objection, calls for speculation.

Page 163

THE WITNESS: Because generally speaking, I would say that -- that the subject matter wasn't something where the lawyers could contribute anything.
BY MR. OLSON:
Q Do you recall whether anyone ever discussed whether lawyers should attend?
A I don't remember. I -- no, I don't recall that.
Q Okay. And at this -- at this private meeting with no lawyers there, it appears there was a -- a discussion about how these railroads applied fuel surcharges, correct?
A That's what it says.
MR. CROSS: Mischaracterizes the facts, objection.
BY MR. OLSON:
Q And there's no -- nowhere it says here this discussion was limited to particular interline movements, is there?
MR. CHILDRESS: Objection, the document speaks for itself.
THE WITNESS: It just says various railroads; it didn't define what railroads.

Page 164

BY MR. OLSON:
Q And it doesn't define that the conversation was limited to any particular interline movements, does it?
A No. It says what it says.
Q I mean, from the face of the document, there would be no way to conclude that this discussion was limited to particular interline movements, correct?
MR. CHILDRESS: Vague and ambiguous. The document speaks for itself.
THE WITNESS: I mean, what the document is really saying, it would be customer-friendly if there was some way to simplify the process.
BY MR. OLSON:
Q And that discussion wasn't limited to particular interline movements, it was a general discussion about --
A That's what it says, yes, sir. I -- I don't remember it specifically. But, you know, from the data -- from the information here, that's what it says.
MR. OLSON: All right. Let's take a quick break and change the tape. I think we can

just keep going.
VIDEOGRAPHER: This is the end of Videotape No. 3. The time is 11:56 a.m. Counsel, we're off the record.
(Lunch break taken.)
VIDEOGRAPHER: This is the beginning of Videotape No. 4. The time is 12:46 p.m. Counsel, we're back on the record.
BY MR. OLSON:
Q Okay. Mr. Davidson, before lunch we were discussingKoraleski Exhibit 23, which you have in front of you.
A Yes.
Q And that's UP Alliance Meeting, May 14, 2003?
A Yes.
Q Now, you had testified that NS, as far as you viewed, that company was just a friendly business partner, correct?
A Yes, sir.
Q Now, and you had alliance meetings with them during the period 2002 through 2005, correct?
A Well, a much longer time span than that.
Q Oh, but at least during that period?
A Yes.



Q Did you ever invite lawyers to attend a meeting between one of those alliance meetings?
A Not that I recall.
Q Okay. Now, you also testified this morning, I believe, that you are aware of the possibility that NS had its own alliance relationships outside of the UP relationship, correct?
A I didn't know that specifically, but I think it was probably a safe assumption that you could make. I don't know that they did, you know. I mean, I'm assuming.
Q Right. But it was a safe assumption, correct?
A Well, I don't know if it was safe or not. It was an assumption.
Q Well, you just said it was a safe assumption.
A Yeah, I probably was too certain of that --
Q Okay.
A -- because I really don't know.
Q Okay. But you are aware it was a possibility?
A Yes.



Q Okay. And you are aware it was a possibility that NS had a -- an alliance relationship with the BNSF, correct?
A Well, it certainly was a possibility.
Q Now, on May 14, 2003, you acknowledge, I take it, that there was some discussion of -- of fuel surcharge processes between NS and UP, correct?
MR. CHILDRESS: Objection, no foundation.
THE WITNESS: Well, that's what's reflected in the minutes of that meeting.
BY MR. OLSON:
Q And you have no reason to doubt that that occurred, do you?
A No. I assume these minutes are fairly accurate.
Q Did you ever direct anybody to take accurate meeting minutes of these alliance meetings?
A I don't recall if I asked somebody to keep minutes or not. It -- it was kind of necessary to do that, though, so that we would know what new milestones and objectives were as far as achieving customer service and that sort of thing.
Q So taking -- taking accurate minutes would have been important at these meetings, correct?



