**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF/GMH) |
| This Document Relates To:<br><br>ALL CASES | **PUBLICLY FILED VERSION** |

**BNSF RAILWAY COMPANY'S MEMORANDUM**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

I. BNSF's Historical Use of Fuel Surcharges ..... 2

A. BNSF Independently Adopted Its Basic Fuel Surcharge Formulas Before the Alleged Conspiracy Period ..... 3

B. Starting in 2000, BNSF Continually Worked to Expand Participation in Its Fuel Surcharge Programs ..... 6

II. BNSF Reacts in 2003 to the Resurgence of Fuel Volatility and Price Spikes ..... 8

A. BNSF's Top Executives Set the Tone for Continued Focus on Fuel Cost Recovery in Early 2003 ..... 8

B. Lanigan Joins BNSF as Chief Marketing Officer, Immediately Focuses on Fuel Surcharges, and Convenes an Internal Fuel Surcharge Review Team ..... 9

C. The Fuel Surcharge Team's Recommendations & BNSF's Actions ..... 12

D. BNSF Continued to Engage in Legitimate Interline Meetings in 2003 ..... 15

III. BNSF Continues Efforts Begun in 2003 to Establish the Industry's First Mileage-Based Fuel Surcharge ..... 18

CONCLUSION ..... 21

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

* *Anderson News L.L.C. v. American Media, Inc.*,
899 F.3d 87 (2d Cir. 2018)....................14

* *In re Chocolate Confectionary Antitrust Litigation*,
801 F.3d 383 (3d Cir. 2015) ....................5

* *City of Moundridge v. Exxon Mobil Corp.*,
No. 04-940, 2009 WL 5385975 (D.D.C. Sept. 30, 2009)....................9, 15

*Clamp-All Corp. v. Cast Iron Soil Pipe Institute*,
851 F.2d 478 (1st Cir. 1988)....................12

* *Kleen Products LLC v. Georgia-Pacific LLC*,
910 F.3d 927 (7th Cir. 2018) ....................1, 5

* *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ....................1

* *Monsanto Co. v. Spray-Rite Service Corp.*,
465 U.S. 752 (1984) ....................1

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ....................5

## OTHER AUTHORITIES

*Effect of Modifying Proclamation No. 3279 etc.*, Ex Parte No. 311,
350 I.C.C. 563 (1975)....................3

*In re Fuel Surcharges*, Ex Parte No. 661, 2007 STB Lexis 39 (Jan. 25, 2007) ....................21

Weekly U.S. No. 2 Diesel Retail Prices,
https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?
n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W....................3

**INTRODUCTION**

BNSF Railway Company ("BNSF") moves, individually for itself and jointly with the other defendants, for summary judgment. BNSF fully joins Defendants' Common Memorandum in Support of Defendants' Joint and Individual Motions for Summary Judgment, which lays out the legal authorities and record material showing that Plaintiffs lack direct evidence of a conspiracy, and lack circumstantial "evidence that tends to exclude the possibility that the [defendants] were acting independently," *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). This memorandum focuses on the history and context of BNSF's unilateral adoption of fuel surcharges ("FSCs")—a history that exonerates BNSF regardless of what the others did. *See Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 939 (7th Cir. 2018) (Wood, C.J.) (holding that evidence must "show that [each particular defendant] was a part of that cartel."). Plaintiffs' conspiracy claim is untenable for three basic reasons.

*First*, BNSF imposed rate-based FSCs since at least the 1990s and, beginning in 2000, focused on increasing participation in its FSC program, setting a goal that every contract include an FSC. Plaintiffs admit that these actions, all of which happened before 2003, were BNSF's independent decisions. Plaintiffs' burden is to supply evidence that BNSF's *continuation of this same conduct* in 2003 and beyond "tends to exclude the possibility" of independent action. They cannot. BNSF made only one, minor adjustment to its published rate-based carload FSC, a change that—given the actual prices of fuel—made absolutely no difference. And BNSF's intermodal FSC remained completely unchanged during the alleged conspiracy period.

*Second*, BNSF's conduct had a clear and independent rationale: As fuel prices and volatility rose in late 2002, BNSF executives increasingly focused on recovering fuel costs. In early 2003—before Plaintiffs claim any conspiracy existed—BNSF convened an internal "Fuel

Surcharge Review Team" to analyze competitor conduct and recommend policies to meet this goal. That team of 17 met many times over many weeks and produced a mountain of analysis and recommendations. Such a huge internal effort, all motivated by a clear and legitimate business justification, refutes any possible inference of conspiracy.

*Third*, when BNSF did make its single adjustment to its rate-based carload FSC during the relevant period, it reacted in part to an announcement from UP. But BNSF's competitive reaction was to adopt a program *less aggressive* than the one that BNSF had been internally contemplating. And, *after* BNSF's announced change, UP surprised BNSF by revising its program *again*, adopting an FSC even *less aggressive* than the one BNSF had just announced. These type of reactions, which respond to—and undermine—the actions of a competitor, are paradigmatic examples of independent competitive conduct.

## I. BNSF's Historical Use of Fuel Surcharges

BNSF had four "business units" in the relevant period: Industrial Products, Consumer Products, Agricultural Products, and Coal. Within Consumer Products, intermodal shipping—moving containers or trailers that are also moved by trucks or ocean vessels—accounted for more than 40% of BNSF's unregulated traffic between 2000 and 2008. The balance of BNSF's commodity types can generally be referred to as "carload" traffic, although (as discussed below) some commodities such as coal and agricultural products have distinctive characteristics. BNSF's largest carload commodity was coal, accounting for more than 20% of its revenues between 2000 and 2008. Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment ("DA") 03025 at 29 (Garin 61:5-12); DA03346 at 79.

