**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/GMH) |
| This document relates to:<br><br>ALL CASES | **PUBLICLY FILED VERSION**<br><br>**Oral Argument Requested** |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S SEPARATE MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. INTRODUCTION ..........1

II. STATEMENT OF FACTS ..........3

A. UP Fuel Surcharge Practices Prior to the Alleged Conspiracy ..........3

B. The Spring 2003, Allegedly Conspiratorial Fuel Surcharges ..........6

C. Later Developments ..........13

III. CONCLUSION ..........17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

**Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................ 2, 3

**Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................ 1, 2

**Monsanto Co. v. Spray-Rite Service Corp.*,
465 U.S. 752 (1984) ........................................ 1

## I. INTRODUCTION

Union Pacific Railroad Company ("UP") did not conspire with anyone in adopting, modifying and implementing its rate-based fuel surcharges. It therefore moves for summary judgment both in its individual capacity and jointly with its co-defendants. UP fully joins Defendants' Common Memorandum (also filed today), which lays out the legal authorities and record material showing that Plaintiffs lack direct evidence of a conspiracy or circumstantial "evidence that tends to exclude the possibility that the [defendants] were acting independently." *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764 (1984); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986). This separate memorandum complements the Common Memorandum by providing a more detailed factual summary of UP's adoption and enforcement of fuel surcharges.

For context, Plaintiffs' case against UP is simple enough: Plaintiffs allege that UP and CSXT held an alliance meeting on March 12-13, 2003, where UP allegedly agreed to match standardized, more aggressive fuel surcharges. Later alliance meetings supposedly cement the conspiracy.

But there is no evidence that UP came out of the March 12-13 alliance meeting having agreed to do anything, least of all adopt standardized, more aggressive fuel surcharges. Over the course of the next two months, UP (a) continuously analyzed internally what, if any, changes it should make to its own published carload fuel surcharge, (b) debated whether to concur with CSXT's revised published fuel surcharge for interline traffic, and match it for all UP traffic, (c) initially matched CSXT but then changed its mind after shippers and UP's own sales groups objected to the move, and (d) after still more study and internal debate adopted a less aggressive version of the HDF fuel surcharge that its closest competitor, BNSF, was using. That series of events in no way "tend[s] to rule out the possibility that the defendants were acting

independently[.]" *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 554 (2007), citing *Matsushita*, 475 U.S. at 574. It is flatly inconsistent with conspiracy.

Things do not get better for Plaintiffs when they claim "direct evidence" of conspiracy based on a May 14, 2003 NS-UP Alliance Meeting. This meeting occurred *after* UP announced its last relevant change to its published carload fuel surcharge on May 9, 2003, dropping the WTI-based fuel surcharge that it had been using prior to the alleged conspiracy, and announcing a new HDF surcharge instead. That meant that while NS and UP had identical WTI-based fuel surcharges *prior to the alleged conspiracy*, that would no longer be the case. There was a discussion and "consensus" that customers would prefer "if all roads had the same process," but there was no agreement on that issue; explicitly, that "process" issue was referred to legal counsel. There is furthermore no evidence of discussion, let alone direct evidence of agreement, on anything related to the *substance* of the parties' fuel surcharges. Going into this meeting, NS had not changed its fuel surcharge at all; UP had changed its to make it *less aggressive* and different than NS's. And in the aftermath of this supposedly critical meeting? Neither UP nor NS did *anything* to change its published carload fuel surcharge.

The remainder of Plaintiffs' case against UP is a strikingly weak version of a parallel conduct argument. UP concededly adopted a published carload fuel surcharge identical to two of its co-defendants unilaterally, *before* any alleged conspiracy. It did not *ever* make any change to that surcharge that caused it to generate more revenue at post-March 2003 fuel prices than would have been generated by its original October 2002 fuel surcharge. UP's conduct is therefore: (a) fully consistent with prior unilateral behavior, and (b) fully inconsistent with Plaintiffs' arguments that Defendants adopted standardized, more aggressive fuel surcharges. Nor is an inference of conspiracy needed to justify UP's increasing emphasis on "coverage" given that

(a) UP had only first adopted a published carload fuel surcharge four months before the alleged conspiracy, and (b) between the time UP's first published carload fuel surcharge went into effect on December 1, 2002, to the same date five years later, Highway Diesel Fuel Prices climbed from $1.31/gal to $3.03/gal. Substantive antitrust law disallows "infer[ring] that the [defendants] had agreed among themselves to do what was only natural anyway[.]" *Twombly,* 550 U.S. at 566.

