**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF) |
| This Document Relates to:<br><br>ALL CASES | **PUBLICLY FILED VERSION**<br><br>**Oral Argument Requested** |

**CSX TRANSPORTATION, INC.'S**
**MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I. CSXT's Creation, Implementation And Modification Of Its Fuel Surcharge Was Consistent With Its Unilateral Self-Interest. .... 3

A. CSXT Adopted And Published A Rate-based Fuel Surcharge In 2000 .... 3

B. CSXT Modified Its Published Fuel Surcharge Formula In 2003. .... 5

II. CSXT Made A Unilateral Decision To Modify Its Formula, With No Agreement With Other Railroads. .... 10

III. CSXT's Conduct After March 2003 Is Flatly Inconsistent With Plaintiffs' Conspiracy Theory. .... 13

A. CSXT's Modified Formula Was Very Similar To Its Original Formula. .... 14

B. CSXT's Fuel Surcharge Coverage Did Not Increase Dramatically After Its Modified Formula Became Effective .... 14

C. CSXT Continued To Significantly Discount Its Fuel Surcharge And Negotiate Alternatives As It Competed For Shippers' Business. .... 16

IV. Conclusion .... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999)....1

**Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....1

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999)....1

**City of Moundridge v. Exxon Mobil Corp.*,
No. 04-940 (RWR), 2009 WL 5385975 (D.D.C. Sept. 30, 2009)....10, 19, 20

*Cohen v. D.C. Nat'l Bank*,
59 F.R.D. 84 (D.D.C. 1972)....1

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
910 F.3d 927 (7th Cir. 2018)....17

**Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....1

## Other Authorities

1 ANTITRUST LAW DEVELOPMENTS, ch. 1D (Am. Bar. Ass'n, 8th ed. 2017)....12

As discussed in Defendants' common brief, Plaintiffs here can point to no direct evidence of conspiracy, but rely on ambiguous, circumstantial evidence and inferences they seek to draw from it. Courts are clear that each defendant in an antitrust conspiracy case is entitled to be judged on its own evidence, not swept into joint and several liability through evidence tied only to alleged co-conspirators.[1] That does not mean CSXT believes there is evidence any of the Defendants colluded here. What it does mean is Plaintiffs must have evidence that "tends to exclude the possibility" that CSXT acted unilaterally with regard to its fuel surcharges. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy must tend to rule out that the defendants were acting independently"). Plaintiffs cannot meet that burden, for three main reasons:

1. Plaintiffs allege that CSXT's March 2003 modification of its fuel surcharge formula was the product of conspiracy, because: It was rate-based; used the same formula used by CSXT's competitor Norfolk Southern Railway ("NS"); and, was accompanied by concurrence requests to CSXT's interline railroad partners, public announcement that it applied to both interline and local traffic, and internal management directives to apply it broadly to contracts.

The problem with this theory is that CSXT did the same thing when it first created its fuel surcharge in 2000, conduct Plaintiffs have conceded was all "unilateral." CSXT implemented a

---

[1] *See Cohen v. D.C. Nat'l Bank*, 59 F.R.D. 84, 88 (D.D.C. 1972) ("Each [defendant] is entitled . . . to have its defense determined on the facts that are specifically relevant to its own activities."); *In re Citric Acid Litig.*, 191 F.3d 1090, 1093, 1105-06 (9th Cir. 1999) (record evidence did "not tend to exclude the possibility that Cargill acted independently—and thus does not support a reasonable inference that *Cargill* was involved in the price-fixing conspiracy"); *see also AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 233-34 (2d Cir. 1999) (consistent with *Matsushita* and *Monsanto*, "we require a factual showing that each defendant conspired in violation of the antitrust laws").

rate-based surcharge; used the exact same formula as NS at the time; and issued directives to apply the surcharge broadly to all contracts. Yet, Plaintiffs were forced to admit that they "ha[ve] not observed evidence in this litigation that Defendants were involved in the alleged conspiracy before March 2003." DA06292 at 93-94 (Pls' Resp. to RFA 27). There thus is no dispute that CSXT's use of rate-based surcharges, matching a competitor's formula, obtaining interline concurrences, applying its surcharges to interline and local traffic, and seeking comprehensive coverage, all are fully consistent with unilateral behavior, and do not give rise to any inference of collusion.

2. Plaintiffs have no evidence that CSXT's decision to modify its fuel surcharge formula in March 2003—which came before any other railroad modified its concededly unilateral formula—involved any agreement with any other railroad. Nor do Plaintiffs have evidence that "rules out" the extensive, contemporaneous documentation surrounding CSXT's decision. And once CSXT made and announced that decision, it made no further changes to its published surcharge formula until it switched to a mileage-based surcharge in 2007.

3. Plaintiffs assert that what happened after CSXT modified its formula is probative of conspiracy, because: CSXT's new formula was far more "aggressive," imposing much higher surcharge rates than under its original formula; CSXT was able to dramatically increase from low coverage levels starting with the conspiracy in March 2003; and it stopped negotiating with customers regarding alternatives or discounts to its surcharge.

Once again, each of these allegations is wrong, belied by the undisputed record. CSXT's modified formula produced nearly the same revenue as the original formula would have at the same fuel prices. CSXT only gradually increased its fuel surcharge coverage as fuel prices increased, from nearly 40% of its traffic before the alleged conspiracy to just 50% two years

later; there was no dramatic increase associated with a "non-negotiable" surcharge. Nor did CSXT cease discounting its surcharge rates; to the contrary, as Plaintiffs' expert concedes, CSXT offered what amounted to a 25% average discount from its supposedly "conspiratorial" surcharges during the supposedly "no discount" conspiracy. And it continued to negotiate alternatives to its surcharge, including with the largest Plaintiff in this case.

