**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. I) | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/GMH) |
| This document relates to:<br><br>ALL CASES | **PUBLICLY FILED VERSION**<br><br>**Oral Argument Requested** |

**NORFOLK SOUTHERN RAILWAY COMPANY'S**
**SEPARATE MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

ARGUMENT .......... 1

I. NORFOLK SOUTHERN'S USE OF FUEL SURCHARGES WAS IN ITS OWN UNILATERAL SELF-INTEREST AND INCONSISTENT WITH CONSPIRACY. .......... 1

A. NORFOLK SOUTHERN IMPLEMENTED AND APPLIED A PUBLISHED CARLOAD FUEL SURCHARGE BEGINNING IN 2000. .......... 2

B. NS MODIFIED ITS 2000 FORMULA AFTER MONTHS OF EVALUATION. .......... 4

1. NS Twice Decided Not to Adopt the Modified CSXT Formula. .......... 4

2. NS Decided to Modify Its 2000 Formula in December 2003. .......... 7

3. NS's Failure to Follow Its Primary Competitor for Nine Months Is Inconsistent with Conspiracy. .......... 8

4. NS's Conduct in the Intervening Nine Months Does Not tend to Exclude the Possibility of Independent Action. .......... 9

II. THE ALLIANCE MEETINGS THAT ARE THE CORE OF PLAINTIFFS' CASE DO NOT ALLOW AN INFERENCE OF CONSPIRACY. .......... 12

III. NS'S APPROACH TO FUEL SURCHARGES BEFORE AND DURING THE ALLEGED CONSPIRACY PERIOD SHOWS THAT NS ACTED IN ITS OWN, UNILATERAL SELF-INTEREST. .......... 16

A. NS INSTITUTED A COVERAGE POLICY IN 2000, AND CONTINUED THAT POLICY THROUGHOUT THE ALLEGED CONSPIRACY PERIOD. .......... 16

B. NS CREATED AND USED EXCEPTIONS TO ITS PUBLIC CARLOAD FUEL SURCHARGE FORMULA THROUGHOUT THE ALLEGED CONSPIRACY PERIOD. .......... 17

C. NS'S "REBASING" ITS PUBLISHED CARLOAD FUEL SURCHARGE IS INCONSISTENT WITH CONSPIRACY. .......... 18

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

*In re Baby Food Antitrust Litigation*,
166 F.3d 112 (3d Cir. 1999)....................8

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*,
203 F.3d 1028 (8th Cir. 2000) ....................20

*In re Citric Acid Litigation*,
191 F.3d 1090 (9th Cir. 1999) ....................8, 20

*Gangi Bros. Packing Co. v. Cargill, Inc.*,
529 U.S. 1037 (2000)....................8

*Kleen Products LLC v. International Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ....................9

*Kleen Products LLC v. Georgia-Pacific, LLC*,
910 F.3d 927 (7th Cir. 2018) ....................9

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................2

*Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*,
988 F.2d 587 (5th Cir. 1993) ....................16

*In re Text Messaging Antitrust Litigation*,
46 F. Supp. 3d 788 (N.D. Ill. 2014) .................... 8

*In re Text Messaging Antitrust Litigation*,
782 F.3d 867 (7th Cir. 2015) ....................8, 9

*Wallace v. Bank of Bartlett*,
55 F.3d 1166 (6th Cir. 1995) ....................9

## ARGUMENT

### I. NORFOLK SOUTHERN'S USE OF FUEL SURCHARGES WAS IN ITS OWN UNILATERAL SELF-INTEREST AND INCONSISTENT WITH CONSPIRACY.

Norfolk Southern moves individually and jointly with the other Defendants on the issue of conspiracy. Defendants' Common Memorandum, which Norfolk Southern Railway Company ("NS") joins in full, demonstrates that Plaintiffs have no direct evidence of NS agreeing to conspire with any other Defendant. Nor can Plaintiffs conjure up NS's participation in a conspiracy through circumstantial evidence, because the undisputed facts show that NS's actions with respect to its fuel surcharges were unilateral and consistent with its independent self-interest. This separate memorandum provides a more detailed account of NS's fuel surcharge history.[1]

Plaintiffs concede that NS's pre-2003 fuel surcharges were adopted unilaterally. While Plaintiffs contend that NS had by no later than May 14, 2003 agreed to conspire with the other Defendants, Plaintiffs' accusations are wholly undercut by the undisputed facts that NS did not decide to modify its formula until December 2003, and only after NS conducted multiple internal analyses to evaluate its options. Even after adopting the purportedly conspiratorial formula that CSXT had announced in March 2003, NS negotiated fuel surcharges, creating and using 30 new surcharge formulas. During the relevant period approximately the same amount of NS customer revenue was associated with these fuel surcharge *exceptions* as with the allegedly conspiratorial formula. Finally, in April 2006 NS further distanced itself from its primary competitor, CSXT, by "rebasing" its public carload fuel surcharge, creating a competitive difference between their published formulas. This is no way to carry out an illegal agreement. NS's conduct is

---

[1] For the Court's convenience, NS's separate memorandum refers to materials contained in Defendants' Appendix in Support of Defendants' Joint and Individual Motions for Summary Judgment (the "DA") submitted with Defendants' Common Memorandum.

inconsistent with conspiracy, and it is consistent with its own unilateral self-interest.

In light of these facts, Plaintiffs' evidence does not tend to "exclude the possibility" that NS acted unilaterally, and summary judgment is warranted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

### A. <u>Norfolk Southern Implemented and Applied a Published Carload Fuel Surcharge Beginning in 2000.</u>

In June 2000, NS implemented a fuel surcharge for published carload traffic based on the West Texas Intermediate ("WTI") crude oil index (the "2000 formula").[2] The 2000 formula triggered a charge of 2% of the shipper's base rate if the WTI remained above $28 for 30 consecutive "reporting" days, as reported in *The Wall Street Journal*, and triggered an additional 2% each time the WTI remained above successive $5 thresholds for 30 consecutive reporting days.[3] Likewise, the 2000 formula decreased or was removed when the WTI remained below a trigger price for 30 consecutive reporting days.[4] It applied automatically to published price authorities, both regulated by the STB and those exempt from regulation, but did not automatically apply to private price authorities (*i.e.*, negotiated contracts). However, NS sought to add the 2000 formula to new contracts or existing ones as they came up for renewal.[5]

NS adopted the 2000 formula as a "backstop" to protect against fuel price volatility.[6] Don Seale, at the time Senior Vice President for Marketing Services, testified that, after a period of "unprecedented volatility" in fuel prices, NS investigated what kinds of fuel surcharges NS

---

[2] DA05698; DA05529 at 29-34; DA05940 at 40-44.

