# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:  RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to: ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-0489 (BAH/GMH) |
| OXBOW CARBON & MINERALS LLC, et al.,<br><br>                         Plaintiffs,<br>v.<br>UNION PACIFIC RAILROAD CO., et al.,<br>                         Defendants. | Civil Action No. 11-1049 (BAH) |
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to:  ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH)<br><br>**PUBLICLY FILED VERSION**<br><br>**Oral Argument Requested** |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE FALSE POSITIVES ECONOMETRIC OVERCHARGE MODELS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      Preliminary Statement .................................................................................................. 1

II.     Each Plaintiff Expert's Modeling Generates Disqualifying False Positives. ..................... 2

      A.      Dr. B. Douglas Bernheim ................................................................................. 2

      B.      Dr. E. Allen Jacobs ........................................................................................... 8

      C.      Dr. Jeffrey Leitzinger ...................................................................................... 10

      D.      Dr. James McClave ......................................................................................... 12

      E.      Dr. Leslie Marx ............................................................................................... 12

      F.      Dr. Alan S. Frankel ......................................................................................... 14

III.    Individual Plaintiffs' Experiences Illustrate the Unreliability of the Plaintiffs' Experts' Analyses. ..................................................................................................................... 15

      A.      Honda .............................................................................................................. 15

      B.      Ford ................................................................................................................. 17

IV.     Conclusion ................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*In re Aluminum Ultimately Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ........................................................................................................2

*Coleman Motor Co.* v. *Chrysler Corp.*,
    525 F.2d 1338 (3d Cir. 1975) ........................................................................................................2

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ........................................................................................................................2

*Concord Boat Corp.* v. *Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ...................................................................................................1-2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ...................................................................................................................1, 2

*MCI Commc'ns Corp.* v. *AT&T Co.*,
    708 F.2d 1081 (7th Cir. 1983) ......................................................................................................2

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    292 F. Supp. 3d 14 (D.D.C. 2017) *aff'd*, 934 F.3d 619 (D.C. Cir. 2019) ...................................2

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) .................................................................................................1, 18

I.    **Preliminary Statement**

Defendants move to exclude the econometric overcharge models of Plaintiffs' experts, Drs. B. Douglas Bernheim, E. Allen Jacobs, Jeffrey Leitzinger, James McClave, Leslie Marx, and Alan S. Frankel submitted in the *MDL II*, *MDL I*, and *Oxbow* proceedings. Those models produce legally disqualifying "false positives" because they cannot distinguish between effects from conspiracy and effects from non-conspiratorial factors. Each of the experts' models finds damages on rail shipments that could not plausibly have been affected by the alleged conspiracy. Consequently, as a matter of law, the Court should exclude them under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252–54 (D.C. Cir. 2013) (rejecting model that generated "false positives").

Plaintiffs' economists each prepared econometric overcharge models to try to demonstrate that the alleged conspiracy raised prices and caused antitrust injury to their clients on shipments subject to allegedly standardized, rate-based fuel surcharges during the alleged conspiracy period. They each maintain that their models show that shippers paid more for freight transportation under contracts with rate-based fuel surcharges entered during the alleged conspiracy period, July 2003 to December 2008, than they would have but for the alleged conspiracy. And yet, taking the outputs at face value, the models find damages on a wide range of shipments that could not plausibly have been affected by the alleged conspiracy.

As a matter of law, if a model finds overcharges on purchases that could not plausibly be affected for a given set of purchases (often called "false positives"), then the model's estimated "overcharges" cannot reasonably be attributed to the alleged conspiracy and must instead result from other economic factors not appropriately captured by the model. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056–57 (8th Cir. 2000) (damages model inadmissible

because it "failed to account for market events that both sides agreed were not related to any anticompetitive conduct" and "did not separate lawful from unlawful conduct"); *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("It is essential…that damages reflect only the losses directly attributable to unlawful competition"); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975) (vacating judgment where damages expert failed to distinguish between "losses resulting from unlawful, as opposed to lawful, competition."); *see also In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 53 (S.D.N.Y. 2020) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013)) (model "suffers from a classic *Comcast* infirmity, in that it impermissibly 'identifies damages that are not the result [of the alleged] wrong.'").[1]  Here, Plaintiffs' experts' models generate overcharges on shipments under contracts with terms set long before the alleged conspiracy and on shipments that were not subject to any fuel surcharge at all.  Both are false positives that render the models unreliable.

