**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br>This document relates to: ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-0489 (BAH/GMH) |
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br>This document relates to: ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH)<br>**Filed Under Seal**<br>**Oral Argument Requested** |

**Plaintiffs' Memorandum of Law in Support of Motion to Exclude Avram S. Tucker**

# Table of Contents


Table of Authorities .......... ii

Introduction .......... 1

Legal Standard .......... 4

Argument .......... 5

I. Mr. Tucker Did Not Review the Econometric Models He Was Supposedly Retained to Rebut, and Is Not Qualified to Comment on Them .......... 5

II. "Forensic Analysis" is Not a Methodology or Accepted Expertise Outside the Accounting-Fraud Environment and Has No Applicability to This Case .......... 9

III. Mr. Tucker's "Forensic Analysis" Is Nothing More Than a Selective Recitation of the Record, Unconnected to Any Legitimate Expert Conclusion, and Is Not Reliable or Helpful .......... 14

A. Mr. Tucker's "forensic analysis" is not a cognizable, testable, or replicable methodology .......... 14

B. An "opinion" that is merely a layperson's narration of disputed facts unconnected to any expert methodology is inadmissible .......... 18

Conclusion .......... 23

## Table of Authorities

**Page(s)**

**Cases**

*Alabama Aircraft Indus., Inc. v. Boeing Co.*,
No. 2:11-cv-03577 (RDP), 2019 WL 13172372 (N.D. Ala. July 1, 2019)..........................4, 19

*Brown v. Ill. Cent. R.R. Co.*,
705 F.3d 531 (5th Cir. 2013) ..........................................................................................10

*Burkhart v. Wash. Metro. Area Transit Auth.*,
112 F.3d 1207 (D.C. Cir. 1997) ..........................................................................................9

*Daubert* v. *Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........................................................................................... *passim*

*EEOC v. Kaplan Higher Educ. Corp.*,
748 F.3d 749 (6th Cir. 2014) ..........................................................................................14

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)..........................................................................................15

*Halcomb v. Washington Metro. Area Transit Auth.*,
526 F. Supp. 2d 24 (D.D.C. 2007) ..........................................................................................17

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
No. 3:20-MN-02972 (JFA), 2024 WL 2155221 (D.S.C. May 14, 2024) ...............................16

*Joy v. Bell Helicopter Textron, Inc.*,
999 F.2d 549 (D.C. Cir. 1993) ..........................................................................................9

*Meister v. Med. Eng'g Corp.*,
267 F.3d 1123 (D.C. Cir. 2001) ..........................................................................................5

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000)..........................................................................................15

*Riegel v. Medtronic, Inc.*,
451 F.3d 104 (2d Cir. 2006)..........................................................................................15

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) ..........................................................................................4

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
949 F.3d 825 (3d Cir. 2020)..........................................................................................16, 17

*United States v. Washington*,
106 F.3d 983 (D.C. Cir. 1997) ........................................ 5, 19

*Weil v. Seltzer*,
873 F.2d 1453 (D.C. Cir. 1989) ........................................ 6

*White v. Ford Motor Co.*,
312 F.3d 998 (9th Cir. 2002) ........................................ 6

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
395 F.3d 416 (7th Cir. 2005) ........................................ 14

**Rules**

Fed. R. Civ. P. 26 ........................................ 17, 18

FED. R. EVID. 702 ........................................ *passim*

**Other Authorities**

AICPA, *Consulting Services Special Report 03-1: Litigation Services and Applicable Professional Standards* (2003) ........................................ 9

AICPA, Fraud Task Force of Forensic & Litig. Servs. Comm., *Special Report: Forensic Procedures and Specialists: Useful Tools and Techniques* (2006) ........................................ 9

Avram S. Tucker, *The Numbers Tell a Story*, CALIFORNIA LAWYER Vol. 31, No. 6 (June 2, 2011) ........................................ 21

## Introduction

Avram S. Tucker, a certified public accountant, submitted more than 20,000 pages of expert disclosures across MDL I and MDL II[1] claiming to analyze each plaintiff's "facts and circumstances" using "forensic analysis," in order "to assess the reliability and reasonableness of Plaintiffs' damages experts' methods, assumptions, and opinions." MDL I Rpt. ¶¶ 6, 22; MDL II Rpt. ¶¶ 6, 395. Yet, incredibly, Mr. Tucker admits he has not even reviewed (and is not qualified to evaluate) the econometric models he is criticizing. His "forensic analysis" approach is also inapplicable here. Forensic accounting techniques are typically used by accountants to search for indicia of suspected financial fraud, and have no application to this antitrust price-fixing case. Mr. Tucker claims his background in accounting and "financial forensics" give him license to rummage through the entire factual record, decide which evidence he finds persuasive on issues of fact, and then render opinions to the jury about which inferences he prefers they make. But no accounting literature or published academic sources support his approach to reviewing the evidence; he employs no reliable methodology; and his conclusions are not helpful to the fact finder. Mr. Tucker's opinions are inadmissible and should be excluded under Federal Rule of Evidence 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Unlike the other experts in this case, Mr. Tucker has no degree in economics, econometrics, statistics, or other matters pertinent to antitrust law. He is not an expert on the railroad industry,

[1] Mr. Tucker's MDL I report is attached as Ex. 1 (Expert Report of Avram S. Tucker, dated April 15, 2021, as corrected October 29, 2021) ("MDL I Rpt."). Mr. Tucker's MDL II report is attached as Ex. 2 (Expert Report of Avram S. Tucker, dated August 15, 2023, as corrected October 30, 2023) ("MDL II Rpt."). Mr. Tucker submitted his MDL II report in all cases in MDL II except *Environmental Protection & Improvement Company, LLC v. Union Pacific Railroad Company et al.*, No. 1:22-cv-2587 (BAH). The transcript of Mr. Tucker's deposition in MDL I is attached as Ex. 3 (Transcript of Deposition of Avram S. Tucker, dated Nov. 3, 2021) ("MDL I Tr."). The transcript of Mr. Tucker's two-day deposition in MDL II is attached as Ex. 4 (Transcript of Deposition of Avram S. Tucker, dated Nov. 2–3, 2023) ("MDL II Tr.").

fuel surcharges, or contract negotiation. Instead, Mr. Tucker is an accountant who, for the past thirty years, has been a full-time expert witness mostly offering accounting-related opinions.

