# Defendants' Appendix

# Volume 21 of 40

# DA09000 - DA10261

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AIR PRODUCTS AND CHEMICALS, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BNSF RAILWAY COMPANY, CSX TRANSPORTATION, INC., NORFOLK SOUTHERN RAILWAY COMPANY, and UNION PACIFIC RAILROAD COMPANY,**<br><br>**Defendants.** | **<u>COMPLAINT</u>**<br><br>**CIVIL ACTION NO.**<br><br>**JURY TRIAL DEMANDED** |

This is an antitrust action brought by Plaintiff Air Products And Chemicals, Inc. charging BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company (collectively, "Defendants") with price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff brings this action against Defendants, from whom Plaintiff directly purchased unregulated rail freight transportation services from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and by one or more of whom Plaintiff was assessed a rail fuel surcharge ("FSC") for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

## NATURE OF THE ACTION

1. This lawsuit alleges violations of Section 1 of the Sherman Act by Defendants, the four largest United States-based Class I railroads, during the Relevant Period. Defendants

have damaged Plaintiff by jointly increasing the prices Plaintiff paid Defendants to ship products by rail.

2. In 2003, the four largest United States-based Class I railroads engaged in an extraordinary series of meetings, phone calls, and email communications through which they embarked on a conspiracy – under the guise of a fuel cost recovery program – to apply and enforce rail fuel surcharges across their customers in order to generate profits. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") together controlled about ***90 percent*** of rail freight traffic in the United States during the Relevant Period. Defendants used "rate-based" FSCs – *i.e.*, surcharges that use a percentage applied to the base rate for a shipment – as a means to impose across-the-board rate increases on rail freight shipments, a result that would have been prohibitively difficult to achieve on a contract-by-contract basis. Throughout the conspiracy, and despite customer pushback against Defendants' FSCs, Defendants set aside their individual economic self-interest to undercut one another and instead staunchly maintained their FSC program, pocketing billions of dollars in profits as a result.

3. Prior to conspiring, Defendants operated as businesses should: they actively competed against each other over rates generally and with respect to fuel recovery mechanisms to the benefit of their customers. According to a historical study of rail rates undertaken by the Surface Transportation Board ("STB"), "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Defendants were aware of, and concerned about, this trend. According to one CSX internal analysis from 2002, this decline resulted from factors including

"some very vicious historical price wars" in the rail industry and "destructive pricing for rail share."

4. Between 2000 and 2003, Defendants independently tried to implement revenue-enhancing policies, including uncoordinated efforts to impose stand-alone FSCs. These efforts failed. Defendants used the inclusion or absence of FSCs as a basis to compete for each other's business and customers successfully resisted FSCs. They were rarely included in contracts and more rarely collected; those seeking to impose them lost customers to competitors or compensated customers by negotiating discounts. For example:

- BNSF explained in a May 2002 Enterprise Wide Risk Assessment that "***We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace***. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. ***We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it***."
- In September 2002, NS's manager of pricing systems Pat Glennon reported to the then-Senior Vice President of Marketing Services and later its CMO Don Seale that ***"[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause***," and that eastern competitor CSX (together, the "Eastern Railroads") "appear[s] to be more lax in applying the surcharge to private authorities."

- As late as April 2003, UP's Bob Toy reported, "***Fuel surcharge $ are melting away at the competition***. In a downward-pressure environment, what's on paper must not work in the real world."

5. Moreover, since the passage of the Staggers Act in 1980, which significantly deregulated the American railroad industry, railroads typically entered into private freight transportation contracts that included escalation provisions tied to indexes that weighted actual cost factors, including fuel cost. As UP President James Young acknowledged on an October 2004 earnings call, the Rail Cost Adjustment Factor ("RCAF") "looks at *actual* costs through the industry." In that respect, Defendants were *already* recovering fuel costs through the RCAF or the related All Inclusive Index ("AII").

6. In March 2003, everything began to change. Rather than competing, Defendants began coordinating FSC programs. Senior executives at the highest levels of each company began to discuss with one another the implementation of more aggressive FSC formulas that the Surface Transportation Board ("STB") later found bore "***no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied . . . .***" In short, Defendants stopped competing and started conspiring.

7. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates. Simultaneously, UP's CMO Jack Koraleski was recommending escalation of UP's FSC program to be substantially more aggressive. ***The very next day***, Koraleski traveled to competitor CSX to play golf, socialize, and discuss "fuel surcharge methodology." ***Within one week***, CSX's leadership abruptly reversed course, abandoning its recommended FSC reduction and adopting a program ***matching*** UP's escalation.

8. On March 18, 2003, BNSF and NS senior executives met to discuss "***synchroniz[ing]***" FSCs. Action items for the meeting attended by John Lanigan (BNSF's CMO) and Don Seale stated: "BNSF's fuel surcharge is structured differently than NS, CSX and UP. ***Should BNSF's by [sic] synchronized with the other big players in the industry?***" The answer based on what followed: a resounding yes.

9. On March 20, 2003, CSX publicly announced a new, more aggressive FSC program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "***the same approach as the CSXT***." On April 4, 2003, UP sent a "concurrence" to competitors that its new FSC program will "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "***This is sweet !!! Just like the CSXT.***"

10. On April 1, 2003, BNSF and CSX senior executives met. The agenda dictated that CSX's CMO Mike Giftos and BNSF's CMO John Lanigan were to discuss "***Fuel Surcharge***." Documents also reveal that, between April 2 and 6, 2003, NS's Seale and BNSF's Lanigan continued a prior discussion on "***the fuel surcharge issue***" at a National Freight Transportation Association meeting.

11. Similar to CSX's abandonment of a less aggressive FSC regime following a meeting with UP in March 2003, BNSF abandoned the internal consideration of an FSC program that could have been fairer for shippers. Between February and April 2003, BNSF had been "[l]eaning toward [a] Cost Per Mile" FSC formula (a mileage-based FSC which could have better correlated the resulting FSCs to actual fuel costs compared to the rate-based FSCs that Defendants broadly implemented during the conspiracy), but abandoned this approach. Instead, BNSF and UP (together, the "Western Railroads") adopted nearly identical *rate-based* FSCs.

An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, ***it exactly matches the BNSF FSC percentage progression***, including lag times and effective dates."

12. Defendants' employees recognized these new FSCs were not genuine fuel cost recovery mechanisms as Defendants sought to portray. For example, on March 19, 2003, CSX's Director of Market Strategy John Couch explained that while the coordinated FSC "***seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%***." On April 7, 2003, NS's Manager of Pricing Systems Pat Glennon recounted "[t]he case in favor of adopting the CSXT standard" to Don Seale and AVP Charlie Brenner, writing the "CSXT standard ***clearly produces significantly more compensation, and it does it sooner and more consistently***." On April 29, 2003, Glennon told Seale that "[b]y dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, ***the change is in fact a <u>blatant general rate increase</u>***, and will appear so to customers."

12. Glennon was correct that customers saw the rate increases for what they were and were outraged. Handwritten notes from a June 2003 meeting between CSX and UP's senior executives – including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden, VP of Strategic Planning Les Passa, and Alan Blumenfield and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan – reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes. The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

13. But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall***."

14. And, instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants maintained the scheme and imposed policies designed to ensure their new "standard" or "published" FSCs were enforced broadly across their customers without the waivers and discounts they had frequently offered between 2000 and 2002:

- **BNSF**: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "***Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed.***"
- **UP**: On December 22, 2003, a sales representative explained to a customer, "As a company policy, all ***contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice***."
- **CSX**: A May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence Gooden stated that any exception had to come through him and that he had zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE

is authorized to approve a renewal with [a base rate] increase of less than 10%" and "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***."

- **NS**: A 2004 email from Don Seale to his subordinates mandated "***no deviation from NS's published FSC without [his] prior approval***." He also rejected any negotiations to forego base rate increases in return for FSC application as a "shell game."

15. In the fall of 2003, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to get all Defendants to agree to remove fuel costs out of the weighted RCAF and AAI indices (which already permitted the Defendants to recover all of their fuel costs), so that they could more easily charge artificially high FSCs as a revenue enhancement mechanism. As a result, the AAR—whose board was dominated by Defendants—created an unprecedented All Inclusive Index *Less Fuel* ("AAILF"). Defendants' conspiratorial implementation of the AAILF allowed Defendants to move away from use of the RCAF and more easily apply their FSCs.

16. Defendants worked tirelessly to achieve 100 percent FSC coverage across their customers. All four Defendants pursued 100 percent participation goals and tracked their progress toward attaining that goal. Defendants also policed the conspiracy by exchanging FSC coverage data with one another. In addition, Defendants started their negotiations using the standard FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (*i.e.*, facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he

expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

17. Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150 per barrel during the Relevant Period, so did Defendants' profits. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," and included the following chart documenting the significant growth in profits during the Relevant Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

18. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") similarly found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

19. Defendants also attributed their record revenues to FSCs. For example:

- **NS**'s 2006 "***[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase*** and modestly higher traffic volume."
- **BNSF**'s freight revenues "***increased 15 percent [in 2006] to a record high of $14.5 billion*** on double-digit increases in each of our four business units." "***Growth in prices and fuel surcharges*** drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."
- **UP** "achieved record revenue levels [in 2006] in all six of our commodity groups, ***primarily driven by better pricing and fuel surcharges***."
- **CSX**'s operating revenue increased $948 million in 2006; "the primary components of the revenue gain" were "continued yield management ***and the Company's fuel surcharge program, which drove revenue per unit across all major markets.***"

**PARTIES**

20. Plaintiff Air Products and Chemicals, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 7201 Hamilton Boulevard, Allentown, Pennsylvania 18195. During the Relevant Period, Plaintiff purchased unregulated rail freight transportation directly from the Defendants, and during the Relevant Period, the Defendants assessed FSCs on Plaintiff in connection with that unregulated rail freight transportation. The prices Plaintiff paid to Defendants for unregulated rail freight transportation services on which FSCs were imposed were greater than the prices Plaintiff would have paid

absent the conspiracy alleged herein. Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

21. Plaintiff purchased rate-unregulated rail freight transportation directly from Defendants, or their subsidiaries and affiliates, or agents controlled by Defendants or their subsidiaries and affiliates, during the Relevant Period and pursuant to agreements and other arrangements entered into during the Relevant Period. Defendants assessed rail fuel surcharges on Plaintiff in connection with those purchases. Plaintiff paid Defendants millions of dollars more for rate-unregulated rail freight transportation services on which rail fuel surcharges were imposed than Plaintiff would have paid absent the conspiracy alleged herein. As a direct result of Defendants' unlawful conduct, Plaintiff suffered injury to its business or property.

20. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). During the Relevant Period, BNSF, or its subsidiaries and affiliates, or agents controlled by BNSF or its subsidiaries and affiliates, entered into agreements and other arrangements with Plaintiff that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to Plaintiff, and assessed Plaintiff rail fuel surcharges for the agreed-upon transportation.

21. Defendant CSX has its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts

of the country (including in this District). During the Relevant Period, CSX, or its subsidiaries and affiliates, or agents controlled by CSX or its subsidiaries and affiliates, entered into agreements and other arrangements with Plaintiff that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to Plaintiff, and assessed Plaintiff rail fuel surcharges for the agreed-upon transportation.

22. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). NS operates an intermodal terminal in this District located at 2400 Commerce Center Boulevard, Bethlehem, Pennsylvania 18015. During the Relevant Period, NS, or its subsidiaries and affiliates, or agents controlled by NS or its subsidiaries and affiliates, entered into agreements and other arrangements with Plaintiff that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to Plaintiff, and assessed Plaintiff rail fuel surcharges for the agreed-upon transportation.

23. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). During the Relevant Period, UP, or its subsidiaries and affiliates, or agents controlled by UP or its subsidiaries and affiliates, entered into agreements and other arrangements with Plaintiff that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation

services to Plaintiff, and assessed Plaintiff rail fuel surcharges for the agreed-upon transportation.

24. Each Defendant acted as the agent of or co-conspirator with the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

25. Whenever this Complaint refers to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, employees, agents or representatives while they were actively engaged in the usual management, direction, control or transaction of the corporations business or affairs.

**JURISDICTION AND VENUE**

26. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiff by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

27. Jurisdiction of this Court is founded on 15 U.S.C. §§ 15 and 22, and 28 U.S.C. §§ 1331 and 1337.

27. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

28. This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business with Plaintiff in this District; (b) directly or indirectly sold and

delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, Plaintiff in this District.

## INTERSTATE TRADE AND COMMERCE

29. During the Relevant Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

30. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

31. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## I. CONGRESS DEREGULATED THE RAILROAD INDUSTRY, AND CONSOLIDATION INCREASED OPPORTUNITIES FOR COLLUSION

32. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

33. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission

("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

34. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

35. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry is now (and was during the Relevant Period) highly concentrated: four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (*i.e.*, the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

36. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

**II. DEFENDANTS ATTEMPT TO RAISE RATES BEFORE THE CONSPIRACY**

37. For many years before the Relevant Period, Defendants confronted a long-term, structural decline in rail freight rates. Indeed, according to the Surface Transportation Board,

Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of Railroad Rates: 1985-2007*, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Figure 1 from the *Study of Railroad Rates* evidences that trend:




38. Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts by the individual Defendants to apply stand-alone FSCs. Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

39. During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs. The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an

internal analysis as "some very vicious historical price wars" and "destructive pricing for rail share." A 2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? ***We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy***.

40. During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs. By way of example:

- **NS**: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty." VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it." The same month, Director of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC." In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS." Glennon testified that in 2001 and 2002, FSCs were only "***theoretically billable***."

- **CSX**: In August 2000, CSX reported at a staff meeting that it could collect only 67.4 percent of the then-modest FSCs it had billed over the preceding nine months. EVP of Sales and Marketing Clarence Gooden testified that CSX's FSC coverage was "***very low***" and that he was "***embarrassed***" by the figure.
- **BNSF**: In May 2002, BNSF's Enterprise Wide Risk Assessment explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, EVP and CMO Charles Schultz told Chairman, President, and CEO Matthew Rose and other executives, "***any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive***." Schultz's successor John Lanigan testified BNSF's FSC coverage was "low" in January 2003 – "in the 25 to 30 percent range."
- **UP**: Current EVP and CFO Robert Knight Jr. testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position." UP implemented an FSC program in December 2002, but initially limited the application of that program to certain tariffs and circulars and exempted private shipments in its Industrial Products group from FSCs. This was true even though FSCs were generally not triggered and only "theoretically billable." And in April 2003, Director Bob Toy reported, "Fuel surcharge $ are melting away at the

competition. In a downward-pressure environment, what's on paper must not work in the real world."

41. The reason Defendants were not able to achieve broader FSC coverage was clear: Defendants were concerned about losing business to other Defendants that did not apply FSCs, made concessions, or otherwise applied FSCs less aggressively. Defendants expressed these concerns internally and, in fact, lost business through FSC competition. Each Defendant also frequently agreed not to apply FSCs in the face of shipper objections.

42. For example, in May 2002, BNSF reported that it was challenging to impose FSCs because its main western competitor, "UP[,] does not use a fuel surcharge in the competitive marketplace." It continued, "rail competitors do not [use FSCs] and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, NS reported that its main eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS."

43. And, in May 2003, BNSF announced that it would ***reduce*** its standard FSC to 2 percent from 5 percent in May 2003 because a 5 percent FSC "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage." In response, UP observed internally that "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

44. Another impediment to broad application of FSCs during this period was the so-called Rail Cost Adjustment Factor, or "RCAF." The RCAF is a weighted index that accounts

for all significant input costs, including fuel. The RCAF was utilized in multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.

45. Defendants recognized that imposing a stand-alone FSC where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping." For example, Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."

46. As a result, the number of shippers covered by stand-alone, rate-based FSCs was relatively low before the Relevant Period, and FSCs did not contribute significantly to Defendants' revenues or bottom lines.

## III. DEFENDANTS CONSPIRE IN 2003 TO RAISE PRICES BY ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS MEANS TO INCREASE ALL-IN RATES

47. By 2003, Defendants' initial attempts to apply rate-based FSCs on their own taught them an important lesson: they could not achieve their revenue enhancement objectives unless the FSC was widely applied on a coordinated basis by all four Defendants. Absent coordination, a railroad seeking to impose FSCs more aggressively than its competitors would risk losing business to another railroad who imposed no FSC or whose FSC policies were more flexible. By early 2003, it became apparent to Defendants that they would encounter difficulties making their FSC policies "stick" absent an industry-wide agreement.

48. Thus, beginning in the spring of 2003, Defendants' senior executives – including their CEOs and top sales/marketing executives – engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC

program. The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers industry-wide.

49. The FSC programs that Defendants implemented between March 2003 and January 2004 by mutual agreement are exactly the sort of industry standard FSC that Defendants' senior executives discussed.

50. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates.

51. That same day, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" attributed to UP CMO Jack Koraleski. Under the UP "Revised" proposal, FSCs were more aggressive, escalating at roughly twice the rate of the formula CSX had internally recommended. The "Revised Surcharge proposal" retained the $28 WTI strike price of UP's existing program but would increase by 0.4 percent for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0 percent increase for every $5 increase in the WTI index.

52. The following day, Koraleski traveled to CSX to play golf, socialize, and discuss "fuel surcharge methodology." Beforehand, Koraleski and CSX's executive vice president of sales and marketing, Clarence Gooden "talked on" the subject of "[f]uel surcharge methodology."

53. On March 19 and 20, 2003, within one week of the UP-CSX meeting on "fuel surcharge methodology," CSX publicly announced a new FSC policy. The program retained the lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal." Thus, under CSX's new FSC policy, CSX would assess a

0.4 percent FSC when the price of oil on the West Texas Intermediate (WTI) index exceeded $23 per barrel, and an additional 0.4 percent for every dollar increase above $23.48.

54. Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. CSX reasoned that while these modifications to its FSC program might "seem[] somewhat benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

55. On March 31, 2003, less than two weeks after CSX's announcement, UP decided to adopt "the same approach as the CSXT." Following the CSX approach, UP would impose a 0.4 percent FSC at a monthly-average WTI "trigger" price of $23 (*i.e.* the index price at which FSCs begin), and assess an additional 0.4 percent charge for every dollar increase in the WTI index above $23. BNSF, which had previously discussed the need for a "synchronized" FSC policy with NS, had a predictably positive reaction to UP's announcement: "This is sweet!!!! Just like the CXST."

56. On March 18, 2003, NS and BNSF senior executives – including NS's Chairman, President, and CEO David Goode, Vice Chairman and COO Steve Tobias, Vice Chairman and CFO Hank Wolf, VP and CMO Ike Prillaman, SVP of Planning Jim McClellan, VP of Intermodal Mike McClellan, SVP of Transportation Mark Manion, SVP of Marketing Services Don Seale, BNSF's Chairman, President, and CEO Matt Rose, current President and CEO and then-VP and COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete Rickershauser, VP of Consumer Products and head of intermodal activities Steve Branscum – met and discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address

"synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. This discussion point was assigned to NS's Seale and BNSF's Lanigan.

57. On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."

58. The trade association meeting was the biannual National Freight Transportation Association ("NFTA") meeting that took place on April 2-6, 2003 at the Wigwam resort, in Litchfield Park, Arizona. Each of the Defendants attended the meeting. Almost immediately following the NFTA meeting, a new internal directive was issued at BNSF that was designed to ensure across-the-board FSC application: "Effective immediately and urgently per John Lanigan[:] Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

59. On April 1, 2003, CSX CMO Mike Giftos and BNSF CMO John Lanigan met in Jacksonville, FL to discuss "Fuel Surcharge."

60. In early 2003, BNSF had been leaning toward a mileage-based FSC and trying to drum up support within the industry for a mileage-based FSC formula. But on May 7, 2003 – approximately one month after the NFTA meeting and its meeting with CSX – BNSF abandoned that effort. Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the HDF index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."

61. Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index. The BNSF FSC had been based on the HDF Index. In or about July 2003, UP switched to the HDF Index. From that point on, BNSF and UP (the "Western Railroads")

moved in lockstep and charged the exact same FSC percentage for each month of the Relevant Period.

62. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied an FSC of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2 percent. The FSC would increase 2 percent for every 20 cent increase in the HDF Index.

63. The Western Railroads also coordinated when they would change their FSC. They agreed that the FSC would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March. The Western Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

64. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

65. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing FSC program. In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

66. As to NS, between March 2003 and December 2003, while positioning itself to quickly implement the FSC first announced by CSX, NS had regular discussions with the other Defendants, including discussions of what FSC was "acceptable" to them and the desirability of an industry-standard FSC.

67. As it had planned and prepared for from March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, a new FSC policy, which mimicked the policy announced by CSX in March 2003 and was intended to "standardize" NS's FSC with the FSCs of the other Defendants. As with CSX's program, NS would assess a 0.4 percent FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4 percent for every dollar increase thereafter. Also like CSX, NS's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days.

68. After NS's announcement, all four Defendants had essentially uniform FSCs and remained in synch throughout the Relevant Period.

## IV. DEFENDANTS' CONSPIRACY DROVE CREATION OF NEW ALL-INCLUSIVE INDEX LESS FUEL (AIILF)

69. Even after having agreed to coordinate their FSCs, however, Defendants still faced a significant barrier to widespread use of FSCs: widely-used private contracts had cost escalation provisions that already accounted for fuel costs. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely-used cost escalation indexes, thereby paving the way for widespread imposition of the new FSC program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

70. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

71. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, who dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the "AIILF"). This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

72. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice and marked the first time that the AAR created a cost escalation index without a fuel cost component.

73. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

74. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSX and NS (the "Eastern Railroads"), suddenly moved in lockstep with their FSCs based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

75. Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2 percent. The FSC would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

76. The Eastern Railroads also coordinated when they would change their FSC – two calendar months after the WTI Index had adjusted – thereby adopting the same FSC price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same FSC percentage month after month. The Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

77. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their FSC programs: including using the WTI Index for FSCs, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

78. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel

costs. The FSC program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Relevant Period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

79. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to *revenue* (*i.e.*, the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, Defendants BNSF, UP, CSX and NS planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on FSC prices to undercut one another.

80. In November of 2004, BNSF's CMO John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC

[Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for a mileage-based FSC program." The other Defendants "pushed back as expected." Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive ratebased FSCs.

81. With the conspiracy underway, the two Western Railroads, using the HDF Index, moved in lockstep and charged virtually identical FSCs on a monthly basis throughout the Relevant Period. The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began, but were identical starting in July 2003:

**MONTHLY FSC PERCENTAGES – WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

83. Figure A reflects the Western Railroads' lockstep standard rail fuel surcharges.

**Figure A**




84. As detailed above, there also was uniformity among the Eastern Railroads in the monthly FSC percentages, based on the WTI Index, which they charged customers for most of the Relevant Period. The chart below shows that the FSC percentages charged by Defendants CSX

and NS for carload shipments varied before the Relevant Period, but were identical starting in March 2004:

**<u>MONTHLY FSC PERCENTAGES – EASTERN RAILROADS</u>**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |

| MONTH | CSX | NS |
|---|---|---|
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06[1] | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

85. Figure B reflects the Eastern Railroads' lockstep standard rail fuel surcharges.

[1] On April 24, 2006, NS announced that it would "revise its fuel surcharge program," assessing a 0.3 percent surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3 percent for every dollar increase above $64 per barrel. While NS claimed to the STB that it was rebasing because of a "decision to reduce its fuel surcharge percentage," NS had calculated the rebased fuel surcharge "to bake in FSC [the existing fuel surcharges] to [base] rate." NS had determined that a 16.4 percent base rate increase would allow it a "full % [fuel surcharge] pass thru" under the new program. Importantly, NS executives discussed the rebasing plan with its counterparts at the other Defendants, who recognized that the new FSC program was an economic wash compared to the program announced in late 2003 (which continued to apply to shippers under earlier contracts in any event).

**Figure B**




86. In stark contrast to this uniformity in FSC percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their FSCs to arrive at the identical percentage month after month, year after year. The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior and conspired to fix prices for FSCs. In addition, the advance announcements of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

87. Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below – including, in some cases, by adopting mileage based FSCs – Defendants continued to engage in discussions concerning FSCs following the STB ruling, and to apply rate-based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before the STB Ruling.

88. While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (*i.e.*, shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the FSCs applied to their intermodal business (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship).

89. The direct heads of Defendants' intermodal businesses attended conspiratorial meetings. NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum participated in the March 2003 meeting at which their railroads discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. CSX's Alan Blumenfield, his predecessor Les Passa, and UP's Brad King EVP of Network Design and Integration participated in the June 2003 meeting at which CSX and UP's senior executives discussed their FSC formulas, their FSC strike prices, and the "outcry" they were facing from the initial rollout of their new FSC regimes. UP's intermodal group regularly imposed adjustable FSC provisions and their practice was to adjust them on ad hoc bases to align with BNSF's FSCs. In fall of 2003, CSX and BNSF officers exchanged percentages of intermodal business that "either had fuel surcharges or an escalator on the revenue."

87. Moreover, Defendants' intermodal business was led by the same senior executives who conspired to impose synchronized FSCs. Intermodal was not treated separately and apart from carload traffic. When Defendants met to conspire, they did not limit their discussions to carload traffic.

## V. IMPLEMENTATION OF THE SCHEME: DEFENDANTS' ACROSS-THE-BOARD APPLICATION OF FSCs

88. Defendants recognized that their coordinated FSCs were more aggressive and could generate substantially more revenue. For example, describing the new FSC program that resulted from Defendants' coordination, CSX's John Couch remarked: "While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." In addition, an internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

89. Defendants recognized that their new aggressive FSC program could be undermined by resistance from shippers and competition between the Defendant railroads. A 2003 internal NS memorandum recognized that moving to the more aggressive formula would "run the risk of losing the surcharge altogether. . . . The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC." And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

90. To ensure that shipper resistance would be muted, and to achieve their conspiratorial goals, each Defendant adopted policies to apply FSCs to 100 percent of its traffic and tracked its progress toward attaining that goal. For example, in 2004, BNSF marketing leadership began an initiative to monitor FSC "adherence" on a quarterly basis. These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (*e.g.*, shippers with expiring contracts that do not include an FSC). The reports – showing increasing FSC coverage each year – were

presented to the chief marketing officer with a goal of achieving a 100 percent participation rate for BNSF's shippers.

91. CSX also monitored its effectiveness in applying FSCs to its shippers, and started tracking its progress toward implementing its FSC mandate – that "[e]verything is subject to fuel surcharge." CSX tracked the progress that its individual marketing teams were making toward widespread FSC application, and tracked contracts without FSCs to ensure they would receive FSCs upon renewal.

92. Starting in early 2004, UP engaged in similar analyses. An analysis of UP's FSC coverage was also performed for the chief marketing officer – who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004."

93. NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed his team to identify "the largest remaining contracts (including annual revenue involved) that do not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007."

94. Defendants policed the conspiracy by exchanging FSC coverage data. For example, subsequent to a meeting between the two railroads in late 2004, BNSF sent NS's Don Seale a report addressing FSC coverage for "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

95. In furtherance of the conspiracy, Defendants instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the

Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the FSCs were "not negotiable."

96. Defendants also enforced strict policies against discounting base rates to offset the standard FSCs. For example, in an internal NS email, NS's CMO (Don Seale) remarked, "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play."

97. As a result of these and related policies, any negotiations with their shippers about FSCs that took place started from the standard, supracompetitive FSC.

98. In addition, Defendants applied their standard FSCs uniformly to all traffic and commodities. For example, in October of 2005, NS advised UP as follows: "We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."

99. And Defendants imposed standard FSCs on all shippers without regard to whether the shipper had access to alternative modes of transportation. In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers – shippers without access to alternative modes of transportation – have leverage in negotiating a better rate/serve package on traffic at single served facilities. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

100. Before the conspiracy, captive shippers could negotiate out of the FSCs. But during the conspiracy they could not.

## VI. THE SURFACE TRANSPORTATION BOARD DECLARED DEFENDANTS' ACTIONS AN "UNREASONABLE PRACTICE" AND "MISLABELING"

101. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of the base rate for rate-regulated rail freight transport was an "unreasonable practice," because the FSCs are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. ***Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied***. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, Jan. 26, 2007) at 6 (emphasis added).

102. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

103. As detailed above, pursuant to their conspiracy, Defendants applied the same unreasonable FSC practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## VII. THE RESULT: DEFENDANTS' SUPRACOMPETITIVE PROFITS

104. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on FSCs, Defendants realized billions of dollars in revenue during the Relevant Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the FSC.

105. Defendants recognized that their coordinated FSCs in fact resulted in significant over-recovery of fuel price increases. NS, for example, recognized by July 2004 that "[c]urrent FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base," and Don Seale of NS testified that in 2005, NS's "increase in Fuel Surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."

106. UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." An October 2005 presentation shows UP estimated greater than 100 percent of incremental fuel cost recovery through FSCs for each of its six business groups.

107. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4 percent from 3rd Quarter 2003 to 2004. In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3 percent increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11 percent more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods, particularly since the inflated

percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

108. By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9 percent improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

109. As a result, Defendants' conspiracy worked as planned to help to remove the competitive pressures that had kept their rates down for years. As the head of UP, James Young, admitted in 2007, "three, four years ago [the FSCs] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has started to move in the right direction."

110. Following Defendants' agreement to coordinate their FSCs, Defendants' total revenue skyrocketed during the Relevant Period, with the Defendants reporting record revenues and profits virtually every year. As noted above, Defendants themselves attributed these record figures in large part to FSCs.

111. As result of Defendants' conspiracy, they were able to reverse the "destructive pricing for rail share" that led to their conspiracy. In the 2009 STB study referenced above, the STB concluded that "inflation-adjusted rail rates increased in 2005, 2006, and 2007," representing "*a significant change from prior years*, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004." The STB concluded that while rising

fuel costs contributed to the rate increases "*even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades*."

112. And a 2010 Senate Commerce Committee Report conducted a "review of the largest four railroads' Securities and Exchange Commission (SEC) filings," which it found "show[ed] just how profitable the large rail companies have become over the last decade. Figure 1 demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%." The referenced Figure 1 demonstrates that Defendants' profits spiked following their collective imposition of the new FSC regime described above:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

## VIII. DEFENDANTS' ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL

113. Defendants' anticompetitive conduct caused shippers to pay dramatically higher prices for rail freight transportation services and significantly increased Defendants' profits. Their conspiracy—not a reduction in their costs, more efficient operations, or competition—was

the source of their increased profitability. Shippers, end users, and the public were damaged as a result.

114. The rail fuel surcharge, by itself, enabled Defendants to reap extraordinary profits. Defendants over-recovered billions of dollars for their rail fuel surcharges during the Relevant Period.

115. Defendants' anticompetitive conduct was within the flow of, and substantially affected, interstate and international commerce. Defendants sold and carried out rail shipments in a continuous flow of interstate and foreign commerce to shippers throughout the United States. Each Defendant used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services. Defendants' unlawful activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce and have denied those who ship freight of the benefits of free, open, and unrestricted competition.

## IX. PLAINTIFF SUFFERED INJURY BY VIRTUE OF DEFENDANTS' ANTICOMPETITIVE CONDUCT

116. During the Relevant Period, Plaintiff entered into and/or paid Defendants pursuant to private contracts or other arrangements with Defendants that contained rail fuel surcharges that were the subject of Defendants' anticompetitive conduct.

117. During the Relevant Period, Plaintiff entered into and/or paid each of the Defendants pursuant to private contracts or other arrangements with the Defendants that contained rail fuel surcharges that were the subject of Defendants' anticompetitive conduct.

118. As a proximate result of Defendants' unlawful conduct, combination, or conspiracy, Plaintiff has paid supracompetitive rates to ship freight, received reduced profits from sales of its products, experienced increased costs of doing business, and lost the benefits of

competition. These are the type of injuries that the antitrust laws are designed to prevent, and Plaintiff incurred these injuries as direct purchasers of Defendants' rate-unregulated but pricefixed rail shipping services.

113. As direct purchasers of rail freight services, Plaintiff has collectively paid millions of dollars in collusively imposed fuel surcharges since the initiation of the conspiracy and have thereby been damages in their business and property.

**COUNT I**
**(Violation of Section 1 of The Sherman Act**
**And Section 4 of The Clayton Act)**

114. Plaintiff incorporates by reference the allegations in the paragraphs above as if they were fully set forth herein.

115. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

116. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

117. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

118. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

119. The contract, combination, or conspiracy has had the following effects:

a. Prices charged to Plaintiff for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

120. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury in that it has paid supracompetitive prices for FSCs applied to unregulated rail freight transportation services during the Relevant Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1) That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(2) That Plaintiff recover compensatory damages, as provided by law, determined to have been sustained by Plaintiff, and that judgment be entered against Defendants on behalf of Plaintiff;

(3) That Plaintiff recover treble damages, as provided by law;

(4) That Plaintiff recover its costs of the suit, including attorneys' fees, as provided by law; and

(5) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: Philadelphia, Pennsylvania
July 1, 2020

Respectfully submitted,

LAW OFFICE OF MICHAEL D. LIPUMA

/s/ Michael D. LiPuma________________

325 Chestnut Street, Suite 1109
Philadelphia, PA 19106
Phone: (215) 922-2126
Fax: (215) 922-2128
mlipuma@lipumalaw.com

WOLLMUTH MAHER & DEUTSCH LLP

/s/ Ronald J. Aranoff_______________

Ronald J. Aranoff
Fletcher W. Strong
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com

QUINN EMANUEL URQUHART &
SULLIVAN LLP

/s/ Stephen R. Neuwirth_____________

Stephen R. Neuwirth
Sami H. Rashid
51 Madison Avenue, 22nd Floor
New York, New York 10010
Phone: (212) 849-7000
Fax: (212) 849-7100
stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com

*Attorneys for Air Products and Chemicals, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALABAMA POWER COMPANY
600 18th St. N.
Birmingham, AL 35203

GEORGIA POWER COMPANY
241 Ralph McGill Blvd. NE
Atlanta, GA 30308-3374

and

MISSISSIPPI POWER COMPANY
2992 W. Beach Blvd.
Gulfport, MS 39501

Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY
1400 Douglas Street
Omaha, NE 68179

BNSF RAILWAY COMPANY
2650 Lou Menk Drive
Fort Worth, TX 76131

CSX TRANSPORTATION, INC.
500 Water Street
Jacksonville, FL 32202

and

NORFOLK SOUTHERN RAILWAY COMPANY
Three Commercial Place
Norfolk, VA 23510

Defendants.

Civil Action No.

Judge

**COMPLAINT**

**JURY TRIAL DEMANDED**

# COMPLAINT

Plaintiffs Alabama Power Company ("APC"), Georgia Power Company ("GPC"), and Mississippi Power Company ("MPC") (collectively "Plaintiffs"), all subsidiaries of The Southern Company, bring this action under the antitrust laws of the United States against defendants Union Pacific Railroad Company ("UP"), BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (collectively, "Defendants" or "Defendant Railroads"). Plaintiffs allege as follows:

## INTRODUCTION

1. This is an action under the Sherman and Clayton Acts for compensatory damages, treble damages, and other relief against Defendants, the four largest Class I railroads in the United States, jointly and severally, for illegally conspiring to use rail fuel surcharges as a mechanism to fix, raise, maintain, and stabilize prices of rail freight transportation services sold in the United States. Plaintiffs are electric utilities located in the southeastern United States that operate coal-burning electric generation plants that power homes, businesses, hospitals, and schools. To operate these plants, the Plaintiffs directly purchased from one or more of the Defendants rate-unregulated[1] rail freight transportation services for the huge volumes of coal and other commodities often shipped long distances. Because of the conspiracy and its imposition of the mechanism of fuel surcharges to raise artificially shipping prices, the Plaintiff utilities paid hundreds of millions of dollars in overcharges. The Plaintiff utilities purchased transportation

---

[1] As used in this Complaint, "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

services through long-term contracts, meaning that they often paid excessive rates through the duration of those agreements.

2. Prior to deregulation of the railroad industry that began in the early 1980s with the Staggers Rail Act of 1980 ("Staggers Act"), rail freight was transported by numerous federally-regulated railroads in accordance with rates published in tariffs filed with the Interstate Commerce Commission ("ICC"). During this period, Defendants could apply to the ICC for across-the-board rate increases. But after the Staggers Act and deregulation, railroad rates for shippers became subject to negotiation. By the early 2000s, the Defendant railroads were unable to obtain unilaterally higher rates from their customers to increase revenues and no longer had the means to institute across-the-board rate increases.

3. Given these dynamics, the railroads concluded that they could increase overall prices through the mechanism of a fuel surcharge applied to as many shipments and customers as possible. They also determined that joint action was necessary to implement successfully this scheme. Absent coordination, industry-wide agreement, and a uniform front, a railroad seeking to impose a fuel surcharge more aggressively than its competitors would risk losing business to another railroad that imposed no fuel surcharge at all, applied a less onerous fuel surcharge, or had more flexible fuel surcharge policies. Uniformity also ensured the Defendants could justify their fuel surcharges as "standard" in the industry in response to objections by rail customers.

4. The railroad industry by the early 2000s was also highly concentrated. Before the Staggers Act, approximately 35 Class I railroads operated within the United States. ("Class I" railroads are the largest nationwide freight railroads in the United States by annual revenues.) After the Staggers Act, the freight rail industry experienced dramatic consolidation. By the early 2000s, there were only seven Class I railroads operating in the United States. Defendants were at

that time, and are today, by far the largest of the remaining Class I railroads, which collect about 90% of all rail freight revenue in the United States.

5. The highly concentrated nature of the freight rail industry made it possible for Defendants in 2003 to conspire and agree to impose an artificially high surcharge structure, purportedly to cover fuel costs, as the means to raise rates across the board and thereby increase profits. Prior to the unlawful agreement, Defendants had individually experimented with fuel surcharges by establishing public fuel surcharge programs for certain traffic. However, these provisions were not applicable to contracts unless specifically incorporated or referenced in the contract itself. Therefore, the contract traffic at issue in this case was almost never subject to a fuel surcharge provision before the unlawful agreement. Even if a fuel surcharge provision applied to traffic, the pre-agreement fuel surcharge programs were not necessarily triggered or enforced. Moreover, these programs relied upon a wide variety of methods and formulas – many of which were not percentage-based – in contrast to the later unlawful agreement which resulted in widespread application of a percentage-based fuel surcharge to the base rates for contract traffic.

6. Beginning in or around the start of 2003, the Defendants agreed to coordinate their fuel surcharges and base them not on the actual amount of fuel usage or cost, but instead on a percentage of the base rate charged to the shipper, with that percentage determined and applied in addition to other rate adjustment formulas or methods that had customarily addressed changes in fuel prices. The President and CEO of UP stated in a July 2007 interview that the new rail fuel surcharges as applied to rail freight were "really unique to the railroad industry. Three, four years ago they were really non-existent."

7. The surcharge mechanism also had an aggressive triggering point, or "strike price," which ensured that fuel surcharges would virtually always be applied based upon fuel prices at the time of contracting. The concept of fuel surcharges also was intended to disguise their intended effect and provided the railroad Defendants a pretext for the additional charges.

8. Defendants' conspiracy occurred through, and was facilitated by, an extraordinary number of communications, conversations, and meetings, often between and among high-level railroad executives. These communications, and the Defendant Railroads' efforts to impose and enforce coordinated fuel surcharges, began at least as early as the spring of 2003. In these communications, Defendants agreed to coordinate those fuel surcharges and apply them as widely as possible, as uniformly as possible, and to as many freight shipments as possible. They also agreed to limit or avoid negotiating the application and terms of the surcharges. The Defendants also discussed fuel surcharges at meetings of the Association of American Railroads ("AAR") and other industry meetings, including the National Freight Transportation Association biannual meeting.

9. The Defendant Railroads began to implement their scheme in 2003. By June 2003, UP, which had based its prior, published fuel surcharge program on a West Texas Intermediate Index ("WTI Index"), switched to the index that was being used by BNSF's program, the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF Index"). Thereafter, if the HDF Index reported a change in the average price of diesel fuel above a set "trigger price," BNSF and UP would each adjust their fuel surcharge percentage in a similar increment. Crucially, BNSF and UP began incorporating or referencing their published fuel surcharge programs into contracts as broadly as possible or otherwise including fuel surcharge

provisions in as many contracts as possible. This allowed UP and BNSF to apply similar fuel surcharge percentages to freight transportation. This change was a result of the conspiracy.

10. At the same time, Defendant CSX, pursuant to the conspiracy, agreed to impose a percentage-based fuel surcharge as broadly as possible. In mid-2003, CSX also announced that its fuel surcharge program would entail application of a fuel surcharge based on the monthly average of WTI Index prices in the second prior month, a method that had also been adopted by UP and BNSF for applying their programs using the HDF Index price. Like BNSF and UP, CSX began including percentage-based fuel surcharges in as many contracts as possible.

11. Pursuant to the conspiracy, NS also agreed during 2003 to impose a percentage-based fuel surcharge on contract traffic as broadly as possible. NS made certain revisions to its fuel surcharge formula in early 2004, but could not immediately switch all contract traffic to its new program because NS had previously encoded its original fuel surcharge directly in some publications and contracts, which hampered its ability to rapidly change to the new fuel surcharge for all traffic. Like CSX, NS utilized the WTI Index for its fuel surcharge program and implemented it as broadly as possible.

12. In furtherance of the conspiracy, Defendants each applied the rail fuel surcharge the same way, namely, as a percentage multiplier of the total base rate for rail freight transportation. That meant, for example, that if the applicable fuel index (*i.e.*, the HDF or the WTI) resulted in a 20% surcharge on the base rate, the "all-in" rate charged to the customer for the transportation would be increased by 20%, even though fuel accounted for just a portion of the total rail freight transport cost incurred by the railroad. Defendants' agreement to adopt this approach resulted in their earning billions of dollars in additional profits.

13. Because many shippers (including the Plaintiff utilities) purchased shipping by means of long-term contracts, the Defendant Railroads were stymied in immediately imposing their new fuel surcharge plan for shipments under those pre-existing multi-year contracts. To address this set of circumstances, Defendants took a variety of steps. Defendants required a fuel surcharge in new replacement contracts and dedicated themselves to this effort once the pre-existing contracts expired or were open to renegotiation. Where possible, Defendants sought to incorporate fuel surcharge language in amendments to pre-existing contracts so that the supracompetitive profits could be secured before the expiration date of the pre-existing contracts.

14. In order to facilitate implementation of these more uniform fuel surcharges, Defendants also changed the existing methodology often used for adjusting freight rates. As of 2003, many rail freight transportation contracts incorporated rate adjustment provisions that included a variety of weighted cost factors, including fuel, based on an index called the All Inclusive Index ("AII") and a related index called the Rail Cost Adjustment Factor ("RCAF"), which were both published by the AAR, the railroad trade organization. Some agreements did not rely on RCAF or AII for rate adjustment, but used other cost-based indexes that similarly encompassed fuel costs. The AII, the RCAF, and the other cost-based indexes already permitted recovery by the Defendants of actual fuel cost increases, no matter how large. A cost index (like the AII or RCAF) that accounted for increases in the cost of fuel hampered the Defendants' ability to justify the fuel surcharges that they implemented in their conspiracy.

15. To address and overcome the existing freight rate adjustment formulas that already accounted for fuel costs, Defendants designed and commenced a scheme to remove fuel from the AII. Defendants conspired to take collective action through the AAR that would facilitate modification of the rate adjustment provisions in their contracts with freight customers.

At AAR meetings in the Fall of 2003, Defendants conspired to cause the AAR to develop and publish a new rail cost index with fuel removed called the All Inclusive Index Less Fuel ("AIILF"). A senior officer of BNSF admitted in a 2005 letter that BNSF's Chairman, President, and CEO had compelled the AAR to adopt in 2003 the new index without fuel, something that had never been done before but would "tremendously help" the bottom line for years to come. This collective action in December 2003 facilitated the Defendants' imposition of the new, separate, and artificially high rail fuel surcharges on their customers.

16. Defendants maintained their conspiracy by uniformly computing the surcharges as a percentage of the rail freight transport base rate and further by agreeing upon similar trigger points for adjusting the percentages monthly. Defendants also published their rail fuel surcharges on their websites to facilitate coordination and the exposure of any nonconformity with the uniform pricing scheme. Defendants applied their fuel surcharge programs as widely as possible and sought to limit deviation from these programs. Defendants also aimed to not undercut each other on fuel surcharge percentages, even though the surcharges far exceeded their actual increases in fuel costs.

17. The Defendants also took other collective action to enforce the conspiracy and make it effective. Each Defendant tracked its success towards 100% coverage. Discipline within the conspiracy was maintained by the exchange of coverage data and regular inter-Defendant discussions concerning fuel surcharges and their uniform application. When a Defendant's executives informed other Defendants' executives about the possibility of deviating from the scheme, they faced strong opposition.

18. The Defendants also imposed similar fuel surcharges in their posted tariffs, which applied to regulated rates for transportation services that were not subject to specific customer

contracts. In early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic (unlike the unregulated contract freight at issue here), found that Defendants' rail fuel surcharge programs were "unreasonable" because they were not tied to the railroads' actual cost of fuel. The STB found that "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs." In particular, the STB determined that the Defendants were "imposing rate increases" through use of their so-called fuel surcharge programs. The STB found this action was "a misleading and ultimately unreasonable practice," because "there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied." Rail Fuel Surcharges, STB Ex Parte No. 661 (served January 26, 2007), slip op. at pp. 6-7. The STB's ruling applied only to rate-regulated freight traffic, but involved the same type of rail fuel surcharge programs imposed on rate-unregulated shipments.

19. An independent 2007 study commissioned by the American Chemistry Council ("ACC") and Consumers United for Rail Equity ("CURE") found that the Defendants received over $6 billion more in rail fuel surcharge revenue (as publicly reported or estimated) than they spent in publicly-reported actual fuel costs during the period from 2003 through the first quarter of 2007.

20. Defendants conspired and agreed to use the mechanism of a broadly imposed, percentage-based rail fuel surcharge, under the guise of recovering their actual fuel costs, as the means to raise rates across the board and reap billions of dollars in supracompetitive profits. As a direct and proximate result of the illegal price-fixing conspiracy alleged herein, Defendants restrained competition in rate-unregulated rail freight transportation services in the United States, unreasonably restrained and affected interstate commerce, and injured Plaintiffs in their business

and property. Plaintiffs paid higher prices for unregulated rail freight transportation than they would have paid absent the concerted unlawful and anticompetitive activity alleged herein, and continued to pay unlawfully high prices as a result of contracts entered into during the relevant period.

**PARTIES**

21. Plaintiffs consist of (1) entities that purchased and/or contracted for rate-unregulated rail freight transportation services directly from Defendants and paid rail fuel surcharges in connection with those services, and (2) entities that are successors-in-interest or assignees of such purchasers and/or contractors.

22. APC is an Alabama corporation, with its principal place of business at 600 18th Street North, Birmingham, AL 35203. APC is a subsidiary of The Southern Company ("Southern"), serving 1.4 million homes, businesses, industries, and other customers in the southern two-thirds of Alabama.

23. GPC is a Georgia corporation, with its principal place of business at 241 Ralph McGill Blvd. NE, Atlanta, GA 30308. GPC is a subsidiary of Southern, and GPC operates as a vertically integrated utility providing electric service to 2.5 million retail customers within its traditional service territory located within the State of Georgia and to wholesale customers in the Southeast. Pursuant to a 2006 acquisition, GPC is the successor-in-interest to the Savannah Electric and Power Company ("Savannah Electric"), which was a utility subsidiary of Southern that previously operated in eastern Georgia.

24. MPC is a Mississippi corporation with its principal place of business at 2992 West Beach Blvd., Gulfport, MS 39501. MPC is a subsidiary of Southern and provides electric service to most of the cities, towns, and communities within the 23 counties of southeastern Mississippi.

25. Defendant UP is a Utah corporation with its principal place of business at 1400 Douglas Street, Omaha, NE 68179. UP is the largest Class I freight railroad in the United States and operates primarily in the central and western United States. UP maintains an office at 700 13th Street, N.W., Suite 350, Washington, DC 20005.

26. Defendant NS is a Virginia corporation with its principal place of business at Three Commercial Place, Norfolk, VA 23510. NS is a Class I freight railroad operating primarily in the eastern United States. NS maintains a government relations office at One Constitution Ave., N.E., Suite 300, Washington, DC 20002.

27. Defendant BNSF is a Delaware corporation with its principal place of business at 2650 Lou Menk Drive, Fort Worth, TX 76131. BNSF is the second largest railroad in North America and operates 32,000 miles of railroad primarily in the central and western United States, as well as rail lines that extend into several southeastern states and the Canadian province of British Columbia. BNSF maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, DC 20001.

28. Defendant CSX is a Virginia corporation with its principal place of business at 500 Water Street, Jacksonville, FL 32202. CSX is a Class I freight railroad operating primarily in the eastern United States and Canada. CSX maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, DC 20004.

## **JURISDICTION AND VENUE**

29. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and attorneys' fees and costs from Defendants for the injuries sustained by Plaintiffs because of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has federal question jurisdiction over the subject matter of this action

pursuant to 15 U.S.C. § 4 (Sherman Act jurisdiction), 15 U.S.C. §§ 15 & 26 (Clayton Act jurisdiction), 28 U.S.C. § 1331 (general federal question jurisdiction), and 28 U.S.C. § 1337 (antitrust jurisdiction).

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 15(a) and 22 because Defendants transacted business and/or had agents in this District during the conspiracy and a substantial part of the events giving rise to the claim occurred in this District.

31. This Court has personal jurisdiction over the Defendants because they transact business, maintain offices or are found within this judicial district, have substantial aggregate contacts with this judicial district, and engaged in illegal conduct that was directed at and had the intended effect of causing injury to Plaintiffs. The wrongful conduct alleged in this Complaint was carried out in part within this judicial district.

## INTERSTATE TRADE AND COMMERCE

32. Throughout the conspiracy, there was a continuous and uninterrupted flow of interstate trade and commerce throughout the United States in Defendants' sale of rail transportation to shippers and customers throughout the United States. Each Defendant used instrumentalities of interstate commerce to sell, market, and provide rail freight transportation services. Defendants' unlawful activities have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## THE ILLEGAL CONSPIRACY

### PRE-CONSPIRACY PERIOD: DEREGULATION AND CONSOLIDATION

33. In 1980, Congress introduced competition into the rail transportation industry by passing the Staggers Act, which significantly deregulated freight rail pricing. Before the Staggers Act, freight railroads generally charged published tariff rates filed with the ICC. Rate

increases could be achieved by obtaining ICC approval for new tariffs, which implemented across-the-board rate changes on a collective basis for Defendants and other Class I railroads.

34. The Staggers Act dramatically changed the competitive environment for United States railroads, which had been subject to regulatory control over nearly all aspects of their economic operations for decades. After the Staggers Act, railroads could negotiate and set rates for rail transportation but could no longer apply to the ICC for across-the-board freight rate increases. By 2000, at least 70% of all rail shipments were subject to private contracts that were not rate-regulated.

35. Since the implementation of the Staggers Act, the number of Class I railroads has declined dramatically. In 1980, there were approximately 35 railroads operating in the United States that were designated by the ICC as Class I railroads. Subsequent to a period of consolidation after passage of the Staggers Act, there were, and still are, only seven Class I railroads. The Class I railroads operating in the United States are: (1) BNSF, (2) UP, (3) CSX, (4) NS, (5) Kansas City Southern Railway Company, (6) Soo Line Railroad Company, and (7) Grand Trunk Corporation. Soo Line Railroad is owned by Canadian Pacific Railway, and Grand Trunk Corporation is owned by the Canadian National Railway.

36. The railroad industry is highly concentrated. Defendants BNSF, UP, CSX, and NS operate approximately 70% of all railroad track in the United States and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs and the barriers to entry in the railroad industry, including, for example, the need to obtain locomotives and other equipment, acquire property rights, develop a network of tracks, yards, and facilities, as well as substantial regulatory and environmental burdens, there is only a fringe or niche market of small carriers and the competition offered by these small carriers is negligible.

37. While the goal of railroad industry deregulation, namely to introduce competitive forces, may have been fulfilled for some period leading to the early 2000s, railroad consolidation and other factors created a situation that was highly susceptible to collusion.

**DEFENDANTS AGREE TO INTRODUCE FUEL SURCHARGES AND FIX SHIPPING PRICES**

38. Competition in the railroad industry resulted in declining pricing through the early 2000s, and the Defendants were frustrated by their inability to raise prices in this environment. As one BNSF executive commented in 2002: "We need to be able to achieve rate improvement. How can we do this if the other competing railroads do not do this at the same time?"

39. By the early 2000s, industry consolidation made additional mergers unlikely, if not impossible. In response to the proposed merger of the Burlington Northern and Santa Fe Railway and Canadian National Railway in 2000, the STB announced a moratorium on new mergers and promulgated more stringent standards for merger review.

40. Because of deregulation, Defendants lacked legal means to implement across-the-board price increases. Increased rates also could not be pursued through further consolidation in light of the STB's more stringent review of rail mergers. Consequently, the only feasible way that railroads could increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of a solution to rising fuel costs, the Defendants colluded to create and jointly impose percentage-based rail fuel surcharges as a means to achieve what effectively were across-the-board rate increases.

41. Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included rate adjustment provisions often tied to the AII and the RCAF (which is based on the AII) or to another cost-based index that included fuel costs. Both the RCAF and the AII were published by the AAR, and both indexes included fuel

costs as a factor. The AII and RCAF weighted a number of cost factors – labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses – so that the actual impact of particular cost increases (*e.g.*, for fuel) would be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. The indexes, and the weighted factors within them, were designed for this purpose.

42. Prior to 2003, at least some of the Defendants attempted to impose fuel surcharges on rail freight transportation. But Defendants' efforts to impose fuel surcharges were isolated and inconsistent, with differing surcharge methods that reflected differing fuel costs and different formulas for incorporating them as a rate surcharge. Defendants did not uniformly or consistently include their fuel surcharges in contracts and, even when included, the fuel surcharges were not necessarily triggered by fuel prices or enforced when triggered.

43. In 2003, Defendants conspired and agreed to use fuel surcharges as the means to create an across-the-board rate increase. From at least the spring of 2003 through approximately 2008, Defendants adopted and implemented rail fuel surcharges through a series of coordinated actions using common organization. To do so, the top executives of Defendants communicated frequently and met regularly at restaurants and recreational and conference facilities, at AAR board meetings in Washington, D.C., and at biannual meetings of the National Freight Transportation Association ("NFTA").

44. In April 2003, the NFTA meeting occurred at the Wigwam resort in Litchfield Park, Arizona. Within months of the April 2003 NFTA meeting, BNSF and UP suddenly began coordinating their rail fuel surcharges. Previously, UP's fuel surcharge was adjusted monthly based on the WTI Index, while BNSF's fuel surcharge was based on the HDF Index. However, in or about June or July of 2003, pursuant to its agreement with BNSF, UP switched to the HDF

Index. From that point forward, BNSF and UP's fuel surcharge programs resulted in application of similar percentages, and both utilized a monthly percentage-based fuel surcharge based on the HDF Index.

45. BNSF and UP conspired and agreed to use the HDF Index and apply a substantial percentage-based fuel surcharge to their rail transportation contracts as widely and uniformly as possible. BNSF and UP also agreed to apply the HDF Index in the same way. If the HDF Index reported the average monthly price of diesel fuel at or above a certain per gallon "trigger price" level, such as $1.35 per gallon, BNSF and UP each would apply a percentage-based surcharge in similar increments above the trigger price.

46. BNSF and UP also coordinated the timing of their rail fuel surcharges. They agreed to adjust the rail fuel surcharge for shipments made in the second month after the month in which there was a change in the HDF Index average price. So, for example, the HDF Index average price in January would determine the new rail fuel surcharge percentage announced by BNSF and UP on February 1, and this percentage would apply to shipments in March. BNSF and UP published their fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable. Pursuant to their agreement with CSX and NS, BNSF and UP also sought to apply their fuel surcharges as widely as possible.

47. BNSF and UP simultaneously selected and adopted the same novel, arbitrary, and complex combination of features for their rail fuel surcharge programs, including the same index and similar trigger points, as well as the same timing for announcement and application of changes in the HDF Index. The similarities are too precise and comprehensive to have been independent responses to a common market phenomenon, especially considering BNSF and UP had differing rate and cost structures, customer bases, fuel sources, and fuel costs.

48. As further evidence of concerted conduct, in April 2003, just two months before moving to the same fuel price index as BNSF, UP announced a modification to its existing fuel surcharge formula: it changed the trigger points used for adjusting surcharges and began relying on a monthly average of WTI prices, but UP did not change the WTI index used to monitor fuel costs. Two months later, UP switched to the HDF Index and started imposing fuel surcharges under a program very similar to that of BNSF.

49. At same time that UP and BNSF began to coordinate their fuel surcharges and began pushing to impose them as broadly and uniformly as they could, Defendant CSX, pursuant to the conspiracy, also announced that it would begin applying its fuel surcharge based on the monthly average of WTI Index prices in the second prior month, a method that had also been adopted by UP and BNSF, though using the HDF Index price. The similarities are too precise and comprehensive to have been independent responses to a common market phenomenon, especially considering the Defendant Railroads had differing rate and cost structures, customer bases, fuel sources, and fuel costs.

50. Pursuant to the conspiracy, NS also agreed during 2003 to impose a percentage-based fuel surcharge on contract traffic as broadly as possible. NS made certain revisions to its fuel surcharge formula in early 2004, but could not immediately switch all contract traffic to the revised formula because NS had previously encoded its original fuel surcharge directly in certain publications and contracts – rather than simply citing to its published fuel surcharge formula – which hampered its ability to rapidly change to its revised formula. Like CSX, NS used the WTI Index for its program, with triggering prices that were analogous to those utilized by CSX, BNSF, and UP. NS further realized that it would be much easier in the future to modify the fuel

surcharge program applicable to contract traffic if the contracts simply referenced the NS fuel surcharge tariff.

51. As a result, CSX and NS each implemented the Defendants' prior agreement by applying a substantial percentage-based fuel surcharge to their rail transportation contracts as widely as possible. For many shipments, CSX and NS utilized functionally similar WTI trigger prices. As the WTI price increased from the trigger prices, CSX's and NS's rates would be adjusted upward by substantially similar percentage amounts. These concerted changes were part of, and flowed from, the aforementioned agreements reached and implemented by Defendants in late 2003.

52. For many shipments, CSX and NS also coordinated the timing for adjustments to their rail fuel surcharges. For these shipments, they adopted the same timing as BNSF and UP, *i.e.*, two calendar months after any adjustment to the applicable fuel (HDF) or oil (WTI) index. Thus, for example, if the WTI average price exceeded the triggering level in January, CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could coordinate application of the relevant fuel surcharge percentage month after month. Like BNSF and UP, CSX and NS published their fuel surcharge percentages on their websites to enable the other railroads to detect any deviation from the agreed pricing and enforce the agreement. Defendants generally applied rail fuel surcharges as a separate item on shippers' bills. Fuel surcharges were not only included in contracts that contained cost adjustment clauses based on the new AIILF index, but they were also incorporated into contracts that continued to utilize the RCAF cost adjustment factor. In either circumstance, Defendants used monthly changes to their rail fuel surcharges as an easy way to increase revenues in an across-the-board manner.

53. All Defendants agreed to implement percentage-based fuel surcharges as broadly as possible, based on the reported price in a public fuel (HDF) or oil (WTI) index, rather than on their actual fuel costs. For many shipments, NS and CSX went even further: they selected and adopted the same novel, arbitrary, and complex combination of features for their rail fuel surcharge programs – features that were also utilized by BNSF and UP. For these shipments, NS and CSX utilized the same WTI Index for fuel surcharges, assessed a percentage-based fuel surcharge to transportation rates based on the monthly average WTI Index level, and applied the surcharge in the second calendar month after the monthly WTI Index figure was determined. Defendants' contemporaneous adoption of similar fuel surcharge programs reflected their coordination and agreement to implement percentage-based fuel surcharges. The similarities, and the coordination among the railroads, are too precise and comprehensive to have been independent responses to a common market phenomenon or conditions.

54. While Defendants suggested that their rail fuel surcharges were imposed to account for unanticipated increases in fuel prices, they were in reality merely coordinated price increases. NS documents filed in *In re Rail Freight Fuel Surcharge Antitrust Litigation* reflect that the fuel-based surcharges were a "blatant general rate increase" on customers. An internal NS e-mail, dated April 29, 2003, includes the following statement:

- **By dropping the base to $23 per barrel, raising the percentage yield and talking it sooner, the change is in fact a blatant general rate increase, and will appear so to customers.**

(*See In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, attached to Doc. 705-17, NS 001000012, filed Feb. 10, 2014.)

55. Defendants' rail fuel surcharges bore no direct relationship to Defendants' actual increases in fuel costs. The AII and RCAF both included a fuel cost component and would have

permitted Defendants to recover all their increased fuel costs throughout the conspiracy. By removing fuel costs from the newly applicable index (the AIILF) and adding a pretextual "fuel surcharge" formula applied to the entire base rate, Defendants were able to drive revenue increases far out of proportion to any actual increases in fuel costs. Thus, there was no legitimate business justification or other innocent explanation for the collective action of the Defendants to cause the AAR to adopt and publish the AIILF.

56. Defendants also used the fuel surcharge and the AIILF as a means to raise prices by "re-basing," whereby rail transportation base rates were raised along with the trigger price for imposition of fuel surcharges. When shippers complained that, for example, a trigger of $23 or $28 per barrel for WTI was leading to unfairly high surcharge recoveries as oil prices rose, the railroads sometimes offered to increase the trigger price to, for example, $90 per barrel, but insisted that the base rate be adjusted upward so that the all-in charges would remain the same as they were at the lower trigger price. While this had the appearance of reducing the application of fuel surcharges (because they would only be applied when the applicable fuel cost index reached the new, higher trigger price), in reality Defendants were able to incorporate supracompetitive prices previously obtained through fuel surcharges in the higher base rates. In other words, the higher base rates were premised on Defendants' unlawfully imposed fuel surcharges and therefore generated higher revenues attributable to Defendants' conspiracy.

57. Because of the Defendants' concerted action, prices of rail freight transport were increased above competitive levels, and freight shippers including Plaintiffs were forced to pay artificially and unlawfully high prices for Defendants' services.

**DEFENDANTS COLLECTIVELY CHANGE AII TO REMOVE FUEL**

58. Even after agreeing to coordinate their fuel surcharges, Defendants faced an obstacle to the imposition of fuel surcharges. Many contracts contained rate adjustment

provisions that already accounted for railroads' fuel costs by incorporating the RCAF or another cost-based index that included changes in fuel costs. The Defendants agreed to solve this problem by conspiring to remove fuel from the most widely utilized rate adjustment index, thereby creating a new rail cost index without fuel known as the AIILF.

59. In furtherance of the previously-agreed conspiracy, Defendants initiated an effort in the AAR in the fall of 2003 to remove fuel costs from the weighted RCAF and AII (which already allowed Defendants to recover all their fuel costs), and thereby facilitate use of artificially high rail fuel surcharges as a revenue enhancement mechanism. The "surcharge" would be implemented as a percentage increase on the total rate for freight transport, regardless of the actual cost of fuel. At AAR meetings and discussions in late 2003, Defendants agreed to create and implement the AIILF, a new rail cost index that omitted fuel.

60. The AAR is (and was at all relevant times) based in Washington, D.C., and describes itself as "the world's leading railroad policy, research, standard setting, and technology organization that focuses on the safety and productivity of the U.S. rail freight industry." CSX describes the AAR as "the central coordinating and research agency of the North American rail industry." The AAR is (and was at all relevant times) controlled by Defendants. The AAR Board, of which Defendants' CEOs are all members, meets regularly in Washington, D.C., and board members communicate regularly between meetings.

61. Through their combination and conspiracy, Defendants caused the AAR to announce the creation of the AIILF in December 2003. The AAR's official publication of the "AAR Railroad Cost Indexes" in March 2004 stated: "In this publication, the AAR also calculates a version of the All-Inclusive Index that does not include fuel. This All-Inclusive Index Less Fuel (AII-LF) is calculated exactly the same, with matching component indexes, as

the All-Inclusive Index used with the RCAF – with the exception of the exclusion of the fuel component." The new AIILF specified the fourth quarter of 2002 as its base period. The announcement of the AIILF and the underlying decision to create the new index were the result of collective action by the Defendants, and neither could have happened without the conspiracy.

62. Defendants conspired to cause the AAR to inaugurate the AIILF in order to facilitate the use of separate, stand-alone rail fuel surcharges, applied against the total rate charged for rail freight transportation, and coordinated that practice. The creation of this new index was an important, carefully planned step taken collectively by Defendants to foster and continue their previously-agreed price-fixing conspiracy, a conspiracy that involved Defendants imposing price increases on the entire rate for rail freight transport and thereby obtaining additional revenues far beyond any actual increases in fuel costs.

63. The creation of the AIILF was a notable departure from past practice and marked the first time that the AAR created a rail cost index without a fuel cost component. The new index was not the result of a general change in assessing railroad industry cost factors, as the STB-published RCAF continued to contain a fuel cost component. The reason for creation of the AIILF was to enable Defendants to raise shipping prices and to implement their price-fixing conspiracy by imposing percentage-based price increases on the entire rate for rail freight transport. Defendants collectively decided to switch to a percentage-based fuel surcharge not because it better tracked their costs than prior indexes, but because it did not.

64. BNSF admitted that it worked through the AAR to establish the new AIILF index during a second quarter earnings conference call in July 2004. BNSF's Chief Marketing Officer, responding to a question about how BNSF could apply the new percentage-based fuel surcharges in contracts with coal shippers, said it could do so because of the changes to the applicable

indexes published by the AAR. Referring to BNSF's Chairman, President, and CEO, the Chief Marketing Officer stated, "What happened last year, and [BNSF] led the charge on this, is that there's a new index that [the AAR] has that's basically an index without fuel. . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future."

65. The Defendants' collective action in December 2003 helped them impose a new, separate, and artificially high rail fuel surcharge on their customers, which they could claim was justified because fuel was no longer automatically covered by standard rate adjustment clauses. As UP's President and CEO admitted during an October 2004 earnings call, UP got "away from the RCAF" and was "putting in the specified fuel recovery mechanism in areas that historically would have used RCAF."

**DEFENDANTS IMPLEMENT THE FUEL SURCHARGE SCHEME**

66. Defendants' agreement in 2003 to implement as broadly as they could a separate rail fuel surcharge as a multiplier percentage of the base rate and remove fuel as a part of cost adjustments in contracts was successfully implemented through Defendants' collective action. This meant that the fuel surcharge could operate as a means to impose an effective rate increase and thereby raise revenues far beyond the actual costs of fuel (which could have been recovered through cost indexes that tracked actual fuel prices). Defendants applied the rail freight surcharges to published tariff rates, as well as private contracts and other traffic not subject to rate regulation.

67. Defendants recognized the need for uniformity and collective action to implement and maintain their rail fuel surcharge scheme. Evidence of their desire to implement and enforce the scheme on a uniform basis exists in documents that have been made public. For example, in a January 2004 e-mail, UP stated:

**The Highway Diesel Fuel surcharge policy is required for any new and renewed contracts within Industrial Products. ANY deviation from that policy requires advance sign-off by Bob Toy. Have heard some rumors recently that people have been trying to "game" the system. Not a good idea.**

(*See In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, attached to Doc. 705-30, UPFSC 0276597, filed Feb. 10, 2014.) Similarly, the minutes of a May 2003 meeting of the "NS-UP Alliance" make clear that Defendants intended to, and did, agree to act collectively:

**Attendees:**
**UP** - Dick Davidson, Ike Evans, Dennis Duffy, Jack Koraleski, Brad King, Jim Young, Merill Bryan, John Gray, Woody Sutton, Jeff Koch

**NS** - David Goode, Ike Prillaman, Jim McClellan, Don Seale, Steve Renken, Wick Moorman, Tony Ingram, Mark Manion, Mike McClellan

automotive business going forward. Discussion followed on fuel surcharges and various application processes as used by different roads. Consensus was reached that it would be a positive outcome if all roads had the same process in the eyes of our customers. There was some question as to whether or not the industry can work together on this opportunity, probably through the AAR, or do roads have to handle the opportunity on a bilateral basis. **Follow up: UP - Jack Koraleski/Mike Hemmer, NS – Don Seale/Greg Summy**

(*See In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869, attached to Document 705-63, NS 001000361, filed Feb. 10, 2014.)

68. Defendants succeeded in implementing uniform fuel surcharges as a result of their efforts. In furtherance of the conspiracy, BNSF and UP, using the HDF Index, charged substantially identical rail fuel surcharges beginning in July 2003. CSX and NS also acted in furtherance of the conspiracy by using the WTI Index to charge substantially similar rail fuel surcharges, in a broad and coordinated fashion, starting in 2003. All four Defendants agreed to implement percentage-based fuel surcharges as broadly as possible in the same general manner –

as a percentage-based addition to the base transportation rate after triggering by the applicable fuel (HDF) or oil (WTI) index.

69. Defendants incur differing fuel costs as a percentage of operating cost and have differing fuel efficiency in the operation of their trains. Defendants' use of matching fuel cost indexes and contemporaneous implementation of their rail fuel surcharges indicates that they were coordinating their behavior and conspired to fix prices for rail fuel surcharges. In addition, Defendants' announcements in advance of their surcharges, and the posting of surcharge information on their websites, were important mechanisms for implementation and enforcement of the conspiracy.

70. Defendants' price increases were far higher than what could have been justified by increases in what they actually paid for fuel. BNSF's average cost of diesel fuel in Q3 2003 was $0.846 per gallon, and its average cost of diesel fuel for Q3 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 16.8% from Q3 2003 to Q3 2004. By contrast, the standard BNSF fuel surcharge was based on an HDF level of $1.46 per gallon (far higher than what BNSF was actually paying) in Q3 2003 and $1.83 per gallon in Q3 2004, a 25.3% increase. While BNSF's cost of fuel increased only 16.8% from Q3 2003 to Q3 2004, the HDF index (on which the BNSF fuel surcharge was based) increased over 25% in the same time period. As a result of this disparity, rail customers were paying a fuel surcharge based on an index fuel price that rose far faster than the increase in BNSF's actual fuel costs. Shippers similarly overpaid the other Defendants during this and other periods, particularly because the inflated percentage increase was applied to the entire rate at issue, not merely the fuel cost component of that rate.

71. The fuel surcharge levels also disregarded gains in fuel efficiency, another indication that the rail fuel surcharges were not a natural reaction to increased fuel costs. As an

AAR publication explained in 2007, Defendants' fuel efficiency is "constantly improving." For example, BNSF announced in 2005 that it achieved a 9% improvement in fuel efficiency over the prior decade. In 2006, railroads could move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, Defendants deflected attention from the cost savings they had achieved through efficiency gains.

72. Defendants' actions were contrary to each of their respective independent economic self-interest. Both fuel efficiency and actual fuel cost as a percentage of operating cost differ widely among railroads and different rail routes and movements. In a competitive environment, carriers with lower fuel costs would negotiate regarding application of fuel cost adjustments in an effort to increase market share and revenues. Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and broadly applied similar percentage-based fuel surcharges to the total rate for transportation. Starting around 2003, Defendants generally refused to negotiate applicability of their rail fuel surcharge programs, even when doing so would have allowed them to capture additional business, revenue, and market share. Defendants' conspiracy to decouple fuel costs from the existing railroad cost indexes (such as RCAF and AII) was a method of achieving uniform pricing and avoiding competition. Through their collective action, Defendants could use the stand-alone rail fuel surcharge as an easy way to dramatically increase profits, so long as Defendants complied by not competing on rail fuel surcharge prices or otherwise undercutting one another.

73. Defendants' discussions, communications, and meetings relating to fuel surcharges, either directly or by and through the AAR or NFTA, did not concern the interline movement of a rail carrier with one or more other rail carriers but were instead concerned with

securing agreement upon, and adherence to, an unlawful scheme to eliminate price competition. The discussions, communications, and meetings were conducted for the purpose of reaching agreement on a uniform fuel surcharge methodology, divorced from fuel costs actually incurred for any given rail movement, to which each Defendant's adherence could be readily monitored and whose application was independent of interline movements of any Defendant with another Defendant. The foregoing conduct had nothing to do with facilitating interline movement of traffic or acting together with respect to an interline rate or related matter but was, instead, intended to eliminate price competition on all movement of traffic.

74. Railroad industry analysts and experts expressed concerns about the "convergence" in Defendants' rail fuel surcharge methodologies. One analyst concluded in 2003 that the rail fuel surcharges were "not supported" by fuel cost increases and said that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives" as a "way to gain significant market share." ("Following the Competition," *Traffic World*, July 14, 2003.) An independent 2007 study commissioned by ACC and CURE found that Defendants' rail fuel surcharge revenue exceeded their publicly reported actual fuel costs between 2003 and early 2007 by over $6 billion. A 2010 joint report by the United States Departments of Agriculture and Transportation, titled "Study of Rural Transportation Issues," similarly found: "There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits. From 2001-2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."

75. Defendants' coordinated implementation of fuel surcharges could not have been a coincidence, and was not a rational response to business conditions that were affecting each

railroad equally. Defendants' purpose was to use recovery of fuel costs as a cover for implementing what were, effectively, across-the-board rate increases.

76. The wide-spread imposition of the fuel charge mechanism was a change from past industry practice. The President and CEO of UP stated in a July 2007 interview that the new rail fuel surcharges as applied to rail freight were "really unique to the railroad industry. Three, four years ago they were really non-existent."

77. At or about the time Defendants agreed to impose rail fuel surcharges, they also took other steps in furtherance of the conspiracy. For example, Defendants typically declined to negotiate either the application of the fuel surcharges or significant discounts from the fuel surcharges. Plaintiffs, as well as shippers from many different industries, including some with substantial economic power, tried to negotiate the applicability of the fuel surcharge, but Defendants took the position that rail fuel surcharges must apply.

78. Defendants also agreed not to use their increased revenues and profits to subsidize the discounting of underlying rates to undercut agreed pricing or "steal" market share from each other. As a result, Defendants' relative market shares remained stable after the 2003 agreements.

## STB FINDS RAIL FUEL SURCHARGES UNREASONABLE

79. On January 25, 2007, the STB issued an administrative decision concluding that the Defendants' practice of computing rail fuel surcharges as a percentage of base rates for rate-regulated rail freight transport was an "unreasonable practice" because such fuel surcharges were not tied to the fuel consumption associated with the individual movements to which they were applied.

80. The STB found that "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs . . . [The railroads' fuel surcharge program was] a misleading and ultimately unreasonable practice,"

because "there is no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied." Rail Fuel Surcharges, STB Ex Parte No. 661 (served January 26, 2007), slip op. at p. 6-7. Although the STB was considering only rate-regulated freight traffic which is not at issue here, the STB's findings and opinion support Plaintiffs' allegations.

81. In furtherance of the conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case. The fuel surcharges the railroads had imposed in their tariffs for rate-regulated traffic were substantially similar, if not identical, to those they were foisting on their customers who were moving freight under rate-unregulated arrangements.

**DEFENDANTS' SUPRACOMPETITIVE PROFITS**

82. As a result of the success of their conspiracy, Defendants reaped huge, supracompetitive profits. They realized billions of dollars in revenue in excess of their actual increases in fuel costs from the specific customers on whom they imposed the surcharge. From July 2003 until the end of 2008, Defendants increased their market capitalization from approximately $40 billion to approximately $71 billion, a 78% increase. During the same period, the S&P 500, a broad-based stock index, declined by approximately eight percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to more than $52 billion in 2006 and approximately $61 billion in 2008. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price-fixing conspiracy. As the President and CEO of UP admitted in 2007, "it's only been in the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

83. The unlawful conduct, combination, or conspiracy alleged herein has had the following effects, among others:

(a) The rail fuel surcharges charged to Plaintiffs have raised, fixed, or stabilized prices and resulted in supracompetitive prices for unregulated rail freight transportation;

(b) Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in unregulated rail freight transportation; and

(c) Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed, and eliminated.

**ANTITRUST INJURY – IMPACT ON PLAINTIFFS**

84. During all relevant times addressed herein, Plaintiffs operated multiple coal-fired steam-generating electric power plants and sourced coal from mines throughout the United States. Many power plants were further divided into separate operating units, and individual operating units sometimes had different characteristics. Coal for steam generation was transported on unit trains, often with more than 100 cars, in most cases without any substitution or unloading of cars between the mine and the plant. There were often no economically feasible alternatives to rail transportation of coal. Because of the volume of coal consumed at each plant and the overland distance between a plant and the mine or mines from which coal was sourced, other means of transportation were grossly inefficient, prohibitively expensive, or otherwise foreclosed. Plaintiffs had no economic alternative but to purchase rate-unregulated rail transportation services from Defendants for delivery of coal to their plants, and rail transportation of coal pursuant to private contracts is a relevant service market.

85. Railroads have historically derived more revenue from the shipment of coal than from any other single commodity. In 2008, for example, gross revenue from coal exceeded $14 billion for Class I railroads, and coal accounted for more than 24% of the total revenue of the five largest railroads.[2]

86. Plaintiffs purchased different types of coal, depending upon design features, emission controls, and other relevant equipment at the operating units within a given plant. Plaintiffs needed to obtain the appropriate coal, with the correct specifications, to correlate with the particular characteristics of the destination coal-burning units. Some units were restricted to burning only lower sulfur coal, while other units may have been able to burn coal with a higher sulfur content. Other coal specifications were also critical, including BTU rating, ash content, moisture, and various metals, minerals, and other trace elements. Plaintiffs sourced coal for each plant from multiple mines, and they typically entered into long-term supply contracts with mine operators to ensure the uninterrupted flow of coal with the characteristics appropriate to each plant. Plaintiffs purchased low-sulfur, high-BTU coal from mines in Colorado and Utah, low-sulfur, low-BTU coal from the Powder River Basin (in Wyoming and Montana), and comparatively high-sulfur, high-BTU coal from mines east of the Mississippi River, including those in the Illinois Basin, Alabama, Kentucky, Virginia, West Virginia, and other states. The contiguous 48 states constitute the geographic market within which Plaintiffs could turn for the purchase of services for transportation of coal by unit trains from mines to their plants.[3]

[2] Ass'n of American Railroads, "Railroads and Coal," at 7 (June 2017), *available at* https://www.aar.org.

[3] Infrequently, Plaintiffs purchased import coal that was transported by Defendants from one or more port areas.

87. Defendants' violations of Section 1 of the Sherman Act have unlawfully restrained trade in the market for transportation of coal by unit trains to coal-fired power plants in the foregoing geographic market and have injured Plaintiffs in their business and property. Plaintiffs have paid for rail freight transportation at prices above what would have been charged in a competitive market as a result of Defendants' illegal contract, combination, or conspiracy to restrain trade as alleged in detail herein. This is an antitrust injury of the type that the federal antitrust laws were meant to punish and prevent.

88. APC was a party to numerous rail transportation agreements with Defendants by and after 2003 (such as contracts with BNSF, NS, and CSX), and these agreements included the unlawful percentage-based fuel surcharges described herein. The percentage-based fuel surcharges were imposed by Defendants in these agreements as a result of, and in furtherance of, Defendants' conspiracy, and injured APC.

89. GPC was a party to numerous rail transportation agreements with Defendants in and after 2003 (such as contracts with NS, CSX, and UP), both in its own name and as the successor-in-interest to Savannah Electric, as well as the contracting agent for and/or assignee of co-owners of Plants Scherer and Wansley, and these agreements included the unlawful percentage-based fuel surcharges described herein. The percentage-based fuel surcharges were imposed by Defendants in these agreements as a result of, and in furtherance of, Defendants' conspiracy, and injured GPC and the co-owners.

90. MPC was a party to numerous rail transportation agreements with Defendants in and after 2003 (such as contracts with UP and BNSF), and these agreements included the unlawful percentage-based fuel surcharges described herein. The percentage-based fuel

surcharges were imposed by Defendants in these agreements as a result of, and in furtherance of, Defendants' conspiracy, and injured MPC.

**COUNT I**
**ILLEGAL CONSPIRACY IN RESTRAINT OF TRADE**

91. Plaintiffs incorporate by reference the allegations in the above paragraphs as if they were fully set forth herein.

92. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

93. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for rail fuel surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade in the market for the rail transportation of coal from mines to coal-fired steam generating electric power plants in the 48 contiguous states.

94. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate commerce. Defendants' unlawful conduct was through mutual understandings or agreements, by, between, and among Defendants.

95. The contract, combination, or conspiracy has had the following effects:

(a) Prices charged to Plaintiffs for rate-unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels as a result of rail fuel surcharges applied as a percentage of base rates;

(b) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

(c) Competition establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

96. As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury in that they have paid supracompetitive prices for rate-unregulated rail freight transportation services.

WHEREFORE, Plaintiffs pray for relief as follows:

1) That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

2) That Plaintiffs recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs;

3) That each of Defendants and their respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

4) That Plaintiffs recover treble damages, as provided by law;

5) That Plaintiffs recover their costs of the suit, including attorneys' fees and interest, as provided by law; and

6) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by jury.

Dated: October 2, 2019

**THOMPSON HINE LLP**

By: /s/ Sandra L. Brown

Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
Daniel Ferrel McInnis (D.C. Bar No. 452452)
David E. Benz (D.C. Bar No. 485868)
Joseph A. Smith (D.C. Bar No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W., Suite 700
Washington, D.C. 20036
Telephone: (202) 331-8800
Facsimile: (202) 331-8330
sandra.brown@thompsonhine.com

Robert F. Ware (*pro hac vice* motion to be filed)
Jennifer S. Roach (*pro hac vice* motion to be filed)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: (216) 566-5500
Facsimile: (216) 566-5800

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
LEO D. CASERIA, Cal. Bar No. 240323
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone: 213.620.1780
Facsimile: 213.620.1398
E mail lcaseria@sheppardmullin.com

HELEN C. ECKERT, Cal. Bar No. 240531
JOY O. SIU, Cal. Bar No. 307610
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: 415.434.9100
Facsimile: 415.434.3947
E-mail: heckert@sheppardmullin.com
jsiu@sheppardmullin.com

Attorneys for Plaintiff
CALPORTLAND COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION JUDICIAL DISTRICT

| | |
|---|---|
| CALPORTLAND COMPANY<br><br>Plaintiff,<br><br>v.<br><br>BNSF RAILWAY COMPANY; CSX TRANSPORTATION, INC.; NORFOLK SOUTHERN RAILWAY COMPANY; UNION PACIFIC RAILROAD COMPANY<br><br>Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED**<br><br>**COMPLAINT FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff CalPortland Company ("Plaintiff" or "CalPortland") files this Complaint under the antitrust laws of the United States against Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), Union Pacific Railroad Company ("UP") (collectively, "Defendants"), and alleges as follows:

## I. INTRODUCTION

1. This is a civil antitrust action against Defendant railroads and their co-conspirators for violating Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff purchased rate-unregulated[1] freight from one or more of the Defendant railroads and was assessed a rail fuel surcharge by one or more of the Defendant railroads. Defendants engaged in a price-fixing conspiracy to coordinate their rail fuel surcharge programs as a mechanism for imposing supra-competitive total price increases on their shipping customers beginning no later than July 1, 2003 and continuing until at least December 31, 2008. As a result of this unlawful conspiracy, Plaintiff seeks damages against Defendants, jointly and severally, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, injunctive relief, and such other relief as provided by law.

2. Defendants conspired to use rail fuel surcharges, which were added to customers' total bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States.

3. The total freight price for a shipping customer is called the "all-in rate." This rate consists of a base rate and a fuel surcharge applied as some percentage of the base rate. The base rate is calculated according to fixed costs such as the cost of organizing a particular shipment, the cost to build and maintain tracks and other

---

[1] "Rate-unregulated" refers to rail freight transportation services in which the rates are set by private contracts or through other means exempt from rate regulation under federal law.

structures, and the railroad's markup of price over costs. A rail fuel surcharge is a separately identified fee that is charged by the railroads for the agreed-upon transportation, supposedly to compensate the railroads for increases in the cost of fuel. Defendants imposed the rail fuel surcharge as a percentage multiplier of the base rates. These surcharges raised rates beyond the real increased costs of fuel, which allowed Defendants to collect billions of dollars of additional profits during the conspiracy at the expense of Plaintiff and other shippers.

4. An independent study commissioned by the American Chemistry Council found that through their fuel surcharge programs, Defendants generated revenues from customers that far exceeded their actual increase in fuel costs. From 2003 to the first quarter of 2007, the study found that railroads collected $11.66 billion in fuel surcharge revenue while costs in fuel rose by only $5.26 billion. Defendants used their fuel surcharge programs, which were the result of an unlawful agreement, to generate revenue.

5. For example, BNSF's annual fuel surcharge revenue increased from about $110.5 million in 2003 to about $357 million, $1.06 billion, and $1.7 billion in 2004, 2005, and 2006, respectively. CSX increased its fuel surcharge revenue from $72 million in 2003 to about $201 million in 2004, $525 million in 2005, and $821 million in 2006. NS and UP reaped similar financial benefits from the conspiracy. NS increased its fuel revenue from about $65 million in 2003 to $184 million in 2004, $609 million in 2005, and then $1.14 billion in 2006. UP increased its revenue from fuel surcharges from about $112 million in 2003 to about $330 million and $1 billion in 2004 and 2005, respectively. This exponential increase in revenue allowed Defendants to collect billions of dollars of additional profits during the conspiracy.

6. According to an independent study on Railroad Fuel Surcharge practices commissioned by the American Chemistry Council, Defendants

overcharged rail shippers by over $6 billion between 2003 and the first quarter of 2007.

7. Prior to the conspiracy, fuel surcharges were not always applied. In order to increase revenue, Defendants devised and implemented a conspiracy to maintain certain fuel surcharges to the extent they had been applied previously, to impose certain new fuel surcharges to the extent they had not been applied previously, and to largely standardize fuel surcharges for most customers. Defendants implemented this conspiracy through unlawful agreements reached in or about the spring of 2003.

8. Defendants' collective conspiracy has been the subject of class action litigation for several years. *See In re Rail Freight Fuel Surcharge Antitrust Litig. (Rail Freight)*, 292 F. Supp. 3d 14 (D.D.C. 2017). While denying class certification, the U.S. District Court for the District of Columbia ("D.C. Court"), noted that the "documentary evidence is strong evidence of conspiracy and class-wide injury." *Id.* at 32. That Court found that the "evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges" was "substantial." *Id.* at 102. The D.C. Court specifically found that there was "substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." *Id.* at 103.

9. Prior to 2003, the vast majority of rail freight transportation agreements included rate escalation provisions based on an index called the All-Inclusive Index ("AII"), which weighted a variety of cost factors, including fuel. The AII already permitted full recovery by the railroads of actual fuel cost increases, no matter how large. In 2003, Defendants conspired to cause the Association of American Railroads ("AAR") (a railroad trade association in which all Defendants were

members and active participants) to establish a new cost escalation index which removed fuel. This paved the way for Defendants to apply separate and artificially high rail fuel surcharges to many customers as fuel would no longer be covered by standard rate escalation clauses.

10. As the D.C. Court noted, "the evidence shows that defendants employed these fuel surcharges in lockstep" and "sought to apply fuel surcharges to as many customers as possible." *Rail Freight*, 292 F. Supp. 3d at 104. These new "fuel surcharges" were not tied to the actual cost of fuel and, instead, were calculated as a percentage increase on the total base rate of freight transportation, allowing the "fuel surcharges" to function as an across-the-board increase on freight prices.

8. The existence of the conspiracy alleged in this Complaint is further supported by the fact that the Surface Transportation Board (which has jurisdiction over only rate-regulated traffic, traffic not at issue in this case) held in a January 25, 2007 decision that "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs . . . [The railroads' fuel surcharge program was a] misleading and ultimately unreasonable practice . . . ."

9. As a direct and proximate result of the price fixing conspiracy described in this Complaint, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff. Plaintiff paid a higher price for unregulated rail transportation services than it would have paid absent the conspiracy.

## II. PARTIES

### A. Plaintiff

10. Plaintiff CalPortland Company ("CalPortland") is a corporation organized under the laws of the State of California with its principal place of business in Glendora, California. The reference in this Complaint to CalPortland or

Plaintiff refers to CalPortland Company and each of its affiliates, subsidiary companies, predecessors, and any assignors. This includes, but is not limited to, Glacier Northwest, Inc., Arizona Portland Cement Company, and Riverside Cement Company. CalPortland (previously known as California Portland Cement Co.) has been producing, transporting, and selling cement, concrete and/or aggregate in the Western United States since 1891. During the time period relevant to these allegations, CalPortland purchased unregulated rail freight transportation services from one or more of the Defendants, and during this relevant period, one or more of the Defendants assessed fuel surcharges on CalPortland in connection with that unregulated rail freight transportation service. The prices CalPortland paid to Defendants for unregulated rail freight transportation services on which fuel surcharges were imposed were higher than they would have been absent the alleged conspiracy. CalPortland has therefore been injured in its business and property by reason of Defendants' antitrust violations.

**B. <u>Defendants</u>**

11. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). BNSF is defined to include its managers, officers, employees and agents acting on its behalf. During the time period relevant to Plaintiff's claims, BNSF: participated in the conspiracy alleged in this Complaint; sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

12. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight

railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). CSX is defined to include its managers, officers, employees and agents acting on its behalf. During the time period relevant to Plaintiff's claims, CSX: participated in the conspiracy alleged in this Complaint; sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

13. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad that operates primarily in the eastern part of the United States. NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). NS is defined to include its managers, officers, employees and agents acting on its behalf. During the time period relevant to Plaintiff's claims, NS: participated in the conspiracy alleged in this Complaint; sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

14. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). UP is defined to include its managers, officers, employees and agents acting on its behalf. During the time period relevant to Plaintiff's claims, UP: participated in the conspiracy alleged in this Complaint; sold

rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

**C. <u>Co-Conspirators and Agents</u>**

15. Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

16. Plaintiff reserves the right to amend this Complaint based on discovery in this case to allege the identities of co-conspirators as they are discovered.

17. At all times relevant to the allegations in this Complaint, other persons, firms and corporations–referred to as "co-conspirators," the identities of which are presently unknown–have willingly conspired with Defendants in their unlawful scheme as described in this Complaint.

18. The acts alleged in this Complaint that were done by each Defendant or coconspirator were fully authorized by each of the Defendants and co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees or representatives of each Defendant or co-conspirator while actively engaged in the management, direction, or control of its affairs for that Defendant or co-conspirator.

## III. <u>VENUE AND JURISDICTION</u>

19. This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages and reasonable attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1337.

21. Venue is proper in this judicial district pursuant to 15 U.S.C. §15(a) and 22 and 28 U.S.C. § 1391, because during the time period relevant to these allegations, one or more of the Defendants resided, transacted business, were found,

or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

22. This Court has personal jurisdiction over each Defendant because, among other reasons, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts within this District; and/or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV. TRADE AND COMMERCE

23. During the time period relevant to Plaintiff's claims, *i.e.*, the time period relevant to these allegations, Defendants accounted for over 90% of all rail shipments within the United States. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the relevant time period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

24. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce. The effect of Defendants and/or their co-conspirators' anticompetitive conduct as alleged in this Complaint on United States commerce gives rise to Plaintiff's claims.

## V. INDUSTRY BACKGROUND

25. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). Prior to the Staggers Act, the Interstate Commerce Commission ("ICC"), heavily regulated the Railroad Industry. Prior to

1980, railroads could apply to the ICC for across-the-board rate increases, which could be lawfully implemented on a collective basis.

26. Today, by contrast, more than 75% of all rail shipments move under private transportation contracts that are not rate-regulated or that otherwise are exempt from rate regulation. For this rate-unregulated traffic, the railroads cannot turn to an agency to obtain across-the-board increases in freight rates and cannot lawfully collude to set those rates.

27. Currently, the railroad industry is highly concentrated. The four Defendants – BNSF, CSX, NS, and UP – control about 90% of all rail freight track miles.

28. While the purpose of deregulation of the railroad industry was to promote competition and lower rates for shippers (such as the Plaintiff in this case), the opposite occurred – faced with declining profits, the railroads sought to charge supra-competitive prices, yielding billions in unlawful profits for themselves.

## VI. <u>THE PRE-CONSPIRACY PERIOD</u>

29. By the early 2000s, the railroad industry had consolidated to the point where further mergers were unlikely if not impossible. In March 2000, in response to a proposed merger between Defendant BNSF and Canadian National Railway Co., the U.S. government's Surface Transportation Board (the successor to the Interstate Commerce Commission) imposed a moratorium on new mergers. The Surface Transportation Board then promulgated more standards for merger review, effectively cutting off further consolidation as an avenue for revenue growth.

30. Defendants had difficulty imposing fuel surcharges prior to the conspiracy, and to the extent they were able to impose them, found it difficult to maintain or realize additional revenue from them. As BNSF noted in a 2002 internal report, "our rail competitors do not [use fuel surcharges,] and we therefore are hard pressed to achieve it." *See Rail Freight*, 292 F. Supp. 3d. at 103. In a January 2003 memo, BNSF's then-Chief Marketing Officer Chuck Schultz noted

that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104.

31. BNSF's Executive Vice President/Chief Marketing Officer stated that BNSF's fuel surcharge participation rates in January 2003 were "low . . . [in the] 25 to 30 percent range." Opinion at 136, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 10, 2017). CSX's Executive Vice President of Sales and Marketing noted that "the fuel surcharge revenue [CSX] was generating prior to the adoption of this new program in March 2003 [*i.e.* the conspiratorial program]" was "[l]ow – relatively low to where it needed to be." *Id.* The UP CEO also noted that fuel surcharges were rarely implemented prior to the conspiracy: "We had fuel surge [sic] programs in many contracts, but because fuel had not run up, they were never implemented." *Id.* at 131. He also noted that fuel surcharges triggered "during the 2000 through 2002 time period never reached significant percentage levels." *Id.* at 136.

32. Since the passage of the Staggers Act, railroads had increasingly entered into private freight transportation contracts with their customers that included cost escalation provisions that were tied to the AII, or the Rail Cost Adjustment Factor ("RCAF"). The RCAF was based on the AII. Both indices were published by the AAR, and both indices included fuel as a factor. These indices weighted a number of factors such as, for example, labor, fuel, equipment, rent and interest, so that the actual impact of any particular increases to cost (such as rising fuel increases) would be captured by the index. In other words, any actual increase in fuel costs, no matter how large, would be reflected in these indices and the railroads would be able to recover their fuel costs.

33. In 2003, BNSF, UP, CSX, and NS seized upon fuel as the means to create the type of across-the-board rate increases that the railroads could no longer achieve through a regulatory process. Defendants embarked on and implemented an agreed plan to remove fuel costs from the AII (and thus from the RCAF based on

the AII) so that Defendants could apply separate fuel surcharges. Defendants controlled and dominated the AAR and conspired to cause it to publish the All Inclusive Index Less Fuel ("AIILF"). This new index no longer weighted fuel against other cost factors, allowing Defendants to use the separate fuel surcharges to raise total freight prices by a given percentage—and that is precisely what Defendants proceeded to do.

## VII. <u>THE CONSPIRACY</u>

### A. <u>Defendants Entered into the Unlawful Agreement in the Spring of 2003</u>

34. From at least the Spring of 2003 and continuing through at least 2008, the top executives at each of the Defendants met regularly at restaurants, recreational facilities and conference facilities under the guise of discussing the railroad industry. Upon information and belief, at these meetings, they reached an unlawful agreement to impose fuel surcharges on customers. Defendants' conspiracy allowed them to maintain fuel surcharges that had been previously imposed, impose new fuel surcharges where they had not been previously imposed, and to standardize fuel surcharges, all of which caused customers to pay artificially inflated fuel surcharges.

35. For example, in March of 2003, CSX and UP were examining their fuel surcharges together. CSX internally proposed changes to its fuel surcharge program. UP's Chief Marketing Officer Jack Koraleski drafted a revised fuel surcharge recommendation for UP. Class Cert. Tr., 98, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 6, 2010) ("Oct. 6, 2010 Tr."). On March 12 and 13, 2003, UP's Koraleski attended a meeting with CSX; the suggested agenda noted that Koraleski and CSX EVP of Sales and Marketing Clarence Gooden had discussed "fuel surcharge methodology" prior to this meeting. *Id*. at 98-99.

36. On March 20, 2003, within one week of UP's Koraleski's meeting with CSX, CSX abandoned the proposed program it had contemplated earlier in the month and instead announced a plan that matched Koraleski's recommendation for UP. *Id.* at 99. On March 31, 2003, UP adopted Koraleski's program. *Id.*

37. In another example, during a March 18, 2003 meeting, representatives of BNSF and NS discussed "the value of synchronization across the big players in the industry." Class Cert. Tr., 349-50, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Sept. 27, 2016). Not long after, at biannual meetings of the National Freight Transportation Association, executives of the Defendants met to consider and discuss developments in the railroad industry. The spring 2003 meeting of the National Freight Transportation Association ("NFTA") occurred from April 2 to 6 at the Wigwam resort in Litchfield Park, Arizona. There, BNSF and NS continued their discussion of synchronizing the industry. BNSF's and NS's Chief Marking Officers John Lanigan and Don Seale discussed fuel surcharge programs. Oct. 6, 2010 Tr. at 101. Under the cover of these biannual meetings, Defendants colluded and entered into an unlawful agreement to levy stand-alone fuel surcharges.

**B. <u>Pursuant to the Meetings in Early 2003, the Railroads Began to Coordinate Their Fuel Surcharges in Mid-2003</u>**

38. Pursuant to the conspiracy, the Western Railroads (BNSF and UP) tied their fuel surcharge to the U.S. Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index"), while the Eastern Railroads (CSX and NS) tied their programs to the West Texas Intermediate ("WTI") index. To the extent they had done so before, they continued to do so, but now, it was done pursuant to conspiracy and not unilateral action.

39. As early as July 2003, the two Western Railroads (BNSF and UP) began to coordinate their fuel surcharges. In general, prior to July 2003, the UP fuel surcharge had been adjusted monthly based on the WTI Index, while the BNSF fuel

surcharge had been based on the HDF Index. As a result of the unlawful agreement, the Western Railroads began more widely imposing fuel surcharges at the same time and in the same amount and in the same way based on the HDF Index.

40. BNSF and UP agreed to use the HDF Index in virtually the same way. Whenever the average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded this threshold, both BNSF and UP applied a surcharge of 0.5% for every five-cent increase above the threshold. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2%. In other words, the surcharge would increase 2% for every 20-cent increase in the HDF Index.

41. Not only did BNSF and UP coordinate *how* they applied the fuel surcharge, but they also coordinated *when* they would apply the fuel surcharges. As a result of the unlawful agreement, BNSF and UP decided to apply the fuel surcharges to shipments beginning the second month after the month in which there was a change in the HDF Index average price. For example, if the HDF Index average price changed in February, BNSF and UP would announce their new fuel surcharge percentage on March 1, and then apply the surcharge to shipments in April. Defendants published these new fuel surcharges on their websites, which made deviation from the conspiracy pricing readily detectable.

42. The adoption of virtually identical and complex fuel surcharge programs demonstrates that these surcharge programs were the result of a conspiratorial agreement among Defendants rather than independent responses to common market issues such as increasing fuel costs.

43. UP's decision to use the HDF Index (the same Index used by BNSF) in July 2003 is strong evidence of coordinated conduct because two months earlier, in April 2003, UP had announced changes to its trigger point but did not change the index it was using. The fact that UP switched to the HDF Index in July 2003 and

began levying identical surcharges to BNSF is further evidence that UP was acting according to a conspiratorial agreement.

44. A few months after the Western Railroads announced their coordinated surcharge programs, the two Eastern Railroads (CSX and NS) began to use the WTI Index to levy identical surcharges on their customers. This new surcharge program was the result of the unlawful agreement that Defendants reached in the spring of 2003.

45. CSX and NS agreed to apply identical surcharges based on the WTI Index. Whenever the WTI Index exceeded $23 per barrel of crude oil, CSX and NS's rates were increased by 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel. For example, if the price of WTI oil was $28 per barrel, the fuel surcharge would be 2%. In other words, the fuel surcharge would be adjusted upward by 2% for every $5 increase in WTI average price.

46. Not only did CSX and NS coordinate *how* they applied the fuel surcharge, but they also coordinated *when* they would apply the fuel surcharges – two calendar months after the WTI had adjusted, thereby adopting the same schedule that the Western Railroads had adopted. For example, if the WTI Index average price exceeded $23 in February, CSX and NS would assess the applicable fuel surcharges in April. CSX and NS published their fuel surcharges on their website, making deviation from conspiracy pricing readily apparent.

47. This fuel surcharge program was clearly the result of a conspiratorial agreement among Defendants. The programs were too complex and precise to be the result of unilateral action.

## C. <u>Defendants Removed an Obstacle to the Conspiracy</u>

48. Defendants BNSF, UP, CSX, and NS agreed in 2003 to remove fuel from the AII and RCAF. This made it easier for Defendants to apply and justify separate rail fuel surcharges as a percentage multiplier on the total base rate for the rail freight transportation, because the AII and RCAF no longer accounted for fuel.

49. AAR board meetings and discussions took place in October and December 2003. During these meetings, BNSF, CSX, NS and UP reached agreements and collectively caused the AAR to adopt a new cost escalation index called the AIILF. This index was virtually identical to the AII except it removed fuel, thereby opening the door for Defendants to begin assessing separate fuel surcharges. The underlying decision to create this new index was the result of Defendants' coordinated actions and an important step in Defendants' conspiratorial plan.

50. There was no legitimate business justification or natural explanation for the collective action of Defendants to cause the AAR to adopt and publish the AIILF or collectively to adopt rate-based rail fuel surcharges. Such revenue-based fuel surcharges bore no direct relationship to Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure. The fuel component of the AII and RCAF would have permitted Defendants to recover all of their increased fuel costs throughout the conspiracy period. Defendants' motivation in collectively causing the adoption of the AIILF could not have been more accurate or more efficient fuel cost recovery. Defendants' actions were not independent responses to a common problem of increasing fuel costs. Their motivation in causing the AAR to adopt the AIILF was so that they could more easily use fuel surcharges as profit centers to make more money. Their own statements demonstrate that they were using the fuel surcharge programs (the details of which they agreed to) as revenue generators, not cost recovery mechanisms. For example, an internal BNSF memorandum noted that: "Eastern Railroads [CSX and NS] have a 'profit center' with their Fuel Surcharge Programs . . . ." Opinion at 133, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 10, 2017). Additionally, another BNSF employee described the company's fuel surcharge program as "a revenue maximization program, not protection against fuel prices." *Id.* at 134. Similarly, the

other companies recognized that the program was solely meant to generate revenue. In a form 10-K, CSX noted that its "primary components of the revenue gain were continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets." *Id.* at 133. NS employees echoed this sentiment as well: "[I]t seems like all the Merchandise rev/car increases are coming from fuel surcharges." *Id.*

51. As a result of the concerted action among BNSF, UP, CSX, and NS, prices of rail fuel surcharges charged to rail shippers and customers like Plaintiff were raised to or maintained at supracompetitive levels during the conspiracy period.

**D. Defendants Began Imposing the New Fuel Surcharges with Few or No Exceptions**

52. Defendants' conspiratorial restriction of pricing freedom is further evidenced by their policies, which mandated that fuel surcharges be included in all contracts. For example, as of January 2004, BNSF's pricing guidelines stated: "Every Contract should include a fuel surcharge clause. All new and renewing contract negotiations should have a fuel surcharge as the goal." Oct. 6, 2010 Tr. at 109. NS's Vice President acknowledged that "there was a policy [at NS] to apply the standard fuel surcharge to as many customers as possible." *Rail Freight*, 292 F. Supp. 3d. at 104. A CSX employee noted that "[t]he new price vehicle should incorporate [CSX's] [fuel surcharge] program." Opinion at 133, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 10, 2017). Internal UP e-mails stated that: "all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management." *Rail Freight*, 292 F. Supp. 3d. at 100.

53. As a result of their unlawful agreement, Defendants all strictly followed the conspiracy pricing, refusing to offer any material discounts to shippers. A BNSF employee's staff meeting notes indicated that BNSF was following the

conspiracy pricing. The employee wrote: "[There are] [v]irtually no exceptions" to fuel surcharge adherence and "business units have done an excellent job in [fuel surcharge] adherence." Opinion at 137, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 10, 2017). A CSX executive noted that his goal was to have "zero exceptions" when applying fuel surcharges to contracts. *Id.* In an internal e-mail, an NS employee wrote: "There are relatively few [NS] publications with no [fuel surcharge] . . . ." *Id.*

54. CSX noted in its 10-K filing for the 2005 fiscal year that "As existing contracts are renewed or new contracts are executed, CSX is increasing the number of contracts which include fuel surcharge mechanisms." BNSF's Chief Economist Sam Kyei emailed BNSF's Chief Marketing Officer John Lanigan and explained that contracts requiring the CEO's signature "but excluding full fuel surcharge provisions [would] not be signed." *Rail Freight*, 292 F. Supp. 3d. at 104. This lack of negotiation aided Defendants in standardizing pricing along the lines of their collusive agreement and made monitoring pricing among the coconspirators easier.

55. This no-exception policy, adopted and followed by all of the Defendants, would not make economic sense in the absence of a conspiracy. As an internal BNSF report from 2005 recognized, the scheme only worked because Defendants adhered to the scheme: "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall." Oct. 6, 2010 Tr. at 109.

### E. <u>The Fuel Surcharge Percentages Charged by the Railroads Were Virtually Identical For the Entire Conspiracy and Affected Intermodal Traffic and Captive Shippers</u>

56. The first chart below shows that the fuel surcharge percentages charged by the Western Railroads (BNSF and UP) varied before the conspiracy but were virtually identical starting in July 2003. The second chart shows that the fuel surcharge percentages charged by the Eastern Railroads (CSX and NS) varied before 2004 but were virtually identical starting in March 2004.

MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0 |
| Jul-02 | 1.0% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1.0% | 0 |
| Nov-02 | 2.0% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |
| Jul-07 | 15.5% | 15.5% |
| Aug-07 | 16.0% | 16.0% |
| Sep-07 | 16.5% | 16.5% |
| Oct-07 | 16.5% | 16.5% |
| Nov-07 | 17.5% | 17.5% |
| Dec-07 | 18.5% | 18.5% |
| Jan-08 | 21.5% | 21.5% |
| Feb-08 | 21.0% | 21.0% |
| Mar-08 | 21.0% | 21.0% |
| Apr-08 | 21.5% | 21.5% |
| May-08 | 26.5% | 26.5% |

MONTHLY SURCHARGE PERCENTAGES – EASTERN RAILROADS

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |

| MONTH | CSX | NS |
|---|---|---|
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

57. The foregoing uniform pricing for more than four years is not explained by any legitimate business justification, nor was it a common response to the problem of rising fuel costs. As alleged in this Complaint, any actual fuel cost increases experienced by Defendants would have been covered by the AII.

58. Railroad industry analysts took note of the curious "convergence" in rail fuel surcharge methodologies adopted by the Defendants. One analyst concluded that Defendants' rail fuel surcharges were "not supported" by fuel cost increases. The analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives," and noted that "the way to gain significant market share is to lead the

competition rather than following the competition." John Gallagher, *Following the Competition*, TRAFFIC WORLD (July 14, 2003).

## VIII. THE SURFACE TRANSPORTATION BOARD DECISION AND THE HISTORY OF PRIOR CASES

59. As previously alleged, shippers of both rate-regulated and rate-unregulated traffic were affected by the artificially high fuel surcharges imposed by Defendants' conspiracy. Shippers of rate-regulated traffic complained to the Surface Transportation Board in 2006. Shippers of rate-unregulated traffic had similar complaints.

60. In 2006, shippers of rate-unregulated traffic complained that the fuel surcharges imposed on them were unreasonable. The STB instituted a proceeding to inquire into these fuel surcharge practices. The STB proceeding and ultimate decision related only to rate-regulated traffic, not rate-unregulated traffic that is the subject of this Complaint. However, as the fuel surcharges applied to rate-regulated traffic are the same fuel surcharges applied to rate-unregulated traffic, the STB decision further indicates that Defendants entered into an agreement to restrain trade in violation of the antitrust laws.

61. The STB held proceedings in mid-2006 and released an opinion in January 2007, concluding: "[I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because for example it has fewer transportation alternatives) it will pay

dramatically more in fuel surcharges." *Rail Fuel Surcharges*, Ex. Parte No. 661, 2007 WL 201205, at *4 (S.T.B. Jan. 26, 2007). Further, the Court noted that "imposing rate increases in this manner, when there [was] no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge [was] applied, is a misleading and ultimately unreasonable practice." *Id.* at *4.

62. While the STB did not prohibit the use of fuel surcharges, it cautioned the railroads that any surcharge imposed must have "a reasonable nexus to fuel consumption." *Id* at *6.

63. Pursuant to their conspiracy, Defendants applied the same misleading and unreasonable fuel surcharge practices described above to private rail-freight transportation contracts, thus injuring Plaintiff in this case and causing it to pay supra-competitive prices for rail transportation services.

## IX. DEFENDANTS' CONSPIRACY WAS HIGHLY EFFECTIVE

64. As a proximate result of this conspiracy, and during the time period relevant to Plaintiff's claims, Defendants and co-conspirators charged Plaintiff and others in the United States supra-competitive prices for rail transportation services.

65. As alleged above, Defendants reaped huge profits from the unlawful fuel surcharges.

66. As a result of the unlawful conduct, combination, or conspiracy alleged in this Complaint: (a) the fuel surcharges charged to Plaintiff for unregulated rail freight transportation services have been fixed, maintained, increased, or stabilized at supra-competitive levels; (b) Plaintiff has been deprived of the benefits of free and unrestricted competition in the market for unregulated rail freight transportation services; and (c) competition in establishing prices paid, customers of, and territories for unregulated rail freight transportation has been suppressed, restrained, and/or eliminated.

## X. DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

67. Discovery is necessary to determine the full scope of the conspiracy, including the time frame and participants. Plaintiff reserves the right to amend or supplement this Complaint to add other Defendants, claims, time period, or other allegations based upon discovery and further investigation.

## COUNT I

**Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act**

**(Against All Defendants)**

68. Plaintiff incorporates by reference each of the paragraphs alleged above.

69. Beginning in or about 2003 and continuing in force or effect, or both, through at least 2008, with an effect that continued thereafter, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of unregulated rail freight transportations services in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

70. This contract, combination or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, increased and/or standardized prices for fuel surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. This contract, combination or conspiracy constitutes a *per se* violation of trade and is, in any event, an unlawful restraint of trade.

71. Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. As alleged above, Defendants' unlawful conduct was carried out through mutual understandings and agreements.

72. This contract, combination or conspiracy in restraint of trade has had the following effects: (a) the fuel surcharges charged to Plaintiff for unregulated rail freight transportation services have been fixed, increased, maintained and/or stabilized at supra-competitive levels; (b) Plaintiff has been deprived of the benefits of free and unrestricted competition in the market for unregulated rail freight transportation services; and (c) competition in establishing prices paid, customers of, and territories for unregulated rail freight transportation has been suppressed, restrained, and/or eliminated.

73. Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations in amounts not yet ascertained. Plaintiff's injury as a purchaser of the unregulated rail freight is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A. That Defendants' unlawful contract, combination, or conspiracy be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

B. Compensatory damages as provided by law and a judgment against Defendants on behalf of Plaintiff;

C. An order permanently enjoining Defendants from continuing or maintaining their unlawful combination, conspiracy, or agreement;

D. Treble damages as provided by law;

E. Plaintiff's attorneys' fees and costs, as provided by law, and;

F. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: April 21, 2020

Respectfully submitted,

By *\/s/ Leo D. Caseria*

LEO D. CASERIA

Leo D. Caseria (SBN 240323)
lcaseria@sheppardmullin.com
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone: 213-620-1780
Facsimile: 213-620-1398

Helen C. Eckert (SBN 240531)
heckert@sheppardmullin.com
Joy O. Siu (SBN 307610)
jsiu@sheppardmullin.com
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: 415-434-9100
Facsimile: 415-434-3947

Attorneys for plaintiff
CALPORTLAND COMPANY

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTURY ALUMINUM COMPANY; CENTURY ALUMINUM OF KENTUCKY, GP; NSA, GP; CENTURY ALUMINUM OF WEST VIRGINIA, INC.; and CENTURY ALUMINUM OF SOUTH CAROLINA, INC.<br><br>One South Wacker Drive,<br>Suite 1000<br>Chicago, IL 60606;<br><br>Plaintiffs,<br><br>v.<br><br>BNSF RAILWAY COMPANY<br>2650 Lou Menk Drive<br>Fort Worth, TX 76131;<br><br>CSX TRANSPORTATION, INC.<br>500 Water Street<br>Jacksonville, FL 33202;<br><br>NORFOLK SOUTHERN RAILWAY COMPANY<br>Three Commercial Place<br>Norfolk, VA 23510; and<br><br>UNION PACIFIC RAILROAD COMPANY<br>1400 Douglas Street<br>Omaha, NE 68179,<br><br>Defendants. | Civil Action No. _____________<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., and Century Aluminum of South Carolina, Inc. (collectively, "Century Aluminum" or "Plaintiffs") bring this action for damages under the antitrust laws of the United States against BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"),

Norfolk Southern Railway Company ("NS"), and Union Pacific Railway Company ("UP") (collectively, "Defendants").

## I. NATURE OF THE ACTION

1. This is an antitrust case. Defendants are the four largest United States-based "Class I" railroads. Century Aluminum is a global producer of primary aluminum, operating plants in the United States and Iceland. Century Aluminum alleges that Defendants conspired to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2. Century Aluminum purchased unregulated rail freight transportation services from one or more of the Defendants from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and was assessed a rail fuel surcharge by one or more of the Defendants for the agreed-upon transportation. The term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

3. Defendants conspired for years to fix, raise, maintain, and/or stabilize prices of rail freight transportation by agreeing jointly to impose uniform fuel surcharges. A fuel surcharge is a separate fee above and beyond the base rate for transportation and is purportedly to compensate for increases in the cost of fuel. As explained herein, the term "fuel surcharge" was a misnomer because the rates were calculated as a percentage of base shipping rates and were unrelated to the actual fuel charges incurred by Defendants.

4. Defendants engaged in the conspiracy for the purpose of generating billions of dollars of additional revenue for themselves. In a proceeding captioned *Rail Fuel Surcharges*, Ex Parte No. 662 (Jan. 25, 2007), the Surface Transportation Board ("STB"), the federal agency that succeeded the Interstate Commerce Commission ("ICC") as the agency charged with regulating

aspects of the railroad industry, found the Defendants' uniform practice of computing rail fuel surcharges as a percentage of base rail freight rate was "unreasonable" and that the practices, invoices, and documents relating to those fuel surcharges were "misleading."

5. Defendants' conspiracy was the subject of class action litigation. *See*, *e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.* (*Rail Freight I*), 292 F. Supp. 3d 14 (D.D.C. 2017). The court noted that the "documentary evidence is strong evidence of conspiracy and class-wide injury," *id.* at 32, and that the "evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges" was "substantial," *id.* at 102. The court also specifically found that there is "substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." *Id.* at 103.

6. Defendants maintained their conspiracy during the Relevant Period by uniformly computing fuel surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their fuel surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, application, and enforcement, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

7. As the district court overseeing the class action noted, "the evidence shows that defendants employed these fuel surcharges in lockstep" and "sought to apply fuel surcharges to as many customers as possible." *Rail Freight I*, 292 F. Supp. 3d at 104. These new "fuel surcharges" were not tied to the actual cost of fuel and, instead, were calculated as a percentage increase on the

total base rate of freight transportation, allowing the "fuel surcharges" to function as an across-the-board increase on freight prices.

8. Plaintiffs spent millions of dollars shipping materials on Defendants' rail lines during the Relevant Period and, consequently, Plaintiffs and/or their predecessors and/or affiliates were injured by the anticompetitive conduct when they paid overcharges to Defendants. Plaintiffs seek damages for fuel surcharges imposed on carload rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.

## II. PARTIES

9. Plaintiff Century Aluminum Company is a corporation organized under the laws of Delaware, with its principal place of business at One South Wacker Drive, Suite 1000, Chicago, Illinois 60606. Plaintiff Century Aluminum of Kentucky, GP is a corporation organized under the laws of Kentucky, with its principal place of business at 1627 State Route 3543, Hawesville, Kentucky 42348. Plaintiff NSA, GP is a corporation organized under the laws of Kentucky, with its principal place of business at 1627 State Road 271 N, Hawesville, Kentucky 42348. Plaintiff Century Aluminum of West Virginia, Inc. is a corporation organized under the laws of West Virginia, and during the Relevant Period its principal place of business was at Route 2, South, P.O. Box 98, Ravenswood, West Virginia 26164. Plaintiff Century Aluminum of South Carolina, Inc. is a corporation organized under the laws of Delaware with its principal place of business at P.O. Box 1000, US Hwy 52, Goose Creek, South Carolina 29445. During the Relevant Period, Plaintiffs and/or their predecessors and/or affiliates purchased unregulated freight transportation directly from one or more of the Defendants and were injured in their business and property when they paid higher prices for unregulated rail freight transportation services than they would have paid absent Defendants' alleged conspiracy.

10. Defendant CSX has its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including this District).

11. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS connects with rail partners in the West and around the world and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including this District).

12. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is the second largest railroad in North America, operating primarily in the western United States. BNSF maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including this District).

13. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States, operating primarily in the western United States. UP maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including this District).

## III. JURISDICTION AND VENUE

14. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15. Jurisdiction is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

16. Venue is proper pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391 because during the Relevant Period, one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

17. This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV. INTERSTATE TRADE AND COMMERCE

18. During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States. The Association of American Railroads Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

19. Defendants' activities were within the flow of, and substantially affected, interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

20. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## V. FACTUAL ALLEGATIONS

### A. The Railroad Industry Experienced Deregulation and Increasing Concentration in the Years Leading Up to the Alleged Conspiracy.

21. Congress dramatically changed regulation of the U.S. railroads with introduction of the Staggers Rail Act of 1980 ("Staggers Act"). This ended an era of regulatory control over nearly all aspects of railroad economic operations and allowed the railroad industry to independently set market rates for rail transportation.

22. Prior to the Staggers Act, freight railroads typically charged only published tariff rates that the railroads filed with the ICC, the predecessor to the STB. Railroads accordingly could apply to the ICC for across-the-board rate increases, which could then be implemented lawfully on a collective basis.

23. Today, the vast majority—i.e., 80% or more—of all rail shipments take place under private transportation contracts, which are not rate-regulated. The railroads can no longer turn to any government agency to implement across-the-board rate increases in freight rates, and it is unlawful for the railroads to collusively fix rates.

24. Additionally, the railroad industry has become highly concentrated. Since 1980, the number of Class I railroads declined from 35 in 1980 to just seven today—two of which are owned by Canadian entities. Defendants dominate this industry, operating more than 90% of all railroad track in the United States and bringing in close to $50 billion in annual revenue. Given the high fixed costs and significant barriers to entry in the railroad industry (e.g., required investments in a vast network of stations, tracks, yards, and switching facilities, which can take decades to develop and involve burdensome regulatory and environmental reviews and approval), there is only a fringe of smaller, niche carriers offering Defendants negligible competition.

25. Congress deregulated the railroad industry in large part to try to promote competition and reduce freight rates, but this combination of a highly concentrated market and high barriers to entry for new competitors provided Defendants with an environment conducive to anticompetitive conduct and collusive pricing.

**B. Defendants Unsuccessfully Attempted to Raise Rates Prior to the Relevant Period.**

26. By the early 2000s, the railroad industry had reached such high levels of concentration that further mergers were essentially impossible. Indeed, in response to a proposed merger of BNSF and Canadian National Railway Co., the STB imposed a moratorium on new mergers and then promulgated stricter standards for merger review.

27. Without the ability to consolidate further or to petition for rate increases (as Defendants did in the ICC days), Defendants lacked the means to easily and lawfully implement across-the-board rate increases. Indeed, the introduction of greater competition through deregulation of the rail industry meant that Defendants could not unilaterally raise prices, through using fuel surcharges or otherwise. As BNSF noted in a 2002 internal report, "our rail competitors do not [use fuel surcharges,] and we therefore are hard pressed to achieve it." *See Rail Freight I*, 292 F. Supp. 3d. at 103. In a January 2003 memo, BNSF's then-Chief Marketing Officer Chuck Schultz noted that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104.

28. When Defendants did apply stand-alone, rate-based fuel surcharges, such surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight II*"). These fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the" Relevant Period. *Id.* at 48.

29. For example, NS manager of pricing systems Pat Glennon acknowledged in 2001 and 2002 that fuel surcharges were only "theoretically billable . . . ." *Id.* Similarly, the CFO of UP testified that during 2000 through 2002, UP did not have a company-wide policy on fuel surcharges and that "[t]here were some isolated situations where there were surcharges, but . . . no policy position." *Id.* A BNSF executive testified that fuel surcharge participation rates in January 2003 were "low," *id.*, and CSX executives similarly testified that, prior to the Relevant Period, fuel surcharges were "low" and "fairly minimal" among its customers. *Id.*

30. Another challenge to Defendants' ability to implement new fuel surcharges as a means to raise rates was that there was already a mechanism that allowed railroads to recoup for rising fuel costs. The private freight transportation contracts that came into use after the Staggers Act included cost escalation provisions typically tied to the All-Inclusive Index ("AII") and Rail Car Adjustment Factor ("RCAF"), published by the Association of American Railroads ("AAR"). The AII and RCAF already permitted full recovery by the railroads of actual fuel cost increases, no matter how large. As discussed in more detail below, Defendants conspired to change these cost escalation provisions to remove the fuel component in furtherance of the ultimate conspiracy to impose supracompetitive fuel surcharges.

31. In short, before the Relevant Period, Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *Rail Freight I*, 292 F. Supp. 3d at 103. The natural conclusion to Defendants' failure to achieve broad coverage with rate-based fuel surcharges in this period was that they would not be able to increase revenues successfully through implementation of fuel surcharges unless all four Defendants coordinated to do so. Any railroad that attempted to aggressively apply fuel surcharges would risk losing business to competitors who did not assert fuel surcharges or otherwise made their prices more appealing to their customers.

**C. Defendants Colluded to Increase Rates Through a Coordinated Rate-Based Fuel Surcharge Program.**

32. Beginning in the spring of 2003 and continuing at least through 2008, Defendants, through their senior executives, including their CEOs and top sales and marketing executives, began a series of communications through meetings, telephone conversations, and emails regarding the institution of a coordinated campaign to fix fuel surcharges. Defendants' top executives met and discussed their industry at AAR board meetings and biannual meetings of the National Freight Transportation Association ("NFTA").

33. Indeed, the AAR describes itself as "the central coordinating and research agency of the North American rail industry." Defendants control and dominate the AAR, and the CEOs of each defendant railroad are members of the AAR's board. These meetings and others among Defendants' executives provided ample opportunity for collusion.

34. In early March of 2003, CSX and UP began reviewing their fuel surcharge programs together. CSX internally proposed changes to its fuel surcharge program. UP's Chief Marketing Officer Jack Koraleski drafted a revised fuel surcharge recommendation for UP. *See* Class Cert. Tr., 98, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 6, 2010) ("Oct. 6, 2010 Tr."). On March 12 and 13, 2003, Koraleski attended a meeting with CSX, and the suggested agenda noted that Koraleski and CSX EVP of Sales and Marketing Clarence Gooden discussed "fuel surcharge methodology" prior to this meeting. *Id.* at 98-99. Within one week of that meeting, CSX abandoned the program it had been contemplating and announced a plan that matched Koraleski's recommendation for UP. *Id.* at 99. On March 31, 2003, UP adopted Koraleski's program. *Id.*

35. BNSF and NS also began discussing changes to their fuel surcharge programs around this time. During a March 18, 2003 meeting, representatives of BNSF and NS discussed

"the value of synchronization across the big players in the industry." Class Cert. Tr., 349–50, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Sept. 27, 2016). At NFTA meetings, executives of the Defendants met to consider and discuss developments in the railroad industry, including at the spring 2003 meeting where BNSF's and NS's Chief Marking Officers John Lanigan and Don Seale met to discuss fuel surcharge programs. Oct. 6, 2010 Tr. at 101.

36. Likewise, on or around April 1, 2003, BNSF's Lanigan and CSX Chief Marketing Officer Michael Giftos met in Jacksonville, Florida, to discuss the "fuel surcharge" program. Oct. 6, 2010 Tr. at 101. At a May 14, 2003 meeting, NS and UP recognized that "fuel surcharges, if . . . uniformly applied across the industry[,] would be helpful." Class Cert. Tr., 350, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Sept. 27, 2016).

37. By July 2003, all Defendants had agreed to coordinate their rate-based fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed.

38. Beginning in or around July 2003, the two primarily western railroads, BNSF and UP, began to effectuate the conspiracy by coordinating their fuel surcharges. Before then, UP had adjusted its fuel surcharge monthly based on the price of West Texas Intermediate crude oil index ("WTI Index"). In contrast, BNSF had based its fuel surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF Index"). In or about July 2003, UP switched to the HDF Index pursuant to an agreement with BNSF. From that point on, BNSF and UP moved in lockstep and charged the exact same fuel surcharge percentage each month through at least 2007. BNSF and UP calculated these fuel surcharges as a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for the transport job.

39. While BNSF and UP had slightly different triggers for the fuel surcharge, with BNSF at $1.25 (beginning with a surcharge of .5%) and UP at $1.35 (beginning with a surcharge of 1.5%), the reality was that the HDF Index was administered in precisely the same way for both railroads. When the HDF Index exceeded $1.35 per gallon, BNSF and UP thereafter both applied a surcharge of 0.5 percent for every five-cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index. UP and BNSF thus moved in lockstep and charged the exact same fuel surcharge percentage for each month of the Relevant Period.

40. BNSF and UP also coordinated *when* they would change their fuel surcharge. They agreed that the fuel surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new fuel surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. They published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

41. BNSF's and UP's agreement and coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs, including by using the HDF Index, setting the trigger point at $1.35 per gallon of diesel fuel, employing a 0.5% surcharge for every five cent increase above the trigger price, and applying the surcharge in the second calendar month after the HDF Index average price had changed. These similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

42. Further, in April of 2003, UP had made modifications to the trigger points it used for adjusting surcharges in its program but did not change from using the WTI Index. Just two months later, UP's move to the same fuel price index used by BNSF is strong evidence of concerted conduct.

**D. Defendants Conspired to Institute a New Fuel Cost Index and Schemed to Fix the Fuel Surcharge Rates.**

43. Coordination of the fuel surcharge programs only partially addressed the hurdles to actually charging customers with these new surcharges. As discussed above, the industry standard for private contracts still involved use of two cost escalation indices—the RCAF and AII—that accounted for fuel costs, and Defendants feared that customers would perceive application of FSCs as redundant "double dipping." Defendants conspired to address this issue by altering these cost escalation indices to eliminate considerations of changes in fuel costs.

44. In the fall of 2003, UP and BNSF led an effort within the Association of American Railroads ("AAR") to encourage all Defendants to agree to eliminate fuel costs from the RCAF and AII and instead use surcharges to charge a percentage of the total cost of the shipment, regardless of the actual cost of the fuel used in its transportation. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, the Defendants agreed to create, implement, and enforce coordinated fuel surcharge programs. Indeed, the AAR describes itself as "the central coordinating and research agency of the North American rail industry." Defendants control and dominate the AAR, and the CEOs of each defendant railroad are members of the AAR's board.

45. In December 2003, Defendants announced the establishment of the unprecedented All Inclusive Index Less Fuel (the "AIILF"), which (as the name suggests) excluded fuel as a component of the index, but was otherwise similar to the AII and RCAF. The new AIILF used the

fourth quarter of 2002 as its base period. The AAR explained that "This All-inclusive Index Less Fuel (AII-LF) is calculated exactly the same, with matching component indexes, as the All Inclusive Index used with the RCAF—with the exception of the exclusion of the fuel component." Association of American Railroads, AAR Railroad Cost Indexes (March 2004).

46. The institution of the AIILF was a departure from past practice of the AAR and a direct result of the Defendants' collective action, impossible to accomplish without the conspiracy. Defendants sought to create this new index to allow them to begin imposing stand-alone fuel surcharges, calculated as a percentage of the total cost of the freight shipment, which would thus increase Defendants' revenues beyond the mere cost of fuel. This was a carefully planned step that Defendants orchestrated together to allow for the implementation and maintenance of their price fixing conspiracy.

47. Defendant BNSF expressly acknowledged that it worked through the AAR to achieve this result in order to allow for imposition of fuel surcharges. Responding to a question from investors regarding BNSF's contracts with coal shippers, BNSF's Chief Marketing Officer, John Lanigan, indicated that BNSF would be able to institute fuel surcharges in these contracts as a result of the new AIILF. He gave credit for this to BNSF's Chairman, President, and CEO, Matthew K. Rose, noting that "What happened last year, and Matt led the charge on there, is that there's a new index that [the AAR] has that's basically an index without fuel . . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future." BNSF's Chief Economist Sam Kyei, noted in a March 15, 2005 letter, "In my 18-year railroad career, no one had ever succeeded in steering the A.A.R. to do this," and that "this index and a fuel surcharge should tremendously help our bottom-line for years to come. In fact[,] the entire rail industry should benefit. . . ." *Rail Freight II*, 287 F.R.D. at 15.

48. Following AAR's announcement of the AIILF and pursuant to the conspiracy, CSX and NS, the two primarily eastern railroads, simultaneously moved into lockstep compliance with the new fuel surcharge conspiracy. Specifically, NS's announcement of its new program in January 2004 meant that the NS and CSX would now impose a 0.4% fuel surcharge when the average price of oil rose above $23 a barrel on the WTI Index and increase rates by 0.4% for every subsequent $1 increase. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The fuel surcharge increased 2 percent for every $5 increase in the WTI average price. That made it functionally identical to the use of the HDF Index by CSX and NS, as described below.

49. NS and CSX also coordinated the timing of fluctuations to their fuel surcharges, such that they would introduce any change to shipment costs the second month following the change in WTI index, thereby adopting precisely the same schedule that UP and BNSF had already instituted. Like the UP and BNSF, the NS and CSX published their fuel surcharge percentages on their websites such that any diversion from their price fixing plan would be readily apparent.

50. The fact that NS and CSX were guided in their actions by agreed-upon coordination is demonstrated by their synchronized implementation of fuel surcharges that share identical unique, arbitrary, and complicated features, such as their use of the WTI Index, a trigger point at precisely $23 on the WTI Index, and application of new fuel surcharges two months following changes in the average price on the WTI Index. These similarities are too particular and too thorough to be the result of uncoordinated reactions to any common market phenomenon.

51. There was no legitimate business justification or natural explanation for Defendants' coordinated move to cause the AAR to establish the AIILF. The existing, well-established fuel assessments set out by the AII and the RCAF already allowed Defendants to

recover any increases in fuel costs through the Relevant Period and Defendant had long used these. By contrast, Defendants' fuel surcharge programs were not based on Defendants' actual fuel costs but, by charging a fuel surcharge as a percentage of the shipment cost, they were a means of increasing Defendants' revenue that was only made possible by Defendants' conspiracy to eliminate fuel costs from the RCAF.

52. Implementation of the AIILF was a key step in Defendants' conspiracy to undermine resistance from customers who would have objected to paying twice for fuel charges, as long as Defendants enforced consistency and coordination in broad application of these new fuel surcharges.

53. As the court overseeing the class action noted, these new fuel surcharges "were different" than the ones they had previously tried to implement unilaterally. *Rail Freight I*, 292 F. Supp. 3d at 104. Defendants' executives admitted that these new surcharges were "more aggressive" and "yielded more revenue" and was, according to one executive "a blatant general rate increase." *Id.* "A CSX executive similarly stated that although CSX's new fuel surcharge program may seem somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%." *Id.* (internal quotation marks and alterations omitted).

54. Additionally, unlike the spotty earlier attempts to impose fuel surcharges, the new plan applied "to as many customers as possible." *Id.* For example, January 2004 BNSF pricing guidelines stated, "Every Contract should include a fuel surcharge clause. All new and all renewing contract negotiations should have a fuel surcharge as the goal." *Id.* The other Defendants had similar policies regarding the use of fuel surcharges in contracts for rail freight carriage. *Id.* Further, Defendants have admitted that these fuel surcharges were not simply about recovery of fuel costs. Indeed, prior to the introduction of the AIILF, there was already index-based cost

adjustments available for that. Instead, these "new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Id.* And indeed, under these programs—and at customers' expense—Defendants saw revenue from these fuel surcharges increase exponentially. *Id.*

55. Accordingly, Defendants' efforts to institute the AIILF were not motivated by a common problem of increasing fuel costs or a desire for more comprehensive or effective fuel cost recovery. Defendants instead were motivated by a desire for increased profits that they could achieve through broad application of a stand-alone fuel surcharge that was tied to revenue—the entire base rate for the shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment)—as opposed of actual costs. Through this collective action, the Defendants planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

56. Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants' conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well.

57. Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 2003 meeting between BNSF and NS and a June 2003 meeting between UP and CSX, the heads of the respective intermodal business groups (and other personnel with

intermodal and responsibilities) participated as well. For instance, Mick McClellan, Vice President of Intermodal for NS, and Steve Branscum, Vice President of Consumer Products and head of intermodal activities at BNSF, attended the March 2003 meeting at which Defendants adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's fuel surcharge program with those of the other three Defendants. Oct. 6, 2010 Tr. at 100. CSX executives Alan Blumenfeld and Les Passa, as well as UP's EVP of Network Design and Integration, Brad King, attended a June 2003 meeting in which senior executives from CSX and UP discussed the companies' fuel surcharge formulas and trigger points, as well as the customer "outcry" that stemmed from their initial attempts to apply stand-alone fuel surcharges. *Id.* at 103. In the intermodal business, UP often employed adjustable fuel surcharge provisions that they would alter to align with BNSF's fuel surcharges. CSX and BNSF executives also shared intelligence in Fall 2003, discussing percentages of intermodal business that subject to cost escalation provisions. Upon information and belief, Defendants hatched a single conspiracy extending to *all* shippers, regardless of traffic type.

58. As a result of Defendants' conspiracy, Century Aluminum and other rail shippers paid supracompetitive rates, including the inflated fuel surcharges, for rail shipment during the Relevant Period.

**E. Defendants Imposed Supracompetitive Fuel Surcharges During the Relevant Period.**

59. As detailed above, the Defendants agreed in 2003 to remove fuel costs from the AII and RCAF, and thereby permit the application of separate fuel surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the fuel surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). The Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

60. Table 1, below, shows that prior to the Relevant Period, fuel surcharges varied by railroad, but BNSF and UP, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Relevant Period:

**Table 1: BNSF and UP Fuel Surcharges**

| Month & Year | BNSF | UP |
|---|---|---|
| June 2002 | 1.0% | 0% |
| July 2002 | 1.0% | 0% |
| August 2002 | 0% | 0% |
| September 2002 | 0% | 0% |
| October 2002 | 1.0% | 0% |
| November 2002 | 2.0% | 0% |
| December 2002 | 2.% | 0% |
| January 2003 | 2.0% | 2.0% |
| February 2003 | 2.0% | 2.0% |

| | | |
|---|---|---|
| March 2003 | 2.5% | 2.0% |
| April 2003 | 4.5% | 2.0% |
| May 2003 | 2.0% | 2.0% |
| June 2003 | 3.0% | 2.0% |
| July 2003 | 2.5% | 2.5% |
| August 2003 | 2.0% | 2.0% |
| September 2003 | 2.0% | 2.0% |
| October 2003 | 2.5% | 2.5% |
| November 2003 | 2.5% | 2.5% |
| December 2003 | 2.5% | 2.5% |
| January 2004 | 2.5% | 2.5% |
| February 2004 | 2.5% | 2.5% |
| March 2004 | 3.5% | 3.5% |
| April 2004 | 3.5% | 3.5% |
| May 2004 | 4.0% | 4.0% |
| June 2004 | 4.5% | 4.5% |
| July 2004 | 5.0% | 5.0% |
| August 2004 | 5.0% | 5.0% |
| September 2004 | 5.0% | 5.0% |
| October 2004 | 6.0% | 6.0% |
| November 2004 | 7.0% | 7.0% |
| December 2004 | 9.0% | 9.0% |
| January 2005 | 9.0% | 9.0% |

| | | |
|---|---|---|
| February 2005 | 8.0% | 8.0% |
| March 2005 | 7.5% | 7.5% |
| April 2005 | 8.0% | 8.0% |
| May 2005 | 10.0% | 10.0% |
| June 2005 | 10.5% | 10.5% |
| July 2005 | 9.5% | 9.5% |
| August 2005 | 10.5% | 10.5% |
| September 2005 | 11.5% | 11.5% |
| October 2005 | 13.0% | 13.0% |
| November 2005 | 16.0% | 16.0% |
| December 2005 | 18.5% | 18.5% |
| January 2006 | 13.5% | 13.5% |
| February 2006 | 12.0% | 12.0% |
| March 2006 | 12.5% | 12.5% |
| April 2006 | 12.5% | 12.5% |
| May 2006 | 13.5% | 13.5% |
| June 2006 | 15.0% | 15.0% |
| July 2006 | 16.5% | 16.5% |
| August 2006 | 16.5% | 16.5% |
| September 2006 | 17.0% | 17.0% |
| October 2006 | 18.0% | 18.0% |
| November 2006 | 15.5% | 15.5% |
| December 2006 | 13.0% | 13.0% |

| | | |
|---|---|---|
| January 2007 | 13.0% | 13.0% |
| February 2007 | 14.0% | 14.0% |
| March 2007 | 12.5% | 12.5% |
| April 2007 | 12.5% | 12.5% |
| May 2007 | 14.5% | 14.5% |
| June 2007 | 16.0% | 16.0% |

61. CSX and NS used the WTI Index to charge uniform fuel surcharge percentages for most of the relevant period. Table 2, below, demonstrates that the fuel surcharge percentages the Eastern Railroads charged for carload shipments varied before the Relevant Period but became identical starting in March 2004.

**Table 2: CSX and NS Fuel Surcharges**

| Month & Year | CSX | NS |
|---|---|---|
| June 2003 | 2.4% | 2.0% |
| July 2003 | 2.4% | 2.0% |
| August 2003 | 3.2% | 2.0% |
| September 2003 | 3.2% | 2.0% |
| October 2003 | 3.6% | 2.0% |
| November 2003 | 2.4% | 2.0% |
| December 2003 | 3.2% | 2.0% |
| January 2004 | 3.6% | 2.0% |
| February 2004 | 4.0% | 2.0% |
| March 2004 | 4.8% | 4.8% |

| | | |
|---|---|---|
| April 2004 | 4.8% | 4.8% |
| May 2004 | 5.6% | 5.6% |
| June 2004 | 5.6% | 5.6% |
| July 2004 | 7.2% | 7.2% |
| August 2004 | 6.4% | 6.4% |
| September 2004 | 7.2% | 7.2% |
| October 2004 | 8.8% | 8.8% |
| November 2004 | 9.2% | 9.2% |
| December 2004 | 12.4% | 12.4% |
| January 2005 | 10.4% | 10.4% |
| February 2005 | 8.4% | 8.4% |
| March 2005 | 9.6% | 9.6% |
| April 2005 | 10.0% | 10.0% |
| May 2005 | 12.8% | 12.8% |
| June 2005 | 12.4% | 12.4% |
| July 2005 | 10.8% | 10.8% |
| August 2005 | 13.6% | 13.6% |
| September 2005 | 14.4% | 14.4% |
| October 2005 | 16.8% | 16.8% |
| November 2005 | 17.2% | 17.2% |
| December 2005 | 16.0% | 16.0% |
| January 2006 | 14.4% | 14.4% |
| February 2006 | 14.8% | 14.8% |

| | | |
|---|---|---|
| March 2006 | 17.2% | 17.2% |
| April 2006 | 15.6% | 15.6% |
| May 2006 | 16.0% | 16.0% |
| June 2006 | 18.8% | 18.8% |
| July 2006 | 19.2% | 19.2% |
| August 2006 | 19.2% | 19.2% |
| September 2006 | 20.8% | 20.8% |
| October 2006 | 20.4% | 20.4% |
| November 2006 | 16.4% | 16.4% |
| December 2006 | 14.4% | 14.4% |
| January 2007 | 14.8% | 14.8% |
| February 2007 | 16.0% | 16.0% |
| March 2007 | 12.8% | 12.8% |
| April 2007 | 14.8% | 14.8% |
| May 2007 | 15.2% | 15.2% |
| June 2007 | 16.4% | 16.4% |

62. In contrast to this uniformity in fuel surcharge percentages, fuel costs as a percentage of operating costs and fuel efficiency differed widely among Defendants. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for fuel surcharges. The advance announcement of each Defendant's fuel surcharge rate was an important implementation and enforcement mechanism for the conspiracy.

63. Railroad industry analysts took note of the curious "convergence" in fuel surcharge methodologies adopted by Defendants. For example, after concluding in 2003 that the fuel surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." John Gallagher, *Following the Competition*, TRAFFIC WORLD (July 14, 2003).

64. Additionally, Defendants' fuel surcharges were not aligned with Defendants' actual fuel costs because, among other reasons, the surcharge rates did not account for Defendants' improvements in fuel efficiency. By calculating fuel surcharges as a percentage of the base shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

65. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than three years could not have happened by chance or coincidence, and it was not an expected response to a common business problem. The AII and RCAF would have accurately covered any actual increased fuel costs. Defendants' uniform pricing only could have been achieved through an express agreement followed by collective action decoupling fuel prices from the historical cost indexes and agreeing to follow new, uniform programs for imposing stand-alone fuel surcharges. Defendants' purpose was to use increasing fuel costs as a pretext for implementing what were, in effect, across-the-board rate increases.

66. Defendants' behavior in implementing their uniform fuel surcharge programs advanced their collusive interest and was inconsistent with Defendants individually pursuing their

independent, unilateral self-interest. In a competitive environment free of collusion, carriers with lower fuel costs could impose a lower surcharge and increase market share at the expense of competing railroads. Similarly, if a competitor increased their surcharge prices, another carrier could maintain its current prices and attract market share away from its now-higher-priced competitor. Defendants did not engage in such competitive behavior and instead adhered to a collusive, industrywide pattern of uniform fuel surcharge pricing based on the total base rate of the shipment.

### F. Defendants Took Additional Steps to Ensure Industry-Wide Application of Inflated Fuel Surcharges.

67. While Defendants' coordinated, aggressive fuel surcharges would significantly increase their revenue, they recognized that the success of the cartel was potentially vulnerable to Defendants reacting to customer resistance by competing instead of adhering to the fuel surcharge conspiracy. Defendants took steps to ensure a successful and profitable conspiracy.

68. First, Defendants began publishing their Rail Fuel Surcharges publicly on their websites to facilitate monitoring of each participant's loyalty to the collusive arrangement.

69. Second, Defendants often switched from offering long-term contracts to offering contracts that were regularly "re-priced" to ensure that the new collusive fuel surcharges were applied to all customers. Prior to the conspiracy, long term contracts were the norm. This switch allowed Defendants to detect, deter, and if necessary, punish any cheating among the cartelists.

70. Defendants made this switch away from long-term contracts even though shippers generally preferred the former system to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume these greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should in turn promote competition among carriers for their business. Instead, each of the Defendants raised their

prices and did not offer any compensation to customers for assuming the additional risk of short-term contracts. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. Defendants collectively refused to offer long-term contracts and took no steps (other than their mutual conspiracy) to minimize their own risks from fluctuations in demand. This coordinated behavior was not routine market conduct.

71. Third, Defendants took steps to force these changes on customers across the marketplace because they knew that any break in ranks would undermine the conspiracy. An internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers." *Rail Freight I*, 292 F. Supp. 3d at 104. And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail." Class Cert. Tr. at 61.

72. Accordingly, Defendants sought to effectively force these aggressive fuel surcharges on customers across the board by adopting policies to apply fuel surcharges to 100% of their shipments and tracking progress in achieving that goal.

73. BNSF's marketing executives began tracking fuel surcharge "adherence" on a quarterly basis in 2004 through adherence reports that tracked fuel surcharge revenue, the number of newly-issued price authorities including fuel surcharges, and significant opportunities (i.e. customers whose contracts were expiring and did not already provide for fuel surcharges). Oct 6, 2010 Tr. at 123. BNSF sought to obtain 100% coverage of fuel surcharges across its customers

and presented the adherence reports to the chief marketing officer to assess progress towards this goal. *Id.*; *see also Rail Freight I*, 292 F. Supp. 3d at 106-07.

74. CSX also set its sights on ensuring that "[e]verything is subject to fuel surcharge" and tracked its effectiveness in enforcing fuel surcharges with its customers. CSX monitored both its individual marketing teams' activities and potential opportunities in the form of contracts without fuel surcharges that were up for renewal. *Rail Freight I*, 292 F.Supp.3d at 107.

75. UP established a similar monitoring program in early 2004, which included presentation of analysis of UP's fuel surcharge coverage to the chief marketing officer, who made sure his teams looked for ways to expand fuel surcharge coverage. NS likewise tracked its fuel surcharge coverage and monitored significant opportunities for imposing the fuel surcharges. Defendants also ensured one another's compliance with the price fixing conspiracy by sharing data regarding their respective fuel surcharge coverage. For example, BNSF sent NS's Don Seale a report in advance of a meeting between the Defendants in late 2004, which surveyed "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

76. A key part of Defendants' conspiracy involved Defendants' establishment of strict policies against granting individualized exceptions to the announced fuel surcharges or allowing for discounts on the fuel surcharges or overall contract rates. This marked a change of course from Defendants' prior conduct, in which they habitually entertained such negotiations. Defendants instead gave numerous shippers, across a variety of industries, the uniform message that fuel surcharge percentages were "not negotiable." For example, in December 2002, before the conspiracy began, rail customer U.S. Magnesium negotiated out of the application of a fuel surcharge with UP. *Rail Freight I*, 292 F. Supp. 3d. at 100. A year later, after the conspiracy had begun, U.S. Magnesium was unable to do so because UP refused—U.S. Magnesium was informed

that "all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management." *Id.*

77. Defendants also established policies against discounting the base shipping rates in order to offset the impact of fuel surcharges. For instance, NS's Don Seale instructed against this in an internal email, stating: "I want to underscore that we should not be foregoing base rate increases in return for [fuel surcharge] application. That is a shell game that all product managers should not play." Oct. 6, 2010 Tr. at 113.

78. Consequently, any negotiations that Defendants did engage in with their customers had a starting point of the standard, artificially high fuel surcharge.

79. NS's Vice President David Lawson admitted that "there was a policy [at NS] to apply the standard fuel surcharge to as many customers as possible." *Id.* at 104. CSX noted in its 10-K filing for the 2005 fiscal year that "As existing contracts are renewed or new contracts are executed, CSX is increasing the number of contracts which include fuel surcharge mechanisms." CSX Corp. 10-K at 15 (Feb. 24, 2006). BNSF's Chief Economist Sam Kyei emailed BNSF's Chief Marketing Officer John Lanigan and explained that contracts requiring the CEO's signature "but excluding full fuel surcharge provisions [would] not be signed." *Rail Freight I*, 292 F. Supp. 3d. at 104. This lack of negotiation aided Defendants in standardizing pricing along the lines of their collusive agreement and made monitoring pricing among the co-conspirators easier.

80. Defendants imposed their fuel surcharges without variation between different kinds of traffic and commodities. For example, NS advised UP in October 2005 that "We only have one fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it." Class Cert. Tr. at 64.

81. Defendants also uniformly enforced the fuel surcharges regardless of whether a customer could make use of alternative modes of transportation. NS's chairman Moorman acknowledged, in testimony to Congress, that customers that did not have access to alternative modes of transportation—so-called "captive" shippers—could use other sources of leverage to bargain for a better rate package on traffic at facilities that were served by only one railroad. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.[1]

82. Once Defendants resolved to uniformly enforce their fuel surcharge programs, captive shippers were no longer able to negotiate out of the fuel surcharges.

83. Fourth, in furtherance of the conspiracy, Defendants decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the terminating railroad for routes involving more than one railroad. Where a shipment required movement on more than one railroad, Defendants moved increasingly to having rates billed separately for each railroad, rather than as one quote for the entire shipment. Defendants made this change, which could only result from their collective action, as part of their conspiracy for two

[1] Senate Hearing 110-886 Before the Subcomm. on Surface Transp. and Merchant Marine Infrastructure, Safety, and Security, S. Comm. on Commerce, Science, and Transp., 110 Cong. (2007) (statement of Charles W. Moorman, Ass'n of Am. R.R.s).

reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

84. Fifth, in furtherance of the conspiracy, Defendants agreed that none of them would undercut agreed pricing or "steal" market share by using their increased revenues to subsidize discounting of their underlying rates. Defendants' market shares remained stable following the 2003 agreements.

**G. Defendants' Fuel Surcharge Program Drew Scrutiny and Condemnation.**

85. Starting in 2006, the STB, which regulates certain aspects of the railroad industry, began holding hearings and investigating the Defendants' practices relating to fuel surcharges. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). Thus, the STB found, "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particularly [sic] traffic to which the surcharge is applied." *Id.* at 6.

86. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

87. Pursuant to their conspiracy, the Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

88. In addition to the Surface Transportation Board, each Defendant has been the target of a state grand jury subpoena and/or state grand jury inquiry concerning their Rail Fuel Surcharges, as Defendants admitted in their 2008 SEC Form 10-Ks. CSX stated in its 10-K filing that "In July 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the purported class actions. It is possible that additional federal or state agencies could initiate investigations into similar matters." CSX Corp., 10-K, at 99 (February 22, 2008). BNSF stated in its 10-K filing that "The Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges." BNSF Railway Company, 10-K, at 10 (February 15, 2008). NS stated in its 10-K filing that "NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation." Norfolk Southern, 10-K, at K16 (February 15, 2008). UP stated in its 10-K filing that "the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter." Union Pacific Corp., 10-K, at 15 (February 28, 2008).

89. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on fuel surcharges, Defendants realized billions of dollars in revenues in excess of their actual fuel costs. In August 2005, UP's executive Mark J. Draper emailed that UP's senior finance management held the position that the proposed fuel surcharge was "not some 'trying to make whole' value," and other UP employees saw "nothing wrong with recovering at a rate greater than 100%." *Rail Freight I*, 292 F. Supp. 3d at 114 (quoting

E–mail from Mark J. Draper to Mary E. McArdle (Aug. 2, 2005)). In June 2004, CSX's then-Commercial Finance Director Erik Palm emailed that "If we had 100% fuel surcharge coverage, we would actually be recovering twice the incremental fuel expense above the surcharge trigger point." *Id.* (quoting E-mail from Erik Palm (June 3, 2004)).

90. A Senate Commerce Committee report reviewed the Defendants' profits and concluded that "a review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade." The Current Financial State of the Class I Freight Rail Industry, Comm. On Commerce, Science, and Transp. 4 (Sept. 15, 2010).

91. The Defendants themselves also attributed their increased revenue to fuel surcharges. In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume." NS Annual Report 2006, at K20.

92. BNSF recognized rail freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." BNSF Railway Co., 10-K , at 18 (Feb. 16, 2007). "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005." *Id.* at 21.

93. In 2006, UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges." Union Pacific Corporation, 2006 Annual Report, at 17.

94. In 2006, CSX's revenue increased $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets." CSX Corp., 2006 Annual Report, at 25.

95. Private third-party research also disclosed the existence and scale of the scheme. A 2007 independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity found that during the period from 2003 through the first quarter of 2007 Defendant's Rail Fuel Surcharge revenue (as publicly reported or estimated) exceeded Defendants' publicly reported actual fuel costs by over $6 billion. Snavely King Majoros O'Connor & Lee, Inc., Analysis of Rail Fuel Surcharges During the Period 2003-2007: A Report to the Am. Chemistry Council (July 25, 2007).

96. Because of Defendants' unlawful conduct, the fuel surcharges Defendants charged Plaintiffs for unregulated rail freight transportation were fixed or stabilized at supracompetitive levels. Defendants' conspiracy deprived Plaintiffs of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation and unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid in the United States for unregulated rail freight transportation. These effects began in early 2003 and persisted through at least 2008.

97. Plaintiffs and/or their predecessors and/or affiliates sustained injury to their business or property as a direct result of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act. Plaintiffs and/or their predecessors and/or affiliates entered into contracts with one or more of Defendants and were thereby injured by paying supracompetitive prices applied to unregulated rail freight transportation throughout the U.S. as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade. The federal laws were designed to punish and prevent the type of antitrust injury that Plaintiffs suffered here.

## VI. COUNT, PRAYER FOR RELIEF, AND JURY DEMAND

### Count I

### (Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)

98. Century Aluminum incorporates the allegations in the paragraphs above.

99. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

100. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for fuel surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

101. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of and substantially affected interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements between Defendants.

102. Defendants' contract, combination, or conspiracy has had at least the following effects:

a. Prices Defendants charged Plaintiffs for fuel surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Defendants' conduct deprived Plaintiffs of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c. Defendants' conduct unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid for, customers of, and territories for rail freight transportation services.

103. As a proximate result of Defendants' unlawful conduct, Plaintiffs and/or their predecessors and/or affiliates suffered injury in that they paid supracompetitive prices for unregulated rail freight transportation services.

**Prayer for Relief**

Plaintiffs pray for relief as follows:

(1) That this Court adjudicate and decree that the unlawful contract, combination, and conspiracy alleged in Count I was an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act,

(2) That Plaintiffs recover compensatory damages, as provided by law, and that this Court enter judgment against Defendants on behalf of Plaintiffs,

(3) That this Court permanently enjoin and restrain each Defendant's respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them from continuing or maintaining the combination, conspiracy, or agreement alleged in this case,

(4) That Plaintiffs recover treble damages, as provided by law,

(5) That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law, and

(6) That Plaintiffs recover such other and further relief as the Court may deem just and proper.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: April 29, 2020

By:

*/s/ Daniel J. Walker*

Daniel J. Walker (Bar No. 219439)
Berger Montague PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
(202) 559-9745
dwalker@bm.net

H. Laddie Montague, Jr.
Michael C. Dell'Angelo
Michael J. Kane
Michaela Wallin
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000
hlmontague@bm.net
mdellangelo@bm.net
mkane@bm.net
mwallin@bm.net

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| Domino Foods, Inc.<br><br>*Plaintiff,*<br>v.<br><br>CSX Transportation, Inc., Norfolk Southern Railway Company, BNSF Railway Company, and Union Pacific Railroad Company,<br><br>*Defendants.* | **JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

Plaintiff Domino Foods, Inc. ("DFI") brings this action for damages under the antitrust laws of the United States against Defendants, and alleges as follows:

## NATURE OF THE ACTION

1. This is an antitrust action alleging that the four largest United States Class I railroads engaged in price fixing in violation of Section 1 of the Sherman Act. Plaintiff brings this action related to its direct purchases from Defendants of unregulated rail freight transportation services that were assessed a rate-based fuel surcharge from at least July 1, 2003 until at least December 31, 2008 (the "Conspiracy Period"). As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants Norfolk Southern Railway Company ("NS"), CSX Transportation, Inc. ("CSXT") Union Pacific Railroad Company ("UP"), and BNSF Railway Company ("BNSF"), (together, "Defendants") conspired for years to use rail fuel surcharges, which were added to Plaintiff's bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight

transportation services sold in the United States. The rail fuel surcharge ("Rail Fuel Surcharge") is a separately identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' actual fuel costs, and thereby collected billions of dollars of additional profits for a period of more than five years, including from Plaintiff.

3. The Defendants—which together controlled about 90% of rail freight traffic in the United States—began conspiring in 2003 (and continued conspiring for many years thereafter) to impose an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. As part of this plan, they devised and embarked on a scheme to create, apply, and enforce rate-based fuel surcharges that acted as percentage multipliers on base rates (and thus, on revenue). This permitted these dominant railroads to achieve their desired, and mutually agreed, result: an effective percentage rate increase that could be broadly applied to rail freight customers.

4. The Defendants maintained their conspiracy during the Conspiracy Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, application, and enforcement, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

5. In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic for which Plaintiff is not suing here, found that the

Defendants' Rail Fuel Surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel. The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint. In its ruling, the STB explained that:

> [I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.
>
> Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

6. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the first quarter of 2007 came to over $6 billion.

7. As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff in its business and property. Plaintiff has paid a higher price for unregulated rail freight transportation than it would have paid absent the concerted unlawful activity alleged herein.

8. Plaintiff seeks damages on rail freight shipments made under its private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

9. Plaintiff DFI is a Florida corporation with its principal place of business in West Palm Beach, Florida. As a marketing cooperative, DFI includes as members American Sugar Refining, Inc., C&H Sugar Company, Inc., Florida Crystals Food Corp., Okeelanta Corporation and Sem-Chi Rice Products Corp. (the "Members"). On a continuous basis since 2001, including at all times during the Conspiracy Period, DFI has marketed, sold, and distributed sugar and related products for its Members and their affiliates (the "Assignors"), distributing such products to customers under various brand names across the United States, including Domino, C&H, Florida Crystals, and others.

10. Each of DFI and the Assignors (collectively "Plaintiff") is, and was during the Conspiracy Period, a substantial consumer of rail freight services within the United States, transporting refined sugar, liquid sugar and molasses via the Defendant rail freight carriers from multiple points of departure, including refineries located in South Bay, Florida; Baltimore, Maryland; Yonkers, New York; Chalmette, Louisiana; and Crockett, California. DFI negotiated agreements with the Defendants through DFI employees; DFI executed those agreements in the name of DFI; DFI was the only party financially and legally responsible for the purchase of and payment for unregulated rail freight transportation services under the agreements with Defendants; and DFI remitted payment directly to the Defendants for such services.

11. Plaintiff directly purchased unregulated rail freight transportation services from Defendants during the Conspiracy Period: DFI was a direct purchaser; and to the extent that any of the Assignors were, and DFI was not, a direct purchaser, the Assignors have (in an abundance

of caution) assigned to DFI all of their rights (if any) to assert any and all claims based on or arising out of the conduct alleged in this Complaint. During the Conspiracy Period, one or more of the Defendants assessed Rail Fuel Surcharges on Plaintiff in connection with that unregulated rail freight transportation. The prices Plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Plaintiff would have paid absent the conspiracy alleged herein. Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

12. Defendant CSXT has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSXT is a major freight railroad operating primarily in the eastern United States and Canada. CSXT has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

13. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

14. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

15. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

## JURISDICTION AND VENUE

16. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorney fees and costs from Defendants for the injuries sustained by Plaintiff by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

17. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

18. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Conspiracy Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

19. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## INTERSTATE TRADE AND COMMERCE

20. During the Conspiracy Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The Association of American Railroads ("AAR") Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

21. The activities of Defendants were within the flow of, and substantially affected interstate commerce. During the Conspiracy Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant used instrumentalities of interstate commerce to sell and market rail freight transportation services.

22. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

23. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

24. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

25. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency—like

the previously-existing ICC—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

26. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities).[1] The railroad industry is now highly concentrated: four of these railroads—Defendants BNSF, UP, CSXT and NS—operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (*i.e.*, the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require significant regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

27. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite occurred—railroads collectively charged shippers supracompetitive prices.

**BEFORE CONSPIRING, THE DEFENDANTS WERE UNABLE TO SUCCESSFULLY MAINTAIN FUEL SURCHARGES**

28. By the early 2000s, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

[1] A Class I railroad is defined as having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Railway Company; (6) Soo Line Railroad Co.; and (7) Grand Trunk Corporation. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

29. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of rising fuel prices, Defendants colluded to create, implement, enforce, and apply widely the Rail Fuel Surcharges as a means to implement what effectively operated as across-the-board rate increases.

30. Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII"), which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF"), which is based on the AII) weighted a number of cost factors—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses—so that the actual impact of particular cost increases (*e.g.*, for fuel) would be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

31. In 2003, the Defendants seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body. The Defendants embarked upon and implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate

"fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage—and that is precisely what these four railroads proceeded to do.

32. Prior to 2003, at least some of the Defendants inserted so-called "fuel surcharges" into contracts for private rail freight transportation, but these fuel surcharges were applied only in isolated instances at very low levels, and each of the Defendants had different fuel surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad. Those fuel surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight I*"). In short, these fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the" Conspiracy Period. *Rail Freight I* at 48.

33. For example, NS manager of pricing systems Pat Glennon acknowledged in 2001 and 2002 that fuel surcharges were only "theoretically billable . . . ." *Id.* In September 2002, Glennon reported to the then-Senior Vice President of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause."

34. UP's Chief Executive Officer James Young admitted that UP "had fuel [surcharge] programs in many contracts, but because fuel had not been run up, they were never implemented" and agreed that Rail Fuel Surcharges prior to the Conspiracy Period "never reached significant percentage levels." *Id.*

35. UP's Chief Financial Officer Robert Knight explained further that, prior to the Conspiracy Period, UP did not have a company-wide policy on fuel surcharges: "[t]here were some isolated situations where there were surcharges but … no policy position." *Id.*

36. In an "Enterprise Wide Risk Assessment" from May 2002, BNSF explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as [] UP does not use a fuel surcharge in the competitive marketplace . . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

37. BNSF's executive vice president and chief marketing officer admitted that its fuel surcharge participation rates in early 2003 were "low." *Id.*

38. CSXT's executive vice president of sales and marketing testified that the fuel surcharge revenue prior to 2003 was "relatively low to where it needed to be . . . ." *Id.*

39. CSXT's director of marketing described fuel surcharges as "fairly minimal" prior to the Conspiracy Period.

40. Before the Conspiracy Period, the Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 103 (D.D.C. 2012) ("*Rail Freight II*"). The Defendants could not maintain fuel surcharges as a revenue generator because of competition among themselves; as one UP executive stated succinctly in 2003, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world." A BNSF internal memorandum lamented: "[A]ny increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104. This caused the Defendants to take

matters into their own hands in 2003, when they took a series of coordinated actions to switch to a new system that would eliminate competition and thus allow the widespread deployment and enforcement of Rail Fuel Surcharges as a revenue enhancement mechanism.

**THE DEFENDANTS CONSPIRED TO DEVISE A FUEL SURCHARGE SCHEME AND ILLEGALLY AGREED NOT TO COMPETE**

41. From at least the spring of 2003 and continuing until at least 2008, the top executives of each of the Defendants met regularly at resorts and conferences to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and discuss developments in the railroad industry. The Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2 to April 6, at the Wigwam resort, in Litchfield Park, Arizona.

42. On March 11, 2003, CSXT internally recommended making changes to its fuel surcharge program that would have actually reduced the surcharges applied to base rates. Simultaneously, UP's Chief Marketing Officer Jack Koraleski was recommending escalation of UP's fuel surcharge program to be substantially more aggressive. On March 12, 2003, Koraleski traveled to competitor CSXT to discuss "fuel surcharge methodology." Shortly thereafter, CSXT's leadership abruptly reversed course, abandoning its recommended fuel surcharge reduction and adopting a program matching UP's escalation.

43. On March 18, 2003, BNSF and NS senior executives, including John Lanigan and Don Seale, met and discussed "synchroniz[ing]" fuel surcharges.

44. On March 20, 2003, CSXT publicly announced a new, more aggressive fuel surcharge program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSX[T]." On April 4, 2003, UP sent a "concurrence"

to competitors that its new fuel surcharge program would "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "This is sweet !!! Just like the CSX[T]."

45. On April 1, 2003, BNSF and CSXT senior executives (CMOs Mike Giftos and John Lanigan) met to discuss fuel surcharges as well.

46. Between April 2-6, 2003, NS executive Don Seale met again with BNSF executive John Lanigan to continue their prior discussion on "the fuel surcharge issue" at an NFTA meeting.

47. Similar to CSXT's abandonment of a less aggressive fuel surcharge regime following a meeting with UP in March 2003, BNSF decided against a fuel surcharge scheme that could have been fairer for shippers, including Plaintiff. Between February and April 2003, BNSF had been considering a mileage-based fuel surcharge, which could have better correlated the resulting fuel surcharges to actual fuel costs than the rate-based fuel surcharges that the Defendants broadly implemented during the conspiracy, but abandoned this approach. Instead, BNSF and UP adopted nearly identical rate-based fuel surcharges. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates."

48. By July 2003, all four Defendant railroads had agreed to coordinate their rate-based fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed. Under this agreement, BNSF and UP agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index"). BNSF and UP began to charge the exact same fuel surcharges pursuant to this agreement,

using the HDF Index. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the Conspiracy Period.

49. While BNSF and UP had slightly different triggers for the fuel surcharge, with BNSF at $1.25 (beginning with a surcharge of .5 percent) and UP at $1.35 (beginning with a surcharge of 1.5 percent), the reality was that the HDF Index was administered in precisely the same way for both railroads.

50. When the HDF Index exceeded $1.35 per gallon, BNSF and UP thereafter both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

51. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index *average* price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

52. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are

both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

53. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

54. Even after having agreed to coordinate their fuel surcharges, however, BNSF and UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. The Defendants agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn additional profits.

55. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a methodology that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

56. The four Defendants control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

57. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, the Defendants agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

58. Pursuant to their agreements, the Defendants, which dominated the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF)—that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period. The Defendants conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy—a

conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

59. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges to contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

60. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSXT and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSXT and NS in 2003. Specifically, the Eastern Railroads likewise agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5

increase in the WTI average price, and was functionally identical to that of the Eastern Railroads, as described further herein.

61. The Eastern Railroads also coordinated when they would change their fuel surcharge—two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, the Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

62. NS executive Patrick Glennon, a manager of pricing systems, admitted in 2003 that the new fuel surcharge represented a significant change in practice that was "definitely more aggressive," and "definitely yielded more revenue": "By dropping the base to $23 per barrel, raising the percentage yield and taking it sooner, the change is in fact a blatant general rate increase[.]" *Rail Freight I* at 49. Similarly, CSXT internal emails acknowledge that although the new program may "seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%." *Id.*

63. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too

precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

64. Thus, the Defendants began to apply Rail Fuel Surcharges as a separate item on shippers' bills in the form of a percentage multiplier. The Defendants used the Rail Fuel Surcharges as an easy way to increase revenues across the board.

65. The fuel surcharge programs applied by the Defendants during the Conspiracy Period "were more aggressive and yielded more revenue than earlier programs." *Rail Freight I* at 48. With the AIILF they had put in place, and in furtherance of the conspiracy, the Defendants each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, for example, if the percentage increase triggered by the applicable fuel index was 15%, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by 15%—even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed approach yielded the Defendants billions of dollars of additional profits.

66. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSXT and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to the Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for years to measure fuel-cost increases. As an empirical matter,

the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Conspiracy Period.

67. The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to independently institute its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by CSXT, NS, BNSF and UP to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

68. The actions by the Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the Defendants took these collective actions in order to assess a stand-alone fuel surcharge applied to *revenue* (*i.e.*, the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, the Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, the Defendants planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

69. Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants'

conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well. Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 18, 2003 meeting between NS and BNSF and a June 2003 meeting between CSXT and UP, the heads of the respective intermodal business groups (and other personnel with intermodal and coal responsibilities) participated as well.

70. Defendants hatched a single conspiracy extending to *all* shippers, regardless of traffic type, including Plaintiff. When Defendants met to conspire, or otherwise communicated, they did not limit their conversations to carload traffic. And once the conspiracy was underway, the Defendants took steps, e.g., to align their coal and intermodal fuel surcharges, including by ad hoc adjustments, and exchange information about fuel surcharge coverage. Just as with carload traffic, in the absence of competition during the Conspiracy Period, Defendants greatly expanded the imposition and enforcement of rate-based coal and intermodal fuel surcharges, with the result of raising rates altogether.

71. As a result of the Defendants' concerted action, Rail Fuel Surcharges charged to rail shippers (including Plaintiff) were raised to or maintained at supracompetitive levels during the Conspiracy Period.

**THE DEFENDANTS SUCCESSFULLY IMPLEMENTED THEIR ILLEGAL, ANTICOMPETITIVE FUEL SURCHARGE SCHEME**

72. As detailed above, the Defendants agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and

thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). The Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here). With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Conspiracy Period.

73. The chart below shows that the Rail Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Conspiracy Period began, but were identical starting in July 2003:

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |

| MONTH | BNSF | UP |
|---|---|---|
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |

74. As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Conspiracy Period.

75. The chart below shows that the Rail Fuel Surcharge percentages charged by Defendants CSXT and NS for carload shipments varied before the Conspiracy Period, but were identical starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSXT | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |

| MONTH | CSXT | NS |
|---|---|---|
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

76. In stark contrast to this uniformity in Rail Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that the Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that the Defendants moved in uniform lockstep for a period of nearly 38 months indicates that the Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance announcements of each Defendant's Rail Fuel Surcharges was an important implementation and enforcement mechanism for the conspiracy.

77. Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." ("Following the Competition" *Traffic World*, July 14, 2003). The Defendants' use

of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs. An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between the Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and their publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

78. BNSF's average cost for diesel fuel in Third Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for Third Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from Third Quarter 2003 to 2004. In contrast, the surcharge charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from Third Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue, not merely to the fuel cost component of that rate.

79. Another reason why the Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, the Defendants not only deflected attention from the cost savings they achieved through fuel efficiency gains, but also added revenue by continuing to pocket any monies saved from

efficiencies and apply the fuel surcharge percentages to a steadily increasing number despite such efficiencies.

80. There is no independent business justification to explain the Defendants' behavior. Their uniform pricing of fuel surcharges year after year could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by the Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action—*i.e.*, decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

81. In agreeing to collude on fuel surcharges across business segments, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs and/or better efficiencies could impose a lower surcharge or none at all and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, the Defendants "uniformly began their negotiations with their standard fuel surcharge program and their objective was to apply their standard fuel surcharge as widely as possible." *Rail Freight I* at 50.

82. In furtherance of the conspiracy, the Defendants also declined to negotiate discounts on the Rail Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge

percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable."

83. Indeed, each Defendant *mandated* application of rate-based fuel surcharges in furtherance of their agreement.

84. On April 9, 2003, BNSF issued an internal notification stating, "Effective immediately and urgent per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, BNSF's Chief Economist Samuel Kyei noted "contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed."

85. Similarly, UP implemented a no-exceptions policy as explained by a sales representative to a customer in December 2003: "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice."

86. In 2004, Don Seale from NS informed his subordinates, "no deviation from NS's published FSC without [his] prior approval."

87. In 2006, CSXT Vice President of Industrial Products Kyle Hancock established, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT a fuel surcharge."

88. The widespread application of fuel surcharges differed substantively from the Defendants' practices before the Conspiracy Period, when the Defendants were actively competing for customers and could not maintain fuel surcharges in the face of such competition. After the conspiracy began, "any deviations from [D]efendants' standard fuel surcharge programs were rare." *Rail Freight I* at 50. Each Defendant "enforced strict policies ensuring across-the-board

application of these standardized fuel surcharge programs on all of their shippers . . . ." *Id.* In this way, the Defendants could avoid undercutting one another and ensure that each could continue to apply fuel surcharges to its customers and reap their supracompetitive profits.

89. The Defendants acknowledged "that the new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Rail Freight II* at 104. One NS internal email noted that it seemed like all revenue increases were "coming from fuel surcharges." *Id.* A BNSF internal memorandum stated that CSXT and NS "have a 'profit center' with their Fuel Surcharge Programs for the customers that participate[.]" *Id.* at 104-105. Another BNSF document described its own fuel surcharge program as "a revenue maximization program, not protection against fuel prices." *Id.* at 105.

90. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," demonstrated in the following chart documenting the significant growth in profits during the Conspiracy Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

91. The Defendants quickly realized that implementation of fuel surcharges only worked because all the Defendants participated, as noted in a BNSF Executive Team presentation in 2005, "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall." They policed the conspiracy by exchanging fuel surcharge data with one another, resulting in nearly no shift in market share between them.

92. The Defendants agreed not to undercut agreed pricing or steal market share by offsetting fuel surcharges or by discounting underlying rates. As demonstrated in the table that follows, the Defendants' market shares remained stable following the 2003 agreements.

| **Railroad Market Share: Originated Tons and Carloads 2003 - 2006 *** | | | | |
|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** |
| **BNSF** | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| Percent of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% |
| | | | | |
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| Percent of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% |
| | | | | |
| **CSXT** | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| Percent of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% |
| | | | | |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| Percent of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% |
| | | | | |
| **NS** | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| Percent of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% |
| | | | | |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| Percent of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% |
| | | | | |
| **UP** | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| Percent of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% |
| | | | | |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| Percent of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% |
| | | | | |

| | | | | |
|---|---|---|---|---|
| Total | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |
| | | | | |
| * AAR Railroad Facts and Analysis of Class I Railroads | | | | |

93. According to UP President James Young, by July 2007 approximately "eighty to ninety percent" of UP's business overall had "some kind of fuel surcharge mechanism that gets passed on to the customer."

94. Because the Defendants started their negotiations during the Conspiracy Period using their standard fuel surcharge formula, any deviations from that standard fuel surcharge application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (i.e., facilities served by only one of the Defendants) – who are nonetheless able to harness competition among railroads for negotiation purposes absent collusion – suffered from the conspiracy. NS's CEO, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," expressly acknowledging that "even where there is only one railroad serving a facility, there are market factors at play."

**THE STB DECISION**

95. Starting in 2006, the STB, which regulates certain aspects of the railroad industry, began holding hearings and investigating the Defendants' practices relating to fuel surcharges. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate- regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). Thus, the STB found, "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting

the actual increase in fuel costs for handling the particular[] traffic to which the surcharge is applied." *Id.* at 6.

96. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

97. Pursuant to their conspiracy, the Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## THE DEFENDANTS REAPED SUPRACOMPETITIVE PROFITS

98. The Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, the Defendants realized billions of dollars in revenues during the Conspiracy Period in excess of their actual increase in fuel costs from the customers on whom they imposed the surcharge. From July 2003 to June 30, 2007 alone, the Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by the Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

99. A Senate Commerce Committee report reviewed the Defendants' profits and concluded that "a review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade."

100. The Defendants themselves also attributed their increased revenue to fuel surcharges. In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume."

101. BNSF recognized rail freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

102. In 2006, UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

103. In 2006, CSXT's revenue increased $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

104. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a. the Rail Fuel Surcharges charged to Plaintiff for unregulated rail freight transportation have been fixed or stabilized at supracompetitive levels;

b. Plaintiff has been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

105. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff has sustained injury to its business or property. Defendants implemented policies that ensured that their fuel surcharges would be synchronized, rigidly enforced, and applied to as many freight shippers as possible. The injuries sustained by the Plaintiffs are the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of the Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.

**<u>TOLLING OF THE STATUTE OF LIMITATIONS</u>**

106. Plaintiff asserts tolling of the statute of limitations based upon the putative class action filed against Defendants and the stipulation of the parties therein. *In Re Rail Freight Fuel Surcharge Antitrust Litigation*, D.C. District Court Case No. 1:07-Mc-00489-Plf-Jmf (filed May 14, 2007.) Plaintiff was a member of the putative class as defined and originally certified in that case: "[A]ll entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from [Defendants], as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport …" In October 2017, the District Court, on reconsideration, denied class certification. The putative class representatives filed a timely appeal. As memorialized by Order of the District Court, and for the benefit of all putative class members, the parties stipulated to the continued tolling of the statute of limitations following the denial of class certification and for the duration of the pending appeal. On August 16, 2019, the U.S. Court of Appeals affirmed the district

court order denying class certification based on the lack of common proof, but the court allowed individual claims to proceed.

107. Plaintiff has acted diligently and reasonably in pursuing its right to assert individual claims. The individual claims asserted in this Complaint involve the same evidence, memories, and witnesses as were involved in the putative class action. The complaint in the putative class action challenged the conduct that is alleged herein and was sufficient to alert Defendants to preserve all evidence regarding that conduct.

108. In addition, the illegal conduct and the harm Defendants caused in violation of federal law, as alleged above and in the Count below, occurred continuously throughout the Conspiracy Period.

**COUNT I**

**(Violation of Section 1 and 3 of the Sherman Act and Section 4 of the Clayton Act)**

109. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

110. The Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act and Section 4 of the Clayton Act.

111. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants in furtherance of which the Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

112. The Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. The Defendants' unlawful conduct was through mutual understandings or agreements by, between and among the Defendants.

113. The contract, combination or conspiracy has had the following effects:

a. prices charged to Plaintiff for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Plaintiff has been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

114. As a proximate result of Defendants' unlawful conduct, Plaintiff suffered injury in that it paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Conspiracy Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiff recover compensatory damages, as provided by law, and that judgment be entered against Defendants on behalf of Plaintiff;

(3) That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and

restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(4) That Plaintiff recover treble damages, as provided by law;

(5) That Plaintiff recover its costs of the suit, including attorneys' fees, as provided by law; and

(6) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: February 25, 2020

Respectfully submitted,

BOIES SCHILLER FLEXNER LLP

By: /s/ Stuart H. Singer
Stuart H. Singer
(Fla. Bar No. 377325)
Carlos M. Sires
(Fla. Bar No. 319333)
James Grippando
(Fla. Bar No. 383015)
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
ssinger@bsfllp.com
csires@bsfllp.com
jgrippando@bsfllp.com

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| Duke Energy Carolinas, LLC, Duke Energy Florida, LLC, Duke Energy Progress, LLC, Duke Energy Indiana, LLC, Duke Energy Kentucky, LLC, Duke Energy Ohio, LLC, Progress Fuels, LLC, DEGS of Narrows, LLC, and Duke Energy Generation Services, Inc.,<br><br>*Plaintiffs,*<br>v.<br><br>BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company,<br><br>*Defendants.* | **JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

This is an antitrust action charging Defendants with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action against Defendants, from one or more of whom Plaintiffs directly purchased unregulated rail freight transportation services from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and by one or more of whom Plaintiffs were assessed a rail fuel surcharge ("FSC") for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

## NATURE OF THE ACTION

1. In 2003, the four largest United States-based Class I railroads engaged in an extraordinary series of meetings, phone calls, and email communications through which they embarked on a conspiracy – under the guise of a fuel cost recovery program – to apply and enforce rail fuel surcharges across their customers in order to generate profits. Defendants

BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") (all together, "Defendants") together controlled about ***90 percent*** of rail freight traffic in the United States during the Relevant Period. Defendants used "rate-based" FSCs – *i.e.*, surcharges that use a percentage applied to the base rate for a shipment – as a means to impose across-the-board rate increases on rail freight shipments, a result that would have been prohibitively difficult to achieve on a contract-by-contract basis. Throughout the conspiracy and despite customer pushback against Defendants' FSCs, Defendants set aside their individual, economic self-interest to undercut one another and instead staunchly maintained their FSC program, pocketing billions of dollars in profits as a result.

2. Prior to conspiring, Defendants operated as businesses should: they actively competed against each other over rates generally and with respect to fuel recovery mechanisms to the benefit of their customers. According to a historical study of rail rates undertaken by the Surface Transportation Board ("STB"), "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Defendants were aware of, and concerned about, this trend. According to one CSX internal analysis from 2002, this decline resulted from factors including "some very vicious historical price wars" in the rail industry and "destructive pricing for rail share."

3. Between 2000 and 2003, Defendants independently tried to implement revenue-enhancing policies, including uncoordinated efforts to impose stand-alone FSCs. These efforts failed. Defendants used the inclusion or absence of FSCs as a basis to compete for each other's business and customers successfully resisted FSCs. They were rarely included in contracts and

more rarely collected; those seeking to impose them lost customers to competitors or compensated customers by negotiating discounts. For example:

- BNSF explained in a May 2002 Enterprise Wide Risk Assessment that "***We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace***. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. ***We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it***."
- In September 2002, NS's manager of pricing systems Pat Glennon reported to the then-Senior Vice President of Marketing Services and later its CMO Don Seale that ***"[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause***," and that eastern competitor CSX (together, the "Eastern Railroads") "appear[s] to be more lax in applying the surcharge to private authorities."
- As late as April 2003, UP's Bob Toy reported, "***Fuel surcharge $ are melting away at the competition***. In a downward-pressure environment, what's on paper must not work in the real world."

4. Moreover, since the passage of the Staggers Act in 1980, which significantly deregulated the American railroad industry, railroads typically entered into private freight transportation contracts that included escalation provisions tied to indexes that weighted actual cost factors, including fuel cost. As UP President James Young acknowledged on an October 2004 earnings call, the Rail Cost Adjustment Factor ("RCAF") "looks at *actual* costs through the

industry." In that respect, Defendants were *already* recovering fuel costs through the RCAF or the related All Inclusive Index ("AII").

5. In March 2003, everything began to change. Rather than competing, Defendants began coordinating FSC programs. Senior executives at the highest levels of each company began to discuss with one another the implementation of more aggressive FSC formulas that the Surface Transportation Board ("STB") later found bore "***no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied . . . .***" In short, Defendants stopped competing and started conspiring.

6. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates. Simultaneously, UP's CMO Jack Koraleski was recommending escalation of UP's FSC program to be substantially more aggressive. ***The very next day***, Koraleski traveled to competitor CSX to play golf, socialize, and discuss "fuel surcharge methodology." ***Within one week***, CSX's leadership abruptly reversed course, abandoning its recommended FSC reduction and adopting a program ***matching*** UP's escalation.

7. On March 18, 2003, BNSF and NS senior executives met to discuss "***synchroniz[ing]***" FSCs. Action items for the meeting attended by John Lanigan (BNSF's CMO) and Don Seale stated: "BNSF's fuel surcharge is structured differently than NS, CSX and UP. ***Should BNSF's by [sic] synchronized with the other big players in the industry?***" The answer based on what followed: a resounding yes.

8. On March 20, 2003, CSX publicly announced a new, more aggressive FSC program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "***the same approach as the CSXT***." On April 4, 2003, UP sent a "concurrence" to

competitors that its new FSC program will "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "***This is sweet !!! Just like the CSXT.***"

9. On April 1, 2003, BNSF and CSX senior executives met. The agenda dictated that CSX's CMO Mike Giftos and BNSF's CMO John Lanigan were to discuss "***Fuel Surcharge***." Documents also reveal that, between April 2 and 6, 2003, NS's Seale and BNSF's Lanigan continued a prior discussion on "***the fuel surcharge issue***" at a National Freight Transportation Association meeting.

10. Similar to CSX's abandonment of a less aggressive FSC regime following a meeting with UP in March 2003, BNSF abandoned the internal consideration of an FSC program that could have been fairer for shippers. Between February and April 2003, BNSF had been "[l]eaning toward [a] Cost Per Mile" FSC formula (a mileage-based FSC which could have better correlated the resulting FSCs to actual fuel costs compared to the rate-based FSCs that Defendants broadly implemented during the conspiracy), but abandoned this approach. Instead, BNSF and UP (together, the "Western Railroads") adopted nearly identical *rate-based* FSCs. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, ***it exactly matches the BNSF FSC percentage progression***, including lag times and effective dates."

11. Defendants' employees recognized these new FSCs were not genuine fuel cost recovery mechanisms as Defendants sought to portray. For example, on March 19, 2003, CSX's Director of Market Strategy John Couch explained that while the coordinated FSC "***seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%***." On April 7, 2003, NS's Manager of Pricing Systems Pat Glennon recounted "[t]he case in favor of adopting the CSXT standard" to Don Seale and AVP Charlie Brenner,

writing the "CSXT standard ***clearly produces significantly more compensation, and it does it sooner and more consistently***." On April 29, 2003, Glennon told Seale that "[b]y dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, ***the change is in fact a <u>blatant general rate increase</u>***, and will appear so to customers."

12. Glennon was correct that customers saw the rate increases for what they were and were outraged. Handwritten notes from a June 2003 meeting between CSX and UP's senior executives – including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden, VP of Strategic Planning Les Passa, and Alan Blumenfield and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan – reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes. The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

13. But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall***."

14. And, instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants maintained the scheme and imposed policies designed to ensure their new "standard" or "published" FSCs were enforced broadly across their customers without the waivers and discounts they had frequently offered between 2000 and 2002:

- **BNSF**: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "***Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed.***"
- **UP**: On December 22, 2003, a sales representative explained to a customer, "As a company policy, all ***contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice***."
- **CSX**: A May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence Gooden stated that any exception had to come through him and that he had zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***."
- **NS**: A 2004 email from Don Seale to his subordinates mandated "***no deviation from NS's published FSC without [his] prior approval***." He also rejected any negotiations to forego base rate increases in return for FSC application as a "shell game."

15. In the fall of 2003, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to get all Defendants to agree to remove fuel costs out of the weighted RCAF and AAI indices (which already permitted the Defendants to recover all of their fuel costs), so that they could more easily charge artificially high FSCs as a revenue

enhancement mechanism. As a result, the AAR—whose board was dominated by Defendants—created an unprecedented All Inclusive Index *Less Fuel* ("AAILF"). Defendants' conspiratorial implementation of the AAILF allowed Defendants to move away from use of the RCAF and more easily apply their FSCs.

16. Defendants worked tirelessly to achieve 100 percent FSC coverage across their customers. All four Defendants pursued 100 percent participation goals and tracked their progress toward attaining that goal. Defendants also policed the conspiracy by exchanging FSC coverage data with one another. In addition, Defendants started their negotiations using the standard FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (*i.e.*, facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

17. Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150 per barrel during the Relevant Period, so did Defendants' profits. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," and included the following chart documenting the significant growth in profits during the Relevant Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

18. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") similarly found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

19. Defendants also attributed their record revenues to FSCs. For example:

- **NS**'s 2006 "***[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase*** and modestly higher traffic volume."
- **BNSF**'s freight revenues "***increased 15 percent [in 2006] to a record high of $14.5 billion*** on double-digit increases in each of our four business units." "***Growth in prices and fuel surcharges*** drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

- **UP** "achieved record revenue levels [in 2006] in all six of our commodity groups, ***primarily driven by better pricing and fuel surcharges***."
- **CSX**'s operating revenue increased $948 million in 2006; "the primary components of the revenue gain" were "continued yield management ***and the Company's fuel surcharge program, which drove revenue per unit across all major markets.***"

**PARTIES**

20. Plaintiffs Duke Energy Carolinas, LLC, Duke Energy Florida, LLC, Duke Energy Progress, LLC, Duke Energy Indiana, LLC, Duke Energy Kentucky, LLC, Duke Energy Ohio, LLC, Progress Fuels, LLC, DEGS of Narrows, LLC, and Duke Energy Generation Services, Inc. consist of (1) entities that purchased and/or contracted for rate-unregulated rail freight transportation services directly from Defendants and paid rail fuel surcharges in connection with those services, and (2) entities that are successors-in-interest or assignees of such purchasers and/or contractors.

21. Plaintiff Duke Energy Kentucky, Inc. ("Duke Energy Kentucky") is a Kentucky Corporation through which Duke Energy Ohio conducts its operations in Kentucky. Duke Energy Kentucky is in the business of generating electricity in portions of Kentucky and the transportation and sale of natural gas in portions of Kentucky. Duke Energy Kentucky is a wholly owned subsidiary of Duke Energy Ohio.

22. Plaintiff Duke Energy Progress, LLC f/k/a Carolina Power & Light Co. d/b/a Progress Energy Carolinas, Inc. ("Duke Energy Progress") is a North Carolina Limited Liability Company and regulated public utility primarily engaged in the generation, transmission, distribution and sale of electricity in portions of North Carolina and South Carolina. Duke Energy Progress's service area covers approximately 32,000 square miles and supplies electric

service to approximately 1.5 million residential, commercial and industrial customers. Duke Energy Progress is the successor-in-interest to Progress Energy Carolinas, Inc.

23. Plaintiff Progress Fuels, LLC f/k/a Progress Fuels Corporation f/k/a Electric Fuels Corporation ("Progress Fuels") is a Delaware Limited Liability Company. Progress Fuels Corporation, a Florida corporation, became a wholly owned subsidiary of Progress Energy, Inc. during the conspiracy. Progress Energy, Inc. is a wholly owned subsidiary of New Duke Energy. Progress Fuels Corporation contracted with railroads to facilitate such railroads' provision of rail transportation services to Florida Power Corporation d/b/a Progress Energy Florida, Inc., another Progress Energy, Inc. subsidiary. In 2013, Florida Power Corporation changed its name to Duke Energy Florida, Inc., a Florida corporation, which was subsequently converted to Duke Energy Florida, LLC in 2015. Progress Fuels is the successor-in-interest to Progress Fuels Corporation.

24. Plaintiff DEGS of Narrows, LLC is a Delaware Limited Liability Company that was formerly known as Cinergy Solutions of Narrows, LLC.

25. Plaintiff Duke Energy Generation Services, Inc. ("DEGS, Inc.") is a Delaware corporation. DEGS, Inc. is the successor-in-interest to DEGS of Rock Hill, LLC, which was a Delaware Limited Liability Company. DEGS of Rock Hill, LLC was previously known as Cinergy Solutions of Rock Hill, LLC.

26. During the Relevant Period, Plaintiffs purchased unregulated rail freight transportation directly from one or more of the Defendants, and during the Relevant Period, one or more of the Defendants assessed FSCs on Plaintiffs in connection with that unregulated rail freight transportation. The prices Plaintiffs paid to Defendants for unregulated rail freight transportation services on which FSCs were imposed were greater than the prices Plaintiffs

would have paid absent the conspiracy alleged herein. Plaintiffs have therefore been injured in their business and property by reason of Defendants' antitrust violations.

27. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

28. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

29. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

30. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

## JURISDICTION AND VENUE

31. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiffs by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

32. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

33. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

34. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## INTERSTATE TRADE AND COMMERCE

35. During the Relevant Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

36. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Relevant Period, Defendants sold and

carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

37. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

**DEREGULATION OF THE RAILROAD INDUSTRY**

38. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

39. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

40. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

41. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry is now (and was during the Relevant Period) highly concentrated: four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90 percent of

all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

42. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

**DEFENDANTS SEEK UNSUCCESSFULLY TO RAISE RATES BEFORE THE RELEVANT PERIOD**

43. For many years before the Relevant Period, Defendants confronted a long-term, structural decline in rail freight rates. Indeed, according to the Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of Railroad Rates: 1985-2007*, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Figure 1 from the *Study of Railroad Rates* evidences that trend:




**Figure 1. STB Rail Rate Index 1985 to 2007**
Real Revenue Per Ton-Mile (1985=100)

44. Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts by the individual Defendants to apply stand-alone FSCs. Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

45. During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs. The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an internal analysis as "some very vicious historical price wars" and "destructive pricing for rail share." A 2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to

achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? ***We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy***.

46. During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs. By way of example:

- **NS**: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty." VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it." The same month, Director of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC." In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS." Glennon testified that in 2001 and 2002, FSCs were only "***theoretically billable***."
- **CSX**: In August 2000, CSX reported at a staff meeting that it could collect only 67.4 percent of the then-modest FSCs it had billed over the preceding nine months. EVP of Sales and Marketing Clarence Gooden testified that CSX's FSC coverage was "***very low***" and that he was "***embarrassed***" by the figure.

- **BNSF**: In May 2002, BNSF's Enterprise Wide Risk Assessment explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, EVP and CMO Charles Schultz told Chairman, President, and CEO Matthew Rose and other executives, "***any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive***." Schultz's successor John Lanigan testified BNSF's FSC coverage was "low" in January 2003 – "in the 25 to 30 percent range."
- **UP**: Current EVP and CFO Robert Knight Jr. testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position." UP implemented an FSC program in December 2002, but initially limited the application of that program to certain tariffs and circulars and exempted private shipments in its Industrial Products group from FSCs. This was true even though FSCs were generally not triggered and only "theoretically billable." And in April 2003, Director Bob Toy reported, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

47. The reason Defendants were not able to achieve broader FSC coverage was clear: Defendants were concerned about losing business to other Defendants that did not apply FSCs, made concessions, or otherwise applied FSCs less aggressively. Defendants expressed these

concerns internally and, in fact, lost business through FSC competition. Each Defendant also frequently agreed not to apply FSCs in the face of shipper objections.

48. For example, in May 2002, BNSF reported that it was challenging to impose FSCs because its main western competitor, "UP[,] does not use a fuel surcharge in the competitive marketplace." It continued, "rail competitors do not [use FSCs] and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, NS reported that its main eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS."

49. And, in May 2003, BNSF announced that it would ***reduce*** its standard FSC to 2 percent from 5 percent in May 2003 because a 5 percent FSC "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage."

50. Another impediment to broad application of FSCs during this period was the so-called Rail Cost Adjustment Factor, or "RCAF." The RCAF is a weighted index that accounts for all significant input costs, including fuel. The RCAF was utilized in multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.

51. Defendants recognized that imposing a stand-alone FSC where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping." For example, Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."

52. As a result, the number of shippers covered by stand-alone, rate-based FSCs was relatively low before the Relevant Period, and FSCs did not contribute significantly to Defendants' revenues or bottom lines.

## DEFENDANTS CONSPIRE IN 2003 TO RAISE PRICES BY ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS MEANS TO INCREASE ALL-IN RATES

53. By 2003, Defendants' initial attempts to apply rate-based FSCs on their own taught them an important lesson: they could not achieve their revenue enhancement objectives unless the FSC was widely applied on a coordinated basis by all four Defendants. Absent coordination, a railroad seeking to impose FSCs more aggressively than its competitors would risk losing business to another railroad who imposed no FSC or whose FSC policies were more flexible. By early 2003, it became apparent to Defendants that they would encounter difficulties making their FSC policies "stick" absent an industry-wide agreement.

54. Thus, beginning in the spring of 2003, Defendants' senior executives – including their CEOs and top sales/marketing executives – engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC program. The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers industry-wide.

55. The FSC programs that Defendants implemented between March 2003 and January 2004 by mutual agreement are exactly the sort of industry-standard FSC that Defendants' senior executives discussed.

56. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates.

57. That same day, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" attributed to UP CMO Jack Koraleski. Under the UP "Revised" proposal, FSCs were

more aggressive, escalating at roughly twice the rate of the formula CSX had internally recommended. The "Revised Surcharge proposal" retained the $28 WTI strike price of UP's existing program but would increase by 0.4 percent for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0 percent increase for every $5 increase in the WTI index.

58. The following day, Koraleski traveled to CSX to play golf, socialize, and discuss "fuel surcharge methodology." Beforehand, Koraleski and CSX's executive vice president of sales and marketing, Clarence Gooden "talked on" the subject of "[f]uel surcharge methodology."

59. On March 19 and 20, 2003, within one week of the UP-CSX meeting on "fuel surcharge methodology," CSX publicly announced a new FSC policy. The program retained the lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal." Thus, under CSX's new FSC policy, CSX would assess a 0.4 percent FSC when the price of oil on the West Texas Intermediate (WTI) index exceeded $23 per barrel, and an additional 0.4 percent for every dollar increase above $23.48.

60. Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. CSX reasoned that while these modifications to its FSC program might "seem[] somewhat benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

61. On March 31, 2003, less than two weeks after CSX's announcement, UP decided to adopt "the same approach as the CSXT." Following the CSX approach, UP would impose a

0.4 percent FSC at a monthly-average WTI "trigger" price of $23 (*i.e.* the index price at which FSCs begin), and assess an additional 0.4 percent charge for every dollar increase in the WTI index above $23. BNSF, which had previously discussed the need for a "synchronized" FSC policy with NS, had a predictably positive reaction to UP's announcement: "This is sweet!!!! Just like the CXST."

62. On March 18, 2003, NS and BNSF senior executives – including NS's Chairman, President, and CEO David Goode, Vice Chairman and COO Steve Tobias, Vice Chairman and CFO Hank Wolf, VP and CMO Ike Prillaman, SVP of Planning Jim McClellan, VP of Intermodal Mike McClellan, SVP of Transportation Mark Manion, SVP of Marketing Services Don Seale, BNSF's Chairman, President, and CEO Matt Rose, current President and CEO and then-VP and COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete Rickershauser, VP of Consumer Products and head of intermodal activities Steve Branscum – met and discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. This discussion point was assigned to NS's Seale and BNSF's Lanigan.

63. On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."

64. The trade association meeting was the biannual National Freight Transportation Association ("NFTA") meeting that took place on April 2-6, 2003 at the Wigwam resort, in Litchfield Park, Arizona. Each of the Defendants attended the meeting. Almost immediately following the NFTA meeting, a new internal directive was issued at BNSF that was designed to ensure across-the-board FSC application: "Effective immediately and urgently per John

Lanigan[:] Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

65. On April 1, 2003, CSX CMO Mike Giftos and BNSF CMO John Lanigan met in Jacksonville, FL to discuss "Fuel Surcharge."

66. In early 2003, BNSF had been leaning toward a mileage-based FSC and trying to drum up support within the industry for a mileage-based FSC formula. But on May 7, 2003 – approximately one month after the NFTA meeting and its meeting with CSX – BNSF abandoned that effort. Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the HDF index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."

67. Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index. The BNSF FSC had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index. From that point on, BNSF and UP (the "Western Railroads") moved in lockstep and charged the exact same FSC percentage for each month of the Relevant Period.

68. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied an FSC of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2 percent. The FSC would increase 2 percent for every 20 cent increase in the HDF Index.

69. The Western Railroads also coordinated when they would change their FSC. They agreed that the FSC would be applied to shipments beginning the second month after the

month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March. The Western Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

70. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

71. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing FSC program. In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

72. As to NS, between March 2003 and December 2003, while positioning itself to quickly implement the FSC first announced by CSX, NS had regular discussions with the other Defendants, including discussions of what FSC was "acceptable" to them and the desirability of an industry-standard FSC.

73. As it had planned and prepared for from March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, a new FSC policy, which mimicked the policy announced by CSX in March 2003 and was intended to "standardize" NS's FSC with the FSCs of the other Defendants. As with CSX's program, NS would assess a 0.4 percent FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4 percent for every dollar increase thereafter. Also like CSX, NS's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days.

74. After NS's announcement, all four Defendants had essentially uniform FSCs and remained in synch throughout the Relevant Period.

**PUBLICATION OF THE AIILF AND FIXING FSC RATES**

75. Even after having agreed to coordinate their FSCs, however, Defendants still faced a significant barrier to widespread use of FSCs: widely-used private contracts had cost escalation provisions that already accounted for fuel costs. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely-used cost escalation indexes, thereby paving the way for widespread imposition of the new FSC program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

76. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

77. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, who dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF). This new index

was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

78. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

79. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a

new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

80. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSX and NS (the "Eastern Railroads"), suddenly moved into lockstep with FSCs based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

81. Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2 percent. The FSC would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

82. The Eastern Railroads also coordinated when they would change their FSC – two calendar months after the WTI Index had adjusted – thereby adopting the same FSC price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same FSC percentage month after month. The Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

83. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their FSC programs: including using the WTI Index for FSCs, setting the trigger point at $23 per barrel,

and applying the FSC in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

84. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel costs. The FSC program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Relevant Period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

85. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to *revenue* (*i.e.*, the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only

accounts for a portion of the costs of the shipment). Through this collective action, Defendants BNSF, UP, CSX and NS planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on FSC prices to undercut one another.

86. In November of 2004, BNSF's CMO John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC [Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for a mileage-based FSC program." The other Defendants "pushed back as expected." Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive rate-based FSCs.

87. With the conspiracy underway, the two Western Railroads, using the HDF Index, moved in lockstep and charged virtually identical FSCs on a monthly basis throughout the Relevant Period. The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began, but were identical starting in July 2003:

**MONTHLY FSC PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |

| MONTH | BNSF | UP |
|---|---|---|
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |

| MONTH | BNSF | UP |
|---|---|---|
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

88. As detailed above, there also was uniformity among the Eastern Railroads in the monthly FSC percentages, based on the WTI Index, that they charged customers for most of the Relevant Period. The chart below shows that the FSC percentages charged by Defendants CSX and NS for carload shipments varied before the Relevant Period, but were identical starting in March 2004:

**MONTHLY FSC PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |

| MONTH | CSX | NS |
|---|---|---|
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06[1] | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

89. In stark contrast to this uniformity in FSC percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent

[1] On April 24, 2006, NS announced that it would "revise its fuel surcharge program," assessing a 0.3 percent surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3 percent for every dollar increase above $64 per barrel. While NS claimed to the STB that it was rebasing because of a "decision to reduce its fuel surcharge percentage," NS had calculated the rebased fuel surcharge "to bake in FSC [the existing fuel surcharges] to [base] rate." NS had determined that a 16.4 percent base rate increase would allow it a "full % [fuel surcharge] pass thru" under the new program. Importantly, NS executives discussed the rebasing plan with its counterparts at the other Defendants, who recognized that the new FSC program was an economic wash compared to the program (footnote continued)

collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their FSCs to arrive at the identical percentage month after month, year after year. The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior and conspired to fix prices for FSCs. In addition, the advance announcements of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

90. Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below – including, in some cases, by adopting mileage-based FSCs – Defendants continued to engage in discussions concerning FSCs following the STB ruling, and to apply rate-based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before the STB Ruling.

91. While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (*i.e.*, shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the FSCs applied to their intermodal business (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship).

92. The direct heads of Defendants' intermodal businesses attended conspiratorial meetings. NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum participated in the March 2003 meeting at which their railroads discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. CSX's

announced in late 2003 (which continued to apply to shippers under earlier contracts in any event).

Alan Blumenfield, his predecessor Les Passa, and UP's Brad King EVP of Network Design and Integration participated in the June 2003 meeting at which CSX and UP's senior executives discussed their FSC formulas, their FSC strike prices, and the "outcry" they were facing from the initial rollout of their new FSC regimes. UP's intermodal group regularly imposed adjustable FSC provisions and their practice was to adjust them on ad hoc bases to align with BNSF's FSCs. In fall of 2003, CSX and BNSF officers exchanged percentages of intermodal business that "either had fuel surcharges or an escalator on the revenue."

93. Moreover, Defendants' intermodal business was led by the same senior executives who conspired to impose synchronized FSCs. Intermodal was not treated separately and apart from carload traffic. When Defendants met to conspire, they did not limit their discussions to carload traffic.

**IMPLEMENTATION OF THE SCHEME:**
**DEFENDANTS' ACROSS-THE-BOARD APPLICATION OF FSCs**

94. Defendants recognized that their coordinated FSCs were more aggressive and could generate substantially more revenue. For example, describing the new FSC program that resulted from Defendants' coordination, CSX's John Couch remarked: "While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." In addition, an internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

95. Defendants recognized that their new aggressive FSC program could be undermined by resistance from shippers and competition between the Defendant railroads. A 2003 internal NS memorandum recognized that moving to the more aggressive formula would "run the risk of losing the surcharge altogether. . . . The loss of the FSC clause with just a few

major customers could offset some of the gains derived from the new FSC." And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

96. To ensure that shipper resistance would be muted, and to achieve their conspiratorial goals, each Defendant adopted policies to apply FSCs to 100 percent of its traffic and tracked its progress toward attaining that goal. For example, in 2004, BNSF marketing leadership began an initiative to monitor FSC "adherence" on a quarterly basis. These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (*e.g.*, shippers with expiring contracts that do not include an FSC). The reports – showing increasing FSC coverage each year – were presented to the chief marketing officer with a goal of achieving a 100 percent participation rate for BNSF's shippers.

97. CSX also monitored its effectiveness in applying FSCs to its shippers, and started tracking its progress toward implementing its FSC mandate – that "[e]verything is subject to fuel surcharge." CSX tracked the progress that its individual marketing teams were making toward widespread FSC application, and tracked contracts without FSCs to ensure they would receive FSCs upon renewal.

98. Starting in early 2004, UP engaged in similar analyses. An analysis of UP's FSC coverage was also performed for the chief marketing officer – who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004."

99. NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed his team to identify "the largest remaining contracts (including annual revenue involved) that do

not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007."

100. Defendants policed the conspiracy by exchanging FSC coverage data. For example, subsequent to a meeting between the two railroads in late 2004, BNSF sent NS's Don Seale a report addressing FSC coverage for "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

101. In furtherance of the conspiracy, Defendants instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the FSCs were "not negotiable."

102. Defendants also enforced strict policies against discounting base rates to offset the standard FSCs. For example, in an internal NS email, NS's CMO (Don Seale) remarked, "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play."

103. As a result of these and related policies, any negotiations with their shippers about FSCs that took place started from the standard, supracompetitive FSC.

104. In addition, Defendants applied their standard FSCs uniformly to all traffic and commodities. For example, in October of 2005, NS advised UP as follows: "We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."

105. And Defendants imposed standard FSCs on all shippers without regard to whether the shipper had access to alternative modes of transportation. In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers – shippers without access to alternative modes of transportation – have leverage in negotiating a better rate/serve package on traffic at single served facilities. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

106. Before the conspiracy, captive shippers could negotiate out of the FSCs. But during the conspiracy they could not.

## THE STB DECISION

107. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the FSCs are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost

> recovery mechanism. ***Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied***. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6 (emphasis added).

108. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

109. As detailed above, pursuant to their conspiracy, Defendants applied the same unreasonable FSC practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**THE CONSPIRACY SUCCEEDS**

110. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on FSCs, Defendants realized billions of dollars in revenues during the Relevant Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the FSC.

111. Defendants recognized that their coordinated FSCs in fact resulted in significant over-recovery of fuel price increases. NS, for example, recognized by July 2004 that "[c]urrent FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base," and Don Seale of NS testified that in 2005, NS's "increase in Fuel Surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."

112. UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value" and UP's CFO saw "nothing wrong with recovering at a

rate greater than 100%." An October 2005 presentation shows UP estimated greater than 100 percent of incremental fuel cost recovery through FSCs for each of its six business groups.

113. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4 percent from 3rd Quarter 2003 to 2004. In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3 percent increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11 percent more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods, particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

114. By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9 percent improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

115. As a result, Defendants' conspiracy worked as planned to help to remove the competitive pressures that had kept their rates down for years. As the head of UP, James Young, admitted in 2007, "three, four years ago [the FSCs] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

116. Following Defendants' agreement to coordinate their FSCs, Defendants' total revenues skyrocketed during the Relevant Period, with the Defendants reporting record revenues and profits virtually every year. As noted above, Defendants themselves attributed these record figures in large part to FSCs.

117. As result of Defendants' conspiracy, they were able to reverse the "destructive pricing for rail share" that led to their conspiracy. In the 2009 STB study referenced above, the STB concluded that "inflation-adjusted rail rates increased in 2005, 2006, and 2007," representing "*a significant change from prior years*, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004." The STB concluded that while rising fuel costs contributed to the rate increases "*even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades*."

118. And a 2010 Senate Commerce Committee Report conducted a "review of the largest four railroads' Securities and Exchange Commission (SEC) filings," which it found "show[ed] just how profitable the large rail companies have become over the last decade. Figure I demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%." The referenced Figure 1 demonstrates that Defendants' profits spiked following their collective imposition of the new FSC regime described above:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

**COUNT I**

**(Violation Of Section 1 Of The Sherman Act And Section 4 Of The Clayton Act)**

119. Plaintiffs incorporate by reference the allegations in the paragraphs above as if they were fully set forth herein.

120. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

121. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

122. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

123. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

124. The contract, combination, or conspiracy has had the following effects:

a. Prices charged to Plaintiffs for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

125. As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury in that they have paid supracompetitive prices for FSCs applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiffs pray for relief as follows:

(1) That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiffs recover compensatory damages, as provided by law, determined to have been sustained by Plaintiffs, and that judgment be entered against Defendants on behalf of Plaintiffs;

(3) That Plaintiffs recover treble damages, as provided by law;

(4) That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

(5) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: September 30, 2019

WOMBLE BOND DICKINSON (US) LLP

/s/ Claire J. Rauscher
Claire J. Rauscher (N.C. Bar # 21500)
Matthew F. Tilley (N.C. Bar # 40125)
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina, 28202
Telephone: (704) 331-4961
Email: claire.rauscher@wbd-us.com
matthew.tilley@wbd-us.com

And

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Stephen R. Neuwirth*
Sami H. Rashid*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com

* Admission *pro hac vice* to be applied for

*Attorneys for Plaintiffs Duke Energy Carolinas, LLC, Duke Energy Florida, LLC, Duke Energy Progress, LLC, Duke Energy Indiana, LLC, Duke Energy Kentucky, LLC, Duke Energy Ohio, LLC, Progress Fuels, LLC, DEGS of Narrows, LLC, and Duke Energy Generation Services, Inc.*

# Redacted in Full

# DA09224 - DA09227

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Daniel Brockett
David Azar
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Richard Scruggs
Sidney Backstrom
SCRUGGS LAW FIRM, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Stephen Neuwirth
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7100

Paul Donovan
LAROE, WINN, MOERMAN & DONOVAN
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DUST PRO, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, AND KANSAS CITY SOUTHERN RAILWAY COMPANY,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiff Dust Pro, Inc. ("Dust Pro" or "Plaintiff"), an Arizona corporation located in Phoenix, Arizona, individually and on behalf of a class of all those similarly situated, brings this action for damages under the antitrust laws of the United States against Defendants, and alleges as follows:

**NATURE OF THE ACTION**

1. This is an antitrust class action charging five United States based Class I railroads with price fixing in violation of Section 1 of the Sherman Act. Plaintiff brings this action on behalf of itself and an alleged class of direct purchasers who purchased unregulated rail freight transportation services from Defendants and their co-conspirators from July 1, 2003 to the present (the "Class Period," which will also include the period from the date of this filing to the date of class notice) and who were assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law. Defendants collectively control over 90 percent of the rail freight traffic in the United States.

2. Plaintiff alleges that during the Class Period, defendant railroads conspired to fix, raise, maintain, or stabilize prices of rail freight transportation services sold in the United States through use of rail fuel surcharges added to customers' bills. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Throughout the Class Period, Defendants maintained uniformity of prices in Rail Fuel Surcharges by computing the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices and trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

3. As a direct and proximate result of this price fixing conspiracy, Defendants have restrained competition in the market for unregulated rail freight transportation services and injured plaintiff and each Class member in their business and property. Plaintiff and the members of the Class each have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

4. Plaintiff seeks damages on behalf of itself and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

**PARTIES**

5. Plaintiff Dust Pro, Inc. is a corporation organized under the laws of the State of Arizona, with its principal place of business at 3224 West Brown Street, Phoenix, Arizona, 85034.

6. During the class period, Dust Pro manufactured and distributed soil stabilizers.

7. Dust Pro purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on plaintiff in connection with that unregulated rail freight transportation. The prices plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices plaintiff would have paid absent the conspiracy alleged herein. Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations. Plaintiff asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants imposed Rail Fuel Surcharges, during the Class Period.

8. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. In New Jersey, CSX maintains business offices at 1 Pennsylvania Ave, Kearny, New Jersey 07032. CSX also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City, Elizabeth, North Bergen, Kearny and Ridgefield, through which it originates and terminates rail traffic within this District. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States.

9. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. In New Jersey, NS maintains business offices at 125 County Road, Jersey City, New Jersey 07307. NS also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City and Elizabeth through which NS originates and terminates rail traffic within the District. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

10. Defendants CSX and NS jointly own Conrail, which acts as a switching carrier for CSX and NS and operates almost 200 miles of rail lines in the northern half of New Jersey. The hub of Conrail activities in the region is Oak Island Yard in Newark, with smaller local serving yards in Bayonne, Greenville (Jersey City), Linden, Manville, Metuchen, Old Bridge, Port Reading (Woodbridge), Red Bank, and Newark.

11. Together, CSX and NS move all rail traffic into and out of the New Jersey/New York area. The vast majority of that traffic originates or terminates within northern New Jersey, and in the environs of Newark. For example, each year CSX and NS handle to and from the Newark area tens

of thousands of carloads of various commodities, such as chemicals, and merchandise freight. Additionally, with respect to container (or "intermodal") traffic, in 2006 CSX and NS handled 339,000 containers at ExpressRail, the on-dock rail facilities in Newark. CSX and NS also handled an additional 100,000 plus containers moving in domestic service through other rail terminals in the Newark area.

12. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. In New Jersey, BNSF's wholly-owned subsidiary, BNSF Logistics, LLC, maintains business offices at 375 N. Main Street, Suite C-1, Williamstown, New Jersey 08094. BNSF also originates and terminates rail traffic within the District by providing transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

13. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. In New Jersey, UP maintains at least one employee or agent, though the business address is currently unknown. UP also originates and terminates rail traffic within this District by providing transportation in interchange service with CSX and NS. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including New Jersey).

14. Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105. In New Jersey, KCS maintains business offices at 1 Executive, Somerset, New Jersey 08873. It also originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. KCS operates a major freight railroad in ten central and southeastern states.

**JURISDICTION AND VENUE**

15. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15 , to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

17. Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391. Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

18. This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

19. Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated. The "Class" is defined as:

> All purchasers of rail freight transportation services from Defendants (the "Class"), through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint.

20. The Class is so numerous that joinder of all members is impracticable. Given the magnitude of the commerce involved, the members of the Class are geographically dispersed, and joinder of all class members would be impracticable. While the exact number of Class members is unknown to plaintiff at this time, plaintiff believes that there are, at a minimum, thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

21. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the restraint of trade alleged herein. Plaintiff and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.

22. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

23. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b. Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

c. Whether Defendants' conduct violated the federal antitrust laws; and

d. Whether Defendants' conduct caused injury to the business and property of plaintiff and the Class and, if so, the proper measure of damages.

24. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

25. The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable. The

amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. No difficulty is anticipated in the management of this action as a class action.

**INTERSTATE TRADE AND COMMERCE**

26. During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The US market for rail transportation services is estimated at more than $51 billion in 2006.

27. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

28. The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

**DEREGULATION OF THE RAILROAD INDUSTRY**

29. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980. This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

30. Prior to the Staggers Act, the Interstate Commerce Commission ("ICC") prohibited railroads from charging rates different from those contained in published tariffs filed by the railroads with the ICC. Today, however, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

31. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). Five of these railroads -- the Defendants in this case -- operate more than 90 percent of all railroad track in the U.S. and account for more than $51 billion in total revenue.

32. Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, tight capacity, and coordinated pricing. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

33. The railroad industry today does not behave like a competitive market at all. Instead, it is dominated by the Defendants in this case. As one prominent railroad economist put it: "[R]ates charged shippers are surging and bottom lines are growing as if on steroids." Frank N. Wilner, *A Tale of Two (Railroad) Stories*, 72 JOURNAL OF TRANSPORTATION LAW, LOGISTICS AND POLICY 235, 238 (2005).

**THE RAILROADS INTRODUCE FUEL SURCHARGES**

34. By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe (BNSF) and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, put a moratorium on new mergers and then promulgated more stringent standards for merger review. Railroads were experiencing surging freight demand and tight capacity. In this environment, the railroads faced a stark choice: build new rail capacity to meet growing demand, or squeeze more revenue out of shippers using existing capacity. The railroads chose the latter course and seized on the rail fuel surcharge as the means to implement their price fixing conspiracy.

35. Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation. In fourth quarter 2002, the AAR -- which is controlled by the major Class I railroads -- published, for the first time, a RCAF without fuel (i.e., a cost escalation index without fuel as a component). This was not done by accident or mistake. It was a conscious decision made by the AAR to remove fuel costs from the RCAF index so that Defendants, which controlled the AAR, could begin assessing separate Rail Fuel Surcharges and coordinating that practice.

36. Predictably, that is what happened. Following publication of the "RCAF index without fuel," Defendants seized the opportunity and began to apply a Rail Fuel Surcharge as a separate item on the shipper's bill. When the price of oil began to rise dramatically in late 2003 and early 2004, Defendants began to see that they could use monthly changes to the fuel surcharge as an easy way to dramatically increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line to meet growing demand – so long as all the Defendants participated and did not undercut each other.

**DEFENDANTS' PRICE FIXING CONSPIRACY**

37. Commencing in or about July 2003 or earlier, Defendants agreed to stop competing with one another with respect to prices they charged rail shippers and customers for carload shipments. The key element of this price fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from rail shippers and customers. Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (*i.e.*, revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

38. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

39. Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites. They did so for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels.

40. As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels throughout the Class Period.

41. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

42. The STB also found that the railroads had been "double dipping" – applying to the same traffic both a fuel surcharge and a rate increase that is based on the RCAF or other index that includes a fuel cost component. The STB ordered Defendants to change these practices. The STB's decision addressed rate regulated rail freight traffic only (which is not the subject of this Complaint). The STB stated that its decision does not apply to rail freight traffic under contract or otherwise exempted from rate regulation.

43. Defendants applied the same unreasonable fuel surcharge practices to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**ELEMENTS OF THE PRICE FIXING CONSPIRACY**

44. The essential element of Defendants' conspiracy was an agreement to compute Rail Fuel Surcharges not as a cost recovery mechanism for the specific transportation to which it was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation involved. Defendants applied these surcharges not only to published tariff rates, but to private contracts, and other traffic, not subject to rate regulation under federal law (i.e., the unregulated rates at issue here).

45. Defendants began to implement their conspiracy at least as early as June 2003 when the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices relative to Rail Fuel Surcharges. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index. The BNSF carload fuel surcharge was based on the US Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF"). In or about June 2003, however, the UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the class period.

46. The Western Railroads agreed to administer the HDF index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, the

Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

47. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

48. The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF average price had changed. The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

49. Using the HDF index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

50. The chart below shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the class period began, but were identical starting in July 2003:

**MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |

| MONTH | BNSF | UP |
|---|---|---|
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |

51. Defendants CSX and NS, located in the east, began to implement the conspiracy in February 2004 or earlier, and KCS, located in the Midwest, agreed to join the conspiracy in June 2005 or earlier. (Defendants CSX, NS and KCS collectively are the "Eastern Railroads"). The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal*. Indeed, not only did these railroads all agree to use the WTI index (as opposed to many other available indices); once they had joined the conspiracy, they too agreed to administer the index in precisely the same way.

52. Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

53. The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted, thereby adopting fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same

fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

54. The choice to use the WTI index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. The fact that Defendants CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

55. The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period. Although KCS used different fuel surcharge percentages for certain months of the Class Period, in June 2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lock step with them for the remainder of the Class Period. KCS has different operations and fuel consumption patterns from the larger US railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages as the other railroads absent a conspiracy.

56. The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the class period, but were identical starting in February 2004, and they also were identical to those of the KCS starting in June 2005, when the KCS joined the conspiracy:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS | KCS |
|---|---|---|---|
| Jun-03 | 2.4% | 2% | |
| Jul-03 | 2.4% | 2% | |
| Aug-03 | 3.2% | 2% | |
| Sep-03 | 3.2% | 2% | |
| Oct-03 | 3.6% | 2% | |
| Nov-03 | 2.4% | 2.0% | |

| MONTH | CSX | NS | KCS |
|---|---|---|---|
| Dec-03 | 3.2% | 2.0% | |
| Jan-04 | 3.6% | 2.0% | |
| Feb-04 | 4.0% | 2% | |
| **Mar-04** | **4.8%** | **4.8%** | |
| Apr-04 | 4.8% | 4.8% | |
| May-04 | 5.6% | 5.6% | |
| Jun-04 | 5.6% | 5.6% | |
| Jul-04 | 7.2% | 7.2% | |
| Aug-04 | 6.4% | 6.4% | |
| Sep-04 | 7.2% | 7.2% | |
| Oct-04 | 8.8% | 8.8% | |
| Nov-04 | 9.2% | 9.2% | |
| Dec-04 | 12.4% | 12.4% | 10.0% |
| Jan-05 | 10.4% | 10.4% | 10.0% |
| Feb-05 | 8.4% | 8.4% | 10.0% |
| Mar-05 | 9.6% | 9.6% | 10.0% |
| Apr-05 | 10.0% | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% | 10.0% |
| **Jun-05** | **12.4%** | **12.4%** | **12.4%** |
| Jul-05 | 10.8% | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% | 12.8% |

57. In stark contrast to this uniformity in fuel surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after

month, year after year, for a period of more than three years. The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

**ADDITIONAL EVIDENCE OF A CONSPIRACY**

58. Apart from this direct evidence of price fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price fixing cartel feasible:

a. The railroad industry is highly concentrated. Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic. Such high concentration facilitates the possibility of a price fixing cartel.

b. There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These take decades to develop, and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c. Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

d. The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e. The CEO's of Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies).[1] The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

[1] A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) CSX; (3) Grand Trunk Corporation; (4) KCS; (5) NS; (6) Soo Line Railroad Co.; and (7) UP. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

59. Apart from these structural market features, Defendants did not behave as if they were in a competitive market. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

60. Several national shipper organizations in fact met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only the BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. The other Defendants refused to address the concerns of their customers.

61. At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

62. Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an inference of price fixing.

63. Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, Defendants moved to what is known

in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

64. Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during the Class Period is further indication that Defendants agreed to price fix rather than to compete for new sales.

**DEFENDANTS PROFITED FROM THE SURCHARGES**

65. Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

66. Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

67. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a. The Rail Fuel Surcharges charged to plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

b. Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

68. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by the plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

**(Violation Of § 1 Of The Sherman**
**<u>Act And § 4 Of The Clayton Act)</u>**

69. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

70. Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

71. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

72. Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

73. The contract, combination or conspiracy has had the following effects:

a. Prices charged to plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

b. Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

74. As a proximate result of Defendants' unlawful conduct, plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1) That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff be denominated as class representative, and that plaintiff's counsel be appointed as counsel for the Class;

(2) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3) That plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of plaintiff and each and every member of the Class;

(4) That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5) That plaintiff and the Class recover treble damages, as provided by law;

(6) That plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(7) For such further relief as the Court may deem just and proper.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff

By: /s/ James E. Cecchi
JAMES E. CECCHI

Dated: May 14, 2007

Stephen Neuwirth
Quinn Emanuel Urquhart Oliver
& Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7100

Daniel Brockett
David Azar
Quinn Emanuel Urquhart Oliver
& Hedges, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Paul Donovan
LaRoe, Winn, Moerman & Donovan
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

Richard Scruggs
Sidney Backstrom
Scruggs Law Firm, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial as to all issues triable by a jury.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff

By: /s/ James E. Cecchi
JAMES E. CECCHI

Dated: May 14, 2007

**CERTIFICATION**

Counsel for Plaintiff hereby certifies that, to the best of their knowledge, there are no other civil actions or arbitration proceedings pending regarding the subject matter hereof and that none are contemplated, and that all parties who should be joined have been joined.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff

By: /s/ James E. Cecchi
JAMES E. CECCHI

Dated: May 14, 2007

# Intentionally Omitted

## DA09255-DA09258

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HIGH LEVEL MANAGEMENT VENTURERS (F/K/A/ INTERDOM PARTNERS)
11800 S. 75th Avenue, Suite 2N
Palos Heights, IL 60463

Plaintiff,

v.

BNSF RAILWAY COMPANY
2650 Lou Menk Drive
Fort Worth, TX 76131;

CSX TRANSPORTATION, INC.
500 Water Street
Jacksonville, FL 33202;

NORFOLK SOUTHERN RAILWAY COMPANY
Three Commercial Place
Norfolk, VA 23510; and

UNION PACIFIC RAILROAD COMPANY
1400 Douglas Street
Omaha, NE 68179,

Defendants.

Civil Action No. 1:20-cv-010124

**AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

High Level Management Venturers (f/k/a lnterdom Partners) ("Plaintiff") brings this action for damages under the antitrust laws of the United States against BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), and Union Pacific Railway Company ("UP") (collectively, "Defendants").

## I. NATURE OF THE ACTION

1. This is an antitrust case. Defendants are the four largest United States-based "Class I" railroads. Plaintiff is a logistics services provider that offers intermodal, trucking, and transportation management solutions. Plaintiff alleges that Defendants conspired to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2. Plaintiff purchased unregulated rail freight transportation services from one or more of the Defendants from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and was assessed a rail fuel surcharge by one or more of the Defendants for the agreed-upon transportation. The term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

3. Defendants conspired for years to fix, raise, maintain, and/or stabilize prices of rail freight transportation by agreeing to impose jointly uniform fuel surcharges. A fuel surcharge is a separate fee above and beyond the base rate for transportation and is purportedly to compensate for increases in the cost of fuel. As explained herein, the term "fuel surcharge" was a misnomer because the rates were calculated as a percentage of base shipping rates and were unrelated to the actual fuel charges incurred by Defendants.

4. Defendants engaged in the conspiracy for the purpose of generating billions of dollars of additional revenue for themselves. In a proceeding captioned *Rail Fuel Surcharges*, Ex Parte No. 662 (Jan. 25, 2007), the Surface Transportation Board ("STB"), the federal agency that succeeded the Interstate Commerce Commission ("ICC") as the agency charged with regulating aspects of the railroad industry, found the Defendants' uniform practice of computing rail fuel surcharges as a percentage of base rail freight rate was "unreasonable" and that the practices, invoices, and documents relating to those fuel surcharges were "misleading."

5. Defendants' conspiracy was the subject of class action litigation. *See*, *e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.* (*Rail Freight I*), 292 F. Supp. 3d 14 (D.D.C. 2017). The court noted that the "documentary evidence is strong evidence of conspiracy and class-wide injury," *id.* at 32, and that the "evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges" was "substantial," *id.* at 102. The court also specifically found that there is "substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." *Id.* at 103.

6. Defendants maintained their conspiracy during the Relevant Period by uniformly computing fuel surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their fuel surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, application, and enforcement, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

7. As the district court overseeing the class action noted, "the evidence shows that defendants employed these fuel surcharges in lockstep" and "sought to apply fuel surcharges to as many customers as possible." *Rail Freight I*, 292 F. Supp. 3d at 104. These new "fuel surcharges" were not tied to the actual cost of fuel and, instead, were calculated as a percentage increase on the total base rate of freight transportation, allowing the "fuel surcharges" to function as an across-the-board increase on freight prices.

8. Plaintiff spent millions of dollars shipping materials on Defendants' rail lines during the Relevant Period and, consequently, was injured by the anticompetitive conduct when it paid overcharges to Defendants. Plaintiff seeks damages for fuel surcharges imposed on intermodal and/or carload rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.

## II. PARTIES

9. Plaintiff High Level Management Venturers (f/k/a lnterdom Partners) is a joint venture organized under the laws of the State of Illinois, with its principal place of business in Palos Heights, Illinois. During the Relevant Period, Plaintiff purchased unregulated freight transportation directly from and paid intermodal and/or carload rail freight transportation services, including fuel surcharges, directly to one or more of the Defendants to transport intermodal and/or carload shipments. Plaintiff was injured in its business and property when it paid higher prices for unregulated rail freight transportation services than it would have paid absent Defendants' alleged conspiracy.

10. Defendant CSX has its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX maintains coordinated schedules with other rail carriers to handle intermodal and/or carload freight to and from other parts of the country (including this District).

11. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS connects with rail partners in the West and around the world and maintains coordinated schedules with other rail carriers to handle intermodal and/or carload freight to and from other parts of the country (including this District).

12. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is the second largest railroad in North America, operating primarily in the western United States. BNSF maintains coordinated schedules with other rail carriers to handle intermodal and/or carload freight to and from other parts of the country (including this District).

13. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States, operating primarily in the western United States. UP maintains coordinated schedules with other rail carriers to handle intermodal and/or carload freight to and from other parts of the country (including this District).

## III. JURISDICTION AND VENUE

14. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15. Jurisdiction is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

16. Venue is proper pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391 because during the Relevant Period, one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

17. This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV. INTERSTATE TRADE AND COMMERCE

18. During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States. The Association of American Railroads Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

19. Defendants' activities were within the flow of, and substantially affected, interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

20. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## V. FACTUAL ALLEGATIONS

### A. The Railroad Industry Experienced Deregulation and Increasing Concentration in the Years Leading Up to the Alleged Conspiracy.

21. Congress dramatically changed regulation of the U.S. railroads with introduction of the Staggers Rail Act of 1980 ("Staggers Act"). This ended an era of regulatory control over nearly all aspects of railroad economic operations and allowed the railroad industry to independently set market rates for rail transportation.

22. Prior to the Staggers Act, freight railroads typically charged only published tariff rates that the railroads filed with the ICC, the predecessor to the STB. Railroads accordingly could apply to the ICC for across-the-board rate increases, which could then be implemented lawfully on a collective basis.

23. Today, the vast majority—i.e., 80% or more—of all rail shipments take place under private transportation contracts, which are not rate-regulated. The railroads can no longer turn to any government agency to implement across-the-board rate increases in freight rates, and it is unlawful for the railroads to collusively fix rates.

24. Additionally, the railroad industry has become highly concentrated. Since 1980, the number of Class I railroads declined from 35 in 1980 to just seven today—two of which are owned by Canadian entities. Defendants dominate this industry, operating more than 90% of all railroad track in the United States and bringing in close to $50 billion in annual revenue. Given the high fixed costs and significant barriers to entry in the railroad industry (e.g., required investments in a vast network of stations, tracks, yards, and switching facilities, which can take decades to develop and involve burdensome regulatory and environmental reviews and approval), there is only a fringe of smaller, niche carriers offering Defendants negligible competition.

25. Congress deregulated the railroad industry in large part to try to promote competition and reduce freight rates, but this combination of a highly concentrated market and high barriers to entry for new competitors provided Defendants with an environment conducive to anticompetitive conduct and collusive pricing.

**B. Defendants Unsuccessfully Attempted to Raise Rates Prior to the Relevant Period.**

26. By the early 2000s, the railroad industry had reached such high levels of concentration that further mergers were essentially impossible. Indeed, in response to a proposed merger of BNSF and Canadian National Railway Co., the STB imposed a moratorium on new mergers and then promulgated stricter standards for merger review.

27. Without the ability to consolidate further or to petition for rate increases (as Defendants did in the ICC days), Defendants lacked the means to easily and lawfully implement

across-the-board rate increases. Indeed, the introduction of greater competition through deregulation of the rail industry meant that Defendants could not unilaterally raise prices, through using fuel surcharges or otherwise. As BNSF noted in a 2002 internal report, "our rail competitors do not [use fuel surcharges,] and we therefore are hard pressed to achieve it." *See Rail Freight I*, 292 F. Supp. 3d. at 103. In a January 2003 memo, BNSF's then-Chief Marketing Officer Chuck Schultz noted that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104.

28. When Defendants did apply stand-alone, rate-based fuel surcharges, such surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight II*"). These fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the" Relevant Period. *Id.* at 48.

29. For example, NS manager of pricing systems Pat Glennon acknowledged in 2001 and 2002 that fuel surcharges were only "theoretically billable . . . ." *Id.* Similarly, the CFO of UP testified that during 2000 through 2002, UP did not have a company-wide policy on fuel surcharges and that "[t]here were some isolated situations where there were surcharges, but . . . no policy position." *Id.* A BNSF executive testified that fuel surcharge participation rates in January 2003 were "low," *id.*, and CSX executives similarly testified that, prior to the Relevant Period, fuel surcharges were "low" and "fairly minimal" among its customers. *Id.*

30. Another challenge to Defendants' ability to implement new fuel surcharges as a means to raise rates was that there was already a mechanism that allowed railroads to recoup for rising fuel costs. The private freight transportation contracts that came into use after the Staggers

Act included cost escalation provisions typically tied to the All-Inclusive Index ("AII") and Rail Car Adjustment Factor ("RCAF"), published by the Association of American Railroads ("AAR"). The AII and RCAF already permitted full recovery by the railroads of actual fuel cost increases, no matter how large. As discussed in more detail below, Defendants conspired to change these cost escalation provisions to remove the fuel component in furtherance of the ultimate conspiracy to impose supracompetitive fuel surcharges.

31. In short, before the Relevant Period, Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *Rail Freight I*, 292 F. Supp. 3d at 103. The natural conclusion to Defendants' failure to achieve broad coverage with rate-based fuel surcharges in this period was that they would not be able to increase revenues successfully through implementation of fuel surcharges unless all four Defendants coordinated to do so. Any railroad that attempted to aggressively apply fuel surcharges would risk losing business to competitors who did not assert fuel surcharges or otherwise made their prices more appealing to their customers.

### C. Defendants Colluded to Increase Rates Through a Coordinated Rate-Based Fuel Surcharge Program.

32. Beginning in the spring of 2003 and continuing at least through 2008, Defendants, through their senior executives, including their CEOs and top sales and marketing executives, began a series of communications through meetings, telephone conversations, and emails regarding the institution of a coordinated campaign to fix fuel surcharges. Defendants' top executives met and discussed their industry at AAR board meetings and biannual meetings of the National Freight Transportation Association ("NFTA").

33. Indeed, the AAR describes itself as "the central coordinating and research agency of the North American rail industry." Defendants control and dominate the AAR, and the CEOs

of each defendant railroad are members of the AAR's board. These meetings and others among Defendants' executives provided ample opportunity for collusion.

34. In early March of 2003, CSX and UP began reviewing their fuel surcharge programs together. CSX internally proposed changes to its fuel surcharge program. UP's Chief Marketing Officer Jack Koraleski drafted a revised fuel surcharge recommendation for UP. *See* Class Cert. Tr., 98, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Oct. 6, 2010) ("Oct. 6, 2010 Tr."). On March 12 and 13, 2003, Koraleski attended a meeting with CSX, and the suggested agenda noted that Koraleski and CSX EVP of Sales and Marketing Clarence Gooden discussed "fuel surcharge methodology" prior to this meeting. *Id.* at 98-99. Within one week of that meeting, CSX abandoned the program it had been contemplating and announced a plan that matched Koraleski's recommendation for UP. *Id.* at 99. On March 31, 2003, UP adopted Koraleski's program. *Id.*

35. BNSF and NS also began discussing changes to their fuel surcharge programs around this time. During a March 18, 2003 meeting, representatives of BNSF and NS discussed "the value of synchronization across the big players in the industry." Class Cert. Tr., 349–50, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Sept. 27, 2016). At NFTA meetings, executives of the Defendants met to consider and discuss developments in the railroad industry, including at the spring 2003 meeting where BNSF's and NS's Chief Marking Officers John Lanigan and Don Seale met to discuss fuel surcharge programs. Oct. 6, 2010 Tr. at 101.

36. Likewise, on or around April 1, 2003, BNSF's Lanigan and CSX Chief Marketing Officer Michael Giftos met in Jacksonville, Florida, to discuss the "fuel surcharge" program. Oct. 6, 2010 Tr. at 101. At a May 14, 2003 meeting, NS and UP recognized that "fuel surcharges, if . .

. uniformly applied across the industry[,] would be helpful." Class Cert. Tr., 350, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489-PLF-GMH (Sept. 27, 2016).

37. By July 2003, all Defendants had agreed to coordinate their rate-based fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed.

38. Beginning in or around July 2003, the two primarily western railroads, BNSF and UP, began to effectuate the conspiracy by coordinating their fuel surcharges. Before then, UP had adjusted its fuel surcharge monthly based on the price of West Texas Intermediate crude oil index ("WTI Index"). In contrast, BNSF had based its fuel surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF Index"). In or about July 2003, UP switched to the HDF Index pursuant to an agreement with BNSF. From that point on, BNSF and UP moved in lockstep and charged the exact same fuel surcharge percentage each month through at least 2007. BNSF and UP calculated these fuel surcharges as a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for the transport job.

39. While BNSF and UP had slightly different triggers for the fuel surcharge, with BNSF at $1.25 (beginning with a surcharge of .5%) and UP at $1.35 (beginning with a surcharge of 1.5%), the reality was that the HDF Index was administered in precisely the same way for both railroads. When the HDF Index exceeded $1.35 per gallon, BNSF and UP thereafter both applied a surcharge of 0.5 percent for every five-cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index. UP and BNSF thus moved in lockstep and charged the exact same fuel surcharge percentage for each month of the Relevant Period.

40. BNSF and UP also coordinated *when* they would change their fuel surcharge. They agreed that the fuel surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new fuel surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. They published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

41. BNSF's and UP's agreement and coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs, including by using the HDF Index, setting the trigger point at $1.35 per gallon of diesel fuel, employing a 0.5% surcharge for every five cent increase above the trigger price, and applying the surcharge in the second calendar month after the HDF Index average price had changed. These similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

42. Further, in April of 2003, UP had made modifications to the trigger points it used for adjusting surcharges in its program but did not change from using the WTI Index. Just two months later, UP's move to the same fuel price index used by BNSF is strong evidence of concerted conduct.

**D. Defendants Conspired to Institute a New Fuel Cost Index and Schemed to Fix the Fuel Surcharge Rates.**

43. Coordination of the fuel surcharge programs only partially addressed the hurdles to imposing these new fuel surcharges on customers. As discussed above, the industry standard for private contracts still involved the use of two cost escalation indices—the RCAF and AII—that accounted for fuel costs. Defendants feared that customers would perceive application of new fuel

surcharges as altering these cost escalation indices to eliminate considerations of changes in fuel costs.

44. In the fall of 2003, UP and BNSF led an effort within the Association of American Railroads ("AAR") to encourage all Defendants to agree to eliminate fuel costs from the RCAF and AII and instead use surcharges to charge a percentage of the total cost of the shipment, regardless of the actual cost of the fuel used in its transportation. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, the Defendants agreed to create, implement, and enforce coordinated fuel surcharge programs. Indeed, the AAR describes itself as "the central coordinating and research agency of the North American rail industry." Defendants control and dominate the AAR, and the CEOs of each defendant railroad are members of the AAR's board.

45. In December 2003, Defendants announced the establishment of the unprecedented All Inclusive Index Less Fuel (the "AIILF"), which (as the name suggests) excluded fuel as a component of the index, but was otherwise similar to the AII and RCAF. The new AIILF used the fourth quarter of 2002 as its base period. The AAR explained that "This All-inclusive Index Less Fuel (AII-LF) is calculated exactly the same, with matching component indexes, as the All Inclusive Index used with the RCAF—with the exception of the exclusion of the fuel component." Association of American Railroads, AAR Railroad Cost Indexes (March 2004).

46. The institution of the AIILF was a departure from past practice of the AAR and a direct result of the Defendants' collective action, impossible to accomplish without the conspiracy. Defendants sought to create this new index to allow them to begin imposing stand-alone fuel surcharges, calculated as a percentage of the total cost of the freight shipment, which would thus increase Defendants' revenues beyond the mere cost of fuel. This was a carefully planned step that

Defendants orchestrated together to allow for the implementation and maintenance of their price fixing conspiracy.

47. Defendant BNSF expressly acknowledged that it worked through the AAR to achieve this result in order to allow for imposition of fuel surcharges. Responding to a question from investors regarding BNSF's contracts with coal shippers, BNSF's Chief Marketing Officer, John Lanigan, indicated that BNSF would be able to institute fuel surcharges in these contracts as a result of the new AIILF. He gave credit for this to BNSF's Chairman, President, and CEO, Matthew K. Rose, noting that "What happened last year, and Matt led the charge on there, is that there's a new index that [the AAR] has that's basically an index without fuel . . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future." BNSF's Chief Economist Sam Kyei, noted in a March 15, 2005 letter, "In my 18-year railroad career, no one had ever succeeded in steering the A.A.R. to do this," and that "this index and a fuel surcharge should tremendously help our bottom-line for years to come. In fact[,] the entire rail industry should benefit. . . ." *Rail Freight II*, 287 F.R.D. at 15.

48. Following AAR's announcement of the AIILF and pursuant to the conspiracy, CSX and NS, the two primarily eastern railroads, simultaneously moved into lockstep compliance with the new fuel surcharge conspiracy. Specifically, NS's announcement of its new program in January 2004 meant that the NS and CSX would now impose a 0.4% fuel surcharge when the average price of oil rose above $23 a barrel on the WTI Index and increase rates by 0.4% for every subsequent $1 increase. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The fuel surcharge increased 2 percent for every $5 increase in the WTI average price. That made it functionally identical to the use of the HDF Index by CSX and NS, as described below.

49. NS and CSX also coordinated the timing of fluctuations to their fuel surcharges, such that they would introduce any change to shipment costs the second month following the change in WTI index, thereby adopting precisely the same schedule that UP and BNSF had already instituted. Like the UP and BNSF, the NS and CSX published their fuel surcharge percentages on their websites such that any diversion from their price fixing plan would be readily apparent.

50. The fact that NS and CSX were guided in their actions by agreed-upon coordination is demonstrated by their synchronized implementation of fuel surcharges that share identical unique, arbitrary, and complicated features, such as their use of the WTI Index, a trigger point at precisely $23 on the WTI Index, and application of new fuel surcharges two months following changes in the average price on the WTI Index. These similarities are too particular and too thorough to be the result of uncoordinated reactions to any common market phenomenon.

51. There was no legitimate business justification or natural explanation for Defendants' coordinated move to cause the AAR to establish the AIILF. The existing, well-established fuel assessments set out by the AII and the RCAF already allowed Defendants to recover any increases in fuel costs through the Relevant Period and Defendant had long used these. By contrast, Defendants' fuel surcharge programs were not based on Defendants' actual fuel costs but, by charging a fuel surcharge as a percentage of the shipment cost, they were a means of increasing Defendants' revenue that was only made possible by Defendants' conspiracy to eliminate fuel costs from the RCAF.

52. Implementation of the AIILF was a key step in Defendants' conspiracy to undermine resistance from customers who would have objected to paying twice for fuel charges, as long as Defendants enforced consistency and coordination in broad application of these new fuel surcharges.

53. As the court overseeing the class action noted, these new fuel surcharges "were different" than the ones they had previously tried to implement unilaterally. *Rail Freight I*, 292 F. Supp. 3d at 104. Defendants' executives admitted that these new surcharges were "more aggressive" and "yielded more revenue" and was, according to one executive "a blatant general rate increase." *Id.* "A CSX executive similarly stated that although CSX's new fuel surcharge program may seem somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%." *Id.* (internal quotation marks and alterations omitted).

54. Additionally, unlike the spotty earlier attempts to impose fuel surcharges, the new plan applied "to as many customers as possible." *Id.* For example, January 2004 BNSF pricing guidelines stated, "Every Contract should include a fuel surcharge clause. All new and all renewing contract negotiations should have a fuel surcharge as the goal." *Id.* The other Defendants had similar policies regarding the use of fuel surcharges in contracts for rail freight carriage. *Id.* Further, Defendants have admitted that these fuel surcharges were not simply about recovery of fuel costs. Indeed, prior to the introduction of the AIILF, there was already index-based cost adjustments available for that. Instead, these "new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Id.* And indeed, under these programs—and at customers' expense—Defendants saw revenue from these fuel surcharges increase exponentially. *Id.*

55. Accordingly, Defendants' efforts to institute the AIILF were not motivated by a common problem of increasing fuel costs or a desire for more comprehensive or effective fuel cost recovery. Defendants instead were motivated by a desire for increased profits that they could achieve through broad application of a stand-alone fuel surcharge that was tied to revenue—the entire base rate for the shipment (notwithstanding that fuel only accounts for a portion of the costs

of the shipment)—as opposed of actual costs. Through this collective action, the Defendants planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

56. Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants' conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well.

57. Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 2003 meeting between BNSF and NS and a June 2003 meeting between UP and CSX, the heads of the respective intermodal business groups (and other personnel with intermodal and responsibilities) participated as well. For instance, Mick McClellan, Vice President of Intermodal for NS, and Steve Branscum, Vice President of Consumer Products and head of intermodal activities at BNSF, attended the March 2003 meeting at which Defendants adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's fuel surcharge program with those of the other three Defendants. Oct. 6, 2010 Tr. at 100. CSX executives Alan Blumenfeld and Les Passa, as well as UP's EVP of Network Design and Integration, Brad King, attended a June 2003 meeting in which senior executives from CSX and UP discussed the companies' fuel surcharge formulas and trigger points, as well as the customer "outcry" that stemmed from their initial attempts to apply stand-alone fuel surcharges. *Id.* at 103.

In the intermodal business, UP often employed adjustable fuel surcharge provisions that they would alter to align with BNSF's fuel surcharges. CSX and BNSF executives also shared intelligence in Fall 2003, discussing percentages of intermodal business that subject to cost escalation provisions. Upon information and belief, Defendants hatched a single conspiracy extending to *all* shippers, regardless of traffic type.

58. As a result of Defendants' conspiracy, Plaintiff and other rail shippers paid supracompetitive rates, including the inflated fuel surcharges, for rail shipment during the Relevant Period.

**E. Defendants Imposed Supracompetitive Fuel Surcharges During the Relevant Period.**

59. As detailed above, the Defendants agreed in 2003 to remove fuel costs from the AII and RCAF, and thereby permit the application of separate fuel surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the fuel surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). The Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

60. Table 1, below, shows that prior to the Relevant Period, fuel surcharges varied by railroad, but BNSF and UP, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Relevant Period:

**Table 1: BNSF and UP Fuel Surcharges**

| Month & Year | BNSF | UP |
|---|---|---|
| June 2002 | 1.0% | 0% |
| July 2002 | 1.0% | 0% |
| August 2002 | 0% | 0% |
| September 2002 | 0% | 0% |
| October 2002 | 1.0% | 0% |
| November 2002 | 2.0% | 0% |
| December 2002 | 2.% | 0% |
| January 2003 | 2.0% | 2.0% |
| February 2003 | 2.0% | 2.0% |
| March 2003 | 2.5% | 2.0% |
| April 2003 | 4.5% | 2.0% |
| May 2003 | 2.0% | 2.0% |
| June 2003 | 3.0% | 2.0% |
| July 2003 | 2.5% | 2.5% |
| August 2003 | 2.0% | 2.0% |
| September 2003 | 2.0% | 2.0% |
| October 2003 | 2.5% | 2.5% |
| November 2003 | 2.5% | 2.5% |
| December 2003 | 2.5% | 2.5% |
| January 2004 | 2.5% | 2.5% |
| February 2004 | 2.5% | 2.5% |

| | | |
|---|---|---|
| March 2004 | 3.5% | 3.5% |
| April 2004 | 3.5% | 3.5% |
| May 2004 | 4.0% | 4.0% |
| June 2004 | 4.5% | 4.5% |
| July 2004 | 5.0% | 5.0% |
| August 2004 | 5.0% | 5.0% |
| September 2004 | 5.0% | 5.0% |
| October 2004 | 6.0% | 6.0% |
| November 2004 | 7.0% | 7.0% |
| December 2004 | 9.0% | 9.0% |
| January 2005 | 9.0% | 9.0% |
| February 2005 | 8.0% | 8.0% |
| March 2005 | 7.5% | 7.5% |
| April 2005 | 8.0% | 8.0% |
| May 2005 | 10.0% | 10.0% |
| June 2005 | 10.5% | 10.5% |
| July 2005 | 9.5% | 9.5% |
| August 2005 | 10.5% | 10.5% |
| September 2005 | 11.5% | 11.5% |
| October 2005 | 13.0% | 13.0% |
| November 2005 | 16.0% | 16.0% |
| December 2005 | 18.5% | 18.5% |
| January 2006 | 13.5% | 13.5% |

| | | |
|---|---|---|
| February 2006 | 12.0% | 12.0% |
| March 2006 | 12.5% | 12.5% |
| April 2006 | 12.5% | 12.5% |
| May 2006 | 13.5% | 13.5% |
| June 2006 | 15.0% | 15.0% |
| July 2006 | 16.5% | 16.5% |
| August 2006 | 16.5% | 16.5% |
| September 2006 | 17.0% | 17.0% |
| October 2006 | 18.0% | 18.0% |
| November 2006 | 15.5% | 15.5% |
| December 2006 | 13.0% | 13.0% |
| January 2007 | 13.0% | 13.0% |
| February 2007 | 14.0% | 14.0% |
| March 2007 | 12.5% | 12.5% |
| April 2007 | 12.5% | 12.5% |
| May 2007 | 14.5% | 14.5% |
| June 2007 | 16.0% | 16.0% |

61. CSX and NS used the WTI Index to charge uniform fuel surcharge percentages for most of the relevant period. Table 2, below, demonstrates that the fuel surcharge percentages the Eastern Railroads charged for carload shipments varied before the Relevant Period but became identical starting in March 2004.

**Table 2: CSX and NS Fuel Surcharges**

| Month & Year | CSX | NS |
|---|---|---|
| June 2003 | 2.4% | 2.0% |
| July 2003 | 2.4% | 2.0% |
| August 2003 | 3.2% | 2.0% |
| September 2003 | 3.2% | 2.0% |
| October 2003 | 3.6% | 2.0% |
| November 2003 | 2.4% | 2.0% |
| December 2003 | 3.2% | 2.0% |
| January 2004 | 3.6% | 2.0% |
| February 2004 | 4.0% | 2.0% |
| March 2004 | 4.8% | 4.8% |
| April 2004 | 4.8% | 4.8% |
| May 2004 | 5.6% | 5.6% |
| June 2004 | 5.6% | 5.6% |
| July 2004 | 7.2% | 7.2% |
| August 2004 | 6.4% | 6.4% |
| September 2004 | 7.2% | 7.2% |
| October 2004 | 8.8% | 8.8% |
| November 2004 | 9.2% | 9.2% |
| December 2004 | 12.4% | 12.4% |
| January 2005 | 10.4% | 10.4% |
| February 2005 | 8.4% | 8.4% |

| | | |
|---|---|---|
| March 2005 | 9.6% | 9.6% |
| April 2005 | 10.0% | 10.0% |
| May 2005 | 12.8% | 12.8% |
| June 2005 | 12.4% | 12.4% |
| July 2005 | 10.8% | 10.8% |
| August 2005 | 13.6% | 13.6% |
| September 2005 | 14.4% | 14.4% |
| October 2005 | 16.8% | 16.8% |
| November 2005 | 17.2% | 17.2% |
| December 2005 | 16.0% | 16.0% |
| January 2006 | 14.4% | 14.4% |
| February 2006 | 14.8% | 14.8% |
| March 2006 | 17.2% | 17.2% |
| April 2006 | 15.6% | 15.6% |
| May 2006 | 16.0% | 16.0% |
| June 2006 | 18.8% | 18.8% |
| July 2006 | 19.2% | 19.2% |
| August 2006 | 19.2% | 19.2% |
| September 2006 | 20.8% | 20.8% |
| October 2006 | 20.4% | 20.4% |
| November 2006 | 16.4% | 16.4% |
| December 2006 | 14.4% | 14.4% |
| January 2007 | 14.8% | 14.8% |

| | | |
|---|---|---|
| February 2007 | 16.0% | 16.0% |
| March 2007 | 12.8% | 12.8% |
| April 2007 | 14.8% | 14.8% |
| May 2007 | 15.2% | 15.2% |
| June 2007 | 16.4% | 16.4% |

62. While the above formulas and percentages reflect the fuel surcharge percentages applied by Defendants and their co-conspirators to their carload businesses, Defendants and their co-conspirators also coordinated with respect to the FSCs applied to their intermodal business.

63. In contrast to this uniformity in fuel surcharge percentages, fuel costs as a percentage of operating costs and fuel efficiency differed widely among Defendants. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for fuel surcharges. The advance announcement of each Defendant's fuel surcharge rate was an important implementation and enforcement mechanism for the conspiracy.

64. Railroad industry analysts took note of the curious "convergence" in fuel surcharge methodologies adopted by Defendants. For example, after concluding in 2003 that the fuel surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." John Gallagher, *Following the Competition*, TRAFFIC WORLD (July 14, 2003).

65. Additionally, Defendants' fuel surcharges were not aligned with Defendants' actual fuel costs because, among other reasons, the surcharge rates did not account for Defendants' improvements in fuel efficiency. By calculating fuel surcharges as a percentage of the base shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

66. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges for more than three years could not have happened by chance or coincidence, and it was not an expected response to a common business problem. The AII and RCAF would have accurately covered any actual increased fuel costs. Defendants' uniform pricing only could have been achieved through an express agreement followed by collective action decoupling fuel prices from the historical cost indexes and agreeing to follow new, uniform programs for imposing stand-alone fuel surcharges. Defendants' purpose was to use increasing fuel costs as a pretext for implementing what were, in effect, across-the-board rate increases.

67. Defendants' behavior in implementing their uniform fuel surcharge programs advanced their collusive interest and was inconsistent with Defendants individually pursuing their independent, unilateral self-interest. In a competitive environment free of collusion, carriers with lower fuel costs could impose a lower surcharge and increase market share at the expense of competing railroads. Similarly, if a competitor increased their surcharge prices, another carrier could maintain its current prices and attract market share away from its now-higher-priced competitor. Defendants did not engage in such competitive behavior and instead adhered to a collusive, industrywide pattern of uniform fuel surcharge pricing based on the total base rate of the shipment.

### F. Defendants Took Additional Steps to Ensure Industry-Wide Application of Inflated Fuel Surcharges.

68. While Defendants' coordinated, aggressive fuel surcharges would significantly increase their revenue, they recognized that the success of the cartel was potentially vulnerable to Defendants reacting to customer resistance by competing instead of adhering to the fuel surcharge conspiracy. Defendants took steps to ensure a successful and profitable conspiracy.

69. First, Defendants began publishing their Rail Fuel Surcharges publicly on their websites to facilitate monitoring of each participant's loyalty to the collusive arrangement.

70. Second, Defendants often switched from offering long-term contracts to offering contracts that were regularly "re-priced" to ensure that the new collusive fuel surcharges were applied to all customers. Prior to the conspiracy, long term contracts were the norm. This switch allowed Defendants to detect, deter, and if necessary, punish any cheating among the cartelists.

71. Defendants made this switch away from long-term contracts even though shippers generally preferred the former system to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume these greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should in turn promote competition among carriers for their business. Instead, each of the Defendants raised their prices and did not offer any compensation to customers for assuming the additional risk of short-term contracts. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. Defendants collectively refused to offer long-term contracts and took no steps (other than their mutual conspiracy) to minimize their own risks from fluctuations in demand. This coordinated behavior was not routine market conduct.

72. Third, Defendants took steps to force these changes on customers across the marketplace because they knew that any break in ranks would undermine the conspiracy. An internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers." *Rail Freight I*, 292 F. Supp. 3d at 104. And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail." Class Cert. Tr. at 61.

73. Accordingly, Defendants sought to effectively force these aggressive fuel surcharges on customers across the board by adopting policies to apply fuel surcharges to 100% of their shipments, including intermodal, and tracking progress in achieving that goal.

74. BNSF's marketing executives began tracking fuel surcharge "adherence" on a quarterly basis in 2004 through adherence reports that tracked fuel surcharge revenue, the number of newly-issued price authorities including fuel surcharges, and significant opportunities (i.e. customers whose contracts were expiring and did not already provide for fuel surcharges). Oct 6, 2010 Tr. at 123. BNSF sought to obtain 100% coverage of fuel surcharges across its customers and presented the adherence reports to the chief marketing officer to assess progress towards this goal. *Id.*; *see also Rail Freight I*, 292 F. Supp. 3d at 106-07.

75. CSX also set its sights on ensuring that "[e]verything is subject to fuel surcharge" and tracked its effectiveness in enforcing fuel surcharges with its customers. CSX monitored both its individual marketing teams' activities and potential opportunities in the form of contracts without fuel surcharges that were up for renewal. *Rail Freight I*, 292 F.Supp.3d at 107.

76. UP established a similar monitoring program in early 2004, which included presentation of analysis of UP's fuel surcharge coverage to the chief marketing officer, who made sure his teams looked for ways to expand fuel surcharge coverage. NS likewise tracked its fuel surcharge coverage and monitored significant opportunities for imposing the fuel surcharges. Defendants also ensured one another's compliance with the price fixing conspiracy by sharing data regarding their respective fuel surcharge coverage. For example, BNSF sent NS's Don Seale a report in advance of a meeting between the Defendants in late 2004, which surveyed "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

77. A key part of Defendants' conspiracy involved Defendants' establishment of strict policies against granting individualized exceptions to the announced fuel surcharges or allowing for discounts on the fuel surcharges or overall contract rates. This marked a change of course from Defendants' prior conduct, in which they habitually entertained such negotiations. Defendants instead gave numerous shippers, across a variety of industries, the uniform message that fuel surcharge percentages were "not negotiable." For example, in December 2002, before the conspiracy began, rail customer U.S. Magnesium negotiated out of the application of a fuel surcharge with UP. *Rail Freight I*, 292 F. Supp. 3d. at 100. A year later, after the conspiracy had begun, U.S. Magnesium was unable to do so because UP refused—U.S. Magnesium was informed that "all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management." *Id.*

78. Defendants also established policies against discounting the base shipping rates in order to offset the impact of fuel surcharges. For instance, NS's Don Seale instructed against this in an internal email, stating: "I want to underscore that we should not be foregoing base rate

increases in return for [fuel surcharge] application. That is a shell game that all product managers should not play." Oct. 6, 2010 Tr. at 113.

79. Consequently, any negotiations that Defendants did engage in with their customers had a starting point of the standard, artificially high fuel surcharge.

80. NS's Vice President David Lawson admitted that "there was a policy [at NS] to apply the standard fuel surcharge to as many customers as possible." *Id.* at 104. CSX noted in its 10-K filing for the 2005 fiscal year that "As existing contracts are renewed or new contracts are executed, CSX is increasing the number of contracts which include fuel surcharge mechanisms." CSX Corp. 10-K at 15 (Feb. 24, 2006). BNSF's Chief Economist Sam Kyei emailed BNSF's Chief Marketing Officer John Lanigan and explained that contracts requiring the CEO's signature "but excluding full fuel surcharge provisions [would] not be signed." *Rail Freight I*, 292 F. Supp. 3d. at 104. This lack of negotiation aided Defendants in standardizing pricing along the lines of their collusive agreement and made monitoring pricing among the co-conspirators easier.

81. Defendants imposed their fuel surcharges without variation between different kinds of traffic and commodities. For example, NS advised UP in October 2005 that "We only have one fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it." Class Cert. Tr. at 64.

82. Defendants also uniformly enforced the fuel surcharges regardless of whether a customer could make use of alternative modes of transportation. NS's chairman Moorman acknowledged, in testimony to Congress, that customers that did not have access to alternative modes of transportation—so-called "captive" shippers—could use other sources of leverage to bargain for a better rate package on traffic at facilities that were served by only one railroad. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.[1]

83. Once Defendants resolved to uniformly enforce their fuel surcharge programs, captive shippers were no longer able to negotiate out of the fuel surcharges.

84. Fourth, in furtherance of the conspiracy, Defendants decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the terminating railroad for routes involving more than one railroad. Where a shipment required movement on more than one railroad, Defendants moved increasingly to having rates billed separately for each railroad, rather than as one quote for the entire shipment. Defendants made this change, which could only result from their collective action, as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

85. Fifth, in furtherance of the conspiracy, Defendants agreed that none of them would undercut agreed pricing or "steal" market share by using their increased revenues to subsidize discounting of their underlying rates. Defendants' market shares remained stable following the 2003 agreements.

[1] Senate Hearing 110-886 Before the Subcomm. on Surface Transp. and Merchant Marine Infrastructure, Safety, and Security, S. Comm. on Commerce, Science, and Transp., 110 Cong. (2007) (statement of Charles W. Moorman, Ass'n of Am. R.R.s).

**G. Defendants' Fuel Surcharge Program Drew Scrutiny and Condemnation.**

86. Starting in 2006, the STB, which regulates certain aspects of the railroad industry, began holding hearings and investigating the Defendants' practices relating to fuel surcharges. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). Thus, the STB found, "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particularly [sic] traffic to which the surcharge is applied." *Id.* at 6.

87. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

88. Pursuant to their conspiracy, the Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

89. In addition to the Surface Transportation Board, each Defendant has been the target of a state grand jury subpoena and/or state grand jury inquiry concerning their Rail Fuel Surcharges, as Defendants admitted in their 2008 SEC Form 10-Ks. CSX stated in its 10-K filing that "In July 2007, CSXT received a grand jury subpoena from the New Jersey Office of the Attorney General seeking information related to the same fuel surcharges that are the subject of the purported class actions. It is possible that additional federal or state agencies could initiate

investigations into similar matters." CSX Corp., 10-K, at 99 (February 22, 2008). BNSF stated in its 10-K filing that "The Company is also responding to a state grand jury subpoena requesting production of information related to fuel surcharges." BNSF Railway Company, 10-K, at 10 (February 15, 2008). NS stated in its 10-K filing that "NS received a subpoena from a state grand jury on July 13, 2007, requesting documents and materials relating to the setting of fuel surcharges. NS is cooperating with the state in its investigation." Norfolk Southern, 10-K, at K16 (February 15, 2008). UP stated in its 10-K filing that "the Attorney General of a state outside our service area issued a grand jury subpoena to us requesting documents pertaining to our fuel surcharge program. We met with representatives of this Attorney General's office, and we plan to have additional meetings in the future in an effort to resolve that office's interest in this matter." Union Pacific Corp., 10-K, at 15 (February 28, 2008).

90. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on fuel surcharges, Defendants realized billions of dollars in revenues in excess of their actual fuel costs. In August 2005, UP's executive Mark J. Draper emailed that UP's senior finance management held the position that the proposed fuel surcharge was "not some 'trying to make whole' value," and other UP employees saw "nothing wrong with recovering at a rate greater than 100%." *Rail Freight I*, 292 F. Supp. 3d at 114 (quoting E–mail from Mark J. Draper to Mary E. McArdle (Aug. 2, 2005)). In June 2004, CSX's then-Commercial Finance Director Erik Palm emailed that "If we had 100% fuel surcharge coverage, we would actually be recovering twice the incremental fuel expense above the surcharge trigger point." *Id.* (quoting E-mail from Erik Palm (June 3, 2004)).

91. A Senate Commerce Committee report reviewed the Defendants' profits and concluded that "a review of the largest four railroads' [SEC] filings shows just how profitable the

large rail companies have become over the last decade." The Current Financial State of the Class I Freight Rail Industry, Comm. On Commerce, Science, and Transp. 4 (Sept. 15, 2010).

92. The Defendants themselves also attributed their increased revenue to fuel surcharges. In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume." NS Annual Report 2006, at K20.

93. BNSF recognized rail freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." BNSF Railway Co., 10-K , at 18 (Feb. 16, 2007). "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005." *Id.* at 21.

94. In 2006, UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges." Union Pacific Corporation, 2006 Annual Report, at 17.

95. In 2006, CSX's revenue increased $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets." CSX Corp., 2006 Annual Report, at 25.

96. Private third-party research also disclosed the existence and scale of the scheme. A 2007 independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity found that during the period from 2003 through the first quarter of 2007 Defendant's Rail Fuel Surcharge revenue (as publicly reported or estimated) exceeded Defendants' publicly reported actual fuel costs by over $6 billion. Snavely King Majoros O'Connor & Lee, Inc., Analysis of Rail Fuel Surcharges During the Period 2003-2007: A Report to the Am. Chemistry Council (July 25, 2007).

97. Because of Defendants' unlawful conduct, the fuel surcharges Defendants charged Plaintiff for unregulated rail freight transportation were fixed or stabilized at supracompetitive levels. Defendants' conspiracy deprived Plaintiff of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation and unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid in the United States for unregulated rail freight transportation. These effects began in early 2003 and persisted through at least 2008.

98. Plaintiff sustained injury to its business or property as a direct result of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act. Plaintiff entered into contracts with one or more of Defendants and was thereby injured by paying supracompetitive prices applied to unregulated rail freight transportation throughout the U.S. as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade. The federal laws were designed to punish and prevent the type of antitrust injury that Plaintiff suffered here.

## VI. COUNT, PRAYER FOR RELIEF, AND JURY DEMAND

### Count I

### (Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)

99. Plaintiff incorporates the allegations in the paragraphs above.

100. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

101. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for fuel surcharges for rail freight transportation handled through private

contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

102. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of and substantially affected interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements between Defendants.

103. Defendants' contract, combination, or conspiracy has had at least the following effects:

a. Prices Defendants charged Plaintiff for fuel surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Defendants' conduct deprived Plaintiff of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c. Defendants' conduct unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid for, customers of, and territories for rail freight transportation services.

104. As a proximate result of Defendants' unlawful conduct, Plaintiff suffered injury in that it paid supracompetitive prices for unregulated rail freight transportation services.

## Prayer for Relief

Plaintiff prays for relief as follows:

(1) That this Court adjudicate and decree that the unlawful contract, combination, and conspiracy alleged in Count I was an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act,

(2) That Plaintiff recovers compensatory damages, as provided by law, and that this Court enter judgment against Defendants on behalf of Plaintiff,

(3) That this Court permanently enjoin and restrain each Defendant's respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them from continuing or maintaining the combination, conspiracy, or agreement alleged in this case,

(4) That Plaintiff recovers treble damages, as provided by law,

(5) That Plaintiff recovers its costs of the suit, including attorneys' fees, as provided by law, and

(6) That Plaintiff recovers such other and further relief as the Court may deem just and proper.

## Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: December 1, 2020

By:

*/s/ Daniel J. Walker*

Daniel J. Walker (Bar # 219439)
Berger Montague PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
(202) 559-9745
dwalker@bm.net

Michael C. Dell'Angelo
Michael J. Kane
H. Laddie Montague, Jr.
Michaela Wallin
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000
mdellangelo@bm.net
mkane@bm.net
hlmontague@bm.net
mwallin@bm.net

*Counsel for Plaintiff High Level Management Venturers (f/k/a lnterdom Partners)*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to:<br>ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH) |

# **JOINT STATUS REPORT**

The parties submit this Joint Status Report "regarding the status of this litigation, including the numbers of depositions noticed, completed, and anticipated." Mem. and Order 5, ECF No. 676 (July 6, 2021).[1]

## **I. Additional Actions**

Since the parties' January 27, 2023 Joint Status Report, ECF No. 895, no additional actions have been filed and identified as tag-along cases for potential consolidation with this MDL. Accordingly, the current number of cases in this MDL remains at 106.[2]

## **II. Status of Depositions**

Depositions of fact witnesses have concluded. Defendants took their last deposition on January 31, 2023. Plaintiffs took their last deposition on February 2, 2023. The parties do not anticipate any additional depositions of fact witnesses with the exception of the EPIC Action as

1 On January 31, 2023, the Court entered a Minute Order directing the parties "to continue filing Joint Status Reports every twelve weeks." Min. Order (paperless) (Jan. 31, 2023).

2 Defendants' motion to dismiss the complaint in *Environmental Protection & Improvement Company, LLC v. Union Pacific Railroad Company et al.*, 1:22-cv-02587 (BAH) (the "EPIC Action"), filed September 7, 2022, is pending before the Court. MDL 2925 ECF No. 857; EPIC Action ECF No. 17.

explained in footnote 3.[3]

***Number of Depositions****:* Plaintiffs took a total of 31 depositions (24 30(b)(6) depositions[4] and 7 30(b)(1) depositions). Defendants took a total of 342 depositions[5] (24 30(b)(6) depositions and 318 30(b)(1) depositions).

### III. Status of Expert Discovery

On March 1, 2023, Plaintiffs made expert disclosures covering all 105 actions, other than the EPIC Action, as noted above. *See* Min. Order (paperless) (Nov. 8, 2022) (setting the current expert discovery schedule). Plaintiffs' 5 experts served 61 reports, the vast majority of which Plaintiffs have indicated include materially identical economic opinions and methodologies. The parties are meeting and conferring to schedule depositions of Plaintiffs' experts. Defendants' opposition expert reports are due on August 15, 2023. *Id.* Plaintiffs' rebuttal expert reports are due on November 15, 2023. *Id.*

*[Signatures on following pages]*

---

[3] Defendants NS, CSXT, and UP and Plaintiff Environmental Protection & Improvement Company filed a proposed stipulation with the Court on March 24, 2023, agreeing to stay fact and expert discovery in the EPIC Action pending the outcome of Defendants' motion to dismiss. EPIC Action ECF No. 22.

[4] 7 of the 24 30(b)(6) depositions occurred over 2 days.

[5] 5 of the 342 depositions occurred over 2 days.

Dated: April 21, 2023

*/s/ Tara L. Reinhart*
Tara L. Reinhart (D.C. Bar. No. 462106)
Thomas R. Gentry (D.C. Bar No. 1617060)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Phone: (202) 371-7630
tara.reinhart@skadden.com
thomas.gentry@skadden.com

Ronald K. Wray II
GALLIVAN, WHITE & BOYD P.A.
55 Beattie Place, Suite 1200
Greenville, SC 29601
Phone: (864) 271-5362
rwray@GWBlawfirm.com

*Counsel for Defendant Norfolk Southern Railway Company pursuant to the Notices of Appearance entered in each case*

/s/ Glenn D. Pomerantz
Glenn D. Pomerantz
Kuruvilla J. Olasa
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Phone: (213) 683-9100
Glenn.Pomerantz@mto.com
Kuruvilla.Olasa@mto.com
Anne.Conley@mto.com

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Phone: (415) 512-4000
Ben.Horwich@mto.com

Lauren E. Ross (D.C. Bar No. 1659620)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001-5369
Phone: (202) 220-1100
Lauren.Ross@mto.com

/s/ Linda S. Stein
Linda S. Stein (D.C. Bar No. 376217)
Molly Bruder Fox (D.C. Bar No. 981619)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Phone: (202) 429-3000
lstein@steptoe.com
mbfox@steptoe.com

*Counsel for Defendant BNSF Railway Company pursuant to the Notices of Appearance entered in each case*

*/s/ Juan A. Arteaga*
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Juan A. Arteaga
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134
JArteaga@crowell.com

*/s/ Julia M.I. Holden Davis*
David M. Wells
Julia M.I. Holden Davis
Derek K. Mountford
GUNSTER, YOAKLEY & STEWART, P.A.
One Independent Drive, Suite 2300
Jacksonville, Florida 32202
Phone: (904) 354-1980
dwells@gunster.com
jholdendavis@gunster.com
dmountford@gunster.com

*Counsel for Defendant CSX Transportation, Inc. pursuant to the Notices of Appearance entered in each case*

*/s/ Tyrone R. Childress*
Tyrone R. Childress
Kelsey S. Bryan (D.C. Bar # 1034352)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2589
E-mail: tchildress@jonesday.com
E-mail: kbryan@jonesday.com

John M. Majoras (D.C. Bar # 474267)
Kristen Lejnieks (D.C. Bar # 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: kalejnieks@jonesday.com

*/s/ Timothy L. O'Mara*
Timothy L. O'Mara
Kirsten M. Ferguson
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
E-mail: tim.o'mara@lw.com
E-mail: kirsten.ferguson@lw.com

Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Email: allyson.maltas@lw.com

*/s/ Matthew M. Collette*
Matthew M. Collette (D.C. Bar
No. 427167)
Alethea A. Swift (D.C. Bar No. 1644929)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Phone: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com
aswift@masseygail.com

Leonard A. Gail
Suyash Agrawal
Christopher M. Walling
Illinois State Bar No. 6199745
Massey & Gail LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-1590
Fax: (312) 379-0467
lgail@masseygail.com
sagrawal@masseygail.com
cwalling@masseygail.com

*Counsel for Defendant Union Pacific Railroad Company pursuant to the Notices of Appearance entered in each case*

*/s/ Alden L. Atkins*
Craig P. Seebald (D.C. Bar No. 438968)
Alden L. Atkins (D.C. Bar No. 00393922)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com
aatkins@velaw.com

*/s/ John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854)
Daniel M. Jaffe (D.C. Bar No. 461185)
SLOVER & LOFTUS LLP
1224 Seventeenth Street NW
Washington, D.C. 20036
(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining; LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company*

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com

*Attorneys for American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell Recycling Southeast, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC*

*/s/ Sami H. Rashid*
Sami H. Rashid
Richard I. Werder, Jr.
Alexee Conroy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com
rickwerder@quinnemanuel.com
alexeeconroy@quinnemanuel.com

Alicia Cobb
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Facsimile: (206) 905-7100
aliciacobb@quinnemanuel.com

Viola Trebicka
Jennifer D. English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com

*Attorneys for Plaintiffs Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, an Oregon Cooperative Corporation ; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls*

*and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

<u>*/s/ William J. Blechman*</u>
Robert D. W. Landon, III
Richard Alan Arnold
William J. Blechman
Douglas H. Patton
Samuel J. Randall
Michael A. Ponzoli
Joshua B. Gray

*Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc., CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, LLC ; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars (KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Holcim Canada Holdings LLC, Holcim (US) Inc.; Holcim – ACM Management, Inc.; Holcim – SWR, Inc.; Holcim – NER, Inc.; Holcim – MWR, Inc.; Holcim – MAR, Inc.; Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Holcim –*

KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: rlandon@knpa.com
raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
srandall@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Lehigh Hanson, Inc., PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

*SOR, Inc.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC;*

*WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

*/s/ David C. Eddy*
David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Anheuser-Busch, LLC; Anheuser-Busch Companies, LLC; Nestlé Purina PetCare Company; and Nestlé USA, Inc.*

*/s/ Joseph M. Vanek*
Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (*pro hac vice* forthcoming)
SPERLING & SLATER, LLC
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiffs Kellogg Company and Mitsubishi Motors North America, Inc.*

*/s/ Adam Carlis*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
Scott T. Glass
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com

*/s/ Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com

afoulkesgrafton@susmangodfrey.com
sglass@susmangodfrey.com

Raj Mathur
SUSMAN GODFREY, L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
(212) 729-2051
rmathur@susmangodfrey.com

*Attorneys for Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal*

david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

*<u>/s/ Kristopher S. Davis</u>*
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com

*Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*/s/Kirk T. May*
Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

David B. Helms
GM LAW PC
8000 Maryland Avenue, Suite 1060
Clayton, Missouri 63105
PH: 314-474-1750
FX: 816-471-2221
Email: davidh@gmlawpc.com

*Attorneys for Plaintiffs*
*Lansing Ethanol Services, LLC, et al.*

*/s/ Benjamin D. Brown*
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
Leonardo Chingcuanco (D.C. Bar No. 1719708)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,

jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

/s/ *Eric S. Hochstadt*
David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com
luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

*/s/ Edward D. Hassi*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118

N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
lchingcuanco@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

*/s/ James P. Denvir*

James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)
James Grippando (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

*/s/ Frank M. Lowrey IV*

Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com

E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper, Esquire
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

*/s/ Nathan P. Eimer*

Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
dbirk@eimerstahl.com
srazzano@eimerstahl.com
bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc.,*

BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

*Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

*/s/ Michael C. Dell'Angelo*
Michael C. Dell'Angelo
Michael J. Kane
H. Laddie Montague, Jr.
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
hlmontague@bm.net
mwallin@bm.net

Daniel J. Walker
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, D.C. 20006
(202) 559-9745
dwalker@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

*/s/ Daniel B. Goldman*
Daniel B. Goldman
Nathan Schwartzberg
Martin M. McSherry
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com
nschwartzberg@kramerlevin.com
mmcsherry@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company, Tronox Inc., and Tronox US Holdings Inc.*

*/s/ Leo D. Caseria*
Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100

*/s/ Ronald J. Aranoff*
Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP

Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

*/s/ Conte C. Cicala*

Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH) |

## JOINT STATUS REPORT

Pursuant to the Court's February 4, 2021 Minute Order, the parties submit this Joint Status Report regarding the status of the litigation ahead of the May 6, 2021 Status Conference.

### I. Developments Since the January 22, 2021 Status Report

#### A. New Actions and Plaintiffs

Since the January 22, 2021 Joint Status Report, four additional actions have been identified as tag-along cases and have been coordinated or are being coordinated with this MDL. This MDL now involves 104 actions.

#### B. Custodians

The vast majority of custodian negotiations were completed by December 2020. The parties continue to negotiate custodians for recently filed actions and recently added Plaintiffs. In addition, as noted in the January 22, 2021 Joint Status Report (ECF No. 511 at 1 n.1), CSX Transportation, Inc. (CSXT) has advised Plaintiffs that preserved ESI for certain agreed upon CSXT custodians was lost. According to CSXT, the data was inadvertently deleted due to a vendor error that occurred during a routine system upgrade. As detailed below, the parties have been meeting and conferring regarding this issue.

**C. Search Terms**

In late March 2020, the parties completed negotiations regarding the search terms Defendants will run over their ESI. Similarly, in late March and early April, the parties substantially completed negotiations regarding the search terms Plaintiffs will run over their ESI.

**D. Target for Substantial Completion of Document Production**

Plaintiffs have agreed to use best efforts to substantially complete their document productions by June 30, 2021, with the exception of newly-filed Plaintiffs who have stated that they will need 120 days from filing to substantially complete production. To the extent any Plaintiff believes it cannot meet the June 30, 2021 target, they will so inform Defendants. Plaintiffs have also informed Defendants that a number of Plaintiffs will substantially complete production in advance of June 30. As requested by Defendants, Plaintiffs have agreed to identify which particular Plaintiffs may substantially complete their document productions before June 30, although Plaintiffs have not yet done so.

Defendants have agreed to use best efforts to also meet a June 30, 2021, target date for substantial completion of document production, except with respect to Plaintiffs that recently joined this MDL. With respect to those new Plaintiffs, custodian and search term negotiations are ongoing.

**E. Depositions**

The Parties are meeting and conferring regarding deposition scheduling with the expectation that depositions will begin in early June for those cases in which document production permits early scheduling prior to the June 30 target date for document production in all cases.

### F. Current Disputes and Potential Disputes

1. On March 17, 2021, Plaintiffs filed their motion to compel Defendants to produce post-2008 transaction data, and on March 31, 2021, Defendants filed their consolidated opposition to the motion to compel and cross-motion for reconsideration of the Court's ruling on availability of post-2008 damages. On April 20, 2021, Plaintiffs filed their combined memoranda of law in support of their motion to compel and opposition to Defendants' motion for reconsideration. These motions will be fully briefed on April 23. Based on the Court's statements during the March 26, 2021 discovery hearing, the parties understand that the Court intends to resolve these disputes at or by the May 6, 2021 Status Conference.

2. Defendants and Plaintiffs continue to actively meet and confer on the extent to which Plaintiffs will provide information in response to certain of Defendants' interrogatories, discussed in further detail below. To the extent the parties cannot resolve these issues, they will present them to the Court as necessary.

3. The parties are discussing the extent to which UP will use a Technology Assisted Review ("TAR") to limit its review and production of documents hitting on the parties' agreed search terms. To the extent the parties cannot resolve this issue, they will present it to the Court.

### G. Participants for Status Conference on Behalf of Plaintiffs

The liaisons appointed by the Court will participate by video:

- Alden L. Atkins (Vinson & Elkins LLP)
- William Blechman (Kenny Nachwalter PA)
- Michael Hausfeld (Hausfeld LLP)
- Stephen Neuwirth (Quinn Emanuel Urquhart & Sullivan)

For the pending motions and specific discovery issues that may arise, the following persons will also participate by video and speak on behalf of the Plaintiffs:

- Plaintiffs' Motion to Compel: Alden L. Atkins (Vinson & Elkins LLP)
- Defendants' Motion for Reconsideration: Daniel D. Birk (Eimer Stahl LLP)
- Discovery matters: Swathi Bojedla (Hausfeld LLP)

### H. Participants for Status Conference on Behalf of Defendants

Defendants intend to have the following individuals participate by video and will inform the Court ahead of time if there are any necessary changes to this list:

1. Defendant BNSF: Kuruvilla J. Olasa (Munger Tolles & Olson LLP)
2. Defendant CSX Transportation: Juan Arteaga (Crowell & Moring LLP)
3. Defendant Norfolk Southern: Ron Wray (Gallivan, White & Boyd, P.A)
4. Defendant Union Pacific: Ty Childress (Jones Day)
5. Motion to Compel & Motion for Reconsideration: Tara L. Reinhart (Skadden, Arps, Slate, Meagher & Flom LLP) and Ronald K. Wray, II

## II. Plaintiffs' Separate Statement on Status of Discovery

1. Substantial Completion of Document Production

After repeatedly rejecting Plaintiffs' requests for a substantial completion date for fact discovery, Defendants finally agreed on April 8, 2021 to Plaintiffs' proposed June 30, 2021 substantial production deadline.[1]

[1] Plaintiffs tried for months—since September 2020—to set a date for the parties to substantially complete production. In the parties' September 3, 2020 Joint Status Report, Plaintiffs noted that they had proposed a substantial completion date of March 1, 2020, and that Defendants had rejected that date and made no counter-proposal with a date certain. ECF No. 364 at 4. On February 27, 2021, Plaintiffs again proposed a substantial completion deadline, of either: a) May 31, 2021, if Defendants would agree to Plaintiffs' proposed compromise regarding non-defendant railroads and rail carrier alternatives, or b) three months from the resolution of scope of production, if Defendants insisted on bringing that dispute to the Court. Defendants ultimately sought to move to compel that discovery, and the Court ruled in Plaintiffs' favor on March 26, 2021. On March 31, 2021, with the scope of Plaintiffs' discovery finally complete, Plaintiffs sent Defendants another proposal to set a substantial completion deadline of June 30, 2021, or three months out, with all parties using their best efforts to complete production by that date (with the exception of

In a further effort to ensure discovery can move forward as quickly as possible, Plaintiffs are proactively in the process of identifying which Plaintiffs anticipate being able to substantially complete production by earlier interim target dates of May 15, May 31, and June 15 and will provide that information to Defendants shortly. Defendants have not committed to compiling a similar list identifying the Plaintiffs for whom they anticipate they will be able to complete production before June 30. Plaintiffs are hopeful that Defendants will agree to provide Plaintiffs with the requested information regarding substantial completion status for documents related to specific Plaintiffs, so that depositions can begin without delay.

At the end of the parties' March 26, 2021 discovery hearing, Plaintiffs were disappointed to hear counsel for Defendants state for the first time that they believed the discovery deadline was in jeopardy. 3/26/21 Discovery Conf. Tr. 73:2-20. Plaintiffs have been working diligently towards meeting the discovery deadline and agree with the Court that that deadline should not move. Plaintiffs hope that the parties can collaboratively work together to substantially complete production for those Plaintiffs for whom it is feasible to do so before June 30 and that doing so will help Defendants meet the Court-ordered deadline.

2. UP Only Recently Disclosed That It Anticipates Using Technology Assisted Review in Addition to Agreed Search Terms

During custodian and search term negotiations, Defendants—including UP—insisted on numerous concessions to limit the number of documents that they would need to gather and review for responsiveness in MDL II. For example, UP took the position that custodians should be limited to individuals with high-level positions in order to limit the number of non-substantive or

later-filed plaintiffs, who would require 120 days from filing, and potentially a small number of other plaintiffs, who would identify themselves to Defendants if they felt they could not meet the deadline).

duplicative emails that were gathered. UP then also insisted on using search term limiters for plaintiff-specific terms in order to, as Defendants put it, "avoid returning an unreasonably large number of documents that must be reviewed but which are unlikely to be relevant to this case."[2] While not conceding these points, Plaintiffs made discovery concessions in response, including drastically cutting the number of Defendant custodians Plaintiffs requested, and agreeing to narrowed search terms. For example, in many instances, Plaintiffs agreed to allow Defendants to use search term limiters for searches of an individual plaintiff's corporate name or domain name. Then, *after more than five months of negotiations on search terms and custodians*, UP notified Plaintiffs on April 1 that it intends to use a form of Technology Assisted Review ("TAR") for its documents in addition to the agreed search terms, and in a manner that would allow it to halt its review without reviewing each document that hits on search terms. When Plaintiffs inquired about UP's proposed review "cutoff,"[3] UP pointed to a brief reference in the ESI Stipulation noting that some parties "may" use TAR to limit the volume of documents but that any such parties will meet and confer regarding acceptable methodologies for validating such use of TAR.[4]

Plaintiffs have requested that UP discloses certain metrics and specifics regarding its proposed use of TAR, so that Plaintiffs can properly evaluate its proposal. For example, Plaintiffs have asked UP whether it will include documents relating to all cases when training the machine to determine which documents to elevate as responsive. With hundreds of named Plaintiffs, training the machine to recognize each individual Plaintiff as a relevant entity is crucial to ensuring that each Plaintiff receives the discovery relevant to its case. UP has provided only limited

---

[2] September 4, 2020 Ltr. from Defendants to Plaintiffs at 2; December 8, 2020 Ltr. from Defendants to Plaintiffs, at 2 (same).
[3] UP has notified Plaintiffs that it will use a cutoff for review at an as-yet unspecified point.
[4] ESI Stipulation, ECF No. 281-1 at 18-19.

information. On April 22, 2021, just hours before this Joint Status Report was filed, Plaintiffs learned that UP has already begun its review using TAR, even though the parties have not agreed on a protocol. Upon learning that, Plaintiffs asked whether UP had performed an initial review to estimate the number of responsive documents in the collection, which is a routine initial step used to provide guidance about when a review can stop, but counsel for UP did not know.

Plaintiffs are concerned about UP's belated disclosure of TAR for a cutoff, because it could mean that responsive, relevant documents relating to each independent case are not produced. However, Plaintiffs are hopeful that UP will work productively and engage in a meaningful manner on these issues in the near term, so that they can be resolved quickly without the need to involve the Court. Plaintiffs will continue our discussions with UP and will update the Court if we need assistance to resolve this issue.

3. CSX's Loss of Custodial Documents

On January 20, 2021, CSX informed Plaintiffs that it had discovered that custodial ESI for all 10 of the new custodians CSX agreed to in MDL II (*i.e.*, all the custodians who were not already custodians in MDL I) had been almost completely deleted with the exception of a small number of emails. For most of the 10 custodians, this means that there are between 100 and 200 emails *total* for an eight-year period, and for one custodian there are just 35 emails. CSX said its investigation into its deletion of the data, which was subject to litigation holds when it was apparently deleted in 2018, is ongoing. In response to Plaintiffs' inquiries regarding whether CSX retained data for any other individuals who could be used as replacement custodians, CSX informed Plaintiffs that its "investigation to date suggests that minimal data for other custodians not previously collected for in MDL I would have survived."[5]

[5] April 22, 2021 Ltr. from Juan Arteaga to Plaintiffs at 2.

This deletion will definitely prejudice certain Plaintiffs who regularly dealt with the custodians whose data was lost. The extent of the loss is not currently known and depending on the record that emerges the prejudice may extend to all Plaintiffs. Plaintiffs and CSX spent months negotiating custodians, and Plaintiffs had significantly narrowed their list of custodians based on representations from CSX regarding which proposed custodians were subject to litigation holds in MDL I. When Plaintiffs agreed to narrow their list of requested CSX custodians, they did so with the understanding that CSX had responsive documents for all of its agreed upon custodians that were subject to a litigation hold, including the 10 custodians at issue. CSX has now made clear that the only agreed CSX custodians that have documents are those that were already custodians in MDL I.

At this time, Plaintiffs are not seeking any relief from the Court, and will continue to attempt to resolve this loss of evidence with CSX. On April 22, 2021 at 3:25 PM EST, just before this Joint Status Report was filed, CSX sent Plaintiffs a letter containing a proposal that offered to substitute eight custodians in place of the ten lost custodians. Most of the custodians offered by CSXT do not appear to cover the same industries or functions as the custodians whose data were lost. CSX's proposal also contained several additional proposed remedial measures. Plaintiffs have asked for additional details on CSX's custodial data loss but have not received complete responses to many of their questions. Plaintiffs are evaluating CSX's proposal and hope to be able to obtain the information they need to assess whether it adequately mitigates the prejudice caused by CSX's loss of data.

4. Defendants' Interrogatories

Defendants have served Plaintiffs with very broad interrogatories seeking discovery wholly unrelated to any claim or defense in this litigation. The interrogatories currently in dispute are included below.

> 2. Identify each individual who received a litigation hold notice related to this Litigation, the claims in Your complaint, or the claims in MDL No. 1869, and the date on which each such individual received that hold notice.
>
> 3. For each entity identified in Your response to Interrogatory 1 [an interrogatory concerning identification of each entity claiming damages, which Plaintiffs have answered], state the dates on which the entity (1) first learned of a lawsuit in any U.S. federal district court alleging that Defendants conspired to fix prices through the use of fuel surcharges, including but not limited to any of the class action lawsuits that were consolidated in MDL No. 1869; (2) first communicated with a lawyer (whether in-house or outside counsel) regarding a potential claim against one or more of the Defendants related to an alleged conspiracy to fix prices through the use of fuel surcharges; and (3) first anticipated participating in litigation against one or more Defendants for an alleged conspiracy to fix prices through use of fuel surcharges.
>
> 5. Describe every communication You participated in that both occurred before the date You first anticipated litigation against Defendants for a price fixing conspiracy and concerned discussion of potential claims by You against one or more Defendants related to Defendants' alleged price fixing through use of fuel surcharges, including in Your description of each communication: (1) the date of communication; (2) the identification of all participants in the communication; (3) whether the communication was oral or in writing; and (4) the substance of any such communications.

Despite Plaintiffs' significant misgivings about the protracted discovery-on-discovery it will lead to, and concerns about encouraging Defendants' fishing expedition, in order to avoid burdening the Court, Plaintiffs are considering providing some of the requested information concerning litigation holds. There is currently no dispute for the Court's consideration.

## III. Defendants' Separate Statement Regarding Status of Discovery

Defendants respectfully submit this statement to describe their own view of the status of this case, including the scope of the parties' significant ongoing discovery efforts, the progress the parties have made, and the substantial discovery that remains to be completed.

### A. Discovery from Plaintiffs

Defendants will face the more than 300 Plaintiffs in the over 100 cases in this *MDL* at summary judgment or, if necessary, at trials across the country. Defendants are entitled to Plaintiff-specific discovery from each Plaintiff in order to develop the legal and factual arguments needed to defend against each Plaintiff's liability and damages claims. Although Plaintiffs' complaints repeat boilerplate allegations from *MDL I* that Defendants conspired to impose uniform fuel surcharges on Plaintiffs and refused to negotiate those surcharges, and that Plaintiffs paid inflated rates for rail transportation as a result, the circumstances of each Plaintiff's claim differ. Indeed, Plaintiffs' antitrust claims are proceeding on an individual basis precisely because issues common to their claims do not predominate over questions affecting only individual members. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 32 (D.D.C. 2017). As a result, Plaintiff-specific discovery is necessary because it tends to disprove Plaintiffs' allegation of a conspiracy, or because it bears directly on Plaintiffs' asserted injury and damages flowing from the alleged conspiracy.

As just one example, it is BNSF's understanding that its key contract with Plaintiff American Honda Motors, which was entered into in 2002 with an end date of 2011, did not contain any fuel surcharge provision at any point during the relevant period (2003 – 2008), and that Honda administered its own voluntary fuel surcharge program to compensate BNSF for the increased cost of fuel. BNSF served Requests for Admission on Honda to confirm these facts,

but Honda declined to provide substantive responses to these requests on the basis that discovery is ongoing.[6] BNSF seeks discovery from Honda to confirm BNSF's understanding of the facts and allow BNSF to rebut Honda's claim that it paid allegedly conspiratorial fuel surcharges to BNSF.

Similarly, even at this early stage of Plaintiff-specific discovery, Defendants are aware that many Plaintiffs negotiated fuel surcharge provisions that contain unique elements, obtained concessions on their base rates in exchange for agreeing to a fuel surcharge provision, or expressed a preference for a rate based fuel surcharge over a mileage based fuel surcharge. One Plaintiff, Grand River Dam Authority, appears to have agreed to a fuel surcharge to settle litigation about whether undue economic hardship warranted the addition of a fuel surcharge to the Plaintiff's contract. Another Plaintiff, Keystone, appears to have tied its negotiations over a fuel surcharge provision in a contract up for renewal to the completion of a new route to serve its generating station. Discovery from these Plaintiffs and others like them is critical to understand their negotiations with one or more of the Defendants during the relevant period. Any negotiations that occurred over fuel surcharge provisions directly undermines both Plaintiffs' alleged conspiracy and damages claims.

The discovery Defendants seek here from Plaintiffs is not the kind Defendants could have obtained in *MDL I*, because it is specific to these particular Plaintiffs' claims—their contracts, their negotiations with Defendants, and the unique circumstances of their claims. During the class certification proceedings, Defendants were parties and therefore subject to significant discovery from class counsel on behalf of the class, but the *MDL II* Plaintiffs were absent

[6] At the Court's request, BNSF can submit its correspondence with Honda along with Honda's responses and objections to these Requests for Admission.

putative class members that were not before the Court. Discovery from these absent class members during *MDL I* would have required Defendants to divine which Plaintiffs would ultimately decide to bring their own claims and would have needed to meet a high threshold and been limited in scope. *See Barham v. Ramsey*, 246 F.R.D. 60, 63 (D.D.C. 2007) (noting that discovery from absent class members is an "unusual measure" that may be justified when necessary for "trial of the issues common to the class"); *Moore v. Johnson*, 303 F.R.D. 105, 108 (D.D.C. 2014) (same).

The effort involved with securing this Plaintiff-specific discovery is an enormous and logistically challenging undertaking. Unlike Plaintiffs, who need discovery from only four Defendants, Defendants need discovery from hundreds of Plaintiffs.[7] The 104 filed complaints include over 300 Plaintiffs, some of which are affiliates of other Plaintiffs. These 104 complaints also purport to allege damages on behalf of more than 650 entities. And Plaintiffs' interrogatory responses, served less than three months ago, identify 1,105 entities, including affiliates or predecessors, that were purportedly injured by Defendants' alleged conspiracy. Since May 2020, the resulting enormity of the associated discovery undertaking has become clear.

### 1. Document Discovery from Plaintiffs

**Custodians**: Given the number of Plaintiffs in this MDL, it took the parties nearly 5 months to identify, negotiate, and agree upon Plaintiff custodians. During these negotiations, the parties exchanged over 100 letters and emails regarding potential Plaintiff custodians, and

[7] In May 2020, when the parties filed their initial status report, there were 85 separate actions in this MDL. There are now 104 actions included in this MDL, involving over 300 named Plaintiffs. Moreover, in the last four months, Plaintiffs in 6 matters have amended their complaints to add 8 new Plaintiff entities in addition to named and unnamed associated entities and predecessors-in-interest. *See* Dkt. Nos. 493, 494, 513, 560, 564, 565.

Defendants participated in dozens of hours of meet and confer calls. The negotiation process was further drawn out because many Plaintiffs provided little information regarding potential witnesses in their initial disclosures, and approximately two-thirds of Plaintiffs were unable to produce organizational charts, hampering the parties' ability to identify Plaintiff custodians. The parties also had to engage in extra rounds of negotiations after numerous Plaintiffs later revealed that they have not retained relevant custodial files, even for individuals they identified as relevant witnesses in their initial disclosures and individuals they proposed as custodians. In roughly 25% of cases Plaintiffs have no custodians and in another roughly 25% of cases Plaintiffs have one or two custodians for which they have documents.

**Search Terms:** It took the parties an additional 5 months to negotiate search terms to be run on Plaintiffs' ESI. Defendants first proposed search terms to Plaintiffs on August 7, 2020. And, to keep things simple and avoid protracted negotiations, Defendants proposed the *exact search terms* employed by the plaintiffs in *MDL I*, who were represented by counsel representing more than half of the *MDL II* Plaintiffs. Unfortunately, Plaintiffs did not agree to run these *MDL I* terms without modifications, and Defendants were forced to negotiate separately with each Plaintiff group on modifications they requested. *See* Defs' Mar. 25, 2021 Letter to Plfs (attached hereto as **Defendants' Exhibit 1**).

**Substantial Completion of Document Production**: Now that the parties have turned to the review and production of documents, Plaintiffs have agreed on a June 30, 2021, target date for using best efforts to substantially complete document production, except for recently filed Plaintiffs who have stated that they will need 120 days from filing. Plaintiffs acknowledged, including in correspondence on March 31, 2021, and on April 15, 2021, that some other Plaintiffs, not recently filed, may not be able to meet the June 30, 2021 date, but they have not

yet identified which, if any, Plaintiffs will be unable to do so. And although Plaintiffs have indicated that some Plaintiffs may substantially complete their productions before June 30, they have not identified *which Plaintiffs* will be complete early and *when* they anticipate being complete. Defendants have requested this information, including in a letter sent on April 8, 2021, and follow up correspondence, which should be known to many Plaintiffs at this point. Plaintiffs have indicated that they will provide this information to Defendants, but have not yet done so.

Unlike Defendants, who are reviewing and will be producing documents related to more than 300 Plaintiff entities from 186 custodians using more than 1,600 search strings, Plaintiffs' production will be much more limited, focusing on documents related to the 4 Defendants and their transportation contracts. Moreover, many Plaintiffs have few, if any, custodians, and the other Plaintiffs will have much smaller and less complicated reviews than Defendants, as the below chart illustrates.

| **Party** | **BNSF** | **Union Pacific** | **NS** | **CSXT** | **Each Plaintiff** |
|---|---|---|---|---|---|
| **Custodians** | 40 | 71 | 41 | 34 | 25% of Plaintiffs have no custodians<br>25% of Plaintiffs have one or two custodians |
| **Search Strings** | 1,600+ | 1,600+ | 1,600+ | 1,600+ | 49 |

**<u>Contract Production</u>**: No Plaintiff has notified Defendants that it has completed production of their contracts and, during a recent meet and confer, Plaintiffs were unable to identify which Plaintiffs, if any, have completed such productions.

### 2. Depositions of Plaintiffs

Without having had the opportunity to review Plaintiffs' documents, Defendants cannot yet provide a precise estimate of the number of depositions they will need to take. Many

Plaintiffs have identified multiple witnesses in their initial disclosures. By way of example, the Southern Company Plaintiffs (Alabama Power Company, Georgie Power Company, and Mississippi Power Company) identified 6 witnesses in total; the AK Steel Plaintiffs (AK Steel Corporation, CF Industries, Dairyland Power, Dyno Nobel, Entergy, Exelon, North Star Bluescope Steel / Steelscape, and Wisconsin Electric Power) identified between 2 and 4 witnesses *each;* and the Ameren Plaintiffs (Union Electric Company d/b/a Ameren Missouri and Ameren Development Company) identified a total of 4 witnesses.

Given the sheer number of Plaintiffs in this MDL, even if Defendants limit themselves to just a few witnesses per Plaintiff, the number of Plaintiff depositions will be in the hundreds. As Plaintiffs explained at the initial status conference, in Plaintiffs' view, Olin, "one of the named plaintiffs [in *MDL I*] . . . is very comparable to the types of companies we have now" and Defendants took "four depositions of Olin witnesses." Tr. 27:10-21 (May 22. 2020). Indeed, many of the Plaintiffs in this MDL are sophisticated entities that are significantly larger than Olin and consumed significantly more freight transportation. In addition, the need for depositions is especially critical here because so many Plaintiffs have limited or even no custodial ESI. Accordingly, Defendants are unlikely to learn of the subject matter of those witnesses' likely testimony, and are unlikely to be adequately prepared to cross-examine these witnesses at trial, without taking their depositions.

If, as Plaintiffs' counsel suggested, Defendants take an average of just 4 depositions per *complaint*—even though many complaints involve multiple separate Plaintiffs—they will need to take over 400 depositions. And if Defendants take, on average, 4 depositions per Plaintiff—recognizing that some Plaintiffs are large entities with significant traffic that will require more

than 4 depositions, and other Plaintiffs are small entities or affiliates of other Plaintiffs that will require fewer than 4 depositions—they will need to take over 1,200 depositions.

In scheduling these depositions, Defendants are very mindful of the Court's previous warning to the parties: "I caution all sides: Do not call witnesses prematurely." May 5, 2020 Status Conference Tr. at 38:3-12. Plaintiffs have taken the position that depositions for a Plaintiff cannot begin until all parties have produced documents for the Plaintiff. As noted above, the parties have been discussing deposition scheduling, with the expectation that depositions will begin in early June for those cases in which document production permits early scheduling prior to the June 30, 2021 target date for document production to be substantially complete in all cases. Defendants await information from Plaintiffs regarding which Plaintiffs could substantially complete their document productions earlier, and plan to notice depositions beginning in June in select cases where earlier document production for both sides is feasible.

**3. Plaintiffs' Retention of Materials**

As Defendants have noted, many Plaintiffs have indicated that, given the passage of time, they have not retained responsive materials. Others appear to have retained only limited materials. This issue has already complicated the parties' discovery efforts, and Defendants are concerned that many Plaintiffs will ultimately produce little to nothing regarding their claims or from their witnesses' files.

Defendants have asked Plaintiffs, through interrogatories, to identify the dates and recipients of their hold notices (but not the notices themselves). In *MDL I*, Defendants provided similar information to Plaintiffs. Defendants have also asked each Plaintiff to identify when it first anticipated litigation against Defendants and their external communications regarding this litigation that pre-date the date they claim to have first anticipated litigation. Plaintiffs have, so far, declined to provide any information regarding these issues.

The parties are discussing a potential compromise to resolve Plaintiffs' objections. Specifically, Plaintiffs have offered, "subject to client approval," to provide "date information relating to when MDL II litigation hold notices were sent and/or received for agreed-upon Plaintiff custodians, in exchange for Defendants' agreeing not to move to compel on" Defendants' remaining interrogatories on these issues. *See* Mar. 24, 2021 Jennifer English Email. Defendants have indicated that they are amenable to this compromise if (a) sufficient Plaintiffs provide "client approval," and (b) Defendants can reserve the right to follow up with specific Plaintiffs, if necessary, to the extent there is information suggesting that particular Plaintiff failed to comply with its preservation obligations. Defendants will inform the Court if the parties are unable to resolve their differences.

**B. Discovery From Defendants**

**1. Custodians**

Plaintiffs initially asked Defendants to produce documents from a collective 426 new custodians (i.e., custodians who were not *MDL I* custodians).[8] After dozens of hours of meet and confers and exchanges of many letters over several weeks, the parties compromised on November 12, 2020, and agreed to 186 total MDL II custodians—40 BNSF custodians, 34 CSXT custodians, 41 NS custodians, and 71 UP custodians.

**2. Search Terms**

With respect to search terms, at Plaintiffs' request, Defendants have agreed to run 1,632 separate search strings to identify Plaintiff-specific materials. After some initial negotiations in

[8] On August 14, 2020, Plaintiffs sent a list of 426 requested new Defendant custodians—80 from BNSF, 111 from CSX, 109 from NS, and 126 from UP. Plaintiffs requested these custodians on top of Defendants' 131 MDL I custodians (32 BNSF MDL I custodians, 29 CSXT MDL I custodians, 36 NS MDL I custodians, and 34 UP MDL I custodians).

the fall of 2020, Defendants sent Plaintiffs a comprehensive search term proposal on December 8, 2020. Defendants agreed to test the vast majority of the roughly 1,800 terms proposed by Plaintiffs, including many common and generic terms, and began that testing process once Defendants' custodians were finalized in late 2020. Given the number of terms identified by Plaintiffs, this was an extremely complex and time-consuming process. For example, UP's working spreadsheet of term variations it was testing in February 2021 included approximately 4,000 searches, and continued to grow as UP tested various limiter strings and proximity connectors requested by Plaintiffs.

As Defendants tested the search terms, they continued to engage in search term negotiations with the Plaintiffs that had responded to Defendants' December 8, 2020 letter in January and February. However, a number of Plaintiffs did not respond to Defendants' proposal for months, some because Plaintiffs' Liaison Counsel failed to provide the correspondence to all Plaintiffs. *See, e.g.*, Caseria Letter to Defs., Mar. 9, 2021 (stating that the "first time we received" Defendants' December 8, 2020 letter on search terms for Defendants' ESI was "on March 4, 2021, when plaintiffs' liaison discovery committee circulated it to all plaintiffs"). On March 4 and 6, 2021, Defendants sent Plaintiffs complete lists of search terms with the necessary revisions as determined by Defendants' testing of the terms.

Over the next several weeks, Plaintiffs requested even more revisions, and Defendants therefore conducted additional testing. Even though many of Plaintiffs' requests resulted in inclusion of higher numbers of irrelevant documents, in the spirit of compromise and in order to conclude search term negotiations, Defendants agreed to numerous concessions. *See* Defs' Mar. 22, 2021 Letter to Plfs (attached hereto as **Defendants' Exhibit 2**, illustrating the complexity

and final outcome of the parties' extensive negotiations). The parties concluded negotiations over the search terms Defendants would run over their ESI at the end of March 2021.

### 3. Defendants' Document Production

Plaintiffs have repeatedly suggested to the Court, including in their briefs regarding post-2008 data, that Defendants are somehow taking too long to produce materials to Plaintiffs. Defendants reject that suggestion.

Defendants produced their entire MDL I productions to Plaintiffs more than a year ago, which included 2,949,000 pages of documents and 58 fact and expert deposition transcripts. In addition to that substantial production, Defendants have already produced over 4.8 million pages of contract and rate authority documents, which Defendants prioritized searching for and producing at Plaintiffs' request, given that many Plaintiffs apparently have not retained copies of their own contracts. Specifically, NS has produced approximately 92,000 additional pages, CSXT has produced over 260,000 pages, BNSF has produced over 3,850,000 pages, and UP has produced approximately 608,000 pages.[9]

[9] As previously described to the Court and repeatedly explained to Plaintiffs, UP's signed contracts from the relevant period generally exist in individual custodial files rather than a central location, and those documents must therefore be produced in the course of UP's production of responsive custodial documents. However, to accommodate Plaintiffs' request to prioritize searches for contract information, UP has dedicated significant resources to prioritizing and producing pricing authorities from UP's pricing database and began rolling productions of that information on April 7, 2021. This information is essentially in the form of unsigned contracts or price authorities (*e.g.*, circulars and quotes). As noted, signed contracts, would be located in individual custodial files during this time period and could include additional terms. Determining whether it was feasible to produce contracts from the pricing database, confirming the completeness of the information in the database, and preparing the first production involved a significant undertaking.

By contrast, Plaintiffs have produced only 80,253 pages between all 300+ of them and Plaintiffs in approximately 40 cases have produced no documents at all. No Plaintiff has indicated that its production of contracts and price authorities is substantially complete.

Defendants have agreed to use best efforts to meet Plaintiffs' proposed June 30, 2021 substantial completion date for all parties. Defendants have approximately 150 contract attorneys engaged in document reviews. Defendants are keenly focused on using best efforts to produce documents as efficiently and promptly as possible.

### C. UP Is Entitled To Use Technology Assisted Review

Defendant UP is meeting and conferring with Plaintiffs regarding the extent to which it will use technology assisted review ("TAR") to limit the burden of document review. UP does not believe this issue is ripe for the Court's resolution at this time and it may never reach that stage. Nevertheless, UP provides the following information regarding this issue so that the Court is apprised of the status of the parties' negotiations.

Defendant UP determined, based on the volume of documents resulting from the number of custodians and final search terms, that it likely needs to use technology assisted review ("TAR") to limit the undue burden of reviewing irrelevant documents. On April 1, 2021, UP informed Plaintiffs of its plans, and soon after provided additional information regarding its TAR tool and proposed validation methodology.

Plaintiffs do not object to Defendants' use of TAR to prioritize documents for review, but have raised objections to the use of TAR to limit the volume of documents that must be manually reviewed. UP is meeting and conferring with Plaintiffs to resolve their objections.

Plaintiffs have suggested that UP should have determined earlier that they would need to use TAR, and that Plaintiffs would somehow have negotiated search terms differently had they

known that was the case. Both of Plaintiffs' positions are incorrect and inconsistent with the entire ESI process undertaken by the parties here.

Defendants are clearly entitled to use TAR under the heavily negotiated ESI Protocol entered by the Court on June 30, 2020 (ECF 283), and, in fact, they specifically negotiated for the right to do so. Section VI of the ESI Protocol, entitled "Search Terms and Technology Assisted Review," provides:

> The parties anticipate utilizing agreed-upon search terms as a means of limiting the volume of documents and ESI, and some parties ***may also utilize computer assisted review programs to limit the volume of documents and ESI*** or identify responsive documents or ESI. The parties will meet and confer to determine (1) applicable search terms for each party's production(s), (2) processes for refinement/modification of search terms based on initial testing and/or hit reports, and (3) acceptable methodologies for validation of computer assisted review."

ESI Stipulation, ECF 283 at p.18-19 (emphasis added).[10] Until the completion of custodian and search term negotiations in late March, UP was unsure about whether a TAR would be necessary.

---

[10] Moreover, "it is now black letter law that where the producing party wants to utilize TAR for document review, courts will permit it." *Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 127 (S.D.N.Y. 2015); *Entrata, Inc. v. Yardi Sys., Inc.*, No. 2:15-CV-00102, 2018 WL 5470454, at *7 (D. Utah Oct. 29, 2018) (party "was not required to seek approval from the Magistrate Court to use TAR where there was never an agreement to utilize a different search methodology"). And Defendants' use of TAR in addition to search terms is consistent with the ESI Stipulation and the proportionality requirements of the Federal Rules. *See Livingston v. City of Chicago*, No. 16 CV 10156, 2020 WL 5253848, at *3 (N.D. Ill. Sept. 3, 2020); *In re Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*, No. 3:12-MD-2391, 2013 WL 1729682, at *2 (N.D. Ind. Apr. 18, 2013); *Bridgestone Americas, Inc. v. Int'l Bus. Machines Corp.*, No. 3:13-1196, 2014 WL 4923014, at *1 (M.D. Tenn. July 22, 2014). These issues have been litigated since 2007, Defendants have already conducted large document reviews and produced millions of pages of documents to Plaintiffs from MDL I, and the parties spent more than eight months negotiating the new custodians and search terms. In this context, requiring Defendants to forego TAR or to use TAR on their entire ESI collections rather than documents isolated based on Plaintiff-specific search terms would be unduly burdensome. *See Livingston*, 2020 WL 5253848, at *3 ("[U]sing TAR on the entire ESI collection—when, as Plaintiffs aptly point out, the parties spent nearly a year litigating the protocol for collecting and searching the City's ESI—would be

UP has been transparent with Plaintiffs regarding its plans. It has disclosed its TAR software and validation methodologies and has been, and continues to, meet and confer with Plaintiffs regarding validation. The Federal Rules do not require more of UP. *Livingston v. City of Chicago, No. 16 CV 10156, 2020 WL 5253848, at *3 (N.D. Ill. Sept. 3, 2020)* ("Plaintiffs' insistence that the City must collaborate with them to establish a review protocol and validation process has no foothold in the federal rules governing discovery.")

### D. CSXT Custodians

As part of the process of collecting the ESI for the agreed upon custodians, CSXT determined that almost all of the preserved ESI for 10 CSXT custodians was inadvertently lost due to a vendor error that occurred during a routine information system upgrade in 2018. The impact of this vendor error was not limited to material preserved for this litigation.

After informing Plaintiffs about this vendor error, CSXT met and conferred with Plaintiffs and responded to Plaintiffs' questions. In an effort to minimize the potential impact to both sides, CSXT has agreed to several requests made by Plaintiffs, including (i) producing all relevant ESI for these 10 custodians that was not lost due to the vendor error; (ii) producing all relevant ESI collected in connection with *MDL I* that includes these 10 custodians in the to, from, or cc fields; (iii) removing all search term limiters when collecting and reviewing ESI related to these 10 custodians with the exception of certain specific limiters; and (iv) removing all search term limiters when collecting and reviewing ESI for the other 24 agreed upon CSXT custodians with the exception of certain specific limiters.

---

wasteful and unduly burdensome, and would further delay the resolution of this almost four-year-old case.").

Moreover, CSXT has proposed adding eight new custodians who worked in the commodity groups responsible for handling CSXT's contract negotiations with Plaintiffs.

**E. Conclusion**

While the parties have continuing disagreements about certain aspects of discovery, the parties have been actively engaged in addressing these complex discovery issues and devoted enormous time and resources to the effort, including hundreds of letters and emails (sometimes over a dozen in a day) and weekly meet and confer calls. However, there is still substantial discovery to complete with the parties targeting June 30, 2021, for substantial completion of document productions and, as explained above, Defendants planning to begin depositions in select cases where earlier document production is feasible in early June. While Defendants will continue to attempt to avoid burdening the Court with discovery disputes where possible, Defendants did want the Court to be fully informed of the scope of discovery involved in this MDL, what discovery efforts have been completed to date, and the significant amount of discovery that remains. Defendants look forward to addressing any questions the Court may have at the conference.

*/s/ Tyrone R. Childress*
Tyrone R. Childress
Kelsey S. Bryan (D.C. Bar # 1034352)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2589
E-mail: tchildress@jonesday.com
E-mail: kbryan@jonesday.com

M. Majoras (D.C. Bar # 474267)
Kristen Lejnieks (D.C. Bar # 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: kalejnieks@jonesday.com

*/s/ Daniel M. Wall*
Daniel M. Wall
Timothy L. O'Mara
Tyler Young
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600

Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
allyson.maltas@lw.com

*/s/ Matthew M. Collette*
Matthew M. Collette (D.C. Bar No. 427167)
Kathryn A. Robinette (D.C. Bar No. 1659218)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Phone: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com
krobinette@masseygail.com

Leonard A. Gail
Illinois State Bar No. 6199745
Massey & Gail LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-1590
Fax: (312) 379-0467
lgail@masseygail.com

*Counsel for Defendant Union Pacific Railroad Company pursuant to the Notices of Appearance entered in each case*

/s/ Glenn D. Pomerantz
Glenn D. Pomerantz
E. Martin Estrada
Kuruvilla J. Olasa
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Phone: (213) 683-9100
Glenn.Pomerantz@mto.com
Martin.Estrada@mto.com
Kuruvilla.Olasa@mto.com
Anne.Conley@mto.com

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Phone: (415) 512-4000
Ben.Horwich@mto.com

/s/ Linda S. Stein
Linda S. Stein (D.C. Bar No. 376217)
Molly Bruder Fox (D.C. Bar No. 981619)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Phone: (202) 429-3000
lstein@steptoe.com
mbfox@steptoe.com

Jacobus P. van der Ven (D.C. Bar No. 1644774)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001-5369
Phone: (202) 220-1100
Jacobus.vanderven@mto.com

*Attorneys for Defendant BNSF Railway Company pursuant to the Notices of Appearance entered in each case*

/s/ Tara L. Reinhart
Tara L. Reinhart (D.C. Bar. No. 462106)
John R. Thornburgh II (D.C. Bar No. 1044137)
Thomas R. Gentry (D.C. Bar No. 1617060)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
tara.reinhart@skadden.com
john.thornburgh@skadden.com
thomas.gentry@skadden.com

Ronald K. Wray II
GALLIVAN, WHITE & BOYD P.A.
55 Beattie Place, Suite 1200
Greenville, SC 29601
Telephone: (864) 271-5362
rwray@GWBlawfirm.com

*Counsel for Defendant Norfolk Southern Railway Company pursuant to the Notices of Appearance entered in each case*

*/s/ Kent A. Gardiner*
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Juan A. Arteaga
Mara R. Lieber
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134
JArteaga@crowell.com
MLieber@crowell.com

/s/ David M. Wells
David M. Wells
Anne Coxe Mesrobian
GUNSTER, YOAKLEY & STEWART, P.A.
One Independent Drive, Suite 2300
Jacksonville, FL 32202
Phone: (904) 354-1980
Primary Email: dwells@gunster.com
Primary Email: amesrobian@gunster.com
Secondary Email: dculmer@gunster.com
Secondary Email: awinsor@gunster.com

*Counsel for Defendant CSX Transportation, Inc. pursuant to the Notices of Appearance entered in each case*

/s/ Michael D. Hausfeld
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo
Halli E. Spraggins
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com
hspraggins@hausfeld.com

Seth R. Gassman
HAUSFELD LLP
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
(415) 633-1908
sgassman@hausfeld.com

*Attorneys for American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company;*

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Sami H. Rashid
Viola Trebicka
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com
violatrebicka@quinnemanuel.com

*Attorneys for Plaintiffs Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; Coffeyville Resources Refining &*

*LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell Recycling Southeast, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc.; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*/s/ Alden L. Atkins*
Craig P. Seebald (D.C. Bar No. 438968)
Alden L. Atkins (D.C. Bar No. 00393922)
Lindsey R. Vaala (D.C. Bar No. 974770)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West

*Marketing, LLC; Wynnewood Refining Company, LLC; East Dubuque Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars (KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries - WCR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; Northdown Industries, Inc.; Normerica Inc.; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing*

Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com
aatkins@velaw.com
lvaala@velaw.com

*/s/ John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854) Daniel M. Jaffe (D.C. Bar No. 461185) SLOVER & LOFTUS LLP 1224 Seventeenth Street NW Washington, D.C. 20036 (202) 347-7170 (202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining; LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company*

*/s/ Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400) David E. Benz (D.C. Bar No. 485868) Joe Smith (D.C. Bar. No. 1010223) THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036

*partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock –Rex, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; and The J.M. Smucker Company*

*/s/ William J. Blechman*
Robert D. W. Landon, III

Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

/s/ *David C. Eddy*

David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted pro hac vice)
Travis C. Wheeler (DC Bar No. 484023)
Chase C. Keibler (admitted pro hac vice)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com
ckeibler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Anheuser-Busch, LLC; and Anheuser-Busch Companies, LLC*

/s/ *Adam Carlis*

Geoffrey L. Harrison

Richard Alan Arnold
William J. Blechman
Douglas H. Patton
Samuel J. Randall
Michael A. Ponzoli
Joshua B. Gray
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: rlandon@knpa.com
raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
srandall@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Lehigh Hanson, Inc., PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

/s/ *Nathan P. Eimer*

Nathan P. Eimer (*pro hac vice*)

Shawn Raymond
Adam Carlis
Matt Wood
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
mwood@susmangodfrey.com

Raj Mathur
SUSMAN GODFREY, L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
(212) 729-2051
rmathur@susmangodfrey.com

*Attorneys for Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal*

Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
dbirk@eimerstahl.com
srazzano@eimerstahl.com
bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com
*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, and Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, GenOn REMA, LLC*

/s/ Joseph M. Vanek
Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (*pro hac vice* forthcoming)
SPERLING & SLATER, P.C.
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492

*Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc.; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiffs Kellogg Company and Mitsubishi Motors North America, Inc.*

/s/ *David B. Helms*
David B. Helms
GM LAW PC
8000 Maryland Avenue, Suite 1060
Clayton, Missouri 63105
PH: 314-474-1750
FX: 816-471-2221
Email: davidh@gmlawpc.com

Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

*Attorneys for Plaintiffs Brady McCasland, Inc.; Lansing Ethanol Services, LLC, et al.*

*/s/ Eric S. Hochstadt*
David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*) Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com
luna.barrington@weil.com
sarah.ryu@weil.com

Carrie C. Mahan (D.C. Bar No. 459802)
WEIL, GOTSHAL & MANGES LLP
2001 M. Street NW #600
Washington, DC 20036
Telephone: (202) 682-7000
Fax: (202) 857-0940
carrie.mahan@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

*/s/ Benjamin D. Brown*
Benjamin D. Brown (DC Bar. No. 495836)
Robert A. Braun (DC Bar. No. 1023352)
Leonardo Chingcuanco
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
lchingcuanco@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, and NYK Line (North America) Inc.*

*/s/ Edward D. Hassi*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper, Esquire
Tristan M. Ellis, Esquire
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com
tmellis@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

*/s/ James P. Denvir*
James P. Denvir
(D.C. Bar No. 284554)
Scott E. Gant
(D.C. Bar No. 455392
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (pro hac vice)
James Grippando (pro hac vice)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*/s/ Kristopher S. Davis*
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, and Pizo Operating Company, LLC*

*<u>/s/ Frank M. Lowrey IV</u>*
Frank M. Lowrey IV (pro hac vice)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (pro hac vice)
mykkeltvedt@bmelaw.com
Amanda D. Bradley (pro hac vice)
bradley@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

*<u>/s/ Michael C. Dell'Angelo</u>*
Michael C. Dell'Angelo
Michael J. Kane
H. Laddie Montague, Jr.
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
hlmontague@bm.net
mwallin@bm.net

Daniel J. Walker
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, D.C. 20006
(202) 559-9745
dwalker@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West*

*<u>/s/ Daniel B. Goldman</u>*
Daniel B. Goldman
Steven S. Sparling
Daniel Lennard
Zachary C. Naidich
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com
ssparling@kramerlevin.com
dlennard@kramerlevin.com
znaidich@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company, Tronox Inc., and Tronox US Holdings Inc.*

*Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

/s/ *Leo D. Caseria*
Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

*/s/ Ronald J. Aranoff*
Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to:<br>ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH) |

**JOINT STATUS REPORT**

Pursuant to the Court's July 18, 2023 Order, the parties respectfully submit this Joint Status Report "regarding the status of this litigation and the status of the 'potential dispute' identified by the parties in the [July 14, 2023] Joint Status Report." 7/18/23 Minute Order (Paperless); *see also* 7/6/21 Mem. and Order 5, ECF No. 676; 1/31/23 Minute Order (Paperless) (instructing the parties "to continue filing Joint Status Reports every twelve weeks").

**I. Additional MDL II Actions**

Since the parties' July 14, 2023 Joint Status Report (ECF No. 925), no additional actions have been filed and identified as tag-along cases for potential consolidation with this MDL. Accordingly, the current number of cases in this MDL remains at 106.

**II. Status of EPIC Action**

On August 8, 2023, the Court entered a Minute Order setting forth the schedule for the completion of fact and expert discovery in *Environmental Protection & Improvement Company, LLC v. Union Pacific Railroad Company et al.* (the "EPIC Action"), No. 1:22-cv-2587 (BAH), ECF Nos. 23 & 24.[1] Consistent with the Court's Scheduling Order, the parties concluded fact discovery in the EPIC Action on September 15, 2023, with the exception that EPIC agreed to revise certain responses and objections to Defendants' interrogatories in an attempt to address

[1] BNSF Railway Company is not a defendant in the EPIC Action.

concerns raised by Defendants. EPIC served supplemental responses and objections to Defendants' interrogatories on October 4, 2023.

Under the Court's Scheduling Order, EPIC's expert disclosures are due October 16, 2023 and Defendants' opposition expert disclosures are due December 11, 2023.

### III. Status of MDL II Fact Discovery

Fact discovery ended on February 1, 2023, pursuant to the Court's November 8, 2022 minute order.[2] During fact discovery, Plaintiffs conducted a total of 31 depositions (24 30(b)(6) depositions and 7 30(b)(1) depositions). Defendants conducted a total of 342 depositions (24 30(b)(6) depositions and 318 30(b)(1) depositions).

As detailed below, the parties disagree as to whether Defendants improperly produced material after the close of fact discovery in connection with the current dispute regarding certain damages claims.

### IV. Status of MDL II Expert Discovery

In accord with the Court's November 8, 2022 Order, Plaintiffs made expert disclosures in all actions in this MDL, with the exception of the EPIC Action, on March 1, 2023. *See* 11/8/22 Minute Order (Paperless). Plaintiffs' five experts served 61 reports, the vast majority of which Plaintiffs have indicated include materially identical economic opinions and methodologies. Plaintiffs made each of their experts available for two-day depositions, and Defendants completed depositions of Plaintiffs' five experts between June 12, 2023 and August 3, 2023.

[2] The parties have also stipulated that certain depositions may be taken after the close of fact discovery if those witnesses are relied upon by opposing parties in connection with expert reports, summary judgment, or trial. (Joint Stip. Re. Supp. Disclosures and Deferment of Witness Deps., ¶ 3, Nov. 22, 2021, Dkt. No. 751).

Defendants' served opposition expert reports from four joint experts and three individual Defendant experts on August 15, 2023, in accord with the Court's November 8, 2022 Order. *Id.* One of Defendants' experts, Avram Tucker, served a report totaling nearly 23,000 pages, including over 14,000 pages of Plaintiff-specific appendices purporting to describe the shipping experience and negotiating history of every one of the over 100 Plaintiffs.[3] The parties have agreed to deposition dates for Defendants' experts between October 12 and November 9.

Plaintiffs' rebuttal expert reports are due on November 15, 2023. *Id.*

## V. Status of Potential Dispute

**Defendants' Statement**

In the July 14, 2023 Joint Status Report, Defendants informed the Court that various Plaintiffs are improperly seeking approximately $1 billion in the following categories of damages in violation of the Court's prior *American Pipe* rulings: (i) damages under contracts and price authorities that applied mileage-based fuel surcharges;[4] (ii) damages related to transportation services provided by non-*MDL II* defendant (and non-*MDL I* defendant) CSX

[3] As to Mr. Tucker, in light of the expansive nature of his report, in order to keep the deposition schedule manageable Plaintiffs have agreed to proceed the two-day deposition offered by Defendants. However, because that timeline will not allow for Plaintiffs to fully depose Mr. Tucker as to each of his over 100 Plaintiff-specific appendices, to the extent Mr. Tucker later is to testify at trial, Plaintiffs have reserved the right to seek further Plaintiff-specific depositions of Mr. Tucker prior to that trial testimony. Defendants have reserved their rights to oppose any such request.

[4] *See In re Rail Freight Fuel Surcharge Antitrust Litig. (NO. II)* ("*MDL II*"), 2020 WL 5016922, at *19-*22 (D.D.C. Aug. 25, 2020) (holding that *MDL II* plaintiffs are "time-barred" from asserting claims or damages related to Defendants' application of mileage-based fuel surcharges because the fuel surcharges challenged in *MDL I* "were always rate-based fuel surcharges," and because "[t]he class the *MDL I* plaintiffs moved to certify—the controlling class for *American Pipe* purposes—expressly . . . defin[ed] [ ] the fuel surcharges at issue as rate-based fuel surcharges").

Intermodal, Inc. ("CSXI");[5] and (iii) lingering effects damages that require litigation of post-2008 conduct, such as bilateral, fixed term contracts that were amended after 2008 and rail services purchased after 2008 under open transportation offers or after an evergreen contract's annual renewal in 2009.[6]

Although Defendants were prepared to brief these issues during the fall of 2023, they agreed to Plaintiffs' request to continue the meet and confer process because Plaintiffs claimed that (i) the additional exchange of information could potentially narrow any disputes, and (ii) it would be burdensome for them to brief these issues while preparing their rebuttal expert reports.

Over the last 12 weeks, Defendants have made efforts to meet and confer with Plaintiffs to try to narrow any disputes ultimately brought before the Court. On July 26, 2023, Defendants provided Plaintiffs with lists of shippers that Defendants identified as improperly seeking damages for transportation services that assessed a mileage-based fuel surcharge or were purchased from CSXI. Defendants prepared these lists based on their review of Plaintiffs' expert reports at Plaintiffs' request, despite the fact that Plaintiffs already possessed this information. With respect to the Plaintiffs seeking post-2008 damages, Defendants requested that these Plaintiffs explain the process they undertook to confirm that those claimed damages comply with the Court's prior rulings. Three Plaintiff groups responded in late August and a final group

---

[5] *Id.* at *17-*19 (holding that *MDL II* plaintiffs are "time-barred" from asserting claims and damages related to conduct of three alleged co-conspirators not named as defendants in *MDL I* because "courts consistently hold that *American Pipe* does not apply to entities or individuals not named as defendants by the putative class").

[6] *See MDL II*, 2021 WL 1909777, at *9-*22 (D.D.C. May 12, 2021) (stating that the Court had already "unambiguously held that claims of continuing harm from the conspiracy that would require proof of conduct after December 31, 2008 were time-barred" and concluding that this "bright-line" precludes lingering effects damages under bilateral, fixed term contracts that were amended after 2008, transactions under open offers after December 31, 2008, and transactions under evergreen contracts after the contracts "annual renewal in 2009" as examples of the Court's "categorical conclusions . . . about the availability of lingering effects damages").

responded in mid-September, seven weeks after they received Defendants' correspondence. All Plaintiffs continued to assert that they are entitled to the damages they have claimed despite the Court's clear rulings regarding limitations on damages claims that qualify for *American Pipe* tolling.

On September 22, 2023, Defendants provided Plaintiffs a letter which further explained why Plaintiffs' claims for damages related to price authorities with mileage-based fuel surcharges, CSXI traffic, and certain lingering effects damages violate the Court's prior *American Pipe* rulings. As part of their effort to narrow any disputes, Defendants also provided Plaintiffs with lists of the specific price authorities that fall into each category of improper damages claims. Defendants supplemented their lists of price authorities under which Plaintiffs are improperly seeking lingering effects damages claims on September 28, 2023.

In addition, Defendants identified documentary support for each improper claim to post-2008 damages on these lists. The majority of this cited documentary support consisted of material produced during the fact discovery period. Defendants also provided Plaintiffs with courtesy copies of approximately 95 post-2008 agreements or amendments to price authorities that cut-off lingering effects damages. Given that fact discovery was limited to the period between 2000 and 2008, Defendants had no reason to search for or produce any post-2008 agreements or amendments until Plaintiffs served their March 2023 expert reports claiming over $1 billion in lingering effects damages through 2018 (i.e., more than a decade after the Court has determined that Plaintiffs were on notice of Defendants' alleged conspiracy).[7] Indeed,

*Id.* at *10 (stating that the "bright-line" established by the Court for cutting off lingering effects damages claims took "into account that plaintiffs were on notice from 2007, when the [STB] 'determined . . . that defendants' practices of imposing rate-based fuel surcharge for regulated rail freight traffic was an unreasonable practice, and *MDL I* began, advancing the same theory

Defendants would have had no way to know which post-2008 contract amendments and agreements may be implicated by Plaintiffs' eventual improper lingering effects claims before Plaintiffs' March 2023 expert reports. And, Defendants can hardly have been expected to search for and produce all post-2008 amendments and agreements impacting the terms of price authorities entered between 2003 and 2008 given their lack of relevance to properly alleged damages claims.

From the outset of the meet and confer process, Defendants asked Plaintiffs if they had reviewed their files to confirm that they were not asserting lingering effects damages claims under price authorities that were amended or otherwise changed after 2008. Defendants also informed Plaintiffs that they were undertaking such a review of their files to confirm whether these damages claims complied with the Court's rulings. Nonetheless, Plaintiffs are now claiming that Defendants' challenge to their post-2008 damages claims improperly relies on material that was supposedly "produced" after the close of fact discovery. This argument lacks merit for multiple reasons.

*First*, the majority of the material that Defendants have cited to challenge Plaintiffs' improper post-2008 damages claims was produced by the parties during the fact discovery period.[8] *Second*, Defendants have not made any document productions outside the discovery period. Instead, Defendants provided Plaintiffs with courtesy copies of post-2008 agreements and amendments in the hopes that such material would help narrow any disputes brought to the Court. Defendants were forced to provide these courtesy copies because Plaintiffs—who, as the

---

with respect to unregulated rail-freight traffic, that their agreements with defendants might contain artificially high rate-based fuel surcharges").

[8] Indeed, UP's challenge to Plaintiffs' post-2008 damages claims under UP contracts and price authorities does not rely on any material provided after the discovery period.

Court has noted, "carry the burden of proving that their [post-2008 damages claims] qualify for *American Pipe* tolling"[9]—failed to take any steps to ensure that their post-2008 damages claims comply with the Court's rulings. The absence of such work by Plaintiffs is confirmed by the fact that the discovery record includes post-2008 amendments to contracts and price authorities under which they are improperly claiming hundreds of millions in lingering effects damages. *Finally*, the Court's rulings establish that material showing that the parties' contractual relationship changed after 2008, such as through an amendment, should and must be considered in order to assess the appropriateness of any post-2008 damages claims.[10]

Plaintiffs also contend that Defendants should not be permitted to rely on the cited post-2008 material because they lack discovery related to these post-2008 agreements and amendments, which, as properly anticipated by the Court's earlier rulings, reflects the inherent problem with Plaintiffs' lingering effects claims: Plaintiffs are attempting to litigate post-2008 facts and conduct not at issue in *MDL I*. The Court has already "unambiguously held that claims of continuing harm from the conspiracy that would require proof of conduct after December 31, 2008 [are] time-barred." *MDL II*, 2020 WL 1909777, at *9 (D.D.C. May 12, 2021).

Throughout the meet and confer process, Defendants have requested that Plaintiffs withdraw their improper damages claims but Plaintiffs have declined to do so. Consequently, Defendants respectfully request the Court's permission to move to strike Plaintiffs' improper damages claims on the following briefing schedule:

- Defendants' Opening Brief due December 1, 2023

[9] *MDL II*, 2021 WL 1909777, at *9.

[10] *Id.* at *11 (holding that Plaintiffs are time-barred from pursuing lingering effects damages after any post-2008 change in the parties' contractual relationship, including a contract amendment, because "such altered agreements would likewise require inquiry into the parties' post-2008 conduct").

- Plaintiffs' Opposition Brief due January 10, 2024
- Defendants' Reply Brief due January 31, 2024

This schedule avoids overlap with the expert discovery schedule, as Plaintiffs requested, but allows the Court to consider these issues, which are relevant to a large number of cases, before taking up other potential motions. Contrary to Plaintiffs' assertions, these motions will involve the straightforward application of the Court's *American Pipe* rulings. As noted above, the Court previously ruled on these issues in its August 25, 2020 and May 12, 2021 opinions, and Defendants' motion will simply seek application and enforcement of those legal rulings to Plaintiffs' improper damages claims. As explained in the July 2023 Joint Status Report, enforcing the Court's rulings prior to other motions practice will greatly promote judicial economy because it will avoid the waste of significant time and resources on clearly time-barred claims across a large number of cases, and will allow the parties and Court to focus on issues that are properly part of this MDL when addressing summary judgment and other dispositive motions.

Three days before this submission—and nearly three months after the parties' July 2023 Joint Status Report—Plaintiffs proposed for the first time that the parties brief the question of whether the challenged damages claims violate the Court's *American Pipe* rulings along with summary judgment and *Daubert* motions pursuant to the following schedule:

- Opening Briefs: January 30, 2024
- Opposition Briefs: April 30, 2024
- Reply Briefs: June 17, 2024

In accordance with the Court's prior Orders, Defendants will meet and confer with Plaintiffs on a briefing schedule and plan for summary judgment, *Dauber*t and other pre-trial

motions and will include a proposal in the parties' December 2023 Joint Status Report. However, the parties' discussions on the schedule for these other motions should not prevent them from moving forward with briefing the question of whether the challenged damages claims violate the Court's *American Pipe* rulings because, as noted above, the Court's early enforcement of these rulings will resolve an important preliminary issue applicable to numerous cases—enforcement of the Court's prior rulings—thereby allowing the parties to focus their summary judgment, *Daubert* and other pre-trial motions on issues that are properly part of this MDL.[11] These significant efficiencies will be lost under Plaintiffs' proposal.

Finally, Defendants are willing to continue to meet and confer with Plaintiffs to try to narrow the damages disputes involving the application of the Court's *American Pipe* rulings that would be addressed in the December 2023 motion proposed by Defendants, but Plaintiffs have indicated no openness to making progress on these issues despite being presented with clear rulings and documentary proof establishing the inappropriateness of the challenged damages claims.

To assist the Court's assessment of their request, Defendants provide below a brief summary of their positions regarding each category of improper damages claims. Defendants will fully set forth their basis for challenging Plaintiffs' improper damages claims in their motion papers.

---

[11] Plaintiffs suggest that Defendants' requested briefing should be delayed because Judge Friedman may rule on the pending summary judgment motion in *MDL I* between now and January 30, 2024, and that ruling may "shap[e] the issues to be determined at summary judgment in MDL II." This argument misses the mark because, as noted above, Defendants requested briefing schedule does not involve a summary judgment motion. Instead, Defendants intend to move to strike Plaintiffs' improper damages claims based upon the Court's prior *American Pipe* rulings. This Court is undoubtedly best positioned to interpret and apply its own rulings. Moreover, the summary judgment motions pending before Judge Friedman do not implicate this Court's *American Pipe* rulings.

1. ***Defendants' Application of Mileage-Based Fuel Surcharges***: In its decision addressing Defendants' motion to dismiss, the Court ruled that Plaintiffs are time-barred from pursuing claims related to Defendants' application of mileage-based fuel surcharges because the fuel surcharges challenged in the *MDL I* putative class proceedings "were always rate-based fuel surcharges," and because "[t]he class the *MDL I* plaintiffs moved to certify—the controlling class for *American Pipe* purposes—expressly . . . [defined] the fuel surcharges at issue as rate-based fuel surcharges[.]" *MDL II*, 2020 WL 5016922, at *21.

Despite these clear rulings, some Plaintiffs claim they are entitled to damages related to price authorities with mileage-based fuel surcharges, as opposed to rate-based fuel surcharges, because they seek damages related to purportedly inflated base rates (i.e., rates before any application of a fuel surcharge) to which mileage-based fuel surcharges were applied, but not the mileage-based fuel surcharges themselves. As Defendants explained during the meet and confer process, these lawyer instructions to economic experts do not permit Plaintiffs to evade this Court's unambiguous rulings because this Court has already determined that claims and damages based on the assertion that Defendants' manipulated a contract or price authority's overall rail rates through the application of mileage-based fuel surcharges are time-barred. For example, in its decision addressing Defendants' motion to dismiss, this Court ruled that:

> The *MDL I* putative class proceedings did not provide defendants with adequate notice of omnibus plaintiffs' allegations that defendants manipulated overall freight prices through the use of mileage-based fuel surcharges. To the extent these allegations are included in omnibus plaintiffs' complaints to support a damages demand, they are time-barred.

*Id.* at *22.

> The two types of fuel surcharges alleged by omnibus plaintiffs, as two distinct methods of price fixing, represent two different factual theories "predicated" on different acts of defendants. Both were

> allegedly implemented with the goal of increasing overall rail freight rates, but otherwise do not appear rooted in the same conduct. Omnibus plaintiffs claim that defendants imposed rate-based fuel surcharges in 2003 and, after "differentiating" their conspiracy, first introduced mileage-based fuel surcharges in 2007. The claims therefore likely do not turn on "the same evidence, memories, and witnesses," and change the scope of defendants' liability to former putative class members. . . . Tolling of these claims would therefore create undue prejudice to defendants.

*Id.*

Plaintiffs also assert that this "rebasing" theory allows them to seek damages under contracts and price authorities that applied mileage-based fuel surcharges because "rebasing conduct was explicitly part of the proposed class definition in MDL since March 2010." This assertion conveniently ignores the fact that the *MDL I* representatives' class certification motion papers expressly limited the traffic with supposedly "rebased" base rates to instances where Defendants applied non-standard ***rate***-based fuel surcharges and purportedly sought to recapture any lost fuel surcharge revenue through higher base rates that "baked in" at a least portion of the standard ***rate***-based fuel surcharge.

Indeed, Judge Friedman's class certification decision confirms that the *MDL I* class representatives' "rebasing" assertions were limited to instances where Defendants applied non-standard ***rate***-based fuel surcharges rather than mileage-based fuel surcharges:

> As plaintiffs describe it, at some point during the alleged conspiracy NS engaged in something that has come to be known in this case as rebasing; namely folding at least part of the fuel surcharge into the base rate. . . .
>
> Plaintiffs assert that shippers who paid a rebased rate simply paid a new base rate with a portion of the previous supra-competitive fuel surcharge bake[d] in. As [plaintiffs' expert] explains it, NS' rebasing strategy effectively made permanent a surcharge based on a WTI of $64 by folding that amount into base rates, and supplemented that with a new stand-alone fuel surcharge anytime WTI exceeded $64.

*In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*MDL I*"), 287 F.R.D. 1, 30 (D.D.C. 2012) (quotation marks and citations omitted), *rev'd on other grounds*, 725 F.3d 244 (D.C. Cir. 2013).

The fact that the *MDL I* class representatives' "rebasing" assertions did not include Defendants' application of mileage-based fuel surcharges is further confirmed by the decision of the Quinn Emanuel firm—which served as Co-Class Counsel in *MDL I*—not to seek these damages on behalf of the nearly 200 Plaintiffs that it represents in this MDL.

Defendants will further explain in their motion papers why the *MDL I* record and the Court's rulings bar Plaintiffs' improper attempt to seek approximately $300 million in damages under contracts and price authorities where Defendants applied mileage-based surcharges.[12]

2. ***CSXI Damages***: In its decision addressing Defendants' motion to dismiss, the Court held that Plaintiffs are time-barred from asserting claims and damages related to the supposed conspiratorial conduct of three non-*MDL I* defendants because *American Pipe* tolling "does not apply to entities or individuals not named as defendants by the putative class." *MDL II*, 2020 WL 5016922, at *18.

Despite this clear ruling, Plaintiffs contend they are entitled to seek damages related to transportation services purchased from CSXI because they claim "CSXI shipments have always been part of this litigation (MDL I and MDL II)[.]" During the meet and confer process, Defendants repeatedly explained that this contention lacks merit because, as Judge Friedman concluded in *MDL I*, "[CSXI] was a separate company from CSX[T] during the class period and is not a party to this case. ***CSXI shippers therefore are not class members.***" *MDL I*, 292 F. Supp. 3d 14, 123 n.37 (D.D.C. 2017) (emphasis added), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019).

[12] This damages figure is based on Defendants' work to date and thus could be adjusted based on additional work.

Defendants also explained in the meet and confer process that Judge Friedman's conclusion is fully supported by the fact that the *MDL I* class representatives chose not to include CSXI or CSXI shippers within the class they moved to certify, which, as this Court has ruled, is "the controlling class for *American Pipe* purposes[.]" *MDL II*, 2020 WL 5016922, at *21.

Defendants further explained that the fact that CSXT and CSXI were subsidiaries of the same corporate parent does not save Plaintiffs' untimely claims because courts have held that corporate "affiliation with a named defendant is not sufficient to trigger *American Pipe* tolling." *Allianz Global Investors GmbH v. Bank of Am.*, 463 F. Supp. 3d 409, 428 (S.D.N.Y. 2020). Moreover, Defendants explained that this Court has already rejected the argument that joint and several liability under the antitrust laws permits Plaintiffs to pursue claims and damages based on the supposed conspiratorial conduct of a non-*MDL I* defendant.[13]

When Plaintiffs wrongly requested CSXI document custodians in this MDL, Defendants objected on the grounds that any CSXI-related claims were time-barred and proposed bringing this issue to Court at the outset of discovery. However, Plaintiffs declined to do so and thereafter withdrew any requests for CSXI document custodians and deponents.

Defendants will further explain in their motion papers why the *MDL I* and *II* records and the Court's rulings bar Plaintiffs' improper attempt to seek approximately $40 million in damages arising out of transportation services purchased from CSXI.[14]

---

[13] *MDL II*, 2020 WL 5016922, at *18 ("Plaintiffs' [joint and several liability argument] confuses the issue: the question is not whether, under the antitrust laws, defendants are or could be liable for [non-*MDL I* defendants'] involvement in the conspiracy alleged by omnibus plaintiffs. Instead, the question is whether omnibus plaintiffs' otherwise time-barred claims with respect to these three [non-*MDL I* defendants] are in fact timely because of *American Pipe* tolling.").

[14] This damages figure is based on Defendants' work to date and thus could be adjusted based on additional work.

3. ***Post-2008 Damages Claims***: In its May 2021 decision, the Court held that Plaintiffs are time-barred from pursuing "lingering-effects damages that . . . would require litigation of post-2008 conduct." *MDL II*, 2021 WL 1909777, at *9. Thereafter, the Court applied this "bright-line" to specific categories of contracts and price authorities, holding that Plaintiffs are time-barred from pursuing lingering effects damages claims for (i) "purchases made under an evergreen contract after its annual renewal in 2009 or later;" (ii) purchases made under open offers after December 31, 2008; and (iii) purchases under bilateral, fixed-term contracts that were made after any post-2008 change in the parties' contractual relationship, such as a contract amendment. *Id.* at *11-*12. The Court held that these lingering effects damages claims do not qualify for *American Pipe* tolling because they would require litigation of the parties' post-2008 conduct, which was not the subject of *MDL I*. *Id.*

Despite these clear rulings, numerous Plaintiffs are seeking hundreds of million in lingering effects damages claims for transportation purchases that fall into the above time-barred categories.[15] For example, some Plaintiffs are seeking damages during 2009 for shipments that were made pursuant to open offers, where the Plaintiff had no obligation to ship under that price authority. Other Plaintiffs are seeking post-2008 damages after the term for the contract entered during the alleged conspiracy period ended. Another Plaintiff is seeking hundreds of millions in damages through 2018 even though the material produced during the discovery period establishes that the relevant contracts were repeatedly amended after 2008.

These Plaintiffs are continuing to seek such improper damages claims even though in the meet and confer process Defendants have either identified evidence in the discovery record or

[15] This damages figure is based on Defendants' work to date and thus could be adjusted based on additional work.

provided courtesy copies of post-2008 material (i.e., post-2008 contract amendments) confirming that these claims violate the Court's rulings. (Notably, the nearly 200 Plaintiffs represented by the Quinn Emanuel firm—which served as *MDL I* Co-Class Counsel—have also correctly chosen not to seek post-2008 damages.)

One group of Plaintiffs (the Thompson Hine Plaintiffs)—which are seeking approximately $900 million in post-2008 damages through 2018—have argued that the Court's rulings do not preclude them from pursuing damages claims after a post-2008 contract amendment because their expert supposedly concluded that the contracts continued to have "the same all-in price" after the amendment. During the meet and confer process, in addition to pointing out that the "same all-in price" did not apply after some post-2008 amendments at issue,[16] Defendants explained that this argument finds no support in the Court's rulings because at no point has the Court adopted a "price change" standard for determining whether post-2008 damages claims qualify for *American Pipe* tolling. To the contrary, the Court has made clear that lingering effects damages claims under all "altered agreements would likewise require inquiry into the parties' post-2008 conduct" and thus are "time-barred." *Id.* at *10. Of course, even litigating the question of whether a post-2008 amendment effected a "price change" would require post-2008 evidence and litigation of the parties' post-2008 conduct. Plaintiffs appear not to address this category of improper lingering effects damages claims in their position statement.

Defendants will further explain in their motion papers why the challenged post-2008 damages claims fail to comply with this Court's unambiguous rulings.

[16] For example, the Defendants identified Thompson Hine Plaintiffs such as Alabama Power and Georgia Power that had post-2008 amendments that modified the rate structure.

**Plaintiffs' Statement**

The "potential dispute" raised by Defendants in the parties' July 14, 2023 Joint Status Report, and again in this filing, does not require any action from the Court at this time. Instead, Defendants seek to dispute certain categories of damages that they claim are not recoverable in this MDL. Defendants have described their intended motion as one to "strike" damages, but they have not provided further clarity of the nature of that motion to "strike" (*i.e.*, whether it would be a summary judgment, a *Daubert*, or some other evidentiary motion), nor have they explained why it needs to be addressed separately from any other dispositive and/or pre-trial exclusionary motions. Given that Defendants' damages challenges are, at most, partial summary judgment motions (if not motions *in limine* or damages issues more appropriately reserved for the ultimate factfinder), Plaintiffs have proposed that the parties begin meeting and conferring to develop a schedule for all remaining dispositive and *Daubert* motions, so as not to burden the Court with piecemeal briefing. Indeed, the Court's own operative Scheduling Order requires the parties to, by December 1, 2023, "file a joint status report proposing a schedule for further proceedings, including any anticipated motions." 11/8/22 Minute Order (Paperless).

To that end, and given that Defendants are eager to brief these issues, Plaintiffs have proposed to Defendants the following schedule:

- January 30, 2024 – Opening summary judgment and *Daubert* motions due
- April 30, 2024 – Oppositions to summary judgment and *Daubert* motions due
- June 17, 2024 – Replies in further support of summary judgment and *Daubert* motions due

Plaintiffs' proposed schedule has two benefits over Defendants' proposal to file its motion on December 1, 2023. First, it avoids seriatim motions; given that Defendants will presumably seek

to file other dispositive and/or *Daubert* motions, it is more efficient for the Court to consider all such issues at the same time and on the same record. Second, given Judge Friedman's pending summary judgment decision in MDL I, somewhat later motions may allow all the parties and this Court the benefit of that decision in shaping the issues to be determined at summary judgment in MDL II.[17]

Based on the foregoing, the Court need not do anything further at this time; the parties will submit a briefing schedule for all future motions by December 1, 2023 in accordance with the operative Scheduling Order and taking into account any summary judgment decision in MDL I between now and then.

Defendants write at length about the to and fro surrounding how and when this dispute arose. Plaintiffs do not wish to burden the Court with extensive briefing on process issues but do want to emphasize two points. First, Plaintiffs' consistent position since June 2023 has been that Defendants' motions should be briefed with dispositive and *Daubert* motions, with a proposed schedule to be submitted to the Court on December 1, 2023, as Plaintiffs laid out in the last Joint Status Report. ECF No. 925 at 5. Plaintiffs have asked Defendants since this issue was first raised what, exactly, Defendants intended to file, under what rule of civil procedure or evidence, and why these motions should be excluded from the December 1, 2023 schedule proposal. Defendants still cannot answer those questions, supporting Plaintiffs' original view.

Further, in July, Plaintiffs asked Defendants to identify the Plaintiffs and price authorities for which Defendants claim that certain damages are unrecoverable and asked other questions

---

[17] Plaintiffs first received Defendants' scheduling proposal for their proposed motions on October 5. That proposal calls for Defendants' motion be filed December 1, 2023, with Plaintiffs' opposition due January 10, 2024 and Defendants' reply due on January 31, 2024, needlessly requiring Plaintiffs to brief their oppositions over the year-end holidays.

about their contentions that Defendants could not answer. Defendants' statement concedes that they first identified these authorities on September 22 and 28, 2023. And while Defendants' statement lists their purported efforts to narrow issues relating to post-2008 damages, they simultaneously admit that they failed to properly address this issue in expert discovery, completely ignoring the August 15, 2023 deadline to file opposition expert reports where disclosure of this information should have been made.

Given that the Defendants have made certain mischaracterizations of the damages involved in the "dispute" at issue, Plaintiffs are compelled to respond (as briefly as possible). Defendants have categorized these damages as: "(i) damages under contracts and price authorities that applied mileage-based fuel surcharges; (ii) damages related to transportation services provided by non-defendant CSX Intermodal, Inc. ("CSXI"); and (iii) lingering effects damages that require litigation of post-2008 conduct." Each of these categories is discussed briefly below:

1. Mileage-Based Fuel Surcharges

Both in the July 14, 2023 Joint Status Report and in this filing, Defendants have told the Court that certain Plaintiffs are seeking to recover damages for price authorities that applied mileage-based fuel surcharges. This misrepresents Plaintiffs' theory of damages as to the shipments at issue. In 2007, the evidence demonstrates that Defendants UP and CSX shifted certain price authorities or shipments with a rate-based fuel surcharge to a mileage-based fuel surcharge, while simultaneously coupling that shift with a "rebasing" of base rates, to move the conspiratorial rate-based fuel surcharge into the base rate. Certain Plaintiffs have introduced expert evidence concerning damages flowing from those Defendants' practice of rebasing.

These issues have always been part of MDL I, and they have been known to Defendants for many years. As this Court has previously observed, rebasing conduct was explicitly part of the proposed class definition in MDL I since March 2010, ECF. No. 358 at 7-8 (including as alleged conspiratorial fuel surcharges "where some or all of the fuel surcharge was included in the base rate through a method referred to as 'rebasing'"), and was part of the certified class in MDL I.[18]

Defendants have had ample opportunity to fully discover each expert's damages analysis, and the evidence underlying it, during expert discovery of Plaintiffs' experts, and have had a full opportunity to challenge those analyses in Defendants' own opposition expert reports. To the extent Defendants intend to seek exclusion of specific portions of Plaintiffs' damages, such a motion can be made at summary judgment, as a motion *in limine*, or at trial.

2. CSXI Shipments

Defendant CSX claims that Plaintiffs cannot claim damages for shipments by CSXI during the conspiracy period, because CSXI was not a named Defendant in the MDL I action. Plaintiffs have always maintained through discovery, in both MDL I and MDL II, that CSXI shipments are a part of this litigation. During the conspiracy period, CSXI reimbursed CSXT for costs related to intermodal operations; CSXT collected revenue on behalf of CSXI; and individuals at CSXT with responsibility over fuel surcharges also oversaw implementation of fuel surcharges at CSXI. Additionally, CSXI merged into CSXT in June 2010, before briefing on the initial class certification motion in MDL I was even complete. Any damages flowing from CSXI contracts and price authorities are properly recoverable in this litigation, including because

[18] *See In re Rail Freight Fuel Surcharge Antitrust Litigation*, 287 F.R.D. 1, 29 (D.D.C. 2012).

of joint and several liability. Naming CSXI as a defendant, which would have been impossible by the time of MDL II in any event given that it no longer existed as an independent entity, has never been a requirement to seek damages on CSX's intermodal shipments. If CSX would like to ask this Court to determine as a matter of law that it is not liable for this subset of shipments, such a motion can be made during the normal course of dispositive briefing.

3. Post-2008 Damages

More than three years ago, in 2020, this Court held that Plaintiffs can recover from damages on rates paid after 2008 so long as the governing price authorities were negotiated during the class period. ECF. No. 358 at 53-54. Since at least that time, Defendants have been on notice that Plaintiffs sought post-2008 damages flowing from conduct during the class period (*i.e.* price authorities that were negotiated during the class period). In 2021, the parties brought a dispute to the Court's attention concerning the time frame for Defendants' data production so that Plaintiffs could prove their post-2008 damages. The Court clarified its prior ruling, distinguishing between lingering effects damages that "would require litigation of post-2008 conduct"—which would not be tolled under *American Pipe*—and lingering effects damages flowing from underlying conduct that would have occurred during the 2003-2008 putative MDL I class period. ECF No. 631 at 20-21.

Here, Plaintiffs seek only those damages falling into the latter category. Plaintiffs' experts have reviewed the documentary evidence and transactional data produced in this litigation, and they have identified in their reports exactly which price authorities, negotiated and made effective during the class period, resulted in damages incurred after 2008. Defendants had ample opportunity in each expert's two-day deposition to ask specific questions or challenge the

categorization of any price authorities that they believed were not appropriately classified. Defendants' experts have also had the opportunity to do the same in their opposition reports.

Rather than doing any of this work, on September 28 and 29, 2023, *eight months after the close of fact discovery*, and over a month after their own expert disclosures were due, Defendants surprised Plaintiffs with productions of documents that they claim relate to post-2008 damages. Incredibly, Defendants have provided no information about where these documents came from, why they were not produced earlier in litigation (particularly because Defendants have been on notice since at least August 2020 that lingering effects damages were part of this case), how the documents were selected, and what other relevant documents may exist that were not produced. Plaintiffs have had no opportunity to depose Defendants' witnesses on these late-produced and cherry-picked documents. While Defendants claim in their statement that Plaintiffs are seeking discovery relating to post-2008 conduct, it is exactly the opposite; Defendants have initiated such discovery, and Plaintiffs object to it. It is all the more shocking that Defendants were able to locate and produce these documents now given how adamantly opposed Defendants were to making additional document productions in MDL II—including *any* document productions that would require Defendants to collect documents post-dating their MDL I collection, which ended in 2007.

The purpose of having a date certain for the close of fact and expert discovery is to avoid exactly this sort of situation. Plaintiffs intend to move to exclude these untimely, self-serving, and cherry-picked documents at the appropriate time.

As to Defendants' factual dispute over the extent to which Plaintiffs can recover post-2008 damages, such a dispute can be resolved in due course through summary judgment or at trial, and requires no additional, piecemeal briefing.

Dated: October 6, 2023

/s/ Tara Reinhart
Tara L. Reinhart (D.C. Bar No. 462106)
Julia K. York (D.C. Bar No. 478001)
Thomas R. Gentry (D.C. Bar No. 1617060)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue NW
Washington, D.C. 20005
Telephone: (202) 371-7000
Tara.Reinhart@skadden.com
Julia.York@skadden.com
Thomas.Gentry@skadden.com

/s/ Ronald K. Wray II
Ronald K. Wray II
GALLIVAN, WHITE & BOYD P.A.
55 Beattie Place, Suite 1200
Greenville, SC 29601
Telephone: (864) 271-5362
rwray@GWBlawfirm.com

*Counsel for Defendant Norfolk Southern Railway Company pursuant to the Notices of Appearance entered in each case*

/s/ Juan A. Arteaga
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Juan A. Arteaga
Mara R. Lieber
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134
JArteaga@crowell.com
MLieber@crowell.com

/s/ David M. Wells
David M. Wells
GUNSTER, YOAKLEY & STEWART, P.A.
225 Water Street, Suite 1750
Jacksonville, FL 32202
Phone: (904) 354-1980
Primary Email: dwells@gunster.com

*Counsel for Defendant CSX Transportation, Inc. pursuant to the Notices of Appearance entered in each case*

*/s/ Tyrone R. Childress*
Tyrone R. Childress
Kelsey S. Bryan (DC Bar No. 1034352)
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2589
E-mail: tchildress@jonesday.com
E-mail: kbryan@jonesday.com

John M. Majoras (DC Bar No. 474267)
Kristen A. Lejnieks (DC Bar No. 502136)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: kalejnieks@jonesday.com

*/s/ Timothy L. O'Mara*
Timothy L. O'Mara
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600

Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
allyson.maltas@lw.com

*/s/ Matthew M. Collette*
Matthew M. Collette (D.C. Bar No. 427167)
Kathryn A. Robinette (D.C. Bar No. 1659218)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Phone: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com
krobinette@masseygail.com

Leonard A. Gail
Illinois State Bar No. 6199745
Massey & Gail LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-1590
Fax: (312) 379-0467
lgail@masseygail.com

*Counsel for Defendant Union Pacific Railroad Company pursuant to the Notices of Appearance entered in each case*

*/s/ Linda S. Stein*
Linda S. Stein (D.C. Bar No. 376217)
Molly Bruder Fox (D.C. Bar No. 981619)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Phone: (202) 429-3000
lstein@steptoe.com
mbfox@steptoe.com

*/s/ Glenn D. Pomerantz*
Glenn D. Pomerantz
Kuruvilla J. Olasa
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Phone: (213) 683-9100
Glenn.Pomerantz@mto.com
Kuruvilla.Olasa@mto.com
Anne.Conley@mto.com

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Phone: (415) 512-4000
Ben.Horwich@mto.com

Lauren Ross (D.C. Bar No. 1659620)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001-5369
Phone: (202) 220-1100
Lauren.Ross@mto.com

*Counsel for Defendant BNSF Railway Company pursuant to the Notices of Appearance entered in each case*

*/s/ Alden L. Atkins*
Craig P. Seebald (D.C. Bar No. 438968)
Alden L. Atkins (D.C. Bar No. 00393922)
Lindsey R. Vaala (D.C. Bar No. 974770)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com
aatkins@velaw.com
lvaala@velaw.com

*/s/ John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854)
Daniel M. Jaffe (D.C. Bar No. 461185)
SLOVER & LOFTUS LLP
1224 Seventeenth Street NW
Washington, D.C. 20036
(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining; LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star*

/s/ Michael D. Hausfeld
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo

HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com

*Attorneys for American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell Recycling Southeast, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company*

/s/ Sami H. Rashid
Sami H. Rashid
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com

Viola Trebicka
Jennifer English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com

*Attorneys for Plaintiffs Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird*

*Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

<u>*/s/ William J. Blechman*</u>
Robert D. W. Landon, III
Richard Alan Arnold
William J. Blechman

*Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars (KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White*

Douglas H. Patton
Samuel J. Randall
Michael A. Ponzoli
Joshua B. Gray
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: rlandon@knpa.com
raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
srandall@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Lehigh Hanson, Inc., PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

*Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container*

*Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

*/s/ David C. Eddy*
David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Anheuser-Busch, LLC; Anheuser-Busch Companies, LLC; Nestlé Purina PetCare Company; and Nestlé USA, Inc.*

*/s/ Joseph M. Vanek*
Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (*pro hac vice* forthcoming)
SPERLING & SLATER, P.C.
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiffs Kellogg Company and Mitsubishi Motors North America, Inc.*

*/s/ Adam Carlis*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
Scott T. Glass
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com
sglass@susmangodfrey.com

Raj Mathur
SUSMAN GODFREY, L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
(212) 729-2051

*/s/ Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500

rmathur@susmangodfrey.com

*Attorneys for Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo*

Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

*/s/ Kristopher S. Davis*
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and*

*Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

/s/Kirk T. May
Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

David B. Helms
GM LAW PC
8000 Maryland Avenue, Suite 1060
Clayton, Missouri 63105
PH: 314-474-1750
FX: 816-471-2221
Email: davidh@gmlawpc.com

*Attorneys for Plaintiffs Lansing Ethanol Services, LLC, et al.*

/s/ Benjamin D. Brown
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki*

*Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

/s/ Eric S. Hochstadt
David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com
luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

/s/ Edward D. Hassi
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper, Esquire
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel: (212) 909 6000

*Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

*/s/ James P. Denvir*
James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)
James Grippando (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

*/s/ Nathan P. Eimer*
Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
dbirk@eimerstahl.com
srazzano@eimerstahl.com
bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

*/s/ Michael C. Dell'Angelo*
Michael C. Dell'Angelo
Michael J. Kane
H. Laddie Montague, Jr.
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
hlmontague@bm.net
mwallin@bm.net

Daniel J. Walker
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, D.C. 20006
(202) 559-9745
dwalker@bm.net

Sophia Rios
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

*/s/ Daniel B. Goldman*
Daniel B. Goldman
Nathan Schwartzberg
Martin M. McSherry
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com
nschwartzberg@kramerlevin.com
mmcsherry@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company*, *Tronox Inc., and Tronox US Holdings Inc.*

*/s/ Leo D. Caseria*
Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100

*/s/ Ronald J. Aranoff*
Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP

Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

*/s/ Conte C. Cicala*

Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the Joint Status Report was filed electronically with the United States District Court for the District of Columbia through the Court's ECF System on October 6, 2023.

*/s/ Juan A. Arteaga*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Kawasaki Kisen Kaisha, Ltd.**<br>Iino Building, 1-1<br>Uchisaiwaicho 2-Chome, Chiyoda-ku,<br>Tokyo 100-8540, Japan<br><br>**"K" Line America, Inc.**<br>4860 Cox Road, Suite 300<br>Glen Allen, VA 23060<br><br>Plaintiffs,<br><br>v.<br><br>**BNSF Railway Company**<br>2650 Lou Menk Drive<br>Fort Worth, Texas 76131<br><br>**CSX Transportation, Inc.**<br>500 Water Street<br>Jacksonville, Florida 32202<br><br>**Norfolk Southern Railway Company**<br>Three Commercial Place<br>Norfolk, Virginia 23510<br><br>**Union Pacific Railroad Company**<br>1400 Douglas Street<br>Omaha, Nebraska 68179<br><br>Defendants. | Civil Action No.<br><br>Judge: |

**<u>COMPLAINT</u>**

## INTRODUCTION

1. Plaintiffs Kawasaki Kisen Kaisha, Ltd. and "K" Line America, Inc., by and through their undersigned attorneys, bring this antitrust suit for treble damages against Defendants BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company ("Defendants").

2. Plaintiffs allege that, from July 1, 2003 until at least September 30, 2012 (the "Relevant Period"), (i) Defendants engaged in price fixing in violation of Section 1 of the Sherman Act, including by fixing rate-based rail fuel surcharges ("FSC") and/or (ii) through the use of multi-year contracts, Defendants continued to reap the benefits of their anticompetitive scheme (in the form supra-competitive fuel surcharges) for years after Defendants' collusion-tainted contracts were negotiated. During the Relevant Period, Plaintiffs directly purchased unregulated rail freight transportation services from one or more Defendants, which assessed Plaintiffs an FSC for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law. Certain allegations in this Complaint are premised on factual assertions reflected in pleadings and other court documents filed by former court-appointed lead class counsel, which had full access to the discovery record in the former class suit alleging an identical conspiracy to violate the antitrust laws.

3. In 2003, the four largest United States-based Class I railroads engaged in an extraordinary series of meetings, phone calls, and email communications through which they embarked on a conspiracy—under the guise of a fuel cost recovery program—to apply and enforce rail fuel surcharges across their customers in order to generate profits. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc.

("CSX"), and Norfolk Southern Railway Company ("NS") together controlled about 90% of rail freight traffic in the United States during the Relevant Period. Defendants used "rate-based" FSCs—i.e., surcharges that use a percentage applied to the base rate for a shipment—as a means to impose across-the-board rate increases on rail freight shipments, a result that would have been prohibitively difficult to achieve on a contract-by-contract basis. Throughout the conspiracy and despite customer pushback against Defendants' FSCs, Defendants set aside their individual, economic self-interest to undercut one another and instead staunchly maintained their FSC program, pocketing billions of dollars in profits as a result.

4. Prior to conspiring, Defendants operated as businesses should: they actively competed against each other over rates generally and with respect to fuel recovery mechanisms to the benefit of their customers. According to a historical study of rail rates undertaken by the Surface Transportation Board ("STB"), "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Defendants were aware of, and concerned about, this trend. According to one CSX internal analysis from 2002, this decline resulted from factors including "some very vicious historical price wars" in the rail industry and "destructive pricing for rail share."

5. Between 2000 and 2003, Defendants independently tried to implement revenue-enhancing policies, including uncoordinated efforts to impose stand-alone FSCs. These efforts failed. Defendants used the inclusion or absence of FSCs as a basis to compete for each other's business and customers successfully resisted FSCs. They were rarely included in contracts and more rarely collected; those seeking to impose them lost customers to competitors or compensated customers by negotiating discounts. For example:

a. BNSF explained in a May 2002 Enterprise Wide Risk Assessment that "We are challenged to mitigate the risk through fuel surcharges, particularly as

the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

b. In September 2002, NS's manager of pricing systems Pat Glennon reported to the then-Senior Vice President of Marketing Services and later its CMO Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities."

c. As late as April 2003, UP's Bob Toy reported, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

6. Moreover, since the passage of the Staggers Act in 1980, which significantly deregulated the American railroad industry, railroads typically entered into private freight transportation contracts that included escalation provisions tied to indexes that weighted actual cost factors, including fuel cost. As UP President James Young acknowledged on an October 2004 earnings call, the Rail Cost Adjustment Factor ("RCAF") "looks at actual costs through the industry." In that respect, Defendants were already recovering fuel costs through the RCAF or the related All Inclusive Index ("AII").

7. In March 2003, everything began to change. Rather than competing, Defendants began coordinating FSC programs. Senior executives at the highest levels of each company began

to discuss with one another the implementation of more aggressive FSC formulas that the Surface Transportation Board ("STB") later found bore "no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied . . . ." In short, Defendants stopped competing and started conspiring.

8. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly reduced the surcharges applied to shippers' base rates. Simultaneously, UP's CMO Jack Koraleski was recommending escalation of UP's FSC program to be substantially more aggressive. The very next day, Koraleski traveled to competitor CSX to play golf, socialize, and discuss "fuel surcharge methodology." Within one week, CSX's leadership abruptly reversed course, abandoning its recommended FSC reduction and adopting a program matching UP's escalation.

9. On March 18, 2003, BNSF and NS senior executives met to discuss "synchroniz[ing]" FSCs. Action items for the meeting attended by John Lanigan (BNSF's CMO) and Don Seale stated: "BNSF's fuel surcharge is structured differently than NS, CSX and UP. Should BNSF's by [sic] synchronized with the other big players in the industry?" The answer based on what followed: a resounding yes.

10. On March 20, 2003, CSX publicly announced a new, more aggressive FSC program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSXT." On April 4, 2003, UP sent a "concurrence" to competitors that its new FSC program will "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "This is sweet!!!! Just like the CSXT."

11. On April 1, 2003, BNSF and CSX senior executives met. The agenda dictated that CSX's CMO Mike Giftos and BNSF's CMO John Lanigan were to discuss "Fuel Surcharge." Documents also reveal that, between April 2 and 6, 2003, NS's Seale and BNSF's Lanigan continued a prior discussion on "the fuel surcharge issue" at a National Freight Transportation Association meeting.

12. Similar to CSX's abandonment of a less aggressive FSC regime following a meeting with UP in March 2003, BNSF abandoned the internal consideration of an FSC program that could have been fairer for shippers. Between February and April 2003, BNSF had been "[l]eaning toward [a] Cost Per Mile" FSC formula (a mileage-based FSC which could have better correlated the resulting FSCs to actual fuel costs compared to the rate-based FSCs that Defendants broadly implemented during the conspiracy), but abandoned this approach. Instead, BNSF and UP adopted nearly identical rate-based FSCs. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates."

13. Defendants' employees recognized these new FSCs were not genuine fuel cost recovery mechanisms as Defendants sought to portray. For example, on March 19, 2003, CSX's Director of Market Strategy John Couch explained that while the coordinated FSC "seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." On April 7, 2003, NS's Manager of Pricing Systems Pat Glennon recounted "[t]he case in favor of adopting the CSXT standard" to Don Seale and AVP Charlie Brenner, writing the "CSXT standard clearly produces significantly more compensation, and it does it sooner and more consistently." On April 29, 2003, Glennon told Seale that "[b]y dropping the base to $23 per barrel,

raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

14. Glennon was correct that customers saw the rate increases for what they were and were outraged. Handwritten notes from a June 2003 meeting between CSX and UP's senior executives—including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden, VP of Strategic Planning Les Passa, and Alan Blumenfield, and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan—reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes. The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

15. But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall."

16. Instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants conspired to assess matching FSCs, without waivers or discounts, to their entire customer bases applied across all rail freight traffic, including carload traffic (i.e., shipments that travel from origin to destination only by railcars) and intermodal traffic (i.e., shipments that travel by rail and one other mode of transportation such as truck or ship). The conspiring Defendants' senior executives and chief marketing officers oversaw their railroads'

carload and intermodal traffic alike and sought to apply FSCs to them broadly. The junior executives overseeing the carload and intermodal traffic also attended and participated in the meetings. Even shippers with "captive" facilities (i.e., facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

17. Defendants maintained the scheme and imposed policies designed to ensure their "standard" or "published" FSCs were enforced broadly across all of their customers and for all products without the waivers and discounts they had frequently offered between 2000 and 2002:

a. BNSF: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed."

b. UP: On December 22, 2003, a sales representative explained to a customer, "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice."

c. CSX: A May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence Gooden stated that any exception had to come through him and that he had

zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge."

d. NS: A 2004 email from Don Seale to his subordinates mandated "no deviation from NS's published FSC without [his] prior approval." He also rejected any negotiations to forego base rate increases in return for FSC application as a "shell game."

18. In the fall of 2003, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to get all Defendants to agree to remove fuel costs out of the weighted RCAF and AAI indices (which already permitted the Defendants to recover all of their fuel costs), so that they could more easily charge artificially high FSCs as a revenue enhancement mechanism. As a result, the AAR—whose board was dominated by Defendants—created an unprecedented All Inclusive Index Less Fuel ("AAILF"). Defendants' conspiratorial implementation of the AAILF allowed Defendants to move away from use of the RCAF and more easily apply their FSCs.

19. Defendants worked tirelessly to achieve 100% FSC coverage across their customers. All four Defendants pursued 100% participation goals and tracked their progress toward attaining that goal. Defendants also policed the conspiracy by exchanging FSC coverage data with one another. In addition, Defendants started their negotiations using the standard FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for shippers.

20. Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150 per barrel during the

Relevant Period, so did Defendants' profits. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," and included the following chart documenting the significant growth in profits during the Relevant Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

21. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") similarly found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

22. Defendants also attributed their record revenues to FSCs. For example:

a. NS's 2006 "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume."

b. BNSF's freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units."

"Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

c. UP "achieved record revenue levels [in 2006] in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

d. CSX's operating revenue increased $948 million in 2006; "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

**THE PARTIES**

23. Plaintiff Kawasaki Kisen Kaisha, Ltd. ("'K' Line") is a corporation organized under the laws of Japan, with its principal place of business at Iino Building, 1-1 Uchisaiwaicho 2-Chome, Chiyoda-ku, Tokyo 100-8540, Japan. For more than 100 years, "K" Line, and its subsidiaries, have provided customers with comprehensive shipping services around the globe. During the Relevant Period, "K" Line purchased unregulated rail freight transportation services directly from and paid intermodal FSCs directly to one or more of the Defendants to transport intermodal shipments between ports, docks, terminals, and gateways nationwide.

24. Plaintiff "K" Line America, Inc. ("KAM"), a direct subsidiary of "K" Line, is incorporated under the laws of the State of Michigan, with its principal place of business at 4860 Cox Road, Suite 300 Glen Allen, VA 23060. KAM is the main American unit of "K" Line, and serves as general agent and representative for "K" Line in North America. During the Relevant Period, KAM purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport intermodal shipments between ports, docks, terminals, and gateways nationwide.

25. As a proximate result of the conspiracy described herein, "K" Line and KAM each paid FSCs in connection with the unregulated rail freight transportation services obtained from Defendants that they would not have paid in the absence of the conspiracy; and therefore the prices each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

26. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

27. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

28. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

29. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

**JURISDICTION AND VENUE**

30. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by each Plaintiff by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

31. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

32. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to each Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

33. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**INTERSTATE TRADE AND COMMERCE**

34. During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

35. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

36. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

37. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

38. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

39. Today, by contrast, 80% or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency—like

the previously-existing ICC—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

40. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry is now (and was during the Relevant Period) highly concentrated: four of these railroads—Defendants BNSF, UP, CSX and NS—operate more than 90% of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

41. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true—railroads are collectively charging shippers supracompetitive rates.

**DEFENDANTS SEEK UNSUCCESSFULLY TO RAISE RATES BEFORE THE RELEVANT PERIOD**

42. For many years before the Relevant Period, Defendants confronted a long-term, structural decline in rail freight rates. Indeed, according to the Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of Railroad Rates: 1985-2007*, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Figure 1 from the *Study of Railroad Rates* evidences that trend:




43. Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts by the individual Defendants to apply stand-alone FSCs. Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

44. During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs. The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an internal analysis as "some very vicious historical price wars" and "destructive pricing for rail share." A 2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We

> need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy.

45. During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs. By way of example:

a. NS: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty." VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it." The same month, Director of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC." In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS." Glennon testified that in 2001 and 2002, FSCs were only "theoretically billable."

b. CSX: In August 2000, CSX reported at a staff meeting that it could collect only 67.4% of the then-modest FSCs it had billed over the preceding nine months. EVP of Sales and Marketing Clarence Gooden testified that CSX's FSC coverage was "very low" and that he was "embarrassed" by the figure.

c. BNSF: In May 2002, BNSF's Enterprise Wide Risk Assessment explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, EVP and CMO Charles Schultz told Chairman, President, and CEO Matthew Rose and other executives, "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." Schultz's successor John Lanigan testified BNSF's FSC coverage was "low" in January 2003—"in the 25 to 30 percent range."

d. UP: Current EVP and CFO Robert Knight Jr. testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position." UP implemented an FSC program in December 2002, but initially limited the application of that program to certain tariffs and circulars and exempted private shipments in its Industrial Products group from FSCs. This was true even though FSCs were generally not triggered and only "theoretically billable." And in April 2003, Director Bob Toy reported, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

46. The reason Defendants were not able to achieve broader FSC coverage was clear: Defendants were concerned about losing business to other Defendants that did not apply FSCs, made concessions, or otherwise applied FSCs less aggressively. Defendants expressed these concerns internally and, in fact, lost business through FSC competition. Each Defendant also frequently agreed not to apply FSCs in the face of shipper objections. These competitive pressures applied across all rail freight traffic, affecting carload and intermodal traffic alike.

47. Defendants undercut each other on FSCs and waived them for competitive advantage. In 2000, NS's intermodal group "made the decision to stop applying the fuel surcharge to International accounts that are under contract." NS "stop[ped] invoicing the fuel surcharge immediately and cancel[led] any outstanding amounts" for any international customers with intermodal contracts who had "refused to pay the fuel surcharge and are not paying." In 2001, an NS intermodal employee noted to SVP of Marketing Services Don Seale and others that "we have finally been forced to acquiesce on some of the International contracts and stop charging an FSC where there is an RCR [Rail Cost Recovery Index]. Even our attorney's [sic] said we were on shakey [sic] ground, and after a year of assessing and collecting this from a few carriers, we have terminated it."

48. In January 2003, BNSF's EVP and CMO Chuck Schultz responded to a series of "Fuel Surcharge Questions" from CEO Matt Rose, including "Why can't we get more fuel surcharges or RCAF escalation in each of the forecast groups?" These groups included intermodal and carload traffic. Schultz responded that "competition [and] contract negotiating power all play a role." The effect was that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive."

49. Absent coordination, Defendants struggled to identify who was undercutting whom. In April 2001, it was reported to Anne McMahon, NS's Manager of Planning and Intermodal, that NS was losing market share in part because its main eastern competitor "CSX has begun waiving the fuel surcharge for specific accounts." But a month later, an intermodal employee reported to UP's President and COO Ike Evans and CMO Jack Koraleski that "[w]hile it is difficult to pinpoint who is cutting prices . . . evidence continues to mount that it is NS."

50. In May 2002, BNSF reported that it was challenging to impose FSCs because its main western competitor, "UP[,] does not use a fuel surcharge in the competitive marketplace." It continued, "rail competitors do not [use FSCs] and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, NS reported that CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS."

51. Customers balked at FSC entries on their bills. In April 2002, an employee complained that NS's intermodal FSC of 1.5% was generating "[n]ot much incremental revenue" and, later, another NS employee reported that shippers were resisting intermodal FSCs of only 3 percent. In October 2002, a UP employee cited an "issue" that intermodal customers had started requiring "separate billings for FSC," which had resulted in "[l]ess customer acceptance/payment as a separate line item charge on the Freight Bill." In 2003, BNSF Chief Economist Sam Kyei informed CMO John Lanigan of the "Status of BNSF Fuel Surcharge Programs," reporting that the railroad had struggled to apply the "General Intermodal Program," garnering only 34% participation among international customers." He continued, BNSF needed to "assess the effectiveness of our participation rates through exception management and tracking."

52. And, in May 2003, BNSF announced that it would reduce its standard carload FSC to 2% from 5% in May 2003 because a 5% FSC "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage." In response, UP observed internally that "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

53. Another impediment to broad application of FSCs during this period was the so-called Rail Cost Adjustment Factor, or "RCAF." The RCAF is a weighted index that accounts for all significant input costs, including fuel. The RCAF was utilized in multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.

54. Defendants recognized that imposing a stand-alone FSC where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping." For example, Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."

55. As a result, the number of shippers covered by stand-alone, rate-based FSCs was relatively low before the Relevant Period, and FSCs did not contribute significantly to Defendants' revenues or bottom lines.

**DEFENDANTS CONSPIRE IN 2003 TO RAISE PRICES BY ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS MEANS TO INCREASE ALL-IN RATES**

56. By 2003, Defendants' initial attempts to apply rate-based FSCs on their own taught them an important lesson: they could not achieve their revenue enhancement objectives unless the FSC was widely applied on a coordinated basis by all four Defendants. Absent coordination, a railroad seeking to impose FSCs more aggressively than its competitors would risk losing business

to another railroad who imposed no FSC or whose FSC policies were more flexible. By early 2003, it became apparent to Defendants that they would encounter difficulties making their FSC policies "stick" absent an industry-wide agreement.

57. Thus, beginning in the spring of 2003, Defendants' senior executives—including their CEOs and top sales/marketing executives—engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC program. The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers industry-wide.

58. The FSC programs that Defendants implemented between March 2003 and January 2004 by mutual agreement are exactly the sort of industry-standard FSC that Defendants' senior executives discussed.

59. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly reduced the surcharges applied to shippers' base rates.

60. That same day, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" attributed to UP CMO Jack Koraleski. Under the UP "Revised" proposal, FSCs were more aggressive, escalating at roughly twice the rate of the formula CSX had internally recommended. The "Revised Surcharge proposal" retained the $28 West Texas Intermediate ("WTI") strike price of UP's existing program but would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0% increase for every $5 increase in the WTI index.

61. The following day, Koraleski traveled to CSX to play golf, socialize, and discuss "fuel surcharge methodology." Beforehand, Koraleski and CSX's executive vice president of sales and marketing, Clarence Gooden, "talked on" the subject of "[f]uel surcharge methodology."

62. On March 19 and 20, 2003, within one week of the UP-CSX meeting on "fuel surcharge methodology," CSX publicly announced a new FSC policy. The program retained the lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal." Thus, under CSX's new FSC policy, CSX would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase above $23.48.

63. Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. CSX reasoned that while these modifications to its FSC program might "seem[] somewhat benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

64. On March 31, 2003, less than two weeks after CSX's announcement, UP decided to adopt "the same approach as the CSXT." Following the CSX approach, UP would impose a 0.4% FSC at a monthly-average WTI "trigger" price of $23 (i.e., the index price at which FSCs begin), and assess an additional 0.4% charge for every dollar increase in the WTI index above $23. BNSF, which had previously discussed the need for a "synchronized" FSC policy with NS, had a predictably positive reaction to UP's announcement: "This is sweet!!!! Just like the CXST."

65. On March 18, 2003, NS and BNSF senior executives—including NS's Chairman, President, and CEO David Goode, Vice Chairman and COO Steve Tobias, Vice Chairman and CFO Hank Wolf, VP and CMO Ike Prillaman, SVP of Planning Jim McClellan, VP of Intermodal Mike McClellan, SVP of Transportation Mark Manion, SVP of Marketing Services Don Seale, BNSF's Chairman, President, and CEO Matt Rose, current President and CEO and then-VP and

COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete Rickershauser, VP of Consumer Products and head of intermodal activities Steve Branscum—met and discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. This discussion point was assigned to NS's Seale and BNSF's Lanigan.

66. On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."

67. The trade association meeting was the biannual National Freight Transportation Association ("NFTA") meeting that took place on April 2-6, 2003 at the Wigwam resort, in Litchfield Park, Arizona. Each of the Defendants attended the meeting. Almost immediately following the NFTA meeting, a new internal directive was issued at BNSF that was designed to ensure across-the-board FSC application: "Effective immediately and urgently per John Lanigan[:] Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

68. On April 1, 2003, CSX CMO Mike Giftos and BNSF CMO John Lanigan met in Jacksonville, Florida to discuss "Fuel Surcharge."

69. When Defendants met to conspire, they discussed applying FSCs across *all* rail freight traffic; they did not distinguish between carload and intermodal traffic. The conspiring Defendants' senior executives and chief marketing officers oversaw their railroads' carload and intermodal traffic alike and sought to apply FSCs to them broadly. The junior executives overseeing the carload and intermodal traffic also attended and participated in the meetings.

70. The same chief marketing officers who oversaw Defendants' carload traffic—and participated in the relevant meetings identified above—were responsible for Defendants'

intermodal businesses. Moreover, those employees directly in charge of intermodal traffic were participants. NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum attended the March 2003 meeting at which their railroads discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. CSX's Alan Blumenfield, his predecessor Les Passa, and UP's Bradley King, EVP of Network Design and Integration, participated in the June 2003 meeting at which CSX and UP's senior executives discussed their FSC formulas, their FSC strike prices, and the "outcry" they were facing from the initial rollout of their new FSC regimes. UP's intermodal group regularly imposed adjustable FSC provisions and their practice was to adjust them on ad hoc bases to align with BNSF's FSCs.

71. In early 2003, BNSF had been leaning toward a mileage-based carload FSC and trying to drum up support within the industry for a mileage-based FSC formula. But on May 7, 2003—approximately one month after the NFTA meeting and its meeting with CSX—BNSF abandoned that effort. Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the On-Highway Diesel Fuel ("HDF") index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."

72. Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index. The BNSF FSC had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index. From that point on, BNSF and UP (together, the "Western Railroads") moved in lockstep and charged the exact same FSC percentage for each month of the Relevant Period.

73. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied an FSC of 0.5% for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2%. The FSC would increase 2% for every 20-cent increase in the HDF Index.

74. The Western Railroads also coordinated when they would change their FSC. They agreed that the FSC would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March. The Western Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

75. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

76. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing FSC program. In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program, but did not change the index it

employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

77. As to NS, between March 2003 and December 2003, while positioning itself to quickly implement the FSC first announced by CSX, NS had regular discussions with the other Defendants, including discussions of what FSC was "acceptable" to them and the desirability of an industry-standard FSC.

78. As it had planned and prepared for from March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, a new FSC policy, which mimicked the policy announced by CSX in March 2003 and was intended to "standardize" NS's FSC with the FSCs of the other Defendants. As with CSX's program, NS would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase thereafter. Also like CSX, NS's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days.

79. After NS's announcement, all four Defendants had essentially uniform carload FSCs and remained in synch throughout the Relevant Period. By October 2004, CSX had changed its intermodal FSC formula to be aligned with BNSF and NS's in every respect. UP's was nearly identical, but looked to weekly, rather than monthly, fuel prices. When weekly fluctuations caused UP's intermodal FSC to exceed the other Defendants', UP would "manually adjust the formula-driven amounts" to the other Defendants' FSCs. The synchronization continued through the end of the Relevant Period.

**PUBLICATION OF THE AIILF AND FIXING FSC RATES**

80. Even after having agreed to coordinate their FSCs, however, Defendants still faced a significant barrier to widespread use of FSCs: widely-used private contracts had cost escalation

provisions that already accounted for fuel costs. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely-used cost escalation indexes, thereby paving the way for widespread imposition of the new FSC program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

81. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

82. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, who dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the "AIILF"). This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

83. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an

important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy—a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

84. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, and Matt led the charge on there, is that there's a new index that [the AAR] has that's basically an index without fuel . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future."

85. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), suddenly moved into lockstep with FSCs based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

86. Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4% for every $1 that the price of WTI oil exceeded $23 per

barrel. So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2%. The FSC would be adjusted upward at 2% for every $5 increase in the WTI average price.

87. The Eastern Railroads also coordinated when they would change their FSC—two calendar months after the WTI Index had adjusted, thereby adopting the same FSC price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same FSC percentage month after month. The Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

88. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their FSC programs: including using the WTI Index for FSCs, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

89. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel costs. The FSC program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases.

As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Relevant Period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

90. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to revenue (i.e., the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel cost increase percentage to the entire cost of the freight shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through these collective actions, Defendants BNSF, UP, CSX and NS planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on FSC prices to undercut one another.

91. In November of 2004, BNSF's CMO John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC [Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for a mileage-based FSC program." The other Defendants "pushed back as expected." Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive rate-based FSCs.

92. With the conspiracy underway, the two Western Railroads, using the HDF Index, moved in lockstep and charged virtually identical FSCs on a monthly basis throughout the Relevant Period. The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began, but were identical starting in July 2003 through at least mid-2007:

**MONTHLY FSC PERCENTAGES – WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |

| | | |
|---|---|---|
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

93. As detailed above, there also was uniformity among the Eastern Railroads in the monthly FSC percentages, based on the WTI Index, that they charged customers for most of the Relevant Period. The chart below shows that the FSC percentages charged by Defendants CSX

and NS for carload shipments varied before the Relevant Period, but were identical starting in March 2004 through at least mid-2007:

**MONTHLY FSC PERCENTAGES – EASTERN RAILROADS[1]**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |

[1] The fact that this Complaint includes charts of the monthly FSC percentages for the Western and Eastern Railroads that end only in mid-2007 is not meant to suggest that either the conspiracy or its effects ended in mid-2007.

| | | |
|---|---|---|
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06[2] | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

94. In stark contrast to this uniformity in FSC percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their FSCs to arrive at the identical percentage month after month, year after year. The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior

[2] On April 24, 2006, NS announced that it would "revise its fuel surcharge program," assessing a 0.3% surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3% for every dollar increase above $64 per barrel. While NS claimed to the STB that it was rebasing because of a "decision to reduce its fuel surcharge percentage," NS had calculated the rebased fuel surcharge "to bake in FSC [the existing fuel surcharges] to [base] rate." NS had determined that a 16.4% base rate increase would allow it a "full % [fuel surcharge] pass thru" under the new program. Importantly, NS executives discussed the rebasing plan with its counterparts at the other Defendants, who recognized that the new FSC program was an economic wash compared to the program announced in late 2003 (which continued to apply to shippers under earlier contracts in any event).

and conspired to fix prices for FSCs. In addition, the advance announcements of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

95. Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below—including, in some cases, by adopting mileage-based FSCs—Defendants continued to engage in discussions concerning FSCs following the STB ruling, and to apply rate-based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before the STB Ruling.

96. While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (i.e., shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the FSCs applied to their intermodal business (i.e., shipments that travel by rail and one other mode of transportation such as truck or ship).

**IMPLEMENTATION OF THE SCHEME: DEFENDANTS' ACROSS-THE-BOARD APPLICATION OF FSCs**

97. Defendants recognized that their coordinated FSCs were more aggressive and could generate substantially more revenue. For example, describing the new FSC program that resulted from Defendants' coordination, CSX's John Couch remarked: "While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." In addition, an internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

98. Defendants recognized that their new aggressive FSC program could be undermined by resistance from shippers and competition between the Defendant railroads. A 2003 internal NS memorandum recognized that moving to the more aggressive formula would "run the risk of losing the surcharge altogether. . . . The loss of the FSC clause with just a few major

customers could offset some of the gains derived from the new FSC." And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

99. To ensure that shipper resistance would be muted, and to achieve their conspiratorial goals, each Defendant adopted policies to apply FSCs to 100% of its traffic and tracked its progress toward attaining that goal. It required "total FSC discipline" on all shipments, including intermodal. For example, in 2004, BNSF marketing leadership began an initiative to monitor FSC "adherence" on a quarterly basis. These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (e.g., shippers with expiring contracts that do not include an FSC). The reports—showing increasing FSC coverage each year—were presented to the chief marketing officer with a goal of achieving a 100% participation rate for BNSF's shippers. The same year, BNSF issued a "Mandate" that the "Marketing Team should strive for 100% fuel coverage by account" and a "business unit strategy of re-signing all expiring contracts with full fuel surcharge provisions."

100. Customers were forced to pay the FSCs despite one BNSF regional sales manager's report that "the response [to a 9% FSC pricing update] was ferocious." He requested some "propaganda" because he could only "muddle through an explanation" that did not "satisf[y] anyone."

101. CSX also monitored its effectiveness in applying FSCs to its shippers, and started tracking its progress toward implementing its FSC mandate—that "[e]verything is subject to fuel surcharge." CSX tracked the progress that its individual marketing teams were making toward widespread FSC application, and tracked contracts without FSCs to ensure they would receive

FSCs upon renewal. Its carload policy was indistinguishable from its intermodal policy. A 2006 CSX analysis projected increased coverage of its intermodal FSC on the presumption that "100% of contracts that come due will be renewed with full fuel surcharge."

102. Starting in early 2004, UP engaged in similar analyses. An analysis of UP's FSC coverage was also performed for the chief marketing officer—who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004." An internal presentation stated that UP had "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."

103. NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed division heads to identify "the largest remaining contracts (including annual revenue involved) that do not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007." An NS intermodal VP said, "Seniors are going to continue to push us aggressively" to avoid FSC exceptions. NS's VP of intermodal marketing reported in 2006 that there were only "a handful" of intermodal customers not paying the standard FSC and that efforts were being made to bring these customers onto the standard program. At this time, only one NS intermodal customer did not pay any fuel surcharge at all and NS expected to apply one when the agreement was renewed the next year.

104. Defendants policed the conspiracy by exchanging FSC coverage data. For example, at a meeting in fall of 2003 CSX-BNSF meeting attended by CSX's Director of Market Strategy John Couch and EVP of Sales and Marketing Clarence Gooden, BNSF told CSX the percentage of its carload and intermodal business having either an FSC or escalator clause. Subsequent to that meeting, Gooden asked Couch how CSX's coverage compared to BNSF's. After a meeting between BNSF and NS in late 2004, BNSF sent NS's SVP of Marketing Services Don Seale a

report addressing FSC coverage for "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

105. In furtherance of the conspiracy, Defendants instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the FSCs were "not negotiable."

106. Defendants also enforced strict policies against discounting base rates to offset the standard FSCs. For example, in an internal NS email, NS's CMO (Don Seale) remarked, "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play." A 2004 presentation to BNSF's Consumer Products business unit,[3] which includes both domestic and international intermodal traffic, identified as part of "CEO's Goals for Marketing's Fuel Surcharge Programs" that "Discounted programs unacceptable. CEO will not sign contracts not meeting the above criteria. . . . Minimize price/fuel surcharge tradeoffs."

107. As a result of these and related policies, any negotiations with their shippers about FSCs that took place started from the standard, supracompetitive FSC.

108. Even an individual Defendant's FSC formula that stayed the same during the Relevant Period as it was before Defendants conspired—like BNSF's intermodal FSC—caused

[3] BNSF has four business units: Agricultural Products, Coal, Consumer Products, and Industrial Products.

shippers to pay supracompetitive prices because the conspiracy allowed Defendants to collect surcharges that were theretofore uncollectable due to customer resistance, Defendants' waiver, or competitive pressures. By uniformly applying and enforcing their FSCs, Defendants collected FSCs they would have been unable to collect from shippers but for their conspiracy.

109. In addition, Defendants applied their standard FSCs uniformly to all traffic and commodities. For example, in October of 2005, NS advised UP as follows: "We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."

110. And Defendants imposed standard FSCs on all shippers without regard to whether the shipper had access to alternative modes of transportation. In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers—shippers without access to alternative modes of transportation—have leverage in negotiating a better rate/serve package on traffic at single served facilities. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

111. Before the conspiracy, captive shippers could negotiate out of the FSCs. But during the conspiracy they could not.

**<u>EFFECT OF THE CONSPIRACY ON "K" LINE</u>**

112. UP's negotiation of its 2008 intermodal contract with "K" Line and KAM illustrates the conspiracy's effect on "K" Line and other shippers.

113. In 2006, "K" Line met with UP management to discuss the terms of a potential new multi-year contract that would begin in 2008. During that meeting, UP indicated that it would not agree to a new contract unless "K" Line and KAM accepted UP's demand to include an aggressive FSC formula that would result in double-digit percentage increases in "K" Line and KAM's rail payments.

114. UP further represented that it had required other intermodal shippers to agree to similarly high FSCs.

115. "K" Line and KAM had little choice but to accede to UP's demands. As noted above, by March 2004, Defendants had synchronized their carload FSC policies. And, by October 2004, Defendants had synchronized their intermodal FSC policies.

116. In an effort to avoid the massive cost increases required by UP, "K" Line and KAM attempted to negotiate a contract with BNSF—the other of the two Western Railroads. But, due to Defendants' conspiracy, "K" Line and KAM's efforts to negotiate around the problem bore no fruit. As a result, "K" Line and KAM were forced to agree to a new five-year deal with UP that included the FSC formula that UP had demanded.

117. The impact on "K" Line and KAM was substantial. For instance, under their existing contract with UP, "K" Line and KAM owed an FSC of 5.1% in March 2003. In comparison, "K" Line estimated that, under the new contract, it would be required to pay an FSC of around 23-24%.

**THE STB DECISION**

118. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable

practice," because the FSCs are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

119. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

120. As detailed above, pursuant to their conspiracy, Defendants applied the same unreasonable FSC practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**<u>THE CONSPIRACY SUCCEEDS</u>**

121. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on FSCs, Defendants realized billions of dollars in revenues during the Relevant Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the FSC.

122. Defendants recognized that their coordinated FSCs in fact resulted in significant over-recovery of fuel price increases. NS, for example, recognized by July 2004 that "[c]urrent FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base," and Don Seale of NS testified that in 2005, NS's "increase in Fuel Surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."

123. UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." An October 2005 presentation shows UP estimated greater than 100% of incremental fuel cost recovery through FSCs for each of its six business groups.

124. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004. In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods, particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

125. This over-recovery applied to intermodal and carload traffic alike. BNSF recognized that Defendants' coordination of fuel surcharges for intermodal shipments made them a "'profit-center' . . . for the customers that participate." UP's finance department calculated a "recovery percentage" of 188% for its intermodal group for the first quarter of 2005.

126. By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

127. As a result, Defendants' conspiracy worked as planned to help to remove the competitive pressures that had kept their rates down for years. As the head of UP, James Young, admitted in 2007, "three, four years ago [the FSCs] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

128. Following Defendants' agreement to coordinate their FSCs, Defendants' total revenues skyrocketed during the Relevant Period, with the Defendants reporting record revenues and profits virtually every year. As noted above, Defendants themselves attributed these record figures in large part to FSCs.

129. As result of Defendants' conspiracy they were able to reverse the "destructive pricing for rail share" that led to their conspiracy. In the 2009 STB study referenced above, the STB concluded that "inflation-adjusted rail rates increased in 2005, 2006, and 2007," representing "*a significant change from prior years*, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004." The STB concluded that while rising fuel costs contributed to the rate increases "*even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades*."

130. And a 2010 Senate Commerce Committee Report conducted a "review of the largest four railroads' Securities and Exchange Commission (SEC) filings," which it found "show[ed] just how profitable the large rail companies have become over the last decade. Figure 1 demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%." The referenced Figure 1 demonstrates that Defendants' profits spiked following their collective imposition of the new FSC regime described above:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

**<u>COUNT I</u>**
**<u>(Violation of Section 1 of The Sherman Act and Section 4 of the Clayton Act)</u>**

131. Plaintiffs incorporate by reference the allegations in the paragraphs above as if they were fully set forth herein.

132. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

133. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed,

maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

134. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

135. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

136. The contract, combination, or conspiracy has had the following effects:

a. Prices charged to each Plaintiff for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Each Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c. Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

137. As a proximate result of the conspiracy described herein, each Plaintiff paid FCSs in connection with those unregulated rail freight transportation services that they would not have paid in the absence of the conspiracy; and the prices each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein.

138. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

WHEREFORE, Plaintiffs pray for relief as follows:

a. That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

b. That Plaintiffs recover compensatory damages, as provided by law, determined to have been sustained by Plaintiffs, and that judgment be entered against Defendants on behalf of Plaintiffs;

c. That Plaintiffs recover treble damages, as provided by law;

d. That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

e. For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

February 14, 2020

Respectfully submitted,

*/s/ Benjamin D. Brown*

Benjamin D. Brown (DC Bar. No. 495836)
Robert A. Braun (DC Bar. No. 1023352.)
Leonardo Chingcuanco
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
lchingcuanco@cohenmilstein.com

*Attorneys for Kawasaki Kisen Kaisha, Ltd. and "K" Line America, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEHIGH HANSON, INC.
300 E John Carpenter Freeway
Irving, Texas 75062

Plaintiff,

vs.

BNSF RAILWAY COMPANY
2650 Lou Menk Drive
Fort Worth, Texas 76131

CSX TRANSPORTATION, INC.
500 Water Street
Jacksonville, Florida 32202

NORFOLK SOUTHERN RAILWAY COMPANY
Three Commercial Place
Norfolk, Virgina 23510

*and,*

UNION PACIFIC RAILROAD COMPANY
1400 Douglas Street
Omaha, Nebraska 68179

Defendants.

Civil Action No:

**JURY TRIAL DEMANDED**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Lehigh Hanson, Inc. ("Plaintiff" or "Lehigh Hanson") files this Complaint under the antitrust laws of the United States against Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), Union Pacific Railroad Company ("UP") (collectively, "Defendants"), and alleges as follows:

## I. INTRODUCTION

1. This is a civil antitrust action against Defendant railroads and their co-conspirators for violating Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff is a company that purchased rate-unregulated[1] freight from the Defendant railroads. Defendants engaged in a price-fixing conspiracy to coordinate their rail fuel surcharge programs as a mechanism for imposing supra-competitive total price increases on their shipping customers from on or about July 1, 2003 until at least December 31, 2008. As a result of this unlawful conspiracy, Plaintiff seeks damages against Defendants, jointly and severally, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, injunctive relief, and such other relief as provided by law.

2. Defendants conspired to use rail fuel surcharges, which were added to customers' total bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States.

3. The total freight price for a shipping customer is called the "all-in rate." This rate consists of a base rate and a fuel surcharge applied as some percentage of the base rate. The base rate is calculated according to fixed costs such as the cost of organizing a particular shipment, the cost to build and maintain tracks and other structures, and the railroad's markup of price over costs. A rail fuel surcharge is a separately identified fee that is charged by the railroads for the agreed-upon transportation, supposedly to compensate the railroads for increases in the cost of fuel. Defendants imposed the rail fuel surcharge as a percentage multiplier of the base rates. These surcharges raised rates beyond the real increased costs of fuel, which allowed Defendants to collect

[1] "Rate-unregulated" refers to rail freight transportation services in which the rates are set by private contracts or through other means exempt from rate regulation under federal law.

billions of dollars of additional profits during the conspiracy at the expense of Plaintiff and other shippers.

4. An independent study commissioned by the American Chemistry Council found that through their fuel surcharge programs, Defendants generated revenues from customers that far exceeded their actual increase in fuel costs. From 2003 to the first quarter of 2007, the study found that railroads collected $11.66 billion in fuel surcharge revenue while costs in fuel rose by only $5.26 billion. Defendants used these new fuel surcharge programs (which were the result of an unlawful agreement) to generate revenue.

5. For example, BNSF's annual fuel surcharge revenue increased from about $110.5 million in 2003 to about $357 million, $1.1 billion, and $1.7 billion in 2004, 2005, and 2006, respectively. CSX increased its fuel surcharge revenue from $76 million in 2003 to about $203 million in 2004, $579 million in 2005, and $1.17 billion in 2006. NS and UP reaped similar financial benefits from the conspiracy. NS increased its fuel revenue from about $65 million in 2003 to $184 million in 2004, $609 million in 2005, and then $1.14 billion in 2006. UP increased its revenue from fuel surcharges from about $93 million in 2003 to about $292 million and $963 million in 2004 and 2005, respectively. This exponential increase in revenue allowed Defendants to collect billions of dollars of additional profits during the conspiracy.

6. According to an economic analysis on Railroad Fuel Surcharge practices commissioned by the American Chemistry Council and released in September 2007, Defendants overcharged rail shippers by over $6 billion between 2005 and the first quarter of 2007.

7. Prior to the conspiracy, Defendants faced a decline in rail freight rates. Acting on their own, each Defendant had limited success when trying to increase revenue through fuel surcharges. These pre-conspiracy fuel surcharges were only applied intermittently because

Defendants were concerned about losing business to other railroads that did not apply the fuel surcharges.

8. In order to increase revenue, Defendants devised and implemented a conspiracy to impose standardized fuel surcharges. Defendants implemented this conspiracy through various actions that began in 2003, including one or more acts as alleged below.

9. First, in or about the spring of 2003, Defendants unlawfully agreed to create and apply artificially high, uniform fuel surcharges as a means to raise rates to shippers across the board, and thereby increase Defendants' profits.

10, Second, shortly after the four Defendants entered into this agreement, two of the Defendants, BNSF and UP (together, the "Western Railroads") announced that they would be using the same fuel surcharge program, resulting in the exact same or similar fuel surcharges. Up until this time, to the extent that railroads were successful in charging shippers a fuel surcharge, the railroads charged different surcharge rates, reflecting that each railroad had different fuel costs. However, in mid-2003, the Western Railroads agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index"). Pursuant to the agreement among all four Defendants, the Western Railroads began charging the exact same or similar fuel surcharges based on the HDF Index from 2003 to 2008. A few months after the Western Railroads began charging the exact same fuel surcharges, CSX and NS (together, the "Eastern Railroads"), announced that they would apply identical surcharges based on the West Texas Intermediate ("WTI") index. Previously, the Eastern Railroads had different fuel surcharges. This announcement by the Eastern Railroads, which came closely on the heels of the announcement by the Western Railroads, was a result of the conspiracy among all Defendants to impose artificially high rail fuel surcharges in a

coordinated fashion. The Eastern Railroads charged the exact same or similar fuel surcharges from 2003 to 2008.

11. Third, Defendants collectively acted to remove any major obstacles to their plan. One of the most significant obstacles was that as of 2003, most rail freight contracts included rate escalation provisions that already permitted recovery by the railroads of actual fuel cost increases, no matter how large. In the fall of 2003, Defendants conspired to cause the Association of American Railroads ("AAR") (a railroad trade association in which all Defendants were members and active participants) to establish a new cost escalation index which removed fuel. As a result of their collective action, Defendants were able to apply new, separate and artificially high rail fuel surcharges to all of their customers as fuel would no longer be covered by standard rate escalation clauses.

12. Fourth, in furtherance of the conspiracy, Defendants now applied their new fuel surcharges uniformly – as a percentage multiplier of the total base rate for the rail freight transportation. The old cost escalation indices were designed to reflect that fuel accounted for only a portion of the total rail transport cost. This new approach allowed Defendants to use the fuel surcharges as "profit centers" to generate a vast amount of revenue that was unconnected to the actual cost of fuel. Defendants used the generally increasing cost of fuel as a pretextual cover for implementing across-the-board rate increases, allowing them to unlawfully collect billions of dollars in profits.

13. Fifth, Defendants took other collective actions to enforce the conspiracy and to make it more effective. For example, they began refusing to negotiate discounts on rail freight rates, even in circumstances in which individual railroads had previously been willing to offer

discounts. These are some of the collective actions Defendants undertook to make the conspiracy more effective.

14. The existence of the conspiracy alleged in this Complaint is further supported by the fact that the Surface Transportation Board (which has jurisdiction over only rate-regulated traffic, traffic not at issue in this case) held that "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs … [The railroads' fuel surcharge program was a] misleading and ultimately unreasonable practice…."

15. As a direct and proximate result of the price fixing conspiracy described in this Complaint, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff. Specifically, Plaintiff paid a higher price for unregulated rail transportation services than it would have paid absent the conspiracy.[2]

## II. PARTIES

### A. Plaintiff

16. Lehigh Hanson is a corporation organized under the laws of the State of Delaware with its principal place of business in Irving, Texas. The reference in this Complaint to Lehigh Hanson refers to Lehigh Hanson, Inc. and each of its affiliates, subsidiary companies, predecessors, and any assignors. During the time period relevant to these allegations, Lehigh Hanson purchased unregulated rail freight transportation services directly from one or more of the Defendants, and during this relevant period, one or more of the Defendants assessed fuel

[2] While Plaintiff seeks damages arising from rail freight shipments made under private transportation contracts, it does not seek damages in connection with rate-regulated freight transportation. The Surface Transportation Board has authority over rate-regulated freight transportation. In a 2007 decision, the STB found that fuel surcharges as applied to rate-regulated traffic were "unreasonable … [because] a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied."

surcharges on Lehigh Hanson in connection with that unregulated rail freight transportation service. The prices Lehigh Hanson paid to Defendants for unregulated rail freight transportation services on which fuel surcharges were imposed were higher than they would have been absent the alleged conspiracy. Lehigh Hanson has therefore been injured in its business and property by reason of Defendants' antitrust violations.

**B. Defendants**

17. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). BNSF is defined to include its managers, officers, employees and agents acting on its behalf. During the time period relevant to Plaintiff's claims, BNSF: directly participated in the conspiracy alleged in this Complaint; directly sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

18. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). CSX is defined to include its managers, officers, employees and agents acting on its behalf. During the time period relevant to Plaintiff's claims, CSX: directly participated in the conspiracy alleged in this Complaint; directly sold rail

transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

19. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad that operates primarily in the eastern part of the United States. NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). NS is defined to include its managers, officers, employees and agents acting on its behalf. During the time period relevant to Plaintiff's claims, NS: directly participated in the conspiracy alleged in this Complaint; directly sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

20. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). UP is defined to include its managers, officers, employees and agents acting on its behalf. During the time period relevant to Plaintiff's claims, UP: directly participated in the conspiracy alleged in this Complaint; directly sold rail transportation services to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

### C. Co-Conspirators and Agents

21. Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

22. Plaintiff reserves the right to amend this Complaint based on discovery in this case to allege the identities of co-conspirators as they are discovered.

23. At all times relevant to the allegations in this Complaint, other persons, firms and corporations – referred to as "co-conspirators," the identities of which are presently unknown – have willingly conspired with Defendants in their unlawful scheme as described in this Complaint.

24. The acts alleged in this Complaint that were done by each Defendant or co-conspirator were fully authorized by each of the Defendants and co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees or representatives of each Defendant or co-conspirator while actively engaged in the management, direction, or control of its affairs for that Defendant or co-conspirator.

## III. VENUE AND JURISDICTION

25. This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1337.

27. Venue is proper in this judicial district pursuant to 15 U.S.C. §15(a) and 22 and 28 U.S.C. § 1391, because during the time period relevant to these allegations, one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to each Plaintiff's claims occurred and a substantial

portion of the affected interstate trade and commerce described below has been carried out in this District.

28. This Court has personal jurisdiction over each Defendant because, among other reasons, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts within this District; and/or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV. TRADE AND COMMERCE

29. During the time period relevant to Plaintiff's claims, *i.e.*, the time period relevant to these allegations, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial. During the time period relevant to Plaintiff's claims, Defendants accounted for over 90% of all rail shipments within the United States. In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that: (a) Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States; (b) data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States; and/or (c) money flowed between banks outside of the State in which each Defendant is located, incorporated or has its principal place of business and other States.

30. The effect of Defendants and/or their co-conspirators' anticompetitive conduct as alleged in this Complaint on United States commerce gives rise to Plaintiff's claims.

## V. INDUSTRY BACKGROUND

31. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). Prior to the Staggers Act, the Interstate Commerce Commission ("ICC"), heavily regulated the Railroad Industry. Prior to 1980, railroads could apply to the ICC for across-the-board rate increases, which could be lawfully implemented on a collective basis. However, after passage of the Staggers Act, railroads were free to set market rates for rail transportation. Today the STB has replaced the ICC. The STB now has jurisdiction over rate-regulated rail traffic.

32. Today, almost forty years after the passage of the Staggers Act, the vast majority of rail shipments (about 80%) move under private transportation contracts. These shipments are not "rate-regulated." For all of this rate-unregulated traffic, the railroads cannot turn to a centralized agency to receive across-the-board rate increases. To the extent that they seek rate increases, they must negotiate those increases in each private contract.

33. Currently, the railroad industry is highly concentrated. The four Defendants – BNSF, CSX, NS, and UP – control about 90% of all rail freight track miles.

34. The Defendant railroads are part of a large, united network. Class I railroads generally perform shipments over long distances. There are two basic types of rail traffic: intermodal and carload. Intermodal traffic travels by rail and one other mode of transportation such as a truck or a boat. All other rail traffic is considered carload traffic.

35. While the purpose of deregulation of the railroad industry was to promote competition and lower rates for shippers (such as the Plaintiff in this case), the opposite occurred – faced with declining profits, the railroads sought to charge supra-competitive prices, yielding billions in unlawful profits for themselves.

## VI. THE PRE-CONSPIRACY PERIOD

36. Since the passage of the Staggers Act, railroads had increasingly entered into private freight transportation contracts with their customers that included cost escalation provisions, that were tied to the All Inclusive Index (the AII"), or the Rail Cost Adjustment Factor ("RCAF"). The RCAF was based on the AII. Both indices were published by the AAR, and both indices included fuel as a factor. These indices weighted a number of factors such as, for example, labor, fuel, equipment, rent and interest, so that the actual impact of any particular increases to cost (such as rising fuel increases) would be captured by the index. In other words, any actual increase in fuel costs, no matter how large, would be reflected in these indices and the railroads would be able to recover their fuel costs.

37. In the early 2000s, Defendants were faced with sharply declining revenues. In an effort to increase their revenues, between 2000 and 2003, they undertook various unilateral actions to attempt to generate revenue. In the early 2000s, Defendants tried to apply stand-alone fuel surcharges to their customers to generate revenue. However, they quickly realized that they would not be able to generate revenue through this mechanism, at least not without losing business to their competitors.

38. The wide use of the RCAF and AII made it impossible for Defendants to impose stand-alone fuel surcharges on a majority of their customers. Defendants were aware that levying a separate fuel surcharge on customers when fuel costs were already covered by the RCAF or the AII would be perceived by customers as double dipping.

39. Before the conspiracy, Defendants faced difficulties in forcing shippers to accept these original fuel surcharges due to competitive circumstances. For example, a BNSF internal memo in 2002 stated that: "[t]he trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and

we may have to lower margin in other aspects in order to keep the business with surcharges where we do apply it."

40. Defendants' own statements reveal that prior to the conspiracy and consistent with the statement above, shippers rarely paid stand-alone fuel surcharges even when there were fuel surcharge provisions in the privately-negotiated contracts.

41. BNSF's Executive Vice President/Chief Marketing Officer stated that BNSF's fuel surcharge participation rates in January 2003 were "low … [in the] 25 to 30 percent range." CSX's Executive Vice President of Sales and Marketing noted that "the fuel surcharge revenue [CSX] was generating prior to the adoption of this new program in March 2003 [*i.e.* the conspiratorial program]" was "[l]ow – relatively low to where it needed to be." The UP CEO also noted that fuel surcharges were rarely implemented prior to the conspiracy: "We had fuel surge [sic] programs in many contracts, but because fuel had not run up, they were never implemented." He also noted that fuel surcharges triggered "during the 2000 through 2002 time period never reached significant percentage levels."

42. Defendants realized that they needed to find another way to implement these stand-alone fuel surcharges. While they could not implement these fuel surcharges unilaterally, they realized that if they colluded with each other, they could get these new surcharges to stick.

43. As more fully described in this Complaint, in the Spring of 2003, Defendants reached an unlawful agreement to apply a new surcharge program. They agreed to use rising fuel prices as a pretext to implement an aggressive, standardized, and supra-competitive fuel surcharge on all of their customers. They also agreed no longer to compete with each other by offering waivers or negotiating discounts to the fuel surcharge program – actions that would be against their self-interest if taken unilaterally and without advance agreement.

## VII. THE CONSPIRACY

### A. Defendants Entered into the Unlawful Agreement in the Spring of 2003

44. From at least the Spring of 2003 and continuing through at least 2008, the top executives at each of the Defendants met regularly at restaurants, recreational facilities and conference facilities under the guise of discussing the railroad industry. Upon information and belief, at these meetings, they reached an unlawful agreement to impose standardized fuel surcharge programs. During the conspiracy, they used these meetings to monitor and further discuss the conspiracy.

45. For example, top executives of Defendants met with each other during annual AAR board meetings. As alleged earlier, the AAR is an industry trade group that represents the major freight railroads in the United States, Canada and Mexico. At times relevant to Plaintiff's claims, each Defendant was a member of the AAR. As the largest Class I railroads in the AAR, Defendants dominated the management of the AAR.

46. Additionally, these executives regularly met with each other at the biannual National Freight Transportation Association ("NFTA") meetings. The NFTA is a forum for executives at transportation companies and transportation executives at industrial firms to meet and discuss the transportation industry. Under the cover of these biannual meetings, Defendants colluded and entered into an unlawful agreement to levy virtually identical stand-alone fuel surcharges.

47. On March 11, 2003, CSX circulated an internal memorandum that provided for a revised fuel surcharge program that would have reduced the surcharges applied to shippers' (such as Plaintiff's) base rates.

48. On that same day, across the country, UP's Chief Marketing Officer Jack Koraleski ("Koraleski") issued a "Revised Fuel Surcharge Recommendation" to his company. Under this

new proposal, Koraleski recommended that UP adopt increased surcharges to shippers, escalating at roughly twice the rate of the formula CSX had internally recommended.

49. On March 12, 2003, UP's Koraleski traveled to CSX to play golf, to socialize, and to discuss "fuel surcharge methodology" with CSX's VP of Marketing and Sales, Clarence Gooden ("Gooden"). The suggested agenda of the meeting noted that the two individuals had previously discussed "fuel surcharge methodology."

50. Within one week of the meeting between UP and CSX, CSX did an about-face. CSX abandoned the revised fuel surcharge program it had been contemplating on March 11, 2003 (which would have reduced fuel surcharges), and adopted the aggressive escalation formula laid out in UP's Revised Fuel Surcharge Recommendation.

51. On March 31, 2003, nearly ten days later, UP formally adopted the same program, making official the policy that Koraleski had circulated to UP on March 11, 2003.

52. This was not an instance of UP merely following CSX or CSX merely following UP through parallel interdependence. Before the March 12, 2003 meeting, CSX was planning to reduce fuel surcharge rates. During the March 12, 2003 meeting, CSX and UP reached an agreement to impose fuel surcharges. After the March 12, 2003 meeting, CSX and UP followed through and adopted the identical fuel surcharge program.

53. During this same time period, the two other Defendants, BNSF and NS, were engaged in meetings regarding fuel surcharges.

54. On March 18, 2003, BNSF and NS's senior management attended an in-person meeting. Among others, the following individuals from NS attended: Chairman David Goode ("Goode"), VP of Intermodal Mike McClennan ("McClennan"), and SVP of Marketing Services Don Seale ("Seale"). Among others, the following individuals from BNSF attended: Chairman

Matt Rose ("Rose"), Chief Marketing Officer John Lanigan ("Lanigan"), and VP of Consumer Products and Head of Intermodal Activities Steve Branscum ("Branscum"). At the meeting, BNSF and NS discussed how the four major railroads structured their fuel surcharge programs. After the meeting, BNSF and NS adopted an "action item" stating: "BNSF's fuel surcharge is structured differently than NS, CSX, and UP. Should BNSF's be synchronized with the other big players in the industry?" This action item was assigned to BNSF's Lanigan and NS's Seale.

55. On March 27, 2003, NS's Seale wrote to BNSF's Lanigan that at an upcoming trade association meeting, Seale wanted to discuss "the fuel surcharge issue we discussed in Norfolk."

56. On April 1, 2003, BNSF's Lanigan and CSX's Chief Marketing Officer Mike Giftos met in Jacksonville, Florida to discuss "Fuel Surcharge."

57. Around the same time, from April 2-6, 2003, an NFTA meeting took place at the Wigwam Resort in Litchfield Park, Arizona. Each of the Defendants attended the meeting at Wigwam. Almost immediately following the Wigwam meeting, BNSF issued a new internal directive adopting a stronger position on fuel surcharges: "Effective immediately and urgently per John Lanigan … Authority to omit FSC [fuel surcharge] provision is to be granted to VP's only (who will also clear with John)."

58. As a result of agreements reached in early 2003, as described in this Complaint, BNSF, CSX, NS, and UP adopted virtually identical fuel surcharge programs and did not stray from these programs for the entire conspiracy. This was intentional and coordinated on the part of the Defendants.

**B. <u>Pursuant to the Meetings in Early 2003, the Railroads Began to Coordinate Their Fuel Surcharges in Mid-2003</u>**

59. The programs that the four Defendants adopted were similar if not virtually the same. The only differences in their fuel surcharge programs concerned the indices used and the

thresholds chosen. The Western Railroads (BNSF and UP) tied their fuel surcharge to the HDF Index, while the Eastern Railroads (CSX and NS) tied their programs to the WTI Index.

60. Shortly after the spring 2003 NFTA meeting, and as early as July 2003, the two Western Railroads (BNSF and UP) began to coordinate their fuel surcharges. Prior to July 2003, the UP fuel surcharge had been adjusted monthly based on the WTI Index, while the BNSF fuel surcharge had been based on the HDF Index. As a result of the unlawful agreement, the Western Railroads began imposing the same fuel surcharges at the same time and in the same amount.

61. BNSF and UP agreed to use the HDF Index in virtually the same way. Whenever the average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded this threshold, both BNSF and UP applied a surcharge of 0.5% for every five-cent increase above the threshold. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2%. In other words, the surcharge would increase 2% for every 20-cent increase in the HDF Index.

62. Not only did BNSF and UP coordinate *how* they applied the fuel surcharge, but they also coordinated *when* they would apply the fuel surcharges. As a result of the unlawful agreement, BNSF and UP decided to apply the fuel surcharges to shipments beginning the second month after the month in which there was a change in the HDF Index average price. For example, if the HDF Index average price changed in February, BNSF and UP would announce their new fuel surcharge percentage on March 1, and then apply the surcharge to shipments in April. Defendants published these new fuel surcharges on their websites, which made deviation from the conspiracy pricing readily apparent.

63. The adoption of virtually identical and complex fuel surcharge programs demonstrates that these surcharge programs were the result of a conspiratorial agreement among

Defendants rather than independent responses to common market issues such as increasing fuel costs.

64. UP's decision to use the HDF Index (the same Index used by BNSF) in July 2003 is strong evidence of coordinated conduct because two months earlier, in April 2003, UP had announced changes to its trigger point but did not change the index it was using. The fact that UP switched to the HDF Index in July 2003 and began levying identical surcharges to BNSF is further evidence that UP was acting according to a conspiratorial agreement.

65. A few months after the Western Railroads announced their coordinated surcharge programs, the two Eastern Railroads (CSX and NS) began to use the WTI Index to levy identical surcharges on their customers. This new surcharge program was the result of the unlawful agreement that Defendants reached in the spring of 2003.

66. CSX and NS agreed to apply identical surcharges based on the WTI Index. Whenever the WTI Index exceeded $23 per barrel of crude oil, CSX and NS's rates were increased by 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel. For example, if the price of WTI oil was $28 per barrel, the fuel surcharge would be 2%. In other words, the fuel surcharge would be adjusted upward by 2% for every $5 increase in WTI average price.

67. Not only did CSX and NS coordinate *how* they applied the fuel surcharge, but they also coordinated *when* they would apply the fuel surcharges – two calendar months after the WTI had adjusted, thereby adopting the same schedule that the Western Railroads had adopted. For example, if the WTI Index average price exceeded $23 in February, CSX and NS would assess the applicable fuel surcharges in April. CSX and NS published their fuel surcharges on their website, making deviation from conspiracy pricing readily apparent.

68. This fuel surcharge program was clearly the result of a conspiratorial agreement among Defendants. The programs were too complex and precise to be the result of unilateral action.

**C. <u>Defendants Removed an Obstacle to the Conspiracy</u>**

69. Around the same time that the Defendants announced their new fuel surcharge programs, they conspired to remove a major obstacle to their price-fixing conspiracy – the RCAF and the AII, the two cost escalation provisions that would make it difficult for them to justify stand-alone fuel surcharges.

70. The AII was published by the AAR. As of 2003, the AII already accounted accurately for the impact of any fuel cost increase. Accordingly, any actual increase in fuel costs (no matter how large) would be contained in the AII. As of 2003, many private freight contracts contained provisions that were linked to the AII. This made it difficult for Defendants to impose stand-alone fuel surcharges because imposing a separate fuel surcharge when fuel costs were already covered by the RCAF or the AII would be perceived by customers as double recovering for fuel costs. Accordingly, in order to carry out their plan, Defendants needed to find a way to justify stand-alone fuel surcharges.

71. Their solution was to force the AAR to adopt a new cost escalation provision, which removed fuel, thereby allowing them to justify stand-alone fuel surcharges. Because of their size, the four Defendants dominated the AAR board.

72. AAR board meetings and discussions took place in October and December 2003. During these meetings, BNSF, CSX, NS and UP used their influence to cause the AAR to adopt a new cost escalation index called the All Inclusive Index Less Fuel ("AIILF"). This index was virtually identical to the AII except it removed fuel, thereby opening the door for Defendants to

begin assessing separate fuel surcharges. The underlying decision to create this new index was the result of Defendants' coordinated actions and an important step in Defendants' conspiratorial plan.

73. Not only was removing fuel from the AII a necessary step in making the conspiracy effective, it was also an unprecedented move by the AAR, one that only could be achieved by coordinated conduct among the four Defendants. The monumental nature of this achievement was documented in a letter from BNSF's chief economist: "In December 2003 [Matt Rose, BNSF's Chief Executive Officer] single-handedly got the A.A.R. to establish [the AIILF]…. **In my 18-year railroad career, no one had ever succeeded in steering the A.A.R. to do this**…. [T]he combination of sound price escalation using this index and a fuel surcharge should tremendously help our bottom-line for years to come. In fact, … the entire rail industry should benefit from the escalation options the index provides." (emphasis added).

74. There was no legitimate business justification for the coordinated action by the four Defendants to remove fuel from the AII. They could not justify the coordinated adoption of the AIILF as a more efficient cost recovery mechanism for fuel because the AII (and the related RCAF) <u>already</u> acted as mechanisms for Defendants to recover their <u>actual</u> fuel costs. Their sole motivation in causing the AAR to adopt the AIILF was so that they could use fuel surcharges as "profit centers" to make more money. With the AII and RCAF now extinct, Defendants could apply the fuel surcharges under the guise of recovering fuel costs. However, their own statements demonstrate that they were using the fuel surcharge programs (the details of which they agreed to) as revenue generators, not cost recovery mechanisms. For example, an internal BNSF memorandum noted that: "Eastern Railroads [CSX and NS] have a 'profit center' with their Fuel Surcharge Programs…." Additionally, another BNSF employee described the company's fuel

surcharge program as "a revenue maximization program, not protection against fuel prices." Similarly, the other companies recognized that the program was solely meant to generate revenue. In a form 10-K, CSX noted that its "primary components of the revenue gain were continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets." NS employees echoed this sentiment as well: "[I]t seems like all the Merchandise rev/car increases are coming from fuel surcharges."

75. As evidenced by the statements above, the actions of Defendants in adopting virtually identical fuel surcharge programs and creating the AIILF were not unilateral responses to the common issue of increasing fuel costs. Instead, the purpose in taking these collective actions was to dramatically and unlawfully increase Defendants' profits at the expense of their customers.

**D. Defendants Began Imposing the New Fuel Surcharges, Which Were More Aggressive, Uniformly Applied, and Non-Negotiable**

76. As alleged earlier, prior to 2003, Defendants had difficulty imposing fuel surcharges because they were afraid that if they strictly imposed fuel surcharges, they would lose business to railroads that did not impose the costly surcharges. However, this changed after Defendants entered into the unlawful agreement in 2003. They began applying aggressive fuel surcharges in lockstep, and Defendants rarely (if ever) offered exceptions to their fuel surcharge policy. As shown by Defendants' previous statements and actions, a strict adherence to a "no fuel surcharge exceptions" policy would have been against each Defendant's self-interest if taken unilaterally and without advance agreement that all Defendants would adhere to the fuel surcharge agreement.

77. These conspiratorial surcharges were incredibly aggressive because they were applied to entire base rates. Following the conspiratorial publication of the AIILF, Defendants began to impose the fuel surcharges as separate items on their customers' bills. As alleged earlier,

Defendants imposed these surcharges as a percentage multiplier of the total base rate for the rail freight transportation. By way of illustration, suppose that fuel costs accounted for 30% of Defendants' total cost of providing rail freight services, and the applicable fuel index increased by 10%. In that instance, Defendants would increase their total charge by 10%, even though their costs only went up by 3%. In other words, pursuant to their agreement, Defendants applied the supposed fuel cost increase percentage to the <u>entire cost of a freight shipment</u> (notwithstanding the fact that fuel only accounts for a portion of the costs of shipment). This agreed upon approach yielded Defendants billions in profits.

78. Additionally, these conspiratorial surcharges were more aggressive than pre-conspiracy surcharges because these new surcharges had lower trigger prices and they were adjusted based on the 30-day average fuel price. In the past, adjustments were only made when the trigger price was exceeded for 30 (or more) consecutive days. In other words, unlike the old fuel surcharges, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, the new program would be triggered at $23 per barrel and would be based on the average price of oil for the preceding month. At least one executive noted that the lower trigger price and the use of the average price netted Defendants an incredible amount of revenue. NS's Pricing System Manager described the new program in an internal NS e-mail: "By dropping the base to $23 per barrel [from $28 per barrel], raising the percentage yield and [taking] it sooner, the change is in fact a blatant general rate increase…."

79. Furthermore, Defendants' new "zero exception" policies demonstrated that these new fuel surcharge programs were the result of a conspiracy to fix prices. Prior to 2003, Defendants had difficulty imposing fuel surcharges because customers resisted them. As one company noted in 2002: "The trucking industry uses fuel surcharges but our rail competitors do

not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with surcharges where we do apply it."

80. In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment free of collusion, carriers with lower fuel costs could impose a lower surcharge and thereby increase market share at the expense of competing railroads. However, rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight.

81. Defendants' restriction of pricing freedom is evidenced by, among other actions, their new policies that were put in place immediately after the unlawful agreement and their unwavering adherence to these policies. All of Defendants' policies mandated that fuel surcharges be included in all contracts. As of January 2004, BNSF's pricing guidelines stated: "Every Contract should include a fuel surcharge clause. All new and renewing contract negotiations should have a fuel surcharge as the goal." NS's Vice President acknowledged that "there was a policy [at NS] to apply the standard fuel surcharge to as many customers as possible." A CSX employee noted that "[t]he new price vehicle should incorporate [CSX's] [fuel surcharge] program." Internal UP e-mails stated that: "all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management."

82. These policies were not empty directives. Far from it. Defendants did not offer discounts to their customers even when doing so would have made sense in a healthy and competitive market, allowing them to increase market share at the expense of competing railroads who were imposing high surcharges. As a result of their unlawful agreement, Defendants all

strictly followed the conspiracy pricing, refusing to offer any material discounts to shippers. A BNSF employee's staff meeting notes indicated that BNSF was following the conspiracy pricing. The employee wrote: "[There are] [v]irtually no exceptions" to fuel surcharge adherence and "business units have done an excellent job in [fuel surcharge] adherence." A CSX executive noted that his goal was to have "zero exceptions" when applying fuel surcharges to contracts. In an internal e-mail, an NS employee wrote: "There are relatively few [NS] publications with no [fuel surcharge]…."

83. Again, this no-exception policy, adopted and followed by all of the Defendants, would not make economic sense in the absence of a conspiracy. Anecdotal evidence of shippers also supports the notion that Defendants were adhering to a conspiratorial agreement. Shippers from different industries tried to negotiate fuel surcharges but were told by Defendants (who had previously been willing to negotiate discounts) that the fuel surcharges were not negotiable.

**E. The Fuel Surcharge Percentages Charged by the Railroads Were Similar if not Virtually Identical For the Entire Conspiracy and Affected Intermodal Traffic and Captive Shippers**

84. The first chart below shows that the fuel surcharge percentages charged by the Western Railroads (BNSF and UP) varied before the conspiracy but were virtually identical starting in July 2003. The second chart shows that the fuel surcharge percentages charged by the Eastern Railroads (CSX and NS) varied before 2004 but were virtually identical starting in March 2004.

**MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0 |
| Jul-02 | 1.0% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1.0% | 0 |
| Nov-02 | 2.0% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |

| MONTH | BNSF | UP |
|---|---|---|
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |
| Jul-07 | 15.5% | 15.5% |
| Aug-07 | 16.0% | 16.0% |
| Sep-07 | 16.5% | 16.5% |
| Oct-07 | 16.5% | 16.5% |
| Nov-07 | 17.5% | 17.5% |
| Dec-07 | 18.5% | 18.5% |
| Jan-08 | 21.5% | 21.5% |
| Feb-08 | 21.0% | 21.0% |
| Mar-08 | 21.0% | 21.0% |
| Apr-08 | 21.5% | 21.5% |
| May-08 | 26.5% | 26.5% |

MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |

| MONTH | CSX | NS |
|---|---|---|
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

85. The foregoing uniform pricing for more than four years is not explained by any legitimate business justification nor was it a common response to the problem of rising fuel costs. As alleged in this Complaint, any actual fuel cost increases experienced by Defendants would have been covered by the AII.

86. While the above formulae and percentages reflect the fuel surcharges applied by Defendants to their carload businesses (*i.e.*, shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the fuel surcharges applied to their intermodal business (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship).

87. The direct heads of Defendants' intermodal businesses attended anticompetitive meetings. NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and Head of Intermodal Activities Steve Branscum participated in the March 2003 meeting in which NS and BNSF discussed how the fuel surcharge programs of all four Defendants were structured, and then adopted an action item for BNSF and NS senior executives to address synchronizing their fuel surcharge programs with the other Defendants.

88. Moreover, the same senior executives who conspired to impose supra-competitive fuel surcharges on their carload businesses led Defendants' intermodal businesses. In other words, Defendants' price-fixing agreements applied to intermodal shipping as well.

89. Furthermore, Defendants imposed standard fuel surcharges on all shippers without regard to whether the shipper had access to alternative modes of transportation. In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers (those shippers who do not have alternative modes of transportation) have leverage in negotiating a better rate at these "captive" locations:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. ... Another major source of competition is geographic competition. ... In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

90. Before the conspiracy, captive shippers could negotiate out of fuel surcharges. But during the conspiracy, they could not.

91. Defendants' conspiratorial goal was clear. They sought to reap billions in profits for themselves – and they did because of their conspiracy. As a means to this end, they used rising

fuel costs as a pretext to enact a misleading fuel surcharge program. They enacted identical fuel surcharge programs, removed fuel from the long-used cost escalation index, applied their fuel surcharges to base rates, and refused to offer discounts or otherwise negotiate around these surcharges. In the end, Defendants reaped the rewards of this conspiracy, making billions in profits at the expense of shippers, including the Plaintiff.

## VIII. THE RAIL FREIGHT INDUSTRY IS SUSCEPTIBLE TO PRICE FIXING

92. Defendants' anticompetitive conduct constitutes a conspiracy to fix prices, which is a *per se* violation of Section 1 of the Sherman Act. Therefore, Plaintiff need not define a relevant market. There are, however, features of the market relevant to this case that show both: (i) that the market is susceptible to collusion, and (ii) that the fuel surcharge programs were in fact the result of collusion and not the result of conscious parallelism, price-matching, or follow-the-leader pricing.

93. The U.S. market for rail freight has been characterized by numerous factors that make the industry susceptible to price fixing, including, without limitation, the following: (1) industry concentration; (2) substantial barriers to entry; (3) demand inelasticity; and (4) well-understood and easily communicated pricing channels.

94. Since 1975, consolidation has reduced the number of competitors in the railroad industry, which has rendered the market ripe for collusion. In 1975, there were 56 Class I railroads. Today, there are only 7 Class I railroads. Thus, the market for rail freight in the United States is extremely concentrated. Additionally, the four Defendants control about 90% of rail freight track miles. While the numbers were small enough to foster collusion, the number of competitors was enough to suggest that, absent collusion, fuel surcharges would not have been imposed in such a uniform and aggressive method.

95. Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supra-competitive prices because it is difficult for new companies to enter the market and destabilize coordinated supra-competitive prices. High fixed costs to create and maintain railroad infrastructure create substantial barriers to entry in the rail freight industry.

96. A price fixing conspiracy is most effective when the demand for the conspirators' services is inelastic. This means that the conspirators can sustain supra-competitive prices without enough customers leaving so as to make the price increase unprofitable. Defendants' businesses are concentrated in commodities and distances over which rail is the most cost-efficient transport option and, therefore, the demand they faced was in general inelastic.

97. Furthermore, railroads use common pricing documents that allowed Defendants to monitor each other's pricing actions during the conspiracy.

98. The sheer complexity and uniqueness of the fuel surcharge programs involved in this case further demonstrates that these programs were not the result of independent actions but were the result of an unlawful agreement.

99. Taken together, these facts show that the U.S. market was susceptible to price fixing, and that Defendants seized on this susceptibility to enact their own unlawful scheme, reaping billions of dollars in profits.

## IX. THE SURFACE TRANSPORTATION BOARD DECISION AND THE HISTORY OF PRIOR CASES

100. As previously alleged, shippers of both rate-regulated and rate-unregulated traffic were affected by the artificially high fuel surcharges imposed by Defendants' conspiracy. Shippers of rate-regulated traffic complained to the Surface Transportation Board in 2006. Shippers of rate-unregulated traffic had similar complaints.

101. In 2006, shippers of rate-unregulated traffic complained that the fuel surcharges imposed on them were unreasonable. The STB instituted a proceeding to inquire into these fuel surcharge practices. The STB proceeding and ultimate decision related only to rate-regulated traffic, not rate-unregulated traffic that is the subject of this Complaint. However, as the fuel surcharges applied to rate-regulated traffic are the same fuel surcharges applied to rate-unregulated traffic, the STB decision further indicates that Defendants entered into an agreement to restrain trade in violation of the antitrust laws.

102. The STB held proceedings in mid-2006 and released an opinion in January 2007, concluding: "[I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because for example it has fewer transportation alternatives) it will pay dramatically more in fuel surcharges." *Rail Fuel Surcharges*, Ex. Parte No. 661, 2007 WL 201205, at *4 (S.T.B. Jan. 26, 2007). Further, the Court noted that "imposing rate increases in this manner, when there [was] no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge [was] applied, is a misleading and ultimately unreasonable practice." *Id.* at *4.[3]

[3] While the STB opinion and findings are non-binding on a federal district court, these findings bolster Plaintiff's claims that Defendants entered into an agreement to restrain trade.

103. While the STB did not prohibit the use of fuel surcharges, it cautioned the railroads that any surcharge imposed must have "a reasonable nexus to fuel consumption." *Id.* at *6.

104. Pursuant to their conspiracy, Defendants applied the same misleading and unreasonable fuel surcharge practices described above to private rail-freight transportation contracts, thus injuring Plaintiff in this case and causing it to pay supra-competitive prices for rail transportation services.

## X. DEFENDANTS' CONSPIRACY WAS HIGHLY EFFECTIVE

105. As a proximate result of this conspiracy, and during the time period relevant to Plaintiff's claims, Defendants and co-conspirators charged Plaintiff and others in the United States supra-competitive prices (*i.e.*, prices above a competitive level) for rail transportation services.

106. Defendants and co-conspirators' conspiracy alleged in this Complaint overcharged Plaintiff on rail freight transportation services that Plaintiff directly purchased from one or more Defendants and co-conspirators

107. As alleged above, Defendants reaped huge profits from the unlawful fuel surcharges. As the head of UP, James Young, admitted in 2007, "three, four years ago [the fuel surcharges] were really non-existent" and "it's only been the last couple of years … that the financial returns in this business [have] started to move in the right direction."

108. As a result of the unlawful conduct, combination, or conspiracy alleged in this Complaint: (a) the fuel surcharges charged to Plaintiff for unregulated rail freight transportation services have been fixed, maintained, increased, or stabilized at supra-competitive levels; (b) Plaintiff has been deprived of the benefits of free and unrestricted competition in the market for unregulated rail freight transportation services; and (c) competition in establishing prices paid,

customers of, and territories for unregulated rail freight transportation has been suppressed, restrained, and/or eliminated.

## XI. DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

109. Discovery is necessary to determine the full scope of the conspiracy, including the time frame and participants. Plaintiff reserves the right to amend or supplement this Complaint to add other Defendants, claims, time period, or other allegations based upon discovery and further investigation.

## XII. TOLLING OF THE STATUTE OF LIMITATIONS

110. The filing of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974); *Crown v. Parker*, 462 U.S. 345, 350 (1983). The mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose. *American Pipe*, 414 U.S. at 559. A class complaint notifies defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential Plaintiff who may participate in the judgment. *Id.* at 555. Defendants will be aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class. Tolling the statute of limitations thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification. *Crown v. Parker*, 462 U.S. 345, 352-353 (1983). Once the statute of limitations has been tolled, it remains tolled for all members of the putative class for a reasonable period after class certification is conclusively denied. At that point, class members may choose to

file their own suits and be afforded a sufficient opportunity to investigate, prepare and file their claims. *Id.* at 354.

111. On May 14, 2007 a first class action suit (*Dust Pro, Inc. v. CSX Transportation, Inc., et al.*, D.N.J., No. 2:07-cv-02251-DMC-MF) ("*Dust Pro*") was filed against Defendants and others on behalf of a class that included direct purchasers of unregulated rail freight transportation services from Defendants and others from July 1, 2003 until at least May 14, 2007 and who were assessed a rail fuel surcharge for the agreed-upon transportation. The class action alleged that Defendants conspired to use rail fuel surcharges, which were added to customers' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. Plaintiff was a member of the putative class.

112. On November 6, 2007, the Multidistrict Litigation Panel consolidated all 18 pending actions, including *Dust Pro*, before the District of District of Columbia under the caption *In Re: Rail Freight Fuel Surcharge Antitrust Litigation* (*see* D.D.C., No. 1:07-mc-00489-PLF, ECF No. 1).

113. In 2012, the District Court initially granted a motion to certify the direct purchaser class. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1 (D.D.C. 2012). However, on appeal, the United States Court of Appeals for the District of Columbia Circuit reversed and vacated the certification ruling and remanded for further consideration. (*In re Rail Freight Surcharge Antitrust Litig. MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013).

114. On October 10, 2017, the District Court on remand denied a motion for certification of the direct purchaser class, *In re Rail Freight Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C. 2017), and class Plaintiffs subsequently appealed that decision to the Court of Appeals.

115. On November 8, 2017 – during the pendency of the class Plaintiffs' Rule 23(f) Petition to the Court of Appeals – the District Court entered an Order staying the case until the earlier of: (a) denial of Plaintiffs' Petition by the Court of Appeals, or (b) January 5, 2018 and further stated that:

> "It is not necessary for the Court to address at this time [class] Plaintiffs' request for tolling, because Defendants have agreed, for claims previously tolled by the pendency of the class action, to exclude from future statutes of limitations calculations the time between (i) the date of the court's order denying class certification and (ii) the earlier of either the date when the pending Rule 23(f) Petition may be denied or January 5, 2018, for actions filed after the date in clause (ii)."

116. On December 20, 2017, the Court of Appeals granted the class Plaintiffs' Rule 23(f) Petition. *In re Rail Freight Surcharge Antitrust Litig.*, No. 17-8005 (D.C. Cir.).

117. On January 8, 2018 – during the pendency of the appeal – the District Court entered a Stipulation and Second Order on Plaintiffs' Motion for a Stay of Proceedings and to Toll The Statute of Limitations, *see* D.D.C., No. 1:07-mc-00489-PLF, ECF No. 856, pending the appeal of the class Plaintiffs pursuant to Fed. R. Civ. P. 23(f). The Stipulation and Order states in pertinent part:

> The Court again acknowledges Defendants' representation regarding future statute of limitations calculations and, on the basis of that representation, again concludes that it is not necessary at this time to decide.
>
> (1) whether to enter an order extending tolling under the *American Pipe* doctrine beyond the date of the Court's order denying class certification, *see Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974), or (2) whether the Court has the power to enter such an order.
>
> Now, therefore, the Court ORDERS as follows:
>
> [Class] Plaintiffs need not renew their request for tolling at this time because Defendants have agreed, for claims previously tolled by the pendency of the class action, to exclude from future statutes of limitations calculations the time between (i) the date of the court's order denying class certification and (ii) the date that the Court of Appeals issues its merits-panel decision on [Class] Plaintiffs' appeal, for actions that are filed after

> the date in clause (ii). This determination is without prejudice to Plaintiffs renewing their request at a future date.

*Id.* at 3.

118. On August 16, 2019, the Court of Appeals affirmed the District Court's 2017 denial of class certification. *In re Rail Freight Surcharge Antitrust Litig.*, No. 18-7010 (D.C. Cir.).

119. Accordingly, at a minimum, the period between October 10, 2017 (the date of the District Court's order denying class certification) and August 16, 2019 (the date that the Court of Appeals issued its decision to affirm the District Court's denial of class certification) must be excluded from the statutes of limitations calculation for individual actions – such as this one – that are filed after August 16, 2019.

120. In addition to the above, other court orders, stipulations, or agreements may be relevant to the application of the statute of limitations to Plaintiff's claims.

**COUNT I**

**(Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)**

121. Plaintiff incorporates by reference each of the paragraphs alleged above.

122. Beginning in or about 2003 and continuing in force or effect, or both, through 2008, with an effect that continued thereafter, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of unregulated rail freight transportations services in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

123. This contract, combination or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, increased and/or standardized prices for fuel surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. This contract,

combination or conspiracy constitutes a *per se* violation of trade and is, in any event, an unlawful restraint of trade.

124. Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. As alleged above, Defendants' unlawful conduct was carried out through mutual understandings and agreements.

125. This contract, combination or conspiracy in restraint of trade has had the following effects: (a) the fuel surcharges charged to Plaintiff for unregulated rail freight transportation services have been fixed, increased, maintained and/or stabilized at supra-competitive levels; (b) Plaintiff has been deprived of the benefits of free and unrestricted competition in the market for unregulated rail freight transportation services; and (c) competition in establishing prices paid, customers of, and territories for unregulated rail freight transportation has been suppressed, restrained, and/or eliminated.

126. Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations in amounts not yet ascertained. Plaintiff's injury as a direct purchaser of the unregulated rail freight is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A. A jury verdict in the amount of the compensatory damages sustained by Plaintiff.

B. A judgment against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's fees, costs and interest as allowable by law.

C. A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and from practices that facilitate those violations.

D. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Dated: June 8, 2020

Respectfully submitted,

*/s/Robert D. W. Landon, III*

Robert D. W. Landon, III
Richard Alan Arnold*
William J. Blechman*
Douglas H. Patton*
Michael A. Ponzoli *
Joshua B. Gray*
Brandon S. Floch*
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
E-mail: rlandon@knpa.com
rarnold@knpa.com
wblechman@knpa.com
dpatton@knpa.com
mponzoli@knpa.com
jgray@knpa.com
bfloch@knpa.com

***Counsel for Plaintiff Lehigh Hanson, Inc.***

***(*Pro hac vice* forthcoming)**

620574.6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LINDE AG,
Dr.-Carl-von-Linde-Straße 6-14
82049 Pullach, Germany,

*and*

PRAXAIR, INC.,
10 Riverview Drive
Danbury, CT 06810,

Plaintiffs,

v.

CSX TRANSPORTATION, INC.,
500 Water Street
Jacksonville, FL 33202;

BNSF RAILWAY COMPANY,
2650 Lou Menk Drive
Fort Worth, TX 76131;

UNION PACIFIC RAILROAD CO.
1400 Douglas Street
Omaha, NE 68179; *and*

NORFOLK SOUTHERN RAILWAY COMPANY,
Three Commercial Place
Norfolk, VA 23510,

Defendants.

Civil Action No.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Linde AG, Praxair, Inc., on behalf of themselves and each of their respective present and former affiliates and subsidiaries, including BOC Gases (collectively, "Plaintiffs"), bring this action for damages under the antitrust laws of the United States against Defendants, and allege as follows:

## NATURE OF THE ACTION

1. This is an antitrust action alleging that the four largest United States-based Class I railroads engaged in price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action related to their direct purchases from Defendants of unregulated rail freight transportation services that were assessed a rate-based fuel surcharge between July 1, 2003 until at least December 31, 2008 (the "Conspiracy Period"). As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants BNSF Railway Company, Union Pacific Railroad Company, CSX Transportation, Inc. and Norfolk Southern Railway Company (together, "Defendants") conspired for years to use rail fuel surcharges, which were added to Plaintiffs' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' fuel costs, and thereby wrongfully collected billions of dollars of additional profits for a period of more than five years, including from Plaintiffs.

3. The Defendants—which together controlled about 90% of rail freight traffic in

Case 1:20-cv-00033 Document 1 Filed 01/07/20 Page 3 of 37

the United States—began conspiring in 2003 (and continued conspiring for many years thereafter) to impose an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. As part of this plan, they devised and embarked on a scheme to create, apply, and enforce rate-based fuel surcharges that acted as percentage multipliers on base rates (and thus, on revenue). This permitted these dominant railroads to achieve their desired, and mutually agreed, result: an effective percentage rate increase that could be broadly applied to rail freight customers.

4. The Defendants maintained their conspiracy during the Conspiracy Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, application, and enforcement, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

5. In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic for which Plaintiffs are not suing here, found that the Defendants' rail fuel surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel. The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint. In its ruling, the STB explained that:

> [I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual

increase in fuel costs for handling the particular traffic to which the surcharge is applied.

> Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

6. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

7. As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiffs in their business and property. Plaintiffs have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

8. Plaintiffs seek damages on rail freight shipments made under their private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiffs do not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

**PARTIES**

9. Plaintiff Linde AG ("Linde") is a corporation organized under the laws of Germany, with its principal place of business at Dr.-Carl-von-Linde-Straße 6-14 82049 Pullach, Germany. Plaintiff Praxair, Inc. ("Praxair") is a corporation organized under the laws of the State

of Delaware, with its principal place of business at 10 Riverview Drive, Danbury, Connecticut 06810. Linde AG, Praxair, Inc., and each of their respective present and former affiliates and subsidiaries, including BOC Gases (collectively "Plaintiffs"), paid for rate-unregulated rail freight transportation directly from one or more of the Defendants during the Conspiracy Period. During the Conspiracy Period, one or more of the Defendants assessed Rail Fuel Surcharges on Plaintiffs in connection with that unregulated rail freight transportation. The prices Plaintiffs paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Plaintiffs would have paid absent the conspiracy alleged herein. Plaintiffs have therefore been injured in their business and property by reason of Defendants' antitrust violations.

10. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States, including rail lines within this District, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

11. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports between New York City and Jacksonville, Florida and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Van Dorn St., in Alexandria, Virginia, and maintains a government relations office at One Constitution Avenue NE, Suite 300, Washington DC 20002.

12. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

13. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including Washington, D.C.). UP maintains an office at 700 13th Street, N.W., Suite 350, Washington, D.C. 20005.

**JURISDICTION AND VENUE**

14. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiffs by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

16. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Conspiracy Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events

giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

17. Venue is also proper because substantially related actions, with common questions of fact, have been transferred to this District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

18. This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**INTERSTATE TRADE AND COMMERCE**

19. During the Conspiracy Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The Association of American Railroads ("AAR") Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

20. The activities of Defendants were within the flow of, and substantially affected interstate commerce. During the Conspiracy Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant used instrumentalities of interstate commerce to sell and market rail freight transportation services.

21. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

**DEREGULATION OF THE RAILROAD INDUSTRY**

22. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

23. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

24. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency—like the previously-existing ICC—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

25. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities).[1] The railroad industry is now highly concentrated: Four of these railroads—Defendants BNSF, UP, CSX and NS—operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (*i.e.*, the need to invest in a vast network of

[1] A Class I railroad is defined as having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Railway Company; (6) Soo Line Railroad Co.; and (7) Grand Trunk Corporation. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

tracks, stations, yards, and switching facilities that take decades to develop, and require significant regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

26. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite occurred—railroads collectively charged shippers supracompetitive prices.

**BEFORE CONSPIRING, THE DEFENDANTS WERE UNABLE TO SUCCESSFULLY MAINTAIN FUEL SURCHARGES**

27. By the early 2000s, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

28. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of rising fuel prices, Defendants colluded to create, implement, enforce, and apply widely the Rail Fuel Surcharges as a means to implement what effectively operated as across-the-board rate increases.

29. Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII"),

which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF") which is based on the AII) weighted a number of cost factors—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses—so that the actual impact of particular cost increases (*e.g.*, for fuel) would be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

30. In 2003, the Defendants seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body. The Defendants embarked upon and implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate "fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage—and that is precisely what these four railroads proceeded to do.

31. Prior to 2003, at least some of the Defendants inserted so-called "fuel surcharges" into contracts for private rail freight transportation, but these fuel surcharges were applied only in isolated instances at very low levels, and each of the Defendants had different fuel surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad. Those fuel surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight I*"). In short, these fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the" Conspiracy

Period. *Rail Freight I* at 48.

32. For example, NS manager of pricing systems Pat Glennon acknowledged in 2001 and 2002 that fuel surcharges were only "theoretically billable . . . ." *Id.* In September 2002, Glennon reported to the then-Senior Vice President of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause."

33. UP's Chief Executive Officer James Young admitted that UP "had fuel [surcharge] programs in many contracts, but because fuel had not been run up, they were never implemented" and agreed that Rail Fuel Surcharges prior to the Conspiracy Period "never reached significant percentage levels." *Id.*

34. UP's Chief Financial Officer Robert Knight explained further that, prior to the Conspiracy Period, UP did not have a company-wide policy on fuel surcharges: "[t]here were some isolated situations where there were surcharges but … no policy position." *Id.*

35. In an "Enterprise Wide Risk Assessment" from May 2002, BNSF explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace . . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

36. BNSF's executive vice president and chief marketing officer admitted that its fuel surcharge participation rates in early 2003 were "low." *Id.*

37. CSX's executive vice president of sales and marketing testified that the fuel surcharge revenue prior to 2003 was "relatively low to where it needed to be . . . ." *Id.*

38. CSX's director of marketing described fuel surcharges as "fairly minimal" prior to the Conspiracy Period.

39. Before the Conspiracy Period, the Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 103 (D.D.C. 2012) ("*Rail Freight II*"). The Defendants could not maintain fuel surcharges as a revenue generator because of competition among themselves; as one UP executive stated succinctly in 2003, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world." A BNSF internal memorandum lamented: "[A]ny increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104. This caused the Defendants to take matters into their own hands in 2003, when they took a series of coordinated actions to switch to a new system that would eliminate competition and thus allow the widespread deployment and enforcement of Rail Fuel Surcharges as a revenue enhancement mechanism.

**THE DEFENDANTS CONSPIRED TO DEVISE A FUEL SURCHARGE SCHEME AND ILLEGALLY AGREED NOT TO COMPETE**

40. From at least the spring of 2003 and continuing until at least 2008, the top executives of each of the Defendants met regularly at resorts and conferences to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and discuss developments in the railroad industry. The Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2nd to April 6th, at the Wigwam resort, in Litchfield Park, Arizona.

41. On March 11, 2003, CSX internally recommended making changes to its fuel surcharge program that would have actually reduced the surcharges applied to base rates.

Simultaneously, UP's Chief Marketing Officer Jack Koraleski was recommending escalation of UP's fuel surcharge program to be substantially more aggressive. On March 12, 2003, Koraleski traveled to competitor CSX to discuss "fuel surcharge methodology." Shortly thereafter, CSX's leadership abruptly reversed course, abandoning its recommended fuel surcharge reduction and adopting a program matching UP's escalation.

42. On March 18, 2003, BNSF and NS senior executives, including John Lanigan and Don Seale, met and discussed "synchroniz[ing]" fuel surcharges.

43. On March 20, 2003, CSX publicly announced a new, more aggressive fuel surcharge program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSXT." On April 4, 2003, UP sent a "concurrence" to competitors that its new fuel surcharge program would "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "This is sweet !!! Just like the CSXT."

44. On April 1, 2003, BNSF and CSX senior executives (CMOs Mike Giftos and John Lanigan) met to discuss fuel surcharges as well.

45. Between April 2-6, 2003, NS executive Don Seale met again with BNSF executive John Lanigan to continue their prior discussion on "the fuel surcharge issue" at an NFTA meeting.

46. Similar to CSX's abandonment of a less aggressive fuel surcharge regime following a meeting with UP in March 2003, BNSF decided against a fuel surcharge scheme that could have been fairer for shippers. Between February and April 2003, BNSF had been considering a mileage-based fuel surcharge, which could have better correlated the resulting fuel surcharges to actual fuel costs than the rate-based fuel surcharges that the Defendants broadly implemented

during the conspiracy, but abandoned this approach. Instead, BNSF and UP adopted nearly identical rate-based fuel surcharges. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates."

47. By July 2003, all four Defendant railroads had agreed to coordinate their rate-based fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed. Under this agreement, BNSF and UP agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index"). BNSF and UP began to charge the exact same fuel surcharges pursuant to this agreement, using the HDF Index. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the Conspiracy Period.

48. While BNSF and UP had slightly different triggers for the fuel surcharge, with BNSF at $1.25 (beginning with a surcharge of .5%) and UP at $1.35 (beginning with a surcharge of 1.5%), the reality was that the HDF Index was administered in precisely the same way for both railroads.

49. An internal analysis from NS stated that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including the lag times and effective dates."

50. When the HDF Index exceeded $1.35 per gallon, BNSF and UP thereafter both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

51. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index *average* price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

52. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

53. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

54. Even after having agreed to coordinate their fuel surcharges, however, BNSF and

UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. The Defendants agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn additional profits.

55. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a methodology that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

56. The four Defendants control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

57. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, the Defendants agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

58. Pursuant to their agreements, the Defendants, which dominated the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF)—that is, a cost escalation index without fuel as a

component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period. The Defendants conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy—a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

59. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges to contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less

fuel plus a direct fuel surcharge in the future." (emphasis added).

60. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSX and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in 2003. Specifically, the Eastern Railroads likewise agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price, and was functionally identical to that of the Eastern Railroads, as described further herein.

61. The Eastern Railroads also coordinated when they would change their fuel surcharge—two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, the Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

62. NS executive Patrick Glennon, a manager of pricing systems, admitted in 2003 that the new fuel surcharge represented a significant change in practice that was "definitely more

aggressive," and "definitely yielded more revenue": "By dropping the base to $23 per barrel, raising the percentage yield and taking it sooner, the change is in fact a blatant general rate increase[.]" *Rail Freight I* at 49. Similarly, CSX internal emails acknowledge that although the new program may "seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%." *Id.*

63. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

64. Thus, the Defendants began to apply Rail Fuel Surcharges as a separate item on shippers' bills in the form of a percentage multiplier. The Defendants used the Rail Fuel Surcharges as an easy way to increase revenues across the board.

65. The fuel surcharge programs applied by the Defendants during the Conspiracy Period "were more aggressive and yielded more revenue than earlier programs." *Rail Freight I* at 48. With the AIILF they had put in place, and in furtherance of the conspiracy, the Defendants each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, for example, if the percentage increase triggered by

the applicable fuel index was 15%, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by 15%—even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed approach yielded the Defendants billions of dollars of additional profits.

66. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to the Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for years to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the conspiracy period.

67. The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to independently institute its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, UP, CSX and NS to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

68. The actions by the Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the Defendants took these collective actions in order to assess a stand-alone fuel surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, the Defendants would now be able to apply the

supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, the Defendants planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

69. Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants' conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well. Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 18, 2003 meeting between BNSF and NS and a June 2003 meeting between UP and CSX, the heads of the respective intermodal business groups (and other personnel with intermodal and coal responsibilities) participated as well.

70. Defendants hatched a single conspiracy extending to *all* shippers, regardless of traffic type. When Defendants met to conspire, or otherwise communicated, they did not limit their conversations to carload traffic. And once the conspiracy was underway, the Defendants took steps, e.g., to align their coal and intermodal fuel surcharges, including by ad hoc adjustments, and exchange information about fuel surcharge coverage. Just as with carload traffic, in the absence of competition during the Conspiracy Period, Defendants greatly expanded the imposition and

enforcement of rate-based coal and intermodal fuel surcharges, with the result of raising rates altogether.

71. As a result of the Defendants' concerted action, Rail Fuel Surcharges charged to rail shippers (including Plaintiffs) were raised to or maintained at supracompetitive levels during the Conspiracy Period.

**THE DEFENDANTS SUCCESSFULLY IMPLEMENTED THEIR ILLEGAL, ANTICOMPETITIVE FUEL SURCHARGE SCHEME**

72. As detailed above, the Defendants agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). The Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here). With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Conspiracy Period.

73. The chart below shows that the Rail Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Conspiracy Period began, but were identical starting in July 2003:

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |

| | | |
|---|---|---|
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |

| | | |
|---|---|---|
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |

74. As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Conspiracy Period.

75. The chart below shows that the Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Conspiracy Period, but were identical starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |

| | | |
|---|---|---|
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

76. In stark contrast to this uniformity in Rail Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that the Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that the Defendants moved in uniform lockstep for a period of nearly 38 months indicates that the Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance announcements of each Defendant's Rail Fuel Surcharges was an important

implementation and enforcement mechanism for the conspiracy.

77. Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." ("Following the Competition" *Traffic World*, July 14, 2003). The Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs. An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between the Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and their publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

78. BNSF's average cost for diesel fuel in Third Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for Third Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from Third Quarter 2003 to 2004. In contrast, the surcharge charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from Third Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue, not merely to the fuel cost component of that rate.

79. Another reason why the Defendants' Rail Fuel Surcharges were not a natural

reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, the Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

80. There is no independent business justification to explain the Defendants' behavior. Their uniform pricing of fuel surcharges year after year could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by the Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action—*i.e.*, decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

81. In agreeing to collude on fuel surcharges across business segments, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs could impose a lower surcharge or none at all and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, the Defendants "uniformly began their negotiations with their standard fuel surcharge program and their objective was to apply their standard fuel surcharge as widely as possible." *Rail Freight I* at 50.

82. In furtherance of the conspiracy, the Defendants also declined to negotiate discounts on the Rail Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable."

83. Indeed, each Defendant *mandated* application of rate-based fuel surcharges in furtherance of their agreement.

84. On April 9, 2003, BNSF issued an internal notification stating, "Effective immediately and urgent per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, BNSF's Chief Economist Samuel Kyei noted "contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed."

85. Similarly, UP implemented a no-exceptions policy as explained by a sales representative to a customer in December 2003: "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice."

86. In 2004, Don Seale from NS informed his subordinates, "no deviation from NS's published FSC without [his] prior approval."

87. In 2006, CSX Vice President of Industrial Products Kyle Hancock established, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT a fuel surcharge."

88. The widespread application of fuel surcharges differed substantively from the

Defendants' practices before the Conspiracy Period, when the Defendants were actively competing for customers and could not maintain fuel surcharges in the face of such competition. After the conspiracy began, "any deviations from [D]efendants' standard fuel surcharge programs were rare." *Rail Freight I* at 50. Each Defendant "enforced strict policies ensuring across-the-board application of these standardized fuel surcharge programs on all of their shippers . . . ." *Id.* In this way, the Defendants could avoid undercutting one another and ensure that each could continue to apply fuel surcharges to its customers and reap their supracompetitive profits.

89. The Defendants acknowledged "that the new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Rail Freight II* at 104. One NS internal email noted that it seemed like all revenue increases were "coming from fuel surcharges." *Id.* A BNSF internal memorandum stated that CSX and NS "have a 'profit center' with their Fuel Surcharge Programs for the customers that participate[.]" *Id.* at 104-105. Another BNSF document described its own fuel surcharge program as "a revenue maximization program, not protection against fuel prices." *Id.* at 105.

90. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," demonstrated in the following chart documenting the significant growth in profits during the Conspiracy Period:




***Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)***

91. The Defendants quickly realized that implementation of fuel surcharges only worked because all the Defendants participated, as noted in a BNSF Executive Team presentation in 2005, "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall." They policed the conspiracy by exchanging fuel surcharge data with one another, resulted in nearly no shift in market share between them.

92. The Defendants agreed that not to undercut agreed pricing or stealing market share by offsetting fuel surcharges by discounting underlying rates. As demonstrated in the table that follows, the Defendants' market shares remained stable following the 2003 agreements.

| **Railroad Market Share: Originated Tons and Carloads 2003 - 2006** [1] | | | | |
|---|---|---|---|---|
| | | | | |
| | **2003** | **2004** | **2005** | **2006** |
| **BNSF** | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| Percent of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% |

| | | | | |
|---|---|---|---|---|
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| Percent of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% |
| | | | | |
| | | | | |
| **CSXT** | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| Percent of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% |
| | | | | |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| Percent of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% |
| | | | | |
| | | | | |
| **NS** | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| Percent of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% |
| | | | | |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| Percent of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% |
| | | | | |
| | | | | |
| **UP** | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| Percent of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% |
| | | | | |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| Percent of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% |
| | | | | |
| | | | | |
| Total | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |
| | | | | |
| | | | | |
| AAR Railroad Facts and Analysis of Class I Railroads | | | | |

93. According to UP President James Young, by July 2007 approximately "eighty to ninety percent" of UP's business overall had "some kind of fuel surcharge mechanism that gets passed on to the customer."

94. Because the Defendants started their negotiations during the Conspiracy Period using their standard fuel surcharge formula, any deviations from that standard fuel surcharge

application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (i.e., facilities served by only one of the Defendants) – who are nonetheless able to harness competition among railroads for negotiation purposes absent collusion – suffered from the conspiracy. NS's CEO, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," expressly acknowledging that "even where there is only one railroad serving a facility, there are market factors at play."

**THE STB DECISION**

95. Starting in 2006, the STB, which regulates certain aspects of the railroad industry, began holding hearings and investigating the Defendants' practices relating to fuel surcharges. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). Thus, the STB found, "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particularly traffic to which the surcharge is applied." *Id.* at 6.

96. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

97. Pursuant to their conspiracy, the Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**THE DEFENDANTS REAPED SUPRACOMPETITIVE PROFITS**

98. The Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, the Defendants realized billions of dollars in revenues during the Conspiracy Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. During the period of the conspiracy (July 2003 to at least June 30, 2007), the Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by the Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

99. A Senate Commerce Committee report reviewed the Defendants' profits and concluded that "a review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade."

100. The Defendants' themselves also attributed their increased revenue to fuel surcharges. In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume."

101. BNSF recognized rail freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." "Growth

in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

102. In 2006, UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

103. In 2006, CSX's revenue increased $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

104. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a. The Rail Fuel Surcharges charged to Plaintiffs for unregulated rail freight transportation have been fixed or stabilized at supracompetitive levels;

b. Plaintiffs have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

105. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs have sustained injury to their business or property. Defendants implemented policies that ensured that their fuel surcharges would be synchronized, rigidly enforced, and applied to as many freight shippers as possible. The injuries sustained by the Plaintiffs are the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of the Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**COUNT I**
**(Violation of Section 1 and 3 of the Sherman**
**Act and Section 4 of the Clayton Act)**

106. Plaintiffs incorporate by reference the allegations in the above paragraphs as if they were fully set forth herein.

107. The Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act and Section 4 of the Clayton Act.

108. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants in furtherance of which the Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

109. The Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. The Defendants' unlawful conduct was through mutual understandings or agreements by, between and among the Defendants.

110. The contract, combination or conspiracy has had the following effects:

a. Prices charged to Plaintiffs for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Plaintiffs have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for

rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

111. As a proximate result of Defendants' unlawful conduct, Plaintiffs suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Conspiracy Period.

WHEREFORE, Plaintiffs pray for relief as follows:

(1) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiffs recover compensatory damages, as provided by law, and that judgment be entered against Defendants on behalf of Plaintiffs;

(3) That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(4) That Plaintiffs recover treble damages, as provided by law;

(5) That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

(6) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: January 7, 2020

By: *Melinda R. Coolidge*

Melinda R. Coolidge
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Theodore F. DiSalvo
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200
mcoolidge@hausfeld.com
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
tdisalvo@hausfeld.com

Michael P. Lehmann
Seth R. Gassman
**HAUSFELD LLP**
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
(415) 633-1908
mlehmann@hausfeld.com
sgassman@hausfeld.com

*Attorneys for Linde AG and Praxair, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LOTTE GLOBAL LOGISTICS (NORTH AMERICA), INC. F/K/A HYUNDAI INTERMODAL, INC.<br>7701 Las Colinas Ridge, Suite 400<br>lrving, Texas 75063,<br><br>Plaintiff,<br><br>V.<br><br>CSX TRANSPORTATION, INC.,<br>500 Water Street<br>Jacksonville, FL 33202;<br><br>BNSF RAILWAY COMPANY,<br>2650 Lou Menk Drive<br>Fort Worth, TX 76131;<br><br>UNION PACIFIC RAILROAD CO.<br>1400 Douglas Street<br>Omaha, NE 68179; *and*<br><br>NORFOLK SOUTHERN RAILWAY COMPANY,<br>Three Commercial Place<br>Norfolk, VA 23510,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Lotte Global Logistics (North America), Inc. F/K/A Hyundai Intermodal, Inc. ("Lotte" or "Plaintiff") brings this action for damages under the antitrust laws of the United States against Defendants, and alleges as follows:

**NATURE OF THE ACTION**

1. This is an antitrust action alleging that the four largest United States Class I

railroads engaged in price fixing in violation of Section 1 of the Sherman Act. Plaintiff brings this action related to its direct purchases from Defendants of unregulated rail freight transportation services that were assessed a rate-based fuel surcharge between July 1, 2003 until at least December 31, 2008 (the "Conspiracy Period"). As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants BNSF Railway Company, Union Pacific Railroad Company, CSX Transportation, Inc. and Norfolk Southern Railway Company (together, "Defendants") conspired for years to use rail fuel surcharges, which were added to Lotte's bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. The rail fuel surcharge ("Rail Fuel Surcharge") is a separately identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' fuel costs, and thereby collected billions of dollars of additional profits for a period of more than five years, including from Lotte.

3. The Defendants—which together controlled about 90% of rail freight traffic in the United States—began conspiring in 2003 (and continued conspiring for many years thereafter) to impose an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. As part of this plan, they devised and embarked on a scheme to create, apply, and enforce rate-based fuel surcharges that acted as percentage multipliers on base rates (and thus, on revenue). This permitted these dominant railroads to achieve their desired, and mutually agreed, result: an effective percentage rate increase that could be broadly applied to rail freight customers.

4. The Defendants maintained their conspiracy during the Conspiracy Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, application, and enforcement, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

5. In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic for which Plaintiff is not suing here, found that the Defendants' Rail Fuel Surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel. The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint. In its ruling, the STB explained that:

> [I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.
>
> Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

6. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants'

rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the first quarter of 2007 came to over $6 billion.

7. As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff in its business and property. Plaintiff has paid a higher price for unregulated rail freight transportation than it would have paid absent the concerted unlawful activity alleged herein.

8. Plaintiff seeks damages on rail freight shipments made under its private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

**PARTIES**

9. Plaintiff Lotte Global Logistics (North America), Inc. ("Lotte") is a corporation organized under the laws of the State of California, with its principal place of business at 7701 Las Colinas Ridge, Suite 400, lrving, Texas 75063. Lotte directly purchased unregulated rail freight transportation services from Defendants during the Conspiracy Period. During the Conspiracy Period, one or more of the Defendants assessed Rail Fuel Surcharges on Lotte in connection with that unregulated rail freight transportation. The prices Lotte paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Lotte would have paid absent the conspiracy alleged herein. Lotte has therefore been injured in its business and property by reason of Defendants' antitrust violations.

10. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business

at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States, including rail lines within this district, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

11. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports between New York, New York, and Jacksonville, Florida and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Van Dorn St., in Alexandria, Virginia, and maintains a government relations office at One Constitution Avenue NE, Suite 300, Washington, DC 20002.

12. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF originates and terminates traffic within this district by providing rail transportation in interchange service with CSX and NS. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

13. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the

country (including Washington, D.C.). UP maintains an office at 700 13th Street, N.W., Suite 350, Washington, D.C. 20005.

## JURISDICTION AND VENUE

14. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorney fees and costs from Defendants for the injuries sustained by Plaintiff by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

16. Venue is proper in this judicial district pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Conspiracy Period one or more of the Defendants resided, transacted business, were found, or had agents in this district, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this district.

17. Venue is also proper because substantially related actions, with common questions of fact, have been transferred to this district by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

18. This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this district; (b) directly or indirectly sold and delivered rail transportation services in this district; (c) has substantial aggregate contacts with this district; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this district.

## INTERSTATE TRADE AND COMMERCE

19. During the Conspiracy Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The Association of American Railroads ("AAR") Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

20. The activities of Defendants were within the flow of, and substantially affected interstate commerce. During the Conspiracy Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant used instrumentalities of interstate commerce to sell and market rail freight transportation services.

21. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

**DEREGULATION OF THE RAILROAD INDUSTRY**

22. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

23. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

24. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency—like

the previously-existing ICC—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

25. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities).[1] The railroad industry is now highly concentrated: Four of these railroads—Defendants BNSF, UP, CSX and NS—operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (*i.e.*, the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require significant regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

26. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite occurred—railroads collectively charged shippers supracompetitive prices.

**BEFORE CONSPIRING, THE DEFENDANTS WERE UNABLE TO SUCCESSFULLY MAINTAIN FUEL SURCHARGES**

27. By the early 2000s, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At

[1] A Class I railroad is defined as having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Railway Company; (6) Soo Line Railroad Co.; and (7) Grand Trunk Corporation. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

the same time, railroads were experiencing surging freight demand and tight capacity.

28. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of rising fuel prices, Defendants colluded to create, implement, enforce, and apply widely the Rail Fuel Surcharges as a means to implement what effectively operated as across-the-board rate increases.

29. Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII"), which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF"), which is based on the AII) weighted a number of cost factors—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses—so that the actual impact of particular cost increases (*e.g.*, for fuel) would be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

30. In 2003, the Defendants seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body. The Defendants embarked upon and implemented an agreed plan to

remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate "fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage—and that is precisely what these four railroads proceeded to do.

31. Prior to 2003, at least some of the Defendants inserted so-called "fuel surcharges" into contracts for private rail freight transportation, but these fuel surcharges were applied only in isolated instances at very low levels, and each of the Defendants had different fuel surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad. Those fuel surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight I*"). In short, these fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the" Conspiracy Period. *Rail Freight I* at 48.

32. For example, NS manager of pricing systems Pat Glennon acknowledged in 2001 and 2002 that fuel surcharges were only "theoretically billable . . . ." *Id.* In September 2002, Glennon reported to the then-Senior Vice President of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause."

33. UP's Chief Executive Officer James Young admitted that UP "had fuel [surcharge] programs in many contracts, but because fuel had not been run up, they were never implemented" and agreed that Rail Fuel Surcharges prior to the Conspiracy Period "never reached significant percentage levels." *Id.*

34. UP's Chief Financial Officer Robert Knight explained further that, prior to the

Conspiracy Period, UP did not have a company-wide policy on fuel surcharges: "[t]here were some isolated situations where there were surcharges but … no policy position." *Id.*

35. In an "Enterprise Wide Risk Assessment" from May 2002, BNSF explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace . . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

36. BNSF's executive vice president and chief marketing officer admitted that its fuel surcharge participation rates in early 2003 were "low." *Id.*

37. CSX's executive vice president of sales and marketing testified that the fuel surcharge revenue prior to 2003 was "relatively low to where it needed to be . . . ." *Id.*

38. CSX's director of marketing described fuel surcharges as "fairly minimal" prior to the Conspiracy Period.

39. Before the Conspiracy Period, the Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 103 (D.D.C. 2012) ("*Rail Freight II*"). The Defendants could not maintain fuel surcharges as a revenue generator because of competition among themselves; as one UP executive stated succinctly in 2003, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world." A BNSF internal memorandum lamented: "[A]ny increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104. This caused the Defendants to take matters into their own hands in 2003, when they took a series of coordinated actions to switch to

a new system that would eliminate competition and thus allow the widespread deployment and enforcement of Rail Fuel Surcharges as a revenue enhancement mechanism.

**THE DEFENDANTS CONSPIRED TO DEVISE A FUEL SURCHARGE SCHEME AND ILLEGALLY AGREED NOT TO COMPETE**

40. From at least the spring of 2003 and continuing until at least 2008, the top executives of each of the Defendants met regularly at resorts and conferences to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and discuss developments in the railroad industry. The Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2 to April 6, at the Wigwam resort, in Litchfield Park, Arizona.

41. On March 11, 2003, CSX internally recommended making changes to its fuel surcharge program that would have actually reduced the surcharges applied to base rates. Simultaneously, UP's Chief Marketing Officer Jack Koraleski was recommending escalation of UP's fuel surcharge program to be substantially more aggressive. On March 12, 2003, Koraleski traveled to competitor CSX to discuss "fuel surcharge methodology." Shortly thereafter, CSX's leadership abruptly reversed course, abandoning its recommended fuel surcharge reduction and adopting a program matching UP's escalation.

42. On March 18, 2003, BNSF and NS senior executives, including John Lanigan and Don Seale, met and discussed "synchroniz[ing]" fuel surcharges.

43. On March 20, 2003, CSX publicly announced a new, more aggressive fuel surcharge program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSXT." On April 4, 2003, UP sent a "concurrence" to competitors that its new fuel surcharge program would "apply to most Union Pacific pricing

documents for local and interline freight movements . . . .” Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: “This is sweet !!! Just like the CSXT.”

44. On April 1, 2003, BNSF and CSX senior executives (CMOs Mike Giftos and John Lanigan) met to discuss fuel surcharges as well.

45. Between April 2-6, 2003, NS executive Don Seale met again with BNSF executive John Lanigan to continue their prior discussion on “the fuel surcharge issue” at an NFTA meeting.

46. Similar to CSX’s abandonment of a less aggressive fuel surcharge regime following a meeting with UP in March 2003, BNSF decided against a fuel surcharge scheme that could have been fairer for shippers. Between February and April 2003, BNSF had been considering a mileage-based fuel surcharge, which could have better correlated the resulting fuel surcharges to actual fuel costs than the rate-based fuel surcharges that the Defendants broadly implemented during the conspiracy, but abandoned this approach. Instead, BNSF and UP adopted nearly identical rate-based fuel surcharges. An internal NS analysis found that “Once [UP’s $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates.”

47. By July 2003, all four Defendant railroads had agreed to coordinate their rate-based fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed. Under this agreement, BNSF and UP agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the “HDF Index”). BNSF and UP began to charge the exact same fuel surcharges pursuant to this agreement, using the HDF Index. From that point on, the Western Railroads moved in lockstep and charged

the exact same Rail Fuel Surcharge percentage for each month of the Conspiracy Period.

48. While BNSF and UP had slightly different triggers for the fuel surcharge, with BNSF at $1.25 (beginning with a surcharge of .5%) and UP at $1.35 (beginning with a surcharge of 1.5%), the reality was that the HDF Index was administered in precisely the same way for both railroads.

49. An internal analysis from NS stated that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including the lag times and effective dates."

50. When the HDF Index exceeded $1.35 per gallon, BNSF and UP thereafter both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

51. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index *average* price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

52. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel

surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

53. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

54. Even after having agreed to coordinate their fuel surcharges, however, BNSF and UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. The Defendants agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn additional profits.

55. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a methodology that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the

freight transport, regardless of the actual cost of fuel for that transport job.

56. The four Defendants control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

57. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, the Defendants agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

58. Pursuant to their agreements, the Defendants, which dominated the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF)—that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period. The Defendants conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the

Defendants to allow implementation and continuation of their price fixing conspiracy—a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

59. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges to contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

60. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSX and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in 2003. Specifically, the Eastern Railroads likewise agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5

increase in the WTI average price, and was functionally identical to that of the Eastern Railroads, as described further herein.

61. The Eastern Railroads also coordinated when they would change their fuel surcharge—two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, the Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

62. NS executive Patrick Glennon, a manager of pricing systems, admitted in 2003 that the new fuel surcharge represented a significant change in practice that was "definitely more aggressive," and "definitely yielded more revenue": "By dropping the base to $23 per barrel, raising the percentage yield and taking it sooner, the change is in fact a blatant general rate increase[.]" *Rail Freight I* at 49. Similarly, CSX internal emails acknowledge that although the new program may "seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%." *Id.*

63. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market

phenomenon that the Defendants were facing.

64. Thus, the Defendants began to apply Rail Fuel Surcharges as a separate item on shippers' bills in the form of a percentage multiplier. The Defendants used the Rail Fuel Surcharges as an easy way to increase revenues across the board.

65. The fuel surcharge programs applied by the Defendants during the Conspiracy Period "were more aggressive and yielded more revenue than earlier programs." *Rail Freight I* at 48. With the AIILF they had put in place, and in furtherance of the conspiracy, the Defendants each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, for example, if the percentage increase triggered by the applicable fuel index was 15%, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by 15%—even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed approach yielded the Defendants billions of dollars of additional profits.

66. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to the Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for years to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of

their increased fuel costs throughout the conspiracy period.

67. The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to independently institute its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, UP, CSX and NS to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

68. The actions by the Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the Defendants took these collective actions in order to assess a stand-alone fuel surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, the Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, the Defendants planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

69. Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants' conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel

surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well. Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 18, 2003 meeting between BNSF and NS and a June 2003 meeting between UP and CSX, the heads of the respective intermodal business groups (and other personnel with intermodal and coal responsibilities) participated as well.

70. Defendants hatched a single conspiracy extending to *all* shippers, regardless of traffic type, including Lotte. When Defendants met to conspire, or otherwise communicated, they did not limit their conversations to carload traffic. And once the conspiracy was underway, the Defendants took steps, e.g., to align their coal and intermodal fuel surcharges, including by ad hoc adjustments, and exchange information about fuel surcharge coverage. Just as with carload traffic, in the absence of competition during the Conspiracy Period, Defendants greatly expanded the imposition and enforcement of rate-based coal and intermodal fuel surcharges, with the result of raising rates altogether.

71. As a result of the Defendants' concerted action, Rail Fuel Surcharges charged to rail shippers (including Plaintiff) were raised to or maintained at supracompetitive levels during the Conspiracy Period.

**THE DEFENDANTS SUCCESSFULLY IMPLEMENTED THEIR ILLEGAL, ANTICOMPETITIVE FUEL SURCHARGE SCHEME**

72. As detailed above, the Defendants agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). The Defendants applied these surcharges not only to

published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here). With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Conspiracy Period.

73. The chart below shows that the Rail Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Conspiracy Period began, but were identical starting in July 2003:

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |

| | | |
|---|---|---|
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |

74. As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Conspiracy Period.

75. The chart below shows that the Rail Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Conspiracy Period, but were identical starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |

| | | |
|---|---|---|
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

76. In stark contrast to this uniformity in Rail Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that the Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that the Defendants moved in uniform lockstep for a period of nearly 38 months indicates that the Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance announcements of each Defendant's Rail Fuel Surcharges was an important implementation and enforcement mechanism for the conspiracy.

77. Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." ("Following the Competition" *Traffic World*, July 14, 2003). The Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs. An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between the Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and their publicly reported actual

fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

78. BNSF's average cost for diesel fuel in Third Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for Third Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from Third Quarter 2003 to 2004. In contrast, the surcharge charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from Third Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue, not merely to the fuel cost component of that rate.

79. Another reason why the Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, the Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

80. There is no independent business justification to explain the Defendants' behavior. Their uniform pricing of fuel surcharges year after year could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by the Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by

collective action—*i.e.*, decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

81. In agreeing to collude on fuel surcharges across business segments, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs could impose a lower surcharge or none at all and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, the Defendants "uniformly began their negotiations with their standard fuel surcharge program and their objective was to apply their standard fuel surcharge as widely as possible." *Rail Freight I* at 50.

82. In furtherance of the conspiracy, the Defendants also declined to negotiate discounts on the Rail Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable."

83. Indeed, each Defendant *mandated* application of rate-based fuel surcharges in furtherance of their agreement.

84. On April 9, 2003, BNSF issued an internal notification stating, "Effective immediately and urgent per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, BNSF's Chief Economist Samuel Kyei noted "contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge

provisions will not be signed."

85. Similarly, UP implemented a no-exceptions policy as explained by a sales representative to a customer in December 2003: "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice."

86. In 2004, Don Seale from NS informed his subordinates, "no deviation from NS's published FSC without [his] prior approval."

87. In 2006, CSX Vice President of Industrial Products Kyle Hancock established, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT a fuel surcharge."

88. The widespread application of fuel surcharges differed substantively from the Defendants' practices before the Conspiracy Period, when the Defendants were actively competing for customers and could not maintain fuel surcharges in the face of such competition. After the conspiracy began, "any deviations from [D]efendants' standard fuel surcharge programs were rare." *Rail Freight I* at 50. Each Defendant "enforced strict policies ensuring across-the-board application of these standardized fuel surcharge programs on all of their shippers . . . ." *Id.* In this way, the Defendants could avoid undercutting one another and ensure that each could continue to apply fuel surcharges to its customers and reap their supracompetitive profits.

89. The Defendants acknowledged "that the new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Rail Freight II* at 104. One NS internal email noted that it seemed like all revenue increases were "coming from fuel surcharges." *Id.* A BNSF internal memorandum stated that CSX and NS "have a 'profit center' with their Fuel Surcharge Programs for the customers that participate[.]" *Id.* at 104-105. Another

BNSF document described its own fuel surcharge program as "a revenue maximization program, not protection against fuel prices." *Id.* at 105.

90. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," demonstrated in the following chart documenting the significant growth in profits during the Conspiracy Period:




***Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)***

91. The Defendants quickly realized that implementation of fuel surcharges only worked because all the Defendants participated, as noted in a BNSF Executive Team presentation in 2005, "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall." They policed the conspiracy by exchanging fuel surcharge data with one another, resulted in nearly no shift in market share between them.

92. The Defendants agreed that not to undercut agreed pricing or stealing market

share by offsetting fuel surcharges by discounting underlying rates. As demonstrated in the table that follows, the Defendants' market shares remained stable following the 2003 agreements.

**Railroad Market Share: Originated Tons and Carloads 2003 - 2006** [1]

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| **BNSF** | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| Percent of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% |
| | | | | |
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| Percent of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% |
| | | | | |
| | | | | |
| **CSXT** | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| Percent of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% |
| | | | | |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| Percent of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% |
| | | | | |
| | | | | |
| **NS** | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| Percent of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% |
| | | | | |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| Percent of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% |
| | | | | |
| | | | | |
| **UP** | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| Percent of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% |
| | | | | |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| Percent of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% |
| | | | | |
| | | | | |
| Total | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |
| | | | | |
| | | | | |
| AAR Railroad Facts and Analysis of Class I Railroads | | | | |

93. According to UP President James Young, by July 2007 approximately "eighty to ninety percent" of UP's business overall had "some kind of fuel surcharge mechanism that gets passed on to the customer."

94. Because the Defendants started their negotiations during the Conspiracy Period using their standard fuel surcharge formula, any deviations from that standard fuel surcharge application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (i.e., facilities served by only one of the Defendants) – who are nonetheless able to harness competition among railroads for negotiation purposes absent collusion – suffered from the conspiracy. NS's CEO, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," expressly acknowledging that "even where there is only one railroad serving a facility, there are market factors at play."

**THE STB DECISION**

95. Starting in 2006, the STB, which regulates certain aspects of the railroad industry, began holding hearings and investigating the Defendants' practices relating to fuel surcharges. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). Thus, the STB found, "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particularly traffic to which the surcharge is applied." *Id.* at 6.

96. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

97. Pursuant to their conspiracy, the Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**THE DEFENDANTS REAPED SUPRACOMPETITIVE PROFITS**

98. The Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, the Defendants realized billions of dollars in revenues during the Conspiracy Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. During the period of the conspiracy (July 2003 to at least June 30, 2007), the Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by the Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

99. A Senate Commerce Committee report reviewed the Defendants' profits and concluded that "a review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade."

100. The Defendants' themselves also attributed their increased revenue to fuel surcharges. In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume."

101. BNSF recognized rail freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

102. In 2006, UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

103. In 2006, CSX's revenue increased $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

104. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a. the Rail Fuel Surcharges charged to Plaintiff for unregulated rail freight transportation have been fixed or stabilized at supracompetitive levels;

b. Plaintiff has been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

105. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff has sustained injury to their business or property. Defendants implemented

policies that ensured that their fuel surcharges would be synchronized, rigidly enforced, and applied to as many freight shippers as possible. The injuries sustained by the Plaintiff are the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of the Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**COUNT I**
**(Violation of Section 1 and 3 of the Sherman Act and Section 4 of the Clayton Act)**

106. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

107. The Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act and Section 4 of the Clayton Act.

108. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants in furtherance of which the Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

109. The Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. The Defendants' unlawful conduct was through mutual understandings or agreements by, between and among the Defendants.

110. The contract, combination or conspiracy has had the following effects:

a. prices charged to Plaintiff for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Plaintiff has been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

108. As a proximate result of Defendants' unlawful conduct, Plaintiff suffered injury in that it has paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Conspiracy Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiff recover compensatory damages, as provided by law, and that judgment be entered against Defendants on behalf of Plaintiff;

(3) That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(4) That Plaintiff recover treble damages, as provided by law;

(5) That Plaintiff recover its costs of the suit, including attorneys' fees, as provided by

law; and

(6) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: January 7, 2020

By: /s/ *Sathya S. Gosselin*

Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Theodore F. DiSalvo
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
tdisalvo@hausfeld.com

Michael P. Lehmann
Seth R. Gassman
**HAUSFELD LLP**
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
(415) 633-1908
mlehmann@hausfeld.com
sgassman@hausfeld.com

Case 1:20-cv-00029 Document 1 Filed 01/07/20 Page 37 of 37

YoungKi Rhee
WE THE PEOPLE LAW GROUP
6F Jin-Yang Bldg., 47 Kyonggidae-ro
Seodaemun-gu, Seoul, Korea 03752
Tel +82-2-2285-0062
Fax +82-2-2285-0071
ykrhee@wethepeople.co.kr

*Attorneys for Lotte Global Logistics (North America), Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AP Møller – Mærsk A/S, Mærsk Inc., and Maersk Line UK Limited,<br><br>*Plaintiffs,*<br>v.<br><br>BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company,<br><br>*Defendants.* | **JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

Plaintiffs AP Møller – Mærsk A/S, Mærsk Inc., and Maersk Line UK Limited, formerly known as P&O Nedlloyd, Limited, by and through their undersigned attorneys, Quinn Emanuel Urquhart & Sullivan LLP, file this Complaint against Defendants BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company, and allege as follows:

## LOCAL CIVIL RULE 10.1 STATEMENT

1. The names and addresses of the parties to this action are as follows:

   a. Plaintiff AP Møller – Mærsk A/S has its principal place of business at Esplanaden 50, 1263 Copenhagen K, Denmark.

between CSX and UP's senior executives – including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden,VP of Strategic Planning Les Passa, and Alan Blumenfield, and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan – reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes. The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

15. But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall***."

16. Instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants conspired to assess matching FSCs, without waivers or discounts, to their entire customer bases applied across *all* rail freight traffic, including carload traffic (*i.e.*, shipments that travel from origin to

destination only by railcars) and intermodal traffic (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship). The conspiring Defendants' senior executives and chief marketing officers oversaw their railroads' carload and intermodal traffic alike and sought to apply FSCs to them broadly. The junior executives overseeing the carload and intermodal traffic also attended and participated in the meetings. Even shippers with "captive" facilities (*i.e.*, facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

17. Defendants maintained the scheme and imposed policies designed to ensure their "standard" or "published" FSCs were enforced broadly across all of their customers and for all products without the waivers and discounts they had frequently offered between 2000 and 2002:

- **BNSF**: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy




**Figure 1. STB Rail Rate Index 1985 to 2007**
Real Revenue Per Ton-Mile (1985=100)

44. Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts by the individual Defendants to apply stand-alone FSCs. Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

45. During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs. The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an internal analysis as "some very

vicious historical price wars" and "destructive pricing for rail share." A 2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? ***We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy***.

46. During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs. By way of example:

- **NS**: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty." VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it." The same month, Director of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC." In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to

/s/ Sandra L. Moser
Sandra L. Moser (N.J. Bar No. 015172002)
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8000
Facsimile: (202) 538-8100
Email: sandramoser@quinnemanuel.com

Stephen R. Neuwirth*
Sami H. Rashid*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com

**pro hac vice* motions to be filed

*Attorneys for AP Møller – Mærsk A/S, Mærsk Inc., and Maersk Line UK Limited*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Mitsubishi Motors North America, Inc.,<br>4031Aspen Grove Drive, Suite 700,<br>Franklin, Tennessee 37067<br><br>Plaintiff,<br><br>v.<br><br>BNSF Railway Company,<br>2650 Lou Menk Drive<br>Fort Worth, TX 76131;<br><br>CSX Transportation, Inc.,<br>500 Water Street<br>Jacksonville, FL 33202;<br><br>Norfolk Southern Railway Company,<br>Three Commercial Place<br>Norfolk, VA 23510, *and*<br><br>Union Pacific Railroad Company,<br>1400 Douglas Street<br>Omaha, NE 68179<br><br>Defendants. | ) | Case No. |

**COMPLAINT**

Plaintiff Mitsubishi Motors North America, Inc. ("MMNA" or "Plaintiff") alleges against Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Union Pacific Railroad Company ("UP"), and Norfolk Southern Railway Company ("NS") (collectively, "Defendants" or "Railroads") based on personal knowledge as to its own acts and practices and otherwise based on information and

belief, the following claim for *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## I. Nature of the Action

1. This is an antitrust action charging the four largest United States-based Class I railroads with price-fixing in violation of Section 1 of the Sherman Act. Plaintiff purchased unregulated car load rail freight transportation services directly from one or more of the Defendants from July 1, 2003 until at least December 31, 2008 (the "Relevant Time Period") and was assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law. Carload refers to freight through a single carrier or container, as opposed to intermodal freight. Intermodal freight is where freight may be carried through multiple modes of transport and/or shippers by rail, truck and/or boat.

2. As alleged in detail, Defendants engaged in multiple *per se* antitrust violations of Section 1 of the Sherman act. The four railroads artificially enhanced rates and resulting revenues by jointly adopting and uniformly imposing a charge on shippers that the railroads called a "fuel surcharge," but which was actually calculated as a percentage of base rates, unrelated to the actual fuel costs the railroads incurred.

3. The concerted surcharge imposed by Defendants and their co-conspirators increased their revenues far in excess of the railroads' actual costs for fuel. UP boasted to its shareholders that its revenues from this fuel surcharge were over $1 billion in 2005. In a proceeding denominated Rail Fuel Surcharges, *Ex Parte* No. 662 (Jan. 25, 2007), the

Surface Transportation Board ("STB"), the federal agency now charged with regulating aspects of the railroad industry, addressed the Railroads' practice of computing rail fuel surcharges as a percentage of their base rail freight rate and found their uniform conduct was "unreasonable" and that the practices, invoices, and documents relating to those fuel surcharges were "misleading."

4. Among those customers who were damaged by the Defendants' price fixing was plaintiff MMNA. During the Relevant Time Period, MMNA paid an overcharge of at least $5 million directly to one or more of the Defendants. As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated carload rail freight transportation services and injured MMNA in their business and property. Plaintiff paid a higher price for unregulated carload rail freight transportation than it would have paid absent the concerted unlawful activity alleged herein.

5. Plaintiff seeks damages for Rail Fuel Surcharges imposed on carload rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## II. Parties

6. Plaintiff Mitsubishi Motors North America, Inc. is a California corporation with headquarters at 4031 Aspen Grove Drive, Suite 700, Franklin, Tennessee 37067. MMNA is the North American subsidiary of Mitsubishi Motors Corporation. MMNA regularly does business within the District of Columbia.

7. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states, and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

8. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States, including rail lines within this District, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

9. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Van Dorn St., in

Alexandria, Virginia, and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

10. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including Washington, D.C.). UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

## III. Jurisdiction and Venue

11. This action is brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiff by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

12. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

13. This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV. Factual Allegations

A. **Rail Industry Background**

14. The railroad freight industry in the United States has played a central role in the country's economic growth and in the laws designed to foster that growth and protect consumers through competition. Congress cited the misuse of rail service to stifle competition as one of the main reasons for passing the Sherman Act in 1890. Lawsuits against the rail industry were some of the cases brought to enforce the Sherman Act.

15. Between 1887 and 1980, railroad operations in the United States were conducted by a large number of federally-regulated railroads with rates for shipment of freight required to be published in tariffs filed with the Interstate Commerce Commission (the "ICC").

16. In 1980, Congress sought to introduce competition and market principles into the rail transportation industry. With the passage of the Staggers Rail Act of 1980 ("Staggers Act"), Pub. L. No. 96-448, 94 Stat. 1985, 49 U.S.C. §10101, *et seq*., the railroads became free to set rates for rail transportation.

17. The policy of the Staggers Act is to rely on competitive forces, rather than government regulation, to improve the efficiency of railroad operations. Among other things, instead of having all rates set in accordance with mandatory tariffs, rail shippers and rail carriers were generally allowed to enter into rail transportation contracts whose terms were not subject to ICC review and approval. The Staggers Act also phased out across-the-board industry-wide rate increases. The objectives of the Staggers Act included the creation of a modern, competitive and healthy railroad industry that would serve the American business community, with competitive rates and concern for serving

the customer base, particularly those that depend on rail freight services for the movement of products. As the House Committee Report for the Staggers act stated with respect to 49 U.S.C. §10709: "If anticompetitive behavior is alleged, under this section, the antitrust laws are the appropriate and only remedy available." H.R. Rep. No. 96-1035, 96th Cong. 2d Sess. 1, (1980), *reprinted in* 1980 U.S.C.C.A.N. 3978, 4003.

18. In 1995, Congress replaced the ICC with a new agency – the Surface Transportation Board ("STB") – which assumed some of the ICC's former functions.

19. More than 80% of all U.S. rail freight shipments move under terms that are not regulated by the STB or any other government agency. This case involves such non-regulated rail traffic.

20. The era between the passage of the Staggers Act in 1980 and the 1995 establishment of the STB saw a dramatic consolidation of the freight rail industry. Before the Staggers Act, 35 Class I railroads operated within the United States. ("Class I" railroads are the largest national freight railroads according to annual carrier revenues.) Today, the industry is highly concentrated – only seven Class I railroads operate within the United States. Of these, the Defendants UP and BNSF (collectively, the "Western Railroads") in the west, and those railroads in the east that combined or conspired with them – CSX and Norfolk (collectively, the "Eastern Railroads") – control the vast majority of rail shipments. These four Class I Railroads now receive approximately 90% of all freight rail revenue in the United States, leaving a highly concentrated industry with great susceptibility to collusion.

## B. The Fuel Surcharge Conspiracy

### 1. Shifting Indices and Collusive Pricing

21. Following the passage of the Staggers Act, railroads typically entered into private freight transportation contracts that included cost-adjustment provisions. The adjustment provisions typically relied on a price index called the All Inclusive Index ("AII") or a price index called Rail Cost Adjustment Factor ("RCAF"). The Association of American Railroads ("AAR") – a railroad trade organization that the four major Railroads control and dominate – publishes the AII, and the STB publishes the RCAF. As the name "*All Inclusive* Index" suggests, the AII and RCAF weighted a number of price inputs, labor, fuel, materials and supplies, equipment rents, depreciation, interest and other expenses, so that the index would reflect the actual impact of particular price increases on overall rail transportation costs. This meant that the AII and RCAF would capture any actual increase in fuel prices, no matter how insignificant. In fact, James R. Young, the President of UP, acknowledged publicly that the RCAF "looks at actual costs through the industry."

22. Prior to 2003, some of the Railroads attempted to impose fuel surcharges on rail freight transportation. But the Railroads' application of these surcharges was neither uniform nor consistent, and each Defendant had different fuel surcharge formulas.

23. In 2003, the Defendants and the Railroads conspired to use fuel surcharge formulas as the means to create an across-the-board rate increase. Defendants conspired to overcome the obstacle that fuel cost increases were already accounted for in the AII and RCAF. They did this by embarking on a scheme to remove the fuel component from

the AII, to refuse to use the RCAF in contract rate adjustment formulas, and to apply a brand new index combined with a "fuel surcharge" to adjust rail rates. This scheme allowed the railroads to pretextually label across-the-board price increases as a "fuel surcharge" to recover increased fuel costs, when what they were actually doing was simply raising total freight prices by a given (and agreed upon) percentage that was the product of conspiracy. The pretextual fuel surcharge was not based on actual cost.

24. The Defendants and those acting in conspiracy with them adopted this "fuel surcharge" through a series of coordinated actions using a common organization. Top executives of the Railroads met frequently, including at the biannual meetings of the National Freight Transportation Association and at AAR board meetings, to discuss "industry developments." The AAR was a particularly potent tool to coordinate and monitor a conspiracy because: (i) the Chief Executive Officers of the four Railroads constitute four members of the AAR's Board of Directors; (ii) the AAR Board of Directors meets regularly and its members regularly communicate between meetings; (iii) many former AAR employees and staff members are now employed by Class I railroads; and (iv) the AAR publishes the AII.

25. At the Spring 2003 meeting of the AAR, and in the months that followed, executives of the four Railroads conspired on a plan to use a new type of ostensible "fuel surcharge."

26. The plan began with the Western Railroads, UP and BNSF, as part of their joint plan to reduce competition and increase revenues and profits. Prior to April 2003, BNSF had assessed a fuel surcharge based on the actual miles that freight traveled. In

April 2003, a BNSF executive called a UP executive and asked if he had "heard anyone charging a fuel surcharge in miles," and the following month, BNSF abandoned a mileage-based program.

27. UP and BNSF then conspired to use the same industry fuel index for new fuel surcharge formulas that calculated a surcharge as a percentage of the base rail transportation rate. Previously, they had used fuel surcharges for a minimal portion of their contracts and adjusted their respective fuel surcharges using different indexes. UP had calculated its fuel surcharge based on the West Texas Intermediate ("WTI") Index; BNSF based its surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price ("HDF") Index. In or about July 2003, however, pursuant to their agreement, UP suddenly switched to the HDF Index for calculation of its fuel surcharges. UP made this sudden switch even though, only three months earlier, it had demonstrated its commitment to the WTI Index by undertaking modifications to surcharges based on that index.

28. UP and BNSF also conspired to apply the HDF Index in the same way. They selected "trigger" points that operated to impose identical rail fuel surcharges on shippers. Although UP and BNSF ostensibly used different thresholds as "trigger points" ($1.35 for UP and $1.25 for BNSF), this difference had no practical effect. The UP and BNSF fuel surcharge programs provided for identical fuel surcharges once the $1.35 threshold was reached – and, in practice, that threshold was always exceeded. UP and BNSF both increased the surcharge by 2% for every twenty-cent increase in the HDF

Index above $1.35 per gallon. Beginning in July 2003, BNSF and UP made their standard rail fuel surcharges identical.

29. UP and BNSF coordinated the timing of their fuel surcharges. They each applied the rail fuel surcharge to shipments beginning in the second month after the month in which there was a change in the HDF Index average price calculation: if the average price changed in January, UP and BNSF would announce their new fuel surcharge percentage on February 1 and then apply the surcharge to shipments in March. Defendants published their monthly fuel surcharge percentages on their websites to enforce against deviation from the pricing conspiracy.

30. UP and BNSF thus simultaneously selected and adopted the same novel, arbitrary and complex combination of features for their rail fuel surcharges, including using the same HDF Index, setting functionally identical trigger points and applying the surcharge at the same time after the HDF Index price had changed. UP and BNSF adopted this common pricing despite the fact that their rate and cost structures, customer bases, fuel sources, fuel costs, and their relationship with the rail rate were different.

31. The chart attached hereto as Exhibit A reflects the absolutely lock-step standard carload fuel surcharges that the Western Railroads, UP and BNSF, applied for the next several years.

32. Even after conspiring to coordinate fuel surcharges, however, UP and BNSF still had to address a significant barrier to widespread application of the fuel surcharge to raise rail rates. Most contracts contained rate adjustment provisions that utilized periodic changes in the AII or the RCAF, both of which accounted for changes in fuel

costs, when adjusting rates over a contract term. This left no objective basis for a separate and additional fuel surcharge.

33. In the fall of 2003, UP and BNSF commenced an effort to get the two Eastern Railroads to conspire on a fuel surcharge program so as to enable the Railroads not to use the RCAF to adjust rail rates, to use instead of the fuel surcharges calculated as a percentage increase of the base rail transportation rate, regardless of actual fuel costs. At AAR meetings in late 2003, including October 2-3 and December 11-12, the Railroads conspired to create and implement coordinated fuel surcharge programs.

34. Through combination or conspiracy by the Railroads, which collectively dominate the AAR and its board, the AAR developed and announced in December 2003 a new index that did not include fuel costs. That index, known paradoxically as ***All-*** Inclusive Index ***Less Fuel*** ("AII-LF"), was similar to the AII and RCAF but excluded a component for changes in fuel costs. The announcement of the AII-LF, and the underlying decision to create the new index, was a product of the collective action of the Defendants and those acting in conspiracy with them. The AII-LF specified the fourth quarter of 2002 as its base period.

35. Never before in its nearly 60-year history had the AAR separated out fuel costs from the AII index, and the STB-published RCAF still contains a fuel cost component. The railroads did not decide it was appropriate to exclude fuel from the index in 1979, when the law still allowed common rate-setting based upon costs and the Arab Oil embargo pushed domestic crude prices to their all-time inflation-adjusted high of more than $99/barrel in 2010 dollars. The railroads did not do so in 1998, when crude

oil prices had dropped to $16/barrel by the same measure. They did not do so in 2000, when prices had more than doubled to almost $35/barrel by that measure.

36. The Railroads planned to create a new index without a fuel cost component not because it better ***tracked*** their costs than the prior indexes; but because it did ***not***. Moreover, they decided to use this new index in combination with pretextual "fuel surcharges" to conceal their conspiracy to impose price increases across the board without regard to recovering actual fuel costs. The Railroads chose a method for calculating rail fuel surcharges that did not correspond with actual or unanticipated increases in fuel costs. The AII and RCAF, in contrast, had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors. Following publication of the AII-LF, the Western Railroads and the Eastern Railroads uniformly applied rail fuel surcharges using the "base rate" method. This method calculated rail fuel surcharges as a percentage of the total rate charged for the freight shipment, regardless of how much fuel contributed to costs, or whether the particular trips used more fuel or less. This made the new "base rate" method a ***less*** accurate fuel cost recovery method than the methods that the industry had previously used for decades. These conspiratorial fuel surcharges were applied to shipments of all kinds, including shipments by MMNA.

37. Just as UP and BNSF had conspired to operate in lockstep based on the HDF Index, the Eastern Railroads also moved in lockstep with their "fuel surcharges" based on the WTI Index. They each conspired: (i) to apply a "fuel surcharge" whenever the monthly average WTI price exceed $23 per barrel crude oil; (ii) to charge a "fuel surcharge" of 0.4 percent for every $1 above the monthly average WTI price of $23 per

barrel; (iii) to time the "fuel surcharge" in the same way; and (iv) to publish their monthly fuel surcharge percentages on their websites to enforce against deviation from such pricing.

38. The Eastern Railroads thus also simultaneously selected and adopted the same novel, arbitrary and complex combination of features for their rail fuel surcharges, in this case using the same WTI Index, setting the same trigger point and applying the surcharge at the same time after the WTI Index price had changed.

39. The chart attached hereto as Exhibit B reflects that the Eastern Railroads, CSX and NS, like their Western counterparts, imposed the identical fuel surcharge month after month for years. The Railroads also declined to undercut one another on fuel surcharge prices, even though the surcharges far exceeded each railroad's actual increase in fuel costs.

40. The four Railroads conspired not only to charge illegal fuel surcharges, but also to use the same cover story. Following AAR's publication of the AII-LF, the Railroads all began to apply rail fuel surcharges as separate billing items on shipping bills. The Railroads also all inaccurately represented the rail fuel surcharges to be charges they imposed merely to account for unanticipated increases in fuel prices. In fact, these charges did not merely account for fuel costs; they were a rate increase.

41. The Railroads coordinated and enforced their rate-based fuel surcharges. For instance, in November 2004, a BNSF executive "shopped the concept" of a mileage-based fuel surcharge with his counterparts at the other railroads, and they "pushed back, as expected." The following year, in an internal assessment, BNSF recognized that its

hugely profitable fuel surcharge program depended upon no one deviating from the plan: "While fuel surcharges are working well now, it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

42. The "convergence" in rail fuel surcharge methodologies and prices among railroad competitors raised concerns of industry experts. At the time, one analyst concluded that the fuel surcharges were "not supported" by fuel cost increases and found it odd that "the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives," as a "way to gain significant market share." An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity found an over $6 billion discrepancy between the Railroads' rail fuel surcharge revenue and their publicly reported fuel costs between 2003 and 2007. A 2010 joint report by the United States Department of Agriculture and Transportation, titled Study of Rural Transportation Issues, similarly found: "There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits. From 2001-2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."

43. There was no business or other procompetitive reason why UP, BNSF, CSX and Norfolk would collectively adopt and publish the AII-LF. The AII and RCAF had been appropriately "weighted" to reflect the relative impact of fuel costs as compared to other cost factors. Reworking the index to operate "less fuel (LF)" and substituting a pretextual "fuel surcharge" formula that would be applied to the entire base rate, ensured

that the formula would drive rate increases far out of proportion to the actual increases in fuel costs for the relevant rail movement.

44. In a competitive environment free of unlawful collusion, carriers with lower fuel costs would negotiate a fuel cost adjustment provision that closely traced actual costs in an effort to compete for additional business and revenues and increased shares of the business. However, starting in 2003, the Railroads uniformly refused to negotiate any changes to their surcharge formulas even when doing so would have allowed them to capture additional business, revenue and market share. Each Railroad instead restricted its freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on a percentage of the base transportation rate. The Railroads did not compete with one another for sales but instead collectively maintained the artificially-high fuel surcharges.

45. If the Railroads had wanted to recover actual fuel costs efficiently and accurately, they would never have adopted uniform percentages applied to the base rate. Actual fuel cost as a percentage of operating cost and fuel efficiency differs widely among the railroads and individual rail movements. Thus, absent conspiracy, it is inconceivable that the four Railroads would each independently design their fuel surcharges to arrive at the identical percentage month after month, for a period of more than three years. The only way to achieve uniform pricing of fuel surcharges (and especially to achieve a pricing that exceeds actual anticipated rises in fuel costs) was by a conspiracy to decouple fuel prices from the historical railroad cost indices and to then conspire to create new

uniform indices and trigger points for computing the resulting stand-alone fuel surcharge percentages.

46. Even within a particular railroad, actual fuel costs for routes and trains vary. A uniform fuel rate applied as a percentage of base rates is inefficient because it taxes routes based upon the rates that the railroad has been charging for them, rather than the amount of fuel the routes require. Accordingly, a percentage surcharge forces MMNA to pay more simply because it was paying more already, regardless of the amount of fuel required by the trip.

47. The rail fuel surcharges also did not correspond with the variation of fuel prices affected by free-market influences. They did not take into account the "hedging" activities of some of the railroads that affected the actual fuel costs incurred. Nor did they account for the phase-out in the railroad diesel fuel tax that occurred between 2004 and 2007.

48. The Railroads' actions thus were not an independent response to a common problem of increasing actual fuel costs. The only purpose in taking these collective actions was to assess a stand-alone fuel surcharge designed to substantially increase revenues rather than recover actual fuel costs, to act illicitly in concert with one another to set the surcharge and demand them from shippers and customers, and to ensure collective enforcement of the conspiratorial program. The rail fuel surcharges were intended to achieve – and did achieve – across-the-board profits and increases in the prices the Railroads charged for unregulated rail freight shipments.

49. By conspiring on rail fuel surcharges, each railroad was acting against the independent business self-interest it would have had absent the conspiracy. In a competitive environment free of combination and conspiracy, carriers with lower fuel costs would impose a lower rail fuel surcharge. That way, they could take business from less efficient competitors. It was the combination and conspiracy not to compete that made the uniform, rate-based fuel surcharges an effective strategy.

50. The Railroads also collectively changed aspects of their pricing and other behavior to advance the conspiracy. Prior to adopting the base rate method, the Railroads had allowed long-term contracts of five years or more with clauses based on the AII, RCAF and other indices that bore a close nexus to the actual fuel costs associated with handling the traffic. After the Railroads announced the AII-LF, the Railroads resisted entering into long-term contracts with shippers and instead entered into contracts for much shorter time periods, making it easier to implement the fuel surcharges.

51. The Railroads forced customers to abide by the new rate adjustment method even though most shippers, including MMNA, preferred the system in place before 2003 that provided for long-term contracts that allowed shippers to ascertain their costs and operating expenses with considerable certainty. In a competitive market, at least some railroads would see a benefit in long-term contracts, because they allow railroads to lock in customers and minimize risks in fluctuating demand.

52. BNSF, UP, CSX and Norfolk also took other collective actions to enforce the conspiracy and make it more effective. For example, pursuant to the conspiracy, they limited the previously prevailing practice of sending a customer a single invoice for the

entire transport in circumstances where more than one railroad (usually an Eastern and a Western Railroad) was involved in long-distance freight transport. Instead, the Railroads, pursuant to the conspiracy, increasingly switched to having each railroad on a multi-railroad trip send a separate invoice (and thus each could separately impose its own fuel surcharge). This practice also made it easier for each railroad to recoup its share of the supra-competitive profits from the fuel surcharge program imposed by the conspiracy.

**2. The Result: Supra-Competitive Profits**

53. Defendants and those who conspired with them reaped huge, supra-competitive profits as a result of the success of their conspiracy. Through their conspiracy to coordinate on fuel surcharges, the Railroads realized billions of dollars in revenues in excess of their actual increase in fuel costs from the customers on whom they imposed the surcharge. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent" and "it's only been the last couple of years" that "the financial returns in the business has [sic] started to move in the right direction."

54. Thus, although fuel prices increased between 2003 and 2008, the Defendants and those who conspired with them continued to realize increasing profits each year of the conspiracy. The report commissioned by the American Chemistry Council estimated that between 2005 and 2007, UP's fuel surcharge formula alone produced $13.69 billion in revenues over and above UP's actual fuel costs.

### 3. Additional Elements of the Conspiracy

55. At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants also took other steps in furtherance of the conspiracy. They largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly. Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or RCAF, or that excluded fuel surcharges altogether.

56. This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase market share and their pricing became more visible to each other.

57. Defendants made this switch even though more shippers preferred the former system in order to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock in market share by entering into long-term contracts. The Defendants, however, collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand. This coordinated behavior was hardly routine market conduct.

58. In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable." By way of example, during the relevant period the Archer-Daniels-Midland Company ("ADM") approached individual Defendants to discuss hedging opportunities to allow ADM and the railroads certainty and a method for cost-containment. The railroads, acting against their own individual interests, refused to enter into hedging contracts with ADM.

59. In addition, several national shipper organizations met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where BNSF is the only carrier. That is, BNSF reduced fuel surcharges on traffic where it faced no competition from the UP, and thus would not violate the agreement to fix competitive prices. The other Defendants refused to address the concerns of their customers.

60. Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing

revenues to subsidize discounting of underlying rates. As demonstrated in the table that follows, Defendants' market shares remained stable following the 2003 agreements.

61. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB *Ex Parte* No. 661 (Jan. 25, 2007).

62. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

63. Pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**C. <u>STB and Other Government Investigations</u>**

64. On January 25, 2007, the STB concluded its investigation. Rail Fuel Surcharges, STB *Ex Parte* No. 661 (Jan. 25, 2007). The STB concluded:

> [I]mposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for the particular movement to which the surcharge is applied, is a misleading and ultimately unreasonable practice. *Id*. at 7.

65. The STB also determined that the term "fuel surcharge" used by the Railroads was itself deliberately misleading:

> The term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. ***If it is used instead as a broader revenue enhancement measure, it is mislabeled***. This sort of mislabeling appears designed to avoid the type of response a carrier would likely receive if it were to honestly inform a shipper that a higher rate was being imposed to recover not only the increased cost of fuel for another shipper's traffic – which is what would often occur under rate-based fuel surcharges. *Id*. at 6-7 (emphasis added).

66. Pursuant to the conspiracy, the Defendants and those who conspired with them continued to apply the same unreasonable fuel surcharge practices addressed by the STB by insisting on a "take it or leave it" basis that these formulas be included in the private rail freight transportation contracts, and other unregulated freight transport, at issue here. These misleading and unreasonable practices removed competitive constraints and raised shipping costs for shippers, such as MMNA.

**D. Antitrust Plus Factors**

67. Antitrust "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price-fixing cartel feasible.

68. The railroad industry is highly concentrated. The Railroad Defendants in this case are the four largest remaining domestic Class I railroads following decades of mergers and consolidation. The Railroad Defendants account for more than 90% of the nation's rail freight traffic. Such high concentration facilitates the possibility of a price-fixing cartel.

69. There are significant barriers to entry into the railroad industry. In order to compete, railroads must invest in a vast network of rail tracks, stations, yards, and switching facilities. Such infrastructure takes decades to develop and requires onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of the power of eminent domain. Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

70. The Rail Fuel Surcharges were highly standardized. The Railroad Defendants structure their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogenous products or services are susceptible to price-fixing.

71. The railroad industry has a history of price-fixing and other anticompetitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price-fixing through establishment of "rate bureaus" and "rate-making committees." Although these bodies disappeared from public view after deregulation, the railroad industry has continued to engage in market manipulation, unreasonable rate

practices, and other discriminatory practices against a wide spectrum of freight customers.

72. The CEOs of the Railroad Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to Class I railroads operating in the United States, four of which are Defendants in this action. The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings. AAR meetings and events provide opportunity for the Railroad Defendants to discuss and agree upon a common course of action with respect to Rail Fuel Surcharges.

73. Defendants acted in contravention of their individual economic interests. The Railroad Defendants did not behave as if they were in a competitive market and each acted in a manner contrary to its independent economic interest in a manner that is inexplicable unless there was a conspiracy.

74. Defendants failed to compete on the Surcharges. In a truly competitive market, rational railroads levying surcharges based on a percentage of a customer's freight rate – bearing no relation to the actual costs of fuel consumed and therefore not actually crucial to cost recovery – would compete on the basis of surcharges in order to lower a customer's overall bill and thereby gain business and market share. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but the Railroad Defendants refused to do so.

75. Defendants' behavior alienated customers. At or about the time the Railroad Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. The Defendants made this switch even though most shippers preferred the former system. In a competitive environment, offering customers less attractive terms would cause customers to seek competitive alternatives. Here, Defendants withdrew the offer of the preferred terms and each one of them declined to offer the preferred terms to customers in an effort to increase its market share. This behavior gives rise to an inference of conspiracy

76. Defendants changed billing practices to expose each other's prices. The Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, the Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. The Defendants declined to issue one bill for two reasons: (1) to provide transparency as to what each railroad was charging on multiple-line shipments and (2) to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

77. During the Relevant Time Period, rail freight demand grew, but each Defendant's market share remained stable. Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, but the

Defendants' market shares remained relatively stable and constant. The fact that market shares did not fluctuate significantly during a period of demand growth is further indication that the Defendants agreed to price-fix rather than to compete for new and increasing sales.

**E. Antitrust Injury to Plaintiff**

78. The unlawful conduct, combination or conspiracy alleged herein had the following effects, among others:

a. The Rail Fuel Surcharges charged to MMNA for unregulated carload rail freight transportation were fixed or stabilized at supra-competitive levels;

b. Plaintiff was deprived of the benefits of free, open and unrestricted competition in the market for unregulated carload rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated carload rail freight transportation was unlawfully restrained, suppressed and eliminated.

79. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff has sustained injury to business or property. The injury sustained by Plaintiff is the payment of supra-competitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**F. Interstate Trade and Commerce**

80. During the Relevant Time Period, Defendants accounted for over 90% of all rail shipments within the United States. The AAR Policy and Economic Department

reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

81. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate commerce. During the Relevant Time Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and its co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

82. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## V. Tolling of Statute of Limitations

83. The filing of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974); *Crown v. Parker*, 462 U.S. 345, 350 (1983). The mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose. *American Pipe*, 414 U.S. at 559. A class complaint notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. *Id.* at 555. The defendants will be aware of the need to preserve evidence and witnesses respecting the claims of all the

members of the class. Tolling the statute of limitations thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification. *Crown v. Parker*, 462 U.S. 345, 352-353 (1983). Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits. *Id*. at 354.

84. On May 14, 2007, a first class action suit (*Dust Pro, Inc. v. CSX Transportation, Inc., et al.*, D.N.J., 2:07-cv-02251-DMC-MF) ("*Dust Pro*") was filed against the Defendants and others on behalf of a class that included direct purchasers of unregulated rail freight transportation services from the Defendants and others from July 1, 2003 until at least May 14, 2007 and who were assessed a rail fuel surcharge for the agreed-upon transportation, alleging that the Defendants conspired to use rail fuel surcharges, which were added to customers' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States

85. On November 6, 2007, the Multidistrict Litigation Panel consolidated all 18 pending actions, including *Dust Pro*, before the District of District of Columbia under the caption *In Re: Rail Freight Fuel Surcharge Antitrust Litigation* (see D.D.C., 1:07-mc-00489-PLF, ECF No. 1).

86. In 2012, the district court had initially certified the direct purchaser class. (*See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1 (D.D.C. 2012). However, on appeal, the United States Court of Appeals for the District of Columbia Circuit vacated

the certification and remanded for further consideration. (*In re Rail Freight Surcharge Antitrust Litig. MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013).

87. On October 10, 2017, on remand and after permitting supplemental discovery and expert reports, the district court **denied** class certification of the direct purchaser class (*In re Rail Freight Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C. 2017) and direct purchaser plaintiffs subsequently appealed to the Court of Appeals. Normally, a district court's denial of class certification ends the tolling of the applicable statute of limitations.

88. However, on November 8, 2017—during the pendency plaintiff's Rule 23(f) Petition to the Court of Appeals—the district court entered a first Order staying the case until the earlier of (1) denial of Plaintiffs' Petition by the Court of Appeals, or (2) January 5, 2018 and further stated that:

> It is not necessary for the Court to address at this time Plaintiff's request for tolling, because Defendants have agreed, for claims previously tolled by the pendency of the class action, to exclude from future statutes of limitations calculations the time between (i) the date of the court's order denying class certification and (ii) the earlier of either the date when the pending Rule 23(f) Petition may be denied or January 5, 2018, for actions filed after the date in clause (ii).

89. On December 20, 2017, the Court of Appeals granted Plaintiff's Rule 23(f) Petition. *In re Rail Freight Surcharge Antitrust Litig.*, Case No. 17-8005 (D.C. Cir.), ECF No. 1709931.

90. On January 8, 2018—during the pendency of the appeal—the district court entered a Stipulation and Second Order on Plaintiff's Motion for a Stay of Proceedings

and to Toll The Statute of Limitations (*see* D.D.C., 1:07-mc-00489-PLF, ECF No. 856) pending the appeal of the direct purchaser class pursuant to Fed. R. Civ. P. 23(f). The Stipulation and Order states in pertinent part:

> The Court again acknowledges Defendants' representation regarding future statute of limitations calculations and, on the basis of that representation, again concludes that it is not necessary at this time to decide (1) whether to enter an order extending tolling under the *American Pipe* doctrine beyond the date of the Court's order denying class certification, see *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974), or (2) whether the Court has the power to enter such an order.
>
> Now, therefore, the Court ORDERS as follows:
>
> Plaintiffs need not renew their request for tolling at this time because Defendants have agreed, for claims previously tolled by the pendency of the class action, to exclude from future statutes of limitations calculations the time between (i) the date of the court's order denying class certification and (ii) the date that the Court of Appeals issues its merits-panel decision on Plaintiffs' appeal, for actions that are filed after the date in clause (ii). This determination is without prejudice to Plaintiffs renewing their request at a future date.

*Id.* at 3.

91. On August 16, 2019, the Court of Appeals affirmed the district court's 2017 denial of class certification. *In re Rail Freight Surcharge Antitrust Litig.*, Case No. 18-7010 (D.C. Cir.), ECF No. 1802468.

92. On September 17, 2018—still during the pendency of the appeal—the district court entered an Order on Joint Proposal Regarding a Stay (*see* D.D.C., 1:07-mc-00489-PLF, ECF No. 869). Stipulation and Order states in pertinent part:

> [I]t is hereby ordered that all proceedings in Miscellaneous Case No. 07-0489 are STAYED until forty-five (45) days after the D.C. Circuit's ruling on the pending appeal of this Court's Order denying class certification. On or

before the date on which the stay expires, the parties shall submit a status report and recommendation(s) concerning further proceedings.

93. Accordingly, the period between October 10, 2017 (the date of the district court's order denying class certification) and August 16, 2019 (the date that the Court of Appeals issued its decision to affirm the district court's denial of class certification) must be excluded from the statutes of limitations calculation for individual actions—such as this—that are filed after August 16, 2019. In addition, the stay entered in *In re Rail Freight Surcharge Antitrust Litig.* expired on September 30, 2019.

## COUNT I

**(Violation of Section 1 Of the Sherman Act And Section 4 Of The Clayton Act)**

94. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

95. Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

96. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

97. Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

98. The contract, combination or conspiracy has had the following effects:

a. Prices charged to Plaintiff for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

b. Plaintiff has been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c. Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

99. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury in that it has paid supra-competitive prices for Rail Fuel Surcharges applied to unregulated carload rail freight transportation services during the Relevant Time Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiff recover compensatory damages, as provided by law, determined to have been sustained by it, and that judgment be entered against Defendants on behalf of Plaintiff;

(3) That Plaintiff's damages be trebled, as provided by law;

(4) That Plaintiff recover the costs of the suit, including reasonable attorneys' fees, as provided by law; and

(5) That Plaintiff be granted such other and further relief as the Court may deem just and proper.

**Jury Trial Demand**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: September 22, 2020

Respectfully submitted,

*/s/ Joseph M. Vanek*

Paul E. Slater
Joseph M. Vanek
David P. Germaine
Matthew T. Slater
Martin V. Sinclair, Jr.
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
pes@sperling-law.com
jvanek@sperling-law.com
dgermaine@sperling-law.com
mslater@sperling-law.com
msinclair@sperling-law.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 22, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

*/s/ Joseph M. Vanek*

# Exhibit A

# Exhibit A

## FUEL SURCHARGES DURING RELEVANT PERIOD

### MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP | MONTH | BNSF | UP |
|---|---|---|---|---|---|
| Jun-02 | 1.0% | 0 | Jun-05 | 10.5% | 10.5% |
| Jul-02 | 1.0% | 0 | Jul-05 | 9.5% | 9.5% |
| Aug-02 | 0 | 0 | Aug-05 | 10.5% | 10.5% |
| Sep-02 | 0 | 0 | Sep-05 | 11.5% | 11.5% |
| Oct-02 | 1.0% | 0 | Oct-05 | 13.0% | 13.0% |
| Nov-02 | 2.0% | 0 | Nov-05 | 16.0% | 16.0% |
| Dec-02 | 2.5% | 0 | Dec-05 | 18.5% | 18.5% |
| Jan-03 | 2.0% | 2.0% | Jan-06 | 13.5% | 13.5% |
| Feb-03 | 2.0% | 2.0% | Feb-06 | 12.0% | 12.0% |
| Mar-03 | 2.5% | 2.0% | Mar-06 | 12.5% | 12.5% |
| Apr-03 | 4.5% | 2.0% | Apr-06 | 12.5% | 12.5% |
| May-03 | 2.0% | 2.0% | May-06 | 13.5% | 13.5% |
| Jun-03 | 3.0% | 2.0% | Jun-06 | 15.0% | 15.0% |
| Jul-03 | 2.5% | 2.5% | Jul-06 | 16.5% | 16.5% |
| Aug-03 | 2.0% | 2.0% | Aug-06 | 16.5% | 16.5% |
| Sep-03 | 2.0% | 2.0% | Sep-06 | 17.0% | 17.0% |
| Oct-03 | 2.5% | 2.5% | Oct-06 | 18.0% | 18.0% |
| Nov-03 | 2.5% | 2.5% | Nov-06 | 15.5% | 15.5% |
| Dec-03 | 2.5% | 2.5% | Dec-06 | 13.0% | 13.0% |
| Jan-04 | 2.5% | 2.5% | Jan-07 | 13.0% | 13.0% |
| Feb-04 | 2.5% | 2.5% | Feb-07 | 14.0% | 14.0% |
| Mar-04 | 3.5% | 3.5% | Mar-07 | 12.5% | 12.5% |
| Apr-04 | 3.5% | 3.5% | Apr-07 | 12.5% | 12.5% |
| May-04 | 4.0% | 4.0% | May-07 | 14.5% | 14.5% |
| Jun-04 | 4.5% | 4.5% | Jun-07 | 16.0% | 16.0% |
| Jul-04 | 5.0% | 5.0% | Jul-07 | 15.5% | 15.5% |
| Aug-04 | 5.0% | 5.0% | Aug-07 | 16.0% | 16.0% |
| Sep-04 | 5.0% | 5.0% | Sep-07 | 16.5% | 16.5% |
| Oct-04 | 6.0% | 6.0% | Oct-07 | 16.5% | 16.5% |
| Nov-04 | 7.0% | 7.0% | Nov-07 | 17.5% | 17.5% |
| Dec-04 | 9.0% | 9.0% | Dec-07 | 18.5% | 18.5% |
| Jan-05 | 9.0% | 9.0% | Jan-08 | 21.5% | 21.5% |
| Feb-05 | 8.0% | 8.0% | Feb-08 | 21.0% | 21.0% |
| Mar-05 | 7.5% | 7.5% | Mar-08 | 21.0% | 21.0% |
| Apr-05 | 8.0% | 8.0% | Apr-08 | 21.5% | 21.5% |
| May-05 | 10.0% | 10.0% | May-08 | 26.5% | 26.5% |

# Exhibit B

**Exhibit B**

## FUEL SURCHARGES DURING RELEVANT PERIOD

### MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |

| MONTH | CSX | NS |
|---|---|---|
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Mitsui O.S.K. Lines, Ltd.**<br>Shosen Mitsui Building, 1-1<br>Toranomon 2-Chome, Minato-ku<br>Tokyo 105-8688<br><br>**MOLAM Legacy, Inc.**<br>10 Woodbridge Center Drive<br>Woodbridge, NJ 07095,<br><br>Plaintiffs,<br><br>v.<br><br>**CSX Transportation, Inc.**<br>500 Water Street<br>Jacksonville, Florida 32202<br><br>**Norfolk Southern Railway Company**<br>Three Commercial Place<br>Norfolk, Virginia 23510<br><br>**Union Pacific Railroad Company**<br>1400 Douglas Street<br>Omaha, Nebraska 68179<br><br>Defendants. | Civil Action No.<br><br>MDL Docket No. 2925<br>Misc. No. 20-008 (BAH)<br><br>Judge: |

**FIRST AMENDED COMPLAINT**

Plaintiffs, Mitsui O.S.K Lines, Ltd. and MOLAM Legacy, Inc. (together, "MOL" or "Plaintiffs") bring this Complaint against CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), and Union Pacific Railway Company ("UP") (collectively, "Defendants") for violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

## PARTIES

**Plaintiffs**

1. Plaintiff Mitsui O.S.K. Lines, Ltd ("Mitsui") is now and was at all times material herein a corporation duly organized and existing under the laws of Japan. Plaintiff was and still is a Vessel Operating Common Carrier of goods for hire between United States ports and foreign ports, regulated by U.S. law and regulations. At all times relevant, Mitsui relied on rail transportation to transport cargo and shipping containers throughout the country.

2. Plaintiff MOLAM Legacy, Inc. ("MOLAM") formerly known as MOL (America) Inc., is incorporated under the laws of the State of Delaware. From 1991 until 2018, MOLAM, as general agent of Mitsui, managed its intermodal transportation business in North America.

3. During the Relevant Period, MOL purchased unregulated rail freight transportation services directly from and paid intermodal FSCs directly to the Defendants for rail transportation services within the United States.

**Defendants**

4. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States and interconnects with other railroads, including the other Defendants. At all times relevant, a related company to CSX called CSX Intermodal. Inc. ("CSXI") acted as an intermediary in arranging rail services. CSXI and CSXT acted in concert for purposes of carrying out the price fixing conspiracy alleged herein.

5. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and interconnects with other railroads, including the other Defendants.

6. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP serves primarily the western two-thirds of the United States, and interconnects with other railroads, including the other Defendants, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

8. Venue is proper in this district pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) and 28 U.S.C. § 1391. Defendants maintain offices, transact business, have agents, and/or are found within this District; a substantial part of the events giving rise to the claims occurred in this District; and Defendants regularly conduct business in interstate commerce that is carried out in part in this District. In addition, at times relevant, Plaintiffs' principal U.S. agency was headquartered in Concord, California, within this district and transacted business with all Defendants from that office.

9. This Court has personal jurisdiction over each Defendant. Without limitation, each Defendant (a) transacted business within this District, (b) directly or indirectly sold or delivered rail transportation services in this District, (c) has substantial contacts with this District, and (d) engaged in an illegal price-fixing conspiracy that had the intended effect of causing injury to persons and entities found in or doing business in this District.

10. INTRADISTRICT ASSIGNMENT – Cargo and containers involved in rail carriage affected by the conspiracy routinely originated and terminated in and around the Port of Oakland, California. As noted above, Plaintiffs' principal U.S. agency was headquartered in Concord, California, within this district and transacted business with all Defendants from that office. For these reasons, this matter is properly assigned to the San Francisco or Oakland Divisions of this Court.

## INTRODUCTION

11. Defendants violated Sections 1 and 3 of the Sherman Act and damaged Plaintiffs under Section 4 of the Clayton Act by conspiring to increase the rates Plaintiffs paid for rate-unregulated rail freight transportation services directly from the Defendants during the period from 2003 through at least December 31, 2008. As used herein, "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

12. Defendants conspired to impose rate-based rail fuel surcharges, which were added to customers' bills, including the Plaintiffs' bills, as a means to artificially and unlawfully increase the amount paid for rate-unregulated rail freight transportation services and to fix, maintain, and/or stabilize the price for those services in the United States. A rate-based rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that railroads included in their calculation of the fee for transportation, with the fee set as a stated percentage of the shipper's rate. The railroads claimed that the Rail Fuel Surcharge compensated them for rising fuel costs, but in actual practice, it was not related to the actual costs the railroads paid for fuel but was instead simply a means to raise and fix the price of rate-unregulated rail freight transportation services. Because competition previously had constrained their ability to increase prices, Defendants took collective action and

conspired to impose Rail Fuel Surcharges calculated as a percentage of the otherwise applicable rates. On a nationwide scale, this conspiracy enabled Defendants to collect billions of dollars of additional supra-competitive profits during the conspiracy.

13. Defendants managed to implement this anticompetitive surcharge by harmonizing the way their companies calculated fuel surcharges in several ways. First, they each linked their surcharge rates to one of two price indexes – the Retail On-Highway Diesel Fuel ("HDF") and West Texas Intermediate ("WTI") indexes. They also agreed to set the trigger points at which their surcharges kicked in to very similar values, and set those trigger points at sufficiently low levels that the Rail Fuel Surcharges remained in effect continuously for years, despite fluctuations in oil prices. The amounts of the surcharges (expressed as percentages of the otherwise applicable rates) were also consistent across Defendants.

14. After the railroad industry was deregulated in the 1980s with the Staggers Rail Act of 1980 ("Staggers Act"), Pub. L. No. 96-448, 94 Stat. 1895, 49 U.S.C. §§ 10101 *et seq*., railroads could no longer impose across-the-board rate increases. The only practicable way the railroads could impose an across-the-board price increase was by agreeing to impose a uniform surcharge to rail rates and imposing it on as many customers as possible.

15. Defendants CSX, NS, and UP—which together with a fourth company, BNSF Railway Company ("BNSF") control about 90% of rail freight traffic in the United States—conspired starting in about 2003 to use the Rail Fuel Surcharges as the means to raise rates across the board by amounts far in excess of their actual fuel costs, and thereby increase their profits. This was a single conspiracy to impose across-the-board fuel surcharges on all customers for all products for private rail freight transportation contracts.

16. One key step in furtherance of this conspiracy was to marginalize and replace the All Inclusive Index ("AII"). The AII was published by the Association of American Railroads ("AAR"), a railroad trade association in which all of the Defendants were members and active participants. The AII was an index previously used in many long-term rail freight transportation agreements to raise—or in theory reduce—the price of rail transportation to account for changes in the costs of the goods and services used to provide rail transportation. Fuel was one of the inputs included in the AII, but there were others. The AII and a related index called the Rail Cost Adjustment Factor ("RCAF") provided the railroads with a means to recover any increase in fuel costs, and for customers to receive the benefit of any reduction in fuel costs, at least in some instances. Both the AII and the RCAF reflected changes in actual prices and/or costs faced by the industry.

17. The AII and the RCAF were a barrier to the imposition of across-the-board rate increases based on a fuel surcharge because those indexes included an explicit component for fuel that already factored in changes to fuel prices. In order to avoid this barrier, Defendants conspired to take collective action through the AAR to marginalize and replace the AII and RCAF with an index that did not include an explicit fuel component. At AAR meetings in the Fall of 2003, Defendants and other co-conspirators conspired to cause the AAR to develop and publish a replacement rate adjustment index that purported to exclude the fuel component. By agreeing to exclude fuel from the index, the Defendants claimed they were free to add separate fuel surcharges, purportedly to recover increased fuel costs but in reality to increase freight rates across the board, and collectively increase their profits, which was their common goal.

18. Pursuant to this agreement and conspiracy, the AAR announced in December 2003 the establishment of the "All Inclusive Index Less Fuel" ("AII-LF"). The AAR's official

publication, entitled "AAR Railroad Cost Indexes," stated that the new index "is calculated using the same components and methods as the [AII] . . . with the exception of the exclusion of the fuel component." This announcement and the underlying removal of fuel from the AII and RCAF were the collective actions of the Defendants. The AII-LF was a first for the railroad industry because it purported to provide a rate adjustment index for rail shipments but did not include fuel.

19. The publication of the AII-LF enhanced the impact of a conspiracy that was already well underway. In July 2003, BNSF and UP agreed to implement an identical percent-of-rate fuel surcharge program on their carload traffic. Fuel surcharges had been applied only intermittently and largely unsuccessfully, and when they were used, each railroad relied upon different rates, reflecting their differing fuel costs. In July 2003, though, BNSF and UP for the first time agreed to coordinate their fuel surcharges on their carload traffic and base them on the U.S. Department of Energy (DOE) HDF Index, even though the price paid for highway diesel fuel was substantially higher than the price railroads paid for diesel fuel in bulk. BNSF and UP began to charge the exact same fuel surcharges pursuant to their agreement, using the HDF Index, and continued to do so through at least 2008 on rate-unregulated carload traffic subject to a rate-based fuel surcharge, and starting in 2004 began to collectively impose even higher rate-based fuel surcharges on their coal traffic. Implementation of the AII-LF in December 2003 facilitated BNSF and UP's imposition of the inflated fuel surcharges based on the HDF Index and calculated using the base shipping rate, as adjusted by the AII-LF (in most instances), rather than what the Defendants paid for fuel. UP President James Young acknowledged during an October 2004 earnings call that UP was "getting away from the RCAF" and "putting in the specific fuel recovery mechanism in areas that historically would have used RCAF." According to Young, by July 2007, approximately "eighty

to ninety percent" of UP's business had "some kind of fuel surcharge mechanism that gets passed on to the customer."

20. Soon after the AAR adopted the AII-LF, CSX and NS, which previously had used different fuel surcharges from each other, announced that each would apply identical West Texas Intermediate ("WTI") Index-based fuel surcharges to their carload traffic. This announcement by CSX and NS, coming right after their collective action in late 2003 to remove fuel from the AII and RCAF, was the result of their conspiracy with BNSF and UP to impose artificially high Rail Fuel Surcharges in a coordinated fashion. CSX and NS charged the exact same fuel surcharges (or rebased fuel surcharges), through at least 2008 on rate-unregulated traffic subject to a rate-based fuel surcharge. This identical decision by CSX and NS, made just after the Defendants' collective action in late 2003 to remove fuel from the AII and RCAF, eliminates any reasonable possibility that CSX and NS decided independently to use the WTI Index in early 2004.

21. With the AII-LF in place, the Defendants were able to use the Rail Fuel Surcharges as a revenue-generating and profit-enhancing device, rather than a mere cost-recovery mechanism. The Defendants each applied the AII-LF to the entire base rate for the rail freight transportation, without excluding any portion of the base rate associated with fuel. The Railroads then applied the percentage fuel surcharge to the entire base rate as already adjusted by the AII-LF. The fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors. The AII-LF removed the fuel component of the AII and RCAF altogether, rather than holding that fuel component constant. The Railroads removed the fuel component from the new AII-LF index, applied the AII-LF to the entire base rate, and then applied the percentage increase in fuel price to the AII-LF-adjusted rate for freight transport. Through this agreed change, the index no longer reflected the actual fuel costs incurred by Defendants.

22. The collective actions of Defendants, including effectively removing fuel from the AII and RCAF by creating the new AII-LF, and moving in lockstep on fuel surcharges, cannot be explained as the result of routine market conduct to reflect increasing fuel prices or costs, or even to do so more efficiently. The fuel cost component in the AII and RCAF was already fully effective for reflecting changes in actual fuel prices and even allowed for over-recovery insofar as the railroad fuel costs did not increase as rapidly as the fuel prices measured in the AII. Indeed, the AII and RCAF had been designed to ensure that fuel and other price increases could be recovered, regardless of the size of the fuel cost increase. Rather, by creating a new cost index without fuel (the AII-LF), Defendants devised and implemented a means to impose an across-the-board rate increase for rail freight transportation services. Instead of competing on fuel prices (which was not possible because Defendants paid different fuel prices and had differing fuel costs), Defendants collectively created an across-the-board rate increase that had not been possible since partial deregulation eliminated across-the-board, lawful collective railroad pricing activities.

23. Defendants were able to maintain their conspiracy by uniformly computing the surcharges as a percentage of the rail freight transport rate and by agreeing upon closely aligned trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. Previously, the UP had explained to the Surface Transportation Board ("STB") that private pricing was crucial to encouraging competition, but Defendants changed to public pricing as part of, and to facilitate, their conspiracy. There was no reasonable business justification for this uniform adoption of a publicized pricing mechanism.

24. Defendants also took other collective action to enforce the conspiracy and make it effective. For example, in many cases, they largely stopped entering into long-term contracts and

entered instead into contracts for periods of approximately 30 days, or with 30-day cancellation provisions, thereby making it easier to implement the fuel surcharges, which were adjusted monthly. In many other cases, Defendants also limited the previously prevailing practice, in circumstances where more than one railroad was involved in long-distance freight transport, of sending a customer a single bill for the entire transport. Instead, Defendants increasingly switched to having each railroad on an interline trip send a separate bill (with its own fuel surcharge). This facilitated each Defendant recouping its share of the supra-competitive profits. Such a switch to separate invoicing on interline trips could be accomplished only through collective action of the Defendants. However, Defendants refused in other cases to separate their rates, where doing so might help a shipper to challenge the rates of only one railroad at the STB. Defendants also began refusing to negotiate discounts on rail freight rates—even in circumstances where individual railroads had previously been willing to do so.

25. The Defendants also collectively imposed Rail Fuel Surcharges for common carrier rail transportation regulated by the STB. When the Rail Fuel Surcharges as applied to regulated transportation were challenged, the STB found in January 2007 that the railroads' rate-based Rail Fuel Surcharges were "unreasonable" because the surcharges did not relate to the railroads' actual cost of fuel. The STB also noted that "[b]ecause railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate . . . cannot fairly be described as merely a cost recovery mechanism." See Rail Fuel Surcharges, Ex Parte No. 661, at 6 (STB served Jan. 26, 2007). The STB also said that the railroads had engaged in "misleading" practices in connection with the fuel surcharges. Id. at 7. While the STB's findings were significant, the STB acknowledged that it would need to expand its regulatory jurisdiction if

it were to regulate rail rates and services governed by contract or that it had exempted from regulation, like those at issue in the case. Id. at 13.

26. A United States District Court has already found that there is "strong evidence of conspiracy." In 2008, a putative class action was filed against BNSF, CSX, NS, and UP alleging price fixing in violation of Section 1 of the Sherman Act. The District Court for the District of Columbia granted class certification in 2012. In re Rail Freight Fuel Surcharge Antitrust Litig., 287 F.R.D. 1, 74 (D.D.C. 2012). After the United States Court of Appeals for the District of Columbia vacated class certification, the District Court concluded on remand that plaintiffs failed to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members" as required for class certification under Federal Rule of Civil Procedure 23(b)(3). In re Rail Freight Fuel Surcharge Antitrust Litig., 292 F. Supp. 3d 14, 32 (D.D.C. 2017) (quoting Fed. R. Civ. P. 23(b)(3)), aff'd, 934 F.3d 619 (D.C. Cir. 2019). However, the Court also stated that "Plaintiff's documentary evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges in the class period is substantial." Id. at 102.

27. Indeed, there is "substantial documentary evidence" indicating that "defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." Id. at 103. Moreover, the "evidence shows that defendants employed these fuel surcharges in lockstep." Id. at 104.

28. The surcharge imposed by Defendants increased their revenues far in excess of the Defendants' actual costs for fuel. By way of example, UP reported over $1 billion in revenue from the surcharge in 2005 alone.

29. As a direct result of their fuel surcharge conspiracy, Defendants collected billions of dollars of revenues in excess of their actual incremental increase in fuel costs from the specific customers, including Plaintiffs, on whom they imposed the surcharge. Collection of these supra-competitive profits injured and damaged shippers, including Plaintiffs, who were the targets of the conspiracy.

30. Defendants' illegal conduct has injured Plaintiffs in this action. Plaintiffs paid illegally-inflated fuel surcharges for the shipment of many types of empty shipping containers and loaded shipping containers of goods, including but not limited to apparel, footwear, electronics, chemicals, foodstuffs, household goods, pharmaceuticals, auto parts, vehicles, machinery, toys, freight of all kinds, and other goods that they would not have paid but for the conspiracy alleged herein. Each of these Plaintiffs is entitled under Section 4 of the Clayton Act, 15 U.S.C. § 15, to damages for violation of Sections 1 and 3 of the Sherman Act.

## FACTUAL BACKGROUND

### I. CONGRESS ENACTED THE STAGGERS ACT TO FOSTER COMPETITION IN THE RAIL INDUSTRY, BUT CONSOLIDATION INCREASED OPPORTUNITIES FOR COLLUSION

31. For almost a hundred years, the Interstate Commerce Commission (the "ICC") regulated rates for shipment of freight and required those rates to be published in tariffs.

32. Under the prior regulatory scheme, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

33. In 1980, Congress passed the Staggers Act, which partially de-regulated the railroads and allowed rail carriers to set rates for rail transportation without government oversight in many instances. In particular, railroads and their customers were granted the statutory authority to negotiate their own individual rail transportation contracts, which were not rate-regulated. In

other cases, the ICC exempted railroad-provided transportation from rate regulation. The Staggers Act also resulted in the ICC's phasing out across-the-board industry-wide rate increases.

34. Instead of direct government oversight, the Staggers Act required rail consumers to rely on market forces and general antitrust laws to maintain fair and competitive prices. As the House Committee Report for the Staggers Act stated with respect to 49 U.S.C. § 10709: "If anticompetitive behavior is alleged, under this section, the antitrust laws are the appropriate and only remedy available." H.R. Rep. No. 96-1035, at 58 (1980), reprinted in 1980 U.S.C.C.A.N. 3978, 4003.

35. In 1995, Congress replaced the ICC with a new agency—the STB—which assumed some of the ICC's former functions, but more than 80% of all U.S. rail freight shipments move under terms that are not regulated by the STB or any other government agency. This case involves such non-regulated rail traffic.

36. At the time the Staggers Act was passed, the freight rail industry was far less concentrated, with 35 Class I railroads operating within the United States. ("Class I" railroads are the largest national freight railroads according to annual carrier revenues.) By the early 2000s, the industry was highly concentrated—only seven Class I freight railroads subject to STB regulation operated within the United States. Of these, BNSF, CSX, NS, and UP control the vast majority of rail shipments. These four Class I Railroads received approximately 90% of all freight rail revenue in the United States, leaving a highly concentrated industry with great susceptibility to collusion.

37. By the early 2000s, the industry had also consolidated to the point where further Class I mergers were very difficult, if not impossible. In response to the proposed merger of BNSF and Canadian National, the STB, which succeeded the ICC, introduced a moratorium on new

mergers and then promulgated more stringent standards for review of Class I mergers. At the same time, railroads were experiencing surging freight demand and tight capacity.

38. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge to as many customers as possible. As explained below, Defendants were able to increase their prices by conspiring to adopt Rail Fuel Surcharges under the guise of rising fuel prices.

## II. IMPLEMENTATION OF THE SCHEME: THE DEFENDANTS CONSPIRE TO DEPART FROM PAST PRACTICE AND CHANGE THE INDEXES USED TO COMPENSATE FOR INCREASED COSTS

39. After the Staggers Act allowed railroads to negotiate individual contracts with consumers, railroads often incorporated rate escalation provisions tied to the AII and the RCAF (which is based on the AII) into contracts to provide protection against rising input prices over the life of the contract. The AAR published the AII, and first the ICC and then the STB published the RCAF, which is based closely on the AAR's AII. The AII and RCAF both include a fuel component. The AII and RCAF weight various index components—labor, fuel, materials & supplies, equipment rents, depreciation, interest, and other expenses—based on actual railroad expenses so that the impact of price changes in the individual components such as fuel are reflected in the index. Any actual increase in fuel prices, no matter how large, are captured in the AII and RCAF. The Indexes, and the weighted components within them, were designed for this purpose.

40. Prior to 2003, at least some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, but (a) these fuel surcharges were applied only in isolated instances because the railroads were constrained by competition, and (b) each of the Defendants

had different fuel surcharges, reflecting, among other things, the differing fuel prices and costs of each railroad. At that time, such surcharges were the exception, with the AII and RCAF indexes widely used to capture fuel and other prices and costs. All of that changed in 2003, however, when the Defendants took a series of coordinated actions to switch to a new system on carload traffic that would allow the widespread use of Rail Fuel Surcharges as a profit enhancement mechanism.

41. From at least the Spring of 2003 and continuing through at least 2008, the top executives of each of the Defendants and their co-conspirators met regularly to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants and their co-conspirators met to consider and discuss developments in the railroad industry. Top executives of Defendants and the co-conspirators also met when they came to Washington, DC for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2 to April 6, at the Wigwam resort, in Litchfield Park, Arizona.

42. In the Fall of 2003, BNSF and UP initiated an effort in the AAR to convince the members to agree on a fuel surcharge program that would enable the railroads to remove fuel as a component of the weighted RCAF and AII, and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total price for the freight transport, regardless of the actual cost of fuel for that movement. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, BNSF, CSX, NS, and UP agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

43. CSX, NS, and UP, which together with BNSF dominate the AAR board, caused the AAR to announce in December 2003 the creation of the unprecedented, new AII-LF. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a

component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AII-LF specified the fourth quarter of 2002 as its base period. Defendants BNSF, CSX, NS, and UP conspired to cause the AAR to inaugurate the AII-LF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges applied against the total rate for rail freight transportation.

44. The creation of the AII-LF was an essential first step of the Defendants' conspiracy to use Rail Fuel Surcharges to increase their prices. Because the RCAF and AII already compensated the railroads for increases in fuel costs, Defendants knew that they would be accused by customers of "double-dipping" if they added a fuel surcharge to the then-existing cost escalation provisions, BNSF, CSX, NS, and UP agreed to address this problem by conspiring to remove the fuel component from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

45. The creation of the AII-LF itself was a notable departure from past practice, and marked the first time that the AAR created a rate escalation index without a fuel cost component. While fuel was not included as a component of the AII-LF, the Defendants still applied the AII-LF to the entire base rate, including the fuel component, so that the entire base rate was increased by the AII-LF before application of the fuel surcharge.

46. There was no legitimate business justification or natural explanation for the collective action of BNSF, CSX, NS, and UP to cause the AAR to adopt and publish the AII-LF. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel prices or costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used rate escalation indexes. The AII and RCAF both included a fuel cost component and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs, and more, throughout the conspiracy period. Thus, the motivation of BNSF, CSX, NS, and UP in collectively causing the adoption of the AII-LF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

47. The actions by Defendants thus were not independent responses to a common problem of increasing fuel prices or costs. Rather, the only purpose in taking these collective actions was: (a) to begin assessing a stand-alone fuel surcharge applied to revenue (i.e., the entire base rate for the freight shipment as first adjusted by the AII-LF in many instances), not costs; (b) to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; (c) to eliminate the constraint that competition had imposed on their ability to raise prices; and (d) to ensure collective enforcement of the program. Pursuant to their conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the entire otherwise applicable rate for the freight shipment (notwithstanding the fact fuel accounts for only a portion of the costs of the shipment).

48. The creation and publication of a rate escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to institute independently its own individual fuel surcharge program. Instead, the creation of the carload Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, CSX, NS, and UP to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

## III. IMPLEMENTATION OF THE SCHEME: THE DEFENDANTS CONSPIRE TO ADOPT FUEL SURCHARGES

49. Almost immediately after the announcement in December 2003 of the new AII-LF, pursuant to the conspiracy, Defendants CSX and NS, suddenly moved in lockstep with fuel surcharges based on the WTI Index. This lockstep move was part and parcel of, and flowed from, the aforementioned agreements implemented and executed by BNSF, CSX, NS, and UP in late 2003.

50. Specifically, CSX and NS agreed to apply a rate fuel surcharge on their carload traffic whenever the monthly average WTI price exceeded $23 per barrel. When that happened, CSX and NS increased their rates by 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. For example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2.4 percent.

51. CSX and NS also coordinated the timing of changes to their fuel surcharge—i.e., two calendar months after the WTI Index had adjusted—thereby adopting the same fuel surcharge price timing used by BNSF and UP. For example, if the WTI average price exceeded $23 per barrel in January, CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge

percentage month after month. CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

52. CSX and NS's coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel; applying the surcharge in the second calendar month after the average price of WTI oil had changed; and applying the fuel surcharge as the rate (including the implicit fuel component) was already increased by the AII-LF.

53. Also within months of the Spring 2003 NFTA meeting, and as early as July 2003, BNSF and UP suddenly began to coordinate their Rail Fuel Surcharges, just as CSX and NS were doing. Prior to this time, the UP fuel surcharge had been adjusted monthly based on the WTI Index. The BNSF fuel surcharge had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, BNSF and UP moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the relevant period for much of their carload rate-unregulated traffic subject to a rate-based fuel surcharge.

54. BNSF and UP agreed to a consistent approach for administering the HDF-based fuel surcharges. When the HDF Index equaled or exceeded $1.35 per gallon, BNSF and UP both applied a surcharge of 1.5 percent plus an additional 0.5 for every five cent increase above $1.35 per gallon. Thus, if the HDF Index rose to $1.60 per gallon, BNSF and UP would apply a surcharge of 4 percent.

55. BNSF and UP also coordinated the timing of changes to their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month

after the month in which there was a change in the HDF Index average price calculation. If the HDF Index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

56. BNSF and UP's coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting closely-aligned trigger points, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

57. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

58. As a result of Defendants' concerted action, rates (including Rail Fuel Surcharges) charged to rail shippers and customers, including Plaintiffs, were raised to or maintained at supra-competitive levels during the relevant period.

59. Defendants initially applied these surcharges not only to regulated rates, but also to the private contracts, exempt traffic, and other traffic not subject to rate regulation under federal law, i.e., the rate-unregulated traffic at issue here.

60. With the conspiracy underway, BNSF and UP, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the relevant period on most rate-unregulated carload traffic subject to a rate-based fuel surcharge.

61. Other shippers have alleged that the chart below shows that the Fuel Surcharge percentages charged by BNSF and UP for carload freight shipments varied before June 2003 but were identical from that date through at least 2008:

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0 |
| Jul-02 | 1.0% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1.0% | 0 |
| Nov-02 | 2.0% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 5.0% | 2.0% |
| Jun-03 | 3.0% | 3.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |
| Jul-07 | 15.5% | 15.5% |
| Aug-07 | 16.0% | 16.0% |
| Sep-07 | 16.5% | 16.5% |
| Oct-07 | 16.5% | 16.5% |
| Nov-07 | 17.5% | 17.5% |
| Dec-07 | 18.5% | 18.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Jan-08 | 21.5% | 21.5% |
| Feb-08 | 21.0% | 21.0% |
| Mar-08 | 21.0% | 21.0% |
| Apr-08 | 21.5% | 21.5% |
| May-08 | 26.5% | 26.5% |
| Jun-08 | 28.5% | 28.5% |
| Jul-08 | 32.0% | 32.0% |
| Aug-08 | 34.5% | 34.5% |
| Sep-08 | 35.0% | 35.0% |
| Oct-08 | 31.0% | 31.0% |
| Nov-08 | 28.0% | 28.0% |
| Dec-08 | 23.5% | 23.5% |

As discussed above, as part of their conspiracy BNSF and UP imposed higher rate-based fuel surcharges on their coal traffic, starting in 2004 and continued to do so through at least 2008 on rate-unregulated coal traffic subject to rate-based fuel surcharges.

62. There also was uniformity between CSX and NS in the monthly WTI Index-based surcharge percentages that they charged for most of the 2003-2008 time period to carload customers subject to a rate-based fuel surcharge.

63. The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before March 2004, but were identical starting in March 2004, as alleged by other rail shippers:

**Monthly Surcharge Percentages – CSX and NS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |

| MONTH | CSX | NS |
|---|---|---|
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |
| Jul-07 | 16.4% | 16.4% |
| Aug-07 | 18.0% | 18.0% |

| MONTH | CSX | NS |
|---|---|---|
| Sep-07 | 20.8% | 20.8% |
| Oct-07 | 20.0% | 20.0% |
| Nov-07 | 22.8% | 22.8% |
| Dec-07 | 25.2% | 25.2% |
| Jan-08 | 28.8% | 28.8% |
| Feb-08 | 27.6% | 27.6% |
| Mar-08 | 28.0% | 28.0% |
| Apr-08 | 29.2% | 29.2% |
| May-08 | 33.2% | 33.2% |
| Jun-08 | 36.0% | 36.0% |
| Jul-08 | 41.2% | 41.2% |
| Aug-08 | 44.4% | 44.4% |
| Sep-08 | 44.4% | 44.4% |
| Oct-08 | 37.6% | 37.6% |
| Nov-08 | 32.4% | 32.4% |
| Dec-08 | 21.6% | 21.6% |

64. Plaintiffs experienced substantially similar activity as alleged herein by other rail shippers in relation to its contracts with and fuel surcharges imposed by the Defendants.

65. During the relevant time period, attempts by Plaintiffs to negotiate different fuel surcharges with Defendants were rejected.

66. In 2006, NS published a "rebased" rate-based fuel surcharge that it applied, starting in July 2006, to some of its carload traffic. This rebased fuel surcharge simply added or "baked in" some or all of NS's previously imposed supra-competitive fuel surcharges into a shipper's base rate, and then applied a new stand-alone fuel surcharge anytime the WTI Index exceeded $64/barrel. NS's rebasing was a sleight-of-hand exercise that produced fuel surcharge recoveries that closely matched the ones it received from its non-rebased fuel surcharges.

67. In stark contrast to this uniformity in their fuel surcharges, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would

independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep for years indicates that Defendants were coordinating their behavior and conspiring to fix prices for Rail Fuel Surcharges. In addition, the advanced announcement of each Defendant's Fuel Surcharges was an important practice to implementing and enforcing the conspiracy.

68. Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." (John Gallagher, Following the Competition, Traffic World, July 14, 2003).

69. Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual incremental fuel cost increases. According to an economic analysis on Railroad Fuel Surcharge practices commissioned by the American Chemistry Council and released in September 2007, Defendants overcharged rail shippers by more than $6.5 billion between 2005 and the first quarter of 2007.

70. Another reason the Defendants' Rail Fuel Surcharges do not evidence a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles

on one gallon of diesel fuel. The fact that Defendants rate-based fuel surcharges did not reflect improvements in fuel efficiency is further evidence that the Rail Fuel Surcharges were not a mechanism to recover changes in fuel costs but instead were a mechanism collectively designed to raise prices.

71. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges unrelated to actual changes in fuel costs for more than a four-year period could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increase in fuel prices experienced by the Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action – first, to decouple fuel prices from the historical railroad rate adjustment indices and, second, to agree upon new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages.

72. In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, railroads with lower fuel costs and/or better efficiency could impose a lower surcharge that reflected actual fuel consumption for movements and thereby increase market share and revenue at the expense of competing railroads. Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight.

73. Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants' conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many

shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well. Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 18, 2003 meeting between BNSF and NS and a June 2003 meeting between UP and CSX, the heads of the respective intermodal business groups (and other personnel with intermodal and coal responsibilities) participated as well.

74. Defendants hatched a single conspiracy extending to all shippers, regardless of traffic type, including Plaintiffs. When Defendants met to conspire, or otherwise communicated, they did not limit their conversations to carload traffic. And once the conspiracy was underway, the Defendants took steps, e.g., to align their coal and intermodal fuel surcharges, including by ad hoc adjustments, and exchange information about fuel surcharge coverage. Just as with carload traffic, in the absence of competition during the Conspiracy Period, Defendants greatly expanded the imposition and enforcement of rate-based coal and intermodal fuel surcharges, with the result of raising rates altogether

75. As a result of the Defendants' concerted action, Rail Fuel Surcharges charged to rail shippers (including Plaintiffs) were raised to or maintained at supracompetitive levels during the Conspiracy Period.

## IV. OTHER ELEMENTS OF THE CONSPIRACY

76. At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants and their co-conspirators also took other steps in furtherance of the conspiracy. For their coal traffic, BNSF and UP generally ceased entering into individually-negotiated contracts and instead insisted on offering form-based arrangements. They also shortened the terms of such arrangements (to no more than three years or even a single year), in contrast to the longer-

term arrangements that they previously favored. They also established rates in advance, even before they were requested, in a sharp departure from their previous practice. They also made the rates more broadly available, even to their competitors, whereas they previously had insisted on strict confidentiality. In addition, the two railroads became much less likely to take business from each other, and each railroad tended to maintain its own roster of customers.

77. For other types of traffic, the Defendants largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly. Previously, Defendants had allowed, and often preferred, long-term contracts extending up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.

78. This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase their market share, and their pricing became more visible to each other in order to reduce competition.

79. Defendants made this switch even though most shippers preferred the former system in order to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised their prices and did not offer any compensation to customers for assuming additional risk. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. Instead, the Defendants collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand. This coordinated behavior was hardly routine market conduct.

80. In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

81. In furtherance of the conspiracy, Defendants also decreased on some traffic the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). Instead, where a shipment required movement on more than one railroad, the Defendants moved increasingly to billing rates separately for each railroad, rather than as one quote for the entire shipment. Defendants collectively made this change for two reasons: to provide transparency to one another as to what each railroad was charging on interline shipments and to allow each Defendant to bill separately for its applicable Rail Fuel Surcharge. In other cases, the railroads insisted on the use of "through rates" in order to prevent shippers from being able to challenge the rate for only part of the movement at the STB.

82. Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing revenues to subsidize discounting of underlying rates. In fact, as can be seen from the table that follows, Defendants' market shares became more stable following the 2003 agreements than they had historically been.

**Railroad Market Share: Originated Tons and Carloads 1998 - 2003[1]**

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| **BNSF** | | | | | | |
| Carloads Originated | 6,739,202 | 6,876,523 | 6,909,907 | 6,928,188 | 6,999,061 | 7,662,699 |

[1] AAR Railroad Facts and Analysis of Class I Railroads

| | | | | | | |
|---|---|---|---|---|---|---|
| Percent of Total Originated Carloads | 31.9% | 28.4% | 26.5% | 27.0% | 26.9% | 28.4% |
| Tons Originated | 429,408,242 | 440,180,814 | 434,255,161 | 442,932,381 | 438,123,355 | 460,789,676 |
| Percent of Total Originated Tons | 31.1% | 28.5% | 26.8% | 27.2% | 26.9% | 27.8% |
| **CSXT**[2] | | | | | | |
| Carloads Originated | 4,184,418 | 5,842,422 | 6,542,784 | 6,321,945 | 6,335,611 | 6,470,386 |
| Percent of Total Originated Carloads | 19.8% | 24.1% | 25.1% | 24.6% | 24.4% | 24.0% |
| Tons Originated | 306,034,673 | 378,007,852 | 406,314,179 | 399,970,764 | 392,903,118 | 391,993,962 |
| Percent of Total Originated Tons | 22.1% | 24.5% | 25.1% | 24.5% | 24.1% | 23.7% |
| **NS**[2] | | | | | | |
| Carloads Originated | 3,621,159 | 4,351,478 | 5,214,436 | 5,025,864 | 5,098,926 | 5,115,859 |
| Percent of Total Originated Carloads | 17.1% | 18.0% | 20.0% | 19.6% | 19.6% | 19.0% |
| Tons Originated | 233,133,810 | 270,383,729 | 320,700,204 | 310,449,934 | 307,770,415 | 306,322,113 |
| Percent of Total Originated Tons | 16.9% | 17.5% | 19.8% | 19.0% | 18.9% | 18.5% |
| **UP** | | | | | | |
| Carloads Originated | 6,570,086 | 7,137,090 | 7,384,503 | 7,393,306 | 7,580,376 | 7,692,160 |
| Percent of Total Originated Carloads | 31.1% | 29.5% | 28.3% | 28.8% | 29.1% | 28.6% |
| Tons Originated | 413,615,706 | 453,417,016 | 459,428,341 | 476,759,328 | 489,305,241 | 497,373,006 |
| Percent of Total Originated Tons | 29.9% | 29.4% | 28.3% | 29.2% | 30.1% | 30.0% |
| **Total** | | | | | | |
| Carloads Originated | 21,114,865 | 24,207,513 | 26,051,630 | 25,669,303 | 26,013,974 | 26,941,104 |
| Tons Originated | 1,382,192,431 | 1,541,989,411 | 1,620,697,885 | 1,630,112,407 | 1,628,102,129 | 1,656,478,757 |

## Railroad Market Share: Originated Tons and Carloads 2004 - 20081

| | **2004** | **2005** | **2006** | **2007** | **2008** |
|---|---|---|---|---|---|
| **BNSF** | | | | | |
| Carloads Originated | 8,237,466 | 8,727,121 | 9,335,024 | 9,174,167 | 9,021,851 |
| Percent of Total Originated Carloads | 29.2% | 30.2% | 31.2% | 31.4% | 31.7% |
| Tons Originated | 483,296,128 | 498,121,970 | 539,511,527 | 546,445,840 | 552,297,049 |
| Percent of Total Originated Tons | 28.3% | 28.7% | 30.1% | 30.8% | 31.1% |
| **CSXT** | | | | | |
| Carloads Originated | 6,611,766 | 6,537,293 | 6,607,931 | 6,348,515 | 6,127,125 |
| Percent of Total Originated Carloads | 23.4% | 22.6% | 22.1% | 21.7% | 21.5% |
| Tons Originated | 403,152,732 | 409,486,655 | 414,266,429 | 405,630,002 | 397,947,902 |
| Percent of Total Originated Tons | 23.6% | 23.6% | 23.1% | 22.8% | 22.4% |
| **NS** | | | | | |
| Carloads Originated | 5,524,545 | 5,800,390 | 5,824,813 | 5,670,400 | 5,617,285 |
| Percent of Total Originated Carloads | 19.6% | 20.0% | 19.5% | 19.4% | 19.7% |
| Tons Originated | 319,014,426 | 325,779,848 | 323,407,280 | 315,583,286 | 316,793,119 |
| Percent of Total Originated Tons | 18.7% | 18.8% | 18.1% | 17.8% | 17.8% |
| **UP** | | | | | |
| Carloads Originated | 7,831,823 | 7,874,879 | 8,132,004 | 8,045,965 | 7,720,041 |
| Percent of Total Originated Carloads | 27.8% | 27.2% | 27.2% | 27.5% | 27.1% |

[2] Data for 1998 and 1999 does not include all of the acquisition Conrail traffic

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Tons Originated | 503,052,146 | 503,056,340 | 514,357,111 | 508,423,635 | 509,083,147 |
| Percent of Total Originated Tons | 29.4% | 29.0% | 28.7% | 28.6% | 28.7% |
| Total | | | | | |
| Carloads Originated | 28,205,600 | 28,939,683 | 29,899,772 | 29,239,047 | 28,486,302 |
| Tons Originated | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 | 1,776,082,763 | 1,776,121,217 |

## V. ADDITIONAL EVIDENCE OF ANTICOMPETITIVE CONDUCT

83. Apart from this direct evidence of price fixing, there is further support that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price fixing conspiracy feasible:

(a) Defendants had a strong collective motive to enter into a price fixing conspiracy because conditions existed in the railroad industry that were conducive to collusion.

(b) The railroad industry is highly concentrated. During the period 2003 to 2008, there were only seven Class I freight railroads. Defendants represented four of those Class I railroads and they accounted for well over 90 percent of the nation's rail traffic.

(c) There are high fixed costs in the railroad industry. Those high fixed costs, together with high concentration, facilitated a price fixing cartel.

(d) There are enormous barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These investments take decades to develop, and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and because rail networks are difficult to build, the fixed costs are largely sunk, creating additional entry barriers. Entry also requires that a new

entrant capture a significant market share from existing carriers in order to survive. Entry is thus both expensive and risky.

(e) Rail Fuel Surcharges, when computed as a percentage of rates, are highly standardized and fungible. Defendants structured their Rail Fuel Surcharges as a percentage of the otherwise applicable rates and then published the percentages on their websites so the colluding railroads could monitor the conspiracy without the necessity of frequent communications. It is well recognized that markets having uniform and homogeneous products or services, such as rail freight transportation services, are susceptible to price fixing.

(f) The railroad industry has a long record of price fixing and other anticompetitive behavior. In the first antitrust case dealing with the railroad industry, United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." The Rail Fuel Surcharge program engaged in by the Defendants is strikingly similar to those collective rate-making practices of the past.

(g) The CEOs of Defendants and their co-conspirators are all board members of the AAR, which facilitated exchange of pricing information. The AAR is described as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly, and board members (and their staff) regularly communicate between meetings.

## VI. THE STB DECISION

84. The Defendants imposed the Rail Fuel Surcharges for both unregulated and exempt transportation (which are at issue here) as well as for common carrier tariffs regulated by the STB. Shippers challenged the Rail Fuel Surcharges in proceedings before the STB.

85. On January 26, 2007, the STB served a decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of the otherwise applicable rate for rate-regulated rail freight transport was a "misleading and ultimately unreasonable practice" because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. Rail Fuel Surcharges, Ex Parte No. 661 (STB served Jan. 26, 2007).

86. The STB further stated that "the term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. If it is used instead as a broader revenue enhancement measure, it is mislabeled." Id.

87. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

88. Pursuant to their conspiracy, Defendants and co-conspirators applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts and other unregulated freight transportation at issue in this case.

## VII. DEFENDANTS' SUPRA-COMPETITIVE PROFITS

89. According to an economic analysis on railroad fuel surcharge practices commissioned by the American Chemistry Council and released in September 2007, Defendants overcharged rail shippers by more than $6.5 billion between 2005 and the first quarter of 2007. The study's findings were based upon regulatory findings and other estimates from Defendants.

90. According to the article "Rail Fuel Surcharges – Fact Versus Fiction" in the trade press report Rail Business by Argus Media Inc. (Volume 14, 15) dated April 14, 2008, the "change[s] in railroads[‘] overall operating expenses (including fuel) do not justify the large fuel surcharges railroads are applying to their movements." The article named several factors that have led to the circumstances in which railroads' fuel surcharges are greater than the change in total operating expense.

(a) Companies have established escalation methods, including fuel surcharges, to assure that they do not under-recover their costs of fuel as the price of oil has increased substantially. "[A] company will therefore frequently establish a margin of error in an escalation method that will ensure it is fully protected from cost increases. However, what is a small dollar margin of error . . . becomes a very large dollar margin of error as oil prices increase . . . ."

(b) "[A]s railroads implemented practices to better manage their cost of fuel internally, they did not reflect these fuel cost improvements in their external fuel surcharge programs." In fact, "none of the four major US railroads revised their surcharge programs to account for the actions management took to control the cost of fuel."

(c) "[T]he STB did not hold a hearing on fuel surcharges until May 2006. This was more than four years after the railroads initiated their fuel surcharge programs." However, "the time to make sure a program like fuel surcharges is working properly is before the dollars generated by the program had a big impact on the railroads' financial statements."

(d) Finally, "when the STB issued the results of its findings from the fuel surcharge hearing it did not require railroads to provide any retroactive reporting on fuel expenses and fuel surcharge revenue."

91. Because fuel surcharges would normally be designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But as discussed above, Defendants used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged to the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

92. Defendants reaped huge, supra-competitive profits as a result of the success of their conspiracy. During the period of the conspiracy (July 2003 to at least 2008), Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, or an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

93. In 2008, a putative class action was filed against BNSF, CSX, NS, and UP alleging price fixing in violation of Section 1 of the Sherman Act as well as violations of state antitrust and consumer protection law. Filing the putative class action tolled the statute of limitations on

Plaintiffs' claims. The District Court for the District of Columbia granted certification of the class in 2012. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 74 (D.D.C. 2012). On appeal, the United States Court of Appeals for the District of Columbia vacated class certification. *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013). On remand, the District Court denied the motion to certify the class, which was ultimately affirmed by the Court of Appeals. *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 292 F. Supp. 3d 14, 145 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019).

## VIII. DEFENDANTS' ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL

94. Defendants' anticompetitive conduct caused dramatically higher rail rates for freight and increased profits. Shippers, end users, and the public were injured as a result.

95. Defendants' anticompetitive conduct was within the flow of, and substantially affected, interstate and international commerce. During the relevant period, the Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each of them used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services. The Defendants added the Rail Fuel Surcharges to Plaintiffs' rail shipments made in interstate commerce. Defendants' unlawful activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce and have denied those who ship the benefits of free, open and unrestricted competition.

## IX. PLAINTIFFS SUFFERED INJURY BY VIRTUE OF DEFENDANTS' ANTICOMPETITIVE CONDUCT

96. As a result of Defendants' conduct MOL has paid supra-competitive rates to ship freight, lost profits, and lost the benefits of competition. These are injuries of the type the antitrust

laws are designed to prevent, and Plaintiffs incurred these injuries as direct purchasers of rail shipping services.

97. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, MOL paid one or more of the Defendants for rate-unregulated rail transportation in interstate commerce that included an unlawful rate-based Rail Fuel Surcharge established through the conspiracy, including payments pursuant to shipping arrangements including contracts, pricing authorities, and private price lists applicable to its inbound and outbound shipments of cargo and shipping containers.

98. The prices MOL paid to Defendants for rate-unregulated rail freight transportation services on which the unlawful Rail Fuel Surcharges were imposed were greater than the prices MOL would have paid absent the conspiracy alleged herein. MOL has therefore been injured in its business and property by reason of Defendants' antitrust violations.

99. Furthermore, by imposing unreasonable and unlawful fuel surcharges on MOL, the Defendants unreasonably increased MOL's cost of doing business, and damaged MOL's ability to compete, including against any other intermodal shippers who may have been treated more favorably by the Defendants, thereby causing further harm.

100. As a consequence of the matters alleged herein, Plaintiffs have been injured in its business and property by reason of Defendants' antitrust violations.

**COUNT I**
**Price Fixing (Fuel Surcharge) in Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15**
**(By all Plaintiffs against all Defendants)**

101. Plaintiffs fully incorporate by reference the allegations in all of the preceding paragraphs herein.

102. The Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in interstate commerce in violation of Sections 1 and 3 of the Sherman Act and Section 4 of the Clayton Act. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators to use Rail Fuel Surcharges as a method of increasing prices charged to shippers like Plaintiffs. The contract, combination, or conspiracy also resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators to refrain from competing against each other in regard to rail fuel surcharges for freight.

103. This conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators in furtherance of which they fixed, maintained, and standardized prices for Rail Fuel Surcharges for Plaintiffs' non-regulated transportation. This conspiracy constitutes a per se violation of Sections 1 and 3 of the Sherman Act and Section 4 of the Clayton Act and constitutes an unreasonable and unlawful restraint of trade.

104. Because of this conspiracy, among other things:

(a) Defendants and their co-conspirators fixed prices charged to Plaintiffs and other shippers and customers for Rail Fuel Surcharges applied to unregulated contract-based rail freight transportation, and maintained those prices at supra-competitive levels;

(b) Plaintiffs and other shippers and customers have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight services; and

(c) Competition in establishing the prices for rail freight services has been unlawfully restrained, suppressed, and eliminated.

105. As a proximate result of the Defendants' unlawful conduct, Plaintiffs have suffered injury in that they have paid supra-competitive prices for Rail Fuel Surcharges applied to rate-unregulated rail freight transportation from approximately July 1, 2003 to at least December 31, 2008 and have otherwise been damaged as above described.

## X. CONCLUSION AND DEMAND FOR JURY TRIAL

106. Wherefore, Plaintiffs pray for relief as follows:

(a) That the unlawful contract, combination and conspiracy alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act;

(b) That Plaintiffs recover compensatory damages, as provided by law;

(c) That Plaintiffs recover treble damages, as provided by law;

(d) That Plaintiffs and the Class recover their costs of the suit, including reasonable attorneys' fees, as provided by law; and

(e) For such further relief as the Court may deem just and proper.

107. Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: April 1, 2021

By: /s/ *Benjamin D. Brown*

Benjamin D. Brown (DC Bar No. 495836)
Robert A. Braun (DC Bar No. 1023352.)
Leonardo Chingcuanco (DC Bar No. 1719708)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
lchingcuanco@cohenmilstein.com

Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
101 Second Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/JMF/AK) |
| This document relates to:<br><br>ALL CASES | **FILED UNDER SEAL** |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**PRELIMINARY STATEMENT**

Direct Purchaser Plaintiffs ("Plaintiffs") respectfully submit this memorandum in support of their motion, pursuant to Fed. R. Civ. P. 23(b)(3), for certification of a class of:

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing") ("Fuel Surcharge").[1]

The named Plaintiffs are eight companies – ranging from Donnelly Commodities (a small business) to U.S. Magnesium and Nyrstar (both mid-sized businesses) to Olin Corporation (a company with revenues exceeding $1 billion per year). Each named Plaintiff, during the Class Period, directly purchased from one or more Defendant rail freight services as to which a Fuel Surcharge was applied.

The four Defendants – BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") – are the dominant freight railroads in the continental United States. Plaintiffs allege that Defendants conspired to coordinate their Fuel Surcharge programs as a means to impose supra-competitive price increases on the Class. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*,

---

[1] Excluded from the Class definition are (a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the Complaint, and all federal governmental entities; and (b) all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract.

predicted or presumed, because predominance of common issues, and Plaintiffs' ability to establish liability and damages at trial through evidence common to the Class, is compellingly confirmed by Defendants' documents, witness testimony, and transaction data produced to date.

As detailed below, evidence common to the Class is available to show that:

- Between 2000 and 2003, the four Defendants functioned as a price-discriminating, interdependent, but non-collusive oligopoly. During this period, each of the Defendants unilaterally undertook actions to increase revenues, including uncoordinated efforts to impose stand-alone fuel surcharges. In 2001, Defendants expressly declined to establish a standard industry approach to fuel cost recovery, and Defendants thereafter used the inclusion or absence of fuel surcharges as a basis to compete for business. By early 2003, Defendants had failed to apply their respective fuel surcharges broadly and had not met their respective revenue-enhancement objectives.

- In 2003, Defendants engaged in an extraordinary series of meetings, phone calls, and email communications through which they colluded to establish coordinated Fuel Surcharge programs intended to permit widespread application of Fuel Surcharges as a means to increase revenues and profits.

- Defendants then implemented Fuel Surcharge programs in lockstep and took various coordinated steps, such as establishing in December 2003 a new "All-Inclusive Index Less Fuel," to facilitate implementation, coordination, and monitoring of the conspiracy.

- Defendants purposefully and aggressively implemented this conspiracy, with a particular focus on achieving near universal application of the new Fuel Surcharge programs as promptly as practicable, and monitored and coordinated each other's success in meeting this objective. Defendants committed themselves not to offer discounts on the Fuel Surcharges, or on base rates as a means to offset the Fuel Surcharges. And Defendants internally heralded their success in avoiding such discounts.

- As a result of the coordinated Fuel Surcharges, Defendants revenues and profits soared during the Class Period, as Defendants themselves contemporaneously acknowledged in both internal documents and filings with the Securities and Exchange Commission.

The accompanying expert report of Dr. Gordon Rausser, attached hereto as Exhibit A, further shows that evidence common to the Class is available to establish the Class-wide impact

flexible.[30] By mid-2003, it became apparent to Defendants that they would encounter difficulties making their fuel surcharge policies [redacted] absent an industry-wide agreement.[31]

The evidence – including Dr. Rausser's opinions – establishes that coordinated fuel surcharges based on a percentage of base rates and applied across the board to all shippers provided an ideal way for Defendants to increase their revenue while continuing to achieve their other business objectives – including their price discrimination objectives. Dr. Rausser explains that "a fuel surcharge set as a percentage of the base rate is a highly successful and ideal mechanism for achieving an across-the-board price increase by agreement of the dominant participants in the highly concentrated rail freight industry."[32]

Defendants therefore set out to capitalize on the opportunity for successful collusion presented by important industry characteristics. As the discovery to date shows, beginning in the spring of 2003, Defendants engaged in an extraordinary series of in-person meetings, phone

---

[30] *See* RD Ex. 203, [redacted]

[31] RD Ex. 43, at NS001000240. [redacted]

[32] Rausser Rep. at 50. First, "adding a percentage fuel surcharge on top of line-haul rates or base rates is by its very nature a general price increase. Prices for all customers, in all regions, are increased in a uniform and easily observed fashion that enables the Defendants to increase profits across the entire customer base ...." *Id.* Second, "because a percentage fuel surcharge is by definition added to the line-haul or base rates otherwise established for particular rail movements by particular customers, prices after the application of the surcharge still reflect the fact that different shippers may have different amounts of leverage in the pricing negotiations with the railroads." *Id.* at 50. Third, "an agreed-upon surcharge does not require constant communications once the details of the surcharge have been agreed upon." *Id.* at 50. Fourth, "using a fuel surcharge ostensibly intended to offset fuel prices as a means to extract a price increase is much easier than raising prices across the board by adjusting base rates. This is because, among other reasons, there was a long history in the rail industry of price escalation based on fuel prices." *Id.* at 51. All of these reasons are subject to Class-wide proof.

calls, and email communications concerning the establishment of a new Fuel Surcharge program. Certain of these meetings, calls, and other communications are described below. But the summary is incomplete both because discovery is ongoing and because it reflects only Defendants' explicit discussions of fuel surcharges as recorded in documents.

The purpose of these communications was to discuss, and agree upon, Fuel Surcharge policies and practices intended to apply generally to the Class as a whole. [redacted][34]

[redacted] including meetings of the Network Efficiency Management Committee ("NEMC") of the Association of American Railroads ("AAR"), described by one BNSF

---

[33] *See, e.g.*, RD Ex. 204 [redacted]

[34] The evidence also indicates that, rather than compete with one another based on relative advantages with respect to fuel costs, Defendants chose to work cooperatively to ensure that no Defendant maintained such an advantage. [redacted]

into account the factors that influenced Defendants' prices during the Class Period as compared to "benchmark" prices during the three preceding years – a period in which he opines Defendants [redacted][192] Significantly, Dr. Rausser has identified a [redacted][193] His regression model demonstrates that a material and quantifiable share of the increase in rail freight transport rates observed during the Class Period was attributable to Defendants' conspiracy.[194] It shows that the members of the Class paid those artificially higher prices, and thus were adversely impacted by the conspiracy.[195] And it provides a Class-wide methodology for determining the percentage overcharge.[196]

### E. The STB's Hearing And Ruling

#### 1. NS "Re-bases" In Anticipation Of The STB Hearing

After receiving complaints from shippers, the STB held a hearing regarding the use of fuel surcharges in the rail freight industry. On April 24, 2006, just two days before NS filed a written submission to the STB on its Fuel Surcharge program,[197] NS announced that it would "revise its fuel surcharge program," assessing a 0.3% surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3% for every dollar increase above $64 per

---

[192] Rausser Rep. at 113.

[193] Rausser Rep. at 120.

[194] Rausser Rep. at VII.

[195] [redacted] *See* Rausser Rep. at VI(C).

[196] Rausser Rep. at VII.

[197] RD Ex. 139 (Written Statement of NS, STB Ex. Parte 661, Apr. 27, 2006).

barrel.[198] While NS characterized this change in its written STB submission as reflecting a "decision to reduce its fuel surcharge percentage,"[199] [redacted][200] NS determined that a [redacted][201]

The other Defendants, [redacted][202] In an email recounting the conversation internally, [redacted] The following day, an internal UP email [redacted][203] BNSF also [redacted] At the request of the CEO, [redacted]

---

[198] RD Ex. 136.

[199] RD Ex. 139, at 13 (Written Statement of NS, STB Ex. Parte 661, Apr. 27, 2006).

[200] RD Ex. 158 [redacted] (emphasis added).

[201] RD Ex. 138 [redacted]

[202] RD Ex. 134 [redacted]

[203] RD Ex. 133, at UPFSC0001667 [redacted]

focused on the extent to which a district court should scrutinize the plaintiffs' expert's proof to determine whether class treatment is appropriate. *Hydrogen Peroxide*, 552 F.3d at 311.

The Third Circuit stated that in price-fixing cases, the "predominance" inquiry tends to turn on whether the plaintiffs will be able to demonstrate the fact of injury from the conspiracy (*i.e.*, "impact") with evidence predominantly common to all members of the proposed class. *See id.* at 311-12.[211] On the predominance issue, the district court in *Hydrogen Peroxide*, in certifying the class, had observed that the plaintiff's expert had "proposed reliable methods for proving impact and damages[,]" but "had not completed any benchmark or regression analyses[.]" *Id.* at 315. The district court had said it "would not require plaintiffs to show at the certification stage that either method would work." *Id.* Rejecting the district court's approach, the Third Circuit stated that "the question at class certification stage is whether, if such impact is plausible in theory, it is also susceptible to proof at trial through available evidence common to the class." *Id.* at 325. The Third Circuit similarly rejected the district court's conclusion that "[s]o long as plaintiffs demonstrate their intention to prove a significant portion of their case through factual evidence and legal arguments common to all class members, that will now suffice." *Id.* at 321 (citation and quotation marks omitted).[212]

---

[211] The Third Circuit's statement of the predominance requirement departs from the law in this and other Circuits to the extent it requires a finding of predominance specific to *impact*, as opposed to the case as a whole. As discussed, *infra*, numerous courts have found in price-fixing cases that proof of the conspiracy itself will raise common questions of law and fact that will predominate in the litigation. *See, e.g., Vitamins*, 209 F.R.D. at 264. The Second Circuit in *Cordes & Co. Fin. Servs., Inc. v. AG Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007) recently reversed a denial of class certification and instructed the district court to determine whether there were individual issues pertaining to proof of impact, and *even if so*, whether those issues would defeat predominance: "Even if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted." *Id.* at 108.

[212] Courts in the D.C. Circuit have never suggested that a plaintiff's mere "intentions" were sufficient to establish "predominance."

## CONCLUSION

Plaintiffs respectfully submit that for the foregoing reasons, Class Certification pursuant to Fed. R. Civ. P. 23(b) should be granted; the named Plaintiffs should be designated Class Representatives; and Co-Lead Interim Class Counsel Quinn Emanuel Urquhart & Sullivan, LLP and Hausfeld LLP should be appointed as Co-Lead Class Counsel pursuant to Fed. R. Civ. P. 23(g).

Dated: March 18, 2010

Respectfully submitted:

/s/ Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-9850
Facsimile: (212) 480-8560
Email: solson@hausfeldllp.com

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email:
stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Sami H. Rashid, an attorney, certify that on March 18, 2010, I caused a true and correct copy of the foregoing memorandum to be served on counsel for Defendants.

/s/ Sami H. Rashid
Sami H. Rashid

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (No. II)<br><br>This document relates to:<br><br>TOYOTA MOTOR SALES, U.S.A., INC.<br>6565 Headquarters Dr., Plano, TX 75024;<br><br>TOYOTA CANADA INC.<br>1 Toyota Pl., Toronto, ON M1H 1H9, Canada,<br><br>Plaintiffs,<br><br>v.<br><br>BNSF RAILWAY COMPANY<br>2650 Lou Menk Drive, Fort Worth, TX 76131;<br><br>UNION PACIFIC RAILROAD COMPANY<br>1400 Douglas Street, Omaha, NE 68179;<br><br>CSX TRANSPORTATION, INC.<br>500 Water Street, Jacksonville, FL 32202;<br><br>NORFOLK SOUTHERN RAILWAY COMPANY<br>Three Commercial Place, Norfolk, VA 23510,<br><br>Defendants. | MDL Docket No. 1:20-mc-00008-BAH<br><br>Civil Action No.: 1:20-cv-00489-BAH<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**AMENDED COMPLAINT**

Plaintiffs Toyota Motor Sales, U.S.A., Inc. ("TMS") and Toyota Canada Inc. ("TCI") (collectively, "Toyota" or the "Toyota Companies") allege against Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") (collectively, the "Defendants"), based on personal knowledge as to their own acts and practices and otherwise based on information and belief, the following claims for violations of Section 1 of the Sherman Act, 15 U.S.C. §1. Other persons injured by Defendants' price-fixing conspiracy have filed Sherman Act Section 1 claims and those lawsuits have been consolidated for pretrial proceedings in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 1:07-mc-00489 (PLF), in the U.S. District Court for the District of Columbia and in *In re Rail Freight Fuel Surcharge Antitrust Litigation (No. II)*, 1:20-mc-00008 (BAH), in the U.S. District Court for the District of Columbia.

## INTRODUCTION

1. This lawsuit challenges violations of Section 1 of the Sherman Act by Defendants, the four largest United States-based Class I railroads,[1] from as early as July 1, 2003 through at least December 31, 2008 (the "Relevant Period"). Defendants have damaged Toyota by jointly dramatically increasing the prices Toyota paid Defendants to ship products by rail.

2. As alleged in detail herein, Defendants jointly fixed, raised, maintained, and/or stabilized the price of rail freight transportation services sold in the United States to their direct customers (shippers), such as the Toyota Companies. Defendants artificially increased prices and their resulting revenues by jointly adopting and in a coordinated manner imposing on

[1] A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars; $447.6 million in 2017 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Southern Railway Company; (6) Soo Line Railroad Company; and (7) Grand Trunk Corporation The Soo Line Railroad Company is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

shippers a charge, calculated as a percentage of the base rail freight rate (the "base rate" method), that Defendants called a "rail fuel surcharge" or "FSC." Because Defendants price their services based on the different shippers' individual elasticities of demand for rail transportation, such a rail fuel surcharge was unrelated to and exceeded Defendants' actual fuel costs.

3. The collusively set rail fuel surcharges significantly exceeded Defendants' actual fuel costs, increased Defendants' revenues by billions of dollars, and wrongfully increased Defendants' profits. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the first quarter of 2007 exceeded $6 billion. UP boasted to its shareholders in its 2005 Annual Report that its rail fuel surcharge revenues in 2005 alone were over $1 billion.

4. In a proceeding denominated Rail Fuel Surcharges, *Ex Parte* No. 661 (Jan. 25, 2007), the Surface Transportation Board ("STB"), the federal agency charged with regulating aspects of the railroad industry, addressed Defendants' practice of computing rail fuel surcharges as a percentage of their base rail freight rate. The STB found Defendants' actions "unreasonable." Defendants' practices, invoices, and documents describing the rail fuel surcharges were, according to the STB, "misleading."

5. Through their collective action during the Relevant Period, Defendants conspired to impose upon shippers coordinated rail fuel surcharges that far exceeded any increases in Defendants' fuel costs, and thereby collected billions of dollars in additional profits, including hundreds of millions of dollars from Toyota.

6. Defendants' rail fuel surcharge conspiracy constitutes a *per se* violation of the Sherman Act Section 1 and is, in any event, an unreasonable and unlawful restraint of trade.

7. Defendants' illegal conduct has injured each of the Toyota Companies that is a plaintiff in this action. Each directly paid illegal rail fuel surcharges that it would not have paid but for the rail fuel surcharge conspiracy. Each of the Toyota Companies is entitled under Section 4 of the Clayton Act, 15 U.S.C. § 15, to damages for violations of Section 1 of the Sherman Act.

8. Toyota seeks damages for the rail fuel surcharges that Defendants imposed on rail freight shipments made under private transportation contracts or other arrangements with Toyota entered during the Relevant Period and through other means exempt from rate regulation under federal law. Toyota does not seek damages arising from rail fuel surcharges imposed on rate-regulated freight transportation.

**PARTIES**

9. Plaintiff Toyota Motor Sales, U.S.A., Inc. is a corporation organized under the laws of the State of California, with its principal place of business in Plano, Texas. During the Relevant Period, TMS's principal place of business was in Torrance, California.

10. TMS and its subsidiaries and affiliates (including but not limited to Toyota Logistics Services, Inc.) oversee the sales, marketing, and distribution of Toyota, Lexus, and (during the Relevant Period) Scion products in the 48 contiguous states and Alaska. TMS and its subsidiaries and affiliates manage U.S. distribution through its twelve parts centers and twelve vehicle processing centers located across the United States.

11. During the Relevant Period, TMS entered into contractual arrangements with Defendants for rate-unregulated rail freight transportation services.

12. TMS purchased rate-unregulated rail freight transportation directly from Defendants, or their subsidiaries and affiliates, or agents controlled by Defendants or their subsidiaries and affiliates, during the Relevant Period and pursuant to agreements and other arrangements entered into during the Relevant Period. Defendants assessed rail fuel surcharges on TMS in connection with those purchases. TMS paid Defendants more for rate-unregulated rail freight transportation services on which rail fuel surcharges were imposed than TMS would have paid absent the conspiracy alleged herein. As a direct result of Defendants' unlawful conduct, TMS suffered injury to its business or property.

13. Plaintiff Toyota Canada Inc. is a corporation organized under the laws of Canada, with its principal place of business in Toronto, Canada.

14. TCI oversees the distribution of Toyota, Lexus, and (during the Relevant Period) Scion products in Canada. A substantial portion of the automobiles TCI distributed during the Relevant Period were transported from plants in the United States, including in Texas and California, to Canada on BSNF's and UP's rail lines.

15. During the Relevant Period, TCI entered into contractual arrangements with BNSF and UP for rate-unregulated rail freight transportation services.

16. TCI purchased rate-unregulated rail freight transportation directly from BNSF and UP, or their subsidiaries and affiliates, or agents controlled by BSNF and UP or their subsidiaries and affiliates, during the Relevant Period and pursuant to agreements and other arrangements entered into during the Relevant Period. BNSF and UP assessed rail fuel surcharges on TCI in connection with those purchases. TCI paid more to BNSF and UP for rate-unregulated rail freight transportation services on which rail fuel surcharges were imposed than TCI would have

paid absent the conspiracy alleged herein. As a direct result of BNSF's and UP's unlawful conduct, TCI suffered injury to its business or property.

17. Defendant CSX Transportation, Inc. is a corporation organized under the laws of Virginia, with its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States. CSX interchanges traffic with BNSF, UP, and NS and some of that traffic originates and terminates within this District. During the Relevant Period, CSX, or its subsidiaries and affiliates, or agents controlled by CSX or its subsidiaries and affiliates, entered into agreements and other arrangements with TMS that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to TMS, and assessed TMS rail fuel surcharges for the agreed-upon transportation.

18. Defendant Norfolk Southern Railway Company is a corporation organized under the laws of Virginia, with its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. During the Relevant Period, NS, or its subsidiaries and affiliates, or agents controlled by NS or its subsidiaries and affiliates, entered into agreements and other arrangements with TMS that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to TMS, and assessed TMS rail fuel surcharges for the agreed-upon transportation.

19. Defendant BNSF Railway Company is a corporation organized under the laws of Delaware, with its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.

BNSF is a wholly owned subsidiary of Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates approximately 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states, including rail lines within this District. BNSF connects with rail partners in the East, linking customers to markets around the world. During the Relevant Period, BNSF, or its subsidiaries and affiliates, or agents controlled by BNSF or its subsidiaries and affiliates, entered into agreements and other arrangements with Toyota that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to Toyota, and assessed Toyota rail fuel surcharges for the agreed-upon transportation.

20. Defendant Union Pacific Railroad Company is a corporation organized under the laws of Delaware, with its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States, including rail lines within this District. UP connects with rail partners in the East, linking customers to markets around the world. During the Relevant Period, UP, or its subsidiaries and affiliates, or agents controlled by UP or its subsidiaries and affiliates, entered into agreements and other arrangements with Toyota that assessed rail fuel surcharges, sold rate-unregulated rail freight transportation services to Toyota, and assessed Toyota rail fuel surcharges for the agreed-upon transportation.

21. Each Defendant acted as the agent of or co-conspirator with the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

22. Whenever this Complaint refers to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its

officers, directors, employees, agents or representatives while they were actively engaged in the usual management, direction, control or transaction of the corporations business or affairs.

## JURISDICTION AND VENUE

23. Toyota brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages, treble damages, injunctive relief, costs, and reasonable attorneys' fees for the injuries sustained by Toyota by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

24. This Court has subject matter jurisdiction over Toyota's federal antitrust claims pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

25. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of Defendants transacted business, maintained offices, were found, or had agents in this District, the wrongful conduct alleged in this Complaint was carried out in part within this District, and the interstate commerce described below was carried on in part within this District.

26. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## INTERSTATE TRADE AND COMMERCE

27. During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States. Defendants collect tens of billions of dollars in revenue each

year. For example, the Association of American Railroads ("AAR") reported that railroad total operating revenue in the United States exceeded $52 billion in 2006.

28. Defendants' activities were within the flow of, and substantially affected, interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers, including Toyota, throughout the United States, including through and into this District. Each Defendant used instrumentalities of interstate commerce to sell and market rail freight transportation services.

29. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

### I. CONGRESS DEREGULATED THE RAILROAD INDUSTRY, AND CONSOLIDATION INCREASED OPPORTUNITIES FOR COLLUSION.

30. The U.S. freight railroad industry has played a central role in the country's economic growth and in the laws designed to foster that growth and protect consumers through competition. As the Supreme Court said nearly 125 years ago in *United States v. Trans-Missouri Freight Ass'n*, "there is no other line of business carried out in our midst which is so intimately connected with the public as that conducted by the railways of this country." 166 U.S. 290, 336 (1897). Indeed, the Sherman Act's legislative history reflects lawmakers' concerns with the railroads' anticompetitive practices.[2] The first two antitrust cases the U.S. Supreme Court decided on the merits—*Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897) and *United States v.*

[2] *See, e.g.*, Cong. Rec. 5959 (1890) (statement of Congressman J. Anderson) (in arguing that railroad rate cartels should be outlawed, asking "whether the people shall be protected by the safeguard of competition between carriers, as they are by competition between merchants, or whether we shall legalize combinations so that the railroads may hereafter charge whatever they see fit in defiance of common law and justice").

*Joint Traffic Ass'n*, 171 U.S. 505 (1898)—involved allegations of price fixing by the railroads' joint operating arrangements.

31. For 93 years—between 1887, when Congress passed the Interstate Commerce Act, and 1980—U.S. railroad operations were conducted by a large number of federally regulated railroads with rates for freight shipment required to be published in documents filed with the Interstate Commerce Commission (the "ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis if approved by the ICC.

32. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 (the "Staggers Act"). This landmark legislation marked a dramatic change in the regulation of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set their own rates for rail transportation. Among other things, instead of having all rates set in accordance with mandatory tariffs, rail shippers and rail carriers were generally allowed to enter into transportation contracts whose terms were not subject to ICC review and approval. The Staggers Act also phased out the across-the-board, industry-wide rate increases.

33. The Staggers Act relies on competitive forces, rather than government regulation, to improve railroad operations' efficiency. The Staggers Act's objectives included creating a modern, competitive, and healthy railroad industry to service the American business community, with competitive rates and concern for serving the customer base, particularly those that depend on rail freight services for the movement of products. As the House Committee Report for the Staggers Act stated with respect to 49 U.S.C. § 10709: "If anticompetitive behavior is alleged,

under this section, the antitrust laws are the appropriate and only remedy available." H.R. Rep. No. 96-1035, 96th Cong. 2d Sess. 1, (1980) *reprinted in* 1980 U.S.C.C.A.N. 3978, 4003.

34. In 1995, Congress replaced the ICC with a new agency—the STB—that assumed some of the ICC's former functions.

35. However, more than 80% of all U.S. rail freight shipments now move under terms that are not regulated by the STB or any other government agency. For all of this rate-unregulated traffic, the railroads cannot turn to an agency—like the STB or its predecessor—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates. This Complaint involves such rate-unregulated rail traffic.

36. Since 1980, the number of Class I railroads has declined dramatically, from thirty-five at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry is (and during the Relevant Period was) highly concentrated: four of these seven railroads—Defendants BNSF, UP, CSX and NS—collect approximately 90% of all freight revenue in the United States, leaving a highly concentrated industry with great susceptibility to collusion.

37. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered to Defendants by these small carriers is negligible.

38. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite occurred—Defendants colluded to charge shippers, including Toyota, supra-competitive rates.

## II. DEFENDANTS AGREED TO PRICE-FIX RAIL FUEL SURCHARGES.

### A. The Pre-Conspiracy Age.

39. By the early 2000s, the railroad industry had consolidated to the point where further mergers were unlikely, if not impermissible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB introduced a moratorium on new mergers and promulgated more stringent standards for merger review.

40. For many years before the Relevant Period, Defendants experienced decreasing prices. The average U.S. rail freight rate decreased steadily after the 1980 passage of the Staggers Act until the early 2000s. A January 2009 STB study, titled "Study of Railroad Rates: 1985-2007," concluded that "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Figure 1 from "Study of Railroad Rates" evidences that trend:

**Figure 1. STB Rail Rate Index 1985 to 2007**
Real Revenue Per Ton-Mile (1985=100)




41. The decline in rail freight rates, reflected in the STB data above, was brought about by various factors, including by what CSX characterized in an internal analysis as

"destructive pricing for rail share" and "some very vicious historical price wars." A 2002 BNSF "risk assessment" described this problem, while also foreshadowing the coordination Defendants would later agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to achieve price rate improvement. ***How can we do this if the other competing railroads do not do this at the same time? We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy.*** (Emphasis added.)

42. After 1980, railroads typically entered into private freight transportation contracts that included cost escalation provisions to give railroads a reasonable cost-recovery mechanism. These provisions typically relied on a price index called the All-Inclusive Index (the "AII") or a price index called the Rail Cost Adjustment Factor (the "RCAF"). The AAR publishes the AII and calculates and submits the RCAF to the STB for approval and publication. The RCAF is based on the AII. As the name "***All-Inclusive*** Index" suggests, the AII and by extension the RCAF weigh a number of price inputs, including labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses, so that the indexes reflect the actual impact of various price changes on overall rail transportation costs. This means that no matter the size of the actual increase in fuel prices, the AII and RCAF would reflect it. James R. Young, the then-CEO of UP, acknowledged publicly in an October 2004 earnings conference call that the RCAF "looks at actual costs through the industry."

43. During this pre-2003 era of competition, at least some Defendants unilaterally inserted separate rail fuel surcharges into contracts for private rail freight transportation. But these pre-conspiracy rail fuel surcharges were applied at very low levels in isolated instances that were neither uniform nor consistent, and each Defendant had different rail fuel surcharge rates, reflecting the differing fuel costs of each railroad. These rail fuel surcharges "were subject to

competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 48 (D.D.C. 2012) ("*Rail Freight I*"). In short, these rail fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the [Relevant Period]." *Id.* Prior to 2003, rail fuel surcharges were the exception and often only theoretically billable, with the AII and RCAF indexes instead widely used to capture fuel and other costs.

44. As an example, at least one contract between Toyota and Defendants—the 2001 Memorandum of Understanding between TMS and UP—contained a provision for a separate rail fuel surcharge. But to the extent this contractual provision either was triggered or, if triggered, was enforced by UP, it would have closely tracked UP's actual fuel costs—taking into account fuel weight, defined as "a ratio of locomotive fuel costs divided by the total railway operative expenses," and including adjustments to account for both increases and decreases in fuel price.

45. Defendants have acknowledged their individual inabilities to contract for and/or collect rail fuel surcharges prior to the Relevant Period. For example, NS executive Pat Glennon, a manager of pricing systems, acknowledged that in 2001 and 2002 rail fuel surcharges were only "theoretically billable." In September 2002, Glennon reported to then-Senior Vice President of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause."

46. UP's former CEO James Young admitted that before the Relevant Period, UP's rail fuel surcharge contractual provisions "were never implemented" and he agreed that those surcharges "never reached significant percentage levels."

47. UP's Current EVP and CFO Robert Knight testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position."

48. In a May 2002 "Enterprise Wide Risk Assessment," BNSF explained, "[w]e are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace . . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

49. BNSF's EVP and Chief Marketing Officer John Lanigan admitted that BNSF's rail fuel surcharge participation rates in the early 2000s were "low."

50. CSX's EVP of Sales and Marketing Clarence Gooden testified that CSX's rail fuel surcharge coverage was "very low" and that it "embarrassed" him. He further testified that the rail freight surcharge revenue prior to 2003 was "relatively low to where it needed to be."

51. CSX's Director of Marketing described rail fuel surcharges as "fairly minimal" prior to the Relevant Period.

52. Prior to the Relevant Period, Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 103 (D.D.C. 2017) ("*Rail Freight II*"). Defendants could not maintain rail fuel surcharges as a revenue generator because of competition. As UP Director Bob Torey reported in April 2003, "[f]uel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world." In January 2003, NS reported that CSX "appear[s] to be more lax in applying the surcharge to private authorities," which "does have competitive implications for NS." And as BNSF EVP and Chief Marketing Officer Charles Schultz told BNSF executives, including Chairman, President, and CEO Matthew Rose, in

January 2003, "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive."

53. Defendants' individual difficulties applying and enforcing fuel surcharges in contracts caused Defendants to stop acting independently. In 2003 they took a series of coordinated actions to switch to a new system that would eliminate competition and thus allow the widespread deployment and enforcement of new rail fuel surcharges to enhance their revenues. Defendants claimed that the new rail fuel surcharges were to combat rising fuel prices, but in reality, Defendants colluded to establish pretextual rail fuel surcharges that were not related to actual fuel costs and effectively served as across-the-board rate increases that would not have been achievable absent conspiracy.

**B. The Conspiracy's Inception and the Imposition of New Rail Fuel Surcharges.**

54. Beginning in 2003, Defendants conspired to use rail fuel surcharges as the means to create the type of across-the-board rate increase for which Defendants, in the era of deregulation, could no longer ask the ICC or its successor, the STB. Defendants embarked on and implemented an agreed-to scheme to (a) remove the fuel component from the AII (and thus from the RCAF based on the AII) to create a new fuel-less index that would allow them to impose a separate fuel surcharge, (b) cease using the RCAF in contract rate adjustment formulas, and (c) instead apply that new fuel-less index, combined with a separate and agreed-upon "rail fuel surcharge," to increase rail rates. Defendants' scheme allowed them pretextually to label the across-the-board price increase as a "rail fuel surcharge" that purportedly recovered increased fuel costs, when the rail fuel surcharge actually raised total freight prices by a standardized (and agreed-upon) percentage that was the product of conspiracy and not based on actual fuel costs or competition among Defendants.

55. This conspiracy was possible, in part, because the freight railroad industry's structure is conducive to collusion. It is heavily concentrated, there are significant entry barriers, services are interchangeable across railroads, shippers are price sensitive, and the demand for rail freight services is generally inelastic.

56. From at least the spring of 2003 and continuing until at least 2008, Defendants' top executives met regularly at restaurants and recreational and conference facilities to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), Defendants' executives met to consider and discuss developments in the railroad industry. Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The AAR was a particularly potent tool to coordinate and monitor a conspiracy because: (a) during the Relevant Period, Defendants' CEOs were AAR board members; (b) the AAR Board met regularly and board members (and their staff) regularly communicated between meetings; (c) Defendants employed many former AAR employees and staff members; and (d) the AAR published the AII and calculated and submitted the RCAF to the STB for approval. AAR describes itself as "the central coordinating and research agency of the North American rail industry."

57. On March 11, 2003, CSX internally recommended changing its rail fuel surcharge program to reduce the surcharges. Simultaneously, UP's Chief Marketing Officer Jack Koraleski recommended that UP escalate its rail fuel surcharge program to be substantially more aggressive. On March 12, 2003, Koraleski traveled to CSX to discuss "fuel surcharge methodology." Shortly thereafter, CSX's leadership abruptly reversed course, abandoning its recommended rail fuel surcharge reduction and adopting a program that matched UP's escalation.

58. On March 18, 2003, BNSF and NS senior executives, including John Lanigan and Don Seale, met and discussed "synchroniz[ing]" rail fuel surcharges.

59. On March 20, 2003, CSX publicly announced a new, more aggressive rail fuel surcharge program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSXT." On April 4, 2003, UP sent a "concurrence" to competitors that its new rail fuel surcharge program would "apply to most Union Pacific pricing documents for local and interline freight movements." Upon receipt, BNSF marketing officer Paul Anderson reacted enthusiastically: "This is sweet!!! Just like the CSXT."

60. On April 1, 2003, BNSF and CSX senior executives, including John Lanigan and CSX Chief Marketing Officer Mike Giftos, met to discuss fuel surcharges as well.

61. Between April 2-6, 2003, at the Spring 2003 NFTA meeting at the Wigwam resort in Litchfield Park, Arizona, NS executive Don Seale met again with BNSF executive John Lanigan to continue their prior discussion on "the fuel surcharge issue."

62. Similar to CSX's abandonment of a less aggressive rail fuel surcharge regime following CSX's meeting with UP in March 2003, BNSF also changed course following conversations with the Defendants. Between February and April 2003, BNSF had been considering a mileage-based rail fuel surcharge, which could have better correlated the resulting rail fuel surcharges to actual fuel costs than the base rate method that Defendants broadly implemented during the conspiracy. But BNSF abandoned that approach.

63. By July 2003, Defendants agreed to coordinate their rate-based rail fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed.

64. Under this agreement, BNSF and UP (collectively, the "Western Railroads") agreed to coordinate their rail fuel surcharges and based them on the U.S. Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index"). Previously, the Western Railroads used fuel surcharges for a minimal portion of their contracts and calculated their respective fuel surcharges using different indexes. Generally, BNSF had based its surcharge on the HDF Index and UP on the WTI Index. The HDF Index reflects the average monthly price of Retail On-Highly Diesel Fuel based on prices reported on the U.S. Department of Energy's website. The WTI Index reflects the West Texas Intermediate crude oil price. In or about July 2003, however, UP suddenly switched to the HDF Index pursuant to an agreement with BNSF. BNSF and UP began to charge the exact same rail fuel surcharges pursuant to this agreement, using the HDF Index. From that point on, the Western Railroads moved in lockstep and charged the same rail fuel surcharge percentage for each month of the Relevant Period.

65. The Western Railroads also conspired to apply the HDF Index in the same way. They selected "trigger points"—a price for the U.S. monthly average per gallon diesel fuel price as measured by the HDF Index—and implemented a scheme that operated to impose nearly identical rail fuel surcharges. While BNSF and UP had slightly different trigger points, with BNSF at $1.25 (beginning with a surcharge of 0.5%) and UP at $1.35 (beginning with a surcharge of 1.5%), the reality was that the HDF Index was administered in precisely the same way for the Western Railroads. Indeed, an internal NS analysis stated that "[o]nce [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including the lag times and effective dates." And when the HDF Index exceeded $1.35, the Western Railroads both applied a rail fuel surcharge of 0.5% for every five cent increase above $1.35. For example, if the HDF Index rose to $1.55 per gallon, BNSF and UP both would apply a surcharge of 2%.

Thus, the Western Railroads' surcharges were virtually identical once the HDF was higher than $1.35, which it was for the entire Relevant Period.

66. The Western Railroads also coordinated when they would change their rail fuel surcharges. They agreed that the rail fuel surcharge would be applied to shipments beginning the second month after the month in which the HDF Index average price changed. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new rail fuel surcharge percentage on February 1 and apply that surcharge to shipments in March.

67. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

68. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their rail fuel surcharges. They used the same index, set functionally identical trigger points, and applied the surcharge at the identical interval after the HDF Index price changed. The Western Railroads adopted this common pricing despite the fact that their rate and cost structures, customer bases, fuel sources, and fuel costs differed. The Western Railroads' adoption of these new surcharges was not a coincidence. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

69. UP's move to the same fuel price index as BNSF in or about July 2003 is striking evidence of concerted conduct as just a few months before, UP had announced a different modification to its existing rail fuel surcharge program. In April 2003, UP made modifications to the trigger points it used for adjusting its program's rail fuel surcharge, but did not change using the WTI Index. The fact that just a few months later, UP switched indexes and began

charging the same surcharge as BNSF is further evidence that this switch was the result of concerted conduct.

70. CSX and NS (collectively, the "Eastern Railroads") soon aligned themselves with the Western Railroads. During the spring of 2003, CSX modified its rail fuel surcharge formula so that when the U.S. monthly per barrel crude oil price as measured by the WTI Index exceeded $23 per barrel (rather than the old CSX formula's $28 per barrel), CSX's rail fuel surcharge increased 0.4% for every dollar the WTI exceeded $23. By June 2003, CSX had implemented this new rail fuel surcharge formula.

71. NS announced in January 2004 that it had adopted a formula that was aligned with CSX's. Effective March 1, 2004, when the U.S. monthly average price of diesel fuel per gallon as measured by the WTI Index exceeded $23 per barrel, NS's rail fuel surcharge rates also increased 0.4% for every dollar the WTI exceeded $23.

72. The Eastern Railroads also coordinated when they would change their rail fuel surcharges. Matching the Western Railroads' timing, the Eastern Railroads applied the rail fuel surcharges to shipments beginning the second month after the month in which there was a change in the WTI Index average price. And like the Western Railroads, they published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

73. The Eastern Railroads thus adopted the same novel, arbitrary, and complex combination of features for their new rail fuel surcharges, in this case using the same WTI Index, setting the same trigger points, and applying the surcharge at the identical interval after the WTI Index price had changed. This too was no coincidence. The similarities, and the coordination

with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that impacted Defendants.

74. Although the details differed slightly, the actual rail fuel surcharges imposed by the Western and Eastern Railroads were virtually identical. During the Relevant Period, the prices of diesel fuel and crude oil were high enough that Defendants' trigger points—CSX and NS's $23 trigger point on the WTI Index, BNSF's $1.25 trigger point on the HDF Index, and UP's $1.35 trigger point on the HDF—were always met. The increments—every dollar on the WTI Index and every 5 cents on the HDF Index—both reflected approximately 4% of the respective trigger point. And the timing—applying a rail fuel surcharge two months after the change in the respective index—was identical.

75. Figure A reflects the Western Railroads' lockstep standard rail fuel surcharges.

**Figure A**




76. Figure B reflects the Eastern Railroads' lockstep standard rail fuel surcharges.

**Figure B**




**C. Defendants Drove the Creation of a New Index: The "All-Inclusive Index Less Fuel."**

77. Even after conspiring to coordinate their new rail fuel surcharges, Defendants still faced a significant barrier to those surcharges' widespread use. Most contracts, including at least one with Toyota, contained rate adjustment provisions that utilized periodic changes in the AII or the RCAF when adjusting rates over the contract term. Because Defendants' contracts incorporated indexes that already accounted for changes in actual fuel costs, they had no basis to impose their new, separate, and additional rail fuel surcharges on shippers.

78. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to cease using the RCAF in contract rate adjustment formulas and remove fuel as a cost component from the AII. By excising the fuel cost component of the AII, Defendants paved the way for widespread imposition of their new artificially high rail fuel surcharge program in which all Defendants could participate, and from which all could earn excessive profits.

79. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants agreed to create and implement coordinated rail fuel surcharge programs and to enforce their program through a variety of means discussed herein.

80. Pursuant to their conspiracy, Defendants, with their large presence within the AAR during the Relevant Period, caused the AAR to develop and announce in December 2003 a new index without fuel costs. That index, paradoxically called the ***All***-Inclusive Index ***Less Fuel*** ("AII-LF"), was similar to the AII and RCAF indexes, but excluded the fuel cost component. The December 2003 AAR announcement stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." The announcement of the AII-LF, and the underlying decision to create it, was the product of Defendants' collective action and could not have been accomplished without the conspiracy.

81. Defendants conspired to cause the AAR to inaugurate the AII-LF so that they could begin assessing separate, stand-alone rail fuel surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of the AII-LF was an important, carefully planned step taken collectively by Defendants to allow implementation and coordination of their price-fixing conspiracy.

82. This December 2003 announcement reflected the first time in its nearly 60-year history that the AAR removed fuel costs from the AII index. The AII included fuel costs in 1979, when the law still permitted common rate-setting based upon costs and the Arab Oil embargo pushed domestic crude oil prices to an inflation-adjusted high, more than $100 per barrel in 2019

dollars. The index included fuel costs in 1998, when domestic crude oil prices dropped to an inflation-adjusted low of $18 per barrel in 2019 dollars. And the index included fuel costs in 2000, when prices more than doubled to approximately $40 per barrel in 2019 dollars.

83. Defendants induced the AAR to create the AII-LF. Defendants planned to use this new index in combination with their pretextual rail fuel surcharges to conceal their conspiracy to impose price increases across the board without regard to actual fuel costs. The AII and the RCAF had been "weighted" to reflect the actual and relative impact of fuel costs as compared to the other cost factors. Defendants instead replaced those indexes with a method for calculating rail fuel surcharges that did not correspond with actual or anticipated fuel cost increases.

84. BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked in a July 2004 earnings call how BNSF would be able to apply the new revenue-based rail fuel surcharges to shipper contracts, John Lanigan responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Lanigan stated: "What happened last year, and Matt [Rose, BNSF's then-Chairman, President, and CEO] led the charge on there, is that there's a new index that [the AAR] has that's basically an index without fuel . . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future."

85. Following publication of the AII-LF in December 2003 and pursuant to the conspiracy, Defendants applied their rail fuel surcharges using the base rate method as separate items on shipping bills, including Toyota's. This new, and less accurate, method of fuel cost recovery calculated rail fuel surcharges as a percentage of the total rate charged for the freight shipment, regardless of how much fuel contributed to costs or whether the particular trip used more or less fuel.

86. Defendants not only conspired to charge illegal fuel surcharges, they also conspired to use the same cover story. Defendants all falsely represented that the rail fuel surcharges were intended only to recoup fuel cost increases. CSX, for example, described its new program as a "fuel cost recovery program." That was false. These charges did not merely recover fuel cost increases; they were a rate increase above and beyond any actual increases in fuel costs.

87. "Defendants' own executives admitted that the new fuel surcharge programs . . . were more aggressive and yielded more revenue than earlier programs." *Rail Freight I* at 48. For example, NS executive Pat Glennon described NS's new rail fuel surcharge program as follows: "By dropping the base to $23 per barrel, raising the percentage yield and taking it sooner, the change is in fact a blatant general rate increase." Similarly, CSX internal emails acknowledge that although the new program may "seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%."

88. The "convergence" in Defendants' rail fuel surcharge methodologies and prices raised industry experts' concerns. One analyst contemporaneously concluded that the fuel surcharges were "not supported" by fuel cost increases and was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives" as a "way to gain significant market share." ("Following the Competition" *Traffic World*, July 14, 2003). A 2010 joint report by the United States Departments of Agriculture and Transportation, titled "Study of Rural Transportation Issues," found: "There is considerable evidence that railroad fuel surcharges recovered more than the additional costs of fuel, artificially boosting railroad profits. From 2001-2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."

**D. Defendants Acted Contrary to Their Independent Self-Interest.**

89. No legitimate business or other procompetitive explanations justify Defendants' collective efforts to cause the AAR to adopt the AII-LF. Defendants had used the AII and the RCAF for decades. Those indexes had been appropriately "weighted" to reflect fuel costs as compared to other cost factors. Using the AII and the RCAF would have permitted Defendants to recover all of their actual fuel costs throughout the Relevant Period. Defendants' reworking the index to operate "less fuel (LF)" and substituting a pretextual "rail fuel surcharge" formula that applied to the entire base rail freight rate ensured that the formula would drive coordinated rate increases far out of proportion to the actual fuel cost increases for the relevant rail transportation.

90. The creation and publication of a cost escalation index without a fuel component, such as the AII-LF, was not necessary for any Defendant to independently institute its own individual rail fuel surcharge program, nor required by any statute or regulatory body.

91. In a competitive environment free of unlawful collusion, railroads with lower costs would negotiate fuel cost adjustment provisions that more closely tracked their actual costs in an effort to obtain additional business, revenue, and increased shares of business.

92. But starting as early as 2003, Defendants acted against their independent self-interest. They refused to negotiate any changes to their rail fuel surcharge formulas even when doing so would have allowed them to capture additional business, revenue, and market share. Each Defendant instead restricted its own freedom to price competitively and adhered to an industry-wide pattern of coordinated rail fuel surcharge pricing based on a percentage of the base rail freight rate. Defendants did not compete with one another, but instead collectively maintained artificially high rail fuel surcharges.

93. Actual fuel cost as a percentage of operating cost and fuel efficiency differs among Defendants and individual rail movements. And even within a particular railroad, actual fuel costs vary across different routes and trains.

94. A rail fuel surcharge applied as a percentage of the base freight rate is inefficient and an inaccurate measure of fuel cost because it taxes a route based upon the rates that a railroad is able to charge, not the amount of fuel that such route requires. Defendants also engaged in differential pricing. As the AAR explains, railroads "charg[e] relatively higher rates to customers who have fewer competitive options than to customers with more competitive options."[3] Thus a percentage surcharge based on the base rail freight rate forces a shipper to pay more simply because it was already paying more, regardless of how much fuel that trip required.

95. Defendants' rail fuel surcharges did not take into account the "hedging" activities of some railroads, which affected the actual fuel costs Defendants incurred. Nor did Defendants' rail fuel surcharges account for the phase-out in the railroad diesel tax that occurred between 2004 and 2007.

96. Defendants' rail fuel surcharges also disregarded fuel efficiency gains during the Relevant Period. BNSF, for example, disclosed in its 2005 Annual Report that "[i]n the past decade, BNSF has improved its fuel efficiency another 9 percent" and reported in its 2008 Annual Report that it was "able to achieve record fuel efficiency with a nearly 2 percent improvement over 2007." And UP in its 2007 Annual Report explained that in 2007 its "fuel conservation efforts allowed us to improve our consumption rate by 2%," which reflected a savings of 21 million gallons of fuel. Defendants' collusive behavior allowed them to avoid

[3] *See* AAR, *Differential Pricing in the Rail Industry*, https://www.aar.org/data/differential-pricing-rail-industry (last visited February 25, 2019).

using fuel efficiency gains as a competitive advantage, and instead allowed them to keep the savings and the excess surcharges.

97. If Defendants' cover stories for the new rail fuel surcharges were true and Defendants in fact merely wanted to recover their actual fuel costs efficiently and accurately, they would not have adopted approaches that applied a set percentage to the base rail freight rate. Absent conspiracy, it is inconceivable that Defendants would independently design their rail fuel surcharge formulas to move in lockstep for years on end. The only way to achieve this coordinated pricing of fuel surcharges (and especially to achieve a pricing formula that exceeded actual and anticipated rises in fuel costs) was by a conspiracy to decouple fuel costs from the historical cost indexes and to create a new index and new formulas to compute the resulting standalone fuel surcharge percentages.

98. Defendants' actions thus were not independent responses to a common problem of increasing fuel costs. Rather, Defendants' purposes in taking these collective actions were to assess a standardized approach to stand-alone rail fuel surcharges designed to substantially increase revenue rather than to compete with respect to the recovery of fuel cost increases, to act illicitly in concert with each other to set the surcharge, and to ensure collective enforcement of the conspiracy. The rail fuel surcharges were intended to achieve—and did achieve—across-the-board supra-competitive profits through coordinated increased prices.

**E. Defendants Changed Other Practices to Facilitate the Conspiracy.**

99. Defendants also collectively changed aspects of their pricing and other behavior to advance the conspiracy.

100. Defendants enforced strict policies to ensure that that their standardized rail fuel surcharge programs were applied across-the-board to all their shippers, including to Toyota.

BNSF's CEO, for instance, issued a "[m]andate" that "[e]very price authority should have a fuel surcharge applied" and conveyed that "contracts requiring his signature but excluding full fuel surcharge provisions will not be signed."

101. Defendants made no exceptions to the strict and non-negotiable mandate regarding rail fuel surcharges. For example, CSX's policy was that "NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge." Shippers from many different industries, including some like Toyota that make significant purchases, were told that the rail fuel surcharge provision was "not negotiable."

102. Defendants also had strict mandates "not to discount base rates" to offset the rail fuel surcharge's effect on the total price. For example, one NS senior executive wrote "we should *absolutely not* be deferring any rate increases because we are applying the [rail fuel surcharge]." Defendants viewed the prohibition on base-rate discounting as an "inseparable" companion to their policies mandating the rail fuel surcharge.

103. This widespread application of rail fuel surcharges differed substantively from Defendants' practices before the Relevant Period, when Defendants were actively competing for customers and could not maintain or collect rail fuel surcharges in the face of such competition. After the conspiracy began, "any deviations from [D]efendants' standard fuel surcharge programs were rare." *Rail Freight I* at 50. In this way, Defendants avoided undercutting one another and ensured that each could continue to apply rail fuel surcharges and reap their supra-competitive profits.

104. Defendants realized that implementation of the rail fuel surcharges only worked because all Defendants participated. As noted in a BNSF Executive Team presentation in 2005, "it would only take one competitor to abandon this in an attempt to gain market share to cause

this to fail." Defendants policed the conspiracy by exchanging rail fuel surcharge data among themselves, resulting in stable market shares.

105. Defendants also enforced each other's adherence to their misleading rate-based fuel surcharges. For instance, in November 2004, a BNSF executive "shopped the concept" of a mileage-based fuel surcharge to his counterparts at the other railroads, and they "pushed back, as expected."

106. Defendants also limited the previously prevailing practice of sending a shipper one invoice for the entire transport where more than one railroad (usually an Eastern and Western) carried the shipment. Instead and pursuant to the conspiracy, Defendants increasingly switched to having each Defendant on a multi-railroad trip send a separate invoice. This permitted each Defendant to separately impose its own fuel surcharge. This practice also made it easier for each Defendant to recoup its share of the supra-competitive profits.

## F. The STB Declared Defendants' Actions an "Unreasonable Practice" and "Mislabeling."

107. In 2006, the STB launched regulatory proceedings to evaluate Defendants' use of rail fuel surcharges with respect to rate-regulated rail traffic. In response to complaints from shippers, the STB held a hearing on Defendants' rail fuel surcharges on May 11, 2006. In August 2006, the STB issued a notice of proposed rulemaking for rate-regulated rail traffic seeking comments on its proposed measures, including requiring Defendants to "develop a means of computing the surcharge that is more closely linked to the increases in the portion of its fuel costs that is attributable to the movement to which the fuel surcharge is applied," and ultimately received seventy-three comments.

108. On January 25, 2007, the STB concluded its investigation and public proceeding concerning Defendants' rail fuel surcharge practices. The STB found that Defendants' practice

of computing rail fuel surcharges as a percentage of the base rail freight rate was an "unreasonable practice" because that method "stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." Rail Fuel Surcharges, STB *Ex Parte* No. 661 (Jan. 25, 2007). Thus, the STB concluded: "imposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for the particular movement to which the surcharge is applied, is a misleading and ultimately unreasonable practice." *Id.* at 7.

109. The STB also determined that the term "fuel surcharge" used by Defendants was itself deliberately misleading:

> The term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. ***If it is used instead as a broader revenue enhancement measure, it is mislabeled***. This sort of mislabeling appears designed to avoid the type of response a carrier would likely receive if it were to honestly inform a shipper that a higher rate was being imposed to recover not only the increased cost of fuel serving that shipped, but also the increased cost of fuel for another shipper's traffic—which is what would often occur under rate-based fuel surcharges.

*Id.* at 6-7 (emphasis added).

110. In announcing its decision, STB Chairman Charles D. Nottingham said: "Our decision today brings common sense and fairness to the railroads' implementation of fuel surcharges. This new rule will preclude them from selectively imposing surcharges in a manner that bears little relationship to actual fuel use. It will also remove the possibility that railroads will view fuel surcharges as a profit center."[4]

[4] Press Release, Surface Transportation Board, Surface Transportation Board Prohibits Misleading Rail Fuel Surcharge Practices (Jan. 26, 2007), *available at* https://www.stb.gov/newsrels.nsf/13c1d2f25165911f8525687a00678fa7/606420c7f58066458525726f0059a591?OpenDocument (last visited Feb. 25, 2020).

111. As the STB explicitly noted in its decision, its jurisdiction does not reach the rate-unregulated traffic addressed in this Complaint. Nevertheless, the STB's conclusions about the rail fuel surcharges logically apply to all of Defendants' rail fuel surcharges.

112. Pursuant to the conspiracy, Defendants applied the same unreasonable rail fuel surcharge practices that the STB addressed by insisting, on a coordinated "take it or leave it" basis, that these formulas be included in the private rail freight transportation contracts, and other rate-unregulated freight transport, at issue here. These coordinated, misleading, and unreasonable practices removed competitive constraints and raised shipping costs for shippers such as Toyota.

**G. The Result: Defendants' Supra-Competitive Profits.**

113. Defendants reaped huge, supra-competitive profits as a result of their conspiracy's success. Through their rail fuel surcharge conspiracy, Defendants realized billions of dollars in revenues in excess of their actual increase in fuel costs from the shippers on whom they imposed the surcharges, including hundreds of millions of dollars from Toyota. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least partially attributable to rail fuel surcharge revenue realized by Defendants through their price-fixing conspiracy. As James R. Young, the then-President, CEO, and Chairman of UP, admitted in an interview in 2007, "three, four years ago [the rail fuel surcharges] were really non-existent," and "it's only been the last couple of years" that "the financial returns in the business has [sic] started to move in the right direction."

114. Defendants "acknowledged that the new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Rail Freight II* at 104. One NS

internal email noted that it seemed like all revenue increases were "coming from fuel surcharges." In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume." That same year UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

115. A BNSF internal memorandum stated that CSX and NS "have a 'profit center' with their Fuel Surcharge Programs for the customers that participate." Another BNSF document described its own rail fuel surcharge program as "a revenue maximization program, not a protection against fuel prices." For BNSF, "[g]rowth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006."

116. CSX's 2006 revenue increased by $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

117. A 2007 independent study commissioned by the American Chemistry Council and CURE found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the first quarter of 2007 was over $6 billion.

118. A 2010 Senate Commerce Committee Report on "The Current Financial State of the Class I Freight Rail Industry" concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," demonstrated in the following chart documenting the significant growth in profit margins during the Relevant Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

## III. DEFENDANTS' ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL.

119. Defendants' anticompetitive conduct caused shippers to pay dramatically higher prices for rail freight transportation services and significantly increased Defendants' profits. Their conspiracy—not a reduction in their costs, more efficient operations, or competition—was the source of their increased profitability. Shippers, end users, and the public were damaged as a result.

120. The rail fuel surcharge, by itself, enabled Defendants to reap extraordinary profits. Defendants over-recovered billions of dollars for their rail fuel surcharges during the Relevant Period.

121. Defendants' anticompetitive conduct was within the flow of, and substantially affected, interstate and international commerce. Defendants sold and carried out rail shipments

in a continuous flow of interstate and foreign commerce to shippers throughout the United States. Each Defendant used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services. Defendants' unlawful activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce and have denied those who ship freight of the benefits of free, open, and unrestricted competition.

## IV. EACH OF THE TOYOTA COMPANIES SUFFERED INJURY BY VIRTUE OF SOME OR ALL OF DEFENDANTS' ANTICOMPETITIVE CONDUCT.

122. During the Relevant Period, TMS entered into and/or paid Defendants pursuant to private contracts or other arrangements with Defendants that contained rail fuel surcharges that were the subject of Defendants' anticompetitive conduct.

123. During the Relevant Period, TCI entered into and/or paid BNSF and UP pursuant to private contracts or other arrangements with BNSF and UP that contained rail fuel surcharges that were the subject of Defendants' anticompetitive conduct.

124. As a proximate result of Defendants' unlawful conduct, combination, or conspiracy, Toyota has paid supra-competitive rates to ship freight, received reduced profits from sales of its products, experienced increased costs of doing business, and lost the benefits of competition. These are the type of injuries that the antitrust laws are designed to prevent, and Toyota incurred these injuries as direct purchasers of Defendants' rate-unregulated but price-fixed rail shipping services.

125. As a proximate result of Defendants' unlawful conduct, combination, or conspiracy, Toyota paid rail fuel surcharges for rate-unregulated rail freight transportation at prices above the price that Toyota would have paid in the absence of the conspiracy.

126. As direct purchasers of rail freight services, the Toyota Companies collectively have paid hundreds of millions of dollars in collusively imposed fuel surcharges since the initiation of the conspiracy and have thereby been damaged in their business and property.

**COUNT I**
**(Price Fixing in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**

127. Toyota incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

128. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

129. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, raised, maintained, and/or stabilized prices for rail fuel surcharges for rate-unregulated rail freight transportation. Such contract, combination, or conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade.

130. Defendants' contract, combination, conspiracy, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

131. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

132. The contract, combination, or conspiracy has had the following effects:

a. Defendants fixed prices charged to Toyota and other shippers for fuel surcharges applied to rate-unregulated rail freight transportation, and maintained those prices at supra-competitive levels.

b. Toyota and other shippers have been deprived of the benefits of free, open, and unrestricted competition in the market for rate-unregulated rail freight transportation services; and

c. Competition in establishing the prices paid for rate-unregulated rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

133. As a proximate result of Defendants' unlawful conduct during the Relevant Period, Toyota has suffered injury in that it has paid supra-competitive prices for rail fuel surcharges applied to rate-unregulated rail freight transportation services pursuant to contracts or other arrangements entered during the Relevant Period, and has otherwise been damaged as above.

**PRAYER FOR RELIEF**

134. WHEREFORE, Toyota prays that the Court enter judgment on its behalf, adjudging and decreeing that:

a. Defendants engaged in a contract, combination, or conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Toyota was injured in its business and property as a result of Defendants' violations;

b. Toyota shall recover the damages it sustained, as provided by the federal antitrust laws, and a joint and several judgment in favor of Toyota shall be entered against Defendants in an amount to be trebled in accordance with such laws;

c. Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their officers, directors, partners, agents, and employees, and all other persons

acting or claiming to act on Defendants' behalf, shall be permanently enjoined and restrained from continuing and maintaining the contract, combination, or conspiracy alleged herein;

d. Toyota shall be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

e. Toyota shall recover its costs of this suit, including reasonable attorneys' fees as provided by the law; and

f. Toyota shall receive such other or further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

135. Pursuant to Federal Rule of Civil Procedure 38(b), Toyota demands a trial by jury of its claims asserted in this Complaint so triable.

Date: February 26, 2020

Respectfully submitted,

By:

_/s/ Edward D. Hassi_

Edward D. Hassi, Esq. (D.C. Bar No. 1026776)
Leah S. Martin, Esq. (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202 383 8000
Facsimile: 202 383 8118
thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper, Esq.
Brooke J. Willig, Esq.
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Telephone: 212 909 6000
Facsimile: 212 909 6836
mschaper@debevoise.com
bwillig@debevoise.com

Clyde M. Siebman
SIEBMAN, FORREST, BURG, & SMITH, L.L.P.
300 North Travis Street
Sherman, TX 75090
Telephone: 903-870-0070
Facsimile: 903-870-0066
clydesiebman@siebman.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRONOX US HOLDINGS INC.<br>263 Tresser Blvd, Suite 1100<br>Stamford, Connecticut 06901<br><br>and<br><br>TRONOX INC.<br>263 Tresser Blvd, Suite 1100<br>Stamford, Connecticut 06901<br><br>*Plaintiffs*,<br><br>v.<br><br>BNSF RAILWAY COMPANY<br>2650 Lou Menk Drive<br>Fort Worth, Texas 76131<br><br>UNION PACIFIC RAILROAD COMPANY<br>1400 Douglas Street<br>Omaha, Nebraska 68179<br><br>CSX TRANSPORTATION, INC.<br>500 Water Street<br>Jacksonville, Florida 32202<br><br>and<br><br>NORFOLK SOUTHERN RAILWAY COMPANY<br>Three Commercial Place<br>Norfolk, Virginia 23510<br><br>*Defendants*. | **CASE NO. _**<br><br>**(JUDGE __________)**<br><br>**JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

Plaintiffs Tronox US Holdings Inc. and Tronox Inc. (collectively, "Plaintiffs") bring this action for damages under the antitrust laws of the United States against BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSXT"), and Norfolk Southern Railway Company ("NS") (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1. This is an antitrust action alleging that the four largest United States Class I railroads engaged in price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action related to their direct purchases from Defendants of unregulated rail freight transportation services that were assessed a rate-based fuel surcharge from at least July 1, 2003 until at least December 31, 2008 (the "Conspiracy Period"). As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants conspired for years to use rail fuel surcharges, which were added to Plaintiffs' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. The rail fuel surcharge ("Rail Fuel Surcharge") is a separately identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective actions, however, Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in Defendants' actual fuel costs, and thereby collected billions of dollars of additional profits for a period of more than five years, including additional illegal profits from Plaintiffs.

3. Defendants – which together controlled approximately 90% of rail freight traffic in the United States – began conspiring in 2003 (and continued conspiring for years thereafter) to impose an artificially high Rail Fuel Surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. As part of this plan, they devised and

embarked on a scheme to create, apply, and enforce rate-based fuel surcharges that acted as percentage multipliers on base rates (and, thus, on revenue). This permitted these dominant railroads to achieve their desired, and mutually agreed-upon, result: an effective percentage rate increase that could be broadly applied to rail freight customers.

4. Defendants maintained their conspiracy during the Conspiracy Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. Defendants also declined to undercut one another on fuel surcharge prices, application, and enforcement, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

5. There was no legitimate basis for this unreasonable practice. In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic for which Plaintiffs are not suing here, found that Defendants' Rail Fuel Surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel. The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint. In its ruling, the STB explained that:

> [I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.

> Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

6. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the first quarter of 2007 came to over $6 billion.

7. As a proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiffs in their business and property. Plaintiffs have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

8. Plaintiffs seek damages on rail freight shipments made under their private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiffs do not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

9. Plaintiff Tronox US Holdings Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 263 Tresser Blvd, Suite 1100, Stamford Connecticut 06901. Tronox US Holdings Inc. was formed in 2011 as a subsidiary of Tronox Limited. In or around 2011, Tronox US Holdings Inc. completed acquisition of all of Tronox Limited's direct and indirect subsidiaries. As a result, Tronox US Holdings Inc. became successor-in-interest to any and all claims held by Tronox Limited's direct and indirect subsidiaries. Tronox

US Holdings Inc. and/or its predecessors-in-interest mine and process titanium ore, zircon, and other minerals, and produce high-quality titanium dioxide products and chemicals for distribution and sale throughout the United States. During the Conspiracy Period, Tronox US Holdings Inc.'s predecessors-in-interest purchased unregulated rail freight transportation services directly from one or more of Defendants for the purposes of transporting raw materials to plants in one or more of the following locations: Hamilton, Mississippi; Hawkins Point, Maryland; Henderson, Nevada; Mobile, Alabama; Ottawa, Illinois; Savannah, Georgia; Soda Springs, Idaho; St. Helena, California; and West Chicago, Illinois, among other plants. These raw materials were utilized to manufacture, among other things, titanium dioxide pigments (including dry pigment and slurry), sodium chlorate, and electrolytic manganese dioxide. Tronox US Holdings Inc. brings this action as successor-in-interest to any and all claims held by entities with which it merged, acquired, or combined, including, but not limited to, the entities it acquired from Tronox Limited.

10. Plaintiff Tronox Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 263 Tresser Blvd, Suite 1110, Stamford Connecticut 06901, and is a wholly owned subsidiary of Plaintiff Tronox US Holdings Inc. Tronox Inc. was formed in 2005 for the purpose of holding Kerr McGee Chemical Corporation's titanium dioxide businesses, including Tronox Worldwide LLC and its direct and indirect subsidiaries. Tronox Inc. completed the acquisition of Tronox Worldwide LLC and its direct and indirect subsidiaries in 2006. Tronox Inc. acquired additional entities, including but not limited to Crimarron Corporation, Southwestern Refining Company, Inc., Transworld Drilling Company, Triangle Refineries, Inc., Triple S Minerals Resources Corporation, and Triple S Refining Corporation, in 2007. Tronox Inc. mines and processes titanium ore, zircon, and other minerals, and produces high-quality titanium dioxide products and chemicals for distribution and sale

throughout the United States. During the Conspiracy Period, Tronox Inc. and/or its predecessors-in-interest purchased unregulated rail freight transportation services directly from one or more of Defendants for the purposes of transporting raw materials to plants in one or more of the following locations: Hamilton, Mississippi; Hawkins Point, Maryland; Henderson, Nevada; Mobile, Alabama; Ottawa, Illinois; Savannah, Georgia; Soda Springs, Idaho; St. Helena, California; and West Chicago, Illinois, among other plants. These raw materials were utilized to manufacture, among other things, titanium dioxide pigments (including dry pigment and slurry), sodium chlorate, and electrolytic manganese dioxide. Tronox Inc. brings this action individually and as successor-in-interest to any and all claims held by entities with which it merged, acquired, or combined including, but not limited to, the entities listed above.

11. As a proximate result of the conspiracy described herein, each Plaintiff paid Rail Fuel Surcharges in connection with the unregulated rail freight transportation services obtained from Defendants that it would not have paid in the absence of the conspiracy. Therefore, the prices each Plaintiff paid to Defendants during the Conspiracy Period for those unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

12. Defendant CSXT has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSXT is a major freight railroad operating primarily in the eastern United States and Canada. CSXT has railway lines throughout the eastern United States (including in this District) and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). CSXT maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

13. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States (including in this District) and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). NS maintains a government relations office at One Constitution Avenue N.E., Suite 300, Washington, D.C. 20002.

14. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). BNSF originates and terminates traffic within this District by providing rail transportation in interchange service with CSXT and NS. BNSF maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

15. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District). UP originates and terminates traffic within this District by providing rail transportation in interchange service with CSXT and NS. UP maintains an office at 700 13th Street, N.W., Suite 350, Washington, D.C. 20005.

## JURISDICTION AND VENUE

16. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorney fees and costs from Defendants for the injuries sustained by Plaintiffs by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

17. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

18. Venue is proper in this judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391 because during the Conspiracy Period one or more of Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

19. Venue is also proper because substantially related actions, with common questions of fact, have been transferred to this District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

20. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## <u>INTERSTATE TRADE AND COMMERCE</u>

21. During the Conspiracy Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The Association of American Railroads Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

22. The activities of Defendants were within the flow of, and substantially affected interstate commerce. During the Conspiracy Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers

throughout the United States. Each Defendant used instrumentalities of interstate commerce to sell and market rail freight transportation services.

23. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

**DEREGULATION OF THE RAILROAD INDUSTRY**

24. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

25. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

26. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

27. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities).[1] The railroad industry is now highly concentrated: four of these railroads – Defendants

[1] A Class I railroad is defined as having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSXT; (4) NS; (5) Kansas City Railway Company; (6) Soo Line Railroad Co.; and (7) Grand Trunk

BNSF, UP, CSXT, and NS – operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require significant regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

28. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite occurred: railroads collectively charged shippers supracompetitive prices.

**BEFORE CONSPIRING, DEFENDANTS WERE UNABLE TO SUCCESSFULLY MAINTAIN FUEL SURCHARGES**

29. By the early 2000s, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

30. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of rising fuel prices, Defendants colluded to create, implement, enforce, and apply widely the Rail

Corporation. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

Fuel Surcharges as a means to implement what effectively operated as across-the-board rate increases.

31. Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII"), which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF"), which is based on the AII) weighted a number of cost factors – labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses – so that the actual impact of particular cost increases (*e.g.*, for fuel) would be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

32. In 2003, Defendants seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body. Defendants embarked upon and implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate "fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage, and that is precisely what these four railroads proceeded to do.

33. Prior to 2003, at least some of Defendants inserted so-called "fuel surcharges" into contracts for private rail freight transportation, but these fuel surcharges were applied only in isolated instances at very low levels, and each of Defendants had different fuel surcharge rates,

reflecting, *inter alia*, the differing fuel costs of each railroad. Those fuel surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight I*"). In short, these fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the" Conspiracy Period. *Rail Freight I* at 48.

34. Defendants have acknowledged their individual inabilities to contract for and/or collect rail fuel surcharges prior to the Conspiracy Period. For example, NS manager of pricing systems Pat Glennon acknowledged in 2001 and 2002 that fuel surcharges were only "theoretically billable . . . ." *Id.* In September 2002, Glennon reported to the then-Senior Vice President of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause."

35. UP's Chief Executive Officer James Young admitted that UP "had fuel [surcharge] programs in many contracts, but because fuel had not been run up, they were never implemented" and agreed that Rail Fuel Surcharges prior to the Conspiracy Period "never reached significant percentage levels." *Id.*

36. UP's Chief Financial Officer Robert Knight explained further that, prior to the Conspiracy Period, UP did not have a company-wide policy on fuel surcharges: "[t]here were some isolated situations where there were surcharges but . . . no policy position." *Id.*

37. In an "Enterprise Wide Risk Assessment" from May 2002, BNSF explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as [] UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business

because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

38. BNSF's executive vice president and chief marketing officer admitted that its fuel surcharge participation rates in early 2003 were "low." *Id.*

39. CSXT's executive vice president of sales and marketing testified that the fuel surcharge revenue prior to 2003 was "relatively low to where it needed to be . . . ." *Id.*

40. CSXT's director of marketing described fuel surcharges as "fairly minimal" prior to the Conspiracy Period. *Id.*

41. Before the Conspiracy Period, Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 103 (D.D.C. 2017) ("*Rail Freight II*"). Defendants could not maintain fuel surcharges as a revenue generator because of competition among themselves; as one UP executive stated succinctly in 2003, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world." A BNSF internal memorandum lamented: "[A]ny increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104. This caused Defendants to take matters into their own hands in 2003, when they took a series of coordinated actions to switch to a new system that would eliminate competition and thus allow the widespread deployment and enforcement of Rail Fuel Surcharges as a revenue enhancement mechanism.

**DEFENDANTS CONSPIRED TO DEVISE A FUEL SURCHARGE SCHEME AND ILLEGALLY AGREED NOT TO COMPETE**

42. From at least the spring of 2003 and continuing until at least 2008, the top executives of each of Defendants met regularly at resorts and conferences to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"),

executives of Defendants met to consider and discuss developments in the railroad industry. Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2 to April 6, at the Wigwam resort, in Litchfield Park, Arizona.

43. On March 11, 2003, CSXT internally recommended making changes to its fuel surcharge program that would have actually reduced the surcharges applied to base rates. Simultaneously, UP's Chief Marketing Officer Jack Koraleski was recommending escalation of UP's fuel surcharge program to be substantially more aggressive. On March 12, 2003, Koraleski traveled to competitor CSXT to discuss "fuel surcharge methodology." Shortly thereafter, CSXT's leadership abruptly reversed course, abandoning its recommended fuel surcharge reduction and adopting a program matching UP's escalation.

44. On March 18, 2003, BNSF and NS senior executives, including John Lanigan and Don Seale, met and discussed "synchroniz[ing]" fuel surcharges.

45. On March 20, 2003, CSXT publicly announced a new, more aggressive fuel surcharge program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSXT." On April 4, 2003, UP sent a "concurrence" to competitors that its new fuel surcharge program would "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "This is sweet !!! Just like the CSXT."

46. On April 1, 2003, BNSF and CSXT senior executives (CMOs Mike Giftos and John Lanigan) met to discuss fuel surcharges as well.

47. Between April 2-6, 2003, NS executive Don Seale met again with BNSF executive John Lanigan to continue their prior discussion on "the fuel surcharge issue" at an NFTA meeting.

48. Similar to CSXT's abandonment of a less aggressive fuel surcharge regime following a meeting with UP in March 2003, BNSF decided against a fuel surcharge scheme that could have been fairer for shippers, including Plaintiffs. Between February and April 2003, BNSF had been considering a mileage-based fuel surcharge, which could have better correlated the resulting fuel surcharges to actual fuel costs than the rate-based fuel surcharges that Defendants broadly implemented during the conspiracy, but abandoned this approach. Instead, BNSF and UP adopted nearly identical rate-based fuel surcharges. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates."

49. By July 2003, all four Defendant railroads had agreed to coordinate their rate-based fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed. Under this agreement, BNSF and UP (collectively, the "Western Railroads") agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index"). BNSF and UP began to charge the exact same fuel surcharges pursuant to this agreement, using the HDF Index. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the Conspiracy Period.

50. While BNSF and UP had slightly different triggers for the fuel surcharge, with BNSF at $1.25 (beginning with a surcharge of .5 percent) and UP at $1.35 (beginning with a surcharge of 1.5 percent), the reality was that the HDF Index was administered in precisely the same way for both railroads.

51. When the HDF Index exceeded $1.35 per gallon, BNSF and UP thereafter both

applied a surcharge of 0.5 percent for every five-cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20-cent increase in the HDF Index.

52. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1, and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

53. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

54. UP's move to the same fuel price index used by BNSF in or about July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began

charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

55. Even after having agreed to coordinate their fuel surcharges, however, BNSF and UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. Defendants agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of Defendants could participate, and from which all four could earn additional profits.

56. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a methodology that would enable Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

57. The four Defendants control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

58. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

59. Pursuant to their agreements, Defendants, which dominated the AAR board, caused

the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the "AIILF") – that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that it excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period. Defendants conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice.

60. The creation of this new index was an important, carefully planned step taken collectively by Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

61. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges to contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and

CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel . . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (Emphasis added).

62. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSXT and NS (collectively, the "Eastern Railroads"), moved into lockstep with Rail Fuel Surcharges based on the index reflecting the West Texas Intermediate crude oil price (the "WTI Index"). This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSXT and NS in 2003.

63. Specifically, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price, and was functionally identical to that of the Eastern Railroads, as described further herein.

64. The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from

cartel pricing easily detectable.

65. NS executive Patrick Glennon, a manager of pricing systems, admitted in 2003 that the new fuel surcharge represented a significant change in practice that was "definitely more aggressive," and "definitely yielded more revenue": "By dropping the base to $23 per barrel, raising the percentage yield and taking it sooner, the change is in fact a blatant general rate increase[.]" *Rail Freight I* at 49. Similarly, CSXT internal emails acknowledge that although the new program may "seem[] somewhat benevolent, it is actually a large increase in fuel surcharge billings—maybe as much as 100%." *Id.*

66. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

67. Thus, Defendants began to apply Rail Fuel Surcharges as a separate item on shippers' bills in the form of a percentage multiplier. Defendants used the Rail Fuel Surcharges as an easy way to increase revenues across the board.

68. The fuel surcharge programs applied by Defendants during the Conspiracy Period "were more aggressive and yielded more revenue than earlier programs." *Id.* at 48. With the AIILF they had put in place, and in furtherance of the conspiracy, Defendants each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect

the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, for example, if the percentage increase triggered by the applicable fuel index was 15%, then by applying the fuel surcharge Defendants would raise the entire cost of the freight transport by 15%, even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed-upon approach yielded Defendants billions of dollars of additional profits.

69. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSXT and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but rather was a revenue enhancement measure. The AII and RCAF both included a fuel cost component, and Defendants had used these indices for years to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted Defendants to recover all of their increased fuel costs throughout the Conspiracy Period. Thus, the motivation of BNSF, UP, CSXT and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

70. The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to independently institute its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by CSXT, NS, BNSF and UP to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

71. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, Defendants took these collective actions in order to assess a stand-alone fuel surcharge applied to *revenue* (i.e., the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, Defendants planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

72. Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but Defendants' conspiracy – to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges – extended to their "intermodal" business segments (in which freight travels by rail and another mode of transportation, such as truck or ship) as well. Notably, when Defendants met in groups in 2003 to discuss fuel surcharges, including the March 18, 2003 meeting between NS and BNSF and a June 2003 meeting between CSXT and UP, the heads of the respective intermodal business groups (and other personnel with intermodal responsibilities) participated as well.

73. Defendants hatched a single conspiracy extending to *all* shippers, regardless of traffic type, including Plaintiffs. When Defendants met to conspire, or otherwise communicated,

they did not limit their conversations to carload traffic. And once the conspiracy was underway, Defendants took steps to align their intermodal fuel surcharges, including by ad hoc adjustments, and to exchange information about fuel surcharge coverage. Just as with carload traffic, in the absence of competition during the Conspiracy Period, Defendants greatly expanded the imposition and enforcement of rate-based intermodal fuel surcharges, with the result of raising rates altogether.

74. As a result of Defendants' concerted action, Rail Fuel Surcharges charged to rail shippers (including Plaintiffs) were raised to or maintained at supracompetitive levels during the Conspiracy Period.

**DEFENDANTS SUCCESSFULLY IMPLEMENTED THEIR ILLEGAL, ANTICOMPETITIVE FUEL SURCHARGE SCHEME**

75. As detailed above, Defendants agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). Defendants applied these surcharges not only to published tariff rates, but also to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here). With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Conspiracy Period.

76. The chart below shows that the Rail Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Conspiracy Period began, but were identical starting in July 2003:

**MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0 |
| Jul-02 | 1.0% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1.0% | 0 |
| Nov-02 | 2.0% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |
| Jul-07 | 15.5% | 15.5% |
| Aug-07 | 16.0% | 16.0% |
| Sep-07 | 16.5% | 16.5% |
| Oct-07 | 16.5% | 16.5% |
| Nov-07 | 17.5% | 17.5% |
| Dec-07 | 18.5% | 18.5% |
| Jan-08 | 21.5% | 21.5% |
| Feb-08 | 21.0% | 21.0% |
| Mar-08 | 21.0% | 21.0% |
| Apr-08 | 21.5% | 21.5% |
| May-08 | 26.5% | 26.5% |
| Jun-08 | 28.5% | 28.5% |
| Jul-08 | 32.0% | 32.0% |
| Aug-08 | 34.5% | 34.5% |
| Sep-08 | 35.0% | 35.0% |
| Oct-08 | 31.0% | 31.0% |
| Nov-08 | 28.0% | 28.0% |
| Dec-08 | 23.5% | 23.5% |

77. As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Conspiracy Period.

78. The chart below shows that the Rail Fuel Surcharge percentages charged by Defendants CSXT and NS for carload shipments varied before the Conspiracy Period, but were identical starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSXT | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |

| MONTH | CSXT | NS |
|---|---|---|
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |
| Jul-07 | 16.4% | 16.4% |
| Aug-07 | 18.0% | 18.0% |
| Sep-07 | 20.8% | 20.8% |
| Oct-07 | 20.0% | 20.0% |
| Nov-07 | 22.8% | 22.8% |
| Dec-07 | 25.2% | 25.2% |
| Jan-08 | 28.8% | 28.8% |
| Feb-08 | 27.6% | 27.6% |
| Mar-08 | 28.0% | 28.0% |
| Apr-08 | 29.2% | 29.2% |
| May-08 | 33.2% | 33.2% |
| Jun-08 | 36.0% | 36.0% |
| Jul-08 | 41.2% | 41.2% |
| Aug-08 | 44.4% | 44.4% |
| Sep-08 | 44.4% | 44.4% |
| Oct-08 | 37.6% | 37.6% |
| Nov-08 | 32.4% | 32.4% |
| Dec-08 | 21.6% | 21.6% |

79. In stark contrast to this uniformity in Rail Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance announcements of each Defendant's Rail Fuel Surcharges was an important implementation and enforcement mechanism for the conspiracy.

80. Although Defendants began to adjust their Rail Fuel Surcharge programs after the 2007 STB ruling discussed below – including, in some cases, by adopting mileage-based Rail Fuel Surcharges – Defendants continued to engage in discussions concerning Rail Fuel Surcharges following the STB ruling, and to apply rate-based Rail Fuel Surcharges that are the subject of this case to their shippers pursuant to agreements entered into before the STB ruling.

81. Railroad industry analysts took note of the suspect "convergence" in Rail Fuel Surcharge methodologies adopted by Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." ("Following the Competition," *Traffic World*, July 14, 2003). The analyst further noted that "the way to gain significant market share is to lead the competition rather than following the competition." *Id.* Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs. An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity found that the difference between Defendants' rail fuel surcharge revenue

(as publicly reported or estimated) and their publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

82. BNSF's average cost for diesel fuel in Third Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for Third Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from Third Quarter 2003 to 2004. In contrast, the surcharge charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from Third Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue, not merely to the fuel cost component of that rate.

83. Another reason why Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

84. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges, year after year, could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action –

i.e., decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

85. In agreeing to collude on fuel surcharges across business segments, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs and/or better efficiencies could impose a lower surcharge or none at all and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, Defendants "uniformly began their negotiations with their standard fuel surcharge program and their objective was to apply their standard fuel surcharge as widely as possible." *Rail Freight I* at 50.

86. In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Rail Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were not negotiable.

87. Indeed, each Defendant *mandated* application of rate-based fuel surcharges in furtherance of their agreement.

88. On April 9, 2003, BNSF issued an internal notification stating, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, BNSF's Chief Economist Samuel Kyei noted "contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge

provisions will not be signed."

89. Similarly, UP implemented a no-exceptions policy as explained by a sales representative to a customer in December 2003: "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice."

90. In 2004, Don Seale from NS informed his subordinates, "no deviation from NS's published FSC without [his] prior approval."

91. In 2006, CSXT Vice President of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT a fuel surcharge."

92. The widespread application of fuel surcharges differed substantively from Defendants' practices before the Conspiracy Period, when Defendants were actively competing for customers and could not maintain fuel surcharges in the face of such competition. After the conspiracy began, "any deviations from [D]efendants' standard fuel surcharge programs were rare." *Rail Freight I* at 50. Each Defendant "enforced strict policies ensuring across-the-board application of these standardized fuel surcharge programs on all of their shippers . . . ." *Id.* In this way, Defendants could avoid undercutting one another and ensure that each could continue to apply fuel surcharges to its customers and reap their supracompetitive profits.

93. Defendants acknowledged "that the new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Rail Freight II* at 104. One NS internal email noted that it seemed like all revenue increases were "coming from fuel surcharges." *Id.* A BNSF internal memorandum stated that CSXT and NS "have a 'profit center' with their Fuel Surcharge Programs for the customers that participate[.]" *Id.* at 104-105. Another BNSF document

described its own fuel surcharge program as "a revenue maximization program, not protection against fuel prices." *Id.* at 105.

94. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," demonstrated in the following chart documenting the significant growth in profits during the Conspiracy Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

95. Defendants realized that implementation of fuel surcharges only worked because all Defendants participated, as noted in a BNSF Executive Team presentation in 2005: "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall." They policed the conspiracy by exchanging fuel surcharge data with one another, resulting in nearly no shift in market share between them.

96. Defendants agreed not to undercut agreed-upon pricing or steal market share by offsetting fuel surcharges or by discounting underlying rates. As demonstrated in the tables that follow, Defendants' market shares remained stable following the 2003 agreements.

## Railroad Market Share: Originated Tons and Carloads 1998 - 2003[1]

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| **BNSF** | | | | | | |
| Carloads Originated | 6,739,202 | 6,876,523 | 6,909,907 | 6,928,188 | 6,999,061 | 7,662,699 |
| Percent of Total Originated Carloads | 31.9% | 28.4% | 26.5% | 27.0% | 26.9% | 28.4% |
| Tons Originated | 429,408,242 | 440,180,814 | 434,255,161 | 442,932,381 | 438,123,355 | 460,789,676 |
| Percent of Total Originated Tons | 31.1% | 28.5% | 26.8% | 27.2% | 26.9% | 27.8% |
| **CSXT**[2] | | | | | | |
| Carloads Originated | 4,184,418 | 5,842,422 | 6,542,784 | 6,321,945 | 6,335,611 | 6,470,386 |
| Percent of Total Originated Carloads | 19.8% | 24.1% | 25.1% | 24.6% | 24.4% | 24.0% |
| Tons Originated | 306,034,673 | 378,007,852 | 406,314,179 | 399,970,764 | 392,903,118 | 391,993,962 |
| Percent of Total Originated Tons | 22.1% | 24.5% | 25.1% | 24.5% | 24.1% | 23.7% |
| **NS**[2] | | | | | | |
| Carloads Originated | 3,621,159 | 4,351,478 | 5,214,436 | 5,025,864 | 5,098,926 | 5,115,859 |
| Percent of Total Originated Carloads | 17.1% | 18.0% | 20.0% | 19.6% | 19.6% | 19.0% |
| Tons Originated | 233,133,810 | 270,383,729 | 320,700,204 | 310,449,934 | 307,770,415 | 306,322,113 |
| Percent of Total Originated Tons | 16.9% | 17.5% | 19.8% | 19.0% | 18.9% | 18.5% |
| **UP** | | | | | | |
| Carloads Originated | 6,570,086 | 7,137,090 | 7,384,503 | 7,393,306 | 7,580,376 | 7,692,160 |
| Percent of Total Originated Carloads | 31.1% | 29.5% | 28.3% | 28.8% | 29.1% | 28.6% |
| Tons Originated | 413,615,706 | 453,417,016 | 459,428,341 | 476,759,328 | 489,305,241 | 497,373,006 |
| Percent of Total Originated Tons | 29.9% | 29.4% | 28.3% | 29.2% | 30.1% | 30.0% |
| **Total** | | | | | | |
| Carloads Originated | 21,114,865 | 24,207,513 | 26,051,630 | 25,669,303 | 26,013,974 | 26,941,104 |
| Tons Originated | 1,382,192,431 | 1,541,989,411 | 1,620,697,885 | 1,630,112,407 | 1,628,102,129 | 1,656,478,757 |

1 AAR Railroad Facts and Analysis of Class I Railroads
2 Data for 1998 and 1999 does not include all of the acquisition Conrail traffic

## Railroad Market Share: Originated Tons and Carloads 2004 - 2008[1]

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| **BNSF** | | | | | |
| Carloads Originated | 8,237,466 | 8,727,121 | 9,335,024 | 9,174,167 | 9,021,851 |
| Percent of Total Originated Carloads | 29.2% | 30.2% | 31.2% | 31.4% | 31.7% |
| Tons Originated | 483,296,128 | 498,121,970 | 539,511,527 | 546,445,840 | 552,297,049 |
| Percent of Total Originated Tons | 28.3% | 28.7% | 30.1% | 30.8% | 31.1% |
| **CSXT** | | | | | |
| Carloads Originated | 6,611,766 | 6,537,293 | 6,607,931 | 6,348,515 | 6,127,125 |
| Percent of Total Originated Carloads | 23.4% | 22.6% | 22.1% | 21.7% | 21.5% |
| Tons Originated | 403,152,732 | 409,486,655 | 414,266,429 | 405,630,002 | 397,947,902 |
| Percent of Total Originated Tons | 23.6% | 23.6% | 23.1% | 22.8% | 22.4% |
| **NS** | | | | | |
| Carloads Originated | 5,524,545 | 5,800,390 | 5,824,813 | 5,670,400 | 5,617,285 |
| Percent of Total Originated Carloads | 19.6% | 20.0% | 19.5% | 19.4% | 19.7% |

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Tons Originated | 319,014,426 | 325,779,848 | 323,407,280 | 315,583,286 | 316,793,119 |
| Percent of Total Originated Tons | 18.7% | 18.8% | 18.1% | 17.8% | 17.8% |
| **UP** | | | | | |
| Carloads Originated | 7,831,823 | 7,874,879 | 8,132,004 | 8,045,965 | 7,720,041 |
| Percent of Total Originated Carloads | 27.8% | 27.2% | 27.2% | 27.5% | 27.1% |
| Tons Originated | 503,052,146 | 503,056,340 | 514,357,111 | 508,423,635 | 509,083,147 |
| Percent of Total Originated Tons | 29.4% | 29.0% | 28.7% | 28.6% | 28.7% |
| Total | | | | | |
| Carloads Originated | 28,205,600 | 28,939,683 | 29,899,772 | 29,239,047 | 28,486,302 |
| Tons Originated | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 | 1,776,082,763 | 1,776,121,217 |

1 AAR Railroad Facts and Analysis of Class I Railroads

97. According to UP President James Young, by July 2007 approximately "eighty to ninety percent" of UP's business overall had "some kind of fuel surcharge mechanism that gets passed on to the customer."

98. Because Defendants started their negotiations during the Conspiracy Period using their standard fuel surcharge formula, any deviations from that standard fuel surcharge application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (i.e., facilities served by only one of Defendants) – who are nonetheless able to harness competition among railroads for negotiation purposes absent collusion – suffered from the conspiracy. NS's CEO, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," expressly acknowledging that "even where there is only one railroad serving a facility, there are market factors at play."

## THE STB DECISION

99. Starting in 2006, the STB, which regulates certain aspects of the railroad industry, began holding hearings and investigating Defendants' practices relating to fuel surcharges. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges were not tied to the fuel

consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). Thus, the STB found, "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular[] traffic to which the surcharge is applied." *Id.* at 6.

100. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

101. As detailed above, pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**DEFENDANTS REAPED SUPRACOMPETITIVE PROFITS**

102. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Conspiracy Period in excess of their actual increase in fuel costs from the customers on whom they imposed the surcharge.

103. During the Conspiracy Period, Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, an increase of about 160 percent.

104. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006.

105. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and

"it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

106. A 2010 Senate Commerce Committee report concluded that "a review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade. . . . [T]he four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%."

107. Defendants themselves also attributed their increased revenue to fuel surcharges. In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume."

108. BNSF recognized rail freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

109. In 2006, UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

110. In 2006, CSXT's revenue increased $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

## COUNT I

### (Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)

111. Plaintiffs incorporate by reference the allegations in the above paragraphs as if they were fully set forth herein.

112. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

113. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

114. Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

115. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

116. The contract, combination or conspiracy has had the following effects:

a. the Rail Fuel Surcharges charged to Plaintiffs and other customers for unregulated rail freight transportation have been fixed or stabilized at supracompetitive levels;

b. Plaintiffs and other customers have been deprived of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed, and eliminated.

117. As a proximate result of the conspiracy described herein, each Plaintiff paid Rail Fuel Surcharges in connection with those unregulated rail freight transportation services that it would not have paid in the absence of the conspiracy; and therefore the prices each Plaintiff paid to Defendants during the Conspiracy Period for those unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein.

118. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

WHEREFORE, Plaintiffs pray for relief as follows:

(1) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiffs recover compensatory damages, as provided by law, and that judgment be entered against Defendants on behalf of Plaintiffs;

(3) That Plaintiffs recover treble damages, as provided by law;

(4) That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

(5) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: August 12, 2020
Washington, D.C.

COBURN & GREENBAUM PLLC

By: /s/ Barry Coburn
Barry Coburn (D.C. Bar No. 358020)
1710 Rhode Island Avenue, NW
Second Floor
Washington, D.C. 20036
Telephone: (202) 643-9472
Fax: (202) 657-4490
Email: barry@coburngreenbaum.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Daniel B. Goldman
Steven S. Sparling
Daniel Lennard
Zachary C. Naidich
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
Email: dgoldman@kramerlevin.com
ssparling@kramerlevin.com
dlennard@kramerlevin.com
znaidich@kramerlevin.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| United Parcel Service, Inc., an Ohio Corporation, UPS Ground Freight, Inc., and UPS Supply Chain Solutions, Inc.,<br><br>*Plaintiffs,*<br><br>v.<br><br>BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company,<br><br>*Defendants.* | **JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

## INTRODUCTION

1. This is an antitrust action charging Defendants with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action against Defendants, from one or more of whom each Plaintiff directly purchased unregulated rail freight transportation services from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and by one or more of whom each Plaintiff was assessed a rate-based rail fuel surcharge ("FSC") for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight

internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall***."

15. Instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants conspired to assess matching FSCs, without waivers or discounts, to their entire customer bases applied across *all* rail freight traffic, including carload traffic (*i.e.*, shipments that travel from origin to destination only by railcars) and intermodal traffic (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship). The conspiring Defendants' senior executives and chief marketing officers oversaw their railroads' carload and intermodal traffic alike and sought to apply FSCs to them broadly. The junior executives overseeing the carload and intermodal traffic also attended and participated in the meetings. Even shippers with "captive" facilities (*i.e.*, facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

16. Defendants maintained the scheme and imposed policies designed to ensure their "standard" or "published" FSCs were enforced broadly across all of their customers and for all products without the waivers and discounts they had frequently offered between 2000 and 2002:

> **BNSF**: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "***Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed.***"
>
> **UP**: On December 22, 2003, a sales representative explained to a customer, "As a company policy, all ***contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice***."
>
> **CSX**: A May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence Gooden stated that any exception had to come through him and that he had zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a

Dated: February 24, 2020

By: CARROLL & WEISS LLP

*/s/ M. Russell Wofford, Jr.*

M. Russell Wofford, Jr.
Georgia Bar No.: 773002
1819 Peachtree Rd. Ste. 104
Atlanta, Georgia 30309
Telephone: (404) 228-5337
Facsimile: (404) 228-5564
Email: rwofford@carrollweiss.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Stephen R. Neuwirth*
Steig D. Olson*
Sami H. Rashid*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com
steigolson@quinnemanuel.com
samirashid@quinnemanuel.com

**pro hac vice* motions to be filed

*Attorneys for United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; and UPS Supply Chain Solutions, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Yang Ming Marine Transport Corp.**<br>No. 271, Ming De 1st Rd.<br>Cidu District, Keelung 20646, Taiwan (R.O.C.)<br><br>**Yang Ming (America) Corp.**<br>One Newark Center<br>1085 Raymond Boulevard, 9th Floor<br>Newark, New Jersey 07102<br><br>Plaintiffs,<br><br>v.<br><br>**BNSF Railway Company**<br>2650 Lou Menk Drive<br>Fort Worth, Texas 76131<br><br>**CSX Transportation, Inc.**<br>500 Water Street<br>Jacksonville, Florida 32202<br><br>**Norfolk Southern Railway Company**<br>Three Commercial Place<br>Norfolk, Virginia 23510<br><br>**Union Pacific Railroad Company**<br>1400 Douglas Street<br>Omaha, Nebraska 68179<br><br>Defendants. | Civil Action No.<br><br>Judge: |

**COMPLAINT**

## INTRODUCTION

1. Plaintiffs Yang Ming Marine Transport Corp. and Yang Ming (America) Corp., by and through their undersigned attorneys, bring this antitrust suit for treble damages against Defendants BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company ("Defendants").

2. Plaintiffs allege that, from July 1, 2003 until at least December 31, 2012 (the "Relevant Period"), (i) Defendants engaged in price fixing in violation of Section 1 of the Sherman Act, including by fixing rate-based rail fuel surcharges ("FSC") and/or (ii) through the use of multi-year contracts, Defendants continued to reap the benefits of their anticompetitive scheme (in the form supra-competitive fuel surcharges) for years after Defendants' collusion-tainted contracts were negotiated.

3. During the Relevant Period, Plaintiffs directly purchased unregulated rail freight transportation services from one or more Defendants, which assessed Plaintiffs an FSC for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law. Certain allegations in this Complaint are premised on factual assertions reflected in pleadings and other court documents filed by former court-appointed lead class counsel, which had full access to the discovery record in the former class suit alleging an identical conspiracy to violate the antitrust laws.

4. In 2003, the four largest United States-based Class I railroads engaged in an extraordinary series of meetings, phone calls, and email communications through which they embarked on a conspiracy—under the guise of a fuel cost recovery program—to apply and enforce rail fuel surcharges across their customers in order to generate profits. Defendants BNSF Railway

Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") together controlled about 90% of rail freight traffic in the United States during the Relevant Period. Defendants used "rate-based" FSCs—i.e., surcharges that use a percentage applied to the base rate for a shipment—as a means to impose across-the-board rate increases on rail freight shipments, a result that would have been prohibitively difficult to achieve on a contract-by-contract basis. Throughout the conspiracy and despite customer pushback against Defendants' FSCs, Defendants set aside their individual, economic self-interest to undercut one another and instead staunchly maintained their FSC program, pocketing billions of dollars in profits as a result.

5. Prior to conspiring, Defendants operated as businesses should: they actively competed against each other over rates generally and with respect to fuel recovery mechanisms to the benefit of their customers. According to a historical study of rail rates undertaken by the Surface Transportation Board ("STB"), "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Defendants were aware of, and concerned about, this trend. According to one CSX internal analysis from 2002, this decline resulted from factors including "some very vicious historical price wars" in the rail industry and "destructive pricing for rail share."

6. Between 2000 and 2003, Defendants independently tried to implement revenue-enhancing policies, including uncoordinated efforts to impose stand-alone FSCs. These efforts failed. Defendants used the inclusion or absence of FSCs as a basis to compete for each other's business and customers successfully resisted FSCs. They were rarely included in contracts and more rarely collected; those seeking to impose them lost customers to competitors or compensated customers by negotiating discounts. For example:

a. BNSF explained in a May 2002 Enterprise Wide Risk Assessment that "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

b. In September 2002, NS's manager of pricing systems Pat Glennon reported to the then-Senior Vice President of Marketing Services and later its CMO Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities."

c. As late as April 2003, UP's Bob Toy reported, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

7. Moreover, since the passage of the Staggers Act in 1980, which significantly deregulated the American railroad industry, railroads typically entered into private freight transportation contracts that included escalation provisions tied to indexes that weighted actual cost factors, including fuel cost. As UP President James Young acknowledged on an October 2004 earnings call, the Rail Cost Adjustment Factor ("RCAF") "looks at actual costs through the industry." In that respect, Defendants were already recovering fuel costs through the RCAF or the related All Inclusive Index ("AII").

8. In March 2003, everything began to change. Rather than competing, Defendants began coordinating FSC programs. Senior executives at the highest levels of each company began to discuss with one another the implementation of more aggressive FSC formulas that the Surface Transportation Board ("STB") later found bore "no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied . . . ." In short, Defendants stopped competing and started conspiring.

9. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly reduced the surcharges applied to shippers' base rates. Simultaneously, UP's CMO Jack Koraleski was recommending escalation of UP's FSC program to be substantially more aggressive. The very next day, Koraleski traveled to competitor CSX to play golf, socialize, and discuss "fuel surcharge methodology." Within one week, CSX's leadership abruptly reversed course, abandoning its recommended FSC reduction and adopting a program matching UP's escalation.

10. On March 18, 2003, BNSF and NS senior executives met to discuss "synchroniz[ing]" FSCs. Action items for the meeting attended by John Lanigan (BNSF's CMO) and Don Seale stated: "BNSF's fuel surcharge is structured differently than NS, CSX and UP. Should BNSF's by [sic] synchronized with the other big players in the industry?" The answer based on what followed: a resounding yes.

11. On March 20, 2003, CSX publicly announced a new, more aggressive FSC program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSXT." On April 4, 2003, UP sent a "concurrence" to competitors that its new FSC program will "apply to most Union Pacific pricing documents for local and interline

freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "This is sweet!!!! Just like the CSXT."

12. On April 1, 2003, BNSF and CSX senior executives met. The agenda dictated that CSX's CMO Mike Giftos and BNSF's CMO John Lanigan were to discuss "Fuel Surcharge." Documents also reveal that, between April 2 and 6, 2003, NS's Seale and BNSF's Lanigan continued a prior discussion on "the fuel surcharge issue" at a National Freight Transportation Association meeting.

13. Similar to CSX's abandonment of a less aggressive FSC regime following a meeting with UP in March 2003, BNSF abandoned the internal consideration of an FSC program that could have been fairer for shippers. Between February and April 2003, BNSF had been "[l]eaning toward [a] Cost Per Mile" FSC formula (a mileage-based FSC which could have better correlated the resulting FSCs to actual fuel costs compared to the rate-based FSCs that Defendants broadly implemented during the conspiracy), but abandoned this approach. Instead, BNSF and UP adopted nearly identical rate-based FSCs. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates."

14. Defendants' employees recognized these new FSCs were not genuine fuel cost recovery mechanisms as Defendants sought to portray. For example, on March 19, 2003, CSX's Director of Market Strategy John Couch explained that while the coordinated FSC "seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." On April 7, 2003, NS's Manager of Pricing Systems Pat Glennon recounted "[t]he case in favor of adopting the CSXT standard" to Don Seale and AVP Charlie Brenner, writing the "CSXT standard clearly produces significantly more compensation, and it does it sooner and more

consistently." On April 29, 2003, Glennon told Seale that "[b]y dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

15. Glennon was correct that customers saw the rate increases for what they were and were outraged. Handwritten notes from a June 2003 meeting between CSX and UP's senior executives—including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden, VP of Strategic Planning Les Passa, and Alan Blumenfield, and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan—reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes. The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

16. But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall."

17. Instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants conspired to assess matching FSCs, without waivers or discounts, to their entire customer bases applied across all rail freight traffic, including carload traffic (i.e., shipments that travel from origin to destination only by railcars) and intermodal traffic (i.e., shipments that travel by rail and one other mode of transportation such as truck or ship). The

conspiring Defendants' senior executives and chief marketing officers oversaw their railroads' carload and intermodal traffic alike and sought to apply FSCs to them broadly. The junior executives overseeing the carload and intermodal traffic also attended and participated in the meetings. Even shippers with "captive" facilities (i.e., facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

18. Defendants maintained the scheme and imposed policies designed to ensure their "standard" or "published" FSCs were enforced broadly across all of their customers and for all products without the waivers and discounts they had frequently offered between 2000 and 2002:

a. BNSF: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed."

b. UP: On December 22, 2003, a sales representative explained to a customer, "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice."

c. CSX: A May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence

Gooden stated that any exception had to come through him and that he had zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge."

d. NS: A 2004 email from Don Seale to his subordinates mandated "no deviation from NS's published FSC without [his] prior approval." He also rejected any negotiations to forego base rate increases in return for FSC application as a "shell game."

19. In the fall of 2003, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to get all Defendants to agree to remove fuel costs out of the weighted RCAF and AAI indices (which already permitted the Defendants to recover all of their fuel costs), so that they could more easily charge artificially high FSCs as a revenue enhancement mechanism. As a result, the AAR—whose board was dominated by Defendants—created an unprecedented All Inclusive Index Less Fuel ("AAILF"). Defendants' conspiratorial implementation of the AAILF allowed Defendants to move away from use of the RCAF and more easily apply their FSCs.

20. Defendants worked tirelessly to achieve 100% FSC coverage across their customers. All four Defendants pursued 100% participation goals and tracked their progress toward attaining that goal. Defendants also policed the conspiracy by exchanging FSC coverage data with one another. In addition, Defendants started their negotiations using the standard FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for shippers.

21. Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150 per barrel during the Relevant Period, so did Defendants' profits. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," and included the following chart documenting the significant growth in profits during the Relevant Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

22. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") similarly found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

23. Defendants also attributed their record revenues to FSCs. For example:

a. NS's 2006 "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume."

b. BNSF's freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

c. UP "achieved record revenue levels [in 2006] in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

d. CSX's operating revenue increased $948 million in 2006; "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

## THE PARTIES

24. Plaintiff Yang Ming Marine Transport Corp. ("Yang Ming") is a corporation organized under the laws of the Republic of China, with its principal place of business at No. 271, Ming De 1st Road, Cidu District, Keelung 20646, Taiwan (R.O.C.). Yang Ming is one of the largest container shipping companies in the world, and for almost 50 years Yang Ming and its subsidiaries have provided customers with comprehensive shipping services around the globe. During the Relevant Period, Yang Ming purchased unregulated rail freight transportation services directly from and paid intermodal FSCs directly to one or more of the Defendants to transport intermodal shipments between ports, docks, terminals, and gateways nationwide.

25. Plaintiff Yang Ming (America) Corp. ("YMA"), an indirect subsidiary of Yang Ming, is incorporated under the laws of the State of New York, with its principal place of business at One Newark Center, 1085 Raymond Boulevard, 9th Floor, Newark, New Jersey 07102. YMA is the main American unit of Yang Ming and serves as general agent and representative for Yang

Ming in North America. During the Relevant Period, YMA purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport intermodal shipments between ports, docks, terminals, and gateways nationwide.

26. As a proximate result of the conspiracy described herein, Yang Ming and YMA each paid FSCs in connection with the unregulated rail freight transportation services obtained from Defendants that they would not have paid in the absence of the conspiracy; and therefore the prices each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

27. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

28. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

29. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated

schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

30. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

## JURISDICTION AND VENUE

31. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by each Plaintiff by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

32. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

33. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to each Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

34. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and

(d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**INTERSTATE TRADE AND COMMERCE**

35. During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

36. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

37. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

**DEREGULATION OF THE RAILROAD INDUSTRY**

38. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

39. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

40. Today, by contrast, 80% or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency—like the previously-existing ICC—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

41. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry is now (and was during the Relevant Period) highly concentrated: four of these railroads—Defendants BNSF, UP, CSX and NS—operate more than 90% of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

42. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true—railroads are collectively charging shippers supracompetitive rates.

**DEFENDANTS SEEK UNSUCCESSFULLY TO RAISE RATES BEFORE THE RELEVANT PERIOD**

43. For many years before the Relevant Period, Defendants confronted a long-term, structural decline in rail freight rates. Indeed, according to the Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of*

*Railroad Rates: 1985-2007*, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Figure 1 from the *Study of Railroad Rates* evidences that trend:



Figure 1. STB Rail Rate Index 1985 to 2007
Real Revenue Per Ton-Mile (1985=100)

44. Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts by the individual Defendants to apply stand-alone FSCs. Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

45. During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs. The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an internal analysis as "some very vicious historical price wars" and "destructive pricing for rail share." A

2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy.

46. During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs. By way of example:

a. NS: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty." VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it." The same month, Director of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC." In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS." Glennon testified that in 2001 and 2002, FSCs were only "theoretically billable."

b. CSX: In August 2000, CSX reported at a staff meeting that it could collect only 67.4% of the then-modest FSCs it had billed over the preceding nine

months. EVP of Sales and Marketing Clarence Gooden testified that CSX's FSC coverage was "very low" and that he was "embarrassed" by the figure.

c. BNSF: In May 2002, BNSF's Enterprise Wide Risk Assessment explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, EVP and CMO Charles Schultz told Chairman, President, and CEO Matthew Rose and other executives, "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." Schultz's successor John Lanigan testified BNSF's FSC coverage was "low" in January 2003—"in the 25 to 30 percent range."

d. UP: Current EVP and CFO Robert Knight Jr. testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position." UP implemented an FSC program in December 2002, but initially limited the application of that program to certain tariffs and circulars and exempted private shipments in its Industrial Products group from FSCs. This was true even though FSCs were generally not triggered and only "theoretically billable." And in April 2003, Director Bob Toy reported, "Fuel surcharge $ are melting away at the competition.

In a downward-pressure environment, what's on paper must not work in the real world."

47. The reason Defendants were not able to achieve broader FSC coverage was clear: Defendants were concerned about losing business to other Defendants that did not apply FSCs, made concessions, or otherwise applied FSCs less aggressively. Defendants expressed these concerns internally and, in fact, lost business through FSC competition. Each Defendant also frequently agreed not to apply FSCs in the face of shipper objections. These competitive pressures applied across all rail freight traffic, affecting carload and intermodal traffic alike.

48. Defendants undercut each other on FSCs and waived them for competitive advantage. In 2000, NS's intermodal group "made the decision to stop applying the fuel surcharge to International accounts that are under contract." NS "stop[ped] invoicing the fuel surcharge immediately and cancel[led] any outstanding amounts" for any international customers with intermodal contracts who had "refused to pay the fuel surcharge and are not paying." In 2001, an NS intermodal employee noted to SVP of Marketing Services Don Seale and others that "we have finally been forced to acquiesce on some of the International contracts and stop charging an FSC where there is an RCR [Rail Cost Recovery Index]. Even our attorney's [sic] said we were on shakey [sic] ground, and after a year of assessing and collecting this from a few carriers, we have terminated it."

49. In January 2003, BNSF's EVP and CMO Chuck Schultz responded to a series of "Fuel Surcharge Questions" from CEO Matt Rose, including "Why can't we get more fuel surcharges or RCAF escalation in each of the forecast groups?" These groups included intermodal and carload traffic. Schultz responded that "competition [and] contract negotiating power all play

a role." The effect was that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive."

50. Absent coordination, Defendants struggled to identify who was undercutting whom. In April 2001, it was reported to Anne McMahon, NS's Manager of Planning and Intermodal, that NS was losing market share in part because its main eastern competitor "CSX has begun waiving the fuel surcharge for specific accounts." But a month later, an intermodal employee reported to UP's President and COO Ike Evans and CMO Jack Koraleski that "[w]hile it is difficult to pinpoint who is cutting prices . . . evidence continues to mount that it is NS."

51. In May 2002, BNSF reported that it was challenging to impose FSCs because its main western competitor, "UP[,] does not use a fuel surcharge in the competitive marketplace." It continued, "rail competitors do not [use FSCs] and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, NS reported that CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS."

52. Customers balked at FSC entries on their bills. In April 2002, an employee complained that NS's intermodal FSC of 1.5% was generating "[n]ot much incremental revenue" and, later, another NS employee reported that shippers were resisting intermodal FSCs of only 3 percent. In October 2002, a UP employee cited an "issue" that intermodal customers had started requiring "separate billings for FSC," which had resulted in "[l]ess customer acceptance/payment as a separate line item charge on the Freight Bill." In 2003, BNSF Chief Economist Sam Kyei informed CMO John Lanigan of the "Status of BNSF Fuel Surcharge Programs," reporting that the railroad had struggled to apply the "General Intermodal Program," garnering only 34%

participation among international customers." He continued, BNSF needed to "assess the effectiveness of our participation rates through exception management and tracking."

53. And, in May 2003, BNSF announced that it would reduce its standard carload FSC to 2% from 5% in May 2003 because a 5% FSC "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage." In response, UP observed internally that "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

54. Another impediment to broad application of FSCs during this period was the so-called Rail Cost Adjustment Factor, or "RCAF." The RCAF is a weighted index that accounts for all significant input costs, including fuel. The RCAF was utilized in multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.

55. Defendants recognized that imposing a stand-alone FSC where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping." For example, Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."

56. As a result, the number of shippers covered by stand-alone, rate-based FSCs was relatively low before the Relevant Period, and FSCs did not contribute significantly to Defendants' revenues or bottom lines.

**DEFENDANTS CONSPIRE IN 2003 TO RAISE PRICES BY ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS MEANS TO INCREASE ALL-IN RATES**

57. By 2003, Defendants' initial attempts to apply rate-based FSCs on their own taught them an important lesson: they could not achieve their revenue enhancement objectives unless the

FSC was widely applied on a coordinated basis by all four Defendants. Absent coordination, a railroad seeking to impose FSCs more aggressively than its competitors would risk losing business to another railroad who imposed no FSC or whose FSC policies were more flexible. By early 2003, it became apparent to Defendants that they would encounter difficulties making their FSC policies "stick" absent an industry-wide agreement.

58. Thus, beginning in the spring of 2003, Defendants' senior executives—including their CEOs and top sales/marketing executives—engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC program. The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers industry-wide.

59. The FSC programs that Defendants implemented between March 2003 and January 2004 by mutual agreement are exactly the sort of industry-standard FSC that Defendants' senior executives discussed.

60. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly reduced the surcharges applied to shippers' base rates.

61. That same day, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" attributed to UP CMO Jack Koraleski. Under the UP "Revised" proposal, FSCs were more aggressive, escalating at roughly twice the rate of the formula CSX had internally recommended. The "Revised Surcharge proposal" retained the $28 West Texas Intermediate ("WTI") strike price of UP's existing program but would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0% increase for every $5 increase in the WTI index.

62. The following day, Koraleski traveled to CSX to play golf, socialize, and discuss "fuel surcharge methodology." Beforehand, Koraleski and CSX's executive vice president of sales and marketing, Clarence Gooden, "talked on" the subject of "[f]uel surcharge methodology."

63. On March 19 and 20, 2003, within one week of the UP-CSX meeting on "fuel surcharge methodology," CSX publicly announced a new FSC policy. The program retained the lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal." Thus, under CSX's new FSC policy, CSX would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase above $23.48.

64. Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. CSX reasoned that while these modifications to its FSC program might "seem[] somewhat benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

65. On March 31, 2003, less than two weeks after CSX's announcement, UP decided to adopt "the same approach as the CSXT." Following the CSX approach, UP would impose a 0.4% FSC at a monthly-average WTI "trigger" price of $23 (i.e., the index price at which FSCs begin), and assess an additional 0.4% charge for every dollar increase in the WTI index above $23. BNSF, which had previously discussed the need for a "synchronized" FSC policy with NS, had a predictably positive reaction to UP's announcement: "This is sweet!!!! Just like the CXST."

66. On March 18, 2003, NS and BNSF senior executives—including NS's Chairman, President, and CEO David Goode, Vice Chairman and COO Steve Tobias, Vice Chairman and

CFO Hank Wolf, VP and CMO Ike Prillaman, SVP of Planning Jim McClellan, VP of Intermodal Mike McClellan, SVP of Transportation Mark Manion, SVP of Marketing Services Don Seale, BNSF's Chairman, President, and CEO Matt Rose, current President and CEO and then-VP and COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete Rickershauser, VP of Consumer Products and head of intermodal activities Steve Branscum—met and discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. This discussion point was assigned to NS's Seale and BNSF's Lanigan.

67. On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."

68. The trade association meeting was the biannual National Freight Transportation Association ("NFTA") meeting that took place on April 2-6, 2003 at the Wigwam resort, in Litchfield Park, Arizona. Each of the Defendants attended the meeting. Almost immediately following the NFTA meeting, a new internal directive was issued at BNSF that was designed to ensure across-the-board FSC application: "Effective immediately and urgently per John Lanigan[:] Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

69. On April 1, 2003, CSX CMO Mike Giftos and BNSF CMO John Lanigan met in Jacksonville, Florida to discuss "Fuel Surcharge."

70. When Defendants met to conspire, they discussed applying FSCs across *all* rail freight traffic; they did not distinguish between carload and intermodal traffic. The conspiring Defendants' senior executives and chief marketing officers oversaw their railroads' carload and

intermodal traffic alike and sought to apply FSCs to them broadly. The junior executives overseeing the carload and intermodal traffic also attended and participated in the meetings.

71. The same chief marketing officers who oversaw Defendants' carload traffic—and participated in the relevant meetings identified above—were responsible for Defendants' intermodal businesses. Moreover, those employees directly in charge of intermodal traffic were participants. NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum attended the March 2003 meeting at which their railroads discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. CSX's Alan Blumenfield, his predecessor Les Passa, and UP's Bradley King, EVP of Network Design and Integration, participated in the June 2003 meeting at which CSX and UP's senior executives discussed their FSC formulas, their FSC strike prices, and the "outcry" they were facing from the initial rollout of their new FSC regimes. UP's intermodal group regularly imposed adjustable FSC provisions and their practice was to adjust them on ad hoc bases to align with BNSF's FSCs.

72. In early 2003, BNSF had been leaning toward a mileage-based carload FSC and trying to drum up support within the industry for a mileage-based FSC formula. But on May 7, 2003—approximately one month after the NFTA meeting and its meeting with CSX—BNSF abandoned that effort. Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the On-Highway Diesel Fuel ("HDF") index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."

73. Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index. The BNSF FSC had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index. From that point on, BNSF and UP (together, the "Western Railroads") moved in lockstep and charged the exact same FSC percentage for each month of the Relevant Period.

74. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied an FSC of 0.5% for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2%. The FSC would increase 2% for every 20-cent increase in the HDF Index.

75. The Western Railroads also coordinated when they would change their FSC. They agreed that the FSC would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March. The Western Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

76. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index

average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

77. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing FSC program. In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

78. As to NS, between March 2003 and December 2003, while positioning itself to quickly implement the FSC first announced by CSX, NS had regular discussions with the other Defendants, including discussions of what FSC was "acceptable" to them and the desirability of an industry-standard FSC.

79. As it had planned and prepared for from March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, a new FSC policy, which mimicked the policy announced by CSX in March 2003 and was intended to "standardize" NS's FSC with the FSCs of the other Defendants. As with CSX's program, NS would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase thereafter. Also like CSX, NS's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days.

80. After NS's announcement, all four Defendants had essentially uniform carload FSCs and remained in synch throughout the Relevant Period. By October 2004, CSX had changed its intermodal FSC formula to be aligned with BNSF and NS's in every respect. UP's was nearly identical, but looked to weekly, rather than monthly, fuel prices. When weekly fluctuations caused

UP's intermodal FSC to exceed the other Defendants', UP would "manually adjust the formula-driven amounts" to the other Defendants' FSCs. The synchronization continued through the end of the Relevant Period.

**PUBLICATION OF THE AIILF AND FIXING FSC RATES**

81. Even after having agreed to coordinate their FSCs, however, Defendants still faced a significant barrier to widespread use of FSCs: widely-used private contracts had cost escalation provisions that already accounted for fuel costs. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely-used cost escalation indexes, thereby paving the way for widespread imposition of the new FSC program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

82. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

83. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, who dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the "AIILF"). This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying

decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

84. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy—a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

85. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, and Matt led the charge on there, is that there's a new index that [the AAR] has that's basically an index without fuel . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future."

86. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), suddenly moved into lockstep with FSCs based on the WTI

Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

87. Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2%. The FSC would be adjusted upward at 2% for every $5 increase in the WTI average price.

88. The Eastern Railroads also coordinated when they would change their FSC—two calendar months after the WTI Index had adjusted, thereby adopting the same FSC price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same FSC percentage month after month. The Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

89. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their FSC programs: including using the WTI Index for FSCs, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

90. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF.

Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel costs. The FSC program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Relevant Period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

91. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to revenue (i.e., the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel cost increase percentage to the entire cost of the freight shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through these collective actions, Defendants BNSF, UP, CSX and NS planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on FSC prices to undercut one another.

92. In November of 2004, BNSF's CMO John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC

[Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for a mileage-based FSC program." The other Defendants "pushed back as expected." Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive rate-based FSCs.

93. With the conspiracy underway, the two Western Railroads, using the HDF Index, moved in lockstep and charged virtually identical FSCs on a monthly basis throughout the Relevant Period. The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began, but were identical starting in July 2003 through at least mid-2007.

**MONTHLY FSC PERCENTAGES – WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |

| | | |
|---|---|---|
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |

| | | |
|---|---|---|
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

94. As detailed above, there also was uniformity among the Eastern Railroads in the monthly FSC percentages, based on the WTI Index, that they charged customers for most of the Relevant Period. The chart below shows that the FSC percentages charged by Defendants CSX and NS for carload shipments varied before the Relevant Period, but were identical starting in March 2004 through at least mid-2007.

**MONTHLY FSC PERCENTAGES – EASTERN RAILROADS[1]**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |

[1] The fact that this Complaint includes charts of the monthly FSC percentages for the Western and Eastern Railroads that end only in mid-2007 is not meant to suggest that either the conspiracy or its effects ended in mid-2007.

| | | |
|---|---|---|
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06[2] | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

[2] On April 24, 2006, NS announced that it would "revise its fuel surcharge program," assessing a 0.3% surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3% for every dollar increase above $64 per barrel. While NS claimed to the STB that it was rebasing because of a "decision to reduce its fuel surcharge percentage," NS had calculated the rebased fuel surcharge "to bake in FSC [the existing fuel surcharges] to [base] rate." NS had determined that a 16.4% base rate increase would allow it a "full % [fuel surcharge] pass thru" under the new program. Importantly, NS executives discussed the rebasing plan with its counterparts at the other Defendants, who recognized that the new FSC program was an economic wash compared to the program announced in late 2003 (which continued to apply to shippers under earlier contracts in any event).

95. In stark contrast to this uniformity in FSC percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their FSCs to arrive at the identical percentage month after month, year after year. The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior and conspired to fix prices for FSCs. In addition, the advance announcements of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

96. Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below—including, in some cases, by adopting mileage-based FSCs—Defendants continued to engage in discussions concerning FSCs following the STB ruling, and to apply rate-based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before the STB Ruling.

97. While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (i.e., shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the FSCs applied to their intermodal business (i.e., shipments that travel by rail and one other mode of transportation such as truck or ship).

**IMPLEMENTATION OF THE SCHEME: DEFENDANTS' ACROSS-THE-BOARD APPLICATION OF FSCs**

98. Defendants recognized that their coordinated FSCs were more aggressive and could generate substantially more revenue. For example, describing the new FSC program that resulted from Defendants' coordination, CSX's John Couch remarked: "While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." In addition, an internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel,

raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

99. Defendants recognized that their new aggressive FSC program could be undermined by resistance from shippers and competition between the Defendant railroads. A 2003 internal NS memorandum recognized that moving to the more aggressive formula would "run the risk of losing the surcharge altogether. . . . The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC." And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

100. To ensure that shipper resistance would be muted, and to achieve their conspiratorial goals, each Defendant adopted policies to apply FSCs to 100% of its traffic and tracked its progress toward attaining that goal. It required "total FSC discipline" on all shipments, including intermodal. For example, in 2004, BNSF marketing leadership began an initiative to monitor FSC "adherence" on a quarterly basis. These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (e.g., shippers with expiring contracts that do not include an FSC). The reports—showing increasing FSC coverage each year—were presented to the chief marketing officer with a goal of achieving a 100% participation rate for BNSF's shippers. The same year, BNSF issued a "Mandate" that the "Marketing Team should strive for 100% fuel coverage by account" and a "business unit strategy of re-signing all expiring contracts with full fuel surcharge provisions."

101. Customers were forced to pay the FSCs despite one BNSF regional sales manager's report that "the response [to a 9% FSC pricing update] was ferocious." He requested some

"propaganda" because he could only "muddle through an explanation" that did not "satisf[y] anyone."

102. CSX also monitored its effectiveness in applying FSCs to its shippers, and started tracking its progress toward implementing its FSC mandate—that "[e]verything is subject to fuel surcharge." CSX tracked the progress that its individual marketing teams were making toward widespread FSC application, and tracked contracts without FSCs to ensure they would receive FSCs upon renewal. Its carload policy was indistinguishable from its intermodal policy. A 2006 CSX analysis projected increased coverage of its intermodal FSC on the presumption that "100% of contracts that come due will be renewed with full fuel surcharge."

103. Starting in early 2004, UP engaged in similar analyses. An analysis of UP's FSC coverage was also performed for the chief marketing officer—who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004." An internal presentation stated that UP had "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."

104. NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed division heads to identify "the largest remaining contracts (including annual revenue involved) that do not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007." An NS intermodal VP said, "Seniors are going to continue to push us aggressively" to avoid FSC exceptions. NS's VP of intermodal marketing reported in 2006 that there were only "a handful" of intermodal customers not paying the standard FSC and that efforts were being made to bring these customers onto the standard program. At this time, only one NS intermodal customer did not pay any fuel surcharge at all and NS expected to apply one when the agreement was renewed the next year.

105. Defendants policed the conspiracy by exchanging FSC coverage data. For example, at a meeting in fall of 2003 CSX-BNSF meeting attended by CSX's Director of Market Strategy John Couch and EVP of Sales and Marketing Clarence Gooden, BNSF told CSX the percentage of its carload and intermodal business having either an FSC or escalator clause. Subsequent to that meeting, Gooden asked Couch how CSX's coverage compared to BNSF's. After a meeting between BNSF and NS in late 2004, BNSF sent NS's SVP of Marketing Services Don Seale a report addressing FSC coverage for "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

106. In furtherance of the conspiracy, Defendants instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the FSCs were "not negotiable."

107. Defendants also enforced strict policies against discounting base rates to offset the standard FSCs. For example, in an internal NS email, NS's CMO (Don Seale) remarked, "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play." A 2004 presentation to BNSF's Consumer Products business unit,[3] which includes both domestic and international intermodal traffic, identified as part of "CEO's Goals for Marketing's Fuel Surcharge Programs" that

[3] BNSF has four business units: Agricultural Products, Coal, Consumer Products, and Industrial Products.

"Discounted programs unacceptable. CEO will not sign contracts not meeting the above criteria. . . . Minimize price/fuel surcharge tradeoffs."

108. As a result of these and related policies, any negotiations with their shippers about FSCs that took place started from the standard, supracompetitive FSC.

109. Even an individual Defendant's FSC formula that stayed the same during the Relevant Period as it was before Defendants conspired—like BNSF's intermodal FSC—caused shippers to pay supracompetitive prices because the conspiracy allowed Defendants to collect surcharges that were theretofore uncollectable due to customer resistance, Defendants' waiver, or competitive pressures. By uniformly applying and enforcing their FSCs, Defendants collected FSCs they would have been unable to collect from shippers but for their conspiracy.

110. In addition, Defendants applied their standard FSCs uniformly to all traffic and commodities. For example, in October of 2005, NS advised UP as follows: "We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."

111. And Defendants imposed standard FSCs on all shippers without regard to whether the shipper had access to alternative modes of transportation. In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers—shippers without access to alternative modes of transportation—have leverage in negotiating a better rate/serve package on traffic at single served facilities. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of

> competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

112. Before the conspiracy, captive shippers could negotiate out of the FSCs. But during the conspiracy they could not.

**EFFECT OF THE CONSPIRACY ON YANG MING**

113. Yang Ming's failed attempts to negotiate lower FSC rates illustrate the conspiracy's effect on Yang Ming and other shippers.

114. For example, prior to the conspiracy, Yang Ming and YMA were regularly able to negotiate FSC rates for their shipments with BNSF.

115. When Yang Ming and YMA found that their FSC payments were increasing during the period of the conspiracy, they sought lower rates with BNSF, including during contract renegotiations. This time, however, BNSF was unwilling to negotiate as it had before. To the contrary, BNSF demanded contracts with punishing rate hikes using an FSC formula set by BNSF itself.

116. As noted above, by March 2004, Defendants had synchronized their carload FSC policies, and by October 2004, Defendants had synchronized their intermodal FSC policies. As a result, Yang Ming and YMA had little choice but to accede to BNSF's demands.

117. Leveraging the conspiracy in its negotiations, BNSF was also able to lock Yang Ming and YMA into long-term contracts, preserving its supracompetitive pricing for years after the contracts were signed. Indeed, in the fall of 2010, even as Yang Ming's total shipments fell in the immediate aftermath of the 2008 financial crisis, its total costs *grew*, driven by high FSC rates.

118. The impact on Yang Ming and YMA was substantial. For instance, before the conspiracy period, Yang Ming and YMA paid negligible FSC rates to BNSF. In comparison, Yang Ming and YMA estimate that in 2008 they paid to BNSF FSC rates that topped 40%.

## THE STB DECISION

119. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the FSCs are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

120. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

121. As detailed above, pursuant to their conspiracy, Defendants applied the same unreasonable FSC practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## THE CONSPIRACY SUCCEEDS

122. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on FSCs, Defendants realized billions of dollars in revenues during the Relevant Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the FSC.

123. Defendants recognized that their coordinated FSCs in fact resulted in significant over-recovery of fuel price increases. NS, for example, recognized by July 2004 that "[c]urrent FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base," and Don Seale of NS testified that in 2005, NS's "increase in Fuel Surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."

124. UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." An October 2005 presentation shows UP estimated greater than 100% of incremental fuel cost recovery through FSCs for each of its six business groups.

125. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004. In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods, particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

126. This over-recovery applied to intermodal and carload traffic alike. BNSF recognized that Defendants' coordination of fuel surcharges for intermodal shipments made them a "'profit-center' . . . for the customers that participate." UP's finance department calculated a "recovery percentage" of 188% for its intermodal group for the first quarter of 2005.

127. By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

128. As a result, Defendants' conspiracy worked as planned to help to remove the competitive pressures that had kept their rates down for years. As the head of UP, James Young, admitted in 2007, "three, four years ago [the FSCs] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

129. Following Defendants' agreement to coordinate their FSCs, Defendants' total revenues skyrocketed during the Relevant Period, with the Defendants reporting record revenues and profits virtually every year. As noted above, Defendants themselves attributed these record figures in large part to FSCs.

130. As result of Defendants' conspiracy they were able to reverse the "destructive pricing for rail share" that led to their conspiracy. In the 2009 STB study referenced above, the STB concluded that "inflation-adjusted rail rates increased in 2005, 2006, and 2007," representing "*a significant change from prior years*, given that inflation-adjusted rail rates declined in every

year but one from 1985 through 2004." The STB concluded that while rising fuel costs contributed to the rate increases "*even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades*."

131. And a 2010 Senate Commerce Committee Report conducted a "review of the largest four railroads' Securities and Exchange Commission (SEC) filings," which it found "show[ed] just how profitable the large rail companies have become over the last decade. Figure 1 demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%." The referenced Figure 1 demonstrates that Defendants' profits spiked following their collective imposition of the new FSC regime described above:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

**<u>COUNT I</u>**
**<u>(Violation of Section 1 of The Sherman Act and Section 4 of the Clayton Act)</u>**

132. Plaintiffs incorporate by reference the allegations in the paragraphs above as if they were fully set forth herein.

133. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

134. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

135. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

136. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

137. The contract, combination, or conspiracy has had the following effects:

a. Prices charged to each Plaintiff for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Each Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c. Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

138. As a proximate result of the conspiracy described herein, each Plaintiff paid FCSs in connection with those unregulated rail freight transportation services that they would not have paid in the absence of the conspiracy; and the prices each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein.

139. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

WHEREFORE, Plaintiffs pray for relief as follows:

a. That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

b. That Plaintiffs recover compensatory damages, as provided by law, determined to have been sustained by Plaintiffs, and that judgment be entered against Defendants on behalf of Plaintiffs;

c. That Plaintiffs recover treble damages, as provided by law;

d. That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

e. For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

February 25, 2020

Respectfully submitted,

/s/ Benjamin D. Brown
*Benjamin D. Brown*
Benjamin D. Brown (DC Bar. No. 495836)
Robert A. Braun (DC Bar. No. 1023352.)
Leonardo Chingcuanco
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
lchingcuanco@cohenmilstein.com

*Attorneys for Yang Ming Marine Transport Corp. and Yang Ming (America) Corp..*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

CHS Inc.,

Plaintiff,

v.

Union Pacific Railroad Company, BNSF Railway Company, CSX Transportation, Inc., and Norfolk Southern Railway Company,

Defendants.

**JURY TRIAL DEMANDED**

Civil No. ____________________

**COMPLAINT**

Plaintiff CHS Inc. ("Plaintiff"), complains as follows:

**NATURE OF THE ACTION**

1. This is an antitrust action charging the four largest United States-based Class I railroads with price fixing in violation of Section 1 of the Sherman Act.

2. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (collectively, "Defendants") conspired to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States by imposing uniform rail fuel surcharges. A rail fuel surcharge is a separately-identified fee above and beyond the base rate for transportation and is charged by the railroads purportedly to compensate for increases in the cost of fuel ("Rail Fuel Surcharge"). Through their collective action, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' actual fuel costs, and thereby collected millions, if not billions, of dollars of additional profits during the conspiracy period, including millions of dollars in additional revenue from Plaintiff in this case.

3. Defendants' conspiracy has been the subject of class action litigation for several years. *See In re Rail Freight Fuel Surcharge Antitrust Litig. (Rail Freight)*, 292 F. Supp. 3d 14 (D.D.C. 2017). While denying class certification, the U.S. District Court for the District of Columbia, noted that the "documentary evidence is strong evidence of conspiracy and class-wide injury." *Id.* at 32. The Court found that the "evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges" was "substantial." *Id.* at 102. In particular, the Court found that there was "substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." *Id.* at 103.

4. Defendants' imposition of uniform Rail Fuel Surcharges faced a significant hurdle because Defendants already had a well-established and reliable mechanism for recovering their fuel costs. As of 2003, the vast majority of rail freight transportation agreements included rate escalation provisions based on an index called the All-Inclusive Index ("AII"), which weighted a variety of cost factors, including fuel. The AII already permitted full recovery by the railroads of actual fuel cost increases, no matter how large.

5. Defendants, however, orchestrated a scheme to remove fuel as a factor from the AII, thus allowing them to impose separate, stand-alone Rail Fuel Surcharges. A railroad trade organization called the Association of American Railroads ("AAR") published the AII. Defendants controlled and dominated the AAR, and the CEOs of each Defendant were members of the AAR's board. Through their collective action, Defendants caused the AAR to publish a new cost escalation index called the All-Inclusive Index Less Fuel ("AIILF") that did not include a fuel component.

6. The AAR's adoption and publishing of the AIILF as a result of Defendants' collective action paved the way for Defendants' widespread implementation of new Rail Fuel Surcharges. Defendants deployed these Rail Fuel Surcharges systematically, aggressively, and uniformly. These Rail Fuel Surcharges were based on mutually agreed

formulas that allowed Defendants to charge identical surcharge rates month after month. As the District Court noted, "the evidence shows that defendants employed these fuel surcharges in lockstep" and "sought to apply fuel surcharges to as many customers as possible." *Rail Freight*, 292 F. Supp. 3d at 104. These new "fuel surcharges" were not tied to the actual cost of fuel and, instead, were calculated as a percentage increase on the total base rate of freight transportation, allowing the "fuel surcharges" to function as an across-the-board increase on freight prices.

7. As a direct and proximate result of Defendants' price fixing conspiracy, Defendants restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff in its business and property. Plaintiff paid a higher price for unregulated rail freight transportation than it would have paid absent Defendants' concerted unlawful activity. Plaintiff spent millions of dollars on rail transportation provided by Defendants from 2003 through 2008, a significant amount of which appears to be attributable to Defendants' Rail Fuel Surcharges.

8. Plaintiff seeks damages for excessive rates imposed as a result of Defendants' conspiracy on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

## PARTIES

9. Plaintiff CHS Inc. ("Plaintiff") is a Minnesota cooperative corporation with its principal place of business in Inver Grove Heights, Minnesota. Plaintiff purchased unregulated rail freight transportation services from Defendants during the 2003 through 2008 conspiracy period. During 2003 through 2008, one or more of the Defendants assessed Rail Fuel Surcharges on Plaintiff in connection with that unregulated rail freight transportation. The prices Plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the

prices Plaintiff would have paid absent the conspiracy alleged herein. Plaintiff has been injured in its business and property as a result of Defendants' antitrust violations.

10. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and it maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

11. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States, and it maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

12. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and it maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

13. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and it maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

**JURISDICTION AND VENUE**

14. Plaintiff brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages as well as reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiff because of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15. This Court has jurisdiction under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

16. Venue is proper in this judicial District under 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391. During the period of Defendants' conspiracy, one or more of the Defendants resided, transacted business, were found, or had agents in this District. A substantial part of the events giving rise to Plaintiff's claims occurred in this District. A substantial portion of the affected interstate trade and commerce described below took place in this District.

17. This Court has personal jurisdiction over each Defendant because each Defendant transacted business in this District, directly or indirectly marketed, sold and delivered rail transportation services in this District, has substantial aggregate contacts with this District, and engaged in an illegal price fixing conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this District.

**INTERSTATE TRADE AND COMMERCE**

18. Defendants' unlawful activities had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

19. During the period of the conspiracy, Defendants accounted for over 90% of all rail shipments within the United States.

20. The activities of Defendants and their co-conspirators were within the flow of and substantially affected interstate commerce. Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Defendants used instrumentalities of interstate commerce to sell and market rail freight transportation services.

**DEREGULATION OF THE RAILROAD INDUSTRY**

21. Congress deregulated the railroad industry when it passed the Staggers Rail Act of 1980 ("Staggers Act"). The Staggers Act caused a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of

railroads' economic operations, the Staggers Act freed the railroads to set market rates for rail freight transportation.

22. Before the Staggers Act, freight railroads generally would only charge the published tariff rates that the railroads filed with the U.S. government's Interstate Commerce Commission. During this pre-Staggers Act time period, railroads could apply to the Interstate Commerce Commission for across-the-board rate increases which could then lawfully be implemented on a collective basis.

23. After passage of the Staggers Act, by contrast, more than 75% of all rail shipments move under private transportation contracts that are not rate-regulated or that otherwise are exempt from rate regulation. For this rate-unregulated traffic, the railroads cannot turn to an agency to obtain across-the-board increases in freight rates and cannot lawfully collude to set those rates.

24. The railroad industry also became highly concentrated with the four defendant railroads (BNSF, UP, CSX, NS) operating over 90% of all railroad track in the U.S. and accounting for approximately 94% of all rail freight revenue. Because there are high fixed costs and significant barriers to entry in the railroad industry, there is only a fringe or niche market of smaller carriers and these carriers provide only negligible competition. This combination of a highly concentrated market protected by high barriers to entry provided Defendants with an environment conducive to anti-competitive conduct and collusive pricing.

25. Congress deregulated the railroad industry in large part to try to promote competition and reduce freight rates. But the defendant railroads took advantage of their oligopolistic industry by conspiring to collectively charge shippers supracompetitive rates.

## DEFENDANTS INTRODUCE FUEL SURCHARGES

26. By the early 2000s, the railroad industry had consolidated to the point where further mergers were unlikely if not impossible. In March 2000, in response to a proposed merger between Defendant BNSF and Canadian National Railway Co., the U.S. government's Surface Transportation Board (the successor to the Interstate Commerce

Commission) imposed a moratorium on new mergers. The Surface Transportation Board then promulgated more standards for merger review, effectively cutting off further consolidation as an avenue for revenue growth.

27. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. Due to deregulation, Defendants could no longer turn to the Interstate Commerce Commission or later to the Surface Transportation Board for across-the-board rate increases, nor could Defendants unilaterally raise rates without losing market share to their competitors.

28. Faced with the threat of competition from one another, Defendants could not unilaterally raise prices through the use of Rail Fuel Surcharges or through other means. As BNSF noted in a 2002 internal report, "our rail competitors do not [use fuel surcharges,] and we therefore are hard pressed to achieve it." *See Rail Freight*, 292 F. Supp. 3d at 103. In a January 2003 memo, BNSF's then-Chief Marketing Officer Chuck Schultz noted that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104.

29. Unlike the risk of competition amongst each other, Defendants were well protected from outside competition. The railroad industry's significant barriers to entry—such as high fixed costs required to create and maintain railroad infrastructure—gave Defendants a large competitive advantage over potential new entrants. Defendants' businesses were concentrated in commodities and distances over which rail is the most cost-efficient mode of transportation, significantly reducing the risk of competition from non-railroad competitors.

30. Defendants were protected from the threat of competition from outsiders but were not able to raise prices unilaterally without ceding market share to each other. The only practicable way for Defendants to increase prices across-the-board without sacrificing short-term revenues was through a uniform surcharge applied to as many customers as possible. Under the guise of addressing rising fuel prices, Defendants colluded to create and implement the Rail Fuel Surcharges, which effectively operated as across-the-board

rate increases.

31. After passage of the Staggers Act, the railroads increasingly entered into private freight transportation contracts that included cost escalation provisions tied to the AII and the Rail Car Adjustment Factor ("RCAF"), which is based on the AII. The AAR published both the RCAF and the AII, and both indexes included fuel costs as a factor. The AII and RCAF weighted a number of cost factors—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses—so that the actual impact of particular cost increases (e.g., for fuel) would be reflected in the index. The AII and RCAF would capture any actual increase in fuel costs no matter how small or large. The indexes and the weighted factors within them were designed for this purpose.

32. In 2003, Defendants seized upon fuel as the means to create the type of across-the-board rate increases that the railroads could no longer achieve through a regulatory process. Defendants embarked on and implemented an agreed plan to remove fuel costs from the AII (and thus from the RCAF based on the AII) so that Defendants could apply separate "fuel surcharges." Defendants controlled and dominated the AAR and conspired to cause it to publish the AIILF. This new index no longer weighted fuel against other cost factors, allowing Defendants to use the separate "fuel surcharges" to raise total freight prices by a given percentage—and that is precisely what Defendants proceeded to do.

33. Prior to 2003, at least some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, but Defendants applied these fuel surcharges only in isolated instances, and each Defendant had different fuel surcharge rates, reflecting among other things the differing fuel costs of each railroad. At that time, such surcharges were the exception, and railroads widely used the AII and RCAF indexes to capture fuel costs as well as other costs. Defendants, then acting unilaterally and without the benefit of coordination, faced difficulties forcing shippers to accept fuel surcharges due to competition. As a result, prior to July 2003, Defendants did not consistently apply fuel

surcharges to all contracts and often modified or waived fuel surcharges in exchange for base rate increases.

## DEFENDANTS' FIRST STEPS OF PRICE COLLUSION

34. In 2003, Defendants took a series of coordinated actions to switch to a new system that would allow the uniform, widespread use of Rail Fuel Surcharges, not merely as a cost recovery device but as a mechanism to enhance revenue.

35. From at least the spring of 2003 and continuing through at least 2008, top executives from each Defendant met with each other regularly. Defendants' top executives met and discussed their industry at AAR board meetings and biannual meetings of the National Freight Transportation Association. These meetings and others among Defendants' executives provided the opportunity for discussion and, ultimately, coordination of Defendants' fuel surcharge programs.

36. Western Railroads. As early as July 2003, the two western railroads, BNSF and UP, began to coordinate their Rail Fuel Surcharges. Prior to this time, UP had adjusted its fuel surcharge monthly based on the price of West Texas Intermediate crude oil settled in Cushing, Oklahoma ("WTI Index"). In contrast, BNSF had based its fuel surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF Index"). In or about July 2003, UP switched to the HDF Index pursuant to an agreement with BNSF. From that point on, BNSF and UP moved in lockstep and charged the exact same Rail Fuel Surcharge percentage each month through at least 2007. BNSF and UP calculated these Rail Fuel Surcharges as a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for the transport job.

37. BNSF and UP agreed to administer their HDF Index-based Rail Fuel Surcharges in precisely the same way. If the HDF Index measured the U.S. average price of diesel fuel as equal to or lower than $1.35 per gallon, BNSF and UP did not apply a surcharge. When the HDF Index exceeded $1.35 per gallon, BNSF and UP both applied a surcharge of 0.5% of the total base rate for every five-cent increase above $1.35 per gallon.

For example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2% of the total base rate.

38. BNSF and UP also coordinated when they would change their fuel surcharge. They agreed that they would apply the Rail Fuel Surcharge to shipments beginning the second calendar month after a change in the HDF Index average price calculation. If the HDF index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments occurring in March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

39. BNSF's and UP's agreement and coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs—including using the HDF Index, setting the trigger point at $1.35 per gallon of diesel fuel, employing a 0.5% surcharge for every five-cent increase above the trigger price, and applying the surcharge in the second calendar month after the HDF Index average price had changed.

40. UP's adoption of the same Rail Fuel Surcharge plan as BNSF in July 2003 is striking evidence of concerted conduct. Just two months earlier, UP had announced an entirely different modification to its then-existing fuel surcharge program. In April 2003, UP modified the trigger points it used for adjusting surcharges in its program but did not change the index it employed. The fact that two months later UP switched indexes and began charging exactly the same surcharges as BNSF indicates that UP's switch was the result of concerted conduct with BNSF.

41. Even after agreeing to coordinate their fuel surcharges, BNSF and UP still faced a significant barrier to widespread use of fuel surcharges. Most shipment contracts contained cost escalation provisions based on the AII or the RCAF, which is based on the AII. The AII and RCAF indexes already accounted for fuel in their escalation rates and allowed Defendants to accurately recover for any increases in fuel costs no matter how

high. Defendants agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, paving the way for widespread imposition of the new fuel surcharge program in which all four Defendants could participate and from which they could enjoy excessive profits.

42. In the fall of 2003, BNSF and UP initiated an effort to get all Defendants to agree to remove fuel costs as a factor from the AII (and thus the RCAF based on the AII) and to instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism. Defendants agreed to create and implement coordinated fuel surcharge programs, and to enforce their agreement through a variety of means.

43. Defendants dominated the AAR board and caused the AAR to announce in December 2003 the creation of an unprecedented new All Inclusive Index Less Fuel ("AIILF"). Per the AAR's announcement in December 2003, the new AIILF "is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement and the underlying decision to create the new fuel-excluded index were the product of Defendants' collective action and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

44. Defendants conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step that Defendants took collectively to allow implementation and continuation of their price fixing conspiracy—a conspiracy to widely impose fuel surcharges against the entire cost of rail freight transportation and thereby to obtain additional revenues far beyond any actual increases in fuel costs.

45. Never in the AAR's history had it created a cost escalation index without a fuel component. This action was a notable departure from the established practice in the industry.

46. Eastern Railroads. Almost immediately after the announcement in December 2003 of the new All Inclusive Index Less Fuel, and pursuant to the conspiracy, the two eastern railroads, CSX and NS, suddenly moved into lockstep with fuel surcharges based on the WTI Index. This synchronization was part and parcel of, and flowed from, the agreements reached and implemented by Defendants in late 2003.

47. CSX and NS agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. CSX and NS increased their rates by 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel. For example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2%.

48. CSX and NS also adopted the same fuel surcharge price timing used by BNSF and UP. Like BNSF and UP in the west, CSX and NS in the east changed their fuel surcharges two calendar months after the WTI Index had adjusted. If the WTI average price exceeded $23 per barrel in January, the eastern railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge percentage month after month. Like BNSF and UP, CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

49. CSX's and NS's agreement and coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs—including using the WTI Index, setting the trigger point at $23 per barrel, employing a 0.4% surcharge for every $1 increase above the trigger price, and applying the surcharge in the second calendar month after the average price of WTI oil had changed.

50. After the conspiratorial publication of the AIILF, Defendants began to apply Rail Fuel Surcharges as a separate item on shippers' bills. Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues in an across-the-board manner. While facially different, the WTI-based Rail Fuel Surcharges employed by

CSX and NS in the east, and the HDF-based Rail Fuel Surcharges employed by BNSF and UP in the west, in practice produced nearly identical rate escalations.

51. There was no legitimate business justification or natural explanation for the collective action of Defendants to cause the AAR to adopt and publish the AIILF or collectively to adopt rate-based Rail Fuel Surcharges. Such "revenue-based" fuel surcharges bore no direct relationship to Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted Defendants to recover all of their increased fuel costs throughout the conspiracy period. As a result, Defendants' motivation in collectively causing the adoption of the AIILF could not have been to obtain more accurate or more efficient fuel cost recovery. Nor were Defendants' actions independent responses to any common problem of increasing or unrecovered fuel costs.

52. The creation and publication of a cost escalation index without a fuel component was not mandated by any regulatory body and was not necessary for any Defendant to institute its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action of Defendants to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges that bore no relationship to actual fuel costs.

53. As a result of the concerted action among Defendants, prices of Rail Fuel Surcharges charged to rail shippers and customers like Plaintiff were raised to or maintained at supracompetitive levels during the conspiracy period.

**<u>THE RAIL FUEL SURCHARGE SCHEME</u>**

54. Defendants agreed in 2003 to remove fuel from the AII and RCAF. This allowed Defendants to apply separate Rail Fuel Surcharges as a percentage-multiplier on



US.133281352.01

DA09782

the total base rate for the rail freight transportation. These Rail Fuel Surcharges operated as an effective across-the-board rate increase, raising revenue far beyond the actual costs of fuel (which could have been accurately recovered through the AII and RCAF). Defendants applied these surcharges not only to published tariff rates but to the private contracts and other traffic not subject to rate regulation under federal law—such as the unregulated rates at issue here.

55. Pursuant to the conspiracy, BNSF and UP used the HDF Index, moved in lockstep, and charged identical Rail Fuel Surcharges on a monthly basis. The chart below shows that BNSF's and UP's Rail Fuel Surcharge percentages for freight shipments were different and varied before July 2003 and were identical starting in July 2003.

Monthly Surcharge Percentages – Western Railroads

| Month | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0.0% |
| Jul-02 | 1.0% | 0.0% |
| Aug-02 | 0.0% | 0.0% |
| Sep-02 | 0.0% | 0.0% |
| Oct-02 | 1.0% | 0.0% |
| Nov-02 | 2.0% | 0.0% |
| Dec-02 | 2.5% | 0.0% |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |

| | | |
|---|---|---|
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

56. CSX and NS also charged customers uniform monthly Rail Fuel Surcharges. CSX and NS based their Rail Fuel Surcharges on the WTI Index. The chart below shows that CSX's and NS's Rail Fuel Surcharge percentages for carload shipments were different and varied before March 2004 and were identical starting in March 2004 (shortly after the introduction of the AIILF) through at least June 2007.

Monthly Surcharge Percentages – Eastern Railroads

| Month | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |

| **Mar-04** | **4.8%** | **4.8%** |
|---|---|---|
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

57. In stark contrast to this uniformity in Rail Fuel Surcharge percentages, fuel costs as a percentage of operating costs and fuel efficiency differed widely among Defendants. Collusion is the only rational explanation for Defendants in both the east and the west having identical Rail Fuel Surcharges percentages month after month for over three years. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix

prices for Rail Fuel Surcharges. The advance announcement of each Defendant's Rail Fuel Surcharge rate was an important implementation and enforcement mechanism for the conspiracy.

58. Defendants' use of Rail Fuel Surcharges tied to a percentage of the total base rate rather than the actual cost of fuel allowed them to over-recover their actual fuel costs.

59. Defendants' Rail Fuel Surcharges were also not aligned with Defendants' actual fuel costs because the surcharge rates did not account for Defendants' improvements in fuel efficiency. By calculating fuel surcharges as a percentage of the base shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

60. Defendants' uniform pricing only could have been achieved through an express agreement followed by collective action decoupling fuel prices from the historical cost indexes and agreeing to follow new, uniform programs for imposing stand-alone fuel surcharges. Defendants' purpose was to use increasing fuel costs as a pretext for implementing what were, in effect, across-the-board rate increases.

61. Defendants' behavior in implementing their uniform Rail Fuel Surcharge programs advanced their collusive interest, and was inconsistent with Defendants individually pursuing their independent, unilateral self-interest. In a competitive environment free of collusion, carriers with lower fuel costs could impose a lower surcharge and increase market share at the expense of competing railroads. Similarly, if a competitor increased their surcharge prices, another carrier could maintain its current prices and attract market share away from its now-higher-priced competitor. Defendants did not engage in such competitive behavior and instead adhered to a collusive, industrywide pattern of uniform fuel surcharge pricing based on the total base rate of the shipment.

**OTHER ELEMENTS OF THE CONSPIRACY**

62. At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, Defendants took additional steps to further the conspiracy. First, Defendants began

publishing their Rail Fuel Surcharges publicly on their websites, facilitating detection of any deviations from the collusive pricing.

63. Second, Defendants largely switched from offering long-term contracts to offering contracts that were "re-priced" as often as monthly. Prior to the conspiracy, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether. This switch allowed Defendants to quickly adjust pricing if they observed any defection.

64. Defendants made this switch away from long-term contracts even though most shippers preferred the former system as a means to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume these greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should in turn promote competition among carriers for their business. Instead, each of the Defendants raised their prices and did not offer any compensation to customers for assuming the additional risk of short-term contracts. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. Defendants collectively refused to offer long-term contracts and took no steps (other than their mutual conspiracy) to minimize their own risks from fluctuations in demand.

65. Third, in furtherance of the conspiracy, Defendants declined to negotiate individual discounts on the Rail Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for Defendants at least to entertain such negotiations. Shippers from many industries, some with significant economic power, tried to negotiate their fuel surcharge percentages, but were now told by Defendants that the Rail Fuel Surcharges were "not negotiable." In December 2002, before the conspiracy began, rail customer U.S. Magnesium negotiated out of the application of a fuel surcharge with UP. *Rail Freight*, 292 F. Supp. 3d at 100. One short year later, after the conspiracy had begun, U.S. Magnesium was unable to do so because UP refused—U.S. Magnesium was

informed that "all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management." *Id.*

66. NS's Vice President David Lawson admitted that "there was a policy [at NS] to apply the standard fuel surcharge to as many customers as possible." *Id.* at 104. BNSF's Chief Economist Sam Kyei emailed BNSF's Chief Marketing Officer John Lanigan and explained that contracts requiring the CEO's signature "but excluding full fuel surcharge provisions [would] not be signed." *Id.* This lack of negotiation aided Defendants in standardizing pricing along the lines of their collusive agreement and made monitoring pricing among the co- conspirators easier.

67. Fourth, in furtherance of the conspiracy, Defendants decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the terminating railroad for routes involving more than one railroad. Where a shipment required movement on more than one railroad, Defendants moved increasingly to having rates billed separately for each railroad, rather than as one quote for the entire shipment. Defendants made this change, which could only result from their collective action, as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each Defendant to bill separately for its applicable fuel surcharge.

68. Fifth, in furtherance of the conspiracy, Defendants agreed that none of them would undercut agreed pricing or "steal" market share by using their increased revenues to subsidize discounting of their underlying rates. Defendants' market shares remained stable following the 2003 agreements.

**DEFENDANTS' SUPRACOMPETITIVE PROFITS**

69. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, Defendants realized billions of dollars in revenues in excess of their actual fuel costs. Defendants obtained these supracompetitive profits at the expense of Plaintiff and the other customers on whom Defendants imposed their surcharges during the conspiracy period.

70. Defendants reported increased revenues attributable to fuel surcharges in their public filings during the conspiracy.

71. During the period of the conspiracy from July 2003 through at least December 2008, Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy.

72. Because of Defendants' unlawful conduct, the Rail Fuel Surcharges Defendants charged Plaintiff for unregulated rail freight transportation were fixed or stabilized at supracompetitive levels. Defendants' conspiracy deprived Plaintiff of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation and unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid in the United States for unregulated rail freight transportation. These effects began in 2003 and persisted through at least 2008.

73. Plaintiff sustained injury to its business or property as a direct result of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act. Plaintiff was injured by paying supracompetitive prices applied to unregulated rail freight transportation throughout the U.S. as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade. The federal laws were designed to punish and prevent the type of antitrust injury that Plaintiff suffered here.

## COUNT I

## Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

74. Plaintiff incorporates the allegations in the paragraphs above.

75. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

76. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

77. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of and substantially affected interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements between Defendants.

78. Defendants' contract, combination, or conspiracy has had at least the following effects:

a. Prices Defendants charged Plaintiff for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Defendants' conduct deprived Plaintiff of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c. Defendants' conduct unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid for, customers of, and territories for rail freight transportation services.

79. As a proximate result of Defendants' unlawful conduct, Plaintiff suffered

injury in that it paid supracompetitive prices for unregulated rail freight transportation services.

## PRAYER

Plaintiff is entitled to relief and respectfully requests that:

(1) this Court adjudicate and decree that the unlawful contract, combination, and conspiracy alleged in Count I was an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

(2) Plaintiff recover compensatory damages as provided by law and that this Court enter judgment against Defendants on behalf of Plaintiff;

(3) this Court permanently enjoin and restrain each Defendant's respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, from continuing or maintaining the combination, conspiracy, or agreement at issue in this case;

(4) Plaintiff recover treble damages as provided by law;

(5) Plaintiff recover the costs of the suit, including attorneys' fees and expenses, as provided by law; and

(6) Plaintiff recover such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

In accordance with FRCP 38(a), Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: June 29, 2021

Respectfully submitted,

/s/ William L. Roberts

William L. Roberts (MN # 0212763)
william.roberts@faegredrinker.com
Jonathan W. Dettmann (MN # 0265032)
jon.dettmann@faegredrinker.com
Craig S. Coleman (MN # 0325491)
craig.coleman@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600

OF COUNSEL:
George T. Caplan (CA #043821)
george.caplan@faegredrinker.com
Kristopher S. Davis (CA #193452)
kristopher.davis@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285

Attorneys for Plaintiff
CHS INC.

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| Axiall Corporation, Axiall, LLC, Westlake Styrene LLC, Westlake Petrochemicals LLC, Westlake Polymers LLC, Westlake Vinyls Inc., Westlake Vinyls Company LP, WPT LLC, Westlake Longview Corporation, and Westlake Management Services, Inc., | **JURY TRIAL DEMANDED** |
| *Plaintiffs,* | **AMENDED COMPLAINT** |
| v. | Civil Action No. 2:19-CV-01272-JDC-KK |
| BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company, | Judge James D. Cain, Jr.<br>Magistrate Judge Kathleen Kay |
| *Defendants.* | |

This is an antitrust action charging Defendants with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action against Defendants, from one or more of whom each Plaintiff directly purchased unregulated rail freight transportation services from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and by one or more of whom each Plaintiff was assessed a rate-based rail fuel surcharge ("FSC") for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

## NATURE OF THE ACTION

1. In 2003, the four largest United States-based Class I railroads engaged in an extraordinary series of meetings, phone calls, and email communications through which they embarked on a conspiracy – under the guise of a fuel cost recovery program – to apply and

enforce rail fuel surcharges across their customers in order to generate profits. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") (all together, "Defendants") together controlled about ***90 percent*** of rail freight traffic in the United States during the Relevant Period. Defendants used "rate-based" FSCs – *i.e.*, surcharges that use a percentage applied to the base rate for a shipment – as a means to impose across-the-board rate increases on rail freight shipments, a result that would have been prohibitively difficult to achieve on a contract-by-contract basis. Throughout the conspiracy and despite customer pushback against Defendants' FSCs, Defendants set aside their individual, economic self-interest to undercut one another and instead staunchly maintained their FSC program, pocketing billions of dollars in profits as a result.

2. Prior to conspiring, Defendants operated as businesses should: they actively competed against each other over rates generally and with respect to fuel recovery mechanisms to the benefit of their customers. According to a historical study of rail rates undertaken by the Surface Transportation Board ("STB"), "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Defendants were aware of, and concerned about, this trend. According to one CSX internal analysis from 2002, this decline resulted from factors including "some very vicious historical price wars" in the rail industry and "destructive pricing for rail share."

3. Between 2000 and 2003, Defendants independently tried to implement revenue-enhancing policies, including uncoordinated efforts to impose stand-alone FSCs. These efforts failed. Defendants used the inclusion or absence of FSCs as a basis to compete for each other's business and customers successfully resisted FSCs. They were rarely included in contracts and

more rarely collected; those seeking to impose them lost customers to competitors or compensated customers by negotiating discounts. For example:

> BNSF explained in a May 2002 Enterprise Wide Risk Assessment that "***We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace***. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. ***We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it***."

> In September 2002, NS's manager of pricing systems Pat Glennon reported to the then-Senior Vice President of Marketing Services and later its CMO Don Seale that ***"[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause***," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities."

> As late as April 2003, UP's Bob Toy reported, "***Fuel surcharge $ are melting away at the competition***. In a downward-pressure environment, what's on paper must not work in the real world."

4. Moreover, since the passage of the Staggers Act in 1980, which significantly deregulated the American railroad industry, railroads typically entered into private freight transportation contracts that included escalation provisions tied to indexes that weighted actual cost factors, including fuel cost. As UP President James Young acknowledged on an October 2004 earnings call, the Rail Cost Adjustment Factor ("RCAF") "looks at *actual* costs through the

industry." In that respect, Defendants were *already* recovering fuel costs through the RCAF or the related All Inclusive Index ("AII").

5. In March 2003, everything began to change. Rather than competing, Defendants began coordinating FSC programs. Senior executives at the highest levels of each company began to discuss with one another the implementation of more aggressive FSC formulas that the Surface Transportation Board ("STB") later found bore "***no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied . . . .***" In short, Defendants stopped competing and started conspiring.

6. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates. Simultaneously, UP's CMO Jack Koraleski was recommending escalation of UP's FSC program to be substantially more aggressive. ***The very next day***, Koraleski traveled to competitor CSX to play golf, socialize, and discuss "fuel surcharge methodology." ***Within one week***, CSX's leadership abruptly reversed course, abandoning its recommended FSC reduction and adopting a program ***matching*** UP's escalation.

7. On March 18, 2003, BNSF and NS senior executives met to discuss "***synchroniz[ing]***" FSCs. Action items for the meeting attended by John Lanigan (BNSF's CMO) and Don Seale stated: "BNSF's fuel surcharge is structured differently than NS, CSX and UP. ***Should BNSF's by [sic] synchronized with the other big players in the industry?***" The answer based on what followed: a resounding yes.

8. On March 20, 2003, CSX publicly announced a new, more aggressive FSC program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "***the same approach as the CSXT***." On April 4, 2003, UP sent a "concurrence" to

competitors that its new FSC program will "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "***This is sweet !!! Just like the CSXT.***"

9. On April 1, 2003, BNSF and CSX senior executives met. The agenda dictated that CSX's CMO Mike Giftos and BNSF's CMO John Lanigan were to discuss "***Fuel Surcharge***." Documents also reveal that, between April 2 and 6, 2003, NS's Seale and BNSF's Lanigan continued a prior discussion on "***the fuel surcharge issue***" at a National Freight Transportation Association meeting.

10. Similar to CSX's abandonment of a less aggressive FSC regime following a meeting with UP in March 2003, BNSF abandoned the internal consideration of an FSC program that could have been fairer for shippers. Between February and April 2003, BNSF had been "[l]eaning toward [a] Cost Per Mile" FSC formula (a mileage-based FSC which could have better correlated the resulting FSCs to actual fuel costs compared to the rate-based FSCs that Defendants broadly implemented during the conspiracy), but abandoned this approach. Instead, BNSF and UP adopted nearly identical *rate-based* FSCs. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, ***it exactly matches the BNSF FSC percentage progression***, including lag times and effective dates."

11. Defendants' employees recognized these new FSCs were not genuine fuel cost recovery mechanisms as Defendants sought to portray. For example, on March 19, 2003, CSX's Director of Market Strategy John Couch explained that while the coordinated FSC "***seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%***." On April 7, 2003, NS's Manager of Pricing Systems Pat Glennon recounted "[t]he case in favor of adopting the CSXT standard" to Don Seale and AVP Charlie Brenner,

writing the "CSXT standard ***clearly produces significantly more compensation, and it does it sooner and more consistently***." On April 29, 2003, Glennon told Seale that "[b]y dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, ***the change is in fact a <u>blatant general rate increase</u>***, and will appear so to customers."

12. Glennon was correct that customers saw the rate increases for what they were and were outraged. Handwritten notes from a June 2003 meeting between CSX and UP's senior executives – including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden, VP of Strategic Planning Les Passa, and Alan Blumenfield, and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan – reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes. The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

13. But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall***."

14. And, instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants maintained the scheme and imposed policies designed to ensure their new "standard" or "published" FSCs were enforced broadly across their customers without the waivers and discounts they had frequently offered between 2000 and 2002:

**BNSF**: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "***Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed.***"

**UP**: On December 22, 2003, a sales representative explained to a customer, "As a company policy, all ***contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice***."

**CSX**: A May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence Gooden stated that any exception had to come through him and that he had zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***."

**NS**: A 2004 email from Don Seale to his subordinates mandated "***no deviation from NS's published FSC without [his] prior approval***." He also rejected any negotiations to forego base rate increases in return for FSC application as a "shell game."

15. In the fall of 2003, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to get all Defendants to agree to remove fuel costs out of the weighted RCAF and AAI indices (which already permitted the Defendants to recover all of their fuel costs), so that they could more easily charge artificially high FSCs as a revenue enhancement mechanism. As a result, the AAR—whose board was dominated by Defendants—created an unprecedented All Inclusive Index *Less Fuel* ("AAILF"). Defendants' conspiratorial

implementation of the AAILF allowed Defendants to move away from use of the RCAF and more easily apply their FSCs.

16. Defendants worked tirelessly to achieve 100 percent FSC coverage across their customers. All four Defendants pursued 100 percent participation goals and tracked their progress toward attaining that goal. Defendants also policed the conspiracy by exchanging FSC coverage data with one another. In addition, Defendants started their negotiations using the standard FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (*i.e.*, facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

17. Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150 per barrel during the Relevant Period, so did Defendants' profits. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," and included the following chart documenting the significant growth in profits during the Relevant Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

18. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") similarly found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

19. Defendants also attributed their record revenues to FSCs. For example:

**NS**'s 2006 "***[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase*** and modestly higher traffic volume."

**BNSF**'s freight revenues "***increased 15 percent [in 2006] to a record high of $14.5 billion*** on double-digit increases in each of our four business units." "***Growth in prices and fuel surcharges*** drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

**UP** "achieved record revenue levels [in 2006] in all six of our commodity groups, ***primarily driven by better pricing and fuel surcharges***."

**CSX**'s operating revenue increased $948 million in 2006; "the primary components of the revenue gain" were "continued yield management ***and the Company's fuel surcharge program, which drove revenue per unit across all major markets.***"

**PARTIES**

20. Plaintiff **Axiall Corporation** ("Axiall Corp.") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056. Axiall Corp., an integrated chemicals and building products company, was created in 2013 following Georgia Gulf's merger with PGC's commodity Chemicals business. Axiall Corp. brings this action in its own name and as successor-in-interest to any and all claims held by **Georgia Gulf Corporation** ("Georgia Gulf") and **Georgia Gulf Lake Charles, LLC** ("Georgia Lake"). During the Relevant Period, Georgia Gulf was an integrated manufacturer and marketer of quality chemical and plastic products, primarily chlorovinyls and aromatic chemicals, to end users in the United States and internationally. During the Relevant Period, it had manufacturing plants throughout the U.S., including in Louisiana, Texas, New Jersey, Tennessee, Mississippi, Delaware, and Oklahoma. On information and belief, during the Relevant Period, Georgia Gulf purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its manufacturing facilities and to transport its finished chlorovinyls and aromatic chemical products from those facilities to customers nationwide. During the Relevant Period, Georgia Lake was an aromatic chemicals company that manufactured and sold chlorine and chlorine-based products. It had manufacturing facilities in Lake Charles, Louisiana. On information and belief, during the

Relevant Period, Georgia Lake purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its manufacturing facilities and to transport its finished aromatic chemical products from those facilities to customers nationwide.

21. Plaintiff **Axiall LLC** ("Axiall LLC") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056. Axiall LLC is a chemical preparations manufacturing company. It was created in 2013 as a successor to Georgia Gulf Chemicals & Vinyls, LLC. ("Georgia Chemicals"). Axiall LLC brings this action in its own name and as successor-in-interest to any and all claims held by **Georgia Gulf Chemicals & Vinyls, LLC**. During the Relevant Period, Georgia Chemicals was an industrial organic chemicals company with manufacturing facilities in Pasadena, Texas. On information and belief, during the Relevant Period, Georgia Chemicals purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its manufacturing facilities and to transport its finished industrial chemical products from those facilities to customers nationwide.

22. Plaintiff **Westlake Styrene LLC** ("Westlake Styrene") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056. Westlake Styrene is a producer of styrene monomer products for use in applications such as injection molding, disposables, food packaging, housewares, paints and coatings, resins, building materials, and toys. Westlake Styrene brings this action in its own name and as successor-in-interest to any and all claims held by **Westlake Styrene LP** ("Styrene LP"), which was converted from a limited partnership to Westlake Styrene in 2007. On information and belief, during the Relevant Period, Westlake Styrene and Styrene LP purchased unregulated rail freight services directly from one or more of

the Defendants to transport raw materials to its manufacturing facilities in Sulphur, Louisiana and to transport its finished industrial chemical products from that facility to customers nationwide.

23. Plaintiff **Westlake Petrochemicals LLC** ("Westlake Petro") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056. Westlake Petro is a manufacturer and supplier of petrochemicals and fabricated products, including polyethylene, epolene polymers, and vinyls. Westlake Petro brings this action in its own name and as successor-in-interest to any and all claims held by **Westlake Petrochemicals LP** (Petro LP"), which was converted from a limited partnership to Westlake Petro in 2007. On information and belief, during the Relevant Period, Westlaw Petro and Petro LP purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its manufacturing facilities in Lake Charles, Louisiana and Longview, Texas and to transport its finished petrochemicals and fabricated products from that facility to customers nationwide.

24. Plaintiff **Westlake Polymers LLC** ("Westlake Poly") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056. Westlake Poly is a manufacturer of polymers, including petrochemicals, vinyls, polymers, and other fabricated products for use in packaging, coating, residential and commercial construction, and other industries throughout the world. Westlake Poly brings this action in its own name and as successor-in-interest to any and all claims held by **Westlake Polymers LP** ("Poly LP"), which was converted from a limited partnership to Westlake Poly in 2007. On information and belief, during the Relevant Period, Westlake Poly and Poly LP purchased unregulated rail freight services directly from one or more

of the Defendants to transport raw materials to its manufacturing facilities and to transport its finished polymer products from those facility to customers nationwide.

25. Plaintiff **Westlake Vinyls Inc.** ("Vinyls Inc.") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056. Westlake Vinyls is a manufacturer of synthetic chemicals such as PVC, plastic materials, and resins used in residential siding, pipe and fittings for various water, sewer and industrial applications. Westlake Vinyls brings this action in its own name and as successor-in-interest to any and all claims held by **Westlake PVC Corporation** ("Westlake PVC"), which was merged into Westlake Vinyls in 2017. On information and belief, during the Relevant Period, Westlake Vinyls purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its facilities in Geismar, Lousisiana and Calvert City, Kentucky, and to transport its finished synthetic chemical products from that facility to customers nationwide. On information and belief, Westlake PVC purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its manufacturing facilities and to transport its finished products from those facilities to customers nationwide.

26. Plaintiff **Westlake Vinyls Company LP** *f/n/a* Geismar Vinyls Company LP ("Westlake Vinyls") is a limited partnership organized under the laws of the state of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056.[1] Westlake Vinyls is a manufacturer of chemical and plastic products, such as olefin, vinyl, polyethylene, epolene polymer, and safety data sheet. On information and belief, during the

[1] Geismar Vinyls Company LP changed its name to Westlake Vinyls Company LP in 2005. Westlake Vinyls also does business as Southwest Westlake Vinyls Company, LP.

Relevant Period, Westlake Vinyls purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its manufacturing facilities in Geismar, Louisiana and to transport its finished chemical and plastic products from those facilities to customers nationwide.

27. Plaintiff **WPT LLC** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056; WPT LLC brings this action in its own name and as successor-in-interest to any and all claims held by **WPT LP** (together with WPT LLC, "WPT"), which was merged into WPT LLC in 2007. On information and belief, during the Relevant Period, WPT purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its facilities in Sulphur, Louisiana and to transport its finished products from that facility to customers nationwide.

28. Plaintiff **Westlake Longview Corporation** *f/k/a* Westlake NG II Corporation ("WLC") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056.[2] WLC manufactures and supplies petrochemicals and fabricated products such as plastic chemicals, vinyl, polymers, and other fabricated products for use in packaging, automotive, and coatings, and in residential and commercial construction. On information and belief, during the Relevant Period, it purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its manufacturing facilities and to transport its finished petrochemical and fabricated products from those facilities to customers nationwide.

[2] Westlake NG II Corporation changed its name to Westlake Longview Corporation in 2006.

29. Plaintiff **Westlake Management Services, Inc.** ("Westlake Management") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2801 Post Oak Blvd., Suite 600, Houston, TX 77056. Westlake Management is a manufacturer of plastics products. On information and belief, during the Relevant Period, Westlake Management purchased unregulated rail freight services directly from one or more of the Defendants to transport raw materials to its manufacturing facilities and to transport its finished plastics products from those facilities to customers nationwide.

30. As a proximate result of the conspiracy described herein, each Plaintiff paid FSCs in connection with the unregulated rail freight transportation services obtained from Defendants that they would not have paid in the absence of the conspiracy; and therefore the prices each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

31. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

32. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States, and maintains coordinated

schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

33. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

34. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

**JURISDICTION AND VENUE**

35. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiffs by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

36. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

37. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to each Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

38. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**INTERSTATE TRADE AND COMMERCE**

39. During the Relevant Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

40. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

41. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

**DEREGULATION OF THE RAILROAD INDUSTRY**

42. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 (“Staggers Act”). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

43. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

44. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

45. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry is now (and was during the Relevant Period) highly concentrated: four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (*i.e.*, the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

46. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

**DEFENDANTS SEEK UNSUCCESSFULLY TO RAISE RATES BEFORE THE RELEVANT PERIOD**

47. For many years before the Relevant Period, Defendants confronted a long-term, structural decline in rail freight rates. Indeed, according to the Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of Railroad Rates: 1985-2007*, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Figure 1 from the *Study of Railroad Rates* evidences that trend:




48. Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts by the individual Defendants to apply stand-alone FSCs. Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

49. During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs. The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an internal analysis as "some very vicious historical price wars" and "destructive pricing for rail share." A 2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? ***We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy***.

50. During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs. By way of example:

> **NS**: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty." VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it." The same month, Director of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC." In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and

"[t]his does have competitive implications for NS." Glennon testified that in 2001 and 2002, FSCs were only "***theoretically billable***."

**CSX**: In August 2000, CSX reported at a staff meeting that it could collect only 67.4 percent of the then-modest FSCs it had billed over the preceding nine months. EVP of Sales and Marketing Clarence Gooden testified that CSX's FSC coverage was "***very low***" and that he was "***embarrassed***" by the figure.

**BNSF**: In May 2002, BNSF's Enterprise Wide Risk Assessment explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, EVP and CMO Charles Schultz told Chairman, President, and CEO Matthew Rose and other executives, "***any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive***." Schultz's successor John Lanigan testified BNSF's FSC coverage was "low" in January 2003 – "in the 25 to 30 percent range."

**UP**: Current EVP and CFO Robert Knight Jr. testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position." UP implemented an FSC program in December 2002, but initially limited the application of that program to certain tariffs and circulars and exempted private shipments in its Industrial Products group from FSCs. This was true even though FSCs were generally not triggered and only "theoretically billable." And in April 2003,

Director Bob Toy reported, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

51. The reason Defendants were not able to achieve broader FSC coverage was clear: Defendants were concerned about losing business to other Defendants that did not apply FSCs, made concessions, or otherwise applied FSCs less aggressively. Defendants expressed these concerns internally and, in fact, lost business through FSC competition. Each Defendant also frequently agreed not to apply FSCs in the face of shipper objections.

52. For example, in May 2002, BNSF reported that it was challenging to impose FSCs because its main western competitor, "UP[,] does not use a fuel surcharge in the competitive marketplace." It continued, "rail competitors do not [use FSCs] and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, NS reported that its main eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS."

53. And, in May 2003, BNSF announced that it would ***reduce*** its standard FSC to 2 percent from 5 percent in May 2003 because a 5 percent FSC "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage." In response, UP observed internally that "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

54. Another impediment to broad application of FSCs during this period was the so-called Rail Cost Adjustment Factor, or "RCAF." The RCAF is a weighted index that accounts

for all significant input costs, including fuel. The RCAF was utilized in multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.

55. Defendants recognized that imposing a stand-alone FSC where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping." For example, Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."

56. As a result, the number of shippers covered by stand-alone, rate-based FSCs was relatively low before the Relevant Period, and FSCs did not contribute significantly to Defendants' revenues or bottom lines.

**DEFENDANTS CONSPIRE IN 2003 TO RAISE PRICES BY ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS MEANS TO INCREASE ALL-IN RATES**

57. By 2003, Defendants' initial attempts to apply rate-based FSCs on their own taught them an important lesson: they could not achieve their revenue enhancement objectives unless the FSC was widely applied on a coordinated basis by all four Defendants. Absent coordination, a railroad seeking to impose FSCs more aggressively than its competitors would risk losing business to another railroad who imposed no FSC or whose FSC policies were more flexible. By early 2003, it became apparent to Defendants that they would encounter difficulties making their FSC policies "stick" absent an industry-wide agreement.

58. Thus, beginning in the spring of 2003, Defendants' senior executives – including their CEOs and top sales/marketing executives – engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC program. The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers industry-wide.

59. The FSC programs that Defendants implemented between March 2003 and January 2004 by mutual agreement are exactly the sort of industry-standard FSC that Defendants' senior executives discussed.

60. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates.

61. That same day, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" attributed to UP CMO Jack Koraleski. Under the UP "Revised" proposal, FSCs were more aggressive, escalating at roughly twice the rate of the formula CSX had internally recommended. The "Revised Surcharge proposal" retained the $28 West Texas Intermediate ("WTI") strike price of UP's existing program but would increase by 0.4 percent for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0 percent increase for every $5 increase in the WTI index.

62. The following day, Koraleski traveled to CSX to play golf, socialize, and discuss "fuel surcharge methodology." Beforehand, Koraleski and CSX's executive vice president of sales and marketing, Clarence Gooden, "talked on" the subject of "[f]uel surcharge methodology."

63. On March 19 and 20, 2003, within one week of the UP-CSX meeting on "fuel surcharge methodology," CSX publicly announced a new FSC policy. The program retained the lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal." Thus, under CSX's new FSC policy, CSX would assess a 0.4 percent FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4 percent for every dollar increase above $23.48.

64. Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. CSX reasoned that while these modifications to its FSC program might "seem[] somewhat benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

65. On March 31, 2003, less than two weeks after CSX's announcement, UP decided to adopt "the same approach as the CSXT." Following the CSX approach, UP would impose a 0.4 percent FSC at a monthly-average WTI "trigger" price of $23 (*i.e.* the index price at which FSCs begin), and assess an additional 0.4 percent charge for every dollar increase in the WTI index above $23. BNSF, which had previously discussed the need for a "synchronized" FSC policy with NS, had a predictably positive reaction to UP's announcement: "This is sweet!!!! Just like the CXST."

66. On March 18, 2003, NS and BNSF senior executives – including NS's Chairman, President, and CEO David Goode, Vice Chairman and COO Steve Tobias, Vice Chairman and CFO Hank Wolf, VP and CMO Ike Prillaman, SVP of Planning Jim McClellan, VP of Intermodal Mike McClellan, SVP of Transportation Mark Manion, SVP of Marketing Services Don Seale, BNSF's Chairman, President, and CEO Matt Rose, current President and CEO and then-VP and COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete Rickershauser, VP of Consumer Products and head of intermodal activities Steve Branscum– met and discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. This discussion point was assigned to NS's Seale and BNSF's Lanigan.

67. On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."

68. The trade association meeting was the biannual National Freight Transportation Association ("NFTA") meeting that took place on April 2-6, 2003 at the Wigwam resort, in Litchfield Park, Arizona. Each of the Defendants attended the meeting. Almost immediately following the NFTA meeting, a new internal directive was issued at BNSF that was designed to ensure across-the-board FSC application: "Effective immediately and urgently per John Lanigan[:] Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

69. On April 1, 2003, CSX CMO Mike Giftos and BNSF CMO John Lanigan met in Jacksonville, Florida to discuss "Fuel Surcharge."

70. In early 2003, BNSF had been leaning toward a mileage-based FSC and trying to drum up support within the industry for a mileage-based FSC formula. But on May 7, 2003 – approximately one month after the NFTA meeting and its meeting with CSX – BNSF abandoned that effort. Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the On-Highway Diesel Fuel ("HDF") index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."

71. Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index. The BNSF FSC had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index. From that point on, BNSF and UP (together, the "Western Railroads") moved in lockstep and charged the exact same FSC percentage for each month of the Relevant Period.

72. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied an FSC of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2 percent. The FSC would increase 2 percent for every 20 cent increase in the HDF Index.

73. The Western Railroads also coordinated when they would change their FSC. They agreed that the FSC would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March. The Western Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

74. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

75. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had

announced a different modification to its existing FSC program. In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

76. As to NS, between March 2003 and December 2003, while positioning itself to quickly implement the FSC first announced by CSX, NS had regular discussions with the other Defendants, including discussions of what FSC was "acceptable" to them and the desirability of an industry-standard FSC.

77. As it had planned and prepared for from March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, a new FSC policy, which mimicked the policy announced by CSX in March 2003 and was intended to "standardize" NS's FSC with the FSCs of the other Defendants. As with CSX's program, NS would assess a 0.4 percent FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4 percent for every dollar increase thereafter. Also like CSX, NS's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days.

78. After NS's announcement, all four Defendants had essentially uniform FSCs and remained in synch throughout the Relevant Period.

**PUBLICATION OF THE AIILF AND FIXING FSC RATES**

79. Even after having agreed to coordinate their FSCs, however, Defendants still faced a significant barrier to widespread use of FSCs: widely-used private contracts had cost escalation provisions that already accounted for fuel costs. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely-used cost escalation indexes,

thereby paving the way for widespread imposition of the new FSC program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

80. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

81. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, who dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF). This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

82. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would

enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

83. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (Emphasis added.)

84. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), suddenly moved into lockstep with FSCs based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

85. Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2 percent. The FSC would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

86. The Eastern Railroads also coordinated when they would change their FSC – two calendar months after the WTI Index had adjusted, thereby adopting the same FSC price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same FSC percentage month after month. The Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

87. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their FSC programs: including using the WTI Index for FSCs, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

88. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel costs. The FSC program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Relevant

Period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

89. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to *revenue* (*i.e.*, the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through these collective actions, Defendants BNSF, UP, CSX and NS planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on FSC prices to undercut one another.

90. In November of 2004, BNSF's CMO John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC [Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for a mileage-based FSC program." The other Defendants "pushed back as expected." Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive rate-based FSCs.

91. With the conspiracy underway, the two Western Railroads, using the HDF Index, moved in lockstep and charged virtually identical FSCs on a monthly basis throughout the Relevant Period. The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began, but were identical starting in July 2003:

**MONTHLY FSC PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |

| MONTH | BNSF | UP |
|---|---|---|
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

92. As detailed above, there also was uniformity among the Eastern Railroads in the monthly FSC percentages, based on the WTI Index, that they charged customers for most of the Relevant Period. The chart below shows that the FSC percentages charged by Defendants CSX and NS for carload shipments varied before the Relevant Period, but were identical starting in March 2004:

**MONTHLY FSC PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |

| MONTH | CSX | NS |
|---|---|---|
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06[3] | 15.6% | 15.6% |

[3] On April 24, 2006, NS announced that it would "revise its fuel surcharge program," assessing a 0.3 percent surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3 percent for every dollar increase above $64 per barrel. While NS claimed to the STB that it was rebasing because of a "decision to reduce its fuel surcharge percentage," NS had calculated the rebased fuel surcharge "to bake in FSC [the existing fuel surcharges] to [base] rate." NS had determined that a 16.4 percent base rate increase would allow it a "full % [fuel surcharge] pass thru" under the new program. Importantly, NS executives discussed the rebasing plan with its counterparts at the other Defendants, who (footnote continued)

| MONTH | CSX | NS |
|---|---|---|
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

93. In stark contrast to this uniformity in FSC percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their FSCs to arrive at the identical percentage month after month, year after year. The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior and conspired to fix prices for FSCs. In addition, the advance announcements of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

94. Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below – including, in some cases, by adopting mileage-based FSCs – Defendants continued to engage in discussions concerning FSCs following the STB ruling, and

recognized that the new FSC program was an economic wash compared to the program announced in late 2003 (which continued to apply to shippers under earlier contracts in any event).

to apply rate-based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before the STB Ruling.

95. While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (*i.e.*, shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the FSCs applied to their intermodal business (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship).

96. The direct heads of Defendants' intermodal businesses attended conspiratorial meetings. NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum participated in the March 2003 meeting at which their railroads discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. CSX's Alan Blumenfield, his predecessor Les Passa, and UP's Brad King EVP of Network Design and Integration participated in the June 2003 meeting at which CSX and UP's senior executives discussed their FSC formulas, their FSC strike prices, and the "outcry" they were facing from the initial rollout of their new FSC regimes. UP's intermodal group regularly imposed adjustable FSC provisions and their practice was to adjust them on ad hoc bases to align with BNSF's FSCs. In fall of 2003, CSX and BNSF officers exchanged percentages of intermodal business that "either had fuel surcharges or an escalator on the revenue."

97. Moreover, Defendants' intermodal business was led by the same senior executives who conspired to impose synchronized FSCs. Intermodal was not treated separately and apart from carload traffic. When Defendants met to conspire, they did not limit their discussions to carload traffic.

## IMPLEMENTATION OF THE SCHEME: DEFENDANTS' ACROSS-THE-BOARD APPLICATION OF FSCs

98. Defendants recognized that their coordinated FSCs were more aggressive and could generate substantially more revenue. For example, describing the new FSC program that resulted from Defendants' coordination, CSX's John Couch remarked: "While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." In addition, an internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

99. Defendants recognized that their new aggressive FSC program could be undermined by resistance from shippers and competition between the Defendant railroads. A 2003 internal NS memorandum recognized that moving to the more aggressive formula would "run the risk of losing the surcharge altogether. . . . The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC." And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

100. To ensure that shipper resistance would be muted, and to achieve their conspiratorial goals, each Defendant adopted policies to apply FSCs to 100 percent of its traffic and tracked its progress toward attaining that goal. For example, in 2004, BNSF marketing leadership began an initiative to monitor FSC "adherence" on a quarterly basis. These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (*e.g.*, shippers with expiring contracts that do not include an FSC).

The reports – showing increasing FSC coverage each year – were presented to the chief marketing officer with a goal of achieving a 100 percent participation rate for BNSF's shippers.

101. CSX also monitored its effectiveness in applying FSCs to its shippers, and started tracking its progress toward implementing its FSC mandate – that "[e]verything is subject to fuel surcharge." CSX tracked the progress that its individual marketing teams were making toward widespread FSC application, and tracked contracts without FSCs to ensure they would receive FSCs upon renewal.

102. Starting in early 2004, UP engaged in similar analyses. An analysis of UP's FSC coverage was also performed for the chief marketing officer – who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004."

103. NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed his team to identify "the largest remaining contracts (including annual revenue involved) that do not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007."

104. Defendants policed the conspiracy by exchanging FSC coverage data. For example, subsequent to a meeting between the two railroads in late 2004, BNSF sent NS's Don Seale a report addressing FSC coverage for "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

105. In furtherance of the conspiracy, Defendants instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the

Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the FSCs were "not negotiable."

106. Defendants also enforced strict policies against discounting base rates to offset the standard FSCs. For example, in an internal NS email, NS's CMO (Don Seale) remarked, "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play."

107. As a result of these and related policies, any negotiations with their shippers about FSCs that took place started from the standard, supracompetitive FSC.

108. In addition, Defendants applied their standard FSCs uniformly to all traffic and commodities. For example, in October of 2005, NS advised UP as follows: "We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."

109. And Defendants imposed standard FSCs on all shippers without regard to whether the shipper had access to alternative modes of transportation. In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers – shippers without access to alternative modes of transportation – have leverage in negotiating a better rate/serve package on traffic at single served facilities. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

110. Before the conspiracy, captive shippers could negotiate out of the FSCs. But during the conspiracy they could not.

**THE STB DECISION**

111. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the FSCs are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. ***Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied***. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6 (emphasis added).

112. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

113. As detailed above, pursuant to their conspiracy, Defendants applied the same unreasonable FSC practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**THE CONSPIRACY SUCCEEDS**

114. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on FSCs, Defendants realized billions of dollars in revenues during the Relevant Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the FSC.

115. Defendants recognized that their coordinated FSCs in fact resulted in significant over-recovery of fuel price increases. NS, for example, recognized by July 2004 that "[c]urrent FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base," and Don Seale of NS testified that in 2005, NS's "increase in Fuel Surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."

116. UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." An October 2005 presentation shows UP estimated greater than 100 percent of incremental fuel cost recovery through FSCs for each of its six business groups.

117. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4 percent from 3rd Quarter 2003 to 2004. In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3 percent increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11 percent more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods, particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

118. By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9 percent improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

119. As a result, Defendants' conspiracy worked as planned to help to remove the competitive pressures that had kept their rates down for years. As the head of UP, James Young, admitted in 2007, "three, four years ago [the FSCs] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

120. Following Defendants' agreement to coordinate their FSCs, Defendants' total revenues skyrocketed during the Relevant Period, with the Defendants reporting record revenues and profits virtually every year. As noted above, Defendants themselves attributed these record figures in large part to FSCs.

121. As result of Defendants' conspiracy they were able to reverse the "destructive pricing for rail share" that led to their conspiracy. In the 2009 STB study referenced above, the STB concluded that "inflation-adjusted rail rates increased in 2005, 2006, and 2007," representing "*a significant change from prior years*, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004." The STB concluded that while rising fuel costs contributed to the rate increases "*even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades*."

122. And a 2010 Senate Commerce Committee Report conducted a "review of the largest four railroads' Securities and Exchange Commission (SEC) filings," which it found "show[ed] just how profitable the large rail companies have become over the last decade. Figure I demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%." The referenced Figure 1 demonstrates that Defendants' profits spiked following their collective imposition of the new FSC regime described above:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

**COUNT I**

**(Violation Of Section 1 Of The Sherman Act And Section 4 Of The Clayton Act)**

123. Plaintiffs incorporate by reference the allegations in the paragraphs above as if they were fully set forth herein.

124. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

125. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

126. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

127. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

128. The contract, combination, or conspiracy has had the following effects:

a. Prices charged to each Plaintiff for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Each Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

129. As a proximate result of the conspiracy described herein, each Plaintiff paid FSCs in connection with those unregulated rail freight transportation services that they would not have paid in the absence of the conspiracy; and therefore the prices each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein.

130. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

WHEREFORE, Plaintiffs pray for relief as follows:

(1) That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiffs recover compensatory damages, as provided by law, determined to have been sustained by Plaintiffs, and that judgment be entered against Defendants on behalf of Plaintiffs;

(3) That Plaintiffs recover treble damages, as provided by law;

(4) That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

(5) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: December 17, 2019
Lake Charles, Louisiana

By:

PLAUCHE, SMITH & NIESET

*/s/ Christopher P. Ieyoub*
Christopher P. Ieyoub
1123 Pithon Street
P.O. Drawer 1705
Lake Charles, LA 70602
Telephone: (337) 436-0522
Facsimile: (337) 436-9637
Email: cieyoub@psnlaw.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Stephen R. Neuwirth, *pro hac vice*
Sami H. Rashid, *pro hac vice*
Monica E. Tarazi, *pro hac vice*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com
monicatarazi@quinnemanuel.com

Robert P. Vance, Jr., *pro hac vice*
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: bobbyvance@quinnemanuel.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CertainTeed LLC, Saint-Gobain Ceramics & Plastics, Inc., Bird Incorporated, CertainTeed Canada, Inc., CertainTeed Gypsum & Ceiling Manufacturing, Inc., CertainTeed Gypsum Manufacturing, Inc., CertainTeed Gypsum NC, Inc., CertainTeed Gypsum West Virginia, Inc., CertainTeed Gypsum, Inc., CertainTeed Ceilings Corporation, and CertainTeed Gypsum and Ceilings USA, Inc.,<br><br>*Plaintiffs,*<br>v.<br><br>BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company,<br><br>*Defendants.* | **JURY TRIAL DEMANDED**<br><br>**AMENDED COMPLAINT**<br><br>Case No. 2:19-cv-04523-WB |

This is an antitrust action charging Defendants with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action against Defendants, from one or more of whom each Plaintiff directly purchased unregulated rail freight transportation services from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and by one or more of whom each Plaintiff was assessed a rail fuel surcharge ("FSC") for the agreed-upon transportation. As used herein, the term "unregulated" refers to rate-based rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

**NATURE OF THE ACTION**

1. In 2003, the four largest United States-based Class I railroads engaged in an extraordinary series of meetings, phone calls, and email communications through which they embarked on a conspiracy – under the guise of a fuel cost recovery program – to apply and enforce

rail fuel surcharges across their customers in order to generate profits. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") (all together, "Defendants") together controlled about ***90%*** of rail freight traffic in the United States during the Relevant Period. Defendants used "rate-based" FSCs – *i.e.*, surcharges that use a percentage applied to the base rate for a shipment – as a means to impose across-the-board rate increases on rail freight shipments, a result that would have been prohibitively difficult to achieve on a contract-by-contract basis. Throughout the conspiracy and despite customer pushback against Defendants' FSCs, Defendants set aside their individual, economic self-interest to undercut one another and instead staunchly maintained their FSC program, pocketing billions of dollars in profits as a result.

2. Prior to conspiring, Defendants operated as businesses should: they actively competed against each other over rates generally and with respect to fuel recovery mechanisms to the benefit of their customers. According to a historical study of rail rates undertaken by the Surface Transportation Board ("STB"), "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Defendants were aware of, and concerned about, this trend. According to one CSX internal analysis from 2002, this decline resulted from factors including "some very vicious historical price wars" in the rail industry and "destructive pricing for rail share."

3. Between 2000 and 2003, Defendants independently tried to implement revenue-enhancing policies, including uncoordinated efforts to impose stand-alone FSCs. These efforts failed. Defendants used the inclusion or absence of FSCs as a basis to compete for each other's business and customers successfully resisted FSCs. They were rarely included in contracts and more rarely collected; those seeking to impose them lost customers to competitors or compensated customers by negotiating discounts. For example:

- BNSF explained in a May 2002 Enterprise Wide Risk Assessment that "***We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace.*** . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. ***We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it.***"
- In September 2002, NS's manager of pricing systems Pat Glennon reported to the then-Senior Vice President of Marketing Services and later its CMO Don Seale that ***"[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause,"*** and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities."
- As late as April 2003, UP's Bob Toy reported, "***Fuel surcharge $ are melting away at the competition***. In a downward-pressure environment, what's on paper must not work in the real world."

4. Moreover, since the passage of the Staggers Act in 1980, which significantly deregulated the American railroad industry, railroads typically entered into private freight transportation contracts that included escalation provisions tied to indexes that weighted actual cost factors, including fuel cost. As UP President James Young acknowledged on an October 2004 earnings call, the Rail Cost Adjustment Factor ("RCAF") "looks at *actual* costs through the industry." In that respect, Defendants were *already* recovering fuel costs through the RCAF or the related All Inclusive Index ("AII").

5. In March 2003, everything began to change. Rather than competing, Defendants began coordinating FSC programs. Senior executives at the highest levels of each company began to discuss with one another the implementation of more aggressive FSC formulas that the Surface Transportation Board ("STB") later found bore "***no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied . . . .***" In short, Defendants stopped competing and started conspiring.

6. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates. Simultaneously, UP's CMO Jack Koraleski was recommending escalation of UP's FSC program to be substantially more aggressive. ***The very next day***, Koraleski traveled to competitor CSX to play golf, socialize, and discuss "fuel surcharge methodology." ***Within one week***, CSX's leadership abruptly reversed course, abandoning its recommended FSC reduction and adopting a program ***matching*** UP's escalation.

7. On March 18, 2003, BNSF and NS senior executives met to discuss "***synchroniz[ing]***" FSCs. Action items for the meeting attended by John Lanigan (BNSF's CMO) and Don Seale stated: "BNSF's fuel surcharge is structured differently than NS, CSX and UP. ***Should BNSF's by [sic] synchronized with the other big players in the industry?***" The answer based on what followed: a resounding yes.

8. On March 20, 2003, CSX publicly announced a new, more aggressive FSC program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "***the same approach as the CSXT.***" On April 4, 2003, UP sent a "concurrence" to competitors that its new FSC program will "apply to most Union Pacific pricing documents for local and interline

freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "***This is sweet !!! Just like the CSXT.***"

9. On April 1, 2003, BNSF and CSX senior executives met. The agenda dictated that CSX's CMO Mike Giftos and BNSF's CMO John Lanigan were to discuss "***Fuel Surcharge***." Documents also reveal that, between April 2 and 6, 2003, NS's Seale and BNSF's Lanigan continued a prior discussion on "***the fuel surcharge issue***" at a National Freight Transportation Association meeting.

10. Similar to CSX's abandonment of a less aggressive FSC regime following a meeting with UP in March 2003, BNSF abandoned the internal consideration of an FSC program that could have been fairer for shippers. Between February and April 2003, BNSF had been "[l]eaning toward [a] Cost Per Mile" FSC formula (a mileage-based FSC which could have better correlated the resulting FSCs to actual fuel costs compared to the rate-based FSCs that Defendants broadly implemented during the conspiracy), but abandoned this approach. Instead, BNSF and UP adopted nearly identical *rate-based* FSCs. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, ***it exactly matches the BNSF FSC percentage progression***, including lag times and effective dates."

11. Defendants' employees recognized these new FSCs were not genuine fuel cost recovery mechanisms as Defendants sought to portray. For example, on March 19, 2003, CSX's Director of Market Strategy John Couch explained that while the coordinated FSC "***seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%***." On April 7, 2003, NS's Manager of Pricing Systems Pat Glennon recounted "[t]he case in favor of adopting the CSXT standard" to Don Seale and AVP Charlie Brenner, writing the "CSXT standard ***clearly produces significantly more compensation, and it does it sooner and more consistently***."

On April 29, 2003, Glennon told Seale that "[b]y dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, ***the change is in fact a <u>blatant general rate increase</u>***, and will appear so to customers."

12. Glennon was correct that customers saw the rate increases for what they were and were outraged. Handwritten notes from a June 2003 meeting between CSX and UP's senior executives – including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden, VP of Strategic Planning Les Passa, and Alan Blumenfield and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan – reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes. The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

13. But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall.***"

14. And, instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants maintained the scheme and imposed policies designed to ensure their new "standard" or "published" FSCs were enforced broadly across their customers without the waivers and discounts they had frequently offered between 2000 and 2002:

- **BNSF**: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "***Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed.***"
- **UP**: On December 22, 2003, a sales representative explained to a customer, "As a company policy, all ***contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice***."
- **CSX**: A May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence Gooden stated that any exception had to come through him and that he had zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***."
- **NS**: A 2004 email from Don Seale to his subordinates mandated "***no deviation from NS's published FSC without [his] prior approval***." He also rejected any negotiations to forego base rate increases in return for FSC application as a "shell game."

15. In the fall of 2003, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to get all Defendants to agree to remove fuel costs out of the weighted RCAF and AAI indices (which already permitted the Defendants to recover all of their fuel costs), so that they could more easily charge artificially high FSCs as a revenue enhancement mechanism. As a result, the AAR—whose board was dominated by Defendants—created an unprecedented All

Inclusive Index *Less Fuel* ("AAILF"). Defendants' conspiratorial implementation of the AAILF allowed Defendants to move away from use of the RCAF and more easily apply their FSCs.

16. Defendants worked tirelessly to achieve 100% FSC coverage across their customers. All four Defendants pursued 100% participation goals and tracked their progress toward attaining that goal. Defendants also policed the conspiracy by exchanging FSC coverage data with one another. In addition, Defendants started their negotiations using the standard FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (*i.e.*, facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

17. Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150 per barrel during the Relevant Period, so did Defendants' profits. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," and included the following chart documenting the significant growth in profits during the Relevant Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

18. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") similarly found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

19. Defendants also attributed their record revenues to FSCs. For example:

- **NS**'s 2006 "***[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase*** and modestly higher traffic volume."
- **BNSF**'s freight revenues "***increased 15 percent [in 2006] to a record high of $14.5 billion*** on double-digit increases in each of our four business units." "***Growth in prices and fuel surcharges*** drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

- **UP** "achieved record revenue levels [in 2006] in all six of our commodity groups, ***primarily driven by better pricing and fuel surcharges***."
- **CSX**'s operating revenue increased $948 million in 2006; "the primary components of the revenue gain" were "continued yield management ***and the Company's fuel surcharge program, which drove revenue per unit across all major markets.***"

**PARTIES**

20. Plaintiff CertainTeed LLC ("CertainTeed") is organized under the laws of the State of Delaware, with its principal place of business at 20 Moores Road, Malvem, PA 19355. CertainTeed LLC, a Delaware limited liability company, successor to certain assets and liabilities, including any rights arising from the claims asserted in this action from an entity that no longer exists named 'CertainTeed Corporation,' formerly a Delaware corporation. CertainTeed operates over forty manufacturing facilities in the United States, producing building materials, including insulation products, residential and commercial roofing, vinyl and fiber cement siding, and vinyl and composite fencing. During the Relevant Period, CertainTeed Corporation purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facilities, (2) stock transfers between different siding facilities and, (3) from the manufacturing facilities, finished products to distributors and customers throughout the United States and Canada.

21. Plaintiff Saint-Gobain Ceramics & Plastics, Inc. ("Ceramics & Plastics") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 20 Moores Road, Malvem, PA 19355. Ceramics & Plastics operates several manufacturing facilities throughout the United States, including in Massachusetts, Kentucky, and Alabama, producing refractory products such as bricks, tiles, and cement. During the Relevant Period, Ceramics &

Plastics purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facilities and, (2) from the manufacturing facilities, finished products to distributors and customers throughout the United States and Canada.

22. Plaintiff CertainTeed Gypsum & Ceiling Manufacturing, Inc. ("Gypsum & Ceiling") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 20 Moores Road, Malvem, PA 19355. Gypsum and Ceiling operates manufacturing facilities, including in Iowa and Wyoming, producing plaster, plasterboard, and other products composed of gypsum. During the Relevant Period, Gypsum & Ceiling purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facilities and, (2) from the manufacturing facilities, finished products to distributors and customers throughout the United States and Canada.

23. Plaintiff CertainTeed Gypsum NC, Inc. ("Gypsum NC") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 20 Moores Road, Malvem, PA 19355. Gypsum NC produces wallboard, commonly referred to as drywall, at a manufacturing facility in Roxboro, North Carolina. During the Relevant Period, Gypsum NC purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facilities and, (2) from the manufacturing facilities, finished products to distributors and customers throughout the United States and Canada.

24. Plaintiff CertainTeed Gypsum West Virginia, Inc. ("Gypsum West Virginia") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 20 Moores Road, Malvem, PA 19355. Gypsum West Virginia produces gypsum-based products at a

manufacturing facility in Moundsville, West Virginia. During the Relevant Period, Gypsum West Virginia purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facilities and, (2) from the manufacturing facilities, finished products to distributors and customers throughout the United States and Canada.

25. Plaintiff CertainTeed Gypsum, Inc. ("Gypsum") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 20 Moores Road, Malvem, PA 19355. Gypsum serves as a sales and transaction entity for the gypsum business, operating on behalf of other United States gypsum entities, including by entering into contracts with vendors and coordinating sales amongst affiliated entities. During the Relevant Period, Gypsum purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facilities and, (2) from the manufacturing facilities, finished products to distributors and customers throughout the United States and Canada.

26. Plaintiff CertainTeed Ceilings Corporation ("Ceilings Corp.") is organized under the laws of the State of Delaware, with its principal place of business at 20 Moores Road, Malvem, PA 19355. Ceilings Corp. operates manufacturing facilities throughout the United States and Canada, producing ceilings and walls, including specialty offerings. During the Relevant Period, Ceilings Corp. purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport raw materials to its manufacturing facilities.

27. Plaintiff CertainTeed Gypsum and Ceilings USA, Inc ("Gypsum & Ceilings USA") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 20 Moores Road, Malvem, PA 19355. Gypsum & Ceilings USA operates manufacturing facilities throughout the United States, producing gypsum-based products and ceilings. During the Relevant

Period, Gypsum & Ceilings USA purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facilities and, (2) from the manufacturing facilities, finished products to distributors and customers throughout the United States.

28. Plaintiff Bird Incorporated ("Bird") is a corporation organized under the laws of the state of Massachusetts, with its principal place of business at 20 Moores Road, Malvem, PA 19355. Bird operates a manufacturing facility in Norwood, Massachusetts, producing roofing products, including asphalt shingles and roll roofing for commercial and residential use. During the Relevant Period, Bird purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facility and, (2) from the manufacturing facility, finished products to distributors and customers throughout the United States and Canada.

29. Plaintiff CertainTeed Canada, Inc. ("CertainTeed Canada") is a corporation organized under the laws of Ontario, Canada, with its principal place of business at 2424 Lakeshore Road, Mississauga, Ontario, Canada. CertainTeed Canada operates manufacturing facilities throughout Canada, producing gypsum and insulation products, sells siding and roofing products, and also serves as a purchasing entity for various Canadian entities. During the Relevant Period, CertainTeed Canada purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facilities, (2) stock transfers between different siding facilities and, (3) from the manufacturing facilities, finished products to distributors and customers throughout the United States and Canada.

30. Plaintiff CertainTeed Gypsum Manufacturing, Inc. ("Gypsum Manufacturing") is a corporation organized under the laws of the state of Nevada, with its principal place of business at 20

Moores Road, Malvem, PA 19355. Gypsum Manufacturing operates manufacturing facilities, including in Nashville, Arkansas, producing drywall products. During the Relevant Period, Gypsum Manufacturing purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport (1) raw materials to its manufacturing facilities and, (2) from the manufacturing facilities, finished products to distributors and customers throughout Canada.

31. As a proximate result of the conspiracy described herein, CertainTeed, Ceramics & Plastics, Gypsum & Ceiling, Gypsum NC, Gypsum West Virginia, Gypsum, Ceilings Corp., Gypsum & Ceilings USA, Bird, CertainTeed Canada, and Gypsum Manufacturing each paid FSCs in connection with the unregulated rail freight transportation services obtained from Defendants that they would not have paid in the absence of the conspiracy; and the prices that each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

32. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

33. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

34. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

35. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

**JURISDICTION AND VENUE**

36. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiffs by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

37. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

38. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to each Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

39. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in

an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## INTERSTATE TRADE AND COMMERCE

40. During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

41. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

42. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

43. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

44. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

45. Today, by contrast, 80% or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation.

For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

46. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry is now (and was during the Relevant Period) highly concentrated: four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90% of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

47. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

**DEFENDANTS SEEK UNSUCCESSFULLY TO RAISE RATES BEFORE THE RELEVANT PERIOD**

48. For many years before the Relevant Period, Defendants confronted a long-term, structural decline in rail freight rates. Indeed, according to the Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of Railroad Rates: 1985-2007*, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Figure 1 from the *Study of Railroad Rates* evidences that trend:




49. Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts by the individual Defendants to apply stand-alone FSCs. Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

50. During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs. The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an internal analysis as "some very vicious historical price wars" and "destructive pricing for rail share." A 2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We

> need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? ***We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy***.

51. During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs. By way of example:

- **NS**: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty." VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it." The same month, Director of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC." In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS." Glennon testified that in 2001 and 2002, FSCs were only "***theoretically billable***."
- **CSX**: In August 2000, CSX reported at a staff meeting that it could collect only 67.4% of the then-modest FSCs it had billed over the preceding nine months. EVP of Sales and Marketing Clarence Gooden testified that CSX's FSC coverage was "***very low***" and that he was "***embarrassed***" by the figure.

- **BNSF**: In May 2002, BNSF's Enterprise Wide Risk Assessment explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, EVP and CMO Charles Schultz told Chairman, President, and CEO Matthew Rose and other executives, "***any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive***." Schultz's successor John Lanigan testified BNSF's FSC coverage was "low" in January 2003 – "in the 25 to 30 percent range."
- **UP**: Current EVP and CFO Robert Knight Jr. testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position." UP implemented an FSC program in December 2002, but initially limited the application of that program to certain tariffs and circulars and exempted private shipments in its Industrial Products group from FSCs. This was true even though FSCs were generally not triggered and only "theoretically billable." And in April 2003, Director Bob Toy reported, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

52. The reason Defendants were not able to achieve broader FSC coverage was clear: Defendants were concerned about losing business to other Defendants that did not apply FSCs, made concessions, or otherwise applied FSCs less aggressively. Defendants expressed these concerns

internally and, in fact, lost business through FSC competition. Each Defendant also frequently agreed not to apply FSCs in the face of shipper objections.

53. For example, in May 2002, BNSF reported that it was challenging to impose FSCs because its main western competitor, "UP[,] does not use a fuel surcharge in the competitive marketplace." It continued, "rail competitors do not [use FSCs] and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, NS reported that its main eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS."

54. And, in May 2003, BNSF announced that it would ***reduce*** its standard FSC to 2% from 5% in May 2003 because a 5% FSC "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage." In response, UP observed internally that "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

55. Another impediment to broad application of FSCs during this period was the so-called Rail Cost Adjustment Factor, or "RCAF." The RCAF is a weighted index that accounts for all significant input costs, including fuel. The RCAF was utilized in multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.

56. Defendants recognized that imposing a stand-alone FSC where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping." For example, Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."

57. As a result, the number of shippers covered by stand-alone, rate-based FSCs was relatively low before the Relevant Period, and FSCs did not contribute significantly to Defendants' revenues or bottom lines.

**DEFENDANTS CONSPIRE IN 2003 TO RAISE PRICES BY ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS MEANS TO INCREASE ALL-IN RATES**

58. By 2003, Defendants' initial attempts to apply rate-based FSCs on their own taught them an important lesson: they could not achieve their revenue enhancement objectives unless the FSC was widely applied on a coordinated basis by all four Defendants. Absent coordination, a railroad seeking to impose FSCs more aggressively than its competitors would risk losing business to another railroad who imposed no FSC or whose FSC policies were more flexible. By early 2003, it became apparent to Defendants that they would encounter difficulties making their FSC policies "stick" absent an industry-wide agreement.

59. Thus, beginning in the spring of 2003, Defendants' senior executives – including their CEOs and top sales/marketing executives – engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC program. The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers industry-wide.

60. The FSC programs that Defendants implemented between March 2003 and January 2004 by mutual agreement are exactly the sort of industry-standard FSC that Defendants' senior executives discussed.

61. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates.

62. That same day, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" attributed to UP CMO Jack Koraleski. Under the UP "Revised" proposal, FSCs were

more aggressive, escalating at roughly twice the rate of the formula CSX had internally recommended. The "Revised Surcharge proposal" retained the $28 West Texas Intermediate ("WTI") strike price of UP's existing program but would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0%increase for every $5 increase in the WTI index.

63. The following day, Koraleski traveled to CSX to play golf, socialize, and discuss "fuel surcharge methodology." Beforehand, Koraleski and CSX's executive vice president of sales and marketing, Clarence Gooden, "talked on" the subject of "[f]uel surcharge methodology."

64. On March 19 and 20, 2003, within one week of the UP-CSX meeting on "fuel surcharge methodology," CSX publicly announced a new FSC policy. The program retained the lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal." Thus, under CSX's new FSC policy, CSX would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase above $23.48.

65. Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. CSX reasoned that while these modifications to its FSC program might "seem[] somewhat benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

66. On March 31, 2003, less than two weeks after CSX's announcement, UP decided to adopt "the same approach as the CSXT." Following the CSX approach, UP would impose a 0.4% FSC at a monthly-average WTI "trigger" price of $23 (*i.e.* the index price at which FSCs begin), and

assess an additional 0.4% charge for every dollar increase in the WTI index above $23. BNSF, which had previously discussed the need for a "synchronized" FSC policy with NS, had a predictably positive reaction to UP's announcement: "This is sweet!!!! Just like the CXST."

67. On March 18, 2003, NS and BNSF senior executives – including NS's Chairman, President, and CEO David Goode, Vice Chairman and COO Steve Tobias, Vice Chairman and CFO Hank Wolf, VP and CMO Ike Prillaman, SVP of Planning Jim McClellan, VP of Intermodal Mike McClellan, SVP of Transportation Mark Manion, SVP of Marketing Services Don Seale, BNSF's Chairman, President, and CEO Matt Rose, current President and CEO and then-VP and COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete Rickershauser, VP of Consumer Products and head of intermodal activities Steve Branscum – met and discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. This discussion point was assigned to NS's Seale and BNSF's Lanigan.

68. On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."

69. The trade association meeting was the biannual National Freight Transportation Association ("NFTA") meeting that took place on April 2-6, 2003 at the Wigwam resort in Litchfield Park, Arizona. Each of the Defendants attended the meeting. Almost immediately following the NFTA meeting, a new internal directive was issued at BNSF that was designed to ensure across-the-board FSC application: "Effective immediately and urgently per John Lanigan[:] Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

70. On April 1, 2003, CSX CMO Mike Giftos and BNSF CMO John Lanigan met in Jacksonville, Florida to discuss "Fuel Surcharge."

71. In early 2003, BNSF had been leaning toward a mileage-based FSC and trying to drum up support within the industry for a mileage-based FSC formula. But on May 7, 2003 – approximately one month after the NFTA meeting and its meeting with CSX – BNSF abandoned that effort. Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the On-Highway Diesel Fuel ("HDF") index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."

72. Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index. The BNSF FSC had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index. From that point on, BNSF and UP (together, the "Western Railroads") moved in lockstep and charged the exact same FSC percentage for each month of the Relevant Period.

73. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied an FSC of 0.5% for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2%. The FSC would increase 2% for every 20 cent increase in the HDF Index.

74. The Western Railroads also coordinated when they would change their FSC. They agreed that the FSC would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF

Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March. The Western Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

75. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

76. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing FSC program. In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

77. As to NS, between March 2003 and December 2003, while positioning itself to quickly implement the FSC first announced by CSX, NS had regular discussions with the other Defendants, including discussions of what FSC was "acceptable" to them and the desirability of an industry-standard FSC.

78. As it had planned and prepared for from March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, a new FSC policy, which mimicked the policy announced by CSX in March 2003 and was intended to "standardize" NS's FSC with the

FSCs of the other Defendants. As with CSX's program, NS would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase thereafter. Also like CSX, NS's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days.

79. After NS's announcement, all four Defendants had essentially uniform FSCs and remained in synch throughout the Relevant Period.

**PUBLICATION OF THE AIILF AND FIXING FSC RATES**

80. Even after having agreed to coordinate their FSCs, however, Defendants still faced a significant barrier to widespread use of FSCs: widely-used private contracts had cost escalation provisions that already accounted for fuel costs. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely-used cost escalation indexes, thereby paving the way for widespread imposition of the new FSC program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

81. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

82. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, who dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the "AIILF"). This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same

components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

83. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

84. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (Emphasis added).

85. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), suddenly moved into lockstep with FSCs based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

86. Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2%. The FSC would be adjusted upward at 2% for every $5 increase in the WTI average price.

87. The Eastern Railroads also coordinated when they would change their FSC – two calendar months after the WTI Index had adjusted – thereby adopting the same FSC price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same FSC percentage month after month. The Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

88. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their FSC programs: including using the WTI Index for FSCs, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

89. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel costs. The FSC program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Relevant Period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

90. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to *revenue* (*i.e.*, the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through these collective actions, Defendants BNSF, UP, CSX and NS planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on FSC prices to undercut one another.

91. In November of 2004, BNSF's CMO John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC [Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for a mileage-based FSC program." The other Defendants "pushed back as expected." Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive rate-based FSCs.

92. With the conspiracy underway, the two Western Railroads, using the HDF Index, moved in lockstep and charged virtually identical FSCs on a monthly basis throughout the Relevant Period. The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began, but were identical starting in July 2003:

**MONTHLY FSC PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

93. As detailed above, there also was uniformity among the Eastern Railroads in the monthly FSC percentages, based on the WTI Index, that they charged customers for most of the

Relevant Period. The chart below shows that the FSC percentages charged by Defendants CSX and NS for carload shipments varied before the Relevant Period, but were identical starting in March 2004:

**MONTHLY FSC PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |

| MONTH | CSX | NS |
|---|---|---|
| Apr-06[1] | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

94. In stark contrast to this uniformity in FSC percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their FSCs to arrive at the identical percentage month after month, year after year. The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior and conspired to fix prices for FSCs. In addition, the advance announcements of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

[1] On April 24, 2006, NS announced that it would "revise its fuel surcharge program," assessing a 0.3 percent surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3 percent for every dollar increase above $64 per barrel. While NS claimed to the STB that it was rebasing because of a "decision to reduce its fuel surcharge percentage," NS had calculated the rebased fuel surcharge "to bake in FSC [the existing fuel surcharges] to [base] rate." NS had determined that a 16.4 percent base rate increase would allow it a "full % [fuel surcharge] pass thru" under the new program. Importantly, NS executives discussed the rebasing plan with its counterparts at the other Defendants, who recognized that the new FSC program was an economic wash compared to the program announced in late 2003 (which continued to apply to shippers under earlier contracts in any event).

95. Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below – including, in some cases, by adopting mileage-based FSCs – Defendants continued to engage in discussions concerning FSCs following the STB ruling, and to apply rate-based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before the STB Ruling.

96. While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (*i.e.*, shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the FSCs applied to their intermodal business (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship).

97. The direct heads of Defendants' intermodal businesses attended conspiratorial meetings. NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum participated in the March 2003 meeting at which their railroads discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. CSX's Alan Blumenfield, his predecessor Les Passa, and UP's Brad King EVP of Network Design and Integration participated in the June 2003 meeting at which CSX and UP's senior executives discussed their FSC formulas, their FSC strike prices, and the "outcry" they were facing from the initial rollout of their new FSC regimes. UP's intermodal group regularly imposed adjustable FSC provisions and their practice was to adjust them on ad hoc bases to align with BNSF's FSCs. In fall of 2003, CSX and BNSF officers exchanged percentages of intermodal business that "either had fuel surcharges or an escalator on the revenue."

98. Moreover, Defendants' intermodal business was led by the same senior executives who conspired to impose synchronized FSCs. Intermodal was not treated separately and apart from carload traffic. When Defendants met to conspire, they did not limit their discussions to carload traffic.

**IMPLEMENTATION OF THE SCHEME:**
**DEFENDANTS' ACROSS-THE-BOARD APPLICATION OF FSCs**

99. Defendants recognized that their coordinated FSCs were more aggressive and could generate substantially more revenue. For example, describing the new FSC program that resulted from Defendants' coordination, CSX's John Couch remarked: "While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." In addition, an internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

100. Defendants recognized that their new aggressive FSC program could be undermined by resistance from shippers and competition between the Defendant railroads. A 2003 internal NS memorandum recognized that moving to the more aggressive formula would "run the risk of losing the surcharge altogether. . . . The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC." And in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

101. To ensure that shipper resistance would be muted, and to achieve their conspiratorial goals, each Defendant adopted policies to apply FSCs to 100% of its traffic and tracked its progress toward attaining that goal. For example, in 2004, BNSF marketing leadership began an initiative to

monitor FSC "adherence" on a quarterly basis. These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (*e.g.*, shippers with expiring contracts that do not include an FSC). The reports – showing increasing FSC coverage each year – were presented to the chief marketing officer with a goal of achieving a 100% participation rate for BNSF's shippers.

102. CSX also monitored its effectiveness in applying FSCs to its shippers, and started tracking its progress toward implementing its FSC mandate – that "[e]verything is subject to fuel surcharge." CSX tracked the progress that its individual marketing teams were making toward widespread FSC application, and tracked contracts without FSCs to ensure they would receive FSCs upon renewal.

103. Starting in early 2004, UP engaged in similar analyses. An analysis of UP's FSC coverage was also performed for the chief marketing officer – who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004."

104. NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed his team to identify "the largest remaining contracts (including annual revenue involved) that do not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007."

105. Defendants policed the conspiracy by exchanging FSC coverage data. For example, subsequent to a meeting between the two railroads in late 2004, BNSF sent NS's Don Seale a report addressing FSC coverage for "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

106. In furtherance of the conspiracy, Defendants instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and overall contract rates, even though prior to mid-2003, it had been customary for the Defendants at least to entertain

such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the FSCs were "not negotiable."

107. Defendants also enforced strict policies against discounting base rates to offset the standard FSCs. For example, in an internal NS email, NS's CMO (Don Seale) remarked, "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play."

108. As a result of these and related policies, any negotiations with their shippers about FSCs that took place started from the standard, supracompetitive FSC.

109. In addition, Defendants applied their standard FSCs uniformly to all traffic and commodities. For example, in October of 2005, NS advised UP as follows: "We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."

110. And Defendants imposed standard FSCs on all shippers without regard to whether the shipper had access to alternative modes of transportation. In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers – shippers without access to alternative modes of transportation – have leverage in negotiating a better rate/serve package on traffic at single served facilities. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is

> only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

111. Before the conspiracy, captive shippers could negotiate out of the FSCs. But during the conspiracy they could not.

**THE STB DECISION**

112. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the FSCs are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. ***Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.*** Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6 (emphasis added).

113. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

114. As detailed above, pursuant to their conspiracy, Defendants applied the same unreasonable FSC practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**THE CONSPIRACY SUCCEEDS**

115. Defendants reaped huge, supra-competitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on FSCs, Defendants realized billions of dollars in revenues during the Relevant Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the FSC.

116. Defendants recognized that their coordinated FSCs in fact resulted in significant over-recovery of fuel price increases. NS, for example, recognized by July 2004 that "[c]urrent FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base," and Don Seale of NS testified that in 2005, NS's "increase in Fuel Surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."

117. UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." An October 2005 presentation shows UP estimated greater than 100% of incremental fuel cost recovery through FSCs for each of its six business groups.

118. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004. In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during

this and other periods, particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

119. By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9 percent improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

120. As a result, Defendants' conspiracy worked as planned to help to remove the competitive pressures that had kept their rates down for years. As the head of UP, James Young, admitted in 2007, "three, four years ago [the FSCs] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

121. Following Defendants' agreement to coordinate their FSCs, Defendants' total revenues skyrocketed during the Relevant Period, with the Defendants reporting record revenues and profits virtually every year. As noted above, Defendants themselves attributed these record figures in large part to FSCs.

122. As result of Defendants' conspiracy, they were able to reverse the "destructive pricing for rail share" that led to their conspiracy. In the 2009 STB study referenced above, the STB concluded that "inflation-adjusted rail rates increased in 2005, 2006, and 2007," representing "*a significant change from prior years*, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004." The STB concluded that while rising fuel costs contributed to the

rate increases "*even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades*."

123. And a 2010 Senate Commerce Committee Report conducted a "review of the largest four railroads' Securities and Exchange Commission (SEC) filings," which it found "show[ed] just how profitable the large rail companies have become over the last decade. Figure I demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%." The referenced Figure 1 demonstrates that Defendants' profits spiked following their collective imposition of the new FSC regime described above:




*Figure I – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

[*Remainder of page intentionally left blank.*]

**COUNT I**

**(Violation Of Section 1 Of The Sherman Act And Section 4 Of The Clayton Act)**

124. Plaintiffs incorporate by reference the allegations in the paragraphs above as if they were fully set forth herein.

125. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

126. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

127. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

128. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

129. The contract, combination, or conspiracy has had the following effects:

a. Prices charged to each Plaintiff for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

b. Each Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

130. As a proximate result of the conspiracy described herein, CertainTeed, Ceramics & Plastics, Gypsum & Ceiling, Gypsum NC, Gypsum West Virginia, Gypsum, Ceilings Corp., Gypsum & Ceilings USA, Bird, CertainTeed Canada, and Gypsum Manufacturing each paid FSCs in connection with the unregulated rail freight transportation services obtained from Defendants that they would not have paid in the absence of the conspiracy; and the prices that each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein.

131. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

WHEREFORE, Plaintiffs pray for relief as follows:

(1) That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiffs recover compensatory damages, as provided by law, determined to have been sustained by Plaintiffs, and that judgment be entered against Defendants on behalf of Plaintiffs;

(3) That Plaintiffs recover treble damages, as provided by law;

(4) That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

(5) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

[*Remainder of page intentionally left blank.*]

Dated: December 17, 2019

By: PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP

Kevin E. Raphael (Pa. Bar No. 72673)
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Telephone: (215) 988-1442
Facsimile: (215) 754-5172
Email: KER@Pietragallo.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Stephen R. Neuwirth (*pro hac vice*)
Sami H. Rashid (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com

*Attorneys for CertainTeed LLC, Saint-Gobain Ceramics & Plastics, Inc., Bird Incorporated, CertainTeed Canada, Inc., CertainTeed Gypsum & Ceiling Manufacturing, Inc., CertainTeed Gypsum Manufacturing, Inc., CertainTeed Gypsum NC, Inc., CertainTeed Gypsum West Virginia, Inc., CertainTeed Gypsum, Inc., CertainTeed Ceilings Corporation, and CertainTeed Gypsum and Ceilings USA, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of Plaintiffs' Amended Complaint was served upon all counsel of record by the Court's Electronic Filing System and on Defendant CSX Transportation, Inc. via electronic mail and/or Certified Mail – R.R.R.

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

By:________________________
1818 Market Street, Suite 3402
Philadelphia, PA 19103
(215) 320-6200
Email: ker@pietragallo.com

Date: December 17, 2019'

5061792v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/JMF/AK) |
| This document relates to:<br><br>ALL CASES | |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Direct Purchaser Plaintiffs ("Plaintiffs"), by and through undersigned counsel, respectfully move this Court, pursuant to Fed. R. Civ. P. 23(b)(3), for certification of a Class of:

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which Defendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing") ("Fuel Surcharge").
>
> Excluded from this Class definition are (a) Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in the Complaint, and all federal governmental entities, and (b) all entities or persons that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered into before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract.

Plaintiffs request that this action be certified as a class action for litigation and trial of Plaintiffs' claim for price fixing under Section 1 of the Sherman Act, 15 U.S.C. § 1, and that the named Plaintiffs – Dust Pro, Inc., Carter Distributing Company, Dakota Granite Company,

Donnelly Commodities, Inc., U.S. Magnesium LLC, Nyrstar Taylor Chemicals, Inc., Olin Corporation, and Strates Shows, Inc. – be appointed Class representatives.

Plaintiffs further request that Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") and Hausfeld LLP ("Hausfeld") be designated Co-Lead Class Counsel for the Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

Pursuant to Local Civil Rule 23.1(c), Plaintiffs propose that, following any motion certifying a class, the notice required by Rule 23(c)(1) be provided directly by mail or other means to those shippers determined, based on information in Defendants' transaction data records, to satisfy the Class criteria. If appropriate, Plaintiffs would anticipate providing any complementary notice by publication. Plaintiffs propose that following any order certifying the Class, the parties promptly meet and confer concerning notice details (including notice costs) and jointly report to the Court.

This Motion is supported by the accompanying Plaintiffs' Memorandum in Support of Motion for Class Certification, the exhibits attached thereto, and the Declaration of Sami H. Rashid, and the exhibits attached thereto. A proposed order is attached as Exhibit D.

Dated: March 18, 2010

Respectfully submitted:

/s/ Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-9850
Facsimile: (212) 480-8560
Email: solson@hausfeldllp.com

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

***Interim Co-Lead Counsel for Direct Purchaser Plaintiffs***

## CERTIFICATE OF SERVICE

I, Sami H. Rashid, an attorney, certify that on March 18, 2010, I caused a true and correct copy of the foregoing motion to be filed with the Clerk of the Court and served on counsel for Defendants.

_/s/ Sami H. Rashid____________________
Sami H. Rashid

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/JMF/AK) |
| This document relates to:<br><br>ALL CASES | **FILED UNDER SEAL** |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 6

I. DEFENDANTS IGNORE FACTUAL REALITY AND APPLICABLE LAW ..... 6

A. Defendants' Arguments and Dr. Willig's Analysis Cannot Be Reconciled With the Actual Evidence of What Happened in the Real World ..... 6

1. Defendants Incorrectly Lump FSCs Before the Conspiracy With the Agreed FSC Program During the Conspiracy. ..... 7

2. Defendants' Assertion That The Same FSCs Would Have Been Imposed Absent the Conspiracy Cannot Be Reconciled With the Actual Facts ..... 10

3. The Evidentiary Record Powerfully Refutes Defendants' and Dr. Willig's Assertion That "Individualized" Factors Predominate ..... 12

B. The Declarations Do Not Support Defendants' and Dr. Willig's Arguments. ..... 17

C. Defendants Ignore the STB Proceedings ..... 22

D. Defendants Misconstrue the Legal Standard For "Impact" ..... 25

II. DEFENDANTS' ARGUMENTS ARE PREMISED ON FAULTY ECONOMIC ANALYSIS THAT FAILS TO SHOW AN ABSENCE OF COMMON PREDOMINATING ISSUES AS TO IMPACT ..... 29

A. Defendants and Dr. Willig Largely Ignore the Structural Factors That Made the Rail Freight Industry Conducive to the Alleged Conspiracy. ..... 29

B. Defendants and Dr. Willig Offer Only Flawed Challenges to Dr. Rausser's Analysis Establishing the Common Impact of the Alleged Conspiracy. ..... 30

III. DAMAGES CAN BE CALCULATED BY A COMMON, WORKABLE METHOD ..... 36

IV. DEFENDANTS' OTHER ARGUMENTS DO NOT PRECLUDE CERTIFICATION ..... 39

## TABLE OF AUTHORITIES

**Page**

### Cases

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
37 F.3d 996 (3d Cir. 1994) ....................23

*American Seed Co. v. Monsanto Co.*,
238 F.R.D. 394 (D. Del. 2006), *aff'd*, 271 Fed. Appx. 138 (3d Cir. Apr. 1, 2008)....................28

*Barnes v. District of Columbia*,
242 F.R.D. 113 (D.D.C. 2007)....................39

**Behrend v. Comcast*,
264 F.R.D. 150 (E.D. Pa. 2010).................... 13, 26, 27, 29

*Bensel v. Allied Pilots Ass'n*,
263 F.R.D. 150 (D.N.J. 2009)....................41

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
974 F.2d 1358 (3d Cir. 1992)....................23

*Bynum v. District of Columbia*,
214 F.R.D. 27 (D.D.C. 2003)....................39

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001)....................6, 34

*Columbus Drywall & Insulation Inc. v. Masco Corp.*,
1:04-CV-3066, 2009 WL 856306 (N.D. Ga. Feb. 9, 2009)....................13

*In re Cotton Yarn Antitrust Litig.*,
505 F.3d 274 (4th Cir. 2007) ....................40

*In re Currency Conversion Fee Antitrust Litig.*,
224 F.R.D. 555 (S.D.N.Y. 2004) ....................28

**In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) .................... 6, 31, 36

*Dechert v. Cadle Co.*,
333 F.3d 801 (7th Cir. 2003) ....................41

*Dimidowich v. Bell & Howell*,
803 F.2d 1473 (9th Cir. 1986) ....................23

*Ernst & Ernst v. U.S. Dist. Court for S. Dist. of Tex.*,
457 F.2d 1399 (5th Cir. 1972) ....................41

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
256 F.R.D. 82 (D. Conn. 2009)....................passim

*Exhaust Unltd., Inc. v. Cintas Corp.*,
223 F.R.D. 506 (S.D. Ill. 2004)....................28

*Feder v. Electronic Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) ....................28, 40

*In re Flash Memory Antitrust Litig.*
07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010)....................34

*Gordon v. Microsoft Corp.*,
No., MC 00-5994, 2003 WL 23105550 (Minn. Dist. Ct. Dec. 15, 2003) ....................34

*Griffith v. Jabitch Block & Rathbone, LLP*,
358 B.R. 342 (S.D. Ohio 2007)....................41

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ....................2

*Hill v. Shell Oil Co.*,
No. 98-C-5766, 2002 WL 663583 (N.D. Ill. Mar. 28, 2002) ....................40

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3rd Cir. 2008) ....................25, 26

*In re Ins. Brokerage Antitrust Litig.*,
579 F.3d 241 (3d Cir. 2009) ....................25

*In re Intel Corp. Microprocessor Antitrust Litig.*,
MDL No. 05-1717 (JJF) 39-40 (D. Del. July 28, 2010)....................7

*Johnson v. District of Columbia*,
248 F.R.D. 46 (D.D.C. 2008)....................39

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ....................37

*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) ....................25

*Lerner v. Haimsohn*,
126 F.R.D. 64 (D. Colo. 1989) ....................40

*In re Lorazepam & Clorazepate Antitrust Litig.*,
202 F.R.D. 12 (D.D.C. 2001)....................36

*McDonough v. Toys R Us, Inc.*,
638 F. Supp. 2d 461 (E.D. Pa. 2009)....................passim

*Meijer, Inc. v. Warner Chilcott Holdings, Co.*,
246 F.R.D. 293 (D.D.C. 2007)....................passim

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) .......... 13, 26, 34

*In re Nat'l Student Mktg. Litig.*,
M.D.L. Docket No. 105, 1973 WL 431 (D.D.C. Oct. 2, 1973) .......... 41

**In re Nifedipine Antitrust Litig.*,
246 F.R.D. 365 (D.D.C. 2007) .......... 26, 27, 34

*Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*,
665 F. Supp. 869 (E.D. Cal. 1986) .......... 29

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
685 F. Supp. 2d 456 (S.D.N.Y. 2010) .......... 40

*Pigford v. Glickman*,
182 F.R.D. 341 (D.D.C. 1998) .......... 39

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
No. 3:03-MDL-1556, 2007 WL 4150666 (M.D. Pa. 2007) .......... 26, 34

*In re Ready-Mixed Concrete Antitrust Litig.*,
261 F.R.D. 154 (S.D. Ind. 2009) .......... 27, 29

*Reed v. Advocate Health Care*,
2009 WL 3146999, No. 06 C 3337 (N.D. Ill. Sept. 28, 2009) .......... 5, 33

*Rimkus Consulting Group, Inc. v. Cammarata*,
688 F. Supp. 2d 598 (S.D. 2010) .......... 41

*Robinson v. Texas Auto. Dealers Ass'n*,
387 F.3d 416 (5th Cir. 2004) .......... 27, 28

*Schnorbach v. Fuqua*,
70 F.R.D. 424 (S.D. Ga. 1975) .......... 41

*Schoenbaum v. E.I. DuPont de Nemours & Co.*,
No. 4:05CV01108 ERW, 2009 WL 4782082 (E.D. Mo. Dec. 8, 2009) .......... 28

*In re Scrap Metal Antitrust Litig.*,
No. 1: 02 CV 0844, 2006 WL 2850453 (N.D. Ohio, Sept. 30, 2006) .......... 34

*Shankroff v. Advest, Inc.*,
112 F.R.D. 190 (S.D.N.Y. 1986) .......... 40

**In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 583 (N.D. Cal. 2010) .......... passim

*In re Universal Service Fund Telephone Billing Practices Litig.*,
219 F.R.D. 661 (D. Kan. 2004) .......... 28

*In re Urethane Antitrust Litig.*,
251 F.R.D. 629 (D. Kan. 2008) .......... 25

**In re Vitamins Antitrust Litig.*,
209 F.R.D. 251 (D.D.C. 2002)....................passim

*Wagner v. Nutrasweet Co.*,
95 F.3d 527 (7th Cir. 1996)....................41

**Rules**

Fed. R. Civ. P. 23....................2, 25, 26

**PRELIMINARY STATEMENT**

Plaintiffs claim, and the evidence confirms, that Defendants [redacted] Defendants worked collusively to apply the new standard, as uniformly as possible, to as many freight shipments as possible, with the express goal of 100% coverage. *See* Plaintiffs' Memorandum in Support of Motion for Class Certification (Dkt. # 337) ("Pl. Mem.") at 27-40 and Point I, *infra*. Defendants' implementation of and adherence to the agreed FSC standard artificially elevated rail freight shipment prices above competitive levels. *See* Pl. Mem. 45-47; Corrected Report of Gordon Rausser (May 27, 2010) ("Rausser Rpt.") (Dkt. 368) at 8, 113-23. This impacted all Class Members.

Plaintiffs' economist, Dr. Gordon Rausser, analyzed structural factors that made the rail freight industry conducive to collusion and the FSC conspiracy a highly effective means of raising Class Members' freight rates above competitive levels. Dr. Rausser used econometric analysis to show that workable formulas, common to the Class, are available both to prove the conspiracy's impact on the Class – [redacted] *see* Rausser Rpt. 120, 122-23 – and to calculate damages both Class-wide and to each Class Member. Dr. Rausser's analysis is compellingly supported by Defendants' own documents, testimony, and data.

Predictably, the core contention of Defendants and their expert, Dr. Robert Willig, is that no Class-wide inquiry could be made to determine whether Class Members were impacted by the

---

[1] [redacted]

conspiracy.[2] But Defendants' "impact" arguments, and Dr. Willig's analysis, depend on speculative and theoretical assertions that cannot be reconciled with the documentary, testimonial, and data evidence of what actually happened in the real world.

Central to Defendants' claim that the alleged conspiracy had no Class-wide impact is their argument that equivalent FSCs would have been imposed even without the conspiracy – an argument that Defendants took the steps they did for no rational reason, even though human nature dictates that companies conspire only because they perceive a benefit from doing so. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (Posner, J.) ("sellers would not bother to fix list prices if they thought there would be no effect on transaction prices"). The evidence shows that the conspiracy here was [redacted] Defendants had been unsuccessful in their pre-conspiracy efforts to achieve widespread application of FSCs and saw a *need* to conspire to raise rates and improve profitability. [redacted]

---

[2] Defendants do not meaningfully challenge Plaintiffs' showing on the requirements of Rule 23(a): numerosity, typicality, commonality, and adequacy. To the extent Defendants do address adequacy and typicality, the arguments are unavailing. *See* Point IV, *infra*.

[3] [redacted]

[redacted] Through their conspiracy, Defendants transformed FSCs into revenue-enhancement vehicles that could be applied across the industry and ushered in a period of record profitability. Pl. Mem. 40-44.

Defendants and Dr. Willig make the related assertion that even before the start of the alleged Class Period, there was already a trend toward increased use of FSCs that would naturally have continued absent the conspiracy. They improperly conflate the start of the Class Period and the start of the conspiracy;[5] but increased application of FSCs during the first half of 2003 occurred when Defendants *already* were conspiring.[6] Defendants and Dr. Willig do not show that all or even most of these pre-Class Period surcharges were comparable to agreed FSCs imposed during the Class Period. They were not. [redacted] *See* Point I, *infra*. And Dr. Willig's model purporting to extrapolate has been exposed as utterly flawed.[8] *See* Point II, *infra*.

---

4 [redacted]

5 The Class Period constitutes the temporal element of the Class definition. Plaintiffs do not allege that the Class Period defines the specific dates when the conspiracy was in effect.

6 [redacted]

7 [redacted]

8 Among other flaws, Dr. Willig's model uses wholly inadequate data inputs (for example, just two for CSX). Dr. Willig also employs a fabricated metric for "FSC incidence," not used in the real world by any Defendant, based on the mere application of a single FSC to Class Member on a single shipment, regardless of the number of shipments that Class Member made, the volume of and revenue from those shipments, or the rate of the FSC applied. In other words, if the effect of the conspiracy was to cause a Class Member paying a 2% surcharge on a

Relying principally on declarations submitted with Defendants' opposition papers, Defendants and Dr. Willig also argue that there was widespread deviation from the agreed FSC program and that this reflected predominantly "individualized" factors determining whether and how FSCs were applied to Class Members. *See, e.g.*, Defendants' Mem. of Law in Opp. to Plaintiffs' Mot. for Class Certification (Dkt. # 381) ("D. Br.") at 20-21, 45-47; Revised Expert Report of Robert D. Willig (Dkt. # 389) ("Willig Rpt.") ¶¶ 17, 103, 156-57. [redacted]

Not surprisingly, the declarations on which Defendants and Dr. Willig so heavily rely thus turn out to be unreliable and unsubstantiated. Declarants' depositions showed that the

---

single route before the Class Period to pay the conspiratorial FSC (at, say, up to 20%) on 50 routes during the Class Period, Dr. Willig's "trend" model would not recognize this change, since his FSC incidence input would treat both circumstances as the same. *See* Point II, *infra*.

[9] [redacted]

underlying facts are consistent with Dr. Rausser's finding, based on the transaction data, that [redacted] – a situation common in price-fixing conspiracies where classes were certified. *See* Point I, *infra.*

Dr. Willig's challenges to Dr. Rausser's analysis are predicated on these declarations and other counterfactual and flawed assertions. Dr. Rausser's analysis, in contrast, is based on the actual evidentiary record and Defendants' transaction data, and his initial conclusions have now been reinforced by application of his regression models to the full set of transaction data. Dr. Willig has not identified any variable that Dr. Rausser failed to include in his multiple regression models, let alone that adding any such variable would alter Dr. Rausser's results. In those few instances where Dr. Willig does proffer alternative models, his methodology is overtly flawed and provides no sustainable answer to Dr. Rausser's conclusions that common evidence can be used to prove the impact of the conspiracy, and that a workable formula common to all Class Members can be used to calculate each Class Member's damages. *See* Points II and III, *infra.* For example, when Dr. Willig constructs a regression model on the relationship between freight rates and marginal cost (a model that, if it had any probative value, would itself constitute Class-wide proof), he uses only highly aggregated and averaged data from third-party sources – precisely the type of input "averages" he has criticized in other cases.[11]

---

[10] [redacted]

[11] *See Reed v. Advocate Health Care*, 2009 WL 3146999, No. 06 C 3337, at *16-18 (N.D. Ill. Sept. 28, 2009) ("*Nurses*") (class certification denied, citing Dr. Willig's opinions that regression models based on averaged inputs were inadequate to assess the impact of a conspiracy). Notably, a principal source of Dr. Willig's averaged, aggregate data is a 2009 report by Christensen & Associates. That report found an unexplained and anomalous increase –

In the end, Defendants' arguments at best present a competing, predominantly common, explanation (albeit a counterfactual one) of what would have happened in the so-called "but for" world absent the alleged conspiracy. But Courts have consistently held that competing views of the "but for" world raise a predominantly common question for trial.[12]

## ARGUMENT

### I. DEFENDANTS IGNORE FACTUAL REALITY AND APPLICABLE LAW

#### A. Defendants' Arguments and Dr. Willig's Analysis Cannot Be Reconciled With the Actual Evidence of What Happened in the Real World

Defendants and Dr. Willig virtually ignore Plaintiffs' detailed discussion of the evidentiary record. *See* Pl. Mem. 7-50.[13] They thus disregard the specific details and consequences of the alleged conspiracy and artificially avoid its inherently Class-wide purpose and effect.[14] Such a disregard of the real world should not be credited.[15]

---

unrelated to fuel costs – in railroads' variable and marginal costs around 2003, corresponding to the start of the alleged conspiracy period. The authors could only speculate about the causes for this increase. *See* Laurits R. Christensen Associates, Inc., Analysis of Competition, Capacity, and Service Quality, v. 2, Revised Final Report Prepared For The Surface Transportation Board, November 2009 ("Christensen Rpt."), at 9-16 to 9-18 (excerpts at HD Ex. 12); *see also* Expert Reply Report of Gordon Rausser ("Rausser Reply") (attached hereto as Exhibit A) at 39-43.

[12] *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 115 (S.D.N.Y. 2010) (expert dispute over which of two "but for" worlds would have existed absent conspiracy presents common question and does not preclude certification); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100-02 (D. Conn. 2009) (experts' competing views relating to market structure and characteristics of "but for" world present merits questions and do not preclude certification); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 320-21 (E.D. Mich. 2001) (arguments concerning how some class members might have behaved absent alleged conspiracy present "merit-based questions that are not considered at the class certification stage").

[13] Remarkably, Defendants seek to disparage Plaintiffs' discussion of actual facts as nothing more than an effort to "poison the well." D. Br. 7.

[14] [redacted]

### 1. Defendants Incorrectly Lump FSCs Before the Conspiracy With the Agreed FSC Program During the Conspiracy.

Most of Defendants' arguments and Dr. Willig's analysis are built on a faulty assumption: that the FSCs used by Defendants before and during the conspiracy were the same. *See, e.g.,* D. Br. 2-3; *see also* Willig Rpt. 7-9. But this is not true. The new "standard" FSCs that Defendants put in place in the Spring of 2003 were different both in design and application from those that came before. For example, these new FSCs (i) got Defendants in lockstep in calculating the percentage based on fuel indexes; (ii) used a trigger equal to about $23 per barrel, rather than the higher $28 per barrel (or higher) that several Defendants had previously used; and (iii) adjusted the FSC based on the 30-day average fuel price, rather than, as in several Defendants' earlier programs, only when the trigger was exceeded for 30 (or more) consecutive days. [redacted]

---

[redacted]

[15] *See, e.g., In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717 (JJF), Special Master's Report and Recommendation at 39-40 (D. Del. July 28, 2010) ("The record clearly and flatly contradicts Dr. Leffler's economic theory.") (attached at HD Ex. 13); *Meijer, Inc. v. Warner Chilcott Holdings, Co.*, 246 F.R.D. 293, 309 (D.D.C. 2007) (defendants' expert's assertions about "but for world" were belied by real world facts); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 594 (N.D. Cal. 2010); *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 476 (E.D. Pa. 2009).

[16] [redacted]

[redacted]

---

[redacted]

18 [redacted]

[redacted]

[redacted]

19 [redacted]

20 [redacted]

21 [redacted]

[redacted]

2. **Defendants' Assertion That The Same FSCs Would Have Been Imposed Absent the Conspiracy Cannot Be Reconciled With the Actual Facts.**

The evidence shows Defendants saw a *need* to conspire to surmount perceived obstacles to widespread application of uncoordinated fuel surcharges. *See* Pl. Mem. 7-12. During the pre-conspiracy period, Defendants were frustrated by [redacted]

---

[redacted]

22 [redacted]

23 [redacted]

24 [redacted]

Summarizing the pre-conspiracy environment, [redacted]

---

[redacted]

25 [redacted]

26 [redacted]

[redacted]

### 3. The Evidentiary Record Powerfully Refutes Defendants' and Dr. Willig's Assertion That "Individualized" Factors Predominate

Dr. Rausser's regression analysis shows that specifically identified common factors predominantly explain the variation in Defendants' freight rates. *See* Rausser Reply at 66-67. He concludes that these common, predominating factors in rail freight pricing can be controlled for in "a common analysis of impact and damages" caused by the alleged conspiracy. *Id.* 67.

Defendants claim that "it will be necessary to examine the result of the individual negotiations on a shipper-by-shipper basis to determine whether a particular shipper actually paid a higher total price." D. Br. 47; Willig Rpt. 72-73. Among other things, Defendants assert that

27 [redacted]

base rates were discounted to offset the FSCs. *See, e.g.*, D. Br. 47. While discounting rates off a standard is no bar to class certification,[28] Defendants' arguments here are factually unsupported.

[redacted]

[28] *See, e.g., Meijer, Inc. v. Warner Chilcott Holdings Co.*, 246 F.R.D. 293, 309 (D.D.C. 2007) (rejecting argument that individual issues predominated due to variations in "pricing among putative class members"); *EPDM*, 256 F.R.D. at 88 (evidence of common impact in "lock-step increases in national price lists in an oligopolistic market"); *Columbus Drywall & Insulation Inc. v. Masco Corp.*, 1:04-CV-3066, 2009 WL 856306, at *9 (N.D. Ga. Feb. 9, 2009) ("[P]laintiffs can easily prove class-wide impact in spite of the fact that prices are subject to individualized negotiations."); *Behrend v. Comcast*, 264 F.R.D. 150, 187-89 (E.D. Pa. 2010) (comparing list prices to "but for" or "benchmark" prices); *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 485-86 (E.D. Pa. 2009) (finding impact based on defendants' maintenance of "uniform list prices nationwide" despite evidence of discounts resulting from sales and coupons); *In re NASDAQ Market-Makers Antitrust Litig. ("NASDAQ")*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) (common impact where "defendants conspired to maintain an inflated 'base' from which all pricing negotiations began.") (quotation omitted).

[29] [redacted]

[30] *See, supra*, p. 9, n.21.

[31] [redacted]

[redacted]

Dr. Willig asserts that significant base rate discounting must have occurred because (a) Dr. Rausser's data purportedly reflect "significant variations in increases and decreases in base rates across commodities and among shippers during the class period," and (b) Defendants' declarations detail "many circumstances in which the negotiations over FSC changes resulted in changes in other contract terms of benefit to the shippers." Willig Rpt. ¶ 46; Willig Dep. 121. But as explained in Dr. Rausser's reply report, Dr. Willig's analysis of FSC variations is deeply flawed, because it fails to isolate the portion of rate increases attributable to FSCs. Once this error is corrected, the data confirm that similar FSCs were imposed on the shippers, regardless of the base rate for the shipment. Rausser Reply 50-53. In addition, as discussed *infra*, the declarations do not support Dr. Willig's assertions on base rate discounting.

Second, the evidence contradicts Defendants' and Dr. Willig's assertions that so-called "captive" shippers could not have been affected by the alleged conspiracy.[32] Defendants

[32] These assertions were contradicted by UP CEO James Young and NS CEO Wick Moorman, who testified in 2007 about why even "captive" shipper routes face competitive pressures: "Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lost the business.... Another major source of competition is geographic competition.... *In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are*

imposed the agreed FSCs on all shippers alike, without regard for whether the shipper was captive or non-captive,[33] or whether the shipper had access to alternative modes of transportation.[34] [redacted] RD Ex. 72.[35]

Ignoring this and other evidence,[36] Dr. Willig, repeatedly asserts that impact can be shown only by "undertaking analysis that is specific to individual plaintiffs." Willig Rpt.¶ 25.

---

*real.*" *See* HD Ex. 36, at 14 (Oral Testimony of James R. Young before the U.S. House Committee on Transportation and Infrastructure, Hearing on Rail Competition and Service (Sept. 25, 2007) (attaching Mr. Moorman's written testimony ) (emphasis added); [redacted]

33 [redacted]

34 [redacted]

35 Defendants' arguments on adequacy and typicality of captive shippers likewise fail.

36 [redacted]

But he never explains what shipper-specific analysis he advocates, and instead admits that such an analysis is not even feasible.[37] His report makes clear that he does not believe even detailed individualized analysis of particular shippers would necessarily prove impact. Willig Rpt. ¶ 82; Willig Dep. 284-95. For this reason, if an individual shipper were to sue separately, its case would not focus on a hypothetical analysis of how it and the Defendants might have behaved in individualized negotiations in the absence of a conspiracy. Rather, a shipper would attempt to prove impact and damages using predominantly the same evidence that Plaintiffs and Dr. Rausser have developed for the Class: evidence of a conspiracy to impose standard FSCs; evidence that the market is conducive to conspiracy; and evidence that the conspiracy raised rail freight shipment rates above competitive levels.[38]

[37] For example, in ¶ 156 of his report, Dr. Willig asserts that individual issues purportedly affecting supply and demand are "the ability to motivate higher volume from the shipper with discounts" and "the willingness of the shipper to accept risks of price changes instead of a contractually steady price." Yet at his deposition, Dr. Willig conceded that the former was "a beauty," because "it's essentially impossible to construct a variable of that kind," and for the latter, he "can't imagine how one would find such a variable at the level of the individual shipper." Willig Dep. 294-95. Dr. Willig's "general conclusion" was "it's somewhere between extremely hard to imagine and essentially impossible to contemplate a reliable way to construct such a regression at the individualistic level without years of individualistic inquiries[ ] just to construct the variables." Willig Dep. 292. In other words, Dr. Willig sets a standard for showing impact that is impossible to meet.

[38] Would Defendants have sought to maintain and enforce aggressive FSC programs in the Class Period absent a conspiracy? Would (and could) Defendants have imposed FSCs only on certain shippers or only in markets satisfying certain competitive criteria if they were unable, through a conspiracy, to ensure broad-based application of the standard FSCs that they agreed to adopt and enforce? And would particular shippers have paid FSCs during the Class Period if it was clear that the FSCs were not being applied essentially across-the-board to all shippers but were instead targeting only competitively vulnerable shippers who lacked sufficient leverage to avoid the surcharges? These questions are all subject to common proof. Defendants and Dr. Willig identify no type of individualized evidence that would allow the Court to determine, one way or another, whether a particular shipper would have paid an FSC absent the conspiracy.

**B. The Declarations Do Not Support Defendants' and Dr. Willig's Arguments.**

Defendants and Dr. Willig rely heavily – and for certain key points almost exclusively – on 21 declarations submitted by railroad executives, who purport to show that deviations from the standard FSC programs were widespread during the Class Period.[39] However, depositions have now exposed that these declarations are both unreliable[40] and inconsistent with the propositions for which Defendants and Dr. Willig invoke them. For example:

[redacted]

---

[39] Dr. Willig relied heavily on the declarations and interviews with other unidentified business people. Willig Dep. 254-83; *see also* Willig Rpt. 45 ("Declarations of railroad personnel identify a wide variety of non-standard FSC provisions for significant shippers.").

[40] [redacted]

[41] [redacted]

[redacted]

---

[redacted]

42 Tr. of Dep. of Marc Allen ("Allen Dep.") 23-24 (attached at HD Ex. 85); Jacobowski Dep. 23 (BNSF); Lawson Dep. 37-38; Osborne Dep. 38-41, 48-49; HD Ex. 40; Listwak Dep. 29-31 (NS); Tr. of Dep. Donna ("Cerwonka Dep.") 7-8 (CSX) (attached at HD Ex. 86); Tr. of Dep. of Dean Piacente ("Piacente Dep.") 7-10 (CSX) (attached at HD Ex. 87).

43 [redacted]

44 [redacted]

45 [redacted]

46 [redacted]

[redacted]

---

[redacted]

47 [redacted]

[redacted] Various omissions and inconsistencies further undermine the declarations.[49]

---

[redacted]

48 [redacted]

Defendants also argue that the fact that trucks compete for some business means a common showing of impact is impossible. But as Dr. Rausser explains, Rausser Rpt. IV.E, Rausser Reply 28-29, truck competition was constrained during this period, [redacted] Dr. Rausser's regression model – which accounts for factors like commodity and route – shows that intermodal shipments were impacted by the conspiracy. Rausser Reply 13, 22-23, 28-29, 54-57, 98 n.225. Defendants' assertion that some shippers could "defeat any attempt by the railroads to raise prices through collusion" (D. Br. 55) is

---

[redacted]

[49] For example, compare: Duggan Decl. ¶ 10 and Duggan Dep. 9-11, HD Ex. 106; Garin Decl. ¶¶ 5, 12 and Garin Dep. 110, 194, 196-99, HD Exs. 118-19; Garin Decl. ¶ 14 and Garin Dep. 134, 137-40, HD Exs. 107, 113-14; Garin Decl. ¶ 15 and Garin Dep. 33, 149-51, 155-56, HD Ex. 107; Garin Decl. ¶ 17 and Garin Dep. 220; Jacobowski Decl. ¶ 6 and Jacobowski Dep. 53-57, HD Exs. 123-26; Jacobowski Decl. ¶ 7 and Jacobowski Dep. 46-47; McNulty Decl. ¶¶ 12, 14, 16 and McNulty Dep. 15, 121-24, 164-66, HD Ex. 128; Piacente Decl. ¶ 7 and Piacente Dep. 44, 45, 61, 74-75, 78, 80, HD Exs. 129-30, 140; D. Br. 49, n. 62 and Piacente Dep. 108-09; Lawson Decl. ¶¶ 13-14 and Lawson Dep. 47; Listwak Decl. ¶ 35 and Listwak Dep. 122, 133-34, 153, 178; Listwak Decl. ¶ 28 and Listwak Dep. 155, 160, HD Ex. 139; Listwak Decl. ¶ 24 and Listwak Dep. 100-01, 123-26, 130, HD Ex. 137; Listwak Decl. ¶ 31 and Listwak Dep. 177, 182-85; Listwak Decl. ¶ 12 and Listwak Dep. 80-84; Listwak Decl. ¶ 5(a) and Listwak Dep. 69, 74-76, HD Ex. 135; Listwak Decl. ¶ 5(b) and Listwak Dep. 84-85, 97, 101-02, 103, HD Exs. 136-37; Listwak Decl. ¶ 7 and Listwak Dep. 58-59, 63-64, HD Ex. 134; Osborne Decl. ¶ 10 and Osborne Dep. 100-10, HD Ex. 143; Adams Decl. ¶ 3 and Young Dep. 148, (Adams was deposed before his declaration was submitted, *see* Young Dep. 13-17, 146-62); D. Br. 29 (citing Adams Decl. Attachment 2) and Young Dep. 159; D. Br. 9, n. 5 (citing Adams Decl. ¶ 6) and Adams Dep. 87, 114-15; Gehl Decl. ¶¶ 3-4 and Gehl Dep. 25; Gehl Decl. ¶ 7, 9 and Gehl Dep. 44, 47, 49-50, 55; D. Br. 29 (citing Gehl Decl.¶¶ 3-4, Krehbiel Decl. ¶ 5(A)) and Gehl Dep. 87, Krehbiel Dep. 123-24; Pagan Decl. ¶ 2 and Pagan Dep. 25-29; *see also* Lawson Dep. 105, 112-13, 116, 121-26, 127-33 (regarding Schaaf and McGregor declarations).

[50] [redacted]

supported by neither economic analysis nor anecdotal evidence. It does not appear that a single shipper "defeated" Defendants' coordinated efforts to raise prices through the FSCs.

### C. Defendants Ignore the STB Proceedings

Defendants assertions about the variability and negotiability of FSCs during the Class Period (and Dr. Willig's reliance on them) also ignore the record of the STB's FSC proceedings. At the May 2006 hearing, and in written submissions, shippers industry-wide advanced a common complaint: Defendants' FSCs had become "non-negotiable," "enacted by unilateral decree," and "mandated," on a "take it or leave it basis." For example:

- *AES Corporation*: "[T]he incorporation by reference of a carrier's 'public' fuel surcharges into a new contract is typically made with no modifications, over the strong objection of the shipper, and such inclusion is mandated on a 'take it or leave it basis.'" HD Ex. 94, at 14 (Comments, April 27, 2006). "[T]he fuel surcharges have been imposed in addition to significant base rate increases as AES' rail transportation contracts have come up for renewal in the past few years." HD Ex. 99 (Transcript, May 11, 2006 STB Hearing) ("STB Tr") 104.
- *Alliance of Automobile Manufacturers*: "Surcharges have become 'non-negotiable,' enacted by unilateral decree." HD Ex. 95, at 3 (Comments, April 27, 2006). "[T]he requests for supporting documentation basically are rebuffed and the surcharges have become non-negotiable." STB Tr. 121.[51]
- *Edison Electric Institute*: "There is a widespread perception that large companies such as utilities or other rail shippers are fully capable of protecting their interests with the railroads because the firms are all large and have the resources to do so. That is completely flawed logic. * * * The very fact that railroads could systematically, and substantially, over-recover for their fuel costs is vivid proof of their market power, and the abuses of it the railroads have committed." HD Ex. 96, at 3 (Comments, April 2, 2007).
- *Griffin Industries Inc.*: "[A]ll railroads have nearly identical methods of determining and levying fuel surcharges. * * * The 'take it or leave it' attitude we have seen has made this situation even more unacceptable." HD Ex. 97, at 1, 3 (Comments, May 11, 2006).
- *Mittal Steel USA*: "[T]hese surcharges are presented as a 'take it or leave it' proposition." HD Ex. 98, at 5 (Comments, April 27, 2006)
- *National Industrial Transportation League*: "[T]here's no negotiation on fuel surcharges today. It's a take it or leave it thing." STB Tr. 242.

---

[51] This Alliance comprises leading automobile shippers that Defendants now claim were freely able to negotiate "fuel surcharges that ranged from *no* fuel surcharge, to a voluntary fuel surcharge, to a surcharge with a higher trigger." D. Br. 57.

- *Western Coal Traffic League*: "UP reports that its 'fuel surcharge will be included on all repriced business' and that all of its newly negotiated 'long term contracts' will include UP's 'standard fuel surcharge.'" HD Ex. 100, at 22 (Comments, April 27, 2006)

Before the STB, Defendants defended their FSCs on the basis that "standard" programs were preferable and that "tailoring" programs to individual shippers was "not practical"[52] – positions clearly inconsistent with their arguments here.

Shippers' vigorous complaints before the STB about how FSC's had become a profit center for the Defendants also corroborate the concerns that Defendants internally expressed about expected shipper resistance to unilaterally imposed FSCs.[53] The STB decision also corroborates the Class-wide impact reflected in Defendants' documents, testimony and transaction data. The STB found, without distinguishing among categories of shippers or routes, that Defendants' FSCs were "a misleading and ultimately unreasonable practice," and that continuing the programs "would permit them to continue to mislead their customers and would be unfair."[54] While Defendants asserted that their FSCs only recouped actual fuel cost

---

[52] HD Ex. 1, at 15-17 (UP: "Some customers may pay more than the actual incremental cost of fuel we use to handle their particular shipments. Some pay less. While this may appear inequitable to some, we believe standard surcharges are the most appropriate and reasonable way to manage a fair, equitable and easily administered fuel surcharge program. … It is simply not practical to have a unique fuel surcharge program for individual customers…."); HD Ex. 9 (BNSF: "Our surcharge program is the same for all customers").

[53] *See, e.g., Alliance of Automobile Manufacturers*: "[W]e believe the ability to mandate fuel surcharges has become a new profit center for the railroads." HD Ex. 95, at 2 (Comments, April 27, 2006). *Chevron Oronite*: "[F]uel surcharges assessed by the railroads are unreasonable and they do not relate to increased fuel costs. Instead, they are simply a rate increase." HD Ex. 101 at 2 (Comments, April 27, 2006). *Dow Chemical Co.*: "[T]he fuel surcharges are allowing the railroads to over-recover their incremental fuel cost and have become a method of revenue enhancement." HD Ex. 102, at 1 (Comments, April 27, 2006).

[54] RD Ex. 147, at 7, 9 (STB Decision, Jan. 26, 2007). The type of pretext here can be powerful evidence of a conspiracy. *E.g.*, *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1012-13 (3d Cir. 1994); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362, 1374-80 (3d Cir. 1992); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1479-80 (9th Cir. 1986).

increases,[55] the STB found that the Defendants' FSCs "cannot fairly be described as merely a cost recovery mechanism." RD Ex. 147, at 6. An FSC program "that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." *Id.* at 6.[56] The STB proceedings highlighted the common application of Defendants' FSCs. STB's then-Chairman told Congress:

> In January of this year we issued a decision declaring it an industry-wide unlawful practice for carriers to use a fuel surcharge to recover more than the increased fuel costs attributable to . . . particular movement[s] [of traffic]. . . . This action ended an industry practice of charging fuel surcharges as a percentage of a shipper's base rate regardless of the actual fuel costs associated with the transportation of the shippers' goods.[57]

---

[55] *See, e.g.*, HD Ex. 46 (CSXT April 27, 2006 Statement to STB at 9-10 (CSXT's fuel surcharge program under-recovered fuel costs and this "belies any suggestion that CSXT has profited" from the program)); STB Tr. 258, 261, 274 ( "fuel surcharge is clearly not a profit center at BNSF"); *id.* 301 (CSXT spokesman saying its fuel surcharge program "has not been a profit center for us"); *id.* 314 (NS spokesman saying there had been no over-recovery through its FSC program during the last six years); *id.* 325-26 (UP spokesman: "[t]he bottom line, Union Pacific is not in the business of making money from its fuel surcharge program").

[56] Other studies confirm the over-recovery resulting from the imposition of the new standard FSCs. *See, e.g.*, HD Ex. 52 (U.S. Dept. of Agriculture & U.S. Dept. of Transportation, "Study of Rural Transportation Issues," Apr. 2010, at ix ("There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits. From 2001 to 2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel.")); *id.* 260 (chart showing the increasing spread between fuel costs and FSCs for grain, which expanded substantially beginning in 2003-04 and continuing thereafter); *id.* 272 ("Rail rates have increased rapidly since 2004 resulting in a surge of railroad profitability. The increase reflects not only increased rail costs, but aggressive pricing and over-recovery of fuel costs. Fuel surcharges seemingly should reimburse railroads for the increase in fuel costs, not be sources of additional revenue."); HD Ex. 53 (Snavely King Majoros O'Connor & Lee, Inc. Report of July 25, 2007 to the American Chemistry Council at p. 2 (calculating over-recovery during 2003-07 of $6 billion).

[57] HD Ex. 155 (Oral Statement of Charles D. Nottingham Before the House Committee on Transportation and Infrastructure at pp. 8-9 (Sept. 25, 2007)).

### D. Defendants Misconstrue the Legal Standard For "Impact"

Plaintiffs moving papers set forth the legal standards governing this motion. *See* Pl. Mem. 50-56. Defendants do not dispute that the issue of liability is subject to common proof.[58]

Defendants do argue that Plaintiffs at class certification purportedly must show how Defendants' conspiracy raised prices for *each* transaction with *each* shipper, D. Br. 3, and that "Defendants' ability to add fuel surcharges was completely exhausted by July 2003," *id.* 30. Such arguments, however, "misconstrue[s] the plaintiffs' burden," since "plaintiffs need not demonstrate to an absolute certainty that all . . . purchasers ultimately suffered damages as a result of inflated list prices." *EDPM*, 256 F.R.D. 82, 89 (D. Conn. 2009); *see also Toys "R" Us, Inc.*, 638 F. Supp. 2d at 483-85 (applying *Hydrogen Peroxide*; "[i]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury . . . .") (quotation and citation omitted).[59]

---

[58] *Vitamins*, 209 F.R.D. at 264 ("the allegations of price fixing relate to the *defendants' conduct*, therefore proof will not vary among the class members"); *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d at 479-80 (following *Hydrogen Peroxide* and finding that the "question [of antitrust violation] calls for evidence related solely to the defendants' conduct"); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 267-68 (3d Cir. 2009) ("'examin[ing] the elements of plaintiffs' claim through the prism of Rule 23,'" and easily "find[ing] that common questions abound with respect to whether the defendants engaged in illegal, concerted action," as these questions "focus[ed] on the conduct of the defendants" (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)).

[59] *See also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (Posner, J.) (decision to certify class should be revisited only if it is ultimately shown that a "high percentage" of the class members were not injured); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 638 n.6 (D. Kan. 2008); *Meijer*, 246 F.R.D. at 308. Defendants' arguments relate to damages, not impact, and are properly viewed as merits arguments for trial. *EPDM*, 256 F.R.D. at 90; *id.* at 94 ("Although those issues may be relevant for calculating *damages* – those rebates, discounts, and non-price factors may mean that a particular plaintiff suffered no damages – they do not mean that plaintiffs were not *impacted* in some way.") (emphasis in original).

Rule 23 calls for an examination of whether Plaintiffs have "offered a colorable method by which they intend to prove impact on a class wide basis." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002); *see also Hydrogen Peroxide*, 552 F.3d at 311-12 (court must determine if plaintiffs can "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members").[60] If so, predominance inquiry is satisfied.

Proof of common impact does not require proof that every class member was actually injured. *In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365, 369 (D.D.C. 2007). Generally accepted methods for establishing class-wide impact include, among other things, economic calculations that cover both impact and damages and show predominance by providing a common method for proving that the class paid higher actual prices than in the but-for world. Other methods of common proof include "lock-step increases in national price lists in an oligopolistic market," *EPDM*, 256 F.R.D. at 88;[61] proof that "defendants conspired to maintain an inflated 'base' from which all pricing negotiations began," *NASDAQ*, 169 F.R.D. at 523

[60] *See In re TFT-LCD (Flat Panel) Antitrust Litig.("TFT-LCD")*, 267 F.R.D. 583, 606 (N.D. Cal. 2010) (assessing whether "plaintiffs have presented plausible methodologies for demonstrating class-wide impact"); *see also Meijer*, 246 F.R.D. at 308-09 (predominance found where plaintiffs' expert "propose[d]" to prove the alleged antitrust impact through a number of types of common proof); *Vitamins*, 209 F.R.D. at 265-68 (where plaintiffs' expert had merely "detailed the approach that plaintiffs intend to take with respect to establishing common impact," it was "enough that plaintiffs ha[d] made a threshold showing of how they intend to prove impact using generalized evidence on a class wide basis"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666, at *16 (M.D. Pa. 2007) (certifying class where there was "a factual basis" for expert's analysis); *Hydrogen Peroxide*, 552 F.3d at 325 (only when it is "genuinely disputed" that impact is "susceptible to proof at trial through available evidence common to the class" must the "district court resolve" disputes between the experts).

[61] *Behrend*, 264 F.R.D. at 187-89 (comparing list prices to "but for" or "benchmark" prices); *Toys "R" Us*, 638 F. Supp. 2d at 485-86 (finding impact based on defendants' maintenance of "uniform list prices nationwide" despite evidence of discounts resulting from sales and coupons); *Ready-Mixed Concrete*, 261 F.R.D. at 172 ("[C]ommon proof of impact is possible because of the direct evidence of price-fixing contained in Defendants' price lists.").

(citations and quotations omitted); *see also In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 171-72 (S.D. Ind. 2009); evidence of structural factors that make defendants' industry susceptible to successful collusion, *EPDM*, 256 F.R.D. at 91-92; *Behrend*, 264 F.R.D. at 160-61; *Ready-Mixed Concrete*, 261 F.R.D. at 170;[62] studies of the relationship between competition and prices, *Nifedipine*, 246 F.R.D. at 370; *Meijer*, 246 F.R.D. at 308-09; evidence concerning defendants' perceptions of the impact of competition (or lack thereof) on prices, *id.*; *Meijer*, 246 F.R.D. at 308-09; analysis of the effect of defendants' conduct on average price, *Nifedipine*, 246 F.R.D. at 369-70; and evidence of price hikes that were "not in line with input prices and were the result of communications between the defendants to sustain supracompetitive prices." *EPDM*, 256 F.R.D. at 85.

Plaintiffs have submitted not just one type, but many mutually-enforcing types of evidence that are widely accepted as sufficient for proving impact on a common basis. Plaintiffs' common evidence of impact goes well beyond what is required under any applicable standard.

Defendants repeatedly invoke *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004), to argue that since the alleged conspiracy here relates only to a single component of price, a finding of predominance necessarily cannot follow. *See* D. Br. 3-4, 41-44, 47, 50, 64. But these cases have nothing in common. Plaintiffs in *Robinson* relied on nothing more than that class members paid a state tax (called a "VIT") that was imposed as a line item (rather than treated as an overhead expense). The Fifth Circuit framed the issue as "whether the mere payment of a VIT – *unaccompanied by any other evidence* – provides enough information such

---

[62] *EPDM*, 256 F.R.D. at 91 ("[T]hose structural characteristics made it more likely that the impact of those price increases would be felt class-wide."); *TFT-LCD*, 267 F.R.D. at 601 (certifying class where plaintiffs' expert provided evidence that industry was susceptible to price-fixing, including evidence of high barriers to entry, and that there were "regular meetings and interactions that allowed defendants to exchange information, come to agreements").

that a party may sustain a price-fixing suit on behalf of the entire class." *Id.* at 423 (emphasis added). The Fifth Circuit held plaintiffs could not "assume that the VIT represents an additional charge that artificially increases the final purchase price for every purchaser in the class" or that "all members of the class suffered an antitrust injury just by paying a VIT." *Id.* at 423, 424.

Plaintiffs here, by contrast, are alleging that the purpose of the conspiracy was to effectuate an increase to "all-in" prices by means of their agreed FSCs. Plaintiffs do not ask this Court to *assume* that payment of FSCs, without more, caused antitrust injury. Plaintiffs have provided persuasive evidence – in the form of documents from Defendants themselves and regression analyses performed by Dr. Rausser – that the FSCs were intended to, and did in fact, raise overall prices.[63] And Defendants ignore the cases in cases involving price or product components where classes were certified.[64]

---

[63] *Robinson* is also inapposite because it involved millions of people raising claims against over a thousand defendants, who could not be certified as a defendant class. *Id.* at 420 & nn. 6, 9. *See Feder v. Electronic Data Sys. Corp.*, 429 F.3d 125, 139-40 (5th Cir. 2005) (distinguishing *Robinson* on that basis). *Exhaust Unltd., Inc. v. Cintas Corp.*, 223 F.R.D. 506 (S.D. Ill. 2004), cited by Defendants, is also inapposite. *Exhaust* involved "*several hundred* various ancillary charges imposed by the Defendants" relating to different fees ("delivery, fuel, waste water, service, inventory and maintenance fees"), which varied "in amount and in the method of calculation," were "subject of individual negotiations, have varying cost justifications, and were not consistently charged by Defendants in particular markets or at particular times." *Id.* at 511 (emphasis added). In *Exhaust*, the expert's "report" consisted of a 15-page, double-spaced affidavit, with no regression analysis, and a proposed "methodology" that would rely on examining defendants' invoices and calculating impact and damages based "simply [on] the environmental charge plus any tax levied on the charge." *See* Affidavit in Support of Class Certification (Oct. 17, 2003), 2003 WL 24334425, at ¶ 23. Other cases cited by Defendants, D. Br. 44-5, are not consistent with the approach courts in this Circuit use in analyzing predominance and are distinguishable based on what the expert for the proposed class did. *See American Seed Co. v. Monsanto Co.,* 238 F.R.D. 394, 400-01 (D. Del. 2006), *aff'd*, 271 Fed. Appx. 138 (3d Cir. Apr. 1, 2008) (plaintiffs' expert did not even conduct a preliminary market analysis; his report was not supported by charts, studies, or articles); *Schoenbaum v. E.I. DuPont de Nemours & Co.*, No. 4:05CV01108 ERW, 2009 WL 4782082, at *10 (E.D. Mo. Dec. 8, 2009) (plaintiffs' theory of impact was too "vague and undeveloped" for the court to understand).

[64] *See e.g., In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555 (S.D.N.Y. 2004) (percentage-based currency conversion charge on credit cards); *In re Universal Service*

## II. DEFENDANTS' ARGUMENTS ARE PREMISED ON FAULTY ECONOMIC ANALYSIS THAT FAILS TO SHOW AN ABSENCE OF COMMON PREDOMINATING ISSUES AS TO IMPACT.

### A. Defendants and Dr. Willig Largely Ignore the Structural Factors That Made the Rail Freight Industry Conducive to the Alleged Conspiracy.

Defendants and Dr. Willig do not seriously challenge – and largely disregard – Dr. Rausser's analysis showing the structural factors that made the rail freight industry conducive to collusion and meant that a pricing agreement among Defendants would likely have a Class-wide impact. *See* Rausser Rpt. 9-40, 49-52.[65] Dr. Willig's principal response is that the presence of so-called "captive" shippers meant that factors such as industry consolidation could not be expected to facilitate collusion, because "captive" shippers would already be subject to monopoly pricing. *See* Willig Rpt. ¶ 209. Not only are such arguments counterfactual, *see* Point I, *supra*, but Defendants' own transaction data shows that during the Class Period, so-called "captive shippers" were subject to the same FSCs as non-captive shippers, precisely as the

*Fund Telephone Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004) (universal service fund telephone service surcharges). *Accord Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 665 F. Supp. 869, 872 (E.D. Cal. 1986) ("[f]inally, defendants have not established beyond doubt by economic evidence that any overcharge on cooling and palletizing charges was offset by an identical decline in other price components, and defendants' argument in this regard is contrary to the holding of the United States Supreme Court in *Catalano*….").

[65] The structure of the rail freight industry meant an agreement by Defendants to fix prices would likely have a Class-wide impact. These factors include (a) the industry is "highly concentrated"; (b) extremely high barriers to entry"; (c) rail freight service "is interchangeable across Defendants" with customers making price-based decisions that create "strong incentives for the railroads to fix those prices"; (d) "demand for the Defendants' rail freight service is in general inelastic"; and (e) "implementation and operation" of a cartel is eased by a "history of regulated pricing and communications between Defendants." Rausser Rpt. 5-6. These factors "lay the groundwork for plaintiffs' argument that, if collusive behavior did occur, it would have been effective in raising prices across the class, thus demonstrating class-wide injury-in-fact." *EPDM*, 256 F.R.D. at 92; *see also Behrend*, 264 F.R.D. at 160-61; *Ready-Mixed Concrete*, 261 F.R.D. at 170; *TFT-LCD*, 267 F.R.D. at 601 (certification where expert provided evidence that industry was susceptible to price-fixing, including high entry barriers and "regular meetings and interactions that allowed defendants to exchange information, come to agreements, and police cheating").

pretext of the FSC program demanded. Rausser Reply 13, 23-27. Dr. Willig himself admitted that competitive forces can affect captive shipper rates. Willig Dep. 159-63.[66]

Even Dr. Willig acknowledges that the FSCs at issue were, in fact, an efficient mechanism to raise freight rates. *See, e.g.,* Willig Rpt. ¶ 26 ("fuel surcharges can enhance economic efficiency in the rail industry" by "reducing transaction costs due to the need to renegotiate prices when fuel costs change"). While Dr. Willig uses this efficiency to support his argument (which is plainly a Class-wide argument) that FSC use would have been prevalent absent a conspiracy, his efficiency argument is also consistent with Dr. Rausser's conclusion that the FSCs here were an effective mechanism by which to achieve a conspiratorial price increase.[67]

### B. Defendants and Dr. Willig Offer Only Flawed Challenges to Dr. Rausser's Analysis Establishing the Common Impact of the Alleged Conspiracy.

Dr. Rausser's regression analysis shows that the conspiracy impacted the Class by, among other things, causing a structural break in the relationship between fuel prices and freight rates. Rausser Rpt. 120, Rausser Reply 83, 92-97. Notably, Dr. Willig himself observed a change in the relationship between rail freight rates and fuel costs during the Class Period.[68] Similarly, the Christensen & Associates report on which Dr. Willig relies concluded that rising fuel prices between 2002 and 2006 could explain only a 3% average annual increase in rates, Christensen Rpt. 9-30, further supporting Dr. Rausser's conclusions. The Christensen report

---

[66] Dr. Willig's assertion that any conspiracy should have had no effect on "captive" shippers is also undermined by his admission that it would not be a simple matter for Defendants to determine which Class Members were truly "captive." Willig Dep. 145, 149, 168.

[67] Dr. Rausser explained that FSCs calculated as a percentage of base rates are "an especially effective mechanism for achieving and sustaining a conspiratorial rate increase in this industry." Rausser Rpt. 6. FSCs provided "a highly cost efficient mechanism for collusion," because they were a "mechanism for coordinated behavior that provides the ability to monitor, detect, and deter violations from agreed-upon collusive strategies." *Id.* at 9; *see also id.* 49-52.

[68] *See* Willig Rpt. ¶ 265 (noting an increase in "the sensitivity of rail rates to fuel prices during the conspiracy").

found that *around 2003* there was an unexplained and anomalous increase in railroads' variable and marginal costs – unrelated to fuel costs – about which the authors could only speculate. Christensen Rpt., 9-16 to 9-18. While Dr. Willig may attempt to offer an alternative, non-conspiratorial explanation for the break, that is a matter of Class-wide proof to be addressed at trial.[69]

In any event, Dr. Willig's purported criticisms of Dr. Rausser's analysis are methodologically flawed (in addition to being factually flawed as shown in Point I, *supra*).

**Industry Trends:** Dr. Willig seeks to demonstrate that the FSCs at issue reflected an industry trend that would have continued during the Class Period even absent collusion. But Dr. Willig utilizes an overtly unreliable model to establish this trend. The analysis uses an insufficient set of data points to establish purported "trends" – just two data points for CSX, and just two clusters of data points for each of the other Defendants. *See* Rausser Reply 7, 32-34.

Dr. Willig also uses a metric for "FSC incidence" that is not weighted to reflect the number of shipments subject to FSCs or the revenue earned on routes where FSCs applied: his analysis treated a shipper who paid FSCs on 1% of its shipments as equal to a shipper that paid FSCs on 100% of its shipments (regardless of the number of routes on which that Class Member

[69] In *In re Currency Conversion Fee Antitrust Litig.*, Plaintiffs alleged that defendants conspired to impose a 2% currency conversion fee, and both sides' experts agreed that the impact of the conspiracy could be determined by comparing that 2% fee to the fee that would have been charged in a "but for" world in which defendants had not engaged in unlawful activity. 264 F.R.D. at 115. The experts disagreed, however, on what fee would have been charged in the "but for" world. Plaintiffs' expert said that the fee would have been zero, so that damages and impact equaled the amount of the fee. Defendants' expert argued that defendants would have imposed the same 2% without collusion, so that class-wide damages were zero and the conspiracy had no impact. *Id.* Faced with these competing views of the "but for" world, the court concluded that both experts were relying on evidence common to the class, and that the court "should not resolve which 'but for' price is correct" at the certification stage. *Id.*

shipped, the volume of shipments, or the rate of the FSC ). *See* Willig Dep. 47, 52-53.[70] This artificially constructed metric was not used by any Defendant. Defendants' witnesses testified [redacted] – metrics that changed dramatically as a result of the conspiracy. [redacted]

In addition, Dr. Willig made no effort to assess whether, in cases where FSCs were applied before the start of the Class Period, those FSCs were the same as the conspiratorial FSCs, and admitted that his trend analysis led to no such conclusion.[73] Dr. Rausser showed that Dr. Willig's failure to weight the data for revenue masked both how much more extensive FSC

---

[70] Dr. Willig's analysis thus would not account for a conspiracy which dramatically increased the absolute number of routes on which FSCs were applied.

[71] [redacted]

[72] [redacted]

[73] "Q: Have you reached a conclusion that [in] the absence of the alleged conspiracy, the Defendants, through individual conduct, would have imposed fuel surcharges substantially similar to those that were imposed during the class period? A: I think it's fair to say that, first, that's not part of the conclusions offered in my report. * * * I am not going to that as a statement of my conclusion." Willig Dep. 235-236.

coverage became during the Class Period and that the sharp increase in coverage began in mid-2003 – wholly consistent with the factual record. Rausser Reply 34-37.

**Alternative Regression Model:** Dr. Willig presents an alternative regression model that purports to show the absence of the conspiracy's impact by comparing rail freight rates to marginal costs. *See* Willig Rpt. ¶¶ 195-199.[74] But rather than use Defendants' actual transaction data, Dr. Willig bases his model on highly aggregated marginal cost data from the Christensen report – *i.e.*, *average* inputs from *annual* railroad reports to the STB including from *non-Defendant* railroads.[75] On the price side, Dr. Willig uses *annual* industry freight rates, including sales data from *non-Defendant* railroads. Rausser Reply 8 n.14, 39-43.

Dr. Willig thus has used the very type of aggregated, average price and cost inputs that he criticized in *Nurses*.[76] Dr. Willig also admitted at his deposition that his analysis does not control for demand, commodity, route, car type, seasonality, or interline traffic, *see* Willig Dep. 211-13 – all of which are accounted for in Dr. Rausser's regression analysis. Thus, Dr. Willig's analysis does not account for critical shifts in the commodity mix, route mix, or the many other

---

[74] The first version of Dr. Willig's report also included an analysis of costs that compared the STB's freight rate index with the RCAF-A cost index, in an attempt to show that industry-wide freight rates increased during the Class Period in proportion to actual cost increases. *See* Expert Report of Robert D. Willig (Dkt. # 381) (June 30, 2010), ¶ 39, Figure C-5. However, Dr. Willig removed this analysis from his corrected report. *See* Willig Rpt. Ex. 4 (Errata) 1. He admitted at his deposition that the STB freight rate index was adjusted for general inflation, but the RCAF-A was not. *See* Willig Dep. 177-181. Accordingly, no direct comparison could be or should have been made. A simple solution would have been to adjust the RCAF-A index for inflation (something Dr. Willig chose not to do). *See* Willig Dep. 176-79. Dr. Rausser made that adjustment, and the result contradicts Defendants' and Dr. Willig's position: the revised comparison shows that the gap between industry-wide freight rates and RCAF-A fuel costs *widened significantly* during the Class Period, corroborating Dr. Rausser's analysis of a structural break and thus impact to Class members. *See* Rausser Reply 8, 37-38.

[75] Willig Dep. 202-03.

[76] *See Nurses*, 2009 WL 3146999, at *11 (criticizing use of "average wages" to "form the basis for" a regression analysis).

factors that would cause average costs and average freight rates to change in ways that makes a comparison of the two meaningless. Rausser Reply 8, 40-42. As Dr. Willig admitted, "doing an average price regression is just not going to help anybody, Professor Rausser or myself, successfully and validly deal with the issues before us in class certification." Willig Dep. 279.

Dr. Rausser's common-factors regression model, on the other hand, uses as inputs Defendants' transaction-specific data. Rausser Reply 66.[77] This model identifies the factors that predominantly explain rail freight shipment prices. *Id.*; Rausser Reply 8, 37-38.[78]

**Univariate Analysis:** Dr. Willig purports to study individual variables that affect rail freight shipment prices. But such univariate analysis is inherently flawed where multiple factors

---

[77] Defendants' reliance on *In re Flash Memory Antitrust Litig.* is misplaced, given that the regression there was based on data from only 3 of the 6 defendants. *See Flash*, 07-0086 SBA, 2010 WL 2332081, at *10 n. 9 (N.D. Cal. June 9, 2010). In addition, "[m]any sales contracts did not specify a future price, pricing formula or reference-pricing method, but instead called for renegotiation of prices on a frequent basis." *Id.* at *8.

[78] To the extent that Dr. Rausser made some very limited use of aggregation in estimating damages, this was primarily to lessen computational time. Rausser Reply 92. Courts have repeatedly found that quantification of damages can involve a reasonable use of average overcharge calculations. *See, e.g., Nifedipine*, 246 F.R.D. at 371 ("the Court can find no fault in [plaintiffs' expert's] consideration of *aggregate* changes in price") (emphasis in original); *NASDAQ*, 169 F.R.D. at 523 (proper to show that price range was affected "generally" by defendants' prices); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 2007 WL 4150666, at *20 ("[Defendants argue that [plaintiffs' expert's] proposed multiple regression analysis is flawed because it yields an average overcharge . . . . This will not defeat Plaintiffs' class certification motion because Plaintiffs do not have to present a precise damages formula at this stage."); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 345 (rejecting defendants' charge that plaintiffs' expert "makes improper use of averages"); *TFT-LCD*, 267 F.R.D. at 605 (noting that averaged data are used by courts in granting class certification); *In re Scrap Metal Antitrust Litig.*, No. 1: 02 CV 0844, 2006 WL 2850453 at *14, 16 (N.D. Ohio, Sept. 30, 2006), *aff'd*, 527 F.3d 517 (6th Cir. 2008) (in situation where plaintiffs' expert used average price spreads to compute average undercharges, court upheld jury verdict for plaintiffs; "[r]ecognizing that antitrust cases present damages questions that often are not amenable to concrete mathematical calculations, courts have regularly recognized averaging of overcharges as a valid method"); *Gordon v. Microsoft Corp.*, No., MC 00-5994, 2003 WL 23105550, at *3 (Minn. Dist. Ct. Dec. 15, 2003) (use of average overcharge analysis was permissible in determining what class-wide damages would have been in the absence of defendants' conduct). Regression analysis, which necessarily involves some aggregation, is a mainstream and widely accepted tool for demonstrating antitrust impact. *See Vitamins* 209 F.R.D. at 267-68; Pl. Mem. 73-74.

are known to influence prices. Rausser Reply 11-12, 69-76. Multiple regression models, like Dr. Rausser's common factors model here, are used in antitrust cases to account for the numerous supply and demand factors that determine prices, and therefore to measure the impact, if any, of alleged conspiratorial prices. *See, e.g.,* Reference Manual on Scientific Evidence, Federal Judicial Center (2d ed. 2000) 182 (excerpts attached at HD Ex. 62). In his univariate analysis, Dr. Willig is looking only at the effect of one price-influencing factor at a time. Not surprisingly, each individual variable evaluated in isolation can suggest significant pricing variations over different routes. But equally unsurprising, as Dr. Rausser shows, the addition of other explanatory factors reduces the extent of that variation. Rausser Reply. 73-76.[79]

**False Positives:** Dr. Willig utilizes a "false positives" analysis that is both misleading and incomplete. Dr. Willig cites no authority for utilizing such an analysis in the context of econometric regression modeling, and the results are flawed and unreliable. Rausser Reply 13-14, 83-90.

**Variations in Impact by Defendant:** Dr. Willig claims his analysis shows that utilizing Dr. Rausser's methodology, the impact of the conspiracy varies substantially when transaction data is analyzed on a Defendant-by-Defendant basis. This is not surprising, given that each Defendant came to the conspiracy with different circumstances. The extent of the variations is overstated by Dr. Willig. And even with variations, the impact for each Defendant here was positive. *See* Rausser Reply 98 n.225.

**Explanatory Power of Dr. Rausser's Regression Model:** Dr. Willig attacks Dr. Rausser's common factors regression model as purportedly failing to explain a sufficient amount

---

[79] Dr. Willing compounds the flaw by presenting variations in freight rates as bar charts or scatter plots, thus emphasizing extreme variation. Dr. Rausser's multivariate analysis shows that variation in freight rates across routes is not greater than in industries with perfectly homogeneous goods. Rausser Reply. 73-76.

of the variation in rail freight rates during the Class Period as compared to the pre-Class period.[80] Willig Rpt. 238-240. Specifically, Dr. Rausser's model had a so-called "R-squared" of 75%, meaning that the model explained over 75% of the variation in rates. Dr. Willig argues that this R-squared in not sufficiently high. But this ignores all of the academic literature explaining that an R-squared of 75% is not only reliable, but also higher than the R-squared measures most peer-reviewed journals are willing to report. Rausser Reply 66-68.[81] And the reliability of Dr. Rausser's model is further evidenced by professionally accepted statistical tests to determine whether a multiple regression model has practical value for predicting the dependent variable.[82]

## III. DAMAGES CAN BE CALCULATED BY A COMMON, WORKABLE METHOD.

By any applicable standard, Dr. Rausser's damage analysis far surpasses the required showing at the class certification stage. *See, e.g., Meijer*, 246 F.R.D. at 311 (plaintiff must present a methodology that is "not so insubstantial as to amount to no method at all"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 30 (D.D.C. 2001); *EPDM*, 256 F.R.D. at 100-01 ("The real question before this court is whether the plaintiffs have established a

---

[80] The type of regression modeling used by Dr. Rausser has been generally accepted by courts as a method for assessing the impact of a conspiracy. *TFT-LCD*, 267 F.R.D. at 606 ("courts have accepted multiple regression analyses as means of proving antitrust injury and damages on a class-wide basis"); *Currency Conversion*, 264 F.R.D. at 115 (affirming the experts' "methodology of determining class-wide impact: comparing actual prices to those that would exist in a 'but for' environment – that is, without the allegedly unlawful activity"); *Vitamins*, 209 F.R.D. at 268 (finding plaintiffs' expert had "viable methodologies by which it is possible to calculate damages on a class-wide basis," including a "multiple regression analysis").

[81] *See also TFT-LCD*, 267 F.R.D. at 601 (accepting regression model explaining 77% of price variation based on five variables).

[82] Dr. Willig also makes the somewhat contradictory argument that "even a regression model with a 'high' $R^2$ can fail to predict accurately the price paid for an individual shipment." Willig Rpt. ¶ 239. But Dr. Willig's fabricated example to support this argument – involving a made-up data set consisting of height for 26 individuals, 13 of whom are NBA players and 13 of whom are jockeys – proves nothing, since the model has a high R-squared resulting from the ability to predict height based on the profession of the individual (either NBA player or jockey). Rausser Reply 68.

workable multiple regression equation, not whether plaintiffs' model actually works, because the issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of damages through generalized proof.").[83]

Dr. Rausser has developed a regression model that can be used to calculate the damages to the Class and to each Class Member, and he has shown that the model works – first with respect to a large sample of the transaction data, and now with respect to *all* of the data. In his original report, Dr. Rausser implemented his methodology on a dataset that includes about 25% of each Defendant's total unregulated traffic over the period 2000 to 2008. Defendants argued (Willig Rpt. ¶ 274) that Dr. Rausser's original sample was unrepresentative (a flawed argument in a context where Plaintiffs are required to do no more than show a workable Class-wide methodology for estimating damages[84]). But Dr. Rausser has now run his regression model on the complete set of transaction data. Confirming the robustness of his model, the results of Dr. Rausser's expanded analyses are consistent with those he originally reported, and show both a structural break in the relationship between fuel prices and freight rates, coincident with the start of the conspiracy, and a statistically significant conspiratorial overcharge of approximately 13.4%. Rausser Reply 83.

---

[83] *See also Toys "R" Us*, 638 F. Supp. 2d at 490 ("Once injury has been shown, 'the jury is permitted to calculate the actual damages suffered using a reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.' Therefore, predominance requires only a viable method whereby damages can be reasonably estimated based on common evidence.") (citations omitted).

[84] *Compare J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) (Rehnquist, J.) ("Our willingness to accept a degree of uncertainty in these [antitrust] cases rests in part on the difficulty of ascertaining business damages . . . . The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. But our willingness also rests on the principle articulated in cases such a[s] *Bigelow*, that it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.") (quotations omitted).

Defendants mount several attacks on Dr. Rausser's analysis of Class-wide proof of damages. *First*, they argue that reporting an average overcharge is legally impermissible. D. Br. 62-63. However, Dr. Rausser's model does not stand alone, but builds upon his common impact regression. As noted above, in appropriate circumstances, use of averages or aggregated data to show an overcharge has been permitted in many antitrust cases, including a decision from this Circuit.[85] Moreover, as Dr. Rausser explains, his damage model does not assume a single overcharge and can be used to calculate individual damages. Rausser Reply 90-92.

*Second*, Defendants contend that Dr. Rausser's damages model cannot be used on a Class-wide basis because damages vary on particular shipments. D. Br. at 63-64. This argument is fallacious: "many courts have held that individual issues with respect to the amount of damages incurred by class members will not defeat certification where common issues predominate with respect to the alleged antitrust conspiracy and impact." *Meijer*, 246 F.R.D. at 312 (quoting *Vitamins*, 209 F.R.D. at 251). And as Dr. Rausser points out, the reported variation is to be expected and does not affect the conclusion to be drawn. Rausser Reply. At 98 n.225.

*Third*, Defendants contend that Dr. Rausser's damages analysis yields "nonsensical results" in the form of damages that exceed actual FSCs. D. Br. 5, 66. But Dr. Rausser explains that this assessment is incorrect: the overcharges to "all in" price found by his model, applied to 100 % of the transaction data, are generally below the applicable FSCs; and to the extent there are instances where the calculated overcharges do exceed the prevailing FSCs, this reflects various factors, including, for example, that in some instances fuel costs were already reflected in base rates (so that adding the FSC was a form of "double dipping" as found by the STB), and that Defendant NS "rebased" its fuel surcharges mid-conspiracy (thereby putting at least part of

---

[85] *See* p. 34, n.78, *supra.*

the surcharge into the base rate). Rausser Reply 96-99. Defendants other assertions – e.g., "negative damages" – are just a rehash of other arguments or otherwise baseless. *Id.* 83-84.

## IV. DEFENDANTS' OTHER ARGUMENTS DO NOT PRECLUDE CERTIFICATION

Plaintiffs' class definition certainly is "tailored properly so that 'an individual would be able to determine, simply by reading the definition, whether he or she is a member of the proposed class.'" *Johnson v. District of Columbia*, 248 F.R.D. 46, 52 (D.D.C. 2008) (quoting *Bynum v. District of Columbia*, 214 F.R.D. 27, 31-32 (D.D.C. 2003)). This is not "a particularly stringent test," and requires only that "the general outlines of the membership of the class are determinable at the outset of the litigation." *Bynum*, 214 F.R.D. at 31 (quoting *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998) (Friedman, J.)); *accord Barnes v. District of Columbia*, 242 F.R.D. 113, 120 (D.D.C. 2007).

Defendants assert, quite implausibly, that there is "no easy way" to determine whether traffic is "rate-unregulated." D. Br. at 75. But the STB ruling in 2007 applied only to rate-regulated traffic, and neither the STB nor Defendants argued then that it was too difficult to figure which traffic the ruling covered. Earlier in this litigation, Defendants had no problem refusing (until ordered) to produce transaction data for rate-regulated traffic. *See* Dkt. # 308. They did not claim then that it was too difficult to determine which transaction data related to rate regulated traffic. Defendants' expert has not claimed difficulty with such distinctions.

Defendants assert (D. Br. 76) that the Class definition is unworkable because it includes shippers who paid a "rebased" FSC. While Defendants suggest such shippers are not readily identifiable, *id.* at 69-70, [redacted]

[redacted] Dr. Rausser accounts for this.[87] Rausser Rpt. 117 n.250.

Defendants claim a "significant number" of contracts have arbitration clauses. D. Br. 77-79 & n.87. But "the possible arbitration of some class member claims will not, by itself, defeat class certification." *Lerner v. Haimsohn*, 126 F.R.D. 64, 66 (D. Colo. 1989); *see also Shankroff v. Advest, Inc*., 112 F.R.D. 190, 194 (S.D.N.Y. 1986). Defendants do not assert that any *named* plaintiffs have contracts containing such arbitration clauses,[88] nor that they have initiated arbitration over the issues in this case. Defendants' assertions as to their "intent" are far too speculative to defeat class certification. *Lerner*, 126 F.R.D. at 66.

Defendants also claim (D. Br. 80-81) that they have a "unique defense" of "spoliation" against Nyrstar. But Nyrstar took steps to address any concern that relevant evidence was lost. *See* Declaration of Mary Jane Fait at ¶¶ 5-12. Courts reject adequacy and typicality challenges based on purported spoliation defenses. *See, e.g., Hill v. Shell Oil Co.*, No. 98-C-5766, 2002 WL 663583, *5 (N.D. Ill. Mar. 28, 2002) (citing *Wagner v. Nutrasweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996)). Here, any such defenses are both hypothetical and speculative.[89]

---

86 [redacted]

87 Defendants claim that Plaintiffs' Proposed Trial Plan is "unworkable," but a trial plan is not even necessary to find superiority. *See Feder v. Elec. Data Sys*. Corp., 429 F.3d 125, 139-40 (5th Cir. 2005).

88 *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274 (4th Cir. 2007), involved three named plaintiffs whose contracts contained enforceable arbitration provisions, which the defendants had sought to enforce.

89 Citing *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010), Defendants argue that absence of a written

Finally, Defendants claim plaintiff Donnelly Commodities ("Donnelly") cannot be a class representative because it has recently filed for bankruptcy. But *Dechert v. Cadle Co.*, 333 F.3d 801 (7th Cir. 2003), rejected any "flat rule that a trustee in a bankruptcy . . . can never be a class representative," especially where, as here, there is a "substantial" "expected recovery." *Id.* at 803. Moreover, both *Dechert* and *Griffith v. Jabitch Block & Rathbone, LLP*, 358 B.R. 342 (S.D. Ohio 2007) involved a *single* bankrupt plaintiff seeking to be the *sole* class representative. Other courts have allowed such representation where (as here) "an additional representative [is designated] to appear as plaintiff along with the Trustee." *Ernst & Ernst v. U.S. Dist. Court for S. Dist. of Tex.*, 457 F.2d 1399, 1400 (5th Cir. 1972). The fact that NS is Donnelly's creditor is irrelevant. *See Schnorbach v. Fuqua*, 70 F.R.D. 424, 429 (S.D. Ga. 1975) (noting that "the action [in *Ernst & Ernst*] was allowed for the corporation and the shareholders, *despite possible liability of the former to the latter*." (emphasis added)); *see also In re Nat'l Student Mktg. Litig.*, M.D.L. Docket No. 105, 1973 WL 431, at *6 & n.9 (D.D.C. Oct. 2, 1973).[90]

---

litigation hold constitutes gross negligence. Putting aside that Nyrstar's counsel did follow oral instructions with a written hold notice, *Pension Committee* is not the mainstream view. *See, e.g., Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp.2d 598, 614-15 & n.13 (S.D. 2010) (distinguishing *Pension Committee*, questioning its compliance with Supreme Court authority, and citing *Bensel v. Allied Pilots Ass'n*, 263 F.R.D. 150 (D.N.J. 2009) (declining to apply spoliation inference or other sanction for loss of information resulting from party's failure to impose timely litigation hold where no bad faith was shown)).

[90] Defendants can cite no authority for their claim, D. Br. 79, that Dust Pro's "non-payment" disqualifies it as a Class representative.

Dated: August 27, 2010

Respectfully submitted:

Michael D. Hausfeld, D.C. Bar #153742
Michael P. Lehmann
William P. Butterfield, D.C. Bar #420354
Sathya S. Gosselin
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com

Steig D. Olson
HAUSFELD LLP
11 Broadway, Suite 615
New York, NY 10004
Telephone: (212) 830-9850
Facsimile: (212) 480-8560
Email: solson@hausfeldllp.com

Stephen R. Neuwirth
Richard I. Werder, Jr.
Daniel L. Brockett
Marc L. Greenwald
Sami H. Rashid
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email:
stephenneuwirth@quinnemanuel.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Sami H. Rashid, an attorney, certify that on August 27, 2010, I caused a true and correct copy of the foregoing memorandum to be served on counsel for Defendants.

/s/ Sami H. Rashid
Sami H. Rashid

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION

This document relates to:

ALL DIRECT PURCHASER CASES

MDL Docket No. 1869
Misc. No. 07-489 (PLF)

**MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ACCESS TO MATERIALS FILED UNDER SEAL**

The undersigned, counsel to The Southern Company, hereby moves this court for reasonable access to the entire, unredacted, unsealed record in the instant action. The grounds for this motion, which are set forth more fully below, are that the undersigned cannot fully advise their client, The Southern Company (and other clients as well) related to the benefits and detriments of "opting out" of the class, and as to other strategic issues, without reasonable access to the entire record in this matter including the unredacted versions of the currently highly redacted materials on file in this matter. A proposed Order embodying the relief requested is attached.[1]

[1] Pursuant to LCvR 7(m), counsel for the Southern Company conferred with counsel for the parties by email concerning their position on this motion. Counsel for various of the defendants indicated that they would not be able to respond to the request immediately and were unsure how long it would take for them to counsel with their clients. In order to afford any parties that might object a reasonable time in which to respond in advance of the Court's currently scheduled August 9, hearing. This motion is being filed now, but Movant remains willing to continue discussions to see if the parties can reach a resolution that avoids the need for response.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. COUNSEL FOR A MAJOR MEMBER OR MEMBERS OF THE CLASS SHOULD BE GRANTED REASONABLE ACCESS TO THE ENTIRE RECORD, NOT MERELY THE UNREDACTED PORTIONS

This firm represents The Southern Company as well as certain other companies that are members of the class certified by this Court's Order dated June 21, 2012 (the "Order of June 21"). We understand that The Southern Company and its affiliates constitute one of the largest victims of the fuel surcharge, having alone made surcharge payments in the hundreds of millions of dollars. We have followed the Class Action proceedings and have reviewed the Court's Order of June 21 and recently published Opinion granting class certification. In light of recent developments, it appears that members of the class will be required to decide how best to seek redress for their claimed injuries. Our and our clients' access to critical filed materials has been severely hindered by the extensive use of sealed or redacted filings.

In order to be in a position to advise The Southern Company and other of our clients regarding "opt out" and related decisions, we respectfully request that the undersigned counsel be permitted to review the entire filed record, including materials currently under seal, as a result of unilateral designations under the provisions of a broad protective order. Unfortunately, virtually all of the meaningful materials that have been filed, have either been marked confidential in their entirety or extensively redacted, and therefore are of limited utility for review by the public or counsel for individual members of the class.

In support of the relief requested we urge the following:

- In their "Joint Status Report Regarding Redactions of Class Certification Opinion" filed on July 11 (the "Report"), class counsel, who know what is in the non-public record, report the "keen interest" of class members in the litigation and the reliance of class members on the public docket which "is replete with heavily redacted materials given Defendants' over-zealous designation of documents – some nearly a decade old – as "Confidential" or "Highly Confidential." Report at 2.

- The parts of the record available for public review are so heavily redacted that it is impossible for members of the class to evaluate such critical matters as the impact on each of them of the damage theories presented by plaintiffs' economist, or the substantive case prepared by class counsel on whom they would be required to rely if they remain in the class. The class counsel describe the public docket as "opaque." Report at 2.

- Members of the class have no way of deciding if they would be well served or disadvantaged by such possible steps as opting out, bringing their own actions or having their recoveries determined by the work of the economists and litigators who have tailored their approaches to the entire class and not necessarily focused on the needs and claims of particular class members.

- As noted by class counsel familiar with the documents, the claims of the class end in 2008 and thus all information and data marked confidential relate to remote times and cannot have any current competitive or business significance which could justify continued confidentiality. Report at 4.

- This court has expressly observed the principles in favor of public access to filed material. In its Order of June 21, this Court observed: "[C]ourts are not intended to be, nor should they be, secretive places for the resolution of secret disputes," citing *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 597 (1978), *Johnson v. Greater Se. Cmty. Hosp. Corp*., 951 F. 2d 1268, 1277 (D.C. Cir. 1991); and *United States v. Hubbard*, 650 F. 2d 293, 317 n. 89 (D.C. Cir. 1980).

- After receiving briefing concerning potential redactions to this Court's opinion, the court declined to make a number of the apparently numerous redactions proposed by the defendants and instead issued a lengthy and detailed opinion on the public record, with minimal redactions.

As this Court recognized, there is a strong public interest in open access to the record. *A fortiori* counsel for entities who have a direct and substantial financial interest in the litigation should have access to the full record so that they can provide informed advice to their clients and so that their clients can make informed choices to best protect their interests. In the rare circumstance that a matter truly should not be available to the "public at large," then parties and their counsel can be subject to a protective order appropriately protecting the confidentiality of such material.

## II. THIS MOTION IS SEPARATE FROM AND UNAFFECTED BY THE PENDING MOTION FILED BY THE UNDERSIGNED ON BEHALF OF OXBOW IN THE OXBOW LITIGATION

As a point of information, we note that this firm is also counsel to Oxbow Carbon and Minerals LLC and related companies in civil action Case no. 11-CV-01049 (PLF) (the "Oxbow case") which asserts claims analogous to those in this action as well as other substantial claims not involved in this action. There is a motion pending in the Oxbow case to compel defendant Union Pacific Railway to comply with certain contractual undertakings and commitments it made to Oxbow, as part of a tolling agreement, related to providing Oxbow with access to discovery and other material in the MDL, and for other relief. That motion, though pending as well before this court, is separate from this application. Although Oxbow may file its own motion for access to the Court's record, neither that pending motion nor the pending motions by defendants in the Oxbow case to dismiss the Complaint are affected by this request.

## REQUEST FOR HEARING

We respectfully request that the Court allow the undersigned to appear at the hearing scheduled for August 9, 2012 for the limited purpose of addressing this motion for access.

## CONCLUSION

For the reasons set forth below, Troutman Sanders LLP should be provided with full access to the record herein including redacted and other documents filed under seal. A proposed Order embodying the relief requested is attached.

Dated: Washington, D.C.
July 24, 2012

Respectfully submitted,

TROUTMAN SANDERS LLP
401 9th Street, N. W.
Suite 1000
Washington, DC 20004-2134
(202) 274-2950

By: /s/ John R. Gerstein

John R. Gerstein, D.C. Bar No. 913228
Merril Hirsh, D.C. Bar No. 366952
901 9th Street, NW, Suite 1000
Washington, DC 20004-2134
Telephone: (202) 274-2950

Barry J. Brett
Daniel N. Anziska
405 Lexington Avenue
New York, NY 10174
Telephone: (212) 704-6000
Admitted *Pro Hac Vice*

Counsel for The Southern Company

**CERTIFICATE OF SERVICE**

I, John R. Gerstein, certify that on July 24, 2012, I electronically filed the foregoing Motion and Memorandum of Points and Authorities in Support of Motion for Access to Materials Filed Under Seal and proposed Order with the Clerk of the U.S. District Court for the District of Columbia using the CM/ECF system, which will in turn send a notice of this electronic filing to all counsel.

___/s/ John R. Gerstein________________

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. I)<br><br>This document relates to: ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-0489 |
| OXBOW CARBON & MINERALS LLC, et al.,<br>Plaintiffs,<br>v.<br>UNION PACIFIC RAILROAD CO., et al.,<br>Defendants. | Civil Action No. 11-1049 |
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br>This document relates to: ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 |

**BRIEFING SCHEDULING ORDER**

Upon consideration of the parties' April 12, 2024 Joint Status Report ("JSR"), MDL No. 1869, 07-MC-0489 ("*MDL I*"), ECF No. 1139; MDL No. 2925, 20-MC-08 ("*MDL II*"), ECF No. 963; *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, 11-CV-1049 ("*Oxbow*"), ECF No. 286, it is hereby—

**ORDERED** that the Scheduling Order previously entered in *MDL II,* Minute Order (Dec. 18, 2024) is **VACATED**; it is further

**ORDERED** that, given the considerations enumerated below, the following **SCHEDULING ORDER** governs the filing of anticipated motions addressing dispositive and Federal Rule of Evidence 702 issues across all or many cases ("cross-case motions") in *MDL I*, *Oxbow*, and *MDL II*.

## I. <u>CONSIDERATIONS:</u>

In setting the Briefing Schedule, the Court has taken into account:

**1.** ***Consolidation of Cases***. *MDL I* and *Oxbow* were transferred from the Honorable Paul L. Friedman to the undersigned on March 27, 2024, *see MDL I*, ECF No. 1129; *Oxbow*, ECF No. 278, and a consolidated briefing schedule for these cases and *MDL II* is now warranted.

**2.** ***Pending Motions As to* 10706 Decision**. The decision in *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.* (*In re Rail Freight Fuel Surcharge Antitrust Litig.*), 2024 U.S. Dist. LEXIS 36870 (D.D.C. Mar. 4, 2024) ("*10706 Decision*"), clarified the admissibility of certain documents, in whole or in part, under 49 U.S.C. § 10706, and the plaintiffs in *MDL I* and *Oxbow* have sought reconsideration and raised objections to defendants' proposed redactions submitted to effectuate that decision, with those pending motions and objections referred to Judge Friedman for resolution. *See MDL I*, Pls.' Sealed Mot. for Reconsideration, ECF No. 1131; *id.*, Minute Order (Apr. 1, 2024) (referring plaintiffs' motion to Judge Friedman for resolution); *id.*, Defs' Mot. for Leave to Respond to Pls.' Objections Re. Section 10706 Redactions, ECF No. 1136; *id.*, Minute Order (Apr. 16, 2024) (referring defendants' motion and all related filings to Judge Friedman for resolution); *Oxbow*, Pls.' Sealed Mot. for Reconsideration, ECF No. 280; *id.*, Minute Order (Apr. 1, 2024) (referring plaintiffs' motion to Judge Friedman for resolution); *id.*, Defs.' Mot. for Leave to Respond to Pls.' Objections Re. Section 10706 Redactions, ECF No. 284; *id.*, Minute Order (Apr. 16, 2024) (referring defendants' motion and all related filings to Judge Friedman for resolution). Any modification on reconsideration of the *10706 Decision* may require adjustment of the evidence relied upon in the parties' briefing on defendants' cross-case motions. Both parties therefore recommend that the Briefing

Schedule accommodate Judge Friedman's resolution of those pending motions and objections. *See* JSR at 3 (defendants' recommendation that "their opening brief be due on June 26, 2024, or three weeks after the reconsideration motion is decided, whichever is later."); *id*. at 17 n.6 (plaintiffs' recommendation that defendants' summary judgment briefs and parties' *Daubert* briefs be filed on June 13, 2024, with acknowledgment that if Judge Friedman has not resolved plaintiffs' reconsideration motion "by May 23, 2024, three weeks before opening briefs are due . . . the parties will meet and confer as to whether further delay is necessary."). The parties' recommendation makes sense and is adopted in the Briefing Schedule.

**3. *Plaintiffs' Invocation of Section 10706 Challenges Is Permissible*.** Based on concern that defendants may use the Section 10706 evidentiary rule as both a shield "to *exclude*" evidence regarding their conduct, JSR at 20 (emphasis in original), and as a sword "to *include"* such evidence, *id*., plaintiffs contend that the briefing schedule should "accommodate both sides' potential need to raise 10706 issues . . . , rather than pre-judging through a scheduling choice that . . . Defendants' own use of evidence is immune from the statute," *id*. at 21. While defendants point out that "Plaintiffs do not benefit from its protections, . . . have never previously moved to exclude any evidence under Section 10706" and "do not presently explain what they would challenge under Section 10706," *id.* at 5–6, plaintiffs' contention has support in the plain statutory text, which bars the admissibility of "evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement," "concern[ing] interline movement," 49 U.S.C. § 10706(a)(3)(B)(ii), without regard to which party is offering or relying upon the evidence. This blunt statutory evidentiary rule thus appears to apply equally to parties alleging that a

rail carrier was a party to an agreement "in violation of Federal law," *id*., and to rail carriers defending against such an allegation. Consequently, plaintiffs are permitted to raise Section 10706 objections to defendants' reliance in cross-party motion briefing on evidence subject to this statutory evidentiary bar.[1]

**4. *10706 Objection Process During Cross-Party Motion Briefing***. Given the detailed instructions to the parties in the *10706 Decision* as to precisely what evidence falls under Section 10706's evidentiary bar, subject to any further clarification by Judge Friedman in resolving the *MDL I* and *Oxbow* plaintiffs' pending reconsideration motion and objections to defendants' proposed redactions, and the expectation that the parties will conscientiously comply with the parameters imposed by those rulings in briefing on defendants' cross-party motions, no further substantial litigation or disputes about this issue is anticipated. Indeed, plaintiffs' counsel assured the Court, at the March 20, 2024 status conference, that while additional documents "might be in the record that could be put forward in a summary judgment opposition . . . it is the case that what is before Judge Friedman currently in *MDL I* is really the evidence that we would be utilizing for that purpose." *MDL II*, March 20, 2024 Status Conf. Tr. at 20:5–11, ECF No. 959 ("*MDL II*, Mar. 2024 Tr."); *see also id*. at 30:6–17 (in response to Court's query whether a "fair description" of the situation was that the *10706 Decision* in *MDL I* has the same effect in *MDL II* and, though "some new 10706 issues" may "come up in the summary judgment briefing in MDL II [] the parties aren't anticipating a lot," plaintiffs' counsel responded, "I think, yes." And defendants' counsel responded, "it depends on what they put in, but I

[1] Plaintiffs raise concern that defendants intend to make use of excluded Section 10706 evidence, citing defense counsel's statement in response to the Court's query at the March 20, 2024 status conference that defendants want to "'display' that 'we met and discussed interline topics.'" JSR at 20 (quoting *MDL II*, Mar. 2024 Tr. at 15:10–12). While, for example, some limited contextualization may be helpful and probative in assessing evidence occurring at the same meeting as Section 10706 protected and excluded discussions, putting before this Court large parts of prior briefing containing excluded evidence regarding the alleged conspiracy from *MDL I,* as defendants suggested at the status conference, *MDL II*, Mar. 2024 Tr. at 15:25–16:1, 37:6–7, would not be helpful to this purpose.

would hope so."); *id*. at 31:21–24 (plaintiffs' counsel stating that "defendants might challenge some new article of evidence that we submit in opposition of summary judgment in *MDL II* on 10706 grounds. I think you have heard from all of the parties that that is highly unlikely.").

Moreover, entertaining—or inviting, no less—additional Section 10706 litigation during the course of cross-party motion briefing would be cumbersome, potentially frustrate set deadlines by extensions of different stages of the briefing schedule for unknown periods awaiting judicial resolution, and possibly result in highly divergent schedules for cross-party motion briefing and *Daubert* briefing, which, as defendants indicate "will lead to inefficiencies in the briefs" since "[s]ome Daubert issues and some summary judgment issues are likely related." JSR at 7. Just as defendants suggest that plaintiffs may present their 10706 objections "in their opposition briefs," JSR at 6, so, too, may defendants, particularly since the audience for the briefing is this Court, not a jury, for which Section 10706 expressly bars "allowing the introduction of any such evidence," 49 U.S.C. § 10706(a)(3)(B).

To avoid further delays in this long-running litigation, should objections arise about the admissibility under Section 10706 of evidence relied upon in the other side's cross-party motion briefing, the parties will be directed to confer promptly and submit jointly a supplemental filing reflecting the results of the conferral process, as outlined in the Briefing Schedule. Any such objections will be considered in resolving the arguments presented in briefing on defendants' cross-party motions, without otherwise interrupting the briefing schedule or piecemeal issuance of rulings sustaining or overruling 10706 objections, beyond the guidance provided in the *10706 Decision*, and any subsequent clarification by Judge Friedman provided in the *MDL I* and *Oxbow* plaintiffs' pending

motions for reconsideration and objections referred to him. While this leaves the parties with some uncertainty about how any Section 10706 objections raised during the course of briefing will be resolved, this Court's expectation is that such objections, if any at all, will be limited, few and minor, after the extensive litigation about these issues that has already occurred and is still underway before Judge Friedman.[2]

**5. *Briefing Deadlines*.** In view of the multi-year duration of this litigation, anticipated volume of briefing, and number of parties, whose positions must be coordinated for efficient and effective presentation of arguments for each side, plus the mere two-week difference in deadlines proposed by the parties for initial briefing, *see* JSR at 3, 19, the defendants' proposed briefing deadlines with "their opening brief [] due June 26, 2024, or three weeks after the reconsideration motion is decided, whichever is later," *id*. at 3, are reasonable.

**6. *Briefing Volume*.** For their opening briefing, defendants seek permission to file: **(a)** 180 pages of summary judgment briefing related to the plaintiffs' conspiracy claims about carload traffic, coal traffic, and intermodal traffic, JSR at 11; **(b)** 45 pages of related summary judgment briefing on defendants' contention that plaintiffs fail "to show how the supposed conspiracy caused any particular injuries, or how any individual plaintiff was damaged," *id*. at 12; **(c)** 25 pages of related summary judgment briefing that no conspiracy "could have continued in 2007," since "the Surface Transportation Board (STB) disallowed the use of rate-based fuel surcharges for rate-regulated traffic" in January, 2007, *id*. at 13; **(d)** 45 pages of briefing on tolling—or lack thereof—under *American Pipe & Construction*

[2] The Court acknowledges that this manner of handling any 10706 objection during cross-party motion briefing means that reliance on evidence testing the limits of prior rulings on application of Section 10706 will be at the risk that such evidence is excluded in evaluating the parties' arguments. At the same time, this process will avoid relitigation of matters already resolved before Judge Friedman and the additional briefing interruption and delay problems identified in paragraph I.4.

*Co. v. Utah*, 414 U.S. 538 (1974), to preclude damages arising from rail traffic involving mileage-based surcharges, CSX Intermodal transportation services, transportation purchases between March 1 and June 30, 2003, claims based on contracts entered before July 1, 2003 and damages claims arising from conduct occurring after December 321, 2008, *id*. at 14, and **(e)** 45 pages for each *Daubert* challenge planned as to each of plaintiffs' nine experts, or a total of 405 pages for the *Daubert* challenges alone, altogether amounting to about 700 possible pages of just opening summary judgment and *Daubert* briefing.

This proposal by defendants is excessive and unduly burdensome on the parties and the Court, while plaintiffs' proposal of 180 pages of opening briefing across all summary judgment and related motions, and 100 pages of opening briefing on *Daubert* issues is more manageable and reasonable.

## II. <u>Briefing Page Limitations:</u>

At the parties' request, the general rule limiting briefing in support or in opposition to a motion not to exceed 45 pages and reply briefing not to exceed 25 pages, *see* D.D.C. LCvR 7(e) (requiring compliance with these page limitations "without prior approval of the Court"), is modified to permit the parties to submit briefing with the following page limitations:

**1.** ***Defendants' Cross-party Motions***. Defendants are allocated 180 pages for their opening cross-party motions briefing, plaintiffs are allocated 180 pages for their opposition briefing, and defendants are allocated 100 pages for their reply briefing. That briefing may be presented by separate or consolidated briefs on separate motions, or a combination thereof, provided the total pages are within the total limit.

**2**. ***Daubert Challenge Briefing***. The parties are allocated 100 pages for their

opening *Daubert* briefing, 100 pages for their opposition briefing, and 50 pages for their reply briefing. That briefing may be presented by separate or consolidated briefs, or a combination thereof, provided all briefing is within the total limit.

**III. Briefing Schedule for *MDL I*, *Oxbow*, and *MDL II*:**

**1.** By **June 26, 2024**, or three weeks after the plaintiffs' motion for reconsideration and objections to defendants' proposed redactions in *MDL I* and *Oxbow* is decided, whichever date is later, defendants shall file their cross-case summary judgment and related motions, and all parties shall file on the docket any *Daubert* motions. If the filing date for defendants' cross-case summary judgment and related motions turns out to be later than June 26, 2024, the parties are directed to submit jointly, within ten days of the new filing date, a motion to update the Scheduling Order with proposed new filing dates for the remainder of the briefing schedule.

**2.** By **July 11, 2024**, the parties shall submit jointly, after conferral regarding any objection by plaintiffs that defendants' cross-case summary judgment briefing relies upon evidence subject to exclusion under Section 10706, either (a) any necessary adjustments to specific pages in the objected-to briefing that removes inadmissible material but without adding additional evidence or making other substantive changes, or (b) if the objection remains unresolved, the parties' positions as to why such relied-upon evidence should be excluded under Section 10706, the *10706 Decision*, and any subsequent rulings on this issue, such that this issue may be considered in resolving the cross-case summary judgment motions.

**3.** By **September 27, 2024**, plaintiffs shall file their oppositions to defendants' summary judgment motions, and all parties shall file oppositions to *Daubert* motions.

**4.** By **October 15, 2024**, the parties shall submit jointly, after conferral regarding any objection by defendants that plaintiffs' opposition briefing relies upon evidence subject to exclusion under Section 10706, either (a) any necessary adjustments to specific pages in the objected-to

briefing that removes inadmissible material but without adding additional evidence or making other substantive changes, or (b) if the objection remains unresolved, the parties' positions as to why such evidence should be excluded under Section 10706, the *10706 Decision*, and any subsequent rulings on this issue, such that this issue may be considered in resolving the cross-case summary judgment motions.

**5.** By **November 22, 2024**, defendants shall submit their replies in support of their summary judgment motions, and the parties shall submit their replies in support of their *Daubert* motions.

**IT IS SO ORDERED.**

DATED: April 26, 2024

**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| Exxon Mobil Corporation, ExxonMobil Oil Corporation, ExxonMobil Global Services Company, Imperial Oil, Imperial Oil Limited, and Canada Imperial Oil Limited,<br><br>*Plaintiffs,*<br>v.<br><br>BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company,<br><br>*Defendants.* | **JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

This is an antitrust action charging Defendants with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action against Defendants, from one or more of whom each Plaintiff directly purchased unregulated rail freight transportation services from July 1, 2003 until at least December 31, 2008 (the "Relevant Period") and by one or more of whom each Plaintiff was assessed a rate-based rail fuel surcharge ("FSC") for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

**NATURE OF THE ACTION**

1. In 2003, the four largest United States-based Class I railroads engaged in an extraordinary series of meetings, phone calls, and email communications through which they embarked on a conspiracy – under the guise of a fuel cost recovery program – to apply and

enforce rail fuel surcharges across their customers in order to generate profits. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") (all together, "Defendants") together controlled about ***90%*** of rail freight traffic in the United States during the Relevant Period. Defendants used "rate-based" FSCs – i.e., surcharges that use a percentage applied to the base rate for a shipment – as a means to impose across-the-board rate increases on rail freight shipments, a result that would have been prohibitively difficult to achieve on a contract-by-contract basis. Throughout the conspiracy and despite customer pushback against Defendants' FSCs, Defendants set aside their individual, economic self-interest to undercut one another and instead staunchly maintained their FSC program, pocketing billions of dollars in profits as a result.

2. Prior to conspiring, Defendants operated as businesses should: they actively competed against each other over rates generally and with respect to fuel recovery mechanisms to the benefit of their customers. According to a historical study of rail rates undertaken by the Surface Transportation Board ("STB"), "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Defendants were aware of, and concerned about, this trend. According to one CSX internal analysis from 2002, this decline resulted from factors including – "some very vicious historical price wars" in the rail industry and "destructive pricing for rail share."

3. Between 2000 and 2003, Defendants independently tried to implement revenue-enhancing policies, including uncoordinated efforts to impose stand-alone FSCs. These efforts failed. Defendants used the inclusion or absence of FSCs as a basis to compete for each other's business and customers successfully resisted FSCs. They were rarely included in contracts and

more rarely collected; those seeking to impose them lost customers to competitors or compensated customers by negotiating discounts. For example:

- BNSF explained in a May 2002 Enterprise Wide Risk Assessment that "***We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace***. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. ***We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it***."
- In September 2002, NS's manager of pricing systems Pat Glennon reported to the then-Senior Vice President of Marketing Services and later its CMO Don Seale that ***"[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause***," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities."
- As late as April 2003, UP's Bob Toy reported, "***Fuel surcharge $ are melting away at the competition***. In a downward-pressure environment, what's on paper must not work in the real world."

4. Moreover, since the passage of the Staggers Act in 1980, which significantly deregulated the American railroad industry, railroads typically entered into private freight transportation contracts that included escalation provisions tied to indexes that weighted actual cost factors, including fuel cost. As UP President James Young acknowledged on an October 2004 earnings call, the Rail Cost Adjustment Factor ("RCAF") "looks at *actual* costs through the

industry." In that respect, Defendants were *already* recovering fuel costs through the RCAF or the related All Inclusive Index ("AII").

5. In March 2003, everything began to change. Rather than competing, Defendants began coordinating FSC programs. Senior executives at the highest levels of each company began to discuss with one another the implementation of more aggressive FSC formulas that the Surface Transportation Board ("STB") later found bore "***no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied . . . .***" In short, Defendants stopped competing and started conspiring.

6. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates. Simultaneously, UP's CMO Jack Koraleski was recommending escalation of UP's FSC program to be substantially more aggressive. ***The very next day***, Koraleski traveled to competitor CSX to play golf, socialize, and discuss "fuel surcharge methodology." ***Within one week***, CSX's leadership abruptly reversed course, abandoning its recommended FSC reduction and adopting a program ***matching*** UP's escalation.

7. On March 18, 2003, BNSF and NS senior executives met to discuss "***synchroniz[ing]***" FSCs. Action items for the meeting attended by John Lanigan (BNSF's CMO) and Don Seale stated: "BNSF's fuel surcharge is structured differently than NS, CSX and UP. ***Should BNSF's by [sic] synchronized with the other big players in the industry?***" The answer based on what followed: a resounding yes.

8. On March 20, 2003, CSX publicly announced a new, more aggressive FSC program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "***the same approach as the CSXT***." On April 4, 2003, UP sent a "concurrence" to

competitors that its new FSC program will "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "***This is sweet !!! Just like the CSXT.***"

9. On April 1, 2003, BNSF and CSX senior executives met. The agenda dictated that CSX's CMO Mike Giftos and BNSF's CMO John Lanigan were to discuss "***Fuel Surcharge***." Documents also reveal that, between April 2 and 6, 2003, NS's Seale and BNSF's Lanigan continued a prior discussion on "***the fuel surcharge issue***" at a National Freight Transportation Association meeting.

10. Similar to CSX's abandonment of a less aggressive FSC regime following a meeting with UP in March 2003, BNSF abandoned the internal consideration of an FSC program that could have been fairer for shippers. Between February and April 2003, BNSF had been "[l]eaning toward [a] Cost Per Mile" FSC formula (a mileage-based FSC which could have better correlated the resulting FSCs to actual fuel costs compared to the rate-based FSCs that Defendants broadly implemented during the conspiracy), but abandoned this approach. Instead, BNSF and UP adopted nearly identical *rate-based* FSCs. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, ***it exactly matches the BNSF FSC percentage progression***, including lag times and effective dates."

11. Defendants' employees recognized these new FSCs were not genuine fuel cost recovery mechanisms as Defendants sought to portray. For example, on March 19, 2003, CSX's Director of Market Strategy John Couch explained that while the coordinated FSC "***seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%***." On April 7, 2003, NS's Manager of Pricing Systems Pat Glennon recounted "[t]he case in favor of adopting the CSXT standard" to Don Seale and AVP Charlie Brenner,

writing the "CSXT standard ***clearly produces significantly more compensation, and it does it sooner and more consistently***." On April 29, 2003, Glennon told Seale that "[b]y dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, ***the change is in fact a <u>blatant general rate increase</u>***, and will appear so to customers."

12. Glennon was correct that customers saw the rate increases for what they were and were outraged. Handwritten notes from a June 2003 meeting between CSX and UP's senior executives – including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden, VP of Strategic Planning Les Passa, and Alan Blumenfield, and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan – reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes. The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

13. But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall***."

14. And, instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants maintained the scheme and imposed policies designed to ensure their new "standard" or "published" FSCs were enforced broadly across their customers without the waivers and discounts they had frequently offered between 2000 and 2002:

- **BNSF**: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "***Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed.***"
- **UP**: On December 22, 2003, a sales representative explained to a customer, "As a company policy, all ***contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice***."
- **CSX**: A May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence Gooden stated that any exception had to come through him and that he had zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***."
- **NS**: A 2004 email from Don Seale to his subordinates mandated "***no deviation from NS's published FSC without [his] prior approval***." He also rejected any negotiations to forego base rate increases in return for FSC application as a "shell game."

15. In the fall of 2003, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to get all Defendants to agree to remove fuel costs out of the weighted RCAF and AAI indices (which already permitted the Defendants to recover all of their fuel costs), so that they could more easily charge artificially high FSCs as a revenue

enhancement mechanism. As a result, the AAR—whose board was dominated by Defendants—created an unprecedented All Inclusive Index *Less Fuel* ("AAILF"). Defendants' conspiratorial implementation of the AAILF allowed Defendants to move away from use of the RCAF and more easily apply their FSCs.

16. Defendants worked tirelessly to achieve 100% FSC coverage across their customers. All four Defendants pursued 100% participation goals and tracked their progress toward attaining that goal. Defendants also policed the conspiracy by exchanging FSC coverage data with one another. In addition, Defendants started their negotiations using the standard FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (*i.e.*, facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

17. Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150 per barrel during the Relevant Period, so did Defendants' profits. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," and included the following chart documenting the significant growth in profits during the Relevant Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

18. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") similarly found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

19. Defendants also attributed their record revenues to FSCs. For example:

- **NS**'s 2006 "***[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase*** and modestly higher traffic volume."
- **BNSF**'s freight revenues "***increased 15 percent [in 2006] to a record high of $14.5 billion*** on double-digit increases in each of our four business units." "***Growth in prices and fuel surcharges*** drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

- **UP** "achieved record revenue levels [in 2006] in all six of our commodity groups, ***primarily driven by better pricing and fuel surcharges***."
- **CSX**'s operating revenue increased $948 million in 2006; "the primary components of the revenue gain" were "continued yield management ***and the Company's fuel surcharge program, which drove revenue per unit across all major markets.***"

**PARTIES**

20. Plaintiff **Exxon Mobil Corporation** ("ExxonMobil") is a corporation organized under the laws of the State of New Jersey with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039. During the Relevant Period, ExxonMobil was one of the world's leading energy companies, and was active in the worldwide exploration, production, transportation, and sale of crude oil and natural gas (Upstream) and the manufacture, transportation and sale of petroleum products (Downstream). ExxonMobil was also a major worldwide manufacturer and marketer of commodity petrochemicals. During the Relevant Period, ExxonMobil purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport raw materials and finished products, including plastics, liquid chemicals, chemical additives, lubricants, fuels, and crude, to and from (A) facilities in Texas, Louisiana, Illinois, Montana, and California, and (B) customers nationwide.

21. Plaintiff **ExxonMobil Oil Corporation** ("ExxonMobil Oil") is a corporation organized under the laws of the State of New York with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039. ExxonMobil Oil is a wholly-owned subsidiary of ExxonMobil. During the Relevant Period, ExxonMobil Oil purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport raw materials and finished products, including plastics, liquid chemicals, chemical additives, lubricants, fuels,

and crude, to and from (A) facilities in Texas, Louisiana, Illinois, Montana, and California, and (B) customers nationwide.

22. Plaintiff **ExxonMobil Global Services Company** ("ExxonMobil Global Services") is a corporation organized under the laws of Delaware with its principal place of business at 22777 Springwoods Village Parkway, Spring, Texas 77389. ExxonMobil Global Services is a wholly-owned subsidiary of ExxonMobil. During the Relevant Period, ExxonMobil Global Services purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport raw materials and finished products, including plastics, liquid chemicals, chemical additives, lubricants, fuels, and crude, to and from (A) facilities in Texas, Louisiana, Illinois, Montana, and California, and (B) customers nationwide.

23. Plaintiff **Imperial Oil** is a company organized under the laws of Canada with its principal place of business in 505 Quarry Park Blvd, Calgary, AB T2C 5N1, Canada. Imperial Oil is partly-owned by ExxonMobil. Imperial Oil is an integrated energy company that is Canada's largest refiner of petroleum products. During the Relevant Period, Imperial Oil purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport raw materials to facilities in Alberta and Ontario and to transport finished petrochemical products from those facilities to customers throughout Canada and the United States.

24. Plaintiff **Imperial Oil Limited** ("Imperial Oil Ltd.") is a company organized under the laws of Canada with its principal place of business in 505 Quarry Park Blvd, Calgary, AB T2C 5N1, Canada. Imperial Oil Ltd. is a partly-owned by ExxonMobil. During the Relevant Period, Imperial Oil Ltd. purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport raw materials to facilities in Alberta and

Ontario and to transport finished petrochemical products from those facilities to customers throughout Canada and the United States.

25. Plaintiff **Canada Imperial Oil Limited** ("Canada Imperial Oil") is a company organized under the laws of Canada with its principal place of business in 505 Quarry Park Blvd, Calgary, AB T2C 5N1, Canada. Canada Imperial Oil is a partly-owned by ExxonMobil. During the Relevant Period, Imperial Oil purchased unregulated rail freight transportation services directly from one or more of the Defendants to transport raw materials to facilities in Alberta and Ontario and to transport finished petrochemical products from those facilities to customers throughout Canada and the United States.

26. As a proximate result of the conspiracy described herein, each Plaintiff paid FSCs in connection with the unregulated rail freight transportation services obtained from Defendants that they would not have paid in the absence of the conspiracy; and therefore the prices each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices Plaintiffs would have paid absent the conspiracy alleged herein. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

27. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

28. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United

States. NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

29. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

30. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

**JURISDICTION AND VENUE**

31. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiffs by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

32. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

33. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events

giving rise to each Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

34. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**INTERSTATE TRADE AND COMMERCE**

35. During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

36. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

37. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

**DEREGULATION OF THE RAILROAD INDUSTRY**

38. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution

of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

39. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

40. Today, by contrast, 80% or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

41. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry is now (and was during the Relevant Period) highly concentrated: four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90% of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

42. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

**DEFENDANTS SEEK UNSUCCESSFULLY TO RAISE RATES BEFORE THE RELEVANT PERIOD**

43. For many years before the Relevant Period, Defendants confronted a long-term, structural decline in rail freight rates. Indeed, according to the Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of Railroad Rates: 1985-2007*, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Figure 1 from the *Study of Railroad Rates* evidences that trend:




44. Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts by the

individual Defendants to apply stand-alone FSCs. Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

45. During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs. The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an internal analysis as "some very vicious historical price wars" and "destructive pricing for rail share." A 2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? ***We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy***.

46. During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs. By way of example:

- **NS**: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty." VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it." The same month, Director of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC." In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to

a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS." Glennon testified that in 2001 and 2002, FSCs were only "***theoretically billable***."

- **CSX**: In August 2000, CSX reported at a staff meeting that it could collect only 67.4% of the then-modest FSCs it had billed over the preceding nine months. EVP of Sales and Marketing Clarence Gooden testified that CSX's FSC coverage was "***very low***" and that he was "***embarrassed***" by the figure.

- **BNSF**: In May 2002, BNSF's Enterprise Wide Risk Assessment explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, EVP and CMO Charles Schultz told Chairman, President, and CEO Matthew Rose and other executives, "***any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive***." Schultz's successor John Lanigan testified BNSF's FSC coverage was "low" in January 2003 – "in the 25 to 30 percent range."

- **UP**: Current EVP and CFO Robert Knight Jr. testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position." UP implemented an FSC program in December 2002, but initially limited the application of that program to certain tariffs and circulars and exempted private

shipments in its Industrial Products group from FSCs. This was true even though FSCs were generally not triggered and only "theoretically billable." And in April 2003, Director Bob Toy reported, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

47. The reason Defendants were not able to achieve broader FSC coverage was clear: Defendants were concerned about losing business to other Defendants that did not apply FSCs, made concessions, or otherwise applied FSCs less aggressively. Defendants expressed these concerns internally and, in fact, lost business through FSC competition. Each Defendant also frequently agreed not to apply FSCs in the face of shipper objections.

48. For example, in May 2002, BNSF reported that it was challenging to impose FSCs because its main western competitor, "UP[,] does not use a fuel surcharge in the competitive marketplace." It continued, "rail competitors do not [use FSCs] and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, NS reported that its main eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS."

49. And, in May 2003, BNSF announced that it would ***reduce*** its standard FSC to 2% from 5% in May 2003 because a 5% FSC "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage." In response, UP observed internally that "Fuel surcharge $ are melting away at

the competition. In a downward-pressure environment, what's on paper must not work in the real world."

50. Another impediment to broad application of FSCs during this period was the so-called Rail Cost Adjustment Factor, or "RCAF." The RCAF is a weighted index that accounts for all significant input costs, including fuel. The RCAF was utilized in multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.

51. Defendants recognized that imposing a stand-alone FSC where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping." For example, Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."

52. As a result, the number of shippers covered by stand-alone, rate-based FSCs was relatively low before the Relevant Period, and FSCs did not contribute significantly to Defendants' revenues or bottom lines.

**DEFENDANTS CONSPIRE IN 2003 TO RAISE PRICES BY ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS MEANS TO INCREASE ALL-IN RATES**

53. By 2003, Defendants' initial attempts to apply rate-based FSCs on their own taught them an important lesson: they could not achieve their revenue enhancement objectives unless the FSC was widely applied on a coordinated basis by all four Defendants. Absent coordination, a railroad seeking to impose FSCs more aggressively than its competitors would risk losing business to another railroad who imposed no FSC or whose FSC policies were more flexible. By early 2003, it became apparent to Defendants that they would encounter difficulties making their FSC policies "stick" absent an industry-wide agreement.

54. Thus, beginning in the spring of 2003, Defendants' senior executives – including their CEOs and top sales/marketing executives – engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC program. The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers industry-wide.

55. The FSC programs that Defendants implemented between March 2003 and January 2004 by mutual agreement are exactly the sort of industry-standard FSC that Defendants' senior executives discussed.

56. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly ***reduced*** the surcharges applied to shippers' base rates.

57. That same day, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" attributed to UP CMO Jack Koraleski. Under the UP "Revised" proposal, FSCs were more aggressive, escalating at roughly twice the rate of the formula CSX had internally recommended. The "Revised Surcharge proposal" retained the $28 West Texas Intermediate ("WTI") strike price of UP's existing program but would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0% increase for every $5 increase in the WTI index.

58. The following day, Koraleski traveled to CSX to play golf, socialize, and discuss "fuel surcharge methodology." Beforehand, Koraleski and CSX's executive vice president of sales and marketing, Clarence Gooden, "talked on" the subject of "[f]uel surcharge methodology."

59. On March 19 and 20, 2003, within one week of the UP-CSX meeting on "fuel surcharge methodology," CSX publicly announced a new FSC policy. The program retained the

lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal." Thus, under CSX's new FSC policy, CSX would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase above $23.48.

60. Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. CSX reasoned that while these modifications to its FSC program might "seem[] somewhat benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

61. On March 31, 2003, less than two weeks after CSX's announcement, UP decided to adopt "the same approach as the CSXT." Following the CSX approach, UP would impose a 0.4% FSC at a monthly-average WTI "trigger" price of $23 (*i.e.* the index price at which FSCs begin), and assess an additional 0.4% charge for every dollar increase in the WTI index above $23. BNSF, which had previously discussed the need for a "synchronized" FSC policy with NS, had a predictably positive reaction to UP's announcement: "This is sweet!!!! Just like the CXST."

62. On March 18, 2003, NS and BNSF senior executives – including NS's Chairman, President, and CEO David Goode, Vice Chairman and COO Steve Tobias, Vice Chairman and CFO Hank Wolf, VP and CMO Ike Prillaman, SVP of Planning Jim McClellan, VP of Intermodal Mike McClellan, SVP of Transportation Mark Manion, SVP of Marketing Services Don Seale, BNSF's Chairman, President, and CEO Matt Rose, current President and CEO and then-VP and COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete

Rickershauser, VP of Consumer Products and head of intermodal activities Steve Branscum – met and discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. This discussion point was assigned to NS's Seale and BNSF's Lanigan.

63. On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."

64. The trade association meeting was the biannual National Freight Transportation Association ("NFTA") meeting that took place on April 2-6, 2003 at the Wigwam resort, in Litchfield Park, Arizona. Each of the Defendants attended the meeting. Almost immediately following the NFTA meeting, a new internal directive was issued at BNSF that was designed to ensure across-the-board FSC application: "Effective immediately and urgently per John Lanigan[:] Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

65. On April 1, 2003, CSX CMO Mike Giftos and BNSF CMO John Lanigan met in Jacksonville, Florida to discuss "Fuel Surcharge."

66. In early 2003, BNSF had been leaning toward a mileage-based FSC and trying to drum up support within the industry for a mileage-based FSC formula. But on May 7, 2003 – approximately one month after the NFTA meeting and its meeting with CSX – BNSF abandoned that effort. Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the On-Highway Diesel Fuel ("HDF") index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."

67. Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index. The BNSF FSC had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index. From that point on, BNSF and UP (together, the "Western Railroads") moved in lockstep and charged the exact same FSC percentage for each month of the Relevant Period.

68. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied an FSC of 0.5% for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2%. The FSC would increase 2% for every 20 cent increase in the HDF Index.

69. The Western Railroads also coordinated when they would change their FSC. They agreed that the FSC would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March. The Western Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

70. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after

the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

71. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing FSC program. In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

72. As to NS, between March 2003 and December 2003, while positioning itself to quickly implement the FSC first announced by CSX, NS had regular discussions with the other Defendants, including discussions of what FSC was "acceptable" to them and the desirability of an industry-standard FSC.

73. As it had planned and prepared for from March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, a new FSC policy, which mimicked the policy announced by CSX in March 2003 and was intended to "standardize" NS's FSC with the FSCs of the other Defendants. As with CSX's program, NS would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase thereafter. Also like CSX, NS's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days.

74. After NS's announcement, all four Defendants had essentially uniform FSCs and remained in synch throughout the Relevant Period.

**PUBLICATION OF THE AIILF AND FIXING FSC RATES**

75. Even after having agreed to coordinate their FSCs, however, Defendants still faced a significant barrier to widespread use of FSCs: widely-used private contracts had cost escalation provisions that already accounted for fuel costs. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely-used cost escalation indexes, thereby paving the way for widespread imposition of the new FSC program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

76. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

77. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, who dominate the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the "AIILF"). This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

78. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

79. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (Emphasis added.)

80. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), suddenly moved into lockstep with FSCs based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

81. Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2%. The FSC would be adjusted upward at 2% for every $5 increase in the WTI average price.

82. The Eastern Railroads also coordinated when they would change their FSC – two calendar months after the WTI Index had adjusted – thereby adopting the same FSC price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same FSC percentage month after month. The Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

83. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their FSC programs: including using the WTI Index for FSCs, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

84. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel costs. The FSC program was not a cost recovery mechanism, but a revenue enhancement

measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Relevant Period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

85. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to *revenue* (*i.e.*, the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through these collective actions, Defendants BNSF, UP, CSX and NS planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on FSC prices to undercut one another.

86. In November of 2004, BNSF's CMO John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC [Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for

a mileage-based FSC program." The other Defendants "pushed back as expected." Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive rate-based FSCs.

87. With the conspiracy underway, the two Western Railroads, using the HDF Index, moved in lockstep and charged virtually identical FSCs on a monthly basis throughout the Relevant Period. The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began, but were identical starting in July 2003:

**MONTHLY FSC PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |

| MONTH | BNSF | UP |
|---|---|---|
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

88. As detailed above, there also was uniformity among the Eastern Railroads in the monthly FSC percentages, based on the WTI Index, that they charged customers for most of the Relevant Period. The chart below shows that the FSC percentages charged by Defendants CSX

and NS for carload shipments varied before the Relevant Period, but were identical starting in March 2004:

**MONTHLY FSC PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |

| MONTH | CSX | NS |
|---|---|---|
| Apr-06[1] | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

89. In stark contrast to this uniformity in FSC percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their FSCs to arrive at the identical percentage month after month, year after year. The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior and conspired to fix prices for FSCs. In addition, the advance announcements of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

[1] On April 24, 2006, NS announced that it would "revise its fuel surcharge program," assessing a 0.3% surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3% for every dollar increase above $64 per barrel. While NS claimed to the STB that it was rebasing because of a "decision to reduce its fuel surcharge percentage," NS had calculated the rebased fuel surcharge "to bake in FSC [the existing fuel surcharges] to [base] rate." NS had determined that a 16.4% base rate increase would allow it a "full % [fuel surcharge] pass thru" under the new program. Importantly, NS executives discussed the rebasing plan with its counterparts at the other Defendants, who recognized that the new FSC program was an economic wash compared to the program announced in late 2003 (which continued to apply to shippers under earlier contracts in any event).

90. Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below – including, in some cases, by adopting mileage-based FSCs – Defendants continued to engage in discussions concerning FSCs following the STB ruling, and to apply rate-based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before the STB Ruling.

91. While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (*i.e.*, shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the FSCs applied to their intermodal business (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship).

92. The direct heads of Defendants' intermodal businesses attended conspiratorial meetings. NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum participated in the March 2003 meeting at which their railroads discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. CSX's Alan Blumenfield, his predecessor Les Passa, and UP's Brad King EVP of Network Design and Integration participated in the June 2003 meeting at which CSX and UP's senior executives discussed their FSC formulas, their FSC strike prices, and the "outcry" they were facing from the initial rollout of their new FSC regimes. UP's intermodal group regularly imposed adjustable FSC provisions and their practice was to adjust them on ad hoc bases to align with BNSF's FSCs. In fall of 2003, CSX and BNSF officers exchanged percentages of intermodal business that "either had fuel surcharges or an escalator on the revenue."

93. Moreover, Defendants' intermodal business was led by the same senior executives who conspired to impose synchronized FSCs. Intermodal was not treated separately and apart from carload traffic. When Defendants met to conspire, they did not limit their discussions to carload traffic.

**IMPLEMENTATION OF THE SCHEME:**
**DEFENDANTS' ACROSS-THE-BOARD APPLICATION OF FSCs**

94. Defendants recognized that their coordinated FSCs were more aggressive and could generate substantially more revenue. For example, describing the new FSC program that resulted from Defendants' coordination, CSX's John Couch remarked: "While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." In addition, an internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

95. Defendants recognized that their new aggressive FSC program could be undermined by resistance from shippers and competition between the Defendant railroads. A 2003 internal NS memorandum recognized that moving to the more aggressive formula would "run the risk of losing the surcharge altogether. . . . The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC." And in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

96. To ensure that shipper resistance would be muted, and to achieve their conspiratorial goals, each Defendant adopted policies to apply FSCs to 100% of its traffic and tracked its progress toward attaining that goal. For example, in 2004, BNSF marketing

leadership began an initiative to monitor FSC "adherence" on a quarterly basis. These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (*e.g.*, shippers with expiring contracts that do not include an FSC). The reports – showing increasing FSC coverage each year – were presented to the chief marketing officer with a goal of achieving a 100% participation rate for BNSF's shippers.

97. CSX also monitored its effectiveness in applying FSCs to its shippers, and started tracking its progress toward implementing its FSC mandate – that "[e]verything is subject to fuel surcharge." CSX tracked the progress that its individual marketing teams were making toward widespread FSC application, and tracked contracts without FSCs to ensure they would receive FSCs upon renewal.

98. Starting in early 2004, UP engaged in similar analyses. An analysis of UP's FSC coverage was also performed for the chief marketing officer – who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004."

99. NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed his team to identify "the largest remaining contracts (including annual revenue involved) that do not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007."

100. Defendants policed the conspiracy by exchanging FSC coverage data. For example, subsequent to a meeting between the two railroads in late 2004, BNSF sent NS's Don Seale a report addressing FSC coverage for "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

101. In furtherance of the conspiracy, Defendants instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and

overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the FSCs were "not negotiable."

102. Defendants also enforced strict policies against discounting base rates to offset the standard FSCs. For example, in an internal NS email, NS's CMO (Don Seale) remarked, "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play."

103. As a result of these and related policies, any negotiations with their shippers about FSCs that took place started from the standard, supracompetitive FSC.

104. In addition, Defendants applied their standard FSCs uniformly to all traffic and commodities. For example, in October of 2005, NS advised UP as follows: "We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."

105. And Defendants imposed standard FSCs on all shippers without regard to whether the shipper had access to alternative modes of transportation. In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers – shippers without access to alternative modes of transportation – have leverage in negotiating a better rate/serve package on traffic at single served facilities. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical

> plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

106. Before the conspiracy, captive shippers could negotiate out of the FSCs. But during the conspiracy they could not.

## THE STB DECISION

107. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the FSCs are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. ***Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied***. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6 (emphasis added).

108. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

109. As detailed above, pursuant to their conspiracy, Defendants applied the same unreasonable FSC practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**THE CONSPIRACY SUCCEEDS**

110. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on FSCs, Defendants realized billions of dollars in revenues during the Relevant Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the FSC.

111. Defendants recognized that their coordinated FSCs in fact resulted in significant over-recovery of fuel price increases. NS, for example, recognized by July 2004 that "[c]urrent FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base," and Don Seale of NS testified that in 2005, NS's "increase in Fuel Surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."

112. UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." An October 2005 presentation shows UP estimated greater than 100% of incremental fuel cost recovery through FSCs for each of its six business groups.

113. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004. In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11 % more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other

Defendants similarly overpaid during this and other periods, particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

114. By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

115. As a result, Defendants' conspiracy worked as planned to help to remove the competitive pressures that had kept their rates down for years. As the head of UP, James Young, admitted in 2007, "three, four years ago [the FSCs] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

116. Following Defendants' agreement to coordinate their FSCs, Defendants' total revenues skyrocketed during the Relevant Period, with the Defendants reporting record revenues and profits virtually every year. As noted above, Defendants themselves attributed these record figures in large part to FSCs.

117. As result of Defendants' conspiracy, they were able to reverse the "destructive pricing for rail share" that led to their conspiracy. In the 2009 STB study referenced above, the STB concluded that "inflation-adjusted rail rates increased in 2005, 2006, and 2007," representing "*a significant change from prior years*, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004." The STB concluded that while rising

fuel costs contributed to the rate increases "*even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades*."

118. And a 2010 Senate Commerce Committee Report conducted a "review of the largest four railroads' Securities and Exchange Commission (SEC) filings," which it found "show[ed] just how profitable the large rail companies have become over the last decade. Figure I demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%." The referenced Figure 1 demonstrates that Defendants' profits spiked following their collective imposition of the new FSC regime described above:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

## COUNT I

**(Violation Of Section 1 Of The Sherman Act And Section 4 Of The Clayton Act)**

119. Plaintiffs incorporate by reference the allegations in the paragraphs above as if they were fully set forth herein.

120. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

121. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

122. Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

123. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

124. The contract, combination, or conspiracy has had the following effects:

a. Prices charged to each Plaintiff for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Each Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation

services; and

c. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

125. As a proximate result of the conspiracy described herein, each Plaintiff paid FSCs in connection with those unregulated rail freight transportation services that they would not have paid in the absence of the conspiracy; and the prices each Plaintiff paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices each Plaintiff would have paid absent the conspiracy alleged herein.

126. Each Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.

WHEREFORE, Plaintiffs pray for relief as follows:

(1) That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiffs recover compensatory damages, as provided by law, determined to have been sustained by Plaintiffs, and that judgment be entered against Defendants on behalf of Plaintiffs;

(3) That Plaintiffs recover treble damages, as provided by law;

(4) That Plaintiffs recover their costs of the suit, including attorneys' fees, as provided by law; and

(5) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: January 13, 2020

By: QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/* Karl Stern
Karl Stern
Attorney-in-Charge
Texas State Bar No. 19175665
Southern District of Texas Bar No. 4870
Email: karlstern@quinnemanuel.com
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone: (713) 221-7000
Facsimile: (713) 221-7100

Stephen R. Neuwirth
Email:stephenneuwirth@quinnemanuel.com
Sami H. Rashid
Email: samirashid@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Plaintiffs Exxon Mobil Corporation, ExxonMobil Oil Corporation, ExxonMobil Global Services Company, Imperial Oil, Imperial Oil Limited, and Canada Imperial Oil Limited*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AK STEEL CORPORATION
9227 Centre Pointe Drive
West Chester, OH 45069;

CF INDUSTRIES, INC.
4 Parkway North, Suite 400
Deerfield, IL 60015;

DAIRYLAND POWER COOPERATIVE
3200 East Avenue, S.
La Crosse, WI 54602;

DYNO NOBEL, INC.
5 East Cottonwood Parkway, Suite 500
Salt Lake City, UT 84121;

ENTERGY ARKANSAS, LLC
425 West Capitol Avenue
Little Rock, AR 72201;

ENTERGY LOUISIANA, LLC
4809 Jefferson Highway
Jefferson, LA 70121;

EXELON GENERATION COMPANY, LLC
300 Exelon Way
Kennett Square, PA 19348;

NORTH STAR BLUESCOPE STEEL LLC
6767 County Road 9
Delta, OH 43515;

STEELSCAPE, LLC
222 West Kalama River Road
Kalama, WA 98625;

*and*

**Case No. ____________**

**JURY TRIAL DEMANDED**

WISCONSIN ELECTRIC POWER COMPANY,
D/B/A WE ENERGIES
231 W. Michigan Street
Milwaukee, WI 53203,

*Plaintiffs,*

v.

BNSF RAILWAY COMPANY
2650 Lou Menk Drive
Fort Worth, TX 76131;

CSX TRANSPORTATION, INC.
500 Water Street
Jacksonville, FL 32202;

NORFOLK SOUTHERN RAILWAY COMPANY
Three Commercial Place
Norfolk, VA 23510;

*and*

UNION PACIFIC RAILROAD COMPANY
1400 Douglas Street
Omaha, NE 68179,

*Defendants.*

**COMPLAINT**

Plaintiffs AK Steel Corporation ("AK Steel"), CF Industries, Inc. ("CF Industries"), Dairyland Power Cooperative ("Dairyland"), Dyno Nobel, Inc. ("Dyno Nobel"), Entergy Arkansas, LLC ("Entergy Arkansas"), Entergy Louisiana, LLC ("Entergy Louisiana"), Exelon Generation Company, LLC ("Exelon"), North Star BlueScope Steel LLC ("North Star"), Steelscape, LLC ("Steelscape"), and Wisconsin Electric Power Company, d/b/a We Energies ("WEPCO") (collectively, "Plaintiffs") bring this Complaint against CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company ("NS"), BNSF Railway Company ("BNSF"), and

Union Pacific Railway Company ("UP") (collectively, "Defendants") for violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

**Introduction**

1. Defendants violated Sections 1 and 3 of the Sherman Act and damaged each of the Plaintiffs under Section 4 of the Clayton Act by conspiring to increase the rates Plaintiffs paid for rate-unregulated rail freight transportation services directly from the Defendants during the period from 2003 through at least December 31, 2008.

2. Defendants BNSF, CSX, NS, and UP conspired to impose rate-based rail fuel surcharges, which were added to customers' bills, including the Plaintiffs' bills, as a means to artificially and unlawfully increase the amount paid for rate-unregulated rail freight transportation services and to fix, maintain, and/or stabilize the price for those services in the United States. A rate-based rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that railroads included in their calculation of the fee for transportation, with the fee set as a stated percentage of the shipper's rate. The railroads claimed that the Rail Fuel Surcharge compensated them for rising fuel costs, but in actual practice, it was not related to the actual costs the railroads paid for fuel but was instead simply a means to raise and fix the price of rate-unregulated rail freight transportation services. Because competition previously had constrained their ability to increase prices, Defendants took collective action and conspired to impose Rail Fuel Surcharges calculated as a percentage of the otherwise applicable rates. On a nationwide scale, this conspiracy enabled Defendants to collect billions of dollars of additional supra-competitive profits during the conspiracy.

3. Defendants managed to implement this anticompetitive surcharge by harmonizing the way their companies calculated fuel surcharges in several ways. First, they each linked their surcharge rates to one of two price indexes – the Retail On-Highway Diesel Fuel ("HDF") and

West Texas Intermediate ("WTI") indexes. They also agreed to set the trigger points at which their surcharges kicked in to very similar values, and set those trigger points at sufficiently low levels that the Rail Fuel Surcharges remained in effect continuously for years, despite fluctuations in oil prices. The amounts of the surcharges (expressed as percentages of the otherwise applicable rates) were also consistent across Defendants.

4. After the railroad industry was deregulated in the 1980s with the Staggers Rail Act of 1980 ("Staggers Act"), Pub. L. No. 96-448, 94 Stat. 1895, 49 U.S.C. §§ 10101 *et seq*., railroads could no longer impose across-the-board rate increases. The only practicable way the railroads could impose an across-the-board price increase was by agreeing to impose a uniform surcharge to rail rates and imposing it on as many customers as possible.

5. Defendants BNSF, CSX, NS, and UP—which together control about 90% of rail freight traffic in the United States—conspired starting in about 2003 to use the Rail Fuel Surcharges as the means to raise rates across the board by amounts far in excess of their actual fuel costs, and thereby increase their profits. This was a single conspiracy to impose across-the-board fuel surcharges on all customers for all products for private rail freight transportation contracts.

6. One key step in furtherance of this conspiracy was to marginalize and replace the All Inclusive Index ("AII"). The AII was published by the Association of American Railroads ("AAR"), a railroad trade association in which all of the Defendants were members and active participants. The AII was an index previously used in many long-term rail freight transportation agreements to raise—or in theory reduce—the price of rail transportation to account for changes in the costs of the goods and services used to provide rail transportation. Fuel was one of the inputs included in the AII, but there were others. The AII and a related index called the Rail Cost Adjustment Factor ("RCAF") provided the railroads with a means to recover any increase in fuel

costs, and for customers to receive the benefit of any reduction in fuel costs, at least in some instances. Both the AII and the RCAF reflected changes in *actual prices and/or costs* faced by the industry.

7. The AII and the RCAF were a barrier to the imposition of across-the-board rate increases based on a fuel surcharge because those indexes included an explicit component for fuel that already factored in changes to fuel prices. In order to avoid this barrier, Defendants conspired to take collective action through the AAR to marginalize and replace the AII and RCAF with an index that did not include an explicit fuel component. At AAR meetings in the Fall of 2003, Defendants and other co-conspirators conspired to cause the AAR to develop and publish a replacement rate adjustment index that purported to exclude the fuel component. By agreeing to exclude fuel from the index, the Defendants claimed they were free to add separate fuel surcharges, purportedly to recover increased fuel costs but in reality to increase freight rates across the board, and collectively increase their profits, which was their common goal.

8. Pursuant to this agreement and conspiracy, the AAR announced in December 2003 the establishment of the "All Inclusive Index Less Fuel" ("AII-LF"). The AAR's official publication, entitled "AAR Railroad Cost Indexes," stated that the new index "is calculated using the same components and methods as the [AII] . . . with the exception of the exclusion of the fuel component." This announcement and the underlying removal of fuel from the AII and RCAF were the collective actions of the Defendants. A senior officer of defendant BNSF, for example, admitted in 2004 that BNSF's Chairman, President, and CEO "led the charge" on the AAR's 2003 adoption of the AII-LF. The AII-LF was a first for the railroad industry because it purported to provide a rate adjustment index for rail shipments but did not include fuel.

9. The publication of the AII-LF enhanced the impact of a conspiracy that was already well underway. In July 2003, BNSF and UP agreed to implement an identical percent-of-rate fuel surcharge program on their carload traffic. Fuel surcharges had been applied only intermittently and largely unsuccessfully, and when they were used, each railroad relied upon different rates, reflecting their differing fuel costs. In July 2003, though, BNSF and UP for the first time agreed to coordinate their fuel surcharges on their carload traffic and base them on the U.S. Department of Energy (DOE) HDF Index, even though the price paid for highway diesel fuel was substantially higher than the price railroads paid for diesel fuel in bulk. BNSF and UP began to charge the exact same fuel surcharges pursuant to their agreement, using the HDF Index, and continued to do so through at least 2008 on rate-unregulated carload traffic subject to a rate-based fuel surcharge, and starting in 2004 began to collectively impose even higher rate-based fuel surcharges on their coal traffic. Implementation of the AII-LF in December 2003 facilitated BNSF and UP's imposition of the inflated fuel surcharges based on the HDF Index and calculated using the base shipping rate, as adjusted by the AII-LF (in most instances), rather than what the Defendants paid for fuel. UP President James Young acknowledged during an October 2004 earnings call that UP was "getting away from the RCAF" and "putting in the specific fuel recovery mechanism in areas that historically would have used RCAF." According to Young, by July 2007, approximately "eighty to ninety percent" of UP's business had "some kind of fuel surcharge mechanism that gets passed on to the customer."

10. Soon after the AAR adopted the AII-LF, CSX and NS, which previously had used different fuel surcharges from each other, announced that each would apply identical West Texas Intermediate ("WTI") Index-based fuel surcharges to their carload traffic. This announcement by CSX and NS, coming right after their collective action in late 2003 to remove fuel from the AII

and RCAF, was the result of their conspiracy with BNSF and UP to impose artificially high Rail Fuel Surcharges in a coordinated fashion. CSX and NS charged the exact same fuel surcharges (or rebased fuel surcharges), through at least 2008 on rate-unregulated traffic subject to a rate-based fuel surcharge. This identical decision by CSX and NS, made just after the Defendants' collective action in late 2003 to remove fuel from the AII and RCAF, eliminates any reasonable possibility that CSX and NS decided independently to use the WTI Index in early 2004.

11. With the AII-LF in place, the Defendants were able to use the Rail Fuel Surcharges as a revenue-generating and profit-enhancing device, rather than a mere cost-recovery mechanism. The Defendants each applied the AII-LF to the entire base rate for the rail freight transportation, without excluding any portion of the base rate associated with fuel. The Railroads then applied the percentage fuel surcharge to the entire base rate as already adjusted by the AII-LF. The fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors. The AII-LF removed the fuel component of the AII and RCAF altogether, rather than holding that fuel component constant. The Railroads removed the fuel component from the new AII-LF index, applied the AII-LF to the entire base rate, and then applied the percentage increase in fuel price to the AII-LF-adjusted rate for freight transport. Through this agreed change, the index no longer reflected the actual fuel costs incurred by Defendants.

12. The collective actions of Defendants, including effectively removing fuel from the AII and RCAF by creating the new AII-LF, and moving in lockstep on fuel surcharges, cannot be explained as the result of routine market conduct to reflect increasing fuel prices or costs, or even to do so more efficiently. The fuel cost component in the AII and RCAF was already fully effective for reflecting changes in actual fuel prices and even allowed for over-recovery insofar as the railroad fuel costs did not increase as rapidly as the fuel prices measured in the AII. Indeed, the

AII and RCAF had been designed to ensure that fuel and other price increases could be recovered, regardless of the size of the fuel cost increase. Rather, by creating a new cost index without fuel (the AII-LF), Defendants devised and implemented a means to impose an across-the-board rate increase for rail freight transportation services. Instead of competing on fuel prices (which was not possible because Defendants paid different fuel prices and had differing fuel costs), Defendants collectively created an across-the-board rate increase that had not been possible since partial deregulation eliminated across-the-board, lawful collective railroad pricing activities.

13. Defendants were able to maintain their conspiracy by uniformly computing the surcharges as a percentage of the rail freight transport rate and by agreeing upon closely aligned trigger points for adjusting the percentages monthly. Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. Previously, the UP had explained to the Surface Transportation Board ("STB") that private pricing was crucial to encouraging competition, but Defendants changed to public pricing as part of, and to facilitate, their conspiracy. There was no reasonable business justification for this uniform adoption of a publicized pricing mechanism.

14. Defendants also took other collective action to enforce the conspiracy and make it effective. For example, in many cases, they largely stopped entering into long-term contracts and entered instead into contracts for periods of approximately 30 days, or with 30-day cancellation provisions, thereby making it easier to implement the fuel surcharges, which were adjusted monthly. In many other cases, Defendants also limited the previously prevailing practice, in circumstances where more than one railroad was involved in long-distance freight transport, of sending a customer a single bill for the entire transport. Instead, Defendants increasingly switched to having each railroad on an interline trip send a separate bill (with its own fuel surcharge). This

facilitated each Defendant recouping its share of the supra-competitive profits. Such a switch to separate invoicing on interline trips could be accomplished only through collective action of the Defendants. However, Defendants refused in other cases to separate their rates, where doing so might help a shipper to challenge the rates of only one railroad at the STB. Defendants also began refusing to negotiate discounts on rail freight rates—even in circumstances where individual railroads had previously been willing to do so.

15. The Defendants also collectively imposed Rail Fuel Surcharges for common carrier rail transportation regulated by the STB. When the Rail Fuel Surcharges as applied to regulated transportation were challenged, the STB found in January 2007 that the railroads' rate-based Rail Fuel Surcharges were "unreasonable" because the surcharges did not relate to the railroads' actual cost of fuel. The STB also noted that "[b]ecause railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate . . . cannot fairly be described as merely a cost recovery mechanism." *See Rail Fuel Surcharges,* Ex Parte No. 661, at 6 (STB served Jan. 26, 2007). The STB also said that the railroads had engaged in "misleading" practices in connection with the fuel surcharges. *Id.* at 7. While the STB's findings were significant, the STB acknowledged that it would need to expand its regulatory jurisdiction if it were to regulate rail rates and services governed by contract or that it had exempted from regulation, like those at issue in the case. *Id.* at 13.

16. This Court has already found that there is "strong evidence of conspiracy." In 2008, a putative class action was filed against BNSF, CSX, NS, and UP alleging price fixing in violation of Section 1 of the Sherman Act. The District Court for the District of Columbia granted class certification in 2012. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 74 (D.D.C. 2012). After the United States Court of Appeals for the District of Columbia vacated class

certification, the District Court concluded on remand that plaintiffs failed to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members" as required for class certification under Federal Rule of Civil Procedure 23(b)(3). *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 32 (D.D.C. 2017) (quoting Fed. R. Civ. P. 23(b)(3)), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019). However, the Court also stated that "plaintiffs' documentary evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges in the class period is substantial." *Id*. at 102.

17. Indeed, there is "substantial documentary evidence" indicating that "defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers." *Id.* at 103. Moreover, the "evidence shows that defendants employed these fuel surcharges in lockstep." *Id*. at 104.

18. The surcharge imposed by Defendants increased their revenues far in excess of the Defendants' actual costs for fuel. By way of example, UP reported over $1 billion in revenue from the surcharge in 2005 alone.

19. As a direct result of their fuel surcharge conspiracy, Defendants collected billions of dollars of revenues in excess of their actual incremental increase in fuel costs from the specific customers, including Plaintiffs, on whom they imposed the surcharge. Collection of these supra-competitive profits injured and damaged shippers, including Plaintiffs, who were the targets of the conspiracy.

20. Defendants' illegal conduct has injured each of the Plaintiffs in this action. Plaintiffs each paid illegal fuel surcharges for the shipment of many types of goods, including

various steel products, coal, grain, other agricultural products, fertilizer, industrial components, shipping containers, and other goods that they would not have paid but for the conspiracy alleged herein. Each of these Plaintiffs is entitled under Section 4 of the Clayton Act, 15 U.S.C. § 15, to damages for violation of Sections 1 and 3 of the Sherman Act.

## Parties

### Plaintiffs

21. Plaintiff AK Steel is a Delaware corporation with its principal office at 9227 Centre Pointe Drive, West Chester, OH 45069. AK Steel is a leading producer of flat-rolled carbon, stainless and electric steel products and carbon and stainless tubular products, primarily for automotive, infrastructure and manufacturing, electrical power generation and distribution networks. Headquartered in West Chester, Ohio (Greater Cincinnati), the company operates eight steel plants, and two coke plants across six states (Indiana, Kentucky, Michigan, Ohio, Pennsylvania, and West Virginia). AK Steel relies on rail transportation to transport a large majority of its freight. The freight consists of inbound movements of raw materials, inter-plant movements of in-process products, and outbound movements of finished products. Inbound shipments include shipments of iron ore, coal, coke, limestone, carbon, stainless steel scrap, and other materials. Outbound shipments include flat-rolled carbon, stainless and electrical steel products. During the relevant period, AK Steel purchased unregulated rail freight transport services from two or more of the Defendants and paid unlawful Rail Fuel Surcharges to the Defendants on rate-unregulated shipments.

22. Plaintiff CF Industries is a Delaware corporation with its principal office at 4 Parkway North, Suite 400, Deerfield, Illinois 60015. During the relevant time period, Plaintiff CF Industries or its subsidiaries transported nitrogen products for agricultural and industrial use by railroad pursuant to contracts with one or more Defendants that contained Rail Fuel Surcharges.

During the relevant time period, Plaintiff CF Industries or its subsidiaries purchased unregulated rail freight transport services from one or more of the Defendants and paid unlawful Rail Fuel Surcharges to the Defendants on rate-unregulated shipments. On April 15, 2010, Plaintiff CF Industries acquired Terra Industries Inc. ("Terra") by merger with a subsidiary of CF Industries. During the relevant time period, Terra or its subsidiaries transported products by railroad pursuant to contracts with one or more Defendants that contained Rail Fuel Surcharges. During the relevant time period, Terra or its subsidiaries purchased unregulated rail freight transport services from one or more of the Defendants and paid unlawful Rail Fuel Surcharges to the Defendants on rate-unregulated shipments.

23. Plaintiff Dairyland is a not-for-profit electric generation and transmission cooperative organized under the laws of the states of Wisconsin and Minnesota that has its headquarters at 3200 East Avenue South, La Crosse, Wisconsin 54602. Dairyland provides wholesale electricity, electric transmission, and other services for 24 electric distribution cooperative members and 17 municipal utilities. These cooperatives and municipals, in turn, supply the energy needs of more than half a million people. Dairyland serves areas in four states (Illinois, Iowa, Minnesota, and Wisconsin). During the relevant time period, Dairyland purchased rate-unregulated rail freight transportation services from and paid unlawful rate-based Rail Fuel Surcharges to one or more of the Defendants on rate-unregulated shipments.

24. Plaintiff Dyno Nobel is a corporation organized under the laws of the State of Delaware with its headquarters at 5 East Cottonwood Parkway, Suite 500, Salt Lake City, Utah 84121. Dyno Nobel manufactures explosives, and it transports raw materials and finished products by rail pursuant to contracts with one or more Defendants that contained Rail Fuel Surcharges. During the relevant time period, Plaintiff Dyno Nobel purchased unregulated rail freight transport

services from one or more of the Defendants and paid Rail Fuel Surcharges to the Defendants on rate-unregulated shipments.

25. Plaintiff Entergy Arkansas is a Texas limited liability company with its principal office at 425 West Capitol Avenue, Little Rock, Arkansas 72201. Entergy Arkansas serves approximately 711,000 electric customers in 63 counties. Entergy Arkansas transported coal to its power plants pursuant to contracts with one or more Defendants that contained Rail Fuel Surcharges. During the relevant time period, Plaintiff Entergy Arkansas purchased unregulated rail freight transport services from one or more of the Defendants and paid Rail Fuel Surcharges to the Defendants on rate-unregulated shipments.

26. Plaintiff Entergy Louisiana is a Texas limited liability company with its principal office at 4809 Jefferson Highway, Jefferson, Louisiana 70121. Entergy Louisiana serves approximately 1.08 million electric customers in 58 parishes. Entergy Louisiana transported coal to its power plants pursuant to contracts with one or more Defendants that contained Rail Fuel Surcharges. During the relevant time period, Plaintiff Entergy Louisiana purchased unregulated rail freight transport services from one or more of the Defendants and paid Rail Fuel Surcharges to the Defendants on rate-unregulated shipments.

27. Plaintiff Exelon is a Pennsylvania limited liability company with its headquarters at 300 Exelon Way, Kennett Square, Pennsylvania 19348. Exelon is a direct subsidiary of Exelon Corporation. On February 1, 2013, Constellation Energy Commodities Group, Inc. ("Constellation") merged into Exelon with Exelon the surviving entity. As a result, any agreements Constellation had with third parties became agreements with Exelon by operation of law. During the relevant time period, Exelon and Constellation purchased rate-unregulated rail

freight transportation services from and paid unlawful Rail Fuel Surcharges to one or more of the Defendants on rate-unregulated shipments.

28. Plaintiff North Star is organized under Delaware law with its principal office at 6767 County Road 9, Delta, Ohio 43515. North Star manufactures rolled steel products for use in automotive, construction, agriculture and general manufacturing applications. North Star relies on rail transportation to transport a large majority of its freight, including raw materials like pig iron and scrap metal to its plants, and finished products from its plants. During the relative time period, Plaintiff North Star purchased unregulated rail freight transport services from one or more of the Defendants and paid unlawful Rail Fuel Surcharges to the Defendants on rate-unregulated shipments.

29. Plaintiff Steelscape is organized under California law, with a principal place of business at 222 West Kalama River Road, Kalama, Washington 98625. Steelscape manufactures coated steel products for the construction industry, including architectural roofing, decking and framing. Steelscape relies on rail transportation to transport a large majority of its freight, including raw materials to its plants and finished products from its plants. During the relevant time period, Plaintiff Steelscape purchased unregulated rail freight transport services from one or more of the Defendants and paid unlawful Rail Fuel Surcharges to the Defendants on rate-unregulated shipments.

30. Plaintiff WEPCO is a Wisconsin corporation having its principal place of business in Milwaukee, Wisconsin. WEPCO does business as We Energies and is one of the principal utility subsidiaries of WEC Energy Group, Inc. WEPCO serves more than one million electric customers in Wisconsin and Michigan's Upper Peninsula. WEPCO relies on rail transportation to transport coal to fuel its power generation plants. During the relevant time period, WEPCO

purchased unregulated rail freight transport services from one or more of the Defendants and paid unlawful Rail Fuel Surcharges to the Defendants on rate-unregulated shipments.

**Defendants**

31. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States and interconnects with other railroads, including the other Defendants.

32. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and interconnects with other railroads, including the other Defendants.

33. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a wholly owned subsidiary of Burlington Northern Santa Fe, LLC. BNSF operates 32,500 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states, interconnects with other railroads, including the other Defendants.

34. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP serves primarily the western two-thirds of the United States, and interconnects with other railroads, including the other Defendants, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country.

**Jurisdiction and Venue**

35. This Court has jurisdiction pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

36. Venue is proper in this district pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) and 28 U.S.C. § 1391. Defendants maintain offices, transact business, have agents, and are found within this District; a substantial part of the events giving rise to the claims occurred in this District; and Defendants regularly conduct business in interstate commerce that is carried out in part in this District.

37. This Court has personal jurisdiction over each Defendant. Each Defendant (a) transacted business within this District, (b) directly or indirectly sold or delivered rail transportation services in this District, (c) has substantial contacts with this District, and (d) engaged in an illegal price-fixing conspiracy that had the intended effect of causing injury to persons and entities found in or doing business in this District.

## Factual Background

### I. CONGRESS ENACTED THE STAGGERS ACT TO FOSTER COMPETITION IN THE RAIL INDUSTRY, BUT CONSOLIDATION INCREASED OPPORTUNITIES FOR COLLUSION

38. For almost a hundred years, the Interstate Commerce Commission (the "ICC") regulated rates for shipment of freight and required those rates to be published in tariffs.

39. Under the prior regulatory scheme, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

40. In 1980, Congress passed the Staggers Act, which partially de-regulated the railroads and allowed rail carriers to set rates for rail transportation without government oversight in many instances. In particular, railroads and their customers were granted the statutory authority to negotiate their own individual rail transportation contracts, which were not rate-regulated. In other cases, the ICC exempted railroad-provided transportation from rate regulation. The Staggers Act also resulted in the ICC's phasing out across-the-board industry-wide rate increases.

41. Instead of direct government oversight, the Staggers Act required rail consumers to rely on market forces and general antitrust laws to maintain fair and competitive prices. As the House Committee Report for the Staggers Act stated with respect to 49 U.S.C. § 10709: "If anticompetitive behavior is alleged, under this section, the antitrust laws are the appropriate and only remedy available." H.R. Rep. No. 96-1035, at 58 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3978, 4003.

42. In 1995, Congress replaced the ICC with a new agency—the STB—which assumed some of the ICC's former functions, but more than 80% of all U.S. rail freight shipments move under terms that are not regulated by the STB or any other government agency. This case involves such non-regulated rail traffic.

43. At the time the Staggers Act was passed, the freight rail industry was far less concentrated, with 35 Class I railroads operating within the United States. ("Class I" railroads are the largest national freight railroads according to annual carrier revenues.) By the early 2000s, the industry was highly concentrated—only seven Class I freight railroads subject to STB regulation operated within the United States. Of these, Defendants BNSF, CSX, NS, and UP control the vast majority of rail shipments. These four Class I Railroads received approximately 90% of all freight rail revenue in the United States, leaving a highly concentrated industry with great susceptibility to collusion.

44. By the early 2000s, the industry had also consolidated to the point where further Class I mergers were very difficult, if not impossible. In response to the proposed merger of BNSF and Canadian National, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for review of Class I mergers. At the same time, railroads were experiencing surging freight demand and tight capacity.

45. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge to as many customers as possible. As explained below, Defendants were able to increase their prices by conspiring to adopt Rail Fuel Surcharges under the guise of rising fuel prices.

## II. IMPLEMENTATION OF THE SCHEME: THE DEFENDANTS CONSPIRE TO DEPART FROM PAST PRACTICE AND CHANGE THE INDEXES USED TO COMPENSATE FOR INCREASED COSTS

46. After the Staggers Act allowed railroads to negotiate individual contracts with consumers, railroads often incorporated rate escalation provisions tied to the AII and the RCAF (which is based on the AII) into contracts to provide protection against rising input prices over the life of the contract. The AAR published the AII, and first the ICC and then the STB published the RCAF, which is based closely on the AAR's AII. The AII and RCAF both include a fuel component. The AII and RCAF weight various index components—labor, fuel, materials & supplies, equipment rents, depreciation, interest, and other expenses—based on actual railroad expenses so that the impact of price changes in the individual components such as fuel are reflected in the index. Any actual increase in fuel prices, no matter how large, are captured in the AII and RCAF. The Indexes, and the weighted components within them, were designed for this purpose.

47. Prior to 2003, at least some of the Defendants imposed so-called "fuel surcharges" on private rail freight transportation, but (a) these fuel surcharges were applied only in isolated instances because the railroads were constrained by competition, and (b) each of the Defendants had different fuel surcharges, reflecting, among other things, the differing fuel prices and costs of each railroad. At that time, such surcharges were the exception, with the AII and RCAF indexes

widely used to capture fuel and other prices and costs. All of that changed in 2003, however, when the Defendants took a series of coordinated actions to switch to a new system on carload traffic that would allow the widespread use of Rail Fuel Surcharges as a profit enhancement mechanism.

48. From at least the Spring of 2003 and continuing through at least 2008, the top executives of each of the Defendants and their co-conspirators met regularly to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants and their co-conspirators met to consider and discuss developments in the railroad industry. Top executives of Defendants and the co-conspirators also met when they came to Washington, DC for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2 to April 6, at the Wigwam resort, in Litchfield Park, Arizona.

49. In the Fall of 2003, BNSF and UP initiated an effort in the AAR to convince all Defendants to agree on a fuel surcharge program that would enable the Defendants to remove fuel as a component of the weighted RCAF and AII, and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total price for the freight transport, regardless of the actual cost of fuel for that movement. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, Defendants BNSF, CSX, NS, and UP agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

50. Defendants BNSF, CSX, NS, and UP, which dominate the AAR board, caused the AAR to announce in December 2003 the creation of the unprecedented, new AII-LF. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost

Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AII-LF specified the fourth quarter of 2002 as its base period. Defendants BNSF, CSX, NS, and UP conspired to cause the AAR to inaugurate the AII-LF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges applied against the total rate for rail freight transportation.

51. The creation of the AII-LF was an essential first step of the Defendants' conspiracy to use Rail Fuel Surcharges to increase their prices. Because the RCAF and AII already compensated the railroads for increases in fuel costs, Defendants knew that they would be accused by customers of "double-dipping" if they added a fuel surcharge to the then-existing cost escalation provisions, BNSF, CSX, NS, and UP agreed to address this problem by conspiring to remove the fuel component from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

52. The creation of the AII-LF itself was a notable departure from past practice, and marked the first time that the AAR created a rate escalation index without a fuel cost component. While fuel was not included as a component of the AII-LF, the Defendants still applied the AII-LF to the entire base rate, including the fuel component, so that the entire base rate was increased by the AII-LF before application of the fuel surcharge.

53. There was no legitimate business justification or natural explanation for the collective action of BNSF, CSX, NS, and UP to cause the AAR to adopt and publish the AII-LF.

Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel prices or costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used rate escalation indexes. The AII and RCAF both included a fuel cost component and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs, and more, throughout the conspiracy period. Thus, the motivation of BNSF, CSX, NS, and UP in collectively causing the adoption of the AII-LF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

54. The actions by Defendants thus were not independent responses to a common problem of increasing fuel prices or costs. Rather, the only purpose in taking these collective actions was: (a) to begin assessing a stand-alone fuel surcharge applied to revenue (i.e., the entire base rate for the freight shipment as first adjusted by the AII-LF in many instances), not costs; (b) to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; (c) to eliminate the constraint that competition had imposed on their ability to raise prices; and (d) to ensure collective enforcement of the program. Pursuant to their conspiracy, Defendants would now be able to apply the supposed fuel cost increase percentage to the entire otherwise applicable rate for the freight shipment (notwithstanding the fact fuel accounts for only a portion of the costs of the shipment).

55. The creation and publication of a rate escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to institute independently its own individual fuel surcharge program. Instead, the creation of the carload Rail

Fuel Surcharge program starting in 2003 was the joint action by BNSF, CSX, NS, and UP to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

56. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new rate-based fuel surcharges into contracts with coal shippers, John Lanigan ("Lanigan"), BNSF's Chief Marketing Officer at the time, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR (that is, the new AII-LF). Referring to Matthew K. Rose (BNSF's Chairman, President, and CEO at the time), Lanigan stated: "What happened last year, and Matt led the charge on there, is that there's a new index that [the AAR] has that's basically an index without fuel. . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future."

## III. <u>IMPLEMENTATION OF THE SCHEME: THE DEFENDANTS CONSPIRE TO ADOPT FUEL SURCHARGES</u>

57. Almost immediately after the announcement in December 2003 of the new AII-LF, pursuant to the conspiracy, Defendants CSX and NS, suddenly moved in lockstep with fuel surcharges based on the WTI Index. This lockstep move was part and parcel of, and flowed from, the aforementioned agreements implemented and executed by BNSF, CSX, NS, and UP in late 2003.

58. Specifically, CSX and NS agreed to apply a rate fuel surcharge on their carload traffic whenever the monthly average WTI price exceeded $23 per barrel. When that happened, CSX and NS increased their rates by 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. For example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2.4 percent.

59. CSX and NS also coordinated the timing of changes to their fuel surcharge—i.e., two calendar months after the WTI Index had adjusted—thereby adopting the same fuel surcharge price timing used by BNSF and UP. For example, if the WTI average price exceeded $23 per barrel in January, CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge percentage month after month. CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

60. CSX and NS's coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel; applying the surcharge in the second calendar month after the average price of WTI oil had changed; and applying the fuel surcharge as the rate (including the implicit fuel component) was already increased by the AII-LF.

61. Also within months of the Spring 2003 NFTA meeting, and as early as July 2003, BNSF and UP suddenly began to coordinate their Rail Fuel Surcharges, just as CSX and NS were doing. Prior to this time, the UP fuel surcharge had been adjusted monthly based on the WTI Index. The BNSF fuel surcharge had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From that point on, BNSF and UP moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the relevant period for much of their carload rate-unregulated traffic subject to a rate-based fuel surcharge.

62. BNSF and UP agreed to a consistent approach for administering the HDF-based fuel surcharges. When the HDF Index equaled or exceeded $1.35 per gallon, BNSF and UP both

applied a surcharge of 1.5 percent plus an additional 0.5 for every five cent increase above $1.35 per gallon. Thus, if the HDF Index rose to $1.60 per gallon, BNSF and UP would apply a surcharge of 4 percent.

63. BNSF and UP also coordinated the timing of changes to their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. If the HDF Index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

64. BNSF and UP's coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting closely-aligned trigger points, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

65. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

66. A little more than one year after the commencement of the conspiracy, BNSF and UP, as part of Defendants' ongoing conspiracy to increase revenue by imposing across-the-board, non-negotiable percent-of-rate fuel surcharges on all customers for all shipments, agreed to impose even higher percent-of-rate fuel surcharges on the transportation of their coal shipments than they imposed on their other products. As coal accounted at the time for a substantial portion of their volumes and revenues, a further increase in already unlawful fuel surcharges for coal shipments was especially lucrative for BNSF and UP.

67. Beginning in July 2004, while using the same 0.5 percent fuel surcharge percentage increment that applied to other products, BNSF began applying to the transportation of coal a 0.5 percent surcharge increment for every 4-cent increase in the HDF index, rather than for every 5-cent increase in the HDF Index BNSF applied to other products. This was the equivalent of taking a 0.625 percent increase in the fuel surcharge for every 5-cent increase in the HDF index. In November 2004, UP began increasing the fuel surcharge percentage increment on its coal traffic by imposing a 0.75 percent surcharge for every 5-cent increase in the HDF index above $1.60 per gallon (the standard fuel surcharge applied from $1.35 to $1.60 per gallon).

68. As with all other products covered by the fuel surcharge conspiracy, BNSF and UP calculated their new coal fuel surcharge as a percentage of the otherwise applicable rate, utilized the HDF index in their fuel surcharge calculations, tied the applicable shipment surcharge per month to the HDF Index price in effect two months prior to the shipment month, demanded that their coal shippers accept the new coal fuel surcharge on a "take it or leave it" basis, and continued to demand that their coal shippers accept the AII-LF index (or other onerous mechanisms) to adjust their base coal transportation prices on a "take it or leave it" basis.

69. The new coal surcharge formulas applied by BNSF and UP produced monthly surcharges that that were almost identical. BNSF's unlawful fuel surcharges for coal under its new formula differed from UP's by a little over one-tenth of one percent (0.125 percent). Thus, for the duration of the conspiracy, coal fuel surcharges either equaled (for the first year of the conspiracy) or exceeded (for the remaining years of the conspiracy) the unlawful fuel surcharges BNSF and UP imposed on all their other product shipments.

70. As a result of Defendants' concerted action, rates (including Rail Fuel Surcharges) charged to rail shippers and customers, including Plaintiffs, were raised to or maintained at supra-competitive levels during the relevant period.

71. Defendants initially applied these surcharges not only to regulated rates, but also to the private contracts, exempt traffic, and other traffic not subject to rate regulation under federal law, i.e., the rate-unregulated traffic at issue here.

72. With the conspiracy underway, BNSF and UP, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the relevant period on most rate-unregulated carload traffic subject to a rate-based fuel surcharge.

73. The chart below shows that the Fuel Surcharge percentages charged by BNSF and UP for carload freight shipments varied before June 2003 but were identical from that date through at least 2008:

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0 |
| Jul-02 | 1.0% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1.0% | 0 |
| Nov-02 | 2.0% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |

| MONTH | BNSF | UP |
|---|---|---|
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 5.0% | 2.0% |
| Jun-03 | 3.0% | 3.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |

| MONTH | BNSF | UP |
|---|---|---|
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |
| Jul-07 | 15.5% | 15.5% |
| Aug-07 | 16.0% | 16.0% |
| Sep-07 | 16.5% | 16.5% |
| Oct-07 | 16.5% | 16.5% |
| Nov-07 | 17.5% | 17.5% |
| Dec-07 | 18.5% | 18.5% |
| Jan-08 | 21.5% | 21.5% |
| Feb-08 | 21.0% | 21.0% |
| Mar-08 | 21.0% | 21.0% |
| Apr-08 | 21.5% | 21.5% |
| May-08 | 26.5% | 26.5% |
| Jun-08 | 28.5% | 28.5% |
| Jul-08 | 32.0% | 32.0% |
| Aug-08 | 34.5% | 34.5% |
| Sep-08 | 35.0% | 35.0% |
| Oct-08 | 31.0% | 31.0% |
| Nov-08 | 28.0% | 28.0% |
| Dec-08 | 23.5% | 23.5% |

As discussed above, as part of their conspiracy BNSF and UP imposed higher rate-based fuel surcharges on their coal traffic, starting in 2004 and continued to do so through at least 2008 on rate-unregulated coal traffic subject to rate-based fuel surcharges.

74. There also was uniformity between CSX and NS in the monthly WTI Index-based surcharge percentages that they charged for most of the 2003-2008 time period to carload customers subject to a rate-based fuel surcharge.

75. The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before March 2004, but were identical starting in March 2004:

**Monthly Surcharge Percentages – CSX and NS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |

| MONTH | CSX | NS |
|---|---|---|
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |
| Jul-07 | 16.4% | 16.4% |
| Aug-07 | 18.0% | 18.0% |
| Sep-07 | 20.8% | 20.8% |
| Oct-07 | 20.0% | 20.0% |
| Nov-07 | 22.8% | 22.8% |
| Dec-07 | 25.2% | 25.2% |
| Jan-08 | 28.8% | 28.8% |
| Feb-08 | 27.6% | 27.6% |
| Mar-08 | 28.0% | 28.0% |
| Apr-08 | 29.2% | 29.2% |
| May-08 | 33.2% | 33.2% |
| Jun-08 | 36.0% | 36.0% |
| Jul-08 | 41.2% | 41.2% |
| Aug-08 | 44.4% | 44.4% |
| Sep-08 | 44.4% | 44.4% |
| Oct-08 | 37.6% | 37.6% |
| Nov-08 | 32.4% | 32.4% |
| Dec-08 | 21.6% | 21.6% |

76. In 2006, NS published a "rebased" rate-based fuel surcharge that it applied, starting in July 2006, to some of its carload traffic. This rebased fuel surcharge simply added or "baked in" some or all of NS's previously imposed supra-competitive fuel surcharges into a shipper's base rate, and then applied a new stand-alone fuel surcharge anytime the WTI Index exceeded $64/barrel. NS's rebasing was a sleight-of-hand exercise that produced fuel surcharge recoveries that closely matched the ones it received from its non-rebased fuel surcharges.

77. In stark contrast to this uniformity in their fuel surcharges, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would

independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep for years indicates that Defendants were coordinating their behavior and conspiring to fix prices for Rail Fuel Surcharges. In addition, the advanced announcement of each Defendant's Fuel Surcharges was an important practice to implementing and enforcing the conspiracy.

78. Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." (John Gallagher, *Following the Competition*, Traffic World, July 14, 2003).

79. Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual incremental fuel cost increases. According to an economic analysis on Railroad Fuel Surcharge practices commissioned by the American Chemistry Council and released in September 2007, Defendants overcharged rail shippers by more than $6.5 billion between 2005 and the first quarter of 2007.

80. Another reason the Defendants' Rail Fuel Surcharges do not evidence a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423

miles on one gallon of diesel fuel. The fact that Defendants rate-based fuel surcharges did not reflect improvements in fuel efficiency is further evidence that the Rail Fuel Surcharges were not a mechanism to recover changes in fuel costs but instead were a mechanism collectively designed to raise prices.

81. There is no independent business justification to explain Defendants' behavior. Their uniform pricing of fuel surcharges unrelated to actual changes in fuel costs for more than a four-year period could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increase in fuel prices experienced by the Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action – first, to decouple fuel prices from the historical railroad rate adjustment indices and, second, to agree upon new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages.

82. In agreeing to collude on fuel surcharges, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, railroads with lower fuel costs and/or better efficiency could impose a lower surcharge that reflected actual fuel consumption for movements and thereby increase market share and revenue at the expense of competing railroads. Rather than engage in such competitive behavior, Defendants instead restricted their freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on the total cost of the freight.

## IV. OTHER ELEMENTS OF THE CONSPIRACY

83. At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants and their co-conspirators also took other steps in furtherance of the conspiracy. For their coal traffic, BNSF and UP generally ceased entering into individually-negotiated contracts and instead insisted on offering form-based arrangements. They also shortened the terms

of such arrangements (to no more than three years or even a single year), in contrast to the longer-term arrangements that they previously favored. They also established rates in advance, even before they were requested, in a sharp departure from their previous practice. They also made the rates more broadly available, even to their competitors, whereas they previously had insisted on strict confidentiality. In addition, the two railroads became much less likely to take business from each other, and each railroad tended to maintain its own roster of customers.

84. For other types of traffic, the Defendants largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly. Previously, Defendants had allowed, and often preferred, long-term contracts extending up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.

85. This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase their market share, and their pricing became more visible to each other in order to reduce competition.

86. Defendants made this switch even though most shippers preferred the former system in order to minimize risk and make costs more predictable. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Defendants raised their prices and did not offer any compensation to customers for assuming additional risk. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts. Instead, the Defendants collectively refused to offer long-

term contracts and took no steps to minimize their own risks from fluctuations in demand. This coordinated behavior was hardly routine market conduct.

87. In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

88. In furtherance of the conspiracy, Defendants also decreased on some traffic the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the termination railroad on a long-distance trip involving more than one railroad (so that a single fee would be allocated among the railroads that shipped). Instead, where a shipment required movement on more than one railroad, the Defendants moved increasingly to billing rates separately for each railroad, rather than as one quote for the entire shipment. Defendants collectively made this change for two reasons: to provide transparency to one another as to what each railroad was charging on interline shipments and to allow each Defendant to bill separately for its applicable Rail Fuel Surcharge. In other cases, the railroads insisted on the use of "through rates" in order to prevent shippers from being able to challenge the rate for only part of the movement at the STB.

89. Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing revenues to subsidize discounting of underlying rates. In fact, as can be seen from the table that follows, Defendants' market shares became more stable following the 2003 agreements than they had historically been.

**Railroad Market Share: Originated Tons and Carloads 1998 - 2003[1]**

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| **BNSF** | | | | | | |
| Carloads Originated | 6,739,202 | 6,876,523 | 6,909,907 | 6,928,188 | 6,999,061 | 7,662,699 |
| Percent of Total Originated Carloads | 31.9% | 28.4% | 26.5% | 27.0% | 26.9% | 28.4% |
| Tons Originated | 429,408,242 | 440,180,814 | 434,255,161 | 442,932,381 | 438,123,355 | 460,789,676 |
| Percent of Total Originated Tons | 31.1% | 28.5% | 26.8% | 27.2% | 26.9% | 27.8% |
| **CSXT**[2] | | | | | | |
| Carloads Originated | 4,184,418 | 5,842,422 | 6,542,784 | 6,321,945 | 6,335,611 | 6,470,386 |
| Percent of Total Originated Carloads | 19.8% | 24.1% | 25.1% | 24.6% | 24.4% | 24.0% |
| Tons Originated | 306,034,673 | 378,007,852 | 406,314,179 | 399,970,764 | 392,903,118 | 391,993,962 |
| Percent of Total Originated Tons | 22.1% | 24.5% | 25.1% | 24.5% | 24.1% | 23.7% |
| **NS**[2] | | | | | | |
| Carloads Originated | 3,621,159 | 4,351,478 | 5,214,436 | 5,025,864 | 5,098,926 | 5,115,859 |
| Percent of Total Originated Carloads | 17.1% | 18.0% | 20.0% | 19.6% | 19.6% | 19.0% |
| Tons Originated | 233,133,810 | 270,383,729 | 320,700,204 | 310,449,934 | 307,770,415 | 306,322,113 |
| Percent of Total Originated Tons | 16.9% | 17.5% | 19.8% | 19.0% | 18.9% | 18.5% |
| **UP** | | | | | | |
| Carloads Originated | 6,570,086 | 7,137,090 | 7,384,503 | 7,393,306 | 7,580,376 | 7,692,160 |
| Percent of Total Originated Carloads | 31.1% | 29.5% | 28.3% | 28.8% | 29.1% | 28.6% |
| Tons Originated | 413,615,706 | 453,417,016 | 459,428,341 | 476,759,328 | 489,305,241 | 497,373,006 |
| Percent of Total Originated Tons | 29.9% | 29.4% | 28.3% | 29.2% | 30.1% | 30.0% |
| **Total** | | | | | | |
| Carloads Originated | 21,114,865 | 24,207,513 | 26,051,630 | 25,669,303 | 26,013,974 | 26,941,104 |
| Tons Originated | 1,382,192,431 | 1,541,989,411 | 1,620,697,885 | 1,630,112,407 | 1,628,102,129 | 1,656,478,757 |

1 AAR Railroad Facts and Analysis of Class I Railroads
2 Data for 1998 and 1999 does not include all of the acquisition Conrail traffic

## Railroad Market Share: Originated Tons and Carloads 2004 - 2008[1]

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| **BNSF** | | | | | |
| Carloads Originated | 8,237,466 | 8,727,121 | 9,335,024 | 9,174,167 | 9,021,851 |
| Percent of Total Originated Carloads | 29.2% | 30.2% | 31.2% | 31.4% | 31.7% |
| Tons Originated | 483,296,128 | 498,121,970 | 539,511,527 | 546,445,840 | 552,297,049 |
| Percent of Total Originated Tons | 28.3% | 28.7% | 30.1% | 30.8% | 31.1% |
| **CSXT** | | | | | |
| Carloads Originated | 6,611,766 | 6,537,293 | 6,607,931 | 6,348,515 | 6,127,125 |
| Percent of Total Originated Carloads | 23.4% | 22.6% | 22.1% | 21.7% | 21.5% |
| Tons Originated | 403,152,732 | 409,486,655 | 414,266,429 | 405,630,002 | 397,947,902 |
| Percent of Total Originated Tons | 23.6% | 23.6% | 23.1% | 22.8% | 22.4% |
| **NS** | | | | | |
| Carloads Originated | 5,524,545 | 5,800,390 | 5,824,813 | 5,670,400 | 5,617,285 |
| Percent of Total Originated Carloads | 19.6% | 20.0% | 19.5% | 19.4% | 19.7% |
| Tons Originated | 319,014,426 | 325,779,848 | 323,407,280 | 315,583,286 | 316,793,119 |
| Percent of Total Originated Tons | 18.7% | 18.8% | 18.1% | 17.8% | 17.8% |
| **UP** | | | | | |
| Carloads Originated | 7,831,823 | 7,874,879 | 8,132,004 | 8,045,965 | 7,720,041 |
| Percent of Total Originated Carloads | 27.8% | 27.2% | 27.2% | 27.5% | 27.1% |
| Tons Originated | 503,052,146 | 503,056,340 | 514,357,111 | 508,423,635 | 509,083,147 |
| Percent of Total Originated Tons | 29.4% | 29.0% | 28.7% | 28.6% | 28.7% |

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Total | | | | | |
| Carloads Originated | 28,205,600 | 28,939,683 | 29,899,772 | 29,239,047 | 28,486,302 |
| Tons Originated | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 | 1,776,082,763 | 1,776,121,217 |

1 AAR Railroad Facts and Analysis of Class I Railroads

## V. ADDITIONAL EVIDENCE OF ANTICOMPETITIVE CONDUCT

90. Apart from this direct evidence of price fixing, there is further support that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price fixing conspiracy feasible:

a. Defendants had a strong collective motive to enter into a price fixing conspiracy because conditions existed in the railroad industry that were conducive to collusion.

b. The railroad industry is highly concentrated. During the period 2003 to 2008, there were only seven Class I freight railroads. Defendants represented four of those Class I railroads and they accounted for well over 90 percent of the nation's rail traffic.

c. There are high fixed costs in the railroad industry. Those high fixed costs, together with high concentration, facilitated a price fixing cartel.

d. There are enormous barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These investments take decades to develop, and require onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is of minimal value for other purposes, and because rail networks are difficult to build, the fixed costs are largely sunk, creating additional entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers in order to survive. Entry is thus both expensive and risky.

e. Rail Fuel Surcharges, when computed as a percentage of rates, are highly standardized and fungible. Defendants structured their Rail Fuel Surcharges as a percentage of the

otherwise applicable rates and then published the percentages on their websites so the colluding railroads could monitor the conspiracy without the necessity of frequent communications. It is well recognized that markets having uniform and homogeneous products or services, such as rail freight transportation services, are susceptible to price fixing.

f. The railroad industry has a long record of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." The Rail Fuel Surcharge program engaged in by the Defendants is strikingly similar to those collective rate-making practices of the past.

g. The CEOs of Defendants and their co-conspirators are all board members of the AAR, which facilitated exchange of pricing information. The AAR is described as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly, and board members (and their staff) regularly communicate between meetings.

## VI. THE STB DECISION

91. The Defendants imposed the Rail Fuel Surcharges for both unregulated and exempt transportation (which are at issue here) as well as for common carrier tariffs regulated by the STB. Shippers challenged the Rail Fuel Surcharges in proceedings before the STB.

92. On January 26, 2007, the STB served a decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of the otherwise applicable rate for rate-regulated rail freight transport was a "misleading and ultimately unreasonable practice" because the fuel surcharges are not tied to the fuel consumption associated with the individual

movements to which they are applied. *Rail Fuel Surcharges*, Ex Parte No. 661 (STB served Jan. 26, 2007).

93. The STB further stated that "the term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. If it is used instead as a broader revenue enhancement measure, it is mislabeled." *Id*.

94. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

95. Pursuant to their conspiracy, Defendants and co-conspirators applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts and other unregulated freight transportation at issue in this case.

## VII. DEFENDANTS' SUPRA-COMPETITIVE PROFITS

96. According to an economic analysis on railroad fuel surcharge practices commissioned by the American Chemistry Council and released in September 2007, Defendants overcharged rail shippers by more than $6.5 billion between 2005 and the first quarter of 2007. The study's findings were based upon regulatory findings and other estimates from Defendants.

97. According to the article "Rail Fuel Surcharges – Fact Versus Fiction" in the trade press report Rail Business by Argus Media Inc. (Volume 14, 15) dated April 14, 2008, the "change[s] in railroads['] overall operating expenses (including fuel) do not justify the large fuel surcharges railroads are applying to their movements." The article named several factors that have led to the circumstances in which railroads' fuel surcharges are greater than the change in total operating expense.

a. Companies have established escalation methods, including fuel surcharges, to assure that they do not under-recover their costs of fuel as the price of oil has increased

substantially. "[A] company will therefore frequently establish a margin of error in an escalation method that will ensure it is fully protected from cost increases. However, what is a small dollar margin of error . . . becomes a very large dollar margin of error as oil prices increase . . . ."

b. "[A]s railroads implemented practices to better manage their cost of fuel internally, they did not reflect these fuel cost improvements in their external fuel surcharge programs." In fact, "none of the four major US railroads revised their surcharge programs to account for the actions management took to control the cost of fuel."

c. "[T]he STB did not hold a hearing on fuel surcharges until May 2006. This was more than four years after the railroads initiated their fuel surcharge programs." However, "the time to make sure a program like fuel surcharges is working properly is before the dollars generated by the program had a big impact on the railroads' financial statements."

d. Finally, "when the STB issued the results of its findings from the fuel surcharge hearing it did not require railroads to provide any retroactive reporting on fuel expenses and fuel surcharge revenue."

98. Because fuel surcharges would normally be designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But as discussed above, Defendants used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged to the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

99. Defendants reaped huge, supra-competitive profits as a result of the success of their conspiracy. During the period of the conspiracy (July 2003 to at least 2008), Defendants increased

their market capitalization from approximately $40 billion to approximately $105 billion, or an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

100. In 2008, a putative class action was filed against BNSF, CSX, NS, and UP alleging price fixing in violation of Section 1 of the Sherman Act as well as violations of state antitrust and consumer protection law. Filing the putative class action tolled the statute of limitations on Plaintiffs' claims. The District Court for the District of Columbia granted certification of the class in 2012. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 74 (D.D.C. 2012). On appeal, the United States Court of Appeals for the District of Columbia vacated class certification. *In re Rail Freight Fuel Surcharge Antitrust Litig.*-MDL No. 1869, 725 F.3d 244 (D.C. Cir. 2013). On remand, the District Court denied the motion to certify the class, which was ultimately affirmed by the Court of Appeals. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 145 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019). The statute of limitations was tolled until the District Court denied class certification. During the appeal, the defendant railroads stipulated to the Court that they would not count toward the limitations period the time between the District Court's denial of class certification and the D.C. Circuit's decision. The statute of limitations has only begun to run again since the D.C. Circuit affirmed denial of class certification on August 16, 2019.

## VIII. DEFENDANTS' ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL

101. Defendants' anticompetitive conduct caused dramatically higher rail rates for freight and increased profits. Shippers, end users, and the public were injured as a result.

102. Defendants' anticompetitive conduct was within the flow of, and substantially affected, interstate and international commerce. During the relevant period, the Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each of them used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services. The Defendants added the Rail Fuel Surcharges to Plaintiffs' rail shipments made in interstate commerce. Defendants' unlawful activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce and have denied those who ship the benefits of free, open and unrestricted competition.

## IX. EACH OF THE PLAINTIFFS SUFFERED INJURY BY VIRTUE OF DEFENDANTS' ANTICOMPETITIVE CONDUCT

103. As a result of Defendants' conduct, each of the Plaintiffs has paid supra-competitive rates to ship freight, lost profits, and lost the benefits of competition. These are injuries of the type the antitrust laws are designed to prevent, and Plaintiffs incurred these injuries as direct purchasers of rail shipping services.

### AK Steel

104. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, AK Steel paid one or more of the Defendants for rate-unregulated rail transportation in interstate commerce that included an unlawful rate-based Rail Fuel Surcharge established through the conspiracy, including payments to Defendants NS and CSX pursuant to shipping arrangements including contracts, pricing authorities, and private price lists applicable to

its inbound and outbound shipments of commodities including scrap, steel plate, steel slabs, hot briquette iron, and steel coil.

105. The prices AK Steel paid to Defendants for rate-unregulated rail freight transportation services on which the unlawful Rail Fuel Surcharges were imposed were greater than the prices AK Steel would have paid absent the conspiracy alleged herein. AK Steel has therefore been injured in its business and property by reason of Defendants' antitrust violations.

**CF Industries**

106. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, CF Industries or its subsidiaries paid one or more of the Defendants for rate-unregulated rail transportation in interstate commerce that included an unlawful rate-based Rail Fuel Surcharge established through the conspiracy.

107. The prices CF Industries or its subsidiaries paid to one or more Defendants for rate-unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices CF Industries would have paid absent the conspiracy alleged herein. CF Industries has therefore been injured in its business and property by reason of Defendants' antitrust violations.

108. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, Terra or its subsidiaries paid one or more of the Defendants for rate-unregulated rail transportation in interstate commerce that included an unlawful rate-based Rail Fuel Surcharge established through the conspiracy.

109. The prices Terra or its subsidiaries paid to one or more Defendants for rate-unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Terra would have paid absent the conspiracy alleged herein. CF Industries

has therefore been injured in its business and property by reason of Defendants' antitrust violations.

**Dairyland**

110. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, Dairyland paid one or more of the Defendants for rate-unregulated rail transportation of coal in interstate commerce from mines in Utah to a rail/barge transloading facility in Sauget, IL. Dairyland's payments included unlawful rate-based Rail Fuel Surcharges established through the conspiracy.

111. The prices Dairyland paid to UP for rate-unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices it would have paid absent the conspiracy alleged herein. Dairyland has therefore been injured in its business and property by reason of Defendants' antitrust violations.

**Dyno Nobel**

112. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, Dyno Nobel paid one or more of the Defendants for rate-unregulated rail transportation in interstate commerce that included an unlawful rate-based Rail Fuel Surcharge established through the conspiracy.

113. The prices Dyno paid to one or more Defendants for rate-unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices it would have paid absent the conspiracy alleged herein. Dyno has therefore been injured in its business and property by reason of Defendants' antitrust violations.

**Entergy Arkansas**

114. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, Entergy Arkansas paid one or more Defendants for rate-unregulated rail

transportation of coal from Colorado to its White Bluff Steam Electric Station and its Independence Steam Electric Station, both located in Arkansas. Entergy Arkansas payments included unlawful rate-based Rail Fuel Surcharges established through the conspiracy.

115. The prices Entergy Arkansas paid to UP for rate-unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Entergy Arkansas would have paid absent the conspiracy alleged herein. Entergy Arkansas therefore has been injured in its business and property by reason of Defendants' antitrust violations.

**Entergy Louisiana**

116. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, Entergy Louisiana paid one or more Defendants for rate-unregulated rail transportation of coal in interstate commerce from the Wyoming Powder River Basin to its Roy S. Nelson Generating Station located in Louisiana. Entergy Louisiana's payments included unlawful rate-based Rail Fuel Surcharges established through the conspiracy.

117. The prices Entergy Louisiana paid for rate-unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Entergy Louisiana would have paid absent the conspiracy alleged herein. Energy Louisiana therefore has been injured in its business and property by reason of Defendants' antitrust violations.

**Exelon**

118. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, Exelon and Constellation paid one or more of the Defendants for rate-unregulated rail transportation of coal to their respective power generation plants in interstate commerce that included payments for unlawful rate-based Rail Fuel Surcharge established through the conspiracy.

119. The prices Exelon and Constellation paid to one or more Defendants for rate-unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices they would have paid absent the conspiracy alleged herein. Exelon (itself and as successor to Constellation) has therefore been injured in its business and property by reason of Defendants' antitrust violations.

**North Star**

120. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, North Star paid one or more of the Defendants for rate-unregulated rail transportation of raw materials, including pig iron and scrap metal, and finished steel products in interstate commerce. North Star's payments included an unlawful rate-based Rail Fuel Surcharge established through the conspiracy.

121. The prices North Star paid for rate-unregulated rail freight transportation services on which the unlawful Rail Fuel Surcharges were imposed were greater than the prices North Star would have paid absent the conspiracy alleged herein. North Star has therefore been injured in its business and property by reason of Defendants' antitrust violations.

**Steelscape**

122. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, Steelscape paid one or more of the Defendants for rate-unregulated rail transportation of steel and steel products in interstate commerce to and from its manufacturing facilities located in California and Washington. The payments by Steelscape included an unlawful rate-based Rail Fuel Surcharge established through the conspiracy.

123. The prices Steelscape paid for rate-unregulated rail freight transportation services on which the unlawful Rail Fuel Surcharges were imposed were greater than the prices Steelscape

would have paid absent the conspiracy alleged herein. Steelscape has therefore been injured in its business and property by reason of Defendants' antitrust violations

**WEPCO**

124. During some or all of the relevant period from July 1, 2003 through at least December 31, 2008, WEPCO paid one or more of the Defendants for rate-unregulated rail transportation of coal in interstate commerce from mines in Colorado and Appalachia to its Presque Isle, Valley, and Elm Road power generation plants. WEPCO's payments included unlawful percentage-based Rail Fuel Surcharges established pursuant to the conspiracy.

125. The prices WEPCO paid for rate-unregulated rail freight transportation services on which the unlawful Rail Fuel Surcharges were imposed were greater than the prices WEPCO would have paid absent the conspiracy alleged herein. WEPCO has therefore been injured in its business and property by reason of Defendants' antitrust violations.

**COUNT I**
**Price Fixing (Fuel Surcharge) in Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15**
**(By all Plaintiffs against all Defendants)**

126. Plaintiffs fully incorporate by reference the allegations in all of the preceding paragraphs herein.

127. The Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in interstate commerce in violation of Sections 1 and 3 of the Sherman Act and Section 4 of the Clayton Act. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators to use Rail Fuel Surcharges as a method of increasing prices charged to shippers like Plaintiffs. The contract, combination, or conspiracy also resulted in an agreement, understanding,

or concerted action between and among the Defendants and their co-conspirators to refrain from competing against each other in regard to rail fuel surcharges for freight.

128. This conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators in furtherance of which they fixed, maintained, and standardized prices for Rail Fuel Surcharges for Plaintiffs' non-regulated transportation. This conspiracy constitutes a per se violation of Sections 1 and 3 of the Sherman Act and Section 4 of the Clayton Act and constitutes an unreasonable and unlawful restraint of trade.

129. Because of this conspiracy, among other things:

a. Defendants and their co-conspirators fixed prices charged to Plaintiffs and other shippers and customers for Rail Fuel Surcharges applied to unregulated contract-based rail freight transportation, and maintained those prices at supra-competitive levels;

b. Plaintiffs and other shippers and customers have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight services; and

c. Competition in establishing the prices for rail freight services has been unlawfully restrained, suppressed, and eliminated.

130. As a proximate result of the Defendants' unlawful conduct, Plaintiffs have suffered injury in that they have paid supra-competitive prices for Rail Fuel Surcharges applied to rate-unregulated rail freight transportation from approximately July 1, 2003 to at least December 31, 2008 and have otherwise been damaged as above described.

## X. CONCLUSION AND DEMAND FOR JURY TRIAL

131. Wherefore, Plaintiffs pray for relief as follows:

a. That the unlawful contract, combination and conspiracy alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act;

b. That Plaintiffs recover compensatory damages, as provided by law;

c. That Plaintiffs recover treble damages, as provided by law;

d. That Plaintiffs and the Class recover their costs of the suit, including reasonable attorneys' fees, as provided by law; and

e. For such further relief as the Court may deem just and proper.

132. Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

October 2, 2019

Respectfully Submitted,

**VINSON & ELKINS L.L.P.**

By: /s/ Alden L. Atkins

Craig P. Seebald (D.C. Bar No. 438968)
Alden L. Atkins (D.C. Bar No. 00393922)
David Smith (D.C. Bar No. 1002860)
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com
aatkins@velaw.com
davidsmith@velaw.com

**AND**

**SLOVER & LOFTUS LLP**

John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854)
1224 Seventeenth Street NW
Washington, D.C. 20036
(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MILLERCOORS LLC,
250 S. Wacker Drive
Chicago, IL 60606,

Plaintiff,

v.

CSX TRANSPORTATION, INC.,
500 Water Street
Jacksonville, FL 33202;

BNSF RAILWAY COMPANY,
2650 Lou Menk Drive
Fort Worth, TX 76131;

UNION PACIFIC RAILROAD CO.
1400 Douglas Street
Omaha, NE 68179; *and*

NORFOLK SOUTHERN RAILWAY COMPANY,
Three Commercial Place
Norfolk, VA 23510,

Defendants.

Civil Action No.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff MillerCoors LLC (“MillerCoors” or “Plaintiff”)[1] brings this action for damages under the antitrust laws of the United States against Defendants, and alleges as follows:

[1] As defined in ¶ 9 of this Complaint.

## NATURE OF THE ACTION

1. This antitrust action is brought under Section 4 of the Clayton Act in order to recover treble damages and attorneys' fees from the four largest United States-based Class I railroads for price fixing – a *per se* violation of Section 1 of the Sherman Act. MillerCoors brings this action related to its direct purchases from Defendants of unregulated rail freight transportation services that were assessed a rate-based fuel surcharge between July 1, 2003 until at least December 31, 2008 (the "Conspiracy Period"). As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants BNSF Railway Company, Union Pacific Railroad Company, CSX Transportation, Inc. and Norfolk Southern Railway Company (together, "Defendants") conspired for years to use rail fuel surcharges, which were added to MillerCoors' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' fuel costs, and thereby collected billions of dollars of additional profits for a period of more than five years, including from MillerCoors.

3. The Defendants—which together controlled about 90% of rail freight traffic in the United States—began conspiring in 2003 (and continued conspiring for many years thereafter) to impose an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. As part of this plan, they devised and embarked on

a scheme to create, apply, and enforce rate-based fuel surcharges that acted as percentage multipliers on base rates (and thus, on revenue). This permitted these dominant railroads to achieve their desired, and mutually agreed, result: an effective percentage rate increase that could be broadly applied to rail freight customers.

4. The Defendants maintained their conspiracy during the Conspiracy Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, application, and enforcement, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

5. In a ruling in early 2007, the Surface Transportation Board ("STB"), which has authority over rate-regulated freight traffic for which Plaintiff is not suing here, found that the Defendants' rail fuel surcharges, as applied to STB-regulated freight traffic, were "unreasonable" and did not relate to the railroads' actual cost of fuel. The STB expressly stated that it lacks jurisdiction over the private contracts, and other freight traffic exempt from rate regulation, that is the subject of this Complaint. In its ruling, the STB explained that:

> [I]t is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.
>
> Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6.

6. An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

7. As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated rail freight transportation services and injured Plaintiff in its business and property. Plaintiff has paid a higher price for unregulated rail freight transportation than it would have paid absent the concerted unlawful activity alleged herein.

8. Plaintiff seeks damages on rail freight shipments made under its private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

**PARTIES**

9. Plaintiff MillerCoors, for purchases made by it or as successor and/or assignee in interest to purchases made by Molson Coors Beverage Company f/k/a Molson Coors Brewing Company, MillerCoors USA LLC, Coors Brewing Company, Adolph Coors Company, Adolph Coors Brewery Company, Miller Brewing Company, and the Jacob Leinenkugel Brewing Company ("MillerCoors") is organized under the laws of the State of Delaware, with its principal place of business at 250 S. Wacker Drive, Chicago, Illinois 60606. MillerCoors paid for rate-

unregulated rail freight transportation directly from one or more of the Defendants during the Conspiracy Period. During the Conspiracy Period, one or more of the Defendants assessed Rail Fuel Surcharges on MillerCoors in connection with that unregulated rail freight transportation. The prices MillerCoors paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices MillerCoors would have paid absent the conspiracy alleged herein. MillerCoors has therefore been injured in its business and property by reason of Defendants' antitrust violations.

10. Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States, including rail lines within this District, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

11. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports between New York City and Jacksonville, Florida and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Van Dorn St., in Alexandria, Virginia, and maintains a government relations office at One Constitution Avenue NE, Suite 300, Washington DC 20002.

12. Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. BNSF is the

second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

13. Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including Washington, D.C.). UP maintains an office at 700 13th Street, N.W., Suite 350, Washington, D.C. 20005.

**JURISDICTION AND VENUE**

14. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiff by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

16. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Conspiracy Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

17. Venue is also proper because substantially related actions, with common

questions of fact, have been transferred to this District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

18. This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**INTERSTATE TRADE AND COMMERCE**

19. During the Conspiracy Period, Defendants accounted for over 90 percent of all rail shipments within the United States. The Association of American Railroads ("AAR") Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

20. The activities of Defendants were within the flow of, and substantially affected interstate commerce. During the Conspiracy Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant used instrumentalities of interstate commerce to sell and market rail freight transportation services.

21. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

**DEREGULATION OF THE RAILROAD INDUSTRY**

22. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic

operations, railroads were free to set market rates for rail transportation.

23. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

24. Today, by contrast, 80 percent or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency—like the previously-existing ICC—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

25. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities).[2] The railroad industry is now highly concentrated: Four of these railroads—Defendants BNSF, UP, CSX and NS—operate more than 90 percent of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (*i.e.*, the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require significant regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

26. Although the reason for deregulation of the railroad industry was to promote

[2] A Class I railroad is defined as having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Railway Company; (6) Soo Line Railroad Co.; and (7) Grand Trunk Corporation. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

competition and lower freight rates, it is now clear that the opposite occurred—railroads collectively charged shippers supracompetitive prices.

**BEFORE CONSPIRING, THE DEFENDANTS WERE UNABLE TO SUCCESSFULLY MAINTAIN FUEL SURCHARGES**

27. By the early 2000s, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe and Canadian National Railway Co. merger, the STB, which succeeded the ICC, introduced a moratorium on new mergers and then promulgated more stringent standards for merger review. At the same time, railroads were experiencing surging freight demand and tight capacity.

28. In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase. As a result of deregulation, Defendants could no longer ask the ICC or its successor, the STB, for across-the-board rate increases. Thus, the only practicable way to increase prices across-the-board and increase revenues in the short term was through the mechanism of a uniform surcharge applied to as many customers as possible. Under the guise of rising fuel prices, Defendants colluded to create, implement, enforce, and apply widely the Rail Fuel Surcharges as a means to implement what effectively operated as across-the-board rate increases.

29. Since passage of the Staggers Act in 1980, railroads had increasingly entered into private freight transportation contracts that included cost escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII"), which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF") which is based on the AII) weighted a number of cost factors—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses—so that the actual impact

of particular cost increases (*e.g.*, for fuel) would be reflected in the index. Any actual increase in fuel costs, no matter how large, would be captured in the AII and RCAF. James R. Young, the President of UP, acknowledged during an October 2004 earnings call that the RCAF "looks at actual costs through the industry."

30. In 2003, the Defendants seized upon fuel as the means to create the type of across-the-board rate increase for which these railroads, in the era of deregulation, could no longer apply to a regulatory body. The Defendants embarked upon and implemented an agreed plan to remove fuel from the AII (and thus from the RCAF based on the AII), and thereby permit separate "fuel surcharges" to be widely applied. With fuel no longer weighted against other cost factors, the separate "fuel surcharges" could be used simply to raise total freight prices by a given percentage—and that is precisely what these four railroads proceeded to do.

31. Prior to 2003, at least some of the Defendants inserted so-called "fuel surcharges" into contracts for private rail freight transportation, but these fuel surcharges were applied only in isolated instances at very low levels, and each of the Defendants had different fuel surcharge rates, reflecting, *inter alia*, the differing fuel costs of each railroad. Those fuel surcharges "were subject to competition and negotiation with shippers, were less aggressive, and were applied only sporadically." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 49 (D.D.C. 2012) ("*Rail Freight I*"). In short, these fuel surcharge programs "were nothing like the widespread and uniform application of standardized fuel surcharges during the" Conspiracy Period. *Rail Freight I* at 48.

32. For example, NS manager of pricing systems Pat Glennon acknowledged in 2001 and 2002 that fuel surcharges were only "theoretically billable . . . ." *Id.* In September 2002, Glennon reported to the then-Senior Vice President of Marketing Services Don Seale that

"[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause."

33. UP's Chief Executive Officer James Young admitted that UP "had fuel [surcharge] programs in many contracts, but because fuel had not been run up, they were never implemented" and agreed that Rail Fuel Surcharges prior to the Conspiracy Period "never reached significant percentage levels." *Id.*

34. UP's Chief Financial Officer Robert Knight explained further that, prior to the Conspiracy Period, UP did not have a company-wide policy on fuel surcharges: "[t]here were some isolated situations where there were surcharges but … no policy position." *Id.*

35. In an "Enterprise Wide Risk Assessment" from May 2002, BNSF explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace . . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

36. BNSF's executive vice president and chief marketing officer admitted that its fuel surcharge participation rates in early 2003 were "low." *Id.*

37. CSX's executive vice president of sales and marketing testified that the fuel surcharge revenue prior to 2003 was "relatively low to where it needed to be . . . ." *Id.*

38. CSX's director of marketing described fuel surcharges as "fairly minimal" prior to the Conspiracy Period.

39. Before the Conspiracy Period, the Defendants "had difficulty applying and enforcing fuel surcharges in contracts." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F.

Supp. 3d 14, 103 (D.D.C. 2012) ("*Rail Freight II*"). The Defendants could not maintain fuel surcharges as a revenue generator because of competition among themselves; as one UP executive stated succinctly in 2003, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world." A BNSF internal memorandum lamented: "[A]ny increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104. This caused the Defendants to take matters into their own hands in 2003, when they took a series of coordinated actions to switch to a new system that would eliminate competition and thus allow the widespread deployment and enforcement of Rail Fuel Surcharges as a revenue enhancement mechanism.

**THE DEFENDANTS CONSPIRED TO DEVISE A FUEL SURCHARGE SCHEME AND ILLEGALLY AGREED NOT TO COMPETE**

40. From at least the spring of 2003 and continuing until at least 2008, the top executives of each of the Defendants met regularly at resorts and conferences to discuss their industry. For example, at biannual meetings of the National Freight Transportation Association ("NFTA"), executives of the Defendants met to consider and discuss developments in the railroad industry. The Defendants' top executives also met and discussed their industry when they came to Washington, D.C. for AAR board meetings. The Spring 2003 meeting of the NFTA occurred from April 2nd to April 6th, at the Wigwam resort, in Litchfield Park, Arizona.

41. On March 11, 2003, CSX internally recommended making changes to its fuel surcharge program that would have actually reduced the surcharges applied to base rates. Simultaneously, UP's Chief Marketing Officer Jack Koraleski was recommending escalation of UP's fuel surcharge program to be substantially more aggressive. On March 12, 2003, Koraleski traveled to competitor CSX to discuss "fuel surcharge methodology." Shortly thereafter, CSX's leadership abruptly reversed course, abandoning its recommended fuel surcharge reduction and

adopting a program matching UP's escalation.

42. On March 18, 2003, BNSF and NS senior executives, including John Lanigan and Don Seale, met and discussed "synchroniz[ing]" fuel surcharges.

43. On March 20, 2003, CSX publicly announced a new, more aggressive fuel surcharge program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSXT." On April 4, 2003, UP sent a "concurrence" to competitors that its new fuel surcharge program would "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "This is sweet !!! Just like the CSXT."

44. On April 1, 2003, BNSF and CSX senior executives (CMOs Mike Giftos and John Lanigan) met to discuss fuel surcharges as well.

45. Between April 2-6, 2003, NS executive Don Seale met again with BNSF executive John Lanigan to continue their prior discussion on "the fuel surcharge issue" at an NFTA meeting.

46. Similar to CSX's abandonment of a less aggressive fuel surcharge regime following a meeting with UP in March 2003, BNSF decided against a fuel surcharge scheme that could have been fairer for shippers. Between February and April 2003, BNSF had been considering a mileage-based fuel surcharge, which could have better correlated the resulting fuel surcharges to actual fuel costs than the rate-based fuel surcharges that the Defendants broadly implemented during the conspiracy, but abandoned this approach. Instead, BNSF and UP adopted nearly identical rate-based fuel surcharges. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates."

47. By July 2003, all four Defendant railroads had agreed to coordinate their rate-based fuel surcharge programs, including through uniform enforcement and a shared goal of application to 100% of their customers as contracts came up for renewal and new contracts were signed. Under this agreement, BNSF and UP agreed to coordinate their fuel surcharges and base them on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index (the "HDF Index"). BNSF and UP began to charge the exact same fuel surcharges pursuant to this agreement, using the HDF Index. From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the Conspiracy Period.

48. While BNSF and UP had slightly different triggers for the fuel surcharge, with BNSF at $1.25 (beginning with a surcharge of .5%) and UP at $1.35 (beginning with a surcharge of 1.5%), the reality was that the HDF Index was administered in precisely the same way for both railroads.

49. An internal analysis from NS stated that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including the lag times and effective dates."

50. When the HDF Index exceeded $1.35 per gallon, BNSF and UP thereafter both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

51. The Western Railroads also coordinated when they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index *average* price calculation. So, for example, if the HDF Index average price changed in January, the Western

Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

52. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs, including use of the HDF Index for fuel surcharges, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the surcharge in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

53. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that just two months before, UP had announced a different modification to its existing fuel surcharge program. In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same surcharges as BNSF is further evidence that this switch was the result of concerted conduct.

54. Even after having agreed to coordinate their fuel surcharges, however, BNSF and UP still faced the significant barrier to widespread use of fuel surcharges: specifically, the widely used private contracts had cost escalation provisions that already accounted for fuel. The Defendants agreed to solve this problem by conspiring to remove fuel from the widely used cost escalation indexes, thereby paving the way for widespread imposition of the new fuel surcharge

program in which all four of the Defendants could participate, and from which all four could earn additional profits.

55. In the fall of 2003, BNSF and UP initiated an effort in the AAR to get all Defendants to agree on a methodology that would enable the Defendants to take fuel costs out of the weighted RCAF and AII (which already permitted the Defendants to recover all of their fuel costs), and instead apply artificially high Rail Fuel Surcharges as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

56. The four Defendants control and dominate the AAR, and the CEOs of these railroads are all board members of the AAR, which describes itself as "the central coordinating and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

57. Through meetings and discussions within the AAR board on October 2-3, December 11-12 and otherwise in 2003, the Defendants agreed to create and implement coordinated fuel surcharge programs, and to enforce their program through a variety of means discussed herein.

58. Pursuant to their agreements, the Defendants, which dominated the AAR board, caused the AAR to announce in December 2003 the creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF)—that is, a cost escalation index without fuel as a component. This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail

Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period. The Defendants conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone Rail Fuel Surcharges, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy—a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

59. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based fuel surcharges to contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (emphasis added).

60. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, the two Eastern Railroads, Defendants CSX and NS, suddenly moved into lockstep with fuel surcharges based on

the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in 2003. Specifically, the Eastern Railroads likewise agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price, and was functionally identical to that of the Eastern Railroads, as described further herein.

61. The Eastern Railroads also coordinated when they would change their fuel surcharge—two calendar months after the WTI Index had adjusted, thereby adopting the same fuel surcharge price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, the Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

62. NS executive Patrick Glennon, a manager of pricing systems, admitted in 2003 that the new fuel surcharge represented a significant change in practice that was "definitely more aggressive," and "definitely yielded more revenue": "By dropping the base to $23 per barrel, raising the percentage yield and taking it sooner, the change is in fact a blatant general rate increase[.]" *Rail Freight I* at 49. Similarly, CSX internal emails acknowledge that although the new program may "seem[] somewhat benevolent, it is actually a large increase in fuel surcharge

billings—maybe as much as 100%." *Id.*

63. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their Rail Fuel Surcharge programs: including using the WTI Index for fuel surcharges, setting the trigger point at $23 per barrel, and applying the surcharge in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

64. Thus, the Defendants began to apply Rail Fuel Surcharges as a separate item on shippers' bills in the form of a percentage multiplier. The Defendants used the Rail Fuel Surcharges as an easy way to increase revenues across the board.

65. The fuel surcharge programs applied by the Defendants during the Conspiracy Period "were more aggressive and yielded more revenue than earlier programs." *Rail Freight I* at 48. With the AIILF they had put in place, and in furtherance of the conspiracy, the Defendants each applied the fuel surcharge the same way: as a percentage multiplier of the *total* base rate for the rail freight transportation. That is, while the fuel factor in the AII and RCAF had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors, Defendants now were able to apply the percentage increase in fuel costs triggered by the applicable index to the *entire* cost of the freight transport. Thus, for example, if the percentage increase triggered by the applicable fuel index was 15%, then by applying the fuel surcharge the Defendants would raise the entire cost of the freight transport by 15%—even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed approach yielded the Defendants billions of dollars of additional profits.

66. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" fuel surcharge bore no direct relationship to the Defendants' actual increase in fuel costs. The fuel surcharge program was not a cost recovery mechanism, but a revenue enhancement measure. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for years to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the conspiracy period.

67. The creation and publication of a cost escalation index without a fuel component was not required by any regulatory body, nor was it necessary for any Defendant to independently institute its own individual fuel surcharge program. Instead, the creation of the Rail Fuel Surcharge program starting in 2003 was the joint action by BNSF, UP, CSX and NS to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

68. The actions by the Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the Defendants took these collective actions in order to assess a stand-alone fuel surcharge applied to *revenue* (*i.e.,* the entire base rate for the freight shipment), not costs; to act in concert with one another in setting fuel surcharge prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, the Defendants would now be able to apply the supposed fuel cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, the Defendants planned to use the stand-alone fuel surcharge as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing

demand—so long as these railroads participated by not competing on fuel surcharge prices to undercut one another.

69. Many of the 2003 conspiratorial communications among Defendants, including some of the conversations detailed above, concerned the creation of a fuel-surcharge program for their "carload" business segments (in which freight travels exclusively by rail), but the Defendants' conspiracy—to synchronize, coordinate, enforce, and apply rate-based fuel surcharges to as many shippers as possible, amounting fundamentally to an agreement not to compete on the basis of fuel surcharges—extended to their "coal" and "intermodal" business segments (in which freight travels by multiple modes of transportation) as well. Notably, when the Defendants met in groups in 2003 to discuss fuel surcharges, including the March 18, 2003 meeting between BNSF and NS and a June 2003 meeting between UP and CSX, the heads of the respective intermodal business groups (and other personnel with intermodal and coal responsibilities) participated as well.

70. Defendants hatched a single conspiracy extending to *all* shippers, regardless of traffic type. When Defendants met to conspire, or otherwise communicated, they did not limit their conversations to carload traffic. And once the conspiracy was underway, the Defendants took steps, e.g., to align their coal and intermodal fuel surcharges, including by ad hoc adjustments, and exchange information about fuel surcharge coverage. Just as with carload traffic, in the absence of competition during the Conspiracy Period, Defendants greatly expanded the imposition and enforcement of rate-based coal and intermodal fuel surcharges, with the result of raising rates altogether.

71. As a result of the Defendants' concerted action, Rail Fuel Surcharges charged to rail shippers (including Plaintiff) were raised to or maintained at supracompetitive levels during the Conspiracy Period.

**THE DEFENDANTS SUCCESSFULLY IMPLEMENTED THEIR ILLEGAL, ANTICOMPETITIVE FUEL SURCHARGE SCHEME**

72. As detailed above, the Defendants agreed in 2003 to remove fuel from the AII and RCAF, and thereby permit the application of separate Rail Fuel Surcharges as a multiplier percentage of the base rate charged for the rail freight transportation involved. This meant that the Fuel Surcharge could operate as a means to impose an effective across-the-board rate increase, and thereby raise revenue far beyond the actual costs of fuel (which could have continued to be recovered through the AII and RCAF). The Defendants applied these surcharges not only to published tariff rates, but to the private contracts, and other traffic, not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here). With the conspiracy underway, the two Western Railroads, using the HDF index, moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Conspiracy Period.

73. The chart below shows that the Rail Fuel Surcharge percentages charged by the Western Railroads for freight shipments varied before the Conspiracy Period began, but were identical starting in July 2003:

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1.0% | 0 |
| Jul-02 | 1.0% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1.0% | 0 |
| Nov-02 | 2.0% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |

| | | |
|---|---|---|
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |

74. As detailed above, there also was uniformity among the Eastern Railroads in the monthly surcharge percentages, based on the WTI Index, that they charged customers for most of the Conspiracy Period.

75. The chart below shows that the Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Conspiracy Period, but were identical starting in March 2004:

**MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| Mar-04 | 4.8% | 4.8% |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |

| | | |
|---|---|---|
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

76. In stark contrast to this uniformity in Rail Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that the Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that the Defendants moved in uniform lockstep for a period of nearly 38 months indicates that the Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges. In addition, the advance announcements of each Defendant's Rail Fuel Surcharges was an important implementation and enforcement mechanism for the conspiracy.

77. Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Defendants. For example, after concluding in 2003 that the Rail Fuel Surcharges charged by the Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel

surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition." ("Following the Competition" *Traffic World*, July 14, 2003). The Defendants' use of retail price indices in furtherance of the conspiracy also allowed them to over-recover their actual fuel costs. An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity ("CURE") found that the difference between the Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and their publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

78. BNSF's average cost for diesel fuel in Third Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for Third Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from Third Quarter 2003 to 2004. In contrast, the surcharge charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from Third Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods particularly since the inflated percentage increase was applied to the entire rate at issue, not merely to the fuel cost component of that rate.

79. Another reason why the Defendants' Rail Fuel Surcharges were not a natural reaction to increased fuel costs is that the surcharge levels disregarded gains in fuel efficiency. As explained in a 2007 AAR publication, the Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel. By calculating fuel surcharges as a percentage of the shipping rate,

the Defendants deflected attention from the cost savings they achieved through fuel efficiency gains.

80. There is no independent business justification to explain the Defendants' behavior. Their uniform pricing of fuel surcharges year after year could not have happened by chance or coincidence. Nor was it an expected response to a common business problem. Any actual increased fuel costs experienced by the Defendants would have been covered by the AII and RCAF. The uniform pricing could only have been achieved by an express agreement followed by collective action—*i.e.*, decoupling fuel prices from the historical railroad cost indices and agreeing to follow new and complex indices and trigger points for computing the stand-alone fuel surcharge percentages. The Defendants' purpose was to use generally increasing fuel costs as a cover for implementing what were, in effect, across-the-board rate increases.

81. In agreeing to collude on fuel surcharges across business segments, each Defendant was acting against its independent short-term, economic self-interest. In a competitive environment, free of collusion, carriers with lower fuel costs could impose a lower surcharge or none at all and thereby increase market share at the expense of competing railroads. Rather than engage in such competitive behavior, the Defendants "uniformly began their negotiations with their standard fuel surcharge program and their objective was to apply their standard fuel surcharge as widely as possible." *Rail Freight I* at 50.

82. In furtherance of the conspiracy, the Defendants also declined to negotiate discounts on the Rail Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate

discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable."

83. Indeed, each Defendant *mandated* application of rate-based fuel surcharges in furtherance of their agreement.

84. On April 9, 2003, BNSF issued an internal notification stating, "Effective immediately and urgent per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, BNSF's Chief Economist Samuel Kyei noted "contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed."

85. Similarly, UP implemented a no-exceptions policy as explained by a sales representative to a customer in December 2003: "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice."

86. In 2004, Don Seale from NS informed his subordinates, "no deviation from NS's published FSC without [his] prior approval."

87. In 2006, CSX Vice President of Industrial Products Kyle Hancock established, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT a fuel surcharge."

88. The widespread application of fuel surcharges differed substantively from the Defendants' practices before the Conspiracy Period, when the Defendants were actively competing for customers and could not maintain fuel surcharges in the face of such competition. After the conspiracy began, "any deviations from [D]efendants' standard fuel surcharge programs were rare." *Rail Freight I* at 50. Each Defendant "enforced strict policies ensuring across-the-board application of these standardized fuel surcharge programs on all of their shippers . . . ." *Id.* In this

way, the Defendants could avoid undercutting one another and ensure that each could continue to apply fuel surcharges to its customers and reap their supracompetitive profits.

89. The Defendants acknowledged "that the new fuel surcharge programs were intended to generate revenue and were envisioned as profit centers." *Rail Freight II* at 104. One NS internal email noted that it seemed like all revenue increases were "coming from fuel surcharges." *Id.* A BNSF internal memorandum stated that CSX and NS "have a 'profit center' with their Fuel Surcharge Programs for the customers that participate[.]" *Id.* at 104-105. Another BNSF document described its own fuel surcharge program as "a revenue maximization program, not protection against fuel prices." *Id.* at 105.

90. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," demonstrated in the following chart documenting the significant growth in profits during the Conspiracy Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

91. The Defendants quickly realized that implementation of fuel surcharges only worked because all the Defendants participated, as noted in a BNSF Executive Team presentation in 2005, "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall." They policed the conspiracy by exchanging fuel surcharge data with one another, resulted in nearly no shift in market share between them.

92. The Defendants agreed that not to undercut agreed pricing or stealing market share by offsetting fuel surcharges by discounting underlying rates. As demonstrated in the table that follows, the Defendants' market shares remained stable following the 2003 agreements.

| **Railroad Market Share: Originated Tons and Carloads 2003 - 2006** [1] | | | | |
|---|---|---|---|---|
| | | | | |
| | **2003** | **2004** | **2005** | **2006** |
| **BNSF** | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 |
| Percent of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% |

| | | | | |
|---|---|---|---|---|
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 |
| Percent of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% |
| | | | | |
| | | | | |
| **CSXT** | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 |
| Percent of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% |
| | | | | |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 |
| Percent of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% |
| | | | | |
| | | | | |
| **NS** | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 |
| Percent of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% |
| | | | | |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 |
| Percent of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% |
| | | | | |
| | | | | |
| **UP** | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 |
| Percent of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% |
| | | | | |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 |
| Percent of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% |
| | | | | |
| | | | | |
| Total | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 |
| | | | | |
| | | | | |
| [1] AAR Railroad Facts and Analysis of Class I Railroads | | | | |

93. According to UP President James Young, by July 2007 approximately "eighty to ninety percent" of UP's business overall had "some kind of fuel surcharge mechanism that gets passed on to the customer."

94. Because the Defendants started their negotiations during the Conspiracy Period using their standard fuel surcharge formula, any deviations from that standard fuel surcharge

application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (i.e., facilities served by only one of the Defendants) – who are nonetheless able to harness competition among railroads for negotiation purposes absent collusion – suffered from the conspiracy. NS's CEO, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," expressly acknowledging that "even where there is only one railroad serving a facility, there are market factors at play."

**THE STB DECISION**

95. Starting in 2006, the STB, which regulates certain aspects of the railroad industry, began holding hearings and investigating the Defendants' practices relating to fuel surcharges. On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). Thus, the STB found, "a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particularly traffic to which the surcharge is applied." *Id.* at 6.

96. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

97. Pursuant to their conspiracy, the Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## THE DEFENDANTS REAPED SUPRACOMPETITIVE PROFITS

98. The Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on Rail Fuel Surcharges, the Defendants realized billions of dollars in revenues during the Conspiracy Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge. During the period of the conspiracy (July 2003 to at least June 30, 2007), the Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion, an increase of about 160 percent. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to fuel surcharge revenue realized by the Defendants through their price fixing conspiracy. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

99. A Senate Commerce Committee report reviewed the Defendants' profits and concluded that "a review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade."

100. The Defendants' themselves also attributed their increased revenue to fuel surcharges. In 2006, NS observed, "[r]ailway operating revenues increased $880 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume."

101. BNSF recognized rail freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." "Growth

in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

102. In 2006, UP "achieved record revenue levels in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

103. In 2006, CSX's revenue increased $968 million: "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

104. The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a. The Rail Fuel Surcharges charged to Plaintiff for unregulated rail freight transportation have been fixed or stabilized at supracompetitive levels;

b. Plaintiff has been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

105. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff has sustained injury to their business or property. Defendants implemented policies that ensured that their fuel surcharges would be synchronized, rigidly enforced, and applied to as many freight shippers as possible. The injuries sustained by the Plaintiff are the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of the Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

**COUNT I**
**(Violation of Section 1 and 3 of the Sherman**
**Act and Section 4 of the Clayton Act)**

106. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

107. The Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act and Section 4 of the Clayton Act.

108. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants in furtherance of which the Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

109. The Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. The Defendants' unlawful conduct was through mutual understandings or agreements by, between and among the Defendants.

110. The contract, combination or conspiracy has had the following effects:

a. Prices charged to Plaintiff for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Prices paid for unregulated rail freight transportation services were fixed and/or maintained at supracompetitive levels;

c. Plaintiff has been deprived of the benefits of free, open and unrestricted

competition in the market for rail freight transportation services; and

d. competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

111. As a proximate result of Defendants' unlawful conduct, Plaintiff suffered injury in that it has paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Conspiracy Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act;

(2) That Plaintiff recover compensatory damages, as provided by law, and that judgment be entered against Defendants on behalf of Plaintiff;

(3) That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(4) That Plaintiff recover treble damages, as provided by law;

(5) That Plaintiff recover its costs of the suit, including attorneys' fees, as provided by law; and

(6) For such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: February 7, 2020

By: /s/ *Melinda R. Coolidge*

Melinda R. Coolidge
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Theodore F. DiSalvo
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200
mcoolidge@hausfeld.com
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
tdisalvo@hausfeld.com

Michael P. Lehmann
Seth R. Gassman
**HAUSFELD LLP**
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
(415) 633-1908
mlehmann@hausfeld.com
sgassman@hausfeld.com

Douglas A. Millen
Steven A. Kanner
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Rd # 130,
Bannockburn, IL 60015
(224) 632-4500
dmillen@fklmlaw.com
skanner@fklmlaw.com

*Attorneys for MillerCoors*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-0489 (PLF/GMH) |
| OXBOW CARBON & MINERALS LLC, et al.,<br>*Plaintiffs*,<br>v.<br>UNION PACIFIC RAILROAD CO., et al.,<br>*Defendants*. | Civil Action No. 11-1049 (PLF) |

**JOINT STATUS REPORT**

Pursuant to the Court's Order of July 27, 2022, ECF No. 1088; *Oxbow* ECF No. 260,[1] Defendants and Plaintiffs, by and through their respective counsel, submit this Joint Status Report to advise the Court on the outcome of the parties' discussions regarding the application of Section 10706 to evidence in the summary judgment record.

The Court directed the parties to "identify documents relevant to the pending summary judgment motions," then to "meet and confer and attempt to agree on which documents should be excluded, in whole or in part, under Section 10706," and finally to "inform[] the Court of the outcome of their discussions." ECF No. 1088 at 3; *Oxbow* ECF No. 260 at 3. The parties have diligently engaged in that process, through extensive email communication, exchange of letters, and more than three hours of live discussion by videoconference spread across three meetings.

[1] Docket citations in this Joint Status Report are to the docket in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, No. 07-mc-0489-PLF ("*MDL I*"). Where a parallel citation exists for the docket in *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, No. 11-cv-1049-PLF ("*Oxbow*"), that citation is referenced as "*Oxbow* ECF No."

On August 12, 2022, Defendants shared with Plaintiffs a proposed list of discussions and agreements that they believe are subject to Section 10706 and worthy of the parties' attention. That list included references to what Defendants understand to be the specific exhibits evidencing each of those discussions or agreements, focusing on the exhibits cited in Plaintiffs' opposition briefs. A copy of this list (with certain updates and corrections to the listed exhibits) is attached as Exhibit 1 to this Joint Status Report ("Exhibit 1").

On August 26, 2022, Plaintiffs responded and—in order to narrow the disputes between the parties—identified particular documents (all exhibits from the summary judgment briefing) that they do not believe that the Court needs to consider when reviewing the parties' summary judgment briefing. Those exhibits are: PX0143, PX0206, PX0238, PX0239, PX0271, PX0470, PX0471, and PX0472. Five of those exhibits (PX0143, PX0206, PX0238, PX0271, PX0472) appear on Exhibit 1 and are indicated in strikethrough on Exhibit 1 to reflect that Plaintiffs have withdrawn their reliance on those documents in connection with the pending summary judgment briefing.

The parties had subsequent conferences, but were unable to reach agreement on other documents. Because the parties have not come to mutual agreement on all issues, each includes an additional statement below.

**Defendants' Statement**

Through letters, emails, and several hours of live discussion, the parties made progress in understanding each other's position as a result of the Court's order, ECF No. 1088; *Oxbow* ECF No. 260. *See* Exs. 2-5 (Email thread and correspondence between the parties). But little agreement exists: Defendants listed 25 "discussion[s] or agreement[s]" (as Section 10706 commands) reflected in 43 key documents relevant to summary judgment. Plaintiffs denied that *any* is covered by Section 10706, and instead merely offered that they "do not believe that the Court needs to

consider" 5 of those documents to resolve summary judgment. Basic disagreements about basic material remain to be decided. And the disputed material is so central to Plaintiffs' own version of their case that the Court could not realistically deny summary judgment without confronting Defendants' objections to this material. The Court, however, has not been advised by the parties on the particulars of their disagreements about how the D.C. Circuit's framework applies to the disputed material, let alone the implications for summary judgment. Accordingly, Defendants believe that the Court will need to receive briefing, but that such briefing can be efficiently focused on disputed issues of Section 10706's application, and how those issues bear on summary judgment. Defendants submit this statement to explain how they have tried to promote the agreement this Court sought—including how they identified the documents at issue, and their approach to analyzing whether material is inadmissible under Section 10706—as well as the nature of the parties' disagreements, and Defendants' proposal for efficient further proceedings.

***1. Defendants Offer a Workable Set of Materials Worth Disputing.*** Exhibit 1 does not list everything in the record that could conceivably be challenged under Section 10706; it lists what matters for purposes of summary judgment. The Court ordered the parties to focus on "documents relevant to the pending summary judgment motions," ECF No. 1088 at 3; *Oxbow* ECF No. 260 at 3, and that is what Defendants did from the start—developing a list of discussions and agreements (and associated evidence) worth debating at this stage. *See* Ex. 3. Defendants went to considerable lengths to develop that limited list, because the summary judgment record in this case is large—so large that the Court asked the parties to retrieve the paper copies for the time being, *see* ECF No. 1063; *Oxbow* ECF No. 253—and because raising every Section 10706 dispute is neither helpful nor necessary. Defendants assume that, given that order and the pendency of the appeal in the D.C. Circuit, the Court has not had reason to study that briefing or the broader record, so some context may be helpful.

One reason that record is large is because there is a robust record of the independent decision-making that led to the railroads' adoptions of revised fuel surcharge formulas in 2003 and 2004, and their efforts to impose and collect them.[2] Another reason, and the salient one here, is that, in addition to their opposition brief, the *MDL I* Plaintiffs submitted a 405-page set of objections and responses (ECF No. 1050-2) to Defendants' statement of undisputed material facts (*ten times* the length of Defendants' statement (ECF No. 1034-1) to which it purportedly responds); a 228-page "Counterstatement of Material Facts" (ECF No. 1050-1); and reams of documents underlying these tomes (many of which are never cited directly in Plaintiffs' opposition briefs). Defendants have taken issue with Plaintiffs' failure to heed Civil Local Rule 7(h), which requires a "*concise* statement of *genuine issues* setting forth all material facts as to which it is contended there exists *a genuine issue necessary to be litigated*" (emphases added). *See* ECF No. 1061. Indeed, much of Plaintiffs' evidence is so peripheral to the events in dispute, or buried so deep in their voluminous submissions, that its admissibility is exceedingly unlikely to matter at this stage; if it were material, it would feature in Plaintiffs' opposition briefs. Other evidence may have merited a citation in a summary judgment opposition brief, but is best dispatched through powerful summary judgment arguments, regardless of its admissibility under Section 10706. Defendants recognize that paging through every piece of evidence and raising a large number of Section 10706 disputes is unhelpful and would put a tremendous burden on the Court. Accordingly, Defendants worked to focus on material that is truly "relevant" to resolution of the summary judgment motions,

[2] This record of independent action is key: The law demands that Plaintiffs offer "evidence that tends to exclude the possibility that the [defendants] were acting independently," and it accepts only an "inference of conspiracy [that] is reasonable *in light of the competing inferences of independent action*." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (emphasis added). But this part of the record almost by definition does not implicate Section 10706, because that independent decision-making occurred internally at each railroad.

ECF No. 1088 at 3, and which is best addressed under Section 10706.

To that end, what Defendants listed in the meet-and-confer process—and what they would have the Court evaluate in further proceedings—is a tailored set of interline communications that Plaintiffs themselves have put at the center of their case, or that cry out for exclusion under Section 10706. *See* Ex. 1. These are the interline communications that Plaintiffs cite directly in their opposition briefs and seek to weaponize, on the theory that, because Defendants were talking at times that matter in Plaintiffs' narrative, they must have been conspiring—even though, as the D.C. Circuit recognized, " '[c]arriers must talk to competitors about interline movements in which they interchange. That requirement could falsely lead to conclusions about rate agreements that were lawfully discussed.' " *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 34 F.4th 1, 10 (D.C. Cir. 2022) (quoting H.R. Rep. No. 96-1430, at 114 (1980)). In addition, Defendants listed a few representative concurrence communications. These typically appear in passing in Plaintiffs' papers, but their inadmissible status is worth noting because they are discussions culminating in the agreements under which interlining railroads established the terms on which they would offer their joint product to customers. Defendants repeatedly invited Plaintiffs to add to the list for meet-and-confer discussion any documents that, in Plaintiffs' view, were relevant to summary judgment, but Plaintiffs have never suggested anything else worth discussing at this stage. The upshot is that Defendants listed 25 discussions, reflected in 43 key documents; Plaintiffs withdrew their reliance on 5 of those documents, in effect resolving 3 discussions. *See* Ex. 1. What remains is Defendants' best effort to identify material actually worth the Court's present attention.[3]

[3] The question of what is worth challenging under Section 10706 would be a quite different matter if the parties were preparing for trial, facing the question of how to control the presentation of evidence to a jury through *in limine* motions geared toward an exhibit list. That is one reason why "failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial." Fed. R. Civ. P. 56(c)(2) & 2010 adv. comm. note. Defendants reserve that right to challenge the admissibility at any trial of evidence under Section 10706.

***2. Defendants Use a Workable, Discussion-Oriented Approach to Evaluate Evidence.*** As the D.C. Circuit, this Court, Plaintiffs, and Defendants have all repeatedly emphasized, Section 10706 asks whether a "discussion or agreement" between rail carriers meets certain conditions and, if it does, excludes all "*evidence of* [that] discussion or agreement." 49 U.S.C. § 10706(a)(3)(B)(ii) (emphasis added). Section 10706's analytic focus is thus a "discussion or agreement" between rail carriers, not documents in isolation. *See, e.g.*, *Rail Freight*, 34 F.4th at 9 ("The court must consider each discussion and agreement separately in determining whether it should be excluded under Section 10706."). Such a discussion or agreement may be reflected in a lone document; it could span multiple documents; or different parts of a single document could be evidence of different discussions. *See Rail Freight*, 34 F.4th at 9; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 520 F. Supp. 3d 1, 25 (D.D.C. 2021), *aff'd in part, vacated in part, rev'd in part*, 34 F.4th 1 (D.C. Cir. 2022). For that reason, Defendants' tailored list of documents is organized around particular discussions or agreements. That approach follows Section 10706's instruction to focus on "discussion[s] or agreement[s]." It is efficient: When multiple documents are evidence of a single discussion, going discussion-by-discussion can kill multiple birds with one stone. And in the end, the key question usually is what the "focus of the discussion or agreement" was, *Rail Freight*, 34 F.4th at 10, not whether a given document is "evidence of [that] discussion or agreement," 49 U.S.C. § 10706(a)(3)(b)(ii).

Plaintiffs initially agreed—they "agree[d]" that the first step in the meet-and-confer process should be for Defendants to "shar[e] a proposed list of discussions and agreements in [Plaintiffs'] Summary Judgment Opposition (along with PX cites [used to reference exhibits in the summary judgment briefing]) that defendants believe are subject to Section 10706." Ex. 2 (Email from M. Hausfeld to B. Horwich, Aug. 9, 2022). Defendants did so, sending Plaintiffs the limited group of 25 specific discussions and agreements described above. *See* Ex. 3. But in later conferences,

Plaintiffs maintained that the parties either should focus only on individual documents, irrespective of any particular "discussion or agreement," or (in seeming contradiction) should decide admissibility based on the entire arc of events starting before the supposed conspiracy period and continuing well into that period. Plaintiffs also demanded that *Defendants* propose partially redacted versions of the documents on Defendants' list—a puzzling approach when *Plaintiffs* know best what material they would salvage from an otherwise inadmissible document.[4]

None of Plaintiffs' various approaches would be a good path forward. To begin, this Court has already rejected Plaintiffs' claim that everything must be considered together as evidence of one overarching agreement; that does not comport with the "common parlance" meaning of "discussion." *See Rail Freight*, 520 F. Supp. 3d at 24-25. Second, a focus on isolated documents, and not the discussions or agreements to which they pertain, would miss how Section 10706 fits into summary judgment: Document-by-document examination (and perhaps redaction) is the inevitable prelude to a jury trial, because a jury can only be shown documents. But we know of no instance in which a Court deciding summary judgment has redacted documents for itself. Rather, the Court is obviously capable of recognizing that if, for example, a particular discussion at an alliance meeting satisfies the Section 10706 criteria, then Plaintiffs cannot rely on that discussion to create a genuine issue of material fact, because Plaintiffs have no admissible evidence of that discussion. And that implication for summary judgment would stand, regardless of how hard one scoured the record for stray references to that discussion, and regardless of how one might redact particular documents. Defendants continue to believe that a discussion-oriented approach

[4] Though Defendants have good grounds to believe the documents are inadmissible, period, they repeatedly made clear that they were willing to hear Plaintiffs' contrary perspective on particular documents. But Plaintiffs never proposed specific redactions for any document, let alone workable and appropriate ones. And regardless, the guiding principle for any redactions must be an understanding of *why* the redactions are being made—which circles back to basic question of whether a given discussion or agreement meets Section 10706's criteria.

is the best (and most efficient) one, allowing the Court focus on substance rather than micromanaging the evidentiary record.

***3. Important Disagreements Remain on Basic Material.*** Despite letters, emails, and multiple hour-long live meetings, the parties eventually found themselves returning to recurring points of disagreement. In particular, the parties did not agree on what Defendants believe should be the most straightforward applications of the D.C. Circuit's interpretation of Section 10706. And without agreements on the basic discussions, agreement on more complicated matters was not possible. Take, for example, the March 12-13, 2003 alliance meeting between UP and CSXT. The key evidence Plaintiffs cite for the point that UP and CSXT executives discussed fuel surcharges at that meeting is a single two-page exhibit, PX0202. That is an email from a week before the meeting, in which UP's correspondent shared with CSXT's correspondent several "suggested agenda items" for the upcoming alliance meeting, including:

```
Other Pricing Issues on CSX/UP Interline Business
    Fuel surcharge methodology [believe Jack & Clarence talked on this]
    Bilateral accounting agreement
```

PX0202 at 1 (highlighting added). Plaintiffs omit the highlighted words from their summary judgment opposition brief, but they are plain as day. Plaintiffs responded that the word "interline" is a mere "fig leaf" that cannot satisfy Defendants' burden. That cannot be right. Section 10706 covers precious little if not exchanges like this, in which the relevant text of the *only* documentary evidence on which Plaintiffs rely shows an Eastern and a Western railroad—established interline partners—*explicitly* saying that their discussion is about *interline* issues.

A similar difficulty arose with many documents relating to discussions about concurrence requests between interline partners. For example, on March 28, 2003, a CSXT employee emailed UP employees notification of a modified fuel cost recovery program, asking that UP "provide

concurrence to the modified CSXT fuel surcharge program on joint-line rates between CSXT and UP," and noting that the surcharge would "be divided in the same proportion as the joint-line freight charges." PX0467 at 4.[5] The fact that the corresponding interline partners described the subject of their own discussion as "concurrence" ought to be proof enough—absent some other evidence—of the focus of the correspondents' discussion. Plaintiffs responded that, because these concurrence discussions occurred at roughly the same time that one railroad involved was making broader changes to its surcharges, these communications fall outside Section 10706—even though they expressly state that they concern interline business. Respectfully, the parties should be far past such a debate: The practical necessity of having similar rates and practices on both interline routes and other traffic was a pillar of Congress's reason for enacting Section 10706. Plaintiffs' position denies what everyone involved understood "concurrence" on "joint-line rates" to mean, rejects a basic application of Section 10706's evidentiary protection, and offends Section 10706's bar on inferring a conspiracy from the mere fact that two railroads collaborated on an interline price and one charged a similar price on "another route or traffic," 49 U.S.C. § 10706(a)(3)(B)(ii).

Further, Plaintiffs repeatedly expressed that they do not agree that *anything* is excluded by Section 10706; rather, they will only agree not to rely on some specific documents for purposes of summary judgment.[6] Withdrawing a document moots disputes about that single document. But

---

[5] When a rail carrier makes pricing or policy changes that affects traffic moving under joint rates, it must seek approval—known as "concurrence"—from each rail carrier with which it interchanges affected traffic. *See Soc'y of Plastics Indus., Inc. v. ICC*, 955 F.2d 722, 725, 729 (D.C. Cir. 1992). That is because, in general, it is the originating carrier under whose prices and policies interline traffic moves, and which usually communicates with the customer about rates and handles billing. But both interline partners must agree to the prices that will apply to their shared traffic. For that reason, when a rail carrier wants to change the fuel surcharge applicable to traffic moving under joint rates, it must seek concurrence from its interline partners. *See id.* at 724-25.

[6] Plaintiffs also wrote that "[w]ith respect to any document Plaintiffs no longer intends [sic] to use, Plaintiffs reserve the right to propose alternate citations or documents in support of any proposition

it reflects no principled stance that can be applied more broadly to resolve other disputes. Indeed, it does not even resolve the status of *the very discussion to which the withdrawn document relates*. For example, in September 2004, BNSF and NS personnel engaged in a weeks-long discussion about a technical issue that had resulted in inconsistent reporting of fuel surcharge coverage on their interline traffic. *MDL I* Plaintiffs collected the documents reflecting that discussion (alongside some others) in one footnote, ECF No. 1050 at 41-42 n.10, and Defendants grouped them together in their opening letter to Plaintiffs, Ex. 3 at 5 (Discussion 16). When Plaintiffs responded by simply withdrawing one of those documents—PX0271, *see* Ex. 4 at 2—Defendants asked why that concession wouldn't apply equally to all evidence of that same discussion, Ex. 5 at 3. Indeed, several of those documents cross-reference one another, and they involve the same people, discussing the same issue, in the same timeframe. Plaintiffs have offered no principle on which to distinguish among those documents. This too leaves issues for the Court to resolve.

***4. The Path Forward.*** All agree that there are disagreements about the application of Section 10706 that persist and will not be resolved except by this Court. Some of those disagreements could be adjudicated on the documents themselves. Others may require some contextual material—such as deposition testimony that is not otherwise featured in existing briefing, or a related document that did not make it into the summary judgment record (which was, of course, geared toward the *Monsanto* / *Matsushita* standard, not the D.C. Circuit's interpretation of Section 10706). And in other instances, a page of explanation may save the Court hours of puzzlement, such as the September 2004 correspondence between BNSF and NS described above, which spans a fair number of documents. Briefing on those subjects is likely to be all the more useful now that the parties have a better understanding of each other's positions.

---

the withdrawn document was offered to support." Ex. 4 at 2 n.1. That reservation (to which Defendants do not agree) threatens to create *new* disputes over evidence not even in the record.

Moreover, although applying Section 10706 to the summary judgment record is important, it has never been an end unto itself. Rather, it exposes yet another foundational problem with Plaintiffs' case, on top of the independent reasons for granting summary judgment that Defendants briefed (without the benefit of Section 10706) under the landmark cases recognizing that "mistaken inferences" of conspiracy from lawful conduct can harm the competitive process that antitrust law seeks to protect. *Matsushita*, 475 U.S. at 588; *see Monsanto*, 465 U.S. 752. With those motions now briefed, summary judgment could be granted without deciding the remaining Section 10706 issues, but it cannot be denied without addressing the admissibility of the challenged evidence—evidence that features so significantly in Plaintiffs' narrative. Moreover, the governing summary judgment standard requires consideration of "the record taken as a whole." *Matsushita*, 475 U.S. at 587. Thus, the exclusion of evidence under Section 10706 reshapes the larger picture even for the evidence that remains, and Defendants believe the Court should be briefed on how that is so.

Here again, some context on the summary judgment briefing is helpful: Plaintiffs say the conspiracy was formed in mid-March to mid-May of 2003. Defendants have explained in their summary judgment papers why that formation story does not hold together, especially not in the face of the overwhelming inference of independent action reflected by the rich and undisputed record of internal deliberations. But even setting that aside, much of what Defendants continue to challenge relates to that supposed "formation" period. Excluding Plaintiffs' evidence from that early period strips evidence of later events of any force it might have had: If Plaintiffs cannot show that a conspiracy *began*, a jury certainly cannot reasonably interpret later evidence to show that it *continued*.

One simple example illustrates that point: if the Court excludes (as indeed it should) the evidence of CSXT and UP's discussion on March 12-13, 2003 of "Other Pricing Issues on CSX/UP Interline Business" (PX0202), and Plaintiffs offer no other evidence that CSXT was

communicating *at all* with another railroad about fuel surcharges before its March 20, 2003 public announcement of a new fuel surcharge (as indeed Plaintiffs have not), then a reasonable jury obviously could not conclude that surcharge was conspiratorial. And because every other supposedly conspiratorial change by every other Defendant followed that publicly announced change, this case looks like so many others where summary judgment was granted: Cases do not go to trial when similar conduct in the marketplace can be explained by common reactions to common external events (here, rising and volatile fuel prices), follow-the-leader behavior, or both—all of which is entirely lawful.

Such implications are quite important for evaluating summary judgment, and they are bound up with *both* the summary judgment standard and Section 10706. But they are not briefed for the Court. For that reason, Defendants suggest that the Court order briefing focused on the remaining Section 10706 issues and their implication for the pending summary judgment motions. Defendants would be prepared to make a specific proposal on the timing and format of such briefing or confer further with Plaintiffs on that subject at the Court's direction. Defendants also believe the Court and the parties would benefit from a status conference to address these issues.

**<u>Plaintiffs' Statement</u>**

On July 27, 2022, this Court rejected the parties' request for supplemental briefing and instead ordered the parties to "attempt to agree on which documents should be excluded, in whole or in part, under Section 10706" and to then "file a joint status report . . . informing the Court of the outcome of their discussions." The parties complied with the first instruction, but Defendants insisted on submitting substantive argument—effectively an entire brief—addressing (again) the merits of their 10706 challenges without showing it to Plaintiffs first to provide Plaintiffs an opportunity to respond. We understand from Defendants that this will include arguments about, *e.g.*, why Defendants believe the Court should make its 10706 admissibility determinations on a

"discussion-by-discussion" basis rather than "document-by-document," and Defendants' characterization of the parties' positions on the application of Section 10706.

While mindful of the Court's Order, given Defendants' insistence on submitting what amounts to a brief, Plaintiffs reluctantly provide a short summary of the meet-and-confer process and a brief overview of Plaintiffs' positions and potential next steps.

Following this Court's July 27, 2022 Order, the parties began discussing how to proceed. Plaintiffs proposed, as the parties had previously agreed in their July 12, 2022 submission, Dkt. No. 1085, that the most sensible and efficient way forward would be for Defendants to first identify the documents relevant to the pending summary judgment motion that they still believed should be excluded, based upon the standard announced in the D.C. Circuit's May 17, 2022 opinion, *In re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869*, 34 F.4th 1, (D.C. Cir. 2022) ("*Rail*"). Plaintiffs would then identify any documents on Defendants' list that Plaintiffs no longer intended to rely upon for purposes of opposing summary judgment, thereby narrowing and defining the scope of any remaining dispute and facilitating subsequent meet and confers.

On August 12, 2022, Defendants provided Plaintiffs with a letter and "List of Discussions or Agreements," identifying by day, year, or even simply subject matter, 25 "Discussions," and approximately 50 documents or testimony "evidencing" those "Discussions," that Defendants still contend should be excluded in their entirety, while also noting that their list "*may not be the full range of evidence* of those discussions or agreements." In response, Plaintiffs noted that the Court's order required identification of "*documents* relevant to the pending summary judgment motions," and determination of "which *documents* relating to the pending summary judgment motions should be excluded, in whole or in part, under Section 10706," Dkt. No. 1088 (emphases added), and that the D.C. Circuit's opinion recognizes that the admissibility analysis must take

place on a document-by-document basis (and indeed, even a portion of a document at a time).[7] Plaintiffs therefore repeatedly asked for Defendants' *complete* list of documents and related deposition testimony relevant to the summary judgment motion but never received any additional identifications. Nevertheless, Plaintiffs reviewed Defendants' August 12 list—as well as the documents Defendants previously sought to exclude in their February 21, 2020 10706 motion, Dkt. No. 927—to determine whether Plaintiffs might be willing to withdraw any of that evidence from the summary judgment record. As a result of that review, Plaintiffs have withdrawn from the summary judgment record 8 documents (PX0143, PX0206, PX0238, PX0239, PX0271, PX0470, PX0471, PX0472), thereby narrowing the scope of the parties' dispute.[8]

Over a series of meet and confers, the parties have come to a better understanding of their respective positions as to the remaining documents on Defendants' August 12 list. It is clear, however, that the parties will not reach agreement on the admissibility of the 38 remaining documents. For example, Defendants still assert that evidence of NS and BNSF executives discussing "synchroniz[ing]" fuel surcharges "with other big players in the industry"[9] is

[7] *See Rail*, 34 F.4th at 13 ("A single document may reference more than one discussion or agreement. Defendants acknowledge that this is so. The court must consider each discussion and agreement separately in determining whether it should be excluded under Section 10706."); *id.* at 19 ("As Defendants concede, 'different parts of a single document could conceivably reflect two separate discussions, one of which conerns interline traffic and one of which does not." Under such a scenario, "redacting only the interline discussion would be appropriate because the underlying material is not evidence of a qualifying discussion . . .").

[8] As Plaintiffs explained to Defendants, Plaintiffs do not concede these documents are excludable under Section 10706, but Plaintiffs have agreed to withdraw them from the summary judgment record to spare the Court unnecessary disputes.

[9] *See* PX0145 (March 18, 2003 BNSF-NS meeting: "BNSF fuel surcharge is structured differently than NS, CSX, and UP. Should BNSF's [be] ***synchronized with the other big players in the industry***?") (emphasis added). Notably, however, Defendants appear to no longer challenge evidence of a meeting between senior executives of BNSF and NS at which their CMOs agreed to "lead a discussion of a potential ***industry position on fuel surcharges*** at the next N.E.M.C. meeting," *see* PX0243 (emphasis added), as that document does not appear on Defendants' August 12 list.

excludable under Section 10706, although that document by its very terms goes beyond the "participating rail carriers' shared interline traffic." *Rail*, 34 F.4th at 12. Elsewhere, Defendants' position with respect to competitor communications about across-the-board programmatic changes rekindles their unsuccessful argument that *any* discussion or agreement with a "practical bearing on . . . the discussant railroads' shared interline traffic" is subject to exclusion. *Id.* at 12.

To the extent the Court welcomes any further submissions from the parties, Plainitffs suggest a streamlined approach like the one the parties used when Defendants disputed documents during the class certification phase:

- Within 21 days, Defendants file a chart identifying the 38 remaining documents from their August 12 list with a column explaining their position that the document should be excluded in its entirety or redacted under the statute;
- 21 days after that filing, Plaintiffs add a column to that chart explaining why each document is admissible in its entirety or with redactions under the statute (with a cross-reference to the summary-judgment briefing, to provide further context).
- These submissions can be limited to 5,000 words each.

This order of argument is consistent with Defendants' burden of proof under Section 10706. *See, e.g.*, *Rail*, 34 F.4th at 9 ("We hold that a discussion or agreement 'concern[s] an interline movement" only if *Defendants meet their burden* of showing that the movements at issue are the participating rail carriers' shared interline traffic." (emphasis added)). Such a process would also allow all parties to provide a fulsome explanation of their positions, in a format that is more streamlined and efficient than another round of briefing.

Of course, additional submissions may not be necessary given the Court's familiarity with the evidence at issue and the D.C. Circuit's decision. The D.C. Circuit affirmed all of this Court's

core reasoning and made only minor adjustments that have little (if any) effect in this case. The parties' principal dispute over the statute was about the meaning of "concerned an interline movement of the rail carrier." 49 U.S.C. § 10706(a)(3)(B)(ii)(II). This Court held that "for a discussion or agreement to be inadmissible, the carriers must be discussing or agreeing upon identifiable interline movements which they share." Dkt. 1008 at 40.[1] Consistent with this Court's approach, the D.C. Circuit held that "a discussion or agreement 'concern[s] an interline movement' only if Defendants meet their burden of showing that the movements at issue are the participating rail carriers' shared interline traffic," and "a discussion or agreement does not 'concern[ ] an interline movement' if the discussion or agreement is about single-line traffic or rail freight generally." *Rail*, 34 F. 4th at 9-10. Just as this Court held that the shared interline movements must be "identifiable," Dkt. 1008 at 40, the D.C. Circuit held that evidence is excludable only if "the court can identify the movements at issue as the carriers' shared interline traffic," *id.* at 9. In doing so, the D.C. Circuit rejected Defendants' "practical bearing" approach as "render[ing] Section 10706 'little more than a de facto immunity for anticompetitive actions that happen to coincide with interline traffic.'" *Id.* at 9-10.

There are only two slight clarifications on this issue in the D.C. Circuit's opinion. *First*, identifiability does not necessarily require "a specific shipper, shipments, or destinations." *Id.* This Court had used such specifics as exemplars but did not suggest they were required, Dkt. 1008 at 40, so this is not a material change. *Second*, the D.C. Circuit held that "[a] de minimis (*i.e.*, brief and insignificant) reference to non-interline traffic does not automatically disqualify evidence from exclusion under Section 10706 … if the carriers demonstrate that the reference was either fleeting and inconsequential or appropriate to the advancement of the interline discussion itself." *Rail*, 34 F. 4th at 10. This point is largely, if not entirely, immaterial here given the challenged evidence. Even assuming any piece of evidence contained a truly de minimis reference to non-

interline traffic, limited redactions could protect any supposedly inadmissible discussions or agreements. *Id*. at 9, 13 (affirming this Court's holding that "[a] single document may reference more than one discussion or agreement" and that "where segregable portions of documents contain protected evidence of discussions or agreements concerning interline movements, the District Court may employ redactions").

The only true difference is the D.C. Circuit's holding that a "rail carrier's internal documents need not convey the substance of a discussion or agreement concerning interline movements to qualify for exclusion under the statute." *Id.* at 11-12. But, once again, this clarification has minimal significance here because to qualify for exclusion, "the discussion or agreement to which the internal document refers" still must "concern[] the participating railroads' shared interline traffic." *Id.* at 12. And, as discussed above, the D.C. Circuit adopted this Court's interpretation of the "concerned" language as not covering a discussion or agreement about single-line traffic or rail freight generally. Thus, none of the 38 documents remaining are candidates for exclusion under the D.C. Circuit's ruling.

Dated: September 23, 2022

Respectfully submitted,

/s/ Glenn D. Pomerantz
Glenn D. Pomerantz
Kuruvilla J. Olasa
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Glenn.Pomerantz@mto.com
Martin.Estrada@mto.com
Kuruvilla.Olasa@mto.com
Anne.Conley@mto.com

Linda S. Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
lstein@steptoe.com

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Ben.Horwich@mto.com

Lauren Ross (D.C. Bar No. 1659620)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500 East
Washington, DC 20001
Telephone: (202) 220-1100
Lauren.Ross@mto.com

Joshua H. Soven (D.C. Bar No. 436633)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 223-7482
jsoven@paulweiss.com

*Counsel for Defendant BNSF Railway Company*

/s/ Kent A. Gardiner
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen
(D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Juan A. Arteaga
Mara R. Lieber
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134
JArteaga@crowell.com
MLieber@crowell.com

*Counsel for Defendant CSX Transportation, Inc.*

/s/ Daniel M. Wall
Daniel M. Wall
Timothy L. O'Mara
Kirsten Ferguson
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
dan.wall@lw.com
tim.o'mara@lw.com
kirsten.ferguson@lw.com

Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
allyson.maltas@lw.com

Matthew M. Collette (D.C. Bar No. 427167)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Phone: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com

Leonard A. Gail
MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-1590
Fax: (312) 379-0467
lgail@masseygail.com

*Counsel for Defendant Union Pacific Railroad Company in MDL I*

/s/ John M. Majoras
John M. Majoras (D.C. Bar No. 474267)
Kristen Lejnieks (D.C. Bar No. 502136)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
Telephone: (202) 879-3939
jmmajoras@jonesday.com
kalejnieks@jonesday.com

Tyrone R. Childress
Kelsey S. Bryan (D.C. Bar No. 1034352)
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939
tchildress@jonesday.com
kbryan@jonesday.com

*Counsel for Defendant Union Pacific Railroad Company*

/s/ Tara L. Reinhart
Tara L. Reinhart (D.C. Bar. No. 462106)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7630
tara.reinhart@skadden.com

Jennifer B. Patterson
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10075
Telephone: (212) 836-8000
jennifer.patterson@arnoldporter.com

*Counsel for Defendant Norfolk Southern Railway Company*

*/s/ Stephen R. Neuwirth*
Stephen R. Neuwirth
Sami H. Rashid
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com

Alicia M. Cobb
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
aliciacobb.@quinnemanuel.com

Paul M. Donovan
LAROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue, N.W. Suite 700
Washington, DC 20036
Telephone: (202) 298-8100
paul.donovan@laroelaw.com

*Counsel for Plaintiffs Olin Corporation, US Magnesium LLC, and Dust Pro, Inc.*

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
mhausfeld@hausfeld.com

Seth R. Gassman
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
sgassman@hausfeld.com

Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
SUSMAN GODFREY LLP
1000 Louisiana Street Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
gharrison@susmangodfrey.com

*Counsel for Plaintiffs Donnelly Commodities Incorporated and Strates Shows, Inc.*

*/s/ Meegan Hollywood*
Meegan Hollywood
ROBINS KAPLAN LLP
1325 Avenue of the Americas, Suite 2601
New York, NY 10022
Telephone: (212) 980-7400
mhollywood@robinskaplan.com

Stephen P. Safranski
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
SSafranski@RobinsKaplan.com

Roman M. Silberfeld
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: (310) 552-0130
RSilberfeld@RobinsKaplan.com

*Counsel for Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC*

# EXHIBIT 1

# EXHIBIT 1

***List of Discussions or Agreements***

*Documents indicated in strikethrough are those that Plaintiffs "no longer intend to use . . . in opposing summary judgment." Aug. 26, 2022 Pls. Ltr. to Defs.*

1. Discussions between CSXT and UP during and leading up to their March 12-13, 2003 alliance meeting—including a discussion regarding "[f]uel surcharge methodology"—as evidenced in PX0202.

2. Discussions between BNSF and NS during and following up from their March 18, 2003 alliance meeting—including a discussion regarding "fuel surcharge"—as evidenced in PX0145 / Oxbow Ex. 25, PX0610 (Lanigan Dep. 178:9-15, 112:11-24), PX0596 (Seale Dep. 122-24, 256-58), and PX0237 / Oxbow Ex. 21.

3. Discussion between BNSF and CSXT on March 28, 2003 regarding a request for fuel surcharge concurrence, as evidenced in ~~PX0143~~ and PX0595 (Giftos Dep. 125-26).

4. Discussion between NS and CSXT on March 28, 2003 regarding a request for fuel surcharge concurrence, as evidenced in ~~PX0238~~ and PX0595 (Giftos Dep. 125-26).

5. Discussion between UP and CSXT on March 20-31, 2003 regarding CSXT's modified fuel surcharge and request for concurrence, as evidenced in PX0483, PX0467, PX0468, and PX0595 (Giftos Dep. 125-26).

6. Discussions between BNSF and CSXT at their April 1, 2003 alliance meeting—including a discussion regarding "Fuel Surcharge"—as evidenced in PX0120 / Oxbow Ex. 22.

7. Discussion between CSXT and UP on April 4, 2003 regarding a request for concurrence, as evidenced in PX0144.

8. Discussion between BNSF and UP on April 4, 2003 regarding a request for concurrence, as evidenced in PX0144.

9. Discussion between NS and UP on and leading up to April 9, 2003 regarding fuel surcharge concurrence, as evidenced in PX0253 and PX0242.

10. Discussion between NS and UP on or around May 9, 2003 regarding a request for fuel surcharge concurrence, as evidenced in ~~PX0472~~ and PX0240.

11. Discussion between BNSF and UP on May 9, 2003 regarding a request for fuel surcharge concurrence, as evidenced in ~~PX0472~~.

12. Discussion between CSXT and UP on May 9, 2003 regarding a request for fuel surcharge concurrence, as evidenced in ~~PX0472~~.

13. Discussions between UP and CSXT at their June 3, 2003 alliance meeting—including a discussion regarding "Fuel Surcharges"—as evidenced in PX0167 and PX0474.

14. Discussions between BNSF and NS at their December 16, 2003 alliance meeting, as evidenced in PX0121 and PX0117.

15. Discussion between BNSF and UP on April 12-13, 2004 regarding the application of fuel surcharge to price authorities, as evidenced in PX0476 / Oxbow Ex. 28.

16. Discussion between BNSF and NS from September 8-29, 2004 regarding fuel surcharge coverage and data, as evidenced in PX0056, PX0066, PX0147, PX0148, PX0245, PX0246 / Oxbow Ex. 31, PX0247, PX0248, and ~~PX0271~~.

17. Discussion between BNSF and NS in November 2004 regarding a possible mileage-based fuel surcharge, as evidenced in PX0067, PX0085, PX0095, PX0151 / Oxbow Ex. 100 / Oxbow Ex. 39, and Oxbow Ex. 24.

18. Discussion between BNSF and CSXT in November 2004 regarding a possible mileage-based fuel surcharge, as evidenced in PX0067, PX0085, PX0095, PX0151 / Oxbow Ex. 100 / Oxbow Ex. 39, and Oxbow Ex. 24.

19. Discussion between BNSF and UP in December 2004 regarding AEPCO traffic fuel surcharges, as evidenced in Oxbow Ex. 11.

20. Discussion between CSXT and UP in August 2005 regarding joint line price authorities, as evidenced in ~~PX0206~~.

21. Discussion between BNSF and CSXT in 2005 or 2006 regarding mileage-based fuel surcharges, as evidenced in PX0612 (Gooden Dep. 77-78, 221-24).

22. Discussion between UP and NS on April 11, 2006 regarding rebased fuel surcharges and related concurrence, as evidenced in PX0479 / Oxbow Ex. 107.

23. Discussion between CSXT and NS in April 2006 regarding rebased fuel surcharges and related concurrence, as evidenced in PX0612 (Gooden Dep. at 241-42, 244).

24. Discussion between BNSF and NS on April 11, 2006 regarding fuel surcharges and related concurrence, as evidenced in PX0039 and PX0040 / Oxbow Ex. 102.

25. Discussions between BNSF and UP regarding BNSF's coal fuel surcharge, as evidenced in Oxbow Ex. 8 (Brandl (UP 30(b)(6)) Dep. 166-68).

# EXHIBIT 2

**Ross, Lauren**

**From:** Michael D. Hausfeld <mhausfeld@hausfeld.com>
**Sent:** Monday, September 19, 2022 10:32 AM
**To:** Horwich, Benjamin
**Cc:** Sami Rashid; Sathya S. Gosselin; Stephen Neuwirth; Alicia Cobb; Meegan F. Hollywood; Angela Wan; Seth R. Gassman; G Harrison; Shawn Raymond; acarlis@susmangodfrey.com; Alexandre Tschumi; Robert Joynt; dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn; Alicia.Jovais@lw.com; Tim.O'Mara@lw.com; Ross, Lauren; Aaron Healey; Thomas R Gentry; van der Ven, Cobus; kirsten.ferguson@lw.com; Julia K York; Kent Gardiner; John M. Majoras; Olasa, Kuruvilla; Tyrone R. Childress; Tyce.Walters@lw.com
**Subject:** Re: Rail Freight - 10706 Discussion (all parties)

Dear Ben,

In light of our discussion today, it would be appreciated if you also addressed the following exhibits;

PX 117
PX 151
PX 479
PX 483

Please stay well and we look forward to speaking later today,

Michael

Sent from my iPad

**MICHAEL D. HAUSFELD**
Chair Emeritus
mhausfeld@hausfeld.com
+1 202-540-7140 direct
*Pronouns: he/him/his*

HAUSFELD

888 16th Street, N.W.
Suite 300
Washington, DC 20006
+1 202 540 7200
**hausfeld.com**

This electronic mail transmission from Hausfeld LLP may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

On Sep 17, 2022, at 10:04 AM, Horwich, Benjamin <Ben.Horwich@mto.com> wrote:

Thanks, Sami. See you on Monday.

Best,

Ben

---

**From:** Sami Rashid <samirashid@quinnemanuel.com>
**Sent:** Friday, September 16, 2022 2:03 PM
**To:** Horwich, Benjamin <Ben.Horwich@mto.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; Sathya S. Gosselin <sgosselin@hausfeld.com>; Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Seth R. Gassman <sgassman@hausfeld.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com; Alexandre Tschumi <alexandretschumi@quinnemanuel.com>; Robert Joynt <robertjoynt@quinnemanuel.com>
**Cc:** dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Ben,

As discussed, here are the documents we'd like to discuss on Monday:

1. PX0474
2. PX0145

At the very least, we expect Defendants to (1) explain why Defendants contend each document is excludable under 10706; and (2) convey any information Defendants believe bears on the excludability of the document.

Thanks and have a good weekend,
Sami

**Sami H. Rashid** | Partner
Quinn Emanuel Urquhart & Sullivan, LLP

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7237 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
SamiRashid@QuinnEmanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Horwich, Benjamin <Ben.Horwich@mto.com>
**Sent:** Thursday, September 15, 2022 2:18 PM
**To:** Sami Rashid <samirashid@quinnemanuel.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; Sathya S. Gosselin <sgosselin@hausfeld.com>; Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Seth R. Gassman <sgassman@hausfeld.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com; Alexandre Tschumi <alexandretschumi@quinnemanuel.com>; Robert Joynt <robertjoynt@quinnemanuel.com>
**Cc:** dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

**[EXTERNAL EMAIL from ben.horwich@mto.com]**

Sami and Michael, thank you for your emails. We agree that, among other things, we should have a discussion of how to report back to the Court on what we have accomplished. I'll reiterate that the unaddressed items in my September 1 letter are an important part of understanding where the parties stand, so we do expect to discuss those later today as well.

Let me clarify one point that seems ambiguous in Michael's email. Michael describes Defendants' position on redactions as being that we do not think redaction is appropriate or feasible. It would be more accurate to say that Defendants have not identified any documents for which we think redactions are appropriate and feasible. But as we said in our meeting last week, and as I wrote in my email below, we have an open mind that something of that sort might be possible for some documents. If you think there are documents that are partially covered by 10706 / partially not covered, and where redactions would be feasible and appropriate, please identify those redactions for us, so that we can consider them.

I would also ask for clarification on the point in Michael's email that refers to Plaintiffs' concession regarding "challenged materials that need not be considered by [the Court] in its summary judgment determination." Does that mean that Plaintiffs do not agree that those materials are indeed excluded by Section 10706 under the DC Circuit's standard, but rather that Plaintiffs are simply withdrawing them from consideration? That has been the tenor of our communications, but I wanted to be sure. Judge Friedman's order, of course, asks the parties to "attempt to agree on which documents should be excluded, in whole or in part, under Section 10706."

In response to Sami's email, Defendants have two observations. First, Plaintiffs may not agree that Defendants have met their burden, but it is obviously false to say that "Defendants are making no attempt to meet their burden." Judge Friedman asked the parties to confer, and we have done so in multiple letters, emails, and meetings. More than a month ago, we enumerated the "discussion[s] or agreement[s]" that we thought worthy of conversation, and you have never disagreed with that list or with how we've described the contours of those discussions and agreements. In that same list, we pointed you to the key documents evidencing those discussions and agreements—documents Plaintiffs themselves understand, because they cited those documents at summary judgment. And in our correspondence since, we have pointed you to other materials beyond. Typically, all those materials on

their face (and where it exists, the relevant deposition testimony) demonstrate the statute's application, including through their use of established industry terminology—that we all know well by now—such as "interline" or "joint line" or "concurrence." We have walked you through several of those documents in our meeting last week; you asked questions, which we answered; and although you had to end that meeting, we look forward to doing more of the same later today with some further documents. That seems to more than cover most of what you are asking for.

Second, Defendants reject your assumption that "the impermissible purpose for which Plaintiffs purportedly use the document" is relevant here. Section 10706's rule of inadmissibility says nothing about the "purpose for which [the proponent] use[s] the document." The D.C. Circuit's rejection of limiting instructions removes any doubt: Some evidence rules authorize the fact-finder to consider evidence only for a limited and proper purpose. Section 10706 is not such a rule. Qualifying evidence is excluded because of the characteristics of the discussion it evidences, not because of how Plaintiffs choose to use it. The only respect in which something like "purpose" might matter is if distinct parts of a document were evidence of two different discussions, one covered by Section 10706 and the other not. Plaintiffs might, in theory, have the "purpose" of citing only the latter portion. But this, again, is a scenario on which we have an open mind, yet Plaintiffs have not pointed to where or why this might be so.

Finally, I can reconfirm that Defendants' group is all available at 5p ET today. Glad we found a good time for everyone. See you then.

Best,

Ben

**Benjamin J. Horwich (he/him/his)** | **Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel: 415.512.4066 | Ben.Horwich@mto.com | www.mto.com

****NOTICE****
*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by, any unauthorized person. If you have received this message in error, do not read it. Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.*

---

**From:** Sami Rashid <samirashid@quinnemanuel.com>
**Sent:** Wednesday, September 14, 2022 11:33 AM
**To:** Michael D. Hausfeld <mhausfeld@hausfeld.com>; Horwich, Benjamin <Ben.Horwich@mto.com>; Sathya S. Gosselin <sgosselin@hausfeld.com>; Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Seth R. Gassman <sgassman@hausfeld.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com; Alexandre Tschumi <alexandretschumi@quinnemanuel.com>; Robert Joynt <robertjoynt@quinnemanuel.com>
**Cc:** dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner

<kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Dear Ben,

In addition, while we feel some progress has been made, we don't believe that Defendants' approach of pushing the parties without the burden for their positions makes sense.

As we have stated repeatedly in emails, our August 26 letter, and at the September 8 meet-and-confer, Plaintiffs continue to believe Defendants are making no attempt to meet their burden. To date, Defendants have merely identified documents and vague discussions (comprised of unidentified documents). If the mere identification of a document a party wanted excluded met the party's burden, it would be no burden at all. To make any significant progress, it would be more productive if, as to each and every document Defendants believe excludable in Plaintiffs' summary judgment submissions they provided the following information, taking into account the content of each document: (1) exhibit number; (2) why Defendants contend the document is excludable under the D.C. Circuit's standard or any unaffected portion of the District Court's opinion; (3) the impermissible purpose for which Plaintiffs purportedly use the document; (4) whether Defendants believe exclusion can be accomplished via redaction and how; and (5) any other information Defendants believe bears on the excludability of the document.

As Michael notes, we would also like to begin discussing how the parties will report our progress and remaining disagreements to the Court.

Thanks,
Sami

**Sami H. Rashid** | Partner
Quinn Emanuel Urquhart & Sullivan, LLP

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7237 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
SamiRashid@QuinnEmanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

---

**From:** Michael D. Hausfeld <mhausfeld@hausfeld.com>
**Sent:** Wednesday, September 14, 2022 2:19 PM
**To:** Horwich, Benjamin <Ben.Horwich@mto.com>; Sathya S. Gosselin <sgosselin@hausfeld.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; Seth R. Gassman <sgassman@hausfeld.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com

**Cc:** dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

**[EXTERNAL EMAIL from mhausfeld@hausfeld.com]**

---

Dear Ben,

Contrary to the impression that might be mis-conveyed by your note, we believe that progress has been made in satisfying the Court's order. First, you have provided us with the list of documents you still intend to seek exclusion of for purposes of the summary judgment process. Second, we have responded by noting our disagreement (on the statutory exclusion) but also that certain of those documents need not be considered by the court in that process, resulting in a winnowed list.

During our conference we expressed our belief that those documents which you contend should be excluded in their entirety do not satisfy the statute (or your burden), nor have you proposed any redactions for us to consider because you don't believe redaction appropriate or feasible. No consensus could be reached, and it does not seem likely.

We are prepared to further discuss these differences in our positions with you, and we also need to discuss how we present the court with the final list of those challenged materials that need not be considered by it in its summary judgment determination and those for which there is a continuing dispute between us.

We will follow up with dates and times for further discussion.

Michael

**ANNA GALLOWAY**
Legal Administrative Assistant
agalloway@hausfeld.com
+1 202-540-7162 direct

**HAUSFELD**

888 16th Street, N.W.
Suite 300
Washington, DC 20006
+1 202 540 7200
**hausfeld.com**

This electronic mail transmission from Hausfeld LLP may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

---

**From:** Horwich, Benjamin <Ben.Horwich@mto.com>
**Sent:** Tuesday, September 13, 2022 11:30 PM
**To:** Sathya S. Gosselin <sgosselin@hausfeld.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; Seth R. Gassman <sgassman@hausfeld.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com
**Cc:** dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Counsel –

This group conferred (some by video and others just by audio) for an hour last Thursday, September 8, at which point Plaintiffs' counsel indicated that other obligations prevented them from continuing the discussion. We had discussed the subjects in Sathya's email below, and had begun to address some of the items raised in my letter of September 1, but all agreed that we would need to reconvene. Defendants proposed late afternoon on Monday, September 12; Michael indicated that Plaintiffs' counsel would discuss and confirm. I've followed up a couple times and spoken by phone with Michael, but no time has been set.

Given the September 23 reporting deadline set by the Court, we think it's essential to continue our group discussion, and promptly. Please let me know when you are available to meet on Wednesday or Thursday. (I am traveling essentially all day Friday, unfortunately, and we want to make sure this group has time to cover everything worth covering.)

As before, we ask that you be prepared to discuss the issues listed in my letter of September 1. In general, we raised those issues because they should prompt discussion on key points of agreement or disagreement, and because they involve what we think are relatively straightforward communications and/or relate to documents that Plaintiffs have already indicated that they will no longer rely on. In other words, these issues seemed to us most likely to generate the "mutual agreement" that Judge Friedman seeks. Naturally, in addition to those issues, we would be glad to discuss other topics Plaintiffs would like to raise (as we did with the topics Sathya raised). For example, if Plaintiffs believe that it would be productive to address certain other documents listed on Exhibit 1 to my August 12 letter, please let us know immediately so that we are prepared to speak to them.

Finally, a question was raised during our September 8 meeting as to whether Plaintiffs could shed light on their position that redaction in part, rather than simple exclusion, would be the more appropriate approach to some documents. Plaintiffs have not identified what documents those are, and as I explained during our September 8 meeting, that would be something of a guessing game for Defendants

to do on our own. But we would welcome your views as to how any documents should be redacted, especially those listed in Exhibit 1 to my August 12 letter.

Best,

Ben

**Benjamin J. Horwich (he/him/his)** | **Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel: 415.512.4066 | Ben.Horwich@mto.com | www.mto.com

****NOTICE****
*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by, any unauthorized person. If you have received this message in error, do not read it. Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.*

---

**From:** Horwich, Benjamin <Ben.Horwich@mto.com>
**Sent:** Thursday, September 08, 2022 9:28 AM
**To:** Sathya S. Gosselin <sgosselin@hausfeld.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; Seth R. Gassman <sgassman@hausfeld.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com
**Cc:** dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Thanks for your email, Sathya. We're certainly happy to talk about both topics, although I'm somewhat concerned that posing the questions as you have invites a lot of posturing without promoting the "mutual agreement" that Judge Friedman is looking for. I hope that a dialogue about specific examples will get us heading in the right direction, and we're committed to spending as much time this afternoon as it takes to get there. And to that point, yes, we are glad to talk about why we think the discussions referenced in my letter qualify under Section 10706.

Best,

Ben

**Benjamin J. Horwich (he/him/his)** | **Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel: 415.512.4066 | Ben.Horwich@mto.com | www.mto.com

****NOTICE****

*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by, any unauthorized person. If you have received this message in error, do not read it. Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.*

---

**From:** Sathya S. Gosselin <sgosselin@hausfeld.com>
**Sent:** Wednesday, September 07, 2022 3:08 PM
**To:** Horwich, Benjamin <Ben.Horwich@mto.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; Seth R. Gassman <sgassman@hausfeld.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com
**Cc:** dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** Re: Rail Freight - 10706 Discussion (all parties)

Counsel,

We are in receipt of your September 1, 2022 letter. In order to make productive use of our time tomorrow, we think it is important to begin with our two previous questions: Do we now have a complete list of the evidence bearing on summary judgment that the defendants believe warrants exclusion under the statute? And for the evidence that the defendants have identified, do the defendants believe each item warrants exclusion in part or in full (and if in part, which part)? At that point, we think it best if the defendants – consistent with their burden of proof – explain why they believe each remaining document warrants exclusion, and the plaintiffs can respond (and in doing so the parties can address the questions you raise in your most recent letter).

Regards,
Sathya

**SATHYA S. GOSSELIN**
Partner
sgosselin@hausfeld.com
+1 202-540-7175 direct
*Pronouns: he/him/his*

HAUSFELD

888 16th Street, N.W.
Suite 300
Washington, DC 20006
+1 202 540 7200
**hausfeld.com**

This electronic mail transmission from Hausfeld LLP may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

---

**From:** Horwich, Benjamin <Ben.Horwich@mto.com>
**Date:** Thursday, September 1, 2022 at 12:49 PM
**To:** Sathya S. Gosselin <sgosselin@hausfeld.com>, Michael D. Hausfeld <mhausfeld@hausfeld.com>, Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>, Alicia Cobb <aliciacobb@quinnemanuel.com>, Meegan F. Hollywood <mhollywood@robinskaplan.com>, Angela Wan <awan@hausfeld.com>, Sami Rashid <samirashid@quinnemanuel.com>, Seth R. Gassman <sgassman@hausfeld.com>, G Harrison <gharrison@susmangodfrey.com>, Shawn Raymond <sraymond@susmangodfrey.com>, acarlis@susmangodfrey.com <acarlis@susmangodfrey.com>
**Cc:** dan.wall@lw.com <dan.wall@lw.com>, Tara.Reinhart@skadden.com <Tara.Reinhart@skadden.com>, LVanHouwelingen@crowell.com <LVanHouwelingen@crowell.com>, Pomerantz, Glenn <Glenn.Pomerantz@mto.com>, Alicia.Jovais@lw.com <Alicia.Jovais@lw.com>, tim.o'mara@lw.com <tim.o'mara@lw.com>, Ross, Lauren <Lauren.Ross@mto.com>, Aaron Healey <ahealey@jonesday.com>, Thomas R Gentry <Thomas.Gentry@skadden.com>, van der Ven, Cobus <Jacobus.VanderVen@mto.com>, kirsten.ferguson@lw.com <kirsten.ferguson@lw.com>, Julia K York <Julia.York@skadden.com>, Kent Gardiner <kgardiner@crowell.com>, John M. Majoras <jmmajoras@jonesday.com>, Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>, Tyrone R. Childress <tchildress@jonesday.com>, Tyce.Walters@lw.com <Tyce.Walters@lw.com>
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Counsel – please see the attached correspondence regarding Section 10706 in response to your letter of August 26.

Best,

Ben

**Benjamin J. Horwich (he/him/his)** | **Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel: 415.512.4066 | Ben.Horwich@mto.com | www.mto.com

****NOTICE****
*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by, any unauthorized person. If you have received this message in error, do not read it. Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.*

---

**From:** Sathya S. Gosselin <sgosselin@hausfeld.com>
**Sent:** Friday, August 26, 2022 11:35 AM
**To:** Horwich, Benjamin <Ben.Horwich@mto.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela

Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; Seth R. Gassman <sgassman@hausfeld.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com
**Cc:** dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** Re: Rail Freight - 10706 Discussion (all parties)

Ben,

Please find attached our response to the defendants' letter of August 12. Have a good weekend.

Regards,
Sathya

**SATHYA S. GOSSELIN**
Partner
sgosselin@hausfeld.com
+1 202-540-7175 direct
*Pronouns: he/him/his*

HAUSFELD

888 16th Street, N.W.
Suite 300
Washington, DC 20006
+1 202 540 7200
**hausfeld.com**

This electronic mail transmission from Hausfeld LLP may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

---

**From:** Horwich, Benjamin <Ben.Horwich@mto.com>
**Date:** Monday, August 15, 2022 at 10:03 PM
**To:** Michael D. Hausfeld <mhausfeld@hausfeld.com>, Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>, Alicia Cobb <aliciacobb@quinnemanuel.com>, Meegan F. Hollywood <mhollywood@robinskaplan.com>, Angela Wan <awan@hausfeld.com>, Sami Rashid <samirashid@quinnemanuel.com>, Seth R. Gassman <sgassman@hausfeld.com>, Sathya S. Gosselin <sgosselin@hausfeld.com>, G Harrison <gharrison@susmangodfrey.com>, Shawn Raymond <sraymond@susmangodfrey.com>, acarlis@susmangodfrey.com <acarlis@susmangodfrey.com>
**Cc:** dan.wall@lw.com <dan.wall@lw.com>, Tara.Reinhart@skadden.com <Tara.Reinhart@skadden.com>, LVanHouwelingen@crowell.com <LVanHouwelingen@crowell.com>, Pomerantz, Glenn <Glenn.Pomerantz@mto.com>,

Alicia.Jovais@lw.com <Alicia.Jovais@lw.com>, tim.o'mara@lw.com <tim.o'mara@lw.com>, Ross, Lauren <Lauren.Ross@mto.com>, Aaron Healey <ahealey@jonesday.com>, Thomas R Gentry <Thomas.Gentry@skadden.com>, van der Ven, Cobus <Jacobus.VanderVen@mto.com>, kirsten.ferguson@lw.com <kirsten.ferguson@lw.com>, Julia K York <Julia.York@skadden.com>, Kent Gardiner <kgardiner@crowell.com>, John M. Majoras <jmmajoras@jonesday.com>, Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>, Tyrone R. Childress <tchildress@jonesday.com>, Tyce.Walters@lw.com <Tyce.Walters@lw.com>
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Counsel -- we noticed an error in Exhibit 1 to my letter of August 12. Items 7 and 8 in Exhibit 1 refer to Oxbow Ex. 22 as matching PX0144. This is incorrect; the documents are different. Rather, Oxbow Ex. 22 reproduces part of PX0120, which appears in Item 6. I apologize for any confusion.

**Benjamin J. Horwich (he/him/his)** | **Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel: 415.512.4066 | Ben.Horwich@mto.com | www.mto.com

****NOTICE****
*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by, any unauthorized person. If you have received this message in error, do not read it. Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.*

---

**From:** Horwich, Benjamin <Ben.Horwich@mto.com>
**Sent:** Friday, August 12, 2022 12:24 PM
**To:** Michael D. Hausfeld <mhausfeld@hausfeld.com>; Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; Seth R. Gassman <sgassman@hausfeld.com>; Sathya S. Gosselin <sgosselin@hausfeld.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com
**Cc:** dan.wall@lw.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Counsel – please see the attached correspondence regarding Section 10706.

**Benjamin J. Horwich (he/him/his)** | **Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel: 415.512.4066 | Ben.Horwich@mto.com | www.mto.com

****NOTICE****
*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by,*

*any unauthorized person. If you have received this message in error, do not read it. Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.*

---

**From:** Michael D. Hausfeld <mhausfeld@hausfeld.com>
**Sent:** Tuesday, August 09, 2022 9:32 AM
**To:** Horwich, Benjamin <Ben.Horwich@mto.com>
**Cc:** Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; dan.wall@lw.com; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com; Sathya S. Gosselin <sgosselin@hausfeld.com>; Seth R. Gassman <sgassman@hausfeld.com>
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Dear Ben,

Thank you for your email of August 8th. We agree that the first step in responding to Judge Friedmans' order would be Defendants identifying and sharing a proposed list of discussions and agreements in our Summary Judgement Opposition (along with PX cites) that defendants believe are subject to Section 10706. That list would also consolidate any additional discussions/agreements and exhibit references from the Oxbow opposition brief.

Once we receive this list by the end of this week, we will reconnect with you as to next steps.

Thank you,
Michael

**MICHAEL D. HAUSFELD**
Chair Emeritus
mhausfeld@hausfeld.com
+1 202-540-7140 direct
*Pronouns: he/him/his*

**HAUSFELD**

888 16th Street, N.W.
Suite 300
Washington, DC 20006
+1 202 540 7200
**hausfeld.com**

This electronic mail transmission from Hausfeld LLP may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

---

Horwich, Benjamin <Ben.Horwich@mto.com>
**Sent:** Monday, August 8, 2022 9:59 PM
**To:** Sathya S. Gosselin <sgosselin@hausfeld.com>; Seth R. Gassman <sgassman@hausfeld.com>
**Cc:** Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; dan.wall@lw.com; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Thanks for your earlier email, Sathya. Our group's vacation schedules over the last week prevented us from following up until now.

We agree with Judge Friedman that this should be straightforward. Defendants will review plaintiffs' summary judgement opposition brief. Based on that review, we will identify and share a proposed list of discussions and agreements that we believe are subject to Section 10706, along with references to what we understand are the specific exhibits evidencing each of those discussions or agreements (focusing on the PX cites in the opposition brief). Defendants will consolidate into that list any additional discussions/agreements and exhibit references from the Oxbow opposition brief. Plaintiffs can then respond with whether they no longer intend to use evidence of each discussion or agreement in opposing summary judgment. Plaintiffs should also identify (a) any other "discussion or agreement" involving two or more Defendants that they believe is "relevant to the pending summary judgment motions," and (b) any other specific evidence that plaintiffs think applies to the list of discussions and agreements identified by defendants. Defendants will then confirm whether they think Section 10706 applies to any of the additional discussions or agreements identified by plaintiffs (in which case, the parties can confer on it), or whether they don't believe pursuing exclusion under Section 10706 is a good use of resources at this stage (which will, for whatever the reason, take that discussion or agreement off the meet and confer list).

Obviously, all parties need to contribute to a shared understanding of exactly what is at issue, and this exchange efficiently accomplishes that. Once we have the parties' mutual lists, we can meet to discuss any areas of disagreement.

Please let us know whether we are in agreement on this initial process. We are already working on our initial list of discussions and agreements, which we expect to send to you this week. Once you have our list, let us know when to expect your input. We will respond to that input promptly.

Thanks,

Ben

**Benjamin J. Horwich (he/him/his)** | **Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel: 415.512.4066 | Ben.Horwich@mto.com | www.mto.com

****NOTICE****
*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by, any unauthorized person. If you have received this message in error, do not read it. Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.*

---

**From:** Sathya S. Gosselin <sgosselin@hausfeld.com>
**Sent:** Tuesday, August 02, 2022 10:41 AM
**To:** Horwich, Benjamin <Ben.Horwich@mto.com>; Seth R. Gassman <sgassman@hausfeld.com>
**Cc:** Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; dan.wall@lw.com; Alicia Cobb <aliciacobb@quinnemanuel.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** RE: Rail Freight - 10706 Discussion (all parties)

Ben,

Given Judge Friedman's order, we believe the best way to get started is for the defendants to share their proposed exclusions with the plaintiffs, to which plaintiffs would respond with a list of documents they no longer intend to use in opposing summary judgment, as we had previously contemplated. Once we use that process to determine the scope of the 10706 dispute, we will be in a better position to decide on next steps in resolving it. If you could let us know when to expect those proposed exclusions, we can plan accordingly. Should you still want to talk, we are available on Friday at noon or 2 pm ET.

**SATHYA S. GOSSELIN**
Partner
sgosselin@hausfeld.com
+1 202-540-7175 direct
*Pronouns: he/him/his*

HAUSFELD

888 16th Street, N.W.
Suite 300
Washington, DC 20006
+1 202 540 7200
**hausfeld.com**

This electronic mail transmission from Hausfeld LLP may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

---

**From:** Horwich, Benjamin <Ben.Horwich@mto.com>
**Sent:** Friday, July 29, 2022 4:18 PM
**To:** Seth R. Gassman <sgassman@hausfeld.com>
**Cc:** Stephen Neuwirth <stephenneuwirth@quinnemanuel.com>; Michael D. Hausfeld <mhausfeld@hausfeld.com>; dan.wall@lw.com; Alicia Cobb <aliciacobb@quinnemanuel.com>; Sathya S. Gosselin <sgosselin@hausfeld.com>; Meegan F. Hollywood <mhollywood@robinskaplan.com>; Angela Wan <awan@hausfeld.com>; Sami Rashid <samirashid@quinnemanuel.com>; G Harrison <gharrison@susmangodfrey.com>; Shawn Raymond <sraymond@susmangodfrey.com>; acarlis@susmangodfrey.com; Tara.Reinhart@skadden.com; LVanHouwelingen@crowell.com; Pomerantz, Glenn <Glenn.Pomerantz@mto.com>; Alicia.Jovais@lw.com; tim.o'mara@lw.com; Ross, Lauren <Lauren.Ross@mto.com>; Aaron Healey <ahealey@jonesday.com>; Thomas R Gentry <Thomas.Gentry@skadden.com>; van der Ven, Cobus <Jacobus.VanderVen@mto.com>; kirsten.ferguson@lw.com; Julia K York <Julia.York@skadden.com>; Kent Gardiner <kgardiner@crowell.com>; John M. Majoras <jmmajoras@jonesday.com>; Olasa, Kuruvilla <Kuruvilla.Olasa@mto.com>; Tyrone R. Childress <tchildress@jonesday.com>; Tyce.Walters@lw.com
**Subject:** Re: Rail Freight - 10706 Discussion (all parties)

Counsel —

We assume you have seen Judge Friedman's order from late Wednesday rejecting the parties' proposal for how to move forward on summary judgment in MDL I and Oxbow. Defendants are still considering that order. Let's find a time to discuss how to proceed.

Best,

Ben

> On Jul 19, 2022, at 12:05 PM, Seth R. Gassman <sgassman@hausfeld.com> wrote:
>
> Thanks, Ben.
>
> **SETH R. GASSMAN**
> Of Counsel
> sgassman@hausfeld.com
> +1 415-744-1954 direct
> *Pronouns: he/him/his*

# EXHIBIT 3

MUNGER, TOLLES & OLSON LLP

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

601 MASSACHUSETTS AVENUE NW
SUITE 500E
WASHINGTON, D.C. 20001-5369
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

RONALD L. OLSON
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. P.C.*
TERRY E. SANCHEZ
STEVEN M. PERRY
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. McDOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
GARTH T. VINCENT
TED DANE
STUART N. SENATOR
MARTIN D. BERN
ROBERT L. DELL ANGELO
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
BRETT J. RODDA P.C.*
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
MISTY M. SANFORD
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
E. MARTIN ESTRADA
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG P.C.*
GINGER D. ANDERS P.C.*
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
KELLY L.C. KRIEBS
JEREMY A. LAWRENCE
LAURA K. LIN
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
JONATHAN KRAVIS*
KAREN A. LORANG
JOHN L. SCHWAB
EMILY C. CURRAN-HUBERTY
MATTHEW S. SCHONHOLZ
AIMEE M. CONTRERAS-CAMUA
L. ASHLEY AULL
WESLEY T.L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
TYLER HILTON
VINCENT LING
LAUREN BELL
JULIANA M. YEE
JEREMY K. BEECHER
MATTHEW K. DONOHUE
JOHN B. MAJOR
LAUREN C. BARNETT
NICK R. SIDNEY
SKYLAR B. GROVE
SARAH S. LEE
LAURA M. LOPEZ
COLIN A. DEVINE
DANE P. SHIKMAN
LEXI PEACOCK
MAGGIE THOMPSON
SAMUEL H. ALLEN
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
STEPHANIE G. HERRERA
TERESA REED DIPPO
DANIEL BENYAMIN
SARA A. MCDERMOTT
J. MAX ROSEN
RACHEL G. MILLER-ZIEGLER*
ANNE K. CONLEY
DAVID W. MORESHEAD
ANDRE W. BREWSTER III
ROWLEY J. RICE
DAHLIA MIGNOUNA*
BRANDON R. TEACHOUT
USHA CHILUKURI VANCE
ALEXANDER S. GORIN
ZARA BARI
BRENDAN B. GANTS*
LAUREN E. ROSS*
BENJAMIN G. BAROKH
ABE DYK
MICHELE C. NIELSEN
APRIL YOUPEE-ROLL
COBUS VAN DER VEN*
MEGAN MCCREADIE
STEPHEN HYLAS
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
XIAONAN APRIL HU*
NATALIE KARL
BRANDON MARTINEZ
ERINMA E. MAN
CARRIE C. LITTEN
RUBY J. GARRETT*
JAMES R. SALZMANN
SAMIR HALAWI
ROBIN S. GRAY
MICA L. MOORE
JOSEPH MOSES
MICHAEL I. SELVIN
HUNTER V. ARMOUR
NATHANIEL F. SUSSMAN
PAUL E. MARTIN
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
AVI REJWAN OVED
ROBERT E. BOWEN
RICHARD T. JOHNSON
GRACE DAVIS FISHER
LAUREN N. BECK
CALEB W. PEIFFER
ANDRÉS CANTERO, JR.
GREGORY T. S. BISCHOPING*
JAMIE B. LUGURI
STEVEN B. R. LEVICK
SARA H. WORTH
NATALIE G. MOYCE
WILLIAM M. ORR
GABRIEL M. BRONSHTEYN
JING JIN
ALEX C. WERNER
ROSIO FLORES
JESSICA O. LAIRD
ERICA C. TOOCH
EVELYN DANFORTH-SCOTT
EVAN MANN
ANDREW T. NGUYEN
RACHEL M. SCHIFF
MIRANDA E. REHAUT
TIANA S. BAHERI
STEPHANY REAVES*
LAUREN E. KUHN

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
ADAM R. LAWTON
MICHAEL E. GREANEY
SARAH J. COLE
FAYE PAUL TELLER

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN DC,
ALL OTHERS ADMITTED IN CA

August 12, 2022

Writer's Direct Contact
(415) 512-4066
(415) 644-6966 FAX
Ben.Horwich@mto.com

**VIA ELECTRONIC MAIL ONLY**

Stephen R. Neuwirth
Sami H. Rashid
Alicia M. Cobb
Quinn Emanuel Urquhart & Sullivan, LLP
*stephenneuwirth@quinnemanuel.com*
*samirashid@quinnemanuel.com*
*aliciacobb@quinnemanuel.com*

Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Susman Godfrey LLP
*gharrison@susmangodfrey.com*
*sraymond@susmangodfrey.com*
*acarlis@susmangodfrey.com*

Michael D. Hausfeld
Seth R. Gassman
Sathya S. Gosselin
Hausfeld LLP
*mhausfeld@hausfeld.com*
*sgassman@hausfeld.com*
*sgosselin@hausfeld.com*

Meegan Hollywood
Robins Kaplan LLP
*mhollywood@robinskaplan.com*

Re: *In re Rail Freight Fuel Surcharge Antitrust Litigation, MDL 1869*, Misc. No. 07-0489 (PLF/GMH) (D.D.C.), and *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, No. 11-1049 (PLF) (D.D.C.) — Identification of Discussions or Agreements that Defendants Believe Should Be Excluded Under 49 U.S.C. § 10706(a)(3)(B)(ii) ("Section 10706")

Dear Counsel:

I write on behalf of Defendants, pursuant to Judge Friedman's July 28, 2022 Order directing the parties to identify material "relevant to the pending summary judgment motions," and "meet and confer and attempt to agree on which documents should be excluded … under Section 10706." ECF No. 1088. As the parties agreed in our email exchange on August 8 and 9, 2022, the first step in responding to that order is for Defendants to share a proposed list of discussions and agreements that Defendants believe are subject to Section 10706, along with references to what Defendants understand are the specific exhibits evidencing each of those discussions or agreements, focusing on the PX cites in the opposition brief. Email from B. Horwich to M. Hausfeld (Aug. 8, 2022); Email from M. Hausfeld to B. Horwich (Aug. 9, 2022).

Per that agreement, the attached Exhibit 1 identifies the discussions or agreements that are referenced in Plaintiffs' opposition briefs (*i.e.*, ECF No. 1050 in *MDL I*, and ECF No. 241 in *Oxbow*), and that Defendants believe should be excluded under Section 10706. We have included references to what we understand are the specific "PX" exhibits cited in the opposition briefs as evidence of these discussions or agreements. (Materials that both *MDL I* and *Oxbow* Plaintiffs cited directly in their summary judgment briefing are styled as PX[Ex. No.] / Oxbow Ex. [Ex. No.]) Of course, because Section 10706 excludes *all* "evidence of" covered discussions and agreements, the materials cited in the opposition briefs may not be the full range of evidence of those discussions or agreements. Accordingly, for any discussions or agreements that Plaintiffs no longer intend to rely on, we expect that the parties can easily confer on what additional evidence (if any) is affected.

In addition, Defendants believe that the parties should address the application of Section 10706 to concurrence communications. These communications are scattered throughout the record—alluded to in various ways, and part of many email chains. So that the parties can confer on a representative sample, we have included a few concurrence discussions in the attached list (*e.g.*, discussions numbered 3 and 4), even though those particular PX exhibits are not directly cited in the opposition briefs.

Defendants ask that Plaintiffs respond to Exhibit 1 by indicating whether Plaintiffs no longer intend to use evidence of each discussion or agreement in opposing summary judgment. Plaintiffs should also identify (a) any other "discussion or agreement" involving two or more Defendants that Plaintiffs believe is "relevant to the pending summary judgment motions," ECF No. 1088, and (b) any other specific evidence that Plaintiffs think applies to the list of discussions and agreements identified by Defendants. Once Plaintiffs provide this information, Defendants will then confirm whether they think Section 10706 applies to any of the additional discussions or agreements identified by Plaintiffs (in which case, the parties can confer), or whether they do not believe that pursuing exclusion under Section 10706 is a good use of resources at this stage (which will, for whatever the reason, take that discussion or agreement off the meet-and-confer list).

Please note that, in offering Exhibit 1, Defendants do not concede that any evidence offered by Plaintiffs (whether listed in Exhibit 1 or not) is material, and Defendants reserve all their arguments with respect to why summary judgment should be granted regardless of the resolution of questions of admissibility under Section 10706. In addition, Defendants do not waive their right to challenge the admissibility of any evidence (whether or not cited in connection with Plaintiffs' summary judgment briefing) at this stage or at a later stage of proceedings in these cases or in *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, MDL No. 2925, Misc. No. 20-00008 (BAH) (D.D.C.), including at any trial. *See* Fed. R. Civ. P. 56(c)(2) & 2010 adv. comm. note.

To facilitate a timely and productive exchange that keeps us on track to meet the timeline set by Judge Friedman, please let us know at your earliest convenience when we can expect your response.

Yours truly,



Benjamin J. Horwich

Exhibit

cc: Counsel for Defendants

# EXHIBIT 1

## *List of Discussions or Agreements*

1. Discussions between CSXT and UP during and leading up to their March 12-13, 2003 alliance meeting—including a discussion regarding "[f]uel surcharge methodology"—as evidenced in PX0202.

2. Discussions between BNSF and NS during and following up from their March 18, 2003 alliance meeting—including a discussion regarding "fuel surcharge"—as evidenced in PX0145 / Oxbow Ex. 25, PX0610 (Lanigan Dep. 178:9-15, 112:11-24), PX0596 (Seale Dep. 122-24, 256-58), and PX0237.

3. Discussion between BNSF and CSXT on March 28, 2003 regarding a request for fuel surcharge concurrence, as evidenced in PX0143 and PX0595 (Giftos Dep. 125-26).

4. Discussion between NS and CSXT on March 28, 2003 regarding a request for fuel surcharge concurrence, as evidenced in PX0238 and PX0595 (Giftos Dep. 125-26).

5. Discussion between UP and CSXT on March 20-31, 2003 regarding CSXT's modified fuel surcharge and request for concurrence, as evidenced in PX0483, PX0467, PX0468, and PX0595 (Giftos Dep. 125-26).

6. Discussions between BNSF and CSXT at their April 1, 2003 alliance meeting—including a discussion regarding "Fuel Surcharge"—as evidenced in PX0120.

7. Discussion between CSXT and UP on April 4, 2003 regarding a request for concurrence, as evidenced in PX0144 / Oxbow Ex. 22.

8. Discussion between BNSF and UP on April 4, 2003 regarding a request for concurrence, as evidenced in PX0144 / Oxbow Ex. 22.

9. Discussion between NS and UP on and leading up to April 9, 2003 regarding fuel surcharge concurrence, as evidenced in PX0253 and PX0242.

10. Discussion between NS and UP on or around May 9, 2003 regarding a request for fuel surcharge concurrence, as evidenced in PX0472 and PX0240.

11. Discussion between BNSF and UP on May 9, 2003 regarding a request for fuel surcharge concurrence, as evidenced in PX0472.

12. Discussion between CSXT and UP on May 9, 2003 regarding a request for fuel surcharge concurrence, as evidenced in PX0472.

13. Discussions between UP and CSXT at their June 3, 2003 alliance meeting—including a discussion regarding "Fuel Surcharges"—as evidenced in PX0167 and PX0474.

14. Discussions between BNSF and NS at their December 16, 2003 alliance meeting, as evidenced in PX0121 and PX0117.

15. Discussion between BNSF and UP on April 12-13, 2004 regarding the application of fuel surcharge to price authorities, as evidenced in PX0476 / Oxbow Ex. 28.

16. Discussion between BNSF and NS from September 8-29, 2004 regarding fuel surcharge coverage and data, as evidenced in PX0056, PX0066, PX0147, PX0148, PX0245, PX0246 / Oxbow Ex. 31, PX0247, PX0248, and PX0271.

17. Discussion between BNSF and NS in November 2004 regarding a possible mileage-based fuel surcharge, as evidenced in PX0067, PX0085, PX0095, PX0151 / Oxbow Ex. 100, and Oxbow Ex. 24.

18. Discussion between BNSF and CSXT in November 2004 regarding a possible mileage-based fuel surcharge, as evidenced in PX0067, PX0085, PX0095, PX0151 / Oxbow Ex. 100, and Oxbow Ex. 24.

19. Discussion between BNSF and UP in December 2004 regarding AEPCO traffic fuel surcharges, as evidenced in Oxbow Ex. 11.

20. Discussion between CSXT and UP in August 2005 regarding joint line price authorities, as evidenced in PX0206.

21. Discussion between BNSF and CSXT in 2005 or 2006 regarding mileage-based fuel surcharges, as evidenced in PX0612 (Gooden Dep. 77-78, 221-24).

22. Discussion between UP and NS on April 11, 2006 regarding rebased fuel surcharges and related concurrence, as evidenced in PX0479.

23. Discussion between CSXT and NS in April 2006 regarding rebased fuel surcharges and related concurrence, as evidenced in PX0612 (Gooden Dep. at 241-42, 244).

24. Discussion between BNSF and NS on April 11, 2006 regarding fuel surcharges and related concurrence, as evidenced in PX0039 and PX0040 / Oxbow Ex. 102.

25. Discussions between BNSF and UP regarding BNSF's coal fuel surcharge, as evidenced in Oxbow Ex. 8 (Brandl (UP 30(b)(6)) Dep. 166-68).

# EXHIBIT 4

August 26, 2022

Daniel M. Wall
Timothy L. O'Mara
Kirsten M. Ferguson
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
dan.wall@lw.com
tim.o'mara@lw.com
kirsten.ferguson@lw.com

Tara L. Reinhart
Julia K. York
Thomas R. Gentry
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
tara.reinhart@skadden.com
julia.york@skadden.com
thomas.gentry@skadden.com

Glenn D. Pomerantz
E. Martin Estrada
Kuruvilla J. Olasa
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Glenn.Pomerantz@mto.com
Martin.Estrada@mto.com
Kuruvilla.Olasa@mto.com
Anne.Conley@mto.com

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Ben.Horwich@mto.com

Kent A. Gardiner
Luke van Houwelingen
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Re: *In re Rail Freight Fuel Surcharge Antitrust Litigation, MDL 1869*, Misc. No. 07-0489 (PLF/GMH) (D.D.C.), and *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, No. 11-1049 (PLF) (D.D.C.) — Response to Identification of Evidence that Defendants Believe Should Be Excluded Under 49 U.S.C. § 10706(a)(3)(B)(ii) ("10706")

Counsel:

We write on behalf of all Plaintiffs in *In re Rail Freight Fuel Surcharge Antitrust Litigation, MDL 1869*, Misc. No. 07-0489 (PLF/GMH) (D.D.C.) and *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, No. 11-1049 (PLF) (D.D.C.), in response to Defendants' August 12, 2022 Letter (the "August 12 Letter"). Our dialogue centers on the Court's Order of July 27, 2022, which requires the parties to "identify documents relevant to the pending summary judgment motions; meet and confer and attempt to agree on which documents should

be excluded, in whole or in part, under Section 10706; and file a joint status report, on or before September 23, 2022, informing the Court of the outcome of their discussions." Order at 3.

On August 8, 2022, Defendants proposed "identify[ing] and shar[ing] a proposed list of discussions and agreements that we believe are subject to Section 10706, along with references to what we understand are the specific exhibits evidencing each of those discussions or agreements (focusing on the PX cites in the opposition brief)." Aug. 8, 2022 e-mail from B. Horwich. The next day, Plaintiffs agreed as a first step to review and consider Defendants' "proposed list of discussions and agreements in [Plaintiffs'] Summary Judgement Opposition (along with PX cites) that defendants believe are subject to Section 10706." We have now reviewed your August 12 letter.

To move things forward and meet the Court's September 23 deadline, Plaintiffs have reviewed the specific evidence (documents and testimony excerpts) that Defendants cited in their August 12 letter, as well as (unlike Defendants) the specific evidence Defendants previously sought to exclude by their 10706 motion of February 21, 2020, to the extent cited by Plaintiffs in opposing summary judgment. As a result of that process, Plaintiffs hereby identify the following evidence from those two sources that Plaintiffs no longer intend to use in opposing summary judgment[1]:

1. PX0143
2. PX0206
3. PX0238
4. PX0239
5. PX0271
6. PX0470
7. PX0471
8. PX0472

Unfortunately, the Defendants' August 12 letter raises more questions than it answers. It appears that Defendants' statement that they would "focus[] on the PX cites in the opposition brief" meant that they would not provide a complete list of the documents relevant to the pending summary judgment motions that Defendants believe warrant exclusion under the statute. That prevents compliance with the Court's Order directing identification of "*documents relevant to the pending summary judgment motions*," Order at 3, and determination of "which *documents relating to the pending summary judgment motions* should be excluded, in whole or in part, under Section 10706," *id.* at 2. It is also inconsistent with the Parties' numerous past discussions and their proposal to the Court. *See* July 8, 2022 e-mail from D. Wall (proposing that "Defendants identify *documents relevant to the summary judgment motion* that they continue to believe should be excluded under Section 10706" and, from that list, "Plaintiffs identify documents . . . that they no longer intend to use in opposing summary judgment"); July 11, 2022 e-mail from S. Gosselin (agreeing that "Defendants identify *documents relevant to the summary*

[1] With respect to any document Plaintiffs no longer intends to use, Plaintiffs reserve the right to propose alternate citations or documents in support of any proposition the withdrawn document was offered to support.

*judgment motion* that they continue to believe should be excluded under Section 10706" and, from that list, "Plaintiffs identify documents . . . that they no longer intend to use in opposing summary judgment"); Notice of Joint Status Report, Stipulation, and Proposed Order in Advance of July 19, 2022 Status Conference, Dkt. 1085 ("Notice of Joint Status Report") ("Defendants identify *documents relevant to the summary judgment motion* that they continue to believe should be excluded under Section 10706" and, from that list, "Plaintiffs identify documents . . . that they no longer intend to use in opposing summary judgment").

Plaintiffs expected that Defendants' proposal to categorize documents into "discussions and agreements" would be an organizing principle for grouping and sequencing negotiations of documents in the meet-and-confer process. Now Defendants seem to propose determining the admissibility of "discussions and agreements" rather than documents themselves, *and* applying those determinations to documents that Defendants have never identified. We do not accept the premise that the Court has directed the parties to negotiate exclusions of "discussions or agreements" or any *sub silentio* exclusion of unidentified documents. Again, the Court's Order, the Parties' prior expressions, and the D.C. Circuit all recognize that the proper evidentiary assessment under 10706 should be on a document-by-document basis. *See* Notice of Joint Status Report (confirming Defendants' intention to "identify documents relevant to the summary judgment motion that they continue to believe should be excluded under Section 10706"); *see also, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869*, 34 F.4th 1, 12–13 (D.C. Cir. 2022) ("*Rail*") ("We agree with Plaintiffs that Section 10706 can be implemented through redactions of truly segregable portions of documents. As Defendants concede, 'different parts of a single document could conceivably reflect two separate discussions, one of which concerns interline traffic, and one of which does not.' Opening Br. Of Appellants 74-75.").

We also do not accept Defendants' proposals that Plaintiffs identify "any other specific evidence that plaintiffs think applies to the list of discussions and agreements identified by defendants" as well as any "any other 'discussion or agreement' involving two or more Defendants that Plaintiffs believe is 'relevant to the pending summary judgment motions." These proposals are inappropriate in at least two respects. *First*, Defendants are very familiar with Plaintiffs' positions on liability (as expressed in the summary judgment briefing, interrogatory responses, and other prior briefing), the existing summary judgment record (which closed approximately one year ago), as well as the evidence Defendants wish to exclude. Defendants have briefed it many times and recently represented to the Court and Plaintiffs that they alone could "identify documents relevant to the summary judgment motion that they continue to believe should be excluded under Section 10706" in short order. Notice of Joint Status Report (proposing submission of Defendants' list ten days after the status conference convened to discuss the Parties' proposed schedule and process). *Second*, this is Defendants' motion, and Defendants bear the burden of proof on 10706. *See, e.g.*, *Rail*, 34 F.4th at 9 ("We hold that a discussion or agreement 'concern[s] an interline movement" only if *Defendants meet their burden* of showing that the movements at issue are the participating rail carriers' shared interline traffic." (emphasis added)). Plaintiffs have no obligation to review Defendants' list and then provide "any other specific evidence that plaintiffs think applies to the list of discussions and agreements identified by defendants."

If Defendants' August 12 Letter is not the complete list of documents and related deposition testimony relevant to the summary judgment motion that Defendants contend should be excluded under the D.C. Circuit's opinion, please let us know now and provide your complete list within the next 10 days. Additionally, please advise us, for the remainder of the evidence identified on August 12 and any additional evidence, whether Defendants seek to exclude each item in whole or in part (and if Defendants seek to exclude any item only in part, which portions you contend should be excluded).

Finally, please tell us when the defendants are available to meet and confer in September in compliance with the Court's Order of July 27.

Regards,


/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Sami H. Rashid
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Email: stephenneuwirth@quinnemanuel.com

Alicia M. Cobb
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1109 First Avenue,
Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Email: aliciacobb.@quinnemanuel.com

*Counsel for Plaintiffs Olin Corporation, US Magnesium LLC, and Dust Pro, Inc.*

/s/ Meegan Hollywood
Meegan Hollywood
ROBINS KAPLAN LLP
1325 Avenue of the Americas, Suite 2601
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
E-mail: mhollywood@robinskaplan.com

/s/ Michael D. Hausfeld
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
HAUSFELD LLP
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeld.com

Seth R. Gassman
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
Email: sgassman@hausfeld.com

Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
SUSMAN GODFREY LLP
1000 Louisiana Street
Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
E-mail: gharrison@susmangodfrey.com

*Counsel for Plaintiffs Donnelly Commodities Incorporated and Strates Shows, Inc.*

Stephen P. Safranski
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
E-mail: SSafranski@RobinsKaplan.com

Roman M. Silberfeld
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5800
Email: RSilberfeld@RobinsKaplan.com

*Counsel for Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC*

# EXHIBIT 5

MUNGER, TOLLES & OLSON LLP

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

601 MASSACHUSETTS AVENUE NW
SUITE 500E
WASHINGTON, D.C. 20001-5369
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

RONALD L. OLSON
ROBERT E.DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. P.C.*
TERRY E. SANCHEZ
STEVEN M. PERRY
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. McDOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
GARTH T. VINCENT
TED DANE
STUART N. SENATOR
MARTIN D. BERN
ROBERT L. DELL ANGELO
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
BRETT J. RODDA P.C.*
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
MISTY M. SANFORD
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE

KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
E. MARTIN ESTRADA
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG P.C.*
GINGER D. ANDERS P.C.*
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
KELLY L.C. KRIEBS
JEREMY A. LAWRENCE
LAURA K. LIN
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
JONATHAN KRAVIS*
KAREN A. LORANG
JOHN L. SCHWAB
EMILY C. CURRAN-HUBERTY
MATTHEW S. SCHONHOLZ
AIMEE M. CONTRERAS-CAMUA
L. ASHLEY AULL
WESLEY T.L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
TYLER HILTON
VINCENT LING
LAUREN BELL
JULIANA M. YEE
JEREMY K. BEECHER
MATTHEW K. DONOHUE
JOHN B. MAJOR
LAUREN C. BARNETT
NICK R. SIDNEY
SKYLAR B. GROVE
SARAH S. LEE
LAURA M. LOPEZ
COLIN A. DEVINE
DANE P. SHIKMAN
LEXI PEACOCK
MAGGIE THOMPSON
SAMUEL H. ALLEN

ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
STEPHANIE G. HERRERA
TERESA REED DIPPO
DANIEL BENYAMIN
SARA A. MCDERMOTT
J. MAX ROSEN
RACHEL G. MILLER-ZIEGLER*
ANNE K. CONLEY
DAVID W. MORESHEAD
ANDRE W. BREWSTER III
ROWLEY J. RICE
DAHLIA MIGNOUNA*
BRANDON R. TEACHOUT
USHA CHILUKURI VANCE
ALEXANDER S. GORIN
ZARA BARI
BRENDAN B. GANTS*
LAUREN E. ROSS*
BENJAMIN G. BAROKH
ABE DYK
MICHELE C. NIELSEN
APRIL YOUPEE-ROLL
COBUS VAN DER VEN*
MEGAN MCCREADIE
STEPHEN HYLAS
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
XIAONAN APRIL HU*
NATALIE KARL
BRANDON MARTINEZ
ERINMA E. MAN
CARRIE C. LITTEN
RUBY J. GARRETT*
JAMES R. SALZMANN
SAMIR HALAWI
ROBIN S. GRAY
MICA L. MOORE
JOSEPH MOSES
MICHAEL I. SELVIN
HUNTER V. ARMOUR
NATHANIEL F. SUSSMAN
PAUL E. MARTIN
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
AVI REJWAN OVED
ROBERT E. BOWEN
RICHARD T. JOHNSON
GRACE DAVIS FISHER
LAUREN N. BECK

CALEB W. PEIFFER
ANDRÉS CANTERO, JR.
GREGORY T. S. BISCHOPING*
JAMIE B. LUGURI
STEVEN B. R. LEVICK
SARA H. WORTH
NATALIE G. MOYCE
WILLIAM M. ORR
GABRIEL M. BRONSHTEYN
JING JIN
ALEX C. WERNER
ROSIO FLORES
JESSICA O. LAIRD
ERICA C. TOOCH
EVELYN DANFORTH-SCOTT
EVAN MANN
ANDREW T. NGUYEN
RACHEL M. SCHIFF
MIRANDA E. REHAUT
TIANA S. BAHERI
STEPHANY REAVES*
LAUREN E. KUHN

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
ADAM R. LAWTON
MICHAEL E. GREANEY
SARAH J. COLE
FAYE PAUL TELLER

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN DC,
ALL OTHERS ADMITTED IN CA

September 1, 2022

Writer's Direct Contact
(415) 512-4066
(415) 644-6966 FAX
Ben.Horwich@mto.com

**VIA ELECTRONIC MAIL ONLY**

Stephen R. Neuwirth
Sami H. Rashid
Alicia M. Cobb
Quinn Emanuel Urquhart & Sullivan, LLP
*stephenneuwirth@quinnemanuel.com*
*samirashid@quinnemanuel.com*
*aliciacobb@quinnemanuel.com*

Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Susman Godfrey LLP
*gharrison@susmangodfrey.com*
*sraymond@susmangodfrey.com*
*acarlis@susmangodfrey.com*

Michael D. Hausfeld
Seth R. Gassman
Sathya S. Gosselin
Hausfeld LLP
*mhausfeld@hausfeld.com*
*sgassman@hausfeld.com*
*sgosselin@hausfeld.com*

Meegan Hollywood
Robins Kaplan LLP
*mhollywood@robinskaplan.com*

Re: *In re Rail Freight Fuel Surcharge Antitrust Litigation, MDL 1869*, Misc. No. 07-0489 (PLF/GMH) (D.D.C.), and *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, No. 11-1049 (PLF) (D.D.C.) — Conferring on Discussions or Agreements that Defendants Believe Should Be Excluded Under 49 U.S.C. § 10706(a)(3)(B)(ii) ("Section 10706")

Dear Counsel:

Thank you for your letter of August 26, 2022. I write to you in response, on behalf of Defendants, and pursuant to Judge Friedman's July 27, 2022 Order directing the parties to identify material "relevant to the pending summary judgment motions," and "meet and confer and attempt to agree on which documents should be excluded … under Section 10706." ECF No. 1088.

As the parties agreed in our email exchange on August 8 and 9, 2022, Defendants took the first step in that process by sharing my letter to you of August 12, 2022. That letter included a proposed list of discussions or agreements that Defendants believe meet the criteria of Section 10706, along with references to what Defendants understand are the specific exhibits evidencing each of those discussions or agreements, focusing on the PX cites in the *MDL I* opposition brief. Your response letter of August 26, 2022 identified eight exhibits "Plaintiffs no longer intend to use." Pls. August 26, 2022 Letter at 2. Five of those exhibits also appear on Defendants' list, as evidence of discussions or agreements protected by Section 10706. Plaintiffs also noted three additional exhibits, which Plaintiffs did not cite in their summary judgment opposition briefs, but which Defendants had previously mentioned in their February 2020 Section 10706 motion in the District Court, before the parties briefed summary judgment.

As your letter suggests, the next stage in this process is to meet and confer on the applicability of Section 10706 to the evidence in the summary judgment record. Plaintiffs and Defendants have set a meeting for September 8, 2022. To facilitate a productive conversation, Defendants have listed below seven topics that we believe it would be helpful for the parties to confer on at this stage. These topics, gleaned from the positions each of us has laid out in our respective letters, are intended to make concrete progress with respect to evidence of specific discussions, and more generally to allow us to understand each other's views, so that we can reach "mutual agreement," as directed by Judge Friedman. ECF No. 1088. We invite you to add additional topics to this list. In addition, if you believe that there are topics raised in your August 26, 2022 letter that are not addressed here, but would be productive to discuss together, please let us know.

**1.** Plaintiffs' letter acknowledges that evidence of the concurrence communications shown in PX0143 and PX0238 is subject to exclusion under Section 10706. But Plaintiffs' letter does not list as similarly excludable the corresponding deposition testimony cited in Defendants' letter, which is evidence of these same concurrence discussions (*see* PX0595 (Giftos Dep. 125-26), listed in Items 3 and 4 on Exhibit 1 to my letter of August 12). It would be helpful to understand if Plaintiffs do not believe that this deposition testimony is equally subject to exclusion under Section 10706, and if so, why.

**2.** As noted above, Plaintiffs' letter acknowledges that Section 10706 protects evidence of some concurrence discussions (PX0143, PX0238, and PX0472, for example). But Plaintiffs have not acknowledged that Section 10706 excludes evidence of other similar

concurrence discussions. For example, PX0483, PX0467, PX0468, and PX0595 (Giftos Dep. 125-26) all contain evidence of a discussion between UP and CSXT about a concurrence to CSXT's modified fuel surcharge (listed as Item 5 on Exhibit 1 to my letter of August 12). Likewise, PX0612 (Gooden Dep. 241-42, 244) contains evidence of a discussion between CSXT and NS in April 2006 regarding rebased fuel surcharges and a related concurrence (listed as Item 23 on Exhibit 1 to my letter of August 12). As context for this discussion, we also suggest you review the written correspondence relating to this request that was produced at CSXFSC000213514. It would be helpful to understand the basis on which Plaintiffs would differentiate between the concurrence discussions that Plaintiffs acknowledge support the exclusion of evidence, and the concurrence discussions Plaintiffs have not acknowledged support the exclusion of evidence.

**3.** PX0202 (listed as Item 1 on Exhibit 1 to my letter of August 12) is evidence of a discussion between CSXT and UP regarding a "[f]uel surcharge methodology" on "CSX/UP Interline Business." Plaintiffs' letter, however, suggests that Plaintiffs take the position that the discussion evidenced in PX0202 is not protected by Section 10706. On what basis do Plaintiffs believe that this CSXT-UP discussion does not meet the criteria of Section 10706?

**4.** Plaintiffs have agreed that the discussion evidenced in PX0271—which concerns an exchange between NS and BNSF in September 2004 about the policies applicable to the their joint traffic, including fuel surcharge coverage as reported through REN—is protected by Section 10706. In Item 16 on Exhibit 1 to my letter of August 12, Defendants identified several other exhibits alongside PX0271 that contain evidence of this same discussion, *viz.*, PX0056, PX0066, PX0147, PX0148, PX0245, PX0246 / Oxbow Ex. 31, PX0247, and PX0248. It would be helpful to understand what distinction, if any, Plaintiffs perceive among these documents.

**5.** Plaintiffs have agreed that PX0206, which contains evidence of a discussion concerning a "CSXT/UP executive meeting" and related furnishing of data on "[j]oint CSXT price authorities and their fuel surcharge," is protected by Section 10706. PX0117 and PX0121 (listed as Item 14 on Exhibit 1 to my letter of August 12) similarly reference an exchange of data on "BNSF-NS shipments moving under BNSF price authorities subject to fuel surcharges" related to a BNSF-NS alliance meeting. It would be helpful to understand why Plaintiffs believe that Section 10706 applies to the discussion evidenced in PX0206 but not the similar discussion evidenced in PX0117 and PX0121.

**6.** Plaintiffs' letter reserved the right to substitute in "alternate citations or documents," in opposing summary judgment, to support the propositions that the named excludable documents were "offered to support." Pls. August 26, 2022 Letter at 2 n.1. We were surprised—and disappointed—to see your reservation on this point, which seems to run counter to the productive meet-and-confer process Judge Friedman seems to have in

mind. Does this reservation threaten to nullify Judge Friedman's order? If, for example, another document contains the same email that Plaintiffs agree is inadmissible in the form of PX0143 or PX0238, do Plaintiffs contend that they can properly rely on that alternative document as admissible evidence in opposing summary judgment?

**7.** For evidence of any of the discussions listed in my August 12 letter that Plaintiffs contend are admissible, do Plaintiffs believe that evidence of those discussions or agreements is not excludable under Section 10706 because the discussion or agreement in question, considered by itself, would violate the antitrust laws?

Defendants believe that the best way to reach the goal set for us by Judge Friedman is to focus our attention on the discussions and evidence at issue—reflected in the questions posed above—rather than abstract debates. We do, however, want to clear up some apparent confusion about our rationale for emphasizing "discussions or agreements," rather than documents in isolation. Defendants believe that a shared understanding of why we have listed "discussions or agreements" will further the parties' dialogue. As the D.C. Circuit, Judge Friedman, Plaintiffs, and Defendants have all recognized, Section 10706's test asks whether a "discussion or agreement" between rail carriers meets certain conditions and, if it does, excludes all "*evidence of* [that] discussion or agreement." 49 U.S.C. § 10706(a)(3)(B)(ii) (emphasis added). Such a discussion or agreement may be reflected in a lone document; it could span multiple documents; or different parts of a single document could be evidence of different discussions. *See* D.C. Cir. Op. 19; ECF No. 1008 (Op.) at 33-34. For that reason, the proper approach is to start by identifying a "discussion or agreement" (a process that, of course, requires looking to the relevant evidence), and asking whether that discussion or agreement meets Section 10706's criteria. If the parties agree that a discussion or agreement qualifies, we can then determine the universe of documents (or portions of documents) that are excludable, because they reflect "evidence" of the protected discussion or agreement.

But it makes little sense to do this process in reverse, and begin by considering documents in isolation. There is no way to determine whether a document is admissible without articulating, and considering, the relevant "discussion or agreement." That is why Judge Friedman previously found Defendants' focus on *documents*, as opposed to protectable *discussions*, to be a "problem." ECF No. 1008 at 33. And that is why Plaintiffs told the D.C. Circuit that "Section 10706 determines whether 'evidence,'"—*i.e.*, "evidence of a discussion or agreement," 49 U.S.C. § 10706(a)(3)(B)(ii)—"not a document in its entirety, is admissible." Appellees' Br. at 53-54, D.C. Cir. Case No. 21-7093, (Feb. 2, 2022); *accord* Appellees' Opp. Br. to § 1292(b) Appeal at 17, D.C. Cir. Dkt. No. 21-8002, (July 6, 2021) (similar); Pls. Opp. Br. to § 1292(b) Appeal at 26, ECF No. 1013 (similar).

Considering individual pieces of evidence, item by item on a list, is likely to obscure the issues that the Court is asking us to engage on. Indeed, we take Judge Friedman's *rejection* of the parties' proposal to exchange lists of documents to indicate that he is looking for a different

exchange of views, one more likely to identify areas of substantive agreement and disagreement. Certainly, part of our report to the Court will likely involve stating what documentary evidence is excluded under Section 10706. But the starting point is what discussions or agreements trigger the statute, now that we have the D.C. Circuit's decision.

Similarly, we recognize that you have asked us to provide a "complete list of documents and related deposition testimony"—presumably, a list that ranges beyond the evidence cited in Plaintiffs' opposition briefs that is the focus of my August 12 letter—that is "relevant to the summary judgment motion [and] that Defendants contend should be excluded." Pls. August 26, 2022 Letter at 4. Our purpose in attempting to agree with you on a limited set of evidence to be addressed is simply to make the Court's task in deciding summary judgment more manageable. It seems obvious that the contested evidence *most likely* to be "relevant to the summary judgment motions" is that which Plaintiffs cited in their opposition briefs to the Court. Any debate and difficulty about how to assemble a "complete list of documents and related deposition testimony" is the product of Plaintiffs' choice not to file an appropriately focused response to Defendants' summary judgment papers, but to instead burden the Court with a 235-page counterstatement and 407-page objections and responses to Defendants' proposed undisputed material facts. Evidence that is peripheral to the summary judgment issues need not be part of the Court's Section 10706 analysis now. Instead, if there comes a time when Plaintiffs truly need to rely on discussions or agreements not even referenced in their opposition briefs, that would be the time for the Court to address admissibility.

That said, we will consider your request. But, in the meantime, we suggest that the parties begin conferring on the material listed in Exhibit 1 to my August 12 letter, such as the material mentioned above. We look forward to addressing these topics at our scheduled meeting on September 8, 2022.

Yours truly,

Benjamin J. Horwich

cc: Counsel for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| South Carolina Public Service Authority<br><br>Plaintiff,<br><br>v.<br><br>BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

This is an antitrust action charging Defendants with price-fixing in violation of Section 1 of the Sherman Act. Plaintiff brings this action because it directly purchased unregulated rail freight transportation services under contracts with one or more Defendants during the period July 1, 2003 until at least December 31, 2008 (the "Relevant Period") which assessed a revenue-based rail fuel surcharge ("FSC") for the agreed-upon transportation during the Relevant Period. Plaintiff continued to pay these illegal FSCs after the Relevant Period pursuant to contracts entered into during the conspiracy. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

## NATURE OF THE ACTION

1. In 2003, the four largest United States-based Class I railroads engaged in an extraordinary series of meetings, phone calls, and email communications through which they embarked on a conspiracy – under the guise of a fuel cost recovery program – to apply and enforce rail fuel surcharges across their customers in order to generate profits. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc.

("CSX"), and Norfolk Southern Railway Company ("NS") (collectively the "Defendants") together controlled about 90% of rail freight traffic in the United States during the Relevant Period. Defendants used "rate-based" FSCs - *i.e.*, surcharges that use a percentage applied to the base rate for a shipment – as a means to impose across-the-board rate increases on rail freight shipments, a result that would have been prohibitively difficult to achieve on a contract-by-contract basis. Throughout the conspiracy and despite customer pushback against Defendants' FSCs, Defendants set aside their individual, economic self-interest to undercut one another and instead staunchly maintained their FSC program, pocketing billions of dollars in profits as a result.

2. Prior to conspiring, Defendants operated as businesses should: they actively competed against each other over rates generally and with respect to fuel recovery mechanisms to the benefit of their customers. According to a historical study of rail rates undertaken by the Surface Transportation Board ("STB"), "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Defendants were aware of, and concerned about, this trend. According to one CSX internal analysis from 2002, this decline resulted from factors including "some very vicious historical price wars" in the rail industry and "destructive pricing for rail share."

3. Between 2000 and 2003, Defendants independently tried to implement revenue-enhancing policies, including uncoordinated efforts to impose stand-alone FSCs. These efforts failed. Defendants used the inclusion or absence of FSCs as a basis to compete for each other's business and customers successfully resisted FSCs. They were rarely included in contracts and more rarely collected; those seeking to impose these FSCs lost customers to competitors or compensated customers by negotiating discounts. For example:

a. BNSF explained in a May 2002 Enterprise Wide Risk Assessment that "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does

not use a fuel surcharge in the competitive marketplace. . . The trucking industry used fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."

b. In September 2002, NS's manager of pricing systems Pat Glennon reported to the then-Senior Vice President of Marketing Services and later its CMO Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities."

c. As late as April 2003, UP's Bob Toy reported, "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

4. Moreover, since the passage of the Staggers Act in 1980, which significantly deregulated the American railroad industry, railroads typically entered into private freight transportation contracts that included escalation provisions tied to indexes that weighted actual cost factors, including fuel cost. As UP President James Young acknowledged on an October 2004 earnings call, the Rail Cost Adjustment Factor ("RCAF") "looks at actual costs through the industry." In that respect, Defendants were already recovering fuel costs through the RCAF or the related All Inclusive Index ("AII").

5. Rather than competing, Defendants began coordinating FSC programs. Senior executives at the highest levels of each company began to discuss with one another the implementation of more aggressive FSC formulas that the Surface Transportation Board ("STB")

later found bore "no real correlation between the rate increase and the increase in fuel costs for that particular movement to which the surcharge is applied . . . ." In short, Defendants stopped competing and started conspiring.

6. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly reduced the surcharges applied to shippers' base rates. Simultaneously, UP's CMO Jack Koraleski was recommending escalation of UP's FSC program to be substantially more aggressive. The very next day, Koraleski traveled to competitor CSX to play golf, socialize, and discuss "fuel surcharge methodology." Within one week, CSX's leadership abruptly reversed course, abandoning its recommended FSC reduction and adopting a program matching UP's escalation.

7. On March 18, 2003, BNSF and NS senior executives met to discuss "synchroniz[ing]" FSCs. Action items for the meeting attended by John Lanigan (BNSF's CMO) and Don Seale stated: "BNSF's fuel surcharge is structured differently than NS, CSX and UP. Should BNSF's by [sic] synchronized with the other big players in the industry?" The answer based on what followed: a resounding yes.

8. On March 20, 2003, CSX publicly announced a new, more aggressive FSC program with a lower trigger and higher base-rate multiplier. On March 31, 2003, UP decided to adopt "the same approach as the CSXT." On April 4, 2003, UP sent a "concurrence" to competitors that its new FSC program will "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF marketing officer Paul Anderson reacted ecstatically: "This is sweet !!! Just like the CSXT."

9. On April 2, 2003, BNSF and CSX senior executives met. The agenda dictated that CSX's CMO Mike Giftos and BNSF's CMO John Lanigan were to discuss "Fuel Surcharge."

Documents also reveal that, between April 2 and 6, 2003, NS's Seale and BNSF's Lanigan continued a prior discussion on "the fuel surcharge issue" at a National Freight Transportation Association meeting.

10. Similar to CSX's abandonment of a less aggressive FSC regime following a meeting with UP in March 2003, BNSF abandoned the internal consideration of an FSC program that could have been fairer for shippers. Between February and April 2003, BNSF had been "[l]eaning toward [a] Cost Per Mile" FSC formula (a mileage-based FSC which could have better correlated the resulting FSCs to actual fuel costs compared to the rate-based FSCs that Defendants broadly implemented during the conspiracy), but abandoned this approach. Instead, BNSF and UP adopted nearly identical rate-based FSCs. An internal NS analysis found that "Once [UP's $1.35 trigger] kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates."

11. Defendants' employees recognized these new FSCs were not genuine fuel cost recovery mechanisms as Defendants sought to portray. For example, on March 19, 2003, CSX's Director of Market Strategy John Couch explained that while the coordinated FSC "seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." On April 7, 2003, NS's Manager of Pricing Systems Pat Glennon recounted "[t]he case in favor of adopting the CSXT standard" to Don Seale and AVP Charlie Brenner, writing the "CSXT standard clearly produces significantly more compensation, and it does it sooner and more consistently." On April 29, 2003, Glennon told Seale that "[b]y dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

12. Glennon was correct that customers saw the rate increases for what they were and

were outraged. Handwritten notes from a June 2003 meeting between CSX and UP's senior executives – including (i) CSX's CEO Michael Ward, EVP and COO Al Crown, CMO Mike Giftos, EVP Clarence Gooden, VP of Strategic Planning Les Passa, and Alan Blumenfield,, and (ii) UP's CEO Dick Davidson, President and COO Ike Evans, CMO Jack Koraleski, Head of Operations Dennis Duffy, SVP Charley Eisele, VP and CIO Merill Bryan – reflect that the companies' senior executives discussed their FSC formulas and the "outcry" they were facing from the initial rollout of their new FSC regimes. The notes also state that "Both roads starts [sic] at a $23 trigger," reflecting an explicit discussion of the strike price above which their FSCs were triggered, and that the competitors "[m]ay have to revisit $23 if [fuel prices] stay high."

13. But, once the conspiracy was underway, they no longer had to fear customer loss as their imposition of these rate-based FSCs industry-wide meant that customers had no leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

14. And, instead of undercutting their competitors to gain market share and maximize their economic interests, Defendants maintained the scheme and imposed policies designed to ensure their new "standard" or "published" FSCs were enforced broadly across their customers without the waivers and discounts they had frequently offered between 2000 and 2002:

a. **BNSF**: On April 9, 2003, BNSF ordered, "Effective immediately and urgently per John Lanigan. Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)." On March 11, 2004, Chief Economist Samuel Kyei recounted the company's policy that "Contracts requiring [CEO Matthew Rose's] signature but excluding full fuel surcharge provisions will not be signed."

b. **UP**: On December 22, 2003, a sales representative explained to a customer, "As a company policy, all contracts without fuel language will have fuel language upon renewal. This is a mandate by UP management, I have no choice"

c. **CSX**: a May 2004 policy memorandum clarified that all CSX traffic would be "subject to fuel surcharge." EVP of Sales and Marketing Clarence Gooden stated that any exception had to come through him and that he had zero exceptions as his goal. In 2006, VP of Industrial Products Kyle Hancock directed, "NO ONE is authorized to approve a renewal with [a base rate] increase of less than 10%" and "NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge."

d. **NS**: a 2004 email from Don Seale to his subordinates mandated "no deviation from NS's published FSC without [his] prior approval." He also rejected any negotiations to forego base rate increases in return for FSC application as a "shell game."

15. In the fall of 2003, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to get all Defendants to agree to remove fuel costs out of the weighted RCAF and AII indices (which already permitted the Defendants to recover all of their fuel costs), so that they could more easily charge artificially high FSCs as a revenue enhancement mechanism. As a result, the AAR—whose board was dominated by Defendants— created an unprecedented All Inclusive Index *Less Fuel* ("AIILF"). Defendants' conspiratorial implementation of the AIILF allowed Defendants to move away from use of the RCAF and more easily apply their FSCs.

16. Defendants worked tirelessly to achieve 100% FSC coverage across their customers. All four Defendants pursued 100% participation goals and tracked their progress

toward attaining that goal. Defendants also policed the conspiracy by exchanging FSC coverage data with one another. In addition, Defendants started their negotiations using the standard FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for shippers. Even shippers with "captive" facilities (*i.e.*, facilities served by only one of the Defendants) suffered from the conspiracy. For example, NS's chief executive officer, Charles W. Moorman, testified before Congress in 2007 that even captive shippers are subject to "competitive constraints [that] are real," and he expressly acknowledged that "even where there is only one railroad serving a facility, there are market factors at play."

17. Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150 per barrel during the Relevant Period, so did Defendants' profits. A Senate Commerce committee report concluded that a "review of the largest four railroads' [SEC] filings shows just how profitable the large rail companies have become over the last decade," and included the following chart documenting the significant growth in profits during the Relevant Period:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

18. An independent 2007 study commissioned by the American Chemistry Council

and Consumers United for Rail Equity ("CURE") similarly found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

19. Defendants also attributed their record revenues to FSCs. For example:

a. **NS**'s 2006 "[r]ailway operating revenues increased $800 million, reflecting higher rates, including fuel surcharges that accounted for about 40% of the increase and modestly higher traffic volume."

b. **BNSF**'s freight revenues increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from $1,258 in 2005."

c. **UP** "achieved record revenue levels [in 2006] in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

d. **CSX**'s operating revenue increased $948 million in 2006; "the primary components of the revenue gain" were "continued yield management and the Company's fuel surcharge program, which drove revenue per unit across all major markets."

**PARTIES**

20. Plaintiff South Carolina Public Service Authority a/k/a Santee Cooper (hereinafter "Santee Cooper") is an electric and water utility company headquartered at One Riverwood Drive, Moncks Corner, South Carolina. Santee Cooper is a corporate entity owned by the State of South Carolina. Santee Cooper owns and operates coal-fired electric generating

facilities in South Carolina and provides power to more than 625,000 customers in all 46 counties in the State of South Carolina. Santee Cooper purchased more than $1 billion of unregulated rail freight transportation directly from one or more Defendants, including Defendant CSX, beginning at least as early as 2003 under contracts which assessed FSCs and continued in effect beyond December 2008 at least through 2010. The prices Santee Cooper paid to Defendants for unregulated rail freight transportation services on which FSCs were imposed were greater than the prices Santee Cooper would have paid absent the conspiracy alleged herein. Santee Cooper has therefore been injured in its business and property by reason of Defendants' antitrust violations.

21. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

22. Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS has railway lines throughout the eastern United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

23. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the

country (including in this District).

24. Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States, and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

**JURISDICTION AND VENUE**

25. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiff by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

26. Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

27. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the Relevant Period one or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

28. This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this

District.

## INTERSTATE TRADE AND COMMERCE

29. During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

30. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected interstate commerce. During the Relevant Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

31. The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

32. Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

33. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

34. Today, by contrast, 80% or more of all rail shipments move under private

transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency – like the previously-existing ICC – to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

35. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry is now (and was during the Relevant Period) highly concentrated: four of these railroads – Defendants BNSF, UP, CSX and NS – operate more than 90% of all railroad track in the U.S. and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (*i.e.*, the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered by these small carriers is negligible.

36. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

**DEFENDANTS SEEK UNSUCCESSFULLY TO RAISE RATES BEFORE THE RELEVANT PERIOD**

37. For many years before the Relevant Period, Defendants confronted a long-term, structural decline in rail freight rates. Indeed, according to the Surface Transportation Board, Office of Economics, Environmental Analysis & Administration Section of Economics, *Study of Railroad Rates: 1985-2007*, "inflation-adjusted rail rates declined in every year but one from 1985 through 2004." Figure 1 from the *Study of Railroad Rates* evidences that trend:

**Figure 1. STB Rail Rate Index 1985 to 2007**
Real Revenue Per Ton-Mile (1985=100)




38. Between 2000 and early 2003, the three-year period preceding the Relevant Period, Defendants unilaterally took various actions designed to increase rail freight prices and revenues. These uncoordinated actions included, among other things, unilateral attempts by the individual Defendants to apply stand-alone FSCs. Indeed, in March 2001, Defendants considered but expressly decided not to create an industry-standard FSC.

39. During this period, Defendants acting on their own had limited success when trying to boost rates and revenues including through FSCs. The trend reflected in the STB data above was brought about by various factors, including what Defendant CSX characterized in an internal analysis as "some very vicious historical price wars" and "destructive pricing for rail share." A 2002 BNSF "risk assessment" described this problem, while at the same time foreshadowing the eventual coordination Defendants would agree upon to solve this problem:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. We

> need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? We are still not together as an industry. We are fighting for revenue share as opposed to rate adequacy.

40. During this era of competition, Defendants' efforts to impose FSCs were met by customer resistance and FSCs were applied only sporadically to a limited number of shippers. During this period, Defendants acknowledged their failure to contract for and collect FSCs. By way of example:

a. NS: In June 2000, VP Thomas Brugman reported, "Customers are picking up on the surcharge situation and are starting to get nasty." VP Jeffrey Heller directed his group to "discontinue billing and waive outstanding [FSCs] immediately" for "[c]contract customers who have refused to pay the FSC and are not paying it." The same month, Direct of Marketing Ken Yopp made plans to keep "track of lost business [sic] account [sic] the FSC." In September 2002, manager of pricing systems Pat Glennon reported to SVP of Marketing Services Don Seale that "[c]ustomers are now more attuned to fuel issues and are less inclined to agree to a surcharge clause," and that eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS." Glennon testified that in 2001 and 2002, FSCs were only "*theoretically billable*."

b. **CSX**: In August 2000, CSX reported at a staff meeting that it could collect only 67.4% of the then-modest FSCs it had billed over the preceding nine months. EVP of Sales and Marketing Clarence Gooden testified that CSX's FSC coverage was "very low" and that he was "embarrassed" by the figure.

c. **BNSF**: In May 2002, BNSF's Enterprise Wide Risk Assessment explained, "We are challenged to mitigate the risk through fuel surcharges, particularly as the UP

does not use a fuel surcharge in the competitive marketplace. . . . The trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges were we do apply it." In January 2003, EVP and CMO Charles Schultz told Chairman, President, and CEO Matthew Rose and other executives, "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." Schultz's successor John Lanigan testified BNSF's FSC coverage was "low" in January 2003 – "in the 25 to 30 percent range."

d. **UP**: Current EVP and CFO Robert Knight Jr. testified that between 2000 and 2002, "[t]here were some isolated situations where there were surcharges, but . . . no policy position." UP implemented an FSC program in December 2002, but initially limited the application of that program to certain tariffs and circulars and exempted private shipments in its Industrial Products group from FSCs. This was true even though FSCs were generally not triggered and only "theoretically billable." And in April 2003, Director Bob Toy reported. "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

41. The reason Defendants were not able to achieve broader FSC coverage was clear: Defendants were concerned about losing business to other Defendants that did not apply FSCs made concessions, or otherwise applied FSCs less aggressively. Defendants expressed these concerns internally and, in fact, lost business through FSC competition. Each Defendant

also frequently agreed not to apply FSCs in the face of shipper objections.

42. For example, in May 2002, "UP[,] does not use a fuel surcharge in the competitive marketplace." It continued, "rail competitors do not [use FSCs] and we therefore are hard pressed to achieve it. We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." In January 2003, NS reported that its main eastern competitor CSX "appear[s] to be more lax in applying the surcharge to private authorities" and "[t]his does have competitive implications for NS."

43. And, in May 2003, BNSF announced that it would reduce its standard FSC to 2% from 5% in May 2003 because a 5% FSC "would be significantly higher than several competing railroads and that we might place ourselves, as well as our patrons, at a competitive disadvantage." In response, UP observed internally that "Fuel surcharge $ are melting away at the competition. In a downward-pressure environment, what's on paper must not work in the real world."

44. Another impediment to broad application of FSCs during this period was the so-called Rail Cost Adjustment Factor, or "RCAF." The RCAF is a weighted index that accounts for all significant input costs, including fuel. The RCAF was utilized in multi-year contracts as a formula to adjust prices to account for increasing (or decreasing) input costs.

45. Defendants recognized that imposing a stand-alone FSC where fuel price increases were already covered by the RCAF would be perceived by shippers as "double dipping." For example, Pat Glennon, at the time NS's director of price administration, observed that "[p]hilosophically, it is hard to defend applying both a FSC and an index based rail cost recovery formula, particularly now that we are significantly increasing the FSC percentages."

46. As a result, the number of shippers covered by stand-alone, rate-based FSCs was relatively low before the Relevant Period, and FSCs did not contribute significantly to Defendants' revenues or bottom lines.

**DEFENDANTS CONSPIRE IN 2003 TO RAISE PRICES BY ESTABLISHING AND BROADLY ENFORCING A COORDINATED RATE-BASED FSC PROGRAM AS A MEANS TO INCREASE ALL-IN RATES**

47. By 2003, Defendants' initial attempts to apply rate-based FSCs on their own taught them an important lesson: they could not achieve their revenue enhancement objectives unless the FSC was widely applied on a coordinated basis by all four Defendants. Absent coordination, a railroad seeking to impose FSCs more aggressively than its competitors would risk losing business to another railroad who imposed no FSC or whose FSC policies were more flexible. By early 2003, it became apparent to Defendants that they would encounter difficulties making their FSC policies "stick" absent an industry-wide agreement.

48. Thus, beginning in the spring of 2003, Defendants' senior executives – including their CEOs and top sales/marketing executives – engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC program. The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers industry-wide.

49. The FSC programs that Defendants implemented between March 2003 and January 2004 by mutual agreement are exactly the sort of industry-standard FSC that Defendants' senior executives discussed.

50. On March 11, 2003, CSX internally recommended making changes to its FSC program that would have significantly *reduced* the surcharges applied to shippers' base rates.

51. That same day, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" attributed to UP CMO Jack Koraleski. Under the UP "Revised" proposal, FSCs were

more aggressive, escalating at roughly twice the rate of the formula CSX had internally recommended. The "Revised Surcharge proposal" retained the $28 WTI strike price of UP's existing program but would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0% increase for every $5 increase in the WTI index.

52. The following day, Koraleski traveled to CSX to play golf, socialize, and discuss "fuel surcharge methodology." Beforehand, Koraleski and CSX's executive vice president of sales and marketing, Clarence Gooden "talked on" the subject of "[f]uel surcharge methodology."

53. On March 19 and 20, 2003, within one week of the UP-CSX meeting on "fuel surcharge methodology," CSX publicly announced a new FSC policy. The program retained the lower $23 WTI trigger that CSX had proposed but abandoned the planned change to a relaxed escalation schedule, and instead adopted the more aggressive escalation formula contemplated in UP's "Revised Surcharge proposal." Thus, under CSX's new FSC policy, CSX would assess a 0.4% FSC when the price of oil on the West Texas Intermediate (WTI) index exceeded $23 per barrel, and an additional 0.4% for every dollar increase above $23.48.

54. Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, CSX's new program would be based on the average price of oil from the preceding month. CSX reasoned that while these modifications to its FSC program might "seem[] somewhat benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

55. On March 31, 2003, less than two weeks after CSX's announcement, UP decided to adopt "the same approach as the CSXT." Following the CSX approach, UP would

impose a 0.4% FSC at a monthly-average WTI "trigger" price of $23 (*i.e.* the index price at which FSCs begin), and assess an additional 0.4% charge for every dollar increase in the WTI index above $23. BNSF, which had previously discussed the need for a "synchronized" FSC policy with NS, had a predictably positive reaction to UP's announcement: "This is sweet!!!! Just like the CXST."

56. On March 18, 2003, NS and BNSF senior executives – including NS's Chairman, President, and CEO David Goode, Vice Chairman and COO Steve Tobias, Vice Chairman and CFO Hank Wolf, VP and CMO Ike Prillaman, SVP of Planning Jim McClellan, VP of Intermodal Mike McClellan, SVP of Transportation Mark Manion, SVP of Marketing Services Don Seale, BNSF's Chairman, President, and CEO Matt Rose, current President and CEO and then-VP and COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete Rickershauser, VP of Consumer Products and head of intermodal activities Steve Branscum– met and discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. This discussion point was assigned to NS's Seale and BNSF's Lanigan.

57. On March 27, 2003, Seale wrote to Lanigan that at an upcoming trade association meeting, he wanted to talk about "the fuel surcharge issue we discussed in Norfolk."

58. The trade association meeting was the biannual National Freight Transportation Association ("NFTA") meeting that took place on April 2–6, 2003 at the Wigwam resort, in Litchfield Park, Arizona. Each of the Defendants attended the meeting. Almost immediately following the NFTA meeting, a new internal directive was issued at BNSF that was designed to ensure across-the-board FSC application: "Effective immediately and urgently per John

Lanigan[:] Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

59. On April 1, 2003, CSX CMO Mike Giftos and BNSF CMO John Lanigan met in Jacksonville, FL to discuss "Fuel Surcharge."

60. In early 2003, BNSF had been leaning toward a mileage-based FSC and trying to drum up support within the industry for a mileage-based FSC formula. But on May 7, 2003 – approximately one month after the NFTA meeting and its meeting with CSX – BNSF abandoned that effort. Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the HDF index, to $1.25, a number that "reflected the $23 WTI crude price used by UP."

61. Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index. The BNSF FSC had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index. From that point on, BNSF and UP (together, the "Western Railroads") moved in lockstep and charged the exact same FSC percentage for each month of the Relevant Period.

62. BNSF and UP agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied an FSC of 0.5% for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2%. The FSC would increase 2% for every 20 cent increase in the HDF Index.

63. The Western Railroads also coordinated when they would change their FSC. They agreed that the FSC would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March. The Western Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

64. The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

65. UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing FSC program. In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program, but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

66. As to NS, between March 2003 and December 2003, while positioning itself to quickly implement the FSC first announced by CSX, NS had regular discussions with the other Defendants, including discussions of what FSC was "acceptable" to them and the desirability of

an industry-standard FSC.

67. As it had planned and prepared for from March 2003 onward, NS announced in January 2004 that it was adopting, effective March 1, 2004, a new FSC policy, which mimicked the policy announced by CSX in March 2003 and was intended to "standardize" NS's FSC with the FSCs of the other Defendants. As with CSX's program, NS would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase thereafter. Also like CSX, NS's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days.

68. After NS's announcement, all four Defendants had essentially uniform FSCs and remained in synch throughout the Relevant Period.

**PUBLICATION OF THE AIILF AND FIXING FSC RATES**

69. Evan after having agreed to coordinate their FSCs, however, Defendants still faced a significant barrier to widespread use of FSCs: widely-used private contracts had cost escalation provisions that already accounted for fuel costs. BNSF, UP, CSX and NS agreed to solve this problem by conspiring to remove fuel from the widely-used cost escalation indexes, thereby paving the way for widespread imposition of the new FSC program in which all four of the Defendants could participate, and from which all four could earn excessive profits.

70. In the fall of 2003, NSF and UP initiated an effort in the AAR to get all Defendants to agree to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

71. Pursuant to the agreements among Defendants BNSF, UP, CSX and NS, the Defendants, who dominate the AAR board, caused the AAR to announce in December 2003 the

creation of an unprecedented, new All Inclusive Index Less Fuel (the AIILF). This new index was similar to the AII and the RCAF, except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of the Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

72. Defendants BNSF, UP, CSX and NS conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by the Defendants to allow implementation and continuation of their price fixing conspiracy – a conspiracy that would enable the Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice, and marked the first time that the AAR created a cost escalation index without a fuel cost component.

73. Defendant BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President,

and CEO, Lanigan stated: "What happened last year, *and Matt led the charge on there*, is that there's a new index that [the AAR] has that's basically an index without fuel. . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future." (Emphasis added).

74. Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel), and pursuant to the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), suddenly moved into lockstep with FSCs based on the WTI Index. This move into lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, CSX and NS in late 2003.

75. Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the Eastern Railroads' rates were increased 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2%. The FSC would be adjusted upward at 2% for every $5 increase in the WTI average price.

76. The Eastern Railroads also coordinated when they would change their FSC – two calendar months after the WTI Index had adjusted, thereby adopting the same FSC price timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same FSC percentage month after month. The Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

77. The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary and complex combination of features for their FSC

programs: including using the WTI Index for FSCs, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that the Defendants were facing.

78. There was no legitimate business justification or natural explanation for the collective action of BNSF, UP, CSX and NS to cause the AAR to adopt and publish the AIILF. Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel costs. The FSC program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by the Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and the Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs throughout the Relevant Period. Thus, the motivation of BNSF, UP, CSX and NS in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

79. The actions by Defendants thus were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to *revenue* (*i.e.*, the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel

cost increase percentage to the *entire cost of the freight* shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through this collective action, Defendants BNSF, UP, CSX and NS planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand – so long as these railroads participated by not competing on FSC prices to undercut one another.

80. In November of 2004, BNSF's CMO John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC [Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for a mileage-based FSC program." The other Defendants "pushed back as expected." Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive rate-based FSCs.

81. With the conspiracy underway, the two Western Railroads, using the HDF Index, moved in lockstep and charged virtually identical FSCs on a monthly basis throughout the Relevant Period. The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began, but were identical starting in July 2003:

**MONTHLY FSC PERCENTAGES—WESTERN RAILROADS**

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0% |
| Jul-02 | 1% | 0% |
| Aug-02 | 0% | 0% |
| Sep-02 | 0% | 0% |
| Oct-02 | 1% | 0% |
| Nov-02 | 2% | 0% |
| Dec-02 | 2.5% | 0% |

| | | |
|---|---|---|
| Jan-03 | 2% | 2% |
| Feb-03 | 2% | 2% |
| Mar-03 | 2.5% | 2% |
| Apr-03 | 4.5% | 2% |
| May-03 | 2% | 2% |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | 2.5% | 2.5% |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |

| | | |
|---|---|---|
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

82. As detailed above, there also was uniformity among the Eastern Railroads in the monthly FSC percentages, based on the WTI Index that they charged customers for most of the Relevant Period. The chart below shows that the FSC percentages charged by Defendants CSX and NS for carload shipments varied before the Relevant Period, but were identical starting in March 2004:

**MONTHLY FSC PERCENTAGES – EASTERN RAILROADS**

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2% |
| Jul-03 | 2.4% | 2% |
| Aug-03 | 3.2% | 2% |
| Sep-03 | 3.2% | 2% |
| Oct-03 | 3.6% | 2% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |

| | | |
|---|---|---|
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06[1] | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

83. In stark contrast to this uniformity in FSC percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would

[1] On April 24, 2006, NS announced that it would "revise its fuel surcharge program," assessing a 0.3% surcharge when the price of oil on the WTI index exceeded $64 per barrel, and an additional 0.3% for every dollar increase above $64 per barrel. While NS claimed to the STB that it was rebasing because of a "decision to reduce its fuel surcharge percentage," NS had calculated the rebased fuel surcharge "to bake in FSC [the existing fuel surcharges] to [base] rate." NS had determined that a 16.4% base rate increase would allow it a "full % [fuel surcharge] pass thru" under the new program. Importantly, NS executives discussed the rebasing plan with its counterparts at the other Defendants, who recognized that the new FSC program was an economic wash compared to the program announced in late 2003 (which continued to apply to shippers under earlier contracts in any event).

independently price their FSCs to arrive at the identical percentage month after month, year after year. The fact that Defendants moved in uniform lockstep indicates that Defendants were coordinating their behavior and conspired to fix prices for FSCs. In addition, the advance announcements of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

84. Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below – including, in some cases, by adopting mileage-based FSCs – Defendants continued to engage in discussions concerning FSCs following the STB ruling, and to apply rate-based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before the STB Ruling.

85. While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (*i.e.*, shipments that travel from origin to destination only by railcars), Defendants also coordinated with respect to the FSCs applied to their intermodal business (*i.e.*, shipments that travel by rail and one other mode of transportation such as truck or ship).

86. The direct heads of Defendants' intermodal businesses attended conspiratorial meetings. NS's VP of Intermodal Mike McClellan and BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum participated in the March 2003 meeting at which their railroads discussed how the FSC programs of all four Defendants were structured, and then adopted an "action item" for the BNSF and NS senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the other Defendants. CSX's Alan Blumenfield, his predecessor Les Passa, and UP's Brad King EVP of Network Design and Integration participated in the June 2003 meeting at which CSX and UP's senior executives

discussed their FSC formulas, their FSC strike prices, and the "outcry" they were facing from the initial rollout of their new FSC regimes. UP's intermodal group regularly imposed adjustable FSC provisions and their practice was to adjust them on a ad hoc bases to align with BNSF's FSCs. In the fall of 2003, CSX and BNSF officers exchanged percentages of intermodal business that "either had fuel surcharges or an escalator on the revenue."

87. Moreover, Defendants' intermodal business was led by the same senior executives who conspired to impose synchronized FSCs. Intermodal was not treated separately and apart from carload traffic. When Defendants met to conspire, they did not limit their discussions to carload traffic.

**IMPLEMENTATION OF THE SCHEME:**
**DEFENDANTS' ACROSS-THE-BOARD APPLICATION OF FSCs**

88. Defendants recognized that their coordinated FSCs were more aggressive and could generate substantially more revenue. For example, describing the new FSC program that resulted from Defendants' coordination, CSX's John Couch remarked: "While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." In addition, an internal NS email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

89. Defendants recognized that their new aggressive FSC program could be undermined by resistance from shippers and competition between the Defendant railroads. A 2003 internal NS memorandum recognized that moving to the more aggressive formula would "run the risk of losing the surcharge altogether. . . . The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC." And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the "risk that competitors reverse

course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

90. To ensure that shipper resistance would be muted, and to achieve their conspiratorial goals, each Defendant adopted policies to apply FSCs to 100% of its traffic and tracked its progress toward attaining that goal. For example, in 2004, BNSF marketing leadership began an initiative to monitor FSC "adherence" on a quarterly basis. These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (*e.g.*, shippers with expiring contracts that do not include an FSC). The reports – showing increasing FSC coverage each year – were presented to the chief marketing officer with a goal of achieving a 100% participation rate for BNSF's shippers.

91. CSX also monitored its effectiveness in applying FSCs to its shippers, and started tracking its progress toward implementing its FSC mandate – that "[e]verything is subject to fuel surcharge." CSX tracked the progress that its individual marketing teams were making toward widespread FSC application, and tracked contracts without FSCs to ensure they would receive FSCs upon renewal. Starting in early 2004, UP engaged in similar analyses. An analysis of UP's FSC coverage was also performed for the chief marketing officer – who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004."

92. NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed his team to identify "the largest remaining contracts (including annual revenue involved) that do not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007."

93. NS also tracked its ever-expanding FSC coverage and NS's Don Seale instructed his team to identify "the largest remaining contracts (including annual revenue involved) that do

not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007."

94. Defendants policed the conspiracy by exchanging FSC coverage data. For example, subsequent to a meeting between the two railroads in late 2004, BNSF sent NS's Don Seale a report addressing FSC coverage for "all [BNSF] traffic (not solely with NS) that moved under the price authority in the past twelve months."

95. In furtherance of the conspiracy, Defendants instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the FSCs were "not negotiable."

96. Defendant also enforced strict policies against discounting base rates to offset the standard FSCs. For example, in an internal NS email, NS's CMO (Don Seale) remarked, "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play."

97. As a result of these and related policies, any negotiations with their shippers about FSCs that took place started from the standard, supracompetitive FSC.

98. In addition, Defendants applied their standard FSCs uniformly to all traffic and commodities. For example, in October of 2005, NS advised UP as follows: "We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."

99. And Defendants imposed standard FSCs on all shippers without regard to whether the shipper had access to alternative modes of transportation. In written testimony submitted to Congress, NS's Chairman Moorman recognized that even so-called "captive" shippers – shippers without access to alternative modes of transportation – have leverage in negotiating a better rate/serve package on traffic at single served facilities. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

100. Before the conspiracy, captive shippers could negotiate out of the FSCs. But during the conspiracy they could not.

**THE STB DECISION**

101. On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the FSCs are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. **Rather, a fuel surcharge**

> **program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.** Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*See Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, January 26, 2007) at 6 (emphasis added).

102. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

103. As detailed above, pursuant to their conspiracy, Defendants applied the same unreasonable FSC practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## THE CONSPIRACY SUCCEEDS

104. Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy. Through their agreement to coordinate on FSCs, Defendants realized billions of dollars in revenues during the Relevant Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the FSC.

105. Defendants recognized that their coordinated FSCs in fact resulted in significant over-recovery of fuel price increases. NS, for example, recognized by July 2004 that "[c]urrent FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base," and Don Seale of NS testified that in 2005, NS's "increase in Fuel Surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."

106. UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." An October 2005 presentation shows UP estimated greater than

100% of incremental fuel cost recovery through FSCs for each of its six business groups.

107. BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004. In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004. Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods, particularly since the inflated percentage increase was applied to the entire rate at issue not merely to the fuel cost component of that rate.

108. By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

109. As a result, Defendants' conspiracy worked as planned to help to remove the competitive pressures that had kept their rates down for years. As the head of UP, James Young, admitted in 2007, "three, four years ago [the FSCs] were really non-existent," and "it's only been the last couple of years that . . . the financial returns in this business has [sic] started to move in the right direction."

110. Following Defendants' agreement to coordinate their FSCs, Defendants' total

revenues skyrocketed during the Relevant Period, with the Defendants reporting record revenues and profits virtually every year. As noted above, Defendants themselves attributed these record figures in large part to FSCs.

111. As a result of Defendants' conspiracy they were able to reverse the "destructive pricing for rail share" that led to their conspiracy. In the 2009 STB study referenced above, the STB concluded that "inflation-adjusted rail rates increased in 2005, 2006, and 2007," representing "a significant change from prior years, given that inflation-adjusted rail rates declined in every year but one from 1985 through 2004." The STB concluded that while rising fuel costs contributed to the rate increases "even after factoring out rising fuel costs, railroad rates have risen in the last three years after falling for decades."

112. And a 2010 Senate Commerce Committee Report conducted a "review of the largest four railroads' Securities and Exchange Commission (SEC) filings," which it found "show[ed] just how profitable the large rail companies have become over the last decade. Figure I demonstrates that the four largest U.S. rail carriers have nearly doubled their collective profit margin in the last ten years to 13%." The referenced Figure 1 demonstrates that Defendants' profits spiked following their collective imposition of the new FSC regime described above:




*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

## CLAIMS

## COUNT I

(Violation of Section 1 of the
Sherman Act and Section 4 of the Clayton Act)

113. Plaintiff incorporates by reference the allegations in the paragraphs above as if they were fully set forth herein.

114. Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

115. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade. Defendants' contract, combination, agreement,

understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

116. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

117. The contract, combination, or conspiracy has had the following effects:

a. Prices charged to Plaintiff for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

b. Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services, and

c. Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

118. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury in that they have paid supracompetitive prices for FSCs applied to unregulated rail freight transportation services during the Relevant Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1) That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2) That Plaintiff recovers compensatory damages, as provided by law, determined to have been sustained by Plaintiff, and that judgment be entered against Defendants on behalf of Plaintiff;

(3) That Plaintiff recover treble damages, as provided by law;

(4) That Plaintiff recover their costs of the suit, including attorneys' fees, as provided by law; and

(5) For such further relief as the Court may deem just.

**DEMAND FOR JURY TRAIL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Respectfully submitted,

**NEXSEN PRUET LLC**

By: /s/ David C. Eddy

David C. Eddy (D.C. Bar No. 250712)
Travis C. Wheeler (D.C. Bar No. 484023
Dennis J. Lynch (*pro hac vice* motion to be filed)
Chase C. Keibler (*pro hac vice* motion to be filed)
NEXSEN PRUET LLC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 771-8900
Facsimile: (803) 253-8277
deddy@nexsenpruet.com
twheeler@nexsenpruet.com
dlynch@nexsenpruet.com
ckeibler@nexsenpruet.com

**Attorneys for Plaintiff South Carolina Public Service Authority**

February 1, 2020

Columbia, South Carolina

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OXBOW CARBON & MINERALS LLC; OXBOW MINING, LLC; OXBOW MIDWEST CALCINING LLC; OXBOW CALCINING LLC; and TERROR CREEK LLC,

Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY; and BNSF RAILWAY COMPANY,

Defendants.

Case No. 1:11-cv-01049 (PLF)

# FIRST AMENDED COMPLAINT

TROUTMAN SANDERS LLP
John R. Gerstein, D.C. Bar No. 913228
Merril Hirsh, D.C. Bar No. 366952
901 9th Street, NW, Suite 1000
Washington, DC 20004-2134
Telephone: (202) 274-2950

Fletcher Paddison
11682 El Camino Real, Suite 400
San Diego, CA 92130-2092
Telephone: (858) 509-6007

BOIES SCHILLER & FLEXNER LLP
David Boies
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8201

Robert B. Silver
Ellen Brockman
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2394

Samuel C. Kaplan, D.C. Bar No. 463350
5301 Wisconsin Ave., NW
Washington, DC 20015
Telephone: (202) 237-2727

*Attorneys for Plaintiffs Oxbow Carbon & Minerals LLC; Oxbow Mining, LLC; Oxbow Midwest Calcining LLC; Oxbow Calcining LLC; and Terror Creek LLC*

# TABLE OF CONTENTS

Page

Introduction ........................................ 1

The Parties ........................................ 4

The Non-Party Co-Conspirators ........................................ 6

Jurisdiction and Venue ........................................ 6

Factual Background ........................................ 7

I. CONGRESS ENACTED THE STAGGERS ACT TO FOSTER COMPETITION IN THE RAIL INDUSTRY, BUT CONSOLIDATION INCREASED OPPORTUNITIES FOR COLLUSION ........................................ 7

II. TO OVERCOME OBJECTIONS THAT THE UP/SP MERGER WOULD HARM COMPETITION, UP AGREED TO PROVIDE TRACKAGE RIGHTS TO BNSF AND UTAH RAILWAY THAT IT SAID WOULD PRESERVE AND EVEN INTENSIFY PRIOR COMPETITION IN THE CENTRAL CORRIDOR AND FOR THE RAIL TRANSPORTATION OF UINTA BASIN COAL ........................................ 9

III. UNTIL UP AND BNSF BEGAN TO COLLUDE IN 2003, COMPETITIVE PRESSURE FROM BNSF PREVENTED UP FROM RAISING RATES TO MONOPOLY LEVELS IN THE UINTA BASIN ......... 12

IV. UP AND BNSF AGREED TO FIX FUEL SURCHARGES AND NOT TO COMPETE TO SHIP COAL ........................................ 14

A. The Fuel Surcharge Conspiracy ........................................ 16

1. Prior to 2003: The age of the All-Inclusive Index ("AII") ..................... 16

2. 2003: The inception of the fuel surcharge conspiracy through the Association of American Railroads ........................................ 16

3. The Railroads adopted a new "*All* Inclusive Index – *Less Fuel*" ("AII-LF") and used it to coordinate fuel surcharges ............................. 17

4. The Railroads acted contrary to their independent self-interest .............. 24

5. The Railroads changed other practices to facilitate the conspiracy ......... 26

6. Increasing the fuel surcharge for coal ........................................ 27

7. The Result: supra-competitive profits ........................................ 28

8. The STB declared it an "unreasonable practice" and "mislabeling" ....... 28

**TABLE OF CONTENTS**
(continued)

**Page**


B. BNSF Agreed Not to Compete for Uinta Basin Coal, Giving UP an Effective Monopoly, and the Railroads Generally Agreed Not to Compete for New Coal Business ..... 30

C. UP and BNSF's Rates Increased Drastically, and Both Offered Reduced Service Terms ..... 35

D. UP and BNSF Both Switched to Public Pricing ..... 37

E. UP and BNSF Both Abandoned Long-Term Contracts ..... 39

V. UP's RESULTING MONOPOLY OVER THE SHIPMENT BY RAIL OF COAL EMANATING FROM THE UINTA BASIN ..... 40

VI. UP's AND BNSF'S ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL ..... 43

VII. EACH OF THE OXBOW COMPANIES SUFFERED INJURY BY VIRTUE OF SOME OR ALL OF UP'S AND BNSF'S ANTICOMPETITIVE CONDUCT ..... 44

COUNT I Price Fixing (Fuel Surcharge) in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ..... 47

COUNT II Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ..... 48

COUNT III Monopolization (and Attempt to Monopolize and Conspiracy to Monopolize) by UP in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ..... 49

COUNT IV Breach of Contract: Tolling Agreement ..... 52

PRAYER FOR RELIEF ..... 54

DEMAND FOR JURY TRIAL ..... 55

Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC and Terror Creek LLC (collectively,"Oxbow" or the "Oxbow Companies") allege against Defendants Union Pacific Railroad Company ("UP") and BNSF Railway Company ("BNSF") (collectively, the "Defendants"), based on personal knowledge as to their own acts and practices and otherwise based on information and belief, the following claims for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

## Introduction

1. This lawsuit challenges violations of both Sections 1 and 2 of the Sherman Act that have damaged each of the respective Oxbow Companies by dramatically increasing the rates it paid to ship products by rail during the period 2004-2012.

2. As alleged in detail, defendants UP and BNSF engaged in multiple interrelated antitrust violations. UP and BNSF conspired with their eastern United States counterparts, CSX Transportation, Inc. and Norfolk Southern Railway Company, to engage in price fixing in violation of Section 1 of the Sherman Act. The four railroads artificially enhanced rates and resulting revenues by jointly adopting and uniformly imposing a charge to shippers that the railroads called a "fuel surcharge," but which was actually calculated as a percentage of base rates, unrelated to the actual fuel costs the railroads incurred.

3. The concerted surcharge imposed by Defendants and their co-conspirators increased their revenues far in excess of the railroads' actual costs for fuel. UP boasted to its shareholders that its revenues from this surcharge were over $1 billion in 2005. In a proceeding denominated Rail Fuel Surcharges, *Ex Parte* No. 662 (Jan. 25, 2007), the Surface Transportation Board ("STB"), the federal agency now charged with regulating aspects of the railroad industry, addressed the Railroads' practice of computing rail fuel surcharges as a percentage of their base

rail freight rate and found their uniform conduct was "unreasonable" and that the practices, invoices, and documents relating to those fuel surcharges were "misleading." The fuel surcharge conspiracy imposed even more severe burdens on coal shippers when UP and BNSF later raised the percentage of coal shippers' base rates that determined the fuel surcharge.

4. Defendants' fuel surcharge conspiracy was part of a broader conspiracy. At the same time that UP and BNSF were conspiring with their eastern counterparts to impose illegal fuel surcharges, UP and BNSF also agreed to take a series of steps that were a marked departure from a prior history of competition in connection with the shipment of coal—the commodity representing by far the largest percentage of freight carload traffic. Among other things, they both stopped competing for each other's customers, announced dramatic rate increases unsupported by market conditions, moved to "public pricing" so as to exchange information, refused to enter long-term contracts with their customers, and ended a previous practice of quoting prices to junction points that would enable competition. By their nature, these steps required agreement—they would not have been in UP's or BNSF's business interests were it not for the security of an agreement to do so jointly. Defendants' fuel surcharge conspiracy facilitated this broader conspiracy.

5. Defendants' conspiracy constituted a *per se* violation of Section 1 of the Sherman Act. The conspiracy also violated Section 2 of the Sherman Act by enabling UP to obtain and to maintain a monopoly over markets for rail transportation of coal produced from the Uinta Basin—a region located in western Colorado and eastern Utah, where high-BTU, low-sulfur coal is mined.

6. UP dominates what is known as the "Central Corridor"—a 1,200 mile stretch of track from Denver, Colorado to Stockton, California that includes the only effective means for

transporting coal for any significant distance from the Uinta Basin mines in Colorado and Utah. At the time of its 1996 merger with the Southern Pacific Railroad ("SP"), UP entered into trackage agreements with both BNSF and Utah Railway Company to preserve prior levels of competition. As UP and BNSF recognized (and said) at the time, these trackage agreements would preserve, indeed intensify, the competition for the transportation of Uinta Basin coal and prevent UP from acquiring a monopoly. As discussed below, in the absence of concerted conduct, a number of other factors contributed to the competitive pressure in the Central Corridor.

7. Competitive pressure did in fact keep rates at competitive levels throughout the late 1990s and the first few years of the 21st century. At or about the end of 2003, however, as a result of the conspiracy between UP and BNSF, UP succeeded in eliminating those competitive pressures and began to exercise monopoly power over Uinta Basin coal shipments, resulting in dramatically increased rates for Uinta Basin coal shippers.

8. Defendants' illegal conduct has injured each of the Oxbow companies that are plaintiffs in this action. Three Oxbow companies (Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, and Terror Creek LLC) each paid illegal fuel surcharges for the shipment of coal that they would not have paid but for the fuel surcharge conspiracy. Three Oxbow companies (Oxbow Carbon & Minerals LLC, Oxbow Calcining LLC, and Oxbow Midwest Calcining LLC) each directly paid illegal fuel surcharges for the shipment of petroleum coke ("petcoke") that they would not have paid but for the fuel surcharge conspiracy. Each of these plaintiffs is entitled under Section 4A of the Clayton Act, 15 U.S.C. § 15a, to damages for violation of Section 1 of the Sherman Act. In addition, as a result of UP's wrongful acquisition and maintenance of a monopoly in the Uinta Basin and its related conspiracy with BNSF, Oxbow

Carbon & Minerals LLC and Oxbow Mining, LLC, as well as all other shippers of coal, have paid inflated amounts to ship coal produced from the Uinta Basin. These Oxbow plaintiffs are entitled to damages and other relief under Section 4A of the Clayton Act for violations of both Section 1 and Section 2 of the Sherman Act.

**The Parties**

9. Oxbow Carbon & Minerals LLC is a limited liability company formed and organized under the laws of the State of Delaware, having its principal place of business in West Palm Beach, Florida. Oxbow Carbon & Minerals LLC contracts with UP for the rail shipment of coal from mines in the Uinta Basin of Western Colorado and Utah, including some of the shipments from the Elk Creek Mine operated by Oxbow Mining, LLC, as well as other Uinta Basin mines which obtain rail access along the "Central Corridor" rail line that runs from Denver, Colorado to Stockton, California. It also contracts with both UP and BNSF for shipment of petcoke from refineries located throughout the western United States including but not limited to California, Wyoming, and Kansas. Petcoke is a by-product produced from the process of refining petroleum into gasoline, aviation or diesel fuel and can be used as a utility and industrial fuel source or can be "calcined" for use in the process of making anodes for the aluminum, steel and titanium smelting industry.

10. Oxbow Mining, LLC is a limited liability company formed and organized under the laws of the State of Delaware and has its principal place of business in West Palm Beach, Florida. Oxbow Mining, LLC owns and operates the Elk Creek Mine near Somerset, Colorado, and has operated coal mines in Colorado for over 15 years. Some of the rail shipments from the mine are under contract with Oxbow Carbon & Minerals LLC; in others, Oxbow Mining, LLC contracts directly as the "shipper."

11. Terror Creek LLC is a limited liability company formed and organized under the laws of the State of Delaware and has its principal place of business in West Palm Beach, Florida. Terror Creek LLC owns and operates a coal blending operation, is an aggregator of coal and is involved in the marketing, sale and rail shipment of coal, and also holds the rail contracts directly or through Oxbow Carbon & Minerals LLC, acting as its agent, for shipments of stoker coal. Stoker coal is an egg-shaped coal generally used for fuel in automatically-fired stoves.

12. Oxbow Calcining LLC, formerly known as Great Lakes Carbon LLC, is a limited liability company formed and organized under the laws of the State of Delaware and has its principal place of business in West Palm Beach, Florida. Oxbow Calcining LLC owns calcining facilities served by rail in Enid, Oklahoma, Baton Rouge, Louisiana and Texas City, Texas. Oxbow Calcining LLC receives petcoke by rail, treats the petcoke at its calcining facility, and then ships calcined coke out to end users by rail.

13. Oxbow Midwest Calcining LLC is a wholly-owned subsidiary of Oxbow Calcining International. It is a limited liability company formed and organized under the laws of the State of Delaware and has its principal place of business in West Palm Beach, Florida. Oxbow Midwest Calcining LLC owns a calcining facility in Lamont, Illinois. Oxbow Midwest Calcining LLC receives petcoke by rail, treats the petcoke at its calcining facility, and then ships calcined coke out to end users by rail.

14. Defendant UP is a corporation formed and organized under the laws of Utah and has its principal place of business at 1416 Douglas Street, Omaha, Nebraska 68179. UP is the largest railroad network in North America. It serves primarily the western two-thirds of the United States and maintains coordinated schedules with other carriers to handle freight to and from other parts of the country.

15. Defendant BNSF is a corporation formed and organized under the laws of Delaware and has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is the second largest railroad network in North America and has offices and rail lines throughout the western United States.

**The Non-Party Co-Conspirators**

16. CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX has railway lines throughout the eastern United States and connects with rail partners in the west.

17. Norfolk Southern Railway Company ("Norfolk") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. Norfolk has railway lines in the eastern United States and connects with rail partners in the west.

**Jurisdiction and Venue**

18. This action is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15, § 26, to recover damages, treble damages, injunctive relief, costs, and reasonable attorneys' fees for the injuries sustained by Oxbow by reason of violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

19. This Court has jurisdiction over this Action under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337, and 1367.

20. This Court has personal jurisdiction over the Defendants and venue in this judicial district is proper pursuant to the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391. Defendants transact business, maintain offices or are found within this judicial district, have substantial aggregate contacts with this judicial district, and engaged in illegal conduct that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or

doing business in this District. The interstate commerce described below was and is carried on in part within this judicial district, and the wrongful conduct alleged in this Complaint was carried out in part within this judicial district.

## Factual Background

### I. CONGRESS ENACTED THE STAGGERS ACT TO FOSTER COMPETITION IN THE RAIL INDUSTRY, BUT CONSOLIDATION INCREASED OPPORTUNITIES FOR COLLUSION

21. The freight railroad industry in the United States has played a central role in the country's economic growth and in the laws designed to foster that growth and protect consumers through competition. The United States Supreme Court said over 100 years ago that "there is no other line of business carried on in our midst which is so intimately connected with the public as that conducted by the railways of the country." *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 336 (1897). Congress cited the misuse of rail service to stifle competition as one of the main reasons for passing the Sherman Act in 1890. Lawsuits against the rail industry formed one of the first subjects for enforcement of the Sherman Act.

22. For 93 years, between 1887, when Congress passed the Interstate Commerce Act, and 1980, railroad operations in the United States were conducted by a large number of federally-regulated railroads with rates for shipment of freight required to be published in tariffs filed with the Interstate Commerce Commission (the "ICC").

23. In 1980, Congress sought to introduce competition and market principles into the rail transportation industry. With the passage of the Staggers Rail Act of 1980 ("Staggers Act"), Pub. L. No. 96-448, 94 Stat. 1895, 49 U.S.C. § 10101, *et seq*., the railroads became free to set rates for rail transportation.

24. The policy of the Staggers Act is to rely on competitive forces, rather than government regulation, to improve the efficiency of railroad operations. Among other things, instead of having all rates set in accordance with mandatory tariffs, rail shippers and rail carriers were generally allowed to enter into rail transportation contracts whose terms were not subject to ICC review and approval. The Staggers Act also phased out across-the-board industry-wide rate increases. The objectives of the Staggers Act included the creation of a modern, competitive and healthy railroad industry that would serve the American business community, with competitive rates and concern for serving the customer base, particularly those that depend on rail freight services for the movement of products. As the House Committee Report for the Staggers Act stated with respect to 49 U.S.C. § 10709: "If anticompetitive behavior is alleged, under this section, the antitrust laws are the appropriate and only remedy available." H.R. Rep. No. 96-1035, 96th Cong. 2d Sess. 1, (1980) *reprinted in* 1980 U.S.C.C.A.N. 3978, 4003.

25. In 1995, Congress replaced the ICC with a new agency—the Surface Transportation Board ("STB")—which assumed some of the ICC's former functions.

26. More than 80% of all U.S. rail freight shipments move under terms that are not regulated by the STB or any other government agency. This case involves such non-regulated rail traffic.

27. The era between the passage of the Staggers Act in 1980 and the 1996 saw a dramatic consolidation of the freight rail industry. Before the Staggers Act, 35 Class I railroads operated within the United States. ("Class I" railroads are the largest national freight railroads according to annual carrier revenues.) Today, the industry is highly concentrated—only seven Class I railroads operate within the United States. Of these, the Defendants UP and BNSF (collectively, the "Western Railroads") in the west, and those railroads in the east who combined

or conspired with them—CSX and Norfolk (collectively, the "Eastern Railroads")—control the vast majority of rail shipments. These four Class I Railroads now receive approximately 90% of all freight rail revenue in the United States, leaving a highly concentrated industry with great susceptibility to collusion.

## II. TO OVERCOME OBJECTIONS THAT THE UP/SP MERGER WOULD HARM COMPETITION, UP AGREED TO PROVIDE TRACKAGE RIGHTS TO BNSF AND UTAH RAILWAY THAT IT SAID WOULD PRESERVE AND EVEN INTENSIFY PRIOR COMPETITION IN THE CENTRAL CORRIDOR AND FOR THE RAIL TRANSPORTATION OF UINTA BASIN COAL

28. The last consolidation in the freight rail industry's 1980-96 period of concentration was UP's 1996 merger with Southern Pacific Railroad ("SP"). At the time of the merger, UP agreed to provide trackage rights to BNSF along the Central Corridor, a route critical to the shipment of various commodities including coal from mines in the Uinta Basin where Oxbow's Elk Creek mine is located. Responding to the objections of those who asserted that only divestiture of the Central Corridor would preserve competition, UP represented that enabling UP to retain the Central Corridor, while providing trackage rights to BNSF and Utah Railway, would not only preserve the prior vigorous levels of competition, but would intensify it. This competition historically had limited the ability of any one railroad to raise rates on shippers of Uinta Basin coal, including rates paid by shippers served only by one railroad.

29. The UP/SP merger was one of the largest in the history of American railroads. It merged two of the three largest freight railroads in the western United States, leaving no significant Class I carrier to compete in the west besides UP and BNSF. To obtain approval for this merger, UP needed to convince the STB that the merger was in the public interest.

30. Shippers and shipper organizations were concerned that railroad consolidations such as the UP/SP merger increased the chances for successful collusion affecting rates for the

shipment of coal, particularly in the Central Corridor. Coal is a particularly important commodity to the rail business, accounting for over 40% of the freight shipped by rail in the United States—a far higher percentage than any other product.

31. The Central Corridor is the only rail line that provides for effective shipment of coal from the mines in the Uinta Basin.

32. The Uinta Basin is a coal mining region in western Colorado and eastern Utah that produces a very desirable type of coal. Uinta Basin coal is uniquely high in British Thermal Unit ("BTU") content—which means that it produces high energy when it is burned. It burns clean and has an environmentally-attractive low sulfur content. Oxbow's Elk Creek Mine is located in the Uinta Basin. Coal mined by one mine in the Uinta Basin is fungible and entirely substitutable with coal mined by another mine in the Uinta Basin, whether the mine is located in Colorado or in Utah.

33. The sale of Uinta Basin coal depends on the railroads and the Central Corridor. In the Uinta Basin, there are no rivers that provide access to barge traffic. Although trucking or other modes of transportation may be feasible for certain distances, coal mines in the Uinta Basin have no meaningful substitute for rail transportation of coal for distances of approximately 100 miles or more.

34. The competition that existed in the Uinta Basin limited the rates that could be charged to mine owners, including the rates to ship coal from those Uinta mines served by only one railroad. Because Uinta coal is generally fungible regardless of which mine produces it, utilities and industry purchasers of such coal are particularly price-sensitive. Competition thus limited the prices a railroad could charge to the mines it alone served because excessive increases to such mines would have prevented the mines from delivering the coal to customers at

a competitive price. Accordingly, the need to limit the "as delivered" price of Utah/Colorado coal constrained the amount that a railroad could charge shippers for shipping such coal.

35. BNSF repeatedly recognized (and said, including in 2000) that BNSF served as a competitive constraint on the prices that UP could charge for shipping "Utah/Colorado" coal even though it served no Colorado mines. UP's CEO similarly acknowledged even in those geographic regions where there is only one railroad serving a facility, there are market factors that create "competitive constraints" on the prices that railroads can charge in those regions.

36. Before filing for merger approval, UP and SP entered into settlement agreements with both BNSF and Utah Railway, which were adopted as conditions of the merger. The settlement agreement with BNSF included a grant of certain trackage rights to BNSF over 4,000 miles of UP and SP track (the "trackage rights agreement"). In the Central Corridor through the Uinta Basin, the agreement gave BNSF access to rail shippers that had previously been served by both UP and SP, and allowed BNSF to serve new facilities that were located along the tracks of the merged UP/SP after the merger.

37. Utah Railway is a Class III carrier that, among other things, provides rail service to and from coal mines in Utah. Under its settlement agreement with UP and SP, Utah Railway obtained trackage rights from Utah Railway Junction, near Salt Lake City, Utah, to Grand Junction, Colorado, as well as rights to serve a coal loading facility in Utah and an additional Utah coal mine. These rights enabled Utah Railway to pick up coal at the Utah mines to which it had existing rights and access rights via the agreement, and transport the coal along the Central Corridor to junctions where BNSF, UP or both, would provide further transportation service. As Utah Railway stated at the time, the agreement "will provide the market discipline to assure competitive rates for coal customers in the western region by means of its cost-efficient

operations and access to Utah coal acting either in conjunction with the BNSF or with the UPSP."

38. UP understood (and said) that, in the absence of collusion, the trackage rights it contracted to give BNSF and Utah Railway would preserve, and intensify, the competition that had previously existed with respect to the shipment of Uinta Basin coal. UP further understood (and said) that the merger would lead to greater efficiency in connection with the shipment of Utah and Colorado coal and that this would enable, and competition would require, UP to continue SP's prior policy of aggressive pricing. UP also understood (and said at the time of the merger) that the super-compliant, high-BTU coal that Oxbow and other Uinta miners produce is "particularly well-suited to export markets," and that the lower costs that resulted from its merger with SP would allow for "significant increases" in exports of Colorado coal to Asia.

39. UP further understood (and said) that, in the absence of collusion, vigorous competition would force UP to provide a wide range of benefits for shippers including, among other things: (i) to invest in infrastructure to provide reliable service and opportunities for connections by proposed competitors; (ii) to provide competitive rates to facilitate competition that required access to shippers dependent on UP tracks; and (iii) otherwise, to promote access to areas it served.

## III. UNTIL UP AND BNSF BEGAN TO COLLUDE IN 2003, COMPETITIVE PRESSURE FROM BNSF PREVENTED UP FROM RAISING RATES TO MONOPOLY LEVELS IN THE UINTA BASIN

40. Until the decision of UP and BNSF to conspire in 2003, competitive pressure from BNSF prevented UP from substantially raising rates for transporting Uinta Basin coal, and rates remained at competitive levels.

41. From the time of the UP/SP merger until UP and BNSF began to conspire in 2003, BNSF moved to take advantage of its trackage rights and become an effective competitor in the Central Corridor, both generally and with respect to coal. BNSF represented in 1997 that it would "not be satisfied until the conditions are working as intended to provide customers with a full substitute for the competition that was lost" when SP merged with UP. Thus, prior to the conspiracy, BNSF did not hesitate to object when it felt that UP was deliberately impeding its efforts to take full advantage of its trackage rights. BNSF complained among other things about UP's practice of crewing UP's trains first, notwithstanding an obligation to make sufficient crews available for BNSF, and of blocking switching stations.

42. Throughout the period, BNSF significantly increased the amount of traffic that it carried using its Central Corridor rights, provided daily merchandise service along the Central Corridor that enabled it to take on any new business that it was able to win, and established BNSF as a realistic alternative to UP in the view of Central Corridor shippers. BNSF substantially invested in improving its Central Corridor trackage rights lines. BNSF also made numerous bids for coal sourced in Utah and was successful on a number of occasions in acquiring the business.

43. As the STB recognized a few years after the merger, "pre-merger UP vs. SP competition *has* been effectively replicated by post-merger UP vs. BNSF competition." As the STB also recognized, the "most important indicator of the impact of BNSF's Central Corridor traffic rights is the effect that BNSF's presence in the market has on the rates offered by UP." Throughout the period prior to the conspiracy, the competitive constraint posed by BNSF and Utah Railway had the intended effect of preventing UP from significantly raising rates on Oxbow and other coal shippers in the Uinta Basin. As the STB also found, "BNSF is indeed an

effective competitor in the Central Corridor," and "its presence has placed a competitive discipline on UP's rates both in the Central Corridor ***and with respect to Utah/Colorado coal***" (emphasis added).

44. UP and BNSF repeatedly internally recognized (and publically said) in the period prior to the conspiracy that BNSF exerted substantial competitive pressure on UP. In 1998, for example, UP quoted with approval the statement of Utah Railway's Executive Vice President that "BNSF has shown itself to be an aggressive competitor for business in our corridor" and has been "vigorous in bidding for new business." UP reported in 1999 that Utah Railway's trackage rights—which could serve as a competitive constraint only if BNSF was available to serve as a competitive alternative to UP—"continue to act as a competitive check on UP" and that "UP's rates for Utah and Colorado coal have remained highly competitive." UP represented in July 2000 that Utah Railway's "trackage rights continue to act as a competitive check on UP."

45. BNSF recognized in a 2000 filing: "There can be no real doubt that BNSF service offerings have been—and remain—a level which provides a 'realistic choice' for shippers." BNSF added that "BNSF has served as an effective competitive alternative to UP, and the evidence submitted by UP establishes that BNSF's presence has placed a competitive discipline on UP's rates in general ***and in the Central Corridor and with respect to Utah/Colorado coal***" (emphasis added).

## IV. UP AND BNSF AGREED TO FIX FUEL SURCHARGES AND NOT TO COMPETE TO SHIP COAL

46. The period between 1996 and 2003 was not just a period of competitive prices in the Uinta Basin. It was a period of competitive prices generally for commercial rail freight service.

47. Not everyone, however, was pleased by low prices. As one BNSF executive commented in 2002:

> We need to be able to achieve price rate improvement. ***How can we do this if the other competing railroads do not do this at the same time?*** (Emphasis added.)

48. The solution that the Railroads found to this competitive predicament was collusion. They were well poised to do so. The freight railroad industry is conducive to collusion. It is heavily concentrated, there are significant barriers to entry, services are interchangeable across railroads, shippers are price sensitive, and the demand for freight rail services is generally inelastic.

49. Beginning in the second half of 2003, UP and BNSF entered into a conspiracy to increase revenue by (i) imposing across-the-board, non-negotiable "fuel surcharges" on all customers and for all products; and (ii) agreeing not to compete with each other to ship coal. During this period, UP and BNSF jointly departed from prior practice in a number of ways, including (i) the joint imposition of fuel surcharges that formed the basis for the Court's decision in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 587 F. Supp.2d 27 (D.D.C. 2008); (ii) the unexplained cessation of competitive bidding for each other's coal customers in the Powder River Basin; (iii) the elimination of the competitive constraint that BNSF had imposed on UP's pricing in the Uinta Basin; (iv) significant increases in rates for shipment of coal in both the Powder River Basin and Uinta Basin; (v) increases by both BNSF and UP in the fuel surcharges for coal over and above the standard fuel surcharge imposed on all products as a result of the conspiracy; (vi) the use of public pricing in contravention of the STB's prior recognition that the confidentiality of prices was an essential check against collusion in this industry; and (vii) the joint refusal to offer long-term contracts notwithstanding the existing demand for such contracts. These departures from past practice, both individually and

collectively, were contrary to the individual self-interest of each party in the absence of collusive assurance that the other party would abide by their common agreement.

**A. The Fuel Surcharge Conspiracy**

**1. Prior to 2003: The age of the All-Inclusive Index ("AII")**

50. Following the passage of the Staggers Act, railroads typically entered into private freight transportation contracts that included cost-adjustment provisions. The adjustment provisions typically relied on a price index called the All Inclusive Index ("AII") or a price index called Rail Cost Adjustment Factor ("RCAF"). The Association of American Railroads ("AAR")—a railroad trade organization that the four major Railroads control and dominate—publishes the AII, and the STB publishes the RCAF. As the name "*All Inclusive* Index" suggests, the AII and RCAF weighted a number of price inputs, labor, fuel, materials and supplies, equipment rents, depreciation, interest and other expenses, so that the index would reflect the actual impact of particular price increases on overall rail transportation costs. This meant that the AII and RCAF would capture any actual increase in fuel prices, no matter how significant. In fact, James R. Young, the President of UP, acknowledged publicly that the RCAF "looks at actual costs through the industry."

51. Prior to 2003, some of the Railroads attempted to impose fuel surcharges on rail freight transportation. But the Railroads' application of these surcharges was neither uniform nor consistent, and each Defendant had different fuel surcharge formulas.

**2. 2003: The inception of the fuel surcharge conspiracy through the Association of American Railroads**

52. In 2003, the Defendants and the Eastern Railroads conspired to use fuel surcharge formulas as the means to create an across-the-board rate increase. Defendants conspired to overcome the obstacle that fuel cost increases were already accounted for in the AII and RCAF;

they embarked on a scheme to remove the fuel component from the AII, to refuse to use the RCAF in contact rate adjustment formulas, and to apply a brand new index, combined with a "fuel surcharge" to adjust rail rates. This scheme allowed the railroads pretextually to label across-the-board price increases as a "fuel surcharge" to recover increased fuel costs, when what they were actually doing was simply raising total freight prices by a given (and agreed) percentage that was the product of conspiracy. The pretextual fuel surcharge was not based on actual cost.

53. The Defendants and those acting in conspiracy with them adopted this "fuel surcharge" through a series of coordinated actions using a common organization. Top executives of the Railroads met frequently, including at the biannual meetings of the National Freight Transportation Association and at AAR board meetings, to discuss "industry developments." The AAR was a particularly potent tool to coordinate and monitor a conspiracy because: (i) the Chief Executive Officers of the four Railroads constitute four members of the AAR's Board of Directors; (ii) the AAR Board of Directors meets regularly and its members regularly communicate between meetings; (iii) many former AAR employees and staff members are now employed by Class I railroads; and (iv) the AAR publishes the AII.

54. At the Spring 2003 meeting of the AAR and, in the months that followed, executives of the four Railroads conspired on a plan to use a new type of ostensible "fuel surcharge."

### 3. The Railroads adopted a new "*All* Inclusive Index – *Less Fuel*" ("AII-LF") and used it to coordinate fuel surcharges

55. The plan began with the Western Railroads—UP and BNSF, as part of their joint plan to reduce competition and increase revenues and profits. Prior to April 2003, BNSF had assessed a fuel surcharge based on the actual miles that freight traveled. In April 2003, a BNSF

executive called a UP executive and asked if he had "heard anyone charging a fuel surcharge in miles," and the following month, BNSF abandoned a mileage-based program.

56. UP and BNSF then conspired to use the same industry fuel index for new fuel surcharge formulas that calculated a surcharge as a percentage of the base rail transportation rate. Previously, they used fuel surcharges for a minimal portion of their contracts and adjusted their respective fuel surcharges using different indexes. UP had calculated its fuel surcharge based on the West Texas Intermediate ("WTI") Index; BNSF based its surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price ("HDF") Index. In or about July 2003, however, pursuant to their agreement, UP suddenly switched to the HDF Index for calculation of its fuel surcharges. UP made this sudden switch even though, only three months earlier, it had demonstrated its commitment to the WTI Index by undertaking modifications to surcharges based on that index.

57. UP and BNSF also conspired to apply the HDF Index in the same way. They selected "trigger" points that operated to impose identical rail fuel surcharges on shippers. Although UP and BNSF ostensibly used different thresholds as "trigger points" ($1.35 for UP and $1.25 for BNSF), this difference had no practical effect. The UP and BNSF fuel surcharge programs provided for identical fuel surcharges once the $1.35 threshold was reached—and in practice, that threshold was always exceeded. UP and BNSF both increased the surcharge by 2% for every twenty-cent increase in the HDF Index above $1.35 per gallon. Beginning in July 2003, BNSF and UP made their standard rail fuel surcharges identical.

58. UP and BNSF coordinated the timing of their fuel surcharges. They each applied the rail fuel surcharge to shipments beginning in the second month after the month in which there was a change in the HDF Index average price calculation: if the average price changed in

January, UP and BNSF would announce their new fuel surcharge percentage on February 1 and then apply the surcharge to shipments in March. Defendants published their monthly fuel surcharge percentages on their websites to enforce against deviation from the pricing conspiracy.

59. UP and BNSF thus simultaneously selected and adopted the same novel, arbitrary and complex combination of features for their rail fuel surcharges, including using the same HDF Index, setting functionally identical trigger points and applying the surcharge at the same time after the HDF Index price had changed. UP and BNSF adopted this common pricing despite the fact that their rate and cost structures, customer bases, fuel sources, fuel costs, and their relationship with the rail rate were different.

60. Figure 1 reflects the absolutely lock-step standard carload fuel surcharges the two companies were to apply for nearly the next four years:

**Figure 1**




61. Even after conspiring to coordinate fuel surcharges, however, UP and BNSF still had to address a significant barrier to widespread application of the fuel surcharge to raise rail rates. Most contracts contained rate adjustment provisions that utilized periodic changes in the

AII or the RCAF, both of which accounted for changes in fuel costs, when adjusting rates over a contract term. This left no objective basis for a separate and additional fuel surcharge.

62. In the fall of 2003, UP and BNSF commenced an effort to get the two Eastern Railroads to conspire on a fuel surcharge program that would enable the Railroads not to use the RCAF to adjust rail rates, to remove the fuel cost component from the weighted AII, and to substitute it with artificially high rail fuel surcharges calculated as a percentage increase of the base rail transportation rate, regardless of actual fuel costs. At AAR meetings in late 2003, including October 2-3 and December 11-12, the Railroads conspired to create and implement coordinated fuel surcharge programs.

63. Through combination or conspiracy the Railroads, which collectively dominate the AAR and its board, caused the AAR to develop and announce in December 2003 a new index that did not include fuel costs. That index, known paradoxically as the ***All***-Inclusive Index ***Less Fuel*** ("AII-LF"), was similar to the AII and RCAF but excluded a component for changes in fuel costs. The announcement of the AII-LF, and the underlying decision to create the new index, was a product of the collective action of the Defendants and those acting in conspiracy with them. The AII-LF specified the fourth quarter of 2002 as its base period.

64. Never before in its nearly 60-year history had the AAR separated out fuel costs from the AII index, and the STB-published RCAF still contains a fuel cost component. The railroads did not decide it was appropriate to exclude fuel from the index in 1979, when the law still allowed common rate-setting based upon costs and the Arab Oil embargo pushed domestic crude oil prices to their all time inflation-adjusted high of more than $99/barrel in 2010 dollars. The railroads did not do so in 1998, when crude oil prices had dropped to $16/barrel by the same

measure. They did not do so in 2000, when prices had more than doubled to almost $35/barrel by that measure.

65. UP and BNSF (and the Eastern Railroads in conspiracy with them) planned to create a new index without a fuel cost component not because it better ***tracked*** their costs than the prior indexes; but because it did ***not***. Moreover, they decided to use this new index in combination with pretextual "fuel surcharges" to conceal their conspiracy to impose price increases across the board without regard to recovering actual fuel costs. The Railroads chose a method for calculating rail fuel surcharges that did not correspond with actual or unanticipated increases in fuel costs. The AII and RCAF, in contrast, had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors. Following publication of the AII-LF, the Western Railroads and the Eastern Railroads uniformly applied rail fuel surcharges using the "base rate" method. This method calculated rail fuel surcharges as a percentage of the total rate charged for the freight shipment, regardless of how much fuel contributed to costs, or whether the particular trips used more fuel or less. This made the new "base rate" method a ***less*** accurate fuel cost recovery method than the methods that the industry had previously used for decades. These conspiratorial fuel surcharges were applied to shipments of coal and petcoke, including shipments by the Oxbow plaintiffs.

66. Just as UP and BNSF had conspired to operate in lockstep based on the HDF Index, the Eastern Railroads also moved in lockstep with their "fuel surcharges" based on the WTI Index. They each conspired: (i) to apply a "fuel surcharge" whenever the monthly average WTI price exceeded $23 per barrel crude oil; (ii) to charge a "fuel surcharge" of 0.4 percent for every $1 above the monthly average WTI price of $23 per barrel; (iii) to time the "fuel

surcharge" in the same way; and (iv) to publish their monthly fuel surcharge percentages on their websites to enforce against deviation from such pricing.

67. The Eastern Railroads thus also simultaneously selected and adopted the same novel, arbitrary and complex combination of features for their rail fuel surcharges, in this case using the same WTI Index, setting the same trigger point and applying the surcharge at the same time after the WTI Index price had changed.

68. As Figure 2 reflects, the Eastern Railroads, like their Western counterparts, imposed the same fuel surcharge month after month for years. The Railroads also declined to undercut one another on fuel surcharge prices, even though the surcharges far exceeded each railroad's actual increase in fuel costs:

**Figure 2**




69. The four Railroads conspired not only to charge illegal fuel surcharges, but also to use the same cover story. Following AAR's publication of the AII-LF, the Railroads all began to apply rail fuel surcharges as separate items on shipping bills. The Railroads also all inaccurately

represented the rail fuel surcharges to be charges they imposed merely to account for unanticipated increases in fuel prices. In fact, these charges did not merely account for fuel costs; they were a rate increase.

70. The Railroads coordinated and enforced their rate-based fuel surcharges. For instance, in November 2004, a BNSF executive "shopped the concept" of a mileage-based fuel surcharge with his counterparts at the other railroads, and they "pushed back, as expected." The following year, in an internal assessment, BNSF recognized that its hugely profitable fuel surcharge program depended upon no one deviating from the plan: "While fuel surcharges are working well now, it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

71. The "convergence" in rail fuel surcharge methodologies and prices among railroad competitors raised concerns of industry experts. At the time, one analyst concluded that the fuel surcharges were "not supported" by fuel cost increases and found it odd that "the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives," as a "way to gain significant market share." An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity found an over $6 billion discrepancy between the Railroads' rail fuel surcharge revenue and their publicly reported fuel costs between 2003 and early 2007. A 2010 joint report by the United States Departments of Agriculture and Transportation, titled Study of Rural Transportation Issues, similarly found: "There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits. From 2001-2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."

**4. The Railroads acted contrary to their independent self-interest**

72. There was no business or other procompetitive reason why UP, BNSF, CSX and Norfolk would collectively adopt and publish the AII-LF. The AII and RCAF had been appropriately "weighted" to reflect the relative impact of fuel costs as compared to other cost factors. Reworking the index to operate "less fuel (LF)" and substituting a pretextual "fuel surcharge" formula that would be applied to the entire base rate, ensured that the formula would drive rate increases far out of proportion to the actual increases in fuel costs for the relevant rail movement.

73. In a competitive environment free of unlawful collusion, carriers with lower fuel costs would negotiate a fuel cost adjustment provision that closely tracked actual costs in an effort to increase competition for additional business and revenues and increased shares of business. However, starting in 2003, the Railroads uniformly refused to negotiate any changes to their surcharge formulas even when doing so would have allowed them to capture additional business, revenue and market share rather than engage in competitive behavior. Each Railroad instead restricted its freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on a percentage of the base transportation rate. The Railroads did not compete with one another for sales but instead collectively maintained the artificially-high fuel surcharges.

74. If the Railroads had wanted to recover actual fuel costs efficiently and accurately, they would never have adopted uniform percentages applied to the base rate. Actual fuel cost as a percentage of operating cost and fuel efficiency differs widely among the railroads and individual rail movements. Thus, absent conspiracy, it is inconceivable that the four Railroads would each independently design their fuel surcharges to arrive at the identical percentage month

after month, for a period of more than three years. The only way to achieve uniform pricing of fuel surcharges (and especially to achieve a pricing that exceeds actual anticipated rises in fuel costs) was by a conspiracy to decouple fuel prices from the historical railroad cost indices and to then conspire to create new uniform indices and trigger points for computing the resulting stand-alone fuel surcharge percentages.

75. Even within a particular railroad, actual fuel costs for routes and trains vary. A uniform fuel rate applied as a percentage of base rates is inefficient because it taxes routes based upon the rates that the railroad has been charging for them, rather than the amount of fuel the routes require. Accordingly, a percentage surcharge forces Oxbow to pay more simply because it was paying more already, regardless of the amount of fuel required by the trip.

76. The rail fuel surcharges also did not correspond with the variation of fuel prices affected by free-market influences. They did not take into account the "hedging" activities of some of the railroads that affected the actual fuel costs incurred. Nor did they account for the phase-out in the railroad diesel fuel tax that occurred between 2004 and 2007.

77. The Railroads' actions thus were not independent responses to a common problem of increasing actual fuel costs. The only purpose in taking these collective actions was to assess a stand-alone fuel surcharge designed to substantially increase revenues rather than recover actual fuel costs, to act illicitly in concert with one another to set the surcharge and demand them from shippers and customers, and to ensure collective enforcement of the conspiratorial program. The rail fuel surcharges were intended to achieve—and did achieve—across-the-board profits and increases in the prices the Railroads charged for unregulated rail freight shipments.

78. By conspiring on rail fuel surcharges, each railroad was acting against the independent business self-interest it would have had absent the conspiracy. In a competitive environment free of combination and conspiracy, carriers with lower fuel costs would impose a lower rail fuel surcharge. That way, they could obtain business from less efficient competitors. It was the combination and conspiracy not to compete that made the uniform, rate-based fuel surcharges an effective strategy.

**5. The Railroads changed other practices to facilitate the conspiracy**

79. The Railroads also collectively changed aspects of their pricing and other behavior to advance the conspiracy. Prior to adopting the base rate method, the Railroads had allowed long-term contracts of five years or more with clauses based on the AII, RCAF and other indices that bore a close nexus to the actual fuel costs associated with handling the traffic. After the Railroads announced the AII-LF, the Railroads resisted entering into long-term contracts with shippers and instead entered into contracts for much shorter time periods, making it easier to implement the fuel surcharges.

80. The Railroads forced customers to abide by the new rate adjustment method even though most shippers, including Oxbow, preferred the system in place before 2003 that provided for long-term contracts that allowed shippers to ascertain their costs and operating expenses with considerable certainty. In a competitive market, at least some railroads would see a benefit in long-term contracts, because they allow railroads to lock-in customers and minimize risks in fluctuating demand.

81. BNSF, UP, CSX and Norfolk also took other collective actions to enforce the conspiracy and make it more effective. For example, pursuant to the conspiracy, they limited the previously prevailing practice of sending a customer a single invoice for the entire transport in

circumstances where more than one railroad (usually an Eastern and a Western Railroad) was involved in long-distance freight transport. Instead, the Railroads, pursuant to the conspiracy, increasingly switched to having each railroad on a multi-railroad trip send a separate invoice (and thus each could separately impose its own fuel surcharge). This practice also made it easier for each railroad to recoup its share of the supra-competitive profits from the fuel surcharge program imposed by the conspiracy.

**6. Increasing the fuel surcharge for coal**

82. More than a year after the commencement of the conspiracy, UP and BNSF agreed to impose even higher rate-based fuel surcharges on transportation for coal. As coal accounts for more than 40% of the freight shipped by rail, a conspiracy to further increase the already illegal fuel surcharge for coal shipments was especially lucrative.

83. As with all other products covered by the fuel surcharge conspiracy, UP and BNSF continued to calculate their fuel surcharges as a percentage of the base rate, apply the fuel surcharge on a "take it or leave it" basis, use the HDF index and the AII-LF, and apply changes to the HDF average price calculation to shipments beginning in the second month following this change.

84. Beginning in July 2004, however, while using the same percentage increment that it applied to all other products (.5%), BNSF began increasing the fuel surcharge percentage for every 4 cent increase in the HDF index, rather than for every 5 cent increase as applied to other products (effectively yielding an increase of .625 percent for every 5 cent increase). In November 2004, UP began increasing the percentage by .75 percent for every 5 cent increase. The formulas employed by UP and BNSF thus effectively used the fuel surcharge conspiracy core predicates and then increased the charges even further—by amounts that were almost

identical. BNSF's illegal fuel surcharges for coal under these formulas differed from UP's by a little over one-tenth of one percent (.00125). Thus, for the duration of the conspiracy, coal fuel surcharges either exceeded or (for the first year of the conspiracy) equaled the illegal fuel surcharges applied to all other products, including petcoke.

**7. The Result: supra-competitive profits**

85. Defendants and those who conspired with them reaped huge, supra-competitive profits as a result of the success of their conspiracy. Through their conspiracy to coordinate on fuel surcharges, the Railroads realized billions of dollars in revenues in excess of their actual increase in fuel costs from the customers on whom they imposed the surcharge. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent," and "it's only been the last couple of years" that "the financial returns in the business has [sic] started to move in the right direction."

86. Thus, although fuel prices increased between 2003 and 2008, the Defendants and those who conspired with them continued to realize increasing profits each year of the conspiracy. A report commissioned by the American Chemistry Council estimates that between 2005 and 2007, UP's fuel surcharge formula alone produced $1.369 billion in revenues over and above UP's actual fuel costs.

**8. The STB declared it an "unreasonable practice" and "mislabeling"**

87. On January 25, 2007, the STB concluded an investigation and public proceeding concerning railroad fuel surcharge practices by issuing an administrative decision finding that the Railroads' practice of computing rail fuel surcharges as a percentage of the base rail freight rate for regulated rail freight traffic was an "unreasonable practice" because the method "stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular

traffic to which the surcharge is applied." Rail Fuel Surcharges, STB *Ex Parte* No. 661 (Jan. 25, 2007). Thus, the STB concluded:

> [I]mposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for the particular movement to which the surcharge is applied, is a misleading and ultimately unreasonable practice. *Id.* at 7.

88. The STB also determined that the term "fuel surcharge" used by the Railroads was itself deliberately misleading:

> The term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. ***If it is used instead as a broader revenue enhancement measure, it is mislabeled***. This sort of mislabeling appears designed to avoid the type of response a carrier would likely receive if it were to honestly inform a shipper that a higher rate was being imposed to recover not only the increased cost of fuel serving that shipper, but also the increased cost of fuel for another shipper's traffic—which is what would often occur under rate-based fuel surcharges. *Id.* at 6-7 (emphasis added).

89. Although the conclusions the STB reached about the fuel surcharge apply to all of the instances in which the railroads applied fuel surcharges, the STB's decision did not. In that decision, the STB explicitly noted that it was addressing rate-regulated rail freight traffic only (as opposed to non-rate regulated traffic addressed in this Complaint) and that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

90. Pursuant to the conspiracy, the Defendants and those who conspired with them continued to apply the same unreasonable fuel surcharge practices addressed by the STB by insisting on a "take it or leave it" basis that these formulas be included in the private rail freight transportation contracts, and other unregulated freight transport, at issue here. These misleading and unreasonable practices removed competitive constraints and raised shipping costs for shippers such as Oxbow.

### B. BNSF Agreed Not to Compete for Uinta Basin Coal, Giving UP an Effective Monopoly, and the Railroads Generally Agreed Not to Compete for New Coal Business

91. At the same time that UP and BNSF agreed with their eastern counterparts to impose functionally identical across-the-board rate-based fuel surcharges on their customers, they also agreed to cease competition for each other's coal customers. This conspiracy prevented competition on base rates, rate adjustment provisions (including for changes in fuel costs), and service terms that would have undercut the fuel surcharge conspiracy for the commodity that represented the greatest percentage of railcar traffic, and enabled BNSF and UP to impose significant rate increases and markedly inferior service terms on their existing customers. As part of the agreement, BNSF agreed not to compete to serve shippers of Uinta Basin coal.

92. Prior to 2004, in most of the Western United States UP and BNSF had vigorously competed to gain market share. For coal mines in the Powder River Basin, located in Wyoming and Montana, shippers served by more than one railroad regularly received more than one competitive bid, and large coal transportation contracts regularly changed hands.
In 2002, for example, BNSF won a bid to transport 7 million tons of Powder River Basin coal to Georgia Power's Scherer plant, one of the largest power plants in the country, which had previously been served by UP. In March 2003, UP underbid BNSF to win a major coal contract from the Omaha Public Power District ("OPPD"), which had previously been served by BNSF. The five-year contract called for delivery of 2.4 million tons of coal per year from the Powder River Basin. After its loss of the OPPD contract to UP, BNSF secured a new 10 million ton per year contract with Dynergy, which had previously been served by UP. Wall Street analysts

estimated that losing the Scherer and Dynergy business reduced UP's coal transportation revenue by $50 million in 2004 alone.

93. As the STB found, after the UP/SP merger (but prior to the conspiracy) rail competition for Colorado coal and Utah coal was stronger than it was prior to the merger, BNSF was an effective competitor to UP in the Central Corridor, and BNSF had placed competitive discipline on UP's rates both in the Central Corridor and specifically with respect to Utah/Colorado coal.

94. Starting in or about 2004, however, the railroads stopped competing for new coal business. UP and BSNF stopped offering competitive bids for one another's customers. As a result, the incumbent railroad retained the business no matter what unfavorable terms it sought to impose.

95. As an example, prior to 2004, Ameren Corporation, the fifth largest coal consumer in the United States, saw railroads regularly compete for its business. During that period, the non-incumbent railroad typically either would successfully compete to take business from the incumbent railroad through lower rates, or the incumbent railroad would retain the business by reducing its rates. By contrast, in every instance from 2004 to 2010 when Ameren issued bids for rail rate quotes for its competitively served plants, the incumbent railroad both retained the business and significantly increased rates. This was because the non-incumbent's quoted rate or tariff was, on average, 43 percent higher than the rate of the incumbent railroad. Ameren also experienced a number of instances of what it has referred to in testimony as "non-responsive bidding"—*i.e.*, no bids at all in response to a request, responses with extreme one-sided conditions that made the quotation unacceptable, or bids that varied from Ameren's bid parameters.

96. Also in departure from prior practice, UP and BNSF refused to quote rates to locations where a shipper served by one railroad could access the competitor by building out tracks. For example, between 1990 and 2003, Ameren had often obtained competitive quotes in advance of constructing facilities that enabled it to obtain competitive access to its plants through constructing build-outs, forming short-line railroads, and building barge facilities. After 2003, both BNSF and UP refused to quote a rate unless the track had been constructed.

97. AES Corporation experienced a similar lack of competition when it attempted to negotiate a new contract in 2011. The starting point for negotiations with BNSF and Kansas City Southern was 100% higher than a contract the utility had signed in 2005 for deliveries to its Shady Point plant in Bonanza, Oklahoma. The utility never received a competitive rate from UP.

98. Similarly, while OPPD was able to secure competitive terms from UP in 2003, when OPPD's contract ended in 2008, OPPD could not obtain a competitive quote from BNSF. Its contract rate with UP increased by 90 percent, and it lost service and delivery guarantees from its prior agreement.

99. The experience of Ameren, AES, and OPPD after 2003 was typical of coal shippers generally. Individuals in the business of negotiating with the Railroads observed these anticompetitive bidding practices over the course of multiple negotiations. A railroad would offer an unrealistically high bid when bidding as the non-incumbent railroad and justify the bid as the supposed "market rate." When bidding as the incumbent, however, the same railroad would offer a far lower bid as the supposed "market rate." In these negotiations, the non-incumbent railroad would not attempt to justify the invariable quotation of a non-competitive rate as being caused by capacity constraints, cost disadvantages, or some other purported reason that prevented it from profitably taking on new business at a rate lower than the exorbitant non-

competitive rate it was quoting. Instead, the non-incumbent railroad would simply declare the exorbitant rate as the "market rate" with no additional explanation offered and even though the incumbent railroad was offering a significantly lower, but nevertheless still high, rate.

100. Nor could the non-incumbent railroads have credibly justified their non-competitive bids as resulting from capacity constraints or inherent cost advantages even had they offered such a justification. The railroads had ample capacity to take on new business profitably throughout the period, and the railroads continued to fail to compete even during the economic downturn and period of reduced demand that began in 2008. Capacity constraints also could not have accounted for the uniformity of the failure to compete for new coal business throughout the period regardless of destination. Nor could capacity constraints have explained the decision to favor only existing business, particularly when each railroad would have no way of knowing that the railroad's competitor had similarly chosen not to compete for new business. Nor can inherent cost advantages explain why a market in which customers ***saw*** competitive bidding and frequently switched railroads, ***transformed*** into one afterwards in which non-incumbents stopped making offers that were even remotely competitive and customers had no choice but to remain with incumbents.

101. At the same time UP and BNSF stopped quoting competitive rates for each other's incumbent business, UP and BNSF also abandoned what had been their practice of negotiating off the rates they had quoted. Previously, shippers could make counteroffers and negotiate. Now, the incumbent railroad refused to negotiate, because it knew that the shippers would not face a competitive alternative.

102. As part of the agreement not to compete with UP for customers, BNSF agreed that it would not utilize its trackage rights to compete for customers shipping coal from the Uinta

Basin. It therefore stopped submitting competitive bids for Utah coal and ceased to serve as a competitive constraint on UP prices in the region. This failure persisted even as UP began to raise rates significantly in the Uinta Basin, thereby increasing opportunities for BNSF to take Utah coal business from UP. As a result, UP acquired monopoly power in the Uinta Basin, and competition for coal shipments from the Powder River Basin ceased as well.

103. Against the background of historical competition, and the decision of UP and BNSF to join the fuel surcharge conspiracy, their simultaneous decision to cease to compete for business was not the natural or expected result of duopoly, much less "coincidence."

104. Prior to the conspiracy, neither UP nor BNSF could afford to raise rates or offer inferior service terms unilaterally without risking a significant loss of business to the other as BNSF learned when it attempted to raise rates unilaterally on OPPD in 2003, and UP learned when it lost the Georgia Power and Dynergy contracts to BNSF.

105. That the railroads achieved this result afterwards was not the result of unilateral action that just happened to be the same. Indeed, in advocating for approval of the merger, UP specifically attacked suggestions by witnesses that coal rates would be subject to tacit collusion. According to UP, a strategy of refraining from bidding aggressively to increase rate levels would be "dangerous in the extreme and could readily result in a multi-year loss of substantial traffic and associated revenue." In particular setting rates at higher levels for Utah/Colorado coal "would risk the loss of traffic to a Utah Railway-BN/Santa Fe interline movement."

106. UP further mocked as the "esoterica of the classroom, not the stuff of facts," the suggestion that UP and BNSF might "magically" arrive at a "simple understanding that each would not aggressively pursue business in corridors that the other had dominated in the past, corridors where they had trackage rights or corridors where the other had made substantial

investments." Instead, according to UP, "***Not knowing each other's actual prices, present or proposed, the railroads can be expected, in pursuit of their self-interests, to seek business and aggressively to compete, holding no respect for the other's traffic and indeed seeing that traffic as something to be sought in the interest of revenue and profit enhancement***." (Emphasis added).

### C. UP and BNSF's Rates Increased Drastically, and Both Offered Reduced Service Terms

107. The railroads' agreements to fix fuel surcharges and not to compete for new business resulted in drastic increases in rates and reductions in service.

108. As a result of the conspiracy, average rates to ship coal more than 500 miles from mines in the Uinta Basin increased dramatically. Average rates using shipper cars increased by **8% during the period 2000-2003**, but increased by **71.5% during the period 2004-2007**. Likewise, average rates using railroad railcars increased **29% during the period 2000-2003**, but increased by **70.2% during the period 2004-2007**. Rates continued to increase significantly throughout the economic downturn beginning in 2008. Thus, during the period 2008-2011, rates did not go down but instead went **up an additional 30% or more** for both shipments using railroad railcars and shipper railcars. By 2012 (indeed by 2010), rates were over **250%** the 2003 rates for coal shipments using shipper cars and over **200%** the 2003 rates for coal shipments using railroad railcars. Oxbow's rates to ship Uinta Basin coal likewise increased over **200%** during the same period.

109. Average rates to ship coal more than 500 miles from mines in the Powder River Basin for coal using shipper railcars increased by **.1% during the period 2000-2003**, but those same rates increased by **84% during the period 2004-2007**. Similarly, analogous average rates to ship coal using railroad railcars increased by **26% during the period 2000-2003,** but

increased by **54% during the period 2004-2007**. Moreover, rates continued to increase significantly throughout the economic downturn beginning in 2008, and 2012 rates were more than **275%** those in 2003 for coal shipped in shipper railcars and more than **200%** the rates for coal shipped in railroad railcars.

110. The lack of competition has also resulted in degraded service in the Uinta Basin. Although prior to the conspiracy UP internally recognized and publically said that vigorous competition would force UP, among other things, to improve service, the opposite has been true since 2003.

111. Despite having internally recognized, and publically said, that coal, like Oxbow's, was "particularly well-suited to export markets," and that the lower costs that resulted from its merger with SP would allow for "significant increases" in exports of Colorado coal to Asia, after the conspiracy UP generally refused to ship Oxbow's coal west. In a competitive market, UP would not have done so.

112. Distinguished economists, including the former chief economist of the Antitrust Division of the Department of Justice who also served as Deputy Assistant Attorney General for Economic Analysis, have publically expressed the following and other conclusions:

- "There is strong evidence that in about 2004 BNSF and UP successfully colluded to raise prices…"
- "We conclude that there is strong evidence that BNSF and UP have successfully exercised market power in markets for transportation of western coal…" and
- "[T]here have been excessive increases in the prices for the railroads' transportation of Western coal since 2004. These increases are consistent with tacit or explicit collusion, and cannot be reconciled with competitive markets…"

113. The railroads also jointly stopped offering rate adjustment mechanisms designed to track actual cost changes, and service commitments that had been common in prior contracts,

including guaranteed cycle and transit times and liquidated damage provisions. They also demanded that customers assume regulatory responsibilities such as required railcar inspections for which the railroads are responsible in the first instance under applicable federal regulations.

**D. UP and BNSF Both Switched to Public Pricing**

114. In another significant departure from prior practice, UP and BNSF used public pricing to support both the fuel surcharge conspiracy and the conspiracy not to compete.

115. Prior to the conspiracies at issue in this case, the confidentiality of price and service terms in rail transportation contracts had served as an important check against collusion in the highly concentrated rail industry.

116. When the railroads began to conspire, however, they adopted public pricing mechanisms that announced an intent to haul coal only for significantly higher rates and minimal service terms. These new practices served no legitimate business purpose and instead were adopted to signal price changes and coordinate market allocation by enabling competitors to structure bids to avoid taking business away from their rivals. BNSF first experimented with public pricing beginning in January 2003, publishing a tariff that specified rate and service terms for shipping coal from mines in the Powder River Basin to various plants, including existing competitively served customers under contract with BNSF. As a result, in mid-2003, UP underbid BNSF and won a five year contract to transport 2.4 million tons of PRB coal annually to OPPD's coal plants. BNSF quickly suspended its unilateral efforts to treat its tariff as non-negotiable and recommenced aggressive competition until the commencement of the conspiracy described in this First Amended Complaint.

117. In March 2004, almost immediately after the adoption of the AII-LF, and at the same time that the railroads stopped competing for new business, UP issued a non-confidential

"circular" to coal shippers that specified the rate and service terms for delivering coal from the Powder River Basin to over 30 utilities, over 80 percent of which could be served both by UP and BNSF. UP also issued a separate public circular announcing the terms under which it would transport coal from the Uinta Basin. The circulars contained non-competitive terms, including significantly increased rates and service terms that were markedly inferior to those previously offered in rail transportation contracts.

118. The railroads have attempted to justify the turn to public pricing as an extension of their statutory common carrier obligations to offer a rate upon reasonable request, but as the STB recognized, these practices were new and represented a marked departure from prior contracting practice that the Staggers Act was intended to foster. The circulars quoted rates and service terms for competitively served traffic that had traditionally moved by confidential contract. Indeed, over 80% of the coal shippers in UP's circular could be served by both UP and BNSF. For this reason, the STB expressed concern in a proceeding that commenced shortly after the issuance of the UP circular for PRB coal that whereas

> the terms and conditions of common carrier rates must be publicly disclosed under section 11101, the terms of a rail transportation contract are to be kept confidential, a factor that makes collusion in this highly concentrated industry more difficult. Thus, a carrier's hybrid pricing mechanism may not contain the same protection against collusion as do confidential transportation contracts. An important benefit of contracts is that they often enable shippers to obtain service commitments and lower rates that carriers might not otherwise offer through the public tariff process. Surface Transportation Board, Interpretation of the Term "Contract" in 49 U.S.C. § 10709, 2007 WL 934379, *3 (March 28, 2007).

119. The circulars also contained terms that were not typically found in traditional tariffs, such as annual minimum volume commitments and contract terms that went beyond the 20 day term provided by statute. Thus, as the STB stated, the "new pricing structures we are witnessing" involve

> a mutuality of obligation between the carriers and shippers that appear to have the hallmarks of a contractual relationship. These bilateral agreements mutually bind both the shipper and the carrier for a given period of time. In exchange for some sort of consideration from the shipper, the carrier commits to a specific rate or service for a specific term. While Congress intended to permit carriers to have the pricing flexibility to enter into these kinds of agreements, ***we believe that Congress also intended for these contractual agreements to be confidential, outside Board jurisdiction, and subject to the scrutiny of the antitrust laws***, rather than regulation under the Interstate Commerce Act. *Id*. (emphasis added).

**E. UP and BNSF Both Abandoned Long-Term Contracts**

120. UP and BNSF changed another longstanding practice by offering only short-term contracts and refusing to agree to long-term contracts. Whereas the railroads had traditionally entered into coal transportation contracts with terms ranging from 5-20 years, after 2004, UP denied Oxbow contracts longer than one year. Other shippers suffered similar experiences, and the railroads' public pricing circulars imposed minimum volume commitments to obtain contracts from 1-3 years. As economists for shippers have concluded, this change from the prior competitive contracting enhanced the ability of UP to raise prices and reduced the incentives to compete, as well as the ability of customers to seek lower prices.

121. As with the UP's and BNSF's other contemporaneous changes to longstanding business practices, the simultaneous move to short-term contracts was not in their independent business interest absent a conspiracy and demonstrated a lack of fear of competition. In competitive industries, long-term contracts are a way sellers can keep customers that might otherwise move to a competitor. In many fields (for example, cellular telephone service) keeping customers in this way is so valuable that companies offer substantial discounts to obtain long-term contracts. It also is not in a railroad's economic interest to refuse—across the board—

to enter into long-term contracts even when substantial customers for their own reasons might want them.

122. An absolute insistence on short-term contracts would only be in UP's and BNSF's ***collective*** interest as part of an illicit agreement. If both knew that neither would be competing with the other, both could insist on a short-term contract to take advantage of the latest rate increase, without fearing the loss of a customer. Short-term contracts also provided assurances that each railroad would not deviate on the conspiracy by leaving its customers regularly available for competitive bidding. Absent agreement, there is no reason why either UP or BNSF, much less both of them, would have this level of confidence about the lack of competition, in an industry that had, up until recently, experienced robust competition for customers the size of Ameren, OPPD and other large utilities.

## V. UP's RESULTING MONOPOLY OVER THE SHIPMENT BY RAIL OF COAL EMANATING FROM THE UINTA BASIN

123. As a result of the actions described above, commencing in or about the end of 2003, UP illegally acquired and maintained a monopoly over the shipment of coal from the Uinta Basin.

124. For purposes of monopolization, attempted monopolization, and conspiracy to monopolize, the long-range (over 100 mile) shipment of Uinta Basin coal by rail is a relevant market.

125. For purposes of monopolization, attempted monopolization, and conspiracy to monopolize, the long-range (over 100 mile) shipment of Uinta Basin coal by rail to customers west of the Mississippi River is also a relevant market.

126. There is no significant cross-elasticity of demand, nor are there reasonably interchangeable alternatives, for rail transportation services for most shippers of coal. Although

the shipment of coal in some instances shares similarities with the shipment of other types of freight, and for convenience sometimes can be analyzed together with freight shipment generally, there is no significant cross-elasticity between the shipment of coal and the shipment of other freight. Thus, for example, a rise in the cost of non-coal freight shipment does not have a significant effect on the demand for coal shipment.

127. Uinta Basin coal is uniquely high in BTU (British Thermal Unit) content, burns clean, and has an environmentally attractive low sulfur content. Coal mined by one mine in the Uinta Basin is entirely substitutable with coal mined by another mine in the Uinta Basin, whether the mine is located in Colorado or in Utah. Uinta Basin coal is fungible, and hence the "as delivered" price of coal shipped from one mine in the Uinta Basin constrains not only the coal price, but also the shipping price, for all mines in the Uinta Basin.

128. Uinta Basin coal, however, is only partially substitutable with coal mined outside the Uinta Basin, for example in the Powder River Basin of Wyoming and Montana. Powder River Basin coal has a much lower BTU content and a higher sulfur content than Uinta Basin coal. Most customers, principally industrial users and utilities, have plants that either can efficiently burn only Uinta coal or only PRB coal, or some blend of the two. Customers whose plants are built to burn only one type of coal cannot readily shift to the other type of coal. Customers whose plants are built to burn a blend of the two types generally cannot greatly vary the relative proportions of the blend. There are a number of reasons for this. One reason is that Uinta Basin coal, having a much higher BTU content than Powder River Basin coal, "burns hot," and some end user's plants are not designed to burn coal that "burns hot," whereas other plants are specifically designed to burn such coal and cannot efficiently burn "low BTU" coal. Another reason that PRB coal and Uinta Basin coal are not fully substitutable is that some end users have

emissions related constraints that effectively require them to utilize Uinta coal, because of its low sulfur content and positive environmental characteristics. Likewise, Illinois Basin coal has an even higher sulfur content than PRB coal, and for this and other reasons is generally not a competitive alternative for customers of Uinta Basin coal. As delivered prices for Powder River Basin coal, and coal from certain other areas, have some effect on the price, and shipping price, for Uinta Basin coal. However, the characteristics of Uinta Basin coal and the nature and location of customers for it cause the transportation of Uinta Basin coal to be a separate market for antitrust purposes.

129. As a result of UP's wrongful conduct in restricting competition, and UP's and BNSF's conspiratorial conduct in agreeing not to compete for rail transportation in the Central Corridor in general, and from the Uinta Basin in particular, UP has obtained a monopoly and eliminated the competitive constraint that BNSF had previously imposed on rates for rail shipment of Utah/Colorado coal. UP now has a market share of approximately 100% for the rail shipment of coal mined in the Uinta Basin and has eliminated competitive constraints in the relevant markets.

130. Even if UP had otherwise lawfully acquired monopoly power over the market in which Oxbow's Elk Creek mine is located, it nonetheless illegally maintained that monopoly. Through its participation in the fuel surcharge conspiracy (and other anticompetitive acts alleged herein), UP artificially raised the "as delivered" price of coal throughout the country—including in all locations in the United States where Uinta Basin coal, including Oxbow's, is sold. UP thereby artificially raised the ceiling on prices it could charge even captive shippers of coal and obtained revenues and profits that it could not have obtained if it were a lawful monopolist. UP accordingly abused, illegally maintained, and enhanced the monopoly power over Oxbow and

other mine owners in the Uinta Basin that it had acquired (regardless of whether that power was acquired lawfully, as UP has said, or not, as Oxbow alleges here).

## VI. UP's AND BNSF'S ANTICOMPETITIVE CONDUCT HARMED COMMERCE AND THE PUBLIC IN GENERAL

131. UP and BNSF's anticompetitive conduct caused poorer service, fewer options, and dramatically higher rail rates for freight in general, even more so for the shipment of coal, and still more for the shipment of coal emanating from the Uinta Basin. As a result of their anticompetitive conduct, they received increased profits as the result of conspiracy rather than a reduction in their costs or more efficient operations. Shippers, end users, and the public were damaged as a result.

132. The fuel surcharge, by itself, reaped extraordinary profits. As UP's CEO, James Young, admitted in 2007, "three, four years ago [the rail fuel surcharges] were really non-existent," and "it's only been the last couple of years that…the financial returns in this business has [sic] started to move in the right direction." A Report commissioned by the American Chemistry Council estimates that between 2005 and 2007, UP over-recovered $1.369 billion for fuel surcharges.

133. UP's and BNSF's anticompetitive conduct was within the flow of, and substantially affected, interstate and international commerce. During the relevant period, these railroads sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each of them used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services for coal and other commodities. UP and BNSF's unlawful activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international

commerce and have denied those who ship freight in general, and coal emanating in the Uinta Basin, of the benefits of free, open and unrestricted competition.

## VII. EACH OF THE OXBOW COMPANIES SUFFERED INJURY BY VIRTUE OF SOME OR ALL OF UP'S AND BNSF'S ANTICOMPETITIVE CONDUCT

134. As a proximate result of UP's and BNSF's conduct, each of the Oxbow plaintiffs has paid supra-competitive rates to ship freight, lost business and profits by virtue of UP's and BNSF's reduction of service and refusals to ship coal west from Colorado mines, received reduced revenues from sales of their products, experienced increased costs of doing business, and lost the benefits of competition that would have led to growth. These are injuries of the type the antitrust laws are designed to prevent, and Plaintiffs incurred these injuries as direct purchasers of rail shipping services.

135. As a proximate result of the conspiracy described above, Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, and Terror Creek LLC each paid fuel charges for shipments of coal above that they would not have paid in the absence of the conspiracy.

136. As a proximate result of the conspiracy described above, Oxbow Carbon & Minerals LLC, Oxbow Calcining LLC, and Oxbow Midwest Calcining LLC each paid fuel surcharges for shipment of petcoke, and other commercial rail freight, that they would not have paid in the absence of the conspiracy.

137. As direct purchasers of rail freight services the Oxbow Companies collectively have paid ***more than $50,000,000*** in wrongfully imposed fuel surcharges since the initiation of the conspiracy and have thereby been damaged in their business and property. Oxbow Carbon & Minerals LLC paid in excess of $40,000,000 in illegal fuel surcharges. Oxbow Mining, LLC paid directly, or through Oxbow Carbon & Minerals LLC acting as its agent, in excess of $9,000,000 in illegal fuel surcharges. Oxbow Calcining LLC paid in excess of $2,000,000 in

illegal fuel surcharges. Oxbow Midwest Calcining LLC paid in excess of $1,600,000 in illegal fuel surcharges. Terror Creek LLC directly or through Oxbow Carbon & Minerals LLC acting as its agent, paid illegal fuel surcharges in excess of $400,000.

138. Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC, have each paid supra-competitive prices to ship coal emanating in the Uinta Basin, because of the unlawful monopolization, conspiracy to monopolize, and conspiracy not to compete alleged above. Indeed, these companies saw the rates they paid for shipping coal from Uinta mines more than double during the period 2003 to 2012.

139. In a competitive market, each of the plaintiffs would have the option to ship freight on more than one railroad. During the period of the fuel surcharge conspiracy described above, Oxbow Carbon & Minerals LLC, Terror Creek LLC, Oxbow Calcining LLC, and Oxbow Midwest Calcining LLC, each shipped coal and/or petcoke from various locations that are served by more than one railroad.

140. During the period of the anticompetitive conduct described above, Oxbow Carbon & Minerals LLC also shipped coal from Uinta Basin mines along the Central Corridor at locations along the tracks over which BNSF and Utah Railway had been granted trackage rights and other rights under their settlement agreements with UP and SP. Oxbow Carbon & Minerals LLC also owns additional rights to mine coal in the Uinta Basin, but it has been unable to make economic use of its mining rights because of supra-competitive prices that UP charges for shipment of coal from the Uinta Basin as the proximate result of its conspiracy with BNSF and other illegal conduct.

141. Oxbow Mining, LLC and Oxbow Carbon & Minerals LLC, similarly suffered anticompetitive harm in connection with the shipment of coal from the Elk Creek Mine, which is

served by UP and located on an approximately 70-mile UP rail spur connecting the mine head with the Central Corridor. Both paid the illegal fuel surcharge that UP imposed for shipments from the Elk Creek Mine as the proximate result of the conspiracy between UP and BNSF.

142. These companies also paid more for shipping coal by rail from the Elk Creek Mine than they would have in a competitive market, because competitive pressure from BNSF and Utah Railway at other mines in the Uinta Basin would have constrained UP's rates for shipping coal emanating from the Elk Creek Mine as it had prior to the conspiracy. As UP's CEO has acknowledged, because coal from the Elk Creek Mine is substitutable (indeed, fungible) with coal from other Uinta Mines, competition for rail service at these mines would have created "competitive constraints" on the prices that UP could charge even "captive shippers." In a competitive Uinta Basin market, where Utah shippers could get competitive quotes from UP and BNSF, UP could not increase its prices to the Elk Creek Mine, as much as it did in fact, because once it increased the "as delivered" price beyond that charged from other Uinta mines, customers would not buy coal from the Elk Creek Mine, and UP would receive no shipping business from the mine.

143. In addition, were it not for the anticompetitive conduct described above, it would be economically reasonable for Oxbow Mining, LLC and Oxbow Carbon & Minerals LLC to obtain the benefits of a competitive alternative to UP by transporting coal the 70 miles to Grand Junction, Colorado (where both BNSF and Utah Railway have trackage rights and other rights under their agreements with UP) and building truck-to-rail loading facilities there. Indeed, the relative cost of doing so would be less than the cost Ameren invested in building its own rail spurs to reduce its transportation costs via competition between UP and BNSF prior to the onset

of the conspiracy. And, by virtue of their trackage agreements with UP, BNSF and Utah Railway would both have had the right to ship coal from these new facilities.

144. Oxbow Mining, LLC and Oxbow Carbon & Minerals LLC also suffered from inferior service and lost business because UP refused to ship Oxbow's coal west.

**COUNT I**

**Price Fixing (Fuel Surcharge) in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

(By all Plaintiffs against UP and BNSF)

145. Oxbow fully incorporates by reference the allegations in all of the preceding paragraphs herein.

146. The Defendants and those colluding with them entered into and engaged in a contract, combination, or conspiracy in violation of Section 1 of the Sherman Act. The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators to use rail fuel surcharges as a method of extracting profit from shippers. The contract, combination, or conspiracy also resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators to refrain from competing against each other in regard to rail fuel surcharges both for freight, in general, and coal, in particular.

147. This conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators in furtherance of which they fixed, maintained, and standardized prices for rail fuel surcharges for Oxbow's non-regulated transportation. This conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act and an unreasonable and unlawful restraint of trade.

148. Because of this conspiracy, among other things:

a. UP and BNSF fixed prices charged to Oxbow and other shippers and customers for fuel surcharges applied to unregulated contract-based rail freight transportation in general and coal in particular, and maintained those prices at supra-competitive levels;

b. Oxbow and other shippers and customers have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight services; and

c. Competition in establishing the prices paid, customers of, and territories for rail freight services has been unlawfully restrained, suppressed and eliminated.

149. As a proximate result of the Defendants' unlawful conduct, Oxbow has suffered injury in that it has paid and continues to pay supra-competitive prices for rail fuel surcharges applied to unregulated contract-based rail freight transportation for materials, including but not limited to coal and petroleum coke, since approximately June 2003 and has otherwise been damaged as above described.

**COUNT II**

**Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

(By Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC against UP and BNSF)

150. Oxbow fully incorporates by reference the allegations in all of the preceding paragraphs herein.

151. In addition to, and contemporaneous with engaging in, the fuel surcharge conspiracy, Defendants UP and BNSF conspired to allocate customers and to fix the terms of service by, agreeing and conspiring, among other things:

a. Not to compete for customers;

b. To stabilize and dramatically to increase their rates for shipments of freight, including coal;

c. To break with prior practice by engaging in public pricing; and

d. To break with prior practice by refusing to enter into long-term contracts.

152. This conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act and an unreasonable and unlawful restraint of trade.

153. Because of this conspiracy, among other things:

a. UP and BNSF stabilized and increased prices to supra-competitive rates

b. UP and BNSF degraded service without fear of competition;

c. Oxbow and other shippers and customers have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight services; and

d. Competition in establishing the prices paid, customers of, and territories for rail freight services has been unlawfully restrained, suppressed and eliminated.

154. As a proximate result of the Defendants' unlawful conduct, Oxbow has suffered injury in that it has paid and continues to pay supra-competitive rates applied to unregulated contract-based rail freight transportation for coal and has otherwise been damaged as above described.

## COUNT III

## Monopolization (and Attempt to Monopolize and Conspiracy to Monopolize) by UP in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

(By Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC against UP and BNSF (as UP's co-conspirator))

155. Oxbow fully incorporates by reference the allegations in all of the preceding paragraphs herein.

156. UP has monopolized and/or attempted to monopolize and, with BNSF, has conspired to monopolize the relevant markets for rail shipment of coal emanating from the Uinta

Basin in violation of Section 2 of the Sherman Act by using exclusionary and anticompetitive means to secure, maintain, enhance, and abuse monopoly power and to attempt to secure monopoly power with a dangerous probability of success of that attempt.

157. UP and BNSF intentionally conspired to afford UP a monopoly over the relevant markets for rail shipment of coal emanating from the Uinta Basin. UP and BNSF effected this conspiracy by, among other things:

a. agreeing that BNSF would not make use of the trackage rights BNSF had been afforded as part of the UP/SP merger in order to compete for customers shipping Uinta Basin coal, in exchange for UP agreeing not to compete with BNSF for each other's customers in PRB;

b. agreeing that BNSF and UP would not compete for customers, including the utilities and industries that purchase Uinta coal—thus, eliminating the competitive pressure on the "as delivered" price;

c. agreeing otherwise to increase prices, engage in public pricing, and eliminate long-term contracts, all of which ensured that UP could charge not only monopolistic prices, but monopolistic prices without the constraint that the "as delivered" price would otherwise have placed on those prices.

158. This conspiracy violates Section 2 of the Sherman Act.

159. Even if these actions had not been taken as they were by agreement, UP's unilateral decision to take all of these actions, particularly in the context of the fuel surcharge conspiracy, and to signal BNSF, knowing and expecting that the BNSF would act in kind, and to induce BNSF to act in kind by providing the *quid pro quo* of not competing with BNSF, constitutes unlawful monopolization and attempted monopolization. UP acted with the specific intent to secure, maintain, enhance and abuse monopoly power and in violation of Section 2 of the Sherman Act. UP has either achieved monopoly power, with a share approaching 100% of the relevant market, or its anticompetitive conduct demonstrates a dangerous probability of obtaining monopoly power in the relevant market.

160. Even if UP had otherwise lawfully acquired monopoly power over the market in which Oxbow's Elk Creek mine is located, it nonetheless illegally maintained that monopoly. Through its participation in the fuel surcharge conspiracy (and other anticompetitive acts alleged herein), UP artificially raised the "as delivered" price of coal throughout the country—including in all locations in the United States where Uinta Basin coal, including Oxbow's, is sold. UP thereby artificially raised the ceiling on prices it could charge even captive shippers of coal and obtained revenues and profits that it could not have obtained if it were a lawful monopolist. UP thereby violated Section 2 of the Sherman Act by abusing, illegally maintaining, and enhancing its monopoly power over Oxbow and other mine owners in the Uinta Basin, regardless of whether that power was acquired lawfully, as UP has said, or not, as Oxbow alleges here.

161. As a result of these violations:

a. UP has set and maintained prices for Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC and other shippers and customers at supra-competitive levels;

b. Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC and other shippers and customers have been deprived of the benefits of free, open and unrestricted competition in the markets for rail freight services and rail freight services for coal;

c. Competition in establishing the prices paid, customers of, and territories for rail freight services and rail freight services for coal have been unlawfully restrained, suppressed and eliminated;

d. UP has manipulated shipments, quotes and rail rates, specifically the rate differential for rail shipments of coal from Colorado and Utah, to dictate the location of Oxbow Carbon & Minerals LLC's and Oxbow Mining, LLC's coal customers; and

e. UP has degraded service.

162. As a proximate result of these violations of Section 2 of the Sherman Act, Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC have suffered injury in that, among other things, they: (i) paid and continue to pay supra-competitive prices for rail freight service than

they would have paid absent the violation; (ii) were deprived of access to certain customers and the ability to sell their coal in other geographic regions that they could not practicably service because of UP's illegal monopoly maintenance and abuse; and (iii) have suffered other damages and injuries.

**COUNT IV**

**Breach of Contract: Tolling Agreement**

**(By all Plaintiffs against UP)**

163. Oxbow fully incorporates by reference the allegations in all of the preceding paragraphs herein.

164. On January 14, 2010, Oxbow entered into an agreement (the "Tolling Agreement") with UP to toll the statute of limitations applicable to its claims in this action. A copy of the Tolling Agreement has been previously furnished to this court [ECF No. 26-2].

165. The purpose of the Tolling Agreement was to facilitate business discussions of the parties in the hope that the discussions might lead to an amicable resolution of the disputes underlying Oxbow's claims against UP, without either party admitting the validity of any claims or defenses of the other party.

166. In order to incentivize Oxbow to refrain from initiating litigation, UP agreed in the Tolling Agreement not only to toll the applicable statute of limitations but, among other things:

a. to "keep Oxbow reasonably informed of the status of discovery proceedings" in the then pending putative class action, *In re Rail Freight Surcharge Antitrust Litigation*, MDL No. 1869, Misc. No. 07-489 (the "MDL"), in which UP was and is a defendant (ECF No. 26-2 at ¶5); and,

b. in order for Oxbow to avoid "being prejudiced" for engaging in discussions, "if Oxbow becomes a party to the class action or files a

> complaint, UP will take reasonable steps to facilitate Oxbow's access to discovery" in the MDL. [(ECF No. 26-2 at ¶6(c)).

167. Oxbow fully performed all of its obligations under the Tolling Agreement and satisfied all conditions to UP's performance.

168. UP breached its obligations under the Tolling Agreement. It made no effort to keep Oxbow reasonably informed of discovery proceedings in the MDL, and it failed to take reasonable steps to facilitate Oxbow's access to discovery in the MDL upon Oxbow's filing of its initial complaint in this action.

169. UP has continued to impede Oxbow's access to obtaining discovery in the MDL, including access to documents that UP owns, controls, and produced in the MDL.

170. Oxbow has repeatedly asked UP to comply with its obligations under the Tolling Agreement, and UP has repeatedly refused or declined to comply.

171. Oxbow asked UP to take actions to facilitate its access to discovery in the MDL that were designed to permit UP to comply without violating the existing 2009 protective order in the MDL. Oxbow asked UP to provide or facilitate its access to the following MDL materials: (a) all materials produced by UP, (b) UP's answers to interrogatories and requests for admissions, (c) depositions of UP personnel, and (d) all other discovery materials not covered by a protective order. In addition, Oxbow asked UP to facilitate its access to MDL discovery, as it had agreed, by stipulating to Oxbow becoming a party to the MDL Protective Order. However, UP did not provide any of the requested material or stipulate to Oxbow becoming a party to the MDL Protective Order.

172. Oxbow has suffered and continues to suffer damages, including without limitation, increased legal fees as a result of UP's breaches. Oxbow is entitled to an order granting it specific performance of the Tolling Agreement, compelling UP to comply with its

obligations thereunder, as well as an award of damages in an amount to be established at trial that will reimburse it for its economic losses sustained as a result of UP's breaches.

## PRAYER FOR RELIEF

WHEREFORE, Oxbow requests judgment against Defendants as follows:

(1) On Counts I and II, that

a. judgment be entered against both of the Defendants adjudging and decreeing that they have violated Section 1 of the Sherman Act;

b. each Oxbow plaintiff be awarded three times the damages it has sustained, as shown at trial, together with legal fees, costs, interest and other relief recoverable by law;

c. each of the Defendants and their respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case, or from enjoying the benefits therefrom;

(2) On Count III, that:

a. judgment be entered against UP that it has unlawfully monopolized and attempted to monopolize in violation of Section 2 of the Sherman Act;

b. judgment be entered against UP and BNSF that they have unlawfully conspired to monopolize in violation of Section 2 of the Sherman Act;

c. Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC be awarded three times the damages they have sustained, as shown at trial, together with legal fees, costs, interest and other relief recoverable by law.

d. UP, BNSF and their respective officers, directors, agents, and employees, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the monopoly or conspiracy to monopolize alleged in this case, or from enjoying the benefits therefrom; and providing for UP and BNSF to take such steps as may be necessary or proper to promote and restore competition;

(3) On Count IV, that

a. UP be declared to be in breach of the Tolling Agreement and ordered to perform in accordance with its terms;

b. Oxbow Carbon & Minerals LLC and Oxbow Mining, LLC be awarded the damages they sustained, as shown at trial, together with legal fees, costs, interest and other relief recoverable by law;

(4) That the Court grants such other and further relief as deemed just and proper.

**DEMAND FOR JURY TRIAL**

Oxbow hereby demands a trial by jury on all issues triable to a jury.

Dated: May 1, 2013

Respectfully submitted,

TROUTMAN SANDERS LLP

/s/ John R. Gerstein
John R. Gerstein, D.C. Bar No. 913228
Merril Hirsh, D.C. Bar No. 366952
901 9th Street, NW, Suite 1000
Washington, DC 20004-2134
Telephone: (202) 274-2950

Fletcher W. Paddison
11682 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (619) 235-4040

David Boies, admitted *pro hac vice*
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200

Robert B. Silver, admitted *pro hac vice*
Ellen Brockman
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300

Samuel C. Kaplan, D.C. Bar No. 463350
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
Telephone: (202) 237 2727

*Attorneys for Plaintiffs Oxbow Carbon & Minerals LLC; Oxbow Mining, LLC; Oxbow Midwest Calcining LLC; Oxbow Calcining LLC; and Terror Creek LLC*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION | MDL No. 1869<br>Misc. No. 07-489 (PLF) (GMH) |
| This Document Relates To:<br>ALL CASES | |

**JOINT SUBMISSION CONCERNING PROPOSED SCHEDULE**

Pursuant to the Court's December 9, 2019 Memorandum Opinion and Order (Dkt. 907), the Plaintiffs represented by Quinn Emanuel Urquhart & Sullivan LLP and Hausfeld LLP ("Plaintiffs"); Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSXT") and Norfolk Southern Railway Company ("NS") (collectively, "Defendants"); and the Related Plaintiffs hereby submit their respective supplemental responses on scheduling.

## I. Plaintiffs' Response

Plaintiffs have reviewed and carefully considered the Court's request for clarification of the proposed schedules and the points articulated in the December 9 order. Plaintiffs understand that the Court intends to resolve two issues over the course of approximately one year: "(1) the meaning and scope of 49 U.S.C. § 10706; and (2) summary judgment on the question of liability only." Dkt. 907 at 1.

Plaintiffs therefore respectfully propose the following revised schedule, which can readily accomplish the Court's objectives:

| ***Date*** | ***Event*** |
|---|---|
| n/a | Court ruling on Defendants' pending Section 10706 motion (briefing on Section 10706 is closed) |
| 60 days after issuance of Section 10706 district court opinion (*e.g.*, mid-summer) | Summary judgment motions on liability – whether defendants entered a conspiratorial agreement |
| 60 days after summary judgment motions on liability only | Responses to summary judgment motions on liability – whether defendants entered a conspiratorial agreement |
| 30 days after responses to summary judgment motions | Replies to summary judgment motions on liability – whether defendants entered a conspiratorial agreement |
| Hearing on summary judgment motions | If needed, on a date selected by the Court |
| 7/1/2020 | Plaintiffs serve supplemental expert reports. Defendants serve "alliances" report on topics previously covered by Linda Morgan. Parties serve any appropriate updates to relevant discovery responses. [No Court action required.] |
| 8/1/2020 | Expert depositions. [No Court action required.] |
| 10/1/2020 | Response expert reports. [No Court action required.] |
| 11/1/2020 | Response expert depositions. [No Court action required.] |
| 12/1/2020 | Reply expert reports. [No Court action required.] |
| 12/31/2020 | Reply expert depositions and close of expert discovery. [No Court action required.] |

Under the foregoing schedule, consistent with the Court's preferences, summary judgement briefing on liability should be limited to the issue of whether Defendants reached a conspiratorial agreement. As long as the Court limits summary judgment solely to whether Defendants reached a conspiratorial agreement, the Plaintiffs submit that there would be no need for the Court to "revisit any of its [prior *Daubert*] determinations in the context of resolving summary judgment motions on liability only." Dkt. 907 at 2. Injury is an element of liability under Section 1 of the Sherman Act, but that element of liability cannot be properly addressed at summary judgment until Plaintiffs have had the opportunity – which no party disputes Plaintiffs are entitled to – to submit supplemental expert reports on non-class damages. Those reports necessarily will address causation and impact – factors inherently relevant to the development of

a non-class damages model (which the Plaintiffs did not have the burden of proffering when the case remained a class action). Summary judgment motions on those issues will await a further schedule, once Plaintiffs have had the opportunity to serve the related supplement expert reports.

This revised schedule set forth above enables the Court to begin its analysis of the Section 10706 issue right away, with summary judgment motions on liability (conspiratorial agreement) coming quickly on the heels of the Court's determination. So, for example, if the Court were to rule on Defendants' pending Section 10706 motion in April 2020, summary judgment briefing would be complete by September 2020, facilitating a ruling by the end of 2020 or the beginning of 2021. In the meantime, the parties can exchange supplemental expert reports, and complete depositions of those experts, without the Court's intervention. Plaintiffs submit that this compromise schedule, which again accepts Defendants' proposal to tie summary judgment briefing deadlines to the resolution of Section 10706, provides the most efficient path to advancing this longstanding litigation. With the rulings on Section 10706 and summary judgment as to liability – and the concurrent completion of expert discovery – the parties will be best positioned to proceed to trial in 2021.

As reflected in the foregoing proposed schedule, Plaintiffs respectfully submit that there is no need to burden the parties and the Court with a new round of briefing on Section 10706; the record closed years ago. And Defendants have not identified any subject matter related to Section 10706 that was not already argued or briefed in the multiple papers previously submitted by the parties. It is also unrealistic for Defendants to suggest that new Section 10706 briefing can be submitted, this Court can rule on Section 10706, after which summary judgment be briefed, argued, and decided – all purportedly within one year.

Plaintiffs also reiterate that all of the Plaintiffs are entitled to engage experts of their own choosing to prepare their individual damages expert reports; and that Plaintiffs need an opportunity to respond to Defendants' new alliance expert, who cannot simply replicate the Morgan report, which purported to have been based in large part on Ms. Morgan's personal experience at the Surface Transportation Board. *See* Joint Submission Concerning Proposed Schedules (Dkt. 900), at 5-7.

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the proposed revised schedule set forth above.

## II. Defendants' Response

Defendants agree with the Court that resolution of the Section 10706 Motion or any liability-related summary judgment motions directed at the claims of the former putative class representatives need not await the limited supplemental expert disclosures that remain or the outcome of any damages-related motions. As discussed at the November 14 Case Management Conference, Defendants propose two tracks during the next year, each of which can proceed simultaneously and in parallel.[1]

Section 10706 Motion and Liability-Related Summary Judgment. As described in the December 4 Joint Submission Concerning Proposed Schedules, ECF No. 900 ("Joint Scheduling Submission"), Defendants believe that Section 10706 issues and summary judgment motions on liability can be resolved in a separate track. Joint Scheduling Submission at 8-13. Under

[1] Defendants' position regarding why the parties and Court cannot simply rely on previous briefing regarding Section 10706, the most efficient structure of the Section 10706 proceeding that is necessary now, and the appropriate scope and pace of any additional supplemental expert discovery was addressed in Defendants' portion of the December 4 Joint Submission Concerning Proposed Schedules, ECF No. 900 at 8-15. Mindful that the Court's December 9 Order asked for clarification on a single, discrete issue, Defendants do not reargue those points now and respectfully refer the Court to the parties' prior submission. *Id.*

Defendants' schedule, the Section 10706 Motion would be fully briefed and submitted for decision by May 2020. Summary judgment briefing on liability would commence 60 days after a final ruling on the Section 10706 Motion. Defendants do not believe that the parallel supplemental expert discovery described below, or any subsequent *Daubert* motions or damages-related summary judgment motions, must be completed before the Court can hear and resolve these Section 10706 and liability issues.

Damages And Alliances Expert Discovery. As described in the Joint Scheduling Submission, Plaintiffs intend to submit supplemental expert damages testimony addressing the individual damages claims of the six former class representatives, and Defendants intend to submit a report from their replacement "alliances" expert. Defendants' schedule proposes completing that process by August 2020, which is a reasonable and achievable timeline. On damages, all that remains is for Plaintiffs to disclose their individualized damages calculations and for Defendants to respond. Such calculations should come from Plaintiffs' existing damages expert, Dr. Rausser, or in any event should not retread any ground Dr. Rausser has already addressed. Joint Scheduling Submission at 13-14. Defendants are likewise committed to completing the disclosure of their replacement "alliances" expert within that timeframe.

After this process is complete, Defendants may have *Daubert* and damages-related summary judgment motions that will require resolution by the Court. Defendants cannot speculate on what specific motions will be required until they receive Plaintiffs' individualized damages opinions. However, Defendants do not believe that either the expert disclosures or any subsequent *Daubert* or damages-related summary judgment motions must be resolved before the Court resolves Defendants' Section 10706 Motion or any liability-related summary judgment motions, which are discussed above.

**III. Related Plaintiffs' Response[2]**

The Related Plaintiffs believe that briefing should begin right away on liability and section 10706 on a single, coordinated schedule in the MDL and in *Oxbow*. Briefing on those issues should proceed while damages and other case-specific issues proceed on parallel tracks for the claims of the former class representatives and the Related Plaintiffs. The Related Plaintiffs should be permitted to submit briefs on liability and section 10706 to ensure their views are heard on those central issues. Of course, Related Plaintiffs will endeavor to avoid duplicative briefing and will try to coordinate with the former class representatives and Oxbow.

The Related Plaintiffs believe that these cases would progress most efficiently by following Oxbow's proposal for summary judgment on liability to include issues relating to the applicability of section 10706, rather than having those issues decided separately. If, however, the Court determines that the applicability of section 10706 should be decided first, the Related Plaintiffs have not yet received the MDL record[3] and therefore take no position on whether the Court should decide those issues on the current record (as the former class representatives

[2] Related Plaintiffs have filed the following individual actions: *ArcelorMittal USA LLC et al. v. CSX Transportation, Inc.*, 19-cv-03379-PLF (D.D.C.), *AK Steel Corporation et al. v. BNSF Railway Company et al.*, 19-cv-02970-PLF (D.D.C.), *Alabama Power Company et al. v. BNSF Railway Company et al.*, 19-cv-02963-PLF (D.D.C.), *Dow Chemical Company v. Union Pacific Railroad Company et al.*, 19-cv-03516-PLF (D.D.C.), *Gerdau Ameristeel Corp. et al. v. Union Pacific Railroad Company et al.*, 19-cv-03618-PLF (D.D.C.), *Kellogg Company et al. v. BNSF Railway Company et al.*, 19-cv-02969-PLF (D.D.C.), *Northern Indiana Public Service Company LLC v. Union Pacific Railroad Company et al.*, 19-cv-02927-PLF (D.D.C.), *Sterling Steel Co., LLC v. Union Pacific Railroad Company, et al.*, 08-cv-00539-PLF (D.D.C.); *Union Carbide Corporation et al. v. Union Pacific Railroad Company et al.*, 19-cv-03517-PLF (D.D.C.), and *Union Electric Company d/b/a Ameren Missouri et al. v. BNSF Railway Company et al.*, 19-cv-02940-PLF (D.D.C.). These actions were all filed in this Court and have been consolidated with the MDL.

[3] The Defendants have agreed to begin producing the MDL record within 21 days of the Court's entry of an amended protective order, which occurred in the MDL on December 4, with substantial completion by January 31.

propose) or on a renewed motion (as defendants propose). Importantly, if the Court intends to rely on the papers already filed regarding the applicability of section 10706, Related Plaintiffs request the opportunity to submit a supplemental brief once they have received the unredacted briefing on that issue.

The Related Plaintiffs are not in a position to comment on whether the Court should resolve *Daubert* motions as part of liability and section 10706 because they have not yet received the full record.

December 16, 2019 Respectfully Submitted,

/s/ Michael D. Hausfeld
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com

Michael P. Lehmann
Seth R. Gassman
HAUSFELD LLP
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
mlehmann@hausfeld.com
sgassman@hausfeld.com

*Counsel for Plaintiffs CONSOL Energy, Inc., TMS International, LLC, Dakota Granite Company, Donnelly Commodities Incorporated, and Strates Shows, Inc.*

s/ Stephen R. Neuwirth

Stephen R. Neuwirth
Sami H. Rashid
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: stephenneuwirth@quinnemanuel.com

*Counsel for Olin Corporation; US Magnesium LLC; Dust Pro, Inc.; Alcoa Corporation; Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Northwest Alloys, Inc.; Reynolds Metal Company; Alcoa World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; Campbell Soup Company; Campbell Soup Supply Company L.L.C.; Pepperidge Farm Inc.; Conagra Brands f/k/a ConAgra Foods, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; Coffeyville Resources Refining & Marketing, LLC; Wynnewood Refining Company, LLC; East Dubuque Nitrogen Fertilizers, LLC; Dominion Energy, Inc. Virginia Electric & Power Company; Dominion Energy Fuel Services, Inc. (dba Dominion Energy); Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemicals Company Solutia Inc.; Taminco Corporation; Grain Craft, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars (KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc.; Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries - WCR, Inc.; Aggregate Industries Northeast Region,*

| | |
|---|---|
| | *Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region) Cement Transport, LTD; Fredonia Valley Railroad, Inc.; Geocycle LLC; Systech Environmental Corporation; Tarrant Concrete, CO., Inc.; Kost, Inc.; Lafarge Aggregates Illinois, Inc.; Lafarge PNW, Inc.; Lattimore Materials Corp.; Meyer Material Company, LLC; Redland Quarries NY Inc.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; Northdown Industries, Inc.; Normerica Inc.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc.; PCS Nitrogen, Inc.; Phillips 66 Company; CertainTeed Corporation; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated; CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Talen Energy Supply, LLC (f/k/a PPL Energy Supply, LLC) and subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; H.A. Wagner LLC; Brandon Shores LLC; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite Company; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton Concrete Company, LLC; McCartney Construction Company, Inc.; Arundel Company, LLC; Harper Brothers, LLC; Maryland Rock Industries, LLC; Virginia Concrete Company, LLC; Maryland Stone, LLC; S & G Concrete Company, LLC; TCS Materials, LLC; Azusa Rock, LLC; Stone Creek Mira Mesa LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG* |

| | |
|---|---|
| | *Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Augusta), LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc* |

| | |
|---|---|
| /s/ Daniel M. Wall<br>Daniel M. Wall<br>Timothy L. O'Mara<br>Christopher B. Campbell<br>Allyson M. Maltas (D.C. Bar No. 494566)<br>LATHAM & WATKINS LLP<br>505 Montgomery Street, Suite 2000<br>San Francisco, CA 94111<br>Telephone: (415) 391-0600 | Tyrone R. Childress<br>JONES DAY<br>555 South Flower Street, 50th Floor<br>Los Angeles, CA 90071-2300<br>Telephone: (213) 489-3939 |
| *Attorneys for Defendant Union Pacific Railroad Company* | |
| /s/ Kent A. Gardiner<br>Kent A. Gardiner (D.C. Bar No. 432081)<br>Luke van Houwelingen (D.C. Bar No. 989950)<br>CROWELL & MORING LLP<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Telephone: (202) 624-2500 | |
| *Attorneys for Defendant CSX Transportation, Inc.* | |

| | |
|---|---|
| /s/ *John M. Nannes*<br>John M. Nannes (D.C. Bar. No. 195966)<br>Tara L. Reinhart (D.C. Bar. No. 462106)<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>1440 New York Avenue, N.W.<br>Washington, DC 20005<br>Telephone: (202) 371-7000<br>john.nannes@skadden.com<br>tara.reinhart@skadden.com | Saul P. Morgenstern<br>Jennifer B. Patterson<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>250 West 55th Street<br>New York, NY 10075<br>Telephone: (212) 836-8000<br>saul.morgenstern@arnoldporter.com<br>jennifer.patterson@arnoldporter.com |

*Attorneys for Defendant Norfolk Southern Railway Company*

| | |
|---|---|
| /s/ *Veronica S. Lewis*<br>Veronica S. Lewis<br>Andrew P. LeGrand<br>GIBSON, DUNN & CRUTCHER LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, TX 75201<br>Telephone: (214) 698-3100<br>vlewis@gibsondunn.com<br>alegrand@gibsondunn.com | Andrew S. Tulumello (D.C. Bar No. 468351)<br>Joshua Lipton (D.C. Bar No. 461731)<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, NW<br>Washington, DC 20036<br>Telephone: (202) 955-8500<br>atulumello@gibsondunn.com<br>jlipton@gibsondunn.com |
| Randy M. Mastro<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166<br>Telephone: (212) 351-4000<br>RMastro@gibsondunn.com | Joshua S. Soven (D.C. Bar No. 436633)<br>WILSON SONSINI GOODRICH & ROSATI<br>1700 K Street NW, Fifth Floor<br>Washington, DC 20006<br>Telephone: (202) 973-8800<br>jsoven@wsgr.com |
| Samuel M. Sipe, Jr. (D.C. Bar No. 256446)<br>Linda Stein (D.C. Bar No. 376217)<br>STEPTOE & JOHNSON LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC 20036<br>Telephone: (202) 429-3000<br>ssipe@steptoe.com<br>lstein@steptoe.com | Charles W. Shewmake<br>THOMPSON & KNIGHT<br>1722 Routh Street, Suite 1500<br>Dallas, TX 75201<br>Telephone: (214) 969-1700<br>Charles.Shewmake@tklaw.com |

*Attorneys for BNSF Railway Company*

| | |
|---|---|
| /s/ Eric S. Hochstadt<br><br>Eric S. Hochstadt (admitted pro hac vice)<br>David J. Lender (admitted pro hac vice)<br>Luna Barrington (admitted pro hac vice)<br>Sarah Ryu (admitted pro hac vice)<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Telephone: (212) 310-8000<br>Fax: (212) 310-8007<br>eric.hochstadt@weil.com<br>david.lender@weil.com<br>luna.barrington@weil.com<br>sarah.ryu@weil.com<br><br>Carrie C. Mahan (D.C. Bar No. 459802)<br>WEIL, GOTSHAL & MANGES LLP<br>2001 M. Street NW #600<br>Washington, DC 20036<br>Telephone: (202) 682-7000<br>Fax: (202) 857-0940<br>carrie.mahan@weil.com<br><br>*Counsel for Plaintiffs ArcelorMittal USA LLC and ArcelorMittal Dofasco G.P.* | VINSON & ELKINS L.L.P.<br><br>By: /s/ Alden L. Atkins<br>Craig P. Seebald (D.C. Bar No. 438968)<br>Alden L. Atkins (D.C. Bar No. 00393922)<br>Lindsey R. Vaala (D.C. Bar No. 974770)<br>David Smith (D.C. Bar No. 1002860)<br>2200 Pennsylvania Avenue, N.W.<br>Suite 500 West<br>Washington, DC 20037<br>(202) 639-6500<br>(202) 639-6604 (Facsimile)<br>cseebald@velaw.com<br>aatkins@velaw.com<br>lvaala@velaw.com<br>davidsmith@velaw.com<br><br>SLOVER & LOFTUS LLP<br><br>By: /s/ John H. LeSeur<br>John H. LeSeur (D.C. Bar No. 293357)<br>Frank J. Pergolizzi (D.C. Bar No. 405174)<br>Peter A. Pfohl (D.C. Bar No. 456854)<br>1224 Seventeenth Street NW<br>Washington, D.C. 20036<br>(202) 347-7170<br>(202) 347-3619 (Facsimile)<br>jhl@sloverandloftus.com<br>fjp@sloverandloftus.com<br>pap@sloverandloftus.com<br><br>*Counsel for Plaintiffs AK Steel Corporation; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Exelon Generation Company, LLC; North Star BlueScope Steel LLC; Steelscape, LLC; Wisconsin Electric Power Company* |

| | |
|---|---|
| /s/ Nathan P. Eimer<br>Nathan P. Eimer (pro hac vice)<br>Scott C. Solberg (pro hac vice)<br>Benjamin Waldin (D.D.C. Bar No. IL0061)<br>EIMER STAHL LLP<br>224 South Michigan Avenue<br>Suite 1100<br>Chicago, IL 60604<br>Telephone: (312) 660-7600<br>Fax: (312) 692-1718<br>neimer@eimerstahl.com<br>ssolberg@eimerstahl.com<br>bwaldin@eimerstahl.com<br><br>Ryan J. Walsh (D.C. Bar No. 1029407)<br>EIMER STAHL LLP<br>10 East Doty Street<br>Suite 800<br>Madison, WI 53703<br>Telephone: (608) 441-5798<br>Fax: (608) 441-5707<br>Email: rwalsh@eimerstahl.com<br><br>*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Union Carbide Ethylene Oxide/Glycol Company, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, and Gerdau Macsteel, Inc.* | |

| | |
|---|---|
| /s/ Sandra L. Brown<br>Sandra L. Brown (D.C. Bar No. 452988)<br>David A. Wilson (D.C. Bar No. 430400)<br>Daniel Ferrel McInnis (D.C. Bar No. 452452)<br>David E. Benz (D.C. Bar No. 485868)<br>Joseph A. Smith (D.C. Bar No. 1010223)<br>THOMPSON HINE LLP<br>1919 M Street N.W., Suite 700<br>Washington, D.C. 20036<br>Telephone: (202) 331-8800<br>Facsimile: (202) 331-8330<br>sandra.brown@thompsonhine.com<br><br>Robert F. Ware (*pro hac vice* motion to be filed)<br>Jennifer S. Roach (*pro hac vice* motion to be filed)<br>THOMPSON HINE LLP<br>3900 Key Center<br>127 Public Square<br>Cleveland, OH 44114<br>Telephone: (216) 566-5500<br>Facsimile: (216) 566-5800<br><br>*Counsel for Plaintiffs Alabama Power Company, Georgia Power Company, Mississippi Power Company, Northern Indiana Public Service Company LLC, Union Electric Company d/b/a Ameren Missouri and Ameren Development Company* | /s/Robert D. W. Landon, III<br>Robert D. W. Landon, III<br>Richard Alan Arnold<br>William J. Blechman<br>Douglas H. Patton<br>Samuel J. Randall<br>Joshua B. Gray<br>Brandon S. Floch<br>KENNY NACHWALTER, P.A.<br>1441 Brickell Avenue<br>Suite 1100, Four Seasons Tower<br>Miami, Florida 33131<br>Tel.: (305) 373-1000<br>Fax: (305) 372-1861<br><br>*Counsel for Sterling Steel Co., LLC* |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF)<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, individually and on behalf of a class of all those similarly situated, bring this action for damages under the antitrust laws of the United States against Defendants, and allege as follows:

**NATURE OF THE ACTION**

1. This is an antitrust class action charging the four largest United States-based Class I railroads with price fixing in violation of Section 1 of the Sherman Act. Plaintiffs bring this action on behalf of themselves and a proposed class of direct purchasers who purchased unregulated rail freight transportation services directly from Defendants from July 1, 2003 until at least June 30, 2007 (the "Class Period") and who were assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

2. Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX") and Norfolk Southern Railway Company ("NS") (together, "Defendants") conspired to use rail fuel surcharges, which were added to

customers' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States. A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel. Through their collective action, however, the Defendants conspired to impose Rail Fuel Surcharges that far exceeded any increases in the Defendants' fuel costs, and thereby collected billions of dollars of additional profits during the four year period of the conspiracy.

3. In the early 2000s, the Defendants sought to increase their revenues by raising prices. However, unlike in the past era of full regulation of the railroad industry, when the railroads could have applied to the Interstate Commerce Commission (the "ICC") for across-the-board rate increases, the railroads now no longer could do so as a result of deregulation that began in the early 1980s with the Staggers Act. Given deregulation, the only practicable way the railroads now could increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible.

4. Defendants BNSF, UP, CSX and NS – which together control about 90% of rail freight traffic in the United States – conspired in 2003 to use an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits. But this plan faced a significant hurdle: as of 2003, the great majority of rail freight transportation agreements included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index ( the "AII") which was published by the railroad trade organization known as the Association of American Railroads (the "AAR"). The AII (and a related index called the Rail Cost Adjustment Factor ("RCAF") which is based on the AII) already permitted full recovery by the railroads of actual fuel cost

15 % – even though fuel accounted for only a portion of the total rail transport cost (which is what the AII and RCAF indexes had been designed to reflect). This agreed approach yielded the Defendants billions of dollars of additional profits.

14. BNSF, UP, CSX and NS maintained their conspiracy during the Class Period by uniformly computing the surcharges as a percentage of the rail freight transport base rate, and by agreeing upon common trigger points for adjusting the percentages monthly. The Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing. The Defendants also declined to undercut one another on fuel surcharge prices, even though the surcharges far exceeded each Defendant's actual increases in fuel costs.

15. BNSF, UP, CSX and NS also took other collective actions to enforce the conspiracy and make it effective. For example, pursuant to the conspiracy, they largely stopped entering into long-term contracts and entered instead into contracts for periods of approximately 30 days, or with 30-day cancellation provisions – making it easier to implement the fuel surcharges, which were adjusted monthly. The Defendants also limited the previously prevailing practice, in circumstances where more than one railroad (usually an eastern and a western railroad) was involved in long-distance freight transport, of sending a customer a single bill for the entire transport. Instead, the Defendants, pursuant to the conspiracy, increasingly switched to having each railroad on a multi-railroad trip send a separate bill (and thus each could separately impose its own fuel surcharge). This facilitated each Defendant recouping its share of the supracompetitive profits from the Fuel Surcharge program imposed by the conspiracy. Such a switch to separate invoicing on multi-railroad trips could be accomplished only through collective action of the Defendants. The Defendants also began refusing to negotiate discounts

37. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**CLASS ACTION ALLEGATIONS**

38. Plaintiffs bring this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated. The proposed "Class" is defined as:

> All direct purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from July 1, 2003 until at least June 30, 2007 (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and all federal governmental entities.

39. The Class is numerous and geographically dispersed, and, given the magnitude of the commerce involved, joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are many thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

40. Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and all members of the Class directly purchased unregulated rail freight transportation from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of Defendants in connection with the

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

Dated: April 15, 2008


| | |
|---|---|
| By: /s/ Stephen Neuwirth<br>Stephen Neuwirth<br>Daniel Brockett<br>Sami H. Rashid<br>QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>(212) 849-7000 | By: /s/ Michael D. Hausfeld<br>Michael D. Hausfeld (D.C. Bar #153742)<br>Benjamin D. Brown (D.C. Bar #495836)<br>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.<br>1100 New York Avenue NW<br>Suite 500, West Tower<br>Washington, DC 20005<br>(202) 408-4600<br><br>Steig D. Olson<br>COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.<br>150 E. 52nd Street, 30th Floor<br>New York, NY 10022<br>(212) 838-7797 |
| *Interim Co-Lead Class Counsel for the Proposed Direct Purchaser Class* | |