# Defendants' Appendix

# Volume 23 of 40

# DA11000 - DA11792

367 I.C.C. 425, 1983 WL 28016

SURFACE TRANSPORTATION BOARD (S.T.B.)

EXEMPTION FROM REGULATION—BOXCAR TRAFFIC

Decided April 29, 1983

****1** Transportation by boxcar of all commodities except nonferrous recyclable materials is exempted from regulation under authority of 49 U.S.C. 10505(a). Railroads are authorized to impose charges for storage or return of empty boxcars and at their option to negotiate bilateral car hire agreements to apply in lieu of car hire rates prescribed by the Commission.

EX PARTE NO. 346 (SUB-NO. 8)

**DECISION**

***468** By the Commission, Chairman Taylor, Vice Chairman Sterrett, Commissioners Andre, and Gradison.

***425** BY THE COMMISSION:

I. INTRODUCTION

By petition filed May 22, 1981, the Consolidated Rail Corporation (Conrail) asked the Commission to grant an exemption from regulation under 49 U.S.C. 10505(a) [1] for all transportation it provides in boxcars. The exemption would apply to movements in all boxcar types—equipped, unequipped, refrigerated, and livestock [2]—and would embrace all regulated aspects of a movement, including rates, divisions, car hire, car service, and common carrier duties. In response to Conrail's petition, the Commission instituted this rulemaking proceeding inviting public comment not only on the proposed exemption as applicable to Conrail, but also on a partial or complete exemption of boxcar transportation by all railroads nationwide. [3]

More than 200 comments were filed by Federal and State agencies, railroads, boxcar lessors, shippers, motor and water carriers, and others. ***426** Replying to the comments, Conrail offered a somewhat less expansive proposal: to end boxcar rate regulation for all commodities except non-ferrous recyclable materials, allow railroads to impose storage and return movement charges on empty boxcars, and permit carowners and users to negotiate car hire charges in lieu of Commission-prescribed charges; but to retain Commission jurisdiction over car hire and car service mandatory interchange of equipment, reciprocal switching, car supply, and freight car pooling agreements. We received supplemental comments on Conrail's modified proposal. [4] On November 23, 1982, we heard oral argument.

After carefully considering the comments and arguments, we are exempting boxcar service from regulation to the extent described in Conrail's modified proposal. The exemption applies to all railroads subject to our jurisdiction. It affects the pricing of boxcar transportation and the charges that apply to boxcar equipment. We shall discuss each of these separately.

II. EXEMPTION OF BOXCAR TRAFFIC FROM RATE REGULATION

A. *Background.*—Until the mid-seventies, 1970s, the Commission administered a pervasive scheme of railroad rate regulation to preserve rather complex, rigid relationships among the freight rates charged to competing shippers located throughout the country. Challenged rates were often judged unreasonably high if they exceeded rates on 'comparable' movements and were held to be discriminatory if their disparity with other rates was not justified in accepted, and highly limited, ways. Among the key features of this regulatory scheme were the required publication and filing of tariffs by railroads specifying all their freight

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

rates; the opportunity for shippers and other railroads to challenge filed rates before the Commission's Suspension Board at the time of filing; and the right of any party to challenge the lawfulness of an existing rate at any time by filing a complaint with the Commission. This scheme of regulation minimized upward and downward rail rate flexibility. It often prevented timely rail rate increases to adjust to changing rail costs and rail rate decreases to compete for new traffic or retain existing traffic. The rigidity of railroad rate structures was reinforced by rules governing shipments transported jointly by two or more connecting carriers under a single rate. Any party to such a joint rate that sought to change or cancel the rate without the concurrence of the other participants was required to justify its action to the Commission in an adversary proceeding that was generally strongly contested by the other participants and extraordinarily expensive and time consuming.

****2 *427** The rise of a vigorous trucking industry in the United States, and the inability of the regulated rail industry to compete effectively in its pricing and routing decisions were among the reasons for the steady financial deterioration of the industry and a number of bankruptcies, including that of the giant Penn-Central Transportation Company, the main predecessor to Conrail. In the 1970's, in recognition of these problems, public policy toward the railroads took a new turn. Public and congressional sentiment were principally embodied in the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act) [5] and the Staggers Rail Act of 1980 (SRA) [6] The premise of both bills was that trucking competition had rendered continued railroad regulation, to a large degree, both undesirable and unnecessary. It was undesirable because it deprived the railroads of the marketing and pricing flexibility needed to compete effectively both inter- and intramodally. It was largely unnecessary to protect users of the rail system because the option of truck transportation gave most shippers all the protection they needed against unfair or unreasonable railroad practices.

To provide rail carriers with greater flexibility in marketing their services more competitively, the SRA significantly limited the Commission's regulatory powers. It withdrew Commission jurisdiction to find rates unreasonably high when they do not exceed specified ratios of revenue to variable cost, [7] precluded the Commission from finding rates unreasonably low when they cover a narrow category of railroad expenses, [8] eliminated the unlawfulness of discrimination where the compared rates apply over different routes, [9] permitted cancellation by a carrier of marginally profitable or unprofitable joint rates without the concurrence of connecting carriers, [10] and allowed carriers and shippers to negotiate contracts in lieu of relying solely on published tariffs. [11]

While these deregulatory steps freed the railroads of major restrictions on a large share of their activities, Congress left in place much of the regulatory mechanism. In particular, carriers must still file and conform to public tariffs specifying the prices charged for all noncontract services performed between all points and areas served. Price changes must be delayed to observe tariff notice requirements. Moreover, tariffs are still subject to expensive and time-consuming Commission proceedings and litigation.

***428** Congress addressed the problem of these and other remaining regulatory encumbrances by instructing the Commission to exempt railroad services from regulation under specified circumstances. Exemptions under the 4–R Act required findings that regulation was unduly burdensome and served no useful purpose. The SRA exemption provision, now codified at 49 U.S.C. 10505(a), (see footnote 1), eliminates the test of burdensomeness, and instead requires that exemptions be granted wherever continued regulation is unnecessary. The Conference Committee's report on the SRA places an affirmative duty on the Commission to 'pursue partial and complete exemptions from remaining regulation' so as to 'eventually reduce its exercise of authority to instances where regulation is necessary to protect against abuses of market power * * * reviewing carrier actions after the fact to correct abuses * * *.' [12]

****3** The Commission has granted general exemptions from regulation for rail transportation of fresh fruits and vegetables (1979), certain other food items (1980), vegetable seeds (1981), citrus pomace (1981), hops (1982), liquid iron chloride (1983), and other agricultural commodities except grain and sunflower seeds (1983). Now pending is a proposed exemption for frozen foods. In addition, the Commission has exempted *all* transportation provided in rail 'piggyback' equipment (trailers and containers on flatcars, or TOFC/COFC) (1981). We are also considering an exemption for export coal. [13]

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

B. *Overview of public comments.*—Conrail asserts that a boxcar exemption would further the goals of the SRA and of the national rail transportation policy embodied therein. Specifically, Conrail envisions that, by eliminating tariff filing requirements, an exemption would obviate much paperwork [14] and end the delay in rate adjustments caused by notice ***429** requirements and administrative proceedings. It would also lead to simpler and more responsive rate quotations tailored to the circumstances of particular movements, and would facilitate the adjustments needed to keep each rate both competitive and compensatory.

An exemption would also give Conrail more freedom to negotiate satisfactory divisions of revenue from joint rates or to establish proportional rates to assure the profitability of interline traffic. [15] Although 49 U.S.C. 10705a enables a carrier to cancel or apply surcharges to joint rates, Conrail views this remedy as less than satisfactory since it applies only to traffic making little or no contribution to overhead costs, requires time-consuming preparation for administrative proceedings and possible litigation, and leads to a proliferation of surcharges, making tariffs more complex.

Conrail states that the value of pricing flexibility and ratemaking simplicity has already been shown in the context of other exemptions. On fresh fruits and vegetables traffic, for example, carload volume increased by 23 percent the first year after exemption, [16] and by an additional 11 percent the next year.

Conrail predicts that the threat of existing and potential motor carrier competition, as well as competition between railroads and other market forces, such as geographic and product competition would check the railroads' ability to abuse any market power they may possess on boxcar traffic. Further, Conrail submitted data substantiating its claim that it has little or no market power over most boxcar traffic. Although Conrail petitioned for an exemption applicable only to its own traffic, it states that application of the exemption to all railroads would be desirable to facilitate negotiations on jointly provided services.

Among the railroads, the Southern Pacific Transportation Company (SP) and its subsidiary, the St. Louis Southwestern Railway Company, also support a nationwide exemption of boxcar traffic from rate regulation. Their experience under the Commission's exemption of TOFC/COFC traffic is favorable, and they believe that similar results would occur if regulatory ratemaking restraints were removed from boxcar traffic. They state that the railroads reversed a trend of decline in TOFC/COFC shipments in 1981 after the traffic was exempted from regulation in March of that year, while boxcar loadings continued to decline. SP credits the TOFC/COFC success to the carriers' greater willingness to commit capital, time, manpower, research and service to TOFC/COFC operations given the assurance that prospective regulatory action would not negate the benefits of the commitments.

****4** ***430** The Federal Trade Commission (FTC), the Department of Transportation (DOT), and the Department of Justice (DOJ) strongly support an exemption of boxcar traffic applicable to all railroads. They argue that maximum reliance on freely competitive ratemaking is the most cost-effective approach to meeting shipper needs and protecting them from abuse of market power. They also contend that railroad pricing freedom is constrained not only by truck competition but also by intramodal competition and by the ability of users of a given commodity to draw from more than one source of supply or use substitute products. DOJ suggests that the Commission exclude from the exemption any individual commodities found subject to abuse of railroad market power.

Shippers supporting the exemption state that their traffic in many cases has already shifted substantially from boxcars to trucks or TOFC/COFC service. They expect a boxcar exemption to enable the railroads to offer more flexible and responsive service. Some of the supporting shippers deal in commodities such as coal that do not move in boxcars. They contend that they are paying unnecessarily high rates to subsidize unprofitable rail operations such as boxcar service, and they support an exemption to allow the railroads to rationalize their boxcar rate levels.

A user of refrigerated boxcars, Iowa Beef Processors, Inc., states that the refrigerated car supply has gravitated toward traffic now exempt from regulation, to the detriment of shippers of regulated commodities, such as meat. It seeks an exemption for all commodities transported in refrigerated boxcars.

Many railroads, on the other hand, oppose the exemption, believing that rate exemption of all traffic transported in boxcars is too large a step to take at one time. They urge the Commission to pursue exemptions on a commodity-by-commodity basis. Carriers connecting with Conrail fear that the latter's free use of proportional rates will cause overall rate levels on through shipments to rise to noncompetitive levels and cause diversion to trucks. Short-line railroads fear that selective joint rate cancellations by Conrail will leave them without connections and leave their shippers without service.

The Departments of Defense (DOD) and Agriculture (USDA) also oppose a boxcar exemption. DOD regards regulation as necessary to assure that boxcar service will continue to be provided. USDA fears increased food transportation costs and loss of service to certain destinations. The Commission's Office of Special Counsel, although not opposed to an exemption for refrigerated and livestock boxcars, would limit any further exemption to individual commodities identified as not being subject to abuse of market power.

***431** A number of shippers, along with several State and local agencies, also oppose a boxcar exemption. Some assert that the absence of tariffs would mean a loss of stability in transportation rate levels and would deprive shippers of knowledge of the rates paid by their business competitors. Small shippers say that they lack leverage to negotiate favorable rate levels and fear that an exemption would encourage rate discrimination. There is also a fear that car supply would become unreliable if carriers are exempted from the common carrier obligation to provide equipment for loading upon request. Many shippers regard themselves as captive to railroads and believe that an exemption would expose them to excessive rates.

****5** Finally, certain motor carriers and a water carrier seek continued boxcar regulation to protect them from predatory pricing. Several State regulatory commissions ask that the boxcar exemption be applied to intrastate traffic only at their discretion. Other groups seek assurance that uniform packaging requirements and loss and damage liability would continue.

C. *Threshold issues.*—Some participants argue that an exemption from rate regulation for all boxcar traffic is beyond our authority. They contend that Congress intended our exemption authority to extend only to single commodities or minor segments of railroad service. Wereject this view. Our mandate is framed in very broad terms and extends to exemptions for 'a person, class of persons, or a transaction or service' [17] whenever we make the findings required. Our action here is applicable to a class of persons (railroads subject to our jurisdiction) and to a service (transportation provided in boxcars). Congress specifically sanctioned a comparably broad interpretation of these terms in stating that it would permit an exemption of TOFC/COFC service. [18] Moreover, Congress must have foreseen that for the Commission to 'eventually reduce its exercise of authority to instances where regulation is necessary to protect against abuses of market power,' [19] it must apply the exemption authority to broad categories of service where circumstances permit. Furthermore, our prior equipment exemptions have been sustained by the courts and by all reports are working quite well, see *e.g.*, Ex Parte 230 (Sub-No. 5), *Improvement of TOFC/COFC Regulation* (not printed), served February 19, 1981, affirmed *sub. nom. American Trucking Associations* v. *I.C.C.*, 656 F.2d 115 (5th Cir. 1981). In any event, we have given considerable attention here to the commodities normally transported in boxcar.

***432** Another general argument made by opponents is that the railroads do not need an exemption of boxcar traffic because of the other freedoms they have been granted under the Staggers Act. In effect, they argue that regulation should be retained, because it is not unduly burdensome. This argument fundamentally misconceives the mandate of section 10505(a). Congress has directed that the Commission *shall* grant exemptions wherever it finds that continued regulation is *not necessary*. The ultimate issue is not whether regulation is harmless, but only whether it *must* be retained to carry out the rail transportation policy and protect shippers from market power abuse. If regulation is not necessary under these criteria, our instructions are to grant the exemption.

The great depth of the congressional commitment to use of the exemption power is further revealed by the SRA's modification of the earlier version of section 10505 so as to eliminate a requirement that the Commission act 'only after an opportunity for a proceeding.' In other words, the statute no longer even requires us to develop a public evidentiary record before we utilize our exemption power. (Nevertheless, out of a desire to act with the best possible record before us, we solicited and received substantial public commentary.)

**6 Although one of the options before us is to grant an exemption for Conrail alone, this approach has virtually no support in the record and requires little discussion. Conrail and virtually every other party recognize the desirability of applying any exemption to all railroads. To exempt the boxcar traffic of Conrail while subjecting the traffic of other carriers to continued regulation would give Conrail a competitive advantage not warranted by economic considerations. In addition, it would introduce greater complexity into the provision of boxcar service by railroads and its use by shippers. For these reasons and in light of our action on the broader exemption, we will reject the Conrail-only option without further discussion and focus our attention on the question of exempting the boxcar traffic of all railroads.

To grant an exemption, we must find *both* (1) that continued regulation is not necessary to carry out the policy of section 10101a, *and* (2) that either the transaction is of limited scope *or* that regulation is not needed to protect shippers from the abuse of market power. We grant the exemption on the basis that continued regulation is not necessary either to carry out the rail transportation policy of section 10101a or to protect shippers from the abuse of market power. Therefore, there is no need to determine whether a boxcar exemption is a matter of limited scope.

We next discuss whether continued regulation of boxcar traffic is necessary with regard to each of the major aspects of rate regulation addressed by the participants in this proceeding.

D. *Maximum reasonableness.*—Whether continued regulation of boxcar traffic is necessary to prevent unreasonably high rates is an important ***433** question under the exemption criteria of section 10505(a). One aspect of the rail transportation policy is to maintain reasonable rates in the absence of effective competition (section 10101a(6)). Controlling unreasonable rates is also an essential component of protecting shippers from the abuse of market power.

1. *General constraints on boxcar rates.*—The fundamental premise underlying the proposal for a boxcar exemption is that truck competition for the transportation of boxcar commodities is pervasive and limits the railroads' pricing freedom. The typical boxcar commodity is a packaged or palletized commodity loaded by a forklift truck—the same type of commodity that is typically transported in motor carrier van trailers. Virtually anything that can be transported in a boxcar can be transported in a truck. Motor carriage tends to be faster, more accessible, more convenient, and sometimes less damaging to freight than rail service, meaning that boxcar transportation generally must be priced to reflect these service differences to compete successfully. Thus, the market itself places an effective ceiling on rail rates for boxcar transportation, and regulation is unnecessary to assure that boxcar rates do not rise to unreasonably high levels.

**7 A number of parties contend, nonetheless, that maximum rate regulation of boxcar traffic is necessary. They argue that, where the cost of truck service is much higher than the cost of reasonably priced rail service, truck competition does not prevent boxcar rates from rising to exorbitant levels. They cite long distance, large volume, and special loading characteristics as factors that can make truck transportation more costly and, in effect, of negligible competitive importance.

Shippers will not have to rely on truck competition alone to control boxcar rates. Alternate routes over different railroads are often available, especially over longer routes, giving shippers the benefit of intramodal price competition. [20] Moreover, most boxcar commodities can also be transported in other types of rail equipment. Since shippers control the type of car ordered, they can turn to nonboxcar equipment if threatened with unreasonable boxcar rates. On TOFC/COFC equipment, rates are strictly controlled by truck competition, while on other types of equipment, market dominant rates remain regulated.

A shipper's transportation options are not the only market constraint on boxcar rates. Carriers are aware that there is a certain rate level above which a shipment simply will not move. The shipper must set a market price for his product at a level that covers, among other things, the cost ***434** of transportation. At a given market location, if the delivered price of the product exceeds the cost to a buyer of purchasing from another source or purchasing a substitute product, the shipper cannot compete in that market and will cease shipping to it. Carriers have no incentive to price their shippers out of their markets and thereby lose their own profitable business. Geographic and product competition, then, often set effective limits on the carrier's pricing freedom.

It should also be recognized that powerful shippers can exert leverage to control transportation rates in markets where competition may be weak. Many rail shippers are large companies shipping or receiving a variety of commodities regularly at a number of points. The railroads serving them simply cannot afford to lose their patronage. Thus, even if a carrier should find itself in a position to charge an unreasonably high rate to the company at one location, it normally would refrain from doing so to avoid a retaliatory loss of the shipper's business at that or at other locations where competition exists.

2. *Measures of ability to abuse market power.*—The record contains two types of general quantitative data on the railroads' ability to abuse market power in pricing boxcar commodities. Modal share figures show the percentage of total traffic of particular commodities that have been handled by boxcars and by trucks. Revenue to variable cost ratios provide a basis for judging rate levels on particular commodities. [21]

Conrail adduced 1980 modal share figures for 18 groups of commodities moving to, from, or within the Northeast. [22] These 18 groups account for over 70 percent of total boxcar tonnage in 1980. For the majority of the groups, trucks transported well over 50 percent of the traffic. In all but two groups, the boxcar share is below 40 percent. Boxcar shares increase substantially for shipments moving farther than 1,000 miles, but exceed 90 percent for only 3 of the 18 commodity groups even at that distance. Boxcar shares also increase for shipments over 60,000 pounds, again exceeding 90 percent for 3 of the 18 groups. Commodities moving by design or choice in larger shipments will tend to move more in boxcars than in trucks as compared to smaller shipments. However, as noted by Conrail, shipment size '* * * reflects the actual loaded weight of boxcars and trucks, not the inherent commodity characteristics or order quantities which might limit a product to a single mode.' In addition, DOT presented 1977 nationwide figures for 25 groups of commodities which show that none had a truck market share lower than 20 *435 percent and most were well above 50 percent. [23] These data show that trucks have already captured the lion's share of the market. Further, these statistics on market share percentages are more indicative of what transportation alternatives have been selected in the past as opposed to what alternatives are currently available, especially as a result of the more recent regulatory reform legislation.

**8 Exemption opponents raise two major questions about the market share data. First, they contend that the commodity groups analyzed by Conrail and DOT are aggregations of many individual commodities. Thus, the market share figures are averages that may mask high boxcar market shares for certain commodities within the groups. Second, they argue that even though trucks may transport a high share of a particular commodity, the traffic in that commodity which continues to move by boxcar may have different characteristics making it captive to railroads.

Conrail also provided revenue to variable cost ratios for the 18 commodity groups in its study. [24] The ratio for the highest group is only 154 percent; all but four groups have ratios below 120 percent. The Commission has no jurisdiction even to examine the reasonableness of any rate producing a ratio below 170 percent. [25] Thus, it is clear that rates on all these commodity groups are severely constrained by market forces.

Exemption opponents challenge Conrail's reliance on average ratios for aggregations of commodities. A witness for Itel Corporation, Robert L. Banks, used data from a 1977 report by A. T. Kearney to show that some of the commodities included in Conrail's study have ratios above 180 percent for some of their movements on a nationwide basis. [26] Rates by themselves do not indicate the degree of market power possessed by the railroad, since they do not tell us whether a proposed rate will actually move traffic over an extended period of time. If the rate is high, shippers may find alternatives more attractive, forcing the rate back down again. Some may accept the high rate because of a preference for the carrier or because of a premium service associated with it. The market share data and revenue/cost ratios clearly show, however, that on the vast majority of boxcar traffic railroads are experiencing severe competition from motor carriers and are under stringent market constraints in setting boxcar rates. Moreover, we have criticized on a number of occasions the validity of the Kearney report data. Exemption opponents, at best, have raised the possibility that there may be occasional exceptions to this general conclusion among the particular commodities transported by boxcar.

***436** Moreover, we would be totally unable to exercise our powers to exempt a 'class of persons' or a 'service' under section 10505 if we were required to find that every person in the class (rather than the class as a whole) or every recipient of the service (rather than the recipients as a group) satisfied the requirements for an exemption. Of course, in an investigation under section 10505, reasonable classes of persons and categories of service should be defined to guide the investigation. Here, the evidence of record divided boxcar commodities into reasonably related groups under a standard classification system. We do not believe that, once reasonable classes and categories have been defined, as they have been here, the statutory criteria could feasibly be applied to individual shippers and movements within each class.

****9** 3. *Commodities.*—While we see no need to examine every possible boxcar commodity individually, we shall review specifically those few commodities about which the creates cause for concern has been presented. These are: auto parts, paper and forest products, grain, and metals.

a. *Auto parts.*—The major American automobile manufacturers oppose a boxcar exemption, arguing that transportation of motor vehicle components by truck is not an economical alternative because the traffic is geared to boxcar transportation. Auto parts are transported in high volume on specially designed reusable racks in extra large (86 foot) boxcars. Shippers assert that the same volume could not be handled efficiently in truck-sized shipments.

The market share and revenue/cost data submitted by Conrail and DOT on automotive equipment unfortunately lump together auto parts transported in boxcars and finished vehicles transported in a different type of freight car.[27] An attachment to the statement of Ford Motor Company shows that about half of the 1977 shipments of automobile parts within the Eastern United States were transported by truck.

Conrail indicates that automobile manufacturers are now shifting more of their parts traffic to trucks as they attempt to minimize in-process inventory. Conrail also states that there is strong competition between railroads to transport automobile parts. Of the 38 automotive assembly plants in the eastern ratemaking territory, 28 have direct access to more than one railroad. Even plants served by a single carrier receive traffic for which many routings are possible.

Although boxcars may be the lowest cost mode of transportation for many shipments of automobile parts, it does not necessarily follow that boxcar rates on this traffic would rise to unreasonable levels in the ***437** absence of regulation. With trucks already heavily involved in this market, any increase in boxcar rates can be expected to cause some diversion of traffic. Intramodal competition also exists to prevent any individual carrier from pricing at unreasonable levels. Finally, automobile manufacturers are a classic example of large shippers that can exercise economic leverage to deter unreasonable pricing by the carriers serving them. We have little doubt that this combination of factors would suffice to preclude any significant abuse of market power on auto parts traffic in the absence of regulation. Indeed, rail carriers have entered into a number of contracts with auto parts shippers. This reflects the relatively equal bargaining power of the two groups and the carriers' desire to retain this traffic. Furthermore, high revenue/cost ratios do not necessarily mean that market power is or can be abused. It may, instead, reflect a shipper's willingness to pay more for a premium service, see also 49 U.S.C. 10709(d)(4).

b. *Paper and forest products.*—The category of paper and forest products embraces a large array of commodities, only a few of which present any serious question concerning market power. Conrail's market share data[28] show an overall boxcar share of 85 percent for pulp.[29] The boxcar share rises to 96 percent for shipments over 1,000 miles. Paperboard has an overall boxcar share of 75 percent, rising to 96 percent for shipments over 60,000 pounds. Comparable figures for paper are 40 percent and 94 percent. The boxcar share of millwork is only 37 percent overall, rising to 90 percent for movements over 1,000 miles. On the other hand, according to Conrail data, none of these commodity groups has an average revenue to variable cost ratio above 122 percent. Itel's evidence shows that about 15 to 25 percent of the shipments of these commodities moved at revenue to variable cost ratios above 180 percent; newsprint stands out with 64 percent of shipments above that level.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works

****10** Even though boxcars transport relatively high percentages of the shipments of these commodities, it is nonetheless apparent that railroads are generally subject to severe market constraints in pricing that transportation. Trucks already participate substantially in the shorter movements and smaller shipments. Even in the case of newsprint, Conrail states that it has received requests from shippers for competitive rate reductions, showing that trucks are increasingly viable competitors even at fairly remote origins in Eastern Canada.

Intramodal competition also exists for the transportation of paper and forest products, even where only one rail carrier directly serves a ***438** receiver. Reciprocal switching is available at many points. At others, rail competitors interline with trucks to effect delivery—as CSX is doing on pulpboard shipments to points in Conrail's territory. Conrail states that it experienced a precipitous falloff in weekly carloadings of SP when it put a surcharge into effect, showing heavy diversion to rail and truck competitors. Finally, these commodities are available from a number of producers, so that no carrier can price a movement excessively without making its shipper's product uncompetitive and thereby drying up the flow of traffic. We conclude that continued regulation of boxcar transportation of paper and forest products is not necessary to protect shippers from unreasonably high rates.

c. *Grain.*—Several grain shippers oppose a boxcar exemption, although others support it. Conrail's study shows only 23 percent of grain mill products moving by boxcar, with an average ratio of revenue to variable cost of only 107 percent, and 41 percent of the traffic moving by truck. DOT's nationwide figures show the truck share to be even greater. Much of the truck and boxcar traffic appears to be grain in packages or bags.

The only serious question of market power in grain transportation concerns bulk shipments. The Miller's National Federation alleges that revenue to variable cost ratios on grain are frequently in excess of 200 percent and would rise to 300 or 400 percent in the absence of regulation. It cites the recent decision of an Administrative Law Judge which determined that a railroad's rates on wheat and barley transported from Montana to the Pacific coast produced ratios of nearly 300 percent, a level which the Administrative Law Judge found to be unreasonably high. [30]

Other evidence in the record substantially mitigates these concerns in our view. Boxcars transport only a minor and rapidly decreasing share of bulk grain traffic, with most rail transportation provided in covered hopper cars. For example, in North Dakota, boxcars transported 31 percent of the interstate tonnage in 1979, but only 2 percent in 1981. [31] This record, and our knowledge of transportation issues generally, convince us that the 40-foot boxcars used to transport bulk grain are obsolete and eventually will all be retired from service and branch lines may be upgraded to accommodate larger covered hoppers. As long as shippers have the option of shipping in regulated covered hopper cars and in trucks, exemption of boxcar rates will not expose them to abuse of market power by railroads. We note that the Commission will retain, as ***439** part of its jurisdiction over car supply obligations, its ability to ensure that railroads provide shippers with an appropriate supply of available regulated equipment.

****11** d. *Metals.*—Comments submitted by shippers of metals are evenly divided between supporters and opponents of a boxcar exemption. Conrail's evidence shows high truck shares and low revenue to variable cost ratios for steel mill products, nonferrous metal products, and nonferrous metal shapes.

Although shippers of aluminum and aluminum products claim to be defenseless against boxcar rate increases, large amounts of their traffic move by truck or by other types of rail equipment. The average revenue to variable cost ratio that they claim for their boxcar movements, 'well over 160 percent,' is below our jurisdictional threshold.

Aluminum shippers argue that railroads have a substantial cost advantage over trucks in carrying large items such as aluminum ingots over long distances. They have cited a pending Commission proceeding in which rates on aluminum ingots from the Northwest to the East, Midwest, and South were shown to produce revenue to variable cost ratios averaging 227 percent, which an Administrative Law Judge deemed to be unreasonably high. [32]

Even if, as these shippers contend, some aluminum shipments are tied to railroads, they are not tied to boxcars. The traffic at issue in the cited *Aluminum Association* case moved in bulkheaded flatcars, gondola cars, and boxcars. Some of it, indeed, moved by truck, on flat-bed trailers. As long as shippers have the option of using regulated service, their boxcar rates can be expected to remain competitive with the regulated service rates. Again, we note that the Commission will retain its ability to ensure that railroads provide shippers with an appropriate supply of available regulated equipment. In the case of those aluminum products that do move chiefly by boxcar, other market forces exist to control rail rate levels. An Administrative Law Judge recently found that shipments of 'aluminum can sheet' face both geographic and product competition. [33] We conclude that continued regulation of boxcar rates is not necessary to protect aluminum shippers from the abuse of market power.

e. *Other commodities.*—We have specifically discussed those commodities about which the most plausible concerns have been expressed. Some shippers of a number of other commodities have claimed to be 'captive' to railroad boxcar transportation and unable to resist the ***440** imposition of unreasonably high freight rates. In no case, however, have we found reason to believe that the boxcar rates on these commodities are unconstrained by the market forces we have discussed.

However, we will not exempt nonferrous recyclables from regulation in boxcar service, only because Congress itself has singled them out for the application of special standards. In section 10731(e), Congress directs that rates on these commodities may not produce a revenue/cost ratio higher than necessary to cover a pro rata share of the railroads' fixed costs, a ratio that currently stands at 146 percent. [34] In view of this specific provision, Congress apparently did not intend our exemption authority under section 10505(a) to apply to nonferrous recyclable commodities.

****12** 4. *Conclusion: maximum reasonableness.*—Rate regulation is arguably necessary to prevent abuse of market power only if market forces would permit railroads to increase rates on the service to unreasonably high levels without experiencing a severe loss of traffic. After careful consideration of the present record, we conclude that railroads could not successfully maintain unreasonably high rates on any commodity transported by boxcar.

On most boxcar commodity groups, trucks already are the dominant transportation mode. Even in cases where they are not, boxcar rate levels are generally well below our jurisdictional threshold. We have separately considered the few commodity groups of most apparent concern and found the existence of ample market forces to control boxcar rate levels.

Although it may be that occasional boxcar shipments move at rates above a 180-percent revenue to variable cost ratio, that ratio is only a jurisdiction test, not a reasonableness one. In fact Congress explicitly stated that no presumption of unreasonableness or market dominance attaches to a rate above the threshold level. 49 U.S.C. 10709(d)(4). We have often held rates at higher levels to be reasonable. The present record identifies no commodity moving chiefly by boxcar on which the rate levels are now being controlled by Commission maximum rate prescriptions rather than by market forces.

Conceivably, there exists a specific commodity that for some reason can be transported only by boxcar and on which the rate levels, being uncontrolled by intramodal competition or other market forces, would rise to very high levels in the absence of regulation. We do not totally rule out the possible existence of such a situation. Nonetheless, the Commission must not succumb to 'paralysis by analysis.' Congress desires that we move aggressively forward in extending the exempt sector of rail transportation, without laboriously erasing every shadow of a ***441** doubt before we act. Indeed, it is not possible to erase all doubts about the consequences of an exemption before the fact. Thus, Congress declared that we should instead make exemptions effective and then deal with any special problems 'after the fact,' not on *a priori* possibilities. (As noted *supra*, we are no longer even required to provide an 'opportunity for a proceeding' before we create an exemption under section 10505.) In this spirit, we find no reason to delay further in exempting boxcar traffic from maximum rate regulation.

E. *Predatory pricing.*—A few participants contend that continued regulation is necessary to prevent boxcar rates from being set at levels so low as to be predatory. One goal of the rail transportation policy is to encourage the elimination of noncompensatory rates (section 10101a(10)). Another is to prohibit predatory pricing and practices (section 10101a(13)). Nonetheless, we conclude that there are probably no instances where predatory pricing by railroads on boxcar traffic is a realistic possibility.

****13** Rate decreases are a desired outcome in a competitive environment and ordinarily are not to be discouraged. They become predatory only under a special set of circumstances. These are that the carrier cuts its rates to a level below its marginal costs for the purpose of driving a competitor out of business, so that the carrier can then raise its rates to monopolistically high levels and recoup the losses incurred with the rate cuts. Predatory pricing cannot succeed where the competitor is strong enough to withstand a rate war or where new competitors can quickly enter the market when the carrier attempts to raise its rates to monopolistic levels.

We do not regard railroad predatory pricing on boxcar traffic as a realistic concern for water carriers, motor carriers, and other large railroads. Water carriers operating within the United States mainly transport large volume bulk shipments and depend little, if at all, on the types of commodities transported in boxcars. [35] Motor carriers have the ability to enter any transportation market quickly, so that a railroad could not drive them out of a market long enough to enjoy a sustained period of monopoly pricing. Large railroads have the resources and diversity of ***442** other business to withstand any rate war that could be waged on boxcar traffic, making it extremely unlikely that predation against them would ever be attempted.

Predatory pricing on boxcar traffic might be of theoretical concern in a situation where a large railroad's only competition for the transportation of boxcar commodities is a short-line rail carrier with limited resources. However, given the normally intense intermodal competition for boxcar traffic, these situtions must be extremely rare. Furthermore, it is important to emphasize that the mere cutting of rates in a competitive situation is not predatory where the rates cover the carrier's marginal costs, and these costs are difficult to measure precisely. For this reason, the Commission, at the direction of Congress, refuses to interfere in rate decreases except in extreme situations. Even on regulated traffic, we do not disapprove rate decreases where the rate covers that small portion of railroad costs we have labeled as 'directly variable.' [36] It is also important to recognize that the antitrust laws provide a remedy against attempted monopolization by means of predatory pricing.

We conclude that predatory pricing on boxcar traffic is highly unlikely to occur, and even in those few instances where it is a remote possibility, the antitrust laws exist to provide a sufficient deterrent and remedy. Congress' instruction is that we regulate only in those instances where regulation is necessary to protect against market power abuse *and* other Federal remedies are inadequate for the purpose. See footnote 12, *supra*. Continued regulation of boxcar traffic is not necessary to prevent predatory pricing, nor does it meet Congress' tests for a continued Commission role.

****14** F. *Rate discrimination.*—The third reason urged for continued regulation of boxcar traffic is to prevent discrimination among shippers. A goal of the rail transportation policy is to prohibit 'unlawful' discrimination (section 10101a(13)). The field of 'unlawful' discrimination, however, is a limited one.

Regulation has never sought to eliminate all railroad rate discrimination, but only those variances which caused 'unjust' discrimination. Pricing differences have always been permitted, whether known as 'value of service ratemaking,' 'differential ratemaking,' or, more recently, 'Ramsey pricing.' Rates have also commonly been allowed to vary at different locations depending upon competitive circumstances.

To the extent that the Commission formerly attempted to achieve comparability on rates charged for different movements of a commodity over a broad area, a rigid and uneconomic rate structure resulted which ***443** unduly inhibited the carriers' pricing flexibility and handicapped them in adapting to changing competitive environments. The thrust of regulation today has moved away from this focus on rate comparability and toward freedom for individual carrier pricing initiatives to maximize revenues in competitive markets. Of particular significance are two actions taken by Congress in the SRA to minimize regulation of rate discrimination. First, Congress provided that prohibitions against discrimination do not apply to rail rates applicable over different routes (49 U.S.C. 10741(f)(4)). This provision removed from the Commission's jurisdiction many of the situations in which discrimination complaints had previously been filed. Second, Congress expressly authorized rail carriers to enter into contracts with individual shippers and almost entirely removed contract service from regulation under 49 U.S.C. Subtitle IV

(49 U.S.C. 10713(a) and (i)). Thus, to the extent that carriers and shippers resort to contracts, carriers may lawfully discriminate with virtually complete freedom.[37]

To the minor extent that legal constraints are still applicable to discrimination among shippers of boxcar traffic, it is extremely unlikely that exemption from regulation would give rise to unlawful conduct. Carriers are essentially free to make contracts of this nature in any event, and an exemption from regulation would not seem to provide greater discriminatory impetus. We conclude that continued regulation of boxcar traffic is not necessary to carry out the objective of prohibiting unlawful discrimination.

G. *Joint rates.*—A number of parties argue that continued regulation of boxcar traffic is necessary to preserve joint rates for transportation of through boxcar traffic. They view joint rates as essential to the development and continuation of a sound rail transportation system (section 10101a(4)) and to effective coordination among railroads (section 10101a(5), and apparently fear that an exemption would end them.

****15** There is no reason to expect that an exemption would lead to cancellation of all joint boxcar rates. In the face of truck competition, carriers have strong incentives to make through rail service as attractive as possible. One way of doing this is to offer joint rates. Where carriers cannot resolve disputes over revenue divisions, they may resort to proportional rates instead, but this action need not disrupt through movements. As ***444** long as the revenue available from a movement is sufficient to afford a revenue contribution above costs to both carriers, they can be relied upon to set their rates, whether joint or proportional, at a level that will keep the traffic moving.[38] In reaching agreement on divisions on joint rates, neither carrier will insist on a division of profits so disproportionate as to force the other to withdraw from the movement to avoid a loss and thus to forfeit the traffic for both carriers. On the other hand, if the revenue available from the traffic is not great enough to allow even a small revenue contribution for both carriers, no shipper could reasonably expect joint rates to be maintained whether or not the traffic is exempt from regulation. This is especially true since the SRA included new provisions facilitating unilateral cancellation of unprofitable joint rates which has been used extensively by carriers.

H. *Through routes.*—Some parties contend that continued regulation is necessary to prevent carriers from closing through routes for boxcar commodities by refusing to maintain any rates, joint or otherwise, under which through shipments could be transported. These parties contend that through route closings could cripple short-line carriers that depend upon interline boxcar traffic and could deprive shippers on their lines of all access to the rail system. In addition, through route closings could assertedly be used to eliminate intramodal competition and leave shippers without routing alternatives. Thus, they argue that in these respects boxcar regulation is needed under the rail transportation policy to allow competition to establish reasonable rail rates (section 10101a(1)) and to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers (section 10101a(4)).

We see no reason to expect large railroads to cancel through routes with originating or terminating short-line railroads. Of course, route closings might occur if a carrier wishes to close routes that involve long hauls over the lines of connecting railroads in order to concentrate the traffic on routes that involve long hauls over its own lines. Nonetheless, it is unlikely that a carrier acting in an economically rational manner would close efficient routings, and the statute (section 10705(e)) specifically recognizes distance and fuel efficiency as factors corroborating the public interest of closing joint routings. Moreover, the Commission will retain jurisdiction[39] over mandatory interchange, reciprocal switching and joint use of terminal facilities which should allow for remedial action should it be necessary.

****16** ***445** I. *Tariff publication.*—Some exemption opponents contend that continued publication of tariffs for boxcar service is necessary to maintain rate stability, to prevent unmanageable ratemaking complexity, and to inform shippers of rates paid by their competitors. This is a legitimate concern. Nonetheless, we do not expect either undue instability or unmanageable complexity to result from this exemption.

Flexibility to adjust rates quickly to meet changing market needs does not imply that rates will change with a frequency that would be disruptive to the business of shippers. Often, rate changes serve to allow a shipper quick access to a new marketing opportunity. This has certainly been our experience with requests to make contracts effective on short notice. Where rate stability is important to a shipper's operations, there is every reason to expect that carriers will provide it in order to retain the shipper's patronage. Indeed a shipper can assure itself of rate stability for exempt services by entering into transportation contracts. [40]

It is difficult to imagine how rates quoted directly to a shipper for exempt transportation could be more complex than some tariff rates. In fact, a major benefit anticipated from this exemption is rate simplification. Railroad tariffs are so complex that we have found it necessary in the past to maintain a staff of tariff experts to find and interpret them for our attorneys and accountants. Under other broad exemptions applying to fresh fruits and vegetables and TOFC/COFC service, rail traffic has increased, suggesting that exemptions make rail service easier and more attractive for shippers to use.

Finally, we recognize that published tariffs provide shippers a convenient source of useful information about their own competitive environments, of which transportation is often an important part. Nonetheless, there is nothing in the rail transportation policy that calls for publicizing railroad rates other than as a tool of rate regulation. Shippers function without knowing their competitors' nontransportation costs. We have consistently resisted attempts to retain regulation merely to serve tangential interests outside of the scope of our direct statutory responsibilities. Freedom from tariff filing requirements is an essential part of the ratemaking flexibility being sought in this proceeding.

J. *Benefits of exemption.*—We have focused on claims of negative effects of a boxcar rate exemption, since section 10101a requires us to find continued regulation unnecessary in granting an exemption. It is appropriate ***446** to recognize, however, that the exemption will actively promote the objectives of the rail transportation policy in a number of ways. Clearly, it will: (1) allow competition and the demand for services to establish reasonable rates (section 10101a(1)); (2) minimize the need for Federal regulatory control over a substantial portion of the rail transportation system (section 10101a(2)); (3) promote more efficient pricing and service on boxcar traffic and allow carriers, to the extent possible, to earn adequate revenues on this traffic, by removing procedural regulatory burdens and allowing rail management to respond flexibly to market conditions (section 10101a(3)); (4) promote effective competition with motor carriers (sections 10101a(4) and (5)); (5) encourage efficient railroad management and elimination of noncompensatory rates by allowing full flexibility to manage boxcar service in the most economic manner (section 10101a(10); and finally, (6) to the extent that it enables railroads to retrieve business lost to the motor carrier industry, promote energy conservation (section 10101a(15)).

****17** K. *Conclusion: exemption from rate regulation.*—Taking the transportation of boxcar commodities as a class of service, and excluding only the carriage of nonferrous recyclable commodities, we find that continued rate regulation is not necessary either to carry out the rail transportation policy or to protect shippers from the abuse of market power. Consequently, we shall grant an exemption under section 10505(a). [41] To allow the rail industry and its customers a reasonable period of time to prepare for the implementation of this exemption, we shall delay its effective date for a period of 6 months.

Implicit in the granting of this exemption is the removal of antitrust immunity for collective ratemaking on boxcar traffic. As DOJ observes, removal of antitrust immunity is the *quid pro quo* for the bestowal of freedom from regulation. Meaningful deregulation is more than a selective relaxation of the regulatory constraints most disliked by the industry. It fosters vigorous competition among the railroads themselves as well as between the railroads and their rival modes of transportation. Removing antitrust immunity for collective ratemaking has been our uniform preclude requisite in exempting other commodities and services from rate regulation. There has been no showing that the public interest requires a different approach in this proceeding.

However, our removal of antitrust immunity is not intended to preclude collective agreements relating to per diem, mileage, demurrage, ***447** storage agreements. As explained *infra*, we are retaining jurisdiction over car hire and car service, with certain limited exceptions. In this proceeding, there is no evidence of record which would allow us to find that collective arrangements for car hire, demurrage, et cetera, such as the central car hire processing and clearinghouse function performed by the Association

of American Railroads, do not meet the criteria of section 10706. Such issues can be considered in our investigation in Section 5b Application No. 7, *Railroads Per Diem, Mileage, Demurrage and Storage Agreement* or possibly another proceeding.

We are convinced that the exemption of boxcar traffic is a major step toward establishing a vigorously competitive climate in American freight transportation. Once the railroads and their customers have learned to provide and purchase boxcar service as they would any other service in the unregulated sector of the economy, we are certain that they will have no desire to return to an artificially constrained market.

## III. EXEMPTION OF BOXCAR EQUIPMENT CHARGES

A. *Background.*—Conrail proposed an exemption not only for ratemaking on boxcar commodities but also for those facets of Commission regulation that apply directly to the use of boxcar equipment. For example, the Commission may prescribe the rental (car hire) rates that railroads charge one another for the use of freight cars. We also have jurisdiction to promulgate car service rules concerning the use or return of empty cars, although this authority is now largely delegated to the Association of American Railroads. In addition the Commission regulates car use in certain other ways. [42]

****18** The concerns expressed by Conrail in relation to car regulation focus on car hire. The car compensation formula prescribed by the Commission distributes car ownership costs evenly over the days that a car is in use, regardless of whether a car is on the tracks of the railroad that owns it, or on the tracks of another railroad. While this type of regulation seeks to provide carowners with a fair return on their investment, it can have counterproductive effects on car use. Car hire rates remain the same regardless of whether demand for cars is strong or weak. In times of strong demand, severe car shortages often occur, in part because car hire rates do not rise to a level that would match demand to supply. At the same time, an unvarying car hire rate may fail to allocate freight car capacity to the most profitable traffic, impairing the carriers' ability to maximize ***448** revenue. When demand is weak, car hire rates tend not to fall as they should to stimulate the use of idle car capacity. Anonomously, in fact, car hire rates tend to rise somewhat when demand is weak, because a surplus of cars reduces the number of active car days over which the ownership costs are distributed. [43] Moreover, empty car mileage tends to increase as originating railroads send foreign cars home empty and load interline shipments in their own cars to maximize car hire earnings. [44] Thus, the current system of car hire rules can distort both shortrun decisions about the most efficient utilization of cars and longrun decisions about optimal fleet size.

Conrail, supported by DOT, DOJ and FTC, initially sought a complete exemption of boxcars from car regulation, contending that market-determined car hire rates would lead to better car utilization and that regulating other aspects of car use was unnecessary. This proposal met with massive opposition from the railroad industry and others, and Conrail modified its proposal to suggest that the Commission allow carriers to take the following actions with regard to boxcar equipment use:

(1) assess charges for empty movement or return of cars where performed at the direction of the car owner, the Association of American Railroads, or the Commission.

(2) store empty cars and reclaim car hire beginning 3 days after the car is made empty.

(3) negotiate bilateral agreements governing car hire rates, empty movements, and storage. [45]

Conrail states that the maximum empty mileage charge would be 35 cents per mile, that storage reclaim could not begin until the expiration of a 72-hour grace period from the time the car is made empty, and that these conditions could be made part of the exemption order. Conrail proposes that, in all other respects, boxcars remain subject to car regulation, including the prescription of car hire rates by the Commission for use where carowners and users choose not to negotiate car hire rates bilaterally.

***449** Thus, the alternatives presented for our consideration are to continue car regulation for boxcars in its present form, to exempt boxcars from car regulation altogether, or to adopt the modified Conrail proposal. We are not disposed to leave the

present system of car regulation unchanged for boxcars if a less restrictive alternative is available. Excessive costs resulting from wasteful empty movements of boxcars are a problem that must be addressed if our action in this proceeding is to restore the competitiveness of boxcar transportation. Nonetheless, a complete exemption of boxcars from car regulation now has little, if any, support. Consequently, we shall reserve consideration of a complete exemption for car hire and car service and focus on the modified Conrail proposal.

****19** B. *Comments of participants.*—Conrail states that the purposes of the storage and empty return charges are to improve car use and to help it and similarly situated carriers control their car-hire costs. Because Conrail serves an area which receives more freight than it originates, Conrail incurs great expense in the payment of car hire charges on empty foreign boxcars. It predicts that originating carriers would be less eager to send their cars onto the lines of other carriers unnecessarily if those cars were subject to the imposition of empty return charges or storage reclaim. In addition, the power to impose these charges would make other carriers more willing to enter into bilateral agreements with it on car compensation, storage, and return. By reducing its equipment-related costs in periods of slack economic activity, Conrail would be able to price its boxcar transportation more competitively and generate additional traffic.

DOT supports the modified proposal as a means of improving car use without resorting to the more sweeping changes in car regulation originally proposed. It notes the railroads have successfully negotiated and implemented car hire reclaim agreements in the past, demonstrating that bilateral agreements are both beneficial and practical.

The modified proposal failed to elicit support from other participants. A group of western carriers questions whether the proposed empty return charges would improve equipment use. Many parties contend that the proposal would result in inadequate compensation to carowners, since the revenue they receive from car hire payments would be offset by charges imposed by receiving carriers. They fear that boxcar ownership would cease to be profitable and new boxcar investments would not be made. These consequences, they assert, would be contrary to requirements in the rail transportation policy to ensure the development and continuation of sound rail transportation (section 10101a(4)) and to foster sound economic conditions in transportation (section 10101a(5)). A related fear is that carowners would prohibit the loading of their cars ***450** with shipments destined to carriers that impose storage and return charges, thus reducing boxcar availability, delaying the loading of shipments, and defeating the policy of promoting an efficient rail transportation system (section 10101a(3)).

The comments of some also suggest that the proposal should be denied to protect shippers from the abuse of market power. In fact, the proposal does not directly affect shippers, since it relates only to transactions between railroads for the use of cars owned by or leased to railroads. Use of shipper-owned cars is compensated by a system of allowances negotiated between carriers and shippers. Some contend, however, that Conrail's role as a large destination carrier gives it 'market power' in negotiating boxcar compensation with other railroads. The exercise of this market power, they believe, would result in service disruptions having adverse effects on shippers.

****20** C. *Evaluation of proposal.*—We will separately discuss the proposal's likely effects on boxcar use, boxcar investment, and service to shippers.

1. *Effect on car use.*—The western carriers question whether empty return charges would improve boxcar use. They argue that a carrier with a shipment to load would not be deterred by the charges from loading its own equipment and returning foreign equipment empty. Although the origin carrier would have to pay charges for the return of its equipment, this would be offset by charges it would collect for returning the foreign equipment empty.

The concern raised by these carriers is a valid one, warranting a closer look at the new incentives that would be created by empty return charges. While carriers will not be directly encouraged by these charges to load empty foreign cars, they can be expected, in light of the mileagebased return charge, to seek to minimize the length of empty return of their own cars. Assuming that a carrier has 10 loads destined to points beyond its territory and five of its own cars available, it will tend to load its cars

to the closest destinations and foreign cars to the more distant destinations. Nationwide, a new pattern should emerge in which off-line equipment penetrates less deeply into other territories, resulting in shorter return hauls of empty cars.

In addition, the empty return charges are only one part of a package of reforms that should induce more efficient practices in other ways. The rule allowing reclaim of car hire for cars not loaded within 3 days should be clearly beneficial. It will take much of the profit out of the practice of sending equipment off line to collect car hire in times of slack demand. It should also encourage carriers, when loading their own equipment rather than foreign cars, to select destinations where return loads are normally available.

***451** The storage and empty return features will benefit the rail system as a whole, and ultimately shippers, by reducing the tendency of the current boxcar interchange system to create empty movements. For example, when an origin carrier makes a decision to press the destination carrier to return boxcars empty, the origin carrier should be given an incentive to weigh the benefits to it from the immediate return of the cars against the cost of the empty movement that the decision will impose on the destination carrier. The empty mileage charge will provide such an incentive. Only when this is done will the efficiency of the *rail network as a whole* be maximized, to the advantage of shippers and consumers.

The third element of the package, the freedom to negotiate bilateral agreements on equipment compensation and charges, should be the most beneficial of all. The main inducement to send cars off line unnecessarily will disappear if car hire rates are free to fall when demand is low. Voluntary car hire reductions are permissible now but are rare, because carowners that originate traffic have no reason to accept less than prescribed levels. The new leverage that car users will have with return charges and storage reclaims should lead to meaningful negotiations on reduced car hire levels. Conversely, carowners will benefit from the freedom to negotiate car hire rates above prescribed levels when demand is strong.

****21** 2. *Effect on boxcar investment.*—While the adoption of Conrail's proposal will have some effect on the levels of net compen sation received by carowners, we are confident that it will not impair any needed boxcar investment. Those who fear that Conrail or any other carrier would abuse the freedom to impose storage and return charges are overlooking the existence of constraints against such abuse. First, as proposed by Conrail, we will condition this freedom on the observance of a limit on the mileage rate that can be charged for empty movements,[46] and will prohibit the application of a storage reclaim during a 3-day grace period after the car is made empty. A carowner that calls for the return of its car during the 3-day grace period will incur no storage reclaims at all and will pay a return charge subject to the 35-cent limit.

***452** Second, a carowner that desires a different arrangement governing storage and return has the option of entering into bilateral agreements with car users governing all applicable car rates and charges. There is every reason to expect that the receiving carrier will cooperate if boxcars would otherwise become unavailable for shipments to its territory. Legal freedom to impose storage and return charges does not enable the carrier to disregard the requirements of the carowner. Bilateral agreements may be more or less favorable to the carowner depending on the general level of scarcity of boxcar equipment. In any case, we have no doubt that car users will agree to terms sufficiently remunerative to carowners to assure that cars are available for shipments to there territories[47].

The proposed changes, which allow demand to influence car compensation levels, should not forestall any needed new investment. If the size of the boxcar fleet is excessive for the amount of traffic available, as some now believe, new investment would be inappropriate and should not be stimulated.[48] On the other hand, if the fleet size ever threatened to become inadequate, car users would respond to equipment shortages by bidding up car hire levels to a point that would make new investment profitable. Needed stability of return on the investment can be assured through bilateral car compensation agreements. In response to market stimuli, investment in boxcars, as in any other business asset, will be commensurate with anticipated longrun demand.

Short-line railroads, on the other hand, may have good cause to be concerned about the near term effects of the proposal. For them, the impact of empty return charges is not softened by the opportunity to profit by these charges. Returning foreign

equipment cannot be transported nearly as far on their lines as their returning equipment can on the lines of others, so they may earn less from empty return charges than they might pay to retrieve their own equipment. They are left with ***453** very strong incentives, in times of slack demand, to load foreign equipment and store their own. While this behavior would be good for the national rail system as a whole in minimizing empty car mileage, it may not fit the mode of operations on which some of these railroads rely. A number of very small carriers have very large boxcar fleets (particularly when measured by the size of the railroad), and they have unfortunately come to depend upon car hire as their main source of income.

****22** When demand for boxcars improves, these carriers should benefit from the opportunity to negotiate car hire rates higher than Commission-prescribed levels. This new system should provide adequate returns in the long run to justify investment in an appropriately sized boxcar fleet. On the other hand, it probably will not provide the steady flow of income that may be desired by individuals who invest in boxcars as tax shelters, using short-line railroads as a medium to place their cars on the Nation's rail system. To the extent that the interests of these investors require the preservation of inefficient and costly mechanisms of car compensation, we must subordinate them to the broader interests of the Nation's railroads and their shippers in restoring the competitiveness of rail transportation. The purchases of boxcars by individuals as investments was in part a response to incentive elements added to the car hire charges for plain boxcars, the purpose of which was to stimulate investment in boxcars. While the incentive element may have stimulated purchase of boxcars, it clearly did not solve the underlying rail problems involving freight rates and car utilization. The Commission instituted a rulemaking to consider the issue and after public comment eliminated incentive per diem charges in Ex Parte No. 252 (Sub-No. 5), *Elimination of Incentive Per Diem Charges*, 364 I.C.C. 116 (1980). Congress was aware of the problem of incentive per diem and in section 224(a)(1) of the Staggers Act, formally removed future Commission consideration of an incentive per diem element in setting car hire charges. The Conference report of the Staggers Act is quite clear that Congress believed that a market based system of arriving at car compensation was preferable and that the Commission should examine means of making the system more responsive to market forces. [49]

***454** Subsequent to the Staggers Act, the Commission instituted other proceedings to add elements of market response to the existing system. Today's decision represents another step in the direction of substituting market forces for regulation in the setting of car hire charges consistent with congressional directives.

Congress surely understood the problems associated with car hire charges and appreciated that any movement away from the incentive per diem system or the current system could potentially harm existing third party investors.

The Commission has been instructed to find ways to make car compensation more responsive to market forces. This inescapably introduces supply and demand factors into the compensation equation and, in a market where supply greatly exceeds demand, is bound to result in some financial burdens falling on suppliers. This is indeed unfortunate, but we do not see this as contrary to any of the pertinent considerations under section 10505.

3. *Effect on shippers*.—We acknowledge the possibility that instances of delay or disruption of boxcar supply may occur temporarily as a transition is made to a system involving storage reclaim, return charges, and optional bilateral agreements. Such disruption could occur, for example, if carowners begin restricting their cars against loading to destinations on the lines of carriers imposing the charges. In the end, however, neither carowners nor car users will have any choice but to strike reasonable bargains and go on doing business. No car user can afford to forfeit incoming traffic for lack of cars, and no carowner can afford to forfeit all car rental by insisting on unrealistic terms of net car compensation. Most railroads are both carowners and car users with strong market incentives to avoid traffic disruption.

****23** For shippers, the effect of more market-oriented equipment charges should be beneficial. When demand for cars is low, carriers' equipment-related costs should fall, reflecting lower net compensation to carowners and less handling of empty cars. Carriers will then be able to offer lower freight rates. When demand for equipment is strong, higher car hire will dictate that preference in equipment allocation be given to high-rated traffic. Thus, shippers making the greatest contribution to rail revenues will be best able to obtain the cars they need.

D. *Retention of jurisdiction.*—Many of the fears expressed on the present record concerning exemption of boxcars from car regulation involve areas of our jurisdiction that will not be disturbed by our present action. As proposed by Conrail, we shall retain jurisdiction over car hire and car service, including the prescription of car hire rates, except to the extent ***455** that we permit imposition of storage and return charges and the optional use of bilateral car compensation agreements. We shall not relax the mandatory interchange requirement for boxcars; equipment loaded with an interline shipment must be passed on to, and accepted by, the connecting carrier to whom the shipment is transferred at a gateway. We shall retain our authority to require reciprocal switching of, and the joint use of terminal facilities for, boxcar traffic. We shall also retain jurisdiction to enforce the railroads' obligation as common carriers to supply boxcar equipment to shippers for loading upon reasonable request. Moreover, our decision has no effect on freight car pooling agreements.

In addition, this exemption is limited by the terms of section 10505(c), which provides that we may not relieve any rail carrier from an obligation to provide contractual terms for liability and claims. Nor shall we require any change in the procedures by which freight packaging requirements are established and administered. For clarification, we note that this decision also does not affect the obligations of rail carriers to compute demurrage charges and establish rules related to those charges, as provided in 49 U.S.C. 10750.

E. *Benefits of exemption.*—Any possible adverse effects of our action on a sound and efficient rail transportation system and on sound economic conditions in transportation will be of limited extent and duration. On the other hand, this action overall will positively serve the rail transportation policy by allowing competition and demand to establish car compensation (section 10101a(1)), promoting efficiency in car use (section 10101a(3)), fostering sound economic conditions in transportation by allowing car compensation to fluctuate with market conditions (section 10101a(5)), promoting reasonable rates for boxcar service (section 10101a(6)), promoting individual rail responses to market conditions in place of collective responses (section 10101a(11)), and promoting energy conservation through reductions in empty car-miles (section 10101a(15)).

****24** F. *Conclusions: exemption of equipment charges.*—In approving Conrail's modified proposal on the subject of car compensation, we are confident that the potential benefits of improved boxcar use and reduced costs of providing boxcar service clearly outweigh the shortrun adverse effects that may be experienced during the transition period. Thus, we conclude that retention of the complete present scheme of car regulation for boxcars, to the extent that it would preclude railroad freedom to impose storage and return charges and make bilateral agreements on car compensation, ***456** is necessary neither to carry out the rail transportation policy of section 10101a, nor to protect shippers from abuse of market power.[50]

Our order adopting Conrail's modified proposal is a partial exemption from regulation subject to conditions. We recognize, however, that it could be construed in some respects as being new regulation. To allay any doubt about the sufficiency of section 10505(a) as authority for our approval of Conrail's modified proposal, we shall take this action also under section 11122. Under that section, we are to encourage not only the purchase and acquisition of freight cars, but also their efficient use. In addition to car compensation, our regulations may include the other terms of any arrangement for use of freight cars. Storage reclaim and return charges clearly constitute such 'other terms' and will serve to encourage efficient boxcar use. Section 11122 authorizes, but does not require, the Commission to prescribe car hire charges. Consequently, it permits us to make the prescribed car hire optional and allow the substitution of bilateral car hire agreements (as we have already done to some extent in Ex Parte No. 334 (Sub-No. 4)). In our supplemental notice published June 25, 1982 (47 F.R. 27573), we fully informed the public that we were considering a proposal to authorize the imposition of storage reclaim and return charges on boxcars and to allow optional bilateral car hire agreements; we have received ample public comment on the proposal. Consequently, whether Conrail's proposal with respect to boxcar equipment charges is viewed as an exemption or an affirmative regulation, we may properly adopt it in this proceeding.

The effective date of this action will be delayed for 6 months to enable carowners and users to prepare for it. As provided in 49 U.S.C. 10505(d), we retain jurisdiction to reexamine this exemption in the future if necessary to correct unforeseen problems.

## IV. OTHER MATTERS

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

*Regulatory flexibility analysis.*—The initial Notice of Proposed Exemption in this proceeding invited public comment on the effect on small entities of both a Conrail boxcar exemption and a nationwide boxcar exemption. This issue was addressed by a number of parties, particularly small shippers and short-line railroads.

Of the anticipated adverse effects on small entities, the most frequently cited is loss of traffic or revenue by short-line railroads as a consequence of joint rate cancellations. Small shippers, lacking the bargaining power of large shippers, fear rate increases that would put them at a competitive ***457** disadvantage. Boxcar-owning small railroads expect a loss of profits if car users are allowed to impose storage and empty return charges. They also assert their inability to manage the complexity of negotiating car hire charges with many railroads.

****25** We agree that small entities could possibly experience adverse effects in these areas, but we believe, as indicated earlier in this decision, that the extent of the adverse effects tends to be overstated by those opposing the exemption. Carriers desiring to cancel joint rates may do so irrespective of whether this exemption is granted. A beneficial effect of an exemption on joint rate cancellations will be to eliminate possible litigation and other expensive procedural obstacles before the Commission.

There will undoubtedly be instances where large shippers obtain more favorable rates than small shippers for transportation of exempt commodities. Given the economies inherent in handling regularly occurring large volume movements, that result is to be expected. Nonetheless, the greater efficiencies and more vigorous competition that carriers should experience in a free market environment can be expected to benefit small shippers as well as large ones.

Boxcar owners, large and small, may experience a decrease in net revenues as a consequence of storage reclaim and empty return charges. This effect, however, is likely to be limited to periods of slack demand for boxcars. When demand is strong, competition for scarce equipment should lead to negotiated car hire rates higher than prescribed levels, thus offsetting to some degree the adverse effects on carowners during slack periods.

Boxcar-owning small railroads that choose to negotiate car hire certainly will not be alone among other entities of their size in negotiating price levels with a large number of trading partners. We have no reason to think that they will be any less successful than others in adapting to the requirements of their commercial environment. Moreover, under the proposal we are adopting, these railroads will have the option of continuing to employ Commission-prescribed car hire rates.

Alternatives that would avoid the potential adverse effects on small entities would substantially nullify the benefits of the exemption. These would include retaining jurisdiction over joint rate cancellations, retaining Commission review of rate changes, and disallowing the imposition of storage reclaim and empty return charges. We conclude that such effects on small entities that may result from the exemption are not of a type, duration, or severity to warrant adoption of alternatives that would fundamentally undermine the exemption.

***458** Moreover, we note that the intent of the Regulatory Flexibility Act is to correct problems created when laws and regulations designed for application to large scale entities are applied uniformly to small businesses without regard for the disproportionate costs that may be imposed on the smallbusinesses.[51] For the most part, rather than imposing new regulatory requirements, we are decreasing regulation. The resulting adverse impacts on small entities, if any, will result not from regulatory burdens but from the increased scope for operation of market forces. Avoiding impacts of this type is not the intent of the Regulatory Flexibility Act.

****26** In any event, we conclude that adverse impacts that may be experienced by small entities as a result of this proceeding are outweighed by the public benefits of the improved transportation service, lower overall rate levels, and better car use that we expect to result from the action we are taking.

One point deserves particular emphasis in this decision. As has already been noted, the statutory history makes it abundantly clear that we are not to be hesitant in exercising the exemption power in section 10505. Indeed, we have been 'charged with the responsibility of actively pursuing exemptions.' But we have also been instructed 'to adopt a policy of reviewing carriers' action after the fact to correct abuses of market power.' (See note 12, *supra*.) The public should be apprised that we have every intention of reviewing this matter, and we wish to leave no doubt that we will correct problems should they develop as we gain experience under this exemption.

*Energy and environmental considerations.*—An Environmental Assessment prepared by the Commission's Section of Energy and Environment was published December 7, 1982.[52] The assessment was premised on a 'worst case' assumption that the exemption would result in diversion to motor carriers of all boxcar traffic earning less than 125 percent of variable cost or moving less than 700 miles, that is, 11.5 percent of boxcar traffic nationwide. The projected consequences were increases in fuel consumption, highway accidents, and emissions of air pollutants.[53] Because the increases were small in comparison to national base line ***459** figures, the assessment concluded that they would not be significant. No public comments were received in response to the assessment.

We emphasize that the traffic diversion assumptions in the assessment are highly unlikely to occur. In fact, we anticipate little, if any, net diversion to trucks. While some unprofitable boxcar traffic may be shed as a result of increased pricing flexibility, we think this effect will be minor, because railroads can already lawfully raise their rates on all traffic to profitable levels. Some of the traffic now earning ratios below 125 percent and moving less than 700 miles may be regarded as desirable by therailroads.[54] If they become stronger competitors as a result of this exemption, they should be able to avert losses of this traffic that might otherwise occur. A major objective of the exemption is to allow boxcar service to compete with trucks. The degree to which this objective will be achieved may be difficult to quantify beforehand. Nonetheless, we confidently expect that any boxcar traffic lost to trucks as a result of this exemption will be more than offset by boxcar traffic gains.

The Environmental Assessment recognized the possibility that the exemption could result in diversion of traffic from motor carriers to railroads. In that event, the environmental impacts could take the form of increased delays for motorists at rail crossings and increased rail yard noise and congestion. These would be the trade-offs for decreases in truck-generated air pollutants and reductions in highway congestion and deterioration.

****27** The assessment did not separately evaluate the environmental consequences of exemption effects other than rate changes. These include possible changes in divisions of revenue between connecting carriers on through movements and new charges for storage or return of empty cars. To the extent that these changes help preserve boxcar service and make it more competitive, they should lessen future diversion of boxcar traffic to trucks, thus minimizing any possible adverse environmental consequences associated with such diversion. Moreover, assuming that the car charges reduce unnecessary empty mileage, there should be some reduction in railroad fuel consumption and rail yard congestion.

We conclude that the effects of the boxcar exemption, being no greater than those projected in the assessment and very likely less, will not be environmentally significant. From the energy perspective, the same reasoning applies. The assessment's worst case analysis projects an increase in fuel consumption, but a decrease is more likely, based on reduced diversion of boxcar traffic to trucks and less unnecessary movement of empty equipment. Thus, the impacts of the exemption on ***460** energy efficiency and energy consumption, although not readily quantifiable, are most likely to be beneficial.

## I. FINDINGS AND ORDER

We find that except to the extent we reserve jurisdiction, continued regulation of railroad boxcar service under 49 U.S.C. Subchapter IV is not necessary to carry out the transportation policy of 49 U.S.C. 10101 or to protect shippers from the abuse of market power, and consequently that an exemption must be granted under 49 U.S.C. 10505.

This action does not significantly affect the quality of the human environment or the conservation of energy resources.

CHAIRMAN TAYLOR dissenting:

A thoughtful review of this decision, wherein the exemption of rail traffic moving in boxcars is approved, can only lead to the conclusion that the grant of such exemption is based upon wishful thinking and unverifiable predictions and assumptions, all of which rely more on theory than fact. This Commission has been charged by Congress with the duty of rationally deregulating the railroad industry in a manner consistent with the national rail transportation policy. To this end, we have been given standards to consider, but reasonable conclusions predicated upon such standards cannot be drawn in the absence of adequate supporting evidence.

Advocates of the exemption in this proceeding consist of one railroad,[55] two Government agencies, and a handful of shippers, most of whom do not even use boxcars. On the other hand, a multitude of parties apposed the exemption by the submittal of an enormous body of evidence demonstrating the fallacies inherent in the proposal. These parties included the railroads themselves (except for the SP on the rate issue) and the general thrust of their opposition was that the boxcar exemption will radically alter both financial and operational relationships throughout the entire railroad industry. Accordingly, those opposing the exemption comprise virtually every group which participates in or depends upon our national railway system.[56]

****28 *461** Moreover, this exemption is totally unlike any other proposed by either the Commission or the railroad industry. It cannot be compared with a commodity exemption which deals with individual products moving in specific markets, thereby allowing for a rational analysis of the probable effects of the exemption.[57] Nor can the TOFC/COFC exemption serve as precedent, since that exemption was specifically supported by the Staggers Act, 49 U.S.C. 10505(f), and its legislative history.[58]

To grant the exemption, the Commission must make certain findings in accordance with the statutory criteria set forth in 49 U.S.C. 10505 based upon the evidence of record. The almost complete lack of positive response to this exemption, coupled with the embarrassing paucity of supporting evidence, should have led to the conclusion that the proposal under consideration fails to satisfy any of the criteria of section 10505. Consequently, a denial was clearly mandated, because the Commission cannot make the requisite findings to grant the exemption.

*The Statutory Criteria of 49 U.S.C. 10505(a)(2)*

*Limited scope*:

No one has made a serious effort to argue that a proposal affecting 40 percent of the total car-miles in the U.S. is of limited scope. Various parties have noted that the exemption would encompass 25 percent of the national railcar fleet, 22 percent of the country's rail traffic, 25 percent of Conrail's total traffic, and 90 percent of the major commodity groups. Of the 35 major commodity classifications, 34 have boxcar movements. Of these 34, 14 move by boxcar at least 50 percent of the time. In 1981, there were 3,237,676 boxcar shipments in this country, and boxcar traffic accounted for 42 percent of total rail movements into and out of the eastern territory. Conrail originates and terminates more boxcars than ***462** any other railroad and has control over one out of every six boxcar shipments. Conrail serves 2,690 stations in the Northeast. These stations serve industrial areas which turn out 84 percent of the manufactured goods produced in that section of the country. Conrail also loads and unloads 54.1 percent of all boxcar traffic in that section. In light of these figures, a limited scope argument is clearly not available.

*Abuse of market power.*

Nor can an appropriate finding be made with regard to the abuse of market power criterion. To determine whether market power is likely to be abused, an adequate definition of the market is necessary. But product markets are defined by commodities not car types, and it is the contents of a car, not the car type, that competes on the open market. The fundamental premise of the exemption proposed herein is that all commodities (except nonferrous recyclables), when transported in boxcars, move

competitively. This assumption requires an enormous leap of faith, as boxcar freight is exceptionally diverse. It covers a wide range of commodities, rates, competitive situations, characteristics, locations, and destinations, all of which go into the definition of a market. Because of the lack of focus of this proposal, it is not possible for the Commission to make a finding that the application of every rate provision of the Interstate Commerce Act is no longer necessary for all boxcar transportation.

****29** Even were such a finding possible, the complete inadequacy of the record precludes the Commission from drawing the necessary conclusions.[59] The evidence presented by Conrail does not reflect or represent the rest of the country outside the Northeast.[60] The Northeast differs from the rest of the country in number of cars terminated, manufacturing output, level of consumption, population, length of haul of shipments, and efficiency of rail carriers. The nationwide statistics on which the majority relies to fill the gaps are well over 6 years old.[61] Moreover, the majority decision doesn't even attempt to show that these studies, conducted during the restrictive era of rail regulation, bear any relationship to the current railroad industry, which has changed so remarkably in the last few years, especially since enactment of the Staggers Act.

***463** Also, much traffic that now moves in boxcars tends to be inherently rail oriented. But the broad brush methods of support used here ignore all but the most general figures. In spite of the fact that the Commission specifically requested disaggregated data to determine which markets were competitive, Conrail chose to rely on the Reebie study which is not broken down further than the three-digit Standard Transportation Commodity Code (STCC). At this level, the data are too generic and not specific enough to enable an adequate analysis of the competition in any particular market.[62]

Another major objection to this proposal is that many commodities, which can be regarded as 'boxcar traffic,' also move in other types of railroad equipment, and such commodities will now compete in the same markets when moving in different types of railroad equipment. This situation presents the substantial likelihood that the deregulation of those commodities, when moving in boxcars, will affect their marketing merely because of an anomaly of regulatory policy.

A perfect example is the movement of grain, soybeans, and sunflower seeds. In our recent decision in Ex Parte 346 (Sub-No. 14), *Rail General Exemption Authority—Miscellaneous Agricultural Commodities* (not printed), decided February 17, 1983, we specifically declined to include grain and soybeans. After considerable analysis, however, we also concluded that sunflower seeds should not be exempted. Now, with only a brief reference by the majority to grain generally, all these commodities will be exempt when transported in boxcars. Such an obvious undoing with the left hand of what the right hand has done is nonsensical to say the least.

Different rules and rates for different types of equipment surely will lead to a distortion in the demand for certain cars, because equipment choices will be influenced by the boxcar exemption rather than the efficiencies and benefits of particular equipment relative to any given movement. This is a special concern of shippers, because even though they may request a specific type of equipment, if they receive an unregulated boxcar, their choice may be to accept it or face, unacceptable delays in receiving the requested equipment. It is ironic that this so-called 'deregulatory' proposal will, in actuality, interfere with decisions based on natural market forces and perhaps even encourage the continued use of equipment which many in the railroad industry believe is eventually destined to become obsolete.

****30** ***464** Thus, the proposed exemption fails the tests of both sections 10505(a)(2)(A) and (B). It is not of limited scope, and the record cannot support a finding that there will not be an abuse of market power, because there is no evidence to determine what the market is.

*The Modified Car Hire/Car Service Proposal*

To fully consider the relationship of this exemption to the statutory criteria and the national rail transportation policy, it is first necessary to discuss the serious problems raised by the grant of the modified car hire and service proposal.

If the car hire and car service issues occupy such a prominent place in the record, it is with good cause, as they lie at the heart of this Conrailinitiated proceeding, which is really concerned with how the car hire and distribution system has worked and how it should work. Under the current system, both the provider and user of cars are restricted in their decisionmaking. The owner has no control when the car is off-line, and users are restricted in terms of car supply availability. Therefore, it has been properly argued that some effort should be made to move toward a more market-based system.

The problem with the modified Conrail proposal, [63] as I see it, is that while the individual steps proposed, taken in isolation, seem to be key ingredients of a market-based system, when superimposed over the current system, they turn out to be logically incompatible.

Consider first the imposition of empty mileage charges and reclaim per diem after 3 days. This puts using roads in a position to make car use decisions that affect a third party's costs. Using roads will control whether the owning road incurs empty movement charges, on excess cars to remote points, by deciding what cars to load for given shipments.

This is the key to the objections registered by both large and small carriers. As the majority recognizes, short-line railroads will be severely affected by Conrail's modified proposal. For instance, a short line could purchase cars for the use of its shippers and then load these cars for termination on another line in the same region. But that latter line could then send the reloaded cars thousands of miles away. If the original road needed the cars for its shippers, it would have to pay the empty mileage charge to secure return.

***465** Another problem of even greater magnitude for the short lines is that their share of the freight revenues may not even equal the empty mileage charges assessed. The long-haul road, on the other hand, will receive the benefit of both the greater share of the revenue plus all the empty mileage charges. In many instances, it would even be to the holding road's advantage to move this equipment the longest route possible in order to maximize the mileage charges. Moreover, it certainly seems peculiar to allow a terminating carrier to assess demurrage on shippers who do not timely release cars, and then allow such terminating carrier to also assess charges on the carrier that owns the cars once they are empty. Whether the short lines can survive until they reach the majority's nirvana of having equal bargaining power with Conrail is indeed problematical.

****31** Keeping in mind the Commission's retention of reciprocal switching obligations, the majority's effort to graft a little 'free market' onto regulation can be expected to produce some serious difficulties. Regardless of whether there is an agreement between the parties, compulsory interchange will require Conrail and other roads to accept whatever car is tendered for further movements—no matter what its expense. The receiving road cannot refuse to accept a car.

Equally shaky are the majority's predictions regarding the incentive to own boxcars. 49 U.S.C. 11122(a) requires the Commission to encourage the purchase, acquisition, and efficient use of freight cars. However, the investment risk that owners would be subject to by virtue of Conrail's modified proposal is clearly unwarranted, especially as control of the cars has not been offered as a *quid pro quo.* One does not move in and out of the freight car business on short notice. Any disincentive to invest in freight cars can result in later shortages, since there is a built-in timelag of many months between the time a car is ordered and the time it is delivered.

High car costs and empty car-miles are an important concern, not only to Conrail, but also to many other railroads. The solution is not to reward one at the expense of all the others. Clearly, a process which penalizes owners, be they shippers, railroads, or third parties (who after all are largely supplying the debtor roads such as Conrail with car capacity) is not what Congress envisioned. The Commission, the AAR, and all other interested parties should be directing their efforts toward finding an overall solution, not a makeshift one.

*The Rail Transportation Policy of 49 U.S.C. 10101a*

After considering all the individual issues in an exemption proposal, the Commission must then bring them together for a balancing of the many goals set forth in the national rail transportation policy.

***466** The broad policy arguments used to support the exemption herein proposed are the same ones that are generally relied upon to support every deregulatory action, *e.g.*, less paperwork and pricing flexibility. However, the necessity of individual agreements with every shipper and carowner should more than offset the reduced amount of paperwork that must be filed with the Commission, and without resort to the exemption, an abundance of price flexibility is already available under the current statutory system. With particular reference to pricing flexibility, one need only review the many protests and complaints filed in the last year by shippers and carriers regarding cancellations of joint rates and routes to understand that existing flexibility is already producing serious shipper and carrier concern.[64] Thus, the majority is correct that the exemption will eliminate, at least with respect to boxcar movements, 'litigation and other expensive procedural obstacles' placed in a railroad's way by Congress. In any event, such general 'benefits,' even if balancing allows them to be characterized as such, cannot outweigh the needs of our national rail system as a whole.

****32** The goal of the national rail transportation policy is to promote and ensure the continuation of a healthy railroad system. To this end, regulation is recognized as a legitimate function of the Federal Government to (i) prevent discrimination against shippers or connecting carriers, (ii) facilitate the establishment of single factor through rates, (iii) publicize rail rates, (iv) assure shippers that traffic will move efficiently, and (v) provide incentives for investment.

49 U.S.C. 10101a, subparagraphs (1), (3), (4), (5), and (6), emphasize the importance of competition, stress the need for reasonable rates and adequate revenues, and accentuate the necessity of maintaining a financially sound and integrated rail system. However, the very nature of the boxcar exemption is inapposite to all these goals. True competition relies on a rational system of decisionmaking based upon market realities—not on whether a commodity moves in a boxcar. Reasonable rates and adequate revenues should go together to benefit both shipper and carrier—and not just Conrail. Ratemaking decisions should be based on more than the type of equipment used. In addition, it cannot be said that the proposed exemption will encourage equipment investment or the efficient movement of traffic. What can be predicted is that boxcars will simply become the joker in the deck, with their own special compensation rules grafted onto the current system.

The national rail transportation policy also instructs the Commission to cooperate with the States on transportation matters. ***467** 49 U.S.C. 10101a(9). In spite of having recently forced the States to accede to Federal exemptions as the price for certification of intrastate railroad jurisdiction, the majority has not even attempted an analysis of the effect of this massive boxcar exemption on intrastate rail transportation.

Certainly the proposed exemption will not encourage (per 49 U.S.C. 10101a(10)), the elimination of noncompensatory rates, as many smaller carriers will be forced to that level to retain any traffic at all. Nor can it be argued (per 49 U.S.C. 10101a(13)) that the proposed exemption will prohibit predatory pricing and practices, avoid undue concentrations of market power, and prohibit unlawful discrimination, because there will be no forum to which a carrier or shipper may bring a complaint. Lastly, contrary to 49 U.S.C. 10101a(4), the proposed exemption will seriously endanger our rail transportation system, whose healthy continuation Congress, through its stated policy, wishes to maintain.

*Summary*

I have strongly supported and openly invited resort to the Commission's exemption authority as a means of leading, perhaps even pushing the railroad industry toward more reliance on themselves and the marketplace. To date, I believe such efforts have been crowned with success, in that the industry's requests for exemptions, together with the Commission's responses, have been genuinely responsible in every instance that comes to mind. Today, however, the majority has mandated a step backward by allowing deregulatory zeal to impose an unworkable system on an unwilling public. This is the kind of irresponsibility which can only serve the interests of those who are patiently searching for reasons to justify reregulation. I deeply regret the ammunition provided by the majority's decision in this proceeding.[65]

**33 *It is ordered*:

1. The rail transportation of all commodities in boxcars is exempted from the provisions of 49 U.S.C. Subtitle IV to the extent provided in appendix D to this decision.

2. Notice of our action shall be given to the general public by publication of a summary of this decision in the Federal Register.

3. This decision will be effective 6 months from the date of Federal Register publication.

## *469 APPENDIX A

Boxcar market shares and profitability[1]

| Commodity | | | | | Movements over 1,000 miles | | Shipments over 60K pounds | | |
|---|---|---|---|---|---|---|---|---|---|
| STCC | Name | 1980 tons | Boxcar share | Truck share | Category size | Boxcar share | Category size[2] | Boxcar share | Conrail rev/vc |
| | | | Percent | Percent | Percent | Percent | Percent | Percent | |
| 20 | Canned food | 17,726,000 | 22.1 | 75.7 | 30 | 47.6 | 24.7 | 86.1 | 0.97 |
| 20 | Grain mill products | 29,971,000 | 22.5 | 40.5 | 13 | 25.9 | 51.1 | 33.3 | 1.07 |
| 20 | Beverages | 37,899,000 | 11.7 | 83.6 | 7 | 64.5 | 16.2 | 52.4 | 1.06 |
| 20 | Soybean products. miscellaneous food products | 42,073,000 | 6.0 | 69.6 | 7 | 30.7 | 63.2 | 10.2 | 1.00 |
| 24 | Lumber | 3,789,000 | 28.8 | 33.2 | 40 | 54.8 | 82.3 | 38.9 | 0.90 |
| 24 | Millwork | 5,583,000 | 37.4 | 61.5 | 27 | 90.2 | 38.6 | 86.1 | 0.97 |
| 24 | Particle board | 6,658,000 | 15.5 | 75.6 | 12 | 51.5 | 29.8 | 38.8 | 1.10 |
| 26 | Pulp | 3,002,000 | 85.3 | 10.0 | 19 | 96.5 | 98.0 | 95.2 | 1.22 |
| 26 | Paper | 15,098,000 | 39.6 | 58.7 | 17 | 66.0 | 40.3 | 93.6 | 1.18 |
| 26 | Paperboard | 10,193,000 | 75.5 | 23.0 | 15 | 93.2 | 83.2 | 96.4 | 0.92 |
| 26 | Converted paper | 7,824,000 | 36.9 | 62.3 | 22 | 46.7 | 5.9 | 67.4 | 0.94 |
| 28 | Industrial chemicals | 55,954,000 | 1.9 | 46.2 | 22 | 3.8 | 56.8 | 3.0 | 1.14 |
| 32 | Structural clay products | 10,557,000 | 19.1 | 80.0 | 4 | 62.8 | 29.2 | 52.4 | 1.10 |
| 32 | Abrasives and asbestos | 34,734,000 | 5.9 | 76.9 | 7 | 30.6 | 59.5 | N[3] | [illegible] |
| 33 | Steel mill products | 109,187,000 | 1.8 | 65.3 | 7 | 8.6 | 45.2 | 3.5 | 1.11 |
| 33 | Nonferrous metal products | 7,367,000 | 31.9 | 51.1 | 23 | 63.2 | 48.2 | 54.9 | 1.39 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 335 Nonferrous metal shapes | 9,471,000 | 13.6 | 83.8 | 16 | 38.7 | 16.2 | 68.8 | [illegible] |
| 371 Auto equipment[4] | 37,302,000 | 26.6 | 56.3 | 14 | 29.3 | 19 1 | 66 1 | 1.54 |

1 Market share data derived from Reebie Associates Commodity Profiles for traffic originating and/or terminating in the Northeast. Revenue/variable cost ratios from M.S. Sanders' exhibit III.

2 Percentages of those shipments of which shipment size is specified in the data base (generally 70–95 percent of total shipments).

3 N = negligible. Records on nearly half the tonnage for this commodity group did not specify shipment size, so conclusions related to shipment size cannot be reliably drawn.

4 Includes both vehicles and parts. Specific conclusions on boxcar traffic (auto parts) cannot be drawn from these data.

***470** APPENDIX B

*Modal share of three-digit STCC commodities: ranked by percent of rail tons moved by boxcar*

| | | 1977 tonnage all modes[1] | Percent of tonnage by mode (1977)[2] | | |
|---|---|---|---|---|---|
| Commodity code | Commodity | (000s) | Rail | Truck | Other |
| 263 | Fiberboard, paperboard or pulpboard | 27,629 | 67 | 30 | 3 |
| 264 | Converted paper or paperboard products | 14,728 | 35 | 62 | 3 |
| 262 | Paper | 30,768 | 49 | 44 | 7 |
| 325 | Structural clay products | 24,218 | 24 | 76 | 0 |
| 301 | Tires or inner tubes | 5,067 | 39 | 60 | 0 |
| 243 | Millwork or prefabricated wood products | 26,258 | 34 | 62 | 4 |
| 261 | Pulp or pulpmill products | 9,381 | 58 | 21 | 21 |
| 335 | Nonferrous metal basic shapes | 13,213 | 18 | 81 | 1 |
| 266 | Building paper or building board | 2,618 | 29 | 66 | 5 |
| 249 | Miscellaneous wood products | 23,967 | 29 | 69 | 2 |
| 333 | Nonferrous metal primary shelter products | 13,986 | 42 | 52 | 6 |
| 371 | Motor vehicles | 50,734 | 49 | 47 | 4 |
| 242 | Sawmill or planing mill products | 60,707 | 26 | 70 | 4 |
| 204 | Grain mill products | 109,538 | 37 | 61 | 2 |

| | | | | | |
|---|---|---|---|---|---|
| 206 | Sugar, beet or cane.................. ....................... | 21,036 | 32 | 56 | 12 |
| 208 | Beverages or flavoring extracts......................... | 80,713 | 17 | 82 | 1 |
| 402 | Waste or scrap................................................ | N/A | N/A | N/A | N/A |
| 329 | Abrasives or asbestos products.......................... | 56,985 | 36 | 64 | 1 |
| 203 | Canned or preserved fruits................................ | 36,825 | 27 | 69 | 4 |
| 289 | Miscellaneous chemical products...................... | 23,421 | 22 | 71 | 8 |
| 282 | Plastic materials................................................ | 29,733 | 44 | 52 | 4 |
| 209 | Miscellaneous food preparations....................... | 69,557 | 29 | 64 | 7 |
| 011 | Field crops...................................................... | N/A | N/A | N/A | N/A |
| 331 | Steelworks or rolling mill products.................... | 130,195 | 36 | 60 | 3 |
| 281 | Industrial inorganic chemicals........................... | 197,352 | 33 | 39 | 28 |

1

2 1977 Census of Transportation, Commodity Transportation Survey.

NOTE: Mode shares may not sum to 100 due to rounding.

APPENDIX C

**Boxcar commodities with some r/vc ratios exceeding 180 percent [1]**

| SPC code | Commodity | Percent in boxcars [2] | Traffic exceeding 180 percent r/vc [3] |
|---|---|---|---|
| | | Percent | |
| 1 | Cotton................................................ | 94.4 | 13.4 |
| 27 | Phosphate fertilizers.......................... | 10.2 | 18.9 |
| 30 | Canned fruits and vegetables............ | 90.9 | 5.6 |
| *471<br>31 | Other canned foodstuffs.................... | 92.9 | 5.3 |
| 32 | Frozen fruits and vegetables............. | 97.9 | 7.8 |
| 33 | Wheat mill products.......................... | 50.6 | 6.0 |
| 34 | Dry commill products........................ | 64.7 | 33.3 |
| 35 | Other grain mill products................... | 60.1 | 12.6 |
| 37 | Cereal preparations........................... | 99.6 | 6.7 |

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| 38 | Sugar | 31.3 | 30.7 |
| 39 | Malt liquors | 98.4 | 11.6 |
| 40 | Wines and brandy | 75.4 | 1.4 |
| 44 | Tobacco products | 96.0 | 1.6 |
| 45 | Textile products | 72.0 | 0.5 |
| 48 | Lumber | 42.9 | 11.5 |
| 51 | Millwork | 96.3 | 5.0 |
| 52 | Plywood | 97.1 | 14.2 |
| 54 | Particle board | 83.7 | 17.9 |
| 55 | Furniture | 91.4 | 2.5 |
| 56 | Woodpulp | 97.8 | 24.1 |
| 57 | Newsprint | 98.5 | 63.6 |
| 58 | Ground wood paper | 98.5 | 19.8 |
| 59 | Printing paper | 91.7 | 14.9 |
| 60 | Wrapping paper | 97.6 | 19.5 |
| 61 | Pulpboard | 98.6 | 14.7 |
| 62 | Pulpboard, corrugated | 98.7 | 26.1 |
| 63 | Sanitary paper products | 99.2 | 4.7 |
| 64 | Paperboard boxes | 96.9 | 10.2 |
| 65 | Food containers | 93.0 | 7.4 |
| 66 | Building paper | 81.5 | 6.3 |
| 76 | Agricultural chemicals | 12.5 | 28.7 |
| 78 | Rubber | 72.2 | 46.4 |
| 79 | Detergents | 54.9 | 18.2 |
| 86 | Construction materials | 84.3 | 21.6 |
| 89 | Tires | 92.1 | 13.5 |
| 90 | Plastic products | 96.0 | 11.6 |
| 93 | Bricks | 95.2 | 1.9 |
| 94 | Clay refractories | 94.6 | 12.6 |

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| 97 | Mineral wool.................................... | 95.1 | 10.9 |
| 104 | Primary copper products................... | 56.0 | 53.6 |
| 105 | Primary zinc products....................... | 100.0 | 36.2 |
| 106 | Primary aluminum products............. | 61.1 | 47.8 |
| 107 | Brass shapes..................................... | 64.7 | 49.2 |
| 108 | Aluminum shapes............................. | 76.1 | 50.7 |
| 109 | Metal containers............................... | 71.1 | 20.2 |
| 112 | Major appliances.............................. | 81.7 | 25.6 |
| 116 | Motor vehicle parts.......................... | 94.3 | 52.3 |
| 119 | Nonferrous metal scrap..................... | 70.7 | 30.7 |
| 120 | Textile waste..................................... | 97.2 | 2.1 |
| 121 | Paper waste....................................... | 99.0 | 6.6 |
| 123 | Shipping containers.......................... | 60.6 | 5.4 |

1 Excerpted from Robert L. Banks' table 9, based on A. T. Kearney study of April 29, 1977.

2 Percent of rail traffic, not of total commodity traffic. Most commodities below 50 percent and fresh fruits and vegetables omitted.

3 Percent of rail traffic between points in U.S.

***472** APPENDIX D

****34** Chapter X of Title 49 of the Code of Federal Regulations is amended by the addition of a new section 1039.14 as follows:

1039.14 BOXCAR TRANSPORTATION EXEMPTION

(a) The rail transportation of all commodities in boxcars is exempt from the provisions of 49 U.S.C. Subtitle IV except as otherwise provided in this section.

(b) The Commission retains jurisdiction in the following areas:

(1) Car hire and car service.

(2) Mandatory interchange of equipment.

(3) Reciprocal switching or joint use of terminal facilities.

(4) Car supply.

(5) Rates for the transportation of recyclable or recycled materials other than iron and steel.

(6) Freight carpooling agreements.

(c) Rail carriers are authorized to take the following actions with respect to boxcar equipment use:

(1) Assess charges for empty movement of cars where movements are made at the request of the carowner, the Association of American Railroads, or the Commission. The empty mileage charge is subject to a maximum of 35 cents per mile, as adjusted for inflation or deflation using the rail cost adjustment factors published periodically by the Commission in Ex Parte No. 290 (Sub-No. 2), *Railroad Cost Recovery Procedures*. In applying those factors, the figure of 35 cents shall be treated as having been in effect on October 1, 1982.

(2) Store empty cars and reclaim car hire payments beginning at the expiration of a 72-hour grace period after the car is made empty.

(3) Negotiate bilateral agreements governing car hire rates, empty movements, and storage.

(d) Carriers must continue to comply with Commission accounting and reporting requirements. Railroad tariffs pertaining to the exempted transportation of commodities in boxcars will no longer apply. This exemption shall remain in effect, unless modified or revoked by a subsequent order of this Commission. (Authority 49 U.S.C. 10321(a), 10505 and 11122.)

1 Section 10505(a) provides as follows:
In a matter related to a rail carrier providing transportation subject to the jurisdiction of Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—
(1) is not necessary to carry out the transportation policy of section 10101a of this title; and
(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

2 Types A, B, R, and S.

3 Notice published January 28, 1982 (47 F.R. 4100).

4 Notice published June 25, 1982 (47 F.R. 27573).

5 Public Law 94–210, 90 Stat. 31 (1976).

6 Public Law 96–448, 94 Stat. 1895 (1980).

7 49 U.S.C. 10709.

8 49 U.S.C. 10701a(c)(4)(B).

9 49 U.S.C. 10741(f)(3) and (4).

10 49 U.S.C. 10705a(c).

11 49 U.S.C. 10713.

12 The Conference Committee report states that:

The bill permits exemptions whenever regulation is not needed to prevent abuses of market power, regardless of the presence of effective competition. The policy underlying this provision is that while Congress has been able to identify broad areas of commerce where reduced regulation is clearly warranted, the Commission is more capable through the administrative process of examining specific regulatory provisions and practices not yet addressed by Congress to determine where they can be deregulated consistent with the policies of Congress. The conferees expect that, consistent with the policies of this Act, the Commission will pursue partial and complete exemptions from remaining regulation. The conferees anticipate that through the exemption process the Commission will eventually reduce its exercise of authority to instances where regulation is necessary to protect against abuses of market power where other federal remedies are inadequate for this purpose. Particularly, the conferees expect that as many as possible of the Commission's restrictions on changes in prices and services by rail carriers will be removed and that the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power.

H.R. Rept. 96th Cong., 2d sess. 83, 105 (1980).

13 Ex Parte No. 346 (Sub-No. 7), *Railroad Exemption—Export Coal.*

14 Conrail states that it printed 5 ½ million pages of tariffs in 1980. With deregulation, it would maintain its boxcar rate information on computers.

15 Eighty percent of Conrail's boxcar traffic is interlined. Conrail states that revenue division arrangements have forced it to handle most of this traffic at a loss.

16 *Rail General Exemption Authority*, 361 I.C.C. 211 (1979).

17 See note 1, *supra*.

18 Section 10505(f).

19 See note 12, *supra*.

20 Even though a shipper's plant may be served directly by only a single railroad, we can require that railroad to provide switching services for other railroads serving the same vicinity. We are retaining jurisdiction to require reciprocal switching of or joint use of terminal facilities for boxcar traffic. Shippers themselves may dictate routing of any shipment.

21 The statistics cited in the parties' comments, referring to 1980 or earlier, do not fully reflect the present strength of truck competition. The Motor Carrier Act of 1980 resulted in significant new entry into the business of common carrier trucking, while contract and private motor carriage have benefited from the removal of operating and equipment leasing limitations, and recent legislation has relaxed truck size and weight limits.

22 See appendix A.

23 See appendix B.

24 See appendix A.

25 49 U.S.C. 10709(d)(2)(C).

26 See appendix C.

27 The overall boxcar share for parts and vehicles considered together is only 26.6 percent. See appendix A.

28 See appendix A.

29 DOT's nationwide data show a rail share of only 58 percent for pulp (appendix B).

30 No. 37809, *McCarthy Farms, Inc.* v. *Burlington Northern, Inc.*, (not printed), served December 14, 1981. The Commission has reopened this proceeding for further consideration.

31 Source: ALK Associates, 1979–1981 ICC 1-percent waybill sample. Transmitted to Chairman Taylor by letter of November 30, 1982, from Charles N. Marshall of Conrail, in response to a question asked at oral argument.

32 No. 37466, *Aluminum Association, Inc.*, v. *Akron, Canton & Youngstown Railroad Co.* (not printed), served August 5, 1981. We have reopened this proceeding for further consideration.

33 No. 37715S, *Aluminum Company of America v. Burlington Northern, Inc.* (not printed), served April 11, 1983.

34 Ex Parte No. 394, *Cost Ratio for Recyclables—1980 Determination* (not printed), decided November 30, 1982.

35 An exception is the Alaska trade, where boxcars moving in water-rail service between the West coast and Alaska compete with trailers and containers moving in water-truck service. Sea-Land Service, Inc. contends that regulation of the Alaska Railroad (ARR) is necessary to prevent predatory pricing since ARR is publicly owned and could rely on subsidies to price below cost.

We regard true predatory pricing on the part of ARR as highly unlikely. In 1981, we determined that the rates of ARR cover the cost of service. *Study of Alaska Railroad Water/Rail Contract Rates and Water/Rail Tariff Charge Rates* (served June 15, 1981). As DOT notes, competitors of ARR transport 75 percent of the freight moving between the continental United States and the area served by ARR. Finally, since there would be no barrier to rapid reentry of competing water-motor service, ARR could not enjoy a sustained period of post-predation monopoly pricing.

36 Ex Parte No. 355, *Cost Standards for Railroad Rates*, 364 I.C.C. 898 (1981).

37 Section 10713(d) allows a brief period after the filing of a contract with the Commission during which a complaint seeking review of the contract may be filed. As pertinent, only the following grounds for complaint are recognized: (1) the contract unduly impairs the ability of the carrier to serve the complainant; (2) the contract will result in unreasonable discrimination against a port; and (3) in the case of agricultural commodities (including forest products and paper), the carrier has discriminated against the complainant by refusing to enter into a contract with it under similar conditions. Discrimination for these purposes has no broader meaning than under section 10741(f)(4), i.e., it does not pertain to rail rates applicable over different routes.

38 Indeed, Conrail indicates that the exemption of fresh fruits and vegetables has enabled carriers to make interline arrangements on short notice and to increase the volume of traffic they transport.

39 Discussed below under the heading 'Retention of Jurisdiction.'

40 Nor do we believe that boxcar tariffs are necessary for the long-term predictability and stability of rates which Lykes Bros. Steamship Company considers to be essential to the flow of import/export traffic. We discounted similar arguments when we granted the TOFC/COFC exemption, and railroads continue to participate in import/export shipments of containerized goods. Water-rail breakbulk traffic, which relies mainly on boxcars for inland movement, should be no less adaptable to exempt rail transportation.

41 This exemption also applies to intrastate regulation of boxcar traffic. Once a particular category of traffic is exempted by the Commission, this becomes a standard from which a State cannot deviate, unless we find that conditions within the State warrant an exception. *State Intrastate Rail Rate Authority—P.L. 96–448*, 367 I.C.C. 149 (1983).

42 Mandatory interchange, reciprocal switching and the joint use of terminal facilities, car supply obligations, and carpooling agreements are discussed below under the heading, 'Retention of Jurisdiction.'

43 In fact, under the Commission's current car hire compensation formula, car hire rates were scheduled to rise by 25 percent despite a large surplus of cars, and we granted the railroad's petition to suspend this increase. See Ex Parte No. 334, *Car Service Compensation—Basic Per Diem Charges* (not printed), served March 30, 1983.

44 The history of car hire/car service regulation and the recurring problems in the area are discussed in the Commission's notice of proposed rulemaking in Ex Parte No. 334 (Sub-No. 5), *Zone of Reasonableness for Car Hire Charges*, published November 5, 1980 (45 F.R. 73524). See also Carl D. Martland, *Overcoming Fundamental Problems in the Car Hire/Car Service System*, 23 Transportation Research Forum Proceedings 549.

45 Carriers can now negotiate bilateral car hire reductions below prescribed rates. Ex Parte No. 334 (Sub-No. 4), *Flexibility in Setting Railroads Per Diem Levels*, 364 I.C.C. 291 (1980). Conrail argues, however, that traffic-originating railroads have little incentive to agree to such reductions under the present scheme.
Flexibility to negotiate car hire increases above prescribed ratesis under consideration in Ex Parte No. 334 (Sub-No. 5), *Zone of Reasonableness for Car-hire Charges*, 364 I.C.C. 299 (1980).

46 Conrail states that the proposed ceiling of 35 cents per mile is currently agreed to by members of the Trailer Train pool for movement of empty Trailer Train cars and is accepted as an approximation of the variable cost of handling an empty car. Since other parties presented no reason to question the appropriateness of the 35-cent rate for boxcars, we shall adopt it subject to any modification shown to be appropriate in the future. An inflation adjustment will be allowed, based on the rail cost adjustment factors published periodically by the Commission in Ex Parte No. 290 (Sub-No. 2). Those factors currently relate to a base level existing on October 1, 1982, a date relatively close to the April 30, 1982 filing date of Conrail's modified proposal. For convenience, we shall provide that the rail cost adjustment factors shall be applied as though the figure of 35 cents per mile were in effect on October 1, 1982. (See appendix D.)

47 Since the traffic flow between Conrail's territory and other regions is imbalanced, Conrail tends to have many empty foreign boxcars on its lines and may often be able to strike more favorable bargains on car compensation than other carriers. Some parties decry this possibility as an exercise of market power. We are not convinced that the exercise of market power would be directed against 'shippers' as that term is used in the statute. In any event, we view the result forecast as desirable. Boxcar capacity costs are properly recovered mainly on movements in the direction of the peak traffic flow—in this case, toward Conrail—since these movements create most of the boxcar capacity needs. To require equal car compensation on movements in the reverse direction, thus burdening the offpeak flow with an equal share of capacity costs, is economically inefficient. See 1 A. Kahn, *The Economics of Regulation*, 101–103 (1970).

48 We cannot accept the apparent view of some that Congress intends the Commission to encourage the acquisition of boxcars at all times without regard to the needs of the Nation's rail system. Under 49 U.S.C. 11122, if we prescribe car hire charges, we may not hold them down to levels that render car ownership unprofitable and discourage new investment. However, that section neither mandates the prescription of car hire charges nor precludes us from relying on market forces to establish appropriate car compensation. Indeed, it requires us to encourage the efficient use of boxcars —an unattainable goal if the fleet size is excessive.

49 The Conference Committee report states that:
The conferees do not believe that the provision of an incentive element on freight equipment is the best means of attracting capital into the industry for the acquisition of rolling stock. Rather, the rental rate for such rolling stock should be sufficient to pay an adequate return on investment. The conferees do anticipate, however, that the Commission shall continue to examine means such as flexible car hire of making basic car hire more responsive to market forces where this is possible without subjecting carriers which are forced to use cars received in interchange to unreasonable rates. H.R. Rept. 96–1430 96th Cong., 2d sess. 83, 117 (1980).

50 The bilateral agreements for car compensation that we are now permitting will be exempt from the requirement for Commission approval under 49 U.S.C. 10706(a)(2)(A) and will not be immune from the application of the antitrust laws.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

51 Public Law 96–354, section 2(a).

52 47 F.R. 54985.

53 On an annual basis, the projected increases were as follows:

| | |
|---|---|
| Fuel consumption | 133,514,957 gallons |
| Highway accidents | 5,630 occurrences |
| Air pollutant emission: | |
| Carbon monoxide | 9,308,838 pounds |
| Hydrocarbons | 1,326,587 pounds |
| Nitrogen oxides | 38,502,065 pounds |

54 While this traffic may not make a pro rata contribution to coverage of the carriers' fixed costs, even a small contribution is better than none.

55 The SP and its subsidiary the St. Louis Southwestern Railway Company support only the rate exemption.

56 It bears repeating here that denial of this proposed exemption was supported by: (1) Two branches of the Government, the Departments of Defense and Agriculture, which, as large shippers, have legitimate commercial interests in the rail transportation business; (2) The Association of Western Railways, (including the Chicago & North Western Transportation Company, Burlington Northern Railroad Company, Denver & Rio Grande Western Railroad Company, Green Bay & Western Railroad Company, Illinois Central Gulf Railroad Company, Atchison, Topeka & Santa Fe Railway Company, Elgin, Joliet & Eastern Railway Company, Missouri-Kansas-Texas Railroad Company, Soo Line Railroad Company, Missouri Pacific Railroad Company, Western Pacific Railroad Company, Kansas City Southern Railway Company, and Union Pacific Railroad Company), one-third of the individual class railroads and about 20 short-line railroads. (The American Association of Railroads also opposes the car service/car hire portion of the exemption.); (3) Eleven State and local agencies; (4) Nine private carowners; (5) Over 70 shippers, associations, and nonrail carriers; and (6) Numerous members of Congress.

57 The railroads themselves have stated that the most logical and reasonable approach to exemptions is by commodity and not car type.

58 See H.R. Rept. 1035, 96th Cong., 2d sess. 60 (1980). Further, the special nature of TOFC traffic makes it highly competitive and versatile. TOFC/COFC operations are from a limited number of ramp origins to a limited number of ramp point destinations. In 1980, the number of boxcar loads shipped was about 200 percent of the TOFC carloadings. The predominant rate form for TOFC is FAK (Freight all kinds) and the commodity is the trailer—usually a 40-foot van. There is generally no rate differential on different kinds of goods sealed in the trailer. This enables shippers to switch modes at whim, and provides built-in controls against abuses and excessive rates.

59 Compare the aggregated data for the Northeast supplied by Conrail in this proceeding with No. 38676, *Changes in Routing Provisions Conrail—July 1981*, 365 I.C.C. 753 (1982) (remanded, *Chesapeake and Ohio Railway Co. et al.* v. *United States of America*, 7th Cir. Nos. 81–2286, 82–1625, and 82–1693 (April 4, 1983). The court held that there was not substantial evidence to support the conclusion that certain joint rate cancellations were consistent with the public interest because, among other things, the Conrail study on which the Commission relied heavily was deficient since (i) it considered only some of the traffic, i.e., that on which Conrail was a terminating carrier, and (ii) it was in grossly aggregated form).

60 See appendix A, note 1 of majority decision.

61 See appendix B, note 1, 2 and appendix C, note 1 of majority decision.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works 

62 For example, STCC 331 covers steelworks, rolling mill or other reduction plant products. The STCC is then further divided into 245 separate commodity groups. Another example is STCC 204, grain mill products, which, as Conrail has shown, travels 41.5 percent in boxcars. However, when this is expanded to the four-digit level, there are six separate subgroups with boxcar shares of from 11.5 to 97.2 percent!

63 I would like to point out that the notice of this proposal was made under the auspices of 49 U.S.C. 10505, which authorizes exemptions from regulation. This proposal, which will authorize the authority to assess charges at certain levels and to store empty cars while reclaiming car rental charges, is a regulation—not an exemption. Certainly 49 U.S.C. 11122 would permit such regulations, but only after proper notice. Respondents who commented on this proposal, as noticed by the Commission under section 10505, were clearly denied the opportunity to address it under section 11122. These sections have different purposes and different standards. The courts have consistently found procedural defects of this nature to be fatal for lack of proper notice.

64 See, for example, No. 39176, *The Chlorine Institute, Inc.* v. *Atchison, Topeka & Santa Fe Railway Co., et al.*; No. 38676, *Changes in Routing Provisions, supra*, note 5.

65 On February 28, 1983 former Commissioner Simmons submitted the following separate expression:

A grant of Conrail's exemption from regulation of rates on boxcar traffic files in the face of the evidence of record and the criteria of section 10505.

Of particular concern to me is that no persuasive arguments have been raised which demonstrate that we can state for certain that there is absolutely *no* potential for abuse of market power. The Commission is required to make an affirmative finding that continued regulation is not needed to protect shippers from the abuse of market power. A number of shippers have presented persuasive data to demonstrate that the likelihood of market power abuse is great on a significant amount of traffic. Conrail and other supporters of the exemption have not amply contradicted those assertions. Instead, Conrail has submitted evidence limited to the Northeast and fails to present any picture of the country as a whole or of specific classes or types of commodities.

An exemption of boxcars from car hire and car service regulation would not be consistent with the national rail transportation policy. The evidence suggests that such an exemption would only serve the parochial interests of Conrail at the expense of the shippers, the other railroads, and the public.

I.C.C.
367 I.C.C. 425, 1983 WL 28016

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Econometrics

## Legal, Practical, and Technical Issues

Second Edition

ABA Section of Antitrust Law
Promoting Competition
Protecting Consumers

ABA American Bar Association
Defending Liberty
Pursuing Justice

# Econometrics

## Legal, Practical, and Technical Issues

### Second Edition

ABA Section of Antitrust Law
Promoting Competition Protecting Consumers

ABA American Bar Association
Defending Liberty Pursuing Justice

This volume should be officially cited as:

ABA SECTION OF ANTITRUST LAW,
ECONOMETRICS, SECOND EDITION (2014)

Cover design by ABA Publishing.

The materials contained herein represent the opinions of the authors and editors and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Antitrust Law unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book and any forms and agreements herein are intended for educational and informational purposes only.

© 2014 American Bar Association. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission contact the ABA Copyrights & Contracts Department, copyright@americanbar.org or via fax at (312) 988-6030, or complete the online form at http://www.americanbar.org/utility/reprint.html.

Printed in the United States of America.

18 17 16 15 14 5 4 3 2 1

ISBN: 978-1-61438-935-4
Library of Congress Catalog Number: 2014933353

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

# CONTENTS

*Foreword* ........ xiii
*Preface* ........ xv

**Chapter 1**
**An Introduction to Econometric Analysis ........ 1**
A. How Econometrics Can Be Helpful in an Antitrust Analysis ........ 1
1. Providing Measures of Quantitative Inputs to an Antitrust Analysis ........ 2
2. Identifying and Measuring Causal Relationships ........ 2
3. Testing Propositions about the Behavior of Companies and Consumers ........ 3
B. The Elements of an Econometric Study ........ 3
1. Articulating the Question to Be Studied ........ 4
2. Considering the Underlying Economics ........ 4
3. Collecting Relevant and Useful Data ........ 5
4. Formulating and Estimating an Econometric Model ........ 5
5. Interpreting the Results ........ 5
a. A Word of Caution in Interpreting a "Not Statistically Significant" Result ........ 6
b. A Word of Caution in Interpreting a "Statistically Significant" Result ........ 7
6. Presenting the Results ........ 7
C. Conclusions ........ 9

**Chapter 2**
**Formulating Empirical Questions of Interest ........ 11**
A. Market Definition and Market Power ........ 11
1. Market Definition ........ 11
2. Market Power ........ 14
B. Merger Analysis ........ 15
1. Prospective Analysis ........ 15
a. Event Analysis ........ 15
b. Demand Modeling ........ 16

2. Retrospective Analysis ..... 17
C. Damages ..... 18
1. Overcharges ..... 19
2. Lost Profits ..... 20
D. Class Certification ..... 21
E. Conclusions ..... 22

**Chapter 3**
**The Econometric Framework ..... 25**
A. Brief History of Statistics and Econometrics: Drawing Inferences about Causal Relationships from Data ..... 25
1. Statistics and Randomized Experimental Design ..... 26
2. Causality ..... 31
3. Econometrics ..... 34
a. Structural Models ..... 35
b. Econometric Estimation Methods for Structural Models ..... 36
c. Reduced Form Models ..... 38
d. Analysis of Natural Experiments ..... 39
e. Specification Testing ..... 41
B. Conclusions ..... 43

**Chapter 4**
**Collecting Relevant and Useful Data ..... 45**
A. Introduction ..... 45
B. Nature of Economic Data ..... 45
1. Cross-Sectional Data ..... 46
2. Time Series Data ..... 46
3. Data with Both Cross-Sectional and Time Series Data ..... 47
C. Types of Data ..... 48
1. Accounting Data ..... 48
2. Transaction Data ..... 49
3. Scanner Data ..... 51
4. Survey Data ..... 54
D. Sources of Data ..... 55
1. Ordinary Course Data Maintained by the Parties ..... 55
2. Commercial Databases ..... 56

3. Publicly Available Data ........ 57
E. Data Considerations That May Affect the Analysis ........ 57
1. Outliers ........ 58
2. Missing Observations ........ 59
3. Small Sample Size ........ 60
4. Omitted Variables ........ 61
5. Data Aggregation ........ 61
6. Admissibility of Data Analysis ........ 63
F. Conclusions ........ 64

**Chapter 5**
**Specifying and Estimating an Appropriate Econometric Model ........ 65**
A. Basics of an Econometric Model ........ 65
B. Key Considerations in Specifying an Econometric Model ........ 68
1. Examples of How Available Data Affects the Specification of Econometric Models ........ 68
a. Fixed Effects ........ 68
b. Benchmark Models ........ 70
(1) Cross-Sectional Data and Contemporaneous Benchmark Models ........ 70
(2) Time Series Data and Before-and-After Models ........ 71
(3) Panel Data and Difference-in-Differences Models ........ 72
2. Multiple Equation Models ........ 75
3. Analyzing Consumer Preferences Using Discrete Choice Models ........ 77
C. Some Potential Modeling and Estimation Issues ........ 79
1. Functional Form ........ 80
2. Omitted Variables ........ 81
3. Multicollinearity ........ 82
4. Endogeneity ........ 83
5. Homoskedasticity, No Autocorrelation, and Other Assumptions of the Classical Linear Regression Model ........ 86
D. Conclusions ........ 88

**Chapter 6**
**Interpreting Regression Results ........ 89**

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 42 of 794



A. Understanding Regression Results ........ 89
1. Evaluating the Specification of the Regression Model ........ 89
2. Interpreting Regression Coefficients in an OLS Regression Model ........ 90
3. Interpreting Regression Coefficients in a Discrete Choice Model ........ 92
4. An Example: Estimating Price Overcharges ........ 94
B. Hypothesis Testing ........ 95
1. Statistical Tests ........ 96
a. Hypotheses about a Single Parameter: t-tests ........ 96
b. Testing Multiple Hypotheses: F-tests ........ 97
2. Statistical Significance ........ 98
3. Practical Significance ........ 99
C. Specification Testing ........ 99
1. Goodness of Fit ........ 100
a. R-Squared and Adjusted R-Squared ........ 100
b. Tests to Compare Two Model Specifications ........ 101
2. Modeling Issues That Could Affect the Reliability of the Results ........ 102
a. Omitted Variables ........ 102
b. Multicollinearity ........ 104
c. Endogeneity ........ 106
d. Heteroskedasticity and Autocorrelation ........ 107
e. Special Considerations in Time Series Analysis ........ 109
D. Data Issues That Could Affect the Reliability of the Results ........ 111
1. Insufficient Data ........ 111
2. Outliers ........ 112
3. Missing Data ........ 113
4. Measurement Errors ........ 114
5. Improper Aggregation of the Data ........ 115
E. Conclusions ........ 116

**Chapter 7**
**Presentation of Econometric Analyses ........ 117**
A. Knowing Your Audience ........ 117
1. The Client ........ 118
2. Opposing Counsel and Experts ........ 118

3. The Judge .......... 119
4. The Jury .......... 119
B. Presenting Econometric Evidence in an Expert Report .......... 120
1. Preparing an Econometric Primer .......... 120
a. Laying Out Basic Concepts of Econometrics .......... 120
b. Introducing More Advanced Concepts of Econometrics .......... 123
2. Describing the Underlying Data .......... 124
3. Describing the Choice of Regression Models .......... 125
4. Discussing the Variables .......... 127
5. Presenting the Results of an Econometric Analysis .......... 129
6. Presenting the Robustness of Econometric Results .......... 132
7. Presenting Critiques of the Econometric Analysis .......... 134
8. Demonstrative Exhibits .......... 137
C. Presenting Econometric Evidence at Trial .......... 138
1. Trial Testimony .......... 139
2. Approaches and Examples .......... 142
D. Conclusions .......... 146

**Chapter 8**
**Evidentiary Issues .......... 147**
A. Admissibility Under *Daubert* .......... 147
1. Introduction .......... 147
2. Qualifications of the Expert .......... 149
3. Relevance .......... 151
4. Sufficient Facts or Data .......... 153
a. Weaknesses in the Underlying Data .......... 153
b. The "Fit" Between the Data and the Analysis .......... 158
5. Reliability .......... 160
a. Analysis Can Be Empirically Tested .......... 161
b. Analysis Has Been Published or Subjected to Peer Review .......... 163
c. Analysis Presents an Acceptable Known or Potential Rate of Error .......... 164
d. Analysis Is Generally Accepted in Scientific Community .......... 165

e. Analysis Grows Naturally and Directly Out of Research Conducted Independently of the Litigation ......... 169
f. Analysis Includes All Relevant Variables ......... 170
g. Analysis Treats Outliers Appropriately ......... 176

B. Burden of Proof ......... 176

C. Additional Issues Regarding the Admissibility of Econometric Evidence ......... 180
1. Appellate Standard of Review ......... 181
2. Preserving the Issue of Admissibility on Appeal ......... 181
3. Using *Daubert* Factors after Admission ......... 183
4. Using *Daubert* Factors at Class Certification Stage ......... 183

D. Conclusions ......... 186

**Chapter 9**
**Expert Discovery ......... 187**

A. Discovery of Testifying Experts ......... 187
1. Document and Data Discovery ......... 188
2. Deposition of a Testifying Expert ......... 194
a. Expert's Qualifications as an Econometrician ......... 195
b. Potential Data Problems ......... 196
c. Violations of Statistical Assumptions ......... 197
d. Prior Inconsistent Econometric Results ......... 197
e. Discussions with Other Experts ......... 198

B. Discovery of Non-Testifying Experts ......... 198

C. Other Discovery Issues ......... 205
1. Discovery from Non-Parties ......... 205
2. Discovery from the Government ......... 207
a. Governmental Privileges ......... 207
b. The Freedom of Information Act ......... 211
3. Consequences of Non-Compliance ......... 212

D. Conclusions ......... 214

**Chapter 10**
**Applying Econometrics to Assess Market Definition and Market Power ......... 215**

A. Legal and Economic Framework ......... 215

B. Market Definition ......... 217

1. Estimating the Elasticity of Demand .......... 218
   a. Modeling Different Types of Consumer Preferences .......... 220
      (1) Product Space Models .......... 222
      (2) Characteristic Space Models .......... 224
   b. Applying the Elasticity of Demand to the Hypothetical Monopolist Test .......... 227
   c. Applying the Elasticity of Demand to the Critical Loss Test .......... 229
   d. Elasticities of Marshallian Demand and Residual Demand .......... 229
2. Assessing the Relationship between Prices of Competing Products or Prices in Different Regions .......... 232
   a. Price Correlations and Other Non-Causal Approaches .......... 233
      (1) Price Correlations .......... 233
      (2) Price Equality Tests .......... 234
   b. More Advanced Econometric Approaches .......... 235
      (1) Cointegration Analyses .......... 235
      (2) Speed of Adjustment Tests .......... 236
      (3) Price Responsiveness Tests .......... 237
      (4) Natural Experiments .......... 238
3. Analysis of Shipment Data .......... 240

C. Market Power .......... 241
1. Market Share, Concentration, and Entry .......... 241
   a. Market Share as a Measure of Market Power .......... 241
   b. Constructing Market Share from Market Data .......... 242
   c. Calculating the Herfindahl-Hirschman Index .......... 243
   d. Econometric Models of Market Structure and Entry .......... 245
2. Supracompetitive Profit Margins .......... 247
   a. Profit Margins as a Measure of Market Power .......... 247
   b. Measuring Profit Margins Using Financial and Accounting Data .......... 248
   c. Estimating Profit Margins from the Inverse Demand Elasticity .......... 249
3. Supracompetitive Pricing .......... 252
   a. Supracompetitive Pricing as a Measure of Market Power .......... 252
   b. Identifying Benchmark Prices .......... 253

c. Estimating Supracompetitive Pricing Using a Benchmark Price ........ 253
d. Estimating Supracompetitive Pricing Using Reduced-Form, Price-Concentration Models ........ 257
e. Estimating Supracompetitive Pricing Using a Structural Regression Model ........ 261
D. Conclusions ........ 262

**Chapter 11**
**Applying Econometrics to Merger Review ........ 265**
A. Legal and Regulatory Framework ........ 265
B. Empirical Methods for Merger Analysis ........ 267
1. Diagnostic Techniques Used to Identify Potentially Problematic Mergers ........ 267
2. Natural Experiments ........ 268
3. Merger Simulation ........ 271
a. Overview ........ 271
b. Implementation ........ 273
c. Reliability of Merger Simulation ........ 276
C. Estimating the Price Effects of Proposed Transactions ........ 277
1. Analyses of Potential Unilateral Effects ........ 277
a. Whole Foods and Wild Oats ........ 277
b. Hospital Mergers ........ 281
2. Analyses of Potential Coordinated Effects ........ 284
a. The Cruise Lines Mergers ........ 284
b. The Australian Mortgage Market ........ 288
c. HP-Compaq ........ 291
D. Estimating the Competitive Effects of Consummated Transactions ........ 295
E. Conclusions ........ 299

**Chapter 12**
**Applying Econometrics to Estimate Damages ........ 301**
A. Non-Econometric Approaches to Damages ........ 302
B. The Econometric Approach to Damages ........ 305
C. Overview of Legal and Economic Framework ........ 306
D. Estimating Damages Using Econometric Techniques ........ 308

1. Before-During Approach ..... 312
a. "Dummy Variable" Models Versus "Prediction" Models ..... 312
2. Before-During-After Models ..... 316
3. Benchmark and Difference-in-Differences Approaches to Damages ..... 319
E. Key Considerations in Creating and Evaluating Econometric Models of Damages ..... 320
F. Case Study: Applying the Before-During and Benchmark Approaches ..... 325
1. Background ..... 325
2. Economic Model, Data, and Choice of Explanatory Variables ..... 326
3. Assumption of Liability and Causation ..... 329
4. Stationarity of the Time Series ..... 329
5. The Before-During Approach with the Dummy Variable Model ..... 331
6. The Before-During Approach with the Prediction Model ..... 336
7. Benchmark Approach ..... 338
G. Conclusions ..... 340

**Chapter 13**
**Applying Econometrics to Address Class Certification ..... 341**
A. Legal and Economic Framework ..... 342
1. Demonstrating Common Proof of Injury ..... 343
2. Proving Damages ..... 348
B. Econometric Analysis in Class Certification Disputes ..... 349
1. Regression Analysis ..... 351
a. Assessing the Extent of Customer-Specific Pricing ..... 351
b. Testing for the Existence of a Common Price Structure ..... 354
c. Testing for Classwide Impact ..... 355
(1) Regression Analysis to Measure Average Impact ..... 356
(2) Regression Analysis as a Test of Classwide Impact Using a Common Method of Proof ..... 357
d. Summary ..... 360
C. Case Studies ..... 361

1. Identifying Customer-Specific Pricing: *In re Graphics Processing Units Antitrust Litigation (GPU)* .......................... 361
   a. Case Background .......................................................... 361
   b. Plaintiffs' Expert's Econometric Analysis.......................... 362
   c. Defendants' Expert's Econometric Analysis ...................... 365
   d. Case Study Insights.......................................................... 366
2. Case Study of Testing for Classwide Impact: Plastic Additives .................................................................... 367
   a. Case Background .......................................................... 367
   b. Plaintiffs' Expert's Econometric Analysis.......................... 368
   c. Defendants' Expert's Econometric Analysis ...................... 368
   d. Case Study Insights.......................................................... 369

D. Conclusions ...................................................................... 370

**Appendix and Glossary ............................................................ 371**

A. Introduction ...................................................................... 371
B. Correlation Between Two Variables.......................................... 371
C. Classic Linear Regression Analysis.......................................... 373
   1. Ordinary Least Squares Regression........................................ 374
   2. Simple Regression Models with One Explanatory Variable.......................................................................... 376
   3. Regression Models with Multiple Independent Variables....... 377
   4. The Regression Residual ................................................... 380
D. The Precision of Regression Results .......................................... 380
   1. Standard Errors ............................................................... 380
   2. Confidence Intervals.......................................................... 383
   3. t-Statistics, Statistical Significance and Hypothesis Testing ......................................................................... 384
   4. Testing the Difference Between Two Means.......................... 387
   5. Goodness-of-Fit ............................................................... 388
E. Glossary ............................................................................. 390

Table of Cases............................................................................ 423

Index ........................................................................................ 435

competitive, and is sufficiently similar to the product being studied, can serve as the competitive benchmark.

Damages are generally measured in terms of *overcharges* or *lost profits*. The results of the natural experiment can be used to quantify the prices or profits that would have prevailed in the counterfactual scenario, and then overcharges or lost profits can be estimated as the difference between the counterfactual (i.e., but-for) and actual prices or profits. In what follows, we outline the ways in which empirical analysis is typically used in the calculation of antitrust damages.

### *1. Overcharges*

The concept of overcharges arises naturally in price-fixing matters in which prices allegedly have been inflated relative to the level that would have prevailed in the absence of a cartel. To determine damages, it is necessary to first estimate what prices would have been but for the cartel (i.e., but-for prices). Overcharges—the difference between the actual price and the but-for price—can then be calculated in a straightforward manner. Finally, to obtain an estimate of total damages, the estimated overcharge is multiplied by the quantities purchased during the existence of the cartel.

Prices that prevailed while the alleged cartel was in operation can be observed, while but-for prices are unobservable and need to be estimated.[15] A regression can be used to estimate but-for prices by analyzing how prices are related to economic factors such as cost and demand factors.[16] The estimated relationship is then used to predict how prices would have evolved absent the cartel during the period when the alleged cartel was in effect.

To ensure that the effect of the cartel on prices is properly measured by using a regression analysis, one needs to pay careful attention to (1) whether the time period used to estimate the relationship between prices

15. The most common approaches used to estimate but-for prices are the dummy variable approach and the prediction approach. The dummy variable approach is based on a regression estimated over a period of time that includes the time when the cartel was operating—the cartel period. The prediction approach is based on a regression estimated over a cartel free period.

16. If the time period used to estimate the regression also includes the cartel period, then one or more cartel dummies are included among the economic variables that are related to prices.

and cost and demand factors includes or excludes the cartel period; (2) whether cost and demand factors included in the regression were affected by the alleged cartel; (3) whether the relationship between prices and certain cost and demand factors could have been affected by the alleged cartel; (4) whether all relevant cost and demand factors are accounted for in the regression; (5) whether the regression includes irrelevant cost and demand factors that spuriously could be seen as factors that relate to prices; and (6) whether, when price dynamics are allowed for, the estimated relationship between prices and cost and demand factors implies that after the cartel ceased to operate, the estimated prices eventually resemble the prices observed in the real world.[17]

The estimation of but-for prices allows economists to answer questions such as:

- Which products were affected by the cartel?
- By how much did prices of certain products rise (or fail to fall) as a result of the alleged price-fixing arrangements?
- For how long did the cartel have an impact on prices?
- Was the effect of the cartel on prices constant through time? If not, how effective was the cartel through time?

Chapter 12 provides a discussion of the econometric tools used to measure but-for prices.

### *2. Lost Profits*

Another question of interest is the computation of damages in terms of lost profits. Lost profits can be measured by estimating the sales and the resulting incremental profits that the plaintiff would have earned but for the alleged anticompetitive behavior on the part of the defendants. For instance, in an exclusionary conduct case, lost profits are computed as the incremental revenues that competitors would have earned from sales in the absence of exclusionary conduct, less the incremental costs that competitors would have incurred to produce and sell the additional units.

17. *See* Halbert White, Robert Marshall & Pauline Kennedy, *The Measurement of Economic Damages in Antitrust Civil Litigation*, 6 ECON. COMM. NEWSL. 1, 17 (2006).

The types of counterfactual questions similar to those asked for the overcharges analysis can be addressed by using regression analysis techniques. Chapter 12 provides a discussion of the econometric techniques used to measure lost profits.

## D. Class Certification

The key criteria that a group of plaintiffs must satisfy in order to be certified as a class are laid out in Rule 23 of the Federal Rules of Civil Procedure. Specifically, Rule 23(a) requires that the class be sufficiently numerous ("numerosity"); that questions of fact or law relevant to the case are common among plaintiffs ("commonality"); that claims or defenses of the representatives of the class must be typical of class members ("typicality"); and that the class representatives must be able to fairly and adequately protect the interests of the class ("adequacy").[18] For a class to be certified, class members must also show that the requirements of one of the subsections of Rule 23(b) have been met. Class certification disputes often focus on Rule 23(b)(3), which requires that questions of law or fact common to class members predominate over questions affecting individual plaintiffs ("predominance") and that a class action be superior to other available methods for the fair and efficient adjudication of the controversy ("superiority").[19]

In recent times, courts have raised the bar on standards for class certification, particularly with regard to the commonality and predominance criteria. The Third Circuit's ruling in the *In re Hydrogen Peroxide Antitrust Litigation*[20] stated that the "district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case"[21] and that "the court must resolve all factual and legal disputes relevant to class certification even if they overlap with the merits."[22] As a consequence, the importance of economic analysis, which can provide a framework for determining whether common issues predominate over individual issues, has been elevated.

---

18. *See* FED. R. CIV. P. 23(a).
19. *See* FED. R. CIV. P. 23(b)(3).
20. *In re* Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008).
21. *Id.* at 311 (citing *In re* New Motor Vehicles Can. Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008) (quoting Waste Mgmt. Holdings v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000)).
22. *Id.* at 307.

Commonly used econometric methods provide a relevant framework for class certification. A regression model can be constructed to estimate the effect of the alleged antitrust violation for both individual plaintiffs as well as the class as a whole. Statistical analyses can be used to determine whether the variation in the impacts among individual class members is consistent with a finding of common impact.[23] Such analysis may lead to a finding that, although the data do not support common impact among the members of the entire class, there are sub-classes of plaintiffs for whom common impact exists.

Empirical analysis undertaken by an economic expert can address the following questions relevant to class certification matters:

- Can a common economic framework for assessing damages be specified for the putative class of plaintiffs? For example, is there a common damages theory that applies to all class members?
- Is the variation of damages among individual plaintiffs sufficiently small such that it is still consistent with common impact?
- Is there evidence of common damages for sub-classes of plaintiffs?
- Were all or almost all of the class members injured by the alleged antitrust violation?
- Were there any members of the class that benefited from the challenged conduct while others were allegedly harmed?

The application of econometric methods to address issues relevant for class certification is discussed further in Chapter 13. Two case studies discussed in that chapter illustrate the types of econometric analysis undertaken by plaintiff and defendant experts in class certification matters.

## E. Conclusions

The questions and issues discussed above motivate the kinds of econometric analyses that are often used and encountered in an antitrust

---

23. *See* Bret M. Dickey & Daniel L. Rubinfeld, *Antitrust Class Certification: Towards and Economic Framework*, 66 NYU ANN. SURV. AM. L. 459 (2011).

### *1. Outliers*

Any economic investigation undertaken with a data set consisting of only a small numbers of data points suffers from the possibility that certain data points may have an undue influence on the outcome of the analysis. An observation that has an unexplained and inordinate power is known as an outlier. An outlier may or may not be a data coding error.

For example, the monthly average spot-market prices for wholesale electricity at Pennsylvania-New Jersey-Maryland (PJM) Interconnection in 1999 are the following[14]:

| Month | Price ($/MWh) |
|---|---|
| January | $19.92 |
| February | $16.51 |
| March | $19.59 |
| April | $21.44 |
| May | $22.50 |
| June | $36.93 |
| July | $89.96 |
| August | $31.78 |
| September | $21.59 |
| October | $19.84 |
| November | $16.55 |
| December | $18.13 |

The July price of $89.96 is visibly quite different from, and higher than, other prices in this price series. Indeed, the average price of the year was $27.90, but only $22.25 excluding the July price. In this example, monthly prices are simple averages of hourly prices. Within a given month, there may be outliers of hourly prices. For example, for July, the maximum price was $999, much higher than the average of $89.96. Such outliers may not be a recording error—demand for electricity can vary widely across different seasons and between peak and off peak hours, and unexpected supply interruptions may occur.

Outliers may be identified, and their effect controlled in a number of ways. Oftentimes, outliers can be detected by visually inspecting and

14. These data are taken from http://www.eia.gov/cneaf/electricity/epav1/wholesale.html#tab6.

plotting out the data. Some common statistical methods to identify outliers assume that the data are distributed normally and are based on the calculated mean and standard deviation for the underlying data. The general idea behind this method is to identify data points that are too far away from the mean relative to the standard deviation. These data points are then looked at as possibly being outliers that might inadvertently skew results.

While influential observations should not be dropped simply because they are outliers, it can be helpful to identify additional variables that have an impact on the relationships being analyzed in order to mitigate the outliers' effects. For example, a labor strike on an essential input might drive up the cost to all competitors in a highly concentrated market, thus causing prices to rise. Without a proper control for cost, it would be tempting to conclude that the market's high concentration led to high prices. This example demonstrates that determining a possible cause for an outlier may lead to a better model that can also contain the outlier's undue influence. Where no apparent explanation can be found for outliers, it is still important to be mindful as to whether the economic analysis performed will be robust enough to withstand the inclusion of such outliers.

### 2. *Missing Observations*

A frequent problem encountered in analyzing data is the problem of missing observations. Missing observations in a data set may occur for a variety of reasons. For example, the data may not have been collected in the first place for some observations. Or, the need to use certain information may necessarily require the researcher to remove observations for which the data to be studied are not available or cannot be calculated. For example, if the data to be analyzed are from a survey of customers that was desgined to determine whether and to what extent customers believe there will be a post-merger price increase, it could be the case that not all of the customers surveyed may have answered the survey and not all survey respondents may have answered all of the questions. Another frequent problem is that attempts to collect pricing data in the ordinary course of business often miss certain data entries.

Scanner data may also have gaps. For example, they may focus on big box stores and not on the mom-and-pop retailers.

One solution to the problem of missing data is to drop observations with missing data. If the fact that data are missing is correlated with the dependent variable, this solution can affect the validity of the statistical

results. Assume that the data from the above example of a customer survey were used in a regression where the dependent variable was the level of price increase (for example, 1 percent, 2 percent . . .) and the independent variables were a vector of client characteristics such as size, industry, and geographic location. If clients who believed that there would be a large post-merger price increase were more likely to answer survey questions on their reaction to the merger than those clients who did not believe that there would be a price increase, then simply performing a regression on this data set—without attempting to correct for self-selection bias—would result in biased regression results without statistical validity.

Because data sets in their original form are rarely clean, analysts frequently drop variables for which information is missing so that they can perform the desired statistical analysis. Such cleaning is often not apparent even to a trained expert, allowing some dubious statistical practices to escape detection.

Suppose we are interested in studying the price pattern for a product from 2008 to 2010. After obtaining a monthly price series for this product for the three year period, an additional variable, lag price, is added as a good predictor of the current price. Generating a one-month lag value for price would lead to a missing value for this variable for January 2008, the first month in this time series. If this does not seem to be a problem, imagine what would happen if instead, the desired variable were the one-year lag to explain price for the current month. This would result in twelve missing values for all twelve months in 2008, or one-third of the total number of data points. The more appropriate practice would have been obtaining the 2007 price data to be used for generating lag values for 2008. However, the 2007 data might not be available. In that case, one should at least be mindful of the consequences of generating missing values for the purpose of a statistical study.

Another solution to the problem of missing data is to fill in the gap by imputation, interpolation, or extrapolation, or even from another data source. Counsel should be mindful that filling in data (and the method used to do that) may bring a particular and perhaps unwarranted pattern into the data. Using another data source to replace missing data raises the question of the consistency between different data sources.

### *3. Small Sample Size*

Any econometric or statistical analysis requires a sufficiently large data set, both with respect to the number of observations in a given time

period and over a sufficient length of time. These are essentially two separate problems. In the first case, having too few observations means that the data will not be robust enough to allow any kind of statistical testing to be performed with accurate results. In the second case, not having data covering a long enough period of time will prevent the kind of analysis necessary for certain kinds of cases.

Price-fixing litigation is a prime example. The most robust analysis is done when data are available before, during, and after the alleged cartel period. In some cases, it may be a challenge to obtain data from early time periods. When the cartel is alleged to have lasted many years, the companies may no longer have the data from the pre-cartel period. If the sample size is too small, proper regression analysis may not be possible.

#### *4. Omitted Variables*

Sometimes a relevant causal variable may not be available for a regression study, or it is inadvertently omitted from the regression. This can lead to misleading or inaccurate results. To study the demand for a certain product, the most useful data would be transaction prices that reflect what customers actually paid for the product. But suppose the rebate and discount part of the transaction price is missing, and the analyst only has list prices. Because of the missing important data, the transaction price variable is badly measured. Economic analysis designed to estimate demand for the product using list price in place of true transaction price would result in misleading conclusions on how sensitive customer demand is to the price of the product.

#### *5. Data Aggregation*

The way the data are aggregated is another consideration. For example, aggregate data may hide useful information that is only apparent when the data are disaggregated. Consider the following three examples:

- Although aggregate data on the average price of a particular product sold by a national retailer in the U.S. in a given year may be useful for the purpose of understanding the larger picture, it may be more useful to get the monthly average price and sales data for each model sold at each of the retailer's local stores.

- Rather than analyze aggregate data on the price-per-minute charged by a mobile phone operator, it may be more useful to differentiate household minutes from business minutes and within each of these categories, to obtain and analyze the price-per-minute for customers on basic plans and the customers on high usage plans separately.
- Although it may be interesting to analyze data on the average price of newspaper advertisements, it may be more useful to collect and analyze the price of classified advertisements and the price of display advertisements separately.

Although aggregation can be an important issue for different types of data, it has particular implications for the use of scanner data to estimate demand elasticities. Products in the scanner data may be sold through different channels, and customers who purchase through different channels (supermarkets, grocery stores, large merchandise, and convenience stores) may have different demand elasticities. Aggregating data across different channels may mask such differences. Aggregation across different product sizes and packages may also raise estimation issues.

Scanner data also may be aggregated over time. But this may hide important changes in prices and transactions over time. For example, weekly data may provide more precise estimates of demand elasticities because grocery stores tend to change prices weekly, but an analysis of weekly data may lead to an overestimate of the elasticities of demand if consumers respond to lower prices by stocking up when prices fall.

Using aggregate data in a single econometric model can be problematic when there are different competitive dynamics for different subsets of the data. For example, in challenging Staples' proposed acquisition of Office Depot, the Federal Trade Commission (FTC) pooled all the Staples stores into a single model. However, Staples' economic experts argued that this was not appropriate based on a statistical test that revealed that the coefficients on the variables of interest were different depending upon the location of the store.[15]

15. Jerry A. Hausman & Gregory K. Leonard, Documents Versus Econometrics in *Staples*, *available at* http://www.nera.com/nera-files/PUB_Staples_963.pdf.

### 6. *Admissibility of Data Analysis*

Data flaws and the resulting deficiencies in data analysis may be grounds for a *Daubert* challenge of the admissibility of the expert testimony.[16] Even when the challenge does not result in the exclusion of the expert opinion, such criticisms may still seriously undermine the credibility of that testimony.

In *SMS System Maintenance Services., Inc. v. Digital Equipment Corp.*,[17] the plaintiff alleged that the computer manufacturer violated Section 2 of the Sherman Act "by integrating three-year warranties with sales of computer systems"[18] because this practice "unfairly constrained consumers' ability to choose their preferred service providers and thereby paved the way for a monopoly in the services aftermarket for DEC computers."[19] The district court granted summary judgment in DEC's favor, and the First Circuit affirmed. Though the plaintiff's expert opinion was not excluded, it was given no weight. Judge Selya wrote that "an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession."[20] Judge Selya found that the expert failed to vouch for "the information-gathering technique," "whether the data was sufficiently representative to . . . draw relevant conclusions," and "the sampling method" used to compile documents.[21]

In *Lantec, Inc. v. Novell, Inc.*,[22] plaintiffs put forth both contract and promissory estoppel claims and antitrust claims, and alleged that the software manufacturer was illegally forcing them from the market. One key issue for the antitrust claims was the scope of the relevant market, and the plaintiffs' expert provided testimony on this issue. The district court found, and the Tenth Circuit affirmed, that the plaintiffs' expert

---

16. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Federal judges may exclude expert testimony on the grounds that the expert is unqualified or the expert testimony is unreliable, legally irrelevant, or does not fit the facts of the case.
17. SMS Sys. Maint. Servs. v. Digital Equip. Corp. 188 F.3d 11 (1st Cir. 1999).
18. *Id.* at 12.
19. *Id.*
20. *Id.* at 25.
21. *Id.*
22. Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1025 (10th Cir. 2002).

testimony was unreliable and thus inadmissible. Among the reasons stated, the plaintiffs' expert "used unreliable data."[23]

In *In re Scrap Metal Antitrust Litigation*,[24] industrial scrap metal generators in Northeastern Ohio accused eight dealers and brokers of conspiring to limit competition in the purchase of scrap metal. One of the defendants, Columbia Iron and Metal Company, moved to exclude plaintiffs' expert because he used a published data series that was inaccurate according to the publisher's statements. In addition, Columbia argued that the plaintiffs' expert's method to adjust that inaccurate data was erroneous. The Sixth Circuit affirmed the district court's decision to permit plaintiffs' expert testimony, stating that the issue "goes to the weight of the evidence, not to its admissibility, and the district court appropriately passed the torch to the jury to make this determination."[25] The jury did cut the damages amount by almost half.

## F. Conclusions

Data are crucial for econometric and other quantitative analyses in litigation and mergers. Proper analysis based on reliable and adequate data can greatly aid the trier of fact. However, drawing conclusions based upon deficient or otherwise unreliable data is unhelpful or even misleading, and may result in the expert being excluded by the court. Different forms, types, and sources of data present distinct issues both counsel and the economic expert need to consider carefully.

23. *Id.* at 1025.
24. *In re* Scrap Metal Antitrust Litig., 527 F.3d 517 (6th Cir. 2008).
25. *Id.* at 531-32.

that the two non-stationary wholesale price series are determined separately by an underlying common cost factor, the price of crude oil.[35]

## D. Data Issues That Could Affect the Reliability of the Results

Suppose that the testing discussed in previous sections indicates that a particular model is appropriate for the data available and the questions to be addressed. The next set of questions a researcher should consider relate to potential problems with the underlying data that may lead to biased or misleading results. Estimates of a regression model generally are sensitive to the sample used to estimate the model, thus, a preliminary analysis of the data is important to get a feel for the data and for the relationships that may exist between variables of interest.

### 1. *Insufficient Data*

A common problem associated with small sample sizes is that there may be insufficient variation in the sample data to allow the researcher to isolate the incremental effects of all of the variables of interest on the dependent variable.[36] Parameter estimates tend to be less precise with smaller samples, and an analysis may be less likely to find statistical significance in a small dataset compared to the same model estimated on a larger dataset. Small datasets may also limit the number of explanatory variables that can be included in a regression model. Each parameter estimated uses up a degree of freedom in the data and small sample sizes may restrict the number of variables included in the model.[37]

Consider a variation on the simple wage regression described above. To isolate the impact of education and on-the-job experience on wages, ideally the researcher should collect a sample that includes workers with varying degrees of experience at all of the relevant education levels. A large enough sample size is needed to ensure that there is variation in each variable across all of the other categories of variables under investigation. The greater the number of variables under investigation,

---

35. There are many advanced methods for estimating econometric models using time series data. See STOCK & WATSON, *supra* note 31, for an introductory discussion and FUMIO HAYASHI, ECONOMETRICS (1st ed. 2000) for a more advanced discussion.
36. Lack of variation in the data can be a problem even in larger datasets.
37. See the Appendix and Glossary entry for Degrees of Freedom for additional discussion.

and the more complex the model, the greater the sample size should be to allow for independent variation in each pair-wise combination of variables.

### *2. Outliers*

Another problem, often associated with small samples, is the impact of outliers. An outlier is an observation or data point that lies far outside the range of data for other observations in the sample. The smaller the sample size, the greater the impact an outlier is likely have on the sample statistics. As a general matter, the data should be inspected to determine whether a sample includes unusual data points because statistics, such as the sample mean and OLS regression estimates, can be very sensitive to the presence of outliers. Recall that the OLS estimator is obtained by minimizing the sum of squared deviations between a sample point and the fitted line. As a result, the estimation procedure will be sensitive to the presence of extreme outliers. OLS tends to place significant weight on an outlier, causing the fitted regression line to swing towards that observation.

If the data appear to include outliers, the economist should investigate whether the inclusion of the outliers has an effect on basic summary statistics or the estimated regression model.[38] In some cases, outliers may be explained by simple data entry error, which often can be corrected. On the other hand, outliers may reflect actual outcomes of interest that the economist would like to explain with the model. In fact, a careful examination of outliers may lead to important changes in the regression model so that it better fits the data.

While there is no commonly accepted definition of an outlier, researchers often use rules of thumb to identify outliers. One possibility is to look for observations that are more than, say, three standard deviations from the sample mean. Unfortunately, the sample mean and the standard deviation also are sensitive to outliers. An alternative rule is to define an outlier as an observation that is more than 1.5 times the *interquartile range* above the third quartile or below the first quartile.

---

38. Observations that have a significant effect on OLS estimates are often referred to as *influential observations*.

While the interquartile range is robust to the presence of outliers, this rule can be sensitive to the nature of the data.[39]

The key point is that, if the sample includes outliers, these observations should not be automatically eliminated from the analysis. Regression results and other summary statistics should be reported with and without the outliers to determine whether the outliers influence the results. If outliers are removed from the sample, the procedure for eliminating outliers should be documented clearly, including the rule used to identify outliers and a count of outliers removed.

### *3. Missing Data*

Data sets collected for the purposes of estimating regression models often suffer from the problem of missing data. Information may be missing in a subset of the data for key variables used in the econometric model. If data are missing for an observation for either the dependent variable or one of the independent variables in a multiple regression model, then that observation cannot be used to calculate parameter estimates. Most computer software applications simply drop observations with missing data when computing parameter estimates and other statistics. Dropping observations with missing data reduces the sample size used to estimate the model, but does the problem of missing data create statistical problems that could lead to biased or misleading results?

If data are missing randomly in a sample, then the usual properties of OLS estimators continue to hold. The parameter estimates may be less precise due to a smaller sample size, but the missing data do not introduce bias into the OLS parameter estimates.

However, the statistical implications can be more severe if data are missing for nonrandom reasons. Suppose, for example, that demand models are being estimated using scanner data. If data were missing for a large retailer and that retailer behaved differently than the other stores in the sample, regression analysis could generate results that are not representative of the entire population. The extent of the problems depends in part on why the data are missing or, alternatively, how the sample used for estimation was selected.

---

39. Outliers become even more difficult to detect in multivariate distributions where the presence of an outlier may depend on multiple dimensions of the observation.

Similarly, if a sample is selected based on values of the dependent variable, then OLS is likely to generate biased results. As an example, consider estimating an income regression model that specifies income as a function of education and other explanatory variables. If the sample used to estimate the model is based on individuals with income below some threshold, then OLS will generate biased results. The problem occurs because the simple OLS estimation algorithm does not account for the fact that the sample was chosen based on income being below some threshold. This type of model is referred to as a *truncated regression* model.

Another example of a data set with missing data is one in which the dependent variable has been censored. In censored data, while the sample is chosen randomly and information is collected on the dependent variable and all independent variables, the dependent variable is censored at some threshold value. For example, suppose data are collected on income and education levels. Censoring can occur if income is reported only for values below a certain threshold. For observations with income above the threshold, the variable is *top coded* at the threshold.

Alternative estimation methods, such as the Tobit model, are available to estimate both truncated regression models and censored regression models.[40] If the data used to estimate a model contain missing values, a researcher should evaluate whether the observations that are affected by the missing data appear to be distinct in any way from the rest of the dataset. In many cases, this can be evaluated by calculating summary statistics for the observations affected by missing data and comparing them to summary statistics for the sample as whole. If the set of observations affected by missing values appears to be unique, or if the sample is missing data altogether from a relevant portion of the population, the researcher should consider employing more advanced econometric methods to deal with the missing data.

#### *4. Measurement Errors*

Additional problems can arise when one or more of the variables in the regression model are measured with error. In specifying the regression model, the researcher generally assumes that the variables of interest are measured accurately in the sample used to estimate the

40. *See* JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH (4th ed. 2009).

model. As discussed above, the error term in a multiple regression model accounts for unobserved factors that affect the dependent variable. If the dependent variable is measured with error, the measurement error will be absorbed by the error term and the usual properties of OLS estimators continue to hold. However, the implications are more serious if one or more of the independent variables are measured with error.

When one of the independent variables is measured with error, the error term in the regression model will be correlated with the independent variables. This correlation between the error term and the variables included in the model violates one of the assumptions of the OLS regression model and, as a result, parameter estimates will be biased. The measurement error bias is similar in nature to the omitted-variable bias discussed above. Furthermore, even when only one variable is measured with error, all parameter estimates will be biased.

A bias in an estimator that tends toward zero is referred to as *attenuation bias*. As a result of attenuation bias, the OLS parameter estimate on a variable with measurement error may show no effect when in fact that variable, properly measured, does have an effect on the dependent variable.[41]

### *5. Improper Aggregation of the Data*

In many cases, the data available to estimate regression models are aggregated in at least some dimension from the raw data generated from individual economic behavior. Examples include aggregating a variable over some time dimension, such as taking daily stock prices instead of tick-by-tick stock prices; aggregating across individuals, such as taking total household income instead of incomes for each member of the household; and aggregating across products, such as taking the average price across all package sizes of Cheerios instead of prices for individual SKUs which vary by size of package.

In many cases, data are aggregated across multiple dimensions. Scanner data used to estimate demand models often are aggregated across products, across geography, and across time. A data point often used in such models represents the price and quantity for a product

---

41. Measurement error can be an important issue in many applications. However, more advanced econometric methods, such as instrumental variables estimators, can be used to address the problem.

aggregated across SKUs, across retail outlets in a particular city, and across days during a particular week.

Estimating regression models using aggregated data typically requires certain assumptions to be satisfied. When working with aggregated data, a researcher should investigate whether such assumptions are likely to be valid, and if not, what the consequences would be for estimates of key parameters. For certain products, one might expect differences in the elasticity of demand across some of the dimensions over which data have been aggregated. Aggregating data across time, for example, could affect estimates of the elasticity of demand if consumers' behavior and responses to price changes reflects inventory behavior.

## E. Conclusions

Specifying and estimating a multiple regression model are just the first steps in a statistical analysis of an economic question. Interpreting the results and evaluating their meaning in the context of other market information requires careful consideration of the statistical results, the quality of the data, and potential confounding factors in the regression model. This chapter provided an overview of how to interpret results from an econometric regression analysis, and the kinds of problems that can arise if proper precautions are not taken. The discussion addressed common issues that arise in specifying multiple regression models and highlights statistical tests and procedures that can be used to evaluate the robustness and reliability of parameter estimates from standard regression models.

### *1. Before-During Approach*

The before-during approach identifies the effect of the alleged conduct by using data from a period before the alleged conduct in combination with data from the period when the alleged conduct occurred.[28] Comparing the values of the dependent variable in the before period to the values it took on in the during period may serve to identify the effect of the alleged conduct.[29] In making this comparison, however, it is critical to account for any significant differences in other economic factors between the before and during periods.[30]

#### a. "Dummy Variable" Models Versus "Prediction" Models

For simplicity of exposition, assume that the best explanatory variable available for capturing the potentially anticompetitive effects is a dummy variable representing the time period when the alleged anticompetitive acts took place.[31] This variable will be one during that

---

28. *See* van Dijk & Verboven, *supra* note 1, at 2335-36.
29. *Id.* The before period may be considered the control period and the during period the treatment period. See the discussion in part A of this chapter.
30. *See* van Dijk & Verboven, *supra* note 1, at 2335-36.
31. Depending on the nature of the antitrust allegations, the theory of causation, and specific facts of the case, variables other than a dummy may better measure the anticompetitive behavior in estimating damages. *See* Philip Johnson & Armen Markosyan, *Regression Techniques for Estimating Overcharges Using Market Concentration Data*, 12 ECON. COMM. NEWSL. 7 (2012). Assume, for example, prices can only increase when existing customer contracts expire over time. The impact of the alleged conspiracy would not increase prices to all customers immediately, so average price increases related to the alleged conspiracy would be expected to trend upward over time. There could be several ways to model this effect other than using a simple dummy variable for the alleged conspiracy period, depending on the available data. *Id.* Under certain circumstances, one simple method to create a variable to approximate the conspiracy might be a "time trend" beginning at the period of the alleged conspiracy, with the value "1" in the first observation (e.g., a month) of the conspiracy period, "2" in the second, "3" in the third, etc. If average prices were the appropriate dependent variable, then the coefficient on this trend variable would be interpreted as the average monthly price increase due to the conspiracy. The

period and zero at other times. Assuming prices relate to other economic factors in the during period in the same way as they did in the before period, prices can be expressed of as an equation of these other economic factors plus the dummy variable.[32]

With data on prices and other economic factors in the before and during periods available, one can estimate the relationship between the price, other economic factors, and the dummy variable, using regression techniques. The coefficient on the dummy variable represents the estimated impact of the alleged anticompetitive conduct on prices in the during period while taking into account the impact of other economic factors on price. Because of the crucial role played by the dummy variable, this type of model is often called a ***dummy variable model.***[33]

---

overcharge in any month during the conspiracy would be the corresponding time trend value multiplied by that coefficient. However, care must be used with this and any approach for creating a variable that measures the impact of an alleged anticompetitive act. For example, at some point all contracts will have been renegotiated, so it would be inappropriate to continue to predict price increases beyond a certain number of observations.

32. Specifically focusing on a reduced form model, one can account for the differences, if any, between the way price was determined in the during period (for example, with alleged price-fixing) and the way price was determined in the before period (without price-fixing). Suppose that the reduced form equation for price in the before period and the during period can be represented by a single equation that applies to both periods (See Chapter 5 for a discussion of reduced form models). Further, suppose that the price-fixing conspirators set price by adding a fixed amount "$\Delta$" to the price that would have prevailed otherwise. The "overcharge" resulting from the price-fixing conspiracy would then simply be $\Delta$. The reduced form equation for price would then be:
$$P_t = \alpha + \beta_1 x_{1t} + \beta_2 x_{2t} ... + \beta_n x_{nt} + \Delta A_t + v_t$$
where α is an intercept term, $x_{1t}$, $x_{2t}$ ..., $x_{nt}$ are a full set of exogenous explanatory variables (identified by any relevant economic analysis), $\beta_1$, $\beta_2$ ..., $\beta_n$ are the estimated coefficients capturing the partial impact of these variables on the price $P_t$, $A_t$ is a dummy or indicator variable that takes the value of one if the time period t is in the during period and the value of zero if the time period t is in the before period, and $v_t$ is the error term.

33. *See* Daniel L. Rubinfeld, *Econometrics in the Courtroom*, 85 COLUM. L. REV. 1048 (1985); James F. Nieberding, *Estimating Overcharges in*

This model assumes that the relationships between price and the predetermined variables that represent other economic factors are the same in both the before and during periods. This assumption may not always be valid. For example, price-fixing conspirators may react differently to changes in supply and demand factors than they would have had they not been conspiring.[34] Thus, it may be important to test whether prices relate differently to the supply and demand factors in the during period than they did in the before period. In more technical terms, it can be important to test whether there has been a significant shift in the relationship between the exogenous variables and the dependent variable of interest.[35] Statistical tests of whether the additional restrictions inherent in the dummy variable model are appropriate can be performed by including *interaction* terms in the equation; this is equivalent to testing whether the parameters of the model differ between the before and during period.[36] If the hypothesis that the coefficients of the regression have not changed is rejected, then this test suggests that the underlying assumption of the dummy variable model is inconsistent with the data.

An alternative to the dummy variable model is the *prediction model*.[37] The prediction model assumes the relationships between prices and other economic factors would have been the same in the during period but for the anticompetitive acts as they were in the before period. The first step in implementing a prediction model is to estimate the relationship between prices and other economic factors using data from the before period. One can then predict what the prices would have been in the during period but for the alleged anticompetitive conduct based on the estimated relationship in the before period.[38] Finally, the differences

---

*Antitrust Cases Using a Reduced-Form Approach: Methods and Issues*, 9 J. APPLIED ECON., 361, 367-69 (2006). See Appendix and Glossary.

34. For example, Rosa M. Abrantes-Metz, Luke M. Froeb & Christopher T. Taylor, *A Variance Screen for Collusion*, 24 INT'L J. INDUS. ORG. 467 (2006) shows that the relationship between prices and costs during a collusive period may be very different from the relationship during a competitive period.

35. *See* GREENE, *supra* note 27, at 287-93.

36. *Id.*

37. *See* G.S. MADDALA, INTRODUCTION TO ECONOMETRICS 5 (3d ed. 2001), § 4.7; Nieberding, *supra* note 33, at 367-69.

38. Let $x_{1t}$, $x_{2t}$ ..., $x_{nt}$ denote the values of the exogenous variables in the during period and $\alpha$, $\theta_1$, $\theta_2$ ..., $\theta_n$ are the coefficients for these

between the actual and the predicted but-for prices in the during period provide a measurement of the overcharge due to the alleged anticompetitive conduct.

As noted above, the prediction model assumes the relationships between the variable of interest (e.g., price) and other economic factors would have been the same in the during period in the but-for world as they were in the before period in the actual world. Under certain conditions, however, this assumption may not be valid. For example, assume there was a change in the relationship between other economic factors and the price in the during period that had nothing to do with the alleged anticompetitive conduct (e.g., entry or exit of firms from the market) and the prediction model does not take that change into account. Under these conditions, estimates using data solely from the before period may not accurately predict pricing but for an alleged conspiracy or other anticompetitive act.[39] Moreover, a prediction model should be tested where possible to check whether it accurately predicts turning points in the data.[40]

In addition, the model also may be fit to the during period and used to predict back ("backcast") into the before period. To the extent that the backcast is above the actual prices in the before period, that would suggest the price-setting process in the during period produced higher prices than the price-setting process in the before period. This finding would be consistent with the proposition that the alleged anticompetitive behavior in the during period increased prices, and the difference between the actual and predicted prices in the before period could form the basis for calculating an overcharge and damages.[41]

---

variables estimated based only on data from the before period. Then the "predicted" price for time t of the during period, $\hat{P}_t$, can be written as: $\hat{P}_t = \alpha + \theta_1 x_{1t} + \theta_2 x_{2t} ... + \theta_n x_{nt}$.

39. In this way, the prediction model may suffer from some of the same limitations related to the dummy variable model discussed above. However, unlike the dummy variable model, the prediction model does not assume that the coefficients for the exogenous variables are the same across the before and during periods in the actual world.

40. A dummy variable model can suffer from a similar problem of failing to fit turning points well, and thus incorrectly attributing to the conduct turning points that may have nothing to do with the alleged conduct. *See* WOOLDRIDGE, *supra* note 6, at 61-62.

41. Of course, the backcast model suffers from some of the same limitations as the forecast model.

### 2. *Before-During-After Models*

The previous section discussed before-during models that assume there is a single unaffected period (the before period). Sometimes, data might exist on several unaffected periods. For example, data may exist not only for the before period, but also for an after period. With more than one unaffected period, the question arises as to whether one should combine the two unaffected periods and, if not, then which of the two unaffected periods should be compared to the affected period.[42]

The before and after periods should be combined, if appropriate, since that will result in a larger sample and more precise estimation.[43] It is appropriate to combine them if the parameters of the reduced form equation are the same across the two periods.[44] The difficult decision arises when this test rejects combining the two periods into a single model and one must choose which unaffected period is the better basis of comparison for the affected period, assuming both are truly unaffected.

Before addressing how to decide which unaffected period to use, first consider why two unaffected periods might exhibit different relationships between the dependent variable and the explanatory variables. There are economic models of competition that suggest that periods of more intense competition ("price wars") will alternate with periods of less intense competition.[45] These models suggest that the relationship between price and the explanatory variables may change over time with the intensity of competition. In this case, a before period that was dominated by more intense competition might look different than an after period that was dominated by less intense competition, even though both periods were unaffected by the anticompetitive conduct at issue.[46] Alternatively, there may have been substantial differences in market conditions between the two periods (e.g., there may have been

---

42. *See* van Dijk & Verboven, *supra* note 1, at 2336. Of course, it is important to ensure that the supposedly unaffected periods really are unaffected.

43. *See* MADDALA, *supra* note 37, at 69, 270; A.H. STUDENMUND, USING ECONOMETRICS: A PRACTICAL GUIDE 71 (5th ed. 2006).

44. *See* Appendix and Glossary, and TAKESHI AMEMIYA, ADVANCED ECONOMETRICS 399-402 (1985).

45. *See, e.g.*, Jerry Green & Robert Porter, *Noncooperative Collusion Under Imperfect Price Information*, 52 ECONOMETRICA 87 (1984).

46. *Id.*

substantial new entry into the market), which led to the differences in the model coefficients.

In the event that there are substantial differences between the before and after periods, one needs to determine how to select which period to use. One way to answer this question is to try to model explicitly the switches between competitive regimes, and then use this model to predict which competitive regimes would have prevailed during the affected period in the but-for world. *Switching models* are econometric techniques that can be used to do this.[47] Although not commonly applied, a switching model of this sort may also provide a more realistic picture of competition in the during period. In contrast to the implicit assumption of the dummy variable model, a price-fixing conspiracy may be subject to breakdowns, where price would return to competitive levels (or even below-competitive levels) for a period before the conspiracy price level was re-established. Failure to model this possibility may lead to less precision in the estimate of the damages, or possibly even to an unreliable estimate of damages if explanatory variables are correlated with the onset of price wars because of omitted-variable bias.

An alternative approach for choosing between the before and after periods involves using general market information and non-quantitative evidence from the case. For example, suppose that the after and during periods were characterized by strong demand for the product, while the before period was characterized by weak demand. These factors would suggest that the after period would provide a better basis of comparison for the affected period than would the before period. It is also possible that the effects of the anticompetitive conduct at issue last beyond the time when the conduct actually ended.[48] If so, then the after period is not truly "unaffected" and the before period may be the superior basis for comparison.

Another approach is to predict but-for prices (absent the allegedly anticompetitive acts) for the affected period alternatively using the before and after periods, using the greater of these two predictions. Both of these predictions are consistent with competitive behavior. Using the higher of the predicted but-for prices will yield a lower estimate of

---

47. *See* AMEMIYA, *supra* note 44, at 399-402.

48. For example, Joseph E. Harrington, Jr., *Post-Cartel Pricing During Litigation*, 52 J. INDUS. ECON. 517 (2004) argues that standard methods for calculating antitrust damages in price-fixing cases may create a strategic incentive for firms to price above the non-collusive price after the cartel has been dissolved.

damages (calculated as the difference between the actual and but-for prices) and thus represents a "conservative" approach from the plaintiffs' perspective.

When assessing damages using a before-during or a before-during-after approach, the beginning and end points of the damages period must be identified. However, the beginning and the end of the damages period alleged in many cases may not accurately reflect the actual beginning or end of the alleged unlawful conduct. For example, in price-fixing class action cases, the plaintiffs' attorneys often choose the beginning and end dates for the "class period" before discovery is undertaken. Moreover, the beginning or end of the effects of the alleged unlawful conduct may not coincide with the beginning or end of the conduct itself. The effects might occur later, end earlier, or last longer than the conduct. Experts should rely on the evidence developed in discovery, market facts, and the analysis of liability experts when determining the relevant starting and ending dates for calculating damages.

Damages experts should be flexible when determining the appropriate beginning and end dates for damages, and econometric analysis may be able to assist in this respect. Recently, econometric methods have been developed that may be used to choose beginning and end dates based on market data.[49] These methods involve estimating the point in time when an econometric model exhibits a *structural change*, or shift in the model parameters. In the case of alleged anticompetitive conduct that had an effect, a structural shift in the econometric model should have occurred when the effect of the conduct began and a second structural shift should have occurred when the effect of the conduct ended. Thus, for example, identifying when there were structural shifts in the regression model can provide useful evidence concerning the beginning and end of overcharges from a price-fixing conspiracy.[50]

49. Jushan Bai & Pierre Perron, *Estimating and Testing Linear Models with Multiple Structural Changes*, 66 ECONOMETRICA 47 (1998). See Carlton & Leonard, *supra* note 4, for a discussion of the application of these methods to price-fixing cases.

50. *See* Carlton & Leonard, *supra* note 4.

### *3. Benchmark and Difference-in-Differences Approaches to Damages*

The benchmark approach to damages is based on the same basic principles and econometric tools as the before-during-after approach.[51] However, in a benchmark analysis, the variable of interest (e.g., price) in the affected market is compared to that variable in an unaffected benchmark market.[52] Instead of using past prices in the affected market as a control, the benchmark approach uses prices in the unaffected market as a control. The benchmark market (or markets) can be a different area or a different end-use market. The key is that the benchmarks (the control group) were unaffected by the alleged anticompetitive conduct. This approach may be particularly useful if there are insufficient data for the before period, such that a before-during approach cannot reliably be performed.

One potentially significant problem with the benchmark approach is that differences in economic conditions between benchmark and affected markets make it likely that prices in those markets would not be identical, even if there were no anticompetitive behavior.[53] Comparing variable profit margins between the market of interest and the benchmark can control for many cost- and demand-based differences in prices, although there are recognized problems in calculating and comparing economically meaningful profit margins.[54]

The difference-in-differences approach also can be used to account for at least some of the persistent unobserved differences between the benchmark market and the market of interest. This approach requires data for the market of interest and the benchmark that cover both a period of time that is unaffected by the alleged anticompetitive act and the period of time when the market of interest allegedly was affected.

---

51. The benchmark approach is sometimes also referred to as the cross-sectional approach.

52. *See* van Dijk & Verboven, *supra* note 1, at 2336.

53. *Id.*

54. *See, e.g.*, Franklin Fisher, *On the Misuse of the Profits-Sales Ratio to Infer Monopoly Power*, 18 RAND J. ECON. 384 (1987). However, if the benchmark and the market of interest can be shown (1) to have similar supply and demand characteristics and (2) to have similar accounting methodologies, then one may be able to estimate the difference in those margins and from that calculate whether prices are higher in the market of interest, even if data are only available in the during period.

Thus, the difference-in-differences approach combines the before-during and benchmark approaches.[55] The difference-in-differences approach can be implemented using a regression that takes into account the various factors that differ between markets and time periods, as shown in the Appendix and Glossary.

## E. Key Considerations in Creating and Evaluating Econometric Models of Damages

A number of considerations should be taken into account when building or evaluating an econometric model used to estimate damages.[56] As discussed in previous chapters, model specification and estimation involve many choices: explanatory variables, functional form, dynamic specification in a time series, estimation technique, and which of the basic approaches to damages to use. In many cases, statistical tests can help guide these choices. However, the starting point for any econometric model is economic theory and knowledge of the industry, and being sure that there are sufficiently reliable data to perform an econometric analysis.

Economic theory provides guidance as to the general types of explanatory variables that should be included in the model. For example, for an econometric model of price, economic theory suggests that variables representing cost, demand, and competitive factors would be important types of explanatory variables.[57] Knowledge of the industry helps determine with more specificity which variables to include. For example, if the industry in question were plastics, the price of petroleum (an important input to plastics) likely would be a relevant cost variable and production levels in downstream industries that use plastics likely would be relevant demand shifters.

One must be able to obtain sufficiently reliable data to implement an economically sound econometric model. Econometric analysis based on very few data points in general will be much less reliable than econometric analysis based on a larger data set. There may also be issues with how accurate the data are, and whether they represent an unbiased

55. *See* WOOLDRIDGE, *supra* note 6, at 130.

56. Much of the discussion here and elsewhere in this chapter can be applied to any econometric analysis. *See, e.g.*, WOOLDRIDGE, *supra* note 6; GREENE, *supra* note 27.

57. *See* van Dijk & Verboven, *supra* note 1, at 2335.

sample of what has occurred in the market. Accordingly, the data need to be checked for accuracy and any potential selection bias. Finally, in many instances the data will need to be "cleaned" to some extent, removing obviously incorrect observations. For example, many damages analyses use data from a company's sales database. Care must be taken with such data to ensure that all significant discounts have been accounted for, and to weed out any obvious errors.[58]

Economic theory and industry knowledge might suggest a large number of potential explanatory variables. While there is a benefit to parsimony (namely, potentially increased precision of the estimates), there is typically a greater concern with omitting a potentially important explanatory variable, which can induce omitted-variable bias. Thus one generally should exercise great care if potentially important variables are to be excluded from a model. In general, statistical tests or the Akaike Information Criterion ("AIC") and Schwarz Criterion ("SC") criteria should be employed before dropping variables.[59] It is rarely advisable to drop a theoretically important variable, especially if its coefficient is statistically significantly different from zero. Similarly, one generally should not drop a group of theoretically important variables when their coefficients are jointly statistically significantly different from zero (even if they are individually not statistically significantly different from zero).[60] In some circumstances, "shrinkage" estimators may be used to help make a model more parsimonious.[61]

An important step of model specification concerns the selection of the mathematical formula (functional form) relating the dependent variable to the explanatory variables.[62] For example, the dependent variable might be the price level (i.e., dollars per unit) of the product at issue, and the explanatory variable could be its variable costs of production. This model would provide an estimate of the price increase

---

58. For example, frequently these transactions data sets include credits for returned goods, etc. It is important to use net revenue and net sales to calculate a measure of the price actually paid.

59. See the Appendix and Glossary for the definitions of AIC and SC.

60. *See* KENNEDY, *supra* note 19, at 94.

61. Shrinkage estimators adjust least squares estimates by imposing a constraint on the estimates. The resulting estimator is no longer unbiased, but may have lower mean squared error than least squares. *See, e.g.*, Robert Tibshirani, *Regression Shrinkage and Selection via the Lasso*, 58 J. R. STATIST. SOC. B 267 (1996).

62. *See* Chapter 5. Results may be sensitive to the functional form selected.

related to a dollar increase in costs (The coefficient on costs represents the answer to the following question: what is the price increase in dollars caused by a one dollar increase in costs?) However, there may be good theoretical or industry-specific reasons to believe that the relationship between price and production costs is better measured in percentage change terms. If so, then it would be more appropriate to regress the logarithms of price on the logarithm of variable costs (The coefficient on the logarithm of costs represents the answer to the following question: what is the percentage price increase caused by a one percentage increase in costs?)[63] Statistical tests can help determine which functional form is most appropriate for the situation at hand.[64]

In a time series context, specification of the dynamics is important. Again, model specification might be guided by industry knowledge and statistical tests. The AIC and SC tests can help identify the appropriate lag structure.[65]

The statistical distribution of the econometric error term also must be carefully specified. It is frequently appropriate to use estimates of the standard errors that are robust to deviations from the assumption of independent, identically distributed error terms. Only with correct standard errors will the resulting statistical inference be valid. The correct method for calculating standard errors can be determined based on the outcome of statistical tests, and in general such tests should be performed.[66]

The decision of which of the basic damages models to use can be of great importance. A reduced-form model typically will provide the most straightforward model for damage estimation. However, the explanatory variables to be included in such a model need to reflect the important underlying supply and demand aspects of the market, and in some

---

63. More precisely, if *a* is the coefficient on the logarithm of variable costs, the percentage price increase caused by a one percentage increase in costs is *exp(a) - 1*, where *exp(a)* is the exponential transformation of *a*. For values of *a* close to zero, *exp(a) 1* is approximately equal to *a* (for example, when *a = 5 percent*, then *exp(a) 1 = 5.13 percent*) but the approximation is less precise away from zero (for example, when *a = 50 percent*, then *exp(a) 1 = 64.9 percent*).
64. *Id.*
65. *See* Chapter 5 and the Appendix and Glossary for further discussion.
66. *See* Chapter 6 and the Appendix and Glossary for further discussion.

instances estimating the underlying structural model will be a superior approach.[67]

The decision regarding which damages approach to employ also will depend on the available data and the nature of the market. Are there sufficient data to implement a before-during or before-during-after model? Is there a good benchmark? Can a difference-in-differences approach be used? In general, if reliable data are available from outside of the period of that alleged anticompetitive act, then techniques that take advantage of those data will likely be the most reliable.[68]

Deciding whether to use a dummy variable or prediction model can also be important. Is there evidence that the dummy variable technique is unreliable due to substantial changes in the model coefficients due to the alleged illegal act? Will the prediction model yield reliable results? Again, there are statistical tests that can help determine if one approach is clearly superior to another.[69] Because neither approach likely is perfect, in the absence of strong statistical test results favoring one or the other, it may make sense to use both approaches and see if they yield similar results.

Once the econometric model is specified and estimated, another series of statistical tests and checks can be performed on the reliability and robustness of the estimates.[70] The starting place is typically examining the sign and statistical significance of the coefficients. If, for example, the coefficient on cost in a price regression is negative and statistically significantly different from zero, this would cast doubt on the reliability of the model, since we would normally expect cost to have a positive effect on price. When performing this sort of check, however, one must take care that there is a clear interpretation to the coefficients; there may not be one in a reduced-form model, for instance.[71]

When there is reason to question a model's specification, a variety of specification tests can and should be employed. For example, a model may impose potentially questionable restrictions on the coefficients, such as that the coefficients are the same during two time periods. Specifically, an econometric model of pricing at the customer level might assume that all customers have the same coefficients on the cost and demand variables. However, there may be reason to think that

---

67. *See* Chapter 5.
68. *See* Chapter 5 and the Appendix and Glossary for further discussion.
69. *See* Chapters 5 and 6 for additional discussion.
70. *See* Chapters 5 and 6 for additional discussion.
71. *See* Baker & Rubinfeld, *supra* note 5, at 392.

customers have different responses to cost and demand conditions, so there could be different coefficients on the explanatory variables across customers, including the variable measuring damages. In this case, it may be necessary to estimate the model for different groups of customers, or otherwise to employ a more complex model that takes these differences into account.[72] Similarly, a time series model might assume that the coefficients are the same over the course of the entire time period, but there may be evidence that the structure of the model changed at some point in time. A Chow test (or a more sophisticated test for structural breaks) can be used to test whether such a change occurred.[73] If so, the appropriate model needs to adequately control for such a change.

There may also be reason to question the crucial assumption that the error term of the regression is uncorrelated with the explanatory variables (which leads to endogeneity bias). This assumption often can be tested using a form of the Hausman specification test. For example, if there is concern that an explanatory variable might be endogenous (which would bias OLS regression results), then the Hausman specification test comparing the OLS results to the IV results can be used to check for this problem.[74] If such a problem is found to exist, then more complex econometric techniques can be used to correct for the bias.[75]

Finally, virtually any regression model eventually will fail one or more tests if enough tests and specifications are run, even if nothing is wrong with the model. However, failure of a test should be taken seriously, and a model should be rejected when it fails a test of a critical assumption, or if it fails a large number of the specification tests to which it is subjected.[76]

---

72. *See, e.g.*, John H. Johnson & Gregory K. Leonard, *Economics and the Rigorous Analysis of Class Certification in Antitrust Cases*, 3 J. COMP. L. & ECON. 341, 351-52 (2007).

73. The Chow test is a statistical and econometric test of whether the coefficients in two linear regressions on different data sets are equal. *See* Gregory C. Chow, *Tests of Equality Between Sets of Coefficients in Two Linear Regressions*, 28 ECONOMETRICA 591 (1960).

74. *See* Jerry A. Hausman, *Specification Tests in Econometrics*, 46 ECONOMETRICA 1251 (1978).

75. *See* WOOLDRIDGE, *supra* note 6, at 167-180.

76. *See* KENNEDY, *supra* note 19, at 76-79.

## F. Case Study: Applying the Before-During and Benchmark Approaches

As discussed above, econometric techniques can be applied in a variety of ways to estimate the impact of alleged anticompetitive conduct on certain economic outcomes, such as estimating lost sales or price changes due to the alleged conduct. This is illustrated in the following sections, in which some of the econometric techniques and tests discussed above are applied to estimate the price effects of alleged collusive behavior using actual data relating to Southern Powder River Basin ("SPRB") coal that was the subject of a DOJ investigation in 2001.

### *1. Background*

Virtually all coal produced in the United States is used for electric power generation.[77] About one-third of the coal now comes from the SPRB, which contains vast amounts of low-sulfur coal available in low-cost surface mines. SPRB coal is relatively homogeneous, with two main types: 8400 Btu/lb. coal and 8800 Btu/lb. coal. SPRB coal mining began with the 8400 Btu coal, which was closer to the surface and easier to mine. During the 1970s, many coal-powered electric generation units were constructed to burn this coal. Virtually all of these units also can burn the higher-quality 8800 Btu coal. As sulfur emissions regulations became more stringent, older electric generation units were converted from burning 12,000 Btu bituminous coals to burning 8800 Btu SPRB coals. Because these plants already suffer capacity losses from burning lower Btu SPRB coals, they generally will not burn 8400 Btu coal.

During 1999 and 2000, the three leading SPRB coal producers conducted what economists may describe as "cheap talk." Cheap talk refers to communications between oligopolists about future intentions. Such talk can facilitate understanding of each other's goals and intentions, which can lead to collusive production and pricing.[78] The statements were of the nature that they would reduce production "until

77. U.S. ENERGY INFORMATION ADMINISTRATION, ANNUAL COAL REPORT 2008 8 (2010), *available at* http://www.eia.gov/coal/annual/archive/05842010.pdf.

78. *See* MICHAEL D. WHINSTON, LECTURES ON ANTITRUST ECONOMICS 20 (2006). Whether such behavior constitutes an unlawful price-fixing "agreement" is a legal question.

prices improved." The largest producer, Peabody Energy, closed a mine in 1999. The third largest producer—Arch Coal, Inc.—closed another mine in 2000, and several other planned expansions were cancelled. The result was a spot price increase in 2001. In the aftermath of the capacity reductions, prices settled about 30 percent above the level before the shut-downs. The DOJ opened an investigation in July 2001, but ultimately took no action against the SPRB producers.

### 2. *Economic Model, Data, and Choice of Explanatory Variables*

For the purpose of this case study, the simplest economic model hypothesizes that if the alleged collusion had an effect, then prices of SPRB coal during the damages period should be higher than before the damages period after controlling for other supply and demand influences. As will generally be the case, the most straightforward econometric models for estimating damages use a reduced form, rather than a structural form,[79] but the model still needs to include the major supply and demand influences on price that would be included in a structural model. Here, we assume a linear relationship between the relevant market forces and SPRB prices. A full analysis would investigate (and potentially test) whether the relationship of these factors to price should be specified differently, such as in percentage change terms.[80]

The price of SPRB coal used in the analysis is the spot price reported by the utilities that purchased the SPRB coal.[81] The utilities reported the spot price at the time of delivery instead of at the time of actual sales. As a result, there was a lag between the reported spot price and the spot price at the time of actual sales that ranges from one quarter to one year. Therefore, although the alleged collusion occurred in the first quarter of 2001, the reported spot price did not increase until late 2001. This case study defines the before collusion period as before November 2001 and the during collusion period as between November 2001 and May 2005.

---

79. See Chapter 5 for a discussion of structural form models versus reduced form models.

80. *See* WILLIAM H. GREENE, ECONOMETRIC ANALYSIS § 8.3 (2d ed. 1990).

81. The data source is FERC Form-423; Energy Velocity. Regulated utilities report the delivered price of their fuels in FERC Form-423. Energy Velocity estimates transportations costs and subtracts these from the delivered costs to provide a comparable FOB mine price for each utility. The average of these monthly spot FOB prices provides data for our dependent variable.

Before one can engage in econometric analysis of the data, it is important to review the data and check whether there are potential coding errors or other issues in the data that deserve further investigation. As discussed in section A, data do not have to be perfectly accurate to be useful in econometric analysis, but it is important to ensure that the data are reasonably reliable. To illustrate the importance of initial data review before running any regression analysis, the original data on the average SPRB coal price are plotted in Figure 5.




Figure 5. Average Price of SPRB Coal before Data Cleaning

As can be seen clearly from Figure 5, something is not right with the SPRB coal price data before 1998. Further review of the data reveals that before 1998, the transportation cost from the coal mines to the utilities was in the column for the spot price and vice versa. Correcting these data and conducting some other cleaning of the data, such as estimating the spot prices that were missing, results in data on the corrected average spot price for SPRB coal that are presented in Figure 6.




Figure 6. Average Price of SPRB Coal

These prices represent the prices of SPRB coal delivered from January 1993 to May 2005. Through most of the 1990s, these prices display significant volatility, but they did not have any trend up or down. Beginning in November 2001, prices began increasing from average levels of around $5.60/ton in the before period to over $7.00/ton in the during period. The question is whether this increase in prices was caused by changes in demand, changes in costs, or changes in the behavior of mine operators.

To take into account the major demand and supply factors that potentially could affect the prices of the SPRB coal, data on these factors were obtained from public sources. Supply data include quality measures of SPRB coal (Btu content, ash percentage, and sulfur content); productivity of the mines that produce the SPRB coal as measured by the average tons of SPRB coal produced per person day; and costs of fuels that are used in the production of SPRB coal, including diesel fuel cost and electricity cost.[82] Demand was measured using data on total electric power production.[83]

82. Time series data on capacity for SPRB coal production were not available. If the data were available, one may want to consider capacity in

### 3. *Assumption of Liability and Causation*

In performing a damage analysis, experts usually assume that the plaintiff has been found liable for the alleged anticompetitive conduct. Accordingly, this case study assumes that SPRB coal producers engaged in collusive behavior from November 2001 to May 2005. As discussed above, however, even assuming collusion did occur, one still needs to study whether the observed price increase was at least in part due to other demand or supply changes or could be attributed to the collusive behavior. To help answer this question and estimate the price increase that resulted from the assumed collusion, the dummy variable model and the prediction model under the before-during approach are used to isolate the price effects of the alleged collusive behavior.

### 4. *Stationarity of the Time Series*

As discussed in the Appendix and Glossary, when using time series data to conduct regression analysis, one should test whether the time series are stationary.[84] If they are not stationary, different econometric techniques should be employed. To study whether nonstationarity is an

---

the analysis as well since it may affect the supply of SPRB coal. As discussed in the "Background" section for this case study, some of the producers reduced capacity during the alleged collusive period. If the alleged collusion increased prices solely through capacity reduction, but did not alter producers' pricing behavior conditional on available capacity, the coefficient for the collusion dummy variable could be zero in a model where capacity is included as an independent variable. In this case, one may be able to estimate the relationship between the SPRB coal price and the supply and demand factors, including capacity, first, and then estimate the but-for SPRB coal price using the but-for capacity in the absence of the alleged collusion.

83. The spot prices of SPRB coal were reported by the utilities at the time of delivery instead of at the time of sales, so there is a lag between the time when the prices were reported and the time when the prices were determined. This delay in reporting is not an issue for other independent variables, such as diesel cost, electricity cost, electricity production and SPRB coal productivity measurement. Therefore, in theory, one should lag these independent variables for certain periods and include these lagged variables as independent variables in the regression as well.

84. See Appendix and Glossary.

issue in the time series data, Dickey-Fuller/Augmented Dickey-Fuller unit root tests were conducted[85] on the SPRB coal price data and certain independent variables.

The unit root test results indicate that the SPRB coal price data are stationary while some of the independent variables may be nonstationary, such as the diesel price series. However, as pointed out in the Appendix and Glossary, many unit root tests have a low ability to reject nonstationarity.[86] Therefore, one should view the results of the tests within the context of the economic theory. In this case, if the dependent variable, SPRB coal price, is stationary, it is unlikely that the demand or supply factors that interact with each other to determine the SPRB coal price are nonstationary. If these demand or supply factors were nonstationary, they likely would drive the SPRB coal price to be nonstationary as well.

To further investigate the nonstationarity issue, a Dickey-Fuller/Augmented Dickey-Fuller test and a KPSS test were conducted on the residuals from the OLS regression where the SPRB coal price is the dependent variable and other demand and supply factors along with a collusion dummy variable are included as the explanatory variables.[87] These stationarity tests indicate that the residuals from the OLS regression are stationary. Since the SPRB coal price is stationary, this result again suggests that nonstationarity of other explanatory variables is

---

85. *See* MADDALA, *supra* note 37, at 548-52. In the Dickey-Fuller/Augmented Dickey-Fuller test, the null hypothesis is that the time series is nonstationary. *Id.* For a brief introduction to stationarity tests, see MADDALA, *supra* note 37, ch. 14.
86. See Appendix and Glossary.
87. The OLS regression model specification is discussed in more detail in part F.5. of this chapter. In conducting the Dickey-Fuller/Augmented Dickey-Fuller tests of the OLS regression residuals, one should use the Engle-Granger critical values instead of the standard Dickey-Fuller critical values because the Dickey-Fuller test of the residuals is a co-integration test. For more details on the Engle-Granger critical values, see WALTER ENDERS, APPLIED ECONOMETRIC TIME SERIES 335-42 (2d ed. 2003). However, the exact Engle-Granger critical values for these tests were not available because the number of independent variables in our regression exceeds those listed in the table of Engle-Granger critical values in Enders. Therefore, the KPSS test was also performed. In the KPSS test, the null hypothesis is that the time series is stationary. See MADDALA, *supra* note 37, ch. 14, for more details.

not an issue in the case study. Thus, an OLS regression analysis was conducted to assess how the assumed collusion affected the SPRB coal price.

### 5. *The Before-During Approach with the Dummy Variable Model*

The dummy variable model under the before-during approach can be used to measure how assumed collusion changed the price of SPRB coal. The dummy variable is constructed by creating a variable equal to zero before November 2001 (before period) and equal to one from November 2001 onward (during period). Then the SPRB coal price can be expressed as an equation of the dummy variable and other factors that can affect the SPRB coal price, including the Btu content of the SPRB coal, the ash percentage of the SPRB coal, the pounds of sulfur per million Btu of energy in the coal, the average tons of SPRB coal produced per person day, the price of diesel, the price of electricity, the production of electricity.[88]

If the assumed collusion led to an increase in the price of SPRB coal, the coefficient on the dummy variable should be positive and statistically significant after controlling for the demand and supply factors that affect the price of SPRB coal. As discussed in part E of this chapter, valid hypothesis testing requires consistent estimates of the standard error of the coefficient estimates. Tests for serial correlation indicate that the error terms in the regression are serially correlated. To estimate the standard errors consistently, the Newey-West procedure was used to obtain the heteroskedasticity and autocorrelation consistent Newey-West

---

88. More specifically, the dummy variable model for the before-during approach can be specified as follows:

$$SPRB_price_t = \alpha + \beta_1 \cdot Btu_t + \beta_2 \cdot Ash_t + \beta_3 \cdot lbsSO2_t + \beta_4 \cdot ton_prod_t$$
$$+ \beta_5 \cdot diesel_price_t + \beta_6 \cdot electricity_price_t + \beta_7 \cdot electricity_production_t$$
$$+ \gamma \cdot dummy_t + \varepsilon_t$$

where $Btu_t$ is the Btu content of the SPRB coal, $Ash_t$ is the ash percentage of the SPRB coal, $lbsSO2_t$ is the pounds of sulfur per million Btu of energy in the coal, $ton_prod_t$ is the average tons of SPRB coal produced per person day, $diesel_price_t$ is the price of diesel, $electricity\text{-}price_t$ is the price of electricity, $electricity_production_t$ is the production of electricity, $dummy_t$ is the dummy variable, and $\varepsilon_t$ is the error term.

standard errors.[89] The result of the OLS regression with the Newey-West standard errors is presented in Table 1.[90]

| | | | | |
|---|---|---|---|---|
| Dependent Variable: | | | | Average Price of SPRB Coal |
| R-squared: | | | | 0.7132 |
| Adj R-squared: | | | | 0.6968 |
| Number of Obs: | | | | 149 |
| | Coefficient | Newey-West Standard Error | t-Statistic | P>\|t\| |
| Dummy variable for the alleged collusion period | 1.2362 | 0.1798 | 6.8800 | 0.0000 |
| Btu content of SPRB coal | -0.0013 | 0.0011 | -1.1300 | 0.2590 |
| Ash percentage of the SPRB coal | -1.0727 | 0.7633 | -1.4100 | 0.1620 |
| Pounds of sulfur per million Btu | -1.1665 | 1.5701 | -0.7400 | |
| Average tons of SPRB coal produced per person day | 0.0015 | 0.0024 | 0.6200 | 0.5330 |
| Price of diesel | 0.0978 | 0.3283 | 0.3000 | 0.7660 |
| Price of electricity | 0.0497 | 0.0483 | 0.2400 | 0.8080 |
| Production of electricity | 4.33E-10 | 1.78E-09 | 0.2400 | 0.8080 |
| Constant | 20.7707 | 11.0578 | 1.8800 | 0.0620 |

Table 1. Regression Results for Dummy Variable Method

As can be seen from Table 1, the variables that control for supply and demand changes are of the expected signs. Individually they are not statistically significant from zero at the 5 percent level, although they are statistically significant when taken together.[91] The coefficient on the

89. *See* JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS—A MODERN APPROACH 428-30 (4d ed. 2009).

90. Obtaining the Newey-West standard error requires determining the maximum order of lag in advance. This illustration follows the practice of using the smallest integer greater than or equal to T/4 where T is the sample size. *See* GREENE, *supra* note 27, at 465.

91. The hypothesis that all of the coefficients for the supply and demand factors are zero is rejected at about the 5 percent level based on the joint F-test with a P-value for the F-statistic equal to 0.05. In a more detailed analysis, other measures of supply and demand might be considered or the estimating equation might be modified to better take into account more specific demand and supply considerations for each of the utilities.

dummy variable is positive and statistically significant. The regression result indicates that on average, SPRB coal prices were $1.23/ton (or about 22 percent) higher in the during period compared to the before period, holding constant the exogenous variables.

As discussed in part D of this chapter, the dummy variable model assumes that the relationship between the dependent variable and the explanatory variables in the during period is the same as in the before period. To test this assumption, interaction terms involving the dummy variable and each of the other explanatory variables except the intercept term were added as explanatory variables in the model specification as well.[92] The null hypothesis that all of the coefficients on the interaction terms are jointly equal to zero was tested. If this hypothesis is not rejected, it indicates that the relationship between the price of SPRB coal and the demand and supply factors did not change from the before period to the during period. If the null hypothesis is rejected, it suggests that the relationship has changed, either due to the alleged behavior or because of other reasons.[93]

92. These interaction terms are equal to zero in the pre-collusion period and equal to the respective values of the original explanatory variables during the collusion period. *See* MADDALA, *supra* note 37, at 307-10.

93. *See* part C.1. of this chapter.

As shown in Table 2, the test rejected the null hypothesis that the relationship between the price of the SPRB coal and the demand and supply factors remained the same in the during period.[94] As discussed above, even though the test suggests that the coefficients on the demand and supply factors in the during period have changed (contrary to the assumption of the dummy variable model), it does not necessarily mean that the coefficient estimate of the dummy variable will not provide any economically meaningful information. A possibility that should be investigated is that the restrictions on the coefficients of the demand and supply factors imposed by the dummy variable model may not have substantially affected the model's estimate of the effect of the alleged antitrust violation. Accordingly, the next section uses the prediction model to assess the impact of the assumed collusion on the price of SPRB coal.[95]

---

94. To implement the joint F-test correctly, again, the Newey-West covariance matrix is used. *See* WOOLDRIDGE, *supra* note 89.

95. When one fully interacts the dummy variable with other explanatory variables, one in fact is assuming that the regression equations in the before period and in the during period are completely different. *See* MADDALA, *supra* note 37, at 309. For example, the regression equation in the during period can have smaller intercept terms, hence a negative coefficient on the dummy variable, but higher slope terms. As a result, one cannot interpret the coefficient on the dummy variable as the measurement of the average impact of the alleged collusion anymore.

| | |
|---|---|
| Dependent Variable: | Average Price of SPRB Coal |
| R-squared: | 0.7417 |
| Adj R-squared: | 0.7126 |
| Number of Obs: | 149 |

| | Coefficient | Newey-West Standard Error | t-Statistic | P>\|t\| |
|---|---|---|---|---|
| Dummy variable for the alleged collusion period | -57.0152 | 23.4560 | -2.4300 | 0.0160 |
| Btu content of SPRB coal | -0.0021 | 0.0016 | -1.3000 | 0.1940 |
| Ash percentage of the SPRB coal | -1.9244 | 0.8683 | -2.2200 | 0.0280 |
| Pounds of sulfur per million Btu | 0.9237 | 1.7494 | 0.5300 | 0.5980 |
| Average tons of SPRB coal produced per person day | 0.0038 | 0.0025 | 1.5300 | 0.1280 |
| Price of diesel | -0.0652 | 0.4501 | -0.1400 | 0.8850 |
| Price of electricity | 0.0296 | 0.0860 | 0.3400 | 0.7310 |
| Production of electricity | 9.85E-10 | 2.32E-09 | 0.4300 | 0.6710 |
| Interaction term for Btu content of SPRB coal | 0.0056 | 0.0025 | 2.2600 | 0.0260 |
| Interaction term for ash percentage of the SPRB coal | 2.5203 | 1.2294 | 2.0500 | 0.0420 |
| Interaction term for pounds of sulfur per million Btu | -5.2794 | 2.4693 | -2.1400 | 0.0340 |
| Interaction term for average tons of SPRB coal produced per person day | 0.0038 | 0.0081 | 0.4700 | 0.6370 |
| Interaction term for price of diesel | 0.5961 | 0.5924 | 1.0100 | 0.3160 |
| Interaction term for price of electricity | -0.0406 | 0.1036 | -0.3900 | 0.6960 |
| Interaction term for production of electricity | -6.07E-10 | 2.96E-09 | -0.2100 | 0.8380 |
| Constant | 29.8307 | 14.1026 | 2.1200 | 0.0360 |
| **Joint F test for all interaction terms are equal to zero** | F(7, 133) = 3.09 | | Prob>F = 0.0048 | |

Table 2. Regression Results—Testing for Relationship Change in the Dummy Variable Method

### 6. *The Before-During Approach with the Prediction Model*

The prediction model assumes that the relationship between the price of SPRB coal and the demand and supply factors in the actual world before the alleged anticompetitive behavior would have remained the same but for the alleged behavior in the during period.[96] If the relationship change found in the last section is all due to the collusive behavior, then the prediction model still would be valid.

To use the prediction model to estimate the impact of the assumed collusion on the price of SPRB coal, one would first run an OLS regression similar to the dummy variable model, but instead using the data in the before collusion period only and excluding the dummy variable from the explanatory variables. The result of this regression is presented in Table 3.

| | | | | |
|---|---|---|---|---|
| Dependent Variable: | | | | Average Price of SPRB Coal |
| R-squared: | | | | 0.2104 |
| Adj R-squared: | | | | 0.1540 |
| Number of Obs: | | | | 106 |
| | Coefficient | Newey-West Standard Error | t-Statistic | P>\|t\| |
| Btu content of SPRB coal | -0.0021 | 0.0015 | -1.3300 | 0.1870 |
| Ash percentage of the SPRB coal | -1.9244 | 0.8532 | -2.2600 | 0.0260 |
| Pounds of sulfur per million Btu | 0.9237 | 1.7189 | 0.5400 | 0.5920 |
| Average tons of SPRB coal produced per person day | 0.0038 | 0.0025 | 1.5600 | 0.1220 |
| Price of diesel | -0.0652 | 0.4423 | -0.1500 | 0.8830 |
| Price of electricity | 0.0296 | 0.0845 | 0.3500 | 0.7270 |
| Production of electricity | 9.85E-10 | 2.28E-09 | 0.4300 | 0.6660 |
| Constant | 29.8307 | 13.8571 | 2.1500 | 0.0340 |

Table 3. Regression Results for Prediction Model

Given the coefficients from the before period OLS regression, the next step is to predict the price of SPRB coal in the but-for world without collusion, using the data on the explanatory variables in the during period. Figure 7 shows the actual price of the SPRB coal, the predicted price of the SPRB coal based on relationships estimated in the before

96. *See* part C.1. of this chapter.

period, and the lower and upper bound of the 95 percent confidence interval for the predicted price of the SPRB coal.[97]




Figure 7. Average vs. Predicted Price of SPRB Coal—Newey Standard Error

As shown in Figure 7, in every month in the during period the actual price of the SPRB coal is higher than its predicted price. Moreover, in 28 of the 43 months in the during period the actual price of the SPRB coal is higher than the upper bound of the 95 percent confidence interval for the predicted price of the SPRB coal. The average predicted price of the SPRB coal for the during period is $5.72/ton, while the average actual

97. The 95 percent confidence interval for the predicted value of the SPRB coal price means that the there is a 95 percent "confidence" that the price of the SPRB coal in the but-for world will fall within this interval. See GREENE, *supra* note 27, § 6.6, for detailed discussion on how to construct a confidence interval for the predicted values. Constructing a confidence interval for the predicted value requires estimating the variances of the predicted value and the error term. The illustration uses the Newey-West standard errors in estimating the variance of the predicted value and uses the residuals from the OLS regression to estimate the variance of the error term.

price of the SPRB coal is $7.16/ton in the during period. Therefore, according to the prediction model the assumed collusion resulted in a $1.66/ton (or about a 30 percent) increase of the SPRB coal price. The prediction model results suggest a somewhat larger impact of the assumed collusion on the price of the SPRB coal compared to the $1.23/ton (or 22 percent) increase of the SPRB coal price based on the dummy variable model. The results of both of these approaches are consistent with the alleged behavior causing higher prices. However, the prediction approach in this case would yield greater damages.

Given that the test shown in Table 2 above rejected the hypothesis that the relationship between the price of the SPRB coal and the demand and supply factors were the same in the before and during periods, the prediction approach would appear to yield the more reliable quantification of the impact of the hypothesized conspiracy. However, to determine if the prediction approach is clearly superior, one could test the prediction approach for a portion of the period before the alleged anticompetitive behavior, as discussed above in part D. If it predicted prices before the alleged anticompetitive act reasonably accurately, then the prediction approach presumably would be more accurate in this example. If it does not predict prices before the alleged anticompetitive act that well, then it would be more accurate to say that the impact of the alleged anticompetitive behavior likely falls somewhere in the range indicated by the two methodologies.

### *7. Benchmark Approach*

The first question in a benchmark analysis is whether there are any products that might provide a reasonably good benchmark. As discussed in part D above, the benchmark should be (1) subject to similar supply and demand factors as SPRB coal and (2) unaffected by alleged anticompetitive acts. This illustration will use the price of bituminous coal ("BIT").[98]

---

98. Utilities also purchase BIT to generate electricity, and so BIT prices likely reflect many of the same cost and demand factors. There is no allegation that the conspiracy extended to BIT. Moreover, most utilities cannot substitute SPRB and BIT, at least in the short run, so the alleged conspiracy should have no direct effect on the price of BIT. In *FTC v. Arch Coal, Inc.*, the court found "the relevant product market is no broader and no narrower than SPRB coal." FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 123 (D.D.C. 2004).

An econometric analysis using the benchmark approach can be implemented in several ways. To keep the illustration relatively simple, the impact of the alleged conspiracy is tested using the dummy variable model discussed above. Most of the supply and demand factors used in the before-during approaches are replaced by the benchmark BIT price, since it should be capturing those effects.[99] The model includes the same dummy variable, as well as the three variables that control for the quality of SPRB coal, namely, the Btu content of the SPRB coal, the ash percentage of the SPRB coal, and the pounds of sulfur per million Btu of energy in the coal.[100] The results of this regression are shown in Table 4.

| | |
|---|---|
| Dependent Variable: | Average Price of SPRB Coal |
| R-squared: | 0.7191 |
| Adj R-squared: | 0.7093 |
| Number of Obs: | 149 |

| | Coefficient | Newey-West Standard Error | t-Statistic | P>\|t\| |
|---|---|---|---|---|
| Dummy variable for the alleged collusion period | 1.1527 | 0.1867 | 6.1700 | 0.0000 |
| Btu content of SPRB coal | -0.0005 | 0.0010 | -0.4800 | 0.6300 |
| Ash percentage of the SPRB coal | -1.1329 | 0.6171 | -1.8400 | 0.0680 |
| Pounds of sulfur per million Btu | -1.1130 | 1.3201 | -0.8400 | 0.4010 |
| Price of BIT coal | 0.0063 | 0.0028 | 2.2800 | 0.0240 |
| Constant | 15.7235 | 9.7266 | 1.6200 | 0.1080 |

Table 4. Regression Results for Benchmark Approach

As shown in Table 4, the BIT price is of the expected sign (positive) and is statistically significant. The results show a statistically significant impact on SPRB prices in the period during the alleged conspiracy, again

99. The supply and demand factors could still be included in the model, and if they affect the benchmark differently than the price in question, including them will generally improve the model.

100. The estimating equation can be specified as:

$$SPRB_price_t = \alpha + \beta_1 \cdot Btu_t + \beta_2 \cdot Ash_t + \beta_3 \cdot lbsSO2_t + \beta_4 \cdot BIT_price_t + \gamma \cdot dummy_t + \varepsilon_t$$

where $BIT_price_t$ is the price of BIT coal in period t.

consistent with the alleged conspiracy increasing price. This specification of the benchmark dummy variable model estimates a $1.15/ton (or about 21 percent) increase in the SPRB coal price, which is somewhat smaller than the reduced form estimates in the before-during models using either the dummy variable or prediction approaches. Although BIT should not have been directly affected by the alleged anticompetitive act related to SPRB coal, it is possible that the customers who bought BIT faced substantially different supply and demand conditions than the plants purchasing the SPRB coal. In deciding whether the benchmark approach yields a more accurate quantification of the alleged anticompetitive behavior than the dummy variable or prediction approaches, one would need to analyze in more depth the comparability of the exogenous influences on BIT and SPRB to determine how good a benchmark BIT is for SPRB. If there are substantial questions about how comparable BIT is to SPRB, then the other approaches likely would yield more accurate estimates.

## G. Conclusions

Econometric analysis can be an extremely useful technique for estimating damages, if performed correctly. Estimating damages attributable to alleged anticompetitive acts requires separating the impact of the alleged anticompetitive acts from other influences on key variables, such as prices or the quantity sold. Econometric techniques are particularly useful in separating the effect of an alleged anticompetitive act from other influences.

To perform econometric analyses reliably, the testifying expert must verify that available data are of sufficient quality for the techniques chosen. Depending upon the data, the expert may use before-during techniques, before-during-after, or benchmarking approaches. These approaches to damage estimation may employ one or more well accepted regression techniques, such as dummy variable, prediction, or difference-in-differences to estimate the effects of the alleged anticompetitive acts. However, the expert should be able to state and support the reason for choosing particular techniques and data over potential alternatives. Moreover, since the finder of fact is not typically an economist or econometrician, the expert needs to be able to clearly and simply explain both the fundamental intuition of econometric analysis and why his approach is most appropriate.

# DEPARTMENT OF JUSTICE

STATEMENT OF

STEVEN C. SUNSHINE
DEPUTY ASSISTANT ATTORNEY GENERAL
ANTITRUST DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

BEFORE THE

SUBCOMMITTEE ON RAILROADS
COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE
HOUSE OF REPRESENTATIVES

CONCERNING

COMPETITIVE REVIEW OF RAILROAD MERGERS AFTER ICC SUNSET

ON

JANUARY 26, 1995

Madam Chairwoman and Members of the Subcommittee:

I very much appreciate this opportunity to appear before you today to explain how the Department of Justice would review railroad mergers and acquisitions if the Interstate Commerce Commission's authority to review and approve those transactions is repealed. The Department of Justice believes that railroad mergers and acquisitions should be reviewed under the same legal standards that apply to virtually every other sector of our nation's economy. We believe that the antitrust approach would provide significant advantages, saving time and scarce federal resources and reducing burden and delay on the merging parties, while still protecting the public interest by preventing anticompetitive mergers.

For most of our economy, Congress has chosen to rely on market competition rather than government regulation to protect consumers and the public interest. Not only does competition best allocate scarce goods and services to those who value them most highly, it also forces firms to become as efficient as possible. Consumers benefit where competition is vibrant -- it provides the highest possible quality of goods and services at the lowest possible cost. The antitrust laws protect competition by prohibiting unreasonable restraints of trade, including mergers that threaten substantially to lessen competition.

A number of important industries have in recent years been largely freed from economic regulation, including trucking, airlines, and natural gas production. Building on earlier regulatory and legislative efforts, the Staggers Rail Act of 1980 substantially deregulated the freight rail industry by placing more reliance on market forces. The Staggers Act is widely credited with revitalizing freight railroads, many of which were in precarious financial condition. The next logical step to deregulate further the rail industry would be to eliminate prior government review and approval of mergers under the "public interest" standard that is currently embodied in the Interstate Commerce Act.

Under the Interstate Commerce Act (ICA), rail carrier mergers must receive prior government approval under a broad "public interest" standard before they are permitted to occur. If a merger transaction involves two class I railroads, the ICC may not approve it unless and until the Commission determines that the transaction is, on balance, "consistent with the public interest."[1]

The ICA directs the Commission to consider competition, but only as one of five factors to balance in assessing the public

---

[1] 49 U.S.C. § 11344(c). If a merger transaction does not involve two class I railroads, the ICA requires approval unless the ICC finds there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States and the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs. Id. § 11344(d).

interest: the effect of the proposed transaction on the adequacy of transportation to the public; the effect on the public interest of including, or failing to include, other rail carriers in the proposed transaction; the total fixed charges that would result from the proposed transaction; the interest of carrier employees affected by the proposed transaction; and whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region.[2]

The ICA contemplates intervention in the process by competitors and other interested parties, and provides for lengthy time periods for the Commission to conduct evidentiary hearings and issue its determinations. It can take the Commission up to two to three years to render its decisions on mergers having significant competition issues. Even a rail merger that raises few competitive concerns can be under review at the ICC for a year or more. For example, the ICC recently completed its review of the proposal by the Union Pacific for authority to take control of the Chicago & North Western. Union Pacific filed its application on January 29, 1993; the ICC approved the transaction in December 1994. There was extensive participation by competitors -- competitors who were perhaps

---

[2] 49 U.S.C. § 11344(b)(1).

more concerned with their own private interests than with the merger's likely impact on rail customers.

A more dramatic example of the time that ICC proceedings can take was the Santa Fe's proposal to take control of the Southern Pacific, which the Department opposed at the Commission. Those railroads first notified the ICC about their proposed combination on November 22, 1983. The ICC's ultimate decision, which disapproved the transaction, was not made until almost 3 years later, on October 10, 1986. Then, close to 2 more years passed before the ICC ordered Santa Fe to divest the Southern Pacific stock, which the ICC had allowed Santa Fe to hold in a voting trust.

The ICA's public interest standard as applied in ICC railroad merger proceedings has led to the negotiation of many protective and other conditions that caused the merged carrier to make concessions to protesting parties, which often include its principal competitors. Such conditions can limit the potential efficiencies of a merger and protect competitors from the enhanced competition that could otherwise result from a procompetitive combination.

In contrast, merger enforcement under the antitrust laws protects competition, not competitors. Section 7 of the Clayton Act, 15 U.S.C. § 18, the primary provision of the antitrust laws governing mergers and acquisitions, prohibits those transactions that threaten "substantially to lessen competition in any line of commerce in any section of the country." The central issue under

the Clayton Act is whether the merger will result in increased prices to consumers or reduced services.

Merger decisions are made far more quickly under the antitrust laws than under the ICA. Under the premerger notification provisions of the Hart-Scott-Rodino ("HSR") Act,[3] routine mergers that raise no antitrust issues can be consummated upon the expiration of a 30-day waiting period (15 days for cash tender offers). When requested, the antitrust enforcement agencies will in appropriate cases agree to "early termination" of the waiting period in less than 30 days.

Where a merger does raise antitrust concerns, we are able to obtain all of the information we need to resolve those concerns expeditiously. If we need additional information from the parties to complete our investigation, we can issue a "second request" that will extend the waiting period an additional 20 days after the parties supply the requested information.[4] The Department seeks information from competitors, suppliers, customers, employees, and other knowledgeable parties in order to analyze the effects of the merger. In addition, we can seek documents, deposition testimony, and interrogatory answers from the parties and other persons pursuant to the Antitrust Civil Process Act.

When the Department determines that a proposed merger raises significant competitive issues, several steps are available to

---

[3] 15 U.S.C. § 18a.

[4] 15 U.S.C. §§ 18(b)(1), (e).

speed resolution of the matter. Most such matters are resolved in 6 months to a year. The parties can "fix-it-first" by restructuring the transaction, which avoids a legal challenge by the Department. If the investigation runs its course and the Department decides to challenge the transaction, the parties and the Department frequently negotiate a consent judgment that corrects the competitive problem but otherwise allows the remainder of the transaction to go forward.

If the Department concludes that a merger transaction as structured would violate the antitrust laws, and the parties do not wish to restructure it, the Department must go to court to prevent the transaction. The Department can seek a preliminary injunction, which prohibits the merger pending a full trial for a permanent injunction. Even if the case goes through a full trial, it will likely be resolved less than a year after the complaint is filed, substantially less time than it usually takes the ICC to reach a final decision on a merger under the ICA. However, only a small percentage of the mergers reviewed by the Department are challenged in court.

The analytical framework we use in merger investigations is set forth in the 1992 Horizontal Merger Guidelines, issued jointly by the Department of Justice and the Federal Trade Commission. These Merger Guidelines have been cited and relied on by the courts in merger cases. Under the Merger Guidelines, we assess the merger's likely harm to competition, and consider any efficiencies that may outweigh potential harmful effects.

Our competitive analysis takes into account the position of each of the merging firms in each economically meaningful "relevant market", the relevant market's concentration, the extent to which that concentration would be increased, the competitive conditions likely to exist in the market after the transaction, and the likely ability of the resulting firm to raise prices or lower services to the detriment of consumers. We define relevant markets carefully, through an evaluation of any effective substitutes customers have for the services provided by the merging firms.

For railroad mergers, the analysis begins with identification of the affected routes. For two railroads with largely parallel routes, the logical starting point for defining a market is the carriage of a particular commodity from one point (called an origin) to a second point (called a destination) by the merging railroads.

Once the affected routes are identified, the analysis generally focuses on an evaluation of the other rail, intermodal, product, and source competition options available to shippers. Intermodal competition is the ability of a shipper to substitute another mode of transportation, usually truck or water carriage, for the shipment of a particular commodity between a particular origin and destination. If truck or water service is available and is a close substitute for rail carriage for certain commodities, these competitive alternatives would prevent a rail carrier from raising its rates for these commodities. For other commodities, however, trucks may be at a significant disadvantage to rail where, for example, the distance the commodity is shipped is great, the volume of the commodity shipped is large, or the value of the commodity as compared to its weight is small.

Other forms of competition considered include product and source competition. "Product competition" is the ability of a shipper to substitute another commodity that allows use of a transportation system other than the merged rail carrier. "Source competition" is the ability of shippers in the region of the merging railroads to avoid high rail rates by shipping a commodity to another destination or by obtaining it from another source, again using other than the merged rail carrier.

If one or more of these forms of competition is available, its existence will be reflected in the Department's definition of the markets affected by the merger. If such competition is significant, it may defeat or limit the ability of the merged carrier to raise prices. The degree to which any of these methods of competition will be effective will vary according to the nature of the commodities, routes, and perhaps other factors, including differences in demand and/or supply elasticity for different commodities.

The antitrust laws do not prohibit efficient railroad mergers that can benefit shippers. The Merger Guidelines expressly recognize that mergers can enhance efficiency. When necessary to an evaluation of the net competitive effects of a merger, we consider the prospect that real efficiencies will be achieved that could not be realized absent the merger. Thus, the Department of Justice will challenge a merger only when its likely harm to competition is not outweighed by its likely efficiencies.

The Department has not opposed rail mergers that did not significantly threaten competition. Over the past 10 years, the Department opposed only one rail merger in its entirety -- the proposed consolidation of the Santa Fe and Southern Pacific Railroads -- a transaction the ICC ultimately disapproved. The Department raised no objection to the two rail mergers most recently approved by the ICC: Kansas City Southern's acquisition of Mid-South, and the Union Pacific's control of the Chicago &

North Western.

In sum, our analysis of proposed railroad mergers using the Merger Guidelines is the same general analysis we use in reviewing mergers subject to the antitrust laws. That analysis is sophisticated, thorough, and flexible -- it involves far more than simply computing market shares or concentration figures. It takes into account all the dynamics of the markets with which we are dealing.

Subjecting railroad mergers and acquisitions to the antitrust laws would expedite both the investigation and resolution of such transactions.

Madam Chairwoman, this concludes my prepared remarks. I would be happy to respond to any questions that you or other members of the Subcommittee may have.

HEINONLINE

DATE DOWNLOADED: Wed Jun 5 15:29:48 2024
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
13379 1 (1980) Staggers rail act of 1980

ALWD 7th ed.
, Staggers rail act of 1980, 1 (1980).

Chicago 17th ed.
"Staggers rail act of 1980," U.S. Congressional Serial Set (1980): 1-145

McGill Guide 9th ed.
"Staggers rail act of 1980" [1980] 1.

AGLC 4th ed.
'Staggers rail act of 1980' [1980] U.S. Congressional Serial Set 1

MLA 9th ed.
"Staggers rail act of 1980." U.S. Congressional Serial Set, , 1980, pp. 1-145. HeinOnline.

OSCOLA 4th ed.
'Staggers rail act of 1980' (1980) 1 Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

96TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT No. 96-1430

# STAGGERS RAIL ACT OF 1980

SEPTEMBER 29, 1980.—Ordered to be printed

Mr. STAGGERS, from the committee of conference, submitted the following

# CONFERENCE REPORT

[To accompany S. 1946]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the amendment of the House to the bill (S. 1946) to reform the economic regulation of railroads, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate to the amendment of the House and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment insert the following:

*SHORT TITLE*

*SECTION 1. This Act may be cited as the "Staggers Rail Act of 1980".*

*TABLE OF CONTENTS*

*Sec. 1. Short title.*
*Sec. 2. Findings.*
*Sec. 3. Goals.*

*TITLE I—RAIL TRANSPORTATION POLICY*

*Sec. 101. Rail transportation policy.*



Digitized from Best Copy Available

*TITLE II—RAILROAD RATES AND INTER-CARRIER PRACTICES*


Sec. 201. Regulation of railroad rates.
Sec. 202. Determination of market dominance.
Sec. 203. Zone of rate flexibility.
Sec. 204. Transportation of recyclable materials.
Sec. 205. Rate regulation proceedings; adequate revenues.
Sec. 206. Inflation-based rate increases.
Sec. 207. Investigation and suspension of rates.
Sec. 208. Contracts.
Sec. 209. Demand sensitive rates.
Sec. 210. Phaseout of capital incentive rates.
Sec. 211. Permissive limited liability rates.
Sec. 212. Rate discrimination.
Sec. 213. Exemption.
Sec. 214. Intrastate rates.
Sec. 215. Business entertainment expenses.
Sec. 216. Efficient marketing.
Sec. 217. Compensatory joint rate relief.
Sec. 218. Expedited division of revenues proceedings.
Sec. 219. Rate bureaus.
Sec. 220. Long and short haul transportation.
Sec. 221. Railroad entry.
Sec. 222. Service during periods of peak demand.
Sec. 223. Reciprocal switching.
Sec. 224. Car service compensation.
Sec. 225. Car utilization.
Sec. 226. Car service orders for exigent circumstances.
Sec. 227. Employee protection.
Sec. 228. Mergers and other transactions.
Sec. 229. Savings provisions.


*TITLE III—RAILROAD COST DETERMINATIONS*


Sec. 301. Uniform accounting system.
Sec. 302. Railroad cost accounting.
Sec. 303. Civil penalties for violations of accounting principles provisions.


*TITLE IV—RAILROAD MODERNIZATION ASSISTANCE*


Sec. 401. Feeder railroad development program.
Sec. 402. Abandonment.
Sec. 403. Conversion of abondoned railroad rights-of-way.
Sec. 404. Extension of redeemable preference share financing.
Sec. 405. Financing.
Sec. 406. Transaction assistance.
Sec. 407. Electrification loan guarantees.
Sec. 408. Amendment to the Regional Rail Reorganization Act of 1973.
Sec. 409. Federal assistance report.


*TITLE V—CONRAIL TITLE V LABOR PROTECTION*


Sec. 501. Monthly displacement allowance.
Sec. 502. Duration of monthly displacement allowance.
Sec. 503. Training and transfer.
Sec. 504. Payment, audit, and report.
Sec. 505. Railroad hiring.
Sec. 506. Single collective-bargaining agreement.
Sec. 507. Employee protection payments.
Sec. 508. Technical amendments.


*TITLE VI—EXPEDITED SUPPLEMENTAL TRANSACTION PROPOSALS*


Sec. 601. Expedited supplemental transaction proposals.


*TITLE VII—MISCELLANEOUS PROVISIONS*


Sec. 701. Rock Island and Milwaukee Railroads amendments.
Sec. 702. Loan guarantees.
Sec. 703. Conrail studies and emergency funding.


Digitized from Best Copy Available

*Sec. 704. USRA authorization of appropriations.*
*Sec. 705. Feeder line rehabilitation study.*
*Sec. 706. Effect on pending matters.*
*Sec. 707. Construction of amendments.*
*Sec. 708. Surplus property.*
*Sec. 709. Study of Alaska railroad rates.*
*Sec. 710. Effective dates.*

*FINDINGS*

*SEC. 2. The Congress hereby finds that—*

*(1) historically, railroads were the essential factor in the national transportation system;*

*(2) the enactment of the Interstate Commerce Act was essential to prevent an abuse of monopoly power by railroads and to establish and maintain a national railroad network;*

*(3) today, most transportation within the United States is competitive;*

*(4) many of the Government regulations affecting railroads have become unnecessary and inefficient;*

*(5) nearly two-thirds of the Nation's intercity freight is transported by modes of transportation other than railroads;*

*(6) earnings by the railroad industry are the lowest of any transportation mode and are insufficient to generate funds for necessary capital improvements;*

*(7) by 1985, there will be a capital shortfall within the railroad industry of between $16,000,000,000 and $20,000,000,000;*

*(8) failure to achieve increased earnings within the railroad industry will result in either further deterioration of the rail system or the necessity for additional Federal subsidy; and*

*(9) modernization of economic regulation for the railroad industry with a greater reliance on the marketplace is essential in order to achieve maximum utilization of railroads to save energy and combat inflation.*

*GOALS*

*SEC. 3. The purpose of this Act is to provide for the restoration, maintenance, and improvement of the physical facilities and financial stability of the rail system of the United States. In order to achieve this purpose, it is hereby declared that the goals of this Act are—*

*(1) to assist the railroads of the Nation in rehabilitating the rail system in order to meet the demands of interstate commerce and the national defense;*

*(2) to reform Federal regulatory policy so as to preserve a safe, adequate, economical, efficient, and financially stable rail system;*

*(3) to assist the rail system to remain viable in the private sector of the economy;*

*(4) to provide a regulatory process that balances the needs of carriers, shippers, and the public; and*

*(5) to assist in the rehabilitation and financing of the rail system.*

Digitized from Best Copy Available

## *TITLE I—RAIL TRANSPORTATION POLICY*

### *RAIL TRANSPORTATION POLICY*

*SEC. 101. (a) Chapter 101 of title 49, United States Code, is amended by inserting after section 10101 the following new section:*

**"§ 10101a. Rail transportation policy**

*"In regulating the railroad industry, it is the policy of the United States Government—*

*"(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;*

*"(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;*

*"(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;*

*"(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;*

*"(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;*

*"(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;*

*"(7) to reduce regulatory barriers to entry into and exit from the industry;*

*"(8) to operate transportation facilities and equipment without detriment to the public health and safety;*

*"(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;*

*"(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;*

*"(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;*

*"(12) to encourage fair wages and safe and suitable working conditions in the railroad industry;*

*"(13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;*

*"(14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and*

*"(15) to encourage and promote energy conservation.".*

*(b) Section 10101(a) of title 49, United States Code, is amended by striking out "To ensure" and inserting in lieu thereof "Except where*

Digitized from Best Copy Available

*policy has an impact on rail carriers, in which case the principles of section 10101a of this title shall govern, to ensure".*

*(c) The section analysis of chapter 101 of title 49, United States Code, is amended by inserting after the item relating to section 10101 the following new item:*

*"10101a. Rail transportation policy.".*

## *TITLE II—RAILROAD RATES AND INTER-CARRIER PRACTICES*

### *REGULATION OF RAILROAD RATES*

*SEC. 201. (a) Subchapter I of chapter 107 of title 49, United States Code, is amended by inserting after section 10701 the following new section:*

***"§ 10701a. Standards for rates for rail carriers***

*"(a) Except as provided in subsection (b) or (c) of this section and unless a rate is prohibited by a provision of this title, a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may establish any rate for transportation or other service provided by the carrier.*

*"(b)(1) If the Commission determines, under section 10709 of this title, that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established by such carrier for such transportation must be reasonable.*

*"(2) In any proceeding to determine the reasonableness of a rate described in paragraph (1) of this subsection—*

*"(A) the shipper challenging such rate shall have the burden of proving that such rate is not reasonable if—*

*"(i) such rate (I) is authorized under section 10707a of this title, and (II) results in a revenue-variable cost percentage for the transportation to which the rate applies that is less than the lesser of the percentages described in clauses (i) and (ii) of section 10707a(e)(2)(A) of this title; or*

*"(ii) such rate does not meet the description set forth in clause (i) of this subparagraph, but the Commission does not begin an investigation proceeding under section 10707 of this title to determine whether such rate is reasonable; and*

*"(B) the rail carrier establishing the challenged rate shall have the burden of proving that such rate is reasonable if—*

*"(i) such rate (I) is greater than that authorized under section 10707a of this title, or (II) results in a revenue-variable cost percentage for the transportation to which the rate applies that is equal to or greater than the lesser of the percentages described in clauses (i) and (ii) of section 10707a(e)(2)(A) of this title; and*

*"(ii) the Commission begins an investigation proceeding under section 10707 of this title to determine whether such rate is reasonable.*

*"(3) In determining whether a rate established by a rail carrier is reasonable for purposes of this section, the Commission shall recognize the policy of this title that rail carriers shall earn adequate*

Digitized from Best Copy Available

*revenues, as established by the Commission under section 10704(a)(2) of this title.*

*"(c)(1) A rate for transportation or other service provided by a rail carrier subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may not be established below a reasonable minimim. Any rate for transportation by such a rail carrier that does not contribute to the going concern value of such carrier is presumed to be not reasonable. A rate that contributes to the going concern value of such carrier is conclusively presumed not to be below a reasonable minimum.*

*"(2) A rate for transportation by a rail carrier that equals or exceeds the variable cost of providing the transportation is conclusively presumed to contribute to the going concern value of such rail carrier.*

*"(3)(A) Upon the filing of a complaint alleging that a rate is in violation of this subsection, the Commission shall take final action thereon by the 90th day after the date such complaint is filed.*

*"(B) If the Commission determines, based on the record after opportunity for a hearing, that a rate is in violation of this subsection, the Commission shall order such rate to be raised, but only to the minimum level required by this subsection. The complainant shall have the burden of proving that such rate is in violation of this subsection.*

*"(4)(A) For purposes of this subsection, variable costs shall be determined under formulas or procedures prescribed or certified by the Commission.*

*"(B) In the determination of variable costs for purposes of minimum rate regulation, the Commission shall, on application of the rail carrier proposing the rate, determine only the costs of such carrier and only those costs of the specific service in question unless the specific information is not available. The Commission may not include in such variable costs an expense that does not vary directly with the level of transportation provided under the proposed rate.".*

*(b)(1) Section 10701(a) of title 49, United States Code, is amended—*

*(A) by inserting "(other than a rail rate)" immediately after "A rate" in the first sentence;*

*(B) by inserting "(including a rail carrier)" immediately after "such a carrier" in the second sentence thereof; and*

*(C) by inserting "(including rail carriers)" immediately after "those carriers" in the third sentence thereof.*

*(2) Section 10701(b) of title 49, United States Code, is repealed.*

*(3) The section analysis of chapter 107 of title 49, United States Code, is amended by inserting immediately below the item relating to section 10701 the following new item:*

*"10701a. Standards for rates for rail carriers.".*

*DETERMINATION OF MARKET DOMINANCE*

*SEC. 202. Section 10709 of title 49, United States Code, is amended by adding at the end thereof the following new subsection:*

*"(d)(1) In this subsection—*

*"(A) 'fixed and variable cost' means all cost incurred by rail carriers in the transportation of freight, but limiting the return on equity capital to a rate equal to the embedded cost of debt.*

*"(B)(i) 'cost recovery percentage' means the lowest revenue-variable cost percentage which, if all movements that produced revenues resulting in revenue-variable cost percentages in excess of the cost recovery percentage are deemed to have produced only revenues resulting in the cost recovery percentage, would produce revenues which would be equal, when combined with total revenues produced by all other traffic transported by rail carrier, to the total fixed and variable cost of the transportation of all traffic by rail carrier.*

*"(ii) For purposes of determining the cost recovery percentage only, 'revenue-variable cost percentage' means the quotient, expressed as a percentage figure, obtained by dividing the total revenues produced by the transportation of all traffic received by rail carriers for rail transportation by the total variable cost of such transportation.*

*"(2) In making a determination under this section, the Commission shall find that the rail carrier establishing the challenged rate does not have market dominance over the transportation to which the rate applies if such rail carrier proves that the rate charged results in a revenue-variable cost percentage for such transportation that is less than—*

*"(A) 160 percent during the period beginning on the effective date of the Staggers Rail Act of 1980 and ending September 30, 1981;*

*"(B) 165 percent during the period beginning October 1, 1981, and ending September 30, 1982;*

*"(C) 170 percent during the period beginning October 1, 1982, and ending September 30, 1983;*

*"(D) 175 percent or the cost recovery percentage, whichever is less, during the period beginning October 1, 1983, and ending September 30, 1984; and*

*"(E) the cost recovery percentage, during each 12-month period beginning on or after October 1, 1984.*

*For purposes of subparagraphs (D) and (E) of this paragraph, the cost recovery percentage shall in no event be less than a revenue-variable cost percentage of 170 percent or more than a revenue-variable cost percentage of 180 percent.*

*"(3) For purposes of determining the revenue-variable cost percentage for a particular transportation, variable costs shall be determined pursuant to section 10705a(m)(1) of this title, with adjustments specified by the Commission. A rail carrier may meet its burden of proof under this subsection by establishing its variable costs in accordance with such section 10705a(m)(1), but a shipper may rebut that showing by evidence of such type, and in accordance with such burden of proof, as the Commission shall prescribe.*

*"(4) A finding by the Commission that a rate charged by a rail carrier results in a revenue-variable cost percentage for the transportation to which the rate applies that is equal to or greater than the applicable percentage under paragraph (2) of this subsection does not establish a presumption that (A) such rail carrier has or does not have market dominance over such transportation, or (B) the proposed rate exceeds or does not exceed a reasonable maximum.*

*"(5)(A) Within 180 days after the effective date of the Staggers Rail Act of 1980 and on an annual basis thereafter, the Commission shall determine the cost recovery percentage for the transportation*

*of all traffic received by rail carriers. The Commission shall make such determination after considering each individual revenue-variable cost percentage resulting from the revenues and costs of a valid and reliable statistical sample of all movements of commodities transported by class I rail carriers during the most recent calendar year for which such information is available.*

*"(B) If, on the basis of calculations under subparagraph (A) of this paragraph, the Commission determines that revenues earned by all class I rail carriers during the previous calendar year do not exceed the fixed and variable costs of such carriers, then the cost recovery percentage for purposes of this section shall be deemed to be equal to the cost recovery percentage last determined by the Commission.*

*"(C) The Commission shall, in its annual report submitted to the Congress under section 10311 of this title, set forth the cost recovery percentage determined for that year under subparagraph (A) of this paragraph.".*

*ZONE OF RATE FLEXIBILITY*

*SEC. 203. (a) Subchapter I of chapter 107 of title 49, United States Code, is amended by inserting after section 10707 the following new section:*

***"§ 10707a. Zone of rail carrier rate flexibility***

*"(a) In this section—*

*"(1)(A) 'base rate' means, with respect to the transportation of a particular commodity (i) for the 24-month period beginning on October 1, 1980, the rate in effect on October 1, 1980, (ii) for the 24-month period beginning on October 1, 1982, the rate in effect on October 1, 1982, and (iii) for the 5-year period beginning on October 1, 1984, and for each subsequent 5-year period, the rate in effect on the first day of applicable 5-year period.*

*"(B) If no rate exists for the transportation of a particular commodity on October 1, 1980, the base rate for the transportation of such commodity shall be the rate established by the rail carrier (divided by the latest rail cost adjustment factor published by the Commission), unless such rate is found to be unreasonable by the Commission, in which case the base rate shall be the rate authorized by the Commission (divided by the latest rail cost adjustment factor published by the Commission).*

*"(2)(A) 'adjusted base rate' means the base rate for the transportation of a particular commodity multiplied by the latest rail cost adjustment factor published by the Commission pursuant to this paragraph.*

*"(B) Commencing with the fourth quarter of 1980, the Commission shall, as often as practicable but in no event less often than quarterly, publish a rail cost adjustment factor which shall be a fraction, the numerator of which is the latest published Index of Railroad Costs (which index shall be compiled or verified by the Commission, with appropriate adjustments to reflect the changing composition of railroad costs, including the quality and mix of material and labor), and the denominator of which is the same index for the fourth quarter of 1980, or for*

*the fourth quarter of 1982 or for the fourth quarter of every fifth year thereafter, as appropriate.*

*"(b)(1) Except as provided in paragraph (2) of this subsection, a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may increase any rate over which the Commission has jurisdiction under section 10709 of this title so long as the increased rate is not greater than the adjusted base rate for the transportation involved, plus any rate increases implemented under subsection (c) or (d) of this section.*

*"(2) A rate increase authorized under this subsection may not be found to exceed a reasonable maximum for the transportation involved.*

*"(3) A rail carrier may not increase a rate under this subsection to the extent that the cost increases to such carrier due to inflation are recovered through (A) general rate increases pursuant to section 10706 of this title, or (B) inflation-based rate increases under section 10712 of this title applicable to that rate.*

*"(c)(1) During the 12-month period beginning on the effective date of the Staggers Rail Act of 1980 and during each of the 3 succeeding 12-month periods a rail carrier may, in addition to rate increases authorized under subsection (b) of this section, increase any rate over which the Commission has jurisdiction under section 10709 of this title by an annual amount of not more than 6 percent of the adjusted base rate, except that in no event shall the total increase under this subsection result in a rate which is more than 118 percent of the adjusted base rate.*

*"(2)(A) If any portion of a rate increase under this subsection is not implemented in the year in which it is authorized, such portion may, except as provided in subparagraph (B) of this paragraph, be implemented only in the next succeeding year.*

*"(B) If any portion of the total rate increase authorized under this subsection is not implemented by the end of the 4-year period beginning on the effective date of the Staggers Rail Act of 1980, such portion may be implemented in the next 2 succeeding years, except that in no event may a rail carrier increase a rate under this subsection or under subsection (d) of this section in either of such 2 succeeding years by an annual amount of more than 10 percent of the adjusted base rate.*

*"(d)(1) Except as provided in paragraph (3) of this subsection, during the 12-month period beginning on October 1, 1984, and during each succeeding 12-month period, a rail carrier may, in addition to rate increases under subsection (b) of this section, increase any rate over which the Commission has jurisdiction under section 10709 of this title by an annual amount of not more than 4 percent of the adjusted base rate.*

*"(2) No portion of any rate increase under this subsection which is not implemented in the year in which it is authorized may be implemented in any other year.*

*"(3)(A) The provisions of this subsection shall not apply to a rail carrier proposing to increase a single line rate if such carrier earns adequate revenues, as determined by the Commission under section 10704(a)(2) of this title.*

*"(B) The Commission shall, after a hearing on the record, prescribe such rules with respect to joint rates as necessary to ensure*

*that rail carriers which earn adequate revenues, as determined under section 10704(a)(2) of this title, do not receive the rate increases authorized by this subsection unless the Commission determines that it is unable to prescribe such rules without precluding rail carriers not earning adequate revenues from receiving the rate increases authorized under this subsection.*

*"(e)(1) Notwithstanding the provisions of section 10707 of this title, in the case of any rate increase by a rail carrier that is authorized under subsection (c) or (d) of this section—*

*"(A)(i) the Commission may not suspend such rate increase pending final Commission action; and*

*"(ii) except as provided in paragraph (2) of this subsection, the Commission may not begin an investigation proceeding under section 10707 of this title with respect to the reasonableness of such rate increase; but*

*"(B) an interested party may file a complaint under section 11701(b) of this title alleging that such rate increase violates the provisions of this subtitle.*

*In considering any complaint challenging a rate increase that is authorized under subsection (c) of this section and that results in a revenue-variable cost percentage that is less than the lesser of the percentages described in clauses (i) and (ii) of paragraph (2)(A), the Commission shall, in determining the reasonableness of such rate increase, give due consideration to whether the carrier proposing the rate increase has attained adequate revenues, as determined by the Commission under section 10704(a)(2) of this title, giving regard ro preventing a carrier with adequate revenues from realizing excessive profits on the traffic involved and also the policy of bringing to an adequate level the revenues of carriers not having an adequate revenue level.*

*"(2)(A) If a rate increase authorized under this section in any year results in a revenue-variable cost percentage for the transportation to which the rate applies that is equal to or greater than—*

*"(i) 20 percentage points above the revenue-variable cost percentage applicable in that year under section 10709(d) of this title; or*

*"(ii) a revenue-variable cost percentage of 190 percent,*

*whichever is less, the Commission may, on its own initiative, or on complaint of an interested party, begin an investigation proceeding to determine whether the proposed rate increase violates this subtitle.*

*"(B) In determining whether to investigate or not to investigate any proposed rate increase that results in a revenue-variable cost percentage for the transportation to which the rate applies that is equal to or greater than the lesser of the percentages described in clauses (i) and (ii) of subparagraph (A) of this paragraph (without regard to whether such rate increase is authorized under this section), the Commission shall set forth its reasons therefor, giving due consideration to the following factors:*

*"(i) the amount of traffic which is transported at revenues which do not contribute to going concern value and efforts made to minimize such traffic;*

*"(ii) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traf-*

*fic can be changed to maximize the revenues from such traffic; and*

*"(iii) the impact of the proposed rate or rate increase on the attainment of the national energy goals and the rail transportation policy under section 10101a of this title, taking into account the railroads' role as a primary source of energy transportation and the need for a sound rail transportation system in accordance with the revenue adequacy goals of section 10704 of this title.*

*This subparagraph shall not be construed to change existing law with regard to the nonreviewability of such determination.*

*"(C) In determining whether a rate is reasonable, the Commission shall consider, among other factors, evidence of the following:*

*"(i) the amount of traffic which is transported at revenues which do not contribute to going concern value and efforts made to minimize such traffic;*

*"(ii) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and*

*"(iii) the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues.*

*"(f) In any proceeding under this section, evidence of the underlying rail carrier rate is admissible.*

*"(g) A finding by the Commission that a rate increase exceeds the increase authorized under this section does not establish a presumption that (1) the rail carrier proposing such rate increase has or does not have market dominance over the transportation to which the rate applies, or (2) the proposed rate exceeds or does not exceed a reasonable maximum.*

*"(h) The authority of the Commission to determine and prescribe reasonable rules, classifications, and practices may not be used, directly or indirectly, to limit the rates which rail carriers are otherwise authorized to establish under this subtitle.".*

*(b) The section analysis of chapter 107 of title 49, United States Code, is amended by inserting immediately after the item relating to section 10707 the following new item:*

*"10707a. Zone of rail carrier rate flexibility.".*

*(c)(1) Any rail carrier rate which increased over 70 percent between 1976 and 1979 inclusive for the transportation, in shipper owned equipment over a distance exceeding 1,550 miles between points within the United States, of coal pursuant to a tariff calling for an annual volume of more than 2,000,000 tons per year purchased by a municipally owned utility for the generation of electric power under a 20-year purchase agreement entered into by such utility in the year 1974 shall not be increased so long as coal is purchased under such original agreement, except that—*

*(A) during the period beginning October 1, 1980, and ending September 30, 1987, the Interstate Commerce Commission may permit increases in such rate which result in a revenue-variable cost percentage of not more than 162 percent; and*

*(B) after October 1, 1987, such rate shall be subject to section 10701a of title 49, United States Code, and related provisions of*

*such title governing regulation of rail carrier rates, except that until such rate results in a revenue-variable cost percentage that is equal to or greater than the revenue-variable cost percentage applicable under section 10709(d) of such title, such rate may not be increased more than 4 percent, in addition to inflation, in any year.*

*(2) Neither the provisions of this subsection nor any rate subject to this subsection shall be admissible as evidence or considered in any way in any proceeding involving any other rail carrier rate that is commenced to determine market dominance under section 10709 of title 49, United States Code, or to determine reasonableness under section 10701a of such title.*

*TRANSPORTATION OF RECYCLABLE MATERIALS*

*SEC. 204. Section 10731 of title 49, United States Code, is amended by adding at the end thereof the following new subsection:*

*"(e) Notwithstanding any other provision of this title or any other law, within 90 days after the effective date of the Staggers Rail Act of 1980, all rail carriers providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title shall take all actions necessary to reduce and thereafter maintain rates for the transportation of recyclable or recycled materials, other than recyclable or recycled iron or steel, at revenue-to-variable cost ratio levels that are equal to or less than the average revenue-to-variable cost ratio that rail carriers would be required to realize, under honest, economical, and efficient management in order to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business sufficient to attract and retain capital in amounts adequate to provide a sound transportation system in the United States. As long as any such rate equals or exceeds such average revenue-to-variable cost ratio established by the Commission, such rate shall not be required to bear any further rate increase. The Commission shall have jurisdiction to issue all orders necessary to enforce the requirements of this subsection.".*

*RATE REGULATION PROCEEDINGS; ADEQUATE REVENUES*

*SEC. 205. (a)(1) The Interstate Commerce Commission shall commence a proceeding for purposes of determining whether, and to what extent, product competition should be considered in proceedings under subtitle IV of title 49, United States Code, to determine the reasonableness of rail carrier rates. The Commission shall complete its proceeding under this subsection within 230 days after the effective date of this Act.*

*(2)(A) For purposes of this subsection, the term "product competition" means the availability to a consignee, at a competitive delivered cost and in sufficient quantities, of products or commodities which are of the same type as the commodity or product to which the rate in question applies, without regard to whether such products or commodities are available from the same or a different origin as those to which the rate applies.*

*(B) In determining the availability of alternative sources of a particular commodity for purposes of this subsection, such commodity*

*must be capable, by reason of similar specifications, of being effectively utilized by the consignee.*

*(C) In determining the availability of alternative sources of coal for purposes of this subsection, such coal must be capable, by reason of similar specifications such as Btu's, sulfur content, and ash content, of being effectively utilized by the consignee.*

*(D) For purposes of this subsection, any coal imported in the United States for the generation of electricity by utilities shall not be taken into account in the determination of whether coal is available to a consignee from another source.*

*(3)(A) Nothing in this subsection shall be construed as requiring the Commission to modify its standards for the determination of the reasonableness of rail carrier rates under existing law and procedures.*

*(B) Nothing in this subsection shall be construed as altering the meaning, use, or interpretation by the Commission, the courts, or any party of the term "market dominance", as defined in section 10709(a) of title 49, United States Code. The enactment of this subsection shall not be considered by the Commission in any proceeding, or by any court on an appeal from that or any other proceeding, to determine the proper scope of the term "market dominance" or whether there is market dominance over the transportation to which any particular rate applies.*

*(b)(1) Section 10704(a)(2) of title 49, United States Code, is amended by inserting "and revise as necessary" immediately after "shall maintain".*

*(2) Section 10704(a) of title 49, United States Code, is amended by adding at the end thereof the following new paragraphs:*

*"(3) The Commission shall conclude a proceeding under paragraph (2) of this subsection within 180 days after the effective date of the Staggers Rail Act of 1980 and thereafter as necessary.*

*"(4) On the basis of the standards and procedures under paragraph (2) of this subsection, the Commission shall, within 180 days after the effective date of the Staggers Rail Act of 1980 and on an annual basis thereafter, determine which rail carriers are earning adequate revenues.".*

*INFLATION-BASED RATE INCREASES*

*SEC. 206. (a) Subchapter I of chapter 107 of title 49, United States Code, is amended by adding at the end thereof the following new section:*

***"§ 10712. Inflation-based rate increases***

*"(a) The Commission may, on a quarterly basis and consistent with the rail transportation policy set forth in section 10101a of this title, prescribe a percentage rate increase or rate index for rail carriers in order to compensate for inflationary cost increases. Such percentage rate increase or rate index may be applicable on an industry-wide, territory-wide or carrier-by-carrier basis.*

*"(b) Within 60 days after the date the Commission prescribes a percentage rate increase or rate index under subsection (a) of this section, each rail carrier or group of rail carriers shall notify the Commission of any rate or group of rates which such carrier or car-*

*riers intend to be excluded from the application of such percentage rate increase or rate index.*

*"(c) For purposes of this section, a percentage rate index may permit rate increases within a specified range to allow carriers to recover a total revenue increase specified by the Commission as necessary to compensate for inflationary cost increases.".*

*(b) The section analysis for chapter 107 of title 49, United States Code, is amended by inserting immediately after the item relating to section 10711 the following new item:*

*"10712. Inflation-based rate increases.".*

*INVESTIGATION AND SUSPENSION OF RATES*

*SEC. 207. (a) Section 10707(b)(1) of title 49, United States Code, is amended to read as follows:*

*"(b)(1) The Commission must complete a proceeding under this section and make its final decision by the end of the 5th month after the rate, classification, rule, or practice was to become effective, except that if the Commission reports to the Congress by the end of such 5th month that it cannot make a final decision by that time and explains the reason for the delay, it may take an additional 3 months to complete the proceeding and make its final decision. If the Commission does not reach a final decision within the applicable time period, the rate, classification, rule, or practice—*

*"(A) is effective at the end of that time period; or*

*"(B) if already in effect at the end of that time period, remains in effect.".*

*(b) Section 10707(c) of title 49, United States Code, is amended to read as follows:*

*"(c)(1) The Commission may not suspend a proposed rate, classification, rule, or practice during the course of a Commission proceeding under this section unless it appears from the specific facts shown by the verified statement of a person that—*

*"(A) it is substantially likely that the protestant will prevail on the merits;*

*"(B) without suspension, the proposed rate change will cause substantial injury to the protestant or the party represented by the protestant; and*

*"(C) because of the peculiar economic circumstances of the protestant, the provisions of subsection (d) of this section do not protect the protestant.*

*"(2) The burden shall be on the protestant to prove the matters described in paragraph (1) (A), (B), and (C) of this subsection.".*

*(c) Section 10707(d) of title 49, United States Code, is amended to read as follows:*

*"(d)(1) If the Commission does not suspend a proposed rate increase under subsection (c) of this section, the Commission shall require the rail carrier to account for all amounts received under the increase until the Commission completes its proceedings under subsection (b) of this section. The accounting shall specify by whom and for whom the amounts are paid. When the Commission takes final action, it shall require the carrier to refund to the person for whom the amounts were paid that part of the increased rate found to be unreasonable, plus interest at a rate equal to the average yield (on*

*the date the statement is filed) of marketable securities of the United States Government having a duration of 90 days.*

*"(2) If a rate is suspended under subsection (c) of this section and any portion of such rate is later found to be reasonable under this title, the carrier shall collect from each person using the transportation to which the rate applies the difference between the original rate and the portion of the suspended rate found to be reasonable for any services performed during the period of suspension, plus interest at a rate equal to the average yield (on the date the statement is filed) of marketable securities of the United States Government having a duration of 90 days, except that this paragraph shall not apply to general rate increases under section 10706 of this title.*

*"(3) If any portion of a proposed rate decrease is suspended under subsection (c) of this section and later found to be reasonable under this title, the rail carrier may refund any part of the portion of the decrease found to comply with this title if the carrier makes the refund available to each shipper who participated in the rate, in accordance with the relative amount of such shipper's traffic transported at such rate.*

*"(4) Notwithstanding the provisions of section 10741 or section 10761 of this title, the Commission shall, by rule, establish standards and procedures permitting a rail carrier to waive the collection of amounts due under this subsection if such amounts are not significant.".*

*(d) Section 10707(e) of title 49, United States Code, is repealed.*

*CONTRACTS*

*SEC. 208. (a) Subchapter I of chapter 107 of title 49, United States Code, as amended by this Act, is further amended by adding at the end thereof the following new section:*

***"§ 10713. Contracts***

*"(a) One or more rail carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions. Such a rail carrier may not enter into a contract with purchasers of rail service except as provided in this section.*

*"(b) Each contract entered into under this section shall be filed with the Commission, together with a summary of the contract containing such nonconfidential information as the Commission prescribes. The Commission shall publish special tariff rules for such contracts in order to assure that the essential terms of the contract are available to the general public in tariff format.*

*"(c) A contract filed under this section shall be approved by the Commission, as provided in subsection (e) of this section, unless the Commission determines in a proceeding under subsection (d) of this section that such contract is in violation of this section.*

*"(d)(1) No later than 30 days after the date of filing of a contract under this section, the Commission may, on its own initiative or on complaint, begin a proceeding to review such contract on the grounds described in this subsection.*



Digitized from Best Copy Available

*"(2)(A) In the case of a contract other than a contract for the transportation of agricultural commodities (including forest products and paper), a complaint may be filed—*

*"(i) by a shipper only on the grounds that such shipper individually will be harmed because the proposed contract unduly impairs the ability of the contracting carrier or carriers to meet their common carrier obligations to the complainant under section 11101 of this title; or*

*"(ii) by a port only on the grounds that such port individually will be harmed because the proposed contract will result in unreasonable discrimination against such port.*

*"(B) In the case of a contract for the transportation of agricultural commodities (including forest products and paper), in addition to the grounds for a complaint described in subparagraph (A) of this paragraph, a complaint may be filed by a shipper on the grounds that such shipper individually will be harmed because—*

*"(i) the rail carrier has unreasonably discriminated by refusing to enter into a contract with such shipper for rates and services for the transportation of the same type of commodity under similar conditions to the contract at issue, and that shipper was ready, willing, and able to enter into such a contract at a time essentially contemporaneous with the period during which the contract at issue was offered; or*

*"(ii) the proposed contract constitutes a destructive competitive practice under this subtitle.*

*In making a determination under clause (ii) of this subparagraph, the Commission shall consider the difference between contract rates and published single car rates.*

*"(C) For purposes of this paragraph, the term 'unreasonable discrimination' has the same meaning as such term has under section 10741 of this title.*

*"(3)(A) Within 30 days after the date a proceeding is commenced under paragraph (1) of this subsection, or within such shorter time period after such date as the Commission may establish, the Commission shall determine whether the contract that is the subject of such proceeding is in violation of this section.*

*"(B) If the Commission determines, on the basis of a complaint filed under paragraph (2)(B)(i) of this subsection, that the grounds for a complaint described in such paragraph have been established with respect to a carrier, the Commission shall, subject to the provisions of this section, order such carrier to provide rates and service substantially similar to the contract at issue with such differentials in terms and conditions as are justified by the evidence.*

*"(e) Approval of a contract filed under this section shall be effective—*

*"(1) on the date the Commission expressly approves such contract, but in no event before the end of the 30-day period beginning on the date such contract is filed or after the end of the 60-day period beginning on such date; or*

*"(2) if the Commission has not disapproved such contract by the end of the 60-day period beginning on the date such contract is filed, at the end of such 60-day period.*

*"(f) The Commission may limit the right of a rail carrier to enter into future contracts under this section following a determination that additional contracts would impair the ability of the rail carri-*

*er to fulfill its common carrier obligations under section 11101 of this title.*

*"(g) The Commission may not require a rail carrier to violate the terms of a contract that has been approved under this section, except to the extent necessary to comply with section 11128 of this title.*

*"(h) A party to a contract entered into under this section shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract.*

*"(i)(1) A contract that is approved by the Commission under this section, and transportation under such contract, shall not be subject to this subtitle, and may not be subsequently challenged before the Commission or in any court on the grounds that such contract violates a provision of this subtitle.*

*"(2) The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree.*

*"(j) The provisions of this section shall not affect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section. Nothing in this section shall affect the rights of the parties to challenge the existence of such a contract.*

*"(k)(1) Any rail carrier may, in accordance with the terms of this section, enter into contracts for the transportation of agricultural commodities (including forest products and paper) involving the utilization of carrier owned or leased equipment not in excess of 40 percent of the capacity of such carrier's owned or leased equipment by major car type (plain boxcars, covered hopper cars, gondolas and open top hoppers, coal cars, bulkhead flatcars, pulpwood rackcars, and flatbed equipment, including TOFC/COFC), except that in the case of a proposed contract between a class I carrier and a shipper originating an average of 1,000 cars or more per year during the prior 3-year period by major car type on a particular carrier, not more than 40 percent of carrier owned or leased equipment utilized on the average during the prior 3-year period may be used for such contract without prior authorization by the Commission.*

*"(2) The Commission may, on request of a rail carrier or other party or on its own initiative, grant such relief from the limitations of paragraph (1) of this subsection as the Commission considers appropriate, if it appears that additional equipment may be made available without impairing the rail carrier's ability to meet its common carrier obligations under section 11101 of this title.*

*"(l) Service under a contract approved under this section shall be deemed to be a separate and distinct class of service, and the equipment used in the fulfillment of such a contract shall not be subject to car service decisions under section 11123 of this title.*

*"(m) The Commission shall establish a railroad contract rate advisory service. The advisory service shall—*

*"(1) compile and disseminate to interested parties nonconfidential summaries of the provisions of individual contract information relating to the provisions of contracts entered into under this section with regard to various goods, items, and commodities covered by such contracts;*

Digitized from Best Copy Available

*"(2) provide the Commission and interested parties with advice regarding contracts; and*

*"(3) assess the impact on competition among shippers of variations between contract rates for various shipments and the published single car rates, and submit a report on such impact to the Congress not later than 90 days after the effective date of the Staggers Rail Act of 1980.".*

*(b) The section analysis for chapter 107 of title 49, United States Code, is amended by inserting immediately after the item relating to section 10712, as added by this Act, the following new item:*

*"10713. Contracts.".*

*DEMAND SENSITIVE RATES*

*SEC. 209. Section 10727 of title 49, United States Code, and the item relating to such section in the section analysis for chapter 107 of such title, are repealed.*

*PHASEOUT OF CAPITAL INCENTIVE RATES*

*SEC. 210. (a) Section 10729 of title 49, United States Code, and the item relating to such section in the section analysis of chapter 107 of such title, are repealed.*

*(b) Notwithstanding any other provision of law, any rate established by a rail carrier under section 10729 of title 49, United States Code, prior to the effective date of this Act shall remain in effect in accordance with its terms, but for no longer than 5 years after the date it became effective, unless the parties otherwise agree. However, the Interstate Commerce Commission may, during the period such a rate is in effect, order such rate revised to a level equal to the incremental cost of providing the transportation if the Commission finds that the level then in effect reduces the going concern value of the rail carrier.*

*PERMISSIVE LIMITED LIABILITY RATES*

*SEC. 211. (a) Section 10730(a) of title 49, United States Code, is amended by inserting "and excluding any rail carrier" immediately after "motor common carrier of property".*

*(b) Section 10730 of title 49, United States Code, is amended by adding at the end thereof the following new subsection:*

*"(c) A rail carrier providing transportation or service subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may establish rates for transportation of property under which the liability of the carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier, and may provide in such written declaration or agreement for specified amounts to be deducted from any claim against the carrier for loss or damage to the property or for delay in the transportation of such property.".*

*(c) Section 11707(d) of title 49, United States Code, is amended—*

*(1) by inserting "(1)" immediately after "(d)";*

*(2) by inserting "(other than a rail carrier)" immediately after "delivering carrier"; and*

*(3) by adding at the end thereof the following new paragraph:*

*"(2)(A) A civil action under this section may only be brought—*

*"(i) against the originating rail carrier, in the judicial district in which the point of origin is located;*

*"(ii) against the delivering rail carrier, in the judicial district in which the principal place of business of the person bringing the action is located if the delivering carrier operates a railroad or a route through such judicial district, or in the judicial district in which the point of destination is located; and*

*"(iii) against the carrier alleged to have caused the loss or damage, in the judicial district in which such loss or damage is alleged to have occurred.*

*"(B) A civil action under this section may be brought in a United States district court or in a State court.*

*"(C) In this section, 'judicial district' means (i) in the case of a United States district court, a judicial district of the United States, and (ii) in the case of a State court, the applicable geographic area over which such court exercises jurisdiction.".*

*(d) Within one year after the effective date of this Act, the Attorney General and the Interstate Commerce Commission shall independently investigate whether rail carriers should continue to be subject to section 11707 of title 49, United States Code, and submit a report to the Congress setting forth recommendations to Congress for appropriate legislative action. Each such investigation shall address the following issues:*

*(1) Whether, in the case of traffic with respect to which rail carriers do not have market dominance, such carriers should be subject to any higher level of liability for loss and damage than they are willing to agree to with the shippers of such traffic.*

*(2) Whether, in the case of traffic with respect to which rail carriers have market dominance, such carriers should be subject to any greater liability than would be imposed under a statutory comparative negligence standard.*

*(3) Whether liability for damage to rail traffic should be determined under a no-fault liability system and what shippers should bear the cost of such a system.*

*(4) Whether venue in cases arising from rail carrier liability for damages to traffic should be further limited.*

*(5) Whether rail carrier property damage cases should be subject to laws other than Federal law.*

*(6) Whether the right to claims should be limited to either the shipper or receiver of property.*

*(7) Whether maximum time limits should be imposed on the filing of claims with rail carriers and the courts.*

*(8) Whether the prevailing party in a claims proceeding should be awarded attorneys fees in order to limit needless litigation.*

*(9) Whether excessive attorneys fees are awarded in cases under section 11707 of title 49, United States Code.*

*(10) Whether claimants should be able to recover damages in excess of the market value of the commodity transported unless liability for special or consequential damages is agreed to by the carrier in unity.*

*RATE DISCRIMINATION*

*SEC. 212. Section 10741 of title 49, United States Code, is amended by striking out subsection (e) and inserting in lieu thereof the following new subsections:*

*"(e) Differences between rates, classifications, rules, and practices of rail carriers providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title do not constitute a violation of this section if such differences result from different services provided by rail carriers.*

*"(f) This section shall not apply to—*

*"(1) contracts approved under section 10713 of this title, other than as provided in subsection (d)(2)(A)(ii) and (d)(2)(B) of such section;*

*"(2) surcharges or cancellations under section 10705a of this title;*

*"(3) separate rates for distinct rail services under section 10728 of this title;*

*"(4) rail rates applicable to different routes; or*

*"(5) expenses authorized under section 10751 of this title,*

*except that with respect to rates described in paragraphs (2), (3), and (4), nothing in this subsection shall affect the authority of the Commission under this section with respect to rate relationships between ports or within the same port.".*

*EXEMPTION*

*SEC. 213. Section 10505 of title 49, United States Code, is amended to read as follows:*

***"§ 10505. Authority to exempt rail carrier transportation***

*"(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—*

*"(1) is not necessary to carry out the transportation policy of section 10101a of this title; and*

*"(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.*

*"(b) The Commission may, where appropriate, begin a proceeding under this section on its own initiative or on application by the Secretary of Transportation or an interested party.*

*"(c) The Commission may specify the period of time during which an exemption granted under this section is effective.*

*"(d) The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class, or transportation is necessary to carry out the transportation policy of section 10101a of this title.*

*"(e) No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11707 of this title. Nothing in this subsection or section 11707 of this title shall prevent rail carriers from offering*

Digitized from Best Copy Available

*alternative terms nor give the Commission the authority to require any specific level of rates or services based upon the provisions of section 11707 of this title.*

*"(f) The Commission may exercise its authority under this section to exempt transportation that is provided by a rail carrier as a part of a continuous intermodal movement.*

*"(g) The Commission may not exercise its authority under this section (1) to authorize intermodal ownership that is otherwise prohibited by this title, or (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle.".*

*INTRASTATE RATES*

*SEC. 214. (a) Section 11501(a) of title 49, United States Code, is amended—*

*(1) by striking out paragraph (2);*

*(2) by striking out "(a)(1)" and inserting in lieu thereof "(a)";*

*(3) by striking out "subchapter I or IV" and inserting in lieu thereof "subchapter IV"; and*

*(4) by redesignating subparagraphs (A) and (B) as paragraphs (1) and (2), respectively.*

*(b) Section 11501 of title 49, United States Code, is amended by redesignating subsections (b) and (c) as subsections (d) and (e), respectively, and by inserting immediately after subsection (a) the following new subsections:*

*"(b)(1) A State authority may only exercise jurisdiction over intrastate transportation provided by a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle.*

*"(2) Within 120 days after the effective date of the Staggers Rail Act of 1980, each State authority exercising jurisdiction over intrastate rates, classifications, rules, and practices for intrastate transportation described in paragraph (1) of this subsection shall submit to the Commission the standards and procedures (including timing requirements) used by such State authority in exercising such jurisdiction.*

*"(3)(A) Within 90 days after receipt of the intrastate regulatory rate standards and procedures of a State authority under paragraph (2) of this subsection, the Commission shall certify such State authority for purposes of this subsection if the Commission determines that such standards and procedures are in accordance with the standards and procedures applicable to regulation of rail carriers by the Commission under this title. If the Commission determines that such standards and procedures are not in such accordance, it shall deny certification to such State authority, and such State authority may resubmit new standards and procedures to the Commission for review in accordance with this subsection.*

*"(B) The standards and procedures existing in each State on the effective date of the Staggers Rail Act of 1980 for the exercise of jurisdiction over intrastate rail rates, classifications, rules, and practices shall be deemed to be certified by the Commission from that date until the date an initial determination is made by the Commission under subparagraph (A) of this paragraph.*

Digitized from Best Copy Available

*"(4)(A) Any State authority which is certified by the Commission under this subsection may use its standards and procedures in exercising jurisdiction over intrastate rail rates, classifications, rules, and practices during the 5-year period commencing on the date of such certification. Any State authority which is denied certification or which does not seek certification may not exercise any jurisdiction over intrastate rates, classifications, rules, and practices until it receives certification under this subsection.*

*"(B) Any intrastate transportation provided by a rail carrier in a State which may not exercise jurisdiction over an intrastate rate, classification, rule, or practice of that carrier due to a denial of certification under this subsection shall be deemed to be transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.*

*"(5)(A) Certification of a State authority under this subsection is valid for the 5-year period beginning on the date of such certification. Prior to the expiration of such 5-year period, the State authority shall resubmit its intrastate regulatory standards procedures to the Commission for subsequent certification in accordance with this subsection.*

*"(B) During any 5-year certification period, a State may not change its certified standards and procedures without notifying and receiving express approval from the Commission.*

*"(6) Notwithstanding any other provision of this subtitle, a State authority may not exercise any jurisdiction over general rate increases under section 10706 of this title, inflation-based rate increases under section 10712 of this title, or fuel adjustment surcharges approved by the Commission.*

*"(c) Any rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may petition the Commission to review the decision of any State authority, in any administrative proceeding in which the lawfulness of an intrastate rate, classification, rule, or practice is determined, on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of this subtitle. The Commission shall take final action on any such petition within 30 days after the date it is received. If the Commission determines that the standards and procedures were not in accordance with the provisions of this subtitle, its order shall determine and authorize the carrier to establish the appropriate rate, classification, rule, or practice.".*

*(c)(1) Section 11501(d)(2) of title 49, United States Code, as redesignated by subsection (b) of this section, is amended by inserting "and chapter 107 of this title" immediately before the period at the end of the first sentence.*

*(2) Section 10103(a) of title 49, United States Code, is amended by striking out "The" and inserting in lieu thereof "Except as otherwise provided in this subtitle, the".*

*(3) Section 10501(a)(2) of title 49, United States Code, is amended by inserting "such juridiction is not limited by subsection (b) of this section or the extent" immediately after "to the extent".*

*(4) Section 10501(c) of title 49, United States Code, is amended by inserting "(1) the transportation is deemed to be subject to the jurisdiction of the Commission pursuant to section 11501(b)(4)(B) of this title, or (2)" immediately after "unless".*

*(5) Section 10501 of title 49, United States Code, is amended by adding at the end thereof the following new subsection:*

*"(d) The jurisdiction of the Commission and of State authorities (to the extent such authorities are authorized to administer the standards and procedures of this title pursuant to this section and section 11501(b) of this title) over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules, and practices of such carriers, is exclusive.".*

*BUSINESS ENTERTAINMENT EXPENSES*

*SEC. 215. Section 10751 of title 49, United States Code, is amended by striking out "(other than transportation by rail)" in subsections (a) and (b).*

*(b) The provisions of section 10751 of title 49, United States Code, as amended by subsection (a) of this section, shall apply to any expense of the type described in subsection (a) of such section 10751 that was incurred prior to the effective date of this Act (other than an expense with respect to which a penalty was paid pursuant to section 10761 of such title 49) or that is incurred on or after such effective date.*

*EFFICIENT MARKETING*

*SEC. 216. (a) Section 10762(c)(3) of title 49, United States Code, is amended by striking out the second sentence and inserting in lieu thereof the following: "In the case of a carrier other than a rail carrier, a proposed rate change or a new or reduced rate may not become effective for 30 days after the notice is published, filed, and held open as required under subsections (a) and (b) of this section. In the case of a rail carrier, a proposed rate change resulting in an increased rate or a new rate shall not become effective for 20 days after the notice is published and a proposed rate change resulting in a reduced rate shall not become effective for 10 days after the notice is published, except that a contract authorized under section 10713 of this title shall become effective in accordance with the provisions of such section.".*

*(b) Section 10762(d)(1) of title 49, United States Code, is amended by striking out "30-day" and inserting in lieu thereof "notice".*

*COMPENSATORY JOINT RATE RELIEF*

*SEC. 217. (a)(1) Chapter 107 of title 49, United States Code, is amended by inserting after section 10705 the following new section:*

***"§ 10705a. Joint rate surcharges and cancellations***

*"(a)(1)(A) Except as provided in subparagraph (B) of this paragraph, a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may publish and apply a surcharge increasing or decreasing the through charge applicable to any movement between points designated by the surcharging carrier subject to a joint rate. Such a surcharge may be applied without the concurrence of the other carriers that are party in such joint rate.*

*"(B) A carrier earning adequate revenues, as determined under section 10704(a)(2) of this title, may not apply such a surcharge to*

*any movement on a line operated by such carrier which carried more than 3,000,000 gross ton miles of traffic per mile in the preceding calendar year.*

*"(C) Any surcharge applied pursuant to this subsection must be applied in equal dollar amounts to the movement subject to the surcharge over all routes between the points designated by the surcharging carrier which such carrier participates in under the joint rate involved, and when the surcharge increases the through charges, under any of such carrier's single line rates between the same points.*

*"(2)(A) Whenever a rail carrier applies a surcharge increasing a through charge pursuant to paragraph (1) of this subsection, any other rail carrier that participates in any movement subject to such surcharge may cancel the application of such surcharge to any route participated in by such other carrier, if such carrier makes the demonstration described in subparagraph (B) of this paragraph.*

*"(B) A rail carrier may cancel the application of a surcharge under this paragraph if such carrier demonstrates to the Commission that the surcharging carrier's share of the revenues, at the time the surcharge was filed with the Commission, from its participation in the movement over the route involved would have been equal to or greater than 110 percent of its variable costs of providing service over such route, under either—*

*"(i) the applicable joint rate in effect at the time the surcharge was filed with the Commission, without the surcharge;*

*"(ii) a new rate division increasing the share of the surcharging carrier;*

*"(iii) a new higher lawful rate published by the canceling carrier; or*

*"(iv) a new, lesser surcharge which shall be prescribed by the Commission upon and in conformity with the request of the carrier proposing to cancel the surcharge. Any such prescribed surcharge shall, in conjunction with the surcharging carrier's division of the joint rate in effect on the date the original surcharge was filed with the Commission, provide the carrier proposing the original surcharge revenues equal to or greater than 110 percent of such surcharging carrier's variable cost of providing service over such route.*

*"(C)(i) The canceling tariff shall only become effective if the rail carrier proposing to cancel the application of the surcharge makes the demonstration described in subparagraph (B) of this paragraph.*

*"(ii) If the demonstration described in clause (i) of this subparagraph is made on the basis of the applicable joint rate in effect at the time the surcharge was filed with the Commission, without the surcharge, the tariff shall become effective on one day's notice after such determination is made.*

*"(iii) If the demonstration described in clause (i) of this subparagraph is made on the basis of a new rate, division, or surcharge prescribed pursuant to subparagraph (B)(iv) of this paragraph, the tariff shall become effective on the date such new rate, division, or surcharge becomes effective.*

*"(D) The remedy available to a rail carrier canceling the application of a surcharge under this paragraph shall be in addition to any other remedy available to such carrier under this chapter.*

*"(3)(A) The Commission may cancel the application of a surcharge to a route to which such surcharge applies if a shipper moving traffic over such route demonstrates to the Commission that—*

*"(i) there is no competitive alternative to such route for the movement of the traffic involved that is not subject to such surcharge; and*

*"(ii) the surcharging carrier's share of the revenues from its participation in the movement over the route to which such surcharge applies, under the applicable joint rate in effect at the time the surcharge was filed with the Commission, with the surcharge, would be greater than 110 percent of its variable cost of providing service over such route.*

*"(B) If the Commission cancels the application of a surcharge to a particular route pursuant to subparagraph (A) of this paragraph, the Commission shall determine the level of surcharge which, in conjunction with the surcharging carrier's division of the joint rate in effect at the time the surcharge was filed with the Commission, would equal 110 percent of the surcharging carrier's variable cost of providing service over such route, and shall authorize such carrier immediately to apply such a surcharge without any further proceedings under this subsection.*

*"(4) A rail carrier may not apply a surcharge under this subsection unless, for the one-year period preceding the surcharge, such carrier has concurred in all rate increases of general applicability applicable to the joint rate to which such surcharge applies and agreed to by all other carriers that are party to such joint rate.*

*"(5) A rail carrier may not apply a surcharge under this subsection increasing a through charge applicable to a particular movement more than once each calendar year.*

*"(6) Notwithstanding any other provision of this subsection, a rail carrier may, by tariff, reduce the total charges applicable to a movement over any specific joint line or single line route or routes in which such carrier participates, if such reduction does not lower the total charges applicable to such movement to a level that is less than the lowest total charges applicable to the same movement over a competing route. Any such reduction may be made without the concurrence of any other rail carrier, and shall be borne solely by the carrier reducing the charge. Nothing in this paragraph shall be construed to limit the right of a carrier to reduce rates over routes not in direct competition between the same points with routes to which it has applied a surcharge.*

*"(b)(1) Notwithstanding subsection (a) of this section—*

*"(A) a rail carrier not earning adequate revenues, as determined under section 10704(a)(2) of this title, may publish and apply a surcharge applicable to traffic originating or terminating upon any of its lines that carried less than 3,000,000 gross ton miles of traffic per mile in the most recent calendar year for which traffic data is available; and*

*"(B) a rail carrier earning adequate revenues, as so determined, may publish and apply a surcharge applicable to traffic originating or terminating upon any of its lines that carried less than 1,000,000 gross ton miles of traffic per mile in such most recent calendar year.*

*Such a surcharge may be applied without the concurrence of any rail carrier. Any such surcharge may be allocated, subject to the pro-*

*visions of paragraph (4) of this subsection, in different amounts among different movements between different origins and destinations, and shall accrue solely to the surcharging carrier.*

*"(2) A rail carrier may apply a surcharge under this subsection if, prior to the application of such surcharge, that portion of the charges applicable to traffic to and from the line to which the surcharge applies and accruing to the surcharging carrier does not provide such carrier revenues adequate to cover—*

*"(A) 110 percent of such carrier's variable cost of transporting the traffic involved to or from such line; plus*

*"(B) 100 percent of such carrier's reasonably expected costs of continuing to operate such line, which shall include all costs necessary to sustain service on the line.*

*The Commission shall, within 120 days after the effective date of the Staggers Rail Act of 1980, complete a proceeding to define the term 'reasonably expected costs' as used in subparagraph (B) of this paragraph. In the interim, the term shall be construed in accordance with Rail Services Planning Office subsidy standards.*

*"(3)(A) Upon petition of a shipper located upon a line to which a surcharge under this subsection is applied, the Commission may cancel the application of a surcharge under this subsection if such shipper demonstrates to the Commission that, after application of the surcharge, the surcharging carrier's revenues from all traffic originating or terminating upon the line to which the surcharge applies exceed 110 percent of such carrier's variable cost of transporting all traffic to or from such line plus such carrier's reasonably expected costs of continuing to operate such line.*

*"(B)(i) A rail carrier's revenue from all traffic originating or terminating upon a line shall be presumed to exceed 110 percent of its variable cost of transporting all traffic to or from such line plus its reasonably expected costs of continuing to operate such line if the complaining shipper demonstrates that the carrier is earning revenues from all traffic originating or terminating upon such line that result in a revenue-variable cost percentage that is equal to or greater than the revenue-variable cost percentage applicable in that year under section 10709(d) of this title.*

*"(ii) A surcharging carrier may rebut the presumption set forth in clause (i) of this subparagraph by demonstrating to the Commission that its reasonably expected costs for operating the line to which the surcharge applies exceed the percentage of variable cost set forth in such clause (i).*

*"(C) Upon a finding by the Commission that application of the surcharge will produce revenues in excess of 110 percent of the surcharging carrier's variable cost of transporting traffic to or from the line plus its reasonably expected costs for operating the line, the Commission shall determine the level of surcharge which would produce revenues equal to such figure and shall authorize such carrier immediately to apply such surcharges as will generate such revenues without any further proceedings, subject only to the right of a shipper to proceed under paragraph (4) of this subsection.*

*"(4)(A) A rail carrier may not apply a surcharge under this subsection that results in any shipper being required to bear more than a reasonable proportion of the reasonably expected costs of continuing to operate the line to which such surcharge applies.*

*"(B) Upon complaint of a shipper, the Commission shall determine whether the shipper is being required to bear more than a reasonable proportion of the costs described in subparagraph (A) of this paragraph.*

*"(C) If the Commission finds that a complaining shipper is being required to bear more than a reasonable proportion of the costs described in subparagraph (A) of this paragraph, the Commission may reallocate the surcharge among the traffic originating or terminating on the line to which the surcharge applies, but may not order relief which would result in the surcharging carrier earning revenues less than those which the carrier would have earned had the surcharge been applied as filed.*

*"(5) A shipper may, in a single complaint, seek relief under paragraphs (3) and (4) of this subsection. In any such complaint, the Commission shall first determine the right to relief under paragraph (3) and shall grant such relief as is appropriate under such paragraph.*

*"(6) In any proceeding brought before the Commission challenging the application or amount of a surcharge under this subsection, whether the surcharge is claimed to violate this subsection or some other provision of this chapter, the Commission shall not suspend the application of any such surcharge unless the person filing the verified statement required by section 10707(c) of this title, in addition to the matters required by such section, also makes the demonstration required by paragraph (3)(A) of this subsection. If the demonstration required by such paragraph (3)(A) is made, the Commission may suspend the application of only so much of the surcharge as will produce revenues in excess of the amount so demonstrated.*

*"(c)(1) Notwithstanding any other provision of this title, any prior agreement in effect on the effective date of the Staggers Rail Act of 1980, or any requirement of the Commission, a rail carrier may cancel the application of a joint rate to a through route in which it participates, without the concurrence of any other rail carrier that is a party to such joint rate, unless another rail carrier that participates in such through route or a shipper that has no competitive alternative to such route makes the demonstration described in paragraph (2) of this subsection.*

*"(2) The application of a joint rate to a through route may not be canceled under this subsection if a rail carrier that participates in such through route or a shipper that has no competitive alternative to such route from an origin or destination served by such route demonstrates to the Commission that the canceling carrier's share of the revenues, under the joint rate in effect at the time the application of the joint rate is canceled, is equal to or greater than—*

*"(A) 110 percent of the canceling carrier's variable cost of providing service over such route; or*

*"(B) such lesser percent of the canceling carrier's variable cost as such carrier earns over a competing through route to which application of the joint rate has not been canceled, or over a competing single line route.*

*"(3) When a complaining party is unable to make the demonstration required by paragraph (2) of this subsection, the Commission may suspend the tariff canceling the joint rate only if—*

*"(A) a complaining carrier publishes a new rate division or a new higher lawful rate which increases the canceling carrier's*

*share of the revenues over such route to the amount calculated under paragraph (2)(A) or (2)(B) of this subsection, whichever is less; or*

*"(B) a complaining carrier or shipper petitions the Commission and the Commission imposes a surcharge, in conformity with such petition, upon the joint rate which will accrue solely to the canceling carrier and which, in conjunction with the canceling carrier's division of the joint rate in effect on the date the tariff canceling the joint rate was filed, will provide the canceling carrier revenues equal to or greater than 110 percent of its variable cost of providing service over such route.*

*Unless a new rate, division, or surcharge described in this paragraph becomes effective within 120 days after the proposed effective date of the rate cancellation, the canceling tariff shall, nevertheless, become effective.*

*"(4) If the demonstration described in paragraph (2) is made or a new rate, division, or surcharge described in paragraph (3) becomes effective, the tariff canceling the joint rate shall be considered by the Commission in accordance with section 10705 of this title. The existing joint rate or the new rate, division, or surcharge shall remain in effect during the pendency of the Commission's consideration.*

*"(5) Whenever the application of a joint rate to a through route is canceled under this subsection and a rate other than a joint rate is or has been published by the canceling carrier to apply to such route, such rate shall thereafter apply in lieu of all other rates (except joint rates subsequently agreed to by such carrier) and any through rate of which such rate is a facto· shall divide as the separate factors of such rate are made.*

*"(6) Nothing in this subsection shall be construed to limit the authority of the Commission under section 10705(a) of this title to prescribe joint rates which provide a rail carrier participating in such joint rate revenues equal to or greater than 110 percent of its variable cost of providing service over each route to which such rate applies.*

*"(d)(1) Except as provided in paragraph (2) of this subsection, any increase or decrease in revenue resulting from the application of a surcharge under subsection (a) of this section, or from the cancellation of the application of a joint rate under subsection (c) of this section, shall accrue solely to or be borne solely by the carrier applying the surcharge or canceling the application of the joint rate, as the case may be.*

*"(2) Whenever a class III rail carrier which participates in a through route to which a surcharge has been applied under subsection (a) of this section by a carrier operating in the same rate territory as such class III carrier demonstrates to the Commission that the application of such surcharge to such route provides, in the absence of any increase in the joint rate in effect on the date the surcharge was filed with the Commission, revenues from traffic moving over such route to such surcharging carrier in excess of 110 percent of its variable costs over such route, such surcharging carrier shall, from the date of such demonstration, share those revenues from such route, from the surcharge and the applicable joint rate in effect on the date the surcharge was filed with the Commission, in excess of 110 percent of its variable costs with all class III rail carri-*

*ers in the same rate territory participating in such route, on the basis of their existing divisions of the joint rate to which the surcharge applies.*

*"(e)(1) Except as provided in paragraph (2) of this subsection, whenever a rail carrier proposes to apply a surcharge under subsection (a) of this section or to cancel the application of a joint rate under subsection (c) of this section and another rail carrier subsequently agrees to a new rate division or a new lawful rate that increases the surcharging or canceling carrier's share of the total through charges for a movement over a particular through route subject to a joint rate, such other rail carrier shall also agree to any other new rate division and new lawful rate—*

*"(A) that is proposed within 120 days after the date of the first agreement; and*

*"(B) that increases the surcharging or canceling carrier's share of the total through charges for movements over a competing through route subject to such joint rate.*

*"(2) A rail carrier shall not be required to agree under this subsection to any proposed new division or new rate which would—*

*"(A) reduce such carrier's share of the total through charges for a movement over any through route to less than (i) 110 percent of its variable costs of providing service over such route, or (ii) such lesser percent of its variable costs as such carrier earns from such movement over a competing through route with respect to which such carrier has agreed to a new division or rate;*

*"(B) increase the surcharging or canceling carrier's share of the total through charges for a movement over any through route to an amount in excess of 110 percent of its variable costs of providing service over such route;*

*"(C) reduce such carrier's share of the total through charges for a movement over any through route by a dollar amount in excess of the greatest dollar reduction which such carrier has agreed to make, for purposes of increasing the surcharging or canceling carrier's share, to its share of the total through charges for a movement over any competing through route; or*

*"(D) reduce such carrier's share of the total through charges for a movement over any through route in an amount in excess of such carrier's pro rata share (based on established divisions for movements over such route) of the increase of the surcharging or canceling carrier's share of the total through charges for movements over such route.*

*"(f) A rail carrier applying a surcharge or canceling the application of a joint rate under this section shall file a tariff with the Commission in accordance with section 10762 of this title. Such a tariff may not become effective until the expiration of the 45-day period (or such longer period as the filing carrier specifies) beginning on the date such tariff is filed.*

*"(g)(1) Any rail rate to which a surcharge is applied under this section shall be subject to section 10701a and 10709 of this title, and any such surcharge shall constitute a rate increase for purposes of such sections.*

*"(2) For purposes of rate regulation under section 10701a of this title—*

*"(A) only the rail carrier proposing a surcharge under this section shall be required to defend such surcharge; and*

*"(B) the reasonableness of the surcharge and the revenues received by the rail carrier proposing the surcharge under the joint rate to which the surcharge applies shall be determined without regard to amount received and services performed by other rail carriers that are party to such joint rate.*

*"(3) Except as provided in subsection (i), (j), or (k) of this section, if the application of a surcharge or the cancellation of the application of a joint rate under this section is found to constitute a violation of any provision of this title, such violation shall not be ordered remedied in any manner which—*

*"(A) requires the carrier applying a surcharge under subsection (a) of this section or canceling the application of a joint rate under subsection (c) of this section to provide service over any rate under a rate that provides revenues to such carrier that are less than 110 percent of its variable costs of providing such service; or*

*"(B) which requires the carrier applying a surcharge under subsection (b) of this section to provide service over the route to which such surcharge applies in a manner that provides revenues to such carrier that are less than 110 percent of such carrier's variable cost of transporting the traffic involved to or from the line to which the surcharge applies, plus such carrier's reasonably expected costs of providing service over such line.*

*"(h) Within 5 days after the request of a rail carrier participating in a joint rate subject to a surcharge or cancellation under this section, a shipper moving traffic over a route to which such surcharge or cancellation applies, or an affected port, the Commission shall make available to such carrier, shipper, or port the Commission's determination of the variable costs and revenues, over the route or routes to which the surcharge or cancellation applies, of the carrier applying the surcharge or canceling the application of the joint rate.*

*"(i)(1) Whenever a class III rail carrier, in a protest filed with the Commission, makes a prima facie showing that the application of a surcharge under subsection (a) of this section or the cancellation of the application of a joint rate under subsection (c) of this section will have an adverse effect on competition, the Commission shall investigate such protest. If, on the basis of such investigation, the Commission finds that the protested surcharge or cancellation is or is intended to be anticompetitive, the Commission shall, within 30 days after the date such protest is filed, enter an order rescinding such surcharge or cancellation, and may, on presentation of an adequate record, prescribe new joint rates or divisions of joint rates.*

*"(2) No order prescribed under this subsection shall require a carrier to provide service over any route under a rate which provides revenues less than 110 percent of the variable cost of providing such service unless the Commission determines that the public interest requires a lesser revenue to variable cost ratio to avoid anticompetitive action and to preserve service on the route involved.*

*"(j)(1) Any class III rail carrier which originates or terminates traffic subject to the application of a surcharge under subsection (a) of this section or the cancellation of the application of a joint rate under subsection (c) of this section may protest such surcharge or cancellation whenever—*

*"(A) such surcharge or cancellation affects the sole remaining route available to that carrier for that traffic; and*

*"(B)(i) such carrier demonstrates that alternative transportation is available or that a shipper dependent on that carrier will suffer significant market loss because of such surcharge or cancellation; or*

*"(ii) such surcharge or cancellation, alone or when considered in conjunction with other surcharges or cancellations affecting the carrier, is likely to unduly impair a carrier's ability to earn an adequate rate of return.*

*"(2)(A) The Commission may, after an investigation on the basis of a protest under this subsection, prescribe a lesser surcharge or a different division of the joint rate. The Commission shall grant the surcharging or canceling carrier revenues not less than 110 percent of its variable cost of the movement involved, unless it determines that the public interest requires a lesser revenue to variable cost ratio to preserve service on the route involved. Any action by the Commission based on a protest under this subsection shall be taken within 30 days after the date such protest is filed.*

*"(B) If the Commission prescribes a different division of a joint rate under this paragraph, the Commission shall, upon petition of the surcharging or canceling carrier or the protesting class III rail carrier, reopen the proceeding in which such division was prescribed to reconsider whether such prescribed division is reasonable. If, on the basis of such reconsideration, the Commission determines that such division is not reasonable, it shall prescribe a new, reasonable division of the joint rate to which the surcharge or cancellation applied.*

*"(k)(1) Upon the complaint of a class III rail carrier which originates or terminates traffic subject to the application of a surcharge under subsection (a) of this section or the cancellation of the application of a joint rate under subsection (c) of this section that such surcharge or cancellation will result in differences or greater differences in rates, including any surcharges, for the traffic to which the surcharge or cancellation applies over different routes in which the surcharging or canceling carrier participates—*

*"(A) from a single origin point to destination points within a 75 mile direct radius from the destination point on such class III rail carrier; or*

*"(B) to a single destination point from origin points within a 75 mile direct radius from the origin point on such class III rail carrier,*

*the Commission shall investigate such complaint and shall, within 30 days after the date such complaint is filed, take such actions, including rescinding surcharges or cancellations or prescribing new joint rates or surcharges, as it determines are required to eliminate such differences in rates, unless it finds that such actions are not warranted by the public interest in ensuring effective competition among rail carriers or in the preservation of rail service on the route involved.*

*"(2) No action taken by the Commission under this subsection shall require a carrier to provide service over any route under a rate which provides a revenue to variable cost ratio over such route less than that provided under the joint rate to which the surcharge or cancellation was applied or less than 110 percent, whichever is greater, unless the Commission determines that the public interest in ensuring effective competition among rail carriers or in preserv-*



Digitized from Best Copy Available

*ing service over such route warrants requiring the surcharging or canceling carrier to provide service at a lesser revenue to variable cost ratio.*

*"(3) Notwithstanding subsection (m)(1) of this section, if, in a proceeding under this subsection or under subsection (i) or (j) of this section, the Commission considers whether to require the revenues of a carrier applying a surcharge under subsection (a) of this section or canceling the application of a joint rate under subsection (c) of this section to be less than 110 percent of its variable costs (as calculated using the Commission's Rail Form A cost finding methodology), such surcharging or canceling carrier may prove its actual variable costs on the basis of evidence other than unadjusted costs calculated using such Rail Form A cost finding methodology. Such evidence shall be prepared in accordance with generally accepted accounting principles.*

*"(l) Whenever the application of a joint rate to a through route is canceled under subsection (c) of this section, the Commission shall, upon petition by a class II or III rail carrier participating in such route, prescribe a new compensatory through rate or rates over such route within 30 days after the date such petition is filed.*

*"(m) For purposes of this section—*

*"(1) variable costs for a class I rail carrier shall be determined only by using such carrier's unadjusted costs, calculated using the Commission's Rail Form A cost finding methodology (or an alternative methodology adopted by the Commission in lieu thereof) and indexed quarterly to account for current wage and price levels in the region in which the carrier operates;*

*"(2) variable costs for a rail carrier other than class I shall be presumed to be the average variable costs of all class I rail carriers in the region in which such carrier operates (as determined under paragraph (1) of this subsection) unless a rail carrier rebuts such presumption with other proof of variable costs; and*

*"(3) at the option of a carrier applying a surcharge or canceling the application of a joint rate under this section, revenue share may be determined by reference to past revenue settlements actually made in the most recent calendar year by connecting lines.*

*"(n) Surcharges applied under subsection (a) or (c) of this section and cancellations under subsection (c) of this section shall not be subject to the provisions of section 10726 (a)(1)(B) of this title.*

*"(o) The Special Counsel of the Commission may, consistent with the rail transportation policy in section 10101a of this title, provide assistance to class III rail carriers and small businesses in preparing actions under this section.*

*"(p)(1) The authority to apply a surcharge under subsection (a) of this section, and (except as provided in paragraph (2)) the authority to cancel such a surcharge, shall expire 3 years after the effective date of the Staggers Rail Act of 1980 unless extended for one additional year by the Commission upon petition of any rail carrier and for good cause shown.*

*"(2) Any surcharge lawfully applied under subsection (a) of this section shall remain in effect in accordance with its terms following the expiration of the provisions of this section. Any such surcharge applied during the 45-day period immediately preceding the date of the expiration of the provisions of this section shall, notwithstand-*

*ing such expiration, be subject to cancellation under subsection (a)(2) or (a)(3) of this section during the 45-day period beginning on the date such surcharge is applied.".*

*(2) The section analysis of chapter 107 of title 49, United States Code, is amended by inserting immediately after the item relating to section 10705 the following new item:*

*"10705a. Joint rate surcharges and cancellations.".*

*(b) For purposes of section 10705a of title 49, United States Code, the Interstate Commerce Commission shall classify all rail carriers on the basis of revenues, shall from time to time review its regulations setting forth revenue-based classifications for rail carriers, and shall make appropriate changes in such regulations in order to reflect inflation. The Commission shall not reclassify switching and terminal carriers, or any other rail carriers not classified on the basis of revenues on the effective date of this Act, for any purpose other than for purposes of such section 10705a.*

*(c)(1) The Interstate Commerce Commission shall include in its annual report to the Congress under section 10311 of title 49, United States Code, a report with respect to the application of surcharges and the cancellation of the application of joint rates by the Consolidated Rail Corporation and other rail carriers, during the preceding year, under section 10705a of title 49, United States Code. Each such report shall include—*

*(A) an analysis of the effect of application of surcharges and the cancellation of the application of joint rates under such section 10705a on shippers, ports, class II and class III rail carriers, railroad employees, and other elements of the rail system;*

*(B)(i) the number of surcharges applied by the Consolidated Rail Corporation and all other rail carriers under such section 10705a and the amount of revenue received by the Corporation and all other rail carriers from the application of such surcharges, (ii) the number of surcharges applied by the Corporation and all other rail carriers that were canceled under the procedures of such section 10705a, and (iii) the number of cancellations of the application of a joint rate by the Corporation and all other rail carriers under such section 10705a; and*

*(C) an analysis of the operation of the remedies made available to class III rail carriers under subsections (i), (j), and (k) of such section 10705a and to class II and class III rail carriers under subsection (l) of such section 10705a.*

*(2) The Interstate Commerce Commission shall, within 2 years after the effective date of this Act, submit a report to the Congress with respect to whether the provisions of section 10705a of title 49, United States Code, have adequately addressed the joint rate problems of rail carriers. The report shall include such recommendations with respect to such joint rate problems as the Commission considers necessary and appropriate.*

*EXPEDITED DIVISION OF REVENUES PROCEEDINGS*

*SEC. 218. (a) Section 10705(f)(1) of title 49, United States Code, is amended to read as follows:*

*"(f)(1)(A) The Commission may begin a proceeding under subsection (a) or (b) of this section on its own initiative or on complaint.*

*The Commission must complete all evidentiary proceedings to adjust the division of joint rates for transportation by a rail carrier within 9 months after the complaint is filed if the proceeding is brought on complaint or within 18 months after the commencement of a proceeding on the initiative of the Commission. The Commission must take final action by the 180th day after completion of the evidentiary proceedings, except that—*

*"(i) when the proceeding involves a railroad in reorganization or a contention that the divisions at issue do not cover the variable costs of handling the traffic, the Commission shall give the proceedings preference over all other proceedings and shall take final action at the earliest practicable time, which in no event may exceed 100 days after the completion of the evidentiary proceedings; and*

*"(ii) in all cases other than those specified in clause (i) of this subparagraph, the Commission may decide to extend such a proceeding to permit its fair and expeditious completion, but whenever the Commission decides to extend a proceeding pursuant to this clause, it must report its reasons to Congress.*

*"(B) The provisions of this paragraph imposing time limitations upon Commission action shall not apply to any division proceeding involving a joint rate participated in by a class III rail carrier.".*

*(b) Section 10705(f)(1) of title 49, United States Code, as amended by subsection (a) of this section, is further amended—*

*(1) by striking out subparagraph (B);*

*(2) by striking out "(A)" immediately before "The Commission";*

*(3) by striking out "(i)" and inserting in lieu thereof "(A)";*

*(4) by striking out "(ii)" and inserting in lieu thereof "(B)"; and*

*(5) by striking out "clause (i) of this subparagraph" and inserting in lieu thereof "subparagraph (A) of this paragraph".*

*RATE BUREAUS*

*SEC. 219. (a) Section 10706(a)(1) of title 49, United States Code, is amended by adding at the end thereof the following new subparagraph:*

*"(C) 'practicably participates in that movement' shall have such meaning as the Commission shall by regulation prescribe.".*

*(b) Section 10706(a)(2)(A) of title 49, United States Code, is amended—*

*(1) by inserting "publication," immediately after "initiation," in the first sentence; and*

*(2) by striking out "section 10101" in the second sentence and inserting in lieu thereof "section 10101a".*

*(c)(1) Section 10706(a)(3)(A) of title 49, United States Code, is amended to read as follows:*

*"(3)(A) An organization established or continued under an agreement approved under this subsection shall make a final disposition of a rule or rate docketed with it by the 120th day after the proposal is docketed. Such an organization may not—*

*"(i) permit a rail carrier to discuss, to participate in agreements related to, or to vote on single line rates proposed by an-*

*other rail carrier, except that for purposes of general rate increases and broad tariff changes only, if the Commission finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part;*

*"(ii) permit a rail carrier to discuss, to participate in agreements related to, or to vote on rates related to a particular interline movement unless that rail carrier practicably participates in that movement; or*

*"(iii) if there are interline movements over two or more routes between the same end points, permit a carrier to discuss, to participate in agreements related to, or to vote on rates except with a carrier which forms part of a particular single route. This clause shall take effect on January 1, 1984, or on such earlier date as the Commission determines. If the Commission finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part.".*

*(2) Section 10706(a)(3)(B) of title 49, United States Code, is amended to read as follows:*

*"(B) Until January 1, 1984, subparagraph (A)(ii) and (A)(iii) of this paragraph do not apply to—*

*"(i) general rate increases to cover inflationary cost increases, or general rate decreases, for joint rates if the agreement gives shippers, under specified procedures, at least 15 days notice of the proposal and an opportunity to present comments on it before a tariff containing the increases or decreases is filed with the Commission; or*

*"(ii) broad tariff changes that are of at least substantially general application throughout the area where the changes will apply, except single line rates where subparagraph (A)(i) of this paragraph prohibits the participation of carriers with single line rates.*

*If the Commission finds at any time that the implementation of this subparagraph is not feasible, it may delay or suspend such implementation in whole or in part.".*

*(3) Section 10706(a)(3)(C) of title 49, United States Code, is amended—*

*(A) by inserting "(i)" immediately after "(C)"; and*

*(B) by adding at the end thereof the following new clause:*

*"(ii) In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section or of any similar State law, proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic. In any proceeding in which such a violation is alleged, evidence of a discussion or agreement between or among such carrier and one or more other carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible if the discussion or agreement—*

*"(I) was in substantial accordance with an agreement approved under paragraph (2) of this subsection; or*

*"(II) concerned an interline movement of the carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause.*

*In any proceeding before a jury, the court shall determine whether the requirements of clause (I) or (II) are satisfied before allowing the introduction of any such evidence.".*

*(4) Section 10706(a)(3) of title 49, United States Code, is amended by adding at the end thereof the following new subparagraph:*

*"(D) An organization described in subparagraph (A) of this paragraph shall provide that transcripts or sound recordings be made of all meetings, that records of votes be made, and that such transcripts or recordings and voting records be submitted to the Commission and made available to other Federal agencies in connection with their statutory responsibilities over rate bureaus, except that such material shall be kept confidential and shall not be subject to disclosure under section 552 of title 5, United States Code.".*

*(d) Section 10706(a) of title 49, United States Code, is amended by adding at the end thereof the following new paragraph:*

*"(4) Notwithstanding any other provision of this subsection, one or more rail carriers may enter into an agreement, without obtaining prior Commission approval, that provides solely for compilation, publication, and other distribution of rates in effect or to become effective. The Sherman Act (15 U.S.C. 1 et seq.), the Clayton Act (15 U.S.C. 12 et seq.), the Federal Trade Commission Act (15 U.S.C. 41 et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C 8 and 9), and the Act of June 19, 1936, as amended (15 U.S.C. 13, 13a, 13b, 21a) shall not apply to parties and other persons with respect to making or carrying out such agreement. However, the Commission may, upon application or on its own initiative, investigate whether the parties to such an agreement have exceeded its scope, and upon a finding that they have, the Commission may issue such orders as are necessary, including an order dissolving the agreement, to ensure that actions taken pursuant to the agreement are limited as provided in this paragraph.".*

*(e) Section 10706(i)(1)(B) of title 49, United States Code, is amended by striking out "section 10101" and inserting in lieu thereof "section 10101a".*

*(f) The Interstate Commerce Commission may not take any action with respect to the elimination of general rate increases or decreases prior to April 1, 1982.*

*(g) The Interstate Commerce Commission shall require rail carrier members of a rate bureau to provide the employees of such rate bureau who are affected by the amendments made by this section with fair arrangements no less protective of the interests of such employees than those established pursuant to section 11347 of title 49, United States Code. For purposes of this subsection, the term "employees" does not include any individual serving as president, vice-president, secretary, treasurer, comptroller, counsel, member of the board of directors, or any other person performing such functions.*

### *LONG AND SHORT HAUL TRANSPORTATION*

*SEC. 220. Section 10726(c) of title 49, United States Code, is repealed.*

*RAILROAD ENTRY*

*SEC. 221. (a) Section 10901(a) of title 49, United States Code, is amended by striking "will be enhanced by" and inserting in lieu thereof "permit".*

*(b) Section 10901 of title 49, United States Code, is further amended by adding at the end thereof the following new subsections:*

*"(d)(1) Where a rail carrier has been issued a certificate of public convenience and necessity by the Commission authorizing the construction or extension of a railroad line, no other rail carrier may block such construction or extension by refusing to permit the carrier to cross its property if (A) the construction does not unreasonably interfere with the operation of the crossed line, (B) the operation does not materially interfere with the operation of the crossed line, and (C) the owner of the crossing line compensates the owner of the crossed line.*

*"(2) If the carriers are unable to agree on the terms of operation or the amount of payment for purposes of paragraph (1) of this subsection, either party may submit the matters in dispute to the Commission for determination.*

*"(e) The Commission may require any rail carrier proposing both to construct and operate a new railroad line pursuant to this section to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected thereby no less protective of and beneficial to the interests of such employees than those established pursuant to section 11347 of this title.".*

*SERVICE DURING PERIODS OF PEAK DEMAND*

*SEC. 222. Section 11101(a) of title 49, United States Code, is amended by adding at the end thereof the following new sentence: "A rail carrier shall not be found to have violated this section because it fulfills its commitments under contracts approved under section 10713 of this title before responding to reasonable requests for service."*

*RECIPROCAL SWITCHING*

*SEC. 223. Section 11103 of title 49, United States Code, is amended by adding at the end thereof the following new subsection:*

*"(c)(1) The Commission may require rail carriers to enter into reciprocal switching agreements, where it finds such agreements to be practicable and in the public interest, or where such agreements are necessary to provide competitive rail service. The carriers entering into such an agreement shall establish the conditions and compensation applicable to such agreement, but, if the carriers cannot agree upon such conditions and compensation within a reasonable period of time, the Commission may establish such conditions and compensation.*

*"(2) The Commission may require reciprocal switching agreements entered into by rail carriers pursuant to this subsection to contain provisions for the protection of the interests of employees affected thereby.".*

*CAR SERVICE COMPENSATION*

*SEC. 224. (a)(1) Section 11122(b)(2) of title 49, United States Code, is repealed.*

*(2) Section 11122(b)(1) of title 49, United States Code, is amended by striking out "(1)" immediately before "The rate".*

*(b) Section 10706(a) of title 49, United States Code, as amended by this Act, is further amended by adding at the end thereof the following new paragraph:*

*"(5)(A) Whenever two or more shippers enter into an agreement to discuss among themselves that relates to the amount of compensation such shippers propose to be paid by rail carriers providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title, for use by such rail carriers of rolling stock owned or leased by such shippers, the shippers shall apply to the Commission for approval of that agreement under this paragraph. The Commission shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy set forth in section 10101a of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of approval. If the Commission approves the agreement, it may be made and carried out under its terms and under the terms required by the Commission, and the antitrust laws set forth in paragraph (2) of this subsection do not apply to parties and other persons with respect to making or carrying out the agreement. The Commission shall approve or disapprove an agreement under this paragraph within one year after the date application for approval of such agreement is made.*

*"(B) If the Commission approves an agreement described in subparagraph (A) of this paragraph and the shippers entering into such agreement and the rail carriers proposing to use rolling stock owned or leased by such shippers, under payment by such carriers or under a published allowance, are unable to agree upon the amount of compensation to be paid for the use of such rolling stock, any party directly involved in the negotiations may require that the matter be settled by submitting the issues in dispute to the Commission. The Commission shall render a binding decision, based upon a standard of reasonableness and after taking into consideration any past precedents on the subject matter of the negotiations, no later than 90 days after the date of the submission of the dispute to the Commission.*

*"(C) Nothing in this paragraph shall be construed to change the law in effect prior to the effective date of the Staggers Rail Act of 1980 with respect to the obligation of rail carriers to utilize rolling stock owned or leased by shippers.".*

*CAR UTILIZATION*

*SEC. 225. (a) Subchapter II of chapter 107 of title 49, United States Code, is amended by inserting at the end thereof the following new section:*

***"§ 10734. Car utilization***

*"In order to encourage more efficient use of freight cars, notwithstanding any other provision of this subtitle, rail carriers shall be permitted to establish tariffs containing premium charges for special services or special levels of services not provided in any tariff otherwise applicable to the movement. The Commission shall facilitate development of such tariffs so as to increase the utilization of equipment.".*

*(b) The section analysis of chapter 107 of title 49, United States Code, is amended by inserting immediately after the item relating to section 10731 the following new item:*

*"10734. Car utilization.".*

*CAR SERVICE ORDERS FOR EXIGENT CIRCUMSTANCES*

*SEC. 226. Section 11123(a) of title 49, United States Code, is amended to read as follows:*

*"(a)(1) When the Interstate Commerce Commission finds that a shortage of equipment, congestion of traffic, or other failure in traffic movement exists which creates an emergency situation of such magnitude as to have substantial adverse effects on rail service in the United States or a substantial region of the United States, the Commission may, for a period not to exceed thirty days—*

*"(A) suspend any car service rule or practice;*

*"(B) take action during the emergency to promote service in the interest of the public and of commerce regardless of the ownership (as between carriers) of a locomotive, car, or other vehicle on terms of compensation the carriers establish between themselves, subject to subsection (b)(2) of this section;*

*"(C) require joint or common use of facilities, on terms of compensation the carriers establish between themselves, subject to subsection (b)(2) of this section, when that action will best meet the emergency and serve the public interest; and*

*"(D) give directions for preference or priority in transportation, embargoes, or movement of traffic under permits.*

*"(2) The Commission may extend any action taken under paragraph (1) of this subsection beyond the thirty-day period provided in such paragraph only if the full Commission, after a hearing, certifies that a transportation emergency exists.*

*"(3) In carrying out the provisions of this subsection, the Commission shall require, to the maximum extent practicable, the use of the employees who would normally have performed work in connection with the traffic subject to the action of the Commission.".*

*EMPLOYEE PROTECTION*

*SEC. 227. (a) Section 1170 of title 11, United States Code, is amended by adding at the end thereof the following new subsection:*

*"(e)(1) In authorizing any abandonment of a railroad line under this section, the court shall require the rail carrier to provide a fair arrangement at least as protective of the interests of employees as that established under section 11347 of title 49.*

*"(2) Nothing in this subsection shall be deemed to affect the priorities or timing of payment of employee protection which might have existed in the absence of this subsection.".*

Digitized from Best Copy Available

*(b) Section 1172 of title 11, United States Code, is amended by adding at the end thereof the following new subsection:*

*"(c)(1) In approving an application under subsection (b) of this section, the Commission shall require the rail carrier to provide a fair arrangement at least as protective of the interests of employees as that established under section 11347 of title 49.*

*"(2) Nothing in this subsection shall be deemed to affect the priorities or timing of payment of employee protection which might have existed in the absence of this subsection.".*

***MERGERS AND OTHER TRANSACTIONS***

*SEC. 228. (a) Section 11344(b) of title 49, United States Code, is amended—*

*(1) by inserting immediately after "section" the following: "which involves the merger or control of at least two class I railroads, as defined by the Commission"; and*

*(2) by adding at the end thereof the following new paragraph:*

*"(5) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region.".*

*(b) Section 11344 of title 49, United States Code, is amended by adding at the end thereof the following new subsection:*

*"(d) In a proceeding under this section which does not involve the merger or control of at least two class I railroads, as defined by the Commission, the Commission shall approve such an application unless it finds that—*

*"(1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and*

*"(2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.*

*In making such findings, the Commission shall, with respect to any application that is part of a plan or proposal developed under section 5 (a)-(d) of the Department of Transportation Act (49 U.S.C. 1654 (a)-(d)), accord substantial weight to any recommendations of the Secretary of Transportation.".*

*(c) Section 11344 of title 49, United States Code, as amended by this Act, is further amended by adding at the end thereof the following new subsection:*

*"(e) If a rail carrier, or a person controlled by or affiliated with a rail carrier, together with one or more affected shippers, may apply for approval under this subsection of a transaction for the purpose of providing motor carrier transportation prior or subsequent to rail transportation to serve inadequately served shippers located on a railroad other than the applicant carrier. Such application shall be approved by the Commission if the applicants demonstrate presently impaired rail service and inadequate motor common carrier service which results in the serious failure of the rail carrier serving the shippers to meet the rail equipment or transportation schedules of shippers or seriously to fail otherwise to provide adequate normal rail services required by shippers and which shippers would reasonably expect the rail carrier to provide. The Commission shall approve or disapprove applications under this subsection within 30*

*days after receipt of such application. The Commission shall approve applications which are not protested by interested parties within 30 days following receipt of such application.".*

*(d) Section 11345 of title 49, United States Code, is amended to read as follows:*

***"§ 11345. Consolidation, merger, and acquisition of control: rail carrier procedure***

*"(a) If a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title is involved in a proposed transaction under section 11343 of this title, this section and section 11344 of this title also apply to the transaction. The Commission shall publish notice of the application in the Federal Register by the end of the 30th day after the application is filed with the Commission and after a certified copy of it is furnished to the Secretary of Transportation. However, if the application is incomplete, the Commission shall reject it by the end of that period. The order of rejection is a final action of the Commission under section 10327 of this title. The published notice shall indicate whether the application involves—*

*"(1) the merger or control of at least two class I railroads, as defined by the Commission, to be decided within the time limits specified in subsection (b) of this section;*

*"(2) transactions of regional or national transportation significance, to be decided within the time limits specified in subsection (c) of this section; or*

*"(3) any other transaction covered by this section, to be decided within the time limits specified in subsection (d) of this section.*

*"(b) If the application involves the merger or control of two or more class I railroads, as defined by the Commission:*

*"(1) Written comments about an application may be filed with the Commission within 45 days after notice of the application is published under subsection (a) of this section. Copies of such comments shall be served on the Secretary of Transportation and the Attorney General, each of whom may decide to intervene as a party to the proceeding. That decision must be made by the 15th day after the date of receipt of the written comments, and if the decision is to intervene, preliminary comments about the application must be sent to the Commission by the end of the 15th day after the date of receipt of the written comments.*

*"(2) The Commission shall require that applications inconsistent with an application, notice of which was published under subsection (a) of this section, and applications for inclusion in the transaction, be filed with it and given to the Secretary of Transportation by the 90th day after publication of notice under that subsection.*

*"(3) The Commission must conclude evidentiary proceedings by the end of the 24th month after the date of publication of notice under subsection (a) of this section. The Commission must issue a final decision by the 180th day after the date on which it concludes the evidentiary proceedings.*

*"(c) If the application involves a transaction other than the merger or control of at least two class I railroads, as defined by the*

*Commission, which the Commission has determined to be of regional or national transportation significance:*

*"(1) Written comments about an application may be filed with the Commission within 30 days after notice of the application is published under subsection (a) of this section. Copies of such comments shall be served on the Secretary of Transportation and the Attorney General, each of whom may decide to intervene as a party to the proceeding. That decision must be made by the 15th day after the date of receipt of the written comments, and if the decision is to intervene, preliminary comments about the application must be sent to the Commission by the end of the 15th day after the date of receipt of the written comments.*

*"(2) The Commission shall require that applications inconsistent with an application, notice of which was published under subsection (a) of this section, and applications for inclusion in the transaction, be filed with it and given to the Secretary of Transportation by the 60th day after publication of notice under that subsection.*

*"(3) The Commission must conclude any evidentiary proceedings by the 180th day after the date of publication of notice under subsection (a) of this section. The Commission must issue a final decision by the 90th day after the date on which it concludes the evidentiary proceedings.*

*"(d) For all applications under this section other than those specified in subsections (b) and (c) of this section:*

*"(1) Written comments about an application may be filed with the Commission within 30 days after notice of the application is published under subsection (a) of this section. Copies of such comments shall be served on the Secretary of Transportation and the Attorney General, each of whom may decide to intervene as a party to the proceeding. That decision must be made by the 15th day after the date of receipt of the written comments, and if the decision is to intervene, preliminary comments about the application must be sent to the Commission by the end of the 15th day after the date of receipt of the written comments.*

*"(2) The Commission must conclude any evidentiary proceedings by the 105th day after the date of publication of notice under subsection (a) of this section. The Commission must issue a final decision by the 45th day after the date on which it concludes the evidentiary proceedings.*

*"(e) If the Commission does not issue a decision that is a final action under section 10327 of this title, it shall send written notice to Congress that a decision was not issued and the reasons why it was not issued.*

*"(f) The Commission may waive the requirement that an initial decision be made under section 10327 of this title and make a final decision itself when it determines that action is required for the timely execution of its functions under this subchapter or that an application governed by this section is of major transportation importance. The decision of the Commission under this subsection is a final action under section 10327 of this title.".*

*(e) Any application filed or pending on the effective date of this Act under section 11343, 11344, or 11345 of title 49, United States*

*Code, before the Secretary of Transportation, the Interstate Commerce Commission, or any court shall be adjudicated or determined as if this Act had not been enacted.*

*SAVINGS PROVISIONS*

*SEC. 229. (a) Any rate that is in effect on the effective date of this Act for transportation by a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of title 49, United States Code, may, during the 180-day period beginning on such effective date, be challenged in a complaint filed with the Interstate Commerce Commission by any interested party alleging that the rail carrier has market dominance over the transportation to which the rate applies, as determined under section 10709 of such title, and that the rate is not reasonable under section 10701a of such title.*

*(b) Any rate described in subsection (a) of this section—*

*(1) which is not challenged in a complaint filed within the 180-day period provided in such subsection; or*

*(2) which is challenged in such a complaint, but (A) the rail carrier is found not to have market dominance over the transportation to which the rate applies, or (B) the rate is found to be reasonable,*

*shall be deemed to be lawful and may not thereafter be challenged in the Commission or in any court (other than on appeal from a decision of the Commission).*

*(c) The provisions of this section shall not apply to any rate under which the volume of traffic moved during the 12-month period immediately preceding the effective date of this Act did not exceed 500 net tons and has increased tenfold within the 3-year period immediately preceding the bringing of a challenge to the reasonableness of such rate.*

*(d) The burden of proof in any proceeding under this section shall be on the complainant.*

## *TITLE III—RAILROAD COST DETERMINATIONS*

*UNIFORM ACCOUNTING SYSTEM*

*SEC. 301. Section 11142 of title 49, United States Code, is amended to read as follows:*

***"§ 11142. Uniform accounting system***

*"The Interstate Commerce Commission may prescribe a uniform accounting system for classes of carriers providing, and brokers for, transportation subject to the jurisdiction of the Commission under subchapters II, III, and IV of chapter 105 of this title.".*

*RAILROAD COST ACCOUNTING*

*SEC. 302. (a) Chapter 111 of title 49, United States Code, is amended by adding at the end thereof the following new subchapter:*

*"SUBCHAPTER IV—RAILROAD COST ACCOUNTING*

***"§ 11161. Railroad Accounting Principles Board***

*"(a)(1) There is established a Railroad Accounting Principles Board which shall be within and responsible to the legislative branch of the Federal Government.*

*"(2) The Board shall be composed of the Comptroller General of the United States, who shall serve as chairman, and six members to be appointed by the Comptroller General.*

*"(3) The Comptroller General shall appoint members of the Board from among persons who are well qualified for such position by virtue of experience in or knowledge of rate regulation, accounting, or cost determinations. Of the members of the Board so appointed—*

*"(A) one shall be from the accounting profession;*

*"(B) one shall be from the railroad industry;*

*"(C) one shall be a representative of major rail shippers;*

*"(D) one shall be from the Interstate Commerce Commission;*

*"(E) one shall be a representative of small rail shippers; and*

*"(F) one shall be from the economics profession.*

*"(4) The term of office of each appointed member of the Board shall be three years, except that any member appointed to fill a vacancy in the Board shall serve for the remainder of the term for which his predecessor was appointed.*

*"(5) The Board shall not act in the absence of a quorum, which shall consist of three members.*

*"(b) Each appointed member of the Board shall receive compensation at a rate equal to 1/260 of the rate prescribed for level IV of the Executive Schedule, under section 5315 of title 5, for each day (including traveltime) in which he is engaged in the actual performance of duties vested in the Board.*

*"(c)(1) The Board may utilize personnel from the Federal Government, with the consent of the head of the appropriate Federal department or agency, or appoint individuals from private life, to serve on advisory committees or to provide the staff services necessary to assist the Board in carrying out its functions and responsibilities under this subchapter.*

*"(2) Individuals appointed by the Board under this subsection may be appointed without regard to the provisions of title 5 governing appointments in the competitive service, and may be paid without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title, relating to classification and General Schedule pay rates.*

*"(d) All Federal departments and agencies are authorized to cooperate with the Board and to furnish information, appropriate personnel (with or without reimbursement), and such financial and other assistance as may be agreed upon by the Board and the Federal department or agency involved.*

*"(e) Members and employees of the Board and all other individuals appointed under this subsection having or having had access to information in the possession of the Board shall be subject to the provisions of section 1905 of title 18.*

*"(f) The Board shall cease to exist three years after the effective date of the Staggers Rail Act of 1980.*

***"§ 11162. Cost accounting principles***

*"(a) Within two years after the effective date of the Staggers Rail Act of 1980, the Railroad Accounting Principles Board shall establish, for rail carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title, principles governing the determination of economically accurate railroad costs directly and indirectly associated with particular movements of goods, including the variable costs associated with particular movements of goods or such other costs as the Board believes most accurately represent the economic costs of such movements. Such principles shall govern the determination of all railroad costs for specific regulatory proceedings under this title.*

*"(b) In developing cost accounting principles under this section, the Board shall take into account the following considerations:*

*"(1) The specific regulatory purposes for which railroad costs are required.*

*"(2) The degree of accuracy of the cost information which is needed to meet regulatory purposes.*

*"(3) The existing capability and the probable future capability of rail carriers to provide such information and the relative benefits and costs of requiring development of additional capability.*

*"(4) The means by which the degree of economic accuracy required can be obtained at the least possible expense and with the least possible information reporting.*

*"(5) The means by which the confidentiality of such costs can best be maintained while meeting the need for such information in regulatory proceedings.*

*"(c) The cost accounting principles established by the Board shall require that cost information be reported or disclosed only for the essential regulatory purposes defined by the Board.*

***"§ 11163. Implementation of cost accounting principles***

*"Upon the establishment of cost accounting principles by the Railroad Accounting Principles Board under section 11162 of this title, the Interstate Commerce Commission shall promptly promulgate rules to implement and enforce such principles. Not less than once every five years after the promulgation of the original rules, the Commission shall review the principles of the Board and shall, by rule, make such changes in such principles as are required to achieve the regulatory purposes of this title and the goals of this subchapter. The Commission shall insure that the rules promulgated under this section are the most efficient and least burdensome means by which the required information may be developed for regulatory purposes.*

***"§ 11164. Certification of rail carrier cost accounting systems***

*"(a) Within 180 days after the effective date of the Staggers Rail Act of 1980, each rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title shall file with the Commission a request for preliminary certification of its cost accounting system. The Commission shall grant such preliminary certification if it determines that the cost accounting system of such rail carrier is in*

*compliance with the accounting standards of the Commission in effect on the day prior to the effective date of the Staggers Rail Act of 1980.*

*"(b)(1) As soon as practicable, but not later than 9 months, after the promulgation of rules by the Commission under section 11163 of this title, each rail carrier described in subsection (a) of this section shall file with the Commission a request for final certification of its cost accounting system developed to comply with this section.*

*"(2) Within 90 days, or such additional time as the Commission finds necessary, after a rail carrier files its request for final certification under paragraph (1) of this subsection, the Commission shall grant such final certfication to such carrier if the Commission determines that the cost accounting system of such carrier is in compliance with the rules promulgated by the Commission under section 11163 of this title. If the Commission denies such final certification, the rail carrier shall revise its cost accounting system and file a new request for certification within 90 days after the date of such denial. The Commission shall thereupon grant final certification if it determines that such cost accounting system, as revised, is in compliance with such rules. If the Commission again denies final certification to the rail carrier, the Commission shall prescribe a cost accounting system which such carrier shall adopt within a reasonable time and which shall be considered a finally certified cost accounting system for purposes of this section.*

*"(c) Each rail carrier shall have and maintain a cost accounting system that is in compliance with the rules promulgated by the Commission under section 11163 of this title.*

*"(d)(1) Certification under this section that the cost accounting system of a rail carrier is in compliance with the rules promulgated by the Commission under section 11163 of this title shall be valid until the promulgation of new rules by the Commission.*

*"(2) After the cost accounting system of a rail carrier is certified under this section, such rail carrier may, after notifying the Commission, make modifications in such system unless, within 60 days after the date of notification, the Commission finds such modifications to be inconsistent with the rules promulgated by the Commission under section 11163 of this title.*

*"(e) For purposes of determining whether the cost accounting system of a rail carrier is in compliance with the rules promulgated by the Commission, the Commission shall have the right to examine and make copies of any documents, papers, or records of such rail carrier relating to compliance with such rules. Such documents, papers, and records (and any copies thereof) shall not be subject to the mandatory disclosure requirements of section 552 of title 5.*

***"§ 11165. Cost availability***

*"As required by the rules of the Interstate Commerce Commission governing discovery in Commission proceedings, rail carriers shall make relevant cost data available to shippers, States, ports, communities, and other interested parties that are a party to a Commission proceeding in which such data is required.*

***"§ 11166. Accounting and cost reporting***

*"(a) To obtain expense and revenue information for regulatory purposes, the Interstate Commerce Commission may promulgate rea-*

*sonable rules for rail carriers providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title, prescribing expense and revenue accounting and reporting requirements consistent with generally accepted accounting principles uniformly applied to such carriers. Such requirements shall be cost effective and compatible with and not duplicative of the managerial and responsibility accounting requirements of those carriers. To the extent such rules are required solely to provide expense and revenue information necessary for determining railroad costs in regulatory proceedings pursuant to this title, such rules shall be promulgated in accordance with the cost accounting principles established by the Railroad Accounting Principles Board under section 11162 of this title.*

*"(b) Any reports required by the rules established by the Commission under this section shall include only information considered necessary for disclosure under the cost accounting principles established by the Board or under generally accepted accounting principles or the requirements of the Securities and Exchange Commission.*

***"§ 11167. Report***

*"The Railroad Accounting Principles Board shall, within 2 years after the effective date of the Staggers Rail Act of 1980, submit to the Congress a report setting forth any recommendations of the Board for appropriate legislative or administrative action in order to integrate the cost accounting principles and the cost accounting system certification process under this subchapter into existing rail carrier rate regulation under this title, including determinations under section 10709 of this title.*

***"§ 11168. Authorization of appropriations***

*"There are authorized to be appropriated to carry out the provisions of this subchapter not to exceed $1,000,000 for the fiscal year ending September 30, 1981, not to exceed $1,000,000 for the fiscal year ending September 30, 1982, and not to exceed $1,000,000 for the fiscal year ending September 30, 1983.".*

*(b) The analysis of chapter 111 of title 49, United States Code, is amended by adding at the end thereof the following:*

*"SUBCHAPTER IV—RAILROAD COST ACCOUNTING*

*"11161. Railroad Accounting Principles Board.*
*"11162. Cost accounting principles.*
*"11163. Implementation of cost accounting principles.*
*"11164. Certification of rail carrier cost accounting systems.*
*"11165. Cost availability.*
*"11166. Accounting and cost reporting.*
*"11167. Report.*
*"11168. Authorization of appropriations.".*

*CIVIL PENALTIES FOR VIOLATIONS OF ACCOUNTING PRINCIPLES PROVISIONS*

*SEC. 303. (a)(1) Chapter 119 of title 49, United States Code, is amended by inserting immediately after section 11913 the following new section:*



Digitized from Best Copy Available

**"§ 11913a. Accounting principles violations**

*"Any rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title that fails to obtain final certification of its cost accounting system under section 11164(b) of this title shall be fined not less than $50,000.".*

*(2) The section analysis of chapter 119 of title 49, United States Code, is amended by inserting immediately after the item relating to section 11913 the following new item:*

*"11913a. Accounting principles violations.".*

*(b) Section 11910 of title 49, United States Code, is amended by adding at the end thereof the following new subsection:*

*"(d) A person that knowingly discloses confidential data made available to such person under section 11165 of this title by a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title shall be fined not more than $50,000.".*

## *TITLE IV—RAILROAD MODERNIZATION ASSISTANCE*

### *FEEDER RAILROAD DEVELOPMENT PROGRAM*

*SEC. 401. (a) Subchapter I of chapter 109 of title 49, United States Code, is amended by adding at the end thereof the following new section:*

**"§ 10910. Railroad development**

*"(a) In this section—*

*"(1) 'financially responsible person' means a person who (A) is capable of paying the constitutional minimum value of the railroad line proposed to be acquired, and (B) is able to assure that adequate transportation will be provided over such line for a period of not less than 3 years. Such term includes a government authority but does not include a class I or a class II rail carrier.*

*"(2) 'railroad line' means (A) during the 3-year period beginning on the effective date of the Staggers Rail Act of 1980, a line of railroad which carried less than 3,000,000 gross ton miles of traffic per mile in the preceding calendar year, and (B) after the end of such 3-year period, any line of railroad.*

*"(b)(1) When the Interstate Commerce Commission finds that—*

*"(A)(i) the public convenience and necessity require or permit the sale of a particular railroad line under this section; or*

*"(ii) a railroad line has been placed on a system diagram map as required under section 10904 of this title, but the rail carrier owning such line has not filed an application to abandon such line under sections 10903 and 10904 of this title; and*

*"(B) an application to purchase such line has been filed, in accordance with regulations required under subsection (k) of this section, by a financially responsible person,*

*the Commission shall require the rail carrier owning the railroad line to sell such line to such financially responsible person at a price not less than the constitutional minimum value.*

*"(2) For purposes of this subsection, the constitutional minimum value of a particular railroad line shall be presumed to be not less than the net liquidation value of such line or the going concern value of such line, whichever is greater, but shall not include the cost of providing a protective arrangement under subsection (j) of this section.*

*"(c)(1) For purposes of this section, the Commission may determine that the public convenience and necessity require or permit the sale of a railroad line if the Commission determines, after a hearing on the record, that—*

*"(A) the rail carrier operating such line refuses within a reasonable time to make the necessary efforts to provide adequate service to shippers who transport traffic over such line;*

*"(B) the transportation over such line is inadequate for the majority of shippers who transport traffic over such line;*

*"(C) the sale of such line will not have a significantly adverse financial effect on the rail carrier operating such line;*

*"(D) the sale of such line will not have an adverse effect on the overall operational performance of the rail carrier operating such line; and*

*"(E) the sale of such line will be likely to result in improved railroad transportation for shippers that transport traffic over such line.*

*"(2) In a proceeding under this subsection, the burden of proving that the public convenience and necessity require or permit the sale of a particular railroad line is on the person filing the application to acquire such line. If the Commission finds under this subsection that the public convenience and necessity require or permit the sale of a particular railroad line, the Commission shall concurrently notify the parties of such finding and publish such finding in the Federal Register.*

*"(d) In the case of any railroad line subject to sale under subsection (a) of this section, the Commission shall, upon the request of the acquiring carrier, require the selling carrier to provide to the acquiring carrier trackage rights to allow a reasonable interchange with the selling carrier or to move power equipment or empty rolling stock between noncontiguous feeder lines operated by the acquiring carrier. The Commission shall require the acquiring carrier to provide the selling carrier reasonable compensation for any such trackage rights.*

*"(e) The Commission shall require, to the maximum extent practicable, the use of the employees who would normally have performed work in connection with a railroad line subject to a sale under this section.*

*"(f) In the case of a railroad line which carried less than 3,000,000 gross ton miles of traffice per mile in the preceding calendar year, whenever a purchasing carrier under this section petitions the Commission for joint rates applicable to traffic moving over through routes in which the purchasing carrier may practicably participate, the Commission shall, within 30 days after the date such petition is filed and pursuant to section 10705(a) of this title, require the establishment of reasonable joint rates and divisions over such route.*

*"(g)(1) Any person operating a railroad line acquired under this section may elect to be exempt from any of the provisions of this*

*title, except that such a person may not be exempt from the provisions of chapter 107 of this title with respect to transportation under a joint rate.*

*"(2) The provisions of paragraph (1) of this subsection shall apply to any line of railroad which was abandoned during the 18-month period immediately prior to the effective date of the Staggers Rail Act of 1980 and was subsequently purchased by a financially responsible person.*

*"(h) If a purchasing carrier under this section proposes to sell or abandon all or any portion of a purchased railroad line, such purchasing carrier shall offer the right of first refusal with respect to such line or portion thereof to the carrier which sold such line under this section. Such offer shall be made at a price equal to the sum of the price paid by such purchasing carrier to such selling carrier for such line or portion thereof and the fair market value (less deterioration) of any improvements made, as adjusted to reflect inflation.*

*"(i) Any person operating a railroad line acquired under this section may determine preconditions, such as payment of a subsidy, which must be met by shippers in order to obtain service over such lines, but such operator must notify the shippers on the line of its intention to impose such preconditions.*

*"(j) In the case of any railroad line sold pursuant to this section, the Commission shall require the selling carrier to provide a fair arrangement at least as protective of the interests of employees as that established under section 11347 of this title.*

*"(k) The Commission shall, within 60 days after the effective date of the Staggers Rail Act of 1980, prescribe such regulations and procedures as may be necessary to carry out the provisions of this section.".*

*(b) The section analysis of chapter 109 of title 49, United States Code, is amended by adding immediately after the item relating to section 10909 the following new item:*

*"10910. Railroad development.".*

***ABANDONMENT***

*SEC. 402. (a)(1) Section 10903(b)(1) of title 49, United States Code, is amended by striking out the first sentence.*

*(2) Section 10903 (c) of title 49, United States Code, is repealed.*

*(b)(1) Section 10904(a) of title 49, United States Code, is amended—*

*(A) by striking out "at least 60" and all that follows through "effective" in paragraph (1);*

*(B) by striking out "and" at the end of paragraph (2)(A);*

*(C) by striking out the period at the end of paragraph (2)(B) and inserting in lieu thereof "; and";*

*(D) by adding at the end of paragraph (2) the following new subparagraph:*

*"(C)(i) a statement that the line is available for subsidy or sale in accordance with section 10905 of this title, (ii) a statement that the carrier will promptly provide to each interested party an estimate of the subsidy and minimum purchase price required to keep the line in operation, calculated in accordance with section 10905 of this title, and (iii) the name and business*

*address of the person who is authorized to discuss sale or subsidy terms for the carrier."; and*

*(E) by inserting immediately before the period at the end of paragraph (3)(E) the following: ", and certifying that clauses (A)-(D) have been satisfied within the most recent 30 days prior to the date the application is filed".*

*(2) Section 10904(b) of title 49, United States Code, is amended to read as follows:*

*"(b) If no protest is received within 30 days after the application is filed, the Commission shall find that the public convenience and necessity require or permit the abandonment or discontinuance. In such a case, the Commission shall, within 45 days after the application is filed, issue a certificate which permits the abandonment or discontinuance to occur within 75 days after the application is filed.".*

*(3) Section 10904(c) of title 49, United States Code, is amended to read as follows:*

*"(c)(1) If a protest is received within 30 days after the application is filed, the Commission shall, within 45 days after the application is filed, determine whether an investigation is needed to assist in determining what disposition to make of the application.*

*"(2) If the Commission decides that no investigation is to be undertaken, the Commission shall, within 75 days after the application is filed, decide whether the present or future public convenience and necessity require or permit the abandonment or discontinuance, taking into consideration the application of the rail carrier and any materials submitted by protestants. If the Commission finds that the present or future public convenience and necessity require or permit the abandonment, it shall, within 90 days after the date of application, issue a certificate which permits the abandonment or discontinuance to occur within 120 days after the application is filed.*

*"(3) If the Commission decides that an investigation should be undertaken under this section, the investigation must be completed within 135 days, and an initial decision must be rendered within 165 days, after the date the application is filed. Thirty days after such decision, the initial decision shall become the final decision of the Commission unless, during the interim, the Commission decides to hear appeals. If an initial decision is appealed and considered by the Commission, the Commission shall issue a final decision within 255 days after the date of application. Whenever the Commission decides upon investigation that the present or future public convenience and necessity require or permit the abandonment or discontinuance of rail service, it shall, within 15 days of the final decision, issue a certificate which permits the abandonment or discontinuance to occur within 75 days of the date of the final decision.*

*"(4) The effective date of any certificate which permits abandonment or discontinuance may be stayed by the Commission pursuant to the provisions of section 10905 of this title.".*

*(4) Section 10904 of title 49, United States Code, is amended by redesignating subsection (d) as subsection (e), and by inserting immediately after subsection (c) the following new subsection:*

*"(d)(1) The burden is on the person applying for the certificate to prove that the present or future public convenience and necessity require or permit the abandonment or discontinuance.*

*"(2) For applications approved by the Secretary of Transportation as part of a plan or proposal under section 5 (a)–(d) of the Department of Transportation Act (49 U.S.C. 1654 (a)–(d)), the Commission shall consider whether any detriment from the abandonment or discontinuance exceeds the transportation benefit from the plan or proposal as a whole.".*

*(5) Section 10904(e) of title 49, United States Code, as redesignated by paragraph (4) of this subsection, is amended by inserting immediately before the period at the end thereof the following: ", except that the requirement of such description or identification in such diagram may be waived by the Commission if the application was approved by the Secretary of Transportation as part of a plan or proposal under section 5(a)–(d) of the Department of Transportation Act (49 U.S.C. 1654(a)–(d)), or the application is filed by a railroad in bankruptcy".*

*(c) Section 10905 of title 49, United States Code, is amended to read as follows:*

**"§ 10905. Offers of financial assistance to avoid abandonment and discontinuance**

*"(a) In this section—*

*"(1) 'avoidable cost' means all expenses that would be incurred by a rail carrier in providing transportation that would not be incurred if the railroad line over which the transportation was provided were abandoned or if the transportation were discontinued. Expenses include cash inflows foregone and cash outflows incurred by the rail carrier as a result of not abandoning or discontinuing the transportation. Cash inflows foregone and cash outflows incurred include—*

*"(A) working capital and required capital expenditure;*

*"(B) expenditures to eliminate deferred maintenance;*

*"(C) the current cost of freight cars, locomotives, and other equipment; and*

*"(D) the foregone tax benefits from not retiring properties from rail service and other effects of applicable Federal and State income taxes.*

*"(2) 'reasonable return' means—*

*"(A) if a rail carrier is not in reorganization, the cost of capital to the rail carrier, as determined by the Interstate Commerce Commission; and*

*"(B) if a rail carrier is in reorganization, the mean cost of capital of rail carriers not in reorganization, as determined by the Commission.*

*"(b) Any rail carrier which has filed an application for a certificate of abandonment or discontinuance shall provide promptly to a party considering an offer of financial assistance and shall provide concurrently to the Commission—*

*"(1) an estimate of the annual subsidy and minimum purchase price required to keep the line or a portion of the line in operation;*

*"(2) its most recent reports on the physical condition of that part of the railroad line involved in the proposed abandonment or discontinuance;*

*"(3) traffic, revenue, and other data necessary to determine the amount of annual financial assistance which would be re-*

*quired to continue rail transportation over that part of the railroad line; and*

*"(4) any other information that the Commission may deem necessary to allow a potential offeror to calculate an adequate subsidy or purchase offer.*

*"(c) When the Commission finds under section 10903 of this title that the public convenience and necessity require or permit abandonment or discontinuance of a particular railroad line, it shall, concurrently with service of the decision upon the parties, publish the finding in the Federal Register. Within 10 days following the publication, any person may offer to pay the carrier a subsidy or offer to purchase the line. Such offer shall be filed concurrently with the Commission. If the offer to subsidize or purchase the line is less than the carrier's estimate provided under subsection (b)(1) of this section, the offer shall explain the basis of the disparity, and the manner in which the offer of subsidy or purchase is calculated.*

*"(d) If, within 15 days after the publication required in subsection (c) of this section, the Commission finds that—*

*"(1) a financially responsible person (including a government authority) has offered financial assistance to enable the rail transportation to be continued over that part of the railroad line to be abandoned or over which all rail transportation is to be discontinued; and*

*"(2) it is likely that the assistance would be equal to—*

*"(A) the difference between the revenues attributable to that part of the railroad line and the avoidable cost of providing rail freight transportation on the line, plus a reasonable return on the value of the line; or*

*"(B) the acquisition cost of that part of the railroad line;*

*the Commission shall postpone the issuance of a certificate authorizing abandonment or discontinuance in accordance with subsections (e) and (f) of this section.*

*"(e) If the carrier and a person offering financial assistance enter into an agreement which will provide continued rail service, the Commission shall postpone the issuance of the certificate for so long as the agreement, or an extension or modification of the agreement, is in effect. If the carrrier and a person offering to purchase a line enter into an agreement which will provide continued rail service, the Commission shall approve the transaction and dismiss the application for abandonment or discontinuance. If the carrier and a financially responsible person (including a government authority) fail to agree on the amount or terms of the subsidy or purchase, either party may, within 30 days after the offer is made, request that the Commission establish the conditions and amount of compensation. If no agreement is reached within 30 days after the offer is made and neither party requests that the Commission establish the conditions and amount of compensation during that same period, the Commission shall immediately issue a certificate authorizing the abandonment or discontinuance.*

*"(f)(1) Whenever the Commission is requested to establish the conditions and amount of compensation under this section—*

*"(A) the Commission shall render its decision within 60 days;*

*"(B) where subsidy has been offered, the Commission shall determine the amount and terms of subsidy based on the avoid-*

*able cost of providing continued rail transportation, plus a reasonable return on the value of the line; and*

*"(C) where an offer of purchase has been made in order to continue rail service on the line, the Commission shall determine the price and other terms of sale. In no case shall the Commission set a price which is below the fair market value of the line (including, unless otherwise mutually agreed, all facilities on the line or portion necessary to provide effective transportation services).*

*"(2) The decision of the Commission shall be binding on both parties, except that the person who has offered to subsidize or purchase the line may withdraw his offer within 10 days of the Commission's decision. In such a case, the Commission shall immediately issue a certificate authorizing the abandonment or discontinuance, unless other offers are being considered pursuant to paragraph (3) of this subsection.*

*"(3) If a carrier receives more than one offer to purchase or subsidize, it shall select the offeror with whom it wishes to transact business, and complete the sale or subsidy agreement, or request that the Commission establish the conditions and amount of compensation prior to the 40th day after the date on which notice was published under subsection (c) of this section. If no agreement on subsidy or sale is reached within the 40-day period and the Commission has not been requested to establish the conditions and amount of compensation, any other offeror may request that the Commission establish the conditions and amount of compensation. If the Commission has established the conditions and amount of compensation and the original offer has been withdrawn, any other offeror may accept the Commission's decision within 20 days of such decision, and the Commission shall require the carrier to enter into a sale or subsidy agreement with such offeror, if such sale or agreement incorporates the Commission's decision.*

*"(4) No purchaser of a line or portion of line sold under this section may transfer or discontinue service on such line prior to the end of the second year after consummation of the sale, nor may such purchaser transfer such line, except to the carrier from whom it was purchased, prior to the end of the fifth year after consummation of the sale.*

*"(5) Any subsidy provided under this section may be discontinued on notice of 60 days. Unless, within such 60-day period, another financially responsible party enters into a subsidy agreement at least as beneficial to the carrier as that which was or was to be discontinued, the Commission shall, at the carrier's request, immediately issue a certificate authorizing the abandonment or discontinuance of service on the line.".*

*CONVERSION OF ABANDONED RAILROAD RIGHT-OF-WAY*

*SEC. 403. Section 809(d) of the Railroad Revitalization and Regulatory Reform Act of 1976 is amended—*

*(1) by inserting "(1)" immediately before the first sentence thereof; and*

*(2) by adding at the end thereof the following new paragraph:*

*"(2) There are authorized to be appropriated, for the purposes of carrying out the provisions of subsection (b)(2) of this section, not to*

*exceed an aggregate amount of $10,000,000 for the fiscal years 1981, 1982, and 1983. Such sums are authorized to remain available until expended. Notwithstanding the provisions of subsection (b)(2) of this section, the Federal share for each grant made from the funds authorized to be appropriated pursuant to this paragraph may not exceed 80 percent of the total cost of any project.".*

*EXTENSION OF REDEEMABLE PREFERENCE SHARE FINANCING*

*SEC. 404. Sections 505(e), 507(a), 507(d), and 509 of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 825(e), 827(a), 827(d), and 829) are each amended by striking out "September 30, 1980" wherever it appears and inserting in lieu thereof "September 30, 1982" in each such place.*

*FINANCING*

*SEC. 405. (a)(1) Section 505(d)(3) of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 825(d)(3)) is amended by striking out "$700,000,000" and inserting in lieu thereof "$1,400,000,000".*

*(2) Sections 507(a) and 509 of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 827(a) and 829) are each amended by striking out "$600,000,000" and inserting in lieu thereof "$1,400,000,000".*

*(b)(1) Section 509 of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 829) is amended by inserting "(a)" immediately after "SEC. 509." and by adding at the end thereof the following new subsection:*

*"(b)(1) Not more than $200,000,000 of the funds received by the Secretary of Transportation from amounts appropriated under subsection (a) of this section shall be transferred by the Secretary to the United States Railway Association for use by the Association in accordance with section 216)b)(3) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 726(b)(3)). Such funds shall be transferred immediately upon the finding by the Finance Committee under such section 216(b)(3).*

*"(2) Not less than 5 percent of the funds received by the Secretary of Transportation from amounts appropriated under subsection (a) (excluding funds transferred under paragraph (1) of this subsection) shall be available for the purchase or rehabilitation of railroad lines acquired under section 10910 of title 49, United States Code, except that no such funds shall be available for the purchase or rehabilitation of such a railroad line unless such purchase or rehabilitation is consistent with the rail plan (as defined under section 5 of the Department of Transportation Act) of the State in which such line is located.*

*"(3) Of the funds authorized to be appropriated under this section (other than funds described in paragraphs (1) and (2) of this subsection) not more than $180,000,000 are authorized to be appropriated in fiscal year 1981.".*

*(2) Section 216(b) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 726(b)) is amended by adding at the end thereof the following new paragraph:*

*"(3)(A) Amounts transferred to the Association pursuant to section 509(b)(1) of the Railroad Revitalization and Regulatory Reform Act of 1976 may be used to purchase series A preferred stock of the Corporation to provide for the implementation by the Corporation of a program to reduce the Corporation's work force, if the Finance Committee finds that the implementation of such program will result in substantial savings to the United States.*

*"(B) An employee who ceases to be an employee as a result of the reduction of work force under a program implemented pursuant to this paragraph shall not, by reason of so ceasing to be an employee, or by reason of any work or employment entered into after so ceasing to be an employee, lose such employee's current connection with the railroad industry for the purposes of the Railroad Retirement Act of 1974.".*

*(c)(1) Section 505(a) of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 725(a)) is amended—*

*(A) by inserting "(1)" immediately before "Any railroad"; and*

*(B) by adding at the end thereof the following new paragraph:*

*"(2) An employee or employee-shipper group may apply to the Secretary for financial assistance pursuant to subsection (b)(3) of this section.*

*"(3) A financially responsible person (as defined in section 10910(a)(1) of title 49, United States Code) may apply to the Secretary for financial assistance from funds made available pursuant to section 509(b)(2) of this title.".*

*(2) Section 505(b) of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 825(b)) is amended by adding at the end thereof the following new paragraph:*

*"(3) The Secretary may approve applications to provide financial assistance to any employee or employee-shipper ownership group formed pursuant to a plan for the purchase or rehabilitation of a line or lines of railroad or of rail facilities which are considered to be in the public interest. The Secretary shall not use more than 20 percent of the total funds available under this section for such financial assistance. In considering the allocation of available funds and priority of eligible projects under this subsection, the Secretary shall consider the availability of viable alternatives to the ownership or rehabilitation by the eligible employee-shipper group for the continuation of rail service. Projects with no such alternative shall receive highest priority.".*

*(3) Sections 506 through 509 of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 826 through 829) are amended by—*

*(A) inserting "employee or employer-shipper group" immediately after "railroad" wherever it appears;*

*(B) inserting "employee or employee-shipper groups" immediately after "railroads" wherever it appears; and*

*(C) inserting "employee or employee-shipper group's" immediately after "railroad's" wherever it appears.*

*(4) Section 505(d) of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 825(d)) is amended by redesignating paragraph (3) as paragraph (4) and by inserting after paragraph (2) the following new paragraph:*

*"(3) In the case of a Government authority that applies for financial assistance from funds made available pursuant to section 509(b)(2) for the purchase or rehabilitation of railroad lines purchased under section 10910 of title 49. United States Code, financing pursuant to this section shall be in the form of purchase by the Secretary of bonds or other debt obligations issued for such purpose by such Government authority.".*

*(5) Paragraph (4) of section 505(d) of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 725(d)), as redesignated by this subsection, is amended by inserting ", bonds, and other debt obligations" immediately after "trustee certificates".*

*(d) Section 501 of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 821), as amended, is further amended by—*

*(1) striking out "and" at the end of paragraph (7);*

*(2) inserting "acquisition or sale of assets or securities," immediately after "merger," in paragraph (8);*

*(3) striking out the period at the end of paragraph (8) and inserting in lieu thereof a semicolon; and*

*(4) adding at the end thereof the following new paragraphs:*

*"(9) 'consolidation' means the combination of separate rail facilities and the abandonment of the excess facilities, except that such term does not include the combination by a single railroad of multiple tracks into fewer tracks where the tracks do not constitute separate physical and operating lines of railroad; and*

*"(10) 'coordination' means the combination of rail freight traffic flows through the use of joint facilities arrangements or internally that result in a reduction of service on at least one facility and includes arrangements for joint use of tracks or other facilities and the acquisition or sale of assets.".*

*(e) The first sentence of section 511(a) of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 831(a)) is amended by inserting immediately after "equipment" the following: "(which includes but is not limited to computerized car management systems)".*

### *TRANSACTION ASSISTANCE*

*SEC. 406. Section 505(h) of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 825(h)) is amended by adding at the end thereof the following new paragraphs:*

*"(5) Financial assistance made available under paragraph (1)(B) of this subsection may be used to purchase, for purposes of rail banking, properties of the Milwaukee Railroad located in the State of Montana with respect to which an interest in future rail common carrier operations has been evidenced.*

*"(6) Applications for rail banking shall be treated equally with other applications for transaction assistance."*

### *ELECTRIFICATION LOAN GUARANTEES*

*SEC. 407. Section 211(i) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 721(i)) is amended—*

*(1) by inserting "or any other railroad" immediately after "the Corporation" the first place it appears;*

*(2) by inserting "or such railroad" immediately after "the Corporation" the second and third places it appears; and*

*(3) by inserting immediately after the first sentence the following new sentences: "Upon application by the Corporation or by any railroad in reorganization in the region which receives a loan under section 211(a) of this Act, the Secretary shall, pursuant to the provisions of and within the obligational limitations contained in sections 511 through 513 of such Act, guarantee obligations of the Corporation or such railroad for purposes of making capital improvements to coal export facilities.".*

*AMENDMENT TO THE REGIONAL RAIL REORGANIZATION ACT OF 1973*

*SEC. 408. (a) The second sentence of section 211(d) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 721(d)) is amended by inserting "is not required to make the findings with respect to subsections (e)(3) and (f) and" immediately after "the Association" the first place it appears.*

*(b) Section 211(d)(2) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 721(d)(2)) is amended by striking out "$4,000,000" and inserting in lieu thereof "$7,500,000".*

*(c) The last sentence of section 211(d) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 721(d)) is amended by striking out "1980" and inserting in lieu thereof "1981".*

*FEDERAL ASSISTANCE REPORT*

*SEC. 409. Within 90 days after the end of each fiscal year, the Secretary of Transportation shall submit a report to the Congress listing the specific Federal assistance provided the railroad industry during such fiscal year. Each such report shall set forth the reasons for each Federal loan or grant and explain the way in which such loan or grant contributed to the overall goal of providing a safe and efficient transportation system.*

## *TITLE V—CONRAIL TITLE V LABOR PROTECTION*

*MONTHLY DISPLACEMENT ALLOWANCE*

*SEC. 501. Section 505(b) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 775(b)) is amended to read as follows:*

*"(b) MONTHLY DISPLACEMENT ALLOWANCE.—A protected employee shall be paid a monthly displacement allowance for any calendar month within the period identified in subsection (c) of this section in which the employee is deprived of employment or adversely affected with respect to such employee's compensation, in accordance with the following provisions:*

*"(1)(A) Effective on the effective date of the Staggers Rail Act of 1980, the protected rate of pay of a protected nonoperating employee (other than a maintenance-of-way employee) who has been deprived of employment or adversely affected with respect to such employee's compensation shall be based on the rate of pay of the position held by the employee on September 1, 1979,*

*or if the employee held no position on that date, the rate of pay of the last position held by the employee prior to that date. A guaranteed hourly rate of pay will be computed for each protected employee, based on the rate described in the preceding sentence, and will be (i) the actual hourly rate for hourly rated employees, (ii) the daily rate divided by 8 for daily rated employees, and (iii) the monthly rate divided by the working days in the claim month, further divided by 8, in the case of monthly rated employees. For employees occupying relief positions, the guarantee shall be computed on the basis of the weighted average daily rate of the positions relieved. Extra list employees will be guaranteed the extra list rate.*

*"(B) In the event a protected employee's position is abolished or such employee is displaced and is thereby required to occupy a position paying an hourly rate that is less than such employee's guaranteed hourly rate, the protected employee shall be paid the difference between the hourly rate of pay of the position such employee is occupying and his guaranteed hourly rate for all hours included in the straight time work schedule of such employee's position for the month of claim, less any time lost on account of voluntary absences other than vacations. Hours worked in excess of the straight time work schedule shall be paid in addition to the guarantee at the rate applicable to the position occupied, as provided for in the applicable collective bargaining agreement.*

*"(C) For any month or portion thereof in which a protected employee is deprived of employment, the protected employee shall be paid such employee's guaranteed hourly rate for the number of hours such employee would have worked in the straight time work schedule of such employee's previously held position.*

*"(D) Notwithstanding the provision that the protected rate shall be the rate of the position held on or immediately preceding September 1, 1979, if a protected employee becomes the permanent incumbent of a higher rated position and is not disqualified therefrom, the higher rate shall become such employee's protected rate.*

*"(2) Notwithstanding paragraph (1) of this subsection, effective on the effective date of the Staggers Rail Act of 1980, a protected maintenance-of-way employee shall be afforded his average monthly compensation, which is defined as the total compensation received by such employee during the 12 months immediately preceding January 1, 1975, divided by his total time paid for during that period and multiplied by 174 or by his average monthly time paid for, whichever is less, and adjusted to reflect subsequent general wage increases. If a protected employee is deprived of employment or if the employee's straight-time compensation in his current position is less in any month than the employee's average monthly compensation, the employee shall be paid the difference between his straight-time earnings, if any, and 80 percent of the average monthly compensation, less any time lost on account of voluntary absences other than vacations. If, at the close of the calendar year, the sum of the protected employee's annual straight-time compensation, monthly displacement allowance payments and offsets applica-*

*ble pursuant to this title is less than the employee's average monthly compensation multiplied by 12, the employee shall receive an additional payment representing the difference. If in the previous calendar year an employee has received displacement allowance payments in excess of his annual entitlement, the excess payments shall be recovered from any current or future entitlement to monetary benefits afforded by this title, exclusive of benefits afforded by section 505(g) of this title.*

*"(3) Effective on the effective date of the Staggers Rail Act of 1980 a protected operating employee (as defined in Interstate Commerce Commission classifications 107 through 128) who has been deprived of employment or adversely affected with respect to such employee's compensation shall be afforded his average monthly compensation computed in accordance with this subsection as in effect prior to such effective date, but subject to a maximum amount equal to one-twelfth of the average annual earnings of all employees in the Interstate Commerce Commission classification, computed by cumulating the employee earnings reported to the Commission by the Corporation on a monthly basis for calendar year 1977 for the Interstate Commerce Commission classification of operating service in which such employee performed the preponderance of such employee's work in calendar year 1974, increased by applicable general wage increases. If the employee performed no operating service in 1974, the Interstate Commerce Commission classification shall be determined by the preponderance of such employee's operating service in an immediately preceding calendar year. If the average monthly compensation of a protected operating employee exceeds the maximum amount described in the first sentence of this paragraph, the average monthly compensation of the employee will be reduced to such maximum amount for purposes of computing such employee's monthly displacement allowance, if any. If the average monthly compensation of a protected operating employee is less than such maximum amount, the average monthly compensation of the employee will be used to compute such employee's monthly displacement allowance, if any. If a protected employee is deprived of employment, or if the employee is adversely affected with respect to his compensation such that the compensation in such employee's current position is less in any month than the average monthly compensation of the employee or such maximum amount, whichever is less, the employee shall be paid 75 per centum of the difference between such employee's earnings, if any, and the lesser figure, minus any time lost on account of voluntary absences other than vacations. If at the close of the calendar year the sum of the protected employee's annual earnings, monthly displacement allowance payments, and offsets applicable pursuant to this title is less than such employee's average monthly compensation subject to the maximum amount and multiplied by 12, the employee shall receive an additional payment representing the difference. In the computation of the annual payment, if during the calendar year an employee has been force assigned to, or has been required to exercise seniority to, a position in an Interstate Commerce Commission classification with a lesser maximum amount than the maximum amount applicable to such employee's 1974 Interstate*

*Commerce Commission classification, such employee shall be paid the difference without credit being taken for compensation earned by virtue of actual working hours in the calendar year in excess of the number of hours paid for in such employee's average monthly compensation multiplied by 12 or such employee's annual 1977 maximum amount, whichever is less. An employee's compensation for purposes of this subsection shall not include savings sharing productivity payments received pursuant to paragraph (t) of the Crew Consist Agreement between the Corporation and the United Transportation Union dated September 8, 1978. If, in the previous calendar year, an employee has received displacement allowance payments in excess of such employee's annual entitlement, the excess payments shall be recovered from any current or future entitlement to monetary benefits afforded by this title, exclusive of benefits afforded by subsection (g) of this section.*

*"(4) Effective on the effective date of the Staggers Rail Act of 1980, a protected noncontract employee who has been deprived of employment or adversely affected with respect to such employee's compensation shall retain his average monthly compensation and monthly displacement allowance computed in accordance with this subsection as in effect prior to such effective date. In the event such noncontract employee exercises or has exercised seniority in a craft or class of operating employees, such employee's entitlement to a monthly displacement allowance and fringe benefits, and such employee's eligibility for transfer, shall be the same as the entitlement and eligibility of other protected employees in the craft or class in which seniority is exercised. In the event such noncontract employee exercises or has exercised seniority in a craft or class of nonoperating employees, the entitlement of such employee to a monthly displacement allowance and fringe benefits, and such employee's eligibility for transfer, shall be consistent with the entitlement and eligibility of other protected employees in the craft or class in which seniority is exercised, except that the protected rate of pay shall be based on the rate of pay of the position first obtained through the exercise of seniority, rather than the rate of any position held on or prior to September 1, 1979.*

*"(5) Notwithstanding the preceding provisions of this subsection, employees who, prior to September 1, 1979, accepted transfer to positions requiring a change of residence pursuant to subsection (d) of this section, shall retain their average monthly compensation and monthly displacement allowance computed in accordance with this subsection prior to the effective date of the Staggers Rail Act of 1980.*

*"(6) In determining compensation in a protected employee's current employment, such employee shall be treated as occupying the position producing the highest rate of pay to which such employee's qualifications and seniority entitle the employee under the applicable collective bargaining agreement and which does not require a change in residence. A protected operating employee will be considered to be occupying the position producing the highest rate of pay if the employee occupies a position producing compensation equal to such employee's average monthly compensation, subject to the maximum amount.*

*"(7) With respect to a protected employee who has been deprived of employment, the monthly displacement allowance shall be reduced by (A) the full amount of any unemployment compensation benefits received by such employee, and (B) an amount equivalent to any outside earnings of such employee.*

*"(8) A protected employee's average monthly compensation or protected rate of pay shall be adjusted from time to time thereafter to reflect subsequent general wage increases.*

*"(9) The average monthly compensation or protected rate of pay provided by this section shall in no event exceed $2,500 in any month, except that such amount shall be adjusted to reflect general wage increases subsequent to April 1, 1976.*

*"(10) A protected employee and his representative shall be furnished with such employee's protected rate of pay, or average monthly compensation and average monthly time paid for, subject to the maximum amount, computed in accordance with the terms of this subsection. Each protected employee who has been deprived of employment or his representative and the employer shall agree upon a procedure by which the employee shall keep the employer currently informed of the unemployment compensation benefits received by such employee and the earnings of such employee in employment other than with such employer.*

*"(11) In the case of a supplemental transaction—*

*"(A) with respect to an employee described in paragraph (1) of this subsection who was not employed on September 1, 1979, the protected rate of pay of such employee shall be based on the rate of pay of the position held by such employee on the first day of the first month after September 1979 in which such employee was employed;*

*"(B) with respect to an employee described in paragraph (2) of this subsection who was not employed during the 12 months immediately preceding January 1, 1975, the average monthly compensation of such employee shall be determined on the basis of the first 12-month period after January 1, 1974, during which such employee was employed; and*

*"(C) with respect to an employee described in paragraph (3) of this subsection—*

*"(i) if such employee was employed during the 12 months immediately preceding January 1, 1975, the average monthly compensation of such employee shall be determined on the basis of such 12-month period; and*

*"(ii) if such employee was not employed during the 12 months immediately preceding January 1, 1975, the preponderance of work of such employee shall be determined on the basis of the first 12-month period after January 1, 1974, during which such employee was employed.*

*DURATION OF MONTHLY DISPLACEMENT ALLOWANCE*

*SEC. 502. Section 505(c) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 775(c)) is amended to read as follows:*

*"(c) DURATION OF MONTHLY DISPLACEMENT ALLOWANCE.—The monthly displacement allowance provided for in subsection (b) of*

*this section shall, in the case of a protected employee with 5 or more years of service on the effective date of this Act, continue until the attainment of age 65 by such employee, and shall, in the case of a protected employee who has less than 5 years of service on such date, continue for a period equal to the employee's total prior years of service, except that such monthly displacement allowance—*

*"(1) shall terminate upon the protected employee's death, retirement, resignation, or dismissal for cause;*

*"(2) shall not be paid with respect to any period of disciplinary suspension for cause, failure to work due to illness or disability, voluntary furlough, or failure to retain or obtain a position available to the employee by the exercise of such employee's seniority rights in accordance with the provisions of this section;*

*"(3) shall not be paid to a protected employee deprived of employment with respect to any period of failure to work due to strike, fire, flood, snowstorm, hurricane, earthquake, tornado, or other similar natural occurrence that causes a suspension of operations in whole or in part and precludes performance of the work which would be performed by the incumbents of the positions to be abolished or the work which would be performed by the employees involved in the force reductions (but the payment of monthly displacement allowances shall be resumed upon termination of the emergency); and*

*"(4) shall not be paid with respect to any month that commences after the effective date of the Staggers Rail Act of 1980 for which the employee has failed to make a claim for such allowance within 3 full calendar months (unless otherwise agreed upon by the employee or his representative and the employer) after the last day of the month for which such allowance is sought, except that such 3-month limit shall not apply to any claim which is the subject of or is based upon an arbitration decision issued pursuant to section 507 of this title.*

*Unless otherwise agreed upon by the employee or his representative and the employer, the entitlement of an employee to an allowance shall be approved or denied within 150 days after the claim therefor is made if such claim is filed during the 12-month period beginning on the effective date of the Staggers Rail Act of 1980, and within 90 days after the claim therefor is made if such claim is filed after such 12-month period. Any claim not approved or denied at the expiration of the time limits described in the preceding sentence shall be deemed approved.".*

*TRAINING AND TRANSFER*

*SEC. 503. (a)(1) Section 505(d) (1) and (3) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 775(d) (1) and (3)) are each amended by inserting "or other employers with employees protected under this section" immediately after "Corporation" wherever it appears.*

*(2) Section 505(d)(1) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 775(d)(1)) is amended by inserting "or the system of other employers with employees protected under this section" immediately after "Corporation's system".*



Digitized from Best Copy Available

*(3) Section 505(d)(2) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 775(d)(2)) is amended by adding at the end thereof the following new sentence: "Notwithstanding any other provision of this subsection, a protected employee of the National Railroad Passenger Corporation shall not be required to transfer to a location outside the seniority district of such protected employee.".*

*(b) Section 505(d)(4) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 775(d)(4)) is amended by striking out "Transfers" and inserting in lieu thereof "Except as provided in paragraph (5) of this subsection, transfers".*

*(c) Section 505(d) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 775(d)(4)), as amended, is further amended by adding at the end thereof the following new paragraph:*

*"(5) In the case of a marine craft or class on the Corporation's system, or in the craft or class of a Penn Truck Lines, Incorporated, employee, transfers to vacancies requiring a change in residence shall be subject to the following:*

*"(A) The vacancy shall be first offered to the junior qualified protected employee or employees deprived of employment in the seniority district where the vacancy exists, and each such employee shall have 20 days to elect one of the options set forth in paragraph (1) of this subsection. The Corporation shall determine the number of junior qualified protected employees deprived of employment (not to exceed four employees per offer) who will be included in the offer of transfer. The vacancy will be awarded to the most junior qualified protected employee who accepts transfer. Other qualified protected employees who have accepted the transfer will retain their status as employees deprived of employment. Employees junior to the acceptor who have elected one of the options set forth in paragraph (1) of this subsection shall retain the option. If the vacancy is not filled, it may be again offered in inverse seniority order to remaining qualified protected employee(s) deprived of employment (not to exceed four employees per offer) in the seniority district.*

*"(B) If there are no qualified protected employees deprived of employment in the seniority district where the vacancy exists, the vacancy may be offered in inverse seniority order to qualified protected employees deprived of employment (not to exceed four employees per offer) on the system, in accordance with the procedure in subparagraph (A) of this paragraph. Employees offered transfer pursuant to this paragraph will be afforded 30 days to elect one of the options set forth in paragraph (1) of this subsection.*

*"(C) The provisions of this paragraph shall not prevent the adoption of other procedures pursuant to an agreement made by the Corporation and representatives of the class or craft of employees involved.*

*"(D) When no bona fide vacancies exist in such craft or class, the Corporation may offer such employee comparable employment for which the employee is qualified, or for which the employee can be trained, in another craft or class. The Corporation shall first attempt to locate a comparable position in a seniority district which encompasses the employee's last work location, and if successful, a transfer notice may be tendered pursuant to subparagraph (A) of this paragraph. If no such position exists,*

*the Corporation may tender the employee a transfer notice involving a position elsewhere on the system pursuant to subparagraph (B) of this paragraph. In the event it is necessary to train an employee after such employee's acceptance of a position pursuant to this paragraph, such training shall be provided by the Corporation at no cost to the employee.".*

*(d) Section 505(i)(1) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 775(i)(1)) is amended by adding at the end thereof the following new sentences: "The Corporation may simultaneously offer a position to not more than 4 protected noncontract employees. The position shall be given to the protected employee accepting transfer whom the Corporation considers to be best qualified for the particular position involved. Other protected employees who have accepted the transfer shall retain their previous status. Employees who have elected a voluntary suspension of employment at their home location in lieu of protective benefits or a severance of employment shall retain the option elected.".*

*PAYMENT, AUDIT, AND REPORT*

*SEC. 504. Section 509 of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 779) is amended to read as follows:*

*"PAYMENT, AUDIT, AND REPORT*

*"SEC. 509. (a) PAYMENT.—The Corporation, the Association (where applicable), replacement operators, and acquiring railroads, as the case may be, shall be responsible for the actual payment of all allowances, expenses, and costs provided protected employees pursuant to the provisions of this title. The Corporation, the Association (where applicable), replacement operators, and acquiring railroads shall then be reimbursed for the actual amounts paid to, or for the benefit of, protected employees, pursuant to the provisions of this title (including such amounts paid by the employer prior to the effective date of the Staggers Rail Act of 1980 and training costs incurred by the Corporation pursuant to section 505(d)(4)(D) of this title), other than provisions with respect to employee pension benefits, not to exceed an aggregate sum of $485,000,000, by the Railroad Retirement Board, upon certification to such Board in such detail as the Board may reasonably require, by the Corporation, the Association (where applicable), replacements operators, and acquiring railroads, of the amounts paid such employees, except that the aggregate amount of reimbursements made by the Board for the payment of monthly displacement allowances in the period after the effective date of the Staggers Rail Act of 1980 shall not exceed $180,000,000. There is authorized to be appropriated to the Secretary annually such sums as may be required to meet the obligations payable under this title, not to exceed the aggregate sum of $485,000,000. Upon the exhaustion of such authorization, the Corporation, the Association (where applicable), replacement operators, and acquiring railroads shall retain responsibility for the payment of benefits otherwise reimbursable under this title, but they shall not be reimbursed therefor. There is further authorized to be appropriated to the Secretary such sums as may be necessary to provide for additional administrative expenses to be incurred by the Railroad Retirement Board in*

*the performance of its functions under this section. Appropriations authorized under this section may be allocated by the Secretary to the Railroad Retirement Board.*

*"(b) AUDIT.—Beginning October 1, 1980, the Association shall conduct a program audit of the payment of benefits pursuant to this title and shall evaluate the effectiveness of the provisions of this title in improving the Corporation's management of certain protected employees in its workforce who are entitled to receive monthly displacement allowances. Such audits and evaluations shall be conducted in accordance with such rules and regulations as the Association may prescribe. The representatives of the Association shall have access to all books, accounts, records, reports, files, and other papers, things, or property belonging to, or in use by or in connection with, the Corporation, replacement operators, acquiring railroads, or the Railroad Retirement Board which pertain to the benefits provided protected employees pursuant to this title and which are necessary to facilitate such audit and evaluation.*

*"(c) REPORT.—The Association shall transmit to the Congress and the President, not later than 90 days after the end of each fiscal year, a comprehensive and detailed report on the payment of benefits under this title and the effectiveness of the provisions of this title in improving the Corporation's management of certain protected employees in its workforce who are entitled to receive monthly displacement allowances.".*

*RAILROAD HIRING*

*SEC. 505. Title V of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 771 et seq.) is amended by adding at the end thereof the following new section:*

*"RAILROAD HIRING*

*"SEC. 510. Any protected employee of the Corporation and any employee of the Corporation who is separated or furloughed from his employment with the Corporation (other than for cause) shall, unless found to be less qualified than other applicants, have the first right of hire by any other railroad that is subject to regulation by the Commission for any vacancy that is not covered by (1) an affirmative action plan, or a hiring plan designed to eliminate discrimination, that is required by Federal or State statute, regulation, or Executive order, or by the order of a Federal court or agency, or (2) a permissible voluntary affirmative action plan. For purposes of this section, a railroad shall not be considered to be hiring new employees when it recalls any of its own furloughed employees.".*

*SINGLE COLLECTIVE-BARGAINING AGREEMENT*

*SEC. 506. Section 504(d) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 774(d)) is amended to read as follows:*

*"(d) NEW COLLECTIVE-BARGAINING AGREEMENTS.—Not later than 60 days after the effective date of any conveyance pursuant to the provisions of this Act, the representatives of the various classes of crafts of the employees of a railroad in reorganization involved in a conveyance and representatives of the Corporation shall commence negotiation of a new single collective-bargaining agreement for each*

*class and craft of employees covering the rate of pay, rules, and working conditions of employees who are employees of the Corporation. Such collective-bargaining agreement shall include appropriate provisions concerning rates of pay, rules, and working conditions, but shall not include any provisions for job stabilization resulting from any transaction effected pursuant to this Act which may exceed or conflict with those established herein. Negotiations with respect to such single collective-bargaining agreement, and any successor thereto, shall be conducted systemwide.".*

*EMPLOYEE PROTECTION PAYMENTS*

*SEC. 507. Notwithstanding any other provision of law, the Consolidated Rail Corporation and other employers with employees protected under the provisions of title V of the Regional Rail Reorganization Act of 1973 shall, until the effective date of this Act, continue to make payments for employee protection under such Act in accordance with the provisions of such Act which were in effect on January 1, 1979. Notwithstanding any other provision of law, such Corporation and employers shall be reimbursed for such payments in accordance with the provisions of section 509(a) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 779(a)).*

*TECHNICAL AMENDMENTS*

*SEC. 508. (a)(1) The item relating to section 509 in the table of contents of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 701 et seq.) is amended to read as follows:*

*"Sec. 509. Payment, audit, and report.".*

*(2) The table of contents of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 701 et seq.) is amended by inserting immediately after the item relating to section 509 the following new item:*

*"Sec. 510. Railroad hiring.".*

*(b) Section 102(16) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 702(16)) is amended to read as follows:*

*"(16) 'Secretary' means the Secretary of Transportation or the designated representative of the Secretary;".*

*(c) Section 201 of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 711) is amended—*

*(1) by amending subsection (d)(2) to read as follows:*

*"(2) three Government members, who shall be (A) the Secretary, acting directly or at any time through the Deputy Secretary of Transportation, the General Counsel of the Department of Transportation, the Federal Railroad Administrator, or the Deputy Administrator of the Federal Railroad Administration, (B) the Secretary of the Treasury, acting directly or at any time through an officer of the Department of the Treasury who has been appointed with the advise and consent of the Senate, and (C) the Chairman of the Commission, acting directly or at any time through the Vice Chairman of the Commission; and";*

*(2) striking out "through their respective Deputy Secretaries" from the first sentence of subsection (i) and inserting in lieu thereof "in the case of the Secretary, through the Deputy Secretary of Transportation, the General Counsel of the Department*

*of Transportation, the Federal Railroad Administrator, or the Deputy Administrator of the Federal Railroad Administration, and, in the case of the Secretary of the Treasury, through an officer of the Department of the Treasury who has been appointed with the advise and consent of the Senate"; and*

*(3) by striking out the first sentence of subsection (j)(4).*

*(d) Section 501 of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 771) is amended—*

*(1) in paragraph (6), by inserting immediately after "disability," the following: "failure to work due to strike, fire, flood, snowstorm, hurricane, earthquake, tornado, or other similar natural occurrence that causes a suspension of operations in whole or in part and precludes performance of the work which would be performed by the incumbents of the positions to be abolished or the work which would be performed by the employees involved in the force reductions,"; and*

*(2) by striking out "and" at the end of paragraph (10), by striking out the period at the end of paragraph (11) and inserting in lieu thereof "; and", and by adding at the end thereof the following new paragraph:*

*"(12) 'compensation' means earnings in employment subject to the Railroad Retirement Act.".*

*(e) Section 507 of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 777) is amended by inserting ", section 509(b), or section 509(c)" immediately after "section 504(d)".*

*(f) The first sentence of section 403(d)(1) of the Rail Passenger Service Act (45 U.S.C. 563(d)(1)) is amended by striking out "if such State" and all that follows through "service".*

## *TITLE VI—EXPEDITED SUPPLEMENTAL TRANSACTION PROPOSALS*

### *EXPEDITED SUPPLEMENTAL TRANSACTION PROPOSALS*

*SEC. 601. (a) Section 305 of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 745) is amended by adding at the end thereof the following new subsection:*

*"(f) EXPEDITED PROPOSALS.—(1) Within 240 days after the effective date of the Staggers Rail Act of 1980, the Secretary, after providing an opportunity for comments from interested parties, shall determine whether to initiate a proposal for a supplemental transaction under this section for the transfer of all rail properties of the Corporation in the States of Connecticut and Rhode Island to another railroad in the region. If the Secretary determines that—*

*"(A) the proposed transferee railroad is financially and operationally capable of assuming the freight operations and freight service obligations of the Corporation on a financially self-sustaining basis;*

*"(B) the proposed transfer would promote the establishment and retention of a financially self- sustaining rail system in the States of Connecticut and Rhode Island adequate to meet the needs of such States; and*

*"(C) the proposed transfer is consistent with the goals set forth in section 206(a)(8) of this Act,*

*the Secretary shall develop such a proposal and may, after providing the Association, the Commission, and the States of Connecticut and Rhode Island an opportunity to review and comment on such proposal, petition the special court for an order to carry out such proposal.*

*"(2) The Secretary shall establish a fair and equitable price for any rail properties transferred pursuant to a proposal developed under this subsection.*

*"(3) If the special court determines that a proposal developed under this subsection is fair and equitable, meets the requirements of this subsection, and is in the public interest, it shall issue such orders as may be necessary to carry out such proposal. The provisions of paragraphs (2)-(6) of subsection (d) of this section shall apply to the determination of the special court under this subsection, except that the standards for such determination shall be those set forth in this paragraph.*

*"(4) In complying with the requirements of subsection (d)(7) of this section with respect to the application of the provisions of title V of this Act to supplemental transactions, the parties to an expedited supplemental transaction under this subsection and the representatives of the employees affected thereby shall enter into a new agreement pursuant to section 508 of this Act and shall not be bound by the terms of any agreement executed under such section 508 and in effect on the date of enactment of the Staggers Rail Act of 1980.".*

*(b) Section 102(19) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 702(19)) is amended by striking out ", within 6 years after the date on which the special court orders conveyances of rail properties to the Corporation".*

## *TITLE VII—MISCELLANEOUS PROVISIONS*

### *ROCK ISLAND AND MILWAUKEE RAILROADS AMENDMENTS*

*SEC. 701. (a)(1) The Rock Island Railroad Transition and Employee Assistance Act (45 U.S.C. 1001 et seq.) is amended by redesignating section 124 as section 125 and by inserting immediately after section 123 the following new section:*

### *"JUDICIAL REVIEW*

*"SEC. 124. (a) Notwithstanding any other provision of law, any appeal from—*

*"(1) any decision of the bankruptcy court with respect to the constitutionality of any provision of this Act; and*

*"(2) any decision of the court having jurisdiction over the reorganization of the Milwaukee Railroad with respect to the constitutionality of the Milwaukee Railroad Restructuring Act (45 U.S.C. 901 et seq.),*

*shall be taken to the United States Court of Appeals for the Seventh Circuit.*

*"(b) If appeals are taken from decisions described in subsection (a) of this section involving section 106 or 110 of this title or section 9 or 15 of the Milwaukee Railroad Restructuring Act, the court of appeals shall determine such appeals in a consolidated proceeding, sit-*

*ting en banc, and shall render a final decision no later than 60 days after the date the last such appeal is filed.*

*"(c) Nothing in this Act or in the Milwaukee Railroad Restructuring Act (45 U.S.C. 901 et seq.) shall limit the right of any person to commence an action in the United States Court of Claims under section 1491 of title 28, United States Code (commonly referred to as the Tucker Act).".*

*(2) Section 110(e) of the Rock Island Railroad Transition and Employee Assistance Act (45 U.S.C. 1008(e)) is amended by inserting "to employees" immediately after "liability".*

*(3) Section 15(e) of the Milwaukee Railroad Restructuring Act (45 U.S.C. 914(E)) is amended by inserting "to employees" immediately after "liability".*

*(b)(1) Section 106 of the Rock Island Railroad Transition and Employee Assistance Act (45 U.S.C. 1005) is amended to read as follows:*

*"EMPLOYEE PROTECTION AGREEMENTS*

*"SEC. 106. (a) No later than 5 days after the date of enactment of the Staggers Rail Act of 1980, in order to avoid disruption of rail service and undue displacement of employees, the Rock Island Railroad and labor organizations representing the employees of such railroad with the assistance of the National Mediation Board, may enter into an agreement providing protection for employees of such railroad who are adversely affected as a result of a reduction in service by such railroad. Such employee protection may include, but need not be limited to, employee relocation incentive compensation, moving expenses, and separation allowances.*

*"(b) If the Rock Island Railroad and the labor organizations representing the employees of such railroad are unable to enter into an employee protection agreement under subsection (a) of this section within 5 days after the date of enactment of the Staggers Rail Act of 1980, the matter shall be immediately submitted to the Commission. The Commission shall impose upon the parties by appropriate order a fair and equitable arrangement with respect to employee protection no later than 15 days after the date of enactment of the Staggers Rail Act of 1980, unless the Rock Island Railroad, and the authorized represen'atives of its employees have by then entered into a labor protection agreement. For purposes of this subsection, the term 'fair and equitable' means no less protective of the interests of employees than protection established by and pursuant to section 9 of the Milwaukee Railroad Restructuring Act (45 U.S.C. 908), subject to the limitations set forth in section 110 of this title.*

*"(c) If an employee protection arrangement is imposed by the Commission under subsection (b) of this section, the bankruptcy court shall immediately authorize and direct the Rock Island Railroad trustee to, and the Rock Island Railroad trustee and the labor organizations representing the employees of the railroad shall, immediately implement such arrangement.*

*"(d) Any order of the Commission under subsection (b) of this section and any order of the bankruptcy court under subsection (c) of this section may be appealed only to the United States Court of Appeals for the Seventh Circuit. Any such appeal to such court of appeals shall be filed within 5 days after the date of entry of the order of the Commission or the bankrupty court, as the case may be, and*

*such court of appeals shall finally determine such appeal within 60 days after the date such appeal is filed.*

*"(e)(1) Any claim of an employee for benefits and allowances under an employee protection agreement or arrangement entered into under this section shall be filed with the Board in such time and manner as the Board by regulation shall prescribe. The Board shall determine the amount for which such employee is eligible under such agreement or arrangement and shall certify such amount to the Rock Island Railroad for payment.*

*"(2) Benefits and allowances under such agreement or arrangement entered into this section shall be paid by the Rock Island Railroad from its own assets or in accordance with section 110 of this title, and claims of employees for such benefits and allowances shall be treated as administrative expenses of the estate of the Rock Island Railroad.*

*"(f) The first sentence of section 7(b)(7) of the Railroad Retirement Act of 1974 (45 U.S.C. 231f(b)(7)) is amended by striking out "Milwaukee Railroad Restructuring Act" and inserting in lieu thereof ", the Milwaukee Railroad Restructuring Act, and the Rock Island Railroad Transition and Employee Assistance Act.".*

*(2) Section 108(a) of the Rock Island Railroad Transition and Employee Assistance Act (45 U.S.C. 1007(a)) is amended by inserting immediately before the period at the end thereof the following: "(other than as provided in the agreement entered into in Washington, District of Columbia, on March 4, 1980, entitled 'Labor Protective Agreement Between Railroads Parties Hereto Involved in Midwest Rail Restructuring and Employees of Such Railroads Represented by the Rail Labor Organizations Operating Through the Railway Labor Executives' Association')."*

*(3) Section 103(5) of the Rock Island Railroad Transition and Employee Assistance Act (45 U.S.C. 1002(5)) is amended by inserting immediately before the period at the end thereof the following: ", the estate of such Company in its reorganization proceeding, or the trustee appointed in such proceeding".*

*(c)(1) Section 7 of the Milwaukee Railroad Restructuring Act (45 U.S.C. 906) is amended by adding at the end thereof the following new subsection:*

*"(h)(1) All obligations to the United States or any agency or instrumentality of the United States incurred pursuant to this section by the Milwaukee Railroad or the trustee of the property of the Milwaukee Railroad shall be waived and canceled when—*

*"(A) the Milwaukee Railroad is reorganized as an operating rail carrier; or*

*"(B) substantially all of the Milwaukee Railroad is purchased.*

*"(2) For purposes of this subsection, substantially all of the Milwaukee Railroad shall be considered as having been purchased when (A) more than 50 percent of the rail system operated by the Milwaukee Railroad on the date of enactment of the Staggers Rail Act of 1980 has been purchased, and (B) more than 50 percent of the employees employed by the Milwaukee Railroad on such date of enactment have obtained employment with other rail carriers.".*

*(2) Section 14 of the Milwaukee Railroad Restructuring Act (45 U.S.C. 913) is amended by redesignating subsection (d) as subsection (e) and by inserting after subsection (c) the following new subsection:*

*"(d) There are authorized to be appropriated $15,000,000 for purposes of providing transaction assistance in accordance with section 505(h)(1) (A) and (B) of the Railroad Revitalization and Regulatory Reform Act of 1976.".*

*(d) Section 505(h) of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 825(h)) is amended—*

*(1) in paragraph (1)(A), by striking out "$25,000,000" and inserting in lieu thereof "$38,000,000";*

*(2) in paragraph (1)(B), by striking out "$18,000,000" and inserting in lieu thereof "$27,000,000"; and*

*(3) by amending paragraph (4) to read as follows:*

*"(4) This subsection shall apply to (A) purchase offers submitted to the Trustee of the Rock Island Railroad Estate and filed with the Commission prior to September 15, 1980 (or such other time as the Secretary considers appropriate), and (B) purchase applications filed with the Commission prior to September 15, 1980 (or such other time as the Secretary considers appropriate) and approved by the court having jurisdiction over the reorganization of the Rock Island Railroad or the Milwaukee Railroad, as the case may be, and by the Commission.".*

*LOAN GUARANTEES*

*SEC. 702. (a) To promote competition in the transportation of coal, the Secretary of Transportation shall, no later than 75 days after the date of the issuance of the final environmental impact statement with respect to the loan application, take final action on any application for loan guarantees, under section 511 of the Railroad Revitalization and Regulatory Reform Act of 1976, to be used in connection with joint ownership, construction, or rehabilitation of any facilities (including support facilities) for a second rail carrier to serve the Powder River Coal Region in Montana and Wyoming.*

*(b)(1) The Secretary of Transportation shall review the proposed Chicago and North Western connector line route and shall not approve any route which requires the use of any agricultural land unless (A) there is no feasible and prudent alternative to the use of such land, and (B) the proposed route construction plan requires all possible planning to minimize harm to such agricultural land resulting from such use. The Secretary of Transportation may not otherwise disapprove a proposed route for the Chicago and North Western line under the authority of this subsection. This review of a proposed route shall be conducted within 90 days after the final action specified in subsection (a) of this section.*

*(2)(A) The Secretary shall review the use of any agricultural land used in any route for newly constructed line and shall require, to the maximum extent prudent and feasible, that such railroad provide a private grade crossing for the convenience of each landowner whose agricultural holdings are divided by such newly constructed line when the Secretary finds that such division of property will cause a substantial disruption to the agricultural use of such land. The owners of such property shall file a request for such grade crossing with the Secretary within 180 days of the final determination of the route. The finding of the Secretary under this subsection shall be final.*

Digitized from Best Copy Available

*(B) The Secretary shall render a decision on each request for grade crossing under this paragraph within 180 days of its receipt. Such review shall not require the delay of construction of new line under subsection (a) of this section.*

*(c)(1) Notwithstanding any other provision of law, the actions of Secretary of Transportation taken pursuant to subsections (a) and (b) of this section shall not be subject to judicial review except as provided in this section.*

*(2) A claim alleging the invalidity of this section may be brought no later than the 60th day following the date a final action is taken pursuant to subsections (a) and (b) of this section.*

*(3) A claim challenging an action of the Secretary of Transportation under subsection (a) or (b) of this section may be brought only on the grounds that such action will deny rights under the Constitution of the United States, is arbitrary capricious, or an abuse of discretion, exceeds statutory jurisdiction, authority, or limitations, or is short of statutory right. Such a claim may be brought not later than the 60th day following the date of such action.*

*(4) A claim under paragraph (2) or (3) shall be barred unless prior to the expiration of such time limits, a complaint is filed in the United States Court of Appeals for the District of Columbia acting as a special court. Such court shall have exclusive jurisdiction to determine such proceeding in accordance with the procedures hereinafter provided, and no other court of the United States, of any State, territory, or possession of the United States, or of the District of Columbia, shall have jurisdiction of any such claim in any proceeding instituted prior to or on or after the date of enactment of this Act.*

*(5) Any such proceeding shall be assigned for hearing and completed at the earliest possible date, and to the greatest extent practical shall take precedence over all other matters pending on the docket of the court at that time, and shall be expedited in every way by such court, and such court shall render its decision relative to any claim within 90 days from the date such claim is brought unless such court determines that a longer period is required to satisfy requirements of the Constitution of the United States.*

*(d) Notwithstanding any other provision of law, the Secretary shall take the final action described in subsection (a) of this section without regard to the consent, or lack thereof, of any Committee of the Congress.*

*CONRAIL STUDIES AND EMERGENCY FUNDING*

*SEC. 703. (a) For purposes of this section, the term—*

*(1) "Association" means the United States Railway Association;*

*(2) "Commission" means the Interstate Commerce Commission;*

*(3) "Corporation" means the Consolidated Rail Corporation;*

*(4) "rail properties" means assets or rights owned, leased, or otherwise controlled by the Corporation which are used or useful in rail transportation service;*

*(5) "region" has the meaning given such term in section 101(15) of the Regional Rail Reorganization Act of 1973; and*

*(6) "Secretary" means the Secretary of Transportation.*

*(b)(1) No later than April 1, 1980, the Association and the Corporation shall each submit a report to the Congress analyzing the impact, upon the Corporation, rail service in the region, railroad employees, the economy of the region, and other rail carriers in the region and elsewhere, and the Federal budget, of—*

*(A) no further Federal funding for the Corporation;*

*(B) continued Federal funding of the rail system of the Corporation as it is presently structured; and*

*(C) future Federal funding of the Corporation to the extent necessary to preserve rail service in the region which can be self-supporting, without undue interim disruption of operations which will be maintained.*

*(2) Each report submitted under paragraph (1) of this subsection shall contain a description, under each of the Federal funding alternatives set forth in subsection (a) of this section, of the lines of the Corporation which would be maintained, the lines of the Corporation which would be abandoned, and the lines which would be transferred.*

*(3) Each report submitted under paragraph (1) of this subsection shall also include specific recommendations with respect to—*

*(A) future projected funding requirements of the Corporation;*

*(B) future structure and activities of the Corporation in the region;*

*(C) any legislative action needed with respect to the matters described in subparagraphs (A) and (B) of this paragraph; and*

*(D) any other matters which the Association or the Corporation considers appropriate.*

*The specific recommendations submitted under this paragraph shall set forth alternatives for the Congress to consider in the event it determines that modification of such recommendations is appropriate.*

*(4) In developing recommendations in accordance with this subsection, the Association and the Corporation shall identify measures designed to ensure a financially self-sustaining rail system in the region. The recommendations shall be based on analyses of rail properties which might be proposed for abandonment or transfer to another railroad or qualified person and proposed operating efficiencies which could improve the Corporation's revenue-to-cost ratio.*

*(5) In developing recommendations under this subsection, the Association and the Corporation shall each analyze and consider—*

*(A) projections of the Corporation's future traffic, revenues, operating costs, and capital requirements;*

*(B) rail properties which might be proposed for abandonment or transfer to another railroad or qualified person, taking into account the potential impact of changes in the regulatory environment;*

*(C) the impact on communities served by lines proposed for abandonment or transfer;*

*(D) proposed operating efficiencies which could improve the Corporation's revenue-to-cost ratio;*

*(E) the impact on the Corporation of proposed mergers by connecting or competing railroads;*

*(F) employee motivation and labor productivity programs and a projection of labor protection costs which could result from the recommendations;*

*(G) the future capital structure of the Corporation; and*

Digitized from Best Copy Available

*(H) any other factors identified by the Association as relevant to the recommendations required to be developed and submitted pursuant to this section.*

*(6)(A) The Association and the Corporation shall, on the date of submission of their recommendations to the Congress under this subsection, transmit copies of such recommendations to the Secretary, the Commission, and the Governor of each State that could be affected by such recommendations. Upon request, the Association and the Corporation shall furnish a copy of their recommendations to any interested person.*

*(2) As soon as practicable afer submission of their recommendations to the Congress, the Association and the Corporation shall publish in the Federal Register a summary of such recommendations and invite interested parties to comment on such recommendations.*

*(7) The Commission shall, no later than May 1, 1981, submit to the Congress its comments on the reports of the Association, the Secretary, and the Corporation under this subsection.*

*(8) Not later than April 1, 1981, the Secretary shall submit to the Congress his recommendations with respect to the future structure and operations of the Corporation. Not later than May 1, 1981, the Secretary shall submit to the Congress his comments and recommendations with respect to the reports of the Association and the Corporation under this subsection, and shall make any changes in his recommendations that he determines are necessary.*

*(9) The antitrust laws, as defined in section 601(a)(3) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 791(a)(3)), shall not apply to any action taken by the Association or the Secretary prior to May 1, 1981, in accordance with and under the authority of the provisions of this subsection.*

*(c) The Corporation shall, no later than March 15, 1981, submit to the Congress an analysis of the effects upon the Corporation and its employees of alternative changes in labor agreements and related operational changes. Such report shall include an analysis of any Federal funding that will be required.*

*(d) The Corporation shall, no later than January 15, 1981, submit to the Association its projections of the benefits to the Corporation of the Staggers Rail act of 1980, its projections of changes needed in the structure of the rail system of the Corporation including properties which may be abandoned or transferred, and other projections of potential savings or increased revenues to the Corporation.*

*(e) Section 216(b) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 726(b)), as amended by this Act, is further amended by adding at the end thereof the following new paragraph:*

*"(4) Purchases of up to $329,000,000 of a series A preferred stock shall be made by the Association, subject to the availability of appropriations, as required and requested by the Corporation, if the Finance Committee makes an affirmative finding that the Corporation has taken appropriate action to eliminate losses on light density lines and other lines which are unprofitable. Such action shall include the imposition of surcharges on such lines, the abandonment of such lines, and the transfer of such lines.".*

*(f)(1) Section 216(a) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 726(a)) is amended by striking out "$2,300,000,000" and inserting in lieu thereof "$2,629,000,000".*

*(2) Section 216(g) of such Act (45 U.S.C. 726(g)) is amended by striking out "$3,300,000,000" and insertinbg in lieu thereof "$3,629,000,000".*

*(3) Section 210(e) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 720(e)) is amended by inserting immediately after "section" in the first sentence thereof the following: "or under subsection (a) of section 306 of this Act".*

*USRA AUTHORIZATION OF APPROPRIATIONS*

*SEC. 704. Section 214(c) of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 724(c)) is amended to read as follows:*

*"(c) ASSOCIATION.—For the fiscal year ending September 30, 1981, there are authorized to be appropriated to the Association for purposes of carrying out its administrative expenses under this Act such sums as are necessary, not to exceed $30,000,000. Sums appropriated under this subsection are authorized to remain available until expended.".*

*FEEDER LINE REHABILITATION STUDY*

*SEC. 705. (a) The Secretary of Transportation and the Secretary of the Treasury shall jointly submit to the Congress, within 9 months of the effective date of this Act, a comprehensive report on the anticipated effect (including the loss of revenue to the Federal Treasury) of amending section 103 of the Internal Revenue Code of 1954 to provide an exemption from taxation for obligations incurred in connection with the rehabilitation of railroad feeder lines. Such report shall also include such criteria as may be necessary to prevent the abuse of such special tax status.*

*(b) For purposes of this section, railroad feeder line rehabilitation includes the acquisition, construction, reconstruction, or erection of any feeder line roadbed, track, trestle, depot, switching, and signaling equipment, or any other rail equipment (other than rolling stock).*

*EFFECT ON PENDING MATTERS*

*SEC. 706. In the case of any proposal docketed with a rate bureau prior to the effective date of this Act which is or becomes the subject of an application or proceeding before the Interstate Commerce Commission, such application or proceeding shall be determined as if this Act had not been enacted, and the antitrust immunity provided in section 10706(b) of title 49, United States Code, resulting from approval of such agreement shall continue in effect.*

*CONSTRUCTION OF AMENDMENTS*

*SEC. 707. With respect to the relationship between water carriers and rail carriers, none of the amendments made by this Act shall be construed to make lawful (1) any competitive practice that is unfair, destructive, predatory, or otherwise undermines competition and that was unlawful on the effective date of this Act, or (2) any other competitive practice that is unfair, destructive, predatory, or otherwise undermines competition.*

Digitized from Best Copy Available

### *SURPLUS PROPERTY*

*SEC. 708. Notwithstanding any other provision of law, the Consolidated Rail Corporation shall be considered a Federal agency for the sole purpose of Department of the Army Regulations 735–5, paragraph 1–16. Such Corporation may enter into a contract under the authority granted by this section only when it determines that the safety of the public so requires.*

### *STUDY OF ALASKA RAILROAD RATES*

*SEC. 709. Within 6 months after the effective date of this Act, the Interstate Commerce Commission shall commence and complete a study to determine whether the rates charged by the Alaska Railroad pursuant to ICC–ARR Freight Tariffs 4108 and 4109 (as supplemented by supplements 1–4) would, if such rates had been entered into after the effective date of this Act, have constituted a violation of section 10701a(c)(1) of title 49, United States Code, as amended by this Act. To the extent feasible, such study shall be coordinated with the study by the State of Alaska in progress on the effective date of this Act.*

### *EFFECTIVE DATES*

*SEC. 710. (a) Except as provided in subsections (b), (c), and (d) of this section, the provisions of this Act and the amendments made by this Act shall take effect on October 1, 1980.*

*(b) Section 206 of this Act shall take effect on January 1, 1981.*

*(c) Section 218(b) of this Act shall take effect on October 1, 1983.*

*(d) Section 701 of this Act shall take effect on the date of enactment of this Act.*

And the Senate agree to the same.

HARLEY O. STAGGERS,
JAMES J. FLORIO,
JOHN M. MURPHY,
BOB ECKHARDT,
JIM SANTINI,
BARBARA A. MIKULSKI,
ROBERT T. MATSUI,
JAMES T. BROYHILL,
EDWARD R. MADIGAN,
TOM LOEFFLER,
GARY A. LEE,
*Managers on the Part of the House.*
HOWARD W. CANNON,
RUSSELL B. LONG,
J. JAMES EXON,
BOB PACKWOOD,
NANCY LANDON KASSEBAUM,
*Managers on the Part of the Senate.*

Digitized from Best Copy Available

Blank Page

Digitized from Best Copy Available

## JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the Senate to the amendment of the House to the text of the bill (S. 1946) to reform the economic regulation of railroads, and for other purposes, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

The House amendment to the text of the bill struck out all of the Senate bill after the enacting clause and inserted a substitute text.

The Senate amendment to the House amendment struck out all of the House amendment and inserted a substitute text.

The House recedes from its disagreement to the amendment of the Senate with an amendment which is a substitute for the Senate amendment and the House amendment. The differences between the Senate amendment, the House amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clarifying changes.

### SUMMARY AND DESCRIPTION

#### SECTION I—SHORT TITLE

Section 1 states that this bill may be cited as the "Staggers Rail Act of 1980".

#### SECTION II—FINDINGS

The Conferees find that historically the enactment of the Interstate Commerce Act was essential to prevent an abuse of monopoly power by railroads and to maintain a national railroad network as an essential part of the national transportation system. However, today, most transportation is competitive and many of the Government regulations affecting railroads have become unnecessary and inefficient. Nearly two-thirds of intercity freight is transported by modes of transportation other than railroads. Earnings by the railroad industry are the lowest of any transportation mode and are insufficient to generate funds for necessary capital improvements. By 1985, the railroad industry will experience a capital shortfall of between $16 billion and $20 billion. The industry's failure to achieve increased earnings will result in either further deterioration of the rail system or the need for additional Federal subsidy. Modernization of economic regulation of railroads, with greater reliance on the marketplace, is essential to achieve maximum utilization of railroads, to save energy and to combat inflation.



68-059 O - 80 - 6

Digitized from Best Copy Available

## SECTION III—GOALS

The specific goals of this Act are to assist the industry in the rehabilitation and financing of the rail system; to reform Federal Regulation to preserve a safe, adequate, economical, efficient and financially stable rail system, to assist the rail system to remain viable in the private sector of the economy; and to provide a regulatory process that balances the needs of carriers, shippers, and the public. The overall purpose of the Act is to provide, through financial assistance and freedom from unnecessary regulation, the opportunity for railroads to obtain adequate earnings to restore, maintain and improve their physical facilities while achieving the financial stability of the national rail system.

*Title I—Rail Transportation Policy*

Title I of the Conference substitute sets forth the congressional declaration of policy for railroads by adding a new section 10101(a) to the Interstate Commerce Act. The new section establishes a specific rail transportation policy to guide the Commission in its duties in regulation of the railroad industry. The Conferees intend that this policy include the encouragement and promotion of the transportation of coal by rail in accordance with the objective of energy independence at rates which do not exceed a reasonable maximum where there is an absence of effective competition.

*Title II—Railroad Rates and Inter-Carrier Practices*

Title II is related to the key areas of the Interstate Commerce Act which involve railroad rates and inter-carrier practices. In general, the title assures railroads substantially more rate freedom than is afforded them under existing law. It continues the policy started under the Railroad Revitalization and Regulatory Reform Act of 1976 of substantially eliminating rate regulation of railroads where there is effective competition. The title also affirmatively encourages railroads to use new marketing practices by permitting contracts between carriers and shippers; permissive limited liability rates; business entertainment expenses; efficient marketing through faster implementation of rates; and premium charges to encourage better car utilization.

A number of provisions are included to foster greater competition by simplifying coordination, minor mergers procedures, entry and reciprocal switching agreements. Moreover, the Commission is given the mandate to place greater emphasis on the need for carriers to have adequate revenue levels. Among other tools given the Commission for this purpose is the ability to determine the effects of inflation and to assure carriers the opportunity to recover inflation.

Specifically, Title II provides the Interstate Commerce Commission with jurisdiction to determine rate reasonableness only when a rail carrier has market dominance and the rate exceeds the applicable revenue-variable cost percentage threshold. The revenue-variable cost percentage is a level below which the Commission has no jurisdiction over the reasonableness of maximum rates. This codifies and refines the practice followed by the Commission for determining market dominance on, among other matters, the relationship of revenue to variable cost.

Digitized from Best Copy Available

For four years beginning October 1, 1980 and until October 1, 1984, there is a rate flexibility zone of 6 percent, subject to a cumulative total of 18 percent, in addition to inflation. If an portion of the 6 percent rate increase is not implemented in a year in which it is authorized, it may be carried over to the succeeding year. However, within the four year period no carrier can take an increase within the flexibility zone in excess of 12 percent in any one except that in the first year the zone is limited to 6 percent. If any portion of the 18 percent cumulative rate increase is not taken by October 1, 1984, it may be carried over to the next two succeeding years, with the limitation of an annual increase of 10 percent between October 1, 1984 and October 1, 1986.

Effective October 1, 1984, and in succeeding years thereafter, a carrier may annually implement a 4 percent increase, which may not be carried over in subsequent years.

The 4 percent zone is not available to increase single-line rates of carriers with adequate revenues. The Commission is to promulgate regulations in connection with joint-line movements involving both carriers with adequate revenues and carriers with inadequate revenues.

When determining the reasonableness of rates, the Commission is to recognize the policy that rail carriers shall earn adequate revenues. This title also authorizes carriers to increase a rate to cover cost increases due to inflation.

The rate of a carrier in effect upon enactment of this Act may be challenged before the Commission during the 180-day period following enactment on the basis that the carrier has market dominance over the transportation to which the rate applies. If the rate is not challenged during the 180-day period, or is found to be lawful, the rate may not be challenged thereafter. This provision does not apply to rates for volumes of traffic in the past year of under 500 net tons and which has increased tenfold in the three years prior to the challenge. The burden of proof under this section is with the complainant.

In order to encourage more effective marketing by railroads the notice period for rate increases is lowered from 30 days to 20 days and from 30 days to 10 days for rate decreases.

The Commission is required to maintain, and revise as necessary, standards and procedures for determining revenue adequacy. On the basis of the standards, the Commission is to determine within 180 days of the effective date of this Act and annually, thereafter, which carriers are earning adequate revenues.

The Commission may prescribe, on a quarterly basis, a percentage rate increase or rate index for rail carriers to compensate for inflationary cost increases. Within 60 days after the Commission prescribes such percentage rate increase or index, rail carriers intending to be excluded from such percentage rate increase or index, shall notify the Commission, and all carriers participating in a particular route must agree to be excluded for the exclusion to be effective. The percentage rate index may include percentage increases within a specified range to allow carriers to recover a total increase specified by the Commission as necessary to compensate for inflationary cost increases.

The Commission must complete an investigation or suspension proceeding concerning a rate, classification, rule or practice within

5 months, or 8 months if it reports to Congress. The Commission may not suspend a proposed rate, classification, rule or practice if a protestant is likely to prevail on the merits, substantial injury will result without the suspension, and because of the peculiar economic circumstances of the protestant precluded protection of the protestant by means of a refund if the rate is later found unreasonable by the Commission.

This title authorizes one or more carriers to enter into contracts with one or more shippers unless the Commission finds that the proposed contract unduly impairs the ability of the contract carrier(s) to meet their common carrier obligation or unreasonable discriminates against a port. In the case of agricultural commodities (including forest products and paper), a complaint may be filed on the grounds that a carrier has unreasonably discriminated by refusing to provide the complainant a similar contract under similar conditions or that the proposed contract constitutes a destructive competitive practice.

Once a contract has been approved, the Commission cannot require a carrier to violate its terms except under the Commission's emergency powers. The exclusive remedy for a breach of contract is an action in a State or U.S. district court unless the parties otherwise agree.

Demand sensitive rates under Section 10724 of title 49 U.S.C. are repealed.

Capital incentive rates under Section 10729 of title 49 U.S.C. are repealed except that capital incentive rates prior to enactment of this Act shall remain in effect no longer than five years, unless the parties otherwise agree.

To provide both shippers and railroads with greater rate-service options the Act permits the establishment of lesser liability requirements than presently assured by law. Such liability limitations are available only if the shipper agrees to them.

To permit use of the new provisions available to both shippers and railroads, Section 10741 of title 49 U.S.C. is amended by exempting certain services from the rate discrimination provision in current law. Exempted are certain contracts, surcharges and cancellations, separate rates for distinct services, rail rates applicable to different routes or business expenses authorized under section 10751 of this title. These exemptions do not affect existing prohibitions against discrimination between ports or within the same port.

The bill authorizes a carrier to surcharge or cancel a joint rate when the existing joint rate does not provide the carrier with 110 percent of its variable cost. Other carriers may prevent the surcharge or cancellation from becoming effective, however, by adjusting the division of revenues of proposing a new rate which brings the surcharging or cancelling carrier's revenues up to 110 percent. Alternatively, a shipper or carrier can reduce to the 110 pecent level a surcharge which would provide the surcharging carrier with revenues greater than 110 percent of variable cost, and can prevent a joint rate from being cancelled by providing a surcharge in lieu of cancellation which would being the revenues of the cancelling carrier to 110 percent of its variable cost. Such a reduced surcharge or surcharge in lieu of cancellation of a joint rate is to be imposed

by the Commission in conformity with the petition of the protesting shipper or carrier.

In addition a class III railroad may obtain review by the Commission of either a surcharge or cancellation if the surcharge or cancellation will have an adverse effect on the ability of a class III railroad to compete effectively, or if it will affect the class III railroad's last available route for a particular movement and produce certain adverse results for the class III railroad, or it it will adversely affect the competitive position of a shipper or receiver located on the class III railroad. In making its review, the Commission shall act to prevent anticompetitive surcharges or cancellations which affect class III railroads, and the Commission is given authority to preserve service on the route participated in by the class III railroad. The Commission may rescind the surcharge or cancellation and may require the surcharging or cancelling carrier to carry the traffic at less than 110 percent of its variable costs if necessary to preserve competition or service by the class III railroad which is required by the public interest.

The conferees note that nothing in the bill's protections reduces the availability of the Federal antitrust laws to protect against improper use of the surcharge or cancellation provisions. A rail rate to which a surcharge is applied shall constitute a rate increase for the purpose of section 10701a and 10709 of title 49, United States Code. An expedited division of revenue procedure is also established.

A similar below cost service problem occurs with respect to light density lines. That problem, however, relates more to shippers on a particular line than to inter-carrier relationships. The bill institutes the use of branchline surcharges on any lines carrying less than 3 million gross tons per year. (1 million gross tons for carriers with adequate revenues).

State authority over intrastate transportaton is limited to administering the provisions of the Interstate Commerce Act. Within 120 days of the effective date of this Act, State authorities must submit to the Commission standards and procedures to be used in exercising such jurisdiction. With 90 days of the receipt of the State's filing, the Commission shall certify the State's compliance with the regulations and procedures of this Act. States are precluded from authority over general rate increases, inflation—based rate increases and fuel adjustment surcharges.

In order to encourage competitive pricing, no rail carrier is permitted to discuss single line rates proposed by another carrier, except for the purposes of general rate increases and broad tariff changes. No rail carrier may discuss a joint line rate unless it practicably participates in that movement. After January 1, 1984 (or earlier if the Commission decides), no carrier may discuss a joint line rate where there are two or more routes between the same end points, except with a carrier that forms part of a particular single route. If the Commission finds that implementation of the section is not feasible, it may delay or suspend implementation in whole or in part.

Transcripts or sound recordings and records of votes are to be available to the Commission and other Federal agencies.

The Commission shall require protective conditions for rate bureau employees.

Digitized from Best Copy Available

Competition is encouraged by permitting entry by a rail carrier, through new construction, if public convenience and necessity permit or require it. Where the Commission has authorized construction or extension of a line, no other railroad may refuse to permit the carrier to cross its property if the construction or operation does not interfere with the operation of the crossed line and the owner of the crossing line compensates the owner of the crossed line. The Commission may require protective conditions for the employees affected by new construction.

The Commission may require reciprocal switching where practicable and in the public interest or where such agreements are necessary to provide competitive rail service. The Commission may establish conditions and compensation where carriers are unable to agree within a reasonable time. The Commission may require that reciprocal switching agreements include labor protection provisions.

This title repeals existing incentive per diem provisions. The Commission is authorized to grant shippers antitrust immunity to conduct negotiations with carriers regarding charges for rolling stock owned or leased by such shippers. The participants have the right to petition the Commission to set compensation at a reasonable level, if the parties cannot agree.

In order to encourage more efficient car utilization, carriers are permitted to charge for special services or special levels of service not otherwise included in any tariff applicable to the movement.

For transactions that do not involve the merger or control of at least two Class I railroads, the Commission is required to approve an application unless it finds there is a likelihood of substantially lessening competition, creation of a monopoly or restraint of trade and the anticompetitive effects of the transaction outweigh the public interest.

The application of the Elkins Act to business expenses by rail carriers and motor carriers is clarified by treating these businesses as all other businesses.

Finally the Commission is given exemption authority if regulation is not necessary to carry out the Railroad Transportation Policy and protect shippers from market abuse.

*Title III—Railroad Cost Determinations*

Previous accounting and reporting systems developed by the Commission for rail carriers are to be replaced by the accounting and reporting requirements of Title III of this bill. There is established a Railroad Accounting Principles Board for the purpose of developing cost accounting principles which identify variable costs which accurately represent the most accurate costs of rail movements.

The Board shall exist for three years. Within two years, it shall issue cost determination principles necessary for regulatory purposes which shall identify accurate costs. The principles are to apply to the entire railroad industry to ensure consistency in railroad cost accounting practices.

Each rail carrier is to maintain a system that is in compliance with the rules promulgated under Section 11163 of this title and are required to make cost data available to shippers, states, ports,

communities and other interested parties that are party to a Commission proceeding.

*Title IV—Railroad Modernization Assistance*

This title continues the existing redeemable preference share financing program.

The Secretary must report to Congress within 90 days after the end of each fiscal year specifying how each grant or loan contributes to the goal of providing a safe and efficient rail system.

A new feeder railroad development program is established which gives shippers the opportunity to acquire a rail line carrying less than 3,000,000 gross tons a year if the railroad is not providing adequate service. After the third year any rail line may be acquired under this provision. The Commission must make certain findings before any acquisition can take place and the rail carrier must be given compensation for selling the line.

New time limits are established for considering abandonment applications. Applications for abandonment which are not opposed would be granted within 45 days, and the abandonment would occur within 75 days. With respect to unopposed applications, this would basically codify existing ICC practice. For applications which are opposed, ICC decisions would be reached much more quickly than under present law, and the ICC would be required to process and decide such cases within 9 months. No changes are made in the substantive abandonment standards.

The low interest redeemable preference share program under section 505 of the 4R Act is extended for two years. An additional $700 million is authorized for the program, and of that amount $200 million shall be transferred to the United States Railway Association for use by Conrail in reducing the size of its workforce.

Section 211(i) the Regional Rail Reorganization Act is also amended to make available to railroads in addition to Conrail loan guarantees for the purpose of electrifying high density mainlines or for other capital improvements to achieve the goals to the national energy policy.

Finally, section 211(d) the Regional Rail Reorganization Act of 1973 is amended to extend the time period from December 31, 1980 to December 31, 1981 to permit the United States Railway Association to continue to act on loan modifications this provision and increases the principal amount of a loan made under Section 211(d) from $4 million to $7.5 million.

*Title V—Conrail Title V Labor Protection*

Section 501 changes the formula for calculating monthly guarantees for non-operating employees, maintenance-of-way employees and operating employees. No change is proposed in the guarantee formula currently applicable to non-contract employees and employees who have been transferred.

Section 502 would restrict the payment of the MDA in two situations. First, a protected employee's entitlement to an MDA would be suspended for the period that the employee fails to work for reasons beyond the control of his or her current employer due to strikes, floods, snowstorms, and similar occurrences. Second, the legislation would require a protected employee to claim an MDA within three months of entitlement and would require that entitle-

ment to claims be resolved within 150 days after a claim is filed for the first year and 90 days thereafter. This provision will eliminate bookkeeping problems caused by procrastination in filing a claim for an MDA, and enable the Corporation to assess more accurately expected payments for labor protection.

In addition, this legislation would clarify that the period of protection for a protected employee with less than 5 years of service begins to run from the beginning of the first month for which the employees receives an MDA.

Subsection 505(d) of the current law sets out transfer procedures by which the Corporation may require a protected employee deprived of employment to transfer to a bona fide vacancy within the employee's class or craft.

Section 503 addresses restrictions on manpower utilization by including employees in the marine crafts and unemployed Penn Truck Lines, Inc. truck drivers in the provisions permitting transfer of adversely affected employees to another class, and by offering retraining programs to make the interclass transfer provision meaningful. In addition, the Corporation can make use of an expedited multiple offer procedure to Penn Truck Line and marine craft employees.

Section 504 would redesignate section 509 of the 3-R Act as section 509(a) and increase the amount of funds authorized to be appropriated under title V by $235 million to a new authorization level of $485 million make training and retraining costs incurred by the Corporation under revised section 505(d)(4)(D) reimbursable costs, and confirm existing practice whereby title V funds are used to reimburse the Railroad Retirement Board's unemployment compensation paid to protected employees.

An additional $235 million is authorized to fund the substantially reduced level of benefits afforded by these amendments. This sum would fund the program during a transition period, after which the carriers employing protected employees would be responsible for the payment of benefits without reimbursement.

In addition, this section would add two new subsections to section 509 that impose auditing and reporting responsibilities upon the Association. Section 509(b) would direct the Association to conduct a program audit of the payment of benefits under title V and evaluate the effectiveness of the provisions of Title V in providing a reasonable level of protection to protected employees and enabling the Corporation to improve management of the protected employees in the workforce. The Association would be afforded access to pertinent documents for the purpose of facilitating its audit and evaluation functions. Section 509(c) would require the Association to transmit an annual detailed and comprehensive report of its periodic audit and evaluation to the Congress and the President within 90 days after the end of each fiscal year.

Section 505 gives Conrail employees the right of first hire on other railroads.

Section 506 requires the single collective bargaining agreements be negotiated with each class and craft and that such negotiations be conducted on a system wide basis.

Section 507 would make the new formulas provided by this title effective August 1, 1980, as already required by a recent Supplemental Appropriations bill, Public Law 96-304.

Digitized from Best Copy Available

Section 508 makes certain technical amendments.

*Title VI—Expedited Supplemental Transaction Proposals*

Section 305 of the Regional Rail Reorganization Act of 1973 is changed by requiring that within the 240 days after the effective date of this Act the Secretary shall determine whether to initiate a proposal for the transfer of all Conrail properties in Connecticut and Rhode Island to another rail carrier in the region. The Secretary shall develop such proposal if the proposed transferee railroad is financially and operationally capable of assuming freight obligations on a financially self-sustaining basis and the transfer would promote a financially self-sustaining rail system in Connecticut and Rhode Island.

The Secretary shall establish a fair and equitable price for proposed transfers. If the special court determines that the proposal is fair and equitable and meets the other requirements of this section, it shall issue order to carry out the proposal.

The parties to a supplemental transaction under this section and the representatives of the affected employees are to enter into a new agreement.

*Title VII—Miscellaneous Provisions*

Title VII of the Conference substitute includes provisions related to effective dates, status of pending matters and construction of amendments. In addition, the title provides the annual authorization for the United States Railway Association and funds for Conrail.

Specific provisions are also included to clarify or remedy legislation enacted early this year related to the Rock Island and Milwaukee Railroads.

## Short Title

*Senate bill.*—The Senate bill has as a short title "Railroad Transportation Policy Act of 1979".

*House amendment.*—The House amendment has as a short title "Harley O. Staggers Rail Act of 1980".

*Conference substitute.*—adopts the "Staggers Rail Act of 1980" as the short title of the Act.

## Findings

*Senate bill.*—The Senate bill has no findings.

*House amendment.*—The house amendment has findings which provide an overview of the need for legislation. Among other considerations stated are findings that today, most transportation within the United States is competitive, nearly two-thirds of intercity freight is transported by modes other than railroads, earnings of railroads are insufficient to generate funds for necessary capital improvements, by 1985 there will be a capital shortfall of between $16 billion and $20 billion and that modernization of economic regulation for the railroad industry with a greater reliance on the marketplace is essential in order to achieve maximum utilization or railroads to save energy and combat inflation.

*Conference substitute.*—The House amendment.

Digitized from Best Copy Available

*Senate bill.*—The Senate bill has no statement of goals except as included in the railroad transportation.

*House amendment.*—The House amendment sets forth specific overall goals to provide for the restoration, maintenance, and improvement of the physical facilities and financial stability of the rail system of the United States.

*Conference substitute.*—The House amendment.

## TITLE I

### RAILROAD TRANSPORTATION POLICY

*Senate bill.*—The Senate bill adds an independent railroad transportation policy to the Interstate Commerce Act to guide the Commission in formulating its rules, regulation, and divisions arising from its administration of the Act.

*House amendment.*—The House amendment is similar to the Senate provision but puts a greater emphasis on the need to minimize Federal regulatory control over railroads.

*Conference substitute.*—Adopts the House amendment with additional policy considerations taken from the Senate bill.

## TITLE II—RAILROAD RATES AND INTER-CARRIER PRACTICES

### SECTION 201—REGULATION OF RAILROAD RATES

*Senate bill.*—The Senate bill provides that a rail carrier may establish any rate which yields a revenue to variable cost ratio that is equal to or less than the average ratio of revenue to variable costs established by the Commission. It sets out standards to be used by the Commission in establishing the average ratio and establishes timeframes for action under this section.

*House amendment.*—Section 203 of the House amendment provides that rail carriers may establish any rate for transportation or other services provided by rail carriers unless a rail carrier has market dominance over the traffic. It establishes which parties shall have the burden of proof in complaint and investigation proceedings to challenge the lawfulness of rates or rate increases. The House amendment requires the Commission in determining the reasonableness of rates, to recognize the policy that rail carriers must earn adequate revenues.

*Conference substitute.*—The Conference substitute adopts the House amendment with various changes to conform it to the Senate bill. It allows a rail carrier to establish any rate for transportation unless a rail carrier has market dominance over the transportation, in which case the rate must be reasonable. The definition of market dominance under existing law has not been altered by the substitute, and it is not intended that there be any change in the meaning of the term, nor is any change intended in the Commission's authority to determine market dominance and reasonableness concurrently. However, since other parts of the Conference substitute provide additional rate freedom for rail carriers beyond those found in present law or under existing or proposed Commission regulations, the Commission must revise its market dominance regulations.

In maintaining the term market dominance, in addition to statutory changes designed to provide more rate freedom to rail carriers, the Conferees intend that whenever there is effective competition which will restrain rate increases by the railroads, such competition should continue to function as the regulator of the rate rather than the Commission. Maintenance of the "market dominance" standard is not intended in any way to restrict the ability of the Commission to apply this concept, both in its regulations and individual cases.

Consistent with the new rail transportation policy of this Act, the Conferees intend that competition be recognized as the best control on the ability of railroads to raise rates. The purpose of this legislation is to reverse the decline of the railroad industry, which has been caused, in part, by excessive government regulation. The Conferees believe that by allowing the forces of the marketplace to regulate railroad rates wherever possible the financial health of the railroad industry will be improved and will benefit all parts of the economy, including shippers, consumers, and rail employees.

The Conference substitute establishes which party shall have the burden of proof in establishing that a rate is not reasonable and has the effect of maintaining the existing burden of proof in determining reasonableness, i.e. the carrier has the burden of proof in investigation and suspension proceedings and the shipper in compliant cases. The railroad bears the burden of proof when a rate increase is greater than the 6 percent zone for the first four years, or the 4 percent zone after the first four years. If the rate increase is within the 6 percent or 4 percent zones, but is more than 20 percentage points above the jurisdictional threshold or 190 percent of revenue to variable cost, whichever is lesser, the railroad will also bear the burden of proof if the Commission decides to investigate.

In complaint cases, i.e., where the shipper is complaining about an existing rate, the burden remains on the shipper to prove that the rate is unreasonable, no matter what level the rate is. The Conference substitute does not alter the existing procedure which places such a burden on the shipper.

The shipper must bear the burden of proof when the rate increase is within the 6 percent or 4 percent zones, and the rate is not more than 20 percentage points above the jurisdictional threshold or 190 percent of revenue to variable cost whichever is lower. The shipper also bears the burden whenever a rate increase is within the 6 percent or 4 percent zone, but the rate increase brings the rate more than 20 percentage points above the jurisdictional threshold or 190 percent of revenue to variable cost whichever is lower, and the Commission decides not to investigate.

The Conference substitute adopts the language from the House bill that in determining rate reasonableness the Commission must recognize the policy of this Act that carriers must earn adequate revenues. The difficult economic situation of much of the railroad industry is one of the reasons for this legislation, and the Commission is required to make efforts to ensure that rail carriers earn adequate revenues.

The Conference substitute maintains language similar to existing law which states that variable costs shall be determined by formulas or procedures prescribed or certified by the Commission.

The Conference substitute maintains the requirement that joint rates must be reasonable. The conferees intend that the rate standard for the reasonableness of joint rates shall be the same as for all rates. The establishment of the minimum compensatory joint rate relief in Section 217 of this Act is not intended to mean that such minimum levels relate to the maximum reasonable level for joint rates. A joint rate must be reasonable, as must the divisions of such a joint rate between carriers, and the Commission should not interfere to require joint rates or any carrier's division of a joint rate to be maintained below the rate levels permitted by this Act.

Rates may not be established below a reasonable minimum. Rates which contribute to going concern value shall be reasonable and rates which do not contribute to going concern value shall be presumed to be unreasonable. In essence, these provisions strengthen the minimum rate policies of the 4R Act by placing the burden of proof on the party challenging a rate as too low and by expediting the procedures whereby rates which are too low can be raised.

These modifications will ensure that carriers pricing in a manner that meets rational economic standards will not be prevented from improving their economic position by reducing rates. While the Conferees believe there may be circumstances in which rates which do not contribute to going concern value are reasonable, those circumstances are likely to be unusual and once a complainant has shown a rate does not contribute to going concern value, that rate shall be presumed to be unreasonable until the carrier charging the rate bears the burden of showing that the rate is reasonable.

These provisions will ensure that those shippers can protest that a rate is too low and that a carrier is worse off than it would be if the rate were raised. Upon finding this to be the case, the Commission may raise the rate to the minimum level at which the rate benefits the carrier. All shippers as well as the carrier are better off if traffic which makes a contribution moves than if it does not, because the carrier is made financially stronger and need not rely as much on revenue from other shippers.

The Conferees do not intend, however, that rates which are contributing to the going concern value of a carrier should be forced to be raised. The Commission should not restrict the carriage of this beneficial traffic, placing a greater burden on other shippers. This is a decision that is best made by the carrier as it judges the market. Since a carrier has no reason to keep a rate below the most beneficial level, the Conferees have no reason to believe rates will be held below the most beneficial level except by oversight. Accordingly, rates that contribute to going concern value shall be reasonable and the Commission may not require that those rates be raised.

### SECTION 202—DETERMINATION OF MARKET DOMINANCE

*Senate bill.*—The Senate bill establishes a level below which the Commission will have no jurisdiction over railroad rates. The jurisdictional level is equal to the average ratio of revenue to variable costs for all transportation. Until such level is determined by the Commission the jurisdictional level is set at 150 percent of revenue to variable cost. The Senate bill also repeals 49 U.S.C. 10709, which

is the section establishing "market dominance" as a test for Commission jurisdiction over railroad rates.

*House amendment.*—Section 204 of the House amendment retains 49 U.S.C. 10709 and adds a new subsection. The new subsection requires the Commission to find that a rail carrier does not have market dominance over the transportation to which a rate applies if that rate is below a revenue to variable cost ratio of:

160 percent from the effective date of the Act to September 30, 1981;

165 percent from September 30, 1981, to September 30, 1982;

170 percent from September 30, 1982, to September 30, 1983;

175 percent or the "cost recovery percentage", whichever is lower, from September 1, 1983 to September 30, 1984; and

the "cost recovery percentage" thereafter, except that the "CRP" may not exceed 180 percent nor be lower than 170 percent.

The House amendment establishes a "cost recovery percentage" which is the revenue to variable level at which the industry is covering its costs as defined in the House amendment. The Commission is required to establish the "cost recovery percentage" annually.

*Conference substitute.*—The Conference substitute adopts the House provision establishing and defining the "cost recovery percentage". It also adopts the House language establishing a jurisdictional threshold of 160 percent increasing 5 percent each year through 1984, when the jurisdictional threshold is 175 percent or the cost recovery percentage, whichever is lower. After September 30, 1984, the jurisdictional threshold is the cost recovery percentage, but it may not be lower than 170 percent or higher than 180 percent.

The Conferees have adopted the concept of a jurisdictional level that varies according to the performance of the railroad industry. When the industry is earning revenues which are adequate, it is appropriate for the Commission to have the authority to review rate increases more carefully.

The Conference substitute incorporates a provision which allows a carrier to use present Rail Form A, with adjustments specified by the Commission as appropriate for the type of traffic involved, or its successor as the basis for determining the revenue to variable cost ratio of a rate. The burden is on the carrier to establish on such a basis that the rate is below the jurisdictional level, and the complainant may rebut the showing of the revenue to variable cost ratio according to the Commission formula by evidence of such type and under such burden of proof as the Commission shall prescribe. By such a showing the complainant or the railway may demonstrate that the revenue to variable cost ratio is different than the one established under adjusted Rail Form A or its successor.

The Conferees do not intend that the Commission alter the jurisdictional threshold by reducing the items which will be considered as part of the variable cost.

The Conferees have adopted a jurisdictional threshold which will deny the Commission jurisdiction over rates which the Commission reviews under present law. The reduction in Commission jurisdiction is adopted because the conferees believe that competition

should be the determining factor in railroad rates wherever possible. The railroads' share of intercity freight traffic has decreased dramatically in the past three decades, to the point where most freight traffic can be transported by another mode and is subject to competition.

SECTION 203—ZONE OF RATE FLEXIBILITY

*Senate bill.*—The Senate bill establishes procedures and standards for determining a "base rate" and an "adjusted base rate" for purposes of computing rate increases. Carriers are allowed to recover inflation quarterly on individual rates up to the level of the adjusted base rate without challenge.

To determine the adjusted base rate the Commission must publish quarterly a rail cost adjustment factor, which uses an Index of Railroad Costs to keep rates equal with inflation.

The Senate bill allows a rail carrier to increase a rate by an amount not exceeding 5 percent of the adjusted base rate, subject to the restriction that the increase over 5 years under this section not exceed 14 percent. The Commission is not allowed to suspend any rate increase within this 5 percent zone, and it may investigate such increase only if it exceeds a revenue to variable cost ratio established by the Commission or if the carrier or carriers proposing the rate increase have achieved an adequate revenue level. Even a rate increase within the 5 percent zone is subject to challenge on complaint, with the burden of proof on the shipper.

If the Commission decides not to investigate a rate within the 5 percent zone, it must set forth its reasons for not doing so, after giving consideration to three factors—the amount of traffic transported below variable cost, the amount of traffic which contributes only marginally to fixed cost and the extent to which such rates can be changed, and the impact of the proposed rate increase on national energy goals, taking into account the railroads' role as a primary source of transportation and the need for a sound rail transportation system.

The Commission shall consider, among other factors, when determining the reasonableness of a rate, the amount of traffic which is transported below variable costs, the amount of traffic which contributes only marginally to fixed costs and the extent to which such rates can be changed, and the carrier's mix of rail traffic to determine whether one commodity is paying a disproportionate share of the carrier's overall revenues.

The Senate bill allows the Commission to investigate a rate even if it is within the 5 percent zone if such a rate is proposed by a carrier or carriers with adequate revenues.

*House amendment.*—The House amendment establishes a base rate for purposes of rate increases, and an adjusted base rate to account for inflation. It also provides for a 6 percent zone for each of the four years after the date of enactment, and a 4 percent zone for carriers without adequate revenue for each succeeding year.

The House amendment does not permit a suspension or investigation of rate increases within the 6 percent or 4 percent zones, if the resulting rate is less than 190 percent or revenue to variable cost or 20 percentage points above the jurisdictional threshold, whichever is lower. It also prohibits the Commission from using

rules, classifications, or practice changes to limit rates. It includes a provision that limits the allowable rate on coal movements fitting a particular description.

*Conference substitute.*—The conference substitute adopts parts of the Senate bill and parts of the House amendment. It establishes the base rate as the rate in effect on the effective date of the Act. The "adjusted base rate" is computed quarterly by means of a "rail cost adjustment factor", as contained in the Senate bill.

A carrier is allowed to change a rate to conform to the "adjusted base rate" at any time without challenge. A carrier may not receive a rate increase under the adjusted base rate method if the carrier has received an inflation increase through general rate increases or the inflation index thereby already assuring that the rate reflects inflation.

The language of subsection (b) makes it clear that rate increases which do not exceed the adjusted base rate may not be found by the Commission to exceed a maximum reasonable level. The reference to rate increases under subsections (c) and (d) of this section is not intended to suggest that increases under those subsections are presumed to be reasonable. The reasonableness of such rate increases shall be determined under the same standards of maximum reasonableness applicable to any other rate or rate increase.

The conference substitute adopts the 6 percent zone contained in the House amendment. A carrier is free to increase any rate by 6 percent of the adjusted base rate.

During the four year period after the effective date of the Act, the total increase allowed under this section is limited to 118 percent of the adjusted base rate. If a carrier does not take all or a portion of a rate increase in a year, the carrier may take that portion in the next succeeding year.

If a carrier chooses not to take some portion of the allowed 18 percent increase during the first four years, the carrier may take that portion in the next 2 succeeding years, except that the rate increase allowed under this section is limited to 10 percent for each of those years.

The 6 percent zone does not establish a limit for allowable rate increases by the Commission. If the Commission finds further rate increases do not exceed a reasonable maximum, it may allow such rate increases under the normal standards and procedures of the Act. The 6 percent zone is established as a procedural mechanism for carriers to change rates without undue regulatory interference. The Conferees believe that the best regulator is the marketplace, and the forces of competition will restrain railroad rates more effectively than federal regulation.

The Conference substitute requires the Commission, when considering a rate increase within the 6 percent zone and below the point 20 percentage points higher than the jurisdictional level or 190 percent of revenue to variable cost, whichever is lower, to give due consideration to whether a carrier proposing a rate increase has attained adequate revenues, giving regard to preventing a carrier with adequate revenues from realizing excessive profits on the traffic involved and also the policy of bringing to an adequate level the revenues of carriers not having an adequate revenue level. This provision is intended to apply only for the four years that the 6 percent zone applies, and only to those rate increases which are

within the 6 percent zone and below the point 20 points higher than the jurisdictional level or 190 percent of revenue to variable cost, whichever is lower.

The Conferees intend that the Commission give due regard to two things, whether a rate increase would mean excessive profits, and the need for a rate increase in light of the carrier's revenue position taking into account the policy of this Act that inadequate revenue carriers make adequate revenues. This language is not intended to imply that excessive profits for inadequate revenue carriers are reasonable.

The Conferees understand that the Commission presently considers the adequacy of revenues in its determination of reasonableness, and the Conferees intend that the Commission continue to consider the adequacy of revenues in its determination of reasonableness. The Conferees intend that the Commission continue to look carefully at the adequacy of a rail carrier's revenues when considering whether a rate is reasonable and to consider all the other factors which it presently considers in determining reasonableness.

The Conference substitute adopts the 4 percent zone from the House amendment. A 4 percent zone is established free from suspension, and free from investigation if the resulting rate is below 190 percent or 20 percentage points above the jurisdictional threshold, whichever is lower. A carrier is allowed 4 percent of the existing rate as an increase without undue regulatory interference.

This zone is limited to carriers without adequate revenues. Carriers with adequate revenues are not allowed this 4 percent zone on single line rates, and are not allowed the zone on joint line rates unless the Commission determines in its rulemaking under this provision that it cannot establish rules preventing rail carriers with adequate revenues from taking advantage of the 4 percent zone without denying the zone to carriers without adequate revenues. The conferees expect the Commission to establish the rules for determining how the 4 percent zone is to be applied in conformity with the policy of this Act, which is designed to provide increased regulatory freedom and to allow carriers to earn adequate revenues.

Neither the 4 percent or the 6 percent zone is intended to create any presumptions about the rate increases beyond the zone. The Conference substitute states unequivocally that a rate increase beyond the zone establishes no presumption of market dominance or reasonableness.

The Conference substitute adopts the House amendment which establishes the point at which the Commission may investigate a rate increase within the 6 percent or 4 percent zones. The point is 20 percentage points above the jurisdictional threshold or 190 percent of revenue to variable cost, whichever is lower. For example in the first year the jurisdictional threshold is 160 percent, and the point at which the Commission may investigate is 180 percent.

The Conference substitute adopts the Senate provision which requires the commission to set forth its reason for not reviewing a rate increase or new rate. The Commission shall give due consideration, in its decision whether or not to investigate, to the following factors:

1. the amount of traffic which is transported below going concern value, and efforts made to minimize such traffic;
2. the amount of traffic which contributes only marginally to fixed costs; and
3. the impact of the proposed rate increase on the attainment of the national energy goals and the rail transportation policy of this Act, taking into account the railroads' role as a primary source of energy transportation and the need for adequate revenues to achieve a sound rail system.

The Conferees have used the term "going concern value" in the first consideration in place of "variable cost" to eliminate any confusion about what is intended. Railroads should not be carrying traffic which is losing money but in a competitive environment railroads should be attracting whatever traffic they can at the lowest rates that will attract the traffic. There should be no incentive to prevent such pricing, which is to the advantage of the shipper and the consumer.

The Conferees have added to the third consideration the rail transportation policy of this Act. The national energy goals, which include a reduction of dependence on foreign energy sources and the encouragement of fuel efficient forms of transportation within the United States, are compatible with the transportation policy of this Act. To reduce dependence on foreign energy sources this country must stimulate utilization of its abundant, indigenous coal reserves. For coal to be a viable alternative, we must have a sound rail transportation system capable of handling such coal efficiently and economically. At a minimum the rail system will need to invest over $5 billion over the next 4 years to maintain a system adequate for increased coal use. Without such an investment the national energy policy of decreasing reliance on foreign energy sources will never be achieved.

Decisions whether to investigate a rate are not presently reviewable in court. The conferees intend, and the Act specifically states, that a decision whether or not to investigate remains not reviewable.

The Conference substitute adopts the language of the Senate bill specifying three factors among those already considered by the Commission which the Commission must consider in determining the reasonableness of a rate, with changes. As in the previous section the term "going concern value" is substituted for "variable costs". In the third consideration, the word "disproportionate" is changed to "unreasonable". It requires the Commission to consider evidence of the factors listed.

The Conference substitute adopts the House provision limiting coal rates which meet a specific description. This provision deals with the celebrated and extended dispute over the freight rate for rail transportation of coal to a municipally owned utility in San Antonio, Texas. This utility decided voluntarily in 1973, prior to the oil embargo, and prior to any legislative requirements concerning use of alternate fuels, to convert an oil/gas unit then on order to coal and to build this and an additional unit on an accelerated basis, resulting in the displacement of oil and gas equivalent to more than 50 billion cubic feet of gas on an annual basis. Unfortunately the appropriate rate for the transportation of coal to these new plants has been the subject of dispute and protracted litiga-

tion. Due to the unique circumstances of the San Antonio situation, this provision imposes certain short term limitations on the rate level for the San Antonio coal movement. The purpose of this provision is not punitive and the rate specified for such a coal movement shall have no effect on any decision of the Commission or a court, and evidence of the rate or this section shall be inadmissible in any proceeding.

The Conference substitute adopts the House provision. New section 10709(h) makes it clear that the Commission may not use any of its residual powers to regulate rates, rules, classifications, and practices as tools to interfere with the rate freedom provided by the Staggers Rail Act. The Conferees intend that a practical rule or classification which has the effect of resulting in an increased rate for transportation shall not be found unreasonable unless, in the absence of its effect on rate levels, it would itself be unreasonable.

SECTION 204—TRANSPORTATION OF RECYCLABLE MATERIALS

*Senate bill.*—The Senate bill requires that rates for recyclable or recycled materials be no higher than the average revenue to variable cost ratio of all rates for railroad transportation. Any rate which exceeds that threshold shall not be required to bear further rate increases.

*House amendment.*—No provision.

*Conference substitute.*—The Conference substitute adopts the Senate bill with certain changes. The substitute excludes recyclable or recycled iron and steel from this provision. Rates which are currently above the threshold would be prohibited from increases until such time as the rate falls below the average revenue to variable cost threshold. The standard for establishing the average revenue to variable cost threshold is the standard used in the Senate bill.

SECTION 205—RATE REGULATION PROCEEDINGS; ADEQUATE REVENUES

*Senate bill.*—The Senate bill required the Commission to submit to Congress, within one year after the enactment of the act, a study on the desirability of using return-on-investment as a threshold standard for jurisdiction over the reasonableness of rail carrier rates. The Commission was also required to submit a report to the Congress every three years which analyzed the revenue needs of carriers and made appropriate recommendations.

*House amendment.*—The House amendment requires the Commission to commence and conclude within 230 days of enactment a proceeding to determine whether, and to what extent, product competition should be considered in determining the reasonableness of rail carrier rates. For purposes of only this proceeding product competition is defined in the amendment. This definition is not intended to be taken into account in any other Commission or court proceeding dealing with competition from alternative sources or types of commodities. The amendment provides that on the basis of the study the Commission may find that in determining the reasonableness of a rate, product competition should be given the same or greater weight than in current proceedings or proof of product competition should be given greater or conclusive weight.

The section is not to be construed as requiring any change in the Commission's present standards concerning reasonableness and is not to influence in any way the meaning of market dominance.

The House amendment also requires the Commission to submit to Congress within three years of the effective date of the Act recommendations as to the threshold level for Commission jurisdiction over the reasonableness of a proposed rail carrier rate.

The House amendment also requires that the Commission within 180 days after the effective date of the Act establish standards for determining what constitutes adequate revenues under section 10704 of the Act and to report to the Congress, within 180 days after the effective date and annually thereafter, which carriers were earning adequate revenues.

The House amendment makes the rail carrier rate level resulting from any case pending in any Federal court on July 22, 1980, the base rate for purposes of determining permissible rate increases.

*Conference substitute.*—The Conference substitute adopts the provision from the House amendment requiring the Commission to initiate a proceeding within 230 days of the effective date of the Act to determine whether and to what extent, product competition should be considered in determining the reasonableness of rail carrier rates. The substitute amends the House amendment to underscore the fact that the ICC proceeding shall not be evidence in a Commission or court proceeding regarding the scope of the market dominance concept.

The Conferees intend to exclude from any rule adopted under this subsection existing supply contracts, or for two years, whichever is less. The Conferees also intend that the Commission, in its rule-making, look at the existence of long-term contracts in determining how to apply product competition. Product competition means the availability to a consignee at a competitive delivered cost and in sufficient quantities of products or commodities which are of the same type as the commodity or product to which the rate applies without regard to whether such products or commodities are available from the same or a different origin as those to which a rate applies. An example of where product competition does not exist is a situation in which a particular automobile company manufactures bumpers at Plant A and ships them to its Plant B for assembly because it cannot use another automobile company's bumpers.

The Conference substitute amends existing Section 10704(a)(2) of Title 49 clarifying that the Commission has the authority to revise its standards and procedures for determining revenue adequacy as necessary; by directing the Commission to conclude a proceeding under Section 10704(a)(2) within 180 days after the effective date of the Act; and on the basis of standards and procedures under Section 10704(a)(2) to determine which rail carriers have adequate revenues within 180 days of the effective date of the Act and on an annual basis thereafter.

SECTION 206—INFLATION-BASED INCREASES

*Senate bill.*—The Senate bill provides a free zone for the recovery of inflationary cost increases.

*House amendment.*—The House amendment allows the Commission to establish a percentage rate increase or rate index for rail carriers in order to compensate for inflation. Such percentage increase or index may be applied carrier by carrier or industry wide. The percentage rate index allows the Commission to establish a range within which carriers may increase rates differently for different commodities, but recovering no more than total inflation.

*Conference substitute.*—The Conference substitute provides that the Commission may establish a percentage rate increase or index to allow carriers to cover inflation. Such an index or percentage may not be necessary, since carriers will be free to recover inflation on individual rates without challenge. In the event that carriers find they are unable to keep up with inflation, and the Commission believes that it must prescribe a general mechanism to allow carriers to cover inflation, this percentage increase or index is allowed. The provision makes specific reference to the policy section of the Act which discourages the automatic pass-through of inflation through increases of general applicability.

Under this provision, the Commission is allowed to establish a range of permissible increases, and the carriers may take increases within that range. The total increase in revenue may not account for more than is necessary to cover the total of inflationary cost increases.

### SECTION 207—INVESTIGATION AND SUSPENSION OF RATES

*Senate bill.*—The Senate bill requires the Commission to complete a proceeding when a suspension has occurred within five months, unless it reports to the Congress that it is unable to do so, in which case it may take an additional three months.

*House amendment.*—The House amendment requires the Commission to act within five months if a suspension has occurred, and provides an additional 3 months if the Commission reports to the Congress that it is necessary. The House amendment also revises the standards under which the Commission may suspend a rate by adding the word "substantially" to the requirement that the Commission find that it is likely that the complainant will prevail on the merits and by adding a new standard which requires the Commission to find that because of the peculiar economic circumstances of the protestant, he is not protected by the refund provisions. The burden is on the protestant to prove that the standards are met.

The House amendment also provides for an accounting and refunds to shippers where a proposed rate increase is suspended, and to rail carriers if the proposed rate increase is suspended and later found to be reasonable.

*Conference substitute.*—The Conference substitute adopts the House amendment with a modification with respect to refunds. The substitute makes suspension more difficult.

### SECTION 208—CONTRACTS

*Senate bill.*—The Senate provision clarifies the status of contract rate and service agreements in an effort to encourage carriers and purchasers of rail service to make widespread use of such agree-

ments. In addressing concerns of small shippers the Senate provision also limited the percentage of equipment a rail carrier could dedicate to contract service. This limitation was designed to insure that the carriers always had sufficient equipment to meet common carrier obligations. The Senate bill limits the number of cars a carrier can dedicate to contract service to 35 percent of the carriers' capacity by major car type. A further limitation was imposed on large shippers, again to protect the small shippers' ability to obtain sufficient cars, with respect to contracts between Class I carriers and shippers which originate an average of 1,000 cars or more per year by major car type during any preceding three-year period, nor more than 40 percent of that coverage could be used for contracts. The remainder of the shipper's car needs would be supplied by the carrier under the common carrier obligation as with all other non-contracting shippers. The smaller shippers, i.e., one who originates less than 1,000 cars per year (based on a 3 year average prior to the contracting period) could contract for 100 percent of the shipper's needs.

Further, the Commission may order a carrier to provide rates and services similar to those in any contract which it finds the carrier did not make available to a similarly situated shipper.

*House amendment.*—The House amendment permits carriers to enter into contracts with shippers. Once approved, a contract is not subject to challenge.

First, carriers may enter into contracts filed with the Commission (along with summaries to be made public) unless the Commission finds that the contract unduly impairs the ability of the carrier to fulfill its common carrier obligation to a complaint, unreasonably discriminates against a port or, in the case of agricultural commodities, the carrier has unreasonably discriminated the complainant a similar contract under similar conditions or the contract constitutes a destructive competitive practice.

Second, the Commission may begin an investigation within 30 days of the filing of a contract on its own motion or on complaint. The Commission has 30 days following the initiation of a proceeding to approve the contract. If the Commission fails to act, then the contract is approved.

Third, if the Commission determines that a carrier has refused to provide an agricultural shipper with a similar contract, the Commission may order the carrier to enter into such a contract with appropriate adjustments.

Fourth, once a contract has been approved by the Commission, the Commission may not require violation of the contract except to require compliance under the Commission or any court under the provisions of this subtitle. The exclusive remedy for breach of a contract entered into under this section is an action in a State or U.S. district court, unless the parties otherwise agree.

Fifth, during the first three years after passage of the Act, a carrier may enter into contracts for the transportation of agricultural commodities involving the utilization of carrier-owned or leased equipment not in excess of 40 percent of the capacity of such carriers' owned or leased equipment by major car type, except with respect to a contract with a shipper of over 1,000 cars or more per year for the prior three years in which case the carrier may con-

Digitized from Best Copy Available

tract for more than 40 percent of the average equipment utilized in the three year period. The Commission may raise these limits.

*Conference substitute.*—The conference substitute adopts the Senate amendment with several changes. The percentage of limitation on cars for contracts for agricultural commodities, is expanded to include forest products and paper and is not limited to three years after passage of the Act. However, the Commission, as well as any other party, may initiate a proceeding to modify this percentage limitation. Unreasonable discrimination with respect to agricultural, forest product or paper shippers is defined for purposes of this section as that term is used in section 10741 of the Interstate Commerce Act. A similar provision with respect to ports from the House amendment is retained. The conferees stress that the establishment of contract rates is a significant aspect of the new freedom allowed to carriers to market rail transportation more effectively. Therefore, the grounds for disapproving contracts have been intentionally limited.

The provision establishes a separate class of rail service and thereby makes carriers entering into such contracts both common carriers and contract carriers. Once a contract is approved by the Commission or goes into effect because the Commission has not acted within the specified time limits, the service provided under the contract is exempt, subject to the specific limitation of section 11128, from all regulation and all of the requirements of the Interstate Commerce Act. However, the Commission is given the specific authority to limit the right of a rail carrier to enter into future contracts if it determines that such additional contracts will impair the ability of the rail carrier to fulfill its common carrier obligations under Section 11101 of the Act. Once contracts are approved under this section, they are to be enforced in the courts and not at the Commission.

Shippers who do not elect to enter into contracts, or are unable to do so, are assured that carriers will have the same common carrier obligations as in existing law. The percentage limitation on equipment for agricultural commodities, forest products and paper result from problems experienced in providing adequate numbers of cars for the shipment of these products and are intended to ensure that a carrier can meet its common carrier obligations. These limits are to apply to any type of car which could practicably be used for shipping agricultural commodities, forest products or paper. However, they are not intended in any way to imply a limit on a carrier's ability to contract with respect to other types of equipment.

While the Conferees intend to encourage shippers to contract they recognize the difficulty that small shippers may have in negotiating contracts, and therefore, the Conference substitute adopts the Senate provision establishing a railroad contract rate advisory service. The Conference substitute also includes the Senate provision which gives the Commission the ability to order a carrier to provide rates and services similar to those in any contract which it finds the carriers did not make available to similarly situated agricultural shippers. Finally, the Conference substitute includes a provision which allows agricultural shippers to challenge a contract on the grounds that the proposed contract constitutes a destructive competitive practice. It should be noted that these provisions were

included in recognition of the fact that smaller shippers are particularly concerned about the market power of their larger competitors once the contract rate provisions are put into effect. It is the intention of the Conferees that the Commission carefully review this aspect of the competitive situation in approving contracts.

The existing Federal antitrust laws apply to this section.

SECTION 209—DEMAND SENSITIVE RATES

*Senate bill.*—The Senate bill amends 49 U.S.C. 10727 to provide for the filing of a demand-sensitive tariff in repsonse to explicit or anticipated fluctuations in demand for rail services. The tariff would apply to a specified movement and would include a maximum and minimum rate, subject to maximum and minimum rate regulation. The Senate bill specifically excluded grain from this provision.

*House amendment.*—The House amendment repealed 49 U.S.C. 10727 because of the concerns raised by agriculture interest groups about the way demand-sensitive tariffs had been implemented. The provision was originally included in the 4R Act to provide greater car utilization by encouraging rail shippers to ship in off-peak, low demand periods. The repeal of the demand-sensitive tariff authority should not be construed by the Commission as a resolution of the car utilization problems. The Commission has other ways to abate the serious problem of the declining car utilization in the rail industry.

*Conference substitute.*—The Conference substitute adopts the House provision. The conferees direct the Commission to explore alternative methods of improving car utilization and making railroad prices and services more responsive to market conditions instead of artificial regulatory restraints. However, the Commission is on specific notice not to contravene the policy set out by Congress which is clearly to prevent demand-sensitive rates by any means to apply to agricultural commodities.

A letter from Chairman Gaskins on the Commission's existing authority in this area is attached as an appendix.

SECTION 210—PHASEOUT OF CAPITAL INCENTIVE RATES

*Senate bill.*—The Senate bill repealed 49 U.S.C. 10729, which provides that if a capital incentive rate is approved by the Commission, such rate not be found unreasonable or discriminatory for 5 years. A capital incentive rate is based on an investment by a shipper, railroad or interested third party of $1 million or more in rail-related equipment or facilities. The intent of this provision was to encourage the negotiation of rates reflecting individualized and innovative service and to create stability which would promote large investments. Regulatory complexities and ambiguities have frustrated the intent of this section. Moreover, the explicit authorization of contracts makes this section unnecessary. Capital-incentive rates filed not less than 90 days before the date of enactment would not become effective, but rates filed before that date remain effective subject to the 5-year limitation.

*House amendment.*—The House amendment repeals the capital-incentive rate provision, but preserves all capital-incentive rates

from challenge as unreasonable or discriminatory if filed prior to the effective date of this Act, subject to the 5-year limitation from the date the rate became effective, unless the parties otherwise agree. The Commission may, during the period the rate is in effect, order the rate revised to a level equal to the incremental cost of providing the transportation, if the Commission finds that the rate level in effect reduces the going concern value of the rail carrier.

*Conference substitute.*—The Conference substitute adopts the House amendment.

SECTION 211—PERMISSIVE LIMITED LIABILITY

*Senate bill.*—The Senate bill amends 49 U.S.C. 10730 with respect to released rates. Under existing law, the Commission is authorized to permit released rates in cases where rates based on a declared or released value would be just and reasonable under the circumstances surrounding the transportation. Under this section, no carrier may publish rates based on the declared or agreed value without specific authority from the Commission.

Under the Senate bill, rail carriers may establish released value rates subject to the provisions and procedures set forth in chapter 107. The effect of this change is to authorize the filing of such rates without prior Commission authorization. In many instances, shippers have the resources to obtain insurance at a reasonable price and to bear at least a portion of the risk of lost damaged cargo. Carriers and shippers should be allowed to agree on a fair rate which explicitly takes into account the risk of loss or damage.

Rail carriers should be able to negotiate for the type of service required and the rate to be paid for that service. It is with that purpose in mind that this subsection has been added to section 10730—to permit the establishment of released rates as an additional option available to shippers and rail carriers. Full value rates will of course continue in effect for the use of those shippers and receivers which choose not to utilize released rates established and filed under this provision or agree to other terms as part of a contract for services.

*House amendment.*—The House amendment provides that rail carriers may establish rates for the transportation of property under which the liability of the carrier for such property is limited to a value established by a written declaration of the shippers or by a written agreement between the shipper and carrier, and such agreement may provide for a specified deductible for any claim against the carrier for loss or damage to the property or delay in the transportation of such property. The ability to use released rates including the deductible in an agreement, gives both the shipper and carrier greater flexibility with respect to negotiation of rates without harrassment and delay at the Commission.

The House amendment changes provisions of the Carmack Amendment, 49 U.S.C. 11707 concerning the availability of special damages, comparative negligence standards for liability and the time period when claims must be filed with the carrier and where actions must be instituted against a carrier under the Carmack Amendment.

*Conference substitute.*—The Conference substitute adopts the House provision with respect to released rates, including deducti-

bles, but drops the references to the Carmack Amendment, except for venue provisions. It adds a study with respect to the need for the Carmack Amendment. At the insistence of several shipper groups, explicit statutory language prohibiting special damages was eliminated because special damages are not permitted under the Carmack Amendment.

A provision regarding the changing of the existing case law that makes the railroad almost strictly liable, unless it can establish that it was neither negligent nor not liable under certain recognized absolute defenses, was dropped and has been included in the study. While the study is being completed, carriers are not prohibited from arguing to the courts that the Carmack Amendment was intended to codify common law standards and therefore, a comparative negligence standard ought to be adopted.

The Conference substitute adopts the House amendment with respect to changes in venue for Carmack Amendment cases. Hereafter, cases may only be brought in the court having jurisdiction over the originating carrier's point of origin, against the delievering carrier in a court at the principal place of business of the person entitled to recover against the carrier or having jurisdiction over the point of destination, or against an originating, intermediate or delivering carrier in a court having jurisdiction over the point where the loss or damage is alleged to have occurred. Because existing law permits an action wherever the carrier operates, venue is virtually uncontrollable and frequently, inconvenient.

The Carmack Amendment was enacted at a different time with different factors affecting rail carriers. Among other issues, the studies should examine whether special damages are being recovered from rail carriers, and, whether a rail carrier ought to be responsible for such damages in the absence of a clear showing, by written agreement, that the carrier was made aware of certain foreseeable risks and had an opportunity to make appropriate arrangements.

Similarly, the studies should consider whether it makes sense in 1980 to hold a carrier liable for 100 percent of the damages even if the carrier was only 10 percent at fault. Current law makes a carrier totally liable unless the carrier can show that it was completely free from fault and that the shipper's negligence was the sole cause of the damages. The study should consider whether it is appropriate to follow the recent trend among the states to adopt comparative negligence standards, requiring each party to bear the costs of its own negligence. More than a majority of states have departed from prior law making liability an all or nothing alternative. The study should determine whether similar policy goals would require similar legislation with respect to common carrier obligations.

The studies should also address other issues raised by the Carmack Act, including the recovery of attorneys' fees, appropriate time limits, the feasibility of a "no-fault" system, and proper venue requirements.

SECTION 212—RATE DISCRIMINATION

*Senate bill.*—No provision.

*House amendment.*—The House amendment amends section 10741 to state that differences between rates, rules, or practices which result from different services do not constitute a violation of this section. The amendment specifically exempts surcharges, approved contracts, separate rates for distinct services under 10728, rail rates applicable to different routes and customer solicitation expenses from being challenged as discriminatory. The Commission retains its existing authority to regulate rate relationships between and within ports.

*Conference substitute.*—The Conference substitute adopts the House amendment. The Conference substitute will help ensure that, with the exception of the right of ports to complain of unjust discrimination between and within ports and the special remedies provided for certain unjustly discriminatory contracts in new section 10713, claims of unjust discrimination may not be used to hamper the development of sound economic rate and service relationships. The conferees also expect the Commission to exercise its remaining power under section 10741 only where it is needed to prevent abuses of market power where discrimination cannot be justified by differences in demand for services or costs.

The conferees intend that the reference to separate rates or distinct rail services in this section shall not affect the *Wichita* doctrine.

SECTION 213—EXEMPTIONS

*Senate bill.*—The Senate bill amended section 10505 to provide that, where any provision of the Interstate Commerce Act is not needed to protect shippers from the abuse of market power, the "limited scope" restriction in the original section 10505 would not apply. The Senate bill also removed the requirement that a proceeding be held in all cases before an exemption is granted.

The Senate bill requires the Commission to provide an exemption from regulation when it finds that regulation is not necessary to carry out the transportation policy and the transportation or service is either of limited scope or regulation is not needed to protect shippers from the abuse of market power. The Commission may not issue an exemption which will substantially lessen competition and coordination between water and rail carriers. No exemption order shall operate to relieve railroads of their common carrier liability for claims under 49 U.S.C. 11707.

*House amendment.*—The House amendment amends section 10505 of the Interstate Commerce Act and provides that the Commission shall exempt a person or transaction from one or more provisions of the Act where it is not necessary to carry out the rail transportation policy and where (1) the transportation or service is of a limited scope or (2) the application of a provision is not needed to protect shippers or receivers where there is an absence of effective competition or (3) where there is effective competition. The House bill, like the Senate bill, removed the requirement that a proceeding be held in all cases. The Commission is charged with the responsibility of actively pursuing exemptions for transportation and service that comply with the section's standards.

The amendment places certain limits on the Commission's authority to grant exemptions. First, section 10505(e) provides con-

tractual terms for liability and claims consistent with section 11707. This limitation does not affect the ability of a carrier to offer alternative terms nor give the Commission the authority to require either any specific level of rates or services based on Section 11707, nor does it require the filing of those terms with the Commission. Second, the exemption authority may not be used to relieve a carrier of its obligation to protect the interests of employees. Third, under section 10505(f) the exemption authority may not be used to authorize intermodal ownership otherwise prohibited by this title.

*Conference substitute.*—The Conference substitute combines the Senate and House provisions. The bill permits exemptions wherever regulation is not needed to prevent abuses of market power, regardless of the presence of effective competition. The policy underlying this provision is that while Congress has been able to indentify broad areas of Commerce where reduced regulation is clearly warranted, the Commission is more capable through the administrative process of examining specific regulatory provisions and practices not yet addressed by Congress to determine where they can be deregulated consistent with the policies of Congress. The conferees expect that, consistent with the policies of this Act, the Commission will pursue partial and complete exemptions from remaining regulation. The conferees anticipate that through the exemption process the Commission will eventually reduce its exercise of authority to instances where regulation is necessary to protect against abuses of market power where other federal remedies are inadequate for this purpose. Particularly, the conferees expect that as many as possible of the Commission's restrictions on changes in prices and services by rail carriers will be removed and that the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power.

For these reasons we also expect that except to the extent necessary to comply with subsections (e) and (g) of section 10505 of title 49 U.S.C. as amended by the Staggers Rail Act of 1980, an exemption order issued by the Commission prior to the effective date of the Staggers Rail Act of 1980 shall remain in full force and effect unless revoked pursuant to subsection (d) of section 10505 of title 49 U.S.C. as amended.

### SECTION 214—INTRASTATE RATES

*Senate bill.*—The Senate bill amends section 11501 to reaffirm both that the Commission's power in this area is only as otherwise authorized by this title and that the States' power cannot conflict with the Federal regulatory scheme.

First, it amends section 11501 to limit the Commission's authority to prescribe a rate or effect other action which is inconsistent with its rate regulatory authority as limited by the act.

Second, it reaffirms that where the Commission has withdrawn its jurisdiction to regulate, the State could not assume such jurisdiction.

Third, it provides that to the extent States do have jurisdiction, they are to regulate in accordance with the transportation policies set forth in the act.

Finally, it shortens the time in which a failure by the State to act on an intrastate rate allows Commission action.

*House amendment.*—The House amendment amends sections 11501, 10103, and 10501 of the Interstate Commerce Act by exempting rail carriers from the provisions of section 11501(a) and by adding provisions making the Commission's and certified States' jurisdiction over intrastate and interstate rail carrier rates, classifications, rules and practices and the remedies provided by the Act exclusive.

First, it amends section 11501(a) of the Interstate Commerce Act to exempt rail carriers from present provisions for Commission jurisdiction over intrastate carriers.

Second, it amends section 11501 by adding new provisions which provide that only State authorities whose standards and procedures have been certified by the Commission may exercise jurisdiction over intrastate rail rates, classifications, rules and practices. Intrastate rail transportation not subject to the jurisdiction of a certified State authority is subject to the jurisdiction of the Commission. In no event may a State authority exercise jurisdiction over general rate or inflation-based rate increases. Decisions of State authorities may be appealed to the Commission if not in accordance with this subtitle.

Third, it amends section 10103(a) to make explicit that where the Interstate Commerce Act provides an exclusive remedy, such remedy is not in addition to remedies under another law or at common law.

Finally, it amends section 10501 by adding a new paragraph providing that the jurisdiction of the Commission and of certified State authorities over rail transportation, as well as the remedies provided with respect to rail rates, classifications, rules and practices are exclusive.

*Conference substitute.*—The Conference substitute adopts the House amendment, except that the Commission's power to adjust intrastate rates is retained in the event that actions by certified states impose a burden on intrastate commerce. The conferees' intent is to ensure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by state regulation of rates, practices, etc., which are not in accordance with these goals. Accordingly, the Act preempts state authority over rail rates, classifications, rules and practices. States may only regulate in these areas if they are certified under the procedures of this section.

The remedies available against rail carriers with respect to rail rates, classifications, rules and practices are exclusively those provided by the Interstate Commerce Act, as amended, and any other federal statutes which are not inconsistent with the Interstate Commerce Act. No state law or federal or state common law remedies are available.

### SECTION 215—BUSINESS ENTERTAINMENT EXPENSES

*Senate bill.*—No provision.

*House amendment.*—The House amendment adds a new section 10751 to subchapter 111 of chapter 107 of title 49 U.S.C. to provide that business solicitation or entertainment expenses incurred by

rail carriers do not constitute illegal rebates or discrimination, if these expenses would be legal when incurred by a non-Commission regulated entity. The House amendment treats rail carriers in a similar manner as other businesses.

To discourage excessive solicitation or entertainment expenses, these expenses are not to be taken into account in determining the cost of service or the rate base for rate regulation purposes.

The Commission is directed to institute a rulemaking proceeding to establish standards and guidelines for authorized expenses under this section.

*Conference substitute.*—The Conference substitute follows House amendment. It amends Section 10751 of Title 49 U.S.C., which was added by the Motor Carrier Act of 1980, by striking out "other than transportation by rail". In addition, Subsection (b) of Section 215 makes clear that Section 10751 should be construed so as to include any permissible business expense that was incurred prior to the effective date of this Act (other than expenses on which a penalty has been paid) or that is incurred on or after such date.

SECTION 216—EFFICIENT MARKETING

*Senate bill.*—The Senate bill amends 49 U.S.C. 10762(c)(3) to permit new or increased rates to become effective 20 days after the notice of such rate is published and filed, but delayed the effective date of this change for 60 days. The Senate bill also leaves contracts and demand-sensitive tariffs subject to the provisions of existing law that require that tariffs shall not become effective on less than 30 days notice.

*House amendment.*—The House amendment reduced the period after which tariffs increasing rates can become effective to 10 days and the period after filing tariffs which reduce rates can become effective to 5 days after filing. The House amendment also permits the Commission to reduce the notice period if cause exists. The House amendment establishes a separate filing procedure for contracts in the contract section.

*Conference substitute.*—The Conference substitute permits tariffs increasing rates to become effective upon 20 days notice and tariffs reducing rates to become effective upon 10 days notice. The Conference substitute does not change existing law which permits the effective dates of tariffs to be reduced upon cause shown.

SECTION 217—JOINT RATES

*Senate bill.*—The Senate bill authorizes a carrier to publish a surcharge without the concurrence of other carriers if the surcharge is applied in equal dollar amounts to all of the routes participated in by that carrier between the same points and, if an increase in joint rates, to all of its competing single-line routes between each such origin and destination. The change in revenues shall accrue solely to the carrier applying the surcharge.

The proposing carrier must give 45 days' notice to other carriers party to the joint rate.

A carrier which participates in any route subject to a surcharge may by tariff cancel the application of such surcharge to any route if such carrier demonstrates that, under the applicable joint rate

without the surcharge or under a new lawful rate or division concurred in by the carrier, the surcharging carrier's revenues for its participation over such route are less than 110 percent of its variable costs.

A carrier may not apply a surcharge unless, for 1 year prior to the surcharge, it has participated in all increases in rates of general applicability agreed to by other parties to the rates.

Only the carrier proposing a surcharge shall be required to defend the surcharge, and the lawfulness of the surcharge shall be determined without regard to the amounts received and the services performed by other carriers party to the joint tariff to which the surcharge is applied.

A rail carrier may, without the concurrence of any connecting rail carrier, publish surcharges applicable to traffic originating or terminating upon any line of railroad originating and terminating less than 3 million gross ton miles of traffic per mile in the most recent calendar year for which traffic data are available if, prior to the application of any such surcharge, the through charges applicable to traffic to and from any such line do not provide the surcharging carrier revenues adequate to cover 100 percent of the reasonably expected costs (including the cost of capital) of continuing to operate the line involved. The change in revenues resulting from any such surcharge shall accrue solely to the carrier applying the surcharge.

A carrier may cancel the application of a joint rate to any through route without the concurrence of any connecting carrier unless another carrier party to the rate over that route demonstrates that the canceling carrier's share of revenue under the canceled rate is not less than 110 percent of the canceling carrier's variable cost of providing service over that route.

The carrier would be required to provide an estimate to class III carriers or other parties upon a showing of good cause in developing necessary data to challenge surcharges. The Commission's Special Council is authorized to assist class III carriers in actions brought under this section.

*House amendment.*—Consistent with the goal of preserving a financially stable, private sector rail system set forth in section 3 of the amendment, section 301 establishes procedures by which rail carriers which do not earn adequate revenues under existing joint rates and divisions can surcharge such rates or cancel their application to particular routes without the concurrence of other carriers. The purpose of this section is to insure than no rail carrier will be compelled to carry goods unless its share of the revenues from the joint rate, including any surcharges, is at least 110 percent of the carrier's variable cost of providing the particular services involved. In addition, for light density lines owned by a single carrier which carry less than 3 million gross ton miles per mile of traffic, this section allows such a carrier to apply surcharges to recover in full its reasonably expected costs of providing services over such lines.

With respect to a particular route to which a surcharge has been applied under subsection (a) or to which the application of a joint rate has been cancelled, section 301 allows connecting carriers who participate in the route or shippers who demonstrate that they have no competitive alternative to the route to respond to provide

Digitized from Best Copy Available

revenues to the surcharging or canceling carrier in excess of 110 percent of that carrier's variable cost. Alternatively, the connecting carrier may agree to a new division or new lawful rate or the carrier or a shipper in an affected route may petition the Commission to establish a new rate which is sufficient to produce revenues equal to 110 percent of the variable cost to the carrier proposing the surcharge or cancellation. Under either alternative, the surcharge would be cancelled or the application of the joint rate continued for that particular route. A surcharge to a light density line may be challenged by a shipper who has no competitive alternative to such line on the basis that the revenues generated exceed the surcharging carrier's reasonably expected costs of providing services over the particular line or that the shipper is bearing an unreasonable proportion of the reasonably expected costs. Special provisions are also included in section 301 to protect class III carriers from unfair competition as a result of action taken by another carrier under this section.

## Section-by-Section Analysis

*Section 301.* This section amends chapter 107 of title 49 by adding a new section 10705a which provides standards and procedures for surcharging an existing joint rate or for canceling the application of a joint rate to a particular route to increase revenues for rail carriers earning inadequate revenues from existing joint rates and divisions.

Subsection (a) authorizes a carrier to apply a surcharge increasing or decreasing the joint rate for a particular movement between two points without the concurrence of other parties to the joint rate provided the surcharge is applied in equal dollar amounts to all routes for the movement under the joint rate in which the surcharging carrier participates and, if the surcharge increases the rate, to all single line routes of that carrier between the same points. A connecting carrier may cancel the application of a surcharge to a route in which it participates by demonstrating that the surcharging carrier's revenues over that route without the surcharge exceed 110 percent of the surcharging carrier's variable cost or by putting into effect a new division or a new lawful rate which provides the surcharging carrier 110 percent of its variable cost. In addition, a shipper showing that it has no competitive alternative to that route and a carrier in the affected route, may petition the Commission to cancel the application of a surcharge to a particular route by showing that the surcharging carrier's revenues with the surcharge exceed 110 percent of variable cost. The Commission must then authorize the surcharging carrier to apply a surcharge sufficient to generate revenues equal to 110 percent of the surcharging carrier's variable cost. The right of surcharge may be exercised by a particular carrier only once a year for a particular movement and only if that carrier has participated in all generally applicable rate increases to that joint rate for one year prior to the surcharge.

Subsection (b) authorizes a surcharge applicable to traffic which originates or terminates upon a light density line, owned by a single carrier, which carrries less than 3 million gross ton miles of traffic per mile per year. The surcharge may be applied (in differ-

ent amounts to different traffic in order to optimize market relationships if necessary) whenever the revenues under existing rates do not cover 110 percent of the carrier's variable cost of transporting traffic to or from the line plus 100 percent of the carrier's reasonably expected costs (including the cost of capital) of operating the line. A shipper located upon a light density line to which a surcharge is applied may petition the Commission for two kinds of relief: (1) if it is established that the revenues generated by the surcharge exceed 100 percent of the variable cost of transporting traffic to and from the line plus all the reasonably expected costs of continuing to operate the line (including normalized maintenance and the replacement cost of equipment), the Commission may reduce the surcharge to the level needed to generate such revenues; and (2) if it is established that the complaining shipper would, by virtue of the surcharge, bear an unreasonable proportion of the reasonably expected costs of operating the light density line, the Commission may reallocate the surcharge among the traffic originating or terminating upon the line.

Subsection (c) authorizes a carrier to cancel the application of a joint rate to a particular through route subject to that rate. Another carrier participating in that route or the Commission, upon petition of a shipper having no competitive alternative to the route, may prevent the cancellation upon the same demonstration or by putting into effect the same type of new rate or division necessary to cancel a surcharge under subsection (a). When a cencellation is prevented in this manner, the Commission shall consider the cancelling tariff under the provisions of existing law relative to the cancellation of joint rates. If a cancellation becomes effective, the canceling carrier may establish a local or proportional rate for that movement. Any through rate of which that local or proportional rate is a part will divide as the separate factors of the through rate are made and not by prescribed divisions.

No matter when a surcharge or cancellation is challenged under this section, the issue to be decided by the Commission is whether the surcharge or cancellation met the standards of this section at the time it was filed and not at the time it is challenged.

Subsection (d) provides that revenue changes resulting from surcharges shall accrue to the surcharging carrier. Upon demonstration by an intraterritorial connecting class III carrier particularly in a surcharged route, and in the absence of any increase in the joint rate, revenues resulting from a surcharge under subsection (a) in excess of 110 percent of variable cost over that route will be divided with intraterriorial connecting class III carriers in that route on the basis of existing divisions. This section does not apply to revenues resulting from the diversions to a line but only to revenue directly accruing from the surcharge.

Subsection (e) provides that, when a carrier puts into effect a new rate or division in order to prevent a surcharge or cancellation from taking effect over a particular route, other carriers can require similar concessions on other routes under the same joint rate in which they particpate, subject to the limitations set forth in this subsection.

Subsections (f) through (h) set forth ancillary provisions with respect to surcharges and cancellations regarding notice, effect upon other sections of title 49, and access to informtion from the Com-

mission regarding revenues and variable cost. In particular, subsection (g) provides that, except where specifically provided in this section, the Commission may not remedy a surcharge or cancellation found to violate another section of title 49 in a way which would require a carrier to provide service at less than 110 percent of variable cost (or reasonably expected costs in the case of a light density line).

Subsections (i) through (k) set forth special remedial provisions available to class III rail carriers relative to surcharges under subsection (a) or cancellations under subsection (c). These provisions allow aggrieved class III carriers to protest surcharges or cancellations which are alleged to be anticompetitive, which will unduly affect the complaining carrier's ability to earn an adequate rate of return or which create unreasonable differences in existing rates. In these limited circumstances the Commission may order relief which requires a surcharging or canceling carrier to carry traffic at less than 110 percent of variable cost if it determines that such relief is warranted by the public interest in preserving rail service or ensuring competition among rail carriers.

Subsection (1) requires the Commission, upon petition by a participating class II or III rail carrier, to prescribe a new compensatory through rate when the application of a joint rate to a through route is canceled under subsection (c).

Subsection (m) sets forth the method for determining variable cost for purposes of this section.

Subsection (n) provides that the authority to make surcharges under subsection (a) expires three years after the effective date of the Act (unless extended for one additional year by the Commission), but that surcharges made before the date will continue to be lawful.

SENATE AMENDMENT TO HOUSE AMENDMENT—NO PROVISION

*Conference substitute.*—The Conference substitute adopts the House substitute, with modifications. Today, most of the property transported by rail moves over through routes subject to joint rates, and the revenue derived from these movements is divided among the participating carriers according to divisions generally prescribed by the Commission. The existing joint rates and divisions do not allow some rail carriers to recover even the variable cost of providing transportation services on certain through routes. Under existing law, unless all carriers participating in the joint rate concur, these rates and divisions can be changed only by protracted proceedings before the Commission.

Two of the major problems caused by the existing joint rate system are too low rate divisions and a proliferation of uneconomic routes protected by the archaic "commercial closing" doctrine.

The Conferees intend that the conference substitute will alleviate these problems in part by assuring that a carrier, with a minimum of regulatory interference will be able, by applying surcharges or directly cancelling routes, to either earn revenues over all lines equal to or exceeding 110 percent of unadjusted ICC formula variable costs or to close routes not providing this level of earnings and, in the case of railroads earning less than adequate revenues with lines carrying less than 3 million gross ton miles, to cover all

the costs of operating those lines. The same holds for railroads earning adequate revenues, except only with respect to lines carrying less than 1 million gross ton miles.

With regard to surcharges on light density lines, the conferees intend that such surcharges may not be imposed in a manner which would require shippers to pay for extraordinary occurrences (i.e. bridge washouts, landslides) in a short period of time. The Commission's proceeding should address this issue.

These provisions are intended to insure these results but they in no way imply an intent on the part of Conferees that a carrier's existing rights under the Act to secure improved earnings over specific routes should be limited. The Conferees recognize that a carrier cannot remain healthy only earning revenues at these levels, but believe that at this time the extraordinary provisions of this section are only needed to attain the revenue levels specified in this section and that existing remedies, assuming the Commission chooses to administer them in order to realize the revenue adequacy goals of the Act, should be adequate to remedy other joint route and division problems.

The key to the success of these provisions will be the ease with which they may be implemented by a surcharging or cancelling carrier. The Conferees intend that the revenue levels guaranteed by this section take precedence wherever possible to competing claims and that only where action is essential to protect vital public interests should the Commission or the Court act to frustrate the implementation of these provisions.

Administrative feasibility is also the reason the conferees have selected formula costs for use under all provisions except where otherwise specified; and the conferees encourage the Commission not to permit cost debates to delay the policy of this Act that carriers earn the full and reasonably expected costs of providing service on lines carrying less than 3 million gross ton miles for revenue inadequate carriers and 1 million gross ton miles for revenue adequate carriers. Only if carriers are able to cover all these costs can they expect to begin to invest to provide the service on which our nation's commerce depends.

In determining which carriers qualify as class III carriers, the Commission shall exclude any revenues not earned from freight operations, specifically excluding revenues from passenger service.

All of the provisions as described in the House amendment are available for class III rail carriers.

### SECTION 218—EXPEDITED DIVISION OF REVENUES PROCEEDINGS

*Senate bill.*—The Senate bill amended section 10705(e)(1) of the Interstate Commerce Act by requiring the Commission to complete all evidentiary proceedings to adjust the division of joint rail rates within nine months if the proceeding is brought on complaint or within 18 months if the proceeding is initiated by the Commission. The Commission is required to take final action by the 180th day after the completion of evidentiary proceedings unless the Commission requires more time in which case it must report its reasons to Congress.

However, when the divisions proceeding involves a railroad in reorganization or a contention that the divisions at issue do not cover

the variable costs of handling the traffic, the Commission must give the proceeding preference over all other proceedings and must take action within the earliest practicable time. In no event may the Commission fail to act more than 100 days after the completion of the evidentiary proceedings.

*House amendment.*—The House amendment is the same as the Senate bill except it exempts division proceedings involving joint rates participated in by class III carriers.

*Conference substitute.*—The Conference substitute adopts the Senate provision, except that for a three-year period the expedited divisions provision shall not apply to class III carriers. The conferees intend that the Commission will modify its regulations governing divisions proceedings to insure that prefiling requirements do not frustrate the purpose of the Congress to expedite divisions proceedings as much as possible. The conferees also expect the Commission to examine closely alternative means of dividing revenues among carriers in a manner which might better reflect market conditions than the crude, across the board divisions which now apply regardless of the specific economic conditions of the carriers involved and the markets they serve.

### SECTION 219—RATE BUREAUS

*Senate bill.*—The Senate bill modified some of the activities which a rate bureau may permit its members to engage in if it is to be approved by the Commission.

First, intrastate rates affecting interstate commerce may be set collectively in the same manner as interstate rates.

Second, the extent of carrier discussion of single line rates and interline rates related to a particular interline movement is defined and limited.

Third, sound recordings or transcripts must be kept of bureau proceedings, submitted to the ICC and made available to any other federal agency with jurisdiction.

*House amendment.*—The House amendment modified the activities which a rate bureau may permit its members to engage in if it is to be approved by the Commission and its members are to be immune from the application of the antitrust laws.

First, no carrier may discuss, vote or agree on single line rates proposed by another carrier. The Commission may allow such discussions for general rate increases only if it finds that the implementation of the limitation is not feasible.

Second, no carrier may discuss a joint line rate unless it practicably participates in the movement. The term "practicably participates" is to be defined by the Commission.

Third, after January 1, 1984, or earlier, if the Commission decides, unless the Commission finds it is not feasible, no carrier may discuss a joint line rate where there are two routes between the same end points, except with a carrier that forms part of a particular single route.

Until January 1, 1983, such carriers may discuss general increases for joint rates and broad tariff charges, if the rate bureau has a special procedure allowing shippers to comment prior to the filing of the tariff with the Commission.

Fourth, employee protective provisions are provided for rate bureau employees affected by this section.

Fifth, in any proceeding in which an antitrust violation is alleged concerning a rail carrier the party making the allegation shall have the burden of proving the violation by clear and convincing evidence. Proof of the violation may not rest on or be inferred from evidence that two or more carriers acted together with respect to an interline movement and that one of the parties took similar action with respect to a competitive route.

Sixth, transcripts or sound recordings must be kept of bureau meetings and submitted to the ICC and made available to other federal agencies with jurisdiction.

*Conference substitute.*—The Conference substitute adopts the House amendment with modifications. The Commission shall define "practicably participate" for determining when a carrier participates in a movement. The Conferees believe that railroads, shippers, and consumers will benefit from increased rail to rail competition, and expect that the Commission will interpret the term in a manner which encourages competition while maintaining a rail system which functions efficiently.

The Conference substitute extends the date by which the Commission must eliminate general rate increases by one year, to January 1, 1984. General rate increases are also limited to inflationary cost increases. Rate bureau discussions are limited to joint movements where carriers have an actual interline movement by January 1, 1984, unless the Commission acts sooner. Car compensation, demurrage, and car allowances are not considered single-line rates.

The Conferees wish to emphasize that nothing in the new law will prevent a carrier from publishing broad territorial rate changes in a tariff.

Because of the requirement that carriers concur in changes to joint rates, carriers must talk to competitors about interline movements in which they interchange. That requirement could falsely lead to conclusions about rate agreements that were lawfully discussed. To prevent such a conclusion the Conference substitute provides procedural protections about lawful discussions and resulting rates. The Conferees intend that these protections be construed to insure that remedies for anti-competitive activities remain under existing laws.

SECTION 220—LONG AND SHORT HAUL TRANSPORTATION

*Senate bill.*—No provision.

*House amendment.*—The House bill amended section 10726 by limiting the provisions of existing law to rates applicable to grains, soybeans, rice or cotton or to situations in which the Commission determines that competition exists between rail and water carriers and the provisions are necessary to prevent anti-competitive behavior. The House amendment also repealed 10726(c) which limited a rail carrier's ability to increase a rate which had been previously decreased to meet water carrier competition.

*Conference substitute.*—The Conference substitute repeals 10726(c). The conferees repealed this subsection in order to encourage flexible and innovative pricing by railroads. The conferees' decision to otherwise retain the existing section 10726 is not to be

Digitized from Best Copy Available

construed to indicate that the Commission is not to take steps consistent with the policy of this act to reduce barriers to market-oriented pricing without the need for prior Commission approval.

SECTION 221—RAILROAD ENTRY

*Senate bill.*—The Senate bill changes existing law to permit easier entry, consistent with the policy of this Act to encourage greater reliance on marketplace forces than on government regulation.

Under present law, the Commission may authorize the construction of a railroad only if it finds that the public convenience and necessity "require or will be enhanced" by the construction. This is a more stringent test than that applied to either the abandonment of rail lines or mergers. There does not appear to be any reason why the Commission should apply a more difficult standard for the construction of new facilities than for the abandonment of old facilities. The Senate bill changes the test applied by the Commission from "require or will be enhanced" to "require or permit".

When a railroad has been issued a certificate of public convenience and necessity by the Commission and where the construction or extension of that line would cross another carrier, it is unclear whether the second railroad could block the construction by refusing to let the first railroad cross another carrier. The Senate bill provides that when a railroad has been issued a certificate of public convenience and necessity, no other railroad may block construction by refusing to let the first railroad cross its property, provided that the construction and operation do not materially interfere with the operation of the second railroad and the owner of the crossing line compensates the owner of the crossed line. If the railroads cannot agree on the terms of compensation, the Commission may establish the compensation.

*House amendment.*—The House amendment changes the standard under 49 U.S.C. 10901 for the construction or extension of a rail line from requiring the Commission to find that the "public convenience and necessity require or will be enhanced" by the construction or acquisition (or both) and the operation of the railroad line to requiring the Commission to find that the "public convenience and necessity permit the construction or acquisition". The House amendment permits one railroad that has been issued a certificate of public convenience and necessity to cross the property of another carrier if the construction does not unreasonably interfere with the operation of the crossed line, the operation does not materially interfere with the operation of the crossed line and the owner of the crossing line compensates the owner of the crossed line. If the carriers are unable to agree to the terms of operation or compensation, either party may submit the matters in dispute to the Commission. The House amendment requires the Commission to impose employee protection under 49 U.S.C. 11347 upon any rail carrier proposing to both construct and operate a new railroad line. If a rail carrier rearranges or adjusts its work force in anticipation of a transaction with the purpose of depriving an employee of benefits under this title, the provisions of this title apply to such employee.

Digitized from Best Copy Available

*Conference substitute.*—The Conference substitute adopts the House amendment, but makes employee protection discretionary and drops the provision regarding deprivation of employee benefits in anticipation of a transaction. The Commission does not have authority over the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team switching, or sidetracks, if the tracks are located, or intended to be located, entirely in one state (49 U.S.C. 10907). The Committee does not intend that new subsections added to 49 U.S.C. 10901 shall expand the Commission's jurisdiction. If the construction or extension of a line of railroad would be otherwise exempt under 49 U.S.C. 10901, there should be no reason to obtain a certificate of public convenience and necessity even if the constructing railroad reaches a voluntary agreement to cross another carrier's line. Only if a dispute is submitted to the Commission would there be a need to obtain a certificate of public convenience and necessity. This certificate could be sought at the same time as the dispute is submitted to the Commission. The Conferees wish to emphasize that if a certificate would not otherwise be required under section 10907, the certificate should be issued routinely and that its purpose is (1) to assure Commission jurisdiction under 10901(d) and (2) to assure that the crossing carrier has its right to serve a shipper sanctioned by the Commission.

### SECTION 222—SERVICE DURING PERIODS OF PEAK DEMAND

*Senate bill.*—No provision.

*House amendment.*—The House amendment provides that a rail carrier may not be found to have violated its common-carrier obligation under 49 U.S.C. 11101 to provide transportation or service on reasonable request if it fulfills its commitments under contracts for the shipment of goods before responding to reasonable requests for service.

*Conference substitute.*—The Conference substitute adopts the House amendment. However, this provision does not abrogate the power of the Commission to refuse to approve contracts on the grounds that they will impair a carrier's ability to meet its common carrier obligation.

### SECTION 223—RECIPROCAL SWITCHING

*Senate bill.*—The Senate authorized the Commission to require railroads to enter into reciprocal switching where it finds such agreements to be practicable and in the public interest. In many parts of the country, reciprocal switching agreements are in effect where carriers pick up and deliver traffic for other railroads. In areas where reciprocal switching is feasible, it provides an avenue of relief for shippers where only one railroad provides service and it is inadequate. The standard "practicable and in the public interest" is the same standard the Commission has applied in considering whether to order the joint use of terminal facilities.

*House amendment.*—The House amendment is the same as the Senate bill, but permits the Commission in its discretion to order protection for employees who are adversely affected by a grant of authority by the Commission under this section.

Digitized from Best Copy Available

*Conference substitute.*—The Conference substitute adopts the House provision. The Conferees note that the Commission should use the "practicable and in the public interest" standard even though section 11123 has been expanded to include all facilities, not just the joint use of terminals. The Conferees note that the entry and reciprocal switching provisions should not be used to allow Class I carriers to force their way into traffic originating or terminating on a Class III carrier.

SECTION 224—CAR SERVICE COMPENSATION

*Senate bill.*—No provision.

*House amendment.*—The House amendment repeals section 11122(b)(2) which allowed the Commission to impose incentive per diem rates.

The House amendment also provides that when shippers enter into an agreement to discuss what they will propose to charge rail carriers for the use by such rail carriers of rolling stock owned or leased by such shippers, they shall apply to the Commission for approval of the agreement. The Commission shall approve the agreement only when it finds that the making and carrying out of the agreement will further the rail transportation policy in section 10101a of this title. The Commission may require compliance with conditions necessary to make the agreement further the rail transportation policy. If the Commission approves the agreement, any action by a party under its terms or the terms required by the Commission shall receive antitrust immunity under section 10706(a)(2).

The House amendment also provides that where the shippers who have entered into an agreement approved by the Commission and the rail carriers proposing to use the rolling stock owned or leased by the shippers cannot agree upon the amount of compensation to be paid for the use of such rolling stock, any party directly involved in the negotiations may settle the matter by submitting the issues in dispute to the Commisison. The Commission shall render a binding decision on the issues based on a standard of reasonableness. The Commission's decision may consider any past precedents on the history of the negotiations and must be rendered within 90 days of the submission of the dispute to the Commisison.

*Conference substitute.*—The Conference substitute adopts the provisions of the House amendment and adds a provision which states that the law in effect prior to the effective date of this Act with respect to the obligation of rail carriers to utilize rolling stock owned or leased by shippers shall remain in effect.

The conferees do not believe that the provision of an incentive element on freight equipment is the best means of attracting capital into the industry for the acquisition of rolling stock. Rather, the rental rate for such rolling stock should be sufficient to pay an adequate return on investment. The conferees do anticipate, however, that the Commission shall continue to examine means (such as flexible car hire) of making basic car hire more responsive to market forces where this is possible without subjecting carriers which are forced to use cars received in interchange to unreasonable rates.

The conferees intend that marketplace decisions govern the railroad industry and its relationship with shippers. Indeed this policy is enunciated in the rail transportation policy. The conferees expect that antitrust immunity be granted under this section consistent with previous Commission decisions. The conferees are aware that shippers could have antitrust immunity to establish private car-hire when participating in a Commission proceeding and do not intend that this provision shall change existing law in that regard.

If the Commission allows per diem rates below basic per diem during periods of surplus car supply, the Commission should allow rates above basic per diem during periods of shortage.

SECTION 225—CAR UTILIZATION

*Senate bill.*—The Senate bill created a new section 10732 of the Interstate Commerce Act. This section provides that rail carriers are free to establish a special elective tariff which contains premium freight rates for special services or levels of services that may be requested by a shipper. Throughout Senate hearings on rail regulatory reform, testimony was submitted by many shippers who advised that they were prepared to pay a higher rate for a higher level or a more expeditious service. This amendment will give those shippers that option and, in turn, allow the rail carriers to increase the utilization of their cars.

Essentially, this subsection allows carriers to privide a more specialized service to shippers who choose to pay the premium rate, but the common carrier obligation is not abrogated in any way. This will insure that the shipper is still guaranteed the same level of service that he receives today. This subsection is simply another option for the shipper and the rail carrier.

*House amendment.*—No provision.

*Conference substitute.*—The Conference substitute adopts the Senate provision, with an amendment.

SECTION 226—CAR SERVICE ORDERS FOR EXIGENT CIRCUMSTANCES

*Senate bill.*—The Senate bill limited the Commission's authority to issue car service orders under 49 U.S.C. 11123 in two ways. First, the Commission would be restricted to emergencies "of such magnitude as to have substantial adverse effects on rail service to the nation or a substantial region of the nation". Second, the Senate bill restricted emergency orders to 30 days, but permitted the Commission to extend the order another 60 days if the Commission had a proceeding to resolve the service problems which generated the need for the emergency order on a more permanent basis. The two restrictions were adopted based on the belief that only real emergencies should trigger such orders and that in the past, the Commission has been far too willing to issue car service orders in other than emergency situations. The Senate bill removed the limitation in existing law that the Commission may order only the joint or common use of terminals, including mainline tracks for a reasonable distance outside of those terminals. The Commission would be permitted to require the joint or common use of all facilities when

it considers that a shortage of equipment, congestion of traffic, or qualifying emergency exists.

*House amendment.*—The House amendment limited the Commission's authority to issue car service orders under 49 U.S.C. 11123 in instances where it finds a "shortage of equipment, congestion of traffic or other failure in traffic movement exists which creates an emergency situation resulting in substantial adverse effects of rail service in the United States or a substantial region of the United States". The House amendment requires the Commission to find a nationwide emergency or broad regional emergency that justifies the extraordinary remedy of the imposition of car service orders. The House amendment permits the Commission to extend such orders beyond 30 days if the Secretary of Transportation certifies that a transportation emergency exists. The House amendment permits the Commission when it makes the prerequisite findings to require the joint use of all facilities, not just terminal and mainline tracks a reasonable distance outside those terminals. This provision will permit the Commission to effectively address genuine emergency situations in an expeditious manner without restrictions regarding the use of a railroad's facilities, including mainlines and equipment by another railroad or over that railroad. This provision specifically overrules the decision in *Atchison, Topeka and Santa Fe* v. *ICC*, 617 F. 2nd 485 (7th Cir., 1980). When the Commission does require one railroad to use or go over another railroad's facilities, the Commission shall require, to the maximum extent practicable, the use of employees who would have performed work in connection with the traffic subject to the action of the Commission.

*Conference substitute.*—The Conference substitute adopts the House provision, but authorizes the full Commission after a hearing to determine that a transportation emergency exists if the original 30-day order is to be extended. The conferees emphasize that the Commission's powers under this section are extraordinary and should be exercised only in genuine emergencies. Some shipping interests have expressed concern as to the scope of this section. An important distinction must be borne in mind. Section 11123 of title 49 is being amended as to the required regional or national type emergency before the Commission can issue car service orders, as well as the duration and the scope of the car service orders.

The Conferees want to emphasize that the provisions of section 11122 of title 49 of the United States Code as to permanent rules and regulations on railroad car service are unaffected and remain intact. The importance of insuring on a day-to-day basis the efficient functioning of our unified national rail system and network remains. The Commission still retains its power to issue permanent mandatory car service rules such as those which are now in effect and which govern the movement of railroad cars throughout the country.

SECTION 227—EMPLOYEE PROTECTION

*Senate bill.*—No provision.

*House amendment.*—The House amendment provided for employee protection, as described in 49 U.S.C. 11347, to be imposed in transactions involving transfers or the operation of or over a debt-

or's lines by another entity under section 1172(b) of the Bankruptcy Act of 1978. The provision puts employees of rail carriers which entered bankruptcy after the effective date of the Bankruptcy Act of 1978 in the same position as employees of rail carriers that entered bankruptcy prior to the Bankruptcy Act of 1978 with respect to employee protection. This provision is not intended to change existing law with respect to either the priority or the timing of payment of employee protection in a bankruptcy proceeding.

*Conference substitute.*—The Conference substitute follows the House provision.

SECTION 228—MERGERS AND OTHER TRANSACTIONS

*Senate bill.*—The Senate bill would make no changes in the present law with respect to major rail mergers: the ICC would consider such proposals under existing standards and procedures, and the present time limit of about 31 months (which was established by the 4R Act) would be retained. However, this section makes two major changes in the present law under which the Commission is required to consider all other restructuring transactions among railroads (including the purchase or sale of assets, trackage rights, and the like). These changes are intended to encourage the rationalization and restructuring of the rail system through actions less than merger.

First, the Commission would have to decide on smaller transactions faster than under present law. Present law permits the Commission 15 months to decide all such cases regardless of their complexity or importance. For transactions having regional or national significance, this section would require the Commission to reach a decision within 10 months. For transactions which do not have regional or national transportation significance, this section would require the Commission to reach a decision within 6 months. These deadlines are, of course, maximum time limits and the Committee believes that many applications can and should be processed without taking the full amount of time allowed.

In order to meet the deadlines specified in this section, the number of factors the Commission must consider in ruling on transactions less than merger would be reduced. (The Commission now applies the same test to all transactions as to major mergers.) This section would require the Commission to balance the transportation benefits of the transaction against any anticompetitive effects. In addition, where the transaction is part of a restructuring project previously approved by the Secretary of Transportation under section 401 of the 4R Act, the Commission would be required to give substantial weight to the recommendations of the Secretary.

*House amendment.*—The House bill contains a provision relating to the factors the Commission is required to consider when passing on major mergers. The House provision would require the Commission to consider whether the proposed transaction would have an adverse effect on competition among rail carriers.

*Conference substitute.*—The Conference substitute includes a combination of the House and Senate provisions. The conferees note that many transactions for which Commission approval is required are minor in nature and routinely approved. The Committee believes that the Commission should focus its attention on more

important issues and judiciously use its statutory authority to reduce the burden on all parties (including a reduction in paperwork) where approval is routinely and consistently granted.

SECTION 229—SAVINGS PROVISIONS

*Senate bill.*—The Senate bill provided that a rail rate in existence on the date of enactment of this Act could only be challenged as being not reasonable within 270 days after enactment. Such rate would not be found not reasonable if its revenue-to-variable cost ratios did not exceed the average ratio of revenue-to-variable cost established by the Commission.

*House amendment.*—The House amendment provided that any rate for a carrier in effect on the effective date of this Act could be challenged within 180 days of that date in a complaint filed with the Commission alleging that the carrier had market dominance under section 10709 over the particular route to which the rate applied and that the rate was not reasonable under new section 10701(a). If a rate in effect upon enactment has not been challenged within 180 days or was challenged and found to be reasonable, the rate could not again be challenged before the Commission or any court.

The savings provisions would not apply to any rate under which the volume of traffic moved during the 12-month period immediately preceding the effective date did not exceed 500 net tons where such rate has increased tenfold in the 3-year period immediately preceding the bringing of a challenge to the increase of such rate.

In all cases under this section, the burden of proof is on the complainant.

*Conference substitute.*—The Conference substitute adopts the House bill. This Conference substitute allows a 180-day period from the effective date of the bill in which existing rates may be challenged as unreasonably high under the procedures of 11701. The Conferees do not intend this right to be construed as creating any presumption as to the reasonableness of the rates subject to challenge. The purpose of this provision is to give affected parties a final opportunity to review the reasonableness of existing rates before their opportunity to challenge those rates is curtailed. Any challenges arising under this section shall be limited by the jurisdictional standards otherwise newly adopted in the Staggers Rail Act of 1980.

SECTION 301—UNIFORM ACCOUNTING SYSTEM

*Senate bill.*—No provision.

*House amendment.*—The House amendment makes section 11142, which requires the Commission to prescribe a uniform cost and revenue accounting and reporting system applicable only to non-rail carriers. Previous accounting and reporting systems developed by the Commission for rail carriers are to be replaced by the accounting and reporting requirements of Title III of the amendment.

*Conference substitute.*—The Conference substitute is the same as the House amendment.

SECTION 302—RAILROAD COST ACCOUNTING

*Senate bill.*—No provision.

*House amendment.*—The House amendment establishes a Railroad Accounting Standards Board, consisting of seven members and chaired by the Comptroller General of the United States. The purpose of the Board is to develop cost accounting principles which identify—variable costs which accurately represent the economic costs of rail movements.

The Board, in developing principles, is to take into account several factors concerning the regulatory purpose, the costs and benefits for rail carriers, and the least expensive way of obtaining the cost information.

The Commission is to promulgate rules to implement the principles developed by the Board.

Within 180 days after enactment, each railroad must file a request with the ICC for preliminary certification, which is to be granted if the carrier's cost accounting system is in compliance with the ICC accounting princples in effect on the date of enactment. The Conferees do not envision the requirements for preliminary certification to be any more than a simple affirmation that the carrier is meeting and will continue to meet the existing requirements of the Commission.

The Commission shall grant final certification if it finds that a carrier's accounting system is in compliance with the rules promulgated by the Commission, under the principles of the Board.

Each rail carrier is to maintain a system that is in compliance with rules promulgated by the Commission, under the principles of the Board.

Rail carriers are required to make cost data available to parties to a Commission proceeding.

In order to obtain expense and revenue information for regulatory purposes, the Commission may promulgate rules which prescribe expense and revenue accounting and reporting requirements consistent with generally accepted accounting principles uniformly applied to rail carriers. The Commission in promulgating rules for expense and revenue accounting and reporitng requirements, shall ensure that such requirements are cost effective and not duplicative of the managerial and responsibility accounting requirements of carriers.

The Board shall file two reports with the Congress within 2 years after the effective date of this legislation. One report is to compare the cost of implementing the accounting standards to possible benefits. A second report is to recommend changes to the regulatory system, including maximum rate regulation, to integrate the new cost accounting standards and rules.

*Conference substitute.*—The Conference adopted the House provision with the following changes: First, the Conference substitute makes it clear that the primary purpose of the Cost Accounting Principles Board is to promulgate sound principles to govern the determination of railroad costs rather than detailed standards. Second, the Conference substitute limits the availability of cost evidence to that which the Commission will allow under its discovery rules. Third, the Conference substitute authorizes the appropriation of $1 million per year to carry out the functions of the Cost

Digitized from Best Copy Available

Accounting Principles Board. Fourth, the Conference substitute limits the number of Board members to seven. Fifth, the Conference substitute requires that the Board conduct one study, recommending legislative or administrative action that may be necessary to integrate the cost accounting principles and certification process with the regulatory system, including maximum rate regulation. Sixth, the conference substitute makes certain technical changes to stress that the principles promulgated by the Board and the rules promulgated by the Commission are to emphasize the degree of economic accuracy needed for regulatory purposes and not merely the accumulation of more detailed, but not necessarily more accurate, accounting information.

The substitute clarifies the description of the type of principles to be determined in order to eliminate redundant language contained in the House bill. The Conferees intent is to provide for the most accurate possible statement of costs, both direct and indirect, associated with particular movements of goods, and the Board in developing its principles should consider the degree of reliability with which such costs can be attributed to specific movements.

The Conferees expect that while the Board develops its principles, the Commission will continue its efforts to complete the uniform revenue and cost systems which it commenced after the passage of the 4R Act so that the Board, as part of its task, will be able to evaluate that system as it is developing its principles.

The conferees desire that the Board's principles will be sufficiently sound that they will be generally applicable for both regulatory and management purposes. To this end, railroads are to be afforded maximum possible freedom consistent with the commission's regulatory needs, to develop internal accounting and cost finding systems that are suited to the needs of the carriers themselves. The Conferees wish to emphasize, however, that the purpose of the Board's efforts is to develop a regulatory accounting system and that this section is not intended to limit the use of cost finding systems by railroads which railroads might find useful for management purposes.

The substitute allows, but does not require, the Commission to promulgate rules prescribing expense and revenue accounting and reporting requirements. In addition to other limitations in the bill designed to minimize the burden of such rules on carriers, the bill requires that to the extent they are required solely to provide expense and revenue information necessary for determining railroad costs in regulatory proceedings, the rules must comply with the principles established by the Railroad Accounting Principles board.

The Committee recognizes that the Commission has exempted Class III railroads from the Uniform System of Accounts. The Committee shares the view that elaborate accounting systems imposed upon smaller railroads could produce a much greater burden on the railroad than could be justified by offsetting public benefits. Thus, the Committee has left with the Commission the discretion to exempt carriers from the burdens of a Cost Accounting System if that seems desirable. We encourage the Commission to continue the practice of granting exemptions as needed to relieve unnecessary paperwork burdens and costs on small businesses.

SECTION 303—CIVIL PENALTIES FOR VIOLATIONS OF ACCOUNTING PRINCIPLES PROVISIONS

*Senate bill.*—No provision.

*House amendment.*—A carrier failing to obtain final certification of its cost accounting system is to be fined not less than $50,000. Any party to a proceeding who knowingly discloses confidential data made available by a railroad pursuant to this title may be fined up to $50,000.

*Conference substitute.*—The Conference substitute is the same as the House amendment.

SECTION 401—FEEDER RAILROAD DEVELOPMENT PROGRAM

*Senate bill.*—No provision.

*House amendment.*—To provide shipper groups and government agencies an alternative to inadequate rail service and to preserve feeder lines prior to the total downgrading of such lines, the House amendment provides for a feeder line development program which would require a rail carrier to sell a railroad line to a financially responsible person at a price not less than the constitutional minimum, if the Commission makes a finding that the present or future public convenience and necessity required or permited the abandonment or discontinuance of a railroad line, or if the Commission makes a finding that the transportation provided over a particular line is inadequate. Inadequate transportation is defined by five criteria. The Commission must affirmatively determine the existence of the conditions set forth in all five criteria as a prerequisite to the sale of a railroad line under this section. The burden of proving inadequacy of service is on the person filing to acquire the rail line.

The Commission may require the selling carrier to provide the acquiring carrier trackage rights if the acquiring carrier compensates the selling carrier for such trackage rights. If an acquiring rail carrier petitions the Commission for a joint rate, the Commission is required to grant such acquiring carrier a reasonable compensatory joint rate.

The carrier is exempt from sections 10901 and 10903 of the Interstate Commerce Act, except if an acquiring carrier participates in a joint rate. The feeder line development program permits an acquiring carrier to set conditions which shippers must meet as a prerequisite to using the line.

*Conference substitute.*—The Conference substitute adopts the House provision with several modifications.

First, the program is limited for the first three years to lines carrying 3,000,000 gross ton miles per year or less. After the third year any line is eligible for acquisition under the program but joint rates can not be mandated for lines acquired carrying more than 3,000,000 gross tons per mile per year.

Second, the feeder railroad program is not intended to surplant the branch line program under existing law. Where an application for abandonment has been actually filed with the Commission, existing provisions of the Interstate Commerce Act and of the Local Rail Service Assistance Act will be available.

Third, an opportunity is given for the Commission to allow a rail carrier a reasonable time to make the necessary efforts to provide

Digitized from Best Copy Available

adequate service to shippers who transport traffic over a line in question.

Fourth, it is made clear that the Commission may require trackage rights to the acquiring carrier in order to allow a reasonable interchange with the selling carrier or to move power equipment or empty rolling stock between non-contiguous feeder lines operated by the acquiring carrier. The Conferees recognize that one operator may acquire a number of non-contiguous branch lines thereby requiring the allocation of trackage rights in order to permit movement of power equipment between the non-contiguous lines.

Fifth, normal labor protection is afforded employees of the selling carrier and the provision requires the acquiring carrier to hire, to the maximum extent practicable, the employees who would normally have performed work in connection with a line subject to sale under the program.

The Conferees believe that the feeder line program will give shippers and communities an opportunity to insist upon adequate rail service. Where such service is not forthcoming the provision provides, through acquisition, a viable alternative to poor service or total abandonment.

SECTION 402—ABANDONMENT

*Senate bill.*—Section 202 of the Senate bill alters the existing provisions of the Interstate Commerce Act relating to abandonments of railroad lines. This section expedites abandonment proceedings by specifically setting forth time periods within which the Commission must act upon abandonment applications, depending on the complexity of and the opposition to the abandonment proceeding. For example, under existing law, there is no time limit within which an investigation of an abandonment application must be concluded. Section 202(c)(3) places a time limit of 135 days upon such investigations.

Section 202 repeals existing 49 U.S.C. 10905. New section 10905 creates a mechanism that requires railroads to sell a railroad line approved for abandonment to a financially responsible party if the financially responsible party has offered to pay the acquisition cost of the line or the difference between the revenues attributable to providing that service plus a reasonable return on the value of the line. Section 202 also requires rail carriers petitioning for abandonment of a railroad line to provide interested parties an estimate of the subsidy or the minimum purchase price required to keep the line in operation, calculated in accordance with the new provisions in 49 U.S.C. 10905.

The provisions in section 202 assist shippers who are sincerely interested in improving rail service, while at the same time protecting carriers from protracted legal proceedings which are calculated merely to tediously extend the abandonment process.

*House amendment.*—No provision.

*Conference substitute.*—The Conference substitute adopts the Senate provision.

### SECTION 403—CONVERSION OF ABANDONED RAILROAD RIGHTS-OF-WAY

*Senate bill.*—Section 305 of the Senate bill is an amendment to the original bill, S. 1946, the Railroad Transportation Policy Act of 1979. The section authorized $20 million over a 3-year period for acquisition of abandoned railroad rights-of-way for future use as bicycle paths, jogging and hiking trails and related transportation, recreation and conservation uses, as stated in section 809 of the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act). This authorization includes matching Federal and State funds, with the Federal share being 80 percent and the State share being 20 percent.

The 4R Act authorized $20 million for fiscal year 1976, 1977 and 1978 to the Department of Interior for acquisition of abandoned railroad rights-of-way for conversion to trails related to transportation, recreation, and conservation. Based on this initial authorization $5 million was appropriated during the 95th Congress to Department of Interior Bureau of Recreation (now the Heritage and Recreational Services) for funding the Rail-to-Trail program.

The response to the Department of Interior's public notice of funding for the Rail-to-Trail program was very enthusiastic. The Department received 135 applications totaling $70 million. Because of the large response to the project, DOI felt they could be selective in the application approval. Top priority was given to applications for trails based or originating in metropolitan areas as well as trails used for commuter transportation.

Ten projects received funding from the $5 million appropriated. These 10 projects represent 111.62 miles of multiple-use trails from abandoned rail lines in 10 States. This is a small percentage of the 6,232 miles of nation-wide abandonments suitable for conversion to transportation and recreational uses.

Funding authority for this project expired as of September 30, 1979. This authorization will allow for the continuation of the Rail-to-Trail program started in the 4R Act. Evidence from State governments has shown intense interest in preserving funding for this program.

*House amendment.*—The House amendment has no provision.

*Conference substitute.*—The Conference substitute adopted the Senate provision, but reduces the authorization to $10 million.

### SECTION 404—EXTENSION OF REDEEMABLE PREFERENCE SHARE FINANCING

*Senate bill.*—The Senate bill continues the existing redeemable preference share program for two years, until September 30, 1982, and it authorizes an additional $400 million for this purpose. The Senate provision expands the scope of eligible participants under the program and provides a specific allocation of program funds for labor cost associated with improved manpower effectiveness.

*House amendment.*—The House amendment extends the existing redeemable preference share program for two years.

*Conference substitute.*—The Conference substitute extends the redeemable preference share program until September 30, 1982. The funding provisions are discussed in the following section.

SECTION 405—FINANCING

*Senate bill.*—The Senate bill contains an amendment to section 511(a) of the 4-R Act. Section 511 of the 4-R Act is one of the financial assistance programs available to railroads for the acquisition, repair, or improvement of rolling stock and facilities associated with rolling stock. This amendment opens the doors of eligibility to this loan program to computerized car management systems which carriers desire to acquire, repair, or rehabilitate. Most railroads in this Nation operate sophisticated computer systems to follow their rolling stock throughout their rail network. These computers are essential to the efficient management of a railroad's car fleet. Unfortunately, as technology improves, many of the early computer systems have become obsolete. The new technology which is available would certainly pay for itself in a short period as a result of increased utilization of the car fleet. All loans under the 511 loan program are absolutely secured.

*House amendment.*—The House amendment authorizes the Secretary to provide assistance (either alone or as a participant with other investors) to any railroad or its subsidiary to achieve significant restructuring. The assistance may be used for the purchase of securities or the rehabilitation, improvement, or acquisition of facilities (including track, maintenance, equipment and related labor protection costs) which the Secretary, based upon a restructuring plan provided to the Secretary or as part of a restructuring project supported by the Secretary under section 5 (a)-(d) of the Department of Transportation Act, or both, determines will contribute to significant railroad restructuring that would not likely be achieved without Federal assistance. The assistance may also be used for purchase or rehabilitation of feeder lines. States, communities, or shipper groups that intend to purchase a feeder line are to be considered railroads for the purposes of this section.

*Senate amendment.*—The Senate amendment extends the existing section 505 to September 30, 1982, and authorizes an additional $400 million.

A new paragraph is added to section 505(b) to authorize the Secretary to provide a percentage not more than 20 percent of the total funds authorized for this program to employee or shipper groups formed pursuant to an employee and/or shipper stock ownership plan for the purchase and/or rehabilitation of rail lines or facilities. In determining the priority by which such groups should receive funding under this program, the Secretary is directed to consider the availability of other feasible alternatives for providing rail service. It is specifically intended that those projects without a viable or feasible alternative would receive a priority in the allocaton of available funds under this section.

The Senate amendment adds a new section 505(A) to the current law granting the Secretary of Transportation the authority to provide Class I rail carriers with financial assistance to cover labor costs associated with operational improvements.

The Senate bill clarifies what specific actions would be considered a form of restructuring for the purposes of the 505 program.

*Conference substitute.*—The Conference substitute adopts the Senate provisions, but increases the authorization to $700,000,000, in section 505 funds. Conferees do not agree with any suggestion

that a legitimate need for rehabilitation of track cannot exist outside a restructuring. Conferees have provided for restructuring under the Milwaukee Railroad Restructuring Act and are expanding that under this bill to include purchase of rail assets as elements of an eligible project—but not necesssarily priority elements. The Congressional intent in establishing the Preference Share Program under section 505 was to provide a "bank of last resort" to put money quickly into railroads to address the deferred maintenance problem while solutions to the overall financial shortfall in the industry could be developed. Much deferred maintenance remains. This Conference does not believe that now is the time to scrap the existing program, thereby forcing the marginal carrier to seek Federal assistance on terms more appropriate for healthy railroads.

The Conference substitute earmarks in the section 505 authorization $200,000,000, originally authorized in the restructuring provisions of the House bill, for automatic transfer by the Secretary to the United States Railway Association for use by Conrail in establishing a voluntary annuity program to reduce the size of its workforce. The money is to be transferred to the account under Section 216 of the Regional Reorganization Act, notwithstanding the authorization limitation of that section.

The Conferees intend for the Finance Committee of the Association to determine if (1) any program proposed by the Corporation will in fact reduce the size of the Corporation's workforce, and (2) funding of the program will result in substantial savings to the United States as measured against the probable costs to the Government of not reducing the Corporation's workforce to the extent contemplated by the institution of a voluntary early retirement annuity program.

To facilitate the institution of such a program subsection (b)(1) of section 405 amends Section 216(b) of the Regional Rail Reorganization Act of 1973 by adding paragraph (B) which makes it clear that employees of the Corporation taking advantage of an early retirement program will be deemed to have a "current connection with the railroad industry" so as to avoid losing Railroad Retirement eligibility at the appropriate age.

SECTION 406—TRANSACTION ASSISTANCE

*Senate bill.*—No provision.

*House amendment.*—The House amendment creates a new category for financial assistance under section 505(h) of the Railroad Revitalization and Regulatory Reform Act of 1976 (Public Law 94-210). Specifically, financial assistance would be available to purchase properties of the Milwaukee Railroad located in the State of Montana for rail banking.

*Conference substitute.*—The Conference substitute adopts the House amendment.

SECTION 407—ELECTRIFICATION LOAN GUARANTEES

*Senate bill.*—No provision.

*House amendment.*—The House amendment amends 211(i) of the Regional Rail Reorganization Act to make available to railroads in

addition to Conrail loan guarantees for the purpose of electrifying high density mainlines. Loan guarantees for capital improvements for coal export facilities are provided for Corporation and other railroads in the region receiving assistance under the 3-R Act.

*Conference substitute.*—The Conference substitute is the same as the House amendment, but the Secretary's authority to waive findings in 511(g) has been deleted. The Conferees expect that the loan guarantees for capital improvements for coal export facilities available under this section will be used to construct coal export facilities such as the proposed coal facility at the Port of Philadelphia.

SECTION 408—AMENDMENT TO THE REGIONAL RAIL REORGANIZATION ACT OF 1973

*Senate bill.*—No provision.

*House amendment.*—The House amendment raises the amount authorized to be loaned to any railroad in the region receiving assistance under section 211(d)(2) of the Regional Rail Reorganization Act of 1973, notwithstanding sections 211 (e)(3) and (f).

*Conference substitute.*—The Conference substitute adopts the House provision.

SECTION 409—FEDERAL ASSISTANCE REPORT

*Senate bill.*—No provision.

*House amendment.*—The House amendment provides direction to the Secretary of Transportation on the coordination of federal assistance and also requires the Secretary to file an annual report on federal assistance provided to the rail industry, the reasons for each loan or grant, and the results to be expected.

*Conference substitute.*—The Conference substitute requires the study described above but does not include the directions for coordination to the Secretary.

SECTION 501—MONTHLY DISPLACEMENT ALLOWANCE

*Senate bill.*—No provision.

*House amendment.*—The House amendment proposed four new formulas for monthly displacement allowance as follows:

1. *Non-operating employees.*—Except for maintenance-of-way employees, non-operating employees (i.e., other than train and engine service employees) will receive an hourly guarantee, based upon the rate of pay of the position they held on September 1, 1979. This guarantee will be increased to reflect subsequent general wage increases, and will be increased whenever the employee, through the exercise of his or her seniority, becomes the qualified incumbent of a higher rated position. If, as a result of a reduction in the number of positions available, a protected employee is required to exercise seniority to a position with an hourly rate less than the guarantee, the employee will receive a monthly guarantee payment representing the hourly differential multiplied by the number of hours in the new position's straight-time work schedule for the claim month. If a protected employee is unable to retain any position, the employee will receive the guaranteed hourly rate for the number of hours the employee would have worked on a straight-time basis if he or she had retained his or her previous position.

2. *Maintenance-of-way employees.*—The maintenance-of-way guarantee is based on average monthly compensation, which is total compensation received by an employee during 1974, divided by total time paid for, and multiplied by 174 or by average monthly time paid for, whichever is less, and adjusted to reflect subsequent general wage increases. The protected employee's monthly displacement allowance is the difference between the straight-time earnings and 80 percent of the average monthly compensation, less time lost due to voluntary absences other than vacations.

If, at the close of a calendar year, the sum of the employee's annual straight-time compensation, monthly displacement allowance payments, and offsets under this title are less than the employee's average monthly compensation divided by 12, the employee would receive an additional payment for the difference. If, in the previous calendar year, an employee has received displacement allowances payments greater than his annual guarantee, the excess benefits would be recovered from current or future entitlements, exclusive of moving expense benefits.

The House amendment also conforms the guarantee formulas for employees affected by a supplemental transaction to the revised guarantee formulas for other protected employees.

3. *Operating employees.*—It is proposed that operating employees (i.e., train and engine service employees) retain their current monthly guarantee subject to two important modifications. Average 1977 Conrail earnings will be calculated for each Commission classification of operating employees. These values will be upgraded by subsequent general wage increases, and will constitute maxima. These protected employees whose current monthly guarantees exceed the applicable maximum will have their guarantees reduced to the maximum. The second modification is an annual calculation in accordance with the maintenance-of-way formula described above. If a protected employee's earnings are less than the guarantee in any month, 75 percent of the difference will be paid. At the end of the calendar year, a comparison of guarantee and earnings on the annual basis will determine whether an additional payment will be made or whether future payments will be withheld pending recovery.

4. *Non-contract employees and employees who have been transferred.*—No change is proposed in the guarantee formula currently applicable to these employees. Non-contract employees receive salaries which do not include overtime compensation. Additionally, they receive merit increases rather than general wage increases, so that their guarantees have not changed since the formation of Conrail. Consequently, they have not been the recipients of "windfall" payments as is the case with contract employees.

Transferred employees retain their current guarantee. They have frequently purchased new homes at a price reflecting the standard of living they were assured of on the basis of the current guarantee formula. A sudden reduction in their monthly income might place them in an untenable financial position. There are approximately 350 employees who have transferred.

There are two other changes made in this section. Under subsection (b)(7), in addition to all unemployment compensation benefits and railroad earnings being set off against the employee's monthly displacement allowance (as under existing law), all outside earn-

ings of a protected employee deprived of employment must be setoff against the employee's MDA. This change will ensure that the monthly displacement allowance of such protected employees are fully offset by other compensation.

An additional change is made by this section in proposed subsection (b)(10). It calls for employees deprived of employment, or the employees' class or craft representative, and the employer to agree on a procedure by which such employees will report their non-railroad earnings in order that they may be setoff against monthly displacement allowances. It also calls for an agreed upon procedure by which the employer is kept apprised of the unemployment benefits currently paid to employees deprived of employment, also for the purpose of off-setting their monthly displacement allowances. These procedures are necessary to ensure that the reporting/investigative burdens are shared by the employer and the employees, rather than having the burden of investigation fall solely on the employer, as now exists.

*Senate amendment.*—The Senate amendment is similar to the House amendment except for maintenance-of-way employee payments. Maintenance-of-way employees often work as portable equipment operators in the summer when extensive track rehabilitation is undertaken, and as trackmen in the winter when only routine maintenance can be performed. As a result of this circumstance, maintenance-of-way employees frequently earn less than their average monthly compensation in the winter and more than their average monthly compensation in the summer. When monthly displacement allowances during the winter months are added to these earnings, the employee's actual annual compensation can well exceed his or her annual compensation guarantee.

In order to correct this situation, a separate calculation is proposed for maintenance-of-way employees. Each protected employee will be assigned a monthly guarantee equal to the employee's 1974 average hourly earnings on a straight-time basis, upgraded by subsequent general wage increases, and multiplied by 174 (i.e., the number of hours in a straight-time work schedule in the average month). If a protected employee's current monthly guarantee is less than this value, the current guarantee will be retained. If, in any month, a protected employee's earnings are less than the guarantee, a payment will be due equal to 75 percent of the difference. At the end of the calendar year the employee's annual guarantee will be compared to his or her annual earnings plus monthly guarantee payments and any offsets. If the annual guarantee is larger, the full difference will be paid. If the annual calculation demonstrates that all or a portion of the monthly guarantee payments represent an overpayment, the employee will be entitled to no further guarantee payments until the overpayment is recovered. In the calculation of guarantee payments on the monthly and the annual basis earnings include overtime rate on any given day.

*Conference substitute.*—This follows the House provision. The conferees note that changes in the monthly displacement allowance formulas were necessary to eliminate expensive inequities in the current formulas. The conferees note that different formulas were provided for different classes and crafts of employees because of different procedures used to determine the basic wages of different classes and crafts of railroad employees and because the work

schedules of certain employees (such as maintenance-of-way employees) are subject to irregular and seasonal fluctuations. The conferees believe the use of these different formulas is rationally related to such differences among the classes and crafts and to the need to conserve scarce government resources.

SECTION 502—DURATION OF MONTHLY DISPLACEMENT ALLOWANCE

*Senate bill.*—No provision.

*House amendment.*—The House amendment would restrict the payment of the monthly displacement allowance in two situations. First, a protected employee's entitlement to a monthly displacement allowance would be suspended for the period that the employee fails to work for reasons beyond the control of his or her current employer due to strikes, flood, snowstorms, and similar natural occurrences. Second, the legislation would require a protected employee to claim a monthly displacement allowance within three months of entitlement unless the claim is the subject of or based upon an arbitration decision. It also would require that entitlement to claims be approved or denied within 150 days after a claim is filed for the first year following enactment and within 90 days thereafter, unless the employee and the employer agree upon other timeframes for filing and determining claims. This provision will eliminate bookkeeping problems caused by delay in filing a claim for a monthly displacement allowance, and enable the Corporation to assess more accurately expected payments for labor protection. The legislation further provides that unless denied within the timeframes by the carrier, the claim would be deemed approved.

*Senate amendment.*—The Senate amendment contains a similar provision.

*Conference substitute.*—The Conference substitute contains the provision in the House and Senate amendments.

SECTION 503—TRAINING AND TRANSFER

*Senate bill.*—No provision.

*House amendment.*—The amendment addresses restrictions on manpower utilization by permitting the Corporaton and other employers with protected employees to transfer such employees in the marine crafts and unemployed Penn Truck Lines, Inc. workers to another class, and by offering retraining programs to make the inter-class transfer provisions meaningful.

The new training and transfer provisions would apply to unemployed protected employees in the marine crafts and unemployed Penn Truck Lines, Inc. employees. No bona fide vacancies exist for these employees in their class or craft. Consequently, their guarantee payments represent a considerable ongoing liability.

Training expenses would be paid for by the Corporation or other employer, which could then be reimbursed from the Regional Rail Transportation Protective Account. Moving expenses incident to transfers would be reimbursable under the provisions of section 505(g), as is the case under existing law.

*Senate amendment.*—The Senate amendment is similar, with two exceptions. The power to transfer unemployed protected employees

is extended to employers besides the Corporation, and the multiple offer provision was not adopted.

The "multiple offer" provision establishes procedures that permit the Corporation and other employers to expedite reassignments by making simultaneous offers of a vacancy to no more than four employees at a time (those contacted employees junior to the least senior employee who accepts the vacancy will be furloughed or severed).

*Conference substitute.*—The Conference substitute follows the Senate bill, but retains the restriction in the House bill which allows only Conrail to transfer protected employees. However, the substitute permits Amtrak to transfer employees within their seniority districts unless Amtrak and the affected unions agree to negotiate an appropriate collective-bargaining agreement in this area.

The substitute also restricts use of the multiple offer provision to unemployed protected employees of the marine crafts and protected employees of Penn Truck Lines. Other employees would not be subject to the multiple offer provision.

SECTION 504—PAYMENT, AUDIT AND REPORT

*Senate bill.*—No provision.

*House amendment.*—The House amendment would redesignate section 509 of the 3R Act as section 509(a) and increase the amount of funds authorized to be appropriated under Title V by $235 million (of which up to $180 million could be spent on monthly displacement allowances) to a new authorization level of $485 million making training costs incurred by the Corporation under revised section 505(d)(4)(D) reimbursable costs, direct the Secretary of Transportation to be responsible for requesting needed appropriations for expenditure by the Railroad Retirement Board, and additionally authorize the appropriation of funds for administrative expenses incurred by the Railroad Retirement Board in performing their functions under section 509. The appropriations may be allocated by the Secretary to the Board and the Association.

It is proposed that an additional $235 million be authorized to fund the revised level of benefits afforded by these amendments. Conrail projects that this sum will fund the program. If in fact the cost of the program exceeds an additional $235 million, the carriers employing protected employees would be responsible for the payment of benefits without reimbursement.

In addition, this section would add two new subsections to section 509 that improve program auditing and reporting responsibilities upon the Association. Section 509(b) would direct the Association to conduct a program audit of the payment of benefits under Title V and evaluate the effectiveness of the provisions of Title V in providing a reasonable level of protection to protected employees and enabling the Corporation to improve management of the protected employees in its workforce. In conducting the program audit, the Association should be particularly sensitive to the impact of Title V provisions upon management policies, so that the Association will be able to suggest corrective legislation quickly in the event inequities are uncovered in the program or the way that the Corporation administers the program.

The Association would be afforded access to pertinent documents for the purpose of facilitating its program audit and evaluation functions. Section 509(c) would require the Association to transmit an annual detailed and comprehensive report of its periodic program audit and evaluation to the Congress and the President within 90 days after the end of each fiscal year.

*Senate amendment.*—The Senate amendment contains an identical provision to the House amendment.

*Conference substitute.*—This provision is contained in the substitute.

SECTION 505—RAILROAD HIRING

*Senate bill.*—No provision.

*House amendment.*—The House amendment provides for a right of first hire on other rail carriers for protected separated, or furloughed employees of Conrail. This right would not apply if an employee was separated for cause, or found to be less qualified than other applicants. The right would also not apply to any vacancy covered by a required or permissible voluntary affirmative action plan. This right is similar to that granted Milwaukee and Rock Island employees by recent legislation.

*Conference substitute.*—This follows the House provision.

SECTION 506—SINGLE COLLECTIVE-BARGAINING AGREEMENT

*Senate bill.*—No provision.

*House amendment.*—No provision.

*Senate amendment.*—The Regional Rail Reorganization Act of 1973, as amended, was based on a recognition that Conrail could succeed only if the predecessor bankrupt roads' operations were combined into a unified system.

A major component of that integration was addressed by section 504(d) of the 3R Act which required representatives of the various classes or crafts of the bankrupt carriers and representatives of Conrail to enter into negotiations for a single collective bargaining agreement for each class and craft of employees. This section was motivated by a recognition that the near countless existing labor agreements had to be replaced by negotiated collective-bargaining agreements for each class and craft.

Such negotiations were commenced and substantial progress has been made toward the goals of the Act. As a significant example, the United Transportation Union and Conrail, after extensive bargaining, concluded an agreement having far-reaching effects on labor costs of train movements while allowing the United Transportation Union members to share in the resulting savings. However, continued implementation of this collectively bargained agreement is imperiled by the findings of a U.S. Magistrate in the case of *Maloof* v. *United Transportation Union and Conrail*, issued March 27, 1980.

As the result of a suit brought by minority members of the union who wish to block the agreement, the U.S. Magistrate has concluded, among other things, that section 504(d) of the 3R Act does not require the negotiation of a single agreement for each class or craft. As a finding of fact, this conclusion must be considered to

have a substantial likelihood of adoption by the Federal District Court. Such an adoption would, in all likelihood, be accompanied by an order effectively terminating the United Transportation Union-Conrail agreement and allowing the continuation of regional distinctions in treatment among members of the same class or craft in opposition to the conclusions of the Final System Plan, and the clearly stated policy of Congress. Revocation of the detailed and comprehensive Crew Consist Agreement, on the strength of findings by a Magistrate, not only denies its benefits to a large number of United Transportation Union members but wipes out needed savings for Conrail.

*Conference substitute.*—The Conference substitute follows the Senate bill, with a clarifying sentence added to ensure that such a single collective bargaining agreement is negotiated systemwide. This follows the historical policy of the National Mediation Board that crafts or classes are to be certified systemwide, and negotiations conducted on a similar basis.

This section will make it absolutely clear that the intent of Congress was in 1973, has remained, and is today that Conrail is entitled to a single collective bargaining agreement with each craft or class of workers. The Magistrate's opinion was premised on what he described as an ambiguous phrase in the existing statutory language. This section should make it clear that the intent of Congress is that Conrail is entitled to a single agreement for each class and craft.

### SECTION 507—EMPLOYEE PROTECTION PAYMENTS

*Senate bill.*—No provision.

*House amendment.*—The House amendment provided an effective data for the new formulas of the first day of the month following enactment.

*Senate amendment.*—The Senate bill provides that the new formulas are to be effective on the first day of the month following enactment. The Corporation and other employers with protected employees were to be reimbursed effective October 1 for any protective payments not previously reimbursed.

*Conference substitute.*—The Conference substitute adopts October 1, 1980 as the effective date.

### SECTION 508—TECHNICAL AMENDMENTS

*Senate bill.*—No provision.

*House amendment.*—The House amendment makes technical changes to the Regional Rail Reorganization Act of 1973 and adds the Attorney General to the Board of Directors of the United States Railway Association.

The Secretary of Transportation and the Secretary of the Treasury are authorized to delegate their responsibilities under the 3R Act, including membership on the Board of Directors of the USRA and its committees, to the following designated representatives. The Secretary of Treasury may designate any officer of the Department whose position is confirmed by the Senate. The Secretary of Transportation is authorized to designate as his representative the



Digitized from Best Copy Available

Deputy Secretary, the General Counsel, the Federal Railroad Administrator, or the Deputy Federal Railroad Administrator.

Subsection (d) amends the definition of "deprived of employment" in subsection 501(6) to exclude from the definition, and thereby excludes from coverage under the protection program consistent with changes made in section 4 of this legislation, failure to work due to Acts of God. Subsection (d) also adds a definition of "compensation" to section 501 so that it is clear the word means only earnings in employment subject to the Railroad Retirement Act rather than such earnings plus earnings from non-railroad employment and compensation for personal injury claims against the employer.

Finally, subsection (e) clarifies that the arbitration provisions that apply to disputes between the Corporation and its employees regarding the interpretation of Title V provisions do not restrict the newly-created audit and reporting responsibilities of the USRA.

*Senate amendment.*—The Senate amendment is similar to the House amendment but does not add the Attorney General to the Association's Board of Directors.

*Conference substitute.*—The Conference substitute follows the House amendment, but deletes the provision to include the Attorney General on the USRA Board of Directors.

Section 508(f) of the House amendment alters section 403(d) of the Rail Passenger Service Act to enable Amtrak greater flexibility in contracting for compensation for providing commuter services with the states. At present, the level of compensation is fixed at the "avoidable cost" level. Conferees expect that this provision will enable Amtrak to have the flexibility to contract for the value of services rendered and not result in commuter revenues below avoidable cost.

SECTION 601—EXPEDITED SUPPLEMENTAL TRANSACTION PROPOSALS

*Senate bill.*—No provision.

*House amendment.*—The House bill amends section 305 of the Regional Rail Reorganization Act of 1973 (45 U.S.C. 745) by providing that the Secretary of Transportation shall determine, after comments from interested parties, whether to propose a supplemental transaction under this section for the transfer of all rail properties of Conrail in Connecticut and Rhode Island to another railroad in the region. If the Secretary determines that another rail carrier is financially and operationally capable of assuming Conrail's freight operations and freight service obligations in the area, that the transfer would promote the establishment and retention of a financially self-sustaining rail system in Connecticut and Rhode Island adequate to meet the needs of those states, and that the transfer would minimize job losses and associated increases in unemployment, should the Secretary develop such a proposal. After providing USRA and the ICC with an opportunity to review and comment on the proposal, the Secretary may petition the special court for an order to carry out the proposed transfer.

Notwithstanding any existing 508 agreements, a new employment agreement would be entered into between the parties to the transfer and affected employees pursuant to section 508. These agreements would involve the Corporation, but would not impose

additional obligations on the Corporation, which is neither an acquiring nor a selling carrier for the purposes of section 508.

The bill would also allow further supplemental transactions under the normal procedures of section 305 to occur by deleting the six year time limit provided in section 102(19) of the Act.

*Conference substitute.*—The Conference substitute adopts the House provision, but allows the States of Connecticut and Rhode Island to comment formally. The time period is also extended to 240 days.

If a proposal is sent to the Special Court, the Special Court shall use the procedures of existing section 305. If a transferee railroad is unwilling to accept the fair and equitable price established by the Secretary, the Secretary need not petition the Special Court. The Special Court may review the proposal to determine if it is in the public interest.

SECTION 701—ROCK ISLAND AND MILWAUKEE RAILROADS AMENDMENTS

*Senate bill.*—No provision.

*House amendment.*—The House amends the Rock Island Transition and Employee Assistance and the Milwaukee Railroad Restructuring Act in several instances. The amendment provides that any decision with respect to constitutionality of the Rock Island Transition Act or the Milwaukee Railroad Restructuring Act from the respective courts having jurisdiction over the respective railroads in bankruptcy shall be taken to the United States Court of Appeals for the Seventh Circuit. If a constitutional challenge is made to the procedure under this provision, the challenge shall be heard by the United States Court of Appeals for the Seventh Circuit because the procedure is part of the Rock Island Transition Act. Should the appeals on constitutionality involve section 106 or section 110 of the Rock Island Transition Act or sections 9 or 15 of the Milwaukee Railroad Restructuring Act, regarding the claim of administration for employee protection claims, the court shall determine the appeals in a consolidated proceeding and render a final decision no later than 60 days after the last such appeal is filed.

The House amendment clarifies the Rock Island Transition and Milwaukee Railroad Restructuring Act to state affirmatively that nothing in these Acts shall limit the right of any person to bring an action under the Tucker Act. This provision was not in the original Acts on the grounds that there continued to exist a Tucker Act remedy where Congress has not explicitly waived such a remedy. See Regional Rail Reorganization Cases, 419 U.S. 102; 125 (1974). However, in reviewing Judge Garr's injunction of the Rock Island Transition Act, Justice Stevens expressed concern about the availability of such a remedy where the injunction to be lifted and were the Act subsequently to be held unconstitutional, —— U.S. ———— (1980). This specific provision clearly establishes that the Tucker Act is available and nothing in these Acts limits the right of any person to seek redress under the Tucker Act.

The House amendment provides for a new schedule for the negotiation of an employee protection agreement between the Rock Island Railroad and the Labor organizations. If these parties are not able to come to an agreement within 5 days, the Commission is

Digitized from Best Copy Available

to impose a fair and equitable arrangement no less protective of the interests of employees than the protection established under section 9 of the Milwaukee Railroad Restructuring Act within 15 days after the enactment of the Staggers Rail Act. The bankruptcy court shall order the Rock Island Trustee and the Rock Island employee organizations to implement such arrangement immediately. Any order of the Commission or the bankruptcy court with respect to implementing such order shall be appealed only to the United States Court of Appeals for the Seventh Circuit within 5 days after the order of the Commission or the bankruptcy court, whichever is later, and shall be determined within 60 days after the appeal is filed. Benefits and allowances under this arrangement shall be paid by the Rock Island Railroad and shall be treated as administrative expenses of the estate of the Rock Island Railroad. By specifically stating that there is a Tucker Act remedy, the benefits and allowances will immediately become available to the qualifying Rock Island employees and the Trustee may pursue his allegations of unconstitutional action under the Tucker Act.

Under Section 7(d), (e), and (f) of the Milwaukee Railroad Restructuring Act, certain obligations to the United States were subordinated to the creditors, but not the stockholders. Hence, there is a gap between these two classes of interests. The House amendment eliminates this gap, by forgiving such subordinated obligations to the United States when the Milwaukee Railroad is either successfully reorganized as a rail carrier or when more than 50% of the railroad as it exists on the effective date of the Staggers Rail Act is purchased and 50% of its employees on that date have obtained employment with other carriers. By eliminating this gap in this way, the House amendment will encourage the Milwaukee Railroad's stockholders to seek a successful reorganization or purchase and not feel it necessary to seek liquidation at this time.

Additional funds for Transaction Assistance under the Rock Island Transition Act for the purchase of abandoned lines by non-rail carrier entities of the Rock Island Railroad and Milwaukee Railroad and for rail banking of lines of the Milwaukee Railroad in Montana are made available. The Secretary may determine if applications for purchase filed after September 15, 1980, are appropriate. Other than the funds specifically reserved for Montana, Transition assistance funds should be equitably distributed without State preference to non-carrier entities which have applied for funds.

*Conference substitute.*—The Conference substitute adopts the House provision, with minor modifications and deletion of the new findings for the Rock Island Transition Act. The conferees believe that there is an obligation upon the Rock Island estate to provide employee protection as a claim of administration to its employees who were not covered by the March 4, 1980, agreement. Further, the conferees believe the Rock Island estate has benefitted from the Rock Island Transition Act by the reduction in its employee protection liability and through the Congressionally-supported March 4, 1980, agreement, the ability to lease its facilities and the use of funds to purchase its facilities, thus preserving its value as a going concern, and the expeditious consideration of Rock Island transactions at the Commission. The conferees reiterate that it is the intention of Congress that employee protection be imposed in

bankruptcy proceedings involving major rail carriers, for to do otherwise would be to promote liquidations, to the detriment of the employees and the public interest.

SECTION 702—LOAN GUARANTEES

*Senate bill.*—No provision.

*House amendment.*—The House amendment provides that the Secretary of Transportation shall not later than 45 days after the effective date of this Act, take final action on any application for a section 511 loan guarantee under the Railroad Revitalization and Regulatory Reform Act to be used in connection with joint ownership, construction or rehabilitation of any facilities for a second rail carrier to serve the Powder River Basin in Wyoming and Montana. This provision is included to promote needed competition for transportation of the low-sulfur coal from the Powder River Basin that is used by a great number of utilities in many states.

The Secretary is authorized to waive findings under 511(g) with respect to such loan guarantees, and section 4 (f) of the Department of Transportation Act is not applicable to such loan guarantees. However, the Secretary shall review the proposed Chicago and North Western connector and shall not approve any route which requires the use of agricultural land unless there is no feasible and prudent alternative to the use of such land and the proposed route construction plan requires all possible planning to minimize loans to such agricultural land. The Secretary shall review the use of any agricultural land in any new constructed line and shall require private land crossings for agricultural land owners whose land is divided by such line. When the Secretary requires the construction of a grade crossing, the Secretary shall require the land owner and the railroad to enter into agreements limiting the railroad's liability at such crossings.

*Conference substitute.*—The Conference substitute adopts the House amendment, but substitutes provisions regarding standards and deadlines for judicial review instead of the Secretary's discretion to waive findings under section 511(g) of the Railroad Revitalization and Regulatory Reform Act of 1976 (P.L. 94-210). It also makes clear that actions can be taken without prior approval of any Committee of Congress.

The standards and deadlines are borrowed from the Alaska Natural Gas Transportation Act, 15 U.S.C. 719h, and the Administrative Procedure Act, 5 U.S.C. 706. The reference to the phrase, "arbitrary, capricious, or an abuse of discretion" is an adaptation of 5 U.S.C. 706(2)(A). The reference to "in excess of statutory jurisdiction, authority or limitations, or short of statutory right" is an incorporation of the grounds for review provided in section 706(2)(C). The Conferees wish to emphasize that the other grounds for review set forth in section 5 U.S.C. 706(2) not in this section are intentionally excluded. Judicial review is to be confined to considerations of whether the agency complied with the Constitution and acted within its authority.

SECTION 703—CONRAIL STUDIES AND EMERGENCY FUNDING & USRA AUTHORIZATION

*Senate bill.*—The Senate bill requires USRA to submit preliminary recommendations by November 15, 1980, with regard to Conrail's future structure, activities and funding. Following review by the Department of Transportation and the Commission, and comment by interested parties, USRA is required to submit to Congress by March 1, 1981 specific final recommendations with respect to (1) future projected funding requirements of Conrail; (2) future structure and activities of Conrail in the region; and (3) legislative proposals, if necessary, to implement such recommendations. The Senate provisions also require specific studies to be completed in developing preliminary and final recommendations. Conrail is required to submit recommendations to USRA by October 1, 1980; it is also free to comment on the Association's preliminary and final recommendations. The provision includes an USRA authorization of $31.5 million for fiscal year 1981 and $27.5 million for fiscal year 1982.

A separate title of the Senate bill provides emergency funding for Conrail of $329 million for fiscal year 1981. This provision is intended to provide interim Federal funding for Conrail while Congress identifies alternative measures, including structural changes, based on the various studies and recommendations discussed above. The funding is conditioned upon a finding by the Finance Committee under section 216(b) of the Regional Rail Reorganization Act of 1963, as amended, that Conrail has taken appropriate action to eliminate losses on light density and unprofitable lines through negotiation of subsidy or trackage rights agreements, sale or lease, imposition of surcharges or abandonment of such lines. Expedited surcharge and abandonment procedures are provided for these light density and unprofitable lines. In addition, the Senate bill requires an economic analysis that will forecast the full effects upon Conrail and rail labor of alternative changes in labor agreements and related operational changes.

*House amendment.*—The House amendment does not contain any provision on Conrail studies or emergency funding. It provides an authorization for USRA of $28.5 million for fiscal year 1981.

*Conference substitute.*—The Conference substitute generally adopts the Senate provision with regard to Conrail studies. However, Conrail is given a larger role and will be required to submit a separate report and recommendations at the same time as USRA on the carrier's future funding requirements, future structure and activities, and legislative action which might be required. Conrail is to submit preliminary projections and recommendations to USRA by January 1, 1981. The report and recommendations of USRA and Conrail are to be submitted to Congress no later than April 1, 1981.

The Department of Transportation is to submit its recommendations by that same date, and there is a provision for comment by the Commission.

The Conference substitute adopts the Conrail emergency funding authorization of $329 million for fiscal year 1981. It retains the Senate provision for an affirmative finding by the Finance Committee that Conrail has taken appropriate action to eliminate losses on light density lines and other lines which are unprofitable. Howev-

er, since the rail bill contains separate surcharge and abandonment provisions, the expedited Conrail surcharge and abandonment procedures have been deleted. The Conferees stress, however, that Congress intends, as a condition of the emergency funding, that Conrail proceed to eliminate or reduce its losses on unprofitable lines and implement such cost conservation measures as are feasible to minimize the needs for additional Federal funds.

Earlier this year, in the Passenger Railroad Rebuilding Act, Congress established the goal of eliminating congestion of rail freight and rail passenger traffic along the Northeast Corridor. At that time, Congress also authorized funds to begin the diversion of freight around Baltimore. It now appears that still more freight may be diverted off the corridor by cooperation between Conrail and the Delaware and Hudson Railroad and that no authorization of appropriations is required to divert additional traffic off the corridor by the negotiations of trackage rights between Conrail and the Delaware and Hudson. Accordingly, the Conferees express their hope that these negotiations will successfully divert additional freight off the corridor and direct the United States Railway Association to monitor these negotiations and to report on their progress to the respective committees.

### SECTION 704—USRA AUTHORIZATION OF APPROPRIATIONS

*Senate bill.*—The Senate bill contained a 2 year authorization of $31.5 million in fiscal year 1981 and $25.5 million in 1982.

*House amendment.*—The House amendment contained a 1 year authorization for $28.5 million.

*Conference substitute.*—The conference substitute provides a 1 year authorization of $30 million for fiscal year 1981.

### SECTION 705—FEEDER LINE REHABILITATION STUDY

*Senate bill.*—No provision.

*House bill.*—Section 231 of the House bill created a Rail Technology and Shippers Needs Board. This Board is to consist of the Secretary of Transportation, the Secretary of Agriculture, the Secretary of Commerce, the Secretary of Housing and Urban Development, the Secretary of Labor, the Chairman of the Interstate Commerce Commission, and two shipper representatives from national agricultural organizations appointed by the President. The Board is given authority to conduct studies of technological means to improve rail productivity and the continuing transportation needs of urban and rural shippers.

Section 231 of the House bill also provides for a study of the revenue impact and public benefits of exempting from taxation State or local government obligations incurred in connection with the rehabilitation of railroad feeder lines. The report must include criteria as may be necessary to prevent the abuse of the special tax status given under this section.

*Conference substitute.*—The Conference Substitute deleted the Rail Technology and Shippers Needs Board but retained the study of the impact of exempting State or local government obligations incurred in connection with the railroad feeder lines. It is anticipated that this report will include recommendations regarding the

Digitized from Best Copy Available

types of railroad properties and services which ought to be eligible for State or local government obligations which are exempt from taxation; ways to narrow the applicability of this special issue to ensure that such obligations will be issued only for productive rail rehabilitation or acquisition projects; and ways to ensure coordination with Federal, State and local rail programs.

SECTION 706—EFFECT ON PENDING MATTERS

*Senate bill.*—No provision.

*House amendment.*—The House bill contains a provision which states that all applications or proceedings pending before the Commission or other agencies, or any court, shall be determined as if this law had not been enacted.

*Conference substitute.*—The conference substitute deletes the House provision, but clarifies that existing rate bureau proceedings shall be conducted under the law prior to the enactment of this Act. The House bill, as passed, contains a section determining the effect of this legislation on pending matters. The fact that the Conference substitute does not contain a similar provision is not intended to create any implication that other cases now pending at the Commission, other affected agencies, or pending in the Federal courts are not to be adjudicated or determined under existing law or the new legislation in accordance with controlling case law. The deletion of these provisions means that existing cases at the Commission, other affected agencies, or pending in the Federal courts, shall be determined as present case law requires that they be determined.

If a case is pending in Federal Court or has been remanded to the Commission, the Conferees intend that the rate ultimately determined by the Commission shall be considered the rate in effect on the date of enactment for the purposes of this Act.

SECTION 707—CONSTRUCTION OF AMENDMENTS

*Senate bill.*—Same as the House bill.

*House amendment.*—The House amendment provided that the amendments made by this Act should not be construed to modify the existing law with respect to competition and coordination as it affected the relationship between water carriers and rail carriers.

*Conference substitute.*—The provision contained in this section, which qualifies each provision of each section of this Act, is designed to make clear that none of the provisions of the Act modifies existing law to make lawful a rate or practice that was unlawful on the day prior to enactment. Also the Conferees intend that this section allow water carriers to challenge practices that were unlawful as unfair, destructive, predatory, or otherwise undermined competition prior to enactment of this Act. In addition, of course, the Conferees do not intend to limit the rights of water carriers to exercise their rights and remedies under the provision of the Interstate Commerce Act as amended by the Staggers Act of 1980 regardless of whether those rights and remedies are related to practices which are unfair, destructive, predatory or otherwise undermine competition.

Digitized from Best Copy Available

The intent is that none of the amendments made by this Act is to be used to legitimize the undermining of rail-water competition. Railroad rates and practices that affect rail-water competition that are unfair, destructive, predatory, or otherwise undermine competition, and that were unlawful immediately prior to enactment of this Act shall continue to be prohibited. Similarly, no change made by this Act makes lawful any other railroad rate or competitive practice that is unfair, destructive, predatory or otherwise undermines competition.

SECTION 708—SURPLUS EQUIPMENT

*Senate bill.*—No provision.

*House amendment.*—The House amendment makes Conrail eligible to borrow excess equipment from the Department of the Army. Now, the effected community must pay a rental fee of the fair market value, which is too high for most local communities. The amendment would set up a two-step process for obtaining the needed equipment (bridge for example). The first would be an application by Conrail to the Army for a contract to borrow the bridge; this would occur only after Conrail has determined that public safety required such action. After Conrail and the Army have concluded negotiations, Conrail would enter into a contract with the local community to pay for the transportation of the bridge to the site and for routine maintenance.

While the language of the amendment is general, it is specifically aimed at solving a problem in the city of Niles, Ohio, where the West Park Avenue Bridge going over Conrail tracks was damaged and traffic is now being rerouted through a public park. This creates a hazardous and dangerous condition for the many children in the area.

*Conference substitute.*—Conference substitute adopts the House provision.

SECTION 709—STUDY OF ALASKA RAILROAD RATES

*Senate bill.*—No provision.

*House amendment.*—The House amendment requires, within 6 months after the effective date of the legislation, the Commission to complete a study to determine whether certain rates charged by the Alaska Railroad would, if such rates were entered into after the enactment of the legislation, have violated Section 10701a(c)(1) of Title 49 U.S.C. as amended by the House amendment.

*Conference substitute.*—The Conference substitute follows the House amendment. Allegations have been made that the Alaska Railroad has been engaged in predatory pricing to the injury of its privately-owned competitors. It has also been alleged that the Alaska Railroad has the capacity to engage in such activity because it is federally owned and subsidized, while its competitors are totally unsubsidized. Clearly, such conduct would be contrary to sound public policy.

Accordingly, an investigation by the Commission is ordered by this Act. It is expected that the Commission will conduct a careful, imprtial analysis of the controversy, weighing all the facts and arguments of the interested parties, and making available its analy-

sis and supporting data for public comment prior to rendering a final report to Congress. The Department of Transportation and other Federal agencies are expected to cooperate fully with the Commission in the conduct of the investigation.

The Commission's study is to be coordinated with a study by the State of Alaska.

SECTION 710—EFFECTIVE DATES

*Senate bill.*—No provision.

*House amendment.*—The House amendment provides that the provisions of this Act and the amendments made by this Act shall take effect October 1, 1980, except certain sections dealing with the Conrail employee protection.

*Conference substitute.*—The Conference substitute adopts the House amendment, but clarifies that the amendments to the Rock Island Transition and Employee Assistance Act in section 227 are effective upon enactment.

APPENDIX A

INTERSTATE COMMERCE COMMISSION,
*Washington, D.C., September 16, 1980.*

Hon. J. JAMES EXON,
U.S. Senate, Washington, D.C.

DEAR SENATOR EXON: This is in reply to your letter of September 11 asking for my interpretation of the Commission's authority regarding demand-sensitive rates if Section 210 of H.R. 7235 (The Rail Act of 1980) were enacted. As your letter points out, Section 210 repeals the existing section of the Interstate Commerce Act which requires the Commission to maintain standards and procedures to permit the establishment of demand-sensitive rates. In my view, repeal of this section will lead the Commission to repeal its existing regulations regarding demand-sensitive rates and to refuse to initiate new rulemakings on this subject.

I hope this addresses your concerns about the Commission's interpretation of existing and pending legislation. I would, or course, be pleased to discuss this with you at any time. If legislation is enacted, I look forward to working closely with you and other members of Congress who have devoted so much effort to bringing a rail bill to fruition.

Sincerely yours,

DARIUS W. GASKINS, Jr., *Chairman.*

APPENDIX B

CHICAGO AND NORTHWESTERN TRANSPORTATION CO.,
*September 26, 1980.*

Hon. J. J. EXON,
U.S. Senate, Washington, D.C.

DEAR SENATOR EXON: We know you are concerned with our plans for the future of our east-west line between the Wyoming State line and the Mississippi River. Please be advised we have no intention of abandoning this line.

The construction of, and successful operation of, our proposed connector line to the Union Pacific near Joyce, Nebraska, not only will not endanger the east-west line, but will enhance its future. Revenues derived from the coal project will make this railroad stronger and better able to maintain this line, which performs a useful service for the citizens of Nebraska.

It is our purpose to maintain this line in condition to respond to service needed by your citizens. As we become stronger, we are better able to increase the quality of this line and our other lines in Nebraska. However, I would like to emphasize that we do have an ongoing program which has resulted in substantial investment. For the period from 1974 to 1979 we have invested $35,456,000 in maintenance and capital in this line. Obviously, it is our intention to continue maintenance and investment at this level or, hopefully, greater.

Sincerely,

JEROME CONLON, *Senior Vice President.*

HARLEY O. STAGGERS,
JAMES J. FLORIO,
JOHN M. MURPHY,
BOB ECKHARDT,
JIM SANTINI,
BARBARA A. MIKULSKI,
ROBERT T. MATSUI,
JAMES T. BROYHILL,
EDWARD R. MADIGAN,
TOM LOEFFLER,
GARY A. LEE,
*Managers on the Part of the House.*
HOWARD W. CANNON,
RUSSELL B. LONG,
J. JAMES EXON,
BOB PACKWOOD,
NANCY LANDON KASSEBAUM,
*Managers on the Part of the Senate.*

O

217668

316 Pennsylvania Ave, S.E.
Suite 300
Washington, DC 20003
202.675.4220 Tel

29 September 2006

The Honorable Vernon A. Williams
Secretary
Surface Transportation Board
1925 K Street, NW
Washington, DC 20423

Re: Ex Parte No. 661, Rail Fuel Surcharges

Dear Secretary Williams:

As one of the nation's largest customers of Class I railroad service, UPS commends the Surface Transportation Board for addressing measures related to railroad practices involving fuel surcharges. With more than 30 years of experience as a major intermodal rail shipper, and almost 100 years as a transportation service provider, UPS recognizes the delicate balance between maximizing operational efficiency and the challenging fuel environment which currently faces all modes of transportation.

UPS has implemented a fuel surcharge, for ground and air shipments, for the past several years. Furthermore, UPS does not object to the concept of an equitably calculated fuel surcharge for rail transportation. However, the current fuel surcharge rates paid to our railroad service partners remain significantly higher than those UPS charges to our customers. Fuel surcharges that are based on a percentage of railroad base rates are inequitable and do not correlate with actual fuel consumption. By any objective measure, the unfair implementation of these charges is driving profitability for the rails, to the detriment of its customers and the shipping community.

In general, UPS pays Class I railroads fuel surcharges on a contracted monthly formula representing a percentage of our gross railroad transportation charges. Current rates, oftentimes in excess of 20%, more than exceed the incremental, inflated costs of fuel. Like many shippers, UPS continues to struggle with increased rail costs, declining service levels, limited capacity, and lack of customer responsiveness. Given these dynamics, it is easy to understand how the railroads' fuel surcharge practices have exacerbated shippers' frustration with the current state of the rail network.

Once again, UPS applauds the STB for reviewing this issue. UPS encourages the Board to implement procedures that would promote uniformity, equity, and greater transparency among railroad fuel surcharge practices. Implementation of these guidelines, and greater regulatory oversight, will be beneficial to railroad shippers, their customers, and the public alike.

Sincerely,

Thomas F. Jensen

Thomas F. Jensen
Vice President

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP
401 9TH STREET, N.W. - SUITE 1000
WASHINGTON, D.C. 20004-2134
www.troutmansanders.com
TELEPHONE: 202-274-2950

Sandra Brown
sandy.brown@troutmansanders.com

Direct Dial: 202-274-2959
Fax: 202-654-5603

October 2, 2006

**VIA E-FILING**

The Honorable Vernon A. Williams
Secretary
Surface Transportation Board
1925 K Street, N.W.
Washington, D.C. 20423-0001

**RE: Supplemental Comments of CEMEX, Inc. in response to *Rail Fuel Surcharges*, Ex Parte No. 661**

Dear Secretary Williams:

Enclosed for filing in the above-referenced proceeding are the Supplemental Comments of CEMEX, Inc.

Yours very truly,

Sandra L. Brown

SLB:bgh
Enclosures

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

**Ex Parte No. 661**

**REVIEW OF RAIL FUEL SURCHARGES**

# SUPPLEMENTAL COMMENTS OF CEMEX, INC.

**Ken Pramik**
**CEMEX, Inc.**
**840 Gessner, Suite 1400**
**Houston, Texas 77024**
**TEL: (713) 722-5885**
**FAX: (713) 722-5124**

**Sandra L. Brown**
**Erika D. Benson**
**TROUTMAN SANDERS LLP**
**401 9th Street, N.W.**
**Suite 1000**
**Washington, DC 20004**
**TEL: (202) 274-2950**
**FAX: (202) 654-5603**

***ATTORNEYS FOR CEMEX, INC.***

**October 2, 2006**

# BEFORE THE
# SURFACE TRANSPORTATION BOARD

STB Ex Parte No. 661

## RAIL FUEL SURCHARGES

## SUPPLEMENTAL COMMENTS OF CEMEX, INC.

### INTRODUCTION

The Surface Transportation Board's ("STB" or "Board") decision served March 14, 2006 in this proceeding provided notice of a public hearing to be held on May 11, 2006 and request for testimony to address fuel surcharges collected by railroads (hereinafter "Notice"). CEMEX, Inc. ("CEMEX") submitted written comments in response to the Notice on April 27, 2006 (hereinafter "CEMEX Comments").[1] In an STB decision served August 3, 2006 in this proceeding, the Board has sought public comments on the Board's proposals set out in the August 3 decision (hereinafter "Decision").

### Supplemental Comments

CEMEX strongly supports the Board's efforts to establish policies which will encourage a reasonable solution to the current unreasonable practice used by the railroads to assess fuel surcharges on shippers. CEMEX generally supports the Supplemental Comments that CEMEX

[1] The Identification and Interest of CEMEX can be found in CEMEX's Comments filed with the Board on April 27. CEMEX's comments filed herein are intended as a supplement to the CEMEX Comments and CEMEX will limit repetition of issues except to the extent necessary to address the Board's proposals as requested.

expects to be filed by The National Industrial Transportation League with the Board on or before October 2, 2006.

First, CEMEX supports the Board's finding that it has the authority to regulate the unreasonable practices of the railroads, including those practices associated with fuel surcharges. If a railroad practice is found to be unreasonable, the Board can order the railroad to cease engaging in it or the Board can prescribe the "practice to be followed." 49 U.S.C. § 10704(a)(1).[2] The Board must order the railroads to immediately desist with their unreasonable fuel surcharge practices.

Second, CEMEX supports the Board's proposal to revoke commodity exemptions to the extent necessary to implement the Decision to all traffic. CEMEX ships commodities that are currently subject to exemptions from Board regulation under 49 CFR § 1039.11, Miscellaneous Commodities Exemptions. Making the Board's Decision apply to exempted traffic is a positive step for shippers such as CEMEX. While CEMEX understands that certain shippers may request the Board to not apply the exemption revocation to them, see letter filed by HUB Group, Inc. on September 27, 2006 (referencing intermodal traffic), CEMEX believes that most shippers will support such a necessary revocation. See for example, the Alliance of Automobile Manufacturers comments dated September 22, 2006. Most importantly, CEMEX supports the Board's concern that the reasonableness of the railroads' fuel surcharge practices should apply equally to all classes of traffic. Decision at 7.

Third, CEMEX supports the Board's finding that fuel surcharge programs must be linked to the actual increased cost of fuel for individual movements and that it is an unreasonable practice to compute fuel surcharges as a percentage of the total rate. In line with this finding, the

[2] Additional support of the Board's authority under 49 U.S.C. § 10702 can be found in CEMEX's Comments filed with the Board on April 27.

Board should find that any fuel surcharge must operate in both a positive and negative fashion so the carriers are not overcompensated when fuel costs decrease.

Fourth, CEMEX supports the Board's finding that it is an unreasonable practice to engage in "double dipping." In order to protect shippers from railroad double dipping, the Board should require the railroads to separate out the fuel and non-fuel components of the total rate and only permit a fuel surcharge, if needed at all, on the fuel portion of the rate. At a minimum, the Board must require the railroad to certify the base period, by month and year, used for establishing base rates.

Fifth, CEMEX generally supports the Board's proposal to require the use of a uniform index to measure increases in fuel costs and supports the Board's proposal to use the EIA No. 2 Diesel Retail Sales Index. However, a separate fuel cost index would not be necessary if the Board just required the use of the RCAF to adjust for all changes in costs, including fuel, and then modify the RCAF as may be needed to provide for appropriate time adjustments.

Finally, CEMEX supports the Board's proposals for railroad reporting and supports the immediate implementation of the proposed reporting. CEMEX is concerned that it appears, from the few filings made by some of the railroads on September 20th that the railroads are going to take the position that they are not able to provide the information requested by the Board. Thus, new or different reporting requirements may be necessary. For example, the Board should consider adding data fields to its Waybill Sample to better monitor fuel surcharge revenues and require carriers to report revenue ton-miles for the month and revenue ton-miles to which the fuel surcharge applies, not just revenue tons. The Board should take whatever additional steps are necessary to ensure that fuel surcharge mechanisms are carried out in transparent, rational and equitable manner.

## CONCLUSION

CEMEX applauds the Board for taking action on the fuel surcharges and for proposing to revoke commodity exemptions to the extent necessary to apply the fuel surcharge findings to all traffic. Proactive and quick steps must be taken to expand and implement the proposals regarding fuel surcharges. The Board must reaffirm its findings made in its August 3 Decision and must take swift action to implement any additional fuel surcharge principals needed to assure that the Board's findings are followed.

Respectfully submitted,

Sandra L. Brown
Erika D. Benson
Troutman Sanders LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 274-2959

*Attorneys for CEMEX, Inc.*

Ken Pramik
CEMEX, Inc.
840 Gessner, Suite 1400
Houston, Texas 77024
TEL: (713) 722-5885
FAX: (713) 722-5124

October 2, 2006

LEBOEUF, LAMB, GREENE & MACRAE LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

1875 CONNECTICUT AVE., N.W.
SUITE 1200
WASHINGTON, D.C. 20009-5728
(202) 986-8000
FACSIMILE: (202) 986-8102

E-MAIL ADDRESS: MICHAEL.MCBRIDE@LLGM.COM
WRITER'S DIRECT DIAL: (202) 986-8050

LONDON
A MULTINATIONAL PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

217691

October 2, 2006

ENTERED
Office of Proceedings
OCT 2 - 2006
Part of
Public Record

OCT 2 2006
RECEIVED

**VIA HAND DELIVERY**

Mr. Vernon A. Williams, Secretary
Surface Transportation Board
1925 K Street, N.W., 7th Floor
Washington, DC 20423-0001

Re: STB Ex Parte No. 661 – Rail Fuel Surcharges

Dear Mr. Williams:

In accordance with the Board's Decision issued August 3, 2006, in the above-referenced proceeding, enclosed for filing in the above-referenced proceeding are the original and ten copies of the "Comments of TOTAL PETROCHEMICALS, USA, INC." Also enclosed is a diskette containing the Comments.

Respectfully submitted,

Michael F. McBride

Michael F. McBride
*Attorney for*
*TOTAL PETROCHEMICALS, USA, INC.*

Enclosure

cc (w/encl.): All Parties of Record

SURFACE TRANSPORTATION BOARD

STB Ex Parte No. 661

RAIL FUEL SURCHARGES

**COMMENTS OF TOTAL PETROCHEMICALS USA, INC.**

Pursuant to the Board's Decision issued August 3, 2006 in the above-referenced proceeding, TOTAL PETROCHEMICALS USA, INC. ("TPI") hereby files its comments on the Board's Decision.

Comments on Portions of the Decision

First, TPI agrees with the Board that it has the legal authority to act under its "unreasonable practice" jurisdiction, for the reasons stated in the Decision at 3-4.

Second, TPI agrees with the Board that it is unreasonable to impose a fuel surcharge as a percentage of the underlying rate, instead of some measure of the cost of fuel used on a per-car basis, as the Board concluded at 4-5. TPI disagrees with the Board, however, that it does "not have the authority, as some shippers have suggested, to order carriers to roll back charges across the board." Decision at 5 n.11. That is exactly what the Board may do, under its unreasonable-practice jurisdiction. If a carrier is engaged in an unreasonable practice, the Board has the authority, and we respectfully submit the duty, to order the carrier to cease and desist from engaging in the unreasonable practice. *E.g., Baltimore & Ohio R. Co. v. United States,* 305 U.S. 507, 524 (1951)("The power, however, is in the Commission, whenever it is of the opinion that any practice is unjust, unreasonable, preferential or otherwise violative of the Act, to prescribe whatever practice will be just, fair and reasonable." [footnote omitted, in which the Court cited 49 U.S.C. § 15(1), the predecessor to the current 49 U.S.C. § 10704].)

Such an order does not constitute a maximum-rate order, as the Board may have implied, because the carrier may be able to charge the same rate as before, after eliminating the unreasonable practice.[1] Whatever the ultimate rate would be, higher, lower, or the same, the Board not only may, but we believe must, order a carrier to cease an unreasonable practice, and if that is being engaged in across-the-board, the remedy must be across-the-board.[2]

Third, the Board actually came to the appropriate conclusion in the next section of its Decision which supports the argument just made. As noted above, the Board appropriately concluded that "double-dipping," *i.e.*, charging twice for fuel by use of both an index containing fuel (such as the Board's Rail Cost Adjustment Factor), and a separate fuel surcharge on the same rate, is an unreasonable practice. Decision at 6. That being so, the Board proposed "to prohibit the use of a fuel surcharge to recover increases in fuel costs to the extent that those same increased costs are also recovered through the application of an escalator to the base rate that incorporates changes in fuel costs." *Id.* This is precisely the sort of "across-the-board" remedy that the Board is empowered to order, and TPI applauds the Board for doing so. But the same

[1] Even if it were assumed *arguendo* that the railroad charged the same total rate (with fuel surcharge) after it complied with an STB order or other requirement of law as it had charged before the STB's order, it is still important to correct the misapprehension applicable to some that the STB's authority would not permit it under those circumstances to act against the unreasonable practice without the filing of a rate complaint satisfying the STB's complex and expensive rate regulatory process. The Board may determine that the unreasonable practice was unlawful, without processing the complaint as a challenge to the reasonableness of the overall rate. In that manner, what has been unclear to some (*i.e.*, has the railroad overcharged particular shippers) could be made clear. Whether relief would be ordered for the shipper does not necessarily follow, but presumably would depend on all the facts and circumstances. If the shipper had any contractual rights, which generally require relief to be sought from a court or arbitration panel, action taken under this Board's statutory authority over tariffs may be instructive, but would not be binding.

[2] Among the ways that the Board could provide for railroads and shippers to solve the problem of a remedy for past overcharges, without resorting to a challenge at the STB or a complaint in court or arbitration, is the principle of set-off. There is no legal obstacle to a shipper setting off the amount it can show it has been overcharged against a current or future invoice (or invoices, if they are not large enough). In that fashion, if a railroad believes the shipper has set-off too much, it can challenge the shipper's quantification of the amount it is owed, and, if need be, commence an action to recover the amount unpaid if the railroad has a good-faith basis for so asserting. But by commenting favorably on such an informal approach (at least initially), the Board could actually facilitate a solution that most shippers and carriers could use without invoking the Board's processes or adding new cases to possibly overcrowded court dockets. Such a declaratory order would be another means within the powers of the STB to resolve the problem across-the-board.

authority can then be used to roll back increases based on improper fuel surcharges, whatever outcome that might have for the rate levels in question.

The important thing is for the Board to establish the proper approach to the problem, *i.e.*, eliminating overcharging for fuel on an individual rate and movement basis, and to provide complete relief for any such unreasonable practice.

Fourth, TPI agrees with the Board (Decision at 6) that use of the Department of Energy's Energy Information Administration's "U.S. No. 2 Diesel Retail Sales by All Sellers (Cents per Gallon)" is a reasonably accurate measure of diesel fuel costs incurred by the railroads. While not perfect (because it reflects highway diesel costs, and railroads incur off-highway diesel costs), its correlation with the AAR fuel cost index is, as the Board noted, quite high (0.998). Moreover, there is only a one-month lag, as the Board noted (at 6).

Fifth, the Board proposed reporting obligations "that would allow the Board and affected shippers to better monitor railroads' fuel surcharge practices." Decision at 6. The Board went on to say that "We believe that this is so important that we are asking each Class I railroad to voluntarily provide this information while we are conducting this proceeding." *Id.* TPI particularly applauds the Board for its observation that "Those who must bear that burden [*i.e.*, the increase in the price of fuel], whether it be the users of rail service or the members of the public who ultimately pay the costs, are entitled to understand the process of assessing those costs and apportioning them. The rate payers and the public are entitled to have that process carried out in a rational and equitable manner, and the disclosure of the information we seek is a necessary step in that process." *Id.* TPI is, in fact, such a user that pays the cost of fuel to make petrochemicals, and therefore is affected precisely in the same way as other users of rail service and of fuel.

But in another respect, TPI feels the sting of the railroads' overcharging for fuel to an even greater extent than do most other rail customers. Why? Because chemical shippers, such as TPI, pay some of the highest rates, on a revenue/variable cost or return basis, of all rail shippers. Therefore, by definition, fuel surcharges imposed on base rates as a percentage of those rates, as has been the railroads' practice to date, have cost TPI a substantial sum of money greater than they should have been required to pay.[3]

Conclusion

The Board is to be commended for issuing the Decision it did on August 3, 2006 in this proceeding. It should adhere to its rulings therein, except that it should provide an across-the-board remedy for past overcharges, either by simply ordering that the railroads may not retain amounts charged in excess of fuel costs, or by declaring that shippers may use set-off with the same carrier to recover past overcharges, with proof provided to the railroad. In the event of a dispute over the set-off that the railroad and shipper cannot resolve amicably, the railroad would then have the right to go to court to recover the unpaid amount(s).

Respectfully submitted,

Michael F. McBride

Michael F. McBride
LeBoeuf, Lamb, Greene & MacRae LLP
1875 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20009-5728
(202) 986-8000 (Telephone)
(202) 986-8102 (Facsimile)

*Attorney for TOTAL PETROCHEMICALS USA, INC.*

October 2, 2006

[3] TPI does not offer comments on the portion of the Board's Decision concerning exempt traffic (Decision at 7), because TPI generally does not ship exempt commodities or rely on exempt traffic, except to say that the Board should not hesitate to revoke exemptions granted in whole or in part where necessary to prevent unreasonable practices from continuing to occur.

SURFACE TRANSPORTATION BOARD

STB Ex Parte No. 661

RAIL FUEL SURCHARGES

**CERTIFICATE OF SERVICE**

I hereby certify that I have served this 2nd day of October 2006, one copy of the foregoing "Comments of TOTAL PETROCHEMICALS, USA, INC." by first-class mail, postage prepaid upon all parties on the official service list.

Michael F. McBride

Michael F. McBride

PageVault

| | |
|---|---|
| Document title: | Weekly U.S. No 2 Diesel Retail Prices (Dollars per Gallon) |
| Capture URL: | https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W |
| Page loaded at (UTC): | Fri, 07 Jun 2024 22:48:35 GMT |
| Capture timestamp (UTC): | Fri, 07 Jun 2024 22:49:06 GMT |
| Capture tool: | 10.47.5 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/124.0.0.0 Safari/537.36 |
| Operating system: | Linux (Node 20.11.1) |
| PDF length: | 10 |
| Capture ID: | 4nZYb8sCowoJLkTQPSdp7g |
| User: | lw-ryork |

PDF REFERENCE #: 67inaCh5XLkSWtVrG2FbJz

# PETROLEUM & OTHER LIQUIDS



**View History:** ● Weekly ○ Monthly ○ Annual Download Data (XLS File)

**Weekly U.S. No 2 Diesel Retail Prices** DOWNLOAD

Dollars per Gallon




Chart Tools
no analysis applied

This series is available through the EIA open data API and can be downloaded to Excel or embedded as an interactive chart or map on your website.

**Weekly U.S. No 2 Diesel Retail Prices (Dollars per Gallon)**

| | Week 1 | | Week 2 | | Week 3 | | Week 4 | | Week 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year-Month | End Date | Value | End Date | Value | End Date | Value | End Date | Value | End Date | Value |
| 1994-Mar | | | | | 03/21 | 1.106 | 03/28 | 1.107 | | |
| 1994-Apr | 04/04 | 1.109 | 04/11 | 1.108 | 04/18 | 1.105 | 04/25 | 1.106 | | |
| 1994-May | 05/02 | 1.104 | 05/09 | 1.101 | 05/16 | 1.099 | 05/23 | 1.099 | 05/30 | 1.098 |
| 1994-Jun | 06/06 | 1.101 | 06/13 | 1.098 | 06/20 | 1.103 | 06/27 | 1.108 | | |
| 1994-Jul | 07/04 | 1.109 | 07/11 | 1.110 | 07/18 | 1.111 | 07/25 | 1.111 | | |
| 1994-Aug | 08/01 | 1.116 | 08/08 | 1.127 | 08/15 | 1.127 | 08/22 | 1.124 | 08/29 | 1.122 |
| 1994-Sep | 09/05 | 1.126 | 09/12 | 1.128 | 09/19 | 1.126 | 09/26 | 1.120 | | |
| 1994-Oct | 10/03 | 1.118 | 10/10 | 1.117 | 10/17 | 1.119 | 10/24 | 1.122 | 10/31 | 1.133 |
| 1994-Nov | 11/07 | 1.133 | 11/14 | 1.135 | 11/21 | 1.130 | 11/28 | 1.126 | | |
| 1994-Dec | 12/05 | 1.123 | 12/12 | 1.114 | 12/19 | 1.109 | 12/26 | 1.106 | | |
| 1995-Jan | 01/02 | 1.104 | 01/09 | 1.102 | 01/16 | 1.100 | 01/23 | 1.095 | 01/30 | 1.090 |
| 1995-Feb | 02/06 | 1.086 | 02/13 | 1.088 | 02/20 | 1.088 | 02/27 | 1.089 | | |
| 1995-Mar | 03/06 | 1.089 | 03/13 | 1.088 | 03/20 | 1.085 | 03/27 | 1.088 | | |
| 1995-Apr | 04/03 | 1.094 | 04/10 | 1.101 | 04/17 | 1.106 | 04/24 | 1.115 | | |
| 1995-May | 05/01 | 1.119 | 05/08 | 1.126 | 05/15 | 1.126 | 05/22 | 1.124 | 05/29 | 1.130 |
| 1995-Jun | 06/05 | 1.124 | 06/12 | 1.122 | 06/19 | 1.117 | 06/26 | 1.112 | | |
| 1995-Jul | 07/03 | 1.106 | 07/10 | 1.103 | 07/17 | 1.099 | 07/24 | 1.098 | 07/31 | 1.093 |
| 1995-Aug | 08/07 | 1.099 | 08/14 | 1.106 | 08/21 | 1.106 | 08/28 | 1.109 | | |
| 1995-Sep | 09/04 | 1.115 | 09/11 | 1.119 | 09/18 | 1.122 | 09/25 | 1.121 | | |
| 1995-Oct | 10/02 | 1.117 | 10/09 | 1.117 | 10/16 | 1.117 | 10/23 | 1.114 | 10/30 | 1.110 |
| 1995-Nov | 11/06 | 1.118 | 11/13 | 1.118 | 11/20 | 1.119 | 11/27 | 1.124 | | |
| 1995-Dec | 12/04 | 1.123 | 12/11 | 1.124 | 12/18 | 1.130 | 12/25 | 1.141 | | |
| 1996-Jan | 01/01 | 1.148 | 01/08 | 1.146 | 01/15 | 1.152 | 01/22 | 1.144 | 01/29 | 1.136 |
| 1996-Feb | 02/05 | 1.130 | 02/12 | 1.134 | 02/19 | 1.151 | 02/26 | 1.164 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1995-Nov | 11/06 | 1.118 | 11/13 | 1.118 | 11/20 | 1.119 | 11/27 | 1.124 | | |
| 1995-Dec | 12/04 | 1.123 | 12/11 | 1.124 | 12/18 | 1.130 | 12/25 | 1.141 | | |
| 1996-Jan | 01/01 | 1.148 | 01/08 | 1.146 | 01/15 | 1.152 | 01/22 | 1.144 | 01/29 | 1.136 |
| 1996-Feb | 02/05 | 1.130 | 02/12 | 1.134 | 02/19 | 1.151 | 02/26 | 1.164 | | |
| 1996-Mar | 03/04 | 1.175 | 03/11 | 1.173 | 03/18 | 1.172 | 03/25 | 1.210 | | |
| 1996-Apr | 04/01 | 1.222 | 04/08 | 1.249 | 04/15 | 1.305 | 04/22 | 1.304 | 04/29 | 1.285 |
| 1996-May | 05/06 | 1.292 | 05/13 | 1.285 | 05/20 | 1.274 | 05/27 | 1.254 | | |
| 1996-Jun | 06/03 | 1.240 | 06/10 | 1.215 | 06/17 | 1.193 | 06/24 | 1.179 | | |
| 1996-Jul | 07/01 | 1.172 | 07/08 | 1.173 | 07/15 | 1.178 | 07/22 | 1.184 | 07/29 | 1.178 |
| 1996-Aug | 08/05 | 1.184 | 08/12 | 1.191 | 08/19 | 1.206 | 08/26 | 1.222 | | |
| 1996-Sep | 09/02 | 1.231 | 09/09 | 1.250 | 09/16 | 1.276 | 09/23 | 1.277 | 09/30 | 1.289 |
| 1996-Oct | 10/07 | 1.308 | 10/14 | 1.326 | 10/21 | 1.329 | 10/28 | 1.329 | | |
| 1996-Nov | 11/04 | 1.323 | 11/11 | 1.316 | 11/18 | 1.324 | 11/25 | 1.327 | | |
| 1996-Dec | 12/02 | 1.323 | 12/09 | 1.320 | 12/16 | 1.307 | 12/23 | 1.300 | 12/30 | 1.295 |
| 1997-Jan | 01/06 | 1.291 | 01/13 | 1.296 | 01/20 | 1.293 | 01/27 | 1.283 | | |
| 1997-Feb | 02/03 | 1.288 | 02/10 | 1.285 | 02/17 | 1.278 | 02/24 | 1.269 | | |
| 1997-Mar | 03/03 | 1.252 | 03/10 | 1.230 | 03/17 | 1.220 | 03/24 | 1.220 | 03/31 | 1.225 |
| 1997-Apr | 04/07 | 1.217 | 04/14 | 1.216 | 04/21 | 1.211 | 04/28 | 1.205 | | |
| 1997-May | 05/05 | 1.205 | 05/12 | 1.191 | 05/19 | 1.191 | 05/26 | 1.196 | | |
| 1997-Jun | 06/02 | 1.190 | 06/09 | 1.187 | 06/16 | 1.172 | 06/23 | 1.162 | 06/30 | 1.153 |
| 1997-Jul | 07/07 | 1.159 | 07/14 | 1.152 | 07/21 | 1.147 | 07/28 | 1.145 | | |
| 1997-Aug | 08/04 | 1.155 | 08/11 | 1.168 | 08/18 | 1.167 | 08/25 | 1.169 | | |
| 1997-Sep | 09/01 | 1.165 | 09/08 | 1.163 | 09/15 | 1.156 | 09/22 | 1.154 | 09/29 | 1.160 |
| 1997-Oct | 10/06 | 1.175 | 10/13 | 1.185 | 10/20 | 1.185 | 10/27 | 1.185 | | |
| 1997-Nov | 11/03 | 1.188 | 11/10 | 1.190 | 11/17 | 1.195 | 11/24 | 1.193 | | |
| 1997-Dec | 12/01 | 1.189 | 12/08 | 1.174 | 12/15 | 1.162 | 12/22 | 1.155 | 12/29 | 1.150 |
| 1998-Jan | 01/05 | 1.147 | 01/12 | 1.126 | 01/19 | 1.109 | 01/26 | 1.096 | | |
| 1998-Feb | 02/02 | 1.091 | 02/09 | 1.085 | 02/16 | 1.082 | 02/23 | 1.079 | | |
| 1998-Mar | 03/02 | 1.074 | 03/09 | 1.066 | 03/16 | 1.057 | 03/23 | 1.049 | 03/30 | 1.068 |
| 1998-Apr | 04/06 | 1.067 | 04/13 | 1.065 | 04/20 | 1.065 | 04/27 | 1.070 | | |
| 1998-May | 05/04 | 1.072 | 05/11 | 1.075 | 05/18 | 1.069 | 05/25 | 1.060 | | |
| 1998-Jun | 06/01 | 1.053 | 06/08 | 1.045 | 06/15 | 1.040 | 06/22 | 1.033 | 06/29 | 1.034 |
| 1998-Jul | 07/06 | 1.036 | 07/13 | 1.031 | 07/20 | 1.027 | 07/27 | 1.020 | | |
| 1998-Aug | 08/03 | 1.016 | 08/10 | 1.010 | 08/17 | 1.007 | 08/24 | 1.004 | 08/31 | 1.000 |
| 1998-Sep | 09/07 | 1.009 | 09/14 | 1.019 | 09/21 | 1.030 | 09/28 | 1.039 | | |
| 1998-Oct | 10/05 | 1.041 | 10/12 | 1.041 | 10/19 | 1.036 | 10/26 | 1.036 | | |
| 1998-Nov | 11/02 | 1.035 | 11/09 | 1.034 | 11/16 | 1.026 | 11/23 | 1.012 | 11/30 | 1.004 |
| 1998-Dec | 12/07 | 0.986 | 12/14 | 0.972 | 12/21 | 0.968 | 12/28 | 0.966 | | |
| 1999-Jan | 01/04 | 0.965 | 01/11 | 0.967 | 01/18 | 0.970 | 01/25 | 0.964 | | |
| 1999-Feb | 02/01 | 0.962 | 02/08 | 0.962 | 02/15 | 0.959 | 02/22 | 0.953 | | |
| 1999-Mar | 03/01 | 0.956 | 03/08 | 0.964 | 03/15 | 1.000 | 03/22 | 1.018 | 03/29 | 1.046 |
| 1999-Apr | 04/05 | 1.075 | 04/12 | 1.084 | 04/19 | 1.080 | 04/26 | 1.078 | | |
| 1999-May | 05/03 | 1.078 | 05/10 | 1.083 | 05/17 | 1.075 | 05/24 | 1.066 | 05/31 | 1.065 |
| 1999-Jun | 06/07 | 1.059 | 06/14 | 1.068 | 06/21 | 1.082 | 06/28 | 1.087 | | |
| 1999-Jul | 07/05 | 1.102 | 07/12 | 1.114 | 07/19 | 1.133 | 07/26 | 1.137 | | |
| 1999-Aug | 08/02 | 1.146 | 08/09 | 1.156 | 08/16 | 1.178 | 08/23 | 1.186 | 08/30 | 1.194 |
| 1999-Sep | 09/06 | 1.198 | 09/13 | 1.209 | 09/20 | 1.226 | 09/27 | 1.226 | | |
| 1999-Oct | 10/04 | 1.234 | 10/11 | 1.228 | 10/18 | 1.224 | 10/25 | 1.226 | | |
| 1999-Nov | 11/01 | 1.229 | 11/08 | 1.234 | 11/15 | 1.261 | 11/22 | 1.289 | 11/29 | 1.304 |
| 1999-Dec | 12/06 | 1.294 | 12/13 | 1.288 | 12/20 | 1.287 | 12/27 | 1.298 | | |
| 2000-Jan | 01/03 | 1.309 | 01/10 | 1.307 | 01/17 | 1.307 | 01/24 | 1.418 | 01/31 | 1.439 |
| 2000-Feb | 02/07 | 1.470 | 02/14 | 1.456 | 02/21 | 1.456 | 02/28 | 1.461 | | |
| 2000-Mar | 03/06 | 1.490 | 03/13 | 1.496 | 03/20 | 1.479 | 03/27 | 1.451 | | |
| 2000-Apr | 04/03 | 1.442 | 04/10 | 1.419 | 04/17 | 1.398 | 04/24 | 1.428 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2000-Jan | 01/03 | 1.309 | 01/10 | 1.307 | 01/17 | 1.307 | 01/24 | 1.418 | 01/31 | 1.439 |
| 2000-Feb | 02/07 | 1.470 | 02/14 | 1.456 | 02/21 | 1.456 | 02/28 | 1.461 | | |
| 2000-Mar | 03/06 | 1.490 | 03/13 | 1.496 | 03/20 | 1.479 | 03/27 | 1.451 | | |
| 2000-Apr | 04/03 | 1.442 | 04/10 | 1.419 | 04/17 | 1.398 | 04/24 | 1.428 | | |
| 2000-May | 05/01 | 1.418 | 05/08 | 1.402 | 05/15 | 1.415 | 05/22 | 1.432 | 05/29 | 1.431 |
| 2000-Jun | 06/05 | 1.419 | 06/12 | 1.411 | 06/19 | 1.423 | 06/26 | 1.432 | | |
| 2000-Jul | 07/03 | 1.453 | 07/10 | 1.449 | 07/17 | 1.435 | 07/24 | 1.424 | 07/31 | 1.408 |
| 2000-Aug | 08/07 | 1.410 | 08/14 | 1.447 | 08/21 | 1.471 | 08/28 | 1.536 | | |
| 2000-Sep | 09/04 | 1.609 | 09/11 | 1.629 | 09/18 | 1.653 | 09/25 | 1.657 | | |
| 2000-Oct | 10/02 | 1.625 | 10/09 | 1.614 | 10/16 | 1.670 | 10/23 | 1.648 | 10/30 | 1.629 |
| 2000-Nov | 11/06 | 1.610 | 11/13 | 1.603 | 11/20 | 1.627 | 11/27 | 1.645 | | |
| 2000-Dec | 12/04 | 1.622 | 12/11 | 1.577 | 12/18 | 1.545 | 12/25 | 1.515 | | |
| 2001-Jan | 01/01 | 1.522 | 01/08 | 1.520 | 01/15 | 1.509 | 01/22 | 1.528 | 01/29 | 1.539 |
| 2001-Feb | 02/05 | 1.520 | 02/12 | 1.518 | 02/19 | 1.480 | 02/26 | 1.451 | | |
| 2001-Mar | 03/05 | 1.420 | 03/12 | 1.406 | 03/19 | 1.392 | 03/26 | 1.379 | | |
| 2001-Apr | 04/02 | 1.391 | 04/09 | 1.397 | 04/16 | 1.437 | 04/23 | 1.443 | 04/30 | 1.442 |
| 2001-May | 05/07 | 1.470 | 05/14 | 1.491 | 05/21 | 1.494 | 05/28 | 1.529 | | |
| 2001-Jun | 06/04 | 1.514 | 06/11 | 1.486 | 06/18 | 1.480 | 06/25 | 1.447 | | |
| 2001-Jul | 07/02 | 1.407 | 07/09 | 1.392 | 07/16 | 1.380 | 07/23 | 1.348 | 07/30 | 1.347 |
| 2001-Aug | 08/06 | 1.345 | 08/13 | 1.367 | 08/20 | 1.394 | 08/27 | 1.452 | | |
| 2001-Sep | 09/03 | 1.488 | 09/10 | 1.492 | 09/17 | 1.527 | 09/24 | 1.473 | | |
| 2001-Oct | 10/01 | 1.390 | 10/08 | 1.371 | 10/15 | 1.353 | 10/22 | 1.318 | 10/29 | 1.310 |
| 2001-Nov | 11/05 | 1.291 | 11/12 | 1.269 | 11/19 | 1.252 | 11/26 | 1.223 | | |
| 2001-Dec | 12/03 | 1.194 | 12/10 | 1.173 | 12/17 | 1.143 | 12/24 | 1.154 | 12/31 | 1.169 |
| 2002-Jan | 01/07 | 1.168 | 01/14 | 1.159 | 01/21 | 1.140 | 01/28 | 1.144 | | |
| 2002-Feb | 02/04 | 1.144 | 02/11 | 1.153 | 02/18 | 1.156 | 02/25 | 1.154 | | |
| 2002-Mar | 03/04 | 1.173 | 03/11 | 1.216 | 03/18 | 1.251 | 03/25 | 1.281 | | |
| 2002-Apr | 04/01 | 1.295 | 04/08 | 1.323 | 04/15 | 1.320 | 04/22 | 1.304 | 04/29 | 1.302 |
| 2002-May | 05/06 | 1.305 | 05/13 | 1.299 | 05/20 | 1.309 | 05/27 | 1.308 | | |
| 2002-Jun | 06/03 | 1.300 | 06/10 | 1.286 | 06/17 | 1.275 | 06/24 | 1.281 | | |
| 2002-Jul | 07/01 | 1.289 | 07/08 | 1.294 | 07/15 | 1.300 | 07/22 | 1.311 | 07/29 | 1.303 |
| 2002-Aug | 08/05 | 1.304 | 08/12 | 1.303 | 08/19 | 1.333 | 08/26 | 1.370 | | |
| 2002-Sep | 09/02 | 1.388 | 09/09 | 1.396 | 09/16 | 1.414 | 09/23 | 1.417 | 09/30 | 1.438 |
| 2002-Oct | 10/07 | 1.460 | 10/14 | 1.461 | 10/21 | 1.469 | 10/28 | 1.456 | | |
| 2002-Nov | 11/04 | 1.442 | 11/11 | 1.427 | 11/18 | 1.405 | 11/25 | 1.405 | | |
| 2002-Dec | 12/02 | 1.407 | 12/09 | 1.405 | 12/16 | 1.401 | 12/23 | 1.440 | 12/30 | 1.491 |
| 2003-Jan | 01/06 | 1.501 | 01/13 | 1.478 | 01/20 | 1.480 | 01/27 | 1.492 | | |
| 2003-Feb | 02/03 | 1.542 | 02/10 | 1.662 | 02/17 | 1.704 | 02/24 | 1.709 | | |
| 2003-Mar | 03/03 | 1.753 | 03/10 | 1.771 | 03/17 | 1.752 | 03/24 | 1.662 | 03/31 | 1.602 |
| 2003-Apr | 04/07 | 1.554 | 04/14 | 1.539 | 04/21 | 1.529 | 04/28 | 1.508 | | |
| 2003-May | 05/05 | 1.484 | 05/12 | 1.444 | 05/19 | 1.443 | 05/26 | 1.434 | | |
| 2003-Jun | 06/02 | 1.423 | 06/09 | 1.422 | 06/16 | 1.432 | 06/23 | 1.423 | 06/30 | 1.420 |
| 2003-Jul | 07/07 | 1.428 | 07/14 | 1.435 | 07/21 | 1.439 | 07/28 | 1.438 | | |
| 2003-Aug | 08/04 | 1.453 | 08/11 | 1.492 | 08/18 | 1.498 | 08/25 | 1.503 | | |
| 2003-Sep | 09/01 | 1.501 | 09/08 | 1.488 | 09/15 | 1.471 | 09/22 | 1.444 | 09/29 | 1.429 |
| 2003-Oct | 10/06 | 1.445 | 10/13 | 1.483 | 10/20 | 1.502 | 10/27 | 1.495 | | |
| 2003-Nov | 11/03 | 1.481 | 11/10 | 1.476 | 11/17 | 1.481 | 11/24 | 1.491 | | |
| 2003-Dec | 12/01 | 1.476 | 12/08 | 1.481 | 12/15 | 1.486 | 12/22 | 1.504 | 12/29 | 1.502 |
| 2004-Jan | 01/05 | 1.503 | 01/12 | 1.551 | 01/19 | 1.559 | 01/26 | 1.591 | | |
| 2004-Feb | 02/02 | 1.581 | 02/09 | 1.568 | 02/16 | 1.584 | 02/23 | 1.595 | | |
| 2004-Mar | 03/01 | 1.619 | 03/08 | 1.628 | 03/15 | 1.617 | 03/22 | 1.641 | 03/29 | 1.642 |
| 2004-Apr | 04/05 | 1.648 | 04/12 | 1.679 | 04/19 | 1.724 | 04/26 | 1.718 | | |
| 2004-May | 05/03 | 1.717 | 05/10 | 1.745 | 05/17 | 1.763 | 05/24 | 1.761 | 05/31 | 1.746 |
| 2004-Jun | 06/07 | 1.734 | 06/14 | 1.711 | 06/21 | 1.700 | 06/28 | 1.700 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2004-Mar | 03/01 | 1.619 | 03/08 | 1.628 | 03/15 | 1.617 | 03/22 | 1.641 | 03/29 | 1.642 |
| 2004-Apr | 04/05 | 1.648 | 04/12 | 1.679 | 04/19 | 1.724 | 04/26 | 1.718 | | |
| 2004-May | 05/03 | 1.717 | 05/10 | 1.745 | 05/17 | 1.763 | 05/24 | 1.761 | 05/31 | 1.746 |
| 2004-Jun | 06/07 | 1.734 | 06/14 | 1.711 | 06/21 | 1.700 | 06/28 | 1.700 | | |
| 2004-Jul | 07/05 | 1.716 | 07/12 | 1.740 | 07/19 | 1.744 | 07/26 | 1.754 | | |
| 2004-Aug | 08/02 | 1.780 | 08/09 | 1.814 | 08/16 | 1.825 | 08/23 | 1.874 | 08/30 | 1.871 |
| 2004-Sep | 09/06 | 1.869 | 09/13 | 1.874 | 09/20 | 1.912 | 09/27 | 2.012 | | |
| 2004-Oct | 10/04 | 2.053 | 10/11 | 2.092 | 10/18 | 2.180 | 10/25 | 2.212 | | |
| 2004-Nov | 11/01 | 2.206 | 11/08 | 2.163 | 11/15 | 2.132 | 11/22 | 2.116 | 11/29 | 2.116 |
| 2004-Dec | 12/06 | 2.069 | 12/13 | 1.997 | 12/20 | 1.984 | 12/27 | 1.987 | | |
| 2005-Jan | 01/03 | 1.957 | 01/10 | 1.934 | 01/17 | 1.952 | 01/24 | 1.959 | 01/31 | 1.992 |
| 2005-Feb | 02/07 | 1.983 | 02/14 | 1.986 | 02/21 | 2.020 | 02/28 | 2.118 | | |
| 2005-Mar | 03/07 | 2.168 | 03/14 | 2.194 | 03/21 | 2.244 | 03/28 | 2.249 | | |
| 2005-Apr | 04/04 | 2.303 | 04/11 | 2.316 | 04/18 | 2.259 | 04/25 | 2.289 | | |
| 2005-May | 05/02 | 2.262 | 05/09 | 2.227 | 05/16 | 2.189 | 05/23 | 2.156 | 05/30 | 2.160 |
| 2005-Jun | 06/06 | 2.234 | 06/13 | 2.276 | 06/20 | 2.313 | 06/27 | 2.336 | | |
| 2005-Jul | 07/04 | 2.348 | 07/11 | 2.408 | 07/18 | 2.392 | 07/25 | 2.342 | | |
| 2005-Aug | 08/01 | 2.348 | 08/08 | 2.407 | 08/15 | 2.567 | 08/22 | 2.588 | 08/29 | 2.590 |
| 2005-Sep | 09/05 | 2.898 | 09/12 | 2.847 | 09/19 | 2.732 | 09/26 | 2.798 | | |
| 2005-Oct | 10/03 | 3.144 | 10/10 | 3.150 | 10/17 | 3.148 | 10/24 | 3.157 | 10/31 | 2.876 |
| 2005-Nov | 11/07 | 2.698 | 11/14 | 2.602 | 11/21 | 2.513 | 11/28 | 2.479 | | |
| 2005-Dec | 12/05 | 2.425 | 12/12 | 2.436 | 12/19 | 2.462 | 12/26 | 2.448 | | |
| 2006-Jan | 01/02 | 2.442 | 01/09 | 2.485 | 01/16 | 2.449 | 01/23 | 2.472 | 01/30 | 2.489 |
| 2006-Feb | 02/06 | 2.499 | 02/13 | 2.476 | 02/20 | 2.455 | 02/27 | 2.471 | | |
| 2006-Mar | 03/06 | 2.545 | 03/13 | 2.543 | 03/20 | 2.581 | 03/27 | 2.565 | | |
| 2006-Apr | 04/03 | 2.617 | 04/10 | 2.654 | 04/17 | 2.765 | 04/24 | 2.876 | | |
| 2006-May | 05/01 | 2.896 | 05/08 | 2.897 | 05/15 | 2.920 | 05/22 | 2.888 | 05/29 | 2.882 |
| 2006-Jun | 06/05 | 2.890 | 06/12 | 2.918 | 06/19 | 2.915 | 06/26 | 2.867 | | |
| 2006-Jul | 07/03 | 2.898 | 07/10 | 2.918 | 07/17 | 2.926 | 07/24 | 2.946 | 07/31 | 2.980 |
| 2006-Aug | 08/07 | 3.055 | 08/14 | 3.065 | 08/21 | 3.033 | 08/28 | 3.027 | | |
| 2006-Sep | 09/04 | 2.967 | 09/11 | 2.857 | 09/18 | 2.713 | 09/25 | 2.595 | | |
| 2006-Oct | 10/02 | 2.546 | 10/09 | 2.506 | 10/16 | 2.503 | 10/23 | 2.524 | 10/30 | 2.517 |
| 2006-Nov | 11/06 | 2.506 | 11/13 | 2.552 | 11/20 | 2.553 | 11/27 | 2.567 | | |
| 2006-Dec | 12/04 | 2.618 | 12/11 | 2.621 | 12/18 | 2.606 | 12/25 | 2.596 | | |
| 2007-Jan | 01/01 | 2.580 | 01/08 | 2.537 | 01/15 | 2.463 | 01/22 | 2.430 | 01/29 | 2.413 |
| 2007-Feb | 02/05 | 2.435 | 02/12 | 2.476 | 02/19 | 2.491 | 02/26 | 2.551 | | |
| 2007-Mar | 03/05 | 2.626 | 03/12 | 2.685 | 03/19 | 2.681 | 03/26 | 2.676 | | |
| 2007-Apr | 04/02 | 2.790 | 04/09 | 2.840 | 04/16 | 2.877 | 04/23 | 2.851 | 04/30 | 2.811 |
| 2007-May | 05/07 | 2.792 | 05/14 | 2.773 | 05/21 | 2.803 | 05/28 | 2.817 | | |
| 2007-Jun | 06/04 | 2.799 | 06/11 | 2.792 | 06/18 | 2.805 | 06/25 | 2.835 | | |
| 2007-Jul | 07/02 | 2.829 | 07/09 | 2.849 | 07/16 | 2.889 | 07/23 | 2.889 | 07/30 | 2.886 |
| 2007-Aug | 08/06 | 2.898 | 08/13 | 2.847 | 08/20 | 2.868 | 08/27 | 2.863 | | |
| 2007-Sep | 09/03 | 2.893 | 09/10 | 2.924 | 09/17 | 2.964 | 09/24 | 3.032 | | |
| 2007-Oct | 10/01 | 3.048 | 10/08 | 3.035 | 10/15 | 3.039 | 10/22 | 3.094 | 10/29 | 3.157 |
| 2007-Nov | 11/05 | 3.303 | 11/12 | 3.425 | 11/19 | 3.410 | 11/26 | 3.444 | | |
| 2007-Dec | 12/03 | 3.416 | 12/10 | 3.325 | 12/17 | 3.309 | 12/24 | 3.308 | 12/31 | 3.345 |
| 2008-Jan | 01/07 | 3.376 | 01/14 | 3.326 | 01/21 | 3.270 | 01/28 | 3.259 | | |
| 2008-Feb | 02/04 | 3.280 | 02/11 | 3.280 | 02/18 | 3.396 | 02/25 | 3.552 | | |
| 2008-Mar | 03/03 | 3.658 | 03/10 | 3.819 | 03/17 | 3.974 | 03/24 | 3.989 | 03/31 | 3.964 |
| 2008-Apr | 04/07 | 3.955 | 04/14 | 4.059 | 04/21 | 4.143 | 04/28 | 4.177 | | |
| 2008-May | 05/05 | 4.149 | 05/12 | 4.331 | 05/19 | 4.497 | 05/26 | 4.723 | | |
| 2008-Jun | 06/02 | 4.707 | 06/09 | 4.692 | 06/16 | 4.692 | 06/23 | 4.648 | 06/30 | 4.645 |
| 2008-Jul | 07/07 | 4.727 | 07/14 | 4.764 | 07/21 | 4.718 | 07/28 | 4.603 | | |
| 2008-Aug | 08/04 | 4.502 | 08/11 | 4.353 | 08/18 | 4.207 | 08/25 | 4.145 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2008-May | 05/05 | 4.149 | 05/12 | 4.331 | 05/19 | 4.497 | 05/26 | 4.723 | | |
| 2008-Jun | 06/02 | 4.707 | 06/09 | 4.692 | 06/16 | 4.692 | 06/23 | 4.648 | 06/30 | 4.645 |
| 2008-Jul | 07/07 | 4.727 | 07/14 | 4.764 | 07/21 | 4.718 | 07/28 | 4.603 | | |
| 2008-Aug | 08/04 | 4.502 | 08/11 | 4.353 | 08/18 | 4.207 | 08/25 | 4.145 | | |
| 2008-Sep | 09/01 | 4.121 | 09/08 | 4.059 | 09/15 | 4.023 | 09/22 | 3.958 | 09/29 | 3.959 |
| 2008-Oct | 10/06 | 3.875 | 10/13 | 3.659 | 10/20 | 3.482 | 10/27 | 3.288 | | |
| 2008-Nov | 11/03 | 3.088 | 11/10 | 2.944 | 11/17 | 2.809 | 11/24 | 2.664 | | |
| 2008-Dec | 12/01 | 2.615 | 12/08 | 2.515 | 12/15 | 2.422 | 12/22 | 2.366 | 12/29 | 2.327 |
| 2009-Jan | 01/05 | 2.291 | 01/12 | 2.314 | 01/19 | 2.296 | 01/26 | 2.268 | | |
| 2009-Feb | 02/02 | 2.246 | 02/09 | 2.219 | 02/16 | 2.186 | 02/23 | 2.130 | | |
| 2009-Mar | 03/02 | 2.087 | 03/09 | 2.045 | 03/16 | 2.017 | 03/23 | 2.090 | 03/30 | 2.221 |
| 2009-Apr | 04/06 | 2.228 | 04/13 | 2.229 | 04/20 | 2.221 | 04/27 | 2.201 | | |
| 2009-May | 05/04 | 2.185 | 05/11 | 2.216 | 05/18 | 2.231 | 05/25 | 2.274 | | |
| 2009-Jun | 06/01 | 2.352 | 06/08 | 2.498 | 06/15 | 2.572 | 06/22 | 2.616 | 06/29 | 2.608 |
| 2009-Jul | 07/06 | 2.594 | 07/13 | 2.542 | 07/20 | 2.496 | 07/27 | 2.528 | | |
| 2009-Aug | 08/03 | 2.550 | 08/10 | 2.625 | 08/17 | 2.652 | 08/24 | 2.668 | 08/31 | 2.674 |
| 2009-Sep | 09/07 | 2.647 | 09/14 | 2.634 | 09/21 | 2.622 | 09/28 | 2.601 | | |
| 2009-Oct | 10/05 | 2.582 | 10/12 | 2.600 | 10/19 | 2.705 | 10/26 | 2.801 | | |
| 2009-Nov | 11/02 | 2.808 | 11/09 | 2.801 | 11/16 | 2.790 | 11/23 | 2.787 | 11/30 | 2.775 |
| 2009-Dec | 12/07 | 2.772 | 12/14 | 2.748 | 12/21 | 2.726 | 12/28 | 2.732 | | |
| 2010-Jan | 01/04 | 2.797 | 01/11 | 2.879 | 01/18 | 2.870 | 01/25 | 2.833 | | |
| 2010-Feb | 02/01 | 2.781 | 02/08 | 2.769 | 02/15 | 2.756 | 02/22 | 2.832 | | |
| 2010-Mar | 03/01 | 2.861 | 03/08 | 2.904 | 03/15 | 2.924 | 03/22 | 2.946 | 03/29 | 2.939 |
| 2010-Apr | 04/05 | 3.015 | 04/12 | 3.069 | 04/19 | 3.074 | 04/26 | 3.078 | | |
| 2010-May | 05/03 | 3.122 | 05/10 | 3.127 | 05/17 | 3.094 | 05/24 | 3.021 | 05/31 | 2.980 |
| 2010-Jun | 06/07 | 2.946 | 06/14 | 2.928 | 06/21 | 2.961 | 06/28 | 2.956 | | |
| 2010-Jul | 07/05 | 2.924 | 07/12 | 2.903 | 07/19 | 2.899 | 07/26 | 2.919 | | |
| 2010-Aug | 08/02 | 2.928 | 08/09 | 2.991 | 08/16 | 2.979 | 08/23 | 2.957 | 08/30 | 2.938 |
| 2010-Sep | 09/06 | 2.931 | 09/13 | 2.943 | 09/20 | 2.960 | 09/27 | 2.951 | | |
| 2010-Oct | 10/04 | 3.000 | 10/11 | 3.066 | 10/18 | 3.073 | 10/25 | 3.067 | | |
| 2010-Nov | 11/01 | 3.067 | 11/08 | 3.116 | 11/15 | 3.184 | 11/22 | 3.171 | 11/29 | 3.162 |
| 2010-Dec | 12/06 | 3.197 | 12/13 | 3.231 | 12/20 | 3.248 | 12/27 | 3.294 | | |
| 2011-Jan | 01/03 | 3.331 | 01/10 | 3.333 | 01/17 | 3.407 | 01/24 | 3.430 | 01/31 | 3.438 |
| 2011-Feb | 02/07 | 3.513 | 02/14 | 3.534 | 02/21 | 3.573 | 02/28 | 3.716 | | |
| 2011-Mar | 03/07 | 3.871 | 03/14 | 3.908 | 03/21 | 3.907 | 03/28 | 3.932 | | |
| 2011-Apr | 04/04 | 3.976 | 04/11 | 4.078 | 04/18 | 4.105 | 04/25 | 4.098 | | |
| 2011-May | 05/02 | 4.124 | 05/09 | 4.104 | 05/16 | 4.061 | 05/23 | 3.997 | 05/30 | 3.948 |
| 2011-Jun | 06/06 | 3.940 | 06/13 | 3.954 | 06/20 | 3.950 | 06/27 | 3.888 | | |
| 2011-Jul | 07/04 | 3.850 | 07/11 | 3.899 | 07/18 | 3.923 | 07/25 | 3.949 | | |
| 2011-Aug | 08/01 | 3.937 | 08/08 | 3.897 | 08/15 | 3.835 | 08/22 | 3.810 | 08/29 | 3.820 |
| 2011-Sep | 09/05 | 3.868 | 09/12 | 3.862 | 09/19 | 3.833 | 09/26 | 3.786 | | |
| 2011-Oct | 10/03 | 3.749 | 10/10 | 3.721 | 10/17 | 3.801 | 10/24 | 3.825 | 10/31 | 3.892 |
| 2011-Nov | 11/07 | 3.887 | 11/14 | 3.987 | 11/21 | 4.010 | 11/28 | 3.964 | | |
| 2011-Dec | 12/05 | 3.931 | 12/12 | 3.894 | 12/19 | 3.828 | 12/26 | 3.791 | | |
| 2012-Jan | 01/02 | 3.783 | 01/09 | 3.828 | 01/16 | 3.854 | 01/23 | 3.848 | 01/30 | 3.850 |
| 2012-Feb | 02/06 | 3.856 | 02/13 | 3.943 | 02/20 | 3.960 | 02/27 | 4.051 | | |
| 2012-Mar | 03/05 | 4.094 | 03/12 | 4.123 | 03/19 | 4.142 | 03/26 | 4.147 | | |
| 2012-Apr | 04/02 | 4.142 | 04/09 | 4.148 | 04/16 | 4.127 | 04/23 | 4.085 | 04/30 | 4.073 |
| 2012-May | 05/07 | 4.057 | 05/14 | 4.004 | 05/21 | 3.956 | 05/28 | 3.897 | | |
| 2012-Jun | 06/04 | 3.846 | 06/11 | 3.781 | 06/18 | 3.729 | 06/25 | 3.678 | | |
| 2012-Jul | 07/02 | 3.648 | 07/09 | 3.683 | 07/16 | 3.695 | 07/23 | 3.783 | 07/30 | 3.796 |
| 2012-Aug | 08/06 | 3.850 | 08/13 | 3.965 | 08/20 | 4.026 | 08/27 | 4.089 | | |
| 2012-Sep | 09/03 | 4.127 | 09/10 | 4.132 | 09/17 | 4.135 | 09/24 | 4.086 | | |
| 2012-Oct | 10/01 | 4.079 | 10/08 | 4.094 | 10/15 | 4.150 | 10/22 | 4.116 | 10/29 | 4.030 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2012-Jul | 07/02 | 3.648 | 07/09 | 3.683 | 07/16 | 3.695 | 07/23 | 3.783 | 07/30 | 3.796 |
| 2012-Aug | 08/06 | 3.850 | 08/13 | 3.965 | 08/20 | 4.026 | 08/27 | 4.089 | | |
| 2012-Sep | 09/03 | 4.127 | 09/10 | 4.132 | 09/17 | 4.135 | 09/24 | 4.086 | | |
| 2012-Oct | 10/01 | 4.079 | 10/08 | 4.094 | 10/15 | 4.150 | 10/22 | 4.116 | 10/29 | 4.030 |
| 2012-Nov | 11/05 | 4.010 | 11/12 | 3.980 | 11/19 | 3.976 | 11/26 | 4.034 | | |
| 2012-Dec | 12/03 | 4.027 | 12/10 | 3.991 | 12/17 | 3.945 | 12/24 | 3.923 | 12/31 | 3.918 |
| 2013-Jan | 01/07 | 3.911 | 01/14 | 3.894 | 01/21 | 3.902 | 01/28 | 3.927 | | |
| 2013-Feb | 02/04 | 4.022 | 02/11 | 4.104 | 02/18 | 4.157 | 02/25 | 4.159 | | |
| 2013-Mar | 03/04 | 4.130 | 03/11 | 4.088 | 03/18 | 4.047 | 03/25 | 4.006 | | |
| 2013-Apr | 04/01 | 3.993 | 04/08 | 3.977 | 04/15 | 3.942 | 04/22 | 3.887 | 04/29 | 3.851 |
| 2013-May | 05/06 | 3.845 | 05/13 | 3.866 | 05/20 | 3.890 | 05/27 | 3.880 | | |
| 2013-Jun | 06/03 | 3.869 | 06/10 | 3.849 | 06/17 | 3.841 | 06/24 | 3.838 | | |
| 2013-Jul | 07/01 | 3.817 | 07/08 | 3.828 | 07/15 | 3.867 | 07/22 | 3.903 | 07/29 | 3.915 |
| 2013-Aug | 08/05 | 3.909 | 08/12 | 3.896 | 08/19 | 3.900 | 08/26 | 3.913 | | |
| 2013-Sep | 09/02 | 3.981 | 09/09 | 3.981 | 09/16 | 3.974 | 09/23 | 3.949 | 09/30 | 3.919 |
| 2013-Oct | 10/07 | 3.897 | 10/14 | 3.886 | 10/21 | 3.886 | 10/28 | 3.870 | | |
| 2013-Nov | 11/04 | 3.857 | 11/11 | 3.832 | 11/18 | 3.822 | 11/25 | 3.844 | | |
| 2013-Dec | 12/02 | 3.883 | 12/09 | 3.879 | 12/16 | 3.871 | 12/23 | 3.873 | 12/30 | 3.903 |
| 2014-Jan | 01/06 | 3.910 | 01/13 | 3.886 | 01/20 | 3.873 | 01/27 | 3.904 | | |
| 2014-Feb | 02/03 | 3.951 | 02/10 | 3.977 | 02/17 | 3.989 | 02/24 | 4.017 | | |
| 2014-Mar | 03/03 | 4.016 | 03/10 | 4.021 | 03/17 | 4.003 | 03/24 | 3.988 | 03/31 | 3.975 |
| 2014-Apr | 04/07 | 3.959 | 04/14 | 3.952 | 04/21 | 3.971 | 04/28 | 3.975 | | |
| 2014-May | 05/05 | 3.964 | 05/12 | 3.948 | 05/19 | 3.934 | 05/26 | 3.925 | | |
| 2014-Jun | 06/02 | 3.918 | 06/09 | 3.892 | 06/16 | 3.882 | 06/23 | 3.919 | 06/30 | 3.920 |
| 2014-Jul | 07/07 | 3.913 | 07/14 | 3.894 | 07/21 | 3.869 | 07/28 | 3.858 | | |
| 2014-Aug | 08/04 | 3.853 | 08/11 | 3.843 | 08/18 | 3.835 | 08/25 | 3.821 | | |
| 2014-Sep | 09/01 | 3.814 | 09/08 | 3.814 | 09/15 | 3.801 | 09/22 | 3.778 | 09/29 | 3.755 |
| 2014-Oct | 10/06 | 3.733 | 10/13 | 3.698 | 10/20 | 3.656 | 10/27 | 3.635 | | |
| 2014-Nov | 11/03 | 3.623 | 11/10 | 3.677 | 11/17 | 3.661 | 11/24 | 3.628 | | |
| 2014-Dec | 12/01 | 3.605 | 12/08 | 3.535 | 12/15 | 3.419 | 12/22 | 3.281 | 12/29 | 3.213 |
| 2015-Jan | 01/05 | 3.137 | 01/12 | 3.053 | 01/19 | 2.933 | 01/26 | 2.866 | | |
| 2015-Feb | 02/02 | 2.831 | 02/09 | 2.835 | 02/16 | 2.865 | 02/23 | 2.900 | | |
| 2015-Mar | 03/02 | 2.936 | 03/09 | 2.944 | 03/16 | 2.917 | 03/23 | 2.864 | 03/30 | 2.824 |
| 2015-Apr | 04/06 | 2.784 | 04/13 | 2.754 | 04/20 | 2.780 | 04/27 | 2.811 | | |
| 2015-May | 05/04 | 2.854 | 05/11 | 2.878 | 05/18 | 2.904 | 05/25 | 2.914 | | |
| 2015-Jun | 06/01 | 2.909 | 06/08 | 2.884 | 06/15 | 2.870 | 06/22 | 2.859 | 06/29 | 2.843 |
| 2015-Jul | 07/06 | 2.832 | 07/13 | 2.814 | 07/20 | 2.782 | 07/27 | 2.723 | | |
| 2015-Aug | 08/03 | 2.668 | 08/10 | 2.617 | 08/17 | 2.615 | 08/24 | 2.561 | 08/31 | 2.514 |
| 2015-Sep | 09/07 | 2.534 | 09/14 | 2.517 | 09/21 | 2.493 | 09/28 | 2.476 | | |
| 2015-Oct | 10/05 | 2.492 | 10/12 | 2.556 | 10/19 | 2.531 | 10/26 | 2.498 | | |
| 2015-Nov | 11/02 | 2.485 | 11/09 | 2.502 | 11/16 | 2.482 | 11/23 | 2.445 | 11/30 | 2.421 |
| 2015-Dec | 12/07 | 2.379 | 12/14 | 2.338 | 12/21 | 2.284 | 12/28 | 2.237 | | |
| 2016-Jan | 01/04 | 2.211 | 01/11 | 2.177 | 01/18 | 2.112 | 01/25 | 2.071 | | |
| 2016-Feb | 02/01 | 2.031 | 02/08 | 2.008 | 02/15 | 1.980 | 02/22 | 1.983 | 02/29 | 1.989 |
| 2016-Mar | 03/07 | 2.021 | 03/14 | 2.099 | 03/21 | 2.119 | 03/28 | 2.121 | | |
| 2016-Apr | 04/04 | 2.115 | 04/11 | 2.128 | 04/18 | 2.165 | 04/25 | 2.198 | | |
| 2016-May | 05/02 | 2.266 | 05/09 | 2.271 | 05/16 | 2.297 | 05/23 | 2.357 | 05/30 | 2.382 |
| 2016-Jun | 06/06 | 2.407 | 06/13 | 2.431 | 06/20 | 2.426 | 06/27 | 2.426 | | |
| 2016-Jul | 07/04 | 2.423 | 07/11 | 2.414 | 07/18 | 2.402 | 07/25 | 2.379 | | |
| 2016-Aug | 08/01 | 2.348 | 08/08 | 2.316 | 08/15 | 2.310 | 08/22 | 2.370 | 08/29 | 2.409 |
| 2016-Sep | 09/05 | 2.407 | 09/12 | 2.399 | 09/19 | 2.389 | 09/26 | 2.382 | | |
| 2016-Oct | 10/03 | 2.389 | 10/10 | 2.445 | 10/17 | 2.481 | 10/24 | 2.478 | 10/31 | 2.479 |
| 2016-Nov | 11/07 | 2.470 | 11/14 | 2.443 | 11/21 | 2.421 | 11/28 | 2.420 | | |
| 2016-Dec | 12/05 | 2.480 | 12/12 | 2.493 | 12/19 | 2.527 | 12/26 | 2.540 | | |

eia + Sources & Uses + Topics + Geography

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2016-Aug | 08/01 | 2.348 | 08/08 | 2.316 | 08/15 | 2.310 | 08/22 | 2.370 | 08/29 | 2.409 |
| 2016-Sep | 09/05 | 2.407 | 09/12 | 2.399 | 09/19 | 2.389 | 09/26 | 2.382 | | |
| 2016-Oct | 10/03 | 2.389 | 10/10 | 2.445 | 10/17 | 2.481 | 10/24 | 2.478 | 10/31 | 2.479 |
| 2016-Nov | 11/07 | 2.470 | 11/14 | 2.443 | 11/21 | 2.421 | 11/28 | 2.420 | | |
| 2016-Dec | 12/05 | 2.480 | 12/12 | 2.493 | 12/19 | 2.527 | 12/26 | 2.540 | | |
| 2017-Jan | 01/02 | 2.586 | 01/09 | 2.597 | 01/16 | 2.585 | 01/23 | 2.569 | 01/30 | 2.562 |
| 2017-Feb | 02/06 | 2.558 | 02/13 | 2.565 | 02/20 | 2.572 | 02/27 | 2.577 | | |
| 2017-Mar | 03/06 | 2.579 | 03/13 | 2.564 | 03/20 | 2.539 | 03/27 | 2.532 | | |
| 2017-Apr | 04/03 | 2.556 | 04/10 | 2.582 | 04/17 | 2.597 | 04/24 | 2.595 | | |
| 2017-May | 05/01 | 2.583 | 05/08 | 2.565 | 05/15 | 2.544 | 05/22 | 2.539 | 05/29 | 2.571 |
| 2017-Jun | 06/05 | 2.564 | 06/12 | 2.524 | 06/19 | 2.489 | 06/26 | 2.465 | | |
| 2017-Jul | 07/03 | 2.472 | 07/10 | 2.481 | 07/17 | 2.491 | 07/24 | 2.507 | 07/31 | 2.531 |
| 2017-Aug | 08/07 | 2.581 | 08/14 | 2.598 | 08/21 | 2.596 | 08/28 | 2.605 | | |
| 2017-Sep | 09/04 | 2.758 | 09/11 | 2.802 | 09/18 | 2.791 | 09/25 | 2.788 | | |
| 2017-Oct | 10/02 | 2.792 | 10/09 | 2.776 | 10/16 | 2.787 | 10/23 | 2.797 | 10/30 | 2.819 |
| 2017-Nov | 11/06 | 2.882 | 11/13 | 2.915 | 11/20 | 2.912 | 11/27 | 2.926 | | |
| 2017-Dec | 12/04 | 2.922 | 12/11 | 2.910 | 12/18 | 2.901 | 12/25 | 2.903 | | |
| 2018-Jan | 01/01 | 2.973 | 01/08 | 2.996 | 01/15 | 3.028 | 01/22 | 3.025 | 01/29 | 3.070 |
| 2018-Feb | 02/05 | 3.086 | 02/12 | 3.063 | 02/19 | 3.027 | 02/26 | 3.007 | | |
| 2018-Mar | 03/05 | 2.992 | 03/12 | 2.976 | 03/19 | 2.972 | 03/26 | 3.010 | | |
| 2018-Apr | 04/02 | 3.042 | 04/09 | 3.043 | 04/16 | 3.104 | 04/23 | 3.133 | 04/30 | 3.157 |
| 2018-May | 05/07 | 3.171 | 05/14 | 3.239 | 05/21 | 3.277 | 05/28 | 3.288 | | |
| 2018-Jun | 06/04 | 3.285 | 06/11 | 3.266 | 06/18 | 3.244 | 06/25 | 3.216 | | |
| 2018-Jul | 07/02 | 3.236 | 07/09 | 3.243 | 07/16 | 3.239 | 07/23 | 3.220 | 07/30 | 3.226 |
| 2018-Aug | 08/06 | 3.223 | 08/13 | 3.217 | 08/20 | 3.207 | 08/27 | 3.226 | | |
| 2018-Sep | 09/03 | 3.252 | 09/10 | 3.258 | 09/17 | 3.268 | 09/24 | 3.271 | | |
| 2018-Oct | 10/01 | 3.313 | 10/08 | 3.385 | 10/15 | 3.394 | 10/22 | 3.380 | 10/29 | 3.355 |
| 2018-Nov | 11/05 | 3.338 | 11/12 | 3.317 | 11/19 | 3.282 | 11/26 | 3.261 | | |
| 2018-Dec | 12/03 | 3.207 | 12/10 | 3.161 | 12/17 | 3.121 | 12/24 | 3.077 | 12/31 | 3.048 |
| 2019-Jan | 01/07 | 3.013 | 01/14 | 2.976 | 01/21 | 2.965 | 01/28 | 2.965 | | |
| 2019-Feb | 02/04 | 2.966 | 02/11 | 2.966 | 02/18 | 3.006 | 02/25 | 3.048 | | |
| 2019-Mar | 03/04 | 3.076 | 03/11 | 3.079 | 03/18 | 3.070 | 03/25 | 3.080 | | |
| 2019-Apr | 04/01 | 3.078 | 04/08 | 3.093 | 04/15 | 3.118 | 04/22 | 3.147 | 04/29 | 3.169 |
| 2019-May | 05/06 | 3.171 | 05/13 | 3.160 | 05/20 | 3.163 | 05/27 | 3.151 | | |
| 2019-Jun | 06/03 | 3.136 | 06/10 | 3.105 | 06/17 | 3.070 | 06/24 | 3.043 | | |
| 2019-Jul | 07/01 | 3.042 | 07/08 | 3.055 | 07/15 | 3.051 | 07/22 | 3.044 | 07/29 | 3.034 |
| 2019-Aug | 08/05 | 3.032 | 08/12 | 3.011 | 08/19 | 2.994 | 08/26 | 2.983 | | |
| 2019-Sep | 09/02 | 2.976 | 09/09 | 2.971 | 09/16 | 2.987 | 09/23 | 3.081 | 09/30 | 3.066 |
| 2019-Oct | 10/07 | 3.047 | 10/14 | 3.051 | 10/21 | 3.050 | 10/28 | 3.064 | | |
| 2019-Nov | 11/04 | 3.062 | 11/11 | 3.073 | 11/18 | 3.074 | 11/25 | 3.066 | | |
| 2019-Dec | 12/02 | 3.070 | 12/09 | 3.049 | 12/16 | 3.046 | 12/23 | 3.041 | 12/30 | 3.069 |
| 2020-Jan | 01/06 | 3.079 | 01/13 | 3.064 | 01/20 | 3.037 | 01/27 | 3.010 | | |
| 2020-Feb | 02/03 | 2.956 | 02/10 | 2.910 | 02/17 | 2.890 | 02/24 | 2.882 | | |
| 2020-Mar | 03/02 | 2.851 | 03/09 | 2.814 | 03/16 | 2.733 | 03/23 | 2.659 | 03/30 | 2.586 |
| 2020-Apr | 04/06 | 2.548 | 04/13 | 2.507 | 04/20 | 2.480 | 04/27 | 2.437 | | |
| 2020-May | 05/04 | 2.399 | 05/11 | 2.394 | 05/18 | 2.386 | 05/25 | 2.390 | | |
| 2020-Jun | 06/01 | 2.386 | 06/08 | 2.396 | 06/15 | 2.403 | 06/22 | 2.425 | 06/29 | 2.430 |
| 2020-Jul | 07/06 | 2.437 | 07/13 | 2.438 | 07/20 | 2.433 | 07/27 | 2.427 | | |
| 2020-Aug | 08/03 | 2.424 | 08/10 | 2.428 | 08/17 | 2.427 | 08/24 | 2.426 | 08/31 | 2.441 |
| 2020-Sep | 09/07 | 2.435 | 09/14 | 2.422 | 09/21 | 2.404 | 09/28 | 2.394 | | |
| 2020-Oct | 10/05 | 2.387 | 10/12 | 2.395 | 10/19 | 2.388 | 10/26 | 2.385 | | |
| 2020-Nov | 11/02 | 2.372 | 11/09 | 2.383 | 11/16 | 2.441 | 11/23 | 2.462 | 11/30 | 2.502 |
| 2020-Dec | 12/07 | 2.526 | 12/14 | 2.559 | 12/21 | 2.619 | 12/28 | 2.635 | | |
| 2021-Jan | 01/04 | 2.640 | 01/11 | 2.670 | 01/18 | 2.696 | 01/25 | 2.716 | | |
| 2021-Feb | 02/01 | 2.738 | 02/08 | 2.801 | 02/15 | 2.876 | 02/22 | 2.973 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2020-Oct | 10/05 | 2.387 | 10/12 | 2.395 | 10/19 | 2.388 | 10/26 | 2.385 | | |
| 2020-Nov | 11/02 | 2.372 | 11/09 | 2.383 | 11/16 | 2.441 | 11/23 | 2.462 | 11/30 | 2.502 |
| 2020-Dec | 12/07 | 2.526 | 12/14 | 2.559 | 12/21 | 2.619 | 12/28 | 2.635 | | |
| 2021-Jan | 01/04 | 2.640 | 01/11 | 2.670 | 01/18 | 2.696 | 01/25 | 2.716 | | |
| 2021-Feb | 02/01 | 2.738 | 02/08 | 2.801 | 02/15 | 2.876 | 02/22 | 2.973 | | |
| 2021-Mar | 03/01 | 3.072 | 03/08 | 3.143 | 03/15 | 3.191 | 03/22 | 3.194 | 03/29 | 3.161 |
| 2021-Apr | 04/05 | 3.144 | 04/12 | 3.129 | 04/19 | 3.124 | 04/26 | 3.124 | | |
| 2021-May | 05/03 | 3.142 | 05/10 | 3.186 | 05/17 | 3.249 | 05/24 | 3.253 | 05/31 | 3.255 |
| 2021-Jun | 06/07 | 3.274 | 06/14 | 3.286 | 06/21 | 3.287 | 06/28 | 3.300 | | |
| 2021-Jul | 07/05 | 3.331 | 07/12 | 3.338 | 07/19 | 3.344 | 07/26 | 3.342 | | |
| 2021-Aug | 08/02 | 3.367 | 08/09 | 3.364 | 08/16 | 3.356 | 08/23 | 3.324 | 08/30 | 3.339 |
| 2021-Sep | 09/06 | 3.373 | 09/13 | 3.372 | 09/20 | 3.385 | 09/27 | 3.406 | | |
| 2021-Oct | 10/04 | 3.477 | 10/11 | 3.586 | 10/18 | 3.671 | 10/25 | 3.713 | | |
| 2021-Nov | 11/01 | 3.727 | 11/08 | 3.730 | 11/15 | 3.734 | 11/22 | 3.724 | 11/29 | 3.720 |
| 2021-Dec | 12/06 | 3.674 | 12/13 | 3.649 | 12/20 | 3.626 | 12/27 | 3.615 | | |
| 2022-Jan | 01/03 | 3.613 | 01/10 | 3.657 | 01/17 | 3.725 | 01/24 | 3.780 | 01/31 | 3.846 |
| 2022-Feb | 02/07 | 3.951 | 02/14 | 4.019 | 02/21 | 4.055 | 02/28 | 4.104 | | |
| 2022-Mar | 03/07 | 4.849 | 03/14 | 5.250 | 03/21 | 5.134 | 03/28 | 5.185 | | |
| 2022-Apr | 04/04 | 5.144 | 04/11 | 5.073 | 04/18 | 5.101 | 04/25 | 5.160 | | |
| 2022-May | 05/02 | 5.509 | 05/09 | 5.623 | 05/16 | 5.613 | 05/23 | 5.571 | 05/30 | 5.539 |
| 2022-Jun | 06/06 | 5.703 | 06/13 | 5.718 | 06/20 | 5.810 | 06/27 | 5.783 | | |
| 2022-Jul | 07/04 | 5.675 | 07/11 | 5.568 | 07/18 | 5.432 | 07/25 | 5.268 | | |
| 2022-Aug | 08/01 | 5.138 | 08/08 | 4.993 | 08/15 | 4.911 | 08/22 | 4.909 | 08/29 | 5.115 |
| 2022-Sep | 09/05 | 5.084 | 09/12 | 5.033 | 09/19 | 4.964 | 09/26 | 4.889 | | |
| 2022-Oct | 10/03 | 4.836 | 10/10 | 5.224 | 10/17 | 5.339 | 10/24 | 5.341 | 10/31 | 5.317 |
| 2022-Nov | 11/07 | 5.333 | 11/14 | 5.313 | 11/21 | 5.233 | 11/28 | 5.141 | | |
| 2022-Dec | 12/05 | 4.967 | 12/12 | 4.754 | 12/19 | 4.596 | 12/26 | 4.537 | | |
| 2023-Jan | 01/02 | 4.583 | 01/09 | 4.549 | 01/16 | 4.524 | 01/23 | 4.604 | 01/30 | 4.622 |
| 2023-Feb | 02/06 | 4.539 | 02/13 | 4.444 | 02/20 | 4.376 | 02/27 | 4.294 | | |
| 2023-Mar | 03/06 | 4.282 | 03/13 | 4.247 | 03/20 | 4.185 | 03/27 | 4.128 | | |
| 2023-Apr | 04/03 | 4.105 | 04/10 | 4.098 | 04/17 | 4.116 | 04/24 | 4.077 | | |
| 2023-May | 05/01 | 4.018 | 05/08 | 3.922 | 05/15 | 3.897 | 05/22 | 3.883 | 05/29 | 3.855 |
| 2023-Jun | 06/05 | 3.797 | 06/12 | 3.794 | 06/19 | 3.815 | 06/26 | 3.801 | | |
| 2023-Jul | 07/03 | 3.767 | 07/10 | 3.806 | 07/17 | 3.806 | 07/24 | 3.905 | 07/31 | 4.127 |
| 2023-Aug | 08/07 | 4.239 | 08/14 | 4.378 | 08/21 | 4.389 | 08/28 | 4.475 | | |
| 2023-Sep | 09/04 | 4.492 | 09/11 | 4.540 | 09/18 | 4.633 | 09/25 | 4.586 | | |
| 2023-Oct | 10/02 | 4.593 | 10/09 | 4.498 | 10/16 | 4.444 | 10/23 | 4.545 | 10/30 | 4.454 |
| 2023-Nov | 11/06 | 4.366 | 11/13 | 4.294 | 11/20 | 4.209 | 11/27 | 4.146 | | |
| 2023-Dec | 12/04 | 4.092 | 12/11 | 3.987 | 12/18 | 3.894 | 12/25 | 3.914 | | |
| 2024-Jan | 01/01 | 3.876 | 01/08 | 3.828 | 01/15 | 3.863 | 01/22 | 3.838 | 01/29 | 3.867 |
| 2024-Feb | 02/05 | 3.899 | 02/12 | 4.109 | 02/19 | 4.109 | 02/26 | 4.058 | | |
| 2024-Mar | 03/04 | 4.022 | 03/11 | 4.004 | 03/18 | 4.028 | 03/25 | 4.034 | | |
| 2024-Apr | 04/01 | 3.996 | 04/08 | 4.061 | 04/15 | 4.015 | 04/22 | 3.992 | 04/29 | 3.947 |
| 2024-May | 05/06 | 3.894 | 05/13 | 3.848 | 05/20 | 3.789 | 05/27 | 3.758 | | |
| 2024-Jun | 06/03 | 3.726 | | | | | | | | |

- = No Data Reported; -- = Not Applicable; NA = Not Available; W = Withheld to avoid disclosure of individual company data.

Release Date: 6/3/2024
Next Release Date: 6/10/2024

**Referring Pages:**

- Retail Prices for Diesel (On-Highway) - All Types
- U.S. Gasoline and Diesel Retail Prices

eia + Sources & Uses + Topics + Geography

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2021-Nov | 11/01 | 3.727 | 11/08 | 3.730 | 11/15 | 3.734 | 11/22 | 3.724 | 11/29 | 3.720 |
| 2021-Dec | 12/06 | 3.674 | 12/13 | 3.649 | 12/20 | 3.626 | 12/27 | 3.615 | | |
| 2022-Jan | 01/03 | 3.613 | 01/10 | 3.657 | 01/17 | 3.725 | 01/24 | 3.780 | 01/31 | 3.846 |
| 2022-Feb | 02/07 | 3.951 | 02/14 | 4.019 | 02/21 | 4.055 | 02/28 | 4.104 | | |
| 2022-Mar | 03/07 | 4.849 | 03/14 | 5.250 | 03/21 | 5.134 | 03/28 | 5.185 | | |
| 2022-Apr | 04/04 | 5.144 | 04/11 | 5.073 | 04/18 | 5.101 | 04/25 | 5.160 | | |
| 2022-May | 05/02 | 5.509 | 05/09 | 5.623 | 05/16 | 5.613 | 05/23 | 5.571 | 05/30 | 5.539 |
| 2022-Jun | 06/06 | 5.703 | 06/13 | 5.718 | 06/20 | 5.810 | 06/27 | 5.783 | | |
| 2022-Jul | 07/04 | 5.675 | 07/11 | 5.568 | 07/18 | 5.432 | 07/25 | 5.268 | | |
| 2022-Aug | 08/01 | 5.138 | 08/08 | 4.993 | 08/15 | 4.911 | 08/22 | 4.909 | 08/29 | 5.115 |
| 2022-Sep | 09/05 | 5.084 | 09/12 | 5.033 | 09/19 | 4.964 | 09/26 | 4.889 | | |
| 2022-Oct | 10/03 | 4.836 | 10/10 | 5.224 | 10/17 | 5.339 | 10/24 | 5.341 | 10/31 | 5.317 |
| 2022-Nov | 11/07 | 5.333 | 11/14 | 5.313 | 11/21 | 5.233 | 11/28 | 5.141 | | |
| 2022-Dec | 12/05 | 4.967 | 12/12 | 4.754 | 12/19 | 4.596 | 12/26 | 4.537 | | |
| 2023-Jan | 01/02 | 4.583 | 01/09 | 4.549 | 01/16 | 4.524 | 01/23 | 4.604 | 01/30 | 4.622 |
| 2023-Feb | 02/06 | 4.539 | 02/13 | 4.444 | 02/20 | 4.376 | 02/27 | 4.294 | | |
| 2023-Mar | 03/06 | 4.282 | 03/13 | 4.247 | 03/20 | 4.185 | 03/27 | 4.128 | | |
| 2023-Apr | 04/03 | 4.105 | 04/10 | 4.098 | 04/17 | 4.116 | 04/24 | 4.077 | | |
| 2023-May | 05/01 | 4.018 | 05/08 | 3.922 | 05/15 | 3.897 | 05/22 | 3.883 | 05/29 | 3.855 |
| 2023-Jun | 06/05 | 3.797 | 06/12 | 3.794 | 06/19 | 3.815 | 06/26 | 3.801 | | |
| 2023-Jul | 07/03 | 3.767 | 07/10 | 3.806 | 07/17 | 3.806 | 07/24 | 3.905 | 07/31 | 4.127 |
| 2023-Aug | 08/07 | 4.239 | 08/14 | 4.378 | 08/21 | 4.389 | 08/28 | 4.475 | | |
| 2023-Sep | 09/04 | 4.492 | 09/11 | 4.540 | 09/18 | 4.633 | 09/25 | 4.586 | | |
| 2023-Oct | 10/02 | 4.593 | 10/09 | 4.498 | 10/16 | 4.444 | 10/23 | 4.545 | 10/30 | 4.454 |
| 2023-Nov | 11/06 | 4.366 | 11/13 | 4.294 | 11/20 | 4.209 | 11/27 | 4.146 | | |
| 2023-Dec | 12/04 | 4.092 | 12/11 | 3.987 | 12/18 | 3.894 | 12/25 | 3.914 | | |
| 2024-Jan | 01/01 | 3.876 | 01/08 | 3.828 | 01/15 | 3.863 | 01/22 | 3.838 | 01/29 | 3.867 |
| 2024-Feb | 02/05 | 3.899 | 02/12 | 4.109 | 02/19 | 4.109 | 02/26 | 4.058 | | |
| 2024-Mar | 03/04 | 4.022 | 03/11 | 4.004 | 03/18 | 4.028 | 03/25 | 4.034 | | |
| 2024-Apr | 04/01 | 3.996 | 04/08 | 4.061 | 04/15 | 4.015 | 04/22 | 3.992 | 04/29 | 3.947 |
| 2024-May | 05/06 | 3.894 | 05/13 | 3.848 | 05/20 | 3.789 | 05/27 | 3.758 | | |
| 2024-Jun | 06/03 | 3.726 | | | | | | | | |

- = No Data Reported; -- = Not Applicable; NA = Not Available; W = Withheld to avoid disclosure of individual company data.

Release Date: 6/3/2024
Next Release Date: 6/10/2024

**Referring Pages:**

- Retail Prices for Diesel (On-Highway) - All Types
- U.S. Gasoline and Diesel Retail Prices



Document title: Weekly U.S. No 2 Diesel Retail Prices (Dollars per Gallon)
Capture URL: https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W
Capture timestamp (UTC): Fri, 07 Jun 2024 22:49:06 GMT

Page Vault

| | |
|---|---|
| Document title: | Weekly U.S. No 2 Diesel Retail Prices (Dollars per Gallon) |
| Capture URL: | https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W |
| Page loaded at (UTC): | Fri, 07 Jun 2024 22:49:09 GMT |
| Capture timestamp (UTC): | Fri, 07 Jun 2024 22:49:11 GMT |
| Capture tool: | 2.58.2 |
| Collection server IP: | 54.174.78.137 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 10 |
| Capture ID: | cQZCh3d1KerTqZKHtAv1q1 |
| User: | automation@page-vaul |

PDF REFERENCE #: 22pirhfbBpo9nnzjfthXKB

Independent Statistics and Analysis
**U.S. Energy Information Administration**

+ Sources & Uses + Topics + Geography

# PETROLEUM & OTHER LIQUIDS

OVERVIEW | DATA | ANALYSIS & PROJECTIONS GLOSSARY FAQS

View History: Weekly Monthly Annual Download Data (XLS File)

## Weekly U.S. No 2 Diesel Retail Prices

DOWNLOAD




Chart Tools
no analysis applied

This series is available through the EIA open data API and can be downloaded to Excel or embedded as an interactive chart or map on your website.

### Weekly U.S. No 2 Diesel Retail Prices (Dollars per Gallon)

| | Week 1 | | Week 2 | | Week 3 | | Week 4 | | Week 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year-Month | End Date | Value | End Date | Value | End Date | Value | End Date | Value | End Date | Value |
| 1994-Mar | | | | | 03/21 | 1.106 | 03/28 | 1.107 | | |
| 1994-Apr | 04/04 | 1.109 | 04/11 | 1.108 | 04/18 | 1.105 | 04/25 | 1.106 | | |
| 1994-May | 05/02 | 1.104 | 05/09 | 1.101 | 05/16 | 1.099 | 05/23 | 1.099 | 05/30 | 1.098 |
| 1994-Jun | 06/06 | 1.101 | 06/13 | 1.098 | 06/20 | 1.103 | 06/27 | 1.108 | | |
| 1994-Jul | 07/04 | 1.109 | 07/11 | 1.110 | 07/18 | 1.111 | 07/25 | 1.111 | | |
| 1994-Aug | 08/01 | 1.116 | 08/08 | 1.127 | 08/15 | 1.127 | 08/22 | 1.124 | 08/29 | 1.122 |
| 1994-Sep | 09/05 | 1.126 | 09/12 | 1.128 | 09/19 | 1.126 | 09/26 | 1.120 | | |
| 1994-Oct | 10/03 | 1.118 | 10/10 | 1.117 | 10/17 | 1.119 | 10/24 | 1.122 | 10/31 | 1.133 |
| 1994-Nov | 11/07 | 1.133 | 11/14 | 1.135 | 11/21 | 1.130 | 11/28 | 1.126 | | |
| 1994-Dec | 12/05 | 1.123 | 12/12 | 1.114 | 12/19 | 1.109 | 12/26 | 1.106 | | |
| 1995-Jan | 01/02 | 1.104 | 01/09 | 1.102 | 01/16 | 1.100 | 01/23 | 1.095 | 01/30 | 1.090 |
| 1995-Feb | 02/06 | 1.086 | 02/13 | 1.088 | 02/20 | 1.088 | 02/27 | 1.089 | | |
| 1995-Mar | 03/06 | 1.089 | 03/13 | 1.088 | 03/20 | 1.085 | 03/27 | 1.088 | | |
| 1995-Apr | 04/03 | 1.094 | 04/10 | 1.101 | 04/17 | 1.106 | 04/24 | 1.115 | | |
| 1995-May | 05/01 | 1.119 | 05/08 | 1.126 | 05/15 | 1.126 | 05/22 | 1.124 | 05/29 | 1.130 |
| 1995-Jun | 06/05 | 1.124 | 06/12 | 1.122 | 06/19 | 1.117 | 06/26 | 1.112 | | |
| 1995-Jul | 07/03 | 1.106 | 07/10 | 1.103 | 07/17 | 1.099 | 07/24 | 1.098 | 07/31 | 1.093 |
| 1995-Aug | 08/07 | 1.099 | 08/14 | 1.106 | 08/21 | 1.106 | 08/28 | 1.109 | | |
| 1995-Sep | 09/04 | 1.115 | 09/11 | 1.119 | 09/18 | 1.122 | 09/25 | 1.121 | | |
| 1995-Oct | 10/02 | 1.117 | 10/09 | 1.117 | 10/16 | 1.117 | 10/23 | 1.114 | 10/30 | 1.110 |
| 1995-Nov | 11/06 | 1.118 | 11/13 | 1.118 | 11/20 | 1.119 | 11/27 | 1.124 | | |

Document title: Weekly U.S. No 2 Diesel Retail Prices (Dollars per Gallon)
Capture URL: https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W
Capture timestamp (UTC): Fri, 07 Jun 2024 22:49:11 GMT



DA11274

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1995-Aug | 08/07 | 1.099 | 08/14 | 1.106 | 08/21 | 1.106 | 08/28 | 1.109 | | |
| 1995-Sep | 09/04 | 1.115 | 09/11 | 1.119 | 09/18 | 1.122 | 09/25 | 1.121 | | |
| 1995-Oct | 10/02 | 1.117 | 10/09 | 1.117 | 10/16 | 1.117 | 10/23 | 1.114 | 10/30 | 1.110 |
| 1995-Nov | 11/06 | 1.118 | 11/13 | 1.118 | 11/20 | 1.119 | 11/27 | 1.124 | | |
| 1995-Dec | 12/04 | 1.123 | 12/11 | 1.124 | 12/18 | 1.130 | 12/25 | 1.141 | | |
| 1996-Jan | 01/01 | 1.148 | 01/08 | 1.146 | 01/15 | 1.152 | 01/22 | 1.144 | 01/29 | 1.136 |
| 1996-Feb | 02/05 | 1.130 | 02/12 | 1.134 | 02/19 | 1.151 | 02/26 | 1.164 | | |
| 1996-Mar | 03/04 | 1.175 | 03/11 | 1.173 | 03/18 | 1.172 | 03/25 | 1.210 | | |
| 1996-Apr | 04/01 | 1.222 | 04/08 | 1.249 | 04/15 | 1.305 | 04/22 | 1.304 | 04/29 | 1.285 |
| 1996-May | 05/06 | 1.292 | 05/13 | 1.285 | 05/20 | 1.274 | 05/27 | 1.254 | | |
| 1996-Jun | 06/03 | 1.240 | 06/10 | 1.215 | 06/17 | 1.193 | 06/24 | 1.179 | | |
| 1996-Jul | 07/01 | 1.172 | 07/08 | 1.173 | 07/15 | 1.178 | 07/22 | 1.184 | 07/29 | 1.178 |
| 1996-Aug | 08/05 | 1.184 | 08/12 | 1.191 | 08/19 | 1.206 | 08/26 | 1.222 | | |
| 1996-Sep | 09/02 | 1.231 | 09/09 | 1.250 | 09/16 | 1.276 | 09/23 | 1.277 | 09/30 | 1.289 |
| 1996-Oct | 10/07 | 1.308 | 10/14 | 1.326 | 10/21 | 1.329 | 10/28 | 1.329 | | |
| 1996-Nov | 11/04 | 1.323 | 11/11 | 1.316 | 11/18 | 1.324 | 11/25 | 1.327 | | |
| 1996-Dec | 12/02 | 1.323 | 12/09 | 1.320 | 12/16 | 1.307 | 12/23 | 1.300 | 12/30 | 1.295 |
| 1997-Jan | 01/06 | 1.291 | 01/13 | 1.296 | 01/20 | 1.293 | 01/27 | 1.283 | | |
| 1997-Feb | 02/03 | 1.288 | 02/10 | 1.285 | 02/17 | 1.278 | 02/24 | 1.269 | | |
| 1997-Mar | 03/03 | 1.252 | 03/10 | 1.230 | 03/17 | 1.220 | 03/24 | 1.220 | 03/31 | 1.225 |
| 1997-Apr | 04/07 | 1.217 | 04/14 | 1.216 | 04/21 | 1.211 | 04/28 | 1.205 | | |
| 1997-May | 05/05 | 1.205 | 05/12 | 1.191 | 05/19 | 1.191 | 05/26 | 1.196 | | |
| 1997-Jun | 06/02 | 1.190 | 06/09 | 1.187 | 06/16 | 1.172 | 06/23 | 1.162 | 06/30 | 1.153 |
| 1997-Jul | 07/07 | 1.159 | 07/14 | 1.152 | 07/21 | 1.147 | 07/28 | 1.145 | | |
| 1997-Aug | 08/04 | 1.155 | 08/11 | 1.168 | 08/18 | 1.167 | 08/25 | 1.169 | | |
| 1997-Sep | 09/01 | 1.165 | 09/08 | 1.163 | 09/15 | 1.156 | 09/22 | 1.154 | 09/29 | 1.160 |
| 1997-Oct | 10/06 | 1.175 | 10/13 | 1.185 | 10/20 | 1.185 | 10/27 | 1.185 | | |
| 1997-Nov | 11/03 | 1.188 | 11/10 | 1.190 | 11/17 | 1.195 | 11/24 | 1.193 | | |
| 1997-Dec | 12/01 | 1.189 | 12/08 | 1.174 | 12/15 | 1.162 | 12/22 | 1.155 | 12/29 | 1.150 |
| 1998-Jan | 01/05 | 1.147 | 01/12 | 1.126 | 01/19 | 1.109 | 01/26 | 1.096 | | |
| 1998-Feb | 02/02 | 1.091 | 02/09 | 1.085 | 02/16 | 1.082 | 02/23 | 1.079 | | |
| 1998-Mar | 03/02 | 1.074 | 03/09 | 1.066 | 03/16 | 1.057 | 03/23 | 1.049 | 03/30 | 1.068 |
| 1998-Apr | 04/06 | 1.067 | 04/13 | 1.065 | 04/20 | 1.065 | 04/27 | 1.070 | | |
| 1998-May | 05/04 | 1.072 | 05/11 | 1.075 | 05/18 | 1.069 | 05/25 | 1.060 | | |
| 1998-Jun | 06/01 | 1.053 | 06/08 | 1.045 | 06/15 | 1.040 | 06/22 | 1.033 | 06/29 | 1.034 |
| 1998-Jul | 07/06 | 1.036 | 07/13 | 1.031 | 07/20 | 1.027 | 07/27 | 1.020 | | |
| 1998-Aug | 08/03 | 1.016 | 08/10 | 1.010 | 08/17 | 1.007 | 08/24 | 1.004 | 08/31 | 1.000 |
| 1998-Sep | 09/07 | 1.009 | 09/14 | 1.019 | 09/21 | 1.030 | 09/28 | 1.039 | | |
| 1998-Oct | 10/05 | 1.041 | 10/12 | 1.041 | 10/19 | 1.036 | 10/26 | 1.036 | | |
| 1998-Nov | 11/02 | 1.035 | 11/09 | 1.034 | 11/16 | 1.026 | 11/23 | 1.012 | 11/30 | 1.004 |
| 1998-Dec | 12/07 | 0.986 | 12/14 | 0.972 | 12/21 | 0.968 | 12/28 | 0.966 | | |
| 1999-Jan | 01/04 | 0.965 | 01/11 | 0.967 | 01/18 | 0.970 | 01/25 | 0.964 | | |
| 1999-Feb | 02/01 | 0.962 | 02/08 | 0.962 | 02/15 | 0.959 | 02/22 | 0.953 | | |
| 1999-Mar | 03/01 | 0.956 | 03/08 | 0.964 | 03/15 | 1.000 | 03/22 | 1.018 | 03/29 | 1.046 |
| 1999-Apr | 04/05 | 1.075 | 04/12 | 1.084 | 04/19 | 1.080 | 04/26 | 1.078 | | |
| 1999-May | 05/03 | 1.078 | 05/10 | 1.083 | 05/17 | 1.075 | 05/24 | 1.066 | 05/31 | 1.065 |
| 1999-Jun | 06/07 | 1.059 | 06/14 | 1.068 | 06/21 | 1.082 | 06/28 | 1.087 | | |
| 1999-Jul | 07/05 | 1.102 | 07/12 | 1.114 | 07/19 | 1.133 | 07/26 | 1.137 | | |
| 1999-Aug | 08/02 | 1.146 | 08/09 | 1.156 | 08/16 | 1.178 | 08/23 | 1.186 | 08/30 | 1.194 |
| 1999-Sep | 09/06 | 1.198 | 09/13 | 1.209 | 09/20 | 1.226 | 09/27 | 1.226 | | |
| 1999-Oct | 10/04 | 1.234 | 10/11 | 1.228 | 10/18 | 1.224 | 10/25 | 1.226 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1999-Jun | 06/07 | 1.059 | 06/14 | 1.068 | 06/21 | 1.082 | 06/28 | 1.087 | | |
| 1999-Jul | 07/05 | 1.102 | 07/12 | 1.114 | 07/19 | 1.133 | 07/26 | 1.137 | | |
| 1999-Aug | 08/02 | 1.146 | 08/09 | 1.156 | 08/16 | 1.178 | 08/23 | 1.186 | 08/30 | 1.194 |
| 1999-Sep | 09/06 | 1.198 | 09/13 | 1.209 | 09/20 | 1.226 | 09/27 | 1.226 | | |
| 1999-Oct | 10/04 | 1.234 | 10/11 | 1.228 | 10/18 | 1.224 | 10/25 | 1.226 | | |
| 1999-Nov | 11/01 | 1.229 | 11/08 | 1.234 | 11/15 | 1.261 | 11/22 | 1.289 | 11/29 | 1.304 |
| 1999-Dec | 12/06 | 1.294 | 12/13 | 1.288 | 12/20 | 1.287 | 12/27 | 1.298 | | |
| 2000-Jan | 01/03 | 1.309 | 01/10 | 1.307 | 01/17 | 1.307 | 01/24 | 1.418 | 01/31 | 1.439 |
| 2000-Feb | 02/07 | 1.470 | 02/14 | 1.456 | 02/21 | 1.456 | 02/28 | 1.461 | | |
| 2000-Mar | 03/06 | 1.490 | 03/13 | 1.496 | 03/20 | 1.479 | 03/27 | 1.451 | | |
| 2000-Apr | 04/03 | 1.442 | 04/10 | 1.419 | 04/17 | 1.398 | 04/24 | 1.428 | | |
| 2000-May | 05/01 | 1.418 | 05/08 | 1.402 | 05/15 | 1.415 | 05/22 | 1.432 | 05/29 | 1.431 |
| 2000-Jun | 06/05 | 1.419 | 06/12 | 1.411 | 06/19 | 1.423 | 06/26 | 1.432 | | |
| 2000-Jul | 07/03 | 1.453 | 07/10 | 1.449 | 07/17 | 1.435 | 07/24 | 1.424 | 07/31 | 1.408 |
| 2000-Aug | 08/07 | 1.410 | 08/14 | 1.447 | 08/21 | 1.471 | 08/28 | 1.536 | | |
| 2000-Sep | 09/04 | 1.609 | 09/11 | 1.629 | 09/18 | 1.653 | 09/25 | 1.657 | | |
| 2000-Oct | 10/02 | 1.625 | 10/09 | 1.614 | 10/16 | 1.670 | 10/23 | 1.648 | 10/30 | 1.629 |
| 2000-Nov | 11/06 | 1.610 | 11/13 | 1.603 | 11/20 | 1.627 | 11/27 | 1.645 | | |
| 2000-Dec | 12/04 | 1.622 | 12/11 | 1.577 | 12/18 | 1.545 | 12/25 | 1.515 | | |
| 2001-Jan | 01/01 | 1.522 | 01/08 | 1.520 | 01/15 | 1.509 | 01/22 | 1.528 | 01/29 | 1.539 |
| 2001-Feb | 02/05 | 1.520 | 02/12 | 1.518 | 02/19 | 1.480 | 02/26 | 1.451 | | |
| 2001-Mar | 03/05 | 1.420 | 03/12 | 1.406 | 03/19 | 1.392 | 03/26 | 1.379 | | |
| 2001-Apr | 04/02 | 1.391 | 04/09 | 1.397 | 04/16 | 1.437 | 04/23 | 1.443 | 04/30 | 1.442 |
| 2001-May | 05/07 | 1.470 | 05/14 | 1.491 | 05/21 | 1.494 | 05/28 | 1.529 | | |
| 2001-Jun | 06/04 | 1.514 | 06/11 | 1.486 | 06/18 | 1.480 | 06/25 | 1.447 | | |
| 2001-Jul | 07/02 | 1.407 | 07/09 | 1.392 | 07/16 | 1.380 | 07/23 | 1.348 | 07/30 | 1.347 |
| 2001-Aug | 08/06 | 1.345 | 08/13 | 1.367 | 08/20 | 1.394 | 08/27 | 1.452 | | |
| 2001-Sep | 09/03 | 1.488 | 09/10 | 1.492 | 09/17 | 1.527 | 09/24 | 1.473 | | |
| 2001-Oct | 10/01 | 1.390 | 10/08 | 1.371 | 10/15 | 1.353 | 10/22 | 1.318 | 10/29 | 1.310 |
| 2001-Nov | 11/05 | 1.291 | 11/12 | 1.269 | 11/19 | 1.252 | 11/26 | 1.223 | | |
| 2001-Dec | 12/03 | 1.194 | 12/10 | 1.173 | 12/17 | 1.143 | 12/24 | 1.154 | 12/31 | 1.169 |
| 2002-Jan | 01/07 | 1.168 | 01/14 | 1.159 | 01/21 | 1.140 | 01/28 | 1.144 | | |
| 2002-Feb | 02/04 | 1.144 | 02/11 | 1.153 | 02/18 | 1.156 | 02/25 | 1.154 | | |
| 2002-Mar | 03/04 | 1.173 | 03/11 | 1.216 | 03/18 | 1.251 | 03/25 | 1.281 | | |
| 2002-Apr | 04/01 | 1.295 | 04/08 | 1.323 | 04/15 | 1.320 | 04/22 | 1.304 | 04/29 | 1.302 |
| 2002-May | 05/06 | 1.305 | 05/13 | 1.299 | 05/20 | 1.309 | 05/27 | 1.308 | | |
| 2002-Jun | 06/03 | 1.300 | 06/10 | 1.286 | 06/17 | 1.275 | 06/24 | 1.281 | | |
| 2002-Jul | 07/01 | 1.289 | 07/08 | 1.294 | 07/15 | 1.300 | 07/22 | 1.311 | 07/29 | 1.303 |
| 2002-Aug | 08/05 | 1.304 | 08/12 | 1.303 | 08/19 | 1.333 | 08/26 | 1.370 | | |
| 2002-Sep | 09/02 | 1.388 | 09/09 | 1.396 | 09/16 | 1.414 | 09/23 | 1.417 | 09/30 | 1.438 |
| 2002-Oct | 10/07 | 1.460 | 10/14 | 1.461 | 10/21 | 1.469 | 10/28 | 1.456 | | |
| 2002-Nov | 11/04 | 1.442 | 11/11 | 1.427 | 11/18 | 1.405 | 11/25 | 1.405 | | |
| 2002-Dec | 12/02 | 1.407 | 12/09 | 1.405 | 12/16 | 1.401 | 12/23 | 1.440 | 12/30 | 1.491 |
| 2003-Jan | 01/06 | 1.501 | 01/13 | 1.478 | 01/20 | 1.480 | 01/27 | 1.492 | | |
| 2003-Feb | 02/03 | 1.542 | 02/10 | 1.662 | 02/17 | 1.704 | 02/24 | 1.709 | | |
| 2003-Mar | 03/03 | 1.753 | 03/10 | 1.771 | 03/17 | 1.752 | 03/24 | 1.662 | 03/31 | 1.602 |
| 2003-Apr | 04/07 | 1.554 | 04/14 | 1.539 | 04/21 | 1.529 | 04/28 | 1.508 | | |
| 2003-May | 05/05 | 1.484 | 05/12 | 1.444 | 05/19 | 1.443 | 05/26 | 1.434 | | |
| 2003-Jun | 06/02 | 1.423 | 06/09 | 1.422 | 06/16 | 1.432 | 06/23 | 1.423 | 06/30 | 1.420 |
| 2003-Jul | 07/07 | 1.428 | 07/14 | 1.435 | 07/21 | 1.439 | 07/28 | 1.438 | | |
| 2003-Aug | 08/04 | 1.453 | 08/11 | 1.492 | 08/18 | 1.498 | 08/25 | 1.503 | | |

eia + Sources & Uses + Topics + Geography

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2003-May | 05/05 | 1.484 | 05/12 | 1.444 | 05/19 | 1.443 | 05/26 | 1.434 | | |
| 2003-Jun | 06/02 | 1.423 | 06/09 | 1.422 | 06/16 | 1.432 | 06/23 | 1.423 | 06/30 | 1.420 |
| 2003-Jul | 07/07 | 1.428 | 07/14 | 1.435 | 07/21 | 1.439 | 07/28 | 1.438 | | |
| 2003-Aug | 08/04 | 1.453 | 08/11 | 1.492 | 08/18 | 1.498 | 08/25 | 1.503 | | |
| 2003-Sep | 09/01 | 1.501 | 09/08 | 1.488 | 09/15 | 1.471 | 09/22 | 1.444 | 09/29 | 1.429 |
| 2003-Oct | 10/06 | 1.445 | 10/13 | 1.483 | 10/20 | 1.502 | 10/27 | 1.495 | | |
| 2003-Nov | 11/03 | 1.481 | 11/10 | 1.476 | 11/17 | 1.481 | 11/24 | 1.491 | | |
| 2003-Dec | 12/01 | 1.476 | 12/08 | 1.481 | 12/15 | 1.486 | 12/22 | 1.504 | 12/29 | 1.502 |
| 2004-Jan | 01/05 | 1.503 | 01/12 | 1.551 | 01/19 | 1.559 | 01/26 | 1.591 | | |
| 2004-Feb | 02/02 | 1.581 | 02/09 | 1.568 | 02/16 | 1.584 | 02/23 | 1.595 | | |
| 2004-Mar | 03/01 | 1.619 | 03/08 | 1.628 | 03/15 | 1.617 | 03/22 | 1.641 | 03/29 | 1.642 |
| 2004-Apr | 04/05 | 1.648 | 04/12 | 1.679 | 04/19 | 1.724 | 04/26 | 1.718 | | |
| 2004-May | 05/03 | 1.717 | 05/10 | 1.745 | 05/17 | 1.763 | 05/24 | 1.761 | 05/31 | 1.746 |
| 2004-Jun | 06/07 | 1.734 | 06/14 | 1.711 | 06/21 | 1.700 | 06/28 | 1.700 | | |
| 2004-Jul | 07/05 | 1.716 | 07/12 | 1.740 | 07/19 | 1.744 | 07/26 | 1.754 | | |
| 2004-Aug | 08/02 | 1.780 | 08/09 | 1.814 | 08/16 | 1.825 | 08/23 | 1.874 | 08/30 | 1.871 |
| 2004-Sep | 09/06 | 1.869 | 09/13 | 1.874 | 09/20 | 1.912 | 09/27 | 2.012 | | |
| 2004-Oct | 10/04 | 2.053 | 10/11 | 2.092 | 10/18 | 2.180 | 10/25 | 2.212 | | |
| 2004-Nov | 11/01 | 2.206 | 11/08 | 2.163 | 11/15 | 2.132 | 11/22 | 2.116 | 11/29 | 2.116 |
| 2004-Dec | 12/06 | 2.069 | 12/13 | 1.997 | 12/20 | 1.984 | 12/27 | 1.987 | | |
| 2005-Jan | 01/03 | 1.957 | 01/10 | 1.934 | 01/17 | 1.952 | 01/24 | 1.959 | 01/31 | 1.992 |
| 2005-Feb | 02/07 | 1.983 | 02/14 | 1.986 | 02/21 | 2.020 | 02/28 | 2.118 | | |
| 2005-Mar | 03/07 | 2.168 | 03/14 | 2.194 | 03/21 | 2.244 | 03/28 | 2.249 | | |
| 2005-Apr | 04/04 | 2.303 | 04/11 | 2.316 | 04/18 | 2.259 | 04/25 | 2.289 | | |
| 2005-May | 05/02 | 2.262 | 05/09 | 2.227 | 05/16 | 2.189 | 05/23 | 2.156 | 05/30 | 2.160 |
| 2005-Jun | 06/06 | 2.234 | 06/13 | 2.276 | 06/20 | 2.313 | 06/27 | 2.336 | | |
| 2005-Jul | 07/04 | 2.348 | 07/11 | 2.408 | 07/18 | 2.392 | 07/25 | 2.342 | | |
| 2005-Aug | 08/01 | 2.348 | 08/08 | 2.407 | 08/15 | 2.567 | 08/22 | 2.588 | 08/29 | 2.590 |
| 2005-Sep | 09/05 | 2.898 | 09/12 | 2.847 | 09/19 | 2.732 | 09/26 | 2.798 | | |
| 2005-Oct | 10/03 | 3.144 | 10/10 | 3.150 | 10/17 | 3.148 | 10/24 | 3.157 | 10/31 | 2.876 |
| 2005-Nov | 11/07 | 2.698 | 11/14 | 2.602 | 11/21 | 2.513 | 11/28 | 2.479 | | |
| 2005-Dec | 12/05 | 2.425 | 12/12 | 2.436 | 12/19 | 2.462 | 12/26 | 2.448 | | |
| 2006-Jan | 01/02 | 2.442 | 01/09 | 2.485 | 01/16 | 2.449 | 01/23 | 2.472 | 01/30 | 2.489 |
| 2006-Feb | 02/06 | 2.499 | 02/13 | 2.476 | 02/20 | 2.455 | 02/27 | 2.471 | | |
| 2006-Mar | 03/06 | 2.545 | 03/13 | 2.543 | 03/20 | 2.581 | 03/27 | 2.565 | | |
| 2006-Apr | 04/03 | 2.617 | 04/10 | 2.654 | 04/17 | 2.765 | 04/24 | 2.876 | | |
| 2006-May | 05/01 | 2.896 | 05/08 | 2.897 | 05/15 | 2.920 | 05/22 | 2.888 | 05/29 | 2.882 |
| 2006-Jun | 06/05 | 2.890 | 06/12 | 2.918 | 06/19 | 2.915 | 06/26 | 2.867 | | |
| 2006-Jul | 07/03 | 2.898 | 07/10 | 2.918 | 07/17 | 2.926 | 07/24 | 2.946 | 07/31 | 2.980 |
| 2006-Aug | 08/07 | 3.055 | 08/14 | 3.065 | 08/21 | 3.033 | 08/28 | 3.027 | | |
| 2006-Sep | 09/04 | 2.967 | 09/11 | 2.857 | 09/18 | 2.713 | 09/25 | 2.595 | | |
| 2006-Oct | 10/02 | 2.546 | 10/09 | 2.506 | 10/16 | 2.503 | 10/23 | 2.524 | 10/30 | 2.517 |
| 2006-Nov | 11/06 | 2.506 | 11/13 | 2.552 | 11/20 | 2.553 | 11/27 | 2.567 | | |
| 2006-Dec | 12/04 | 2.618 | 12/11 | 2.621 | 12/18 | 2.606 | 12/25 | 2.596 | | |
| 2007-Jan | 01/01 | 2.580 | 01/08 | 2.537 | 01/15 | 2.463 | 01/22 | 2.430 | 01/29 | 2.413 |
| 2007-Feb | 02/05 | 2.435 | 02/12 | 2.476 | 02/19 | 2.491 | 02/26 | 2.551 | | |
| 2007-Mar | 03/05 | 2.626 | 03/12 | 2.685 | 03/19 | 2.681 | 03/26 | 2.676 | | |
| 2007-Apr | 04/02 | 2.790 | 04/09 | 2.840 | 04/16 | 2.877 | 04/23 | 2.851 | 04/30 | 2.811 |
| 2007-May | 05/07 | 2.792 | 05/14 | 2.773 | 05/21 | 2.803 | 05/28 | 2.817 | | |
| 2007-Jun | 06/04 | 2.799 | 06/11 | 2.792 | 06/18 | 2.805 | 06/25 | 2.835 | | |
| 2007-Jul | 07/02 | 2.829 | 07/09 | 2.849 | 07/16 | 2.889 | 07/23 | 2.889 | 07/30 | 2.886 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2007-Mar | 03/05 | 2.626 | 03/12 | 2.685 | 03/19 | 2.681 | 03/26 | 2.676 | | |
| 2007-Apr | 04/02 | 2.790 | 04/09 | 2.840 | 04/16 | 2.877 | 04/23 | 2.851 | 04/30 | 2.811 |
| 2007-May | 05/07 | 2.792 | 05/14 | 2.773 | 05/21 | 2.803 | 05/28 | 2.817 | | |
| 2007-Jun | 06/04 | 2.799 | 06/11 | 2.792 | 06/18 | 2.805 | 06/25 | 2.835 | | |
| 2007-Jul | 07/02 | 2.829 | 07/09 | 2.849 | 07/16 | 2.889 | 07/23 | 2.889 | 07/30 | 2.886 |
| 2007-Aug | 08/06 | 2.898 | 08/13 | 2.847 | 08/20 | 2.868 | 08/27 | 2.863 | | |
| 2007-Sep | 09/03 | 2.893 | 09/10 | 2.924 | 09/17 | 2.964 | 09/24 | 3.032 | | |
| 2007-Oct | 10/01 | 3.048 | 10/08 | 3.035 | 10/15 | 3.039 | 10/22 | 3.094 | 10/29 | 3.157 |
| 2007-Nov | 11/05 | 3.303 | 11/12 | 3.425 | 11/19 | 3.410 | 11/26 | 3.444 | | |
| 2007-Dec | 12/03 | 3.416 | 12/10 | 3.325 | 12/17 | 3.309 | 12/24 | 3.308 | 12/31 | 3.345 |
| 2008-Jan | 01/07 | 3.376 | 01/14 | 3.326 | 01/21 | 3.270 | 01/28 | 3.259 | | |
| 2008-Feb | 02/04 | 3.280 | 02/11 | 3.280 | 02/18 | 3.396 | 02/25 | 3.552 | | |
| 2008-Mar | 03/03 | 3.658 | 03/10 | 3.819 | 03/17 | 3.974 | 03/24 | 3.989 | 03/31 | 3.964 |
| 2008-Apr | 04/07 | 3.955 | 04/14 | 4.059 | 04/21 | 4.143 | 04/28 | 4.177 | | |
| 2008-May | 05/05 | 4.149 | 05/12 | 4.331 | 05/19 | 4.497 | 05/26 | 4.723 | | |
| 2008-Jun | 06/02 | 4.707 | 06/09 | 4.692 | 06/16 | 4.692 | 06/23 | 4.648 | 06/30 | 4.645 |
| 2008-Jul | 07/07 | 4.727 | 07/14 | 4.764 | 07/21 | 4.718 | 07/28 | 4.603 | | |
| 2008-Aug | 08/04 | 4.502 | 08/11 | 4.353 | 08/18 | 4.207 | 08/25 | 4.145 | | |
| 2008-Sep | 09/01 | 4.121 | 09/08 | 4.059 | 09/15 | 4.023 | 09/22 | 3.958 | 09/29 | 3.959 |
| 2008-Oct | 10/06 | 3.875 | 10/13 | 3.659 | 10/20 | 3.482 | 10/27 | 3.288 | | |
| 2008-Nov | 11/03 | 3.088 | 11/10 | 2.944 | 11/17 | 2.809 | 11/24 | 2.664 | | |
| 2008-Dec | 12/01 | 2.615 | 12/08 | 2.515 | 12/15 | 2.422 | 12/22 | 2.366 | 12/29 | 2.327 |
| 2009-Jan | 01/05 | 2.291 | 01/12 | 2.314 | 01/19 | 2.296 | 01/26 | 2.268 | | |
| 2009-Feb | 02/02 | 2.246 | 02/09 | 2.219 | 02/16 | 2.186 | 02/23 | 2.130 | | |
| 2009-Mar | 03/02 | 2.087 | 03/09 | 2.045 | 03/16 | 2.017 | 03/23 | 2.090 | 03/30 | 2.221 |
| 2009-Apr | 04/06 | 2.228 | 04/13 | 2.229 | 04/20 | 2.221 | 04/27 | 2.201 | | |
| 2009-May | 05/04 | 2.185 | 05/11 | 2.216 | 05/18 | 2.231 | 05/25 | 2.274 | | |
| 2009-Jun | 06/01 | 2.352 | 06/08 | 2.498 | 06/15 | 2.572 | 06/22 | 2.616 | 06/29 | 2.608 |
| 2009-Jul | 07/06 | 2.594 | 07/13 | 2.542 | 07/20 | 2.496 | 07/27 | 2.528 | | |
| 2009-Aug | 08/03 | 2.550 | 08/10 | 2.625 | 08/17 | 2.652 | 08/24 | 2.668 | 08/31 | 2.674 |
| 2009-Sep | 09/07 | 2.647 | 09/14 | 2.634 | 09/21 | 2.622 | 09/28 | 2.601 | | |
| 2009-Oct | 10/05 | 2.582 | 10/12 | 2.600 | 10/19 | 2.705 | 10/26 | 2.801 | | |
| 2009-Nov | 11/02 | 2.808 | 11/09 | 2.801 | 11/16 | 2.790 | 11/23 | 2.787 | 11/30 | 2.775 |
| 2009-Dec | 12/07 | 2.772 | 12/14 | 2.748 | 12/21 | 2.726 | 12/28 | 2.732 | | |
| 2010-Jan | 01/04 | 2.797 | 01/11 | 2.879 | 01/18 | 2.870 | 01/25 | 2.833 | | |
| 2010-Feb | 02/01 | 2.781 | 02/08 | 2.769 | 02/15 | 2.756 | 02/22 | 2.832 | | |
| 2010-Mar | 03/01 | 2.861 | 03/08 | 2.904 | 03/15 | 2.924 | 03/22 | 2.946 | 03/29 | 2.939 |
| 2010-Apr | 04/05 | 3.015 | 04/12 | 3.069 | 04/19 | 3.074 | 04/26 | 3.078 | | |
| 2010-May | 05/03 | 3.122 | 05/10 | 3.127 | 05/17 | 3.094 | 05/24 | 3.021 | 05/31 | 2.980 |
| 2010-Jun | 06/07 | 2.946 | 06/14 | 2.928 | 06/21 | 2.961 | 06/28 | 2.956 | | |
| 2010-Jul | 07/05 | 2.924 | 07/12 | 2.903 | 07/19 | 2.899 | 07/26 | 2.919 | | |
| 2010-Aug | 08/02 | 2.928 | 08/09 | 2.991 | 08/16 | 2.979 | 08/23 | 2.957 | 08/30 | 2.938 |
| 2010-Sep | 09/06 | 2.931 | 09/13 | 2.943 | 09/20 | 2.960 | 09/27 | 2.951 | | |
| 2010-Oct | 10/04 | 3.000 | 10/11 | 3.066 | 10/18 | 3.073 | 10/25 | 3.067 | | |
| 2010-Nov | 11/01 | 3.067 | 11/08 | 3.116 | 11/15 | 3.184 | 11/22 | 3.171 | 11/29 | 3.162 |
| 2010-Dec | 12/06 | 3.197 | 12/13 | 3.231 | 12/20 | 3.248 | 12/27 | 3.294 | | |
| 2011-Jan | 01/03 | 3.331 | 01/10 | 3.333 | 01/17 | 3.407 | 01/24 | 3.430 | 01/31 | 3.438 |
| 2011-Feb | 02/07 | 3.513 | 02/14 | 3.534 | 02/21 | 3.573 | 02/28 | 3.716 | | |
| 2011-Mar | 03/07 | 3.871 | 03/14 | 3.908 | 03/21 | 3.907 | 03/28 | 3.932 | | |
| 2011-Apr | 04/04 | 3.976 | 04/11 | 4.078 | 04/18 | 4.105 | 04/25 | 4.098 | | |
| 2011-May | 05/02 | 4.124 | 05/09 | 4.104 | 05/16 | 4.061 | 05/23 | 3.997 | 05/30 | 3.948 |

eia + Sources & Uses + Topics + Geography

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 2011-Feb | 02/07 | 3.513 | 02/14 | 3.534 | 02/21 | 3.573 | 02/28 | 3.716 | | |
| 2011-Mar | 03/07 | 3.871 | 03/14 | 3.908 | 03/21 | 3.907 | 03/28 | 3.932 | | |
| 2011-Apr | 04/04 | 3.976 | 04/11 | 4.078 | 04/18 | 4.105 | 04/25 | 4.098 | | |
| 2011-May | 05/02 | 4.124 | 05/09 | 4.104 | 05/16 | 4.061 | 05/23 | 3.997 | 05/30 | 3.948 |
| 2011-Jun | 06/06 | 3.940 | 06/13 | 3.954 | 06/20 | 3.950 | 06/27 | 3.888 | | |
| 2011-Jul | 07/04 | 3.850 | 07/11 | 3.899 | 07/18 | 3.923 | 07/25 | 3.949 | | |
| 2011-Aug | 08/01 | 3.937 | 08/08 | 3.897 | 08/15 | 3.835 | 08/22 | 3.810 | 08/29 | 3.820 |
| 2011-Sep | 09/05 | 3.868 | 09/12 | 3.862 | 09/19 | 3.833 | 09/26 | 3.786 | | |
| 2011-Oct | 10/03 | 3.749 | 10/10 | 3.721 | 10/17 | 3.801 | 10/24 | 3.825 | 10/31 | 3.892 |
| 2011-Nov | 11/07 | 3.887 | 11/14 | 3.987 | 11/21 | 4.010 | 11/28 | 3.964 | | |
| 2011-Dec | 12/05 | 3.931 | 12/12 | 3.894 | 12/19 | 3.828 | 12/26 | 3.791 | | |
| 2012-Jan | 01/02 | 3.783 | 01/09 | 3.828 | 01/16 | 3.854 | 01/23 | 3.848 | 01/30 | 3.850 |
| 2012-Feb | 02/06 | 3.856 | 02/13 | 3.943 | 02/20 | 3.960 | 02/27 | 4.051 | | |
| 2012-Mar | 03/05 | 4.094 | 03/12 | 4.123 | 03/19 | 4.142 | 03/26 | 4.147 | | |
| 2012-Apr | 04/02 | 4.142 | 04/09 | 4.148 | 04/16 | 4.127 | 04/23 | 4.085 | 04/30 | 4.073 |
| 2012-May | 05/07 | 4.057 | 05/14 | 4.004 | 05/21 | 3.956 | 05/28 | 3.897 | | |
| 2012-Jun | 06/04 | 3.846 | 06/11 | 3.781 | 06/18 | 3.729 | 06/25 | 3.678 | | |
| 2012-Jul | 07/02 | 3.648 | 07/09 | 3.683 | 07/16 | 3.695 | 07/23 | 3.783 | 07/30 | 3.796 |
| 2012-Aug | 08/06 | 3.850 | 08/13 | 3.965 | 08/20 | 4.026 | 08/27 | 4.089 | | |
| 2012-Sep | 09/03 | 4.127 | 09/10 | 4.132 | 09/17 | 4.135 | 09/24 | 4.086 | | |
| 2012-Oct | 10/01 | 4.079 | 10/08 | 4.094 | 10/15 | 4.150 | 10/22 | 4.116 | 10/29 | 4.030 |
| 2012-Nov | 11/05 | 4.010 | 11/12 | 3.980 | 11/19 | 3.976 | 11/26 | 4.034 | | |
| 2012-Dec | 12/03 | 4.027 | 12/10 | 3.991 | 12/17 | 3.945 | 12/24 | 3.923 | 12/31 | 3.918 |
| 2013-Jan | 01/07 | 3.911 | 01/14 | 3.894 | 01/21 | 3.902 | 01/28 | 3.927 | | |
| 2013-Feb | 02/04 | 4.022 | 02/11 | 4.104 | 02/18 | 4.157 | 02/25 | 4.159 | | |
| 2013-Mar | 03/04 | 4.130 | 03/11 | 4.088 | 03/18 | 4.047 | 03/25 | 4.006 | | |
| 2013-Apr | 04/01 | 3.993 | 04/08 | 3.977 | 04/15 | 3.942 | 04/22 | 3.887 | 04/29 | 3.851 |
| 2013-May | 05/06 | 3.845 | 05/13 | 3.866 | 05/20 | 3.890 | 05/27 | 3.880 | | |
| 2013-Jun | 06/03 | 3.869 | 06/10 | 3.849 | 06/17 | 3.841 | 06/24 | 3.838 | | |
| 2013-Jul | 07/01 | 3.817 | 07/08 | 3.828 | 07/15 | 3.867 | 07/22 | 3.903 | 07/29 | 3.915 |
| 2013-Aug | 08/05 | 3.909 | 08/12 | 3.896 | 08/19 | 3.900 | 08/26 | 3.913 | | |
| 2013-Sep | 09/02 | 3.981 | 09/09 | 3.981 | 09/16 | 3.974 | 09/23 | 3.949 | 09/30 | 3.919 |
| 2013-Oct | 10/07 | 3.897 | 10/14 | 3.886 | 10/21 | 3.886 | 10/28 | 3.870 | | |
| 2013-Nov | 11/04 | 3.857 | 11/11 | 3.832 | 11/18 | 3.822 | 11/25 | 3.844 | | |
| 2013-Dec | 12/02 | 3.883 | 12/09 | 3.879 | 12/16 | 3.871 | 12/23 | 3.873 | 12/30 | 3.903 |
| 2014-Jan | 01/06 | 3.910 | 01/13 | 3.886 | 01/20 | 3.873 | 01/27 | 3.904 | | |
| 2014-Feb | 02/03 | 3.951 | 02/10 | 3.977 | 02/17 | 3.989 | 02/24 | 4.017 | | |
| 2014-Mar | 03/03 | 4.016 | 03/10 | 4.021 | 03/17 | 4.003 | 03/24 | 3.988 | 03/31 | 3.975 |
| 2014-Apr | 04/07 | 3.959 | 04/14 | 3.952 | 04/21 | 3.971 | 04/28 | 3.975 | | |
| 2014-May | 05/05 | 3.964 | 05/12 | 3.948 | 05/19 | 3.934 | 05/26 | 3.925 | | |
| 2014-Jun | 06/02 | 3.918 | 06/09 | 3.892 | 06/16 | 3.882 | 06/23 | 3.919 | 06/30 | 3.920 |
| 2014-Jul | 07/07 | 3.913 | 07/14 | 3.894 | 07/21 | 3.869 | 07/28 | 3.858 | | |
| 2014-Aug | 08/04 | 3.853 | 08/11 | 3.843 | 08/18 | 3.835 | 08/25 | 3.821 | | |
| 2014-Sep | 09/01 | 3.814 | 09/08 | 3.814 | 09/15 | 3.801 | 09/22 | 3.778 | 09/29 | 3.755 |
| 2014-Oct | 10/06 | 3.733 | 10/13 | 3.698 | 10/20 | 3.656 | 10/27 | 3.635 | | |
| 2014-Nov | 11/03 | 3.623 | 11/10 | 3.677 | 11/17 | 3.661 | 11/24 | 3.628 | | |
| 2014-Dec | 12/01 | 3.605 | 12/08 | 3.535 | 12/15 | 3.419 | 12/22 | 3.281 | 12/29 | 3.213 |
| 2015-Jan | 01/05 | 3.137 | 01/12 | 3.053 | 01/19 | 2.933 | 01/26 | 2.866 | | |
| 2015-Feb | 02/02 | 2.831 | 02/09 | 2.835 | 02/16 | 2.865 | 02/23 | 2.900 | | |
| 2015-Mar | 03/02 | 2.936 | 03/09 | 2.944 | 03/16 | 2.917 | 03/23 | 2.864 | 03/30 | 2.824 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2014-Dec | 12/01 | 3.605 | 12/08 | 3.535 | 12/15 | 3.419 | 12/22 | 3.281 | 12/29 | 3.213 |
| 2015-Jan | 01/05 | 3.137 | 01/12 | 3.053 | 01/19 | 2.933 | 01/26 | 2.866 | | |
| 2015-Feb | 02/02 | 2.831 | 02/09 | 2.835 | 02/16 | 2.865 | 02/23 | 2.900 | | |
| 2015-Mar | 03/02 | 2.936 | 03/09 | 2.944 | 03/16 | 2.917 | 03/23 | 2.864 | 03/30 | 2.824 |
| 2015-Apr | 04/06 | 2.784 | 04/13 | 2.754 | 04/20 | 2.780 | 04/27 | 2.811 | | |
| 2015-May | 05/04 | 2.854 | 05/11 | 2.878 | 05/18 | 2.904 | 05/25 | 2.914 | | |
| 2015-Jun | 06/01 | 2.909 | 06/08 | 2.884 | 06/15 | 2.870 | 06/22 | 2.859 | 06/29 | 2.843 |
| 2015-Jul | 07/06 | 2.832 | 07/13 | 2.814 | 07/20 | 2.782 | 07/27 | 2.723 | | |
| 2015-Aug | 08/03 | 2.668 | 08/10 | 2.617 | 08/17 | 2.615 | 08/24 | 2.561 | 08/31 | 2.514 |
| 2015-Sep | 09/07 | 2.534 | 09/14 | 2.517 | 09/21 | 2.493 | 09/28 | 2.476 | | |
| 2015-Oct | 10/05 | 2.492 | 10/12 | 2.556 | 10/19 | 2.531 | 10/26 | 2.498 | | |
| 2015-Nov | 11/02 | 2.485 | 11/09 | 2.502 | 11/16 | 2.482 | 11/23 | 2.445 | 11/30 | 2.421 |
| 2015-Dec | 12/07 | 2.379 | 12/14 | 2.338 | 12/21 | 2.284 | 12/28 | 2.237 | | |
| 2016-Jan | 01/04 | 2.211 | 01/11 | 2.177 | 01/18 | 2.112 | 01/25 | 2.071 | | |
| 2016-Feb | 02/01 | 2.031 | 02/08 | 2.008 | 02/15 | 1.980 | 02/22 | 1.983 | 02/29 | 1.989 |
| 2016-Mar | 03/07 | 2.021 | 03/14 | 2.099 | 03/21 | 2.119 | 03/28 | 2.121 | | |
| 2016-Apr | 04/04 | 2.115 | 04/11 | 2.128 | 04/18 | 2.165 | 04/25 | 2.198 | | |
| 2016-May | 05/02 | 2.266 | 05/09 | 2.271 | 05/16 | 2.297 | 05/23 | 2.357 | 05/30 | 2.382 |
| 2016-Jun | 06/06 | 2.407 | 06/13 | 2.431 | 06/20 | 2.426 | 06/27 | 2.426 | | |
| 2016-Jul | 07/04 | 2.423 | 07/11 | 2.414 | 07/18 | 2.402 | 07/25 | 2.379 | | |
| 2016-Aug | 08/01 | 2.348 | 08/08 | 2.316 | 08/15 | 2.310 | 08/22 | 2.370 | 08/29 | 2.409 |
| 2016-Sep | 09/05 | 2.407 | 09/12 | 2.399 | 09/19 | 2.389 | 09/26 | 2.382 | | |
| 2016-Oct | 10/03 | 2.389 | 10/10 | 2.445 | 10/17 | 2.481 | 10/24 | 2.478 | 10/31 | 2.479 |
| 2016-Nov | 11/07 | 2.470 | 11/14 | 2.443 | 11/21 | 2.421 | 11/28 | 2.420 | | |
| 2016-Dec | 12/05 | 2.480 | 12/12 | 2.493 | 12/19 | 2.527 | 12/26 | 2.540 | | |
| 2017-Jan | 01/02 | 2.586 | 01/09 | 2.597 | 01/16 | 2.585 | 01/23 | 2.569 | 01/30 | 2.562 |
| 2017-Feb | 02/06 | 2.558 | 02/13 | 2.565 | 02/20 | 2.572 | 02/27 | 2.577 | | |
| 2017-Mar | 03/06 | 2.579 | 03/13 | 2.564 | 03/20 | 2.539 | 03/27 | 2.532 | | |
| 2017-Apr | 04/03 | 2.556 | 04/10 | 2.582 | 04/17 | 2.597 | 04/24 | 2.595 | | |
| 2017-May | 05/01 | 2.583 | 05/08 | 2.565 | 05/15 | 2.544 | 05/22 | 2.539 | 05/29 | 2.571 |
| 2017-Jun | 06/05 | 2.564 | 06/12 | 2.524 | 06/19 | 2.489 | 06/26 | 2.465 | | |
| 2017-Jul | 07/03 | 2.472 | 07/10 | 2.481 | 07/17 | 2.491 | 07/24 | 2.507 | 07/31 | 2.531 |
| 2017-Aug | 08/07 | 2.581 | 08/14 | 2.598 | 08/21 | 2.596 | 08/28 | 2.605 | | |
| 2017-Sep | 09/04 | 2.758 | 09/11 | 2.802 | 09/18 | 2.791 | 09/25 | 2.788 | | |
| 2017-Oct | 10/02 | 2.792 | 10/09 | 2.776 | 10/16 | 2.787 | 10/23 | 2.797 | 10/30 | 2.819 |
| 2017-Nov | 11/06 | 2.882 | 11/13 | 2.915 | 11/20 | 2.912 | 11/27 | 2.926 | | |
| 2017-Dec | 12/04 | 2.922 | 12/11 | 2.910 | 12/18 | 2.901 | 12/25 | 2.903 | | |
| 2018-Jan | 01/01 | 2.973 | 01/08 | 2.996 | 01/15 | 3.028 | 01/22 | 3.025 | 01/29 | 3.070 |
| 2018-Feb | 02/05 | 3.086 | 02/12 | 3.063 | 02/19 | 3.027 | 02/26 | 3.007 | | |
| 2018-Mar | 03/05 | 2.992 | 03/12 | 2.976 | 03/19 | 2.972 | 03/26 | 3.010 | | |
| 2018-Apr | 04/02 | 3.042 | 04/09 | 3.043 | 04/16 | 3.104 | 04/23 | 3.133 | 04/30 | 3.157 |
| 2018-May | 05/07 | 3.171 | 05/14 | 3.239 | 05/21 | 3.277 | 05/28 | 3.288 | | |
| 2018-Jun | 06/04 | 3.285 | 06/11 | 3.266 | 06/18 | 3.244 | 06/25 | 3.216 | | |
| 2018-Jul | 07/02 | 3.236 | 07/09 | 3.243 | 07/16 | 3.239 | 07/23 | 3.220 | 07/30 | 3.225 |
| 2018-Aug | 08/06 | 3.223 | 08/13 | 3.217 | 08/20 | 3.207 | 08/27 | 3.226 | | |
| 2018-Sep | 09/03 | 3.252 | 09/10 | 3.258 | 09/17 | 3.268 | 09/24 | 3.271 | | |
| 2018-Oct | 10/01 | 3.313 | 10/08 | 3.385 | 10/15 | 3.394 | 10/22 | 3.380 | 10/29 | 3.355 |
| 2018-Nov | 11/05 | 3.338 | 11/12 | 3.317 | 11/19 | 3.282 | 11/26 | 3.261 | | |
| 2018-Dec | 12/03 | 3.207 | 12/10 | 3.161 | 12/17 | 3.121 | 12/24 | 3.077 | 12/31 | 3.048 |
| 2019-Jan | 01/07 | 3.013 | 01/14 | 2.976 | 01/21 | 2.965 | 01/28 | 2.965 | | |
| 2019-Feb | 02/04 | 2.966 | 02/11 | 2.966 | 02/18 | 3.006 | 02/25 | 3.048 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2018-Oct | 10/01 | 3.313 | 10/08 | 3.385 | 10/15 | 3.394 | 10/22 | 3.380 | 10/29 | 3.355 |
| 2018-Nov | 11/05 | 3.338 | 11/12 | 3.317 | 11/19 | 3.282 | 11/26 | 3.261 | | |
| 2018-Dec | 12/03 | 3.207 | 12/10 | 3.161 | 12/17 | 3.121 | 12/24 | 3.077 | 12/31 | 3.048 |
| 2019-Jan | 01/07 | 3.013 | 01/14 | 2.976 | 01/21 | 2.965 | 01/28 | 2.965 | | |
| 2019-Feb | 02/04 | 2.966 | 02/11 | 2.966 | 02/18 | 3.006 | 02/25 | 3.048 | | |
| 2019-Mar | 03/04 | 3.076 | 03/11 | 3.079 | 03/18 | 3.070 | 03/25 | 3.080 | | |
| 2019-Apr | 04/01 | 3.078 | 04/08 | 3.093 | 04/15 | 3.118 | 04/22 | 3.147 | 04/29 | 3.169 |
| 2019-May | 05/06 | 3.171 | 05/13 | 3.160 | 05/20 | 3.163 | 05/27 | 3.151 | | |
| 2019-Jun | 06/03 | 3.136 | 06/10 | 3.105 | 06/17 | 3.070 | 06/24 | 3.043 | | |
| 2019-Jul | 07/01 | 3.042 | 07/08 | 3.055 | 07/15 | 3.051 | 07/22 | 3.044 | 07/29 | 3.034 |
| 2019-Aug | 08/05 | 3.032 | 08/12 | 3.011 | 08/19 | 2.994 | 08/26 | 2.983 | | |
| 2019-Sep | 09/02 | 2.976 | 09/09 | 2.971 | 09/16 | 2.987 | 09/23 | 3.081 | 09/30 | 3.066 |
| 2019-Oct | 10/07 | 3.047 | 10/14 | 3.051 | 10/21 | 3.050 | 10/28 | 3.064 | | |
| 2019-Nov | 11/04 | 3.062 | 11/11 | 3.073 | 11/18 | 3.074 | 11/25 | 3.066 | | |
| 2019-Dec | 12/02 | 3.070 | 12/09 | 3.049 | 12/16 | 3.046 | 12/23 | 3.041 | 12/30 | 3.069 |
| 2020-Jan | 01/06 | 3.079 | 01/13 | 3.064 | 01/20 | 3.037 | 01/27 | 3.010 | | |
| 2020-Feb | 02/03 | 2.956 | 02/10 | 2.910 | 02/17 | 2.890 | 02/24 | 2.882 | | |
| 2020-Mar | 03/02 | 2.851 | 03/09 | 2.814 | 03/16 | 2.733 | 03/23 | 2.659 | 03/30 | 2.586 |
| 2020-Apr | 04/06 | 2.548 | 04/13 | 2.507 | 04/20 | 2.480 | 04/27 | 2.437 | | |
| 2020-May | 05/04 | 2.399 | 05/11 | 2.394 | 05/18 | 2.386 | 05/25 | 2.390 | | |
| 2020-Jun | 06/01 | 2.386 | 06/08 | 2.396 | 06/15 | 2.403 | 06/22 | 2.425 | 06/29 | 2.430 |
| 2020-Jul | 07/06 | 2.437 | 07/13 | 2.438 | 07/20 | 2.433 | 07/27 | 2.427 | | |
| 2020-Aug | 08/03 | 2.424 | 08/10 | 2.428 | 08/17 | 2.427 | 08/24 | 2.426 | 08/31 | 2.441 |
| 2020-Sep | 09/07 | 2.435 | 09/14 | 2.422 | 09/21 | 2.404 | 09/28 | 2.394 | | |
| 2020-Oct | 10/05 | 2.387 | 10/12 | 2.395 | 10/19 | 2.388 | 10/26 | 2.385 | | |
| 2020-Nov | 11/02 | 2.372 | 11/09 | 2.383 | 11/16 | 2.441 | 11/23 | 2.462 | 11/30 | 2.502 |
| 2020-Dec | 12/07 | 2.526 | 12/14 | 2.559 | 12/21 | 2.619 | 12/28 | 2.635 | | |
| 2021-Jan | 01/04 | 2.640 | 01/11 | 2.670 | 01/18 | 2.696 | 01/25 | 2.716 | | |
| 2021-Feb | 02/01 | 2.738 | 02/08 | 2.801 | 02/15 | 2.876 | 02/22 | 2.973 | | |
| 2021-Mar | 03/01 | 3.072 | 03/08 | 3.143 | 03/15 | 3.191 | 03/22 | 3.194 | 03/29 | 3.161 |
| 2021-Apr | 04/05 | 3.144 | 04/12 | 3.129 | 04/19 | 3.124 | 04/26 | 3.124 | | |
| 2021-May | 05/03 | 3.142 | 05/10 | 3.186 | 05/17 | 3.249 | 05/24 | 3.253 | 05/31 | 3.255 |
| 2021-Jun | 06/07 | 3.274 | 06/14 | 3.286 | 06/21 | 3.287 | 06/28 | 3.300 | | |
| 2021-Jul | 07/05 | 3.331 | 07/12 | 3.338 | 07/19 | 3.344 | 07/26 | 3.342 | | |
| 2021-Aug | 08/02 | 3.367 | 08/09 | 3.364 | 08/16 | 3.356 | 08/23 | 3.324 | 08/30 | 3.339 |
| 2021-Sep | 09/06 | 3.373 | 09/13 | 3.372 | 09/20 | 3.385 | 09/27 | 3.406 | | |
| 2021-Oct | 10/04 | 3.477 | 10/11 | 3.586 | 10/18 | 3.671 | 10/25 | 3.713 | | |
| 2021-Nov | 11/01 | 3.727 | 11/08 | 3.730 | 11/15 | 3.734 | 11/22 | 3.724 | 11/29 | 3.720 |
| 2021-Dec | 12/06 | 3.674 | 12/13 | 3.649 | 12/20 | 3.626 | 12/27 | 3.615 | | |
| 2022-Jan | 01/03 | 3.613 | 01/10 | 3.657 | 01/17 | 3.725 | 01/24 | 3.780 | 01/31 | 3.846 |
| 2022-Feb | 02/07 | 3.951 | 02/14 | 4.019 | 02/21 | 4.055 | 02/28 | 4.104 | | |
| 2022-Mar | 03/07 | 4.849 | 03/14 | 5.250 | 03/21 | 5.134 | 03/28 | 5.185 | | |
| 2022-Apr | 04/04 | 5.144 | 04/11 | 5.073 | 04/18 | 5.101 | 04/25 | 5.160 | | |
| 2022-May | 05/02 | 5.509 | 05/09 | 5.623 | 05/16 | 5.613 | 05/23 | 5.571 | 05/30 | 5.539 |
| 2022-Jun | 06/06 | 5.703 | 06/13 | 5.718 | 06/20 | 5.810 | 06/27 | 5.783 | | |
| 2022-Jul | 07/04 | 5.675 | 07/11 | 5.568 | 07/18 | 5.432 | 07/25 | 5.268 | | |
| 2022-Aug | 08/01 | 5.138 | 08/08 | 4.993 | 08/15 | 4.911 | 08/22 | 4.909 | 08/29 | 5.115 |
| 2022-Sep | 09/05 | 5.084 | 09/12 | 5.033 | 09/19 | 4.964 | 09/26 | 4.889 | | |
| 2022-Oct | 10/03 | 4.836 | 10/10 | 5.224 | 10/17 | 5.339 | 10/24 | 5.341 | 10/31 | 5.317 |
| 2022-Nov | 11/07 | 5.333 | 11/14 | 5.313 | 11/21 | 5.233 | 11/28 | 5.141 | | |
| 2022-Dec | 12/05 | 4.967 | 12/12 | 4.754 | 12/19 | 4.596 | 12/26 | 4.537 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2022-Feb | 02/07 | 3.951 | 02/14 | 4.019 | 02/21 | 4.055 | 02/28 | 4.104 | | |
| 2022-Mar | 03/07 | 4.849 | 03/14 | 5.250 | 03/21 | 5.134 | 03/28 | 5.185 | | |
| 2022-Apr | 04/04 | 5.144 | 04/11 | 5.073 | 04/18 | 5.101 | 04/25 | 5.160 | | |
| 2022-May | 05/02 | 5.509 | 05/09 | 5.623 | 05/16 | 5.613 | 05/23 | 5.571 | 05/30 | 5.539 |
| 2022-Jun | 06/06 | 5.703 | 06/13 | 5.718 | 06/20 | 5.810 | 06/27 | 5.783 | | |
| 2022-Jul | 07/04 | 5.675 | 07/11 | 5.568 | 07/18 | 5.432 | 07/25 | 5.268 | | |
| 2022-Aug | 08/01 | 5.138 | 08/08 | 4.993 | 08/15 | 4.911 | 08/22 | 4.909 | 08/29 | 5.115 |
| 2022-Sep | 09/05 | 5.084 | 09/12 | 5.033 | 09/19 | 4.964 | 09/26 | 4.889 | | |
| 2022-Oct | 10/03 | 4.836 | 10/10 | 5.224 | 10/17 | 5.339 | 10/24 | 5.341 | 10/31 | 5.317 |
| 2022-Nov | 11/07 | 5.333 | 11/14 | 5.313 | 11/21 | 5.233 | 11/28 | 5.141 | | |
| 2022-Dec | 12/05 | 4.967 | 12/12 | 4.754 | 12/19 | 4.596 | 12/26 | 4.537 | | |
| 2023-Jan | 01/02 | 4.583 | 01/09 | 4.549 | 01/16 | 4.524 | 01/23 | 4.604 | 01/30 | 4.622 |
| 2023-Feb | 02/06 | 4.539 | 02/13 | 4.444 | 02/20 | 4.376 | 02/27 | 4.294 | | |
| 2023-Mar | 03/06 | 4.282 | 03/13 | 4.247 | 03/20 | 4.185 | 03/27 | 4.128 | | |
| 2023-Apr | 04/03 | 4.105 | 04/10 | 4.098 | 04/17 | 4.116 | 04/24 | 4.077 | | |
| 2023-May | 05/01 | 4.018 | 05/08 | 3.922 | 05/15 | 3.897 | 05/22 | 3.883 | 05/29 | 3.855 |
| 2023-Jun | 06/05 | 3.797 | 06/12 | 3.794 | 06/19 | 3.815 | 06/26 | 3.801 | | |
| 2023-Jul | 07/03 | 3.767 | 07/10 | 3.806 | 07/17 | 3.806 | 07/24 | 3.905 | 07/31 | 4.127 |
| 2023-Aug | 08/07 | 4.239 | 08/14 | 4.378 | 08/21 | 4.389 | 08/28 | 4.475 | | |
| 2023-Sep | 09/04 | 4.492 | 09/11 | 4.540 | 09/18 | 4.633 | 09/25 | 4.586 | | |
| 2023-Oct | 10/02 | 4.593 | 10/09 | 4.498 | 10/16 | 4.444 | 10/23 | 4.545 | 10/30 | 4.454 |
| 2023-Nov | 11/06 | 4.366 | 11/13 | 4.294 | 11/20 | 4.209 | 11/27 | 4.146 | | |
| 2023-Dec | 12/04 | 4.092 | 12/11 | 3.987 | 12/18 | 3.894 | 12/25 | 3.914 | | |
| 2024-Jan | 01/01 | 3.876 | 01/08 | 3.828 | 01/15 | 3.863 | 01/22 | 3.838 | 01/29 | 3.867 |
| 2024-Feb | 02/05 | 3.899 | 02/12 | 4.109 | 02/19 | 4.109 | 02/26 | 4.058 | | |
| 2024-Mar | 03/04 | 4.022 | 03/11 | 4.004 | 03/18 | 4.028 | 03/25 | 4.034 | | |
| 2024-Apr | 04/01 | 3.996 | 04/08 | 4.061 | 04/15 | 4.015 | 04/22 | 3.992 | 04/29 | 3.947 |
| 2024-May | 05/06 | 3.894 | 05/13 | 3.848 | 05/20 | 3.789 | 05/27 | 3.758 | | |
| 2024-Jun | 06/03 | 3.726 | | | | | | | | |

- = No Data Reported; -- = Not Applicable; NA = Not Available; W = Withheld to avoid disclosure of individual company data

Release Date: 6/3/2024
Next Release Date: 6/10/2024

**Referring Pages:**

- Retail Prices for Diesel (On-Highway) - All Types
- U.S. Gasoline and Diesel Retail Prices



Document title: Weekly U.S. No 2 Diesel Retail Prices (Dollars per Gallon)
Capture URL: https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EMD_EPD2D_PTE_NUS_DPG&f=W
Capture timestamp (UTC): Fri, 07 Jun 2024 22:49:11 GMT

PageVault

| | |
|---|---|
| Document title: | Weekly Cushing, OK WTI Spot Price FOB (Dollars per Barrel) |
| Capture URL: | https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=W |
| Page loaded at (UTC): | Sat, 08 Jun 2024 01:54:47 GMT |
| Capture timestamp (UTC): | Sat, 08 Jun 2024 01:56:39 GMT |
| Capture tool: | 10.47.5 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/124.0.0.0 Safari/537.36 |
| Operating system: | Linux (Node 20.11.1) |
| PDF length: | 12 |
| Capture ID: | jDY5KGWgMVnxsnJwSkFrN8 |
| User: | lw-ryork |

PDF REFERENCE #: 9C3rxNb5MRNVzv6Z6X7bur

eia Independent Statistics and Analysis
U.S. Energy Information Administration
+ Sources & Uses + Topics + Geography

# PETROLEUM & OTHER LIQUIDS

OVERVIEW DATA ANALYSIS & PROJECTIONS GLOSSARY FAQS

**View History:** Daily Weekly Monthly Annual Download Data (XLS File)

## Weekly Cushing, OK WTI Spot Price FOB

DOWNLOAD




Chart Tools
no analysis applied

This series is available through the EIA open data API and can be downloaded to Excel or embedded as an interactive chart or map on your website.

## Weekly Cushing, OK WTI Spot Price FOB (Dollars per Barrel)

| | Week 1 | | Week 2 | | Week 3 | | Week 4 | | Week 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year-Month | End Date | Value | End Date | Value | End Date | Value | End Date | Value | End Date | Value |
| 1986-Jan | 01/03 | 25.78 | 01/10 | 25.99 | 01/17 | 24.57 | 01/24 | 20.31 | 01/31 | 19.69 |
| 1986-Feb | 02/07 | 16.72 | 02/14 | 16.25 | 02/21 | 14.39 | 02/28 | 14.25 | | |
| 1986-Mar | 03/07 | 12.27 | 03/14 | 13.07 | 03/21 | 13.45 | 03/28 | 12.00 | | |
| 1986-Apr | 04/04 | 11.44 | 04/11 | 13.46 | 04/18 | 12.16 | 04/25 | 13.44 | | |
| 1986-May | 05/02 | 13.76 | 05/09 | 15.08 | 05/16 | 15.74 | 05/23 | 16.37 | 05/30 | 14.64 |
| 1986-Jun | 06/06 | 13.25 | 06/13 | 13.21 | 06/20 | 13.82 | 06/27 | 13.56 | | |
| 1986-Jul | 07/04 | 12.23 | 07/11 | 11.13 | 07/18 | 12.17 | 07/25 | 11.31 | | |
| 1986-Aug | 08/01 | 11.45 | 08/08 | 14.63 | 08/15 | 15.39 | 08/22 | 15.30 | 08/29 | 15.77 |
| 1986-Sep | 09/05 | 16.07 | 09/12 | 15.13 | 09/19 | 14.23 | 09/26 | 14.30 | | |
| 1986-Oct | 10/03 | 15.02 | 10/10 | 15.16 | 10/17 | 14.69 | 10/24 | 15.01 | 10/31 | 14.53 |
| 1986-Nov | 11/07 | 14.98 | 11/14 | 15.45 | 11/21 | 15.40 | 11/28 | 15.01 | | |
| 1986-Dec | 12/05 | 15.20 | 12/12 | 15.34 | 12/19 | 16.23 | 12/26 | 17.05 | | |
| 1987-Jan | 01/02 | 17.86 | 01/09 | 18.38 | 01/16 | 19.04 | 01/23 | 18.68 | 01/30 | 18.62 |
| 1987-Feb | 02/06 | 18.45 | 02/13 | 18.14 | 02/20 | 17.63 | 02/27 | 16.75 | | |
| 1987-Mar | 03/06 | 17.47 | 03/13 | 18.31 | 03/20 | 18.72 | 03/27 | 18.59 | | |
| 1987-Apr | 04/03 | 18.77 | 04/10 | 18.60 | 04/17 | 18.30 | 04/24 | 18.94 | | |
| 1987-May | 05/01 | 18.76 | 05/08 | 19.14 | 05/15 | 19.52 | 05/22 | 19.85 | 05/29 | 19.34 |
| 1987-Jun | 06/05 | 19.73 | 06/12 | 19.88 | 06/19 | 20.38 | 06/26 | 20.21 | | |
| 1987-Jul | 07/03 | 20.46 | 07/10 | 21.06 | 07/17 | 22.03 | 07/24 | 21.50 | 07/31 | 21.25 |
| 1987-Aug | 08/07 | 21.52 | 08/14 | 20.80 | 08/21 | 19.61 | 08/28 | 19.42 | | |
| 1987-Sep | 09/04 | 19.56 | 09/11 | 19.38 | 09/18 | 19.63 | 09/25 | 19.57 | | |
| 1987-Oct | 10/02 | 19.64 | 10/09 | 19.65 | 10/16 | 19.82 | 10/23 | 19.98 | 10/30 | 20.03 |
| 1987-Nov | 11/06 | 19.17 | 11/13 | 18.88 | 11/20 | 18.60 | 11/27 | 18.83 | | |
| 1987-Dec | 12/04 | 18.62 | 12/11 | 18.34 | 12/18 | 16.35 | 12/25 | 16.23 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1987-Sep | 09/04 | 19 56 | 09/11 | 19.38 | 09/18 | 19.63 | 09/25 | 19 57 | | |
| 1987-Oct | 10/02 | 19.64 | 10/09 | 19 65 | 10/16 | 19 82 | 10/23 | 19.98 | 10/30 | 20.03 |
| 1987-Nov | 11/06 | 19.17 | 11/13 | 18.88 | 11/20 | 18.60 | 11/27 | 18 63 | | |
| 1987-Dec | 12/04 | 18.62 | 12/11 | 18.34 | 12/18 | 16 35 | 12/25 | 16.23 | | |
| 1988-Jan | 01/01 | 16.78 | 01/08 | 17.60 | 01/15 | 16.79 | 01/22 | 17.20 | 01/29 | 16.92 |
| 1988-Feb | 02/05 | 17.08 | 02/12 | 17.24 | 02/19 | 16.70 | 02/26 | 16.33 | | |
| 1988-Mar | 03/04 | 15.64 | 03/11 | 15.74 | 03/18 | 16.08 | 03/25 | 16 58 | | |
| 1988-Apr | 04/01 | 17.07 | 04/08 | 16.89 | 04/15 | 18 15 | 04/22 | 18 16 | 04/29 | 18.25 |
| 1988-May | 05/06 | 17.34 | 05/13 | 17.51 | 05/20 | 17.53 | 05/27 | 17.29 | | |
| 1988-Jun | 06/03 | 17.55 | 06/10 | 17.15 | 06/17 | 16 58 | 06/24 | 15 95 | | |
| 1988-Jul | 07/01 | 15.47 | 07/08 | 15.45 | 07/15 | 14.64 | 07/22 | 15 86 | 07/29 | 16.14 |
| 1988-Aug | 08/05 | 15.45 | 08/12 | 15.67 | 08/19 | 15 58 | 08/26 | 15.54 | | |
| 1988-Sep | 09/02 | 15.13 | 09/09 | 14.40 | 09/16 | 14.75 | 09/23 | 14.90 | 09/30 | 13.94 |
| 1988-Oct | 10/07 | 12.85 | 10/14 | 14.08 | 10/21 | 14 76 | 10/28 | 13.44 | | |
| 1988-Nov | 11/04 | 13.75 | 11/11 | 13.93 | 11/18 | 13 75 | 11/25 | 14.43 | | |
| 1988-Dec | 12/02 | 15.33 | 12/09 | 15.61 | 12/16 | 16 31 | 12/23 | 17.04 | 12/30 | 16.99 |
| 1989-Jan | 01/06 | 17.35 | 01/13 | 18.06 | 01/20 | 19.05 | 01/27 | 17.85 | | |
| 1989-Feb | 02/03 | 17.41 | 02/10 | 17.39 | 02/17 | 18.08 | 02/24 | 18 46 | | |
| 1989-Mar | 03/03 | 18.40 | 03/10 | 18 50 | 03/17 | 19 71 | 03/24 | 20.00 | 03/31 | 20 40 |
| 1989-Apr | 04/07 | 20.11 | 04/14 | 20.56 | 04/21 | 22.73 | 04/28 | 20.87 | | |
| 1989-May | 05/05 | 20.23 | 05/12 | 19.75 | 05/19 | 20.42 | 05/26 | 20.28 | | |
| 1989-Jun | 06/02 | 19.89 | 06/09 | 20.08 | 06/16 | 19.94 | 06/23 | 19 95 | 06/30 | 20.25 |
| 1989-Jul | 07/07 | 20.59 | 07/14 | 20.42 | 07/21 | 20.06 | 07/28 | 18 34 | | |
| 1989-Aug | 08/04 | 18.15 | 08/11 | 18.25 | 08/18 | 18 77 | 08/25 | 18 96 | | |
| 1989-Sep | 09/01 | 18.77 | 09/08 | 19.31 | 09/15 | 19 80 | 09/22 | 19 63 | 09/29 | 19.77 |
| 1989-Oct | 10/06 | 20.03 | 10/13 | 20.37 | 10/20 | 20.46 | 10/27 | 19.65 | | |
| 1989-Nov | 11/03 | 19.99 | 11/10 | 19.89 | 11/17 | 19.74 | 11/24 | 20.02 | | |
| 1989-Dec | 12/01 | 19.70 | 12/08 | 20.36 | 12/15 | 20.81 | 12/22 | 21.76 | 12/29 | 21.78 |
| 1990-Jan | 01/05 | 23.29 | 01/12 | 22 62 | 01/19 | 22.71 | 01/26 | 23 08 | | |
| 1990-Feb | 02/02 | 22.70 | 02/09 | 22.23 | 02/16 | 22.27 | 02/23 | 21.81 | | |
| 1990-Mar | 03/02 | 21 51 | 03/09 | 21.01 | 03/16 | 20.19 | 03/23 | 19.73 | 03/30 | 20.26 |
| 1990-Apr | 04/06 | 19.83 | 04/13 | 17.96 | 04/20 | 17.60 | 04/27 | 18.20 | | |
| 1990-May | 05/04 | 18.37 | 05/11 | 18.71 | 05/18 | 19.19 | 05/25 | 16.83 | | |
| 1990-Jun | 06/01 | 17.72 | 06/08 | 16.77 | 06/15 | 17.11 | 06/22 | 15.90 | 06/29 | 16.84 |
| 1990-Jul | 07/06 | 16.68 | 07/13 | 17.64 | 07/20 | 18.83 | 07/27 | 19.89 | | |
| 1990-Aug | 08/03 | 21.98 | 08/10 | 27.32 | 08/17 | 27.27 | 08/24 | 30.08 | 08/31 | 27.13 |
| 1990-Sep | 09/07 | 29 67 | 09/14 | 30 99 | 09/21 | 34.21 | 09/28 | 39 16 | | |
| 1990-Oct | 10/05 | 36.64 | 10/12 | 39.88 | 10/19 | 36.84 | 10/26 | 31.32 | | |
| 1990-Nov | 11/02 | 34.95 | 11/09 | 33.89 | 11/16 | 31.50 | 11/23 | 30.69 | 11/30 | 32.32 |
| 1990-Dec | 12/07 | 27.72 | 12/14 | 26.39 | 12/21 | 27 56 | 12/28 | 27.21 | | |
| 1991-Jan | 01/04 | 26.38 | 01/11 | 27.55 | 01/18 | 26 85 | 01/25 | 24 08 | | |
| 1991-Feb | 02/01 | 21.41 | 02/08 | 21.30 | 02/15 | 22.12 | 02/22 | 19 38 | | |
| 1991-Mar | 03/01 | 18.73 | 03/08 | 19.86 | 03/15 | 19.89 | 03/22 | 20.30 | 03/29 | 19 58 |
| 1991-Apr | 04/05 | 19.63 | 04/12 | 20.89 | 04/19 | 21 48 | 04/26 | 21.19 | | |
| 1991-May | 05/03 | 21.23 | 05/10 | 21.69 | 05/17 | 20 95 | 05/24 | 21.04 | 05/31 | 21.21 |
| 1991-Jun | 06/07 | 20.63 | 06/14 | 19.84 | 06/21 | 20.08 | 06/28 | 20 21 | | |
| 1991-Jul | 07/05 | 20.80 | 07/12 | 21.43 | 07/19 | 21.91 | 07/26 | 21.40 | | |
| 1991-Aug | 08/02 | 21.46 | 08/09 | 21.50 | 08/16 | 21.44 | 08/23 | 21.99 | 08/30 | 21 98 |
| 1991-Sep | 09/06 | 21.84 | 09/13 | 21.54 | 09/20 | 21.85 | 09/27 | 22.24 | | |
| 1991-Oct | 10/04 | 22.41 | 10/11 | 23.08 | 10/18 | 23.82 | 10/25 | 23 46 | | |
| 1991-Nov | 11/01 | 23.32 | 11/08 | 23.47 | 11/15 | 22.57 | 11/22 | 22 04 | 11/29 | 21.49 |
| 1991-Dec | 12/06 | 20.55 | 12/13 | 19.64 | 12/20 | 19.20 | 12/27 | 18 68 | | |
| 1992-Jan | 01/03 | 19.11 | 01/10 | 18.41 | 01/17 | 18 81 | 01/24 | 18 66 | 01/31 | 19.05 |
| 1992-Feb | 02/07 | 19.42 | 02/14 | 19.49 | 02/21 | 18 62 | 02/28 | 18 51 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1991-Nov | 11/01 | 23.32 | 11/08 | 23.47 | 11/15 | 22.57 | 11/22 | 22.04 | 11/29 | 21.49 |
| 1991-Dec | 12/06 | 20.55 | 12/13 | 19.64 | 12/20 | 19.20 | 12/27 | 18.68 | | |
| 1992-Jan | 01/03 | 19.11 | 01/10 | 18.41 | 01/17 | 18.81 | 01/24 | 18.66 | 01/31 | 19.05 |
| 1992-Feb | 02/07 | 19.42 | 02/14 | 19.49 | 02/21 | 18.62 | 02/28 | 18.51 | | |
| 1992-Mar | 03/06 | 18.55 | 03/13 | 18.76 | 03/20 | 19.10 | 03/27 | 19.09 | | |
| 1992-Apr | 04/03 | 19.73 | 04/10 | 20.43 | 04/17 | 20.06 | 04/24 | 20.06 | | |
| 1992-May | 05/01 | 20.63 | 05/08 | 20.86 | 05/15 | 20.80 | 05/22 | 20.49 | 05/29 | 21.98 |
| 1992-Jun | 06/05 | 22.38 | 06/12 | 22.35 | 06/19 | 22.26 | 06/26 | 22.68 | | |
| 1992-Jul | 07/03 | 22.03 | 07/10 | 21.48 | 07/17 | 21.58 | 07/24 | 21.95 | 07/31 | 21.95 |
| 1992-Aug | 08/07 | 21.34 | 08/14 | 21.18 | 08/21 | 21.39 | 08/28 | 21.43 | | |
| 1992-Sep | 09/04 | 21.66 | 09/11 | 21.94 | 09/18 | 22.21 | 09/25 | 21.71 | | |
| 1992-Oct | 10/02 | 21.81 | 10/09 | 21.90 | 10/16 | 22.25 | 10/23 | 21.58 | 10/30 | 20.95 |
| 1992-Nov | 11/06 | 20.52 | 11/13 | 20.37 | 11/20 | 20.35 | 11/27 | 20.16 | | |
| 1992-Dec | 12/04 | 19.38 | 12/11 | 19.01 | 12/18 | 19.38 | 12/25 | 19.91 | | |
| 1993-Jan | 01/01 | 19.63 | 01/08 | 19.00 | 01/15 | 18.62 | 01/22 | 18.61 | 01/29 | 19.90 |
| 1993-Feb | 02/05 | 20.22 | 02/12 | 20.13 | 02/19 | 19.51 | 02/26 | 20.40 | | |
| 1993-Mar | 03/05 | 20.69 | 03/12 | 20.45 | 03/19 | 20.14 | 03/26 | 20.00 | | |
| 1993-Apr | 04/02 | 20.44 | 04/09 | 20.37 | 04/16 | 20.28 | 04/23 | 19.95 | 04/30 | 20.30 |
| 1993-May | 05/07 | 20.47 | 05/14 | 20.06 | 05/21 | 19.43 | 05/28 | 19.84 | | |
| 1993-Jun | 06/04 | 19.95 | 06/11 | 19.43 | 06/18 | 18.76 | 06/25 | 18.52 | | |
| 1993-Jul | 07/02 | 18.61 | 07/09 | 18.02 | 07/16 | 17.72 | 07/23 | 17.54 | 07/30 | 18.18 |
| 1993-Aug | 08/06 | 17.67 | 08/13 | 17.87 | 08/20 | 17.84 | 08/27 | 18.49 | | |
| 1993-Sep | 09/03 | 18.10 | 09/10 | 16.96 | 09/17 | 16.94 | 09/24 | 17.67 | | |
| 1993-Oct | 10/01 | 18.33 | 10/08 | 18.46 | 10/15 | 18.57 | 10/22 | 18.12 | 10/29 | 17.37 |
| 1993-Nov | 11/05 | 17.29 | 11/12 | 16.71 | 11/19 | 16.75 | 11/26 | 16.08 | | |
| 1993-Dec | 12/03 | 15.21 | 12/10 | 14.68 | 12/17 | 14.31 | 12/24 | 14.40 | 12/31 | 14.21 |
| 1994-Jan | 01/07 | 15.03 | 01/14 | 14.67 | 01/21 | 15.02 | 01/28 | 15.34 | | |
| 1994-Feb | 02/04 | 15.76 | 02/11 | 14.87 | 02/18 | 14.13 | 02/25 | 14.44 | | |
| 1994-Mar | 03/04 | 14.68 | 03/11 | 14.24 | 03/18 | 14.82 | 03/25 | 15.15 | | |
| 1994-Apr | 04/01 | 14.44 | 04/08 | 15.65 | 04/15 | 16.07 | 04/22 | 17.02 | 04/29 | 16.93 |
| 1994-May | 05/06 | 17.20 | 05/13 | 17.93 | 05/20 | 18.21 | 05/27 | 18.14 | | |
| 1994-Jun | 06/03 | 18.24 | 06/10 | 18.26 | 06/17 | 19.61 | 06/24 | 19.80 | | |
| 1994-Jul | 07/01 | 19.16 | 07/08 | 19.39 | 07/15 | 20.16 | 07/22 | 19.39 | 07/29 | 19.66 |
| 1994-Aug | 08/05 | 20.09 | 08/12 | 18.88 | 08/19 | 17.85 | 08/26 | 17.23 | | |
| 1994-Sep | 09/02 | 17.52 | 09/09 | 17.65 | 09/16 | 16.93 | 09/23 | 17.38 | 09/30 | 17.83 |
| 1994-Oct | 10/07 | 18.13 | 10/14 | 17.37 | 10/21 | 17.35 | 10/28 | 17.93 | | |
| 1994-Nov | 11/04 | 18.69 | 11/11 | 18.25 | 11/18 | 17.51 | 11/25 | 17.73 | | |
| 1994-Dec | 12/02 | 17.78 | 12/09 | 16.99 | 12/16 | 16.86 | 12/23 | 17.10 | 12/30 | 17.71 |
| 1995-Jan | 01/06 | 17.62 | 01/13 | 17.55 | 01/20 | 18.45 | 01/27 | 18.34 | | |
| 1995-Feb | 02/03 | 18.50 | 02/10 | 18.42 | 02/17 | 18.55 | 02/24 | 18.75 | | |
| 1995-Mar | 03/03 | 18.50 | 03/10 | 18.27 | 03/17 | 18.13 | 03/24 | 18.69 | 03/31 | 19.12 |
| 1995-Apr | 04/07 | 19.43 | 04/14 | 19.53 | 04/21 | 20.26 | 04/28 | 20.29 | | |
| 1995-May | 05/05 | 20.24 | 05/12 | 19.74 | 05/19 | 19.98 | 05/26 | 19.37 | | |
| 1995-Jun | 06/02 | 18.92 | 06/09 | 19.05 | 06/16 | 18.91 | 06/23 | 17.88 | 06/30 | 17.71 |
| 1995-Jul | 07/07 | 17.28 | 07/14 | 17.34 | 07/21 | 17.21 | 07/28 | 17.41 | | |
| 1995-Aug | 08/04 | 17.72 | 08/11 | 17.81 | 08/18 | 17.60 | 08/25 | 19.02 | | |
| 1995-Sep | 09/01 | 17.88 | 09/08 | 18.37 | 09/15 | 18.72 | 09/22 | 18.32 | 09/29 | 17.55 |
| 1995-Oct | 10/06 | 17.29 | 10/13 | 17.28 | 10/20 | 17.51 | 10/27 | 17.56 | | |
| 1995-Nov | 11/03 | 17.79 | 11/10 | 17.76 | 11/17 | 18.06 | 11/24 | 17.99 | | |
| 1995-Dec | 12/01 | 18.32 | 12/08 | 18.74 | 12/15 | 19.02 | 12/22 | 19.12 | 12/29 | 19.44 |
| 1996-Jan | 01/05 | 19.99 | 01/12 | 19.43 | 01/19 | 18.64 | 01/26 | 18.35 | | |
| 1996-Feb | 02/02 | 17.64 | 02/09 | 17.72 | 02/16 | 18.80 | 02/23 | 21.45 | | |
| 1996-Mar | 03/01 | 19.49 | 03/08 | 19.72 | 03/15 | 20.80 | 03/22 | 23.16 | 03/29 | 22.03 |
| 1996-Apr | 04/05 | 22.49 | 04/12 | 23.95 | 04/19 | 24.34 | 04/26 | 23.80 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1996-Jan | 01/05 | 19.99 | 01/12 | 19.43 | 01/19 | 18.64 | 01/26 | 18.35 | | |
| 1996-Feb | 02/02 | 17.64 | 02/09 | 17.72 | 02/16 | 18.80 | 02/23 | 21.45 | | |
| 1996-Mar | 03/01 | 19.49 | 03/08 | 19.72 | 03/15 | 20.80 | 03/22 | 23.16 | 03/29 | 22.03 |
| 1996-Apr | 04/05 | 22.49 | 04/12 | 23.95 | 04/19 | 24.34 | 04/26 | 23.80 | | |
| 1996-May | 05/03 | 21.16 | 05/10 | 20.98 | 05/17 | 21.06 | 05/24 | 22.24 | 05/31 | 20.37 |
| 1996-Jun | 06/07 | 20.04 | 06/14 | 20.15 | 06/21 | 20.95 | 06/28 | 20.55 | | |
| 1996-Jul | 07/05 | 21.40 | 07/12 | 21.65 | 07/19 | 21.80 | 07/26 | 20.96 | | |
| 1996-Aug | 08/02 | 20.66 | 08/09 | 21.35 | 08/16 | 22.25 | 08/23 | 22.50 | 08/30 | 21.82 |
| 1996-Sep | 09/06 | 23.48 | 09/13 | 24.42 | 09/20 | 23.52 | 09/27 | 24.33 | | |
| 1996-Oct | 10/04 | 24.44 | 10/11 | 24.93 | 10/18 | 25.45 | 10/25 | 25.15 | | |
| 1996-Nov | 11/01 | 23.91 | 11/08 | 22.92 | 11/15 | 23.90 | 11/22 | 24.03 | 11/29 | 24.21 |
| 1996-Dec | 12/06 | 25.14 | 12/13 | 24.20 | 12/20 | 26.02 | 12/27 | 25.44 | | |
| 1997-Jan | 01/03 | 25.59 | 01/10 | 26.30 | 01/17 | 25.42 | 01/24 | 24.40 | 01/31 | 24.24 |
| 1997-Feb | 02/07 | 23.49 | 02/14 | 22.21 | 02/21 | 22.18 | 02/28 | 20.83 | | |
| 1997-Mar | 03/07 | 20.77 | 03/14 | 20.64 | 03/21 | 21.72 | 03/28 | 20.83 | | |
| 1997-Apr | 04/04 | 19.76 | 04/11 | 19.38 | 04/18 | 19.65 | 04/25 | 19.85 | | |
| 1997-May | 05/02 | 19.99 | 05/09 | 19.94 | 05/16 | 21.45 | 05/23 | 21.43 | 05/30 | 20.90 |
| 1997-Jun | 06/06 | 20.12 | 06/13 | 18.88 | 06/20 | 18.93 | 06/27 | 19.00 | | |
| 1997-Jul | 07/04 | 19.95 | 07/11 | 19.44 | 07/18 | 19.49 | 07/25 | 19.52 | | |
| 1997-Aug | 08/01 | 20.13 | 08/08 | 20.35 | 08/15 | 19.99 | 08/22 | 19.92 | 08/29 | 19.50 |
| 1997-Sep | 09/05 | 19.61 | 09/12 | 19.44 | 09/19 | 19.44 | 09/26 | 20.12 | | |
| 1997-Oct | 10/03 | 21.62 | 10/10 | 22.01 | 10/17 | 21.03 | 10/24 | 21.00 | 10/31 | 20.92 |
| 1997-Nov | 11/07 | 20.65 | 11/14 | 20.66 | 11/21 | 19.81 | 11/28 | 19.30 | | |
| 1997-Dec | 12/05 | 18.69 | 12/12 | 18.44 | 12/19 | 18.31 | 12/26 | 18.31 | | |
| 1998-Jan | 01/02 | 17.58 | 01/09 | 16.83 | 01/16 | 16.47 | 01/23 | 16.02 | 01/30 | 17.30 |
| 1998-Feb | 02/06 | 16.65 | 02/13 | 16.25 | 02/20 | 16.03 | 02/27 | 15.30 | | |
| 1998-Mar | 03/06 | 15.23 | 03/13 | 14.40 | 03/20 | 14.04 | 03/27 | 16.42 | | |
| 1998-Apr | 04/03 | 15.98 | 04/10 | 15.55 | 04/17 | 15.53 | 04/24 | 14.50 | | |
| 1998-May | 05/01 | 15.71 | 05/08 | 15.48 | 05/15 | 15.03 | 05/22 | 13.91 | 05/29 | 14.99 |
| 1998-Jun | 06/05 | 15.02 | 06/12 | 13.42 | 06/19 | 12.04 | 06/26 | 14.17 | | |
| 1998-Jul | 07/03 | 14.41 | 07/10 | 13.94 | 07/17 | 14.48 | 07/24 | 13.89 | 07/31 | 14.24 |
| 1998-Aug | 08/07 | 13.83 | 08/14 | 13.12 | 08/21 | 13.23 | 08/28 | 13.65 | | |
| 1998-Sep | 09/04 | 13.98 | 09/11 | 14.45 | 09/18 | 14.88 | 09/25 | 15.78 | | |
| 1998-Oct | 10/02 | 15.83 | 10/09 | 15.02 | 10/16 | 14.21 | 10/23 | 13.81 | 10/30 | 14.34 |
| 1998-Nov | 11/06 | 14.13 | 11/13 | 13.63 | 11/20 | 12.40 | 11/27 | 11.62 | | |
| 1998-Dec | 12/04 | 11.28 | 12/11 | 11.16 | 12/18 | 11.50 | 12/25 | 11.00 | | |
| 1999-Jan | 01/01 | 11.83 | 01/08 | 12.67 | 01/15 | 12.62 | 01/22 | 12.26 | 01/29 | 12.46 |
| 1999-Feb | 02/05 | 12.16 | 02/12 | 11.81 | 02/19 | 11.66 | 02/26 | 12.36 | | |
| 1999-Mar | 03/05 | 12.90 | 03/12 | 14.19 | 03/19 | 14.91 | 03/26 | 15.55 | | |
| 1999-Apr | 04/02 | 16.61 | 04/09 | 16.45 | 04/16 | 16.77 | 04/23 | 17.93 | 04/30 | 18.23 |
| 1999-May | 05/07 | 18.62 | 05/14 | 18.00 | 05/21 | 17.18 | 05/28 | 17.07 | | |
| 1999-Jun | 06/04 | 16.77 | 06/11 | 17.96 | 06/18 | 18.21 | 06/25 | 18.05 | | |
| 1999-Jul | 07/02 | 19.04 | 07/09 | 19.87 | 07/16 | 20.21 | 07/23 | 19.89 | 07/30 | 20.62 |
| 1999-Aug | 08/06 | 20.54 | 08/13 | 21.44 | 08/20 | 21.62 | 08/27 | 21.21 | | |
| 1999-Sep | 09/03 | 21.88 | 09/10 | 23.00 | 09/17 | 24.28 | 09/24 | 24.53 | | |
| 1999-Oct | 10/01 | 24.58 | 10/08 | 22.72 | 10/15 | 22.54 | 10/22 | 22.65 | 10/29 | 22.50 |
| 1999-Nov | 11/05 | 22.72 | 11/12 | 24.22 | 11/19 | 26.05 | 11/26 | 27.35 | | |
| 1999-Dec | 12/03 | 25.46 | 12/10 | 26.19 | 12/17 | 26.20 | 12/24 | 26.07 | 12/31 | 26.34 |
| 2000-Jan | 01/07 | 24.95 | 01/14 | 26.27 | 01/21 | 29.37 | 01/28 | 28.34 | | |
| 2000-Feb | 02/04 | 28.08 | 02/11 | 28.83 | 02/18 | 29.87 | 02/25 | 30.10 | | |
| 2000-Mar | 03/03 | 31.07 | 03/10 | 32.14 | 03/17 | 31.29 | 03/24 | 27.99 | 03/31 | 26.92 |
| 2000-Apr | 04/07 | 25.60 | 04/14 | 24.87 | 04/21 | 26.66 | 04/28 | 25.95 | | |
| 2000-May | 05/05 | 26.75 | 05/12 | 28.70 | 05/19 | 29.88 | 05/26 | 29.46 | | |
| 2000-Jun | 06/02 | 29.98 | 06/09 | 29.79 | 06/16 | 32.45 | 06/23 | 33.55 | 06/30 | 32.12 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2000-Mar | 03/03 | 31.07 | 03/10 | 32.14 | 03/17 | 31.29 | 03/24 | 27.99 | 03/31 | 26.92 |
| 2000-Apr | 04/07 | 25.60 | 04/14 | 24.87 | 04/21 | 26.66 | 04/28 | 25.95 | | |
| 2000 May | 05/05 | 26.75 | 05/12 | 28.70 | 05/19 | 29.88 | 05/26 | 29.46 | | |
| 2000-Jun | 06/02 | 29.98 | 06/09 | 29.79 | 06/16 | 32.45 | 06/23 | 33.55 | 06/30 | 32.12 |
| 2000-Jul | 07/07 | 30.40 | 07/14 | 30.44 | 07/21 | 30.65 | 07/28 | 28.02 | | |
| 2000-Aug | 08/04 | 28.50 | 08/11 | 30.14 | 08/18 | 31.82 | 08/25 | 32.46 | | |
| 2000-Sep | 09/01 | 33.08 | 09/08 | 34.42 | 09/15 | 34.70 | 09/22 | 35.49 | 09/29 | 31.13 |
| 2000-Oct | 10/06 | 31.27 | 10/13 | 33.90 | 10/20 | 33.48 | 10/27 | 33.92 | | |
| 2000-Nov | 11/03 | 32.78 | 11/10 | 33.46 | 11/17 | 35.00 | 11/24 | 35.91 | | |
| 2000-Dec | 12/01 | 34.10 | 12/08 | 29.69 | 12/15 | 29.05 | 12/22 | 27.38 | 12/29 | 26.52 |
| 2001-Jan | 01/05 | 27.80 | 01/12 | 28.81 | 01/19 | 30.63 | 01/26 | 31.35 | | |
| 2001-Feb | 02/02 | 29.59 | 02/09 | 30.92 | 02/16 | 29.67 | 02/23 | 28.65 | | |
| 2001-Mar | 03/02 | 27.91 | 03/09 | 28.45 | 03/16 | 27.02 | 03/23 | 26.42 | 03/30 | 26.86 |
| 2001-Apr | 04/06 | 26.76 | 04/13 | 28.27 | 04/20 | 27.89 | 04/27 | 26.99 | | |
| 2001-May | 05/04 | 28.36 | 05/11 | 28.12 | 05/18 | 29.08 | 05/25 | 28.92 | | |
| 2001-Jun | 06/01 | 28.44 | 06/08 | 27.98 | 06/15 | 28.90 | 06/22 | 27.09 | 06/29 | 26.37 |
| 2001-Jul | 07/06 | 26.87 | 07/13 | 27.07 | 07/20 | 25.26 | 07/27 | 26.50 | | |
| 2001-Aug | 08/03 | 27.10 | 08/10 | 27.87 | 08/17 | 27.52 | 08/24 | 27.25 | 08/31 | 26.84 |
| 2001-Sep | 09/07 | 27.38 | 09/14 | 28.22 | 09/21 | 27.09 | 09/28 | 22.35 | | |
| 2001-Oct | 10/05 | 22.60 | 10/12 | 22.66 | 10/19 | 21.92 | 10/26 | 21.78 | | |
| 2001-Nov | 11/02 | 21.17 | 11/09 | 20.70 | 11/16 | 19.61 | 11/23 | 18.28 | 11/30 | 19.13 |
| 2001-Dec | 12/07 | 19.47 | 12/14 | 18.45 | 12/21 | 19.20 | 12/28 | 20.94 | | |
| 2002-Jan | 01/04 | 20.80 | 01/11 | 20.54 | 01/18 | 18.61 | 01/25 | 19.21 | | |
| 2002-Feb | 02/01 | 19.71 | 02/08 | 19.97 | 02/15 | 21.18 | 02/22 | 20.70 | | |
| 2002-Mar | 03/01 | 21.43 | 03/08 | 23.31 | 03/15 | 24.40 | 03/22 | 25.25 | 03/29 | 25.86 |
| 2002-Apr | 04/05 | 26.99 | 04/12 | 25.24 | 04/19 | 25.54 | 04/26 | 26.46 | | |
| 2002-May | 05/03 | 26.88 | 05/10 | 27.27 | 05/17 | 28.43 | 05/24 | 27.18 | 05/31 | 25.22 |
| 2002-Jun | 06/07 | 25.01 | 06/14 | 24.94 | 06/21 | 25.61 | 06/28 | 26.52 | | |
| 2002-Jul | 07/05 | 26.81 | 07/12 | 26.70 | 07/19 | 27.62 | 07/26 | 26.64 | | |
| 2002-Aug | 08/02 | 26.87 | 08/09 | 26.77 | 08/16 | 28.52 | 08/23 | 30.09 | 08/30 | 28.84 |
| 2002-Sep | 09/06 | 28.65 | 09/13 | 29.59 | 09/20 | 29.39 | 09/27 | 30.63 | | |
| 2002-Oct | 10/04 | 30.25 | 10/11 | 29.37 | 10/18 | 29.65 | 10/25 | 27.88 | | |
| 2002-Nov | 11/01 | 27.03 | 11/08 | 25.97 | 11/15 | 25.68 | 11/22 | 26.98 | 11/29 | 26.83 |
| 2002-Dec | 12/06 | 27.14 | 12/13 | 27.82 | 12/20 | 30.35 | 12/27 | 32.38 | | |
| 2003-Jan | 01/03 | 31.96 | 01/10 | 31.54 | 01/17 | 33.04 | 01/24 | 34.46 | 01/31 | 33.19 |
| 2003-Feb | 02/07 | 33.95 | 02/14 | 35.79 | 02/21 | 36.78 | 02/28 | 36.98 | | |
| 2003-Mar | 03/07 | 36.98 | 03/14 | 36.66 | 03/21 | 30.46 | 03/28 | 30.43 | | |
| 2003-Apr | 04/04 | 29.33 | 04/11 | 28.03 | 04/18 | 29.28 | 04/25 | 28.43 | | |
| 2003-May | 05/02 | 25.69 | 05/09 | 26.58 | 05/16 | 28.54 | 05/23 | 29.29 | 05/30 | 29.10 |
| 2003-Jun | 06/06 | 30.68 | 06/13 | 31.46 | 06/20 | 30.60 | 06/27 | 30.01 | | |
| 2003-Jul | 07/04 | 30.31 | 07/11 | 30.73 | 07/18 | 31.48 | 07/25 | 30.61 | | |
| 2003-Aug | 08/01 | 30.73 | 08/08 | 32.11 | 08/15 | 31.31 | 08/22 | 31.19 | 08/29 | 31.56 |
| 2003-Sep | 09/05 | 29.20 | 09/12 | 28.92 | 09/19 | 27.39 | 09/26 | 27.73 | | |
| 2003-Oct | 10/03 | 29.43 | 10/10 | 30.69 | 10/17 | 31.49 | 10/24 | 30.17 | 10/31 | 29.28 |
| 2003-Nov | 11/07 | 29.79 | 11/14 | 31.56 | 11/21 | 32.58 | 11/28 | 30.11 | | |
| 2003-Dec | 12/05 | 30.63 | 12/12 | 32.16 | 12/19 | 33.20 | 12/26 | 32.24 | | |
| 2004-Jan | 01/02 | 32.68 | 01/09 | 33.89 | 01/16 | 34.51 | 01/23 | 35.45 | 01/30 | 33.61 |
| 2004-Feb | 02/06 | 33.41 | 02/13 | 33.88 | 02/20 | 35.54 | 02/27 | 36.08 | | |
| 2004-Mar | 03/05 | 36.67 | 03/12 | 36.44 | 03/19 | 37.78 | 03/26 | 36.65 | | |
| 2004-Apr | 04/02 | 35.23 | 04/09 | 35.70 | 04/16 | 37.39 | 04/23 | 37.32 | 04/30 | 37.31 |
| 2004-May | 05/07 | 39.24 | 05/14 | 40.37 | 05/21 | 40.84 | 05/28 | 40.65 | | |
| 2004-Jun | 06/04 | 40.01 | 06/11 | 37.99 | 06/18 | 37.86 | 06/25 | 37.70 | | |
| 2004-Jul | 07/02 | 37.14 | 07/09 | 39.73 | 07/16 | 40.33 | 07/23 | 41.27 | 07/30 | 42.50 |
| 2004-Aug | 08/06 | 43.81 | 08/13 | 45.24 | 08/20 | 47.28 | 08/27 | 44.34 | | |

eia + Sources & Uses + Topics + Geography

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2004-May | 05/07 | 39.24 | 05/14 | 40.37 | 05/21 | 40.84 | 05/28 | 40.65 | | |
| 2004-Jun | 06/04 | 40.01 | 06/11 | 37.99 | 06/18 | 37.86 | 06/25 | 37.70 | | |
| 2004-Jul | 07/02 | 37.14 | 07/09 | 39.73 | 07/16 | 40.33 | 07/23 | 41.27 | 07/30 | 42.50 |
| 2004-Aug | 08/06 | 43.81 | 08/13 | 45.24 | 08/20 | 47.28 | 08/27 | 44.34 | | |
| 2004-Sep | 09/03 | 43.28 | 09/10 | 43.33 | 09/17 | 44.39 | 09/24 | 47.82 | | |
| 2004-Oct | 10/01 | 49.71 | 10/08 | 51.77 | 10/15 | 54.12 | 10/22 | 54.43 | 10/29 | 53.43 |
| 2004-Nov | 11/05 | 49.81 | 11/12 | 48.00 | 11/19 | 47.02 | 11/26 | 48.79 | | |
| 2004-Dec | 12/03 | 46.06 | 12/10 | 41.91 | 12/17 | 43.50 | 12/24 | 44.39 | 12/31 | 42.52 |
| 2005-Jan | 01/07 | 44.07 | 01/14 | 46.79 | 01/21 | 47.85 | 01/28 | 48.56 | | |
| 2005-Feb | 02/04 | 46.97 | 02/11 | 46.08 | 02/18 | 47.82 | 02/25 | 51.75 | | |
| 2005-Mar | 03/04 | 52.74 | 03/11 | 54.22 | 03/18 | 55.93 | 03/25 | 52.95 | | |
| 2005-Apr | 04/01 | 54.97 | 04/08 | 55.24 | 04/15 | 51.44 | 04/22 | 52.39 | 04/29 | 52.00 |
| 2005-May | 05/06 | 50.64 | 05/13 | 50.33 | 05/20 | 47.77 | 05/27 | 50.15 | | |
| 2005-Jun | 06/03 | 53.76 | 06/10 | 53.74 | 06/17 | 56.18 | 06/24 | 59.04 | | |
| 2005-Jul | 07/01 | 58.21 | 07/08 | 60.36 | 07/15 | 59.18 | 07/22 | 57.30 | 07/29 | 59.39 |
| 2005-Aug | 08/05 | 61.64 | 08/12 | 64.85 | 08/19 | 64.92 | 08/26 | 66.34 | | |
| 2005-Sep | 09/02 | 68.47 | 09/09 | 64.81 | 09/16 | 63.84 | 09/23 | 66.43 | 09/30 | 66.06 |
| 2005-Oct | 10/07 | 63.06 | 10/14 | 62.87 | 10/21 | 62.28 | 10/28 | 61.33 | | |
| 2005-Nov | 11/04 | 60.34 | 11/11 | 58.80 | 11/18 | 57.00 | 11/25 | 58.13 | | |
| 2005-Dec | 12/02 | 57.78 | 12/09 | 59.83 | 12/16 | 60.32 | 12/23 | 57.97 | 12/30 | 59.82 |
| 2006-Jan | 01/06 | 63.39 | 01/13 | 63.74 | 01/20 | 66.79 | 01/27 | 66.82 | | |
| 2006-Feb | 02/03 | 66.59 | 02/10 | 63.06 | 02/17 | 59.37 | 02/24 | 59.93 | | |
| 2006-Mar | 03/03 | 62.27 | 03/10 | 60.89 | 03/17 | 62.64 | 03/24 | 61.36 | 03/31 | 65.67 |
| 2006-Apr | 04/07 | 66.56 | 04/14 | 68.85 | 04/21 | 71.87 | 04/28 | 70.38 | | |
| 2006-May | 05/05 | 72.14 | 05/12 | 71.50 | 05/19 | 69.07 | 05/26 | 70.35 | | |
| 2006-Jun | 06/02 | 71.53 | 06/09 | 71.54 | 06/16 | 69.48 | 06/23 | 69.94 | 06/30 | 72.65 |
| 2006-Jul | 07/07 | 74.65 | 07/14 | 75.21 | 07/21 | 73.98 | 07/28 | 73.87 | | |
| 2006-Aug | 08/04 | 75.20 | 08/11 | 75.63 | 08/18 | 71.79 | 08/25 | 72.12 | | |
| 2006-Sep | 09/01 | 70.01 | 09/08 | 67.53 | 09/15 | 63.98 | 09/22 | 61.40 | 09/29 | 61.94 |
| 2006-Oct | 10/06 | 59.77 | 10/13 | 58.58 | 10/20 | 58.48 | 10/27 | 58.88 | | |
| 2006-Nov | 11/03 | 58.55 | 11/10 | 59.96 | 11/17 | 57.56 | 11/24 | 57.24 | | |
| 2006-Dec | 12/01 | 62.02 | 12/08 | 62.32 | 12/15 | 61.91 | 12/22 | 62.40 | 12/29 | 60.66 |
| 2007-Jan | 01/05 | 57.76 | 01/12 | 54.11 | 01/19 | 51.51 | 01/26 | 53.57 | | |
| 2007-Feb | 02/02 | 57.11 | 02/09 | 58.99 | 02/16 | 58.41 | 02/23 | 59.57 | | |
| 2007-Mar | 03/02 | 61.64 | 03/09 | 60.85 | 03/16 | 57.94 | 03/23 | 58.26 | 03/30 | 64.18 |
| 2007-Apr | 04/06 | 64.82 | 04/13 | 62.58 | 04/20 | 63.06 | 04/27 | 65.26 | | |
| 2007-May | 05/04 | 63.82 | 05/11 | 61.90 | 05/18 | 63.61 | 05/25 | 64.89 | | |
| 2007-Jun | 06/01 | 63.94 | 06/08 | 65.90 | 06/15 | 66.62 | 06/22 | 68.78 | 06/29 | 69.13 |
| 2007-Jul | 07/06 | 71.78 | 07/13 | 72.79 | 07/20 | 74.92 | 07/27 | 75.15 | | |
| 2007-Aug | 08/03 | 76.75 | 08/10 | 71.92 | 08/17 | 72.05 | 08/24 | 70.19 | 08/31 | 72.93 |
| 2007-Sep | 09/07 | 75.96 | 09/14 | 78.95 | 09/21 | 82.26 | 09/28 | 81.70 | | |
| 2007-Oct | 10/05 | 80.59 | 10/12 | 81.46 | 10/19 | 87.80 | 10/26 | 89.23 | | |
| 2007-Nov | 11/02 | 93.46 | 11/09 | 95.81 | 11/16 | 93.56 | 11/23 | 97.93 | 11/30 | 92.47 |
| 2007-Dec | 12/07 | 88.71 | 12/14 | 91.18 | 12/21 | 91.16 | 12/28 | 95.64 | | |
| 2008-Jan | 01/04 | 98.17 | 01/11 | 94.76 | 01/18 | 91.51 | 01/25 | 89.41 | | |
| 2008-Feb | 02/01 | 91.14 | 02/08 | 89.08 | 02/15 | 94.13 | 02/22 | 99.61 | 02/29 | 100.84 |
| 2008-Mar | 03/07 | 103.44 | 03/14 | 109.35 | 03/21 | 105.28 | 03/28 | 104.49 | | |
| 2008-Apr | 04/04 | 103.46 | 04/11 | 109.71 | 04/18 | 114.33 | 04/25 | 118.53 | | |
| 2008-May | 05/02 | 115.42 | 05/09 | 123.01 | 05/16 | 124.96 | 05/23 | 130.14 | 05/30 | 128.47 |
| 2008-Jun | 06/06 | 128.16 | 06/13 | 134.80 | 06/20 | 134.34 | 06/27 | 137.00 | | |
| 2008-Jul | 07/04 | 142.52 | 07/11 | 139.95 | 07/18 | 135.37 | 07/25 | 125.92 | | |
| 2008-Aug | 08/01 | 124.57 | 08/08 | 118.80 | 08/15 | 114.40 | 08/22 | 115.70 | 08/29 | 116.09 |
| 2008-Sep | 09/05 | 108.37 | 09/12 | 102.88 | 09/19 | 97.19 | 09/26 | 111.12 | | |
| 2008-Oct | 10/03 | 96.59 | 10/10 | 86.24 | 10/17 | 75.19 | 10/24 | 68.56 | 10/31 | 65.21 |

eia + Sources & Uses + Topics + Geography

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2008-Jun | 06/06 | 128.16 | 06/13 | 134.80 | 06/20 | 134.34 | 06/27 | 137.00 | | |
| 2008-Jul | 07/04 | 142.52 | 07/11 | 139.95 | 07/18 | 135.37 | 07/25 | 125.92 | | |
| 2008-Aug | 08/01 | 124.57 | 08/08 | 118.80 | 08/15 | 114.40 | 08/22 | 115.70 | 08/29 | 116.09 |
| 2008-Sep | 09/05 | 108.37 | 09/12 | 102.88 | 09/19 | 97.19 | 09/26 | 111.12 | | |
| 2008-Oct | 10/03 | 96.59 | 10/10 | 86.24 | 10/17 | 75.19 | 10/24 | 68.56 | 10/31 | 65.21 |
| 2008-Nov | 11/07 | 64.31 | 11/14 | 58.60 | 11/21 | 52.26 | 11/28 | 53.27 | | |
| 2008-Dec | 12/05 | 45.60 | 12/12 | 44.57 | 12/19 | 39.70 | 12/26 | 32.98 | | |
| 2009-Jan | 01/02 | 42.40 | 01/09 | 44.46 | 01/16 | 36.73 | 01/23 | 42.15 | 01/30 | 42.70 |
| 2009-Feb | 02/06 | 40.78 | 02/13 | 36.94 | 02/20 | 37.15 | 02/27 | 41.10 | | |
| 2009-Mar | 03/06 | 43.18 | 03/13 | 45.66 | 03/20 | 49.49 | 03/27 | 52.99 | | |
| 2009-Apr | 04/03 | 50.34 | 04/10 | 50.46 | 04/17 | 49.86 | 04/24 | 47.80 | | |
| 2009-May | 05/01 | 50.20 | 05/08 | 55.96 | 05/15 | 57.94 | 05/22 | 60.32 | 05/29 | 64.32 |
| 2009-Jun | 06/05 | 68.11 | 06/12 | 70.85 | 06/19 | 70.62 | 06/26 | 68.58 | | |
| 2009-Jul | 07/03 | 69.32 | 07/10 | 61.48 | 07/17 | 61.29 | 07/24 | 65.28 | 07/31 | 67.03 |
| 2009-Aug | 08/07 | 71.58 | 08/14 | 69.64 | 08/21 | 70.80 | 08/28 | 72.37 | | |
| 2009-Sep | 09/04 | 68.39 | 09/11 | 70.91 | 09/18 | 71.32 | 09/25 | 68.33 | | |
| 2009-Oct | 10/02 | 68.84 | 10/09 | 70.80 | 10/16 | 75.73 | 10/23 | 80.06 | 10/30 | 78.47 |
| 2009-Nov | 11/06 | 79.00 | 11/13 | 78.24 | 11/20 | 78.37 | 11/27 | 76.14 | | |
| 2009-Dec | 12/04 | 76.81 | 12/11 | 71.51 | 12/18 | 71.72 | 12/25 | 74.76 | | |
| 2010-Jan | 01/01 | 79.07 | 01/08 | 82.34 | 01/15 | 80.06 | 01/22 | 76.62 | 01/29 | 73.94 |
| 2010-Feb | 02/05 | 74.57 | 02/12 | 73.88 | 02/19 | 78.25 | 02/26 | 79.22 | | |
| 2010-Mar | 03/05 | 80.19 | 03/12 | 81.76 | 03/19 | 81.44 | 03/26 | 80.65 | | |
| 2010-Apr | 04/02 | 83.01 | 04/09 | 85.66 | 04/16 | 84.34 | 04/23 | 82.90 | 04/30 | 84.22 |
| 2010-May | 05/07 | 80.24 | 05/14 | 74.98 | 05/21 | 69.14 | 05/28 | 70.62 | | |
| 2010-Jun | 06/04 | 72.91 | 06/11 | 73.44 | 06/18 | 76.70 | 06/25 | 77.06 | | |
| 2010-Jul | 07/02 | 74.96 | 07/09 | 74.39 | 07/16 | 76.35 | 07/23 | 77.56 | 07/30 | 78.12 |
| 2010-Aug | 08/06 | 81.79 | 08/13 | 78.17 | 08/20 | 74.84 | 08/27 | 72.91 | | |
| 2010-Sep | 09/03 | 74.02 | 09/10 | 74.82 | 09/17 | 75.62 | 09/24 | 73.76 | | |
| 2010-Oct | 10/01 | 78.41 | 10/08 | 82.29 | 10/15 | 82.16 | 10/22 | 81.15 | 10/29 | 82.03 |
| 2010-Nov | 11/05 | 84.93 | 11/12 | 86.91 | 11/19 | 82.23 | 11/26 | 82.28 | | |
| 2010-Dec | 12/03 | 86.75 | 12/10 | 88.50 | 12/17 | 88.27 | 12/24 | 89.66 | 12/31 | 90.97 |
| 2011-Jan | 01/07 | 89.54 | 01/14 | 91.02 | 01/21 | 89.75 | 01/28 | 86.11 | | |
| 2011-Feb | 02/04 | 89.52 | 02/11 | 85.51 | 02/18 | 84.13 | 02/25 | 95.26 | | |
| 2011-Mar | 03/04 | 101.05 | 03/11 | 103.74 | 03/18 | 99.79 | 03/25 | 104.41 | | |
| 2011-Apr | 04/01 | 105.08 | 04/08 | 109.29 | 04/15 | 107.75 | 04/22 | 109.11 | 04/29 | 112.30 |
| 2011-May | 05/06 | 105.84 | 05/13 | 99.87 | 05/20 | 97.99 | 05/27 | 99.55 | | |
| 2011-Jun | 06/03 | 100.92 | 06/10 | 100.05 | 06/17 | 95.87 | 06/24 | 92.70 | | |
| 2011-Jul | 07/01 | 93.70 | 07/08 | 97.12 | 07/15 | 96.72 | 07/22 | 98.01 | 07/29 | 97.83 |
| 2011-Aug | 08/05 | 90.85 | 08/12 | 82.86 | 08/19 | 85.36 | 08/26 | 85.06 | | |
| 2011-Sep | 09/02 | 88.07 | 09/09 | 87.91 | 09/16 | 88.93 | 09/23 | 83.65 | 09/30 | 81.18 |
| 2011-Oct | 10/07 | 79.43 | 10/14 | 85.35 | 10/21 | 86.82 | 10/28 | 92.32 | | |
| 2011-Nov | 11/04 | 93.24 | 11/11 | 96.97 | 11/18 | 99.32 | 11/25 | 96.89 | | |
| 2011-Dec | 12/02 | 99.91 | 12/09 | 100.08 | 12/16 | 96.06 | 12/23 | 97.74 | 12/30 | 99.81 |
| 2012-Jan | 01/06 | 102.39 | 01/13 | 100.43 | 01/20 | 99.95 | 01/27 | 99.35 | | |
| 2012-Feb | 02/03 | 97.80 | 02/10 | 98.56 | 02/17 | 101.73 | 02/24 | 107.18 | | |
| 2012-Mar | 03/02 | 107.52 | 03/09 | 106.32 | 03/16 | 106.15 | 03/23 | 106.41 | 03/30 | 105.12 |
| 2012-Apr | 04/06 | 103.52 | 04/13 | 102.55 | 04/20 | 103.15 | 04/27 | 103.78 | | |
| 2012-May | 05/04 | 103.47 | 05/11 | 96.98 | 05/18 | 93.11 | 05/25 | 90.88 | | |
| 2012-Jun | 06/01 | 87.06 | 06/08 | 84.43 | 06/15 | 83.27 | 06/22 | 81.11 | 06/29 | 80.23 |
| 2012-Jul | 07/06 | 85.74 | 07/13 | 85.78 | 07/20 | 90.34 | 07/27 | 88.88 | | |
| 2012-Aug | 08/03 | 89.10 | 08/10 | 93.14 | 08/17 | 94.43 | 08/24 | 96.22 | 08/31 | 95.68 |
| 2012-Sep | 09/07 | 95.68 | 09/14 | 97.56 | 09/21 | 93.70 | 09/28 | 91.35 | | |
| 2012-Oct | 10/05 | 90.81 | 10/12 | 91.42 | 10/19 | 91.59 | 10/26 | 86.35 | | |
| 2012-Nov | 11/02 | 85.87 | 11/09 | 85.98 | 11/16 | 85.87 | 11/23 | 87.40 | 11/30 | 87.27 |
| 2012-Dec | 12/07 | 87.00 | 12/14 | 85.71 | 12/21 | 88.24 | 12/28 | 90.14 | | |

Document title: Weekly Cushing, OK WTI Spot Price FOB (Dollars per Barrel)
Capture URL: https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=W
Capture timestamp (UTC): Sat, 08 Jun 2024 01:56:39 GMT

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2012-Aug | 08/03 | 89.10 | 08/10 | 93.14 | 08/17 | 94.43 | 08/24 | 96.22 | 08/31 | 95.68 |
| 2012-Sep | 09/07 | 95.68 | 09/14 | 97.56 | 09/21 | 93.70 | 09/28 | 91.35 | | |
| 2012-Oct | 10/05 | 90.81 | 10/12 | 91.42 | 10/19 | 91.59 | 10/26 | 86.35 | | |
| 2012-Nov | 11/02 | 85.87 | 11/09 | 85.98 | 11/16 | 85.87 | 11/23 | 87.40 | 11/30 | 87.27 |
| 2012-Dec | 12/07 | 87.00 | 12/14 | 85.71 | 12/21 | 88.24 | 12/28 | 90.14 | | |
| 2013-Jan | 01/04 | 92.77 | 01/11 | 93.38 | 01/18 | 94.58 | 01/25 | 95.41 | | |
| 2013-Feb | 02/01 | 97.33 | 02/08 | 96.18 | 02/15 | 96.95 | 02/22 | 94.38 | | |
| 2013-Mar | 03/01 | 92.19 | 03/08 | 91.00 | 03/15 | 92.70 | 03/22 | 93.05 | 03/29 | 96.08 |
| 2013-Apr | 04/05 | 95.07 | 04/12 | 93.36 | 04/19 | 88.00 | 04/26 | 91.00 | | |
| 2013-May | 05/03 | 93.40 | 05/10 | 95.84 | 05/17 | 94.65 | 05/24 | 94.76 | 05/31 | 93.32 |
| 2013-Jun | 06/07 | 94.25 | 06/14 | 96.36 | 06/21 | 96.65 | 06/28 | 95.83 | | |
| 2013-Jul | 07/05 | 100.65 | 07/12 | 104.70 | 07/19 | 106.68 | 07/26 | 105.88 | | |
| 2013-Aug | 08/02 | 105.54 | 08/09 | 105.17 | 08/16 | 106.97 | 08/23 | 105.48 | 08/30 | 108.33 |
| 2013-Sep | 09/06 | 108.77 | 09/13 | 108.36 | 09/20 | 106.22 | 09/27 | 103.10 | | |
| 2013-Oct | 10/04 | 103.14 | 10/11 | 102.70 | 10/18 | 101.51 | 10/25 | 97.57 | | |
| 2013-Nov | 11/01 | 96.94 | 11/08 | 94.31 | 11/15 | 93.94 | 11/22 | 93.92 | 11/29 | 92.97 |
| 2013-Dec | 12/06 | 96.21 | 12/13 | 97.23 | 12/20 | 97.85 | 12/27 | 99.15 | | |
| 2014-Jan | 01/03 | 96.47 | 01/10 | 92.42 | 01/17 | 92.98 | 01/24 | 96.19 | 01/31 | 97.29 |
| 2014-Feb | 02/07 | 97.78 | 02/14 | 100.21 | 02/21 | 102.93 | 02/28 | 102.77 | | |
| 2014-Mar | 03/07 | 103.07 | 03/14 | 99.55 | 03/21 | 99.77 | 03/28 | 100.66 | | |
| 2014-Apr | 04/04 | 100.46 | 04/11 | 102.72 | 04/18 | 103.95 | 04/25 | 102.11 | | |
| 2014-May | 05/02 | 100.51 | 05/09 | 100.29 | 05/16 | 101.92 | 05/23 | 103.82 | 05/30 | 103.95 |
| 2014-Jun | 06/06 | 103.23 | 06/13 | 105.97 | 06/20 | 107.23 | 06/27 | 106.69 | | |
| 2014-Jul | 07/04 | 105.52 | 07/11 | 103.25 | 07/18 | 102.37 | 07/25 | 104.35 | | |
| 2014-Aug | 08/01 | 102.19 | 08/08 | 97.50 | 08/15 | 97.17 | 08/22 | 94.95 | 08/29 | 96.25 |
| 2014-Sep | 09/05 | 94.06 | 09/12 | 92.43 | 09/19 | 93.52 | 09/26 | 93.15 | | |
| 2014-Oct | 10/03 | 91.44 | 10/10 | 87.63 | 10/17 | 82.88 | 10/24 | 82.12 | 10/31 | 81.29 |
| 2014-Nov | 11/07 | 78.24 | 11/14 | 76.50 | 11/21 | 75.38 | 11/28 | 72.36 | | |
| 2014-Dec | 12/05 | 67.18 | 12/12 | 61.14 | 12/19 | 55.89 | 12/26 | 55.58 | | |
| 2015-Jan | 01/02 | 53.44 | 01/09 | 48.77 | 01/16 | 47.07 | 01/23 | 46.46 | 01/30 | 45.32 |
| 2015-Feb | 02/06 | 50.58 | 02/13 | 51.14 | 02/20 | 51.69 | 02/27 | 49.16 | | |
| 2015-Mar | 03/06 | 50.38 | 03/13 | 47.69 | 03/20 | 44.39 | 03/27 | 48.68 | | |
| 2015-Apr | 04/03 | 48.91 | 04/10 | 51.78 | 04/17 | 54.78 | 04/24 | 56.14 | | |
| 2015-May | 05/01 | 57.98 | 05/08 | 59.73 | 05/15 | 60.01 | 05/22 | 58.95 | 05/29 | 58.19 |
| 2015-Jun | 06/05 | 59.66 | 06/12 | 60.07 | 06/19 | 59.89 | 06/26 | 60.01 | | |
| 2015-Jul | 07/03 | 57.92 | 07/10 | 52.38 | 07/17 | 51.68 | 07/24 | 49.21 | 07/31 | 47.91 |
| 2015-Aug | 08/07 | 44.94 | 08/14 | 43.20 | 08/21 | 41.34 | 08/28 | 40.73 | | |
| 2015-Sep | 09/04 | 46.73 | 09/11 | 45.16 | 09/18 | 45.48 | 09/25 | 45.57 | | |
| 2015-Oct | 10/02 | 45.00 | 10/09 | 48.36 | 10/16 | 46.82 | 10/23 | 45.16 | 10/30 | 44.99 |
| 2015-Nov | 11/06 | 45.98 | 11/13 | 42.70 | 11/20 | 40.62 | 11/27 | 40.49 | | |
| 2015-Dec | 12/04 | 40.40 | 12/11 | 36.93 | 12/18 | 35.78 | 12/25 | 36.26 | | |
| 2016-Jan | 01/01 | 36.99 | 01/08 | 34.65 | 01/15 | 30.59 | 01/22 | 29.19 | 01/29 | 31.81 |
| 2016-Feb | 02/05 | 31.26 | 02/12 | 28.14 | 02/19 | 30.02 | 02/26 | 31.32 | | |
| 2016-Mar | 03/04 | 34.43 | 03/11 | 37.69 | 03/18 | 38.32 | 03/25 | 39.45 | | |
| 2016-Apr | 04/01 | 36.82 | 04/08 | 36.72 | 04/15 | 41.23 | 04/22 | 41.86 | 04/29 | 44.30 |
| 2016-May | 05/06 | 44.22 | 05/13 | 45.44 | 05/20 | 47.99 | 05/27 | 48.72 | | |
| 2016-Jun | 06/03 | 49.00 | 06/10 | 50.18 | 06/17 | 47.89 | 06/24 | 48.71 | | |
| 2016-Jul | 07/01 | 48.17 | 07/08 | 46.17 | 07/15 | 45.60 | 07/22 | 44.44 | 07/29 | 41.83 |
| 2016-Aug | 08/05 | 40.82 | 08/12 | 43.11 | 08/19 | 47.16 | 08/26 | 47.05 | | |
| 2016-Sep | 09/02 | 45.11 | 09/09 | 45.96 | 09/16 | 44.34 | 09/23 | 44.59 | 09/30 | 46.55 |
| 2016-Oct | 10/07 | 49.48 | 10/14 | 50.29 | 10/21 | 50.56 | 10/28 | 49.36 | | |
| 2016-Nov | 11/04 | 45.51 | 11/11 | 44.61 | 11/18 | 45.15 | 11/25 | 47.25 | | |
| 2016-Dec | 12/02 | 48.63 | 12/09 | 50.97 | 12/16 | 51.91 | 12/23 | 51.95 | 12/30 | 53.60 |
| 2017-Jan | 01/06 | 53.34 | 01/13 | 52.07 | 01/20 | 51.82 | 01/27 | 52.74 | | |
| 2017-Feb | 02/03 | 53.33 | 02/10 | 52.88 | 02/17 | 53.22 | 02/24 | 54.03 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2016-Oct | 10/07 | 49.48 | 10/14 | 50.29 | 10/21 | 50.56 | 10/28 | 49.36 | | |
| 2016-Nov | 11/04 | 45.51 | 11/11 | 44.61 | 11/18 | 45.15 | 11/25 | 47.25 | | |
| 2016-Dec | 12/02 | 48.63 | 12/09 | 50.97 | 12/16 | 51.91 | 12/23 | 51.95 | 12/30 | 53.60 |
| 2017-Jan | 01/06 | 53.34 | 01/13 | 52.07 | 01/20 | 51.82 | 01/27 | 52.74 | | |
| 2017-Feb | 02/03 | 53.33 | 02/10 | 52.88 | 02/17 | 53.22 | 02/24 | 54.03 | | |
| 2017-Mar | 03/03 | 53.56 | 03/10 | 50.50 | 03/17 | 48.03 | 03/24 | 47.28 | 03/31 | 49.14 |
| 2017-Apr | 04/07 | 51.26 | 04/14 | 53.19 | 04/21 | 51.09 | 04/28 | 49.12 | | |
| 2017-May | 05/05 | 47.21 | 05/12 | 47.04 | 05/19 | 49.24 | 05/26 | 50.21 | | |
| 2017-Jun | 06/02 | 48.48 | 06/09 | 46.57 | 06/16 | 45.30 | 06/23 | 43.09 | 06/30 | 44.63 |
| 2017-Jul | 07/07 | 44.96 | 07/14 | 45.51 | 07/21 | 46.41 | 07/28 | 48.27 | | |
| 2017-Aug | 08/04 | 49.52 | 08/11 | 49.08 | 08/18 | 47.52 | 08/25 | 47.68 | | |
| 2017-Sep | 09/01 | 46.68 | 09/08 | 48.58 | 09/15 | 49.07 | 09/22 | 50.12 | 09/29 | 51.77 |
| 2017-Oct | 10/06 | 50.23 | 10/13 | 50.77 | 10/20 | 51.74 | 10/27 | 52.51 | | |
| 2017-Nov | 11/03 | 54.59 | 11/10 | 57.05 | 11/17 | 55.81 | 11/24 | 57.47 | | |
| 2017-Dec | 12/01 | 57.81 | 12/08 | 56.92 | 12/15 | 57.17 | 12/22 | 57.87 | 12/29 | 59.88 |
| 2018-Jan | 01/05 | 61.36 | 01/12 | 63.26 | 01/19 | 63.77 | 01/26 | 65.14 | | |
| 2018-Feb | 02/02 | 65.32 | 02/09 | 62.01 | 02/16 | 60.56 | 02/23 | 62.47 | | |
| 2018-Mar | 03/02 | 62.07 | 03/09 | 61.65 | 03/16 | 61.28 | 03/23 | 64.11 | 03/30 | 64.97 |
| 2018-Apr | 04/06 | 63.07 | 04/13 | 66.02 | 04/20 | 67.55 | 04/27 | 67.91 | | |
| 2018-May | 05/04 | 68.38 | 05/11 | 70.56 | 05/18 | 71.30 | 05/25 | 70.98 | | |
| 2018-Jun | 06/01 | 66.96 | 06/08 | 65.35 | 06/15 | 66.21 | 06/22 | 66.32 | 06/29 | 74.03 |
| 2018-Jul | 07/06 | 73.73 | 07/13 | 71.96 | 07/20 | 68.95 | 07/27 | 70.01 | | |
| 2018-Aug | 08/03 | 69.46 | 08/10 | 67.90 | 08/17 | 66.15 | 08/24 | 68.10 | 08/31 | 69.66 |
| 2018-Sep | 09/07 | 68.51 | 09/14 | 68.96 | 09/21 | 70.28 | 09/28 | 72.84 | | |
| 2018-Oct | 10/05 | 75.13 | 10/12 | 72.96 | 10/19 | 70.24 | 10/26 | 67.43 | | |
| 2018-Nov | 11/02 | 65.06 | 11/09 | 61.57 | 11/16 | 56.92 | 11/23 | 54.99 | 11/30 | 51.01 |
| 2018-Dec | 12/07 | 52.63 | 12/14 | 51.54 | 12/21 | 46.98 | 12/28 | 45.22 | | |
| 2019-Jan | 01/04 | 47.00 | 01/11 | 50.78 | 01/18 | 51.92 | 01/25 | 52.88 | | |
| 2019-Feb | 02/01 | 53.63 | 02/08 | 53.53 | 02/15 | 53.88 | 02/22 | 56.74 | | |
| 2019-Mar | 03/01 | 56.12 | 03/08 | 56.35 | 03/15 | 57.81 | 03/22 | 59.44 | 03/29 | 59.49 |
| 2019-Apr | 04/05 | 62.36 | 04/12 | 64.10 | 04/19 | 63.80 | 04/26 | 65.28 | | |
| 2019-May | 05/03 | 62.90 | 05/10 | 61.81 | 05/17 | 62.10 | 05/24 | 60.72 | 05/31 | 56.93 |
| 2019-Jun | 06/07 | 52.97 | 06/14 | 52.52 | 06/21 | 54.75 | 06/28 | 58.38 | | |
| 2019-Jul | 07/05 | 57.32 | 07/12 | 59.02 | 07/19 | 56.74 | 07/26 | 56.05 | | |
| 2019-Aug | 08/02 | 56.55 | 08/09 | 53.28 | 08/16 | 55.31 | 08/23 | 55.50 | 08/30 | 55.21 |
| 2019-Sep | 09/06 | 55.73 | 09/13 | 56.16 | 09/20 | 59.33 | 09/27 | 56.90 | | |
| 2019-Oct | 10/04 | 53.12 | 10/11 | 53.27 | 10/18 | 53.49 | 10/25 | 55.20 | | |
| 2019-Nov | 11/01 | 55.17 | 11/08 | 56.69 | 11/15 | 56.85 | 11/22 | 56.90 | 11/29 | 58.07 |
| 2019-Dec | 12/06 | 57.64 | 12/13 | 59.25 | 12/20 | 60.75 | 12/27 | 61.29 | | |
| 2020-Jan | 01/03 | 62.09 | 01/10 | 60.84 | 01/17 | 58.29 | 01/24 | 56.15 | 01/31 | 52.70 |
| 2020-Feb | 02/07 | 50.36 | 02/14 | 50.83 | 02/21 | 53.14 | 02/28 | 48.36 | | |
| 2020-Mar | 03/06 | 45.57 | 03/13 | 32.39 | 03/20 | 24.19 | 03/27 | 19.44 | | |
| 2020-Apr | 04/03 | 21.69 | 04/10 | 24.41 | 04/17 | 20.12 | 04/24 | 3.32 | | |
| 2020-May | 05/01 | 15.71 | 05/08 | 23.46 | 05/15 | 26.40 | 05/22 | 33.10 | 05/29 | 34.19 |
| 2020-Jun | 06/05 | 37.32 | 06/12 | 37.87 | 06/19 | 38.35 | 06/26 | 39.22 | | |
| 2020-Jul | 07/03 | 39.85 | 07/10 | 40.44 | 07/17 | 40.57 | 07/24 | 41.34 | 07/31 | 40.69 |
| 2020-Aug | 08/07 | 41.57 | 08/14 | 42.08 | 08/21 | 42.73 | 08/28 | 42.93 | | |
| 2020-Sep | 09/04 | 41.84 | 09/11 | 37.38 | 09/18 | 39.55 | 09/25 | 39.78 | | |
| 2020-Oct | 10/02 | 38.99 | 10/09 | 40.19 | 10/16 | 40.33 | 10/23 | 40.43 | 10/30 | 37.32 |
| 2020-Nov | 11/06 | 37.71 | 11/13 | 40.66 | 11/20 | 41.52 | 11/27 | 44.40 | | |
| 2020-Dec | 12/04 | 45.37 | 12/11 | 46.04 | 12/18 | 47.97 | 12/25 | 47.73 | | |
| 2021-Jan | 01/01 | 47.98 | 01/08 | 50.09 | 01/15 | 52.75 | 01/22 | 52.82 | 01/29 | 52.52 |
| 2021-Feb | 02/05 | 55.39 | 02/12 | 58.54 | 02/19 | 60.17 | 02/26 | 62.30 | | |
| 2021-Mar | 03/05 | 62.29 | 03/12 | 65.02 | 03/19 | 63.22 | 03/26 | 59.95 | | |
| 2021-Apr | 04/02 | 60.66 | 04/09 | 59.35 | 04/16 | 61.93 | 04/23 | 62.18 | 04/30 | 63.47 |

eia + Sources & Uses + Topics + Geography

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2020-Dec | 12/04 | 45.37 | 12/11 | 46.04 | 12/18 | 47.97 | 12/25 | 47.73 | | |
| 2021-Jan | 01/01 | 47.98 | 01/08 | 50.09 | 01/15 | 52.75 | 01/22 | 52.82 | 01/29 | 52.52 |
| 2021-Feb | 02/05 | 55.39 | 02/12 | 58.54 | 02/19 | 60.17 | 02/26 | 62.30 | | |
| 2021-Mar | 03/05 | 62.29 | 03/12 | 65.02 | 03/19 | 63.22 | 03/26 | 59.95 | | |
| 2021-Apr | 04/02 | 60.66 | 04/09 | 59.35 | 04/16 | 61.93 | 04/23 | 62.18 | 04/30 | 63.47 |
| 2021-May | 05/07 | 65.10 | 05/14 | 65.07 | 05/21 | 64.11 | 05/28 | 66.40 | | |
| 2021-Jun | 06/04 | 68.74 | 06/11 | 70.11 | 06/18 | 71.55 | 06/25 | 73.48 | | |
| 2021-Jul | 07/02 | 74.07 | 07/09 | 73.35 | 07/16 | 73.19 | 07/23 | 69.68 | 07/30 | 72.75 |
| 2021-Aug | 08/06 | 69.50 | 08/13 | 68.33 | 08/20 | 65.05 | 08/27 | 67.59 | | |
| 2021-Sep | 09/03 | 69.15 | 09/10 | 68.98 | 09/17 | 71.69 | 09/24 | 72.18 | | |
| 2021-Oct | 10/01 | 75.45 | 10/08 | 78.50 | 10/15 | 81.18 | 10/22 | 83.48 | 10/29 | 83.84 |
| 2021-Nov | 11/05 | 81.79 | 11/12 | 81.93 | 11/19 | 78.99 | 11/26 | 77.79 | | |
| 2021-Dec | 12/03 | 66.89 | 12/10 | 71.31 | 12/17 | 71.18 | 12/24 | 71.63 | 12/31 | 76.05 |
| 2022-Jan | 01/07 | 77.86 | 01/14 | 81.52 | 01/21 | 85.93 | 01/28 | 86.94 | | |
| 2022-Feb | 02/04 | 89.60 | 02/11 | 90.61 | 02/18 | 92.89 | 02/25 | 92.18 | | |
| 2022-Mar | 03/04 | 106.80 | 03/11 | 113.39 | 03/18 | 100.43 | 03/25 | 113.69 | | |
| 2022-Apr | 04/01 | 103.89 | 04/08 | 99.21 | 04/15 | 101.46 | 04/22 | 104.02 | 04/29 | 102.85 |
| 2022-May | 05/06 | 106.69 | 05/13 | 105.00 | 05/20 | 112.18 | 05/27 | 113.38 | | |
| 2022-Jun | 06/03 | 116.37 | 06/10 | 120.43 | 06/17 | 116.46 | 06/24 | 107.88 | | |
| 2022-Jul | 07/01 | 110.96 | 07/08 | 103.32 | 07/15 | 99.92 | 07/22 | 102.24 | 07/29 | 99.60 |
| 2022-Aug | 08/05 | 94.01 | 08/12 | 94.65 | 08/19 | 91.81 | 08/26 | 94.47 | | |
| 2022-Sep | 09/02 | 90.79 | 09/09 | 85.29 | 09/16 | 87.24 | 09/23 | 83.46 | 09/30 | 80.08 |
| 2022-Oct | 10/07 | 88.22 | 10/14 | 88.97 | 10/21 | 85.36 | 10/28 | 87.87 | | |
| 2022-Nov | 11/04 | 89.14 | 11/11 | 88.41 | 11/18 | 84.02 | 11/25 | 78.74 | | |
| 2022-Dec | 12/02 | 79.29 | 12/09 | 73.06 | 12/16 | 75.12 | 12/23 | 77.28 | 12/30 | 79.23 |
| 2023-Jan | 01/06 | 74.27 | 01/13 | 77.10 | 01/20 | 80.34 | 01/27 | 80.33 | | |
| 2023-Feb | 02/03 | 76.51 | 02/10 | 77.51 | 02/17 | 78.51 | 02/24 | 75.42 | | |
| 2023-Mar | 03/03 | 77.54 | 03/10 | 77.31 | 03/17 | 69.60 | 03/24 | 69.33 | 03/31 | 73.79 |
| 2023-Apr | 04/07 | 80.62 | 04/14 | 81.87 | 04/21 | 79.22 | 04/28 | 76.31 | | |
| 2023-May | 05/05 | 71.16 | 05/12 | 72.03 | 05/19 | 71.62 | 05/26 | 72.62 | | |
| 2023-Jun | 06/02 | 69.85 | 06/09 | 71.56 | 06/16 | 69.42 | 06/23 | 70.41 | 06/30 | 69.36 |
| 2023-Jul | 07/07 | 71.79 | 07/14 | 75.20 | 07/21 | 75.61 | 07/28 | 79.68 | | |
| 2023-Aug | 08/04 | 81.40 | 08/11 | 83.04 | 08/18 | 80.93 | 08/25 | 79.97 | | |
| 2023-Sep | 09/01 | 82.50 | 09/08 | 87.17 | 09/15 | 89.14 | 09/22 | 90.28 | 09/29 | 91.44 |
| 2023-Oct | 10/06 | 85.50 | 10/13 | 85.03 | 10/20 | 88.03 | 10/27 | 85.20 | | |
| 2023-Nov | 11/03 | 81.99 | 11/10 | 77.92 | 11/17 | 76.98 | 11/24 | 77.02 | | |
| 2023-Dec | 12/01 | 75.49 | 12/08 | 70.71 | 12/15 | 70.11 | 12/22 | 73.23 | 12/29 | 73.52 |
| 2024-Jan | 01/05 | 72.49 | 01/12 | 72.03 | 01/19 | 73.36 | 01/26 | 76.36 | | |
| 2024-Feb | 02/02 | 75.78 | 02/09 | 75.05 | 02/16 | 78.17 | 02/23 | 78.71 | | |
| 2024-Mar | 03/01 | 79.58 | 03/08 | 79.53 | 03/15 | 80.43 | 03/22 | 82.79 | 03/29 | 82.73 |
| 2024-Apr | 04/05 | 86.35 | 04/12 | 86.50 | 04/19 | 84.65 | 04/26 | 84.48 | | |
| 2024-May | 05/03 | 81.74 | 05/10 | 80.26 | 05/17 | 80.61 | 05/24 | 79.43 | 05/31 | 80.03 |

- = No Data Reported; -- = Not Applicable; NA = Not Available; W = Withheld to avoid disclosure of individual company data.

Release Date: 6/5/2024
Next Release Date: 6/12/2024

**Referring Pages:**

- Spot Prices for Crude Oil and Petroleum Products

About EIA › Open Data › Press Room › Careers › Contact Us

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2021-Sep | 09/03 | 69.15 | 09/10 | 68.98 | 09/17 | 71.69 | 09/24 | 72.18 | | |
| 2021-Oct | 10/01 | 75.45 | 10/08 | 78.50 | 10/15 | 81.18 | 10/22 | 83.48 | 10/29 | 83.84 |
| 2021-Nov | 11/05 | 81.79 | 11/12 | 81.93 | 11/19 | 78.99 | 11/26 | 77.79 | | |
| 2021-Dec | 12/03 | 66.89 | 12/10 | 71.31 | 12/17 | 71.18 | 12/24 | 71.63 | 12/31 | 76.05 |
| 2022-Jan | 01/07 | 77.86 | 01/14 | 81.52 | 01/21 | 85.93 | 01/28 | 86.94 | | |
| 2022-Feb | 02/04 | 89.60 | 02/11 | 90.61 | 02/18 | 92.89 | 02/25 | 92.18 | | |
| 2022-Mar | 03/04 | 106.80 | 03/11 | 113.39 | 03/18 | 100.43 | 03/25 | 113.69 | | |
| 2022-Apr | 04/01 | 103.89 | 04/08 | 99.21 | 04/15 | 101.46 | 04/22 | 104.02 | 04/29 | 102.85 |
| 2022-May | 05/06 | 106.69 | 05/13 | 105.00 | 05/20 | 112.18 | 05/27 | 113.38 | | |
| 2022-Jun | 06/03 | 116.37 | 06/10 | 120.43 | 06/17 | 116.46 | 06/24 | 107.88 | | |
| 2022-Jul | 07/01 | 110.96 | 07/08 | 103.32 | 07/15 | 99.92 | 07/22 | 102.24 | 07/29 | 99.60 |
| 2022-Aug | 08/05 | 94.01 | 08/12 | 94.65 | 08/19 | 91.81 | 08/26 | 94.47 | | |
| 2022-Sep | 09/02 | 90.79 | 09/09 | 85.29 | 09/16 | 87.24 | 09/23 | 83.46 | 09/30 | 80.08 |
| 2022-Oct | 10/07 | 88.22 | 10/14 | 88.97 | 10/21 | 85.36 | 10/28 | 87.87 | | |
| 2022-Nov | 11/04 | 89.14 | 11/11 | 88.41 | 11/18 | 84.02 | 11/25 | 78.74 | | |
| 2022-Dec | 12/02 | 79.29 | 12/09 | 73.06 | 12/16 | 75.12 | 12/23 | 77.28 | 12/30 | 79.23 |
| 2023-Jan | 01/06 | 74.27 | 01/13 | 77.10 | 01/20 | 80.34 | 01/27 | 80.33 | | |
| 2023-Feb | 02/03 | 76.51 | 02/10 | 77.51 | 02/17 | 78.51 | 02/24 | 75.42 | | |
| 2023-Mar | 03/03 | 77.54 | 03/10 | 77.31 | 03/17 | 69.60 | 03/24 | 69.33 | 03/31 | 73.79 |
| 2023-Apr | 04/07 | 80.62 | 04/14 | 81.87 | 04/21 | 79.22 | 04/28 | 76.31 | | |
| 2023-May | 05/05 | 71.16 | 05/12 | 72.03 | 05/19 | 71.62 | 05/26 | 72.62 | | |
| 2023-Jun | 06/02 | 69.85 | 06/09 | 71.56 | 06/16 | 69.42 | 06/23 | 70.41 | 06/30 | 69.36 |
| 2023-Jul | 07/07 | 71.79 | 07/14 | 75.20 | 07/21 | 75.61 | 07/28 | 79.68 | | |
| 2023-Aug | 08/04 | 81.40 | 08/11 | 83.04 | 08/18 | 80.93 | 08/25 | 79.97 | | |
| 2023-Sep | 09/01 | 82.50 | 09/08 | 87.17 | 09/15 | 89.14 | 09/22 | 90.28 | 09/29 | 91.44 |
| 2023-Oct | 10/06 | 85.50 | 10/13 | 85.03 | 10/20 | 88.03 | 10/27 | 85.20 | | |
| 2023-Nov | 11/03 | 81.99 | 11/10 | 77.92 | 11/17 | 76.98 | 11/24 | 77.02 | | |
| 2023-Dec | 12/01 | 75.49 | 12/08 | 70.71 | 12/15 | 70.11 | 12/22 | 73.23 | 12/29 | 73.52 |
| 2024-Jan | 01/05 | 72.49 | 01/12 | 72.03 | 01/19 | 73.36 | 01/26 | 76.36 | | |
| 2024-Feb | 02/02 | 75.78 | 02/09 | 75.05 | 02/16 | 78.17 | 02/23 | 78.71 | | |
| 2024-Mar | 03/01 | 79.58 | 03/08 | 79.53 | 03/15 | 80.43 | 03/22 | 82.79 | 03/29 | 82.73 |
| 2024-Apr | 04/05 | 86.35 | 04/12 | 86.50 | 04/19 | 84.65 | 04/26 | 84.48 | | |
| 2024-May | 05/03 | 81.74 | 05/10 | 80.26 | 05/17 | 80.61 | 05/24 | 79.43 | 05/31 | 80.03 |

- = No Data Reported; -- = Not Applicable; NA = Not Available; W = Withheld to avoid disclosure of individual company data.

Release Date: 6/5/2024
Next Release Date: 6/12/2024

**Referring Pages:**

- Spot Prices for Crude Oil and Petroleum Products

PageVault

| | |
|---|---|
| Document title: | UP: What Is Intermodal Equipment? |
| Capture URL: | https://www.up.com/customers/track-record/tr060821-what-is-intermodal-equipment.htm |
| Page loaded at (UTC): | Fri, 07 Jun 2024 22:49:52 GMT |
| Capture timestamp (UTC): | Fri, 07 Jun 2024 22:51:04 GMT |
| Capture tool: | 10.47.5 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/124.0.0.0 Safari/537.36 |
| Operating system: | Linux (Node 20.11.1) |
| PDF length: | 7 |
| Capture ID: | uXnjFaBq7iqbxGeKYRR7nm |
| User: | lw-ryork |

PDF REFERENCE #: ffXnUhemhEbm4tXR856RNj

# What Is Intermodal Equipment?

**Take an in-depth look at intermodal equipment, like containers and trailers, which is used to ship consumer goods, food, agricultural products and much more**




Intermodal equipment can travel by land or by sea, and can carry a wide range of products, too. Dive into the details with these answers to frequently asked questions about intermodal equipment to learn just how versatile it is.

Intermodal equipment is perhaps the most versatile of all rail equipment. That's because intermodal containers can go just about anywhere: they can travel across North America on trains or on trucks. They can be loaded onto cargo ships for travel overseas. Or, they can move between those three modes, often without unloading or reloading the cargo. In fact, it's called "intermodal equipment" because it can move between two or more modes of transportation.

But the way intermodal containers travel isn't the only thing that makes them versatile. Intermodal containers can also carry just about anything, from clothing to electronics to grain, making intermodal shipping a great option for a wide variety of shippers.

## What Is Intermodal Equipment Used For?

Intermodal containers can carry a wide variety of goods, including:



**Food and Beverages**

- Frozen pork
- Bottled beer
- Cans of hard seltzer
- Cocktail mix (both dry and liquid)
- Potatoes
- Coffee beans

**Agricultural Products**

- Soybeans
- Hay
- Grain
- Grain products

Subscribe to Track Record
Email address
Sign Up

Learn How Your Products Can Ship by Rail ❯

Connect with Track Record

About Track Record

Latest Stories



TIPS

Why Shipping to The West Coast Is Your Competitive Solution




INSIGHTS

Webinar - Nearshoring: Best Practices for Shipping to and from Mexico



**Agricultural Products**

- Soybeans
- Hay
- Grain
- Grain products

**Consumer Goods**

- Shoes
- Clothing
- Electronics
- Appliances
- Toys
- Christmas trees
- Motorcycles

**Building, Construction and Manufacturing Materials**

- Plastics
- Rolled rubber
- Scaffolding
- Quartz slabs
- Spooled chains

## What Are the Different Types of Intermodal Equipment?

**Intermodal Containers**

Intermodal containers are large, rectangular boxes that look a lot like truck trailers, except they don't have wheels. Containers can be transferred between ships, trains and trucks without unloading or reloading the cargo. When they travel by rail, they are loaded onto well cars. When they travel by truck, they are loaded on a chassis. Containers can range in length from 20' to 53' and can be dry or refrigerated. Containers can be stacked on top of each other for efficient storage or stacked one on top of another during rail transport.

**Intermodal Tanks**

Intermodal tanks are 20-foot or 40-foot cylindrical tanks that can be filled with liquid goods such as fruit juices, liquors, solvents and other chemicals. ISO tanks, as they are commonly referred to, can be used to move freight domestically (between U.S. cities) as well as internationally, moving on ships just like intermodal containers. IOS tanks can also can be transferred between ships, trains and trucks without unloading or reloading the cargo. When they travel by rail, they are loaded onto well cars. When they travel by truck, they are loaded on a chassis. ISO tanks can be stacked on top of each other for efficient storage or stacked one on top of another during rail transport, depending on the commodity.

**Trailers**

Trailers are the part of an over-the-road truck that holds freight. Trailers have their own rear wheels and hook up to a truck cab to travel on roadways. To move by rail, trailers are loaded onto flatcars. Like containers, trailers can be transferred between trucks and rail cars. However, because they have wheels, they cannot be stacked.

**Chassis**

A chassis is the frame underneath a truck to which other truck components are mounted. A truck chassis has its own tires, allowing containers to be mounted on them for over-the-road travel. Chassis can come in a variety of sizes to fit different sized containers.

## What Are the Different Kinds of Containers?

Containers generally fall into two categories: domestic and international.

**International containers**



INSIGHTS

How to Ship Sustainable Aviation Fuel



INSIGHTS

The Rise of Sustainable Aviation Fuel



101

How Railroad Special Agents Keep Customer Goods Safe




FUN

Track Record's Top Stories of 2023: Nos. 1-5




FUN

Track Record's Top Stories of 2023: Nos. 6-10

See More

variety of sizes to fit different sized containers.

Track Record's Top Stories of 2023: Nos. 6-10

See More

## What Are the Different Kinds of Containers?

Containers generally fall into two categories: domestic and international.

**International containers**

International containers are usually 20- or 40-feet in length. These containers are used for international/overseas intermodal shipments. They are transferred between cargo ships, trucks and trains, with the product staying in the same container for the entirety of the trip.

**Domestic containers**

Domestic containers are typically 53 feet in length and can either be dry or refrigerated and are used for domestic intermodal shipments. Although shipments that travel in domestic containers are bound for inland (i.e., "domestic") destinations, the products that travel in them may still arrive from overseas. In this instance, products arrive at a port on cargo ships in 20- or 40-foot international containers. Then, they are transferred to 53-foot domestic containers at a cross dock facility, transload facility or distribution center. From there, products travel to their final inland destination.

## What Does Intermodal Equipment Look Like?



**Intermodal containers** look like large, rectangular boxes. In fact, they are often referred to as "boxes." Intermodal containers have doors at one end that can be sealed and locked. They are made of very strong corrugated steel panels that keep the products inside safe from the environment and damage. Containers are always 8-feet wide, but their length and height varies by container type. Container length can range from 20 to 53 feet and container height can range from 8 feet to 10 feet 6 inche

**Trailers** look similar to containers but have wheels attached to the back. They look like the back of a semi-truck that has been unattached from the cab.

A **chassis** is a metal structure with rubber wheels attached.

## What Are Other Names for Intermodal Containers?

Other names for intermodal containers include:

- Box
- Cargo container
- Freight container
- ISO container
- Shipping container
- Sea container
- Ocean container
- Sea van
- Conex box
- Container van
- Sea can
- C can

## How Is Intermodal Equipment Loaded and Unloaded?

Intermodal containers and trailers are loaded and

- Container van
- Sea can
- C can

## How Is Intermodal Equipment Loaded and Unloaded?



Intermodal containers and trailers are loaded and unloaded through double doors at the back end of the container or trailer. The way products are loaded or unloaded depends on the product. For instance, if products are palletized, they would be loaded or unloaded by a forklift.

Intermodal containers themselves are moved between transportation modes in a number ways, including:

- Cranes
- Forklifts
- Straddle carriers
- Reach stackers
- Swap bodies
- Sidelifters
- Tilt deck trucks
- Hook trucks

## Why Do Shippers Use Intermodal?

Because intermodal shipping allows shippers to use more than one mode of transportation, it allows them to take advantage of the benefits of each mode. For instance, rail is typically the most economical and environmentally responsible way to ship goods long distances. Trucks are flexible and make it such that shippers don't have to have railroad tracks at the origin or destination to ship by train. When shippers use intermodal, they can ship by train for the long haul and use trucks for first- and last-mile delivery and get the benefits of both rail and truck.

Shippers also use intermodal shipping for the available capacity to move their products. In fact, some railroads have programs that allow shippers to "reserve" capacity. For instance, Union Pacific's Mutual Commitment Program provides shippers with year-round committed capacity and consistent pricing. With more than 80,000 containers – the largest dedicated container fleet for domestic customers – Union Pacific and our rail partners can provide the capacity shippers need for domestic shipments.

## Intermodal Equipment Fun Facts



- In 2012, there were about 20.5 million intermodal containers in the world.
- When trailers ride on flat cars, rail fans call them "piggybacks."
- When trucks haul containers, it's referred to as "drayage."
- When you see a green intermodal container with EMP on the side, that's part of Union Pacific's interline container service with Norfolk Southern.
- When you see a blue intermodal container with UMAX on the side, that's part of Union Pacific's interline container service with CSX.

## Learn More

To learn more about how intermodal can give you a more economical, environmentally responsible shipping solution, get in touch.

interline container service with CSX.

## Learn More

To learn more about how intermodal can give you a more economical, environmentally responsible shipping solution, get in touch.

Want to learn more about other types of rail car equipment, including auto racks, boxcars, flatcars, hoppers and gondolas? Check out our rail car type guide.

**Related Articles**

- How to Keep Intermodal Shipments Safe
- Rail Car Types Defined
- Intermodal vs. Transloading
- What Is Intermodal Shipping ...and Why Should Shippers Care?
- Transportation Modes Revealed: A Comprehensive Look
- The Art of Loading a Rail Car
- What Is a Refrigerated Boxcar — and How Do They Keep Shipments Cold?
- Quiz: Can Your Product Ship by Rail?

## "What Is Intermodal Equipment" Video




---

Share This!

Share | Share | Post | Pin it | Email

## "What Is Intermodal Equipment" Video




Share This!

Share | Share | Post | Pin it | Email

Section Menu

- Track Record
  - 2023
  - 2022
  - 2021
  - 2020
  - 2019
  - 101
  - Tips
  - Insights
  - Fun

UP.com Menu

- Home
- Customers
- Employees
- Suppliers
- Investors
- Media
- About Us
- Heritage
- Careers

Quick Links

- Safety
- Privacy
- Contact UP
- Search
- Feedback
- Site Info
- Copyright

Follow Us:

- Facebook
- Instagram
- LinkedIn
- Twitter
- YouTube

Report

**Unusual or Suspicious Occurrences and Environmental Hazards**

Please call 1-888-UPRRCOP (877-7267) to report hazardous materials releases, personal injuries, criminal activities, illegal dumping, or other environmental incidents.

**Rough or Damaged Grade Crossings**

To report grade crossing blockages or damage, please call 1-800-848-8715.

HEINONLINE

DATE DOWNLOADED: Wed Jun 5 17:51:30 2024
SOURCE: Content Downloaded from HeinOnline

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Jeffrey Leitzinger & Russell L. Lamb, The Predominance Requirement for Antitrust Class Actions - Can Relevant Market Analysis Help, 7 ECON. COMM. NEWSL. 18 (2007).

ALWD 7th ed.
Jeffrey Leitzinger & Russell L. Lamb, The Predominance Requirement for Antitrust Class Actions - Can Relevant Market Analysis Help, 7 Econ. Comm. Newsl. 18 (2007).

APA 7th ed.
Leitzinger, Jeffrey, & Lamb, R. L. (2007). The predominance requirement for antitrust class actions can relevant market analysis help. Economics Committee Newsletter, 7(1), 18-24.

Chicago 17th ed.
Jeffrey Leitzinger; Russell L. Lamb, "The Predominance Requirement for Antitrust Class Actions - Can Relevant Market Analysis Help," Economics Committee Newsletter 7, no. 1 (Spring 2007): 18-24

McGill Guide 9th ed.
Jeffrey Leitzinger & Russell L. Lamb, "The Predominance Requirement for Antitrust Class Actions - Can Relevant Market Analysis Help" (2007) 7:1 Econ Comm Newsl 18.

AGLC 4th ed.
Jeffrey Leitzinger and Russell L. Lamb, 'The Predominance Requirement for Antitrust Class Actions - Can Relevant Market Analysis Help' (2007) 7(1) Economics Committee Newsletter 18

MLA 9th ed.
Leitzinger, Jeffrey, and Russell L. Lamb. "The Predominance Requirement for Antitrust Class Actions - Can Relevant Market Analysis Help." Economics Committee Newsletter, vol. 7, no. 1, Spring 2007, pp. 18-24. HeinOnline.

OSCOLA 4th ed.
Jeffrey Leitzinger & Russell L. Lamb, 'The Predominance Requirement for Antitrust Class Actions - Can Relevant Market Analysis Help' (2007) 7 Econ Comm Newsl 18
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

# The Predominance Requirement for Antitrust Class Actions—Can Relevant Market Analysis Help?

Jeffrey Leitzinger and Russell L. Lamb
*Econ One Research, Inc.*

## Introduction

Adjudication of class certification issues has become a focal point in antitrust class action litigation in recent years, particularly regarding proof of antitrust injury and the "predominance" requirement.[1] A key question has been, "Will common evidentiary issues predominate over individual ones"? As is described below, the evidentiary burden associated with this requirement is changing.

Indeed, the debate in establishing predominance in class certification is often as much about the proper standard as it is about whether the standard can be met. This creates uncertainty and raises the costs of class action review to the parties and to the court system. In the same fashion that generalized evidentiary frameworks have been adopted by the courts for analyzing market power, mergers, and predation, a generally accepted framework within which to assess the predominance requirement for proof of antitrust injury is needed.

We believe that relevant market analysis—along with its accepted analytical framework, modes of proof, and standards for evidence—may be the answer. In particular, there is compelling economic logic to suggest that proof of the relevant market (combined with a showing that the proposed class members were participants within that market) should be sufficient to meet the predominance requirement as to proof of injury.

## Predominance and proof of antitrust injury

We understand that, as a legal matter, the fact of antitrust injury is necessary for a plaintiff to have standing to bring a private antitrust action and collect damages.[2] In deciding whether or not to certify a proposed class, one requirement is that common issues associated with proof of impact predominate over individualized issues.

Procedural timing plays a key role in shaping this requirement.[3] The question of class certification is typically addressed before merits discovery has occurred. Hence, at the time class certification is usually examined, one could not fairly expect plaintiffs to provide evidence demonstrating the fact of antitrust injury as to the proposed class members. Instead, one would typically start with the assumption that the alleged illegal behavior did occur and then ask the question, "Would economic conditions permit some demonstration of antitrust injury using evidence common to the proposed class members, thereby avoiding individualized inquiries (or 'mini-trials')?"

Until recently, this question was usually answered in the affirmative. A decade ago, the fact of a price-fixing claim was often considered in itself a presumptive indicator of class-wide injury.[4] There was a straightforward logic supporting this presumption. If plaintiffs allege that defendant sellers conspired to stop competing and raise prices for widgets, it stands to reason that—assuming the truth of those allegations—widget buyers would be injured.[5]

It seems that this historical presumption is eroding, raising the evidentiary burden for proof of classwide injury in antitrust class actions.[6] Recent commentary surrounding class certification decisions consistently speaks to the need to look more closely at the specific nature of the antitrust claims, the operation of the market, and the manner in which class members were injured.[7]

A plaintiff's burden is now described, in some instances, as having to show the likelihood that evidence common to class members will demonstrate their individual antitrust injuries ("common evidence"). In other instances, however, that burden is stated as having to show that antitrust injury was likely shared in common by members of the proposed class ("common injury"). That is, plaintiffs must make a showing that, given the claims in the case, the expected antitrust injury would extend to all members of the proposed class. Finally, notwithstanding the evidentiary limitations inherent in the early procedural stage at which class certification is typically addressed, some recent decisions suggest that plaintiffs must prove the fact of common injury for purposes of class certification.[8]

As a result of these differing formulations, participants in class certification disputes often approach the issue from entirely different analytical perspectives, presenting broadly inconsistent points of view from which to address the predominance requirement. This inconsistency increases the cost of certifying classes, decreases the quality of the information presented to the courts, and increases the uncertainty associated with the outcomes.[9] Clearly, there is need for a consistent, analytically sound approach.

## The relevant market as an indicator of antitrust injury

One can frame the predominance inquiry in the following fashion. Assume there has been anticompetitive conduct among sellers for the purpose of raising or maintaining prices above competitive levels. What would one need to know in order to determine whether or not a proposed class member was subjected to supracompetitive prices as a result of that conduct? Under what circumstances would it be reasonable to expect that the same information would suffice to answer the question for all proposed class members?[10]

To address the first question, consider how one typically approaches this question when there is a single antitrust plaintiff. One would typically define a relevant market and then assess the impact of the defendants' conduct on competition and pricing within that market. Liability arises when the conduct at issue materially limits competition and thereby allows the defendants to establish or maintain supracompetitive prices.[11] Once this liability is established, the further showing that the plaintiff purchased a product in that market is sufficient to show antitrust injury. In fact, as Areeda and Hovenkamp put it "...[C]onsumer standing to recover for an overcharge paid directly to an illegal cartel or monopoly is seldom doubted."[12]

In a class setting, we assume that the evidentiary burden for individual class members with respect to antitrust injury is the same as they would face as individual plaintiffs—certainly no greater. If we apply the logic described for an individual plaintiff above, the fact of injury as to each class member would then be established by: 1) showing antitrust liability on the part of the defendants; and 2) showing that the class member in question was a participant in the

relevant market. Of necessity, the answer to 1) involves the same evidence as to each class member. For a given market definition, the answer to 2) requires the same process generally used to determine the identity of class members.[13]

Therefore, a possible approach to analyzing the predominance requirement in connection with proof of antitrust injury issues at the class certification stage is to address the relevant market question at that time (rather than waiting for the class to be certified and considering it in connection with the merits of the case).[14] If the purchases that define the class fall within the relevant market, the evidentiary demonstration of some antitrust injury as to each of those individual class members will flow directly—just as it would in a single plaintiff case—from the demonstration of antitrust liability concerning conduct directed at that market (evidence that is common to members of the class)

Importantly, we note that as a matter of economics there is a natural relationship between market definition and the question of antitrust injury. The antitrust injury at issue when considering defendant sellers is inflated prices.[15] The ability to raise and maintain prices profitably has been at the center of market definition since the U.S. Department of Justice (DOJ) first formulated its Merger Guidelines in 1982.[16] Market definition involves identification of the customers (technically speaking, the products they purchase) that the defendant must control in order for the anticompetitive conduct alleged in the case to raise prices successfully. If the class members fall within this group, a successful effort to raise prices anticompetitively (i.e., plaintiffs' liability claims are valid) must mean higher prices for those customers.[17]

Furthermore, under the Merger Guidelines, a relevant market is supposed to consist of the smallest group of products that the defendant in question would need to control in order to achieve meaningfully supracompetitive prices.[18] Hence, a properly defined relevant market should not give rise to a situation in which the behavior in question could lead to higher prices for some, but not all, of the participants.

Viewed from this perspective, the logic underlying the traditional presumption of common injury had some validity, even if not always applied correctly. It is technically correct to say that a rising (anticompetitive) tide should float all prices—as long as those prices are formed in the market relevant to that anticompetitive behavior. Hence, while it would be too strong to say that common impact is a foregone conclusion in a class action antitrust case, it seems to us that it would not be too strong to say so with the proviso that all members of the proposed class were participants in the appropriately defined relevant market.[19]

The use of market definition as a means for assessing issues associated with classwide proof of injury at the time of class certification has a number of significant advantages over the status quo. Since the DOJ introduced its approach to market definition in the 1982 Merger Guidelines, there have been almost 25 years of scholarly work on, and practical application of, the approach by economists. There is an accumulated base of legal precedent regarding application of this approach and the associated evidentiary requirements. The use of market definition as a means for assessing predominance regarding proof of injury would add a well-understood framework and intellectual rigor to the undertaking. While the need to tackle the question of market definition at the time of class certification might create some

additional discovery requirements, much of the discovery associated with the behavior at issue (e.g., the parties' intent and the impact on the market) could still be deferred pending class certification. In short, much of the savings in litigation costs afforded by early attention to certification issues could still be preserved.

Interestingly, the use of market definition in determining class certification might more closely align the positions of plaintiffs and defendants. Plaintiffs might find their usual interest in narrower market definition moderated by the desire to have a market definition that supports certification of their proposed class. Plaintiffs might then limit their class definitions to correspond with the relevant market they expect to prove for liability. Similarly, defendants might think twice about advocating broad relevant markets given the effect such advocacy could have on class certification. Closer alignment in litigation positions could simplify the court's task in deciding the issues and improve the accuracy of the litigation process.

Moreover, under this proposal, the parties will have a decision regarding the relevant market at the conclusion of the class certification phase. That would certainly improve the prospects for settlement, potentially making more efficient use of judicial resources and reducing costs for litigants.

## Relevant market analysis correctly reveals the absence of antitrust injury

If relevant market analysis is to be considered useful in establishing shared antitrust injury, it should also correctly identify situations in which there has been no injury to a proposed class member, even if the alleged misconduct did in fact occur. For instance, it is sometimes argued that a particular proposed class member (customer) would not have benefited from the lower prices arising from the competition eliminated by the conspiracy (because, for example, that customer resides in a remote location served only by one of the alleged co-conspirators).

Market definition, properly managed, begins with the products and locations that are directly affected by the conduct which gives rise to the antitrust complaint. If control over that activity does not confer monopoly power on a hypothetical monopolist seller, one then expands the product definition or the locations included to capture the next most immediate source of competitive discipline. One then re-asks the hypothetical monopolist question as to this expanded collection of products and locations, repeating as necessary until the answer as to monopoly power is "yes."

Following that paradigm, our "uniquely situated" proposed class member would not be part of the commerce directly affected by the limits on competition. Hence, it would not enter the analysis at the starting point. Moreover, owing to the fact that this unique customer does not engage in price-related switching among different sellers, it would not then be added to the relevant market in any of the subsequent iterations. In short, this proposed class member would fall outside the relevant market and would not be presumed to have been injured by the conduct in question.[20]

A second circumstance in which an illegal conspiracy would not give rise to injury on the part of a proposed class member occurs when that customer faces uniquely effective alternatives (or, perhaps, has a highly price elastic demand for the product). In that case, one can envision an outcome in which the conspiring sellers forego any effort to

extract a monopoly premium, preferring to keep the customer at a competitive price rather than lose it altogether. In other words, the conspirators were able to successfully institute a conspiracy to raise prices to other customers (proposed class members) without having to eliminate or restrict the competition disciplining this particular customer's prices. In a relevant market context, this means that the boundaries of the market would not be extended to include this proposed class member and the competitive alternatives it faces.

## Conclusion

The evidentiary burden a proposed plaintiff class must now meet to prove antitrust injury using common evidence on a class-wide basis is far from clear. We suggest that relevant market analysis may provide a useful framework in which to assess this issue. If proposed class members all purchased products within the relevant market (the definition of which is an evidentiary question that is independent of individual—and therefore common to all—proposed class members), it seems reasonable to then presume that, given demonstration of antitrust liability, they were all injured.

---

[1] Fed. R. Civ. P. 23(b)(3).

[2] Proof regarding the fact of some overcharge (the injury we refer to here) is associated with a higher evidentiary burden—and is therefore dealt with separately—than the quantification of damages.

[3] Marc Ashley, The Scope and Timing of Discovery in Antitrust Class Action Litigation, 5 The Antitrust Practitioner, 14-17 (2006).

[4] Under what is often described as the "Bogosian shortcut," predominance was presumed with respect to proof of injury as long as there was an economic rationale connecting the conduct at issue and injury to class members. *See Bogosian v. Gulf Oil,* 561 F.2d 434 (3d Cir. 1977).

[5] This logic is sometimes expressed allegorically as, "A rising tide floats all boats."

---

[6] There have been several recent articles discussing the evolving treatment of these same issues. See, for instance, Gregory C. Cook and Charlton A. Rugg, 4 Tightening Trends in Antitrust Class Certification, The Antitrust Practitioner, 2-5 (2006); Jack E. Pace and Victoria L. Oswald, The Recent Wave, or Ripple, of Antitrust Class Certification Denials, 5 The Antitrust Practitioner 2-8 (2006). Also see *In re Linerboard Antitrust Litig.*, 205 F.3d (3d Cir. 2002).

[7] See, for instance, Certification Claims Come Under Tighter Scrutiny, National Law Journal, December, 4, 2006.

[8] For instance, *Blades v. Monsanto*, 400 F.3d 562 (8th Cir. 2005); *In re Med. Waste Servs. Antitrust Litig.*, (D. of Utah 2006).

[9] The circumstances are becoming especially perilous from the standpoint of expert testimony addressing these issues in light of increasing calls for the hearing of Daubert challenges to that testimony.

[10] Predominance, as we understand it, does not require that no individualized inquiries are needed. However, for purposes of expositional simplicity, we discuss it here in those terms.

[11] Assuming further that the analysis shows no overriding procompetitive justification for which the anticompetitive restraints at issue are necessary.

[12] Phillip Areeda and Herbert Hovenkamp, Antitrust Law, Vol II, (1995 edition), ¶ 370.

[13] In practice, this "individualized" inquiry is usually managed using defendants' electronic sales databases.

[14] In many cases, as suggested here, this simply involves a shift of the relevant market analysis from the merits phase to the certification phase. In pure per se cases and in those cases where impact on competition is established through direct evidence, this approach might require relevant market analysis that wouldn't otherwise be necessary. Even in these instances, we believe the improved focus and predictability of the relevant market framework compared with the status quo brings important advantages and is likely no more costly than the efforts currently undertaken.

[15] By "inflated" we mean prices that are higher than the prices that would have prevailed but for the alleged misconduct. It is not necessary that prices be rising for antitrust injury to have occurred (as the Court indeed affirmed in *In re High Fructose Corn Syrup Antitrust Litig.*).

[16] Department of Justice, Horizontal Merger Guidelines, issued June 14, 1982.

[17] The use of the relevant market paradigm as a screen for assessing predominance of proof of antitrust injury presumes that the criterion embedded

within that paradigm regarding the type, amount and duration of price effects that matter for purposes of liability also apply when gauging antitrust injury. This seems reasonable to us.

[18] Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines, issued April 2, 1992 (revised April 8, 1997) (hereafter, Merger Guidelines).

[19] A few years ago, Nieberding and Cantor considered whether the "law of one price" would create a presumption of common impact in antitrust cases. They concluded that generally it would not because the law frequently doesn't hold when actual markets are concerned. (See James Nieberding and Robin Cantor, Price Dispersion, the 'Bogosian Shortcut,' and Class Certification in Antitrust Cases, Texas Business Litigation Quarterly, (Spring 2005).) We would differentiate our proposal by noting that a properly defined relevant market should only include transaction activity and prices that are affected in the event that the conduct at issue has meaningfully affected prices. Hence, where the "law of one price" failed to operate, a properly defined relevant market should capture only that activity affected by the behavior at issue.

[20] Plaintiffs might be able to prove that, as an ancillary matter, anticompetitive behavior within a relevant market also caused some prices outside of that market to increase. Our notion about the potential usefulness of relevant market analysis as a sufficiency threshold for plaintiffs to meet regarding predominance as to class members within the relevant market would not preclude the introduction of evidence regarding additional ancillary effects and affected purchasers outside the relevant market.

Committee Leadership

**Co-Chair**
David T. Scheffman
LECG, LLC
1725 I Street, NW, Suite 800
Washington, DC 20006
DScheffman@lecg.com

**Co-Chair**
Joseph Simons
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1615 L Street, NW, Suite 1300
Washington, DC 20036
jsimons@paulweiss.com

**Vice-Chair**
Neil W. Imus
Vinson & Ekins LL
1455 Pennsylvania Ave, NW, Suite 600
Washington, DC 20004
nimus@velaw.com

**Vice-Chair**
William Rooney
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019
wrooney@willkie.com

**Vice-Chair**
Bruce Snapp
MICRA
1155 Connecticut Avenue, NW, Suite 900
Washington, DC 20036
brs@micradc.com

**Vice-Chair**
Henry B. McFarland
Economists Inc
1200 New Hampshire Ave. NW, Suite 400
Washington, DC 20036
Mcfarland.h@ei.com

**Council Representative**
Jonathan B. Baker
American University, College of Law
4801 Massachusetts Avenue, NW
Washington, DC 20016-8196
jbaker@wcl.american.edu

## Contact Information

For more information about the Committee, please visit our website at
http://www.abanet.org/dch/committee.cfm?com=AT308000

Please contact the committee members if you wish to share suggestions for future brown-bag seminars, articles or publications.

To submit articles for a future newsletter or to comment on articles in this issue, please contact:

Seth Sacher, Economics Editor
Bates White, LLC
1300 Eye Street, NW, Suite 600
Washington, DC 20005
(202) 747-1413
seth.sacher@bateswhite.com

Neil Imus, Legal Editor
Vinson & Elkins, LLP
1455 Pennsylvania Avenue, NW Suite 600
Washington, DC 2004
(202) 639-6675
nimus@velaw.com

*The Economics Committee Newsletter* is published by the American Bar Association Section of Antitrust Law Economics Committee. The views expressed in *The Economics Committee Newsletter* are the authors' only and not necessarily those of the American Bar Association, the Section of Antitrust Law or the Economics Committee. If you wish to comment on the contents of *The Economics Committee Newsletter*, please write to the American Bar Association, Section of Antitrust Law, 321 North Clark, Chicago, Il 60610-4714.

HEINONLINE

DATE DOWNLOADED: Wed Jun 5 15:19:16 2024
SOURCE: Content Downloaded from HeinOnline

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Laurence H. Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 HARV. L. REV. 1329 (1971).

ALWD 7th ed.
Laurence H. Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv. L. Rev. 1329 (1971).

APA 7th ed.
Tribe, L. H. (1971). Trial by mathematics: precision and ritual in the legal process. Harvard Law Review, 84(6), 1329-1393.

Chicago 17th ed.
Laurence H. Tribe, "Trial by Mathematics: Precision and Ritual in the Legal Process," Harvard Law Review 84, no. 6 (April 1971): 1329-1393

McGill Guide 9th ed.
Laurence H. Tribe, "Trial by Mathematics: Precision and Ritual in the Legal Process" (1971) 84:6 Harv L Rev 1329.

AGLC 4th ed.
Laurence H. Tribe, 'Trial by Mathematics: Precision and Ritual in the Legal Process' (1971) 84(6) Harvard Law Review 1329

MLA 9th ed.
Tribe, Laurence H. "Trial by Mathematics: Precision and Ritual in the Legal Process." Harvard Law Review, vol. 84, no. 6, April 1971, pp. 1329-1393. HeinOnline.

OSCOLA 4th ed.
Laurence H. Tribe, 'Trial by Mathematics: Precision and Ritual in the Legal Process' (1971) 84 Harv L Rev 1329 Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use: Copyright Information

VOLUME 84 APRIL 1971 NUMBER 6

HARVARD LAW REVIEW

# TRIAL BY MATHEMATICS: PRECISION AND RITUAL IN THE LEGAL PROCESS

*Laurence H. Tribe* *

*Professor Tribe considers the accuracy, appropriateness, and possible dangers of utilizing mathematical methods in the legal process, first in the actual conduct of civil and criminal trials, and then in designing procedures for the trial system as a whole. He concludes that the utility of mathematical methods for these purposes has been greatly exaggerated. Even if mathematical techniques could significantly enhance the accuracy of the trial process, Professor Tribe also shows that their inherent conflict with other important values would be too great to allow their general use.*

THE system of legal proof that replaced trial by battle in Continental Europe during the Middle Ages reflected a starkly numerical jurisprudence. The law typically specified how many uncontradicted witnesses were required to establish various categories of propositions, and defined precisely how many witnesses of a particular class or gender were needed to cancel the testimony of a single witness of a more elevated order.[1] So it was that medieval law, nurtured by the abstractions of scholasticism, sought in mathematical precision an escape from the perils of irrational and subjective judgment.

In a more pragmatic era, it should come as no surprise that the search for objectivity in adjudication has taken another tack. Yesterday's practice of numerology has given way to today's theory of probability, currently the *sine qua non* of rational analysis. Without indulging in the dubious speculation that con-

* Assistant Professor of Law, Harvard University. A.B. Harvard, 1962; J.D. Harvard, 1966.

[1] *See* M. CAPPELLETTI & J. PERILLO, CIVIL PROCEDURE IN ITALY 35–36 (1965); A. ENGELMANN, A HISTORY OF CONTINENTAL CIVIL PROCEDURE 41–47 (1927); R. GINSBURG & A. BRUZELIUS, CIVIL PROCEDURE IN SWEDEN 33 & n.131, 295 & n.471 (1965); J. GLASER, LEHRE VOM BEWEIS IM STRAFPROZESS 132–35 (1883); Kunert, *Some Observations on the Origin and Structure of Evidence Rules Under the Common Law System and the Civil Law System of "Free Proof" in the German Code of Criminal Procedure*, 16 BUFF. L. REV. 122, 141–42 & nn.99–100, 144–45 (1966). *See also* A. ESMEIN, A HISTORY OF CONTINENTAL CRIMINAL PROCEDURE 264–71 (J. Simpson, transl. 1913); 1 F. HÉLIE, TRAITÉ DE L'INSTRUCTION CRIMINELLE 650–53, 656–57 (1845); F. VOLTAIRE, A COMMENTARY ON BECCARIA'S ESSAY ON CRIMES AND PUNISHMENTS 227–28 (1872).

temporary probabilistic methods will one day seem as quaint as their more mystical predecessors, one can at least observe that the resort to mathematical techniques as alternatives to more intuitive tools in the trial process has ancient roots. Nor is it entirely accidental that those roots seem oddly twisted when examined outside their native soil. For, although the mathematical or pseudo-mathematical devices which a society embraces to rationalize its systems for adjudication may be quite comprehensible to a student of that society's customs and culture, those devices may nonetheless operate to distort — and, in some instances, to destroy — important values which that society means to express or to pursue through the conduct of legal trials. This article discusses the respects in which this is the case — and, in so doing, suggests a framework of analysis for the assessment of the potentialities and dangers of current and proposed uses of mathematical methods in the trial process.

In speaking of mathematical methods "in the trial process," I am referring to two related but nonetheless separable topics: not only to the use of mathematical tools in the actual conduct of a particular trial, but also to the use of such tools in the design of the trial system as a whole. The first topic encompasses such questions as the propriety of allowing the parties in a lawsuit to employ explicitly statistical evidence or overtly probabilistic arguments for various purposes,[2] and the wisdom of permitting or encouraging the trier to resolve the conflicting claims of a lawsuit with the assistance of mathematical methods.[3] The second topic, in contrast, centers on the desirability of employing such methods in establishing the procedural and evidentiary rules according to which lawsuits generally should be conducted. Both topics, of course, share a common core: both involve the wisdom of using mathematical tools to facilitate the making of choices among available courses of action with respect to the trial process. In this sense, both topics form part of the larger subject of when and how mathematical methods ought to

[2] I am, of course, aware that *all* factual evidence is ultimately "statistical," and all legal proof ultimately "probabilistic," in the epistemological sense that no conclusion can ever be drawn from empirical data without some step of inductive inference — even if only an inference that things are usually what they are perceived to be. *See, e.g.*, D. Hume, A Treatise of Human Nature, bk. I, pt. III, § 6, at 87 (L.A. Selby-Bigge ed. 1958). My concern, however, is only with types of evidence and modes of proof that bring this probabilistic element of inference to explicit attention in a quantified way. As I hope to show, much turns on whether such explicit quantification is attempted.

[3] By "mathematical methods," I mean the entire family of formal techniques of analysis that build on explicit axiomatic foundations, employ rigorous principles of deduction to construct chains of argument, and rely on symbolic modes of expression calculated to reduce ambiguity to a minimum.

be employed in decisionmaking. And this subject, in turn, is part of the still more inclusive topic of when it is desirable to make decisions in a calculating, deliberate way, with the aid of precise and rigorous techniques of analysis. To the extent that this article sheds any light on those larger matters, I will of course be gratified. I will not, however, attempt to deal directly with them here, and will instead confine myself to the narrower inquiries outlined above.

Two further introductory remarks are in order. First, my subject is the use of mathematics as a tool for decisionmaking rather than simply as a mode of thought, as an instrument rather than as a language. Conceivably, the very enterprise of describing some phenomena in precise mathematical terms, and particularly the enterprise of quantifying them, might be shown to entail some significant costs in addition to its obvious benefits. Perhaps it is in some sense "dehumanizing" to talk in highly abstract or quantitative terms about some subjects,[4] but this is another issue not to be treated here.

Second, although my central concern is the wisdom of using mathematical methods for certain decisionmaking purposes even when those methods are rationally employed, I will also examine what must be regarded as clearly irrational uses of those methods. Thus, some might charge that, by relying on such misuses in any overall assessment, I have confused the avoidable costs of using a tool badly with the inherent costs of using it well. It is rather like the claim that statistics can lie. One may always respond that this claim is false while conceding that the devil can quote Scripture to his own purposes. In a sense, this is obviously the case. But in another sense, it is only a half-truth, for the costs of abusing a technique must be reckoned among the costs of using it at all to the extent that the latter creates risks of the former. To be more precise, in at least some contexts, permitting *any* use of certain mathematical methods entails a sufficiently high risk of misuse, or a risk of misuse sufficiently costly to avoid, that it would be irrational not to take such misuse into account when deciding whether to permit the methods to be employed at all.

Finally, a word about objectives. This analysis has been undertaken partly because I suspect that the lure of objectivity and precision may prove increasingly hard to resist for lawyers concerned with reliable, or simply successful, adjudication; partly because a critique of mathematical efforts to enhance the reliability and impartiality of legal trials may yield helpful insights into what such trials are and ought to be; and partly because such a

[4] One senses that much of the contemporary opposition to the technological emphasis upon rationality and technique rests on some such premise.

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 316 of 794



critique may ultimately contribute to an appreciation of how rigor and quantification, once their real costs and limits are better understood, might actually prove useful in processes of decision-making. Most fundamentally, though, I write in reaction to a growing and bewildering literature of praise for mathematical precision in the trial process,[5] a literature that has tended to catalogue or to assume the virtues of mathematical approaches quite as uncritically as earlier writers[6] tended to deny their relevance.

## I. Factfinding with Mathematical Probabilities

### A. Mysteries of Expertise

The infamous trial in 1899 of Alfred Dreyfus, Captain in the French General Staff, furnishes one of the earliest reported instances of proof by mathematical probabilities. In attempting to establish that the author of a certain document that allegedly fell into German hands was none other than Captain Dreyfus, the prosecution called several witnesses who theorized that Dreyfus must have written the document in question by tracing the word *intérêt* from a letter written by his brother, constructing a chain of several of these traced words in a row, and then writing over this chain as a model when preparing the document — in order to give it the appearance of a forgery and thereby to protect himself should the document later be traced to him.[7] To identify the writing in the document as that of Dreyfus, the prosecution's witnesses reported a number of close matches between the lengths of certain words and letters in the document and the lengths of certain words and letters in correspondence taken from Dreyfus' home. Obscure lexicographical and graphological "coincidences" within the document itself were said by the witnesses to indicate

[5] *See, e.g.*, Cullison, *Probability Analysis of Judicial Fact-Finding: A Preliminary Outline of The Subjective Approach*, 1969 U. Tol. L. Rev. 538 (1969) [hereinafter cited as Cullison]; Finkelstein & Fairley, *A Bayesian Approach to Identification Evidence*, 83 Harv. L. Rev. 489 (1970) [hereinafter cited as Finkelstein & Fairley]. *See also*, Becker, *Crime and Punishment: An Economic Approach*, 76 J. Pol. Econ. 169 (1968) [hereinafter cited as Becker]; Birmingham, *A Model of Criminal Process: Game Theory and Law*, 56 Cornell L. Rev. 57 (1970) [hereinafter cited as Birmingham]; Kaplan, *Decision Theory and the Factfinding Process*, 20 Stan. L. Rev. 1065 (1968) [hereinafter cited as Kaplan]; *cf.* Broun & Kelly, *Playing the Percentages and the Law of Evidence*, 1970 Ill. L. F. 23 [hereinafter cited as Broun & Kelly].

[6] *See, e.g.*, W. Wills, An Essay on the Principles of Circumstantial Evidence 6–10, 15, 282 (4th ed. 1862); M. Houts, From Evidence to Proof 132 (1956).

[7] *See* the trial testimony of Jan. 18, 1899, and Feb. 4, 1899, reported in a special supplement to Le Petit Temps (Paris), April 22, 1899.

the high probability of its disguised character and of its use to convey coded information.[8] To establish the validity of the hypothesis that the document had been traced over the handwriting of Dreyfus' brother, the prosecution's witnesses computed the "amazing" frequency with which certain letters in the document appeared over the same letters of the word chain constructed by repeating *intérêt* a number of times, once a variety of complex adjustments had been made.[9]

The very opacity of these demonstrations protected them to some degree from effective spontaneous criticism, but the "mathematics" on which they were based was in fact utter nonsense. As the panel of experts appointed several years later to review the evidence in the Dreyfus case easily showed,[10] there was nothing statistically remarkable about the existence of close matches in some word lengths between the disputed document and Dreyfus' correspondence, given the many word pairs from which the prosecution was free to choose those that displayed such similarities.[11] Moreover, the supposed coincidences within the document itself reflected no significant deviation from what one would expect in normal French prose. Finally, the frequency with which various letters in the document could be "localized" over the letters of *intérêt* was likewise statistically insignificant.

Armand Charpentier, a prominent student of the Dreyfus affair, reports that counsel for Dreyfus and the Government Commissioner alike declared that they had understood not a word of the witness' mathematical demonstrations.[12] Charpentier adds that, although the judges who convicted Dreyfus were in all likelihood equally mystified, they nonetheless "allowed themselves to

---

[8] For example, one witness stressed the presence of four coincidences out of the 26 initial and final letters of the 13 repeated polysyllabic words in the document. He evaluated at .2 the probability of an isolated coincidence and calculated a probability of $(0.2)^4$ = .0016 that four such coincidences would occur in normal writing. But $(0.2)^4$ is the probability of four coincidences out of four; that of four or more out of 13 is some 400 times greater, or approximately .7. *See Rapport de Mm. Les Experts Darboux, Appell, et Poincaré*, in LES DOCUMENTS JUDICIARES DE L'AFFAIRE DREYFUS, in LA RÉVISION DU PROCÈS DE RENNES (1909) [hereinafter cited as *Rappord*]. *Cf.* note 40 *infra*.

[9] Two witnesses observed that, when the word chain *"intérêt/intérêt/intérêt/intérêt . . . ."* was compared with the document itself, allowing one letter of slipping-back for each space between words and aligning the word chain with the actual or the ideal left-hand margin as convenient, the letter *l* appeared with particular frequency over the word-chain letter *i*; the letters *n* and *p* appeared frequently over the word-chain letter *n*; and so on. Far from being in any way remarkable, however, the probability that *some* such pattern can be discerned in any document is nearly certainty. *See Rappord* 534.

[10] *See id.*

[11] *See* the discussion of the "selection effect," note 40 *infra*.

[12] A. CHARPENTIER, THE DREYFUS CASE 52–53 (J. May transl. 1935).

be impressed by the scientific phraseology of the system." [13] It would be difficult to verify that proposition in the particular case, but the general point it makes is a crucial one: the very mystery that surrounds mathematical arguments — the relative obscurity that makes them at once impenetrable by the layman and impressive to him — creates a continuing risk that he will give such arguments a credence they may not deserve and a weight they cannot logically claim.

The California Supreme Court recently perceived this danger when it warned that "[m]athematics, a veritable sorcerer in our computerized society, while assisting the trier of fact in the search for truth, must not [be allowed to] cast a spell over him." [14] The court ruled improper a prosecutor's misconceived attempt to link an accused interracial couple with a robbery by using probability theory. The victim of the robbery, an elderly woman, had testified that she saw her assailant, a young woman with blond hair, run from the scene. One of the victim's neighbors had testified that he saw a Caucasian woman, with her hair in a dark blond ponytail, run from the scene of the crime and enter a yellow automobile driven by a male Negro wearing a mustache and beard. Several days later, officers arrested a couple that seemed to match these descriptions.[15] At the week-long trial of this couple, the victim was unable to identify either defendant, and her neighbor's trial identification of the male defendant was effectively impeached.[16] Moreover, the defense introduced evidence that the female defendant had worn light-colored clothing on the day of the robbery, although both witnesses testified that the girl they observed had worn dark clothing. Finally, both defendants took the stand to deny any participation in the crime, providing an alibi that was at least consistent with the testimony of another defense witness.

In an effort to bolster the identification of the defendants as the perpetrators of the crime, the prosecutor called a college mathematics instructor to establish that, if the robbery was indeed committed by a Caucasian woman with a blond ponytail accom-

[13] *Id.* at 53. *See also id.* at 265.

[14] People v. Collins, 68 Cal. 2d 319, 320, 438 P.2d 33, 66 Cal. Rptr. 497 (1968).

[15] There was testimony that the female defendant's hair color at the time of the robbery was light blond rather than dark blond, as it appeared at trial. The male defendant had no beard at trial or when arrested and told the arresting offcers that he had not worn one on the day of the robbery. There was testimony corroborating his claim that he had shaved his beard approximately two weeks before the robbery, but other testimony that he was bearded the day after the robbery.

[16] The neighbor admitted at trial "that at the preliminary hearing he [had] testified to an uncertain identification at the police lineup shortly after the attack . . . ." 68 Cal. 2d at 321, 438 P.2d at 34, 66 Cal. Rptr. at 498.

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 319 of 794



panied by a Negro with a beard and mustache and driving a yellow car, there was an overwhelming probability that the accused couple were guilty because they matched this detailed description.

The witness first testified to the "product rule" of probability theory, according to which the probability of the joint occurrence of a number of mutually independent events equals the product of the individual probabilities of each of the events.[17] Without presenting any supporting statistical evidence, the prosecutor had the witness assume specific probability factors for each of the six characteristics allegedly shared by the defendants and the guilty couple.[18] Applying the product rule to the assumed factors, the prosecutor concluded that there was but one chance in twelve million that any couple chosen at random would possess the characteristics in question, and asked the jury to infer that there was therefore but one chance in twelve million of the defendants' innocence.

The jury convicted but the California Supreme Court reversed, holding the mathematical testimony and the prosecutor's associated argument inadmissible on four separate grounds. First, the record was devoid of any empirical evidence to support the individual probabilities assumed by the prosecutor.[19]

Second, even if the assumed probabilities were themselves correct, their multiplication under the product rule presupposed the independence of the factors they measured — a presupposition for which no proof was presented, and which was plainly false.[20] If two or more events tend to occur together, the chances of their separate occurrence obviously cannot be multiplied to yield the chance of their joint occurrence.[21] For example, if every tenth

---

[17] *See* explanation in note 63 *infra*.

[18]

| *Characteristic* | *Assumed Probability of its Occurrence* |
|---|---|
| 1. Partly yellow automobile | 1/10 |
| 2. Man with mustache | 1/4 |
| 3. Girl with ponytail | 1/10 |
| 4. Girl with blond hair | 1/3 |
| 5. Negro man with beard | 1/10 |
| 6. Interracial couple in car | 1/1000 |

[19] *See* State v. Sneed, 76 N.M. 349, 414 P.2d 858 (1966); People v. Risley, 214 N.Y. 75, 108 N.E. 200 (1915), *discussed at* pp. 1344–45 & notes 47–49 *infra*. *See also* Campbell v. Board of Educ., 310 F. Supp. 94, 105 (E.D.N.Y. 1970).

[20] The sixth factor, for example, essentially restates parts of the first five. *See* note 18 *supra*.

[21] Precisely this mistake is made in C. McCormick, Handbook of the Law of Evidence § 171 (1954) and in J. Wigmore, The Science of Judicial Proof § 154, at 270–71 (3d ed. 1937). One court has treated such dependence, I think mistakenly, as going only to the "weight" of the product and not to its admissibility.

man is black and bearded, and if every fourth man wears a mustache, it may nonetheless be true that most bearded black men wear mustaches, so that nearly one man in ten — not one in forty — will be a black man with a beard *and* a mustache.

Third, even if the product rule could properly be applied to conclude that there was but one chance in twelve million that a randomly chosen couple would possess the six features in question, there would remain a substantial possibility that the guilty couple did not in fact possess all of those characteristics — either because the prosecution's witnesses were mistaken or lying, or because the guilty couple was somehow disguised. "Traditionally," the court reasoned, "the jury weighs such risks in evaluating the credibility and probative value of trial testimony,"[22] but — finding itself unable to quantify these possibilities of error or falsification — the jury would be forced to exclude such risks from any effort to assign a number to the probability of guilt or innocence and would be tempted to accord disproportionate weight to the prosecution's computations.

Fourth, and entirely apart from the first three objections, the prosecutor erroneously equated the probability that a randomly chosen couple would possess the incriminating characteristics, with the probability that any given couple possessing those characteristics would be innocent. After all, if the suspect population contained, for example, twenty-four million couples, and if there were a probability of one in twelve million that a couple chosen at random from the suspect population would possess the six characteristics in question, then one could well expect to find two such couples in the suspect population, and there would be a probability of approximately one in two — not one in twelve million — that any given couple possessing the six characteristics would be innocent.[23] The court quite reasonably thought that few

State v. Coolidge, 109 N.H. 403, 419, 260 A.2d 547, 559 (1969), *cert. granted on other issues*, 399 U.S. 926 (1970) (No. 1318 Misc., 1969 Term; renumbered No. 323, 1970 Term), *discussed at* note 40 *infra*.

[22] 68 Cal. 2d at 330, 438 P.2d at 40, 66 Cal. Rptr. at 504.

[23] In a separate mathematical appendix, the court demonstrated that, even if the number of suspect couples approaches only twelve million, the probability that *at least one other couple* (in addition to the actually guilty couple) will possess the six characteristics rises to somewhat over *forty-one percent*, even on the assumption that the prosecutor was correct in concluding that the probability that a randomly chosen couple would possess all six characteristics is but one in twelve million. More generally, the court showed that the probability of such duplication equals

$$\frac{1-(1-Pr)^N-NPr(1-Pr)^{N-1}}{1-(1-Pr)^N},$$

where Pr equals the probability that a random couple will possess the characteristics in question and N is the number of couples in the suspect population. 68 Cal. 2d at 333–35, 438 P.2d at 42–43, 66 Cal. Rptr. at 506–07. If $\lambda$ is taken to represent the value of $N \cdot Pr$, then the Poisson approximation for the above

defense attorneys, and fewer jurors, could be expected to comprehend these basic flaws in the prosecution's analysis.[24] Under the circumstances, the court concluded, this "trial by mathematics" so distorted the jury's role and so disadvantaged defense counsel as to constitute a miscarriage of justice.[25]

But the California Supreme Court discerned "no inherent incompatability between the disciplines of law and mathematics and intend[ed] no general disapproval . . . of the latter as an auxiliary in the fact-finding processes of the former." [26] Thus expressed, the court's position seems reasonable enough. Any highly specialized category of knowledge or technique of analysis is likely to share in some degree the divergence between impressiveness and understandability that characterizes mathematical proof; surely, adjudication should not for that reason be deprived

---

quotient is $1 - \frac{\lambda}{e^{\lambda} - 1}$, where e is the transcendental number 2.71828. . . . that is used as the base for natural logarithms. *See* 1 W. FELLER, AN INTRODUCTION TO PROBABILITY THEORY AND ITS APPLICATIONS 153–64 (3d ed. 1968); Kingston, *Applications of Probability Theory in Criminalistics*, 60 J. AM. STATIST. ASS'N 70, 74 (1965). On the assumption that $Pr=1/N$ (so that $\lambda=1$), the value of the above quotient as N grows without limit is thus $(e-2)/(e-1)$, which is approximately .42, as the court correctly concluded. *See* Cullison, *Identification by Probabilities and Trial by Arithmetic (A Lesson For Beginners in How to be Wrong With Greater Precision)*, 6 HOUST. L. REV. 471, 484–502 (1969).

Finkelstein and Fairley suggest that the court's argument was mathematically incorrect because "the court's assumption that one in twelve million is a fair estimate of the probability of selecting such a couple at random necessarily implies that it is a fair estimate of the number of such couples in the population." Finkelstein & Fairley 493; *accord*, Broun & Kelly, *supra* note 5, at 43. But this completely misconceives the argument. Of course, if the figure of one in twelve million had represented an estimate, based upon random sampling, of *the actual frequency of Collins-like couples in a known population*, the criticism of the court's opinion would be well taken. But in fact the "one-in-twelve-million" figure represented nothing of the sort. Since nothing was known about exactly who was and who was not a member of the population of "suspect" couples, that figure represented only an estimate of the probability that any given couple, chosen at random from an unknown population of "suspect" couples, would turn out to have the six "Collins" characteristics — with that estimate itself based only on a multiplication of component factors, each representing the frequency of one of the six characteristics in a much larger population.

[24] *See also* note 40 *infra*.

[25] The court stressed the fact that the prosecutor had criticized the traditional notion of proof beyond a reasonable doubt as "hackneyed" and "trite"; that he "sought to reconcile the jury to the risk that, under his 'new math' approach to criminal jurisprudence, 'on some rare occasion . . . an innocent person may be convicted' "; and that he thereby sought "to persuade the jury to convict [the] defendants whether or not they were convinced of their guilt to a moral certainty and beyond a reasonable doubt." 68 Cal. 2d at 331–32, 438 P.2d at 41, 66 Cal. Rptr. at 505. The interaction between mathematical proof and reasonable doubt is discussed at pp. 1372–75 *infra*.

[26] 68 Cal. 2d at 320, 438 P.2d at 33, 66 Cal. Rptr. at 497.

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 322 of 794



of the benefits of all expertise. On the contrary, the drawing of unwarranted inferences from expert testimony has long been viewed as rectifiable by cross-examination, coupled with the opportunity to rebut. Particularly if these devices are linked to judicial power to give cautionary jury instructions and to exclude evidence altogether on a case-by-case basis if prejudicial impact is found to outweigh probative force, and if these techniques are then supplemented by a requirement of advance notice of intent to use a particular item of technical proof, and by some provision for publicly financed expert assistance to the indigent accused confronted with an expert adversary,[27] there might seem to be no valid remaining objection to probabilistic proof.

But can such proof simply be equated with expert evidence generally, or does it in fact pose problems of a more pervasive and fundamental character? A consideration of that question requires the more careful development of just what "mathematical proof" should be taken to mean, and what major forms it can assume.

### *B. Illustrative Cases: Occurrence; Identity; Intention*

In an examination of the role of mathematical methods in the trial itself, whether used by one or more of the parties in the presentation of proof or employed by the trier in reaching a decision, we may set aside at the outset those situations in which the very issues at stake in a litigation are in some sense mathematical and hence require the explicit trial use of mathematical techniques — when, for example, the governing substantive law makes a controversy turn on such questions as percentage of market control,[28] expected lifetime earnings,[29] likelihood of widespread public confusion,[30] or the randomness of a jury selection process.[31] My concern is with cases in which mathematical methods are turned to the task of deciding what occurred on a particular, unique occasion, as opposed to cases in which the very

[27] *See, e.g.*, 1967 DUKE L.J. 665, 681–83, *discussing* State v. Sneed, 76 N.M. 349, 414 P.2d 858 (1966).

[28] *E.g.*, United States v. United Shoe Machinery Corp., 110 F. Supp. 295, 304–05 (D. Mass. 1953) (Wyzanski, J.), *aff'd per curiam*, 347 U.S. 521 (1954).

[29] *See, e.g.*, Louisville & N.R.R. v. Steel, 257 Ala. 474, 59 So. 2d 664 (1952); Von Tersch v. Ahrendsen, 251 Iowa 115, 99 N.W.2d 287 (1959).

[30] *See, e.g.*, United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverage, 187 F.2d 967, 974 (3d Cir. 1951).

[31] *See generally*, Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 HARV. L. REV. 338 (1966); Zeisel, *Dr. Spock and the Case of the Vanishing Women Jurors*, 37 U. CHI. L. REV. 1 (1969) [hereinafter cited as Zeisel]. *But see* State v. Smith, 102 N.J. Super. 325, 341, 246 A.2d 35, 50 (1968), *aff'd*, 55 N.J. 476, 262 A.2d 868 (1970), *cert. denied*, 400 U.S. 949 (1970).

task defined by the applicable law is that of measuring the statistical characteristics or likely effects of some process or the statistical features of some population of people or events.

With this initial qualification in mind, it is possible — and will occasionally prove helpful — to separate mathematical proof into three distinct but partially overlapping categories: (1) those in which such proof is directed to the *occurrence* or nonoccurrence of the event, act, or type of conduct on which the litigation is premised; (2) those in which such proof is directed to the *identity* of the individual responsible for a certain act or set of acts; and (3) those in which such proof is directed to *intention* or to some other mental element of responsibility, such as knowledge or provocation. In dealing with the utility of mathematical proof in the trial process, I will later show how such a tripartite division can be useful. It is sufficient to say at this stage that the significance, appropriateness, and dangers of mathematical proof may depend dramatically on whether such proof is meant to bear upon occurrence, identity, or frame of mind.[32] Several examples should suffice to illustrate the contents of each of these categories.

*1. Occurrence.* — Consider first the cases in which the existence of the legally significant occurrence or act is itself in question. A barrel falls from the defendant's window onto the plaintiff's head. The question is whether some negligent act or omission by defendant caused the fall. Proof is available to support a finding that, in over sixty percent of all such barrel-falling incidents, a negligent act or omission was the cause. Should such proof be allowed and, if so, to what effect? [33]

A man is found in possession of heroin. The question is whether he is guilty of concealing an illegally imported narcotic drug. Evidence exists to support the finding that ninety-eight

[32] *See* pp. 1365–67, p. 1381 & notes 33, 37 & 41 *infra*.

[33] A sensible, and now quite conventional, approach to this question is "to treat the probability as the fact if the defendant has the power to rebut the inference." Jaffe, *Res Ipsa Loquitur Vindicated*, 1 BUFF. L. REV. 1, 6 (1951). On this theory, if the defendant produces a reasonably satisfactory explanation consistent with a conclusion of no negligence, and if the plaintiff produces no further evidence, the plaintiff should lose on a directed verdict despite his mathematical proof — unless (1) he can adequately explain his inability to make a more particularized showing (a possibility not adverted to in *id.*), or (2) no specific explanation is given, but there is some policy reason to ground liability in the area in question on a substantial probability of negligence in the *type* of case rather than to require a reasoned probability in the *particular* case, *cf.* note 100 *infra*, thereby moving toward a broader basis of liability. It will be noticed that no such policy is likely to operate when the mathematical evidence goes to the question of the defendant's *identity* and the plaintiff does not explain his failure to produce any more particularized evidence, for it will almost always be important to impose liability on the correct party, *whatever* the basis of such liability might be. *See* p. 1349 *infra*. *See also* notes 37 & 102 *infra*.

percent of all heroin in the United States is illegally imported. What role, if any, may that fact play at the defendant's trial? [34]

A man is charged with overtime parking in a one-hour zone. The question is whether his car had remained in the parking space beyond the time limit. To prove that it had not been moved, the government calls an officer to testify that he recorded the positions of the tire air-valves on one side of the car. Both before and after a period in excess of one hour, the front-wheel valve was pointing at one o'clock; the rear-wheel valve, at eight o'clock. The driver's defense is that he had driven away during the period in question and just happened to return to the same parking place with his tires in approximately the same position. The probability of such a fortunate accident is somewhere between one in twelve and one in one hundred forty-four.[35] Should proof of that fact be allowed and, if so, to what end? [36]

2. *Identity.* — Consider next the cases in which the identity of the responsible agent is in doubt. Plaintiff is negligently run down by a blue bus. The question is whether the bus belonged to the defendant. Plaintiff is prepared to prove that defendant

---

[34] It has now been settled as a federal constitutional matter, *see* Turner v. United States, 396 U.S. 398 (1970), that this statistical fact permits a legislature to authorize a jury to find illegal importation once it finds possession "unless the defendant explains the possession to the satisfaction of the jury." 21 U.S.C. § 174 (1964); *cf.* Leary v. United States, 395 U.S. 6 (1969). At least one commentator has urged the alternative position that the jury should not in such cases be instructed that proof of possession is sufficient to find illegal importation (for that shifts to the accused the practical burden of persuasion, with its accompanying pressure to testify, notwithstanding any contrary jury charge) but should instead be told that ninety-eight percent of all heroin in the United States is illegally imported (for that leaves the jury more likely to give even the non-testifying accused the benefit of the doubt created by the remaining two percent). Comment, *Statutory Criminal Presumptions: Reconciling the Practical With the Sacrosanct*, 18 U.C.L.A. L. REV. 157 (1970). But it is by no means clear, despite the commentator's assertion, that "the jury is more likely to consider other relevant circumstances unique to the particular case on a more equal footing with the 98 percent statistic than it would with a presumption." *Id.* at 183 n.102. *See generally* the discussion at pp. 1359–65 *infra*.

[35] If tires rotated in complete synchrony with one another, the probability would be 1/12; if independently, 1/12 × 1/12, or 1/144.

[36] A Swedish court, computing the probability at 1/12 × 1/12 = 1/144 on the dubious assumption that car wheels rotate independently, ruled that fraction large enough to establish reasonable doubt. Parkeringsfrägor, II. Tilförlitligheten av det S.K. locksystemet för parkernigskontroll. *Svensk juristidining*, 47 (1962) 17–32, *cited in* Zeisel, *supra* note 31, at 12. The court's mathematical knife cut both ways, however, for it added that, had all four tire-valves been recorded and found in the same position, the probability of 1/12 × 1/12 × 1/12 × 1/12 = 1/20, 736 would have constituted proof beyond a reasonable doubt. *Id.* For a discussion of why no such translation of the "reasonable doubt" concept into mathematical terms should be attempted, see pp. 1372–75 *infra*.

operates four-fifths of all the blue buses in town. What effect, if any, should such proof be given? [37]

A policeman is seen assaulting someone at an undetermined time between 7 p.m. and midnight. The question is whether the defendant, whose beat includes the place of the assault, was the particular policeman who committed the crime. It can be shown that the defendant's beat brings him to the place of the assault four times during the relevant five-hour period each night, and that other policemen are there only once during the same period. In what way, if at all, may this evidence be used? [38]

A man is found shot to death in the apartment occupied by his mistress. The question is whether she shot him. Evidence is available to the effect that, in ninety-five percent of all known cases in which a man was killed in his mistress' apartment, the mistress was the killer. How, if at all, may such evidence be used? [39]

A civil rights worker is beaten savagely by a completely bald

---

[37] In Smith v. Rapid Transit, Inc., 317 Mass. 469, 58 N.E.2d 754 (1945), the actual case on which this famous chestnut is based, no statistical data were in fact presented, but the plaintiff did introduce evidence sufficient to show that the defendant's bus line was the only one chartered to operate on the street where the accident occurred. Affirming the direction of a verdict for the defendant, the court observed: "The most that can be said of the evidence in the instant case is that perhaps the mathematical chances somewhat favor the proposition that a bus of the defendant caused the accident. This was not enough." 317 Mass. at 470, 58 N.E.2d at 755. *See also* Sawyer v. United States, 148 F. Supp. 877 (M.D. Ga. 1956); Reid v. San Pedro, L.A.&S.L.R.R., 39 Utah 617, 118 P. 1009 (1911). If understood as insisting on a numerically higher showing — an "extra margin" of probability above, say, .55 — then the decision in *Smith* would make no sense, at least if the court's objective were the minimization of the total number of judicial errors in situations of this kind, an objective essentially implicit in the adoption of a "preponderance of the evidence" standard. *See* Ball, *The Moment of Truth: Probability Theory and Standards of Proof*, 14 VAND. L. REV. 807, 822–23 (1961) [hereinafter cited as Ball]. But cases like *Smith* are entirely sensible if understood instead as insisting on the presentation of *some* non-statistical and "individualized" proof of identity before compelling a party to pay damages, and even before compelling him to come forward with defensive evidence, absent an adequate explanation of the failure to present such individualized proof. *Compare* p. 1349 *infra with* note 33 *supra*.

[38] Note that in this criminal case, as in the preceding civil one, *a fact known about the particular defendant* provides reason to believe that the defendant is involved in a certain percentage of all cases (here, cases of being at the crucial place between 7 p.m. and midnight) possessing a characteristic shared by the litigated case.

[39] In this case, unlike the preceding two, it is *a fact known about the particular event that underlies the litigation,* not any fact known about the defendant, that triggers the probabilistic showing: a certain percentage of all events in which the crucial fact (here, the killing of a man in his mistress' apartment) is true are supposedly caused by a person with a characteristic (here, being the mistress) shared by the defendant in this case.

man with a wooden left leg, wearing a black patch over his right eye and bearing a six-inch scar under his left, who flees from the scene of the crime in a chartreuse Thunderbird with two dented fenders. A man having these six characteristics is charged with criminal battery. The question is whether the defendant is in fact the assailant. Evidence is available to show that less than one person in twenty has any of these six characteristics, and that the six are statistically independent, so that less than one person in sixty-four million shares all six of them. In what ways, if at all, may that calculation be employed? [40]

*3. Intention.* — Consider finally the cases in which the issue is one of intent, knowledge, or some other "mental" element of responsibility. A recently insured building burns down. The insured admits causing the fire but insists that it was an accident.

---

[40] This is, of course, People v. Collins, 68 Cal. 2d 319, 438 P.2d 33, 66 Cal. Rptr. 497 (1968), minus the specific mathematical errors of *Collins* and without the interracial couple. One special factor that can lead to major mathematical distortions in this type of case is the "selection effect" that may arise from either party's power to choose matching features for quantification while ignoring non-matching features, thereby producing a grossly exaggerated estimate of the improbability that the observed matching would have occurred by chance. *See* Finkelstein & Fairley 495 n.14. This difficulty may well have been present in People v. Trujillo, 32 Cal. 2d 105, 194 P.2d 681, *cert. denied*, 335 U.S. 887 (1948), in which an expert examined a large number of fibers taken from clothing worn by the accused and concluded, upon finding eleven matches with fibers taken from the scene of the crime, that there was only a one-in-a-billion probability of such matching occurring by chance. A particularly egregious case of this sort is State v. Coolidge, 109 N.H. 403, 260 A.2d 547 (1969), *cert. granted on other issues*, 399 U.S. 926 (1970) (No. 1318 Misc., 1969 Term; renumbered No. 323, 1970 Term), where particles taken from the victim's clothing were found to match particles taken from the defendant's car and clothing in twenty-seven out of forty cases.

> In expressing his conclusion based upon statistical probabilities, the [consultant in micro-analysis and director of a university laboratory for scientific investigation] relied upon previous studies made by him, indicating that the probability of finding similar particles in sweepings from a series of automobiles was one in ten. Applying this as a standard, he determined the probability of finding 27 similar particles in sweepings from independent sources would be only one in ten to the 27th power.

109 N.H. at 418–19, 260 A.2d at 559. The court upheld the admissibility of that testimony, 109 N.H. at 422, 260 A.2d at 561, notwithstanding the weakness of the underlying figure of 1/10 and the expert's own concession that the particle sweepings "may not have been wholly independent," 109 N.H. at 419, 260 A.2d at 559. *See* note 21 *supra*. Most significantly, the court was evidently unaware that the relevant probability, that of finding 27 or more matches *out of 40 attempts*, was very much larger than $1/10^{27}$ — larger, in fact, by a factor of approximately $10^{10}$. Indeed, even the 40 particles chosen for comparison were visually selected for similarity from a still larger set of particle candidates, 109 N.H. at 421, 260 A.2d at 560 — so large a set, conceivably, that the probability of finding 27 or more matches in sweeping over such a large sample, even from two entirely different sources, could well have been as high as 1/2 or more. *Cf.* note 8 *supra*. Oddly, the expert testimony in *Coolidge* has recently been described as "not misleading." Broun & Kelly, *supra* note 5, at 48.

On the question of intent to commit arson, what use, if any, may be made of evidence tending to show that less than one such fire out of twenty is in fact accidentally caused? [41]

As in an earlier example,[42] a man is found possessing heroin. This time the heroin is stipulated at trial to have been illegally imported. In his prosecution for concealing the heroin with knowledge that it had been illegally imported, what effect may be given to proof that ninety-eight percent of all heroin in the United States is in fact illegally imported? [43]

A doctor sued for malpractice is accused of having dispensed a drug without adequate warning, knowing of its tendency to cause blindness in pregnant women. Should he be allowed to introduce evidence that ninety-eight percent of all doctors are unaware of the side-effect in question?

*4. An Overview.* — The reader will surely note that this collection of cases might have been subdivided along a variety of different axes. Some of the cases are civil, others criminal. Some involve imputations of moral fault; others do not. Some rest upon statistical calculations that might readily be made; others, on figures that are at best difficult to obtain and at worst entirely inaccessible. Some entail the use of probabilistic evidence to establish liability; others, to negate it. In some, the probabilities refer to a party's own involvement in a category of events; in others, they refer to the proportion of similar events in which a certain critical feature is present, or in which the responsible party has a certain important characteristic. In some of these cases, the mathematics seems best suited to assisting the judge in his allocation of burdens of production or persuasion; in others, its most natural role seems to be as evidence for the finder of fact.

My aim in classifying the cases in terms of occurrence, identity, and intention is not to imply that these other ways of carving up the topic have less significance, but merely to sketch one possible map of the territory I mean to cover — using a set of boundaries that are intuitively suggestive and that will prove helpful from time to time as the discussion unfolds.[44]

Courts confronted with problems of the several sorts enumerated in the three preceding sub-sections have reacted to them on an almost totally ad hoc basis, occasionally upholding an attempt

[41] It is, of course, a fair question how such evidence could ever be compiled; the difficulty, and perhaps the impossibility, of compiling it no doubt reflects the "non-objective" nature of the intent inquiry. *See* pp. 1365–66 *infra*.

[42] *See* p. 1339 *supra*.

[43] Turner v. United States, 396 U.S. 398 (1970), sustained an authorized jury inference of knowledge in these circumstances. *See* note 34 *supra*.

[44] *See* note 32 *supra*.

at probabilistic proof,[45] but more commonly ruling the particular attempt improper.[46] A perhaps understandable pre-occupation with the novelties and factual nuances of the particular cases has marked the opinions in this field, to the virtual exclusion of any broader analysis of what mathematics can or cannot achieve at trial — and at what price. As the number and variety of cases continue to mount, the difficulty of dealing intelligently with them in the absence of any coherent theory is becoming increasingly apparent. Believing that a more general analysis than the cases provide is therefore called for, I begin by examining — and ultimately rejecting — the several arguments most commonly advanced against mathematical proof. I then undertake an assessment of what I regard as the real costs of such proof, and reach several tentative conclusions about the balance of costs and benefits.

### C. *The Traditional Objections*

The cases sketched in the preceding section differ in many respects, but all of them share three central features which have at times been thought to preclude any meaningful application of mathematical techniques. The first of those is that, in all of these cases, concepts of probability based upon the relative frequency of various events must be applied, if at all, not to the statistical prediction of a possible *future* event but to a determination of the occurrence or characteristics of an alleged *past* event. At first glance, probability concepts might appear to have no application in deciding precisely what did or did not happen on a specific prior occasion: either it did or it didn't — period.

The New York Court of Appeals elevated that intuition into a rule of law when it rejected probabilistic testimony to show that a forgery had been done on the defendant's typewriter.[47]

[45] *See, e.g.*, People v. Trujillo, 32 Cal. 2d 105, 194 P.2d 681, *cert. denied*, 335 U.S. 887 (1948); State v. Coolidge, 109 N.H. 403, 260 A.2d 547 (1969), *cert. granted on other issues*, 399 U.S. 926 (1970) (No. 1318 Misc., 1969 Term; Renumbered No. 323, 1970 Term), *discussed in* note 40 *supra*. *See also* Note, *The Howland Will Case*, 4 AM. L. REV. 625 (1870), *discussing* Robinson v. Mandell, 20 F. Cas. 1027 (No. 11,959) (C.C.D. Mass. 1868), *discussed in* note 47 *infra*; People v. Jordan, 45 Cal. 2d 697, 707, 290 P.2d 484, 490 (1955), *discussed in* note 155 *infra*.

[46] *See, e.g.*, People v. Collins, 68 Cal. 2d 319, 438 P.2d 33, 66 Cal. Rptr. 497 (1968), *discussed at* pp. 1334–37 *supra*; State v. Sneed, 76 N.M. 349, 414 P.2d 858 (1966); People v. Risley, 214 N.Y. 75, 108 N.E. 200 (1915). *See also* Smith v. Rapid Transit, Inc., 317 Mass. 469, 58 N.E.2d 754 (1945), *discussed in* note 37 *supra*; Miller v. State, 240 Ark. 340, 399 S.W.2d 268 (1966), *discussed in* note 155 *infra*.

[47] People v. Risley, 214 N.Y. 75, 108 N.E. 200 (1915). Experts on typewriters had been called to testify that certain peculiarities in the forged document corre-

The court distinguished the judicially accepted use of life expectancy tables on the ground that such use arises "from necessity when the fact to be proved is the probability of the happening of a future event. It would not be allowed," the court continued, "if the fact to be established were whether *A* had in fact died, to prove by the Carlisle Table he should still be alive."[48] Thus, the court reasoned, probabilistic testimony (as to the rarity of the coincidence between peculiarities in the defendant's typewriter and peculiarities in the forged document) should be disallowed since the "fact to be established . . . was not the probability of a future event, but whether an occurrence asserted by the people to have happened had actually taken place."[49] The court's result was defensible on far narrower grounds,[50] but this reasoning is not. It is not the future character of an event that induces us to give weight to probabilistic evidence, but the lack of other, more convincing, evidence — an absence more common in, but

---

sponded completely with peculiarities in a typed sample produced by the defendant's typewriter. *Cf.* State v. Freshwater, 30 Utah 442, 85 P. 447 (1906). A mathematician was then allowed to testify, in response to a hypothetical question ascribing certain probabilities to the occurrence of any one defect in a random typewriter, that the probability of the coincidence of all these defects in any single machine was but one in four billion. *Cf.* Note, *supra* note 45, at 648–49 (1870), *discussing* Robinson v. Mandell, 20 F. Cas. 1027 (No. 11,959) (C.C.D. Mass 1868), in which Benjamin Pierce, Harvard Professor of Mathematics, applied the product rule to strokes of authentic and disputed signatures to conclude that their similarities should be expected to occur by chance only once in a number of times equal to the thirtieth power of five. The *Risley* court found reversible error in the use of the "one-in-four-billion" argument on the narrow and obviously correct ground that the hypothetically assumed probabilities for the separate defects were unsupported by any evidence in the case. But the court went on to indicate its view, quoted in text above, that probabilistic evidence is necessarily inadmissible to establish a past event.

[48] 214 N.Y. at 86, 108 N.E. at 203. If the court's use of the phrase "should still be alive" is taken to suggest that *A*'s death has otherwise been firmly established, then the court's example has a surface plausibility arising not out of the fact that *A*'s alleged death is past rather than future, but out of the obviously low probative force of general statistical averages of this sort when confronted with convincing evidence more narrowly focused on the disputed event itself. *Cf.* note 100 *infra*. If, on the other hand, the court's assertion is taken to deny the relevance of life expectancy data in deciding a genuine factual dispute as to whether or not *A* had died, then the court's denial flies in the face of at least the theory that underlies the traditional presumption of death in cases of long and unexplained absence. *See* Comment, *A Review of the Presumption of Death in New York*, 26 ALBANY L. REV. 231, 245 (1962). *See also* note 101 *infra*.

[49] 214 N.Y. at 86, 108 N.E. at 203. *But see* Liddle, *Mathematical and Statistical Probability As a Test of Circumstantial Evidence*, 19 CASE W. RES. L. REV. 254, 277–78 (1968), expressing the surprising view that "[m]athematical probability is . . . most useful in establishing the existence of or identifying facts relating to past events and least useful in the predicting of future events . . . ."

[50] *See* note 47 *supra*.

certainly not limited to, future occurrences.[51] Indeed, "sense-perception itself" might be viewed as "a form of prediction for action purposes," [52] and "propositions about past facts . . . [can be regarded as] 'predictions,' on existing information, as to what the 'truth' will turn out to be when and if more knowledge is available." [53] Insofar as the relevance of probability concepts is concerned, then, there is simply no inherent distinction between future and past events. That all of the cases sketched in the preceding section would apply such concepts to a determination about a past occurrence therefore gives rise to no objection of substance.

However, a second similarity among the cases put above is less easily dismissed: in all of them, making use of the mathematical information available first requires transforming it from evidence about the *generality* of cases to evidence about the *particular* case before us. Some might suggest that no such transformation is possible, and that no translation can be made from probability as a measure of objective frequency in the generality of cases to probability as a measure of subjective belief in the particular instance. That suggestion would be incorrect.[54] In the bus case, to take a typical example, we start with the objective fact that four-fifths of the blue buses are operated by the defendant. That datum can obviously point to a correct conclusion in the particular case, for it suggests that, in the absence of other information, in some sense there is a "four-fifths certainty" that the defendant's bus hit this plaintiff. To be sure, the complete "absence of other information" is rare,[55] but the mathematical datum nonetheless provides a useful sort of knowledge — in part to guide the judge's allocation of the burden of producing believable evidence,[56] and in part to convey to the factfinder a relatively precise sense of the probative force of the background information that is available.

But does it really mean anything at all to be "four-fifths

[51] *See* Note, *Evidential Use of Mathematically Determined Probability*, 28 HARV. L. REV. 693, 695–96 (1915).

[52] Ball, *supra* note 37, at 815 n.19, *citing* A. AMES, THE MORNING NOTES OF ADELBERT AMES, JR. (H. Cantril ed. 1960).

[53] Ball, *supra* note 37, at 815.

[54] *Cf.* note 100 *infra* for a related but more supportable proposition.

[55] If no other evidence has been adduced by the time the plaintiff has rested, we at least know the very fact that no other evidence has been adduced — a fact that may properly be treated as dispositive in some situations if other evidence on the issue of identity seems likely to have been available. *Cf.* Case v. New York Central R.R., 329 F.2d 936, 938 (2d Cir. 1964) (Friendly, J.); National Life & Accident Ins. Co. v. Eddings, 188 Tenn. 512, 221 S.W.2d 695 (1949). *See* p. 1349 *infra*.

[56] *See* note 33 *supra* and note 102 *infra*.

certain" in a particular case? Unlike many such questions, this last, fortunately, has an answer — one first formulated rigorously by Leonard Savage in a seminal 1950 work.[57] Professor Savage, employing elegantly few assumptions, developed a "personalistic" or "subjective" theory of probability based on the notion that it makes sense to ask someone what he would do if offered a reward for guessing correctly whether any proposition, designated $X$, is true or false. If he guesses that $X$ is true under these circumstances, we say that *for him* the subjective probability of $X$, written $P(X)$, exceeds fifty percent. Symbolically, $P(X) > .5$. If he would be equally satisfied guessing either way, then we say that, for him, $P(X) = .5$.

As Professor Savage demonstrated, this basic concept can readily be expanded into a complete scale of probabilities ranging from 0 to 1, with $P(X) = 0$ representing a subjective belief that $X$ is impossible and $P(X) = 1$ representing a subjective belief that $X$ is certain.[58] Thus, one could take a sequence of boxes each containing a well-shuffled deck of one hundred cards, some marked "True" and others marked "False." The first box, $B_0$, would contain no cards marked "True" and 100 marked "False"; the second box, $B_1$, would contain 1 card marked "True" and 99 marked "False;" the next box, $B_2$, would contain 2 cards marked "True" and 98 marked "False"; and so on, until the last box, $B_{100}$, would contain 100 cards marked "True" and no cards marked "False." To say that a person is "four-fifths" or "eighty percent" certain of $X$ is simply to say that he would be as willing to bet that the proposition $X$ is true as he would be willing to bet (with the same stakes) that a card chosen at random from box $B_{80}$ will turn out to be marked "True." In these circumstances, the person would say that, for him, $P(X) = .8$.

In the context of the bus case, if a person knew only that eighty percent of all blue buses are operated by the defendant,[59] and if he had to bet one way or the other, he should be as willing to bet that the bus involved *in this case* was defendant's as he would be willing to bet that a card chosen at random from $B_{80}$

[57] L. SAVAGE, FOUNDATIONS OF STATISTICS (1950).

[58] The notion of probabilities as measures of an individual's "degree of confidence" or "degree of belief" in an uncertain proposition or event traces to JAMES BERNOULLI, ARS CONJECTANDI (1713). See the extremely helpful historical discussion in H. RAIFFA, DECISION ANALYSIS, INTRODUCTORY LECTURES ON CHOICES UNDER UNCERTAINTY 273–78 (1968) [hereinafter cited as RAIFFA]. The special contribution of Savage was to formalize that notion in terms useful for the rigorous study of decisionmaking under uncertainty.

[59] It is possible to know *only* this fact at the outset of the trial — though not, of course, at its conclusion, *see* note 55 *supra* — unless the bulk of the trial record were somehow destroyed and, with it, all memory of what had been established during the proceedings.

would be marked "True." [60] This is what it means to say that, for him, the subjective probability of the defendant's liability [61] — pending the receipt of further information — equals .8.

Different people, of course, would typically assign different subjective probabilities to the same propositions — but that is as it must be, unless the propositions in question are unusually simple. And at least in the law we do not find startling the notion that reasonable men with differing life experiences and differing assumptions will assess the same evidence differently.

The interesting thing about subjective probabilities as defined by Savage is that, once a few entirely plausible postulates are accepted,[62] these probabilities obey the usual rules that the schoolboy associates with such simple operations as flipping fair coins or drawing cards from a well-shuffled deck; hence the translation from objective frequencies to subjective probabilities called for by all of the cases we have considered can indeed be made.[63]

---

[60] To make the idea of a "bet" involving $B_{80}$ correspond as nearly as possible to the situation that actually confronts the trier of fact, one need only postulate that the reward accorded a correct guess consists in learning that a particular lawsuit which the trier wants to see rightly decided has in fact been correctly determined.

[61] Equating the defendant's liability with the mere fact of identity may, of course, overlook other important elements of legal responsibility, a matter taken up at pp. 1365–66 *infra*. I make the equation here only on the explicit assumption that identity is the sole issue in the litigation.

[62] Typical is the "transitivity" postulate that one who regards $X$ as more probable than $Y$, and $Y$ as more probable than $Z$, should also regard $X$ as more probable than $Z$. The other postulates simply specify that P(X) is never less than zero or greater than one and that, if $A$ and $B$ are any two mutually exclusive propositions, P(A) + P(B) equals P(A or B).

[63] Perhaps the most involved of the few basic rules that make the translation a useful one is the rule used to calculate the probability that two propositions, $A$ and $B$, are both true. If a person learned somehow that $A$ was in fact true, how sure would he *then* be of $B$'s truth? The answer to that question, calibrated in terms of the sequence of boxes described above, measures the probability, for this person, of $B$ *conditioned on* $A$, or of $B$ *given* $A$, written P(B|A). *See* note 71 *infra*. The rule in question simply states that the person's probability estimate of the *joint* truth of $A$ and $B$ equals his probability estimate of $A$, multiplied by his probability estimate of $B$ conditioned on $A$. Symbolically, $P(A\&B) = P(A) \cdot P(B|A)$. For example, if a person thinks that $A$ is exactly as likely to be true as false (*i.e.*, $P(A) = 1/2$), and if learning of $A$'s truth would lead him to think that $B$ is only half as likely to be true as false (*i.e.*, $P(B|A) = 1/3$), then he should conclude that the probability of $A$ and $B$ *both* being true is $(1/2) \cdot (1/3) = 1/6$. In the special case where he believes $A$ and $B$ are *mutually independent*, his knowledge of $A$'s truth would have no effect on his estimate of $B$, so that, for him, P(B|A) would equal P(B), and thus P(A&B) would simply equal P(A) · P(B) — which is the "product rule," *noted at* p. 1335 *supra*.

It should be noted here that Finkelstein and Fairley suggest that no complete translation from objective frequencies to subjective probabilities is actually re-required, for they theorize that even subjective probabilities may be interpreted as

Again, there are no insuperable obstacles to the application of mathematical techniques.

Once the translation to subjective probabilities is completed, we encounter the third similarity among the cases. In very few of them, if any, can the mathematical evidence, *taken alone and in the setting of a completed lawsuit*, establish the proposition to which it is directed with sufficient probative force to prevail. To return once again to the blue bus litigation,[64] even assuming a standard of proof under which the plaintiff need only establish his case "by a preponderance of the evidence" in order to succeed, the plaintiff does not discharge that burden by showing simply that four-fifths, or indeed ninety-nine percent, of all blue buses belong to the defendant.[65] For, unless there is a satisfactory explanation for the plaintiff's singular failure to do more than present this sort of general statistical evidence, we might well rationally arrive, once the trial is over, at *a subjective probability of less than .5* that defendant's bus was really involved in the specific case.[66] And in any event, absent satisfactory explanation, there are compelling reasons of policy to *treat* the subjective probability as less than .5 — or simply as insufficient to support a verdict for plaintiff. To give less force to the plaintiff's evidentiary omission would eliminate any incentive for plaintiffs to do more than establish the background statistics. The upshot would be a regime in which the company owning four-fifths of

---

expressing frequencies. Thus, they equate the statement that the subjective probability of the defendant's guilt is 1/2 with the statement that "if a jury convicted whenever the evidence generated a similar degree of belief in guilt, the verdicts in this group of cases would tend to be right about half the time." Finkelstein & Fairley 504. *See also* Broun & Kelly, *supra* note 5, at 31; Kaplan 1073. But the functional relationship between subjective probabilities and likely outcomes is far more complex than this equation assumes, for it turns on such factors as how easy or difficult it is for either party to generate a given level of belief in a false propositon. *See* the related discussion at p. 1385 *infra.*

[64] *See* p. 1340 *supra.*

[65] *See* note 37 *supra.* Indeed, some statistical evidence, *see, e.g.*, note 48 *supra*, is so general and remote from the particular case as to be of only marginal relevance — if that. Of course, if plaintiff can satisfactorily account for the evidentiary omission, the statistical evidence alone might well suffice. *See* note 102 *infra.* And what constitutes a satisfactory explanation of the failure to adduce non-statistical evidence might *itself* turn, at least in part, on the level of probability suggested by the statistics. This possibility was not noted by Ball, *supra* note 37, at 822–823.

[66] *See id.* at 823. This seems to me the only sensible meaning that can be attached to such pronouncements as that "a verdict must be based upon what the jury finds to be facts rather than what they find to be more 'probable'." Lampe v. Franklin Am. Trust Co., 339 Mo. 361, 384, 96 S.W.2d 710, 723 (1936). *Accord*, Frazier v. Frazier, 228 S.C. 149, 168, 89 S.E.2d 225, 235 (1955). *See also* Note, *Variable Verbalistics — the Measure of Persuasion in Tennessee*, 11 VAND. L. REV. 1413 (1958).

the blue buses, however careful, would have to pay for *five*-fifths of all unexplained blue bus accidents — a result as inefficient as it is unfair.[67]

A fortiori, when the governing standard of proof is more stringent still, the mathematics taken alone would typically fall short of satisfying it. As the California Supreme Court put it in the *Collins* case, "no mathematical equation can prove beyond a reasonable doubt (1) that the guilty [party] *in fact* possessed the characteristics described by the People's witnesses, or even (2) that only *one* [party] possessing those characteristics could be found in the [relevant] area." [68]

But the fact that mathematical evidence *taken alone* can rarely, if ever, establish the crucial proposition with sufficient certitude to meet the applicable standard of proof does not imply that such evidence — *when properly combined with other, more conventional, evidence in the same case* — cannot supply a useful link in the process of proof. Few categories of evidence indeed could ever be ruled admissible if each category had to stand on its own, unaided by the process of cumulating information that characterizes the way any rational person uses evidence to reach conclusions. The real issue is whether there is any acceptable way of combining mathematical with non-mathematical evidence. If there is, mathematical evidence can indeed assume the role traditionally played by other forms of proof. The difficulty, as we shall see, lies precisely in this direction — in the discovery of an acceptable integration of mathematics into the trial process. I now turn to a consideration of the only plausible mode of integration yet proposed.

### *D. A Possible Solution*

In deciding a disputed proposition, a rational factfinder probably begins with some initial, a priori estimate of the likelihood of the proposition's truth, then updates his prior estimate in light of discoverable evidence bearing on that proposition, and arrives finally at a modified assessment of the proposition's likely truth in light of whatever evidence he has considered. When many items of evidence are involved, each has the effect of adjusting, in greater or lesser degree, the factfinder's evaluation of the probability that the proposition before him is true. If this

[67] There are, of course, possibilities of proportioned verdicts or other forms of judicial compromise in obviously doubtful cases, but these are not without their own subtle difficulties. *See* Allen, Coons, Freund, Fuller, Jones, Kaufman, Nathanson, Noonan, Ruder, Schuyler, Sowle & Snyder, *On Approaches to Court Imposed Compromises — The Uses of Doubt and Reason*, 58 Nw. U.L. Rev. 750, 795 (1964).

[68] People v. Collins, 68 Cal. 2d 319, 330, 438 P.2d 33, 40, 66 Cal. Rptr. 497, 504 (1968).

incremental process of cumulating evidence could be given quantitative expression, the factfinder might then be able to combine mathematical and non-mathematical evidence in a perfectly natural way, giving each neither more nor less weight than it logically deserves.

A quantitative description of the ordinary process of weighing evidence has long been available.[69] Before deciding whether that description can be put to the suggested use of enabling the factfinder to integrate mathematical and non-mathematical evidence, it will be necessary to develop the description briefly here.

Suppose $X$ represents a disputed factual proposition; that is, the question for the trier is whether $X$ is true or false. And suppose $E$ represents some other proposition, the truth of which has just been established. Prior to learning $E$, the trier's subjective probability assessment of $X$ was $P(X)$. After learning $E$, the trier's assessment of $X$ will typically change. That is, the trier's subjective probability for $X$ *given the fact that* $E$ *is true*, designated $P(X|E)$,[70] will ordinarily differ from the trier's prior subjective probability for $X$.[71] The problem is to determine exactly how $P(X|E)$, the probability of $X$ given $E$, can be calculated in terms of $P(X)$ and such other quantities as are available — to discover, that is, how the receipt of evidence $E$ quantitatively transforms $P(X)$ into $P(X|E)$.

The solution to that problem, commonly known as Bayes' Theorem, will be summarized verbally after its mathematical formulation has been explained. The theorem follows directly from two elementary formulas of probability theory: if $A$ and $B$ are any two propositions, then:

(1) $P(A \& B) = P(A|B) \cdot P(B)$

(2) $P(A) = P(A \& B) + P(A \& \text{not-}B)$.[72]

---

[69] Reverend Thomas Bayes, in *An Essay Toward Solving a Problem in the Doctrine of Chance*, PHILOSOPHICAL TRANS. OF THE ROYAL SOCIETY (1763), suggested that probability judgments based on intuitive guesses should be combined with probabilities based on frequencies by the use of what has come to be known as Bayes' Theorem, a fairly simple formula that is derived at p. 1352 *infra*. More recently, it has become common to think of Bayes' Theorem as providing "a quantitative description of the ordinary process of weighing evidence." I. GOOD, PROBABILITY AND THE WEIGHING OF EVIDENCE 62 (1950). *See also* J. VENN, THE LOGIC OF CHANCE ch. 16–17 (3rd ed. 1868).

[70] $P(X|E)$ is usually read "*P* of *X* given *E*," or "the probability of *X* given the truth of *E*."

[71] A conditional probability like $P(X|E)$ is often understood to assume the given condition $E$ as a certainty. One can as readily interpret $P(X|E)$, however, as measuring the degree to which the trier would believe $X$ *if* he were sure of $E$. *See* note 63 *supra*.

[72] To make these formulas intuitively transparent, consider exactly what they assert. The first asserts that the probability that $A$ and $B$ are *both* true equals

These formulas can be shown to imply

$$(3) \quad P(X|E) = \left[\frac{P(E|X)}{P(E)}\right] \cdot P(X)$$

and

$$(4) \quad P(E) = P(E|X) \cdot P(X) + P(E|\text{not-}X) \cdot P(\text{not-}X).$$ [73]

And, using (4) to calculate P(E) in (3), we obtain

$$(5) \quad P(X|E) = \left[\frac{P(E|X)}{P(E|X) \cdot P(X) + P(E|\text{not-}X) \cdot P(\text{not-}X)}\right] \cdot P(X).$$

Formula (5), known as Bayes' Theorem, determines P(X|E) in terms of P(X), P(E|X), and P(E|not-X).[74] In the abbreviated form of formula (3), Bayes' Theorem expresses the common sense notion that, to obtain P(X|E) from P(X), one multiplies the latter by a factor representing the probative force of *E* — that is, a factor equal to the ratio of P(E|X) (designating the probability of *E if X* is true) to P(E) (designating the probability of *E* whether or *not X* is true).[75]

---

the product of two other probabilities: the probability that *B* is true, multiplied by the probability that *A* would also be true *if B* were true. *See* notes 63 & 71 *supra*.

The second formula asserts that the probability that *A* is true equals the sum of two other probabilities: the probability that *A* is true and *B* is *true*, plus the probability that *A* is true and *B* is *false*. Of course, *B* is either true or false, mutually exclusive possibilities, so the second formula reduces to the assertion that the probability that one of two mutually exclusive events will occur equals the sum of the probabilities of each event's occurrence. For example, if a well-shuffled deck contains ten white cards, ten gray cards, and eighty black cards, the probability that a card chosen randomly from the deck will be either white or gray equals .2, the sum of the probability that it will be white (.1) and the probability that it will be gray (.1).

[73] Formula (1) implies that P(E&X) = P(E|X) · P(X). But E&X is identical with X&E so P(E&X) = P(X&E) = P(X|E) · P(E). Thus P(X|E) · P(E) = P(E|X) · P(X), from which we obtain formula (3) by dividing P(E) into both sides of this equation. Formula (2) implies that P(E) = P(E&X) + P(E & not-X). Applying formula (1), we know that P(E&X) = P(E|X) · P(X) and that P(E & not-X) = P(E|not-X) · P(not-X), from which we obtain formula (4) by adding these two terms.

[74] The only other variable in (5), P(not-X), is equal to 1−P(X).

[75] Another formulation of Bayes' Theorem, less conventional and for most purposes less convenient, might nonetheless be noted here inasmuch as it may be easier to grasp intuitively. If O(X) represents the "odds of *X*," defined as P(X)/P(not-X), then

$$O(X|E) = \frac{P(E|X)}{P(E|\text{not-}X)} \cdot O(X),$$

which in effect defines the "probative force" of *E* with respect to *X*, written PF(E wrt X), as the ratio of the probability that *E* would be true if *X* were *true*

Perhaps the easiest way to express Bayes' Theorem for the non-mathematician, though it is not the most convenient expression for actual use of the theorem, is to say that

$$(6) \quad P(X|E) = \frac{P(E \& X)}{P(E)} = \frac{P(E|X) \cdot P(X)}{P(E)} \quad .$$

This simply asserts that the probability of $X$ being true if $E$ is known to be true, designated $P(X|E)$, may be determined by measuring how often, out of all cases in which $E$ is true, will $X$ *also* be true — that is, by calculating the ratio of $P(E \& X)$ to $P(E)$. That ratio, in turn, equals $P(E|X) \cdot P(X)$ divided by $P(E)$, which completes the equation in Bayes' Theorem.

To give a concrete example, let $X$ represent the proposition that the defendant in a particular murder case is guilty, and let $E$ represent the evidentiary fact that the defendant left town on the first available plane after the murder was committed. Suppose that, prior to learning $E$, an individual juror would have guessed, on the basis of all the information then available to him, that the defendant was approximately twice as likely to be guilty as he was to be innocent, so that the juror's prior subjective probability for the defendant's guilt was $P(X) = 2/3$, and his prior subjective probability for the defendant's innocence was $P(\text{not-}X) = 1/3$. What effect should learning $E$ have upon his probability assessment — *i.e.*, $P(X|E)$? The answer to that question will depend, of course, on how much more likely he thinks a guilty man would be to fly out of town immediately after the murder than an innocent man would be.

Suppose his best guess is that the probability of such flight if the defendant is guilty, designated $P(E|X)$, is twenty percent, and that the probability of such flight if the defendant is innocent, designated $P(E|\text{not-}X)$, is ten percent. Then $P(E|X) = 1/5$ and $P(E|\text{not-}X) = 1/10$. Recall formula (4):

$$P(E) = P(E|X) \cdot P(X) + P(E|\text{not-}X) \cdot P(\text{not-}X).$$

---

to the probability that $E$ would be true if $X$ were *false*. It is tempting, but incorrect, to assume that $PF(E_1 \& E_2 \text{ wrt } X)$, the probative force of the combination of $E_1$ and $E_2$ with respect to $X$, always equals the product of their separate probative forces, $PF(E_1 \text{ wrt } X) \cdot PF(E_2 \text{ wrt } X)$. If $E_1$ and $E_2$ are not *conditionally independent* of both $X$ and not-$X$ (*i.e.*, if $P(E_1 \& E_2|X) \neq P(E_1|X) \cdot P(E_2|X)$ *or* if $P(E_1 \& E_2|\text{not-}X) \neq P(E_1|\text{not-}X) \cdot P(E_2|\text{not-}X)$), then one *cannot conclude* that

$$O(X|E_1 \& E_2) = PF(E_1 \text{ wrt } X) \cdot PF(E_2 \text{ wrt } X) \cdot O(X),$$

although the above formula *does* hold if conditional independence obtains (*i.e.*, if $P(E_1 \& E_2|X) = P(E_1|X) \cdot P(E_2|X)$ *and* $P(E_1 \& E_2|\text{not-}X) = P(E_1|\text{not-}X) \cdot P(E_2|\text{not-}X)$). *See* pp. 1366–68 *infra*. These difficulties are overlooked in Kaplan 1085–86.

As applied to this case, we have

$$P(E) = (1/5)(2/3) + (1/10)(1/3) = 1/6.$$

In other words, given his prior assessment of $P(X) = 2/3$, the juror's best estimate of the probability of the defendant's flight, $P(E)$, would have been 1/6. But if he knew that the defendant were in fact guilty, his best estimate of the probability that the defendant would flee, $P(E|X)$, would be 1/5. Learning that he actually did flee should thus multiply the juror's prior assessment by the ratio

$$\frac{P(E|X)}{P(E)} = \frac{1/5}{1/6} = \frac{6}{5}.$$

Applying formula (3),

$$P(X|E) = \left[\frac{P(E|X)}{P(E)}\right] \cdot P(X),$$

or

$$P(X|E) = \left[\frac{6}{5}\right] \cdot \frac{2}{3} = \frac{4}{5}.$$

Therefore, his subsequent probability assessment of the defendant's guilt, after learning of his flight, should be 4/5. The evidence of flight should thus increase the juror's subjective probability estimate of the defendant's guilt from 2/3 to 4/5 — assuming that he thinks there would be a 1/5 probability of flight if the defendant were guilty and a 1/10 probability of flight if he were not.

Given this precise a tool for cumulating evidence in a quantitative way, there might seem to be no obstacle to assimilating mathematical evidence into the trial process. Indeed, two commentators — one a lawyer, the other a statistician — have proposed doing exactly that. In an article in this *Review*,[76] Michael Finkelstein and William Fairley recently suggested that mathematically expert witnesses might be employed to explain to jurors the precise probative force of mathematical evidence in terms of its quantitative impact on the jurors' prior probability assessments.[77] As the next section of this article tries to show, although their analysis is both intriguing and illuminating, neither the technique proposed by Finkelstein and Fairley, nor any other

---

[76] Finkelstein & Fairley, *supra* note 5.

[77] *Id.* 502, 516–17. Although he is somewhat less precise about his suggestion, another commentator may have intended to advance a similar proposal in an earlier article. *See* Cullison, *supra* note 23, at 505. And a roughly equivalent proposal was in fact put forth over twenty years ago. *See* I. GOOD, PROBABILITY AND THE WEIGHING OF EVIDENCE 66–67 (1950).

like it, can serve the intended purpose at an acceptable cost. It will be necessary first, however, to review the method they have suggested. To that end, it is useful to begin with the hypothetical case Finkelstein and Fairley posit.

A woman's body is found in a ditch in an urban area. There is evidence that the deceased quarreled violently with her boyfriend the night before and that he struck her on other occasions. A palm print similar to the defendant's is found on the knife that was used to kill the woman. Because the information in the print is limited, an expert can say only that such prints appear in no more than one case in a thousand. The question Finkelstein and Fairley ask themselves is how the jury might best be informed of the precise incriminating significance of that finding.

By itself, of course, the "one-in-a-thousand" statistic is not a very meaningful one. It does not, as the California Supreme Court in *Collins* showed,[78] measure the probability of the defendant's innocence — although many jurors would be hard-pressed to understand why not. As Finkelstein and Fairley recognize,[79] even if there were as few as one hundred thousand potential suspects, one would expect approximately one hundred persons to have such prints; if there were a million potential suspects, one would expect to find a thousand or so similar prints. Thus the palm print would hardly pinpoint the defendant in any unique way.

To be sure, the finding of so relatively rare a print which matches the defendant's is an event of significant probative value, an event of which the jury should almost certainly be informed.[80] Yet the *numerical index* of the print's rarity, as measured by the frequency of its random occurrence, may be more misleading than enlightening, and the jury should be informed of that frequency — if at all — only if it is also given a careful explanation that there might well be many other individuals with similar prints. The jury should thus be made to understand that the frequency figure does not in any sense measure the probability of the defendant's innocence.[81]

---

[78] 68 Cal. 2d at 320, 438 P.2d at 33, 66 Cal. Rptr. at 497.

[79] Finkelstein & Fairley 497.

[80] Contrary to the implication in *id.*, nothing whatever in the *Collins* opinion suggests that the palm-print evidence *itself* would be thought to have insufficient probative value to be admissible. Had that been the view of the *Collins* court, it would have been forced to conclude that the evidence of the six matching characteristics was inadmissible on the facts of that case. Of course, the court concluded no such thing, and rejected only the prosecutor's particular attempt to *quantify* the probative force of the coincidence of characteristics. *Cf.* note 2 *supra*.

[81] *See* pp. 1336–38 *supra*.

Finkelstein and Fairley are distressed that this might leave the jury with too little information about the print's full probative value. The solution they propose to meet this difficulty is the use at trial of Bayes' Theorem; it is this solution to which I particularly object.[82] Let $X$ represent the proposition that the defendant used the knife to kill his girlfriend, and let $E$ represent the proposition that a palm print resembling the defendant's was found on the knife that killed her. $P(E|X)$ is the probability of finding a palm print resembling the defendant's on the murder weapon if he was in fact the one who used the knife to kill, and $P(E|\text{not-}X)$ is the probability of finding a palm print resembling the defendant's on the murder weapon if he was *not* the knife-user. $P(X)$ represents the trier's probability assessment of the truth of $X$ *before* learning $E$, and $P(X|E)$ represents the trier's probability assessment of the truth of $X$ *after* learning $E$. Finally, $P(\text{not-}X)$ represents the trier's probability assessment of the falsity of $X$ before learning $E$, so that $P(\text{not-}X) = 1 - P(X)$. Recall now Bayes' Theorem:

$$P(X|E) = \left[\frac{P(E|X)}{P(E|X) \cdot P(X) + P(E|\text{not-}X) \cdot P(\text{not-}X)}\right] \cdot P(X).$$

In applying this formula, Finkelstein and Fairley "assume for simplicity that defendant would inevitably leave such a print," [83] so that $P(E|X) = 1$. They also state that the probability $P(E|\text{not-}X)$ equals "the frequency of the print in the suspect population." [84] In other words, they assume that the probability of finding a print like the defendant's on the knife, if the defendant did not in fact use the knife to kill his girlfriend, is equal to the probability that a randomly chosen person would have a print like the defendant's. In a later section of this article,[85] I will try to show that both of those assumptions are entirely unrealistic, that this error substantially distorts the results derived by Finkelstein and Fairley, and — most importantly — that the error reflects not so much carelessness in their application of math-

[82] In fairness, it should be said that the solution is put forth quite tentatively, *see* Finkelstein & Fairley 502, and that, although Finkelstein and Fairley do expressly advocate its adoption, *see id.* 516–17, the main thrust of their work is to enlarge our understanding of the process of evidentiary inference through the application of Bayesian techniques, a task that they perform admirably and with a candor and explicitness that makes it possible for others to criticize and build upon their initial efforts. My disagreement is only with their suggested use of those techniques, however improved, *at trial.*

[83] *Id.* 498.

[84] *Id.* 500.

[85] *See* pp. 1362–65 *infra.*

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 341 of 794



ematical methods as an inherent bias generated by the use of the methods themselves in the trial process.[86]

For now, however, my only purpose is to see where the method, as Finkelstein and Fairley apply it, leads us. They undertake, using Bayes' Theorem, to construct a table showing the resulting value of P(X|E) for a range of prior probabilities P(X) varying from .01 to .75, and for a range of different values for the frequency of the print in the suspect population varying from .001 to .50. Nine typical values for P(X|E) taken from the table Finkelstein and Fairley obtain (using the two simplifying assumptions noted above) are as follows:[87]

TABLE

Posterior Probability of *X* Given *E* as a Function of Frequency of Print and Prior Probability

| | *Prior Probability, P(X)* | | |
|---|---|---|---|
| *Frequency of Print* | .01 | .25 | .75 |
| .50 | .019 | .400 | .857 |
| .10 | .091 | .769 | .967 |
| .001 | .909 | .997 | .9996 |

The table shows, for example, that if a print like defendant's occurs with a frequency of one in a thousand, and if the trier's prior assessment of the probability that defendant used the knife to kill his girlfriend is one in four before he learns of the palm-print evidence *E*, then the palm-print evidence should increase to .997 the trier's posterior assessment of the probability that defendant used the knife to kill: P(X|E) = .997.

Finkelstein and Fairley would first have each juror listen to the evidence and arrive at a value for P(X) based upon his own view of the non-mathematical evidence (in this case, the prior quarrels and violent incidents). Then an expert witness would in effect show the jury the appropriate row from a table like the above, choosing the row to correspond with the testimony as to the print's frequency, so that each juror could locate the appro-

[86] I do not argue that the methods in question will invariably display any intrinsic bias *outside* the trial context, at least insofar as their use can be subjected to continuing scrutiny and improvement over time. In the trial setting, however, there are institutional goals and constraints that effectively preclude the undistorted use of mathematical techniques. *See generally* pp. 1358–77 *infra*.

[87] Finkelstein & Fairley 500.

priate value of P(X|E) as his final estimate of the probability that the defendant was in fact the knife-user. If the print's frequency were established to be .001, for example, the jurors need only be shown the last row; if it were .10, the jurors need only be shown the second row.[88] In this way, Finkelstein and Fairley argue, the frequency statistic would be translated for the jury into a probability statement which accurately describes its probative force. And, the authors add,[89] most of the respondents in an informal survey conducted by them would have derived higher final probabilities by this method than they did without the assistance of Bayes' Theorem. "Probably the greatest danger to a defendant from Bayesian methods," the authors conclude, "is that jurors may be surprised at the strength of the inference of guilt flowing from the combination of their prior suspicions and the statistical evidence. But this, if the suspicions are correctly estimated, is no more than the evidence deserves." [90]

Is it? We will be in a better position to answer that question at the end of the next section, which examines the costs we must be prepared to incur if we would follow the path Finkelstein and Fairley propose. What will presently be identified as certain costs of quantified methods of proof might conceivably be worth incurring if the benefit in increased trial accuracy were great enough. It turns out, however, that mathematical proof, far from providing any clear benefit, may in fact decrease the likelihood of accurate outcomes. It is the accuracy issue that I will consider first.

### *E. The Costs of Precision*

*1. The Distortion of Outcomes. — a. The Elusive Starting Point.* — It is of course necessary, if the trier is to make any use at all of techniques like that proposed by Finkelstein and Fairley, for him first to settle on a numerical value for P(X), his assessment of the probability of *X* prior to the mathematical bombshell typically represented by the evidence *E*. But the lay trier will surely find it difficult at best, and sometimes impossible, to attach to P(X) a number that correctly represents his real prior assessment. Few laymen have had experience with the assignment of probabilities, and it might end up being a matter of pure chance whether a particular juror converts his mental state of partial certainty to a figure like .33, .43, or somewhere in between. An estimate of .5 might signify for one juror a guess

[88] *Id.* 502. If the print's frequency were disputed, the jurors would of course have to be shown more than one row of such a table.

[89] *Id.* 502–03 n.33.

[90] *Id.* 517.

in the absence of any information and, for another, the conclusion of a search that has narrowed the inquiry to two equally probable suspects. And a juror's statement that he is "four-fifths sure," to revert to an earlier example,[91] is likely, in all but the simplest cases, to be spuriously exact.

Because the Finkelstein-Fairley technique thus compels the jury to begin with a number of the most dubious value, the use of that technique at trial would be very likely to yield wholly inaccurate, and misleadingly precise, conclusions. Even setting this threshold problem aside, major difficulties remain.

*b. The Case of the Mathematical Prior.* — Finkelstein and Fairley consider the application of their technique primarily to cases in which the prior probability assessment of a disputed proposition is based on non-mathematical evidence[92] and is then modified by the application of Bayes' Theorem to some further item of evidence that links the defendant to the case in a quantifiable way[93] or sheds some quantifiable light upon his conduct.[94] When statistical evidence is so used to modify a prior probability assessment, it is true, as the authors claim, that

> Bayesian analysis would demonstrate that the evidentiary weight of an impressive figure like one in a thousand — which might otherwise exercise an undue influence — would depend on the other evidence in the case, and might well be relatively insignificant if the prior suspicion were sufficiently weak.[95]

What they ignore, however, is that in most cases, whether civil or criminal, it will be none other than this "impressive figure like one in a thousand" that their general approach to proof would highlight. For, in most cases, the mathematical evidence will not

---

[91] *See* p. 1346 *supra*.

[92] *See* Finkelstein & Fairley 498–505. The authors do assert that "[u]nder certain restricted conditions, useful prior probabilities can be estimated on the basis of objective population statistics without resort to subjective evaluations," *id.* 506, and discuss studies of the use of statistics to determine prior probabilities in Polish paternity suits. *Id.* 506–09. But while discussing others' suggestions of the uses judges could make of such statistically based prior probability assessments, Finkelstein and Fairley do not consider the application of their technique of using Bayesian analysis at trial to such prior probabilities, nor consider its implications. Moreover, the authors suggest that, even if statistics could be used to arrive at an objective prior probability, "[w]here in [the judge's] opinion the facts showed that the case was either stronger or weaker than usual, he could subjectively adjust the prior [probability] accordingly." *Id.* 509.

[93] *E.g.*, the palm-print hypothetical, *discussed at* pp. 1355–58 *supra*, or the *Collins* case, *discussed at* pp. 1334–37 *supra*, or the Thunderbird hypothetical, *discussed at* p. 1342 *supra*.

[94] *E.g.*, the parking hypothetical, *discussed at* p. 1340 *supra*.

[95] Finkelstein & Fairley 517.

be such as to modify a prior probability assessment by furnishing added data about the specific case at hand. Instead, the mathematical evidence will typically bear only upon the broad category of cases of which the one being litigated will be merely an instance. Recall, for example, the situation in which sixty percent of all barrel-falling incidents were negligently caused,[96] the situations in which ninety-eight percent of all heroin was illegally imported,[97] the case in which four out of five blue buses belonged to the defendant,[98] or the prosecution in which the mistress was the murderess in ninety-five percent of all known similar instances.[99] In all of these cases, the mathematical evidence $E$ simply describes the *class* of cases of which the litigated case is one. In such cases, $E$ can *only* shed light on what initial value to assign to $P(X)$.[100] Thus, the statistical information in these cases will, if given to the jury, create a high probability assessment of civil or criminal liability — and there is no assurance that the jury, either with or without the aid of Bayes' Theorem, will be able to make all of the adjustments in that high prior assessment that will be called for by the other evidence (or lack of it) that the rest of the trial reveals. The problem of the overpowering number, that one hard piece of information, is that it may dwarf all efforts to put it into perspective with more impressionistic sorts of evidence. This problem of acceptably combining the mathematical with the non-mathematical evidence is not touched in these cases by the Bayesian approach.

In situations of the sort being examined here, however, when the thrust of the mathematical evidence is to shed light on the probability assessment with which the trier ought rationally to begin, there is at least one way to take the evidence into account at trial without incurring the risk that the jury will give it too much weight when undertaking to combine the mathematical

---

[96] *See* p. 1339 *supra*.

[97] *See* pp. 1339–40 & p. 1343 *supra*.

[98] *See* pp. 1340–41 *supra*.

[99] *See* p. 1341 *supra*.

[100] When the mathematical evidence $E$ simply describes the *class* of cases of which the litigated case is one, the truth or falsity of the litigated proposition $X$ in no way affects the probability of the truth of $E$; *i.e.*, $P(E|X)$ equals $P(E)$. Bayes' Theorem then simply asserts that $P(X|E) = P(X)$. *See* equation (3), p. 1352 *supra*. Hence, in all such cases, $E$ can suggest what *initial* value to assign to $P(X)$ but cannot serve to *refine* that initial value — as can, for example, evidence of the palm-print variety. This formulation makes more precise the common-sense notion, *cf.* p. 1346 *supra*, that the sort of statistical evidence that was offered in the bus case pertains not to the *particular* dispute being litigated but to a broad *category* of possible disputes. Evidence $E$ is of this character if, although $E$ is *relevant* to the disputed proposition $X$, it is nonetheless true that $P(E|X) = P(E)$.

datum with fuzzier information. Let the judge rather than the jury weigh the probabilistic proof in order to determine whether it might not be both equitable and conducive to an accurate outcome to shift to the other side the burden of producing some believable evidence to take the case outside the general rule seemingly established by the probabilities.[101] If one is to avoid a distortion in results, however, any such proposal must be qualified, at least when the question is one of the defendant's identity, by the principle that a party is not entitled to a jury verdict on statistical evidence alone absent some plausible explanation for his failure to adduce proof of a more individualized character.[102]

But the difficulty that calls forth this solution is not limited to cases in which the mathematics points to a readily quantifiable prior assessment. The problem — that of the overbearing impressiveness of numbers — pervades all cases in which the trial use of mathematics is proposed. And, whenever such use is in fact accomplished by methods resembling those of Finkelstein and Fairley, the problem becomes acute.

*c. The Dwarfing of Soft Variables.* — The syndrome is a familiar one: If you can't count it, it doesn't exist. Equipped with a mathematically powerful intellectual machine, even the

[101] For example, in line with the suggested approach, the judge might decide to employ the doctrine of *res ipsa loquitur, see* note 33 *supra*, or any of a variety of rebuttable presumptions. *See, e.g.*, O'Dea v. Amodeo, 118 Conn. 58, 170 A. 486 (1934) (presumption of father's consent to son's operation of automobile); Hinds v. John Hancock Mut. Life Ins. Co., 155 Me. 349, 354–67, 155 A.2d 721, 725–32 (1959) (presumption against suicide). One of the traditional functions of the use of presumptions, at least those rebuttable by any substantial contrary evidence, is "to make more likely a finding in accord with the balance of probability." Morgan, *Instructing the Jury upon Presumptions and Burden of Proof*, 47 HARV. L. REV. 59, 77 (1933).

[102] *See* p. 1349 *supra.* If the statistical evidence standing alone establishes a sufficiently high prior probability of $X$, and a satisfactory explanation is provided for the failure to adduce more individualized proof, there seems no defensible alternative (absent believable evidence contrary to $X$) to directing a verdict for the party claiming $X$, for no factual question remains about which the jury can reason, and directing a verdict the other way would be more likely to lead to an unjust result. If, however, more individualized proof *is* adduced, and if the party opposing $X$ has discharged the burden (created by the statistical evidence, *see* note 33 *supra*) of producing believable evidence to the contrary, the question remains whether the risk of distortion created by informing the trier of fact of the potentially overbearing statistics so outweighs the probative value of such statistics as to compel their judicial exclusion. If this situation arises in a criminal case, *see, e.g.*, the heroin hypotheticals, p. 1340 & p. 1343 *supra*; the police hypothetical, p. 1341 *supra*; and the mistress hypothetical, *id.*, the added threats to important values, *see* pp. 1368–75 *infra*, should probably suffice, in combination with the danger of a distorted outcome, to outweigh the probative value of the statistics. But if the situation arises in a civil case, as in the barrel hypothetical, p. 1339 *supra*, or in the bus hypothetical, p. 1340 *supra*, all that I am now prepared to say is that the question of admissibility seems to me a very close one.

most sophisticated user is subject to an overwhelming temptation to feed his pet the food it can most comfortably digest. Readily quantifiable factors are easier to process — and hence more likely to be recognized and then reflected in the outcome — than are factors that resist ready quantification. The result, despite what turns out to be a spurious appearance of accuracy and completeness, is likely to be significantly warped and hence highly suspect.

The best illustration is none other than the computations performed by Finkelstein and Fairley themselves in their palm-print hypothetical. To begin with, they assume that, if the defendant had in fact used the knife to kill his girlfriend, then a palm print resembling his would certainly have been found on it, *i.e.*, $P(E|X) = 1$.[103] Had they not been moved by the greater ease of applying Bayes' Theorem under that assumption, the authors would surely have noted that a man about to commit murder with a knife might well choose to wear gloves, or that one who has committed murder might wipe off such prints as he happened to leave behind. Thus $P(E|X)$ equals not 1, but $1-g$, where $g$ represents the combined probability of these contingencies and of the further contingency, later considered by Finkelstein and Fairley,[104] that such factors as variations within the suspected source [105] might prevent a print left by the defendant from seeming to match his palm.[106]

Far more significantly, Finkelstein and Fairley equate the frequency of the palm print in the suspect population with $P(E|\text{not-}X)$, the probability of finding a print like the defendant's on the knife if he did not use it to kill.[107] That equation, however, strangely assumes that finding an innocent man's palm print on the murder weapon must represent a simple coincidence. If that were so, then the likelihood of such a coincidence, as measured by the print's frequency in the population, would of course yield the probability that a print like the defendant's would appear on the knife despite his innocence.[108] But this ignores the obvious fact that the print might have belonged to the defendant after all — without his having used the knife to kill the girl. He could simply have been framed, the real murderer having worn gloves when planting the defendant's knife at the

[103] Finkelstein & Fairley 498.

[104] *Id.* 509–11.

[105] The same palm might leave a variety of seemingly different partial prints.

[106] Significantly, the authors take account of the problem of source variations, Finkelstein & Fairley 510, but neglect to consider the other, less readily quantifiable, components of the variable $g$. *See id.* 498 n.22.

[107] *Id.* 498, 500.

[108] Even this is somewhat oversimplified since it neglects to multiply the frequency by the factor $(1-g)$. *See also* note 113 *infra*.

scene of the crime. The California Supreme Court recognized that sort of possibility in *Collins*,[109] noting that a jury traditionally weighs such risks in assessing the probative value of trial testimony. Finkelstein and Fairley, however, overlook the risk of frame-up altogether[110] — despite the nasty fact that the most inculpatory item of evidence may be the item most likely to be used to frame an innocent man.[111]

One can only surmise that it was the awkwardness of fitting the frame-up possibility into their formula that blinded even these sophisticated authors, one a legal scholar and the other a teacher of statistical theory, to a risk which they could not otherwise have failed to perceive. And if *they* were seduced by the mathematical machinery, one is entitled to doubt the efficacy of even the adversary process as a corrective to the jury's natural tendency to be similarly distracted.[112]

As it turns out, the frame-up risk would have been awkward indeed to work into the calculation, increasing $P(E|\text{not-}X)$ from a value equal to the frequency of the palm print, hereinafter designated $f$, to a value equal to $f + F$, where $F$ represents the

---

[109] *See* p. 1336 *supra*.

[110] The frame-up possibility was also overlooked by Broun & Kelly, *supra* note 5, at 27–28 & n.20. Finkelstein and Fairley seem to have overlooked this possibility literally by definition. They define $X$ (the authors labeled it $G$; *see* pp. 1365–66 *infra*) to be "the event that defendant used the knife," apparently meaning that the defendant used the knife to kill. Finkelstein & Fairley 498. Yet they define not-X to be the event "that a palm print [was] left by someone other than the defendant," *id.*, leaving the frame-up case as one where both $X$ and not-X are untrue, a logical impossibility.

Of course, it is possible that the authors intentionally prevented the frame-up possibility from affecting their calculations by the use of the definition of $X$, "the event that defendant used the knife," to mean the event that the print was the defendant's — in which case the frame-up case is included within $X$. But this would require another application of Bayes' Theorem to determine the probability of guilt from the knowledge of the probability that the print was the defendant's, a step that Finkelstein and Fairley clearly did not intend. Instead, they repeatedly referred to $P(X)$ as the "prior probability of guilt." *See, e.g.*, *id.* 500; *see* pp. 1365–66 *infra*.

[111] A quite distinct problem, more serious in cases relying on human identification than in cases where identification is based on physical evidence, is that the characteristics of the defendant relied upon in the probabilistic formula may not in fact have been shared by the actually guilty individual or individuals because of some mistake in observation or memory. Such risks of error, like the risk of frame-up, are hard to quantify and hence likely to be underemphasized in a quantitative analysis, but differ from the risk of frame-up in that they need not perversely increase as the apparent probative value of the evidence increases.

[112] *Cf.* pp. 1337–38 *supra*. This is not to say, of course, that a professional decisionmaking body, possessed of both the skills and the time to refine its sophistication in mathematical techniques, could not overcome such a tendency — but the jury is not such a body, and making it into one for all but a very limited set of purposes would entail staggeringly high costs.

probability of frame-up.[113] Bayes' Theorem would then have assumed the messy form

$$P(X|E) = \left[ \frac{(1-g)}{(1-g)\,P(X) + (f + F)\,P(\text{not-}X)} \right] \cdot P(X)\ .^{114}$$

This formula may be easy enough to use when one assumes, with Finkelstein and Fairley, that $g = 0$ and $F = 0$, but is rather more troublesome to handle when one has no real idea *how* large those two probabilities are.

Moreover, it makes quite a difference to the outcome just how large the probabilities, $g$ and $f$, turn out to be. Consider again the case in which the print is assumed to occur in one case in a thousand, so that $f = .001$, and in which the prior assessment is $P(X) = .25$. On those facts, Finkelstein and Fairley conclude — by treating $g$ and $F$ as though they were both zero — that $P(X|E) = .997$, an overwhelming probability that the defendant did the killing. If, however, we assume that $g = .1$ and $F = .1$, then the same initial values $f = .001$ and $P(X) = .25$ yield the strikingly different conclusion $P(X|E) = .75$, a very much lower probability than Finkelstein and Fairley calculated.[115]

What, then, is one to tell the jurors? That each of them should arrive somehow at his own values for $g$ and $F$, as to neither of which any evidence will be available, and should then wait while a mathematician explains what $P(X|E)$ turns out to be given those values? Surely we have by now strained the system beyond its breaking point.[116] If the jurors are to work with mathematical proof in any capacity beyond that of passive ob-

---

[113] More precisely, $P(E|\text{not-}X)$ equals not simply $f+F$, but $(1-g)f+F$. *Cf.* note 108 *supra*. This fact makes the final computation even more complex, although it changes the outcome only slightly if $g$ is small in relation to $f$ or $F$.

[114] *See* equation (5), p. 1352 *supra*. The complete equation, taking into account note 113 *supra*, is more involved still:

$$P(X|E) = \left[ \frac{(1-g)}{(1-g)\,P(X) + [(1-g)\,f + F]\,P(\text{not-}X)} \right] \cdot P(X).$$

[115] Indeed, if $F = .25$, $f = .1$, $g = .1$, and $P(X) = .25$, then $P(X|E) = .469$, not .769 (as Finkelstein and Fairley calculated, *id.* 500) — this time enough of a difference to cross even the "preponderance" line of .5, making $P(X|E)$ *less* likely than not rather than *more* likely than not, as the Finkelstein-Fairley method would suggest. As Professor Howard Raiffa pointed out to me upon reading this argument, it highlights how useful mathematics can be in illuminating the source, size, and structure of such distortions and underscores the point that my objection is not to mathematical analysis as such but to its formal use at trial. *See also* note 132 *infra*.

[116] *See* pp. 1375–77 *infra*. Further complicating the picture, there will often be dispute as to the truth of such underlying evidentiary facts as $E$ which call forth the use of statistics, a circumstance that makes the use of Bayes' Theorem more complex still.

servers, they will in the end have to be given the numbers computed by Finkelstein and Fairley and asked to draw their own conclusions, keeping in mind — unless the judge who instructs them is as blinded by the formulas as the authors were — that possibilities such as frame-up distort the figures in the table so that they overstate the truth by some indeterminate amount.

But then we have come full circle. At the outset some way of integrating the mathematical evidence with the non-mathematical was sought, so that the jury would not be confronted with an impressive number that it could not intelligently combine with the rest of the evidence, and to which it would therefore be tempted to assign disproportionate weight. At first glance, the use Finkelstein and Fairley made of Bayes' Theorem appeared to provide the needed amalgam. Yet, on closer inspection, their method too left a number — the exaggerated and much *more* impressive $P(X|E) = .997$ — which the jury must again be asked to balance against such fuzzy imponderables as the risk of frame-up or of misobservation, if indeed it is not induced to ignore those imponderables altogether.

What is least clear in all of this is whether the proponents of mathematical proof have made any headway at all. Even assuming with Finkelstein and Fairley that the accuracy of trial outcomes could be somewhat enhanced if *all* crucial variables could be quantified precisely and analyzed with the aid of Bayes' Theorem, it simply does not follow that trial accuracy will be enhanced if *some* of the important variables are quantified and subjected to Bayesian analysis, leaving the softer ones — those to which meaningful numbers are hardest to attach — in an impressionistic limbo. On the contrary, the excessive weight that will thereby be given to those factors that can most easily be treated mathematically indicates that, on balance, more mistakes may well be made with partial quantification than with no quantification at all.[117]

*d. Asking the Wrong Questions.* — Throughout the preceding discussion, I have referred to $P(X)$ and to $P(X|E)$, deliberately eschewing the terminology employed by Finkelstein and Fairley.[118] Instead of *X*, they write *G* — impling that $P(X|E)$

[117] *Cf.* Lipsey & Lancaster, *The General Theory of Second Best*, 24 REV. ECON. STUDIES 11 (1956) (economic theory that, once some constraint prevents attainment of one optimum condition, other previously optimal conditions are generally no longer desirable as means to best solution):

> Specifically, it is *not* true that a situation in which more, but not all, of the optimum conditions are fulfilled is necessarily, or is even likely to be, superior to a situation in which fewer are fulfilled.

*Id.* 12.

[118] Finkelstein & Fairley 498–500.

represents the probability that the defendant is *guilty of murder* if a palm-print matching his is found on the murder weapon. But of course it represents no such thing, for murder means much more than causing death. To say that P(X|E) = .997 is to say that, given the palm-print evidence, there is a probability of .997 that the defendant used the knife to kill the deceased. It is to say nothing at all about his state of mind at the time, nothing about whether he intended to cause death, nothing about whether the act was premeditated.[119] To be sure, these elements can be called to each juror's attention, but his eyes are likely to return quickly to that imposing number on the board.

It is no accident that such matters as identity — matters that are objectively verifiable in the world outside the courtroom — lend themselves more readily to mathematical treatment than do such issues as intent — issues that correspond to no verifiable "fact" outside the verdict of the jury. It is not surprising that in none of the cases earlier enumerated under the heading of "intention" [120] was the mathematical evidence linked to any fact specifically about the defendant himself or about his own conduct or state of mind — for it is difficult even to imagine cases in which such a link could be found.

One consequence of mathematical proof, then, may be to shift the focus away from such elements as volition, knowledge, and intent, and toward such elements as identity and occurrence — for the same reason that the hard variables tend to swamp the soft. It is by no means clear that such marginal gains, if any, as we may make by finding somewhat more precise answers would not be offset by a tendency to emphasize the wrong questions.[121]

*e. The Problem of Interdependence.* — Essential to the application of Bayes' Theorem to derive P(X|E) from P(X) is that the trier be able somehow to make a prior estimate of P(X), the probability of the disputed proposition $X$. If that estimate is arrived at after knowing or even suspecting $E$, then to use the information provided by $E$ to refine the estimate through Bayes' Theorem to obtain P(X|E) would obviously involve counting the same thing twice. Particularly when the proposition $X$ goes to the identity of the person responsible for an alleged wrong, and when the tendency of $E$ is to pinpoint the defendant as the

[119] Although such matters will rarely be at issue in cases where the defense rests in part on a claim of mistaken identity, it is of course possible for both identity and intent to be disputed in the same case.

[120] *See* pp. 1342–43 *supra*.

[121] This difficulty would be somewhat easier to correct than any of the others identified thus far — through the use of special instructions to the jury, or perhaps through special verdicts.

responsible person, the knowledge or suspicion of *E* is likely to have entered into the plaintiff's choice of this particular defendant. Having learned of the features of the interracial couple from the witnesses in *Collins*,[122] for example, the prosecution was hardly likely to charge someone *not* sharing those features; having found a latent palm print on the murder weapon, the State was less likely to file an indictment against a person whose palm print *failed* to match. And the trier would be hard put to disregard those obvious realities in attempting to derive a value for P(X). The accurate application of Bayes' Theorem along the lines proposed by Finkelstein and Fairley necessarily assumes that the evidence *E* of quantifiable probative value can be made independent of the prior suspicion,[123] but in most trials the two will be hopelessly enmeshed.

Indeed, even if P(X) is arrived at without any reliance whatever upon *E*, the straightforward application of Bayes' Theorem will still entail a distorted outcome if some or all of the evidence that *did* underlie P(X) was related to *E*, in the sense that knowing something about the truth of *X* and of that underlying evidence would yield information one way or the other about the likely truth of *E*. To take a simple example, suppose that an armed robbery taking fifteen minutes to complete was committed between 3.00 a.m. and 3:30 a.m. The trier first learns $E_1$: that the accused was seen in a car a half-mile from the scene of the crime at 3:10 a.m. Based on this information, the trier will assess a subjective probability P(X) of the accused's likely involvement in the robbery. Then the trier learns $E_2$: that the accused was also seen in a car a half-mile from the scene of the crime at 3:20 a.m. By itself, $E_2$ appears to make *X*, the proposition that the accused was involved, more likely than it would have seemed without any evidence as to the accused's whereabouts, so that $P(X|E_2)$ will exceed P(X) if computed by applying Bayes' Theorem directly, *i.e.*, by multiplying P(X) by the ratio $P(E_2|X)/P(E_2)$. Yet this is surely wrong, for if $E_1$ and $E_2$ are *both* true, then *X* must be false, and $P(X|E_2)$ should equal zero.[124] One

[122] People v. Collins, 68 Cal. 2d 319, 321, 438 P.2d 33, 34, 66 Cal. Rptr. 497, 498 (1968).

[123] Strictly speaking, the requirement is that *E* be *conditionally* independent of both *X* and not-X, where *X* is the proposition in dispute. *See* note 75 *supra*.

[124] An illustration of the converse situation, in which $P(X|E_1)$ and $P(X|E_2)$ are both smaller than P(X) but $P(X|E_1 \& E_2)$ is much larger, is easy to construct. $E_1$ and $E_2$ could, for example, represent mutually inconsistent but nonetheless strikingly similar alibis. Independently, the alibis might seem plausible, thus reducing the probability of *X*. Taken together, not only does the inconsistency destroy the effectiveness of each in reducing the likelihood of *X*, but the similarity makes both seem contrived, allowing a more probable inference of *X*.

can with some effort make the appropriate adjustment — by using Bayes' Theorem to compute [125]

$$P(X|E_1 \& E_2) = \left[\frac{P(E_2|X \& E_1)}{P(E_2|E_1)}\right] \cdot P(X|E_1).$$

This means, however, that the theorem cannot be applied sequentially, with one simple multiplication by $P(E|X) / P(E)$ as each new item of evidence, *E*, comes in,[126] but must instead be applied in the terribly cumbrous form shown above,[127] unless one knows somehow that the item of evidence to which the theorem is being applied at any given point is not linked conditionally [128] to any evidence already reflected in one's estimate of $P(X)$. Finkelstein and Fairley ignore that requirement; taking it into account in order to avoid grossly inaccurate outcomes would make the machinery they propose so complex and so unwieldy that its operation, already hard enough for the juror to comprehend, would become completely opaque to all but the trained mathematician.

2. *The End of Innocence: A Presumption of Guilt?* — At least in criminal cases, and perhaps also in civil cases resting on allegations of moral fault, further difficulties lurk in the very fact that the trier is forced by the Finkelstein-Fairley technique to arrive at an explicit quantitative estimate of the likely truth at or near the trial's start, or at least before some of the most significant evidence has been put before him.[129]

To return for a moment to the palm-print case posited by Finkelstein and Fairley, a juror compelled to derive a quantitative measure $P(X)$ of the defendant's likely guilt after having heard no evidence at all, or at most only the evidence about the

---

[125] By successive applications of equations (1) and (3), pp. 1351–52 *supra*:

$$P(X|E_1 \& E_2) = \frac{P(X) \cdot P(E_1 \& E_2|X)}{P(E_1 \& E_2)} = \frac{P(X \& E_1 \& E_2)}{P(E_1 \& E_2)} =$$

$$\frac{P(X \& E_1) \cdot P(E_2|X \& E_1)}{P(E_1 \& E_2)} = \frac{P(E_1) \cdot P(X|E_1) \cdot P(E_2|X \& E_1)}{P(E_1) \cdot P(E_2|E_1)} =$$

$$\frac{P(E_2|X \& E_1) \cdot P(X|E_1)}{P(E_2|E_1)}.$$

[126] This limitation is simply ignored by Kaplan, *supra* note 5, at 1084–85; *see* note 75 *supra*.

[127] More generally, $P(X|E_1 \& E_2 \& \ldots \& E_n \& E_{n+1}) =$

$$\frac{P(E_{n+1}|X \& E_1 \& \ldots \& E_n)}{P(E_{n+1}|E_1 \& \ldots \& E_n)} \cdot P(X|E_1 \& \ldots \& E_n).$$

[128] *See* note 75 *supra*.

[129] The crucial factor is not so much that of time sequence as that of priority in thought. Even if all of the evidence has in fact been introduced before the trier is asked to quantify the probative force of a limited part of it without taking account of the rest, the problems discussed here still obtain.

defendant's altercations with the victim, cannot escape the task of deciding just how much weight to give the undeniable fact that the defendant is, after all, not a person chosen at random but one strongly suspected and hence accused by officials of the state after extended investigation. If the juror undertakes to assess the probative value of that fact as realistically as he can, he will have to give weight to whatever information he supposes was known to the grand jury or to the prosecutor who filed the accusation. To the extent that this supposed information contains facts that will be duplicated by later evidence, such evidence will end up being counted twice, and will thus be given more weight than it deserves.[130] And, to the extent that the information attributed to the prosecutor or the grand jury is *not* duplicative in this sense, it will include some facts that will not be, and some facts that cannot properly be, introduced at trial as evidence against the accused.[131] Inviting jurors to take account of such facts is at war with the fundamental notion that the jury should make an independent judgment based only on the evidence properly before it, and would undercut the many weighty policies that render some categories of evidence legally inadmissible.[132]

---

[130] *See* p. 1366 *supra*.

[131] Such facts would typically include, for example, hearsay of a sort that, though inadmissible at trial, may support a valid indictment. *See* Costello v. United States, 350 U.S. 359, 362–63 (1956). *But cf.* United States v. Payton, 363 F.2d 996 (2d Cir.), *cert. denied*, 385 U.S. 993 (1966).

[132] Nor would it be a satisfactory solution to instruct the jury to assign an artificially low starting value to P(X) on the pretense that the accused was plucked randomly from the population, even if the jury could be trusted to follow such an instruction. Suppose that P(X) would be thought to equal 1/2 but for the suggested pretense of random selection, and suppose that the prosecution's evidence *E* is so compelling that, given this P(X), it turns out that $P(X|E) > .999$. This would be the case, for example, if $P(E|X) = 1/2$ and $P(E|\text{not-}X) = 1/2{,}000$. *See* formula (5) at p. 1352 *supra*. Given this same evidence *E*, if the trier were to pretend that the accused had been chosen randomly from the population of the United States and were thus to treat P(X) as equal to approximately 1/200,000,000, he would obtain $P(X|E) < 1/200{,}000$ — a miniscule, and evidently understated, probability that the defendant did the killing. If, however, the trier could manage to treat P(X) as *completely indeterminate* until at least some evidence *E'* (some significant part of *E*) had been introduced, he might rationally assign to P(X|E') a value high enough to bring P(X|E & E') close to .999 or higher. *See* note 125 *supra*. What this suggests is that setting P(X) equal to an artificially small (and essentially meaningless) quantity at the outset of the trial may distort the final probability downward in a way that need not occur if *no judgment at all* is made about the starting value of P(X) apart from at least some significant evidence in the case. *Cf.* note 100 *supra*. But once the jury is invited to assess the probability of guilt in light of less than *all* the evidence, there can be no assurance that it will not make an initial assessment that depends on *none* of the evidence. And, as has been shown, such an assessment can cause serious distortions whether the existence of an indictment or other charge is treated as probative background information or as equivalent to random selection. It should be noted that, without using Bayes'

Moreover, even if no such problem were present, directing the jury to focus on the probative weight of an indictment or other charge, or even directing it simply to assess the probability of the accused's guilt at some point before he has presented his case, would entail a significant cost. It may be supposed that no juror would be permitted to announce publicly in mid-trial that the defendant was already burdened with, say, a sixty percent probability of guilt — but even without such a public statement it would be exceedingly difficult for the accused, for the prosecution, and ultimately for the community, to avoid the explicit recognition that, having been forced to focus on the question, the rational juror could hardly avoid reaching some such answer. And, once that recognition had become a general one, our society's traditional affirmation of the "presumption of innocence" could lose much of its value.

That presumption, as I have suggested elsewhere, "represents far more than a rule of evidence. It represents a commitment to the proposition that a man who stands accused of crime is no less entitled than his accuser to freedom and respect as an innocent member of the community." [133] In terms of tangible consequences for the accused, this commitment is significant because it can protect him from a variety of onerous restraints not needed to effectuate the interest in completing his trial; [134] because the suspension of adverse judgment that it mandates can encourage the trier to make an independent and more accurate assessment of his guilt; and because it may help to preserve an atmosphere in which his acquittal, should that be the outcome, will be taken seriously by the community. But no less important are what seem to me the intangible aspects of that commitment: its expressive and educative nature as a refusal to acknowledge prosecutorial omniscience in the face of the defendant's protest of innocence, and as an affirmation of respect for the accused — a respect expressed by the trier's willingness to listen to all the accused has to say before reaching any judgment, even a tentative one, as to his probable guilt.

It may be that most jurors would suspect, if forced to think about it, that a substantial percentage of those tried for crime

Theorem to compute the figures employed in this footnote, the degree of understatement that might be caused by an artificially deflated starting value for P(X) would be difficult if not impossible to assess, a fact that again serves to illustrate the usefulness of mathematical techniques in illuminating the process of proof even when, and perhaps especially when, one is rejecting the formal application of such techniques in the process itself. *See also* note 115 *supra*.

[133] Tribe, *An Ounce of Detention: Preventive Justice in the World of John Mitchell*, 56 U. VA. L. REV. 371, 404 (1970) [hereinafter cited as Tribe].

[134] *Id.* 404–06.

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 355 of 794



are guilty as charged. And that suspicion might find its way unconsciously into the behavior of at least some jurors sitting in judgment in criminal cases. But I very much doubt that this fact alone reduces the "presumption of innocence" to a useless fiction. The presumption retains force not as a *factual* judgment, but as a *normative* one — as a judgment that society *ought* to *speak* of accused men as innocent, and *treat* them as innocent, until they have been properly convicted after all they have to offer in their defense has been carefully weighed. The suspicion that many are *in fact* guilty need not undermine either this normative conclusion or its symbolic expression through trial procedure, so long as jurors are not compelled to articulate their prior suspicions of guilt in an explicit and precise way.

But if they *are* compelled to measure and acknowledge a factual presumption of guilt at or near each trial's start, then their underlying suspicion that such a presumption would often accord with reality may indeed frustrate the expressive and instructional values of affirming in the criminal process a normative presumption of innocence. Jurors cannot at the same time estimate probable guilt and suspend judgment until they have heard all the defendant has to say. It is here that the great virtue of mathematical rigor — its demand for precision, completeness, and candor — may become its greatest vice, for it may force jurors to articulate propositions whose truth virtually all might already suspect, but whose explicit and repeated expression may interfere with what seem to me the complex symbolic functions of trial procedure and its associated rhetoric.

To the extent that this argument and the one that immediately follows it [135] appear to run counter to rarely questioned assumptions about the transcending values of full candor and complete clarity, I should stress that the arguments in question are entirely independent of my other criticisms of mathematical methods in the trial process. Nor do I mean by advancing these arguments to suggest that departures from candor are lightly to be countenanced. Indeed, I have not proposed that anyone deceive either himself or another about the factual underpinnings of the presumption of innocence, but only that worthwhile values served by that presumption as a normative standard might be harder to secure if the probability of guilt became a matter for precise and explicit assessment and articulation early in the typical criminal trial. The point, then, is not that any factual truth should be concealed or even obscured, but only that one need not say everything all at once in order to be truthful, and that saying some things in certain ways and at certain times in the trial process

[135] *See* pp. 1372–75 & 1390 *infra*.

may interfere with other more important messages that the process should seek to convey and with attitudes that it should seek to preserve.

*3. The Quantification of Sacrifice.* — This concern for the expressive role of trial procedure is no less relevant to the trial's end than to its start. Limiting myself here to the ordinary criminal proceeding,[136] I suggest that the acceptance of anything like the method Finkelstein and Fairley propose, given the precision and explicitness its use demands, could dangerously undermine yet another complex of values — the values surrounding the notion that juries should convict only when guilt is beyond real doubt.[137]

An inescapable corollary of the proposed method, and indeed of any method that aims to assimilate mathematical proof by quantifying the probative force of evidence generally, is that it leaves the trier of fact, when all is said and done, with a number that purports to represent his assessment of the probability that the defendant is guilty as charged.[138] Needless to say, that number will never quite equal 1.0, so the result will be to produce a quantity — take .95 for the sake of illustration — which openly signifies a measurable (and potentially reducible) margin of doubt, here a margin of .05, or 1/20.

Now it may well be, as I have argued elsewhere,[139] that there is something intrinsically immoral about condemning a man as a criminal while telling oneself, "I believe that there is a chance of one in twenty that this defendant is innocent, but a 1/20 risk of sacrificing him erroneously is one I am willing to run in the interest of the public's —and my own — safety." It may be that

[136] The argument I advance here — unlike the arguments beginning at pp. 1358–59 *supra*, and unlike at least part of the argument beginning at p. 1368 *supra*, is meant to apply only to criminal cases, and perhaps only to those criminal cases in which either the penalty attached or the moral blame imputed makes the crime a sufficiently "serious" one.

[137] Although this notion is readily confused with the presumption of innocence, *discussed at* pp. 1370–71 *supra*, it is in fact quite different and rests on a partially overlapping but partially distinct set of objectives. To some extent, in fact, the concept that conviction is proper only after all real doubt has been dispelled may tend to undercut the purposes served by the presumption of innocence, for that concept suggests that a defendant's acquittal signifies only the existence of some doubt as to his guilt, whereas one function of the presumption of innocence is to encourage the community to treat a defendant's acquittal as banishing all lingering suspicion that he might have been guilty. *See* p. 1370 *supra*.

[138] Even when the number measures only one element of the offense and omits an element like intent, *see* pp. 1365–66 *supra*, it sets an upper bound on the probability of guilt, and the argument made below follows a fortiori.

[139] Tribe 385–87.

— quite apart from the particular number — there is something basically immoral in this posture, but I do not insist here on that position. All I suggest is that a useful purpose may be served by structuring a system of criminal justice so that it can avoid having to proclaim, as the Finkelstein-Fairley procedure would force us to proclaim, that it will impose its sanctions in the face of a recognized and quantitatively measured doubt in the particular case.

If the system in fact did exactly that, such compelled candor about its operation might have great value. It could generate pressure for useful procedural reform, and it should probably be considered worthwhile in itself.[140] But to let the matter rest

---

[140] Even if this were the case, I would find it difficult wholly to ignore the fact that at least some who witness the trial process might interpret a series of publicly proclaimed decisions to condemn in the face of numerically measurable doubt as teaching that the sacrifice of innocent men is not to be regarded as a terribly serious matter. *See id.* 387 n.65. Those who adopt this interpretation might become more willing than they should be to tolerate the sacrifice of others and less confident than they ought to be of their own security from unjust conviction. Although such an interpretation would be in error, it would not be *wholly* unjustified, for a society that does not recoil from confronting defendants in quantitative terms with the magnitude of its willingness to risk their erroneous conviction *is*, it seems to me, a society that takes the tragic necessity of such sacrifice less seriously than it might.

When the Supreme Court held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," it stressed the importance of not leaving the community "in doubt whether innocent men are being condemned," reasoning in part that such doubt would dilute "the moral force of the criminal law" and in part that it would impair the confidence of "every individual going about his ordinary affairs . . . that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty." *In re* Winship, 397 U.S. 358, 364 (1970). If due process required less than this publicly announced insistence upon "a subjective state of certitude," *id.*, *quoting* Dorsen & Rezneck, *In re Gault and the Future of Juvenile Law*, 1 FAMILY L.Q. 1, 26 (1967), the Court seemed to be saying, the sense of security conferred by a system that at least proclaims an unwillingness to punish in the face of palpable doubt would be irreparably eroded. *See* Tribe 389.

Both callousness and insecurity, then, might be increased by the explicit quantification of jury doubts in criminal trials — whether or not it would be *factually accurate* to describe the trial system as imposing criminal sanctions in the face of quantitatively measured uncertainty in particular cases. In considering a somewhat analogous problem in the area of accident law, Professor Calabresi has argued that there is a great difference in social cost between a set of individual market choices that indirectly sacrifice human lives by investing less than possible in life-saving resources and a collective societal choice that consciously and calculatingly sacrifices precisely the same lives for exactly the same reasons of economy. *See* Calabresi, *Reflections on Medical Experimentation in Humans*, 1969 DAEDALUS 387, 388–92. *See also* Schelling, *The Life You Save May Be Your Own*, in PROBLEMS IN PUBLIC EXPENDITURE ANALYSIS 127, 142–62 (S.B. Chase ed. 1968).

there would be wrong, for the system does *not* in fact authorize the imposition of criminal punishment when the trier recognizes a quantifiable doubt as to the defendant's guilt. Instead, the system dramatically — if imprecisely — insists upon as close an approximation to certainty as seems humanly attainable in the circumstances.[141] The jury is charged that any "reasonable doubt," of whatever magnitude, must be resolved in favor of the accused. Such insistence on the greatest certainty that seems reasonably attainable can serve at the trial's end, like the presumption of innocence at the trial's start,[142] to affirm the dignity of the accused and to display respect for his rights as a person — in this instance, by declining to put those rights in deliberate jeopardy and by refusing to sacrifice him to the interests of others.

In contrast, for the jury to announce that it is prepared to convict the defendant in the face of an acknowledged and numerically measurable doubt as to his guilt is to tell the accused that those who judge him find it preferable to accept the resulting risk of his unjust conviction than to reduce that risk by demanding any further or more convincing proof of his guilt. I am far from persuaded that this represents the sort of thought process through which jurors do, or should, arrive at verdicts of guilt. Many jurors would no doubt describe themselves as being "completely sure," or at least as being "as sure as possible," before they vote to convict. That some mistaken verdicts are inevitably returned even by jurors who regard themselves as "certain" is of course true but is irrelevant; such unavoidable errors are in no sense *intended*,[143] and the fact that they must occur if trials are to be conducted at all need not undermine the effort, through the symbols of trial procedure, to express society's fundamental commitment to the protection of the defendant's rights as a person, as an end in himself. On the other hand, formulating an "acceptable" risk of error to which the trier is willing deliberately to subject the defendant would interfere seriously with this expressive role of the demand for certitude — however unattainable real certitude may be, and however clearly all may ultimately recognize its unattainability.

---

[141] *See The Supreme Court, 1969 Term*, 84 HARV. L. REV. 1, 157 & nn.8, 9 (1970).

[142] In some respects, it should be stressed, the insistence on certainty does *not* parallel the presumption of innocence. See note 137 *supra*.

[143] Tolerating a system in which perhaps one innocent man in a hundred is erroneously convicted despite each jury's attempt to make *as few mistakes as possible* is in this respect vastly different from instructing a jury to *aim* at a 1% rate (or even a .1% rate) of mistaken convictions. *See* Tribe 385-86, 388.

In short, to say that society recognizes the necessity of tolerating the erroneous "conviction of some innocent suspects in order to assure the confinement of a vastly larger number of guilty criminals" [144] is not at all to say that society does, or should, embrace a policy that juries, *conscious of the magnitude of their doubts in a particular case*, ought to convict in the face of this acknowledged and quantified uncertainty. It is to the complex difference between these two propositions that the concept of "guilt beyond a reasonable doubt" inevitably speaks. The concept signifies not any mathematical measure of the precise degree of certitude we require of juries in criminal cases,[145] but a subtle compromise between the knowledge, on the one hand, that we cannot realistically insist on acquittal whenever guilt is less than absolutely certain, and the realization, on the other hand, that the cost of spelling that out explicitly and with calculated precision in the trial itself would be too high.[146]

*4. The Dehumanization of Justice.* — Finally, we have been told by Finkelstein and Fairley that jurors using their method may find themselves "surprised" at the strength of the inference of guilt flowing from the combination of mathematical and nonmathematical evidence.[147] Indeed they may,[148] and in a far deeper sense than with other equally obscure forms of expert testimony, for such testimony typically represents no more than an input into the trial process, whereas the proposed use of Bayesian methods changes the character of the trial process itself. When that change yields a "surprisingly" strong inference of guilt in a particular case, it is by no means clear that, so long as one keeps one's numbers straight, "this . . . is no more than the evidence deserves." [149] Methods of proof that impose moral

---

[144] Dershowitz, *Preventive Detention: Social Threat*, TRIAL, Dec.-Jan. 1969-70, at 22.

[145] *Contra*, Finkelstein & Fairley 504; Ashford & Risinger, *Presumptions, Assumptions and Due Process in Criminal Cases: A Theoretical Overview*, 79 YALE L.J. 165, 183 (1969); Broun & Kelly, *supra* note 5, at 27.

[146] This seems to me a much more plausible account of the fuzziness of the "reasonable doubt" concept than does the alternative account that "courts shun responsibility for fixing a more precise threshold probability because they feel it should vary to some extent from case to case." Cullison, *supra* note 5, at 567. *See also* Broun & Kelly, *supra* note 5, at 31; Kaplan 1073.

[147] Finkelstein & Fairley 517; *see* p. 1358 *supra*.

[148] Suppose, for example, that each of three items of evidence, $E_1$, $E_2$, and $E_3$, has the effect of increasing a prior 1 percent suspicion of guilt ($P(X) = .01$) tenfold, so that $P(X|E_1) = P(X|E_2) = P(X|E_3) = .1$ If $E_1$, $E_2$, and $E_3$ are conditionally independent of $X$ and not-X, *see* note 75 *supra*, then it turns out that $P(X|E_1 \& E_2 \& E_3)$ is *in excess of .93*, a result that might be counter-intuitive for many laymen. For another illustration, *see* RAIFFA, *supra* note 58, at 20-21.

[149] Finkelstein & Fairley 517.

blame or authorize official sanctions [150] on the basis of evidence that fails to penetrate or convince the untutored contemporary intuition threaten to make the legal system seem even more alien and inhuman than it already does to distressingly many. There is at stake not only the further weakening of the confidence of the parties and of their willingness to abide by the result, but also the further erosion of the public's sense that the law's fact-finding apparatus is functioning in a somewhat comprehensible way, on the basis of evidence that speaks, at least in general terms, to the larger community that the processes of adjudication must ultimately serve. The need now is to enhance community comprehension of the trial process, not to exacerbate an already serious problem by shrouding the process in mathematical obscurity.

It would be a terrible mistake to forget that a typical lawsuit, whether civil or criminal, is only in part an objective search for historical truth. It is also, and no less importantly, a ritual — a complex pattern of gestures comprising what Henry Hart and John McNaughton once called "society's last line of defense in the indispensable effort to secure the peaceful settlement of social conflicts." [151]

One element, at least, of that ritual of conflict-settlement is the presence and functioning of the jury — a cumbersome and imperfect institution, to be sure, but an institution well calculated, at least potentially, to mediate between "the law" in the abstract and the human needs of those affected by it. Guided and perhaps intimidated by the seeming inexorability of numbers, induced by the persuasive force of formulas and the precision of decimal points to perceive themselves as performing a largely mechanical and automatic role, few jurors — whether in criminal cases or in civil — could be relied upon to recall, let alone to perform, this humanizing function, to employ their intuition and their sense of community values to shape their ultimate conclusions.[152]

When one remembers these things, one must acknowledge that there was a wisdom of sorts even in trial by battle — for at least that mode of ascertaining truth and resolving conflict re-

---

[150] The argument I am here advancing applies with greatest force in the criminal context, but it also has some significance in much ordinary civil litigation.

[151] Hart & McNaughton, *Evidence and Inference in the Law*, in EVIDENCE AND INFERENCE 48, 52 (D. Lerner ed. 1958). I do not exclude the possibility that, in extraordinary cases, and especially in cases involving highly technical controversies, the "historical" function may be so dominant and the need for public comprehension so peripheral that a different analysis would be in order, laying greater stress on trial accuracy and less on the elements of drama and ritual.

[152] *See* United States v. Spock, 416 F.2d 165, 182 (1st Cir. 1969).

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 361 of 794



flected well the deeply-felt beliefs of the times and places in which it was practiced.[153] This is something that can hardly be said of trial by mathematics today.

### *F. Conclusions*

I am not yet prepared to say that the costs of mathematical precision enumerated here are so great as to outweigh any possible gain that might be derived from the carefully limited use of probabilistic proof in special circumstances. I do think it clear, however, that those circumstances would have to be extraordinary indeed for the proponents of mathematical methods of proof to make even a plausible case.

With the possible exception of using statistical data to shift the burden of production,[154] and perhaps with the further exception of using evidence as to frequencies in order to negate a misleading impression of uniqueness that expert opinion might otherwise convey,[155] I think it fair to say that the costs of attempting to integrate mathematics into the factfinding process of a legal trial outweigh the benefits. In particular, the technique proposed by Finkelstein and Fairley is incapable of achiev-

---

[153] *See generally* A. ENGELMANN, A HISTORY OF CONTINENTAL CIVIL PROCEDURE 155, 651–52 (1928).

[154] *See* p. 1361 & notes 33 and 102 *supra.*

[155] Some, but by no means all, of the costs of precision identified in this section are primarily costs for persons actually or potentially accused of crime. To the extent that a defendant in a criminal case wishes to employ mathematical methods in his own defense, these costs obviously weigh less heavily than they do in the case of prosecutorial use. One can imagine a variety of defensive uses of mathematics — for example, to establish the likelihood of an "accidental" cause of a seemingly incriminating event (as in the parking case, p. 1340 *supra*), or to show the likelihood that a person other than the accused committed the crime (as in the police and mistress cases, p. 1341 *supra*, modified by assuming different defendants from those there posited). But the most common defensive use would probably be the translation into quantitative form of an expert's damaging opinion that a certain physical trace or combination of traces must "almost certainly" have been left by the accused. *See* Finkelstein & Fairley 517. Courts otherwise hostile to probabilistic proof have at times allowed such quantification of expert opinion about trace evidence even at the prosecutor's initiation. *See* People v. Jordan, 45 Cal. 2d 697, 707, 290 P.2d 484, 490 (1955); *cf.* Miller v. State, 240 Ark. 340, 343–44, 399 S.W.2d 268, 270 (1966) (quantification rejected only because the prosecutor laid "no foundation upon which to base his probabilities"). Although the analysis of the preceding section would make me somewhat reluctant to accept such holdings (particularly in light of the "selection effect" described in note 40 *supra*), I am of the tentative view that the criminal defendant should nonetheless be permitted to initiate the quantification of this sort of expert opinion in order to establish a "reasonable doubt" as to his guilt. And, once such quantification has been initiated by the defense, the case for allowing the prosecution to rebut in mathematical terms becomes quite persuasive.

ing the objectives claimed for it, and possesses grave deficiencies that any other similarly conceived approach would be very likely to share.

It does not follow, however, that mathematical methods must play an equally limited role in the enterprise of designing trial procedures. What is true of mathematics as an aid to factfinding may be false of mathematics as an aid to rulemaking. In the pages that follow, I examine this separate issue and attempt to show that, although one can have somewhat more hope for mathematics in rulemaking, special problems of a quite serious character arise in that related context as well.

## II. Rulemaking with Numbers and Curves

### *A. One Simplified Model*

Thus far, I have considered the role of mathematics in the process of proof, its potentialities and limitations in helping the trier of fact assess the probability of a disputed proposition. Once that probability has been assessed — by whatever means, mathematical or otherwise — there remains the problem of deciding what to do, what verdict to return. Can mathematical techniques be of assistance in formulating a rule of procedure — a standard of proof — that will solve that problem? More generally, what role can mathematics play in designing procedural rules for the trial process?

I want to consider first the narrower of those two questions, for it is the only one to which significant effort has thus far been directed. John Kaplan [156] and Alan Cullison [157] have both proposed a rather simple mathematical model of the trial process in order to determine the probability necessary to return a verdict. Although the model is as applicable to civil cases as to criminal, it is most readily understood in the setting of a criminal trial. They propose that a criminal trial be viewed as analogous to any other situation in which one must choose between two or more courses of action on the basis of a body of information which reduces, but does not wholly eliminate, the decisionmaker's uncertainty about the true state of the world and about the consequences in that world of any chosen strategy of conduct.[158]

In particular, the trier must choose between conviction (designated $C$) and acquittal (designated $A$) in the face of at least partial uncertainty as to whether the defendant is in fact guilty

---

[156] *See* Kaplan, *supra* note 5.
[157] *See* Cullison, *supra* note 5.
[158] *See generally* Raiffa, *supra* note 58.

(designated $G$) or innocent (designated $I$). The four possible outcomes of the trier's decision problem are:

*Outcome*

(1) Convicting a guilty man, designated $C_G$
(2) Convicting an innocent man, designated $C_I$
(3) Acquitting a guilty man, designated $A_G$
(4) Acquitting an innocent man, designated $A_I$

The model posits that the rational trier should[159] choose $C$ rather than $A$ whenever the "expected utility" to the trier of the former choice would exceed the "expected utility" of the latter, in light of such factors as the seriousness of the offense, the severity of the punishment, and so on — much as a rational gambler would select the bet that maximizes his expected gains, taking into account his present position, his needs, and his attitudes toward risk.[160]

In order to make the necessary choice, the trier must first decide how much he would like or dislike each of the four possible outcomes of the proceeding — that is, he must decide what "utility" each has for him.[161] Suppose that the trier's order of preference, from the outcome he would like best to the one he would like least, is $C_G$, $A_I$, $A_G$, $C_I$. In order to assign quantitative utilities $U(C_G)$, $U(A_I)$, $U(A_G)$, and $U(C_I)$ to these outcomes, he begins by assigning a maximum utility of 1 to the outcome he likes most and a minimum utility of 0 to the outcome he likes least:

$$U(C_G) = 1$$
$$U(C_I) = 0$$

To decide what utility between 0 and 1 to assign $A_I$, the trier

[159] It is not entirely clear to what extent the model is intended by Kaplan or Cullison as a description of how trial decisions are in fact made, *see, e.g.*, Kaplan 1069–70, 1075, to what extent it is offered as an heuristic device for illuminating the trial process, *see, e.g., id.* 1066, 1091, and to what extent it is meant as a normative guide to the trier's choice of verdict, *see, e.g., id.* 1065, 1072–74, 1092. I am concerned here with the model's heuristic and normative roles only, and of the four criticisms I later advance, *see* pp. 1381–85 *infra*, all but one, *see* p. 1384 *infra*, apply to the former as well as to the latter.

[160] It might be objected that the gambling analogy is a weak one insofar as the payoffs in the trial "game" accrue directly to persons other than the decision-maker. Since there are obviously significant psychological payoffs for the gambler as well, however, the objection seems to me a superficial one. *Cf.* note 60 *supra.*

[161] An alternative approach is possible, focusing simply upon the "disutility" of each of the two possible kinds of errors (erroneous conviction or erroneous acquittal), *see* note 168 *infra*, but expressing the problem in the terms used here facilitates the assignment of numbers to the various outcomes and makes somewhat more transparent the "cognitive dissonance" problem *discussed at* pp. 1383–84 *infra.*

asks himself such questions as the following: Would I rather get $A_I$ for sure or get a 1/2 chance of the best outcome, $C_G$, and a 1/2 chance of the worst, $C_I$? If the answer is that he would rather get $A_I$, then $U(A_I)$ is said to exceed 1/2; if he would prefer the gamble, $U(A_I)$ is less than 1/2. If it turns out that $U(A_I)$ exceeds 1/2 by this test, then the trier asks himself whether he would rather get $A_I$ for sure or get, say, a 3/4 chance of $C_G$ and a 1/4 chance of $C_I$. If the answer this time is that he would rather take the chance, then $U(A_I)$ falls between 1/2 and 3/4. In this way, the trier "closes in" on $U(A_I)$ until he ultimately pinpoints its value. To say, for example, that $U(A_I) = 2/3$ is to say that the trier would be as satisfied getting $A_I$ for sure as he would be getting a 2/3 chance of $C_G$ and 1/3 chance of $C_I$. Suppose for the sake of illustration that, by this same process, the trier concludes that, for him, $U(A_G) = 1/2$.

Now the trier is in a position to decide how sure of the defendant's guilt he would have to be before preferring $C$ to $A$. To that end, let $P$ designate the trier's probability assessment of $G$ in light of all the evidence in the case. Then, if the trier chooses $C$, there is a probability of $P$ that he will get $C_G$ and a probability of $1-P$ that he will get $C_I$. EU(C), the "expected utility" or "expected desirability" of this choice, is the sum of two products: (1) the probability of guilt, $P$, multiplied by the desirability of $C_G$; and (2) the probability of innocence, $1-P$, multiplied by the desirability of $C_I$:

$$EU(C) = P \cdot U(C_G) + (1-P) \cdot U(C_I)\ .$$

But this simply equals $P$, since $U(C_G) = 1$ and $U(C_I) = 0$. If the trier chooses $A$, there is a probability of $P$ that he will get $A_G$ and a probability of $1-P$ that he will get $A_I$. EU(A), the "expected utility" of $A$, is thus

$$EU(A) = P \cdot U(A_G) + (1-P) \cdot U(A_I)\ ,$$

which in our case equals $P \cdot 1/2 + (1-P) \cdot 2/3$, or $\frac{4-P}{6}$. Thus the expected utility of choosing $C$ exceeds that of choosing $A$ whenever $P$ exceeds $\frac{4-P}{6}$, which occurs whenever $P$ exceeds 4/7. Hence, given the utilities the trier has assigned to the four possible outcomes, the model supplies him with a rule of procedure for this criminal case: "Consider the evidence and then vote to convict if and only if you think that the probability of the defendant's guilt exceeds 4/7." [162]

[162] It should be noted that the procedural rule produced by the model will

Now, one might have qualms about the resulting procedural rule — because one regards a threshold probability of 4/7 as much too low, or because one objects in principle to the willing taking of *any* measurable risk of convicting an innocent man,[163] or because one regards as unacceptable the cost of openly *announcing* that willingness[164] — but my concern here is not so much with the result as with the method used to arrive at it. It is to a criticism of that method that the next section is addressed.

### B. *A Critique of the Model*

1. *Misspecification of Consequences.* — The model described above assumes the existence of meaningful answers to such questions as: "How much would you regret the erroneous conviction of this defendant for armed robbery?" But the answer must surely be "It depends." It depends in part upon the *character* of the error itself; mistaken identity might be worse, for instance, than misjudged intention and worse still than a miscalculated statute of limitations.[165] And it depends even more significantly upon the *process* that led to the error; one cannot equate the lynching of an innocent man with his mistaken conviction after a fair trial. Indeed, it is at least arguable that there is nothing good or bad about *any* trial outcome as such; that the *process*, and not the *result in any particular case*, is all-important. To be sure, some concern for the mix of correct and erroneous outcomes operates as a constraint on what might other-

always have this numerical form; it can never assume the indefinite shape of "subjective certitude" or "guilt beyond a reasonable doubt." *Cf.* pp. 1374–75 *supra*. In his concurring opinion in *In re* Winship, 397 U.S. 358, 368 (1970), Mr. Justice Harlan argued that the "reasonable doubt" standard in criminal cases, like the quite different "preponderance of the evidence" standard in much civil litigation, merely reflects an assessment of the comparative social disutility of erroneous acquittal and erroneous conviction. *Id.* 370–71. Given the societal recognition that the latter error is far worse than the former, *id.* 372, a demanding burden of proof is imposed on the prosecution in order to assure that men are wrongly convicted much less often than they are wrongly acquitted. *Id.* at 371. *See also* Ball, *supra* note 37, at 816. This analysis, for which Mr. Justice Harlan credits Kaplan, *supra* note 5, 397 U.S. at 370 n.2, suffers from all of the defects I will shortly discuss with respect to Kaplan, *see* pp. 1381–85 *infra*, and suffers in addition from the defect that it proves too little. Specifically, the objective of assuring that erroneous acquittals of the guilty occur with greater frequency than erroneous convictions of the innocent demands only that the prosecution be required to prove its case more convincingly than must a civil plaintiff (*e.g.*, by "clear and convincing evidence," or perhaps "to a probability of 9/10"), *not* that it produce the "subjective state of certitude" stressed by the Court's majority opinion. *See The Supreme Court, 1969 Term*, 84 HARV. L. REV. 1, 158 n.13 (1970).

[163] *See* pp. 1372–74 *supra*.

[164] *See* note 140 *supra*.

[165] *See* Kaplan 1073.

wise be deemed acceptable trial procedures — but the acceptability of a process is not simply a function of the number of correct or erroneous convictions or acquittals it yields. At the very least it is clear that our preferences, and those of the trier, attach not to the bare consequences of correct or erroneous conviction or acquittal. They attach instead, and properly so, to the consequences — for a broad range of values and interests — of the defendant's correct or erroneous conviction or acquittal after a given sort of trial, operating with a particular set of rules and biases, and governed by a specific standard of proof.[166]

In particular, the trier might justly regard as worse the erroneous conviction of a man to whose guilt he had attached a probability of just over 4/7 than the erroneous conviction of one whose guilt had seemed to be virtually certain. Indeed, the trier would probably have to attach a different "utility" to the outcome of erroneously convicting a man on the basis of a standard that appeared to convey to the community at large a willingness to take calculated risks of such errors, than he would to the outcome of erroneously convicting a man on the basis of a standard that gave no such appearance.[167] At a minimum, therefore, because the utilities of the various consequences would themselves be functions of the apparent probability of the de-

[166] To illustrate the sharp difference between this view and the model put forth by Kaplan, note how Kaplan explains why our legal system typically excludes evidence of previous convictions from the prosecution's case-in-chief. This is done, he says, because including such evidence might lead the jurors "to the perhaps rational but clearly undesirable conclusion that because of his earlier convictions, $D_1$, the disutility of convicting the defendant should he be innocent, is minimal," Kaplan 1074, and that a low probability of present guilt should thus suffice to warrant his conviction. *Id.* 1077. But if it were simply a matter of fitting the standard of proof to the comparative utilities and disutilities of the four possible outcomes, *why* would that conclusion be "clearly undesirable"? Because, we are told, ours is "a system of justice that regards it as crucial that the defendant be found guilty only of the crime specifically charged." *Id.* 1074. Yet, if that is so, and if a conclusion that flies in its face nonetheless emerges as "perhaps rational" and indeed inevitable within the four corners of Kaplan's utilities, must one not conclude that the model built on those four utilities is inherently defective? Our system typically excludes prior convictions (with, of course, many exceptions) for the kinds of reasons that any adequate model of the criminal trial must somehow reflect — for reasons of repose; for the prevention of multiple punishment; for the appearance of fairness; for the preservation of a substantive system of law in which the accused, however long his record, can by his own choice avoid future entanglement with the criminal process, *cf.* Tribe 394–96; and for the preservation of a procedural system of law in which the accused, whatever his background, is given a well-defined opportunity to rebut a precise charge. *Cf. id.* 392–94. All of those factors enter into the question whether a man's trial was a "fair" one; none of them figures in the simplistic calculation of how desirable or undesirable would be each of its four possible outcomes.

[167] *See* note 140 *supra*.

fendant's guilt, any equation designed to compute the threshold probability above which conviction would be preferable to acquittal would have to be far more complex than Kaplan and Cullison have supposed.[168] And that, in turn, could preclude the existence of *any* single threshold and would in any event make the model, already too obscure for actual use by a trier of fact, more esoteric still.

2. *Problems of Cognitive Dissonance.* — The preceding discussion demonstrates that a legal trial differs from the usual sort of management problem to which utility theory has previously been applied[169] in at least one important respect: various features of the procedure followed to reach the decision, including the standard of proof applied, are themselves integral parts of the consequences to be optimized, a fact that greatly complicates the optimization process. The trial decision also differs from the classical management problem in another crucial respect: the decisionmaker will invariably have preferences not only with respect to the consequences of his choice but also with respect to the underlying facts themselves, facts over which he can exercise no control. Thus, for example, the trier's reluctance to see an innocent man put to the ordeal of trial and his wish to avoid discovering that the man who is in fact guilty remains at liberty may combine to reduce the desirability, for him, of the outcome previously designated $A_I$ (acquittal of the defendant who is in fact innocent), as compared with the outcome previously designed $C_G$ (conviction of the defendant who is in fact

[168] The Kaplan-Cullison model, to generalize the computation performed at pp. 1379–81 *supra*, yields the rule that conviction should be preferred to acquittal whenever $P$, the final probability estimate of the defendant's guilt, exceeds the quotient:

$$\frac{1}{1+\dfrac{U(C_G)-U(A_G)}{U(A_I)-U(C_I)}}.$$

Kaplan designates the difference $U(C_G) - U(A_G)$ by the symbol $D_g$ and the difference $U(A_I) - U(C_I)$ by the symbol $D_i$. *See* note 161 *supra*. If, as I have suggested in text, the values of $U(C_G)$, $U(A_G)$, $U(A_I)$, and $U(C_I)$ themselves depend on $P$, then the rule will have a more complex form. Thus, if the utilities or at least their differences ($U(C_G) - U(A_G)$ and $U(A_I) - U(C_I)$) depend in a linear way on $P$, there will exist numbers $U_1$, $U_2$, and $U_3$ such that conviction is preferable to acquittal whenever $U_1 P^2 + U_2 P + U_3 > 0$. Because such an equation can have two roots between 0 and 1, there may be no single threshold value $P^*$ such that conviction is preferable to acquittal for all $P \geq P^*$.

[169] A typical example would be the question whether or not to drill for oil at a given site before one's option expires, given incomplete information about such variables as the cost of drilling and the extent of oil deposits at the site. *See* RAIFFA, *supra* note 58, at *xx*.

guilty).[170] The risk is that the trier will not only allow his hope that the accused is in fact guilty to influence his perception of the evidence — a classic case of adjusting cognition to avoid psychological dissonance[171] — but will also allow that hope, through a distortion in the comparative magnitudes of $U(A_I)$ and $U(C_G)$, to influence his determination of what standard of proof to apply. The suggested method for arriving at that standard in no way guards against this danger.

*3. Positing the Wrong Decisionmaker.* — It may be that *no* method of arriving at the standard of proof can avoid the problem identified above unless it effectively separates the selection of that standard from the decision of the particular case. Indeed, a variety of other important values, including that of both real and apparent equality in the treatment of accused persons, all point in the same direction: the factfinder in a criminal trial should not be encouraged to do what the proposed model demands of him — namely, that he expressly assess the desirability or "utility" of the various consequences that might flow from correctly or erroneously convicting or acquitting the particular defendant then on trial.[172]

The fact that such matters as the defendant's reputation and the likely sentence, all of which, of course, bear directly on the utilities of the four possible outcomes, are nonetheless often kept from the jury "is hard to defend . . . on a decision-theoretic view"[173] only if one's decision theory neglects to ask about the institutional competencies of the several elements of the legal system. But when one gives due weight to the costs of combining in the trier the separate functions of deciding what happened in a particular case and evaluating the anticipated consequences of alternative verdicts, one will expect the lawmaker rather than the factfinder to use a model such as the one Kaplan and Cullison propose, and one will define the decision problem to be

---

[170] An analogous problem outside the trial context would be presented by a choice among alternative medical strategies, all entailing some risks, for a patient who might or might not have cancer. The application of classical techniques of decision-analysis to such situations, in which the decisionmaker cannot be entirely neutral with respect to the uncertain facts underlying his problem, is a matter of much current interest and research within the decision-analysis profession, although I am aware of no published discussions of the problem thus far.

[171] *See generally* L. FESTINGER, A THEORY OF COGNITIVE DISSONANCE (1957).

[172] *But see* note 177 *infra.* I would not have as much quarrel with techniques that called upon the factfinder to think in less formal terms about how high a probability of guilt to require as a precondition of returning a verdict against the defendant, but any method yielding a numerical conclusion to that question would be subject to the basic objection I have made to attempts at quantifying the final probability of guilt. *See* pp. 1372–75 *supra.*

[173] Kaplan 1075.

solved not as the one-shot problem of fixing a standard of proof for a particular trial with four possible outcomes, but as the much larger problem of establishing such standards for the trial system as a whole.

4. *Operating in a Factual Vacuum.* — Having thus broadened the inquiry, one cannot avoid noticing that the model proposed by Kaplan and Cullison is, oddly enough, structured to make use of *none* of the crucial facts one would surely want to know when establishing a standard of proof. We are, after all, talking about some real things: crimes, their prevention, the incapacitation of their perpetrators, and the protection of innocent persons from being falsely convicted for them. If it be proposed that juries in a certain kind of case should convict whenever they think a defendant's probability of guilt exceeds 4/7, no one concerned with these real things could fail to ask questions such as these: How many guilty men are likely to be erroneously acquitted under that standard? How many innocent men are likely to be erroneously convicted? What will be the effect on the likely number of offenses? What will be the impact on the fear of false prosecution and unjust imprisonment? The answers to such questions, in turn, will depend on such other inquiries as these: How easy or difficult is it for the state to make the probability of an innocent man's guilt appear to exceed 4/7? How easy is it for a guilty defendant to make the probability of his innocence appear to exceed 3/7? How many innocent men are brought to trial? How might the number of innocents tried depend on the announced standard of proof? How do the number of offenses or the fear of erroneous conviction relate to the probability of conviction if guilty? To the probability of conviction if innocent? To the ratio of convictions to acquittals? To the absolute number of convictions? To the absolute number of acquittals?

The striking thing is that the answers to virtually none of these obviously relevant questions could ever find their way into the Kaplan-Cullison model, for the answers simply do not relate, in the main, to an assessment of the desirability or undesirability of one or another outcome of a paradigm trial; they relate instead to the characteristics of a much broader system.[174] The proposed model, then, is not really useful and does not provide

---

[174] The answer to such an obviously crucial question as "how much deterrent effect will flow from convicting whenever the probability of guilt exceeds 4/7" cannot influence the trier's assessment of the desirability or undesirability of correctly or erroneously convicting or acquitting any given defendant, and hence cannot affect the decision in the Kaplan-Cullison model whether to treat a 4/7 probability of guilt as sufficient to convict.

a fair test for the potentialities of mathematical methods in procedural design.

### C. *More Sophisticated Techniques*

A somewhat fairer test might be provided by an approach employing what economists usually call "choice sets" and either "indifference curves" or "preference contours."[175] For a particular crime, the rulemaker would first establish the "choice set" open to him by investigating the functional relationship to be expected between the percentage of guilty convicted and the percentage of innocent convicted, recognizing that — at any given level of resource investment — convicting more of the guilty may require relaxing various procedural standards (including, but not limited to, the probability of guilt required for conviction in any particular case) and thereby convicting more of the innocent as well. That functional relationship will reflect, among other things, the ratio of guilty to innocent defendants among those brought to trial for the crime in question, the sensitivity of trial outcomes to various procedural rules, and a number of other factors that would surely vary from one jurisdiction to another, and from one crime to another.

Having thus established in some empirical way the choices open to him with respect to this crime, the rulemaker would next think about his preferences, or those of his constituents. If he could convict, for example, 60% of the guilty with a 1% chance of convicting an innocent, how much would he let the latter percentage rise in order to convict an additional 5% of the guilty? To convict an additional 10% of the guilty? In thinking about the answers to such questions, the rulemaker would, of course, have to take account of whatever information he could develop on such topics as the relationship between the probability of conviction if guilty and the corresponding frequency of offenses,[176] and he would also have to take account of such factors as the relationship between the probability of conviction if inno-

---

[175] I am much indebted to Professor Thomas C. Schelling for helping me translate my earlier and more intuitive formulation of this general approach into the one employed in the present article. Techniques of a related sort are employed by both Becker, *supra* note 5, and Birmingham, *supra* note 5.

[176] Of course it might turn out that the frequency of offenses depends strongly not only on the probability of conviction if guilty but also on the ratio of convictions to trials, or even on the absolute number of convictions. If this should prove to be the case, a rulemaker using this sort of approach might be tempted to design the system so as to convict more innocents, not only as an unavoidable cost of convicting a higher percentage of guilty, but also as part of a deliberate strategy of deterrence. Needless to say, this may well be a decisive objection to this form of analysis.

cent and the corresponding level of fear and insecurity among his constituents.[177]

Starting with any arbitrarily chosen point — such as the one at which 60% of the guilty and 1% of the innocent are convicted — the rulemaker would consider such relationships in deriving his "preference contour" through the point (60, 1):




The curve drawn indicates, among other things, that the rulemaker would be willing to let the figure of 1 climb to 1.5 (but no higher) in order to increase the 60 to 65, and to 2 (but no higher) in order to increase the 65 to 70. It also indicates that he would be willing to let the 60 drop to 56 (but no lower) in order to decrease the 1 to .5.

The rulemaker would then draw another preference contour starting at the point (60, 2); another one starting at (60, 3);

---

[177] If, as one might well suspect, the constituents who matter most to the rulemaker, *see* V.O. KEY, AMERICAN STATE POLITICS: AN INTRODUCTION 140–41 (1956), will themselves be insulated by social or economic status from the "insecurity costs" of a rising risk of convicting innocents, the rules arrived at through the procedure outlined here (and perhaps, though by no means certainly, the rules that would be arrived at in less calculating ways as well) will expose categories of persons more susceptible to false arrest and mistaken conviction to a greater danger of such misfortunes than would result from rules chosen by, or on behalf of, men acting under a veil of ignorance as to their ultimate status in the society they are designing. *See* Rawls, *Justice as Fairness*, 67 PHILOS. REV. 145 (1958). The jury, on the other hand, is — or can more readily be made into — a body of persons more likely than the typical legislator's important constituents to pay in false convictions the price of relaxed prosecutorial burdens. This may create a powerful reason for leaving to the jury broader discretion with respect to such matters as standards of proof than was argued for at p. 1384 *supra*, at least so long as the delegation of such discretion takes a sufficiently inarticulate form.

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 372 of 794



and so on, thereby building up a complete set of indifference curves or preference contours:[178]




Finally, the rulemaker would superimpose on these preference contours the empirically established "choice set" $C$ — the functional relationship telling him, at the assumed level of resource investment, how many innocents would be convicted for any given percentage of guilty:




The optimum point on the choice set is $Q$, the point of tangency between that set and a preference contour.[179] By finding

[178] Each rulemaker has, of course, an infinite number of these preference contours for a given crime; in the above illustration, only a representative subset of the entire family of contours can be depicted.

[179] To see why $Q$ is optimal, simply imagine any alternative points on the

DA11370

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 373 of 794



that point of tangency, the rulemaker determines the percentage of guilty convictions he should aim for and knows the corresponding percentage of innocent convictions that will result. If, for example, *Q* is at the point (80, 1.2), the rulemaker knows that he should design the procedure for trials of the crime in question so as to convict some 80% of the guilty at a cost of convicting some 1.2% of the innocent. The problem of discovering just what combination of procedures (standards of proof, presumptions, rules of admissibility and exclusion, and the like) will have that approximate effect then becomes the next task — obviously a difficult one — on the rulemaker's agenda for empirical research and mathematical analysis.

### *D. Some Tentative Reservations*

*1. On Precision and Quantification.* — To whatever extent all of this represents, albeit in somewhat simplified and preliminary form, a typical instance of mathematical reasoning in the design of trial procedures, it is important to explore the costs that may be incurred by its use.

Those costs, in large measure, are the same costs of precision that I have examined in another context.[180] In particular, there is a significant risk that the greater ease with which the rulemaker will be able to quantify some variables (such as the incidence of crime) as compared to others (such as the insecurity flowing from fear of false conviction) will skew his decision in unfortunate directions, leaving serious doubt whether the exactitude of the numbers and curves will, in the end, lead to better rules.[181] In the preference contour exercise attempted above, for example, it seems clear that the shape of the contours ought at least to reflect the procedures and the philosophy that would be required to achieve any given mix of trial outcomes. One cannot really say, for example, whether one feels better or worse about con-

---

choice set *C* such as *R* or *T*. Because *S*, *Q*, and *U* in the above illustration lie on the same preference contour or indifference curve, the rulemaker feels equally satisfied at those three points. But he clearly feels better at *S* than at *R* and better at *U* than at *T*, since in each case the first point of the pair provides the same benefit as the second (the same percentage of guilty convicted) at lower cost than the second (a lower percentage of innocent convicted), assuming that the perversity described in note 176 *supra*, does not obtain. Since the rulemaker is indifferent as among *S*, *Q*, and *U*, and prefers *S* to *R* and *U* to *T*, he must prefer *Q* to either *R* or *T*, which implies that *Q* is indeed optimal. It should be noted, however, that the ability of this model to yield a unique optimum depends upon several assumptions with respect to the shape of the preference contours, that of the choice set, and the relationships among them.

[180] *See* pp. 1358–77 *supra*.

[181] *Cf.* pp. 1361–66 *supra*.

victing 80% of the guilty and 1.2% of the innocent than one feels about convicting 90% of the guilty and 2.5% of the innocent, unless one knows how trial procedures might have to be altered[182] in order to go from the former point to the latter. But the costs of that procedural alteration, in terms of the many intangible consequences of such a change for a broad spectrum of values, will almost certainly prove harder to quantify than will the benefits of convicting another 10% of the guilty.[183] As a result, the preference contours may fail to reflect how the rule-maker really *does* feel about things — and the conclusion to which they point may be less acceptable than one more intuitively and impressionistically derived.

Moreover, once one is precise and calculating about rule-making, one can no longer so easily enjoy the benefits of those profoundly useful notions — like the "presumption of innocence" and "acquittal in all cases of doubt" — that we earlier saw threatened by mathematical proof.[184] After deciding in a deliberate and calculated way that it is willing to convict twelve innocent defendants out of 1000 in order to convict 800 who are guilty — because that is thought to be preferable to convicting just six who are innocent but only 500 who are guilty — a community would be hard pressed to insist in its culture and rhetoric that the rights of innocent persons must not be deliberately sacrificed for social gain.[185]

There are, finally, several problems of a different order — problems that go to the wisdom of being somewhat fuzzy and open-ended in one's statement of at least some kinds of standards and procedures that are designed to guide others over time. I have in mind the great advantage in some areas of principles over rules,[186] of formulations that facilitate consensus on re-

---

[182] As, for example, by relaxing the privilege against self-incrimination, or the requirement of proof beyond a reasonable doubt.

[183] Particularly is this so in light of the expressive role of procedure discussed at pp. 1391–93 *infra*.

[184] *See* pp. 1370–75 *supra*.

[185] Although I regard this as an important problem, I do not think it quite as significant as the analogous problem in the context of mathematical proof, where the decision to take a visible and calculated risk of erroneously convicting a specific accused person is more dramatic, may be thought to entail a lack of respect for the accused as an individual person, and seems more likely to have wide-ranging psychological impact. *See* pp. 1372–75 *supra*. *Cf.* Tribe, *supra* note 133, at 386 n.65.

[186] *See, e.g.*, Dworkin, *The Model of Rules*, 35 U. CHI. L. REV. 14 (1967). *See also* p. 1375 *supra* and note 162 *supra*. This is not to deny, of course, that "bright line" rules are occasionally preferable, *see, e.g.*, Bok, *Section 7 of the Clayton Act and the Merging of Law and Economics*, 74 HARV. L. REV. 226, 270–73, 350–55 (1960), but only to stress the importance of being able to choose general principles when they seem better suited to one's purposes.

sults [187] and leave one free to move in many different directions as one's understanding grows and as one's needs evolve.[188] There is no necessary reason why mathematical analysis, operating with deliberately unspecified variables, cannot someday prove helpful in this subtle business — but I doubt that the day has come. At least in the rudimentary state of the art represented by the preceding two sections, the mission of mathematics *is* specification, and the almost inevitable corollary of its serious use in these circumstances is a move away from the open-ended to the rigorously defined.

2. *On Utility and Ritual.* — The appropriateness of applying mathematical methods to decisionmaking seems clearest when the alternative acts among which one is deciding are significant only as means to some external set of agreed-upon ends. For the decisionmaker can then approach his problem as the essentially mechanical one of choosing the act whose expected consequences will maximize a suitably weighted combination of those ends, subject to some appropriately defined set of constraints.

The great difficulty with thinking in this way about the choice of legal rules and the design of legal institutions is that such rules and institutions are often significant, not only as means of achieving various ends external to themselves, but also as ends in their own right, or at least as symbolic expressions of certain ends and values.

As much of the preceding analysis has indicated,[189] rules of trial procedure in particular have importance largely as expressive entities and only in part as means of influencing independently significant conduct and outcomes.[190] Some of those rules, to be sure, reflect only "an arid ritual of meaningless form," [191] but others express profoundly significant moral relationships and principles — principles too subtle to be translated into anything less complex than the intricate symbolism of the trial process. Far from being either barren or obsolete, much of what goes on in the trial of a lawsuit — particularly in a criminal case — is partly ceremonial or ritualistic in this deeply positive sense, and partly educational as well; procedure can serve a vital role as conventionalized communication among a trial's participants, and as something like a reminder to the community of the principles

[187] *See generally* C. LINDBLOM, THE INTELLIGENCE OF DEMOCRACY 207–08 (1965) (a study of decisionmaking through mutual adjustment).

[188] *See, e.g.*, Freund, *Privacy: One Right or Many*, 13 NOMOS 182 (1971).

[189] *See* pp. 1370–71 & 1372–76 *supra*.

[190] *See, e.g.*, C. FRIED, AN ANATOMY OF VALUES 125–32 (1970); E. GOFFMAN, INTERACTION RITUAL 10–11, 19, 54 (1967). *See also* J. Feinberg, *The Expressive Function of Punishment*, 49 THE MONIST 397 (1965), in DOING AND DESERVING (1970). For much of the discussion that follows, I am heavily indebted to the work of both Professor Goffman and Professor Fried.

[191] Staub v. City of Baxley, 355 U.S. 313, 320 (1958).

it holds important.[192] The presumption of innocence,[193] the rights to counsel [194] and confrontation,[195] the privilege against self-incrimination,[196] and a variety of other trial rights,[197] matter not only as devices for achieving or avoiding certain kinds of trial outcomes,[198] but also as affirmations of respect for the accused as a human being — affirmations that remind him and the public about the sort of society we want to become and, indeed, about the sort of society we are.[199]

Perhaps these expressive roles of procedure can be formally assimilated into a utility-maximizing model by adding on appropriate values to the weighted combination of preferred ends.[200] But, however completely this amplification of the model mirrors all of one's values, there is little chance of capturing the fact that much of what matters about expressive rules, procedural or otherwise, is that they *embody* and do not merely *implement* the values of the community that follows them. To employ mathematical techniques to help choose that rule which will maximize an appropriately weighted mix of certain values or preferences is to take those values as given — as objects outside the rules among which one is choosing. In fact, however, the very *choice* of one rule rather than another — of a rule that the accused cannot be forced to testify against himself, for example — may itself evidence and indeed constitute a *change* in the mix of basic values of the society that has made the choice in question.[201] At this point, the decision problem — if it can

[192] As Thurman Arnold once observed,

> Trials are like the miracle or morality plays of ancient times. They dramatically present the conflicting moral values of a community in a way that could not be done by logical formalization. Civil trials perform this function as well as do criminal trials, but the more important emotional impact upon a society occurs in a criminal trial.

Arnold, *The Criminal Trial as a Symbol of Public Morality*, in CRIMINAL JUSTICE IN OUR TIME 141–42, 143–44 (A. Howard ed. 1965).

[193] *See* pp. 1370–71 *supra*.

[194] *See, e.g.*, Gideon v. Wainwright, 372 U.S. 335 (1963).

[195] *See, e.g.*, Pointer v. Texas, 380 U.S. 400 (1965).

[196] *See, e.g.*, Malloy v. Hogan, 378 U.S. 1 (1964).

[197] *E.g.*, the defendant's right in some circumstances to exclude evidence of prior crimes, discussed in note 166 *supra*.

[198] *E.g.*, fewer erroneous convictions.

[199] *See, e.g.*, pp. 1370–71 & 1373–75 *supra*.

[200] *See, e.g.*, Nozick, *Moral Complications and Moral Structures*, 13 NAT. L.F. 1, 3 (1968), *discussed in* C. FRIED, AN ANATOMY OF VALUES 95, 157 (1970).

[201] For example, the illustration given by Nozick, *id.*, proposes that for any theory $T$ that describes which actions are morally impermissible, one may define a function $f$ whose maximization mirrors the structure of $T$ by setting $f(A) = 0$ whenever action $A$ is impermissible according to $T$ and $f(A) = 1$ otherwise. But if some $A$'s have the perverse effect of *changing* $T$, then even this "gimmicked-up" real-valued function will not do as a function whose maximization mirrors the moral values implicit in $T$. The character of at least some procedural rules, I am

still be called that — is to "choose" what fundamental values one wants to have and not simply to find the best way of implementing a set of values accepted as given.[202] Numbers and curves can be of relatively little use at so ultimate a level.

### *E. Conclusions*

Reluctant as I am to make confident pronouncements about the final limits of mathematics in the fact-finding process of a civil or criminal trial,[203] I am more reluctant still to attempt any definitive assessment of how far mathematical methods and models can acceptably be exploited in the rulemaking process that determines how trials are conducted.

I have examined in some detail one simple model proposed by Kaplan and Cullison to assist in the determination of standards of proof, and have concluded that their approach, like that of Finkelstein and Fairley in the context of mathematical evidence, is more misleading than helpful. I have analyzed less closely the outlines of a more complex methodology — one that would apply preference contours and choice sets to the derivation of rules of criminal procedure — and have found that methodology substantially more enlightening but still far from satisfactory. And I have attempted to show, finally, that there may be at least some inherent limitations in the linking of mathematics to procedural rulemaking — limitations arising in part from the tendency of more readily quantifiable variables to dwarf those that are harder to measure, in part from the uneasy partnership of mathematical precision and certain important values, in part from the possible incompatibility of mathematics with open-ended and deliberately ill-defined formulations, and in part from the intrinsic difficulty of applying techniques of maximization to the rich fabric of ritual and to the selection of ends as opposed to the specification of means.

In an era when the power but not the wisdom of science is increasingly taken for granted, there has been a rapidly growing interest in the conjunction of mathematics and the trial process. The literature of legal praise for the progeny of such a wedding has been little short of lyrical. Surely the time has come for someone to suggest that the union would be more dangerous than fruitful.

---

suggesting, is related to our value system precisely as *T*-changing *A*'s are related to *T*.

[202] Even if one takes the view that means and ends (or values) differ not in kind but only in degree, this argument still has significance as indicative of how extraordinarily little can be taken as "given," and hence as subject to weighted maximization, in the procedural area.

[203] *See* p. 1377 *supra*.

Document information

Publication
Antitrust Law - An Analysis of Antitrust Principles and Their Application

Jurisdiction
United States of America

Topics
Cartels

Bibliographic reference
'¶308. Summary Judgment', in Phillip E. Areeda and Herbert Hovenkamp , Antitrust Law - An Analysis of Antitrust Principles and Their Application, (© President and Fellows of Harvard College; Wolters Kluwer 1978, Supplement No. 8/2023, August 2023)

# ¶308. Summary Judgment

**Summary Judgment** (1)

**Last Updated: 8/2023**

### 308a. The problem; key point.

Summary judgment is particularly important in antitrust cases because of the fearful dimensions that such cases can assume. Quite apart from the allure of treble damages, commercial disappointment rather than antitrust policy motivates many claims, while many defenses seek merely to confuse the court, burden plaintiffs, or delay judgment.

Federal Rule of Civil Procedure 56(a) addresses this problem by providing that

> [a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

The Supreme Court emphasized that this language

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. (2)

While a claim or defense need not be supported by probative evidence at the outset, such evidence must be forthcoming once the party seeking summary judgment offers admissible evidence, from persons with personal knowledge of the facts, that there is no genuine issue for trial as to a material fact. In any event, the courts generally state that reasonable inferences should be drawn against the movant. (3)

Accordingly, the Supreme Court has rejected the contention that antitrust plaintiffs can "get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial" to support the allegations. (4) Thus, once the discovery record has been closed, the party wishing to resist summary judgment must show sufficient dispute about an essential fact and may not offer the argument that, while the fact is not yet in the record, trial may produce it.

Notwithstanding occasional coolness toward summary disposition of antitrust claims, the Court has now made clear that Rule 56 applies to all civil cases in the federal courts. (See ¶¶b – c.) The difficulty, of course, lies in deciding when there is a "genuine issue" that requires trial. Many courts had denied summary judgment when any evidence that was not demonstrably false supported the plaintiff's claim—for example, that evidence of parallel conduct was consistent with the existence of a conspiracy.

However, the Supreme Court has now come to the position that if all relevant discovery is in, mere consistency with the allegations or mere dispute between the parties does not necessarily require trial. There is no "genuine issue" as to a material fact unless the record would allow a reasonable jury to find that the claimant has satisfied its proof burden as determined by the governing substantive rule. When the pre-trial record would, were it the trial record, justify a directed verdict, then the Rule 56(c) test is satisfied and that record must be sufficient to allow a reasonable jury to find it more probable than not that such a conspiracy existed. The classic error has been a failure to see that the party bearing the burden of persuading the tribunal that fact *X* exists can prevail only if the reasonable juror can fairly conclude not only that *X* might exist but that *X* is more probable than not. See ¶c.

This process need not turn the judge into a controlling "thirteenth juror." For more than a century judges have exercised a supervisory role at the directed verdict or JNOV stage to determine whether a reasonable jury could find that a key fact was more likely than not to exist. Indeed, the standard for summary judgment is essentially the same as for the later dispositions. The right to a jury trial has always been subject to judicial supervision of this kind. See ¶b, where we also note some obstacles to summary disposition.

The substantive law, of course, defines which issues are material and what proofs are sufficient. For example, a legal doctrine might consider an actor's state of mind, which is often left to the jury, while also requiring proof of market power as an essential element of the plaintiff's case; if the power issue can be decided summarily, that case will be over, no matter what the outcome might have been on the state-of-mind issue. (See ¶d.)


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Legal doctrine also bears on summary judgment in a more subtle way. We explain in ¶¶e – i how many apparently factual rulings are really rules of law—for example, about what is needed to establish a conspiracy or the existence of predatory pricing.

We do not undertake any general restatement of the law of summary judgment. (5) Nor is it feasible to preview the details of all substantive antitrust doctrines bearing on the cases discussed in this Paragraph, which relies on cross-references to later chapters. We begin with a few of the reasons impeding summary disposition.

### 308b. Obstacles to summary judgment.

The first barrier to summary disposition is a psychological one arising from doubt about the nature and content of substantive antitrust offenses. Many judges have not had the opportunity to work their way through this subject, with its often opaque precedents and complex and sometimes meaningless jargon. Judges who doubt their grasp of the subject would rather not decide sharply focused legal questions posed by a motion for summary judgment. Such focused legal issues, which may heighten the opportunity for reversible error, might disappear after some delay. The suit might be dropped or settled or take a different tack in the course of trial, or the surrounding facts actually proved might ease its resolution in one way or another. This psychological barrier can be overcome as the substance of antitrust law becomes better understood.

A second hesitation arises from the fear that early disposition might prematurely save the defendant from the exposure of its wrong. Many of the key facts are peculiarly within the defendant's knowledge. The existence of a conspiracy, for example, may be hidden from the world; knowledge can be expected to replace conjecture only after trial. Similarly, the defendant's motive or intention, which is relevant in some cases, can only be speculated about in advance of discovery or trial. Indeed, the Supreme Court took pains to disapprove summary judgment resting on the plaintiff's apparent inability to satisfy a market-power requirement because discovery had been prematurely circumscribed. (6) Any such concern, however, must disappear once discovery discloses the relevant facts.

A third possible hesitation about granting summary judgment might be doubt that statements and affidavits, interrogatories, and depositions would survive cross-examination at trial. It is often objected, for example, that factual disputes should be resolved at trial. However, two factors moderate the force of this troublesome point. Each party can depose and cross-examine the other side prior to trial and prior to the filing of a summary judgment motion. (7) Furthermore, discovery can be used by either party to buttress its position or to weaken the other's. In the absence of such evidence, the mere disbelief by one party of another's testimony is not usually sufficient ground for rejecting it.

Fourth, some judges have hesitated to deprive the plaintiff of access to the jury, fearing that summary judgment makes the judge a dispositive thirteenth juror. (8) However, judges have always supervised juries, directing or upsetting verdicts whenever the judges have concluded a reasonable jury could decide only one way. The same standard governs summary judgment. This is not to say that judges should substitute their fact finding for that of the jury or else juries would be superfluous. However, the judge can resolve all reasonable inferences in favor of the party opposing summary judgment, (9) leave ample room for different views of the facts, and yet conclude that no reasonable juror could find more likely than not a fact that is essential to the nonmoving party's case and as to which that party bears the burden of persuasion. As we shall see in ¶¶e – i, moreover, many seeming factual questions turn out to be issues of law that are resolved by strong or weak presumptions.

The fifth obstacle to summary judgment was the Supreme Court's *Poller* language that summary judgment "should be used sparingly" in antitrust cases. (10) As we now show, however, that language had a limited context, as the Court has subsequently ruled.

### 308c. No "genuine issue" though facts disputed— major Supreme Court holdings; more and less plausible claims.

#### 1. *Earlier decisions.*

In retrospect, it is hard to extract a serious antitrust issue from the *Poller* case. (11) The actors in Milwaukee were plaintiff UHF television station, *A*, a second UHF station, *B*, owned by Bartell, a more desirable VHF station, *C*, the CBS network, and its station-buying broker, Holt. When CBS, via Holt, acquired *B*, it ended its six-month affiliation with *A*, which then sold its facilities to *B* in return for the latter's facilities and cash, and exited from the market after a few months. Upon affiliating with *C*, CBS ended its *B* operation. The Supreme Court disapproved summary judgment, seeing allegations that CBS had acted with Holt and Bartell and alone (1) to depress the value of *A*'s assets in order to acquire them cheaply and (2) to force out a UHF leader in order to protect CBS's VHF interests.

Although full discovery revealed no such purpose, (12) the majority declared,

> We believe that summary procedures should be used sparingly in complex


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

> antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. (13)

In fact, nothing in Rule 56 provides or even implies that summary judgment is less appropriate in antitrust cases than elsewhere. Nor did the quoted statement address antitrust cases generally; it spoke only of those antitrust cases turning on motive and intent, the testimony of hostile witnesses, and witness credibility. Once the Court decided, whether correctly or not, that intent and credibility were critical, summary judgment was indeed inappropriate. (14)

The Supreme Court also rejected summary judgment in *Norfolk Monument* . (15) The essential fact was that the plaintiff's sales of grave markers were impaired when nearby cemeteries specified the alloy content of certain markers, charged substantial installation fees on markers purchased elsewhere, and otherwise discouraged customers from buying "outside" markers. Many of these practices were suggested by a rival firm that sold markers to some of the defendant cemeteries (and that evaded or violated outstanding consent decrees). The practices and charges of the several cemeteries were not identical, and some varied substantially. While installation charges seemed extravagant, each cemetery could be understood to exploit its position as landowner to discourage or exclude outside suppliers. Apart from partial parallelism among the cemeteries, there was no evidence of a horizontal agreement among them or even of a vertical agreement with the rival manufacturer. (16) But parallel action does not satisfy even the most expansive conceptions of conspiracy unless the conduct is interdependent. Unless cemeteries were in competition with each other and consumers had a significant brand preference for plaintiff's grave markers, each cemetery would not care whether another cemetery charged a low or an exorbitant installation fee for markers purchased from persons other than the cemeteries. Absent some reason for believing that such interdependence existed, each cemetery's behavior can be explained as an independently-arrived-at and non-interdependent decision to further its own profits. That the rival supplier pointed out these opportunities for profit to the cemeteries would not indicate any agreement among them. (17) In any event, "conspiracy" as ordinarily defined does not include mere parallel, interdependent, supracompetitive prices. (18)

In disapproving summary judgment in *Norfolk* , the Supreme Court held that

> the alleged conspiracy had not been conclusively disproved by pretrial discovery and that there remained material issues of fact which could only be resolved by the jury after a plenary trial. (19)

The Court did not mean that plaintiffs always get to the jury until their allegations are "conclusively disproved." Rather, the Court saw sufficient evidence of conspiracy that had not been adequately rebutted.

This reading makes *Norfolk* consistent with later Supreme Court rulings. In *First National Bank* , the Court cited *Poller* for its point that "given no contrary evidence, a jury question might well be presented as to [defendant's] motives in not dealing with [plaintiff] ....However ... the record in this case [ *First National* ] contains an overwhelming amount of such contrary evidence ...." (20) Thus, the Court did not insist that the defendant conclusively disprove its alleged participation in a conspiracy. It was enough that the evidence prevented a reasonable jury from finding that the plaintiff had met its burden of proving that the alleged conspiracy was more likely than not. (21)

**308c2. Matsushita.**

In its *Matsushita* decision the Supreme Court clarified many issues left unaddressed or unresolved by the earlier decisions. (22) More significantly, it changed what courts had previously seen as a presumption against the granting of summary judgment in complex antitrust cases. Any such presumption has now disappeared. (23)

The plaintiffs, domestic television manufacturers, alleged that their Japanese competitors agreed with one another to fix the price of television sets high in Japan and predatorily low in the United States. High prices in Japan did not injure the domestic manufacturers, (24) and extensive discovery revealed virtually no evidence of any price-fixing agreement by the Japanese manufacturers in the United States. Summary judgment for the defendants was reversed by the Third Circuit, which was reversed in turn by the Supreme Court.

The Court ruled that "a genuine issue of material fact" is not established by

> some metaphysical doubt as to the material facts ....Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." (25)

The alleged conspiracy did not seem more likely than not when the alleged predatory campaign had allegedly continued for some 20 years—too long a period to make its


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

ultimate profitability plausible; (26) the defendants lacked a dominant market share; (27) and they numbered 21—too many to achieve monopolistic tacit price coordination later. In short, successful predation seemed implausible, and

> if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary. (28)

While facts and inferences "must be viewed in the light most favorable" to the plaintiffs,

> antitrust law limits the range of permissible inferences from ambiguous evidence in a §1 case. Thus, in *Monsanto* (29) ... we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy ....[A] plaintiff seeking damages for a violation of §1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action .... (30)

The *Monsanto* language quoted in *Matsushita* means that summary judgment should be granted for the defendant unless the evidence as a whole would allow a reasonable fact finder to conclude not just that the evidence is consistent with a conspiracy but that the alleged conspiracy is more probable than not. (31) This interpretation of *Matsushita* is reinforced by the Court's faulting of the Third Circuit for failing to "consider whether it was as plausible to conclude that petitioners' price-cutting behavior was independent and not conspiratorial" as to conclude that it was conspiratorial. (32)

*Matsushita* thus emphasized a party's burden of proof: when the evidence is in equipoise on a matter that a party must establish by a preponderance of the evidence, summary judgment will be granted against that party. Interestingly, the dissenting Justices accused the majority of weighing the evidence (33) without acknowledging that judges always "weigh" evidence in the sense of determining whether a reasonable jury could find conspiracy more likely than not. The question is not, as the Third Circuit once said, whether the plaintiff's inferences are "so far-fetched that a trier of fact should not be allowed to consider them", (34) but whether the evidence, though not far-fetched, sufficed to meet the plaintiff's burden of proof.

Quite wrong, therefore, was the Ninth Circuit panel that denied that *Matsushita* 's "more likely than not" language meant

> that a district court may grant summary judgment to antitrust defendants whenever the court concludes that inferences of conspiracy and inferences of innocent conduct are equally plausible. (35)

That was exactly what *Matsushita* held: equal plausibility means that neither interpretation is more likely than not and thus that the party with the burden of persuasion has not satisfied it. More than consistency is required in order to tilt the inference from independent to concerted action. That is what the Supreme Court meant when it required evidence tending to exclude the possibility of independent behavior.

The Ninth Circuit feared that

> requiring judges to ask whether the circumstantial evidence is more "consistent" with the defendants' theory than with the plaintiff's theory would imply that the jury should be permitted to choose an inference of conspiracy *only* if the judge has first decided that he would himself draw that inference. (36)

But assessing the sufficiency of the evidence to determine whether a reasonable juror could find that the plaintiff has satisfied its burden of persuasion is a traditional judicial function in deciding whether a defendant is entitled to a directed verdict or JNOV. This role has never been thought to make the judge a thirteenth juror or to depend on what the judge would decide, were he or she a juror. The same is true at the summary judgment stage. *Matsushita* tells us that if the post-discovery evidence were the evidence at trial and if a party (whether plaintiff or defendant) is entitled to a directed verdict on such a record, then that party is entitled to summary judgment before trial.

In its *Brooke* decision, moreover, the Supreme Court applied the same standard to approve judgment as a matter of law for the defendant notwithstanding a jury verdict for the plaintiff after a long trial. (37) The Court cited summary judgment cases without differentiating JNOV (38) and explained that "summary disposition of the case is appropriate" when market structure—concentration, easy entry, or insufficient capacity to depress market prices predatorily— shows that predation would not pay off for the predator. (39) A majority of the Justices concluded that no reasonable jury could find that potential recoupment—an essential element to sustain a predatory pricing finding (40) — was more likely than not.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Most of the lower courts have understood the *Matsushita* message. For example, a court that considered predatory intent an essential element of a predatory pricing claim gave the defendant summary judgment because the evidence was in equipoise—"as consistent with permissible competitive motivation as with noncompetitive motivation"—and thus insufficient to satisfy the plaintiff's proof burden by excluding "a reasonable inference that the defendant was engaged in permissible competition." (41) Courts often say that a party cannot resist summary judgment with evidence that is merely "ambiguous" in the sense that it is "as consistent with" conspiracy as with unilateral conduct. (42) With that kind of ambiguity, a reasonable jury could not say that conspiracy is more likely than not. (43) Mere circumstantial evidence of conspiracy may not defeat summary judgment unless that evidence would allow an inference that conspiracy is more probable than an inference of independent action. (44)

We now illustrate the central proposition that the key to summary judgment is careful defi‥ition of the elements of substantive doctrine and the presumptions that guide their application.

**308c3. *More and less plausible claims.***

*Matsushita* spoke in the context of an alleged highly implausible decades-long predatory pricing conspiracy and found a severe proof requirement in such cases. Accordingly, when the claim is more plausible, less proof is required to avoid summary judgment.

In the *HFCS* litigation the Seventh Circuit observed about *Matsushita* : (45)

> More evidence is required the less plausible the charge of collusive conduct. In *Matsushita* , for example, the charge was that the defendants had conspired to lower prices below cost in order to drive out competitors, and then to raise prices to monopoly levels. This was implausible for a variety of reasons, such as that it would mean that losses would be incurred in the near term in exchange for the speculative possibility of more than making them up in the uncertain and perhaps remote future—when, moreover, the competitors might come right back into the market as soon as (or shortly after) prices rose above cost, thus thwarting the conspirators' effort at recouping their losses with a commensurate profit. But the charge in this case involves no implausibility. The charge is of a garden-variety price-fixing conspiracy orchestrated by a firm, ADM, conceded to have fixed prices on related products (lysine and citric acid) during a period overlapping the period of the alleged conspiracy to fix the prices of HFCS. (46)

The court then noted that the trial judge had granted summary judgment because the evid nce would not establish that a conspiracy existed unless the fact finder drew a "substantial inference." The Seventh Circuit replied:

> This is correct in the sense that no single piece of the evidence that we're about to summarize is sufficient in itself to prove a price-fixing conspiracy. But that is not the question. The question is simply whether this evidence, considered as a whole and in combination with the economic evidence, is sufficient to defeat summary judgment. The judge may have been confused by the language found in cases such as *In re Baby Food Antitrust Litigation* , 166 F.3d 112, 118 (3d Cir. 1999), that "direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." We tried in *Troupe v. May Department Stores Co.* , 20 F.3d 734, 736-37 (7th Cir. 1994), to straighten out the confusing (and, as it seems to us, largely if not entirely superfluous) distinction between direct and circumstantial evidence. The former is evidence tantamount to an acknowledgment of guilt; the latter is everything else *including* ambiguous statements. These are not to be disregarded because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial. (47)

In sum, in a case in which conspiracy is deemed quite plausible, perhaps by virtue of the industry's structure and past attempts at collusion, then a broader range of inferences can be drawn from ambiguous evidence.

### 308d. Single issue can resolve or simplify case.

To point out the obvious, summary judgment can be appropriate on one factual dispute in a case even though one or more "genuine issues" remain. Early resolution of one issue can simplify the subsequent trial or even eliminate the occasion for any trial, for the court must dismiss the plaintiff who cannot produce sufficient evidence of an element essential to its claim. (48) In *Brooke*, for example, the Supreme Court held that predatory pricing requires proof of below-cost pricing with actual (or reasonably likely) recoupment of predatory losses through later monopolistic prices. (49) Once the Court concluded that no reasonable jury could find recoupment, it approved judgment for the defendant notwithstanding the verdict against it; and notwithstanding adequate proof of below-cost pricing, predatory intent, and other issues.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

### 308e. Exception to per se condemnation.

Many summary judgment controversies turn on matters of legal doctrine rather than on the facts. In the *Palmer* case, for example, prices nearly tripled after a local and national seller of Georgia bar review courses expressly agreed that the national firm would sell its Georgia materials through the local firm, which agreed not to compete with the national firm in any other state. (50) Notwithstanding this explicit agreement dividing territories between competitors, the Eleventh Circuit approved summary judgment for defendants on the ground that the local firm would not have operated outside of Georgia in any event, and therefore its conduct was consistent with permissible competition and thus could not "support an inference of antitrust conspiracy," especially when the price rise was as consistent with increased costs as with gouging consumers. (51) The court was entirely wrong. Doubt that prices were supracompetitive may prevent inferring an agreement from ambiguous evidence but does not excuse an express agreement of the kind usually condemned per se. (52) The Supreme Court reversed per curiam and adopted the legal rule that an intention to remain within one's own market does not save an express territorial allocation agreement among former competitors. (53)

Similarly, the Supreme Court rejected the legal rule underlying the trial court's grant of summary judgment for the defendant in *Kodak* . (54) While competing in making and selling certain photocopiers, Kodak usually sold unique "aftermarket" repair parts only in connection with its servicing of those machines. Independent firms providing repair services claimed a per se illegal tie of repair parts and service. Because "power" in the tying market was essential to that claim, (55) Kodak obtained summary judgment on the ground that a firm lacking power in the machine market could not have power in the aftermarket, because supracompetitive parts prices could not be sustained without diverting too many machine sales to other manufacturers. Without denying that Kodak's theory might generally be correct, the Supreme Court saw enough evidence in a limited summary judgment record that indicated supracompetitive prices for Kodak parts: it charged more for service than the independents who were preferred by some machine owners and, in effect, charged higher aftermarket prices to those customers who were least likely to consider future repair prices when initially buying the machines. Obviously, and correctly, the Court refused to read *Matsushita* to award summary judgment to one who "enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market." (56) Here, the plaintiff's inferences from the summary judgment record seemed reasonable to the Court, which was all that *Matsushita* required; Kodak had not yet shown "that despite evidence of increased prices and excluded competition, an inference of market power is unreasonable." (57)

Mainly, *Kodak* warns that summary judgment should not be granted when further discovery seems helpful to opposing the motion. The trial court had issued summary judgment after severely truncated discovery. In such a case further discovery might establish the defendant's entitlement to summary judgment.

### 308f. Conduct desirable or not.

The Ninth Circuit has held that equal consistency with innocence did not warrant summary judgment for the defendant unless "an inference of conspiracy would pose a significant deterrent to beneficial procompetitive behavior." (58) True, *Matsushita* had expressed concern that finding a low-priced predatory conspiracy too readily would chill desirable price competition. (59) Moreover, the *Kodak* Court noted in passing that the alleged tie-in did not so "enhance competition" as "to warrant a legal presumption" of non-power "without any evidence of its actual economic impact ....[W]hen we weigh the risk of deterring procompetitive behavior by proceeding to trial against the risk that illegal behavior will go unpunished, the balance tips against summary judgment." (60)

Contrary to the Ninth Circuit, however, *Matsushita* (or *Kodak* ) does not authorize a jury verdict against practices that are not deemed procompetitive without proof that each essential element of the alleged antitrust violation is more likely than not to exist. Plainly, the jury's role is *not* to decide not whether finding a price-fixing conspiracy or market power would harm or benefit society but whether the alleged conspiracy or power exists under the legal definitions provided by the judge. Our quarrel with the Ninth Circuit is therefore that the jury was invited to decide the policy question as well as the fact question.

To be sure, the court's judgment about the utility of conduct bears on the court's formulation of the governing substantive doctrine. In *Monsanto* , for example, the Supreme Court declared that juries may not infer that a manufacturer ceasing to supply one dealer conspired with other dealers merely from evidence that the latter complained about the former. (61) The Court did not deny that such complaints could be connected with the manufacturer's conduct or could bear on whether there was a "meeting of minds" with the complainers. Rather, the Court believed it unfair to tag a manufacturer with conspiracy on the basis of complaints that the manufacturer cannot control, and inefficient to discourage dealers from providing information to their suppliers. The Justices therefore would approve, on policy grounds, summary judgment for a manufacturer when the only evidence of a required conspiracy was conduct consistent with that favored by complaining dealers. The Court did not say that a jury should make that policy decision. Likewise, in *Brooke*, (62) the policy of the antitrust laws


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

to encourage low prices coupled with our sense that predatory pricing rarely occurs serves to require strong elements of proof. This affects summary judgment in the sense that the plaintiff must come in with more and a greater variety of evidence in order to avoid summary judgment. But the policy conclusions are drawn in the formulation of the substantive rules, not in the articulation of summary judgment standards.

That lesson seems to have been overlooked by the Third Circuit, which rejected summary judgment against a claim that a manufacturer conspired with existing dealers to deny a dealership to the plaintiff. (63) Most of allegations or evidence cited by the court merely reiterated that the defendant refused to appoint a new dealer (64) or that existing dealers had told the manufacturer of their opposition to plaintiff. (65) Relying on the latter communications seems inconsistent with *Monsanto*, for listening to the objections of other dealers may serve or disserve the manufacturer's own interest, but the former is much more likely. Finally, the court gave weight to the generality that manufacturers would ordinarily welcome a high-volume, low-price dealer such as the plaintiff. It was equally plausible, of course, that a low-priced plaintiff would free-ride on the sales efforts of other dealers (66) and that his past "sellathon" promotions would undercut the luxury image projected by the defendant's product. (67) Further, for each existing dealer to object to the creation of a new dealership hardly indicated a conspiracy among the existing dealers. Such an objection would be fully consistent with the independent best interest of each. Presumably, each existing dealer would itself sell more vehicles if the plaintiff's dealership were not created. The dissenting judge insisted that summary judgment cannot be avoided simply by showing that the evidence is consistent with an agreement.

Indeed, in a similar case, the Eighth Circuit approved judgment as a matter of law for the manufacturer. (68) The plaintiff dealer sold cars at $49 above invoice—cars that were often taken to other dealers for warranty service, which dealers regard as inadequately compensated. After several dealers complained, GM restricted the plaintiff's purchases. The court understood the complainers' and GM's concern about free riding and thought the evidence, at most, equally consistent with conspiracy as with a unilateral decision by GM.

A related illustration is replacement of one sole-outlet dealer with another. The disappointed dealer then brings an antitrust suit alleging that the manufacturer and substitute dealer conspired unlawfully or monopolized or attempted to monopolize something. (69) The conspiracy claim is usually rejected either because the sole distributorship reflects the manufacturer's unilateral decision rather than any agreement with the new dealer, or because promising a new dealer exclusivity is presumably reasonable. (70) While many such cases are decided summarily, a few courts refuse because of a theoretical possibility that "monopolization" might occur. (71) However, antitrust experience suggests that sole outlets arrangements are virtually always reasonable when the manufacturer is a competitor and usually when it is a monopolist. Hence, summary judgment should be automatic once the court sees significant competition with the manufacturer. Summary judgment is usually warranted in the rare monopoly case as well, unless the plaintiff has a plausible, factually supported theory under which the termination increases or extends the manufacturer's market power.

In *Ezzo's* the Sixth Circuit found sufficient evidence to preclude summary judgment against a conspiracy claim. (72) The alleged conspiracy was mainly vertical, involving a manufacturer and distributor of beauty products as well as a salon-retailer in competition with the plaintiff. The court noted *Matsushita*'s language that in order "[t]o survive a motion for summary judgment ... a plaintiff seeking damages for a violation of [the Sherman Act] §1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." (73) However, it was then willing to accept evidence that did "not preclude an inference that Royal and Matrix agreed ...." (74) While this standard seems to conflict with the standard that *Matsushita* articulated, the court also noted that

> *Matsushita* ... involved an alleged conspiracy to *reduce* prices which the Court deemed implausible. This case involves, instead, the classic antitrust situation: an attempt to avoid a competitive marketplace by setting prices at an artificially high level. There is nothing implausible or unlikely about the conduct alleged ... in this case. (75)

However, the facts instead suggested that the plaintiff was in violation of the manufacturer's policy of distributing its products only through retailers whose greater business came from styling hair rather than selling products, and that rival dealers had complained about the plaintiff's practices. At that point it would have been in the manufacturer/distributor's best interest to enforce its policy, which would not constitute an agreement with the complaining dealers if the policy furthered the manufacturer's own independent interests.

With respect to claimed horizontal conspiracies, the courts routinely reject at the summary judgment stage allegations that parallel conduct by competitors allows a jury to find that they conspired with each other. (76) This approach results partly from judicial recognition that competitors often respond similarly to common market forces and partly from judicial reluctance to interfere with legitimate business conduct—again, matters of


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

antitrust policy. So, it is often said that a defendant showing "a plausible and justifiable reason for its conduct that is consistent with proper business practice" is entitled to summary judgment on a conspiracy allegation unless the plaintiff provides "specific factual support ... tending to show that the defendant was not acting independently" and "from which a jury could infer reasonably that [the]conduct was conspiratorial." (77)

Of course, conspiracy may be inferred from parallel conduct that deviates from normal business practice or cannot be explained except by conspiracy. (78) For example, in *Petruzzi's*, buyers of meat wastes allegedly conspired to depress buying prices: they did not bid against each other for existing suppliers, who received less than new suppliers, for whom the buyers did bid. (79) They bid up prices offered suppliers by non-cartel buyers. There were also documents suggesting "understandings" among the defendants. The court saw that a buying cartel was plausible. As the court explained in finding evidence of a horizontal conspiracy among buyers sufficient to withstand a summary judgment motion, the two "important circumstances" underlying *Matsushita* were

> (1) that the plaintiffs' theory of conspiracy was implausible and (2) that permitting an inference of antitrust conspiracy in the circumstances "would have the effect of deterring *significant* procompetitive conduct." (80) In particular, the *Matsushita* Court worried that if it allowed mistaken inferences to be drawn from the defendants' price-cutting policies, it would chill procompetitive behavior. Thus, the Court stated that the acceptable inferences which can be drawn from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the dangers associated with such inferences.

But in the present case,

> in stark contrast with the circumstances in *Matsushita* , the plaintiff's theory of conspiracy is not implausible. In fact, it makes perfect economic sense. In particular, if Petruzzi's IGA is correct, the defendants' action would enable them to make profits that the free market would not allow them, in both the short-run and the long-run. (81)

The court then explained how the defendants were in a perfect situation for profitable buyers' collusion: a concentrated market, a fungible product, inelastic demand, and small sellers who lacked significant power themselves. (82) Further, while predatory pricing threats like the one in *Matsushita* always risk chilling procompetitive behavior, no comparable policy reasons justified reluctance about going after a naked price fixing conspiracy among buyers.

The *Petruzzi* opinion also characterized *Matsushita* as stating that

> in the absence of a plausible theory of conspiracy, a court must consider whether the plaintiff put forward "sufficiently unambiguous" evidence that the defendants conspired. (83) Therefore, in section 1 cases, it is unnecessary for a court to engage in the exercise of distinguishing strong circumstantial evidence of concerted action from direct evidence of concerted action for both are "sufficiently unambiguous." Moreover, in this case, such an exercise is doubly unnecessary because [the plaintiff's] theory is not implausible. (84)

The court later concluded that, while mere consciously parallel behavior alone is insufficient to prove a conspiracy, it does provide circumstantial evidence that, when supplemented by additional evidence, supports an inference of illegal agreement. (85)

The court did not cite *Matsushita* 's footnote 21, which states:

> We do not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in *Monsanto Co. v. Spray-Rite Service Corp* ., 465 U.S. 752 (1984) establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy. (86)

But the Court surely did not mean by this statement that any evidence insufficient to create a fact issue respecting an "irrational" conspiracy would also fail with respect to a "rational" conspiracy. To the contrary, a large part of the *Matsushita* opinion is taken up with the fact that the conspiracy alleged in that case seemed fundamentally irrational and that a record needs stronger evidence in order to avoid summary judgment when the alleged conspiracy seems economically implausible. For example, *Matsushita* noted that

> the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy. (87)


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Thus the Court's footnote 21 indicated only that there is a minimum evidentiary standard even in cases where the alleged conspiracy is a rational one: if the proffered evidence is equally consistent with competition and collusion, then no fact issue of collusion is established. (88) Footnote 21 should not be read, however, to suggest that given evidence must be treated precisely the same way in all cases. On the contrary, as the Court stated, the "range of permissible conclusions" that a fact finder might draw becomes larger as the alleged conspiracy becomes more economically plausible.

Thus, determining whether a fact issue of conspiracy exists is an exercise in judgment and cannot ignore the overall picture. As previously noted, *Matsushita* alleged a predatory pricing scheme involving as much as 20 years of losses before any prospect of monopoly gains. The substantive law of predatory pricing generally presumes that a rational firm would not engage in such a venture, particularly not when it requires coordinated pricing by numerous firms. (89) As a result, only the most compelling evidence of conspiracy should suffice to create a fact issue. By contrast, collusion in a concentrated market conducive to price fixing is quite plausible. Further, the behavioral expectations in such markets are that firms will not engage in extensive discussions about prices, urge one another to stop discounting or to stick to list prices, retaliate against price cutters, and the like. Where the underlying conspiracy is itself rational, such evidence goes much further toward establishing a fact issue.

A different problem arises in a market sufficiently concentrated to allow its inhabitants—so-called oligopolists—to coordinate their prices at supracompetitive levels simply by observing one another's conduct in the marketplace. (90) Whether "conspiracy" should be defined to include such oligopolistic coordination is, of course, a legal—not a factual—question that has generally been answered in the negative. (91) To be sure, when competitors provide each other with nonpublic information about their prices or plans, they have "conspired" to that extent, and such a conspiracy can be held unreasonable and condemned if it unjustifiably helps oligopolists coordinate their prices tacitly. (92) But suppose that each competitor merely takes pains to announce its own price increases immediately, loudly, and publicly; the sooner rivals hear, the sooner they will decide whether to follow and the shorter the period at which the price leader is at risk—thus making upward price leadership less dangerous. Such announcements are thus a unilateral (at least) facilitating practice. A Ninth Circuit panel even held that such announcements were unnecessary to communicate with customers in a particular situation and therefore were not substantially procompetitive. (93) The court then held that the jury could infer that the announcements were conspiratorial and, in turn, that the defendants had agreed to fix prices.

That court thus made a new rule of antitrust doctrine in the guise of ruling on the factual inferences reasonably available to the jury. The court's new substantive test of conspiracy holds that a jury may (but, apparently, need not) infer a price-fixing conspiracy when the defendants engage in individual but parallel conduct that is not itself significantly procompetitive and that can facilitate oligopolistic coordination. Such a rule, however, does not involve any factual inference of conspiracy. Under the court's logic, condemnation follows once conduct is determined to facilitate coordination and to be without procompetitive merit; nothing remains for the jury to infer (or to refuse to infer) after the court has defined conspiracy as a matter of law to embrace certain unjustified facilitating conduct, whether unilateral or not. Although such a legal doctrine is defensible and appropriate, (94) the court purported to speak of traditional factual inferences.

More traditional, and also reflecting policy judgments about the social utility of conduct, are those cases that allow a jury to find a conspiracy on the basis of evidence that competitors discussed selling prices, exchanged price lists, and discussed ways to prevent buyers from learning that the volume available was high. This is not mere evidence of conscious parallelism; it is circumstantial evidence of an actual agreement. (95)

In *JTC Petroleum* the Seventh Circuit found sufficient evidence of a relevant conspiracy to upset the district court's grant of summary judgment against the plaintiff. (96) The theory of the complaint (improved by the reasoning of the court) was that applicators of asphalt road materials were fixing the prices of road construction and repair; further, they were compensating the manufacturers of the asphalt to go along with their cartel by refusing to sell to competing applicators, one of whom was the plaintiff. (97) This theory explained why the plaintiff, a competitor of a cartel, could be injured by the cartel. In this case the evidence indicated that the asphalt manufacturers received significantly higher prices for asphalt they sold to the defendant. Further, the asphalt manufacturers refused to sell the plaintiff asphalt for no obvious reason, even when the plaintiff offered to pay cash. These facts were sufficient to create a fact inference that the asphalt producers were being compensated for aiding in the orchestration of a cartel.

Finally, summary judgment in favor of the party with the burden of persuasion is sometimes appropriate, as the Supreme Court held for a per se offense in *Palmer* . (98) Once it appears that a reasonable jury must find each essential element of a violation and that there is no "genuine issue" as to any legally material defense, there is no need for a trial


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

### 308g. Motivation and rationality, especially in conspiracy doctrine.

When competitors expressly contract in writing to, say, boycott the plaintiff, they have by definition conspired. Their conspiracy exists even when it fails to serve their own interests or when rational persons in their situation lack any motive to enter it. (99) Thus, we should not read literally the demand by some courts that the "plaintiff must satisfy the court that the conspiracy which he alleges is, objectively, an economically reasonable one." (100) A "reasonable" conspiracy (in the quoted sense) is one that rational firms in the defendants' situation would (apart from legal constraints) have a motive to form. Such courts do not mean to save defendants who have clearly, though foolishly, conspired. Thus, motivation to conspire is not strictly a necessary condition for a conspiracy finding, although it often provides support for an inference of conspiracy when more explicit evidence is lacking. As *Matsushita* declared, an unlikely motive negates a conspiracy claim only when the plaintiff fails to "come forward with more persuasive evidence." (101)

As a practical matter, however, a conspiracy's "objective rationality" or motive is a necessary condition for inferring conspiracy from the usual array of evidence, which is generally circumstantial. The courts have wisely recognized that many alleged conspiracies are implausible in that the defendants would not want to enter them even if they were undoubtedly legal. (102) In such cases, it would take very strong evidence indeed to allow a finding that the alleged conspiracy was more likely than not. The 20-year predatory pricing scheme alleged in *Matsushita* seemed so unlikely to pay off for the defendants that the Court doubted their motive to enter that conspiracy. In that case, summary judgment was proper in the absence of more explicit evidence that such a conspiracy had actually occurred.

While conspiratorial motivation is a prerequisite for inferring conspiracy from most circumstantial evidence, such a motive will not support a conspiracy finding. For example, because competitors can profit from conspiring to fix prices, they are deemed to have the motive to do so. If that were sufficient to show conspiracy, then parallel pricing, especially in oligopoly, would be automatically conspiratorial, but it is not. (103) As the *Matsushita* Court explained,

> We do not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy .... [C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy. (104)

Thus, proof that competing physicians had a "nonlegitimate" motive for conspiring to exclude the plaintiff physician from a hospital and would "benefit" from doing so would not defeat summary judgment for them unless the evidence also tends to exclude the possibility that the defendants acted independently. (105)

Motive to conspire tends to be negated when a defendant shows that the alleged agreement would harm the alleged conspirators (106) or when the defendant shows "a plausible and justifiable reason for its conduct that is consistent with proper business practice." (107) Thus, natural gas suppliers accepting market prices that were below those in their contracts with a buying pipeline acted consistently with their long-term self-interest in disposing of their gas profitably. (108) Of course, the plaintiff readily gets to the jury when it shows undesirable conduct and market effects unlikely to occur in the absence of conspiracy.

### 308h. Summary judgment in rule of reason cases.

Most antitrust controversies are subject to the so-called rule of reason, which opens many more issues to inquiry than in per se cases—especially, the final judgment of reasonableness or not. (109) Reasonableness is a mixed question of fact and law that courts nevertheless often leave to the jury. But many rule of reason cases can be decided summarily once the court defines the necessary elements of an unreasonable restraint. Consider a joint research venture by two "small" firms in competition with numerous larger firms in an industry where research is both important and expensive. (110) Because of the obvious efficiency potential, such productive joint venture agreements are presumably lawful. Summary judgment for the defendant is appropriate unless a challenger can show that the venture has significant market power. (111) Or suppose that a rival firm would like to join the venture although it is as able as the venturers to conduct such research—either because it has the resources individually that the venturers have collectively or because it can form equally efficient ventures with other firms. Expanding the membership increases the danger that the venture will possess market power, while refusing to expand forces the equally able applicant to compete with the venture. Because the venturers' collective refusal to admit this applicant is procompetitive, the court should summarily reject this applicant's complaint that the refusal is an unreasonable restraint or "boycott." (112)

The main point of these examples is that the court considering summary judgment must first decide on the legal doctrine governing the case—for example, that joint research ventures without market power are reasonable and, even if powerful, may refuse to admit


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

rivals who can effectively compete with the venture rather than expand it. That decision will dispose of the case unless the plaintiff offers reasonable proofs escaping the doctrine. When the governing rule conditions legality or a defense on certain elements that may not reasonably be inferred from the pre-trial record, nothing remains to be tried. Summary judgment is then appropriate.

### 308i. Direct versus circumstantial evidence.

As noted previously, several courts have indicated that " *Matsushita* standards do not apply when the plaintiff has offered direct evidence of conspiracy." (113) To be sure, a conspiracy is undoubtedly established by the signed contract in *Palmer*, (114) assuming, of course, that the written agreement contained all the elements necessary to produce the antitrust violation. (115) But "direct evidence" includes evidence less compelling than a written contract. Consider, for example, a witness testifying that he observed a Chicago meeting between two competitors who promised each other that they would each fix prices at $X. Though direct rather than circumstantial, such evidence does not make conspiracy more likely than not when a dozen disinterested persons saw the witness in a different city at the time of the alleged meeting. Though factual doubts arise most often when the evidence is circumstantial, the *Matsushita* principle holds that there is no genuine issue unless the whole record, including direct and circumstantial evidence, makes a necessary fact more likely than not in the mind of a reasonable juror. As the Third Circuit explained, *Matsushita* distinguishes not between "direct" and "circumstantial" evidence, but between ambiguous and relatively unambiguous evidence. (116)

## References

1) Unless otherwise stated or implied, most of the present Paragraph applies equally to directed verdicts and judgment notwithstanding the verdict (JNOV), which is now known in federal practice as "judgment as a matter of law" (JML). The main difference is that the JNOV or JML typically occurs after rather than prior to trial. On a motion for JML, all reasonable inferences are drawn against the movant, who was typically the loser at trial. *See* Fed. R. Civ. P. 50; 9B Charles A. Wright & Arthur Miller, Federal Practice and Procedure (Civil, 3d ed. 2021).

   On summary judgment generally, see 10 & 10A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, Federal Practice and Procedure §§2711 et seq. (Civil, 4th ed. 2020); Stephen Calkins, *Summary Judgment, Motions to Dismiss, and Other Examples of Equilibrating Tendencies in the Antitrust System* , 74 Geo. L.J. 1065 (1986).

2) *Celotex Corp. v. Catrett* , 477 U.S. 317, 322 (1986).

3) *Wai Man Tom v. Hospitality Ventures, LLC* , 980 F.3d 1027 (4th Cir. 2020) (non-antitrust case; all reasonable inferences and ambiguities against the movant); *BanxCorp. v. Bankrate, Inc* ., 847 Fed. Appx. 116, 2021 WL 733032 (3d Cir. Feb. 25, 2021) (rejecting claim that district court failed to construe evidence against movant, particularly on existence or not of market power). *Cf. Sorenson v. H & R Block, Inc* ., 107 Fed. Appx. 227 (1st Cir. 2004) (cross-motions for summary judgment; for each, ambiguities must be construed against the author of that motion).
4) *First Nat'l Bank of Ariz. v. Cities Serv. Co.* , 391 U.S. 253, 289–90 (1968).
5) Readers should consult Wright, Miller, & Kane, *supra* .
6) *Eastman Kodak Co. v. Image Technical Servs., Inc.* , 504 U.S. 451 (1992). See ¶1740.
7) Fed. R. Civ. P. 56(e)–(f). *See Perkasie Indus. Corp. v. Advance Transformer, Inc.* , 1992 WL 166042 (E.D. Pa. June 11, 1992) (deponent may be cross-examined; if deponent's deposition is modified later, further cross-examination may be permitted); *Sorisio v. Lenox, Inc.* , 701 F. Supp. 950, 955 (D. Conn.), *aff'd* , 863 F.2d 195 (2d Cir. 1988) (permitting cross-examination of deponent); *Dyer v. MacDougall* , 201 F.2d 265, 266–68 (2d Cir. 1952); *Radio City Music Hall Corp. v. United States* , 135 F.2d 715, 718 (2d Cir. 1943). *See* 8A Charles A. Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice and Procedure §§2142 et seq. (Civil, 3d ed. 2013).
8) *Petroleum Prods. Antitrust Litig.* , 906 F.2d 432, 438 (9th Cir. 1990), *cert. denied* , 500 U.S. 959 (1991). *Contrast Midwest Radio Co., Inc. v. Forum Publ'g Co.* , 942 F.2d 1294 (8th Cir. 1991) (a court should not be hesitant to grant summary judgment; and there are no heightened standards to be applied).
9) *United States v. Diebold, Inc.* , 369 U.S. 654 (1962).
10) *Poller v. CBS, Inc.* , 368 U.S. 464, 473 (1962).
11) To simplify the presentation, we equate plaintiff with its assignor and ignore the regulatory contingencies in certain contracts.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

12) CBS had planned to expand the *B* facilities on its own; it was the plaintiff that had initiated the "trade." As for monopolization, plaintiff's insistence that a UHF station could not survive without network affiliation meant that either *A* or *B* was destined to expire in any event. Monopolizing UHF broadcasting in Milwaukee was implausible because UHF competed with VHF stations, which viewers preferred. Moreover, CBS had no VHF investment in Milwaukee that could be impaired by successful UHF stations; nor could such success overcome consumer preference for VHF stations elsewhere. Nor was it plausible to think that CBS would or could enter UHF in order to strangle it. As for any conspiracy, Bartell was merely a seller, and Holt was merely an agent. See ¶1474.
13) *Poller*, 368 U.S. at 473.
14) *E.g., High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987 (9th Cir. 1993) (denying summary judgment to explore defendant newspaper's intent in ceasing to distribute plaintiff's advertising insert while requiring advertisers to deal directly with newspaper).
15) *Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700 (1969), *rev'g* 404 F.2d 1008, 1011 (4th Cir. 1968), which states the facts.
16) One court of appeals judge saw a jury question because of consciously parallel, exorbitant fees. 404 F.2d at 1017–18.
17) See ¶¶1411, 1425. The *Norfolk Monument* dissenter cited Third Circuit language implying that parallelism required submission of the issue to the jury. *Milgram v. Loew's, Inc.*, 192 F.2d 579, 583–84 (3d Cir. 1951), *cert. denied*, 343 U.S. 929 (1952). He did not cite a later decision from the same court implying the opposite. *See Delaware Valley Marine Supply Co. v. American Tobacco Co.*, 297 F.2d 199, 204–05 (3d Cir. 1961), *cert. denied*, 369 U.S. 839 (1962). *See also* Gregory J. Werden, *Economic Evidence on the Existence of Collusion: Reconciling Antitrust Law with Oligopoly Theory*, 71 Antitrust L.J. 719, 778–80 (2004); Roger D. Blair & Jill Boylston Herndon, *Inferring Collusion from Economic Evidence*, 15 Antitrust 17 (Summer 2001); Donald F. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv. L. Rev. 655 (1962).
18) See ¶¶1426 and 1433.
19) *Norfolk Monument*, 394 U.S. at 704.
20) *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 277 (1968).
21) Justice Black dissented, but he was well known for the view that the jury should not be constrained very much by judges. Consider his opinion in *Wilkerson v. McCarthy*, 336 U.S. 53 (1949). *See also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962).
22) *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). *See Symposium on* Matsushita *at Twenty*, 38 Loy. U. Chi. L.J. 399 (2007).
23) *See, e.g., Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 342 (8th Cir. 1995) ("in complex antitrust cases, no different or heightened standard for the grant of summary judgment applies") (to the extent it is relevant, H.H. was consulted by the defendant).
24) See ¶¶338, 348b.
25) *Matsushita*, 475 U.S. at 586–87.
26) *Id.* at 591.
27) *Ibid.*
28) *Id.* at 587. The Court recalled *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 280 (1968): "Since the defendant lacked any rational motive to join the alleged boycott, and since its refusal to deal was consistent with the defendant's independent interest, the refusal to deal could not by itself support a finding of antitrust liability." *Matsushita*, 475 U.S. at 587. For the relevance of motive to conspire, see ¶¶1412, 1434c.
29) Referring to *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984), which is discussed in detail at ¶1446.
30) *Matsushita*, 475 U.S. at 588.
31) Requiring plaintiffs to exclude the possibility of defendant's innocence would increase the burden of proof beyond the usual civil standard of "a preponderance of the evidence" to "beyond a reasonable doubt" or even to "certainty." *Monsanto* meant no such revolution, for evidence that "tends to exclude" independent unilateral conduct may allow a jury to tilt the balance of inferences in favor of the alleged conspiracy.
32) *Matsushita*, 475 U.S. at 581.
33) *Id.* at 598–604.
34) *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 763 F.2d 1482, 1495 (3d Cir. 1985), *vacated for further consideration in the light of* Matsushita, 475 U.S. 1105 (1986), *on remand*, 823 F.2d 49 (3d Cir. 1987), *cert. denied*, 484 U.S. 1060 (1988).
35) *Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 438 (9th Cir. 1990), *cert. denied*, 500 U.S. 959 (1991). (To the extent it is relevant, P.A.'s views about the meaning and correctness of the Ninth Circuit's decision were sought by the defendants.)
36) *Ibid.*
37) *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) (to the extent it is relevant, P.A. represented the plaintiff on appeal). For fuller discussion of the facts, see ¶¶726, 745.
38) *See Brooke*, 509 U.S. at 226.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

39) *Ibid.* Factual disputes on such matters seldom turn on witness credibility or the subjective elements emphasized in *Poller* .
40) *Brooke* , 509 U.S. at 243.
41) *Morristown Block & Concrete Prods. Co. v. General Shale Prods. Corp.* , 829 F.2d 39, 1987 WL 44741, 1987-2 Trade Cas. ¶67,713 (6th Cir. Sept. 9, 1987) (unpublished). The quoted language describes much intent evidence. For example, an expressed desire to take business away from rivals does not even tend to prove predatory intent, for taking business away from rivals is inherent in competition. See ¶776.
42) *See Gibson v. Greater Park City Co.* , 818 F.2d 722, 724 (10th Cir. 1987).
43) This is the essence of the *Gibson* court's largely redundant two-part test: (1) if the conspiracy evidence is merely "ambiguous," then the defendant is prima facie entitled to summary judgment unless (2) the plaintiff offers additional evidence that would justify a conspiracy finding by tending to exclude unilateral conduct. *Id.* at 724. The court applied this test again in *Dreiling v. Peugeot Motors of America, Inc.* , 850 F.2d 1373, 1988-2 Trade Cas. ¶68,125 (10th Cir. June 28, 1988).
44) *Wilcox v. First Interstate Bank of Or., N.A.* , 815 F.2d 522, 525 (9th Cir. 1987); *T.W. Elec. Serv., Inc. v. PECA* , 809 F.2d 626, 632 (9th Cir. 1987). *See also H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.* , 672 F. Supp. 724, 733 n.12 (S.D.N.Y. 1987), *aff'd* , 879 F.2d 1005 (2d Cir. 1989) (because alleged scheme between two dealers to convince a supplier to terminate a third dealer seemed more plausible than the *Matsushita* allegation, "plaintiffs need not come forward with more persuasive evidence than would otherwise be necessary to survive defendants' summary judgment motion").
45) *High Fructose Corn Syrup Antitrust Litig.* , 295 F.3d 651 (7th Cir. 2002), *cert. denied* , 537 U.S. 1188 (2003) ( *HFCS* ) (to the extent it is relevant, H.H. was consulted by one defendant after the Seventh Circuit's decision issued). On remand, see *High Fructose Corn Syrup Antitrust Litigation* , 261 F. Supp. 2d 1017 (C.D. Ill. 2003) (denying summary judgment). *See also Morning Star Packing Co. v. Los Gatos Tomato Prods* ., 839 Fed. Appx. 116, 2020 WL 7496467 (9th Cir. Dec. 21, 2020) (granting summary judgment; plaintiff did not raise sufficient factual inference of conspiracy); *Kleen Prods., LLC v. International Paper* , 276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd* , 910 F.3d 927 (7th Cir. 2018) (granting summary judgment; conspiracy could not be inferred from a highly concentrated market, parallel price increases, and supply reductions, even during an economic recession, or from trade association discussions, or managers' statements about condition of their industry). Other decisions include *Dairy Farmers of America, Inc., Cheese Antitrust Litigation* , 60 F. Supp. 3d 914 (N.D. Ill. 2014), *aff'd* , 801 F.3d 758 (7th Cir. 2015) (distributors' frequent trades on Chicago Mercantile Exchange and regular communications with other Exchange members were insufficient evidence of price-fixing conspiracy when such communications were routine in the business); *Hyland v. HomeServices of America, Inc.* , 771 F.3d 310 (6th Cir. 2015), *reh'g en banc denied* (6th Cir. Feb. 19, 2015) (granting summary judgment against plaintiff's claim that defendant real estate brokers fixed commissions, because activity was equally consistent with permissible competition; not defeated by evidence that the defendants met, that each of them had a policy of charging a commission of 6 percent subject to occasional deviations, that they jointly cooperated in "splitting" commissions when buyer and seller were represented by different agents, and that there may have been awareness of the rates charged by others, as well as conscious parallelism, but these were insufficient); *U.S. Information Systems, Inc. v. International Brotherhood of Electrical Workers* , 366 Fed. Appx. 290, 2010 WL 571769, 2010-1 Trade Cas. ¶76,917 (2d Cir. Feb. 19, 2010) (unpublished), *cert. denied* , 562 U.S. 1053 (2010) (granting summary judgment on claim that labor union and unionized electrical contractors conspired to exclude firms whose employers were members of a different union; actions were consistent with individual self-interest); *United Magazine Co. v. Curtis Circulation Co* ., 279 Fed. Appx. 14, 2008 WL 833077, 2008-1 Trade Cas. ¶76,088 (2d Cir. Mar. 25, 2008) (unpublished) (district court properly granted summary judgment on predatory pricing claim that made no sense; publishers allegedly drove distributors out of business through below-cost pricing, but they could lawfully have simply terminated them); *TRI, Inc. v. Boise Cascade Office Products, Inc.* , 315 F.3d 915 (8th Cir.), *cert. denied* , 539 U.S. 960 (2003) (granting summary judgment for insufficient evidence that distributor conspired with customer not to purchase plaintiff supplier's products; distributor would have no economic motive to conspire); *Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc.* , 94 F.3d 1032 (6th Cir. 1996) (discussed in ¶f ; denying summary judgment after finding vertical conspiracy claim more plausible than the one alleged in *Matsushita* ); *Lantec, Inc. v. Novell, Inc.* , 306 F.3d 1003 (10th Cir. 2002) (pre-merger coordination between Novell and Wordperfect did not amount to §2 conspiracy to monopolize when it was equally consistent with independent decision making; JML); *Steward Health Care System, LLC v. Blue Cross & Blue Shield of Rhode Island* , 311 F. Supp. 3d 468 (D.R.I. 2018) (finding genuine issue on question of whether defendant insurer's refusal to deal was part of concerted effort to exclude plaintiff from Rhode Island provider market); *Pool Products Distribution Market Antitrust Litigation* , 158 F. Supp. 3d 544 (E.D. La. 2016) (granting summary judgment; one ambiguous email exchange and simultaneous decisions to increase minimum order size insufficient evidence of horizontal conspiracy); *Resco Products, Inc. v. Bosai Minerals Group Co.* , 158 F. Supp. 3d 406 (W.D. Pa. 2016), *appeal dismissed* , 2017 WL 4012694 (3d Cir. June 16, 2017) (granting summary judgment;


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

finding not even the parallel behavior necessary to support conscious parallelism); and *PepsiCo, Inc. v. Coca-Cola Co.* , 315 F.3d 101, 104 (2d Cir. 2002) ("In the context of antitrust cases ... summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces.").

*See also Domestic Drywall Antitrust Litig* ., 163 F. Supp. 3d 175 (E.D. Pa. 2016) (finding sufficient evidence to deny summary judgment on conspiracy claim where defendants in parallel announced a 35 percent price increase without any observed increase in demand, eliminated advance job quote, and artificially limited certain supplies); *High-Tech Emp. Antitrust Litig* ., No. 11–CV–02509–LHK, 2014 WL 1283086 (N.D. Cal. Mar. 28, 2014) (finding enough evidence of a wage-fixing conspiracy to deny summary judgment motion); *Abraham & Veneklasen Joint Venture v. American Quarter Horse Ass'n* , 2013 WL 2297104, 2013-1 Trade Cas. ¶78,399 (N.D. Tex. May 24, 2013) (denying summary judgment on claim that horse breeders' association made up of market participants violated antitrust laws but excluding cloned horses from registration, citing ¶¶651, 806, 1477); *Urethane Antitrust Litig.* , 913 F. Supp. 2d 1145, 1152 (D. Kan. 2012) (The defendant "urges the Court to apply this standard from *Matsushita* by examining every piece of evidence to determine whether it 'tends to exclude the possibility' that the alleged conspirators acted independently. The Supreme Court [in *Matsushita* ] was making clear, however, that the evidence, as a whole, must tip the scales ...."); *Hackman v. Dickerson Realtors* , *Inc* ., 746 F. Supp. 2d 962 (N.D. Ill. 2010) (record failed to support claims that realtors conspired to exclude commission-cutter, and no individual realtor satisfied power requirements of §2); *Suzuki of W. Mass., Inc. v. Outdoor Sports Expo.* , 126 F. Supp. 2d 40 (D. Mass. 2001) (MSJ granted because record conclusively showed that boat show promoter's decision favoring certain dealers to display certain boats was unilateral, not product of conspiracy between promoter and favored dealers).

**46)** *HFCS* , 295 F.3d at 661, citing *United States v. Andreas* , 216 F.3d 645, 650–54 (7th Cir.), *cert. denied* , 531 U.S. 1014 (2000); and *Citric Acid Litig.* , 996 F. Supp. 951, 953–54 (N.D. Cal. 1998), *aff'd* , 191 F.3d 1090 (9th Cir. 1999), *cert. denied* , 529 U.S. 1037 (2000). *See also U.S. Info. Sys., Inc. v. International Bhd. of Elec. Workers* , 366 Fed. Appx. 290, 2010 WL 571769, 2010-1 Trade Cas. ¶76,917 (2d Cir. Feb. 19, 2010) (unpublished), *cert. denied* , 562 U.S. 1053 (2010) (granting summary judgment on claim that labor union and unionized electrical contractors conspired to exclude firms whose employers were members of a different union; actions were consistent with individual self-interest); *United Magazine Co., Inc. v. Curtis Circulation Co.* , 279 Fed. Appx. 14, 2008 WL 833077, 2008-1 Trade Cas. ¶76,088 (2d Cir. Mar. 25, 2008) (unpublished) (district court properly granted summary judgment on predatory pricing claim that made no sense; publishers allegedly drove distributors out of business through below-cost pricing, but they could lawfully have simply terminated them).

**47)** *Id.* at 661–62. *See also Vitamins Antitrust Litig.* , 320 F. Supp. 2d 1 (D.D.C. 2004) (denying summary judgment motion on conspiracy claim when conspiracy seemed plausible).

**48)** Indeed, whenever one essential element can be discovered more simply than the others, the court may properly limit initial discovery to that issue. See ¶311a.

**49)** *Brooke Grp. Ltd v. Brown & Williamson Tobacco Corp.* , 509 U.S. 209 (1993); see ¶726. Many other issues may be involved. Intent may bear on whether below-cost prices are legitimately promotional. Market structure and entry barriers affect recoupment, and the damaged plaintiff must establish and measure its loss. *See also Bathke v. Casey's Gen. Stores, Inc.* , 64 F.3d 340, 342 (8th Cir. 1995) (summary judgment in predatory pricing claim appropriate once it was clear that evidence of relevant geographic market had failed).

**50)** *Palmer v. BRG of Ga., Inc.* , 498 U.S. 46 (1990).

**51)** 874 F.2d 1417, 1437 n.28 (11th Cir. 1989), *amended* , 893 F.2d 293 (11th Cir.), *rev'd* , 498 U.S. 46 (1990).

**52)** Although it was by no means clear, the court might have meant something like this: although the two providers had competed in providing bar review courses, the national firm had not made a profit and decided to withdraw. The interesting question was then whether that withdrawal from competition was a quid pro quo for the remaining firm's decision to use and distribute the withdrawing firm's bar review publications. That question, the court may have believed, was not illuminated very far by the Georgia firm's agreement to remain in Georgia. By contrast, the agreement to stay in Georgia (even by one not intending to expand outside the state) could indicate that the parties had entered into a comprehensive understanding about all aspects of their competition inter se.

The *Petroleum Products* court also noted that "the *Matsushita* standards do not apply when the plaintiff has offered direct evidence of conspiracy." *Petroleum Prods. Antitrust Litig.* , 906 F.2d 432, 441 (9th Cir. 1990), *cert. denied* , 500 U.S. 959 (1991). This observation is certainly correct to the extent that the direct evidence is sufficient to support a conclusion that conspiracy is more probable than not.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

53) *Palmer*, 498 U.S. at 50. Justice Marshall dissented, believing "that summary dispositions deprive litigants of a fair opportunity to be heard on the merits and significantly increase the risk of an erroneous decision." *Ibid.* He did not indicate what issues needed a trial to resolve, although he might have meant that the facts were less straightforward than the Court indicated. Whether Justice Marshall meant to suggest that summary judgment is *never* appropriate in antitrust cases is not clear.
54) *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992). This decision is discussed and analyzed in detail in ¶¶1733f and 1740.
55) See Ch. 17C.
56) *Kodak*, 504 U.S. at 468.
57) *Id.* at 469.
58) *Petroleum Prods.*, 906 F.2d at 438–40. See also the discussion of the *Citric Acid* case. *Citric Acid Litig.*, 996 F. Supp. 951, 954–55 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999), *cert. denied*, 529 U.S. 1037 (2000).
59) *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584–85, 588–89 (1986).
60) *Kodak*, 504 U.S. at 479.
61) *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763–64 (1984). See ¶1454.
62) *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).
63) *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993). For simplicity, we speak of the manufacturer although the actual defendant was the manufacturer's North American distribution subsidiary.
64) According to the allegations, defendant BMW met with the applicant several times and acceded orally to its request for a dealership but then refused to negotiate further; ended an existing dealership when its lease expired rather than extending the lease and allowing the plaintiff to take over; and delayed its rejection of plaintiff an unreasonably long time. *Big Apple*, 974 F.2d at 1365–67.
65) The court pointed to "19 bits"—more than a "mere scintilla"—of conspiracy evidence: existing dealers discussed the plaintiff's various applications, opposed adding another dealership, and expressed these views to BMW on more than one occasion. *Id.* at 1363, 1367, 1385–86.
66) See ¶1611.
67) *Big Apple*, 974 F.2d at 1375–76.
68) *Lovett v. General Motors Corp.*, 998 F.2d 575 (8th Cir. 1993), *cert. denied*, 510 U.S. 1113 (1994). *See also Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994), *cert. denied*, 514 U.S. 1063 (1995) (finding sufficient fact issues to support inference of conspiracy in trade association protests against "800-number" dealers who sell wallpaper at discounts by free-riding on stocking and displays of defendant dealers); *Rosefielde v. Falcon Jet Corp.*, 701 F. Supp. 1053 (D.N.J. 1988) (finding fact issues supporting inference of price-fixing conspiracy).
69) See Ch. 16E.
70) See ¶1653.
71) *E.g., Snyder v. Howard Johnson's Motor Lodges, Inc.*, 412 F. Supp. 724 (S.D. Ill. 1976) (denying summary judgment in favor of franchisor who opened a business competing with plaintiff franchisee, who is to have opportunity of proving defendant's anticompetitive intent).
72) *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032 (6th Cir. 1996).
73) *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).
74) *Ezzo's*, 94 F.3d at 1036.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

**75)** *Ibid. Cf. Publication Paper Antitrust Litig.* , 690 F.3d 51 (2d Cir. 2012), *cert. denied* , 568 U.S. 1123 (2013) (record provided sufficient evidence of price-fixing conspiracy); in particular:

> Plaintiffs have provided additional evidence to support a reasonable finding that SENA and UPM engaged in price fixing. The district court found, and defendants do not contest, that the publication paper industry is conducive to collusion: publication paper is a commodity product with few substitutes; the market is controlled by a limited number of sellers (principally, IP, SENA, and UPM); and high capital investment costs limit the entry of new market players. Furthermore, during the class period, the publication paper industry suffered from excess capacity and historically low prices, conditions that make "price competition more than usually risky and collusion more than usually attractive." Finally, there is ample evidence of conspiratorial behavior. Most notably, it is undisputed that in private phone calls and meetings—for which no social or personal purpose has been persuasively identified—Tynkkynen shared UPM's pricing strategies with Korhonen and both men disclosed to each other their companies' intentions to increase prices before those decisions had been publicly announced. Tynkkynen and Korhonen also developed a "joint story" to conceal from the government the true nature of their communications—behavior from which a jury could infer that both men were aware that their communications and related actions regarding publication paper pricing violated the law.

*Id.* at 65 (footnote references omitted).).

**76)** See ¶¶1411 and 1433.
**77)** *Richards v. Neilsen Freight Lines* , 810 F.2d 898, 902 (9th Cir. 1987). See ¶¶1413 – 1415. Some courts go even further.
**78)** *City of Long Beach v. Standard Oil Co. of California* , 872 F.2d 1401, 1406–07 (9th Cir.), *amended* , 886 F.2d 246 (9th Cir. 1989), *cert. denied* , 493 U.S. 1076 (1990), reversed summary judgment for refiners charged with agreeing on the prices they paid the plaintiff for crude oil. The court did not object to exchanges by which a refiner with oil at one place would provide some to a rival without oil there, while the latter would provide oil to the former at a different location. Although they had to settle in cash when the quality or quantity of the exchanges did not fully match, the court believed that the settlement formulas were more cumbersome than normal or necessary and had the effect of depressing the prices paid the plaintiff.
**79)** *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.* , 998 F.2d 1224, 1232 (3d Cir.), *cert. denied* , 510 U.S. 994 (1993).
**80)** Quoting *Petroleum Prods. Antitrust Litig.* , 906 F.2d 432, 439 (9th Cir. 1990), *cert. denied* , 500 U.S. 959 (1991).
**81)** *Petruzzi's* , 998 F.2d at 1232.
**82)** *Ibid.* On buyers' cartels, see ¶¶2010 – 2015.
**83)** Citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* , 475 U.S. 574, 597 (1986).
**84)** *Petruzzi's* , 998 F.2d at 1233.
**85)** *Id.* at 1242. *See also Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co* ., 817 F.2d 639, 646 (10th Cir. 1987) ( *Matsushita* holding was based on twin premises of an alleged conspiracy that was fundamentally irrational and ambiguous circumstantial evidence; as the rationality of the alleged conspiracy increases, the evidentiary burden is lessened). In *H.J.* , the Eighth Circuit went even further, suggesting that *Matsushita* "does not apply" in a case where the alleged conspiracy seems quite rational. *H.J., Inc. v. International Tel. & Tel. Corp.* , 867 F.2d 1531, 1544 n.10 (8th Cir. 1989) ("There is no claim in this case that the supposed conspiracy makes no economic sense. *Matsushita Electric* does not apply.").
**86)** *Matsushita* , 475 U.S. at 597 n.21.
**87)** *Id.* at 596–97.
**88)** For example, evidence that gasoline stations with publicly posted prices changed their prices in lockstep is equally consistent with the propositions that (1) they are fixing prices, or (2) they are merely following the prices of a tacitly acknowledged leader. Standing alone, such evidence would not create a fact issue of conspiracy even in a concentrated market, where a cartel agreement would be quite rational.
**89)** See ¶725a.
**90)** See ¶¶1429 – 1431.
**91)** See ¶¶1432 – 1434.
**92)** See ¶1435. *But see Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan* , 203 F.3d 1028 (8th Cir.) (en banc), *cert. denied* , 531 U.S. 815 (2000), which found insufficient evidence of a price-fixing conspiracy to survive the defendant's summary judgment motion. The majority was most disturbed by inter-competitor price-verification calls made in a tight oligopoly of producers of a fungible product; however, it concluded that there was insufficient evidence that any particular price increase resulted from a specific price-verification call. The dissenters found this requirement too strenuous and appeared ready to condemn significant use of direct price verification in an oligopoly market for a commodity.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

93) *Petroleum Prods. Antitrust Litig.* , 906 F.2d 432, 438 (9th Cir. 1990), *cert. denied* , 500 U.S. 959 (1991).
94) See ¶1436.
95) *Bulk Popcorn Antitrust Litig.* , 783 F. Supp. 1194 (D. Minn. 1991) (facts that popcorn supplier's employees discussed prices with competitors, exchanged price lists and at least discussed joint attempts to prevent public dissemination of information showing wide availability of popcorn was sufficient to undermine defendant's summary judgment motion against price-fixing claim). *But see Blomkest* , 203 F.3d 1028.
96) *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.* , 190 F.3d 775 (7th Cir. 1999). *Contrast Chocolate Confectionary Antitrust Litig* ., 999 F. Supp. 2d 777 (M.D. Pa. 2014) (evidence that candy makers were aware of one another's pricing decisions, that the market was structurally conducive to price fixing, that there was a pattern of increasing prices, and that there was executive attendance at the same trade meetings insufficient to withstand motion for summary judgment when the prices were equally consistent with follow-the-leader unilateral action).
97) *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.* , 190 F.3d at 778.
98) *Palmer v. BRG of Ga., Inc.* , 498 U.S. 46 (1990).
99) See the discussion of the Supreme Court's *Palmer* decision. *Ibid.*
100) *See Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.* , 818 F.2d 1530, 1534 (11th Cir. 1987).
101) *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* , 475 U.S. 574, 587 (1986). At the pleading stage, of course, the complaint need not offer a plausible reason for the defendants' conspiracy but "merely needs to allege that they did indeed conspire and give some factual allegations that would support such a claim." *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* , 961 F.2d 1148, 1159 (5th Cir. 1992), *cert. denied* , 506 U.S. 1079 (1993) (no dismissal of complaint alleging parallel and interdependent use of substantially identical contract clauses after collective dissemination of information about such clauses). On summary disposition before discovery, see ¶307.
102) See ¶1412.
103) See ¶¶1412 and 1434c.
104) *Matsushita* , 475 U.S. at 597 n.21.
105) *Bolt v. Halifax Hosp. Med. Ctr.* , 891 F.2d 810, 819 (11th Cir.), *cert. denied* , 495 U.S. 924 (1990). The court added that this §1 plaintiff "need not prove an intent on the part of the co-conspirators 'to restrain trade or build a monopoly'"; if the "purported conspiracy has an anticompetitive effect, the plaintiff has made out a case ...." *Id.* at 819–20.

    *See also Citric Acid Litig.* , 191 F.3d 1090 (9th Cir. 1999), *cert. denied* , 529 U.S. 1037 (2000), concluding that one could not infer that Cargill participated in an antitrust conspiracy from the fact that it slowed down its capacity expansion; court noted some questions about timing but also that Cargill did in fact expand its capacity rapidly during the conspiracy period, although not so rapidly as it originally intended to do. The plaintiffs believed that allegations concerning Cargill's conduct were not inherently implausible, nor was the slowing of its capacity expansion a procompetitive act. But the Ninth Circuit found this insufficient, noting that there were both collusive and noncollusive plausible explanations for Cargill's actions. Indeed, such evidence rarely proves anything unless accompanied by more explicit evidence of cartel participation. Suppose four out of five firms in a market fix prices, while the fifth does not participate. In response to the cartel's output reduction and price increase, the nonparticipant will settle on its own profit-maximizing strategy, which may involve rapid expansion of capacity-restoring output toward the competitive level. But it would even more likely be a strategy of permitting its own price to rise to something approaching that of the cartel, and this may involve producing greater, the same amount, or less than it did before the conspiracy period.

    The court also held that the mere fact that the non-settling defendant was a member of a trade association and that association may have been a front for a cartel was insufficient to establish defendant's participation; in fact, most of the meetings of the acknowledged cartel took place away from the trade association, and in which non-settling defendant did not participate; and there were many benefits to joining the association other than participation in a conspiracy.

106) *E.g., Eichman v. Fotomat Corp.* , 880 F.2d 149, 161 (9th Cir. 1989) (implausible that film processors conspired with franchisor Fotomat to destroy franchisees who became processors' increasingly important customers as Fotomat shifted to self-processing). Although the Eleventh Circuit approved a directed verdict against a plaintiff with insufficient evidence of a resale price maintenance agreement, the court erred in thinking that such an agreement could bring the manufacturer and dealer "monopoly profits." *See Winn v. Edna Hibel Corp.* , 858 F.2d 1517, 1520 (11th Cir. 1988). Insulating a dealer from intrabrand price competition might sometimes increase efficiency but excess profit for dealers harms the manufacturer. See ¶1603.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

107) *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987) (once a defendant makes that showing, "a plaintiff must provide specific factual support for its allegations of conspiracy tending to show that the defendant was not acting independently"). *See Merck-Medco Managed Care, LLC v. Rite Aid Corp*., 201 F.3d 436, 1999 WL 691840, 1999-2 Trade Cas. ¶72,640 (4th Cir. Sept. 7, 1999) (unpublished) (allegations that pharmacies conspired not to participate in plaintiff's prepaid pharmaceuticals plan; (1) conspiracy was plausible, in that pharmacies could maintain higher prices by collectively refusing to participate—although if only one or a few refused, they would simply lose the business; (2) there was conscious parallelism because each pharmacy knew that if others failed to participate the plan as a whole would fail; (3) plenty of interfirm contacts; (4) however, this evidence was amply rebutted by statements by individual defendants to the effect that participation would be very costly to them and that the interfirm contacts were concerned other matters; summary judgment granted).

108) *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357 (10th Cir. 1989). *Cf. Corner Pocket of Sioux Falls, Inc. v. Video Lottery Techs., Inc.*, 123 F.3d 1107 (8th Cir. 1997), *cert. denied*, 522 U.S. 1117 (1998) (in order to avoid summary judgment under *Matsushita* a plaintiff must show not merely that the alleged conspiracy makes economic sense, but if the only evidence is circumstantial, that the acts are not consistent with individual self-interest; citing an earlier version of this Paragraph).

109) See Ch. 15.

110) On research joint ventures, see ¶2115.

111) See ¶1503. Once the plaintiff shows such power and the defendant documents the efficiencies, the plaintiff must persuade the tribunal that the venture is reasonably likely to lead to higher prices or lesser quality. See ¶1507.

112) See ¶¶2214.

113) *E.g., Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 441 (9th Cir. 1990), *cert. denied*, 500 U.S. 959 (1991).

114) *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990).

115) The caveat is necessary because some written agreements fail to show elements essential to the antitrust claim, such as coercion in a tying case. For example, in a case challenging tying, a written contract under which the plaintiff agrees to purchase "*A* + *B*" does not itself show that the plaintiff was forced to do so. *See, e.g., Paramount Pictures Corp. v. Johnson Broad. Inc.*, 2006 WL 367874, 2006-1 Trade Cas. ¶75,236 (S.D. Tex. Feb. 15, 2006) (denying summary judgment on block-booking claim where it could not be inferred from the written contract whether the plaintiff had licensed three shows because it was forced to or whether it did so willingly).

116) *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1233 (9th Cir.), *cert. denied*, 510 U.S. 994 (1993).

© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Competition Law is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwercompetitionlaw.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Document information

Publication
Antitrust Law - An Analysis of Antitrust Principles and Their Application

Jurisdiction
United States of America

Topics
Cartels

Bibliographic reference
'¶1407. Facilitating Practices; Statutory Remedies', in Phillip E. Areeda and Herbert Hovenkamp , Antitrust Law - An Analysis of Antitrust Principles and Their Application, (© President and Fellows of Harvard College; Wolters Kluwer 1978, Supplement No. 8/2023, August 2023)

# ¶1407. Facilitating Practices; Statutory Remedies

**Last Updated: 8/2023**

### 1407a. Introduction and summary.

Although not inherently or obviously offensive to competition, certain practices might simply increase the likelihood of, and thus "facilitate"—or even lead to—other anticompetitive behavior. For example, a discussion among competitors about prices might facilitate oligopolistic price coordination (1) or might actually be part of a traditional price-fixing agreement. We see in ¶¶c – d that the latter can sometimes be inferred. Frequently, however, we are entitled to say no more than that the specified practice unjustifiably facilitates and thereby increases the likelihood of anticompetitive results. Fortunately, as discussed in ¶e, that limited conclusion allows us to treat the challenged practice as an unreasonable restraint of trade and therefore as a violation of Sherman Act §1 when the practice itself manifests an agreement, as the illustrative meeting among competitors does. (2)

Other facilitating practices, such as seriatim public speeches by competitors "predicting" future prices, do not rest on any apparent agreement. However, when none can be inferred, the unilateral facilitating practice can be reached through the narrower remedial provisions of Federal Trade Commission Act §5 or, in limited circumstances, Sherman Act §2. Subparagraph f discusses this issue in greater detail.

Subchapter B returns to the question of whether a facilitating practice implies some commitment on the matter facilitated. (3) Subchapter C suggests the wisdom of a "containment policy" of challenging practices that facilitate oligopolistic coordination (4) even if we cannot readily prevent anticompetitive pricing as such. (5)

It is useful to introduce at the beginning of this Paragraph the basic concept of a facilitating practice; some problems of characterization, causation, and remedy; the distinction between unilateral and collective facilitating practices; and the difference between a mere conspiracy to commit a facilitating act and a more serious conspiracy to do the very thing facilitated.

### 1407b. Definition and distinctions.

1. ***Generally.***

A "facilitating practice" is an activity that makes it easier for parties to coordinate price, output, or other behavior in an anticompetitive way. It increases the likelihood of a consequence that is offensive to antitrust policy. The anticompetitive result may in fact ensue, but its actual occurrence is not necessary to the presence of a facilitating practice. The vice of a facilitating practice is its anticompetitive *tendency* in the circumstances rather than a proved anticompetitive *result* in the particular case. Similarly, a facilitating practice may lead to a *further* agreement, but proof of the latter is not essential to finding the initial agreement. As we saw in ¶1406, for example, an agreement to exchange information may lead to or be part of an agreement to fix prices, but even without the latter agreement, the exchange itself is an agreement that may undesirably facilitate price coordination. As such, prospective injunctive relief may be warranted even though damages cannot be proven.

The contours of this definition are sharpened by its purpose. There are two reasons for antitrust concern with a facilitating practice: (1) as a factual predicate for the inference of an agreement, as introduced in ¶c ; and (2) as an activity to be forbidden in itself because of its anticompetitive tendencies, whether realized or not in a particular case.

Even when we supplement our definition of "facilitating practice" with the legal purpose of controlling it, there are at least two complications in identifying it. First, the likelihood of an undesirable result obviously varies with the circumstances. Second, a practice may facilitate such a result and yet have offsetting redeeming virtues that prevent us from condemning it or even from discouraging parties from using it.

The anticompetitive tendencies of a particular act will vary with the circumstances. For example, industrywide dissemination of price information is less likely to produce adverse consequences in a competitively structured market than in an oligopoly market. (6) When characterizing a particular act as a facilitating practice, we do not suggest that such an act must always be so regarded.

Furthermore, we must remember that an act can facilitate undesirable consequences without being an unalloyed evil. For example, seriatim testimony before a congressional committee might facilitate subsequent price coordination among the witnesses' firms. Nevertheless, no one would use antitrust law to control a witness's answers in a congressional hearing. The point is this: an agreement to behave in a way that facilitates


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

some undesirable result, such as price coordination, cannot be found unreasonable without considering the offsetting economic or social benefits of the practice. Thus, the label "facilitating practice" is only an invitation to further analysis, not a license for automatic condemnation.

**1407b2. *Causation revisited.***

We noted at the outset that proven causation of an anticompetitive result is not a prerequisite to identifying or condemning a facilitating practice in a government action, although it may be necessary for a private plaintiff and is almost certainly a prerequisite to a damages action. (7) But causation may be relevant to our on-balance judgment of a practice that both tends to facilitate anticompetitive results and simultaneously serves desirable ends. A practice can tend to cause anticompetitive results in oligopolistic markets generally and yet fail to be significant in a particular case or class of cases. For example, if deprived of private meetings, oligopolists might simply turn to seriatim public speeches revealing their intentions en route to a consensus. (8) Or tacit coordination might already be so effective that the facilitating practice adds too little to be worth condemning, especially if condemnation sacrifices some redeeming virtue of the practice.

The FTC's *DuPont* case is illustrative. (9) Four firms occupied the entire market for a homogeneous product, tetraethyl lead, which was added to gasoline to reduce "knocking" in automobile engines. Each firm unilaterally announced price changes in advance both to customers and to the press, contracted with buyers on terms requiring the seller to give each buyer the best terms given by that seller to any buyer, and used uniform delivered pricing notwithstanding significant freight costs and widely dispersed buyers and sellers. A discussion of how these and other practices might facilitate tacit price coordination is found in ¶1435. The immediate point is that these practices, or some of them, also seemed useful to buyers, who would appreciate advance announcement of price increases and guarantees that they were paying no more than their rivals.

Assuming for the moment that tetraethyl lead prices were anticompetitively high, one is still entitled to wonder whether the challenged practices really made much of a difference. After all, effective tacit price coordination might well be expected in a market with only four firms selling a homogeneous product in repetitive transactions. (10) If a challenged practice does not actually contribute very much to the assumed exploitative price, then buyers might prefer to see the practice continued, as some of them testified in *DuPont*. The Commission correctly recognized the point in this case but could hardly resolve it satisfactorily in view of the inherent uncertainty. In essence, the Commission satisfied itself with the plausible observation that most of these practices facilitated somewhat the major suppliers' tacit price coordination.

Likewise, in *Jays Foods* the plaintiff alleged that the defendant truckers' association published a freight "classification manual" that classified potatoes in terms of certain characteristics relevant for setting shipping rates, thereby facilitating the setting of common rates. (11) Although the manual contained no rates or specific rate formulas, it did create uniform classifications and thus undoubtedly facilitated the carriers' ability to track one another's rates. A peculiarity of the manual was that many of the products classified were subject to federal regulations, which at that time permitted truckers to set rates jointly. (12) Agricultural commodities were not covered by such regulations, and agreements with respect to them remained subject to the antitrust laws. The court found no violation, noting different rather than identical prices and thus finding no improper spillover from classification to price fixing. Furthermore, such classification was not without a redeeming virtue. The court noted the Interstate Commerce Commission view that such classification provided a "useful reference tool" permitting comparison. (13)

**1407b3. *Relation to remedy, particularly in private actions.***

We see in ¶d that a facilitating practice can be condemned as a violation of Sherman Act §1 when it tends, without adequate justification, to lead to anticompetitive results. Such an antitrust violation may be enjoined and may even warrant criminal sanctions in appropriate cases. The Justice Department, the FTC, and perhaps some private plaintiffs would be content with such relief.

However, damages cannot be awarded on the basis of a mere tendency to cause anticompetitive results. Unlike the government, the private plaintiff must prove causation and harm. Further, in order to obtain damages, a private plaintiff must prove and quantify its injury. Accordingly, the damaged plaintiff must show not only that an anticompetitive result was facilitated but also that it occurred. Most private conspiracy suits, therefore, will attempt to prove both (1) that action was concerted improperly in the circumstances because it facilitated an impairment of competition and (2) that anticompetitive effects ensued. Actual causation must thus be shown before damages can be awarded.

The impulse for focusing on a facilitating practice as such is, to repeat, the difficulty of knowing its result. This means that it will often be difficult to establish causation in fact from a facilitating practice. Some actual injury will thus be uncompensated and, absent criminal punishment, some wrongdoing will be unpunished and therefore undeterred. To that extent, statutory policies are ill-served. On the other hand, compensation,


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

punishment, and deterrence would be excessive and express statutory requirements ignored if damages were awarded without such proof. As a result we cannot recommend a presumption of law that damage resulted from an improper facilitating practice. Also inadvisable is a sliding-scale requirement reducing the causation demonstration according to the relative harmfulness in principle of the improper facilitating practice before the tribunal. Such sliding scales are not administrable; they merely invite the fact finder to punish blameworthy defendants. To some extent, of course, all causation and damage formulas may do that and thereby provide "rough justice." But such inevitable incidents of running any damage system in a highly uncertain world should not be made even more arbitrary and uncertain by a sliding-scale instruction that will be largely unintelligible to jurors or other fact finders.

However, deterrence need not be sacrificed. Once it becomes reasonably clear that a particular practice—such as certain types of meetings (14) is unreasonable, those who subsequently engage in that practice can appropriately be treated as violators. Courts now seem to do this by treating certain facilitating practices as conspiracies to engage in the matter facilitated.

### 1407c. Concerted facilitating practice as equivalent to conspiracy on matter facilitated.

In rare cases a concerted facilitating practice should be treated as a conspiracy on the facilitated matter. Suppose that over a series of years competing buyers repeatedly refrained from bidding against each other to purchase timber-cutting rights. Such noncompetitive self-restraint might come about through interdependence if the parties could know which timberlands were of maximum interest to which of the others. Obviously, periodic meetings at which each party discloses that information would enable the buyer with the greatest interest in each transaction to be the sole bidder. The meetings not only facilitate this noncompetitive result, they are probably indispensable for bid rotation to occur over numerous transactions. If so, the facilitating practice would "cause" the bid rotation and any damage that resulted from it. Indeed, with no other plausible purpose for the meetings, the rivals must have intended and willed the result. We can treat the meeting of minds on the decision to have meetings of this sort as also a meeting of the minds on that which clearly resulted from those meetings. (15) An important factor is ongoing repetition of undesirable conduct, which establishes a pattern and permits rivals to rely on one another's conduct as a surrogate for more explicit types of communication.

### 1407d. Concerted facilitating practice as indirect evidence of conspiracy on the matter facilitated; question of fact or law?

Consider once again this standard example. Competitors collaborate to discuss economic conditions in their industry, including past prices, output, profits, and demand elasticity. Although nothing is said or intimated about future market behavior, uniform and noncompetitive pricing might result. If the discussants are few in number and dominate their industry and if tacit coordination of their pricing behavior had previously been difficult because of great uncertainty about each other's view of the profit-maximizing price, then discussions leading to a consensus—whether expressed or not—about, say, demand conditions would increase the likelihood that each would follow the adoption of such a price by one of them.

Suppose that such a follow-the-leader price increase occurred a few weeks after the meeting. May we infer that the new price resulted from a conspiracy or that a jury should be permitted to decide that question from this evidence? Our answer is no, although some judges have suggested otherwise.

In *Esco* the Ninth Circuit posed a hypothetical in which five competitors met to discuss their problems. (16) Each said in turn that it would not fix prices with the others but that it would set its own price at *X* dollars on the following Monday. Each then did so. The Court concluded that

> we do not say that the foregoing illustration compels an inference in this case that the competitors' conduct constituted a price-fixing conspiracy, including an agreement to so conspire, but neither can we say, as a matter of law, that an inference of no agreement is compelled. As in so many other instances, it remains a question for the trier of fact to consider and determine what inference appeals to it (the jury) as most logical and persuasive, after it has heard all the evidence as to what these competitors had done before such meeting, and what actions they took thereafter, or what actions they did not take. (17)

The five identical seriatim statements at a meeting that each would adopt *X* price on Monday suggest a proposed price agreement by the first speaker and expressed assent by the remaining four. If that is the teaching of experience, an inference of agreement is compelled; if not, then no agreement should be inferred. (One might believe that it is the jury's experience that is relevant, but they personally have little or no experience with price-fixing meetings.) That each increased its price on Monday does not seem probative


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

where such uniformity can occur through mere marketplace interdependence.

Of course, there might be other evidence, even disputed evidence, for a jury to resolve on what the parties said or did before, during, or after the meeting that implies some understanding on how each would use the information gathered at the meeting about the others' intentions. But in the absence of other evidence, the judge rather than the jury should rule that what transpired at the meeting should (or should not) be deemed to be a price-fixing conspiracy—that is, under these circumstances the question of conspiracy *vel non* is one of law. If the court does not so rule, the only function that would be left to a jury would be speculation, which is generally considered insufficient to support the plaintiff's burden of proof. That is to say, once the facts of what happened are beyond dispute, the question whether these facts constitute a "conspiracy" is driven by legal policy. (18)

Even if no agreement to fix prices is present, the court's hypothetical in *Esco* does show an illegal agreement to meet together, (19) as we show below.

### 1407e. Concerted facilitating practices as unreasonable restraints of trade.

Certain practices can make anticompetitive results more likely. Especially in oligopoly markets, noncompetitive performance can occur, although it is not observed or expected in every such market. A small number of firms are an essential precondition for recognized interdependence and tacit coordination of price or other matters. But fewness alone is not enough when other market circumstances are uncongenial. (20)

Uncertainty is the most general impediment to cartel-like results in oligopoly. It follows that collective practices reducing such uncertainty, such as the discussions of the *Esco* hypothetical, are dangerous to competition. The vice of the meeting is not that the participants have agreed upon anything—although they may have—but that uncertainties have been reduced such that the likelihood of tacit price coordination has been increased. The same thing results from repetition. A series of such events tends to increase our confidence that they will continue.

Thus, the agreement to have certain discussions has anticompetitive tendencies in oligopoly markets. There are no procompetitive redeeming virtues in permitting such discussions. Accordingly, there is no difficulty in concluding that the agreement to have the discussion is itself an unreasonable restraint of trade. Therefore, Sherman Act §1 is violated.

Furthermore, there is no need for any jury finding unless there is a disputed fact whose resolution is needed; the conclusion that practices of this sort, once proven, are dangerous to competition is entirely one of law. To be sure, the phenomenon of oligopoly coordination might be disputed, but that is not a matter to be proved as a matter of fact in each case. Rather, it is an economic premise that antitrust judges choose to adopt (or not), not one that varies from case to case.

Any doubt on this point is readily dispelled by considering the law governing horizontal mergers. The courts have accepted the premise that a merger making a market significantly more concentrated is likely substantially to lessen competition and therefore violates Clayton Act §7. The jury is not allowed to decide whether that premise should or should not be adopted. (21)

It might still be argued that a jury should decide whether the particular market is sufficiently concentrated to trigger our concern that a reduction of uncertainty would have an anticompetitive tendency in the particular case. Of course, even that question would not be open to the tribunal that held that *Esco* -type meetings were so totally lacking in redeeming virtue that they ought to be condemned absolutely. But even if market structure determines the condemnation, the court rather than the jury ought to characterize the market as sufficiently oligopolistic—or not—to warrant control of facilitating practices there. After all, the relevant criteria are not within the jury's competence, and there is an obvious need for uniform treatment of similarly situated defendants. The judge rather than the jury should decide. (22) While the market definition question lies with the fact finder, the question of the concentration levels that trigger concern should be regarded as one of law.

Thus, upon examination the *Esco* hypothetical is less fact-specific than the judge supposed. The court is entitled to hold that the conspiracy to discuss is itself unlawful. (23)

### 1407f. Facilitating practices without concerted action.

**1. *Generally; FTC Act §5.***

Some facilitating practices do not involve concerted action. Competitors might give seriatim public speeches in which each states its market analysis or future plans. In that event merely reading the newspapers would reduce the uncertainty of each about the others' future behavior and thereby make cartel-like pricing results more likely. Similarly, the FTC's *DuPont* decision challenged such unilaterally adopted practices as advance price announcements, contracts assuring buyers of the lowest price granted any other buyer, and basing-point pricing. (24) Explicitly disclaiming any conspiracy, the FTC


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

condemned these acts as unfair methods of competition in violation of FTC Act §5. Such a violation warrants a cease and desist order against continuation of the practice, although it does not support a private damage claim or any criminal punishment. (25) Most important, because §5 of the FTC Act prohibits "unfair methods of competition" without requiring any agreement whatsoever, that provision can be used to reach anticompetitive collusion-facilitating practices in circumstances where agreement as such is economically irrelevant or cannot be proven. (26)

**1407f2. *Attempted monopolization.***

An attempt-to-monopolize route might also be available in some circumstances. Consider a defendant who expressly solicits its rival(s) to engage in price fixing. Acceptance would, of course, create a conspiracy. A rejection can be ambiguous when the solicited act is later performed. (27) In any event, the solicitation could be seen as an attempt to monopolize on the following reasoning. (1) Monopoly power is customarily said to be the power to control price. (28) (2) Although the solicitor lacks the individual power to control price, its solicitation, if successful, would bring about a noncompetitive or monopoly price. The solicitation is an attempt to induce collective action and thereby to gain a greater power over price than the free market would permit. Accordingly, the solicitor must have a specific intent to bring about the result. The solicitation is also a clearly improper act that is totally lacking in any claim to legitimacy. (3) The solicitation creates a "dangerous probability" that forbidden control over price will come to pass, (29) for the solicitor expects and hopes that the invitation will be accepted and that anticompetitive or monopoly prices will result. The happenstance that it was rejected, at least verbally, does not eliminate the competitive danger of the invitation.

Thus, the doctrinal prerequisites of attempted monopolization are satisfied: a specific intent to attain monopoly power, albeit collective rather than individual, through improper means; improper conduct; and the dangerous probability that such results will occur.

The doctrinal obstacle to reaching this conclusion is that "monopoly" ordinarily refers to a single firm and that this is reflected in the "dangerous probability" requirement as actually applied. Notwithstanding the solicitor's significant market share, the *American Airlines* trial court (30) found an insufficient probability of monopoly. That court was looking only to the prospect of single-firm monopoly, which, it is true, would not result from success in forming a price-fixing cartel. The legal issue is thus isolated: does the attempt provision of Sherman Act §2 address only single-firm monopoly or does it also embrace market control achieved through a cartel? The customary concept of monopoly is admittedly that of the single firm, but that need not be determinative when the enacting legislature never considered the issue and when the language used readily embraces the fear of monopoly results. (31) Certainly, there is no policy argument in favor of protecting unsuccessful solicitations to form a cartel. Yet it could be maintained that courts ought not to "stretch" the definition of "attempted monopoly" to correct a supposed congressional oversight in not explicitly forbidding attempts to form a conspiracy that is illegal under Sherman Act §1. Thus, the Fifth Circuit was correct to reverse the trial court and find an unlawful attempt under §2 of the Sherman Act. (32)

A final caveat is in order. Even if unaccepted solicitations to form a price-fixing cartel constitute an attempt to monopolize, many other unilateral facilitating practices would not do so. For example, the *DuPont* assurance to buyers of the lowest price offered any buyer differs from the price-fixing solicitation both in its potential legitimacy and in a seller's state of mind. Because such price protection clauses serve the immediate interests of buyers and may even be requested by them, (33) the clauses are not totally without redeeming virtue. For the same reason, we are not entitled to presume that the seller contracting on these terms must inevitably have a "specific intent" to control market prices through improper means.

Whether or not facilitating practices can be controlled without finding a conspiracy, efforts will continue to infer a traditional conspiracy from them. (34)

## References


1) See ¶¶1429 – 1430.
2) See ¶1406.
3) See ¶¶1417,1422.
4) See ¶¶1435 – 1436.
5) See ¶¶1432 – 1433.
6) See ¶1430 on agreement issues and ¶2112e on substantive issues.
7) The private plaintiff seeking an injunction must prove threatened loss or damage. See ¶326. The private plaintiff seeking damages must prove actual loss. See Chs. 3F – G.
8) See ¶1435c.
9) *E.I. du Pont de Nemours & Co. v. FTC* , 729 F.2d 128 (2d Cir. 1984).
10) See ¶¶1429 – 1430.



© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

11) *Jays Foods v. National Classification Comm'n* , 646 F. Supp. 604 (E.D. Va. 1985), *aff'd mem* ., 801 F.2d 394 (4th Cir. 1986).
12) *See Southern Motor Carriers Rate Conf. v. United States* , 471 U.S. 48 (1985); and see ¶¶224 – 225.
13) *Jays Foods* , 646 F. Supp. at 606. *See also United States v. American Soc'y of Anesthesiologists* , 473 F. Supp. 147, 159 (S.D.N.Y. 1979) (joint classifications of medical procedures "tend to affect price formation" but are reasonable where no evidence of fee stabilization).
14) See ¶¶1417 – 1418.
15) See the discussion of the *Champion* case in ¶1418b4.
16) *Esco Corp. v. United States* , 340 F.2d 1000, 1007 (9th Cir. 1965).
17) *Id.*
18) *See, e.g., Baby Food Antitrust Litig.* , 166 F.3d 112 (3d Cir. 1999) (price discussions among lower-level sales personnel lacking price-setting authority insufficient to establish fact issue of conspiracy).
19) *See also Petroleum Prods. Antitrust Litig.* , 906 F.2d 432, 438 (9th Cir. 1990), *cert. denied* , 500 U.S. 959 (1991) (seriatim price announcements were a facilitating practice and created a jury issue of anticompetitive agreement). See ¶308f.
20) See ¶1430.
21) On the principles governing horizontal mergers, see Chapter 9.
22) Of course, the jury may have to decide the relevant market in the first place. See Ch. 5.
23) Whether damage has been caused would remain a factual inquiry in the particular case. See ¶b3.
24) *See E.I. du Pont de Nemours & Co. v. FTC (Ethyl)* , 729 F.2d 128 (2d Cir. 1984); and see ¶¶1435 – 1436. The FTC decision and the Second Circuit's reversal are discussed in ¶1436c.
25) See ¶302e.
26) *See* Herbert Hovenkamp, *The Federal Trade Commission and the Sherman Act* , 62 Fla. L. Rev. 871 (2010).
27) See ¶1419.
28) *See United States v. E.I. du Pont de Nemours & Co. (Cellophane)* , 351 U.S. 377 (1956).
29) On these various requirements of the attempt-to-monopolize offense, see ¶¶804 – 808.
30) *United States v. American Airlines* , 570 F. Supp. 654 (N.D. Tex. 1983), *rev'd* , 743 F.2d 1114 (5th Cir. 1984).
31) Had the 1890 Congress thought about the question, it might well have prohibited in §1 attempts to bring about a conspiracy in restraint of trade.
32) *American Airlines* , 743 F.2d 1114 (5th Cir. 1984). The district court in *Microsoft* came to the same conclusion about Microsoft's offer to Netscape to divide the Internet browser market. *See United States v. Microsoft Corp.* , 87 F. Supp. 2d 30, 39 (D.D.C. 2000), *aff'd in part* , *rev'd in part* , 253 F.3d 34 (D.C. Cir.), *cert. denied* , 534 U.S. 952 (2001).
33) The long-run impact on price levels is a different and potentially uncertain matter.
34) See ¶¶1417, 1425.

© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Competition Law is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwercompetitionlaw.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.

Wolters Kluwer KluwerCompetitionLaw


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Document information

Publication
Antitrust Law - An Analysis of Antitrust Principles and Their Application

Jurisdiction
United States of America

Topics
Cartels

Bibliographic reference
'¶1417. Conspiratorial Opportunity, Unexplained Meetings, Furtive Behavior, and Cover-Ups', in Phillip E. Areeda and Herbert Hovenkamp , Antitrust Law - An Analysis of Antitrust Principles and Their Application, (© President and Fellows of Harvard College; Wolters Kluwer 1978, Supplement No. 8/2023, August 2023)

# ¶1417. Conspiratorial Opportunity, Unexplained Meetings, Furtive Behavior, and Cover-Ups

**Last Updated: 8/2023**

### 1417a. Introduction and summary.

An opportunity to arrange a traditional conspiracy is a necessary but insufficient precondition to establishing a conspiracy. After all, in this day of telephone, email, and other forms of rapid communication, an opportunity to conspire may be presumed in the absence of evidence to the contrary. A physical meeting is inherently no more suspicious than an exchange of electronic messages. However, a call or meeting that occurred and that has not been innocently explained can invite a sinister inference. An exchange carried out in a furtive manner warrants an even stronger inference. Offering an innocent explanation that turns out to be false can also be suspicious.

### 1417b. Mere opportunity or something more?

Some conspiracy complaints make much of the defendants' opportunity to conspire—for example, that they were simultaneously present at the same place or even in the same meeting ostensibly devoted to a lawful topic. (1) Such proof satisfies the necessary precondition of any traditional conspiracy that the parties have the opportunity to conspire. But it remains the plaintiff's burden to prove that the defendant succumbed to temptation and conspired. It is not enough to point out the temptation and ask that the defendants bear the onerous, if not impossible, burden of proving a negative—that no conspiracy occurred. (2)

Even if "opportunity" were defined narrowly and limited to proven interfirm contacts, deeming opportunity to be prima facie proof of conspiracy would lead to widespread condemnation of procompetitive collaborations. Once competitors assemble for a lawful activity, they would be presumptive conspirators—even though subject to some opportunities for rebuttal—on every parallel action subsequently occurring. Because parallel pricing is common even in competitive markets, juries would be entitled to infer that competitors had agreed on prices, and price agreements are condemned absolutely. Thus, the effect of holding opportunity sufficient would be to discourage all trade associations, industry gatherings, or joint ventures. Thereby to imperil reasonable and procompetitive collaborations would be inconsistent both with the purposes of the antitrust laws and with well-established Supreme Court permission for many kinds of collaboration among competitors. (3) Mere conspiratorial opportunity is routinely and correctly held insufficient to support a conspiracy finding. (4)

In his *Twombly* dissent, Justice Stevens was willing to find sufficient allegations at the pleading stage from a combination of parallel behavior, numerous opportunities to meet, and one statement by a manager of one of the defendants to the effect that for the defendants to stay out of one another's territories was good business. (5) By contrast, the majority dismissed the complaint, finding little more than "descriptions of parallel conduct" and no "independent allegation of actual agreement." (6) The majority observed in a footnote, the complaint "mentioned no specific time, place, or person involved in the alleged conspiracies." (7) Further, "the complaint here furnishes no clue as to which of the four ILECs [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place." (8) In sum, a conceded "opportunity" to conspire was completely insufficient absent additional allegations about when and where such an opportunity occurred, and which of the defendants' employees participated.

In the *Travel Agent Commission* decision the defendant airlines in parallel fashion introduced several commission cuts that injured travel agents. (9) In addition, they had met several times and thus had an opportunity to collude, but the court concluded that mere parallelism and the opportunity to collude were insufficient. It rejected the plaintiff's argument "that no rational airline would attempt to cut commission rates without entering into a prior agreement because the leader airline would lose revenue to its competitors." (10) In support of this position the plaintiffs cited an attempt by American Airlines to cut commissions in 1983, which proved unsuccessful when other airlines refused to go along. (11)

To this the court replied, citing expert testimony:

> Each defendant could have calculated reasonably that a successful commission cut would yield greater net revenue than the likely net loss due to business diverted by plaintiffs to their competitors. This decision is especially plausible in a marketplace that has changed fundamentally since 1983 due to technological advances in airline ticket purchasing. Defendants contend that



© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

> new, alternate methods for airfare purchase—including direct purchases by customers on the internet—provided a greater economic incentive to cut commission rates on a trial-and-error basis. Defendants also assert that it was simple and inexpensive for a leader airline to innovate and then wait and see, with the hope and expectation that its competitors would institute similar cuts. If the industry did not follow, the leader airline could simply retract the cut. Thus, defendants have offered a reasonable, alternative explanation for their parallel pricing behavior. In addition, if we follow plaintiffs' argument to its logical end, it is difficult to imagine a scenario where a commission cut could *ever* occur without collusion. Based on these facts, we conclude that each defendant had a reasonable, independent economic interest in adopting a competitor's commission cut rather than to maintain the status quo. (12)

The court concluded that "based on the facts alleged by plaintiffs, it is just as likely that American's 2001 commission cap was an effort to reduce its internal commission costs, with the ancillary hope that its competitors would follow its lead." (13)

A dissenter complained that the majority required not merely "plausibility," as the Supreme Court had required in its *Twombly* decision, but also required that a plaintiff at the pleading stage show "a strong probability of winning the case and excluding any possibility that the defendants acted independently and not in unison." Indeed, the majority required "the plaintiff to offer detailed facts that if true would create a clear and convincing case of antitrust liability at trial without allowing the plaintiff the normal right to conduct discovery and have the jury draw reasonable inferences of liability from strong direct and circumstantial evidence." (14)

The dissent noted that there were not one but five independent rounds of commission fee cuts, all undertaken in parallel. The dissent complained that "[a]lthough at present there is no written contract to that effect, the facts alleged present so plain a case that they might as well have put the plan in writing." (15)

In *Weit* the plaintiffs relied heavily on simple opportunity evidence. (16) The defendant banks, members of a Mastercharge (17) bank card system in Illinois, were accused of conspiring to fix interest rates on their cards at 18 percent. It is unclear whether bank card users "comparison shop" enough to make such an agreement useful; the court overlooked the question, but we may assume arguendo that the banks had an adequate motive to conspire. They certainly had an adequate opportunity. In order to establish a compatible credit card system involving the interchange of funds and other necessary interactions between member banks, the defendants held regular system meetings. Furthermore, they met at annual bankers' meetings and on social occasions. Yet the court found that

> [the] only rational inference here is that the need to set up a compatible system mandated that defendants work together. Given the need for some degree of cooperation in a venture of this nature, the opportunity to conspire lacks significant probative value. (18)

Moreover, the parallel interest rates charged by the defendants were not inherently suspicious. The court found that they were adequately explained both by parallel costs and by the fact that 18 percent was the interest rate charged on most other competing credit cards. (A conspiracy among issuers of competing credit cards was not alleged.) Therefore, the grant of summary judgment for the defendants was affirmed notwithstanding ample conspiratorial opportunity.

In *Blomkest* (19) a divided Eighth Circuit also declined to find a conspiracy on the basis of evidence that included meetings at trade shows and conventions, accompanied by discussions and verification of prices. Further, as the dissenters noted, in some cases rivals at such meetings took the opportunity to complain or apologize to one another about low bids made to the other's customer. (20) Further, there was at least some evidence of solicitations to fix prices, although no explicit evidence of acceptance. (21) To us, complaints, apologies, and express solicitations are all highly suspicious and merit an injunction under the *Blomkest* circumstances. Whether they actually lead to higher prices and thus support the proof of any damages is another matter.

As these decisions illustrate, the term "opportunity" covers a wide range of possible contacts, from mutual access to the mails, through publicized meetings, to secret meetings behind closed doors. As one court put it, opportunity evidence

> may be arranged along a continuum of persuasiveness, from that which merely prevents a negative inference by demonstrating that communication and thus agreement were physically possible, to evidence of specific contacts and exchanges of information or suggestion which make agreement in some measure more probable. (22)

*General Electric* found insufficient evidence of a criminal price-fixing conspiracy in industrial diamonds between GE and DeBeers. (23) The issue was whether Philippe Liotier, who sat on the board of directors of a DeBeers subsidiary, had been acting as an agent of DeBeers when he obtained pricing information in his capacity as a purchaser of


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

diamonds from GE—information that GE had not supplied to other customers. No explicit evidence indicated that Liotier acted as an agent between the two diamond producers for the purpose of price fixing, and the court held that no inference of agency could be drawn from various meetings or conversations. At most, the court believed, the evidence showed only that Liotier had had opportunities to discuss diamond pricing with DeBeers and that prices for the diamonds under consideration subsequently increased at both firms.

The ordinary and justifiable contact between rivals, such as those in *Weit* and *General Electric* , do not suggest existence of a conspiracy. But we expect competitors to meet together only minimally and to assemble publicly for relatively open meetings conducted with a particular and justifiable purpose in mind. To the extent that rivals move away from this model, their activity becomes less consistent with normal competition and more consistent with a conspiracy to suppress it. Adverse inferences become stronger when we move toward meetings among rivals that are not satisfactorily explained by any legitimate purpose and stronger still when we come to hidden meetings, furtive behavior, and falsehoods.

### 1417c. Unexplained meetings or other communications.

Because contacts among competitors present a definite danger to competition, it is reasonable as a policy matter to require the companies that are meeting to explain their actions. When an innocent explanation is not forthcoming or is not plausible, the suspicion arises that the contact was made in furtherance of a conspiracy to suppress competition. To say, however, that a circumstance is suspicious is not necessarily to allow a jury to find a conspiracy and to support a conspiracy verdict.

Suppose that the principal producers of a product undoubtedly have met together and (1) offer no testimony whatever about what happened, or (2) all testify that they cannot remember what transpired, or (3) all offer a consistent and not incredible explanation of what was discussed. Let us suppose that the defendants are charged with a price-fixing or boycott conspiracy in circumstances where they would have a theoretical motive to conspire. First we consider what a reasonable fact finder might reasonably conclude. The critical challenge is to separate reasonable inference from rank speculation.

Although completely mute defendants are rare, silence may suggest that there is much to hide. But as a matter of fact divorced from antitrust policy, we are not logically entitled to infer from silence that any and every conspiracy that anyone may allege is thereby proved. But the policy that competitors ought not to get together without a legitimate reason requires some implementing sanction. As a matter of law, therefore, the alleged conspiracy should be held proved by a significant assemblage consistent with it as to which *no* testimony is offered. (24) Observe that such a policy generates no jury question, for the conspiracy conclusion rests not on factual inference but on a rule of law. (25)

Of course, such a legal rule dissuades total silence. Suppose that each defendant testifies that a meeting occurred but that she cannot remember what transpired. Here, there is the factual question of whether the witnesses are truthful. If not, we again proclaim a conspiracy to implement the legal policy that competitors make a sincere effort to explain their get-togethers. An actual failure of memory allows no inference of conspiracy in fact. Nevertheless, the courts could still impose upon competitors the duty to keep records in order to explain their meetings and enforce this duty by deeming an unexplained contact to prove an alleged conspiracy consistent with it. However, such a duty would have to be confined to more or less planned meetings as distinct from apparently unplanned contacts on the golf course, in airplanes, or in the course of otherwise explained gatherings such as trade association conventions.

Of course, defendants frequently offer an innocent topic for their interfirm contacts. “Innocent” here includes not only the clearly legitimate, as in *Weit* , and the competitively neutral, but even an illegitimate topic unrelated to the subject matter of the alleged antitrust conspiracy. (26) Accepting their explanation makes that meeting irrelevant to the conspiracy charged, while a false explanation could properly be treated the same as complete silence and thus serve as proof of any alleged conspiracy consistent with it. But the severity of this consequence of disbelief suggests caution in assessing truthfulness.

That competitors present at a trade convention had dinner together afterwards and talked about football or opera is not inherently incredible, although an assembly especially for that purpose might seem implausible. But we cannot assume that a scheduled gathering avowedly dedicated to a topic of plausible industry concern actually addressed the subject of the alleged conspiracy. To be sure, a jury might feel that each witness lied, and juries are sometimes allowed to infer fact *X* from disbelief of a witness's testimony concerning *Y* . Nevertheless, such disbelief cannot be added to a meeting to make it more probable than not that the defendants entered a forbidden agreement. To hold that such disbelief sustains a conspiracy verdict would be to hold that every interfirm contact, even that in *Weit* , would suffice to get a conspiracy claim to the jury and to uphold a conspiracy verdict. Such a holding would be unsound and contrary to the precedents noted at the beginning of this Subparagraph. When the defendant testifies plausibly about the subject of an interfirm contact, the court should


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

not find otherwise in the absence of other evidence of anticompetitive collusion.

### 1417d. Secret meetings and other furtive collaboration.

Furtive collaboration can be innocent or can reflect consciousness of wrongdoing. (27) An example of innocent stealth would be a hidden meeting to plan lawful lobbying, research, advertising, or joint ventures. Whenever rival firms or industries may lawfully be excluded from such activities, as would ordinarily be the case, concealment is proper. In the absence of such a justification, clandestine collaboration implies a consciousness of wrongdoing that, a fortiori, imports the ¶c analysis of unexplained meetings. Like before, a satisfactory explanation includes even unlawful collaboration on a subject other than the conspiracy alleged.

The policy against unjustified assemblies of competitors would again be implemented by holding as a matter of law that significant and unexplained furtive collaboration proves any alleged conspiracy consistent with it. Moreover, consciousness of wrongdoing justifies greater severity than the issues discussed in ¶c in three respects. First, the recommended policy in favor of keeping records about hidden contacts counsels against any qualification of the proposed holding for those who testify, even truthfully, that they cannot remember what occurred. Second, an avowed subject other than the conspiracy charged must not only be a matter of plausible industry concern but also one that reasonably calls for secrecy. Third, allowing a jury to disbelieve such an explanation would not imperil all interfirm contacts, only the furtive ones. Whether this last step should be taken depends upon the degree to which one believes that fact finders should be free simply to disbelieve such testimony. In any event, if additional consequences are attached to "furtiveness," the judge rather than the jury should determine its presence; otherwise, virtually any nonpublic element could bootstrap any interfirm contact to a jury, which, as noted in ¶c, would be unsound.

### 1417e. "Cover-ups" and other suspicious behavior.

The various legal rules governing the retention or suppression of evidence lie far beyond the present discussion of the factual and legal implications of concealment or destruction with a consciousness of wrongdoing. For example, we are not considering a firm's general document management policy calling for the annual destruction of all but specified files more than seven years old. To be sure, company officials surely know that any incriminating evidence in those files will thereby be destroyed. Nevertheless, eliminating old documents legitimately reduces filing costs; it justifies neither adverse inferences of fact with respect to any particular alleged conspiracy nor a legal rule equating a file management policy, even an unreasonable one, with whatever conspiracy happens to be alleged.

Even apart from any general document retention policy in a company, the unavailability of a particular document can be over-emphasized. In the *Trist* case, (28) for example, summary judgment was denied to banks charged with a conspiracy to fix mortgage terms. The court gave vague weight to the failure of the banks and their trade association to produce copies of certain monthly questionnaires regarding each bank's mortgage policies. But no sinister inference should be drawn from the absence of such documents, which had not been used in some four and one half years.

Whether behavior is truly suspicious depends upon the circumstances and on the plausibility of any explanation. Appraising the truth of an explanation implicates the issues discussed in ¶¶c – d. But let us assume suspicious and unexplained activity has transpired: imagine that an official of one firm charged with conspiracy was seen after midnight removing and shredding a file inscribed with the name of a rival company. We are entitled to infer an intention to conceal an embarrassment—perhaps clear evidence of a conspiracy, perhaps something that could be "misconstrued" as pointing toward a conspiracy, or perhaps something nonconspiratorial, such as industrial espionage. Added to other evidence, this could be probative of the conspiracy charged. (29) However, standing alone, one firm's suspicious destruction of a file with unknown content cannot be used against the other alleged conspirators unless they behaved similarly.

### 1417f. Contemporaneous false or incomplete explanations.

Falsity or incompleteness in the explanation accompanying an act risks two adverse inferences. First, it may suggest that a different "independent" and nonconspiratorial reason (30) was either a later fabrication or a true but insignificant motivation for the challenged act. Second, it may suggest that the actor wished to conceal his true motivation—perhaps a conspiracy.

This issue often arises in connection with an allegedly conspiratorial refusal to deal that was explained at the time in terms that now appear false or at least different from the explanation offered at trial. Many of these cases can be resolved without detailed analysis of possibly sinister fragments of evidence. No conspiracy can be inferred from parallel action in the absence of at least a theoretical motive to conspire. (31) Even in the presence of conspiratorial motivation, no adverse factual inference of contemporaneous concealment or later fabrication is warranted unless an innocent person in the defendant's position would probably (or surely?) have given a full or true explanation in


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

the first instance.

The *Beech* case illustrates the problems and several of the traps. (32) The plaintiff movie exhibitor alleged that defendant Fox, a distributor, agreed with General, a rival exhibitor, that it would license films solely to General and hence not to the plaintiff. (33) At the time, Fox explained to the plaintiff that a particular General theater had won exclusive first-run exhibition rights for a particular film. This turned out to be false, for another General theater exhibited the film at the same time. The falsehood might have implied that Fox had concealed an improper motive, perhaps the alleged general exclusive-dealing agreement. Fox attempted to rebut this interpretation by showing the plaintiff's unpaid debt. But the strength of such an independent and nonconspiratorial explanation was weakened by Fox's failure to mention it at the time. If important, it seemed the kind of fact that would be used both to explain Fox's actions and to encourage payment. The court upheld a jury finding of conspiracy based on this evidence—Fox's history of making such agreements with large exhibitors and the fact that Fox films received markedly increased promotion at General theaters during the conspiracy period. (34)

Compare the case of a seller who falsely justifies its price to a complaining buyer on the grounds of narrow profit margins or rising costs. No traditional conspiracy may be inferred, for we would not expect a nonconspiring seller to admit high profits or extortionate prices, however lawful they may be. Nor do we expect an oligopolist to tell a buyer that a price cut would prove profitless because he anticipates that rivals would quickly match it.

The *Lamb's* court was right to hold that inaccurate or inconsistent statements of the reason for not dealing with the plaintiff do not serve to establish a prima facie conspiracy. (35) Such statements can be relevant, but the court must use them with caution lest the wrong inferences be drawn from the courteous brush-off, the businessperson's casual way of speaking when precision is unimportant, or simple error.

### 1417g. Mere parallelism unexplained.

This Paragraph has been discussing false explanations, cover-ups, and unexplained interfirm contacts and the adverse inferences that might be drawn from them, either as a matter of fact or as a legal rule implementing an antitrust policy controlling behavior outside the marketplace. We now ask whether any similar inference or policy applies to unexplained parallelism standing alone. What is or should be the significance of the silence of defendants where the only evidence of conspiracy is parallel behavior on, say, price or on refusing to deal with the plaintiff?

There is some judicial language that might be read to draw an adverse inference from the failure to testify. For example, the Seventh Circuit once said that

> an inference unfavorable to a defendant corporation arises from failure to "tender the testimony, at their command, of any officer or agent of a [defendant] who knew, or was in a position to know whether in fact an agreement had been reached among them for concerted action." (36)

However, the court was drawing on *Interstate Circuit*, (37) where the Supreme Court had already judged that the challenged parallelism was extremely unlikely without advance coordination. (38) In that event, the burden of coming forward with nonconspiratorial evidence properly shifts to the defendants. But if the facts or circumstances do not otherwise warrant an inference of conspiracy, then mere parallelism does not satisfy the plaintiff's burden of proving that a conspiracy is more likely than not.

It might be argued that defendants acting in parallel should always, as a matter of antitrust policy, be judged to be conspirators in the absence of contrary testimony in order to encourage the production of all relevant witnesses. We argued for just such a policy in the case of meetings among competitors, but reject its extension here for reasons of precedent and principle. Such meetings are relatively infrequent and are themselves dangerous for competition, and they should be discouraged in the absence of legitimate explanations. Mere parallelism, by contrast, is widely present, especially in perfectly competitive markets, and is not itself a compelling subject for legal control. At all events, it seems clearly established that mere parallelism is insufficient to get to the jury. (39)

## References

1) On the pleading standards for conspiracy claims, see the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), discussed in ¶307, and see the numerous lower court decisions discussed in ¶307d1 concerning pleading standards for agreement cases in the wake of *Twombly*.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

2) *See Travel Agent Comm'n Antitrust Litig.* , 583 F.3d 896, 910 (6th Cir. 2009) (pleading that parallel caps on commissions were imposed a few months after defendants jointly participated in golf weekend insufficient); *American Chiropractic Ass'n v. Trigon Healthcare, Inc.* , 367 F.3d 212 (4th Cir.), *cert. denied* , 543 U.S. 979 (2004) (the mere fact that physician groups and insurers had opportunity to conspire to apply severe reimbursement rates to chiropractors is insufficient to establish an agreement to do so; in any event, if chiropractic was cost-effective, as plaintiffs claimed, the health insurer had no motive to enter a conspiracy to exclude them); *Graphics Processing Units Antitrust Litig.* , 527 F. Supp. 2d 1011, 1014–17 (N.D. Cal. 2007) (dismissing complaint notwithstanding allegations that defendants participated in some 30 industry conferences identified by date and location); *Fears v. Wilhelmina Model Agency, Inc.* , 2004 WL 594396, at *9 (S.D.N.Y. Mar. 23, 2004) (conspiracy among modeling agencies to fix commissions charged to models could be inferred from evidence of parallel pricing in addition to two plus factors—namely, a motive to conspire and an unusually high level of interfirm communication about prices and fees; trade association memoranda included such statements as "[t]he suggestion of increasing client service charge ... was not accepted by the Association ....The general feeling was that with the increase of modeling rates, and the agencies benefiting by models' commissions, clients would not be agreeable to a higher service charge." As the court concluded, "[t]his memorandum reveals both that one agency sought the 'acceptance' of the trade association before increasing its client service fee and also strongly suggests that the 'increase of model rates' was applicable to all members and not a decision made unilaterally by each company."); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.* , 231 F. Supp. 2d 1253 (N.D. Ga. 2002), *aff'd* , 346 F.3d 1287 (11th Cir. 2003) (defendants' discussions of specific price increases that might be brought about by proposed congressional legislation granting partial antitrust immunity was not sufficient evidence of price fixing; also rejecting for insufficient evidence claim that defendants used public statements of intentions to raise prices as signals, as well as evidence that price fixing was facilitated by the firms' provision of detailed pricing and output information to a clearing house that processed it). *See also* Max Huffman, Iqbal, Twombly, *and the Expected Cost of False Positive Errors* , 20 Cornell J.L. & Pub. Pol'y 1 (2010), which notes that excessive inferences of conspiracy from trade meetings will disincline business managers to engage in them, thus reducing the opportunity for discussion of developments and improvements in the industry.

3) *E.g., Maple Flooring Mfrs. Ass'n v. United States* , 268 U.S. 563 (1925) (competitors exchanging price information and holding meetings through their trade association not engaged in price-fixing conspiracy). On information exchanges via trade associations, see ¶¶2111 – 2112


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

4) Thus, the courts always conclude that the mere fact of meetings or discussions at which a conspiracy might have occurred, but without additional evidence of conspiracy, is insufficient. *E.g., Blomkest Fertilizer v. Potash Corp. of Saskatchewan* , 203 F.3d 1028, 1036 (8th Cir.) (en banc), *cert. denied* , 531 U.S. 815 (2000) (dicta, for much more than mere meetings was going on); *Souza v. Estate of Bishop* , 821 F.2d 1332 (9th Cir. 1987) (social contacts insufficient); *Cooper v. Forsyth Cnty. Hosp. Auth.* , 789 F.2d 278, 281 (4th Cir.) *cert. denied* , 479 U.S. 972 (1986) ("mere contacts and communications" insufficient); *Ralph C. Wilson Indus. v. Chronicle Broad. Co.* , 794 F.2d 1359 (9th Cir. 1986) (same); *Apex Oil Co. v. DiMauro* , 641 F. Supp. 1246 (S.D.N.Y. 1986), *aff'd in part, rev'd in part* , 822 F.2d 246 (2d Cir.), *cert. denied* , 484 U.S. 977 (1988) (same); *Hanson v. Shell Oil Co.* , 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied* , 429 U.S. 1074 (1977) (meetings insufficient); *Overseas Motors v. Import Motors Ltd.* , 375 F. Supp. 499, 534 (E.D. Mich. 1974), *aff'd* , 519 F.2d 119 (6th Cir. 1975), *cert. denied* , 423 U.S. 987 (1975) (bare physical possibility insufficient). *C-O-Two Fire Equipment Co. v. United States* , 197 F.2d 489, 493 (9th Cir.), *cert. denied* , 344 U.S. 892 (1952), declared that conspiratorial opportunity at trade association meetings is insufficient to imply conspiracy but may be taken into account along with other evidence. But perhaps the court meant only that opportunity completes the inference drawn from otherwise sufficient independent evidence of conspiracy. *See also High Fructose Corn Syrup Antitrust Litig.* , 295 F.3d 651 (7th Cir. 2002) (horizontal agreement could be inferred from fact that former employees of one defendant invoked Fifth Amendment, from parallel shifts in pricing formulas and issuance of identical price lists, or trade association meetings, plus other evidence).

*Contrast Eli Lilly Co. v. Zenith Goldline Pharms.* , 172 F. Supp. 2d 2001 (S.D. Ind. 2001) (finding disputed factual issues on existence of agreement between patentee and bulk supplier/licensee to boycott plaintiff); *Alexander v. Phoenix Bond & Indem. Co.* , 149 F. Supp. 2d 989 (N.D. Ill. 2001) (refusing to dismiss complaint that purchasers at tax foreclosure auctions conspired to suppress bidding prices); *Compact Disc Minimum Advertised Price Antitrust Litig.* , 138 F. Supp. 2d 25 (D. Me. 2001) (complaint was sufficient to state a claim that compact disc manufacturers and retailers agreed with each other to fix and maintain CD prices); *Sony Elecs. v. Soundview Techs.* , 157 F. Supp. 2d 180 (D. Conn. 2001) (plaintiff, patentee of V-Chip, stated claim that defendant television manufacturers conspired to fix the maximum license fee they would pay); *Mercedes-Benz Antitrust Litig.* , 157 F. Supp. 2d 355 (D.N.J. 2001) (consumer action; complaint adequately stated claim for price-fixing conspiracy, both horizontal and vertical, among Mercedes-Benz distributor and numerous dealers with allegations of dealer meetings at which importance of not cutting price was discussed); *Alexander v. Phoenix Bond & Indem. Co.* , 149 F. Supp. 2d 989 (N.D. Ill. 2001) (denying summary judgment as to most defendants on plaintiff's claim that defendant conspired to fix maximum bids at property tax auctions; suspicious meetings prior to auctions); *Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.* , 656 F. Supp. 1296 (C.D. Cal. 1986); *Posa v. Miller Brewing Co.* , 642 F. Supp. 1198 (E.D.N.Y. 1986); *Feldman v. Jackson Mem'l Hosp.* , 571 F. Supp. 1000, 1007 (S.D. Fla. 1983), *aff'd* , 752 F.2d 647 (11th Cir.), *cert. denied* , 472 U.S. 1029 (1985); *Kaczanowski v. Medical Ctr. Hosp. of Vt.* , 612 F. Supp. 688, 695 (D. Vt. 1985).

*Cf. Davric Me. Corp. v. Rancourt* , 216 F.3d 143 (1st Cir. 2000) (evidence indicated that one rival racetrack would have liked to boycott plaintiff's track and another once tried to engineer a boycott, but this was insufficient to establish the plaintiff's conspiracy allegations); *Salts v. Moore* , 107 F. Supp. 2d 732 (N.D. Miss. 2000), *dismissed* , 250 F.3d 741 (5th Cir. 2001) (dismissing on pleadings allegations that government officials conspired to make defamatory statements about plaintiff's funeral home and conducted illegal search of premises; allegations were completely consistent with unilateral action); *H.E. Reeves v. Laredo Ready Mix* , 589 F. Supp. 132 (S.D. Tex. 1984) (denying summary judgment for defendant where evidence showed little more than opportunity); *Brown v. Cameron-Brown Co.* , 1980 WL 1856 (E.D. Va. June 13, 1980), *rev'd on other grounds* , 652 F.2d 375 (4th Cir. 1981) (allegation of parallel action and conspiratorial opportunity and motive sufficient to prevent dismissal of complaint).

5) *Twombly* , 550 U.S. at 591 (Stevens, J., dissenting, joined on this portion by Justice Ginsburg).
6) *Id.* at 564.
7) *Id* . at 565 n.10.
8) *Id.*
9) *Travel Agent Comm'n Antitrust Litig.* , 583 F.3d 896 (6th Cir. 2009). *See also Nitro Distrib., Inc. v. Alticor, Inc.* , 565 F.3d 417 (8th Cir. 2009), *cert. denied* , 558 U.S. 1114 (2010) (plaintiff distributors of Amway's supporting materials failed to adequately allege conspiracy between Amway and a new supplier of these materials to allocate business to different distributors; court concludes that plaintiffs mischaracterized a vertical relationship as horizontal and that much of the evidence in fact showed Amway's independent interest in limiting the plaintiff's business).
10) *Travel Agent* , 583 F.3d at 908.
11) *Id.*
12) *Id.*
13) *Id.* at 910, citing and quoting ¶1410b.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

14) *Travel Agent* , 583 F.3d at 912 (Merrit, J., dissenting).
15) *Id.* The dissent characterized the majority as proposing

> to require either an express written agreement among competitors or a transcribed oral agreement to fix prices. Nothing less will do. Insider testimony, a strong motivation to collude, and aggressive, lock-step unanimity by competitors in pricing become insufficient to state a case.
>
> *Id.* at 915.

16) *Weit v. Continental Ill. Bank* , 641 F.2d 457 (7th Cir. 1981), *cert. denied* , 455 U.S. 988 (1982).
17) Now called Mastercard.
18) *Weit* , 641 F.2d at 462. *See also Kreuzer v. American Acad. of Periodontology* , 735 F.2d 1479, 1489 (D.C. Cir. 1984) (lawful general contacts insufficient).
19) *Blomkest Fertilizer v. Potash Corp. of Saskatchewan* , 203 F.3d 1028, 1036 (8th Cir.) (en banc), *cert. denied* , 531 U.S. 815 (2000).
20) *Id* . at 1045 (Gibson, J., dissenting), relating these accounts:

> Another time, a PCS employee took advantage of a trade meeting to apologize to Kalium's Turner about a low bid PCS had made by mistake. The PCS employee testified that he explained the mistake to Turner because he had "some concern that [the low price] may spread in the marketplace," and that he "was hopeful that it wouldn't go any darn further." Turner testified that Kalium matched the bid, but the reaction was "pretty much confined to that account. It did not go beyond that."
>
> Though PCS made most of these overtures, on isolated occasions others did the same. Kalium's Turner called Ripperger of PCA to complain about a salesman who was cutting prices in Wisconsin. Similarly, Kip Williams of IMC complained to Ripperger about price-cutting in Florida.

21) *Blomkest* , 203 F.3d at 1045.
22) *Overseas Motors v. Import Motors Ltd.* , 375 F. Supp. 499, 534 (E.D. Mich. 1974), *aff'd* , 519 F.2d 119 (6th Cir.), *cert. denied* , 423 U.S. 987 (1975) (bare physical possibility insufficient).
23) *United States v. General Elec. Co.* , 869 F. Supp. 1285 (S.D. Ohio 1994). The court granted a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, which means that the evidence is insufficient to support a criminal conviction. *Id* . at 1289.
24) This conclusion must, of course, be subject to any qualifications imposed in a criminal case by the Fifth Amendment privilege against self-incrimination.
25) Because this would be a legal rule rather than a factual inference, prospective announcement seems preferable to retroactive application.
26) Although defendants rarely claim that they met to discuss a forbidden subject, believing them means that this meeting does not imply a conspiracy on a different subject matter. For example, the defendants may have conspired to commit fraud, to violate the securities laws, or to engage in immoral activity while away from home at a convention. None of these would establish an antitrust conspiracy.
27) *See, e.g., Bray v. Safeway Stores* , 392 F. Supp. 851 (N.D. Cal. 1975) (jury verdict of buyers' price fixing upheld on evidence, inter alia, of secret unexplained meetings).
28) *Trist v. First Fed. Sav. & Loan Ass'n* , 466 F. Supp. 578 (E.D. Pa. 1979).
29) *See, e.g* ., *ES Dev. v. RWM Enters., Inc.* , 939 F.2d 547 (8th Cir. 1991), *cert. denied* , 502 U.S. 1097 (1992) (agreement between competing dealers to frustrate plaintiff's attempt to build a "mall" of multiple automobile dealerships could be inferred from meeting of the dealers, their retention of an attorney to advise them on legal tactics to use to object to mall's construction, and to jointly fund market study to supply data to be used in opposition to construction of such a mall); *Pacific Gas & Elec. Co. v. Howard P. Foley Co.* , 79 F.3d 1154, 1996 WL 102581 (9th Cir. Mar. 6, 1996) (unpublished), *cert. denied* , 519 U.S. 1056 (1997) (bid-rigging conspiracy among contractors could have been inferred from evidence that contractors met together, that a manager of one admitted that on other occasions he had submitted bids on behalf of other contractors, and that a witness testified that allocation of bids had been discussed in at least one meeting); *Medical X-Ray Film Antitrust Litig.* , 946 F. Supp. 209 (E.D.N.Y. 1996) (for purposes of considering motion to dismiss, these alleged facts constituted sufficient evidence to support finding of conspiracy: (1) manufacturers increased prices by comparable amounts each January; (2) sales representatives met and exchanged information on planned price increases before they were announced and supplied this information to their own sales representatives; (3) managers requested representatives to seek out information about rivals' planned price increases; (4) at least one manufacturer obtained internal documents from another manufacturer concerning prospective price increases); *Reazin v. Blue Cross & Blue Shield of Kan.* , 663 F. Supp. 1360 (D. Kan. 1987), *aff'd* , 899 F.2d 951 (10th Cir.), *cert. denied* , 497 U.S. 1005 (1990) (series of meetings plus memoranda among parties discussing plaintiff's termination sufficient to create jury issue on conspiracy).
30) For a discussion of the nature and significance of independent reasons, see ¶1413.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

31) See ¶1412.
32) *Beech Cinema v. Twentieth Century-Fox Film Corp.* , 622 F.2d 1106 (2d Cir. 1980).
33) The court regarded such an agreement as an unreasonable restraint of trade, although it did not analyze that question. See generally Ch. 16E.
34) The last fact could point the other way. Licensing first-runs to theaters able and willing to undertake promotion useful to the distributor explains a preference for such theaters independent of any promise not to license other first-runs to other exhibitors.
35) *Lamb's Patio Theater v. Universal Film Exch.* , 582 F.2d 1068, 1070 (7th Cir. 1978). The court appeared to think that this conclusion followed from the absence of a legal obligation on the part of the film distributor to give a would-be exhibitor any reason for refusing to deal.
36) *United States v. Standard Oil Co.* , 316 F.2d 884, 890 (7th Cir. 1963), quoting in part from *Interstate Circuit v. United States* , 306 U.S. 208 (1939).
37) *Interstate Circuit* case, *supra.*
38) See ¶1426.
39) See ¶1433.

© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Competition Law is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwercompetitionlaw.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.

Wolters Kluwer KluwerCompetitionLaw


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Document information

Publication
Antitrust Law - An Analysis of Antitrust Principles and Their Application

Jurisdiction
United States of America

Topics
Cartels

Bibliographic reference
'¶1421. Conspiracy or Competition in Other Markets or Times', in Phillip E. Areeda and Herbert Hovenkamp , Antitrust Law - An Analysis of Antitrust Principles and Their Application, (© President and Fellows of Harvard College; Wolters Kluwer 1978, Supplement No. 8/2023, August 2023)

# ¶1421. Conspiracy or Competition in Other Markets or Times

**Last Updated: 8/2023**

### 1421a. Introduction and summary.

Defendants who have conspired in the past or in other markets might be conspiring in the market under scrutiny. (It is convenient to designate the market under scrutiny as "here," which is distinguished from markets "elsewhere" in time or place.) Economic performance in comparable markets might also be probative: proof of conspiracy elsewhere may suggest that similar prices or actions here are also attributable to a conspiracy; or proof of competition elsewhere may suggest that less competitive performance here results from a conspiracy. Finally, the agreement elsewhere may be ancillary to the agreement locally.

In ¶¶c – d, we show that comparing the economic performance of two sufficiently similar markets may prove the existence of a conspiracy. Where a market is governed by a proved conspiracy that is necessary to the economic results observed there, a similar conspiracy must be present in an otherwise identical market with the same prices or other economic performance. Similarly, noncompetitive performance must reflect a conspiracy where competitive results are found in an otherwise identical market. Unfortunately, these propositions can resolve only the unusual case offering satisfactory proof about the similarity of markets and their relative economic performance. Sometimes the differences are subject to statistical study, such as a regression analysis, which must ordinarily be performed by an economist. (1)

We deal here mainly with less technical proofs, as discussed in ¶b. Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy. If the immediately challenged behavior would not imply a conspiracy among firms that are similar to the defendants (except for no conspiracy elsewhere), then a distinct conspiracy in the past or in a different market has little power to explain the present behavior. But if there is other evidence of a present conspiracy, the defendants' sins elsewhere may cast doubt on the truthfulness of their innocent explanations.

Of course, the scope of a proved conspiracy will often be uncertain. It may be difficult to define the boundaries of a conspiracy proved to cover an adjacent time period, product, or region. Competitors who were conspiring in this market yesterday may still be doing so today. Parties who are conspiring in New York may be doing the same in New Jersey.

If immediate parallelism is as likely to result from present interdependence as from proved conspiracy in the past, we should not lightly assume in fact or presume in law that the earlier conspiracy continues. Contemporaneous conspiracies in adjacent geographic markets could reasonably be deemed sufficient to transfer to the defendants at least the burden of going forward with evidence of an explanation that performance is different in the second market, that any motivation for conspiracy in one market does not extend to the other, or that the personnel or other circumstances make it unreasonable to interpret the proved conspiracy as extending to the adjacent market.

### 1421b. Scope of other conspiracy.

Once a conspiracy among certain defendants is proved with respect to one time, product, or place, we must consider whether it extends to the particular time, product, or place now alleged. There are three possible connections: the proved conspiracy might demonstrate an evil proclivity; there might be no natural boundary between the conspiracy proved and the one alleged; and the structural characteristics of the two markets involved might be sufficiently alike to mean that similar results imply similar conspiracies.

#### 1421b1. *Distinct past conspiracy.*

Although earlier illegal collusion among the same defendants has been mentioned in support of finding a later conspiracy, prior conspiracy is not alone probative of present collusion. (2) For example, price parallelism today among defendants who previously agreed expressly on common prices cannot be attributed to a present conspiracy when similar parallelism among those who had never had a cartel would be attributed to recognized interdependence rather than to a traditional conspiracy. The prior conspirators are subject to the same interdependencies and other market forces as those who had never conspired. That parties once met and agreed does not mean that they are still meeting and agreeing.

Illustrating this approach is the *Steel Castings* case. (3) The manufacturers of railroad couplers had once maintained a classic formal trust, which they later dissolved in order



© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

to avoid prosecution. Although coupler prices remained uniform during the decade following dissolution of the trust, the court found that the maintenance of uniform prices resulted naturally from interdependence and from government price controls and therefore did not suggest that the manufacturers had met in recent years to fix prices. The court's reasoning seems correct, although its interpretation of other evidence may have been unduly generous to the defendants. (4)

**1421b2. *Character and credibility.***

This is not the place for a general discussion of the law of evidence concerning patterns of conduct or character as bearing on an inference of a propensity to act in a forbidden way or on an appraisal of witnesses' credibility. Note only that participation in an illegal conspiracy elsewhere can affect a fact finder's view of a defendant's character and thus of the sincerity of an independent explanation of the conduct now challenged. Perhaps doubt about the defendants' present truthfulness is all that is meant by those courts that speak of the defendants' transgressions elsewhere.

The significance of such character evidence is, of course, weakened when the other conspiracy finding was itself highly circumstantial or when personnel have changed. More important, caution is required lest the defendants' demonstrated moral infirmities distract the court's attention from the distinction between tacit coordination through mere interdependence and traditional conspiracy and from clear identification of a plausible hypothetical motivation to conspire. (5)

Where a reasonable inference of conspiracy contends with the defendants' innocent explanation, evidence reflecting upon their character can undermine their credibility and tip the balance against them. In the *De Jong* case, for example, an inference of conspiracy arose when the defendant meat packers wrote oddly parallel letters to the stockyards from whom they purchased. (6) Each letter announced an intent to buy cattle after May 1 only on a "subject" basis—a form of warranty—rather than on the previously standard "as is" basis. The defendants explained the letters as an independently determined parallel response to a relevant court decision. In affirming a conspiracy finding, the court rejected this explanation as implausible and incredible in view of the fact that these defendants had conspired to effect the same change two years earlier and had abandoned that plan only in the face of litigation.

**1421b3. *Continuing conspiracy?***

We have been dealing with a distinct conspiracy elsewhere. But the very conspiracy proved for an earlier time or different market might extend to the time or market now in issue. The past conspiracy could still be operating or the current conspiracy in a nearby market could embrace other markets as well. Of course, challenged behavior resembling the subject matter of the other conspiracy can surely be attributed to that conspiracy when it is not consistent with mere interdependence. (7) But how are we to rule when the behavior now challenged might have resulted from mere interdependence, perhaps facilitated by the prior conspiracy, or from a continuation of the former conspiracy?

Suppose that the defendant oligopolists expressly agreed ten years ago that all would follow the price leadership of firm *L* , that the statute of limitation has run, (8) that they are still following the price increases initiated by *L*, that such price leadership could result from mere interdependence, and that tacit price coordination through mere interdependence would not be regarded as a conspiracy. (9) As a matter of fact, we are unable to find it more probable than not that the old agreement is still in effect, especially when the relevant personnel of the defendant firms have changed, as is likely over a decade. As a matter of policy, we might adopt a presumption that a conspiracy once proved is deemed to continue in the absence of affirmative evidence of explicit abandonment (10) or of changed circumstances.

Such a presumption responds to our legitimate concerns (1) that continuing or renewed but unproved agreements might exist or (2) that the earlier agreement facilitates tacit coordination today. Furthermore, it may seem fair to require the wrongdoers to take affirmative steps to undo or at least to disclaim unlawful collusion. That was the approach of the *Basle* case. (11) The defendant film distributors had maintained stable and identical systems of "runs and clearances" (12) in the plaintiff exhibitor's county for 20 years. The Court found that this system originated in a conspiracy but did not clearly decide whether the motive was to increase profits at the downtown first-run theaters then owned by the defendants or to limit competition among the distributors for exhibitor customers. (13) The defendants argued that any such conspiracy had been abandoned some years earlier when they were divested of their theater interests and that the system was maintained only because each distributor individually found it profitable to do so. The court rejected this contention and deemed maintenance of the old system to be a continuing conspiracy in the absence of affirmative evidence of abandonment. (14)

However, we should not require positive evidence of abandonment unless we can specify the act sufficient for the purpose and can reasonably expect innocent defendants to undertake it. In the *Basle* case, the court expected the defendants to alter their previous run-clearance schedules. In the preceding hypothetical, however, we cannot reasonably expect firm *L* to refrain from increasing its prices when it feels that the market would


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

accept them, or the others to refrain from following. Price leadership from a different firm would hardly be more competitive, although it might be somewhat more difficult because it had not been worked out in the past. Moreover, after the lapse of some years, the influence of the earlier agreement on the firms' present interdependent calculations becomes quite doubtful. In *Basle* , by contrast, mere inertia can explain the continuation of a system that no one is sufficiently motivated to alter. To be sure, there is one difference from the mere interdependence analyzed in Subchapter C: it may not be unfair to punish the defendants now for their earlier conspiracy. But even that difference disappears when the defendants have already been punished for their earlier conspiracy.

When present parallelism is as likely to result from present interdependence as from a proved conspiracy in the past, we should not assume in fact or presume in law that an earlier conspiracy continues. This conclusion is stronger as the lapse of time from the earlier proof is longer. With respect to earlier price fixing in particular, it would be unreasonable to expect rivals to produce variant prices today on pains of being held to a continuing conspiracy.

Nor should the conspiracy be presumed to continue when the surrounding circumstances have changed significantly. (15) The change in *Basle*, where the distributors dropped out of the exhibition business, was very significant.

**1421b4. *Adjacent contemporaneous conspiracy.***

Similar problems arise where a current conspiracy is proved in one market and the defendants are charging the same prices, contracting on the same terms, or dealing or not dealing on a similar basis in another market. Again, we can easily find a conspiracy in the second market if the defendants' behavior there is not consistent with independence or even with mere interdependence. But if interdependence alone could explain the behavior in the second market, are we entitled to find a conspiracy in fact or to deem one to be present as a matter of law? The ¶c economic reasoning may provide an answer in some instances, but let us defer that more general approach for a moment.

Suppose that the defendants have expressly agreed to charge certain prices or to use basing-point pricing in New York. The same defendants charge the same prices or use the same basing-point system in New Jersey. The inference in fact of a contemporaneous New Jersey conspiracy is more intuitively supportable than in the lapse-of-time situation. Unless the market circumstances are quite different in New Jersey, we need not assume that the defendants would limit their collusion to New York. Close geographical proximity is probably sufficient to support a conspiracy finding in the absence of probative rebuttal evidence. After all, it is the defendants who are in the best position to explain why they chose to enter a conspiracy in one place and not next door, at least when that conspiracy was consciously entered as compared with conspiracies inferred from weak circumstantial evidence. Where different products are involved, however, a prima facie case for conspiracy should require the plaintiff to establish a close similarity of the two markets, as we now discuss.

**1421b5. *Ancillary conspiracy in different market;* Matsushita.** (16)

In *Matsushita* the plaintiffs alleged a number of conspiracies among Japanese television manufacturers: (1) to fix high prices in Japan, (2) to not sell below certain prices in the United States, (3) to use only five independent distributors each in the United States, and (4) to destroy American manufacturers through predatorily low prices. Although only the last of these was relevant for reasons noted elsewhere, (17) the plaintiffs argued that all were part of a single large conspiracy or at least that the first three conspiracies were circumstantial evidence of the fourth. Plaintiffs frequently attempt to get to the jury on this basis even though they offer no other evidence of the relevant domestic conspiracy. The Supreme Court refused to allow this in *Matsushita*, where it approved the district court's grant of summary judgment in favor of the alleged conspirators. The Court's general point was that the existence of conspiracies to charge high prices in Japan or the United States does not support an inference of a conspiracy to charge predatorily low prices in the United States. (18)

The main problem with the *Matsushita* evidence is that the primary conspiracy—fixing high prices in Japan—is fully profitable itself and does not need to be explained by a secondary conspiracy elsewhere. The defendants might profit from high television prices in Japan whether or not they were also engaged in predatory pricing in the United States. Of course, a different outcome might be warranted if the readily proven conspiracy were to do something that would be unprofitable absent a secondary conspiracy elsewhere.

### 1421c. Conspiracy in "similar" market with "similar" results.

**1. The logical proposition.**

Imagine that a conspiracy is proved in one of two identical markets inhabited by the very same firms. Suppose also that prices, profits, or other challenged economic results or business behavior is identical in the two markets. If the proved conspiracy is actually necessary to effect the results present in the first market—and the defendants must have thought it was, else they would not have conspired—then similar results in the second market could not have been achieved without a conspiracy there as well. Identity of


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

markets, identity of results, and the necessity of conspiracy to these results in one market necessarily prove conspiracy in the other market. Furthermore, this proof does not depend upon the two markets in question being adjacent in time, geography, or product. A conspiracy in Asia proves a conspiracy in Boston when the three stated conditions are satisfied.

Although the argument of the previous paragraph is incontrovertible, its utility in actual litigation is questionable. Consider briefly the difficulties of establishing the three conditions.

**1421c2. *Conspiracy's necessity.***

It is often difficult to know whether a conspiracy caused or was necessary to the economic performance or behavior present in a market. If the defendants had not thought it was, they would not have entered into so perilous an undertaking. However, conspiracies are often inferred from evidence that does not reveal, or sometimes even suggest, conscious awareness of wrongdoing. And even conscious price fixing can lack effect, as is suggested by the difficulties many plaintiffs have in proving that they paid more than the price that would otherwise have prevailed.

**1421c3. *Identity or sufficient similarity.***

The number and identity of buyers and sellers, the decision-making personnel within them, the probabilities and characteristics of new entrants, and many other factors vary widely among markets that look similar at first blush. Of course, our initial logical proposition may be true for markets that are "essentially" identical. However, the opportunities for rampant speculation and conclusionary opinions by supposed experts are so overwhelming that we should despair of proving a sufficient similarity of markets, or of economic results, to invoke our initial logical proposition. It is probably not worth trying to prove, except as a factor bearing on the inference of a conspiracy in an adjacent market, as in the New York–New Jersey illustration in ¶b.

### 1421d. Less competitive performance than elsewhere implies conspiracy?

Similar reasoning provides another logical proposition, with similar difficulties of application. If two markets are identical in every respect (other than the possibility of conspiracy), then substantially less competitive performance or behavior in one of them must be attributable to a conspiracy. The logic is unassailable, but it will be difficult to prove the significant dissimilarity of performance or behavior that can be explained by no market, personnel, or other difference apart from conspiracy.

Even without exact identity in every respect, conditions preventing tacit price coordination in one market should have the same effect in a substantially similar market. Accordingly, if a given set of rivals maintains relatively competitive prices in one of those markets but not in the other, then an extra factor—such as an explicit agreement—must explain the significantly less competitive prices in the other market. This scenario invites this troubling question: Why would the defendants have confined their alleged conspiracy to only one of two substantially identical markets? If the answer is, for example, different personnel, then the conspiracy inference is no longer tenable; for the psychological factors may permit tacit price coordination in one market but not the other market. Thus, different results in apparently comparable markets are not explained by conspiracy unless essential comparability is proved or, which is the same thing, unless nonconspiratorial explanations for the price differences are excluded.

The difficulties of such market comparisons and their implications have already been discussed and are illustrated by the *Eli Lilly* and *Beatrice* cases. (19) In *Lilly*, the defendant manufacturers were accused of conspiring to fix the price of polio vaccine sold to public agencies in the United States. They had sold the vaccine at a succession of parallel "established" prices. The prosecutor offered to prove that they had in some instances offered disparate bids and had sold the vaccine to foreign governments at less than the domestic price. This evidence was intended to imply that vaccine prices were not naturally parallel and high and therefore that the domestic pricing practices were attributable to a conspiracy.

The court was right to consider such evidence, but it does not prove a domestic conspiracy. As it turned out, the court found that domestic price uniformity was explained by "most-favored-buyer" clauses, under which state and federal buyers require each supplier to charge them no more than the lowest price it charges its other domestic customers. (20) Such clauses did not apply to foreign sales, thus explaining the lack of uniformity there. (21)

Behavior in other markets was helpful in appraising the defendants' innocent explanation of their conduct in the *Beatrice* case. Three dairies were convicted of allocating bids for supplying milk to an air force base and a veterans' hospital in such a way as to sell uniformly at only a 2 percent discount from prevailing wholesale prices. The defendants attributed such uniformity to their standardized product made from ingredients purchased at common prices, processed under uniform union contracts, and sold within a small area. The court judged the defendants' explanation improbable in view of the fact that the same market circumstances existed three years earlier, when the


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

several defendants bid competitively at disparate discounts ranging from 0 to 10 percent below regular wholesale prices and with discounts ranging up to 15 percent on two hospital contracts.

## References

1) *See, e.g., City of Tuscaloosa v. Harcros Chems.* , 158 F.3d 548, 566 (11th Cir. 1998), *cert. denied* , 528 U.S. 812 (1999) (admitting economist's statistical market comparison as evidencing conspiracy); *Ohio v. Louis Trauth Dairy* , 925 F. Supp. 1247 (S.D. Ohio 1996) (similar). On the admissibility of such evidence, see ¶309 ; on the use of statistical inference in antitrust cases, see ¶393. *See also High Fructose Corn Syrup Antitrust Litig.* , 2002 WL 1315285 (7th Cir. June 18, 2002).
2) *E.g., C-O-Two Fire Equip. Co. v. United States* , 197 F.2d 489, 497 (9th Cir.), *cert. denied* , 344 U.S. 892 (1952); *Milgram v. Loew's* , 192 F.2d 579, 583 (3d Cir. 1951), *cert. denied* , 343 U.S. 929 (1952). *See Chocolate Confectionary Antitrust Litig* ., 801 F.3d 383, 403 (3d Cir. 2015) (proof of a price-fixing conspiracy in Canada was insufficient to establish a conspiracy in the United States:

   > A conspiracy elsewhere, without more, generally does not tend to prove a domestic conspiracy, especially when the conduct observed domestically is just as consistent with lawful interdependence as with an antitrust conspiracy. To hold otherwise would sanction the use of unabashed propensity reasoning—the fallacy that "if it happened there, it could have happened here"—to prove a domestic conspiracy using evidence of a foreign conspiracy.).

3) *United States v. National Malleable Steel Castings Co.* , 1957 U.S. Dist. LEXIS 4209 (N.D. Ohio 1957), *aff'd mem.* , 358 U.S. 38 (1958).
4) The court believed that the exchange of technical and cost information improved efficiency, disregarded meetings between accountants of the rival firms, admired the courtesy of one defendant for sending its price schedules to the others, and praised the defendants at length for producing a safe railroad coupler.
5) See ¶1412.
6) *De Jong Packing Co. v. United States* , 618 F.2d 1329 (9th Cir.), *cert. denied* , 449 U.S. 1061 (1980) (Packers and Stockyards Act case).
7) Conspiracy would also be excluded by the presence of independent and non-interdependent grounds for the challenged action. However, a prior conspiracy on the same subject implies interdependence unless circumstances have changed.
8) See ¶320.
9) See ¶1433.
10) A different issue is the withdrawal of one party from a proved continuing conspiracy. In such cases, the party claiming it has abandoned has the burden of producing evidence of withdrawal. *See United States v. Consolidated Laundries* , 291 F.2d 563 (2d Cir. 1961).
11) *Basle Theatres v. Warner Bros. Pictures* , 168 F. Supp. 553 (W.D. Pa. 1959).
12) These are the schedules determining the duration of initial and subsequent exhibitions and the period between first and second runs, etc.
13) The court seems to have concluded that the distributors feared that the exhibitors would force them to use less profitable runs and clearances if they did not present a united front.
14) The one defendant that had slightly altered its system was held to have withdrawn from the conspiracy.
15) *See, e.g., Processed Egg Prods. Antitrust Litig* ., 2016 WL 410279, at *4 (E.D. Pa. Feb. 3, 2016) (mere fact that the conspiracy had previously been challenged in court does not indicate abandonment).
16) *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* , 475 U.S. 574 (1986). *Cf. Maric v. St. Agnes Hosp. Corp.* , 63 F.3d 310 (2d Cir. 1995) (even assuming that staff physicians had conspiratorial capacity, an agreement to exclude the plaintiff could not be inferred from their collateral commitment to the "common end" of maintaining a high level of patient care).
17) See ¶1409.
18) For additional detail and arguments, see ¶¶310b, c4, and 1409.
19) *United States v. Eli Lilly & Co.* , 1959 Trade Cas. ¶69,411 (D.N.J. 1959); *Beatrice Foods v. United States* , 312 F.2d 29 (8th Cir.), *cert. denied* , 373 U.S. 904 (1963).
20) *United States v. Eli Lilly & Co.* , 24 F.R.D. 285 (D.N.J. 1959) (directing verdict for defendants).
21) Such clauses could also explain a higher price level domestically and might be regarded as a facilitating practice or as a "plus factor" sufficient to transform interdependent pricing into an "agreement." See ¶1435.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Competition Law is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwercompetitionlaw.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.

Wolters Kluwer KluwerCompetitionLaw


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Document information

Publication
Antitrust Law - An Analysis of Antitrust Principles and Their Application

Jurisdiction
United States of America

Topics
Cartels

Bibliographic reference
'¶1425. "Unnatural Parallelism" Too Close for Coincidence; Simultaneous versus Sequential Actions', in Phillip E. Areeda and Herbert Hovenkamp , Antitrust Law - An Analysis of Antitrust Principles and Their Application, (© President and Fellows of Harvard College; Wolters Kluwer 1978, Supplement No. 8/2023, August 2023)

# ¶1425. "Unnatural Parallelism" Too Close for Coincidence; Simultaneous versus Sequential Actions

**Last Updated: 8/2023**

## 1425a. Introduction and summary.

"Unnatural" parallelism refers to parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties. Of course, there may be a continuum of "advance understanding" ranging from the clear and strong to the vague and weak. Indeed, a long history of price following might well give the leader contemplating an increase substantial confidence that its rivals will follow. We put that situation aside until Subchapter C. This Paragraph examines the expressly communicated advance understanding that is inferred from behavior that cannot be reasonably explained without it.

If the actual defendants could not or would not have acted as they did without advance communication and understanding, then their action necessarily proves a traditional conspiracy. The logic is unassailable, but the conclusion obviously lies in the premise. As a practical matter, when can we know, and how sure must we be, that the defendants would not have acted without such communication and assurance? In rare cases, the existence of such a precondition to their action may be established by their own testimony or records. Ordinarily, however, it will be necessary to infer from the circumstances that parallel action depends upon advance communication and understanding.

Such an inference is easily made when the challenged action would simply not be possible without a traditional conspiracy. A good example would be identical secret bids on a made-to-order item unlike anything previously sold and not a mere assembly of common items with a standard price. (1) To be sure, even that parallelism might result from mere coincidence, just as it is conceivable that an ape with a typewriter might produce a Shakespeare sonnet through mere chance. Nevertheless, the law does not insist on absolute certainty and rightfully disregards such low-order possibilities. A directed verdict of conspiracy is warranted against the hypothetical parallel bidders. In less clear cases, the antitrust tribunal must make a more delicate judgment of whether it is more probable than not that parallel action is attributable to advance communication and understanding rather than to mere coincidence or mere interdependence.

Of course, chance is not the only nonconspiratorial explanation for parallel conduct. Each actor may simply have responded in an obviously reasonable way to a common external stimulus or business problem. If each was indifferent to the other's behavior, there would be no interdependence, no conspiratorial motive, and thus no reason to suppose that they did conspire. But if the interdependence prerequisite to a conspiracy inference is absent, the plaintiff's claim can ordinarily be rejected quickly on that ground. (2)

An illustration of behavior that is interdependent is when each firm's decision depends on what its rivals have done or are likely to do. If each defendant can easily alter its decision as a physical and contractual matter, and can do so with little or no loss of actual or potential profit, then the defendant may feel comfortable in acting without advance agreement with its rivals. It can act, or it can wait and revise its behavior after seeing what the others do. Otherwise, unilateral action will be very uncomfortable. At some point, the discomfort will be so great that no rational businessperson will take the challenged step without advance agreement. To restate this point in a formulation already explored in ¶1415, a conspiracy may be inferred if a defendant's action would have been contrary to its self-interest in the absence of advance agreement.

If the defendants themselves have revealed this conspiratorial mental state, we must find a conspiracy. Contrary testimony is more likely, but such self-serving assertions should be disbelieved and should also be insufficient to prevent a directed verdict of conspiracy where we are convinced that the objective "reasonable businessperson" would not have acted the way the defendants did without advance assurance. To be sure, that conclusion depends either on the fact or on the presumption of law that defendants are rational actors. But antitrust generally assumes such rationality unless there is reason not to, and then it ordinarily requires proof.

These formulations are not much disputed. The hard questions are ones of degree. When is parallelism "too close" for coincidence? When are interdependent decisions too perilous for each actor to make without advance agreement? Although the challenged behavior might come about simply through conscious parallelism, would it have been very difficult to attain without express collusion? Is the parallelism of an unusual sort that would not be expected without express collusion, even in an oligopolistic market? (3)



© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

After a brief qualification to the requirement of a conspiratorial motivation, we explore simultaneous and sequential parallelism and then uniformity on matters not likely to be coordinated even in an oligopoly. Although this simultaneous-sequential distinction is neither sharp nor crucial, it is useful to contrast (1) parallelism that is virtually impossible (or nearly so) without advance agreement with (2) parallelism that could result from observing rivals in the marketplace. Sometimes the latter will seem improbable in the absence of an advance agreement.

### 1425b. Conspiratorial motive prerequisite qualified.

A conspiracy cannot be inferred from parallel action unless there is good reason to believe that the defendants had a motive to conspire or, which is the same thing, that their behavior is interdependent. For example, that 1,000 sellers of beef charge precisely the same price at a given time does not provide evidence of a conspiracy if each is indifferent to what the others are doing. The much more obvious explanation is that they are competitors, all selling by reference to the going market price.

Of course, no showing of motive or interdependence is necessary for a written or distinctly witnessed exchange of promises to engage in common action. The contract is a conspiracy without proof of motive. Similarly, the parallelism that would have been impossible without express agreement warrants a conspiracy conclusion so strongly that we must believe a conspiracy occurred even though we can identify no motive for it. Although always subject to rebuttal, some conspiracy inferences are so powerful that they can be treated in the same way as a written contract. But dispensing with proof of conspiratorial motive as a prerequisite to inferring conspiracy is a narrow exception that applies where the traditional conspiracy is the only practicable explanation for the challenged conduct.

### 1425c. Incredible simultaneous parallelism.

Convincing evidence of conspiracy is *simultaneous* parallel action that is not a plausible coincidence or an expectable response to a common business problem. (4) When two competitors announce a price increase or an identical change in business at the very same moment, a conspiracy may be the explanation, although not necessarily, as we shall see. Thus, for example, in the *Text Messaging* case, the Seventh Circuit initially sustained a complaint of simultaneous changes in text messaging prices but then later approved the district court's grant of summary judgment to the defendant when the discovery record showed that the price changes were seriatim, not simultaneous. (5) Simultaneous price changes were highly suspicious, but seriatim changes were completely consistent with unilateral follow-the-leader pricing.

"Simultaneous" in this context is not limited to events occurring at a single moment. The definition is functional rather than literal and asks whether each alleged conspirator would normally have knowledge of another's act before deciding upon its own course of action. To be contrasted are sequential actions, discussed in ¶d, when a leader's action is known to others before they need to make their own decisions and when the leader can often alter or reverse his position after seeing what the others do. Thus, secret bids on a given contract are simultaneous even though submitted at different times. Rivals' responses at different times to a customer's request are simultaneous if each would not normally know the content of another's response. (6)

For example, in *Cement Institute* (7) the identical bids were opened after they were made, supposedly by bidders not having any communications with their rivals. The bidding was functionally simultaneous even though individual bidders may have filed their bids with the recipient at different times. This uniformity in closed bids is very suspicious. The opportunity to win a contract through a temporary and secret price cut could encourage defections from price uniformity. But where the bids cover standard "off the shelf" items ordinarily sold without secret bids, interdependent sellers wishing to maintain the prevailing market price are likely to use it for their secret bids as well, especially for bids that ultimately become public. The same would be true for standard goods or services sold only through secret bids that are frequent and ultimately public. But the inference of express collusion is strong where secret bids involve complex and uncertain calculations preventing simultaneous price uniformity in the absence of prior communication. Similarly, simultaneous uniform bids offering unusual discounts, markups, or other terms also imply advance communication among the bidders unless they are responding in an "obvious" way to a common stimulus.

Consider the *Taxi Weekly* case. (8) The defendant taxi fleet owners all telephoned cancellations of their long-standing bulk subscriptions to the plaintiff's trade paper within a half-hour period. They had made no prior complaints about quality, prices, or anything else. The defendants had attended a meeting of their trade association the day before. To be sure, the factors inducing one subscriber to cancel—such as the initiation of a rival publication involving the participation of an employee of that association—could lead the others to do the same. But the sudden unanimity of the cancellations within such a short time period, coupled with the hostile efforts of some of the defendants to induce major advertisers to cease advertising with the plaintiff, supported the jury's finding that the defendants had conspired to boycott the plaintiff.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

In *Standard Oil* , simultaneous removal by rival gasoline retailers of their price signs supported a jury verdict of a conspiracy among their suppliers to limit retail price competition. (9) Not only was the simultaneous action hard to explain without a conspiracy, but there was also evidence that a Tidewater representative had told the plaintiff dealer in that brand that removal of the plaintiff's sign would be followed within five minutes by removal of the price sign at the Shell station across the street. The plaintiff complied, the supplier made some telephone calls, and the Shell sign came down within the promised time. Two other dealers from other companies reported similar incidents. (10)

However, it is important to recognize that similar simultaneous actions may merely reflect independent responses to a common business problem. For example, in *Milgram* the defendant film distributors were charged with conspiratorially refusing to grant first-run exhibition rights to the plaintiff drive-in theater. (11) The defendants all explained their refusals in terms of the greater drawing power and greater regularity of exhibitions in downtown indoor theaters unaffected by weather or daylight—business reasons that the district court expressly refused to find unsound. The court seemed to believe that the very uniformity of explanations indicated conspiracy. As we saw earlier, (12) the *Milgram* holding seems quite wrong. The relative attractiveness of drive-in theaters for first-run exhibitions depends upon business facts and factors that would be equally known to and equally relevant to all of the distributors. That they reacted to these facts in the same way is to be expected. There was no reason whatever to suppose that independent actors entirely ignorant of each other's decisions would not come out the same way on drive-in theaters, and for the same reasons. (13)

An earlier film distribution case found a conspiracy with more justification. In *Ball* the defendant distributors granted all first-run exhibitions to the plaintiff's rival, Pennware, although the court believed that the plaintiff offered better terms and that the two theaters were of comparable quality. They were also within two blocks of each other. (14) The plaintiff testified that when he discontinued the lease of his theater to Pennware, an affiliate of distributor Paramount, Paramount had threatened to keep its fellow distributors from licensing films to him. The defendants had engaged in such conspiracies in the past to destroy the competition of independents with their affiliated distributors. (15) The defendants attempted to explain their preference for Pennware over the plaintiff by pointing out that Pennware's manager was a long-standing and reliable customer. The court rejected this excuse of independent decision making with the comment that the "gravamen of the instant offense" was an "extraordinary and unexplained unanimity of action by the distributors." (16) Finding a boycott conspiracy is justifiable in the light of the plaintiff's superior terms, similar conspiracies in other markets, the threat, and the weakness of the explanation.

But let us put aside the fact that the distributors also owned theaters and had previously protected each other's exhibition interests; suppose that the only incriminating fact in *Ball* was a parallel and simultaneous refusal to license the plaintiff where each distributor stated that the other exhibitor had proved reliable over many years. Such behavior, perhaps reflecting only inertia, does not speak well of the efficiency or competitive aggressiveness of the distributors, who would presumably be better off with two rival theaters bidding for exhibition rights. Although common use of a weak reason is very troubling, such inertia is common enough to prevent us from concluding that a conspiracy among the defendants is more probable than not. (17)

### 1425d. Perilous leading and sequential parallelism.

**1. *Generally.***

Sequential parallelism differs from simultaneous action in that one firm's price rise, warranty policy, refusal to deal, or other behavior becomes known to its rivals, who can then choose whether to imitate the move. The information or tacit invitation issued by the leader becomes known in the ordinary course of business in the marketplace. No additional fact, such as advance agreement, is needed to explain that process. As a result, agreement is ordinarily more difficult to infer from sequential actions, in which interfirm observation is possible, from simultaneous actions, in which it is not.

No advance agreement is necessary to explain leading or following for the bulk of business parallelism. In deciding whether to follow a rival's price increase, each firm knows that a widely unfollowed price increase will be rescinded. Accordingly, each rival will consider whether it is better off when everyone charges the same high or low price. (18) If the former, it will follow. By that process, noncompetitive prices and other practices, once initiated, can spread through a market without any traditional conspiracy.

Initiating a price increase or other move can also be explained without any advance agreement. The initiator and the early followers can always reverse the move if most rivals do not follow. Not much business or goodwill would be lost if the retraction was reasonably prompt, and perhaps none would be lost if the original announcement had a future effective date that was never reached.

However, there are some circumstances in which a would-be initiator fears (1) that it will


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

suffer significant losses if rivals do not follow and (2) that rivals will not follow. (Virtually everything we say about an initiator also applies to an early follower.) The would-be initiator will attempt to calculate whether the gains from a followed move substantially exceed the losses from an unfollowed move; she will discount the former and increase the latter according to the probability that rivals will not follow.

At some point the business risks of leading will be so great that no rational firm will take the first step without advance assurance that rivals will follow. That such a step nevertheless has been taken proves a conspiracy. But this proposition is easier to state than to apply, for it is difficult to know when the peril faced by a would-be leader is so great as to require advance assurance of a common front. The peril will be small when rivals are very likely to follow *or* reversal is relatively costless; the peril will be great when following is doubtful *and* reversal is costly.

**1425d2.** ***Prospect that a move will be followed.***

Without any advance agreement, the leader's expectation that rivals will follow it depends on the relative clarity with which widespread following will increase the profits of major firms within the market. Even a simple price rise will generate disparate reactions among firms that differ significantly in their costs or their demand elasticity estimates. The prospective profitability of altering business practices may be even more obscure to the other firms.

To judge the leader's estimate of whether rivals would follow as a step to judging whether the leader would have acted without advance assurance, we must either look to the leader's state of mind or, presuming her to be rational, look to the probable outlook of the reasonable decision maker in the leader's position. The leader's own trial testimony is likely to be self-serving. Unless internal documentation is revealing, we must infer state of mind from the business circumstances. Perhaps the only clear point is that a judge or juror cannot assess the probable reaction of rivals without first learning the business facts that would be relevant to them.

Of course, such matters are best known to the alleged conspirators and other firms in the market, perhaps including the plaintiff. Nevertheless, the defendants are not burdened with producing evidence in the first instance, and mere parallelism is generally held insufficient to create a prima facie conspiracy case. (19) Thus, it is part of the plaintiff's burden to give the tribunal some reason to believe that the leader, or a reasonable person in her position, would have had substantial reason to doubt that the initial move, if followed by most, would have been considered profitable. Such a showing might consist of little more than an appealing argument supplemented by expert testimony.

Unfortunately, knowing the leader's estimate of the likelihood that it will be followed does not tell us what degree of confidence it would require to proceed without advance assurances. The required confidence level depends both on the potential gain when most follow and the loss when they do not. At best, the relevant magnitudes available in antitrust legislation will be very crude.

**1425d3.** ***Consequence of unfollowed move: ease of reversal; cost of nonreversal.***

In very rough terms, we can gauge the relative ease with which an unfollowed move can be reversed. Even when following the leader seems improbable, the first firm to announce a price increase "effective next month" risks little or nothing, for that firm can quickly rescind the move if rivals fail to announce a similar move soon after. This is paradigmatic no-risk leadership. Even if the announced price increase went into effect before it was rescinded, a known policy of refunding the excess could minimize any loss of sales or goodwill. At the other extreme, an altered business practice that is immediately embodied in a long-term contract that the other party would not rescind could not be reversed at all during the contract period. In certain regulatory regimes, a filed price list will be binding for a prescribed period, or a revised price list cannot become effective until a specified time elapses.

Quantifying the losses that would result from an unfollowed move is even more difficult. The magnitude of the loss depends on the significance of any transactions governed by an unreversed move. Prompt reversal ordinarily means that few, if any, transactions would have been affected, and we might well presume that any loss (including sacrificed goodwill) will be modest in such cases. Of course, it is possible that those few transactions would be of great significance. For example, submitting an irreversible bid could cause the bidder to lose an extremely important contract if rivals bid less. As a generality, however, prompt reversibility probably indicates that only a very modest loss would attend the failure of rivals to follow a would-be leader.

### 1425e. Other lower court decisions on allegedly unnatural simultaneous or sequential parallelism.

In addition to *Interstate Circuit,* analyzed in ¶1426, consider the following.

**1425e1.** ***Sequential price movements or stabilization.***

In *Market Force* , the Seventh Circuit held that no agreement could be inferred from evidence that (1) real estate brokers had circulated information about the commission


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

that each broker acting as listing agent intended to give to other brokers acting as selling agents; and (2) after this information had been circulated, such commissions tended to become uniform. (20) When the plaintiff entered the market, commission splits between listing and selling agents varied widely, with some splits giving the selling agent as much as 40 percent of the total commission. After one realtor communicated to all others its intention to limit the selling agent's share to 20 percent, other realtors followed suit. In finding that this evidence did not tend to exclude the possibility of unilateral action, the court concluded that "evidence that brokers were aware of other brokers' policies regarding buyers' brokers before enacting their own policy is nothing more than a restatement of conscious parallelism," which is not enough to show an antitrust conspiracy. (21) Further, since brokers commonly act as both listing agents and selling agents in different transactions, the communication had a legitimate business purpose of informing other brokers that the sender was limiting the amount it would pay to them when they acted as selling agents for its listings. (22)

In *Petroleum* , the district court found the plaintiffs' evidence of parallel pricing behavior insufficient to avoid summary judgment. (23) The plaintiffs alleged horizontal and vertical price fixing among gasoline wholesalers, but their evidence of conspiracy was based mainly on information about retail prices, which were conceded to be quite uniform among the various brands. Further, there was no showing that retail prices rigidly tracked wholesale prices. Thus, uniformity of wholesale prices could not be inferred from uniformity of retail prices. Second, the plaintiff's evidence of "simultaneous" retail price changes among the defendants' various brands was actually evidence based on weekly observations, so the price changes may not have been simultaneous at all. Third, the plaintiffs' figures showed average prices across a large number of individual gas stations rather than individual prices, and averaging tended to exaggerate the uniformity in the prices from one brand to another. Finally, the court noted that "closely parallel retail prices" were as consistent with vigorous competition as with collusion.

Although it reversed on other grounds, the Ninth Circuit agreed, holding that no inference of conspiracy could be drawn from the fact that the defendants' price changes to dealers were parallel and seemed to be interdependent. The court reasoned that parallel price changes might be evidence of conspiracy in an unconcentrated market. In such a market, a firm that makes an unjustified price increase would quickly lose sales to others unless it has an understanding with them that they would raise their prices as well. However, in a concentrated market, such as the one at hand, a pattern of oligopoly coordination might give a firm reason to believe that its own price increases would be matched by others. (24) Thus, the presence of a concentrated oligopoly market tends to undermine the circumstantial evidence of agreement. This finding was bolstered by the court's observation that unmatched price increases in the market were quickly reversible, thus reducing greatly the risk of market share loss in the event the increase was not followed by competitors. (25)

Nor was the parallelism too incredible to be explained by ordinary price leadership in *Wilcox*. (26) The Ninth Circuit refused to infer a price-fixing agreement among banks whose prime rates changed in parallel. Each bank's prime rate was public knowledge, and the defendant bank admitted the practice of changing its prime rate whenever four out of seven banks whose interest rates it tracked changed their rates. However, the practice was determined to be in the defendant's independent self-interest, because the changes in interest rates reflected forecasts shared by the banking community in general about the supply and demand of money and the condition of the economy.

**1425e2. *Price fixing and boycott.***

By contrast to *Market Force* , (27) the Fifth Circuit found the degree of parallelism in the *Park* case sufficient to support a jury verdict that 68 real estate brokers conspired to fix prices and boycott the plaintiff, a price-cutting broker. (28) All were members of a multiple listing organization that made it possible for the properties listed with any broker to be sold by any of the others. When one broker sold a property listed with another, the listing and selling brokers usually split the brokerage fee. The court relied on the following evidence: (1) brokers selling a property listed with the plaintiff requested their customary 7 percent commission, rather than the flat fee charged by the plaintiff, even though the multiple listing book, which displayed the offerings of all brokers, stipulated a flat fee for the plaintiff's listings; (2) when the plaintiff attempted to sell the homes listed with other brokers, many sought to impose "punitive" splits that gave those brokers a larger percentage of the commission than the normal 50 percent share; (3) other brokers made disparaging remarks about the plaintiff, telling customers that he was not reputable; (4) these brokers may have made anonymous telephone calls to the plaintiff's customers; (29) (5) other brokers sometimes refused to show the plaintiff's listings (30) or represented that the properties had already been sold; and (6) on one occasion a defendant broker stated that the plaintiff would not "survive for long," because the other brokers would drive him out of business. The court said:

> The appellants contend that since the plaintiff relied on evidence of parallel conduct rather than on direct evidence of a boycott conspiracy, he was required to show that this parallel conduct was not in the [individual] realtors' self-interest ....


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

> Although this argument has some force, in the present context we ultimately disagree. Here, we are not faced with evidence that the defendants merely refused to enter into an unprofitable business relationship ....[Rather], they had disparaged him, had attempted to discriminate against him in the division of commissions, (31) and had interfered with his attempts to charge a flat fee. Given both the separate jury finding that a price-fixing conspiracy existed and the evidence of widespread parallel conduct, we believe that this is a setting where common action bespeaks accord. (32)

Real estate brokers were also charged in *Brokers' Assistant* with conspiring to deny information about their listings to the plaintiff publisher of a computerized list of properties for sale. (33) The brokers were denied summary judgment. Although this information was provided to others, there was evidence of conversations in which the defendants voiced to each other objections that the plaintiff's publication merely restated information generally available to brokers. The plaintiff argued that the real estate market would surely benefit from the wide dissemination of information about properties listed for sale. To the defendant's assertions of a long-standing policy of refusing to provide listing information to nonbrokers and concern about the accuracy of the plaintiff's lists, the plaintiff pointed out that the brokers often gave listing information to nonbrokers and said that he knew of no complaints about his accuracy. The court apparently thought that the defendants had a plausible motive to restrict the flow of information among brokers, notwithstanding the ready availability of the information in question and the absence of any broker objection to more information.

**1425e3. *Idiosyncratic pricing system.***

In the *Trist* case, 20 defendant savings and loan associations were charged with conspiring to use a peculiar hybrid formula for amortizing mortgages, which resulted in higher interest charges than other more common formulas. (34) Although there was no direct evidence of conspiracy, the court denied the defendants' request for summary judgment. It held that the jury could consider the plaintiff's claims that this formula was so idiosyncratic that it was improbable that the defendants could have independently adopted such a computation method without a conspiracy. This seems wrong. Even if the jury were capable of determining what is idiosyncratic, there is no reason to believe that each defendant could not have adopted an odd calculation method sequentially through mere recognized interdependence. The first to adopt such a method could probably have reversed it easily. If it generated more revenue, rivals would be likely to recognize that fact and react to it as they would react to a straight price rise. If they do not follow, the business lost by the leader in the meantime would probably not be large, in view of imperfect information among householders looking for mortgages and in view of the modest size of each transaction.

**1425e4. *Bid rotation.***

With insufficient evidence of an express agreement, analysis of bid rotation is complex. Might one firm refrain from bidding in the hope that its rivals would also behave similarly on later contracts? This would be very difficult to arrange for a dozen firms, but there were only three in the *Champion* and *Beatrice* cases. (35) In the former, the trial court found that the defendant competitors ceased to bid against each other as an "experiment." When each found that the others reciprocated, they continued this practice, which the court declined to characterize as a conspiracy until the parties began having meetings to discuss which deals each preferred. (36)

In *Beatrice* the court also noted that defendants Alamito and Beatrice took an Air Force base contract in almost perfect rotation at 2 percent below the wholesale price. A Veterans' Administration hospital contract, taken every time by defendant Roberts, involved almost exactly half as much business as the Air Force contract, so that each conspirator obtained one-third of the total government business. (37) Here, the number of such contracts was fewer than in *Champion,* which reduces the likelihood that each of the defendants would have risked an "experimental" abstention to see what developed.

**1425e5. *Market divisions.***

The *J&J Furniture* case raises a nice question. (38) Slumber and Brenham manufactured and distributed mattresses in Louisiana and Texas, respectively. Brenham began supplying a Louisiana discounter who became a major competitor of Slumber's dealers. In retaliation, Slumber supplied a Texas discount retailer. Each earned healthy profits from supplying the dealer in the other's state. While attending the same trade show, each terminated its out-of-state dealer at about the same time. The court found sufficient evidence of an agreement to allocate territories to require a trial and denied the summary judgment sought by the defendants. The simultaneous action in circumstances suggesting communication supports an inference of conspiracy. Their decisions were certainly interdependent, for there seemed no good reason to terminate a profitable arrangement except in exchange for similar action by the other.

Let us suppose that the *J&J* parties had acted sequentially, with no other evidence of conspiracy. Because it would have been unprofitable for one to terminate its out-of-state dealer without reciprocation by the other, we are entitled to see the first termination as


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

an invitation to its rival to follow—rather like a price increase. How likely was the other to reciprocate? If reciprocation did not occur, how much would the first terminator suffer? The court's opinion does not reveal the availability of effective substitutes or the business momentum that would be lost, but it would likely be substantial.

A much weaker basis than that in *J&J* for finding traditional conspiracy is a mere failure to expand or to solicit a rival's customers. Suppose, for example, that the *J&J* suppliers had never attempted to sell outside of their home states. It would be difficult to infer as a matter of fact that their selling patterns reflected any agreement or even any interdependence. After all, the behavior of each could as easily have been determined by limited capacity, increased costs of serving remote customers, doubts about probable success in a different region, and myriad other considerations bearing on the profitability of attempting to expand one's product or geographic operations. Even within a given market, it is easy to understand a court's refusal to infer a conspiracy from evidence that the defendant and its rival each refrained from soliciting each other's customers while "each channeled its solicitation efforts" toward winning new accounts and recapturing customers each had lost to a new rival. (39)

Of course, we can construct situations that appear less innocent, as discussed in connection with sham bidding and refusals to bid. (40) Consider a refusal to solicit a rival's customers in one's own primary operating area when each has excess capacity, adjacent plants, and customers of similar desirability. Although the facts will usually be ambiguous, let us suppose that a tribunal is persuaded that any reasonably competitive firm in this situation would try to win over at least some of its rival's customers. The rival's refusal to try to compete would then appear "unnatural" and suggest either (1) that the two sellers have expressly agreed not to solicit each other's customers or (2) that each refrains from seeking the other's customers in the hope that the other will reciprocate or in the fear that aggressive solicitation would surely invite counter-solicitation of her customers by the other. Perhaps a failure to solicit a rival's customers would be extremely perilous in the absence of an express agreement, but in the absence of such proof we cannot say that a traditional agreement is more probable than not.

Even so, it might be argued that tacit market allocation through mere recognized interdependence, such as in the preceding hypothetical and in the *Champion* case, should be treated as a conspiracy even if price leadership is not. This question will be examined in Subchapter C. (41)

### 1425f. Parallelism on unlikely matters, even in oligopoly.

Although noncompetitive parallel pricing among interdependent firms is easily explained without explicit agreement, some other types of parallelism are not ordinarily expected even in oligopoly. For example, nonprice competition can be intense even though the number of firms is too few to maintain price competition. Fierce rivalry is often observed in such matters as product innovation, product design, packaging, advertising, service, and marketing generally. The possible explanations are several. Nonprice rivalry can offer an oligopolist a greater hope of expanding his market share than a price cut could. Rivals, who can match a price cut immediately and perfectly, may not be able to imitate or offset a new product, or even a clever advertising campaign, quickly or at all. Nonprice competition may raise costs by less than an across-the-board price reduction would reduce revenues. Finally, to the extent that it increases real or perceived value to consumers, it supports the oligopoly price, or an even higher price, more firmly.

Would the absence of competition on these matters imply a traditional agreement? Would similarity of product design or advertising imply express collusion? Before trying to answer this question, a brief word about the legal and economic background is necessary.

Although express product standardization agreements raise a variety of legal issues, (42) one common concern is that standardization facilitates, and therefore may be evidence of, an express price-fixing agreement. The economic proposition is that rivals will find it easier to agree on prices and to monitor compliance with such an agreement when the product is uniform. The inference of a price-fixing agreement was held to be aided by the existence of an express product standardization agreement on, for example, milk and ice cream container size and construction, (43) and bottle cap construction, dimension, and even coloring and lettering. (44)

In the *C-O-Two* case the court not only inferred a price-fixing agreement but also seemed to infer an agreement to standardize fire extinguishers. (45) The latter inference was based on identical size, red color, and appearance of components such that rival products were indistinguishable without their labels. Indeed, one of the judges, dissenting from the denial of a rehearing, acknowledged that earlier he "was too much impressed with the fact of identity of appearance of the products of the several manufacturers." (46)

The court admitted that size standardization might be explained by the specifications of the independent Underwriters Laboratories and unrelated to the defendants. It regarded the other uniformities as unexplained. Of course, some identity would not be surprising for a product with the simple function of dispensing carbon dioxide, subject to insurer


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

standards, with an ideal color of fire engine red, and a public desire for a product that anyone can use quickly without bothering to read directions.

If there seems to be an objective "best" form of the product, we cannot be surprised that rival manufacturers all move toward it. However, we are accustomed to seeing rivals trade upon and promote their individual variations of a product in the effort to gain a market advantage by differentiating their products and outguessing competitors as to what will appeal to buyers' tastes. When they abandon this form of competition in favor of standardization, we are entitled to wonder about their motivations and about the manner in which industrywide uniformity arose. Nevertheless, one must be wary about drawing an inference of agreement from similarity of products, especially where possible variations would be unlikely to affect relative sales significantly.

## References

1) *Cf. FTC v. Cement Inst.*, 333 U.S. 683, 713 n.15 (1948), where the product was fungible (cement), but the bids were identical to the ten-thousandth of a cent.
2) See ¶¶1411 – 1415.
3) *See, e.g., City of Moundridge v. Exxon Mobil Corp*., 429 F. Supp. 2d 117 (D.D.C. 2006) (denying request for preliminary injunction in case alleging that natural gas companies inflated prices in wake of hurricanes; very little evidence of "plus" factors; in presence of tight supply high profits were not a good indicator of collusion).
4) *Compare Sausalito Pharmacy v. Blue Shield (Cal.)*, 544 F. Supp. 230 (N.D. Cal. 1981), *aff'd*, 677 F.2d 47 (9th Cir.), *cert. denied*, 459 U.S. 1016 (1982) (no conspiracy inference without acts against self-interest or circumstances logically suggesting traditional agreement), *and Murdaugh Volkswagen v. First Nat'l Bank of S.C.*, 639 F.2d 1073 (4th Cir. 1981) (judgment for bank allegedly conspiring with rival auto dealer to destroy plaintiff by not extending loan; bank officer had suggested that plaintiff sell certain assets to the rival, who phoned plaintiff after bank's decision; coincidences held too few and too insubstantial to imply conspiracy), *with Strobl v. New York Mercantile Exch.*, 582 F. Supp. 770 (S.D.N.Y. 1984) (upholding verdict of conspiracy by processors to depress buying prices on basis of "unusual parallel conduct"—failing to liquidate short orders and using "limit" rather than "market" orders, as well as express agreement to use same broker).
5) *Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010), *cert. denied*, 563 U.S. 961 (2011) (denying motion to dismiss); *Text Messaging Antitrust Litig.*, 782 F.3d 867 (7th Cir.), *cert. denied*, 577 U.S. 987 (2015) (sustaining summary judgment).
6) If the defendants admitted that they communicated their responses or intended bids to each other, we would no longer classify their actions as simultaneous, but such classification would be superfluous once they admit an agreement to exchange secret bids.
7) *See FTC v. Cement Inst.*, 333 U.S. 683, 713 n.15 (1948).
8) *Taxi Weekly v. Metropolitan Taxicab Bd. of Trade*, 539 F.2d 907 (2d Cir. 1976).
9) *Standard Oil Co. (Cal.) v. Moore*, 251 F.2d 188 (9th Cir. 1957), *cert. denied*, 356 U.S. 975 (1958).
10) *See also De Jong Packing Co. v. United States*, 618 F.2d 1329 (9th Cir.), *cert. denied*, 449 U.S. 1061 (1980) (Packers and Stockyards Act). The defendants had each sent out letters changing their warranty policies in an identical way, using similar phrasing, and setting May 1 (April 29 for one defendant) as the effective date. Assume arguendo that the letters were simultaneous, although the court said only that they were all sent during April. The choice of a single date does indicate advance agreement unless the characteristics of the trade make May 1 a "natural" date to begin the new policy. Similar phrasing is also suspicious unless it reflects the obvious way to state the matter. Simultaneous decisions to change the policy might be suspicious, although they follow on the heels of a certain state court ruling that might rationally have triggered a parallel response. The key to the court's approval of a conspiracy inference was the existence two years before of an aborted express conspiracy to do the same thing. See ¶1421b on the relevance of past conspiracies.
11) *Milgram v. Loew's*, 192 F.2d 579 (3d Cir. 1951), *cert. denied*, 343 U.S. 929 (1952).
12) See ¶1415e.
13) Conspiratorial motivation is also extremely doubtful in this case. See the discussion of the *Theatre Enterprises* case in ¶1412b.
14) *Ball v. Paramount Pictures*, 169 F.2d 317 (3d Cir. 1948).
15) On the relevance of past conspiracies, see ¶1421.
16) *Ball*, 169 F.2d at 320.
17) The implications of parallel rejection of an allegedly superior offer are explored in ¶1415e.
18) Whether the higher price is more profitable depends on such factors as costs, capacity, and expectations of each about demand elasticity.
19) See ¶1433.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

20) *Market Force v. Wauwatosa Realty* , 906 F.2d 1167 (7th Cir. 1990). *See also Wallace v. Bank of Bartlett* , 55 F.3d 1166 (6th Cir. 1995), *cert. denied* , 516 U.S. 1047 (1996) (no inference of conspiracy among banks from fact that all charged approximately the same fees for insufficient fund checks, that each bank made its fee structure public, and that according to expert testimony the fees were well above costs and could not have been maintained without an agreement).
21) 906 F.2d at 1172.
22) *Id.*
23) *Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.* , 656 F. Supp. 1296 (C.D. Cal. 1986), *rev'd on other grounds* , 906 F.2d 432, 443 (9th Cir. 1990), *cert. denied* , 500 U.S. 959 (1991). *See also Kleen Prods., LLC v. Georgia-Pacific LLC* , 910 F.3d 927, 937 (7th Cir. 2018) (dismissing complaint, noting problem of "perilous leading," where price or output leader's decisions could prove very costly if not followed, and thus its existence might indicate a preexisting agreement to follow the leader, citing ¶1425). *See also Park Irmat Drug Corp. v. Express Scripts Holding Co.* , 911 F.3d 505, 516–17 (8th Cir. 2018) (terminations from separate network benefit manager plans did not indicate agreement to terminate relationships with mail-order pharmacies, because the terminations were six months apart and under dissimilar circumstances).
24) *Petroleum Prods.* , 906 F.2d at 443. *See also E.W. French & Sons v. General Portland, Inc.* , 62 F.3d 1424, 1995 WL 470825 (9th Cir. Aug. 8, 1995) (unpublished) (although evidence of parallel pricing and memoranda among rivals discussing price stabilizing was as consistent with unilateral as concerted behavior, the additional fact that one alleged co-conspirator mailed pricing information to others in plain white envelopes and concealed the mailings sufficed to create inference of conspiracy sufficient to support jury finding). In *Coleman v. Cannon Oil Co.* , 849 F. Supp. 1458 (M.D. Ala. 1993), parallel movement of retail gasoline prices did not alone establish a price-fixing conspiracy. In addition, however, there was evidence of "prolonged periods of identical pricing followed by almost simultaneous changes; prices did not vary over time and between competitors." *Id.* at 1466, citing ¶1405 in a previous edition. Branded and unbranded dealers charged the same price in the town, even though the branded dealers charged more in other towns, and a drop in wholesale prices did not result in a drop in retail prices. When the lawsuit was filed, the defendants lowered their price by 5 or 6 cents, just as prices were rising in adjacent towns. The court concluded that this evidence could have reflected "interdependent conscious parallelism" and sufficed to support the jury's verdict for the plaintiff. *Id.* at 1470, citing ¶1434c in a previous edition. There was also anecdotal evidence that several defendants had individually entered agreements to fix prices, that one defendant seller successfully predicted how other sellers were going to set their prices, that one defendant had called other defendants and asked them to raise their prices, that when the defendants discussed gasoline prices they used the term "eggs and oranges" to disguise the fact that they were discussing price, and that one defendant had called other defendants to inform them that "everyone" was about to move the price in a certain direction. *Id.* at 1468.
25) *Petroleum Prods* ., 906 F.2d at 444. *See also Petruzzi's IGA Supermarkets v. Darling-Delaware Co.* , 1992 WL 212230 (M.D. Pa. July 31, 1992), *rev'd in part on other grounds* , 998 F.2d 1224 (3d Cir.), *cert. denied* , 510 U.S. 994 (1993) ("If the product is fungible, the probative significance of parallel conduct is lessened, because it is natural that competitors exhibiting good business judgment will tend to conduct their business in a similar fashion."). The Third Circuit found sufficient evidence of conspiracy from other factors.
26) *Wilcox v. First Interstate Bank of Or., N.A.* , 815 F.2d 522 (9th Cir. 1987).
27) *See Market Force v. Wauwatosa Realty* , 906 F.2d 1167 (7th Cir. 1990). *See also Wallace v. Bank of Bartlett*, 55 F.3d 1166 (6th Cir. 1995), *cert. denied* , 516 U.S. 1047 (1996) (no inference of conspiracy among banks from fact that all charged approximately the same fees for insufficient fund checks, that each bank made its fee structure public, and that according to expert testimony the fees were well above costs and could not have been maintained without an agreement).
28) *Park v. El Paso Bd. of Realtors* , 764 F.2d 1053 (5th Cir. 1985), *cert. denied* , 474 U.S. 1102 (1986).
29) The plaintiff's customers testified about the calls but did not know their origin.
30) The evidence was quite inconclusive on this point, however, and showed that more than 50 percent of the plaintiff's listings were sold by other brokers, and that this percentage was slightly higher than the average percentage for other brokers. 764 F.2d at 1060 n.10.
31) The court does not say whether other brokers were attempting to take more than 50 percent of a 7 percent commission, or of the plaintiff's customary flat fee. If the latter, this evidence represents nothing more than the defendant brokers' unwillingness to take less than their usual fee—about 3.5 percent—for selling a home listed by another broker.


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

32) *Park v. El Paso Bd. of Realtors* , 764 F.2d 1053, 1060–61 (5th Cir. 1985), *cert. denied* , 474 U.S. 1102 (1986). However, the plaintiff's use of a flat fee-listing arrangement may be explained by the fact that listing homes is cheaper than selling them. One who advertised a low commission could expect to receive many prospective sellers as clients, take the listings, and then hope that other brokers would make the sales. Thus, the plaintiff may have been attempting to free-ride on the sales efforts of others.
33) *Brokers' Assistant, Inc. v. Williams Real Estate Co.* , 646 F. Supp. 1110 (S.D.N.Y. 1986). *See also Re/Max Int'l v. Realty One* , 173 F.3d 995, 1009–10 (6th Cir. 1999), *appeal after remand* , 271 F.3d 633 (6th Cir. 2001), *cert. denied* , 535 U.S. 987 (2002) (conspiracy could be inferred from parallel decisions of real estate brokers to impose adverse commission splits on plaintiff when individually such splits seemed to be contrary to defendants' self-interest).
34) *Trist v. First Fed. Sav. & Loan Ass'n* , 466 F. Supp. 578 (E.D. Pa. 1979).
35) *United States v. Champion Int'l Corp.*, 1975 WL 920 (D. Or. July 16, 1975), *aff'd* , 557 F.2d 1270 (9th Cir.), *cert. denied* , 434 U.S. 938 (1977); *Beatrice Foods v. United States*, 312 F.2d 29 (8th Cir. 1963).
36) For further elaboration of the facts, see ¶1418b4.
37) For another aspect of this case, see ¶1421d4.
38) *J&J Furniture & Sleep Shop v. Sealy Se.* , 1981 WL 2104 (S.D. Tex. Feb. 24, 1981).
39) *See United States v. Borden Co.* , 111 F. Supp. 562, 579–80 (N.D. Ill. 1953), *aff'd on this point* , 347 U.S. 514 (1954) (refraining from actively soliciting competitors' accounts in order to solicit new accounts from a common competitor without evidence of an agreement to work in concert is insufficient for an inference of conspiracy).
40) See ¶1420c.
41) See ¶1436.
42) See ¶¶2014 (restricting inputs and suppressing their price), 2136 (facilitating collusion), and Ch. 22C (excluding rivals).
43) *Milk & Ice Cream Can Inst. v. FTC* , 152 F.2d 478 (7th Cir. 1946).
44) *Bond Crown & Cork Co. v. FTC* , 176 F.2d 974 (4th Cir. 1949).
45) *C-O-Two Fire Equip. Co. v. United States* , 197 F.2d 489, 493 (9th Cir.), *cert. denied* , 344 U.S. 892 (1952) (criminal price-fixing conviction affirmed).
46) *Id.* at 498.

© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Competition Law is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwercompetitionlaw.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.

Wolters Kluwer KluwerCompetitionLaw


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Document information

Publication
Antitrust Law - An Analysis of Antitrust Principles and Their Application

Jurisdiction
United States of America

Topics
Cartels

Bibliographic reference
'¶1428. Introduction and Summary', in Phillip E. Areeda and Herbert Hovenkamp , Antitrust Law - An Analysis of Antitrust Principles and Their Application, (© President and Fellows of Harvard College; Wolters Kluwer 1978, Supplement No. 8/2023, August 2023)

# ¶1428. Introduction and Summary

**Last Updated: 8/2023**

Until now, this chapter has discussed "traditional" conspiracies involving some measure of commitment by one person to another. We have seen many cases where there was no reason to suspect that the defendants conspired or indeed had any motivation to coordinate their behavior, because each believed that its own decision would not affect its rivals or cause them to act in a way that affected the profitability of the actor's own decision. We also saw many instances in which an actor had contrary beliefs, and that such interdependence sometimes contributed to the inference of a traditional agreement for Sherman Act §1 purposes.

We now consider interdependence as such. Although mere interdependent parallelism has not been held to constitute an agreement, we examine various arguments for so holding. The main reason for treating "tacit coordination" as a conspiracy is that the anticompetitive results often approximate those of express cartels, as discussed in ¶1429. However, such monopoly-like results are by no means inevitable. Further, as we see in our discussion in ¶¶1430 – 1431 of the circumstances in which such tacit coordination is more or less likely, the difficulties of appraising what is happening in any particular market are formidable. Further, doubts about the seriousness of the threat to competition are virtually always present.

In the ¶1432 analysis of reasons for and against treating interdependent behavior as a conspiracy, we see that the major practical obstacles to condemning interdependent pricing as a price-fixing conspiracy are the absence of a practical remedy other than judicial price control and the impropriety of punitive sanctions against the firm that independently chooses its own profit-maximizing course while necessarily taking into account market circumstances, including the likely reactions of rivals. Of course, these obstacles can be overcome by condemning only "avoidable" interdependent behavior—for example, basing-point pricing or other "facilitating practices"—and only for purposes of injunctive relief. These possibilities are explored in ¶1436.

Before getting to that concluding analysis, we see in ¶1433 that the courts have refused to treat interdependent parallelism as agreement in the absence of "plus factors." But, as briefly considered in ¶1434, some of the plus factors referred to merely restate the fact of interdependence and thus cannot support a conspiracy inference where interdependence itself does not.

To prepare for the final discussion of unilateral facilitating practices as "avoidable" interdependent conduct that might be regarded as a Sherman Act §1 agreement or Federal Trade Commission Act §5 unfair method of competition, ¶1435 considers the business utility and market effects of such devices as delivered pricing, advance price announcements, and most-favored-buyer clauses.

© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Competition Law is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwercompetitionlaw.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.




© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Document information

Publication
Antitrust Law - An Analysis of Antitrust Principles and Their Application

Jurisdiction
United States of America

Topics
Cartels

Bibliographic reference
'¶1429. Oligopoly Makes Interdependent Behavior Inevitable', in Phillip E. Areeda and Herbert Hovenkamp , Antitrust Law - An Analysis of Antitrust Principles and Their Application, (© President and Fellows of Harvard College; Wolters Kluwer 1978, Supplement No. 8/2023, August 2023)

# ¶1429. Oligopoly Makes Interdependent Behavior Inevitable

**Last Updated: 8/2023**

### 1429a. Interdependence.

"Oligopoly" means few sellers. (1) When there are few sellers they will almost always behave very differently from firms in a market with many sellers. The key to this difference is that an oligopolist's price and output decisions will have a noticeable impact on the market and on its rivals. In a market inhabited by 1,000 small firms, for example, a single firm could double its output without any expectation that total supply would be so affected as to cause any price change; the effects of the firm's increased sales would be so diffused among its numerous competitors that they would not be aware of any change. By contrast, in a market served by three large companies, each firm must know that if it reduces its price and increases its sales at the expense of its rivals, they will notice the sales loss, identify the cause, and probably respond. In short, each firm is aware of its impact upon the others. Though each may independently decide upon its own course of action, any rational decision must take into account the anticipated reaction of the other two firms. Whenever rational decision making requires an estimate of the impact of any decision on the remaining firms and an estimate of their response, decisions are said to be "interdependent." Because of their mutual awareness, oligopolists' decisions may be interdependent although arrived at independently.

### 1429b. Noncompetitive results.

Interdependent decision making can produce the same unhappy results as a cartel, although it need not always do so. Assume that a market is made up of five similar one-plant firms with similar costs and sales. If a monopolist with those five plants would maximize profits at particular price *X* , then a perfectly functioning cartel would set that price as well. Would oligopolists not engaging in explicit price coordination charge any less? On the one hand, each firm might assume that the other four will hold their own output constant and maximize its own immediate profits on that assumption. In such a "noncooperative" oligopoly the price would be greater than the competitive level but less than the monopoly level. Further, the price would decrease, moving toward the competitive level, as the number of firms in the market increase. (2) On the other hand, and with a somewhat higher degree of express or tacit cooperation, the firms might actually attain the monopoly rate of output and price, thereby attaining the same result as a monopolist or cartel would attain. This type of oligopoly is called "cooperative." In many markets the firms may move back and forth between the two types of oligopoly. Both may be enhanced by various "facilitating" practices, although cooperative oligopoly typically requires them more frequently.

In both the general result is the same, although the degree varies. The first firm in a five-firm oligopoly, Alpha, may be eager to lower its price somewhat in order to expand its sales. However, it knows that the other four firms would probably respond to a price cut by reducing their prices to maintain their previous market shares. Unless Alpha believes that it can conceal its price reduction for a time or otherwise gain a substantial advantage from being the first to move, the price reduction would merely reduce Alpha's profits and the profits of the other firms as well. (3)

Such "oligopolistic rationality" cannot only forestall rivalrous price reductions, it can also provide for price increases through, for example, price leadership. If the price had for some reason been less than *X* , firm Beta might announce its decision to raise its price to *X* effective immediately, or in several days, or next season. The other four firms may each choose to follow Beta's lead; if they do not increase their prices to Beta's level, Beta may be forced to reduce its price to their level. Because each of the other firms knows this, each will consider whether it is better off when all are charging the old price or price *X* . They will obviously choose *X* when they believe that it will maximize industry profits.

### 1429c. Nonprice competition.

Rivalry occurs not only in price but also in product quality and in sales promotion. Some products, like sulfuric acid, are not susceptible to much product variation or sales promotion. But the characteristics of a computer, automobile, or shirt can be varied and promoted in a number of ways. As a result, decisions concerning quality and sales promotion may be more complex than pricing decisions.

Oligopolists are typically readier to "compete" in sales promotion or product variation than in price. The possible reasons are several. Prices above competitive levels create a powerful incentive for each oligopolist to win increased business by any means that will not bring the whole price structure down. And unlike a price cut that can be exactly and



© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

DA11426

quickly duplicated by rivals, effective advertising or product alteration might be beyond imitation, or at least might be copied or offset by rivals only with considerable difficulty and delay. An advertising campaign or product variation may reflect rare skill and imagination. A style change can be followed, but not as quickly as a price cut. When the outcome is thus uncertain, a particular firm will be tempted to try to increase its market share by this route. And because there is always the possibility that a rival might make such a move, each oligopolist may feel compelled to continue planning for new advertising campaigns or style changes in order to be able to respond quickly when necessary. Moreover, there is the possibility that businesspersons often view nonprice competition as less "ruinous" or threatening than price cutting. Nonprice competition may increase costs by less than an across-the-board price reduction would reduce revenues. Finally, to the extent that it increases real or perceived value to consumers, nonprice competition supports the oligopoly price or even a higher price. In any event, collusion or coordination seems less frequent in these areas than in prices, even though the parties may realize that their product and promotional decisions are also interdependent.

Four points are worth emphasizing. *First* , firms may be sufficiently few in number to coordinate prices at noncompetitive levels through mere interdependence and yet may compete vigorously in other matters. The latter may include not only advertising and minor product variations but also research, development, and significant innovations. *Second* , such nonprice competition may improve the product, but whether the improvement is one that consumers prefer over lower prices is uncertain when buyers are never given that choice. A competitive market usually allows buyers a menu of price-quality mixes that is likely to be narrowed by oligopolistic price coordination. *Third* , nonprice competition might drive costs up to a point where the oligopolists do not earn high profits even though prices exceed the competitive level. *Fourth* , the subject of most of this Subchapter, antitrust law has only a limited role in attacking oligopoly as such; however, it can be brought to bear on practices implemented by a market's participants, which are designed to make the oligopoly result more likely or more effective.

## References

1) On the very basic economics of oligopoly and the distinction between "cooperative" and "noncooperative" oligopoly, see ¶404.
2) See ¶404. These results are quantified in most standard texts on industrial organization or microeconomics. *See, e.g.,* Jeffrey M. Perloff, Microeconomics ch. 12 (2008); Robert Pindyck & Daniel Rubinfeld, Microeconomics ch. 12 (8th ed. 2013). An accessible digital analysis is "Cournot Competition," https://inomics.com/terms/cournot-competition-1525473 (2022).
3) With different assumptions, Alpha's price reduction could be profitable. If *X* were not a hypothetical monopolist's short-run profit-maximizing price, an industrywide price reduction could stimulate industry sales enough to increase profits for all. Or Alpha might believe that a lower price would discourage entry and thus maximize long-run profits. Or if Alpha were more efficient than its rivals, it might capture a greater and more profitable share of industry sales at the lower price.

© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Competition Law is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwercompetitionlaw.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.

Wolters Kluwer KluwerCompetitionLaw


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Document information

Publication
Antitrust Law - An Analysis of Antitrust Principles and Their Application

Jurisdiction
United States of America

Topics
Liberalisation
Antitrust
Cartels

Bibliographic reference
'¶1430. Factors Affecting Likelihood of Oligopolistic Coordination', in Phillip E. Areeda and Herbert Hovenkamp , Antitrust Law - An Analysis of Antitrust Principles and Their Application, (© President and Fellows of Harvard College; Wolters Kluwer 1978, Supplement No. 8/2023, August 2023)

# ¶1430. Factors Affecting Likelihood of Oligopolistic Coordination

**Last Updated: 8/2023**

Notwithstanding recognized interdependence, oligopolists may have difficulty settling upon a noncompetitive price when there is great peril in charging a supracompetitive price that is not followed and when each is uncertain about its rivals' prospective responses. The uncertainty is compounded when costs and perceptions about market demand differ.

### 1430a. Verbal communication, direct and indirect.

Conventional negotiation and agreement would be the most effective route for arriving at a mutually acceptable price. Implicit verbal negotiation and agreement may also be possible when each firm's spokesperson states his views about demand, costs, or recent or forthcoming changes in them; about the characteristics, adequacy, or desirability of past, present, or prospective prices; about industry profit, revenue, prices, or other "needs"; or about his own firm's expectations or intentions with respect to output or prices. The more detailed each oligopolist's statements about its future price intentions become, the closer they approach traditional negotiations. And if each speaks seriatim, in as many "rounds" as necessary, until each states an identical price conclusion, the process approximates conventional verbal negotiation and agreement. (1) Observe that the process does not depend on any letters, meetings, or one-to-one communication. Seriatim public speeches or interviews with the press can be just as effective.

### 1430b. Nonverbal communication through known, repeated, and standardized transactions.

The process just described can be approximated much less precisely through nonverbal transactions in the marketplace. That is most apparent when standardized goods are repeatedly sold in market transactions that are immediately known in every detail by customers and rivals. In that situation, each seller may hesitate to reduce its price for even a single transaction out of fear that its other customers will demand similar concessions or that rivals will respond with a matching across-the-board reduction. Each seller will know, moreover, that every price increase (or reduction) may be perceived by rivals as an implicit invitation to accept and settle upon that price for the industry.

### 1430c. Uncertainty compared: infrequent or secret transactions; differentiated products.

A firm will be constrained by rivals' reactions when rivals can discover the firm's move soon enough to counter the move effectively. Similarly, one can risk leading a price rise if rivals are likely to follow or if, when they don't, one can withdraw the higher price without having suffered a significant loss of business in the meantime. The risk of leading or the "policing" of cartel-like prices depends upon this combination of knowledge about rivals' behavior and the ability effectively to alter one's own behavior "before it is too late."

If transactions are relatively infrequent, each firm will have less fear of rival imitation or retaliation because an observed transaction may simply not be comparable to another transaction occurring much later amidst substantially altered market circumstances. By the same token, long-past transactions give each firm but little assurance on how its rivals will bid in different circumstances today. If sales opportunities are rare, each has a powerful incentive to prevail at each opportunity. And if we add secret bidding and made-to-order goods, oligopolistic coordination will be very unlikely indeed. This is a particularly strong illustration of a more general proposition: uncertainty about rivals' behavior may force each oligopolist to act more like a perfect competitor, pricing nearer to its costs in order to win each sale.

Such uncertainty, with its attendant impairment of oligopolistic coordination, grows as the number of transactions declines, as public knowledge fails or lags and as transactions become less comparable. Different buyer preferences for different product brands or configurations complicate the process of observation, coordination, or retaliation. (2)

### 1430d. Customary patterns, formulas, or leadership.

Some products bear a customary relationship to something else. In that event, a price movement in the latter would be the occasion for changing the former's price. In other industries, there may be a formula for determining price, such as a customary markup on some published industry cost figure. The most flexible and obvious route for settling upon price is a tradition of following the price leadership of a particular member of the industry—often the largest firm. To avoid the appearance of a tacit industry agreement to


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

follow a particular leader, however, the dominant firm might on occasion refuse to raise its own price until a rival feels moved to act upon a significant and widely recognized change in demand or costs.

### 1430e. Cost asymmetry, capital intensity, attitude.

Great divergence among the interests of the several firms can prevent them from finding any monopolistic price satisfactory to all. The low-cost firm may earn greater profits with lower prices and higher volume for the industry and for itself than with higher prices and a lesser industry volume distributed more "democratically" among the rivals. Or a price satisfactory to most oligopolists may not generate enough business for one of them to operate its particular plant at a volume yielding unit costs low enough to allow any profit. Such a firm will take steps to increase its sales, even if the industry price falls as a consequence. At times, moreover, each oligopolist may be so "hungry" for sales—and know that its rivals are similarly situated—that it cannot risk the possibility that a rival will undercut the "monopoly" price. Each may then compromise that price and move toward the competitive price.

This is most likely to occur when demand weakens in capital intensive industries where high fixed costs impel some firms to win business by any means. Even a few such firms can collapse the monopoly price. Or a particular firm may price near competitive levels in an attempt to build market share at the expense of less efficient firms; it may fear that the dynamics of its particular market preclude standing still and dictate that one either grows or declines. Again, one major firm can prevent effective oligopolistic coordination in its market.

These several illustrations are particular manifestations of a more general point: the attitudes of the several firms bear very strongly on the possibility of effective price coordination among oligopolists. Such coordination is not likely to be effective when any significant firm chooses for any reason to "go it alone."

### 1430f. Number of sellers; fringe expansion.

Each of the above impediments to effective oligopolistic coordination will be increasingly exacerbated as the number of firms becomes larger. Where individual market shares are smaller, the consequences of cheating by a single firm are more difficult to detect. A larger number of rivals give each firm more to watch. The chances that one firm will be a maverick are greater. More elaborate communications are necessary to organize the larger number of participants. (3) At the same time, the number of firms posing a threat can vary greatly from one market to the next, depending on ease of entry and ease of coordination and the amount of information each firm has about its rivals. (4)

A related factor of great importance is the so-called competitive fringe. If smaller firms can expand, they may act competitively and increase output so long as the market price exceeds their costs and a reasonable profit. (5) If they find it profitable to expand their capacity at the price settled upon by the dominant firms, they will do so and will come to occupy an increasingly important place in the industry. The larger firms may thus be compelled to choose short-term monopoly profits with declining market shares or to sacrifice such profits by setting their price at a level that is not profitable enough to the fringe firms to encourage their significant expansion. Whether such a price would earn excess profits for the dominant firms depends upon the relationship of their long-run costs to those of the fringe firms.

### 1430g. Substitute products or new entry.

The availability of substitute products may so increase the number of players as to make coordination impossible. Or the closeness of substitutes or the ease of entry for new producers may so limit the opportunities for monopoly profits that efforts toward price coordination may not seem worthwhile. Stated simply, when the collective market power of the coordinating oligopolists is relatively low, their price coordination will cause relatively little harm to the economy. Just as the market power of a monopolist may be great or small, coordinating oligopolists might manage effective coordination and yet be able to profit little from it, because they face a highly responsive demand curve, meet competition from close substitutes, see that unobstructed new entry will be attracted by monopoly profits, or otherwise lack significant market power.

This is not to say that all oligopolies are harmless, but some degree of market power is implicit in virtually every departure from perfect competition. If the law is to move against market power, it can do so sensibly only by focusing its attention on instances of substantial power. For oligopoly as well as for monopoly, therefore, legal intervention must be predicated on a finding that the defendants' power is excessive. Accordingly, the Sherman Act §2 problem of assessing market power is equally present here. (6)

## References


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

1) Of course, antitrust law would find it easier to enjoin conventional meetings and agreements than to enjoin "mere free speech." See ¶1435c.
2) This fact accounts for some industry attempts to adopt delivered or basing-point pricing that standardizes transportation costs to reduce product variety or to adopt some common denominator for disparate goods. If, for example, the price of each of hundreds of steel products is determined by a specified standard addition or subtraction from the price of a specified "base" steel product, each transaction in any steel product would reflect a particular base price that would thus serve as a common and observable element in otherwise disparate transactions. See ¶¶1435 (possibly "unilateral" basing-point pricing as facilitating practice), 2025 (basing-point pricing resulting from acknowledged or proven agreement).
3) See generally ¶404.
4) *See* Richard A. Posner, Antitrust Law 70 (2d ed. 2001).
5) *See id.* at 70–71.
6) On market power, see Chapter 5.

© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Competition Law is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwercompetitionlaw.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.

Wolters Kluwer KluwerCompetitionLaw


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Document information

Publication
Antitrust Law - An Analysis of Antitrust Principles and Their Application

Jurisdiction
United States of America

Topics
Cartels

Bibliographic reference
'¶1433. What Courts Actually Do: Interdependent Parallelism Without "Plus Factors"', in Phillip E. Areeda and Herbert Hovenkamp , Antitrust Law - An Analysis of Antitrust Principles and Their Application, (© President and Fellows of Harvard College; Wolters Kluwer 1978, Supplement No. 8/2023, August 2023)

# ¶1433. What Courts Actually Do: Interdependent Parallelism Without "Plus Factors"

**Last Updated: 8/2023**

## 1433a. Introduction and summary.

The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act §1. (1) In *Brooke Group*, dicta spoke of conscious parallelism as a phenomenon

> *not in itself unlawful* , by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests. (2)

And *Twombly* made clear

> that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy ....Hence, when allegations of parallel conduct are set out in order to make a §1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. (3)

The Court then related this to pleading requirements:

> A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a §1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a §1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." (4)

Justice Stevens's dissent also agreed with the proposition that parallel conduct standing alone is insufficient, but he found the "something more" that would have carried the complaint across the threshold. (5)

Other cases hold that price parallelism, even when obviously interdependent, does not alone warrant an inference of conspiracy. (6)

There are two groups of precedents that might point toward the opposite conclusion. (1) Three older Supreme Court cases could be read to reach mere interdependent pricing, as we discuss here, although the lower courts have not so held. Rather, the courts have required additional "plus" factors, as are described in the next Paragraph. (2) Some of those very plus factors, such as conspiratorial motivation, seem to describe mere interdependence. However, we shall see in ¶1434 that the courts' frequent statements that parallelism cannot imply agreement in the absence of a motive to conspire means that the absence of such a motivation counts against a conspiracy inference, not that its presence allows a conspiracy inference.

## 1433b. *American Tobacco.* (7)

The Supreme Court affirmed the conviction of the three leading cigarette manufacturers for monopolization and conspiracy to monopolize as well as for attempted monopolization and conspiracy to restrain trade.

The defendants' pricing behavior certainly appeared noncompetitive. For the dozen years before 1940, they accounted for the bulk of cigarette sales, and throughout the period they charged uniform prices, which had been changed only seven times. When one manufacturer changed its price, the others quickly followed, suspending sales until their own new prices could be put into effect. In 1931, when they accounted for some 90 percent of sales, they raised prices notwithstanding the Great Depression and declining costs. As customers shifted increasingly to the less well-known "ten cent" brands made by others, the defendants "commenced to make large purchases of the cheaper tobacco leaves used for the manufacture of the lower priced cigarettes." (8) Because the defendants did not themselves use such leaves or otherwise explain their purchases, the government, and apparently the Court, inferred that the defendants sought to reduce the supply and drive up the price of the tobacco used by their lower-priced rivals.

Although the Court's reasoning was not altogether clear, it spoke mainly in terms of a


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Sherman Act §2 violation and adopted a good bit of Judge Hand's *Alcoa* language. (9) The *American Tobacco* Court's conspiracy language emphasized the defendants' unity of purpose. A conspiracy is established "[w]here the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." (10) This formula seems to cover the defendants' pricing as well as their exclusionary purchase of the cheaper tobacco leaf used by the "ten cent" brands.

The defendants' noncompetitive pricing could be explained by mere interdependence, as discussed in ¶1430. Moreover, no one defendant alone would be likely to bear the burden of buying up the cheaper tobacco leaf while its major rivals would reap the bulk of the benefit. That need not indicate any advance agreement, for one could begin the process and only continue it when the others did the same—just as one may raise prices but then retract the increase if the others do not follow. However, we can distinguish preclusive purchases from pricing. The former are easier for the law to identify and to remedy, as discussed in ¶1436.

#### 1433c. *Interstate Circuit.* (11)

The facts supporting the Supreme Court's affirmance of a conspiracy finding in *Interstate Circuit* were discussed in ¶1426. The Court said:

> While the District Court's finding of an agreement of the distributors among themselves is supported by the evidence, we think that *in the circumstances of this case* such agreement for the imposition of the restrictions about subsequent-run exhibitions was not a prerequisite to an unlawful conspiracy. It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce, which ... was unreasonable ... and knowing it, all participated in the plan. (12)

Although the Court discussed none of the reasons for equating interdependence with agreement, the relentless application of this formula could embrace all interdependent behavior, as explained earlier, (13) unless (1) the italicized phrase negates any general application, (2) "invited" and "advised" refer to direct communication rather than observation of marketplace behavior, or (3) "restraint of commerce" requires more than interdependent parallelism. In any event, this formula has not been used to reach oligopolistic pricing generally.

#### 1433d. *Norfolk Monument.* (14)

Five defendant cemetery operators had adopted various restrictive practices that made it difficult, if not impossible, for the plaintiff retailer to sell and install its bronze grave markers. These restrictions had been suggested by the defendant manufacturer of bronze grave markers, who also had pointed out to the cemeteries the profitability of doing their own retailing and installing of markers. Four of the five cemeteries were customers of the defendant manufacturer. The plaintiff claimed that the defendants acted jointly and violated Sherman Act §§1 and 2 but "admitted that it had no letters, agreements, correspondence, or any other testimonials to a conspiracy among the several defendants." Summary judgment in the defendants' favor was reversed per curiam. The Court believed that a jury could

> have found that the respondents had conspired to exclude the petitioner from and monopolize the market for bronze grave markers ....We express no opinion, of course, on the strength or weakness of the petitioner's case, but hold only that the alleged conspiracy had not been conclusively disproved by pretrial discovery and that there remained material issues of fact which could only be resolved by the jury after a plenary trial. (15)

The Court's short opinion was written by Justice Black, whose antipathy for taking any question away from the jury might explain his requirement of "conclusive disproof" by the defendants in order to win summary judgment. That is not the usual rule. (16) Nor did the Court consider why the cemeteries acting in their respective interests would find it useful to have either a horizontal agreement with each other or a vertical agreement with the manufacturer.

#### 1433e. "Plus factors" required.

The inelegant term "plus factors" refers simply to the additional facts or factors required to be proved as a prerequisite to finding that parallel action amounts to a conspiracy. In the absence of plus factors, there is no issue to submit to a jury, (17) and in the absence of a controversy about the existence of plus factors, there is no triable issue precluding disposition on summary judgment or, occasionally, at the pleading stage. (18) In *Twombly* the Supreme Court made the latter point clear, rejecting the lower court's conclusion that


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

"plus factors" are largely evidentiary and need to be established in discovery, but need not be asserted at the pleading stage. (19)

Even those courts that say that conscious parallelism is a factor "to be weighed, and generally to be weighed heavily" in establishing a §1 violation (20) are usually speaking about fact situations in which there is other evidence of conspiracy. In *Morton Salt*, for example, there had been "completely free exchange of pricing information"; various common codes, "keys and scales"; "telephone calls ... to ascertain if" price variations were errors or new prices; and at least one express assurance that a price change would be followed. (21) Similarly, the *Pittsburgh Plate Glass* court upheld a jury verdict finding a conspiracy on the basis of parallelism accompanied by evidence that one manufacturer announced at a meeting with rivals an intention to increase its price to a specified level, that others agreed at a later meeting on this course of action with announcements on a specified date, and that they increased prices on that day or within two days. (22)

These cases, and others, were described in *Delaware Valley* as cases

> utilizing the theory of conscious parallelism to find conspiracy [where] at least two of the following three circumstances are present: "plus" factors such as those emphasized in the simple refusal to deal cases ...; parallelism of a much more elaborate and complex nature; a web of circumstantial evidence pointing very convincingly to the ultimate fact of agreement. (23)

These and other facts that serve to transform parallelism into conspiracy, or that allow a jury to do so, are the "plus factors" that virtually every antitrust court requires. The discussion now turns to those factors, including those that facilitate tacit oligopolistic coordination. Facilitating practices are further discussed in ¶1435. Then ¶1436 considers whether interdependent behavior that can be more easily remedied than oligopolistic pricing should be treated as a conspiracy even though tacitly coordinated oligopolistic pricing is not.

The district court's *Cascades* decision sustained a complaint that manufacturers agreed with each other to license their patents only via a "defensive" patent aggregator, RPX. (24) The latter had entered nonexclusive agreements with the defendant device manufacturers to license patents on their behalf and allegedly negotiated reduced licensing rates. RPX also promised protection from invalid patents, presumably by obtaining validity opinions on behalf of all of its clients. The dispute arose when plaintiff NPE Cascades made each device maker individually a licensing offer, granting a heavy discount on certain patents to the first manufacturer to accept, but each declined, stating that they would negotiate only collectively through RPX. The court found that the complaint stated a claim but warned that the final outcome could rest on many issues, including determinations about the validity and infringement of Cascades' patents. In any event, parallel refusal to license another's patent is no more suspicious than the parallel failures to enter one another's territories in the *Twombly* case. (25) Individually, and consistent with its independent self-interest, each firm could readily have concluded that a particular patent held by a non-practicing entity was unnecessary to its technology, invalid, or overpriced. In this case, validity had not yet been determined, and the court expressed some doubt about it. It acknowledged that

> [t]here are a number of reasons why the alleged individual licenses might have been unattractive to an individual Manufacturing Defendant acting independently, including perceived weakness of Cascades' claims to patent validity, perceived weakness of Cascades' infringement claims, or a desire to repel perceived nuisance suits. (26)

Nevertheless, the court held, the claims of independent action and conspiracy were equally plausible, and in such a case a motion to dismiss should be rejected. The court appeared to assume that for a group of competitors to hire a common firm to filter patents based on quality and then act as a nonexclusive licensing agent was unlawful. It did not discuss standards that might have made group or parallel licensing valuable or multi-user economies of scale in the types of services that RPX could provide. In such a case the existence or not of plus factors could be significant.

## References


1) Our rationale for this position is stated in the previous Paragraph.
2) *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (emphasis added).
3) *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (to the extent it is relevant, H.H. was consulted by a defendant) (citing ¶1425 and Michael D. Blechman, *Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws*, 24 N.Y.L. Sch. L. Rev. 881, 899 (1979)).
4) *Twombly*, 550 U.S. at 557.
5) *Id.* at 572–73. *See* Herbert Hovenkamp, *The Pleading Problem in Antitrust Cases and Beyond*, 95 Iowa L. Rev. Bull. 55 (2010).



© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

6) *E.g., Todd v. Exxon Corp.* , 275 F.3d 191, 198 (2d Cir. 2001) ("even in the absence of direct 'smoking gun' evidence, a horizontal price-fixing agreement may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices."); *Blomkest Fertilizer v. Potash Corp. of Saskatchewan* , 203 F.3d 1028, 1033 (8th Cir.) (en banc), *cert. denied* , 531 U.S. 815 (2000) ("An agreement is properly inferred from conscious parallelism only when certain 'plus factors' exist"). *Baby Food Antitrust Litigation* , 166 F.3d 112, 122 (3d Cir. 1999), stated:

> Because the evidence of conscious parallelism is circumstantial in nature, courts are concerned that they do not punish unilateral, independent conduct of competitors ....They therefore require that evidence of a defendant's parallel pricing be supplemented with "plus factors."

The court later continued:

> From our own analysis of the evidence, we perceive no error on the part of the District Court in concluding that the evidence was insufficient to prove conscious parallelism. Because Gerber controlled 70% of the market in baby foods and was the acknowledged leader in this industry, Gerber's pricing understandably may have had an influence on its competitors' pricing. Conscious parallelism, however, will not be inferred merely because the evidence tends to show that a defendant may have followed a competitor's price increase.

*Id.* at 128.

*See also Merck-Medco Managed Care v. Rite Aid Corp.* , 201 F.3d 436 (4th Cir. 1999) ("In order to infer a conspiracy, conscious parallelism must be accompanied by 'plus factors.'"); *Japanese Elec. Prods. Antitrust Litig.* , 723 F.2d 238, 304 (3d Cir. 1983), *rev'd on other grounds* , 475 U.S. 574 (1986) ("While consciously parallel conduct has some tendency suggestive of concert of action, the tendency is so slight that we have held that circumstance, standing alone, to be legally insufficient"); *Quality Auto Body v. Allstate Ins. Co.* , 660 F.2d 1195 (7th Cir. 1981), *cert. denied* , 455 U.S. 1020 (1982) (even if defendants adopted same formula, jury could not infer conscious commitment to common scheme); *Weit v. Continental Ill. Bank* , 641 F.2d 457 (7th Cir. 1981), *cert. denied* , 455 U.S. 988 (1982); *Bogosian v. Gulf Oil Corp.* , 561 F.2d 434 (3d Cir. 1977), *cert. denied* , 434 U.S. 1086 (1978) (requiring evidence in addition to conscious parallelism); *Pevely Dairy Co. v. United States* , 178 F.2d 363, 368 (8th Cir. 1949), *cert. denied* , 339 U.S. 942 (1950) ("Each is forced by the situation itself to take into account the policy of his rival in determining his own [price], and this can not be construed as a 'tacit agreement' between the two"); *Wilcox Dev. Corp. v. First Interstate Bank* , 605 F. Supp. 592 (D. Or. 1985) (bank policy to change prime rate following four of seven specified major banks not conspiratorial); *Levitch v. CBS* , 495 F. Supp. 649, 674 (S.D.N.Y. 1980), *aff'd per curiam* , 697 F.2d 495 (2d Cir. 1983) ("interdependent conscious parallelism" insufficient); *United States v. Chas. Pfizer & Co.* , 367 F. Supp. 91, 101 (S.D.N.Y. 1973) ("parallel pricing ... standing alone, does not indicate price fixing"). The same point is made by many of the cases cited in ¶¶1411 – 1415, 1434, and 1436.

7) *American Tobacco Co. v. United States* , 328 U.S. 781 (1946).
8) *Id.* at 803.
9) On *Alcoa* , see ¶611.
10) 328 U.S. at 810.
11) *Interstate Circuit v. United States* , 306 U.S. 208 (1939).
12) *Id.* at 226 (emphasis added). *See also United States v. Paramount Pictures* , 334 U.S. 131, 142 (1948): "It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement."
13) See ¶1426d.
14) *Norfolk Monument Co. v. Woodlawn Mem'l Gardens* , 394 U.S. 700 (1969). See also ¶308c.
15) *Norfolk Momument* , 394 U.S. at 701–04.
16) *E.g., First Nat'l Bank of Ariz. v. Cities Serv. Co.* , 391 U.S. 253 (1968). See ¶308.
17) See the parenthetical quotations from the various decisions cited in note 6.
18) See ¶1434. On summary judgment and other early disposition, see ¶308.
19) *Bell Atl. Corp. v. Twombly* , 550 U.S. 544, 553, 569 (2007). *See* Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation* , 115 Nw. U. L. Rev. 1581 (2021).
20) *E.g., United States v. Morton Salt Co.* , 235 F.2d 573, 577 (10th Cir. 1956).
21) *Id.*
22) *Pittsburgh Plate Glass Co. v. United States* , 260 F.2d 397, 401 (4th Cir. 1958), *aff'd on other grounds* , 360 U.S. 395 (1959).
23) *Delaware Valley Marine Supply Co. v. American Tobacco Co.* , 297 F.2d 199, 205 n.19 (3d Cir. 1961), *cert. denied* , 369 U.S. 839 (1962).


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

24) *Cascades Computer Innovation, LLC v. RPX Corp* ., 2013 WL 6247594 (N.D. Cal. Dec. 3, 2013), *subsequent determination* , 2014 WL 900376 (N.D. Cal. Mar. 4, 2014). *See also Text Messaging Antitrust Litig.* , 782 F.3d 867 (7th Cir.), *cert. denied* , 577 U.S. 987 (2015) (seriatim, parallel price changes were to be expected and did not indicate conspiracy; approving summary judgment); *Florida Cement & Concrete Antitrust Litig* ., 746 F. Supp. 2d 1291 (S.D. Fla. 2010) (refusing to infer conspiracy from observed, presumably interdependent parallel price increases; claims were consistent with mere follow-the-leader behavior).
25) *Bell Atl. Corp. v. Twombly* , 550 U.S. 544 (2007). See ¶¶307a, d, 1405, 1415.
26) *Cascades* , 2013 WL 6247594, at *8 n.5.

© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Competition Law is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwercompetitionlaw.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.

Wolters Kluwer KluwerCompetitionLaw


© 2024 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

HEINONLINE

DATE DOWNLOADED: Wed Jun 5 15:31:30 2024
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
13248 I (1979) Railroad transportation policy act of 1979

ALWD 7th ed.
, Railroad transportation policy act of 1979, I (1979).

Chicago 17th ed.
"Railroad transportation policy act of 1979," U.S. Congressional Serial Set (1979): I-86

McGill Guide 9th ed.
"Railroad transportation policy act of 1979" [1979] I.

AGLC 4th ed.
'Railroad transportation policy act of 1979' [1979] U.S. Congressional Serial Set I

MLA 9th ed.
"Railroad transportation policy act of 1979." U.S. Congressional Serial Set, , 1979, pp. I-86. HeinOnline.

OSCOLA 4th ed.
'Railroad transportation policy act of 1979' (1979) I Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

Calendar No. 502

96TH CONGRESS } 1st Session } SENATE { REPORT No. 96-470

# RAILROAD TRANSPORTATION POLICY ACT OF 1979

## REPORT

OF THE

## SENATE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

ON

## S. 1946

TO REFORM THE ECONOMIC REGULATION OF RAILROADS, AND FOR OTHER PURPOSES

DECEMBER 7 (legislative day, NOVEMBER 29), 1979.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
54-921 O WASHINGTON : 1979

COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

HOWARD W. CANNON, Nevada, *Chairman*

WARREN G. MAGNUSON, Washington
RUSSELL B. LONG, Louisiana
ERNEST F. HOLLINGS, South Carolina
DANIEL K. INOUYE, Hawaii
ADLAI E. STEVENSON, Illinois
WENDELL H. FORD, Kentucky
DONALD W. RIEGLE, Jr., Michigan
J. JAMES EXON, Nebraska
HOWELL HEFLIN, Alabama
BOB PACKWOOD, Oregon
BARRY GOLDWATER, Arizona
HARRISON H. SCHMITT, New Mexico
JOHN C. DANFORTH, Missouri
NANCY LANDON KASSEBAUM, Kansas
LARRY PRESSLER, South Dakota
JOHN W. WARNER, Virginia

AUBREY L. SARVIS, *Staff Director and Chief Counsel*
EDWIN K. HALL, *General Counsel*
WILLIAM DIEFENDERFER, *Minority Staff Director*

# CONTENTS


| | Page |
|---|---|
| Purpose and short description | 1 |
| Background and needs | 2 |
| Committee action | 6 |
| Maximum rate regulation | 7 |
| Contracts | 8 |
| Divisions | 9 |
| Rate bureaus | 10 |
| Joint rates | 11 |
| Securities | 13 |
| Estimated costs | 13 |
| Regulatory impact statement | 15 |
| Section-by-section analysis | 15 |
| Rollcall votes in Committee | 47 |
| Changes in existing law | 48 |
| Appendix | 81 |

**Calendar No. 502**

96TH CONGRESS } SENATE { REPORT
*1st Session* } { No. 96-470

# RAILROAD TRANSPORTATION POLICY ACT OF 1979

DECEMBER 7 (legislative day, NOVEMBER 29), 1979.—Ordered to be printed

Mr. CANNON, from the Committee on Commerce, Science, and Transportation, submitted the following

## REPORT

[To accompany S. 1946]

The Committee on Commerce, Science, and Transportation to which was referred the bill (S. 1946) to reform the economic regulation of railroads, and for other purposes, having considered the same, reports favorably thereon with an amendment in the nature of a substitute and recommends that the bill do pass.

### PURPOSE AND SHORT DESCRIPTION

It is the purpose of this bill to promote the revitalization of the railroad industry in the United States by providing substantial regulatory reform. The bill takes steps to provide the railroads with greater pricing flexibility while retaining protection for captive shippers; it would also streamline the administrative process by simplifying transportation regulation and providing for expedited time frames wherever practicable.

Prior to introduction of S. 1946, the Committee held extensive hearings on S. 796, the Railroad Deregulation Act of 1979. While the hearings indicated that regulatory reform was necessary, there was substantial opposition to many of the provisions of S. 796. Based on the hearing record and on discussions with the railroads, shippers, unions, and other interested parties, S. 1946, the Railroad Transportation Policy Act of 1979 was introduced by Senators Cannon, Long, and Packwood. After further hearings and amendment, S. 1946 was ordered favorably reported by the Committee.

The bill is divided into three titles: Title I revises the ratemaking provisions of title 49, United States Code. It establishes a simplified threshold test for jurisdiction in lieu of the market dominance concept

which has proved extremely complex to administer. In addition, title I sets forth limitations on the type of rate proposals which may be challenged as unreasonably high, and it explicitly authorizes contract rates. Expedited procedures are created for divisions cases and suspension proceedings.

In order to encourage more selective pricing, a phase-down of general rate increases is mandated; the issue of whether this type of ratemaking can be eliminated will be separately studied by the Interstate Commerce Commission (ICC) and the Department of Transportation (DOT). Since the Railroad Revitalization and Regulatory Reform Act of 1976, P.L. 94–210, (4R Act) made substantial changes in the statutory provisions governing rate bureaus, extensive reforms were not deemed necessary in this area. S. 1946, as reported, permits rate bureau consideration of intrastate rates that affect interstate commerce, clarifies the statute with regard to the type of discussions which are permissible, and requires tape recordings or transcripts of rate bureau meetings and that a record be made of all votes.

Title II relates to industry structure. It imposes more stringent deadlines for abandonments and for most merger proceedings and other restructuring transactions. This title also makes it clear that a railroad which has been issued a certificate of public convenience and necessity may cross another railroad's line, and it provides that the Commission may require railroads to enter into reciprocal switching agreements where such agreements are in the public interest.

Title III clarifies the Commission's power to exempt rail transportation from regulation. It also restricts the Commission's car service powers to emergency situations, and encourages state authorities to exercise their regulatory jurisdiction in a manner consistent with standards established in the railroad transportation policy. Another provision authorizes Federal grants for conversion of abandoned railroad rights-of-way.

Finally, to foster rail technological improvements, the Federal Railroad Administration is given discretionary authority to grant exemptions from the Safety Appliances Acts' requirements when these requirements preclude development or implementation of new technology.

## Background and Needs

An efficiently operating transportation system is essential to the well-being of the Nation. About 20 percent of our total annual expenditures for goods and services goes for transportation of people or freight. More than 12 percent of our total civilian employment is in transportation or related industries, amounting to more than 10 million jobs in 1977. The tremendous demands on the national transportation network to move goods are evident when total freight ton-miles number over 2 trillion annually. Of this total tonnage, railroads carry over 70 percent of coal ton-miles and 60 percent of grain ton-miles. They are also the principal mode for pulp and paper products, automotive products, foodstuffs, chemical and primary metals. Unfortunately, at a time when the need for increased transport capacity is developing at a rapid pace, the railroads are the weakest sector in our transportation system, and the ability of the railroad industry to meet

its future responsibilities to society is considered by many to be in doubt.

Basically, the railroads cannot function without constant large infusions of capital. The ability to get capital depends on profitability. The railroads' profitability, however, has been declining since the boom World War II period when all-time peak earnings of $993 million were reported. The decline in earnings has occurred while the cost of capital has risen from 4 percent to double-digit percentages. For a disproportionate share of class I railroads, investment money is not available at any rate because of decreases in cash earnings versus increasing capital expenditure requirements on the one hand and, on the other, the increased cost of money which reduces the purchasing power of what earnings will buy.

After adjusting for inflation, railroad ordinary income today is one-quarter its 1947 level. Over the past decade the rate of return on the investment of Class I railroads in transportation property has averaged less than 2.8 percent. In a study by the Department of Transportation entitled "A Prospectus for Change in the Freight Railroad Industry" cash flow from internal operations and funds that could be raised from private capital markets were concluded to be insufficient to renew the existing plant and equipment and provide the capacity for anticipated levels of traffic. Specifically, cash flow from all Class I railroads in 1977 was reported to be $1.7 billion less than capital expenditures with projection that, excluding the capital requirements of ConRail, the rail industry will suffer a financial shortfall of $13 to $16 billion over the decade 1976 to 1985.

The rail industry's historical response to inadequate financial performance has been to defer maintenance and delay capital expenditures for roadway and equipment. This practice has led to reduced speeds under slow orders on 47,200 miles of track. This, in turn, has resulted in a deterioration of the quality of rail service and loss of business. In short, many of the railroads are caught in a vicious cycle. Depressed earnings have robbed them of the ability to make improvements inplant which are needed to reduce cost and improve service. The inability to reduce costs and improve service eventually erodes the railroads' competitive position and adversely affects their net income—as the cycle is repeated.

In reciting such facts, the temptation is to run up the danger flag over the entire railroad industry. It should be pointed out that the railroads, though financially troubled, are not in uniformly desperate financial straits. The severe distress of some carriers, such as the Milwaukee, the Rock Island, and other bankrupt or near bankrupt roads in the Midwest and Northeast, obscures the far stronger positions of roads in the South and West. Nonetheless, it does not take an accountant to determine that an industry operating in a financial environment illustrated by a declining rate of return over a 20-year period is, as a whole, in financial trouble.

Notable among the weaker railroads is the Consolidated Rail Corporation (ConRail). Formed out of pieces of six railroads, the Penn Central, Erie Lackawanna, Reading, Jersey Central, Lehigh Valley, and the Lehigh and Hudson, and with authorized Federal capitaliza-

tion of $2.1 billion, ConRail began operations on April 1, 1976. Although there was some recognition that ConRail might need additional Federal funds to obtain self-sustainability, at the conveyance of the bankrupt properties and startup of operations for ConRail, the financial forecast assumed that the $2.026 billion actually appropriated would be the total Federal investment required to revitalize the Northeastern region's rail freight system. ConRail was projected to become financially self-sustaining within 5 years but has failed to live up to its expectations. ConRail's losses during its first 2 years of operation have far exceeded loss projections with the result being the Federal investment in that railroad has increased by $1.2 billion.

As ConRail struggled in its initial years, two more midwestern railroads, the Rock Island and the Milwaukee fell into bankruptcy. In addition, other railroads in the national network have illustrated signs of serious financial problems that could make them prey for the same fate. The situation of railroads in New England is equally discouraging. The Boston and Maine is in receivership, and other lines could follow.

The Delaware and Hudson (D&H), which almost doubled in size by being required to absorb parts of bankrupt lines as a result of the desire to maintain some competition at the time of ConRail's creation, is also on the verge of bankruptcy. The D&H has been unable to operate its new segments without substantial Federal assistance and is currently able to continue operating only as long as there are Federal funds available.

The need for alarm rests on the interdependent nature of the rail network. Since approximately 70 percent of all freight moves from origin to destination through the interchange of that freight between two or more rail carriers, the fortunes of the stronger carriers of the West and South are, to that extent, tied to the efficiencies and capacity of the weaker roads.

Virtually every American has suffered some consequence of the rail industry's afflictions. In 1947, the railroads accounted for two-thirds of the total intercity freight ton-miles; today they account for only a little more than one-third. In the absence of traffic growth to offset gains in labor productivity, employment in the railroad industry has declined over 60 percent in the past 25 years. Moreover, shippers with a choice among transport modes have turned to trucks in ever increasing numbers. Shippers without a choice have had to carry a greater burden of higher freight rates and in many instances, poorer service.

The causes of the change in railroad circumstance from one of financial strength at the end of the 1920's to financial uncertainty at the end of the 1970's are found in the historical development of the railroad industry itself, in government policies, in competing transportation technologies, and in the changing national economy.

The technical and economic success of rail transportation was firmly established by 1850. The last half of the 19th century witnessed a phenomenal expansion of railroads. Many factors encouraged this expansion. Technological improvement continued to reduce railroad costs and to increase efficiency and safety. Growing public confidence resulted in the increasing investment of domestic and foreign capital.

After the Civil War, the Nation's population expanded into the West, and increased mechanization of agriculture led to higher production and greater need for economical transportation. Finally, aid was received from all levels of government in the form of bonds and land.

Unfortunately, rail expansion was too extensive. Overbuilding resulted in excess capacity and extensive duplication of competitive lines, both rural and urban. This persists as a problem to the rail industry even today. The total railroad mileage in the United States peaked in 1916 at 254,000 and has decreased steadily ever since.

Even in the period of fastest growth, price wars, which were considered intolerable by railroads, shippers, and Congress, resulted in unsatisfactory earnings and financial failures. To counteract this, railroad cartels were formed and soon financial abuses and excesses resulting from monopolistic practices became common. There was enough pricing collusion and pooling for railroads to effectively establish tariffs on the principle of monopolistic price discrimination; that is, the railroads were charging as much as the traffic would bear. The instability of railroad cartels and discriminatory practices of non-competitive rail industry resulted in the establishment of the Interstate Commerce Commission in 1887.

By the 1920's, the railroads' competitive environment began to change. Other modes of transportation—in part because of their technological advances, in part because of the provision of government infrastructure—provided increasingly tough competition for the railroads. The inland waterway operators and the pipelines diverted some bulk traffic and the trucks have taken a large share of higher-valued manufactured goods traffic. Pinched from both sides, the railroads' position had been weakened, with greatest harm coming in the manufactured goods area since here the rates of growth were the fastest and the revenue yields most substantial. Here also, though, the competition was most intense because service factors (speed, schedule reliability, etc.) were substantial. Patterns of output have since changed and, in its share of the economy, the Northeast has lost ground to the South and West. For some railroads this has been markedly debilitating, for others it has been a key to expansion. Even in face of a much altered competitive situation, cumulative regulatory attitudes reflecting deeply ingrained legal stadards and a status quo outlook has remained the governing regulatory policy for railroads at least until 1976 when the Railroad Revitalization and Regulatory Reform Act (4R Act) was enacted.

Overall the regulatory reform sections of the 4R Act have been viewed as good. However, the very positive, substantive and far-reaching changes of that legislation have not achieved their intended results of significantly reduced regulatory and bureaucratic lag, increased pricing flexibility and innovative and market-responsive pricing. On this, most parties of interest agree. The reasons as to what went wrong with the 4R Act differ.

The Committee examined this question in a hearing before the Surface Transportation Subcommittee prior to its consideration of the administration's proposal to deregulate the rail industry. During that hearing the Interstate Commerce Commission took the position that the

4R Act was generally constructive and would have been adequate if only the railroads had utilized the flexibility afforded them.

The Interstate Commerce Commission further indicated that not enough time had elapsed to adequately evaluate the 4R Act, since ongoing ICC rulemaking required a substantial amount of time to complete, and the rail industry response to procedures developed through rulemaking requires additional time. Also, some of the Commission's rules and decision pursuant to the 4R Act had been challenged in the courts, and others were being reviewed by the ICC for further modification. Particularly significant in regard to evolving ICC decisions and rules were the definition of market dominance and the extent of antitrust immunity for discussions at rate bureau meetings.

The railroads generally took the position that the 4R Act did not go far enough in granting railroads flexibility and that further rail deregulation was necessary.

The Department of Transportation's opinion was that the railroads had been too timid in using the new flexibility contained in the 4R Act, but far more important, the ICC had not adequately implemented the law and had taken too long in doing so. Additionally, according to the Department of Transportation, there were serious flaws in the 4R Act itself which require further legislation to correct.

Some have expressed doubts that regulatory reform will achieve in practice the benefits that can be shown in theory. Others think that if the regulatory lid is removed sufficiently, the same abuses of the powerful, aggressive and too often predatory railroad magnates of the past will spring back to haunt us. Still others believe that we have already gone so far toward emasculating the industry's initiative that the real problem will be to restore some of the dynamism which motivated the construction of the railroads in the last century. Almost all agree that something further must be done to improve the financial health of the nation's railroads or the industry will continue to falter with the likely alternative being only an increasingly heavy burden on the consumer and taxpayer. To the extent it remains desirable to continue private sector ownership of this nation's rail industry the need for this legislation is obvious and accepted. The goal is to allow for the restoration of the rail industry to vigorous and profitable growth. The Committee believes this goal need not be achieved to the detriment of rail labor, shippers, intermoral competitive relationships which foster healthy competition, or any other interest group. The rail industry may be allowed more latitude in ratemaking, operations, mergers, and abandonments. The only significant question is what is the proper mix of regulation and latitude in the marketplace necessary to maximize rail efficiency and service.

The Committee believes that the bill as reported achieves that proper mix without causing disruptions and inequities.

## Committee Action

On March 27, 1979, the Railroad Deregulation Act of 1979 (S. 796) was introduced at the request of the administration. From April 12 through July 6, 10 days of hearings were held on S. 796. At the conclusion of those hearings, the Committee believed that substantial changes

were needed in the regulation of the Nation's railroads. While these changes would build upon and extend the reforms brought about by the Railroad Revitalization and Regulatory Reform Act of 1976, the Committee did not believe that the reform needed was as extensive as the virtually total deregulation contemplated in S. 796.

On October 29, 1979, Senators Cannon, Long, and Packwood introduced S. 1946, the Railroad Transportation Policy Act of 1979. Between November 7 and November 16, 5 days of hearings were held on this legislation. The Committee considered this bill in executive session on November 27, and after adoption of a number of amendments ordered the bill favorably reported by a rollcall vote of 14 yeas to 0 nays.

### MAXIMUM RATE REGULATIONS

Title I of the bill provides new standards and procedures for the regulation of rail rates. It reaffirms the basic concept of the 4–R Act—greater pricing flexibility for the railroads where there is effective competition from other carriers or modes of transportation. However, the provisions of S. 1946 are designed to simplify rate regulation by setting forth a clear threshold test, a free zone for rate increases which do not exceed the railroads' increased costs, and a rate flexibility zone which is free from investigation and suspension, but may be challenged on complaint. In this matter, the Committee hopes to avoid many of the problems that arose in connection with implementation of the complex concept of market dominance.

The Committee has a continuing concern with the precarious financial condition of many railroads. The Committee believes that it is important to assist the carriers in achieving adequate rate levels. Noncompensatory rates must be eliminated. Rates that are marginally profitable should be increased whenever possible, where such increase will not result in diversion of traffic. More economical and efficient service must be provided if the railroads are to compete effectively. The Committee believes that more selective pricing and less reliance on general increases will improve the carriers' competitive position. At the same time, the Committee wishes to make it crystal clear that the adequate revenue level provisions are not to be construed in a manner which ignores other important considerations of this title and 49 U.S.C. This bill provides continued protection for shippers where such protection is necessary in the public interest. The Committee expects this protection to be utilized by the Commission to prevent extensive cross-subsidization or an excessive contribution from captive traffic. The rates on coal are of particular concern in view of the many substantial increases imposed on this traffic in the last several years. While recognizing that not all traffic can be transported at a fully allocated cost level due to competitive considerations, it is the Committee's intent that the Commission play an active role in insuring that such traffic bears its fair share of costs and that higher rated captive traffic is not unduly burdened.

The bill provides a jurisdictional test based on an average ratio of revenue-to-variable cost that rail carriers would be required to realize, under honest, economical, and efficient management, to cover total operating expenses, plus a reasonable and economic profit or return (or

both) on capital employed in the business sufficient to attract and retain capital in amounts adequate to provide a sound transportation system. Below this level, absent discrimination or preference and prejudice, the railroads are free to raise prices as they choose in order to maximize revenues. As indicated above, rate freedom is also provided for cost increases, and a separate zone, free from investigation and suspension, is provided for rate flexibility.

The threshold test is not an ultimate regulatory standard. Rather, it is designed to direct the Comimssion's regulation to areas where the public interest needs protection. Above the threshold, where cost-based increases under section 103 are not involved. the Commission is expected to apply traditional tests of reasonableness, including costs and rate comparisons, to determine the lawfulness of proposed rates. The Committee expects innovative pricing and service under this legislation. Explicit authorization of contract rates also offers substantial potential benefits to carriers and shippers. The Committee emphasizes that the railroads must improve their efficiency and cannot expect to achieve revenue adequacy by simply increasing rates which are already at a high level in relation to costs. The Commission is directed to continue to provide protection in such situations.

The bill provides a phase-down of general increases during the next 3 years and directs separate studies by the ICC and DOT to determine the feasibility of eliminating general increases. The phase-down should encourage a de-emphasis of this type of ratemaking.

S. 1946 does not change minimum rate regulations. The 4-R Act incorporated new standards for minimum reasonableness. Since those standards appear to be working satisfactorily, further changes in the minimum rate area are not deemed by the Committee to be warranted at this time.

The ratemaking provisions discussed above, in conjunction with other provisions of the legislation such as the contract provision and expedited regulatory procedures, should assist in revitalizing the railroads while protecting the public interest where necessary. They are designed to provide an appropriate mix between regulation and the marketplace.

### CONTRACTS

Less restrictive and simplified rate regulation is essential to the goals of this bill and the goals set forth in the new railroad transportation policy. This type of regulation, together with shipper protection from market abuse, is intended to be provided by the maximum rate provisions of S. 1946.

Equally important to the Committee's view is explicit authorization for contracts provided under section 106 of the bill. During the hearings on this bill and related hearings on other rail matters, the Committee has received numerous complaints concerning car supply and uncertain transit times. Part of the problem is attributable to the railroads' financial condition which is discussed in other portions of this report. However, greater certainty with regard to demand could lead to better planning and allocation of carrier equipment and other resources. Contract provisions offer this type of transportation benefit.

In recent years, various volume rates have become common. Rates of this nature have been seen as a means of improving service, reducing transportation costs, and increasing efficiency. But for many years con-

tract rates have been thought to be unlawful *per se* under several Commission and court cases decided in the early 1960's. The Commission has changed its view on this matter, and, on April 4, 1979, it issued a policy statement indicating that the lawfulness of contract rates would be decided on a case by case basis. Uncertainty still exists, however, on such issues as the relationship of contract rates to the railroads' common carrier obligation. As a result, few contracts (and no major contracts) have been filed since the Commission's issuance of its contract rate policy statement.

The 4R Act also touched upon this general area in its capital incentive rate provision, (section 10729, title 49). The intent was to authorize contract-like rates, immune from attack for 5 years after approval, in an effort to encourage capital investments of $1 million or more. Unfortunately, that provision did not achieve its stated purpose: agreements were not reached between carriers and shippers. On the contrary, every filing under the provision was opposed, not by competing shippers or carriers, but by the very shippers which were to be served under the rate. In some instances, carriers used the provision to avoid agreements previously entered into with regard to rates and service. Clearly, incentive rates, as authorized by the 4R Act, are not the answer.

It is the Committee's view that potential benefits, including improved car utilization and encouragement of capital investments, cannot be fully realized without clear statutory authorization for contract provisions. It is also the Committee's view that contracts, once entered into and allowed to become effective without suspension or investigation, should not be permitted to be modified or abrogated by the Commission and should be enforceable only in the courts. A provision of this nature is included in the bill.

While contracts should be encouraged, it is also essential that we not lose sight of the common carrier obligation and the need for protection of small shippers. The bill clearly retains the carriers' overall common carrier obligation under section 11101, and it provides that Commission authorization is necessary to enter into contracts involving more than a stated percentage of the capacity of carrier owned or leased equipment. A further limitation is imposed with regard to contracts between Class I carriers and shippers which originated an annual average of 1,000 cars or more (by major car type) over the preceding 3-year period. Finally, the bill establishes a contract advisory service to insure that nonconfidential contract information will be available to interested parties on a timely basis.

The Committee believes that the contract provision is among the most important in the bill and that it will achieve its dual purposes of encouraging contracts (without extended litigation or burdensome procedures) and providing necessary protection for small shippers by retaining the common carrier obligation and affording relief in the case of discriminatory treatment.

## DIVISIONS

When rail movements involve more than one carrier, the resulting revenues must be divided among the participating roads. Since a large proportion of rail traffic is interlined (70 percent according to most estimates), the matter of divisions is extremely significant to the

financial health of individual carriers and groups of carriers operating in various regions of the country.

In general, divisions disputes are settled by negotiations between the parties. However, if agreement cannot be reached, section 10705 (b) of title 49, U.S.C., provides that the Commission shall prescribe "reasonable" divisions of joint rates after consideration of various factors, including operating expenses, fair return on transportation property, and the efficiency with which the carriers are operated. Traditionally, the divisions cases which have reached the Commission and the courts have taken many years to resolve, thus affording an advantage to those seeking to maintain the status quo. It should also be noted that, in the interim, those carriers alleging a need for additional revenues have often had difficulty in obtaining such revenues from changes in joint rates. Under past Commission precedent, changes of this nature require the concurrence of connecting carriers, a matter which is discussed in more detail in the section of this report discussing the joint rate issue.

The 4–R Act specifically recognized the importance of the divisions problem. As emphasized in the legislative history, "The settlement of territorial divisions disputes must be speeded up and simplified so that prevailing divisions more accurately reflect prevailing cost and economic conditions." [1] Expedited procedures were provided in that legislation to speed up and simplify the divisions adjustment process. Despite these new procedures, serious problems remain. For example, the hearing record before this Committee indicates that certain carriers, such as Conrail, attribute their financial difficulties, at least in part, to inequitable divisions. Nevertheless, only three proceedings have been initiated since enactment of the 4–R Act in 1976, and these have not involved major territorial disputes.

The Committee has concluded that adoption of major changes in the divisions statute are not warranted at this time, in view of the fact that the 4–R Act procedures have not been fully tested. Nevertheless, the bill further tightens the time frames in section 10705 to encourage increased use of the divisions procedures, and it requires special expedited action in cases involving railroads in reorganization or divisions which do not meet the variable costs of the complaining carrier or carriers.

RATE BUREAUS

Rate bureaus are organizations of carriers whose purpose is joint consideration of rates and related matters. Under the Reed-Bulwinkle Act of 1948, carrier members of rate bureaus are exempted from operation of the antitrust laws when operating in accordance with agreements approved by the Interstate Commerce Commission. That legislation was enacted for the purpose of providing a means for avoiding conflict between the national transportation policy and the antitrust laws; cooperation and collective action by and among common carriers were deemed necessary to effectuate national transportation policy and permit the public to receive the kind of transportation service to which it is entitled with reasonable and nondiscriminatory rates.

[1] S. Rept. 94–499, 94th Congress, 1st session (1975), p. 10.

The Reed-Bulwinkle Act was passed at a time when railroads were closely regulated and had little flexibility. Subsequently, the rail industry received certain flexibility under the 4R Act, and it will receive additional, but not complete, rate freedom under this bill. To the extent rail carriers are treated like other industries in regard to pricing, rate bureaus must be scrutinized to ensure they are not inhibiting rate innovation or competition among carriers of the same mode.

The 4R Act made substantial changes in the law governing rate bureaus. Of particular importance is the fact that the legislation strengthened the right of independent action and prohibited approval of agreements which permit voting on single-line rates or joint-line rates unless a carrier can practically participate in the movement. Many of the 4R Act changes are in effect; others are in the process of being implemented.

During the course of the hearings on S. 1946, the Committee closely examined the rate bureau issue. The Committee is of the view that rail rate bureaus serve a useful function, and that their role should be continued essentially in its present form. The Committee fully supports the 4R Act rate bureau provisions and sees no need for major substantive changes at this time. The hearing record, however, did reflect a need to clarify a number of important aspects of rate bureau operation as contemplated by the 4R Act. Accordingly, S. 1946 would clarify the scope of permissible discussion in certain instances, permit consideration of intrastate rates that affect intrastate commerce, and require transcripts or sound recordings of meetings and records of votes which are to be submitted to the Interstate Commerce Commission and made available to other Federal agencies concerned with rate bureaus. The Committee specifically considered and rejected a requirement for completely open meetings and open voting. The provision for more complete records, the Committee believes, will receive the proper balance and should improve monitoring efforts. In this regard the Committee notes with approval that the Commission has stepped up its monitoring of rate bureaus since passage of the 4R Act. This activity is extremely important, particularly in view of the additional flexibility provided the railroads in this bill, and it is the Committee's intention that such monitoring should be continued in implementing the rate bureau provisions of section 10706, as amended here.

While the close continued supervision of rail rate bureaus is anticipated, it should also be stressed that the Committee has carefully examined the rate bureau procedures and decided to maintain the status quo in most respects. Under these circumstances, the Committee would not expect the Interstate Commerce Commission to take any action inconsistent with Congressional intent in this area.

## JOINT RATES

One of the matters being carefully studied by the Committee is the joint rate issue. The bill itself, as introduced, did not contain a specific provision with regard to joint rates. However, possible statutory language prepared by Committee staff based on a compromise approach suggested by certain railroads was set forth in the RECORD to generate comments and suggestions. (See Appendix in this Report)

The preponderance of rail traffic moves over the line of more than one railroad, and in most instances a joint rate applies over the entire movement. The resulting revenues are divided among the participating roads on the basis of agreement between the carriers. If agreement cannot be reached, the Commission is authorized to prescribe reasonable divisions of joint rates. The Commission also has authority to prescribe joint rates and to require through routes. S. 796 proposed to continue the through-route authority but to eliminate the Commission's authority with regard to joint rates. This provision of S. 796 met serious opposition from carriers and shippers alike.

The rail industry itself is deeply divided on the joint rate issue. The railroads which advocate maintenance of the status quo argue that the present statutory requirements are necessary to preserve a national rail system and that changes in this area could result in elimination of smaller bridge carriers as well as diversion of traffic to other modes.

Other railroads take the position that true rate flexibility is not possible without some change in the joint rate approach. Carriers such as Conrail contend that cost increases may result in divisions which are non-compensatory, yet that railroad often cannot renegotiate divisions without lengthy proceedings. Ability to impose a surcharge without concurrence of connecting carriers is viewed by some railroads as the answer to this problem. Other carriers disagree; possible diversion of traffic is of particular concern to those in opposition to unilateral surcharges. Shippers recognize the divisions problem, but generally favor the status quo. Joint rates are viewed by the shipping community as extremely important, and many contend that surcharges result in unjustifiable increases in rates.

The Committee's hearings addressed the joint rate issue in depth. Virtually all witnesses support, as does the Committee, continued Commission authority to prescribe joint rates. This unanimity did not exist, however, with regard to various compromise approaches to the joint rate issue suggested during the hearings. One suggested approach, a copy of which is set forth in the appendix as the "TRAIN" proposal, would permit carriers to increase or decrease their portion of the joint rate by means of a surcharge without the concurrence of connecting carriers where the existing divisions of the rate do not cover the carrier's variable costs. The proposed language would also permit rate changes involving not more than a 10 percent increase or decrease in the joint rate—again without the concurrence of the connecting carrier or carriers—conditioned upon 45 days' notice and division of surcharge revenues with intraterritorial connecting carriers if desired by such carriers.

Alternative statutory language offered by Southern Railway System is also set forth in the appendix. This proposal would (for a 2-year period) permit a carrier to propose a surcharge on any joint rate if its earnings do not permit recovery of efficient costs which are defined as the composite unit costs of the group of railroads used by the Commission in making rail revenue need determinations. The connecting carrier would have an option to cancel the joint rate in lieu of accepting a surcharge. A study is suggested to consider the use of this type of composite unit costs as an optional expedited means of resolving division disputes.

Some parties view the Southern proposal as one which permits flexibility without the potential for harm to connecting carriers which is present in the TRAIN proposal. Other parties such as the Department of Transportation believe the relief offered is too limited in nature, since it would not permit carriers like Conrail to recover their costs. Variations of both proposals are of course possible; the variable cost portion of the TRAIN compromise could be adopted without the 10 percent zone. Similarly, regional groupings of carriers could be utilized in lieu of the "adequate revenue" group in the Southern proposal.

Having considered the hearing record and the various approaches and statutory changes suggested during the hearing process, the Committee has decided to make no changes with regard to joint rates. This action has the effect of maintaining the status quo: the Commission's authority to prescribe joint rates is unchanged. In making this decision, the Committee recognizes that the Commission is presently looking into the problem of below-cost divsions. It is not our intention to interfere with the Commission's authority to proceed in this area and to take whatever actions are warranted under existing law.

### SECURITIES

As originally written, S. 1946 would have removed the Interstate Commerce Commission's jurisdiction over rail securities and left jurisdiction over such securities exclusively with the Securities and Exchange Commission. However, because of concern expressed by both Commissions that doing so would leave a potential loophole in the regulation of railway euipment trusts and because the present concurrent jurisdiction seems to be causing few problems, the Committee adopted an amendment which struck this provision. The result is that the present law on the regulation of rail securities would remain unchanged.

### ESTIMATED COSTS

In accordance with section 252(a) of the Legislative Reorganization Act of 1970 and section 403 of the Congressional Budget Act of 1974, the Committee provides the following cost estimate, prepared by the Congressional Budget Office.

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., December 5, 1979.*

Hon. HOWARD W. CANNON,
*Chairman, Committee on Commerce, Science and Transportation, U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for S. 1946, the Railroad Transportation Policy Act of 1979.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

ALICE M. RIVLIN, *Director.*

54-921 O - 79 - 3

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

DECEMBER 5, 1979.

1. Bill No.: S. 1946.
2. Bill title: Railroad Transportation Policy Act of 1979.
3. Bill status: As ordered reported by the Senate Committee on Commerce, Science and Transportation, November 27, 1979.
4. Bill purpose: The bill would amend current freight railroad regulation laws. It would change Interstate Commerce Commission (ICC) rules regarding rate-making, car utilization and car service, merger, acquisition and consolidation of rail companies, rail line abandonment and service discontinuance, and other matters. These changes would remove some but not all regulatory restraints on rail service pricing, entry, exit, and other practices. The bill would permit railroads a more complete recovery of annual cost increases and the full recovery of fuel cost increases. In addition, the bill would gradually reduce the amount of annual cost increases recoverable through general rate increases, lower current recyclable materials' rates, and exclude grain traffic from a provision permitting demand-sensitive rates. The bill authorizes appropriations of $20 million over a three-year period for a Department of Interior (DOI) program to convert abandoned rail property to conservation or recreation use. This program was originally funded by a $5 million appropriation in 1978. DOI obligated the $5 million during fiscal years 1978 and 1979. The ICC and the Department of Transportation (DOT) would be required to study the proposed regulatory changes and to provide research support and recommendations for specific rules.
5. Cost estimate:

[In millions of dollars]

| | |
|---|---|
| Authorization level: | |
| Fiscal year: | |
| 1981 | |
| 1982 | 20.0 |
| 1983 | |
| 1984 | |
| 1984 | |
| 1985 | |
| Estimated outlays: | |
| Fiscal year: | |
| 1981 | |
| 1982 | 1.8 |
| 1983 | 3.8 |
| 1984 | 6.1 |
| 1985 | 4.9 |

The above costs fall within budget function 300.

In addition to the $20 million specifically authorized, the bill would require DOT and the ICC to conduct research and write reports. The research and reports are estimated to cost about $1.2 million over the five-year period.

6. Basis of estimate: The outlay estimate assumes full appropriation of the $20 million authorized for rail conversion activities with obligations made in equal amounts in each of the fiscal years 1981 through 1983. Based on experience with this and similar programs, each year's conversion grant recipients should require four years to draw down their federal funds.

The bill's ratemaking, equipment utilization and other regulatory provisions authorize no new federal spending. However, when combined with other recent legislative changes, including the Milwaukee Railroad law (Public Law 96–101), and the Administration's proposed railroad restructuring assistance program, they may hasten or redirect federal outlays. For example, to the extent that the expedited procedures mandated by the bill encourage railroads to submit more merger or abandonment applications or to submit currently planned applications sooner, short-term demand for rail assistance funds will probably increase. In the long-term, though, the limited pricing and operational freedom provided by the bill should help reduce railroads' reliance on federal assistance. No estimate of the potential budget effect of these changes is possible at the present time.

7. Estimate comparison: None.
8. Previous CBO estimate: None.
9. Estimate prepared by Allen Kraus.
10. Estimate approved by:

JAMES L. BLUM,
*Assistant Director for Budget Analysis.*

## REGULATORY IMPACT STATEMENT

In compliance with paragraph 5, rule XXIX of the Standing Rules of the Senate, it is the judgment of the committee that implementation of the bill, as reported, will not result in any increased Federal regulation. In point of fact the legislation calls for a reduction in Federal regulation by providing the railroads with more rate flexibility and by explicitly authorizing carrier-shipper contracts. It is anticipated that the additional rate flexibility provided under the maximum rate provisions of the bill will result in a reduction in the paperwork associated with the regulation of rates. It is further anticipated that the Commission will not need to promulgate extensive new regulations to implement the provisions of the bill.

## SECTION-BY-SECTION ANALYSIS

### RAILROAD TRANSPORTATION POLICY

*Section 2.*—The present National Transportation Policy was enacted in 1940, and has ben interpreted to emphasize protection of each mode of transportation rather than the benefits that can result from increased competition among and between the modes. The Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act) stressed fostering of competition as one of the purposes of the legislation, but it did not enact a separate transportation policy for railroads. At this time, there is a need for a separate railroad policy which incorporates many of the existing policy declarations but places increased emphasis on competitive market forces.

Subsection (a) of section 10101 embodying existing national transportation policy, is amended by limiting its application to modes of transportation subject to subtitle IV other than rail carriers.

A new subsection (b) would be added to establish a separate national railroad transportation policy. That section states that in implement-

ing congressionally mandated policies the Interstate Commerce Commission shall consider as being in the public interest: maximum reliance on competitive market forces and on intramodal and intermodal competition; the avoidance of undue concentrations of market power and the maintenance of protection for shippers against the abuse of market power; reduction of the barriers to entry and exit; maintenance of fair wages and working conditions; and encouragement of safe transportation operations and energy conservation. The Commission is also required to encourage reasonable rates for transportation without unreasonable discrimination or destructive competitive practices and to further the elimination of noncompensatory rail rates. In addition, the Commission is to be responsive to the needs of the public to issue decisions expeditiously, and to promote cooperation with the States on transportation matters to insure that intrastate regulatory jurisdiction is exercised consistently with the act. It is in the public interest to promote a healthy and efficient freight transportation system in private sector of which the rail industry is a vital part.

## Title I: Ratemaking

After almost one hundred years of railroad regulation, it is necessary to reassess once again a key question—what is the proper mix of regulation and the marketplace? The Commission has long held the power to investigate and hold down or change rail rate proposals. For many years, Congress attempted to resolve transportation problems by increasing regulation. However, the 4–R Act represented a significant shift in approach. This legislation was intended to inaugurate a new era of competitive pricing in order to revitalize the railroads. It stressed greater freedom for the ralroads to raise or lower rates in competitive markets. Through the threshold test of market dominance, maximum rate regulation was to be limited to situations where the public interest needed protection, while the railroads were to be free from such regulation where there is effective competition from other carriers or modes of transportation.

Unfortunately, the benefits of the 4–R Act have been less than anticipated. The railroads have not achieved adequate revenue levels, and many of the rate provisions (that is, peak period pricing and separate rates for distinct rail services) have been little used. Carriers and shippers alike are dissatisfied with the market dominance test; they point out that the concept is so complex as to be almost unworkable in view of the time available to the parties in the context of rate cases which must be completed within strict statutory deadlines. A recent study by consultants supports this viewpoint; the study concluded that there is no single satisfactory test to determine whether traffic is market dominant or nonmarket dominant.[1]

The new provisions of this bill are intended to simplify rate regulation, thus avoiding some of the difficulties that have arisen in the implementation of the 4–R Act. The basic concept is the same—to provide protection for captive shippers where necessary in the public

[1] "A Study To Perform an In-depth Analysis of Market Dominance and its Relationship to Other Provisions of the 4–R Act," Kearney, Management Consultants, Apr. 10, 1979.

interest and to provide pricing freedom for the railroads in the many areas where competition exists. In the latter situation, free market forces should determine the prices to be paid and the conditions of service. The maximum rate provisions, in conjunction with the explicit authorization of contract rates and clarification of the Commission's exemption authority, are designed to provide an appropriate mix between regulation and the marketplace.

In general, the bill provides a free zone for rate increases which do not exceed the railroads' increased costs, based on a rail index to be compiled or verified by the ICC and which shall include appropriate adjustments to reflect the quality and mix of material and labor. In addition, a 4-percent rate flexibility zone, subject to a 5-year maximum of 12 percent, is provided above cost increases. Increases within this zone cannot be suspended or investigated, but they may be challenged through formal complaint procedures.

Following enactment, no rate proposal may be challenged as unreasonably high, except in accordance with the procedures set forth in the new rate provisions. A rate filing in excess of these zones is subject to investigation or suspension, but it would have to exceed the jurisdictional threshold described in section 102, namely a revenue-to-cost ratio higher than the average ratio established by the Commission as necessary for the railroad industry to cover total operating expenses, plus a reasonable and economic profit or return on capital employed in the business sufficient to attract and retain capital in amounts adequate to provide a sound transportation system in the United States. A saving provision is included to permit challenge of existing rates in an orderly fashion during a period of transition to the ratemaking provisions and procedures of S. 1946.

The Committee believes that the maximum rate provisions of this bill provide the carriers with pricing flexibility and the ability to obtain adequate revenues so that rail service can be maintained and improved. The bill also clearly maintains protection for captive shippers by retaining maximum rate regulation. It is the Committee's intent that the Commission implement these provisions in a manner which assures continued protection.

Some of the testimony at the Committee hearings on S. 1946 indicates that the Commission, in recent proceedings, has tended to stress the adequate revenue provisions of the 4–R Act, giving less weight to other important provisions of 49 U.S.C. This legislation attempts to achieve a proper balance. The carriers are encouraged to eliminate noncompensatory rates and to compete aggressively for competitive traffic.

Adequate revenues are not to be obtained by requiring an excessive contribution from captive traffic. In this regard, we are particularly concerned with the magnitude of the rate increases on coal movements during the past several years, as well as the loss of energy efficiency through a shift to other modes, and have accordingly stressed energy considerations in the railroad transportation policy set forth in the bill. In evaluating proposals above the jurisdictional and cost thresholds set forth in this legislation, the Committee expects the ICC to apply traditional tests of "reasonableness" without undue emphasis on revenue needs. Furthermore, many past problems in this area can

be avoided through use of the contract provisions of the bill, and the Committee urges carriers and shippers to engage in good faith negotiations.

The Committee emphasizes that the maximum rate provisions provide simpler threshold tests than existing law. Since administrative feasibility and timely regulatory action are of prime concern to the Committee and all affected parties, this legislation should represent a significant improvement for both railroads and shippers.

The bill does not propose changes in minimum rate regulation. The 4–R Act incorporated new standards for minimum reasonableness under which no rate may be found unlawful (assuming it does not violate other provisions of the act) if it contributes to going concern value. There is also a presumption that a rate that exceeds variable costs contributes to the going concern value of the carrier proposing the rate. Since the 4–R Act provisions in this area are being implemented without serious problems, further changes in the minimum rate area do not appear unwarranted at this time.

### REASONABLENESS OF RAIL RATES

*Section 101.*—Section 101 amends section 10701(b) of the Code by deleting language which is no longer necessary in view of the jurisdictional tests set forth in the succeeding sections of the bill. The 4–R Act language which will be deleted by the bill was intended to make it clear that the railroads were not prohibited from raising below-cost rates to a compensatory level, even if a finding of market dominance could be made. Since, under the new procedures, the Commission will not have jurisdiction to determine maximum reasonableness unless the rate exceeds the cost threshold set forth in section 102 of the bill, the deleted language is no longer required.

### MAXIMUM RATE REGULATION

*Section 102.*—A new subsection (e) is added to section 10701, 49 U.S.C. Paragraph (1) provides that a rail carrier may establish any rate which yields a revenue-to-variable cost ratio that is equal to or less than the average ratio of revenue-to-variable cost established by the Commission.

Paragraph (2) sets forth the standard to be followed by the Commission in establishing an average ratio, to be expressed as a percentage. The Commission is required to determine, on no less than an annual basis, the average ratio-to-variable cost ratio the railroad industry (or group of railroads) would have to realize from all transportation under honest, economical, and efficient management to cover total operating expenses, plus a reasonable and economic profit or return on capital employed in the business sufficient to attract and retain capital in amounts adequate to provide a sound transportation system. The level described in this paragraph is based on the language of the "adequate revenue" provision set forth in the existing section 10704(a)(2). Under this standard, the Commission is to consider all pertinent financial indicators, including a rate of return on net investment equal to the cost of capital, other financial ratios, and the flow of funds.

Paragraph (2) establishes a time limit of 120 days for the Commission's initial determination, and it provides for use of a revenue-to-variable cost ratio of 150 percent during the interim period between enactment and the first publication of an average ratio under this subsection. This interim ratio is based on "variable cost" as presently construed. This is the so-called "strict" variable cost level, which does not include the current cost of capital as an expense, but as a revenue need consideration. In determining the ratio, the Commission has flexibility to utilize data of all carriers, that group of carriers selected for determining adequate revenue levels under section 10704(a)(2) of this title, or any other carrier group deemed appropriate for the purposes of this subsection.

Paragraph (3) mandates a 1-year study by the Commission of the feasibility and desirability of the use of a return on investment (ROI) standard as an alternative to the ratio of revenue-to-variable costs standard set forth in paragraph (2) of this subsection. During the course of the hearings on S. 1946 and meetings with interested parties, certain shippers suggested use of a return on investment standard, in lieu of, or in addition to, the revenue-to-variable cost ratio. Adoption of an ROI standard is not practical at this time in the Committee's view due to the difficulty of computation and the problems in allocating investments to particular movements under present costing methods. However, further study may indicate the desirability of utilizing this type of standard as an additional standard in the future.

The Committee stresses that the mandated ROI study relates to use of a return on investment standard as a threshold jurisdictional test. The advantages and disadvantages of an additional standard have to be weighed.

Several standards may lead to greater precision. On the other hand, the intent of this legislation is to simplify rate regulation and to avoid the difficulties and uncertainty that surrounded application of the market dominance concept. It is for this reason that a further study is deemed warranted.

With regard to determinations of maximum reasonableness when the jurisdictional test is met, the Committee emphasizes that under this legislation, as in the past, all relevant factors may be considered, including return on investment, costs of the movement, other revenue need considerations, and comparisons of rates for similar movements under similar transportation circumstances.

The changes in this subsection relate solely to maximum reasonableness. The discrimination and long- and short-haul provisions of sections 10741 and 10726 remain unchanged. Protection against discrimination is one of the important aspects of rate regulation, and it should be maintained in its present form. The Commission is expected to apply the discrimination provisions in accordance with existing law but not in a manner which would negate the rate flexibility provided by this bill.

RAIL COST ADJUSTMENT INCREASES

*Section 103.*—The railroads' financial difficulties may be attributed, in part, to the time lag involved in recovering cost increases. This section will help assure that rail rates reflect a carrier's current

costs by adding a new subsection (f) to section 10701 of the Code to provide a zone of rate freedom for adjustments not in excess of the carriers' increased costs, determined on the basis of an Index of Railroad Costs (which will be compiled or verified by the Commission with appropriate adjustments to reflect the actual quality and mix of material and prices).

As provided in subsection (f)(2)(A), the base rate is the rate in effect on January 1, 1980, except that the Commission may prescribe a different base rate if it finds the rate in effect on January 1, 1980, to be unreasonably high. The exception is intended to afford relief with regard to rates found unreasonably high when challenged in accordance with the Savings Provision, section 116, or rates found unreasonably high in investigation proceedings which may be pending on the date of enactment. In instances where no commodity rate is in effect on that date, paragraph (f)(2)(B) of the new subsection provides that the base rate shall be the rate in effect on January 1, 1980, for the most nearly comparable commodity and service, a matter which may be challenged by shippers under the proviso of this subsection. Subparagraph (C) sets forth the method for adjusting the rate by the rail cost adjustment factor—the base rate is multiplied by the latest rail cost adjustment factor.

Subsection (f)(3) describes the rail cost adjustment factor as a comparison of the latest Index of Railroad Costs with the same index for the fourth quarter of 1979. This is to be set forth as a fraction in which the latest published index (to be published no *less* than quarterly) is the numerator and the 1979 four quarter index is the denominator.

Paragraph (4) makes it clear that any rate within the zone described in the preceding paragraphs of the subsection may not be found to be above a reasonable maximum. In other words, a rate increase may not be challenged if it is within the cost increase zone determined in accordance with the procedures set forth in this subsection.

The Committee also emphasizes that any general rate increases taken under section 105 are to be considered by the Commission in determining whether proposed increases equal or exceed the adjusted base rates for such transportation.

### RATE FLEXIBILITY ZONE ABOVE COST INCREASES

*Section 104.*—In order to assist the railroads in achieving adequate revenue levels and to provide additional flexibility for rate changes without regulatory interference, section 104 provides that a rail carrier may increase a rate by an amount not exceeding 4 percent of the base rate, adjusted as defined in section 103, free from suspension or investigation. Because of shipper concern that rates increased in this manner could become excessive, the new section provides that such rates may be challenged by the filing of a formal complaint under section 11701(b), 49 U.S.C.

Under the new section 10701(g)(2), any part of the authorized 4-percent increase not implemented during a particular calendar year may be implemented in the succeeding year, subject to the proviso that (1) the increased rates in any year may not exceed 108 percent of the

adjusted base rate and (2) the increased rates during any 5-year period (i.e., January 1, 1980 to December 1, 1984, January 1, 1985, to December 31, 1989, et cetera) may not exceed 112 percent of the adjusted base rate for such transportation. Of course, a carrier may file a proposed rate in excess of the 4-percent zone. However, this filing will be subject to the suspension, investigation, and complaint procedures which remain essentially unchanged under this legislation.

As indicated in section 105, any general rate increases implemented under that section shall be considered in determining whether proposed rates exceed the zone of freedom from investigation and suspension set forth in this rate flexibility section. The Committee intends that the Commission promulgate regulations as necessary under this section and/or section 105 to insure avoidance of duplicative increases.

Finally, the Commission is to analyze the carriers' overall revenue levels and submit reports to Congress on this matter every 3 years. These reports will enable Congress to determine whether there is a need for modification of this section.

GENERAL RATE INCREASES

*Section 105.*—General rate increases, which have been used by the rail industry to recover yearly inflationary costs, are those increases which substantially all rail carriers nationwide or in certain territories file for application to the movements of a substantial number of commodities. Under the present law, general rate increases are subject to review by the Commission, and the Commission reviews such increases in light of other increases on individual commodity movements to determine whether the resulting rates are unreasonably high or otherwise unlawful. Section 10706(a)(3)(B)(i) of Title 49, U.S.C., grants rate bureau antitrust immunity for the discussion of and voting on general increases but exempts them from certain limitations placed on rate bureaus procedures by the 4R act. This section also requires a prepublication period of 15 days in addition to the normal 30-day notice period necessary before a rate becomes effective.

Section 105 of S. 1946, as originally introduced, provided for a phaseout of general rate increases over a 6-year period with an elimination of such increases at the end of this period. During this phaseout period, increases would be limited to recovery of a decreasing percentage of inflationary cost increases: 100 percent in the first 2 years after the effective date of this act; 90 percent in the third year; 80 percent in the fourth and fifth years; and 70 percent in the sixth year. A study would have been mandated for completion at the end of the fourth year to determine if the elimination of general increases was feasible.

During the hearings on S. 1946 as introduced, serious opposition was voiced by the rail industry against the elimination of general rate increases. The carriers contend that such increases are essential to the financial stability of the industry in periods of rapid inflation. On the other hand, shippers, the administration, and the Commission expressed strong support for the elimination of general increases. Shippers believe that across-the-board increases of the nature of general increases result in individual rates which do not necessarily reflect costs associated with a particular movement and are disproportion-

ately high. In this regard, legislation could encourage the rail industry to adjust its pricing system to allow for more extensive use of selective commodity increases to cover all increased costs.

Section 105, as amended, represents a balance of the opposing views toward the need for general increases. The provision as amended includes no termination date for general increases but does provide for a phasedown over a shortened period of 3 years, with a study at the end of this period. The increases would be limited to inflationary costs, but to insure the railroads' recovery of fuel costs in this time of energy shortages, carriers would be able to recover all fuel costs, notwithstanding the percentage limitations imposed during the 3-year phasedown period.

Specifically, under (h)(i)(A) to (D) of section 10701, 49 U.S.C. as amended, the carriers would be able to put into effect a general rate increase based on demonstrated costs—those actual inflationary costs shown by the carriers in their filing for an increase and not dependent on or adjusted by the quarterly index of rail costs to be established by the Commission pursuant to section 103 of this bill as amended. In the first year after the enactment of this act, the carriers would be able to recover full cost, fuel and nonfuel. Under (h)(2), the Commission would determine the portion of inflationary costs attributable to fuel in its quarterly publication of the rail cost adjustment factor defined in section 103 as amended. In the second year, recovery by general increase would be limited to 90 percent of demonstrated nonfuel costs, and in the third year, recovery would be limited to 85 percent. Under (h)(5), it is made clear that these limitations in no way affect broad tariff changes described in section 10706 (a)(3)(B)(ii), 49 U.S.C. As soon as possible, but no later than 9 months after the enactment of this act, the Commission is to issue any regulations necessary to facilitate the implementation of this section.

Under (h)(3) of section 10701, 49 U.S.C., as amended by this act, the Department of Transportation and the Interstate Commerce Commission are each mandated to conduct studies on general increases, focusing specifically on the need for general rate increases, the impact of the phasedown provided under this section, particularly in light of the additional rate flexibility provided by this act, and the feasibility of eliminating general increases. These studies are to be submitted with any legislative recommendations to the Senate Committee on Commerce, Science, and Transportation and the House Committee on Interstate and Foreign Commerce by the end of the third year after the enactment of this act.

After the submission of the studies, the Congress would have 180 days in which to act based on the conclusions and recommendations included therein. It is intended that during this period, the committees would carefully evaluate the need for general rate increases, particularly in light of the experience with the additional rate flexibility provided for selective rate increases. If Congress does not act within this 180-day period, the limit on general rate increases would drop to 80 percent until such time as Congress does act. During the 180-day period pending congressional action, the limit of 85 percent would remain applicable. The variation in percentages should serve as an incentive for rapid congressional action.

Certain clarifying limitations have been included in section 105 as amended. Under the proviso at the end of (h)(1) of section 10701 as amended by this section, general increases would not be allowed, on the average, to result in rates which exceed the adjusted base rates defined in section 103 of this act. The proviso also makes it clear that in determining whether adjusted base rates have been exceeded, selective increases taken pursuant to sections 102 to 104 of the bill as reported are to be added to general increases. Carriers can choose to cover costs through a combination of selective increases and general increases. In this regard, (h)(5) makes it clear that the Commission still has the authority, as it now has, to limit the application of a general rate increase on a particular movement.

In this section, the Committee has responded to the important concerns relating to general rate increases. The Committee understands the rail industry's need to recover inflationary costs, a need with which no one disagrees, in view of the financial status of the rail industry and the rapid pace of inflation. It is for this very reason that the provision provides for full recovery of fuel costs, the recovery of actual demonstrated costs, limited at this time to no less than 80 percent, and the maintenance of broad tariff changes.

With particular regard to fuel costs, the Committee believes that at this time the general rate increase mechanism is an acceptable way to insure that rail carriers are able to recover their increased costs solely attributed to the rising costs of diesel fuel. Testimony presented before the Committee by the rail industry supported this belief. The Committee is also of the opinion that maintaining the existing fuel recovery mechanisms will enable carriers to more easily adapt to the new inflationary costs recovery procedures described in section 105 for costs other than fuel. The Committee notes that the recovery of fuel costs under this section does not preclude the Interstate Commerce Commission from implementing a fuel surcharge recovery program for the rail industry similar to that maintained for the interstate motor carrier industry, if the Commission deems it appropriate. The fuel surcharge program for motor carriers appears to have been successful thus far in enabling carriers to adequately recove fuel costs.

In general, section 105, as amended, is intended to encourage more extensive use of selective commodity increases to cover increased costs. Over the 3-year period during which general increases would be allowed, the use of such increases to cover inflation would necessarily diminish as the ceiling decreases, and selective commodity increases would have to be used in conjunction with the general increases to cover inflation. Both types of increases would be considered together in determining whether the inflationary zone free of regulation as provided in section 103 of this bill has been exceeded.

The gradual change in the method of pricing over the 3-year phasedown period would result in a more sophisticated pricing system in which individual rates would reflect more accurately individual costs on individual movements. The 3-year period would allow sufficient time for the indsutry to make the necessary pricing adjustments in this regard, and the phasedown would encourage experimentation with the additional rate flexibility provided by this act in the area of individual commodity increases. Furthermore, the study mandated under this section would provide the opportunity for a thorough evaluation

of the feasibility of eliminating general rate increases, based on the experience of the first years of the phasedown period and the impact of the additional rate flexibility provided in other provisions of the bill.

CONTRACT PROVISION

*Section 106.*—A contract rate provision is one of the most important provisions in the bill. Explicit authorization to enter into contracts, as provided in this section, offers great potential benefits to both carriers and shippers, regardless of size. Contracts will give the railroads assured levels of revenues and assure shippers of specified levels of service at known rates.

For many years, this type of ratemaking was thought to be prohibited by several Commission and court decisions.[2] Although the ICC recently issued a general policy statement indicating that contract rates are not unlawful per se, lawfulness of contracts is being decided on a case by case basis and uncertainty still exists with regard to such matters as the relationship of contract rates to the railroads' common carrier obligation under other sections of the statute. The language of section 106 is intended to clarify the status of contract rate and service agreements in an effort to encourage carriers and purchasers of rail service to make widespread use of such agreements.

The new section provides that service under contract shall be a separate class of service, and the equipment used in this service shall not be subject to car service orders. Discrimination provisions remain applicable, however, and the existence of a contract is not a defense to a carrier's obligation to provide adequate service. Contract rates are not subject to maximum or minimum rate regulation, except that the Commission continues to have jurisdiction to determine issues of unfair or destructive competitive practices. Existing law governing relationships between rail carriers and water carriers remains unchanged. Tariff filing requirements for contract rates are simplified as described in the analysis of section 107.

The concept of contract rates was strongly endorsed by many witnesses during the course of the Committee's hearings. Contract provisions offer significant transportation benefits in that they allow for better planning on the part of both shippers and carriers and should improve car utilization and allocation of equipment and other resources. The greater certainty provided by contracts, particularly in areas where large rail capital investments are needed, will provide substantial benefits.

At the same time, small shippers expressed concern with regard to the possible impact contracts might have on their transportation. S. 1946, as introduced, attempted to balance these competing interests by requiring the Commission to determine the percentage of locomotives and equipment (by major car type) which could be made available for contract service without interfering with the carrier's ability to meet its common carrier obligations. Further hearings con-

[2] See *Contract Rates, Rugs and Carpeting from Amsterdam, N.Y.*, 313 I.C.C. 247 (1961), aff'd sub nom., *New York Central R.C. v. United States*, 194 F. Supp. 947 (S.D. N.Y. 1961), aff'd per curiam, 363 U.S. 349 (1962) and *Guaranteed Rates from Sault St. Marie, Ontario, Canada to Chicago*, 315 I.C.C. 311 (1961).

vinced the Committee that the proposed procedures were cumbersome and that the same goals (namely protection for smaller shippers) could be accomplished with less regulatory interference. The bill, as reported by the Committee, provides carriers, shippers, and shipper associations or cooperatives with an immediate ability to contract for a stated portion of carrier-owned or leased equipment, subject to a further limitation to a percentage of previously supplied carrier equipment which may be made available to shippers which originated an average of 1,000 cars or more per year during the prior 3-year period. Relief from the statutory limitations of this provision are available upon application to the Commission. It should be stressed that the described limitations in the bill apply only to carrier owned or leased equipment and *not* to any shipper owned equipment or assigned cars. The limitations apply only to contract provisions and are not intended to affect assigned car arrangements which predate by many years the change in policy on contract rates. Such arrangements may continue to exist separate and apart from contract agreements.

Subsection (a) provides specific authority for contract rate and service agreements. Under subsection (b)(1), contract service is deemed to be a separate class; the equipment utilized is not subject to car service decisions under section 11123. Subsection (b)(2) retains the railroads' overall common carrier service obligations in accordance with section 11101. It further provides that the Commission may limit carriers' rights to enter into additional contracts if such additional contracts would impair the ability of such railroad or railroads to fulfill common carrier obligations to the complaining shipper or party represented by complainant.

Subsection (b)(3)(A) specifies that a contract proposed or entered into under this section may be suspended or investigated only upon a showing that the contract would (1) interfere with common carrier obligations, (2) be discriminatory, or (3) constitute a destructive competitive practice. The terms "discrimination" and "destructive competitive practice" have recognized meanings and are well understood in transportation law; it is not the Committee's intent to change the meaning of these terms. With regard to he phrase "essentially contemporaneous," the bill provides the Commission with discretion to consider all relevant circumstances. While "essentially contemporaneous" may normally be defined as 30 to 60 or 60 to 90 days, this would not prevent the Commission from extending the period if circumstances have not changed and a complaining shipper presents convincing evidence of the need to take into account a longer period.

Once a contract becomes effective without suspension or investigation, the Commission may not abrogate, modify or in any way impair the obligations under such contract. These obligations would be enforceable only in a court of law. On the other hand, the Commission retains authority to order a carrier to provide rates and service substantially similar to a contract at issue for other shippers, regardless of size, if discrimination is found to exist. This action may be taken even though a challenged contract has become effective without suspension or investigation.

Subsection (c)(1) provides that parties may, without impairing the common carrier obligation, immediately upon the effective date of this

act enter into contracts involving utilization of not more than 35 percent of the capacity of carrier-owned or leased equipment by major car type. (The term "plain boxcar" is intended to encompass "whole door" and "all door" boxcars.) A further limitation is imposed with respect to contracts between Class I carriers and shippers which originated an average of 1,000 cars or more per year by major car type during the past 3 years on such carrier's line: no more than 40 percent of the average carrier-owned or leased equipment utilized during the prior 3-year period may be used for contracts to that shipper without prior Commission authorization. The limitations in this section apply to the particular car types listed, not to more specialized equipment.

Subsections (c)(2) and (3) specify that relief from the limitations in subsection (c)(1) may be obtained from the Commission as long as contracts involving additional carrier-owned or leased equipment will not interfere with the common carrier obligation. Findings in this regard may be modified upon a showing of changed circumstances or other good cause. Again, it should be stressed that the Committee intends, once a contract becomes effective without suspension or investigation, that it may not be abrogated or modified by the Commission.

Under subsection (d), contracts authorized in this section will not be subject to the provisions of chapter 107 or chapter 111 of this title except as expressly provided. As indicated above, in order to protect the rights of all shippers, contracts will be subject to the anti-discrimination provisions of sections 10726 and 10741 and to prohibitions against destructive competitive practices. General tariff requirements of sections 10761 and 10762 are applicable, but the form and publishing provisions of these sections have been modified with regard to contract rate filings. While contract rates are not subject to minimum and maximum rate regulation generally, Commission jurisdiction to suspend or investigate is retained. Review prior to the effective date is intended to protect the shipping public, since contract agreements, once effective, are to be free from regulatory interference.

Subsection (e) provides for the establishment of a contract rate advisory service. It requires compilation and dissemination of summaries of nonconfidential contract information to interested parties. This provision of the bill further requires that the advisory service provide the Commission and interested parties with advice regarding contracts. This subsection is intended to insure that smaller shippers and other interested parties are to be kept informed of the relevant provisions of contracts as they are filed and acted upon by the Commission. To perform this function, it is essential that the required summaries are disseminated as soon as possible.

Subsection (f) is a technical conforming change.

The Committee emphasizes that the contract provision of the bill is intended to enecourage contracts while providing necessary protection for small shippers by retaining the common carrier obligation. These goals should be kept in mind by the Commission in implementing the provisions of section 10701a.

#### EXPEDITIOUS DIVISIONS OF REVENUE

*Section 107.*—Joint rates assessed and collected by common carrier railroads for the transportation of freight from a point on one line

to a point on another line must be divided among participating carriers. This division of revenue is ordinarily governed by private agreements negotiated by the concerned carriers. However, if the carriers cannot resolve their differences, they may file a complaint under section 10705, 40 U.S.C., requesting the Commission to prescribe just and reasonable divisions. The resulting divisions of revenue cases can involve hundreds of millions of dollars and are among the most complex proceedings the Commission must decide. Since these cases often involved extensive periods of time, the 4R Act added new provisions designed to expedite the handling of divisions proceedings. Nevertheless, the response by carriers has been extremely limited; no major divisions cases have been filed despite apparent carrier dissatisfaction with existing divisions agreements in some instances. In order to encourage expedited resolution of disputes in this area, existing time frames in section 10705 are being further shortened. The requirement of a "full hearing" would be deleted to avoid any implication that an oral hearing is required; a proceeding would still be required, but the evidence could be submitted orally or under modified procedure.

Section 10705, as amended, generally provides for completion of all evidentiary procedures within 9 months if the proceeding is brought on complaint or within 18 months after the commencement of a proceeding by the Commission on its own initiative.

The Commission is required to take final action by the 180th day after completion of the evidentiary proceedings. In addition, the proceeding must be further expedited and the decision issued within 100 days after close of the record (subparagraph A) if there is an allegation that the divisions at issue do not exceed variable costs or if a railroad in reorganization is involved. Subparagraph (B) permits extension of the time frames upon report to Congress in cases other than those involving bankrupt carriers or below-cost divisions.

The Committee strongly believes that divisions should accurately reflect current cost and economic conditions. This will not occur unless divisions decisions are rendered in a timely manner. In setting forth specific statutory deadlines, it is not our intention that *all* divisions proceedings should consume the state time limits. On the contrary, the deadlines are designed with major cases in mind. Divisions proceedings in some instances may involve as few as two carriers and only a few commodities. Such cases should be handled more expeditiously than required under the statutory time frames, and it is the Committee's expectation that the Commission will speed up its handling of this type of proceeding in order that the goals of the railroad transportation policy can be met.

RATE BUREAUS

*Section 108.*—Rate bureaus are organizations of carriers whose express purpose is the joint consideration of rates and related matters. Under the Red-Bulwinkle Act of 948 (62 Stat. 472), Commission approval of a rate bureau agreement, based on a finding of furtherance of the national transportation policy, affords carrier members relief from operation of the antitrust laws with regard to the carrying out of such agreement. Rate bureaus provide a forum for shipper and carrier comment or complaint concerning proposed changes. In addition, the bureaus publish tariffs and provide other transportation

related services for member carriers. Joint carrier activities are permitted under the statute as a means of avoiding conflict between the carriers' responsibilities under regulatory provisions and the policies of the antitrust laws.

The 4R Act made important changes in the governing statute. It strengthened the right of independent action and prohibited approval of agreements which permit voting on single-line rates. A similar restriction applies to rates for interline movements unless a carrier can practicably participate in the movement.[3] Periodic review of existing agreements is also mandated. In view of this recent legislation, which is still in the process of being implemented, extensive changes in section 10706 are not included in this bill. Changes are proposed, however, to accomplish the following: (1) permit consideration of intrastate rates that affect interstate commerce; (2) clarify the scope of permissible discussion; and (3) require transcripts or sound recordings of meeting and records of voting, which are otherwise permitted to be closed.

Paragraph (1) amends subsection (a)(2)(A) of section 10706, Title 49, U.S.C. to permit agreements to provide for consideration of intrastate rates that affect intrastate commerce. This change codifies a recent Federal court decision (*Atchison, Topeka and Sante Fe Railway* v. *United States and the Intrastate Commerce Commission*, U.S.C.A. 7th Cir., 1979).

Paragraphs (2) and (3) are technical conforming amendments.

Paragraph (4) amends subsection (a)(3)(A) of section 10706 to permit participation in agreements which provide for transcripts or sound recordings of meetings and records of all votes. The paragraph further provides for submission of this material to the Commission on a confidential basis; it would not be subject to disclosure under the Freedom of Information Act but would be made available to other Federal agencies having statutory responsibilities with regard to rate bureaus. Courts are not prohibited from disclosure, however, if such action is deemed necessary in connection with pending court suits.

Initially, the bill proposed that agreements could not be approved by the Commission unless they provided that all meetings, other than those of a purely administrative nature, be open and that all voting would likewise be open. Considerable and conflicting testimony was received by the Committee on this point. Federal agencies and some shippers favored the open meeting and open vote provision. The railroads and other shippers opposed this subsection of S. 1946.

Those in opposition stressed the likelihood of harassment by powerful shippers and the need for confidentiality to protect proprietary information submitted by shippers. Those in favor of the "open" provision pointed out that Reed-Bulwinkle is an exemption from the antitrust laws, and, as such, should be strictly construed to lessen the possible anticompetitive effect of approved rate bureau agreements. After carefully considering the hearing record, the Committee has adopted an amendment which would require transcripts or sound recordings of meetings and records of votes which will be submitted to the Commission and made available to other agencies with statutory responsibili-

[3] Exceptions to these restrictions are provided in section 10706(a)(3)(B) (i) and (ii) for general increases and decreases and broad tariff changes.

ties relating to rate bureaus. It is our view that this provision, as amended, provides the proper balance between the need for adequate information for monitoring and oversight purposes and the need for a certain amount of confidentiality for the effective functioning of rate bureaus.

The testimony indicates that rail rate bureaus serve a useful purpose, and there is no indication on this record that such bureaus are not complying with approved agreements. In continuing immunity for rate bureaus under section 10706(a), the Committee takes note of the interrelated nature of the rail system and the large percentage of traffic which moves via more than one rail carrier. The Committee further notes that the Commission has stepped up its monitoring of rate bureaus, partly in response to the 4R Act provisions. This activity is essential, and it is the Committee's intent that it be continued under section 10706 as amended by this bill, consistent with the amendments proposed herein.

Paragraph (5) amends subsection (a)(3)(A) to clarify the scope of discussion which is permissible in regard to single-line rate proposals and joint-line proposals in which not all of the discussion participants can practicably participate. Discussion of single-line rates and joint-line rates by carriers other than those which can practicably participate is not specifically prohibited under the present statute; the 4R Act prohibition relates to voting rather than discussion. Nevertheless, serious questions have arisen as to the type of discussions which should be authorized in approving rate bureau agreements. By delineating generally the matters which may be discussed, it is the Committee's intention to avoid further protracted litigation of this issue. The amendment also makes it clear that the discussions shall be in the nature of comments, and that no express or implied agreement may be reached except in the case of carriers which can practicably participate in the movement.

INVESTIGATION AND SUSPENSION OF RAIL CARRIER RATES

*Section 109.*—Under present law, the ICC has the power to suspend rates if a vertified complaint is filed showing that the proposed rate change will cause substantial injury and a likelihood that the complainant will prevail on the merits; an investigation may be instituted on the Commission's own initiative or on complaint of an interested party. Investigation and suspension proceedings must be completed within 7 months, unless a report to Congress is made explaining why the deadline cannot be met, in which case a 3-month extension is available.

The suspension power is sparingly used by the Commission. Nevertheless, it is an important tool which can prevent excessively high rates from becoming effective and being pased on to the consumer. A refund provision alone is not a satisfactory substitute, since it is frequently not possible to pass through awards to the persons who actually paid the unlawful rates. With regard to investigation on the Commission's own motion, we note that this power is exercised only in extraordinary circumstances. However, the power is useful in that it permits inclusion of related tariffs in an investigation, and it serves as an

54-921 O - 79 - 5

avenue to provide relief for small, unsophisticated shippers whose pleadings may not comply with technical filing requirements. Accordingly, the bill does not provide substantive changes in maximum rate regulation in sections 10701 and 10701a. (See descriptions of sections 101–104 and 106 above.)

Changes are proposed, however, in the existing time frames. Because of the importance of the suspension power, and in view of the fact that revenues lost to rail carriers during the suspension period cannot be recouped, expedited handling of such proceedings is essential.

S. 1946, as originally introduced, would have imposed shorter time limits in all suspension and investigation cases. A 5-month deadline was proposed, except when a report was made to Congress in which case completion of the proceeding was required within 8 months. Consideration of the testimony has convinced the Committee that application of the new deadlines to all suspension and investigation proceedings could prove unduly burdensome to the parties and the Commission. Accordingly, the provision adopted by the Committee has been amended to apply the 5- and 8-month deadlines to suspension cases, but to retain the existing time frames (7 and 10 months) for investigation proceedings. This more limited change should provide a proper balance, since it is only the suspension of proposed rate which involves a loss of revenues to the carriers.

We would emphasize, however, that section 10707 requires that proceedings under this section—involving investigation as well as suspension—are to be accorded "preference over all other proceedings". It is our intention that the Commission takes seriously its responsibilities under this section and issue its decisions in suspenion and investigation cases at the earliest practical time, giving due consideration to the rights of the parties.

APPLICABILITY

*Section 110.*—This section reaffirms congressional recognition of the importance of the rail-water competitive relationship and is included to emphasize our intent to insure that the greater rate freedoms incorporated in S. 1946 are not to result in the undermining of healthy competition of railroads with water transportation. The statutory language preserves existing law in this regard.

Throughout the Interstate Commerce Act there are numerous provisions which illustrate prior congressional recognition of the importance of rail-water competitive relationship. We believe that the benefit to the public of rail-water competition and coordination is hundreds of millions of dollars in freight rate savings which are passed through to the consumer. Moreover, pressures of competition improve the efficiency of both rail and water modes. This section continues that prior congressional recognition and emphasizes our intent to insure that the provisions in S. 1946 are not to result in the undermining of healthy competition between railroads and water carriers. Practices which undermine such healthy competition are contrary to this congressional recognition.

DEMAND-SENSITIVE RATES

*Section 111.*—A demand-sensitive rate provision was included in the 4R Act to encourage a system of pricing in the rail industry by which adjustments to fluctuating demand could be made to achieve better car

utilization and increased revenues for the industry. Under section 10727 of Title 49 of the United States Code, the Commission was mandate to formulate standards and procedures for the establishment of demand-sensitive rates, defined as seasonal, regional and peak-period rates, which would provide incentive to shippers to reduce peak-period shipments; generate additional revenue for rail carriers; make more efficient use of the national supply of freight cars; and improve the transportation of property by rail carriers, the level of employment by rail carriers, and the financial stability of markets served by rail carriers. The Commission also was mandated to do an annual report on the implementation of demand-sensitive rates and offer any recommendations for additional legislation which would facilitate such implementation.

In response to this mandate, the Commission decided Ex Parte 324 which further defined demand-sensitive rates and established certain procedures for the filing and review of such rates. Specifically, the Commission made demand-sensitive rates subject to suspension and investigation and the normal notice period of 30 days and required that certain cost data be supplied in support of the filed rates. The Commission decision has aroused much controversy with respect to these specific rulings. Such requirements are considered by some to be unnecessarily cumbersome, thereby preventing the use of such rates in response to sudden changes in the marketplace as originally intended. Few rates have been filed under this provision, and the Commission is reevaluating its original decision.

Section 111 as amended would replace the provision in the current law and provide for the filing of a demand-sensitive tariff in response to expected or actual fluctuations in demand for rail service. The tariff would apply to a specified movement and would include a maximum and minimum rate level, which would be subject to the maximum and minimum rate regulation provisions in section 10701 of 49 U.S.C., as amended by this act. Such tariffs also would be subject to the prohibition against discrimination and the notice and publication requirements, including the 30-day notice period provided in section 114 of this bill. Within these published maximum and minimum rate levels, the carriers would be able to raise or lower rates without challenge, subject to a 5-day notice period as required in section 114. The Commission is encouraged to do whatever is necessary to facilitate the establishment of these rates.

This section is intended to encourage the use of demand-sensitive rates as an integral part of an innovative and market-responsive pricing system which the rail carriers should endeavor to maintain. The establishment of a demand-sensitive tariff would provide an opportunity for the rail carriers to anticipate market changes in certain seasonal commodities and to have available a mechanism for adequate response to these predicted changes. It is hoped that with such a mechanism, the rail carriers would be able to provide the necessary equipment in peak periods. Shippers would be protected from unlawful rates because the maximum and minium m levels of the tariff would be subject to challenge during the notice period of 30 days.

Also, shippers would be sufficiently on notice to adjust their operations if necessary because the movement or movements to which the tariff would apply and the range of possible rates would be known in

advance through the publication of the tariff. The rail carriers would be able to respond quickly to the market through rate changes, within the published maximums and minimums, without delays resulting from challenges or prolonged notice periods. The unfettered nature of the process as established in this section would avoid the confusion and lengthy proceedings which have impeded the implementation of the demand-sensitive mechanism in the past.

Because the movement of grain is conditioned upon the market prices of the commodity itself, rates involving the movement of grain are excluded from the demand-sensitive rate authority provided under this section. If there were adequate storage capacity at final grain destinations, it would be possible to initiate demand-sensitive rates which would at least encourage the movement of grain from the farm areas to the final destination points, such as the Gulf and Pacific ports, for storage until such time as the market price for the commodity increases and the grain is sold. However, testimony reveals that there is inadequate storage capacity at most ports, and even if transportation rates could stimulate the movement of grain, it would move to a final destination with little or no storage capacity. In fact, during peak-demand seasons for grains, the storage of grain, in many situations, is actually within the ship which is commissioned to carry the grain to a foreign port. Obviously, this could not be a constant source of storage capacity.

There is no question, however, that demand-sensitive rates are meaninful with regard to many other bulk commodities. Such commodities do move in cycles that are predictable and do not require sophisticated storage facilities.

RELEASED RATES

*Section 112.*—As a general rule, carriers are held liable (under common law and 49 U.S.C.) for the full actual loss, damage, or injury to property. In 1916, the Interstate Commerce Act was modified by the Cummins Amendment to permit the Commission to authorize released rates in cases where rates based on a declared or released value would be "just and reasonable under the circumstances surrounding the transportation." Under this section, no carrier may publish rates based on the declared or agreed value without specific authority from the Commission. Specific criteria, established in an early released rate case and still generally followed, resuire a detailed showing before released rates are authorized. Even where there is no opposition, the ICC has been hesitant to authorize released rates. Delays in processing have also occurred.

In many instances, shippers have the resources to obtain insurance at a reasonable price and to bear at least a portion of the risk of lost or damaged cargo. Carriers and shippers should be allowed to agree on a fair rate which explicitly takes into account the risk of loss or damage. This can be accomplished by allowing the filing of released rates in the same manner as other rate changes.

Section 112 amends section 10730 by adding a new subsection which provides that rail carriers may establish released value rates subject to the provisions and procedures set forth in chapter 107. The effect of this change is to authorize the filing of such rates without prior Commission authorization.

The Committee believes that rail carriers should be able to negotiate for the type of service required and the rate to be paid for that service. It is with that purpose in mind that this subsection has been added to section 10730—to permit the establishment of released rates as an additional option available to shippers. Full value rates will of course continue in effect for the use of those shippers and receivers which choose not to utilize released rates established and filed under this provision or agree to other terms as part of a contract for services.

TRANSPORTATION OF RECYCLABLE COMMODITIES

*Section 113.*—This section places an upper limit on rates to be found reasonable for recyclable commodities that would equal the level established under section 102 of the bill. This level would be recomputed each year by the Commission, and the maximum level of reasonableness for recyclables would be adjusted to reflect the annual adjustments under section 102.

It has been an established national policy, since at least 1965, to encourage and assist in the development and promotion of the collection, transportation, processing and industrial utilization of recyclable materials. Beginning with the Solid Waste Disposal Act of 1965, Congress directed the Environmental Protection Agency to investigate the effects of existing Federal programs and policies on industrial recycling and to recommend what might be done to eliminate or moderate all Federally sponsored disincentives to the reuse, recycling and conservation of materials.

In 1970 Congress passed two additional statutes, the National Environmental Policy Act and the National Materials Policy Act. Together these acts reinforced the National Policy on recyclable materials by directing all Federal agencies to use every practicable means to enhance the quality of renewable resources and to obtain maximum recycling of depletable resources. Additional legislation expressing this national policy include the Resource Conservation and Recovery Act of 1976, the National Energy Conservation Policy Act of 1978, and the Energy Tax Act of 1978.

The freight rate issue has been a key in legislation attempting to encourage increased recycling as a way to mitigate the problem of energy and resource conservation. Rail freight rates are an important factor in the economics of recycling. Often the rates on these commodities equal or substantially exceed the value of the recyclable materials and thereby make it economically impossible for these materials to be marketed competitively. This is inconsistent with the national interests incorporated in and comprise the focal point of the energy resource legislation described above.

This Committee and Congress, through section 603 of the Regional Rail Reorganization Act of 1973 and section 204 of the 4R Act, issued statutory mandates to the Interstate Commerce Commission to remove all unreasonable, discriminatory freight rates for recyclables. Congress' concern then, as it is now, was with the disparity of rates charged to ship recyclable and competing virgin materials. Unless such rate disparities were cost justified, they were to be eliminated without regard to the railroads' general revenue needs.

The need for this additional legislation arises because the Interstate Commerce Commission initially failed to properly comply with the clear congressional mandates, with the result that its proposed actions were unanimously reversed, vacated and set aside by the United States Court of Appeals in Washington in 1978. In response to the court's remand of the Interstate Commerce Commission recently proposed to place a "cap" on freight rates for recyclables at 180 percent of variable cost. At the time this "cap" was imposed it exceeded the average revenue/variable cost level for all traffic moving by rail by 53 points, the rebuttable market dominance presumption under the Commission's rules by 20 points and approximately 30 points above the reasonable levels that would be fixed by section 102 of S. 1946. The Committee notes that the Department of Justice, the Department of Energy and the Environmental Protection Agency have all filed briefs in opposition to the ICC's proposed cap. It is therefore the Committee's belief that after a full 6 years since the clear mandate to remove those economic barriers to the promotion of recyclable materials was first issued, it is now necessary to insure reasonable and nondiscriminatory rate levels on these vital commodities by statutory proscription.

The Committee's provision is quite simple: it merely reduces the Commission's cap on recyclables from the 180 percent revenue/variable cost ratio level to the ratio level established by section 102 of S. 1946.

At the estimated level of 140 percent to 160 percent, to be established under this section, the railroads would receive revenues that exceed their variable costs by 40 percent to 60 percent and at that level they should be able to make a profit on this recyclable traffic. At this level, neither the railroads nor any other traffic will be "subsidizing" recyclables. This traffic will be paying its full way—including all costs, plus a reasonable rate of return to the railroads.

It is the Committee's intent that the railroads be afforded their full cost plus a reasonable return on the movement of recyclables and therefore the applicable ratio under this provision will be recomputed by the Commission each year, just as the same ratio is to be recomputed annually under section 102 of the bill. This level, however, will represent a "maximum level of reasonableness" for recyclables, and as long as rates charged for the transportation of these materials of such vital importance to the United States are at this level, there can be no further rate increases above such revenues to variable cost ratios.

NOTICE AND PUBLICATION

*Section 114.*—Under section 10762(a), 49 U.S.C., rail carriers must publish and file tariffs and related rules and practices, which are to be kept open for public inspection, and under section 10761 of the Code the carriers cannot charge what has not been so filed and published in a tariff. A new or change rate is likewise to be published, filed and kept open under section 10762(c)(1) of the Code. Pursuant to section 10762(b), the Commission must prescribe the form and manner of such publishing, filing and keeping open for inspection, subject to the provision in (b)(1) which mandates the filing and publishing of certain information on charges. Concomitant with this authority, the Commission

under section 10762(d)(2) of the Code has the power to prescribe rules for tariff simplification and abbreviated filing if consistent with the public interest.

With regard to notice, as provided in section 10762(c)(3) of the Code a new or changed rate may not become effective for a period of 30 days after the notice of such change is published and filed. Under (d)(1) of this section, however, the Commission has the authority to reduce the 30-day period and any other requirements if cause exists.

Section 114 as originally introduced would have amended subsection (c)(3) of 10762 to provide for a reduced notice period of 15 days applicable to new or changed rail rates, except that for contracts authorized under Section 106 and demand-sensitive tariffs filed pursuant to section 111 of this bill a 30-day notice period would be required, and that for rate changes within a demand-sensitive tariff only a 5-day notice period would be required. However, many agricultural shippers testified that a 15-day period was too short. In response to this concern, the bill as reported out would provide for a 20-day notice period, effective 60 days after the date of enactment of the bill. During this period of 60 days, the 30-day period in the current law would be applicable. Of course, attendant to this notice provision would be the Commission's present power to reduce the notice period if cause existed, and it is hoped that the Commission will fully exercise its authority in this area.

Relating to the Commission's authority over the publishing and filing of rail rates, subsection (b)(1) of 10762 as amended by paragraph (3) of section 114 would maintain the Commission's obligation to insure that tariffs are published, filed, and kept open for public inspection, but that the authority over the form and manner of such publication, filing and inspection would be permissive with respect to rail carriers rather than mandatory as now provided. The Commission still would have the power to provide for tariff simplification and abbreviated filings.

Paragraph (2) of section 114 would amend section 10762 of the Code to establish special rules for the publishing and filing of contracts authorized under section 106 of this act. Contracts would be exempt from the normal tariff rules, and the Commission would have the authority to promulgate, if necessary, special rules applicable to contracts. At least, however, the essential terms of the contract, as the Commission may define, would have to be published and filed in lieu of a normal tariff filing. Information in the contract in addition to the essential terms could be filed at the option of a party to the contract with the consent of the other parties to the contract and at the request of any party the Commission would place such additional information in a confidential file, made available at the discretion of the Commission only to a party in a proceeding authorized under section 106 of this act relating to contracts.

The above provision relating to the publishing and filing of contracts would avoid unnecessary regulatory scrutiny of contracts as a result of cumbersome and needless tariff rules. As the parties to the contract already would have had notice, the contract need only be filed for review by interested competitors and potential litigants, requiring less dissemination than normal tariffs. At a minimum, however, the essential terms of the contract should be filed, including but not neces-

sarily limited to the rates, commodities, origin and destination, and parties to the contract. In some situations, a party might not want to take the risk of deciding which are essential terms and instead would choose to file the entire contract. In such cases, shippers might be concerned about revealing certain information to their competitors. The party concerned could request that any information other than the essential terms be kept in a confidential file and shown only to parties in a subsequent proceeding stemming from the contract, specifically relating to cases involving discrimination, the common carrier obligation, and destructive competitive practices.

Section 114 in general is intended to make the notice and publication requirements less cumbersome for the railroads. The shortened notice period of 20 days would facilitate the rail carries' response to changes in the marketplace while providing the shippers with adequate time to adjust their operations or file protests. The transition period of 60 days would further allow shippers time to become accustomed to the shorter notice period. In the case of demand-sensitive tariffs, however, a longer notice period of 30 days would be required for adequate review and appropriate challenge of the range of rates, although for rate changes within the tariff no more than 5-days notice would be necessary, given that the tariff itself already would have been subject to notice. Contracts also would be subject to a longer notice period of 30 days to allow for adequate review and appropriate challenge, as no rate challenges would be permitted once a contract had become effective. It is expected that allowing the Commission to prescribe the form and manner of filing and publishing only if it so desires would encourage the Commission to use its discretion to relax cumbersome rules and facilitate an adjustment to new technology in tariff publication.

REPEALS

*Section 115.—Market dominance.*—Paragraph (a) would repeal section 10709, 49 U.S.C., pertaining to market dominance. This provision is to be replaced by the proposed maximum rate regulation provisions in sections 102, 103, and 104 of this bill.

*Capital incentive rates.*—Paragraph (b) would repeal section 10729 of the Code pertaining to capital-incentive rates. However, the provisions of section 10729 would remain in effect with respect to notices of intent to establish such rates filed pursuant to section 10729 not less than 90 days prior to be date of enactment of this act.

The 4R Act provided for capital-incentive rates which were to be based on an investment by a shipper, railroad, or interested third party of $1 million or more in rail-related equipment or facilities. Once approved by the Commission, such rates were not to be found unlawful for 5 years based on a claim of unreasonableness or discrimination. The intent of this provision was to encourage the negotiation of rates reflecting individualized and innovative service and to create stability which would promote large investments, particularly in the movement of coal.

The Committee is concerned that the intent of this provision has been frustrated by regulatory complexities and ambiguities and by protracted litigation, and is thus recommending its repeal. More importantly, with the legalization of contracts for rates and services under

section 106 of this act, this provision becomes superfluous. It is intended that contracts will be negotiated for coal movements.

*"Yo-Yo" rates.*—Paragraph (c) repeals sections 15(8) (c) and (d) of the Interstate Commerce Act, as amended by section 401 of the Local Rail Service Assistance Act of 1978, pertaining to "yo-yo" established under the 4R Act. Under the 4R Act, a no-suspend zone was established within which rates could be raised or lowered under certain conditions 7 percent within a given year without suspension by the Commission for unlawfulness. This provision is unnecessary in light of the rail cost adjustments zone, free of regulation as described in section 103, and the 4 percent no-suspend zone in section 104.

SAVINGS PROVISION

*Section 116.*—The maximum rate provisions of this legislation are intended to simplify rate regulation: to provide protection for captive shippers where necessary in the public interest and to provide pricing freedom for railroads where competition exists. In general, section 102 provides a jurisdictional threshold below which a rate may not be challenged as unreasonably high. A free zone is established for increased costs, and an additional 4 percent rate flexibility zone is provided within which increases cannot be suspended or investigated although they may be challenged by formal complaint.

The purpose of the savings provision of section 116 is to permit challenge of existing rates in an orderly fashion during a period of transition to the ratemaking provisions and procedures of S. 1946. Otherwise, shippers would be faced with the prospect of unavoidable rate increases without adequate opportunity to have the Commission consider the reasonableness of the underlying rate. Without a reasonable opportunity for challenge, many shippers might have felt compelled to file complaints immediately prior to enactment of this bill.

S. 1946, as introduced, provided a 6-month challenge period. The record before the Committee established that a longer period was needed in view of the complexity of the existing rate structure. Section 116(a) as amended, provides that existing rates may be challenged as exceeding maximum reasonableness as long as the complaint is filed within 270 days of the date of enactment and the challenged rate exceeds the jurisdictional threshold of section 10701(e).

Subsection (b) makes it clear that, following enactment of this bill, rate changes (as opposed to existing rates) may only be challenged in accordance with the new ratemaking provisions and procedures.

CAR UTILIZATION

*Section 117.*—Section 117(a) creates a new section 10732 of the Interstate Commerce Act. This section provides that rail carriers are free to establish a special *elective* tariff which contains premium freight rates for special services or levels of services that may be requested by a shipper. Throughout our hearings on rail regulatory reform, we received testimony from many shippers who advised that they were prepared to pay a higher rate for a higher level or a more expeditious service. This amendment will give those shippers that option and, in turn, allow the rail carriers to increase the utilization of their cars.

Essentially, this subsection allows carriers to provide a more specialized service to shippers who choose to pay the premium rate. The Committee would like to emphasize that the rules of "reasonable dispatch" and the common carrier obligation would not be abrogated in any way. This will insure that the shipper is still guaranteed the same level of service that he receives today. This subsection is simply another option for the shipper.

Section 117(b) contains an amendment to section 511(a) of the 4–R Act. Section 511 of the 4–R Act is one of the financial assistance programs available to railroads for the acquisition, repair, or improvement of rolling stock and facilities associated with rolling stock. This amendment opens the doors of eligibility to this loan program to computerized car management systems which carriers desire to acquire, repair, or rehabilitate. Most railroads in this Nation operate sophisticated computer systems to follow their rolling stock throughout their rail network. These computers are *essential* to the efficient management of a railroad's car fleet. Unfortunately, as technology improves, many of the early computer systems have become obsolete. The new technology which is available would certainly pay for itself in a short period as a result of increased utilization of the car fleet. All loans under the 511 loan program are absolutely *secured*.

## Title II: Structure

Title II of S. 1946 deals with issues which affect the structure of the rail industry. Two major changes are made with respect to restructuring actions less than merger: tighter time limits are imposed on the ICC's consideration of such actions and the standards under which the ICC judges such actions are simplified. These changes are included to encourage the rationalization of the Nation's rail system through actions less than merger.

The abandonment of rail lines is always a controversial issue, and this legislation does not change the substantive standards under which abandonment decisions are made. However, this legislation would substantially improve and speed up the process by which such decisions are reached. In addition, the procedures for subsidizing lines which might otherwise be abandoned are significantly improved by giving the Commission the power to arbitrate disputes between the railroad seeking to abandon the line and those who wish to subsidize or purchase the line.

To encourage intramodal competition, the standards under which the Commission considers applications to build or extend rail lines are liberalized. Also, the Commission is given the power to require reciprocal switching where it finds doing so to be in the public interest.

### MERGERS AND OTHER TRANSACTIONS

*Section 201.*—This section would make no changes in the present law with respect to major rail mergers: the ICC would consider such proposals under existing standards and procedures, and the present time limit of about 31 months (which was established by the 4R Act) would be retained. However, this section makes two major changes

in the present law under which the Commission is required to consider all other restructuring transactions among railroads (including the purchase or sale of assets, trackage rights, and the like). These changes are intended to encourage the rationalization and restructuring of the rail system through actions less than merger.

First, the Commission would have to decide on smaller transactions faster than under present law. Present law permits the Commission 15 months to decide all such cases regardless of their complexity or importance. For transactions having regional or national significance, this section would require the Commission to reach a decision within 10 months. For transactions which do not have regional or national transportation significance, this section would require the Commission to reach a decision within 6 months. These deadlines are, of course, maximum time limits and the Committee believes that many applications can and should be processed without taking the full amount of time allowed.

In order to meet the deadlines specified in this section, the number of factors the Commission must consider in ruling on transactions less than merger would be reduced. (The Commission now applies the same test to all transactions as to major mergers.) Section 201 would require the Commission to balance the transportation benefits of the transaction against any anticompetitive effects. In addition, where the transaction is part of a restructuring project previously approved by the Secretary of Transportation under section 401 of the 4R Act, the Commission would be required to give substantial weight to the recommendations of the Secretary.

The Committee notes that many transactions for which Commission approval is required are minor in nature and routinely approved. The Committee believes that the Commission should focus its attention on more important issues and judiciously use its statutory authority to reduce the burden on all parties (including a reduction in paperwork) where approval is routinely and consistently granted.

### ABANDONMENT

*Section 202.*—The abandonment provisions of this bill are designed to accomplish two major objectives: significantly reducing the time spent processing such cases at the Commission and improving the process by which abandoned lines can be subsidized. No changes are made in the standards under which the ICC decides whether or not to grant the abandonment of railroad lines.

Section 202(a) eliminates the mandatory waiting period now required after an abandonment certificate is issued and before the abandonment can actually occur. The waiting period is now mandatory, and the Commission has no discretion to waive it even where no useful purpose would be served. Under the procedures described below, the Commission would be able to require railroads to continue service after abandonment is approved, but would have the discretion to waive that requirement.

Section 202(b) spells out the new time limits for considering abandonment applications. Applications for abandonment which are not opposed would be granted within 45 days, and the abandonment would

occur within 75 days. With respect to unopposed applications, this would basically codify existing ICC practice. For applications which are opposed, ICC decisions would be reached much more quickly than under present law, and the ICC would be required to process and decide such cases within 9 months.

Two other changes are made by section 202(b). First, for applications approved by the Secretary of Transportation as part of a restructuring action under section 401 of the 4–R Act, the Commission would be required to consider whether any detriment from the abandonment or discontinuance exceeds the transportation benefit from the restructuring plan as a whole. Thus, in ruling on an abandonment that is part of a program to consolidate traffic on an upgraded line, the Commission would be required to consider the benefits of the upgrading in addition to the effects of the abandonment. Second, the law now prohibits the ICC from granting an opposed abandonment application unless the line to be abandoned was shown on system diagram maps for at least 4 months before the application is filed. The Commission would be given discretion to waive this requirement for lines of railroads which are in bankruptcy or for abandonment applications which are part of a 401 restructuring action.

As noted above, while section 202(b) will provide much faster processing of abandonment cases, the standards under which the ICC decides whether or not to approve an abandonment would remain unchanged. Along these same lines, the Committee adopted an amendment during its consideration of S. 1946 to delete language which was viewed by some as limiting the right to protest abandonments. This reflects the Committee's intent to significantly speed up the decision process without changing the standards involved or the standing of the parties in abandonment cases.

Section 202(c) deals with the purchase or subsidization of rail lines which have been approved for abandonment. Present law (section 10905 of title 49 of the U.S. Code) sets up a procedure where rail lines approved for abandonment may be purchased or subsidized in order to continue rail service. The Commission now has the power to stay the effective date of an abandonment for 6 months while negotiations to subsidize or purchase a line are conducted. However, if such negotiations are not successful, the abandonment becomes effective at the end of 6 months. Thus, a railroad unwilling to consider subsidy or sale of the line can frustrate the intention of section 10905 of 49 U.S.C. by simply refusing to negotiate in good faith.

Section 202(c) of this bill revises section 10905 to provide that, when a railroad and a potential subsidizer or purchaser cannot reach agreement, either party may request that the ICC establish the amount of subsidy or the purchase price of the line. If the amount of subsidy is set by the Commission, the potential subsidizer may accept the decision or withdraw his offer. The railroad, however, is obligated to accept the subsidy or purchase offer as established by the Commission. The opportunity for the offeror to withdraw is provided because some States have provisions in their State constitutions which would limit their ability to enter into arbitration binding on both sides.

Where multiple offers are received, the railroad may choose the offeror with which it wishes to negotiate. If negotiations do not lead

to the subsidy or purchase of the rail line in order to provide continued rail service, offers made by other parties may be considered. However, it should be stressed that the intent of this legislation is to simplify and speed up the subsidy process and that the Commission must not permit the existence of multiple offers to unduly or unfairly delay the process.

ENTRY

*Section 203.*—The new railroad transportation policy established by this bill emphasizes the need for increased intramodal and intermodal competition, and section 203 deals with intramodal competition among railroads. Under present law, railroads may not construct new rail lines or extend their lines without the approval of the Interstate Commerce Commission. Tight control of entry is most appropriate for public utilities where prices and service offerings are also tightly controlled. As the Government moves toward significantly less regulation of the services offered by railroads, the Government should encourage, rather than discourage, competition among railroads. Competition among railroads, or at least the realistic threat of competition, can serve as an important safeguard against inadequate service or unreasonably high prices.

Section 203(a) of the bill proposes two changes to current law.

(1) Under present law, the Commission may authorize the construction of a railroad only if it finds that the public convenience and necessity (PC&N) "require or will be enhanced" by the construction. This is a more stringent test than that applied to either the abandonment of rail lines or mergers. There does not appear to be any reason why the Commission should apply a more difficult standard for the construction of new facilities than for the abandonment of old facilities. Section 203(a)(1) of this legislation will change the test applied by the Commission from "require or will be enhanced" to "require or permit". By making this change, the Commission would be required to apply the same standards to entry applications as to abandonment application.

(2) Where a railroad has been issued a certificate of public convenience and necessity by the Commision and where the construction or extension of that line would cross another carrier, it is unclear whether the second railroad could block the construction by refusing to let the first railroad cross its property. The prevailing opinion is that, where the Commission has issued a certificate of public conveniece and necessity, another regulated carrier cannot block construction. However, the issue has not been clearly settled. Thus, section 203(a)(2) of this legislation provides that, when a railroad has been issued a certificate of PC&N, no other railroad may block construction by refusing to let the first railroad cross its property, provided that the construction and operation do not materially interfere with the operation of the second railroad and the owner of the crossing line compensates the owner of the crossed line. If the railroads cannot agree on the terms of compensation, the Commission may establish the compensation.

Section 203(b) deals with the issue of reciprocal switching. In many parts of the country, reciprocal switching agreements are in effect

where carriers pick up and deliver traffic for other railroads. In areas where reciprocal switching is feasible, it provides an avenue of relief for shippers served by only one railroad where service is inadequate. While the Commission now has the power to order joint use of terminal facilities, its power to order the more limited action of reciprocal switching is less clear. In S. 796, the administration has proposed to require reciprocal switching in all standard metropolitan areas. Section 203(b) of this bill provides simply that the Commission may require the railroads to enter reciprocal switching agreements where it finds such agreements to be "practicable and in the public interest". The standard "practicable and in the public interest" is the same standard the Commission has applied for many years in considering whether to order the joint use of terminal facilities.

## Title 3: General Provisions

### CAR SERVICE ORDERS

*Section 301.*—Section 301 would alter the Commission's emergency powers to issue car service orders. The Commission's power to issue car service orders would be restricted in two ways. First, the power would be restricted to emergencies "of such magnitude as to have substantial adverse effects on rail service to the nation or a substantial region of the nation". This is intended to ensure that the Commission restricts the use of its emergency powers to real emergencies and reflects a widespread consensus that the ICC issues far too many car service orders in situations where real emergencies do not exist.

Second, the ICC's emergency powers are also restricted in that emergency orders would be limited to an initial 30 days, but could be extended by 60 days when the Commission has begun a proceeding to resolve the service problems which generated the need for the emergency order on a more permanent basis.

While section 301 restricts the circumstances under which the Commission may use its emergency powers to issue car service orders, this bill would expand somewhat the Commission's power to deal with true emergencies. Under present law, the Commission may suspend car service rules or practices, switch equipment among carriers, require the joint use of terminals, and give direction for the preference and priority of transportation. This bill would remove the limitation that joint use would be required only in terminal areas. Where a transportation emergency exists, the ICC's power would extend to ordering the joint use of all facilities rather than the joint use of only some facilities. Some concern has been expressed that the time limits may have the impact of restricting certain types of car service orders which are not controversial, and often extend for more than 90 days. However, these types of orders are permissive rather than mandatory (for example, they often involve relief from tariff rules or permission to reroute trains over another railroad's lines while facilities are under repair). The Committee notes that the Commission has adequate authority to issue such orders under its special permission powers, exemption powers, and under section 11124.

EXEMPTIONS

*Section 302.*—Section 302 would restate the Commission's existing exemption authority in clearer terms. The Commission's present power to exempt transportation from regulation is restricted to situations where the activity is of "limited scope", even if the regulation of that activity is not needed to carry out national transportation policy, represents an unreasonable burden on interstate commerce, and serves little or no useful purpose. Section 302 would provide that, where any provision of the Interstate Commerce Act is not needed to protect shippers from the abuse of market power, the "limited scope" restriction would not apply. This allows the Commission to exempt important areas of competitive traffic and to concentrate its resources on the problems of noncompetitive traffic where continued regulation is most needed. Section 302 would also remove the requirement that proceedings be conducted in all cases before exemptions are granted.

Three amendments were adopted by the Committee during its consideration of S. 1946. First, as noted above, the Commission may not grant exemptions which are beyond the "limited scope" language of existing law if continued regulation is needed to "protect shippers from the abuse of market power." The purpose of this language is to reemphasize the Committee's concern that greater use of the exemption power should not be at the expense of captive shippers who have no reasonable transportation alternatives.

The second amendment provides that the Commission "may not issue any exemption which will substantially lessen competition and coordination between water and rail carriers." As with language contained elsewhere in this bill, the intent of this legislation is to make no changes in existing law on the relationship between rail and water carriers, and this language is intended to reemphasize that intent, and make sure that the exemption authority is not used contrary to that intent.

The third amendment provides that no exemption order shall operate to relieve railroads of their common carrier liability for claims under 49 U.S.C. 11707. This amendment requires railroads to maintain their common carrier liability for claims where released rates are not in effect (as provided in section 11707(c)(4)) or where carriers and shippers have not entered into a contract under which liability for loss is limited to a value established by a voluntary declaration of the shipper. This amendment is not intended to restrict the ability of carriers and shippers to agree on released rates or to enter into contracts.

FEDERAL-STATE RELATIONS

*Section 303.*—Under accepted legal principles of federalism. Federal law preempts State law in areas which affect interstate commerce. More specifically, State regulations may not unreasonably discriminate against or place a burden on interstate commerce. State regulation will prevail over Federal regulation when the interest affected is of particular local concern, as in the areas of health and safety, unless there is either discrimination against interstate commerce or a superseding national regulatory scheme. Federal law preempts State law when a

State law either directly conflicts with a federal law or is inconsistent with a preexisting Federal scheme.

In the area of transportation, the concepts of federalism have been codified in Title 49 of the United States Code. Under section 10501, the Commission has jurisdiction over carriers moving in interstate commerce but not over intrastate transportation unless otherwise provided in this title. As otherwise provided, under section 11501 of the Code, the Commission can nullify State regulation which unreasonably discriminates against or burdens interstate commerce. In particular, the act provides the Commission with exclusive jurisdiction under 11501(b) over an intrastate rate which has been filed with a State agency for the purpose of adjusting the rate to the level of the interstate rate on similar traffic, if a decision by the agency has not been reached within 120 days of the filing of the rate. As provided in sections 10501(c) and 11501(c) of the Code, any Commission action taken pursuant to its authority under this title supersedes conflicting State law or action will have the force of law if it is in conflict with or prohibited under the Federal scheme of regulation provided in Title 49 of the United States Code.

Section 304 as amended would not change the present law with respect to Federal-State relations. It would merely reaffirm both that the Commission's power in this area is only as otherwise authorized in the title and that the States' power cannot conflict with the Federal regulatory scheme. Specifically, paragraphs (1) and (3) would provide that the Commission could only prescribe a rate or effect other action which is consistent with its rate regulatory authority as limited under this act, particularly in light of sections 103 and 104 relating to the rail cost adjustment zone free of regulation and the no-suspend rate flexibility zone. Paragraph (4) reaffirms that where the Commission has no jurisdiction to regulate, as in the area of maximum rate regulation, the State could not assume jurisdiction. Federal law would preempt any such inconsistent State law or action in this regard, and no such State regulation would be allowed. The section as reported out would add a further point to the original provision as introduced to insure that where the States do have jurisdiction, they are to regulate in accordance with the transportation policies set forth in the act, particularly those stressing maximum reliance on competitive market forces, reduced regulation, expeditious regulatory decisions, and cooperation between State and Federal officials on rail matters. In this way, the Federal intent to limit and streamline regulation under this act would not be frustrated.

The section as reported out would include in paragraph (3) an additional provision shortening the time under section 11501(b) from 120 days to 90 days. Concern has been expressed that State regulation in some instances causes unnecessary delays in rate changes. In light of the purpose behind the act to improve the financial status of the rail industry through additional rate flexibility, it is important that unnecessary impediments to needed rate changes be minimized. The shortened period should not unduly burden State jurisdiction over intrastate rates.

FUEL ADJUSTMENT SURCHARGES

*Section 304*—Section 304 of the bill provides that the 100 percent fuel recovery permitted under section 105 of the bill shall be applied to *intrastate* rates as well as interstate rates. Because the nation's rail system operates as one unified network, fuel impact on intrastate movements is identical with its interstate counterparts. Accordingly, fuel cost recovery permitted by the Interstate Commerce Commission for interstate movements shall be applied equally to intrastate movements. The Committee wishes to emphasize that section 304 does not preclude the jurisdiction of State regulatory bodies from their traditional intrastate rate-making functions other than fuel costs recovery. The Committee expects the Interstate Commerce Commission proceedings designed to determine adequate fuel costs recovery will provide State regulatory bodies ample opportunity to participate and to contribute data and other pertinent information which will be reflected in the final Commission decision.

CONVERSION OF ABAONDONED RAILROAD RIGHTS-OF-WAY

*Section 305.*—Section 305 is an amendment to the original bill, S. 1946, the Railroad Transportation Policy Act of 1979. It is the purpose of this section to authorize $20 million over a 3-year period for acquisition of abandoned railroad rights-of-way for future use as bicycle paths, jogging and hiking trails and related transportation, recreation and conservation uses, as stated in section 809 of the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act). This authorization includes matching Federal and State funds, with the Federal share being 80 percent and the State share being 20 percent.

The 4R Act authorized $20 million for fiscal year 1976, 1977 and 1978 to the Department of Interior for acquisition of abandoned railroad rights-of-way for conversion to trails related to transportation, recreation, and conservation. Based on this initial authorization $5 million was appropriated during the 95th Congress to Department of Interior Bureau of Recreation (now the Heritage Conservation and Recreational Services) for funding the Rail-to-Trail program.

The response to the Department of Interior's public notice of funding for the Rail-to-Trail program was very enthusiastic. The Department received 135 applications totaling $70 million. Because of the large response to the project, DOI felt they could be selective in the application approval. Top priority was given to applications for trails based or originating in metropolitan areas as well as trails used for commuter transportation.

Ten projects received funding from the $5 million appropriated. These 10 projects represent 111.62 miles of multiple-use trails from abandoned rail lines in 10 States. This is a small percentage of the 6,232 miles of nationwide abandonments suitable for conversion to transportation and recreational uses.

Funding authority for this project expired as of September 30, 1979. This authorization will allow for the continuation of the Rail-

54-921 O - 79 - 6

to-Trail program started in the 4R Act. Evidence from State governments has shown intense interest in preserving funding for this program.

RAIL TECHNOLOGICAL IMPROVEMENTS

*Section 306.*—This section fosters rail technological improvements by giving the Federal Railroad Administration discretionary authority to grant exemptions from the Safety Appliances Acts' mandatory requirements when those requirements preclude the development or implementation of new rail technology.

In the era preceding the development of an extensive highway system and a fully developed trucking industry, the rail freight market was conducive to door-to-door deliveries over a dense rail network using general-purpose freight cars. Today the freight market may be divided into distinct categories of bulk and manufactured commodities. Bulk commodities tend to move profitably in high-volume flows over relatively long distances between a relatively limited number of origin areas and a limited number of market areas. Many of the manufactured commodities are moving by the swifter, reliable trucks. However in 1973, traffic in manufactured goods continued to provide the railroad industry with 45 percent of its total tonnage and 74 percent of its freight revenues.

Since the drift of the economy is toward traffic having characteristics more suited to truck transport, a key to improving the railroad's rate of return would be in the development of rail technology better suited to the emerging patterns of general merchandise freight traffic and which would make the rail industry a more able competitor for this traffic. This may suggest some need to redesign freight cars or train systems. Specifically, the suspension, automatic coupling and braking systems of present-day freight cars are designed to accomodate safety requirements resulting from the need to detach and switch cars frequently. The Task Force on Railroad Productivity in its final report to the National Commission on Productivity and the Council of Economic Advisers intimated that these present systems have deficiencies that might be overcome in cars that would remain permanently or semi-permanently attached and would not have to be interchangeable with all the other cars in the fleet. However, even if the technology was available, the current Safety Appliances Act would restrict the implementation of innovative rail equipment. The issue of Roadrailer (a new innovative piece of equipment that is designed to operate in both the highway and railway modes), is a case in point.

Section 2 of 45 U.S.C. states, "It shall be unlawful to any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with *couplers coupling automatically by impact*, and which can be uncoupled without the necessity of men going between the ends of the cars." (March 2, 1893, ch. 196, sec. 2, 27, stat. 531.)

In traditional railroad operations, the need for this provision is reasonably obvious since the cars are frequently coupled with both cars in motion where the lack of an automatic coupling provision would make it necessary for a trainman to either ride the car or run

alongside the car in order to accomplish the coupling. It would be hard to picture this as a safe operation. With RoadRailers, however, coupling *cannot* be performed in motion since the forward end of the car being coupled must be resting on its landing gear which requires that it be stationary.

This appears to be much safer than the coupling of conventional railroad cars where it is often necessary for men to go between the cars before coupling to position the coupler, and *always* necessary to crawl between the cars to connect air hoses after coupling. The requirement to couple on impact may be appropriate for conventional cars in hump yards, but apparently adds nothing to the safety of coupling RoadRailers.

This provision of S. 1946 would allow greater flexibility in the development of more efficient railroad transportation equipment. The sections of 45 U.S.C. specifically at issue are sections 1 through 16.

While this legislation would be immediately applicable to the RoadRailer, progress with other types of railroad equipment might similarly benefit. The Railway Safety Board, as delegate to the authority of the Federal Railroad Administration, would have discretionary powers in determining what type of equipment should be exempted from the present mandatory requirements. The exemptions for RaodRailer and possibly other equipment, rests on the fact that there is no need for this new equipment to be interchangeable with or compatible with existing equipment since they will be prohibited from being commingled with equipment built to current regulations. The change in legislation would serve the additional purpose of relieving the Congress of the necessity for reviewing the highly technical equipment considerations involved in attempting to make innovations under the existing statutes.

## Rollcall Votes in Committee

In compliance with section 133 (b) and (d) of the Legislative Reorganization Act of 1946, as amended, the record of rollcall votes in the Committee on Commerce, Science, and Transportation, during its consideration of S. 1946 is as follows:

| *Yeas* | *Nays* |
| --- | --- |
| Cannon | |
| Magnuson | |
| Hollings [1] | |
| Inouye [1] | |
| Ford | |
| Riegle [1] | |
| Exon | |
| Packwood | |
| Goldwater [1] | |
| Schmitt | |
| Danforth | |
| Kassebaum | |
| Pressler | |
| Warner | |

[1] By proxy.

## CHANGES IN EXISTING LAW

In compliance with subsection (4) of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new material is printed in italic, existing law in which no change is proposed is shown in roman):

**§ 10101. Transportation policy**

(a) **[**To**]** *Except where policy may have an impact on rail carriers, in which case the principles of subsection (b) of this section shall govern, to* ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—

(1) to recognize and preserve the inherent advantage of each mode of transportation;

(2) to promote safe, adequate, economical, and efficient transportation;

(3) to encourage sound economic conditions among carriers;

(4) to encourage the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices;

(5) to cooperate with each State and the officials of each State on transportation matters; and

(6) to encourage fair wages and working conditions in the transportation industry.

*(b) In regulating transportation provided by carriers, the Commission shall consider the following as being in the public interest:*

*(1) development and maintenance of a healthy, efficient freight transportation system, in the private sector, in which various modes of transportation are subject to impartial regulation;*

*(2) maximum reliance on competitive market forces and on actual and potential intramodal and intermodal competition to provide transportation services at fair prices and to enable efficient and well-managed carriers to earn adequate profits and to attract capital;*

*(3) avoidance of undue concentrations of market power on the part of rail carriers and the maintenance of regulatory protection for shippers and receivers against the abuse of market power;*

*(4) reduction of regulatory barriers to entry into and exit from the industry;*

*(5) maintenance of fair wages and working conditions;*

*(6) operation of transportation facilities and equipment without detriment to the public health and safety;*

*(7) development and maintenance of a transportation system responsive to the needs of the public, in which regulatory decisions are reached fairly and expeditiously;*

*(8) encouragement of the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices;*

*(9) cooperation with each State and the officials of each State on transportation matters in an effort to assure that intrastate regulatory jurisdiction is exercised in a manner consistent with the standards established in this subsection;*

*(10) elimination of noncompensatory rates for rail transportation; and*

*(11) encouragement and promotion of energy conservation.*

**[**(b)**]** *(c)* This subtitle shall be administered and enforced to carry out the policy of this section.

**[§ 10505. Authority to exempt rail carrier transportation**

(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under the subchapter, the Commission shall exempt a person, class of persons, or a transaction or service because of the limited scope of the transaction or service, when the Commission finds that the application of a provision of this subtitle—

(1) is not necessary to carry out the transportation policy of section 10101 of this title;

(2) would be an unreasonable burden on a person, class of persons, or interstate and foreign commerce; and

(3) would serve little or no useful public purpose.

(b) The Commission may begin a proceeding under this section on its own initiative or on application by the Secretary of Transportation or an interested party. The Commission may specify the period of time during which the exemption is effective.

(c) The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class, or transportation is necessary—

(1) to carry out the transportation policy of section 10101 of this title;

(2) to achieve effective regulation by the Commission; and

(3) to serve a useful public purpose.

(d) The Commission may act under this section only after an opportunity for a proceeding.**]**

***§ 10505. Authority to exempt rail carrier transportation***

*(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle is not necessary to carry out the transportation policy of section 10101(b) of this title and either the transportation or service is of limited scope or the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power: Provided, however, That the Commission may not issue any exemption which will substantially lessen competition and coordination between water and rail carriers.*

*(b) No exemption order issued pursuant to this section shall operate to relieve any common carrier by railroad from the common carrier liability for claims imposed under section 11707 of this title.*

*(c) The Commission may where appropriate begin a proceeding under this section on its own initiative or on application by the Sec-*

*ratary of Transportation or an interested party. The Commission may specify the period of time during which the exemption is effective.*

*(d) The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class, or transportation is necessary to carry out the transportation policy of section 10101(b) of this title.*

### § 10701. Standards for rates, classifications, through routes, rules, and practices

(a) A rate, classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title must be reasonable. A through route established by such a carrier must be reasonable. Divisions of joint rates by those carriers must be made without unreasonable discrimination against a participating carrier and must be reasonable.

(b) (1) A rate for transportation provided by a rail carrier subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title that contributes, or would contribute, to the going concern value of that carrier does not violate subsection (a) of this section because it is below a reasonable minimum rate for the service rendered or to be rendered. [This subsection does not prohibit increasing a rate to a level that contributes to the going concern value of a rail carrier if the increase is otherwise reasonable. The increased rate is presumed reasonable if it does not exceed the incremental costs of rendering the transportation to which the increase applies.]

(2) (A) A rate for transportation by a rail carrier that equals or exceeds the variable costs of providing the transportation is presumed to contribute to the going concern value of the rail carrier proposing the rate. However, the presumption may be rebutted by clear and convincing evidence.

(B) Variable [and incremental] costs shall be determined under formulas prescribed by the Commission. However, when making a determination of variable costs, the Commission shall, on application of the rail carrier proposing the rate, determine only the costs of that carrier and only those costs of the specific service in question unless the specific information is not available. The Commission may not include in variable costs an expense that does not vary directly with the level of transportation provided under the proposed rate.

(c) A common carrier providing transportation subject to the jurisdiction of the Commission under subchapter I or III of chapter 105 of this title may not discriminate in its rates against a connecting line of another carrier providing transportation subject to the jurisdiction of the Commission under either of those subchapters or unreasonably discriminate against that line in the distribution of traffic that is not routed specifically by the shipper.

(d) In a proceeding to determine whether a rate for transportation or service provided by a common carrier subject to the jurisdiction of the Commission under subchapter II, III, or IV of chapter 105 of this title complies with subsection (a) of this section, the good will, earning power, or certificate or permit under which that carrier is operating may not be considered or admitted as evidence of the value of the prop-

erty of that carrier. When the carrier receives a certificate or permit under chapter 109 of this title, it is considered to have agreed to this subsection for itself and for all transferees of that certificate or permit.

*(e) (1) A rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may establish any rate for such transportation if such rate yields a revenue-to-variable cost ratio that is equal to or less than the average ratio of revenue-to-variable cost established by the Commission pursuant to this subsection.*

*(2) At regular intervals, but in no event less often than annually, the Commission shall determine and publish the average ratio of revenue-to-variable cost that rail carriers would be required to realize from transportation provided by such carriers under honest, economical, and efficient management in order to cover total operating expenses including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business sufficient to attract and retain capital in amounts adequate to provide a sound transportation system in the United States. The first such average ratio shall be determined and published by the Commission no later than 120 days from the date of enactment of this subsection, until which date a ratio of revenue-to-variable cost (expressed as a percentage) of 150 percent shall be considered to constitute such average ratio for the purposes of this section and the related provisions of sections 10704, 10705, 10707, and 11701 of this title.*

*(3) Within 1 year after the date of enactment of this subsection, the Commission shall complete and submit to the Congress a study to determine the feasibility and desirability of the use of a return on investment standard as an alternative to the ratio of revenue-to-variable cost standard set forth in paragraph (2) of this subsection.*

*(4) Notwithstanding any other provisions of this subchapter, the Commission shall not have authority to find any rate for transportation authorized under this subsection to be unjust or unreasonable on the basis that such rate exceeds a reasonable maximum for the service rendered or to be rendered, nor may the Commission suspend or investigate such rate as unreasonably high under section 10707 of this title.*

*(f) (1) A rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may increase any rate for such transportation so long as the new rate is equal to or less than the adjusted base rate for such transportation.*

*(2) For the purposes of this subsection—*

*(A) the base rate for the transportation of a commodity shall be the rate in effect on January 1, 1980: Provided, however, That if the Commission finds such rate to be unreasonably high, the Commission may prescribe a different base rate for the transportation of such commodity;*

*(B) if no commodity rate existed for the transportation of a commodity on January 1, 1980, the base rate for the transportation of such commodity shall be the commodity rate for the most nearly comparable commodity and service, divided by the latest rail cost adjustment factor published by the Commission pursu-*

*ant to paragraph (3) of this subsection at the time the transportation is commenced: Provided, That a base rate determined pursuant to this subparagraph shall be subject to challenge on the issue of whether it represents the most nearly comparable commodity or the most nearly comparable service; and*

*(C) the adjusted base rate for the transportation of a commodity shall be an amount determined by multiplying the base rate for the transportation of such commodity by the latest rail cost adjustment factor published by the Commission pursuant to this subsection.*

*(3) As often as practicable, but in no event less often than quarterly, the Commission shall publish, commencing with the fourth quarter of 1979, a rail cost adjustment factor which shall be a fraction, the numerator of which is the latest published Index of Railroad Costs (which index shall be compiled or verified by the Commission, with appropriate adjustments to reflect the quality and mix of material and labor), and the denominator of which is the same index for the fourth quarter of 1979.*

*(4) Notwithstanding any other provision of this subchapter, the Commission shall not have authority to find any rate for transportation authorized under this subsection to be unjust or unreasonable on the basis that such rate exceeds a reasonable maximum for the service rendered or to be rendered, nor may the Commission suspend or investigate such rate as unreasonably high under section 10707 of this title.*

*(g)(1) During any calendar year a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may increase the rate for such transportation by an amount not exceeding 4 percent of the adjusted base rate for such transportation as defined in subsection (f)(2) of this section: Provided, That in no event shall the total increase under this subsection during the period from January 1, 1980 to December 31, 1984, ordering each consecutive period of 5 years thereafter, result in rates which exceed an amount equal to 112 percent of the adjusted base rate for such transportation as defined in subsection (f)(2) of this section.*

*(2) Any part of a rate increase authorized under paragraph (1) of this subsection which is not implemented in a calendar year may be implemented in the next succeeding calendar year: Provided, That in no event shall the total increase under this subsection in any calendar year result in rates which exceed an amount equal to 108 percent of the adjusted base rate for such transportation as defined in subsection (f)(2) of this section.*

*(3) Notwithstanding the provisions of section 10707 of this title, the Commission may not suspend any rate increase authorized by this subsection as unreasonably high pending final Commission action, nor may it begin an investigation proceeding under section 10707 of this title with regard to the reasonableness of a rate increase authorized by this subsection: Provided, That an interested party may file a complaint under section 11701(b) of this title alleging that such increase violates the provisions of this subtitle.*

*(4) Not later than 3 years after the date of enactment of this subsection, and at least every 3 years thereafter, the Commission shall submit to the Congress a report that analyzes the revenue needs of rail*

*carriers and makes such recommendations for the modification of this subsection as the Commission determines may be necessary.*

*(h) (1) A rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may put into effect a general rate increase described in section 10706(a)(3)(B)(i) of this title for the purpose of recovering increased costs, provided the increase does not exceed the following:*

*(A) demonstrated cost increases if such general rate increase is filed with the Commission in the 1st year after the date of enactment of this subsection;*

*(B) 90 percent of demonstrated cost increases if the increase is filed with the Commission in the 2d year after the date of enactment of this subsection, except that increases attributable to increases in the cost of fuel shall not be subject to such percentage limitation;*

*(C) 85 percent of demonstrated cost increases if the increase is filed with the Commission in the 3d year or the first 180 days of the 4th year after the date of enactment of this subsection, except that increases attributable to increases in the cost of fuel shall not be subject to such percentage limitation; or*

*(D) unless the Congress provides otherwise, 80 percent of demonstrated cost increases if such general rate increase is filed with the Commission at any time after the end of the 180th day of the 4th year after the date of enactment of this subsection, except that increases attributable to increases in the cost of fuel shall not be subject to such percentage limitation:*

*Provided, however, That the resulting rates in the aggregate may not exceed the adjusted base rates for such transportation as defined in subsection (f)(2) of this section: And provided further, That increases taken under this section shall be considered in determining whether increases proposed under subsections (f) and (g) of this section equal or exceed the adjusted base rates for such transportation.*

*(2) Each time that the Commission publishes a rail cost adjustment factor pursuant to section 10701(f)(3) of this title, it shall indicate what portion of any increase or decrease in such rail cost adjustment factor is attributable to an increase or a decrease in the cost of fuel used in providing rail transportation.*

*(3) The Commission and the Secretary of Transportation shall each conduct a study of the need for general rate increases, the effect of the phase-down of general rate increases provided in this subsection, the impact of the additional rate flexibility provided by the amendments to this title made by the Rail Transportation Policy Act of 1979, and the feasibility of eliminating general rate increases. At the end of the 3d year after the date of enactment of this subsection, the Commission and the Secretary shall separately transmit the results of such studies, along with any recommendations for legislative changes in this subsection, subsection (g) of this section, or any other provision of this title to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Interstate and Foreign Commerce of the House of Representatives.*

*(4) As soon as practicable, but in no event later than 9 months after the date of enactment of this subsection, the Commission shall*

*promulgate such final regulations as may be necessary to implement this subsection.*

*(5) Nothing in this subsection shall be construed as limiting (A) the Commission's authority to deny or limit the application of general rate increases to particular movements; or (B) broad tariff changes described in section 10706(a)(3)(B)(ii) of this title.*

### *§ 10701a. Authority for rail carriers to establish contract rates and service*

*(a) One or more rail carriers may enter into contracts with one or more purchasers of rail services to provide specified services under specified rates and conditions. Such contracts may contain provisions on subjects including, but not limited to, extension of credit to such purchasers, cancellation or termination, service, safety and inspection standards in excess of those required under existing law, escalation or reduction of charges, car compensation, force majeure, and financing of or investment in railroad equipment, plant, and other facilities.*

*(b)(1) Service under such a contract shall be deemed to be a separate and distinct class of service, and the equipment used in the fulfillment of such a contract shall not be subject to car service decisions under section 11123 of this title.*

*(2) Notwithstanding the provisions of paragraph (1) of this subsection, the existence of a contract shall not eliminate the obligation of a rail carrier to provide transportation or service on reasonable request, as set forth in section 11101 of this title. Upon complaint, the Commission may limit the right of a rail carrier to enter into future contracts under this section following a determination that additional contracts would impair the ability of the rail carrier to fulfill its common carrier obligations under section 11101 of this title.*

*(3)(A) A contract entered into under this section may be investigated or suspended under section 10707 of this title only upon the following grounds:*

*(i) that fulfillment of the contract will cause the carrier to be unable to fulfill its common carrier obligations under section 11101 of this title,*

*(ii) that the carrier has discriminated by refusing to enter into a contract for rates and services with a prospective purchaser of rail services under similar conditions to the contract at issue, and that the complainant or affected shipper was ready, willing, and able to enter into such a contract at a time essentially contemporaneous with the period during which the contract at issue was offered, or*

*(iii) that the proposed contract constitutes a destructive competitive practice.*

*If the Commission does not suspend or investigate a contract entered into under this section, it may not modify, abrogate, or otherwise impair the obligations under such contract: Provided, however, That the provisions of this subparagraph shall not interfere with the Commission's authority to order a carrier to provide rates and services substantially similar to the contract at issue upon a showing of discrimination.*

*(B) If the Commission determines that the carrier has discriminated against a complainant or a prospective purchaser by failing to enter into a contract for rates and services under similar conditions to the contract at issue, and such complainant or prospective purchaser was ready, willing and able to enter into such a contract at a time essentially contemporaneous with the period during which the contract at issue was offered, the Commission shall order the carrier to provide rates and service substantially similar to the contract at issue with such differentials in terms and conditions as are justified by the evidence.*

*(c)(1) Any carrier may, without specific authorization from the Commission, enter into contracts involving utilization of carrier owned or leased equipment not in excess of 35 percent of the capacity of such carrier's owned or leased equipment by major car type (plain boxcars, covered hopper cars, gondolas and open top hoppers, coal cars, bulkhead flatcars, pulpwood rack cars, and flatbed equipment, including TOFC/COFC): Provided, however, That with regard to proposed contracts between class I carriers and shippers originating an average of 1,000 cars or more per day during the past 3 years by major car type on a particular carrier, no more than 40 percent of carrier owned or leased equipment utilized on the average during the prior 3-year period may be used for such contracts without prior Commission authorization.*

*(2) Carriers or other parties may seek relief from the limitations of paragraph (1) of this subsection, and the Commission may grant such relief as it deems appropriate, if it appears that additional equipment may be made available without impairing the carrier's ability to meet its common carrier obligations under section 11101 of this title.*

*(3) Any interested party may request modification of the Commission's findings upon a showing of changed circumstances or other good cause.*

*(d) Except as expressly provided in this section or in other sections of this title, contracts authorized under subsection (a) of this section shall not be subject to the provisions of chapter 107, subchapter II of chapter 111, or section 11701 of this title, except that complaints may be filed alleging violations of section 11101 or 10741 of this title, subject to the limitation that available remedies for a violation of such sections shall not include modification or abrogation of contracts which have become effective without suspension or investigation. Contracts authorized under subsection (a) of this section shall be subject to the provisions of sections 10704, 10705, 10706, 10707, 10726, 10741, 10761, and 10762 of this title.*

*(e) The Commission shall establish a railroad contract rate advisory service. The advisory service shall:*

*(1) compile and disseminate to interested parties nonconfidential summaries of the provisions of individual contract information relating to the provisions of contracts entered into under this section with regard to various goods, items, and commodities covered by such contracts; and*

*(2) provide the Commission and interested parties with advice regarding contracts.*

**§ 10704. Authority and criteria: rates, classifications, rules, and practices prescribed by Interstate Commission**

(a) (1) When the Interstate Commerce Commission, after a full hearing, decides that a rate charged or collected by a carrier for transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title, or that a classification, rule, or practice of that carrier, does or will violate this subtitle, the Commission may prescribe the rate (including a maximum or minimum rate, or both), classification, rule, or practice to be followed. The Commission may order the carrier to stop the violation. When a rate, classification, rule, or practice is prescribed under this subsection, the affected carrier may not publish, charge, or collect a different rate and shall adopt the classification and observe the rule or practice prescribed by the Commission, *subject to the limitations of sections 10701 and 10701a of this title.*

(2) * * * *

[**§10705. Authority: Through routes, joint classifications, rates, and divisions prescribed by Interstate Commerce Commission**

(a)–(d) * * * *

[(e) (1) The Commission may begin a proceeding under subsection (a) or (b) of this section on its own initiative or on complaint and may take action only after a full hearing. The Commission must complete all evidentiary proceedings to adjust the division of joint rates for transportation by rail carrier within one year after the complaint is filed if the proceeding is brought on complaint or within 2 years after the commencement of a proceeding on the initiative of the Commission and must take final action by the 270th day after completion of the evidentiary proceedings. The Commission may decide to extend such a proceeding to permit its fair and expeditious completion, but when the Commission cannot meet those time limits, it must report its reasons to Congress.]

*(e) (1) The Commission may begin a proceeding under subsection (a) or (b) of this section on its own initiative or on complaint. The Commission must complete all evidentiary proceedings to adjust the division of joint rates for transportation by a rail carrier within 9 months after the complaint is filed if the proceeding is brought on complaint or within 18 months after the commencement of a proceeding on the initiative of the Commission. The Commission must take final action by the 180th day after completion of the evidentiary proceedings, except that—*

*(A) when the proceeding involves a railroad in reorganization or a contention that the divisions at issue do not cover the variable costs of handling the traffic, the Commission shall give the proceeding preference over all other proceedings and shall take final action at the earliest practicable time, which in no event may exceed 100 days after the completion of the evidentiary proceedings; and*

*(B) in all cases other than those specified in subparagraph (A) of this paragraph, the Commission may decide to extend such a proceeding to permit its fair and expeditious completion, but*

*whenever the Commission decides to extend a proceeding pursuant to this subparagraph, it must report its reasons to Congress.*

(2) * * * *

## § 10706. Rate agreements: exemption from antitrust laws

(a)(1) In this subsection—

(A) "affiliate" means a person controlling, controlled by, or under common control or ownership with another person and "ownership" refers to equity holdings in a business entity of at least 5 percent.

(B) "single-line rate" refers to a rate or allowance proposed by a single rail carrier that is applicable only over its line and for which the transportation (exclusive of terminal services by switching, drayage or other terminal carriers or agencies) can be provided by that carrier.

(2)(A) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title that is a party to an agreement of at least 2 rail carriers or an agreement with a class of carriers referred to in subsection (c)(1)(B)–(E) of this section, that relates to rates (including charges between rail carriers and compensation paid or received for the use of facilities and equipment *and including intrastate rates that affect interstate commerce*), classifications, divisions, or rules related to them, or procedures for joint consideration, initiation, or establishment of them, shall apply to the Commission for approval of that agreement under this subsection. The Commission shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy of section 10101 of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of its approval. If the Commission approves the agreement, it may be made and carried out under its terms and under the conditions required by the Commission, and the Sherman Act (15 U.S.C. 1, et seq.), the Clayton Act (15 U.S.C. 12, et seq.), the Federal Trade Commission Act (15 U.S.C. 41, et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936, as amended (15 U.S.C. 13, 13a, 13b, 21a) do not apply to parties and other persons with respect to making or carrying out the agreement. However, the Commission may not approve or continue approval of an agreement when the conditions required by it are not met or if it does not receive a verified statement under subparagraph (B) of this paragraph.

(B) The Commission may approve an agreement under subparagraph (A) of this paragraph only when the carriers applying for approval file a verified statement with the Commission. Each statement must specify for each rail carrier that is a party to the agreement—

(i) the name of the carrier;

(ii) the mailing address and telephone number of its headquarter's office; and

(iii) the names of each of its affiliates and the names, addresses, and affiliates of each of its officers and directors and of each person, together with an affiliate, owning or controlling any debt,

equity, or security interest in it having a value of at least $1,000,000.

(3) (A) An organization established or continued under an agreement approved under this subsection shall make a final disposition of a rule or rate docketed with it by the 120th day after the proposal is docketed. Such an organization may not—

(i) permit a rail carrier to participate in agreements related to, or to vote on single-line rates proposed by another rail carrier, or on rates related to a particular interline movement unless that rail carrier can practicably participate in that movement; **[**or**]**

*(ii) permit a rail carrire to participate in an agreement unless the terms of such agreement provide that transcripts or sound recordings shall be made of all meetings, that records of votes shall be made, and such transcripts or recordings and voting records shall be submitted to the Commission and made available to other Federal agencies in connection with their statutory responsibilities over rate bureaus: Provided, however, That such material shall be kept confidential and not subject to disclosure under the provisions of section 552 of title 5, United States Code; or*

**[**(ii)**]** *(iii)* permit, provide for, or establish a procedure for joint consideration or joint action to protest or seek the suspension of a rate or classification filed by a rail carrier under section 10707 of this title when that rate or classification is established by independent action.

*Notwithstanding clause (i) of this paragraph, a rail carrier may participate in discussions related to single-line rates proposed by another rail carrier or rates related to a particular interline movement. Such discussions may include such matters as whether the proposed rates are noncompensatory, would result in discrimination between shippers or localities would adversely affect the movement of traffic, would result in violations of section 10726 of this title, or would necessitate adjustments in other rates. Such discussions shall be limited to comments upon the proposal and shall exclude any agreement, express or implied, to approve, modify, disapprove or withdraw the proposals, except that in the case of a proposed interline movement, such agreements may be made by a rail carrier that can practicably participate in that movement.*

*(B)* * * *

**§ 10707. Investigation and suspension of new rail carrier rates, classifications, rules, and practices**

(a) When a new individual or joint rate or individual or joint classification, rule, or practice related to a rate is filed with the Interstate Commerce Commission by a rail carrier providing transportation subject to its jurisdiction under subchapter I of chapter 105 of this title, the Commission may begin a proceeding, on its own initiative or on complaint of an interested party, *subject to the limitations of sections 10701 and 10701a of this subchapter*, to determine whether the proposed rate, classification, rule, or practice violates this subtitle. The Commission must give reasonable notice to interested parties before beginning a proceeding under this subsection but may act without

allowing an interested party to file an answer or other formal pleading in response to its decision to begin the proceeding.

(b) (1) The Commission must complete a proceeding under this section and make its final decision by the end of the 7th month after the rate, classification, rule, or practice was to become effective, *unless the proposed rate, classification, rule or practice is suspended, in which case the proceeding must be completed by the end of the 5th month after the rate, classification, rule or practice was to become effective.* However, if the Commission reports to Congress by the end of the 7th month , *or the 5th month if suspension is involved*, that it cannot make a final decision by that time and explains the reason for the delay, it may take an additional 3 months to complete the proceeding and make its final decision. If the Commission does not reach a final decision within the applicable time period, the rate, classification, rule, or practice—

(A) is effective at the end of that time period; or

(B) if already in effect at the end of that time period, remains in effect.

(2) If an interested party has filed a complaint under subsection (a) of this section, the Commission may set aside a rate, classification, rule, or practice that has become effective under this section if the Commission finds it to be in violation of this chapter.

(c) (1) Pending final Commission action in a proceeding under subsection (a) of this section, the Commission may suspend the proposed rate, classification, rule, or practice for [7] *5* months after the time it would otherwise go into effect or, if a report is made under subsection (b) of this section, for [10] *8* months after the time it would otherwise go into effect. However, the Commission may suspend a rate under this subsection only if it appears from specific facts shown by the verified complaint of a person that—

(A) without suspension, the proposed rate change will cause substantial injury to the complainant or the party represented by the complainant; and

(B) it is likely that the complainant will prevail on the merits.

(2) The burden is on the complainant to prove the facts required under paragraph (1) (A) and (B) of this subsection.

(d) * * *

**[§ 10709. Determination of market dominance in rail carrier rate proceedings**

(a) In this section, "market dominance" means an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies.

(b) When a rate for transportation by a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title is challenged as being unreasonably high, the Commission shall determine, within 90 days after the start of a proceeding under section 10707 of this title to investigate the lawfulness of that rate, whether the carrier proposing the rate has market dominance over the transportation to which the rate applies. The Commission may make that determination on its own initiative or on complaint. A finding by the Commission that the

carrier does not have market dominance is determinative in a proceeding under this subtitle related to that rate or transportation unless changed or set aside by the Commission or set aside by a court of competent jurisdiction.

(c) When the Commission finds in any proceeding that a rail carrier proposing or defending a rate for transportation has market dominance over the transportation to which the rate applies, it may then determine that rate to be unreasonable if it exceeds a reasonable maximum for that transportation. However, a finding of market dominance does not establish a presumption that the proposed rate exceeds a reasonable maximum. This subsection does not limit the power of the Commission to suspend a rate under section 10707(c) of this title. However, if the Commission has found that a carrier does not have market dominance over the transportation to which the rate applies, the Commission may suspend an increase in that rate as being in excess of a reasonable maximum for that transportation only if it specifically changes or sets aside its prior determination of market dominance.]

**§ 10711. Effect of certain sections on rail rates and practices**

(*a*) Sections 10701 (a) and (b), 10707, 10709, 10727, and 107278 of this title, related to rail cariers, do not—

(1) modify the application of sections 10701(c), 10726, 10741–10744, or 11103 of this title in determining whether a rate or practice complies with ths subtitle;

(2) make a competitive practice that is unfair, destructive, predatory, or otherwise undermines competition that is necessary in the public interest comply with this subtitle;

(3) affect a law in existence on February 5, 1976, or the authority of the Interstate Commerce Commission related to rate relationships between ports; or

(4) affect the authority and responsibility of the Commission to guarantee the equalization of rates in the same port.

*(b) With respect to the relationship between water carriers and rail carriers, none of the amendments to this subtitle made by the Railroad Transportation Policy Act of 1979 shall be construed to modify the application of existing law with respect to competition and coordination, or to make lawful a competitive practice that is unfair, destructive, predatory or otherwise undermines competition.*

**[§ 10727. Demand-sensitive rates**

(a) The Interstate Commerce Commission shall maintain standards and procedures to permit seasonal, regional, or peak-period demand rates for transportation by rail carrier subject to its jurisdiction under subchapter I of chapter 105 of this title, that—

(1) provide sufficient incentives to shippers, through rescheduling and advance planning, to reduce peak-period shipments;

(2) generate additional revenue for rail carriers;

(3) make better use of the national supply of freight cars;

(4) improve—

(A) the transportation of property by rail carriers;

(B) the level of employment by rail carriers; and

(C) the financial stability of markets served by rail carriers.

(b) The Commission shall submit to Congress an annual report on the implementation of rates under this section and shall include recommendations for additional legislation needed to make it easier to establish those rates.]

**§ *10727. Demand-sensitive rates***

*"A rail carrier may establish a tariff, subject to section 10701 of this title and other provisions of this chapter, for any movement or group of movements, under which rates, except those rates involving the movement of grain, may be raised and lowered, between published maximum and minimum levels, in response to either expected or actual fluctuations in demand for rail service. The Commission shall facilitate the establishment of such demand-sensitive rates.*

**§ 10729. Rail carriers; incentive for capital investment**

(a) * * *

(b) * * *

(c) * * *

(*d*) *A proposed rate, classification, rule or practice for transportation by a rail carrier may not become effective under this section unless notice of intent to establish such rate, classification, rule, or practice under this section is filed with the Commission not less than 90 days prior to the date of enactment of this subsection.*

**§ 10730. Rates and liability based on value**

(*a*) The Interstate Commerce Commission may require or authorize a carrier, *other than a rail carrier*, providing transportation or service subject to its jurisdiction under subchapter I, II, or IV of chapter 105 of this title, to establish rates for transporation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation. A rate may be made applicable under this section to livestock only if the livestock is valuable chiefly for breeding, racing, show purposes, or other special uses. A tariff filed with the Commission under subchapter IV of this chapter shall refer specifically to the action of the Commission under this section.

(*b*) *A rail carrier providing transportation or service subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may, subject to the provisions and procedures set forth in this chapter and the general tariff requirements of section 10762 of this title, establish rates for the transportation of property under which the liability of the carrier for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier and the shipper.*

**§ 10731. Investigation of discriminatory rail rates for transportation of recyclable or recycled materials**

(a)-(d) * * *

(*e*) *Notwithstanding any other provision of this title or any other law, within 90 days after the date of enactment of this subsection, all rail carriers providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title shall take*

54-921 O - 79 - 4

*all actions necessary to reduce and thereafter maintain rates for the transportation of recyclable or recycled materials at revenue-to-variable cost ratio levels that are equal to or less than the average revenue-to-variable cost ratios initially established and thereafter published annually by the Commission pursuant to section 10701(e)(2) of this title, and any such rate which equals or exceeds such average revenue-to-variable cost ratio established by the Commission shall not be required to bear any further rate increases. The Commission shall have jurisdiction to issue all orders necessary to enforce the requirements of this subsection.*

### § *10732. Car utilization*

*In order to encourage more efficient use of freight cars, carriers shall be permitted to establish tariffs containing premium charges for special services or special levels of services not provided in any tariff otherwise applicable to the movement. The Commission shall facilitate development of such tariffs so as to increase the utilization of equipment.*

### § 10762. General tariff requirements

(a)(1) A carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title (except a motor common carrier *or service by a rail carrier pursuant to a contract authorized under section 10701a of this title*) shall publish and file with the Commission tariffs containing the rates and (A) if a common carrier, classifications, rules, and practices related to those rates, and (B) if a contract carrier, rules and practices related to those rates, established under this chapter for transportation or service it may provide under this subtitle. A motor common carrier shall publish and file with the Commission tariffs containing the rates for transportation it may provide under this subtitle. The Commission may prescribe other information that motor common carriers shall include in their tariffs. A motor contract carrier that serves only one shipper and has provided continuous transportation to that shipper for at least one year may file only its minimum rates unless the Commission finds that filing of actual rates is required in the public interest.

(2) Carriers that publish tariffs under paragraph (1) of this subsection shall keep them open for public inspection. A rate contained in a tariff filed by a common carrier providing transportation or service subject to the jurisdiction of the Commission under subchapter II, III, or IV of chapter 105 shall be stated in money of the United States. A tariff filed by a motor or water contract carrier or by a freight forwarder providing transportation or service subject to the jurisdiction of the Commission under subchapter II, III, or IV of that chapter, respectively, may not become effective for 30 days after it is filed.

*(3) A rail carrier which has entered in a contract authorized under section 10701a of this title shall publish and file with the Commission, in such manner as the Commission may provide, the essential terms of such contract. Such filing shall constitute a tariff for the purposes of compliance with the provisions of section 10761 of this title. Such contracts shall not be subject to the normal tariff rules promulgated pursuant to this section (49 CFR 1300 et seq.), but the Commission if necessary may promulgate special tariff rules for such contracts.*

*Any party to such a contract may, with the consent of the other parties to the contract, elect to file with the Commission information in addition to the essential terms of the contract. In such cases, the Commission shall, upon the request of any party to the contract, place any such additional information (other than the essential terms of the contract) in a confidential file. Notwithstanding such a request, the information filed with the Commission and kept in a confidential file may, at the discretion of the Commission, be made available to any party to a proceeding as authorized under section 10701a or other provisions of this title.*

(b)(1) [The Commission shall prescribe the form and manner of publishing, filing, and keeping tariffs open for public inspection under this section.] *Except in the case of a rail carrier, the Commission shall prescribe the form and manner of publishing, filing, and keeping tariffs open for public inspection under this section. In the case of a rail carrier, the Commission shall ensure that tariffs are published, filed, and kept open for public inspection and may, in its discretion, prescribe the form and manner of such publishing, filing, and keeping tariffs open for public inspection.* The Commission may prescribe specific charges to be identified in a tariff published by a common carrier providing transportation or service subject to its jurisdiction under subchapter I, III, or IV of that chapter, but those tariffs must identify plainly—

(A) the places between which property and passengers will be transported;

(B) terminal, storage, and icing charges (stated separately) if a carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of that chapter;

(C) terminal charges if a common carrier providing transportation or service subject to the jurisdiction of the Commission under subchapter III or IV of that chapter;

(D) privileges given and facilities allowed; and

(E) any rules that change, affect, or determine any part of the published rate.

(2) A joint tariff filed by a carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of that chapter shall identify the carriers that are parties to it. The carriers that are parties to a joint tariff, other than the carrier filing it, must file a concurrence or acceptance of the tariff with the Commission but are not required to file a copy of the tariff. The Commission may prescribe or approve what constitutes a concurrence or acceptance.

(c)(1) When a common carrier providing transportation or service subject to the jurisdiction of the Commission (A) under subchapter I of chapter 105 of this title proposes to change a rate, or (B) under another subchapter of that chapter proposes to change a rate, classification, rule, or practice, the carrier shall publish, file, and keep open for public inspection a notice of the proposed change as required under subsections (a) and (b) of this section.

(2) When a contract carrier providing transportation subject to the jurisdiction of the Commission under subchapter II or III of chapter 105 of this title proposes to establish a new rate or to reduce a rate, directly or by changing a rule or practice related to the rate

or the value of service under the rate, the carrier shall publish, file, and keep open for public inspection a notice of the new or reduced rate as required under subsections (a) and (b) of this section.

(3) A notice filed under this subsection shall plainly identify the proposed change or new or reduced rate and indicate its proposed effective date. [A proposed change and a new or reduced rate may not become effective for 30 days after the notice is published, filed, and held open as required under subsections (a) and (b) of this section.] "*Except in the case of a rail carrier, a proposed change or a new or reduced rate may not become effective for 30 days after the notice is published, filed, and held open as required under subsections* (*a*) *and* (*b*) *of this section. In the case of a rail carrier, a proposed change or a new or reduced rate shall not become effective for 20 days after the notice is published, except that, within the first 60 days after the date of enactment of this sentence, such change or rate shall not become effective for 30 days after the notice is published: Provided, however, That a contract authorized under section 10701a of this title shall not become effective for 30 days: And provided further, That a tariff authorized under section 10727 of this title shall not become effective for 30 days, nor shall rates raised or lowered within the published minimum and maximum levels of such a tariff become effective for 5 days, after the notice is published, filed, and held open as required under subsections* (*a*) *and* (*b*) *of this section.*

(d) (1) The Commission may reduce the [30-day] *notice* period of subsections (a) and (c) of this section if cause exists. The Commission may change the other requirements of this section if cause exists in particular instances or as they apply to special circumstances.

(2) The Commission may prescribe regulations for the simplification of tariffs by carriers providing transportation subject to its jurisdiction under subchapter I of chapter 105 of this title and permit them to change rates, classifications, rules, and practices without filing complete tariffs that cover matter that is not being changed when the Commission finds that action to be consistent with the public interest. Those carriers may publish new tariffs that incorporate changes or plainly indicate the proposed changes in the tariffs then in effect and kept open for public inspection. However, the Commission shall require that all rates of rail carriers and rail rate-making associations be incorporated in their individual tariffs by the end of the 2d year after initial publication of the rate, or by the end of the 2d year after a change in a rate becomes effective, whichever is later. The Commission may extend those periods if cause exists, but if it does it must send a notice of the extension and a statement of the reasons for the extension to Congress. A rate not incorporated in an individual tariff as required by the Commission is void.

**§ 10901. Authorizing construction and operation of railroad lines**

(a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may—

(1) construct an extension to any of its railroad lines;

(2) construct an additional railroad line;

(3) acquire or operate an extended or additional railroad line; or

(4) provide transportation over, or by means of, an extended or additional railroad line;

only if the Commission finds that the present or future public convenience and necessity require or [will be enhanced by] *permit* the construction or acquisition (or both) and operation of the railroad line.

(b) * * *

(c) * * *

*(d) Where a railroad has been issued a certificate of public convenience and necessity by the Commission authorizing the construction or extension of a railroad line, no other railroad may block the construction or extension by refusing to permit the carrier to cross its property: Provided, That (1) the construction does not unreasonably interfere with the operation of the crossed line; (2) the operation does not materially interfere with the operation of the crossed line; and (3) the owner of the crossing line shall compensate the owner of the crossed line. The carriers are responsible for establishing the conditions of such compensation. However, if the carriers cannot agree, the Commission may establish conditions of compensation.*

**§ 10903. Authorizing abandonment and discontinuance of railroad lines and rail transportation**

(a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may—

(1) abandon any part of its railroad lines; or

(2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.

on rural and community development.

(b)(1) [A proceeding to grant authority under subsection (a) of this section begins on application filed with the Commission.] Subject to sections 10904–10906 of this title, if the Commission—

(A) finds public convenience and necessity, it shall—

(i) approve the application as filed; or

(ii) approve the application with modifications and require compliance with conditions that the Commission finds are required by public convenience and necessity; or

(B) fails to find public convenience and necessity, it shall deny the application.

(2) On approval, the Commission shall issue to the rail carrier a certificate describing the abandonment or discontinuance approved by the Commission. Each certificate shall also contain provisions to protect the interests of employees. The provisions shall be at least as beneficial to those interests as the provisions established under section 11347 of this title and section 565(b) of title 45.

[(c) Except as provided in sections 10905 and 10906 of this title—

[(1) if a certificate is issued without an investigation under section 10904(c) of this title, the abandonment or discontinuance

may take effect under the certificate on the 30th day after the issuance of the certificate; or

[(2) if a certificate is issued after an investigation under section 10904(c) of this title, the abandonment or discontinuance may take effect under the certificate on the 120th day after the issuance of the certificate.]

**§ 10904. Filing and procedure for applications to abandon or discontinue**

(a)(1) An application for a certificate of abandonment or discontinuance under section 10903 of this title, and a notice of intent to abandon or discontinue, must be filed with the Interstate Commerce Commission [at least 60 days before the day on which the abandonment or discontinuance is to become effective].

(2) When a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title files an application and notice of intent, the notice shall include—

(A) an accurate and understandable summary of the rail carrier's application and the reasons for the proposed abandonment or discontinuance; [and]

(B) a statement indicating that each interested person is entitled to recommend to the Commission that it approve, deny, or take other action concerning the application[.]*; and*

*(C) a statement that the line is available for subsidy or sale in accordance with section 10905 of this title; a statement that the carrier will promptly provide to each interested party an estimate of the subsidy and minimium purchase price required to keep the line in operation, calculated in accordance with section 10905 of this title; and the name and business address of the person who is authorized to discuss sale or subsidy terms for the carrier.*

(3) The rail carrier shall—

(A) send by certified mail a copy of the notice of intent to the chief evecutive officer of each State that would be directly affected by the proposed abandonment or discontinuance;

(B) post a copy of the notice in each terminal and station on each portion of a railroad line proposed to be abandoned or over which all transportation is to be discontinued;

(C) publish a copy of the notice for 3 consecutive weeks in a newspaper of general circulation in each county in which each such portion is located;

(D) mail a copy of the notice, to the extent practicable, to all shippers that have made significant use (as designated by the Commission) of the railroad line during the 12 months preceding the filing of the application; and

(E) attach to the notice filed with the Commission an affidavit certifying the manner in which clauses (A)–(D) of this paragraph have been satisfied, *and certifying that clauses (A)–(D) have been satisfied within the most recent 30 days prior to the date the application is filed*".

[(b) The burden is on the person applying for the certificate to prove that the present or future public convenience and necessity require or permit the abandonment or discontinuance.]

*(b) If no protest is received within 30 days after the application is filed, the Commission shall find that the public convenience and necessity require or permit the abandonment or discontinuance. In such a case, the Commission shall, within 45 days after the application is filed, issue a certificate which permits the abandonment or discontinuance to occur within 75 days after the application is filed.*

[(c) (1) During the period between the date the application is filed through the day immediately before the date proposed in the application that the abandonment or discontinuance become effective, the Commission shall, on petition, and may, on its own initiative, begin an investigation to assist it in determining what disposition to make of the application. The order to conduct the investigation must be served on any affected rail carrier not later than the 5th day before the proposed effective date of the abandonment or discontinuance. An investigation may include public hearings at any location reasonably adjacent to the railroad line involved in the abandonment or discontinuance. The hearing may be held on the request of an interested party or on the initiative of the Commission.

(2) If an investigation is not conducted, the Commission shall act under section 10903(b) of this title by the last day of the period referred to in paragraph (1) of this subsection. If an investigation is to be conducted, the Commission shall postpone the proposed effective date of any part of the abandonment or discontinuance. The postponement shall be for a reasonable period of time necessary to complete the investigation]

*(c) (1) If a protest is received within 30 days after the application is filed, the Commission shall, within 45 days after the application is filed, determine whether an investigation is needed to assist in determining what disposition to make of the application.*

*(2) If the Commission decides that no investigation is to be undertaken, the Commission shall, within 75 days after the application is filed, decide whether the present or future public convenience and necessity require or permit the abandonment or discontinuance, taking into consideration the application of the railroad and any materials submitted by protestants. If the Commission finds that the present or future public convenience and necessity require or permit the abandonment, it shall, within 90 days after the date of application, issue a certificate which permits the abandonment or discontinuance to occur within 120 days after the application is filed.*

*(3) If the Commission decides that an investigation should be undertaken under this section, the investigation must be completed within 135 days, and an initial decision must be rendered within 165 days, of the date the application is filed. Thirty days after such decision, the initial decision shall become the final decision of the Commission unless, during the interim, the Commission decides to hear appeals. If an initial decision is appealed and considered by the Commission, the Commission shall issue a final decision within 255 days of the date of application. Whenever the Commission decides upon investigation that the present or future public convenience and necessity require or permit the abandonment or discontinuance of rail service, it shall within 15 days of the final decision, issue a certificate which permits the abandonment or discontinuance to occur within 75 days of the date of the final decision.*

*(4) The effective date of any certificate which permits abandonment or discontinuance may be stayed by the Commission pursuant to the provisions of section 10905 of this title.*

*(d) (1) The burden is on the person applying for the certificate to prove that the present or future public convenience and necessity require or permit the abandonment or discontinuance.*

*(2) For applications approved by the Secretary of Transportation as part of a plan or proposal under section 5 (a) through (d) of the Department of Transportation Act (49 U.S.C. 1654 (a) through (d)), the Commission shall consider whether any detriment from the abandonment or discontinuance exceeds the transportation benefit from the plan or proposal as a whole.*

[(d)] *(e)* (1) In this subsection, "potentially subject to abandonment" has the meaning given the term in regulations of the Commission. The regulations may include standards that vary by region of the United States and by railroad or group of railroads.

(2) Each rail carrier shall maintain a complete diagram of the transportation system operated, directly or indirectly, by the carrier. The carrier shall submit to the Commission and publish amendments to its diagram that are necessary to maintain the accuracy of the diagram. The diagram shall—

(A) include a detailed description of each of its railroad lines potentially subject to abandonment; and

(B) identify each railroad line for which the carrier plans to file an application for a certificate under subsection (a) of this section.

(3) If an application for a certificate is opposed by—

(A) a shipper or other person that has made significant use (as determined by the Commission) of the railroad line involved in the proposed abandonment or discontinuance during the 12-month period before the filing of the application for a certificate; or

(B) a State or political subdivision of a State in which any part of the railroad line is located;

the Commission may issue a certificate under section 10903 of this title only if the railroad line has been described and identified in the diagram or amendment to the diagram of the rail carrier that was submitted to the Commission at least 4 months before the date on which the application was filed*: Provided, however, That the requirement of such description or identification in such diagram may be waived by the Commission if the application was approved by the Secretary of Transportation as part of a plan or proposal under section 5 (a) though (d) of the Department of Transportation Act (49 U.S.C. 1654 (a) through (d)), or the application is filed by a railroad in bankruptcy.*

**§ 10905. Offers of financial assistance to avoid abandonment and discontinuance**

(a) In this section—

(1) "avoidable cost" means all expenses that would be incurred by a rail carrier in providing transportation that would not be incurred if the railroad line over which the transportation was provided were abandoned or if the transportation were discon-

tinued. Expenses include cash inflows foregone and cash outflows incurred by the rail carrier as a result of not abandoning or discontinuing the transportation. Cash inflows foregone and cash outflows incurred include—

(A) working capital and required capital expenditure;

(B) expenditures to eliminate deferred maintenance;

(C) the current cost of freight cars, locomotives, and other equipment; and

(D) the foregone tax benefits from not retiring properties from rail service and other effects of applicable Federal and State income taxes.

(2) "reasonable return" means—

(A) if a rail carrier is not in reorganization, the cost of capital to the rail carrier, as determined by the Interstate Commerce Commission; and

(B) if a rail carrier is in reorganization, the mean cost of capital of rail carriers not in reorganization, as determined by the Commission.

(b) When the Commission finds under section 10903 of this title that the present or future public convenience and necessity require or permit abandonment or discontinuance, it shall publish the finding in the Federal Register. If, within 30 days after the publication, the Commission finds that—

(1) a financially responsible person (including a governmental authority) has offered financial assistance to enable the rail transportation to be continued over that part of the railroad line to be abondoned or over which all rail transportation is to be discontinued; and

(2 it is likely that the assistance would be equal too—

(A) the difference between the revenues attributable to that part of the railroad line and the avoidable cost of providing rail freight transportation on the line, plus a reasonable return on the value of the line; or

(B) the acquisition cost of that part of the railroad line;

the Commission shall postpone the issuance of a certificate authorizing abandonment or discontinuance for a reasonable time, not to exceed 6 months, to enable the person or governmental authority to enter into an agreement with the rail carrier to provide the assistance or to buy that part of the railroad line and to continue to provide rail transportation over the line. Thereafter, the Commission shall determine the extent to which the avoidable cost of providing rail transportation plus a reasonable return on the rail properties involved exceed the revenues attributable to the railroad line or the rail transportation proposed to be abandoned or discontinued. On notice to the Commission that such an agreement has been executed, the Commission shall further postpone the issuance of the certificate as long as the agreement, or an extension or modification of the agreement, is in effect.

(c) The rail carrier shall provide promptly to a party considering offering financial assistance under subsection (b) of this section—

(1) its most recent reports on the physical condition of that part of the railroad line involved in the proposed abandonment or discontinuance; and

(2) traffic, revenue, and other data necessary to determine the amount of financial assistance that would be required to continue rail transportation over that part of the railroad line.]

### § *10905. Offers of financial assistance to avoid abandonment and discontinuance*

*(a) In this section—*

*(1) "avoidable cost" means all expenses that would be incurred by a rail carrier in providing transportation that would not be incurred if the railroad line over which the transportation was provided were abandoned or if the transportation were discontinued. Expenses include cash inflows foregone and cash outflows incurred by the rail carrier as a result of not abandoning or discontinuing the transportation. Cash inflows foregone and cash outflows incurred include—*

*(A) working capital and required capital expenditures;*

*(B) expenditures to eliminate deferred maintenance;*

*(C) the current cost of freight cars, locomotives, and other equipment and;*

*(D) the foregone tax benefits from not retiring properties from rail service and other effects of applicable Federal and State income taxes.*

*(2) "reasonable return" means—*

*(A) if a rail carrier is not in reorganization, the cost of capital to the rail carrier, as determined by the Interstate Commerce Commission; and*

*(B) if a rail carrier is in reorganization, the mean cost of capital of rail carriers not in reorganization, as determined by the Commission.*

*(b) Any rail carrier which has filed an application for a certificate of abandonment or discontinuance shall provide promptly to a party considering an offer of financial assistance and shall provide concurrently to the Commission—*

*(1) an estimate of the annual subsidy and minimum purchase price required to keep the line or a portion of the line in operation;*

*(2) its most recent reports on the physical condition of that part of the railroad line involved in the proposed abandonment or discontinuance;*

*(3) traffic, revenue, and other data necessary to determine the amount of annual financial assistance which would be required to continue rail transportation over that part of the railroad line; and*

*(4) any other information that the Commission may deem necessary to allow a potential offeror to calculate an adequate subsidy or purchase offer.*

*(c) When the Commission finds under section 10903 of this title that the public convenience and necessity require or permit abandonment or discontinuance, it shall, concurrently with service of the decision upon the parties, publish the finding in the Federal Register. Within 10 days following the publication, any person may offer to pay the carrier a subsidy or offer to purchase the line. Such offer shall be*

*filed concurrently with the Commission. If the offer to subsidize or purchase the line is less than the carrier's estimate provided under subsection (b)(1) of this section, the offer shall explain the basis of the disparity, and the manner in which the offer of subsidy or purchase is calculated.*

*(d) If, within 15 days after the publication required in subsection (c) of this section, the Commission finds that—*

*(1) a financially responsible person (including a government entity) has offered financial assistance to enable the rail transportation to be continued over that part of the railroad line to be abandoned or over which all rail transportation is to be discontinued; and*

*(2) it is likely that the assistance could be equal to—*

*(A) the difference between the revenues attributable to that part of the railroad line and the avoidable cost of providing rail freight transportation on the line, plus a reasonable return on the value of the line; or*

*(B) the acquistion cost of that part of the railroad line;*

*the Commission shall postpone the issuance of a certificate authorizing abandonment or discontinuance in accordance with subsections (e) and (f) of this section.*

*(e) If the carrier and a person offering financial assistance enter into an agreement which will provide continued rail service, the Commission shall postpone the issuance of the certificate for so long as the agreement, or an extension or modification of the agreement is in effect. If the carrier and a person offering to purchase a line enter into an agreement which will provide continued rail service, the Commission shall approve the transaction and dismiss the application for abandonment or discontinuance. If the carrier and a financially responsible person (including a government entity) fail to agree on the amount or terms of the subsidy or purchase, either party may, within 30 days after the offer is made, request that the Commission establish the conditions and amount of compensation. If no agreement is reached within 30 days after the offer is made and neither party requests that the Commission establish the conditions and amount of compensation during that same period, the Commission shall immediately issue a certificate authorizing the abandonment or discontinuance.*

*(f)(1) Whenever the Commission is requested to establish the conditions and amount of compensation under this section—*

*(A) the Commission shall render its decision within 60 days;*

*(B) where subsidy has been offered, the Commission shall determine the amount and terms of subsidy based on the avoidable cost of providing continued rail transportation, plus a reasonable return on the value of the line; and*

*(C) where an offer of purchase has been made in order to continue rail service on the line, the Commission shall determine the price and other terms of sale. In no case shall the Commission set a price which is below the fair market value of the line (including, unless otherwise mutually agreed, all facilities on the line or portion necessary to provide effective transportation services).*

*(2) The decision of the Commission shall be binding on both parties, except that the person who has offered to subsidize or purchase the line may withdraw his offer within 10 days of the Commission's decision. In such a case, the Commission shall immediately issue a certificate authorizing the abandonment or discontinuance, unless other offers are being considered pursuant to paragraph (3) of this subsection.*

*(3) If a carrier receives more than one offer to purchase or subsidize, it shall select the offeror with whom it wishes to transact business, and complete the sale or subsidy agreement, or request that the Commission establish the conditions and amount of compensation prior to the 40th day after the date on which notice was published under subsection (c) of this section. If no agreement on subsidy or sale is reached within the 40-day period and the Commission has not been requested to establish the conditions and amount of compensation, any other offeror may request that the Commission establish the conditions and amount of compensation. If the Commission has established the conditions and amount of compensation and the original offer has been withdrawn, any other offeror may accept the Commission's decision within 20 days of such decision, and the Commission shall require the carrier to enter into a sale or subsidy agreement with such offeror, if such sale or agreement incorporates the Commission's decision.*

*(4) No purchaser of a line or portion of line sold under this section may transfer or discontinue service on such line prior to the end of the second year after consummation of the sale, nor may such purchaser transfer such line, except to the carrier from whom it was purchased, prior to the end of the fifth year after consummation of the sale.*

*(5) Any subsidy provided under this section may be discontinued on notice of 60 days. Unless, within such 60-day period, another financially responsible party enters into a subsidy agreement at least as beneficial to the carrier as that which was or was to be discontinued, the Commission shall, at the carrier's request, immediately issue a certificate authorizing the abandonment or discontinuance of service on the line.*

**§ 11103. Use of terminal facilities**

(a) * * * *

(b) * * * *

*(c) The Commission may require railroads to enter reciprocal switching agreements where it finds such agreements to be practicable and in the public interest. The carriers are responsible for establishing the conditions and compensation for such agreements. However, if the carriers cannot agree, the Commission may establish the conditions and compensation for such agreements.*

**§ 11123. Situations requiring immediate action**

(a) When the Interstate Commerce Commission considers that a shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists [in a section of the United States,] *of such magnitude as to have substantial adverse effects on rail service to the Nation or a substantial region of the Nation*, the Commission may—

(1) suspend any car service rule or practice;

(2) take action during the emergency to promote service in the interest of the public and of commerce regardless of the ownership (as between carriers) of a locomotive, car, or other vehicle on terms of compensation the carriers establish between themselves subject to subsection (b)(2) of this section;

(3) require joint or common use of [terminals, including main-line tracks for a reasonable distance outside of those terminals,] *facilities*, on terms of compensation the carriers establish between themselves, subject to subsection (b)(2) of this section, when that action will best meet the emergency and serve the public interest; and

(4) give directions for preference or prority in transportation, embargoes, or movement of traffic under permits.

(b) * * *

*(c) No action undertaken or order issued under the emergency powers of this section shall extend for more than 30 days from the date of initial Commission action unless, during the interim, the Commission has begun a proceeding to resolve the service problems on a more permanent basis. When the Commission has begun such a proceeding, an emergency order may be renewed and extended by the Commission for a maximum of 60 days.*

**§ 11344. Consolidation, merger, and acquisition of control: general procedure and conditions of approval**

(a) The Interstate Commerce Commission may begin a proceeding to approve and authorize a transaction referred to in section 11343 of this title on application of the person seeking that authority. When an application is filed with the Commission, the Commission shall notify the chief executive officer of each State in which property of the carriers involved in the proposed transaction is located and shall notify those carriers. If a motor carrier providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title is involved in the transaction, the Commission must notify the persons specified in section 10328(b) of this title. The Commission shall hold a public hearing when a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of that chapter is involved in the transaction unless the Commission determines that a public hearing is not necessary in the public interest.

(b) In a proceeding under this section *which involves the merger or control of at least two class I railroads, as defined by the Commission*, the Commission shall consider at least the following:

(1) the effect of the proposed transaction on the adequacy of transportation to the public.

(2) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.

(3) the total fixed charges that result from the proposed transaction.

(4) the interest of carrier employees affected by the proposed transaction.

(c) * * * *

*(d) In a proceeding under this section which does not involve the merger or control of at least two class I railroads, as defined by the Commission, the Commission shall approve such an application unless it finds that—*

*(1) as a result of the transportation, there is likely to be a substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and*

*(2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.*

*In making such findings, the Commission shall, with respect to any application that is part of a plan or proposal developed under section 5 (a) through (d) of the Department of Transportation Act (49 U.S.C. 1654 (a) through (d)), accord substantial weight to any recommendations of the Secretary of Transportation.*

**§ 11345. Consolidation, merger, and acquisition of control: rail carrier procedure**

(a) If a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title is involved in a proposed transaction under section 11343 of this title, this section and section 11344 of this title also apply to the transaction. The Commission shall publish notice of the application in the Federal Register by the end of the 30th day after the application is filed with the Commission and after a certified copy of it is furnished to the Secretary of Transportation. However, if the application is incomplete, the Commission shall reject it by the end of that period. The order of rejection is a final action of the Commission under section 10327 of this title.

(b) Written comments about an application may be filed with the Commission within 45 days after notice of the application is published under subsection (a) of this section. Copies of those comments shall be served on the Secretary of Transportation and the Attorney General, each of whom may decide to intervene as a party to the proceeding. That decision must be made by the 15th day after the date of receipt of the written comments, and if the decision is to intervene, preliminary comments about the application must be sent to the Commission by the end of the 15th day after the date of receipt of the written comments.

(c) The Commission shall require that applications inconsistent with an application, notice of which was published under subsection (a) of this section, and applications for inclusion in the transaction, be filed with it and given to the Secretary of Transportation by the 90th day after publication of notice under that subsection.

(d) The Commission must conclude evidentiary proceedings by the 240th day after the date of publication of notice under subsection (a) of this section. However, if the application involves the merger or control of at least 2 class I railroads, as defined by the Commission, it must conclude evidentiary proceedings by the end of the 24th month after the date of publication of notice under subsection (a) of this section. The Commission must issue a final decision by the 180th day after the date it concludes the evidentiary proceedings. If the Com-

mission does not issue a decision that is a final action under section 10327 of this title, it shall send written notice to Congress that a decision was not issued and the reason why it was not issued.

(e) The Commission may waive the requirement that an initial decision be made under section 10327 of this title and make a final decision itself when it determines that action is required for the timely execution of its functions under this subchapter or that an application governed by this section is of major transportation importance. The decision of the Commission under this subsection is a final action under section 10327 of this title.

(f) The Secretary of Transportation may propose changes in transactions governed by this section when a rail carrier is involved. The Secretary may appear before the Commission to support those changes.]

***§ 11345. Consolidation, merger, and acquisition of control: rail carrier procedure***

*(a) If a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title is involved in a proposed transaction under section 11343 of this title, this section and section 11344 of this title also apply to the transaction. The Commission shall publish notice of the application in the Federal Register by the end of the 30th day after the application is filed with the Commission and after a certified copy of it is furnished to the Secretary of Transportation. However, if the application is incomplete, the Commission shall reject it by the end of that period. The order of rejection is a final action of the Commission under section 10327 of this title. The published notice shall indicate whether the application involves:*

*(1) the merger or control of at least two class I railroads, as defined by the Commission, to be decided within the time limits specified in subsection (b) of this section;*

*(2) transactions of regional or national transportation significance, to be decided within the time limits specified in subsection (c) of this section; or*

*(3) any other transaction covered by this section, to be decided within the time limits specified in subsection (d) of this section.*

*(b) If the application involves the merger or control of two or more class I railroads, as defined by the Commission:*

*(1) Written comments about an application may be filed with the Commission within 45 days after notice of the application is published under subsection (a) of this section. Copies of those comments shall be served on the Secretary of Transportation and the Attorney General, each of whom may decide to intervene as a party to the proceeding. That decision must be made by the 15th day after the date of receipt of the written comments, and if the decision is to intervene, preliminary comments about the application must be sent to the Commission by the end of the 15th day after the date of receipt of the written comments.*

*(2) The Commission shall require that applications inconsistent with an application, notice of which was published under subsection (a) of this section, and applications for inclusion in the*

*transaction be filed with it and given to the Secretary of Transportation by the 90th day after publication of notice under that subsection.*

*(3) The Commission must include evidentiary proceedings by the end of the 24th month after the date of publication of notice under subsection (a) of this section. The Commission must issue a final decision by the 180th day after the date on which it concludes the evidentiary proceedings.*

*(c) If the application involves a transaction other than the merger or control of at least two class I railroads, as defined by the Commission, which the Commission has determined to be of regional or national transportation significance:*

*(1) Written comments about an application may be filed with the Commission within 30 days after notice of the application is published under subsection (a) of this section. Copies of those comments shall be served on the Secretary of Transportation and the Attorney General, each of whom may decide to intervene as a party to the proceeding. That decision must be made by the 15th day after the date of receipt of the written comments, and if the decision is to intervene, preliminary comments about the application must be sent to the Commission by the end of the 15th day after the date of receipt of the written comments.*

*(2) The Commission shall require that applications inconsistent with an application, notice of which was published under subsection (a) of this section, and applications for inclusion in the transaction, be filed with it and given to the Secretary of Transportation by the 60th day after publication of notice under that subsection.*

*(3) The Commission must conclude any evidentiary proceedings by the 180th day after the date of publication of notice under subsection (a) of this section. The Commission must issue a final decision by the 90th day after the date on which it concludes the evidentiary proceedings.*

*(d) For all applications under this section other than those specified in subsections (b) and (c) of this section:*

*(1) Written comments about an application may be filed with the Commission within 30 days after notice of the application is published under subsection (a) of this section. Copies of those comments shall be served on the Secretary of Transportation and the Attorney General, each of whom may decide to intervene as a party to the proceeding. That decision must be made by the 15th day after the date of receipt of the written comments, and if the decision is to intervene, preliminary comments about the application must be sent to the Commission by the end of the 15th day after the date of receipt of the written comments.*

*(2) The Commission must conclude any evidentiary proceedings by the 105th day after the date of publication of notice under subsection (a) of this section. The Commission must issue a final decision by the 45th day after the date on which it concludes the evidentiary proceedings.*

*(e) If the Commission does not issue a decision that is a final action under section 10327 of this title, it shall send written notice to Congress that a decision was not issued and the reasons why it was not issued.*

*(f) The Commission may waive the requirement that an initial decisoin be made under section 10327 of this title and make a final decision itself when it determines that action is required for the timely execution of its functions under this subchapter or that an application governed by this section is of major transportation importance. The decision of the Commission under this subsection is a final action under section 10327 of this title.*

*(g) The Secretary of Transportation may propose changes in transactions governed by this section when a rail carrier is involved. The Secretary may appear before the Commission to support those changes.*

**§ 11501. Interstate Commerce Commission authority over intrastate transportation**

(a) (1) [The] *Where the Interstate Commerce Commission under other sections of this title has the authority to do so, the* Interstate Commerce Commission shall prescribe the rate, classification, rule, or practice for transportation or service provided by a carrier subject to the jurisdiction of the Commission under subchapter I or IV of chapter 105 of this title when the Commission finds that a rate, classification, rule, or practice of a State causes—

(A) between persons or localities in intrastate commerce and in interstate and foreign commerce, unreasonable discrimination against those persons or localities in interstate or foreign commerce; or

(B) unreasonable discrimination against or imposes an unreasonable burden on interstate or foreign commerce.

(2) The Commission may make a finding under this subsection involving a carrier providing transportation subject to its jurisdiction under subchapter I of chapter 105 of this title without separating interstate and intrastate property, revenues, and expenses, and without considering the total operations, or their results, of a carrier or group of carriers operating entirely in one State.

(b) (1) The Commission has exclusive authority to prescribe an intrastate rate for transportation provided by a rail carrier subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title when—

(A) a rail carrier files with an appropriate State authority a change in an intrastate rate, or a change in a classification, rule, or practice that has the effect of changing an intrastate rate, that adjusts the rate to the rate charged on similar traffic moving in interstate or foreign commerce; and

(B) the State authority does not act finally on the change by the [120th] 90th day after it was led.

(2) When a rail carrier files an application with the Commission under this subsection, the Commission, *subject to its authority as provided in the other sections of this title*, shall prescribe the intrastate rate under the standards of subsection (a) of this section. Notice of the application shall be served on the State authority.

(C) * * * *

*(d) Federal withdrawal from certain areas of regulation shall not be construed as relinquishing Federal jurisdiction and State authorities are encouraged to exercise their regulatory jurisdiction in*

54-921 O - 79 - 2

*a manner consistent with standards established in the railroad transportation as determined by the Commission pursuant to section*

### § 11507. Prison-made property governed by State law

* * * *

### § 11508. State authority over fuel adjustment surcharges

*Notwithstanding any other provision of law, no State (including the Commonwealth of Puerto Rico) shall have authority to prevent a rail carrier providing intrastate rail transportation from increasing rates for such transportation in order to pass through increases in the cost of providing such transportation that are attributable to increases in the cost of fuel used in such transportation if such increases do not exceed increases in the cost of fuel used in rail transportation as determined by the Commission pursuant to section 10701(h)(2) of this title.*

# INDEX TO TITLE 49, UNITED STATES CODE

## CHAPTER 107—RATES, TARIFFS, AND VALUATIONS

### SUBCHAPTER I—GENERAL AUTHORITY

Sec.
10701. Standards for rates, classifications, through routes, rules and practices.
*10701a. Authority for rail carriers to establish contract rates and service.*
10702. Authority for carriers to establish rates, classifications, rules, and practices.
10703. Authority for carriers to establish through routes.
10704. Authority and criteria: rates, classifications, rules, and practices prescribed by Interstate Commerce Commission.
10705. Authority: through routes, joint classifications, rates and divisions prescribed by Interstate Commerce Commission.
10706. Rate agreements: exemption from antitrust laws.
10707. Investigation and suspension of new rail carrier rates, classifications, rules, and practices.
10708. Investigation and suspension of new nonrail carrier rates, classifications, rules, and practices.
[10709. Determination of market dominance in rail carrier rate proceedings.]
10710. Elimination of discrimination against recyclable materials.
10711. Effect of certain sections on rail rates and practices.

### SUBCHAPTER II—SPECIAL CIRCUMSTANCES

10721. Government traffic.
10722. Special passenger rates.
10723. Charitable purposes.
10724. Emergency rates.
10725. Special freight forwarder rates.
10726. Long and short haul transportation.
10727. Demand-sensitive rates.
10728. Separate rates for distinct rail services.
10729. Rail carriers; incentive for capital investment.
10730. Rates and liability based on value.
10731. Investigation of discriminatory rail rates for transportation of recyclable or recycled materials.
*10732. Car Utilization.*

* * * * * * *

## CHAPTER 115—FEDERAL-STATE RELATIONS

Sec.
11501. Interstate Commerce Commission authority over intrastate transportation.
11502. Conferences and joint hearings with State authorities.
11503. Tax discrimination against rail transportation property.
11504. Withholding State and local income tax by certain carriers.
11505. State action to enjoin rail carriers from certain actions.
11506. Registration of motor carriers by a State.
11507. Prison-made property governed by State law.
*11508. State authority over fuel adjustment surcharges.*

### THE INTERSTATE COMMERCE ACT

Section 15(8)(c) of that Act:

[(c) The limitations upon the Commission's power to suspend rate changes set forth in subdivisions (b)(i) and (ii) apply only to rate changes which are not of general applicability to all or substantially all classes of traffic and only if—

(i) the rate increase or decrease is filed prior to July 1, 1980;

(ii) the common carrier by railroad notifies the Commission that it wishes to have the rate considered pursuant to this subdivision; and

(iii) the aggregate of increases or decreases in any rate filed pursuant to clause (i) or (ii) of this subdivision during any calendar year is not greater than 7 per centum of the rate in effect on January 1 of that year.]

Section 15(8)(d) of that Act:

(d) The Commission may not suspend a rate under this paragraph unless it appears from specific facts shown by the verified complaint of any person that—

(i) without suspension the proposed rate change will cause substantial injury to the complainant or the party represented by such complainant; and

(ii) it is likely that such complainant will prevail on the merits.

The burden of proof shall be upon the complainant to establish the matters set forth in clauses (i) and (ii) of this subdivision. Nothing in this paragraph shall be construed as establishing a presumption that any rate increase or decrease in excess of the limits set forth in clause (iii) of subdivision (c) is unlawful or should be suspended.

### RAILROAD REVITALIZATION AND REGULATORY REFORM ACT OF 1976

Section 511:

(a) General.—The Secretary may, in accordance with the provisions of this section, guarantee and make commitments to guarantee the payment of the principal balance of, and any interest on, an obligation of an applicant prior to, on, or after the date of execution or the date of disbursement of such obligation, if the proceeds of such obligation shall be or have been used to acquire or to rehabilitate and improve facilities or equipment *which includes but is not limited to computerized car management systems.* Each guarantee of such an obligation shall be made in accordance with the provisions of sections 511 through

513 of this title and such rules as the Secretary may prescribe to protect reasonably the interest of the United States. Each application for the guarantee of such an obligation or for a commitment to guarantee such an obligation shall be made in writing to the Secretary in such form and with such content as the Secretary prescribes. Such application shall be granted, in whole or in part, if the Secretary determines that the proposed, negotiated, or executed obligation is eligible for such guaranteed. Each such guarantee or commitment to guarantee shall be extended in such form, under such terms and conditions, and pursuant to such regulations as the Secretary deems appropriate, consistent with the purposes of this title. Such a guarantee or commitment to guarantee shall inure to the benefit of the holder of the obligation to which such guarantee or commitment to guarantee applies, or to develop or establish new railroad facilities.

(b)–(m) * * * *

Section 809:

(a) * * * *

(b) * * * *

(c) * * * *

(d) AUTHORIZATION OF APPROPRIATIONS.—(1) There are authorized to be appropriated to carry out the provisions of this section, not to exceed $6,000,000 for the fiscal year and the transitional fiscal period ending September 30, 1976, not to exceed $7,000,000 for the fiscal year ending September 30, 1977, and not to exceed $7,000,000 for the fiscal year ending September 30, 1978. Sums appropriated pursuant to this authorization are authorized to remain available until expended. Of the funds appropriated, at least four-fifths are to be made available to the Secretary of the Interior to carry out subsection (b) of this section.

*"(2) There are authorized to be appropriated, for the purposes of carrying out the provisions of subsection (b)(2) of this section, not to exceed an aggregate amount of $20,000,000 for the fiscal years 1981, 1982, and 1983. Such sums shall remain available until expended: Provided, however, That, notwithstanding the provisions of subsection (b)(2) of this section, the Federal share for each grant made from the funds authorized to be appropriated pursuant to this paragraph may not exceed 80 percent of the total cost of any project.".*

# APPENDIX

## JOINT RATE PROVISIONS

Set forth below (not in any particular order of preference) are various proposals which were before the Committee as possible compromise approaches in the area of joint rates.

Alternative No. 1 contains possible statutory language prepared by the Committee staff based on a proposal by certain railroads, members of a group called TRAIN (Transportation by Rail for our Agricultural-Industrial Needs). Alternative No. 2 is the TRAIN proposal. Alternative No. 3 is a proposal suggested by Southern Railway System.

*Alternative No. 1—Proposal published in Record*

1. Notwithstanding any other provision of law, any carrier may publish a surcharge in order to bring its earnings over any route to a level that will cover its variable costs of handling the given traffic moving over that route under any joint rate, without the concurrence of its connecting carriers. The surcharge must be applied in equal dollar amounts to all of that carrier's routes under the rate and to all of its competing single line routes. Such increases shall accrue solely to that carrier.

a. Before increasing the rate, the carreir proposing the rate must give other carriers party to the rate 45 days notice. If a connecting carrier wishes to respond to a surcharge on the effective date of another carriers' surcharge, it may initiate its own surcharge no less than 25 days before that effective date. At this time only, a carrier responding to a surcharge which results in different charges applicable to different routes under the same joint rate, may make unequal surcharges applicable to its routes under the rate and any competing single line route in order to re-establish route parity.

b. In an investigation, the proponent carrier shall bear the burden, consistent with 49 U.S.S. 10707, of showing that the surcharge is required to cover variable costs.

c. Any further increases in the joint rate to which such a "variable cost" surcharge applies shall increase the surcharge in the same proportion of the increases to the joint rate.

d. A carrier may not adopt a surcharge unless, for 1 year prior to the surcharge, it has participated in all increases in rates of general applicability agreed to by all other parties to the rates in question, or unless it agrees to participate in such increases for 1 year following adoption of a surcharge.

2. A carrier may otherwise publish and apply to a joint rate (in the form of a surcharge) an increase or decrease not exceeding 10 percent annually of the joint rate, subject to the following conditions:

a. The rate change must be applied in equal dollar amounts to all of the proponent carrier's routes under that rate. Rate decreases may and rate increases must also be applied in equal dollar amounts to all of its competing single line routes.

b. A surcharge must be divided with the proponent carrier's connections on the basis of existing divisions. A connecting carrier may refuse to accept all or any portion of its division of the surcharge, in which case, the surcharge applied to that route will be applicable in the amount of the proponent carrier's division, plus any amount accepted by its connections. The proponent carrier may, within 10 days of receiving notice of any such refusal, decrease its surcharge over any competing route to re-establish route parity.

c. Surcharges reflecting either an increase or decrease shall not be applicable to other carriers except as provided in paragraph (b).

d. Connecting carriers shall be given 45 days notice of an above variable cost surcharge.

e. If a connecting carrier wishes to respond to a surcharge on the effective date of another carrier's surcharge, it may initiate its own surcharge no less than 25 days before that effective date. At this time only, a carrier responding to a surcharge which results in different routes under the same joint rate, may make unequal surcharges applicable to its routes under the rate and any competing single line routes in order to re-establish route parity.

f. A carrier may not adopt a surcharge unless, for 1 year prior to the surcharge, it has participated in all increases in rates of general applicability agreed to by all other parties to the rates in question, or unless it agrees to participate in such increases for 1 year following adoption of a surcharge.

*Alternative No. 2—TRAIN proposal*

1. Notwithstanding any other provision of law, any carrier may publish and apply a surcharge in order to bring its earnings over any route to a level that will cover its variable costs of handling the given traffic moving over that route under any joint rate, without the concurrence of its connecting carriers. The surcharge must be applied in equal dollar amounts to all of that carrier's routes under the rate and to all of its competing single line routes. Such increases shall accrue solely to that carrier.

a. Before increasing the rate, the carrier proposing the rate must give other carriers party to the rate 45 days notice. If a connecting carrier wishes to respond to a surcharge on the effective date of another carrier's surcharge, it may initiate its own surcharge no less than 25 days before that effective date. At this time only, a carrier responding to a surcharge which results in different charges applicable to different routes under the same joint rate, may make unequal surcharges applicable to its routes under the rate and any competing single line route in order to re-establish route parity.

b. As proof of its costs, the proponent carrier may file a cost analysis developed in accordance with a cost accounting system accepted by the ICC.

c. In an investigation, the proponent carrier shall bear the burden of showing that the surcharge is required to cover its variable costs. The Commission may suspend such a surcharge only to the extent that the amount of the surcharge exceeds a variable costs showing accepted by the Commission. Any such suspension must apply to the application of the surcharge via all routes. The Commission must complete its investigation of the matter within 4 months. If the investigation is not completed within that period, it shall be terminated and the surcharge shall become effective.

d. The Commission may not investigate the lawfulness of the overall joint rate as a result of the application of a surcharge.

e. Any further increases in the joint rate to which such a "variable cost" surcharge applies shall increase the surcharge in the same proportion as the proportion of the increase to the joint rate.

f. A carrier may not adopt a surcharge unless, for 1 year prior to the surcharge, it has participated in all increases in rates of general applicability agreed to by all other parties to the rates in question.

2. A carrier may otherwise publish and apply to a joint rate (in the form of a surcharge) an increase or decrease not exceeding 10 percent annually of the joint rate, subject to the following conditions:

a. The rate change must be applied in equal dollar amounts to all of the proponent carrier's routes under that rate. Rate decreases may and rate increase must also be applied in equal dollar amounts to all of its competing single line routes.

b. A surcharge must be divided with the proponent carrier's intra-territorial connections on the basis of intra-territorial divisions. An intra-territorial connecting carrier may refuse to accept all or any portion of its division of the surcharge, in which case, the surcharge applied to that route will be applicable in the amount of the proponent carrier's division, plus any amount accepted by its intra-territorial connections. The proponent carrier may, within 10 days of receiving notice of any such refusal, decrease its surcharge over any competing route or routes to re-establish route parity.

c. Surcharges reflecting either an increase or decrease shall not be applicable to other carriers except as provided in paragraph (b).

d. Connecting carriers shall be given 45 days notice of an above variable cost surcharge.

e. If a connecting carrier wishes to respond to a surcharge on the effective date of another carrier's surcharge, it may initiate its own surcharge no less than 25 days before that effective date. At this time only, a carrier responding to a surcharge which results in different charges applicable to different routes under the same joint rate, may make unequal surcharges applicable to its routes under the rate and any competing single line routes in order to re-establish route parity.

f. A carrier may not adopt a surcharge unless, for 1 year prior to the surcharge, it has participated in all increases in rates of

general applicability agreed to by all other parties to the rates in question.

g. Surcharges made applicable under this subsection shall not limit the increases permitted connecting carriers under Section 10701a(b). For purposes of maximum rate regulation under the Act, only the carrier proposing a surcharge and any carrier claiming a division of that surcharge pursuant to paragraph (b) shall be required to defend the surcharge, and the lawfulness of the surcharge shall be determined without regard to the amounts received and the services performed by other carriers other than carriers claiming a division of that surcharge pursuant to paragraph (b) party to the joint tariff to which the surcharge is applied. In any subsequent proceeding to investigate the lawfulness of the joint rate to which a surcharge applies, that surcharge shall not be taken into consideration unless the Commission determines that each carrier participating in the surcharge is earning adequate revenues as defined in 49 U.S.C. Sec. 10704(a)(2).

*Alternative No. 3—Southern Railway System proposal*

POSSIBLE JOINT RATES AND DIVISIONS PROVISIONS

(a) Notwithstanding the provisions of Section 10705, any railroad, upon 45 days' notice to its connecting lines, may propose to publish a surcharge without the concurrence of its connecting lines in order to bring its earnings under a specific joint rate up to a level that will cover the variable costs of handling the traffic over its portion of the route, provided, however, that the variable costs shall be determined on the basis of the composite unit costs of that group of railroads which the Commission has selected for its periodic calculation of cost of capital in making its railroad revenue needs determinations. The Commission shall determine and publish the composite unit costs on an annual basis.

(b) The surcharge, if and when made effective, must be applied in equal dollar amounts to all of the routes, whether single line or joint line, to which the rate applies. Within 25 days from the date of the notice, the connecting lines may, at their option, agree to the cancellation of the joint rate with respect to the route or routes claimed to provide earnings insufficient to meet the standard in subparagraph (a) above, in which case the proposing carrier may not proceed further with its surcharge in the absence of concurrence of its connecting lines.

(c) A railroad may not propose or implement a surcharge pursuant to subparagraph (a) above if it has had the opportunity within the past year, by extending its concurrence, to realize the standard of earnings provided for in subparagraph (a) above but has declined to accept that opportunity.

(d) A railroad proposing a surcharge under these provisions shall bear the burden of proof that its earnings under a specific joint rate are below the standard provided for in subparagraph (a) above and that the surcharge proposed is needed to meet that standard.

(e) The rights provided herein shall expire 2 years after enactment of these provisions; and surcharges which are in effect on that expiration date shall, within 1 year, be incorporated into the joint rates and the surcharges cancelled.

NEW SECTION 10705(C) (ALSO PART OF SOUTHERN RAILWAY PROPOSAL)

[Present subparagraphs (c) through (f) become (d) through (g)]

(c) The Commission shall, within 6 months, commence a study of the feasibility of constructing divisions and divisions scales based on the composite unit costs of that group of railroads which the Commission has selected for its periodic calculation of cost of capital in making its railroad revenue needs determinations. In making the study the Commission shall solicit and consider the views of the Department of Transportation and the railroads. Within 1 year the Commission shall report to the Congress its views as to whether the use of such composite units costs would provide a simpler and more expeditious way to resolve divisions disputes between railroads and whether it would also provide incentives to the railroads to increase efficiency and reduce costs.

O

July 2009

# Calculation of Bunker Fuel, Currency, and Inland Freight Fuel Price Adjustment Factors for USTRANSCOM Commercial Shipping Contracts

## FINAL REPORT

**Prepared for the U.S. DOD/Transportation Command (USTRANSCOM)**

Abstract: Military units that move equipment and supplies to and from points around the globe rely on USTRANSCOM to provide sea, land, and air shipping services when needed. USTRANSCOM, for 95% of all tonnage moved, contracts for intermodal shipping services from regularly scheduled commercial carriers. The offered rates—per measurement ton or per TEU—apply to a given origin-destination pair for as much as 17 months from the time the offers are made. During that interval, prices of fuel and foreign currencies may fluctuate. In order to shift some of this volatility risk to shippers, carriers apply price adjustment factors to their published ocean and inland rates to compensate the carriers (or the shipper) for price changes. The specific adjustments apply to bunker and diesel fuel for ships, selected foreign currencies, and surface transportation fuel. This study describes the theoretical and practical considerations in designing these three types of price adjustment factors, and proposes methods for calculating the technical factors and their components.

**U. S. Department of Transportation**
**Volpe National Transportation Systems Center**
**Cambridge, MA**

| | |
|---|---|
| **Authors:** | Lee Biernbaum<br>Mario Caputo<br>Mark Gentile<br>David Hyde<br>Gustaf Lawson<br>Douglass B. Lee, Jr<br>Joseph Mergel<br>David Pace |

# *Contents*

**Executive Summary** . . . . . 1
Bunker Allocation Factor (BAF) . . . . . 2
Currency Adjustment Factor (CAF) . . . . . 4
Inland Intermodal Fuel Adjustment Factor (FAF) . . . . . 6

**Bunker Adjustment Factor (BAF)** . . . . . 9
General Principles of a BAF. . . . . 9
Volatility . . . . . 9
Time Lag Between Purchase and Delivery . . . . . 10
Basic Components of a BAF. . . . . 10
BAF Computation Requirements . . . . . 11
Fuel Consumption per Cargo Unit . . . . . 12
Distance. . . . . 12
Speed . . . . . 13
Vessel Capacity . . . . . 13
Fuel Price Differential. . . . . 14
Mix of Fuel Types . . . . . 16
Other Fuel Adjustment Factor Components . . . . . 16
Trade Imbalance . . . . . 16
Substitution. . . . . 17
Risk Sharing . . . . . 17
Positive/Negative Symmetry . . . . . 17
Defects of an Asymmetrical BAF . . . . . 17
Symmetrical BAFs . . . . . 18
Price Change Buffer Thresholds . . . . . 18
Anticipated or Unexpected . . . . . 19
Hedging . . . . . 19
Options . . . . . 19
Hedging and BAFs . . . . . 19
Pricing Alternatives . . . . . 20
With/Without BAF . . . . . 20
A La Carte Pricing . . . . . 20
Example of Airline Fuel Surcharges . . . . . 21
Transparency . . . . . 21
Updating BAF Components . . . . . 22
Current Fuel Price . . . . . 22
Absolute Surcharge or Percentage . . . . . 22
Flagging and Buy America . . . . . 22
Industry BAF Practices . . . . . 23
Proposed USTRANSCOM BAF Methods and Assumptions. . . . . 24
Price Indexing Factors . . . . . 24

Prices of Different Fuels . . . 25
Prices at Different Locations . . . 25
Fuel Consumption Factors . . . 26
Representation of the Typical Vessel . . . 26
Transit Time Estimation . . . 29
Fuel Consumption Factor. . . . 30
Engineering Analysis of Fuel Consumption Rates . . . 31
Composite Vessels by Trade. . . . 31
Ship Characteristics per Lane . . . 33
Model Calculation and Results . . . 38
Comparison of Fuel Consumption Factors and Transit Times with Maersk Lines 39
Circuity Factor . . . 42
Concepts and Theory . . . 42
Empirical Estimation . . . 44
Transhipment . . . 45
Input Substitution Factor . . . 46
Production Function . . . 47
Speed . . . 47
Marine Propulsion . . . 48
Fuel Economy . . . 49
Fuel Inputs . . . 51
The Production Function . . . 51
The Cost Function . . . 55
Other Production Function Forms . . . 56
Substitution Factor. . . . 56
Risk Distribution Factor . . . 58
Buffer Threshold and Risk Distribution . . . 59
Base Price Bidding Process . . . 59
20-to-40 Foot Container Equivalence (TEUs vs. FEUs). . . . 60
Weight versus Volume . . . 61
Industry Survey. . . . 62
Developing a USTRANSCOM Conversion Factor. . . . 63
A Network-Wide Conversion Factor . . . 63
All Factors Combined . . . 65
Technical Factor Comparison Between 1993 and 2009 Volpe Studies, and Maersk 65
References . . . 68

**Currency Adjustment Factor (CAF). . . . 73**
Introduction . . . 73
Foreign Exchange Markets and Currency Volatility . . . 75
Foreign Currency Markets . . . 75
Managing Exchange Rate Risk . . . 76
Measuring Currency Volatility . . . 77
Industry CAFs and Developing a USTRANSCOM CAF . . . 81

Key Components of a CAF . . . 81
Developing a CAF Methodology . . . 83
Choosing the Right Currencies . . . 83
Currency Baseline and Carrier Base Rates . . . 86
Measuring Volatility and Establishing a Buffer Zone . . . 87
Currency Analysis Results . . . 87
Addressing Dominant Exchange Rates . . . 92
Foreign Currency Expenses . . . 93
Risk Sharing Factor . . . 96
Conclusions and Recommendations . . . 96
References . . . 98

**Inland Intermodal Fuel Adjustment Factor (FAF) . . . 101**
Inland Intermodal Fuel Adjustment Factor (FAF) . . . 101
Feasibility of a CONUS and/or OCONUS FAF . . . 102
FAF Methodology Development . . . 103
FAF Input . . . 104
Base Period for Fuel Pricing . . . 104
Fuel Price Data . . . 104
Truck Fuel Consumption Factors . . . 104
Rail Fuel Consumption Factors . . . 106
Truck/Rail Competitive Break Even Point . . . 108
Industry Practice for Applying Inland Fuel Charges . . . 109
Alternative Approaches to Modeling a FAF . . . 109
Recommended FAF Methodology . . . 113
FAF Implementation Details . . . 115
Sample Internet Site . . . 116
CONUS Inland Fuel Surcharge (FAF) for USC-06 Shipments . . . 116
Limitations of the Proposed FAF Methodology . . . 122
References . . . 124

**Appendices . . . 127**

**BAF Appendix A: Critical Lane Fuel & Distance Tables . . . 127**

**CAF Appendix A: Currency Adjustment Factor Methodologies . . . 145**
References . . . 146

**CAF Appendix B: Individual Currency Figures over Varying Contracting Periods 147**
Japanese Yen . . . 147
South Korean Won . . . 148
Singapore Dollar . . . 149

United Arab Emirates Dirham . . . 150
Djibouti Franc . . . 152
Jordanian Dinar . . . 153
Kuwaiti Dinar . . . 154
Pakistani Rupee . . . 155
Qatari Rial . . . 156
Egyptian Pound . . . 157
Euro . . . 158
Pound Sterling . . . 159
Israeli New Shekel . . . 160
Norwegian Kroner . . . 161
Polish Zloty . . . 162
Turkish New Lira . . . 163

**CAF Appendix C: Applying the CAF . . . 165**
Step 1: Superlane Assignment . . . 165
Step 2: The applicability of the CAF . . . 165
Step 3: Calculate CAF . . . 166

**CAF Appendix D: Lanes and Superlanes . . . 167**

**FAF Appendix A: FAF Current Industry Practice . . . 173**
Trucking . . . 173
Rail/Intermodal . . . 175
Ocean Carrier Inland Moves . . . 175
Conclusions/Observations on Current Industry Practice . . . 177
Trucking . . . 177
Rail/Intermodal . . . 178
Ocean Carrier Inland Moves . . . 179
References . . . 179

**FAF Appendix B: Typical Rate-Based Truck Fuel Surcharge Estimator . . . 183**

**FAF Appendix C: Underlying Logic of the Rate-Based Fuel Surcharge . . . 185**

**FAF Appendix D: Typical Mileage-Based Truck Fuel Surcharge Estimator . . . 187**

**FAF Appendix E: SDDC Transportation and Travel Policy No. Tr-12 . . . 189**

**FAF Appendix F: GSA Approach to Fuel Charge Calculation for Household Goods Movements . . . 191**

**FAF Appendix G: BNSF Railroad Approach to Estimating the Fuel Surcharge for an Intermodal Shipment . . . 193**

**FAF Appendix H: TSA Inland Fuel Surcharge Calculator . . . . . . . . 195**
Inland Fuel Surcharge Calculator . . . . . . . . . . . . . . . . . . . 195
Calculating the Inland Fuel Surcharge . . . . . . . . . . . . . . . . . 197

**FAF Appendix J: FAF Calculator . . . . . . . . . . . . . . . . . . 199**
Input Values- Container Shipments . . . . . . . . . . . . . . . . . . 205
Input Values-Breakbulk Less Than 50,000 Lbs./Shipment Unit . . . . . . . . 206
Input Values-Breakbulk Greater Than 50,000 Lbs./Shipment Unit . . . . . . . 207

| Acronym | Full Name |
|---|---|
| BAF | Bunker Fuel Adjustment Factor |
| bunker | Fuel used to power large ocean vessels, mainly IFO 380 |
| CAF | Currency Adjustment Factor |
| CONUS | Continental United States |
| CU | Cargo Unit |
| CST | Centistoke, a measure of viscosity, as in IFO 380 |
| DFAR | Defense Federal Acquisition Regulations |
| DOE | Department of Energy |
| EC | United States East Coast |
| EIA | Energy Information Administration |
| EPA | Economic Price Adjustment |
| EU | European Union |
| FAF | Inland Intermodal Fuel Adjustment Factor |
| FAR | Federal Acquisition Regulations |
| FEU | Forty-foot Equivalent Unit |
| GC | United States Gulf Coast |
| GVW | Gross Vehicle Weight |
| IBS | Integrated Booking System |
| IFO | Intermediate (blended) Fuel Oil, usually either 380 or 180 |
| mpg | Miles per Gallon |
| MT | Measurement Ton |
| OCONUS | Outside Continental United States |
| POD | Point of Debarkation |
| POE | Point of Embarkation |
| SDDC | Military Surface Deployment and Distribution Command |
| TEU | Twenty-foot Equivalent Unit |
| USC-05 | Universal Service Contract 05 |
| USC-06 | Universal Service Contract 06 |
| USTRANCOM | United States Transportation Command |
| WC | United States West Coast |

# 1: Executive Summary

This report presents the final findings of the Volpe Center's study on the use of Economic Price Adjustment (EPA) factors for USTRANSCOM commercial shipping contracts. Along with investigating the use of these factors within the Universal Services Contract (USC) USTRANSCOM establishes with ocean carries, the study also proposes new methodologies for the bunker fuel adjustment factor (BAF), currency adjustment factor (CAF) and includes the addition of a fuel adjustment factor (FAF) for inland cargo moves.

This analysis, while more comprehensive, represents to some degree an update of a 1993 study performed by the Volpe Center in support of USTRANSCOM's USC to calculate EPAs. In that earlier study methodologies for both a BAF and CAF were developed, while the FAF was not addressed. These factors were subsequently used in USC-02 through USC-05.

The long time lag since the last study has led to changes in ocean carrier market conditions that may no longer be reflected in a 16 year old EPA. Indeed, on average it is likely that the ocean liner fleet is now more efficient in the use of inputs, such as fuel, per ton-mile. Any improvements in fleet fuel consumption would be expected to manifest itself in lower technical factors that are a component of developing a BAF. In addition, the global scope of USTRANSCOM's shipments along with the decline of the dollar during recent years warrants reviewing and updating the CAF methodology and the number of currencies it covers. Finally, the carrier industry has moved towards adopting fuel surcharges on inland portions of a shipment's overall journey, prompting USTRANSCOM to examine the need for an additional EPA, the inland intermodal FAF. To account for the changing commercial shipping market structure, updated or new EPA's were deemed necessary for USC-06.

This study examines in detail the development of methodologies for constructing a BAF, CAF and FAF for the Universal Services Contract, USC-06. This includes a review of current industry-wide EPA practice and the economic theory behind the development of these factors. In particular, this study introduces the concept of input substitution to development of a BAF. This factor takes into account how carriers will adjust the mix of ocean liner vessel inputs to counter rising fuel prices. An example of this trade off between inputs became evident during the past year when fuel prices spiked and carriers began reducing ship speed to lower fuel consumption. In effect they are lowering the use of an input (fuel in this case) relative to all other inputs. The role an EPA plays in risk management and sharing between USTRANSCOM and carriers is also explored. An important component of any EPA is the acknowledgment of the relative market positions of the two parties involved and their ability to manage fuel and currency volatility risk.

In developing new EPA's, attention was paid to ensure they were compliant with the EPA provisions of the Federal Acquisition Regulations and the Defense Federal

Acquisition Regulations. Additionally, the methodologies developed were done in the light of current commercial practices and were constructed to be commercially reasonable, auditable, and not to present significant barriers to the efficient administration of USC-06.

## *1.1. Bunker Allocation Factor (BAF)*

Surcharges, or adjustments, for fluctuations in bunker fuel prices first appeared in the shipping industry following the first oil shock in the mid-1970s. As fuel price volatility increased, carriers sought to minimize their exposure to unexpected fuel price increases and pass those costs, and risk, along to their customers. Initially these charges were percent increases on the freight rate, but the industry practice has now evolved to applying a flat fee, or bunker fuel adjustment factor per unit of cargo.

Conceptually, a BAF is an allocation of the unanticipated increase in the cost of fuel to a unit of cargo. In this way the BAF allows the carrier to transfer some of the risk from fluctuations in fuel prices to the shipper. In principle, this EPA should have three components: a fuel consumption amount, a fuel price differential (representing the change in fuel prices from a baseline, set at the time of contracting, to the current period) and additional multiplier factors such as a distance circuity factor.

The first step in developing a new BAF requires measuring the "typical" fuel consumption rate for ocean liner vessels. This was achieved through scanning the ocean carriers' commercial practice for industry standards in tracking the cost of fuel as well as the allocation of fuel per unit of cargo. Next, using USTRANSCOM data to identify vessels used in each trade, a "typical" vessel's characteristics were constructed from subscription vessel databases. Combining fuel consumption rates with vessel capacity and distance, a fuel consumption factor was developed for each trade. This fuel consumption factor is similar in construct to the 1993 Volpe Center BAF technical factors, but as would be expected is generally lower in value due to improvements in fleet fuel efficiency.

A circuity factor is then added to the direct distance component of the BAF formula. This factor takes into account the fact that ocean liners optimize schedules, vessel capacity and demand through using a tour or circuit looping around a set of ports. This strategy means that ships travel across more vessel-ton-miles than if a direct route was used. A circuity factor, which has a value greater than 1, is introduced into the BAF fuel consumption calculation to account for the extra distance traveled, and fuel used, around a "loop".

In addition to the fuel consumption factor, two new multiplier factors were added to the BAF calculation. The first of these, the Input Substitution Factor, accounts for decisions by carriers to modify their services in the face of changing prices by substi-

tuting production inputs. In practice, this manifests itself through carriers reducing speed, and lowering fuel consumption (an input), during periods of high oil prices. The Risk Distribution Factor assigns the risk of rising fuel costs between USTRANSCOM and carriers. This factor allows for USTRANSCOM to determine the level of risk between it and the carrier. If a carrier is better placed to manage this risk, through hedging or other means, then it should bear more of the risk. Alternatively, if the risk is beyond anyone's control, then either the shipper or the carrier can bear the risk.

The fuel consumption factor is combined with these two new factors into a technical factor for each trade, both for container and RoRo cargo. The base cargo unit used in the development of the technical factor is a TEU, which refers to a twenty foot shipping container. The technical factor is converted to a forty-foot equivalent unit through the use of a TEU/FEU conversion factor. This factor, which has a calculated value of 1.86, was developed based upon USTRANSCOM's historical use of, and weight of cargo moved in, twenty-foot and forty-foot containers. The technical factor for RoRo, or breakbulk, cargo is calculated in measurement tons. Whether per TEU, FEU or measurement ton, the technical factor is multiplied by the change in fuel price above or below a 20% buffer for calculating the BAF payment.

The new BAF methodology provides technical factors for both container and breakbulk cargos on ninety-nine lanes identified within USC-06. When compared with high volume routes from the 1993 study, the new technical factors are lower than those developed previously. This reflects lower fuel consumption estimates, due to improved ocean liner vessel fuel efficiency, and the inclusion of the new Input Substitution and Risk Distribution factors; it is recommended that these factors be set at 0.8 and 0.75 respectively. As a result, these lower technical factors will result in lower BAF payments to carriers as prices rise outside the 20% buffer (as well as lower payments from carriers if prices fall).

Specifics of the development of the fuel consumption and technical factors are detailed in the BAF section of this report. This section provides details on the theory and methods utilized in the creation of the new recommended technical factors, including the development of fuel consumption factors, circuity factors and the TEU/FEU conversion factor. The actual calculations of the technical factors from the new BAF methodology are presented in the Microsoft Excel workbook titled "BAF Calculation 070109". This workbook shows the mechanics of the BAF calculations for all USTRANSCOM routes and compares these with the values for the high volume routes from the 1993 study.

The new BAF methodology was developed considering the current contracting bidding process established under USC-06. Through this process carrier base freight rates can remain in place for up to 17 months. Reducing the time this process takes and the length shipping rates remain in force will lower the risk from fuel price fluctuations. Reduced risk due to a shorter bidding process can be reflected in the BAF by lowering the Risk Distribution Factor.

## *1.2. Currency Adjustment Factor (CAF)*

Similar to the BAF, the currency adjustment factor (CAF) first came into use in the marine shipping industry during the 1970s following the demise of the Bretton Woods fixed exchange rate system. Under a floating currency regime carriers were exposed to financial uncertainty as exchange rate volatility resulted in unexpected price changes. While carriers receive revenues in one currency, some expenses, in particular foreign port handling charges, are paid in another. Movements in the exchange rate between the point when a freight rate is set and payment is required for foreign services exposes an ocean carrier to financial risk and uncertainty. As a result ocean carriers introduced a CAF surcharge to minimize risk arising from currency volatility.

In determining the requirements for an updated CAF methodology, this study examines current industry practice on exchange rate surcharges, along with literature on measuring currency volatility and methods, such as hedging through forward exchange markets, used by businesses to manage this risk. This research provided insight into the important components of a CAF, and techniques and methods for analyzing and measuring exchange rate volatility.

From the industry research it was determined that in constructing a CAF for USC-06, three main components need to be included: a baseline rate, against which changes are measured, a mechanism for acknowledging the positions of carriers and shippers relative to foreign exchange markets (a buffer zone and Risk Sharing Factor) and a technical factor that will allow for the amount of shipping costs invoiced in a foreign currency. Each of these factors is briefly touched upon below and discussed in detail within the CAF section of this report.

The CAF methodology proposed in this study is consistent with general industry practice in that it recommends the adoption of a CAF based on currencies grouped regionally and trade weighted by USTRANSCOM shipping patterns. Nonetheless, it continues to retain some unique qualities, including the symmetrical buffer zone.

This study recommends applying a CAF across three superlanes, where previously the CAF only applied to four currencies. These superlanes cover trading lanes between the U.S. and Eastern Asia, Western India Ocean and Europe/North Africa. This approach provides a more specific CAF based on USTRANSCOM's historical shipping patterns, the variations in currency volatility by region, and captures 90% of USTRANSCOM's CONUS to OCONUS freight movements (the CAF does not apply

to OCONUS to OCONUS freight). Across the three superlanes the CAF will apply to 17 major trading currencies shown in Table 1.

**Table 1: CAF Currencies**

| Currencies | |
|---|---|
| Japanese yen | Qatari rial |
| South Korean won | Egyptian pound |
| Singapore dollar | Euro |
| United Arab Emirates dirham | Pound sterling |
| Bahrani dinar | Israeli New sheqel |
| Djibouti franc | Norwegian krone |
| Jordanian dinar | Polish złoty |
| Kuwaiti dinar | Turkish lira |
| Pakistan rupee | |

The importance of each currency within a superlane is determined by calculating a trade-weighted average of exchange rate volatility.

The period during which the USTRANSCOM CAF, and the baseline exchange rate, remains in force, currently up to 17 months, is longer than the industry norm. While this is a function of the nature of USTRANSCOM contracts, the length a baseline exchange rate and CAF are in place affects the size of the buffer zone. Longer time frames are consistent with higher levels of expected currency volatility.

The size of the buffer zone is aligned to the degree of normal expected volatility. To do so, 16 years of historical exchange rate data was examined and a distinct buffer zone was established and set for each superlane for a 17-month contracting period, subject to a worldwide minimum to prevent a fixed exchange rate from dominating a region.

The technical factor for the CAF calculation is proposed at 7%. This recommendation is based on an analysis of ocean carrier financial data and estimated terminal costs. This factor allocates the percent of costs in the base freight rate requiring payment in a foreign currency. Typically this relates to charges incurred at foreign ports where cargo is loaded or unloaded.

For a superlane, if the change in the current monthly average exchange rate, which is set as a monthly average from two months previously (as is the current practice), compared with the baseline (also set as a monthly average) is higher or lower than the base buffer zone, then a CAF will be put into place. The exchange rate ratio is then multiplied by the technical factor of 7% and a risk sharing factor. The CAF ratio is then multiplied against the base freight rate to determine the dollar adjustment level.

The new CAF methodology uses more currencies than previously and combined with USTRANSCOM and carrier terminal operations information to develop a regional approach. Applying the new CAF methodology to a much broader group of lanes is more consistent with the global pattern of USTRANSCOM's shipments and using region-specific currency baskets and volatility buffers better reflects observed currency fluctuations. The new CAF also has a smaller technical factor to account for U.S. versus foreign terminal operations and a risk sharing factor. Both of these factors serve to lower CAF payments to and from carriers, although this study does not recommend a specific value for the risk sharing factor. Specifics on applying the CAF are presented in the appendix section and are demonstrated in the Microsoft Excel workbook titled "CAF Worksheet for USTRANSCOM". This workbook will also accept the monthly inputs from USTRANSCOM personnel and calculate the output for posting on the website.

## *1.3. Inland Intermodal Fuel Adjustment Factor (FAF)*

Not part of the 1993 study, an intermodal fuel adjustment factor (FAF) is a fuel surcharge levied by overland common carriers designed to pass risk of fluctuations in fuel prices to shippers. The FAF is conceptually similar to a BAF in that its purpose is to protect ocean carriers from the risk of fluctuating fuel prices, but is focused on the inland portion of surface shipments. This surcharge was initially developed by U.S. trucking companies to pass fuel price volatility along to shippers.

Since USTRANSCOM did not have a FAF in place in USC-05 an initial focus of this section of the study was on determining whether a FAF is necessary and feasible. This was done through examining current industry practice and determining the necessary components of a FAF. Key to developing a FAF is the consistent availability of fuel price data and mode-specific technical factors related to fuel consumption. These data are readily available in the U.S. making the development of a FAF for movement within CONUS feasible. It was determined, however, that it is not currently feasible to develop and administer an OCONUS FAF. This is due to a lack of readily available fuel price data and technical (fuel consumption) factors on transportation operations beyond the U.S. As a result of this finding, this study presents a methodology for applying a FAF only on the inland portions of USTRANSCOM container and break-bulk CONUS shipments.

After examining several different methodologies for constructing a FAF using actual USTRANSCOM shipment data, a recommended approach was selected based on an optimal tradeoff between simplicity (administrative burden) and accuracy. The proposed approach involves the calculation of a FAF for six "zones". These zones are East Coast ports to East Coast states; East Coast ports to all other states; Gulf Coast ports to Gulf Coast states; Gulf Coast ports to all other states; West Coast ports to West Coast states; and West Coast ports to all other states. For the FAF analysis, ship-

ments moving less than 700 miles are assumed to be going by truck, while those shipped more than 700 miles are assumed to have gone by rail.

Fuel usage factors used in the FAF calculation were obtained through a literature review of reports and papers on this topic. For cargo moving via truck a value of 6 miles per gallon, or 0.16667 gallons per mile, was used to determine fuel consumption per container. For intermodal rail fuel consumption is estimated at 0.0330 gallons per container mile. For breakbulk shipments weighing less than 50,000lbs the truck fuel factor was unchanged but was adjusted to 0.0872 gallons per trailer mile for rail movement due in part to differences in the empty weight of the equipment required for breakbulk. For breakbulk weighing more than 50,000lbs the truck fuel factor was adjusted higher to 0.2192 gallons per mile, while the consumption figure for trains was reset at 0.1454 gallons per car mile due to conventional rail carload services having to be utilized instead of rail intermodal services.

The FAF methodology is based on the fuel price differential between a specified base period (time of solicitation) and the current time period, and the fuel used in moving a container or breakbulk shipment an average distance by truck or rail within a given zone. The approach is similar to, but more transparent than, current industry practice on FAFs for inland CONUS container movements. The calculated FAFs are based on the widely available data published by the Department of Energy's Energy Information Agency, typical fuel consumption factors for U.S. trucking and intermodal rail operations, and typical USTRANSCOM inland container movements as indicated in the IBS (Integrated Booking System) data for 2008. To keep the USTRANSCOM FAF consistent with industry practice and with SDDC Policy TR-12 the recommended FAF methodology does not include a buffer zone. It is recommended that, consistent with FAR regulations, the FAF should be symmetrical and responsive to upward or downward variations in fuel price away from the base rate fuel price.

Specific details on applying the FAF are presented in the appendix and in the accompanying Microsoft Excel workbook titled FAF Calculator.

# 2: Bunker Adjustment Factor (BAF)

This chapter discusses the general concept behind a bunker fuel adjustment factor, the industry practices used in calculating a BAF, as well as the concepts utilized in building a new BAF for USTRANSCOM. The accompanying workbook "BAF Calculation 070109" puts the concepts and assumptions described below into a working model for determining the new BAF.

## *2.1. General Principles of a BAF*

Historically, the cost of bunker fuel used by carriers was built into the basic freight rate charged to shippers. These rates were fixed for a period of time usually not more than six months. As bunker fuel costs were both stable and a relatively small share of carriers' costs, price increases were reflected in the subsequent round of carrier freight rates. When fuel price volatility increased within the term of a contract, carriers sought to minimize their exposure to dramatic fuel price increases and pass those costs along to their customers.

The first BAF appeared in 1974 after the oil shocks caused a significant rise in bunker prices. Initial versions of BAFs were percent increases on the freight rate if the rise in fuel prices met the conditions set forth in the agreement. These evolved into a flat fee per unit of cargo, the method that is used in industry today.

Carriers argue that fuel costs, as any cost of production, are rightly passed along to shippers as the price of their service. Using a BAF surcharge keeps basic freight rates constant, allowing for shipper cost certainty. Shippers counter that fuel, as any input, is the burden of the carrier, and shippers prefer that costs be added into the basic freight rate in the next bargaining round. With BAFs, shippers argue that total costs were still widely variable, preventing cost certainty. Furthermore, the mechanism for calculating the BAF is opaque and shippers are suspicious that carriers recover more than what the rise in bunker prices would justify.

**Volatility**

While price volatility in inputs is an uncertainty and hence a risk factor, it is not obvious which party—buyer or seller—is the most efficient one to absorb the risk. If the carrier acquires the fuel, adjusts its input mix to optimize its production function and relevant prices, and has the opportunity to hedge on prices by advance purchases or other instruments, then that would suggest that the carrier is in a good position to control many of the risks. Even though the carrier may not have control over spot prices in world markets, it has more levers to deal with variations than the shipper, who has little or no control over the carrier's production function.

Nor is price volatility without cost to the shipper. Assuming there is some demand elasticity, the shipper has to estimate its preferred point on its own demand schedule without knowing the exact amount of the price. If demand is inelastic, and funds can be transferred into or out of other activities readily easily in the short run, then the volatility cost may be minimal to the shipper. If the shipper needs to plan more accurately, than volatility may be a substantial cost.

An argument in favor of passing fuel volatility costs on to the shipper is that the base price charged by the carrier will be lower if it doesn't have to include uncertainty within the base price. To what the extent expected value of total (shipper plus carrier) cost is less than what carriers would charge in the absence of a BAF is an empirical question, but there is no obvious a priori reason why carriers should be abnormally risk averse in their pricing, i.e., charge very high base prices to cover the risk.

A BAF as a surcharge on the price of shipping a container is an example of risk management. In this instance, the risk is the uncertainty in the future price of petroleum fuels. The first principle of risk management is that risk should be allocated to the parties that are in the best position to control or minimize adverse risk.

The importance of fuel price as a risk factor depends upon two criteria: (1) the magnitude of the component in total cost, and (2) the volatility of the component. Both conditions must be present, i.e., a volatile but minor component is not worth much attention (the price of fresh peaches), nor is a large but stable component (a containership)[1].

## Time Lag Between Purchase and Delivery

For fuel costs, a key factor is the time horizon over which the cost must be estimated. If the price quote and the delivery date are relatively close-less than, say, two months-then the likely changes in fuel price are smaller in magnitude and more easily estimated. Price quotes that need to be valid for as much as a year in advance may be subject to substantial cost variability in fuel.

Thus the utility of a BAF is dependent upon and presumes a lag between purchase and delivery of a large enough elapsed time as to make price volatility a problem. Otherwise—as with charters—the price can be estimated and quoted at the time the service is to be provided.

## Basic Components of a BAF

Looking at industry practice, a BAF formula is essentially capturing two things: the change in the price of bunker fuel, and the allocation of fuel use to a unit of cargo. If the price of bunker fuel rises by a given amount for a specified time period, some portion of the increase is passed to the shipper in the BAF.

A BAF has three types of elements:

(1) A fuel consumption amount for the transit of the vessel from load port to discharge port, allocated to units of cargo;

[1] Vessel prices can also be volatile; see Gaffen (2009).

(2) A fuel price differential representing the change in the unit price of fuel from the baseline to the current period; and

(3) Any number of multiplier factors whose default value is 1.0.

Examples of the third type are trade imbalance or other capacity utilization, and distance circuity factors.

### BAF Computation Requirements

A BAF consists of

- A technical component that takes in to account vessel capacity, fuel consumption, and travel distance, updated annually or less frequently.
- A price component derived from published current prices in relevant markets for applicable fuels, updated monthly or quarterly if prices change.

In order to calculate a BAF, the following are needed:

- A method for updating the factors, including time period or triggers (economic rationale)
- The share of the fuel price increase to be absorbed by the shipper (risk allocation)
- The consequence (if any) of the time lag between price increase and application of the new BAF (risk exposure)
- Sources of objective data (transparency)

The base price component of the freight rate may be updated monthly or specified for a longer period. The two components are additive and the BAF is not affected by the magnitude of the base freight rate. Together they make up the unit price (per TEU or measurement ton) of the shipping.

Fuel use depends on both the characteristics of the vessel as well as the operational constraints of the carrier and specific trade route. These characteristics include:

- Vessel type and age
- Vessel capacity
- Vessel speeds
- Balance of trade
- Voyage length

The daily burn rates are multiplied by the voyage length to determine the total fuel consumption for a vessel in a given trade. Dividing this by the average vessel TEU capacity gives the amount of fuel required to move a single container within a trade.

Combining the allocated fuel cost per container with the price change information gives the resultant BAF, expressed as a charge per TEU of cargo and rounded to the nearest $5 to $20 increment.

## Fuel Consumption per Cargo Unit

USC cargo is categorized as containerized or breakbulk. Further breakdowns of containers are 20-foot, 40-foot, over- and out-sized, and refrigerated. Over- and out-sized breakbulk cargo can be palletized or roll-on roll-off (RoRo). For BAF purposes, the primary units are 20-foot standard containers (TEU), 40-foot standard (FEU), and measurement tons for non-containerized breakbulk cargo.[2] These three categories provide sufficient accuracy for adjusting shipping prices to changes in fuel price.

Converting the vessel fuel consumption to a per-cargo-unit basis requires estimating the capacity of the typical vessel in the trade. Container ships are assumed to carry only or mostly containers, with a flexible mix of 20s and 40s.[3] For RoRo or breakbulk ships, the capacity is approximated in measurement tons. Thus the fundamental formula is

$$\text{Fuel Consumption per CU} = \frac{\text{Vessel Fuel Consumption}}{\text{Vessel Capacity in CUs}} \quad [1]$$

where CUs = cargo units (in TEUs or measurement tons) and

$$\text{Vessel Fuel Consumption} = \text{Vessel Fuel Consumption per day} \times \text{Steaming days} \quad [2]$$

### Distance

Fuel consumption is calculated using distance and burn rate averaged for typical vessels in the trade under typical conditions. Because speed can be adjusted to meet schedules, distance and fuel consumption rates are commonly measured in days. Direct distance can be obtained from port distance tables, but a vessel may not travel along a direct route between the cargo's load and discharge unless the ports are sequential on the vessel's itinerary. What can be called actual distance is an expansion of the direct distance via,

$$\text{Actual Distance} = \text{Direct Distance} \times \text{Circuity Factor} \quad [3]$$

The Circuity Factor makes allowance for the vessel not transiting directly from load port to discharge port. As with other business decisions, the carrier seeks scale economies carrying more cargo on the same voyage. Both shippers and carriers gain from this, to the extent it is efficient, as reflected in prices and revenues.[4]

2 Measurement tons, sometimes referred to as shipping tons, is a measure of volume equaling 40 cubic feet.

3 The comparison of 20-foot and 40-foot containers takes into account both bulk and weight, as explained in section "20-to-40 Foot Container Equivalence (TEUs vs. FEUs)" on page 60. For this analysis, the TEU is taken as the unit of cargo, and subsequently converted to FEU rates by a single factor.

4 If the circuity factor is estimated by the ratio of actual days to calculated direct days, days in port should be subtracted from observed elapsed travel days.

If total fuel consumption for the round-trip voyage is divided by the total direct distance of the A-to-B cargo movements served, then this result should be a minimum if the combination of movements is optimal (e.g., diverting to pick up more cargo was worthwhile, but further diversions would not be). This fuel consumption per CU will be higher than if the ship transited directly between load and discharge ports and was fully loaded. The circuity factor takes into account the benefit of circuity to increase load size and associated scale economies, and to offer more frequent service.

### Speed

Speed is an endogenous variable, i.e., the most economically efficient speed depending upon all input costs and performance requirements. Fuel consumption rate and distance then are the primary technical factors for each lane/route/trade. For a given speed, distance converts to time via the standard formula,

$$\text{Steaming Days} = \frac{\text{Distance}}{\text{Speed}} \quad [4]$$

where Steaming Days = total days for the vessel voyage from port A to port B, without intermediate stops. Distance is in nautical miles from [3] above, and Speed = average speed made good in nautical miles per hour (knots) times 24 hours. If fuel consumption is measured for steaming time only, and speed is average speed underway, then days in port are not included in Steaming Days.

While speed is not an explicit variable in a BAF, it can enter through a substitution factor, developed conceptually in more detail below under “Input Substitution Factor” on page 46. The reason for calculating steaming days in the BAF is because fuel consumption in the data source is given in days for the associated steaming speed.

### Vessel Capacity

Vessel size or capacity allows for scale economies in fuel consumption per ton or TEU. Published (subscription) service data for fuel consumption and capacity are used for these measures, corroborated by means of Volpe internal estimates. Sensitivities of these estimates to vessel age, speed, weather, size, and other variables are reflected in empirical averages or are assumed to be unbiased error around calculated quantities.

For various reasons, the nominal maximum capacity of the vessel may not be achievable in practice. In particular, the typical configurations of vessel cargo spaces and of military breakbulk and RoRo cargo may require broken stowage, meaning that some space is unavoidably left over as unusable.

$$\text{Actual Capacity} = \text{Design Capacity} \times \text{Stowage Factor} \quad [5]$$

where Design Capacity is taken from published sources and averaged for typical vessels in the trade, and the Stowage Factor is a fraction $\leq 1.0$ to allow for unusable capacity. This factor may be specific to the cargo type and trade.

**Fuel Price Differential**

Fuel costs at prices applicable to the date on which the bid or offer is received are assumed to be incorporated into the base freight rate; thus the BAF is an adjustment relative to the base fuel price. A buffer or threshold change is usually applied, to avoid calculating and imposing BAF charges for minor fluctuations in price. An example is shown in Figure 1.




**Figure 1. Fuel price differential, with threshold.**

The upper line with square marks plots the bunker price for a series of months in Singapore when fuel prices were rising. The threshold of 20% is also plotted, indicating which months are outside the buffer, triggering a (hypothetical) BAF. The base price is taken to be July 2007, although it could also be a moving average of three months. The price differential, shown as the lower line (right scale) stays at zero for two months, then shoots up because the threshold is slightly breached. Several months later the price dips slightly below the threshold and the BAF goes to zero for one month. These sudden jumps in the BAF can be minimized by smoothing the data with a moving average.[5]

[5] see http://www.tsacarriers.org/fs_bunker.html for a carrier conference BAF.

Both base and actual prices can be averaged across ports to smooth the differences. Several inputs may be used to track changes for a BAF including:

- Share of fuel consumption in base freight rates
- Current prices for different classes of bunker fuels, such as intermediate fuel oil (IFO), 380 CST, and Marine Diesel Oil (MDO)
- Locations of fuel purchases
- Share of fuel purchased per location
- Baseline time period
- Time frame for price observation
- Price change threshold

Carriers identify an amount of fuel cost above the baseline freight rate to be passed on to the shipper. The specific price information used to create that figure is determined by each carrier.

The primary issue in determining the change in bunker price is determining the baseline price against which changes are measured. A carrier quotes a base freight rate to shippers that includes at least some portion of bunker costs. A baseline bunker price is also established. When a shipment departs at a later date, the relevant cost figure is the change in bunker price from the base time period to the current period.

The baseline bunker price is generally an average price of bunker fuel for a preceding time period, varying in length of one to three months. Carriers use the average daily or weekly price to determine the base price for calculating future changes. After identifying the base price, carriers typically post the price a month in advance before it takes effect, creating a lag of at least one month on actual prices represented in the baseline. For instance, if a carrier uses a three month average price with a month lag for publication, the baseline reflects the prior three month time period. Whatever the time period used, the price change between the baseline time period and the date of shipment is the figure used to calculate the BAF.

Apart from the time period used in the calculation, carriers utilize other information in the construction of their BAF formulas. Carriers are sometimes required by local law to burn the cleaner, more expensive MDO while in port or protected waters but will burn the cheaper bunker fuel for the majority of a voyage. Some carriers use bunker (IFO 380) fuel prices exclusively in their calculations both due to its larger share of total fuel consumed as well as to simplify the calculation methodology. Other carriers create fixed ratios to mimic the relative shares of fuel burned in operation.

The locations of carrier fuel purchases may take into account any regional price variance. Some carriers may use specific ports for a given shipment while others will create a regional average of several ports, weighting prices by their share of fuel purchased at those ports.

In all cases, carriers quote the fuel prices used in their calculations from 3rd party sources such as Bunkerworld, Platts Bunker Wire, or Bunker Index. These prices don't necessarily incorporate the actual prices paid as carriers may purchase fuel months in advance, but rather, the prevailing market price at the time. A carrier active in fuel hedging markets can mitigate their exposure to price fluctuation whether or not they have a BAF.

### Mix of Fuel Types

Crude oil is refined by "cracking," which involves heating the crude to various temperatures and condensing the components that vaporize. Hence they are called distillates. The residual from this process is thick (viscous) and full of impurities. This residual, mixed with a modest amount of distillate, can be used to fuel diesel engines designed for the purpose. The most common grade, or standard, is CST 380 or IFO 380, called bunkers in reference to the space where coal was originally stored aboard ship.

Because bunker fuel has limited application and is hard to use (it has to be heated), it is a relatively cheap fuel. Because of its impurities, however, it produces high emissions when burned in engines. These emissions have been accepted so far on the open ocean, but are increasingly being prohibited in ports and near coastlines. In these locations, ships are required to burn a higher grade of petroleum product, labeled marine diesel oil, or MDO. The price, of course, is higher than for IFO 380 or IFO 180.

At the present time, ships use IFO for about 95% of their needs and MDO for the other 5%. The price of fuel, then, is a weighted combination of the prices for these two fuels.

## Other Fuel Adjustment Factor Components

A BAF can be modified using some number of additional elements that are applied to fuel consumption cost to arrive at a price adjustment amount for the purpose of shifting or spreading the risk of price volatility in bunker fuel.

Some other factors that have been or might be included in BAF calculations are described below:

### Trade Imbalance

World trade occurs in many directions, but not necessarily equally. The U.S., especially, imports more than it exports. Thus there is a "peak" direction (toward the U.S.) where demand is usually higher than in the other direction. Most of this effect is reflected in base shipping rates, but there will still be some directional tendency in traffic, leaving fewer cargo units across which to spread fuel costs.

An imbalanced flow factor acknowledges that the utilization of capacity is bound to be unequal between eastbound and westbound routes. There are marketing efforts and operational strategies that carriers can take to reduce or mitigate the imbalance, and

BAF components should not reduce the incentives for carriers to utilize excess capacity.

### Substitution

The way in which a mix of inputs is combined to produce an output is called a production function by economists. In practice, this is often a very complex process. Economists, however, study the properties of production functions in theory by representing them in abstract (mathematical or graphic) forms.

In theory, the mix of inputs into a given production function is selected according to their relative prices. The price of labor, the opportunity cost of a vessel, and the price of fuel usually have some effect on the amounts and proportions of those inputs that produce a vessel voyage. As the prices change, the mix changes. As the price of fuel rises, the vessel operator tries to produce the same output at the least cost by substituting other inputs for the more-expensive fuel. The primary means for saving on fuel on ocean vessels is to reduce speed.

### Risk Sharing

Because the BAF is a mechanism for shifting the risk of fuel price volatility, the decision should be explicitly made as to how much of the risk each party should bear. That allocation will then be reflected in the bid or offered basic freight rates. The more that the risk is borne by carriers, the lower will be the BAF and the higher will be the base freight rates in order to absorb the risk, assuming rates are set in competitive markets.

**Positive/Negative Symmetry**

In practice, commercial BAFs never go below zero, while U.S. government price adjustment factors (EPAs, or economic price adjustments) are required to be symmetrical with respect to increases or decreases in the exogenous commodity price.[6]

When using an economic price adjustment, the FAR/DFAR acquisition regulations require "mutuality" to protect both parties. The concept behind mutuality is that when contract inputs are volatile enough to make cost projections and thus contracting difficult, a price range is identified outside of which either party is compensated by the other. A contract is created assuming an input's market price and an index is used to track the price. If the price stays constant, the input price at the time of bidding is assumed to be the full responsibility of the contractor and their bid reflects that amount.

### Defects of an Asymmetrical BAF

Carriers seem to have a strong preference for BAFs that only go up if the price of fuel goes up, but never go below zero if prices go down. If carriers want protection from

6 FAR: Subpart 16.2-Fixed-Price Contracts, DFAR 216.203- Fixed-price contracts with economic price adjustment.

the downside but get to keep all the upside, then their base freight rates should reflect this favorable bias. The only obvious way to test this is to get them to offer all three: symmetric BAF, asymmetric BAF, and no BAF.

The current stance of the carriers is a bargaining strategy: the best situation for them is a BAF that overcompensates upward and has no downward action. To the extent that carriers can get shippers to go along with this strategy, they will use it. If the BAF is set to recover only a part of the fuel cost increase, the carriers will be less enthusiastic about having a BAF. A fuel price increase is an adverse event, for carrier, shipper, or both; protecting the carrier against the downside risk implies that they lose the opportunity for upside risk. There is no particular asymmetry in the volatility risk that would suggest that one party be protected against movement in one direction only.

### Symmetrical BAFs

It is fundamental to any hedging or risk-reducing measure that it allow for both positive and negative outcomes. If the BAF is positive for price increases but not negative with price decreases, the carrier is relieved of any downside risk but gets to keep the upside gains. This is having your cake and eating it too. It costs the carriers nothing, transfers all the risk to the shipper, and offers the potential to augment the basic price. While in a competitive market these advantages should be reflected in lower base freight rates, the market is only partially competitive and, like complex derivatives, the true costs and risks are obscured. If there is a BAF at all, it should at least be symmetrical upward and downward.

### Price Change Buffer Thresholds

The USC-5/6 contract set the price threshold for bunker fuel at 20% in either direction off the baseline price. At prices 20% above the baseline price, the carriers are compensated by a BAF for the added costs of fuel that wasn't included in their base freight rates which were fixed at the time of bidding. The principle of mutuality required by the FAR/DFAR also enables USTRANSCOM to be compensated by carriers if the input price of fuel falls below the threshold. This prevents a carrier from taking windfall profits if the price of fuel fell significantly below the baseline price assumed in the fixed contract.

The price factor should not be changed daily with each slight change in the price of bunker fuel. For planning purposes, the BAF needs to stay fixed for some reasonable period of time, say, at least a month. The more frequently is the BAF adjusted, the less point there is in having a freight rate published in advance.

The price index is typically a weighted average of the posted prices of applicable fuels in the relevant ports of call for a given route. It is thus a composite price, rather than an abstract index.

With a buffer, then, the BAF functions as catastrophe insurance for carriers against potentially damaging price swings, i.e., prevents windfalls and wipeouts for the carriers. Shippers suffer the volatility, but retain the option not to buy the service.

### Anticipated or Unexpected

A question raised by ISRI is the extent to which a price increase was anticipated and built into the base freight rate, not only the current fuel cost but also expected future cost. Hence the compensation should be for unanticipated price increases.[7]

There might be a consensus forecast, or there might be an imputed forecast derived from futures market prices.

Over the time period of a year, carriers are fairly unlikely to anticipate price changes greater than 10% or 20%, so the risk might be partitioned into normal risk (absorbed by the carrier) and unanticipated risk (shifted to the shipper). As mentioned above, unanticipated price changes do not need to be fully compensated, but the more that they are compensated the less needs to be built into the base price.

## Hedging

A strategy for reducing the impacts of uncertainty and volatility is generically referred to as hedging. Hedging is a form of speculation that allows a buyer to suppress the volatility of future price changes, both up and down. The fundamental concept of hedging is that you give away some of the upside potential in order to limit the downside.

Fuel price hedging can be accomplished by purchasing futures contracts on the commodities market. The buyer agrees to pay a given price at a future date for a given quantity. Futures trading in petroleum products began in 1978 on the New York Mercantile Exchange.

The buyer can hedge all or some portion of future fuel purchases, and buy the rest at the time of consumption or on the spot market. If the market price is higher at the time of consumption, the buyer has received a windfall; if the market price is lower, the buyer pays a higher price.

### Options

An option is a form of hedging in which the buyer agrees to pay a certain future price, but is not obligated to take the commodity if the cash/spot price is lower. In that case, the option expires without any transaction. The buyer has paid some amount up front for the option to buy at a certain price, but does not exercise the option if the market price turns out to be lower.

### Hedging and BAFs

Although the inclusion of a BAF in purchasing transportation services is a form of hedging, the one does not obviate the other, nor are they exact substitutes. Inclusion of a BAF does, however, reduce the need for hedging. Without a BAF, carriers are likely to hedge or pre-purchase a larger share of their fuel than with the BAF.

---

[7] Israel Shipping Research Institute, 1980.

Since there is no inherent need for a BAF in order to accomplish hedging, the question of whether and how much to use a BAF then depends on risk allocation. Cariou and Wolff recommend that

> *...carriers could decide to eliminate all surcharges or the rate restoration system and bear the risk of potential deviations from pre-announced freight rates. This would call for the abolition of adjustments from pre-announced freight rates, and it could lead to the adoption of more hedging against bunker or currency fluctuations; such techniques are already used by the major shipping lines. This extreme solution could also give rise to the following question: are shippers ready to pay more to eliminate the uncertainty stemming from unanticipated announcements in BAF and CAF surcharges? The eventuality of an increase in price is conceivable, and justified in our opinion if one considers that most of the risk concerning future cost elements will be borne by shipowners who could therefore call for a premium.*

The authors are suggesting that the alternative to shippers complaints about BAFs would be higher prices so as to absorb the costs/risk of fuel price volatility.

## Pricing Alternatives

For purposes of comparison, a few alternative pricing strategies might be considered for illustration.

### With/Without BAF

Buyers (shippers) could request quotes for future services (e.g., 6 months to a year) in both forms, both with and without a BAF. They would then have to select one or the other. If shippers chose to not accept either offer, then they could still ship at the intended date, but would only have the choice of the current price, including fuel, at the time of delivery. In this way, shippers could participate in the hedging to the extent they wanted to.

USTRANSCOM shippers do not have the alternative of an all-in price at present; thus if they want to hedge, they would have to go to the futures market themselves, which would be (for them) an unrelated exercise in speculation and not possible within the DOD purchasing framework.

What USTRANSCOM shippers gain is a fixed set of prices per container that are good for a year, so long as the shippers are willing to absorb the fuel price volatility in the form of a BAF. When the BAF was small or nonexistent (within the buffer), the utility of the BAF was not an issue; it was there in the event of violent price movements, but the actual movements were small. It is only recently that price fluctuations—as well as possible future increases—have become a major concern.

### A La Carte Pricing

At one extreme of the spectrum of pricing formats, all costs are included in a single lump sum, take it or leave it. At the other extreme, all costs are broken out separately

and presented as options to the buyer, in lump sum, itemized actual expenses, or formula form. In between are surcharges or factors or options that may be invoked under certain conditions, at the discretion of buyer or seller. A BAF is one categorical example from the ocean shipping industry, within the larger category of fuel adjustment factors that are used in many industries, electric power utilities in particular.

The opposite end from the fixed price method is cost-plus-fee method; in the latter case unit prices are stated in the contract and all quantities are itemized, metered and billed. If unit prices are set in the contract, the incentives for the seller are to find input prices that are less than the contract prices and use the maximum quantities of those inputs to the extent they are substitutable. If all costs are itemized and billed to the buyer as actual expenses, then the seller has no incentive to economize on inputs or seek lower prices.

### Example of Airline Fuel Surcharges

Jet fuel is a large component of the cost of air travel, and recent fuel price highs have brought the reputed share of fuel costs to as much as 40% of operating cost. Southwest Airlines has famously hedged its fuel purchases to be almost unaffected by price increases, but has suffered the downside as petroleum prices have declined; presumably, Southwest was paying for fuel back in November 2008 at a price higher than the spot price.

Airlines have imposed fuel surcharges in the last year or so, especially on international flights, where the surcharge can almost equal the base airfare. Domestic airfares have fuel surcharges, but the amounts differ widely (Southwest has none). The methods for calculating the surcharges are generally not published, nor is the date for the base fare given or the amount of fuel cost that is included in the base fare.

Passengers can shop for fares among those offered 6 months or a year in the future, and purchase a ticket at a fixed price, with fuel surcharge included. Airlines can still manipulate the price per seat, the number of seats at each price, and the number of flights in the market, as the date of the flight approaches. This pricing method seems ad hoc, and the relationship of the surcharge is probably related as much to demand as to fuel cost. Clearly, however, the fuel price runups were a primary stimulus for the shift to a la carte pricing (baggage, meals). Particular characteristics of the markets and the industry may have worked for or against fuel adjustment factors in various industries, but, the BAF may be an extreme version arising from the nature of the ocean shipping industry.

### Transparency

The nature of the industry and its customers has a lot to do with how transparent the generation of the amount is and the verifiability of the data sources. BAFs arose during the oil shock of the 1970s, but became pegged to published statistics somewhat later. As a lump sum (rather than a percentage of the base price), BAFs are subject to two factors according to Cariou and Wolff:

- the fuel consumption of ships deployed in the market

- the location and amount of bunkering

A lack of transparency leads shippers to suspect that BAFs are monopoly-imposed rents rather than neutral cost adjustments, so the calculations in the ocean shipping industry are as transparent as for any industry and more so than most. While the calculation of the BAFs is transparent, the amount of fuel cost included in the base price is less so.

### Updating BAF Components

Typical BAFs have two types of components: fixed and adjustable. The fixed components pertain to technical relationships such as fuel consumption rates, vessel size and capacity, speed, and traffic directionality, and can be re-estimated as frequently as once a year. The adjustable component is a measure of current fuel prices for comparison to the base price.

### Current Fuel Price

The current fuel price component is fairly unambiguous, and depends upon using independent and objective data and some averaging or smoothing for time, types of fuel, and location of purchase. The technical factors, in contrast, vary considerably from one commercial carrier to another, and need to be scrutinized carefully with respect to their incentives toward or away from economic efficiency.

### Absolute Surcharge or Percentage

They also raise the issue of absolute surcharge amounts (per container) or rates adjusted to the type of cargo, on the assumption that different cargoes have different prices for the same OD pair (refrigerated, bulk). This depends on the pricing structure but absolute sounds more neutral (e.g., the BAF should not be a percentage increment on the base rate). The BAF should not be based on actual costs or actual load factor, but is a partially compensating adjustment for unanticipated unit input price changes. Hence the technical factors should be based on a stylized set of conditions, not actual. Carriers that use fuel efficient vessels will profit from the BAF adjustment when prices rise; inefficient ships will benefit more when prices drop (fuel efficiency then has less value).

## Flagging and Buy America

Ocean-going ships are registered in some nation, whose rules it must abide by. To be flagged in the U.S. requires that the vessel meet certain safety standards and be crewed by unionized U.S. seamen. Foreign vessels can load and unload in U.S. ports, but cannot carry cargo between U.S. ports (cabotage). Congress requires all military cargo to be carried on U.S. flag vessels (with some exceptions), which is a 'Buy America' trade and labor protection measure primarily for the benefit of domestic U.S. seamen.

A justification for these policies as applied to ocean carriers is to preserve a U.S. fleet of commercial ships and operators in case of national emergency, so the nation would

not have to depend upon foreign carriers that might be inaccessible or hostile. Because foreign carriers can carry U.S. domestic cargo by reflagging their vessels, they can bid on USTRANSCOM cargo, but such ships are not in any practical sense part of the U.S. merchant marine fleet. In practice, international shipowners may flag a portion of their fleet in the U.S. so they can carry the preferred cargo at a higher rate. The portion of the vessel capacity not needed for the restricted cargo is sold to whoever will buy it, at market rates.

## 2.2. *Industry BAF Practices*

**The Transpacific Stabilization Agreement (TSA)** is a conference of carriers serving the Asia to the U.S. West Coast market.[8] The member carriers of the TSA are: APL, CMA CGM, Coscon, Evergreen, Hanjin, Hapag-Lloyd, Hyundai, "K" Line, MSC, NYK, OOCL, Yang Ming, and ZIM. The TSA tracks the price of both MDO and bunker fuel at numerous ports in the Pacific Rim and calculates a geographically weighted average price for a month with a month posting period. Although they don't provide the data used to calculate the fuel consumption figures, a lookup table shows the BAF for any given price of bunker. With no BAF below a price of $80 per metric ton, TSA carriers assume all fuel costs below that level and begin charging a BAF thereafter.

The **Westbound Transpacific Stabilization Agreement (WTSA)** is a conference of carriers serving the U.S. (both East and West Coasts) to Asia market.[9] The member carriers of the WTSA are: APL, Coscon, Evergreen, Hanjin, Hapag-Lloyd, Hyundai, "K" Line, NYK, OOCL, and Yang Ming. The WTSA uses a three month average of weekly bunker prices at Hong Kong, Los Angeles, and New York. Using the typical vessel on the typical voyage, the WTSA creates a total fuel cost per voyage at that price. The WTSA also includes a balance of trade factor that reduces the total fuel cost figure to reflect the movement of empty containers through the system back to their origin. The net total fuel cost is divided by the capacity of the typical vessel to get a fuel cost per container, rounded to the nearest $20. This estimated fuel cost per container is used directly as the BAF as the aim of the WTSA is full bunker cost recovery from shippers.

**Maersk Line** is a worldwide carrier with its own BAF.[10] After the EU banned carrier conferences on all shipping in and out of European ports, effectively banning conference BAFs, Maersk created its own BAF for its European markets and will utilize the

---

8 Transpacific Stabilization Agreement (TSA) conference website: http://www.tsacarriers.org/fs_bunker.html Retrieved: November 2008.

9 Westbound Transpacific Stabilization Agreement (WTSA). Conference website. http://www.wtsacarriers.org/print/p_fs_bunker_newformula.html Retrieved: November 2008.

10 Maersk Lines company website: http://baf.maerskline.com/Forside.aspx Retrieved November 2008.

same formula for its worldwide operations as various trade conference BAF agreements expire. For any given trade, Maersk has established a technical constant based on the fuel consumption per day per container of its vessels, multiplied by the average transit time as well as an additional adjustment to reflect the balance of trade and movement of empty containers through the system back to their origin. This factor is multiplied by the change in price for that route. Within any given trade, Maersk has established a base bunker price under which it will assume all fuel costs. When the average price is above that trade-specific price level (either one or three month averages, again trade-specific), a BAF is calculated.

**Mitsui O.S.K. Lines (MOL)** is a worldwide carrier with its own BAF in some trades.[11] After the EU banned carrier conferences on all shipping in and out of European ports, effectively banning conference BAFs, MOL created its own BAF for its Trans-Atlantic markets. MOL created a "Trade Sensitivity Factor" to estimate average consumption per container, incorporating vessel size, service speed, vessel voyage days, cargo weight, vessel utilization level, trade imbalance and bunker consumption rate. When the three-month average bunker price exceeds $200 per metric ton, the difference is multiplied by the trade sensitivity factor to determine a resulting BAF. For all prices below $200 per metric ton, MOL assumes all fuel costs.

## 2.3. *Proposed USTRANSCOM BAF Methods and Assumptions*

### Price Indexing Factors

The price baseline scenario in the Volpe BAF is driven by the length and terms of the USTRANSCOM contract. At the time of bidding, the baseline is set using average price of the 13-week period immediately preceding the issue date of the solicitation. Bidding for the USTRANSCOM contract takes place five months prior to the start date of the contract which itself lasts a full year. The baseline price quoted at the time of bidding is used 17 months after the initial bid and is reset only as each subsequent yearly option is elected. Under the terms of the USTRANSCOM contract, carriers are only compensated with a BAF for a rise in prices making the market price at the time of bidding the price of fuel at which the carrier assumes all fuel costs.

There is no industry standard practice for setting a baseline price to be borne by the carrier. Maersk sets a unique base bunker price for each trade, below the price of which it bears the full cost of fuel. MOL and the TSA also set fixed price levels below which they do not pass along a BAF surcharge. World carriers have flexibility to modify the base price of bunker that they assume in their contracts while the USTRANSCOM contract fixes the baseline at the market price at the time of bid.

[11] Mitsui O.S.K. Lines company website: http://www.powerinmotion.biz/surcharges/bunker/MOL%20BAF%20Formula%20-%20Announcement%20for%20TAS-21-Jul-08.pdf Retrieved November 2008

The final price of fuel established on the shipping date is compared to the baseline price to determine any BAF compensation. In industry, the price on the date of shipment isn't the market spot price that day but rather, a rolling average, usually between one and three months. The price quoted on any given day within a month is the same and comprised of the average price over the specified length of time. The rolling average serves as a way to smooth out any wide variations while also giving a carrier time to modify its base freight rates. As the base rates on the USTRANSCOM contract are fixed, aligning the window of average prices isn't required. Using spot prices may reflect wider variation than exists in the markets so a one month average of daily prices will be used.

## Prices of Different Fuels

In calculating BAFs, some carriers simplify their formula by tracking bunker fuels exclusively while others also track MDO prices. Doing so also requires that a fixed ratio of the two fuels is established to reflect the fuels as they are used by the carrier. The prices of the two fuels, shown in Figure 2, are highly correlated at 0.95 so tracking one or both will have little effect on the BAF calculation. As the price of one moves up, the other does by a similar amount, and the total rate of change is similar to using bunker fuel exclusively. However, as the baseline prices set at the time of bidding are fixed as the full responsibility of the carriers, calculation simplification is secondary to an accurate representation of the carrier cost structure. As such, a ratio of 95% bunker fuel and 5% MDO are used in the Volpe BAF calculation.




Source: U.S. Maritime Administration

**Figure 2. Average Price of Bunker 380 and MDO, 2006-2006.**

## Prices at Different Locations

The location of the bunker fuel purchases is factored into the industry BAF calculations of carriers reflecting the locations of the trade. The TSA tracks prices at all ports served by its member lines and uses the average price in its calculation. The WTSA uses the price at New York, Los Angeles, and Hong Kong, excluding nearby ports for

simplification. Maersk uses prices at a trade-specific level, identifying the relevant ports for each. The 1993 Volpe Center study averaged the bunker price at Los Angeles and Norfolk as the vast majority of goods left from the vicinity of those ports. While regional differences in spot price may exist, the price at any port is highly correlated with other ports as they both reflect the prevailing worldwide supply. The recent pattern is shown in Figure 3.




Source: U.S. Maritime Administration

**Figure 3. CST 380 Prices at Four Ports, 2006-2008.**

While the data suggest using any single port's bunker price may be sufficient as that port's price will track the worldwide price, the Volpe BAF calculation maintains an average of Los Angeles and Norfolk prices, as with the fuel type mix, to best reflect carrier costs at the time of bid.

## Fuel Consumption Factors

Many factors affect the amount of fuel needed to move a cargo from origin to destination, but a practical BAF can only incorporate a small number of them. The objective is to find ways to estimate fuel consumption under realistic conditions that reflect a recent historical baseline, but will also hold true, on average, under future conditions that may be much different.

### Representation of the Typical Vessel

In creating the typical vessels that serve as the fuel allocation base of the BAF calculation, a relational database was used to merge two data sources. One data source, the IBS data made available by USTRANSCOM contains multiple tables with varying information that identifies the vessels that may potentially be used for a shipment.

The second data source is the Containership and Roll-on/Roll-off (RoRo) Shipping Vessel Registers purchased from Clarkson Research Services, which identify design specifications for specific vessels. The two data sources were matched by vessel name to create the average vessel for each lane.

The IBS data are contained in a series of linked tables that identify, among other things, voyage identifiers, origin-destination pairs, routes, ports, mode of transportation, vessel schedules, carriers, and other aspects of the shipping process. Using the ship schedules provided by each carrier, the lanes bid by each carrier, and the ports within each lane, the set of all potential vessels for a given shipment was identified. These data represent the total set of potential vessels available within a lane, not what vessels were actually booked for a shipment. There are 1,717 unique vessels identified in the IBS dataset.

Clarkson Research Services is a 3rd party shipping research firm, similar to Lloyd's List or Jane's Ships, that collects data on shipping vessels worldwide. The data includes design specifications such as vessel tonnage, cargo capacity, engine type, etc. For containerships, the fields used were total TEU capacity, vessel service speed, and fuel consumption at vessel service speed.[12] For RoRo vessels, the fields used were net registered tonnage (as a measure of capacity), vessel service speed, and fuel consumption at vessel service speed. There are 5,942 vessels in the container registry and 1,933 vessels in the RoRo registry.

While the IBS data contain the IRCS unique vessel identifier, Clarkson uses their own proprietary vessel identifier number making a match on that impossible. Instead, the two datasets were matched on the vessel name contained in both. Although the majority of ships were matched using vessel names, 581 vessels in the IBS data were not matched with either Clarkson database. Three possible reasons may explain the unmatched vessels. First, only active vessels were used in the averages to best reflect future operating conditions. If a vessel in the IBS data had a listed "Inactive Date" it was excluded from the analysis. Second, typos or differences in punctuation may exist in either dataset that prevent matching on the vessel name. For example, the vessel "A P MOLLER" in the IBS data didn't match with "A.P. Moller" in Clarkson. Finally, the Clarkson dataset simply may have no record of some U.S.-flagged vessels used by USTRANSCOM.

After mechanically matching the two datasets, a manual inspection of unmatched vessels was performed. This check allowed for matching ships from the two databases that may have been missed due to differences in naming conventions.

Matching the two data sets allowed for the creation a typical vessel average for each lane by averaging the vessel specifications from Clarkson for all vessels identified in IBS with a particular lane. This typical vessel represents the *potential vessel* that is available for service on a particular lane. It does not represent an average of only

[12] Fuel consumption is reported in metric tons per day at "service speed." Bunker prices are most often quoted in tons but can be converted to barrels (1 ton = 6.63 barrels). http://www.msc.navy.mil/inventory/glossary.htm

those vessels that actually did carry USTRANSCOM shipments, nor is it weighted by those vessels. Using the set of all potential vessels to determine the typical vessel eliminates any bias if those vessels previously used were systematically different.

Within each lane, containership typical vessels were created for exclusively U.S.-flagged vessels as well as world vessels. The typical vessels were constructed from 903 worldwide matched vessels and 64 U.S.-flagged. In some lanes, there were no associated U.S.-flagged vessels or insufficient data to calculate an average and the world average for the lane is substituted. In other lanes with no associated vessels (either U.S.-flagged or worldwide), the overall U.S.-flagged average vessel was used.

Over all lanes, foreign flagged containership vessels have greater capacity and higher fuel economy per TEU (although total fuel consumption is higher), seen from Table 2. As the world typical vessel is more fuel efficient, using it as the basis of the BAF calculation would incentivize carriers to use modern, fuel efficient vessels. However, the USTRANSCOM contract stipulates that preference goes to U.S.-flagged vessels when available. Therefore, the U.S.-flagged typical vessel will be used for the BAF calculation in all lanes where it is available.

**Table 2: Average Containership for Lane 01, by Flag**

| Flag | TEU Capacity | Service Speed | Daily Fuel Consumption (tons) | Daily Fuel per Cargo Unit | Observations |
|---|---|---|---|---|---|
| US | 3,136.8 | 22.2 | 127.4 | 0.0406 | 28 |
| World | 4,321.6 | 23.2 | 148.3 | 0.0343 | 288 |

Creating the typical RoRo vessel followed the same procedure, although with far fewer vessels and active lanes, more worldwide data was used in individual lanes. The data yields 42 U.S.-flagged vessels as well as 212 worldwide matched vessels. Opposite of the containership results, U.S.-flagged RoRo vessels were larger, faster, and more fuel efficient than their worldwide counterparts.

For RoRo vessels, finding an average capacity was more difficult as there are several potential measures that can be used including the vehicle capacity, trailer capacity, and various tonnage capacity measures. None of which matched USTRANSCOM's desire to express RoRo capacity in terms of "measurement tons" as was used in the previous study. Measurement tons is not a measure of weight but rather volume, equaling 40 cubic feet.[13] While the Clarkson dataset was missing measurement tons, it did contain net tonnage,[14] a calculated measure representing the useful volume of a vessel's cargo hold, expressed in tons equaling 100 cubic feet.[15] [16] [17] Multiplying net

---

13 http://www.msc.navy.mil/inventory/glossary.htm

14 http://www.admiraltylawguide.com/conven/tonnage1969.html

15 http://gwydir.demon.co.uk/jo/units/volume.htm#other

16 http://www.tiscali.co.uk/reference/encyclopaedia/hutchinson/m0025967.html

17 http://en.wikipedia.org/wiki/Net_tonnage#cite_note-0

tonnage by 2.5 converts to estimated measurement ton capacity. The summary is shown in Table 3.

**Table 3: Average RORO Ship for Lane 07, by Flag**

| Flag | Estimated Measurement Ton Capacity | Service Speed | Daily Fuel Consumption (tons) | Daily Fuel per Cargo Unit | Observations |
|---|---|---|---|---|---|
| US | 45,529.5 | 21.4 | 51.0 | 0.0011 | 35 |
| World | 36,468.1 | 20.1 | 46.0 | 0.0013 | 54 |

In some cases, there were insufficient data to calculate an average for the typical vessel. However, this does not necessarily mean there were no USTRANSCOM shipments on that route over the timeframe of the data, only that none were matched between the two datasets. In cases where there were few (or no) U.S.-flagged vessels for a trade but sufficient worldwide vessels on that lane, worldwide data was used. Worldwide data captures any geographical constraints on vessels such as requirements to use narrower vessels through the Panama Canal and was used on Lane 09 USEC to Hawaii. In other cases where few or no worldwide vessels were associated with a lane, the overall U.S.-flag average vessel was used as it represents the potential vessel for that lane.

It is important to note that trades with the least USTRANSCOM activity, if used, may not have the demand for volume/capacity as is represented by the overall U.S.-flag average vessel. It is possible that a carrier may choose to use smaller, and likely older and less efficient, vessels to move a smaller volume of cargo. Therefore, while the overall U.S.-flag average vessel is presently used to calculate that lane's Technical Factor, USTRANSCOM may determine that another lane's typical vessel or Technical Factor is most appropriate.

### Transit Time Estimation

Knowing the typical vessel for each lane allows calculation of the average fuel consumed per cargo unit, per day. In order to then find the total fuel consumption per cargo unit, the number of days per trip is needed. Because a lane includes more than one port pair, a weighted average of inter-port distances was developed to represent the average distance between ports for the lane.

Utilizing the IBS data, the ports of debarkation (discharge port) and embarkation (load port) for all shipments were identified for all lanes. Within each lane, a subset of origin-destination pairs accounted for the bulk of the traffic; for example Oakland, United States to Yokohama, Japan represented 19.6% of shipments in Lane 01 US West Coast to Far East. Origin-destination pairs that account for 90% of shipments within each lane were taken as the representative sample for the entire lane.

Publicly available port distance tables were used to find the direct "great circle" distance for each origin-destination port pair in the 90% group for each lane.[18] Multiplying this distance by the number of trips for each pair, and then dividing by the total

number of trips in the group results in a weighted average distance traveled for a typical shipment for each lane:

$$D_L = \frac{\sum_{\text{all port pairs i,j in lane L}} VT_{i,j} \times d_{i,j}}{\sum_{\text{all port pairs i,j in lane L}} VT_{i,j}} \quad [6]$$

where $DL$ = weighted average distance between ports within lane $L$, $VT_{i,j}$ = number of vessel trips between ports $i$ and $j$, and $d_{i,j}$ = direct distance in nautical miles between ports $i$ and $j$ (if $i = j$, both $VT$ and $d$ are zero). All vessel trips are for those in the 90% groups.

This distance represents the direct and shortest route between two ports, a route not actually taken in liner service. To approximate typical liner services utilized by USTRANSCOM, the average trip distance is multiplied by the Circuity Factor for that lane (see section 2.4. Circuity Factor on page 42), giving the average actual distance for the lane (equation [3] on p. 12). Some routes had insufficient activity to calculate an average distance, so a nearby geographic lane was selected as a proxy. For Example, Lane 22 (Canada East coast - Continental Europe, United Kingdom, Ireland) uses Lane 5 (USEC - Continental Europe, United Kingdom, Ireland) as a proxy for distance.

Using equation [4] on p. 13, steaming days are calculated for each lane by dividing the actual distance by the speed of the lane typical ship. This figure represents the average trip length of a voyage within each lane. As the average speed of containerships and RoRo vessels is different within a lane, the transit times are calculated for both types of vessels. Multiplying the transit time by the daily fuel consumption gives the total vessel fuel consumption for each lane from equation [2] on p. 12.

Finally, while typical vessel averages were calculated exclusively at the lane level, some lanes were broken down into their component routes for specific route BAFs. These routes used their overall lane typical vessel in the calculation of the technical factor but used a route-specific average transit time. The difference in transit time accounts for the difference between the overall Lane 06 technical factor and its component routes. The routes with individual transit times are listed in Table 4.

### Fuel Consumption Factor

Combining data from the typical vessel and the average transit time for each lane gives the total voyage fuel consumption. Dividing the daily fuel consumption of the typical vessel by the capacity cargo units yields the daily consumption per potential cargo unit. Multiplying that quotient by the average transit time for each lane results in the fuel consumed per capacity cargo unit on the voyage, or the Fuel Consumption

[18] http://www.portworld.com/map and http://www.distances.com/.

**Table 4: Component routes within selected lanes**

| Route ID | Route Description |
|---|---|
| 06A | US EAST COAST-WESTERN MEDITERRANEAN |
| 06B | US EAST COAST-EASTERN MEDITERRANEAN |
| 06C | US EAST COAST-ADRIATIC SEA |
| 54D | US WEST COAST-GUAM |
| 54F | US WEST COAST-KWAJALEIN |
| 61MG | GUAM-OKINAWA |
| 61MJ | GUAM-SINGAPORE |
| 61ND | GUAM-JAPAN |
| 61WL | GUAM-THAILAND |
| 61ZJ | GUAM-KOREA (SOUTH) |
| 79AG | HAWAII-KWAJALEIN |

Factor. The Fuel Consumption Factor forms the basis of the BAF formula methodology and when combined with other adjustment factors, results in the final Trade Technical Factor.

### Engineering Analysis of Fuel Consumption Rates

We interviewed a Chief Engineer currently in the employ of a U.S.-flagged vessel (*Ship X*) on one of the USTRANSCOM routes. We were able to obtain a copy of the engineering log for a specified period of time. Figure 4 contains a snapshot of a randomly picked day during a voyage.

Data were compiled using a commercially available database of worldwide container and RoRo vessels (Clarkson PLC) to look at average capacities, speed, fuel consumption, and sizes of ships in both the world fleet and the U.S. fleet markets to compare to the *Ship X* data.

### Composite Vessels by Trade

Several composite ships were created using data from the Clarkson's database to determine and compare averages across scenarios. The composites were World Ship Composite, World Ship Composite minus U.S. Fleet, and U.S. Ship Composite.

The World Ship Composite was created using vessel data available from Clarkson. Characteristics were averaged from the data set, over 5900 vessels in total, to determine average characteristics.[19] The World Ship Composite consists of World minus U.S. flagged vessels from the data. The U.S. Ship Composite averaged available data from U.S. flagged vessels.

[19] Note that this data set is not encompassing of every vessel in the world and is limited to companies that have supplied data to Clarksons.

**Chief Engineer's 0800 Report October 3, 2008**

81,079,590 Current Counter
80,940,410 Previous Counter
139,180 Revolutions

537.5 Observed Miles
1500 Running Time
21.5 Average Speed
92.8 Average RPM

554.1 Engine Miles 16.6 3.0 %Slip

**Main Engine Power Generation**

10,519.8 Current Power Meter
10,119.4 Previous Power Meter
400.4 Mega Watt Hr.

Average KW
16,016

Percentage of MCR
63.4 %

**HFO Consumption**

0.9265 Meter Correction Factor

Main Engine FO
225.820 Current FOM
144.610 Previous FOM
81.21 Cubic Meters

A/E FO
787,779 Current FOM
780,343 Previous FOM
7,436 Liters

Main Engine HFO 75.2
Aux. Diesel HFO 6.9
Total HFO 82.1 MTs

Burn Rate
0.153 MT's/NM

**Main Engine CO Consumption**

12972

1.54 Tank Full
1.19 Cylinder Oil Day Tank
0.35 Cubic Meters
345 Liters
0.3 MTs

CO Feed Rate
0.81 grm/KWHr

CO Feed Rate
0.60 grm/BHPHr

| | HFO | MDO | CO | MELO | A/E LO | H2O | Sludge |
|---|---|---|---|---|---|---|---|
| Previous | 1744.3 | 114.1 | 45754.0 | 32250.0 | 4650.0 | 181.0 | 0.0 |
| Consumed | 82.1 | 0.5 | 345.0 | | 0.0 | 7.0 | 0.00 |
| Receive | | | | | | 15.0 | 0.0 |
| Balance | 1662.2 | 113.6 | 45409.0 | 32250.0 | 4650.0 | 189.0 | |
| Soundings | 1684.8 | 113 | 44500 | | | | |
| "Sleave" | 22.6 | -0.6 | -909.0 | | | | |

| Evap Meter | |
|---|---|
| 7122 | Current Meter |
| 7107 | Previous Meter |
| 15 | Metic tons |

**Figure 4. Chief Engineer's Report from *Ship X.***

The average characteristics for ships available in the data set are relatively comparable to each other, although numbers for the U.S. Ship Composite are higher due to a much smaller data set consisting of only 74 vessels in the Clarkson database. Table 5 shows a comparison of the World Ship Composite, World Ship Composite minus U.S. Fleet, and U.S. Ship Composite.

**Table 5: Composite Ships**

| Vessel Name | TEU Capacity Total | Speed (in NM per hr) | Consump-tion Main (per day in MT) | HP Total | Dwt tonnes | GRT | LOA m | LBP m | Breadth m | Mld Depth m | Draft m | NM/dy @ Speed | Fuel Used / mi @ Spd (MT/Nm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| World Ship Comp | 3056.7 | 20.3 | 91.9 | 30242.2 | 39125.7 | 29329 | 201.1 | 183.9 | 28.5 | 15.6 | 10.2 | 487.2 | 0.189 |
| WS Minus U.S. Fleet | 3055.7 | 20.3 | 91.7 | 30144.5 | 39091.1 | 29187 | 200.4 | 182.9 | 28.5 | 15.5 | 10.2 | 486.7 | 0.188 |
| U.S. Ship Comp | 3138.5 | 21.8 | 103.6 | 35585.6 | 41876.4 | 38759 | 249.6 | 234.5 | 31.6 | 19.1 | 11.6 | 524.3 | 0.197 |

The fuel usage from *Ship X* for this particular day was 0.153 Metric Tons / Nautical Mile. The approximations from the composite ship are slightly higher as the composites are based on more than one vessel. Table 6 shows a comparison of *Ship X* with the composite ships.

**Table 6: Composite Ship and *Ship X* Comparison**

| Vessel Name | Fuel Used / mi @ Speed (MT/Nm) |
|---|---|
| World Ship Composite | 0.189 |
| WS Minus U.S. Fleet | 0.188 |
| U.S. Ship Composite | 0.198 |
| Ship X | 0.153 |

### Ship Characteristics per Lane

Data from the IBS database were used to match vessel information with data from Clarkson to match ship names to specific USTRANSCOM lanes.[20] A table was created to match vessel characteristics on each lane for both U.S. Flag vessels (shown in Table 7) and all vessels used on each lane. (shown in Table 8).

Analysis of the composite ships with the characteristics of ships on a given lane show relatively close similarities in TEU Capacities, and Speed. It should be noted, however, that due to the relative small size of the sampling, the averages may be considerably different from the composite averages.

For each of the Critical Routes, the approximate distances, speed, and fuel consumption of the main engines were used to calculate estimated voyage times in days, fuel consumption per miles, and approximated fuel consumption for a single trip. These are shown in "BAF Appendix A: Critical Lane Fuel & Distance Tables" on page 127.

[20] Table 7 and Table 8 only contain the "Critical'" lanes specified by USTRANSCOM.

**Table 7: Characteristics of U.S. Flagged Vessels by Lane**

| Lane | Average Total TEU Capacity | Average Vessel Service Speed (Knots) | Average Fuel Consumption (tons/day) | Number of Observations |
|---|---|---|---|---|
| 01 | 3137 | 22.2 | 127.4 | 28 |
| 02 | 3551 | 22.6 | 141.9 | 30 |
| 03 | 2717 | 22.1 | 120.3 | 25 |
| 04 | 3288 | 22.3 | 118.2 | 49 |
| 05 | 3428 | 22.0 | 111.9 | 29 |
| 06 | 3297 | 21.9 | 93.0 | 25 |
| 07 | 3510 | 22.3 | 114.4 | 35 |
| 08 | 3727 | 22.8 | 151.3 | 12 |
| 09 | 2078 | 18.5 | 57.3 | 4 |
| 10 | 3403 | 21.0 | 73.5 | 9 |
| 11 | 3338 | 22.0 | 86.3 | 22 |
| 12 | 3281 | 21.8 | 107.6 | 27 |
| 13 | 3278 | 21.8 | 84.2 | 24 |
| 14 | 2672 | 20.6 | 132.3 | 5 |
| 15 | 2596 | 19.0 | 62.7 | 6 |
| 16 | 2706 | 22.2 | 127.5 | 20 |
| 19 | 3057 | 22.6 | 122.5 | 30 |
| 20 | 3428 | 22.2 | 111.9 | 29 |
| 23 | 3718 | 23.2 | 143.1 | 23 |
| 24 | 3403 | 21.0 | 73.5 | 9 |
| 25 | 3602 | 23.4 | 151.7 | 19 |
| 26 | 2686 | 22.2 | 113.5 | 9 |
| 27 | 2742 | 20.8 | 97.5 | 7 |
| 28 | 4832 | 24.5 | 178.0 | 1 |
| 29 | 1712 | 20.0 | 70.5 | 3 |
| 31 | 2149 | 19.8 | 41.0 | 2 |
| 32 | 3303 | 20.7 | 73.5 | 10 |
| 33 | 4723 | 21.8 | 125.8 | 2 |
| 34 | 3399 | 22.2 | 118.5 | 32 |
| 36 | 2731 | 20.9 | 97.5 | 8 |
| 37 | 3305 | 22.7 | 110.3 | 19 |
| 39 | 4614 | 19.1 | 73.5 | 2 |
| 42 | 3674 | 23.7 | 115.3 | 12 |
| 47 | 3526 | 23.3 | 136.3 | 30 |
| 48 | 3293 | 22.2 | 88.0 | 25 |
| 49 | 3382 | 22.7 | 144.0 | 12 |
| 50 | 3231 | 22.3 | 150.6 | 9 |

**Table 7: Characteristics of U.S. Flagged Vessels by Lane**

| Lane | Average Total TEU Capacity | Average Vessel Service Speed (Knots) | Average Fuel Consumption (tons/day) | Number of Observations |
|---|---|---|---|---|
| 51 | 3039 | 22.4 | 125.3 | 30 |
| 52 | 3351 | 22.2 | 79.9 | 21 |
| 54 | 3013 | 22.9 | 134.9 | 28 |
| 55 | 4477 | 21.7 | 112.8 | 2 |
| 56 | 4614 | 19.0 | 73.5 | 1 |
| 57 | 3490 | 22.2 | 118.5 | 29 |
| 60 | 3445 | 22.3 | 69.4 | 18 |
| 61 | 3162 | 22.8 | 134.5 | 24 |
| 62 | 3200 | 21.6 | | 1 |
| 64 | 4614 | 19.1 | 73.5 | 1 |
| 67 | 4288 | 23.4 | 178.0 | 3 |
| 70 | 4614 | 19.1 | 73.5 | 1 |
| 71 | 3057 | 20.9 | 73.5 | 9 |
| 72 | 3201 | 21.4 | 70.8 | 6 |
| 73 | 3177 | 20.8 | 74.3 | 11 |
| 74 | 3572 | 22.7 | 62.8 | 12 |
| 75 | 3732 | 23.0 | 88.4 | 13 |
| 77 | 3955 | 21.8 | 113.7 | 7 |
| 78 | 3382 | 19.4 | 62.7 | 4 |
| 79 | 2567 | 22.1 | 103.9 | 20 |
| 80 | 3135 | 22.7 | 134.8 | 23 |
| 81 | 2604 | 22.6 | 118.4 | 19 |
| 82 | 2971 | 22.2 | 113.5 | 6 |
| 83 | 4832 | 24.5 | 178.0 | 2 |
| 84 | 4614 | 19.1 | 73.5 | 1 |
| 85 | 2685 | 22.1 | 125.3 | 14 |
| 86 | 3334 | 20.9 | 73.5 | 9 |
| 88 | 3974 | 24.2 | 157.0 | 10 |
| 89 | 2942 | 21.3 | 57.3 | 4 |
| 91 | 3601 | 23.3 | 143.2 | 4 |
| 92 | 4079 | 24.7 | 157.0 | 9 |
| XX | 3557 | 22.5 | 126.3 | 39 |

**Table 8: Characteristics of All Vessels by Lane**

| Route/ Lane | Average Total TEU Capacity | Average Vessel Service Speed (Knots) | Average Fuel Consumption (tons/day) | Number of Observations |
|---|---|---|---|---|
| 01 | 4322 | 23.2 | 148.3 | 288 |
| 02 | 4397 | 23.0 | 144.3 | 255 |
| 03 | 2832 | 21.9 | 109.1 | 69 |
| 04 | 4013 | 22.7 | 135.3 | 473 |
| 05 | 3313 | 22.2 | 112.6 | 187 |
| 06 | 2914 | 21.3 | 98.5 | 197 |
| 07 | 3378 | 22.4 | 117.6 | 255 |
| 08 | 3846 | 22.6 | 138.6 | 92 |
| 09 | 2051 | 19.0 | 68.8 | 12 |
| 10 | 2534 | 20.7 | 78.9 | 26 |
| 11 | 2998 | 21.7 | 94.9 | 105 |
| 12 | 2822 | 21.3 | 100.6 | 125 |
| 13 | 2983 | 21.7 | 99.7 | 114 |
| 14 | 2180 | 19.7 | 77.6 | 15 |
| 15 | 2292 | 19.3 | 64.5 | 11 |
| 16 | 2940 | 22.1 | 116.6 | 67 |
| 18 | 1148 | 18.3 | 28.8 | 7 |
| 19 | 4181 | 23.0 | 135.4 | 261 |
| 20 | 3822 | 22.0 | 124.4 | 302 |
| 23 | 3004 | 21.9 | 98.1 | 63 |
| 24 | 4587 | 22.1 | 136.0 | 83 |
| 25 | 3512 | 22.7 | 118.3 | 50 |
| 26 | 2492 | 21.3 | 88.0 | 29 |
| 27 | 2320 | 20.5 | 74.6 | 25 |
| 28 | 3039 | 21.7 | 120.0 | 32 |
| 29 | 1784 | 19.7 | 66.1 | 6 |
| 31 | 1926 | 20.0 | 107.7 | 5 |
| 32 | 3160 | 21.9 | 112.8 | 47 |
| 33 | 2758 | 20.5 | 92.6 | 12 |
| 34 | 4406 | 22.6 | 144.0 | 213 |
| 36 | 2401 | 20.9 | 80.8 | 19 |
| 37 | 3015 | 21.8 | 103.3 | 66 |
| 38 | 3451 | 22.3 | 119.8 | 13 |
| 39 | 3137 | 21.9 | 119.7 | 98 |
| 42 | 3530 | 22.8 | 99.6 | 19 |
| 43 | 1211 | 18.8 | 42.7 | 17 |
| 47 | 4533 | 23.5 | 151.9 | 216 |

**Table 8: Characteristics of All Vessels by Lane**

| Route/ Lane | Average Total TEU Capacity | Average Vessel Service Speed (Knots) | Average Fuel Consumption (tons/day) | Number of Observations |
|---|---|---|---|---|
| 48 | 4353 | 22.5 | 141.1 | 253 |
| 49 | 5243 | 23.2 | 159.5 | 117 |
| 50 | 4381 | 22.7 | 135.8 | 84 |
| 51 | 4395 | 23.1 | 143.5 | 244 |
| 52 | 2756 | 21.2 | 85.9 | 70 |
| 53 | 3062 | 21.9 | 111.8 | 27 |
| 54 | 3087 | 22.4 | 114.7 | 112 |
| 55 | 3477 | 22.5 | 126.9 | 106 |
| 56 | 2750 | 20.8 | 88.9 | 23 |
| 57 | 3703 | 22.2 | 123.1 | 224 |
| 58 | 2702 | 21.7 | 88.5 | 18 |
| 59 | 6402 | 24.8 | | 1 |
| 60 | 2890 | 21.8 | 94.4 | 66 |
| 61 | 3557 | 22.7 | 125.1 | 116 |
| 62 | 1261 | 18.5 | 38.2 | 9 |
| 63 | 818 | 17.1 | 31.0 | 5 |
| 64 | 5448 | 22.6 | 154.0 | 51 |
| 65 | 3161 | 23.4 | 76.0 | 6 |
| 66 | 2217 | 20.3 | 63.5 | 10 |
| 67 | 4968 | 24.2 | 167.7 | 31 |
| 68 | 3498 | 22.7 | 139.1 | 78 |
| 69 | 7700 | 24.0 | 260.0 | 1 |
| 70 | 5947 | 23.2 | 158.1 | 47 |
| 71 | 4648 | 22.6 | 141.4 | 61 |
| 72 | 3655 | 22.7 | 97.8 | 34 |
| 73 | 2803 | 21.4 | 86.3 | 31 |
| 74 | 4413 | 22.8 | 120.0 | 78 |
| 75 | 3699 | 22.5 | 125.4 | 84 |
| 76 | 2528 | 20.5 | 93.2 | 46 |
| 77 | 4121 | 21.4 | 132.0 | 9 |
| 78 | 2499 | 19.5 | 56.2 | 7 |
| 79 | 2685 | 22.3 | 106.2 | 42 |
| 80 | 2977 | 22.2 | 117.6 | 44 |
| 81 | 2508 | 21.9 | 108.5 | 36 |
| 82 | 3127 | 22.3 | 118.4 | 28 |
| 83 | 2815 | 22.5 | 113.2 | 9 |
| 84 | 3331 | 22.3 | 113.4 | 11 |

**Table 8: Characteristics of All Vessels by Lane**

| Route/ Lane | Average Total TEU Capacity | Average Vessel Service Speed (Knots) | Average Fuel Consumption (tons/day) | Number of Observations |
|---|---|---|---|---|
| 85 | 2267 | 20.8 | 82.9 | 39 |
| 86 | 5962 | 22.5 | 202.9 | 30 |
| 87 | 1092 | 18.0 | | 1 |
| 88 | 5498 | 24.2 | 171.7 | 26 |
| 89 | 2588 | 21.8 | 74.6 | 11 |
| 90 | 4673 | 24.2 | 138.1 | 5 |
| 91 | 2481 | 21.3 | 83.7 | 19 |
| 92 | 3372 | 23.4 | 89.5 | 18 |
| 93 | 2631 | 21.8 | 96.9 | 6 |
| XX | 3147 | 21.9 | 108.1 | 355 |

## Model Calculation and Results

The attached workbook titled "BAF Calculation 070109 "details the calculation for determining the USTRANSCOM BAF for each trade. The first tab "Trade Technical Factors" contains the final BAF technical factors using the variables and factors from subsequent tabs. The following tabs contain the underlying vessel and fuel data used in the calculation, transit times, and other factors. Using the sample fuel price data in the workbook, BAF charges may be simulated over a specified baseline period or changing factor values in the model.

The source for fuel data is the U.S. Maritime Administration which provided monthly average costs of both bunker fuel and MDO from January 2006 to December 2008 at Los Angeles, New York, Rotterdam, and Singapore. Although the methodology uses an average of Los Angeles and Norfolk prices, Norfolk data was incomplete for the time period and therefore New York is used as a proxy. The fuel mix is set at 95% bunker fuel, 5% MDO.

The technical factors are calculated for each lane by dividing that lane's typical ship fuel consumption (measured in metric tons) by its cargo unit capacity to get the fuel consumed per cargo unit, per day, using equation [1] on p. 12:

For breakbulk cargo, the cargo capacity of a typical RoRo vessel was adjusted downward to reflect "broken stowage," the wasted space between trucks, tanks, or other cargo that cannot be utilized as the cargo is irregularly shaped. USTRANSCOM assumes a 28% loss of cargo capacity due to broken stowage. In calculating the daily fuel consumption per cargo unit, the vessel cargo capacity was multiplied by 0.72 to adjust for this loss.

After calculating the daily fuel consumption per cargo unit, the overall length of the voyage is needed to get total voyage fuel consumption per cargo unit. Daily consumption is multiplied by the average transit time as well as the circuity factor for each trade:

$$\text{Fuel Consumption per CU per voyage} = \text{Fuel per day per CU} \times \text{transit days} \times CF \qquad [7]$$

where CF is the Circuity Factor (see "Circuity Factor" on page 42).

Voyage consumption per cargo unit is then multiplied by the *Input Substitution Factor* and the *Risk Distribution Factor* to adjust for carrier routing decisions and the sharing of risk between USTRANSCOM and carriers, yielding the final Trade Technical Factors:

$$\text{Technical Factor} = \text{Fuel Consumption per CU per voyage} \times \text{Input Substitution} \times \text{Risk Distribution} \qquad [8]$$

The final technical factors for each trade and identified route are shown for each type of cargo unit, TEUs, FEUs, and Measurement Tons. These technical factors, shown in the attached workbook, are compared to industry practice and the previous Volpe technical factors in the subsequent sections. (see "All Factors Combined" on page 65).

## Comparison of Fuel Consumption Factors and Transit Times with Maersk Lines

Maersk lines operates over many of the same lanes served under the USTRANSCOM contract in addition to being the carrier that provides the most public information about the composition of its BAF. Comparing the variables in the BAF Maersk charges its shippers to analogous components within the new BAF methodology described in this report provides an important industry check. Maersk publicizes information on its BAF formula on its website for its liner services, including fuel consumption rates, transit times, and vessel utilization rates. As many lanes are broad geographical areas, serving several countries within each, proxies were used to select Maersk services that closely mimicked the USTRANSCOM lanes covered by the prior study.

The "trade specific constant" within Maersk's BAF, contains a fuel consumption figure (tons of fuel per TEU, per day), the transit time for the lane (1/2 the round trip time), and an imbalance factor which is "the ratio of headhaul to backhaul, measuring the inequality between imports and exports in each trade." This constant is multiplied by the change in bunker price above a trade-specific price. While the imbalance and price factors are trade specific and not generally comparable to the new BAF methodology, the fuel consumption and transit time figures are. The comparison is shown in Table 9.

Overall, the Maersk fuel consumption per TEU figures closely align with the fuel consumption figures estimated by the typical ships, shown in Figure 5. The average daily fuel consumption factor as estimated by the new methodology was 95% that of the Maersk fuel consumption figures, suggesting that across lanes, fuel consumption was closely related. Looking within individual lanes, while the values are still positively related (correlation coefficient = 0.32), differences in fuel consumption become more apparent. For services operating largely in the Atlantic and Mediterranean, Maersk vessels consumed more fuel per TEU than the typical ships as estimated by

**Table 9: Maersk services used as a proxy for trade technical factor comparison**

| Lane or Route ID | USTRANSCOM Lanes & Routes | Maersk Proxy Lanes | |
|---|---|---|---|
| | **Lane/Route Description** | **Departure** | **Arrival** |
| 01 | U.S. West Coast - Far East | USWC | South Korea |
| 02 | Continental Europe, United Kingdom, Ireland - Middle East, South Asia, Indian Ocean | Netherlands | Kuwait |
| 05 | U.S. East Coast - Continental Europe, United Kingdom, Ireland | USEC | Netherlands |
| 06A | U.S. East Coast - Western Mediterranean | USEC | Spain, Mediterranean |
| 06B | U.S. East Coast - Eastern Mediterranean | USEC | France, Mediterranean |
| 06C | U.S. East Coast - Adriatic | USEC | Croatia |
| 07 | U.S. East Coast - Middle East, South Asia, Indian Ocean | USEC | Kuwait |
| 10 | U.S. Gulf Coast - Scandinavia, Baltic Sea | US Gulf Coast | Poland |
| 11 | U.S. Gulf Coast - Continental Europe, United Kingdom, Ireland | US Gulf Coast | Netherlands |
| 12 | U.S. Gulf Coast - Mediterranean | US Gulf Coast | France, Mediterranean |
| 13 | U.S. Gulf Coast - Middle East, South Asia, Indian Ocean | US Gulf Coast | Kuwait |
| 32 | U.S. East Coast - Scandinavia, Baltic Sea | UESC | Poland |
| 39 | U.S. East Coast - Central America/Mexico | UESC | Honduras |
| 43 | U.S. Gulf Coast - Central America/Mexico | US Gulf Coast | Honduras |
| 47 | U.S. West Coast - Middle East, South Asia, Indian Ocean | USWC | Kuwait |
| 54 | U.S. West Coast - Oceania | USWC | Fiji Islands |
| 54D | U.S. West Coast - Guam | Mexico (Pacific) | Guam |
| 54F | U.S. West Coast - Kwajalein | USWC | Papa New Guinea |
| 55 | U.S. East Coast - South America | USEC | Colombia |
| 61 | Far East - Oceania | South Korea | American Samoa |
| 61ZJ | Guam - Korea (South) | Guam | South Korea |
| 61MG | Guam - Okinawa | Guam | Japan |
| 61ND | Guam - Japan | Guam | Japan |
| 61MJ | Guam - Singapore | Guam | Singapore |
| 61WL | Guam - Thailand | Guam | Thailand |

this methodology, while Maersk vessels were relatively more efficient in Transpacific or Indian Ocean voyages, suggesting differences in fleet vessel composition by trade location.

Maersk's transit times were also relatively closely related with the estimated transit times of this methodology, shown in Figure 6. On average, the transit time of Maersk was 0.3 days higher than the estimated transit times across lanes. Within lanes, the




source: Volpe calculations.

**Figure 5. Daily fuel consumption factor, Maersk vs. 2009 methodology**

estimated transit times have a tighter relationship with Maersk's times (correlation coefficient = 0.63) than did the fuel consumption figures. Although Maersk transit times were consistently higher in the Far East, this was balanced by lower times to the Middle East, South Asia, and the Indian Ocean in routes 13 & 47.




**Figure 6. Average transit time by lane, Maersk vs. Volpe 2009 methodology.**

As each BAF method is based on internal practices, differences in specific fuel consumption and transit time values may be explained by the operational differences between Maersk and the average USTRANSCOM carrier. How these factors are combined in the final calculation is also different. Maersk uses trade specific values for vessel utilization which may raise or lower the final BAF while the methodology presented in this report assumes a full container utilization rate. Also, Maersk applies a BAF only above a certain price, their "Base Bunker Element," which is also trade specific, while this methodology applies a BAF to all trades at prices above the 20% threshold. Section 2.8 of this report compares the final trade technical factors for Maersk and the new methodology with the 1993 figures currently used by USTRANSCOM.

## 2.4. *Circuity Factor*

The least amount of vessel-ton-miles would occur if the cargo were carried directly from load port to discharge port. Other than for a few large "markets" (port-to-port pairs), this would effectively amount to charter service. The advantages of liner service is that it offers regular schedules and economies of scale in carrying cargo with multiple origins and destinations on the same vessel. Larger vessels reduce the cost per ton-mile, while combining cargoes enables greater schedule frequency.

### Concepts and Theory

The result of optimizing schedule, demand, voyage directness, and vessel capacity is a liner service that connects a set of ports in a voyage or circuit that loops among a set of ports in a periodic way. The benefits of this strategy is lower base prices for cargo moved, relative to direct or charter service. This benefit is shared among all shippers, whatever their volume or other pricing leverage, and without respect to whether the cargo travels relatively directly or more circuitously.

An abstract 4-node shipping route is shown in Figure 7. The service circulates among the nodes in numerical order. Cargo can be carried between any pair of ports, but the the dashed lines show connections that are not direct. If $n$ = number of port stops, the distances can be represented in an $(n \times n)$ square matrix that is symmetric about the diagonal ($d_{ij} = d_{ji}$, where $i$ and $j$ are index numbers representing ports).

$$\text{distance matrix} = D = \lceil d_{i,j} \rceil = \begin{bmatrix} d_{1,1}..d_{1,n} \\ d_{n,1}..d_{n,n} \end{bmatrix} \qquad [9]$$

Desired movements between the set of ports is given in another $(n \times n)$ matrix that is not symmetric but contains zeroes along the diagonal.




**Figure 7. Example four-node route.**

$$\text{freight volumes matrix} = W = \left\lceil w_{i,j} \right\rceil = \begin{bmatrix} w_{1,1} .. w_{1,n} \\ w_{n,1} .. w_{n,n} \end{bmatrix} \quad [10]$$

The total amount of desired freight movement, in vessel-ton-miles, is

$$\text{Desired Freight} = \sum_{i} \sum_{j \neq i} w_{i,j} \times d_{i,j} \quad [11]$$

summed over all port pairs in both directions. The number of movements represented is, in general

$$\text{desired movements} = n \times (n-1) \quad [12]$$

which = 12 for n = 4.

The cargo movement actually performed is the same amount of deadweight tonnage moved but over a greater distance, because physical movement is confined to the links of the route traveled by the vessel. Stating this calculation in symbolic form is messy, but for $n = 4$ it is

$$\text{Actual Freight} = \sum_{i=1}^{4} \left( w_{i-2,\, i+1} + w_{i-1,\, i+1} + w_{i-1,\, i+2} + \sum_{i \neq j} w_{i,j} \right) \times d_{i,\, i+1} \quad [13]$$

where $i$ +1 or $j$ + 1 wraps around to 1 if $i$ or $j$ = 4. The terms inside the parentheses include the cargoes from previous ports continuing on past the present port $i$, plus the freight loaded at port $i$ for all other ports. This total cargo is then multiplied by the distance to the next port on the route, and summed over the four legs. The circuity factor is then the ratio of the two,

$$\text{Circuity Factor} = CF = \frac{\text{Actual Freight}}{\text{Desired Freight}} \quad [14]$$

If all desired freight movement occurs on the actual vessel legs, in the forward direction, the *CF* will be 1.0, whatever are the distances. If the desired movements are "perverse"—the vessel always picks up only cargo destined for the port it just passed, the *CF* will be 3.0 for $n = 4$, or $(n - 1)$ in general. For $n = 5$, the CF could range from 1 to 4.0.

If no movement is perverse in the sense of taking the long way around, the expected *CF* would approximate the diagonal of a square, whose ratio of semi-perimeter (2 sides) to the diagonal is $2/\sqrt{2} = 1.414$; the analogous ratio of a semicircle to its diameter is $\pi/2 = 1.57$. Presumably carriers select the service route to minimize the total cost of serving the desired movements, but some freight is inevitably carried the longer way. Thus the expected typical *CF* might be around 2.0.

## Empirical Estimation

Three "Superlanes" have been constructed to describe the major trades in which U.S. military cargo is commonly carried. Each Superlane is represented by a sequence of 4-6 ports constituting a typical route within the lane. The matrix of distances between ports is measured in nautical miles, and the freight volume matrix is estimated in TEUs or measurement tons.

It turns out, mathematically, that the cargo volumes only need to be measured in relative terms rather than absolute amounts, because they can be multiplied by a constant without affecting the *CF.* Hence, any consistent measure of actual traffic could be used to represent the desired tonnage movements between each pair of ports, in each direction. The most readily available data consisted of annual TEU moves between port pairs.

Distance and freight movement data for one superstring are shown in Table 10 and

**Table 10: Inter-port distances for Europe superlane (nm)**

| Distance: | Norfolk | Antwerp | Rotterdam | Felixtowne | Bremerhaven |
|---|---|---|---|---|---|
| Norfolk | | 3,488 | 3,483 | 3,412 | 3,607 |
| Antwerp | 3,488 | | 112 | 141 | 322 |
| Rotterdam | 3,483 | 112 | | 121 | 217 |
| Felixtowne | 3,412 | 141 | 121 | | 298 |
| Bremerhaven | 3,607 | 322 | 217 | 298 | |

source: Volpe calculations.

Table 11. The *CF* for this string is 2.10. Data for the Asia superlane are shown in Table 12 and Table 13. The *CF* for the Asia string is 1.76. Sufficient data for Middle-Eastern ports could not be obtained, so a default *CF* = 2.0 is used for the Middle-East and other lanes.

If all desired flows are equal, this represents a neutral or unbiased flow pattern. The numerical result for the *CF* will still depend upon the actual distances, but for the Europe string a neutral-flow *CF* = 2.51 and for the Asia string it is 2.3. A *CF* = 2.1, then, constitutes some productivity improvement over a uniform trade pattern.

**Table 11: Annual TEU volumes between ports in Europe string**

| | Destination: | | | | |
|---|---|---|---|---|---|
| Origin: | Norfolk | Antwerp | Rotterdam | Felixtowne | Bremerhaven |
| Norfolk | | 342,216 | 212,373 | 246,954 | 299,744 |
| Antwerp | 224,362 | | 25,340 | 167,535 | 68,614 |
| Rotterdam | 271,261 | 118,481 | | 733,518 | 63,145 |
| Felixtowne | 197,025 | 343,355 | 502,719 | | 187,404 |
| Bremerhaven | 500,284 | 103,947 | 46,435 | 82,430 | |

source: Eurostat.

**Table 12: Inter-port distances for Asia superlane (nm)**

| Distance: | Los Angeles | Yokohama | Shanghai | Hong Kong | Tanjung Pelepas |
|---|---|---|---|---|---|
| Los Angeles | | 4,924 | 5,678 | 6,369 | 7,699 |
| Yokohama | 4,924 | | 1,033 | 1,594 | 2,902 |
| Shanghai | 5,678 | 1,033 | | 841 | 2,189 |
| Hong Kong | 6,369 | 1,594 | 841 | | 1,432 |
| Tanjung Pelepas | 7,699 | 2,902 | 2,189 | 1,432 | |

source: Volpe calculations.

**Table 13: Annual TEU volumes for Asia superlane**

| | | Destination: | | | | |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| Origin: | | Los Angeles | Yokohama | Shanghai | Hong Kong | Tanjung Pelepas |
| Los Angeles | 1 | | 795,648 | 1,888,937 | 399,706 | 94,527 |
| Yokohama | 2 | 782,834 | | 523,203 | 332,099 | 126,514 |
| Shanghai | 3 | 8,798,691 | 595,455 | | 63,942 | 105,159 |
| Hong Kong | 4 | 644,399 | 293,850 | 120,153 | | 44,775 |
| Tanjung Pelepas | 5 | 266,241 | 91,723 | 100,000 | 49,025 | |

sources:

cells 1,2 to 1,5 and 2,1 to 5,1 (1st row and 1st column, flows into and out of Los Angeles): Port Import Export Reporting Service (PIERS) as reported by MARAD (http://www.marad.dot.gov/library_landing_page/data_and_statistics/Data_and_Statistics.htm) in the table "Container_by_trading_partners.xls" (http://www.marad.dot.gov/documents/Container_by_Trading_Partners.xls).

cell 2,3: 2002 data from "Review of Shipping and Port Development in North-East Asia," UNESCAP.org. Cited as coming from Japan-China Liner Shipping Committee.

cells 3,2 to 3,5 and 4,2 to 4,5: Estimated from April 2006 YTD figure for Intra-Asian TEU Exports. Cited source is Intra-Asian Discussion Forum. (http://info.hktdc.com/shippers/vol30_4/vol30_4_ocean.htm)

cells 2,4 to 2,5 and 5,2 and 5,4: 1998 data from Table 53, UNCTAD Review of Maritime Transport 1998, "Estimated Intra-Asian General Cargo Trade…" (http://www.unctad.org/en/docs/rmt1998ch7_en.pdf)

cell 5,3: No data; order-of-magnitude estimate. The entry in this cell has no effect on the *CF* within a wide range of values.

## Transhipment

Cargo shipped halfway around the world may not arrive at its final port on the same ship it was initially loaded onto. If the tradeoffs in voyage design between the economies of carrying more cargo versus the diseconomies of circuitous routes result in itineraries of about 5-6 ports, then cargo may be off-loaded at an intermediate port

and put on another voyage. The cost of unloading and reloading is less than the inefficiency of trying to serve too many ports on one voyage. A hypothetical pair of connected voyages is shown in Figure 8.




**Figure 8. Voyages linked by transhipment.**

This could be considered a form of hub-and-spoke networking: cargo is carried to a location that is common to another route. Each voyage used to carry the cargo to its ultimate destination can be assumed to have a circuity factor similar to others simply because less efficient or less productive itineraries are squeezed out by market economics.

Hence, for purposes of calculating a BAF, it is not necessary to separately consider whether the cargo is transhipped or is carried on a single bottom for the whole trip.

## 2.5. *Input Substitution Factor*

Fuel is one of many input factors in the production of ocean vessel freight service. Economic theory suggests that when relative prices of inputs change, the mix of inputs should shift so as to maintain the lowest cost for a given level of output. The extent to which the proportions of inputs change in response to price changes depends upon the ability to substitute among inputs within the production function, which, in turn, depends on the technology of the industry and the firm. These substitution elasticities have implications for the design of economically efficient and equitable fuel adjustment factors applied to freight services purchased in advance of the time of delivery.[21]

### Production Function

Fuel is only one component of the production function for vessel freight services, but it appears to be the only component singled out for surcharge treatment.

A production function is a multidimensional relationship between a set of inputs, on the one hand, and the output or outputs on the other. There are many ways to produce the same output, some of them more "productive" than others, meaning that for some production combinations the same output could be produced with less of some input but no more of any input, or the same resources could produce more output.

Assuming the input combination and production process is along the production frontier, the most efficient mix of inputs is the one that produces each quantity of output at the lowest cost. The combination of the production function and the vector of prices of inputs, optimized to produce at the lowest cost, is the firm's cost function. For the competitive firm, the quantity of output is determined by the intersection of the marginal cost function with the market price.

### Speed

Speed and fuel consumption are closely related. Engine power is designed so as to move the vessel at a suitable cruising speed under normal conditions, with some reserve power to spare. A vessel might cruise at 75-85% of its maximum power at a speed of 22 knots, for example. Under heavy weather conditions or to catch up to a schedule, steaming speed may be temporarily increased.

When speed is increased, fuel consumption not only increases per hour but also per mile over-the-ground. Like air resistance only more so, water resistance causes energy efficiency to decline with increasing speed. All freight vessels are displacement hulls (rather than planing hulls), which means the ship is effectively climbing a hill that gets steeper as speed goes up.

Most ocean freight ships are powered by low-speed diesel engines whose efficient range runs from about 70RPM to about 90RPM (typically about 70% to 90% of rated power). Lower speeds are possible but damage the engine over extended periods of time. Higher engine speeds are also possible, but become ineffective at increasing over-the-ground speed. Normal vessel cruising speed is generally at or slightly above the "economical" speed that minimizes the fuel consumption per delivered horsepower.

The term economical is a misnomer because it does not account for the price of fuel; the economical speed is a purely engineering relationship between fuel consumption and the output of the engine. Because over-the-ground fuel efficiency is increased by slowing down vessel speed, the least cost speed involves a tradeoff between fuel consumption, on the one hand, and the other costs of owning and operating the vessel on the other.

---

21 Although the concepts are taken from basic economic theory as presented in any first course in microeconomics at the university level, we have found no evidence that the concepts have previously been applied to designing a BAF for ocean shipping.

Vessel speed is also constrained by schedule, for liners. The route and itinerary of a voyage is typically designed to service each port weekly at normal steaming speeds. If the price of fuel doubles, for example, the vessel will try to steam more slowly while still maintaining its schedule.[22] If the price of fuel stays doubled, the carrier is likely to seek ways to service the same ports with more vessels or a different schedule.

### Marine Propulsion

Prior to the 1970's there was a dominance of steam turbine driven ships in the merchant shipping industry. As a result of the increasing cost of fuel since the early 1970's and advancements in diesel power horsepower, diesel engine propulsion began dominating the industry. Ship designers/marine engineers focused on the development of the slow speed two-stroke diesel engine to increase fuel economy of merchant ships. Slow speed diesels were specifically designed and engineered for marine applications, and as power ratings increased, became very competitive to steam power and are now the predominate mode of power. Some slow speed diesels have now been developed into the 100,000 hp range.

The leading manufacturers of slow speed diesels are Sulzer Brothers, Burmeister & Wain, and, Mitsubishi. Based on the Clarkson database for world ships, the average horsepower range of the typical "composite" ship in service is approximately 30,000 hp. Slow speed, two-stroke, turbocharged diesels are engineered to be direct coupled to the shaft/propeller. Development of this longer stroke engine has improved the propulsion efficiency allowing for the slower RPM direct drive to the propeller, thereby not requiring the need for an expensive, inefficient reduction gear. The predominate use of turbochargers or superchargers, pre-heaters, and waste heat recovery has aided in better overall plant fuel efficiencies by recovering energy in the form of heat. In addition, naval architect design changes to the hull form and advancements in propeller designs have allowed for installation of larger, slower turning propellers, resulting in achieving the ship's propeller design thrust at even lower speeds, allowing for reduced horsepower requirements.

An important fuel aspect of slow speed diesels has been the ability to operate on the lower cost heavy fuel oils (HFO), which also, however, contain much higher levels of sulfur than the cleaner marine diesel oil (MDO) fuels. California Code of Regulations recently (2009) adopted the most stringent shipping environmental regulations in the world applicable to within 24 nautical miles of the California coast. The legislation

> *"requires the use of low sulfur marine distillate fuels in order to reduce emissions of particulate matter (PM), diesel particulate matter, nitrogen oxides and sulfur oxides from the use of auxiliary or diesel electric engines, main propulsion diesel engines, and auxiliary boilers on ocean going vessels within any of the waters subject to this regulation."*

---

[22] Maersk (2009) states in its annual report they achieved "approximately 5% lower fuel consumption due to a large number of fuel reduction measures, including service speed reductions."

There are also indications that the international shipping industry is expected to adopt similar emissions regulations by 2015, to limit these sulfur oxide and other exhaust pollutants, including carbon dioxide.[23]

When these stricter regulations pass worldwide, it will effect how marine engineers and naval architects design and retrofit systems and tank capacities on existing and new ships to accommodate these coastal operating constraints.[24]

### Fuel Economy

Under normal sea conditions, when fuel prices are reasonably low, the typical ship operator will run the main propulsion diesel at 90-95% of the diesels maximum continuous rating, in other words, push the ship at its designed sea speed with a focus on maintaining rigorous schedules. This equates to approximately 20-22 knots ships speed, and 90-100 shaft rpm - typical of the composite ship example discussed in this report. With respect to higher cost fuel/economy, it is now common practice to slow the main engine down when fuel prices are much higher depending on the schedule limitations of the shipping company. The best practices for operating the engine fuel efficiently would be running the shaft rpm in the general range of 80-90 rpm's (refer to fig. 3 characteristic data for a low speed engine) published by the Society of Naval Architects and Marine Engineers. This table demonstrates that the "typical" slow speed diesel best economy fuel consumption / rpm output is shown in the 80- 90 rpm range of the curve. Also, this curve shows that running in the 90-100+ rpm range or below 80 rpm demonstrates an increase in fuel consumption or "inefficiency" of the engine. Although this is typical for the slow speed diesel engine, the specific fuel efficiency data for a particular make/model would be available to the operators by the engine manufacturer.

Containership Chief Engineer interview:

> *"In regards to slow running for the main engine to save fuel, it is a common practice depending on the schedule. Slowing down the main engine can easily save between 25% to 30% in fuel consumption. When fuel was at $729 per metric ton all ship operators were slow running the main engines. Depending on the make and model of the main engine, slow running for a slow speed diesel would be the lowest speed the main engine can run with out the auxiliary blowers running to provide additional combustion air. The auxiliary blowers are electric motor driven blowers which provides supplemental combustion air to the engine under low load conditions where the exhaust driven turbo chargers can not provide sufficient combustion air. The auxiliary blower motors are typically the largest electric motors in the engine room and if they are running increase the load on the electrical generating plant therefore negating any fuel savings from operating the main*

[23] If sulphur were the only concern, low-sulphur heavy fuels are already available at a higher price, but if particulate and other pollutants are removed, the fuel is no longer heavy or cheap.

[24] According to The Guardian (Vidal, 2008), air pollution from shipping is higher than previously thought and a signicant source of greenhouse gas emissions.




Fig. 3 Characteristic data for a low-speed engine [8]

source: Kurt Illies, "Low-Speed Direct-Coupled Diesel Engines."

**Figure 9. Characteristic data for a low-speed engine.**

> *engine at lower speed. When we slow down we run the main engine at approximately 83 rpm. On most legs of a voyage there is slack in the schedule in case the vessel gets behind due to weather or unanticipated port delays. The ship owners know that it is not a perfect world. Also time can be made up in port by working extra longshoreman gangs on a container ship and not back loading as many empty containers."*

In summary, when fuel costs are low, the ship's operators will run the vessels at the higher end/speeds 90+ rpm and fuel consumption will be above the range of the main diesel engines best economy fuel consumption demonstrated on the fuel curve. As fuel costs increase, the ship's operators will typically slow down to 80 - 85 rpm, the lowest end of the best economy fuel consumption curve.

## Fuel Inputs

Because the efficient mix of inputs and scale of output for the producer depends upon the prices of its inputs, the efficient pricing of the firm's outputs should not alter the firm's incentives to select the cost-minimizing mix of inputs. In no sense should a BAF be seen as a payment or compensation for fuel costs. The firm produces ocean freight services, and it should do so in a way that minimizes its (and society's) costs. If the price of fuel goes up relative to other inputs, the producer should shift its input mix so as to use less of the relatively scarce input.

This might be done by slowing down (using less fuel per vessel mile but requiring more vessels to provide the same overall cargo-movement capacity), by increasing the load factor (altering schedules or offering incentives to reduce spare capacity on each vessel), by shifting routes and steaming times to minimize conflict with weather conditions, etc.[25]

Hence a BAF should not be constructed so as to make the producer indifferent to the price of fuel. The purpose (one purpose) is to allow the final price at the time of delivery to approximate what the producer would have calculated at the time of delivery, but also permitting the shipper and carrier to reach an agreement well in advance of the delivery itself. This practice occurs in electricity rate setting and civil construction, where a "cafeteria" of add-ons or price variations can be agreed to at the time a contract is signed. Retaining the incentive to optimize the input mix is retained by making the surcharge unrelated to actual expenditures for fuel. If, however, price increases in one cost component are favored over other components, the carrier may have an incentive to overuse that input. Thus a BAF or fuel surcharge should not be designed to hold the carrier harmless to changes in bunker price, nor to compensate the industry as a whole for changes in fuel cost (or any other input).

The strategy of hold-harmless or "no gain no loss" seeks surcharges that exactly offset costs, which is difficult (requiring detailed data) and not efficient.[26] Due to input substitution, a BAF that assumes the input mix is fixed will overstate the cost effect of fuel price changes. The share of the partial equilibrium effect of fuel price changes that is compensated by the BAF is a discretionary value, but in general should be less than 100%.

## The Production Function

For simplification, it can be assumed that inputs to the production of vessel freight services can be separated into two categories, fuel and everything else. The latter includes operating labor, vessel capital, and vessel maintenance. Output can be measured in ton miles, ton miles per day, TEU miles, etc.

The production function transforms the quantities of inputs provided to the process into output. The production function represents the physical or technological characteristics of production, without regard for the prices of the inputs. This function gives

25 According to the Financial Times of December 17, 2008: "Lines and alliances are now cutting services, merging different strings and slowing ships down to reduce fuel costs and ensure that ships run full. That often requires the use of an extra vessel to maintain a weekly service - Asia-Europe round-trips now typically take 63 days and require nine ships, against 56 days and eight ships before."

26 Israel Shipping Research Institute, 1980.

the output possibilities for any combination of input factors. It does not indicate what mix of inputs is best, nor the optimum or cheapest per-unit level of output.

A "normal" production function has several properties in the abstract:

(1) Each input exhibits diminishing marginal returns, meaning that beyond some point a proportional increase in any input factor produces a less-than-proportional increase in output.

(2) Output never decreases with the increase of any input, i.e., the production function is monotonic upward (also called free disposal).

(3) The production function as a whole can exhibit decreasing, constant, or increasing returns to scale, meaning that output increases less than proportionally, the same, or more than proportionally to a given increase in all input factors.

Thus a production function can show both diminishing returns from any single factor but increasing returns from increases in all factors together. An example of such a function is shown in Figure 10. The two inputs on the horizontal plane are "Fuel Con-




**Figure 10. Production function with 2 inputs.**

sumption" and "Other Inputs," while the output is shown as a surface rising above the plane. Figure 11 shows the same surface from another angle that makes the diminish-

ing marginal returns for each output along with the increasing returns from the origin to the peak more apparent.




**Figure 11. Same production function rotated 90 degrees.**

Vertical slices through the surface from several directions are shown in Figure 12. The lowest curve is cut through the surface five units out from the "Other Inputs" axis and parallel to it; thus it shows output with other inputs fixed at five and fuel varying from 0 to 25. The middle curve is perpendicular to the lowest curve, and five units away from the fuel inputs axis. The two cross at five units of each input. The top curve is cut at 45 degrees to each input axis and assumes equal amounts of each input. The lower two curves show diminishing returns, while the top shows increasing returns or positive scale economies.

Slices can also be cut horizontally through the output surface, indicated in Figure 10 as curved bands. These show the various input combinations that produce equal quantities of output, and are known as isoquants. An isoquant at the output level of 9.0 is shown in Figure 13. The circled points show two combinations of inputs—fuel = 3.8, other = 8.1, and fuel = 6.2, other = 6.2—that yield the same output.

This relationship implies that fuel and other inputs can be substituted for each other. For example, fuel consumption per vessel mile (as well as per vessel hour) increases with speed. Vessels can reduce their fuel inputs for the same ton-mile output by steaming slower, thereby using more labor and vessel capital in exchange for fuel savings.




**Figure 12. Cross-sections of the production function.**




**Figure 13. Production function isoquant.**

The particular production function represented here is called a Cobb-Douglas function and has the general form

$$TM = F^{\alpha} L^{\beta} \qquad \alpha, \beta > 0 \qquad [15]$$

where

$TM$ = output in ton miles
$F$ = fuel in tons/ mile
$L$ = composite for all other inputs, in units per ton mile

and $\alpha + \beta > 1.0$ implies increasing returns to scale (IRTS), $\alpha + \beta < 1.0$ implies decreasing returns, while $\alpha + \beta = 1.0$ implies constant returns (CRTS).

## The Cost Function

The cost function is the production function optimized for input prices. Knowing the prices or unit costs of the inputs, the least cost point on the isoquant can be calculated. A line whose slope is equal to the price ratio of the inputs gives the locus of points with a constant total expenditure. The closer the line is to the origin, the lower the total cost. Hence, a line with the slope of the price ratio and just tangent to the isoquant gives the largest output for that cost. If the price of fuel equals 2 and the price of all other inputs equals 4, then the minimum cost point on the $TM$ = 9.0 isoquant occurs at $F$ = 6.2 and $L$ = 6.2; this point is labeled "Initial Price" and is where the solid line with a slope of 2/4 = 0.5 is tangent to the isoquant.

A simple (abstract) numerical example is constructed in Table 14. Initial equilibrium prices and quantities are shown in the first column, with quantities optimized for given input prices and a fixed output of 9.0 units. The price of fuel is then assumed to increase by 125%. Given the initial input quantities and fixed proportions in production (i.e., only the given mix of inputs is capable of producing the given output, or the firm is otherwise unable or unwilling to change its input mix), the increased fuel price causes total costs to increase by 42%.

**Table 14: Numerical example with Cobb-Douglas production function**

| | Initial Price | | Fixed Proportions | | Efficient Inputs | |
|---|---|---|---|---|---|---|
| | price | quantity | price | quantity | price | quantity |
| F (fuel) | $ 2.00 | 6.2 | $ 4.50 | 6.2 | $ 4.50 | 3.6 |
| L (other) | $ 4.00 | 6.2 | $ 4.00 | 6.2 | $ 4.00 | 8.2 |
| percent change in fuel price | | | 125% | | 125% | |
| total cost | | $ 37.44 | | $ 53.04 | | $ 49.06 |
| percent change in total cost | | | | 42% | | 31% |
| efficient cost % of fixed input cost | | | | | | 74% |
| fuel share of cost | | 33% | | 53% | | 33% |
| fuel productivity (alpha) | 0.4 | | | | | |
| other input productivity (beta) | 0.8 | | | | | |

If the producer can substitute other inputs for fuel under the technology model used here, the economically efficient mix of inputs shifts away from fuel consumption, to the mix labeled "New Price" in Figure 13. Fuel consumption goes down by 42% while other inputs go up, and total cost is 31% higher than before the price change but only 74% as much as if the inputs proportions are fixed at the initial mix.

The Cobb-Douglas function has the property of unitary elasticity of substitution, which means that for any given change in input prices, the efficient mix among inputs will change in such as way as to leave the percentage share of costs for each factor unchanged. Thus whatever the change in fuel price and the corresponding changes in input mix, the fuel share of total cost remains the same (total costs may increase or decrease).[27]

## Other Production Function Forms

The Cobb-Douglas function used above is a useful abstraction that is easy to work with and offers normal economic properties, but it does not necessarily represent the functional relationships between fuel consumption and ton-mile output for ocean freighters. The latter is an empirical question pertaining to the particular characteristics and technologies of the shipping industry.

At the extremes of production function shapes are fixed proportions and perfect substitutes. Fixed proportions mean that input factors must be supplied in exact proportions, e.g., one bus and one driver, or one horse and one rabbit. The shape of the functional form can still exhibit positive and negative scale economies, but there is no substitution at any level of production. An example of the shape of the surface using the Cobb-Douglas form for the spine is shown in Figure 14. Isoquants for such a production function are right angles, as in the right side of Figure 14. The elasticity of substitution among inputs is zero; any amount of either input that is in excess of the fixed proportion (e.g., 1:2) is wasted.

The other extreme is perfect substitutability, an example of which is shown in Figure 15. Each input can be transformed into the other at some fixed rate. The same amount can be produced using only one input or the other, or with a mixture. The elasticity of substitution is infinite; in effect, there is only one input.

The elasticity of substitution of fuel for other inputs in producing vessel ton-miles is probably less than -1.0 in magnitude, as reflected in the Cobb-Douglas function, but it is certainly not zero.

## Substitution Factor

In order to maintain the incentive for efficient adjustment of inputs in response to changes in input prices, the BAF should not compensate carriers for the full change in fuel cost while holding the input mix constant. Although the actual production function for vessel shipping has not been fully modeled, it clearly is not one in which the

[27] Data from NYK Lines and Maersk show fuel costs rising over the period 2000-2008 from about 10% of total cost including vessel capital to over 20% of total cost; for operating costs only, the share rose from 20% to over 40%. This indicates both that fuel can be a major input cost and that the ocean vessel production function does not allow for constant elasticity of substitution.




**Figure 14. Fixed proportions production function.**




**Figure 15. Perfectly Substitutable Inputs production function.**

proportions between fuel and other inputs is fixed. Compensation based on an (implicit) assumption of fixed input proportionality removes the incentive to optimize fuel consumption within the input mix, and overcompensates carriers.

Conceptually, the Substitution Factor is equal to one minus the percentage cost savings from re-optimizing the input mix after a change in the price of fuel. It depends on the elasticity of substitution between fuel and all other inputs, and the share of fuel in total cost. If the elasticity of substitution is zero, the substitution factor = 1.0, because no savings are possible. If the elasticity of substitution is -1.0, as in the Cobb-Douglas

function, the substitution factor is around 75%. The correct value probably lies between 80% and 90%.

The substitution factor is a technical factor in the sense that there is an empirical value that may not be known precisely but could in principal be measured. It may vary substantially from one ship and carrier to another, but the magnitude could be established as an industry norm.

## 2.6. *Risk Distribution Factor*

The substitution factor sets the upper bound on what constitutes full compensation for a fuel price change, but as a matter of policy it is not necessary to provide full or 100% compensation. The BAF is a mechanism for risk distribution, and how that risk is distributed is subject to negotiation and USTRANSCOM policy. If carriers are in the best position to forecast risk and take appropriate actions to minimize the impacts, then they should bear the risk directly; they will pass on the costs in their base freight rates. Alternatively, if the risk is largely out of anyone's control (or any of the relevant parties), and shippers (USTRANSCOM) can absorb the uncertainty of not knowing actual costs until the time of delivery, then shippers can bear the risk. The risk distribution factor assigns some proportion of the risk to each party.

The risk distribution factor can vary (in percentage terms) between zero (no BAF, all risk of price volatility borne by carriers) and 100% (USTRANSCOM bears the cost of price volatility, up to the efficient re-optimization of fuel consumption). The more of the risk that is borne by shippers, the lower should be the base freight rates, assuming adequate competition among carriers.

The existence of the BAF is in part a consequence of the requirement by USTRANSCOM to quote fixed freight rates up to 18 months (with options for extension) in advance of the service date. Commercial carriers normally quote rates that are good for 30 days or perhaps as long as 6 months. USTRANSCOM could reduce the need for a BAF - hence the risk distribution factor - by allowing carriers to revise their rates more frequently. While USTRANSCOM can negotiate whatever terms it finds satisfactory, removing some of the risk of price volatility over a time period for which forecasting is very uncertain is probably worth the reduction in the corresponding freight rates.

At the same time, it is probably not desirable for USTRANSCOM to bear all of the risk. In addition to erring on the side of avoiding overcompensation to carriers (carriers make money on higher fuel prices), the risk of cost increases should be shared between shipper and carrier. This preserves the incentives for each party to be efficient and to seek ways to minimize the cost of price volatility. A price increase is an adverse event whose burden can be assigned to one party, or shared.

### Buffer Threshold and Risk Distribution

The BAF contains two components that allocate price volatility risk between the shipper and the carrier: the explicit risk distribution factor, and the threshold value used to determine whether a BAF is paid or not. The higher the risk distribution factor, the larger the share of risk that is borne by USTRANSCOM, the shipper. The higher is the threshold for the buffer zone, the more of the price risk that is borne by the carrier. These two factors can be combined as shown in Table 15.

**Table 15: Interaction of buffer threshold and risk distribution factor**

| | Low Risk Distribution Factor | High Risk Distribution Factor |
|---|---|---|
| Low Buffer Threshold | BAF is more frequently invoked, but carrier compensation is smaller in magnitude; all risk is borne proportionately but mostly by the carrier | BAF is frequently invoked and shipper bears most of the cost of risk |
| High Buffer Threshold | Carrier bears a large amount of basic risk, and receives only a small compensation for large price fluctuations | BAF is rarely invoked, but compensation is high when large price fluctuations occur. |

The extremes are on the reverse diagonal, for which the combinations of the two factors align in the same direction. A high buffer threshold and low risk allocation factor, for example, place most of the risk on the carrier; deviations from the base fuel rate must be large before any compensation is paid, and even then the share borne by USTRANSCOM is limited. A large buffer zone combined with high share of risk assigned to the shipper places an emphasis on distinguishing what is "normal" (everyday risk typically borne by carriers, and readily mitigated) from what is "unusual" (deemed outside what carriers can reasonably be expected to absorb).

The suggested values for BAF purposes of 20% for the buffer trigger and 75% for the USTRANSCOM share of risk falls on the inner edge of the high-high box in the table. This is roughly akin to catastrophe insurance, in which most of the risk is borne by the insured, but for rare extreme events the compensation is sufficient to avoid ruin.

### Base Price Bidding Process

USTRANSCOM base freight rates are set through a process involving the Surface Deployment and Distribution Command (SDDC) CARE program management office, ocean liners and USTRANSCOM. The establishment of new base freight rates at the start of a contract (e.g. USC-06), and for each subsequent option year, begins with the SDDC CARE program management office creating a new option year database within the CARE system. Once created, this new CARE database is made accessible to carriers who are able to enter their proposed base freight rate prices into the system. Carriers currently have a window of thirty days, or one month, during which they are allowed to enter proposed base freight rates into CARE.

At the end of the initial updating period the CARE system is locked and the proposed shipping rates examined by USTRANSCOM. During this evaluation process, base rates that are outliers or determined to be too high are identified and flagged. Once this initial evaluation, which takes around 4 weeks, is complete the CARE system is again opened to carriers. At this point the carriers, who can see which rates have been flagged as too high, have an opportunity to make adjustments to their proposed rates.

This adjustment period lasts for up to two weeks after which the CARE system is again closed.

Following these adjustments, a final evaluation of the carriers revised proposed base freight rates is then performed. During this evaluation, which takes around two weeks, the proposed carrier rates are either accepted or rejected by USTRANSCOM. After this the SDDC CARE program management office will take around 30 days to run tests on the final base rate data. Once this task is complete, the new base freight rates will be made available for use by USTRANSCOM shippers via a linkage between the Integrated Booking System (IBS) and CARE.

As it currently stands, it takes approximately five months to get from the start of the bidding process through to the first shipments being made using the new base freight rate structure. Around 6 weeks is taken up with carriers entering their proposed shipping rates into the CARE system and then subsequently revising these rates. USTRANSCOM's evaluation process takes a total of six weeks: four for the first review round and two for the second. The checking of the CARE database by the SDDC CARE program management office runs for a further month-long period. Finally, there is a one month lag between the release of the new base freight rates and the first shipments being made under these rates. This is due to new rates needing to be made available to shippers a minimum of 30 days prior to the start of the new contract or option. For example, if new rates are released to shippers on April 1st, the earliest shipments could be made using these rates would be May 1st. Once a contract is in place, USTRANSCOM noted that, depending upon who the shipper is, the typical time between a shipper making a commitment to purchase shipping services and the delivery of these services is somewhere between 2 - 30 days.

USTRANSCOM has indicated that when moving from the initial year of the contract period to subsequent option years it may be possible to reduce the time taken for the initial step of this bidding process. The CARE database allows for carriers to copy over rates from one option year to the next. All rates can then be adjusted up or down using a common percentage (e.g. move all rates up by 3%). This functionality may allow carriers to be more efficient in updating option year rates and possibly allow for reducing the initial CARE base rate updating process from one month to three weeks.

## *2.7. 20-to-40 Foot Container Equivalence (TEUs vs. FEUs)*

The container cargo BAF calculation is done on a twenty foot equivalent or TEU basis. This a standard measure for containerized ocean liner freight with one TEU referring to a twenty foot long shipping container, generally measuring 20 feet by 8 feet by 8 feet 6 inches. Along with twenty foot containers, forty foot containers are also commonly used in moving cargo. This container measures 40 feet by 8 feet by 8 feet 6 inches, which is twice the size of a twenty foot container. The volume of one

forty foot container, or forty foot equivalent unit (FEU), is the equivalent of two TEU's.

Since USTRANSCOM utilizes both sizes of containers for shipments—although one of their largest shippers, the Defense Commissary Agency (DeCA) tends to use predominately forty foot containers—it is necessary to be able to convert between an FEU and a TEU for purposes of consistency when calculating a BAF.[28]

## Weight versus Volume

Converting between an FEU and TEU can be done using either container weight or volume.[29] Containers will "cube out," when reaching their maximum capacity by volume. In this case a 40-foot container would then hold exactly twice as much cargo as a 20-foot container, and the appropriate conversion factor would be 2-1 (or, as a multiplier, 2.0). This relationship, however, does not hold when cargo reaches the maximum container payload weight. For example, if the approximate payload weight of a twenty foot container is 48,000 lbs and for a forty-foot container 59,000 lbs then when "weighing-out," the forty-foot container will hold approximately 23% more cargo than a twenty-foot container.[30] This would imply a weighing-out conversion factor of 1.23-1 (or a 1.23 multiplier) based on maximum payload weight. If the maximum gross weight of the container is used (payload plus tare), then the conversion factor is 1.27.

The average of these two values is 1.25, which is the same as the 5-4 ratio used by carriers. Restrictions on the weight of cargo carried by trucks moving cargo to and from ports, however, add another aspect to the analysis.[31] Ocean Carrier Equipment Management Association (OCEMA) guidelines recommend a 44,000 lbs maximum weight on both 20-foot and 40-foot containers, indicating that a realistic ratio for "weighing-out" containers can be as low as 1.0.

Theoretically, these two ratios establish the bounds for the conversion factor for an FEU. For example, if USTRANSCOM is shipping all relatively light goods, such as pillows, in forty-foot containers, then the cargo would cube out and the applicable network wide factor would be 2.0. In contrast, if they are shipping small but heavy items, such as steel ball bearings, then the cargo would weigh out prior to filling all available space in the forty-foot container. In this case, the conversion factor would be

---

[28] In the 1993 Volpe EPA study, the BAF was increased by a factor of 1.7 for 40 foot containers, compared with twenty foot containers.

[29] Note, the maximum volume a container can hold may be less than the physical space inside the container. This is discussed below.

[30] These payload weights were determined using ISO 688 maximum gross weight for twenty-foot and forty-foot containers, which are 52,911 lbs and 67,197 lbs respectively. Subtracting the container tare weight from these values provides the approximate maximum payload weights of approximately 48,000 lbs and 59,000 lbs.

[31] The Ocean Carrier Equipment Management Association (OCEMA) provides recommended cargo weights for containers shipping on the U.S. Highway System. For twenty-foot dry containers the suggested weight is between 39-44,000 lbs and for forty-foot dry containers the recommendation is 44,000 lbs.

1.0. Since USTRANSCOM ships a combination of light and heavy goods, a conversion factor that blends cubing out and weighing out values may be most appropriate.

## Industry Survey

To provide some context for this container equivalence analysis, a review of conversion factors currently used by industry was performed. A survey of information from several ocean carriers and conferences revealed no consensus on a single worldwide conversion of TEU to FEU for the purposes of a BAF calculation. Carriers appear to choose either the volume-based 2-1 factor or the (roughly) weight-based 5-4 factor. Though not expressed explicitly by carriers, this latter ratio appears to be based upon a maximum container weight of 52,911 lbs for twenty-foot containers and 67,911 lbs for forty-foot containers and a payload cargo weight for a TEU of 48,000 lbs and FEU of 59,000 lbs. No carriers were found to use a factor that blends the two multipliers.

Using one convention or the other seems to be driven more by the trade than the carrier. All carrier data reviewed showed a 2-1 option on at least one trade, but not all carriers use the same conversion within trades. Trades in and out of Europe are all on a 2-1 basis. US trades across the Atlantic seem to all be 2-1, while trans-Pacific trades are all 5-4. Other trades generally not following the 2-1 conversion include South America and Australia.

Historical BAFs for the Trans-Atlantic Carrier Alliance, which disbanded after the EU's recent regulation dissolving conferences, show that the U.S. to Europe trade was also on a 2-1 under conferences. In the Pacific, the Transpacific Stabilization Agreement and Westbound Transpacific Stabilization Agreement carrier conferences continue to use the 5-4, while the non-affiliated MOL and Maersk Line use 5-4 and 2-1 respectively.

The ocean carrier American Presidential Lines (APL) uses a 5-4 ratio on trans-Pacific routes and appears to use 2-1 on all others. For its European trades CAM-CGM uses a 2-1 conversion factor, as does the Mediterranean Shipping Company (MSC). A 2-1 conversion ratio is also used by Hapag-Lloyd on European trades while a 5-4 factor is used on trans-pacific routes.

It seems that the 2-1 is the newer conversion factor. This hints that the industry is evolving in this direction, led by all EU trades adopting the 2-1 and some European carriers shifting to 2-1 worldwide. This trend may be an effort to move towards simplicity and its ability to be applied to containers larger than 40ft. Nonetheless, without understanding what went into the decision for individual carriers to select either option, it is difficult to make a recommendation based on industry practice, as there is not one standard conversion factor.[32] What this research does show, however, is that to be consistent with industry practice, a conversion factor developed for USTRANSCOM would need to be based on either volume or weight or a blend of the two.

---

[32] For example, the evolution in the factor could be due to systematic changes in products shipped that result in more containers cubing out than before, changes in packing/stacking standards increasing the propensity to cube out, an attempt by carriers to increase fees, or some other cause.

### Developing a USTRANSCOM Conversion Factor

A central element of the FEU conversion factor is determining the relationship between the percent of cargo in forty-foot containers that is expected to weigh out compared with cube out. When cargo cubes out before weighing out, the relationship between a TEU and FEU is related to volume. When weighing out, the cargo has reached the weight capacity of the container before its volume has been reached.

This relationship will depend upon the type of goods being shipped and any restrictions placed upon the use of space and maximum payload weight. One of USTRANSCOMS largest shippers, The Defense Commissary Agency (DeCA), indicated that when using forty-foot dry containers they encounter cubing out when moving light snacks and weighing out with canned or bottled products. More specifically, they noted that when using dry containers their cargo tends to weigh out on somewhere around 92% of shipments. In contrast, DeCA cargo cubes out around 100% of the time when using refrigerated containers, which is in large part due to the requirement to leave space around refrigerated cargo. Furthermore, the need to ensure cargo is unharmed during shipment requires limiting the number of layers of product. As a result, only around 55% of the actual volume is utilized for cargo in refrigerated containers. In a similar way, at the request of distributors, and to protect cargo from being damaged, only around 65% of the actual volume is utilized for dry containers. Finally, to meet the weight restrictions placed on trucks traveling on the U.S. highway system, DeCA places a maximum payload weight of 40,000lb on both twenty-foot and forty-foot containers.

A review of 2008 CONUS shipping data contained in IBS database also provided some insight into the relationship between the use of twenty-foot and forty-foot dry and refrigerated containers. Consistent with the informal data from DeCA, the majority, or 64% out of the 30,571 total shipments in 2008 were made using forty-foot containers (this translates into 48,469 forty-foot containers compared with 24,105 twenty-foot containers). Also reflecting the information from DeCA, 98% of the forty-foot containers weigh 40,000 lbs or less. In the case of twenty-foot containers, 51% weigh less than 20,000 lbs and 86% less than 25,000 lbs. Even though DeCA noted that they set a 40,000 lbs weight limit on both containers sizes, it appears as if cargo in twenty-foot containers tends not to reach this maximum.

### A Network-Wide Conversion Factor

A vessel is constrained by its space capacity, measured in TEUs. Because a 40-foot container takes up twice as much space, the cost of the larger container is twice the smaller size times the opportunity cost of the space, per TEU. The market value is reflected in the capital cost of building the ship, per TEU. From a space perspective, a 40-foot container is twice the cost of a 20-footer. Its share of the basic fuel cost to power the vessel is 2:1.

Weight, however, is also an important cost factor. Every kilo of weight, whether payload or container weight, sinks the hull of the vessel deeper in the water and requires more fuel to push the vessel forward. The operating cost of moving a vessel loaded to its waterline is much greater than moving it with ballast only. If the payload weight limit is binding on a 40-footer, then a 20-footer could have carried all or most of the

cargo, and the additional cost of the larger size is less than twice the weight of the smaller unit.

It is not necessary to know precisely what these unit costs are in order to estimate the cost relationship between a 20-footer and a 40-footer. Instead, the degree to which the cargo is dependent upon volume (cube space) rather then weight (weigh out) can be used to establish the relationship.

The rules used to infer a conversion factor for an individual container are outlined in Table 16. These rules were applied to over 70,000 containers shipped by USTRANSCOM in 2008, using data extracted from IBS. The 40,000lb weight limit for both container sizes, which is consistent with DeCA practice and the guidelines suggested by OCEMA for when moving cargo on U.S highways, serves as a threshold weight.

**Table 16: Assumed conversion factors for container types by actual weight**

| van type | actual weight under 20K lbs | actual weight over 20K but less than 40K | actual weight over 40K |
|---|---|---|---|
| refrigerated containers | 2 | 2 | 2 |
| 20-foot dry container | 2 | 1+(40K-actual weight)/20K | 1 |
| 40-foot dry container | 2 | 2 | 1.5 |

Based on the air space requirements with refrigerated cargo and DeCA experience, all refrigerated containers are assumed to cube out before weighing out. A 40-foot container therefore contains twice the weight for this type of cargo as a 20 footer.

If the actual payload for a 20' dry container is under 20,000 lbs, then it is assumed that the cargo has cubed out. A 40' footer containing the same stuff would weigh twice as much, or the contents of two twenty-foot containers carrying the same cargo would fit into a forty-foot container. Hence the conversion is 2.0.

Cargo in a twenty-foot container weighing 40,000 lbs or more is assumed to have weighed out. These same goods carried in a forty-foot container would also weigh out that container as well, making the weights the same and yielding a multiplier of 1.0.

Between 20,000 lbs and 40,000 lbs the multiplier would be expected to move in a linear fashion from 2.0 to 1.0 as the conversion factor moves from cubing out to weighing out. A linear interpolation is shown in the table and in the diagram in Figure 16.

If a forty-foot container is holding less than 40,000 lbs, it is assumed to have cubed-out before weighing out. These goods would require two twenty-foot containers to move them, and the multiplier would be 2.0.

A forty-foot container with 40,000 lbs or more of cargo may have cubed out or weighed out; without further information, either case would be equally likely, implying an average multiplier of 1.5.




**Figure 16. Graphic representation of TEU/FEU conversion function.**

The results of applying these rules to the IBS data are summarized in Table 17. Average conversion factors for each container type, using the rules in Table 16, are averaged over all containers used by USTRANSCOM, for a network-wide average of 1.86 FEUs for each TEU.

**Table 17: TEU/FEU Conversion Factor**

| | |
|---|---|
| 20 FT Container Average Conversion Factor | 1.85 |
| 40 FT Container Average Conversion Factor | 1.87 |
| 20 FT as percent of all containers | 33% |
| 40 FT as percent of all containers | 67% |
| **Combined Weighted Conversion Factor** | **1.86** |
| source: estimated from IBS data (CONUS only) | |

## *2.8. All Factors Combined*

Both the technical substitution factor and the policy risk sharing factor can be set for at least a year or the life of the contract, and multiplied together to give a single number. The number scales the fuel cost factor (fuel consumption per TEU times the change in fuel price) downward by some amount. Although the motivations for each component are entirely different, they are both set for a period of at least a year (unlike the fuel price change) and reduce to a single number.

**Technical Factor Comparison Between 1993 and 2009 Volpe Studies, and Maersk**

Depending on the values chosen for the Input Substitution Factor and the Risk Distribution Factor, the Technical Factors may be either higher or lower than the technical factors reported in the 1993 study. As these factors will be chosen in the future by USTRANSCOM or negotiated between USTRANSCOM and the carriers, the Technical Factors displayed in this section are subject to change. The technical factors

shown in this section will assume values of 0.8 for the Input Substitution Factor and 0.75 for the Risk Distribution Factor.

**Table 18: Technical Factor Comparison (0.8 for Input Substitution Factor, 0.75 for Risk Factor)**

| | 1993 Volpe Methodology | | | 2009 Volpe Methodology | | | Maersk[a] |
|---|---|---|---|---|---|---|---|
| Lane ID | TEU | FEU | Measurement Tons | TEU | FEU | Measurement Ton | TEU |
| 01 | 4.35 | 7.25 | 0.12 | 2.86 | 5.32 | 0.16 | 2.70 |
| 02 | 5.55 | 9.25 | 0.16 | 3.48 | 6.48 | 0.16 | 4.66 |
| 05 | 2.88 | 4.80 | 0.07 | 2.00 | 3.72 | 0.11 | 3.38 |
| 06A | 5.55 | 9.25 | 0.16 | 2.16 | 4.02 | 0.12 | 5.07 |
| 06B | 6.30 | 10.50 | 0.19 | 2.34 | 4.35 | 0.13 | 5.07 |
| 06C | 6.30 | 10.50 | 0.19 | 2.24 | 4.17 | 0.12 | 5.07 |
| 07 | 8.40 | 14.00 | 0.25 | 3.36 | 6.26 | 0.17 | 6.28 |
| 10 | 6.30 | 10.50 | 0.19 | 2.11 | 3.93 | 0.15 | 3.38 |
| 11 | 6.30 | 10.50 | 0.19 | 2.29 | 4.25 | 0.12 | 3.38 |
| 12A | 8.40 | 14.00 | 0.25 | 2.78 | 5.18 | 0.14 | 5.07 |
| 12B | 8.40 | 14.00 | 0.25 | 3.42 | 6.37 | 0.18 | 5.07 |
| 12C | 8.40 | 14.00 | 0.25 | 3.35 | 6.24 | 0.17 | 5.07 |
| 13 | 8.40 | 14.00 | 0.25 | 3.78 | 7.03 | 0.24 | 6.28 |
| 16 | 8.40 | 14.00 | 0.25 | 3.93 | 7.30 | 0.14 | |
| 32 | 6.30 | 10.50 | 0.19 | 2.42 | 4.49 | 0.10 | 3.38 |
| 39 | 4.20 | 7.00 | 0.13 | 0.81 | 1.51 | 0.08 | 2.05 |
| 43 | 4.20 | 7.00 | 0.13 | 1.03 | 1.91 | 0.07 | 2.05 |
| 47 | 9.90 | 16.49 | 0.27 | 5.95 | 11.07 | 0.26 | 6.28 |
| 54 | 8.40 | 14.00 | 0.25 | 3.20 | 5.96 | 0.13 | 6.40 |
| 54D | 6.30 | 10.50 | 0.19 | 3.31 | 6.16 | 0.13 | 2.05 |
| 54F | 6.30 | 10.50 | 0.19 | 2.90 | 5.40 | 0.12 | 6.40 |
| 55 | 8.40 | 14.00 | 0.25 | 1.36 | 2.53 | 0.06 | 3.50 |
| 61 | 2.10 | 3.50 | 0.07 | 1.08 | 2.01 | 0.04 | 5.03 |
| 61ZJ | 2.10 | 3.50 | 0.07 | 0.99 | 1.84 | 0.04 | 2.70 |
| 61MG | 2.10 | 3.50 | 0.07 | 0.76 | 1.42 | 0.03 | 2.70 |
| 61ND | 4.20 | 7.00 | 0.13 | 0.84 | 1.57 | 0.03 | 2.70 |
| 61MJ | 4.20 | 7.00 | 0.13 | 1.60 | 2.98 | 0.07 | 2.70 |
| 61WL | 6.30 | 10.50 | 0.19 | 1.77 | 3.29 | 0.07 | 2.70 |
| 79 | 4.20 | 7.00 | 0.13 | 1.52 | 2.83 | 0.06 | |
| Average | 5.97 | 9.95 | 0.18 | 2.40 | 4.47 | 0.12 | 4.12 |

a. Maersk Technical Factor estimated using proxy routes from carrier's website.

Results with these assumptions are shown in Table 18, Figure 17, and Figure 18. With




**Figure 17. TEU technical factor comparison with Substitution and Risk factors = 1.0.**

the input and risk factors set at the above recommended levels, the new trade technical factors are lower in every lane when compared to the 1993 study. These technical factors per TEU are on average, less than ½ the previous figures. The overall results for breakbulk cargo are similar to that of TEUs, with the average technical factor per measurement ton dropping by nearly 1/3, however a few routes saw an increase in the breakbulk technical factor.

When compared to Maersk (using published BAF data to estimate Maersk technical factors) the new TEU technical factors are on average lower than the private carrier. While higher on average, in a few lanes, the Maersk technical factor was lower than the new technical factors. As the fuel consumption and transit time data are consistent with industry practice (see "Comparison of Fuel Consumption Factors and Transit Times with Maersk Lines" on page 39), the difference in technical factors can be attributed to the new Input Substitution and Risk Distribution Factors.

The technical factor comparison is limited to those trades or routes studied in 1993. A key point in this new methodology was to calculate technical factors for all USTRANSCOM trades.

The technical factors are calculated in the attached spreadsheet "BAF Calculation 070109." The Green "Trade Technical Factors" tab contains the final technical factors by trade or rote, the blue tabs are fixed variables in the model (Fuel Consumption, Days, Etc.), the red "Volpe Factors" tab contains modifiable cells for the Input Substi-




**Figure 18. Breakbulk technical factor comparison with Substitution and Risk factors = 1.0.**

tution and Risk Distribution Factors while the yellow tabs show sample price data with resulting BAF charges and the technical factor comparisons.

Using the previously described BAF calculation methodology with the recommended input (0.8) and risk (0.75) f^ctors, Table 19 displays the final technical factors for each lane and identified route. The technical factors are reported for TEUs, FEUs, and Measurement Tons. The factors represent the amount of fuel required to move a cargo unit within a trade. In practice, this technical factor, expressed in tons, is multiplied by the price of bunker fuel outside the 20% buffer, resulting in a BAF surcharge in dollars per cargo unit.

## *2.9. References*

A.P. Moller-Maersk A/S, *Annual Report 2008 (English)*, Copenhagen, DK: Moller-Maersk (2009).

A.P. Moller-Maersk A/S, "The Maersk Line BAF Formula and Calculator", Maersk Line, Available at: http://baf.maerskline.com/Forside.aspx (Last Accessed: April 2009).

APL Lines, Inc, "Rates & Tariffs", APL, Available at: http://www.apl.com/cgi-bin/pricing/surcharge.cgi (Last Accessed: April 2009).

Cariou, Pierre, "Liner Shipping Strategies: An Overview," *International. Journal of Ocean Systems Management*, Intersciences Enterprises, 1:1 (2008), pp. 2-13.

**Table 19: Final Technical Factors by Lane, Input Substitution (0.8) and Risk Distribution Factor (0.75)**

| Lane | Lane Description | TEU[a] | FEU[b] | MT[c] |
|---|---|---|---|---|
| 01 | U.S. West Coast - Far East | 0.43 | 0.80 | 0.024 |
| 02 | Continental Europe, United Kingdom, Ireland - Middle East, South Asia, Indian Ocean | 0.53 | 0.98 | 0.024 |
| 03 | U.S. West Coast - Hawaii | 0.22 | 0.42 | 0.007 |
| 04 | Middle East, South Asia, Indian Ocean Interport | 0.25 | 0.47 | 0.012 |
| 05 | U.S. East Coast - Continental Europe, United Kingdom, Ireland | 0.30 | 0.56 | 0.017 |
| 06 | U.S. East Coast - Mediterranean | 0.34 | 0.64 | 0.019 |
| 06A | U.S. East Coast - Western Mediterranean | 0.33 | 0.61 | 0.018 |
| 06B | U.S. East Coast - Eastern Mediterranean | 0.35 | 0.66 | 0.019 |
| 06C | U.S. East Coast - Adriatic | 0.34 | 0.63 | 0.019 |
| 07 | U.S. East Coast - Middle East, South Asia, Indian Ocean | 0.51 | 0.94 | 0.025 |
| 08 | U.S. East Coast - Far East | 0.83 | 1.54 | 0.046 |
| 09 | U.S. East Coast - Hawaii | 0.32 | 0.60 | 0.014 |
| 10 | U.S. Gulf Coast - Scandinavia, Baltic Sea | 0.32 | 0.59 | 0.022 |
| 11 | U.S. Gulf Coast - Continental Europe, United Kingdom, Ireland | 0.34 | 0.64 | 0.018 |
| 12 | U.S. Gulf Coast - Mediterranean | 0.47 | 0.87 | 0.024 |
| 13 | U.S. Gulf Coast - Middle East, South Asia, Indian Ocean | 0.57 | 1.06 | 0.036 |
| 14 | U.S. Gulf Coast - Far East | 0.63 | 1.17 | 0.034 |
| 15 | U.S. Gulf Coast - Hawaii | 0.25 | 0.47 | 0.015 |
| 16 | Hawaii - Far East | 0.59 | 1.10 | 0.022 |
| 17 | U.S. Great Lakes - Continental Europe, United Kingdom, Ireland | 0.33 | 0.62 | 0.015 |
| 18 | Caribbean Interport | 0.01 | 0.02 | 0.001 |
| 19 | Far East Interport | 0.14 | 0.26 | 0.007 |
| 20 | Mediterranean Interport | 0.08 | 0.15 | 0.004 |
| 21 | Canada East Coast - Mediterranean | 0.43 | 0.80 | 0.019 |
| 22 | Canada East Coast - Continental Europe, United Kingdom, Ireland | 0.33 | 0.62 | 0.015 |
| 23 | U.S. West Coast - Continental Europe, United Kingdom, Ireland | 0.79 | 1.47 | 0.035 |
| 24 | Scandinavia, Baltic Sea - Continental Europe, United Kingdom, Ireland | 0.04 | 0.07 | 0.001 |
| 25 | U.S. West Coast - Mediterranean | 0.86 | 1.60 | 0.037 |
| 26 | U.S. West Coast - Alaska | 0.14 | 0.27 | 0.005 |
| 27 | Hawaii - Continental Europe, United Kingdom, Ireland | 0.86 | 1.60 | 0.039 |
| 28 | U.S. West Coast - Central America/Mexico | 0.19 | 0.36 | 0.008 |
| 29 | Alaska Interport | 0.14 | 0.25 | 0.006 |
| 30 | U.S. East Coast - Greenland | 0.29 | 0.54 | 0.013 |
| 31 | U.S. East Coast - Iceland | 0.26 | 0.48 | 0.012 |
| 32 | U.S. East Coast - Scandinavia, Baltic Sea | 0.36 | 0.68 | 0.015 |

**Table 19: Final Technical Factors by Lane, Input Substitution (0.8) and Risk Distribution Factor (0.75)**

| Lane | Lane Description | TEU[a] | FEU[b] | MT[c] |
|---|---|---|---|---|
| 33 | U.S. East Coast - Azores | 0.21 | 0.38 | 0.010 |
| 34 | Continental Europe, United Kingdom, Ireland - Mediterranean | 0.24 | 0.44 | 0.013 |
| 35 | (Reserved) | - | - | - |
| 36 | Mediterranean - Hawaii | 0.72 | 1.34 | 0.039 |
| 37 | U.S. East Coast - Caribbean | 0.07 | 0.12 | 0.006 |
| 38 | (Reserved) | - | - | - |
| 39 | U.S. East Coast - Central America/Mexico | 0.12 | 0.23 | 0.012 |
| 40 | (Reserved) | - | - | - |
| 41 | (Reserved) | - | - | - |
| 42 | U.S. Gulf Coast - Caribbean | 0.10 | 0.19 | 0.007 |
| 43 | U.S. Gulf Coast - Central America/Mexico | 0.16 | 0.29 | 0.010 |
| 44 | (Reserved) | - | - | - |
| 45 | U.S. Great Lakes - Far East | 0.90 | 1.68 | 0.041 |
| 46 | U.S. Great Lakes - Mediterranean | 0.43 | 0.80 | 0.019 |
| 47 | U.S. West Coast - Middle East, South Asia, Indian Ocean | 0.90 | 1.67 | 0.039 |
| 48 | Continental Europe - United Kingdom, Ireland Interport | 0.01 | 0.01 | 0.000 |
| 49 | Far East - Continental Europe, United Kingdom, Ireland | 1.02 | 1.89 | 0.049 |
| 50 | Far East - Mediterranean | 0.82 | 1.52 | 0.034 |
| 51 | Far East - Middle East, South Asia, Indian Ocean | 0.48 | 0.89 | 0.021 |
| 52 | U.S. East Coast - Black Sea | 0.31 | 0.58 | 0.024 |
| 53 | U.S. West Coast - South America | 0.28 | 0.51 | 0.013 |
| 54 | U.S. West Coast - Oceania | 0.48 | 0.90 | 0.019 |
| 54D | U.S. West Coast - Guam | 0.50 | 0.93 | 0.020 |
| 54F | U.S. West Coast - Kwajalein | 0.44 | 0.81 | 0.018 |
| 55 | U.S. East Coast - South America | 0.21 | 0.38 | 0.010 |
| 56 | U.S. Gulf Coast - South America | 0.21 | 0.40 | 0.010 |
| 57 | Mediterranean - Middle East, South Asia, Indian Ocean | 0.31 | 0.58 | 0.018 |
| 58 | Far East - South America | 0.06 | 0.11 | 0.003 |
| 59 | (Reserved) | - | - | - |
| 60 | U.S. East Coast - Africa | 0.30 | 0.55 | 0.025 |
| 61 | Far East - Oceania | 0.16 | 0.30 | 0.007 |
| 61MG | Guam - Okinawa | 0.11 | 0.21 | 0.005 |
| 61MJ | Guam - Singapore | 0.24 | 0.45 | 0.010 |
| 61ND | Guam - Japan | 0.13 | 0.24 | 0.005 |
| 61WL | Guam - Thailand | 0.27 | 0.50 | 0.011 |
| 61ZJ | Guam - Korea (South) | 0.15 | 0.28 | 0.006 |

**Table 19: Final Technical Factors by Lane, Input Substitution (0.8) and Risk Distribution Factor (0.75)**

| Lane | Lane Description | TEU[a] | FEU[b] | MT[c] |
|---|---|---|---|---|
| 62 | Continental Europe, United Kingdom, Ireland - Iceland | 0.09 | 0.17 | 0.004 |
| 63 | Iceland - Mediterranean | 0.25 | 0.46 | 0.011 |
| 64 | Continental Europe - Azores | 0.10 | 0.19 | 0.006 |
| 65 | Central America/Mexico - Continental Europe, United Kingdom, Ireland | 0.41 | 0.77 | 0.019 |
| 66 | Central America/Mexico - Mediterranean | 0.34 | 0.64 | 0.019 |
| 67 | U.S. West Coast - Africa | 0.71 | 1.33 | 0.039 |
| 68 | Central America/Mexico - South America | 0.24 | 0.45 | 0.010 |
| 69 | Central America/Mexico - Oceania | 0.42 | 0.78 | 0.019 |
| 70 | Azores - Mediterranean | 0.11 | 0.21 | 0.007 |
| 71 | Continental Europe, United Kingdom, Ireland - Africa | 0.60 | 1.12 | 0.029 |
| 72 | Continental Europe, United Kingdom, Ireland - Oceania | 0.79 | 1.47 | 0.042 |
| 73 | U.S. Gulf Coast - Africa | 0.48 | 0.90 | 0.028 |
| 74 | Mediterranean - Africa | 0.27 | 0.50 | 0.014 |
| 75 | Africa - Middle East/Persian Gulf/Gulf of Oman | 0.36 | 0.66 | 0.019 |
| 76 | Central America/Mexico Interport | 0.07 | 0.14 | 0.003 |
| 77 | U.S. East Coast - Oceania | 0.71 | 1.32 | 0.041 |
| 78 | U.S. Gulf Coast - Oceania | 0.62 | 1.15 | 0.041 |
| 79 | Hawaii - Oceania | 0.23 | 0.43 | 0.010 |
| 79AG | Hawaii - Kwajalein | 0.19 | 0.36 | 0.008 |
| 80 | Oceania - Middle East, South Asia, Indian Ocean | 0.57 | 1.06 | 0.023 |
| 81 | Oceania Interport | 0.46 | 0.85 | 0.018 |
| 82 | Alaska - Far East | 0.30 | 0.56 | 0.013 |
| 83 | Alaska - Oceania | 0.44 | 0.82 | 0.019 |
| 84 | Caribbean - Central America, Mexico | 0.08 | 0.15 | 0.004 |
| 85 | Hawaii - Middle East, South Asia, Indian Ocean | 1.00 | 1.86 | 0.032 |
| 86 | Mediterranean - Scandinavia, Baltic | 0.18 | 0.33 | 0.009 |
| 87 | Far East - Scandinavia | 0.92 | 1.72 | 0.042 |
| 88 | Continental Europe, United Kingdom, Ireland - Caribbean | 0.26 | 0.49 | 0.016 |
| 89 | Mediterranean - Oceania | 0.60 | 1.11 | 0.035 |
| 90 | Far East - Africa | 0.32 | 0.59 | 0.020 |
| 91 | Alaska - Middle East, South Asia, Indian Ocean | 0.80 | 1.48 | 0.027 |
| 92 | Caribbean - Middle East | 0.52 | 0.97 | 0.037 |
| 93 | Far East - Central America/Mexico | 0.45 | 0.84 | 0.021 |
| 99 | Caribbean - Africa | 0.33 | 0.62 | 0.015 |

a. Technical Factors can be expressed in terms of Tons or Barrels of Fuel (prices quoted in Tons)
b. Incorporates FEU Adjustment Factor of 1.86
c. Technical Factor for breakbulk/RORO cargo expressed per Measurement Ton

Cariou, Pierre, and Francois-Charles Wolff, "An Analysis of Bunker Adjustment Factors and Freight Rates in the Europe/Far East Market (2000-2004)," *Maritime Economics and Logistics*, Palgrave-MacMillan, 8:2 (June, 2006), pp. 187-201.

CMA CGM, Inc., "BAF/CAF Finder", CMA CGM, Available at: http://www.cma-cgm.com/en/eBusiness/BAFFinder/Default.aspx (Last Accessed: April 2009).

Gaffen, David, "As the Values of Their Vessels Sink, Shippers Become Anchored by Debt: Investors Mutiny as DryShips Plans Another Stock Issue," *Wall Street Journal*, (January 30, 2009).

Hapag-LLoyd, Inc., "Ocean Tariff Rates and Surcharges", Hapag-LLoyd, Available at: http://www.hapag-lloyd.com/en/tariffs/ocean_rates_and_surcharges.html (Last Accessed: April 2009).

Menachof, David A., and Gary N. Dicer, "Risk Management Methods for the Liner Shipping Industry: The case of the Bunker Adjustment Factor," *Maritime Political Management*, 28:2 (2001), pp. 141-155.

Miller, John W., "Shippers Taking It Slow in Bad Times: As Volume Drops, Moeller-Maersk Scales Back on Fuel, Napkins and Canal Passages," *Wall Street Journal*, (April 8, 2009).

MOL, "Surcharge Notification", MOL, Available at: http://www.powerinmotion.biz/surcharges/index2.asp (Last Accessed: April 2009).

Nikomboriak, Deuden, "Shipping Cartels: What Can We Do about Them?," *TDRI Quarterly Review*, 19:1 (March, 2004), pp. 7-16.

Regan, Gilbert J., *Report of the Bunker Adjustment Factor/Currency Adjustment Factor Mediation*, Washington, DC: Military Transportation Management Command (December 14, 2000).

Shaham, Vera, *Methodology of Levying Bunker Surcharges*, Haifa, Israel: Israel Shipping Research Institute (June, 1980).

Stoller, Gary, "Jet Fuel's Down, But Surcharges Have Stuck," *USA Today*, (October 29, 2008).

Transpacific Stabilization Agreement, "TSA Bunker Fuel Charges: A Refined Approach", TSA, Available at: http://www.tsacarriers.org/fs_bunker.html (Last Accessed: April 2009).

Varian, Hal R., Intermediate Microeconomics: A Modern Approach, 4th ed., New York, NY: W.W. Norton (1996).

Vidal, John, "True Scale of C02 Emissions From Shipping Revealed: Leaked UN Report Says Pollution Three Times Higher Than Previously Thought," *Guardian, The*, (February 13, 2008).

Westbound Transpacific Stabilization Agreement, "Bunker Charge Fact Sheet (New Formula)", WTSA, Available at: http://www.wtsacarrirs.org/fs_bunker_newformula.html (Last Accessed: April 2009).

Wilson, Wesley W., and Kenneth L. Casavant, "Some Market Power Implications of the Shipping Act of 1984: A Case Study of the U.S. to Pacific Rim Transportation Markets," *Western Journal of Agricultural Economics*, 16:2 (April, 1991), pp. 427-434.

Wright, Robert, "Dead Wait," *Financial Times*, (December 18, 2008).

# 3: Currency Adjustment Factor (CAF)

## 3.1. Introduction

The currency adjustment factor (CAF) came into use in the marine shipping industry during the early 1970s. This followed the demise of the Bretton Woods fixed exchange rate system, after which currencies instead began to "float" freely against one another. Under a floating currency regime, ocean carriers were exposed to new uncertainty due to unexpected price changes resulting from exchange rate volatility. To counter this risk, a CAF surcharge was introduced.

Foreign exchange volatility is of particular concern for businesses that operate and trade internationally. Volatility creates uncertainty for the price of goods or services produced in one currency and sold in another. A depreciation of the currency in which a product or service is consumed, vis-à-vis the currency where it was produced and invoiced, will make this good or service more expensive. Conversely, an appreciation of the currency in which the sales occur will reduce the price. It is important to note, however, that this uncertainty can manifest as either a positive or a negative effect on businesses' costs.

In the case of ocean carriers, (specifically those working with USTRANSCOM) payments are received in one currency (U.S. dollars), while some expenses, in particular foreign port handling charges, must be paid in another currency. Between the time a base (or contract) freight rate for USTRANSCOM is set (in U.S. dollars) and payment is required for services at a foreign location, fluctuations in the price of the currencies can expose an ocean carrier to financial uncertainty.

Depreciation of the dollar relative to the foreign expense currency will raise dollar denominated costs for the ocean carrier. In other words, more U.S. dollars will be required to purchase the foreign based service.[33] An example of this type of change can been seen in the general decline in the value of the U.S. dollar since 2002 relative to the euro, shown in Figure 19, below. This trend will have worsened the terms of trade for goods and services produced in countries using the euro, making them more expensive in U.S. dollar terms.

Exchange rate risk due to variability, however, is not unidirectional and can also potentially benefit businesses engaged in international trade. For example, an appreci-

[33] The cost of a foreign service (e.g. unloading at a port) will have been estimated as part of the base "all in" rate. Thus, the expected foreign cost would have been converted to dollars based upon the exchange rate at the time the cost estimate was made.




**Figure 19. Euros per U.S. Dollar 2002-2007.**

ation in the currency used to price an ocean carrier's base freight rate, relative to the foreign expense currency, will lower the cost for those goods or services purchased overseas. In this case, fewer U.S. dollars will be required to pay for the foreign based service. During the late '90s and early part of this decade the dollar generally appreciated relative to euro; this trend is shown in Figure 20.

While over the long run gains and losses from currency volatility tend to offset, the near-term uncertainty surrounding exchange rates presents a cost to businesses. For example, to protect against unexpected changes in the value of currencies, firms may need to hold reserves of each currency larger than they would need if the exchange rate is fixed. These reserves cannot be applied to more productive purposes and, therefore represent a cost.

Businesses trading internationally commonly utilize currency market mechanisms, generally called hedging, to reduce the risk associated with currency volatility.[34] Another approach to mitigating exchange rate risk is through the adoption of a surcharge, such as a CAF. Through this latter method, firms can move currency volatility risk, either in part or totally, to other parties.

This section of the economic price adjustment study examines the development and use of a CAF within the global shipping industry. The discussion begins with the foreign exchange markets, the determinants of exchange rates and how to measure their volatility. After this, the principles behind the creation of a CAF will be outlined, fol-

[34] Dohring (2008).




**Figure 20. Euros per U.S. Dollar 1998-2001.**

lowed by proposals for an updated methodology and CAF for USTRANSCOM shipments. An overview of carrier CAF methodologies and how to apply the recommended CAF are presented in "CAF Appendix A: Currency Adjustment Factor Methodologies" on page 145.

## *3.2. Foreign Exchange Markets and Currency Volatility*

**Foreign Currency Markets**

Economic theory holds that exchange rates are determined by macroeconomic fundamentals such as money supply, income, and prices. In particular, cross-country differences in these fundamentals will influence the relative value of a currency. For example, the dollar would be expected to depreciate following a relative increase in the U.S. money supply. Trade flows and balance-of-trade deficits also play a role in determining currency prices. In addition, in the same way that unexpected bad economic news can affect the stock market, a similar effect can be seen on an exchange rate if the news affects the expectations of the relative position of two trading economies.

While macroeconomic models can be used to capture longer-term currency trends, freely floating exchange rates are much more volatile than these models predict. Indeed, some economists believe macroeconomic fundamentals are irrelevant in explaining short-term exchange rate changes for low inflation countries.[35] This short-

coming led to an asset approach to modeling exchange rates. Under this methodology, exchange rates are thought to equilibrate trade in international financial markets. The continuous trading and rapid price movements of international financial markets, compared with markets for goods or services, leads to higher levels of exchange rate volatility than would be expected from macroeconomic differences alone.

## Managing Exchange Rate Risk

The uncertainty stemming from exchange rate volatility presents a risk to businesses engaged in international trade. This risk is generally grouped within three categories.

(4) Translation Exposure: This risk comes from changes in assets and liabilities denominated in a foreign currency. As currencies fluctuate, the dollar value of a company's overseas assets will change due to currency volatility, rather than from changes in the company's market position.

(5) Transaction Exposure: The second category of risk arises from uncertainty around the dollar cost of foreign goods or services. For example, a company may establish a contract for future delivery of foreign goods at a set price in a foreign currency. Between the time when the contract is signed and the goods are received and invoiced, the price of the goods in dollars, and hence the cost to the business, will have changed due to exchange rate volatility.

(6) Economic Exposure: This risk is from the uncertainty of the future value of revenues from foreign operations and how this may affect the valuation of the business.

Transaction risk is the one most closely aligned with the focus of this study and the creation of a CAF methodology. Indeed, ocean carriers working with USTRANSCOM face transaction risk from establishing a current dollar price as part of the base freight rate for a foreign good or service, such as port handling, that will be paid for in the foreign currency at a later date. Between the point when the dollar price is set and the foreign good or service must be paid for, movements in the relative exchange rate present transaction risk. A depreciation of the dollar during this period would raise the cost of the services in dollar terms, while dollar appreciation will lower the cost.

Several techniques are available that would allow firms to manage or hedge exchange rate risk. Amongst these is the forward exchange market through which firms can "pre-order" foreign currency at a fixed exchange rate for future delivery. This approach would allow a firm to lock-in the dollar cost of a good or service purchased or provided in a foreign country.

Another method to hedging risk is through using currency options. Using this technique, a firm is given the chance to buy a foreign currency at a future point at a specified exchange rate. If at the future date the cost of the currency is above the option price, then the firm cashes in the option; otherwise the option is not exercised and the firm buys at the current "spot price." Other hedging techniques include the currency

[35] Flood and Rose (1999).

futures market or currency swaps. These mechanisms reduce the risk to firms by setting a price in advance or setting a *maximum* price the firm will incur purchasing foreign currency.

Businesses can also manage exchange rate uncertainty through non-hedging techniques. For example, they can speed up payments in foreign currencies that are expected to appreciate and slow down payments in those currencies expected to depreciate. In addition, firms could move exchange risk to their U.S. clients by invoicing directly in the foreign currency. Or, as is done in the international ocean carrier industry, firms can add a CAF surcharge to their set prices to move exchange rate risk to shippers.

While it is difficult to determine the approach individual firms may take to counter exchange rate volatility, currency hedging is reported as a widely used method of minimizing risk.[36] A limited survey of USTRANSCOM ocean carriers was performed as part of this study to determine how they approach managing currency risk. The sample size, however, was not large enough to confidently infer currency hedging practices and their success and provided a mixed picture on the degree to which USTRANSCOM carriers hedge currency risk. Indeed, one carrier noted they are skeptical as to the benefits of hedging. Nonetheless, there is some evidence that ocean carriers do hedge currency risk. For example, in their 2007 financial report, A.P. Moller-Maersk notes that it uses the forward currency market to partially hedge against exchange rate risk. In their 2008 Interim Report, they also indicate that they use currency hedge contracts to help mitigate the effect of exchange rate risk on their performance results when measured in U.S. dollars. Another example is that of Neptune Orient Lines, which notes in its 2007 Annual Report the use of forward contracts to hedge against exchange rate volatility.

## Measuring Currency Volatility

To be able to develop a methodology for modeling a CAF, it is necessary to measure and quantify exchange rate volatility. This will allow for observing how an exchange rate has varied historically, providing insight into the magnitude of volatility, and by extension, the expected level of trading risk in the foreign currency market.

Exchange rate variability can generally be divided into two components: shorter-term daily or monthly fluctuations and longer-term appreciation or depreciation in exchange rate prices. Figure 21 shows the month over month percent changes in the value of the U.S. dollar relative to the British pound. The series shows monthly short-term volatility around a point close to but just greater than zero, a sign of the underlying drift or long-term depreciation of the U.S. currency.

Longer term currency drift can be seen more clearly through using year-over-year percent changes in the dollar/pound exchange rate, with the movement from a central value being more pronounced. This is shown in Figure 22, below. During the period under observation, the dollar has gone through years of either relative depreciation or appreciation.

---

[36] Dohring (2008).




**Figure 21. U.S. Dollars per GB Pound 1993-2007 (Monthly Percent Change).**




**Figure 22. U.S. Dollars per GB Pound 1993-2007 (Annual Percent Change).**

There is no unique or standardized way of measuring exchange rate volatility.[37] The choice of measurement methodology depends to some extent on the purpose of the analysis, the time frame under consideration and whether volatility is being measured against an expected value, such as the mean, or as percent changes. Nonetheless, a review of the academic literature on exchange rate volatility provides guidance on how to proceed.

A common approach used in capturing exchange rate volatility is done through measuring the standard deviation of the change in the monthly exchange rate, which is often expressed in logarithms.[38] This measures the dispersion of the exchange rate around a central value and is calculated for a sample as:

$$s = \sqrt{\frac{\sum_{i=1}^{n}\left(x_i - \bar{x}\right)^2}{n-1}}$$

where:

s = sample standard deviation
n = sample size
$x_i$ = $i^{th}$ observation
$\bar{x}$ = mean

Taking this measure over a one year period provides a view of short-term volatility, while a five year period captures long-run variation.

Other approaches include using the standard deviation of the monthly percent change in the exchange rate, obtaining the standard deviation, or the error, from a log-linear trend, or first-order autoregressive equation of the exchange rate.[39] In a working paper on exchange rate volatility and economic growth, the square root of the sum of the squared mean and squared standard deviation from the percent change of the exchange rate are used to measure volatility.[40] Outside of the standard deviation, methodologies such as the coefficient of variation and GARCH models have also been used to measure or estimate exchange rate volatility.[41]

Another important consideration for measuring currency volatility is the frequency of the series being examined. Commonly daily, monthly, or annual exchange rates are used. The measure of volatility will vary greatly depending on the frequency of mea-

---

37 Bartolini and Bodnar (1995).
38 Clark et al. (2004)
39 Kenen and Rodrik, (1986)
40 Schnabl (2007).
41 Generalized AutoRegressive Conditional Heteroskedasticity models are an econometric technique that use the variance of the error term as part of the estimation process, allowing for swings and cycles in the data.

surement as what looks like a large degree of change over the course of a day can in actuality be small when seen over the course of the year. Figure 23 to Figure 25 demonstrate this by looking at the movement of the British pound over the course of a day (January 29, 2009), a month (January 2009), and over a multi-year period (2006-2009). The rectangles in the latter two figures represent the size of the volatility experienced in the previous figure, notably small in comparison to the price changes over the larger period.



**Figure 23. British Pounds per Dollar (every 5 minutes), January 29, 2009**



**Figure 24. British Pounds per Dollar (daily), January 2009**

When selecting an appropriate methodology of volatility measurement for use in this study, it is important to capture the nature of the contracting process under which a



**Figure 25. British Pounds per Dollar (Monthly), 2006-2009**

CAF applies. For the current USC-06 contracting process, a baseline currency rate is set prior to the implementation of the actual carrier base rates. This baseline is the level from which changes in currency rates are measured and could remain in force for up to 17 months at the start of the contract and then for possibly one year periods thereafter. Any measure of volatility would have to be able to capture the risk from exchange rate fluctuations within a discrete 17-month or one year period. For this analysis, the choice of frequency should be consistent with the measure used to determine movements in the exchange rate relative to the base rate. Since USTRANSCOM uses average monthly exchange rates for this process, this would be the appropriate frequency to use.

## *3.3. Industry CAFs and Developing a USTRANSCOM CAF*

**Key Components of a CAF**

A review of CAF literature, industry practice, and interviews with current USTRANSCOM carriers provided insight into the key components of a CAF. Central amongst these is the establishment of a baseline exchange rate against which currency fluctuations can be measured. This element was part of the methodology presented by O'Brien in his 1980 paper on CAF methodologies.[42] More recently, Röhlig established a baseline rate for a quarterly contract, which is based on monthly exchange rates.[43] A similar method is used by shipid.com, whereby the baseline exchange rate is calculated as the average of the three months prior to the current month.[44] The

[42] T.R. O'Brien, (1980).

[43] http://www.rohlig.pl/index.php?id=dodatekwalutowy&L=1.

logistics company Raben Sea & Air uses the average exchange rate from the prior year as the baseline currency rate. The current average monthly rate is then used to determine changes in the currency relative to the base rate.

The setting of a baseline rate allows the carrier to establish the expected cost, both in local (foreign) and base freight rate currency, for services performed in foreign countries at a later date. Volatility in the exchange rate during a contract period can then be measured against this baseline rate. It is worth pointing out that the longer the base rate remains in effect the higher the risk of unpredictable exchange rate movements.

The introduction of the CAF was intended to reduce the risk faced by carriers from financial loss due to currency fluctuations. To this extent, some of the CAF examples reviewed were based on methodologies that resulted in shippers assuming the entire risk for all of the currency volatility. By shifting the exchange rate volatility burden to the shipper, it is being assumed that the carrier is unable to reduce some of this currency risk through hedging techniques or by changing business operations.

Given that carriers operate in a global environment, they will have experience in dealing with foreign exchange markets. Through buying and selling currencies as part of their operations they are already positioned as players in the international currency markets. This familiarity will provide them with the ability and opportunity to identify market volatility and hedge against currency movements using forward markets or other techniques.

In contrast, shippers, such as USTRANSCOM, are not in a comparable position from which to manage exchange rate risk. Subsequently, they should not be expected to bear the *entire* risk of currency fluctuations. Moreover, carriers have the ability to make changes to operational practices that influence their exchange rate risk (e.g., adjusting transhipment ports, location of suppliers, timing/details of contracts, etc) and should bare some of the risks accordingly.

Any CAF methodology should include a mechanism acknowledging the positions of carriers and shippers relative to foreign exchange markets. This can be done through establishing a buffer zone around a central currency level and/or a risk-sharing factor. The buffer zone should reflect normal deviations, as observed historically, in the exchange rate around the baseline. Carriers engaging in normal business operations can identify and hedge (at their discretion) against the risk from typical or normal currency fluctuations. Therefore, a CAF would not apply within this buffer zone. Outside of this zone, where currency volatility and risk becomes more atypical and harder to effectively hedge against, the burden of risk can then be spread across both carrier and shipper through the application of a CAF with a risk-sharing factor. Furthermore, the inclusion of a buffer zone, with an upper and lower band, is consistent with FAR and DFAR regulations for the application of Economic Price Adjustments.[45]

---

[44] http://www.shipid.com/surcharges/CAF.htm.

[45] FAR: Subpart 16.2-Fixed-Price Contracts, DFAR 216.203- Fixed-price contracts with economic price adjustment.

The last component of a CAF methodology requires an adjustment, or "technical factor," for the level of shipping costs invoiced in a foreign currency. Since the CAF relates to changes in foreign currencies, it should not apply to the entire base freight rate, but rather only to costs whose dollar value is at risk from currency volatility. This adjustment can be made through determining the ratio of foreign costs for items such as port handling charges relative to the base freight rate. While it is not clear whether all carriers include a technical factor, this type of adjustment is made by both Raben Sea & Air and Röhlig in their CAF methodology.

Finally, there appears to be a movement towards simplifying the CAF through the use of a currency basket. This method is used by Hapag-Lloyd and Maersk in their CAF calculations. Both of these carriers use currency baskets that are matched to trade lanes. The current USTRANSCOM CAF formula focuses on four major currencies, and any thought given toward expanding this number should be done in light of an industry trend towards simplification.

### Developing a CAF Methodology

The three CAF components discussed in the previous section form the basis for developing a CAF methodology. For the purpose of analyzing and developing a CAF, daily currency data—expressed in dollars per foreign currency unit—were acquired from the Pacific Exchange Rate Service website.[46]

These data run from September 1992 through February 2009, allowing for examination of currency fluctuations through two business cycles, including the recent financial crisis.

### Choosing the Right Currencies

Currently, USTRANSCOM computes a CAF for only four currencies, the euro,[47] the British pound, the Japanese yen, and the Korean won. These adjustments apply only on the lanes that involve these counties (portions of 01, 05, 08, 11, 12, 14, 23, and 45), leaving 100% of the currency risk with the carriers for all other countries and currencies. In reviewing the CAF, this report will update the list of currencies and countries considered for adjustment and will allow the variables in the CAF to vary across currencies (or groups of currencies) to reflect local (regional) conditions and expectations of currency risk. While introducing more currencies may be seen to increase the complexity of the CAF, the current implementation leaves the carriers responsible for all risk on over 70% of all traffic. Thus, the goal will be to find the *optimal* number of currencies and calculations, taking into account the cost of complexity, rather than merely finding the simplest method overall.

USTRANSCOM sends and receives goods from over 120 different countries using nearly 100 different currencies. Maintaining a CAF for each of these using the current staffing and infrastructure would be onerous and potentially fruitless, as 20 countries constitute over 90% of USTRANSCOM's trade and 30 countries average less than

46 Before issuing euro's in 1999 the exchange rate for the European Monetary Union countries was measured through the ECU.

47 CAF is charged for shipments to Germany, the Netherlands, Belgium, Spain, and Italy within the Eurozone. Consequently, prior to the euro's introduction in 1999, there were additional currencies involved in the CAF.

one shipment a year. Furthermore, USTRANSCOM maintains over 435 routes (region to region pairs), where each route may include multiple currencies. Even though these routes condense down to 72 lanes, monitoring and updating a CAF system at the lane level would still require more effort than would be worthwhile.

In order to attain an optimal process, the countries must be further grouped and generalized. As part of this rationalization process, it was first decided, with agreement from USTRANSCOM, to apply a CAF only on shipments that either begin or end in CONUS. This covers over 80% of all USTRANSCOM traffic and significantly reduces the complexity of the CAF computation formulas. Second, the 72 lanes appearing in IBS data are consolidated into nine "superlanes" roughly corresponding to the world's continents. As can be seen in Table 20, below, three superlanes (Eastern

**Table 20: USTRANSCOM OCONUS Trade by Superlane**

| Superlane Name | % of Trade |
|---|---|
| Eastern Asia | **19.10%** |
| Oceania | 4.39% |
| Western Indian Ocean | **59.04%** |
| Africa | 0.34% |
| Caribbean | 2.79% |
| Central America | 1.05% |
| Europe/North Africa | **12.85%** |
| South America | 0.25% |
| Black Sea | 0.20% |

Asia, Western Indian Ocean, and Europe/North Africa) make up over 90% of USTRANSCOM OCONUS trade.[48]

To simplify implementation of the CAF, and recognize the fact that many low-volume routes have prices negotiated *ad-hoc* on a per-shipment basis, the CAF will only be applied in the three superlanes, Eastern Asia, Western Indian Ocean and Europe/North Africa, making up more than 90% of CONUS/OCONUS shipments.

Within each of these superlanes, the number of currencies used at OCONUS ports ranges from 12 to 16. Most of the trade, however, is concentrated in small groups of three to seven of these currencies. For example, Table 21 shows the breakdown of traffic by currency for the Eastern Asia superlane. Note that trade within this superlane is concentrated in two currencies: the yen and won with only one more (Singapore dollar) making up a noticeably large portion of the trade.

[48] This trade, then, constitutes over 73% of total USTRANSCOM trade.

**Table 21: Trade by Currency within the Eastern Asia Superlane**

| Currency | Number of Shipments | % of Superlane Trade |
|---|---|---|
| Chinese yuan | 4 | 0.02% |
| Indonesian rupiah | 3 | 0.01% |
| Japanese yen | **13,331** | **64.39%** |
| Cambodian riel | 4 | 0.02% |
| Korean won | **5,846** | **28.24%** |
| Malaysian ringgit | 8 | 0.04% |
| Philippine peso | 88 | 0.43% |
| Russian ruble | 1 | 0.00% |
| Singapore dollar | **1,258** | **6.08%** |
| Thai baht | 108 | 0.52% |
| Taiwanese dollar | 47 | 0.23% |
| Vietnamese dong | 4 | 0.02% |

Within each superlane, only currencies that make up over 1% of the superlane's movements were retained, for a grand total of 17 currencies over three superlanes.[49] The relative percent of superlane trade by currency was recomputed from this smaller set of shipments, and will be used as a weight for currency-specific factors when aggregating over a superlane. This allows the heterogeneity of the various currencies to be included within the formula while preventing a single lesser-used currency from skewing the results. The weighting for each of the currencies appears in Table 22.

[49] This process retained over 98% of the movements within each superlane. Thus, after all simplifications, currencies included in the CAF calculations compromise 89.8% of CONUS/OCONUS movements and 72% of total USTRANSCOM movements.

**Table 22: Currency Weights by Superlane**

| Superlane Name | % of Trade | Currency | Currency Name | Weight |
|---|---|---|---|---|
| **Eastern Asia** | **19.10%** | JPY | Japanese yen | 0.652 |
| | | KRW | Korean won | 0.286 |
| | | SGD | Singapore dollar | 0.062 |
| **Western Indian Ocean** | **59.04%** | AED | United Arab Emirates dirham | 0.034 |
| | | BHD | Bahraini dinar | 0.024 |
| | | DJF | Djibouti franc | 0.016 |
| | | JOD | Jordanian dinar | 0.032 |
| | | KWD | Kuwaiti dinar | 0.609 |
| | | PKR | Pakistani rupee | 0.231 |
| | | QAR | Qatari rial | 0.054 |
| **Europe/North Africa** | **12.85%** | EGP | Egyptian pound | 0.026 |
| | | EUR | euro | 0.773 |
| | | GBP | pound sterling | 0.068 |
| | | ILS | Israeli new shekel | 0.017 |
| | | NOK | Norwegian krone | 0.014 |
| | | PLN | Polish zloty | 0.010 |
| | | TRY | Turkish lira | 0.092 |

## Currency Baseline and Carrier Base Rates

A baseline rate provides the benchmark against which currency fluctuations are measured. This rate represents what the expected exchange rate will be during the pricing term. Carriers bid their all-in price (base rates) assuming the currency will remain constant at the baseline throughout the period. The CAF is then designed to compensate for some or all of the variation from this base rate. Thus, the method of calculating a baseline and the frequency of updating it represent important parts of the CAF methodology that cascades throughout the rest of the calculations.

The industry tendency is to set a base rate somewhere between two and four months ahead of the month in which a shipping contract is made. In the case of USTRANSCOM, base rates and baselines are established on a yearly basis, with a five month lag between bids and the beginning of the rate period, so the rate can be up to 17 months old.

The other factor to consider is how the CAF baseline rate is calculated. This could be done through selecting a single day's exchange rate or taking an average rate. Within the carrier industry, a monthly average appears to be prevalent, but in one case a carrier uses a three-month moving average. The current USTRANSCOM contract calls for using a daily spot rate for the baseline.

It is suggested, however, that the average exchange rate from the month prior to bidding be used in lieu of the current daily spot rate. This is both consistent with general industry practice and helps smooth the daily fluctuations across a month, reducing the chance of selecting an outlier as the baseline exchange rate.

This study examines the current USTRANSCOM contracting procedure where a baseline and base rates are set yearly with a five-month delay before taking effect. It also investigates how the situation would change if the delay is shortened and/or the rates are re-based more frequently. As will become evident in the section on the buffer zone, below, re-basing less frequently than currently done is not recommended.

## Measuring Volatility and Establishing a Buffer Zone

Analyzing and understanding exchange rate volatility is a central focus of creating a CAF methodology. In particular, this step will provide the statistical groundwork from which a buffer zone around the CAF can be established.

The currency volatility measure will need to be consistent with the process by which the contracting period and base rate for USTRANSCOM are set. This is important as the period during which the base rate remains in force will influence how a carrier will view and hedge against the potential level of exchange rate volatility. At one extreme, a risk-averse carrier could essentially purchase currency at the baseline price to cover the expected future foreign currency expense, eliminating all currency risk. On the other hand, a less risk-averse carrier would determine the expected or normal deviation of the exchange rate during the contracting period and hedge accordingly. The volatility measure will therefore need to describe the transaction risk associated with the contracting period and have a proxy for the baseline to reflect how carriers will observe the foreign exchange market.

To this end, the measure of exchange rate volatility used in the CAF calculation is the standard deviation around the expected, or mean, exchange rate value over 17 months. This measure is calculated for sequential 17-month periods beginning in March 1993 and running through February 2009, providing 16 discrete observations of the expected value of the currency and the associated volatility. Through this measure, the standard deviation represents the typical deviation around the mean, which can be viewed as a proxy for the baseline, and so provides the bounds for the buffer zone. Using the mean as a proxy baseline is done so that analysis of the buffer zone is not dependent on a particular method for setting the baseline.

To provide the largest possible sample size, the average daily rate is used for this analysis when computing the mean and standard deviation. To obtain a single volatility measure, the 80th percentile value standard deviation is selected for each currency. Doing this allows for capturing 80% of the observed values and excluding any outliers that could potentially skew the analysis. These outliers should be considered the events for which the entire concept of the CAF was created, and thus, the CAF should apply at these times.

This volatility calculation was then repeated for discrete fifteen-, nine-, and six-month periods. Each of these repetitions assumes that the bidding and acceptance process can be reduced to three months (from the current five). As a result, the 15-month period represents the same underlying concept of a one-year contract as the current 17-month period, but with a shorter bidding/acceptance process.

## Currency Analysis Results

As intuition would suggest, in general the longer the time frame being examined the larger the expected level of currency fluctuation. As presented in Table 23, below, the 80th percentile of the standard deviation across all 17 currencies, which measures transaction risk, generally decreases or stays stable as the total effective contract time

falls. This clearly shows that a longer contracting period increases currency volatility and transaction risk. (Note: The low volatility across all time frames shown by a number of currencies in the Western Indian Ocean superlane, such as the Kuwaiti dinar and the United Arab Emirates dirham, reflects the fact that their values are held "fixed" relative to the U.S. dollar by their respective governments).

**Table 23: Currency Volatility Measurements**

| **Bid Processing** | **5 Months** | **3 Months** | | |
|---|---|---|---|---|
| **Total Effective Time** | **17 Months** | **15 Months** | **9 Months** | **6 Months** |
| **Japanese yen** | 7.04% | 6.72% | 5.15% | 3.99% |
| **Korean won** | 16.21% | 6.70% | 5.50% | 4.61% |
| **Singapore dollar** | 3.95% | 3.75% | 3.27% | 1.83% |
| **United Arab Emirates dirham** | 0.24% | 0.21% | 0.22% | 0.21% |
| **Bahraini dinar** | 0.23% | 0.21% | 0.22% | 0.21% |
| **Djibouti franc** | 0.00% | 0.00% | 0.00% | 0.00% |
| **Jordanian dinar** | 0.80% | 1.09% | 1.05% | 0.70% |
| **Kuwaiti dinar** | 1.85% | 0.89% | 0.88% | 0.62% |
| **Pakistani rupee** | 6.93% | 6.73% | 4.43% | 3.51% |
| **Qatari rial** | 1.98% | 2.56% | 1.97% | 1.18% |
| **Egyptian pound** | 6.58% | 3.45% | 3.50% | 2.99% |
| **euro** | 6.85% | 5.36% | 4.10% | 3.43% |
| **pound sterling** | 4.25% | 3.70% | 3.24% | 2.83% |
| **Israeli new shekel** | 6.02% | 4.84% | 4.61% | 3.07% |
| **Norwegian krone** | 6.60% | 6.10% | 3.85% | 3.33% |
| **Polish zloty** | 9.40% | 9.42% | 5.71% | 3.89% |
| **Turkish lira** | 23.16% | 22.92% | 14.30% | 9.59% |
| | | | | |
| **Global Median** | **6.02%** | **3.75%** | **3.50%** | **2.99%** |

These data indicate that for a contracting period that lasts 17 months, the normal level of currency fluctuations for the yen would fall within a band of plus or minus 7.04% around the mean (or baseline). For countries with a floating exchange rate (loosely defined), these buffers are generally in line with, though a bit lower than, USTRANSCOM's current 10% buffer zone. Figure 26 shows an example of the buffer zone applied to the yen for an 17-month period starting in 2000. The currency fluctuates around the base rate, assumed to be the exchange rate in November 1999, with the variation broadly canceling out.




**Figure 26. Single 17-Month Contract Period (yen)**

Note that in this, and similar figures, when the solid black line dips below the lower buffer, the foreign currency has *appreciated* in value and so CAF payments would be sent to the carriers. Conversely, when the currency is above the high buffer, USTRANCOM will receive CAF payment from carriers due to the *depreciation* of the foreign currency.

Examining the application of the buffer zone across a longer period provides insight into how currency volatility will tend to cancel out in the long run. Figure 27 shows the dollar cost of the yen from 1998 through 1999, with a 7.04% buffer zone. The buffer zone represents a 17-month contracting period, with the base rate set five months prior to the contract coming into force. The contract rate then stays active for 12 months before being updated, along with a new base rate. In this case, it can be seen that even when payments occur, over time they begin to cancel out as well.

Shorter contracting periods would suggest a narrowing of the yen buffer zone to 6.72% for 15 months, 5.15% for nine months, and 3.99% for six months. Recall that each of these contracting periods (except the 17-month period) assumes a three-month window at the start, during which time the new contract freight rates are presented by the carriers, accepted by USTRANSCOM and then entered into IBS. In other words, the nine-month time period assumes freight rates will be in place for six months following a three-month preparation period.

Each currency's buffer zone is then weighted by the superlane weights listed in Table 22, above, to come up with a total buffer zone to apply within the superlane.[50] These buffers are listed in Table 24.




**Figure 27. Two 17-Month Contract Periods (yen)**

**Table 24: Provisional Buffers by Superlane**

| Bid Processing | Total Effective Time | CAF Buffer by Superlane (provisional) | | |
|---|---|---|---|---|
| | | Eastern Asia | Western Indian Ocean | Europe / North Africa |
| 5 Months | 17 Months | 9.48% | 2.87% | 8.19% |
| 3 Months | 15 Months | 6.53% | 2.28% | 6.87% |
| | 9 Months | 5.13% | 1.71% | 4.99% |
| | 6 Months | 4.04% | 1.28% | 3.95% |

Figure 28 shows the dollar cost of the euro from 1993 through early 2009, with the updated 8.2% superlane buffer zone (but using the existing one-day base rate and five-month processing time). The buffer zone represents a 17-month contracting period, with the base rate set five months prior to the contract coming into force. The contract rate then stays active for 12 months before being updated, along with a new base rate. Around 14% of the time the euro depreciated outside of the buffer zone, while also 15% of the time the currency was outside of the zone due to appreciation. The relatively small difference in deviations outside of the buffer zone highlights the tendency for currency fluctuations, and subsequently CAF payments, to even out over the long-term.[51]

[50] Note, the CAF only applies to the 17 currencies listed, not other currencies within the superlane.




**Figure 28. Consecutive 17-Month Contract Periods 1993-2009 (Euro).**

Figure 29 repeats the exercise from Figure 28, but with a nine-month time period (i.e., rates bid twice a year in December and June, effective from October to February and March to September). In this new example, the buffer zone more closely tracks the actual exchange rate while also ensuring compensation for substantial changes more frequently. For example, with the 17-month buffer, carriers were not compensated during much of the increase of the euro from 2006 until mid-2008 while USTRANSCOM is not reaping the gains from the appreciating dollar since then. In the nine-month regime, carriers would have been able to set prices to keep pace with the falling dollar and USTRANSCOM would receive compensation for its rapid recovery.[52]

Even the nine-month regime will not be able to perfectly track changes in exchange rates due to the delays in processing (even when reduced to three months) and in posting upcoming rates. The baseline is necessarily set prior to the processing period, causing this delay.

It should also be noted that the smaller time frame (and smaller buffer zone) in the recommended methodology will increase the frequency with which a CAF is applied (though the size of payments will be somewhat smaller). Rather than a concern, this is a demonstration of the effectiveness of the CAF in truly compensating for the severe

[51] Note, that in this and similar graphs, the baseline (and resulting buffers) rate will be from the final month of bidding. The monthly average exchange rate is from two months prior to the "present" to allow for collection and posting of updated rates.

[52] Graphs for each of the currencies and time periods appear in "CAF Appendix B: Individual Currency Figures over Varying Contracting Periods" on page 147.




**Figure 29. Consecutive Nine-Month Contract Periods 1993-2009 (euro).**

currency changes that sometimes occur, while allowing prices to remain as stable as practicable over a given period.

### Addressing Dominant Exchange Rates

The creation of the buffer zone is done on a trade-weight basis. While this methodology is robust to USTRANSCOM's trade patterns and currency volatility, it doesn't capture instances whereby a single currency can skew the size of a superlane buffer zone. This could happen in cases where the majority of trade in a superlane goes to a country with a comparatively stable (or even a fixed) exchange rate. In this case the buffer zone would be overly narrow and not reflect the higher variation in the other currencies. To avoid rendering the CAF irrelevant in these circumstances, a second constraint to the buffer size is being applied. This additional constraint requires that the buffer for the superlane must also be greater than the median buffer size of the 17 individual currencies. Thus, the rule for choosing buffer size shall be the greater of either the weighted buffer by superlane or the median value across all 17 currencies.

Table 25 shows the median buffer zone for each contracting period. Table 26 is the

**Table 25: Global Median Buffer Zone by Contracting Time**

| Bid Processing | 5 Months | 3 Months | | |
|---|---|---|---|---|
| Total Effective Time | 17 Months | 15 Months | 9 Months | 6 Months |
| Global Median | 6.02% | 3.75% | 3.50% | 2.99% |

**Table 26: Final Buffers by Superlane**

| Bid Processing | Total Effective Time | CAF Buffer by Superlane | | |
|---|---|---|---|---|
| | | Eastern Asia | Western Indian Ocean | Europe / North Africa |
| 5 Months | 17 Months | 9.48% | *6.02%* | 8.19% |
| 3 Months | 15 Months | 6.53% | *3.75%* | 6.87% |
| | 9 Months | 5.13% | *3.50%* | 4.99% |
| | 6 Months | 4.04% | *2.99%* | 3.95% |
| Note: Cells in *italics* indicate the worldwide median was used. | | | | |

final set of superlane buffer zones reflecting the double constraint. As can be seen, only the Western Indian Ocean superlane is subject to this second constraint.

## Foreign Currency Expenses

The final component of a currency adjustment factor is a technical factor allocating the level of costs in the base freight rate requiring payment in foreign exchange. Typically this relates to the services paid for at foreign ports where cargo is loaded or unloaded. Specific industry information on this topic was hard to obtain, although Hapag-Lloyd indicated that around 5% of their shipping costs are in foreign currency. In addition, discussion with Maersk as part of this study indicated that around 10-15% of costs are for port or short inland movements of goods invoiced in a foreign currency. Maersk's liner service reported that they spent around 21% of total costs on terminal services across the globe in 2007, although how much of this was non-dollar denominated was not disclosed.[53] Since this figure includes U.S. activities as well as those in foreign ports, it is not a strictly accurate measure of exposure to foreign currency costs. Still, it does provide insight into the total magnitude of port costs relative to carrier costs.

A review of the carrier offers data contained within the Integrated Booking System revealed little in the way of useful information on the level of foreign costs. The base freight rates provided by the carriers are "all in," including services that require payment in foreign currency. This does not allow for isolating the percentage of the

---

[53] 2007 Financial Report.

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 630 of 794



base freight rate that would be for foreign services and require payment in a foreign currency.

With a lack of exact or primary source information on the level of foreign currency expenses, the development of the technical factor was done in a manner similar to the 1993 Volpe EPA study. In this previous study the technical factor was created through first estimating the composition of shipping costs being borne by carriers. These costs included direct voyage costs (e.g., bunker fuel and port handling charges) along with capital expenses (i.e., vessels), administrative costs and an allocation for profit. It is assumed that these costs, and their relative ratios, will be reflected in base freight rate offers made for moving USTRANSCOM freight.[54] These same four categories are used in the current study. The relative shares of these values were determined through USTRANSCOM carrier interviews, shipping company financial reports and presentations, and academic literature. From these data a percentage cost for foreign currency expenses was then estimated.

While carrier interviews were highly instructive, they were limited in depth and by which carriers participated. This presented a fairly broad range for foreign costs as a percentage of the base freight rate. As noted earlier, Hapag-Lloyd indicated that around 5% of their shipping costs are in foreign currency, while APL put foreign side port costs up around 20%. Maersk indicated that around 10-15% of their base rate costs are for port or short inland movements invoiced in a foreign currency. In contrast, the carrier ARC noted that more than 50% of their port, cargo and agency expenses are incurred in foreign currency.

In support of this anecdotal evidence, the top 20 ocean carrier financial reports were reviewed for information on disaggregated cost information. While the majority of carriers do not provide a detailed break-out of voyage and vessel costs, financial reports from three carriers, Maersk, COSCO and NYK line, provided some useful information. For example, in its 2008 financial report, Maersk notes around 21% of unit costs in both 2007 and 2008 were associated with terminal costs, although how much of this was non-dollar denominated was not disclosed. NYK line published what appeared to be vessel operation cost details between 1998 through 2009. Examining these data for the most recent five years to capture operational activity during a period of rising oil prices and enhance comparability of the data with other carriers shows port charges averaging around 16% of voyage operating expenses. Since it wasn't entirely clear whether the NYK data were exclusively related to container shipping it was not used in the final CAF technical factor model. A test of the difference between including and excluding these data in the model showed almost no variation.

Additional information was also obtained from a 1983 paper by J.E. Davies.[55] In this article the unit-cost structure for three separate container companies is detailed. These companies represent a small container shipping firm serving trades from Europe to

[54] The technical factor methodology assumes that foreign currency costs primarily relate to services paid for at a foreign port for the loading or unloading of cargo. They do not include the cost of moving freight inland from the foreign port.

[55] J.E. Davies (1983).



DA11628

East Mediterranean, South Africa, and Australia, a large carrier operating routes in the North Atlantic and a large carrier providing service from Europe to the Far East. Information on their cost structure was broken out by items such as terminal, port, fuel, vessel, and administration. From this study terminal costs represented around 23% of total operating costs. A July 2008 report published by American Shipper also provided details on container shipping industry cost structure.[56] This publication indicated that vessel operating costs amounted to 50% and terminal handling charges 17% of total costs.

Using these data, averages for the key costs centers identified by the 1993 report were calculated and then used to re-estimate the technical factor model. Since the information obtained from carrier financial reports and other sources on shipping costs did not include a measure for profits, a 5% level is assumed; the model was also estimated with 10% and 0% profits, the latter of which is consistent with the data collection method and may be reflective of the current slump in trading conditions. When adding a profit measure, unit cost percentages were adjusted to ensure they added to 100.

Using the new data sourced for this study, the average shipping unit cost structure was calculated and is shown in Table 27.

**Table 27: Average Cost Structure for an Ocean Carrier**

| Carrier Cost Structure | Scenario 1 | Scenario 2 | Scenario 3 | Average |
|---|---|---|---|---|
| Direct Voyage Cost | 67% | 64% | 60% | **64%** |
| Capital Expenses | 24% | 23% | 22% | **23%** |
| Administrative Costs | 9% | 8% | 8% | **8%** |
| Profit | 0% | 5% | 10% | **5%** |

From the carrier data, the average terminal cost is estimated at approximately 21% of direct voyage costs (compared to 25% in the 1993 study). Multiplying the direct voyage cost ratio by the average terminal cost provides an insight into the percentage of costs that are incurred at ports. This calculation results in a technical factor approximately equal to 14%, which is relatively consistent with the 15% value currently being used by USTRANSCOM in USC-06.

No distinction is yet being made in this methodology, or the previous 1993 version, as to whether terminal costs accrue at U.S. or foreign ports. Presumably, the costs incurred at the CONUS side of the voyage are in U.S. dollars and not subject to a CAF. A review of the academic literature revealed little useful empirical analysis on port cost differences. While some papers examine the relative efficiencies of U.S.

[56] Insomnia, Why Challenges facing the world container shipping industry make for more nightmares than they should. July 2008, By MergeGlobal Value Creation Initiative, published by American Shipper.

ports *or* foreign ports, either through quantitative or qualitative measures, they do not provide insight into cost structure differences that may result from labor, capital spending, regulation, government subsidies, negotiated contracts etc. Thus, splitting this cost in half would appear to be appropriate. Indeed, it is reasonable to assume that in some cases U.S. port costs may be higher than at foreign ports, while other cases may be less expensive. As a result, the proposal is to establish the technical factor for the CAF at 7%.

**Risk Sharing Factor**

Like the BAF and FAF, the CAF is a mechanism for risk distribution. As currently established, outside of the buffer zone the CAF provides full compensation to the carriers for unexpected currency changes. This risk sharing structure does not completely account for the relative market position of USTRANSCOM and ocean carriers. As noted earlier in this discussion, carriers are in a relatively stronger position from which to manage exchange rate risk through the use of currency hedging tools. If this position allows carriers to still manage some of the exchange rate risk, even outside of the CAF buffer zone, then they should bear a larger proportion of risk. On the other hand, if this risk is largely deemed to be outside the control of any one party, then USTRANSCOM can bear more of this risk.

The risk sharing factor will assign some portion of the risk to each party. How this risk will be distributed is subject to negotiation and USTRANSCOM policy. The factor itself can vary between 100% (the current default) under which USTRANSCOM shoulders the entire risk from currency fluctuations outside of the buffer zone. At the other extreme, a value of 0% would place the entire currency risk onto the carriers.

## *3.4. Conclusions and Recommendations*

The CAF section of this study reviewed and updated the current methodology being utilized by USTRANSCOM for this economic price adjustment. The proposed methodology moves toward general industry practices in some aspects, notably in more frequent price adjustments, but continues to retain some unique qualities, including the symmetrical buffer zone.

The USTRANSCOM CAF includes a symmetric buffer zone, which does not always appear to be the case in broader industry practice. The inclusion of this element, however, is reflective of the fact that such adjustment factors are designed to compensate for unexpected changes in exchange rates, which are equally likely to favor either party. The buffer zone protects USTRANSCOM from the risk of typical exchange rate volatility, which carriers, who trade in foreign currency markets, are positioned to guard against through hedging techniques if they choose. Atypical volatility, which is outside this buffer zone, is shared between both parties. Furthermore, this characteristic is consistent with the FAR and DFAR regulations.

Based on historical trade patterns, the application of the CAF is broken into three superlanes that capture 90% of USTRANSCOM's CONUS/OCONUS freight movements. The buffer zone for each trade lane is calculated as a trade weighted average of exchange rate volatility. To prevent a superlane from being dominated by a heavily trade-weighted fixed exchange rate, a minimum buffer width equal to the median worldwide buffer is applied to each lane. Once outside of the buffer zone a CAF will become applicable for shipments. The key currencies that are eligible for a CAF, based on trade activity, are also identified. In total there are 17 currencies included in the CAF calculations.

The period during which the USTRANSCOM CAF remains in force, up to 17 months, is longer than the industry norm. This is a function of the nature of USTRANSCOM contracts. The length of these contracts affects the size of the buffer zone, as longer time frames are consistent with higher levels of expected currency volatility. An examination of exchange rate data indicates that the base buffer zone for a 17-month period should be set at 9.5% for the Eastern Asia superlane, 6.0% for Western Indian Ocean and 8.2% for Europe/North Africa. If the contracting period is lessened then the base buffer zone would also narrow. The Western Indian Ocean superlane is set to the worldwide median buffer width (of 6.0% for 17 months) due to the very low volatility of the biggest currencies in the region.

The technical factor for the CAF calculation is proposed at 7%. This recommendation is based on an analysis of industry financial data and terminal costs.

The monthly currency rate should be set as a monthly average from two months previously (as is the current practice). For consistency sake, the baseline should also be set as a monthly average. The CAF equation then becomes:

$$\left(\frac{\text{Current Monthly Average Exchange Rate}}{\text{Base Exchange Rate}} - 1\right) \cdot \text{Technical Factor} \cdot \text{Risk Sharing Factor} \quad [16]$$

In the case of the Europe/North Africa superlane, if the change in the current monthly average exchange rate, compared with the baseline, is more than 8.2% higher or lower, then a CAF will be put in place. The exchange rate ratio is then multiplied by the technical factor of 7% and a risk sharing factor. The CAF ratio is then multiplied against the base freight rate to determine the dollar adjustment level.

The buffer zone as currently constructed applies across only four currencies, the pound, yen, won and euro. This study recommends applying a CAF across three superlanes. This approach provides a more specific CAF based upon USTRANSCOM's historical patterns, and more regional specificity. The superlane CAF buffer zone will be applied to each of the 17 major trading currencies within that lane.

## 3.5. References

Arize, A.C., "The Effects of Exchange Rate Volatility on U.S. Imports: An Empirical Investigation," *International Economic Journal*, (1998).

Barndorff-Nielsen, Ole E., Shephard, Neil, "Modeling and Measuring Volatility," Encyclopedia of Quantitative Finance, (2008).

Bartolini, Leonardo, Bodnar, Gordon M., *Are Exchange Rates Excessively Volatile? And What Does "Excessively Volatile Mean, Anyway?*, International Monetary Fund (1995).

Brookes, Andy, David Hargreaves, Carrick Lucas, Bruce White, *Can Hedging Insulate Firms from Exchange Rate Risk?: Reserve Bank of New Zealand: Bulletin, Vol. 63 No. 1.*

Clark, Peter, Natilia Tamirisa, Shang-Jin Wei, Azim Sadikov and Li Zeng, "Exchange Rate Volatility and Trade Flows - Some New Evidence," International Monetary Fund (2004).

"Currency Adjustment Factor", SAMSKIP

"Currency Adjustment Procedure", The Raben Group, Available at: http://www.raben-group.com/sub.php?p=49&lng=en.

Davies, J.E., "An Analysis of Cost and Supply Conditions in the Liner Shipping Industry," *The Journal of Industrial Economics*, (1983).

Devereux, M.B, Engel, C., *Exchange Rate Pass-Through, Exchange Rate Volatility and Exchange Rate Disconnect: DNB Staff Reports*, De Nederlandsche Bank (2002).

Dohring, Bjorn, "Hedging and Invoicing Strategies to Reduce Exchange Rate Exposure: A Euro-Area Perspective: European Economy, Economic Papers 299," European Commission (2008).

Dornbusch, Rudiger, "Expectations and Exchange Rate Dynamics," *Journal of Political Economy*, Volume 84(6), pp. 1161-1176, December 1976.

Dunis, Christoan L., Huang, Xuehuan, "Forecasting and Trading Currency Volatility: An Application of Recurrent Neural Regression and Model Combination," (2001).

Esquivel, Gerardo, B, Felipe Larrain, "The Impact of G-3 Exchange Rate Volatility on Developing Countries: United Nations G-24 Discussion Paper Series," United Nations (2002).

*Fact Book II (Financial Data and Latest Market Data)*, NYK Line (2008).

Flood, Robert P., "Explanations Of Exchange-Rate Volatility and Other Empirical Regularities in Some Popular Models of the Foreign Exchange Market," Board of Governors of the Federal Reserve System and University of Virginia, Carnegie-Rochester Conference Series on Public Policy (1981).

Flood, Robert P., Rose, Andrew K., "Understanding Exchange Rate Volatility Without the Contrivance of Macroeconomics," *The Economic Journal*, (1999).

Grauwe, Paul De, Schnabl, Gunther, "Exchange Rate Regimes and Macroeconomic Stability in Central and Eastern Europe: CESIFO Working Paper No. 1182 Category 6: Monetary Policy and International Finance," (2004).

Husted, Steven, *International Economics*.

"Insomnia, Why Challenges Facing The World Container Shipping Industry Make For More Nightmares Than They Should" American Shipper, MergeGlobal Value Creation Initiative, (2008).

*Interim Report*, China COSCO Holding Company Limited (2005/2006/2007/2008).

Jayawickrama, S.S., "Devaluation Surcharges In Ocean Freight Rates," *Journal of Transport Economics and Policy*, (1974).

Jorion, Philippe, "Predicting Volatility in the Foreign Exchange Market," *The Journal of Finance*, (1995).

Kenen, Peter B., Rodrik, Dani, "Measuring and Analyzing the Effects of Short-Term Volatility in Real Exchange Rates," *The Review of Economics and Statistics*, (1986).

Landry, Anthony E., "Expectations and Exchange Rate Dynamics: A State-Dependent Pricing Approach," Federal Reserve Bank Of Dallas (2006).

MAERSK, *Annual Report*, (2007), (Available at: http://shareholders.maersk.com/uk/FinancialReports/2007/AnnualReport/uk_04_01.htm).

MAERSK, *Annual Report*, (2007), (Available at: http://shareholders.maersk.com/uk/FinancialReports/2007/AnnualReport/uk_02_03.htm).

MAERSK, *Interim Report*, (2008), (Available at: http://shareholders.maersk.com/uk/FinancialReports/2008/InterimReport/uk_02_03.htm).

"Measuring the Costs of Exchange Rate Volatility," Federal Reserve Bank of San Francisco (2004).

O'Brien., T.R., "Currency Adjustment Factors: Some Alternative Strategies, T.R. O'Brien, Maritime Policy and Management, October 1980.," *Maritime Policy and Management*, October (1980).

Rivera-Batiz, *International Finance and Open Economy Macroeconomics*

Rogoff, Kenneth, "Dornbusch's Overshooting Model After Twenty-Five Years: Second Annual Research Conference, International Monetary Fund, Mundell-Fleming Lecture," (2002).

Röhlig, "Currency Adjustment Factor", Available at: http://www.rohlig.pl/index.php?id=dodatekwalutowy&L=1 (Last Accessed: June 2009).

Schnabl, Gunther, "Exchange Rate Volatility and Growth in Small Open Economies at the EMU Periphery: Working Paper Series, No 773," European Central Bank (2007).

SHIPid.com, "Currency Adjustment Factor", Available at: http://www.shipid.com/surcharges/CAF.htm (Last Accessed: June 2009).

Taylor, Mark P., "The Economics of Exchange Rates," *Journal of Economic Literature*, (1995).

Vergil, Dr. Hasan, "Exchange Rate Volatility in Turkey and Its Effects on Trade Flows," *Journal of Economic and Social Research*.

Viaene, Jean-Marie, Vries, Casper G. de, "International Trade and Exchange Rate Volatility," *European Economic Review*, (1992).

Wolf, Holger, "Volatility: Definitions and Consequences," *Managing Volatility and Crises: A Practitioners Guide*, (2004).

# 4: Inland Intermodal Fuel Adjustment Factor (FAF)

## *4.1. Inland Intermodal Fuel Adjustment Factor (FAF)*

This section of the Economic Price Adjustment study considers the development and use of inland transportation fuel surcharges or a fuel adjustment factor (FAF) for the movement of USTRANSCOM freight. The FAF is similar in concept to the BAF in that its purpose is to protect ocean carriers from the risk of fluctuating fuel prices but is focused on the inland portion of container movements. It was initially developed by overland common carriers (specifically U.S. trucking companies) to pass fuel price volatility along to shippers. USTRANSCOM did not have a FAF provision in USC-05 and currently does not have a FAF in place for USC-06.

It should be noted that the term "FAF" or "fuel adjustment factor" is not widely used in the carrier industry. The term "fuel surcharge" is more commonly used in the trucking and rail industries, while the term "inland fuel charge" is used in the ocean carrier industry. The ocean carrier industry uses the terms "BAF" and "FAF" interchangeably in reference to fuel charges associated with the ship itself. "FAF" and "fuel adjustment factor" are commonly used by electric utilities. For the purposes of this study, the term FAF will be used to refer to an economic price adjustment factor applied to the inland portion of USTRANSCOM container movements.

The objective of this study is to determine if a FAF is necessary and feasible for inland transportation services (rail, truck, and barge) associated with ocean liner services supplied to USTRANSCOM. If deemed necessary and feasible, then the focus would shift to developing CONUS and OCONUS FAFs together with supporting technical factors to manage the consequences of significant and unexpected fluctuations in fuel prices applicable to inland transportation. The resulting FAFs must comply with the EPA provisions of the FAR and DFAR regulations. In addition, the methodology employed to calculate the FAFs and technical factors should be consistent with standard commercial practices and not present significant barriers to the efficient administration of USC-06.

This task was accomplished by conducting a review of:

- Trucking, rail, and ocean carrier industry practice related to fuel surcharges
- The technical factors related to the fuel consumption associated with the truck and rail movement of containers
- The choice of which mode to use in shipping containers to and from ports
- Readily available sources of historic and current fuel price data

- Current USTRANSCOM shipping patterns in terms of origins and destinations, mode used for the inland move, traffic volumes, and landside distances
- T he derivation of the FAF currently in use on SDDC CONUS truck contracts

Recommendations for developing a FAF methodology are presented in the next section. This is then followed by specific details upon which this recommendation was made, including modal technical factors and alternatives considered. Finally, an example of how the FAF can be implemented is then presented. An appendix provides a review of current industry practice.

While the focus of this effort was on development of a FAF for container shipments, two FAFs applicable to breakbulk shipments were also developed. They are the same as the FAF for container shipments in approach and application and differ only in the underlying technical factors.

Analysis of 2008 IBS data indicated that 81% (35,794) of TRANSCOM shipments with either an origin or destination in CONUS were in containers and the remaining 19% (8,440) of shipments were breakbulk. Of the breakbulk shipments just over 95% (8,053) were made up of shipment units weighing less than 50,000 lbs. The other 4.5% (387) of breakbulk shipments (0.9% of total shipments) were made up of shipment units weighing more than 50,000 lbs. This distinction is important in that the lighter shipment units could be handled by regular truck and rail intermodal services, while the heavy shipment units would have to be moved by specialized heavy-hauler trucks operating under oversize/overweight permits or on conventional rail flatcars moving on conventional rail mixed-consist services.

Two FAFs were developed for breakbulk shipments based on the FAF developed for container shipments. The differences among the values of the FAFs for each type of shipment are due to differences in the average haul (as determined from analysis of the IBS data) and in some cases differences in the modal fuel consumption factors.

## Feasibility of a CONUS and/or OCONUS FAF

Part of the initial research focused on whether it was feasible to develop both a CONUS and OCONUS FAF. A valid method for computing a FAF or inland fuel surcharge requires fuel price data at two key points: the current time period and the period when the initial rate offering was formulated. These fuel price data must be available to both USTRANSCOM shippers and carriers and be published on a consistent and timely basis by a reliable and easily accessible source. In addition, mode specific technical factors, which will allow for estimating the amount of fuel used in moving a container from its origin to the POE or from the POD to its final destination, are also required.

Fuel price information and technical detail, which is required for modeling a FAF, is readily available in the U.S. In particular, the Department of Energy (DOE)'s Energy Information Administration (EIA) provides weekly updates of U.S. diesel fuel prices and this information is easily accessible by USTRANSCOM shippers and carriers. Moreover, technical data required for estimating the amount of fuel used in moving a container by truck or rail in CONUS is also available. Thus, it is feasible to develop

and easily administer a FAF methodology for CONUS, which would be credible and consistent with industry standards.

Outside of CONUS, however, there is a lack of both readily available up-to-date fuel price and technical (fuel consumption) data on transport operations. From an analysis of the IBS data, USTRANSCOM's major container movements were identified as involving Pakistan-Afghanistan and Middle Eastern ports including those in Iraq. For these regions there is no easily identifiable source of fuel price data and no technical data on trucking or rail operations that would permit the development of a credible and defensible estimate of the fuel used in moving containers. In addition, while fuel price data is available for some European countries, it is not updated as often as the EIA data and is subject to wide variations due primarily to the fuel taxation policies of the individual countries. Further, the wide country-to-country variation in fuel price and technical characteristics precludes the development of a credible and administratively simple FAF for OCONUS areas. As a result, it is not believed to be currently feasible to either develop or administer an OCONUS FAF.

An additional argument for restricting a FAF to CONUS is that this appears to be in line with current industry practice as applied to private sector shippers. For example, ocean carriers serving the Far East attempt to collect a FAF from shippers for the CONUS portion of the shipment, but not for the inland move in Korea, Japan, China, Australia, etc.

## *4.2. FAF Methodology Development*

Based on an examination of FAF industry practice and the availability of required data, it is recommended that USTRANSCOM utilize a fuel surcharge (FAF) methodology for the CONUS portion of shipments based on a "distance" approach rather than a "rate" approach.[57] The surcharge would be on a per container basis, in line with current ocean carrier industry practice.

The proposed methodology has the advantages of transparency, credibility and equity (carriers will be fairly compensated for increased fuel costs, but will not be awarded windfall profits). Moreover it requires less input data and arbitrary assumptions. In contrast, a rate based approach presumes knowledge of the carrier's cost structure, specifically fuel costs as a percentage of total costs at the time the base rate was offered and at the current time. The following sections detail the steps through which a FAF methodology was developed.

[57] Surcharges based on "distance" are generally expressed as a cost/mile charge increase due to a given fuel price. Surcharges based on a "rate" are generally expressed as a % increase in a base rate as a function of fuel price.

## FAF Input

A number of factors and inputs are required for developing the recommended FAF specification:

- Determination of the base period for fuel prices
- Identification of a source of historical and current fuel price data readily available to all parties
- Determination of fuel consumption factors for those modes used in inland transportation
- Determination of the mode most likely to be used for shipments
- Consideration of the alternative approaches to calculating the FAF used by the carrier industries and current SDDC FAFs
- Characterization of historic USTRANSCOM shipping patterns in terms of origins, destinations, traffic volumes, and landside distances
- Definition of various implementation details such as update frequency, the time period used in defining the current fuel price, the use of a "buffer zone", etc.

Each of these factors, and the assumptions made regarding their use in the proposed approach are discussed in more detail below. This is followed by draft version of the internet site that could be used to present the FAF to the carrier and shipper communities. The model used to produce the FAF tables is included in the Appendix.

## Base Period for Fuel Pricing

For the purposes of developing this methodology, the FAF fuel price baseline will be established using the same method as described for the BAF under USC-06. In this solicitation, the baseline is set as the average for the four month period prior to solicitation issuance (Apr 08 – Jul 08).[58] Looking forward to the USC-06 extension options and beyond, the baseline setting procedures may be subject to further negotiation between the carriers and USTRANSCOM.

## Fuel Price Data

The EIA of the U.S. DOE publishes the U.S. National Average Diesel Fuel Index every Monday, excluding holidays. This is available at their internet site.[59] Historic fuel price data is available on a weekly and monthly basis.

Based on this index, the four month average fuel price to be used as the baseline in FAF computations in this report is $4.47 per gallon. Historic data for the period April 2008 through July 2008 was obtained from the DOE web site.[60]

## Truck Fuel Consumption Factors

A technical factor of six miles per gallon (mpg) was used for to estimate truck fuel consumption for a typical USTRANSCOM container inland move. This value accounts for travel over a variety of highway conditions and distances and accounts

58 *Universal Services Contract (USC)-6* (29 Sep 08).

59 Energy Information Administration (2008)

60 Ibid.

for idling time. It is also based on a fairly recent sample of truck technology, and actual operating fleets. This could be modified if USTRANSCOM shipments are especially atypical in terms of average weight. Otherwise, the mpg figure is "conservative," since it is based on Gross Vehicle Weights (GVW) near the maximum. (See Table 28 below for details on truck fuel consumption data sources.)

**Table 28: Truck Factors**

| MPG | Source | Date | Data Type | Weight | Speed |
|---|---|---|---|---|---|
| 6.5 | 1 | August 2007 | | 80,000 lbs | |
| 6.5 | 2 | July 2008 | Calculated | 80,000 lbs | 65 |
| 6.5 | 3 | April 2008 | | | |
| 5.8 | 4 | | Reported fleet average for Houston drayage | | |
| 6.7 | 5 | 2006 | On-board instrumentation | 30,000 - 80,000 lbs | 29 (includes idling) |
| 6.6 (6.0 with idling) | 6 | | | 80,000 lbs | |
| 6.03 | 7 | June 2008 | Reported fleet averages | | |

1- Grezler, Anthony Vice President Advanced Engineering, U.S. *Heavy Duty Vehicle Fleets, Technologies for Reducing CO2, An Industry Perspective*, Volvo Powertrain Corporation (2007), (Available at: www.its.ucdavis.edu/events/outreachevents/asilomar2007/presentations/Day%202%20Session%201/Anthony%20Greszler.pdf).

2- Ogburn, Michael, et al., *Transformational Trucks: Determining the Energy Efficiency of a Class-8 Tractor-Trailer*, Rocky Mountain Institute (2008), (Available at: www.rmi.org/images/PDFs/Transportation/RMITransformational_Truck_Study_080709compressed.pdf).

3- Maltz, Arnold, *Promoting Green Supply Chains in North America*, (2008).

4- Banks, Sharon, *Greening the Fleet, Cleaner Air, Lower Carbon, and a Better Economy*, (Available at: www.houston-cleancities.org/ATC_08/Bill%20Barton,%20Cascade%20Sierra%20Solutions.pdf).

5- Lascurian, Mary Beth et al, *Data Collection for Class-8 Long-Haul Operations and Fuel Economy Analysis, Center for Transportation Analysis Research Brief: Class-8 Heavy Truck Duty Cycle Project Final Report, report ORNL/TM-2008/122* U.S. Department of Energy, Oak Ridge National Laboratory (2008), (Available at: http://cta.ornl.gov/cta/Research_Areas.shtml).

6- *Improving Efficiency of Freight Movement with EPA's Smartway Transport Partnership*, (Available at: www.trbav030.org/pdf2006/136_S_Rudinski.pdf).

7- *Freight Surcharge Index* Vol. Volume 1, Issue 6, The National Transportation Institute, Volume 1, Issue 6 (2008), (Available at: http://www.energyinstitution.org/publication/pub-detail.php?id=34).

The Gross Vehicle Weight is the combined weight of the container, cargo, chassis and tractor. In the absence of an over weight permit, the GVW within CONUS is limited to 80,000 lbs. For 40' and 45' containers the applicable GVW is 80,000 lbs and for a 20' it is 68,000 lbs. These limits would also apply to movements by rail since almost all rail movements would involve a truck move on either or both ends of the trip. Larger containers have a maximum allowable cargo weight in the range of 40,500 to 43,500 lbs., while smaller containers have a maximum allowable cargo weight in the range of 36,000 to 39,000 lbs.

Analysis of the IBS data for container movements originating or terminating in CONUS in 2008 indicated that 64% of containers were 40 ft. or larger, while 36% were 20 ft. The average weight of the large containers was 38,500 lbs., and that of the smaller containers was 24,100 lbs.

The mpg figure can be transformed to gallons/mile for computational purposes by taking the reciprocal. This results in a value of 0.1667 gallons/mile. Since each truck transports one container (of any size), the fuel used in moving one container by truck would be equal to miles times 0.1667gallons/mile.

The fuel factor for breakbulk shipments of shipment units of less than 50,000 lbs is the same as that used for containers moving by truck. The maximum truck payload under a gross vehicle weight limit of 80,000 lbs. would be about 50,000 lbs. for a conventional van or flatbed trailer. To all intents and purposes the fuel consumption of a conventional tractor trailer operating at or near the 80,000 lb. limit and a tractor hauling a container/chassis operating at or near the weight limit would be the same.

For shipments involving shipment units in excess of 50,000 lbs specialized heavy hauler equipment would have to be utilized and oversize/overweight permits would be required. For these shipments a truck fuel factor of 0.2192 gallons per mile (4.5 miles per gallon) was used.[61] This is based on the movement of a platform trailer hauling a load of 37.75 tons or 73,500 lbs., the average weight/shipment unit of "heavy" shipment units as indicated in the IBS data.

## Rail Fuel Consumption Factors

The technical fuel factor for intermodal rail fuel consumption for a typical USTRANSCOM container inland move is estimated as 0.0330 gallons per container mile. This factor is based on a value of 0.001328 gallons/gross ton mile indicated in Table 29 below and appears to be a typical industry average for intermodal operations.

The gallon/gross ton-mile figure accounts for the fuel used in moving the entire train (cars and locomotives plus cargo). This accounts for the fuel used in rail line-haul operations and does not include fuel used in drayage at either end or in terminal operations. A value of 6 gallons/mile provided in source 6 in Table 29 translates into a value of 0.001579 gallons/gross ton-mile for the typical intermodal train configuration assumed in that analysis.

Using the reported values for typical intermodal train gross weights and typical number of containers per train as reported in the cited studies and summarized in Table 30, Rail Fuel Factors, values of gallons per train mile and gallons per container mile were calculated.

All the analyses cited start with a theoretical capacity of a train in TEU assuming that all containers are the same size. This is reduced by a factor (85% to 90% were cited) to account for the mix of container sizes in a fashion analogous to the broken stowage factor used on ships. TEU were converted to containers within the cited studies using an assumed ratio of 1.8 TEU/container based on a "typical" mix of 20 foot and 40 foot containers.[62]

[61] Knapton, David, *An Investigation of Truck Size and Weight Limits, Technical Supplement Vol.3, Truck and Rail Fuel Effects of Truck Size and Weight Limits,* Report No. DOT-TSC-OST-81-2, prepared for the Office of the Secretary of Transportation, Transportation Systems Center, Cambridge, MA, July 1981.

**Table 29: Intermodal Rail Factors**

| Source | Date | Data Type | Containers / Train | Gallons / Gross Ton-Mile |
|---|---|---|---|---|
| 1 | February 2009 | Reported actual | 300 | |
| 2 | 2004 | Reported actual | 106 | |
| 3 | March 2008 | Planning value based on industry statistics | 240 | |
| 4 | 2004 | Planning value based on industry statistics | 320 TEU | 0.0013 |
| 5 | 2007 | Planning value based on industry statistics | 227 Containers 408 TEU | 0.001328 |
| 6 | 2003 | Planning value based on industry statistics | 400 TEU | 6 gal/mile |
| 7 | 2007 | Planning value based on industry statistics | 240 Containers 425 TEU | 0.001328 |

1-*Train Traffic Down, But Alameda Corridor Still in The Black*, The Cunningham Report (2009), (Available at: www.cunninghamreport.com/news_item.php?id=729).

2-*Southeast Arizona Regional Transportation Profile Study*, Nogales Railroad Assessment Study (2005), (Available at: www.santacruzconnect.com/media/EDocs/Nogales_Railroad_Assessment.pdf).

3- *North Carolina International Terminal, Planning Assumptions*, North Carolina State Ports Authority (2008), (Available at: http://spa.ncports.com/web/ncports.nsf/4a87ff3bf2c03cc38525646f0072ffa9/6d28af86ed9d13458525741900501 7ca/$FILE/NCIT%20Planning%20Assumptions.pdf).

4- Resor, R. R. and Blaze, J. R., *Short-Haul Rail Intermodal: Can It Compete With Trucks?*, Transportation Research Record No. 1873, Transportation Research Board (2004), (Available at: http://dx.doi.org/10.3141/1873-06).

5- *2007 Air Emissions Inventory, Section 5 Railroad Locomotives*, Port of Long Beach (2009), (Available at: www.polb.com/civica/filebank/blobdload.asp?BlobID=6021).

6- Casgar, Christina S., et al, *Rail Short Haul Intermodal Corridor Case Studies Industry Context and Issues*, Foundation for Intermodal Research & Education (FIRE) (2003), (Available at: http://www.fra.dot.gov/us/content/985).

7- *2007 Goods Movement Air Emissions Inventory at the Port of Houston*, Starcrest Consulting Group, LLC (2009), (Available at: www.portofhouston.com/pdf/environmental/PHA-GM-AirEmissions-07.pdf).

Rail movement of breakbulk shipments of shipment units of less than 50,000 lbs. was assumed to utilize rail intermodal TOFC (trailer on flatcar) services rather than the rail intermodal COFC (container on flatcar) services assumed for container shipments.

The fuel factor for breakbulk shipments of shipment units of less than 50,000lbs is 0.0872 gallons per trailer mile based on a trailer moving on rail TOFC service.[63] Differences in fuel consumption between COFC and TOFC can be attributed to differ-

[62] Note: This factor is different than that used in the BAF due to differences in typical mixes of container types between ocean vessels and intermodal rail.

[63] Ibid.

**Table 30: Rail Fuel Factors**

| | Long Beach (source 5) | Houston (source 7) | Short-Haul, Casgar (source 6) | Short-Haul, Resnor (source 4) |
|---|---|---|---|---|
| Gallons / Gross Ton-Mile | 0.001328 | 0.001328 | 0.001579 | 0.0013 |
| Gross Train Weight (tons) | 5646 | 6469 | 3800 | 6200 |
| Gallons / Train Mile | 7.498 | 8.591 | 6.000 | 8.060 |
| Containers / Train | 227 | 240 | 200 | 240 |
| Gallons / Container Mile | 0.0330 | 0.0358 | 0.0300 | 0.0336 |
| Referenced Sources can be found above | | | | |

ences in the empty weight of the equipment and differences in the average number of trailers/containers per train.

For shipments involving shipment units in excess of 50,000 lbs conventional rail carload (most likely flatcars) services would have to be utilized rather than rail intermodal services. This would involve spotting a car or cars at a siding, moving the loaded cars to the nearest freight yard, placing the car on a train heading in the general direction of its ultimate destination and transferring the car from train to train at various intermediate points until it reached its final destination.

For these shipments a rail fuel factor of 0.1454 gallons per car mile was used. This is based on the movement of a rail car hauling a load of 37.75 tons or 73,500 lbs. in conventional rail carload service.[64]

## Truck/Rail Competitive Break Even Point

There is a significant difference in fuel consumption between truck and intermodal rail in terms of gallons/container mile. Accurately estimating the fuel consumption (and fuel cost) associated with the inland move of a container requires knowledge of how the container actually moved, specifically whether it moved by truck or by rail. This information is not available for USTRANSCOM shipments in IBS. In the absence of historical mode data, the assumption is made that the most likely mode of transport used in moving a container inland would be based on the distance moved. This was the approach used in the proposed FAF calculation method.

Containers moving by intermodal rail enjoy a significant line haul cost advantage over truck in terms of dollars/ton-mile. Nonetheless, rail movements must overcome the cost of getting containers to and from the rail terminals and transferring the containers to and from truck (in most cases) to the train. Thus rail intermodal is generally not cost (or service) competitive with truck for short movements. For the purposes of this study "short" was defined as 700 miles. This is based on a middle ground value of the "conventional wisdom" reported in the literature and indicated in Table 31 below. The "conventional wisdom" is based on the known behavior of shippers who have

64 Ibid.

**Table 31: Truck / Rail Competitive Break Point**

| Distance (miles) | Source | Date | Basis |
|---|---|---|---|
| 500-800 | 1 | 2004 | Hypothetical study of specific inland moves |
| 600-900 | 2 | | "Conceptual" |
| 500-750 | 2 | | "Conventional wisdom" |
| >750 | 3 | February 2008 | "Conventional wisdom" |
| >500 | 4 | February 2004 | "Conventional wisdom" |
| >700 | 5 | March 2003 | "Conventional wisdom" |

1-Resor, R. R. and Blaze, J. R, *Short-Haul Rail Intermodal: Can It Compete With Trucks?*, Transportation Research Record No. 1873, Transportation Research Board (2004), (Available at: http://dx.doi.org/10.3141/1873-06).

2- *Goods Movement Truck & Rail Study*, The Tioga Group, (Available at: www.scag.ca.gov/goodsmove/pdf/truckrail/ch7.pdf).

3-Saenz, Norman, *Supply Chain Optimization 101*, MHIA News (2008), (Available at: www.mhia.org/news/industry/7105/supply-chain-optimization-101).

4-*A Glance at Clean Freight Strategies, Intermodal Shipping*, U.S. Environmental Protection Agency, Office of Transportation and Air Quality (2004), (Available at: http://www.epa.gov/smartway/transport/documents/tech/intermodal-shipping.pdf).

5-Casgar, Christina S., et al., *Rail Short Haul Intermodal Corridor Case Studies: Industry Context and Issues*, Foundation for Intermodal Research & Education (FIRE) (2003), (Available at: http://www.fra.dot.gov/us/content/985).

chosen truck or rail intermodal for their specific shipments, presumably determined on a detailed case by case analysis of their own shipment options.

## Industry Practice for Applying Inland Fuel Charges

There is no ocean carrier standard practice for applying inland fuel surcharges on freight movements within CONUS. With the exception of Maersk (who also applies inland fuel charges in Europe), the ocean carriers apply an inland fuel surcharge only on the CONUS end of trips. The level of detail varies from a single charge up to seven different charges depending on the distance from port. All charges are on a "per container" basis. No distinction in fuel surcharges is made between TEU, FEU, or any other measure of container size. This is probably a reflection of the fact that the ocean carriers themselves are paying surcharges to truck and rail carriers on a per container basis. While distance from port seems to implicitly underlie the different approaches to differentiating surcharges, distance only enters into the surcharge on the basis of destination state (coastal vs. inland for example) or on mode used for the move (truck vs. combined truck/rail for example). The actual origin to destination never explicitly enters in the surcharge. Various approaches to applying the inland fuel surcharge that surfaced in our review of industry practice are summarized in Table 32.

## Alternative Approaches to Modeling a FAF

Based on industry practice, a number of alternative approaches to developing and computing a CONUS FAF were considered. These are listed in increasing order of complexity and accuracy in accounting for volatility in fuel costs:

- A single inland fuel surcharge
- A surcharge for truck movements and a surcharge for intermodal rail movements

Table 32: Level of Detail of CONUS Inland Fuel Surcharges

| Carrier / Conference | Source | Number of Surcharges | Basis of Difference |
|---|---|---|---|
| K Line | 1 | 2 | Truck, Rail or Truck/Rail Combination |
| TSA | 2 | 3 | WC Group 4/EC Local SSD, RIPI, Long-haul Rail/Truck Intermodal |
| Crowley | 3 | 13 | 6 State-based Zones Centered on Gulfport, and 7 State-based Zones Centered on Port Everglades |
| Maersk | 4 | 1 | Truck/Rail Combination |
| OOCL | 5 | 2 | West Coast Local SSD/Group 4/East Coast Local SSD, MLB/IPI/RIPI |
| CWTSA | 6 | 2 | Truck, Rail or Truck/Rail Combination |
| N.Y.K. Line | 7 | 4 | From U.S. West Coast to Group 4 States, From U.S. West Coast to Rest of U.S., From U.S. East Coast to Group 3 States, From U.S. East Coast to Rest of U.S. |
| Evergreen | 8 | 3 | West Coast Ports to CA, OR and WA, IPI, RIPI |
| MOL | 9 | 3 | Western and Eastern Coastal States, MLB/IPI/RIPI |
| WTSA | 10 | 2 | Truck, Rail or Truck/Rail Combination |
| Tropical | 11 | 7 | Local Drayage plus 6 State-based Zones Centered on Miami/Jacksonville |

1- "TransPacific Westbound Cargo Surcharges," K Line America Inc, Available at: www.kline.com/KAMSurcharges/Surcharges_TransPacific-Westbound.asp (Last Accessed: April 2009).
2- "Inland Fuel Surcharge Calculator," Transpacific Stabilization Agreement Available at: www.tsacarriers.org/calc_inland.html (Last Accessed: April 2009).
3- "Notice To The Trade, Fuel Charge Filing Change: Central America," Crowley, Available at: www.crowley.com/mediaroom/newsline.asp?ID=824 (Last Accessed: April 2009).
4- "Surcharges Applicable For All Trades," Maersk Line, Available at: https://www.maerskline.com/link/?page=brochure&path=/our_services/adv/0845/all_trade (Last Accessed: April 2009).
5- "Inland Fuel Surcharge (IFS)," OOCL, Available at: www.oocl.com/hongkong/eng/localinformation/localnews/2007/31Dec20070001.htm (Last Accessed: April 2009).
6- "June 2008 Fuel Surcharge," Canadian Westbound Transpacific Stabilization Agreement (CWTSA), Available at: www.ups-scs.ca/about/NewsItemEn.aspx?NewsPostingId=261 (Last Accessed: April 2009).
7- "Letter Announcement: Fuel Surcharges," NYK Line (Thailand) Co., Ltd., Available at: www.nykline.co.th/main/new_release.php (Last Accessed: April 2009).
8- "Local Surcharges," Evergreen Shipping Agency Philippines Corporation, Available at: www.evergreen-shipping.com.ph/Notice/default.asp (Last Accessed: April 2009).
9- "Surcharges: Bunker/Americas," MOL, Available at: www.powerinmotion.biz/surcharges/print_All.asp (Last Accessed: April 2009).
10- "WTSA Inland Fuel Surcharge," Westbound Transpacific Stabilization Agreement (WTSA), Available at: http://www.wtsacarriers.org/fs_inland.html (Last Accessed: April 2009).
11- "Inland Fuel Surcharge Announcements ", Tropical Shipping Available at: http://www.tropical.com/External/En/Press/TropicalNews/announce062707.htm (Last Accessed: April 2009).

- A surcharge for movements from West Coast (WC) ports to West Coast states, a surcharge for movements from East Coast (EC) ports to East Coast states, and a surcharge for intermodal rail movements
- A surcharge for movements from West Coast ports to West Coast states, a surcharge for movements from West Coast ports to rest of U.S., a surcharge for

movements from East Coast ports to East Coast states, and a surcharge for movements from East Coast ports to rest of U.S.

- A surcharge for movements from West Coast ports to West Coast states, a surcharge for movements from West Coast ports to rest of U.S., a surcharge for movements from East Coast ports to East Coast states, a surcharge for movements from East Coast ports to rest of U.S., a surcharge for movements from Gulf Coast (GC) ports to Gulf Coast states, and a surcharge for movements from Gulf Coast ports to rest of U.S.
- A surcharge based on the distance moved by each individual shipment.

This spectrum of approaches was used to calculate the total fuel surcharge that USTRANSCOM would pay using each procedure. For comparison purposes the surcharge was calculated assuming a 1 dollar difference in the fuel price over a base fuel price. Shipments less than 700 miles were assumed to have gone by truck. Shipment distances more than 700 miles were assumed to have gone by rail intermodal. Truck gallons/container mile and rail gallons/container mile are as noted previously. The details of the computations used in each case are presented below.

Case 1 - A single inland fuel surcharge

- Fuel Surcharge = $1*Average (truck and intermodal rail) gallons/container mile*Average haul*Number of containers

Case 2 - A surcharge for truck movements and a surcharge for intermodal rail movements

- *Truck Fuel Surcharge* = $1*Truck gallons/container mile*Average haul by truck*Number of containers by truck
- *Intermodal Rail Fuel Surcharge* = $1*Intermodal rail gallons/container mile*Average haul by intermodal rail* Number of containers by intermodal rail

Case 3 - A surcharge for movements from West Coast ports to West Coast states, a surcharge for movements from East Coast ports to East Coast states, and a surcharge for intermodal rail movements

- *WC to WC Surcharge* = $1*Truck gallons/container mile*Average haul WC ports to WC points*Number of containers WC ports to WC points
- *EC to EC Surcharge* = $1*Truck gallons/container mile*Average haul EC ports to EC points*Number of containers EC ports to EC points
- *Intermodal Rail Fuel Surcharge* = $1*Intermodal rail gallons/container mile*Average haul by intermodal rail* Number of containers to non coastal states

Case 4 - A surcharge for movements from West Coast ports to West Coast states, a surcharge for movements from West Coast ports to rest of U.S., a surcharge for movements from East Coast ports to East Coast states, and a surcharge for movements from East Coast ports to rest of U.S.

- *WC to WC Surcharge* = $1*Truck gallons/container mile*Average haul WC ports to WC points*Number of containers WC ports to WC points

- *EC to EC Surcharge* = $1*Truck gallons/container mile*Average haul EC ports to EC points*Number of containers EC ports to EC points
- *WC to Rest of U.S.* = $1*Intermodal rail gallons/container mile *Average haul WC ports to Rest of U.S.*Number of containers WC ports to Rest of U.S.
- *EC to Rest of U.S.* = $1*Intermodal rail gallons/container mile *Average haul EC ports to Rest of U.S.*Number of containers EC ports to Rest of U.S.

Case 5 - A surcharge for movements from West Coast ports to West Coast states, a surcharge for movements from West Coast ports to rest of U.S., a surcharge for movements from East Coast ports to East Coast states, a surcharge for movements from East Coast ports to rest of U.S., a surcharge for movements from Gulf Coast ports to Gulf Coast states, and a surcharge for movements from Gulf Coast ports to rest of U.S.

- *WC to WC Surcharge* = $1*Truck gallons/container mile*Average haul WC ports to WC points*Number of containers WC ports to WC points
- *EC to EC Surcharge* = $1*Truck gallons/container mile*Average haul EC ports to EC points*Number of containers EC ports to EC points
- *GC to GC Surcharge* = $1*Truck gallons/container mile*Average haul GC ports to GC points*Number of containers GC ports to GC points
- *WC to Rest of U.S.* = $1* Intermodal rail gallons/container mile *Average haul WC ports to Rest of U.S.*Number of containers WC ports to Rest of U.S.
- *EC to Rest of U.S.* = $1* Intermodal rail gallons/container mile *Average haul EC ports to Rest of U.S.*Number of containers EC ports to Rest of U.S.
- *GC to Rest of U.S.* = $1* Intermodal rail gallons/container mile *Average haul GC ports to Rest of U.S.*Number of containers GC ports to Rest of U.S.

Case 6 - A surcharge based on the distance moved by each individual shipment

(This is being used as the baseline FAF scenario)

- *Fuel Surcharge* = Truck Fuel Surcharges for all Truck Shipments + Intermodal Rail Fuel Surcharges for all Intermodal Rail Shipments
- *Truck Fuel Surcharge for a Shipment* = $1*Truck gallons/container mile*Distance by truck*Number of containers in shipment
- *Intermodal Rail Fuel Surcharge for a Shipment* = $1*Intermodal rail gallons/container mile* Distance by intermodal rail* Number of containers in shipment

The shipments considered for analyzing these six alternatives were those moving between the top 100 origin to POE pairs and the top 100 POD to destination pairs in CONUS (measured in terms of number of containers) as reported in IBS for 2008.

The top 100 outbound OD pairs account for 74.7% of outbound container movements (54,503 containers in 20,603 shipments). The top 100 inbound OD pairs account for 86.3% of inbound container movements (9,490 containers in 4,074 shipments). Based on the above criteria, 81.9% of containers (52,416) would have moved by truck and

18.1% (11,577) would have moved by rail intermodal. The average shipment weight of containers moving by truck was 34,698 lbs., and the average shipment weight of containers moving by rail intermodal was 26,809 lbs.

The Defense Table of Official Distances (DTOD) and randmcnally.com were used to determine the distance between each of the OD pairs. These distances were used in computing an average haul appropriate to each of the cases considered.

The results of the example calculations are indicated in Table 33 below. These are the

**Table 33: Variation in Fuel Surcharge Payments**

| Case | Surcharge | Difference from Base Case | % Difference from Base Case |
|---|---|---|---|
| 1 | $3,041,829 | $1,269,110 | 72% |
| 2 | $1,772,719 | $0 | 0% |
| 3 | $1,599,132 | -$173,587 | -10% |
| 4 | $1,743,899 | -$28,820 | -2% |
| 5 | $1,701,926 | -$70,792 | -4% |
| 6 = Base | $1,772,719 | $0 | 0% |

value of the fuel surcharge that would have been paid for sample of shipments in 2008 assuming a diesel fuel price $1/gallon greater than a base fuel price. Alternative six is being used as the baseline. This methodology is the most precise in structure, in that it uses actual miles per container for each shipment to determine a FAF.

## *4.3. Recommended FAF Methodology*

The recommended approach is one based on the "zonal" system of Case 5. It produces results that are close to "actual" (case 6) even though it is an approximate method. It does not require the calculation of distance for every shipment, nor knowledge of whether the shipment moved by truck or rail. The key requirements for this method are the port and the state containing the inland origin/destination of the shipment, which are readily available.

The other methods were rejected either due to inaccuracy or the requirement of unavailable data. For example, Case 1, while simple to use, would produce results that are highly inaccurate. Case 2 is also simple to use and would produce results that in the aggregate were the same as the base case. Nonetheless, it does require a knowl-

edge of whether the shipment actually moved by truck or rail, which is not made available by carriers.

For Case 3, which is based on a mixed zonal/modal approach, the results are somewhat inaccurate. While this method does not require the calculation of distance for every shipment it does require knowledge of the port and the state containing the inland origin/destination of the shipment. It does not, however, explicitly account for Gulf Coast ports. It also does not require a knowledge of whether the shipment moved by truck or rail and implicitly assumes that any shipment not moving to a coastal state from a port on the same coast moved by rail.

Although only an approximate methodology, Case 4 produces results that are close to "actual." This approach does not require the calculation of distance for every shipment nor knowledge of whether the shipment moved by truck or rail. It does require knowledge of the port and the state containing the inland origin/destination of the shipment and doesn't explicitly account for Gulf Coast ports (these were arbitrarily defined as East Coast ports for the example calculations).

Finally, Case 6, or the base case, provides the most accurate estimate of the fuel surcharge, but is the most complex to administer. It requires the calculation of the inland distance for each shipment. It also requires a knowledge of whether the shipment actually moved by truck or rail.

The proposed approach, based on Case 5, represents a compromise between simplicity (administrative burden) and accuracy, and between current industry practice and procedures related to the BAF under USC-06 and the FAF under SDDC Policy TR-12. It involves the calculation of a FAF for six "zones". These zones are:

- East Coast ports to East Coast states
- East Coast ports to all other states
- Gulf Coast ports to Gulf Coast states
- Gulf Coast ports to all other states
- West Coast ports to West Coast states
- West Coast ports to all other states

The FAF is based on the fuel price differential between a specified base period (time of solicitation) and the current time period, and the fuel used in moving a container an average distance by truck or rail within a given zone or between zones. The approach is similar to current industry practice on FAF for inland CONUS container movements. In addition, the proposed approach is more transparent than the current industry practice on FAFs.

The calculated FAFs are based on the widely available diesel fuel price data published by the DOE EIA, typical fuel consumption factors for U.S. trucking and intermodal rail operations, and typical USTRANSCOM inland container movements as indicated

in the IBS data for 2008. The proposed approach applies only to the inland CONUS portion of shipments.

## FAF Implementation Details

Based on the specification of the proposed FAF methodology, a number of details will have to be specified in order to implement the approach in practice. While most of these details are policy decisions, one is required under FAR, the use of a symmetrical FAF. The implementation issues include:

(G) The base period for fuel prices

(H) Update frequency

(I) The period for the current fuel price

(J) The fuel price increment used in the published tables

(K) The use of a "buffer zone"

(L) The use of an asymmetrical FAF or a symmetrical FAF

Industry practice in the CONUS trucking, rail and ocean carrier industries is summarized in the Table 34 below. Current SDDC policy[65] for a trucking FAF is also included, along with the corresponding policy from the USC-06 solicitation related to the BAF/CAF.

**Table 34: Current Practice Regarding FAF Implementation Procedures**

| | Base Period Fuel Price | Update Frequency | "Current" Fuel Price Basis | Fuel Price Increment | Buffer Zone | Symmetry |
|---|---|---|---|---|---|---|
| **USC-06** | April 08 – July 08 BAF | Monthly | Monthly Average | Not Applicable | ± 20% | Symmetrical |
| **SDDC Policy TR-12** | Not specified | Monthly | Monthly Average | 10 cents / gallon | Not used | Asymmetrical |
| **Trucking Industry** | Not specified | Weekly | Weekly Average | 5 cents / gallon | Not used | Asymmetrical |
| **Rail Industry** | Not specified | Weekly / Monthly | Weekly Average / Monthly Average | 4 cents / gallon | Not used | Asymmetrical |
| **Ocean Carrier Industry** | Not specified | Monthly / Quarterly | Not used / Quarterly Average | Not used / 4 cents / gallon | Not used | Asymmetrical |

The proposed approach will incorporate the following implementation details for the purposes of presenting an example of the approach in this report. The final decision with regard to each of these matters lies with USTRANSCOM.

---

[65] Surface Deployment and Distribution Command (SDDC) (2009).

A sample internet site for publishing the proposed FAF is presented later in this report.

The FAF calculator used in producing the monthly tables appears as in the Appendix. This provides the equations and default input values used in calculating the FAF, along with the link to DOE's monthly diesel fuel price data.

The base period for determining a base fuel price will be as specified in the USC-06 solicitation for the BAF (April 08 – July 08). SDDC Policy TR-12 and rail and truck carriers generally specify a base fuel price, but not the time period on which the price is based. Ocean carriers typically do not specify a base fuel price or a current fuel price but generally only provide an inland fuel surcharge figure that will apply for a specified time period.

The FAF will be updated monthly. This is consistent with the USC-06 solicitation for the BAF, SDDC Policy TR-12, and much of current industry practice in the rail and ocean carrier industry.

The current average fuel price will be determined as specified in the USC-06 solicitation for the BAF (section 2.3.3), except that the monthly national average diesel fuel price published by the DOE EIA is used. This average price shall be calculated on or after the first of the month for the prior month and shall apply to shipments in the next month.

A fuel price increment will not be used in the published tables. This is consistent with industry practice in the ocean carrier industry for publishing inland fuel surcharges.

A "buffer zone" has not been included as part of the FAF methodology. This was done to be consistent with industry practice in the trucking, rail, ocean carrier industries, and SDDC Policy TR-12.

The FAF will be symmetrical in nature and be responsive to upward or downward fluctuations in fuel prices. This is consistent with the USC-06 solicitation for the BAF and the FAR regulations. Nonetheless, this is not consistent with industry practice in the trucking, rail, ocean carrier industries, and SDDC Policy TR-12.

## Sample Internet Site

### CONUS Inland Fuel Surcharge (FAF) for USC-06 Shipments

(1) Application

The fuel surcharge on the inland CONUS portion of USC-06 shipments will be based on the shipment's origin state and POE (port of embarkation) or the POD (port of debarkation) and the shipment's destination state as indicated in Table 35: CONUS Inland Fuel Surcharges (FAF), Table 36, "CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments," on page 119, and Table 37, "CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments exceeding 50,000 lbs," on page 121, (below).

**Table 35: CONUS Inland Fuel Surcharges (FAF) per Container**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| AL | -$77 | -$101 | -$146 |
| AR | -$77 | -$111 | -$146 |
| AZ | -$77 | -$111 | -$146 |
| CA | -$77 | -$111 | -$48 |
| CO | -$77 | -$111 | -$146 |
| CT | -$59 | -$111 | -$146 |
| DC | -$59 | -$111 | -$146 |
| DE | -$59 | -$111 | -$146 |
| FL | -$59 | -$111 | -$146 |
| GA | -$59 | -$111 | -$146 |
| IA | -$77 | -$111 | -$146 |
| ID | -$77 | -$111 | -$146 |
| IL | -$77 | -$111 | -$146 |
| IN | -$77 | -$111 | -$146 |
| KS | -$77 | -$111 | -$146 |
| KY | -$77 | -$111 | -$146 |
| LA | -$77 | -$101 | -$146 |
| MA | -$59 | -$111 | -$146 |
| MD | -$59 | -$111 | -$146 |
| ME | -$59 | -$111 | -$146 |
| MI | -$77 | -$111 | -$146 |
| MN | -$77 | -$111 | -$146 |
| MO | -$77 | -$111 | -$146 |
| MS | -$77 | -$101 | -$146 |
| MT | -$77 | -$111 | -$146 |
| NC | -$59 | -$111 | -$146 |
| ND | -$77 | -$111 | -$146 |
| NE | -$77 | -$111 | -$146 |
| NH | -$59 | -$111 | -$146 |

Effective for the Month of May-09
(Negative values indicate a credit to USTRANSCOM)



DA11651

**Table 35: CONUS Inland Fuel Surcharges (FAF) per Container**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| NJ | -$59 | -$111 | -$146 |
| NM | -$77 | -$111 | -$146 |
| NV | -$77 | -$111 | -$146 |
| NY | -$59 | -$111 | -$146 |
| OH | -$77 | -$111 | -$146 |
| OK | -$77 | -$111 | -$146 |
| OR | -$77 | -$111 | -$48 |
| PA | -$59 | -$111 | -$146 |
| RI | -$59 | -$111 | -$146 |
| SC | -$59 | -$111 | -$146 |
| SD | -$77 | -$111 | -$146 |
| TN | -$77 | -$111 | -$146 |
| TX | -$77 | -$101 | -$146 |
| UT | -$77 | -$111 | -$146 |
| VA | -$59 | -$111 | -$146 |
| VT | -$59 | -$111 | -$146 |
| WA | -$77 | -$111 | -$48 |
| WI | -$77 | -$111 | -$146 |
| WV | -$59 | -$111 | -$146 |
| WY | -$77 | -$111 | -$146 |

Effective for the Month of May-09
(Negative values indicate a credit to USTRANSCOM)

For the purpose of determining the surcharge East Coast ports will include those within the states of Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, North/South Carolina, Georgia, and Florida; Gulf Coast ports will include those within the states of Texas, Louisiana, Mississippi and Alabama: and West Coast ports will include those within the states of California, Oregon and Washington.

A different FAF will apply, depending on the type of shipment. A shipment may be a container shipment, a breakbulk shipment with a weight/shipment unit less than or equal to 50,000 lbs., or breakbulk shipment where the weight/shipment unit exceeds 50,000 lbs. Carriers will select the appropriate table for determining the FAF applicable to a given shipment.

(2) Effective Dates

**Table 36: CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| AL | -$160 | -$50 | -$399 |
| AR | -$160 | -$309 | -$399 |
| AZ | -$160 | -$309 | -$399 |
| CA | -$160 | -$309 | -$52 |
| CO | -$160 | -$309 | -$399 |
| CT | -$82 | -$309 | -$399 |
| DC | -$82 | -$309 | -$399 |
| DE | -$82 | -$309 | -$399 |
| FL | -$82 | -$309 | -$399 |
| GA | -$82 | -$309 | -$399 |
| IA | -$160 | -$309 | -$399 |
| ID | -$160 | -$309 | -$399 |
| IL | -$160 | -$309 | -$399 |
| IN | -$160 | -$309 | -$399 |
| KS | -$160 | -$309 | -$399 |
| KY | -$160 | -$309 | -$399 |
| LA | -$160 | -$50 | -$399 |
| MA | -$82 | -$309 | -$399 |
| MD | -$82 | -$309 | -$399 |
| ME | -$82 | -$309 | -$399 |
| MI | -$160 | -$309 | -$399 |
| MN | -$160 | -$309 | -$399 |
| MO | -$160 | -$309 | -$399 |
| MS | -$160 | -$50 | -$399 |
| MT | -$160 | -$309 | -$399 |
| NC | -$82 | -$309 | -$399 |
| ND | -$160 | -$309 | -$399 |
| NE | -$160 | -$309 | -$399 |
| NH | -$82 | -$309 | -$399 |

Effective for the Month of May-09
(Negative values indicate a credit to USTRANSCOM)

**Table 36: CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| NJ | -$82 | -$309 | -$399 |
| NM | -$160 | -$309 | -$399 |
| NV | -$160 | -$309 | -$399 |
| NY | -$82 | -$309 | -$399 |
| OH | -$160 | -$309 | -$399 |
| OK | -$160 | -$309 | -$399 |
| OR | -$160 | -$309 | -$52 |
| PA | -$82 | -$309 | -$399 |
| RI | -$82 | -$309 | -$399 |
| SC | -$82 | -$309 | -$399 |
| SD | -$160 | -$309 | -$399 |
| TN | -$160 | -$309 | -$399 |
| TX | -$160 | -$50 | -$399 |
| UT | -$160 | -$309 | -$399 |
| VA | -$82 | -$309 | -$399 |
| VT | -$82 | -$309 | -$399 |
| WA | -$160 | -$309 | -$52 |
| WI | -$160 | -$309 | -$399 |
| WV | -$82 | -$309 | -$399 |
| WY | -$160 | -$309 | -$399 |
| Effective for the Month of May-09<br>(Negative values indicate a credit to USTRANSCOM) | | | |

For shipments picked up between May 1, 2009 and May 31 2009, the calculation of the surcharge will be based on the March 2009 DOE Fuel Price. The surcharge will be updated monthly.

(3) Billing Procedures

Carriers will clearly show fuel price adjustments on all paper and electronic commercial freight bills and Bills of Lading and invoices. The amount of any diesel fuel rate surcharge must be shown as a separate item on the carrier's invoice. Contractors are responsible for indicating on their shipment invoice whether a fuel payment is due them, whether no fuel payment is to be made or whether a fuel payment is due SDDC. If a fuel payment is due the Contractor or SDDC, the Contractor shall obtain the value of the payment (or credit) from the surcharge table and indicate this on the shipment invoice. If there is no fuel payment, the Contractor shall indicate on the invoice "No Fuel Adjustment".

**Table 37: CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments exceeding 50,000 lbs**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| AL | -$399 | -$113 | -$643 |
| AR | -$399 | -$350 | -$643 |
| AZ | -$399 | -$350 | -$643 |
| CA | -$399 | -$350 | -$29 |
| CO | -$399 | -$350 | -$643 |
| CT | -$17 | -$350 | -$643 |
| DC | -$17 | -$350 | -$643 |
| DE | -$17 | -$350 | -$643 |
| FL | -$17 | -$350 | -$643 |
| GA | -$17 | -$350 | -$643 |
| IA | -$399 | -$350 | -$643 |
| ID | -$399 | -$350 | -$643 |
| IL | -$399 | -$350 | -$643 |
| IN | -$399 | -$350 | -$643 |
| KS | -$399 | -$350 | -$643 |
| KY | -$399 | -$350 | -$643 |
| LA | -$399 | -$113 | -$643 |
| MA | -$17 | -$350 | -$643 |
| MD | -$17 | -$350 | -$643 |
| ME | -$17 | -$350 | -$643 |
| MI | -$399 | -$350 | -$643 |
| MN | -$399 | -$350 | -$643 |
| MO | -$399 | -$350 | -$643 |
| MS | -$399 | -$113 | -$643 |
| MT | -$399 | -$350 | -$643 |
| NC | -$17 | -$350 | -$643 |
| ND | -$399 | -$350 | -$643 |
| NE | -$399 | -$350 | -$643 |
| NH | -$17 | -$350 | -$643 |
| Effective for the Month of May-09<br>(Negative values indicate a credit to USTRANSCOM) | | | |

**Table 37: CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments exceeding 50,000 lbs**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| NJ | -$17 | -$350 | -$643 |
| NM | -$399 | -$350 | -$643 |
| NV | -$399 | -$350 | -$643 |
| NY | -$17 | -$350 | -$643 |
| OH | -$399 | -$350 | -$643 |
| OK | -$399 | -$350 | -$643 |
| OR | -$399 | -$350 | -$29 |
| PA | -$17 | -$350 | -$643 |
| RI | -$17 | -$350 | -$643 |
| SC | -$17 | -$350 | -$643 |
| SD | -$399 | -$350 | -$643 |
| TN | -$399 | -$350 | -$643 |
| TX | -$399 | -$113 | -$643 |
| UT | -$399 | -$350 | -$643 |
| VA | -$17 | -$350 | -$643 |
| VT | -$17 | -$350 | -$643 |
| WA | -$399 | -$350 | -$29 |
| WI | -$399 | -$350 | -$643 |
| WV | -$17 | -$350 | -$643 |
| WY | -$399 | -$350 | -$643 |

Effective for the Month of May-09
(Negative values indicate a credit to USTRANSCOM)

## *4.4. Limitations of the Proposed FAF Methodology*

The proposed approach represents a compromise between simplicity (administrative burden) and accuracy. The fuel surcharges presented in the zonal table are average values. As a result they may result in an over payment or an under payment for any given shipment in relation to a surcharge that could be calculated if one knew the unique characteristics and parameters associated with each individual shipment. This is a characteristic shared with all inland fuel surcharge approaches currently used by the ocean carrier industry. Over the course of the contract under payments and over payments are likely to cancel out.

The proposed approach applies only to the inland CONUS portion of shipments. It was not deemed to be feasible to develop a credible FAF for the OCONUS inland portion of shipments within the current project's scope. The development of the FAF depends on the ready availability of both historic and current fuel price data and knowledge of the technical factors associated with the inland transportation industry of each of the OCONUS countries.

An analysis of the 2008 IBS data indicated that containers leaving CONUS were shipped to 131 OCONUS PODs. These flows were concentrated to Ash Shuwaikh, Kuwait, which was the POD for 39% of outbound containers. The top ten PODs (Ash Shuwaikh plus Karachi, Pakistan; Muhammad Bin Qasim, Pakistan; Yokohama, Japan; Kuwait Naval Base; Pusan, South Korea; Aja Port, Okinawa Island; Guantanamo, Cuba; Aqaba, Jordan; and Ummsaid, Qatar) accounted for 75% of outbound containers.

Shipments originating OCONUS and returning to CONUS were also considered. These containers were shipped from 75 OCONUS POEs. Ash Shuwaikh, Kuwait was the POE for 20% of inbound containers. The top ten POEs (Ash Shuwaikh plus Yokohama, Japan; Pusan, South Korea; Honolulu; Rotterdam, the Netherlands; Bremerhaven, Germany; Haifa, Israel; Anchorage; Aja Port, Okinawa Island; and Muhammad Bin Qasim, Pakistan) accounted for 71% of inbound containers.

Other than the countries of the European Union, we were unable to identify a readily available source of fuel price data that was updated in a timely fashion. Most USTRANSCOM shipments did not involve an OCONUS inland move within the European Union. Moreover, fuel prices vary widely from country to country within the European Union implying a need to know specific details of each inland move such as routing and where fuel was purchased in order the estimate a meaningful FAF.

The other requirement for developing a credible FAF is knowledge of the technical factors and "business model" of the freight transportation industry of each of the OCONUS countries. We were unable to develop this knowledge within the scope of the current project. We have no reason to believe that the freight transportation industries of Kuwait, Korea, Pakistan or Germany, for example, are identical or even closely similar. An extensive effort would be required to determine whether or not this were true. An even more extensive effort would be required to develop FAF approaches (analogous to the CONUS FAF) applicable to individual OCONUS countries or even sets of similar countries. A single FAF applicable to all of OCONUS would likely be meaningless. Furthermore, the administrative burden associated with having numerous country and/or regional FAFs could be extensive.

## 4.5. References

AASHTO, *User Benefit Analysis for Highways*, Washington, D.C.: American Association of State Highway Transportation Officials (2003).

*2007 Air Emissions Inventory, Section 5 Railroad Locomotives*, Port of Long Beach (2009), (Available at: www.polb.com/civica/filebank/blobdload.asp?BlobID=6021).

*2007 Goods Movement Air Emissions Inventory at the Port of Houston*, Starcrest Consulting Group, LLC (2009), (Available at: www.portofhouston.com/pdf/environmental/PHA-GM-AirEmissions-07.pdf).

*A Glance at Clean Freight Strategies, Intermodal Shipping*, U.S. Environmental Protection Agency, Office of Transportation and Air Quality (2004), (Available at: http://www.epa.gov/smartway/transport/documents/tech/intermodal-shipping.pdf).

Casgar, Christina S., et al., *Rail Short Haul Intermodal Corridor Case Studies: Industry Context and Issues*, Foundation for Intermodal Research & Education (FIRE) (2003), (Available at: http://www.fra.dot.gov/us/content/985).

"Fuel-Related Rate Adjustment Policy Update," Surface Deployment and Distribution Command (SDDC), Available at: http://www.sddc.army.mil/sddc/Content/Pub/13851//CABCN13851FSCPE15Oct05.pdf (Last Accessed: April 2009).

*Goods Movement Truck & Rail Study*, The Tioga Group, (Available at: www.scag.ca.gov/goodsmove/pdf/truckrail/ch7.pdf).

"Inland Fuel Surcharge (IFS)," OOCL, Available at: www.oocl.com/hongkong/eng/localinformation/localnews/2007/31Dec20070001.htm (Last Accessed: April 2009).

"Inland Fuel Surcharge Announcements," Tropical Shipping Available at: http://www.tropical.com/External/En/Press/TropicalNews/announce062707.htm (Last Accessed: April 2009).

"Inland Fuel Surcharge Calculator," Transpacific Stabilization Agreement Available at: www.tsacarriers.org/calc_inland.html (Last Accessed: April 2009).

"June 2008 Fuel Surcharge," Canadian Westbound Transpacific Stabilization Agreement (CWTSA), Available at: www.ups-scs.ca/about/NewsItemEn.aspx?NewsPostingId=261 (Last Accessed: April 2009).

"Letter Announcement: Fuel Surcharges," NYK Line (Thailand) Co., Ltd., Available at: www.nykline.co.th/main/new_release.php (Last Accessed: April 2009).

"Local Surcharges," Evergreen Shipping Agency Philippines Corporation, Available at: www.evergreen-shipping.com.ph/Notice/default.asp (Last Accessed: April 2009).

*North Carolina International Terminal, Planning Assumptions*, North Carolina State Ports Authority (2008), (Available at: http://spa.ncports.com/web/ncports.nsf/4a87ff3bf2c03cc38525646f0072ffa9/6d28af86ed9d134585257410005017ca/$FILE/NCIT%20Planning%20Assumptions.pdf).

"Notice To The Trade, Fuel Charge Filing Change: Central America," Crowley, Available at: www.crowley.com/mediaroom/newsline.asp?ID=824 (Last Accessed: April 2009).

Resor, R. R. and Blaze, J. R, *Short-Haul Rail Intermodal: Can It Compete With Trucks?*, Transportation Research Record No. 1873, Transportation Research Board (2004), (Available at: http://dx.doi.org/10.3141/1873-06).

Saenz, Norman, *Supply Chain Optimization 101*, MHIA News (2008), (Available at: www.mhia.org/news/industry/7105/supply-chain-optimization-101).

*Southeast Arizona Regional Transportation Profile Study*, Nogales Railroad Assessment Study (2005), (Available at: www.santacruzconnect.com/media/EDocs/Nogales_Railroad_Assessment.pdf).

"Surcharges Applicable For All Trades," Maersk Line, Available at: https://www.maerskline.com/link/?page=brochure&path=/our_services/adv/0845/all_trade (Last Accessed: April 2009).

"Surcharges: Bunker/Americas," MOL, Available at: www.powerinmotion.biz/surcharges/print_All.asp (Last Accessed: April 2009).

*Train Traffic Down, But Alameda Corridor Still in The Black*, The Cunningham Report (2009), (Available at: www.cunninghamreport.com/news_item.php?id=729).

"TransPacific Westbound Cargo Surcharges," K Line America Inc, Available at: www.kline.com/KAMSurcharges/Surcharges_TransPacific-Westbound.asp (Last Accessed: April 2009).

"U.S. On-Highway Diesel Fuel Prices, data tab 2," Energy Information Administration, Available at: http://tonto.eia.doe.gov/oog/ftparea/wogirs/xls/psw18vwall.xls (Last Accessed: April 2009).

*User Benefit Analysis for Highways*, American Association of State Highway Transportation Officials (AASHTO), Washington, DC, (2003).

"USTRANSCOM/TCAQ-1, MEMORANDUM FOR PROSPECTIVE OFFERORS, *Amendment 03 to Request for Proposal (RFP) #: HTC711-08-R-0011, Universal Services Contract (USC)-6, Scott AFB, IL,"* (Rate Rules and Provisions, Paragraph 2.2, BAF Baseline Fuel Price): (29 Sep 08).

"Weekly Retail On-Highway Diesel Prices," Energy Information Administration, Available at: http://tonto.eia.doe.gov/oog/info/wohdp/diesel.asp (Last Accessed: April 2009).

"WTSA Inland Fuel Surcharge," Westbound Transpacific Stabilization Agreement (WTSA), Available at: http://www.wtsacarriers.org/fs_inland.html (Last Accessed: April 2009).

Zaniewski, John.P., B. C. Butler, G. Cunningham, G. E. Elkins, M. S. Paggi, and R. Machemehl, *Vehicle Operating Costs, Fuel Consumption, and Pavement Type and Condition Factors*, prepared for U. S. Department of Transportation, Federal Highways Administration, Austin, TX: Texas Research and Development Foundation (June, 1982).

# 5: Appendices

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| ROUTE 1: US West Coast - Far East | | | | | | | | | |
| YOKOHAMA, COML TERMINAL | OAKLAND | 4608 | 4490 | 153.38 | 23.38 | 561.02 | 8.21 | 0.27 | 1259.85 |
| PUSAN (COML TML) | OAKLAND | 4911 | 4490 | 153.38 | 23.38 | 561.02 | 8.75 | 0.27 | 1342.69 |
| AJA PORT, OKINAWA ISLAND | OAKLAND | 5426 | 4490 | 153.38 | 23.38 | 561.02 | 9.67 | 0.27 | 1483.50 |
| YOKOHAMA, COML TERMINAL | SAN PEDRO | 4928 | 4490 | 153.38 | 23.38 | 561.02 | 8.78 | 0.27 | 1347.34 |
| PUSAN (COML TML) | SAN PEDRO | 5231 | 4490 | 153.38 | 23.38 | 561.02 | 9.32 | 0.27 | 1430.18 |
| AJA PORT, OKINAWA ISLAND | SAN PEDRO | 5746 | 4490 | 153.38 | 23.38 | 561.02 | 10.24 | 0.27 | 1570.99 |
| OAKLAND | YOKOHAMA, COML TERMINAL | 4608 | 4490 | 153.38 | 23.38 | 561.02 | 8.21 | 0.27 | 1259.85 |
| KOBE | OAKLAND | 4853 | 4490 | 153.38 | 23.38 | 561.02 | 8.65 | 0.27 | 1326.84 |
| OAKLAND | PUSAN (COML TML) | 4911 | 4490 | 153.38 | 23.38 | 561.02 | 8.75 | 0.27 | 1342.69 |
| PUSAN (COML TML) | LOS ANGELES | 5227 | 4490 | 153.38 | 23.38 | 561.02 | 9.32 | 0.27 | 1429.09 |
| SINGAPORE | OAKLAND | 7374 | 4490 | 153.38 | 23.38 | 561.02 | 13.14 | 0.27 | 2016.09 |
| SAN PEDRO | PUSAN (COML TML) | 5231 | 4490 | 153.38 | 23.38 | 561.02 | 9.32 | 0.27 | 1430.18 |
| SAN PEDRO | YOKOHAMA, COML TERMINAL | 4928 | 4490 | 153.38 | 23.38 | 561.02 | 8.78 | 0.27 | 1347.34 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| YOKOHAMA, COML TERMINAL | LOS ANGELES | 4924 | 4490 | 153.38 | 23.38 | 561.02 | 8.78 | 0.27 | 1346.25 |
| SINGAPORE | SAN PEDRO | 7694 | 4490 | 153.38 | 23.38 | 561.02 | 13.71 | 0.27 | 2103.58 |
| SAN PEDRO | AJA PORT, OKINAWA ISLAND | 5746 | 4490 | 153.38 | 23.38 | 561.02 | 10.24 | 0.27 | 1570.99 |
| LOS ANGELES | PUSAN (COML TML) | 5227 | 4490 | 153.38 | 23.38 | 561.02 | 9.32 | 0.27 | 1429.09 |
| KOBE | LOS ANGELES | 5169 | 4490 | 153.38 | 23.38 | 561.02 | 9.21 | 0.27 | 1413.23 |
| OAKLAND | AJA PORT, OKINAWA ISLAND | 5426 | 4490 | 153.38 | 23.38 | 561.02 | 9.67 | 0.27 | 1483.50 |
| TENGAN, OKINAWA | PORT CHICAGO, CONCORD | 5453 | 4490 | 153.38 | 23.38 | 561.02 | 9.72 | 0.27 | 1490.88 |
| LOS ANGELES | YOKOHAMA, COML TERMINAL | 4924 | 4490 | 153.38 | 23.38 | 561.02 | 8.78 | 0.27 | 1346.25 |
| ROUTE 2: Continental Europe, United Kingdom, Ireland - Middle East, South Asia, Indian Ocean | | | | | | | | | |
| ASH SHUWAIKH, KUWAIT | ROTTERDAM | 6724 | 4584 | 149.14 | 23.11 | 554.57 | 12.12 | 0.27 | 1808.27 |
| KARACHI | ANTWERP | 6142 | 4584 | 149.14 | 23.11 | 554.57 | 11.08 | 0.27 | 1651.75 |
| AQABA | ROTTERDAM | 3655 | 4584 | 149.14 | 23.11 | 554.57 | 6.59 | 0.27 | 982.93 |
| MUHAMMAD BIN QASIM | ROTTERDAM | 6137 | 4584 | 149.14 | 23.11 | 554.57 | 11.07 | 0.27 | 1650.41 |
| ASH SHUWAIKH, KUWAIT | ANTWERP | 6544 | 4584 | 149.14 | 23.11 | 554.57 | 11.80 | 0.27 | 1759.86 |
| UMMSAID, QATAR | ROTTERDAM | 6346 | 4584 | 149.14 | 23.11 | 554.57 | 11.44 | 0.27 | 1706.61 |
| ROTTERDAM | KARACHI | 6137 | 4584 | 149.14 | 23.11 | 554.57 | 11.07 | 0.27 | 1650.41 |
| ROTTERDAM | ASH SHUWAIKH, KUWAIT | 6538 | 4584 | 149.14 | 23.11 | 554.57 | 11.79 | 0.27 | 1758.25 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| MUHAMMAD BIN QASIM | BREMERHAVEN | 6338 | 4584 | 149.14 | 23.11 | 554.57 | 11.43 | 0.27 | 1704.46 |
| ASH SHUAIBAH - MILITARY | ANTWERP | 6544 | 4584 | 149.14 | 23.11 | 554.57 | 11.80 | 0.27 | 1759.86 |
| ASH SHUWAIKH, KUWAIT | BREMERHAVEN | 6739 | 4584 | 149.14 | 23.11 | 554.57 | 12.15 | 0.27 | 1812.30 |
| KARACHI | BREMERHAVEN | 6338 | 4584 | 149.14 | 23.11 | 554.57 | 11.43 | 0.27 | 1704.46 |
| SOUTH PORT UMM QASR, IRAQ | ROTTERDAM | 6632 | 4584 | 149.14 | 23.11 | 554.57 | 11.96 | 0.27 | 1783.53 |
| SOUTH PORT UMM QASR, IRAQ | BREMERHAVEN | 6833 | 4584 | 149.14 | 23.11 | 554.57 | 12.32 | 0.27 | 1837.58 |
| AD DAMMAN | ROTTERDAM | 6377 | 4584 | 149.14 | 23.11 | 554.57 | 11.50 | 0.27 | 1714.95 |
| KARACHI | ROTTERDAM | 6137 | 4584 | 149.14 | 23.11 | 554.57 | 11.07 | 0.27 | 1650.41 |
| AQABA | ANTWERP | 3660 | 4584 | 149.14 | 23.11 | 554.57 | 6.60 | 0.27 | 984.27 |
| BREMERHAVEN | KARACHI | 6142 | 4584 | 149.14 | 23.11 | 554.57 | 11.08 | 0.27 | 1651.75 |
| ROUTE 5: U.S. East Coast - Continental Europe, United Kingdom, Ireland | | | | | | | | | |
| CHARLESTON WET STORAGE BASIN | ANTWERP | 3763 | 3373 | 115.69 | 22.25 | 533.95 | 7.05 | 0.22 | 815.32 |
| ANTWERP | NORFOLK | 3488 | 3373 | 115.69 | 22.25 | 533.95 | 6.53 | 0.22 | 755.74 |
| ROTTERDAM | PORTSMOUTH | 3485 | 3373 | 115.69 | 22.25 | 533.95 | 6.53 | 0.22 | 755.09 |
| ROTTERDAM | PORT ELIZABETH, NJ | 3273 | 3373 | 115.69 | 22.25 | 533.95 | 6.13 | 0.22 | 709.16 |
| ANTWERP | CHARLESTON | 3763 | 3373 | 115.69 | 22.25 | 533.95 | 7.05 | 0.22 | 815.32 |
| NORFOLK | ROTTERDAM | 3483 | 3373 | 115.69 | 22.25 | 533.95 | 6.52 | 0.22 | 754.66 |
| NORDENHEIM | SOUTHPORT (MOTSU) | 4280 | 3373 | 115.69 | 22.25 | 533.95 | 8.02 | 0.22 | 927.34 |
| NORFOLK | ANTWERP | 3488 | 3373 | 115.69 | 22.25 | 533.95 | 6.53 | 0.22 | 755.74 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| ANTWERP | BALTIMORE | 3608 | 3373 | 115.69 | 22.25 | 533.95 | 6.76 | 0.22 | 781.74 |
| FELIXSTOWE | PORTSMOUTH | 3004 | 3373 | 115.69 | 22.25 | 533.95 | 5.63 | 0.22 | 650.87 |
| NORFOLK | BREMERHAVEN | 3607 | 3373 | 115.69 | 22.25 | 533.95 | 6.76 | 0.22 | 781.52 |
| BREMERHAVEN | NORFOLK | 3607 | 3373 | 115.69 | 22.25 | 533.95 | 6.76 | 0.22 | 781.52 |
| ANTWERP | CHARLESTON WET STORAGE BASIN | 3763 | 3373 | 115.69 | 22.25 | 533.95 | 7.05 | 0.22 | 815.32 |
| BREMERHAVEN | PORTSMOUTH | 3609 | 3373 | 115.69 | 22.25 | 533.95 | 6.76 | 0.22 | 781.96 |
| CHARLESTON | ROTTERDAM | 3758 | 3373 | 115.69 | 22.25 | 533.95 | 7.04 | 0.22 | 814.24 |
| NORFOLK | FELIXSTOWE | 3412 | 3373 | 115.69 | 22.25 | 533.95 | 6.39 | 0.22 | 739.27 |
| PORTSMOUTH | FELIXSTOWE | 3414 | 3373 | 115.69 | 22.25 | 533.95 | 6.39 | 0.22 | 739.71 |
| CHARLESTON WET STORAGE BASIN | BREMERHAVEN | 3883 | 3373 | 115.69 | 22.25 | 533.95 | 7.27 | 0.22 | 841.32 |
| CHARLESTON | ANTWERP | 3763 | 3373 | 115.69 | 22.25 | 533.95 | 7.05 | 0.22 | 815.32 |
| CHARLESTON WET STORAGE BASIN | SOUTHAMPTON | 3528 | 3373 | 115.69 | 22.25 | 533.95 | 6.61 | 0.22 | 764.41 |
| ROUTE 6A, 6B, 6C: U.S. East Coast - Western Mediterranean, Eastern Mediterranean, Adriatic Sea | | | | | | | | | |
| GIOIA TAURO, ITALY | PORTSMOUTH | 4380 | 3047 | 102.23 | 21.51 | 516.27 | 8.48 | 0.20 | 867.30 |
| GENOA | PORT ELIZABETH, NJ | 4026 | 3047 | 102.23 | 21.51 | 516.27 | 7.80 | 0.20 | 797.20 |
| ALGECIRAS | PORTSMOUTH | 3360 | 3047 | 102.23 | 21.51 | 516.27 | 6.51 | 0.20 | 665.33 |
| GIOIA TAURO, ITALY | NEWPORT NEWS | 4388 | 3047 | 102.23 | 21.51 | 516.27 | 8.50 | 0.20 | 868.89 |
| GIOIA TAURO, ITALY | PORT ELIZABETH, NJ | 4202 | 3047 | 102.23 | 21.51 | 516.27 | 8.14 | 0.20 | 832.06 |
| NEWPORT NEWS | GIOIA TAURO, ITALY | 4388 | 3047 | 102.23 | 21.51 | 516.27 | 8.50 | 0.20 | 868.89 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| ALGECIRAS | PORT ELIZABETH, NJ | 3182 | 3047 | 102.23 | 21.51 | 516.27 | 6.16 | 0.20 | 630.08 |
| PORT ELIZABETH, NJ | GIOIA TAURO, ITALY | 4202 | 3047 | 102.23 | 21.51 | 516.27 | 8.14 | 0.20 | 832.06 |
| ALICANTE | PORT ELIZABETH, NJ | 3530 | 3047 | 102.23 | 21.51 | 516.27 | 6.84 | 0.20 | 698.99 |
| PORT ELIZABETH, NJ | GENOA | 4026 | 3047 | 102.23 | 21.51 | 516.27 | 7.80 | 0.20 | 797.20 |
| GIOIA TAURO, ITALY | CHARLESTON | 4622 | 3047 | 102.23 | 21.51 | 516.27 | 8.95 | 0.20 | 915.22 |
| PORT ELIZABETH, NJ | LEGHORN | 4045 | 3047 | 102.23 | 21.51 | 516.27 | 7.84 | 0.20 | 800.97 |
| ALGECIRAS | NEWPORT NEWS | 3368 | 3047 | 102.23 | 21.51 | 516.27 | 6.52 | 0.20 | 666.91 |
| GENOA | PORTSMOUTH | 4204 | 3047 | 102.23 | 21.51 | 516.27 | 8.14 | 0.20 | 832.45 |
| ALGECIRAS | CHARLESTON | 3602 | 3047 | 102.23 | 21.51 | 516.27 | 6.98 | 0.20 | 713.25 |
| GENOA | CHARLESTON | 4446 | 3047 | 102.23 | 21.51 | 516.27 | 8.61 | 0.20 | 880.37 |
| TOMBOLO (AMMO HANDLING PORT) | SOUTHPORT (MOTSU) | 5583 | 3047 | 102.23 | 21.51 | 516.27 | 10.81 | 0.20 | 1105.51 |
| LEGHORN | CHARLESTON | 4466 | 3047 | 102.23 | 21.51 | 516.27 | 8.65 | 0.20 | 884.33 |
| PORT ELIZABETH, NJ | ALGECIRAS | 3182 | 3047 | 102.23 | 21.51 | 516.27 | 6.16 | 0.20 | 630.08 |
| GENOA | NEWPORT NEWS | 4212 | 3047 | 102.23 | 21.51 | 516.27 | 8.16 | 0.20 | 834.04 |
| CHARLESTON | ALGECIRAS | 3602 | 3047 | 102.23 | 21.51 | 516.27 | 6.98 | 0.20 | 713.25 |
| NEWPORT NEWS | ALGECIRAS | 3368 | 3047 | 102.23 | 21.51 | 516.27 | 6.52 | 0.20 | 666.91 |
| LEGHORN | PORT ELIZABETH, NJ | 4045 | 3047 | 102.23 | 21.51 | 516.27 | 7.84 | 0.20 | 800.97 |
| NEWPORT NEWS | LEGHORN | 4232 | 3047 | 102.23 | 21.51 | 516.27 | 8.20 | 0.20 | 838.00 |
| PORTSMOUTH | GIOIA TAURO, ITALY | 4380 | 3047 | 102.23 | 21.51 | 516.27 | 8.48 | 0.20 | 867.30 |
| LEGHORN | NEWPORT NEWS | 4232 | 3047 | 102.23 | 21.51 | 516.27 | 8.20 | 0.20 | 838.00 |
| CHARLESTON | LA SPEZIA | 4467 | 3047 | 102.23 | 21.51 | 516.27 | 8.65 | 0.20 | 884.53 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| CADIZ | SOUTHPORT (MOTSU) | 3857 | 3047 | 102.23 | 21.51 | 516.27 | 7.47 | 0.20 | 763.74 |
| MALAGA | PORTSMOUTH | 3425 | 3047 | 102.23 | 21.51 | 516.27 | 6.63 | 0.20 | 678.20 |
| PORT ELIZABETH, NJ | LA SPEZIA | 4046 | 3047 | 102.23 | 21.51 | 516.27 | 7.84 | 0.20 | 801.17 |
| ALICANTE | PORTSMOUTH | 3708 | 3047 | 102.23 | 21.51 | 516.27 | 7.18 | 0.20 | 734.24 |
| LEGHORN | PORTSMOUTH | 4224 | 3047 | 102.23 | 21.51 | 516.27 | 8.18 | 0.20 | 836.41 |
| NEWPORT NEWS | CATANIA (NAF SIGONELLA) | 4411 | 3047 | 102.23 | 21.51 | 516.27 | 8.54 | 0.20 | 873.44 |
| CHARLESTON | GIOIA TAURO, ITALY | 4622 | 3047 | 102.23 | 21.51 | 516.27 | 8.95 | 0.20 | 915.22 |
| MERSIN | PORTSMOUTH | 5347 | 3047 | 102.23 | 21.51 | 516.27 | 10.36 | 0.20 | 1058.78 |
| THESSALONIKI | PORT ELIZABETH, NJ | 4892 | 3047 | 102.23 | 21.51 | 516.27 | 9.48 | 0.20 | 968.69 |
| IZMIR | NEWPORT NEWS | 5016 | 3047 | 102.23 | 21.51 | 516.27 | 9.72 | 0.20 | 993.24 |
| IZMIR | PORTSMOUTH | 5008 | 3047 | 102.23 | 21.51 | 516.27 | 9.70 | 0.20 | 991.65 |
| ASHDOD | SOUTHPORT (MOTSU) | 5914 | 3047 | 102.23 | 21.51 | 516.27 | 11.46 | 0.20 | 1171.06 |
| IZMIR | CHARLESTON | 5250 | 3047 | 102.23 | 21.51 | 516.27 | 10.17 | 0.20 | 1039.57 |
| ALEXANDRIA | PORTSMOUTH | 5152 | 3047 | 102.23 | 21.51 | 516.27 | 9.98 | 0.20 | 1020.17 |
| PORT ELIZABETH, NJ | HAIFA | 5177 | 3047 | 102.23 | 21.51 | 516.27 | 10.03 | 0.20 | 1025.12 |
| ALEXANDRIA | SOUTHPORT (MOTSU) | 5708 | 3047 | 102.23 | 21.51 | 516.27 | 11.06 | 0.20 | 1130.26 |
| ALEXANDRIA | NEWPORT NEWS | 5160 | 3047 | 102.23 | 21.51 | 516.27 | 9.99 | 0.20 | 1021.75 |
| PIRAEUS | PORTSMOUTH | 4858 | 3047 | 102.23 | 21.51 | 516.27 | 9.41 | 0.20 | 961.95 |
| IZMIR | NORFOLK | 5007 | 3047 | 102.23 | 21.51 | 516.27 | 9.70 | 0.20 | 991.46 |
| CHARLESTON | HAIFA | 5597 | 3047 | 102.23 | 21.51 | 516.27 | 10.84 | 0.20 | 1108.29 |
| ALEXANDRIA | CHARLESTON | 5597 | 3047 | 102.23 | 21.51 | 516.27 | 10.84 | 0.20 | 1108.29 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| IZMIR | PORT ELIZABETH, NJ | 4830 | 3047 | 102.23 | 21.51 | 516.27 | 9.36 | 0.20 | 956.41 |
| CHARLESTON | IZMIR | 5250 | 3047 | 102.23 | 21.51 | 516.27 | 10.17 | 0.20 | 1039.57 |
| PIRAEUS | NEWPORT NEWS | 4866 | 3047 | 102.23 | 21.51 | 516.27 | 9.43 | 0.20 | 963.54 |
| NEWPORT NEWS | IZMIR | 5016 | 3047 | 102.23 | 21.51 | 516.27 | 9.72 | 0.20 | 993.24 |
| THESSALONIKI | PORT NEWARK, NJ | 4892 | 3047 | 102.23 | 21.51 | 516.27 | 9.48 | 0.20 | 968.69 |
| ALEXANDRIA | PORT ELIZABETH, NJ | 4973 | 3047 | 102.23 | 21.51 | 516.27 | 9.63 | 0.20 | 984.72 |
| PORT ELIZABETH, NJ | IZMIR | 4830 | 3047 | 102.23 | 21.51 | 516.27 | 9.36 | 0.20 | 956.41 |
| PIRAEUS | SOUTHPORT (MOTSU) | 5414 | 3047 | 102.23 | 21.51 | 516.27 | 10.49 | 0.20 | 1072.05 |
| HAIFA | PORT ELIZABETH, NJ | 5177 | 3047 | 102.23 | 21.51 | 516.27 | 10.03 | 0.20 | 1025.12 |
| IZMIR | SAVANNAH | 5412 | 3047 | 102.23 | 21.51 | 516.27 | 10.48 | 0.20 | 1071.65 |
| BEIRUT | CHARLESTON | 5602 | 3047 | 102.23 | 21.51 | 516.27 | 10.85 | 0.20 | 1109.28 |
| MERSIN | CHARLESTON | 5589 | 3047 | 102.23 | 21.51 | 516.27 | 10.83 | 0.20 | 1106.70 |
| THESSALONIKI | NEWPORT NEWS | 5078 | 3047 | 102.23 | 21.51 | 516.27 | 9.84 | 0.20 | 1005.52 |
| THESSALONIKI | PORTSMOUTH | 5070 | 3047 | 102.23 | 21.51 | 516.27 | 9.82 | 0.20 | 1003.93 |
| CHARLESTON | ALEXANDRIA | 5394 | 3047 | 102.23 | 21.51 | 516.27 | 10.45 | 0.20 | 1068.09 |
| SUDA BAY, CRETE | CHARLESTON WET STORAGE BASIN | 5037 | 3047 | 102.23 | 21.51 | 516.27 | 9.76 | 0.20 | 997.40 |
| PIRAEUS | CHARLESTON | 5100 | 3047 | 102.23 | 21.51 | 516.27 | 9.88 | 0.20 | 1009.87 |
| NEWPORT NEWS | HAIFA | 5363 | 3047 | 102.23 | 21.51 | 516.27 | 10.39 | 0.20 | 1061.95 |
| KOPER | NEWPORT NEWS | 5029 | 3047 | 102.23 | 21.51 | 516.27 | 9.74 | 0.20 | 995.81 |
| KOPER | PORTSMOUTH | 5021 | 3047 | 102.23 | 21.51 | 516.27 | 9.73 | 0.20 | 994.23 |
| KOPER | PORT ELIZABETH, NJ | 4843 | 3047 | 102.23 | 21.51 | 516.27 | 9.38 | 0.20 | 958.98 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| PLOCE | NEWPORT NEWS | 4796 | 3047 | 102.23 | 21.51 | 516.27 | 9.29 | 0.20 | 949.68 |
| KOPER | PORT NEWARK, NJ | 4844 | 3047 | 102.23 | 21.51 | 516.27 | 9.38 | 0.20 | 959.18 |
| KOPER | CHARLESTON | 5263 | 3047 | 102.23 | 21.51 | 516.27 | 10.19 | 0.20 | 1042.15 |
| ROUTE 7: U.S. East Coast - Middle East, South Asia, Indian Ocean | | | | | | | | | |
| ASH SHUWAIKH, KUWAIT | PORT ELIZABETH, NJ | 8403 | 3480 | 121.72 | 22.53 | 540.77 | 15.54 | 0.23 | 1891.35 |
| ASH SHUWAIKH, KUWAIT | CHARLESTON | 8779 | 3480 | 121.72 | 22.53 | 540.77 | 16.23 | 0.23 | 1975.98 |
| ASH SHUWAIKH, KUWAIT | PORTSMOUTH | 8537 | 3480 | 121.72 | 22.53 | 540.77 | 15.79 | 0.23 | 1921.51 |
| KUWAIT NAVAL BASE | SOUTHPORT (MOTSU) | 9093 | 3480 | 121.72 | 22.53 | 540.77 | 16.81 | 0.23 | 2046.66 |
| ASH SHUWAIKH, KUWAIT | NORFOLK | 8535 | 3480 | 121.72 | 22.53 | 540.77 | 15.78 | 0.23 | 1921.06 |
| ASH SHUAIBAH - MILITARY | CHARLESTON WET STORAGE BASIN | 8535 | 3480 | 121.72 | 22.53 | 540.77 | 15.78 | 0.23 | 1921.06 |
| MUHAMMAD BIN QASIM | PORT ELIZABETH, NJ | 7957 | 3480 | 121.72 | 22.53 | 540.77 | 14.71 | 0.23 | 1790.96 |
| MUHAMMAD BIN QASIM | PORTSMOUTH | 8136 | 3480 | 121.72 | 22.53 | 540.77 | 15.05 | 0.23 | 1831.25 |
| KARACHI | NORFOLK | 8134 | 3480 | 121.72 | 22.53 | 540.77 | 15.04 | 0.23 | 1830.80 |
| MUHAMMAD BIN QASIM | NORFOLK | 8134 | 3480 | 121.72 | 22.53 | 540.77 | 15.04 | 0.23 | 1830.80 |
| MUHAMMAD BIN QASIM | CHARLESTON | 8378 | 3480 | 121.72 | 22.53 | 540.77 | 15.49 | 0.23 | 1885.72 |
| UMMSAID, QATAR | PORTSMOUTH | 8344 | 3480 | 121.72 | 22.53 | 540.77 | 15.43 | 0.23 | 1878.07 |
| ASH SHUWAIKH, KUWAIT | HOWLAND HOOK,S.IS, NY | 8360 | 3480 | 121.72 | 22.53 | 540.77 | 15.46 | 0.23 | 1881.67 |
| CHARLESTON | ASH SHUWAIKH , KUWAIT | 8779 | 3480 | 121.72 | 22.53 | 540.77 | 16.23 | 0.23 | 1975.98 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| JACKSON-VILLE | ASH SHUAIBAH - MILITARY | 8918 | 3480 | 121.72 | 22.53 | 540.77 | 16.49 | 0.23 | 2007.27 |
| UMMSAID, QATAR | PORT ELIZ-ABETH, NJ | 8166 | 3480 | 121.72 | 22.53 | 540.77 | 15.10 | 0.23 | 1838.01 |
| JEBEL ALI, UNITED ARAB EMIRATES | PORTS-MOUTH | 8186 | 3480 | 121.72 | 22.53 | 540.77 | 15.14 | 0.23 | 1842.51 |
| UMMSAID, QATAR | SOUTH-PORT (MOTSU) | 8901 | 3480 | 121.72 | 22.53 | 540.77 | 16.46 | 0.23 | 2003.44 |
| DJIBOUTI | PORT ELIZ-ABETH, NJ | 6485 | 3480 | 121.72 | 22.53 | 540.77 | 11.99 | 0.23 | 1459.65 |
| AQABA | PORTS-MOUTH | 5654 | 3480 | 121.72 | 22.53 | 540.77 | 10.46 | 0.23 | 1272.60 |
| JEBEL ALI, UNITED ARAB EMIRATES | PORT ELIZ-ABETH, NJ | 8008 | 3480 | 121.72 | 22.53 | 540.77 | 14.81 | 0.23 | 1802.44 |
| ASH SHUWAIKH, KUWAIT | PORT NEWARK, NJ | 8359 | 3480 | 121.72 | 22.53 | 540.77 | 15.46 | 0.23 | 1881.45 |
| CHARLESTON WET STOR-AGE BASIN | ASH SHUAIBAH - MILITARY | 8779 | 3480 | 121.72 | 22.53 | 540.77 | 16.23 | 0.23 | 1975.98 |
| KARACHI | CHARLES-TON | 8378 | 3480 | 121.72 | 22.53 | 540.77 | 15.49 | 0.23 | 1885.72 |
| AQABA | PORT ELIZ-ABETH, NJ | 5475 | 3480 | 121.72 | 22.53 | 540.77 | 10.12 | 0.23 | 1232.31 |
| KARACHI | HOWLAND HOOK,S.IS, NY | 7958 | 3480 | 121.72 | 22.53 | 540.77 | 14.72 | 0.23 | 1791.19 |
| BAHRAIN | PORTS-MOUTH | 8376 | 3480 | 121.72 | 22.53 | 540.77 | 15.49 | 0.23 | 1885.27 |
| KARACHI | PORT ELIZ-ABETH, NJ | 7957 | 3480 | 121.72 | 22.53 | 540.77 | 14.71 | 0.23 | 1790.96 |
| AQABA | CHARLES-TON | 5896 | 3480 | 121.72 | 22.53 | 540.77 | 10.90 | 0.23 | 1327.07 |
| UMMSAID, QATAR | CHARLES-TON | 8586 | 3480 | 121.72 | 22.53 | 540.77 | 15.88 | 0.23 | 1932.54 |
| ASH SHUAI-BAH - MILI-TARY | BALTI-MORE | 8653 | 3480 | 121.72 | 22.53 | 540.77 | 16.00 | 0.23 | 1947.62 |
| BAHRAIN | PORT ELIZ-ABETH, NJ | 8197 | 3480 | 121.72 | 22.53 | 540.77 | 15.16 | 0.23 | 1844.98 |
| DJIBOUTI | PORTS-MOUTH | 6663 | 3480 | 121.72 | 22.53 | 540.77 | 12.32 | 0.23 | 1499.71 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| ASH SHUAIBAH - MILITARY | PHILADELPHIA | 8519 | 3480 | 121.72 | 22.53 | 540.77 | 15.75 | 0.23 | 1917.46 |
| KARACHI | PORT NEWARK, NJ | 7958 | 3480 | 121.72 | 22.53 | 540.77 | 14.72 | 0.23 | 1791.19 |
| KARACHI | PORTSMOUTH | 8136 | 3480 | 121.72 | 22.53 | 540.77 | 15.05 | 0.23 | 1831.25 |
| ROUTE 10: U.S. Gulf Coast - Scandinavia, Baltic Sea | | | | | | | | | |
| GDYNIA | HOUSTON | 5443 | 2681 | 89.75 | 21.09 | 506.26 | 10.75 | 0.18 | 964.94 |
| OSLO | HOUSTON | 5147 | 2681 | 89.75 | 21.09 | 506.26 | 10.17 | 0.18 | 912.46 |
| HOUSTON | OSLO | 5147 | 2681 | 89.75 | 21.09 | 506.26 | 10.17 | 0.18 | 912.46 |
| ROUTE 11: U.S. Gulf Coast - Continental Europe, United Kingdom, Ireland | | | | | | | | | |
| HOUSTON | ANTWERP | 4976 | 3045 | 96.98 | 21.69 | 520.61 | 9.56 | 0.19 | 926.95 |
| HOUSTON | ROTTERDAM | 4972 | 3045 | 96.98 | 21.69 | 520.61 | 9.55 | 0.19 | 926.21 |
| ANTWERP | HOUSTON | 4976 | 3045 | 96.98 | 21.69 | 520.61 | 9.56 | 0.19 | 926.95 |
| ROTTERDAM | HOUSTON | 4972 | 3045 | 96.98 | 21.69 | 520.61 | 9.55 | 0.19 | 926.21 |
| BREMERHAVEN | HOUSTON | 5117 | 3045 | 96.98 | 21.69 | 520.61 | 9.83 | 0.19 | 953.22 |
| HOUSTON | BREMERHAVEN | 5117 | 3045 | 96.98 | 21.69 | 520.61 | 9.83 | 0.19 | 953.22 |
| ROUTE 12A, 12B, 12C: U.S. Gulf Coast - Western Mediterranean, Eastern Mediterranean, Adriatic Sea | | | | | | | | | |
| ALGECIRAS | HOUSTON | 4711 | 2875 | 103.56 | 21.30 | 511.27 | 9.21 | 0.20 | 954.26 |
| LEGHORN | HOUSTON | 5575 | 2875 | 103.56 | 21.30 | 511.27 | 10.90 | 0.20 | 1129.27 |
| GIOIA TAURO, ITALY | HOUSTON | 5731 | 2875 | 103.56 | 21.30 | 511.27 | 11.21 | 0.20 | 1160.87 |
| GENOA | HOUSTON | 5555 | 2875 | 103.56 | 21.30 | 511.27 | 10.87 | 0.20 | 1125.22 |
| BEAUMONT | ROTA | 4598 | 2875 | 103.56 | 21.30 | 511.27 | 8.99 | 0.20 | 931.37 |
| HOUSTON | GENOA | 5555 | 2875 | 103.56 | 21.30 | 511.27 | 10.87 | 0.20 | 1125.22 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| HOUSTON | ALGECIRAS | 4711 | 2875 | 103.56 | 21.30 | 511.27 | 9.21 | 0.20 | 954.26 |
| HOUSTON | LA SPEZIA | 5576 | 2875 | 103.56 | 21.30 | 511.27 | 10.91 | 0.20 | 1129.48 |
| HOUSTON | HAIFA | 6707 | 2875 | 103.56 | 21.30 | 511.27 | 13.12 | 0.20 | 1358.57 |
| HOUSTON | IZMIR | 6360 | 2875 | 103.56 | 21.30 | 511.27 | 12.44 | 0.20 | 1288.28 |
| HOUSTON | PIRAEUS | 6209 | 2875 | 103.56 | 21.30 | 511.27 | 12.14 | 0.20 | 1257.70 |
| IZMIR | HOUSTON | 6360 | 2875 | 103.56 | 21.30 | 511.27 | 12.44 | 0.20 | 1288.28 |
| THESSALONIKI | HOUSTON | 6421 | 2875 | 103.56 | 21.30 | 511.27 | 12.56 | 0.20 | 1300.64 |
| HOUSTON | ALEXANDRIA | 6503 | 2875 | 103.56 | 21.30 | 511.27 | 12.72 | 0.20 | 1317.25 |
| HOUSTON | THESSALONIKI | 6421 | 2875 | 103.56 | 21.30 | 511.27 | 12.56 | 0.20 | 1300.64 |
| KOPER | HOUSTON | 6373 | 2875 | 103.56 | 21.30 | 511.27 | 12.47 | 0.20 | 1290.92 |
| ROUTE 13: U.S. Gulf Coast - Middle East, South Asia, Indian Ocean | | | | | | | | | |
| ASH SHUWAIKH, KUWAIT | HOUSTON | 9888 | 3022 | 103.39 | 21.76 | 522.17 | 18.94 | 0.20 | 1957.77 |
| ASH SHUAIBAH - MILITARY | BEAUMONT | 9838 | 3022 | 103.39 | 21.76 | 522.17 | 18.84 | 0.20 | 1947.87 |
| HOUSTON | ASH SHUWAIKH, KUWAIT | 9888 | 3022 | 103.39 | 21.76 | 522.17 | 18.94 | 0.20 | 1957.77 |
| MUHAMMAD BIN QASIM | HOUSTON | 9487 | 3022 | 103.39 | 21.76 | 522.17 | 18.17 | 0.20 | 1878.37 |
| BEAUMONT | ASH SHUAIBAH - MILITARY | 9838 | 3022 | 103.39 | 21.76 | 522.17 | 18.84 | 0.20 | 1947.87 |
| UMMSAID, QATAR | HOUSTON | 9695 | 3022 | 103.39 | 21.76 | 522.17 | 18.57 | 0.20 | 1919.56 |
| ASH SHUAIBAH - MILITARY | HOUSTON | 9888 | 3022 | 103.39 | 21.76 | 522.17 | 18.94 | 0.20 | 1957.77 |
| KARACHI | HOUSTON | 9487 | 3022 | 103.39 | 21.76 | 522.17 | 18.17 | 0.20 | 1878.37 |
| JEBEL ALI, UNITED ARAB EMIRATES | HOUSTON | 9537 | 3022 | 103.39 | 21.76 | 522.17 | 18.26 | 0.20 | 1888.27 |
| AQABA | HOUSTON | 7005 | 3022 | 103.39 | 21.76 | 522.17 | 13.42 | 0.20 | 1386.95 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| ASH SHUAIBAH - MILITARY | CORPUS CRISTI | 9955 | 3022 | 103.39 | 21.76 | 522.17 | 19.06 | 0.20 | 1971.04 |
| ROUTE 16: Hawaii - Far East | | | | | | | | | |
| HONOLULU | YOKOHAMA, COML TERMINAL | 3518 | 3004 | 120.57 | 22.16 | 531.84 | 6.61 | 0.23 | 797.55 |
| HONOLULU | PUSAN (COML TML) | 4039 | 3004 | 120.57 | 22.16 | 531.84 | 7.59 | 0.23 | 915.66 |
| HONOLULU | AJA PORT, OKINAWA ISLAND | 4442 | 3004 | 120.57 | 22.16 | 531.84 | 8.35 | 0.23 | 1007.02 |
| YOKOHAMA, COML TERMINAL | HONOLULU | 3518 | 3004 | 120.57 | 22.16 | 531.84 | 6.61 | 0.23 | 797.55 |
| HONOLULU | LAEM CHABANG | 6084 | 3004 | 120.57 | 22.16 | 531.84 | 11.44 | 0.23 | 1379.27 |
| SUBIC BAY | HONOLULU | 4995 | 3004 | 120.57 | 22.16 | 531.84 | 9.39 | 0.23 | 1132.39 |
| HONOLULU | MANILA | 4921 | 3004 | 120.57 | 22.16 | 531.84 | 9.25 | 0.23 | 1115.61 |
| HONOLULU | SUBIC BAY | 4995 | 3004 | 120.57 | 22.16 | 531.84 | 9.39 | 0.23 | 1132.39 |
| AJA PORT, OKINAWA ISLAND | HONOLULU | 4442 | 3004 | 120.57 | 22.16 | 531.84 | 8.35 | 0.23 | 1007.02 |
| LAEM CHABANG | HONOLULU | 6084 | 3004 | 120.57 | 22.16 | 531.84 | 11.44 | 0.23 | 1379.27 |
| ROUTE 32: U.S. East Coast - Scandinavia, Baltic Sea | | | | | | | | | |
| SZCZECIN | SOUTHPORT (MOTSU) | 4508 | 3397 | 126.88 | 22.38 | 537.09 | 8.39 | 0.24 | 1064.97 |
| OSLO | CHARLESTON | 3912 | 3397 | 126.88 | 22.38 | 537.09 | 7.28 | 0.24 | 924.17 |
| TRONDHEIM | PORTSMOUTH | 3482 | 3397 | 126.88 | 22.38 | 537.09 | 6.48 | 0.24 | 822.59 |
| OSLO | PORTSMOUTH | 3639 | 3397 | 126.88 | 22.38 | 537.09 | 6.78 | 0.24 | 859.68 |
| DRAMMEN | CHARLESTON WET STORAGE BASIN | 3891 | 3397 | 126.88 | 22.38 | 537.09 | 7.24 | 0.24 | 919.21 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| TRONDHEIM | CHARLESTON | 3770 | 3397 | 126.88 | 22.38 | 537.09 | 7.02 | 0.24 | 890.63 |
| CHARLESTON | TRONDHEIM | 3770 | 3397 | 126.88 | 22.38 | 537.09 | 7.02 | 0.24 | 890.63 |
| CHARLESTON | OSLO | 3912 | 3397 | 126.88 | 22.38 | 537.09 | 7.28 | 0.24 | 924.17 |
| BRUNSWICK | DRAMMEN | 4019 | 3397 | 126.88 | 22.38 | 537.09 | 7.48 | 0.24 | 949.45 |
| NORFOLK | TRONDHEIM | 3481 | 3397 | 126.88 | 22.38 | 537.09 | 6.48 | 0.24 | 822.35 |
| DRAMMEN | BALTIMORE | 3736 | 3397 | 126.88 | 22.38 | 537.09 | 6.96 | 0.24 | 882.59 |
| DRAMMEN | BRUNSWICK | 4019 | 3397 | 126.88 | 22.38 | 537.09 | 7.48 | 0.24 | 949.45 |
| OSLO | NORFOLK | 3637 | 3397 | 126.88 | 22.38 | 537.09 | 6.77 | 0.24 | 859.21 |
| HAMMARNEFODDEN | SOUTHPORT (MOTSU) | | 3397 | 126.88 | 22.38 | 537.09 | 0.00 | 0.24 | 0.00 |
| COPENHAGEN | PORT ELIZABETH, NJ | 3474 | 3397 | 126.88 | 22.38 | 537.09 | 6.47 | 0.24 | 820.70 |
| TRONDHEIM | PORT ELIZABETH, NJ | 3269 | 3397 | 126.88 | 22.38 | 537.09 | 6.09 | 0.24 | 772.27 |
| ROUTE 39: U.S. East Coast - Central America/Mexico | | | | | | | | | |
| PUERTO CORTEX | PORTSMOUTH | 1574 | 3287 | 125.48 | 22.26 | 534.18 | 2.95 | 0.23 | 369.73 |
| PUERTO CORTEX | PORT EVERGLADES | 845 | 3287 | 125.48 | 22.26 | 534.18 | 1.58 | 0.23 | 198.49 |
| PORT EVERGLADES | PUERTO CORTEX | 845 | 3287 | 125.48 | 22.26 | 534.18 | 1.58 | 0.23 | 198.49 |
| BAHIA MANZANILLO, PANAMA | PORT EVERGLADES | 1213 | 3287 | 125.48 | 22.26 | 534.18 | 2.27 | 0.23 | 284.93 |
| PUERTO CORTEX | SOUTHPORT (MOTSU) | 1368 | 3287 | 125.48 | 22.26 | 534.18 | 2.56 | 0.23 | 321.34 |
| BELIZE | PORT EVERGLADES | 717 | 3287 | 125.48 | 22.26 | 534.18 | 1.34 | 0.23 | 168.42 |
| PUERTO CORTEX | CHARLESTON | 1249 | 3287 | 125.48 | 22.26 | 534.18 | 2.34 | 0.23 | 293.39 |
| ROUTE 43: U.S. Gulf Coast - Central America/Mexico | | | | | | | | | |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| PUERTO CORTEX | GULFPORT | 966 | 1120 | 38.80 | 18.81 | 451.42 | 2.14 | 0.09 | 83.03 |
| GULFPORT | PUERTO CORTEX | 966 | 1120 | 38.80 | 18.81 | 451.42 | 2.14 | 0.09 | 83.03 |
| PUERTO CORTEX | HOUSTON | 1111 | 1120 | 38.80 | 18.81 | 451.42 | 2.46 | 0.09 | 95.49 |
| HOUSTON | PUERTO CORTEX | 1111 | 1120 | 38.80 | 18.81 | 451.42 | 2.46 | 0.09 | 95.49 |
| ACAJUTLA (PORT) | HOUSTON | 2360 | 1120 | 38.80 | 18.81 | 451.42 | 5.23 | 0.09 | 202.85 |
| ROUTE 47: U.S. West Coast - Middle East, South Asia, Indian Ocean | | | | | | | | | |
| ASH SHUWAIKH, KUWAIT | OAKLAND | 10912 | 4695 | 157.99 | 23.56 | 565.48 | 19.30 | 0.28 | 3048.70 |
| KARACHI | OAKLAND | 10305 | 4695 | 157.99 | 23.56 | 565.48 | 18.22 | 0.28 | 2879.11 |
| ASH SHUWAIKH, KUWAIT | TACOMA | 10912 | 4695 | 157.99 | 23.56 | 565.48 | 19.30 | 0.28 | 3048.70 |
| ASH SHUWAIKH, KUWAIT | SAN PEDRO | 11521 | 4695 | 157.99 | 23.56 | 565.48 | 20.37 | 0.28 | 3218.85 |
| OAKLAND | ASH SHUWAIKH , KUWAIT | 10912 | 4695 | 157.99 | 23.56 | 565.48 | 19.30 | 0.28 | 3048.70 |
| ASH SHUWAIKH, KUWAIT | SEATTLE | 10897 | 4695 | 157.99 | 23.56 | 565.48 | 19.27 | 0.28 | 3044.51 |
| ASH SHUWAIKH, KUWAIT | LOS ANGELES | 11521 | 4695 | 157.99 | 23.56 | 565.48 | 20.37 | 0.28 | 3218.85 |
| SAN PEDRO | KARACHI | 10621 | 4695 | 157.99 | 23.56 | 565.48 | 18.78 | 0.28 | 2967.40 |
| UMMSAID, QATAR | OAKLAND | 11015 | 4695 | 157.99 | 23.56 | 565.48 | 19.48 | 0.28 | 3077.48 |
| MUHAMMAD BIN QASIM | OAKLAND | 10305 | 4695 | 157.99 | 23.56 | 565.48 | 18.22 | 0.28 | 2879.11 |
| JEBEL ALI, UNITED ARAB EMIRATES | OAKLAND | 10857 | 4695 | 157.99 | 23.56 | 565.48 | 19.20 | 0.28 | 3033.33 |
| AQABA | OAKLAND | 9917 | 4695 | 157.99 | 23.56 | 565.48 | 17.54 | 0.28 | 2770.71 |
| KARACHI | SAN PEDRO | 10621 | 4695 | 157.99 | 23.56 | 565.48 | 18.78 | 0.28 | 2967.40 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| MUHAMMAD BIN QASIM | TACOMA | 10012 | 4695 | 157.99 | 23.56 | 565.48 | 17.71 | 0.28 | 2797.25 |
| SAN PEDRO | ASH SHUWAIKH , KUWAIT | 11521 | 4695 | 157.99 | 23.56 | 565.48 | 20.37 | 0.28 | 3218.85 |
| MUHAMMAD BIN QASIM | LOS ANGELES | 11521 | 4695 | 157.99 | 23.56 | 565.48 | 20.37 | 0.28 | 3218.85 |
| BAHRAIN | OAKLAND | 11044 | 4695 | 157.99 | 23.56 | 565.48 | 19.53 | 0.28 | 3085.58 |
| ROUTE 54: U.S. West Coast - Oceania, Kwajalein | | | | | | | | | |
| APRA HARBOR (GUAM) | OAKLAND | 5336 | 3149 | 118.90 | 22.56 | 541.47 | 9.85 | 0.22 | 1171.72 |
| APRA HARBOR (GUAM) | OAKLAND (MATSON S TERMINAL) | 5336 | 3149 | 118.90 | 22.56 | 541.47 | 9.85 | 0.22 | 1171.72 |
| KWAJALEIN ATOLL | OAKLAND (MATSON S TERMINAL) | 4650 | 3149 | 118.90 | 22.56 | 541.47 | 8.59 | 0.22 | 1021.09 |
| APRA HARBOR (GUAM) | TERMINAL ISLAND | 5340 | 3149 | 118.90 | 22.56 | 541.47 | 9.86 | 0.22 | 1172.60 |
| APRA HARBOR (GUAM) | LOS ANGELES | 5336 | 3149 | 118.90 | 22.56 | 541.47 | 9.85 | 0.22 | 1171.72 |
| PAGO PAGO, TUTILA ISLAND | OAKLAND | 4473 | 3149 | 118.90 | 22.56 | 541.47 | 8.26 | 0.22 | 982.22 |
| APRA HARBOR (GUAM) | TACOMA | 4965 | 3149 | 118.90 | 22.56 | 541.47 | 9.17 | 0.22 | 1090.26 |
| OAKLAND | APRA HARBOR (GUAM) | 5336 | 3149 | 118.90 | 22.56 | 541.47 | 9.85 | 0.22 | 1171.72 |
| TERMINAL ISLAND | KWAJALEIN ATOLL | 4335 | 3149 | 118.90 | 22.56 | 541.47 | 8.01 | 0.22 | 951.91 |
| TERMINAL ISLAND | APRA HARBOR (GUAM) | 5340 | 3149 | 118.90 | 22.56 | 541.47 | 9.86 | 0.22 | 1172.60 |
| KWAJALEIN ATOLL | TERMINAL ISLAND | 4335 | 3149 | 118.90 | 22.56 | 541.47 | 8.01 | 0.22 | 951.91 |
| APRA HARBOR (GUAM) | OAKLAND | 5336 | 3149 | 118.90 | 22.56 | 541.47 | 9.85 | 0.22 | 1171.72 |
| APRA HARBOR (GUAM) | OAKLAND (MATSON S TERMINAL) | 5336 | 3149 | 118.90 | 22.56 | 541.47 | 9.85 | 0.22 | 1171.72 |
| APRA HARBOR (GUAM) | TERMINAL ISLAND | 5340 | 3149 | 118.90 | 22.56 | 541.47 | 9.86 | 0.22 | 1172.60 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| APRA HARBOR (GUAM) | LOS ANGELES | 5336 | 3149 | 118.90 | 22.56 | 541.47 | 9.85 | 0.22 | 1171.72 |
| APRA HARBOR (GUAM) | TACOMA | 4965 | 3149 | 118.90 | 22.56 | 541.47 | 9.17 | 0.22 | 1090.26 |
| OAKLAND | APRA HARBOR (GUAM) | 5336 | 3149 | 118.90 | 22.56 | 541.47 | 9.85 | 0.22 | 1171.72 |
| ROUTE 55: U.S. East Coast - South America | | | | | | | | | |
| BARRANQUILLA | PORTSMOUTH | 1600 | 3574 | 129.25 | 22.71 | 545.15 | 2.93 | 0.24 | 379.33 |
| BARRANQUILLA | PORT ELIZABETH, NJ | 1791 | 3574 | 129.25 | 22.71 | 545.15 | 3.29 | 0.24 | 424.61 |
| SANTA MARTA | PORTSMOUTH | 1584 | 3574 | 129.25 | 22.71 | 545.15 | 2.91 | 0.24 | 375.54 |
| SAN ANTONIO | PORTSMOUTH | 4458 | 3574 | 129.25 | 22.71 | 545.15 | 8.18 | 0.24 | 1056.91 |
| SANTA MARTA | JACKSONVILLE | 1286 | 3574 | 129.25 | 22.71 | 545.15 | 2.36 | 0.24 | 304.89 |
| SANTA MARTA | MIAMI | 1018 | 3574 | 129.25 | 22.71 | 545.15 | 1.87 | 0.24 | 241.35 |
| LA GUAIRA | PORTSMOUTH | 1688 | 3574 | 129.25 | 22.71 | 545.15 | 3.10 | 0.24 | 400.19 |
| CARTAGENA | CHARLESTON | 1411 | 3574 | 129.25 | 22.71 | 545.15 | 2.59 | 0.24 | 334.52 |
| CALLAO | PORTSMOUTH | 3161 | 3574 | 129.25 | 22.71 | 545.15 | 5.80 | 0.24 | 749.42 |
| SANTA MARTA | PORT ELIZABETH, NJ | 1774 | 3574 | 129.25 | 22.71 | 545.15 | 3.25 | 0.24 | 420.58 |
| ARICA | CHARLESTON | 3510 | 3574 | 129.25 | 22.71 | 545.15 | 6.44 | 0.24 | 832.16 |
| GUAYAQUILL | PORTSMOUTH | 2749 | 3574 | 129.25 | 22.71 | 545.15 | 5.04 | 0.24 | 651.74 |
| RIO DE JANEIRO | PORTSMOUTH | 4760 | 3574 | 129.25 | 22.71 | 545.15 | 8.73 | 0.24 | 1128.51 |
| CARTAGENA | PORTSMOUTH | 1636 | 3574 | 129.25 | 22.71 | 545.15 | 3.00 | 0.24 | 387.87 |
| ARICA | PORTSMOUTH | 3739 | 3574 | 129.25 | 22.71 | 545.15 | 6.86 | 0.24 | 886.45 |
| GEORGETOWN | PORTSMOUTH | 2107 | 3574 | 129.25 | 22.71 | 545.15 | 3.86 | 0.24 | 499.53 |
| GUAYAQUILL | MIAMI | 2181 | 3574 | 129.25 | 22.71 | 545.15 | 4.00 | 0.24 | 517.08 |
| SAN ANTONIO | NORFOLK | 4456 | 3574 | 129.25 | 22.71 | 545.15 | 8.17 | 0.24 | 1056.44 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| VALPARAISO | NORFOLK | 4423 | 3574 | 129.25 | 22.71 | 545.15 | 8.11 | 0.24 | 1048.61 |
| SANTOS | NORFOLK | 4883 | 3574 | 129.25 | 22.71 | 545.15 | 8.96 | 0.24 | 1157.67 |
| MIAMI | BARRANQUILLA | 1035 | 3574 | 129.25 | 22.71 | 545.15 | 1.90 | 0.24 | 245.38 |
| BARRANQUILLA | CHARLESTON | 1375 | 3574 | 129.25 | 22.71 | 545.15 | 2.52 | 0.24 | 325.99 |
| BUENAVENTURA | PORTSMOUTH | 2289 | 3574 | 129.25 | 22.71 | 545.15 | 4.20 | 0.24 | 542.68 |
| CHARLESTON | CALLAO | 2932 | 3574 | 129.25 | 22.71 | 545.15 | 5.38 | 0.24 | 695.12 |
| CHARLESTON | GUAYAQUILL | 2519 | 3574 | 129.25 | 22.71 | 545.15 | 4.62 | 0.24 | 597.21 |
| GUAYAQUILL | CHARLESTON | 2519 | 3574 | 129.25 | 22.71 | 545.15 | 4.62 | 0.24 | 597.21 |
| BUENOS AIRES | JACKSONVILLE | 5783 | 3574 | 129.25 | 22.71 | 545.15 | 10.61 | 0.24 | 1371.04 |
| LA GUAIRA | CHARLESTON | 1547 | 3574 | 129.25 | 22.71 | 545.15 | 2.84 | 0.24 | 366.77 |
| PUNTA ARENAS | PORTSMOUTH | 6380 | 3574 | 129.25 | 22.71 | 545.15 | 11.70 | 0.24 | 1512.58 |
| MONTEVIDEO | CHARLESTON | 5673 | 3574 | 129.25 | 22.71 | 545.15 | 10.41 | 0.24 | 1344.97 |
| PARAMARIBO, SURINAME | PORT EVERGLADES | 1895 | 3574 | 129.25 | 22.71 | 545.15 | 3.48 | 0.24 | 449.27 |
| ROUTE 61: Far East - Oceania | | | | | | | | | |
| APRA HARBOR (GUAM) | YOKOHAMA, COML TERMINAL | 1347 | 3677 | 128.23 | 22.83 | 547.92 | 2.46 | 0.23 | 315.24 |
| YOKOHAMA, COML TERMINAL | APRA HARBOR (GUAM) | 1347 | 3677 | 128.23 | 22.83 | 547.92 | 2.46 | 0.23 | 315.24 |
| APRA HARBOR (GUAM) | PUSAN (MILITARY TERMINAL) | 1562 | 3677 | 128.23 | 22.83 | 547.92 | 2.85 | 0.23 | 365.55 |
| APRA HARBOR (GUAM) | PUSAN (COML TML) | 1562 | 3677 | 128.23 | 22.83 | 547.92 | 2.85 | 0.23 | 365.55 |
| KWAJALEIN ATOLL | PUSAN (COML TML) | 2898 | 3677 | 128.23 | 22.83 | 547.92 | 5.29 | 0.23 | 678.22 |
| SINGAPORE | APRA HARBOR (GUAM) | 2583 | 3677 | 128.23 | 22.83 | 547.92 | 4.71 | 0.23 | 604.50 |

**BAF Appendix A: Critical Lane Fuel & Distance Tables**

| Origin Port | Destination Port | Distance (NM) | Avg Teu Capacity Total | Avg Consumption Main (Mt /day) | Avg Spd (Nm/hr) | Avg Spd (Mi/day) | Approx Voyage Time (Days) | Approx Fuel Consumption/mi @ Speed (MT/Nm) | Approx Fuel Consumption Trip (MT) |
|---|---|---|---|---|---|---|---|---|---|
| AJA PORT, OKINAWA ISLAND | APRA HARBOR (GUAM) | 1609 | 3677 | 128.23 | 22.83 | 547.92 | 2.94 | 0.23 | 376.55 |
| APRA HARBOR (GUAM) | SINGAPORE | 2583 | 3677 | 128.23 | 22.83 | 547.92 | 4.71 | 0.23 | 604.50 |
| PUSAN (COML TML) | APRA HARBOR (GUAM) | 1562 | 3677 | 128.23 | 22.83 | 547.92 | 2.85 | 0.23 | 365.55 |
| KAOHSIUNG | APRA HARBOR (GUAM) | 1528 | 3677 | 128.23 | 22.83 | 547.92 | 2.79 | 0.23 | 357.60 |
| APRA HARBOR (GUAM) | AJA PORT, OKINAWA ISLAND | 1609 | 3677 | 128.23 | 22.83 | 547.92 | 2.94 | 0.23 | 376.55 |
| APRA HARBOR (GUAM) | MANILA | 1628 | 3677 | 128.23 | 22.83 | 547.92 | 2.97 | 0.23 | 381.00 |
| ROUTE 79: Hawaii - Oceania | | | | | | | | | |
| KWAJALEIN ATOLL | HONOLULU | 2125 | 2689 | 110.36 | 22.34 | 536.15 | 3.96 | 0.21 | 437.41 |
| APRA HARBOR (GUAM) | HONOLULU | 3328 | 2689 | 110.36 | 22.34 | 536.15 | 6.21 | 0.21 | 685.03 |
| HONOLULU | KWAJALEIN ATOLL | 2125 | 2689 | 110.36 | 22.34 | 536.15 | 3.96 | 0.21 | 437.41 |
| HONOLULU | APRA HARBOR (GUAM) | 3328 | 2689 | 110.36 | 22.34 | 536.15 | 6.21 | 0.21 | 685.03 |
| PAGO PAGO, TUTILA ISLAND | HONOLULU | 2262 | 2689 | 110.36 | 22.34 | 536.15 | 4.22 | 0.21 | 465.61 |
| WAKE ISLAND | NSC PEARL HARBOR | 2017 | 2689 | 110.36 | 22.34 | 536.15 | 3.76 | 0.21 | 415.18 |

### CAF Appendix A: Currency Adjustment Factor Methodologies

To provide context for establishing a USTRANSCOM CAF methodology, a review of industry practices was undertaken. In addition, a small group of current USTRANSCOM carriers were asked about their approach to implementing a CAF.

In an article published in 1980, T.R. O'Brien presents two methods of calculating a CAF: the normal monthly review and the radical review.[66] Under the normal review, the CAF is checked on a monthly basis, through taking a 10-day average of currencies during the early part of the month. Swings of more than 2% result in an adjustment to the CAF (assuming that a CAF is already in place). The same type of procedure takes place under a radical review, except at a higher frequency. In this case, the CAF is reviewed daily based on a three-day moving average of exchange rates. Movements of more than 4% would result in a change in the existing CAF.

The CAF itself is calculated as the sum of the percent of costs incurred in a country, within a designated trade zone (the CAF may cover cargo going to several countries and currencies) multiplied by change in currency relative to a baseline rate.

A separate approach to defining a CAF is presented by Rohlig.[67] Their methodology sets a baseline rate for a quarterly contract period, based on a monthly average exchange rate that is set four months previously. The CAF in the current month is then established as the percent deviation of the exchange rate in prior month compared with the baseline rate. The CAF is then adjusted further through applying a cost structure factor. This factor represents the percentage of costs being incurred in the foreign currency. As of October 2008, this factor was set at 65.5%.

Another way of designing a CAF is through using a longer period to measure baseline currency rates. This method is highlighted by shipid.com, whereby the baseline exchange rate is calculated as the average of the three months prior to the current month.[68] The percentage change in the exchange rate is then applied directly to base freight rate. No allocation for the percent of shipping costs incurred in a foreign currency appears to be made in this methodology.

Currency Adjustment Factors can be based upon either a single exchange rate or a basket of currencies. The latter methodology is used by Hapag-Lloyd. In their CAF calculation they create a basket of currencies within a trade lane. This currency basket will be used to establish a baseline currency rate and fluctuations against this level. Maersk is another carrier employing a currency basket in their CAF calculation. Their methodology calculates a currency basket weighted by the level of costs incurred in each currency. The base rate is set as a monthly average and applies during a period two months ahead. The CAF base rate is then updated every month.

---

66 T.R. O'Brien, (1980).

67 Rohlig

68 SHIPid.com

The logistics company, Raben Sea & Air, uses an average from the prior year to set the base currency rate. The current average monthly rate is used to determine changes in the currency relative to the base rate. A factor for the percent of cost occurred in the non-base rate currency is calculated and used to adjust the CAF to align it with foreign currency expenses.

DHL, an international shipping company, also uses a surcharge to mitigate the risk from currency fluctuations. To protect against volatility in the pound relative to the euro they provide a base currency rate and then charge a surcharge that grows linearly based on the level of depreciation in the pound relative to the base rate.[69]

## References

O'Brien., T.R., "Currency Adjustment factors: Some Alternative Strategies, T.R. O'Brien, Maritime Policy and Management, October 1980.," *Maritime Policy and Management*, October (1980).

ROHLIG, "Currency Adjustment Factor", Available at: http://www.rohlig.pl/index.php?id=dodatekwalutowy&L=1 (Last Accessed: June 19, 2009).

SHIPid.com, "Currency Adjustment Factor", Available at: http://www.shipid.com/surcharges/CAF.htm (Last Accessed: June 19, 2009).

"DHL Freight Fuel Surcharges," *DHL*, Available at: http://www.dhl.co.uk/publish/gb/en/information/shipping/fuel_surcharge/dhl_freight_fuel_surcharges.high.html (Last Accessed: April 2009).

[69] DHL Fuel Freight Surcharges.

## CAF Appendix B: Individual Currency Figures over Varying Contracting Periods

### Japanese Yen




**Figure 30. Consecutive Contracting Periods 1993-2009, Japanese yen (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**




**Figure 31. Consecutive Contracting Periods 1993-2009, South Korean won (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

### Singapore Dollar




**Figure 32. Consecutive Contracting Periods 1993-2009, Singapore dollar (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

**United Arab Emirates Dirham**




**Figure 33. Consecutive Contracting Periods 1993-2009, United Arab Emirates dirham (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

**Bahraini Dinar**




**Figure 34. Consecutive Contracting Periods 1993-2009, Bahraini dinar (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**




**Figure 35. Consecutive Contracting Periods 1993-2009, Djibouti franc (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

**Jordanian Dinar**




**Figure 36. Consecutive Contracting Periods 1993-2009, Jordanian dinar (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**




**Figure 37. Consecutive Contracting Periods 1993-2009, Kuwaiti dinar (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

## Pakistani Rupee




**Figure 38. Consecutive Contracting Periods 1993-2009, Pakistani rupee (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

**Qatari Rial**




**Figure 39. Consecutive Contracting Periods 1993-2009, Qatari rial (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**



DA11690

**Egyptian Pound**




**Figure 40. Consecutive Contracting Periods 1993-2009, Egyptian pound (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

**Euro**




**Figure 41. Consecutive Contracting Periods 1993-2009, euro (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

**Pound Sterling**




**Figure 42. Consecutive Contracting Periods 1993-2009, pound sterling (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**




**Figure 43. Consecutive Contracting Periods 1993-2009, Israeli new shekel (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

## Norwegian Kroner




**Figure 44. Consecutive Contracting Periods 1993-2009, Norwegian kroner**
**(Top Left) 17 Months (Top Right) 15 Months**
**(Bottom Left) 9 Months (Bottom Right) 6 Months**

**Polish Zloty**




**Figure 45. Consecutive Contracting Periods 1993-2009, Polish zloty (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

**Turkish New Lira**




**Figure 46. Consecutive Contracting Periods 1993-2009, Turkish new lira (Top Left) 17 Months (Top Right) 15 Months (Bottom Left) 9 Months (Bottom Right) 6 Months**

### CAF Appendix C: Applying the CAF

Application of the CAF is a three-step process. First, the currency is compared to the list of 17 currencies for which a CAF is calculated and then grouped into a superlane. If so, in step 2, the decision of whether or not to apply a CAF is made. If so, in step 3, the value of the surcharge is calculated.

#### Step 1: Superlane Assignment

Compare the currency to the list below.

**Table 38: Currencies and Superlane**

| Superlane Name | Currency | Currency Name |
|---|---|---|
| **Eastern Asia** | JPY | Japanese yen |
| | KRW | Korean won |
| | SGD | Singapore dollar |
| **Western Indian Ocean** | AED | United Arab Emirates dirham |
| | BHD | Bahraini dinar |
| | DJF | Djibouti franc |
| | JOD | Jordanian dinar |
| | KWD | Kuwaiti dinar |
| | PKR | Pakistani rupee |
| | QAR | Qatari rial |
| **Europe/North Africa** | EGP | Egyptian pound |
| | EUR | euro |
| | GBP | pound sterling |
| | ILS | Israeli new shekel |
| | NOK | Norwegian krone |
| | PLN | Polish zloty |
| | TRY | Turkish lira |

If the currency is on the list, note the superlane and go to step 2.
If the currency is not on the list, then no CAF (i.e. CAF = $0)

Note, "CAF Appendix D: Lanes and Superlanes" contains the full list of route/lane to superlane assignments.

#### Step 2: The applicability of the CAF

- Step 2a: Find the average exchange rate over the previous month.[70]

[70] All exchange rates should be in terms of foreign currency per U.S. dollar.

The formula for this value is:

$$\text{Average Exchange Rate Over Previous Month} = \frac{\text{Rate on 1st of month + Rate on 2nd of month +...+ Rate on last of month}}{\text{Number of Days in Month}} \quad [17]$$

- Step 2b: Determine the Price Change Ratio

The ratio is:

$$\text{Price Change Ratio} = \frac{\text{Average Exchange Rate Over Previous Month}}{\text{Baseline Exchange Rate}} - 1 \quad [18]$$

- Step 2c: Compare to Buffer

The buffer is set to a value for each superlane. With a nine-month contracting time frame, the buffers are represented in the table below:

**Table 39: Buffers by Superlane**

| CAF Buffer by Superlane | | |
|---|---|---|
| **Eastern Asia** | **Western Indian Ocean** | **Europe / North Africa** |
| 5.13% | 3.50% | 4.99% |

If |Price Change Ratio| > Buffer, then Apply a CAF (go to step 3)
If |Price Change Ratio| < Buffer, then No CAF (i.e., CAF = $0)

Where the | | indicates taking the absolute value of the ratio.

### Step 3: Calculate CAF

The technical factor will represent the costs incurred in foreign currency. The recommended technical factor is 7%. The risk sharing factor represents a negotiated agreement on the degree of risk bourne by USTRANSCOM on currency fluctuations outside of the buffer zone. It may range from 0.0 (no risk for USTRANSCOM) to 1.0 (all risk bourne by USTRANSCOM, the *status quo*). It may be a world-wide constant or vary based on lane, trade, or country.

The base rate is the "all-in" shipping rate quoted by the carrier.

$$\text{CAF} = \text{Exchange Rate Ratio} \times \text{Base Rate} \times \text{Risk Sharing Factor} \times 0.07 \quad [19]$$

Note that the CAF can be either positive or negative in this situation.

If CAF > 0, then the foreign currency has *depreciated*, the CAF is a payment to USTRANSCOM.

If CAF <0, then the foreign currency has *appreciated*, the CAF is a payment to the carriers.

**CAF Appendix D: Lanes and Superlanes**

The table below contains the mapping of lanes to superlanes. In most cases, a lane (defined as the first two characters of the IBS route) maps to a single superlane. The table does specifically list the few exceptions to this rule.

**Table 40: Routes and Lanes to Superlanes**

| Lane | Name | Superlane |
|---|---|---|
| 1 | US West Coast - Eastern Asia | Eastern Asia |
| 2 | Western Indian Ocean - Europe/UK/Ireland | OCONUS |
| 3 | US West Coast - US Hawaii | not USC |
| 4 | Western Indian Ocean - Western Indian Ocean | OCONUS |
| 5 | US East Coast - Europe/UK/Ireland | Europe (including UK/Ireland) & Mediterranean |
| 6 | US East Coast - Mediterranean | Europe (including UK/Ireland) & Mediterranean |
| 7 | US East Coast - Western Indian Ocean | Western Indian Ocean |
| 8 | US East Coast - Eastern Asia | Eastern Asia |
| 9 | US East Coast - US Hawaii | not USC |
| 10 | US Gulf Coast - Northern Europe | Europe (including UK/Ireland) & Mediterranean |
| 11 | US Gulf Coast - Europe/UK/Ireland | Europe (including UK/Ireland) & Mediterranean |
| 12 | US Gulf Coast - Mediterranean | Europe (including UK/Ireland) & Mediterranean |
| 13 | US Gulf Coast - Western Indian Ocean | Western Indian Ocean |
| 14 | US Gulf Coast - Eastern Asia | Eastern Asia |
| 15 | US Gulf Coast - US Hawaii | not USC |
| 16 | US Hawaii - Eastern Asia | Eastern Asia |
| 17 | Great Lakes - Europe/UK/Ireland | Europe (including UK/Ireland) & Mediterranean |
| 18 | US Puerto Rico - Caribbean (also St Croix - St Thomas) | Caribbean (except Guantanamo) |
| | LANE 18 EXCEPTIONS | |
| 18AD | St. Thomas - St. Croix | OCONUS |
| 18DA | St. Croix - St. Thomas | OCONUS |
| 19 | Eastern Asia - Eastern Asia | OCONUS |
| 20 | Mediterranean - Mediterranean | OCONUS |
| 21 | Canada East Coast - Mediterranean | OCONUS |
| 22 | Canada East Coast - Europe/UK/Ireland | OCONUS |
| 23 | US West Coast - Europe/UK/Ireland | Europe (including UK/Ireland) & Mediterranean |
| 24 | Europe/UK/Ireland - Northern Europe | OCONUS |
| 25 | US West Coast - Mediterranean | Europe (including UK/Ireland) & Mediterranean |
| 26 | US West Coast - US Alaska | not USC |

**Table 40: Routes and Lanes to Superlanes**

| Lane | Name | Superlane |
|---|---|---|
| 27 | US Hawaii - Europe/UK/Ireland | Europe (including UK/Ireland) & Mediterranean |
| 28 | US West Coast - Central America | Central America |
| 29 | US Alaska - US Alaska | not USC |
| 30 | US East Coast - Greenland | Europe (including UK/Ireland) & Mediterranean |
| 31 | US East Coast - Iceland | Europe (including UK/Ireland) & Mediterranean |
| 32 | US East Coast - Northern Europe | Europe (including UK/Ireland) & Mediterranean |
| 33 | US East/Gulf Coasts - Azores | Europe (including UK/Ireland) & Mediterranean |
| 34 | Europe/UK/Ireland - Mediterranean | OCONUS |
| 35 | US West Coast - Caribbean | Caribbean (except Guantanamo) |
| | LANE 35 EXCEPTIONS | |
| 35D | US West Coast - Guantanamo | not USC |
| 36 | US Hawaii - Mediterranean | Europe (including UK/Ireland) & Mediterranean |
| 37 | US East Coast - Caribbean | Caribbean (except Guantanamo) |
| | LANE 37 EXCEPTIONS | |
| 37F | US East Coast - Guantanamo | not USC |
| 38 | US East Coast - Mexico Caribbean Cost | Central America |
| 39 | US East Coast - Central America | Central America |
| 40 | n/a | n/a |
| 41 | n/a | n/a |
| 42 | US Gulf Coast - Caribbean | Caribbean (except Guantanamo) |
| | LANE 42 EXCEPTIONS | |
| 42F | US Gulf Coast - Guantanamo | not USC |
| 43 | US Gulf Coast - Central America | Central America |
| 44 | Great Lakes - Western Indian Ocean | Western Indian Ocean |
| 45 | Great Lakes - Eastern Asia | Eastern Asia |
| 46 | Great Lakes - Mediterranean | Europe (including UK/Ireland) & Mediterranean |
| 47 | US West Coast - Western Indian Ocean | Western Indian Ocean |
| 48 | Europe/UK/Ireland - Europe/UK/Ireland | OCONUS |
| 49 | Europe/UK/Ireland - Eastern Asia | OCONUS |
| 50 | Mediterranean (inc Adriatic Sea) - Eastern Asia | OCONUS |
| 51 | Eastern Asia - Western Indian Ocean | OCONUS |
| 52 | US East/Gulf Coasts - Black Sea | Black Sea |
| 53 | US West Coast - South America | South America |
| 54 | US West Coast - Oceania | Oceania (Except U.S. Holdings) |
| | LANE 54 EXCEPTIONS | |
| 54A | US West Coast - American Samoa | not USC |

**Table 40: Routes and Lanes to Superlanes**

| Lane | Name | Superlane |
|---|---|---|
| 54D | US WEST COAST-GUAM | not USC |
| 54F | US WEST COAST-KWAJALEIN | not USC |
| 54G | US WEST COAST-MARSHALL ISLANDS | not USC |
| 54H | US WEST COAST-MICRONESIA | not USC |
| 54K | US WEST COAST-NORTHERN MARIANA ISL | not USC |
| 55 | US East Coast - South America | South America |
| 56 | US Gulf Coast - South America | South America |
| 57 | Mediterranean - Western Indian Ocean | OCONUS |
| 58 | US East Coast - Haiti | Caribbean (except Guantanamo) |
| 59 | US Gulf Coast - Haiti | Caribbean (except Guantanamo) |
| 60 | US East Coast - Africa | Africa (except North Coast) |
| 61 | Eastern Asia - Oceania | OCONUS |
| 62 | Europe/UK/Ireland - Iceland | OCONUS |
| 63 | Iceland - Mediterranean/Azores/Persian Gulf/Kuwait | OCONUS |
| 64 | Europe/UK/Ireland - Azores | OCONUS |
| 65 | Europe/UK/Ireland - Central America | OCONUS |
| 66 | Mediterranean - Central America | OCONUS |
| 67 | US West Coast - Africa | Africa (except North Coast) |
| 68 | Central America - South America | OCONUS |
| 69 | Central America - Oceania | OCONUS |
| 70 | Mediterranean - Azores | OCONUS |
| 71 | Europe/UK/Ireland - Africa | OCONUS |
| 72 | Europe/UK/Ireland - Oceania | OCONUS |
| 73 | US Gulf Coast - Africa | Africa (except North Coast) |
| 74 | Mediterranean - Africa | OCONUS |
| 75 | Western Indian Ocean - Africa | OCONUS |
| 76 | Central America - Central America | OCONUS |
| 77 | US East Coast - Oceania | Oceania (Except U.S. Holdings) |
| | LANE 77 EXCEPTIONS | |
| 77A | US East Coast - American Samoa | not USC |
| 77D | US East Coast - Guam | not USC |
| 77F | US East Coast - Kwajalein | not USC |
| 77G | US East Coast - Marshall Islands | not USC |
| 77H | US East Coast - Micronesia | not USC |
| 77K | US East Coast - Northern Mariana Islands | not USC |
| 78 | US Gulf Coast - Oceania | Oceania (Except U.S. Holdings) |

**Table 40: Routes and Lanes to Superlanes**

| Lane | Name | Superlane |
|---|---|---|
| | LANE 78 EXCEPTIONS | |
| 78A | US Gulf Coast - American Samoa | not USC |
| 78D | US Gulf Coast - Guam | not USC |
| 78F | US Gulf Coast - Kwajalein | not USC |
| 78G | US Gulf Coast - Marshall Islands | not USC |
| 78H | US Gulf Coast - Micronesia | not USC |
| 78K | US Gulf Coast - Northern Mariana Islands | not USC |
| 79 | US Hawaii - Oceania | Oceania (Except U.S. Holdings) |
| | LANE 79 EXCEPTIONS | |
| 79A B | US Hawaii - American Samoa | not USC |
| 79A E | US Hawaii - Guam | not USC |
| 79A G | US Hawaii - Kwajalein | not USC |
| 79A H | US Hawaii - Marshall Islands | not USC |
| 79AI | US Hawaii - Micronesia | not USC |
| 79AL | US Hawaii - Northern Mariana Islands | not USC |
| 79B A | American Samoa - US Hawaii | not USC |
| 79E A | Guam - US Hawaii | not USC |
| 79G A | Kwajalein - US Hawaii | not USC |
| 79H A | Marshall Islands - US Hawaii | not USC |
| 79IA | Micronesia - US Hawaii | not USC |
| 79LA | Northern Mariana Islands - US Hawaii - | not USC |
| 80 | Oceania - Western Indian Ocean | OCONUS |
| 81 | Oceania - Oceania | OCONUS |
| 82 | US Alaska - Eastern Asia | Eastern Asia |
| 83 | US Alaska - Oceania | Oceania (Except U.S. Holdings) |
| | LANE 79 EXCEPTIONS | |
| 83A G | US Alaska - Guam | not USC |



DA11704

**Table 40: Routes and Lanes to Superlanes**

| Lane | Name | Superlane |
|---|---|---|
| 84 | US Puerto Rico - Central America | Central America |
| | LANE 84 EXCEPTIONS | |
| 841E | Central America/Mexico East Coast - Jamaica/Caymen/Dominican Republic | not USC |
| 85 | US Hawaii - Western Indian Ocean | Western Indian Ocean |
| 86 | Mediterranean - Norway | OCONUS |
| 87 | Japan - Norway | OCONUS |
| 88 | US Puerto Rico (plus rest of Caribbean) - Europe/UK/Ireland | Europe (including UK/Ireland) & Mediterranean |
| | LANE 88 EXCEPTIONS | |
| 882E | Caribbean Zone 2 - Continental Europe/UK | not USC |
| 89 | Mediterranean - Oceania | OCONUS |
| 90 | Eastern Asia - Africa | OCONUS |
| 91 | US Alaska - Western Indian Ocean | Western Indian Ocean |
| 92 | US Puerto Rico/Virgin Islands - Western Indian Ocean | Western Indian Ocean |
| 93 | Eastern Asia - Central America | OCONUS |
| 94 | n/a | n/a |
| 95 | n/a | n/a |
| 96 | n/a | n/a |
| 97 | n/a | n/a |
| 98 | n/a | n/a |
| 99 | Antigua - Ascension Island | OCONUS |

### FAF Appendix A: FAF Current Industry Practice

The industry review concentrated on fuel surcharges associated with truck, rail/intermodal and the "inland" portion of ocean carriers' moves, which are primarily truck or rail/intermodal. Barge fuel surcharges will be considered at a later time if necessary.

## Trucking

The majority of industry information on fuel surcharges applies to CONUS trucking operations. Nonetheless, some information is available in the UK, Australia and New Zealand.[71] The industry practice in these countries is similar to that in the U.S.

Most truck carriers use tables that provide a percent change in the rate for a given cent/gallon increase in fuel price but do not provide any explanation as to the derivation of the tables.[72] An example from a typical truck carrier fuel surcharge web site (Estes Express Lines) is presented in "FAF Appendix B: Typical Rate-Based Truck Fuel Surcharge Estimator" on page 183. This approach is used by SDDC in their contracts for CONUS freight shipments under the Tailored Transportation Contract (TTC II) and the Defense Transportation Coordination Initiative (DTCI).

The FAF used for CONUS shipments is defined under SDDC Policy TR-12. Note that SDDC is currently utilizing two separate versions of SDDC Policy TR-12. The SDDC Policy TR-12 with the effective date of 8 Jan 07 governs Fuel Related Adjustments for Domestic Freight Program movements based on Voluntary and Negotiated Tenders occurring on and after 8 Jan 2007.[73] The SDDC Policy TR-12 with the effective date of 15 Oct 2005 governs Fuel Related Adjustments for FAR contracts referencing an earlier version than the 8 Jan 2007 version of SDDC Policy TR-12.[74] The October 2005 version of the FAF is also used in MFTRP No.30 which applies to bulk movements by barge.[75]

---

[71] Post Haste Limited.
This provides the factors for Posthaste, a New Zealand carrier, without explanation.

[72] Some typical sites include:
Estes Express Lines.
This site provides the numbers, but no explanation for Estes Express Lines. Base diesel price is $1.12 per gallon. Surcharge is 0.5% increase for every 5 cent increase in fuel price for LTL shipments. Surcharge is 0.7% to 0.8% increase for every 5 cent increase in fuel price for truckload shipments. Surcharge calculated weekly.
ABF Freight System.
This site provides the numbers, but no explanation for ABF. Base diesel price is $1.12 per gallon. Surcharge is 0.1% increase for every 1 cent increase in fuel price for LTL shipments. Surcharge is 0.2% increase for every 1 cent increase in fuel price for truckload shipments. Surcharge calculated weekly. Surcharge applied to line haul charges. Has a link to some software for estimating surcharges among other things.
Forward Air.
This site provides the numbers, but no explanation for Forward Air. Base diesel price is $1.85 per gallon. Surcharge is 0.5% increase for every 5 cent increase in fuel price for LTL shipments. Surcharge is 0.7% increase for every 5 cent increase in fuel price for truckload shipments. Surcharge calculated weekly.

[73] SDDC.

[74] SDDC.

The earlier version of SDDC Policy TR-12 incorporated in the DTCI contract is reproduced as "FAF Appendix E: SDDC Transportation and Travel Policy No. Tr-12" on page 189.

It was not possible to determine the basis of the adjustments used in the tables of SDDC Policy TR-12. Information is lacking on the total rate and fuel cost as a percent of the rate for the landside move, or the time period used to establish the base rate and the corresponding price of fuel. As a result there is no way to determine whether these adjustments were reasonable. For example a 1% increase in the total rate may be smaller, larger or the same as the increase in the cost of fuel used for the move in question.

The contract manager of the DTCI contract understood how the FAF worked in practice but did not know how it was developed. He has played with the numbers and talked to some carriers and noted that some of them do not recover their increased fuel costs under the FAF while others may be reaping windfall profits. It all depends on the line haul base rate that the carrier bid. Carriers who engaged in "aggressive pricing "in their bid (his term) tend to be losing money under the FAF. Carriers who bid a higher base rate are recovering increased fuel costs with FAF or making extra money. He also noted that USTRANSCOM does not get refunds under the FAF.[76]

The individual responsible for maintaining the SDDC fuel adjustment web site did not know the origins and derivation of the surcharge tables, but he did refer to SDDC Policy TR-12.[77]

One plausible approach to the logic underlying the surcharge tables is provided in the method outlined in "FAF Appendix C: Underlying Logic of the Rate-Based Fuel Surcharge" on page 185. This provides some explanation for the relationship between the price per gallon changes and the percent of rate increase used in the surcharge tables. The article is from the UK, but the underlying logic would hold in the U.S.[78]

Other carriers, primarily Owner Operators and specialized truck load carriers use a mileage based approach (increase in cent/mile as a result of increased fuel cost).[79] One carrier's (FWCC Inc.) example calculations are shown in "FAF Appendix D: Typical Mileage-Based Truck Fuel Surcharge Estimator" on page 187.

This mileage based approach is also used by GSA in computing fuel surcharges associated with household goods movements.[80] Their example calculations are presented in "FAF Appendix F: GSA Approach to Fuel Charge Calculation for Household Goods Movements" on page 191.

---

75 SDDC.

76 Cassady (2008).

77 Cody (2008).

78 Engley (2008).

### Rail/Intermodal

Railroads currently use a mixed approach to computing fuel surcharges, depending on the service (e.g., coal unit train, carload, intermodal). Railroads used a rate based approach but are shifting to a mileage based approach. The BNSF approach is provided as an example of current rail industry practice.[81] This is presented in "FAF Appendix G: BNSF Railroad Approach to Estimating the Fuel Surcharge for an Intermodal Shipment" on page 193.

### Ocean Carrier Inland Moves

Ocean carriers have imposed an "inland fuel surcharge" on shippers in an attempt to recover fuel surcharges imposed on the ocean carriers by the trucking companies and railroads used to deliver containers to/from their final destination/origin to/ from the port. These surcharges generally apply to the CONUS end of the trip, although the practice is also used in Europe.

In general ocean carriers impose charges at a gross level of detail usually one flat fee per container for truck only moves and another flat fee for rail/intermodal moves and do not provide any explanation as to the derivation of the fees.[82] This approach is also used in Canada for shipments to the Far East[83] and for at least the CONUS portion of shipments to Australia/New Zealand.[84] Other ocean carriers base the surcharge on a

---

79 Some typical sites include:

FWC Incorporated.

This site provides a first cut at how to estimate a fuel surcharge as used by FWCC. The fuel surcharge in \$/mile is calculated as (BASE FUEL PRICE (\$1.15/gallon) – DOE SELF SERVICE FUEL PRICE}/AVERAGE FUEL CONSUMPTION (5.0 miles/gallon). This is updated weekly.

Transportation Business Associates.

Transportation Business Associates provides an example of how to estimate a fuel surcharge. The fuel surcharge in \$/mile is calculated as (BASE FUEL PRICE – DOE SELF SERVICE FUEL PRICE}/AVERAGE FUEL CONSUMPTION. Also notes that to get a surcharge from shippers, four things have to take place. First, the surcharge must be calculated accurately by the carrier / broker. Next it must be explained and agreed to by the shipper. Third, it must be properly billed to the shipper. And finally the shipper should pay it. There can be problems with each step due to a variety of reasons.

OOIDA.

Presents a spreadsheet for estimating a fuel surcharge chart on a per mile basis. Requires a base fuel price, the current fuel price and mpg figure. Provided by Owner-Operator Independent Drivers Association.

Luck Stone Corporation.

Aggregate hauler who has adopted the approach of calculating actual fuel used per trip times the price differential in order to determine the fuel surcharge. This replaces their former method of adding a percentage to the base rate depending on the actual price of fuel versus a base price. Their base price is \$2.90 per gallon. Assumed fuel economy is 5 mpg. Distance is actual haul distance. Updated every two weeks based on DOE reported prices for Lower Atlantic region. Customer gets a price reduction if price goes below \$2.90 per gallon. Notes advantage of this approach over their competitors who inflate the base rate in order to try to cover increasing fuel costs, but who don't lower base rate if fuel prices decline.

America's Independent Truckers' Association, Inc.

Another example on how to compute fuel surcharges for owner-operators. Uses the approach of calculating fuel used per trip times the price differential for fuel (actual price paid- benchmark price). Notes that \$1.10 per gallon is the "industry benchmark price", but does not indicate where this benchmark came from.

80 U.S. General Services Administration (GSA Fuel Web Item).

coastal state versus an inland state basis,[85] while at least two carriers use a zone approach that is roughly based on distance from the port.[86] In Europe the percent rate approach is used, i.e. a percent of the inland haul charge.[87]

The TSA (Transpacific Stabilization Agreement) approach is the most transparent in that they attempt to link their inland fuel surcharge to the fuel surcharges of the BNSF railroad, who in turn calculate a percent increase in the base rate as a function of the published DOE price of diesel fuel. The BNSF approach is similar in concept to that

---

[81] BSNF Railway.

Some other railroad approaches to computing fuel surcharges can be found at the following sites:

CSX Transportation

The CSX surcharge is based on mileage. The price baseline begins at $2.00 using the DOE-EIA's "No. 2 Diesel Retail Sales by All Sellers" report. The "HDF Average Price" for a month will be the average price for that month of U.S. No. 2 Diesel Retail Sales by All Sellers, as determined and published by the U. S. Department of Energy, Energy Information Administration. For every $0.04 rise in the price of diesel, the charge grows $0.01 per mile per railcar. No explanation on the derivation is provided.

Norfolk Southern.

The Norfolk Southern fuel surcharge applies as a percentage surcharge "per shipment." "Per shipment" isn't defined. Rather than use the DOE's diesel reports, NS tracks the monthly average price per barrel of West Texas Intermediate Crude Oil. The baseline is set at $90 per barrel with a 0.4% rise in the surcharge for every $1 over $90. With a month notice period, a month lag is created. No explanation on the derivation is provided.

Union Pacific.

Union Pacific has both a mileage- and a percentage-based charge. It is unclear if they're shifting to one or the other or what determines which is applied. Both charges use the average monthly price of DOE On-Highway Diesel Fuel. The percentage-based charge is baselined at $1.35 per gallon. For every $0. 5 increase, the rate is increased by 0.5% (after an initial rate of 1.5% for prices between $1.35 and $1.39). For the mileage-based charge, the price is baselined at $2.30. For every $0.05 increase, the surcharge increases by $0.01 per mile (after an initial surcharge of $0.05 per mile for prices between $2.30 and $2.349).

Both charges are for a standard carload. They have another fuel surcharge for their intermodal service, however, the pricing is available for customers only and is password protected. No explanation on the derivation is provided.

[82] NYK Line.

NYK Line announcement of inland fuel surcharges for international shipments from the Far East to the US. These apply to the U.S. portion of the move. There is one flat charge per container (US $134) for all truck moves, and one flat charge per container (US $464) for all rail and combined rail/truck moves. No explanation of the basis of the surcharges is provided. It notes that surcharges will be adjusted on a monthly basis in order to be more responsive to market conditions.

[83] UPS Canada.

UPS Canada announcement of inland fuel surcharges for international shipments to/from the Far East. These apply to the Canadian portion of the move. There is one flat charge per container (US $111) for all truck moves, and one flat charge per container (US $385) for all rail and combined rail/truck moves. No explanation of the basis of the surcharges is provided.

[84] USWC to Aust & NZ Surcharges Provides a list of BAF/CAF/FAF announcements for CMA CGM for the US- Australia/New Zealand trade. Not clear if the Inland fuel surcharge applies in US, Australia/New Zealand or both. There is one flat rate per container ($46) for truck only moves and one flat rate ($158) for rail, barge or truck/rail movements.

[85] MOL.

Provides a list of BAF/FAF announcements for MOL. Inland Fuel Surcharges are presented for the U.S. only. There is one flat charge of $92 per container for West Coast states via West Coast ports and East Coast states via East Coast ports. There is another flat fee per container of $317 for MLB, IPI and RIPI moves.

used by many truck carriers and the TSA method is described in "FAF Appendix H: TSA Inland Fuel Surcharge Calculator" on page 195.[88]

## Conclusions/Observations on Current Industry Practice

Most citations on industry practice reference CONUS truck carriers, or CONUS rail/intermodal carriers. The ocean carrier citations generally only mention inland fuel charges on the CONUS end of the trip. Some truck citations were also found for Australia, New Zealand, and the UK, while some ocean carrier citations provided inland fuel charge information for destinations in various European countries.

Following is a list of the major conclusions and observations regarding carrier industry practice for fuel surcharges for three groups of carriers.

### Trucking

- The percent rate approach widely used in the industry is not transparent. Tables relating current fuel price and the resulting percent increase in rate are presented without explanation as to their source, derivation or underlying logic, especially the use of a low base price of fuel. Most carriers use the same or very similar tables. In many cases these tables seem to have been copied from other carriers.[89]

---

[86] Crowley.

Announcement of Crowley's U.S. inland fuel surcharge increase for shipments to/from Central America via Gulfport, MS and Port Everglades, FL. Charges are a flat rate per zone based on zone distance from the port.

Tropical Shipping.

Surcharge information is presented for Tropical Shipping, but no explanation on its basis or derivation. This ocean carrier charges a flat rate per container based on mileage to Florida. States are placed in zones and the surcharge rises with distance from Florida. No mention of a baseline or price index.

[87] Maersk Line.

Provides Maersk surcharge changes for all trades; U.S. inland intermodal fuel surcharges are a fixed cost per container. "Inland Haulage" surcharges are presented for France, Norway, and Bulgaria as a percentage of the inland haulage rate.

[88] Transpacific Stabilization Agreement.

This site provides numbers with little explanation for the inland fuel surcharge of the Transpacific Stabilization Agreement. The TSA surcharge is based on the BNSF fuel surcharge calculation for intermodal shipments.

[89] Grant (2007).

Confirms other results on surcharge approach, especially base rate fuel price of $1.10 per gallon, and 1% increase in rate for every 1 cent increase in fuel price (5% increase for every 5 cent increase in fuel price) Notes that most surcharge "policies" are dated and are not updated frequently. Also notes that most carriers have copied their surcharge approach from the few carriers who actually developed the tables.

"Carriers revealed that the fuel surcharge relationship was determined through careful and detailed analysis of carrier costs and the revenues received from shippers on a per mile basis. This method was utilized to identify a break-even point where fuel expense is covered by the base transportation rate. This break-even point was commonly referred to as the fuel surcharge base rate. At this point there is no fuel surcharge because the fuel cost at that per gallon rate is covered. This fuel surcharge base rate was reported to be between the DOE fuel average of $1.10 to $1.15 per gallon, depending on the carrier."

Also notes that surcharges do not always recover increased costs. The reason for surcharges is that it is easier to get carriers to accept surcharges than increased base rates.

- Surcharges make up a large portion of carrier revenues.[90]
- Carriers justify the use of surcharges on the basis that it is easier to get shippers to pay surcharges than to accept increased base rates.[91]
- The base fuel price used in most of the tables appears to be outdated and unrealistically low.[92] It is not clear if the base fuel price is related to the base rate.
- Depending on their individual costs carriers may be making or losing money with the surcharges.[93]

### Rail/Intermodal

- Basing fuel surcharges on a percent increase in rates is not transparent, that is, there is no obvious relationship between the increased cost of fuel to move a shipment and the dollar value of the fuel surcharge.
- Surcharges were becoming an ever increasing portion of carrier revenues.[94]
- Shippers took the rail carriers before the STB (Surface Transportation Board, successor to the Interstate Commerce Commission) on the basis that they were being overcharged and that railroads were using fuel surcharges as a means to increase profits. The STB agreed with the shippers on the need to use a more transparent method of calculating the fuel surcharge and has required the rail-

---

90 Today's Trucking.com.

Another carrier weighing in on the base rate vs. surcharge issue. Of note is the fact that fuel surcharges account for 40 to 50% of some carriers' revenue.

91 Thompson (2009).

Article makes two points: it's easier to add surcharges than raise base rates; brokers may add fuel surcharges to the shipper's bill but not pass the money collected onto the carrier.

Canadian trucking Association.

A list of pros and cons on distance based fuel surcharges vs, rate based surcharges, raising base rates vs. large surcharges, and shippers resistance to increased rates vs. paying surcharges. All of this is from the carriers' point of view.

92 Fuel Cost Management Services Consultant whose specialty is helping shippers minimize fuel surcharges. Two items of note: the growth in fuel surcharges as a component of transportation costs; the use of outdated fuel surcharge tables (the $1.10/gallon base line).

Freight Surcharge Index Methodology.

Based on a rotating survey of carriers that provides data on driver, fuel, and other costs and fuel surcharges by truck type (van, refer, flatbed) and region. For our purposes provides average mpg data by truck type and region and data on fuel costs as a percent of total operating costs by truck type and region. Unfortunately this is for one week in June 2008. A subscription is available for a fee. One important item of note, the article decries the use o the low fuel baseline price (circa 1995) resulting in surcharges exceeding the base rate in many cases.

Canadian trucking Association.

A list of pros and cons on distance based fuel surcharges vs, rate based surcharges, raising base rates vs. large surcharges, and shippers resistance to increased rates vs. paying surcharges. All of this is from the carriers' point of view.

93 American Truck Business Services.

Illustrates a per mile approach to fuel surcharge calculation aimed at owner-operators. The approach is based on the difference between the current fuel price and a base fuel price and the truck's mpg. Illustrates that depending on the truck's actual mpg vs. the assumed mpg used in calculating the surcharge it is possible to make money, lose money or break even with a fuel surcharge.

roads to transition to a mileage based approach for calculating fuel surcharges.[95]

### Ocean Carrier Inland Moves

The approach used by ocean carriers to compute a fuel surcharge for movement from port to final destination is not transparent. The surcharges, usually in the form of a flat fee per container bear no obvious relationship to distance, actual extra fuel costs, or the surcharge being paid by the ocean carrier company to the truck or rail carrier. Moreover there is no obvious relationship between the carriers' base rates and the actual price of fuel incorporated into the base rates.

## References

"Are Rail Fuel Surcharges Being Fairly Determined?," Aggregates Manager, Available at: www.aggman.com/articles/apr07aggbeat.htm (Last Accessed: April 2009).

"Assessing Fuel Surcharge", Transportation Business Associates, Available at: www.tbabz.com/AssessingFuelSurcharge.htm (Last Accessed: April 2009).

Berman, Jeff, "STB ruling changes railroads' fuel-surcharge calculations," Logistics Management, Available at: www.logisticsmgmt.com/article/CA6416247.html (Last Accessed: April 2009).

Berman, Jeff, "Study says railroad fuel surcharges exceeded $6.5 billion," Logistics Management, Available at: www.logisticsmgmt.com/article/CA6488182.html (Last Accessed: April 2009).

"BNSF Fuel Surcharge," BNSF Railway, Available at: http://www.bnsf.com/tools/prices/fuelsurcharge/index.html (Last Accessed: April 2009).

---

94 Logistics Management.

Another article on the STB ruling regarding rail fuel surcharges. Two points worthy of note. A study by a shippers group estimated that shippers were overcharged $6.5 billion between 2005 and the first quarter of 2007 because of the methods used by the railroads to compute fuel surcharges.

It also presents an obvious rational for the use of old/low diesel fuel prices as the base in estimating surcharges. "Looking at what the railroads are doing, some are still basing their fuel costs from the 2001-2002 timeframe, although some have updated to the present. But the farther you are going back with your fuel costs the greater this amount (for fuel surcharges) will be."

Freight Railroads, Updated Information on Rates and Competition Issues (2007).

Notes that railroad "miscellaneous revenues" including fuel surcharges increased by a factor of ten (from 141 million to 1.7 billion) over the period 2000 to 2005.

95 Logistics Management.

Article notes STB ruling that declared that fuel surcharges that do not correlate with actual fuel costs for a specific shipment an "unreasonable practice". This prohibits railroads from assessing surcharges that are based on a percentage of the base rate.

Data2Logistics.

Another article on the STB decision regarding rail fuel surcharges.

Aggregates Manager.

Another article (from shippers' point of view) on the STB ruling overturning rate based fuel surcharges.

Boyd.

Another article on the STB ruling overturning rate based fuel surcharges.

Gallagher (2006).

This article makes the point that fuel surcharges applied to already high base rates result in excessive overcharges to shippers.

Boyd, John D., "STB rules against railroads in fuel surcharge case "Traffic World, Available at: www.iwla.com/CustomFiles/downloads/CCAFD43C-CAA6-4101-908E-7CF05D34C13B.doc (Last Accessed: April 2009).

"Consolidated HHG RFO for 2008-2009," U.S. General Services Administration, Available at: http://www.gsa.gov/Portal/gsa/ep/programView.do?pageTypeId=8211&ooid=8883&program-Page=%2Fep%2Fprogram%2FgsaDocument.jsp&programId=8691&channelId=-14542 (Last Accessed: April 2009).

"CSXT FUEL SURCHARGE PUBLICATION 8661-B," CSX Transportation, Available at: http://www.csx.com/share/customers/docs/docs/Fuel_Surcharge_8661-REF23613.pdf (Last Accessed: April 2009).

"CTA does the math on fuel surcharges, rates," Today's Trucking.com, Available at: www.todaystrucking.com/news.cfm?intDocID=19846 (Last Accessed: April 2009).

"Current Fuel Surcharge Terms," Norfolk Southern, Available at: https://www2.nscorp.com/nscportal/nscorp/Customers/Public%20Prices/NS8004_terms.html?leaf=6/1/2008%20FSC%20Program%20Terms (Last Accessed: April 2009).

Engley, Ray, "How to Calculate Fuel Surcharges," RoadTransport.com, Available at: www.roadtransport.com/Articles/2008/06/20/130954/how-to-calculate-fuel-surcharges.html (Last Accessed: April 2009).

"Fuel Adjustment," Post Haste Limited, Available at: www.posthaste.co.nz/fuel.html (Last Accessed: April 2009).

"Fuel Related Rate Adjustment Policy Update," Surface Deployment and Distribution Command (SDDC), Available at: www.sddc.army.mil/sddc/Content/Pub/13851//CABCN13851FSCPE15Oct05.pdf (Last Accessed: April 2009).

"Fuel Surcharge," Estes Express Lines, Available at: www.estes-express.com/cgi-dta/rsn291.mbr/display (Last Accessed: April 2009).

"Fuel Surcharge," ABF Freight System, Inc, Available at: www.abfs.com/resource/fuelsurcharge.asp (Last Accessed: April 2009).

"Fuel Surcharge," FWCC Incorporated, Available at: www.fwccinc.com/surcharge.html (Last Accessed: April 2009).

"Fuel Surcharge," American Truck Business Services Available at: www.attrucktax.com/fuelsurcharge.htm (Last Accessed: April 2009).

"Fuel Surcharge Programs," Union Pacific, Available at: http://www.uprr.com/customers/surcharge/index.shtml (Last Accessed: April 2009).

"Fuel Surcharges," Forward Air, Available at: www.forwardair.com/servlet/fwrd.unix.servlet.GetFuelSurchargeServlet (Last Accessed: April 2009).

"Fuel Surcharges," America's Independent Truckers' Association, Inc, Available at: www.aitaonline.com/Info/General/Fuel%20Surcharges.html (Last Accessed: April 2009).

"Fuel Surcharges: You can debate how they should be calculated, but carriers must be compensated to remain whole", Canadian Trucking Alliance, Available at: www.cantruck.com/news/news/2005/051110a.htm (Last Accessed: April 2009).

Gallagher, John, "Intermodal's Surcharge Gap," TRAFFIC WORLD (2006).

Grant, Keith B., and John L. Kent, *Investigation of Methodologies Used by Less-*

*Than-Truckload (LTL) Motor Carriers to Determine Fuel Surcharges, MTC Project 2006-03*, Midwest Transportation Consortium (2007).

"Global Cargo Distribution, Domestic Fuel," Surface Deployment and Distribution Command (SDDC), Available at: http://www.sddc.army.mil/Public/Global%20Cargo%20Distribution/Domestic/Fuel?summary=fullcontent (Last Accessed: April 2009).

Hecker, JayEtta Z., "FREIGHT RAILROADS, Updated Information on Rates and Competition Issues: *United States Government Accountability Office*," Testimony Before the Committee on Transportation and Infrastructure, House of Representatives, GAO-07-1245T (2007).

"INLAND FUEL CHARGE AUGUST 2008 FOR TRANS-PACIFIC EASTBOUND TRADE," NYK Line, Available at: www.hk.nykline.com/newsrelease/2008/News1240.htm (Last Accessed: April 2009).

"Inland Fuel Surcharge Announcements," Tropical Shipping, Available at: http://www.tropical.com/External/En/Press/Tropical-News/announce062707.htm (Last Accessed: April 2009).

"Inland Fuel Surcharge Calculator," Transpacific Stabilization Agreement Available at: www.tsacarriers.org/calc_inland.html (Last Accessed: April 2009).

"June 2008 Fuel Surcharge," UPS Canada, Available at: www.ups-scs.ca/about/NewsItemEn.aspx?NewsPostingId=261 (Last Accessed: April 2009).

Leonard, John, "New Fuel Surcharge FAQ's," Luck Stone Corporation, Available at: www.luckstone.com/pressroom/article.php?newsid=281 (Last Accessed: April 2009).

"MOL Surcharges: Bunker/Americas," MOL, Available at: www.powerinmotion.biz/surcharges/print_All.asp (Last Accessed: April 2009).

"Notice To The Trade - Fuel Charge Filing Change - Central America," Crowley, Available at: www.crowley.com/mediaroom/newsline.asp?ID=824 (Last Accessed: April 2009).

"Owner-Operator Independent Drivers Association," Available at: www.ooida.com/ (Last Accessed: April 2009).

"SDDC FREIGHT TRAFFIC RULES PUBLICATION NO. 30 (MFTRP NO. 30)," Surface Deployment and Distribution Command (SDDC), Available at: www.sddc.army.mil/sddc/Content/Pub/43244/BARGERules_October172005.pdf (Last Accessed: April 2009).

"Surcharges Applicable For All Trades," Maersk Line, Available at: https://www.maerskline.com/link/?page=brochure&path=/our_services/adv/0845/all_trade (Last Accessed: April 2009).

"Telecon with Richard Cody," (December 2008).

"Telecon with Rick Cassady," (November 2008).

Thompson, Jay, "Fuel Surcharge versus Fuel Costs - Get It Right Or You Are Out Of Business!," Gerson Lehrman Group, Available at: https://www.glgroup.com/News/Fuel-Surcharge-versus-Fuel-Costs---Get-It-Right-Or-You-Are-Out-Of-Business-24654.html (Last Accessed: April 2009).

"Winning Strategies For Transportation Procurement and Payment," Data2Logistics, Available at: www.data2logistics.com/newsletters/clientconnection_mar_07.pdf (Last Accessed: April 2009).

### FAF Appendix B: Typical Rate-Based Truck Fuel Surcharge Estimator

We base the fuel surcharge on the National Average On-Highway Diesel Price. The U.S. Department of Energy updates that figure every Monday. Any surcharge increases or decreases based on that National Average will be effective the following Wednesday.

The Diesel Price chart in Table 41 will help you calculate the current fuel surcharge. Please note the different charges for less-than-truckload (LTL) and truckload (TL) shipments.

We automatically calculate the fuel surcharge in quotes we give you through My Estes. We also show the fuel surcharge separately on freight bills so the exact cause and amount of the increase is clear to our customers.

**Table 41: National Average On-Highway Diesel Price as of 12/10/2008: $2.51**

| When the National Average On-Highway Diesel Price is: | | | | | |
|---|---|---|---|---|---|
| **At Least** | **But Less Than** | **LTL Surcharge** | **At Least** | **But Less Than** | **TL Surcharge** |
| 1.10 | 1.15 | 1.50% | 1.10 | 1.15 | 2.40% |
| 1.15 | 1.20 | 2.00% | 1.15 | 1.20 | 3.10% |
| 1.20 | 1.25 | 2.50% | 1.20 | 1.25 | 3.90% |
| 1.25 | 1.30 | 3.00% | 1.25 | 1.30 | 4.70% |
| 1.30 | 1.35 | 3.50% | 1.30 | 1.35 | 5.50% |
| 1.35 | 1.40 | 4.00% | 1.35 | 1.40 | 6.30% |
| 1.40 | 1.45 | 4.50% | 1.40 | 1.45 | 7.10% |
| 1.45 | 1.50 | 5.00% | 1.45 | 1.50 | 7.90% |
| 1.50 | 1.55 | 5.50% | 1.50 | 1.55 | 8.60% |
| 1.55 | 1.60 | 6.00% | 1.55 | 1.60 | 9.40% |
| 1.60 | 1.65 | 6.50% | 1.60 | 1.65 | 10.20% |
| 1.65 | 1.70 | 7.00% | 1.65 | 1.70 | 11.00% |
| 1.70 | 1.75 | 7.50% | 1.70 | 1.75 | 11.80% |
| 1.75 | 1.80 | 8.00% | 1.75 | 1.80 | 12.60% |
| 1.80 | 1.85 | 8.50% | 1.80 | 1.85 | 13.40% |
| 1.85 | 1.90 | 9.00% | 1.85 | 1.90 | 14.10% |
| 1.90 | 1.95 | 9.50% | 1.90 | 1.95 | 14.90% |

## FAF Appendix C: Underlying Logic of the Rate-Based Fuel Surcharge

### RHA FUEL ADJUSTMENT GUIDE

(1) There is no "cover-all" formula.

(2) There is however a correct "method" which requires that every operator who wishes to apply a surcharge successfully must determine the actual figures which apply in his/her operation.

(3) Method

i) Determine your base buying price.
ii) Determine the percentage effect on the base price of a change of 1 penny per liter.
iii) Determine the percentage of your total costs or, if easier, your revenue, represented by diesel.

(4) Example

i) Assume base buying price is 90 pence per liter.
ii) Every one penny change in price is therefore 1.11%.
iii) a) Your revenue for the last 3 months was £234,567. Your fuel cost for the last 3 months was £ 77,500. (This was at an average buying price during that period of 90 pence per liter, determined by analyzing fuel invoices} Your fuel as a percentage of revenue was therefore 33%. It follows that, for every one penny per liter over and above 90 pence you will require 1.11% x 33% = 0.37%. Therefore, if you are now paying 101 pence per liter, you will be looking for (average) 0.37 x 11 = 4.1%.
NB All figures are illustrative only. They do not purport to represent actual figures.

## FAF Appendix D: Typical Mileage-Based Truck Fuel Surcharge Estimator

In the event that a fuel surcharge should become necessary, the following base price and formula shall be used to calculate the actual fuel surcharge increase:

**Formula**

(A) DOE Self Service Diesel Fuel Price including Taxes each Monday (Tuesday will be used if Monday is a holiday)

(B) Base Price of Fuel ($1.15 per gallon)

(C) Average miles per gallon fuel consumption (5.0 miles per gallon)

(A minus B) divided by C = Fuel Surcharge in cents per loaded mile, rounded to the nearest whole cent.

**Review (adjustments)** will be made each Monday based upon the DOE Index posted that day, and will be applied on all shipments loaded on or after that date until the next adjustment. In the event of a holiday on Monday, the DOE Index for Tuesday will be used and will apply on all shipments loaded on or after that Tuesday.

**Application**; for simplicity in application, Table 42 reflects the above formula:

The same formula will apply if fuel levels exceed those in Table 42.

**Table 42: Fuel Surcharge Calculator**

| **Base Price**<br>**Fleet Mpg**<br>$/gallon | **$1.15**<br>**5** | <br><br>$/gallon | <br>**Fuel Surcharge**<br>$/mile |
|---|---|---|---|
| $1.176 | to | $1.225 | $0.01 |
| $1.226 | to | $1.275 | $0.02 |
| $1.276 | to | $1.325 | $0.03 |
| $1.326 | to | $1.375 | $0.04 |
| $1.376 | to | $1.425 | $0.05 |
| $1.426 | to | $1.475 | $0.06 |
| $1.476 | to | $1.525 | $0.07 |
| $1.526 | to | $1.575 | $0.08 |
| $1.576 | to | $1.625 | $0.09 |
| $1.626 | to | $1.675 | $0.10 |
| $1.676 | to | $1.725 | $0.11 |
| $1.726 | to | $1.775 | $0.12 |
| $1.776 | to | $1.825 | $0.13 |
| $1.826 | to | $1.875 | $0.14 |
| $1.876 | to | $1.925 | $0.15 |
| $1.926 | to | $1.975 | $0.16 |
| $1.976 | to | $2.025 | $0.17 |
| $2.026 | to | $2.075 | $0.18 |
| $2.076 | to | $2.125 | $0.19 |
| $2.976 | to | $3.025 | $0.37 |

**FAF Appendix E: SDDC Transportation and Travel Policy No. Tr-12**
SUBJECT: Fuel-Related Rate Adjustment Policy Update

POLICY

**A. Application**: The policy will apply to SDDC Domestic Freight Programs.

**B. Policy: Domestic Freight Shipments**

1. Application: Application of a Fuel-Related Rate Adjustment will be determined on Monday of each week and based on the National Average diesel fuel price as determined by the Department of Energy, Energy Information Administration (EIA). If Monday is a holiday the fuel price will be determined based on the price on the next business day.

2. Determination of Adjustment: The National Average diesel fuel prices published by the DOE, EIA on each Monday of the week (or the first working day after a Monday if the Monday falls on a Federal Holiday) will be used as a basis for determining the applicability of a Fuel-Related Rate Adjustment. The fuel adjustment will automatically apply to shipment picked up on or after the Tuesday following the Monday.

The diesel fuel prices published by the EIA may be found via the following sources:

- EIA Website: http://www.eia.doe.gov/
- EIA Weekly Petroleum Status Report
- EIA Hotline: (202) 586-6966

It is the responsibility of the Transportation provider to monitor diesel fuel prices via one of the sources identified above. The National Average diesel fuel price determined by the DOE, EIA on Monday of each week will serve as the basis for determining the entitlement to a Fuel-Related Rate Adjustment, until Monday of the following week when the National Average diesel fuel price is published. The National Average fuel price and the actual pickup date of the shipment will determine if there is an entitlement to an adjustment and the amount of the adjustment. An adjustment is not applicable to any portion of transportation in which a surcharge or any other additional payment for fuel is already in existence. For example, portions of transportation to which the Bunker Fuel Surcharge is applicable.

**D. Amount of Adjustment**: The table below will be used to determine the fuel related rate adjustment factor. No fuel adjustment will be granted when prices are within the neutral range "0". When the DOE, EIA fuel price exceeds the neutral range amount, the transportation provider will be entitled to the specific fuel rate adjustment percentage based on the applicable fuel cost per gallon range as indicated in the table. The increase applies to the line haul transportation charges only.

| Fuel Cost Range<br>Cost per Gallon (in cents) | Percent Change<br>Rate Adjustment % |
|---|---|
| 130.0 and below | 0 |
| 130.1-140.0 | 1 |
| 140.1-150.0 | 2 |
| 150.1-160.0 | 3 |
| 160.1-170.0 | 4 |
| 170.1-180.0 | 5 |
| 180.1-190.0 | 6 |
| 190.1-200.0 | 7 |
| 200.1-210.0 | 8 |
| 210.1-220.0 | 9 |
| 220.1-230.0 | 10 |
| 230.1-240.0 | 11 |
| 240.1-250.0 | 12 |
| 250.1-260.0 | 13 |
| 260.1-270.0 | 14 |
| 270.1-280.0 | 15 |
| 280.1-290.0 | 16 |
| 290.1-300.0 | 17 |
| 300.0-310.0 | 18 |
| 310.1-320.0 | 19 |
| 320.1-330.0 | 20 |
| 330.1-340.0 | 21 |
| 340.1-350.0 | 22 |
| (Continues upward at 1% change for each $.10 change in DOE) | |

**E. Billing Procedures:** Transportation providers will clearly show fuel price adjustments on all paper and electronic invoices. The amount of any diesel fuel rate surcharge must be shown as a separate item on the transportation providers' invoice.

**F. Domestic Freight Program**: Specific program applications and exceptions are listed below:

1. Applications:

   a. Applies only to the domestic line haul portion of the transportation provider rate for CONUS shipments only.

   b. Applies to accessorial Commercial Security Escort Vehicles (CSEV). (Effective with shipments picked up after 1 Jul 03.)

**FAF Appendix F: GSA Approach to Fuel Charge Calculation for Household Goods Movements**

For shipments picked up between November 1, 2008 and November 14, 2008, the calculation of the surcharge will be based on the October 6, 2008 DOE Fuel Price.

Effective with shipments picked up on or after November 1, 2008, the calculation of the Fuel Surcharge on domestic and international shipments will be calculated based on the shipment's origin and destination, and if applicable, the distance for delivery in or delivery out of storage in transit (SIT), using the billable mileage as currently identified by ALK Technologies. For international relocations, the fuel surcharge can only be calculated on the portion of the shipment which was handled under traffic in the conterminous United States to the port of debarkation and from the port of embarkation to a location in the conterminous United States. For origins and/or destinations in Canada, Rand-McNally mileage will be used in lieu of ALK Technologies. Rand-McNally will also be used for mileage between the gateways on Alaskan shipments traveling by land through Canada.

When the cost of diesel fuel exceeds $2.499 as identified by the DOE on the first Monday of the month, with an effective date of the 15th of the same month, the Transportation Service Provider (TSP) may calculate a fuel surcharge based on the difference between the DOE price and the trigger price of $2.50.

To determine the fuel surcharge, the TSP must divide the billable miles by five (5) to determine the number of gallons of fuel used. The total gallons will then be multiplied by the cost difference between the DOE price and $2.499.

Example:

DOE Fuel Price = $4.595, Miles = 750
750/5 = 150 gallons
$4.595 - $2.499 = $2.09
$2.09 X 150 = $313.50
Fuel surcharge = $313.50

## FAF Appendix G: BNSF Railroad Approach to Estimating the Fuel Surcharge for an Intermodal Shipment

BNSF assesses fuel surcharges on a mileage basis for Agricultural Products and various Unit Train Coal customers and for certain other customers - mostly Industrial Products and other Coal customers. Shipments on which a mileage-based fuel surcharge is assessed include public regulated, non-contract, non-boxcar shipments for which rates have not been prescribed by the Surface Transportation Board (STB).

Due to current volatility in the fuel markets, BNSF will postpone its previously-announced fuel surcharge program changes. The Highway Diesel Fuel (HDF) price at which BNSF will assess a fuel surcharge on carload shipments - the strike price - will remain at $1.25. BNSF will also postpone the extension of its mileage-based fuel surcharge program to carload (Agricultural Products, Coal, Industrial Products and Automotive) and Intermodal customers who do not currently pay a mileage-based fuel surcharge. BNSF will continue to observe the fuel market and provide an update to our customers no later than July 1, 2009.

Information regarding BNSF's percentage-based fuel surcharge program is available for:

- Carload Shipments
- Coal Unit Train
- Automotive Shipments
- Intermodal Shipments

BNSF may impose a fuel surcharge due to increasing fuel costs as stated in the BNSF Intermodal Rules and Policies Guide. All transportation services and intermodal shipments will be subject to any Intermodal Fuel Surcharges implemented by BNSF or imposed on BNSF, regardless of price authority (including all contracts and agreements).

The BNSF Intermodal Fuel Surcharge (shown in Table 43) is applied to the freight bill based on the BNSF shipping instructions **(waybill) date**. The Intermodal Fuel Surcharge is adjusted each **Wednesday** according to the **previous week's** Department of Energy's U.S. Average On-Highway Diesel Price (HDF). There are no credits or refunds if the HDF price falls below $1.24. The surcharge is subject to change.

If the U.S Average On-Highway Diesel Price equals or exceeds $5.199 per gallon, the fuel surcharge will increase 0.5% for every 4-cent increase in fuel price.

Table 43: BNSF Intermodal Revenue-based Fuel Surcharge

| U.S. National Average Highway Diesel Fuel Price Range | BNSF Intermodal Fuel Surcharge | U.S. National Average Highway Diesel Fuel Price Range | BNSF Intermodal Fuel Surcharge | U.S. National Average Highway Diesel Fuel Price Range | BNSF Intermodal Fuel Surcharge |
|---|---|---|---|---|---|
| $0.00 - $1.239 | 0.0% | $2.56 - $2.599 | 17.5% | $3.92 - $3.959 | 34.5% |
| $1.24 - $1.279 | 1.0% | $2.60 - $2.639 | 18.0% | $3.96 - $3.999 | 35.0% |
| $1.28 - $1.319 | 1.5% | $2.64 - $2.679 | 18.5% | $4.00 - $4.039 | 35.5% |
| $1.32 - $1.359 | 2.0% | $2.68 - $2.719 | 19.0% | $4.04 - $4.079 | 36.0% |
| $1.36 - $1.399 | 2.5% | $2.72 - $2.759 | 19.5% | $4.08 - $4.119 | 36.5% |
| $1.40 - $1.439 | 3.0% | $2.76 - $2.799 | 20.0% | $4.12 - $4.159 | 37.0% |
| $1.44 - $1.479 | 3.5% | $2.80 - $2.839 | 20.5% | $4.16 - $4.199 | 37.5% |
| $1.48 - $1.519 | 4.0% | $2.84 - $2.879 | 21.0% | $4.20 - $4.239 | 38.0% |
| $1.52 - $1.559 | 4.5% | $2.88 - $2.919 | 21.5% | $4.24 - $4.279 | 38.5% |
| $1.56 - $1.599 | 5.0% | $2.92 - $2.959 | 22.0% | $4.28 - $4.319 | 39.0% |
| $1.60 - $1.639 | 5.5% | $2.96 - $2.999 | 22.5% | $4.32 - $4.359 | 39.5% |
| $1.64 - $1.679 | 6.0% | $3.00 - $3.039 | 23.0% | $4.36 - $4.399 | 40.0% |
| $1.68 - $1.719 | 6.5% | $3.04 - $3.079 | 23.5% | $4.40 - $4.439 | 40.5% |
| $1.72 - $1.759 | 7.0% | $3.08 - $3.119 | 24.0% | $4.44 - $4.479 | 41.0% |
| $1.76 - $1.799 | 7.5% | $3.12 - $3.159 | 24.5% | $4.48 - $4.519 | 41.5% |
| $1.80 - $1.839 | 8.0% | $3.16 - $3.199 | 25.0% | $4.52 - $4.559 | 42.0% |
| $1.84 - $1.879 | 8.5% | $3.20 - $3.239 | 25.5% | $4.56 - $4.599 | 42.5% |
| $1.88 - $1.919 | 9.0% | $3.24 - $3.279 | 26.0% | $4.60 - $4.639 | 43.0% |
| $1.92 - $1.959 | 9.5% | $3.28 - $3.319 | 26.5% | $4.64 - $4.679 | 43.5% |
| $1.96 - $1.999 | 10.0% | $3.32 - $3.359 | 27.0% | $4.68 - $4.719 | 44.0% |
| $2.00 - $2.039 | 10.5% | $3.36 - $3.399 | 27.5% | $4.72 - $4.759 | 44.5% |
| $2.04 - $2.079 | 11.0% | $3.40 - $3.439 | 28.0% | $4.76 - $4.799 | 45.0% |
| $2.08 - $2.119 | 11.5% | $3.44 - $3.479 | 28.5% | $4.80 - $4.839 | 45.5% |
| $2.12 - $2.159 | 12.0% | $3.48 - $3.519 | 29.0% | $4.84 - $4.879 | 46.0% |
| $2.16 - $2.199 | 12.5% | $3.52 - $3.559 | 29.5% | $4.88 - $4.919 | 46.5% |
| $2.20 - $2.239 | 13.0% | $3.56 - $3.599 | 30.0% | $4.92 - $4.959 | 47.0% |
| $2.24 - $2.279 | 13.5% | $3.60 - $3.639 | 30.5% | $4.96 - $4.999 | 47.5% |
| $2.28 - $2.319 | 14.0% | $3.64 - $3.679 | 31.0% | $5.00 - $5.039 | 48.0% |
| $2.32 - $2.359 | 14.5% | $3.68 - $3.719 | 31.5% | $5.04 - $5.079 | 48.5% |
| $2.36 - $2.399 | 15.0% | $3.72 - $3.759 | 32.0% | $5.08 - $5.119 | 49.0% |
| $2.40 - $2.439 | 15.5% | $3.76 - $3.799 | 32.5% | $5.12 - $5.159 | 49.5% |
| $2.44 - $2.479 | 16.0% | $3.80 - $3.839 | 33.0% | $5.16 - $5.199 | 50.0% |
| $2.48 - $2.519 | 16.5% | $3.84 - $3.879 | 33.5% | | |
| $2.52 - $2.559 | 17.0% | $3.88 - $3.919 | 34.0% | | |

**FAF Appendix H: TSA Inland Fuel Surcharge Calculator**

## Inland Fuel Surcharge Calculator

To simplify calculation and forecasting of our Inland Fuel Surcharge, TSA has posted the weekly U.S. Department of Energy average retail on-highway diesel fuel prices to date, for the current monthly calculation period. These weighted averages, updated each week, take into account ocean carriers' direct costs as well as fuel-related charges they pay to rail and truck affiliates and vendors.

| Weekly Weighted Average Inland Fuel Prices ($/Gallon) | |
|---|---|
| **Week ending** | **US$** |
| Nov 03 | 3.088 |
| Nov 10 | 2.944 |
| Nov 17 | 2.809 |
| Nov 24 | 2.664 |
| Dec 01 | 2.615 |
| Dec 08 | 2.515 |
| Dec 15 | 2.422 |
| Dec 22 | 2.366 |
| Dec 29 | 2.327 |

Also posted is an Inland Fuel Price-Bunker Charge Conversion Table which translates weighted average fuel prices into a per container inland fuel surcharge. By 1) averaging the weekly fuel price totals to date; and 2) applying that average to the conversion table, users can easily get a sense of price trends and likely future charge adjustments.

(Note: As the above table shows, from the time that the IFS was introduced TSA has used the original BNSF baseline of $1.24 per gallon as the zero threshold past which an IFS is applied. Thus $1.24 per gallon of inland fuel cost has been absorbed by carriers and can be considered as already embedded in base freight rates.)

Effective May 1, 2006, TSA has shifted from quarterly to monthly adjustments to the Inland Fuel Charge. As a result, adjustments are now based on a one-month average of weekly DOE diesel fuel prices. Charges are set based on fuel prices during the month ending 30 days before the effective date of the adjustment. For example, a May charge is based on an average of weekly prices throughout the previous March.

Calculations done later in the reporting period are likely to yield more precise forecasting results. A complete, accurate calculation of the next adjusted charge requires averaging of prices across the entire month.

| Average DOE Diesel Fuel Price | Inland Fuel Surcharge | | |
|---|---|---|---|
| US$/Gallon | WC Group4/ EC Local SDD | RIPI | Long-haul Rail/Truck Intermodal |
| $0 – 1.239 | $0 | $0 | $0 |
| $1.24 – 1.279 | $3 | $6 | $11 |
| $1.28 – 1.319 | $5 | $8 | $16 |
| $1.32 – 1.359 | $6 | $11 | $21 |
| $1.36 – 1.399 | $8 | $13 | $26 |
| $1.40 – 1.439 | $9 | $16 | $32 |
| $1.44 – 1.479 | $11 | $19 | $37 |
| $1.48 – 1.519 | $12 | $21 | $42 |
| $1.52 – 1.559 | $14 | $24 | $47 |
| $1.56 – 1.599 | $15 | $27 | $53 |
| $1.60 – 1.639 | $17 | $29 | $58 |
| $1.64 – 1.679 | $18 | $32 | $63 |
| $1.68 – 1.719 | $20 | $35 | $69 |
| $1.72 – 1.759 | $21 | $37 | $74 |
| $1.76 – 1.799 | $23 | $40 | $79 |
| $1.80 – 1.839 | $24 | $42 | $84 |
| $1.84 – 1.879 | $26 | $45 | $90 |
| $1.88 – 1.919 | $27 | $48 | $95 |
| $1.92 – 1.959 | $29 | $50 | $100 |
| $1.96 – 1.999 | $31 | $53 | $106 |
| $2.00 – 2.039 | $32 | $56 | $111 |
| $2.04 – 2.079 | $34 | $58 | $116 |
| $2.08 – 2.119 | $35 | $61 | $121 |
| $2.12 – 2.159 | $37 | $64 | $127 |
| $2.16 – 2.199 | $38 | $66 | $132 |
| $2.20 – 2.239 | $40 | $69 | $137 |
| $2.24 – 2.279 | $41 | $71 | $142 |
| $2.28 – 2.319 | $43 | $74 | $148 |
| $2.32 – 2.359 | $44 | $77 | $153 |
| $2.36 – 2.399 | $46 | $79 | $158 |
| $2.40 – 2.439 | $47 | $82 | $164 |
| $2.44 – 2.479 | $49 | $85 | $169 |
| $2.48 – 2.519 | $50 | $87 | $174 |
| $2.52 – 2.559 | $52 | $90 | $179 |
| $2.56 – 2.599 | $53 | $93 | $185 |
| $2.60 – 2.639 | $55 | $95 | $190 |
| $2.64 – 2.679 | $56 | $98 | $195 |
| $2.68 – 2.719 | $58 | $100 | $200 |
| $2.72 - 2.759 | $60 | $103 | $206 |
| $2.76 - 2.799 | $61 | $106 | $211 |
| $2.80 - 2.839 | $63 | $108 | $216 |
| $2.84 - 2.879 | $64 | $111 | $222 |
| $2.88 - 2.919 | $66 | $114 | $227 |
| $2.92 - 2.959 | $67 | $116 | $232 |
| $2.96 - 2.999 | $69 | $119 | $237 |
| $3.00 - 3.039 | $70 | $122 | $243 |
| $3.04 - 3.079 | $72 | $124 | $248 |

| | | | |
|---|---|---|---|
| $3.08 - 3.119 | $73 | $127 | $253 |
| $3.12 - 3.159 | $75 | $129 | $258 |
| $3.16 - 3.199 | $76 | $132 | $264 |
| $3.20 - 3.239 | $78 | $135 | $269 |
| $3.24 - 3.279 | $79 | $137 | $274 |
| $3.28 - 3.319 | $81 | $140 | $280 |
| $3.32 - 3.359 | $82 | $143 | $285 |
| $3.36 - 3.399 | $84 | $145 | $290 |
| $3.40 - 3.439 | $85 | $148 | $295 |
| $3.44 - 3.479 | $87 | $151 | $301 |
| $3.48 - 3.519 | $89 | $153 | $306 |
| $3.52 - 3.559 | $90 | $156 | $311 |
| $3.56 - 3.599 | $92 | $159 | $317 |
| $3.60 - 3.639 | $93 | $161 | $322 |
| $3.64 - 3.679 | $95 | $164 | $327 |
| $3.68 - 3.719 | $96 | $166 | $332 |
| $3.72 - 3.759 | $98 | $169 | $338 |
| $3.76 - 3.799 | $99 | $172 | $343 |
| $3.80 - 3.839 | $101 | $174 | $348 |
| $3.84 - 3.879 | $102 | $177 | $353 |
| $3.88 - 3.919 | $104 | $180 | $359 |
| $3.92 - 3.959 | $105 | $182 | $364 |
| $3.96 - 3.999 | $107 | $185 | $369 |
| $4.00 - 4.039 | $108 | $188 | $375 |
| $4.04 - 4.079 | $110 | $190 | $380 |
| $4.08 - 4.119 | $111 | $193 | $385 |
| $4.12 - 4.159 | $113 | $195 | $390 |
| $4.16 - 4.199 | $114 | $198 | $396 |
| $4.20 - 4.239 | $116 | $201 | $401 |
| $4.24 - 4.279 | $117 | $203 | $406 |

More detailed instructions for tracking inland diesel fuel prices, and a more detailed description of TSA's calculation formula, can be found in the Inland Fuel Surcharge Fact Sheet elsewhere in this section of the web site.

### Calculating the Inland Fuel Surcharge

The TSA Inland Fuel Surcharge is based on a simple calculation that has 3 basic components:

- U.S. DOE Weekly Retail On-Highway Diesel Prices

  http://tonto.eia.doe.gov/oog/info/wohdp/diesel.asp
- BNSF Intermodal Revenue-Based Fuel Surcharge

  www.bnsf.com/markets/intermodal/intermodal_fuel_surcharge.html
- Average TSA Intermodal Cost Component

  ($1,055 per FEU longhaul rail; $527 per FEU RIPI; $305 per FEU Group 4 / SDD truck)

Calculation is simple:

(1) Average weekly retail on-highway diesel fuel prices from the USDOE web site over a month, to construct each new monthly IFS adjustment.

(2) Apply the average price to the BNSF percentage-based fuel surcharge formula on its web site.

(3) Apply the BNSF surcharge formula percentage to an average intermodal rate of $1,055 per FEU for longhaul rail intermodal shipments, and $305 per FEU for Group 4 West Coast or East Coast store-door delivery (SDD) truck moves.

(4) Round up to the nearest dollar

Example: An average USDOE retail on-highway diesel fuel price of $3.576, applied to the BNSF surcharge formula, translates into a 30% surcharge and the following calculation:

$1,055 per FEU (longhaul rail) x 0.30 = $317
$527 per FEU (reverse IPI) x 0.30 = $157.50
$305 per FEU (shorthaul truck) x 0.30 = $92

As a shortcut, TSA provides a page on its web site (www.tsacarriers.org/calc_inland.html) that includes both posted weekly USDOE retail on-highway diesel prices and the conversion table that translates average fuel prices directly into the TSA surcharge levels, using BNSF percentage-based values.

**FAF Appendix J: FAF Calculator**

The FAF Calculator included in the accompanying EXCEL spreadsheet *FAF Calculator.xls* is reproduced below. The calculator produces the table of FAFs for each of the zones that would be updated and published monthly on the USTRANSCOM internet site. Tables are produced for three types of shipments; containers, breakbulk shipments with a weight/shipment unit less than 50,000 lbs., and breakbulk shipments with a weight/shipment unit greater than 50,000 lbs. The example tables for May 2009 are indicated below.

**Table 44: CONUS Inland Fuel Surcharges (FAF) per Container**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| AL | -$77 | -$101 | -$146 |
| AR | -$77 | -$111 | -$146 |
| AZ | -$77 | -$111 | -$146 |
| CA | -$77 | -$111 | -$48 |
| CO | -$77 | -$111 | -$146 |
| CT | -$59 | -$111 | -$146 |
| DC | -$59 | -$111 | -$146 |
| DE | -$59 | -$111 | -$146 |
| FL | -$59 | -$111 | -$146 |
| GA | -$59 | -$111 | -$146 |
| IA | -$77 | -$111 | -$146 |
| ID | -$77 | -$111 | -$146 |
| IL | -$77 | -$111 | -$146 |
| IN | -$77 | -$111 | -$146 |
| KS | -$77 | -$111 | -$146 |
| KY | -$77 | -$111 | -$146 |
| LA | -$77 | -$101 | -$146 |
| MA | -$59 | -$111 | -$146 |
| MD | -$59 | -$111 | -$146 |
| ME | -$59 | -$111 | -$146 |
| MI | -$77 | -$111 | -$146 |
| MN | -$77 | -$111 | -$146 |
| MO | -$77 | -$111 | -$146 |
| MS | -$77 | -$101 | -$146 |
| MT | -$77 | -$111 | -$146 |
| NC | -$59 | -$111 | -$146 |

Effective for the Month of May-09
(Negative values indicate a credit)

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 736 of 794



**Table 44: CONUS Inland Fuel Surcharges (FAF) per Container**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| ND | -$77 | -$111 | -$146 |
| NE | -$77 | -$111 | -$146 |
| NH | -$59 | -$111 | -$146 |
| NJ | -$59 | -$111 | -$146 |
| NM | -$77 | -$111 | -$146 |
| NV | -$77 | -$111 | -$146 |
| NY | -$59 | -$111 | -$146 |
| OH | -$77 | -$111 | -$146 |
| OK | -$77 | -$111 | -$146 |
| OR | -$77 | -$111 | -$48 |
| PA | -$59 | -$111 | -$146 |
| RI | -$59 | -$111 | -$146 |
| SC | -$59 | -$111 | -$146 |
| SD | -$77 | -$111 | -$146 |
| TN | -$77 | -$111 | -$146 |
| TX | -$77 | -$101 | -$146 |
| UT | -$77 | -$111 | -$146 |
| VA | -$59 | -$111 | -$146 |
| VT | -$59 | -$111 | -$146 |
| WA | -$77 | -$111 | -$48 |
| WI | -$77 | -$111 | -$146 |
| WV | -$59 | -$111 | -$146 |
| WY | -$77 | -$111 | -$146 |
| Effective for the Month of May-09 (Negative values indicate a credit) | | | |

The equations used in calculating each of the surcharges as follows:

EC to EC Surcharge = (Monthly Average Fuel Price - Baseline Fuel Price)*Truck gallons/container mile*Average haul EC ports to EC points

GC to GC Surcharge = (Monthly Average Fuel Price - Baseline Fuel Price)*Truck gallons/container mile*Average haul GC ports to GC points

WC to WC Surcharge = (Monthly Average Fuel Price - Baseline Fuel Price)*Truck gallons/container mile*Average haul WC ports to WC points

EC to Rest of US = (Monthly Average Fuel Price - Baseline Fuel Price)* Intermodal rail gallons/container mile *Average haul EC ports to Rest of US

GC to Rest of US = (Monthly Average Fuel Price - Baseline Fuel Price)*Intermodal rail gallons/container mile *Average haul GC ports to Rest of US

WC to Rest of US = (Monthly Average Fuel Price - Baseline Fuel Price)*Intermodal rail gallons/container mile *Average haul WC ports to Rest of US

**Table 45: CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| AL | -$160 | -$50 | -$399 |
| AR | -$160 | -$309 | -$399 |
| AZ | -$160 | -$309 | -$399 |
| CA | -$160 | -$309 | -$52 |
| CO | -$160 | -$309 | -$399 |
| CT | -$82 | -$309 | -$399 |
| DC | -$82 | -$309 | -$399 |
| DE | -$82 | -$309 | -$399 |
| FL | -$82 | -$309 | -$399 |
| GA | -$82 | -$309 | -$399 |
| IA | -$160 | -$309 | -$399 |
| ID | -$160 | -$309 | -$399 |
| IL | -$160 | -$309 | -$399 |
| IN | -$160 | -$309 | -$399 |
| KS | -$160 | -$309 | -$399 |
| KY | -$160 | -$309 | -$399 |
| LA | -$160 | -$50 | -$399 |
| MA | -$82 | -$309 | -$399 |
| MD | -$82 | -$309 | -$399 |
| ME | -$82 | -$309 | -$399 |
| MI | -$160 | -$309 | -$399 |
| MN | -$160 | -$309 | -$399 |
| MO | -$160 | -$309 | -$399 |
| MS | -$160 | -$50 | -$399 |
| MT | -$160 | -$309 | -$399 |
| NC | -$82 | -$309 | -$399 |
| ND | -$160 | -$309 | -$399 |
| NE | -$160 | -$309 | -$399 |
| NH | -$82 | -$309 | -$399 |
| Effective for the Month of May-09 (Negative values indicate a credit to USTRANSCOM) | | | |

**Table 45: CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| NJ | -$82 | -$309 | -$399 |
| NM | -$160 | -$309 | -$399 |
| NV | -$160 | -$309 | -$399 |
| NY | -$82 | -$309 | -$399 |
| OH | -$160 | -$309 | -$399 |
| OK | -$160 | -$309 | -$399 |
| OR | -$160 | -$309 | -$52 |
| PA | -$82 | -$309 | -$399 |
| RI | -$82 | -$309 | -$399 |
| SC | -$82 | -$309 | -$399 |
| SD | -$160 | -$309 | -$399 |
| TN | -$160 | -$309 | -$399 |
| TX | -$160 | -$50 | -$399 |
| UT | -$160 | -$309 | -$399 |
| VA | -$82 | -$309 | -$399 |
| VT | -$82 | -$309 | -$399 |
| WA | -$160 | -$309 | -$52 |
| WI | -$160 | -$309 | -$399 |
| WV | -$82 | -$309 | -$399 |
| WY | -$160 | -$309 | -$399 |
| Effective for the Month of May-09<br>(Negative values indicate a credit to USTRANSCOM) | | | |

The equations used in calculating each of the surcharges as follows:

EC to EC Surcharge = (Monthly Average Fuel Price - Baseline Fuel Price)*Truck gallons/trailer mile*Average haul EC ports to EC points

GC to GC Surcharge = (Monthly Average Fuel Price - Baseline Fuel Price)*Truck gallons/trailer mile*Average haul GC ports to GC points

WC to WC Surcharge = (Monthly Average Fuel Price - Baseline Fuel Price)*Truck gallons/trailer mile*Average haul WC ports to WC points

EC to Rest of US = (Monthly Average Fuel Price - Baseline Fuel Price)* Intermodal rail gallons/trailer mile *Average haul EC ports to Rest of US

GC to Rest of US = (Monthly Average Fuel Price - Baseline Fuel Price)*Intermodal rail gallons/trailer mile *Average haul GC ports to Rest of US

WC to Rest of US = (Monthly Average Fuel Price - Baseline Fuel Price)*Intermodal rail gallons/trailer mile *Average haul WC ports to Rest of US

**Table 46: CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments exceeding 50,000 lbs**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| AL | -$399 | -$113 | -$643 |
| AR | -$399 | -$350 | -$643 |
| AZ | -$399 | -$350 | -$643 |
| CA | -$399 | -$350 | -$29 |
| CO | -$399 | -$350 | -$643 |
| CT | -$17 | -$350 | -$643 |
| DC | -$17 | -$350 | -$643 |
| DE | -$17 | -$350 | -$643 |
| FL | -$17 | -$350 | -$643 |
| GA | -$17 | -$350 | -$643 |
| IA | -$399 | -$350 | -$643 |
| ID | -$399 | -$350 | -$643 |
| IL | -$399 | -$350 | -$643 |
| IN | -$399 | -$350 | -$643 |
| KS | -$399 | -$350 | -$643 |
| KY | -$399 | -$350 | -$643 |
| LA | -$399 | -$113 | -$643 |
| MA | -$17 | -$350 | -$643 |
| MD | -$17 | -$350 | -$643 |
| ME | -$17 | -$350 | -$643 |
| MI | -$399 | -$350 | -$643 |
| MN | -$399 | -$350 | -$643 |
| MO | -$399 | -$350 | -$643 |
| MS | -$399 | -$113 | -$643 |
| MT | -$399 | -$350 | -$643 |
| NC | -$17 | -$350 | -$643 |
| ND | -$399 | -$350 | -$643 |
| NE | -$399 | -$350 | -$643 |
| NH | -$17 | -$350 | -$643 |

Effective for the Month of May-09
(Negative values indicate a credit to USTRANSCOM)



DA11737

**Table 46: CONUS Inland Fuel Surcharges (FAF) for Breakbulk Shipments exceeding 50,000 lbs**

| State | VIA USEC | VIA USGC | VIA USWC |
|---|---|---|---|
| NJ | -$17 | -$350 | -$643 |
| NM | -$399 | -$350 | -$643 |
| NV | -$399 | -$350 | -$643 |
| NY | -$17 | -$350 | -$643 |
| OH | -$399 | -$350 | -$643 |
| OK | -$399 | -$350 | -$643 |
| OR | -$399 | -$350 | -$29 |
| PA | -$17 | -$350 | -$643 |
| RI | -$17 | -$350 | -$643 |
| SC | -$17 | -$350 | -$643 |
| SD | -$399 | -$350 | -$643 |
| TN | -$399 | -$350 | -$643 |
| TX | -$399 | -$113 | -$643 |
| UT | -$399 | -$350 | -$643 |
| VA | -$17 | -$350 | -$643 |
| VT | -$17 | -$350 | -$643 |
| WA | -$399 | -$350 | -$29 |
| WI | -$399 | -$350 | -$643 |
| WV | -$17 | -$350 | -$643 |
| WY | -$399 | -$350 | -$643 |

Effective for the Month of May-09
(Negative values indicate a credit to USTRANSCOM)

The equations used in calculating each of the surcharges as follows:

EC to EC Surcharge = (Monthly Average Fuel Price - Baseline Fuel Price)*Truck gallons/ mile*Average haul EC ports to EC points

GC to GC Surcharge = (Monthly Average Fuel Price - Baseline Fuel Price)*Truck gallons/ mile*Average haul GC ports to GC points

WC to WC Surcharge = (Monthly Average Fuel Price - Baseline Fuel Price)*Truck gallons/ mile*Average haul WC ports to WC points

EC to Rest of US = (Monthly Average Fuel Price - Baseline Fuel Price)* Conventional rail gallons/car mile *Average haul EC ports to Rest of US

GC to Rest of US = (Monthly Average Fuel Price - Baseline Fuel Price)* Conventional rail gallons/car mile *Average haul GC ports to Rest of US

WC to Rest of US = (Monthly Average Fuel Price - Baseline Fuel Price)* Conventional rail gallons/car mile *Average haul WC ports to Rest of US

The required input values are presented below. Most of these are default values and would not normally change. However, there would be value to periodically updating them.

The shipments moving between the top 100 origin to POE pairs and the top 100 POD to destination pairs in CONUS (measured in terms of number of containers or shipment units) as reported in IBS for 2008 were used in computing an average haul. For breakbulk shipments with a weight/shipment unit greater than 50,000lbs., the top 50 origin to POE pairs and the top 50 POD to destination pairs in CONUS were used in computing the average haul. Shipments were assigned to the appropriate category, e.g., East Coast port to East Coast point. The Defense Table of Official Distances (DTOD) and randmcnally.com were used to determine the distance between each of the OD pairs. These distances were used in computing an average haul appropriate to each of the categories considered.

The baseline period is currently set at Apr 08-Jul 08, the solicitation period for USC-06. This would have to be changed to the solicitation period for the USC-06 extension option, if it were decided to implement the proposed FAF under that option. The baseline fuel price for that period would be obtained from the U.S. National Average Diesel Fuel Index published by the Energy Information Administration of the U.S. Department of Energy. Historic data for the period is available[96] and would be used to compute a new monthly average fuel price for use as the baseline in FAF computations. Once set, this baseline would apply for the life of the contract.

In practice, the FAF tables would be updated monthly. This would require specification of the current month, the prior month (that for which the latest monthly fuel price data were available), and the upcoming month (that for which the FAF would be in effect). The fuel price data for the prior month would be obtained from the same DOE internet site noted above. This is the price used as the "Monthly Average Fuel Price".

### Input Values- Container Shipments

Average haul EC ports to EC points - 149 miles

Average haul GC ports to GC points - 254 miles

Average haul WC ports to WC points - 121 miles

Average haul EC ports to Rest of US - 975 miles

96 http://tonto.eia.doe.gov/oog/ftparea/wogirs/xls/psw18vwall.xls data tab 2.

Average haul GC ports to Rest of US - 1,418 miles

Average haul WC ports to Rest of US - 1,860 miles

Truck fuel factor - 0.1667 gallons/container mile

Intermodal rail fuel factor - 0.033 gallons/container mile

Baseline Period - Apr 08-Jul 08

Baseline Fuel Price - $4.47

Current Month - Apr-09

Prior Month - Mar-09

Monthly Average Fuel Price Prior Month - $2.09

Next Month (FAF in Effect) - May-09

**Input Values-Breakbulk Less Than 50,000 Lbs./Shipment Unit**

Average haul EC ports to EC points - 207 miles

Average haul GC ports to GC points - 125 miles

Average haul WC ports to WC points - 132 miles

Average haul EC ports to Rest of US - 774 miles

Average haul GC ports to Rest of US - 1,488 miles

Average haul WC ports to Rest of US - 1,924 miles

Truck fuel factor - 0.1667 gallons/trailer mile

Intermodal rail fuel factor - 0.0872 gallons/trailer mile

Baseline Period - Apr 08-Jul 08

Baseline Fuel Price - $4.47

Current Month - Apr-09

Prior Month - Mar-09

Monthly Average Fuel Price Prior Month - $2.09

Next Month (FAF in Effect) - May-09

**Input Values-Breakbulk Greater Than 50,000 Lbs./Shipment Unit**

Average haul EC ports to EC points - 33 miles

Average haul GC ports to GC points - 216 miles

Average haul WC ports to WC points - 55 miles

Average haul EC ports to Rest of US – 1,154 miles

Average haul GC ports to Rest of US - 1,011 miles

Average haul WC ports to Rest of US - 1,859 miles

Truck fuel factor - 0.2192 gallons/trailer mile

Conventional rail fuel factor - 0.1454 gallons/car mile

Baseline Period - Apr 08-Jul 08

Baseline Fuel Price - $4.47

Current Month - Apr-09

Prior Month - Mar-09

Monthly Average Fuel Price Prior Month - $2.09

Next Month (FAF in Effect) - May-09

PageVault

| | |
|---|---|
| Document title: | Freight Rail Overview \| FRA |
| Capture URL: | https://railroads.dot.gov/rail-network-development/freight-rail-overview |
| Page loaded at (UTC): | Fri, 07 Jun 2024 22:51:53 GMT |
| Capture timestamp (UTC): | Fri, 07 Jun 2024 22:52:50 GMT |
| Capture tool: | 10.47.5 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/124.0.0.0 Safari/537.36 |
| Operating system: | Linux (Node 20.11.1) |
| PDF length: | 5 |
| Capture ID: | dtePoFRm9Cn2UJ8oXQXoZK |
| User: | lw-ryork |

PDF REFERENCE #: pKSU9bsSmEmRzKF7YEtQTC

Rail Network Development Overview
Passenger Rail
Freight Rail
Overview
Labor and Employment
Environment
Planning
Project Planning
Systems Planning
Rural
International
Maps and Data
Training & Guidance

# Freight Rail Overview




## The Freight Rail Network

Running on almost 140,000 route miles, the U.S. freight rail network is widely considered the largest, safest, and most cost-efficient freight system in the world. [1] The nearly $80-billion freight rail industry is operated by seven Class I railroads [2] (railroads with operating revenues of $490 million or more) [3] and 22 regional and 584 local/short line railroads. [4] It provides more than 167,000 jobs [5] across the United States and offers ancillary benefits that other modes of transportation cannot, including reductions in road congestion, highway fatalities, fuel consumption, greenhouse gases, cost of logistics, and public infrastructure maintenance costs.

Unlike roadways, U.S. freight railroads are owned by private organizations who are responsible for their own maintenance and improvement projects. Compared with other major modes of transportation, railroad owners invest one of the highest percentages of revenues (19 percent) to maintain and add capacity to their system, spending nearly $25 billion annually. [6]

*[1] See Railway Technology, "The world's 10 longest railway networks," February 2014; Association of American Railroads, "Overview of America's Freight Railroads," March 2020.*
*[2] The seven Class I freight railroads are: BNSF Railway Co., Canadian National Railway (Grand Trunk Corporation), Canadian Pacific (Soo Line Corporation), CSX Transportation, Kansas City Southern Railway Co., Norfolk Southern Combined Railroad Subsidiaries, and Union Pacific Railroad Co. The combined revenue of Class I railroads equaled $67 billion in 2017.*
*[3] Association of American Railroads, "Overview of America's Freight Railroads," March 2020.*
*[4] Association of American Railroads,* Railroad Facts, 2019 Edition, *3.*
*[5]* Railroad Facts, 2019 Edition, *3.*
*[6] Association of American Railroads, "Freight Railroad Capacity and Investment," March 2020.*

## Related Links

- Blocked Crossing Incident Reporter
- Maps - Geographic Information System
- 2019 Pocket Guide to Transportation
- Railroad Crossing Safety & Trespass Prevention
- FRA Grants & Loans
- International Programs

Expand All | Collapse All

### How, What, and Where Freight Moves

Freight is moved by rail, waterways, pipeline, truck, and air throughout the United States. Rail has an advantage in moving heavy freight over long distances efficiently, as do waterways and pipeline services. Trucks provide time-sensitive delivery services for more high-



delivery services for more high-value goods being transported over medium- and short-haul distances.



(includes mail)

Water: 6.9%

Air: 0.1%

*Source: U.S. Department of Transportation, 2019 Pocket Guide to Transportation, 19.*

Heavy freight such as coal, lumber, ore, and heavy freight going long distances are likely to travel by rail, or some combination of truck, rail, and water. The rail network accounted for approximately 28 percent of U.S. freight movement by ton-miles (the length and weight freight travels). [7] The Waybill Sample map shows U.S. rail routes by tonnage of commodities they carry.

*[7] U.S. Department of Transportation, 2019 Pocket Guide to Transportation, 19.*

STB Waybill Sample 2018 – All Commodities




*The Waybill is a stratified sample of carload waybills for all U.S. rail traffic submitted by those rail carriers terminating 4,500 or more revenue carloads annually. Image created by Federal Railroad Administration, Office of Railroad Policy and Development (Office of Policy), based on Surface Transportation Board's 2018 Carload Waybill Sample.*

Rail is a cost-effective and efficient way to move almost any freight in the United States, which benefits both producers and consumers. Each American requires the movement of approximately 54 tons of freight per year. Goods people use or components of the goods people use are largely shipped by rail. [8]



**52%** OF ALL RAIL FREIGHT CONSISTS OF BULK COMMODITIES SUCH AS AGRICULTURE & ENERGY PRODUCTS

**48%** OF ALL RAIL FREIGHT CONSISTS OF CONSUMER GOODS AND OTHER MISCELLANEOUS PRODUCTS

In all, 52 percent of rail freight car loads consist of bulk commodities such as agriculture and energy products, automobiles and components, construction materials, chemicals, equipment, food, metals, minerals, paper, and pulp. The remaining 48 percent is intermodal traffic that generally consists of consumer goods and other miscellaneous products. [9] Intermodal traffic is made up of shipping containers of all types of goods that can be transferred easily from rail to truck, plane, or other vessel, and vice versa.

U.S. rail freight moves on a variety of cars, depending on the goods being transported—from refrigerated cars for shipping perishables to flatbed cars for aircraft or automobile parts to intermodal shipping containers. Modern freight trains average roughly 73 cars (but top train length is 200 cars and growing), whereas the average freight train length in 1929 was 48 cars. [10]

Goods in the United States move predominantly to and from ports, manufacturing hubs, and areas of specific economic activity, from rural areas for agriculture and energy products to population centers or outlying regions where power plants and large manufacturing facilities are located.

Freight rail participates in achieving national export goals and facilitating the safe and efficient importation of goods via both the East and West Coasts and to and from Mexico and Canada. (See U.S. Rail-Carried Trade with Canada and Mexico for additional information on the volumes and values of commodities that flow between North American countries and the most important freight gateways along the borders.)

*[8] Association of American Railroads, "Freight Rail: Making Modern Life Possible for Consumers ," March 2018.*
*[9] Association of American Railroads,* Railroad Facts, 2019 Edition, *27 (Class 1 railroads only).*
*[10] Association of American Railroads,* Railroad Facts, 2019 Edition, *38.*

## Fuel Efficiency

Because of technological advancement and innovation, rail continues to be unrivaled by other modes for fuel efficiency. Trains are four times more efficient than trucks, moving one ton of freight 470 miles on just a single gallon of diesel fuel. [11] Rail's lower fuel consumption also leads to lower carbon emissions overall. Despite handling a third of all intercity freight volume, rail accounts for 2.0% of all transportation-related emissions. [12]

*[11] Association of American Railroads, "Freight Railroads Embrace Sustainability & Environmental Preservation ," February 2019.*
*[12] Environmental Protection Agency, "Fast Facts: U.S. Transportation Sector Greenhouse Gas Emissions 1990–2017," June 2019, 1.*

## The Future

Population and demographic trends pose an enormous challenge for U.S. transportation infrastructure and operators. Forecasts suggest that the United States is becoming more urbanized, and urbanized areas will increasingly converge into larger metropolitan networks (called megaregions) as the population continues to grow. As a result, these regions will demand a higher volume of freight, which means greater traffic congestion, increased emissions, more frequent infrastructure maintenance, and loss of economic productivity.

Freight railroads in the United States are poised to meet increased freight demands by offering innovative transportation solutions, such as intermodal transportation with double-stacked containers on railcars. With future population and economic growth, and the subsequent growth in freight, experts anticipate that railroads will continue to make the necessary investments in the capacity required to move heavy and long-distance shipments. [13]

*[13] American Association of Railroads, "Freight Railroad Capacity and Investment ," March 2020.*

## The Future

Population and demographic trends pose an enormous challenge for U.S. transportation infrastructure and operators. Forecasts suggest that the United States is becoming more urbanized, and urbanized areas will increasingly converge into larger metropolitan networks (called megaregions) as the population continues to grow. As a result, these regions will demand a higher volume of freight, which means greater traffic congestion, increased emissions, more frequent infrastructure maintenance, and loss of economic productivity.

Freight railroads in the United States are poised to meet increased freight demands by offering innovative transportation solutions, such as intermodal transportation with double-stacked containers on railcars. With future population and economic growth, and the subsequent growth in freight, experts anticipate that railroads will continue to make the necessary investments in the capacity required to move heavy and long-distance shipments. [13]

*[13] American Association of Railroads, "Freight Railroad Capacity and Investment," March 2020.*

Last updated: Wednesday, July 8, 2020

HEINONLINE

DATE DOWNLOADED: Tue Jun 11 14:40:36 2024
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Interstate Commerce Commission Reports, 350 I.C.C. 1 (1974-1975).

ALWD 7th ed.
, Interstate Commerce Commission Reports, 350 I.C.C. 1 (1974-1975).

APA 7th ed.
(1974-1975). Interstate Commerce Commission Reports. Interstate Commerce Commission Reports: Reports and Decisions of the Interstate Commerce Commission of the United States, 350, 1-916.

Chicago 17th ed.
"Interstate Commerce Commission Reports," Interstate Commerce Commission Reports: Reports and Decisions of the Interstate Commerce Commission of the United States 350 (1974-1975): 1-916

McGill Guide 9th ed.
"Interstate Commerce Commission Reports" (1974-1975) 350 ICC 1.

AGLC 4th ed.
'Interstate Commerce Commission Reports' (1974-1975) 350 Interstate Commerce Commission Reports: Reports and Decisions of the Interstate Commerce Commission of the United States 1

MLA 9th ed.
"Interstate Commerce Commission Reports." Interstate Commerce Commission Reports: Reports and Decisions of the Interstate Commerce Commission of the United States, 350, 1974-1975, pp. 1-916. HeinOnline.

OSCOLA 4th ed.
'Interstate Commerce Commission Reports' (1974-1975) 350 ICC 1 Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use: *Copyright Information*

EX PARTE NO. 311

# EFFECT OF MODIFYING PROCLAMATION NO. 3279 AND OTHER ANTICIPATED ENERGY CONSERVATION MEASURES ON THE OPERATION OF CARRIERS SUBJECT TO THE INTERSTATE COMMERCE ACT

*Decided August 14, 1975*

Upon consideration of views, arguments, and representations of the parties, and after extensive staff study, certain conclusions reached concerning the effect of Proclamation No. 3279, as amended, on the surface transportation industry. Procedures adopted to provide an expedited method by which regulated carriers can recover increased fuel costs.

*Ralph H. Bell, Jacob P. Billig, Carles J. Braun, Jr., Oliver Callson, William C. Collins, John Harvey, James Iwena, Terrance D. Jones, John H. King, R. L. Lighthall, J. W. Lush, J. G. McKeefery, Frederic W. Mild, R. A. Penk, Harold M. Pockrose, P. R. Reilly, Jr., J. R. Scanlan, Ernest Sigeti, Edwin P. Wintle,* and *Charles G. Wise* for individual shippers.

*Cecil L. Brennan, John M. Cleary, John F. Donelan, James P. Ehret, H. E. Franklin, Jr., Pierce L. Herring, Jr., James M. Jones, Jr., William Q. Keenan, L. O. Kimberly, Jr., John K. Maser III, John G. McGowan, Allan I. Mendelsohn, Frank E. Polom, Daniel J. Sweeney, Fred H. Tolan,* and *Paul P. Watkins* for shipper associations.

*Harris G. Andrews, Robert E. Born, Homer S. Carpenter, J. Fred Dewhurst, Robert G. Gawley, Keith Hale, James L. Howe III, Edward A. Kaier, William E. Kenworthy, Cliff Knowles, F. H. Lynch, Jr., Herman Matthew, W. L. McCraken, Thormond A. Miller, W. A. Myllenbeck, Donald G. Oren, Norman Powell, J. Allen Royal, Albert B. Russ, Jr., John E. Smith II, Mike Smith, D. Paul Stafford, James L. Tapley, J. Anthony Terilla, Joseph P. Wolinsky,* and *John M. Womack,* for individual carriers.

*Thomas M. Auchincloss, Jr., Paul D. Boas, W. A. Bresnahan, Drew L. Carraway, S. S. Eisen, Fred G. Favor, John S. Fessenden, Carroll F. Genovese, Joseph A. Habib, Jr., Frank B. Hand, Joseph*

*M. Harrison, Bryce Rea, Jr., Wesley A. Rogers, Jack C. Sandford, Charles W. Singer, Paul F. Sullivan,* and *F. L. Wyche* for carrier associations.

*George J. Rotblat* for the United States Department of Defense.

*Constance L. Abrams* and *Rodney E. Eyster* for the United States Department of Transportation.

*Robert F. Hemphill, Jr., Eric Hirst, Georgia R. Johnson,* and *Roger W. Sant* for the Federal Energy Administration.

REPORT AND ORDER OF THE COMMISSION

BY THE COMMISSION:

By notice of proposed rulemaking dated January 31, 1975, published in the February 5, 1975 issue of the Federal Register (40 FR 5374), the Commission instituted this proceeding on its own motion pursuant to 5 U.S.C. 552, 553, and 559 (Administrative Procedure Act), the National Transportation Policy *preceding* title 49, Sections 1, 301, 901, and 1001 of the Interstate Commerce Act, and the provisions of the Interstate Commerce Act including 49 U.S.C. 6, 15, 15a, 316, 317, 318, 906, 1005, and 1006.

The purpose of this proceeding, as stated in the notice of proposed rulemaking and in *Energy Crisis and Need for Emergency Trans. Legis.*, 349 I.C.C. 699, 720, is to devise a means of permitting the expedited recovery of fuel cost increases brought about by an import tax or alternative measures having the effect of precipitously increasing the price of fuel. The procedure suggested by the Commission in the notice of proposed rulemaking would require the submission of information of the type set forth in Appendix A to the notice as justification for proposed increases in rates by individual carriers or rate bureaus. The notice also indicated the possibility of an alternative to the Appendix A method. Under the alternate method, if sufficient data were available from the Federal Energy Administration (FEA) and other federal agencies, the Commission proposed to develop a formula for a uniform percentage increase which would be applied either (1) nationally, or (2) regionally so as to take into consideration variations in the prices of fuel experienced by different sections of the Nation.

Comments were solicited by the Commission on or before February 19, 1975 and 59 interested persons representing carrier(26), shipper(30), and governmental interests (3) replied to the Commission's notice.

Generally, the comments were directed to the procedures for recovery of fuel costs outlined in the notice. A number of parties, however, addressed themselves to the question of whether there is now a real need for expedited procedures. The parties who oppose the suggested expedited procedure argued *inter alia*, that fuel increases should not be singled out for special handling; and that cost increases in fuel should be recovered through normal procedures. According to one party, the cost increase resulting from the imposition of the $1 per barrel tax increase on imported crude oil reflects only a .3 percent impact on the average revenue per mile of the Nation's regulated motor carriers. Another calculates the percentage increase in freight rates necessary to offset a $1 per barrel import tax as .3 percent and maintains that this is not sufficient to justify the expense of a general increase proceeding.

On a related matter, many parties contend that the 10-day period for notice to the shipping public which was suggested in the Commission's notice is inadequate since it "forestalls any intelligent appraisal of any increase."

Some shipper interests also request that consideration be given to making fuel related cost increases proportional to the amount of fuel consumed in providing various transportation services. These shippers contend that fuel costs are related to miles and not to revenues and request that carriers be require to translate any fuel cost increase into a cost per mile.

There were also numerous suggestions made relative to the Commission's solicitation of ideas on fuel conservation. This matter of fuel conservation was extensively discussed in Ex Parte No. 301, *Energy Crisis and Need for Emergency Transp. Legis.*, *supra*, and need not be repeated here. The FEA recommended that the Commission allow carriers to recoup only 90 percent of increases in fuel prices through higher transportation rates in order to encourage carriers to improve their fuel efficiency. The Department of Transportation, however, took a contrary position stating that "in the absence of wage and price ceilings it is unfair to apply controls to an industry simply because it is subject to economic regulation." In this instance, we agree with the Department of Transportation. Without the assurance of compensation to cover the full cost of fuel increases, a situation similar to that which existed in connection with the February 1974, fuel crisis might again develop. For a discussion of the February, 1974 fuel embargo crisis see Ex Parte No. MC-92, *Investigation of Impact of Rising Costs*, 346 I.C.C. 712

and *Energy Crisis and Need for Emergency Transp. Legis., supra,* 703.

The primary emphasis of the comments, however, concerned the proposed Appendix A and alternate methods proposed by the Commission as a means of enabling the regulated carrier industry to recover increased fuel costs. Many comments suggest the need for clarification of certain items in the proposed Appendix A format and the mechanical calculations flowing therefrom. Comments directed to the alternate method from those who favor its implementation indicate that adoption thereof would reduce the burden on the carriers, and would lessen disputes as to the accuracy of the data.

## Discussion and Conclusions

As was clearly demonstrated in the winter of 1973-74, rapidly escalating fuel prices cannot be absorbed by carriers for 30 to 45 days before increasing revenues. On an experimental basis and in an atmosphere of transportation crisis, we entered Special Permission No. 74-1825 on December 13, 1973 and Special Permission No. 74-2525 on February 7, 1974 to meet the crisis caused by the oil embargo of late 1973 and early 1974. These Special Permission orders are discussed in *Investigation of Impact of Rising Costs, supra.* Special Permission No. 74-2525 "had the effect of immediately ending the nationwide truck strike," *Energy Crisis and Need for Emergency Transp. Legis., supra,* 703. Having benefitted from our prior experience, we believe that action is now required to assure that the surface transportation industry is not placed in the untenable position of being forced to absorb increased fuel prices for an extended period of time. Although the United States Court of Appeals for the District of Columbia has now held that Proclamation No. 3279 that precipitated the institution of this proceeding was entered without appropriate authority, at this time it is not certain whether the court of appeals decision will be appealed and if appealed whether it will be affirmed. Similarly, at this time it is not certain whether or not domestically produced crude oil will remain subject to price ceilings after August 31, 1975. What is certain, however, is that fuel prices have increased in the past few months, and to await the development of a full scale crisis before acting would not be in accordance with the National Transportation Policy. Therefore, upon consideration of the record in this proceeding, to be subsequently discussed, we have concluded

that existing regulations requiring the submission of a detailed evidentiary case in support of a railroad general increase or an increase proposed by motor carriers subject to the requirements set forth in Ex Parte No. MC-82, *New Procedures in Motor Carrier Rev. Proc.*, 339 I.C.C. 324, 340 I.C.C. 1, should be modified so as to permit an expedited procedure when increases are proposed based on fuel increases during the period specified in our order entered in this proceeding. For similar reasons, we believe special permission is warranted, for the period set forth in the order to be entered in this proceeding, granting relief from the 30-day notice provision set forth in the act.

Because of the uncertainties previously noted, i.e., the legality of the increased tariff on imported oil and the possibility that price ceilings on domestically produced crude oil may continue after August 31, 1975, it is conceivable that fuel prices may not escalate in the near future. Accordingly, the order to be entered in this proceeding will not be self executing but will require the entry of a further order implementing the expedited procedure. Nevertheless, we are proceeding with issuance of the special procedures in order that all parties may be informed of the required data submission and to enable the Commission to act immediately should the situation warrant.

As part of our investigation, fuel cost figures were obtained from the FEA resulting from a national study, made by an independent contractor, of No. 2 diesel fuel oil prices at truck stops for the period from January 1974 through June 1975, the latter being the latest period in which figures were available to FEA. Although this study, as hereinafter indicated, is inappropriate as a means of enabling specific carriers or groups of cariers to recover increased fuel costs, it is, nevertheless, indicative of general trends in fuel prices on a national scale. This study was conducted under FEA's direction and consisted of 80 truck stops in 31 cities or about 6 percent of the entire 1200 truck stops in the United States. The results of this study, as set forth in appendix I hereto, disclose that in January 1974 the national average price of No. 2 diesel fuel, excluding taxes, was 32.2 cents and that in June 1975 the comparable price was 38.6 which is a percentage increase of approximately 20 percent for the 18 month period. FEA's study, including taxes, shows that diesel fuel prices have increased from 49.7 cents in February 1975 to 51.4 cents in June 1975 for a percentage increase of 3.4 percent for a 5-month period. Furthermore, it should be noted that the aforementioned increases

are susceptible to rapid change in the future. As evidence of the inflationary tendency of fuel prices, one need only look at the diesel fuel prices during the period from May 15, 1973 to February 7, 1974, discussed in *Investigation of Impact of Rising Costs, supra.* The decision discloses that during the 9-month period fuel prices had increased over 40 percent. Thus, although the recent 20-percent increase in fuel prices over 18 months is not as alarming as the 40-percent increase experienced during the last fuel crisis, it nevertheless warrants implementing expedited procedures to protect the regulated carrier industry from rapidly rising fuel costs.

Our continuing concern is that the needs of commerce in the United States will be met by a common carrier industry financially able to meet shipper requirements. While shippers are understandably concerned about increases in rates, we believe that a failure of the common carrier industry to promptly recoup fuel price increases flowing from Proclamation No. 3279, as amended, and other engergy measures would, in the long run have a more severe impact on the Nation's commerce. The anticipated fuel price increases are not limited to those resulting from the Presidential Proclamation. The pricing policies of the oil producing Nations with respect to charges for imported oil and the removal of price ceilings on "old" domestic oil could have a substantial effect on the cost of gasoline and diesel fuel. In view of these considerations, we believe that a special permission order similar to (but for reasons hereinafter set forth not identical to) Special Permission No. 74-1825 should be adopted. As relevant Special Permission No. 74-1825 as originally entered read as follows:

> Common carriers and freight forwarders subject to the Interstate Commerce Act and their tariff publishing agents are hereby authorized to depart from the terms of the governing tariff circulars to file and post on not less than 10 days' notice increases in line-haul rates, fares, and charges by means of surcharges stated in percentages to produce additional revenue in an amount not to exceed lawful increases in fuel costs based on the difference in the price of fuel on May 15, 1973, or on the effective date of the last general rate increase of the carrier or forwarder, whichever is later, on the one hand, and the present lawful price of fuel, on the other hand.

As mentioned previously the Commission's notice of proposed rulemaking offered alternative methods of recovery of increased fuel costs. One would require the submission of information as set forth in appendix A to the notice and the other would utilize a uniform percentage formula based on data developed by the FEA or any other Federal Agency. This alternate method relies on the use of truck stop sampling by the FEA and has certain inherent

deficiencies which make it less desirable than the Appendix A method. The sample currently conducted by the FEA consists of 80 truck stops in 31 cities. There are 11 regional cost groupings in the United States which would mean that with 80 truck stops there would be an average of only 7 truck stops to a region. Furthermore, many motor carriers have operations that span these regions and there would be difficulty in determining which regional figure would be most applicable to each of them. Finally, it should be pointed out that the FEA has no information on bulk purchase prices on their current sample and apparently has no plan for compiling such data in the near future. In view of the foregoing, the alternative suggested in the Commission's notice in this proceeding is not a practical or valid method to enable carriers to recover increased fuel costs.

As noted, many of the 59 replies to the Commission's notice offered a number of comments and revisions to the proposed Appendix A format. We have rejected a number of these suggestions because, under the premise of an expedited procedure, the requested additional data would place an undue burden on the carriers. In other instances, the requested refinements per se were not justified based on our consideration of these statements. We have revised Appendix A, attached hereto, with appropriate explanatory material, as Appendix II.

On the subject of adequate notice to the shipping public, we believe the 10 days' notice set forth in the notice of proposed rulemaking, modified to require 10 working days, to be adequate and have incorporated such a provision into the revised Appendix A. The 10-day notice coupled with a requirement that carriers transmit copies of the proposal to their tariff subscribers and to protestants to their last general increase will allow interested persons an adequate opportunity to protest the proposed increases. Further, we intend to examine the proposed increases based on fuel cost very closely to determine whether or not they should be allowed to become effective or be suspended and ordered investigated.

This examination of proposed rate increases based on fuel costs will, in addition to a study of the revised Appendix A data submitted by the carrier also encompass the following considerations: (1) whether increases proposed apply on all traffic, and if not whether the selection of some traffic and the exclusion of other traffic constitutes an undue preference or prejudice or a discrimination of the type prohibited by the act; (2) whether the increase in revenue to be derived from the proposal exceeds shippers' costs of updating rate books or computer programs; (3) and whether the increase

proposed will result in a benefit to the entity actually responsible for paying the higher fuel prices. These additional factors to be considered in evaluating a carrier proposal are matters that require the exercise of judgment and discretion on the part of the Commission and accordingly are not prescribed. All parties are hereby advised that these factors are considered significant, and the failure, for example, to include all commodities in the proposed increase or the failure to apply the increase to all weight brackets may result in suspension and investigation. In order to facilitate the presentation by carriers of information relating to the enumerated factors and other relevant matters, Appendix II includes an item entitled "Other Matters" where such information can be concisely set forth.

A number of shipper interests represented in this proceeding have suggested that consideration be given to making fuel related cost increases equal to the amount of fuel consumed in providing various transportation services. It is also contended, and rightly so, that fuel costs are for the most part related to miles and not to revenues. The exception would appear to be the "start and stop" driving associated with short haul pick up and delivery operations conducted in urban areas. Notwithstanding the conceptual validity of constructing a justification statement similar to Revised Appendix A but based on a mileage-related formula, such a requirement would cause more problems than it would solve. Not all rates are based solely on distance traveled and other factors must also be considered. The rates on railroad transcontinental traffic, taper off as distances increase. In other instances large geographic areas for competitive reasons have been grouped together. An example of this situation is the rail rate on carbon blacks from southwest origins to Chicago and points in Connecticut where the rate is the same although it is obvious that the mileage to Connecticut is greater than that to Chicago. Still another situation that may be cited from railroad tariffs are port relationships prescribed by the Commission which are not based entirely on distance but rather are based upon the public policy set forth in the Act. Similar situations exist in the motor carrier rate structure where rate relationships exist based on weight and densities of the shipments as well as distance. Furthermore, it should again be emphasized that the purpose of this proceeding is to devise an expedited procedure for the recoupment of fuel expenses during a period of rapidly increasing fuel prices. Certainly, the adoption of a mileage related scheme would add complexities making the expedited procedure either unworkable or

so confusing as to frustrate the intent. If, in fact, there are inequities resulting from the simplified procedure here adopted these matters may be called to our attention in the form of protests to rate increases proposed under the expedited procedure or in complaints filed in accordance with our rules of practice.

One of the stated intentions when instituting Ex Parte No. MC-92, *Investigation of Impact of Rising Costs, supra,* 722, was to review the relationship of the increased fuel costs to the surcharge filed under the authority of Special Permission No. 74-2525 insofar as they are applicable to "those operations performed by owner-operators." As a result of that review, we terminated the surcharge concluding that "no owner-operator shall receive less compensation for fuel than he formerly received from the certificated carrier under the authority of Special Permission No. 74-2525." In the order terminating the surcharge we noted that the regulations adopted in Ex Parte No. MC-43 (Sub-No. 2), *Adjustment of Compensation for Equipment Leased by Motor Carriers of Property Because of Rising Fuel Costs,* remain in effect for the protection of owner-operators. As noted in Ex Parte No. 301, *Energy Crisis and Need for Emergency Trans. Legis., supra,* 719-720, the issue of whether this Commission has jurisdiction to assure an adequate pass-through of compensation to owner-operators to cover fuel costs increases is not free from doubt. Because of this uncertainty, an order was entered in Ex Parte No. MC-92 on April 2, 1975 vacating the requirement that "no owner-operator shall receive less, in terms of an actual dollar amount, than he received from the certificated carrier during the period the fuel surcharge was in effect" and discontinuing the proceeding. To end this uncertainty, we have recommended legislation that would confer upon the Commission specific authority to enable us "to impose pass-through requirements on carriers sufficient to compensate owner-operators adequately for fuel cost increases during transportation emergencies."

The protracted litigation over the pass-through provisions that were continued in effect by Ex Parte No. MC-92 makes it clear that if we were to impose a similar condition now our action would in all likelihood be subject to court action seeking a temporary restraining order. While we cannot predict with certainty the eventual outcome of this anticipated litigation we believe it preferable to so tailor our actions as to avoid repetitious court action. Accordingly, we will not prescribe a pass-through provision. In evaluating a carrier proposal, however, we shall consider whether the person actually responsible

for the payment of fuel cost receives the benefit of the proposed increases. If it is clear that no benefit will accrue to the owner-operator in instances where he is responsible for the payment of fuel costs, we will not approve the proposal.

Special Permission Nos. 74-1825 and 74-2525 authorized the filing on short notice of surcharges based on fuel price increases. We must now resolve whether to authorize the publication of a surcharge based on the expedited procedure herein found to be necessary or whether to require that the increases based on fuel cost be made by conventional tariff publication. It has been the traditional view of this Commission that surcharges which add an element of confusion into tariff use should only be sanctioned in unusual situations. Generally, surcharges have only been considered as appropriate in situations where it is anticipated that their use will be of a temporary duration or where in extenuating situations the service performed under the surcharge is considered local to the carrier assessing the charge.

It does not appear reasonable to assume that fuel prices, which have been increasing, will suddenly start decreasing. In other words, it now appears that rate increases here authorized to become effective on an expedited basis will remain part of the rate structure for the foreseeable future. The expedited procedure for recouping fuel costs is not limited to local rates of a carrier but has equal applicaton to joint line rates. Hence the revenue generated will for the most part be shared by connecting carriers rather than accumulate for the benefit of a single carrier. Therefore, the surcharge method of computing freight charges is not appropriate and will not be sanctioned for the publication of increases based on fuel costs.

The freight forwarder industry supported the adoption of the alternative method for recouping fuel cost suggested in the notice of proposed rulemaking. For the reasons previously stated, we have declined to approve the alternative method. The revised Appendix A procedure herein adopted for submission of data in support of an increase based on fuel cost will not be of assistance to the freight forwarder industry. Realizing this fact, the freight forwarders have requested that we consider authorizing the same percentage fuel increase to freight forwarders as is authorized for the motor carrier industry. There is no assurance that the entire motor carrier industry will propose or be able to justify a single percentage increase. Accordingly, we have concluded that the freight forwarders request is without merit. However, an expedited procedure is provided for in a special permission order entered herewith whereby freight forwarders on 10 days' notice may increase their rates upon the

submission of evidence establishing that their underlying carrier increased rates based on fuel costs.

The adoption of an expedited procedure to permit "facially neutral increases" *Aberdeen & Rockfish R. Co.* v. *SCRAP*, 422 U.S. 289 (1975), 7 ERC 2009, is not a major federal action having a significant effect on the environment.

## FINDINGS

We find that the needs of commerce of the United States require the establishment of an expedited procedure to permit the recovery by the surface transportation industry of increased cost directly attributable to the price of fuel. Accordingly, Special Permission No. 76-350 is hereby entered for general use and Special Permission No. 76-360 is hereby entered for use by regulated freight forwarders. As previously indicated, however, these special permission orders may not be used until a further order is entered implementing the expedited procedures adopted herein.

We believe that carriers regulated by this Commission must be able to reflect rapidly increasing fuel costs from whatever causes in the rate structure as quickly as possible. We therefore adopt the procedur~ outlined herein in Appendix II to be used in conjunction with Special Permission No. 76-350 and Special Permission No. 76-360 thus providing, when implemented, an expedited method by which carriers can recover increased fuel costs.

## APPENDIX I

*Retail prices (excluding taxes) of No. 2 diesel in cents per gallon from truck stop sample conducted by Federal Energy Administration*

| *1974* | *Cents* | *1975* | *Cents* |
|---|---|---|---|
| January | 32.2 | January | 37.8 |
| February | 33.7 | February | 37.4 |
| March | 34.6 | March | 37.4 |
| April | 35.1 | April | 37.8 |
| May | 36.3 | May | 38.2 |
| June | 37.1 | June | 38.6 |
| July | 37.5 | | |
| August | 37.7 | | |
| September | 37.4 | | |
| October | 37.1 | | |
| November | 37.1 | | |
| December | 37.0 | | |

RETAIL PRICES (INCLUDING TAXES)[1] OF NO. 2 DIESEL IN CENTS PER GALLON FROM TRUCK STOP SAMPLE CONDUCTED BY FEDERAL ENERGY ADMINISTRATION

| | |
|---|---|
| February | 49.7 |
| March | 50.1 |
| April | 50.5 |
| May | 50.3 |
| June | 51.4 |

[1]Only this study will be continued by Federal Energy Administration after June 1975.

APPENDIX II - REVISED APPENDIX A

VERIFIED STATEMENT OF FUEL EXPENSES AND RELATED DATA IN SUPPORT OF REQUESTED FUEL RATE INCREASE

Filed by: ______________________

Address: ______________________

| Line No. | Item (a) | Ratemaking Carrier (b) | Owner Operator (if applicable) (c) |
|---|---|---|---|
| 1. | (a) Requested fuel rate increase, current period over base period (Not to exceed percent on line 15 col.(b))(Percent) ---------- Effective date: ______ (Mo.) (Day) (Yr.) | % | xxx |
| | (b) Last fuel rate increase granted under this proceeding. (Percent) ------------------ Effective date: ______ (Mo.) (Day) (Yr.) | % | xxx |
| | I. BASE PERIOD DATA: June, 1975 | | |
| 2. | Fuel expenses, including taxes -------------------- | $ | $ |
| 3. | Number of gallons purchased ----------------------- | | |
| 4. | Average purchase price per gallon of fuel, including taxes (L.2 ÷ L.3)(Cents to 2 dec.) ------ | c | c |
| | II. CURRENT PERIOD DATA | | |
| 5. | Indicate month/year for which current period data (Lines 6 through 12) are applicable: ______ (Mo.) (Yr.) | | |
| 6. | Fuel expenses, including taxes -------------------- | $ | $ |
| 7. | Number of gallons purchased ----------------------- | | |
| 8. | Average purchase price per gallon of fuel, including taxes (L.6 ÷ L.7)(Cents to 2 dec.) ------ | c | c |
| 9. | Total operating revenues -------------------------- | $ | xxx |

APPENDIX II - REVISED APPENDIX A (cont'd)

| Line No. | Item (a) | Ratemaking Carrier (b) | Owner-Operator (if applicable) (c) |
|---|---|---|---|
| 10. | Payments to owner-operators ------------------------ | xxx | $ |
| 11. | Revenues retained by ratemaking carrier when transportation is performed by owner-operator. ----------------------------------- | $ | xxx |
| 12. | Balance of operating revenues (L.9, col.(b)) Minus (L.10, col.(c) + L.11, col.(b)) ---------------- | $ | xxx |
| | III. PERCENT THAT INCREASED FUEL COSTS IS OF TOTAL OPERATING REVENUES | | |
| 13. | Increase in purchase price per gallon of fuel, including taxes (L.8 - L.4)(Cents to 2 dec.) ----- | c | c |
| 14. | Increase in fuel expenses, including taxes, current period over base period: (L.7 x L.13) ------------ | $ | $ |
| 15. | Percent that increased fuel costs, including taxes, is to total operating revenues (L.14 cols.(b) and (c)) ÷ (L.9). (2 decimals) ------------------- | % | xxx |

IV. OTHER MATTERS

VERIFICATION

_____________________ )
(State) ) SS:
_____________________ )
(County) )

_____________________, being duly sworn, deposes and says that he has read the foregoing statement, knows the contents thereof, and that the same are true as stated.

_____________________
(Signature)

Subscribed to and sworn before me, a Notary Public, this _____________ day of _____________ (Month), _____________ (Year)

_____________________
(Notary Public)

My Commission expires _____________________



247-746 O - 77 - 38

EXPLANATORY

*Purpose:* The purpose of this verified statement is to develop factual data for the justification of proposed fuel rate increases filed by individual carriers or by various rate bureaus on behalf of their carrier members, which carriers are subject to regulation under the Interstate Commerce Act. This statement shall be used only during periods of significant and rapidly increasing fuel prices as determined by this Commission. The statement is applicable to, and designed for use by, all modes except freight forwarders. In the case of freight forwarders utilizing the services of underlying carriers subject to Part I, II or III of the Act, permission has been granted to these carriers to seek relief on 10 days' notice based on the submission of supporting data appropriately related to Commission-approved fuel rate increases granted to the underlying carriers.

The data to be provided in this statement represent the minimum data required to be filed. If additional data are filed, appropriate explanation should be provided.

This statement is developed for use not only for any initially proposed fuel rate increase but also for use in a proposed fuel rate increase subsequent to the initial request.

*Study carriers:* For the purpose of this statement motor carrier rate bureaus filing under the provisions of MC-82, *New Procedures in Motor Carrier Revenue Proceedings* (340 I.C.C. 1) may use, as a study group, those study carriers used to support their last general rate increase. All other motor carrier rate bureaus may base their statement data on those study carriers which they believe to be representative of the traffic at issue. However, supporting data and explanation for this selection of representative carriers should be provided. In the case of the railroads their study carriers shall, in the minimum, consist of the 25 special study carriers referred to in their comments in this proceeding. The Waterways Freight Bureau should include all carriers participating in its tariffs, or, if this is not possible, an appropriate explanation for any deletions. Other water carriers not members of this bureau, may file either individually or collectively with appropriate data supporting the representativeness of the study carriers selected. In all cases—rail, motor and water—a list of the study carriers should be furnished.

*Filing date:* Under the expedited procedures authorized in this proceeding, the data called for herein and the tariff publication shall be filed at least 10 working days prior to the effective date of the proposed fuel rate increase. Protests and requests for suspension shall reach the Commission at least 5 days before the effective date of the tariff.

*Column (b):* Ratemaking carrier means any ICC-certificated carrier, i.e., one having the authority to publish rates, fares, charges, et cetera, in accordance with its certificate or permit.

*Column (c):* An owner-operator is an independent contractor which performs a transportation service for, and on behalf of, an ICC-certificated carrier and in compliance with the terms and conditions of its contractual arrangements.

*Dollar amounts and percents:* All dollar amounts shall be rounded off to the nearest one-thousand.

*Base Period:* The base period shall be the month of June, 1975. It will remain the same for the purposes of this proceeding.

*Current Period:* When the filing date of a proposed fuel rate increase is the 15th through the 31st day in any given month, the current period shall be the immediately

preceding calendar month. When this filing date is the 1st through the 14th day in any given month, the current period shall be the second preceding calendar month; however, if the data for the immediately preceding month is available then that month may be used as the current period.

L. 1(a) *Requested fuel rate increase (percent):* Indicate the percent (to 1 decimal) of the requested fuel rate increase based on the increase in fuel expenses, including taxes, current period over the base period. This percent should not exceed the percent shown on line 15.

In the absence of special justification, increases of less than 1 percent shall not be requested. The percentage increase being determined based on the increase in fuel expenses, including taxes, for the current period over the base period (for the initially requested increase) or over the previously granted increase in line 1(b), whichever is applicable.

L. 1(b) *Last fuel rate increase granted under this proceeding (percent).* Show the effective date and the percent of the last fuel rate increase granted in this proceeding. This fuel rate increase should be applicable to the same traffic or carrier (whichever is applicable) as that for which the requested fuel rate increase on line 1(a) is shown.

Ls. 2 & 6 *Fuel expenses, including taxes* for both the base and current period shall be based upon the carriers' and owner-operators' actual expenditures in purchasing the number of gallons of fuel indicated on lines 3 and 7.

Ls. 3 & 7 *Gallons purchased* shall be the gallons, associated with the fuel expenses, including taxes, shown on lines 2 and 6.

Ls. 4 & 8 *Average purchase price per gallon, including taxes* for the ratemaking carrier (Column (b)) shall be computed by dividing the fuel expenses, including taxes, on lines 2 and 6 by the respective number of gallons purchased on lines 3 and 7. For the owner-operator (Column (c)) the average purchase price shall be computed in the same manner if the data are available. If owner-operator data are not available for lines 2 and 6 and for lines 3 and 7, a simple average of the purchase price per gallon of fuel including taxes, paid by owner-operators during the base period, line 4, and during the current period, line 8, is acceptable.

L. 9 *Total operating revenues* should include those revenues found in Schedule 3000, Line 6 of the annual report for motor carriers, and in Schedule 310, Line 27 for railroads. Other modes use comparable revenues. The annual report sources indicated above are for the year 1974; for the year 1975 use comparable sources and data.

L. 10 *Payments to owner-operators* (if applicable) should include those amounts paid to owner-operators during the current period.

L. 11 *Revenues retained by ratemaking carrier* is that share of the revenues retained by the carrier when transportation service is performed by owner-operators. These revenues apply to the current period.

L. 12 *Balance of operating revenues.* These are the operating revenues generated when transportation service is not performed by owner-operators, i.e., operating revenues other than those shown on lines 10, column (c) and line 11, column (b).

L. 15 *Percentage that increased fuel costs, including taxes, is to total operating revenues.* This percentage reflects the relationship of the increased fuel expenses, including taxes (current period over the base period) to the total operating revenues. This percentage should be the same as, or greater than, the percentage shown on line 1, column (b).

L. 16 *Other Matters*

ORDER

At a General Session of the INTERSTATE COMMERCE COMMISSION, held at its office in Washington, D.C., on the 14th day of August 1975.

SPECIAL PERMISSION NO. 76-350

## EXPEDITED PROCEDURE—FUEL RELATED RATE INCREASES

*It appearing,* That under the authority of section 6, 217, and 306 of the Interstate Commerce Act, we may issue special permission to depart from tariff publishing regulations and from the statutory requirement of 30 days' notice to the Commission and the public before changing rates and charges, and that in view of the findings and conclusions set forth in the report and order entered today in Ex Parte No. 311, Effect of Modifying Proclamation No. 3279 and Other Anticipated Energy Conservation Measures on the Operation of Carriers Subject to the Interstate Commerce Act, ample justification exists for authorizing common carriers by rail, motor, and water subject to our jurisdiction to publish schedules of increased rates and charges, to become effective upon not less than 10 days' notice, to recoup lawful increases in fuel costs, therefore,

*It is ordered,* That

1. Common carriers by rail, water, and motor common carriers of passengers and property, subject to the Interstate Commerce Act and their tariff publishing agents are hereby authorized to depart from the terms of the governing tariff publishing regulations to file and post in the manner and form described in subparagraphs (a) to (c) except as may be otherwise authorized by the Commission, on notice of effectiveness which will allow an elapse of not less than ten (10) working days of this Commission (that is, excluding Saturdays, Sundays, or legal holidays observed by this Commission) starting from the date filed with the Commission (which, if a working day, may be included as one of the ten days) to the date the publication(s) is indicated to become effective (which may not be counted as one of the aforesaid ten), increases in rates, fares, and charges for line-haul transportation and charges for other services which consume fuel, such as switching and pickup and delivery, to produce additional revenue in an amount not to exceed increases in fuel costs, based on the difference in the average price of fuel during the month of June 1975, on the one hand, and the price of fuel on a specified date which is not later than the date of filing of the tariff hereunder, on the other hand, except that fuel price increases relied upon in support of increases published and filed since June 30, 1975, must be excluded from any increases filed under the authority herein. Tariff publication(s) filed hereunder must specifically identify the charges for other services when applying any increase thereon.

(a) Rail common carriers and their tariff-publishing agents be, and they are hereby, authorized to:

(i) publish and file master tariffs of increased rates and charges providing increased rates and charges by means of conversion tables of rates and charges, which may not be amended except for the purpose of effecting reductions.

(ii) publish and file connecting link supplements to each tariff to be made subject to the particular master tariff, connecting such tariffs with the master. Such supplements may be blanket supplements (a common supplement issued to two or more tariffs);

(iii) The master tariff may not be published and filed for the purpose of increasing passenger fares (see vi);

(iv) The master tariff and connecting link supplements issued and filed hereunder shall not provide for nonapplication of interstate traffic competitive with intrastate traffic not taking an increase between the same points unless the interstate rates and routes are specifically identified in the connecting link supplements;

(v) Connecting link supplements authorized herein shall be exempt from the Commission's tariff-publishing rules governing the number of supplements and the volume of supplemental matter permissible.

(vi) Rail passenger fares and other charges shall be increased by the means of a conversion-type supplement(s).

(b) Motor common carriers of passengers and property and their tariff-publishing agents shall publish and file conversion-type supplements under the authority of Special Permission Order No. 72-100-M which supplements may not be amended unless otherwise authorized by this Commission, except for the purpose of effecting reductions. The provisions of paragraph 15 of said permission are hereby waived. When publishing and filing fuel related adjustments under said permission and the authority granted herein such publications shall provide reference to both permissions.

(c) Water common carriers and their tariff-publishing agents be, and they are hereby, authorized to publish and file conversion-type supplements, similar to those usually published and filed to effect a general increase in rates and charges which may not be amended, unless otherwise authorized by this Commission, except for the purpose of effecting reductions.

2. The carriers, individually, or by tariff publishing bureaus, as appropriate, shall submit with the schedules of proposed increases based on fuel costs, an original and 2 copies of an executed "Verified Statement of Fuel Expenses and Data in Support of Requested Fuel Rate Increase" in the form and manner provided for in Appendix II to the report served this date in Ex Parte No. 311.[1]

3. All tariff schedules filed hereunder shall be indicated to expire on interstate and foreign commerce with a date not beyond one year after the effective date, which may not be extended or canceled except upon specific authorization of this Commission.

4. The tariff schedules filed hereunder shall include a rule for the disposition of fractions of one cent or other stated amounts, for amounts not covered by the tables. Grain rate increase tables shall progress in one-half cent increments.

5. Publications issued and filed hereunder shall bear the following notation: "Issued on 10 days' notice; I.C.C.

"Issued on 10 days' notice; I.C.C.
Permission No. 76-350."

6. A copy of the publication issued and filed hereunder shall be transmitted to each tariff subscriber on the same date that the copies for official filing are transmitted to this Commission, in accordance with Title 49 CFR parts 1300.30, 1306.17, 1307.48, 1308.12, and 1309.5. In addition, railroads and those motor carrier rate bureaus subject to the Ex Parte No. MC-82 requirements shall transmit to each protestant to

[1]Railroads when filing jointly and motor carrier rate bureaus subject to Ex Parte No. MC-82 when filing on behalf of substantially all their members, should submit 20 copies of the Appendix II data.

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 770 of 794



their last general increase a copy of the tariff schedule together with the Appendix II data on the same date, by first class mail, as those documents are transmitted to this Commission.

The letter of transmittal accompanying the proposed schedules must contain a certification to the effect that the foregoing notice has been complied with.

7. Any increase established hereunder may be reduced or canceled upon not less than 10 days' notice to this Commission and the public.

8. Protests and request for suspension shall reach this Commission at least 5 days before the effective date of tariff publication(s) filed hereunder.

9. The initial tariff publications issued and filed hereunder shall provide that the increase shall be applied after the last effective general increase. In the event additional revenue is needed to off-set further increases in fuel costs, then new publications, shall be filed in the form and manner authorized herein, (which shall not direct the cancellation of the preceding publication filed hereunder, unless otherwise authorized by the Commission) and shall provide that the increase must be applied after the last effective preceding publication filed hereunder or the last preceding effective general increase, whichever is the later.

All carriers are hereby notified that they are expected to update their tariff by incorporating the increase published under authority of this permission into the rate structure as soon as practicable, unless under suspension or investigation by this Commission.

*It is further ordered,* That all outstanding orders of the Commission be, and they are hereby, modified to the extent necessary to permit the filing of the tariff schedules authorized herein. Increases filed hereunder shall not be deemed general increases or general adjustments as defined in section 1102.1 and 1104.1(a) of Chapter X of Title 49 of the Code of Federal Regulations.

*And it is further ordered,* That notices of these amendments shall be given to the general public by mailing a copy of this order to the Governor of each State and to the Public Utilities Commission or Board of each State having jurisdiction over transportation, by depositing a copy in the Office of the Secretary, Interstate Commerce Commission, Washington, D.C., for public inspection, and by delivering a copy to the Director, Division of the Federal Register, for publication therein.

ORDER

At a General Session of the INTERSTATE COMMERCE COMMISSION, held at its office in Washington, D.C., on the 14th day of August 1975.

SPECIAL PERMISSION NO. 76-360

## EXPEDITED PROCEDURE—FUEL RELATED RATE INCREASES—FREIGHT FORWARDERS

*It appearing,* That under the authority of section 405 of the Interstate Commerce Act, we may issue special permission to depart from tariff publishing regulations and



DA11768

Case 1:07-mc-00489-BAH Document 1188-23 Filed 08/05/24 Page 771 of 794



from the statutory requirement of 30 days' public notice before changing rates and charges, and that in view of the findings and conclusions set forth in the report and order entered today in Ex Parte No. 311, Effect of Modifying Proclamation No. 3279 and Other Anticipated Energy Conservation Measures on the Operation of Carriers Subject to the Interstate Commerce Act, ample justification exists for authorizing freight forwarders subject to our jurisdiction to publish schedules of increased rates and charges, to become effective upon not less than 10 days' notice, the same as required by Special Permission No. 76-350 to reflect the increases in the underlying cost of transportation by carriers subject to Parts I, II, and III of the Interstate Commerce Act, directly attributable to fuel price increases.

*It further appearing,* That by Special Permission No. 76-350 an expedited procedure has been established to permit carriers subject to Parts I, II, and III of the Interstate Commerce Act to increase their rates and charges on 10 days' notice when such increases are justified on the basis of fuel costs.

*And it further appearing,* That a similar expedited procedure is necessary to insure the financial viability of the regulated freight forwarder industry.

*It is ordered,* That upon the filing of a verified statement that the carriers performing surface transportation have increased their rates and charges under authority of Special Permission No. 76-350, freight forwarders be, and they are hereby, permitted to increase their rates and charges by a corresponding amount on 10 days' notice as specified in Special Permission No. 76-360.

*It is further ordered,* That freight forwarders shall publish and file conversion-type supplements under the authority of Special Permission Order No. 72-200, which supplements may not be amended unless otherwise authorized by this Commission, except for the purpose of effecting reductions. The provisions of paragraph 15 of said permission are hereby waived. When publishing and filing fuel related adjustments under said permission and the authority granted herein (such publication shall provide reference to both permissions); and provisions shall be made for the application of such increases after the last preceding effective general increase. In the event additional revenue is needed to off-set further increases in fuel costs, a new supplement shall be filed (which shall not direct the cancellation of the preceding supplement filed hereunder unless otherwise authorized by the Commission) which shall provide that the increase applies after the last preceding supplement filed hereunder or the last preceding effective general increase.

*It is further ordered,* That tariff publishing agents for freight forwarders be, and they are hereby, authorized to depart from the Commission's tariff publishing regulations to the extent necessary to publish and file conversion-type supplements, subject to the same terms and conditions set forth in the next preceding ordering paragraph.

*It is further ordered,* That tariff schedules filed hereunder shall be indicated to expire on interstate and foreign commerce with a date not beyond 1 year after the effective date, which may not be extended or canceled except upon specific authorization of this Commission.

*It is further ordered,* That the provisions of Special Permission No. 76-350 relating to disposition of fractions, copies, notice, certification, protest, incorporation in subsequently filed tariffs, and cancellation, be, and they are hereby, made applicable to the special permission authority authorized hereunder.

*And it is further ordered,* That publication issued and filed hereunder shall bear the following notation:

"Issued on 10 days' notice, I.C.C. Permission No. 76-360"

*And it is further ordered*, That notices of these amendments shall be given to the general public by mailing a copy of this order to the Governor of each State and to the Public Utilities Commission or Board of each State having jurisdiction over transportation, by depositing a copy in the Office of the Secretary, Interstate Commerce Commission, Washington, D.C., for public inspection, and by delivering a copy to the Director, Division of the Federal Register, for publication therein.

By the Commission.

ROBERT L. OSWALD,
*Secretary*.

(SEAL)

ORDER

At a General Session of the INTERSTATE COMMERCE COMMISSION, held at its office in Washington, D.C., on the 14th day of August 1975.

EX PARTE NO. 311

**EFFECT OF MODIFYING PROCLAMATION NO. 3279 AND OTHER ANTICIPATED ENERGY CONSERVATION MEASURES ON THE OPERATIONS OF CARRIERS SUBJECT TO THE INTERSTATE COMMERCE ACT**

*It appearing*, That by notice of proposed rulemaking dated January 31, 1975, and published in the Federal Register on February 5, 1975 (40 F.R. 5374), the Commission instituted an investigation on its own motion, to determine whether normal general rate increase procedures are adequate to enable the regulated carrier industry to recover rapidly increased costs as a result of the President's action increasing the fee on imported crude oil by Proclamation No. 3279 as amended; proposed alternative methods by which carriers could recover increased fuel costs through expedited procedures; and solicited comments from interested persons on these proposals and on actions which could be taken to deter fuel consumption such as possible limitation of any fuel-related increase;

*It further appearing*, That upon consideration of the matters involved herein, including numerous comments filed in response to our notice, we have concluded that for the reasons cited in our report in this proceeding normal general rate increase procedures are no longer adequate to enable regulated carriers to recover increased fuel costs and that an expedited procedure is necessary to supplement existing procedures;

*It further appearing*, That the instability in fuel prices is not limited to the effects of Proclamation No. 3279 as amended, but is susceptible to such factors as the pricing policies of the oil producing Nations and the price of domestic oil;

*It further appearing*, That for the reasons noted in the above-cited report, a filing consistent with the Appendix A format suggested in the notice of proposed rulemaking in this proceeding, as hereinafter modified (Appendix II), is a more practical and valid method to enable carriers to recover increased fuel costs than the alternate method proposed in the aforementioned notice;

CONGRESS OF THE UNITED STATES
CONGRESSIONAL BUDGET OFFICE

A CBO PAPER

MAY 2005

# Freight Rail Transportation: A Review of the 2004 Experience



TR002563/Photodisc/Getty Images

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

A CBO PAPER

# Freight Rail Transportation: A Review of the 2004 Experience

May 2005

The Congress of the United States ■ Congressional Budget Office

# Note

Unless otherwise specified, the years referred to in this paper are calendar years.

# Preface

In 2004, the freight rail industry in the United States faced a surge in demand for its services as the economy expanded, international trade increased, and farmers harvested bumper crops of grain. As demand for transport by freight rail heightened, policymakers, shippers, and transportation analysts expressed concern over whether the railroads would be able to meet shippers' needs.

This Congressional Budget Office (CBO) paper—prepared at the request of the House Committee on Transportation and Infrastructure—examines the confluence of events that led to last year's rise in demand for rail transport and analyzes measures taken both by the railroads and by shippers to accommodate that demand. The review suggests that although some shippers did experience delays and added costs, major disruptions to the overall economy were avoided. In keeping with CBO's mandate to provide objective, impartial analysis, the paper makes no recommendations.

Elizabeth Pinkston of CBO's Microeconomic and Financial Studies Division wrote the paper under the supervision of Roger Hitchner and David Moore. Several external reviewers offered valuable comments, including Michael Redisch and his colleagues at the Surface Transportation Board, Craig Rockey of the Association of American Railroads, Marvin Prater of the Department of Agriculture, and Francetta Willet of the Bureau of Labor Statistics. (The assistance of outside reviewers implies no responsibility for the final product, which rests solely with CBO.) Within CBO, Chad Chirico, Arlene Holen, and Tom Woodward provided helpful comments.

Loretta Lettner edited the paper, and Christine Bogusz proofread it. Maureen Costantino designed the cover and prepared the paper for publication. Lenny Skutnik produced the printed copies, and Annette Kalicki prepared the electronic version for CBO's Web site (www.cbo.gov).

Douglas Holtz-Eakin
Director

May 2005

# CONTENTS

**Summary and Introduction** *1*

**The Railroad Industry and the Economy** *3*

**Recent Increases in Rail Traffic** *5*

**Industry and Market Responses to Increased Demand** *7*
- Actions Taken by the Railroads *7*
- Actions Taken by Shippers *13*
- Events That Eased Demand Pressures *13*

**Policy Implications** *14*

**Figures**


1. Distribution of Intercity Freight Traffic, by Mode of Transport, Measured in Ton-Miles, 2001 — 3

2. Distribution of Intercity Freight Traffic, by Mode of Transport, Measured in Tons, 2001 — 4

3. Distribution of Freight Revenues, by Mode of Transport, 2001 — 5

4. Freight Transported by U.S. Railroads, Measured in Ton-Miles, 1890 to 2003 — 6

5. Freight Transported by U.S. Railroads, Measured in Ton-Miles, 1990 to 2003 — 7

6. Intermodal Traffic, Measured by Numbers of Shipping Containers and Trailers, 1990 to 2003 — 8

7. Carloads of Freight Transported by Rail, 1990 to 2003 — 9

8. Weekly Traffic Statistics for Major U.S. Railroads, by Carloads and Intermodal Units, 2003 to 2004 — 10

9. Rail Price Indexes, January 2003 to December 2004 — 11

10. Producer Price Indexes for the Freight Rail Industry Compared with Those for Finished Goods, January 2003 to December 2004 — 12

# Freight Rail Transportation: A Review of the 2004 Experience

## Summary and Introduction

In 2004, as rail traffic reached all-time highs, policymakers and shippers expressed concerns about whether the freight rail industry would be able to meet an expected surge in demand for its services. The increasing demand for rail transport was fueled by an expanding economy, growth in international trade, and bumper grain harvests. The overriding concern—that shipping delays would adversely affect the overall economy—centered on the complex and somewhat elusive concept of capacity.

In the transportation industries, "capacity" is usually defined in terms of a level of service, such as how many cars, trains, or airplanes can be handled efficiently and effectively by a facility or network in a given amount of time. Congestion occurs as the number of vehicles rises to such an extent that previous speeds are no longer sustainable. If the number of vehicles rises sufficiently, the "throughput" of the system—the number of vehicles or volume of cargo that passes a set point in a given amount of time—actually diminishes. In the extreme, a systemic breakdown may occur, in which traffic comes to a halt.

Capacity can be constrained by a shortage of any critical input—infrastructure (for example, tracks or switching systems), equipment (locomotives and other railcars), or labor. And because the transportation industries are networks, the existence of capacity constraints at one key junction or along one key corridor can cause delays that cascade throughout the system. A late afternoon thunderstorm at a hub airport, for example, can cause airplanes destined for that hub to be grounded at numerous other locations. Even people traveling between cities with clear weather may be delayed, either because they have to travel through the disrupted hub or because the aircraft they are supposed to fly aboard has been held up. Such effects can occur in the freight rail industry and were a source of last year's concerns about potential systemwide problems.

This Congressional Budget Office paper assesses those concerns and examines measures taken both by the railroads and by shippers to mitigate the effects of demand's outpacing capacity. Although shippers did experience some delays, inconvenience, and added costs, the railroads were able to meet most of the demand and avoid major disruption to the overall economy, despite carrying record volumes of freight.

Throughout 2004, expectations that rail capacity might not be sufficient to meet a surge in demand for freight transportation—especially as the peak back-to-school and holiday seasons approached—received widespread coverage in the news media. An article in *Traffic World*, a major trade publication, reported in August 2004 that "the freight transportation industry is bracing for a peak season meltdown."[1] The article went on to explain that "the potential for a meltdown is part of an overall freight economy that's moving faster and heavier than ever but without a corresponding increase in infrastructure or capacity." The article further suggested that "potential problems loom largest at West Coast ports."

A few months earlier, the *Los Angeles Times* had reported concerns about congestion at the busiest ports in the nation, the California ports of Los Angeles and Long Beach. It warned: "In the summer and fall, the ports' volumes will surge 30 percent or more as Asian goods arrive for the back-to-school and holiday seasons, and some observers fear that the increase will overwhelm Union Pacific

1. John Gallagher, "Fraying Supply Chain," *Traffic World* (August 2, 2004).

[Railroad] and disrupt the economy if the bottlenecks aren't fixed."[2]

The Department of Agriculture reported concerns about the availability of rail service in light of the agency's forecast of record crops and strong export demand:

> "Agricultural producers will have unusually stiff competition for limited rail capacity because year-to-date rail traffic is up across nearly all of the major commodity groups. Furthermore, some railroads are contending with rail service delays caused by the early retirement of train crew members, rail line and switching terminal congestion, and lack of equipment to handle unexpected demand."[3]

In June 2004, Roger Nober, chairman of the Surface Transportation Board (STB), the federal agency charged with regulating the railroads and ensuring adequate service, wrote a letter to the heads of the seven major freight railroads asking how they intended to meet the unprecedented surge in demand.[4] In his correspondence, Nober expressed concern that the railroads' performance in recent months had faltered, as measured by several indicators. Those included factors such as the number of cars on-line, system train speed and yard dwell time, on-time performance, train- and engine-crew utilization, locomotive utilization, and infrastructure and capacity improvements.

Responding individually, the railroads indicated that they were indeed facing unprecedented demand but that they were taking action, such as adding more equipment and hiring greater numbers of new employees than previously planned. Some railroads also stated that they were planning to reroute traffic to avoid bottlenecks.[5]

In August 2004, the Association of American Railroads convened a meeting of representatives from its member railroads, the STB, shippers, and other interested parties to discuss potential problems arising from the surge in demand. At the STB's urging, the Union Pacific Railroad also held its own customer forum in San Francisco, and CSX Transportation held one in Atlanta.

Throughout 2004, the demand for rail transportation was strong, setting an annual record for traffic as measured in ton-miles and setting weekly records for intermodal service (truck trailers and containers transported on railcars) in 28 weeks of the year.[6] Even so, as of April 2005, the feared "meltdown" of service had not materialized. Actions taken by the railroads to increase capacity or manage demand apparently were successful at avoiding massive systemic problems. The railroads dramatically accelerated their hiring and training, acquired new equipment, and modified their operations in order to increase capacity. They also raised rates on some commodities and services and asked shippers to moderate their demands.

Shippers made accommodations in various ways to limitations in the availability of rail service. Some shippers combined into one shipment goods that might otherwise have been sent in several shipments. Some stockpiled materials in anticipation of delays, and some postponed making shipments at peak periods. Some sought alternative shipping methods, such as using less-congested rail routes, trucks, or air freight. As noted previously, as rail traffic continued to grow, railroads raised rates on certain commodities and services.[7] That market mechanism helped allocate the scarce capacity to shippers who valued it most, thus limiting potential damage to the economy.

Other factors helped moderate demand for rail transportation. For example, although 2004 marked the second year in a row of record grain harvests, grain prices were somewhat weaker than in 2003. That development may have reduced pressures to sell—and consequently transport—grain, which many farmers had reportedly felt the

2. James F. Peltz, "Struggling to Get Back on Track: Union Pacific Deals with Major Congestion as the Improving Economy Brings More Cargo Through Southern California," *Los Angeles Times*, Home Edition (May 14, 2004), p. C1.

3. Department of Agriculture, Agricultural Marketing Service, Transportation and Marketing Programs, Transportation Services Branch, "Grain Transportation Report" (August 26, 2004), available at www.ams.usda.gov/tmdtsb/grain.

4. Letter from Roger Nober, Chairman, Surface Transportation Board, to the heads of the seven Class I freight railroads, June 9, 2004, available at www.stb.dot.gov/stb/docs/fallpeakletter.pdf. As the successor to the Interstate Commerce Commission, the STB regulates certain economic aspects of the rail industry. The Federal Railroad Administration regulates rail safety.

5. For example, see the Union Pacific Railroad's response to the Surface Transportation Board, July 9, 2004, available at www.stb.dot.gov/stb/docs/upfallpeakletter.pdf.

6. A ton-mile is the measure of one ton of freight transported the distance of one mile.

7. Other factors, such as rising fuel prices, also played a role in the railroads' decision to increase rates.

previous year. In addition, the combined ports of Los Angeles and Long Beach experienced problems getting enough workers to unload ships in a timely manner, creating a major bottleneck and thus moderating the flow of shipments to the railroads. At one point, there were reportedly 94 cargo ships waiting to be unloaded, and 43 of those could not even get into the harbor.[8]

In sum, the freight market functioned well in the short run: price signals were sent and received, allowing the costs associated with an increase in demand to be accommodated without serious damage to the economy. Yet certain factors that contributed to the surge in demand—increased international trade and intermodal shipping—are likely to continue to grow in the future. That raises questions about how the market will work to provide sufficient capacity for the transportation of freight and how federal policy will influence the mix of capacity among rail, road, and water carriers. Such longer-term considerations, however, are beyond the scope of this review.

## The Railroad Industry and the Economy

There are seven Class I freight railroad systems—defined by the Surface Transportation Board as those with more than $277.7 million in annual revenues in 2003—in the United States.[9] Four of those railroads together account for 93 percent of operating revenues and 94 percent of the ton-miles of Class I railroads. They are the Union Pacific Railroad Company (UP) and BNSF Railway (formerly known as the Burlington Northern Santa Fe), which operate in the western United States, and CSX Transportation, Inc., and Norfolk Southern Railway, which operate in the East. The three smaller Class I railroads are the Grand Trunk Corporation (a unit of the Canadian National Railway Company), Soo Line Railroad Company (a unit of Canadian Pacific Railway), and Kansas City Southern Railway Company.

8. Barney Gimbel, "Yule Log Jam: The Holiday Shipping Season Was Chaos at the Biggest U.S. Container Port," *Fortune* (December 13, 2004), pp. 162-170.

9. The threshold is $250 million in 1991 dollars. The Surface Transportation Board adjusts the threshold annually to reflect the effects of inflation.

**Figure 1.**

### Distribution of Intercity Freight Traffic, by Mode of Transport, Measured in Ton-Miles, 2001

(Percentage of ton-miles)




Source: Department of Transportation, Bureau of Transportation Statistics, *National Transportation Statistics 2004* (January 2005), Table 1-46, available at www.bts.dot.gov/publications/national_transportation_statistics/2004/index.html.

Notes: The traffic total excludes freight carried by pipeline and air carrier.

A ton-mile is the measure of one ton of freight transported the distance of one mile.

Railroads in the United States transport about 47 percent of freight, measured in ton-miles, and 30 percent, measured in tons (see Figures 1 and 2).[10] In 2003, they carried 1.8 billion tons of freight a total of about 1.6 trillion ton-miles.[11] Because rail rates are generally lower than

10. These numbers exclude pipelines and air freight. Pipelines are not generally in direct competition with railroads, nor is air freight. Air freight accounts for a very small proportion of freight tonnage and ton-miles. Ton-mile data are from Department of Transportation, Bureau of Transportation Statistics, *National Transportation Statistics 2004* (January 2005), Table 1-46. Tonnage data are from Rosalyn A. Wilson, *Transportation in America*, 19th ed. (Washington, D.C.: Eno Transportation Foundation, 2002), p. 44.

11. Association of American Railroads, *Railroad Facts, 2004 Edition* (Washington, D.C.: AAR, October 2004), pp. 27-28.

**Figure 2.**

## Distribution of Intercity Freight Traffic, by Mode of Transport, Measured in Tons, 2001

(Percent)




Source: Rosalyn A. Wilson, *Transportation in America,* 19th ed. (Washington, D.C.: Eno Transportation Foundation, 2002), p. 44.

Note: The traffic total excludes freight carried by pipeline and air carrier.

rates for trucking or air freight, however, railroads take in only about 13 percent of intercity freight revenue—about $33.5 billion in 2001 (see Figure 3).[12]

Railroads carried shipments valued at $320.5 billion in 2002. By comparison, during the same period, trucks transported shipments worth $6.2 trillion, air carriers transported shipments worth $279.5 billion, and water carriers transported freight worth $90.9 billion.[13] The value of freight rail shipments in 2002 represented 3.1 percent of gross domestic product (GDP) for that year; it was 10.7 percent of the nonservice (durable plus nondurable goods) portion of GDP.[14] The value of rail shipments accounted for nearly 17 percent of the value of goods imported into and exported from the United States in 2002.[15]

Rail transportation is particularly important to certain industries. About 70 percent of coal delivered to power plants in the United States travels by rail, as does about 70 percent of all automobiles manufactured domestically."[16] Approximately 32 percent of grain shipments are transported by rail.[17] The chemical industry also relies heavily on railroads.

With the exception of a slight dip in 1997, rail traffic, as measured in ton-miles, has risen steadily since 1990 (see Figures 4 and 5). A market segment that has experienced particularly rapid growth is intermodal transportation. Strictly speaking, "intermodal" refers to any shipments that are carried by more than one mode, such as rail and truck or rail and water carrier (for example, ocean liners or barges). But it also generally connotes coordinated movement of freight that remains in the same container or truck trailer until it reaches its final destination.

Intermodal traffic—as measured by the number of trailers and containers on railcars—grew by 60.2 percent between 1990 and 2003, while the total number of rail carloads (including intermodal traffic) grew by 35 percent during that period (see Figure 6 on page 8 and Figure 7 on page 9).[18] About half of rail intermodal shipments are exports or imports—a growing part of the overall U.S. economy.[19]

12. This excludes revenues from pipelines and air freight. If air freight was included, the rail share would drop to 12.4 percent. Air freight would account for 3.8 percent, reflecting its relatively high prices and revenues.

13. Department of Transportation, Bureau of Transportation Statistics, *National Transportation Statistics 2003*, Table 1-52, available at www.bts.gov/publications/national_transportation_statistics/2003/index.html. These numbers double-count the value of goods carried by more than one mode.

14. Council of Economic Advisers, *Economic Report of the President* (February 2004), Table B-1.

15. Ibid., Table B-24.

16. Association of American Railroads, "Economic Impact of U.S. Freight Railroads" (Washington, D.C.: AAR, February 2005), available at www.aar.org.

17. Department of Agriculture, Agricultural Marketing Service, Transportation Services Branch, *Transportation of U.S. Grains: A Modal Share Analysis, 1978-2000* (October 2004), p. 10.

18. This annual carload series includes intermodal traffic. The weekly traffic data presented later in this paper account for carloads and intermodal separately. The two series also differ in the way they account for traffic of U.S. railroads that are owned by Canadian railroads.

19. Association of American Railroads, "Economic Impact of U.S. Freight Railroads."

**Figure 3.**

## Distribution of Freight Revenues, by Mode of Transport, 2001

(Percent)




Source: Department of Transportation, Bureau of Transportation Statistics, *National Transportation Statistics 2004* (January 2005), Table 3-18, available at www.bts.dot.gov/publications/national_transportation_statistics/2004/index.html.

Notes: The total excludes revenues from pipelines and air carriers. The trucking total includes local, short-haul shipments.

Technological advances in railroad equipment over the past two decades have propelled intermodal growth. The development of equipment that can carry large containers on either railcars or trucks and that can carry multiple containers on a single railcar has reduced shipping costs. The emergence of intermodal transportation has affected the relationship between the freight rail and trucking industries: trucking companies are both competitors to railroads and major customers and collaborators as well. For example, the large trucking and logistics company Schneider National no longer transports freight by truck between Los Angeles and Chicago; instead, it loads truck trailers on railcars for that trip.[20] In December 2004, a spokesman for United Parcel Service (UPS), which spent an estimated $750 million on rail service in 2004, was quoted as saying: "If a ground package is going 750 miles or more, it is more economical and efficient for us to load the trailers, move them to the railhead, and put them on a flatcar" than it is to send the same package by truck.[21] Freight sent by rail generally has to travel by truck for local pickup and/or delivery, unless both the shipper and customer have direct rail access (as is mostly the case for coal, which trains can carry straight from the mine to a power plant).

## Recent Increases in Rail Traffic

In 2004, rail traffic reached new highs. The number of nonintermodal carloads of freight (17.4 million) was 2.9 percent higher than in 2003, and intermodal traffic—nearly 11 million trailers and containers—was up by 10.4 percent.[22] As previously noted, intermodal volume set weekly records in 28 weeks of 2004 (see Figure 8 on page 10). The Association of American Railroads reported that total traffic as measured in ton-miles—an estimated 1.61 trillion ton-miles—"was also higher in 2004 than ever before."[23]

The increase in overall economic activity, growth in international trade, and large grain harvests all contributed to an increase in demand for rail transportation. The economy continued its recovery in 2004, with real (inflation-adjusted) gross domestic product 3.8 percent higher in the fourth quarter of 2004 than in the fourth quarter of

20. Scott Arves, President of Transportation, Schneider National (presentation given at the Association for Transportation Law, Logistics, and Policy's Transportation Forum, October 6, 2004).

21. Norman Black, United Parcel Service spokesman, as quoted by Jim Haug, "Iron Tracks Provide an Alternative Route," *Daytona Beach News-Journal* (December 5, 2004).

22. Intermodal traffic is not included in the carload numbers in these weekly traffic reports, in contrast to its inclusion in the annual series presented above. See footnote 18 on page 4 of this report.

23. Association of American Railroads, "U.S. Freight Railroads Complete Record-Breaking Year" (press release, Washington, D.C., January 6, 2005).

**Figure 4.**

## Freight Transported by U.S. Railroads, Measured in Ton-Miles, 1890 to 2003




Sources: Association of American Railroads, *Railroad Facts, 2004 Edition* (Washington, D.C.: AAR, October 2004), pp. 27 and 32, and Rosalyn A. Wilson, *Transportation in America, 2000,* 18th ed. (Washington, D.C.: Eno Transportation Foundation, 2001), p. 12.

Notes: Class I railroads are those with revenues that exceed a threshold set by the Surface Transportation Board or by its predecessor, the Interstate Commerce Commission.

A ton-mile is the measure of one ton of freight transported the distance of one mile.

2003.[24] Nominal GDP (based on current-dollar values) rose by 6.2 percent in that time period.

International trade continued to grow in 2004, fueling demand for rail transportation. The value of goods imported into the United States rose by $213.1 billion from 2003, to a total of $1,473.8 billion.[25] The value of goods exported rose by $94.5 billion from 2003, to a total of $807.6 billion. Exports of grain and feed rose from $14.8 billion in fiscal year 2003 to $17.9 billion in fiscal year 2004.[26] In terms of volume—a unit relevant for measuring the demand for rail transportation—wheat exports rose from 24.3 million metric tons in fiscal year 2003 to 31.1 million metric tons in fiscal year 2004, and exports of coarse grains (corn, barley, sorghum, oats, and rye) increased from 46.1 million metric tons to 52.6 million metric tons.[27] Adding to the demand for rail transportation from West Coast ports—particularly the ports of Los Angeles and Long Beach—were imports from Asia. Total imports from China rose to nearly $197 billion in 2004 from $152 billion in 2003.[28]

The rising costs facing the trucking industry, the railroads' major competitor, have contributed to an increase in demand for rail. Trucking companies have apparently found it difficult to attract enough drivers willing to endure the lengthy separations from home and family that are characteristic of long-distance trucking. Scott Arves, the transportation-sector president of Schneider National, which employs 15,000 drivers, has suggested that the "average annual pay for a truckload driver may have to rise from about $40,000 to $60,000." In 2004, Schneider offered a $5,000 signing bonus to experienced drivers.[29] Moreover, escalating fuel prices have affected truckers as well as railroads. Both trucking companies and railroads typically impose surcharges that reflect increases in fuel prices, but those surcharges have not kept pace with rising fuel costs.[30]

24. Department of Commerce, Bureau of Economic Analysis, "Gross Domestic Product: First Quarter 2005—Advance Estimates" (press release, Washington, D.C., April 28, 2005), available at www.bea.gov/bea/rels.htm.

25. Department of Commerce, Bureau of the Census, "U.S. International Trade in Goods and Services Highlights" (February 10, 2005), available at www.census.gov/indicator/www/ustrade.html.

26. Department of Agriculture, Economic Research Service, "Outlook for U.S. Agricultural Trade," AES-44 (November 22, 2004), available at http://ers.usda.gov/publications/so/view.asp?f=trade/aes-bb/.

27. Ibid.

28. Department of Commerce, Bureau of the Census, "Foreign Trade Statistics: Trade (Imports, Exports, and Trade Balance) with China," available at www.census.gov/foreign-trade/balance/c5700.html.

29. Rick Romell, "The Cost of Shipping Is Likely to Rise Significantly—Along with Drivers' Salaries," *Wichita (Kan.) Eagle* (November 28, 2004), quoting Scott Arves of Schneider National.

30. Scott Flower, "Air Freight and Surface Transportation: 3Q Rail Preview: A Mixed Bag to Say the Least," Citigroup Smith Barney (October 12, 2004), and Sean Kilcarr, "Fuel's Wild Ride," *Fleet Owner* (August 1, 2004), available at http://fleetowner.com/management/feature/fleet_fuels_wild_ride/.

**Figure 5.**

## Freight Transported by U.S. Railroads, Measured in Ton-Miles, 1990 to 2003




Sources: Association of American Railroads, *Railroad Facts, 2004 Edition* (Washington, D.C.: AAR, October 2004), pp. 27 and 32, and Rosalyn A. Wilson, *Transportation in America, 2000,* 18th ed. (Washington, D.C.: Eno Transportation Foundation, 2001), p. 12.

Notes: Class I railroads are those with revenues that exceed a threshold set by the Surface Transportation Board or by its predecessor, the Interstate Commerce Commission.

A ton-mile is the measure of one ton of freight transported the distance of one mile.

## Industry and Market Responses to Increased Demand

Railroads and shippers took a number of steps in 2004 to avert the feared breakdown in rail service. In addition, outside events helped relieve pressures on the rail transportation system.

### Actions Taken by the Railroads

In response to rising demand for their services, the railroad companies took several actions: they increased supply, raised rates, and imposed limits on shippers.

**Increasing Supply.** As they indicated in their respective responses to the chairman of the Surface Transportation Board, the railroads added more cars, engines, and other equipment than they had planned, and they hired and trained more new engineers and conductors than they had in many decades. For example, the Union Pacific Railroad hired more than 5,000 workers to help meet increased demand. It also completed an additional 10 miles of double track west of El Paso, Tex., along the congested Sunset Route.[31] Norfolk Southern hired more than 2,000 train and engine crew members, purchased more than 200 locomotives, and continued testing and implementing train control technologies.[32] CSX hired about 1,400 train and engine employees, purchased or leased about 280 locomotives, and implemented the first phase of its

31. Jack Koraleski, Executive Vice President-Marketing and Sales, Union Pacific Railroad, "Service Updates," letter to customers (January 11, 2005), available at www.uprr.com/customers/updates/2005/011105.shtml.

32. Norfolk Southern Corporation, *Annual Report 2004*, pp. 15-16, available at www.norfolksouthern.com/nscorphtml/ar04/pdf/p17.pdf.

**Figure 6.**

## Intermodal Traffic, Measured by Numbers of Shipping Containers and Trailers, 1990 to 2003




Source: Association of American Railroads, *Railroad Facts, 2004 Edition* (Washington, D.C.: AAR, October 2004), p. 26.

Note: Data are primarily for Class I railroads, but traffic for some non-Class I railroads is included for each year. Beginning in 1995, the data exclude two small Class I railroads, the Grand Trunk Corporation and the Soo Line Railroad Company, which are owned by Canadian railroads. The railroads whose traffic is included represent approximately 96 percent of the U.S. intermodal rail units.

"ONE Plan" to improve network efficiency.[33] BNSF hired about 3,000 employees in 2004 and expects to add about the same number in 2005.[34] The railroad is working to finish double-tracking the single-track segments of its intermodal network in the Southwest and to add sidetracks and improve tunnel capacity on its northern lines.[35] It also undertook initiatives to improve the flow of trains through terminals and to increase the number of cars per train in order to enhance capacity.[36] Where possible, several railroads rerouted traffic to avoid bottlenecks, even though that entailed some trains' having to travel greater distances.

33. Clarence W. Gooden, Executive Vice President and Chief Commercial Officer, CSX Corporation (presentation to the Association of American Railroads, Fall Peak Planning Forum, Kansas City, Mo., September 9, 2004, available at www.csx.com/share/csx/corporation/genericdocs/docs/AAR_Fall_Peak_Forum_-_Sept_7-REF21440.pdf.

34. Susan Green, "You're Hired," *Railway: The Employee Magazine of Team BNSF* (January/February 2005), p. 8, available at www.bnsf.com/employees/communications/railway/pdf/200501.pdf.

35. "Perspective," interview with BNSF Executive Vice President and Chief Operations Officer Carl Ice and Executive Vice President and Chief Marketing Officer John Lanigan, *Railway: The Employee Magazine of Team BNSF* (January/February 2005), pp. 4-5, available at www.bnsf.com/employees/communications/railway/pdf/200501.pdf.

36. Patrick Hiatte, "BNSF Makes Best Use of Resources Handling Record Volume Growth," *Railway: The Employee Magazine of Team BNSF* (January/February 2005), p. 9, available at www.bnsf.com/employees/communications/railway/pdf/200501.pdf.

**Figure 7.**

## Carloads of Freight Transported by Rail, 1990 to 2003




Source: Association of American Railroads, *Railroad Facts, 2004 Edition* (Washington, D.C.: AAR, October 2004), p. 24.

Note: Data are for Class I railroads and include intermodal traffic.

**Increasing Rail Rates.** As demand rose in 2004, the railroads increased their rates, as reflected in the Bureau of Labor Statistics' (BLS's) producer price index (PPI) series (see Figure 9).[37] Rates for intermodal service rose by 5.6 percent from January 2004 to December 2004, compared with 1.8 percent from January 2003 to December 2003.[38] Rates for carload service rose by 6.5 percent from January 2004 to December 2004, compared with 2.6 percent from January 2003 to December 2003.[39] The PPI for finished goods rose by 3.4 percent from January to December 2004 and by 2.6 percent from January to

37. Department of Labor, Bureau of Labor Statistics, "Producer Price Index Industry Data," available at www.bls.gov/ppi/home.htm. The BLS index samples a representative mix of rail movements, which are held constant. (Whenever a movement in the sample is discontinued or is no longer available, BLS substitutes another movement.) By contrast, the rate inflation index calculated by the Surface Transportation Board is based on a sample of waybills in the current period and thus reflects a shifting market basket. The STB index measures rate changes for aggregate sets of rail service, such as all grain movements in the western United States or all coal movements in the East. The STB index has generally indicated less of a price increase (indeea, generally a downward trend in rates) than the BLS index. However, the processing of waybill data and the calculation of the STB's index take about a year, so current data were not available for this paper.

38. The term "rates," as used here, refers to what the Bureau of Labor Statistics calls the net transaction price, which includes the base freight charge, accessorial charges, discounts, and surcharges (including fuel surcharges) involved in a rail movement.

39. The producer price index numbers reported here are not seasonally adjusted. Trucking rates also rose in 2003 and 2004. The price index for truckload service, which is the closest substitute for rail for most types of shipments, rose by 3.2 percent in 2003 and by 3.9 percent in 2004. The price index for less-than-truckload service rose by 2.3 percent in 2003 and by 7.2 percent in 2004.

**Figure 8.**

## Weekly Traffic Statistics for Major U.S. Railroads, by Carloads and Intermodal Units, 2003 to 2004




Source: Association of American Railroads, "Weekly Traffic of Major U.S. Railroads," available from weekly press releases at www.aar.org.

December 2003 (see Figure 10).[40] Railroads are continuing to raise their rates in 2005. For example, the Union Pacific has announced rate increases ranging from 8 percent to 100 percent for goods shipped to and from Arizona, where the Phoenix yard is clogged with traffic.[41]

In 2004, the railroads were able to raise rates for some traffic to adjust to changes in market conditions. That experience suggests that the railroads have greater flexibility in rate-making compared with the regulatory environment in which they once operated. The amount of rail traffic subject to rate regulation was substantially reduced by the Staggers Rail Act of 1980, although the Surface Transportation Board still has authority to regulate rates on traffic for which certain conditions are met.[42]

40. Broader gross domestic product indexes, which are reported on a quarterly basis, rose by somewhat less over the period. The GDP implicit price deflator rose by just under 1 percent from the first to the fourth quarter of 2003 and by 1.7 percent from the first to the fourth quarter of 2004. The GDP chain-type price index rose by 1 percent from the first to the fourth quarter of 2003 and by 1.7 percent from the first to the fourth quarter of 2004. See the *Economic Report of the President* (February 2005),Table B-3, p. 212.

41. Union Pacific Railroad Company, Internet Bulletin, "Arizona Price Changes and Capacity Management" (February 8, 2005), available at http://dx01.my.uprr.com/pubdir/inetbull.nsf/$$industrialByNumber?OpenView.

42. The Staggers Rail Act of 1980 (Public Law 96-448, 49 U.S.C. 10101) removed many regulatory restrictions on the railroads and enabled them to operate more efficiently.

**Figure 9.**

## Rail Price Indexes, January 2003 to December 2004

(January 2003 = 100)




Source: Department of Labor, Bureau of Labor Statistics, Producer Price Index Industry Data, available at www.bls.gov.

Rates that are potentially subject to regulation are those that are available to shippers as part of railroads' "common-carrier obligation."[43] Common-carrier rates are subject to maximum-rate regulation only where the STB finds the existence of market dominance by a railroad. To make a finding of market dominance, the STB must determine that there is no effective competition from other railroads or other modes of transportation for the traffic in question and that the revenues from that traffic equal or exceed 180 percent of the railroad's variable cost of providing the service.

The other major set of rates are those that are covered by individual contracts between railroads and shippers. They are not subject to STB regulation, except that the terms of contracts for certain agricultural commodities must be filed with the STB.

A large portion of rail traffic—estimated in 1999 to be about 70 percent, measured in tons—moves under long-term contracts for which rates can change only as the contracts provide.[44] Contracts often have cost-adjustment provisions based on indexes such as the STB's "Rail Cost Adjustment Factor" (RCAF).[45] Demand-based adjustments may have been rare in past contracts, but at least one railroad reportedly is planning to include provisions for turning away traffic if the volume of a cus-

43. Until passage of the Interstate Commerce Commission Termination Act of 1995, common-carrier rates had to be filed with the ICC. They are now required to be publicly available, but the railroads have a choice of ways to comply with that requirement.

44. General Accounting Office (now known as the Government Accountability Office), *Rail Regulation: Current Issues Associated with the Rate Relief Process*, GAO/RCED-99-46 (February 1999), pp. 3 and 16. The percentage of traffic under contract has probably declined since 1999 as some coal and agricultural movements have shifted to common-carrier rates. Because the terms of contracts are not made public, it is not known to what extent they provide for surges in demand. Before the Staggers Act, contract rates were used very little because of uncertainties about their legal status.

45. The STB has two versions of the RCAF: an RCAF-A, which is adjusted for productivity increases, and an RCAF-U, which is simply an input-price index, not adjusted for productivity increases.

**Figure 10.**

## Producer Price Indexes for the Freight Rail Industry Compared with Those for Finished Goods, January 2003 to December 2004

(January 2003 = 100)




Source: Department of Labor, Bureau of Labor Statistics, Producer Price Index Industry Data, available at www.bls.gov.

tomer's shipments exceeds a set amount.[46] In any event, the BLS price index data suggest that railroads have been able to raise rates within the terms of their contracts. Moreover, the average length of contracts has shortened in recent years. Contracts for coal movements negotiated in the first few years after the Staggers Act went into effect reportedly were for periods as long as 20 years, as electric utilities and railroads sought to lock in rates and service levels. In recent years, as both railroads and electric companies have been buffeted by regulatory and market changes, they have been more reluctant to enter into such lengthy contracts.

In sum, the ability of railroads to raise rates served as an indicator of a surge in demand, a mechanism for allocating scarce capacity to shippers who valued it most highly, and a signal that more investment is needed to increase capacity.

46. Joe Ruff, "Union Pacific Plans to Charge More, Turn Away Less Profitable Cargo," Associated Press Newswires (January 27, 2005).

**Imposing Limits on Shippers.** Railroads also asked customers to limit or consolidate shipments or otherwise moderate their demands. For example, Union Pacific discontinued expedited intermodal service to United Parcel Service on the busy Sunset Route between Los Angeles and El Paso.[47] The UP also set limits on the number of railcars available to carry aggregates in Texas, requiring shippers to wait until they had full carloads. By combining shipments into fewer but longer trains, that action subsequently enabled UP to move 48 percent more rock traffic.[48]

According to the *Los Angeles Times*, BNSF "set limits on some eastbound international cargo from Los Angeles to

47. Jack Koraleski, Executive Vice President-Marketing and Sales, Union Pacific Railroad, "Service Updates," letter to customers (May 4, 2004), available at www.uprr.com/customers/updates/050404.shtml.

48. Jack Koraleski, Executive Vice President-Marketing and Sales, Union Pacific Railroad, "Service Updates," letter to customers (November 17, 2004), available at www.uprr.com/customers/updates/111704.shtml.

prevent congestion as Asian imports rise. The company started a system on June 18 [2004] that sets maximum container-cargo volumes for ocean-shipment haulers." [49]

Such actions imposed costs on shippers—costs that are difficult to identify and quantify—such as those associated with holding inventories.

### Actions Taken by Shippers

Seasonal and cyclical shortages of capacity can be disruptive—at a minimum to the rail customers whose shipments are delayed, and sometimes also to workers and businesses in ancillary industries. There often are ways of responding to such shortages, however.

The predictability of seasonal fluctuations enables some shippers to take measures to reduce potential disruptions associated with expected surges in demand, such as those of the fall peak season when merchandise is being shipped for the year-end holidays and when agricultural crops are harvested. For example, manufacturers and retailers could ship products to regional warehouses earlier in the year. That, of course, would entail higher inventory and storage costs than a just-in-time approach, but companies can make their own calculations as to whether incurring those costs would outweigh the risk of not having enough goods on the shelf to sell at a time of peak consumer demand. Some agricultural shippers have more flexibility than others, because nonperishables often can be stored for short periods until rail capacity is available. Temporary storage of grain under less-than-ideal conditions, however, usually results in some loss of value.

Most rail shippers also can use alternative modes of transportation. Agricultural and other goods that are not time-sensitive can be shipped by barge if they originate along a waterway or close enough to one to be taken there economically by truck. High-value, relatively lightweight goods can go by air freight. Trucks can handle most shipments that otherwise would go by rail, albeit more expensively.[50] (Trucking companies' recent difficulties in finding enough qualified long-distance drivers rendered trucks somewhat less able than in past years to meet rising demand.) Some shipments from Asia that would have gone to Southern California ports could instead go to other Pacific ports, or they could go through the Panama Canal to East Coast ports—although the latter would increase transit time, and many ocean liners now are too big to traverse the canal.

Shippers made such adjustments in response to the events of 2004. For example, after encountering delays in shipping engines and other vehicle parts from California, Toyota Motor Corporation increasingly relied on truck transportation.[51] After the Union Pacific Railroad pushed UPS trailers off its system in April 2004, other major trucking companies also shifted away from intermodal service. The chief executive officer of the large trucking company Yellow Roadway was reported in August 2004 as saying, "We've had to take more and more freight off the rail and put it on the road. There has been no sign of improvement." Some shippers reportedly had to stop production temporarily, and one indicated that the lack of railcars "was having a significant cost impact."[52]

### Events That Eased Demand Pressures

Certain events also helped relieve pressure on the railroad system. Agricultural shippers reportedly placed less demand on the rail system in the fall of 2004 than they had in the fall of 2003 (and than had been expected in 2004, in light of the bumper crops). Grain prices were generally not as high in the fall of 2004 as in the previous autumn. As a result, the opportunity cost of storing rather than selling their crops immediately was less than it was the previous year, and farmers may have decided to hold crops in storage in anticipation of higher prices in coming months. For each week of the last three months of 2004, grain-car loadings were less than the three-year average for that week.[53]

49. "Burlington Northern Limits Some Cargo as Imports Rise," *Los Angeles Times*, Home Edition (June 26, 2004), p. C2, drawn from Bloomberg News.

50. Using trucks not only generally increases shippers' costs but also imposes wear and tear on highways and may add to congestion.

51. Peltz, "Struggling to Get Back on Track."

52. Gallagher, "Fraying Supply Chain."

53. Department of Agriculture, Agricultural Marketing Service, Transportation and Marketing Programs, Transportation Services Branch, "Grain Transportation Report" (February 3, 2005), p. 3, available at www.ams.usda.gov/tmdtsb/grain.

Also relieving pressure on the railroads were delays in unloading ships at the ports of Los Angeles and Long Beach. As noted earlier, the lack of enough dockworkers kept some ships waiting much longer than usual to be unloaded and helped moderate the flow of goods to the railroads.[54]

## Policy Implications

The recent surge in demand for freight rail transportation appears to have been accommodated without significant effects on the overall economy and without substantial government intervention. The expression of concern by the Surface Transportation Board about the potential for a breakdown in service may have prompted the railroads to enhance their efforts to meet demand, but it would have been in the railroads' own interest to do so anyway.

54. Ronald D. White and Leslie Earnest, "Delays Mount at Local Ports as Shipping Surges: At the L.A.-Long Beach Complex, Vessels Filled with Goods for Holiday Shopping Must Wait Days to Be Unloaded," *Los Angeles Times* (September 27, 2004), p. C1.

If a temporary increase in demand stretches rail capacity to its limits, that does not imply a need for government intervention. In most industries, shortages of a product or service simply indicate a need for price increases in order to clear the market. If higher demand is the result of seasonal factors, producers may find it economically unproductive to expand their capacity to meet peak demand because then there would be excess capacity lying idle the rest of the time.

The demand for rail service has been trending upward, however, even when overall economic activity has dipped. That development suggests a need to consider how rising demand for freight transportation will be met in the future. It raises issues about whether current public policies affecting the rail industry—and, indeed, policies affecting the other freight transportation industries as well—are likely to lead to productive investments in transportation infrastructure and an economically efficient allocation of resources among transportation modes. Those issues are beyond the scope of this paper.