**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to: ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-0489 (BAH/GMH) |
| OXBOW CARBON & MINERALS LLC, *et al.*,<br>*Plaintiffs*,<br>v.<br>UNION PACIFIC RAILROAD CO., *et al.*,<br>*Defendants*. | Civil Action No. 11-1049 (BAH) |
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br>This document relates to: ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH)<br>**Oral Argument Requested** |

**Plaintiffs' Opposition to Defendants' Motion**
**to Exclude False Positives Econometric Overcharge Models**

# TABLE OF CONTENTS

Pages

Introduction .......... 1

Legal Standard .......... 2

Argument .......... 2

I. Defendants Misstate the Law on "False Positives" .......... 3

A. Regressions and Type 1 errors. .......... 3

B. Defendants' arguments about false positives go to weight, not admissibility. .......... 4

C. Defendants improperly rely on class certification decisions. .......... 5

D. Defendants' other support is likewise inapposite. .......... 8

E. Defendants' motion rests on a mistaken understanding of damages modeling in antitrust cases. .......... 9

II. Plaintiffs' Experts' Models Do Not Generate False Positive Overcharges .......... 10

A. Dr. Allen Jacobs's Model Is Reliable .......... 10

**1.** Defendants' purported tests do not generate false positives and do not test Dr. Jacobs' actual model. .......... 10

**2.** Dr. Jacobs' actual model produces zero false positives. .......... 13

B. Dr. Jeffrey Leitzinger's Models Are Reliable .......... 14

C. Dr. James T. McClave's Models Are Reliable .......... 16

D. Dr. B. Douglas Bernheim's Methodologies Are Reliable .......... 18

**1.** Dr. Bernheim's over-recovery analysis does not generate false positives. .......... 18

**2.** Dr. Bernheim's MDL II overcharge model does not generate false positives. .......... 21

E. Dr. Leslie Marx's Models Are Reliable .......... 23

**1.** Dr. Marx's MDL I methodology does not generate false positives. .......... 23

**2.** Dr. Marx's MDL II methodology does not generate false positives. .......... 24

F. Dr. Alan S. Frankel's Model Is Reliable .......... 25

G. Honda's Experience During the Conspiracy Further Demonstrates Drs. Bernheim and Marx's Methods Are Reliable ........ 27

H. Ford's Damages Are Not a "False Positive," and Its Experience with FSCs Does Nothing to Undercut the Work of Drs. Bernheim and Marx. ........ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Dairy Mktg. Servs.*,
2013 WL 6909953 (D. Vt. Dec. 31, 2013) ....................4

*Ambrosini v. Labarraque*,
966 F.2d 1464 (D.C. Cir. 1992) ....................10

*City of Phila. v. Bank of Am. Corp.*,
2023 WL 6160534 (S.D.N.Y. Sept. 21, 2023) .................... *passim*

*Coleman v. Chrysler*,
525 F.2d 1338 (3d Cir. 1975) ....................8, 9, 10

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ....................4, 6, 7, 8

*Concord Boat v. Brunswick*,
207 F.3d 1039 (8th Cir. 2000) ....................9

***Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .................... *passim*

*In re Aluminum*,
336 F.R.D. 5 (S.D.N.Y. 2020) ....................6

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
581 F. Supp. 3d 1029 (N.D. Ill. 2022) ....................9, 11, 23

*In re Elec. Books Antitrust Litig.*,
2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ....................5

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
256 F.R.D. 82 (D. Conn. 2009) ....................29

*In re General Motors LLC Ignition Switch Litigation*,
2016 WL 4077117 (S.D.N.Y. Aug. 1, 2016) ....................4

*In re Mushroom Direct Purchaser Antitrust Litig.*,
2015 WL 5767415 (E.D. Pa. July 29, 2015) ....................2, 4, 7, 8

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ....................29

*In re Neurontin Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2009 WL 3756328 (D. Mass. Aug. 14, 2009) ....................5

*In re Packaged Seafood Prod. Antitrust Litig.*,
332 F.R.D. 308 (S.D. Cal. 2019) ....................10

*In re Processed Egg Prod. Antitrust Litig.*,
81 F. Supp. 3d 412 (E.D. Pa. 2015) ....................8

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019).................... *passim*

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
MDL No. 1869, 725 F.3d 244 (D.C. Cir. 2013) ....................5, 6

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ....................5

*In re Takata Airbag Prod. Liability Litig.*,
2022 WL 4594123 (S.D. Fla. July 19, 2022)....................11

*In re Urethane Antitrust Litig.*,
251 F.R.D. 629 (D. Kan. 2008)....................29

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ....................10

*In re Urethane Antitrust Litigation*,
166 F. Supp. 3d 501 (D.N.J. 2016) ....................4, 5

*MCI Communications v. AT&T*,
708 F.2d 1081 (7th Cir. 1983) ....................8, 9, 10

*McReynolds v. Sodexho Marriott Servs., Inc.*,
349 F. Supp. 2d 30 (D.D.C. 2004) ....................10

*Mr. Dee's Inc. v. Inmar, Inc.*,
2021 WL 4224720 (M.D.N.C. Sept. 16, 2021)....................5, 6

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ....................3

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
326 F.3d 1333 (11th Cir. 2003) ....................5

*Smith v. Pro Football, Inc.*,
593 F.2d 1173 (D.C. Cir. 1978)....................9

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931) .....9

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*,
2019 WL 5395739 (D.D.C. Oct. 22, 2019) .....2

**Rules**

**FED. R. EVID. 702 .....2, 4, 6, 7

FED. R. CIV. P. 23 ..... *passim*

## **Introduction**

The Court should deny Defendants' motion to exclude Drs. Jacobs, Leitzinger, McClave, Bernheim, Marx, and Frankel on the basis that their models supposedly generate disqualifying "false positives." MDL I Dkt. 1165; MDL II Dkt. 988; Oxbow Dkt. 305 ("Mot.").

*First*, Plaintiffs' econometric models do not produce false positive overcharges. Defendants claim that because "[e]ach of the experts' models finds damages on rail shipments that," in Defendants' view, "could not plausibly have been affected by the alleged conspiracy," Mot. 1, they generate disqualifying "false positives," *id.* at 1–2. Plaintiffs do not agree with the premise that the shipments at issue could not have been impacted by the alleged conspiracy. Moreover, Defendants do not base these claims on Plaintiffs' experts' actual work. Instead, Defendants' experts contorted and misconstrued Plaintiffs' experts' models, and proffer Defendants' *own* results as "false positives." In short, Defendants have not identified any *true* false positives.

*Second*, even if Plaintiffs' regression models did generate true false positives, it is up to a jury to determine what weight, if any, to give such imperfections. Econometrics is used (in the antitrust context) to provide reasonable estimations, and every reliable model allows for a certain, tolerable "false positive" rate.[1] "[N]o complex model is perfect," as these models "[a]t the end of the day . . . [are] meant to generate *estimates* for what the modeler is attempting to measure." *City of Phila. v. Bank of Am. Corp.*, 2023 WL 6160534, at *4, 5 (S.D.N.Y. Sept. 21, 2023) (emphasis in original). For this reason, Judge Friedman in MDL I—consistent with every court to consider this issue—concluded that, on these grounds, exclusion under *Daubert* was inappropriate because the "false positives" dispute goes to weight, not admissibility. *In re Rail Freight Fuel Surcharge*

---

[1] As explained in more detail below, what Defendants describe as "false positives" are, in econometric terms, better known as "Type 1 errors." *Infra* § I.A.

*Antitrust Litig.*, 292 F. Supp. 3d 14, 60–61 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019) ("*Rail Freight II*"). Assessing a model's accuracy in these circumstances requires a "battle of the experts," and "such a battle should be fought at trial with the benefit of live testimony and cross-examination." *Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, 2019 WL 5395739, at *4 (D.D.C. Oct. 22, 2019). Defendants identify no case in which a court has excluded an expert because his or her regressions produce "false positives."

