**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br><br>No. 1:07-mc-00489-PLF |
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH)<br><br>**Oral Argument Requested** |

**Plaintiffs' Opposition to**
**Defendants' Motion Under Federal Rules of Evidence 702 and 403**
**to Exclude Average Damages Opinions**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ III

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. DEFENDANTS ASK THE COURT TO STEP OUTSIDE THE BOUNDARIES OF RULE 702 ........ 3

A. Under Rule 702, as long as an expert opinion employs a reasonable method, it is for the jury to decide how to weigh it ........ 3

1. The persuasiveness of an expert's conclusion is for the fact finder to decide, not a matter for summary judgment ........ 4

2. Defendants' cases on relevance standards do not address, much less criticize, the use of regressions as evidence in individual cases ........ 5

B. Defendants' argument against the use of econometric techniques incorrectly conflates Rule 23 class action standards with Rule 702 admissibility standards ........ 6

II. REGRESSION-BASED APPROACHES, BEING A WIDELY ACCEPTED METHOD FOR MEASURING ANTITRUST DAMAGES, SATISFY RULE 702 ........ 8

A. Antitrust plaintiffs must present evidence from which a just and reasonable estimate of their damages may be inferred; absolute certainty as to the but-for world is neither possible nor required ........ 8

B. Courts recognize that regression modeling and other econometric techniques are widely accepted in assessing price-fixing damages in complex markets ........ 9

C. Criticisms that a regression model or other statistical model does not consider all necessary factors or apply in all situations are typically weight issues for the jury, not barriers to admissibility ........ 11

D. Defendants' cases on the use of "averages" do not reject regression models of the kind at issue here ........ 14

E. Statistical evidence is not "disfavored" by courts, as Defendants contend ........ 17

F. Defendants' hypothetical "individual-facts-only" approach is at odds with fundamental economic principles and the nature of the alleged conspiracy ........ 18

III. PLAINTIFFS' EXPERTS' DAMAGES METHODOLOGIES ARE RELIABLE, RELEVANT, AND ADMISSIBLE ........ 20

A. Dr. Douglas Bernheim and Dr. Leslie Marx ........ 21

1. Dr. Bernheim's model is a reliable foundation for Marx's model ........ 21

2. The Bernheim/Marx models work together to reliably and conservatively estimate damages for each plaintiff ........ 22

3. Dr. Marx's reliance on Dr. Bernheim is a well-accepted approach ........ 24

4. Dr. Marx's second-step model provides a reliable, plaintiff-specific estimate of damages under Daubert ........ 25

(i) Dr. Marx does not "make [anything] worse," and reliably considers individual circumstances for each Plaintiff. ........ 25

(ii) Dr. Marx does not treat every use of FSCs as conspiratorial ........ 27

(iii) Dr. Marx's model is not "hard-wired" to find damages. ........ 28

B. Dr. Allen Jacobs ........ 29

1. Using a well-established methodology to control for both general and specific factors, Dr. Jacobs found impact and damages ........ 30

2. Dr. Jacobs' approach addresses individual shipper circumstances ........ 33

3. Dr. Jacobs' approach resolves Defendants' arguments about modeling FSC formulas or coverage ........ 34

C. Dr. Jeffrey Leitzinger and Dr. James McClave ........ 36

1. Dr. Leitzinger's methodology ........ 37

2. Dr. McClave's methodology ........ 39

3. Defendants mischaracterize Drs. Leitzinger and McClave's approaches ........ 40

4. Dr. Leitzinger and Dr. McClave's results corroborate one another ........ 44

D. Dr. James Reitzes ........ 44

CONCLUSION ........ 46

# TABLE OF AUTHORITIES

**Cases**

*Ambrosini v. Labarraque*,
101 F.3d 129 (D.C. Cir. 1996) .......... 3, 4

*Bazemore v. Friday*,
478 U.S. 385 (1986) .......... 11

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) .......... 6

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) .......... 8

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) .......... 6, 15

*Blue Dane Simmental Corp. v. American Simmental Ass'n*,
178 F.3d 1035 (8th Cir. 1999) .......... 19

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......... 6

*Carmichael v. West*,
2015 WL 10568893 (D.D.C. Aug. 31, 2015) .......... 4

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) .......... 17

*Concord Boat Corp. v Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2002) .......... 19

*Conwood Co. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) .......... 13, 14

*Cortes-Irizarry v. Corporacion Insular De Seguros*,
111 F.3d 184 (1st Cir. 1997) .......... 5

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......... passim

*Dominguez v. UAL Corp.*,
666 F.3d 1359 (D.C. Cir. 2012) .......... 17

*Eastman Co. v. Southern Photo Co.*,
273 U.S. 359 (1927) .......... 8

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
301 F. Supp. 2d 612 (2003) .......... 18

*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*,
213 F.3d 198 (5th Cir. 2000) .......... 17

*Gates v. Rohm & Haas Co.*,
655 F.3d 255 (3d Cir. 2011) .......... 6, 15

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)........................................................................................ 18

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ........................................................................ 17

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018)............................................................................... 6

*In re Capacitors Antitrust Litig.*,
2021 WL 5407452 (N.D. Cal. Nov. 18, 2021) ............................................. 12

*In re Domestic Drywall Antitrust Litig.*,
322 F.R.D. 188 (E.D. Pa. 2017)..................................................................... 16

*In re Flash Memory Antitrust Litig.*,
2010 WL 2332081 (N.D. Cal. June 9, 2010)..................................................... 6

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008)................................................................ 6, 15

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ............................................................................ 9

*In re High-Tech Employee Antitrust Litig.*,
2014 WL 1351040 (N.D. Cal. Apr. 4, 2014)...................................................... 9

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) ............................................................................. 6

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) .............................................................. 6

*In re LinerBoard Antitrust Litig.*,
497 F. Supp. 2d 666 (E.D. Pa. 2007)............................................................... 10

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ....................................................... 17, 19

*In re Neurontin Mktg. & Sales Pracs. Litig.,*
712 F.3d 21 (1st Cir. 2013)............................................................................... 9

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014)...................................................................... 6

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ............................................................................. 18

*In re Pharm. Benefit Mgrs. Antitrust Litig.*,
2017 WL 275398 (E.D. Pa. Jan. 18, 2017)........................................................ 6

*In re Pre-Filled Propane Tank Antitrust Litig.*,
2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) .............................................. 6, 15

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 124 (E.D. Pa. 2015)................................................................... 6, 15

*In re Rail Freight Antitrust Litig.*,
292 F. Supp. 3d 14 (D.D.C. 2017).................................................................... 2

*In re Southeastern Milk Antitrust Litigation*,
739 F.3d 262 (6th Cir. 2014) .......... 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2012 WL 6708866 (N.D. Cal. Dec. 26, 2012),
*aff'd*, 637 F. App'x 981 (9th Cir. 2016).......... 24

*In re Titanium Dioxide Antitrust Litig.*,
284 F.R.D. 328 (D. Md. 2012).......... 6, 16

*In re Urethane Antitrust Litigation,*
166 F. Supp. 3d 501 (D.N.J. 2016) .......... 24, 25

*In re Vitamins Antitrust Litig.,*
No. 99–MC–00179, MDL No. 1285 (D.D.C. Mar. 20–21, 2003).......... 25

*In re Wholesale Grocery Prods. Antitrust Litig.,*
2018 WL 3862773 (D. Minn. Aug. 14, 2008) .......... 17

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981).......... 8

*Johnson Elec., N. America v. Mabuchi Motor Am.*,
103 F. Supp. 2d 268 (S.D.N.Y. 2000) .......... 9

*Joy v. Bell Helicopter Textron, Inc.*,
999 F.2d 549 (D.C. Cir. 1993).......... 18

*Khairkhwa v. Obama*,
793 F. Supp. 2d 1 (D.D.C. 2011).......... 4

*Krim v. pcOrder.com, Inc.*,
402 F.3d 489 (5th Cir. 2005) .......... 18

*McReynolds v. Sodexho*,
349 F. Supp. 2d 30 (D.D.C. 2004).......... 3

*Meister v. Medical Engineering Corp.*,
267 F.3d 1123 (D.C. Cir. 2001).......... 5

*Nebraska Plastics, Inc. v. Holland Colors Ams., Inc.*,
408 F.3d 410 (8th Cir. 2005) .......... 18

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
998 F.2d 1224 (3d Cir. 1993) .......... 9

*Pickett v. Iowa Beef Processors*,
2003 WL 24275809 (M.D. Ala. Apr. 10, 2003) .......... 13

*Reed v. Advoc. Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009).......... 15

*Resco Prod., Inc. v. Bosai Mins. Grp.*,
2015 WL 5521768 (W.D. Pa. Sept. 18, 2015).......... 14

*Riss & Co. v. Association of American Railroads*,
190 F. Supp. 10 (D.D.C 1960),
*aff'd sub nom. Ass'n of W. Rys. v. Riss & Co.*, 299 F.2d 133 (D.C. Cir. 1962).......... 17

*Robinson v. GEICO Gen. Ins. Co.*,
447 F.3d 1096 (8th Cir. 2006) .......... 4

*Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*,
161 F.3d 77 (1st Cir. 1998) .......... 4

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
556 F. Supp. 825 (D.D.C. 1982) .......... 17

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
282 U.S. 555 (1931) .......... 8

*Sun Microsystems Inc. v. Hynix Semiconductor*, Inc.,
608 F. Supp. 2d 1166 (N.D. Cal. 2009) .......... 9

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) .......... 6, 12

*United States v. 1.161 Acres of Land in Birmingham, Alabama*,
837 F.2d 1036 (11th Cir. 1988) .......... 13

*United States v. Downing*,
753 F.2d 1224 (3d Cir. 1985) .......... 5

*United States v. DynCorp Int'l LLC*,
2024 WL 604923 (D.D.C. Jan. 25, 2024) .......... 4

*United States v. McGill*,
815 F.3d 846 (D.C. Cir. 2016) .......... 5

*United States v. Mitchell*,
365 F.3d 215 (3d Cir. 2004) .......... 4

*United States v. Naegele*,
471 F. Supp. 2d 152 (D.D.C. 2007) .......... 3

*United States v. Veysey*,
334 F.3d 600 (7th Cir. 2003) .......... 18

*Walen v. United States*,
2019 WL 4261160 (D.D.C. Sept. 9, 2019) .......... 3, 5

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 6

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969) .......... 9

**Rules**

FED. R. CIV. P. 403 .......... 4

FED. R. EVID. 702 .......... passim

**Other Authorities**

ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES
(3d ed. 2017) .......... 1, 10, 34

ALLEN, HALL & LAZEAR, REFERENCE MANUAL ON SCI. EVIDENCE: REFERENCE GUIDE ON ESTIMATION OF ECON. DAMAGES (3d ed. 2011) ..... 11

Connor, *Forensic Economics: An Introduction with Special Emphasis on Price Fixing*, 4 J. COMPETITION L. & ECON. 53 (2008) ..... 11

Harrington, J.E. Jr., and L. Ye., *Collusion though Coordination of Announcements*, 67 J. OF INDUS. ECON. (2019) ..... 36

Herbert Hovenkamp, *Economic Experts in Antitrust Cases*, 5 MOD. SCI. EVIDENCE § 44:8 (2023-2024 Edition) ..... 10

Johnathan B. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, AM. L. & ECON. REV. 386 (1999) ..... 10

Johnson, et al., *Statistical Significance and Statistical Error in Antitrust Analysis*, 81 ANTITRUST L.J. 641 (2017) ..... 10

McCrary & Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation*, 3 J. ECONOMETRIC METHODS 63 (2014) ..... 10

## INTRODUCTION

In their *Daubert* Motion (MDL II Dkt. 986), Defendants seek exclusion of the causal injury and damages opinions rendered by six highly qualified economists and econometricians, based almost entirely on the misleading claim that regression analysis is nothing more than an "average damages" approach. That is wrong. Regression analysis is a standard tool of economic and econometric analysis,[1] already deemed reliable and admissible in these cases by Judge Friedman.

Defendants scarcely mention the Plaintiffs' experts' actual methodologies, which bear no resemblance to "average damages." Each expert produced separate damages estimates for each Plaintiff, and those estimates varied widely as a percentage of each shipper's rail freight spending. To isolate and measure the effect of the Defendants' conspiracy, Plaintiffs' experts analyzed railroad transaction data, controlling for thousands of specific characteristics over millions of shipments—specific shippers, origins and destinations, commodities transported, and more—as well as macroeconomic factors like railroad costs and demand. Defendants' portrayals of Plaintiffs' opinions as "average" damages ignore the sophistication of the experts' methods, which are widely accepted by courts to prove causal injury and quantify damages in price-fixing cases like this one. Defendants' expert admitted as much in testimony and in his own damages treatise.