A Well, sure. You want it to reflect the items that you discussed.
Q And do you recall directing anybody to take accurate meeting minutes of these meetings?
MR. CHILDRESS: Asked and answered.
THE WITNESS: No.
BY MR. OLSON:
Q Do you recall anyone directing anyone to take accurate meeting minutes of these alliance meetings?
A You know, I -- no, I don't specific -- specifically remember. And I would think, if you took minutes, that you would assume they'd be accurate.
Q All right. Now, so there was some discussion of fuel surcharge on May 14.
Now, do you know whether NS -- well, and just to back up a little bit, I believe you said you had no concern about that discussion because NS is just -- just this friendly business partner, correct?
A A connecting line railroad, yes, sir.
Q Now, do you know whether NS had a meeting with BNSF, your -- your primary competitor, following this meeting?

A No, I don't.
Q And do you know whether NS, at some sort of -- at some meeting with BNSF following this meeting, talked to BNSF about what you had discussed with NS?
MR. CHILDRESS: Vague, calls for speculation.
THE WITNESS: I have no idea if they even had a meeting.
BY MR. OLSON:
Q Did you take any steps to prevent that sort of discussion between NS and BNSF from occurring?
MR. CHILDRESS: Vague and ambiguous, no foundation.
THE WITNESS: I think that's a mighty leap of -- of an assumption to think I could have an influence of over what the NS did.
BY MR. OLSON:
Q Well, for example, you could have -- you could have reached an agreement with NS that would say no -- no discussion that occurs under our alliance rubric shall be communicated to another railroad, correct?
MR. CHILDRESS: Objection --



BY MR. OLSON:
Q You could have done that, right?
MR. CHILDRESS: Objection, calls for speculation.
THE WITNESS: I don't know that they did.
BY MR. OLSON:
Q No, no. You -- you could have reached an agreement with NS, or at least pursued an agreement with NS that would restrict the discussions that occurred at these meetings from being passed on to other railroads, correct?
A Perhaps. I mean, that's -- you know, that's a -- I guess we could have. I -- I don't know how effective that would have been.
Q Did you ever attempt to reach such an agreement?
A No.
Q Okay. Did you ever make any --
A I -- I must say this, though, in -- you assume, if we were talking about a -- a business relationship, you wouldn't have one party pitting you against the other, and I have no reason to think that happened.
Q Did you take any effort, aside from the



agreement we discussed, to restrict NS's use of the information learned with UP under the alliance umbrella with UP?
MR. CHILDRESS: Objection, no foundation, mischaracterizes testimony about some agreement.
THE WITNESS: I'm not sure what you're asking.
BY MR. OLSON:
Q All right. Let me try it again.
I'm -- what I'm generally asking is whether, within the NS/UP relationship, there were any safeguards or restrictions put into place about how the information learned at -- at those alliance meetings could be used in other contexts. Is that clear? I haven't asked the question yet. I just want to lay that precedent.
A I think so.
Q Okay. So one possibility we talked about is just an agreement, neither NS nor UP shall share the discussions that took -- that take place under the alliance umbrella with another railroad, and you said that that was not pursued, correct?
A Well, I don't recall that. And, you know, most things were transportation matters. I -- I



don't know. I -- I have a hard time getting my head around what you're getting at here. But I -- I think the answer is yes.
Q Okay. That's fine. I just want the record to be complete.
Now, putting aside trying to enter into -- to an agreement like that with NS, were there any -- any attempts at all to restrict the use of the information shared within the NS/UP alliance relationship with other railroads?
MR. CHILDRESS: Vague, incomplete.
BY MR. OLSON:
Q Sorry, to restrict the use of that information in a relationship with other railroads?
MR. CHILDRESS: Still vague, overbroad.
THE WITNESS: No, I mean, we never discussed it. It's --
BY MR. OLSON:
Q So as far as you know, following this meeting, it's possible that NS called up BNSF, said, Let's have a meeting, met a week later, and then there said, Look, we had this interesting discussion with UP about how all the railroads should have uniform fuel surcharges. As far as you know, that