BNSF's contracts with carload shippers "[s]ince at least the early 1990's" have included rate-based FSCs—that is, an incremental percentage of the basic rate that shippers pay when fuel costs are high. DA03855 at 60. BNSF adopted a rate-based FSC for its domestic intermodal

traffic in March 2000. DA03969. The use of FSCs was consistent with the practice of BNSF's competitors in the trucking industry, *see* DA03969 at 73, and the Surface Transportation Board ("STB") (or its predecessor, the Interstate Commerce Commission) had condoned them. *See Effect of Modifying Proclamation No. 3279 etc.*, Ex Parte No. 311, 350 I.C.C. 563 (1975). BNSF's rate-based FSC program thus began independently and long ago. Likewise, the formulas for BNSF's FSCs, its efforts to increase participation in those FSC programs, and its discussions of FSCs with interline partners all began before any alleged conspiracy.

### A. BNSF Independently Adopted Its Basic Fuel Surcharge Formulas Before the Alleged Conspiracy Period

Fuel prices were quite stable during the 1990s, never rising above the FSC strike price (the lowest fuel price at which an FSC would be charged) that BNSF had set for its carload FSC.[1] That changed at the end of the decade. From 1999 to 2001, and again at the end of 2002, fuel prices became more volatile (*i.e.*, rose and fell in a wider band) and rose sharply in absolute terms. BNSF management turned its attention to fuel costs as they grew to take an outsized share of its operating expenses, seeking better ways to recoup increased fuel costs when existing terms proved inadequate. DA03558 at 58-59.

***BNSF's Carload FSC***. In 2000, a BNSF team reviewed its existing carload FSC programs and recommended "mak[ing] [BNSF's] public price rules consistent" by placing a single FSC provision in BNSF's operative "Rules Book 6100" that was "also available on the Internet for easier public access." DA03523 at 24-25. The team also recommended using "similar language in both [BNSF's] contracts and public documents" for FSCs. DA03523 at 24. Along the way (and before any alleged conspiracy), BNSF both expanded the range of carload

---

[1] Weekly U.S. No. 2 Diesel Retail Prices, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W. All references in this brief to Highway Diesel Fuel ("HDF") prices are available in this data series.

traffic to which the FSC applied, and altered components of its FSC formula. DA03523 at 23-25. Effective April 1, 2000, BNSF adopted an FSC with "a floating rate based upon the monthly average price of fuel" using the West Texas Intermediate Crude ("WTI") index (DA03523), and later that year it published its carload FSC in an "easy to read table form in whole percentages" (DA03523; *see* DA03548), which "[f]ollow[ed] what NS did" with its FSC (DA03546 at 47).

In 2001, BNSF revisited its surcharge programs. After exhaustively analyzing whether WTI was "the appropriate index" and "Benchmark Value," DA03865 at 65-66. BNSF found that WTI tracked BNSF's fuel costs (with a 93% correlation), but not nearly as well as the HDF index (with a 99% correlation). DA03862 at 62-63; DA03865 at 65-66; DA03908 at 19-21, 32-34; DA03055 at 65 (Kyei 45:16-24). This put BNSF to a choice: On the one hand, BNSF already used HDF for its intermodal traffic. *See infra*, p. 5. On the other hand, many carload customers were accustomed to WTI because other railroads used it. BNSF's internal team initially recommended that BNSF maintain the two different indices for the two different FSCs. DA03868 at 86, 88. But based on the desire to be internally consistent and respond to customers more familiar with trucking, BNSF decided on "syncing up those tables … to [HDF]." DA03055 at 62 (Kyei 33:17-34:15); *see* DA03155 at 69 (Rose 74:13-17).

In April 2001, BNSF announced that change, along with other adjustments to the carload FSC formula, first to its interline partners (DA03948 at 49; *see* DA03952 at 52-53; DA03954 at 54-62; DA03966 at 66-68) and then a few days later to its customers (DA03963 at 63-65). BNSF explained to its customers that "[t]he Fuel Index we currently use will be changed" because "the fuel prices BNSF pays are more closely correlated with HDF than WTI." DA03963 at 64. BNSF also announced a new trigger price ($1.30 HDF) and published the new carload FSC in table format, illustrating how customers would be assessed a 1% FSC if the previous month's HDF average exceeded $1.30 and an additional 0.5% surcharge for every 5¢ increase

above $1.30 HDF. DA03963 at 64-65. That HDF-based carload FSC formula became effective on July 1, 2001. DA03620 at 40. That April 2001 formula—established two years before the alleged conspiracy—remained the same throughout the alleged conspiracy period, except for BNSF's one change: inserting a continuation of that formula with an incremental surcharge of 0.5% FSC at $1.25 HDF (discussed below) in 2003.

That timing cuts sharply against inferring that BNSF adopted its FSC program as part of a later conspiracy. In *Matsushita* terms, only exceptionally strong circumstantial evidence of later events could "tend[] to exclude the possibility that [BNSF] acted independently." That is because, "[f]or a change in conduct to create an inference of a conspiracy, the shift in behavior must be a 'radical' or 'abrupt' change from the industry's business practices." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 396, 410 (3d Cir. 2015) (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000)). Mere "continuation of a historic pattern … does not plausibly allow one to infer the existence of a cartel." *Kleen*, 910 F.3d at 927 (citations omitted).