UP is therefore entitled to summary judgment.

## II. STATEMENT OF FACTS

### A. UP Fuel Surcharge Practices Prior to the Alleged Conspiracy

UP began using fuel surcharges in the 1990s, and by the year 2000 UP was using nearly 20 different fuel surcharges for non-regulated traffic, applying to over 3,600 pricing documents.[1] For example, the "FMC/Fuel" rate based surcharge covered 1,600 carload price documents and applied a 2% surcharge when the WTI per-barrel price was at least $32 for 60 days, and increased the surcharge by 2% for each $7 increase in the WTI price thereafter.[2] Beginning in the fall of 2000, UP also assessed a rate-based fuel surcharge on intermodal shipments, DA01271-272, which was changed later that year to a formula based upon the HDF index. DA01293-294. That intermodal formula has retained the same basic structure since 2000 (although the formula got better for the shippers during the alleged conspiracy because it had a fuel weight component which went down).[3]

[1] *See* DA01241-248 at 242 ¶ 3; *id.* at 247-248 (Ex. 1). For the Court's convenience, in both the Common Memorandum and in their individual briefs Defendants cite to materials contained in Defendants' Appendix ("DA") which will be submitted with the Common Memorandum.

[2] DA01389-397 at 389-390.

[3] DA01666-668; *see also* DA01101-1215 at 212-215 (App. B).

UP announced its first published carload fuel surcharge program on October 31, 2002, effective December 1, 2002.[4] UP had debated internally for years whether to adopt a standard carload fuel surcharge program. UP's documents show that when, in early 2000, NS first announced a carload fuel surcharge program, there was considerable internal analysis and discussion as to whether UP should concur for interline traffic and adopt a standard fuel surcharge generally. DA01267-269 (noting "a wide range of opinion among the business teams regarding fuel surcharges," and questions about "UPRR's current capabilities" to implement a fuel surcharge program).[5] In early 2001, there was more debate and analysis about BNSF's published carload fuel surcharge program, including analysis of BNSF's fuel surcharge formula and its stated relationship to "fuel as a percent of operating expenses for the previous year."[6] There was also significant analysis of UP's intermodal fuel surcharges during 2001.[7] This activity continued into 2002, particularly as diesel fuel prices began to rise again throughout the year.

---

[4] DA01372-375; *see also* DA06202-268 at 227.

[5] From today's perspective it may seem surprising, but in the 2000-2004 period a major issue for both carriers and customers was whether a fuel surcharge program was feasible given the billing systems and information technology in use. DA01265-266.

[6] DA04022-029 (BNSF July 2000 announcement of WTI-based fuel surcharge); DA01297-316 (analysis of BNSF program).

[7] *E.g.,* DA01317-319 (Aug. 2001 analysis of intermodal fuels surcharges); DA01290-292.




In the Fall of 2002, UP once again analyzed whether it should implement a standard carload fuel surcharge program. Again, there were divergent views. One document from the Industrial Products Group that Plaintiffs cite notes that the IP group's "strategy has been to avoid fuel surcharges and negotiate increases into our price," but also that "fac[ing] an approx. $16 million higher fuel cost in 2003 than originally budgeted," UP needed to consider other options including "[f]uel surcharge application." DA01323-325 at 323. For a marketing staff meeting on October 15, 2002 at which various options were presented, UP's Revenue Information Management ("RIM") team gave a lengthy presentation, including analysis of other railroads' practices. DA01326-361. The decision was made to match the eastern railroads', NS and CSXT, WTI-based surcharges.