In short, CSXT continued to act—and compete—in a unilateral, rational way from March 2003-forward, in the same ways Plaintiffs have conceded CSXT did before that date.

## I. CSXT's Creation, Implementation And Modification Of Its Fuel Surcharge Was Consistent With Its Unilateral Self-Interest.

Plaintiffs have conceded that CSXT's adoption and use of rate-based fuel surcharges in 2000 was entirely lawful:

> Between 2000 and early 2003 . . . , Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts to apply stand-alone fuel surcharges . . . [2]

This admission is critical: it means none of CSXT's conduct before March 2003 is evidence of conspiracy, and by definition what CSXT did in that period was in its unilateral self-interest. And so, when CSXT did the same things in 2003 when it modified its formula, that conduct cannot be recast as contrary to unilateral self-interest, and probative of conspiracy.

### A. CSXT Adopted And Published A Rate-based Fuel Surcharge In 2000.

Throughout the relevant period in this case, CSXT was faced with "fuel costs gone wild." Argument of Mr. Hausfeld, DA06819 at 22 (323:1-6). These costs skyrocketed after mid-2003. Energy Information Admin., Petroleum & Other Liquids, Spot Prices, *available at*

---

[2] DA06850 at 53; DA07435 at 36-37. "Plaintiff has not observed evidence in this litigation that Defendants were involved in the alleged conspiracy prior to March 2003." DA06292 at 93-94 (Pls' Resp. to RFA 27).

https://www.eia.gov/dnav/pet/PET_PRI_SPT_S1_D.htm (last accessed May 12, 2021). But the first fuel price spike, and with it increased volatility, came in 1999-2000. *Id.* In the late 1990s, the price of crude oil on the West Texas Intermediate ("WTI") index generally ranged between $15 and $18 a barrel. *Id.* By summer 2000, the price had increased to $21-23 and higher, *id.*, swelling CSXT's costs to provide its fuel intensive rail service.[3]

In July 2000, CSXT began to consider whether to adopt a fuel surcharge as a means to better recover its costs, in response to direction from Michael Giftos, CSXT's Chief Commercial Officer and former General Counsel. DA01861 at 63 (Giftos 29:4-31:2); DA01908 at 12-13 (McIntyre 51:25-53:9); DA02860. CSXT's sister company, CSX Intermodal, had already adopted a fuel surcharge in March 2000.[4] Its principal rail competitor, Norfolk Southern ("NS"), had published a carload fuel surcharge as of June 2000. DA05698; DA05940. And CSXT had responded to concurrence requests to apply fuel surcharges adopted by other railroads on their joint line traffic. DA02900-01 (NS); DA02880 at 80 (BNSF). Trucks and other transportation companies had adopted similar fuel surcharges as well. DA02915-32.

After conducting an analysis over the summer, on September 22, 2000, CSXT publicly announced that "it must join others in the transportation industry to implement a fuel cost recovery charge to offset costs from continuing sharp increases in fuel prices," effective October 25, 2000. DA02851; *see also* DA02843. CSXT's announcement explained that its fuel costs for

---

[3] DA0195 at 2041, 2058 ("[f]uel expense [in 2000] was $260 million higher than 1999"), 2055-56; DA00513 at 585-86 (Ex. 26) (fuel as share of costs nearly doubled from 1998 and 1999 to 2000).

[4] DA02137 at 38 (noting CSX Intermodal's adoption of a fuel surcharge on March 6, 2000). CSX Intermodal was a separate corporation during the relevant period and was not named as a defendant in this action. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 123 n.37 (D.D.C. 2017).

2000 were projected to be $585 million, up from $320 million the year before, and expressed CSXT's intent that its new surcharge would "apply to local as well as interline freight movements." *Id.* CSXT sought and obtained concurrence from its interline partner railroads to use the surcharge on CSXT-originated joint line rates. DA03006 (UP); DA06910 at 12 (UP); DA06035 (NS); DA01908 at 15 (McIntyre 65:20-66:15). On October 25, 2000, CSXT set its first fuel surcharge at 2% based on fuel prices at the time. DA02867.

CSXT's new surcharge was calculated using the following rate-based formula, the same one NS had adopted several months earlier: "[f]or every five dollars the price of West Texas Intermediate oil (the industry standard for tracking oil prices, also know [sic] as WTI) goes above $23 a barrel (for 30 consecutive days), a 2% recovery charge will be added." DA02843 at 45. That is, the surcharge would increase by 2% if the price of WTI as published remained above the next $5 increment (*i.e.*, $28, $33, $38, etc.) for 30 consecutive days as published in the Wall Street Journal. If fuel costs decreased, the same formula would reduce the surcharge. *Id.*

Starting with its publication, CSXT set a goal that its new fuel surcharge—or a similar cost escalator that accounted for fuel—be included in all contracts and other private price authorities. To achieve this, CSXT adopted a policy to apply the new surcharge to all existing traffic "moving under tariffs, private price quotes [PPQs] and certain contracts that incorporate those general tariffs," while excluding contracts that already contained "a price escalator index published by a government entity, such as RCAF," DA02851; DA02144 at 46, and, for "[n]ew and [r]enewing contracts," to "[a]lways include fuel surcharge language, unless government-based escalator [*i.e.* RCAF] applies." DA02144 at 58; *see also* DA02834 at 35.