[3] *See* DA05623; DA05698; DA05529 at 30; DA04957 at 60 (Glennon 13:18-14:09).

[4] DA05624 at 25; DA05698; DA05529 at 30.

[5] DA05008 at 31 (Seale 130:19-131:17).

[6] DA05008 at 17, 22-23 (Seale 42:22-43:13; 67:24-69:16). *See also* DA04984 at 87 (Goode 49:10-16); DA05529 at 34; (calling fuel surcharge a "national emergency provision" to address "spikes" in fuel prices); DA05937 (referring to fuel surcharge as a "good insurance policy against a future fuel crisis").

could design and use to protect against fuel price spikes.[7] Fuel price volatility was "hard to forecast and very, very unpredictable," and NS wanted a mechanism that would respond well.[8] NS considered formulas used by other railroads, and by other modes of transportation like trucks.[9] CSXT adopted the same formula as NS four months later, effective October 2000. Plaintiffs admit that these formulas were adopted independently.[10]

NS recognized that the 2000 formula was flawed.[11] For example, it required the WTI price to remain above $28 for 30 consecutive *Wall Street Journal* reporting days, and the fuel price volatility meant that the surcharge was often not triggered, and therefore not charged to customers, even when fuel prices remained elevated for a long period of time (*i.e.*, up to 29 days in a row). This caused a flurry of activity, including notifying customers of pending rate increases (required by law), and disruption to prepare for an increase that did not materialize.[12] In such instances, the formula did not capture any of the increased cost of fuel.[13] The process also led some customers to complain about the uncertainty.[14]

---

7 DA05008 at 13 (Seale 27:6-25).

8 DA05008 at 13-14 (Seale 27:4-29:9).

9 DA05626 ("We are considering adopting the UP's plan to generate consistency & minimize billing errors."); DA05980 at 82 ("Let's modify ours to coincide with BNSF formula.").

10 DA06363 at 66.

11 *See, e.g.*, DA05576 (noting "[t]he need for a formula that is more responsive to incremental cost fluctuations."); DA05555 ("It turns out fuel prices fell as soon as NS distributed all the fuel surcharge notifications about the impending 4%. The clock has started over."); DA06043.

12 *See* DA05555; DA06013 (noticing customers that fuel surcharge would increase from 2% to 4% on October 11, 2000 if the WTI index remained above $33. The WTI subsequently fell below $33 prior to October 11, 2000).

13 *See* DA05008 at 36-37 (Seale 164:23-165:13; 166:13-168:9); *see also* DA05784 (noticing 5,024 customers that if the WTI index remained above $33 through March 19, 2003, fuel surcharges would increase), DA06043 (reporting on March 19, 2003, that fuel surcharges would not increase because WTI fell below $33 threshold).

14 DA06046 at 47 (customer stating the "issue isn't the surcharge as much as the timing of it

### B. NS Modified Its 2000 Formula After Months of Evaluation.

Plaintiffs allege that, by no later than May 14, 2003, NS agreed with the other Defendants that it would adopt the formula announced by CSXT on March 20, 2003 (the "modified CSXT formula").[15] That theory cannot be reconciled with what actually happened. NS did not modify its formula after CSXT announced its change. Instead, at the behest of Don Seale, who allegedly participated in the conspiracy, NS analyzed its options and twice decided not to modify its 2000 formula over a nine-month period. NS finally decided to make a change in December 2003.

#### 1. NS Twice Decided Not to Adopt the Modified CSXT Formula.

On March 20, 2003, CSXT announced a modified published carload fuel surcharge formula.[16] By June 1, 2003, UP and BNSF also had announced changes to their existing published carload formulas.[17] Nevertheless, NS did not make a change to its own, and instead began considering whether to keep its 2000 formula, follow CSXT, or do something else.[18]

The day CSXT announced its change, Don Seale asked Pat Glennon, NS's Manager of Pricing Systems, to analyze the modified CSXT formula, including whether it would be "more complex or 'easier to administer.'"[19] Glennon responded with a list of pros and cons.[20] On March 28, CSXT sought NS's concurrence with respect to NS-CSXT interline traffic,[21] which Glennon forwarded to the Group Vice Presidents ("GVPs") responsible for carload traffic:

> CSXT has asked for NS concurrence to the new CSXT Fuel

---

going into effect").

[15] DA6397 at 403-07; DA00005 at 20.

[16] DA02186.

[17] DA05803 ("Since June of 2003, the UP and CSXT have opted to drop our current standard and adopt unique FSC formulas. As a result, the BNSF, UP, CSXT, CN, CP and NS all maintain unique FSC programs."); DA04603.

[18] DA05769; DA05204.

[19] DA05769 at 70.

[20] DA05769.

[21] DA05196.

> Surcharge. As is our practice with any public joint-line blanket rate change, we give the teams an opportunity to comment. This change has received more attention than most. This request only covers CSXT issued prices with NS in the route. While NS reserves the option to non-concur to the new surcharge as it relates [to] CSXT / NS joint line publications, carriers generally defer to the issuing carrier.[22]

Glennon recommended that NS concur.[23] One GVP advocated for concurring on interline traffic, because, "I don't see how we can justify the two different systems to our customers."[24] Another responded with support for the concurrence, because the modified CSXT formula "is much more specific and objective than the current method of application. . . . Let's go ahead with this, and see if it is manageable so as to assess if we should adopt this for NS traffic as our fuel surcharge terms."[25] NS concurred to charging the modified CSXT formula on its joint traffic with CSXT, and yet did *not* change its own published carload fuel surcharge formula to match CSXT.[26]

In April 2003, Don Seale sought a review of the modified CSXT formula. At Seale's request, Glennon prepared a memo "recap[ping] the case for and against changing the NS Fuel Surcharge standard in response to the recent action announced by CSXT."[27] Seale asked the group to provide a consensus recommendation by May 1.[28] At the same time, the NS commodity

---

22 DA05772.

23 DA05772. Prior to 2003, interline partners routinely sought and received concurrences on fuel surcharges. *See, e.g.*, DA05618 (stating on May 19, 2000 "we now have concurrence from CSXT to apply our fuel surcharge note to rates involving CSXT. They now join BNSF and CP as interline partners agreeable to this provision.").