## II.    Each Plaintiff Expert's Modeling Generates Disqualifying False Positives.

### A.    Dr. B. Douglas Bernheim

Dr. Bernheim's models find antitrust damages for a wide range of shipments that could not plausibly have been affected by the alleged conspiracy.  Consequently, Dr. Bernheim's models do not reliably estimate the overcharges associated with the alleged conspiracy and are inadmissible.

---

[1] While the Court in *MDL I* found that certain false positives in Plaintiffs' expert's damages model made the model an unreliable means for proving class-wide injury, it nonetheless found the model reliable enough for admissibility under Rule 702 and *Daubert*.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 58–59, 131 (D.D.C. 2017) *aff'd*, 934 F.3d 619 (D.C. Cir. 2019).  However, the *MDL I* Court's *Daubert* decision, which is inconsistent with case law, was *sua sponte*, and, unlike here, made without the benefit of briefing from the parties about that law.

To conduct his overcharge analyses in *MDL II*, Dr. Bernheim prepared a benchmark of transactions that could not have been affected by the alleged conspiracy.  For his benchmark, Dr. Bernheim selected transactions that he concluded were "*not associated with a collusive fuel surcharge*" because they were levied under contracts entered before the start of the alleged conspiracy, and he called them "Pre-Existing Price Authorit[ies]," or PEPAs.  DA21943 at 2083 (Bernheim/Marx *MDL II* Rpt. ¶¶ 239-240, 3/1/23) (emphasis added).  In Dr. Bernheim's words, "the rates those shippers paid on the benchmark [or PEPA] transactions were *not* directly contaminated by collusive fuel surcharges."  DA21943 at 2083 (Bernheim/Marx *MDL II* Rpt. ¶ 241, 3/1/23) (emphasis added).  Accordingly, shipments made under these pre-existing contracts should not have been affected by the alleged conspiracy and there should not have been any overcharges associated with these contracts. Yet, Dr. Bernheim's model finds the *same or higher levels of overcharges* ███████████████████████ *for these PEPA shipments as the model finds for allegedly impacted shipments*, an obvious false positive.  DA25889 at 89-91 (Carlton *MDL II* Rpt. ¶¶ 143-146, Fig. 13, 8/15/23).  The black line in the figure below illustrates the overcharges his model finds on allegedly impacted ██████ shipments, while the red dotted line shows the overcharges his model generates on ████ shipments:  They are nearly identical—in fact the false positive overcharges on ████ shipments estimated by Dr. Bernheim's model slightly exceed his model's overcharge estimates for the allegedly impacted traffic.  *Id*.  This demonstrates that Dr. Bernheim's model finds false positives and is not a reliable method for estimating overcharges associated with the alleged conspiracy.[2]

---

[2]Similarly, Dr. Bernheim's "corroborative" econometric overcharge model finds false positives. DA21943 at 2090-91 (Bernheim/Marx *MDL* II Rpt. ¶¶ 263 - 266, 3/1/23).  When applied to shipments associated with ██████████████████, Dr. Bernheim's first corroborative model produces overcharge estimates that are even larger than those Dr. Bernheim estimated for his baseline model. *See* DA25889 at 93 (Carlton *MDL II* Rpt. ¶ 148, n. 217,



In addition, Dr. Bernheim's *MDL II* model cannot distinguish between allegedly conspiratorial and non-conspiratorial conduct as it generates overcharges on shipments that occurred *before the alleged conspiracy period*. DA24600 at 04 (Murphy *MDL II* Rpt. ¶ 209, 8/15/23). The blue line in the graph below shows that Dr. Bernheim's model finds an overcharge on shipments made during most of the period from 2000 to early 2003, prior to the alleged conspiracy period, with estimated overcharges of ███████████████████████ ████████████████████████ *Id.* (Ex. 87). These false positives also show that Dr. Bernheim's overcharge analysis does not reliably measure the effects of the alleged conspiracy.

---

8/15/23). This too shows that his corroborative analyses cannot distinguish between allegedly conspiratorial and non-conspiratorial conduct.



Dr. Bernheim's *MDL I* "over-recovery" analysis produces disqualifying false positives as well.  In *MDL I*, Dr. Bernheim claims that, during the alleged conspiracy, Defendants earned more from fuel surcharges than their incremental fuel costs, what Dr. Bernheim calls "over-recovery," and he contends that this is a sign of antitrust injury.  *See* DA21312 at 73-79 (Bernheim *MDL I* Rpt. ¶¶ 116-124, 9/15/20).  Even accepting for present purposes that such purported "over-recovery" is an economically sound indicator of antitrust harm (it is not), Dr. Bernheim's methodology shows similar "over-recovery" on shipments that the conspiracy could not have affected.