That is not what he does here. He is not analyzing financial statements, auditing Defendants' financial records, or reconciling Defendants' books. Rather than doing accounting work, Mr. Tucker asserts he has the expertise to conduct a so-called "forensic analysis," which he characterizes as the "examination of relevant information in anticipation of providing opinions in the context of a court proceeding or arbitration." MDL I Rpt. ¶ 6; MDL II Rpt. ¶ 6 (same). Armed with supposed "expertise" in examining evidence in litigation, he purports to analyze, at a minimum: (i) purported deficiencies of Plaintiffs' econometric models; (ii) antitrust causation; (iii) the "competitive dynamics" of shipper-railroad negotiations; (iv) fuel-surcharge coverage; and (v) the purported "valid" reasons Defendants adopted fuel surcharges in the first place. Mr. Tucker has something to say about nearly every aspect of this case—but none of it involves accounting techniques, or any reliable methodology at all.

In addition to his far-ranging opinions, Mr. Tucker's MDL II report includes more than 100 appendices—one for each plaintiff shipper—that quote or paraphrase record documents (mostly emails and contracts between plaintiffs and defendants) and deposition testimony.[2] Mr. Tucker plans at trial to summarize and recite this evidence to the jury, acting as a mouthpiece for Defendants' version of the facts, and opining on disputed fact issues having nothing to do with his purported accounting expertise or "forensic analysis." That is not admissible expert testimony

[2] Due to their volume, Plaintiffs have not attached to this motion all of Mr. Tucker's MDL II appendices, which are cumulatively thousands of pages, but can provide them to the Court on an electronic drive (or other convenient format) if requested.

Mr. Tucker's MDL I report likewise recites documents and deposition testimony for each MDL I plaintiff. *See* MDL I Rpt. ¶¶ 120–133, 152–165, 174–186.

regardless of the expert's qualifications. An "expert" cannot weigh the evidence in the jury's place and decide which party has the better of contested factual issues.

These overarching problems with Mr. Tucker's expert disclosures, which are substantially the same in MDL I and MDL II, create three separate reasons the Court should exclude his opinions.

First, Mr. Tucker—an accountant with no degree in economics or formal training in econometrics or statistics—asserts he was assigned "to assess the reliability and reasonableness of Plaintiffs' damages experts' methods, assumptions, and opinions." MDL I Rpt. ¶ 6; MDL II Rpt. ¶ 6. But he is not qualified to critique Plaintiffs' econometric models. And even more incredibly, though his reports obscure this fact, at deposition Mr. Tucker conceded that *he did not even review these models*. As a result, he was unaware of which variables they include and whether or how these variables control for issues discussed in his reports. His opinions regarding those "methods, assumptions, and opinions" are therefore unreliable, unhelpful, and inadmissible.

Second, Mr. Tucker is not applying "forensic accounting" or "forensic procedures" as those terms are recognized in the accounting profession. The methodology Mr. Tucker purports to apply is used to uncover and assess a defendant's financial fraud (work sometimes done by accountants like Mr. Tucker). Mr. Tucker's chosen methodology has no application in the antitrust, price-fixing context.

Third, Mr. Tucker's ersatz "forensic analysis" flunks *Daubert*. Mr. Tucker's expansive and circular definition of forensic analysis—examining "relevant information" to provide expert "opinions in the context of" litigation (MDL I Rpt. ¶ 6; MDL II Rpt. ¶ 6)—undermines this Court's gatekeeping function by turning anyone who prepares to testify into an admissible testifying expert. Mr. Tucker's analysis is also not testable, replicable, or verifiable, because it turns entirely

on his subjective judgment calls about what evidence he finds persuasive. And even if forensic analysis could be an accepted methodology in some contexts, Mr. Tucker's self-styled "forensic analysis" in this case includes no rules or process for selecting the documents and deposition testimony he cites. He instead acts as a mouthpiece, unhelpfully summarizing evidence and opining on fact issues that the jury can and should decide. Indeed, Mr. Tucker has tried this ploy before and was rebuffed, with a district court ordering he "may not introduce the substance of any documentary evidence, nor testify as to simple inferences from those documents or other uncomplicated facts." *Alabama Aircraft Indus., Inc. v. Boeing Co.*, No. 2:11-cv-03577 (RDP), 2019 WL 13172372, at *6 (N.D. Ala. July 1, 2019). So too here.

In sum, the Court should exclude Mr. Tucker's opinions in both MDL I and MDL II.

**Legal Standard**

Defendants must show that Mr. Tucker's testimony reflects the application of "scientific, technical, or other specialized" expertise to the evidence in a way that "will help the trier of fact to understand the evidence or determine a fact in issue." FED. R. EVID. 702(a). They must also demonstrate that "it is more likely than not" that Mr. Tucker has employed "reliable principles and methods" and that his "opinion reflects a reliable application of the principles and methods to the facts of the case[s]." FED. R. EVID. 702(c), (d). Rule 702 was amended last year to make clear that "the critical questions of the sufficiency of an expert's basis [for his testimony], and the application of the expert's methodology" are threshold questions of "admissibility" for the court, not merely "questions of weight" for the factfinder. *Id.*, Advisory Committee's Note to 2023 Amendment. This amendment "confirm[s] once again the indispensable nature of district courts' Rule 702 gatekeeping function in all cases in which expert testimony is challenged on relevance and/or reliability grounds." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021).

Courts police a methodology's compliance with *Daubert* using several (non-exhaustive) factors, including "whether the theory or technique had been tested, whether it had been subjected to peer review and publication, the method's known or potential error rate, and the method's general acceptance in the scientific community." *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 (D.C. Cir. 2001).

An expert that does nothing more than act as a paid spokesperson for one side's version of the facts, or weigh evidence and state a layman's view of the facts, is not helpful to the jury and should be excluded. *United States v. Washington*, 106 F.3d 983, 1009 (D.C. Cir. 1997).