*Third*, to avoid this black-letter law, Defendants try a sleight of hand: invoking caselaw governing class certification under Rule 23. But those arguments no longer play a role in these individual, non-class cases. Because Drs. Jacobs, Leitzinger, McClave, Bernheim, Marx, and Frankel satisfy FRE 702 and *Daubert*, the Court should deny Defendants' motion.

## Legal Standard

Helpful expert testimony is admissible if it is "the product of reliable principles and methods," which an expert has reliably applied "to the facts of the case." FED. R. EVID. 702(c)–(d). If an expert satisfies these threshold requirements, the expert's testimony is admissible, and remaining challenges are resolved through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). *Daubert*'s bar is "not that high." *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015); *see Bank of Am. Corp.*, 2023 WL 6160534, at *5.

## Argument

Defendants challenge the admissibility of the econometric models of Drs. Jacobs, Leitzinger, McClave, Bernheim, Marx, and Frankel under FRE 702 on *Daubert* grounds. Mot. 1–2. Defendants do not dispute Plaintiffs' experts' qualifications. They argue instead that the Court should exclude Plaintiffs' experts' models as a matter of law because they supposedly "generate

overcharges" where Defendants' claim none plausibly exist. Mot. 2. Defendants are wrong on both the law and the facts.

## I. Defendants Misstate the Law on "False Positives"

### A. Regressions and Type 1 errors.

An antitrust regression model explains how the variation in a market outcome (like price) is related to variation in other market factors (like demand). Regression models, such as those used by Plaintiffs' experts here, are widely used to estimate damages in antitrust cases, and courts routinely accept regression models as a "generally reliable econometric technique to . . . isolate the impact of the alleged antitrust violations on the prices paid." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677, n.23 (9th Cir. 2022) (collecting cases); *see also* Pls.' Resp. to Defs.' Mot. to Exclude Averages, § II.B. (collecting cases).

Of course, no model, no matter how elaborate, is perfect. In econometric terms, what Defendants conceive of as "false positives" are better known as "Type 1 errors." JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH 5TH ED. (2013): 779–80. Type 1 errors are a natural outcome of almost any regression model. *See* WILLIAM H. GREENE ECONOMETRIC ANALYSIS 7th ed. (2012): 53. ("The disturbance arises for several reasons, primarily because we cannot hope to capture every influence on an economic variable in a model, no matter how elaborate."). Typically, the researcher will choose a significance level of, for example, 5%, which means that the test is designed to allow for a 5% probability of incorrectly concluding an effect occurred when it did not (*i.e.*, a 5% chance of a Type 1 error for any single observation). *See, e.g.,* PX0817, Bernheim MDL II Rebuttal Rpt., § VI.B.8 at 295. But as discussed further below, presence of Type 1 errors (or in Defendants' terminology, "false positives") does not mean a model is unreliable, or inadmissible.

B. **Defendants' arguments about false positives go to weight, not admissibility.**

Defendants' contentions about Plaintiffs' econometric models, while wrong on the merits (as discussed in more detail below, *infra* § II), go to the weight—not admissibility—of Plaintiffs' evidence. Defendants' motion should be denied on this basis alone.

Disputes about the accuracy of a regression model, including Type 1 errors, are not issues for *Daubert*. *Rail Freight II*, 292 F. Supp. 3d at 60–61; *see also In re Urethane Antitrust Litigation,* 166 F. Supp. 3d 501, 509 (D.N.J. 2016) ("Consequently, the Court concludes that the statistical significance issues go to the weight of the models, not their admissibility."). Indeed, Judge Friedman has already recognized in MDL I that a "false positive" finding does not justify excluding an expert witness under Rule 702 or *Daubert*. *Rail Freight II*, 292 F. Supp. 3d at 58, 61. After all, "no complex model is perfect." *Bank of Am. Corp.*, 2023 WL 6160534, at *5.

Every court to have considered this issue agrees—whether a model generates false positives goes the weight of the expert's testimony, and is not grounds for exclusion under *Daubert*. For example, the court in *Mushroom* rejected the notion that an experts' model was unreliable because it returned a "percent 'overcharge' attributable to anticompetitive conduct." 2015 WL 5767415, at *14. Considering *Rail Freight I* and *Comcast*—the same cases Defendants cite in their motion—the *Mushroom* court concluded that the "false positive analysis at most goes to the weight . . . and that [the expert's] regression model is sufficiently reliable under Rule 702." *Id*. Likewise, the court in *Allen v. Dairy Marketing Services* denied a *Daubert* motion, rejecting the "false positives" argument, and holding that "[t]he weight to be accorded Dr. Rausser's regression model should also be decided by the jury." 2013 WL 6909953, at *18 (D. Vt. Dec. 31, 2013). So too in *In re General Motors LLC Ignition Switch Litigation*, where the court concluded that "the fact that there are reported instances of false positives . . . and . . . arguments to the contrary go to weight, not admissibility." 2016 WL 4077117, at *5 (S.D.N.Y. Aug. 1, 2016). Many

other courts agree. *See, e.g.*, *Mr. Dee's Inc. v. Inmar, Inc.*, 2021 WL 4224720, at *22 (M.D.N.C. Sept. 16, 2021) (refusing to find a "false positives" argument exclusionary); *Urethane,* 166 F. Supp. 3d at 509 (collecting cases and concluding "that the statistical significance issues go to the weight of the models, not their admissibility"); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *29 (S.D.N.Y. Mar. 28, 2014) ("Apple's arguments concerning 'false positives' provide no basis to challenge the reliability of Noll's regression model."); *see also Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1344–45 (11th Cir. 2003) ("The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination."); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531–32 (6th Cir. 2008) (finding no abuse of discretion in a district courts' admission of expert testimony where the expert "offered a foundation for how and why he analyzed the data as he did"); *In re Neurontin Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2009 WL 3756328, at **10–11 (D. Mass. Aug. 14, 2009) ("These complaints of Defendants do not demonstrate a wholesale bias on the part of Dr. Maris, nor do they reveal a fatal error. Thus, they go to the weight of the evidence, not its admissibility.").

C. **<u>Defendants improperly rely on class certification decisions.</u>**

Instead of grappling with these cases, Defendants misinterpret and misapply Rule 23 class certification cases to argue that any model generating "false positives" must be excluded as a matter of law. Mot. 2. None of the cases Defendants cite addresses admissibility under *Daubert*. Instead, all address, in assessing whether a class can be certified, whether an expert's model can be used to calculate *class-wide* damages, such that Rule 23's "predominance" requirement is met, without the need for individualized proof. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*,

725 F.3d 244, 253–55 (D.C. Cir. 2013) ("*Rail Freight I*"); *Comcast Corp. v. Behrend*, 569 U.S. 27, 32 n.4, 37 (2013); *In re Aluminum*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020).[2]

For example, the D.C. Circuit in *Rail Freight I* did not once mention *Daubert*, admissibility, or FRE 702. *See generally Rail Freight I*, 725 F.3d at 244, 253–55. Instead, the D.C. Circuit focused on how the expert's model impacted the predominance inquiry. *Id*. Indeed, as discussed in subsequent cases, the D.C. Circuit "ultimately viewed the issue of false positives as relevant to class certification, not admissibility." *Mr. Dee's Inc.*, 2021 WL 4224720, at *22.

And, on remand, Judge Friedman specifically declined to exclude one of Plaintiffs' experts based on Defendants' "false positive" arguments, explaining that the matter "goes to the weight to be accorded each expert's opinion under Rule 23(b), not to its admissibility." *Rail Freight II*, 292 F.Supp.3d at 60; *see also id*. at 58 (explaining that the court would "fully explore defendants' criticisms regarding . . . false positives . . . but that is an examination appropriately for class certification, not for *Daubert*."). Defendants cite *Rail Freight II* but then bury Judge Friedman's holding—in which he squarely rejected the arguments they make now—in a footnote. Mot. 2 n.1. And Judge Friedman did not "*sua sponte*" decide anything "without the benefit of briefing from the parties about the law," as Defendants now protest. In fact, Defendants asked the MDL I Court to hold that purported false positives they identified were "disqualifying." *See* Defs.' MDL I Opp. to Pls.' Renewed Mot. for Class Cert., March 31, 2014, Dkt. 707, at 16–17, 25, 39–58.