Rather than address Plaintiffs' experts' methodologies, Defendants incorrectly posit that federal courts disfavor the use of statistical evidence in general, and argue that this imagined hostility to statistics must also apply to econometric regressions. Misconstruing and misapplying

---

[1] "Econometrics refers to a set of statistical methods or tools that economists use to assess antitrust damages. Regression analysis is the most common tool of econometrics. It enables one to uncover the relationship between a dependent variable (the outcome being modeled, such as prices) and one or more explanatory variables (the potential influences on the dependent variable, such as anticompetitive conduct, supply factors including costs or capacity, and demand factors)." ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES (3d ed. 2017) ch. 6.

cases from outside the antitrust context, Defendants ignore the fact that market-wide statistical analysis is not just an evidentiary option in an antitrust case; it is a virtual necessity to demonstrate and measure competitive harm. Defendants also rely heavily on inapposite *class certification* decisions, in which a court considers whether the parties may need to present individual evidence in addition to whatever statistical models might be advanced. Those issues have already been considered and decided in these *Rail Freight* cases: Judge Friedman denied certification because there were individual questions concerning plaintiffs whose damages were *not* estimated using regression. But that was after Judge Friedman concluded that regression is a reliable, mainstream economic tool producing injury and damages analyses admissible under Rule 702.[2]

Defendants now seek to relitigate the question they lost before Judge Friedman. They ask this Court to hold that econometric regression methods are inherently unreliable and irrelevant. But Defendants *do not cite a single case* in which a court held that regression analysis is an inadmissible "average damages" approach when used to estimate damages in individual price-fixing cases. Defendants offer the Court no reason to adopt that view, which would represent a sea change in antitrust damages law.

Defendants' Motion to exclude should be denied as to each of Plaintiffs' experts.[3]

[2] *In re Rail Freight Antitrust Litig.*, 292 F. Supp. 3d 14, 58-59, 140 (D.D.C. 2017) ("*Class Cert. II*") ("[R]egression analysis is generally a reliable method for determining damages in antitrust cases and is 'a mainstream tool in economic study.' … Dr. Rausser created the damages model using sufficient data and widely accepted methods, and the model is testable by defendants' experts and plaintiffs' supplemental experts. This is sufficient for admissibility under Rule 702 and *Daubert*.").

[3] Defendants move to exclude the opinions of Drs. McClave and Leitzinger with respect to their MDL I and MDL II reports; and the opinions of Drs. Bernheim, Jacobs, Marx, and Reitzes with respect to only their MDL II reports. Defendants do not bring this Motion against Plaintiff experts in the *Oxbow* matter.

## ARGUMENT

### I. DEFENDANTS ASK THE COURT TO STEP OUTSIDE THE BOUNDARIES OF RULE 702.

Defendants' motion misstates the standard for admissibility of expert testimony, particularly in the context of summary judgment. To determine admissibility under Rule 702 and *Daubert*, the Court evaluates the experts' *methodologies*; the persuasiveness of the experts' *conclusions* is a question for the factfinder.

#### A. Under Rule 702, as long as an expert opinion employs a reasonable method, it is for the jury to decide how to weigh it.

Rule 702 governs the admissibility of expert testimony and requires that testimony be based on "sufficient facts or data," be "the product of reliable principles and methods," and "reflect[] a reliable application of the principles and methods to the facts of the case." Rule 702 does not require the Court to usurp the role of the jury in weighing the evidence. Once the Court determines the experts' *methodology* is reliable, it is for the factfinder to decide what weight to give the expert's *opinion*.

In the D.C. Circuit, the twin requirements for the admissibility of expert testimony are evidentiary reliability and relevance. *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996); *see United States v. Naegele*, 471 F. Supp. 2d 152, 156-57 (D.D.C. 2007); *McReynolds v. Sodexho*, 349 F. Supp. 2d 30, 34-35 (D.D.C. 2004). To establish reliability, the party proffering the expert need not prove the expert's opinions are correct, but only that a qualified person has reached the opinions in a sound and methodologically reasonable manner. *Walen v. United States*, 2019 WL 4261160, at *14 (D.D.C. Sept. 9, 2019). Thus, the court "must focus 'solely on principles and methodology, not on the conclusions that they generate.'" *Ambrosini*, 101 F.3d at 133. With respect to relevance, the court must determine whether the proffered testimony is sufficiently tied to the facts of the case and whether it will aid the jury in resolving a factual dispute.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993). "The dispositive question is whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial." *Ambrosini*, 101 F.3d at 135 (citation omitted).

"In general, Rule 702 has been interpreted to favor admissibility." *United States v. DynCorp Int'l LLC*, 2024 WL 604923, at *3 (D.D.C. Jan. 25, 2024). Hence, "the rejection of expert testimony is the exception rather than the rule." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006); *accord Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 10 (D.D.C. 2011).

**1. *The persuasiveness of an expert's conclusion is for the fact finder to decide, not a matter for summary judgment*.**

As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversarial process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny. *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (reversing exclusion of expert under FED. R. CIV. P. 403)).

In considering the admissibility of expert testimony under Rule 702, "[c]ourts are not permitted to pass on the merits of the expert's scientific conclusions and must refrain from evaluating the credibility of opposing experts and the persuasiveness of competing studies." *See Carmichael v. West*, 2015 WL 10568893, at *8 (D.D.C. Aug. 31, 2015) (Howell, D.J.) (citations omitted). Unless the expert's assumptions amount to nothing more than "rampant speculation," expert testimony should not be excluded; the challenge to an expert's conclusions should "appropriately" be "on cross examination." *Id.*

That permissive standard is particularly important when, as here, a party seeks to exclude expert testimony at the summary judgment stage. The movant "faces a steep burden to exclude

expert testimony" at the summary judgment stage. *Walen*, 2019 WL 4261160, at *14. A court "must be cautious—except when defects are obvious on the face of a proffer—not to exclude debatable scientific evidence [at summary judgment] without affording the proponent of the evidence adequate opportunity to defend its admissibility." *Id.* (quoting *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997)) ("[T]he *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage.").

**2. *Defendants' cases on relevance standards do not address, much less criticize, the use of regressions as evidence in individual cases*.**

Defendants argue Rule 702's relevance standard implies that "expert calculation of averages" can never be admitted as evidence. Mot. 13-15. Setting aside for now whether regression-based models calculate "averages" or how those models are used in price-fixing cases, Defendants' authorities simply do not hold that Rule 702's relevance requirement bars the use of statistical methods in individual cases. *See*, *e.g.*, *United States v. McGill*, 815 F.3d 846, 902-03 (D.C. Cir. 2016) (excluding "voice spectrographic analysis" when method was not generally accepted and subject was within lay comprehension); *Meister v. Medical Engineering Corp.*, 267 F.3d 1123, 1129-32 (D.C. Cir. 2001) (excluding testimony on health impacts of silicone breast implants, when the expert used a novel, non-statistical method in face of contrary statistical evidence); *United States v. Downing*, 753 F.2d 1224, 1226, 1238 (3d Cir. 1985) (pre-*Daubert*, reversing exclusion of expert testimony on eyewitness identification reliability, and setting forth a flexible approach to the admissibility of novel scientific evidence).

Defendants' cases do not change the established standards of Rule 702: the admissibility of expert testimony depends on the reliability of the scientific principles and techniques, the potential for confusion or prejudice, and the fit between the scientific research and the disputed factual issues. As discussed further below, Plaintiffs' experts meet these standards.

### B. Defendants' argument against the use of econometric techniques incorrectly conflates Rule 23 class action standards with Rule 702 admissibility standards.

Defendants cite almost no authority relating to the admission of expert testimony at the merits stage, much less relating to price-fixing damages. Instead, Defendants cite at least *seventeen* decisions addressing *class certification* under *Rule 23*.[4] The different contexts of the procedural (Rule 23) analysis and the evidentiary (Rule 702) analysis render Defendants' authorities irrelevant.

As discussed above, in a *Daubert*/Rule 702 analysis, the court considers only whether expert opinions are reliable and helpful to the trier of fact. *Daubert*, 509 U.S. at 594–95. But courts conduct a different, additional inquiry when deciding class certification under Rule 23: specifically, whether common questions predominate over individual ones so thoroughly that absent class members may be disregarded—that they need not be subjected to discovery, not subjected to cross-examination, and may be adjudicated as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *See Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979).

---

[4] *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ("GPU"); *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124 (E.D. Pa. 2015); *In re Pre-Filled Propane Tank Antitrust Litig.*, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021); *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011); *Reed v. Advoc. Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 305-06 (5th Cir. 2003); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171 (E.D. Pa. 2015); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081 (N.D. Cal. June 9, 2010); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D. Cal. 2014); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016); *In re Pharm. Benefit Mgrs. Antitrust Litig.*, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328 (D. Md. 2012); *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184 (3d Cir. 2020); *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018).

In other words, under Rule 23, the court considers whether the available econometric evidence standing alone establishes the element(s) of plaintiffs' claims making *individual evidence of absent class members' injury or damages unnecessary*. That question is not at issue here. Here, class certification has been denied; no one seeks to use econometric models alone, nor does anyone seek to preclude Plaintiffs or Defendants from offering other types of evidence at individual trials to support or challenge the econometric results. Defendants' motion arises under Rule 702, under which a court considers only whether the econometric evidence is relevant and the product of a reliable methodology, not whether it is so conclusive of an individual case that it would render unnecessary any further fact examination relating to an individual plaintiff.

Judge Friedman recognized this very distinction between *Daubert*/702 analysis and Rule 23 analysis at the class certification phase of MDL I. As Judge Friedman held, Rule 23 analysis "goes beyond the scope of the *Daubert* inquiry" and (unlike *Daubert*) "may require evaluating the conclusions and results of competing experts." *Class Cert. II*, 292 F. Supp. 3d at 91; *see also id.* at 42-43. Defendants' Rule 23 cases are therefore inapposite.

Having successfully opposed class certification under Rule 23, Defendants have had the opportunity to take full discovery from all of the MDL I and MDL II Plaintiffs. Indeed, in their Motion, Defendants acknowledge discovery has "produced a record rich in evidence about each Plaintiff's actual negotiations with the railroads, its contracting history, the competitive alternatives for its particular transportation needs, and the market conditions in which those negotiations occurred." Mot. 1. The question on this Motion is not (as it would be under Rule 23) whether Plaintiffs' experts' econometric analyses obviate the need for a Plaintiff or Defendant to proffer evidence at trial of each Plaintiff's individual circumstances; Defendants are free to present such individual circumstances at a given Plaintiff's trial for the jury's consideration. Instead, the

relevant question here is simply whether Plaintiffs' regression-based evidence is relevant and reliable. As discussed below, it is.

## II. REGRESSION-BASED APPROACHES, BEING A WIDELY ACCEPTED METHOD FOR MEASURING ANTITRUST DAMAGES, SATISFY RULE 702.

### A. **Antitrust plaintiffs must present evidence from which a just and reasonable estimate of their damages may be inferred; absolute certainty as to the but-for world is neither possible nor required**.

Defendants concede that *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555 (1931), and *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946), define the standard for proving antitrust damages. Mot. 7. In both cases, the Supreme Court held that quantification of antitrust damages is necessarily "approximate" and predictive—an estimation of "what would have been"—and held that the wrongdoer should bear the risk of uncertainty created by his own conduct: "The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Story Parchment*, 282 U.S. at 561, 563 (citing *Eastman Co. v. Southern Photo Co.*, 273 U.S. 359, 379 (1927)).

Courts therefore apply a flexible and pragmatic approach to antitrust damages. As the Supreme Court explained in *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981), the jury may make "a just and reasonable inference" of plaintiffs' damages based on relevant data. In such circumstances, factfinders are permitted to act on probable and inferential evidence. To hold otherwise would permit antitrust defendants, through their wrongdoing, to cut off recovery, a result the Supreme Court described in *Story Parchment* as a "perversion of fundamental principles of justice." 282 U.S. at 263. Excluding estimated-damages approaches as Defendants suggest "would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure

to apply [the *Story Parchment* standard] would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 124 (1969).

### B. Courts recognize that regression modeling and other econometric techniques are widely accepted in assessing price-fixing damages in complex markets.

As Judge Friedman held at the MDL I class certification stage, regression modeling is a "commonly accepted statistical tool," and "generally a reliable method for determining damages in antitrust cases" that complies with Rule 702. *Class Cert. II* at 54, 55, 58, 59, 63.