***BNSF's Intermodal FSC***. BNSF had created a separate FSC for domestic intermodal shipments in March 2000 using the HDF index. DA03969. At a strike price of $1.10 HDF, the intermodal surcharge was 0.5% of the rate, increasing by 0.5% for each 5¢ increase in HDF. DA03969 at 69-70. At the time, BNSF found its effective surcharge rate to be "lower than the trucking industry fuel surcharges, a reflection of the generally lower fuel consumption by the rail industry as compared to the trucking industry." DA03969 at 73-74. In 2001, BNSF revised its intermodal FSC program: It raised its strike price to $1.24 HDF and set the FSC to 1% at that level, increasing by 0.5% for every 4¢ increase in HDF. DA03985 at 86; DA03514. In adopting this formula BNSF, researched the trucking industry (DA03055 at 59-60 (Kyei 24:20-25:17); DA03969 at 73-74), reviewing HDF's five-year average (DA07082 at 96-97 (Anderson - BNSF 30(b)(6) 140:22-141:1), and analyzing the "price levels … [at which] BNSF's fuel costs will be

stable" (DA03969 at 70). *BNSF's intermodal FSC did not change from September 2001 to 2008*. DA04664 at 664-938; DA06466 at 69-70 (Rausser 394:20-395:7). And BNSF *never* had the same intermodal formula as its head-to-head competitor UP, before or during the alleged conspiracy period. DA00713 at 793-794 & Fig. IV-1D. This intermodal history makes the inference of independent action far stronger than any inference of conspiracy.

### B. Starting in 2000, BNSF Continually Worked to Expand Participation in Its Fuel Surcharge Programs

While BNSF was reviewing and revising its FSC program, fuel prices became increasingly volatile, and began to trend upward, as a result of events including the 9/11 terrorist attacks and the wars in Afghanistan and later Iraq. BNSF's fuel expense in the first quarter of 2001 was a striking 22% higher than its fuel expense in the first quarter of 2000. DA07152 at 65. Fuel costs were significant and growing parts of BNSF's total operating costs from 1999 through 2001. *E.g.*, DA07109 at 28; DA07234 at 48.

Although BNSF could have pursued different business strategies, the one it chose was indisputably rational, in its independent interest, and consistent over time: BNSF began expanding its surcharge programs in 2000, and it continued pushing to increase participation up to and through 2008. Starting in 2000, at the direction of "[t]op [management]," BNSF sought to expand FSC to as much traffic as it could—pursuing "a more aggressive policy" that would impose FSCs "on all prices we can" including "[p]rices that don't specifically reference the Rules Book"—"to help recover [its] higher costs." DA03549 at 49-50; DA03982 at 84. Even in early 2000, BNSF closely tracked which traffic was subject to an FSC, and it worked throughout the year to expand application of the FSC to additional types of carload traffic. DA03515; DA03523 at 23-24; DA03855 at 59. As early as 2001, BNSF's FSC programs' stated goals were to "recover spikes in fuel costs" and "[c]reate policies & processes to maintain Fuel Surcharges

over time." DA03868 at 71 (April 9, 2001 Review of BNSF Fuel Surcharges presentation). BNSF also documented concerns, as early as February 2001, about discounting (or forgoing increases in) base rates as an offset to the FSC. DA03862 at 63-64. By February 2002, more than a year before the alleged conspiracy period, an internal BNSF team had recommended that "[e]very contract should include a fuel surcharge clause" and "[a]ny deviation from … policy should require the approval of the Business Unit VP." DA04019 at 19-20. Later that year, BNSF's internal auditor identified the failure to "consistently include[]" FSC provisions as a "Key Issue[]," and stated that "Marketing has agreed to implement … the approval process for excluding fuel surcharge provisions in contracts," including determining who had that authority. DA04048 at 66, 71, 80.

At the end of 2000, less than a year into BNSF's revised carload and intermodal FSC program, BNSF had expanded its use of FSCs to 42% of its intermodal traffic, including 100% of certain kinds of its domestic intermodal shipments. DA03855 at 61. BNSF's FSC coverage for other traffic varied—25% metals, over 20% minerals and machinery and forest, and over 10% chemicals and auto. DA03855 at 61. But those numbers improved in the period before the alleged conspiracy began, particularly in 2002 and early 2003, as part of a "concerted effort to increase the application of fuel surcharges to Carload documents."[2]

In a public investor call in January 2003, BNSF's outgoing CMO Chuck Schultz and CEO Matt Rose reported collecting FSCs on about 27.5% of its total traffic, and "around 45%"

[2] DA04083 (November 2002 email about expansion of FSC to "293 rate documents that were formerly exempt"); *see* DA04084 at 84-85 (November 2002 email about adding FSC to agricultural shipments); DA04095 at 97 (January 2003 notice to lumber customers about FSC effective March 1, 2003); DA04108 (January 2003 agricultural contract renewal with FSC); *see also* DA03988 at 90 (Consumer Products group's 2002 initiatives, including applying surcharges and increasing collections); DA07104 (November and December 2002 internal BNSF correspondence regarding project to track FSCs for which "wholesale changes through mass maintenance" would be possible, versus "[c]ontracts [that] will have to be amended").

for "consumer products and the industrial products." DA04104 at 05-07; *see* DA04086 at 86. By March 21, 2003, BNSF internally reported more than a 45% participation rate by revenue for carload traffic. DA04451 at 72; DA04286; DA04287. Out of BNSF's 6,731 carload price authorities, 5,525 were covered by an FSC. DA04451 at 72; DA04286; DA04287. An April 2003 FSC presentation reported "improving participation rates" for "carload" traffic. DA04451 at 72. Indeed, excluding coal traffic—which at the time was subject to very long-term contracts that used a price escalator rather than an FSC, DA03055 at 73 (Kyei 85:1-12)—BNSF's carload FSC participation rate in March 2003 was already 62%. DA04451 at 72; *see* DA04282 at 82-83.