On October 31, 2002, UP announced the implementation of a standard carload fuel surcharge program effective December 1, 2002. DA01372-375. That 2002 UP published carload formula was identical to the NS and CSXT published carload fuel surcharges in effect at the time, applying a 2% surcharge when the WTI index remained at or above $28 per barrel for 30 consecutive reporting days, and increasing by an additional 2% for each $5 increase in the

WTI price. DA01380-84. To repeat: there is no allegation that this highly parallel conduct came about through conspiracy.[8]

In October 2002, UP unilaterally committed itself to implementing that new published carload surcharge program to all of its traffic unless regulation or pre-existing contracts prevented that. *See* DA01326-61 at 61 ("on all new price documents effective immediately"); *id.* at 55 (intermodal; "all Union Pacific pricing documents . . . referring to this publication are subject to a fuel surcharge"); DA01362-68 at 66 ("Effective immediately, all new pricing documents and amendments created must now contain the Fuel Surcharge language recently approved by the Marketing and Sales Management team."); DA01372-75. Coverage of the new surcharge in fact escalated rapidly in late 2002 and early 2003—prior to the date Plaintiffs alleged the conspiracy started—including 100% coverage on all carload shipments that used public tariffs. DA07319-322 at 321 (Fig. 76); DA00713 at 810-11 (¶ 148, Fig. IV-7A).

Between October 14, 2002 (the day before UP decided to adopt a standard carload fuel surcharge) and March 10, 2003 (about the latest date that Plaintiffs will admit does not encompass conspiracy), oil prices increased 23%, from $30.06/bbl to $37.18/bbl.[9]

### B. The Spring 2003, Allegedly Conspiratorial Fuel Surcharges

UP next implemented a change to its published carload fuel surcharge formula on June 1, 2003 (announced May 9, 2003). DA01563-64. Plaintiffs' theory is that UP changed its

---

[8] To the contrary, Plaintiffs concede these fuel surcharges were adopted unilaterally. *See* DA06202-268 at 227 ("Between 2000 and 2002, the Defendants independently implemented fuel carload surcharge programs.").

[9] The U.S. Energy Information Administration maintains a website with historical information about various fuel prices. *See* https://www.eia.gov/dnav/pet/hist/rwtcW.htm (WTI crude oil spot prices) and https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W (HDF diesel fuel prices). Both sides experts have used EIA data in their analyses in this case, and unless otherwise stated the pricing data presented here is sourced to the EIA.

surcharge formula—to make it more aggressive—because of agreements worked out in alliance meetings between UP and CSXT on March 12-13, 2003, and between UP and NS on May 14, 2003. Indisputable evidence shows otherwise.

UP's October 31, 2002 published carload fuel surcharge—concededly unilateral—was triggered for the first time on January 27, 2003, when the WTI price had risen above the $28 trigger price and remained above that price for thirty consecutive WTI reporting days. Oil prices continued to rise, and on February 4, 2003, the WTI price rose above $33, the next surcharge milestone. *Id.* That meant that if the WTI price remained above $33 for 30 *consecutive* reporting days the surcharge would increase by another 2%. What happened instead is that the WTI price remained above $33 for 29 consecutive reporting days, when it fell for *one day* to $31.55. *Id.* That single day's fluctuation cost UP millions of dollars in unrecoverable fuel costs, and also left UP and its customers with only one day to adjust their billing and payment systems to retain unexpectedly the 2% surcharge. UP's Finance team was "adamant" that UP change the formula to avoid similar problems in the future.[10] A key UP document from May 2003 looks back on these issues, summarizing:

> During the First Quarter, two flaws in the [October 2002] program became evident. First, the 30-day reporting criteria was not responsive to market conditions, for rising or falling oil prices. Second, the immediate implementation of a surcharge after the threshold criteria was met did not allow adequate time for customers to adjust freight bill rating and payment mechanisms. The combination of these flaws made it difficult for customers to know with any certainty what the effective rate would be not only in a few weeks, but also at times even over a much shorter horizon of a few days.

DA01554-62 at 55.

[10] DA01254-55 at 55 (Koraleski 77:14-78:25); *see also* DA01554-62.

Internally, UP began considering a proposal attributed to Jack Koraleski (the "JJK Revised Surcharge Proposal") that would have broken up the existing surcharge, 2% for every $5 increase in the WTI formula, into a 0.4% surcharge for every $1 increase in the WTI formula, and which would have used *average* prices in the prior month rather than the *consecutive* day rule. DA01417-22. UP's internal documents cite an "[a]dvantage" of this approach as "[c]onsistent with carriers implementing monthly surcharge changes (UP / CSXI / NS Intermodal, BNSF Carload and Intermodal)." *Id.* at 18. In fact, BNSF had been using monthly average fuel prices for years in its published carload fuel surcharge, and also smaller but more frequent "steps" in its fuel surcharge formulas.