All of this, in Plaintiffs' words, was "unilateral" and <u>not</u> part of any "conspiracy."

**B. CSXT Modified Its Published Fuel Surcharge Formula In 2003.**

Oil prices continued to rise after CSXT adopted its fuel surcharge, reaching over $34 per

barrel in November 2000. Prices then fell in late 2001 and generally stayed below $28 until September 2002. Under CSXT's fuel surcharge formula, this meant that it did not apply a surcharge in that period. *See* DA02310 at 11. But in late 2002 and early 2003, oil price levels and volatility rose again in the lead-up to the Iraq War. By October 2002, the WTI price again had moved above $28, and CSXT briefly re-applied a 2% fuel surcharge on October 17, 2002. *Id.* That 2% charge was removed on December 11, 2002 when WTI prices again fell below $28 for just over 30 days, DA02669, before they immediately spiked again, re-triggering the surcharge six weeks later in late January 2003. DA02935. Industry observers identified "the uncertainty of a pending war and the negative impact that continues to have . . . on diesel fuel" and rail costs in turn,[5] while CSXT's internal analyses addressed the impact to its operations of fuel price increases and possibility of war in Iraq.[6]

During this period, CSXT employees examined potential modifications to its existing fuel surcharge formula, to better match its fuel recovery to fuel cost changes and to do so sooner after those costs were incurred. This involved discussion of possible changes to the trigger, timing,

---

[5] DA02772 at 73 (Feb. 27, 2003 Credit Suisse railroad equity report: "[a]s fuel prices have continued to rise throughout 1Q:03 we felt it prudent to re-visit the fuel sensitivity of the various Class 1 carriers," and lowering earnings estimate for CSX Corp); at DA02508 at 09-10 (Jan. 31, 2003 Bear Stearns equity research report, CSX Corp.: "Given the relatively high current spot fuel price . . . and the current uncertain political situation with the potential for a U.S. led war in the Middle East we see higher fuel expense as a primary risk to earnings growth in 2003 for CSX."); *see also* DA02570 at 600-02 (Jan. 30, 2003 CSX Corp. earnings webinar transcript, Mr. Giftos: "[t]he most important thing about the geopolitical situation we're facing is that it . . . ends quickly; and we get . . . a decline in the cost of crude oil and some strength in the overall economy"); DA02514 at 26 (Oct. 24, 2002 CSX Corp. earnings call transcript).

[6] DA02647 at 54 (March 11, 2003 draft CSXT Automotive Services Group Outlook/Review presentation, noting re: "War With Iraq Sensitivities," "Fuel prices spiked prior to Desert Storm then returned to normal. Fuel has been high >$25 per barrel for most of the last two years"); DA02785 at 85, 89.

increments, slope, and index of the formula.[7] CSXT's analysis included consideration of BNSF's fuel surcharge formula, which was based on a different index (*i.e.* HDF, or "On-Highway Diesel Fuel"). CSXT considered a $23 trigger, *see* DA02167 at 72, 75; DA02286 at 89, and it noted as "[a]dvantages of the BNSF program" that its HDF trigger price corresponded to a WTI price of $23, and its use of monthly average fuel costs. DA02167 at 74-75.

By mid-February 2003, the WTI price had risen above $33 per barrel. Because that was the next increment at which CSXT's existing formula would raise its surcharge rate, on March 7, 2003, CSXT advised customers that its surcharge might change from 2% to 4% due to higher fuel prices. DA02933-34; DA07080. In expectation of this increase, CSXT employees prepared a draft letter to CSXT customers on March 17, set to be released on March 19, announcing that the fuel surcharge would change from 2% to 4% because as of March 18, the price of fuel would have been above the $33 per barrel threshold for 30 consecutive days. DA07078.

But after twenty-nine consecutive days above $33, the WTI closing price on March 18, 2003 (published in the March 19 Wall Street Journal) dropped to $31.68 on the thirtieth day. DA02935. As a result, CSXT's fuel surcharge remained at 2%, instead of 4%, leaving it unable to recover for the extra costs it had incurred while prices were above $33.[8]

---

[7] DA02713 (Aug. 20, 2002 internal email addressing the "merits of changing the CSXT fuel surcharge language and formula in order to lower the threshold for activation. . . similar to CSX Intermodal"); DA02790 at 91 (Feb. 26, 2003 "Hypothetical CSX vs BNSF Impact on CSX Fuel"); DA02167 (March 3, 2003 presentation to two sessions to the CSXT Commercial Team); DA02286 (March 11, 2003 presentation with proposal for 1% surcharge charge at $23/barrel and 0.5% increment for each $2.50 change in WTI, based on monthly average prices); DA01831 at 41-42, 45-46 (Couch 92:20-94:6, 110:24-111:20, 115:7-16).

[8] DA02935; DA07080-81; DA02893 at 94-95 (March 25, 2003 memo from Giftos to Ward: "the fuel surcharge will be about $9 million less than previously projected" for Q2 2002 "based on a 2% charge for the entire second quarter."); DA01831 at 45 (Couch 112:11-23).