24 DA05777.

25 DA05779.

26 DA05202 ("Norfolk Southern concurs to the modified CSXT Fuel Surcharge effective June 1, 2003. This concurrence is limited to CSXT issued publications involving CSXT/NS joint line prices that specifically reference the CSXT Fuel Surcharge provision."); DA05008 at 11, 50-51 (Seale 18:13-19:8, 236:10-238:4).

27 DA05820.

28 DA05709.

groups debated fuel surcharge options, including the formulas in use by all of the other Class I railroads: CSXT, UP, BNSF, Kansas City Southern, Canadian National, and Canadian Pacific.[29]

The team evaluated a range of factors bearing on whether it was in NS's interest to make a change.[30] On April 29, 2003, the team recommended that NS "retain the current NS formula."[31] In particular, the team believed that, if NS kept its 2000 formula, NS might be able to leverage any customer opposition to the modified CSXT formula to "negotiate[e] larger rate increases into base rates, or [receive] additional traffic" at CSXT's expense.[32] It also cited fuel price projections, which forecasted declining prices going forward.[33] Seale agreed, writing on May 9, 2003, "[l]et's . . . maintain our current FSC program for the time being."[34]

On June 30, 2003, Seale again asked the GVPs to review NS's options—this second review coming a full six weeks after NS purportedly had agreed with the other Defendants it would adopt the modified CSXT formula.[35] The reviewers again considered a variety of options.[36] At the time, fuel prices were stable, and forecasts predicted prices to decline to approximately $25 per barrel by the end of the year and to the low $20s in 2004.[37] It was also still unclear to NS whether it might attract business against CSXT's fuel surcharge, which was

---

[29] DA05820 at 21-24.

[30] DA05008 at 23-24 (Seale 72:22-73:14 ("We were reviewing that in terms of how much additional business we may be able to secure from our customers because we thought we had a lower fuel surcharge in [place] at the time and we thought we would be rewarded with additional business by maintaining a lower fuel surcharge.")); DA05574 at 74-75.

[31] DA05574.

[32] DA05574.

[33] DA05574 ("[I]t appears we may be entering an extended period of reasonable oil costs which would make the current NS FSC a non-event for our customers.").

[34] DA05670.

[35] DA05843; DA05717 at 17-18; DA05095 at 95-96.

[36] DA05717 at 20 (comparing NS's formula to the formulas of CSXT, BNSF, and UP); DA05095; *id.* at 96 (projecting fuel prices would decline by September 2003).

[37] DA05008 at 23-24 (Seale 72:22-73:14); DA05726.

higher than NS's at the time.[38] After more debate and analysis, NS again decided to do nothing.[39]

### 2. NS Decided to Modify Its 2000 Formula in December 2003.

On October 31, 2003, Seale asked the GVPs to take a "fresh look at the case for and against NS adopting" the modified CSXT formula and provide him with a recommendation.[40] Again, the GVPs considered many factors, including a detailed list of the "pros" and "cons," but for the first time expressed "[g]eneral support for a switch" to the modified CSXT formula.[41] One factor that led NS to change its position: NS had not succeeded in attracting additional business from CSXT by maintaining its existing fuel surcharge formula.[42] Other factors included fuel prices, which had not declined as projected and had become volatile again,[43] and the fact that the modified CSXT formula corrected the flaws in the 2000 NS formula that had prevented it from being responsive to volatility in fuel prices.[44] Lastly, the change addressed shipper complaints about having to administer multiple fuel surcharge processes.[45]

---

38 DA05210 ("[W]e should wait this out and review our position once things settle down.").

39 DA05673 ("Pat Glennon makes some very good points here in favor of not modifying our trigger for the FSC at this time. I am inclined to agree.").

40 DA05647; DA05125.

41 DA05847, DA05648.

42 DA05008 at 23-24, 30 (Seale 72:22-74:2, 127:13-128:12 ("[W]e had hoped that customers would award more business to us by having a lower fuel surcharge. We did not see that taking place over the course of 2003.")); DA05844 (stating on November 6, 2003 that "[s]o far, I have seen no evidence that our customers are rewarding NS versus CSX for maintaining a more reasonable FSC program."); *see also* DA05641 (August 15, 2003 email from the chemicals GVP proposing that NS stick with its existing fuel surcharge program).

43 *See* DA07343 (stating on November 4, 2003, "earlier [WTI] forecasts for 2003 called for a similar drop in second half 2003 and that hasn't materialized").

44 DA06034 (describing customer concerns regarding how NS calculated the 30 consecutive day component); DA05676 ("We could be facing a period where the price drifts back and forth across the threshold."); DA05555 ("It turns out fuel prices fell as soon as NS distributed all the fuel surcharge notifications about the impending 4%."); DA05008 at 37 (Seale 166:12-167:22).

45 DA05803 ("[T]he BNSF, UP, CSXT, CN, CP and NS all maintain unique FSC programs. This fragmentation has led to customer complaints about having to track multiple FCSs….").

Even so, it was not until December 2003, a full nine months after CSXT's announcement, that Don Seale finally made the decision to adopt the modified CSXT formula.[46] On December 15, Seale asked "to take one last look at the [modified] CSXT formula" before making the change.[47] On January 8, 2004, Seale informed Chief Marketing Officer Ike Prillaman and CEO David Goode that NS would announce the modified formula to be effective March 1, 2004.[48]

### 3. NS's Failure to Follow Its Primary Competitor for Nine Months Is Inconsistent with Conspiracy.

No inference of an agreement allegedly reached before May 14, 2003 can be drawn when, as here, NS twice—both before and after that date—carefully deliberated whether to modify its own program, and decided *not* to adopt the CSXT formula. Courts consistently reject conspiracy claims where the evidence shows that the defendants independently evaluated their pricing structure and made their own decisions. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999) (defendants' analysis whether and how to react to another's price increases demonstrated independent pricing); *In re Citric Acid Litig.*, 191 F.3d 1090, 1100 (9th Cir. 1999), *cert. denied, Gangi Bros. Packing Co. v. Cargill, Inc.*,529 U.S. 1037 (2000) (evidence of strategic reasoning for an action is as consistent with independent self-interest as with conspiracy).