First, as shown in the table below, even for a typical shipper that agreed to a contract with standard fuel surcharge terms *before the start of the alleged conspiracy* (*i.e.*, a "legacy" shipper), Dr. Bernheim's methodology would find that the admittedly competitive fuel surcharges also generated substantially more revenue under all four railroads' legacy contracts (an average of

■ for all four Defendants) than their incremental fuel costs. DA25079 at 90 (Carlton *MDL I* Rpt. ¶ 129, Tbl. 16, 4/15/21). Such "over-recovery" of incremental fuel costs from legacy shipments is inconsistent with Dr. Bernheim's position that "over-recovery" can only occur from fuel surcharges that are the product of conspiracy. *Id.*; *see also* DA21312 at 73-79 (Bernheim *MDL I* Rpt. ¶¶ 116-124, 9/15/20).



Second, Dr. Bernheim's *MDL I* methodology would find over-recovery if shipments during the alleged conspiracy period were subject to *the pre-conspiracy period (i.e., non-conspiratorial)* standard fuel surcharge formulas. DA25079 at 90-91 (Carlton *MDL I* Rpt. ¶ 130, Tbl. 17, 4/15/21). As shown in the table below using Dr. Bernheim's model, the admittedly competitive, pre-conspiratorial formulas would have generated *higher* percentages of fuel cost recovery ■ during the alleged conspiracy period than the percentages generated by the formulas utilized during the alleged conspiracy period ■ *Id.* In short, Dr. Bernheim finds substantial incremental fuel cost over-recovery on shipments that the alleged conspiracy could not have reasonably affected.[3] This too is a false positive finding.

---

[3] Dr. Israel applied the pre-conspiratorial FSC formulas to the actual base rate on each shipment for the alleged conspiracy period and found that fuel recovery was "qualitatively the same".



Lastly, as shown in the table below, Dr. Bernheim's *MDL I* methodology would estimate that the railroads "over-recovered" their incremental fuel costs by a larger percentage in the pre-conspiracy period ▮▮▮▮▮ than during the alleged conspiracy ▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 92 (Tbl. 18). This is yet another disqualifying false positive that shows that Dr. Bernheim's methodology cannot distinguish between allegedly conspiratorial and non-conspiratorial factors affecting price. *Id.*



---

compared to the formulas used during the alleged conspiracy period. DA25894 at 95-96 (Israel *MDL I* Report ¶ 300, 4/15/21).

**B.    Dr. E. Allen Jacobs**

Dr. Jacobs's *MDL II* overcharge regression model similarly generates multiple

disqualifying false positives. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

DA22832 at 3013-20 (Jacobs *MDL II* Rpt. ¶¶ 467–481, 3/1/23).  The reliability of Dr. Jacobs's

methodology depends in part on whether it finds overcharges for shipments that are in his control

group—*e.g.*, shipments that Dr. Jacobs treats as unaffected by the alleged conspiracy.  However,

Dr. Jacobs's model does in fact find overcharges ████████████████████ on

shipments in his control group, a result completely inconsistent with Plaintiffs' allegations.

DA25097 at 135-37 (Carlton *MDL II* Rpt. ¶¶ 220-222, Tbl. 18, 8/15/23).



In addition, if Dr. Jacobs's model was reliable, it should find no impact on prices when tested exclusively using data from shipments occurring before March 2003, the earliest claimed start date for the alleged conspiracy. Yet, it does. His model finds impact on shipments that occurred under contract terms set before the alleged conspiracy even started, as shown by the blue lines in the figure below. DA25148 at 199-202 (Israel *MDL II* Rpt. ¶¶ 386–390, Fig. 64, 8/15/23). These blue lines show the time periods in the pre-conspiracy period for which Dr. Jacobs's model would find damages on rail shipments, using data exclusively prior to the alleged conspiracy (top panel) and using data through December 2003 (lower panel). *Id.* These false positives illustrate that Dr. Jacobs's model is unreliable, because it cannot isolate the effects of the alleged conspiracy, as required for it to be admissible.