## Argument

### I. Mr. Tucker Did Not Review the Econometric Models He Was Supposedly Retained to Rebut, and Is Not Qualified to Comment on Them

Mr. Tucker's opines about the assumptions and reasonableness of the econometric models and damages calculations offered by Plaintiffs' experts. But he is not qualified to do so under Rule 702, as he has no training in the relevant fields and floundered when asked how a regression works in deposition. And as was only revealed at deposition, Mr. Tucker did not actually analyze those econometric models, so his expert testimony about them is neither helpful under Rule 702(a) nor reliable under Rules 702(c) and (d). Mr. Tucker merely lobs criticism of Plaintiffs' experts' damages calculations without any expertise or scientific foundation in the matter.

In both MDL I and MDL II, Mr. Tucker claimed to test propositions purportedly "inherent in Plaintiffs' experts' damages calculations," including whether "it is appropriate for the Plaintiff experts to determine damages in this case based on industry-wide generalizations and Defendants' system-wide averages regarding various inputs, such as the use of fuel surcharges and fuel cost recovery." MDL II Rpt. ¶ 5; *see* MDL I Rpt. ¶ 5 (similar). Using "forensic analysis," Mr. Tucker claimed "to assess the reliability and reasonableness of Plaintiffs' damages experts' methods,

assumptions, and opinions," MDL I Rpt. ¶ 6; MDL II Rpt. ¶ 6 (similar), and to have "examined Plaintiffs' experts' methods and calculations" to determine "whether those damages methods and calculations were supported, based on reasonable assumptions, and reliable once individual Plaintiff operations and contracting history are taken into account," MDL I Rpt. ¶ 5; MDL II Rpt. ¶ 5 (similar). *See also* MDL I Rpt. ¶ 9 (claiming to "assess the Plaintiffs' experts' analyses and opinions, including the underlying support, the appropriateness of the methods used from an economic damage perspective, the consistency with contemporaneous documents, data, and information, and the reasonableness of underlying assumptions."); MDL II Rpt. ¶ 11 (similar).

To begin, Mr. Tucker lacks the relevant training to critique Plaintiffs' experts' econometric analyses and is wholly unfamiliar with the technical details of their work. Experts "must have knowledge of the subject area sufficient to aid the trier of fact in its search for the truth." *Weil v. Seltzer*, 873 F.2d 1453, 1464 (D.C. Cir. 1989) (citation omitted).

Mr. Tucker is not an economist, econometrician, or statistician—he has a bachelor's degree in business (with a "major in accounting") and no advanced degree in any field. MDL II. Tr. at 18:2–14. And in deposition, Mr. Tucker could not answer simple questions about the subject area of regressions, instead punting such questions to other defense experts who "analyzed the regression analysis." *Id.* at 387:10–20; *accord* MDL I Tr. at 142:13–16. Mr. Tucker effectively admits that regressions are "outside his area of expertise," and he therefore cannot offer lay testimony disguised as expert opinion critiquing Plaintiffs' econometric analyses. *White v. Ford Motor Co.*, 312 F.3d 998, 1008–09 (9th Cir. 2002). The Court should prohibit Mr. Tucker from testifying about Plaintiffs' experts' econometric models, regressions, and damages models on that basis alone. *See, e.g.*, MDL I Rpt. ¶ 23 ("Plaintiffs' experts' damages approaches . . . are flawed."); MDL II Rpt. ¶ 72 ("Plaintiff experts' damage models are flawed because . . ."); *id.* ¶ 401 ("none

of the Plaintiff experts' regression analyses properly address . . ."); MDL I Tr. at 180:9–181:10 (opining about limitations of regression analyses).

Further, Mr. Tucker has no helpful testimony to offer about these topics, because *he admitted he did not actually look at Plaintiffs' econometric models—despite offering criticisms of them*. Mr. Tucker's reports mask this reality, but the fatal deficiencies of his approach became clear in deposition, where he repeatedly testified that, despite his critiques, he did not (and could not, given his qualifications) verify how Plaintiffs' econometric models actually function:

- Mr. Tucker attributes Plaintiffs' damages "largely" to increases in fuel prices, rather than to the alleged conspiracy. MDL II Rpt. ¶ 91; *see* MDL I Rpt. ¶¶ 27–29; MDL II Rpt. ¶¶ 91–92, 165–169. Mr. Tucker conceded that the veracity of his critique "depend[s] on how [that plaintiffs' expert] controlled for fuel prices" in their models. MDL I Tr. at 135:11–20. But Mr. Tucker did not actually look at the models to determine whether or how they did so. *Id.* at 132:20–136:2; *see id.* at 135:22–136:2 (Q. "But you also don't know how [Dr. McClave] controlled for fuel prices?" A. "Not specifically.").
- Mr. Tucker claimed that "Plaintiffs' experts' damages approaches and assumptions failed to properly reflect the competitive dynamics impacting Plaintiff and Defendant negotiations," MDL I Rpt. ¶ 30, MDL II Rpt. ¶ 87 (similar), including by supposedly not accounting for which routes were sole-served by a single railroad, MDL I Rpt. ¶¶ 145–165, and by supposedly assuming that Defendants did not offer base-rate concessions, MDL I Rpt. ¶¶ 173–186, MDL II Rpt. ¶¶ 76, 86, 188–195. Here too, Mr. Tucker was unaware of whether Plaintiffs' regression models included a route variable, MDL I Tr. at 142:9–146:5, whether they

accounted for base-rate reductions or concessions made in negotiations, *id.* at 158:14–159:14, 160:18–162:13, or whether or what demand variable was used in the models, *id.* at 174:22–175:10.

- Mr. Tucker faults Plaintiff experts for not "ta[king] into consideration" factors like demand for rail transportation (and competition from trucking) during the conspiracy period. *See, e.g.*, MDL II Tr. at 234:19–235:21. Again, when asked whether "any of those factors were accounted for by plaintiffs' experts in their damages analysis," Mr. Tucker responded, "I would leave that up to the railroad experts that studied the regression analyses." *Id.* at 235:9–17; *see also* MDL I Tr. at 174:22–175:10 (unaware of whether or what demand variable Dr. McClave used in his regression model).