Nor does *Comcast,* Mot. 1–2, speak to the issue of the admissibility under FRE 702 and *Daubert*. There, "Petitioners [argued] that certification was improper because respondents had failed to establish that damages could be measured on a classwide basis." 569 U.S. at 32 n.4. The

[2] *In re Aluminum* also addresses *Daubert* challenges, but those challenges were not based on purported "false positive" results. 336 F.R.D. at 26–35.

majority agreed with the dissent, *id*. at 39–40 (Ginsburg, J., joined by Breyer, J., dissenting), that the question presented was *not* one of *admissibility* under *Daubert*, but rather whether the case was susceptible to awarding damages on a class-wide basis, *id.* at 32 n.4. Setting *Daubert* and expert testimony admissibility aside, the Supreme Court concluded that an expert's regression model in that case was not sufficient evidence of class-wide damages to satisfy a showing of "predominance" as required by Rule 23. *Id.* at 34. In doing so, the Court recognized it was conducting an inquiry into the disputed merits of the underlying claim, to the extent necessary to complete the "class certification inquiry," *see id.* at 35—an inquiry which has no place in the *Daubert* and summary judgment context presented here, *see Rail Freight II*, 292 F.Supp.3d at 60.

By relying on inapposite class-certification cases, Defendants ask the Court to apply a wholly inapplicable framework and set the admissibility bar too high. Whether an expert's model can be used to calculate class-wide damages sufficient to meet the predominance standard, obviating the need for individualized proof, is a separate question, which may involve limited inquiry into the merits of the underlying claim. But the answer to that question says nothing about admissibility under *Daubert*, particularly in individual cases where individualized proof apart from the model is permissible. Indeed, in *Mushroom*, the court considered the interplay between *Daubert* and Rule 23 and explained that "while there will inevitably be 'overlap' in the consideration of expert testimony in the *Daubert* and class certification inquiries, finding 'expert testimony admissible under *Daubert* does not preclude the court from denying class certification.'" 2015 WL 5767415, at *3 (quoting *In re Processed Egg Prod. Antitrust Litig.*, 81 F. Supp. 3d 412, 417 (E.D. Pa. 2015)). In other words, admissibility under *Daubert* is necessary but alone insufficient to support the conclusion that an expert's model can be used to calculate class-wide damages. *In re Processed Egg Prod. Antitrust Litig.*, 81 F. Supp. 3d at 417. But a model's failure

to satisfy the required predominance under Rule 23 does not render it inadmissible under *Daubert*. *Rail Freight II*, 292 F. Supp. 3d at 58; *see Comcast*, 569 U.S. at 39–40. The question at this stage is not whether "individual" issues predominate over "common" ones, and the Court should decline Defendants' invitation to apply a higher bar than *Daubert* requires.

D. **Defendants' other support is likewise inapposite.**

Defendants cite three other cases in support of their proposition that purported "false positives" requires exclusion of expert opinion as a matter of law. Mot. 2. These cases are likewise inapposite and do not address a "false positives" challenge under *Daubert*.

*MCI Communications v. AT&T* explains a plaintiff's burden at trial to prove causation for antitrust injury. 708 F.2d 1081, 1161 (7th Cir. 1983). It neither mentions admissibility under *Daubert* (*MCI* predates *Daubert* by a decade) nor any "false positives" argument. Its discussion on "proof" and "causation of damages" is inapposite because "the evidentiary requirement of reliability [under *Daubert*] is lower than the merits standard of correctness." *See Rail Freight II*, 292 F. Supp. 3d at 74.

*MCI* relied on *Coleman v. Chrysler,* to which Defendants also cite. Mot. 2. *Coleman*, even more antiquated, likewise addresses the sufficiency at trial of damages evidence in antitrust suits, as opposed to any argument that "false positive" results make an expert's opinion inadmissible. 525 F.2d 1338, 1353 (3d Cir. 1975). *Coleman* only vacated a jury's findings after considering all the evidence adduced at trial. *See id*. For the same reasons *MCI* does not control, neither does *Coleman*.

Nor does *Concord Boat v. Brunswick* (Mot. 2) address "false positives;" it stands only for the proposition that an expert's mere speculation is inadmissible. 207 F.3d 1039, 1057 (8th Cir. 2000). The *Concord* model conclusively "failed to account for market events that both sides agreed were not related to any anticompetitive conduct" because the expert "admitted on cross

examination that such facts could have been incorporated into his model but that he had not done so." *Id*. Quite the opposite, here, as explained in detail below. *See infra* § II.

E. **Defendants' motion rests on a mistaken understanding of damages modeling in antitrust cases.**

Even if Defendants correctly identified false positives (they did not) *and* the Court departed from the appropriate *Daubert* standard and precedent above (it should not), purported "false positives" still would not warrant exclusion, because Plaintiffs' models need not be perfect to make it to trial. Indeed, *no* model is perfect.

As the Supreme Court has observed, "damages issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1189 (D.C. Cir. 1978) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969)); *accord Bank of Am. Corp.*, 2023 WL 6160534, at *5. Antitrust law, dating back nearly a century, therefore recognizes that some modicum of imprecision and uncertainty is to be expected and does not somehow excuse the wrongdoer. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *see, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1049 (N.D. Ill. 2022) ("The Supreme Court 'has been willing to accept a degree of uncertainty in the calculation of damages[.]'") (quoting *MCI*, 708 F.2d at 1161, and collecting cases and explaining *Daubert* in relevant antitrust context). Even Defendants' own cases recognize this "the amount of damages may be determined by a just and reasonable estimate," *MCI*, 708 F.2d at 1161.

As discussed in more detail in Plaintiffs' Opposition to Defendants' Motion to Exclude Average Damages Opinions (§ III), Plaintiffs' experts offer economic evidence as to whether (and to what extent) the alleged conspiracy was effective. To that end, their models estimate what overcharges (if any) resulted from the conspiracy for each plaintiff. Plaintiffs' sophisticated

econometric models—resulting in hundreds of pages of analysis, voluminous backup materials, and considering thousands of pages of documents and extensive data sets—are far from the "product of speculation or guess work," *MCI*, 708 F.2d at 1161; *cf. Coleman*, 525 F.2d at 1352–53 (model premised on hypothetical unrealistic world without even lawful competition). These models generate admissible, reliable results. *See Bank of Am. Corp.*, 2023 WL 6160534, at *5; *see also In re Urethane Antitrust Litig.,* 768 F.3d 1245, 1260–1261 (10th Cir. 2014) (citing *Koger v. Reno*, 98 F.3d 631, 637 (D.C. Cir. 1996)).

## II. Plaintiffs' Experts' Models Do Not Generate False Positive Overcharges

Defendants are also wrong on the merits. They do not identify a single "false positive" in any of Plaintiffs' expert's models, and their objections do not undermine the reliability of Plaintiffs' models. *See In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 326 (S.D. Cal. 2019) ("[T]here are no glaringly erroneous results that would render the model unreliable.").

To be clear, the Court need not wade into these issues at all. Defendants' motion (at best) sets the stage for an upcoming battle of the experts, which must unfold before the jury. *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 34 (D.D.C. 2004); *Ambrosini v. Labarraque*, 966 F.2d 1464, 1468 (D.C. Cir. 1992). Nevertheless, Plaintiffs address Defendants' criticisms for completeness.

### A. <u>**Dr. Allen Jacobs's Model Is Reliable**</u>

#### **1.** <u>Defendants' purported tests do not generate false positives and do not test Dr. Jacobs' actual model.</u>

Dr. Jacobs' model does not yield false positives. The purported false positives Defendants describe did not result from testing his actual econometric model. Rather, they were generated using different models deliberately re-engineered to fail by two of Defendants' experts, Drs.

Carlton and Israel. When Dr. Jacobs' *actual* model is subjected to *real* false positives testing methods (ones Drs. Carlton and Israel endorsed in their own writing), the Jacobs model passes the tests.