Judge Friedman was correct. "Numerous courts have held that regression analysis is a reliable method for determining damages and 'a mainstream tool in economic study.'" *Johnson Elec., N. America v. Mabuchi Motor Am.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000). Courts at all levels—and across jurisdictions—have accepted regression or other econometric analysis in antitrust litigation, including for the exact purpose of estimating damages for which Plaintiffs offer their expert analyses here.[5]

[5] *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262, 285-86 (6th Cir. 2014) ("A multiple regression analysis is useful in quantifying the relationship between a dependent variable (e.g., the price of milk) and independent variables (e.g., energy costs and/or demand factors)," "isolate and identify the effect" of independent variables, and "can be viewed as evidence of antitrust injury."); *In re Neurontin Mktg. & Sales Pracs. Litig.,* 712 F.3d 21, 42 (1st Cir. 2013) ("[R]egression analysis is a well recognized and scientifically valid approach to understanding statistical data, and courts have long permitted parties to use statistical data to establish causal relationships."); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir. 2002) (overturning summary judgment for defendants where the plaintiffs' expert conducted a regression analysis finding prices were higher during the period of the alleged conspiracy); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1238-41 (3d Cir. 1993) (reversing summary judgment where court rejected regression analysis, noting "the scientific method used by the [plaintiff's] economists, multiple regression analysis, is reliable" and "clearly will assist the trier of fact because it makes sense out of pricing data through the use of multiple regression analysis"); *In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at *14 (N.D. Cal. Apr. 4, 2014) ("[N]umerous courts have held that regression analysis is generally a reliable method for determining damages in antitrust cases and is a mainstream tool in economic study.") (internal quotation marks omitted); *Sun Microsystems Inc. v. Hynix Semiconductor*, Inc., 608 F. Supp. 2d 1166, 1206 (N.D. Cal. 2009) (regression supporting causation and antitrust injury); *In re*

As Judge Friedman recognized,[6] academics and experts agree that regression is a valid tool for antitrust damages proof. Indeed, Defendants' expert Dr. Mark Israel remarked in his own published writings on the consistent acceptance of regression analysis to prove antitrust damages:

> Econometric models—particularly those involving regression analysis—are uniquely suited to isolating the effect of a single factor on the market factor of interest, while properly accounting for other relevant factors…. Regression analyses have met [Rule 702] requirements many times in litigation for a wide range of issues, including the estimation of antitrust damages…[7]

CSX expert Dr. John Johnson likewise agreed that regression-based approaches are "often used" by economists in antitrust cases.[8] These opinions are shared by the leading academics in the field. Professor Herbert Hovenkamp explained:

> Using a regression analysis, the expert estimates a non-cartel price for the market, and the amount by which the cartel price exceeded the non-cartel price…. The general rule in a consumer-brought price-fixing action is that the plaintiff is entitled to recover damages equal to the "overcharge" multiplied by the number of units the plaintiff purchased.

Herbert Hovenkamp, *Economic Experts in Antitrust Cases*, 5 MOD. SCI. EVIDENCE § 44:8 (2023-2024 Edition). Regression analysis is a "standard approach" so "well suited" to the proof of antitrust damages that it is recognized as the "world standard."[9]

---

*LinerBoard Antitrust Litig*., 497 F. Supp. 2d 666, 681 (E.D. Pa. 2007) (regression to establish but-for price supporting damages calculation); *In re Vitamins Antitrust Litig*., 209 F.R.D. 251, 267 (D.D.C. 2002) (regression valid method for proving common impact).

[6] *Class Cert. II* at 58 (citing Johnathan B. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, AM. L. & ECON. REV. 386, 392 (1999)).

[7] ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES (3d ed. 2017) ch. 6. Dr. Israel's CV states that he authored this chapter. Expert Report of Mark A. Israel, Ph.D. at 1.

[8] PX988, Johnson MDL II Dep. (Nov. 8, 2023) at 151-52 ("[E]conomists definitely do analyses with respect to regression … [R]egression is a tool we use, and one of the things that it's often used for is trying to assess how behavior is consistent with competition or not.").

[9] Johnson, et al., *Statistical Significance and Statistical Error in Antitrust Analysis*, 81 ANTITRUST L.J. 641 (2017) ("[R]egression analysis is well suited to proof of impact and estimation of damages in antitrust cases."); McCrary & Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation*, 3 J. ECONOMETRIC METHODS 63, 65 (2014) ("One standard approach to the evaluation

### C. **<u>Criticisms that a regression model or other statistical model does not consider all necessary factors or apply in all situations are typically weight issues for the jury, not barriers to admissibility</u>**.

Each of Plaintiffs' experts conducted their own econometric analysis, but all the experts controlled for literally thousands of factors, both broad (economic conditions and railroad cost levels) and shipment-specific (the railroad carrying a shipment, the type of car used, the mileage, even the specific commodity being transported and the specific route it was carried on). *See infra* Part III. Defendants argue that still more factors could have been incorporated into Plaintiffs' models, like the cost of insurance for shipments of chlorine gas (Mot. 22-23)—though, notably, Defendants do not claim that adding such controls to the models would explain the massive price increases throughout the rail freight industry during the conspiracy period.

The argument that a model could include more controls or could account for plaintiff-specific factors in a different way is not an argument about admissibility under Rule 702. The Supreme Court holds that debates about the construction of a particular regression, such as which variables are relevant to a given plaintiff's circumstances, typically go to weight, not admissibility:

> While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable as evidence.... Normally, failure to include [explanatory] variables will affect the analysis' probativeness, not its admissibility.

*Bazemore v. Friday*, 478 U.S. 385, 400 (1986).

---

of overcharges estimates a regression model for the entire period for which data are available, and evaluates damages by looking at the statistical significance and magnitude of the coefficient on a dummy variable that distinguishes the impact period from the control period."); ALLEN, HALL & LAZEAR, REFERENCE MANUAL ON SCI. EVIDENCE: REFERENCE GUIDE ON ESTIMATION OF ECON. DAMAGES (3d ed. 2011) 431-32 ("Many damages studies use statistical regression analysis" which "isolate[s] the loss of value caused by the harmful act"); Connor, *Forensic Economics: An Introduction with Special Emphasis on Price Fixing*, 4 J. COMPETITION L. & ECON. 53-54 (2008) ("Econometric modeling has become the world standard for proving cartel damages").

This is in keeping with the Supreme Court's broader instruction that statistical evidence can be considered in any type of case—and its persuasiveness as to a given plaintiff is for the jury to decide. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454–55, 459 (2016). Though Defendants cite at length to the Court's decision in *Tyson Foods*, they ignore the Court's holding. In that wage case, the plaintiffs advanced an expert's statistical study of the unpaid time the defendants' employees typically spent donning and doffing protective gear. The Court held that such statistical evidence would sustain a jury finding in individual cases, reasoning that a "representative or statistical sample, like all evidence, is a means to establish or defend against liability." *Id.* at 454-55. If prepared according to statistically adequate methods and plausible assumptions, "its persuasiveness is, in general, a matter for the jury," including as to whether the statistical averages capture any individual plaintiff's circumstances:

> Reasonable minds may differ as to whether the average time [the expert] calculated is probative as to the time actually worked by each employee. Resolving that question, however, is the near-exclusive province of the jury.

*Id.*, 577 U.S. at 459.

Given the Supreme Court's admonition, it is unsurprising that courts routinely reject motions to exclude damages regressions in antitrust cases, even when an opponent criticizes the conclusions of the studies. As Judge Friedman held at the MDL I class certification phase, the focus in a *Daubert* inquiry is on the principles and methodology employed by an expert, not on the conclusions reached. *Class Cert. II* at 42-43. For that reason, arguments that an economist ought to have used additional variables in his or her regression, chose to use a constant for a factor when another economist might have preferred a variable input, or might have employed a different regression method, all generally go to the weight of the economist's opinions, not their admissibility. *See id.* at 55, 58; *accord In re Capacitors Antitrust Litig.*, 2021 WL 5407452 (N.D. Cal. Nov. 18, 2021), at *4 (rejecting *Daubert* challenge where experts disagreed about variables

because "[t]here is more than one way to peel an onion, and the use of a different method is not automatically 'junk science' or a 'bogus' approach that warrants total exclusion").

In *Pickett v. Iowa Beef Processors*, the court rejected a nearly identical argument to the one Defendants advance here. 2003 WL 24275809 (M.D. Ala. Apr. 10, 2003). In that price-manipulation class action, the plaintiffs' expert calculated plaintiffs' damages using a regression analysis to calculate an average overcharge. The defendants moved to exclude that testimony "because it is based on the assumption that captive supply had a uniform effect on the cash market price in all parts of the country." *Id.* at *5; *compare* Mot. 16 ("Rail shippers face dramatically different markets and competitive circumstances… No single average could possibly be representative of all of them."). The *Pickett* court rejected the defendants' argument and held that the scope of the market effect was a question for the jury to decide, and that plaintiffs' regression was admissible on that issue:

> As this is merely a factual dispute regarding the basis of [the expert's] opinion, the Court finds that this question is best left to a jury. "Where the expert's testimony has a reasonable factual basis, a court should not exclude it. Rather, it is for opposing counsel to inquire into the expert's factual basis.… As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."

*Pickett*, 2003 WL 24275809, at * 5 (quoting *United States v. 1.161 Acres of Land in Birmingham, Alabama*, 837 F.2d 1036, 1040 (11th Cir. 1988)).

Likewise, in *Conwood Co. v. U.S. Tobacco Co.*, the Sixth Circuit upheld the district court's admission of a regression analysis to prove antitrust damages, which supported a jury verdict in the plaintiff's favor. 290 F.3d 768 (6th Cir. 2002). The defendant argued that plaintiffs' regression analysis should have been excluded because it "ignored other market variables that could have caused [the plaintiff's] harm." *Id.* at 794. The court disagreed, noting that "[i]n order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible

causes of the injury." *Id*. In so doing, it emphasized the relationship between the *Daubert* inquiry and the reasonable standard for proving antitrust damages:

> While [defendant] demands a more exacting standard, [t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. The antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections.

*Id*. at 794-95 (citations omitted). Speculation that a better model could be devised is no barrier to admissibility,[10] particularly because antitrust law imposes liability on wrongdoers even though the jury must estimate damages as compared to a but-for world that cannot be directly observed.

### D. **Defendants' cases on the use of "averages" do not reject regression models of the kind at issue here**.

Defendants argue that "[c]ountless decisions" hold a party cannot rely on "an average" as evidence of injury, damages, or causation, and conclude that Plaintiffs' experts' regression models must therefore be inadmissible. Mot. 10. Defendants misconstrue the cases they cite. None of them treats regression modeling as an impermissible "averaging" of damages, and none of them rejects the use of regression modeling as damages evidence in an individual case.

First, Defendants cite cases (Mot. 10) in which a plaintiff sought to certify a class based on nothing more than changes in literal mathematical averages of some measurement (not regression analyses) to show defendants caused impact to an *entire* class, when it was undisputed that there

---

[10] *Accord In re Urethane Antitrust Litig.*, 166 F. Supp. 3d 501, 509 (D.N.J. 2016) (concluding that "statistical significance issues go to the weight of the models, not their admissibility" and rejecting the position that failing to consider certain variables or using "dummy variables" are fatal to a regression model); *Resco Prod., Inc. v. Bosai Mins. Grp.*, 2015 WL 5521768, at *5, 10-11 (W.D. Pa. Sept. 18, 2015) (admitting expert testimony on pricing regression analysis where expert selected variables based on his knowledge of the relevant industry, holding "[m]erely point[ing] to economic condition[s] that may [] affect[] the dependent variable" is "not enough to call into question the reliability" of an "econometric model") (alterations in original).

were unimpacted persons included in the averaged data.[11] In these cases, because the plaintiff had no method to address undisputed individual variations in a class-wide setting, certification was denied. These "average impact" cases do not address the regression techniques or Rule 702 standards at issue here.

Second, Defendants cite *class certification decisions* in which a court questioned not admissibility, but whether an expert's use of "averages" in a regression pricing model established impact on a common, classwide basis. Even then, the "averages" issue was not over whether regression modeling could be used to estimate class members' damages; rather, the issue was that the *underlying data fed into the regression models* was "averaged" data rather than actual transaction data.[12] In the cited cases, the expert averaged widely-varying pricing data for individual transactions, and then studied the changes in those averages. But because the data had

[11] *Gates v. Rohm & Hass Co.*, 655 F.3d 255, 265-66 (3d Cir. 2011) (average contamination levels measured over large areas and long time periods were not probative evidence that every city resident had been exposed to the chemical agent); *Blades v. Monsanto Co.*, 400 F.3d 562, 573-75 (8th Cir. 2005) (showing average price of all seeds rose during conspiracy period was not sufficient to demonstrate predominance of common issues in price-fixing class action, where evidence indicated some seeds were unaffected).