## II. BNSF Reacts in 2003 to the Resurgence of Fuel Volatility and Price Spikes

### A. BNSF's Top Executives Set the Tone for Continued Focus on Fuel Cost Recovery in Early 2003

BNSF's fuel costs had moderated in 2002, but by the end of 2002, fuel began to spike again. DA00713 at 802 (Fig. IV-5A); DA04451 at 73; DA07169 at 86. HDF went from $1.30 in July 2002 to $1.49 in January 2003. DA00713 at 802 & Fig. IV-5A; DA04451 at 73. BNSF's calculations indicated that increase would push BNSF's fuel expenses up by more than $200 million a year. DA04451 at 66 (showing a fuel cost of $859 million at $1.30 HDF and a fuel cost of $1.087 billion at $1.50 HDF). That amount represented nearly a quarter of BNSF's entire net income for 2002 of $961 million. DA07169 at 96. Prices continued to spike, with HDF increasing from $1.49 in January to above $1.70 by the end of February 2003.

The highest levels of BNSF's management took this dramatic increase in fuel prices—the second such major spike it had seen since 1999—very seriously. CEO Rose indicated that, as of January 2003 (again, before the alleged conspiracy period), BNSF had an "objective" to "recover the ever-increasing cost of fuel." DA03155 at 74 (Rose 105:5-15). Speaking to financial analysists on January 21, outgoing CMO Schultz noted that BNSF "intend[s] this year to be a

little more aggressive in terms of the groups and commodities that are covered by fuel surcharges." DA04104 at 05-06. Schultz explained: "In the past, our ag[riculture] side has not had fuel surcharges on it. It will, going forward. Our logs program has not had fuel surcharges on it. It will, going forward." DA04104 at 05-06. Rose confirmed: "[W]e are going to have to be more aggressive in terms of going to the marketplace and quite frankly, our model is the trucking industry"; "as we go through these spikes, we need to be more nimble and be able to extract that back through the customers." DA04104 at 06. As BNSF's Vice President of Business Development put it in February 13, 2003 internal correspondence, "Focus on Fuel Cost Recovery will be immense in the coming months." DA07107. Where "there is an independent business justification for the defendant's behavior"—as these rising costs undeniably were—"no inference of conspiracy can be drawn." *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2009 WL 5385975, at *6 (D.D.C. Sept. 30, 2009) (quoting marks omitted).

### B. Lanigan Joins BNSF as Chief Marketing Officer, Immediately Focuses on Fuel Surcharges, and Convenes an Internal Fuel Surcharge Review Team

On January 13, 2003, John Lanigan joined BNSF as its CMO. DA03099 at 102 (Lanigan 10:20-11:20). He came from a long career in the trucking industry, in which FSCs were common; he had personally been involved in developing a trucking FSC program. DA03099 at 103 (Lanigan 15:24-16:23). Lanigan immediately familiarized himself with BNSF's FSC program and reviewed its participation rate. DA03099 at 106 (Lanigan 26:11-27:11). Lanigan understood that BNSF's overall participation rate was "in the 25 to 30 percent range," which he felt "was low." DA03099 at 106 (Lanigan 26:22-27:11). Indeed, BNSF's participation rate for 2002 was 27.4%. DA04086; DA03099 at 106-107 (Lanigan 27:24-29:1). But participation varied significantly by line of business: In 2002, coal was at 0% participation, lumber at 2.1%, and agriculture at 4.5%, while many other categories were much higher—minerals at 65.1%,

construction products at 58%, industrial products overall at 44.8%, and some types of intermodal traffic at 100%. DA04086 at 89. But as noted above, change was already in progress: By March 21, 2003, agriculture had gone from 4.5% participation to 64%, and industrial products had gone from 44.8% to 61.8%. DA04451 at 72. Lanigan made it one of his goals as the new CMO to increase the participation rate for FSCs. DA04109; DA03099 at 107 (Lanigan 29:2-5).

Lanigan decided to conduct a review of BNSF's FSC programs. DA04114; DA03099 at 109 (Lanigan 37:12-23). Indeed, a February 6, 2003, draft of Lanigan's 2003 goals included examining BNSF's "pricing decisions," including "fuel surcharges." DA04109. Lanigan started a formal review of BNSF's FSC in February 2003; meetings to review potential changes to BNSF's FSC programs started that same month—again, before the alleged conspiracy period—and continued into March and April.[3] The initial work product (presented at meetings on February 24 and March 10) "cover[ed] analysis on [Lanigan]'s initial idea of implementing a [mileage-based FSC program]" (*i.e.*, one in which surcharges were paid in proportion to miles travelled). DA04114 at 15-30, 31-54.

Based on that initial work, Sam Kyei, BNSF's Chief Economist at the time, led a 17-member "Fuel Surcharge Review Team." DA04451 at 54; DA03055 at 60 (Kyei 27:23-28:16). Although Lanigan himself was not on the Review Team, the team made several reports to him over time. DA03099 at 108-109 (Lanigan 36:23-37:7, 40:5-11). The elaborate work involved makes sense only as independent action. The Review Team considered moving to a mileage-

[3] DA03055 at 60, 75-76 (Kyei 27:23-28:16, 94:3-99:9); DA04114 at 15-30 (slide decks dated February 24and March 10, 2003); DA04112 (scheduling "Pre-Meeting" for March 10 meeting); DA04114 (scheduling "two back-to-back meetings" for March 13 and 14); DA04155 (agenda for March 14 meeting); DA04204 (agenda for March 19 meeting); DA04159 at 200 (agenda for March 21 meeting); DA04216 (agenda for March 26 meeting); DA04239 (agenda for March 28 meeting); DA04330 (agenda for April 4 meeting); DA04451 at 53-54 (Review Team Recommendations dated April 14, 2003); DA03099 at 108-109 (Lanigan 36:16-37:11).