A UP-CSXT alliance meeting took place on March 12-13, 2003. The draft agenda identified "Fuel surcharge methodology" as a topic, listed under the heading "Other Pricing Issues on CSX/UP Interline Business." DA02800-01 at 00. Plaintiffs claim Mr. Koraleski used that as an opportunity to coordinate with CSXT to change both carriers' carload fuel surcharges to mirror the "JJK Revised Surcharge Proposal" referenced above. Plaintiffs apparently base their argument on the fact that the "JJK Revised Surcharge Proposal" and a later-announced CSXT surcharge both used 0.4%/$1 increments and average fuel prices. It ignores the very different trigger prices ($28 vs. $23), a 20% difference in the actual surcharge amounts (*e.g.*, 2% at $28.01 in the UP internal proposal and 2.4% at $28.01 in the CSXT change), and the fact that while the formula was broken down into smaller increments, the actual slope of the formulas remained exactly the same – i.e., 0.4%/$1 is simply the prior 2%/$5 divided by 5. DA01417-22; DA01441-43. More importantly, it ignores that UP did not actually follow either the "JJK Revised Surcharge Proposal" or the later-announced CSXT surcharge change.

On March 20, 2003, CSXT issued a press release stating that it was changing its carload fuel surcharge program to use a $23.01 WTI trigger price and a 0.4% surcharge increasing an additional 0.4% for each $1 change in the average WTI price for the prior month. DA01430-31. This led to internal discussion within UP on whether to agree to the inevitable CSXT concurrence request for interline traffic and whether to match that formula for UP local traffic. UP's internal documents evidence the debate—without any hint of some understanding or agreement with other railroads about what to do. DA01432-34 at 32; DA01440. CSXT sent UP a formal interline concurrence request for this surcharge change on Friday, March 28, 2003. DA01441-43. How UP should respond was discussed at a Marketing and Sales Department meeting the next Monday, March 31, 2003. DA01444-48 at 44 ("Anybody have a better alternative? I know we don't like what they've proposed, but if that's the case, we need to have a better idea."). UP announced its decision to match the CSXT formula in a press release on Friday, April 4, 2003, which among other things noted the new surcharge would go into effect June 1, 2003. DA01449-52 at 49. *But that did not happen*.

There was substantial customer and internal UP opposition to the announced new surcharge. An April 10 email within the Marketing and Sales team noted that "a growing number of customers have begun to share their resentment to our planned fuel surcharge language (and that of CSX)," and that customers particularly saw the more frequent adjustments as "too complex" and "impossible to administer." DA01453. A Pacific Northwest lumber company, for example, complained to UP that each carrier "not only applies different percentages but indexes as standards for applying changes in the surcharge …. We just simply cannot keep up with all of this activity. It is a nightmare!" DA01454-56 at 55.[11] On April 14,

[11] *See also, e.g.,* DA01459-60; DA01461-65.

2003, the head of UP's Industrial Products Group took action to exempt all IP Group customers from the new surcharge, citing "[n]egative customer feedback." DA01457-58 at 58. On April 22, 2003, UP received a letter from the National Grain and Feed Association, complaining about the lower trigger price and arguing that the smaller increments would "create administrative problems for all your customers." DA01466-67 at 66. The letter was joined by other shipper associations, including the Fertilizer Institute, the National Industrial Transportation League ("NITL"), and the Paper & Forest Industry Transportation Committee. *Id.* at 67.

These events prompted UP to reconsider its stance.[12] A Marketing and Sales Department meeting took place on Monday, April 28, 2003. DA01497-517. Significant analytic work was done both before and after the meeting to analyze whether UP should change the approach it had just announced (and which, according to Plaintiffs, supposedly reflected agreement with CSXT). The relevant UP documents include a chart of the historical monthly average WTI prices; a comparison of the WTI and the HDF historical prices; and an analysis comparing UP's cost recovery for the first quarter of 2003 using the prior and the revised fuel surcharge methodology. *Id.* UP also prepared an analysis of fuel surcharges used by other railroads and the trucking industry,[13] gathering publicly-available information about the then-current BNSF fuel surcharge for that purpose.[14] The Finance Department also did an analysis of the revised carload WTI fuel surcharge methodology, including charting historical UP fuel costs and WTI and HDF prices; comparing UP's per-gallon fuel costs to WTI prices; and analyzing incremental fuel cost recovery if the revised WTI fuel surcharge methodology had been used in various prior periods.