This was the second time in recent months that fuel price changes had interacted with the formula's 30-consecutive day mechanism in a way the that had forced CSXT to absorb substantial costs above its trigger price. DA02185; DA01861 at 65, 67-68 (Giftos 41:18-42:7, 99:3-101:9). Early the next morning, March 19, 2003, Giftos called CEO Michael Ward to inform him that CSXT would not be getting the additional two percent fuel surcharge because of the unexpected price drop, and asked for and received Mr. Ward's permission to change the formula immediately.[9] Giftos then convened a senior staff meeting later that morning to "outline the parameters of the program, get your input, make the appropriate adjustments and get the program implemented." DA02185. Giftos explained that the current formula was "simply unresponsive to the dramatic increases in fuel prices," and that while he "realize[d] we will meet some customer resistance," "given the impact of fuel prices on our revenue numbers, we have no choice but to go forward." *Id.*

Giftos and Director of Market Strategy John Couch met throughout the day, late into the evening and into the next, discussing various options for revising the formula and their pros and cons.[10] They discussed these possible changes with CSXT's in-house counsel, Paul Hitchcock, and worked with Adam Hollingsworth, its top communications officer, to prepare a plan announcing the changes to the formula.[11] Their discussion narrowed to two options, one formula similar to BNSF's existing HDF-based formula, and the other a modification to CSXT's existing WTI formula, which they ultimately selected. DA02639 and DA02643, DA02640; *see*

---

[9] DA01861 at 70, 75 (Giftos 110:11-112:6, 129:6-23); DA01927 at 33-34 (Ward 124:25-126:12); *see* DA02185 (March 19, 2003 Memo. from Giftos, noting he "ha[d] spoken with [Ward] this morning about a new program we want to announce immediately").

[10] *E.g.*, DA02186; DA06915; DA02267; DA01831 at 47-48 (Couch 118:7-123:22).

[11] *Id.*, DA01831 at 52-53 (Couch 138:5-141:25); DA01861 at 75 (Giftos 129:24-131:4); *see* DA02292; *see* DA02185.

DA01831 at 52 (Couch 139:3-140:13). In a memo to Giftos that evening (DA02639), Couch explained why the latter had "the most merit":

1. It is very similar to our program today
2. At $28, $33, $38 etc the customer will see the same fuel surcharge bill
3. Anti-trust concerns are significantly eased as compared to copying another railroad's program
4. The Fuel Surcharge percentage changes occur at smaller intervals
5. Billed monthly
6. Will have impact closer to when fuel costs are changing

The next day (March 20) CSXT publicly announced it was modifying its fuel surcharge "[i]n an effort to more quickly respond to changing market conditions and the continued volatility in fuel prices":[12] First, the modified formula eliminated the requirement that the WTI price be above each incremental trigger for 30 consecutive days to change the surcharge rate. Instead, the surcharge percentage would be determined each month based on the 30-day average WTI price. Second, it "remain[ed] unchanged at $5/barrel intervals" over $23 per barrel WTI, but the 2%/$5 increments were broken out into smaller increments of 0.4% for every $1 increase or decrease in the WTI price.[13] Thus, while the fuel surcharge would now be triggered initially at $23.01 (at 0.4%) instead of $28 (at 2%), the formula's rate-based nature, slope, and baseline price were "exactly the same" as in the 2000 formula. DA01927 at 35-36 (Ward 144:1-145:5); DA02886. But, the new formula would "more directly respond to fuel price changes in a real-time manner," as CSXT explained in announcing it, DA02616, and would better capture fuel costs within the $22-$28/barrel range projected by oil analysts at the time.[14]

---

[12] DA02616; DA02745. Giftos and Couch testified these modifications were intended to "fix the flaw in the old program," but with "as few changes as possible" to address customer concerns. DA01861 at 71 (Giftos 115:7-116:16); DA01831 at 50-51 (Couch 132:9-133:10).

[13] DA02886; DA01861 at 71 (Giftos 114:10-115:6); *see* DA01908 at 17 (McIntyre 86:15-87:19).

[14] *See* DA06202 at 32 n.137 (stating that "[i]n June 2003, [. . .] the 'OPEC price band target of US $22-28 per barrel for its Reference Basket of seven crudes' [was] expected to 'continue to

Thereafter, CSXT made no further change to its published fuel surcharge formula, until it adopted a published mileage-based fuel surcharge formula in its place, in April 2007.[15]

CSXT's independent business rationale for modifying its surcharge formula was logical, rational, and well-documented. Where, as here, "there is an independent business justification for the defendant's behavior, no inference of conspiracy can be drawn." *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940 (RWR), 2009 WL 5385975, at *6 (D.D.C. Sept. 30, 2009) (quotation omitted).

## II. CSXT Made A Unilateral Decision To Modify Its Formula, With No Agreement With Other Railroads.

The focus of Plaintiffs' conspiracy theory as to CSXT is that its March 2003 decision to modify its surcharge formula—unlike the concededly unilateral creation and implementation of its surcharge in 2000—was the product of illegal agreement with other railroads. Magistrate Judge Facciola compelled Plaintiffs to "identify the people that, according to plaintiffs, knowingly participated in the alleged unlawful agreement." *See* DA06823 at 34. For CSXT, Plaintiffs responded with four names: CEO Michael Ward; Mike Giftos; Clarence Gooden, the head of CSXT's Merchandise business group and later Chief Commercial Officer; and John Couch. *See* DA06397 at 408-409. Of these four, Plaintiffs asked only two (Ward and Giftos) about their contact with other railroads regarding CSXT's March 20, 2003 fuel surcharge

---

operate successfully' through 2020."). It is for this reason that Mr. Couch explained, in a document Plaintiffs have cited repeatedly, that the modified formula might generate "as much as 100%" more revenue than the original. *See* DA02186 at 86. The original formula, at fuel prices in the $22-$28 range, generated no revenue. The modified formula did generate revenue, albeit at low rates of 0.4% to 1.6%. That is a lot more revenue than zero. *See also* DA01861 at 70 (Giftos 109:6-19); DA01886 at 89 (Gooden 67:19-68:12).