Moreover, the nine-month gap between CSXT's announcement and NS's eventual decision to do the same is itself plainly inconsistent with the presence of conspiracy. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 46 F. Supp. 3d 788, 808 (N.D. Ill. 2014), *aff'd*, 782 F.3d 867 (7th Cir. 2015) ("the time elapsed between [price] increases," the first after 8 months and the second after 11 months, among other evidence, was "as equally suggestive of independent action

---

46 DA05477; DA05655; DA05008 at 12-13, 30 (Seale 24:20-25:16; 127:13-128:12).
47 DA05477.
48 DA05936.

as collusion," if not "more suggestive of independent action"); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 825 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) (finding that the pattern and gaps in time between price announcements, ranging from hours to 56 days, undermined any inference of conspiracy).

NS's eventual decision to switch its formula is contrary to a suggestion of conspiracy, given how long the modified CSXT formula had been publicly available, and how routinely firms make changes to their positions based on their assessment of competitor pricing. *See, e.g.*, *Text Messaging*, 782 F.3d at 879 ("We can, …without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing and other market behavior and often to find it in their self-interest to imitate that behavior rather than try to undermine it."); *Kleen*, 910 F.3d at 935-36; *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169 (6th Cir. 1995) (evidence of parallel pricing insufficient to survive summary judgment, even where defendant banks acknowledged evaluating the fees charged by others before setting their own fees, because this reflected the natural interest of each firm in "surveying the market . . . in order to make strategic competitive decisions"). Indeed, this is the same behavior that led CSXT to follow NS in 2000.

#### 4. NS's Conduct in the Intervening Nine Months Does Not tend to Exclude the Possibility of Independent Action.

Starting in 2000 when NS first implemented its fuel surcharge, the company generally applied fuel surcharges by including the full text of the formula directly in the contract or price authority, and those contracts and authorities had to be renegotiated before any modified fuel surcharge could be applied.[49] The April 2003 review team, however, recommended that NS

---

[49] DA05613 ("Since we cannot open up existing contracts and private price quotes to insert a fuel surcharge note it is imperative that we get this into all new and renegotiated contracts and private quotes…."); DA05570 ("At the moment we are only applying the fuel surcharges to 'public' prices AND new contracts.").

change this process to give the marketing teams the option of applying the fuel surcharge to private contracts and price authorities through a reference to the separate NS Conditions of Carriage, which contained a fuel surcharge provision.[50] As a result, in July 2003, NS began to insert a reference to the Conditions of Carriage in some new price authorities, and, for some renewed price authorities, NS began to remove the full text of the fuel surcharge formula and replace it with a reference to the Conditions of Carriage.[51] NS did not unilaterally replace fuel surcharge provisions in *existing* contracts with a reference to the Conditions of Carriage; it waited until the existing authority came up for renewal.[52] NS determined that *if* it decided in the future to modify its fuel surcharge formula, the new formula could apply through a change in the NS Conditions of Carriage to all price authorities that incorporated the provision.[53]

Under Plaintiffs' conspiracy theory, *NS had already decided to adopt the modified CSXT formula in the spring of 2003*,[54] but instead of adding the conspiratorial surcharge to new and renewing contracts through the rest of the year, NS decided to add a reference to the Conditions of Carriage that still incorporated the 2000 formula, and then, months later, swap out the 2000 formula for the modified CSXT formula in the Conditions of Carriage, and finally, add that language to contracts. This is a nonsensical, fantastical method for carrying out a conspiracy,

---

50 DA05574.

51 DA04957 at 70, 72, 79-80 (Glennon 88:9-20 ("Q: Norfolk Southern would attempt to make—just make a reference to the conditions of carriage in the contract rather than embedding the 28-dollar fuel surcharge in the contract itself? A: [A]t some point the use of the conditions of carriage is the way to apply the fuel surcharge once it is instituted."); 93:9-15; 122:04 – 125:11); DA05794 at 95.

52 DA05576 ("The new FSC will be applied to private authorities as they are renegotiated and reissued by Product Managers."); DA05008 at 31 (Seale 130:19-131:17).

53 DA05574 (stating that NS could "[r]emove the FSC text from all publications" and "[r]eplace it with a reference to the FSC in the NS Conditions of Carriage.").

54 DA06397 at 403-07; DA00005 at 19-20.

which only Rube Goldberg would design.

Even as NS started referencing the Conditions of Carriage in some contracts in July 2003, it also continued to negotiate other contracts using the "full text" of NS's existing 2000 formula.[55] If, as Plaintiffs contend, NS already had agreed to adopt the modified CSXT formula, NS had *no reason* to continue to add its 2000 formula to new and renewed contracts throughout the summer, fall and winter of 2003, as well as the first two months of 2004. NS could have announced a new carload fuel surcharge, implemented that change immediately on public tariffs, and negotiated with shippers to apply the new fuel surcharge in new or renewing contracts and price authorities, just as it did in 2000. In fact, over the intervening period of July 2003 through February 2004, NS issued 2,172 new rate authorities.[56] Had NS already agreed to follow CSXT, then each of those rate authorities presented a new opportunity to implement the modified CSXT formula. Instead, NS negotiated other fuel surcharge formulas[57] and met competitive terms offered to shippers by CSXT.[58] This behavior is entirely inconsistent with conspiracy.

When NS finally decided to modify its formula in December 2003, NS ended up *not* implementing the change through the Conditions of Carriage reference.[59] During the third

---

55 *See, e.g.*, DA05406 at 10 (June 2004 contract with 2000 formula); DA05902 (approving use of 2000 formula in April 2004).