**C.    Dr. Jeffrey Leitzinger**

Dr. Leitzinger's *MDL II* model is also unreliable as a matter of law because it predicts damages for shipments for which no damages should exist.  Specifically, Dr. Leitzinger's *MDL II* model finds average fuel surcharge damages of 7.4% when applied to shipments made during the alleged conspiracy period subject to contract terms set before the alleged conspiracy, including admittedly competitive, *pre-conspiratorial fuel surcharge* formulas, the exact opposite

result of what the model should have found if it could distinguish between independent and

coordinated conduct.  DA25097 at 129-131 (Carlton *MDL II* Rpt. ¶¶ 201, Tbl. 14, 8/15/23).[4]

### D.    Dr. James McClave

Dr. McClave's models (both *MDL I* and *MDL II*) produce the same types of disqualifying "false positive" overcharges as the other experts.  When his models are applied to *Plaintiffs' legacy shipments*, which contained fuel surcharges that were set *before* the start of the alleged conspiracy period, Dr. McClave's non-intermodal model produces the same level of damages (approximately a 10% carload overcharge) as the shipments that Plaintiffs claim were affected by the alleged conspiracy, and his intermodal model produces *greater* overcharges (6.7 percent, compared to 5.5 percent).  DA25097 at 122-23 (Carlton *MDL II* Rpt. ¶¶ 168-170, 8/15/23); DA25079 at 84-85 (Carlton *MDL I* Rpt. ¶¶ 88-90, 4/15/21).[5]

### E.    Dr. Leslie Marx

Dr. Marx's damages models in both *MDL I* and *MDL II* produce false positives.  In *MDL II*, Dr. Marx attempted to calculate overcharges, which she defined as the "difference between what was actually paid and what would have been paid but for the alleged conspiracy." DA21943 at 51 (Bernheim/Marx *MDL II* Rpt. ¶ 21, 3/1/23).  Accordingly, her damages model should not find damages for a Plaintiff if that Plaintiff had actually paid the "competitive" but-for prices determined by her methodology, meaning a price that she defines as not affected by the alleged conspiracy.   But Dr. Marx's methodology finds overcharges even where a shipper paid the same price levels she claims would have been paid absent the alleged conspiracy.

---

[4] In *MDL I*, the application of pre-conspiracy standard formulas to observed base rates (in lieu of the allegedly conspiratorial formulas) for Dr. Leitzinger's plaintiffs finds overcharge percentages that closely resemble those calculated by Dr. Leitzinger for the allegedly impacted shipments, a false positives result that shows "damages" where none should exist. DA25898 at 899-900 (Carlton MDL I Rpt. ¶ 117, Tbl. 13, 4/15/21).

[5] Similarly, Prof. McClave's econometric model in *MDL I* leads to false positive overcharges that are similar to those found by Prof. McClave for allegedly damaged shipments. DA25079 at 84-85 (Carlton *MDL I* Rpt. ¶ 90, 4/15/21).

DA24600 at 09-10 (Murphy *MDL II* Rpt. ¶¶ 219–221, Ex. 92, 8/15/23).  The first column below shows Dr. Marx's estimated damages for *MDL II* Plaintiffs' shipments with BNSF Railway Company ("BNSF").    The second column shows the damages Professor Marx's methodology calculates when it is run on her but-for prices that, by construction and according to her analysis, are not affected by the alleged conspiracy.   Her methodology would still find damages ███ ████████████ shipments if Plaintiffs had paid prices she asserts were unaffected by the alleged conspiracy.    *Id*.   This is a clear "false positive" by construction.



Dr. Marx's *MDL I* fuel surcharge overcharge calculations are also unreliable, because her methodology finds false positive "damages" even when applied to shipments under contracts with terms that were set prior to the alleged conspiracy.  DA25079 at 87-89 (Carlton *MDL I* Rpt.

¶¶ 124-127, 4/15/21). Specifically, her methodology produces damages ████████ ████████ on legacy shipments for both Norfolk Southern Railway ("NS") and CSX Transportation ("CSXT")—i.e., shipments under contract with terms set prior to the start of the alleged conspiracy. *Id*. at 87-88 (Carlton *MDL I* Rpt. ¶ 125, Tbl. 14, 4/15/21).



Professor Marx's *MDL I* methodology also produces damages when the admittedly competitive, pre-conspiratorial formulas are applied to the shipments that she analyzes. As shown below, her *MDL I* damages model shows overcharges ranging from ████████ on shipments subject to the pre-conspiratorial formulas. DA25079 at 89 (Carlton *MDL I* Rpt. ¶ 127, Tbl. 15, 4/15/21).