Mr. Tucker is oblivious of core elements of Plaintiffs' econometric analyses—to which his expert disclosures purport to respond—and could not even identify their control variables:

> Q. You're not aware of what specific control variables Dr. Bernheim or Dr. Marx used in their regression analyses, correct?
>
> Defense counsel: Objection to form.
>
> A. If you're talking – I'm sorry. If you're talking about it from a regression standpoint, that's true.

MDL II Tr. at 369:24–370:6; *see also, e.g.*, *id.* at 155:17–23 (agreeing he "didn't actually look at what [Dr. Marx] did" and is "just relying on her description in her written report"), 156:1–10 (similar for Dr. Bernheim), 369:11–23 (admitting he did not review "the details of [Dr. Bernheim and Dr. Marx's] regression analyses"), 407:9–408:20 (Mr. Tucker did not "look at the actual model itself" for either Dr. McClave or Dr. Leitzinger), 409:1–415:3 (unable to recall what "industry-wide generalizations" and "system-wide averages" he opines Drs. McClave and Leitzinger used in their damage models), 418:10–17 (Mr. Tucker "didn't examine their detailed models").

The result is analysis that fails even the most permissive *Daubert* test because it lacks any connection to the actual substance of Plaintiff experts' work. *See Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (expert testimony not admissible if it will not "assist the trier of fact"); *see also Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 570 (D.C. Cir. 1993) (noting that Rule 702's requirement of "'knowledge' connotes more than subjective belief or unsupported speculation") (citation omitted).

Not only is Mr. Tucker not qualified to critique Plaintiffs' expert work, but his ignorance of their regressions means his testimony is neither reliable nor helpful to the finder of fact. Any such testimony is more likely to confuse and mislead than to edify. Mr. Tucker should therefore be precluded from offering testimony about Plaintiffs' experts' damages methodologies.

## II. "Forensic Analysis" is Not a Methodology or Accepted Expertise Outside the Accounting-Fraud Environment and Has No Applicability to This Case

Rather than actually examining the econometric modeling performed by Plaintiffs' experts, Mr. Tucker instead criticizes their opinions by "forensically analyzing" the discovery record. Mr. Tucker does not cite a single peer-reviewed source or academic article to support his "forensic analysis" methodology, let alone a source suggesting it applies when assessing the existence or effectiveness of an antitrust, price-fixing conspiracy. Plaintiffs have found no such academic support. Instead, Mr. Tucker's reports cite two "Special Reports" from the American Institute of Certified Public Accountants (AICPA)[3] as the basis for his chosen methodology. *See* MDL I Rpt. ¶¶ 7–8; MDL II Rpt. ¶¶ 9–10. But those special reports actually undermine Mr. Tucker's analysis. And incredibly, at his deposition Mr. Tucker reversed course and admitted that the methodology

[3] *See* Ex. 5, AICPA Fraud Task Force of Forensic & Litig. Servs. Comm., *Special Report: Forensic Procedures and Specialists: Useful Tools and Techniques* (2006); Ex. 6, AICPA, *Consulting Services Special Report 03-1: Litigation Services and Applicable Professional Standards* (2003).

he used to arrive at his opinions in fact *does not* comport with what is described in those sources. Defendants thus cannot carry their "burden of furnishing some objective, independent validation of his methodology." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (cleaned up).

According to the AICPA, accountants use "forensic procedures" in a specific, limited context: to detect fraud in financial records. The first document Mr. Tucker cites, "Forensic Procedures and Specialists: Useful Tools and Techniques" (from 2006), describes "forensic procedures" as investigative techniques used in providing "forensic *accounting services*," and explains that forensic examinations are used "to confirm the existence of *fraud*." Ex. 5 at 1–2 (emphasis added). Its first page provides:

> The paper begins to answer these questions by defining and describing the most widely recognized forensic procedures used by forensic specialists. Forensic examinations or investigations are performed to confirm the existence of fraud. The purposes and structures of financial statement audits and fraud or forensic examinations are different, and the two should not be confused.

*Id.* at 1. The report further describes forensic procedures as "a broad range of procedures" organized into "seven investigative techniques . . . that are designed to *detect fraudulent behavior*." *Id.* at 15 (emphasis added). Those techniques are used by an "*audit* team" to "enhance the *audit process*." *Id.* (emphasis added).

The AICPA makes clear that "forensic services" are not a roving commission to act as a fact finder or tribunal on any subject matter. In the paper Mr. Tucker relies on, the AICPA identifies three specific "potential uses" for forensic procedures: assessing the "risk of fraud" and "the reliability of the client's accounting records and financial representations" when determining whether to accept an audit engagement; attempting during an audit to "obtain the appropriate level of assurance with respect to the financial statements" when the auditor deems that "the risk of

material misstatement due to fraud is exceptionally high"; and "gather[ing] audit evidence useful for testing virtually any of the management assertions for a given account." *Id.* at 12–14.

None of the AICPA's potential uses apply here—because this case involves no accounting fraud or analysis of reliability of accounting records. Plaintiffs make no allegations even bordering on accounting fraud. And Mr. Tucker conceded that he is "not suggesting that this is a fraud investigation or that the plaintiffs are alleging fraud." MDL II Tr. at 82:15–17.

Even if this were an accounting fraud case, the AICPA report still would not support Mr. Tucker's methodology. Claiming to rely on the report, Mr. Tucker asserts that "forensic procedures involve the systematic gathering of evidentiary data through the use of *recognized investigative techniques* that can be presented in a court of law." MDL I Rpt. ¶ 7 (emphasis added); MDL II Rpt. ¶ 9 (same). But Mr. Tucker ignores the narrow purpose of that inquiry, as described by the AICPA: "[T]he seven forensic procedures can be used to gather *audit evidence* that is aimed at testing general or specific *controls* or determining whether specific *accounts* and assertions are *misstated* by a material amount." Ex. 5 at 14 (emphasis added).

Nor did Mr. Tucker use the methodology presented as AICPA's "recognized investigative techniques" in this case. Those seven techniques are:

1. Interviews of knowledgeable persons;
2. Confidential sources;
3. Laboratory analysis of physical and electronic evidence;
4. Physical and electronic surveillance;
5. Undercover operations;
6. Public document review and background investigation; *and*
7. Analysis of financial transactions.