Dr. Jacobs' model compares specific control and treatment groups using a difference-in-differences regression—a standard econometric methodology repeatedly found to satisfy *Daubert* standards. *See, e.g.*, *Dealer Mgmt. Sys.*, 581 F. Supp. 3d at 1055–57 (denying *Daubert* motion against Dr. Israel where he used a difference-in-differences regression to test the impact of alleged collusion); *In re Takata Airbag Prod. Liability Litig.*, 2022 WL 4594123, at **6–8 (S.D. Fla. July 19, 2022) (denying *Daubert* motions where experts used difference-in-differences analyses). Dr. Jacobs' control group consists of routes where the pricing mechanisms were set prior to the conspiracy period, whereas his treatment group consists of routes where the pricing mechanisms were set during the conspiracy period. With active controls for cost, demand, route, commodity, and other factors, Dr. Jacobs then compared price changes in his control routes versus price changes in his treatment routes. This arrangement allowed Dr. Jacobs to isolate the impact of the conspiracy accurately. PX01819, Jacobs MDL II Rpt. V.F.

Defendants first present a purported false positives analysis from Dr. Carlton (Mot. 8) which ignores the control/treatment structure of Dr. Jacobs' model. Dr. Carlton instead divided Dr. Jacobs' *control* group into two new categories: (1) a pseudo-control group comprising routes *without* fuel surcharges ("FSCs"); and (2) a pseudo-treatment group comprising routes *with* FSCs. He then tested whether prices in the group with FSCs rise faster than the group without FSCs. *See* Mot. 8. Unsurprisingly, by artificially splitting the control group in this way, Dr. Carlton showed that prices on routes with FSCs do indeed increase faster than prices on routes without FSCs. But, Dr. Carlton's "test" only confirms that the implementation of rate-based FSCs was an efficient and

effective mechanism for driving up all-in prices. It has nothing to do with testing Dr. Jacobs' actual model, which analyzes the impact of railroads coordinating the use of FSCs (which had existed before) to modify them and broaden their application. Dr. Jacobs' model therefore appropriately uses a control group which includes routes with *and* without FSCs. He finds the conspiracy raised prices for routes with pricing mechanisms set during the conspiracy period as compared to a control group with pricing mechanisms set before the conspiracy period (including those where FSCs were already included). *See* PX0989, Jacobs Reply Rpt., ¶¶ 267–70. Because Dr. Carlton changed the underlying design of Dr. Jacobs' model, his purported "false positives" analysis does nothing to undermine the reliability of Dr. Jacobs' model.

Defendants next present a purported false positives analysis from Dr. Israel, who also created control and treatment groups having nothing to do with Dr. Jacobs' model. Defendants assert that, "if Dr. Jacobs' model was reliable, it should find no impact on prices when tested *exclusively* using data from shipments occurring before March 2003, the earliest claimed start date for the alleged conspiracy." Mot. 9 (emphasis added). But the first step in the Jacobs model is to identify impacted shipments in the data by checking [redacted] PX0989, Jacobs Reply Rpt. ¶ 222. Dr. Israel claims he replicated this step by using the same "tagging" algorithm that Dr. Jacobs used to distinguish between control group routes and treatment group routes, PX0776, Israel MDL II Rpt. ¶ 338, but that claim is misleading at best. One cannot run the Jacobs model on pre-March 2003 data, as Dr. Israel attempts, because the conspiracy period FSC formulas were not in place before March 2003 and Dr. Jacobs' tagging algorithm is designed to detect the application of those specific FSC formulas, not the pre-conspiracy period ones. *See* PX0989,

Jacobs Reply Rpt. ¶¶ 276–85. Therefore, Defendants do not demonstrate that this is a valid testing method.

**2.** Dr. Jacobs' actual model produces zero false positives.

To demonstrate the reliability of his model, Dr. Jacobs performed three different false-positives tests, one of which utilizes a framework that Defendants' experts Drs. Carlton and Israel endorsed in a paper they co-authored. None resulted in a false positive effect.

In all three tests, Dr. Jacobs used the entire dataset after removing observations that would be considered tainted by the conspiracy, *i.e.*, [redacted] *See id.* ¶¶ 287–89. Dr. Jacobs' testing method creates a proper test because there should be no apparent impact on treatment group routes until the collusive FSC appears on those routes.

In the first of his three tests, Dr. Jacobs compared price changes in the control group to price changes in the pseudo-treatment group (with conspiracy-tainted observations removed) in a placebo conspiracy period [redacted] the same "placebo test" approach Drs. Carlton and Israel endorsed in their academic writings.[3] This test generated no false positives; [redacted] *See* PX0989, Jacobs Reply Rpt. ¶¶ 289–90.

In the second test, Dr. Jacobs re-ran the same above-described placebo test [redacted]

[3] *See* PX0989, Jacobs Reply Rpt. ¶ 291 & n.389 (citing D. Carlton, M. Israel, *et al.*, *Are Legacy Airline Mergers Pro- or Anti-Competitive? Evidence from Recent U.S. Airline Mergers*, 62 INT'L J. OF INDUSTRIAL ORG. 58, 85–86 (2019)).

[redacted] Each iteration found no false positive effect. *See id.* ¶¶ 293–94.

And in the third test, Dr. Jacobs ran the same placebo test, but instead of assigning a uniform placebo conspiracy period to all treatment routes, he used a randomly assigned placebo conspiracy period for each treatment route. Once again, [redacted] demonstrating no false positive effect. *See id.* ¶¶ 295–96.

Accordingly, in a properly constructed test, Dr. Jacobs' model produces no false positives. Defendants' motion as to Dr. Jacobs, thus, should be denied.

### B. <u>**Dr. Jeffrey Leitzinger's Models Are Reliable**</u>

Dr. Leitzinger's MDL I and MDL II FSC overcharge models likewise do not produce "false positives." To the contrary, Defendants' claim that Dr. Leitzinger's MDL II FSC overcharge model "finds average [FSC] damages of 7.4% when applied to shipments made during the alleged conspiracy period subject to contract terms set before the alleged conspiracy" (Mot. 10–11) is based on a false premise.[4]

As explained more fully in Plaintiffs' Opposition to Defendants' Motion to Exclude Average Damages Opinions (§ III.C), Dr. Leitzinger developed a model for estimating FSC overcharges (separate from his model for estimating base rate overcharges), where he assumed that Defendants could recover 100% of their incremental fuel costs in the but-for world. Dr. Leitzinger only treated as overcharges Plaintiffs' Damages Period FSC payments which *exceeded* Defendants' incremental fuel costs for a given shipment. PX0769, Leitzinger MDL II Rpt. ¶¶ 227–

[4] In a footnote (Mot. 12 n.4) Defendants raise the same argument as to Dr. Leitzinger's MDL I FSC overcharge model. That argument fails for the same reasons as it does in MDL II. PX0983, Leitzinger MDL I Reply Rpt. ¶¶ 181–87. Defendants do not challenge Dr. Leitzinger's separate base rate overcharge models as producing false positives.

40. Defendants' expert Dr. Carlton responded [redacted] PX0773, Carlton MDL II Rpt. ¶ 201. But Dr. Carlton's analysis rests on the (inaccurate) key assumption that Defendants would have achieved the same levels of FSC coverage without a conspiracy as they obtained during the alleged conspiracy, and that even without a conspiracy Defendants could have continued to apply the same FSC formulas that they applied previously (even while rates resulting from those FSCs soared).

Dr. Carlton's assumption is contrary to the record, which reflects that in the competitive pre-conspiracy period market environment, even though FSCs were rarely triggered and in any event remained low (0-2% of base rates), Defendants had limited success in implementing and enforcing them. PX0769, Leitzinger MDL II Rpt. ¶¶ 86–88, 172–73; PX0984, Leitzinger MDL II Reply Rpt. (Corrected) ¶¶ 71, 102–07, 124–25, 127. This contrasted with the conspiracy period, when Defendants imposed FSCs much more broadly, and FSCs soared (reaching over 30% of base rates), resulting in significant over-recovery of their incremental fuel costs. PX0769, Leitzinger MDL II Rpt. ¶¶ 173–74; PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 70–77, 84–90, 176. Therefore as Dr. Leitzinger has explained, it cannot be assumed (as Dr. Carlton does) that Defendants could have achieved the same levels of FSC coverage and enforcement without a conspiracy; to the contrary, particularly given that FSC percentages increased so substantially, one would expect that in a competitive environment there would have been increased customer resistance to FSCs, and FSC coverage would be expected to *fall*. PX0769, Leitzinger MDL II Rpt. ¶¶ 172–75 & n.490.