[12] *In re Pre-Filled Propane Tank Antitrust Litig.*, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) (expert model assumed common impact by first "combin[ing] the revenues and gallons of all retailers in a given month to compute a singular weighted 'average' measure of revenues per gallon" before running a regression on those averages; defendants showed that unaffected retailers were included in the averaged data); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 158-60 (E.D. Pa. 2015) (underlying data was "averaged across entire cities," holding "[t]he confirmatory regressions are based on IRI and CPI data that are averaged at such a high level that they cannot accurately account for whether the individualized differences in geography, price strategy, retailer, and other variables affect the pass-through rate"); *Reed v. Advoc. Health Care*, 268 F.R.D. 573, 590-92 (N.D. Ill. 2009) (regression model of nursing wages did not prove common impact, where the models analyzed changes in average wages rather than changes in each class member's wages, resulting in an imprecise model that could explain only about half of wage effects); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493 (N.D. Cal. 2008) (finding expert "mysteriously chose to *average* certain products and purchases with one another and then correlate instead of correlating disaggregated data for individual products and particular customers" (emphasis in original)).

been pooled and averaged (or, for class purposes, rendered *common*) before the regression was conducted, the regression had nothing to say about whether *individual* impact could be demonstrated on a class-wide basis. Those concerns are not present in this case. Plaintiffs' experts built models using actual transaction-level data (not pre-averaged data), and this is (at Defendants' request) no longer a class action proceeding under Rule 23. In these individual cases, Plaintiffs and Defendants are free to offer individualized evidence at trial alongside econometric evidence.[13]

Last, Defendants cite (Mot. 10) one class-action case in which the plaintiff expert performed a regression analysis for the explicit purpose of calculating "aggregate damages to the class as a whole" over a nine-year period without attempting to distinguish between individual class members.[14] The court did not conclude regression analysis was impermissible or inadmissible; on the contrary, the court accepted the regression and found it established class-wide impact. The court simply held that the method of resolving individual damages questions could be determined at a later time, perhaps through individual damages trials, subclasses, or other means—not unlike the individual trials that will occur in this case. Neither this case nor any of the cases Defendants cite conclude that a regression model, by isolating and measuring the impact of a conspiracy, should be understood as producing "average" damages.[15]

---

[13] *See, e.g.*, *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 222 (E.D. Pa. 2017).

[14] *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 348–49 (D. Md. 2012) (accepting regression model though model calculates only "an 'aggregate' overcharge that is not capable of distinguishing between individual class members").

[15] Defendants' efforts to use International Paper ("IP") and Old World Industries as examples of why "no single average could possibly be representative of all" Plaintiffs is unavailing. Mot. 16; Defs.' Mot. for Summ. J. 93. First, there was no "single average" applied to these two plaintiffs. They are not even addressed by the same expert; Drs. Bernheim and Marx assessed damages for IP (finding 10.2% of prices paid were overcharges), and Dr. Leitzinger assessed damages for Old World (finding 2.44% of prices paid were overcharges). Second, these Plaintiffs are in separate, individual lawsuits. There is no basis to argue one plaintiff's damages are wrong because of

### E. <u>Statistical evidence is not "disfavored" by courts, as Defendants contend</u>.

Defendants imply the use of "statistics and averages" is disfavored under "the law's general approach to proving an individual's claim," and that statistics cannot be considered if any "individualized" proof is "available." Mot. 9-13. That is not how evidence works, of course. Courts do not exclude relevant, admissible evidence merely because other evidence is "available." Moreover, Defendants are wrong to claim that courts disfavor statistical evidence as damages evidence in general, or in antitrust cases in particular.

None of Defendants' cases criticizes the use of econometric analysis to provide a "just and reasonable" estimate of damages in an antitrust context. Most of Defendants' antitrust cases do not address regression analysis (or anything akin to what Plaintiffs' experts did here),[16] or do not address damages issues at all.[17] Not one of the cases holds that regression analyses constitute some kind of improper "average damages" approach.

---

evidence advanced by another plaintiff in a separate case. Moreover, as explained below, any factors that affected IP specifically are accounted for in Dr. Marx's model. *See infra* Part III-A.

[16] *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1364 (D.C. Cir. 2012) (survey evidence); *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 208-09 (5th Cir. 2000) (damages yardstick was simple average of other businesses' profits, not regression); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1223-24 (9th Cir. 1997) (lost sales analysis); *In re Wholesale Grocery Prods. Antitrust Litig.,* 2018 WL 3862773, *4-9 (D. Minn. Aug. 14, 2008) (putative class plaintiff, a small grocer, advanced a "benchmark" model claiming the prices it paid to distributors should have tracked the largest retailer in the region, though there was no evidence prices ever had before; second regression-based injury model was also limited to the same single benchmark retailer and lacked any market data); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1077, 1090 (D.D.C. 1982) (lost-profits damages model for a phone line business based on unreasonable and arbitrary market share projections; no statistical or regression analysis at issue); *Riss & Co. v. Association of American Railroads*, 190 F. Supp. 10, 17 (D.D.C 1960), *aff'd sub nom. Ass'n of W. Rys. v. Riss & Co.*, 299 F.2d 133 (D.C. Cir. 1962) (railroads claiming truckers used predatory pricing to squeeze them out of munitions-shipping opportunities presented no damages evidence of their but-for or actual market shares or the volume of their lost business).

[17] *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1079-80 (10th Cir. 2006) (market power); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 980 (C.D. Cal. 2012) (relevant

Defendants' starkest attack on the use of statistics-based evidence is based on cases outside the antitrust context altogether.[18] These cases obviously do not address the "just and reasonable" standard applicable to antitrust claims, which necessarily accommodates evidence that can aid the jury in making a predictive assessment of a but-for world that cannot be directly observed. In other contexts, such as in cases where a party seeks to use statistics as a stand-in for direct evidence that some empirically observable event had actually occurred in the past, the admissibility of statistical evidence would depend on case-specific factors.[19] But the openness to statistical tools in *Tyson Foods* and similar cases is particularly relevant in the antitrust damages context. Courts recognize that in antitrust cases, where the but-for world *must* be estimated, the use of econometrics methods to make that estimation is not a dodge—it is the most scientific and reliable approach available.

### F. **Defendants' hypothetical "individual-facts-only" approach is at odds with fundamental economic principles and the nature of the alleged conspiracy**.

Defendants next argue that Plaintiffs are "improperly using averages to avoid individualized proof." Mot. 29. What this means is unclear. These are individual actions. Nothing

---

market); *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, at 624-26 (2003) (market power).

[18] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (personal injury); *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 496 (5th Cir. 2005) (plaintiff shareholder could not establish standing to complain of a misleading registration statement on which he had not relied simply by showing the statistical likelihood that his shares had been issued pursuant to the registration statement); *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567-70 (D.C. Cir. 1993) (products liability); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (personal injury); *Nebraska Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 415-17 (8th Cir. 2005) (breach of implied warranties, negligence, and fraud).

[19] Nevertheless, even Defendants' cases recognize that statistical evidence has value in individual cases. *See United States v. Veysey*, 334 F.3d 600, 603-05 (7th Cir. 2003) (where arson defendant complained an actuary had been allowed to estimate the likelihood he had been the chance victim of four similar residential fires, court found no error in admitting statistical evidence, noting "All evidence is probabilistic—statistical evidence merely explicitly so.").

about Plaintiffs' damages model precludes Defendants from putting in whatever relevant evidence they choose as to a given Plaintiff, including the "wealth of contemporaneous documents and testimony about each Plaintiff's contracting history" that Defendants acknowledge have been produced. Mot. 30. Nothing is being "avoided."

Defendants seem to argue that "the but-for world for a particular Plaintiff" must be based only on evidence pertinent to that specific Plaintiff. Mot. 31. But despite sponsoring a stable of economist experts, Defendants make no showing that a "just and reasonable" estimate must (or even could) be developed using only a single plaintiff's data, much less do they explain how it would be done. Indeed, Defendants' own cases (Mot. 32) explain the appropriateness of considering and analyzing the broader market, not just a single plaintiff's data.[20] Defendants do not explain how one could assess a market effect without considering the market, and do not explain how looking at individual transactions alone would reflect the alleged market effects.[21]

Moreover, as Defendants acknowledge, a damages model must be consistent with the claims and the alleged anticompetitive effect at issue. Defendants in this case are alleged to have imposed fuel surcharges (FSCs) and broadened the use of those FSCs for the purpose of increasing

---

[20] *See Concord Boat Corp. v Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2002) (reversing judgment where expert's damages model "did not incorporate all aspects of the economic reality of the stern drive engine market" that influenced market share, including pricing); *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (rejecting expert's individual-only method because it did not account for variables affecting the cattle market, including market declines in prior period); *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 977, 980 (C.D. Cal. 2012) (observing damages model did not account for market-wide factors that drove increases in ticket prices beginning before the defendant entered the market).

[21] *See, e.g.*, PX989, Jacobs Reply Rpt. ¶¶ 215-19 (explaining he reviewed individual plaintiff circumstances to determine whether a plaintiff-specific model was required, and he "concluded that such an assessment was not only unnecessary, but it was also inconsistent with the best method for determining the impacts of the Defendants' alleged coordinated efforts to implement fuel surcharges" because the alleged conspiracy was "an industry-wide phenomenon [that] would be expected as a matter of economics to affect prices through the industry.").

prices across the market.[22] As will be described below, Plaintiffs' experts measured damages resulting from that conduct, controlling for factors like fluctuating costs and demand. The notion that Plaintiffs' damages could be assessed without *any* market evidence ignores both the alleged mechanism of the conspiracy and the observed facts.[23]

It is ironic that Defendants, pointing to each shipper's individualized circumstances, ask the Court to ignore market data and cabin each shipper to only its own transaction history for damages estimation purposes. After all, this case is the result of Defendants' conspiratorial aim to treat all shippers alike: to publish standardized FSCs; to establish policies against negotiating them; to use them regardless of distance traveled, commodity shipped, region, tons per car, fuel efficiency, or individual competitive circumstances. The evidence shows the railroads demanded shippers in every region pay the same FSCs, and did so in a manner that measurably boosted prices across the market. After engineering a price-fixing scheme that sought to impose market-wide uniformity, Defendants can hardly fault Plaintiffs' economists for analyzing damages in a manner consonant with that reality, incorporating market-wide data in discrete, conservative, and widely accepted ways while also addressing each Plaintiff's individual circumstances.

## III. PLAINTIFFS' EXPERTS' DAMAGES METHODOLOGIES ARE RELIABLE, RELEVANT, AND ADMISSIBLE.

Plaintiffs' experts appropriately address Plaintiff-specific factors, isolate lawful from conspiratorial conduct, and consider overall economic trends.

---

[22] *See, e.g.*, AK Steel Compl. (1:19-cv-02970, Dkt. 1) ¶¶ 1, 5, 127 (alleging Defendants conspired to impose FSCs "as a means to artificially and unlawfully increase the amount paid for rate-unregulated rail freight transportation services," did so "as the means to raise rates across the board," and "as a method of increasing prices charged").

[23] *See, e.g.*, Mot. 24-27 (claiming that the only relevant causal factors are the 2003 changes in FSC levels and an individual plaintiff's propensity to agree to them, based on a defense-expert argument that the 2003 FSC changes were small and a factually-inaccurate claim about coverage "trends").

### A. <u>Dr. Douglas Bernheim and Dr. Leslie Marx</u>.

Dr. Bernheim is a Professor of Economics at Stanford University, where he has taught microeconomics, industrial organization, behavioral economics, and other subjects. He holds a Ph.D. in Economics from MIT, he is a Senior Fellow of the Stanford Institute of Economic Policy Research, and he is a Research Associate at the National Bureau of Economic Research. Dr. Marx is a Professor of Economics at Duke University, where she teaches managerial economics, industrial organization, environmental economics, and other subjects. She holds a Ph.D. in Economics from Northwestern University and previously served as the Chief Economist for the Federal Communications Commission. Both Drs. Bernheim and Marx often serve as testifying experts in antitrust matters, and both are widely published authors and partners at Bates White Economic Consulting. PX770, Bernheim/Marx MDL II Rpt., App'x A and B.

To analyze the conspiracy at issue, Dr. Bernheim prepared a model of market-wide rate impacts, while Dr. Marx modeled individual shipper relationships to market-wide rates. Together, the two models provide a single damages estimate for each plaintiff shipper they addressed.

#### 1. *Dr. Bernheim's model is a reliable foundation for Marx's model*.

Dr. Bernheim's work is reliable. He employed well-accepted, standard economic and statistical methods to reconstruct the average rates that would have prevailed for certain categories of rail freight shipments but for the cartel's illegal activities. Based on that analysis, he concludes that rates for rail-freight shipments were substantially higher because of the Defendants' conspiracy. PX770, Bernheim/Marx MDL II Rpt. at 118, Section IV.D.5. His work shows that competitive market factors did not cause the elevated rates during the conspiracy. *Id.* at 94, IV.D.3.b. After a series of tests and corroborative analyses, Dr. Bernheim concludes that his overcharge estimates are reliable and, if anything, conservative. *Id.* at 6; *id.* at Section V.C.