based FSC and other changes such as reducing strike prices. *See supra*, note 3. By March 28, BNSF's General Director of Revenue Accounting had summarized a long list of systems, accounting, and customer issues with a mileage-based FSC program. DA04258 at 59. Even earlier, by March 17, team members had acknowledged BNSF's existing focus on participation: "Let's fight one battle at a time. Does it make sense to try to sell customers on both a 'radical' program and increased participation at the same time?" DA04240 at 48. By March 31, the team had prepared a draft presentation that indeed recommended that BNSF "[c]oncentrate on improving participation rates" in the "short term" and "fix systems issues" in the "longer term" before implementing mileage-based programs. DA04261 at 81.

On March 20, 2003, while BNSF's Fuel Surcharge Review Team was conducting its review, CSXT publicly announced modifications to its FSC program that would trigger its surcharge at a lower WTI price per barrel. DA02616 at 16-17. There is no evidence BNSF knew about CSXT's plans before they were announced. On March 28, CSXT sought concurrence from BNSF "on joint-line rates between CSXT and BNSF." DA04252. That same day, BNSF compared CSXT's modified program to BNSF's existing program (DA04252), and the Review Team included CSXT's new program as it continued to work on its independent analysis (DA04451 at 61).

On April 4, 2003, UP issued to its interline connecting railroads (including BNSF) a "Request for Joint Line Concurrence" for modifications to its WTI-based FSC program that followed CSXT's. DA04337 at 37-39. Plaintiffs focus on a BNSF employee's reaction (in internal correspondence) that "This is sweet!!! Just like the CSXT." DA04337 at 37-39. But it is entirely natural for BNSF to react positively—*and with surprise*—to its head-to-head competitor modifying its FSC program to allow more recovery of fuel costs, at the very moment when BNSF itself was independently considering modifications to its own programs. The BNSF

Review Team included UP's new program as it refined its analysis in April 2003. DA04451 at 61, 65. UP would later decide not to follow the CSXT model, but rather to adopt an HDF version of an FSC similar to, but with a higher trigger price than, BNSF's formula. UP's *new* new program, however, was not analyzed by BNSF in April because BNSF was unaware of it—BNSF's competitive analysis reflected that UP (and every other railroad) used the WTI index for its carload FSC. DA04451 at 61. BNSF proceeding unaware of its closest competitor's plans is not consistent with conspiracy. More generally, this entire course of events is very easily explained as a sequence of consecutive independent reactions, while a conspiracy would require impossibly intricate choreography. Analyzing and responding to a competitor's behavior—including, especially, setting prices that "follow-the-leader"—is entirely expected behavior by independent actors in a concentrated market. *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.) ("One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.").

### C. The Fuel Surcharge Team's Recommendations & BNSF's Actions

On April 14, 2003, BNSF's FSC Review Team reported its recommendations.

***BNSF Retained a Rate-Based Surcharge***. The Review Team recommended that BNSF stick with a "percent of revenue basis (short term)" and consider a mileage-based formula as a "possibly long term" project. Both programs had pros and cons. The team noted that although a rate-based FSC causes shippers with high rates to pay more, shippers were "used to" such an approach and "not used to" a mileage-based formula. And the team recognized that there were logistical hurdles to implementing a mileage based formula. DA04451 at 53-68, 67. Consistent with these recommendations, BNSF stuck with its rate-based FSC in 2003, but, over time, moved toward a mileage-based program. *See infra*, Part III.

***BNSF Slightly Changes Its Carload FSC Program.*** Tracking a suggestion raised in the February 24, 2003 presentation that the Review Team began its analysis with, the team's April recommendation was to reduce the "strike price" of BNSF's carload FSC to $1.10, which would recover BNSF's fuel cost shortfall, assuming a 100% participation by non-coal customers. DA04114 at 17; DA04451 at 63-66, 68. The team noted that this approach was "aggressive," a conclusion it reached in part by comparing the proposed BNSF program with the competition—UP's just-announced WTI-based FSC program. DA04451 at 53-65. The Review Team recognized that, at both high and low fuel prices, its "aggressive" proposal would result in a higher surcharge than UP's program. DA04451 at 65.

BNSF ultimately did reduce its strike price for its carload program—the only change to its rate-based FSC formula related to the alleged conspiracy period. But it chose a *less* aggressive strike price than the $1.10 HDF strike price recommended by the Review Team. At the time, BNSF's carload FSC program had a strike price of $1.30 HDF, at which the surcharge was 1%, increasing by 0.5% for every 5¢ over $1.30 HDF. DA04451 at 77. BNSF reduced the strike price to $1.25 HDF, and assessed a 0.5% surcharge at that threshold (keeping the same increment formula). DA03978 at 79.[4] Sam Kyei—the Review Team's leader—explained in a July 1, 2003 memorandum that the $1.25/gal strike price "reflected the $23 WTI crude price used by UP" in its program announced on April 4. DA04415 at 15-16. In short, UP's April 4 announcement of a WTI-based FSC program caused BNSF to adopt a *less aggressive* carload FSC program than what BNSF's Review Team had recommended. That is a textbook example of one competitor acting independently in response to another competitor's action.