---

[12] DA01497-517 at 97-98; DA01563-64.

[13] DA01494-96; DA01518-23.

[14] DA01492-93.

DA01468-91. Among other things, that analysis calculated UP's historical average fuel cost for 1997 through 2002 at $.73/gal, and estimated that the $23 WTI trigger in the new formula roughly corresponded to a $.74/gal fuel cost for UP. *Id.* at 69-70.

Following the April 28th meeting, a team of Finance Department employees was tasked with extensive additional analysis, including determining the correlation of the WTI and HDF indices; analyzing cost recovery for certain business groups for the existing and revised surcharge; and determining the impact on UP of various fuel surcharge scenarios, *i.e.*, the existing carload fuel surcharge ($28 trigger), the proposed fuel surcharge ($23 trigger); and the fuel surcharge used by BNSF. DA01524. That analysis was summarized in a May 2, 2003 memo to Jack Koraleski. DA01525-30.

At a meeting on Monday, May 5, 2003, UP decided to abandon the $23 WTI surcharge previously announced and to move instead to a different HDF-based surcharge with a $1.35 trigger price.[15] There is extensive documentation about this decision and its competitive rationale. UP Industrial Products employee Bob Toy prepared a PowerPoint for the meeting that advocated against the CSXT surcharge and for a modified, less aggressive version of the existing BNSF HDF fuel surcharge. DA01534-43. The HDF index was preferred because it "[f]its truck & western RR competitive environment" and correlated more closely to UP's actual fuel prices than the WTI. *Id.* at 42. The PowerPoint highlights the competitive advantage created by adopting a higher trigger price than BNSF, noting that customers viewed the "$23/bbl or $1.30/gal starting point" as a "permanent price increase" but that a "[s]lightly higher starting point ($25.50/bbl or $1.35/gal) offers multiple benefits." *Id.* at 37. And it showed that a $1.35/gal HDF trigger price was equivalent to WTI $25.50—midway between the $28 WTI

[15] DA01531-32 at 32; DA01544-53; DA01554-62.

trigger for UP's existing published carload fuel surcharge and the $23 trigger that UP had announced on April 4th. *Id*. at 39.

In debating and then opting for this HDF Surcharge, UP plainly did not act like it had some agreement with CSXT or any other railroad, as Plaintiffs argue. To the contrary, UP selected a less aggressive surcharge that would result in lower shipping rates for its customers when compared to other railroads and create competitive advantage over UP's primary competitor, BNSF.

Further, documents circulated within UP between May 5 and May 7, 2003, show an important detail, which is that UP clearly did not know—as a cartel member would—that BNSF was about to drop its trigger price (making BNSF's surcharge more aggressive). UP prepared to announce its new HDF fuel surcharge believing that BNSF's trigger price was and would remain HDF $1.30/gal, so that the proposed UP trigger price of $1.35/gal would create competitive advantage; in fact, UP intended to contrast its $1.35/gal trigger with BNSF's $1.30 trigger. *See id*. at 37-42 (Bob Toy's May 5, 2003 analysis stating that customers would like the $1.35 trigger more than BNSF's $1.30 trigger); DA01554-62 at 56 (May 7, 2003 customer communication package with a "Fuel Surcharge FAQ" stating: "Why was the threshold set at $l.35? *** The $1.35 threshold is in the range of what others are doing in the market. BNSF's surcharge has a $1.30 threshold…."). In reality, BNSF had decided a week earlier, on April 30, 2003, to drop its trigger price to $1.25.[16] It made that announcement on May 7, 2003. DA03743-87 at 68. Furthermore, we now know that BNSF learned about UP's $1.35 trigger only after UP publicly announced its change on May 9, 2003—and was concerned that UP "will be very competitive at

---

[16] DA04374-75 at 75 ("going forward …the carload strike price will be $1.25. (This reflects the $23 WTI crude strike price being used by UP in their new carload fuel surcharge table.)").

lower Highway Diesel Fuel (HDF) prices" because of BNSF's lower trigger price. DA04417-19 at 18. This is clear evidence that UP and BNSF were not conspiring.