[15] DA02792 at 95, 97; DA02201. CSXT explored possible changes to its published fuel surcharge, starting as early as May 2005. *See* DA02458 at 466, 477.

modification. They unequivocally denied discussing that change or reaching any agreement with any other railroad before the decision was made. DA01927 at 40 (Ward 222:5-223:7); DA01861 at 73-74 (Giftos 124:25-125:4). No witness or document contradicts this sworn testimony.

Plaintiffs allege that Defendants' conspiracy was hatched between March 2003 and May 14, 2003, "over a series of meetings between Defendants' top executives." DA06397 at 403-404; DA06292 at 93-94 (Pls' Resp. to RFA 27). Under Court order, Plaintiffs were also forced to identify whether there was a specific "moment or moments in time when certain specified persons agreed to fuel surcharges in a manner that in itself was a conspiracy that violated the antitrust laws, [and] who those persons were and when those agreements occurred." DA06823 at 27. Plaintiffs identified no evidence CSXT discussed its surcharge formula with either NS (its main rail competitor) or BNSF (whose published formula CSXT had studied) before CSXT decided to modify it. The only meeting Plaintiffs identified with an alleged co-conspirator before CSXT announced its modification was a strategic alliance meeting with UP, on March 13, 2003.

The one document that Plaintiffs point to—a March 5, 2003 draft agenda for the March 13 meeting emailed from UP's Bob Toy to CSXT's John Couch—included as a topic: "Other Pricing Issues on CSX/UP Interline Business," and under it "Fuel surcharge methodology (believe Jack [Koraleski from UP] & Clarence [Gooden from CSXT] talked on this)." DA02800. The permissible interline context for such a discussion could not be clearer from this draft agenda. The actual presentations for the March 13, 2003 meeting bear out that it was about interline topics—specifically, "interline pricing," use of "common language" for interline movements, and customer web access to interline quotes for joint movements involving CSXT and UP. DA01398; DA01423. Such a conversation among interline partners—here an Eastern

and Western railroad—about pricing and mechanics for interline movements is at the very core of topics that strategic alliance meetings were supposed to cover, and what Section 10706 was designed to protect.

And, regardless of any special statutory protection, when carriers like CSXT and UP work together to move interline traffic, they are engaged in a *vertical* relationship, not a horizontal one—as Plaintiffs' expert Dr. Gordon Rausser admits. DA06436 at 39-40 (Rausser 288:23-291:4). It is axiomatic that "[v]ertically related firms are necessarily in frequent communication with each other." 1 ANTITRUST LAW DEVELOPMENTS, ch. 1D (Am. Bar Ass'n, 8th ed. 2017). These are the very types of conversations that one would expect to occur between two geographically distinct railroads working together to jointly provide rail services to a broader set of shippers that neither could serve alone.

There is thus nothing remotely suspicious—much less unlawful—about the occurrence of this meeting or its agenda. No witness, nor any documents, support Plaintiffs' theory, DA06397 at 399 (n.2), that UP and CSXT agreed to changes to either of their fuel surcharge formulas. Dr. Rausser himself admitted that he could not reach the conclusion that CSXT and UP coordinated their fuel surcharges based on the draft agenda Plaintiffs cite, or that CSXT and UP left the March 13 meeting having reached an unlawful agreement. DA06423 at 27-30 (Rausser 145:21-154:15). The extensive, uncontradicted testimony and documentary evidence reviewed above details how Mr. Giftos made his decision and why.

Unable to identify evidence that CSXT's decision was anything other than unilateral, Plaintiffs seek to create a post-hoc inference of collusion from other railroads' subsequent adoption of surcharge modifications. But the record of what actually happened simply confirms unilateral decision-making by CSXT and the other railroads.

CSXT publicly announced its surcharge modification on March 20, 2003. But the other Defendants did not immediately match CSXT's modification, as one might expect of co-conspirators seeking to assure each other of allegiance to illegal agreement. To the contrary, no other railroad did anything until two weeks later, on April 4, 2003, when UP publicly announced it planned to modify its formula like CSXT. Plaintiffs pounce on this, noting that "CSX[T] and UP announced similarly aggressive standard fuel surcharges." DA06397 at 399 (n.2). But omitted from this narrative (as reflected in Defendants' common brief) is that UP changed its mind a month later, and on May 9 announced a different fuel surcharge than CSXT, based on an entirely different index (HDF vs. WTI). BNSF, which had adopted a rate-based fuel surcharge based on the HDF index in July 2001, left that fuel surcharge unchanged (save a modest change to add a 0.5% surcharge at $1.25 per gallon HDF under the existing trigger of 1% at $1.30—announced in May, 2003) through 2008, and in March 2005 announced it was moving to a mileage-based fuel surcharge for local and Rule 11 traffic. And ***nine months*** passed before CSXT's Eastern rival, NS, announced it would match CSXT's formula in January 2004.