56 DA00203 at 255.

57 *See, e.g.*, DA05274 at 76 (January 2004 contract with 2% fuel surcharge triggered when WTI remained above $38 for 30 consecutive days); DA05432 at 50 (July 2003 contract with 2% fuel surcharge triggered when WTI remained above $37 for 90 consecutive days).

58 DA07338 (stating on July 30, 2003 "[a]nother case of CSXT multi- year contract endangering our business….CSXT seems to be getting the upper hand with non FSC multi-year contracts."); DA07340 at 41 (stating on August 6, 2003 "[s]ee competitive CSX/CN ethanol proposal below. The competition has exempted [redacted] from their fuel surcharge and we need to respond in kind. I recommend granting the fuel surcharge waiver.").

59 DA05576 at 77 ("The new FSC will be applied to private authorities as they are renegotiated and reissued by Product Managers.").

internal review, in November 2003, Pat Glennon explained that doing so could generate contractual legal disputes and customer complaints.[60] Instead, NS applied the new surcharge formula to public price authorities effective March 1, 2004 and began to negotiate to apply it to new and renewed contracts and price authorities—exactly as it did when it implemented its carload fuel surcharge in 2000 and as it could have done at any time in 2003.[61]

## II. THE ALLIANCE MEETINGS THAT ARE THE CORE OF PLAINTIFFS' CASE DO NOT ALLOW AN INFERENCE OF CONSPIRACY.

Plaintiffs identify two alliance meetings that NS attended in the March through May 2003 period during which they claim Defendants reached an unlawful agreement.

***March 18, 2003.*** On March 18, the BNSF and NS CEOs and executives from the marketing, finance, operations and planning departments met in Norfolk, Virginia. The executives discussed many issues regarding their interline business, including opportunities to jointly move western coal to eastern utilities, resolving service problems on BNSF-NS routes, and redesigning gateways where traffic was interchanged.[62] An annotated version of the action items resulting from the meeting poses the following question: "BNSF's fuel surcharge is structured differently than NS, CSX[T], and UP. Should BNSF's by (sic) synchronized with the other big players in the industry? (Lanigan/Seale)."[63] The action item suggests the accurate observation that at the time, CSXT, NS and UP had identical public carload fuel surcharges based on the WTI, while BNSF applied a public carload fuel surcharge based on the HDF index.

John Lanigan (BNSF's new Chief Marketing Officer), Don Seale and others present at

---

60 DA05847 at 48 ("Significant legal and customer issues with applying new C/C provisions to existing contracts prior to renegotiation.").

61 DA04957 at 71, 74 (Glennon 91:17-92:20; 101:15-103:6); DA05008 at 31 (Seale 130:19-131:17); DA07333; DA05638 at 38-40; DA05612; DA06050; DA05570.

62 DA04211 at 12-13.

63 DA04211 at 12.

the meeting testified to their recollections and understandings that the discussion related to concerns about the impact that different fuel surcharge mechanisms have on the ability of their customers to administer fuel surcharges on interline movements.[64] Indeed, contemporaneous, ordinary course documents confirm that customers had raised concerns about having to administer multiple fuel surcharge formulas.[65] Plaintiffs offer nothing that contradicts this explanation of the legitimate nature of this conversation. In any event, what occurred after the meeting is clear evidence no conspiratorial agreement was reached: the structure of BNSF's carload formula *never* matched the structure of any of NS's carload formulas, and, except for decreasing its fuel surcharge trigger price from HDF $1.30 to $1.25 per gallon and a corresponding fuel surcharge percentage (0.5%) at the new trigger price, BNSF never modified its published carload fuel surcharge formula from April 2001 through December 2008.[66]

***May 14, 2003.*** The second alliance meeting identified by Plaintiffs took place in Omaha, Nebraska, on May 14, 2003, between the NS and UP CEOs and executives from the marketing, operations and planning departments. At the time of this meeting, UP had *already* adopted a different published carload fuel surcharge, shifting from the WTI to a HDF index-based formula.[67] The executives' discussion at the meeting covered issues regarding interline business between UP and NS, such as operating metrics on NS-UP traffic, specific marketing projects,

---

64 DA03099 at 125, 137 (Lanigan 178:9-15, 112:11-24 ("customers started to express concerns about the complexity of fuel surcharge within the industry")); DA05008 at 55-56 (Seale 256:6-257:24 ("[W]e could certainly have been talking about NS/BN application on a interline basis and what else was out there in the marketplace.")).

65 DA05518 (customer proposing a standard fuel surcharge to be used by all of its transportation providers for "easier administration"); DA05786 (customer stating "[i]t would be a lot easier if everyone could use the same [FSC] method, pretty difficult to keep track of when different.").

66 BNSF implemented a mileage-based fuel surcharge in 2006. DA04573 at 75.

67 DA01563 at 63-64.

and fixing service deficiencies.[68] According to minutes of the meeting:

> [A d]iscussion followed on fuel surcharges and various application processes as used by different roads. Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers. There was some question as to whether or not the industry can work together on this opportunity, probably through the AAR, or do roads have to handle the opportunity on a bilateral basis. Follow up: UP – Jack Koraleski/Mike Hemmer, NS - Don Seale/Greg Summy.[69]

UP meeting participants recalled that this discussion related to the concerns of customers about differences in fuel surcharge methodologies. UP Vice President and CFO Jim Young testified that the discussion related to "feedback we were getting from customers, there was some frustration that there were multiple methodologies" for fuel surcharges and they "wanted it simplified and somewhat standardized on interline moves."[70] Similarly, UP CEO Dick Davidson testified that he did not recall the discussion, but the minutes reflect a "hypothetical conversation" that "[i]n the eyes of our customers…it would be more customer-friendly if there was one uniform way of doing" a fuel surcharge process.[71] This is consistent with the complaints both railroads heard from customers about managing different fuel surcharge formulas.[72] Indeed, Olin executive Amanda Davis acknowledged the difficulty of administering different fuel surcharge methods.[73]

Don Seale and the UP CMO, Jack Koraleski, were designated to follow up with in-house counsel—Mike Hemmer for UP and Greg Summy for NS—before further discussion of the topic took place. There is no evidence that any internal NS follow-up occurred, or that a subsequent communication between the two railroads on this topic took place between lawyers or otherwise.