### F.    Dr. Alan S. Frankel

In the *Oxbow* case, 11-CV-01049, Defendants Union Pacific ("UP") and BNSF move to exclude the expert opinions offered by Dr. Alan S. Frankel regarding the amount of damages

incurred by the *Oxbow* Plaintiffs (collectively, "Oxbow"), because his model also generates false positives.  Dr. Frankel's model produces overcharges on ███████████████████████ ████████████████████████████████████████████ ████████████████████████  DA24449 at 50-51 (Carlton *Oxbow* Rpt. ¶ 150 & n.202-203, Fig. 24, 9/9/18).  Shipments on price authorities entered into before July 2003 could not have been impacted by the alleged conspiracy.  Thus, Dr. Frankel's model fails in the essential task of reliably estimating rail rates in the absence of the alleged anticompetitive conduct.

## III.    Individual Plaintiffs' Experiences Illustrate the Unreliability of the Plaintiffs' Experts' Analyses.

It is not surprising that the expert models generate false positives.  Plaintiffs continue to offer models that cannot distinguish between fuel surcharges paid because of the alleged conspiracy and those resulting from non-conspiratorial factors.  They do not even attempt to model damages or causation based on each Plaintiff shipper's individualized experience.  *See* Defs.' Avg. Damages Mem. Doing so would require Plaintiffs to confront the reality that shippers' individual experiences varied wildly and are inconsistent with Plaintiffs' own theory of harm—that the alleged conspiracy caused shippers to pay more surcharges that were more aggressive than before the alleged conspiracy. Two examples of such shippers are described below.  Plaintiffs' models cannot help a fact finder determine whether or to what extent these shippers were harmed, and the fact that the models find false positive "damages" where none could be simply reinforces this reality.

### A.    Honda

Honda seeks more than ██████████ in damages even though the supposedly conspiratorial fuel surcharges ███████████████████████████ DA25392 at 99 (Bernheim/Marx *MDL II* Rpt. Honda Appendix E, Fig. E-5, 3/1/23).   Some of those damages

are associated with traffic moving under ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████  DA15789.  This contract did not include a fuel surcharge provision.  And,

Honda's Scott Crail testified that Honda ████████████████████████████████████

████████████████████████  DA15252 at 54-55 (Crail Tr. 65:2-66:5).  But, without amending the

terms of the contract, Honda ██████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████  Yet Dr. Bernheim's damages model, as adjusted by Dr. Marx,

finds damages on this BNSF contract.  DA25392 (Bernheim/Marx *MDL II* Rpt. Honda App. D

and E, Figs. E-3 and E-5, 3/1/23); DA25335 at 50 (Marx 235:4-236:8); *see also* DA25625 at 44.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

███████

**B.     Ford**

Ford seeks more than ████████████ in damages even though its experience with the

railroads does not fit Plaintiffs' core allegations.  DA25382 at 91 (Bernheim/Marx *MDL II* Rpt.

Ford Appendix E, Fig. E-5, 3/1/23).  For example, ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████

During the alleged conspiracy period, Ford negotiated contracts with defendants that

had no fuel surcharge or a non-standard fuel surcharge.  ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

█████████████████



## IV.    Conclusion

The econometric overcharge models put forth by Plaintiffs' experts each have the same disqualifying false positives as the models put forth by Dr. Gordon Rausser in the *MDL I* class action.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252–54 (D.C. Cir. 2013).  When applied to a wide range of shipments that could not reasonably have been affected by the alleged conspiracy, they all find damages, producing false positives.  Accordingly, they are not reliable and are inadmissible at trial as a matter of law.

Dated:  July 17, 2024                                     Respectfully submitted,

_/s/ Benjamin J. Horwich_
Glenn D. Pomerantz                                        Benjamin J. Horwich
Kuruvilla J. Olasa                                        Gabriel M. Bronshteyn
Wesley T.L. Burrell                                       MUNGER, TOLLES & OLSON LLP
Anne K. Conley                                            560 Mission Street, 27th Floor
MUNGER, TOLLES & OLSON LLP                                San Francisco, CA 94105
350 South Grand Avenue, 50th Floor                        Telephone: (415) 512-4000
Los Angeles, CA 90071                                     Ben.Horwich@mto.com
Telephone: (213) 683-9100                                 Gabriel.Bronshten@mto.com
Glenn.Pomerantz@mto.com
Kuruvilla.Olasa@mto.com                                   Lauren Ross (D.C. Bar No. 1659620)
Wesley.Burrell@mto.com                                    MUNGER, TOLLES & OLSON LLP
Anne.Conley@mto.com                                       601 Massachusetts Ave. NW, Suite 500 East
                                                          Washington, DC 20001
Linda S. Stein (D.C. Bar No. 376217)                      Telephone: (202) 220-1100
Molly Bruder Fox (D.C. Bar No. 981619)                    Lauren.Ross@mto.com
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
lstein@steptoe.com