*Id.* at 3–6. Naturally, many of these techniques make no sense outside the context of searching for accounting fraud—here, there is no "laboratory analysis" to conduct (3), nothing to surveil (4), and no need for a stakeout (5). And it is undisputed that Mr. Tucker did not conduct interviews (1) or rely on confidential sources (2).

Mr. Tucker also did not use the two remaining techniques in any way the AICPA would recognize. As to technique 6, he did not conduct a "background investigation," which entails looking at property records, "civil and criminal records," and "stock trading activities on the part of management or board members" to identify conflicts of interest, and his review of documents was not a search of materials "to determine or understand possible motives (incentives and pressures) for perpetrating fraud." *Id.* at 3–4. And as to technique 7, the review of financial transactions, Mr. Tucker did not "analyz[e] manual journal entries," "calculat[e] comparative ratios," or review "transactions to check for improprieties" such as "fictitious vendors and employees," because his review was not used "in conducting a fraud investigation." *Id.* at 6.

The second AICPA special report Mr. Tucker cites, from 2003, also does not present an accepted methodology that Mr. Tucker followed. Indeed, the report warns readers right up front: "This special report . . . does not establish standards" for services; instead, it defers to "other approaches, methodologies, procedures, and presentations" which are necessary to define standards for "the widely varying nature of consulting services as well as specific or unique facts about the client and engagement." Ex. 6 at "Notice to Readers" (PDF p. 3). This AICPA report therefore punts to "state boards of accountancy or other licensing agencies" and "other professional organizations to which the practitioner may belong" to define the "professional standards" applicable to "litigation services." *Id.* at 2. Mr. Tucker cannot use a document that repeatedly disclaims setting "standards," *id.* at "Notice to Readers," to satisfy *Daubert*, which asks the Court

to assess "the *existence and maintenance of standards* controlling [a methodology's] operation." *Daubert*, 509 U.S. at 594 (emphasis added).

Perhaps realizing these AICPA sources—the *only* sources cited to support his methodology—undermine his work, Mr. Tucker abandoned them in his deposition. He testified: "I don't think [the two sources are] going to help you understand my process," "I cited to some AICPA literature, but that was very general and doesn't go through the detail process," and "I didn't rely on these [AICPA sources]." MDL II Tr. 89:17, 342:23–343:1, 343:15–16. But Mr. Tucker cannot simultaneously cite AICPA literature and tout that he is "Certified in Financial Forensics" by the AICPA as support for his supposed expertise and explanation of his methodology,[4] while also running away from the AICPA's explanation of forensic procedures, which bears no resemblance to what he actually did in this case.

Mr. Tucker could not identify any other third-party sources that the Court or the parties could use to decipher his methodology, instead repeatedly pointing to his own report. *See, e.g.*, MDL II Tr. at 343:1–4 ("[my] process . . . is described in my report, and it's based on standard approaches that I've used in the past on hundreds of cases and what other experts in my field use for forensic analysis"), 343:5–7, 15–16 (Q. "Are there any sources that I can look at that are not authored by you for more information about that standard approach?" A. ". . . I don't think [the AICPA sources are] going to help you understand my process. My report describes that."), 93:19–22 (Q. "And is there a process that you engage in in assessing documents qualitatively?" A. "Well, I think you can see the process if you read – as you read my report."). Mr. Tucker's circular reliance on his own report to defend his methodology does not carry Defendants' burden, because an expert cannot rely on "a homemade methodology, crafted by a witness with no particular expertise to

[4] Ex. 7, Resume of Avram S. Tucker, appended as Attachment B to MDL II Rpt., at 1.

craft it, administered by persons with no particular expertise to administer it, tested by no one, and accepted only by the witness himself." *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 754 (6th Cir. 2014); *accord Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."). Mr. Tucker has nothing other than his own say-so to support his application of "forensic analysis" in this case.

In sum, "forensic analysis," as defined and employed by Mr. Tucker, is not a recognized methodology or field of expertise within any scientific or technical community. In a different case, Mr. Tucker might have been qualified to offer expert opinions on accounting or even the indicia of fraud as determined by accounting techniques, but Defendants have not met their burden to show that Mr. Tucker's methodology can be applied to this antitrust case having nothing to do with accounting or fraud. Mr. Tucker's opinions should therefore be excluded in their entirety for failure to qualify as expert testimony.

## III. Mr. Tucker's "Forensic Analysis" Is Nothing More Than a Selective Recitation of the Record, Unconnected to Any Legitimate Expert Conclusion, and Is Not Reliable or Helpful

Even beyond Mr. Tucker's lack of qualifications and noncompliance with "forensic" methodology, Mr. Tucker must still demonstrate that his opinions are reliable under *Daubert* and helpful to the jury. But Mr. Tucker's opinions are formed from an ad hoc review of the factual record in this case, not from any identifiable methodology, so should be excluded.

### A. Mr. Tucker's "forensic analysis" is not a cognizable, testable, or replicable methodology

Mr. Tucker reaches his wide-ranging opinions about plaintiff negotiations and contracting by reviewing documents and data produced in this litigation. MDL I Rpt. ¶¶ 3, 5; MDL II Rpt. ¶¶ 3, 5. But Mr. Tucker did not have any documented process for selecting documents or data for review or for using that information to formulate opinions, so his report lacks any discernable

methodology. *See Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion.").

A methodology is a "body of methods, rules, and postulates employed by a discipline: a particular procedure o[r] set of procedures." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 n.20 (3d Cir. 2000) (citation omitted). In other words, a methodology takes inputs, applies a rules-based procedure, and generates outputs. We have Mr. Tucker's outputs (his opinions), but not his inputs nor any rules or principles. That is because Mr. Tucker did not assemble any identifiable set of materials he considered in connection with any given subject or apply any particular technique in weighing which materials should be credited over other materials. Instead, Mr. Tucker simply searched for information to confirm pre-determined opinions. He explained his formless approach as follows:

- "[B]ased on a particular analysis that I'm performing, I and my team would determine what we thought was relevant to be able *to conduct my analysis and provide my opinions*." MDL II Tr. at 94:18–95:5 (emphasis added).