### C. **Dr. James T. McClave's Models Are Reliable**

Dr. McClave's MDL I and MDL II models also do not produce any legitimate false positives. As explained more fully in Plaintiffs' Opposition to Defendants' Motion to Exclude Average Damages Opinions (§ III.C), Dr. McClave estimated separate regression models for carload and intermodal traffic, which control for various market factors impacting price, and isolate the impact of Defendants' alleged conspiracy on the all-in rates paid by Plaintiffs during the Damage Period. Defendants claim that Dr. McClave's MDL I and II models produce "false positive" overcharges when "applied to Plaintiffs' legacy shipments, which contained fuel surcharges that were set before the start of the alleged conspiracy period." Mot. 12. Defendants rely upon the testimony of their expert Dr. Carlton, who claims to have found "false positives" generated by Dr. McClave's models. But Dr. Carlton does so by estimating models of his own (two carload and two intermodal), that are rendered unreliable by the significant changes he makes to them. Dr. Carlton's unreliable models are not a reflection on Dr. McClave's.

In Dr. Carlton's first set of models, Dr. Carlton uses both FSC and non-FSC shipments in his Benchmark Period, and all "potential legacy contracts" in the Damages Period. Dr. Carlton claims to have found "false positives" on these shipments—*but he included shipments that changed to FSC formulas developed during the conspiracy period*. The damages estimated are not "false." PX0986, McClave MDL II Reply Rpt. at 54–55 ("these overcharges are true positives"); *see also* PX1203, McClave MDL I Reply Rpt. at 31–35 (addressing false positives argument). In the second set of Dr. Carlton's models, Dr. Carlton limits his Damages Period to "potential legacy" shipments before they switched to a conspiracy period FSC formula. But because there are *so few* pre-existing contracts that did not switch to a conspiracy period FSC formula, and because they switched early in the Damages Period, Dr. Carlton used only a small fraction of the available data, biased toward the beginning of the Damages Period, which causes

his models to become unreliable. PX0986, McClave MDL II Reply Rpt. at 55; *see id.* at Figures 9 and 10; *see also* PX1203, McClave MDL I Reply Rpt. at 31–35. Indeed, though Dr. Carlton does not report these results, three out of the four MDL II models he estimates to generate purported "false positives" have non-sensical negative price-demand relationships, and the fourth model has a very weak demand relationship that is not statistically significant. The models that Dr. Carlton uses to create "false positive" overcharges are unreliable, PX0986, McClave MDL II Reply Rpt. at 55, and they do not speak to the reliability of the separate models that Dr. McClave estimated.

Finally, in response to questions raised by Judge Friedman regarding how the alleged conspiracy could impact pre-existing contracts that contained FSCs, Dr. McClave has conducted extensive quantitative analyses regarding the increasing usage of FSCs during the conspiracy period, reflecting that shippers faced a changed economic environment during the conspiracy period, and that even when shipping under pre-existing contracts, Plaintiffs' FSCs nevertheless often changed during the conspiracy period. PX0985, McClave MDL II Rpt. §§ 4.0, 5.0; PX0843, McClave MDL I Rpt. §§ 4.0, 5.0.[5] Dr. Leitzinger, too, has explained that he would expect even pre-existing contracts to be impacted by the alleged conspiracy, as a changed economic environment during the conspiracy period would put pressure on even existing contracts. PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 192–94. Accordingly, Dr. Carlton's assumption that any remaining "legacy" shipments should be wholly unaffected by the alleged conspiracy, and that any

[5] Indeed, as Plaintiffs have explained elsewhere, many of Defendants' pre-existing price authorities did not include a specific FSC formula, but instead stated that the FSC to be applied to a given shipment would be set at the time of the shipment, according to a formula set forth in a *different* document (for example, BNSF Rulebook 6100). Defendants then changed the formulas set forth in those separate documents during the alleged conspiracy.

and all overcharges are "false," is unsupported. PX0986, McClave MDL II Reply Rpt. at p. 55; *id*. at § § 5.0, 5.4.

### D. <u>**Dr. B. Douglas Bernheim's Methodologies Are Reliable**</u>

Defendants do not point to any "false positives" in connection with Dr. Bernheim's methodology (in either MDL I or MDL II). At best, they advance red herrings, misinterpreting easily explainable observations as purported reliability issues.

In each of MDL I and MDL II, Dr. Bernheim applied standard economic techniques to analyze the impact of Defendants' conduct on FSCs and all-in rates during the conspiracy period. Dr. Bernheim's methodology, at its core, included a standard regression analysis that showed that during the conspiracy, Defendants did not offset FSCs by adjusting base rates or providing other forms of discounts. *See* PX0952, Bernheim MDL I Rpt. ¶ 15 and PX0770, Bernheim MDL II Rpt. ¶ 26.[6] Critically, none of Defendants' experts has analyzed the degree to which FSCs were offset by base rate reductions or other forms of discounts. By ignoring this central component of Dr. Bernheim's methodology, Defendants' critiques, as explained in more detail below, miss the mark.

#### **1.** <u>Dr. Bernheim's over-recovery analysis does not generate false positives.</u>

Defendants rely on their experts' erroneous and incomplete application of Dr. Bernheim's methodology to claim that his "over-recovery" analysis[7] produces "false positives" by pointing to three supposed "overcharge findings": (1) on "legacy" shipments during the conspiracy, (2) on

---

[6] Drs. Bernheim and Marx served individual reports in all cases in which they were retained. Except as otherwise noted, Plaintiffs cite exemplar reports from Drs. Bernheim and Marx. *See* COF ¶ 37 n.1.

[7] While Defendants only raise issue with Dr. Bernheim's over-recovery analysis in the context of his MDL I report, Plaintiffs' response equally applies to the same over-recovery analysis that was performed by Dr. Bernheim as part of his MDL II report.

shipments that were subject to "nonconspiratorial FSC formulas," and (3) on shipments before the conspiracy period. Mot. 5–7. Each of Defendants' claims is wrong.

Defendants' purported "false positives" uniformly rest on a faulty premise. Before the conspiracy, Defendants independently attempted to impose rate-based FSCs on some agreements, and sometimes succeeded in collecting and enforcing them. COF ¶¶ 22–32. As Defendants themselves recognized contemporaneously, however, competition between railroads stymied widespread application and enforcement of FSCs. COF ¶¶ 18–21. Shippers revolted, negotiated discounts, or refused to pay FSCs entirely. *See, e.g.*, COF ¶ 58, 238. In short, Defendants were largely unsuccessful in their attempts to impose rate-based FSCs before the conspiracy. COF ¶¶ 46–77.

There is therefore no basis for concluding that over-recovering FSC formulas (designed before sharp fuel price increases) would have *survived* a competitive environment absent the conspiracy. *See* PX0950, Bernheim MDL I Rebuttal Rpt. ¶ 162; PX0949, Bernheim MDL I Dep., March 9, 2021, 175–176. As Dr. Bernheim explained, "Defendants' experts' argument is much like observing that, prior to a conspiracy, firms independently attempted to set high prices, and occasionally succeeded." *See* PX0950, Bernheim MDL I Rebuttal Rpt. ¶ 161. That limited, uncoordinated success does not imply that all subsequent price increases are the result of competition. *See id.*

The nonconspiratorial FSC provisions also had dramatically different implications before the conspiracy (when FSCs were relatively low and sometimes, according to Dr. Bernheim's analysis, over-recovered fuel costs to a small degree) compared to during the conspiracy (when FSCs were large and over-recovered costs to a much more substantial degree). *See* PX0817, Bernheim MDL II Rebuttal Rpt. ¶¶ 162, 186 (explaining that in the pre-conspiracy period, "the

*rate* of cost over-recovery can be extremely large for fuel prices close to the trigger," but "the *economic magnitude* of the associated cost over-recovery is relatively small"). As Defendants' expert Dr. Murphy concedes, [redacted] PX0951, Murphy MDL I Rpt. ¶ 61, at least relative to the conspiracy period when FSC percentages ultimately exceeded 40%, PX0950, Bernheim MDL I Rebuttal Rpt. ¶ 162.