Two corroborative analyses show Dr. Bernheim's work is reliable. One models the relationship between all-in rates and market outcomes using data from a competitive benchmark period, and from benchmark transactions during the conspiracy. PX1072, Bernheim 1/31/2024 MDL II Rebuttal Dep. at 287–88. The other involves simple comparisons between the evolution of all-in rates and the evolution of costs. Both methods yield slightly higher estimates of overcharges than Dr. Bernheim's MDL II model. PX770, Bernheim/Marx MDL II Rpt. ¶¶ 236, 267–73. These two analyses provide independent evidence that "tests" the reliability of Dr. Bernheim's model. *See id.* ¶ 26. Both corroborative analyses produce results consistent with Dr. Bernheim's baseline findings, validating his opinions and indicating his model's reliability. *See id.* ¶¶ 26, 262. Defendants also make certain indirect critiques of Dr. Bernheim's model, which, contrary to their assertions, Mot. 13–15, 18, reliably isolates unlawful conduct and fits the facts of the case.[24]

**2. *The Bernheim/Marx models work together to reliably and conservatively estimate damages for each plaintiff*.**

Dr. Bernheim's model provides reliable and conservative market-wide overcharges by defendant and month during the conspiracy period. *See* PX980, Marx MDL II Dep. at 49. Contrary to Defendants' suggestion, Mot. 37, Dr. Bernheim has never taken the position that an average estimate cannot be reliably achieved. For certain plaintiffs, Dr. Marx concludes that Dr. Bernheim's time- and railroad-specific estimates are the most reliable estimates available, and does not attempt to further refine Dr. Bernheim's calculations, in light of the plaintiff-specific circumstances presented to her. *See* PX980, Marx 6/12/23 MDL II Dep. at 241.

[24] As Plaintiffs explain in response to Defendants' "false positives" motion, Dr. Bernheim reliably isolates the effects of the unlawful conduct. *See* False Positives Opp'n Part II-D; *see also Urethane*, 166 F. Supp. 3d at 509 ("Consequently, the Court concludes that the statistical significance issues go to the weight of the models, not their admissibility.").

Based on his analysis, Dr. Bernheim concludes it would "be perfectly reasonable" to apply his time- and railroad-specific overcharge calculations to a typical shipper because, absent other information, the most accurate estimate for any given plaintiff is that they are average. PX1072, Bernheim 1/31/24 MDL II Dep. at 262. For example, as to Plaintiff BMW, the Bernheim MDL II model generates an overcharge estimate for each railroad within each time period of the conspiracy, and Dr. Marx concludes that applying those estimates for the time periods and railroads used by BMW provides the "best estimate" of overcharges for BMW. *See* PX953, Marx 1/24/24 MDL II Dep. at 220. In so doing, the Bernheim and Marx methodologies account for individual facts and circumstances. *See* PX980, Marx 6/12/23 MDL II Dep. at 238–41. Both Drs. Bernheim and Marx separately considered the "railroads used by the plaintiff," "the timing of the purchases, the prices paid, [and] whether their shipments paid fuel surcharges or not." *See* PX953, 1/24/24 Marx MDL II Dep. at 238; PX770, Bernheim/Marx MDL II Rpt. ¶¶ 256–61; PX1073, Bernheim 7/31/23 MDL II Dep. at 195–96. Their estimates also depended on "the unrebasing of the fuel surcharges," whether contracts predated the conspiracy or were initiated during the conspiracy period, and when pre-existing contracts rolled over or were renegotiated. *See* PX953, 1/24/24 Marx MDL II Dep. at 238. In short, Dr. Bernheim's average overcharge estimate could be—and in fact is—the most reliable overcharge estimate for certain plaintiffs. Far from "ignoring available evidence of individual circumstances,"[25] Dr. Bernheim accounts for many individual circumstances.

But the Bernheim/Marx model does far more than is required to pass muster under the *Daubert* reliability bar. As Defendants concede, Dr. Bernheim's work is a "foundational analysis."

[25] Mot. 4-5. Defendants cite to Bernheim/Marx MDL II Rpt. ¶ 73 n.55, which does not support this statement, and this characterization again ignores Dr. Marx's work entirely. *See also* Mot. 5-6 (citing to Bernheim/Marx MDL II Rpt. ¶¶ 233-62; 270–71).

Mot. 38 n.22; PX1073, Bernheim 7/31/23 MDL II Dep. at 69-70. Dr. Marx's second-step model goes "above and beyond," PX1072, Bernheim 1/31/2024 MDL II Dep. at 275, because "in many antitrust cases, in many cartel cases … the vast majority of damage analyses do not take things all the way to the individual plaintiffs," *id*. Dr. Bernheim's work is foundational to Dr. Marx's work in MDL II because her work is specifically intended to further refine his overcharge estimate, to the extent plaintiff-specific data suggests such a refinement is reliably available.

**3. *Dr. Marx's reliance on Dr. Bernheim is a well-accepted approach*.**

Defendants do not challenge, and courts have accepted, the use of a two-step methodology as employed by Drs. Bernheim and Marx. For example, the court in *In re Urethane Antitrust Litigation* rejected Dow's argument for exclusion "on the grounds that the models fail to account for idiosyncrasies amongst different urethane purchasers or the differences in market conditions in general," and accepted a two-step methodology. 166 F. Supp. 3d 501, 509 (D.N.J. 2016). In *Urethane*, the first step was to use a predictive model to estimate "marketwide but-for prices for each of [the] three urethane products." *See* PX953, Marx 1/24/24 MDL II Rebuttal Dep. at 120–23. The second step was to estimate "damages to particular plaintiffs by comparing what they paid on a transaction by transaction basis to the but-for marketwide price" that was estimated in the first step. *Id.* at 138. Here, and similarly, the first stage (conducted by Dr. Bernheim) estimates damages at the market level and the second focuses on the damages specific to an individual plaintiff. As part of her work in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6708866, at *1 (N.D. Cal. Dec. 26, 2012), *aff'd*, 637 F. App'x 981 (9th Cir. 2016), Dr. Marx took market-wide overcharges from direct purchasers as an input to her second-step analysis to estimate damages to individual indirect purchasers. *See* PX953, Marx 1/24/24 MDL II Dep. at 108–111; *see also In re Vitamins Antitrust Litig.,* No. 99–MC–00179, MDL No. 1285 (D.D.C. Mar. 20–21, 2003) (accepting two-step model).

**4. *Dr. Marx's second-step model provides a reliable, plaintiff-specific estimate of damages under Daubert*.**

Defendants concede that Dr. Marx's second-step model calculates individual damages, negating Defendants' entire argument as to those Plaintiffs' purported failure to consider individual circumstances. Dr. Marx's second-stage analysis is a well-accepted methodology and akin to the second-stage methodologies used in large-scale antitrust actions like *Vitamins* and *Urethane*. *See* PX954, Marx MDL II Rebuttal Rpt. ¶¶ 48-52, 58-59, 69-70.

Dr. Marx's work is reliable, for the reasons explained in Plaintiffs' opposition to Defendant's "false positives" motion. *See* False Positives Opp'n Part II-E; *see also Urethane*, 166 F. Supp. 3d at 504 ("As Plaintiffs correctly note, there are an abundance of judicial decisions supporting the premise that regression models can be a reliable tool for measuring damages in an antitrust case."). Each of Defendants' arguments to the contrary go to weight and not admissibility. *See supra* Parts I-A, II-C; *see also Urethane*, 166 F. Supp. 3d at 508. Nevertheless, misconstruing Dr. Marx's work and citing to no authority, Defendants wrongly conclude her second step is unreliable and should be excluded. But Dr. Marx's work (1) reliably considers individual plaintiff circumstances; (2) does not treat every use of FSC with a Plaintiff as conspiratorial; and (3) is not "hard-wired" to find damages in almost every scenario.

**(i) Dr. Marx does not "make [anything] worse," and reliably considers individual circumstances for each Plaintiff.**

To account for a plaintiff-shipper's individual circumstances, Dr. Marx analyzes pricing data to determine the quantitative relationship, or "gamma," between (1) Plaintiff shipper-Defendant-specific prices and (2) average prices charged by each Defendant. A gamma of approximately one means that the pattern of a given Plaintiff's prices closely resembles the pattern of an average shipper; in those cases, the average, market-wide overcharges imposed by a given Defendant on its FSC-paying shipments in each month would represent the experience of the

specific shipper. Dr. Marx multiplies Dr. Bernheim's overcharges by the gammas she calculates to adjust average estimates and account mathematically for individualized circumstances.[26]

The distribution of gammas for all estimated relations demonstrates that Dr. Marx does not "make [anything] worse." Mot. 40. The estimated gamma distribution centers at about 1, which is consistent with plaintiff-shippers on average facing the market-wide overcharges. *See* PX954, Marx MDL II Rebuttal Rpt. ¶¶ 26-29. The diverse group of Plaintiffs represents a large sample of the overall market, so it is not surprising that the gammas are centered close to 1.[27]

*Distribution of gamma coefficients, which measure the relationship between Plaintiff shipper-Defendant-specific prices and average prices for the Defendant (see Marx MDL II Rebuttal Figure 2)*




[26] The degree of competition, alternative transportation options, and the amount of FSCs paid before the start of the conspiracy are incorporated into each Plaintiffs' prices and are taken into account by Dr. Marx's overcharge analysis. *See* PX954, Marx MDL II Rebuttal Rpt. ¶ 70. Dr. Marx's gamma regression also controls for Plaintiff-specific factors through a collection of fixed effects (commodity group, route, car type, and shipment type). *See id*. ¶ 51.

[27] With respect to the "toxic chemical risk" example proffered by Defendants, only a minimal number of shipments in Dr. Marx's second stage regression were of chlorine transactions. When limiting to NS and CSX shipments, as Dr. Carlton's chlorine spill indicator does, these account for 0.05% of shipments considered. Nothing in connection with these puts into question the reliability of Dr. Marx's work, nor does it warrant exclusion under *Daubert*.

**(ii) Dr. Marx does not treat every use of FSCs as conspiratorial.**

The conspiracy, as alleged, involves the broad implementation of new FSCs, which allowed Defendants to increase all-in prices more than they would have otherwise. Dr. Bernheim's analysis estimates the but-for fuel cost recovery for FSC-paying traffic to estimate Defendant-specific overcharges on all-in rates resulting from the conspiracy. *See* PX770, Bernheim/Marx MDL II Rpt. ¶¶ 256–60. His analysis neither implies, nor requires, that the impacted FSC-paying traffic *never* included an FSC in the but-for world. In fact, his analysis implies that some form of FSC still *could* exist for these shipments in the but-for world, since the estimated overcharges never exceed the FSC revenue collected by Defendants in the actual world. See the figure below from Dr. Bernheim's MDL II Opening workpapers, as described in Bernheim/Marx MDL II Rpt. ¶ 260.

*Dr. Bernheim's estimated overcharges as a percent of FSC revenue per carload*




Defendants' assertion that Dr. Bernheim's model is missing a step, and that Dr. Marx must provide this purported missing step, is simply wrong. As Dr. Bernheim estimates, in the but-for world, Defendants would have charged lower all-in rates—9.1% lower rates in total. *See* PX770,

Bernheim/Marx MDL II Rpt. ¶ 261. Defendants incorrectly claim Dr. Marx's analysis does not allow for the existence of FSCs in the but-for world. To the contrary, because Dr. Marx estimates overcharges using all-in rates, her methodology does in fact allow for the existence of FSCs in the but-for world. Whether the but-for all-in rates would include an FSC does not affect Dr. Marx's analysis. PX954, Marx MDL II Rebuttal Rpt. ¶¶ 61–62. Incorporating an estimate of but-for FSC coverage would unnecessarily overcomplicate the calculation.

Dr. Marx's approach then uses data from before and during the conspiratorial conduct, and this increases the reliability of her model and the estimated "gamma." The shift from "no conduct" to "conduct" is informative about how changes in the effectiveness of the conspiracy affect a shipper's prices. Dropping the pre-conduct data—as Defendants suggest the Bernheim/Marx model should have done—would rely exclusively on shifts in the effectiveness of conduct *within* the conduct period to estimate each shipper's "gamma." But the relationship between the change in rates *between* the pre-conduct and conduct periods for the shipper and for the market provides valuable information concerning the shipper's "gamma." Dr. Marx's approach correctly utilizes that information.

**(iii) Dr. Marx's model is not "hard-wired" to find damages.**

Dr. Marx's analysis is not hard-wired to find damages. It is true that Dr. Marx's model estimates mostly positive gammas, as would be expected from an alleged a market-wide conspiracy with broad impact. Because Dr. Marx found that the gammas are centered close to 1, it is also true that, on average, Dr. Marx finds about the average overcharges that Dr. Bernheim finds. This is to be expected, as Dr. Bernheim measured average overcharges and Dr. Marx studied a wide array of shippers. *See supra* Part III-A(4)(i). Of course, if Dr. Bernheim's overcharge estimate had been near zero, the average of Dr. Marx's estimates would also be near zero.