[4] In practical terms, therefore, BNSF's only change to its published carload rate-based FSCs during the supposed conspiracy was to add a 0.5% surcharge between $1.25 and $1.30 HDF. And because HDF never dipped below $1.30 through 2008, BNSF's former program and its new program had identical effect. DA03346 at 422-424.

BNSF announced this revision to its carload FSC program on May 7, 2003, with an effective date of June 1, 2003. DA04603 at 03-04. As BNSF transitioned programs, it instituted a one-time carload FSC of 2% for May 2003. DA03698 at 723. After BNSF announced its revisions, UP announced that, instead of the WTI-based program it had announced on April 4, it was switching to an HDF-based program with a $1.35 HDF strike price (which was higher than BNSF's estimated conversion to HDF of the "$23 WTI crude price used by UP" converted to HDF). DA01565. UP's program was now less aggressive than BNSF had expected at low fuel costs, and Sam Kyei noted in his July 1, 2003 memo that "[t]his means that UP will be very competitive at lower [HDF] prices." DA04415 at 15-16. Such competitive observations and different formulas are out-of-step with a conspiracy. *See Anderson News L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 105 (2d Cir. 2018) ("[T]hese varying courses of action … undermine[] [Plaintiffs'] assertion that defendants' 'parallel' conduct supports an inference of a conspiracy.").

***BNSF Makes No Changes to Its Intermodal FSC Program.*** Although BNSF's Review Team had recommended moving to a more aggressive $1.10 HDF threshold for intermodal (DA04451 at 53-65), BNSF never changed its intermodal formula in 2003, or at any time during the alleged conspiracy period. Sam Kyei noted in his July 1, 2003 memo that the decision not to make this change was made because "some international customers were added to the program and it was felt that it was too early change the program." DA04415 at 15-16.

***BNSF Focuses on Participation Rates.*** The Review Team recommended that BNSF "[i]ncrease participation rates ASAP." DA04451 at 68. This recommendation was consistent with Lanigan's existing goal to improve participation rates (*see supra*, pp. 9-10), reiterated what was already BNSF's policy (*see supra*, pp. 6-8), and echoed BNSF's October 2002 internal audit report (*see supra*, p. 7). In early April 2003, at Lanigan's direction, BNSF issued a policy requiring a Vice President to approve contracts that omit FSC coverage. DA04340. This new

policy was consistent with both outgoing CMO Schultz's February 2002 recommendation that "deviation from … policy should require the approval of the Business Unit VP" (DA04019 at 19-20) and with the October 2002 internal audit report recognizing that BNSF needed to revise its delegation of authority practices for omitting an FSC provision in a contract. DA04048 at 80, 71. On April 25, 2003, BNSF issued formal guidance on the inclusion of FSCs in carload contracts. DA04369 at 69-70. These events began long before the alleged conspiracy period, and regardless, implementing them does not require a conspiracy: Leaders at *every* company have an independent reason to establish clear policies and exert control over the pricing of their product, especially when facing massive input cost movements of outsized proportions to their entire net income. Running a business in a rational and self-interested manner does not support an inference conspiracy. *See Moundridge*, 2009 WL 5385975, at *6.

### D. BNSF Continued to Engage in Legitimate Interline Meetings in 2003

Plaintiffs argue that interline alliance meetings in 2003 involved the discussion of FSCs, and must therefore be conspiratorial. But interline partners must discuss the price of their product, and in the face of fuel price spikes, surcharges were a component of price very much on each railroad's mind. For example, when BNSF changed its carload FSC program in April 2001, it communicated details about that FSC to its interline partners, and those interline partners responded with concurrences, just as they did in the alleged conspiracy period.[5] And BNSF's witnesses consistently testified that their conversations with other railroads were focused on interline business, or that they had no conversations with other railroads at all.[6] Regardless, none

---

[5] DA03948 at 49 (BNSF April 25, 2001 letter to "Interline Partner"); DA03952 at 52-53 (UP April 26, 2001 response); DA03954 at 54-62 (short line April 26, 2001 response); DA03966 at 66-68 (CSXT April 30, 2001 response).

[6] DA03155 at 64 (Rose 49:12-51:24) ("The conversations that we had with our interline partners at these alliance meetings would have—would have dealt with fuel surcharges on our interline shipments."); DA03155 at 79 (Rose 135:4-9) ("I don't remember ever discussing fuel surcharge

of these alliance meetings directly establishes any agreement at all, and the timing of the 2003 alliance meetings relative to the participants' independent actions points decisively away from any inference of conspiracy.

***BNSF–NS Alliance Meetings.*** Plaintiffs have pointed to the March 18, 2003, alliance meeting between BNSF and NS regarding their interline business as evidence of a supposed conspiracy. Inasmuch as this alliance meeting occurred *after* Lanigan had convened the Review Team and the team had begun meeting (DA04114 at 14-30), the only possible inference is that BNSF was *already* acting *independently*. And the agenda topics reflect BNSF's legitimate interline business with NS—for example, "Interline Volumes By Business Group"; opportunities to collaborate on coal deliveries to the East; "BNSF-NS operations re Logistics Park Chicago." DA04201 at 01-03.