These facts also obliterate the inference Plaintiffs seek from a discussion of fuel surcharges in an alliance meeting between UP and NS on May 14, 2003. *See* DA01594-96. That meeting occurred *after* UP decided to switch to the less aggressive HDF surcharge, and yet NS stayed the course with its WTI surcharge, in place since 2000, after the meeting. In all events, while the minutes of the May 14 meeting refer to a "question as to whether or not the industry can work together" on having the "same [fuel surcharge] process in the eyes of our customers," *id*. at 95, it is indisputable that UP did *not* conform to the WTI surcharge NS favored, but rather switched to one that would *not* have been the same as NS's "in the eyes of our customers."

Plaintiffs also cite an alliance meeting between UP and CSXT on June 3, 2003. DA01589-90; DA01591-93. Again, this was *after* UP decided to switch to the HDF surcharge and *after* it went into effect on June 1. The handwritten notes of the meeting ("CSX has not seen outcry that UP has") imply that UP told CSX about the customer resistance it faced following its April 4 announcement about matching the CSX surcharge. DA01591-93 at 91. But so what? As interline partners, UP and CSX had every right to discuss the market reaction to the fuel surcharges that applied to shared interline business. Furthermore, UP did not make any change to its published carload fuel surcharge after this alliance meeting. In fact, UP did not make any change to its published carload fuel surcharge between June 1, 2003, and *April 26, 2007*, when it moved to a mileage-based fuel surcharge. DA01700-05 at 700. So nothing arguably conspiratorial could have resulted from the June 3, 2003, UP-CSX alliance meeting.

**C. Later Developments**

UP's documents and decisions continued to reflect independent decision making with regard to fuel surcharges throughout the rest of the relevant period. In the summer of 2004, for

example, UP learned from public sources that BNSF had adopted a separate fuel surcharge for coal traffic that increased BNSF's fuel surcharge applicable to coal shipments, by lowering the trigger used in its published carload fuel surcharge from HDF $1.25 to $1.24 and altering the increments from .5% for each 5 cent increase used in the published carload fuel surcharge to .5% for each 4 cent increase. DA01599-61. After careful study of its incremental fuel costs for coal shipments,[17] UP decided *not* to follow BNSF's approach. Instead UP adopted a new coal-specific surcharge with an initial trigger of HDF $1.35, making UP more attractive on price than BNSF. Between HDF $1.35 and $1.60, UP's coal surcharge tracked its published carload surcharge. Beginning at HDF $1.60, it adjusted in increments of .75% for each $.05 change in the HDF price (giving UP a different trigger price and a different slope from the BNSF coal formula).[18]

Similarly, in March 2005, UP learned from public sources that BNSF had announced a mileage-based fuel surcharge program. DA01629-32 at 29. Had there been an ongoing conspiracy to impose rate-based fuel surcharges, BNSF's actions would have signaled the end of the cartel and been received accordingly. Yet there is no evidence that UP (or any other Defendant) complained to BNSF about this development or took it as anything but a normal competitive development.

Instead, UP conducted another internal analysis of BNSF's new mileage-based program when details were posted on BNSF's website in August 2005.[19] That analysis was shared with Mr. Koraleski in a September 8 meeting. DA01662-63. It concluded that UP would have

---

[17] DA01602-11; DA01612-21.

[18] DA01622-23, DA01624-27.

[19] DA01648-60; *see also* DA01633-47.

received less surcharge revenue during the prior year using the BNSF surcharge, and that neither UP nor its customers had the systems in place to use mileage-based surcharges. DA01662-63; DA01661.[20]