## III. CSXT's Conduct After March 2003 Is Flatly Inconsistent With Plaintiffs' Conspiracy Theory.

The Court has heard the same mantra from Plaintiffs for more than a decade now: their alleged conspiracy theory is rendered plausible by how starkly different things were after Defendants' fuel surcharges were modified in 2003 and 2004. "There were dramatic differences in the behavior of the Defendants between the pre-Class Period and the Class Period, concerning the increased use of Fuel Surcharges and the Defendants' refusal to negotiate with shippers concerning those Fuel Surcharges." DA06202 at 05. The alleged conspiracy "necessitated universal coverage and full application across all shippers . . . ." *Id.* at 07. This is the ground Plaintiffs have staked out for years. And when the undisputed evidence (including Plaintiffs'

own data) shows that these theories are demonstrably false, it undercuts any inference of conspiracy and instead supports the inference of independent conduct.

**A. CSXT's Modified Formula Was Very Similar To Its Original Formula.**

Plaintiffs assert that the modified surcharge was a dramatic departure from the prior formula. But the 2003 modified formula used the same slope and basic 2%/$5 increments, with the same surcharge rate at every $5 over $23/WTI—it was exactly the same at $28, $33, $38, and so forth, with smaller increments at each dollar WTI in between. DA00513 at 579 (Ex. 21); DA02886. Consistent with the documented explanation for CSXT's change, the main thing the modified formula did was allow for modest surcharge revenue (0.4%-1.6%) as fuel prices fluctuated between $23 and $28 per barrel, and greater sensitivity to incremental changes in fuel prices, up or down. If one were to apply CSXT's 2000 and 2003 fuel surcharges to what actually happened to fuel prices over the relevant period, the fuel surcharges charged under each formula track closely. DA00513 at 671 (Ex. 53). There is no contrary evidence in the record. Plaintiffs' expert, Dr. Rausser, acknowledged that the surcharges generated by the modified formula used by CSXT and later NS were "approximately the same" as would have been generated under the original. DA06450 at 53 (Rausser 35:1-37:5); DA00713 at 903 (Fig. IV-24B).

**B. CSXT's Fuel Surcharge Coverage Did Not Increase Dramatically After Its Modified Formula Became Effective.**

CSXT's original surcharge coverage had risen gradually throughout the period Plaintiffs concede was unilateral. As Dr. Rausser himself recognized, expanding coverage naturally and necessarily takes time, because fuel surcharges can generally only be added to existing contract traffic as contracts come up for renegotiation and renewal.[16] Nevertheless, by March 2003, the

[16] *See* DA06202 at 35 (recognizing that existence of contracts with no fuel surcharge provision "necessitated a phased implementation" to increase coverage); *see also* DA02144 at 46, 58.

proportion of CSXT's unregulated revenue subject to rate-based fuel surcharges was already approaching 40%, DA06269 at 74 (Fig. 68); DA00513 at 621 (Ex. 34), up from *nothing* when surcharges were first implemented in late 2000. CSXT's effort to apply its fuel surcharge unilaterally before the alleged conspiracy was not the failure Plaintiffs hypothesize.

After the supposed conspiracy began, there was no spike in CSXT's coverage. The gradual growth in its surcharge coverage continued after early 2003. As Dr. Rausser admitted, an entity that has adopted a fuel surcharge has a unilateral interest to want to apply it broadly. DA06423 at 33 (Rausser 272:20-273:11).[17] Yet CSXT's rate-based fuel surcharge coverage had reached just 50% two years later, and a high of only about 65% two years after that. DA06269 at 72-74 (Fig. 68); DA00513 at 621 (Ex. 34). These figures are not disputed (DA06450 at 62 (Rausser 290:23-293:12)), and of course are nothing like the "universal coverage" that supposedly was "necessitated" by conspiracy. DA06202 at 07. And CSXT—unlike the other Defendants—continued to use RCAF(u) in its contracts as "acceptable as an alternative" to fuel surcharges for years after the supposed conspiracy began.[18]

None of this is consistent with Plaintiffs' theory that a conspiracy "dramatic[ally]" increased CSXT's surcharge coverage towards a supposedly "common goal of achieving 100% Fuel Surcharge coverage." DA06202 at 04-05. The undisputed empirical evidence flatly contradicts Plaintiffs' theory.

---

[17] Non-defendant railroads likewise sought to apply their fuel surcharges broadly in this period of increasing fuel costs. *See, e.g.*, DA06836 at 37; DA06838 at 39.

[18] DA06925 at 30 (June 1, 2005 Industrial & Agricultural Products Midyear Review); DA02295 at 299-300; DA02802 at 07 (June 2003 "Current policy": "All price vehicles must contain fuel surcharge language or RCAF(u) . . . [s]ome leeway is given depending on competitive circumstances"); DA01861 at 76 (Giftos 143:24-144:21).

### C. CSXT Continued To Significantly Discount Its Fuel Surcharge And Negotiate Alternatives As It Competed For Shippers' Business.