---

68 DA05216 at 18-19; DA05008 at 57 (Seale 263:1-25).
69 DA05216 at 18.
70 DA01263 at 64 (Young 230:18-232:6).
71 DA07578 at 81-82 (Davidson 158:04-161:07).
72 DA05518; DA05786.
73 DA07528 at 31-34 (Davis 90:14-93:2).

Regardless, subsequent events demonstrate no illegal agreement was reached: Effective June 1, 2003, UP applied a HDF index-based fuel surcharge, having announced its change from a WTI formula before the May 14 meeting with NS. Since then, NS and UP have never applied the same formula. Moreover, at no time after this meeting did all four Defendants apply the same formula.

Testimony from NS participants is clear that no illegal agreement was reached at either meeting. During fact discovery, Judge Fasciolla required Plaintiffs to identify railroad employees who allegedly reached the illegal agreement at these meetings. For NS, Plaintiffs identified CEO and Chairman David Goode, Senior Vice President of Corporate Planning and Services (2003), President (2004), CEO (2005), and Chairman (2006) Wick Moorman, Senior Vice President (until 2006) and Chief Marketing Officer (beginning 2006) Don Seale, and Vice Chairman and Chief Marketing Officer Ike Prillaman (until 2006). *See* Pls. Suppl. Interrog. Resps. (Jan. 4, 2012) at 17. Plaintiffs did not depose Prillaman. Seale testified that he had no communications with executives at other railroads—outside of conversations with interline partners concerning interline rates—with respect to NS's decision to modify its fuel surcharge.[74] Moorman testified that, at meetings with interline partners, there was "an understanding on everyone's part that [they] could not discuss issues that would be in violation of the antitrust guidelines."[75] Goode testified he did not recall any meetings "discuss[ing] fuel surcharges" with the other railroads.[76]

---

[74] DA05008 at 29 (Seale 122:01-124:25).
[75] DA04996 at 004 (Moorman 229:11-13).
[76] DA04984 at 92 (Goode 129:11-14).

## III. NS'S APPROACH TO FUEL SURCHARGES BEFORE AND DURING THE ALLEGED CONSPIRACY PERIOD SHOWS THAT NS ACTED IN ITS OWN, UNILATERAL SELF-INTEREST.

### A. NS Instituted a Coverage Policy in 2000, and Continued That Policy Throughout the Alleged Conspiracy Period.

From 2000 forward, NS instructed its marketing personnel to apply a fuel surcharge to all carload price authorities and required them to get approval from senior executives for deviations from the published formula. In April 2000, before NS even announced its 2000 formula, NS managers directed product managers to "add the fuel surcharge note to all new/reissued contracts and private quotes (NSSQs) and all new open quotes and tariffs."[77] In September 2000, Don Seale instructed marketing to "secure fuel surcharge increases [on] ALL business."[78] As Seale testified, NS sought "general application" of fuel surcharges "[t]o the extent that we could retain the business and be competitive in the marketplace."[79] Because NS had a policy of ensuring broad fuel surcharge coverage prior to the alleged conspiracy, no inference of conspiracy can be drawn from the existence of these policies during the alleged conspiracy. *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc*. 988 F.2d 587, 594 (5th Cir. 1993) (finding the fact that challenged conduct was part of a longstanding distribution policy tended to show conduct was independent).

Moreover, NS *did* successfully achieve broad fuel surcharge coverage before the alleged conspiracy period. *See* **Ex. 1** Kalt Corrected Report, Figure IV-9C. NS's contemporaneous tracking documents confirm this as well: as of February 1, 2003, approximately 82% of carload rate authorities covering 52% of carload revenues were subject to a fuel surcharge.[80]

Similarly, Plaintiffs seek to draw an inference of conspiracy from the fact that NS tracked its fuel

---

77 DA05612. *See also* DA05613; DA05529 at 32.
78 DA06050.
79 DA05008 at 12, 30-31 (Seale 22:7-23:14, 125:20-127:2, 130:19-131:6).
80 DA05765.

surcharge coverage during the conspiracy period.[81] However, NS started tracking its coverage when it first adopted its 2000 fuel surcharge.[82] NS had rational, independent business reasons for tracking its own coverage, including monitoring the progress of its strategy to obtain widespread fuel surcharge application—a strategy in place since 2000—ensuring accurate billing, and tracking collections and revenues.[83] Because this decision is consistent with its unilateral business interests, no inference of a conspiracy can be drawn from it.

### B. NS Created and Used Exceptions to Its Public Carload Fuel Surcharge Formula Throughout the Alleged Conspiracy Period.

Throughout the relevant period, NS negotiated a wide variety of shipper-specific fuel surcharge formulas accounting for a significant portion of its revenue. Attached as **Ex. 2** is Table A-2 from the Harris Corrected Report, which depicts fuel surcharge formulas used in NS rate authorities during the alleged conspiracy period. From 2003 through 2008, NS utilized three dozen fuel surcharge formulas.[84] Thirty of them were created during the alleged conspiracy.[85] Over the relevant period, approximately 24.4% of NS's total revenue was subject to one of the 36 fuel surcharge formulas that were *different from* the modified CSXT formula.[86] This is almost *equal* to the 25% of NS revenue subject to the alleged conspiratorial formula that NS implemented in March 2004.[87]

---

[81] DA06369.

[82] DA05948 (attaching a spreadsheet "containing the status of the fuel surcharge billing for merchandise traffic as of August 1, 2000"); DA05986 (attaching a spreadsheet containing "the fuel surcharge billing for merchandise and coal traffic as of September 1 [2000]"); DA05974 at 74-79 (attaching a spreadsheet containing "the status of the fuel surcharge billing as of December 31, 2001").

[83] DA05948; DA05986; DA05974 at 74-79.

[84] DA00203 at 322-24 (Tbl. A-2).

[85] DA00203 at 322-24 (Tbl. A-2).

[86] DA00203 at 264-65, 322-24 (Tbl. A-2). Approximately 23.8% of NS revenue during this period was not subject to *any* fuel surcharge. *Id.*

[87] DA00203 at 264.