*Counsel for Defendant BNSF Railway Company*
*pursuant to the Notices of Appearance entered in each case*

_/s/ John M. Majoras_
John M. Majoras (D.C. Bar No. 474267)                     Tyrone R. Childress
Kristen Lejnieks (D.C. Bar No. 502136)                    Kelsey S. Bryan (D.C. Bar No. 1034352)
JONES DAY                                                 JONES DAY
51 Louisiana Avenue, NW                                   555 South Flower Street, 50th Floor
Washington, DC 20001-2113                                 Los Angeles, CA 90071-2300
Telephone: (202) 879-3939                                 Telephone: (213) 489-3939
jmmajoras@jonesday.com                                    tchildress@jonesday.com
kalejnieks@jonesday.com                                   kbryan@jonesday.com


*Counsel for Defendant Union Pacific Railroad Company*
*pursuant to the Notices of Appearance entered in each case*

*/s/ Timothy L. O'Mara*
Timothy L. O'Mara
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
tim.o'mara@lw.com

*Counsel for Defendant Union Pacific Railroad Company*
*pursuant to the Notices of Appearance entered in each case*

*/s/ Matthew M. Collette*

| | |
|---|---|
| Matthew M. Collette (D.C. Bar No. 427167) | Leonard A. Gail |
| Alethea A. Swift (D.C. Bar No. 1644929) | Suyash Agrawal |
| MASSEY & GAIL LLP | Massey & Gail LLP |
| 1000 Maine Ave. SW, Suite 450 | 50 E. Washington Street, Suite 400 |
| Washington, DC 20024 | Chicago, IL 60602 |
| Phone: (202) 795-3326 | Phone: (312) 283-1590 |
| Fax: (312) 379-0467 | Fax: (312) 379-0467 |
| mcollette@masseygail.com | lgail@masseygail.com |
| aswift@masseygail.com | sagrawal@masseygail.com |

*Counsel for Defendant Union Pacific Railroad Company*
*pursuant to the Notices of Appearance entered in each case*

*/s/ Tara L. Reinhart*

| | |
|---|---|
| Tara L. Reinhart (D.C. Bar. No. 462106) | Jennifer B. Patterson |
| Julia K. York (D.C. Bar. No. 478001) | HAUG PARTNERS LLP |
| Thomas R. Gentry (D.C. Bar No. 1617060) | 745 Fifth Avenue, 10th Floor |
| SKADDEN, ARPS, SLATE, | New York, NY 10151 |
| MEAGHER & FLOM LLP | Telephone: (212) 588-0800 |
| 1440 New York Avenue, NW | jpatterson@haugpartners.com |
| Washington, DC 20005 | |
| Telephone: (202) 371-7630 | Ronald K. Wray II |
| tara.reinhart@skadden.com | GALLIVAN, WHITE & BOYD P.A. |
| julia.york@skadden.com | 55 Beattie Place, Suite 1200 |
| thomas.gentry@skadden.com | Greenville, SC 29601 |
| | Phone: (864) 271-5362 |
| | rwray@GWBlawfirm.com |

*Counsel for Defendant Norfolk Southern Railway Company*
*pursuant to the Notices of Appearance entered in each case*

_/s/ Kent Gardiner_
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Juan A. Arteaga
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Phone: (212) 223-4000
Fax: (212) 223-4134
JArteaga@crowell.com

_/s/ David Wells_
David M. Wells
Julia M.I. Holden Davis
Derek K. Mountford
GUNSTER, YOAKLEY & STEWART, P.A.
One Independent Drive, Suite 2300
Jacksonville, Florida 32202
Phone: (904) 354-1980
dwells@gunster.com
jholdendavis@gunster.com
dmountford@gunster.com

_Counsel for Defendant CSX Transportation, Inc. pursuant to the
Notices of Appearance entered in each case_