- "What I did in this case is what was important for my analysis and opinions in this case." *Id.* at 89:24–90:1.

- "I supervised and instructed my team to make sure we review available information to *be able to conduct the analyses I wanted done*, and then provide opinions based on the results of my analysis." *Id.* at 426:16–427:1 (emphasis added).

- "I and my team had access to all of the information that's been produced in this case, and then we went through a process of saying what type of information would be relevant *to an assertion* and at *what level do I want to study it* . . . it was an iterative process based on the available information *to get a sufficient detailed analysis to support my opinions*." *Id.* at 422:15–423:8 (emphases added).

Mr. Tucker never articulated in his report, or explained in his deposition, what methods or principles he applies (if any) to his selection and review of documents, deposition testimony, and transaction data to generate his opinions. *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Even if Mr. Tucker's analysis somehow were a cognizable "methodology," it is not capable of replication or falsification, undermining its reliability. *See, e.g.*, *In re Blackbaud, Inc., Customer Data Breach Litig.*, No. 3:20-MN-02972 (JFA), 2024 WL 2155221, at *12 (D.S.C. May 14, 2024) ("replicability is a strong indicator of reliability and . . . the inability to replicate an expert's methods may indicate that the expert's methods are not reliable"). Only Mr. Tucker knows what he wanted to study, what analysis he wanted to conduct, and what was related or relevant to his assessments and opinions. Even if Mr. Tucker had properly disclosed his materials considered (and he did not, as discussed below), no other expert or analyst could replicate his process, which depends entirely on his subjective determinations of what is "relevant" and "appropriate." And there are no standards or guardrails to rein in this homemade technique—whatever Mr. Tucker thinks is "appropriate" is, by definition, appropriate—so his methodology is impossible to independently test or falsify.

Mr. Tucker's methodological black box thus fails *Daubert*'s testing touchstone: "[I]t is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833–34 (3d Cir. 2020) (citation omitted) (holding district court abused its discretion by admitting expert testimony based on methodology lacking peer review, general acceptance, a "known or potential rate of error," and "standards controlling the theory's application"). Other than his own subjective judgment, Mr. Tucker could not identify any principles animating his decisions:

> Q. So if your team or you identified examples in plaintiff shipper deposition testimony indicating that they were not able to negotiate fuel surcharges with

> defendants, did you cite to that deposition testimony in your Appendix B for the relevant shipper?
>
> A. Might be; might not be.
>
> Q. So you may have seen that but not cited it in your negotiation discussion for that shipper?
>
> A. Possible. Because that answer would be true for any document I saw. ***I decided what I felt was appropriate*** for my analysis to ultimately reach my conclusions.
>
> MDL II Tr. at 429:1–13 (emphasis added).

Analysis by what "feels right" is no methodology. *Daubert* forbids this improvised approach to expert analysis, mandating "rigor, not mere haphazard, intuitive inquiry." *UGI Sunbury LLC,* 949 F.3d at 834 (cleaned up).

Mr. Tucker also failed to properly disclose the materials he considered or relied upon in forming his expert opinions, compounding his reliability problems. Disclosure under Federal Rule of Civil Procedure 26(a)(2)(B) serves the important purpose of "prevent[ing] unfair surprise at trial and to permit the opposing party . . . to prepare for . . . cross-examination at trial." *Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 28 (D.D.C. 2007). Unlike every other expert in MDL I and MDL II, Mr. Tucker did not attach a list of materials considered or relied upon to his expert report.

Instead, in MDL II, Mr. Tucker provided a 135-page "Attachment A," titled "Documents and Information," in which he lists more than *ten million pages* of material, including nearly every document produced and every deposition taken in MDL I and MDL II. *See* Ex. 8 (Attachment A to MDL II Rpt.). Mr. Tucker provided a similar "Attachment A" in MDL I, listing almost every document produced and deposition taken in MDL I. *See* Ex. 9 (Attachment A to MDL I Rpt.). Mr. Tucker acknowledged that he had not considered or even laid eyes on all the millions of documents and thousands of hours of deposition testimony he cited, and that there is no way to

determine what he actually "looked at and reviewed." MDL II Tr. at 107:11–108:1; *accord* MDL I Tr. at 37:8–39:8. When asked, he conceded: "*I don't think you could tell*. And I don't think I have committed [it] to memory . . ." MDL II Tr. at 107:17–18 (emphasis added). Rather, he testified that determining what materials he "directly" relied upon would require Plaintiffs to scour through footnotes spread across more than 20,000 pages of expert disclosures. MDL II Tr. at 107:3–10, 107:21–109:5.

Mr. Tucker therefore does not effectively disclose what documents and deposition testimony he reviewed to reach his opinions—the building blocks of his "forensic analysis." Providing materials in this format—claiming to have "considered" or had "access to" tens of millions of documents, but burying the specifics across tens of thousands of pages and Excel files of footnotes—is wholly unmanageable and designed to prevent testing or effective cross-examination.[5]

Mr. Tucker's obfuscation of his process flouts the Federal Rules and is fatal to his expert disclosures, because there is no way for any other expert to replicate, let alone verify or falsify, his results.

B. <u>An "opinion" that is merely a layperson's narration of disputed facts unconnected to any expert methodology is inadmissible</u>

Lacking any discernible methodology, most of Mr. Tucker's "forensic analysis" boils down to him summarizing or quoting select contracts, emails, and deposition testimony, weighing that evidence, and purporting to draw conclusions from those selected facts in the same manner the

[5] At the very least, the Court should deem Mr. Tucker's footnotes to constitute his Rule 26(a)(2)(B)(ii) disclosure of materials "considered" or "relied upon," and not allow him to subvert the expert-disclosure process by claiming he "considered" every document cited in his Appendix A or testifying about every document in the record.

jury could. That is not helpful, relevant, or reliable expert methodology. *See Washington*, 106 F.3d at 1009.

This is not the first time Mr. Tucker has served as a mouthpiece for defendants by merely regurgitating documents and testimony and opining on fact disputes untethered to any expertise or method. In *Alabama Aircraft*, Judge R. David Proctor of the Northern District of Alabama excluded those portions of Mr. Tucker's report that "simply quote certain documents" and held that "Tucker may not introduce the substance of any documentary evidence, nor testify as to simple inferences from those documents or other uncomplicated facts." *Alabama Aircraft Indus.*, 2019 WL 13172372, at *6. That ruling should apply here with equal force.