Defendants recognized that their ability to limit concessions, which may offset revenue derived on FSCs, would impact the success of their efforts to increase prices. *See* PX0950, Bernheim MDL I Rpt. ¶ 93. Purported "over-recovery" before the conspiracy does not equate to an "overcharge finding" if negotiations with shippers may have involved concessions such as discounts and reduced base rates that had the potential to offset FSCs. *See id.* ¶¶ 93–95. Defendants' expert Dr. Carlton [redacted]. *See* PX0773, Carlton MDL II Rpt. ¶ 85. This is precisely why Defendants' pre-conspiracy purported "over-recovery" is unreliable and not indicative of an "overcharge finding" in the pre-conspiracy period. Dr. Bernheim's impact analysis shows that there was little to no difference between the trend of all-in prices paid on FSC-paying traffic relative to all-in prices paid on non-FSC-paying traffic before 2003. *See* PX0952, Bernheim MDL I Rpt. ¶ 167. But after 2003, Defendants did not offset FSCs by adjusting base rates or other forms of discounts at a high frequency. *See* PX0950, Bernheim MDL I Rebuttal Rpt. ¶¶ 156–68.

Defendants also use misleading statistics to support this argument. Although Table 18 (Mot. 7) purports to show "Recovery Rates" between 2006 and 2008, this table does not account for rebasing, the process by which Defendants moved FSC revenue into their base rates. *See*

PX0950, Bernheim MDL I Rebuttal Rpt. ¶¶ 180–82. Although revenue derived from FSCs (the numerator) may have fallen during this period, Defendants recognized that their all-in recovery remained the same or went up. *Id*. By failing to account for rebasing, Table 18 presents a misleading picture of "Recovery Rates" after 2006.

**2.** Dr. Bernheim's MDL II overcharge model does not generate false positives.

Defendants' critique on Dr. Bernheim's treatment of "Preexisting Price Authority" or "PEPA" shipments is also wrong for three reasons.[8]

First, Defendants have not conducted a proper false positives analysis. Defendants' purported PEPA-overcharge analysis (Mot. 3–4) misapplies *portions* of Dr. Bernheim's model to reach misleading outcomes that they label as "false positives." *See* PX0817 Bernheim MDL II Rebuttal Rpt. ¶¶ 756–65. For example, Defendants take inapplicable estimates of key model parameters derived ***from conspiracy-period*** contracts and apply them to FSC-paying PEPA shipments whose terms had been negotiated ***before the conspiracy began***. To correctly identify any "false positives," however, Defendants would have needed to derive all the model parameters for the pre-conspiracy period and recreate Professor Bernheim's overcharge analysis based on those pre-conspiracy values. *See id.* at ¶¶ 756–59. None of Defendants' experts has done this. In fact, one of Defendants' own experts acknowledges that, [redacted]. *See id.* at ¶ 759 (citing to PX0773, Carlton MDL II Rpt. ¶ 143–46, Fig. 13).

Second, Defendants' analyses of PEPA contracts could not provide a legitimate foundation for Defendants' conclusions because Defendants ignore Plaintiffs' allegations. Plaintiffs

[8] Dr. Bernheim and Dr. Marx's approach to PEPA shipments is explained further in Plaintiffs' Opposition to Defendants' MSJ on Plaintiffs' Time Barred Damages Claims (§ V).

acknowledge that Defendants incorporated FSC formulas into shipping contracts during the pre-conspiracy period. Defendants unilaterally achieved a limited degree of success in doing so. But, critically, Plaintiffs also allege that Defendants' inability to impose and enforce FSCs more generally through unilateral action (generating little revenue) led them to collude beginning in early 2003. This collusion successfully expanded FSC coverage, ensured greater discipline, and included modifications to make the FSCs even more aggressive. Limited, purported overcharges on PEPA shipments—as well as limited, purported overcharges on pre-conspiracy shipments (Mot. 4–5)—do not demonstrate that Dr. Bernheim's MDL II model is unreliable. Indeed, these data are consistent with Plaintiffs' allegations. *See* PX0817, Bernheim MDL II Rebuttal Rpt. ¶¶ 760–63.

Third, even if Defendants' analysis were right, it would not provide a legitimate foundation to exclude Dr. Bernheim's model on the grounds that it generates "false positives." *See id.* at ¶¶ 760–63. Defendants' misapplication of Dr. Bernheim's model finds [redacted]

[redacted]

What these data show is that Defendants have not identified quantitatively significant measures to support their position on disqualifying false positives. *See* PX0817, Bernheim MDL II Rebuttal Rpt. ¶ 765 & Figure VI-20; *see, e.g., Dealer Mgmt. Sys.*, 581 F. Supp. 3d at 1049 (collecting cases and explaining *Daubert* in relevant antitrust context).

E. **Dr. Leslie Marx's Models Are Reliable**

**1.** Dr. Marx's MDL I methodology does not generate false positives.

Defendants argue, like they do with Dr. Bernheim, that Dr. Marx's MDL I model is unreliable because she supposedly finds "damages" in connection with pre-conspiracy shipments. Mot. 13–14. In doing so, Defendants improperly characterize Dr. Marx's work and say nothing that goes to the reliability of her work.

First, Defendants' conclusions are a result of *their* erroneous, incomplete, and inappropriate application of Dr. Marx's MDL I methodology. Defendants inappropriately mischaracterize Dr. Marx's MDL I methodology as simply a regression model. *Cf.* PX1197, Marx MDL I Rep. ¶ 54–77. Accordingly, Defendants cite to their experts' work—applying this model in ways it was never meant to be applied—as evidence that Dr. Marx's methodology produces "damages" when applied to legacy shipments for both NS and CSX. Mot. 13–14. But Dr. Marx's MDL I methodology encompasses a detailed review of the economic evidence and circumstances specifically facing MDL I Plaintiffs before and during the conspiracy. *See* PX1198, Marx MDL I Rebuttal Rpt. ¶ 6. This MDL I methodology was not designed or intended to work perfectly for other shippers without considering the factors described in her MDL I Report. *See id.* ¶ 30. Defendants' conclusions are thus the result of their erroneous application of Dr. Marx's MDL I methodology. *See id.*

Second, in criticizing Dr. Marx, Defendants incorrectly assert that pre-conspiratorial FSC formulas are an appropriate competitive benchmark during the conspiracy period. Mot. 14. But as discussed above, Defendants have not performed the necessary analysis to support their assertions about the pre-conspiratorial FSC formulas. Dr. Bernheim's analysis showed that during the conspiracy, Defendants did not offset FSCs by adjusting base rates or providing other forms of discounts. Defendants have not performed any such analysis for agreements entered into prior to the conspiracy.

Most importantly, however, Defendants' arguments on these points say nothing about the reliability of Dr. Marx's MDL I methodology. *See id.*

**2.** <u>Dr. Marx's MDL II methodology does not generate false positives.</u>

Defendants' critiques of Dr. Marx's MDL II methodology—based on Dr. Murphy's work (Mot. 12–13)—miss the mark because they are premised on an inappropriate application of

Dr. Marx's approach. Specifically, Dr. Murphy constructs purported but-for prices for each individual transaction. But Dr. Marx's analysis does not allow for (and does not require) the construction of but-for prices paid by Plaintiffs at the transaction level. Instead, Dr. Marx's calculations of overcharges are at the shipper level. Dr. Murphy does not purport to find any shipper for which the overcharges are a "false positive" because that shipper supposedly had no damages. Rather Dr. Murphy's "false positive" results are entirely driven by his own choices of how to allocate overcharges across time and transactions, which yield inaccurate transaction-level but-for prices that cannot be used for the purpose to which he applies them. In other words, the key input to Dr. Murphy's purported "finding" of "false positives" is unreliable from the start and has nothing to do with Dr. Marx's methodology at all. *See* PX0980, Marx MDL II Dep. at 127; PX0954, Marx MDL II Rebuttal Rpt. ¶¶ 33–39. Dr. Murphy's approach is analytically unsound and, in any event, says nothing about Dr. Marx's actual findings.