The distribution of Dr. Marx's gamma coefficients underscores her model's reliability.[28] The gammas are not constrained to be positive—she finds some gammas close to zero (*i.e.*, wiping out any overcharges Dr. Bernheim found) and negative gammas. The gamma coefficient addresses plaintiff-specific differences and 40% of the time was below 1.0—reducing the estimated overcharge Dr. Bernheim finds and dispelling completely the notion that Dr. Marx's work is somehow "hard-wired" to generate overcharges. Dr. Marx's approach will not somehow always show an overcharge where none might plausibly exist. Mot. 41; *see also* False Positives Opp'n Part II-E; PX770, Bernheim/Marx MDL II Rpt. ¶ 273; PX954, Marx MDL II Rebuttal Rpt. ¶¶ 24–29. Dr. Marx's regression model, like Dr. Bernheim's, is reliable, and Defendants' critiques of her work miss the mark.

**B. <u>Dr. Allen Jacobs</u>.**

Dr. Jacobs, a managing director of the Berkeley Research Group, is an expert in industrial organization, finance, and econometrics. He holds a Ph.D. in Economics from MIT. He served on the faculties of MIT, Harvard, and the University of Texas at Austin, teaching graduate and undergraduate classes including Econometrics, Statistics, Microeconomics, Corporate Finance, and Industrial Organization & Regulation. He has testified as an expert more than fifty times, including in antitrust cases involving oil and gas assets, refinery products, insurance, internet and cable television, aviation services, and taxicabs. He has led more than 300 consulting projects with companies and investors on acquisitions, restructurings, business strategy, and pricing strategy; he was president of an incubator investment firm; and he has served on half-dozen corporate boards.[29]

---

[28] The gamma coefficient represents the relation between each Plaintiff's prices and the prices for FSC-paying traffic for each Defendant. *See* PX770, Bernheim/Marx MDL II Rpt. ¶ 273.

[29] PX819, Jacobs Rpt. Attachment A.

1. ***Using a well-established methodology to control for both general and specific factors, Dr. Jacobs found impact and damages*.**

To evaluate the change in rail freight prices caused by the alleged conspiracy, Dr. Jacobs employed a difference-in-differences regression model,[30] a technique that academics (including Defendants' experts) agree is standard in establishing impact and quantifying damages.[31] The difference-in-differences regression compares price changes experienced by a treatment group (those affected by a conspiracy) with price changes experienced by a control group (those not affected) before and during the time of the collusion.[32] He analyzed approximately six million data points taken from a comprehensive set of waybill data for all of Defendants' U.S. rail shipments from 2000 to 2008,[33] together with the actual shipping contracts for his Plaintiffs, where available.[34]

To determine the effect of the alleged conspiracy on market prices, Dr. Jacobs specified a "log-log" regression model that correlates the total net revenue (or "all-in price") per car for each shipment to the industry's own calculation of railroad costs[35] and aggregate economic demand,[36]

---

[30] *Id.* ¶ 468.

[31] *Id.* ¶ 468 n.855 (collecting publications); PX990, Israel MDL II Dep. 617-18 ("Do you agree that a difference-in-differences model methodology can be an appropriate methodology for estimating overcharges in a price fixing case? A. If—if—if properly implemented and it fits the facts and it works and passes the tests, then, yes.")

[32] PX819, Jacobs Rpt. ¶ 469. Dr. Jacobs' control group comprises all "Routes" (shipments of a given commodity by a given railroad for a given shipper between a given origin and destination) for which prices were not agreed upon during the conspiracy period (*i.e.*, they were set before the conspiracy period and were not affected by the conspiracy). Routes that were priced during the conspiracy period were in the treatment group. *Id.* ¶¶ 470-76.

[33] *Id.* ¶ 472, 479 (fig. V.22), 504 (fig. VI.5), 531 (fig. VII.1).

[34] *Id.* ¶ 475 (indicating that for Dr. Jacobs' Plaintiffs, original contracts were available and analyzed for a majority of shipments in the waybill data).

[35] Dr. Jacobs used the RCAF-A (adjusted rail cost adjustment factor), a metric published by the rail industry itself. *Id.* ¶ 477(e).

[36] To indicate demand, Dr. Jacobs used U.S. gross domestic product. *Id.* ¶ 477(f).

controlling for multiple factors, including for each route: the shipper; the route origin and destination; the commodity shipped; the car type (tank car, boxcar, etc.); whether the shipment was interline; and whether it was carried on railroad-owned cars or shipper-owned cars.[37] Using indicator variables to identify shipments made during the conspiracy period and contracts priced during the conspiracy period, Dr. Jacobs calculated coefficients measuring the difference between prices paid between control-group transactions and treatment-group transactions, controlling for cost, demand, and even the specific route, commodity, and shipper on each shipment.[38] These controls insured that the overcharge estimates were not affected by differences between shippers such as their relative bargaining strengths, competing shipping options, commodity-specific risks, and economic conditions at the time of shipment.[39]

Contrary to Defendants' claims, Dr. Jacobs did not produce a single "average" overcharge estimate or simply average collections of all routes and contracts. He classified shipments based on when each contract was priced,[40] allowing him to analyze the transactions in question over time and compare price impacts in each time period using sets of control-group and treatment-group transactions that were specific to each time period.[41] He measured the effect of the conspiracy separately for each year of the conspiracy period.[42] He measured effects for coal and non-coal transactions separately to account for differences in the FSC structure and in the competitive

---

[37] *Id.* ¶ 477(g)-(j).

[38] *Id.* ¶ 477-78.

[39] PX989, Jacobs Reply Rpt. ¶¶ 209-10, 217-19, 253.

[40] PX819, Jacobs Rpt. ¶¶ 473-76, 486-88.

[41] *See id.* ¶¶ 501-04 and Figure VI.5.

[42] *Id.*

factors affecting coal shipments as compared to shipments of other commodities.[43] Because of these differences, the model produced varying overcharge results for the industry (as great as a 20-to-1 difference)[44] and varying results for the plaintiffs on which Dr. Jacobs reports—as great as a 10-to-1 difference in the damages they suffered as a share of their freight spending.[45]

The model is statistically sound. The variables in Dr. Jacobs' model explain nearly all of the variation in price changes over the time period[46] and produce logical results, including the intuitive findings that when overall economic demand rose, so did prices; when railroad operating costs rose, so did prices; when railroads shipped freight using shipper-owned cars, they charged less; and so on. PX819, Jacobs Rpt. ¶¶ 480.

Dr. Jacobs' model shows the conspiracy at issue caused prices to increase, after controlling for cost, demand, route factors, shipper factors, and the like. The model quantifies the extent of the price increase on a year-by-year basis. *Id.* ¶¶ 479, 504, 507-08, Fig. VI.5. His overcharge estimates are statistically significant (*i.e.*, demonstrably not the result of chance variations in pricing between control and treatment transactions) at the 99% confidence interval. *Id.* ¶ 504.

Dr. Jacobs validates his modeled results in multiple ways. First, he uses a "before-and-after" analysis as an alternative benchmark approach. In contrast to his main model, which examines how pricing on affected routes compares to pricing on unaffected routes in each time period, the alternative approach examines only affected routes, and analyzes whether there was a measurable effect on prices on those routes during the conspiracy period as compared to the prior

---

[43] *Id.* ¶¶ 489-99.

[44] *Id.* ¶ 504 (overcharge estimates ranging from as little as 1.1% to as much as 22.8% depending on time period and commodity).

[45] *See id.* ¶ 533 and Fig. VII.2 [redacted]

[46] *Id.* ¶ 504 & n.869 (describing adjusted $R^2$ of 0.95).

period, after controlling for non-conspiratorial factors. *Id.* ¶ 510. This alternative approach finds conspiratorial effects similar in direction and magnitude to his original model. *Id.* Second, Dr. Jacobs validates his difference-in-differences regression model by running it with alternative measures of railroad costs. Again, the test produces similar results. *Id.* ¶ 511. In two more variations to his model, Dr. Jacobs tests whether his control group transactions underestimate the impact of railroad cost increases during the conspiracy period. He re-runs the comparison between treatment and control transactions, but builds in the assumption that control group prices rise in alignment with railroad costs. Running the model this way produces even larger conspiratorial price effects and damages for the treatment group, demonstrating that Dr. Jacobs' control group transactions do not lag industry cost changes and confirming that his main model is not misattributing to the conspiracy the effect of those cost changes. *Id.* ¶ 512.

**2. *Dr. Jacobs' approach addresses individual shipper circumstances*.**

Contrary to Defendants' assertion, Dr. Jacobs specifically analyzed whether distinctions among the plaintiff shippers required separate calculations. Dr. Jacobs analyzed the fact patterns of each Plaintiff at issue, generating a 110-page appendix describing the business and background of each plaintiff shipper; the competitive rail and non-rail options available for the shipper's key facilities; the terms of each shipper's key contracts; when each shipper began paying FSCs; and how those FSCs changed over time. *Id.*, Pl. App'x. He discussed evidence pertaining to each shipper's negotiations over FSCs, including examples of how plaintiff shippers observed changes in the railroads' negotiation approaches[47]—changes that coincided with his data-based observation that the railroads imposed FSCs on more shipments during the conspiracy period. *See, e.g.*, PX819,

[47] *See, e.g.*, *id.*, Pl. App'x ¶¶ 6, 14 [redacted]

Jacobs Rpt. ¶¶ 336-40. By separating transactions into control and treatment groups based on the individual facts pertaining to each shipper and time period, there was no "averaging" of affected shipments with unaffected shipments. As Dr. Jacobs explained, his regression model isolates the price impact of the alleged conspiracy from price impacts of other causal factors to measure the anticompetitive impact on each plaintiff shipper. *Id.* ¶¶ 237, 467, 473-76. Indeed, "isolating the effect of a single factor" like anticompetitive conduct on prices is something to which regression analysis is "uniquely suited," as Defendants' expert Dr. Israel puts it.[48]

Dr. Jacobs determined that coal shippers were sufficiently different from other shippers that the impact of the conspiracy should be measured separately for that group.[49] In his report, he described the differences in implementation and terms of the coal-specific FSC programs, and the differences in competitive options for shipping coal as compared to other commodities.[50] Based on these economic factors, Dr. Jacobs' regression model measured the price impact coefficients for coal shipments separately.[51]

#### 3. *Dr. Jacobs' approach resolves Defendants' arguments about modeling FSC formulas or coverage.*

In keeping with Plaintiffs' allegations, Dr. Jacobs measured the extent to which Defendants' alleged price-fixing conduct resulted in higher total (or "all-in") prices for rail shipping.[52] Those all-in price impacts result not only from Defendants' increasing their FSC rates,

[48] PROVING ANTITRUST DAMAGES § 6.

[49] PX948, Jacobs Dep. (Aug. 2, 2023) at 254-255 (observing that prior to studying the data, "[i]t wasn't obvious" that coal price impacts should be estimated separately, but he broke coal out after performing tests).

[50] PX819, Jacobs Rpt. ¶¶ 489-99.

[51] PX948, Jacobs Dep. (Aug. 2, 2023) at 254-255.

[52] PX819, Jacobs Rpt. ¶¶ 20-22.

but also from broadening the imposition of FSCs to more shipments, using FSCs to force shipper acceptance of higher total freight prices, and altering how railroads negotiated and competed with one another on price.[53]

Defendants argue that Plaintiffs' experts should have built models that estimated what type of FSCs Defendants would have employed in a competitive environment, and what share of transactions would have been subject to FSCs. But that was not the purpose of Dr. Jacobs' analysis. As Dr. Jacobs observed, economic theory predicts that if all sellers of a good or service raise their "list" price or "asking" price in a coordinated fashion, or impose coordinated surcharges for their inputs, that coordination can lift final negotiated prices paid throughout the market in measurable ways.[54] He observed specific real-world examples of those effects occurring, including shippers who found that new FSCs were imposed on them where none had been before;[55] shippers who found that FSCs they once had been able to negotiate away became mandatory;[56] and shippers who were told that non-negotiable FSCs could be removed only in exchange for

---

[53] *Id.* ¶¶ 20, 441, 444. Though Defendants assert that all the experts, including Dr. Jacobs, found that before the conspiracy there was a nearly 70% chance that a given shipment was subject to an FSC, Mot. 26, that is simply false. Dr. Jacobs' analysis showed that conspiracy-period FSC coverage was *six times* the pre-conspiracy coverage; coverage percentages were flat in the low 20's in 2002; and even when the conspiracy was forming in the second quarter of 2003, coverage was only 34%—less than half the 70% coverage rate Defendants assert. *Id.* ¶ 337 and Fig. V.1; PX989, Jacobs Reply Rpt. ¶¶ 101-06 and Figs. II. 20, 21, and 22.

[54] PX819, Jacobs Rpt. ¶ 444 & n.820 (*quoting* Harrington, J.E. Jr., and L. Ye., *Collusion though Coordination of Announcements*, 67 J. of Indus. Econ. (2019) at 209, 211).