Plaintiffs focus on an action item that notes: "BNSF's fuel surcharge is structured differently than NS, CSXT, and UP. Should BNSF's b[e] synchronized with the other big players in the industry? (John Lanigan/Don Seale)." DA04201 at 01-03. Lanigan's understanding was that he and NS's Don Seale were to "discuss interline fuel surcharges between BNSF and Norfolk Southern." DA03099 at 112 (Lanigan 48:3-17; 51:16-22). BNSF understood that "customers were complaining" that BNSF and its interline partner had programs based on different indexes and that it was creating billing confusion. DA07082 at 86 (Anderson - BNSF 30(b)(6) 57:15-60:4). Taken in the light most favorable to Plaintiffs, that question might therefore be viewed as a request to BNSF to adopt the WTI FSC that "the other big players in the

---

with any railroad except on interline agreements."); DA03025 at 34-36 (Garin 236:2-243:14) (discussing interline meeting between CSXT and BNSF and noting fuel surcharge conversation was led by others and related to "systems" and "administrative" issues); DA03055 at 81 (Kyei 129:19-22) ("Q: [D]id you have discussions with anyone ever about the ideal scenario being to have the BNSF and the UPRR have the same fuel surcharge methodology? A: No.").

industry" were using. But it cannot be evidence of any meeting of the minds, because BNSF did not take any steps to "synchroniz[e]" its FSCs with the "other big players in the industry." BNSF remained on HDF (and NS remained on WTI).

Plaintiffs also point to a July 30, 2003 joint-marketing meeting between BNSF and NS. That meeting came two months *after* BNSF's final revision to its carload FSC program, and nearly *two years after* BNSF's final revision to its intermodal FSC program. *See supra*, pp. 5-6, 12-14. The meeting minutes show that the railroads discussed a variety of interline topics. Under the heading "Fuel Surcharge," they state, "John Lanigan and Don Seale agreed to lead a discussion of a potential industry position on fuel surcharge provisions at the next N.E.M.C. meeting." DA04420 at 24-25. Lanigan explained that this discussion was prompted by customer complaints, DA03099 at 130 (Lanigan 138:16-139:7)—something that independent competitors take more seriously than a cartel. "Many customers" during Lanigan's first six months at BNSF "indicated it was difficult … for them to do business with the rail industry because there were so many variations on fuel surcharge." DA03099 at 130 (Lanigan 138:16-139:7). This led Lanigan to believe that it was worth raising an industry standard "as a potential possibility." DA03099 at 130 (Lanigan 138:16-139:7). In all events, a discussion topic is not the same thing as an agreement, and the contemplated discussion never even occurred. On the advice of legal counsel, the railroads did not discuss an industry position on FSCs at the next N.E.M.C. meeting or at any other time. Lanigan confirmed this, and the minutes of the subsequent N.E.M.C meeting are in accord. DA03099 at 132 (Lanigan 147:16-148:1); DA05914 at 14-32.

***BNSF–CSXT Alliance Meeting.*** On April 1, 2003, BNSF and CSXT met to discuss their shared interline business. The agenda reflects numerous topics concerning interline traffic, including "interline volumes," "interline service measurement," "gateway optimization," and "Fuel Surcharge." DA04224. A BNSF employee in attendance recalled that the last topic

covered "how we're going to administer fuel surcharges on an interline basis" including a "systems issues and administration of pricing documents on interline movements." DA03025 at 35 (Garin 238:8-239:13). This evidence does not tend to exclude the possibility of lawful action because such a discussion makes perfect sense without any conspiracy. During a time of escalating fuel prices—and a fresh revision to CSXT's FSC—the two railroads had an obvious need to ensure their successful collaboration on interline financial issues and recover their costs on interline traffic. Moreover, the timing contradicts Plaintiffs' theory that an agreement was reached at that meeting: By that April 1, 2003 meeting, CSX had *already* announced changes to its carload FSC (DA02616 at 16-17), and BNSF's internal Review Team had *already* independently analyzed those changes (DA04252 at 52-57). And BNSF never matched CSXT's carload FSC formula.

## III. BNSF Continues Efforts Begun in 2003 to Establish the Industry's First Mileage-Based Fuel Surcharge

In early 2005, BNSF announced the rail industry's first mileage-based FSC. DA04573 at 73-79. That announcement marked the culmination of Lanigan's 2003 initiative to explore a mileage-based FSC system—a project that had been tabled in 2003 for possible implementation in the "long term." DA04341 at 56. *See supra*, p. 12. BNSF had not adopted a mileage-based FSC in 2003 due to negative customer feedback and administrative obstacles, *see supra*, pp. 10-11, but in the summer of 2004, as shippers offered increasingly negative feedback about rate-based FSCs, BNSF renewed its efforts to develop a mileage-based approach.[7] Accordingly, in August 2004, Lanigan directed Sam Kyei and the Fuel Surcharge Review Team to "regroup" to

[7] Generally, shippers paying a higher freight rate per mile or per unit (like chemical and agriculture) wanted a mileage-based FSC, while intermodal traffic and shippers paying lower per unit rates wanted to stay with rate-based FSCs; BNSF saw the mileage-based FSC as a fairer way to implement FSCs. DA03055 at 88 (Kyei 238:15-239:7); DA04482 at 82-84.

develop the mileage-based FSC program Lanigan had initially envisioned. DA03055 at 87 (Kyei 236:15-24); DA04481. BNSF continued to explore whether its FSCs should "change to be more like truck," and whether a mileage-based FSC was a superior approach. DA04487 at 87-88. In October 2004, after conducting a detailed assessment, BNSF's Review Team sketched out what a mileage-based surcharge program would look like. DA04521 at 32-35.