The contemporaneous documents show that UP reacted in a similar way to NS's decision to "rebase" its fuel surcharge formula in 2006 by raising its base rates by 16.4% and raising its fuel surcharge trigger to $64 WTI. DA01677. Because UP and NS are almost exclusively interline partners (rather than competitors) the internal discussions about that within UP were about how customers and the STB might react, and whether or not UP should concur on interline traffic.[21] No one expressed a view that NS was breaking with (or implementing) any sort of industry agreement, and there was considerable speculation about how the other railroads might react. *See, e.g.,* DA01680-82 at 80 (email from Rob Knight opining that "I don't think we have much choice" but to concur because "UP saying no probably won't stop NS anyway," and that "the interesting issue is whether CSX will feel compelled to change their program"). As Plaintiffs will note, there were communications between UP's Mr. Koraleski and Don Seale at NS about this. DA01677. But indisputably NS and UP did not agree on, let alone implement, some common rebasing plan. NS rebased; UP did not. Neither NS's moves nor the reaction within UP were consistent with the existence of any conspiracy.

Finally, when in January 2007 the STB ruled that rate-based fuel surcharges were an "unreasonable practice" for regulated traffic, UP again made its own unilateral decisions about how to adjust. UP announced a mileage surcharge that began at HDF $2.30 (rebased to reflect

---

[20] A later study by the Finance Department concluded that the BNSF mileage formula would result in significantly *more* revenue, although its assumptions were debated within UP. DA01664-65.

[21] *See, e.g.,* DA01669-70; DA01671-72; DA01673-74; DA01675-76; DA01678-79; DA01680-82; DA01683-84; DA01685-87.

recent fuel prices) and charged $.05 per mile, increasing $0.01 per mile for each $.05 increase in the HDF price.[22] BNSF, by contrast, expanded its mileage-based surcharge program that did not involve any rebasing. DA03788-854 at 823-826. Jack Koraleski noted that the BNSF approach resulted in a significant competitive difference between the two western carriers, observing: "A significant drop in fuel would likely force us to reduce base rates to stay competitive." DA01699. And although the STB Decision applied only to regulated shipments, UP announced that it intended to transition all of its business to the new surcharge over time.[23]

This history affirmatively refutes any inference of conspiracy with regard to UP carload fuel surcharge programs. What then of coverage—the issue to which Plaintiffs always switch when the weaknesses in their formula case are pointed out? The documents clearly show that UP was already committed back in October 2002—prior to the alleged conspiracy—to implementing fuel surcharges "on all new price documents effective immediately."[24] Thereafter, of course UP gave greater and greater attention to fuel surcharge coverage—as fuel costs skyrocketed and UP was faced with thousands of unprofitable base rates unless fuel surcharges applied to them.[25] There is no evidence of conspiracy in UP's documents during this period, just growing concern that UP would not cover its fuel costs unless more contracts contained fuel surcharges.[26]

---

[22] DA01700-05; DA01692-98.

[23] *Id.*

[24] DA01326-61 at 61; *see also* DA01362-68 at 66.

[25] DA01435-39 (contemplating "possible breakthrough strateg[y]" of "implement[ing] a 100% fuel price recover mechanism" on future contracts); DA01597-98 at 97; DA01628 (requesting "develop[ment of] an analysis that identifies when we would expect to reach 100% recovery of additional fuel expense through implementation of fuel surcharge programs" assuming that UP "implement[s] the HDF program to all business as it becomes available").

[26] *Id.*

## III. CONCLUSION

For the forgoing reasons, as well as the argument and evidence discussed in Defendants' Common Memorandum, UP respectfully requests entry of summary judgment on Plaintiffs' conspiracy claims.

Dated: May 14, 2021

Respectfully Submitted,

_/s/ Daniel M. Wall_
Daniel M. Wall
Timothy L. O'Mara
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Phone: (415) 391-0600
dan.wall@lw.com
tim.o'mara@lw.com

Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Phone: (202) 637-2200
allyson.maltas@lw.com

Leonard A. Gail
MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-1590
Fax: (312) 379-0467
lgail@masseygail.com

Tyrone R. Childress
Kelsey S. Bryan (D.C. Bar No. 1034352)
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Phone: (213) 489-3939
tchildress@jonesday.com
kbryan@jonesday.com

John M. Majoras (D.C. Bar No. 474267)
Kristen Lejnieks (D.C. Bar No. 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
Phone: (202) 879-3939
jmmajoras@jonesday.com
kalejnieks@jonesday.com

Matthew M. Collette (D.C. Bar No. 427167)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Phone: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com

*Counsel for Defendant Union Pacific Railroad Company*