As the modest growth in CSXT's fuel surcharge coverage during the alleged conspiracy suggests—and once again contrary to Plaintiffs' allegations—CSXT continued to negotiate exceptions and discounts to a modified surcharge formula that was, according to Plaintiffs, supposedly "100%" insulated from competition.[19] Indeed, CSXT and its primary rail competitor NS repeatedly competed against each other by negotiating over fuel surcharges.[20]

Illustrative of this competition are two of the five individual Plaintiffs now before the Court, both significant customers of CSXT and NS. Both negotiated substantial exceptions to CSXT's published fuel surcharge during the alleged conspiracy. Plaintiff Olin Corporation

---

[19] *See, e.g.*, DA00513 at 626 (Ex. 37) (compiling examples of CSXT's negotiated discounted or non-standard fuel surcharges), *id.* at 627-640 (negotiated fuel surcharges or exceptions); DA02753; DA02670.

[20] *See, e.g.*, DA06925 at 37 (CSXT Industrial & Agricultural Products business group: reporting, in June 2005, that group used "RCAF(U) as the main recovery vehicle [with Agricultural customers] to compete with the NS" which CSXT understood "d[id] not charge Fuel Surcharge to its AG customers"); DA05666 and DA02763 at 65 ([redacted] CSXT in July 2004 "agreed to forego FSC for five years," and was awarded business that NS was competing for); DA02840 and DA05667 at 68 ([redacted] CSXT awarded 100% of "[redacted] competitive business" in June 2004, with "agree[ment] . . . to forego any FSC."); DA05894 ([redacted] NS renewed a contract with [redacted] without a fuel surcharge during January 2004 negotiations for "highly competitive business with CSXT."); DA02663 and DA05906 ([redacted] CSXT offered [redacted] an RCAF(U) escalator instead of the published fuel surcharge formula in February 2004 where NS was also competing for [redacted] business); [redacted] CSXT agreed to a 50% fuel surcharge with [redacted] in October 2006 after [redacted] explained that "sticking to our public program with them will cost us business head to head with NS," *see* DA02898 (discussing surcharge exception for [redacted] in light of NS competition in July 2006) and DA02957 at 98-99 (Amend. 5 to [redacted] contract CSXT 68608, eff. Oct. 1, 2006, with fuel surcharge of 50% of published formula); DA05901, DA05653, and DA05258 at 66 ([redacted] told NS in 2003 negotiations that "CSXT does not assess [redacted] a Fuel Surcharge," and NS proposed—and [redacted] accepted in a final August 8, 2005 contract—a modified, "catastrophic" fuel surcharge triggered when prices rose above $35); DA05933 and DA05246 at 54 ([redacted] in light of CSXT's having "exempted [redacted] from their fuel surcharge," NS offered in August 2003—and [redacted] accepted—a modified, "catastrophic fuel provision" that was discounted from NS's published fuel surcharge).

("Olin"), a relatively large chemical company and shipper, had paid rate-based fuel surcharges to both CSXT and NS before the alleged conspiracy.[21] It also paid rate-based fuel surcharges to other railroads—[redacted] and [redacted]—during this time, and to several trucking companies.[22] These other railroads' and freight transportation providers' self-interested pursuit of similar conduct refutes Plaintiffs' inference that CSXT's conduct is not consistent with independence. *See Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F. 3d 927, 936 (7th Cir. 2018) (Wood, C.J.) (price increases led by non-defendants suggest free leading-and-following rather than collusive coordination of parallel conduct). And Olin itself announced a fuel surcharge for its customers in February 2003, just before CSXT modified its own.[23]

Over months starting in late-2003, Olin negotiated a new, three-year contract with CSXT for shipments from its Niagara Falls plant. DA06627; DA02781; DA06580 at 95; DA06700. This contract was effective from June 2004 through May 2007, and covered the bulk of Olin's business with CSXT during the alleged conspiracy. DA06627 at 27. <u>It did not include a fuel surcharge</u>. Instead, it contained an RCAF(u) clause, to apply for the second and third years of the contract.[24] In contrast, most of Olin's contracts with NS from 2003 to 2006 included rate-based fuel surcharges. *See, e.g.*, DA06666; DA06670; DA06675. Olin highlighted the

---

[21] *See, e.g.*, DA06620-26; DA06598 at 604; DA06569, at 73-74; DA06575 at 78-79.

[22] *See, e.g.*, DA06654; DA06650 at 52; DA06679; DA07524. As Olin explained in 2006, "[w]ith very few exceptions, all carriers, for all shipping modes apply a fuel cost recovery methodology to their freight bills – referred to as the fuel surcharge." DA06680 at 83, 84.

[23] DA07524 at 26 (Feb. 17, 2003 Olin letter explaining: "[f]or the past two years, the cost of fuel has continued to rise and Olin has incurred fuel surcharges from our carriers ranging from 2% to 6% . . . to a point that Olin will no longer be able to absorb these costs[,]" such that "effective March 1, 2003, we will begin adding to all invoices a line item fuel surcharge based on Olin's contract formula pricing with contract carriers (tank truck, railcar and barge)." *See also* DA06695; DA06697; DA06680 at 89.