Moreover, NS continued to add the old 2000 formula to new and renewing contracts *even after* it implemented the alleged conspiratorial formula in March 2004.[88] NS also offered contracts with no fuel surcharge provision during the alleged conspiracy. For example, NS offered Olin a new master contract that would include a [redacted] rate increase in lieu of a fuel surcharge provision.[89] On August 16, 2004, NS wrote to Olin:

> As we discussed earlier today, we are willing to offer a three year term on the renewal of SOU 541, with [redacted] increases to be applied on September 1 of 2005 and 2006. Also, on the FSC question, we are willing to offer a one-time [redacted] increase in all rates in lieu of the FSC.[90]

Olin declined.[91]

### C. <u>NS's "Rebasing" Its Published Carload Fuel Surcharge Is Inconsistent with Conspiracy.</u>

NS's practice of conducting independent, internal evaluations of its carload fuel surcharge program did not end with its decision to modify its published carload fuel surcharge formula effective March 2004.[92] In 2005, NS concluded that fuel prices were unlikely to return to 2003 levels and considered whether it should "rebase" its fuel surcharge formula to reflect a higher new "normal" in fuel prices.[93]

NS was still considering rebasing its fuel surcharge when the STB announced on March 15, 2006, that it would hold a hearing on whether the use of rate-based fuel surcharges was an

---

88 DA05902 (approving use of 2000 formula in April 2004).

89 DA06597.

90 DA06597.

91 DA07512 at 17 (Olin 237:10-239:25).

92 DA05890 at 91 (requesting FSC "options with pros & Cons [sic] due Wednesday morning July 14[, 2004]").

93 DA05008 at 40 (Seale 178:21-179:25 ("[W]hat we were seeing is the realization in our minds of a new norm with respect to higher oil prices. Oil prices had continued to go up and stayed up.")); DA05563 ("Few thought we would be around $56 when it reached $30.").

unreasonable practice.[94] On April 24, just prior to the hearing, NS announced a new published carload fuel surcharge with a trigger price of $64 that would increase by 0.3% for every $1 increase in average monthly WTI, effective July 1.[95] In addition to the increased trigger, the new fuel surcharge formula decreased the percentage by which the fuel surcharge would increase by 25% (*i.e.*, 0.3% vs. 0.4%). Concurrent with its change in carload FSC formula, NS announced a rate increase of 16.4%, effective July 1, 2006 on published carload rate authorities and sought to negotiate increased rates in private authorities as they came up for renewal.[96]

This change created a difference between the CSXT and NS published carload fuel surcharges. If the WTI price rose above $64, then NS's rate would increase 25% *less* relative to that of CSXT: 0.3% for NS versus 0.4% for CSXT, for every dollar increase in the WTI. If the WTI price fell below $63.01, then CSXT's fuel surcharge would fall, whereas NS's fuel surcharge would disappear with no change in NS's base rate. This had the effect of making CSXT more competitive when the WTI was below $63.01.[97] As it turned out, fuel prices declined and remained below the $64 trigger from September 2006 through May 2007. During that time, shippers complained to NS that its rates were less competitive than CSXT's, and they asked NS to adjust its base rates.[98] Courts have consistently held that evidence of pricing that deviates from the alleged conspiratorial price negates an inference of conspiracy.[99] *See, e.g.*,

---

94 DA05482 (February 14, 2007 "analysis covering various FSC rebase scenarios").

95 DA05191.

96 DA05707; DA00147 at 50.

97 DA00203 at 258.

98 DA05568 ("[Don Seale] reported that customers which have been 'rebased' to the new FSC have been complaining to him and requesting a refund."); DA05895; DA05565. *See also* DA05762 at 63; DA05913.

99 NS did not modify its published carload fuel surcharge formula until March 2004, and NS differentiated itself by publishing a rebased formula effective from July 2006 forward. NS's participation in any alleged conspiracy lasted no more than the 16-month period from March 2004 until July 2006, and summary judgment is warranted for claims outside that time frame.

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1036 (8th Cir. 2000) (affirming summary judgment, in part, due to the fact that several defendants "did not uniformly increase prices to match [competitors]…and [one defendant] did not match the [price ] at all."); *Citric Acid*, 191 F.3d at 1102-03 (rejecting an inference of conspiracy based on uniformity in prices where there were price distinctions in "actual contracts").

This change is fundamentally at odds with Plaintiffs' theory of conspiracy. First, it is plainly inconsistent with the alleged agreement to adopt and apply the modified CSXT formula in 2003. Second, NS's decision to rebase is inconsistent with the alleged rationale for using the fuel surcharge as the conspiratorial device in the first place—to avoid having to agree on and monitor base rates. The aim of any price-fixing conspiracy is to restrain competition, yet NS's action differentiated it from CSXT, and shippers recognized the difference.

## CONCLUSION

For the foregoing reasons, NS's fuel surcharge conduct from 2003 to 2008 is entirely consistent with self-interest and unilateral decision making. NS respectfully requests the Court grant its Motion for Summary Judgment and grant any other relief the Court deems appropriate.

Dated: May 14, 2021

Respectfully submitted,

*/s/ Tara L. Reinhart*
Tara L. Reinhart (D.C. Bar. No. 462106)
John R. Thornburgh II (D.C. Bar No. 1044137)
Thomas R. Gentry (D.C. Bar No. 1617060)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Phone: (202) 371-7630
tara.reinhart@skadden.com
john.thornburgh@skadden.com
thomas.gentry@skadden.com

Saul P. Morgenstern
Jennifer B. Patterson
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
saul.morgenstern@arnoldporter.com
jennifer.patterson@arnoldporter.com

Ronald K. Wray II
GALLIVAN, WHITE & BOYD P.A.
55 Beattie Place, Suite 1200
Greenville, SC 29601
Phone: (864) 271-5362
rwray@GWBlawfirm.com

# EXHIBIT 1

Figure IV-9C

**NS: Fuel Prices and Percent of Revenue with Revenue-Based FSCs**




**Source:** NS_01800073; NS_010006317-19; NS_010006321; NS_010006322-24; Defendants' Transaction Data; U.S. Energy Information Administration