In MDL II, Mr. Tucker submitted an appendix for each plaintiff that merely narrates the portion of that plaintiff's transaction history Mr. Tucker believes will help Defendants, and ignores those portions of the transaction history that do not. In MDL I, Mr. Tucker included this information for the five plaintiffs in that proceeding in the body of his report. Take Mr. Tucker's appendix for shipper Louisiana Pacific in MDL II, for example:

- In Section III, "Shipping Alternatives / Competition," Mr. Tucker summarizes 3.5 pages of excerpts from select deposition testimony and emails. *See* Ex. 10, Appendix B for Plaintiff Louisiana-Pacific Corporation (appended to MDL II Rpt.), at 2–5.

- In Section IV, "Deposition and Documentary Evidence of Louisiana Pacific Contract Negotiations," Mr. Tucker recites snippets of two depositions. *Id.* at 5.

- In Section V, "Analysis of Louisiana Pacific's Price Authorities," Tucker picks two of Louisiana Pacific's hundreds of price authorities and identifies their start date, the date Louisiana Pacific first paid a fuel surcharge, and the contract's revenue relative to Louisiana Pacific's overall shipments. *Id.* at 5–6.

Mr. Tucker's other plaintiff-specific appendices follow, in his words, the same "fairly standard formula." MDL II Tr. at 332:23. But this is not expert analysis. Mr. Tucker excerpts basic

facts, events, and discussions—all of which a jury can understand without his assistance—and then reaches a conclusion that Defendants' litigation contentions are valid.

Much of Mr. Tucker's main report likewise narrates uncomplicated facts and argues his preferred inferences from them. Consider next his opinion that "Plaintiff[] experts . . . ignore the valid business reasons for each Defendant's implementation of fuel surcharges." MDL II Rpt. ¶ 135; *see id.* ¶¶ 89, 135–152; MDL I Rpt. ¶¶ 187–212. To support this claim, Mr. Tucker uncritically quotes or summarizes documents (MDL I Rpt. ¶¶ 191–193, 197; MDL II Rpt. ¶¶ 137–140, 145, 149), and quotes verbatim deposition testimony from Defendants' executives (MDL I Rpt. ¶ 194; MDL II Rpt. ¶¶ 141–142). But he does not purport to evaluate or investigate the "validity" of any purported "business reasons" using any industry knowledge, prior learning, or established methodology—he simply collects evidence and characterizes it as "valid," which is nothing more than *ipse dixit*.

Other sections of Mr. Tucker's report consist entirely of quotations from documents and depositions, bookended with conclusory paragraphs reciting the substance of that evidence without applying any method or expertise or connecting his recitation to any legitimate accounting expert analysis. *See, e.g.*, MDL II Rpt. ¶¶ 259–277, 286–303, 304–312, 313–322, 323–336, 337–349, 350–358, 359–363, 364–373. The same goes for Mr. Tucker's "Appendix A," substantially the same in both MDL I and MDL II, in which he does nothing other than recite Defendants' preferred historical retelling of fuel surcharge programs. Ex. 11 (Appendix A to MDL I. Rpt.); Ex. 12 (Appendix A to MDL II Rpt.); *see* MDL I Tr. at 206:17–22 (testifying that Appendix A describes what Mr. Tucker believes to be the reasons that Defendants made changes to their fuel surcharge formulas, "to the extent that I could glean that from either documents or testimony of

the percipient witnesses."); *id.* at 207:17–22 ("My general view is that the railroads were each independently looking at how to deal with the issue of fuel volatility . . .").

To the extent Mr. Tucker's version of "forensic analysis" could ever lead to admissible expert testimony as a general matter, his expert disclosures in this case are not reliable because he merely engaged in a results-driven exercise to generate opinions which supported Defendants' pre-ordained narrative.

Mr. Tucker's own writings confirm the impropriety of his approach. Before his engagement in MDL I or MDL II, Mr. Tucker wrote that a reliable forensic analysis is one that "*combs through it all*, searching for anomalies and inconsistencies around a common thread that might *explain the entire picture*." Ex. 13, Avram S. Tucker, *The Numbers Tell a Story*, CALIFORNIA LAWYER Vol. 31, No. 6 (June 2, 2011) (comparing forensic analysis to a "detective work[ing] to solve a mystery" or "an investigator from the National Transportation Safety Board walking the scene of a plane crash, trying to figure how, why, and when the aircraft went down" and noting forensic analysis requires "complete immersion in the inner structure of a client's business and everyday operations" (emphasis added)).

Mr. Tucker's process here fell fall short of his own standards. Rather than "comb through it all" to explain the "entire picture," he admits he reviewed only a sliver of the documentary record in this litigation, and only that portion that was necessary "to support [his] opinions." *See, e.g.*, MDL II Tr. at 374:14–19, 392:22–393:5, 403:7–16, 422:15–423:8. Nor did Mr. Tucker's "forensic analysis" include any rules or a defined process to select which documents he reviewed, weighed, and regarded as conclusive.

This analytical failure is on full display in his plaintiff-specific appendices, which Mr. Tucker claims he prepared "us[ing] a fairly standard formula" and purportedly include

everything "meaningful" about a shipper's "contracting history or negotiations." *Id.* at 137:2–7, 332:19–23; *see* MDL II Rpt. ¶ 101. Not so. Although Mr. Tucker attacks Plaintiffs for overlooking "real-world shipping experience," "individual Plaintiff shippers' actual interactions with the Defendant railroads," "Plaintiff shipper-specific circumstances," and "actual negotiations and contracting" (MDL I Rpt. ¶ 21; MDL II Rpt. ¶¶ 71, 75, 83), the appendices attached to his MDL II report draw broad factual conclusions based on a handful of price authorities and negotiations, while omitting myriad *other* "meaningful" facts about each plaintiff's negotiation and contracting history. The same is true of his plaintiff-specific analysis in his MDL I report.