F. **<u>Dr. Alan S. Frankel's Model Is Reliable</u>**

In the *Oxbow* litigation, Defendants UP and BNSF ask this Court to broadly exclude the "expert opinions" offered by Oxbow's damages expert, Dr. Alan S. Frankel, based on two footnotes in the 93-page expert report offered by their own joint expert, Dr. Carlton. Mot. 14–15 (citing DA24449). While Defendants include Dr. Frankel's expert report as an exhibit, they do not actually cite, let alone discuss, that report anywhere in their motion (or anywhere else in their voluminous filings), nor do they offer guidance to the Court—or the parties—as to which of Dr. Frankel's opinions should be excluded.

Defendants' request is based on the false premise that Dr. Frankel's econometric overcharge model must have the same issues as were discussed with respect to the MDL I class certification expert's separate class-wide damage model—a model which is not proffered by any Plaintiff here. Defendants wrongly claim that "Dr. Frankel's model produces overcharges on [redacted]

[redacted].” Mot. 15 (emphasis removed).

Yet, Dr. Frankel *already responded* to Defendants’ self-serving argument and dispensed with it at his deposition. Though Defendants conveniently ignore this testimony, Dr. Frankel explained that Dr. Carlton [redacted] PX0955, Frankel Dep. at 86, 257–59.

Indeed, Dr. Frankel testified that [redacted]. He stated:

> [redacted]

*Id.* at 258–59.

In other words, Dr. Frankel’s econometric model treats any shipment made under a pre-July 2003 pricing authority as a benchmark shipment. DA21312; PX0830, Frankel Rpt. ¶¶ 72–73; PX0955, Frankel Dep. at 82. Because of this, Dr. Frankel measures damages *against* pricing authorities entered into before July 2003. Thus, [redacted] PX0955, Frankel Dep. at 82. And so, when Dr. Carlton removes those benchmark

shipments from Dr. Frankel's model to "test" the model's reliability, Dr. Carlton fundamentally changes the way that Dr. Frankel's model works. As Dr. Frankel advises, [redacted] *Id.* at 86; *see also id.* at 82–87.

UP and BNSF's cursory arguments for excluding Dr. Frankel's econometric overcharge model based on "false positives" never address the safeguards that Dr. Frankel implemented to preclude false positives. Therefore, they have not provided a colorable basis for excluding any of Dr. Frankel's opinions.

### G. **Honda's Experience During the Conspiracy Further Demonstrates Drs. Bernheim and Marx's Methods Are Reliable**

In search of examples to support their "false positives" theory, Defendants cite to two automobile shippers— Honda and Ford—to highlight purported issues with Plaintiffs' experts and their reports. Defendants cherry-picking of two Plaintiffs (out of over 200) fails to provide any further basis to exclude Plaintiffs' experts on "false positives" grounds.[9]

Defendants cite Honda, for example, for the proposition that Dr. Bernheim's MDL II damages model, as applied by Dr. Marx, finds damages for Honda where none could exist (according to Defendants), as "supposedly conspiratorial fuel surcharges [redacted]

[9] Defendants' use of Honda and Ford as examples broadly to exclude Drs. Bernheim and Marx's work across all their respective Plaintiffs—or to exclude *other unrelated* experts' work—is also entirely inappropriate. Honda and Ford are their own Plaintiffs, in their own cases, and Honda's and Ford's specific damages are exactly that—specific to Honda and Ford. Even if Defendants raised appropriate concerns regarding Drs. Bernheim and Marx's work with respect to Honda and Ford, which they do not, those concerns do not extend to *other* Plaintiffs' cases, or *other* Plaintiffs' experts. Instead, Defendants attempt to again inappropriately apply Rule 23 concepts across all Plaintiffs and across all experts, even though Rule 23 has no role to play in the cases before the Court.

[redacted]." Mot. 15. But this misstates the facts, and mischaracterizes Drs. Bernheim and Marx's work.

At the onset, Defendants imply that the FSCs Honda paid to Defendants, particularly around [redacted], and thus cannot serve as a source of damages. Mot. 15–16. At most, however, Defendants raise a factual dispute about the origins of the FSCs paid by Honda and what was [redacted] To hear Defendants tell it, Honda's FSC payments [redacted]. Far from it. [redacted]. *See* PX0956, P_AHMC_000001 at '05. [redacted] *Id.* at '007. [redacted] *Id.* at '008 [redacted]). After repeated pleas, and beginning in 2003 and 2004, [redacted]. Mot. 16 [redacted]).

Defendants suggest this FSC could not be a source of damages because [redacted], differed in some respects from BNSF's "standard" FSC, and was supposedly [redacted] Mot. 16. [redacted] For example, Honda's Logistics Manager Scott Crail testified:

[redacted]

PX0957, Crail (Honda) Dep. 33, 37–38; *see also id.* 33–34 (recounting [redacted]. [redacted]. *Id.* 155–56. In any event, Defendants' criticisms go at most to the weight of Dr. Bernheim and Dr. Marx's expert work at trial, not its admissibility. *See, e.g. Rail Freight II*, 292 F. Supp. 3d at 61.[10] Defendants are free to press their story of "voluntary" FSCs at trial with Honda, but they are incorrect that all parties agree damages could not exist as to these shipments.

Defendants' use of Honda also highlights their fundamental misunderstanding of Dr. Bernheim's work. As described above, Dr. Bernheim reports that even where cartel members conspire to fix posted prices, collusion can be highly effective and impact shippers with non-standard FSC provisions. *See* PX0770, Bernheim and Marx MDL II Honda Rpt. ¶ 97. Indeed, it is a well-recognized principle of antitrust law that purchasers are harmed by a conspiracy to fix prices even when they are ultimately able to negotiate something lower. *See, e.g.*, *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) (plaintiffs may "prove at trial that . . . the price range was affected generally," despite individual customer negotiations on price); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88 (D.

[10] Defendants also incorrectly describe other Honda facts, confirming the dispute. For example, a [redacted] PX0959, P_AHMC_000076 at '80. Further, [redacted] PX0960, BNSF_II_03871107. Defendants' misunderstanding of the record only highlights the inappropriateness of using Honda in support of their larger *Daubert* motion, as noted above.

Conn. 2009); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 638 (D. Kan. 2008). Thus, to the extent Honda's all-in prices were ultimately less than they would have been under the *standard* FSC, this says nothing about whether Honda was impacted and damaged by the conspiracy. And Defendants themselves offer no citation to support their position that Honda could not have been damaged by the alleged conspiracy simply because it had some shipments with a non-standard FSC [redacted] on it. *See* Mot. 15–17.

Defendants likewise misunderstand Dr. Marx's work. Dr. Marx's methodology econometrically tests all shipments with an associated FSC during the conspiracy—not just shipments with a "standard" conspiratorial FSC—to provide a reliable estimate of each Plaintiff's overcharges at the level of all-in rates. S*ee* PX0770, Bernheim and Marx MDL II Honda Rpt. at § IV.D.5; PX0954, Marx MDL II Honda Rebuttal Rpt. ¶¶ 59, 70; *see also* PX0953, Marx MDL II Rebuttal Dep., Jan. 24, 2024, at 148:1–7. Dr. Marx's methodology analyzes whether Honda's FSC paying traffic was impacted by the conspiracy, considering a multitude of relevant factors. *See* PX0770, Bernheim and Marx MDL II Honda Rpt. at § VI.A. The fact that Dr. Marx determines Honda was damaged on shipments involving a non-standard FSC from the use of a reliable, appropriate methodology is not an appropriate basis to exclude her work as generating "false positives."