[55] *See, e.g.*, PX819, Jacobs Rpt., Pl. App'x ¶ 181 [redacted]

[56] *See, e.g.*, PX819, Jacobs Rpt. ¶¶ 202-04 [redacted] *id.*, Pl. App'x ¶¶ 127-130 [redacted] *id.* ¶ 172-73 [redacted] *id.* ¶¶ 253-62, 269, 273 [redacted]

exorbitant base-rate increases.[57] Dr. Jacobs' analysis of the data proved that as a result of the conduct at issue, the market price for rail freight rose during the conspiracy period, and in amounts that could not be explained by cost increases, demand increases, or other factors.[58] The question at issue in this litigation is how Defendants' conduct impacted what shippers paid for freight as compared to what they would have paid in the but-for world, not how those prices would be broken up into different line items on an invoice. Dr. Jacobs answered the question at issue.

### C. Dr. Jeffrey Leitzinger and Dr. James McClave.

Dr. Leitzinger has a Ph.D. in economics from UCLA, and is an economist and a Managing Director at Econ One Research, Inc., an economic research and consulting firm. Dr. Leitzinger has four decades of experience analyzing markets and assessing allegations of anticompetitive conduct, including estimating overcharges from alleged price fixing. PX769, Leitzinger MDL II Rpt. ¶ 1; *id.* Exhibit E01 (CV). Dr. McClave is an econometrician and statistician with a Ph.D. in statistics. He has forty years' experience analyzing price and bid data, performing econometric analyses, and teaching university courses in statistics; and has authored or co-authored six textbooks in statistics and econometrics. PX985, McClave MDL II Rpt., at 1 & App'x C.

Drs. Leitzinger and McClave each submitted reports in both MDL I and MDL II on behalf of Plaintiffs represented by Quinn Emanuel Urquhart & Sullivan, LLP.[59]

---

[57] *Id.*, Pl. App'x ¶ 14 [redacted]

[58] PX819, Jacobs Rpt. ¶ 21.

[59] The experts' damages methodologies were largely the same across MDL I and MDL II, but because MDL I involved only carload Plaintiffs while MDL II involved carload and intermodal Plaintiffs, the experts each produced both carload and intermodal regression models in MDL II.

**1. *Dr. Leitzinger's methodology*.**

*First*, Dr. Leitzinger conducts an economic analysis to determine whether Defendants' alleged conduct was consistent with the alleged conspiracy, including conducting an economic analysis regarding the presence of economic "plus factors" allowing for a reasonable inference of conspiracy. PX769, Leitzinger MDL II Rpt. at 9-134.

*Second*, Dr. Leitzinger then undertakes a two-step approach to model overcharges. As to FSC overcharges, Dr. Leitzinger assumes that in the but-for world Defendants would have passed through to Plaintiffs 100% of Defendants' incremental fuel costs associated with Plaintiffs' shipments, and therefore only treats Plaintiffs' Damages Period FSC payments which *exceed* incremental fuel costs as overcharges. PX769, Leitzinger MDL II Rpt. ¶¶ 227-28. This is conservative because, in the absence of a conspiracy, both economic theory and empirical evidence show it is unlikely Defendants would have been able to achieve 100% pass-through of their incremental fuel costs. *Id.* ¶¶ 230-231; PX984, Leitzinger MDL II Reply Rpt. ¶¶ 165-81. To measure excess fuel cost recovery, Dr. Leitzinger calculates *each Defendant's average fuel cost per gross ton mile* ("GTM"), for each year from 2002-2008, using data reported by Defendants and/or produced by the STB, then subtracts each Defendant's 2002 average from their other annual figures to estimate *each Defendant's* annual incremental fuel costs per GTM. PX769, Leitzinger MDL II Rpt. ¶ 236. Dr. Leitzinger then accounts for differences in fuel intensities by traffic type (intermodal, automotive, coal, etc.), by identifying traffic-specific fuel intensities produced by BNSF, and (because other Defendants did not produce similar information) applying those *relationships* to the other three Defendants' overall fuel intensities, by traffic type. *Id.* ¶¶ 237-38 & Appendix B; PX984, Leitzinger MDL II Reply Rpt. ¶¶ 184-89. To get to FSC overcharges, Dr. Leitzinger calculates each Plaintiff's annual Conspiracy Period ton-miles by Defendant and category of shipment, estimates for each Plaintiff the annual incremental fuel costs (by Defendant

and traffic category), and subtracts those Plaintiffs' incremental fuel costs from their *actual FSC payments* (thereby accounting for any discounts, etc.). PX769, Leitzinger MDL II Rpt. ¶¶ 232, 238-40 & Exs. E05-E07.

As to base rate overcharges, Dr. Leitzinger opines that because the alleged conspiracy included an agreement not to reduce base rates to offset FSCs, the alleged conspiracy could also impact base rates on the shipments that included rate-based FSCs. PX769, Leitzinger MDL II Rpt. ¶¶ 8, 202-05, 241-46, & Ex. E10. Dr. Leitzinger therefore uses regression models—one for carload shipments, and one for intermodal shipments—to regress base rates for each shipment to account for the effects of normal market determinants (in the absence of a conspiracy), such as costs and other supply and demand factors, including weight, route, commodity, car type, fuel price, economic activity, and other variables. PX769, Leitzinger MDL II Rpt. ¶¶ 203, 241-42. Dr. Leitzinger includes an indicator for chlorine shipments beginning in January 2006, to account for potential increases in base rates for those shipments resulting from a chlorine spill in January 2005, and an indicator for shipments related to automobiles, to account for the effects from the restructuring of the automobile industry. *Id.* ¶ 242. Through these regressions, Dr. Leitzinger finds that "base rates were higher during the Conspiracy Period than normal market conditions would otherwise have implied." *Id.* ¶ 203. Each of Dr. Leitzinger's regression models derives an overcharge percentage that differs week by week during the Damages Period. As to carload shipments with rate-based FSCs, Dr. Leitzinger finds that base rates were, on average, 3.7% higher during the Damages Period than market conditions otherwise would have predicted, and that intermodal base rates were, on average, 2.3% higher than would have been predicted. *Id.* ¶ 244. Dr. Leitzinger then applies each week's overcharge percentage separately to each Plaintiff's base

rates for that week, arriving at different overall overcharge percentages for each Plaintiff (as described further below). *Id.* ¶¶ 245-46 & Exs. E09, E10.

### 2. *Dr. McClave's methodology*.

Dr. McClave likewise set out to determine the amount, if any, by which Plaintiffs' rail freight rates were elevated by the alleged conspiracy. PX985, McClave MDL II Rpt. at 4. To do so, Dr. McClave developed a before-and-after regression model, to isolate the all-in price impacts (if any) of the alleged conspiracy. *Id.* at 12. Specifically, Dr. McClave analyzed all-in prices (base rates + FSCs) during the January 2000-June 2003 "benchmark" period, and compared those to all-in prices during the July 2003-December 2008 damages period, to test whether the latter were at supracompetitive levels.[60] Recognizing the differences between carload and intermodal traffic, Dr. McClave developed a separate regression model for each traffic type. He includes in his models variables for, *inter alia*, cost, demand, route, commodity, shipper, and the January 2005 chlorine spill. *Id.* at 14-18. Dr. McClave's carload model includes approximately 5.1 million observations spanning nine years, and results in an R-Squared of .968 (meaning that 96.8% of Plaintiffs' rail shipment price variability is accounted for by Dr. McClave's explanatory variables), whereas Dr. McClave's intermodal model includes approximately 1.3 million observations and results in an R-Squared of 0.941. *Id.* at 19, 22. Each of Dr. McClave's models produces its own separate monthly overcharge percentage, which Dr. McClave then applies to each individual shipper's revenue for that month, to arrive at Plaintiff-specific damage estimates. *Id.* at 21, 24-25, Table 2.

[60] Dr. McClave's analyses conservatively treat March-June 2003 as part of the "benchmark" period, although Plaintiffs allege that Defendants' conspiratorial conduct began in March 2003. *Id.* at 12-13.

### 3. *Defendants mischaracterize Drs. Leitzinger and McClave's approaches*.

Defendants mischaracterize Dr. Leitzinger's and Dr. McClave's damage methodologies. First, as explained above, Dr. Leitzinger's FSC overcharge estimates do not involve applying an average overcharge across Plaintiffs. The purported "averaging" that Defendants point to in Dr. Leitzinger's FSC overcharge model is not an average *overcharge*, but rather Dr. Leitzinger's use of an average "fuel cost per ton-mile of all shipments *by a Defendant in a year*," one out of many calculations he performed in order to arrive at individualized FSC overcharges for each Plaintiff. Mot. 5. That calculation is (1) based on actual cost data reported by Defendants to the STB, (2) broken down on an annual basis and by Defendant, (3) broken down by traffic type to account for differing fuel intensities of different traffic types (intermodal, agricultural, etc.), and (4) ultimately used as one step of the calculation to be applied to *each individual Plaintiff's actual shipments and actual FSC payments* to determine which shipments (if any) had FSCs that exceeded the associated incremental fuel costs. PX769, Leitzinger MDL II Rpt. ¶¶ 227-40 & Exs. E05-E07. Despite Defendants' suggestion otherwise, Mot. 4, 5, 23, Dr. Leitzinger does not apply an average FSC overcharge; his estimated overcharges range from zero to the hundreds of millions.

Second, Defendants mischaracterize Dr. Leitzinger's and Dr. McClave's regression models as purportedly applying a simple "average overcharge." They do not. As described above, Dr. Leitzinger created two distinct base rate regression models—one for carload traffic and one for intermodal traffic—each of which controls for the relevant market factors impacting price (route, commodity, demand, etc.), and which accounts for differences between the two types of traffic. Further, he utilizes industry-specific variables where he thinks appropriate (chlorine, automobile). Each of Dr. Leitzinger's regression models produces its own overcharge for each week of the Damages Period, which Dr. Leitzinger then uses to assess individual Plaintiffs' base rate experience. Dr. Leitzinger only assigns base rate overcharges to Plaintiffs whose actual base

rate appreciation is greater than or equal to the *combination of* (1) the increase predicted by the regression analysis based upon market conditions, *plus* (2) the market-wide base rate overcharge. Only if that condition is met does Dr. Leitzinger "conclude[] that it was appropriate to use the market-wide overcharge as a conservative measure of that Plaintiff's base rate overcharges." PX769, Leitzinger MDL II Rpt. ¶ 246 n.639.[61],[62]

Nor did Dr. McClave's carload or intermodal models simply apply an "average overcharge." Like Dr. Leitzinger, Dr. McClave developed separate regression models for carload and intermodal shippers, each of which controlled for the relevant market factors impacting price, and which are specified differently to account for differences between the two types of traffic. Dr. McClave also includes a chlorine spill indicator variable in the carload (but not intermodal) model. Dr. McClave's carload and intermodal regression models each produce separate overcharge estimates for each of the 66 months in the Damages Period, which are then used to assess individual Plaintiff's overcharges. Dr. McClave's overcharge estimates range from 8.6% to 16% in MDL I, and from 6.4% to 19.3% in MDL II. PX1203, McClave MDL I Reply Rpt. at 24; PX985, McClave MDL II Rpt., Table 2.

Defendants criticize Drs. Leitzinger and McClave for not treating *additional* chemicals with the same sort of indicator variables. Mot. 22. But non-chlorine chemical shipments are not

---

[61] Plaintiff Mercedes did not satisfy this test, and consequently Dr. Leitzinger attributed zero base rate overcharges to it. PX984, Leitzinger MDL II Reply Rpt. ¶ 235.

[62] Defendants claim that trucking became less competitive with rail (increasing demand), and that there was an "unprecedented surge in demand" for rail beginning in late 2003 that "exceeded rail capacity and led to severe congestion in portions of the rail network," which "caused prices to increase … particularly in certain geographies." Mot. 20, 21. But Dr. Leitzinger found that demand growth actually *slowed* during the Conspiracy Period, and congestion *decreased*. PX984, Leitzinger MDL II Reply Rpt. ¶¶ 213-15. In any event, Dr. Leitzinger's regression models control for demand and route, including state-level GDP for carload traffic and the "leading index" published by the Federal Reserve for intermodal traffic. PX769, Leitzinger MDL II Rpt. ¶ 242; PX984, Leitzinger MDL II Reply Rpt. ¶¶ 223-25.

excluded from the regressions. Drs. Leitzinger and McClave account for price differences between different types of chemical shipments through the STCC variable (the commodity indicator) in their models. And Defendants' experts have neither demonstrated a need for additional chemical indicator variables in either of their models, nor shown any kind of bias in the models' estimates due to the absence of additional indicator variables. *See* Mot. 22 n.13 (describing only anecdotal perceptions of pricing, not data).