There were limits to what BNSF could immediately accomplish. The Review Team identified, among other issues, necessary "[a]pplication systems changes," and the fact that BNSF's interline partners "will need to modify interline settlement systems to accept fuel surcharge calculated on [mileage] basis." DA04521 at 41-46. Recognizing that "other railroads on interline traffic will need to change their systems to do any fuel surcharge billing and/or fuel surcharge verification if we change to per mile basis" (DA04487 at 88), Lanigan spoke one-on-one to each of his counterparts at the railroads BNSF interlined with (possibly excluding UP) at a November 2004 meeting of the N.E.M.C. DA03099 at 142-143 (Lanigan 225:11-229:19); *see* DA03055 at 90-91 (Kyei 247:4-250:15); DA04554. BNSF eventually "got the feedback from th[os]e railroads that they would have difficulty doing it from a technology perspective." DA03099 at 143 (Lanigan 232:2-11); DA04555 at 55-56. Thus, because technical changes to the interline accounting system had "to be approved by industry Shipment Conditions Committee (all REN participants – BNSF, CN, CPR, CSXT, KCS, NS, UP)" (DA04559 at 61) and the mileage-based FSC was "not supported (at least initially) by the other carriers," DA04557. BNSF was generally limited to implementing the per-mile surcharge to its own local traffic and Rule 11 traffic, leaving surcharges on its interline traffic rate-based. DA04557.

On March 29, 2005, BNSF announced "the railroad industry's first mileage-based fuel surcharge program," which BNSF planned to implement on January 1, 2006, in order to give customers an opportunity to modify their systems to accommodate mileage-based FSCs.

DA04573. That FSC program was to apply to all "movements that originate and terminate on BNSF"; "the BNSF portion of Rule 11 shipments, a type of interline shipment where each carrier bills the customer separately"; and "certain movements involving BNSF and one or more short lines." DA04573 at 75. "[A]bout 75 percent of BNSF's volume" would use a mileage-based surcharge, while the remaining 25%—"joint-rate interline movements with other Class-I railroads"—would "continue to be covered by BNSF's existing percentage fuel surcharge due to current interline billing systems and practices." DA04573 at 75. BNSF thus aimed to abandon rate-based FSCs for its non-interline traffic.

BNSF soon heard negative feedback from customers about its plan to broadly implement a mileage-based FSC.[8] Based on a survey, BNSF's Review Team concluded that the majority of its customers either did "not support the change" (45%) or would only "consider the change with adjustments" (27%). DA04626 at 28; DA04605 at 05-06; DA04581 at 81-82. BNSF responded to this customer feedback—hardly something cartel members are known for doing—announcing on October 20, 2005 that "its mileage-based fuel surcharge program will take effect for Coal and Agricultural Products customers January 1, 2006, as scheduled," but deferred "[a]n effective date for the mileage-based program for intermodal, automotive and other carload customers," given that "some customers need more time to make adjustments to their own information systems to accommodate the new program." DA04635 at 36. BNSF's mileage-based FSC formula became

[8] *See, e.g.*, DA04613 at 13-25; DA04580; DA04581 at 81-82; DA04605 at 05-06. Customers objected to "[t]he amount of work necessary to implement this," and how it would be an "administrative nightmare," with one auto shipper saying it was "upset about this program and cannot justify changing their systems for one supplier," making it "a deal-breaker going forward" and another shipper calling it "an idea from hell." DA04613 at 21, 24-25. Others expressed concerns about "huge admin. expense" (DA04613 at 25), objected to being "force[d] … to add to staff in order to administer program" (DA04581; *see* DA04613 at 17; DA04607 at 07-12), and questioned "whether [their] IT systems can even be adapted to implement it" (DA04613 at 16). Still others asked that "the effective date of the change be extended further into the year 2006, [and] in fact, at the end of 2006, if possible." DA04613 at 14; *see* DA04613 at 18.

effective on January 1, 2006 for coal and agricultural customers (DA03560 at 90-96), which represented "[a]bout 40 percent" of BNSF's business (DA03099 at 147 (Lanigan 245:7-10)). No other railroad followed for more than a year.

In early 2007—four years after Lanigan proposed mileage-based FSCs, two years after BNSF announced its intention to move from rate-based to mileage-based FSCs, and a year after BNSF first implemented mileage-based FSCs—the STB weighed in. It decided that assessing rate-based FSCs on regulated traffic was an unreasonable practice unless there was a sufficient nexus between the FSC and actual fuel consumption. *In re Fuel Surcharges*, Ex Parte No. 661, 2007 STB Lexis 39 (Jan. 25, 2007). BNSF took that decision to mean that mileage-based surcharges on regulated traffic were "appropriate surcharge[s] to use." DA03155 at 59 (Rose 27:10-28:9). Following this STB decision, BNSF extended its mileage-based surcharge to all regulated traffic. DA04658 at 60-61. BNSF further expanded its mileage-based surcharge in January 2009 to a broader range of carload traffic. DA04950 at 50; DA04939 at 39-40.

**CONCLUSION**

Based on the foregoing, and the arguments and authorities in Defendants' Common Memorandum in Support of Defendants' Joint and Individual Motions for Summary Judgment, BNSF requests that this Court grant summary judgment in favor of BNSF.

Dated: May 14, 2021

Respectfully submitted,

/s/ Glenn D. Pomerantz
Glenn D. Pomerantz
E. Martin Estrada
Kuruvilla J. Olasa
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Glenn.Pomerantz@mto.com
Martin.Estrada@mto.com
Kuruvilla.Olasa@mto.com
Anne.Conley@mto.com

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Ben.Horwich@mto.com

Jacobus P. van der Ven (D.C. Bar No. 1644774)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500 East
Washington, DC 20001
Telephone: (202) 220-1100
Jacobus.vanderven@mto.com

Linda S. Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
lstein@steptoe.com

Joshua H. Soven (D.C. Bar No. 436633)
WILSON SONSINI GOODRICH & ROSATI LLP
1700 K Street NW
Washington, DC 20006
Telephone: (202) 973-8827
jsoven@wsgr.com

*Counsel for Defendant BNSF Railway Company*