[24] DA06627 at 27. This contract was amended to include a mileage-based fuel surcharge, starting in June 2007. DA06699.

differences in fuel surcharges charged (or not) by its "[m]ajor [c]arriers"—rail, truck, and barge—in an internal analysis, which identified $5.3 million in fuel surcharges paid to NS in 2005 and *zero* to CSXT (DA06680 at 84):

**Major Carriers**

- *Top six carriers represent over 90% of total freight spending for the division*
- *27 additional motor carriers with an average spend of less than $150M/year*




*2005 Freight Payments*

*Includes 3rd Party Freight Pass Through*

| *Carrier* | *Mode* | *Annual Base Spending (2005)* | *Fuel Surcharge (2005)* |
|---|---|---|---|
| *Norfolk Southern* | *Rail* | *$45.3 MM* | *$5.3 MM* |
| *CSX* | *Rail* | *$16.9 MM* | *$0 M* |
| [redacted] | *Truck* | *$8.4 MM* | *$1.8 MM* |
| [redacted] | *Truck* | *$1.9 MM* | *$0.3 M* |
| [redacted] | *Truck* | *$0.9 M* | *$0.2 M* |
| [redacted] | *Barge* | *$0.7 M* | *$0.3 M* |

Olin

Plaintiff Strates Shows ("Strates"), a small traveling circus that also shipped primarily with NS and CSXT, also did not pay a rate-based fuel surcharge to CSXT for nearly <u>four years</u> into the alleged conspiracy, again in contrast to NS.[25] Strates negotiated a new two-year contract with CSXT in late April 2003, another in May 2005, and two amendments (in February and May 2006), all without a fuel surcharge.[26] So: four negotiations occurred after the alleged conspiracy began, with its allegedly "common goal of achieving 100% Fuel Surcharge coverage." DA06202 at 04-05. Each time, the negotiations produced no fuel surcharge. More broadly, even Dr. Rausser acknowledged that the low coverage levels achieved by CSXT during the alleged

---

[25] DA06779 at 84, 86; DA06787 at 93; DA06794 at 800-01. Strates, too, was quoted rates that included fuel surcharges by CP as early as May 2002. DA06702; DA06705 at 17 (2005 CP/Strates contract).

[26] DA06719 (Apr. 2003 contract); DA06732, DA06744, DA06747 (May 2005 contract, CSXT 83477, and Feb. and May 2006 amendments). Only with a third amendment in February 2007 did Strates' contract with CSXT include a rate-based fuel surcharge, and then only for a year. DA06747 at 59 (Feb. 9, 2007, Amend. 3 to CSXT 83477).

conspiracy "by itself would not support [the] conclusion" of conspiracy and could be consistent with unilateral behavior. DA06436 at 42 (Rausser 358:5-361:17).[27]

CSXT's frequent negotiation over its fuel surcharge is also reflected in the undisputed substantial discounting from CSXT's alleged conspiratorial fuel surcharge across its traffic: Dr. Rausser presented an analysis which showed that, during the alleged conspiracy, shippers paying fuel surcharges to CSXT on its local, unregulated traffic received an average discount of more than 25% off its published formula. DA06471 at 79-80 (Rausser 814:4-815:19); DA06278 at 81-82 (Tbls. 1 & 2) (comparing CSXT's actual average surcharge rate of 11.9%, to its "Standard Class Period Formula FSC Rate" of 16.2%).

These inconsistencies—between CSXT's surcharge-related behavior and performance and that of other railroads—undermine not only Plaintiffs' fundamental conspiracy theory, but even its premise that the Defendants' conduct and the results they achieved were "parallel." But even if the Court accepts Plaintiffs' premise—that simply having fuel surcharge formulas (however different) and seeking to actually use them broadly as fuel costs skyrocketed (even with widely divergent success rates) equals parallel conduct—that is not enough to carry Plaintiffs' burden. As the court held in *Moundridge*:

> Even if the plaintiffs' theory for parallel behavior is accepted, the plaintiffs do not offer evidence to support the conclusion that the defendants' pricing decision was not just parallel behavior. Rising prices do not themselves permit an inference of a collusive market dynamic. Even in a concentrated market, the occurrence of a price increase does

---

[27] These instances and many more are reflected in the undisputed data showing the substantial portion of CSXT's traffic never "covered" by rate-based fuel surcharges during the alleged conspiracy, discussed above. CSXT's coverage was substantially lower throughout this period than other of the Defendants'—in particular its primary rail competitor, NS, as Plaintiffs' expert shows across a range of commodities, DA06202 at 53, 55 (Figs. 34 & 36); *see also* DA06269 at 73-74 (Figs. 66-69) (showing CSXT's coverage during much of the alleged conspiracy was between 20-30 percentage points lower than NS').

> not in itself permit a rational inference of conscious parallelism for supra competitive pricing. Plaintiffs have not pointed to evidence that tends to exclude the possibility of independent action. Mere interdependent behavior, *i.e.*, actions taken by market actors who are aware of and anticipate similar actions taken by competitors, is insufficient.

2009 WL 5385975, at *6 (internal citation and quotation omitted, citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 131-32 (3d Cir. 1999), *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993), and *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987)), *aff'd*, 409 Fed. Appx. 362, 363-64 (D.C. Cir. 2011) (plaintiffs failed to meet their "burden . . . to present evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently" (citing *Matsushita*, 475 U.S. at 588)).

## IV. Conclusion

For these reasons, CSXT's fuel surcharge conduct from early 2003 to 2008 simply cannot support an inference that it conspired with the other Defendants, compelling summary judgment for CSXT and negating Plaintiffs' conspiracy theory with respect to all Defendants.

Dated: May 14, 2021

Respectfully submitted,

/s/ Kent Gardiner
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Juan A. Arteaga
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134
JArteaga@crowell.com

Katie Yablonka
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Phone: (415) 986-2800
Fax: (415) 986-2827
KYablonka@crowell.com

*Counsel for Defendant CSX Transportation, Inc.*