**Note:** Trigger price for public carload fuel surcharge; dotted line indicates period after rebasing.

# EXHIBIT 2

| FSC Note | Trigger Price | FSC % | WTI Increment | Timing to Measure WTI Change | Class Period Revenue ($) | % of Revenue | FSC Note Creation Date |
|---|---|---|---|---|---|---|---|
| **2006 Public Carload Surcharge** | $64 | 0.30% | $1 | Average Monthly | **2,469,714,288** | **18.8%** | NA |
| **2004 Public Carload Surcharge** | $23 | 0.40% | $1 | Average Monthly | **3,278,793,477** | **25.0%** | NA |
| **2000 Public Carload Surcharge** | $28 | 2% | $5 | 30 Days | **819,785,722** | **6.3%** | NA |
| **Other Norfolk Southern Fuel Surcharges** | | | | | | **0.0%** | |
| M259 | $28 | 2% | $5 | Average Monthly | 9,753,024 | 0.1% | 4/15/2005 |
| H762 | $23 | 0.13% | $1 | Average Monthly | 51,149,978 | 0.4% | 5/7/2004 |
| M451 | $23 | 0.22% | $1 | Average Monthly | 140,396,461 | 1.1% | 6/21/2005 |
| N269 and M486 | $28/$53 | 2%/1.5% | $5 | 30 Days | 488,176,128 | 3.7% | 6/29/2005 |
| H751 and L970 | $28 | 0.4% | $1 | Average Monthly | 64,534,909 | 0.5% | 4/29/2004 |
| 6975 | $32 | 1% | $4 | 90 days | 2,144,005 | 0.0% | 12/7/2000 |
| H710 | $28 | 2% cap | N/A | 30 Days | 23,411,100 | 0.2% | 3/24/2004 |
| L486 | $28 | 2% (8% cap) | $5 | Average Monthly | 4,876,070 | 0.0% | 7/30/2004 |
| N055 | $28 | 2% (10% cap) | $5 | 30 Days | 3,214,893 | 0.0% | 1/20/2006 |
| O183 | $30 | 0.4% | $1 | Average Monthly | 2,287,385 | 0.0% | 7/9/2007 |
| G493 | $30 | 2% | $5 | 30 Days | 8,872,302 | 0.1% | 6/11/2002 |
| L856 | $30 | 2%/0.4% | $1 | Average Monthly | 167,913,326 | 1.3% | 11/5/2004 |
| 7042 | <$20/>$32.99 | -2%/2% | $5 | 30 Days | 104,757,878 | 0.8% | 6/25/2001 |
| O220 | $33 | 0.3% | $1 | Average Monthly | 10,374,408 | 0.1% | 8/1/2007 |
| L491 | $33 | 0.4% | $1 | Average Monthly | 16,971,673 | 0.1% | 8/2/2004 |
| H699 | $33 | 2%/1% | $5 | 30 Days | 98,876,677 | 0.8% | 3/15/2004 |
| H051 | $33 | 2% | $5 | 30 Days | 41,236,326 | 0.3% | 1/3/2003 |
| L837 | $34 | 0.4% | $1 | Average Monthly | 394,184,152 | 3.0% | 11/1/2004 |
| H332 | $34 | 2% | $5 | 30 Days | 33,807,821 | 0.3% | 8/1/2003 |
| M781 | $35 | 0.4% | $1 | Average Monthly | 2,122,837 | 0.0% | 10/21/2005 |
| M450 | $37 | 0.4% | $1 | Average Monthly | 251,019,515 | 1.9% | 6/21/2005 |
| L436 | <$15/>$37 | -2%/2% | $5 | 90 Days | 349,758,267 | 2.7% | 7/8/2004 |
| L888 and N616 | $38 | 0.4% | $1 | Average Monthly | 84,914,738 | 0.6% | 11/24/2004 |
| 6968 | $38 | 2% | $5 | 30 Days | 35,175,020 | 0.3% | 11/15/2000 |
| L755 | $48 | 0.4% | $1 | Average Monthly | 38,193,477 | 0.3% | 9/28/2004 |
| N762 | $50 | 0.3% | $1 | Average Monthly | 197,912,944 | 1.5% | NA |
| O101 | $55 | 0.3% | $1 | Average Monthly | 12,985,312 | 0.1% | 5/21/2007 |
| M922 | $60 | 0.4% | $1 | Average Monthly | 119,502,824 | 0.9% | 12/1/2005 |
| N337 | $64 | 0.22% | $1 | Average Monthly | 177,825,760 | 1.4% | 6/2/2006 |
| O562 and O418 | $64 | 0.4% | $1 | Average Monthly | 51,654,875 | 0.4% | 11/19/2007 |
| O823 | $90 | 0.3% | $1 | Average Monthly | 7,918,575 | 0.1% | 8/1/2008 |
| O708, O725, and O709 | $90 | 0.4% | $1 | Average Monthly | 109,862,935 | 0.8% | 5/22/2008 |
| O457 | Mileage-based for Ford: $0.02 per mile for each $0.04 that average monthly HDF exceeds $2.80. If HDF is less than $2.80, the fuel refund will be $0.02 per mile for each $0.04 that HDF is less than $2.80. | | | | 5,287,857 | 0.0% | 12/12/2007 |
| M287 | "Subject to fuel surcharge as negotiated between Toyota and each carrier." | | | | 2,685,882 | 0.0% | 4/26/2005 |
| O394 | Price is subject to a 4% FSC. | | | | 1,192,367 | 0.0% | 11/7/2007 |
| M473 | FSC shall 50% of the surcharge in NS Conditions of Carriage 1-E as published Jan. 1, 2005 | | | | 89,918,176 | 0.7% | 6/25/2005 |
| **Subtotal of Other Norfolk Southern Fuel Surcharges** | | | | | **3,204,869,877** | **24.4%** | |
| **No Fuel Surcharge** | | | | | **356462279.9** | **2.7%** | |
| **Fuel Surcharges Using Other Railroads' Mechanisms** | | | | | **195,342,030** | **1.5%** | |
| **Notes with Less than $1 Million in Class Period Revenue** | | | | | **24,785,533** | **0.2%** | |
| None | | | | | 2,763,546,884 | 21.1% | |
| **Total** | | | | | **13,113,300,089** | **100.0%** | |