For example, while Mr. Tucker opines that "many price authorities" during the conspiracy period contain "negotiated" fuel surcharges (*e.g.*, MDL II Rpt. ¶ 196), nowhere does he mention the many times Defendants contemporaneously told shippers the opposite. For example:

- BNSF told Toyota: "BNSF Senior Management requires that all new contracts include our standard fuel surcharge and be subject to an annual rate adjustment." Ex. 14, BNSF_II_03870664 at '664.

- NS "repeatedly" told TotalEnergies: "the FSC is NOT negotiable" and that "NS is unable to make an exception to the current Fuel Surcharge." Ex. 15, NS-MDLII-00404714 at '714; Ex. 16, TOTAL_067243 at '243.

- After multiple attempts to negotiate a fuel surcharge provision, NS told Exelon Generation that "NS has a corporate policy that our Fuel Surcharge is to be incorporated in all new contracts." Ex. 17, NS_010161012 at '012.

- Wisconsin Electric Power Company objected to UP's fuel surcharge as excessive and proposed using the RCAF-U or some other method that reflected UP's actual change in fuel costs. Lance Fritz, former UP CEO and then head of UP's Energy group, responded with a one-word answer: "NO." Ex. 18, UPFSC_II_X_00004853 at '856.

- UP informed CF Industries: "All of our rates and rate offers are subject to the Highway Diesel Fuel surcharge." Ex. 19, UPFSC_II_00320008 at '008.

None of these statements is referenced in Mr. Tucker's Appendix B for those shippers, where he purports to describe each of the Plaintiffs' history of contract negotiations, formed from only

snippets. Nevertheless, Mr. Tucker reaches the broad conclusion that any allegations of a conspiracy to chill competition on fuel surcharges are "unsupported and inconsistent" with the evidence. *E.g.*, MDL II Rpt. ¶ 196. That is nothing more than crediting some evidence over other evidence, without any methodological reason for doing so—and the province of the fact finder, not a purported Rule 702 "expert."

In sum, because Mr. Tucker purports to conduct a "forensic analysis" of select negotiations and contracts between Plaintiffs and Defendants without a defined methodology—and in the process acts as a mere vehicle for Defendants' factual narrative—his testimony is both unhelpful and unreliable, and thus should be excluded.

## Conclusion

Because Mr. Tucker does not satisfy the requirements for the admissibility of expert opinions under Federal Rule of Evidence 702 and *Daubert*, Plaintiffs respectfully request that the Court exclude his opinions in MDL I and MDL II.

Respectfully submitted,

Dated: July 17, 2024

/s/ *Michael D. Hausfeld*
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo
James Hamilton

HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com
jhamilton@hausfeld.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell*

/s/ *Sami H. Rashid*
Sami H. Rashid
Richard I. Werder, Jr.
Alexandre J. Tschumi
Alexandria ("Alexee") Deep Conroy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com
rickwerder@quinnemanuel.com
alextschumi@quinnemanuel.com
alexeeconroy@quinnemanuel.com

Alicia Cobb
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Facsimile: (206) 905-7100
aliciacobb@quinnemanuel.com

Viola Trebicka
Jennifer English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com

*Attorneys for Plaintiffs Dust Pro, Inc., Olin Corporation, U.S. Magnesium, Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa*

*Recycling Southeast, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

/s/ *William J. Blechman*
Richard Alan Arnold
William J. Blechman
Douglas H. Patton
Michael A. Ponzoli
Joshua B. Gray

*World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars*

KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Lehigh Hanson, Inc., PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

*/s/ Jason M. Powers*
Jason M. Powers
VINSON & ELKINS L.L.P.
845 Texas Avenue, Suite 4700
Houston, Texas 77002
(713) 758-2522
(713) 615-5809 (Facsimile)
jpowers@velaw.com

Craig P. Seebald (D.C. Bar No. 438968)
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com

*/s/ John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854) Daniel M. Jaffe (D.C. Bar No. 461185) SLOVER & LOFTUS LLP
1828 L Street, NW
Suite 1000
Washington, D.C. 20036

*(KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton*

(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining, LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Constellation Energy Generation, LLC, f/k/a Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company*

*Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

*/s/ David C. Eddy*

David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Anheuser-Busch, LLC; Anheuser-Busch Companies, LLC; Nestlé Purina PetCare Company; and Nestlé USA, Inc.*

*/s/ Joseph M. Vanek*

Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (admitted *pro hac vice*)
SPERLING & SLATER, LLC
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiffs Kellogg Company and Mitsubishi Motors North America, Inc.*

/s/ *Raj Mathur*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Raj Mathur
Scott Glass
SUSMAN GODFREY, L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: 212-336-8330
rmathur@susmangodfrey.com
sglass@susmangodfrey.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and*

/s/ *Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
Caitlin R. Thomas
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com
caitlin.thomas@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

/s/ *Kristopher S. Davis*
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285

*Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

/s/ *Kirk T. May*

Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

*Attorneys for Plaintiffs Lansing Ethanol Services, LLC, et al.*

kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

/s/ *David J. Lender*

David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com

luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

/s/ *Benjamin D. Brown*
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
Sabrina Merold (D.C. Bar No. 1738065)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

/s/ *James P. Denvir*
James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)
James Grippando (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP

/s/ *Michael Schaper*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

/s/ *Nathan P. Eimer*
Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
dbirk@eimerstahl.com
srazzano@eimerstahl.com

401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

*/s/ Michael C. Dell'Angelo*
Michael C. Dell'Angelo
Michael J. Kane
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
mwallin@bm.net

Daniel J. Walker
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, D.C. 20001
(202) 559-9740
dwalker@bm.net

bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

*/s/ Daniel B. Goldman*
Daniel B. Goldman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company, Tronox Inc., and Tronox US Holdings Inc.*

Sophia Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd.
La Mesa, CA 91942
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

/s/ *Leo D. Caseria*

Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

/s/ *Ronald J. Aranoff*

Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

/s/ *Conte C. Cicala*

Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

**Certificate of Service**

The undersigned certifies that on July 17, 2024, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF electronic filing system and was served by secure transfer on all counsel of record in the above-captioned matters.

*/s/ Michael D. Hausfeld*

Michael D. Hausfeld