H. **<u>Ford's Damages Are Not a "False Positive," and Its Experience with FSCs Does Nothing to Undercut the Work of Drs. Bernheim and Marx.</u>**

As with Honda, Defendants suggest that Ford did not "pay surcharges that were more aggressive than before the alleged conspiracy." Mot. 15. This is a false assertion that Defendants make through sleight of hand, by conflating the two very separate lines of Ford's rail freight transport [redacted]. *See* PX0961 Del Corvo (Ford) Dep. at 29–30. Ford

inbound and outbound rail contracts were always separate, and, for much of the conspiracy period, negotiated by separate contracting teams for Ford: Ford relied on UPS Autogistics to negotiate its outbound rail contracts, and Ford in-house logistics personnel for its inbound contracts. Significantly, Ford's outbound shipment volume was vastly greater than its inbound volume. As an example, when [redacted]. PX1200, Bernheim and Marx MDL II Ford Rpt. Appx. E.3.

While Ford paid some carrier-imposed rate-based FSCs on inbound parts freight prior to 2003, Dr. Marx identified and controlled for these in her analysis by stripping out "legacy" contracts. As Defendants acknowledge, [redacted] *See* PX0962 Markwardt (Ford) Dep. at 240–41. But Ford did not begin paying FSCs on its much more substantial *outbound*, finished vehicle contracts until 2004. That Ford could not escape the railroads' rate-based FSCs on this more substantial revenue during the conspiracy period speaks to the efficacy of the conspiracy.

Defendants make much ado over the fact that 2005 negotiations between Ford and BNSF over an outbound finished vehicle contract included a [redacted].[11] Mot. 17–18. That Ford was in some instances able to negotiate a "non-standard" FSC provision does nothing to undercut its experts' findings, as discussed *supra*. Further, the language in the BNSF contract itself confirms this is a distinction without a difference. Per the contract, the [redacted] *See* PX0963,

[11] Of course, negotiating and paying a "non-standard" FSC is no basis to single out Ford amongst MDL II Plaintiffs. And, as discussed, *supra*, a plaintiff still suffers antitrust injury when negotiating off a conspiratorially set price.

BNSF_II_03866804 at '810 (emphasis added). In other words, this was [redacted]

This [redacted] translation did not provide Ford any relief from BNSF's oppressive FSCs. Indeed, the most senior BNSF executives celebrated the contract's execution. BNSF's Marc Allen, in an email to BNSF's CEO Matt Rose, noted that the contract provided a [redacted] PX0964, BNSF-0617595. As Allen put it at the time, [redacted] *Id.* Mr. Rose agreed, noting this contract [redacted] *Id.*

Defendants (Mot. 18) also takes issue with Ford entering into a contract extension with BNSF [redacted].[12] Well, so what? Defendants have yet to admit to any conspiracy. And Ford needs rail to ship its vehicles—Defendants certainly have not argued Ford could have just elected to forego paying an FSC. This provides no basis to exclude the opinions of Dr. Bernheim and Dr. Marx or any Plaintiffs' expert opinion given in this matter.

---

12 [redacted]

Dated: October 18, 2024

Respectfully submitted,

/s/ *Michael D. Hausfeld*
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo
James Hamilton
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com
jhamilton@hausfeld.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell Recycling Southeast, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources*

/s/ *Sami H. Rashid*
Sami H. Rashid
Richard I. Werder, Jr.
Alexandre J. Tschumi
Alexandria ("Alexee") Deep Conroy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com
rickwerder@quinnemanuel.com
alextschumi@quinnemanuel.com
alexeeconroy@quinnemanuel.com

Alicia Cobb
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Facsimile: (206) 905-7100
aliciacobb@quinnemanuel.com

Viola Trebicka
Jennifer English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com

*Attorneys for Plaintiffs Dust Pro, Inc., Olin Corporation, U.S. Magnesium, Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company,*

*Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*<u>/s/ William J. Blechman</u>*
Richard Alan Arnold
William J. Blechman
Douglas H. Patton
Michael A. Ponzoli
Joshua B. Gray
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100

*LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars (KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors*

Miami, Florida 33131
Tel: (305) 373-1000
E-mail: raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Heidelberg Materials US, Inc. (f.k.a.Lehigh Hanson, Inc.), PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

/s/ *Craig P. Seebald*
Craig P. Seebald (D.C. Bar No. 438968)
Stefanie Jackson (D.C. Bar No. 1673265)
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com
sjackson@velaw.com

Jason M. Powers
James L. Leader, Jr.
VINSON & ELKINS L.L.P.
845 Texas Avenue, Suite 4700
Houston, Texas 77002
(713) 758-2522
(713) 615-5809 (Facsimile)
jpowers@velaw.com
jleader@velaw.com

/s/ *John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854)
Daniel M. Jaffe (D.C. Bar No. 461185)
SLOVER & LOFTUS LLP
1828 L Street, NW

*America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun*

Suite 1000
Washington, D.C. 20036
(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining, LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Constellation Energy Generation, LLC, f/k/a Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company, d/b/a WE Energies*

/s/ David C. Eddy
David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Anheuser-Busch, LLC; Anheuser-Busch Companies, LLC; Nestlé Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

/s/ Joseph M. Vanek
Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (admitted *pro hac vice*)
SPERLING & SLATER, LLC
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiff Mitsubishi Motors North America, Inc.*

*Purina PetCare Company; and Nestlé USA, Inc.*

/s/ *Raj Mathur*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Raj Mathur
Scott Glass
SUSMAN GODFREY, L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: 212-336-8330
rmathur@susmangodfrey.com
sglass@susmangodfrey.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales,*

/s/ *Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
Caitlin R. Thomas
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com
caitlin.thomas@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

/s/ *Kristopher S. Davis*
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500

*LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

/s/ *Kirk T. May*

Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

*Attorneys for Plaintiffs*

Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

/s/ *David J. Lender*

David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000

*Lansing Ethanol Services, LLC, et al.*

Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com
luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

/s/ *Benjamin D. Brown*
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
Sabrina Merold (D.C. Bar No. 1738065)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

/s/ *James P. Denvir*
James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)
James Grippando (*pro hac vice*)

/s/ *Michael Schaper*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

/s/ *Nathan P. Eimer*
Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
dbirk@eimerstahl.com

BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

*/s/ Michael C. Dell'Angelo*
Michael C. Dell'Angelo (Bar No. PA0090)
Michael J. Kane
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
mwallin@bm.net

Daniel J. Walker (Bar No. 219439)
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, D.C. 20001
(202) 559-9740

srazzano@eimerstahl.com
bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

*/s/ Daniel B. Goldman*
Daniel B. Goldman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company, Tronox Inc., and Tronox US Holdings Inc.*

dwalker@bm.net

Sophia Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd.
La Mesa, CA 91942
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

*/s/ Leo D. Caseria*
Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

*/s/ Kayleigh T. Keilty*
Kayleigh T. Keilty (Bar No. 18969)

*/s/ Ronald J. Aranoff*
Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

*/s/ Conte C. Cicala*
Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

Austin G. Strine (Bar No. 20637)
SAUL EWING LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-4359
(410) 332-8603 (telephone)
(410) 332-8081 (facsimile)
kayleigh.keilty@saul.com
austin.strine@saul.com

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

James A. Morsch
Casey T. Grabenstein
SAUL EWING LLP
161 N. Clark St., Suite 4200
Chicago, Illinois 60601
jim.morsch@saul.com
casey.grabenstein@saul.com

*Attorneys for Plaintiff Environmental Protection & Improvement Company, LLC*

*<u>/s/ Roman M. Silberfeld</u>*
Roman M. Silberfeld
D.D.C. Bar ID: CA00002
ROBINS KAPLAN LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5800
Email: rsilberfeld@robinskaplan.com

Stephen P. Safranski (admitted *pro hac vice*)
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
Email: ssafranski@robinskaplan.com

*Counsel for Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on October 18, 2024, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF electronic filing system, which automatically notifies counsel of record for all parties of the filing, and was served by secure transfer on all counsel of record in the above-captioned matters.

*/s/ Sami Rashid*
Sami Rashid