Defendants also argue, incorrectly, that, because *at the fuel prices that ultimately occurred in the real world*, Defendants' more aggressive Conspiracy Period FSC formulas ultimately produced FSC percentages similar to or higher than their pre-Conspiracy Period FSC formulas would have at the same fuel prices, "any meaningful damages" must have come *only* from Defendants' ability to "impose[] surcharges on much less traffic in the but-for world." Mot. 25. Defendants then complain that Plaintiffs' experts do not determine "what fuel surcharge formulas Defendants would have used" or model "what any Defendants' fuel surcharge coverage would have been" in the absence of the conspiracy. *Id.* at 6. Defendants misstate the economics and the modeling. Dr. Leitzinger explained that in a competitive environment, FSCs during the Conspiracy Period would not have been maintained at the same levels, given they reached as high as 30% (compared to the 0-2% typically seen during the pre-Conspiracy Period). This renders Defendants' "earning power" defense meaningless. *See* PX769, Leitzinger MDL II Rpt. ¶¶ 173-75; PX984, Leitzinger MDL II Reply Rpt. ¶¶ 88-89, 176-77. Further, Drs. Leitzinger and McClave have both explained that it was not necessary for them to opine upon the specific FSC formulas that would be used in the but-for world, or as to which specific shipments FSCs would be applied. That is because Dr. Leitzinger's analyses conservatively *assume Defendants would collect their full incremental fuel costs on all shipments at issue*; only amounts *exceeding* Defendants'

incremental fuel costs are considered FSC overcharges. PX844, Leitzinger MDL I Dep., Mar. 15, 2022, 96-98, 178-180; PX1067, Leitzinger MDL II Dep., July 27, 2023, 365-66. And because Dr. McClave's regression models look at whether *all-in rates* are inflated above competitive levels, there is no separate need to identify which shipments would have a specific FSC formula in the but-for world. PX986, McClave MDL II Reply Rpt. at 67.[63]

Finally, Defendants criticize Dr. McClave for limiting his intermodal regression model to those intermodal shippers with an FSC coverage experience that Dr. McClave determined to be more representative of the intermodal shippers whose damages he sought to estimate (but not doing the same for his carload regression model). Mot. 28-29. But Dr. McClave explained that the intermodal Plaintiffs for whom he estimated damages had a different pre-Conspiracy Period experience with the application of FSCs than did the broader intermodal shipping population—the reason for this limitation in his intermodal model—while the carload shippers for whom he estimated damages did not have such a different experience than the broader carload shipping population. PX985, McClave MDL II Rpt. at 22-24; PX986, McClave MDL II Reply Rpt. at 57-59. Defendants claim that Dr. McClave admits that the non-intermodal Plaintiffs are not representative of one another, Mot. 29 n.21, but this mischaracterizes his testimony. DA25053, McClave MDL II Dep. (July 11, 2023) at 271-72 (stating that he had not done separate analysis of non-intermodal shippers using a 15% FSC cutoff).[64] Further, Dr. McClave demonstrated the

[63] Defendants mischaracterize Dr. McClave's finding that, by the start of the alleged Conspiracy Period, there was already a 70% chance that a contract had an FSC, claiming this as evidence that FSC coverage would have been high in the absence of the alleged conspiracy. Mot. 26. They ignore Dr. McClave's finding that the range of probabilities for FSC coverage changed substantially from the pre-Conspiracy Period to the Conspiracy Period. *See* PX985, McClave MDL II Rpt. at 72-73.

[64] Defendants also reference, in passing, their claims that Plaintiffs' damages models yield "false positives." Mot. 34. Plaintiffs address that inaccurate claim in their response to Defendants' separate motion on that topic.

robustness of his models by applying each of the carload and intermodal models to only Plaintiffs' data and obtaining positive, statistically significant overcharges consistent with using data from all shippers. PX985, McClave MDL II Rpt. at 23; PX986, McClave MDL II Reply Rept. at 44.

#### 4. *Dr. Leitzinger and Dr. McClave's results corroborate one another*.

Finally, Defendants question the fact that Dr. Leitzinger's and Dr. McClave's damages estimates in MDL II vary as compared to each other. Mot. 23. In fact, their methodologies arrived at very similar damage estimates in MDL I, *compare* PX843, McClave MDL I Rpt. at 26 *and* PX982, Leitzinger MDL I Rpt. at 4, Fig. 1, and in any event their findings support each other. Each expert independently developed his own damage methodology, and each independently found significant damages as to the same group of Plaintiffs. They can hardly be faulted for not having arrived at precisely the same figures for each shipper, when estimating a but-for world that, because of Defendants' anticompetitive conduct, has never existed.

### D. <u>Dr. James Reitzes</u>.

Dr. Reitzes submitted a report in MDL II on behalf of Plaintiff EPIC. Dr. Reitzes holds a Ph.D. in economics and specializes in economics and econometrics concerning "industrial organization, which includes the analysis of firm and consumer behavior under various market conditions, and international trade." PX987, Reitzes Rpt. ¶ 2. Dr. Reitzes has published numerous scholarly articles on anti-competitive collusive conduct and effectiveness of cartels in the freight transportation industry, *id*. ¶ 5, and is well-qualified to render his opinions.

Dr. Reitzes evaluated Plaintiffs' allegations of a conspiracy for impact and artificial elevation of FSCs paid for rail freight transport services during the Cartel Period. *Id.* ¶ 8. Dr. Reitzes' analysis also included an extensive econometric analysis on the damages EPIC sustained in connection with Defendants' anticompetitive conduct. *Id.* ¶¶ 186-97.

Dr. Reitzes employed an econometric regression model that incorporated dispute-specific inquiries, variables, and assessments to generate his conclusions. Dr. Reitzes' approach "is widely accepted in the economics literature and by U.S. Federal courts [and is] regarded as an appropriate and accurate methodology for the calculation of overcharges caused by cartels." *Id.* ¶ 154; *see also supra* Part II-B.

Dr. Reitzes used multiple-regression analytics to observe and estimate the relationship between the price charged by Defendants and the economic determinants of that price. PX987, Reitzes Rpt. ¶ 155. The model compared freight prices on transactions that are alleged to have been affected by cartel behavior with freight prices on benchmark transactions. *Id.* ¶ 167.

Dr. Reitzes' regression analysis accounted for pertinent economic factors, other than alleged collusion, which may influence legitimate pricing of rail freight transport services. *Id.* ¶ 157. Dr. Reitzes even acknowledged that "[f]reight prices can vary significantly across various dimensions, including commodity, shipper, and route." *Id.* ¶ 173. Dr. Reitzes also used a common benchmark approach, which was to estimate the regression of FSC charges on a dataset that includes transactions during the period of alleged collusion, as well as transactions during a benchmark period, i.e., relevant pre-Cartel Period available data, *id.* ¶ 157. Dr. Reitzes elaborated that the benchmark approach "is used as the basis of comparison for 'but-for' pricing behavior in the Cartel Period." *Id.* ¶ 158.

The benchmark dataset included shipments that occurred before the alleged Cartel Period and transactions that occurred during the Cartel Period but that did not include a FSC. *Id.* ¶¶ 168-169. Dr. Reitzes' model relied on transaction data and explanatory variables, such as RCAF-U and U.S. industrial production demand for Defendants, which has been used by experts for both parties in previous related matters. *Id.* ¶¶ 160, 164-66.

Dr. Reitzes considered the following variables: shipper-specific differences in freight prices, systematic differences in average freight prices charged by Defendants, freight prices related to specific routes, distance and relative frequency of shipments, change in freight prices accordingly to product being shipped, variable prices due to car types, and the distinction between interline and non-interline shipment. *Id.* ¶ 173. Dr. Reitzes condensed the data yield to a combination set sharing the following characteristics: year, month, shipper, railroad, route, interline status, commodity code, car type, pricing authority, and whether a FSC was applied. *Id.* ¶ 162. Dr. Reitzes' model conclusively rests on sound controls.

Defendants' conclusion that Dr. Reitzes' opinions improperly aggregate Plaintiffs' damages is defective in the face of Dr. Reitzes' report. Dr. Reitzes was explicit that he used an [redacted] *Id.* ¶ 152. Dr. Reitzes calculated that Defendants unlawfully applied a rate-based FSC to [redacted] *Id.* ¶ 195. Defendants' attempt to exclude Dr. Reitzes' damages determination fails.

**CONCLUSION**

Defendants' Motion should be denied in its entirety.

Respectfully submitted,

Dated: October 18, 2024

/s/ *Michael D. Hausfeld*
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo
James Hamilton
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com
jhamilton@hausfeld.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell Recycling Southeast, LLC; Peabody*

/s/ *Sami H. Rashid*
Sami H. Rashid
Richard I. Werder, Jr.
Alexandre J. Tschumi
Alexandria ("Alexee") Deep Conroy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com
rickwerder@quinnemanuel.com
alextschumi@quinnemanuel.com
alexeeconroy@quinnemanuel.com

Alicia Cobb
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Facsimile: (206) 905-7100
aliciacobb@quinnemanuel.com

Viola Trebicka
Jennifer English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com

*Attorneys for Plaintiffs Dust Pro, Inc., Olin Corporation, U.S. Magnesium, Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa*

*Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

/s/ *William J. Blechman*
Richard Alan Arnold
William J. Blechman
Douglas H. Patton
Michael A. Ponzoli
Joshua B. Gray
KENNY NACHWALTER, P.A.

*World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated; CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars*

1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Heidelberg Materials US, Inc. (f/k/a Lehigh Hanson, Inc.), PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

/s/ *Craig P. Seebald*

Craig P. Seebald (D.C. Bar No. 438968)
Stefanie Jackson (D.C. Bar No. 1673265)
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com
sjackson@velaw.com

Jason M. Powers
James L. Leader, Jr.
VINSON & ELKINS L.L.P.
845 Texas Avenue, Suite 4700
Houston, Texas 77002
(713) 758-2522
(713) 615-5809 (Facsimile)
jpowers@velaw.com
jleader@velaw.com

/s/ *John H. LeSeur*

John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854)
Daniel M. Jaffe (D.C. Bar No. 461185)

*(KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton*

SLOVER & LOFTUS LLP
1828 L Street, NW
Suite 1000
Washington, D.C. 20036
(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining, LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Constellation Energy Generation, LLC, f/k/a Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company, d/b/a WE Energies*

/s/ *David C. Eddy*
David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Anheuser-Busch, LLC; Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

/s/ *Joseph M. Vanek*
Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (admitted *pro hac vice*)
SPERLING & SLATER, LLC
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiff Mitsubishi Motors North America, Inc.*

*Anheuser-Busch Companies, LLC; Nestlé Purina PetCare Company; and Nestlé USA, Inc.*

/s/ *Raj Mathur*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Raj Mathur
Scott Glass
SUSMAN GODFREY, L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: 212-336-8330
rmathur@susmangodfrey.com
sglass@susmangodfrey.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody*

/s/ *Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
Caitlin R. Thomas
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com
caitlin.thomas@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

/s/ *Kristopher S. Davis*
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH LLP

*Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*/s/ Kirk T. May*
Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

*/s/ David J. Lender*
David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com

*Attorneys for Plaintiffs*
*Lansing Ethanol Services, LLC, et al.*

eric.hochstadt@weil.com
luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

/s/ *Benjamin D. Brown*
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
Sabrina Merold (D.C. Bar No. 1738065)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

/s/ *Michael Schaper*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com
Michael Schaper
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

/s/ *James P. Denvir*
James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)
James Grippando (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP

/s/ *Nathan P. Eimer*
Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
dbirk@eimerstahl.com
srazzano@eimerstahl.com

401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

/s/ *Frank M. Lowrey IV*
Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

/s/ *Michael C. Dell'Angelo*
Michael C. Dell'Angelo (Bar No. PA0090)
Michael J. Kane
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
mwallin@bm.net
Daniel J. Walker (Bar No. 219439)
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, D.C. 20001
(202) 559-9740
dwalker@bm.net

bwaldin@eimerstahl.com
Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

/s/ *Daniel B. Goldman*
Daniel B. Goldman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company, Tronox Inc., and Tronox US Holdings Inc.*

Sophia Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd.
La Mesa, CA 91942
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

/s/ *Leo D. Caseria*
Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

/s/ *Kayleigh T. Keilty*
Kayleigh T. Keilty (Bar No. 18969)
Austin G. Strine (Bar No. 20637)
SAUL EWING LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-4359

/s/ *Ronald J. Aranoff*
Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

/s/ *Conte C. Cicala*
Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

(410) 332-8603 (telephone)
(410) 332-8081 (facsimile)
kayleigh.keilty@saul.com
austin.strine@saul.com

James A. Morsch
Casey T. Grabenstein
SAUL EWING LLP
161 N. Clark St., Suite 4200
Chicago, Illinois 60601
jim.morsch@saul.com
casey.grabenstein@saul.com

*Attorneys for Plaintiff Environmental Protection & Improvement Company, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2024, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF electronic filing system and was served by secure transfer on all counsel of record in the above-captioned matters.

*/s/ Raj Mathur*
Raj Mathur