**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. I)<br><br>This Document Relates To: ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (BAH/GMH) |
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This Document Relates To: ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH/GMH) |
| OXBOW CARBON & MINERALS LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY, et al.,<br><br>Defendants. | Civil Action No. 11-cv-1049 (BAH/GMH)<br><br>**Oral Argument Requested** |

**Plaintiffs' Memorandum in Opposition to**
**Defendants' Joint and Individual Motions for Summary Judgment**

# TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT ....................1

LEGAL STANDARD....................5

A. Evidence of Price-Fixing Conspiracy Under Sherman Act § 1 ....................6

B. *Matsushita* Did Not Modify Rule 56 or Impose "Special Standards" ....................9

C. The Alleged Conspiracy Must Be Viewed as a Whole....................12

ARGUMENT....................12

I. THE EXISTENCE OF AN UNLAWFUL AGREEMENT AMONG DEFENDANTS IS A HOTLY DISPUTED ISSUE OF MATERIAL FACT ....................12

A. Before 2003, Defendants Competed Vigorously—Including as to FSCs—Amid Some "Very Vicious Historical Price Wars"....................14

B. In Early 2003, Defendants' Senior Executives Began Unprecedented Communications About, and Made Changes to, Their FSC Programs ....................18

C. Beginning in 2003, Defendants Also Took Unprecedented, Coordinated Action Through the AAR to Impose FSCs ....................30

D. BNSF Twice Abandoned a Competitively Advantageous Mileage-Based FSC ....................34

E. Defendants' FSC formulas were changed, and their FSC programs became non-negotiable, and imposed across-the-board, with the goal of 100% FSC coverage ....................36

F. During the Conspiracy Period, Defendants Monitored Each Other's FSCs, and Exchanged Information About Their Programs ....................45

G. Defendants' Conspiratorial FSCs Were Divorced from Their True Fuel Costs, Reversing the Downward Trend in Rates and Yielding Exorbitant, Record Profits ....................46

H. Meetings and Communications Between Competitors Discussing Pricing and Changes In Conduct Are Compelling Evidence of Conspiracy....................49

I. Defendants' Pretextual Arguments Are Additional Evidence of Conspiracy ....................51

1. Defendants' pretextual claim that FSC changes were a reaction to rising fuel prices....................51

2. Defendants' pretextual claim that FSCs were intended to recover their fuel costs ....53

3. NS's pretextual use of "rebased" FSCs ....56

4. Defendants' pretextual justifications in this litigation ....57

J. Numerous Plus Factors Support an Inference of Conspiracy ....58

1. Defendants' new Conspiracy-Period FSC programs represented a major change in business practices ....58

2. Defendants had a common motive to conspire ....61

3. Defendants had extensive opportunities to conspire ....62

4. Absent a conspiracy, Defendants' broad application and enforcement of FSC mechanisms was an action against self-interest ....63

5. The rail freight industry was highly conducive to collusion ....66

II. DEFENDANTS' ARGUMENTS DO NOT SUPPORT SUMMARY JUDGMENT ....69

A. Neither Defendants' Assertions of Limited Exceptions to Their FSC Programs, Nor the Bryan Declaration, Support Summary Judgment ....69

B. Defendants' Assertion That They Acted Unilaterally and Rationally in Response to Rising Fuel Costs Is Counterfactual and Insufficient ....78

1. A purported alternative business explanation, standing alone, does not justify summary judgment ....78

2. Defendants implemented coordinated FSCs when fuel prices were "low and flat" and not expected to rise ....80

3. Defendants' FSC over-recovery contradicts their assertion that FSCs were merely a response to increasing fuel costs ....81

4. Defendants' cases are inapposite ....83

5. That other industries enacted FSCs is irrelevant ....88

C. Defendants' Assertion of Non-Conspiratorial Follow-the-Leader Parallelism Contradicts the Evidence ....89

1. Defendants imposed parallel FSC policies and practices throughout the Conspiracy Period that do not reflect mere conscious parallelism ....90

2. Defendants' supposed internal processes do not eliminate any factual dispute as to the alleged conspiracy ....92

3. Defendants cannot excuse their unprecedented discussions and agreement on FSCs as "legitimate, vertical communications" ....107

4. NS and CSX Exaggerate Differences in Shipper Experiences ....110

D. Defendants' Conspiracy Included FSCs on Coal Traffic ....114

1. Defendants' FSCs on coal shipments furthered their conspiratorial goal of including FSCs on all shipments ....115

2. BNSF's and UP's coal-related conduct is fully consistent with the conspiracy ....116

E. Defendants' Conspiracy Included Intermodal FSCs ....121

1. Prior to the start of the conspiracy, Defendants' attempts to implement intermodal FSCs in contracts did not stick ....122

2. Defendants' senior executives with authority over intermodal traffic met and discussed FSCs ....123

3. During the conspiracy, Defendants applied and enforced FSCs for their intermodal customers across-the-board ....124

4. Defendants harmonized their intermodal FSC formulas ....127

5. Defendants' other arguments are inconsistent with the law and evidence ....130

F. Section 10706 Presents a Narrow Evidentiary Bar, and Does Not Preclude Inferences That Plaintiffs Present Here ....136

1. Section 10706's history ....136

2. Section 10706's evidentiary rule ....137

3. Section 10706's narrow preclusion on inferences to be drawn from admissible evidence is inapplicable to the evidence presented here ....139

III. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE ENDING DATE OF THEIR CONSPIRACY ....140

A. Plaintiffs Need Only Show a Reasonable Inference that the Conspiracy Was Ongoing ....141

B. Defendants Bear the Burden of Proving Withdrawal From Their Conspiracy ....143

C. Defendants' Pre-STB Ruling Fuel Surcharge Programs Are Not Evidence of Withdrawal ....145

D. The Conspiracy Did Not Suddenly End with the January 25, 2007 STB Decision or When the First *MDL I* Plaintiff Filed a Lawsuit on May 14, 2007....146

E. Defendants' Reactions to the STB Decision Support an Inference of Collusion ....147

F. Defendants Continued FSC Discussions Following the STB Decision....150

G. The Effects of Defendants' Conspiracy Extended Beyond January 25, 2007....151

IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON IMPACT, DAMAGES, AND CAUSATION ....153

A. The *MDL I* Appeals Court Did Not Reject the Use Of Regressions As Evidence....154

B. Defendants' Arguments Against "Averages"-Based Evidence Misconstrue the Cases and Do Not Apply to Plaintiffs' Regression Models....155

C. As Defendants' Own Arguments Suggest, There Is Substantial Evidence that Each Individual Plaintiff Was Harmed, Both Statistical and Otherwise ....156

D. Plaintiffs' Econometric Models Are Sufficient Evidence of Impact, Damages, And Causation....158

CONCLUSION....160

# TABLE OF AUTHORITIES

**Page**

## Cases

*2301 M Cinema LLC v. Silver Cinemas Acq. Co.*,
342 F. Supp. 3d 126 (D.D.C. 2018)....7

*AD/SAT, Division of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999)....134

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*,
2009 WL 302003 (N.D. Cal. Feb. 6, 2009)....83

*Advo, Inc. v. Phila. Newspapers, Inc.*,
51 F.3d 1191 (3d Cir. 1995)....10

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015)....89, 135

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946)....6, 10

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)....7, 130, 134

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....5

*Apex Oil Co. v. Di Mauro*,
822 F.2d 246 (2d Cir. 1987)....5

*Armada de la Republica Arg. (Arg. Gov't-Argentine Navy) v. Yorkington Ltd. P'ship*,
1995 WL 46394 (D.D.C. Jan. 27, 1995)....6, 90

*In re Baby Food Antitrust Litigation*,
166 F.3d 112 (3d Cir. 1999)....130

*Basle Theatres v. Warner Bros. Pictures*,
168 F. Supp. 553 (W.D. Pa. 1959)....142

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....9, 79

*In re Blood Reagents Antitrust Litig.*,
266 F. Supp. 3d 750 (E.D. Pa. 2017)....59, 67, 87, 125, 145

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ....................91, 118

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp*.,
509 U.S. 209 (1993)....................83

*Canadian Nat'l Ry., et al.*,
4 S.T.B. 122, 1999 WL 336285 (1999) ....................110, 136

*Cavallaro v. United States*,
284 F.3d 236 (1st Cir. 2002)....................62

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................158

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015)....................*Passim*

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ....................7

*City of Moundridge v. Exxon Mobil Corp.*,
2009 WL 5385975 (D.D.C. Sept. 30, 2009) ....................79, 84, 86

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998) ....................83

*In re Consumer Credit Counseling Servs. Antitrust Litig.*,
1997 WL 755019 (D.D.C. Dec. 4, 1997)....................12

*Cont'l Ore Co. v. Union Carbide Corp.*,
370 U.S. 690 (1962)....................12

*In re Coordinated Pretrial Procs. In Petroleum Prods. Antitrust Litig*.,
906 F.2d 432 (9th Cir. 1990) ....................65

*In re Corrugated Container Antitrust Litig.*,
1981 WL 2093 (S.D. Tex. June 4, 1981) ....................142

*In re Currency Conversion Fee Antitrust Litig*.,
2012 WL 401113 (S.D.N.Y. Feb. 8, 2012)....................65, 91

*In re Currency Conversion Fee Antitrust Litig.*,
773 F. Supp. 2d 351 (S.D.N.Y. 2011)....................91

*In re Disposable Contact Lens Antitrust Litig*.,
2019 WL 6463343 (M.D. Fla. Nov. 27, 2019) ....................7

*In re Domestic Airline Travel Antitrust Litig.*,
691 F. Supp. 3d 175 (D.D.C. 2023) ........................................ *Passim*

*In re Domestic Drywall Antitrust Litig.*,
2016 WL 3453147 (E.D. Pa. June 22, 2016) ........................................ 142

*In re Domestic Drywall Antitrust Litig.*,
163 F. Supp. 3d 175 (E.D. Pa. 2016) ........................................ 29, 50, 59

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) ........................................ 10, 11

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
681 F. Supp. 2d 141 (D. Conn. 2009) ("*EPDM*") ........................................ 5, 7, 9, 67, 93

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004) ........................................ 81, 87

*Fleischman v. Albany Med. Ctr.*,
728 F. Supp. 2d 130 (N.D.N.Y. 2010) ........................................ 61, 95

*Freedom Holdings, Inc. v. Cuomo*,
624 F.3d 38 (2d Cir. 2010) ........................................ 84, 85

*Gainesville Utils. Dep't v. Fla. Power & Light Co.*,
573 F.2d 292 (5th Cir. 1978) ........................................ 9

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ........................................ 70

*In re Generic Pharms. Pricing Antitrust Litig.*,
338 F. Supp. 3d 404 (E.D. Pa. 2018) ........................................ 91

*Higgins v. Scherr*,
837 F.2d 155 (4th Cir. 1988) ........................................ 158

**In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ........................................ *Passim*

*In re High Pressure Laminates Antitrust Litig.*,
2006 WL 1317023 (S.D.N.Y. May 15, 2006) ........................................ 65

**Home Depot, U.S.A., Inc. v. E.I. DuPont De Nemours & Co.*,
2019 WL 3804667 (N.D. Cal. Aug. 13, 2019) ........................................ 58, 60, 61, 79

*Howard Town Ctr. Dev., LLC v. Howard Univ.*,
267 F. Supp. 3d 229 (D.D.C. 2017) ........................................ 6

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)....................................................................................89

*Int'l Constr. Prod. LLC v. Caterpillar Inc.*,
2020 WL 4589775 (D. Del. Aug. 10, 2020) ...............................................................91

*Interstate Cir. v. United States*,
306 U.S. 208 (1939)..........................................................................................91, 118

*Jung v. Ass'n of Am. Med. Colls.*,
300 F. Supp. 2d 119 (D.D.C. 2004) ...........................................................................12

*Kleen Prods. LLC v. Ga. Pac. LLC*,
910 F.3d 927 (7th Cir. 2018) ........................................................................59, 60, 79, 130

**In re Korean Ramen Antitrust Litig.*,
281 F. Supp. 3d 892 (N.D. Cal. 2017) .......................................................70, 93, 119

*LaFlamme v. Societe Air France*,
702 F. Supp. 2d 136 (E.D.N.Y. 2010) .......................................................84, 85, 86

*Le Baron's Est. v. Rohm & Haas Co.*,
441 F.2d 575 (9th Cir. 1971) ...................................................................................83

**In re Linerboard Antitrust Litig.*,
504 F. Supp. 2d 38 (E.D. Pa. 2007) .........................................................28, 66, 82

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
213 F. Supp. 3d 530 (S.D.N.Y. 2016).....................................................................152

*In re LTL Shipping Servs. Antitrust Litig.*,
2009 WL 323219 (N.D. Ga. Jan. 28, 2009).......................................84, 86, 87, 88

**Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).........................................................................................10, 11, 13

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)...............................................................................6, 107, 108, 109

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir.), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022).......................................................................156

*Panache Broad. of Pa, Inc. v. Richardson Elecs.*,
2001 WL 290408 (N.D. Ill. Mar. 22, 2001)................................................................142

*Palandjian v. Pahlavi*,
614 F. Supp. 1569 (D. Mass. 1985), *aff'd*, 808 F.2d 1513 (1st Cir. 1986)...........................6, 90

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.*,
998 F.2d 1224 (3d Cir. 1993)....................................................................................13

*In re Polypropylene Carpet Antitrust Litig.*,
996 F. Supp. 18 (N.D. Ga. 1997) ..........................................................................156

**In re Polyurethane Foam Antitrust Litig.*,
152 F. Supp. 3d 968 (N.D. Ohio 2015)............................................6, 12, 49, 62, 91, 119, 121

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
2015 WL 4987751 (E.D.N.Y Aug. 19, 2015)..............................................143, 144, 145, 147

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ................................................................89

*In re Processed Egg Prods. Antitrust Litig.*,
2016 WL 410279 (E.D. Pa. Feb. 3, 2016) ...............................................................142

**In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012)...........................................................................................*Passim*

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
287 F.R.D. 1, 50 (D.D.C. 2012)..................................................................44, 57, 72, 73, 111

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
292 F. Supp. 3d 14 (D.D.C. 2017)............................................................................4, 40

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019) ("*D.C. Cir. II*") ........................................................154

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
520 F. Supp. 3d 1 (D.D.C. 2021), *aff'd in part, vacated in part, rev'd in part, on other grounds*, 34 F.4th 1 (D.C. Cir. 2022) ..................................................141, 142

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
34 F.4th 1 (D.C. Cir. 2022)...................................................................................109, 137

*In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*,
2020 WL 5016922 (D.D.C. Aug. 25, 2020) ...........................................................144, 151

*In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*,
2021 WL 1909777 (D.D.C. May 12, 2021) ("*Tolling II*") ..................................150, 151, 153

*Railroad Cost Recovery Procs.*,
364 I.C.C. 841 (1981) ................................................................................................30

**Rail Fuel Surcharges, Ex Parte No. 661*,
2007 WL 201205 (S.T.B. Jan. 25, 2007) ...............................................................46, 54, 118

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
173 F.3d 995 (6th Cir. 1999) ........................................................................7, 9, 60, 63

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023).........................................................................8

*Rsrv. Supply Corp. v. Owens-Corning Fiberglass Corp.*,
799 F. Supp. 840 (N.D. Ill. 1990), *aff'd*, 971 F.2d 37 (7th Cir. 1992) .................................132

*Rsrv. Supply Corp. v. Owens-Corning Fiberglass Corp.*,
971 F.2d 37 (7th Cir. 1992) ..............................................................................................131

*Rossi v. Standard Roofing, Inc.*,
156 F.3d 452 (3d Cir. 1998)...............................................................................................51

*SD3, LLC v. Black & Decker*,
801 F.3d 412 (4th Cir. 2015) ........................................................................................60, 91

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ..............................................................................................6

*Serv. Merch. Co. v. Boyd Corp.*,
722 F.2d 945 (1st Cir. 1983)..............................................................................................152

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)...........................................................................................................128

**SourceOne Dental, Inc. v. Patterson Cos.*,
310 F. Supp. 3d 346 (E.D.N.Y. 2018) ...............................................................49, 50, 89, 124

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*,
431 F.3d 917 (6th Cir. 2005) ..............................................................................................10

*Spray-Rite Serv. Corp. v. Monsanto Co.*,
684 F.2d 1226 (7th Cir. 1982), *aff'd*, 465 U.S. 752 (1984) ................................................156

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
803 F.3d 1084 (9th Cir. 2015) .......................................................................................84, 86

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d Cir. 2010).................................................................................................51

*Supreme Auto Transp. v. Arcelor Mittal USA, Inc.*,
902 F.3d 735 (7th Cir. 2018) .........................................................................................84, 85

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ..............................................................................................81

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015) ........................................................................... *Passim*

*Times–Picayune Pub. Co. v. United States*,
345 U.S. 594 (1953)..........................................................................................156

**In re Titanium Dioxide Antitrust Litig.*,
959 F. Supp. 2d 799 (D. Md. 2013)..............................................................8, 60, 67, 79

*Toys "R" Us, Inc. v. Fed. Trade Comm'n*,
221 F.3d 928 (7th Cir. 2000) ......................................................................11, 59

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
2011 WL 1753738 (N.D. Cal. May 9, 2011) .................................................................89

*United States v. Alcoa*,
2001 WL 1335698 (D.D.C. June 21, 2001) ...............................................................67

*United States v. Apple*,
952 F. Supp. 2d 638 (S.D.N.Y. 2013)................................................11, 50, 59, 68, 121

*United States v. Beaver*,
515 F.3d 730 (7th Cir. 2008) .....................................................................69, 72

*United States v. Brown*,
332 F.3d 363 (6th Cir. 2003) ..........................................................................143

*United States v. Fantroy*,
146 F. App'x 808 (6th Cir. 2005) .......................................................................143

*United States v. Foley*,
598 F.2d 1323 (4th Cir. 1979) ..........................................................................70

*United States v. Gen. Motors Corp.*,
384 U.S. 127 (1966).........................................................................................9

*United States v. Mezzanatto*,
513 U.S.196 (1995)..........................................................................................141

*United States v. Moore*,
651 F.3d 30 (D.C. Cir. 2011), *aff'd sub nom. Smith v. United States*, 568 U.S.
106 (2013).......................................................................................................143

*United States v. Nippon Paper Indus. Co., Ltd.*,
62 F. Supp. 2d 173 (D. Mass. 1999) ....................................................................144

*In re Urethane Antitrust Litig.*,
913 F. Supp. 2d 1145 (D. Kan. 2012) ("*Urethane I*") .............................66, 114, 121, 140, 141

*In re Urethane Antitrust Litig.*,
2013 WL 65988 (D. Kan. Jan. 4, 2013) ("*Urethane II*")....29, 141

*US Airways, Inc. v. Sabre Holdings Corp*.,
105 F. Supp. 3d 265 (S.D.N.Y. 2015)....62

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
873 F.3d 185 (3d Cir. 2017)....59, 60, 131

*Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)....108

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020)....10

*In re Vitamins Antitrust Litig.*,
209 F.R.D. 251 (D.D.C. 2002)....70

*In re Vitamins Antitrust Litig.*,
320 F. Supp. 2d 1 (D.D.C. 2004)....70

*Walder v. United States*,
347 U.S. 62 (1954)....139

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
648 F.3d 452 (6th Cir. 2011)....143

*Weit v. Cont'l Ill. Nat. Bank & Tr. Co. of Chi.*,
641 F.2d 457 (7th Cir. 1981)....108

*Williamson Oil Co. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003)....80

*White v. R.M. Packer Co.*,
635 F.3d 571 (1st Cir. 2011)....51, 79

*Wilcox v. First Interstate Bank of Or., N.A.*,
815 F.2d 522 (9th Cir. 1987)....108

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
401 U.S. 321 (1971)....151

**Statutes / Rules**

*15 U.S.C. § 1....6

49 U.S.C. § 10706....*Passim*

FED. R. CIV. P. 23....142, 156

*FED. R. CIV. P. 56 ........ *Passim*

Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895 ........ 136

**Other Authorities**

ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES (3d ed. 2017) ........ 155

ANTITRUST LAW DEVELOPMENTS (9th ed. 2022) ........ 143

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (5th ed. 2024) ........ 7, 50, 83, 141, 142

B. Douglas Bernheim & Erik Madsen, *Price Cutting and Business Stealing in Imperfect Cartels*, 107 AM. ECON. REV. 387 (2017) ........ 72

DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION (4th glob. ed. 2015) ........ 66

DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION (2000) ........ 120

Edward J. Green & Robert H. Porter, *Noncooperative Collusion Under Imperfect Price Information*, 52 ECONOMETRICA 87 (1984) ........ 72

H.R. CONF. REP. 96-1430 ........ 136

JM Connor, *Forensic Economics: An Introduction with Special Emphasis on Price Fixing*, 4 J. COMPETITION L. & ECON. (2008) ........ 159

William H. Dempsey, *Antitrust and Deregulation: A Railroad Perspective*, 50 ANTITRUST L.J. 363 (1981) ........ 136

Plaintiffs in *In re Rail Freight Fuel Surcharge Antitrust Litigation* MDL No. 1869 ("*MDL I*"), *In re Rail Freight Fuel Surcharge Antitrust Litigation* MDL No. 2925 ("*MDL II*"), and in *Oxbow Carbon & Minerals LLC et al. v. Union Pacific Railroad Company, et al.* ("Oxbow," and collectively with *MDL I* and *MDL II* Plaintiffs, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' primary motions for summary judgment.[1]

**Preliminary Statement**

Plaintiffs allege that Defendants, the four major railroads controlling over 90% of rail freight shipping in the U.S., engaged in a conspiracy from March 2003 to at least December 2008 (the "Conspiracy Period") to increase all-in rail freight shipping rates through coordinated use of rate-based fuel surcharges ("FSCs").[2] Defendants' motions for summary judgment on the question of whether they engaged in such a conspiracy are meritless.

Defendants' motions ignore the large body of evidence of their unprecedented meetings and joint conduct regarding rate-based FSCs beginning in early 2003. These meetings and communications about FSCs followed a lengthy period of competition in the rail freight industry, declining rates, and unsuccessful or scattered efforts to impose FSCs. And these extraordinary meetings involved Defendants' most senior executives and, as Defendants admit, *never* took place prior to the conspiracy. Those same senior executives then unveiled and directed new FSC formulas and policies—frequently at the time of, or directly after, the inter-Defendant meetings

[1] Specifically, Defendants' Motion for Summary Judgment and Defendants' associated common memorandum and individual memoranda. *See MDL I* Dkt. Nos. 1163 ("Defs. Br."), 1158-1 ("BNSF Br."), 1160-1 ("CSX Br."), 1157-1 ("UP Br."), 1155-1 ("NS Br."); *MDL II* Dkt. Nos. 974-1, 976-1, 977-1, 979-1, 982; *Oxbow* Dkt. Nos. 299-1, 300, 301-1.

[2] "Rate-based" FSCs are charges tacked on top of a rail freight shippers' base rate. Rate-based FSC percentages are variable, based on fuel price indices, though resulting FSC charges do not generally reflect the fuel cost on the shipper's shipment. For example, an FSC of 10% on a $1,000 base rate will yield an additional charge of $100 to the shipper, regardless of whether the railroad's fuel costs are $100 (or even close to that amount) on the shipment.

and communications the executives participated in—pursuant to which Defendants were to apply their standard FSCs as broadly as possible, without reducing their base rates to offset the FSCs, and any exceptions would have to be approved by senior executives. And those same senior executives dominated the Association of American Railroads (the "AAR") and jointly forced it to adopt a new fuel-less cost escalation index (the All Inclusive Index *Less Fuel* ("AIILF")) for the express purpose of facilitating their industry-wide application of FSCs. The plethora of evidence of Defendants' collusive meetings, communications, and resulting action that began in 2003 is set forth in detail in Plaintiffs' Counterstatement of Material Facts ("COF").

The evidence also shows that Defendants maintained the pretense that their coordinated FSCs were merely a cost-recovery mechanism, when in fact they were profit centers and "revenue maximization programs" that recovered as much as 200% of Defendants' incremental fuel costs on the shipments to which they were applied, something Defendants internally acknowledged (but concealed from their customers).

This explicit evidence is alone enough to defeat Defendants' motions. But it is further bolstered by testimony from Plaintiffs' expert economists and econometricians,[3] who have conducted economic analyses regarding whether Defendants' conduct was consistent with the alleged conspiracy and inconsistent with independent conduct, and developed models for estimating damages resulting from Defendants' alleged conduct. These well-qualified experts will testify about numerous economic "plus factors" relevant to a jury's evaluation of whether Defendants conspired, including: (1) sudden policy changes among Defendants at or around the same time; (2) prolonged FSC parity, despite Defendants' different fuel costs; (3) actions against

[3] Plaintiffs' experts include Dr. B. Douglas Bernheim, Professor Kenneth G. Elzinga, Dr. Alan S. Frankel, Dr. E. Allen Jacobs, Dr. Jeffrey Leitzinger, Dr. Leslie M. Marx, Dr. James T. McClave, and Dr. James D. Reitzes.

Defendants' unilateral self-interest (such as BNSF twice forgoing a switch to a mileage-based FSC, as recommended by its own salespeople); (4) high levels of industry concentration among Defendants (who together accounted for over 90% of rail freight transportation) that created an environment conducive to collusion; (5) Defendants' pretextual cost-recovery justifications; (6) Defendants' vast over-recovery of their fuel costs, which yielded exorbitant profits; (7) industry meetings (including ones at which Defendants admit they discussed FSCs); (8) a shared motive to conspire after more than a decade of declining prices amid competition; and (9) regulatory scrutiny and governmental investigations, resulting in the condemnation of Defendants' FSCs and prohibition of their application to regulated traffic by the Surface Transportation Board ("STB").

In the face of overwhelming evidence of conspiracy, Defendants offer merely *competing* explanations or evidence, and resort to *changing* the summary judgment standard, rather than applying it. They point to the absence of outright confessions or guilty pleas, which are rare, and not required to avoid summary judgment. They point to minor differences in execution of, and exceptions to, the coordinated FSCs as somehow *disproving* conspiracy, revisiting factual arguments that Judge Friedman rejected. They advance contradictory theories of their own behavior: on the one hand, that Defendants engaged in follow-the-leader parallelism *without* coordination, and on the other, that their discussions of "uniform [FSC] application across the industry" and "industry positions" across "all roads" on FSCs are entirely legitimate and *encouraged* by the STB. And they misinterpret the legal standard as effectively asking plaintiffs in a *per se* price-fixing case to prove their case at summary judgment.

Defendants also argue for summary judgment by claiming that there is *no evidence* of individual Plaintiffs' impact or damages. They say that the most traditional and widely accepted expert method of showing and quantifying harm in antitrust cases (regression-based modeling) is

actually incapable of doing so. In their accompanying *Daubert* motion, Defendants do not cite a single price-fixing case in which a court held that a regression analysis was an improper tool to estimate a plaintiff's damages. And this Court should not so hold, particularly where Plaintiffs' economic experts present opinions derived from reliable and well-accepted methodologies. Both Defendants' *Daubert* motion and resulting request for summary judgment must fail.

Finally, Defendants ask for partial summary judgment regarding the temporal scope of the conspiracy. Defendants claim their conspiracy must have ended on January 25, 2007, when the STB required them to cease using rate-based FSCs on regulated traffic, even though that decision did not concern any alleged conspiracy, and did not extend to Defendants' application of rate-based FSCs on the *un*regulated traffic at issue in this case. If not, Defendants claim their conspiracy must have ended on May 14, 2007, when certain Plaintiffs filed lawsuits, even though Defendants strenuously denied the allegations rather than changing their conduct. In any event, the record shows that these events were not so significant as to render the continuation of Defendants' alleged conspiracy implausible into 2007 and beyond. Defendants did not stop charging rate-based FSCs on Plaintiffs' existing contracts; they did not stop applying rate-based FSCs to new contracts; and, most importantly, they did not take steps to affirmatively withdraw from a conspiracy to enforce supracompetitive rate-based FSCs. Rather, they took steps to entrench their gains and insulate them from regulatory intervention, legal challenges, or customer uproar, including by "rebasing" or "baking in" their FSCs into their base rates. At best, Defendants dispute that their conspiracy continued, but fail to show that a jury could not decide that it did.

Judge Friedman found that there is "*strong [documentary] evidence of conspiracy*" and did so "without relying on *any* of" the documents Defendants had challenged under 49 U.S.C. § 10706. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 32, 50 n.5 (D.D.C. 2017)

(emphases added).[4] Defendants' argument that no disputed issues of material fact exist on the conspiracy question cannot withstand serious scrutiny. For each key issue in dispute, Plaintiffs cite specific and compelling evidence. Defendants put forth, at best, competing explanations and evidence. After 17 years of discovery, motion practice, and appeals, it is now for a jury to determine whether Defendants conspired.

**Legal Standard**

Defendants misinterpret the standards governing Rule 56's application to *per se* price-fixing cases among horizontal competitors. Summary judgment is proper only "*if the movant shows* that *there is no genuine dispute* as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (emphases added). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Summary judgment is a narrow exercise and "should not be regarded as a substitute for trial." *Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 252 (2d Cir. 1987). When "evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial." *In re Publ'n Paper Antitrust Litig*., 690 F.3d 51, 61 (2d Cir. 2012) (reversing grant of summary judgment); *see also In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 168 (D. Conn. 2009) ("*EPDM*") (fact finder's job is to weigh evidence, whereas "[a]t most, the court's role in examining the factual inferences at the summary judgment stage is limited to determining whether the parties have drawn reasonable and therefore

[4] Following the D.C. Circuit's decision interpreting Section 10706, Defendants withdrew their challenge to the admissibility of some key documents, which are now undisputedly *admissible*.

permissible, inferences from the evidence presented" (citations and internal quotation marks omitted)). A party proposing summary judgment cannot advance differing and inconsistent factual theories to suggest the absence of a genuine dispute of material fact. *See, e.g.*, *Armada de la Republica Arg., (Arg. Gov't-Argentine Navy) v. Yorkington Ltd. P'ship*, 1995 WL 46394, at *13 n.12 (D.D.C. Jan. 27, 1995); *Palandjian v. Pahlavi*, 614 F. Supp. 1569, 1579 (D. Mass. 1985), *aff'd*, 808 F.2d 1513 (1st Cir. 1986) (at summary judgment, "the time for the maintenance of inconsistent factual positions has long since passed"); *cf. Howard Town Ctr. Dev., LLC v. Howard Univ.*, 267 F. Supp. 3d 229, 237 (D.D.C. 2017) (Howell, C.J.) (at summary judgment, "[i]f opposing parties tell two different stories," then a court may disregard a story only if "one . . . is blatantly contradicted by the record, so that no reasonable jury could believe it").

### A. Evidence of Price-Fixing Conspiracy Under Sherman Act § 1

Plaintiffs pursuing claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, must prove the existence of (1) a contract, combination, or conspiracy that (2) unreasonably restrains trade, and (3) causes injury to the plaintiffs. *See In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014). This requires proof of "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). When "the conspirators had a unity of purpose or a common design or understanding, or a meeting of the minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946). No formal agreement is necessary to constitute an unlawful conspiracy; it "may be found in a course of dealings or other circumstances as well as in any exchange of words." *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 978 (N.D. Ohio 2015).

Unsurprisingly, summary judgment is relatively rare in price-fixing cases. *Milk*, 739 F.3d at 270 ("[C]ourts are generally reluctant to use summary judgment dispositions in antitrust actions

due to the critical role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference." (citations and internal quotation marks omitted)); *In re Citric Acid Litig.*, 191 F.3d 1090, 1106 n.10 (9th Cir. 1999) ("Because the evidence must, on summary judgment, be construed to the greatest extent reasonably possible in favor of finding an antitrust violation, rare is the antitrust case in which there is absolutely no evidence which could support some inference of an antitrust violation."). To defeat summary judgment on a claim of horizontal price fixing, a plaintiff need only identify an issue of material fact concerning whether the defendants entered into a conspiracy "formed for the purpose and with the effect of raising . . . price[s]." *See Publ'n Paper*, 690 F.3d at 61, 69; *EPDM*, 681 F. Supp. 2d at 166 (same). "[I]n the horizontal context any hint of assent is often assumed to be enough to allow the judge or jury to find a conspiracy." PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1404 (5th ed. 2024).

A conspiracy may be proved by direct or circumstantial evidence. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999). Direct evidence—documents and testimony establishing direct conspiratorial communications and coordination between defendants—categorically precludes summary judgment against the plaintiff in a price-fixing case. *Publ'n Paper*, 690 F.3d at 63-64. Direct evidence is rare and not required.

Circumstantial evidence—evidence of circumstances demonstrating that wrongful conduct was conscious and not the result of independent business decisions—is *almost always* used to prove an antitrust conspiracy. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012); *see also In re Disposable Contact Lens Antitrust Litig.*, 2019 WL 6463343, at *4 (M.D. Fla. Nov. 27, 2019) ("[M]ost conspiracies are demonstrated through circumstantial evidence . . . ."); *2301 M Cinema LLC v. Silver Cinemas Acq. Co.*, 342 F. Supp. 3d 126, 136

(D.D.C. 2018) ("[A]ntitrust plaintiffs may (and often must) prove conspiracies by circumstantial evidence and the reasonable inferences drawn from such evidence . . . ."). Thus, "circumstantial evidence . . . including ambiguous statements . . . are not to be disregarded [at summary judgment] because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.); *see also In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 823 (D. Md. 2013) ("[T]hat this case depends wholly on circumstantial evidence holds no sway.").

To survive summary judgment with circumstantial evidence, a plaintiff need only show "a pattern of parallel behavior as well as the existence of one or more plus factors that tends to exclude the possibility that the alleged conspirators acted independently." *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 192 (D.D.C. 2023) (internal quotation marks omitted). "The court must assess plus factors holistically." *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023). A defendant's "approach of separately evaluating and dissecting each plus factor is legally flawed." *Id.*

For summary judgment purposes, plus factors "indicate the existence of a conspiracy by ruling out the legitimate explanation for parallel behavior" and make it "more likely than not that parallel conduct, once established, was the result of a preceding agreement rather than independent action." *Domestic Airline Travel*, 691 F. Supp. 3d at 192 (citations and internal quotation marks omitted). Plus factors to be considered at summary judgment include "(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether

the defendants have a common motive to conspire," among others. *Re/Max*, 173 F.3d at 1009; *see also EPDM*, 681 F. Supp. 2d at 166-67 (identifying motive to conspire, conduct contrary to economic self-interest, and high level of interfirm communications as plus factors); *Domestic Airline Travel*, 691 F. Supp. 3d at 219 (considering also "structural break from Defendants' past conduct," "admissions by certain [d]efendants that [d]efendants' conduct raised antitrust concerns," and "economic evidence . . . that [actions] are not explained by reasons other than collusion").[5] "[A] pattern of parallel behavior" coupled with merely "the existence of one or more plus factors that tends to exclude the possibility that the alleged conspirators acted independently" is enough to defeat summary judgment. *Domestic Airline Travel*, 691 F. Supp. 3d at 192 (internal quotation marks omitted).

### B. *Matsushita* Did Not Modify Rule 56 or Impose "Special Standards"

Defendants also assert—incorrectly—that Plaintiffs must "prove there is a triable issue of *express* conspiracy" to survive summary judgment. Defs. Br. 18. They cite *In re Text Messaging Antitrust Litigation*, 782 F.3d 867 (7th Cir. 2015), for the proposition that "[e]xpress collusion violates antitrust law" while independent but similar actions do not. *Id.* at 872. Defendants omit that the *Text Messaging* court went on to recognize that "the existence of express collusion can sometimes be ***inferred from circumstantial evidence***." *Id.* at 876 (emphasis added).

Quite simply, "[Section] 1 of the Sherman Act does not require the existence of an express agreement." *Gainesville Utils. Dep't v. Fla. Power & Light Co.*, 573 F.2d 292, 300 (5th Cir. 1978); *see also United States v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966) ("[E]xplicit agreement is not a necessary part of a Sherman Act conspiracy."). Rather, the Sherman Act prohibits an anticompetitive "agreement, ***tacit or express***." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553

[5] Defendants' brief only mentions the crucial "plus factors" in passing.

(2007) (emphasis added) (citations and internal quotation marks omitted); *Am. Tobacco*, 328 U.S. at 809-10 ("The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances . . . .").

Defendants invite this Court to misread *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), as modifying Rule 56, nearly 40 years ago, into an "[un]usual . . . Rule 56" that "requires . . . special standards." Defs. Br. 3. It did no such thing, as the Supreme Court has made clear. The *Matsushita* standard—that circumstantial evidence must "tend[] to exclude the possibility that the alleged conspirators acted independently," 475 U.S. at 588—"did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases," *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 468 (1992); *see also Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 931 (6th Cir. 2005) ("*Matsushita* does not increase the non-movant's burden on a motion for summary judgment."); *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1195 (3d Cir. 1995) ("If there was any doubt" that *Matsushita* did not create "a special summary judgment standard for antitrust cases in general," then "the Court settled it in *Eastman Kodak*"); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) ("Our summary judgment inquiry can be framed in the language of *Matsushita* . . . but this formulation does not get us anywhere beyond the general summary judgment standard.").

Ignoring this, Defendants overstate *Matsushita* by claiming Plaintiffs must offer evidence that "tends to *rule out the possibility* that the alleged conspirators were acting unilaterally" and that "plaintiff's proposed inference of conspiracy must be *stronger*" than the inferences that Defendants seek to draw. Defs. Br. 3, 17 (emphases added). But "the Supreme Court clarified that *Matsushi[t]a*'s 'tends to exclude' standard 'demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely

articulated, in that decision.'" *Domestic Airline Travel*, 691 F. Supp. 3d at 192 (quoting *Eastman Kodak*, 504 U.S. at 468). In other words, plaintiffs are not required to "disprove all nonconspiratorial explanations for the defendants' conduct" under *Matsushita*; rather, plaintiffs at the summary judgment stage need only offer evidence and show that "the existence of a conspiracy [is] a reasonable inference that the jury could draw from that evidence." *United States v. Apple*, 952 F. Supp. 2d 638, 697 (S.D.N.Y. 2013). "Requiring a plaintiff to 'exclude' or 'dispel' the possibility of independent action places too heavy a burden on the plaintiff. Rather, if a plaintiff relies on ambiguous evidence to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence; it need not be the *sole* inference." *Publ'n Paper*, 690 F.3d at 63 (reversing district court decision premised on notion that plaintiffs were required under *Matsushita* and Rule 56 to "exclude" or "dispel" the possibility that defendants acted independently); *see also Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928, 934-35 (7th Cir. 2000) ("[T]hat would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred.").

Wary of misuse of *Matsushita*, the Seventh Circuit cautioned that "[i]n deciding whether there is enough evidence of price fixing to create a jury issue, a court asked to dismiss a price-fixing suit on summary judgment must be careful to avoid three traps" sometimes laid by antitrust defendants invoking *Matsushita*. *High Fructose*, 295 F.3d at 655 (Posner, J.). "The first is to weigh conflicting evidence (the job of the jury)." *Id*. The second "is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment." *Id*. The third "is failing to distinguish between the existence of a conspiracy and its efficacy." *Id*. at 656. Defendants here wrongly urge the Court toward these same traps.

### C. The Alleged Conspiracy Must Be Viewed as a Whole

Defendants, in particular, push Judge Posner's second trap by attempting to dismember the conspiracy, and then focusing on discrete, isolated parts, such as meaningless differences between some Defendants' FSC formulas. *See, e.g.*, Defs. Br. 34-35. The Supreme Court has squarely rejected such an approach: "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 699 (1962); *accord Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 160 (D.D.C. 2004) ("[a]lthough *Continental Ore* was decided in the context of a motion for a directed verdict after trial, its maxim has been applied in a variety of contexts," including summary judgment); *see also In re Consumer Credit Counseling Servs. Antitrust Litig.*, 1997 WL 755019, at *5 (D.D.C. Dec. 4, 1997) ("[T]he ramification and effect of the conspiracy should be looked at as a whole." (citations omitted)). If the evidence reveals that a firm "was aware of the object of the conspiracy and that it voluntarily associated itself with the conspiracy to further its objectives," the firm "cannot absolve itself by showing that . . . it participated only in" one aspect of the conspiracy; "[i]t need not be an active participant in every phase of the conspiracy, so long as it is a party to the general conspiratorial agreement." *Polyurethane Foam*, 152 F. Supp. 3d at 998.

## <u>Argument</u>

## I. THE EXISTENCE OF AN UNLAWFUL AGREEMENT AMONG DEFENDANTS IS A HOTLY DISPUTED ISSUE OF MATERIAL FACT

Whether Defendants conspired is hotly disputed—and cannot yield summary judgment given the strong evidence supporting Plaintiffs' allegations, which Defendants largely ignore while, at the same time, erroneously seeking to have all inferences resolved *in their favor*.

As discussed above, *Matsushita* requires only that "the inference of conspiracy" be "*reasonable* in light of the competing inferences of independent action," 475 U.S. at 588 (emphasis added). And *Matsushita* readily illustrates why summary judgment was proper there and would be improper here. The plaintiff alleged a highly unlikely predatory pricing conspiracy that purportedly involved over 20 defendants and lasted over 20 years with no payoff in sight. The polar opposite is true here. Where, as here, "the conspiracy is economically sensible," courts recognize that, unlike in *Matsushita*, plaintiff's burden on summary judgment "is more easily satisfied." *Publ'n Paper*, 690 F.3d at 63; *see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.*, 998 F.2d 1224, 1232 (3d Cir. 1993) ("[I]n stark contrast with the circumstances in *Matsushita*, the plaintiff's theory of conspiracy is not implausible. In fact, it makes perfect economic sense."); *Domestic Airline Travel*, 691 F. Supp. 3d at 192 ("[B]roader inferences are permitted when the conspiracy is economically sensible."). Under the correct standard, summary judgment is an impossible project for Defendants.

Defendants make the "straw person" argument that the documented meetings among their senior executives are not tantamount to "guilty pleas" and thus cannot constitute direct evidence of the conspiracy. Defs. Br. 48. But the relevant question for summary judgment on the existence of collusion is not whether Defendants have *admitted* that they participated in a conspiracy (a rare occurrence), but rather whether there is any evidence from which a jury could determine that a conspiracy occurred. *Supra* Legal Standard Sec. B. Defendants' attempt to characterize each of their conspiratorial meetings in isolation, Defs. Br. 49-52, and their suggestion that *each piece* of Plaintiffs' evidence purportedly must "stand[] on its own and establish[] an unlawful agreement," *id*. at 19, misstates the governing standard. *Supra* Legal Standard Sec. C.

As described in detail below, the record contains core evidence of conspiracy: express and

unprecedented competitor communications about FSCs (including sit-down meetings among senior executives), clear changes in Defendants' FSC programs and policies in the wake of these meetings, FSCs divorced from Defendants' true fuel costs and resulting exorbitant profits, conduct against unilateral self-interest, exchanges of FSC "coverage" statistics (*i.e.*, the percent of their traffic subject to FSCs), and steps to monitor competitors' coordinated FSC behavior. Whether captioned as direct evidence, circumstantial evidence, or evidence of traditional plus factors, it is more than enough for a reasonable jury to infer that Defendants broke the law.[6]

### A. Before 2003, Defendants Competed Vigorously—Including as to FSCs—Amid Some "Very Vicious Historical Price Wars"

Defendants—the four major freight railroads—accounted for over 90% of the country's track miles and generated more than 94% of the industry's revenue. COF ¶ 1. CSX and NS controlled the eastern United States and BNSF and UP controlled the western United States.

For many years, prior to the conspiracy, the rail industry had been highly competitive. COF ¶¶ 16-21. Defendants described the era as plagued by "very vicious historical price wars," and complained of "Destructive Pricing for Rail Share" among the Defendants that "hindered railroad revenue growth." COF ¶ 16; PX0595, Giftos (CSX) Dep. 85-87; PX0205, CSXFSC000199146, at '149. Indeed, an STB study of historical rail rates found that "inflation-adjusted rail rates declined in every year but one from 1985-2004" (before dramatically reversing

[6] Contrary to Defendants' claim that their brief "begin[s] with several undisputed backgrounds facts," Defs. Br. 5, Plaintiffs dispute *virtually all* of the "facts" Defendants lay out in their "Background." For example, Plaintiffs in no manner agree that "major freight railroads are not . . . even primarily[] competitors," *id.* at 6; that "joint service requires constant communication over . . . how carriers will deal with surcharges," *id.*; that "Congress . . . concluded that it needed to make interline discussions almost completely off limits to antitrust plaintiffs," *id.* at 8; that "[t]his case was born out of a truly historic spike in fuel prices," *id.* at 9; or that there was no "sudden change in the pace at which fuel surcharges were negotiated into agreements with shippers," *id.* at 13. Plaintiffs address the many inaccuracies below, in Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts, and in the appropriate *Daubert* oppositions.

course during the Conspiracy Period):




*See* COF ¶¶ 13-15, 524. As BNSF lamented in a 2002 risk assessment:

> The dynamic that is involved in that is our competition, particularly in the rail industry, not being able to improve revenue through adequate rate increases. ***We need to be able to achieve price rate improvement. How can we do this if the other competing railroads do not do this at the same time? We are still not together as an industry. We are fighting for revenue share*** as opposed to rate adequacy.

COF ¶ 20; PX0128, at p.17 (emphasis added); PX0127, BNSF-0574516, at '617.

As part of these pre-conspiracy "price wars," Defendants actively competed on rail freight rates, including on the basis of FSCs, and—contradicting the supposedly undisputed facts presented by Defendants—contemporaneously bemoaned their inability to impose FSCs broadly. COF ¶¶ 16-21; *see also* Pls. Resp. to Defs. Stmt. of Facts Nos. 12, 18-19, 24-25 31-32, 39, 41-44. For example, BNSF wrote in 2002 that it was "***challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace***" and that if BNSF implemented FSCs, it would either lose business or have to decrease its base rates to offset those FSCs. COF ¶ 73; PX0127, BNSF-0574516, at '617 (emphasis added). By early 2003, only 27% of BNSF's business was covered by an FSC, in no small part because of

competitive pressures from the other railroads. COF ¶¶ 71-74; PX0088, BNSF-0328865, at '866 ("The reasons limiting our ability to pass on fuel cost recovery charges vary—the source of competition . . . industry practices, contract negotiating power all play a role. . . . Therefore, any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive.").

NS also received substantial customer pushback when it tried to impose FSCs unilaterally during the pre-Conspiracy Period, with customers refusing to pay or negotiating out of them even though FSCs at that time were only "***theoretically billable***" because they were rarely triggered given prevailing fuel prices. COF ¶¶ 47-52, 54; PX0614, Glennon (NS) Dep. 26; PX0319, NS_010072620, at '620 ("[m]any" NS customers have "negotiate[d] out of the SC"). NS reported in early 2003, under the heading "Customer push back," that more aggressive FSC programs risked "losing the surcharge altogether." COF ¶ 48; PX0284, NS_010026782, at '784. Consistent with this, before 2003, NS gave marketing personnel authority to reduce or eliminate FSCs. COF ¶ 53.

UP executives likewise testified that there were only "isolated" instances of FSCs from 2000 to 2002, and that "there was not a[n] [FSC] policy" at UP at that time. COF ¶¶ 62-67; PX0611, Knight (UP) Dep. 23-24. UP also faced customer pushback when it tried to impose FSCs during the pre-Conspiracy Period, resulting in UP "being pretty lenient on the fuel surcharges." COF ¶¶ 64-65, 75, 84; PX0514, UPFSC 0184102, at '102 ("[T]here appears to be a lot of inter[es]t/push back coming f[ro]m customers/consultants directed at challenging our fuel surcharges."); *see also, e.g.*, PX0508, UPFSC0129813, at '813 (FSCs were "melting away at the competition" and "what's on paper must not work in the real world"). And there is no evidence that senior UP executives needed to sign off on any waiver of or discounts to the FSCs during this period. COF ¶¶ 65-66.

CSX also confirmed its pre-conspiracy FSC coverage was "***minimal***" and "***embarrass[ing]***" before March 2003. COF ¶¶ 55-56. CSX too faced competitive pressures and customer pushback when trying to impose FSCs, leading to regular discounts and waivers. COF ¶¶ 57-58. And there is likewise no evidence that, before the conspiracy, senior CSX executives needed to approve FSC waivers or discounts. COF ¶ 59.

Before 2003, not a single high-ranking executive of any Defendant attended a meeting with another Defendant at which FSCs were discussed, even though, as Defendants highlight, the industry had a "long history" of FSCs. Defs. Br. 32; COF ¶¶ 93-94. Rather, Michael Giftos, CSX's Chief Commercial Officer, testified that CSX implemented its first FSCs in 2000 and 2001 *without speaking to another railroad beforehand*. COF ¶ 22, 30. Similarly, NS's senior executives testified that they were not aware of *any* communications with the other Defendants before NS adopted its initial FSC program in 2000. COF ¶ 29. And all four Defendants conceded in sworn interrogatory responses that ***before 2003, there were no meetings among their senior executives concerning FSCs***. COF ¶¶ 93-94.

Communications about FSCs during this period were narrow, technical in nature, handled by low-level employees, and limited to interline moves (*i.e.*, moves where two or more rail carriers transport goods between the traffic origin and destination). COF ¶¶ 33-45. Indeed, in 2000, Defendants established a [redacted] of the Interline Revenue Management Committee of the AAR consisting of "lower level management" with responsibility for interline billing systems. COF ¶¶ 39-41. This technical advisory group had responsibility for interline billing systems so the railroads could avoid [redacted] COF ¶ 41. CSX's Giftos described these lower-level employees as the ones:

> that have been doing this [*i.e.*, handling joint-line billing issues] for years. They know how to do it. They know when they have to do it. They know the right way

to do it and they just did it. . . . [They did it] ***in the depths of [the] organization***.

COF ¶ 41; PX0595, Giftos (CSX) Dep. 72, 198 (emphasis added).

Interline shipping includes two distinct types of traffic: "Rule 11" and "joint-rate" traffic. In Rule 11 shipping, each carrier *separately* negotiates with and invoices the shipper directly for its portion of the movement, without the need for carrier-to-carrier discussion of price, let alone FSCs. COF ¶¶ 36-37. More than 40% of Defendants' interline traffic during the Conspiracy Period was shipped on Rule 11 price authorities. COF ¶ 38.

For FSCs on joint-rate shipments, the technical advisory group created (and the AAR adopted) best practices for inter-Defendant concurrence that did not contemplate lengthy discussions between connecting railroads. COF ¶ 42; PX0360, NS_02400001 at '003 ("Acknowledgement [of a request for FSC concurrence request for interline shipment] would be in the form of Yes, No, or a modification."). It also made clear that a railroad could implement FSCs independently *without* seeking concurrence from the connecting railroad. COF ¶¶ 42-43, 45; PX0360, NS_02400001, at '006; PX0632, Usher (AAR 30(b)(6)) Dep. 178-180.

### B. In Early 2003, Defendants' Senior Executives Began Unprecedented Communications About, and Made Changes to, Their FSC Programs

All of that changed in early 2003. A substantial body of evidence demonstrates that Defendants' highest-ranking executives engaged in a series of extraordinary meetings and communications regarding the coordination, application, and enforcement of uniform, industry-wide FSCs—surcharges that had previously been a source of robust, uncoordinated price competition. COF ¶¶ 92-273. The evidence also shows that, in turn, Defendants broke from past practices to each mandate aggressive, non-negotiable FSCs across-the-board to freight shippers nationwide. The results were stark and inconsistent with competitive conditions. Defendants' FSCs were divorced from Defendants' actual fuel costs, leading to a reversal from the prior years

of rate declines, and scaling to enormous profits as Defendants increased their FSC coverage and vastly over-recovered the fuel costs that they were experiencing. *Infra* Sec. I.G.

Defendants' first coordinated structural change to their FSCs occurred in March 2003, when CSX abandoned its plan to *soften* its FSC and, instead, suddenly and without explanation adopted an FSC escalation rate that was *twice as aggressive* and which *only* existed in *UP's internal* files. COF ¶¶ 104-21. CSX EVP of Sales and Marketing Clarence Gooden had been under "pressure from Sales to lower" CSX's FSC program. COF ¶ 104. Therefore, on March 11, CSX internally considered recommended modifications to that program that would have *reduced* its FSCs, by adopting a lower "trigger" price of $23 on the West Texas Intermediate ("WTI") index, but with a *less aggressive escalation rate* (0.5% for each $2.50/barrel increase). COF ¶ 105. The proposed formula would have been more customer-friendly and "lower than the rest of the industry." PX1152, CSXFSC000098458. That same day, UP *internally* circulated a proposal for an FSC formula with a $28 WTI trigger price, but with a *more aggressive escalation rate* than CSX was considering (0.4% for each $1.00/barrel increase). COF ¶¶ 107-10.

Then, on March 20, CSX suddenly announced that, beginning June 1, 2003, it would adopt the $23 WTI trigger price it had been considering, *but with the more aggressive escalation formula that only UP had considered internally* (0.4% for each $1.00/barrel increase). COF ¶¶ 111-21. That escalation formula was *not* public, and there is no evidence that *CSX* had ever independently considered or analyzed it before suddenly announcing that CSX was adopting it. COF ¶¶ 110-15. By doing so, CSX would capture significantly higher FSCs. COF ¶¶ 113, 115-21. Thus, CSX abandoned its plan to soften its FSC, instead adopting UP's, which was *more* aggressive and *less* customer-friendly than both the formula CSX had proposed internally and its prior formula:

[redacted]

**CSXT Modified Fuel Cost Recovery Program Index**

| WTI $/Barrel | Old CSXT Surcharge | New CSXT Surcharge |
|---|---|---|
| $ 23 | | 0.0% |
| $ 24 | | 0.4% |
| $ 25 | | 0.8% |
| $ 26 | | 1.2% |
| $ 27 | | 1.6% |
| $ 28 | 2% | 2.0% |
| $ 29 | 2% | 2.4% |
| $ 30 | 2% | 2.8% |
| $ 31 | 2% | 3.2% |
| $ 32 | 2% | 3.6% |
| $ 33 | 4% | 4.0% |
| $ 34 | 4% | 4.4% |
| $ 35 | 4% | 4.8% |

1 CSX

COF ¶¶ 104-21; PX0769, Leitzinger MDL II Rpt. ¶ 100 fig.12 (comparing UP's internal FSC formula recommendation to CSX's internal recommendation); PX0312, NS_010058122, at '136 (comparing CSX's new FSC to CSX's old FSC). In CSX's words, "***[w]hile [its new formula] seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%.***" PX0163, CSXFSC000000357, at '357 (emphasis added); PX0614, Glennon (CSX) Dep. 42 (NS describing CSX's revised methodology as "definitely . . . more aggressive" and "definitely yield[ing] more revenue").

Defendants now claim CSX's FSC was modified "based on extensively documented internal deliberations," Defs. Br. 2, but CSX cites *no evidence* that CSX deliberated upon or analyzed *UP*'s *more aggressive internally considered escalation rate* before announcing that CSX would adopt it, *id.* at 36 (pointing to a CSX analysis of a $23 WTI trigger and a *different* escalation formula than the one CSX ultimately selected). This was not conscious parallelism: in Defendants' words, CSX "moved first" when it announced a formula that included an escalation rate being considered *internally* by another Defendant. *Id.*; *see also* CSX Br. 1.

UP then announced that it would do the same, adopting the same methodology as CSX, including CSX's lower $23 WTI trigger price (rather than the $28 WTI trigger price UP had

proposed internally), also to be effective June 1, 2003. COF ¶¶ 122-28. Despite Defendants' misleading suggestion otherwise, UP also points to no internal analyses regarding its decision to adopt *CSX's* more aggressive $23 WTI trigger price. *See* Defs. Br. 37 (describing an employee's request to "assess" why CSX's new FSC wasn't yet on its website as an "internal document[] show[ing] evaluation"). In fact, UP's finance team declared it was "[not] in the best position to discuss why $23 [trigger]" because "[t]o be honest, we were not aware of the threshold until we saw the press release so we are not in the best position to describe how and why that threshold was selected" and that the new trigger price cannot be "defend[ed]" to customers on the basis of "historical information and analysis we have on our side." COF ¶¶ 124-25, 127; PX0402, UPFSC 0184695, at '695.[7] The result was the worst of both worlds for shippers: a new, lower trigger coupled with a more aggressive escalation rate—all of it inexplicable absent coordination.

On April 1, 2003, NS's Pat Glennon (Director of Marketing Systems) reported that he had learned that UP would likely be adopting CSX's FSC. COF ¶¶ 132, 134-35; PX0912, NS_062203025, at '025 (Glennon received word from UP that "[i]t sounds like UP will adopt the CSXT fuel surcharge" and expressed his "expect[ation] that'll push us over the top as well"). And days later, Glennon reported to Don Seale (NS's Senior Vice President ("SVP") of Marketing Services and Chief Marketing Officer ("CMO")-in-waiting) that he had learned that UP would likely be matching CSX. DA05709, at '710 ("The UP hasn't announced but it appears that it will."). Glennon also reported talking with CSX "privately" concerning CSX's strategy to

[7] Both CSX and UP claim to have revised their FSCs in response to a March 18, 2003 decrease in the WTI price that prevented them from charging a higher FSC percentage the following month. As discussed below, *infra* Sec. I.I.1, this was not a significant event, let alone the catalyst for change. UP offers no contemporaneous evidence that this played a role in its decision, and CSX's CMO contemporaneously reported to his CEO that any "revenue reduction should be more than offset by declining fuel prices.

implement its new FSC in public and private authorities. *Id.*; *see also* COF ¶ 136.

As of April 15, 2003, NS was unsure whether to modify its FSC. COF ¶ 137. Glennon presented Seale and NS's group VPs with a "Pro/Con" analysis of adopting CSX's new FSC formula. COF ¶ 137. NS's group VPs had advocated against changing NS's FSC because, combined with NS's hedging program, the existing FSC was entirely adequate to mitigate NS's fuel costs. COF ¶ 137. And its account executives opined that "there is no need to implement a change" and "adoption of the CSX fuel surcharge regimen is a marketing decision which does not appear to have much support from our account execs." COF ¶ 137; PX0254 NS001000316, at '317, '319. Seale asked that the group VPs give him a "consensus recommendation" whether to change NS's FSC process by May 1, 2003. COF ¶ 138; PX1153, NS_010004403, at '403. After that internal NS meeting, Glennon reported privately, "I don't have any indication what we might do." COF ¶ 137; PX0254, NS001000316, at '317; *see also* PX0913, NS_010004541, at '541 ("Fox said that he thought [Seale] was going to hold off on any changes for now consistent with [Glennon's] advice.").

But, later that day, Seale and Ike Prillaman (NS's CMO) left for an April 15-17 unsupervised getaway with CMOs and CMOs-in-waiting *from all four Defendants*, and with no other employees invited. COF ¶ 139.[8] On the day Seale and Prillaman returned from that getaway, something had changed—*even though Seale had not yet received the analysis or recommendation of the group VPs that he had requested,* Seale nevertheless reported privately, cc'ing his travel companion Prillaman, that "at this point, ***we do plan to modify our FSC***." COF ¶ 140; PX0254,

[8] *See* PX0356, NS_015000201, at '220 (UP's CMO Koraleski planning April 15-17 "meeting" in honor of its main competitor BNSF's CMO (quotation marks his)); *id.* at '201 (Prillaman expense report showing attendance); PX0350, NS_014002633, at '633 (Seale expense report showing attendance); *id.* at '646-47 (email reflecting CSX's SVP and future CMO Gooden would attend); PX0595, Giftos (CSX) Dep. 269 (CSX's CMO Giftos testifying to attending).

NS001000316, at ‘316 (emphasis added).

As detailed further below, *infra* Sec. I.B, NS adopted CSX’s FSC as quickly as it could, and ultimately announced it was adopting the same FSC program as CSX, with the intent of “standardiz[ing]” FSCs. COF ¶¶ 206-23; PX0347, NS_013001654, at ‘654-56 (“This [] action is being taken for a number of reasons: . . . • **Standardization of FSC provisions in the East.**”).

Defendants continued to meet regarding fuel cost issues throughout early 2003. For example, on April 21, 2003, NS held a meeting to teach CSX about NS’s fuel hedging practices. COF ¶¶ 501-05. At the meeting, NS discussed the correlation of its fuel hedges with the WTI index, explained how to “smooth[] earnings by reducing fuel price variability” and “obtain[] budgeted prices,” helped CSX match its financial contracts with physical fuel purchases, and explained how to structure a “formal fuel hedging strategy team.” COF ¶ 504. Typically, a company does not teach its largest competitor lessons in “reducing fuel expense volatility,” which is a competitively sensitive issue. COF ¶ 505; PX0769, Leitzinger MDL II Rpt. ¶ 180; PX0633, Davidson (UP) Dep. 183-84 (UP executive testifying that he would not have discussed hedging strategy with other Defendants because it would raise legal concerns and “was our own business”).

For its part, BNSF had been considering in February and early March 2003 changing its published FSC formula from rate-based FSC (*i.e.*, a surcharge calculated as a percentage of the base rate) to mileage-based (*i.e.*, an additional amount added to a shipper’s invoice for each mile shipped). COF ¶¶ 141-50; *infra* Sec. I.D. On March 13, BNSF’s EVP and CMO-in-waiting, John Lanigan, requested that his review team provide a recommendation “for a new [mileage-based] program.” COF ¶ 144; PX0106, BNSF-0456278, at ‘278.

While the Review Team was working, Lanigan attended a five-day National Freight Transportation Association (NFTA) meeting, where executives from all four railroads were in

attendance, and spoke with his counterparts. COF ¶ 148, 151. Almost immediately afterward, on April 9, Lanigan issued a new directive that price authorities without BNSF's rate-based FSCs would be "DOA" (dead on arrival): "Effective ***immediately and urgently*** per John Lanigan. Authority to omit FSC provision is to be ***granted to VP's only (who will also clear with John). This needs to be communicated immediately.***" COF ¶¶ 148, 156-57; PX0050, BNSF-0027935, at '935 (emphases added).

Shortly following an April 23 meeting between BNSF and CSX senior executives, including Giftos, Gooden, Lanigan, BNSF CEO Matt Rose, and CSX CEO Mike Ward, BNSF formally abandoned its plans to switch to a mileage-based FSC. COF ¶¶ 159-61. And *during* a gathering of all Defendants' CMOs and CMOs-in-waiting—including UP's Jack Koraleski, BNSF's Lanigan and Schultz, NS's Seale, and CSX's Giftos and Gooden—under the auspices of the AAR's Network Efficiency Management Committee (or "NEMC"),[9] BNSF finalized a plan to lowered its trigger price *in a manner that was designed to reflect the lowered trigger price that UP and CSX had each announced* (albeit using the different Highway Diesel Fuel ("HDF") price index). COF ¶¶ 160-63; PX0084, BNSF-0327011, at '011 (describing BNSF's new $1.25 HDF strike price as "reflect[ing]" the $23 WTI crude strike price used by UP); PX0610, Lanigan (BNSF) Dep. 97 ($1.25 HDF is "roughly equivalent" to $23 WTI). BNSF's new policy requiring VP-level approval of FSC exceptions was consistent with the approval policy CSX was internally discussing. COF ¶ 330-31; PX1158, CSXFSC000195042 (VP stating "ALL EXCEPTIONS must have my explicit approval."); PX0181, CSXFSC000036491, at '493 ("Need a written policy that

---

9 [redacted] COF ¶¶ 419-20.

Fuel Surcharge will apply on all new moves . . . Exceptions to SVP.”).[10]

BNSF’s change to its FSC program was not “modest,” as BNSF now claims. BNSF Br. 1. To the contrary, at the time BNSF acknowledged that its changes included (1) charging FSCs even below 1%, which was not done before; (2) decreasing the formula’s trigger price from $1.30 HDF to $1.25 HDF—meaning that the FSC could kick in at a lower fuel price; (3) mandating that BNSF increase the volume of shipments covered by FSCs; and (4) requiring escalation of any exceptions to the VP level. COF ¶ 163; PX0084, BNSF-0327011, at ‘011. In an internal BNSF document dated May 1, 2003, BNSF described these changes as “an effort to have its Fuel Surcharge Program more closely aligned with [its] competition.” PX0914, BNSF-0572384, at ‘387.

Also within days of the April 30, 2003 NEMC meeting between Defendants’ CMOs and future CMOs discussed above, NS implemented policies to facilitate FSC adoption, including a requirement that all new contracts incorporate any standard NS FSCs, with exceptions requiring Seale’s approval, aligning with the approval requirements that CSX and BNSF had internally implemented. COF ¶¶ 164-65; PX0270, NS_010004522, at ‘523. Also within a few days of the NEMC meeting, Koraleski called a UP meeting with a “[f]ocus on ‘fuel surcharge.’” COF ¶ 165;

[10] BNSF’s decisions to uniformly mandate rate-based FSCs, abandon its mileage-based FSC proposal, and lower its FSC trigger price to match its competitors’ triggers, all also followed a March 18, 2003 meeting between senior executives of BNSF and NS including Lanigan and his NS counterpart Seale. COF ¶¶ 146-47; PX0145, BNSF-FSC 000643. Lanigan and Seale then played “phone tag” and made plans to “catch up next week” at the NFTA meeting attended by all Defendants’ executives. COF ¶¶ 146-47; PX0237, NS 001000225, at ‘225.

After initially excluding PX0145, Judge Friedman granted in part a motion for reconsideration and ordered it admitted with specified redactions. *Oxbow* Dkt. 249. “[T]he remainder of the exhibit may be admitted with no further redactions and considered in connection with the pending summary judgment motions.” *Id.* at 9. Similarly, Judge Friedman ordered partial redaction of PX0237 and otherwise admitted it with redactions proposed by Defendants. *MDL II* Dkt. 1123, at 8, 15. Plaintiffs make no reference to excluded portions of these exhibits, which are redacted in Plaintiffs’ submission. While the Court need not consider these documents to deny Defendants’ motion, they provide context that Defendants’ senior executives communicated before and during the period when they were deciding whether and how to modify their FSCs.

DA01532. There, UP determined to "follow the BNSF's fuel surcharge," but with a $1.35 HDF trigger price. COF ¶ 166; DA01533. UP acknowledged that it had adopted a formula "identical" to BNSF's, COF ¶ 166; PX0401, UPFSC_0183975; PX0610, Lanigan (BNSF) Dep. 119, and that it did so not to compete with BNSF but "[t]o match BNSF's 'standard' HDF based surcharge," COF ¶¶ 167-69; PX0502, UPFSC_0075761; PX0401, UPFSC_0183975. UP also announced an effective date of June 1, 2003, matching BNSF's. COF ¶ 171.

Then on May 12, 2003, NS's Don Seale learned that BNSF had reduced "its FSC to 2% . . . even though their formula calls for 5%," and in anticipation of an upcoming "conversation with UP," Seale complained to his boss Ike Prillaman that "***[t]he industry is not looking good on this issue [fuel surcharges]*** and a stable approach has been the best approach." *See, e.g.*, COF ¶¶ 179-81; PX0303, NS_010042321, at '321 (emphasis added); PX0302, NS_010042306, at '306. As discussed below, *infra* Sec. I.E, Defendants thereafter never engaged in such programmatic, across-the-board discounting of their FSCs during the Conspiracy Period, COF ¶ 522.

Two days later, executives from NS and UP (including Seale, Prillaman, and Koraleski), discussed "***fuel surcharges and various application processes as used by different roads***," reaching "***[c]onsensus . . . that it would be a positive outcome if all roads had the same process in the eyes of our customers.***" COF ¶¶ 182-84, 522; PX0241, NS 001000360, at '361 (emphases added). Meeting notes reflect NS and UP's agreement: "Fuel surcharges: ***Uniform application across the industry would be helpful***." COF ¶¶ 182, 522; PX0460, UPFSC 0616651, at '652 (handwritten meeting notes) (emphasis added). They further questioned "***whether or not the industry can work together on this opportunity, probably through the AAR***," controlled by the four Defendants, or whether they should instead "handle the opportunity on a bilateral basis," *i.e.*, through one-to-one discussions with the other railroads. COF ¶¶ 182, 522. NS's Seale and UP's

Koraleski were assigned to follow up on these issues. COF ¶¶ 183, 522.

On June 3, 2003, UP and CSX senior executives (including Koraleski, Giftos, and Gooden) met and discussed FSCs, including "***both roads[']***" identical trigger prices and potentially "***revisit[ing]***" them together, as well as "customer reaction to our current processes." COF ¶¶ 188-93; PX0474, UPFSC0001088, at '088; *see also id.* ("Fuel surcharge – GIFTOS, CSX has not seen outcry that UP has."); PX0167, CSFSC000000416, at '417 ("Fuel Surcharges: discussion of customer reaction to our current processes.").

And, on July 30, 2003, top marketing executives of NS and BNSF (including Seale and Lanigan) had the same discussion that NS and UP had in May concerning a "***potential industry position***" on FSCs, then jointly appointed BNSF's Lanigan and NS's Seale to lead a discussion on the topic at the next meeting of the AAR's NEMC scheduled for September 11, 2003. COF ¶¶ 196-98; PX0243, NS 001000422, at '424 (emphasis added).[11]

Peculiarly, Defendants offer as a purportedly *exculpatory* fact that Defendants were "quite advisedly" prevented from violating the antitrust laws at the next meeting of the AAR's NEMC, which Defendants' CMOs controlled. Defs. Br. 66. They do not address NS and UP's agreement that, if they could not cause "uniform [FSC] application across the industry" through the AAR, they would achieve the same ends "on a bilateral basis," *i.e.*, through one-to-one meetings with the other Defendants. COF ¶ 268; PX0241, NS 001000360, at '361. Moreover, Defendants' purported determination not to explicitly raise uniform FSC application industry-wide at *one*

---

[11] During this period, executives from the "Eastern railroads" (CSX and NS) and the "Western railroads" (BNSF and UP) also regularly met with one another. COF ¶¶ 175, 199, 202, 204; PX0522, UPFSC_0343267, at '267 (BNSF CEO referencing "previous[] discuss[ions]" with UP CEO and suggesting future meetings); PX0168, CSXFSC000000467, at '467 (Goode (NS) and Ward (CSX) agreed to meet "more frequently"); PX0346, NS_011001321, at '321 (NS expense report for "CSX Meeting"); PX0025, BNSF_CAL_0007136 ("AAR CEOs brkfst. mtg." and "mtg. includes following CEOs only:" Rose (BNSF), Ward (CSX), Evans (UP), and Goode (NS)).

official AAR meeting is hardly exonerating, as Defendants *did* subsequently use the AAR to facilitate that goal at that scheduled meeting and others, as discussed further below. *Infra* Sec. I.C; COF ¶¶ 374-420.[12]

These meetings between Defendants' senior executives also sidestepped the lower-level employees "in the depths of" each Defendant's organization who handled any coordination on joint-line rates and had—through the AAR's technical advisory group—adopted best practices years earlier that did *not* require any extensive discussions about FSC coordination, and allowed a railroad to independently implement an FSC. COF ¶¶ 39-45; *supra* Sec. I.A. Given that FSCs were historically handled by the rank-and-file at each railroad, and given that senior railroad executives did not need to consult with each other to impose FSCs even on interline shipments, there was no legitimate reason for senior executives suddenly to start meeting to discuss FSCs in 2003. *See In re Linerboard Antitrust Litig*., 504 F. Supp. 2d 38, 59 (E.D. Pa. 2007) (denying summary judgment where "plaintiffs do not offer their evidence of opportunity to conspire in isolation" but "show that the communications between" defendants were "highly unusual").

These meetings, which were unknown to those outside of Defendants until they were revealed in discovery in this litigation, took place without counsel or any other procedural safeguards that might have discouraged collusion among competitors. COF ¶¶ 96-100; PX0604, Eisele (UP) Dep. 88 (there was no requirement that attorneys attend "Alliance" meetings and that he could not recall a single time a lawyer from UP, CSX, or NS attended such a meeting). The meetings also defied each Defendant's antitrust compliance policies, which forbade

[12] It also says nothing of discussions at private "rump sessions" between executives that occurred on the sidelines of AAR meetings, that the AAR took no steps to prevent or police. COF ¶¶ 99-100; PX0632, Usher (AAR 30(b)(6)) Dep. 62.

communicating about prices with competitors beyond specific shared interline traffic. COF ¶ 97.[13]

Notably, Defendants did not institute protocols to document their meetings accurately and, after the meetings, even sanitized meeting minutes to omit that they had discussed FSCs. COF ¶¶ 98, 192, 396-97; *compare* PX0474, UPFSC0001088, at '088 (handwritten notes from meeting), *with* PX0167, CSFSC000000416, at '417 (official minutes omitting key discussions on FSCs). Such incomplete meeting notes can support an inference of conspiracy. *See, e.g.*, *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 257 (E.D. Pa. 2016) ("test[imony] that he didn't recall anyone putting anything in writing to justify the 2012 price increase" could "permit[] the inference that PABCO participated in an agreement to . . . raise prices").

Defendants highlight Judge Friedman's exclusion under Section 10706 of *some* direct evidence that they explicitly discussed FSCs in meetings. Defs. Br. 1. From that, Defendants wrongly claim that "[w]hat [direct evidence] remains occurred *after* CSXT, BNSF, and UP . . . had publicly announced their carload formulas, and none of it before May 14, 2003, the outside date by which Plaintiffs allege all four railroads had agreed to conspire." Defs. Br. 49. But ample evidence remains from *on or before* May 14, 2003, supporting a reasonable inference of conspiracy. COF ¶¶ 92-185. And, of course, evidence from *after* May 14, 2003, can also be used to reasonably infer conspiracy *before* that date. *See In re Urethane Antitrust Litig.*, 2013 WL 65988, at *3 (D. Kan. Jan. 4, 2013) ("*Urethane II*") ("[T]he evidence of a conspiracy existing from 1999 to 2003 (which evidence has been found sufficient to survive summary

[13] *See*, *e.g.*, PX0725, CSXFSC00676473, at '473 ("CSX Antitrust Compliance Do's and Don'ts") ("Don't – Allow your conversation to wander to generalizations about freight rates 'in the market,' or your single line rates."); PX0726, CSXFSC000001040, at '048 (March 2, 2007 CSX email and attachments) ("Limit your discussion to that joint line rate."); PX0727, NS_002000110, at '111 (April 6, 1988 NS Antitrust Guidelines) (prohibiting "discussion of rates or practices in connection with any traffic other than the specific joint-line traffic under discussion").

judgment) at least allows for the reasonable inference that the conspiracy was ongoing in 1999 and thus extended back some period before that year."). Moreover, the "plus factors," discussed further below, *infra* Sec. I.J, *also* allow for a reasonable inference of conspiracy.

### C. Beginning in 2003, Defendants Also Took Unprecedented, Coordinated Action Through the AAR to Impose FSCs

In addition to the unprecedented meetings and communications described above, Defendants used the AAR, the trade association they controlled, as a forum to coordinate their FSCs. COF ¶¶ 374-420. These discussions took place during meetings of the AAR Board, on which Defendants' CEOs sat, and during meetings of the AAR's NEMC, comprised of the railroads' CMOs. COF ¶¶ 194-96, 203-04.

Through the AAR Board, Defendants' CEOs agreed to adopt a new rate-escalation index to foster the industry-wide application of FSCs. The railroad industry had long used the Rail Cost Adjustment Factor ("RCAF")—an STB-mandated weighted escalation index that accounts for changes in railroads' input costs, including fuel—as a base rate escalator in long-term contracts. COF ¶¶ 78-81, 374, 376. The RCAF was based on an index known as the All-Inclusive Index ("AII") published by the AAR. COF ¶¶ 79, 377-78; PX0017, AAR-E-00078595, at '611-20. The RCAF had permitted the Defendants to recover their actual fuel costs. COF ¶¶ 79-81, 379-81. Indeed, when the ICC promulgated the RCAF-U, the ICC determined that it was an effective fuel recovery mechanism and that additional fuel recovery mechanisms were unnecessary: and "serve[d] no useful purpose":

> [T]he procedures established in this decision will permit railroads to recover fuel cost increases along with other cost increases on a quarterly basis. Regulatory lag will be minimal under the proposed forecasting method. Maintaining a separate fuel surcharge mechanism for fuel would, in our view, serve no useful purpose . . . .

COF ¶¶ 79-81; PX0915, *R.R. Cost Recovery Procs.*, 364 I.C.C. 841, 852 (1981).

Nevertheless, Defendants recognized that they could increase revenue by imposing

coordinated rate-based FSCs in lieu of the RCAF. As explained by NS's Alby Pfeifer:

> If the choice to a customer is to have an increase based on RCAF-U including the fuel factor and no fuel surcharge vs. RCAF-U without fuel and a fuel surcharge the answer clearly is that the ***customer is better off with the RCAF*** *including fuel and no surcharge.* ***Conversely the railroad stands to collect considerably more under the current fuel surcharge program***.

COF ¶ 385, 389-90; PX0327, NS 010073903, at '903 (emphasis added).

Defendants thus jointly agreed to create a new index that removed the fuel price escalation provision from the RCAF. COF ¶¶ 382, 384-401. In March 2003, CSX called on the AAR to create an RCAF without a fuel component. COF ¶¶ 387-88; PX0184, CSXFSC000040566, at '566. The AAR initially resisted, because of concerns "about the AAR publishing a version of the RCAF that was not calculated the way the law says the RCAF should be calculated." COF ¶ 391; PX0184, CSXFSC000040566, at '566. Nonetheless, on December 11, 2003, Defendants' CEOs jointly directed the AAR to publish a new index, called the All Inclusive Index *Less Fuel* or AIILF, to ease the broad imposition of FSCs on top of non-fuel AII input costs. COF ¶¶ 392-99. As BNSF's chief economist noted in a letter to BNSF CEO Matt Rose, this new index was an unprecedented break from industry practices that would benefit "*the entire rail industry*": ***"[i]n my 18-year railroad career, no one had ever succeeded in steering the AAR to do this.*** " COF ¶ 400; PX0077, BNSF-0070502, at '502 (emphasis added). By utilizing the AAR, Defendants added a veneer of legitimacy to their plan to increasingly impose rate-based FSCs on all customers. COF ¶¶ 388-90, 395, 401, 404, 407, 414. Based on the allegations in the *MDL I* Complaint (which are now established and admissible facts), Judge Friedman concluded that "***[s]hort of being in the boardroom at the meeting, it is hard for the Court to imagine how plaintiffs could more fulsomely allege that defendants entered into an agreement at the AAR meetings.***" *MDL I* Dkt. No. 138, at 10 (emphasis added).

Defendants also realized that this new index would have more credibility if widely published by the AAR. In mid-2004, UP proposed that Defendants discuss publishing the AIILF on the AAR's website at an upcoming NEMC meeting of Defendants' CMOs. COF ¶¶ 402-414; PX0415, UPFSC 0279097, at 6. The publication of the AIILF had nothing to do with NEMC's designated functions. *See, e.g.*, COF ¶ 411. Rather, this venue provided cover for behind-the-scenes joint action by Defendants' CMOs, who were spearheading the coordinated drive to impose coordinated FSCs on shippers nationwide. UP circulated an "agenda item" for the November 2004 meeting, recommending that the AIILF be published on the AAR website expressly *because* it would "facilitate and support" Defendants' use of FSCs. *See, e.g.*, COF ¶ 407; PX0157, BNSF-FSC 000766, at '767; PX0629, Koraleski (UP) Dep. 269.

As Defendants took these coordinated steps, CSX recognized that "***it would likely be an anti-trust violation to discuss/suggest setting an AIILF industry fuel surcharge formula program at NEMC***." COF ¶ 408; PX0172, CSXFSC000000643, at '643 (emphasis added). CSX lawyers counseled CMO Clarence Gooden ***that AIILF publication should not be discussed***, but he attended the NEMC meeting anyway. COF ¶ 408; PX0612, Gooden (CSX) Dep. 181-83.

Defendants ultimately ignored those antitrust concerns. At the NEMC meeting on November 11, 2004, they agreed that their new index would have more credibility if the AAR published the index on its website, which they thought would be viewed by customers and others as a "neutral but authoritative location." COF ¶¶ 402-04, 409-10; PX0415, UPFSC 0279097, at 6. Defendants' CMOs then agreed that the AIILF would be maintained on the AAR's website. COF ¶¶ 402-13; PX0008, AAR-000260, at '262; PX0629, Koraleski (UP) Dep. 269.

The AAR initially resisted publishing the AIILF online, in part because it threatened the AAR's revenue stream from its subscription service. COF ¶ 415. But because Defendants

effectively controlled the AAR, the AAR acquiesced after UP expended "political capital" insisting on the change. *See, e.g.*, COF ¶ 416; PX0410, UPFSC 0274880, at '880; PX0598, Adams (UP) Dep. 112-13. These efforts paved the way for broader reach of Defendants' standalone rate-based FSCs. COF ¶¶ 386, 388-90, 414, 417-18.

Defendants now try to argue that all of this AAR activity was "at the behest of a single railroad." Defs. Br. 52 (citing BNSF Br. 10). But, as demonstrated above, the record is clear that all Defendants participated in directing the AAR to create and publish the AIILF. COF ¶¶ 368-70, 386-88, 394, 398-99, 405-09, 410; *see also* PX0858, AAR-000247, at '247 ([redacted]) (emphasis added).[14]

Defendants argue that the AIILF was not "widely used." Defs. Br. 52. But Defendants entered numerous shipper contracts using AIILF and, in any event, created it, caused its publication, and hid their involvement to facilitate the inclusion of their FSCs in shipper contracts. COF ¶¶ 359, 395-97, 401-04, 407-09, 412 417-18; *see also, e.g.*, PX0916, AMDofasco00000152, at '154-55; PX0917, ENTERGY-00000156, at '164-67. Immediately after the AIILF's creation, each Defendant paired it with its standard FSCs in negotiations to facilitate widespread imposition of those FSCs. COF ¶ 401. The volume of traffic to which AIILF later applied is beside the point—Defendants collectively acted for the explicit purpose of broadly imposing FSCs, and claiming that a particular product is not "widely used" is no defense to a *per se* illegal conspiracy.

---

[14] *See also* PX0857, AAR-E-00036814 [redacted] PX0157, BNSF-FSC 000766, at '767 (reflecting UP proposal for publication of AIILF, which "would facilitate and support carrier initiatives for cost recovery," specifically "use of this index, coupled with a Fuel Surcharge"); PX0184, CSXFSC000040566 ("What would be the process to get the AAR to publish this new modified index?").

Defendants also discussed FSC application strategy and fuel cost hedging practices at the AAR, providing their competitors with information on how they were maximizing fuel-related revenue. *See, e.g.*, COF ¶¶ 371-73, 506-07; PX0869, AAR-E-00069063, at ‘067 [redacted] PX0013, AAR-000389, at ‘391 [redacted] PX0221, CSXFSC000372050, at ‘051 (“Fuel hedging – cross fertilization discussions were held among the railroad representatives as to the extent and methods employed for fuel hedging”); *see also* PX0019, AAR-P-00003356.

**D. BNSF Twice Abandoned a Competitively Advantageous Mileage-Based FSC**

In 2003 and 2004, as Defendants strived to achieve FSC uniformity, BNSF twice abandoned a mileage-based FSC that would have been to BNSF’s advantage in a competitive scenario. COF ¶¶ 141-50, 228-37, 476-79. This is powerful evidence of conspiracy.

In early 2003, and at the direction of CMO John Lanigan, BNSF analyzed possible changes to its FSC methodology. COF ¶¶ 143-45. BNSF’s greater length of haul made mileage-based FSCs a competitive advantage, in that, all else equal, they would lead to more revenue for BNSF than any other Defendant. COF ¶¶ 141-42, 477-78. On February 24, 2003, BNSF’s Review Team internally proposed switching to a mileage-based FSC. COF ¶ 143; PX0132, BNSF-FSC 000002, at ‘003, ‘016. Weeks later, BNSF was still “[l]eaning toward” a mileage-based FSC in place of its existing rate-based FSC. COF ¶ 143; PX0132, BNSF-FSC 000002, at ‘027-28. BNSF’s Review Team had scheduled a meeting to “help finalize” the study showing the benefits to BNSF of a

mileage-based FSC. COF ¶ 145; PX0132, BNSF-FSC 000002, at '002.

While BNSF's Review Team was working,[15] Lanigan attended the five-day NFTA meeting, attended by all four railroads' executives, and spoke with his counterparts. COF ¶¶ 148, 151-52, 154. Upon his return, Lanigan issued a new directive "[e]ffective immediately and urgently" that price authorities without BNSF's rate-based FSCs would be "DOA" (dead on arrival). COF ¶¶ 148, 156-57. Lanigan had not discussed this change with his team before announcing it. COF ¶ 148. Days later, BNSF formally abandoned its plans to switch to a competitively advantageous mileage-based FSC, COF ¶¶ 149, 160, and then lowered its trigger price in a manner that was designed to reflect the lowered trigger price that UP and CSX had each recently announced, COF ¶¶ 149-50, 160-63.

More than a year later, in August 2004, BNSF *once again* internally considered adopting a mileage-based FSC—including on its own single-line traffic—but quickly rejected that competitively advantageous option, sticking instead with its conspiratorial rate-based program. COF ¶¶ 228-37; PX0136, BNSF-FSC 000155, at '155; PX0610, Lanigan (BNSF) Dep. 235; PX0769, Leitzinger MDL II Rpt. ¶¶ 188-191. Though Defendants credit customer opposition, BNSF's contemporaneous documents show that several major shipping associations were actually pressing the railroads to convert to a mileage-based system. COF ¶ 230; PX0769, Leitzinger MDL II Rpt. ¶ 191; *see also* PX0362, NS_033000559, at '560 (NS document referring to "customer and political pressure" for mileage-based FSCs).[16]

---

[15] As discussed above, *supra* n.10, during this entire period, Lanigan and his NS counterpart Donald Seale were meeting, playing "phone tag," and making plans to "catch up" again at the NFTA meeting attended by all Defendants' executives.

[16] BNSF *admits* the other Defendants' *de facto* veto power over BNSF's mileage-based FSC, emphasizing that technical changes to accommodate the surcharge "had 'to be approved by industry Shipment Conditions Committee (all REN participants—BNSF, CN, CPR, CSXT, KCS,

BNSF ultimately waited until 2006 (three years after it began considering a mileage-based formula) to start implementing a mileage-based FSC, and even then, did so just on a minority of its traffic. COF ¶¶ 235-36; PX0137, BNSF-FSC 000218, at '218. Contrary to BNSF's claims, its mileage-based FSC was not applied to "about 75 percent of BNSF's volume." BNSF Br. 11. In total, it applied to only 14% of BNSF's shipments in 2006. COF ¶ 235; PX0769, Leitzinger MDL II Rpt. ¶ 192 & fig.18. BNSF asserts that "[a]fter the STB's 2007 decision," BNSF "extended its mileage-based surcharge to all regulated traffic and to some additional interline carload traffic," BNSF Br. 12, but it was not until January 2009—two years after the STB decision, and six years after it began considering a mileage-based FSC—that BNSF extended its mileage-based FSC to all of its rate-unregulated traffic. COF ¶ 236-37; DA04950; DA04939, at '941.

### E. Defendants' FSC formulas were changed, and their FSC programs became non-negotiable, and imposed across-the-board, with the goal of 100% FSC coverage

As part of their conspiratorial agreement, Defendants changed their FSC formulas and the way they implemented their FSC programs in several ways:

**<u>Changes to Formulas</u>:** Beginning in March 2003, Defendants changed their FSC formulas in three material ways, each increasing their earning power on a given shipment. *First,* Defendants lowered the "trigger" or "strike" prices in their FSC formulas so the FSCs would be imposed on shippers at lower fuel index prices than before, resulting in millions of dollars in additional revenue. CSX, UP, and NS lowered their trigger prices from $28 WTI to $23 WTI,

---

NS, UP).'" BNSF Br. 11 (quoting DA04559, at '561); *see also* COF ¶¶ 231-33; DA04559, at '563 ("Next steps[:] Executive-level support from each REN partner . . . . Address new surcharge with . . . [AAR's] NEMC (Network Efficiency Management Committee)"). Even so, BNSF could have "generally implemented mileage-based fuel surcharges on its own local traffic and Rule 11 traffic (*i.e.*, traffic where a shipper makes separate arrangements with each railroad used for separate legs of an interline shipment), leaving surcharges on its interline traffic rate-based." BNSF Br. 11; *see also* COF ¶¶ 233-36.

COF ¶¶ 111-28, 211-29, 218-27, which Defendants expected would capture FSCs that the old triggers would not, COF ¶¶ 88, 227 (WTI prices were expected to settle below the former $28, but above the new $23).[17] Indeed, there were *fourteen* months between January 2000 and December 2003 in which this lower $23 trigger, but not the old higher $28 trigger, would have captured FSCs. *See* COF ¶ 227; PX0769, Leitzinger MDL II Rpt. ¶¶ 157-59.

Similarly, shortly after CSX and UP announced their planned changes, BNSF lowered its trigger price from $1.30 HDF to $1.25 HDF to "reflect[] the $23 WTI crude [strike] price" in CSX (and UP's) announced formulas. COF ¶¶ 150, 161-63; PX0141, BNSF-FSC 000486, at '486. UP then switched to an HDF index (like BNSF) with a trigger price of $1.35 HDF—lower than UP's pre-conspiracy FSC trigger of $28 WTI. PX0769, Leitzinger MDL II Rpt. ¶ 157 & n.438.[18]

Defendants assert that UP's FSC trigger was "less aggressive" than BNSF's, Defs. Br. 37, 61, purportedly so that UP could compete with BNSF. But contemporaneously, UP acknowledged it had adopted a formula "identical" to BNSF's, COF ¶ 166; PX0401, UPFSC_0183975, at '975; PX0610, Lanigan (BNSF) Dep. 119, and that it switched FSC programs "[t]o match BNSF's 'standard' HDF based surcharge." COF ¶¶ 167-68; PX0502, UPFSC_0075761, at '761; PX0401, UPFSC_0183975, at '975. Once UP's strike price was reached, the program "goes back and picks up the skipped %s," and therefore, "[o]nce it kicks in, it exactly matches the BNSF FSC percentage progression, including lag times and effective dates." COF ¶ 168, PX0242, NS 001000373, at '373. From spring of 2003 onward, the HDF index remained above $1.35, mooting this minor distinction. COF ¶¶ 169, 511.

---

[17] As discussed above, UP also initially announced it would switch from a $28 WTI trigger to a $23 WTI trigger. But ultimately UP elected to use the same HDF index as BNSF.

[18] Using a $1.35 HDF trigger instead has the equivalent effect of using a $24.84 WTI trigger instead of a $23 WTI trigger. PX0769, Leitzinger MDL II Rpt. ¶ 157 n.438. Thus, UP reduced both its trigger (from $28 WTI to $1.35 HDF) and the differentiation between it and BNSF.

*Second*, Defendants all escalated their FSC percentages at smaller increments on the HDF and WTI indexes, yielding higher FSCs at nearly every interval. COF ¶¶ 107-08, 113-16, 155, 162-63, 218-20. The escalator first adopted by CSX (having been considered internally by UP), and then by NS, increased the FSC 0.4% for each $1/barrel WTI increase (in contrast to the old formula, which increased the FSC 2% for each $5/barrel WTI increase). COF ¶¶ 107-08, 113-16. Though the old and new *slopes* were mathematically alike, between each $5 increment the new escalator would capture between 0.4% and 1.6% higher FSCs. *Supra* Sec. I.B; COF ¶ 116; PX0769, Leitzinger MDL II Rpt. ¶ 162 fig.16; PX0819, Jacobs Rpt. ¶¶ 239-41 & fig.III.7. And when UP matched BNSF's HDF formula, UP again adopted smaller increments. COF ¶ 166.

*Third*, Defendants changed their method of determining whether the trigger price conditions had been met. Before early 2003, three of the four Defendants (CSX, UP, and NS) required that fuel prices exceed the trigger price for *30 consecutive days* before an FSC would be imposed. COF ¶¶ 23-24, 27-28. That is, if fuel prices exceeded the trigger price for 29 days, but dipped below the trigger on the 30th day, an FSC would not be billed. But beginning in early 2003, Defendants changed their policies, imposing FSCs any time the *average price over the prior month* exceeded the trigger price—even if fuel prices dipped below the trigger for some number of days during the 30-day period. COF ¶¶ 117, 122-23, 155, 220.

Undermining Defendants' present arguments that their new formulas had "almost precisely the same earning power" as their old ones, such that a conspiracy would be "unnecessary, implausible, and pointless," Defs. Br. 2, Defendants acknowledged in 2003 that these three types of changes "would prompt" "a large increase in fuel surcharge billings" by "maybe as much as 100%." COF ¶¶ 118-21, 224-27; PX0163, CSXFSC000000357, at '357. NS adopted the new CSX formula in all respects after describing it as a "more aggressive formula" and a "money grab,"

and explained that it "clearly produces significantly more compensation, and it does it sooner and more consistently." COF ¶¶ 119, 224; PX0253, NS 010076080, at '080. NS's manager for pricing systems testified that the formula change was "definitely was more aggressive" and "definitely yielded more revenue" than the prior program. COF ¶ 120; PX0614, Glennon (NS) Dep. 42, 67. UP recognized that the changes would lead to more FSC revenue, because the changes "eliminate the requirement that the price of oil remain above (or below when prices are declining) a specific threshold for 30 consecutive" days. COF ¶ 128; PX0473, UPFSC0001074, at '074.

Defendants now argue that, in hindsight, *some* of these changes to FSC formulas were of little consequence because fuel prices during the Conspiracy Period *unexpectedly ended up being* higher than *both* the pre-Conspiracy Period and Conspiracy Period FSC strike prices, and that the "earning power" of the new FSCs was therefore similar to the prior ones. Defs. Br. 41. Defendants' *post hoc* argument that the FSC changes ended up being financially inconsequential is inconsistent with Defendants' views at the time.

Moreover, as discussed below, Defendants' assertion also ignores that, even setting aside changes to the specific *formulas*, Defendants changed their FSC *policies*, and began applying FSCs to more shippers and to more shipments, resulting in greater FSC coverage and greater profits.

**<u>Changes to Policies and Practices on FSC Application</u>:** To achieve uniform application of FSCs, Defendants each mandated new policies designed to impose and enforce FSCs on increasing numbers of shippers and shipments, with the goal of reaching 100% FSC "coverage" across shipments. COF ¶¶ 302-63.

Contrary to Defendants' contention that they had a practice of imposing FSCs on all of their shippers even before the Conspiracy Period, Defs. Br. 44-46, all four Defendants historically struggled to broadly impose FSCs unilaterally, and each railroad frequently waived or reduced

them in the face of customer complaints and competition from other railroads. *Supra* Sec. I.A; *see also Rail Freight*, 292 F. Supp. 3d at 103 ("The documentary evidence shows that before the class period, defendants had difficulty applying and enforcing fuel surcharges in contracts.").

Once the conspiracy began, however, Defendants changed their practices, broadly refusing to negotiate FSCs, even in the face of customer complaints, and requiring unprecedented senior management approval for any deviations from the standard program.

**BNSF** had previously recommended that the company require senior management approval of exceptions to the FSC program, BNSF Br. 3-4, but it was not until April 9, 2003 that BNSF actually announced: "Effective ***immediately and urgently*** per John Lanigan. Authority to omit FSC provision is to be ***granted to VP's only (who will also clear with John).***" COF ¶¶ 156, 325; PX0050, BNSF-0027935, at '935 (emphasis added). In addition, BNSF's pre-conspiracy *aspirational* goal of increasing FSC application became a "zero tolerance policy" in early- to mid-2003 whereby "[a]ny contract it comes due will be renewed with a fuel surcharge." COF ¶ 318. And according to contemporaneous BNSF documents: "contracts requiring [CEO's] signature but excluding full fuel surcharge provisions ***[would] not be signed***." COF ¶¶ 319-21; PX0142, BNSF-FSC 000488, at '488 (emphasis added). Along the way, BNSF tracked its progress toward 100% FSC coverage. COF ¶¶ 326-28. In 2004, Lanigan wrote that "about 92% of all contracts signed this year have FSC." PX0068, BNSF-0041531, at '533. By 2006, BNSF reported internally that it had "[v]irtually no exceptions" to its FSC program, and that 98% of its new and renewed price authorities from November 2005 through April 2006 included its standard FSC. PX0072, BNSF-0048722, at '723, 729; *see also* COF ¶¶ 328-29.

**UP** required elevation of any proposed exception to its new standard FSC during the Conspiracy Period. Beginning in June 2003, UP executives stated "surcharge exceptions now

require VP approval" and "our goal is to have no exceptions." COF ¶ 355; PX1111, UPFSC0048922, at '922; *see also* PX0414, UPFSC 0276597, at '597 ("ANY deviation . . . requires advance sign-off by Bob Toy. Have heard some rumors recently that people have been trying to 'game' the system. Not a good idea."). By October 2004, UP executive Chuck Adams announced he would personally review any attempted exceptions. COF ¶ 355; PX0410, UPFSC0274880, at '881. As of November 2004, UP maintained that it would apply its new FSC "to all business as it becomes available for action." COF ¶¶ 355-57; PX0411, UPFSC 0275003, at '003; *see also* PX0517, UPFSC_0217870, at '871 (discussing an "absolute mandate with our fuel surcharge program"). In 2006, UP told the STB that it was "applying a fuel surcharge on every freight bill that it can," and identified only exception: "customers—who, *as a result of negotiations prior to 2003*, secured a favorable arrangement." PX0766, at 15 (emphasis added). And UP tracked its progress toward 100% coverage. COF ¶¶ 362-63. Jack Koraleski noted that UP achieved "record fuel surcharge coverage" in 2006 and its coverage by revenue reached 65% by the end of 2004, 74% in 2005, and 85% in 2007. COF ¶¶ 362-63; PX0530, UPFSC_0433046, at '050.

**NS**'s new policy was also that "***all new contracts will have the new FSC, no exceptions***," COF ¶ 346; PX0272, NS_010007412, at '412, and NS also stripped from anyone below the Group Vice President ("GVP") level the power to exempt contracts from FSCs, COF ¶ 346; PX0326, NS_010073840, at '841 ("Any deviations from the new standard must have GVP approval and must be reviewed by Pricing Services for applicability"). Before this mandate had even taken effect, Don Seale took this power away from GVPs and exercised direct control himself. COF ¶¶ 221, 352; PX0293, NS_010034040, at '040 ("I assume that in all cases there is to be no deviation from NS's published FSC without your prior approval. . . . [Seale:] Correct."). And NS likewise tracked its progress towards 100% FSC coverage. COF ¶¶ 353-54; PX0304,

NS_010047416, at '417 ("The 'no FSC' gap is shrinking as larger customer[] hold outs agree to some form of energy cost recovery program."); PX0349, NS_013001781, at '781 (Seale reporting that NS's FSC coverage had reached 85% by the end of 2005, and imploring his staff to "move this upward in 2006 and 2007").

**CSX** demanded VP-level review of any FSC exceptions, which ultimately became a bar on exceptions "without going to [Executive VP] Clarence [Gooden]." COF ¶¶ 330-33; PX0181, CSXFSC000036491, at '493; PX1159, CSXFSC000036623, at '623. CSX later summarized its "***[c]hanges to the policy***" in May 2004 to require that "***[e]verything is subject to fuel surcharge,"*** with "***[e]xceptions elevated***." PX0170, CSXFSC00000569, at '574 (emphasis added). The rule was clear: "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***." PX0193, CSXFSC000108545 (emphasis added). CSX produced a "Fuel Surcharge Scorecard" from January 2007 showing its coverage growing from 41% in 2004 to 54% in 2006, and projected growth to 75% by 2008. COF ¶¶ 338-39.

In other words, all four railroads rapidly aligned around two policies: universal application of rate-based FSCs, and the transfer of any discretion on FSCs from the front-line sales teams that once exercised it to a small group of upper-level executives—BNSF's Lanigan, NS's Seale, UP's Adams, and CSX's Gooden—who had each participated in 2003 NEMC meetings involving all four railroads. Given that these policies were *internal* at each railroad, the alignment is remarkable.

The experience of Plaintiff US Magnesium ("USM") reflects this sudden shift. COF ¶ 304. USM's master contract with UP remained unchanged from 2000 through December 2002. PX0459, UPFSC_0615263. In December 2002, while negotiating the contract for 2003, a UP sales representative suggested that USM should accept an FSC. USM objected, and UP dropped the FSC. PX0546, USM005467. But the next year when the same UP sales representative

negotiated with the same executive of USM, UP refused to negotiate the FSC provision. The UP salesperson informed USM that [redacted] PX0547, USM005663 (emphasis added).

And indeed, the documentary record reflects that Defendants during this period began conveying to shipper after shipper, including many others of the Plaintiffs here, that there was little or no room left for negotiation on FSCs. COF ¶¶ 303-06; PX0837, BNSF-0029519, at '521 [redacted]; PX0842, UP_FSC_II_00458845, at '846 ([redacted] PX0923, NS_010161012, at '012 [redacted] PX0839, CSXFSC000149573 ([redacted]).[19] Customer after customer told the same thing to the STB. COF ¶ 306.

Even when Defendants did not impose their standard published FSC formulas, Defendants testified that they started negotiations from the inflated baseline set by those formulas. COF ¶¶ 308, 323, 334, 350, 359; *see, e.g.*, PX0630, Moorman (NS) Dep. 23 (NS's published FSC served as a "common starting point, if you will, in every negotiation"); PX0616, Young (UP)

---

[19] *See also* PX0832, P_ARS00006589, at '090 [redacted] PX0834, NS_010019411, at '411 [redacted] PX0836, NS-MDLII-00010681, at '684 [redacted] PX0838, BNSF-0783834, at '835 ([redacted]); PX0841, UPFSC_II_00038265, at '265 ([redacted]); PX0924, UPFSC_II_X_00004853, at '856 ([redacted]); COF ¶¶ 256, 265, 276, 287, 284, 294.

Dep. 71-75 ("you would start negotiations from, with that methodology" of "us[ing] the AAILF in conjunction with the fuel surcharge"); PX0925, James Schaaf (NS) Dep. 176 (confirming that, in negotiating FSCs, "the default position [for NS] would be to offer NS's standard fuel surcharge"); PX0926, Lee Grimes (UP) Dep. 132 (confirming UP used its "standard" published FSC in negotiations "as a starting point"); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 50 (D.D.C. 2012) ("[T]he railroad executives themselves admitted, that during the class period defendants uniformly began their negotiations with their standard fuel surcharge program and their objective was to apply their standard fuel surcharge as widely as possible.").

And when Defendants successfully imposed FSCs during the Conspiracy Period, they protected those price increases by commonly adopting policies against offsetting base-rate discounts. COF ¶¶ 309, 324, 336, 351, 361; PX0142, BNSF-FSC 000488, at '488 ("Trading fuel surcharges for price will not be encouraged."); PX0099, BNSF-0368425, at '430 ("CEO's Goals for Marketing's Fuel Surcharge Programs" included that "[d]iscounted programs [were] unacceptable. CEO will not sign contracts not meeting the above criteria . . . Minimize price/fuel surcharge tradeoffs."); PX0193, CSXFSC000108545, at '545 (CSX's "firm" pricing policy: "***NO ONE is authorized to approve a renewal with an increase of less than 10***%" and "***NO ONE is authorized to approve a deal WITHOUT Fuel Surcharge***" (emphases added)); PX0293, NS_010034040, at '040 ("[W]e should not be foregoing base rate increases in return for FSC application."); PX0294, NS_0100034244, at '244 ("[W]e should absolutely not be deferring any rate increases because we are applying the FSC."); PX0414, UPFSC 0276597, at '597 ("Have heard some rumors recently that people have been trying to 'game' the system. Not a good idea.").

Defendants' new, coordinated policies allowed them to collect FSCs *from more customers and on more shipments* than they could before the conspiracy. COF ¶¶ 312, 328, 339, 354, 363;

PX0072, BNSF-0048722, at '723 ("In summary business units have done an excellent job in [FSC] adherence. Virtually no exceptions."); PX0530, UPFSC_0433046, at '050 ("I want to start with 'Congratulations' for the many successes of 2006 . . . We . . . posted record core price improvement and record fuel surcharge coverage . . . ."); PX0304, NS_010047416, at '417 ("The 'no FSC' gap is shrinking as larger customer[] hold outs agree to some form of energy cost recovery program."); PX0207, CSXFSC000212937, at '937 ("We will have very few exceptions.").

This allowed Defendants to reverse the decades-long downward trend in rates, *supra* Sec. I.A, and reap significantly increased profits, which they attributed to their FSCs, *infra* Sec. I.G.

### F. During the Conspiracy Period, Defendants Monitored Each Other's FSCs, and Exchanged Information About Their Programs

Defendants discussed *with each other* their policies to apply FSCs across-the board, tracked their respective progress towards 100% FSC coverage, and exchanged FSC coverage data reflecting their respective progress towards that goal. *See*, *e.g.*, COF ¶¶ 326–327, 338, 353, 362, 364-67. Defendants exchanged FSC statistics for carload and intermodal shipments. COF ¶¶ 262, 267, 347, 364, 509; *see also* PX0169, CSXFSC000000476, at '476 ("Clarence [CSX EVP of Sales and Marketing], Ward [CSX CEO] and Giftos [CSX Chief Commercial Officer] met with the BNSF last week. BNSF stated that 82% of their carload and Intermodal business either had a fuel surcharge or an escalator on the revenue."); PX0851, UPFSC_II_00135378, at '378 (UP: "I spoke to the NS this morning and they said that 90% of all their agreements/contracts are subject to their FSC and is non-negotiable. Their fuel cost for 2004 was $450 million vs ours at $1.8 billion. There are some exceptions but none within their food and consumer group.").

Defendants' discussions of FSCs were by no means limited to their shared interline traffic, let alone to any joint-line (rather than Rule 11) shipment being handled by the parties to the discussion. And the record is replete with other evidence demonstrating that the Defendants' FSC

discussions were not limited in any way to their "interline" shipments but instead concerned the application of FSCs industry wide. *Supra* Sec. I.B. And Defendants were also able to signal each other in their public statements about their adherence to their "zero tolerance policies" on fuel surcharge coverage. COF ¶¶ 614-17.

### G. Defendants' Conspiratorial FSCs Were Divorced from Their True Fuel Costs, Reversing the Downward Trend in Rates and Yielding Exorbitant, Record Profits

Defendants' coordinated rate-based FSCs did not reflect the true cost of fuel on the shipments to which they were applied. COF ¶¶ 513-23; PX0653, *Rail Fuel Surcharges*, Ex Parte No. 661, 2007 WL 201205, at *6 (S.T.B. Jan. 25, 2007) (concluding that the Defendants' FSCs stand "virtually no prospect of reflecting the actual increase in fuel costs"). Thus, as Defendants made their FSCs more aggressive and increasingly applied them across-the-board, their FSC revenue became increasingly divorced from their actual fuel costs. Those margins scaled with rising fuel prices during the Conspiracy Period. COF ¶¶ 513-53; PX0770, Bernheim & Marx MDL II Rpt.[20] ¶ 133 [redacted] PX0819, Jacobs Rpt. ¶ 465 [redacted] Profits typically decrease as costs increase; instead, as Defendants' fuel costs increased, their profits skyrocketed. COF ¶¶ 514-19; PX0819, Jacobs

[20] Drs. Bernheim and Marx served individual reports in all cases in which they were retained. Except as otherwise noted, Plaintiffs cite exemplar reports from Drs. Bernheim and Marx. *See* COF ¶ 37.1.

Rpt. ¶ 414 (during Conspiracy Period, [redacted] PX0984, Leitzinger MDL II Reply Rpt. ¶ 166 (when fuel costs increase under competitive conditions, "the more likely result in light of railroad industry structure would be margin compression, meaning that Defendants would have passed through *less than* the entirety of their fuel cost increases"); *id.* ¶ 170 (before Conspiracy Period, Defendants achieved [redacted]

Plaintiffs' experts' analyses confirm that Defendants exorbitantly over-recovered their increasing fuel costs during the Conspiracy Period through their FSC programs. *See, e.g.*, COF ¶¶ 516-19; PX0770, Bernheim & Marx MDL II Rpt., ¶ 149 [redacted] PX0769, Leitzinger MDL II Rpt. Ex. E08 ([redacted]).

As Defendants' FSCs became more divorced from actual costs, Defendants should have been unable to sustain (let alone increase) such extreme over-recoveries. COF ¶¶ 520-23.[21] Under competitive conditions, Defendants' FSC coverage levels would have been expected to *decrease* as their FSCs became further divorced from true costs. COF ¶¶ 521-22. Defendants would have been expected to at least revise FSCs to be less onerous. COF ¶ 521. Defendants recognized their

[21] *See also* PX0984, Leitzinger MDL II Reply Rpt. ¶ 194 ("[T]he competitive pressure for [renegotiations, waivers, or base rate discounts] would have increased significantly with the large increases in [FSC] payments during the Damages Period."); PX0670, Kalt Merits Dep. 264 (Defendants' expert Dr. Kalt: when long term contracts "get out of step with current market conditions," it creates pressure for the disadvantaged party to breach or renegotiate the contract); PX0778, Carlton MDL I Dep. 135-36 (Defendants' expert testifying that although "contracts, as a general matter, are written not to be necessarily renegotiated . . . it doesn't mean if there is a dramatic change in circumstances, they – they couldn't be.").

FSCs could not be maintained in a competitive environment. *See, e.g.*, PX0126, BNSF-0574195 (BNSF in 2005: "reliance on fuel surcharge . . . is working well now," but "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail"). Yet, Defendants steadfastly *increased* FSC coverage, exacerbating the over-recovery. COF ¶¶ 524-53.

Non-Defendant railroads' actions illustrate the types of actions that Defendants would have been expected to take, but did not, during the Conspiracy Period. As pressure from shippers mounted, Canadian National Railway Company ("CN") and Canadian Pacific Railway ("CP") both *reduced* their FSCs. COF ¶ 523; PX0984, Leitzinger MDL II Reply Rpt. ¶ 132. A CP representative testified before the STB that CP reduced its FSC several times in response to customer feedback and to bring its FSCs into line with incremental increases in CP's fuel costs. COF ¶ 523. In 2005, CN reduced its FSC rates by approximately 25% and then a further 15%. COF ¶ 523. A 2006 NS document recognized that "[t]he CN reduced their WTI FSC twice and is currently 43% lower than NS/CSXT." COF ¶ 523; PX0847, NS_008002540, at '551.

Defendants' increased FSC coverage and extraordinary over-recovery is stark in comparison with their results in the pre-Conspiracy Period. When FSCs were *low* and *rarely* triggered in the pre-Conspiracy Period, Defendants broadly failed to impose and collect them, as shippers successfully evaded the meager add-ons. *Supra* Sec. I.A. By contrast, during the Conspiracy Period, Defendants were able to increasingly impose and collect *high* and *always*-triggered FSCs, even as they became increasingly divorced from their actual fuel costs. COF ¶¶ 313, 520, 524. That is the *opposite* of the expectation in a competitive environment. PX0769, Leitzinger MDL II Rpt. ¶ 175 ("The large increases in FSC coverage that occurred notwithstanding the rapidly rising fuel prices suggest a strong shift in pricing power to the railroads during this period—a shift of the sort that collective coordination in pricing would create.");

PX0819, Jacobs Rpt. ¶ 315 ("Unilaterally raising price by more than cost increases would not be sustainable for one market supplier in a competitive market and would put the firm at a disadvantage."). And neutral railroad analysts observed a "fairly implausible" and "puzzling . . . phenomenon" "suggest[ing] that something happened around 2003 to cause the variable cost curve to shift up rather dramatically." COF ¶ 514; PX0687 (2009 report to the STB), at 9-16-9-17.

Defendants' financial results speak for themselves. Defendants enjoyed record revenue from July 2003 through December 2008, reversing the historic two-decade downward trend in rail freight rates. COF ¶¶ 525-27. And Defendants expressly attributed their record annual profits—which measured in the *billions*—to their increasing FSC revenue. COF ¶¶ 529-53.[22]

### H. Meetings and Communications Between Competitors Discussing Pricing and Changes In Conduct Are Compelling Evidence of Conspiracy

It is well established that meetings and communications between competitors at which pricing information is discussed are highly probative evidence of conspiracy. *See, e.g.*, *SourceOne Dental, Inc. v. Patterson Cos.*, 310 F. Supp. 3d 346, 358 (E.D.N.Y. 2018) (that "all three companies were communicating with each other or, at least, were aware of and monitoring each other's decision-making" could lead a jury to conclude the defendants "had reached some kind of agreement"); *Polyurethane Foam*, 86 F. Supp. 3d at 787, 789 (denying summary judgment on the basis of what a "reasonable jury could conclude" from defendant's exchange of price information); *see generally* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1406b ("[M]eeting itself can be

[22] UP saw its $112 million in commodity revenue from FSCs in 2003 grow to $330 million in 2004, $1 billion in 2005, and $1.65 billion in 2006. COF ¶ 530. BNSF's annual FSC revenue also rose dramatically from approximately $110.5 million in 2003, to $357 million in 2004, to $1.06 billion in 2005, and approximately $1.7 billion in 2006. COF ¶ 549. NS saw FSC revenue for its Merchandise, Coal, and Intermodal businesses grow from about $11.6 million in 2002, to approximately $61.7 million, $208 million, $650 million, and $974 million in 2003, 2004, 2005, and 2006, respectively. COF ¶ 537. CSX saw its FSC revenue rise from $72 million in 2003, to $201 million in 2004, to $525 million in 2005, and $821 million in 2006. COF ¶ 543.

understood as a contract, combination, or conspiracy under appropriate circumstances."); *id.* ¶ 308f ("[E]vidence that competitors discussed selling prices . . . is not mere evidence of conscious parallelism; it is circumstantial evidence of an actual agreement."). Even one of Defendants' experts, Dr. Dennis Carlton, admitted that inter-competitor meetings, both at trade associations and other contexts, can "facilitate the establishment and enforcement of cartels." COF ¶ 103; PX1069, Carlton MDL I Dep. 23.

This is especially true when (as here) such meetings and communications are a departure from past conduct or are closely followed by parallel action. COF ¶¶ 13-237; *see also, e.g.*, *SourceOne Dental*, 310 F. Supp. 3d at 359 ("[A] high volume of communications, or communications that represent a departure from the ordinary pattern of communications among defendants, can be probative of an agreement."); *Apple*, 952 F. Supp. 2d at 690 ("An abrupt shift from defendants' past behavior and near-unanimity of action by several defendants may also strengthen the inference."); *Domestic Drywall*, 163 F. Supp. 3d at 197 ("[O]pportunities to conspire may be probative of a conspiracy when meetings of Defendants are closely followed in time by suspicious actions or records.").

*Publication Paper* is instructive. There, the Second Circuit found "ample evidence of conspiratorial behavior," explaining: "Most notably, it is undisputed that in private phone calls and meetings—for which no social or personal purpose has been persuasively identified—Tynkkynen shared . . . pricing strategies with Korhonen and both men disclosed to each other their companies' intentions to increase prices before those decisions had been publicly announced." 690 F.3d at 65. In that case, as here, senior executives engaged in a series of meetings immediately before and amidst changes to their FSC programs. COF ¶¶ 92-237. That evidence was sufficient to overcome defendants' motion for summary judgment. 690 F.3d at 59-60, 69-70. It should be here, too.

### I. Defendants' Pretextual Arguments Are Additional Evidence of Conspiracy

Defendants' pretextual efforts to explain away their anticompetitive behavior further support an inference of conspiracy—and, at the very least, raise disputed issues of fact that only a jury can resolve. *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 478-79 (3d Cir. 1998) ("pretextual excuses are circumstantial evidence that can disprove the likelihood of independent action"); *White v. R.M. Packer Co.*, 635 F.3d 571, 585 (1st Cir. 2011) ("such pretext, standing alone is not sufficient to show joint action, but can only strengthen an inference of joint action that is otherwise in evidence" (internal quotation marks omitted)); *see also Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 323-24 (2d Cir. 2010) (finding a plaintiff had plausibly alleged defendants' parallel conduct was "the result of an agreement among the defendants" where, among other factors, defendants had attempted to conceal their conduct).

#### 1. Defendants' pretextual claim that FSC changes were a reaction to rising fuel prices

Defendants assert that their FSC programs were a response to increasing, or more volatile, fuel prices. Defs. Br. 17-18, 32. But that is after-the-fact pretext, as the jury should hear.

Defendants did not even *expect* fuel prices to rise in early 2003 when they formed this conspiracy. COF ¶¶ 85-91. As Defendants concede, fuel prices "moderated" in 2002. Defs. Br. 9. In April 2003, NS projected that "we may be entering an extended period of reasonable oil cost," COF ¶¶ 89, 133, 213; PX0270, NS_010004522, at '522, and, in April 2006 NS told the STB that *"[i]n March 2003, EIA accurately forecasted a decline in the price of WTI* to around $27 by the end of 2003," and that "NS thought . . . that the oil prices we began to see as 2003 progressed were temporary," COF ¶ 88; PX0344, NS_010275444, at '447, '449 (emphasis added). CSX's Michael Giftos similarly testified that, in Spring 2003 he "*thought fuel prices were going down*." COF ¶ 90; PX0595, Giftos (CSX) Dep. 109 (emphasis added).

Indeed, Defendants' own experts confirm that fuel prices were falling when the conspiracy was hatched. COF ¶¶ 85, 87-88, 227; PX0648, Carlton MDL I Merits Rpt. ¶¶ 61, 148 (opining that between January 1, 2000 and July 1, 2003 fuel costs "were generally ***low and flat,***" and that "at the start of the alleged conspiracy, *fuel prices were actually expected to fall*" (emphases added)); PX0776, Israel MDL II Rpt. ¶ 77 ("futures prices pointed to falling prices for WTI"); *see also* NS Br. 5 (stating that "forecasts predicted declining fuel prices" at the time BNSF, CSX, and UP changed their FSCs and, as the year progressed, fuel prices continued to be "stable," with "forecasts predicted prices to decline to $24/bbl by February 2004").

It is thus unsurprising that a key feature of Defendants' conspiracy was *lowering* trigger prices to ensure FSCs would be applied even when fuel prices remained below $28 per barrel (WTI)—which is at odds with Defendants' suggestion that each was bracing for *increased* fuel prices. Indeed, Defendants' expert Avram Tucker plotted future WTI projections, as of March 2003, showing that that prices were expected to fall below $28 and stay above $23 all the way through September 2005. COF ¶¶ 87-88, 97, 227; PX0775, Tucker MDL II Rpt. ¶ 151 & tbl.10; *see also* PX0774, Johnson MDL II Rpt. ¶ 144 ("NYMEX futures projections from March 2003 and September 2003 show that WTI prices were expected to be between $23 and $28 for most of the months covered by the projections."). ***That is, according to Defendants' own experts, the expectation in early 2003 was that Defendants' new, lower triggers would collect FSCs where old, higher triggers would not have.*** COF ¶¶ 85-88, 97, 227. Against this backdrop, Defendants' assertion that they were merely responding to market stimuli is no basis for summary judgment.

CSX and UP also pretextually claim that they changed their FSCs because, "on March 18, after 29 consecutive days above $33, the WTI dropped . . . below . . . for *one single day*," costing them 2% in FSC revenue that month. CSX Br. 5; *see also* UP Br. 4. CSX quotes from its CMO's

memorandum to its CEO, stating that its FSC collections "will be about $9 million less than previously projected," CSX Br. 5 n.3, but omits the clause that followed: "but this revenue reduction should be more than offset by declining fuel prices." DA02893, at '895. That is, the WTI drop would have no revenue effect, except perhaps to prevent CSX from *over-recovering* its fuel costs for the next month when CSX was projecting fuel prices to decline. UP cites to only a single, after-the-fact document to support its similar claim—talking points giving a *post hoc* excuse for the formula change in the face of customer complaints. UP Br. 5 (passing off DA01554 as evidence of before-the-fact impetus for UP's FSC change). According to UP's strained explanation, its customers *complained* about a last-minute dip below an FSC trigger that *saved customers 2% in FSCs*, compelling UP to then *placate* them by adopting a new FSC that would have *increased* rates by "millions of dollars." UP Br. 5. UP provides no evidence of *any*, let alone many, customers complaining about their savings or demanding that UP increase their FSCs.

### 2. Defendants' pretextual claim that FSCs were intended to recover their fuel costs

Defendants also justified their aggressive, across-the-board FSCs with the pretext that they were intended to recover nothing more than Defendants' rising fuel costs. But Defendants' candid internal communications recognized that the FSCs were in fact a profit center. COF ¶¶ 446-72.

In January 2004, BNSF's finance team wrote internally that the FSC program "is a ***revenue maximization program, not protection against fuel prices***," and, in 2006, that FSCs "make money. Big money," and that the program was a "profit-center." COF ¶¶ 470-72; PX0093, BNSF-0344944 (emphasis added); PX0110, BNSF-0479452. BNSF confirmed that the "Eastern Roads have a '***profit-center***' with their Fuel Surcharge Programs for the customers that participate." COF ¶¶ 258, 472; PX0020, BNSF_0691131, at '138 (emphasis added). UP likewise acknowledged internally that the FSCs were *not* intended to be set at "some 'trying to make whole'

value." COF ¶ 462; PX0391, UPFSC 0066571, at '571. And an October 2005 presentation shows UP estimated that its FSCs recovered more than 100% of its six business groups' incremental fuel costs. COF ¶ 460; PX0395, UPFSC 0103468, at p.13. Likewise, an internal CSX email from June 2004 confirms a dramatic over-recovery of fuel costs: "If we had 100% fuel surcharge coverage, we would actually be recovering twice the incremental fuel expense above the surcharge trigger point." COF ¶¶ 466-67; PX0187, CSXFSC000086525, at '525. And NS's CEO admitted under oath that its FSC program was *not* designed to recover NS's increased fuel costs, but instead was designed to set prices "as high as [NS] can within the confines of the marketplace." COF ¶ 449; PX0630, Moorman (NS) Dep. 140; *id*. at 48-49, 57-58, 62-66, 74-75, 126.

Consistent with these internal acknowledgements, the STB found that the Defendants' FSCs "cannot fairly be described as merely a cost recovery mechanism." COF ¶¶ 427-34; PX0653, *Rail Fuel Surcharges*, Ex Parte No. 661, 2007 WL 201205, at *6. That is because a FSC "that increases all rates by a set percentage," as all Defendants' rate-based FSCs did, "*stands virtually no prospect* of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." *Id.* at *6 (emphasis added). The U.S. Departments of Agriculture and Transportation ("USDA/DOT") concluded in a report *cited by Defendants* (Defs. Stmt. of Facts No. 4.3, n.10) that:

> ***There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits.*** From 2001 to 2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel . . . .
>
> Fuel surcharges are designed to allow railroad firms to recover the costs caused by abnormally high fuel prices; normal fuel costs have always been included in the rail rate determination. ***Fuel surcharges, however, have become profit centers for railroads***.

COF ¶ 474; PX0656, U.S. Dep't of Agriculture & U.S. Dep't of Transp., Study of Rural Transp. Issues (Apr. 2010) at ix, 520 (emphasis added). And, in their SEC filings, Defendants attributed

their increased profits in large part to the conspiratorial FSCs. COF ¶¶ 529-53.

The pretextual nature of Defendants' cost recovery defense is self-evident because Defendants recognized at the time that collectively maintaining this ruse was essential to their ability to impose the FSCs. CSX wrote internally: "***please don't communicate to anybody outside this company that a customer who pays [the FSC] is paying twice his fair share***." COF ¶ 467; PX0187, CSXFSC000086525, at '525 (emphasis added). UP articulated the need "to protect the company (1) from any appearance of building rates with high fuel costs and then charging fuel surcharge and (2) from any embarrassment this appearance would bring should a regulatory agency investigate this pricing mechanism." COF ¶ 464; PX0449, UPFSC_0263385, at '385. And NS internally acknowledged "I'm not sure if Don [Seale] would be in agreement with having [the revenue earned from FSCs] widely known . . . ." COF ¶ 454; PX0286, NS_010027582, at '582.

To maintain the pretext, each Defendant repeatedly lied to its customers. COF ¶¶ 446, 456, 465, 468. For example, CSX represented to several shipper groups that its FSC was an "attempt to recoup some of the huge increases in our costs," and publicly denied that the FSC program was designed to make CSX money. COF ¶ 465; PX0190, CSXFSC000098453, at '453. Likewise, NS told its customers that the FSC "was designed to be fair" and "an equitable fuel cost recovery mechanism," and that NS would "share the cost of significant increases in crude oil" prices. COF ¶ 446; PX0255, NS_003000754, at '754. UP also postured to customers that its FSC was a "full-recovery fuel surcharge program," and publicly stated that the FSCs were "designed to manage unforeseen [fuel] costs." COF ¶ 456; PX0418, UPFSC_0342882, at '883; PX0865, UPFSC_II_00159524, at '524. BNSF also publicly claimed that its FSC program "allow[ed] BNSF to recover a portion of its increased [fuel] expense," COF ¶ 468; PX0125, BNSF-0572444, at '444, and told customers that its FSC program was for [redacted] which was

part of the [redacted] PX0868, P_MAERSK00008769. The record is replete with examples of blatant misrepresentation of Defendants' FSC programs.[23]

### 3. NS's pretextual use of "rebased" FSCs

While the STB's investigation into Defendants' FSCs was underway in early 2006, NS "rebased" its FSC program to maximize profits and undercut the inquiry. COF ¶¶ 559-87. The new FSC for public price authorities would *appear* lower by increasing the trigger from $23 to $64 WTI, but NS simultaneously increased (or "rebased") its base rates by 16.4% so as "to bake in" the old FSC. COF ¶¶ 560-66; PX0318, NS_010067297. Whatever shippers "saved" in FSCs, they would now pay—permanently—in higher base rates, because NS's 16.4% rate increase embodied NS's previous FSC up to $64 WTI. COF ¶¶ 560-66. The change did not result in "NS charging 25% less when fuel prices went up or NS rates staying higher than CSXT's when fuel prices went down," as NS claims. NS Br. 12-13.[24] Rather, the result was a full transfer of the then-applicable

---

[23] *See, e.g.*, PX0353, NS_013006723, at '724 ("[CSX CEO Michael] Ward defended the company's fuel surcharge policy, saying 'in no way is this designed to make us money.'"); PX0196, CSXFSC000152731, at '732 (CSX customer communication describing the FSC as an "effort to more quickly respond" to "continued volatility in fuel prices"); PX0864, P_MAERSK00004328 [redacted] PX0867, CSXFSC000153239, at '239–40 (attributing the new FSC to "[t]he cost of fuel – and the volatility of fuel prices" and claiming new FSC "would enable us, and you, to be held to a more accurate reflection of the cost of fuel – as it increases or decreases"); PX0347, NS_013001654, at '659 (talking points justifying NS adoption of coordinated FSC as a "means to cover broad fluctuations in operating costs due to fuel prices"); PX0865, UPFSC_II_00159524, at '525 (UP to California Steel describing FSC as a "fuel cost recovery program"); PX0866, P_GM00053190, at '190 [redacted] PX0868, P_MAERSK00008769 [redacted]

[24] NS's assertion misleadingly ignores the *increase* NS added to its base rates, resulting in revenue neutrality when multiplied by its FSC. COF ¶ 561.

FSC into the base rate. COF ¶¶ 560-66.[25] And as described by BNSF's chief economist, in analyzing how such a change would have impacted BNSF's bottom line, "***You basically swap approximately $1.1 B of FSC into your rates.***" COF ¶ 572; PX0098, BNSF-0367622, at '622 (emphasis added). NS's CEO testified "it was . . . our policy that we would include a base-rate increase that would effectively make [the change in the FSC program] neutral from a revenue standpoint." COF ¶ 567; PX0630, Moorman (NS) Dep. 9, 187. It was not, as NS claims, "a significant competitive deviation" from the "allegedly conspiratorial formula." NS Br. 1.

NS misleadingly told the STB it had "deci[ded] to reduce its fuel surcharge percentage," without disclosing the accompanying 16.4% base rate increase was designed "to bake in FSC to [base] rate." COF ¶¶ 559-87. When NS issued a press release publicly announcing the change two days before its STB testimony, NS omitted that the FSC change was accompanied by a commensurate base rate increase to lock in the fuel cost over-recovery it had achieved. COF ¶ 564. NS reported to UP's Koraleski that "NS has had no negative feedback on their re-basing." COF ¶ 570; PX0529, UPFSC0425311, at '312.[26]

**4. Defendants' pretextual justifications in this litigation**

Defendants have continued their coordinated use of pretextual justifications in this litigation. In connection with class certification, Defendants submitted 21 declarations from their executives suggesting that their FSC programs during the Conspiracy Period "varied widely from railroad to railroad as well as by shipper and commodity." *Rail Freight*, 287 F.R.D. at 49 (quoting

---

[25] *See also* PX1205, NS_010054083 (NS's conclusion that a 16.4% base rate increase would allow it a "full [fuel surcharge] pass thru" under new program); PX0318, NS_010067297 (NS analysis to determine the amount of base rate increase that would be needed "to bake in [the existing $23] FSC to [base] rate"); PX0925, Schaaf (NS 30(b)(6)) Dep. 155 (testifying that the 16.4% base rate increase "would have been the difference between the 23-dollar fuel and [the] 64-dollar fuel").

[26] Likewise, after UP and CSX both modified their FSCs in 2003, they shared customer reactions. *Supra* Sec. I.B; COF ¶¶ 190-92.

*MDL I* Dkt. No. 381, at 21, 56-58). But Judge Friedman recognized that the declarations were "unpersuasive," and "*the most damning portions of almost every single declaration on which defendants rely are contradicted by the declarant's subsequent deposition testimony*." *Id.* at 50 (emphasis added). This time, the pretextual justifications that Defendants offer contradict those offered in their *MDL I* motion concerning 49 U.S.C. § 10706. In that motion, Defendants jointly insisted that "railroads *must* cooperate and communicate on . . . joint pricing," Defs. 10706 Br., *MDL I* Dkt. No. 927, at 1, including regarding FSCs, and that "such cooperation is both legally compelled and absolutely necessary," *id*. at 2; *see also id.* at 6, 21-22, 24. Defendants argued that, because coordination was legally sanctioned and necessary, much of Plaintiffs' evidence of FSC coordination was inadmissible and could not support an inference of conspiracy.

On this summary judgment motion, however, Defendants now insist *both* that (1) such communications and coordination of FSCs were "procompetitive" and "essential," Defs. Br. 1, 8, but *also* (inconsistently) that (2) in fact ***there was no coordination at all***, and their behavior was nothing more than "follow-the-leader parallelism," *id*. at 60. A jury is entitled to weigh this evidence and judge the credibility of Defendants' contradictory explanations of the facts.

### J. Numerous Plus Factors Support an Inference of Conspiracy

In addition to the evidence of conspiracy above that by itself creates a triable issue of fact, there exists substantial "plus factor" evidence that further supports an inference of conspiracy. PX0769, Leitzinger MDL II Rpt. ¶¶ 35-226; *Domestic Airline Travel*, 691 F. Supp. 3d at 192-93.

#### 1. Defendants' new Conspiracy-Period FSC programs represented a major change in business practices

Both sides agree that an abrupt shift from past behavior strengthens the inference of a conspiracy. *Home Depot, U.S.A., Inc. v. E.I. DuPont De Nemours & Co.*, 2019 WL 3804667, at *7 (N.D. Cal. Aug. 13, 2019) ("sudden jump" in parallel price increases a relevant factor in

determining if a price-fixing conspiracy existed); *Domestic Airline Travel*, 221 F. Supp. 3d at 202-03 (denying summary judgment in part because "there is a colorable argument" that defendants had adopted a "strategy that differed from past practice").[27]

But as discussed above, the evidence demonstrates big changes: (1) after having *never* met to discuss FSCs before 2003, Defendants' senior executives began meeting regularly to do so, *supra* Sec. I.B; (2) Defendants changed their FSCs to make them more aggressive, by lowering their "trigger" prices, changing their escalators, and changing how the trigger price would be determined, *supra* Sec. I.B; (3) Defendants each implemented policies to increase FSC coverage, pursuant to which FSCs were essentially mandatory, and required high-level executive approvals for exceptions, *supra* Sec. I.E; and (4) Defendants' CEOs jointly directed the AAR to publish the new AIILF index, which Defendants' CMOs later persuaded the AAR to publish on its own website, *supra* Sec. I.C, causing BNSF's chief economist to observe that "***[i]n my 18-year railroad career, no one had ever succeeded in steering the AAR to do this***," PX0077, BNSF-0070502, at '502 (emphasis added). In sum, Defendants' sharp changes in FSC practices are probative of conspiracy and present clear factual disputes for the jury to weigh and decide. COF ¶¶ 13-237; PX0769, Leitzinger MDL II Rpt. ¶¶ 151-218; PX0819, Jacobs Rpt. ¶¶ 200-64.

This case is therefore distinguishable from *Kleen Products LLC v. Georgia Pacific LLC*, *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, and *In re Chocolate Confectionary Antitrust*

---

[27] *See also SourceOne Dental*, 310 F. Supp. 3d at 359 ("[C]ommunications that represent a departure from the ordinary pattern of communications among defendants, can be probative of an agreement."); *Blood Reagents*, 266 F. Supp. 3d at 776 ("radical shift from pricing trends over the previous decade" supporting an inference of conspiracy); *Domestic Drywall*, 163 F. Supp. 3d at 255-56 ("[A] jury might be justified in concluding that Defendants' shift in behavior was radical enough to contribute to the inference of conspiracy."); *Apple*, 952 F. Supp. 2d at 690 ("An abrupt shift from defendants' past behavior and near-unanimity of action by several defendants may . . . strengthen the inference [of conspiracy].").

*Litigation*, on which Defendants rely. Defs. Br. 25. In *Kleen*, the court agreed that "an abrupt change in business practices" could "support an inference of conspiracy," 910 F.3d 927, 936-37 (7th Cir. 2018), but found that, "[i]n the present case, the purchasers' evidence reveals *only* changed market conditions," because the defendants "had attempted to raise prices before the class period as well," *id.* at 938 (emphasis added). "A *continuation of a historic pattern*," the court reasoned, where the only difference is that defendants' practices were more successful during alleged conspiracy period, "does not plausibly allow one to infer the existence of a cartel." *Id.* at 937 (emphasis added). In *Kleen*, there was no evidence the defendants had *changed* practices; the opposite is true here.

Likewise, in *Chocolate Confectionary*, the court observed that "[f]or a change of conduct to create an inference of a conspiracy, the shift in behavior must be a 'radical' or 'abrupt' change from the industry's business practices." 801 F.3d 383, 410 (3d Cir. 2015) (quoting *Toys "R" Us*, 221 F.3d at 935). The court determined there, however, that "[h]istorically, parallel pricing in the U.S. chocolate market has not been at all uncommon." *Id.* And in *Valspar*, the Third Circuit reiterated its findings in *Chocolate Confectionary*, then made the unremarkable observation that "radical or abrupt change[s] to indicate conspiracy . . . ha[ve] generally been more than just an uptick in frequency of a pre-established industry practice." 873 F.3d 185, 196 (3d Cir. 2017).[28] In *Kleen*, *Chocolate Confectionary*, and *Valspar*, unlike here, there was no evidence that the

[28] In other respects, the split decision in *Valspar* is an outlier in antitrust law. In two companion cases, courts in the Ninth and Fourth Circuits *denied* summary judgment "on substantially the same record" as in *Valspar*. *See Home Depot*, 2019 WL 3804667, at *1, 4, 6-10 (finding that *Valspar*'s "approach appears to require the plaintiff to present 'smoking gun' type evidence in order to avoid summary judgment"); *Titanium Dioxide*, 959 F. Supp. 2d at 830 (plaintiffs "put forward sufficient evidence tending to exclude the possibility of independent action"). The *Valspar* approach is also at odds with the long-established approach in federal antitrust cases. *See, e.g.*, *SD3, LLC v. Black & Decker*, 801 F.3d 412, 424 (4th Cir. 2015); *High Fructose*, 295 F.3d at 654-56; *Re/Max*, 173 F.3d at 1009.

defendants' behavior had *actually changed* materially during the conspiracy.

### 2. Defendants had a common motive to conspire

Courts have also recognized that a common motive by alleged price fixers is a plus factor that supports denial of summary judgment. *E.g., Publ'n Paper*, 690 F.3d at 62. This is because motive evidence shows why Defendants would seek to replace competition with collusion. *See Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 159 (N.D.N.Y. 2010) ("A conspiracy may be economically plausible if the defendants had a motive to engage in the conspiracy.").

Here, the long-term, structural decline in rail freight rates gave Defendants significant motive to conspire to coordinate their FSC programs. *Home Depot*, 2019 WL 3804667, at *7 (citing that relevant industry "had suffered significant declines in demand and profitability, and that prices were at a low" as evidence of defendant's motivation to conspire).

As detailed above, *supra* Sec. I.A, before the Conspiracy Period, the highly competitive rail industry was, in Defendants' own words, plagued by "very vicious historical price wars" and "Destructive Pricing for Rail Share" among the Defendants that led to a decades-long decline in rail rates. COF ¶¶ 13-21. In this competitive, pre-conspiracy environment, Defendants were unable to effectively boost revenues through FSCs. *See, e.g.*, COF ¶¶ 48-52, 56-58, 62-66, 71-77; PX0127, BNSF-0574516, at '617 ("We are challenged to mitigate the risk through fuel surcharges, particularly as the UP does not use a fuel surcharge in the competitive marketplace . . . . We do loose [sic] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it."); PX0128, Metadata to PX0127, at 114-15; PX0277, NS_010013612, at '612 (NS develops plans to keep "track of lost business [sic] account the FSC"); PX0612, Gooden (CSX) Dep. 197, 226 (prior to adopting new FSC formula in March 2003, CSX's FSC coverage was "very low" and he was "embarrassed" by the figure).

Defendants thus had motive to conspire, because absent coordination and industry-wide

agreement, a railroad seeking to impose FSCs more aggressively than its competitors risked losing (and in fact had lost) business to competitor railroads.

### 3. Defendants had extensive opportunities to conspire

A high level of inter-defendant communications is another plus factor present here, supporting inference of conspiracy. *See US Airways, Inc. v. Sabre Holdings Corp*., 105 F. Supp. 3d 265, 289-90 (S.D.N.Y. 2015) (citing "high degree of communication among" defendants as evidence of conspiracy); *Polyurethane Foam*, 152 F. Supp. 3d at 992 (evidence that defendants had the opportunity to conspire included that defendants were members of trade associations; certain defendant employees exchanged telephone calls throughout the conspiracy; defendant employees mingled during industry events; and defendants "regularly communicated with each other while carrying on supplier-customer relationships"); *see also* PX0769, Leitzinger MDL II Rpt. ¶¶ 97-109; PX0819, Jacobs Rpt. ¶¶ 288-304.

Plaintiffs cite above voluminous evidence that beginning in 2003, Defendants' senior leadership, including their CEOs and CMOs, engaged in an extraordinary series of meetings and communications about establishing new, uniform, industry-wide FSC programs, culminating in an agreement to coordinate FSC programs across the industry. *Supra* Sec. I.B. These discussions occurred at industry meetings of the AAR (where the Defendants' CEOs sat on the board), at meetings of the AAR's NEMC (made up of Defendants' CMOs), at a private gathering of Defendants' CMOs and CMOs-in-waiting, and during bilateral "Alliance" meetings attended by Defendants' senior executives. *Supra* Sec. I.B. Defendants' discussions about FSCs continued as the conspiracy was underway.

Defendants' *post hoc* and conclusory explanations of these unprecedented meetings as "necessary" and "legitimate, vertical communications," Defs. Br. 8, 29, are not evidence and should be credited, *see Cavallaro v. United States*, 284 F.3d 236, 248 (1st Cir. 2002) (declining to

credit a "statement [that] was made after the fact, in the midst of litigation, with little support in the contemporaneous record"). Indeed, Defendants' executives' testimony that they previously implemented and changed FSCs without *ever* communicating, and Defendants' sworn admissions that they *never* had senior executive-level discussions on FSCs before the Conspiracy Period, undermine Defendants' assertions. *Supra* Sec. I.A; COF ¶¶ 22, 29-30, 93-94.

#### 4. Absent a conspiracy, Defendants' broad application and enforcement of FSC mechanisms was an action against self-interest

Acting contrary to one's own interests also constitutes powerful evidence of a conspiracy and "tend[s] to exclude the likelihood of independent conduct." *Re/Max*, 173 F.3d at 1009. Here, Defendants' conduct was contrary to their independent self-interests in several respects. COF ¶¶ 141-50, 228-37, 480-512; *see also* PX0769, Leitzinger MDL II Rpt. ¶¶ 7, 176-194; PX0819, Jacobs Rpt. ¶¶ 317-325.

##### (a) BNSF elected not to differentiate its FSCs to emphasize the competitive advantages of its longer hauls

As discussed above, *supra* Sec. I.D, Defendants elected not to differentiate their FSCs to emphasize their competitive advantages. BNSF *twice* shelved a mileage-based FSC that would have been to its advantage (and its competitors' detriment). PX0769, Leitzinger MDL II Rpt. ¶¶ 183-192; PX0819, Jacobs Rpt. ¶¶ 162-64, 197-98, 437. Eastern railroads CSX and NS had substantially shorter average lengths of hauls than BNSF, so differentiating itself with a mileage-based FSC would emphasized the increased fuel efficiencies of its longer hauls. PX0634, Anderson (BNSF) Dep. 107 (BNSF's lengths of hauls are "more than double what it is on [CSX and NS]" and BNSF "ha[d] a philosophy of putting more horsepower on our trains"); *see also id.* ("[In total, w]e burn almost three times as much fuel [as CSX and NS].").

**(b) Defendants collectively chose not to exploit their competitive advantages on fuel costs and efficiency levels**

Although Defendants' FSC programs mirrored one another, *their fuel costs did not*. Defendants' fuel costs and efficiency levels were different, and improved over time. COF ¶¶ 480-512; *see also* PX0769, Leitzinger MDL II Rpt. Ex. B06 (showing Defendants' varying fuel efficiencies from 2002 to 2008, across commodities). Defendants also realized significantly different financial benefits from fuel price hedging (*i.e.*, using various financial mechanisms to offset potential future fuel costs). COF ¶¶ 489-97.

Defendants with lower fuel costs acted against their unilateral self-interest and surrendered their competitive pricing advantage to participate in a conspiracy that raised profits for competitors that otherwise would have lost market share as a result of their higher fuel costs. COF ¶ 445; PX0769, Leitzinger MDL II Rpt. ¶ 180 & n.506 (explaining that better fuel efficiency and lower fuel costs would be sources of competitive advantage that were in competitors' self-interest to protect); PX0819, Jacobs Rpt. ¶¶ 317-325 (discussing the differences in the Defendants' fuel costs and concluding their adoption of coordinated FSC programs "was contrary to each Defendant's individual interest and is not typically expected in a reasonably competitive market").

As Defendants recognized, a railroad could use its relative advantages on those fronts to create a strong competitive advantage in pricing and profitability. COF ¶ 500-01; PX0631, Goode (NS) Dep. 66-67 ("Q. [I]f Norfolk Southern could figure out ways to be more cost efficient that could . . . give it a competitive advantage over its competitors, correct? A. It could."); *id.* at 72 (if done well, a fuel hedging program "could have a favorable impact on cost"); PX0630, Moorman (NS) Dep. 161 ("Fuel certainly drives pricing and competition. It is one of the drivers of pricing and competition in the marketplace."). And if a Defendant increased its fuel efficiency over time, it could have gained a competitive advantage by reducing its FSC accordingly.

COF ¶ 499; PX0769, Leitzinger MDL II Rpt. ¶ 180 & n.506.

But in opting for coordinated and broad application and enforcement of their FSCs, and by not modifying them as their fuel efficiencies improved, Defendants remarkably chose not to exploit competitive advantages. COF ¶¶ 499-501; PX0769, Leitzinger MDL II Rpt. ¶¶ 180 & n.506, 183-192; PX0819, Jacobs Rpt. ¶ 317-325. That Defendants each had different fuel efficiencies, and different fuel price hedging practices, further reinforces that "fuel cost recovery" cannot justify the similarities among Defendants' FSCs. *See* COF ¶¶ 445, 497-500.

**(c) Defendants shared information that undermined their competitive advantages and enhanced their collective profits**

As discussed in detail above, *supra* Sec. I.F, rather than use confidential business information to their competitive advantage, Defendants instead *shared information with one another* regarding their fuel costs, hedging practices, and FSC policies and implementation, in furtherance of their conspiracy. COF ¶¶ 262, 270, 364-67, 371-73, 500-10; PX0769, Leitzinger MDL II Rpt. ¶¶ 177-182. There is no legitimate reason for Defendants to share this type of competitively sensitive information, as one of Defendants' own experts, Dr. Carlton, admitted at deposition. COF ¶¶ 373; PX0779, Carlton MDL II Dep. 657 ("[I]t's not obvious to me why competitors share their strategic plans about anything with each other . . . it's not obvious to me why private firms share any competitive information with each other."). Defendants' communications about such information would make no sense absent collusion. *In re Coordinated Pretrial Procs. In Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 450 (9th Cir. 1990) (disclosure of "sensitive price information might be considered contrary to a firm's self-interest" and thus could support a jury's finding of a "common understanding" to fix prices); *In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 401113, at *9 (S.D.N.Y. Feb. 8, 2012) (providing sensitive business information to competitors is against unilateral interest); *In re High Pressure*

*Laminates Antitrust Litig.*, 2006 WL 1317023, at *2 (S.D.N.Y. May 15, 2006) (sharing confidential information was against economic self-interest and probative of conspiracy).

**5. The rail freight industry was highly conducive to collusion**

An industry structure that facilitates collusion is another plus factor present here. *Publ'n Paper*, 690 F.3d at 65 (citing as evidence of price fixing that industry was conducive to collusion); *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1153 (D. Kan. 2012) ("*Urethane I*") ("[T]he structure of the industry—a highly concentrated oligopoly with high barriers to entry and homogeneous commodity products without close substitutes—was conducive to a price-fixing conspiracy."). Numerous industry characteristics made the U.S. rail freight industry highly conducive to price fixing by Defendants.

*First*, the industry was highly concentrated, with the four Defendants accounting for approximately 90% of track miles in the United States, and 94% of all rail freight revenue. COF ¶¶ 1-12; PX0769, Leitzinger MDL II Rpt. ¶¶ 40-42; PX0819, Jacobs Rpt. ¶¶ 46, 268-70. Industry concentration at that level makes collusion easier, both because it simplifies coordination and increases firms' ability to sustain high prices, collectively, without losing market share or their market power. *Publ'n Paper*, 690 F.3d at 65 (that the "market is controlled by a limited number of sellers" was evidence that the publication paper industry is conducive to collusion); *Linerboard*, 504 F. Supp. 2d at 54 (describing "concentrated market with high barriers to entry and 'huge' fixed costs of production" as "textbook conditions for illegal collusion"). Notably, Defendants' expert Dr. Carlton has studied the median number of colluding competitors in each (known) transportation cartel and concluded it is most often ***four*** would-be rivals. COF ¶ 12; DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 158 (4th glob. ed. 2015).

*Second*, the rail industry has enormous and nearly insurmountable barriers to entry. New or fledgling railroads must acquire rights of way and land, lay thousands of miles of track, build

bridges and tunnels—and then maintain them all, at great expense. COF ¶¶ 588-93; PX0769, Leitzinger MDL II Rpt. ¶¶ 64-69; PX0819, Jacobs Rpt. ¶¶ 273-77. This eliminates the possibility that new, lower-cost competitors could enter—or even threaten to enter—the industry to constrain Defendants' anticompetitive conduct. *See Publ'n Paper*, 690 F.3d at 65 ("high capital investment costs [that] limit the entry of new market players" was evidence that industry is conducive to collusion); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 772 (E.D. Pa. 2017) ("High barriers to entry also make an industry more conducive to collusion.").

*Third*, demand for Defendants' services was inelastic. Defendants' businesses were concentrated in commodities and distances over which rail was the most cost-efficient (or even only) transport option. COF ¶¶ 594-600; PX0769, Leitzinger MDL II Rpt. ¶¶ 43-63; PX0819, Jacobs Rpt. ¶ 499. Defendants could therefore sustain artificially high prices without losing so many customers as to make the higher prices unprofitable. COF ¶ 594; *see EPDM*, 681 F. Supp. 2d at 169 ("lack of economics substitutes" in market and "the product's price inelastic demand" "make illegal collusion feasible"); *United States v. Alcoa*, 2001 WL 1335698, at *12 (D.D.C. June 21, 2001) (market had "certain characteristics conducive to anticompetitive coordination," including "inelastic demand supply").

*Fourth*, rail freight transportation services are interchangeable across Defendants. Indeed, large shippers commonly use the rail freight services of more than one Defendant. COF ¶¶ 601-02; PX0769, Leitzinger MDL II Rpt. ¶¶ 70-74; PX0989, Jacobs Reply Rpt. ¶¶ 43-46; *see also* PX0819, Jacobs Rpt. ¶¶ 78, 80. That the services are interchangeable made it easier for Defendants to fix prices. *See High Fructose*, 295 F.3d at 656-57 (noting that the product was "highly standardized," which facilitated price collusion); *Titanium Dioxide*, 959 F. Supp. 2d at 822 ("Indicators that a market is conducive to collusion include the homogeneous and highly standardized, or commodity-

like nature, of the product . . . .").

*Fifth*, a history of regulation and communication among Defendants built an institutional understanding of pricing, which lowered the cost of collusion and monitoring. COF ¶¶ 614. During the Conspiracy Period, Defendants made their standard FSC formulas public, and made their pricing more available on the internet. COF ¶¶ 608-14. As detailed above, *supra* Sec. I.B, Defendants had the opportunity to signal each other through public statements and private analyst events, which is an archetypal "facilitating practice" of an antitrust conspiracy. *Domestic Airline Travel*, 691 F. Supp. 3d at 208 ("A 'facilitating practice' is an activity that makes it easier for parties to coordinate pricing or their behavior in an anticompetitive way and increases the likelihood of a consequence offensive to antitrust policy."). And, every few months, Defendants had opportunities to divulge their FSC strategies and their progress towards uniform coverage on earnings calls and in meetings with industry analysts. COF ¶ 614; PX0769, Leitzinger MDL II Rpt. ¶ 144; PX0819, Jacobs Rpt. ¶¶ 297, 305. In *Domestic Airline Travel*, plaintiffs proffered *no* direct communications between defendants, and summary judgment was denied, in part because "determining the purpose" of defendants' communications with the third-party analyst community was "an issue appropriate for a factfinder." 691 F. Supp. 3d at 209. Here, not only were numerous express, private communications between Defendants concerning FSCs, but also Defendants' public statements divulged FSC coverage policies and statistics. COF ¶ 614; *see also* COF ¶¶ 318, 330, 338, 355-57, 614 (citing various earnings calls).

Moreover, Defendants' executives are in the same room more frequently than perhaps any other industry, *see* Defs. Br. 30 ("[C]ollaboration is ubiquitous . . . ."), and the evidence shows that they frequently went beyond acceptable boundaries. *See Apple*, 952 F. Supp. 2d at 690 ("Plus factors commonly considered by courts include . . . information sharing."). As detailed above,

*supra* Sec. I.B, contemporaneous documents show that Defendants used their inter-Defendant discussions as a pretext to coordinate FSCs as to all traffic, and not just shared joint-line traffic.

Each of these foregoing characteristics of the rail freight industry makes it conducive to transforming motive into action, and therefore constitutes strong evidence in support of Defendants' collusion. This is all the more so when considering the characteristics in combination.

## II. DEFENDANTS' ARGUMENTS DO NOT SUPPORT SUMMARY JUDGMENT

### A. Neither Defendants' Assertions of Limited Exceptions to Their FSC Programs, Nor the Bryan Declaration, Support Summary Judgment

Defendants revisit a legally irrelevant and factually disputed argument about the extent of exceptions to their standard FSC formulas to suggest no conspiracy was possible. Defs. Br. 46-48 & n.13, 59, 77; NS Br. 11-12 & n.13; CSX Br. 12-15.[29] In so arguing, Defendants push Judge Posner's first and third traps: "weigh[ing] conflicting evidence" and "failing to distinguish between the existence of a conspiracy and its efficacy." *High Fructose*, 295 F.3d at 655-56.

As an initial matter, the "exceptions" Defendants point to are irrelevant as a matter of law. Courts have long recognized that exceptions to a perfect 100% conspiracy enforcement (particularly in a large complex industry) do not exonerate antitrust conspirators or entitle them to summary judgment. "[Section] 1 of the Sherman Antitrust Act does not outlaw only perfect conspiracies to restrain trade." *United States v. Beaver*, 515 F.3d 730, 739 (7th Cir. 2008). The Seventh Circuit (echoed by the Second Circuit) has warned courts of the "trap," at summary judgment in a price-fixing case, of "failing to distinguish between the existence of a conspiracy

[29] Neither BNSF nor UP assert meaningful exceptions to their standard FSC programs during the conspiracy. UP highlights its finance group's statement that "[not] *all* documents will [] have a fuel surcharge," meaning there would be *some* exceptions. UP Br. 12 (quoting DA19115) (emphasis added). But those exceptions were so few that the group generated projections with the "assump[tion] that going forward *all* price documents will have a fuel surcharge provision." DA19115 (emphasis added).

and its efficacy." *High Fructose*, 295 F.3d at 656; *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 776 (2d Cir. 2016) (similar); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 14 & n.26 (D.D.C. 2004). After all, when "there are some large and some small buyers," as is the case here, "it may simply cause the price fixers to engage in price discrimination." *High Fructose*, 295 F.3d at 658; *see also United States v. Foley*, 598 F.2d 1323, 1333 (4th Cir. 1979) ("[T]he agreement itself, ***not its performance***, is the crime of conspiracy . . . .") (emphasis added); *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 922 (N.D. Cal. 2017) (denying summary judgment and recognizing that evidence defendants may have "charged different end-prices . . . depending on base price, shipping distance, and discounts, at most provides an argument as to the amount of damage suffered by plaintiffs"); *cf. In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 266 (D.D.C. 2002) ("courts have found common impact in cases alleging price-fixing despite individual negotiations, varied purchase methods and different amounts, prices, and types of products purchased"). And indeed, Plaintiffs' experts have explained that the mere fact that Defendants may have in some instances negotiated certain FSCs (rather than apply their standard formula), or in other instances may not have ultimately required an FSC, in no way undermines the existence of the alleged conspiracy. To the contrary, it is entirely unsurprising that Defendants did not achieve perfect 100% standard FSC application, despite their best efforts. COF ¶ 317; PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 108-111.

Regardless, Defendants' well-worn assertions of FSC discounts, exceptions, and negotiability are belied by their own transactional data and testimony. As Plaintiffs set forth in more detail above, *supra* Sec. I.E, in stark contrast to the pre-Conspiracy Period, beginning in 2003 each Defendant formulated a policy to apply its standard FSC as widely as possible, with the goal of reaching 100% of its traffic. In conversations with their customers at the time, Defendants

confirmed the now-uniform application of these FSCs to shippers large and small, as the opportunity arose. To ensure the success of this new directive, each Defendant also instituted strict policies limiting exceptions to the standard FSCs, even requiring the approval of CEOs and CMOs for those rare instances. And in countless depositions, Defendant executives confirmed all of this (and that they would begin all negotiations with that standard FSC).

Those various steps—true of every Defendant—put an end to the fierce competition over FSCs that shippers previously enjoyed in 2000-2002 (when the FSC percentages were non-existent or very low). *Supra* Sec. I.A. By conspiring in 2003, Defendants successfully imposed their FSCs across shippers, even as those FSCs later became increasingly onerous. *Supra* Sec. I.C. Defendants' own transactional data demonstrates that there were no widespread exceptions to the standard FSCs, which only grew as a proportion of traffic, of shippers, and of revenue each year, as new contracts were negotiated and old contracts came up for renewal.

[redacted]

PX0985, McClave MDL II Rpt. at 6 fig.1; *see also id.* App'x A & figs.A.1-A.37 (demonstrating significant coverage increases across Defendants on a Plaintiff-by-Plaintiff basis); PX0986,

McClave MDL II Reply Rpt. App'x A & tbls.A-1-A-37 (demonstrating significant coverage increases on a Defendant-by-Defendant basis for each Plaintiff); PX0769, Leitzinger MDL II Rpt. ¶ 171 (finding FSC coverage increased for nearly all of Defendants' commodity groups, generally more than doubling, between November 2002 and November 2007); COF ¶¶ 312-16, 318-64.

To be sure, as with any conspiracy, there were "exceptions" on certain shipper price authorities among the thousands of shippers that do business with the railroads, but cartels frequently succeed at raising prices despite unsurprising imperfections. *Beaver*, 515 F.3d at 739 ("It is not uncommon for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence of cheating certainly does not, by itself, prevent . . . proving a conspiracy"); *see also* B. Douglas Bernheim & Erik Madsen, *Price Cutting and Business Stealing in Imperfect Cartels*, 107 AM. ECON. REV. 387, 387-93 (2017) (explaining and providing historical examples of cheating in cartels); Edward J. Green & Robert H. Porter, *Noncooperative Collusion Under Imperfect Price Information*, 52 ECONOMETRICA 87, 87-90 (1984) (collusion is not incompatible with recurring price decreases).

Moreover, what Defendants might call "exceptions"—occasional FSC variations and the like—nevertheless started from the inflated baseline of Defendants' standard FSCs and were subject to the same enforcement policies and fuel-cost recovery pretext. *Rail Freight*, 287 F.R.D. at 50 (finding that "the evidence in the record makes plain, and the railroad executives themselves admitted, that during the class period defendants uniformly began their negotiations with their standard fuel surcharge program"); COF ¶¶ 323, 334, 350, 359; PX0617, Lawson (NS) Dep. 38-40 ("Q. But the goal was to at least start from trying to get the standard fuel surcharge in any authority, right? A. That is correct."); PX0624, Allen (BNSF) Dep. 24-27 ("Q. So if I understand you correctly, you started the negotiation with a given customer with the $1.25 HDF standard fuel

surcharge program as the starting point? A. That's correct.").

Defendants nevertheless ask this Court to adopt their view of "overall patterns" with respect to Defendants' application of FSCs. Defs. Br. 46 & n.13. Defendants proffer these "patterns" through a misleading and procedurally deficient attorney declaration (the "Bryan Declaration")[30] that is contradicted by Defendants' contemporary documents, in an effort to suggest that the existence of exceptions to Defendants' policies *means that no FSC conspiracy existed*. No such conclusion can be drawn.

The Bryan Declaration's Attachment A distorts the facts by presenting an underwhelming minority of price authorities as though they constitute a trend across *all* price authorities. Defendants' "pattern" analysis is misleading for the precise reasons Judge Friedman identified in rejecting a similar analysis in 2012. *See Rail Freight*, 287 F.R.D. at 51-52 ("[T]he Court is not persuaded by Dr. Willig. In his analysis, Dr. Willig treated *any* fuel surcharge applied to a single shipment by a class member as equal to a fuel surcharge applied to *all* of that class member's shipments during the class period. The Court finds that analysis inadequate . . . ."). Bryan's methodology counts any shipper with just a *single price authority with a single Defendant* that meets their criteria. In reality, Defendants' transaction data shows that individual Plaintiffs entered into hundreds or thousands of price authorities, the overwhelming majority of which are not acknowledged in the Bryan Declaration. Thus, the Bryan Declaration is merely an exercise in cherry-picking price authorities that meet Defendants' preferred criteria, while ignoring the overwhelming majority of price authorities that defy their "pattern."

Each of Defendants' proffered statistics is contradicted by Defendants' contemporaneous

---

[30] Plaintiffs have moved to strike the Bryan Declaration and its Attachments, DA25422-705, and the similarly deficient Fanchiang Declaration and its Appendices, DA25706-888.

documents and misleading on its face. For one, Defendants assert that [redacted] of *MDL II* shippers entered into at least one pre-Conspiracy Period price authority, with one Defendant, that contained an FSC provision. But as described above, Defendants' own testimony and contemporaneous documents, and Plaintiffs' experts' analyses, reflected that pre-Conspiracy Period FSCs were not commonly imposed, were rarely triggered, and were difficult to collect—and even when they were triggered, they increased rates by very low percentages. *Supra* Sec. I.A; PX0769, Leitzinger MDL II Rpt. ¶¶ 172-173. Moreover, Plaintiffs' experts have explained that the mere fact that a shipper agreed to some kind of FSC on a given price authority in the pre-Conspiracy Period (when FSCs were rarely triggered and only at very low percentages) does not mean the same shipper would, in the absence of a conspiracy, agree to Defendants' Conspiracy Period FSCs that were always triggered at high percentages that were increasingly divorced from their true fuel costs. COF ¶ 317; PX0769, Leitzinger MDL II Rpt. ¶ 175 & n.490.

Illustrating Defendants' sleight of hand, the Bryan Declaration identifies UPS on the basis of a single pre-Conspiracy Period price authority with an FSC. DA25462. But in the pre-Conspiracy Period, UPS had [redacted] price authorities with Defendants: [redacted] with BNSF, [redacted] with CSX, [redacted] with NS, and [redacted] with UP. PX1161, Tucker Rpt. Sch. 2.7 (UPS excerpts). And Defendants count price authorities regardless of whether FSCs were ever triggered or paid during the pre-Conspiracy Period, including price authorities that Defendants' own experts admit *never resulted in any FSCs*. For example, the Bryan Declaration asserts that UP's February 2001 price authority with Phillips 66 and NS's April 2003 price authority with Vulcan [redacted] DA25454; DA25462, but those contracts described the [redacted] [redacted] [redacted] PX1000, P PHIL00085104, at '107; PX1007, NS-MDLII-00108273, at '290, and Defendants' own expert work shows that Defendants never charged FSCs under them before the Conspiracy Period,

PX0995, Tucker App'x B for Phillips 66, at 58; PX0996, Tucker App'x B for Vulcan, at 59, 62.

Likewise, Defendants assert that [redacted] of *MDL II* shippers entered into (or amended) a single Conspiracy Period price authority without having an FSC imposed upon them. Defs. Br. 47. But Defendants' contemporaneous documents and testimony reflect that Conspiracy Period FSCs were imposed as often as possible, with few exceptions or modifications, and that each Defendant's FSC coverage and billings significantly increased during the Conspiracy Period, while their FSCs became increasingly divorced from Defendants' true fuel costs. *Supra* Sec. I.G; *see also* COF ¶¶ 302-63; PX0985, McClave MDL II Rpt. 6 & fig. 1. Further, Plaintiffs' experts have explained that a given shippers' ability to "escape" the conspiracy on a specific shipment or price authority in no way means that the conspiracy did not occur. COF ¶ 317; PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 108-111. And again, Defendants' methodology would include a shipper in this category if that shipper had only *one* (out of up to hundreds or thousands of price authorities) with a single Defendant that did not contain an FSC. DA25427-63 (counting scores of Plaintiffs on the basis of a single contract or amendment with a single Defendant, without considering tens of thousands of contracts or amendments with all Defendants that contained their standard FSCs).

Similarly, Defendants assert that [redacted] of Plaintiffs entered into price authorities with "non-standard" FSCs during the Conspiracy Period. But Defendants' own executives testified that, even when they did ultimately deviate from their standard FSCs during the Conspiracy Period, they *began* negotiations from that standard. *Supra* Sec. I.E. For example, Defendants identify an October 2004 contract between [redacted] with a [redacted] DA25441. But that contract replaced a pre-Conspiracy Period contract that had [redacted] And when the contract came up for renewal in the Conspiracy Period, NS proposed an *extraordinary* [redacted] with [redacted] *and its* [redacted]

[redacted] COF ¶ 305; PX0927, P_EXXON00003424. [redacted] determined that NS's prices (including its FSC) were not linked to its costs and that NS's strategy was to [redacted] *Id.* When [redacted] COF ¶ 305; PX0883, NS_010034533, at '533 [redacted] Ultimately, [redacted] was forced to accept [redacted] COF ¶ 305. NS's [redacted] *See* Defs. Br. 10 (showing that the WTI index was at almost $60 in October 2004 and had been above $30 for nearly a year).

And many of Defendants' examples were otherwise-standard price authorities with *de minimis* modifications with slightly increased triggers (differences mooted by subsequent fuel prices). For example, Defendants assert that Sunoco entered into three Conspiracy Period price authorities with "non-standard" FSCs because Defendants identified three price authorities with [redacted] DA25459. As of the effective dates of each identified price authority, the WTI price was more than $10 higher than that trigger, rendering the "non-standard" aspect of the price authority moot. As these examples show, Defendants' identification of "non-standard" FSCs hardly equates to an undisputed fact that no conspiracy *existed.*

Similarly, many of the price authorities Defendants proffer as those entered during the Conspiracy Period without FSCs are in fact price authorities entered during the pre-Conspiracy Period, and "amended" non-substantively during the Conspiracy Period, without opportunity for

Defendants to add an FSC provision. For example, Defendants include a 2004 Exelon-CSX amendment that merely [redacted] on a pre-Conspiracy Period contract, PX1162, NS-MDLII-00090387, at '398, and a [redacted]-BNSF amendment that was the result of [redacted], PX1014, BNSF_II_03929635, at '639; PX1015, BNSF_II_04040733 [redacted] The interim amendments to master contract BNSFC 306190 reflected [redacted] but [redacted] It is disingenuous to put forward amendments that do so little as instances where shippers "escaped" Defendants' FSCs, and feign as though that means *there is no factual dispute that there existed no conspiracy to impose FSCs broadly*. That is particularly true where, as occurred with many Plaintiffs like [redacted], the second the contract at issue expired and negotiations ensued, [redacted] PX1017, Turner [redacted] 72-73.

Further, the Bryan Declaration Attachment A is littered with errors. *See generally* Pls. Resp. to Defs. Stmt. of Facts Nos. 7, 10, 45-46. For example, many of the price authorities Defendants proffer as entered during the pre-Conspiracy Period but with an FSC, in fact had no FSC during the pre-Conspiracy Period. *Supra* ([redacted]). Similarly, the Bryan Declaration identifies CSX's contract with Atofina Petrochemicals (a predecessor to Plaintiff TotalEnergies Petrochemicals), PX0909, FSC_MDLII_00608661, but omits that [redacted], PX0910,

TOTAL_083731 (Refund Contract); PX0911, TOTAL_083777 (internal correspondence about refund). [redacted] And other contracts listed in the Bryan Declaration Attachment A as pre-Conspiracy Period contracts were actually executed *during* the Conspiracy Period, but backdated to apply to some pre-Conspiracy Period traffic for accounting purposes. *See, e.g.*, PX1163, NS-MDLII-00019243, at '243, '245 ([redacted]); PX1164, [redacted], at '022, '028 ([redacted]); PX0999, [redacted]

Defendants assert that "the point of th[eir] analys[e]s is not to take issue with the story of any particular shipper," Defs. Br. 48, but Defendants' "patterns" are dependent on accepting their version of factual narratives with respect to each and every price authority. At summary judgment, they do not get the benefit on such disputes and all inferences are resolved in Plaintiffs' favor.

### B. Defendants' Assertion That They Acted Unilaterally and Rationally in Response to Rising Fuel Costs Is Counterfactual and Insufficient

#### 1. A purported alternative business explanation, standing alone, does not justify summary judgment

Defendants argue that a jury could not reasonably conclude Defendants conspired because "rising [fuel] costs" are "*the* 'obvious alternative explanation' for fuel surcharges." Defs. Br. 25 (emphasis added); *id.* at 52-56.

As an initial matter, where an antitrust plaintiff presents evidence from which it can be reasonably inferred that the defendant engaged in a conspiracy, an *alternative* business justification for the defendant's actions does not exonerate the defendant—it simply creates a question of material fact as to the actual cause of the defendant's behavior. *Domestic Airline Travel*, 691 F. Supp. 3d at 213 (where defendants "proffered economic justifications for their alleged

unilateral . . . actions" but plaintiffs "cast doubt" on them, "the Court cannot rule out that a factfinder could reasonably infer from the evidence the existence of a conspiracy, and accordingly, summary judgment is not supported"); *Home Depot*, 2019 WL 3804667, at *9 (court "agree[d] that the alleged conspirators' conduct may be explained" by legitimate business justifications, but denied summary judgment based on other evidence of conspiracy); *Titanium Dioxide*, 959 F. Supp. 2d at 828 (denying summary judgment where defendants proffered "legitimate reasons" for their conduct, because plaintiffs' and defendants' dueling explanations of the conduct "reflect genuine issues of material fact").

Here, Plaintiffs have presented more than enough evidence from which a jury could reasonably conclude both that (1) a conspiracy explains Defendants' behavior, *supra* Secs. I.B, I.J, and (2) Defendants' *post hoc* justifications lack factual support, *supra* Sec. I.I.

None of Defendants' cases (Defs. Br. 24-25) stands for the proposition that a competing justification is sufficient to exonerate an antitrust defendant. In *Twombly*, for instance, at the *pleadings stage* the plaintiff failed to allege *any facts* other than parallel conduct to support the claim that defendants had entered into a conspiracy. 550 U.S. at 566-68. When there is ample evidence of a conspiracy far beyond parallel behavior, both in the form of explicit communications and other evidence indicating collusion, *Twombly* is irrelevant.

In *City of Moundridge v. Exxon Mobil Corp.*, while the court found that "the defendants have provided alternative [business] reasons," it granted summary judgment only after carefully evaluating, and finding insufficient, plaintiffs' other evidence of conspiracy. 2009 WL 5385975, *8-12 (D.D.C. Sept. 30, 2009). In *Kleen*, the court found that the defendants' price increases "may be explained by external factors," but granted summary judgment only after similarly evaluating all evidence of conspiracy. 910 F.3d at 936-37, 942. Similarly, in *White v. R.M. Packer Co.*, the

court noted that the defendant gas stations existed in a market where each "is likely to reach its own independent conclusion that its best interests involve keeping prices high," but granted summary judgment only after finding other evidence unpersuasive. 635 F.3d 571, 579-86 (1st Cir. 2011). And in *Williamson Oil Co. v. Philip Morris USA*, the court found that the defendants' "only viable route back to profitability was to increase prices," but went on to consider and reject the plaintiffs' eight other proffered "plus factors" before granting summary judgment. 346 F.3d 1287, 1311-20 (11th Cir. 2003).

In short, Defendants' authorities reflect that "alternative explanations" are not enough to warrant summary judgment, particularly when plaintiffs have amassed ample evidence to raise a disputed fact issue. *Supra* Sec. I.I.

#### 2. Defendants implemented coordinated FSCs when fuel prices were "low and flat" and not expected to rise

Further, Defendants' assertion that "rising fuel costs" are "*the* 'obvious alternative explanation'" for their behavior, Defs. Br. 24, *see also* CSX Br. 3-4 & n.1, BNSF Br. 4, UP Br. 4, fails because, as discussed above, *supra* Sec. I.I.1, the actual evidence shows that when Defendants entered the conspiracy and modified their FSC programs, fuel costs were "***low***," and "***flat***" or declining. Defendants' own experts reached this conclusion. COF ¶¶ 85-91. Even NS contradicts its co-Defendants' pretext by correctly stating that "forecasts predicted declining fuel prices" at the time BNSF, CSX, and UP changed their FSCs. NS Br. 5. And, as the year progressed, fuel prices continued to be "stable," with "forecasts predicted prices to decline to $24/bbl by February 2004." *Id.*; *see also* COF ¶¶ 85-91.

Ignoring their own experts, Defendants instead point to a government website reflecting historical fuel prices, and attribute Defendants' conduct to the fact that fuel prices *ultimately increased after the conspiracy was underway*. Defs. Br. 9-10 & n.3. This is nothing more than a

*post hoc* attempt to justify Defendants' conduct. The Court should allow a jury to decide the issue.

**3. Defendants' FSC over-recovery contradicts their assertion that FSCs were merely a response to increasing fuel costs**

Defendants' reliance on "rising" fuel costs (Defs. Br. 24-25) also cannot be reconciled with the evidence that their FSCs recovered substantially more than their increased cost of fuel. That Defendants continued to over-recover on their incremental cost of fuel, rather than cutting their FSCs to offer more competitive prices, belies the claim that they were unilaterally reacting to increased fuel prices, because "[i]n a competitive industry . . . a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (noting that an increase in a seller's profit margin motivates him, "in the absence of agreement, to reduce his price slightly in order to take business from his competitors"); PX0819, Jacobs Rpt. ¶¶ 250-56 & fig.III.10; PX0769, Leitzinger MDL II Rpt. ¶ 136 & n.384.

This is especially true here for two reasons. *First*, absent a conspiracy, Defendants' own evidence and Plaintiffs' expert evidence demonstrates that Defendants could not have sustained such over-recovery. COF ¶¶ 92, 520-23. In early 2003, BNSF reduced its FSC percentage across-the-board (from 5% to 2%), but never did again after the conspiracy began. *Supra* Sec. I.B; COF ¶¶ 74-75, 168-81, 522. CSX and UP senior executives even discussed that, if fuel prices stayed high, they might have to consider raising the trigger points for their FSC programs. COF ¶¶ 188-92; PX0474, UPFSC0001088, at '088 ("Both roads start at a $23 trigger. May have to revisit $23 if stay high."). Despite the rise in fuel prices *and* in Defendants' over-recovery of fuel costs during the Conspiracy Period, COF ¶¶ 513-53, they never relented or otherwise relaxed their FSC policies. Whereas Defendants faced competition and failed to collect low pre-Conspiracy Period FSCs that

were rarely even triggered, they were overwhelmingly successful in forcing Plaintiffs to pay suddenly non-negotiable that ranged as high as 35% during the Conspiracy Period.[31] Defendants could not have achieved this over-recovery of fuel costs in a competitive environment. *Supra* Sec. I.G. And, absent conspiracy, Defendants' coverage levels would have been expected to *decrease* as fuel prices rose and their FSC revenues became further divorced from their actual costs.[32]

*Second*, Defendants' over-recovery is probative of conspiracy because it shows their stated justification for imposing FSCs—the need to recover increases in the cost of fuel—was an artifice that they perpetrated jointly. *Supra* Sec. I.I.2. Each Defendant attempted to justify the modifications to its FSC program by arguing to customers and the public that such modifications were necessary to recoup increases in the cost of fuel, which was not true. *See id*. That each Defendant sought to conceal its over-recovery in the same manner is evidence that Defendants were coordinating to increase profits. *Supra* Sec. I.I; *Linerboard*, 504 F. Supp. 2d at 59-62 (defendants' separate but mutual usage of the phrase "inventory overhang" to explain the motivation behind allegedly anticompetitive conduct suggested coordination).

Defendants respond that over-recovery of an expense *cannot* be probative of a conspiracy because "*[e]very* capitalist aspires to collect more total revenue than its total costs." Defs. Br. 56. Aspirations are one thing, but significant recoveries in excess of actual costs over several years are

---

[31] *Compare, e.g.*, PX0129, BNSF_0574516, at '624_011 (BNSF in 2002: "[O]ur rail competitors do not [use FSCs] and we therefore are hard pressed to achieve [FSCs]. We do loose [sic] business because of that.") *with* PX0126, BNSF-0574195, at '216 (BNSF in 2005: "[R]eliance on fuel surcharge . . . is working well now," but "***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail***.").

[32] PX0769, Leitzinger MDL II Rpt. ¶ 175 ("The large increases in FSC coverage that occurred notwithstanding the rapidly rising fuel prices suggest a strong shift in pricing power to the railroads during this period—a shift of the sort that collective coordination in pricing would create."); PX0844, Leitzinger MDL I Dep. 100-101 (as fuel prices increased during Conspiracy Period "the bite so to speak that [was] created by rate based FSCs would have become that much greater and . . . in a competitive environment created substantial pushback against rate based FSCs.").

another—and are probative of collusion. *Cf. City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 572-73 (11th Cir. 1998) ("[T]his combination of high profits and high incumbency would not be likely to occur if the defendants either were vigorously competing with each other or were engaging in competitive price leadership."); *Le Baron's Est. v. Rohm & Haas Co.*, 441 F.2d 575, 578 (9th Cir. 1971) ("[E]vidence of high profit margins is probative of the existence of a conspiracy."); *Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, 2009 WL 302003, at *1 (N.D. Cal. Feb. 6, 2009) ("Defendant['s] . . . profits, if extraordinary, can be circumstantial evidence of a conspiracy to fix[—]or otherwise artificially inflate—prices."). And "cost increases are not usually passed on in their entirety" to companies' customers, AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 395b1, further underscoring Defendants' anomalous ability to achieve *increased profits* (which they attributed to FSCs) on the backs of costs increases during the Conspiracy Period. COF ¶¶ 518-20; *see also* PX0769, Leitzinger MDL II Rpt. ¶ 231 ("[E]conomic theory holds that in a highly concentrated oligopoly—such as the rail freight market was prior to the alleged conspiracy—firms will not typically pass through the entirety of their cost increases into higher sales prices."); PX0819, Jacobs Rpt. ¶ 21.

#### 4. Defendants' cases are inapposite

Defendants cite a string of cases for the proposition that their conspiracy-era behavior can be explained as a unilateral response to increasing fuel costs, Defs. Br. 26, 52-56, or as non-collusive conscious parallelism (which pre-supposes the absence of communication), *id.* at 22-23. But here, Defendants cannot argue their coordination was tacit, *i.e.*, done in the absence of "express coordination" and "without communicating," given the facts that plaintiffs have adduced. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 239 (1993). Defendants' cases are inapposite for several other reasons too.

*First*, the cases are distinguishable on the facts. Each concerns actions by defendants

facing rising input costs, unlike our Defendants in early 2003 when the conspiracy began. For example, the court in *Chocolate Confectionary* found that there was evidence that "price increases were taken *in anticipation of* rising costs." 801 F.3d at 399 (emphasis in original).[33] By contrast, here, while fuel prices *ultimately* increased considerably during the Conspiracy Period, Defendants began conspiring to modify their FSC programs at a time when fuel prices were "low and flat," and not expected to rise. *Supra* Sec. I.I.1. Indeed, consistent with that expectation, key early steps in the conspiracy were to *lower* the trigger price for application of FSCs and have them incrementally increase *more often*, capturing FSCs at *lower* fuel prices. *Supra* Secs. I.B, I.I.2.

At best, Defendants argue (Defs. Br. 41-43) that *based on the fuel prices that were ultimately seen during the Conspiracy Period*, there was a similarity in "earning power" between pre-conspiracy and Conspiracy Period FSCs. But as discussed above, *supra* Sec. I.I.2, Defendants' *contemporaneous statements* establish that they viewed their new FSCs as significantly more onerous, and as "profit centers" that according to Defendants' SEC filings drove a sharp increase in profits during the Conspiracy Period. Further, Defendants make their earning-power argument by looking only at after-the-fact fuel prices; under the fuel prices expected at the time Defendants adopted their new FSCs, the new surcharges were expected to yield billings that were impossible under the old ones. *Supra* Sec. I.I.1; PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 121-125 ("[T]he right way to test . . . that these changes represented a meaningful . . . change is to consider their impact in the context of price expectations at the time."). And finally, even if theoretical "earning

---

[33] *See also Supreme Auto Transp. v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 738-39 (7th Cir. 2018); *Text Messaging*, 782 F.3d at 875; *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 54-56 (2d Cir. 2010); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1092 (9th Cir. 2015); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151-52 (E.D.N.Y. 2010); *In re LTL Shipping Servs. Antitrust Litig.*, 2009 WL 323219, at *16-17 (N.D. Ga. Jan. 28, 2009); *Moundridge*, 2009 WL 5385975, at *8.

power" of the two formulas were similar, Defendants' argument ignores a critical element of Defendants' conduct, which included increasing FSC coverage. *Supra* Sec. I.E. A conspiracy that facilitates the broad application of surcharges in a way that they could not have been applied before would still be highly profitable and rational.

But even accepting Defendants' flawed premise that fuel prices were expected to increase at the start of the Conspiracy Period, none of the cases Defendants cite could compel summary judgment here. Four cases cited by Defendants do not even contain a finding that increasing input costs prevented an inference of conspiracy. In *Text Messaging*, the court presented the fact that airlines acting unilaterally might respond to an increase in the price of fuel in parallel fashion as a purely *hypothetical* illustration of conscious parallelism—and considered no other facts in the process. 782 F.3d at 875. In *Supreme Auto Transport*—which concerned a motion to dismiss and thus did not even address what constitutes evidence of conspiracy—the court *expressly declined* to consider whether the pleadings adequately addressed defendants' alternative business justification for their conduct. 902 F.3d at 738-39. In *Chocolate Confectionary*, the court accepted the contention that "the price increases [in chocolate products] were not fully explained by cost increases," 801 F.3d at 400, but found that plaintiffs had essentially *no other evidence* probative of conspiracy, *id.* at 412. And *Freedom Holdings* did not even concern an alleged conspiracy, but rather whether a New York statute was unenforceable because it mandated a *per se* violation of the Sherman Act. 624 F.3d at 56. None of these cases addressed a situation where, as here, there is a considerable evidentiary record from which an inference of conspiracy can be drawn.

The other cases Defendants cite are similarly inapposite. In *LaFlamme*, the court dismissed *at the pleadings stage* a complaint accusing various airlines of price fixing by agreeing to implement FSCs; the decision does not address whether evidence of rising input costs could ever

exonerate an antitrust defendant in the *summary judgment* context. 702 F. Supp. 2d at 145-46. Furthermore, the *LaFlamme* plaintiffs had failed to allege that defendants' pricing was "unreasonably high" or that there was any evidence of conspiratorial meetings and communications between defendants. *Id*. at 152-54. Here, of course, Plaintiffs *have* submitted such evidence. COF ¶¶ 92-237, 446-47, 513-87.

In *LTL Shipping Services*—another motion to dismiss case—while the court dismissed the complaint, in part because "[i]t is quite plausible . . . that the Defendants imposed fuel surcharges as a direct . . . reaction to relatively high fuel costs," 2009 WL 323219 at *16, that explanation was found persuasive because each defendant "allegedly shares the same business model, cost and profit structure, and ratio of fixed to variable costs as all others," *id*. at *17. Here, by contrast, Defendants' FSCs remained in sync notwithstanding that Defendants had *different* fuel costs and fuel efficiencies, and varying levels of fuel price hedging benefits. COF ¶¶ 445, 480-88, 497-99.

In *Stanislaus Food Products* the court granted summary judgment primarily because the alleged conspiracy would have been *irrational*, and therefore the court declined to conclude that a *single* instance of parallel pricing during the Conspiracy Period justified an inference of conspiracy. 803 F.3d. at 1092. Here, by contrast, Defendants do not even attempt to argue that a conspiracy would have been irrational, and their coordinated conduct (which spanned many years) cannot be fairly characterized as only a single instance of parallel conduct.

Nor is this case analogous to *Moundridge*, where the defendants presented an "undisputed" "plausible and justifiable alternative interpretation" of their decisions to reduce output. 2009 WL 5385975 at *8. Here, by contrast, the record is replete with evidence that an increase in fuel prices *cannot* explain the resulting changes to the FSC programs, as (among other things) fuel prices were "low and flat," and *not* expected to increase when the conspiracy began and, as prices

rose during the Conspiracy Period, Defendants' FSCs significantly over-recovered the costs associated with those price increases. *Supra* Sec. I.I.1.

*Second*, Defendants lack any evidentiary foundation for asserting that their conduct during the Conspiracy Period—with respect to over-recovery of fuel costs or otherwise—stemmed from mere conscious parallelism. The history of the rail freight industry shows that the decades before the Conspiracy Period were characterized by price competition—including specifically as to application of FSCs—and a long-term structural decline in rail freight rates. *Supra* Sec. I.A; *see Publ'n Paper*, 690 F.3d at 68 ("scant evidence in the record to support defendants' assertion that [defendant] has historically been a market follower" cut against defendant's claim that its conduct was the result of conscious parallelism). As it is, Defendants' price competition on FSCs ended—and their parallel action and subsequent over-recovery of fuel costs began—when Defendants started engaging, for the first time, in high-level meetings and information sharing regarding FSCs. *Supra* Sec. I.B; *Publ'n Paper*, 690 F.3d at 67-69 (evidence that communication between defendants' officers preceded parallel action tends to exclude the possibility that defendants' actions resulted from conscious parallelism rather than conspiracy); *Flat Glass*, 385 F.3d at 369 (same); *Blood Reagents*, 266 F. Supp. 3d at 777-78 (same).

The cases Defendants cite to support their claim that their over-recovery was the result of conscious parallelism are therefore inapposite. None of Defendants' cases concerns a situation where, as here, the defendants' parallel conduct was a marked break from prior historical behavior. In both *Chocolate Confectionary* and *LTL Shipping Services* the court found that plaintiffs failed to show or allege that the defendants' parallel behavior was in any way inconsistent with their pre-conspiracy conduct. *Chocolate Confectionary*, 801 F.3d at 410 ("Historically, parallel pricing in the U.S. chocolate market has not been at all uncommon."); *LTL Shipping Services*,

2009 WL 323219, at *17 ("[T]he Defendants' fuel surcharges are not alleged to be . . . historically unprecedented."). Here, Plaintiffs have submitted substantial evidence demonstrating exactly that. *Supra* Sec. I.J.1. And *Text Messaging* involved parallel conduct in an industry that was then both new and changing rapidly, 782 F.3d at 875, and thus lacked the sort of pre-history that here tends to exclude conscious parallelism as a basis for Defendants' actions.

Finally, none of Defendants' cases concern a situation where, like here, the defendants were meeting and exchanging information around the time of their parallel conduct. In *Text Messaging*, while the plaintiff identified meetings between different defendants, they lacked evidence showing what information defendants exchanged or that the meetings preceded any pricing decisions. *See* 782 F.3d at 878. Similarly, in *Chocolate Confectionary*, the plaintiffs lacked any evidence that the defendants exchanged relevant pricing information. 801 F.3d at 408. And in *LTL Shipping Services*, which concerned a motion to dismiss (not summary judgment), the plaintiff merely alleged the existence of meetings between defendants without specifying what they discussed or the proximity of the meetings to any pricing decision. 2009 WL 323219, at *14.

**5. That other industries enacted FSCs is irrelevant**

Defendants also argue that this case should end because other industries used FSCs. Defs. Br. 32. This is a red herring. Plaintiffs do not take issue with the use of FSCs *as an independent, unilateral practice*. This case is about Defendants' *coordinated and conspiratorial* use of FSCs, applied across-the-board, in order to raise all-in freight rates.

The use of FSCs in other industries says nothing about whether Defendants conspired here. Indeed, the evidence shows that BNSF recognized in 2002 that while the "trucking industry uses fuel surcharges," BNSF faced competitive pressure because "our rail competitors do not." PX0127, BNSF-0574516, at '617. Of course, FSCs, like any other form of pricing, can be the subject of collusion in one industry, but not in another. "Conduct that would be lawful when

undertaken unilaterally may still be actionable under § 1 when competitors agree to that conduct together." *SourceOne Dental*, 310 F. Supp. 3d at 358.

Nevertheless, and unsurprisingly, FSCs *have* been the subject of collusion in other transportation industries—including in the same timeframe. *See, e.g.*, *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *13, 31 (N.D. Cal. May 9, 2011) (denying motions to dismiss antitrust claims involving fuel surcharges); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *6, 54 (E.D.N.Y. Jan. 4, 2011) (same). Indeed, toward the beginning of this litigation, 21 air freight carriers *pleaded guilty* to a price-fixing conspiracy involving FSCs, resulting in over $1.8 billion in criminal fines. *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *4 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

### C. Defendants' Assertion of Non-Conspiratorial Follow-the-Leader Parallelism Contradicts the Evidence

"Parallel conduct is, of course, consistent with the existence of an agreement; in many cases where an agreement exists, parallel conduct—such as setting prices at the same level—is precisely the concerted action that is the conspiracy's object." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010). But contrary to Defendants' characterizations (Defs. Br. 22), the evidence here shows parallel conduct that is not explained by the fact that "defendants operate in an oligopolistic market." *See Brokerage Antitrust Litig.*, 618 F.3d at 322.

Moreover, Defendants cannot have it both ways: in parts of their brief, they contend that there was no uniformity of action and prices, Defs. Br. 33-35, while elsewhere they contend that follow-the-leader parallelism occurred, *id.* at 62-63, which necessarily *concedes the uniformity* but ignores the discussions and coordination among Defendants. Competitors in non-collusive oligopolies *do not* check with rivals about pricing decisions and customer responses, as Defendants

did repeatedly here. And both scenarios (unilateral action or follow-the-leader parallelism) are in further tension with Defendants' central Section 10706 argument repeated again here—that if price coordination occurred, it was necessary and even sanctioned by Congress. *Id.* at 7-8.

**1. Defendants imposed parallel FSC policies and practices throughout the Conspiracy Period that do not reflect mere conscious parallelism**

Focusing solely on their FSC formulas, Defendants first assert that their FSC programs were not notably parallel. Defs. Br. 33-35. Defendants then confusingly claim that their similar FSC programs were merely the result of "sequential" follow-the-leader pricing. Defs. Br. 62-63. Neither of these contradictory assertions can be reconciled with the evidence or applicable law. *See Armada*, 1995 WL 46394, at *13 n.12 (a party proposing summary judgment cannot advance differing and inconsistent factual theories to suggest the absence of a genuine dispute of material fact); *Palandjian*, 614 F. Supp. at 1579 (at summary judgment, "the time for the maintenance of inconsistent factual positions has long since passed").

*First*, even just considering the more aggressive FSC formulas Defendants imposed during the Conspiracy Period, the record contains compelling evidence of Defendants' essentially lockstep FSC programs. COF ¶¶ 122-28, 166-69, 174, 218-23, 511; *supra* Sec. I.B. Throughout the Conspiracy Period, Defendants each adopted similar policies for the universal application of their new FSC formulas, refusing to negotiate those FSCs in the face of customer complaints, and requiring senior management approval to deviate from standardized FSCs. COF ¶¶ 156, 221, 319-21, 325, 330-33, 346, 352, 355-57; *supra* Sec. I.E. All of these changes came amidst an unprecedented series of meetings and communications among Defendants' senior executives. COF ¶¶ 92-273; *supra* Sec. I.B. Defendants also convened at the AAR later that year to create and publish a new index to facilitate imposing FSCs. COF ¶¶ 374-420; *supra* Sec. I.C. In light of this evidence, Defendants' suggestion that their FSC programs were not "unusually parallel," and,

at most, reflect follow-the-leader pricing, cannot be taken seriously.

*Second*, any effort to explain this away as mere "conscious parallelism" is inconsistent with the record. For example, "first mover" CSX actually implemented UP's *internal* escalation rate, which was twice as aggressive as CSX's internal proposal. COF ¶¶ 104-21; *supra* Sec. I.B.

Defendants make much of the nine-month window between when CSX, UP, and BNSF announced equivalent FSC formulas, and when NS announced that it would follow suit, arguing that these identical actions purportedly are "not remotely suggestive of conspiracy." Defs. Br. 58; *see also id.* at 2-3, 24, 33-34, 36, 40-41, 62. But "the Supreme Court has long held that simultaneous action is [] not a requirement to demonstrate parallel conduct." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (citing *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939); *see also Int'l Constr. Prod. LLC v. Caterpillar Inc.*, 2020 WL 4589775, at *4 (D. Del. Aug. 10, 2020) ("[C]onduct separated by months and even years can be reasonably proximate."); *Currency Conversion*, 2012 WL 401113, at *5 (denying summary judgment even though defendants' actions only "roughly coincided" with their attendance of meetings); *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 367-68 (S.D.N.Y. 2011) (denying summary judgment where, over several months, banks conspired to implement conversion fees that varied by as much as 50%); *Polyurethane Foam*, 152 F. Supp. 3d at 982-83 (holding jury could determine collusion when prices were substantially similar and defendants issued identical or near identical price increases); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 446-47 (E.D. Pa. 2018) (finding sufficient coordinated conduct even if price increases did not "precisely match" and were "several months apart"). Indeed, "parallel conduct need not be exactly simultaneous and identical in order to give rise to an inference of agreement." *SD3*, 801 F.3d at 429 (citation and internal quotation marks omitted). Cartels work differently in the real world:

pricing changes in some industries can take time, and the absence of simultaneous action does not preclude agreement—or success in elevating prices.

Furthermore, and as discussed in greater detail below, *infra* Sec. II.C.2.c, while NS may have waited longer than the other defendants to *announce* its new FSC formula (due to technical constraints), NS actively participated in the discussions among Defendants regarding FSCs during the first half of 2003, and in the adoption of the AIILF at the AAR, and NS began its preparations to implement a new FSC formula in the course of those conversations in early 2003.

Defendants also falsely claim that UP somehow broke from the conspiracy when it revised its FSC program after initially announcing a match with CSX. Defs. Br. 61. First, UP was instrumental in CSX's adoption of a more aggressive FSC, and then UP quickly announced it would match CSX to reset market baselines. COF ¶¶ 104-28. Second, far from a break with the agreement, UP's switch advanced the conspiracy. UP's FSC program simply shifted from the WTI index (matching CSX) to the HDF index (matching BNSF), at comparable trigger prices. COF ¶¶ 164-77. That shift allowed UP and BNSF to present a unified front to shippers in the Western United States, consistent with the conspiracy Defendants' senior executives hatched in their meetings starting in early 2003, with a stated goal to make the Defendants' FSCs the same "in the eyes of the customers." COF ¶¶ 182-84; PX0241, NS 001000360, at '361.

### 2. Defendants' supposed internal processes do not eliminate any factual dispute as to the alleged conspiracy

Defendants assert that no reasonable jury could conclude a conspiracy occurred because, in addition to communications with their competitors about FSCs, Defendants also had *internal* communications concerning FSC programs. Defs. Br. 60-63. But the existence of internal meetings and communications—including among lower-level personnel who were not a part of high-level C-suite communications—is in no way inconsistent with all the evidence of collusive

conduct among the Defendants.

Nor are internal meetings surprising. As the court recognized in *Text Messaging*, "one would expect such 'independent' evaluations even if the firms were expressly colluding, as the 'independent' evaluations would disguise what they were doing." 782 F.3d at 876; *see also Korean Ramen*, 281 F. Supp. 3d at 919 (denying summary judgment where defendant "points to evidence that it engaged in extensive analysis and strategizing before any price changes . . . . That may be so, but plaintiffs have likewise shown evidence that there was analysis in that process of at least some allegedly non-public competitor price and price support information."); *EPDM*, 681 F. Supp. 2d at 172-73 ("Here, by contrast, the plaintiffs have supported with documentary evidence an inference of collusive behavior from an act against economic self-interest. From that act, a reasonable jury could infer that the DSM defendants entered the agreement as part of an illegal conspiracy to apportion market share. The defendants do not avoid the inference merely by offering an independent business justification . . . ."). Notably, Defendants often *rejected* internal recommendations to differentiate their FSCs from their competitors, opting instead to stay with the coordination they discussed at the most senior levels. *Supra* Sec. II.B.

None of Defendants' purportedly unilateral internal deliberations provides reason to grant summary judgment—to the contrary, each highlights factual issues for the jury to decide.

**(a) CSX's purported business justifications are inconsistent with the factual record and do not support summary judgment**

CSX claims that the changes in its FSC formula and policies stemmed solely from independent analysis, primarily undertaken by CSX's Michael Giftos and John Couch. CSX Br. 4-8. But the evidence shows that CSX's decision to increase its FSCs was not born out of independent analysis; at a minimum, there exists a genuine dispute of material fact. In early March 2003, CSX *internally* recommended making changes to its FSC, including an escalation

schedule (0.5% additional surcharge for every $2.50 WTI increase) that would have resulted in a *decrease* in CSX's FSC percentages compared to its existing FSC program, as well as a lower $23 trigger price. *Supra* Sec. I.B; COF ¶¶ 105, 110. Simultaneously, UP *internally* recommended an FSC escalation that utilized a more aggressive escalation (0.4% additional surcharge for every $1 WTI increase), and a $28 trigger price. *Supra* Sec. I.B; COF ¶¶ 107, 110.

But within days CSX's leadership abruptly abandoned the recommended FSC escalation rate *reduction* and instead adopted a program *matching* UP's *internally discussed* more aggressive escalation rate. *Supra* Sec. I.B; COF ¶¶ 111-21. FSCs under the more aggressive formula that CSX ultimately adopted escalated at roughly twice the rate of the formula CSX had previously considered. *Supra* Sec. I.B; COF ¶ 113.[34]

*CSX does not explain (and has never explained) how it came to adopt a rate of escalation that it never internally analyzed and that existed only in the internal files of its competitor, UP.*

**(b) UP's purported business justifications are inconsistent with the factual record and do not support summary judgment**

UP also claims its conspiracy-period FSC program came about as a result of unilateral internal decision-making. Not so. *First*, UP argues that it only changed FSCs in 2003 after its consecutive-day calculations failed to trigger an FSC in 2003. UP Br. 4-5. Setting aside UP's contradictory argument that it never made any meaningful changes to its FSC after October 2002, *id.* at 2, UP cites to only a single after-the-fact talking-points memo to support this claim. UP Br. 5 (passing off DA01554—an FAQ to defend against customer complaints after UP's FSC change—as evidence of before-the-fact impetus for the change). As explained above, *supra* Sec. I.I.1, UP's strained *post hoc* justification is nonsensical. According to UP, customers *complained* about a

[34] UP then quickly announced it would match CSX. *Supra* Sec. II.B; COF ¶ 122.

last-minute dip in fuel prices below an FSC trigger that saved customers 2% in FSCs, compelling UP to *placate* its customers by adopting a new FSC that would have *increased* rates by "millions of dollars." UP Br. 5. In any case, UP's single, self-serving document does not outweigh the legions of inter-Defendant communications, circumstantial evidence, and plus factors supporting a reasonable inference that UP's conduct was instead the result of a conspiracy. *See, e.g.*, COF ¶¶ 122-28, 139, 151-55, 164-77, 182-205. And any "failings" in the consecutive-day calculations reflect, at most, a further motive for the conspiracy—capturing missed profits. *See Fleischman*, 728 F. Supp. 2d at 159.

*Second*, UP claims there is no evidence that it agreed to adopt coordinated FSCs, and that purported internal analyses rule out the possibility that UP acted in concert with the other Defendants. UP Br. 1, 6-7. As explained above, *CSX adopted an FSC formula that existed only in UP's internal analyses, implicating both CSX and UP*. UP then quickly announced it would match CSX (including CSX's $23 WTI trigger), in place of UP's own internal proposal of a $28 WTI trigger. *Supra* Sec. I.B; COF ¶¶ 111-28. Like CSX, UP does not provide (and has never provided) any explanation of how CSX came to adopt an FSC escalation rate that CSX had never internally considered, and that existed only in UP's internal files.

Further, UP's decision to adopt CSX's methodology was made without any analysis by UP's finance team, which declared it was "[not] in the best position to discuss why $23 [trigger]" because "*[t]o be honest, we were not aware of the threshold until we saw the press release* so we are not in the best position to describe how and why that threshold was selected." COF ¶¶ 124-25; PX0402, UPFSC 0184695, at '695 (emphasis added) (observing that the $23 trigger price cannot be "defend[ed]" to customers on the basis of "the historical information and analysis we have on our side"). This sequence of events more than supports the inference that UP's announcement was

not a result of considered internal analysis, but instead the outcome of its coordination with CSX.

*Third*, the documents that Defendants cite as evidencing an internal "evaluation [] and concern" at UP are nothing of the sort. Defs. Br. 37; *see also* UP Br. 6. The only document that Defendants offer as an "internal document[] show[ing] evaluation" is merely a copy of CSX's March 24, 2003 announcement, with a reply from a non-decision-maker at UP requesting that someone "assess" why CSX's new FSC was not yet on its website. *See* Defs. Br. 37 (passing DA01432 off as an "internal document[] show[ing] evaluation"). And UP's assertion that its "internal documents evidence the debate" whether to adopt CSX's FSC is tellingly without citation. UP Br. 6; *see also* Defs. Stmt. of Undisputed Material Facts ¶ 33.4 (claiming without citation that "UP debated internally whether to match [CSX's] formula").

In the past (but not here), UP has offered a March 25, 2003 email to Koraleski (UP) asking for a meeting: "Before we pull the trigger and adopt the CSX methodology, can we discuss it first . . . ?" DA01440. But that email contradicts UP's made-for-litigation narrative, because it suggests that Koraleski had directed that UP adopt CSX's methodology *before* UP undertook any internal analysis. These documents support Plaintiffs' contention that UP's actions flowed from Defendants' agreement; at the very least, they raise a question of fact for the jury to decide.

*Fourth*, UP argues that internal analysis explains its subsequent decision to adopt BNSF's HDF-based FSC program. UP Br. 1, 6-7. UP claims it chose a $1.35 HDF trigger because it created a "competitive advantage" over BNSF, but the cited document states no such thing—it merely states that customers would view UP's previously announced $23 WTI trigger as a permanent price increase. *See* UP Br. 7-8; DA01534, at '534-43. As discussed above, *supra* Sec. I.B, the HDF surcharge that UP adopted *was itself a permanent price increase*, and UP's contemporaneous documents recognized that its program, which was announced within days of

BNSF's announcement, "mirrors BNSF's" program. COF ¶¶ 166-69, 174.

UP's related argument that it could not have been conspiring because it did not know that BNSF was changing its trigger price to HDF $1.25 falls flat. *See* UP Br. 8.[35] As an initial matter, the terms were in fact identical once the $1.35 threshold was met, and BNSF's and UP's FSC programs generated the exact same FSC percentages throughout the Conspiracy Period. COF ¶¶ 166-69, 174. Nor is there any evidence of meaningful competition over FSCs during the Conspiracy Period. While BNSF complained in 2002 that "our rail competitors do not [use FSCs] and we therefore are hard pressed to achieve [FSCs]" and we do loose [sic] business because of that," COF ¶ 73; PX0127, BNSF-0574516, at '617, by 2005 it reported that the use of the FSCs was "working well now," but still acknowledged that any FSC competition from UP and others could threaten this: "***it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail***," COF ¶ 92; PX0126, BNSF-0574195, at '216 (emphasis added).

*Fifth*, UP claims that its switch to BNSF's HDF-based scale was responsive to customer pressures, which UP would "surely have ignored" if it were in a conspiracy. UP Br. 6; Defs. Br. 37. But UP's switch to BNSF's FSC *did* ignore the substantive complaints it received. As UP senior executives told their counterparts at CSX, UP's HDF-based FSC actually led to more customer "outcry." COF ¶¶ 177, 190-91; PX0474, UPFSC0001088, at '088 (handwritten notes summarizing June 3, 2003 CSX-UP meeting); *see also* PX0786, UPFSC 0045717 (UP internal email stating that customers would view the impending adoption of BNSF's FSC as *even worse* than the adoption of CSX's). UP has presented no evidence that customers demanded UP's adoption of BNSF's FSC formula in lieu of CSX's, and customer complaints would not have been

[35] It bears noting that in any event, Plaintiffs do not allege a conspiracy to fix a specific FSC trigger price, but rather that Defendants agreed to use rate-based FSCs to increase all-in freight shipping rates. DA06397, at '404-05.

addressed by UP doing so. DA01453, cited by UP to justify its switch to BNSF's formula, reflects customer accusations of "price collusion," which were not addressed by UP adopting an even more direct competitor's FSC, UP Br. 6. DA01454, also cited by UP to explain the switch, reflects a customer complaining that HDF-based FSCs (which UP adopted with this switch) are *even less defensible* than WTI ones (which UP abandoned with this switch). *Id.*; DA01454, at '455 ("I have trouble understanding how [HDF] Prices are legitimately used as an index . . . ."). Likewise, DA01454 and DA01459 reflect objections to using FSCs for "revenue enhancement" rather than cost recovery, which was also not addressed by UP switching to BNSF's rate-based FSC. And DA01461 reflects a customer complaint about UP's imposition of FSCs any time the average price over the prior month exceeded the trigger price—even if fuel prices dipped below the trigger for some number of days during the 30-day period—something that was again not changed when UP switched to BNSF's FSC. Finally, to the extent customers complained about administrability and frequent percentage changes, DA01453; DA01466, those issues were exacerbated, not resolved, by UP's adoption of an HDF-based FSC with "smaller incremental increases based on average prices," UP Br. 7.

*Sixth*, UP claims it could not have conspired with NS at the May 14, 2003 meeting because it adopted BNSF's FSC program *before* that meeting. UP Br. 8-9. But UP admits that the evidence shows UP and NS reached a "consensus" on May 14 that it would be ideal "if all roads had the same process," and does not offer any alternative explanation about what *was actually discussed* at that meeting. *Id.* at 9. Moreover, the meeting did not merely concern formulas, but also "various application processes," reaching "consensus" that "***[u]niform application*** across the industry would be helpful." COF ¶ 184 (emphasis added). The meeting minutes reflect that executives discussed "whether or not the industry can work together ***on this opportunity***," including "through

the AAR" or "on a bilateral basis," with the follow-up work assigned to UP's Koraleski and NS's Seale (as well as in-house counsel).[36] COF ¶ 182. Reaching "a consensus" and discussing an "opportunity" for the "industry" at their trade association or, in the alternative, accomplishing the same ends on a one-to-one basis, can in no way be characterized as a "legitimate, vertical communication" as Defendants attempt to do. Defs. Br. 29. Defendants also ignore that a central component of the alleged conspiracy was *maintaining* and *growing* fuel-surcharge coverage (*i.e.*, "*uniform application*") by agreeing to eliminate any discounts or waivers—precisely UP and NS's "consensus" on "work[ing] together on this opportunity" across "the industry." COF ¶¶ 182-84. Moreover, Defendants *did* go on to take coordinated action on this "opportunity" by causing the Defendant-dominated AAR to publish the AIILF in December 2003. *Supra* Sec. I.C. UP then led the effort to have the AIILF published on the AAR website expressly because it would "facilitate and support" Defendants' use of FSCs in the eyes of Defendants' customers. *Supra* Sec. I.C. This series of events supports a reasonable inference of conspiracy.

*Seventh*, Defendants claim that no agreement could have been reached during the June 3, 2003 Alliance meeting between UP and CSX, but again offer no real evidence of what *was* discussed. Defs. Br. 51 (commenting merely that "[a]pparently, UP shared some of the negative customer reaction" with CSX). UP claims the meeting cannot be evidence of conspiracy simply because the changes to UP's FSC program had already been made. *Id.* Putting aside the flawed premise that only changes to formulas matter—in fact, Plaintiffs' allegations are not limited to specific formula, but instead are about the use of rate-based FSCs more broadly to increase all-in

---

[36] Defendants mischaracterize this document by asserting that the only thing that happened was a "follow up" discussion on FSCs with "in-house counsel." Defs. Br. 50. That is not what the document reflects. Nor would the involvement of in-house counsel (who were not even present at the May 14 meeting) somehow immunize the discussions.

freight shipping rates—UP's argument that it did not subsequently change its FSC program *corroborates its participation in the conspiracy*. After CSX and UP discussed the potential for "customer outcry" and the potential need to revisit their trigger prices "if [fuel prices] stay high," COF ¶¶ 190-92; PX0474, UPFSC0001088, at '088, ***fuel prices soared, but neither UP nor CSX adjusted their programs*** until 2007, when they made revenue-neutral modifications. COF ¶¶ 579-85. In Defendants' words, "*neither changed course after the meeting*." Defs. Br. 51.

**(c) NS's purported business justifications are inconsistent with the factual record and do not support summary judgment**

NS weaves a counterfactual story of "[m]onths of [i]ndependent [e]valuation" in which it "decided twice not to adopt the modified CSXT formula," instead adopting it in early 2004 after a thorough analysis of its unilateral interests. NS Br. 4. In truth, the evidence reveals that NS was always angling at concerted action. COF ¶¶ 178-85, 196-97. NS took steps to implement the same coordinated FSC programs in the spring of 2003 but was prevented from deploying the new FSC formulas due to technical constraints. COF ¶¶ 206-23. It resolved those technical constraints as quickly as it could, ensuring that a revised FSC program could be adopted "late this year or next year." COF ¶ 215; PX0270, NS_010004522, at '523. That, out of necessity, NS took nine months to adopt another Defendant's FSC formula is no basis on which to award summary judgment.

*First*, the timing of NS's announcement of the new FSC is not a mere reflection of thoughtful deliberation, NS Br. 4-8, but rather was the result of *technical constraints* that were not overcome until the beginning of 2004, at which point NS quickly implemented CSX's FSC formula. When CSX announced the first new FSC program on March 20, 2003, Seale immediately assigned Glennon to analyze NS's potential adoption of CSX's program. COF ¶ 129. Glennon responded that adoption of the formula was not immediately feasible because "[t]he current SC

language is coded in all our publications" and "[t]ransitioning would take some thought."[37] COF ¶ 207; PX0320, NS_010072632, at '632. Still, on March 22, Seale asked another NS employee "to determine if Accounting/Billing for the CSX format would be doable." COF ¶ 130; PX0366, NS 001000215, at '216. Two days later, Glennon again emailed Seale, "[i]f we were to adopt something like CSXTs we could not simply announce it and have it apply across the board at least not on contracts . . . ." COF ¶¶ 131, 209; PX0366, NS 001000215, at '215.[38]

NS asserts that, on April 15, 2003, Seale assembled a team of GVPs to evaluate whether to change NS's FSC and asked for a recommendation by May 1. NS Br. 5. But as explained above, *supra* Sec. I.B, Seale then spent three days on an unsupervised trip with his counterparts from the other Defendants, and immediately upon his return reported privately that, "***at this point, we do plan to modify our FSC***,"—*even before having received the requested analysis and recommendation*. COF ¶¶ 139-40; PX0254, NS 001000316, at '316 (emphasis added).

Seale and NS worked toward implementing that foregone conclusion. And in the intervening time, Seale and his counterparts took steps towards coordinating, applying, and enforcing uniform, industry-wide FSCs. On May 14, 2003, Seale and Koraleski again met at an NS-UP gathering, where they discussed "***fuel surcharges and various application processes as used by different roads***," reaching "***[c]onsensus . . . that it would be a positive outcome if all roads had the same process in the eyes of our customers.***" COF ¶ 182; PX0241, NS 001000360,

[37] By contrast, BNSF, CSX, and UP had been able to adopt revised FSCs earlier in 2003 because their FSC provisions were largely incorporated *by reference* into their price authorities, meaning these Defendants could merely revise the referenced provisions to reflect new FSC formulas, effectively amending contracts in a blanket fashion overnight and without the need for individual renegotiation. COF ¶ 210.

[38] As discussed *supra* n.10, at the time Seale was struggling with this revelation, he and BNSF's Lanigan were meeting, playing "phone tag," and making plans to "catch up" again at the NFTA meeting attended by all Defendants' executives. COF ¶ 146; PX0237, NS 001000225, at '225.

at '361 (emphasis added). Meeting notes reflect NS and UP's agreement: "Fuel surcharges → ***Uniform application across the industry would be helpful***." COF ¶ 184; PX0460, UPFSC 0616651, at '652 (emphasis added). They further questioned "***whether or not the industry can work together on this opportunity, probably through the AAR***," controlled by the four Defendants. COF ¶ 182; PX0241, NS 001000360, at '361 (emphasis added). Seale and Koraleski were assigned to follow up on these issues. COF ¶ 183; PX0241, NS 001000360, at '361.[39]

In the lead up to that meeting, Seale had heard that BNSF had reduced its FSC to 2% (instead of the 5% surcharge called for by its formula) and ***in anticipation of the upcoming "conversation with UP,"*** Seale complained to his boss that "***the industry is not looking good on this issue [fuel surcharges]*** and a stable approach has been the best approach." COF ¶ 181; *see also, e.g.*, PX0303, NS_010042321, at '321 (emphases added); PX0302, NS_010042306 (sending NS-UP meeting agenda for upcoming May 14, 2003 meeting). This evidence—reflecting Seale's concern about BNSF *discounting* its FSC percentage and Seale's plan to discuss the this industry-wide issue with UP—belies Defendants' characterization of the evidence. Notably, no Defendant ever again gave their customers program-wide discounts to their fuel-surcharge percentages for the remainder of the Conspiracy Period.

Then, on July 30, 2003, Seale and BNSF's Lanigan discussed a "***potential industry position***" on FSCs and resolved to lead a discussion on the topic at the next meeting of the AAR's NEMC scheduled for September 11, 2003. COF ¶ 196; PX0243, NS 001000422, at '424 (emphasis

[39] At best, Defendants present an alternative interpretation of this meeting. But a jury should decide the facts, especially where the meeting was a source of significant memory lapses for participants. *See*, *e.g.*, PX0616, Young (UP) Dep. 230-32 (could "not specifically" recall the discussion); PX0633, Davidson (UP) Dep. 158-61 (same). NS CEOs David Goode and Wick Moorman, meanwhile, could not recall *any* of the meetings at which they discussed FSCs with competitors. PX0630, Moorman (NS) Dep. 229 ("I don't recall anything in particular."); PX0631, Goode (NS) Dep. 124 ("I don't remember specific conversations.").

added); *see also* PX0596, Seale (NS) Dep. 226-29; PX0610, Lanigan (BNSF) Dep. 138-43; PX0021, BNSF_CAL-0003386.

Though NS could not bring itself into lockstep with its competitors immediately, due to the technical obstacle flagged by Glennon in March, it spent the better part of the year laying the groundwork to do so as soon as possible. COF ¶¶ 206-17; PX0364, NS001000119, at '119 (reflecting "consensus" for NS to "[c]ontinue laying the groundwork for a conversion, but delay a formal decision until 2QTR04," and reflecting "[g]eneral support for a switch" just at a later time); PX0347, NS_013001654, at '654-56 (announcing the change in FSC formula that had been anticipated in April 2003).

Then, because the language of NS's FSC was encoded directly into contracts, NS had to wait for each to come up for renegotiation before updating its FSC provision. *Supra* Sec. I.C.2.c; COF ¶¶ 208-09. Given this, NS adopted new policies throughout 2003 to facilitate a new FSC as quickly as possible. COF ¶¶ 214-17; *see also, e.g.*, PX0270, NS_010004522, at '523 ("Remove the full FSC text from all publications as they are reissued. • Replace it with a reference to the FSC in the NS Conditions of Carriage. • As NS rate publications are reissued, public and private, modify them to simply refer to the NS Conditions of Carriage. . . . • Issue instructions that no contract can negate or freeze the application of the NS Conditions of Carriage without prior approval of Don Seale."); PX0325, NS_010073466, at '466 ("[P]roceed with the program to remove the full text FSC note from private NS authorities and position ourselves for a conversion . . . .").

After laying the groundwork for the transition, and after discussing FSCs with Defendants throughout 2003, NS formally adopted the new FSC formula in January 2004, announcing that it was adopting the same FSC program as CSX, with the intent of "standardiz[ing]" FSCs. COF ¶ 218; PX0347, NS_013001654, at '654-56 ("This is [sic] action is being taken for a number

of reasons: . . . • **Standardization of FSC provisions in the East.**"); PX0235, NS 001000124, at '124 (Don Seale (NS): "[O]ur new formula essentially mirrors the fuel surcharge that CSX implemented in June 2003."). NS's decision came just weeks after Defendants pushed the AAR to adopt the AIILF. *Supra* Sec. I.C.

*Second*, NS makes too much of its GVPs' decision-making power, NS Br. 5; it was their boss, *Seale*, who had the ultimate authority, NS Br. 8 (admitting Seale made the decision), COF ¶¶ 165, 346, 352 (reflecting Seale's authority). While the GVPs were analyzing whether to modify NS's FSC, ***Seale met with the other Defendants' CMOs and made clear upon his return to NS that "at this point, we do plan to modify our FSC,"*** without yet having heard from the GVPs as requested. COF ¶¶ 139-40; PX0254, NS 001000316, at '316 (emphasis added). And all of the NS analyses were based on the premise that Seale would almost assuredly be changing NS's FSC formula, but NS would have to retain its existing one until structural barriers were removed. *See, e.g.*, *id.*; PX0268, NS_010004393 ("The [GVP] consensus was that NS should not adopt the CSXT formula and should, ***for the time being***, retain the current NS formula." (emphasis added)). The GVPs' conclusion was merely a confirmation of the existence of the structural barriers, which they noted were "[p]robably the most important point" why NS could not adopt CSX's program. COF ¶ 212. Glennon and the GVPs therefore worked out the roadmap towards adoption later in the year or 2004. *Id*. In November 2003, Seale again pushed NS's GVPs regarding implementation of an FSC, which they voted to delay, instead endorsing the plan to "[c]ontinue laying the groundwork for a conversion, but delay a formal decision until 2QTR04," which would "allow[] time for most of the full text FSC clauses to be removed." COF ¶ 216; PX0292, NS_010033393.

NS tells a story of thoughtful analysis leading to the consensus adoption of CSX's FSC, but it ignores that Seale overruled all reasonable opposition. For example, (1) NS's immediate

reaction to CSX's formula was that it "is in fact a blatant general rate increase, and will appear so to customers," COF ¶ 213; PX0270, NS_010004522, at '522; (2) NS had, on multiple occasions, determined that its actual fuel costs more closely tracked a heating oil index than the WTI index it chose to adopt, COF ¶ 211;[40] and (3) NS had also determined that its "current fuel hedging and fuel surcharge collections are effective at protecting NS exposure to fuel price increases. As such, adoption of the new CSX fuel surcharge regimen is a marketing decision which does not appear to have much support from our account execs," COF ¶ 217; PX0262, NS_009000161, at '161.

*Third*, NS ignores Don Seale's extraordinary interactions with his counterparts altogether. *See generally* NS Br. 1-13 (ignoring meetings entirely). On one hand, NS argues a story of internal analysis and deliberation over the better part of a year. *Id*. at 7-8. On the other, Plaintiffs present a series of meetings at which NS's ultimate decision-maker discussed uniform application of FSCs across the industry and also, privately, resolved to change NS's FSC before his employees had concluded an analysis he had commissioned on the issue. *Supra* Sec. I.B.

**(d) BNSF's purported business justifications are inconsistent with the factual record and do not support summary judgment**

*First*, BNSF argues that its CMO John Lanigan instituted an internal FSC "Review Team," and that its FSC program during the Conspiracy Period was the independent result of this review. BNSF Br. 5-7, 10-12. But as explained in detail above, *supra* Sec. I.B, its internal Review Team initially planned to switch BNSF to a mileage-based FSC that would have provided BNSF a competitive advantage, and BNSF reversed course abruptly, abandoning its competitive advantage against self interest. COF ¶¶ 141-50. Before the Review Team made the recommendation that

---

[40] In fact, NS even shared this sensitive information with CSX. COF ¶ 211; PX0608, Neikirk (NS) Dep. 63-64 ("Q. And did NS inform CSX that it believed its fuel costs were most closely tied to the heating oil index? A. I believe we did.").

Lanigan had requested, Lanigan announced "***[e]ffective immediately and urgently***" that price authorities without BNSF's rate-based FSCs would be "DOA." COF ¶¶ 148, 156, 325; PX0050, BNSF-0027935, at '935 (emphasis added). And once the proposed mileage-based FSC was formally abandoned, BNSF revised its rate-based FSC to reflect recent changes to UP and CSX's FSCs. COF ¶ 161. Indeed, BNSF's decision came days after a meeting between the CEOs and CMOs of BNSF and CSX (who was first to announce the $23 WTI program). *See* COF ¶ 159; PX033, BNSF_CAL-0007200 (April 23, 2003 calendar entry re "BNSF/CSX mtg," between Rose, Lanigan, Ward, Giftos, Gooden, and others).[41]

And BNSF once again considered implementing a mileage-based FSC more than a year later to capitalize on its longer hauls, but *again* elected not to pursue its self interest. COF ¶¶ 228-35. It was not until 2006—four years into the conspiracy—that BNSF implemented a mileage-based FSC, and then only as to a minority of traffic and with the goal of keeping the mileage-based FSCs "revenue neutral" when compared to rate-based FSCs. COF ¶¶ 236-37. These facts support the reasonable inference that BNSF's decision to reverse course and delay implementing a competitively advantageous FSC program was a result of coordination with other Defendants, and not merely the considered result of some "unilateral" internal review process.

*Second*, relating to the specifics of the formula itself, Defendants argue that BNSF "did *not follow* CSXT and UP['s]" announcements of a $23 WTI trigger price, and instead continued relying upon the HDF index. Defs. Br. 61; *see also* BNSF Br. 6. Again, Plaintiffs do not allege a conspiracy to set FSCs to a specific index. And the fact that BNSF maintained use of the HDF

[41] Notably, BNSF admits that its decisions not to adopt a mileage-based FSC on *any* traffic were made with input from its interline partners CSX, NS, and UP, BNSF Br. 6-7, 11; *see also* COF ¶¶ 231-33, even though the vast majority of its traffic was local or Rule 11, PX0769, Leitzinger MDL II Rpt. ¶ 24 & fig.9.

index (rather than changing to WTI) does not reflect a decision to have an *independent* FSC program. Rather, BNSF contemporaneously explained that it was changing its strike price from $1.30 HDF to $1.25 to "reflect[] the $23 WTI crude strike price being used by UP [and CSX] in their new carload fuel surcharge table." COF ¶ 161; PX0084, BNSF-0327011, at '011. In other words, even though BNSF had long utilized a different *index*, when the conspiracy started BNSF sought to match the CSX and UP *trigger price*.

Nor was BNSF's decision to reduce its trigger price from $1.30 HDF to $1.25 HDF an attempt to "undercut" UP. BNSF Br. 7. That change made BNSF's FSC *more* aggressive, and was expressly adopted to "reflect[]" UP and CSX's trigger prices. And, as discussed above, *supra* Sec. I.B, it was accompanied by a mandate to apply FSCs on all traffic. A jury must decide the contested fact issue of whether BNSF's change was merely "competitors seeking to undercut each other," BNSF Br. 7, or, as the foregoing and other evidence indicates, the product of conspiracy.

**3. Defendants cannot excuse their unprecedented discussions and agreement on FSCs as "legitimate, vertical communications"**

Hoping to immunize their broad-ranging and unprecedented discussions on, *e.g.*, an "industry position" across "all roads" on FSCs or "uniform application" industry-wide, Defendants try to cabin even those discussions that are not excludable as "legitimate, vertical communications." Defs. Br. 29. Unsurprisingly, Defendants' presumption of legitimacy infects their treatment of alliance meetings, competitor communications, and trade-association gatherings (simultaneously explicit evidence of conspiracy and traditional plus factors) too.

Defendants again invoke *Monsanto* as "refus[ing] to infer a conspiracy" from communications between manufacturers and their distributors, given that such communications

are natural and expected. Defs. Br. 30.[42] Defendants' pleas of "normal" and "ordinary" behavior (akin to examples found in *Monsanto*, *Wilcox*, and *Weit*) cannot succeed. None of them concerned pricing discussions and agreement among competitors about services or goods—"the supreme evil of antitrust." *Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). In each, the court contemplated the absence of *any* evidence of collusion, leaving *only* "perfectly legitimate conduct." *See Monsanto*, 465 U.S. at 762-64 (envisioning, hypothetically, "perfectly legitimate [vertical] conduct" between manufacturer and distributors, including on nonprice restrictions); *Wilcox v. First Interstate Bank of Or., N.A.*, 815 F.2d 522, 526-27 (9th Cir. 1987) (inter-bank meetings to discuss shared loans could not support inference of separate conspiracy on competing prime rates in absence of any evidence of prime-rate discussions at meetings); *Weit v. Cont'l Ill. Nat. Bank & Tr. Co. of Chi.*, 641 F.2d 457, 462 (7th Cir. 1981) ("mere opportunity to conspire [*on interest rates*] . . . is not necessarily probative evidence" where banks met to discuss a universal credit card system desired by consumers and there was no evidence of discussions of competing interest rates).

Defendants' partisan accounting of the evidence cannot gain them summary judgment. *First*, as described above, the communications at issue here were neither routine nor necessary interactions; they included unmonitored social gatherings of high-level executives, including golf games, private caucuses under the guise of trade association gatherings, and the like. Even in the interline context, what had once been quick confirmations between low-level salespeople suddenly became confabs between top executives. This change in approach is itself a circumstance

---

[42] Defendants also mischaracterize their relationships as "vertical." Interlining does not remove the strong horizontal element of competition among railroads. *See* PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 44-46 (explaining that "the presence of multiple railroads both in the east and in the west introduces multiple interline combinations that can compete," so "horizontal agreements over pricing can play an important anti-competitive role even where interlining is required"). And, in any case, the vast majority of each Defendant's traffic was local or Rule 11. PX0769, Leitzinger MDL II Rpt. ¶ 24 & fig.9.

suggestive of conspiracy. *Second*, Defendants do not show that their communications were limited to "legitimate" subjects.

Defendants characterize as nonevents the sudden flurry of meetings, discussions among rival senior executives of FSCs and their "uniform application," and the resulting "consensus" on standardization and dealing with customer resistance. They do so without ever confronting the clear boundaries spelled out in Section 10706, which gives no patina of "legitimacy" to those communications. *Id*. at 27. Defendants' communications were not the type that Congress sought to immunize; they were the kind that Congress intended to be used as proof of conspiracy, as Defendants' withdrawal of objections on remand from the D.C. Circuit confirms.[43] Adopting Defendants' approach of presumptive normalcy would result in the type of "de facto immunity for anticompetitive actions that happen to coincide with interline traffic" that the D.C. Circuit found would be squarely at odds with Congressional intent. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 34 F.4th 1, 10 (D.C. Cir. 2022) (quoting FTC's amicus curiae brief).

Defendants assert that "legitimate reasons exist for [their] meetings," and therefore claim a jury cannot infer conspiracy from them. Defs. Br. 29. But a potentially legitimate setting—*i.e.*, whether it be a trade association meeting or a one-on-one between interline partners—does not preclude illegitimate discussions from occurring in the setting or undermine evidence that those settings coincided with suspicious conduct. Defendants claim that, "[i]n *Monsanto* terms, interline communications between railroads help 'to assure an efficient distribution system,'" *id.* at 30 (quoting *Monsanto*, 465 U.S. at 763), but provide no basis to conflate routine discussions of logistical issues (*e.g.*, interchanges, gateways, access rights) with wholly overbroad discussions of

[43] Defendants confuse the law and the facts: Plaintiffs have never challenged Defendants' ability to communicate with their joint-line partners about specific shared movements. That, however, does not remotely describe the evidence Plaintiffs proffer here.

"industry positions" across "all roads" on FSCs or "uniform [FSC] application" industry-wide. These are fact issues appropriate for jury consideration. Tellingly, even one of Defendants' own experts, Dr. Carlton, admitted that "Alliance" meetings could be "misused" by Defendants as a forum to fix prices. COF ¶ 103; PX0779, Carlton MDL II Dep. 137-38.

Likewise, Defendants' assertion that the "cooperation was *encouraged* by the STB" misses the mark. Defs. Br. 30. Even when the STB acknowledged the possibility of interline cooperation, it warned railroads not to misuse that practice for price signaling purposes. *See Canadian Nat'l Ry. Co., et al.*, 4 S.T.B. 122, 1999 WL 336285, at *14 (1999) ("We emphasize that any collusive efforts that the participants might undertake under the auspices of this [alliance] agreement to . . . diminish competition where they compete with each other . . . would subject these carriers and their management personnel to severe criminal and civil penalties under the antitrust laws."); *id.* at *16 n.79 ("Any attempts at price-signaling activities for competitive traffic under the guise of interline ratemaking will continue to remain subject to the antitrust laws.").

**4. NS and CSX Exaggerate Differences in Shipper Experiences**

NS claims that "[m]any Plaintiffs paid a unique fuel surcharge, and others paid no surcharge, on contracts entered into during the alleged conspiracy period," but offers only three instances. NS Br. 11-12 n.13. The March 2004 amendment to Exelon's October 2001 unexpired contract merely [redacted] and the June 2004 amendment merely [redacted] DA18184, at '194-95. They were not contract renegotiations in which in Exelon managed to escape FSCs. *Id.* NS also highlights an NS-UP-Sunoco contract extension in May 2004 that [redacted] DA18269, at '272. By then, WTI prices were near $40, Defs. Br. 10, had been above a $28 trigger for six months, *id.*, and were not projected to dip below $28 anytime soon, *supra* Sec. I.I.1. Moreover, the inclusion of that FSC represented a

substantial increase over the contract it replaced, which [redacted]

CSX pursues the same line about FSC exceptions, pointing to roughly a dozen examples among 16,000 shippers, CSX Br. 11, coupled with an assertion that its FSC coverage did not grow meaningfully under the conspiracy (and therefore there can be no conspiracy). Both are incorrect. As with examples in the Bryan Declaration, *supra* Sec. II.A, these assertions are overstated.

As Judge Friedman noted, contemporaneous CSX communications that provided "very clear instructions" and "specific directions"; "all renewals include fuel—*very very few exceptions* as we discussed last month"; "any multiyear deals must include FSC in the out years"; and renewals "should incorporate our FSC program [e]ven though these master contracts likely have an RCAF component." *Rail Freight*, 287 F.R.D. at 51 (emphasis added); COF ¶¶ 330-45; PX0186, CSXFSC000086200, at '200. CSX's FSC coverage expanded from roughly 30% at the beginning of 2003, to 49% in 2005, to a height of 85% by late 2008—all during a period in which CSX's FSC rates charged to shippers soared from 0-2% to an enormous tax for shippers (20.8% by September 2006), precipitating the STB proceedings. PX0671, Johnson MDL I Merits Rpt. at 105 Ex. 34; *see also* COF ¶ 339. In other words, CSX nearly [redacted] its FSC *coverage* during the conspiracy ***even as its underlying FSC rate charged to shippers increased by more than tenfold***.

As a result, CSX's annual FSC revenue skyrocketed from just $72 million in 2003 to $201 million in 2004, $525 million in 2005, and ***$821 million in 2006***. COF ¶ 543; PX0203, CSXFSC000182739, at '751. This stands in stark contrast to the "very vicious historical price wars" and "destructive pricing for rail share" (in CSX's words) that preceded the conspiracy, when CSX's FSC generated "relatively low" revenue from "minimal" and "embarrassing" FSC coverage. COF ¶¶ 16, 56. CSX's characterizing this as merely "modest growth in CSXT's fuel surcharge coverage," CSX Br. 11, does not make it so.

CSX repeats NS's mistake of supposing that a limited number of exceptions, CSX Br. 11, might earn it summary judgment. All told, CSX musters only a few dozen examples of purported "discount[s]" and "alternatives" (and one commodity) among roughly 16,000 shippers, various commodity groups and subdivisions, over a time period of nearly six years (2003-2008), CSX Br. 11, none of which provide a basis for summary judgment. Even these limited examples confirm CSX's larger effort to impose its standard FSCs across the board while minimizing any exceptions.

For example, CSX makes much of its Industrial and Agricultural Products group's supposed willingness to agree to the RCAF(u) as an "acceptable alternative" to its standard FSC, CSX Br. 11, but the cited 2005 presentation actually states that "in most cases we prefer fixed [rate] increases with Fuel Surcharge" and, "with the exception of AG," the Industrial and Agricultural Products group's business units "*lead the company in Fuel Surcharge coverage*." DA06930; DA06937 (reporting FSC coverage statistics by commodity types). Similarly, CSX makes much of a few modified FSCs in contracts with shippers like ADM, CSX Br. 14, but CSX only made peace with that term in ADM's 2006 contract upon obtaining [redacted] DA02898. And CSX acknowledged that ADM nevertheless [redacted] and had [redacted] *Id.*

Among these few supposed exceptions, CSX homes in on the experience of a few Plaintiffs as potentially exemplifying FSC competition between NS and CSX in 2003-2008. CSX Br. 12-14. Plaintiff Olin's experience with CSX was consistent with CSX's participation in the conspiracy. Before 2003, Olin negotiated with CSX over FSCs and, in fact, successfully negotiated rail freight contracts with CSX without FSCs. *See, e.g.*, COF ¶¶ 340-45. After 2003, however, CSX's approach changed and it showed "no flexibility" in negotiating with Olin on FSCs, *id.*, and its

FSCs "came together" with NS's FSCs at the same level and the same rates. COF ¶ 303. Beginning in 2004, [redacted] COF ¶ 344. While one of Olin's 2004 contracts with CSX was renewed [redacted] that contract did not previously even have a [redacted], and it was agreed to in the context of CSX requiring FSCs on all new business going forward and renewed [redacted] COF ¶ 342-43; *see also, e.g.*, PX0721, OLI059435, at '345 (reflecting FSC discussions and that new business will have FSC added); PX0720, OLI059433, at '433 (reflecting FSC discussions and that "[n]ew business since goes into a new contract which allows fuel surcharge"). CSX's suggestion that this somehow disproves CSX's participation in the conspiracy is impossible.

CSX also point to one "non-standard" FSC with a "special elevated trigger" in a multi-year contract between [redacted] and NS. CSX Br. 13-14. CSX fails to explain that this trigger also came with a [redacted]," which resulted in NS charging [redacted] [redacted] its standard FSC. PX11119, NS-MDLII-00017456, at '456. After NS forced [redacted] to pay [redacted], it then revised the contract to include its [redacted] for the remainder of the contract term. PX1123, NS-MDLII-00017443, at '443. Thus, this FSC remained in effect for only one year and had all the hallmarks of NS's conspiratorial FSC (and more). And, as implied by Defendants' identification of only a single allegedly non-standard FSC obtained by [redacted] the vast majority of [redacted] other rail contracts during the Conspiracy Period contained Defendants' full, standard FSCs.

These statistics and anecdotes do not eliminate all material factual disputes regarding the existence of a conspiracy; reasonable jurors could find collusion on this record notwithstanding the imperfections present in any cartel spanning thousands of customers, the entire country, and

many years. As with examples in the Bryan Declaration, *supra* Sec. II.A, Defendants' assertions are overstated.

**D. Defendants' Conspiracy Included FSCs on Coal Traffic**

Defendants' coal shipments are commodity-specific carload shipments. Unsurprisingly, the evidence outlined above concerning carload shipments applies equally to Defendants' coal shipments. Indeed, it is undisputed that standard carload FSC formulas were the default formulas for *all* coal shipments during the first year of the conspiracy, Defs. Br. 5, and that the same FSC enforcement policies applied to *all* types of traffic throughout the Conspiracy Period. COF ¶¶ 275-76, 280, 288, 300.

Defendants nonetheless seek summary judgment for coal shipments primarily on the basis that the two Western railroads (BNSF and UP)—which carry more coal for greater distances than the two Eastern railroads (CSX and NS)—each adopted somewhat more aggressive FSCs for coal traffic in 2004. Defs. Br. 64; BNSF Br. 10-11; UP Br. 9-10. Defendants do not suggest that the announcements of coal-specific FSC formulas in 2004 constitute withdrawal from the conspiracy. Rather, Defendants assert that these more aggressive FSCs on coal traffic somehow show there was "no conspiracy" regarding coal. Defs. Br. 64. However, the totality of the evidence shows Defendants' conspiracy and Defendants' after-the-fact theorizing is no basis for summary judgment. The Court should reject Defendants' attempts to differentiate their shipment types because, like in *Urethane I*, "these companies addressed pricing of these products together, and . . . the conspiracy encompassed all of these . . . products." 913 F. Supp. 2d at 1158. "[T]his issue of the scope of the conspiracy is one for the jury," which "could find that th[e] conspiracy also involved" coal shipments. *Id.*

### 1. Defendants' FSCs on coal shipments furthered their conspiratorial goal of including FSCs on all shipments

The evidence that Defendants' conspiracy extended to coal traffic is abundant. Before the Conspiracy Period, Defendants struggled to apply FSCs to their carload traffic—especially coal traffic. COF ¶¶ 274, 276. For example, in January 2003, BNSF's CMO Chuck Schultz responded to a series of "Fuel Surcharge Questions" from CEO Matt Rose by presenting an analysis showing that *zero* percent of BNSF's coal business was "surchargeable" at that time and concluding that, as to coal and other commodity groups, "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." COF ¶ 274; PX0088, BNSF-0328865, at '865-66. Likewise, undisputed evidence shows that the pre-Conspiracy Period competition for coal transportation was fierce. COF ¶ 277. As detailed above, *supra* Sec. I.B, with this competitive reality, senior executives from competing railroads in charge of carload traffic, including coal traffic, met in 2003 about FSCs for the first time ever in private gatherings and "Alliance" meetings where they discussed topics such as "consensus," an "industry position on fuel surcharges," and "uniform [FSC] application across the industry." COF ¶ 268.

Defendants thereafter modified their standard carload FSCs (which Defendants applied to coal traffic) to make them more aggressive, and they adopted enforcement policies to support the same conspiratorial goal, as described above. COF ¶¶ 275, 302-63; *see, e.g.*, PX0655, at p.5 (stating publicly that BNSF's "zero tolerance policy" that "[a]ny contract it comes due will be renewed with a fuel surcharge" was taking longer for coal contracts given their lengthy nature). As a result, the application of FSCs to Defendants' coal traffic increased considerably during the Conspiracy Period. COF ¶ 300; *see, e.g.*, PX0612, Gooden (CSX) Dep. 203-05 (testifying that coal FSC coverage went up from 20% in 2004 to 55.1% by the end of 2007 and was projected to reach 83% by the end of 2008); PX0072, BNSF-0048722, at '729 (showing 100% of new or

renewed BNSF coal price authorities received the standard FSC in prior six months). Within a year of its change, BNSF had achieved "record" revenues for its "coal segment, even with slightly lower volumes" of traffic, and it publicly pointed to FSCs for that growth. PX0655, at p.1, 3.

Indeed, BNSF's argument that it sought to adopt the AIILF through the Defendant-controlled AAR stands as further evidence that Defendants conspiracy included coal shipments—BNSF believed that Defendants needed coordinated conduct to achieve broad application of FSCs to coal traffic. *Supra* Sec. I.C.

**2. BNSF's and UP's coal-related conduct is fully consistent with the conspiracy**

Defendants' assertion that their behavior regarding coal traffic is contrary to the conspiracy—including BNSF's adoption of more aggressive coal FSC formulas in July 2004 and UP's adoption in November 2004—does not withstand scrutiny.

*First*, Defendants' coordinated conduct allowed Defendants to apply FSCs on coal traffic broadly, over the resistance of coal shippers and regardless of any specific formula. For example, the Western Coal Traffic League explained to the STB in October 2006 that Defendants "have apparently decided to move away from the RCAF (at least insofar as incorporating the RCAF's fuel index) by implementing more lucrative fuel surcharges mechanisms that have operated to the economic detriment of their customers and the Nation's commerce." COF ¶ 301; PX0928, BNSF-0655729, at '739.

Defendants do not argue that they sought to compete based on different FSC formulas for their coal customers, and those customers viewed the formulas as strikingly similar. COF ¶ 299; PX0666, at 8 (Western Coal Traffic League: "UP and BNSF's [coal] programs have similar characteristics. . . . Both UP and BNSF are aggressively implementing their fuel surcharge programs and they have been very successful in collecting fuel surcharges."). Indeed, economic

analysis shows that the formulas tracked each other and yielded similar percentages. *See* COF ¶ 299; PX0817, Bernheim MDL II Reply Rpt. fig.III-4; PX0830, Frankel Rpt. at 12-15. Defendants' expert Dennis Carlton demonstrated that UP and BNSF's coal FSCs moved almost identically:

Figure 6

**UP's and BNSF's Public Surcharges Applied to Coal**

Rate-Based: July 2003 – December 2005




COF ¶ 292; PX0929, Carlton *Oxbow* Rpt. at 45 fig.6. Carlton's chart shows that following UP's adoption of coal FSCs, the BNSF and UP FSCs on coal shipments moved in virtual lockstep and during the overall Conspiracy Period; the average difference between the carriers' monthly FSCs they applied to their coal traffic was just over two percentage points. COF ¶ 292; PX0989, Jacobs Reply Rpt. ¶ 75.[44] In addition, economic analysis of rail shipping rates shows that Plaintiff coal shippers suffered considerable damages during the Conspiracy Period. COF ¶¶ 294-301.

*Second*, the supposed non-parallelism of Defendants' conduct regarding coal FSCs is both overstated and ultimately irrelevant. Defendants do not dispute that they all acted in parallel to apply FSCs on coal shippers. Nor are the staggered timing of announcements of the formula

---

[44] This differential was merely a drop in a much larger bucket of BNSF and UP price increases that coal shippers reported to the STB during the Conspiracy Period. *See* PX0930, (Statement of Western Coal Traffic League, *Competition in the Railroad Industry*, Ex Parte No. 705, at 16 (April 13, 2011)) ("[B]etween 2003 and 2010 the going rate level for coal transportation [for competitive PRB traffic] nearly tripled.").

changes—with UP announcing its similar coal FSC formula just four months after BNSF did—grounds for dismissal in light of all the evidence above. At any rate, "the Supreme Court has long held that simultaneous action is [] not a requirement to demonstrate parallel conduct." *Broiler Chicken*, 290 F. Supp. 3d at 791 (citing *Interstate Cir.*, 306 U.S. at 227); *see also supra* Sec. II.C.1. And while Defendants emphasize that only BNSF and UP adopted coal FSC formulas that were separate from their general carload formulas, while CSX and NS did not, Defs. Br. 64, nothing suggests that NS and CSX thought these formula adjustments were material. Instead, Defendants actually admit the coal formulas were a competitive non-event. *Id.* at 65 (CSX and NS "accepted without comment or opposition" the adoption of coal FSC formulas by BNSF and UP).

Defendants' emphasis (Defs. Br. 38) on the cost of coal shipping as the driving factor for their more aggressive FSCs is another red herring. As discussed above, *supra* Sec. I.I.2, the STB explicitly found that the Defendants' FSCs "cannot fairly be described as merely a cost recovery mechanism," COF ¶ 428; PX0653, *Rail Fuel Surcharges*, Ex Parte No. 661, 2007 WL 201205, at *6. As the STB found, Defendants' emphasis on cost was merely a pretext for their interest in making FSCs a profit center.[45]

Moreover, it is not surprising that only UP and BNSF tweaked their FSCs to earn more revenue on their coal shipments, given that they shipped significantly more coal—and for longer

[45] Defendants assert BNSF and UP adopted higher FSCs on their coal traffic in 2004 because the two carriers' internal analyses found their unit coal trains "tended to burn more fuel per mile than a lighter commodity," Defs. Br. 42 n.10, and had "higher fuel consumption . . . compared to other carload traffic," BNSF Br. 10. These findings were the product of pretextual exercises, and provided no economically sound cost-of-service justification for the carriers' imposition of higher coal FSCs, because "it is widely acknowledged in the rail industry that unit trains, such as the trains carrying coal, incur lower fuel costs on [a] per revenue ton-mile basis than regular carload service" and "consume less fuel per revenue ton-mile than traditional freight moves." PX0819, Jacobs Rpt. ¶ 323 & n.652 (quoting leading independent study on railroad fuel consumption and costs by train type).

distances—than their Eastern counterparts. COF ¶ 282. When BNSF implemented more aggressive FSCs on coal in July 2004, NS could "leave" the FSC formula for coal (and other commodity groups) "as is" because it was working as expected to generate substantial revenues. COF ¶ 297; PX0297, NS_010034936, at '936, '942. A Defendant "cannot absolve itself by showing that . . . it participated only in" one aspect of the conspiracy; "[i]t need not be an active participant in every phase of the conspiracy, so long as [it] is a party to the general conspiratorial agreement." *Polyurethane Foam*, 152 F. Supp. 3d at 998. And, in any case, NS and CSX's average carload (and, therefore, coal) FSCs during the Conspiracy Period were 16.3%, almost identical to BNSF's average FSC of 16.9% on coal. COF ¶ 298; PX0989, Jacobs Rpt. ¶ 75 fig.II.10. And on interline (non-Rule 11) moves of coal shipments, NS and CSX collected the higher UP and BNSF FSCs on their portions of the joint hauls.

*Third*, Defendants argue that documents reflecting internal decision-making by BNSF and UP and a lack of evidence that Defendants communicated about the new coal FSC formulas before they were adopted show that they were not a product of conspiracy. Defs. Br. 65. That is not surprising. "[O]ne would expect such 'independent' evaluations even if the firms were expressly colluding . . . ." *Text Messaging*, 782 F.3d at 876; *see also Korean Ramen*, 281 F. Supp. 3d at 919. And it also matters not that Plaintiffs do not have the type of incredibly rare, damning documented evidence of unprecedented executive-level discussions about coal FSCs from 2004 that exist from 2003.[46] "Private communications often are necessary to get a cartel up and running. However, once an agreement is in place, public information and communications can help keep it going and monitor adherence to the agreement." COF ¶ 366; PX0785, Elzinga Rpt. at 36 (citing DENNIS W.

[46] The lack of documented communications may stem from warnings the Defendants' lawyers apparently provided after Defendants' senior executives wrote down that they wanted to discuss an "industry position on fuel surcharges" during a July 2003 meeting. Defs. Br. 66.

CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 135-36, 138 (2000)).

Nevertheless, there *is* evidence that Defendants publicly communicated about their coal FSCs and coal pricing.[47] And they had numerous executive-level discussions in 2004 and beyond, including about coal traffic specifically. For example, in mid-2004 when BNSF adjusted its formula for coal traffic, the BNSF and UP CEOs had "several conversations" about a coal train trip the UP and BNSF organized for the STB. COF ¶ 284. In August 2004, the two CEOs along with the senior managers of the coal marketing departments took the discussed coal train trip in the PRB, and shortly afterward, UP published its coal FSCs. COF ¶¶ 284, 288, 291-93. During this period, Defendants' senior executives also met regularly during and on the sidelines of AAR meetings. *See, e.g.*, COF ¶¶ 99, 284; PX0931, UPFSC 0339562, at '565 (calendar entry for June 17, 2004 "AAR CEO" dinner). This "high level of interfirm communications" more than suffices to "permit a fact-finder to infer a conspiracy." *Publ'n Paper*, 690 F.3d at 62.

*Fifth*, and finally, Defendants argue that BNSF and UP could not have conspired because BNSF later announced in March 2005 a mileage-based FSC program that would apply to coal shipments. Defs. Br. 35, 64. But, as detailed above, BNSF twice abandoned plans for a move to a competitively advantageous mileage-based FSC, keeping its rate-based FSC. *Supra* Sec. I.D. With respect to coal, the mileage-based formula was limited to its local shipments and, as was true for all of BNSF's mileage-based formulas, specifically designed to be a "revenue neutral" economic "wash" such that BNSF earned the same profits that it was earning under its rate-based

---

[47] COF ¶ 275; *see, e.g.*, PX0655, at 17-18 (BNSF's public discussion of its "zero tolerance policy" on FSCs and the impact on coal contracts); PX0932, UPFSC 0584356, at '363 (BNSF 2006 Q2 Earnings Call) (BNSF CEO: "we're getting [FSCs] in, as each one of those [coal] contracts comes up"). And by the end of 2004, BNSF and UP had switched from the typical private negotiations with coal customers to public pricing, which allowed them to publicly and frequently announce key elements of route-specific prices for Western coal transport, including FSCs. COF ¶ 294.

FSCs. *Supra* Sec. III.D; COF ¶¶ 236, 554-57, 561. Thus, for all the reasons explained above, BNSF's mileage-based coal FSC neither exonerates BNSF or nor justifies summary judgment.

**E. Defendants' Conspiracy Included Intermodal FSCs**

Defendants contend that only a "separate conspiracy" for intermodal FSCs could make sense because the implementation of those surcharges differed somewhat from carload FSCs and due to supposed distinctive features of intermodal traffic (*i.e.*, competition from trucks). Defs. Br. 68-69. They also claim Plaintiffs are attempting to rely on an improper inference that a carload conspiracy means "an intermodal conspiracy must have existed too." *Id*. at 69. None of these assertions withstands scrutiny. As outlined below, the evidence supports Plaintiffs' claims that Defendants engaged in a single conspiracy to coordinate their FSCs across their entire customer base, including specifically to intermodal traffic.[48] This evidence is "sufficient to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not," rendering summary judgment inappropriate. *Apple, Inc.*, 791 F.3d at 315. As with Defendants' coal shipping, the Court should reject Defendants' attempts to differentiate their shipment types at the margin because "[t]here is at least some evidence that . . . the conspiracy encompassed all of these . . . products." *Urethane I*, 913 F. Supp. 2d at 1158. "[T]his issue of the scope of the conspiracy is one for the jury," which "could find that th[e] conspiracy also involved" intermodal shipping. *Id.*; *see also Polyurethane Foam*, 152 F. Supp. 3d at 998 (Defendant "need not be an active participant in every phase of the conspiracy, so long as [it] is a party to the general

[48] Defendants' suggestion that Plaintiffs' focus on intermodal is a mere "afterthought[]" is false. Defs. Br. 83. Plaintiffs have consistently maintained that the conspiracy covered intermodal. Indeed, when *MDL I* Plaintiffs moved for class certification in 2010, they did so on behalf of intermodal shippers, and *MDL II* intermodal Plaintiffs have raised intermodal-specific allegations. *See, e.g.*, *Rail Freight*, 287 F.R.D. at 49, 52 & n.16; Maersk Compl. ¶¶ 16, 47-50, 52, 70-72, 80, 102-105, 107, 109 (*MDL II* complaint referencing numerous, specific intermodal-focused allegations).

conspiratorial agreement"; it is liable if it "was aware of the object of the conspiracy and that [it] voluntarily associated [it]self with [the conspiracy] to further its objectives").

**1. Prior to the start of the conspiracy, Defendants' attempts to implement intermodal FSCs in contracts did not stick**

In the pre-Conspiracy period, Defendants sought to increase prices and profits by *unilaterally* attempting to impose FSCs on intermodal traffic—but those efforts failed in the face of overwhelming customer resistance and competition. COF ¶¶ 29-32, 46-77. For example, after NS attempted to apply a 3% FSC to its international intermodal contracts, resistance from customers led it to "[d]iscontinue billing and waive outstanding [FSC bills] immediately" for "[c]ontract customers who have refused to pay the FSC and are not paying it." COF ¶¶ 238; PX0719, NS_037004330, at '330; *see also* PX0718, NS_036018393, at '393 ("Intermodal has made the decision to stop applying the fuel surcharge to International accounts that are under contract."). Similarly, from December 2001 until April 2002, CSX discontinued its intermodal FSC program. COF ¶ 239; PX0791, Crawford (CSX) Dep. 36-37; PX0792, at p.1. This is consistent with evidence from shipper MOL, whose pre-Conspiracy Period long-term contract with CSX did not include any FSC. *See* PX0905, Marx (MOL) MDL II Rpt. ¶ 288; PX1080, CSXT_FSC_MDLII_00772214 [redacted]

In the West, in 2002, BNSF noted that UP was trying to capture market share by, in part, forgiving outstanding balances and waiving or deferring RCAF increases on intermodal traffic. COF ¶ 240; PX0793, BNSF_II_03902582, at p.80. And an internal analysis of UP's intermodal FSC coverage determined that from September 2002 through August 2003, 66% of shipments had no FSC provisions. PX0629, Koraleski (UP) Dep. 254-55; PX0629, UPFSC 0276429, at p.12. For its part, BNSF noted that as of April 2003, it "still [had] some major exceptions" to the

application of its FSC program to intermodal (and carload) traffic. PX0055, BNSF-0028786, at '792; *see also* PX0795, BNSF-0657309, at '312 (noting no FSC applications to international contracts in 2001). For instance, [redacted] *See* PX0884, [redacted], at '900; PX0984, Leitzinger MDL II Reply Rpt. ¶ 103.

This evidence of Defendants' inability to get FSCs to systematically "stick" during the pre-Conspiracy Period undermines Defendants' assertions, Defs. Br. 71-72,[49] and supports the inference that Defendants were able to effectively impose FSCs on customers *only* once they began working in coordination.

**2. Defendants' senior executives with authority over intermodal traffic met and discussed FSCs**

In the face of these struggles, Defendants' senior executives began meeting at least as early as 2003 to discuss and coordinate their imposition of FSCs. COF ¶¶ 93-103. None of the across-the-board discussions in the meetings that kicked off the conspiracy in 2003 excluded or carved out intermodal shipments.

Notably, senior intermodal executives at each railroad participated in these unprecedented meetings and discussions with their competitors. COF ¶¶ 271-72. BNSF CMO John Lanigan, who attended the meetings, admitted that he was responsible for "the intermodal . . . operations" of BNSF. PX0610, Lanigan (BNSF) Dep. 19. UP CMO Jack Koraleski admitted that the

[49] The evidence shows that prior to the Conspiracy Period, intermodal shippers' contracts with Defendants did not include FSC provisions or included FSCs with limited application. *See* PX0889, Marx ([redacted]) MDL II Rpt. ¶ 283 [redacted] PX0905, Marx ([redacted]) MDL II Rpt. ¶ 282 [redacted] PX0897, Marx ([redacted]) MDL II Rpt. ¶¶ 282-83 [redacted]

intermodal group reported up to him. PX0629, Koraleski (UP) Dep. 226. And NS CMO Don Seale testified that he oversaw the intermodal business. PX0596, Seale (NS) Dep. 281 (referring to input on FSCs "from my vice-president of intermodal"). The same is true with respect to CSX: the president of its intermodal division, CSXI, reported directly to Clarence Gooden, CSX's EVP & Chief Commercial Officer, who oversaw both carload and intermodal FSCs. PX0635, Jenkins (CSX) Dep. 40 (CSX AVP testifying that Gooden acted "for all of CSXT and intermodal").

Those directly overseeing the intermodal business on a day-to-day basis also participated in the unprecedented meetings discussed above. *Supra* Sec. I.B; COF ¶¶ 271-72. For example, NS's VP of Intermodal Mike McClellan attended the May 14, 2004 meeting at which NS and UP discussed "Fuel surcharges → Uniform application across the industry would be helpful." PX0460, UPFSC 0616651, at '652. In addition, there is documentary evidence showing that Defendants' most senior executives discussed intermodal FSCs with each other. PX0664, CSXFSC000000476, at '476 ("Clarence [CSX EVP & Chief Commercial Officer], Ward [CSX CEO] and Giftos [CSX Chief Commercial Officer] met with the BNSF last week. BNSF stated that 82% of their carload and Intermodal business either had a fuel surcharge or an escalator on the revenue."). As confirmed by Defendants' sworn concessions, *none* of this happened prior to 2003. COF ¶ 94 (collecting interrogatory responses). And, notably, Defendants never argue—because they cannot plausibly do so—that their far-ranging discussions, including among their top intermodal executives, did not cover both carload and intermodal traffic. This concession dooms their arguments. *See, e.g.*, *SourceOne Dental*, 310 F. Supp. 3d at 359 (relying on inter-firm communications and other evidence to deny summary judgment).

**3. During the conspiracy, Defendants applied and enforced FSCs for their intermodal customers across-the-board**

The thrust of Defendants' argument focuses on supposed differences between intermodal

and carload FSC *formulas*. Defs. Br. 72, 83. This argument ignores the evidence showing that Defendants set the same conspiratorial goal for all traffic types, including intermodal shipments: application of FSCs across the industry to increase rates.

Here, the evidence not only shows that Defendants' senior executives met and discussed intermodal FSCs, *supra* Sec. I.B, and harmonized their intermodal FSC formulas, *infra* Sec. II.E.4, but that Defendants' new FSC policies covered all traffic, including intermodal, *supra* Sec. I.E. As UP's CMO Koraleski testified, starting in 2003, UP moved away from "contract specific" application of FSCs to intermodal traffic toward a "more general approach" that Koraleski referred to as "fuel surcharges on a uniform basis." *See* COF ¶ 269; PX0629, Koraleski (UP) Dep. 93-95. In line with this, UP sought consistent application of FSCs in its intermodal contracts. COF ¶¶ 249, 273. For example, as one internal UP presentation noted, UP "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of [its] customers as their contracts expire. No exceptions." PX0437, UPFSC 0051559, at p.6.

The same is true for the other Defendants. COF ¶¶ 249, 273. For example, a presentation on CSXI's FSC stated CSX's intermodal policy of requiring application of "[f]ull Fuel Surcharge on all customers—No Exceptions!" PX0224, CSXFSC000672464, at '471. NS executives stressed that NS's intermodal FSC scale would be the "starting point for any future contract renegotiations or new contracts." PX0802, NS_062204458. BSNF conducted internal reviews to ensure "total FSC discipline on all [its] traffic," including intermodal. PX0082, BNSF-0326595; *see also* PX0020, BNSF_0691131, at '138 (presentation recognizing that both carload and intermodal FSCs were a "'profit-center' . . . for the customers that participate"). This is worlds apart from *Blood Reagents*, 266 F. Supp. 3d at 778, relied on by Defendants, where the plaintiffs alleged a conspiracy impacted three separate price increases that were years apart.

All of the foregoing evidence also undermines Defendants' suggestion that pre-Conspiracy coverage would have continued without any change through the Conspiracy Period. Instead, the evidence shows what one would expect: Defendants' coordinated approach to intermodal FSC application resulted in greater intermodal FSC application. As Plaintiffs' experts show, FSC coverage was substantially higher during the Conspiracy Period. *See* COF ¶¶ 261; PX0770, Bernheim MDL II Rpt. ¶¶ 157-66; PX0985, McClave MDL II Rpt. at 6 fig.1. Nor are Defendants' contrary "statistics" compelling. For example, while Defendants contend that "BNSF reported internally that 40.7% of its intermodal revenue was covered by a FSC by the fourth quarter of 2002," *see* Defs. Br. 75, the underlying evidence shows *only* 1.9% of its intermodal FSC revenue was actually billed during that time, DA04086, at '090.

Defendants' coordinated change in enforcement even led them to *retroactively* apply intermodal FSCs to pre-conspiracy transactions and impose FSCs under contracts that did not allow for their application. COF ¶ 250. For instance, prior to the conspiracy, intermodal shipper [redacted] *See* COF ¶ 250; *supra* Sec. II.E.1. During the Conspiracy Period, however, BNSF told [redacted] *See* PX0885, BNSF_II_03982221; PX0984, Leitzinger MDL II Reply Rpt. ¶ 103. Likewise, BNSF sought to collect unbilled FSCs from [redacted] However, [redacted] *See* PX0889, Marx ([redacted]) MDL II Rpt. ¶¶ 283-84; PX0890, NYK-00013195. While [redacted]

[redacted] COF ¶ 250.

In sum, this intermodal-specific evidence fully supports Plaintiffs' claims that the conspiracy led to a sea change in FSC enforcement for intermodal shippers.

**4. Defendants harmonized their intermodal FSC formulas**

Both the evidence and established legal principles undermine Defendants' argument that a lack of parallelism in the pricing and timing of intermodal FSCs is inconsistent with any inference of conspiracy. Defs. Br. 77-79.

*First*, and as a general matter, while Defendants make much of minor differences in some intermodal FSC formulas, *see* BNSF Br. 3, 7; NS Br. 3, 13; UP Br. 2, the evidence demonstrates that Defendants viewed any differences as immaterial. For example, when BNSF compared its FSC programs in 2006 with those of CSX and NS, it noted that "the eastern roads' program is slightly higher than that of the western roads for carload and *virtually identical for the intermodal programs*." PX0799, BNSF-0656598 (emphasis added). And, unsurprisingly, expert analyses confirm Defendants' intermodal FSC formulas were similar during the Conspiracy Period. *See* PX0770, Bernheim MDL II Rpt. ¶ 110 fig.III-8; PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 120-21 figs.5, 6. Even one of Defendants' own experts conceded that all four Defendants' intermodal "FSC rates move closely together" during the Conspiracy Period. PX0637, Kalt MDL I Rpt. ¶ 200.

*Second*, that BNSF and NS (with regard to its domestic formula) did not make meaningful changes to their intermodal FSC formulas during the Conspiracy Period is both economically and legally irrelevant. What matters is that, during the conspiracy, Defendants' coordinated efforts replaced competition and led to both increases in their FSC coverage and rates; and, as part of those efforts, CSX and UP matched the BNSF and NS formulas. Price-fixing conspiracies that come to rest at one defendant's previous prices are still unlawful. As one Plaintiff expert explained

(and one defense expert essentially agreed): "if one firm is charging a price of $X+1 before the conspiracy, and another firm is just charging $X, the fact that they both charge $X+1 during the conspiracy does not mean the first competitor did not participate in the conspiracy." PX0984, Leitzinger MDL II Reply Rpt. ¶ 101.[50] This economic logic not only has common sense but accords with longstanding recognized antitrust principles. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) ("Any combination which tampers with price structure is engaged in an unlawful activity. . . . [T]o the extent that [Defendants] raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces.").

*Third*, there is ample evidence that Defendants harmonized their FSC formulas during the Conspiracy Period. This evidence, along with Defendants' enforcement of their new FSC policies, more than readily shows the requisite parallelism.

In the East, CSX in October 2004 modified its intermodal FSC formula to essentially mirror NS's program, changing the formula to have the same trigger price, initial surcharge, fuel increment, and surcharge increment as NS's domestic intermodal FSC program. *See* COF ¶ 242; PX0797, NS_037031133; PX0770, Bernheim & Marx MDL II Rpt. at 54 fig.III-6. Defendants concede that in October 2004, CSX "modified its intermodal fuel surcharge to largely parallel the intermodal surcharges of BNSF," but contend that "[t]his matching of BNSF's intermodal surcharge came roughly 18 months after the alleged conspiracy supposedly began." Defs. Br. 75. However, the very document Defendants point to states that CSX aligned with BNSF's methodology to "begin[] standardization across [the] industry." DA06916, at '924. The fact that this change came in October 2004 is consistent with Plaintiffs' allegations that the conspiracy

---

[50] PX0779, Carlton Dep. 148-51 (defense expert acknowledging that, absent some justification, it would be "disturbing" if three competitors agreed to charge the same price that two of the competitors had previously been charging).

began in 2003 and that coordination continued over time. *See* DA06397, at '404-05. And, in August 2006, NS—whose domestic intermodal formula already matched BNSF's intermodal formula, as well as CSX's October 2004 formula, and which according to NS, accounted for "roughly two-thirds of NS's intermodal traffic," Defs. Br. 74—revised its international intermodal FSC program to bring it "more in line with industry FSC levels," COF ¶ 245; PX0801, NS_062118743, at '743.

In the West, while BNSF and UP might have expressed their formulas in different ways during the Conspiracy Period, they intentionally worked in coordinated fashion. UP adjusted its formula (*i.e.*, by modifying the "fuel weight" multiplier) when it would have resulted in a FSC that was meaningfully different from what was charged under BNSF's intermodal formula. COF ¶ 244; PX0770, Bernheim MDL II Rpt. at 57 fig.III-7. UP attempts to frame these changes as an independent reduction in its intermodal FSC, UP Br. 10, but ignores the evidence that UP's "Intermodal FSC calculation was changed . . . to try and lower the variance between UPRR's Intermodal Surcharge and the comparable BNSF program," DA19001, at '002. The evidence shows that, whenever variances occurred between UP's and BNSF's FSC percentages, UP manually adjusted its FSCs for the express purpose of staying in alignment with BNSF. *See, e.g.*, PX0390, UPFSC 0055388, at '388 (adjusting fuel weight inputs in UP's intermodal FSC to "be more aligned to BNSF").[51]

All of this evidence more than suffices to show requisite parallel conduct. *See, e.g.*, *Domestic Airlines*, 691 F. Supp. 3d at 197, 201 (assessing the defense arguments, including that in

[51] Defendants contend that Plaintiffs' expert Dr. Bernheim acknowledged UP lowered its intermodal FSCs, Defs. Br. 74, but they omit Dr. Bernheim's testimony that these changes sought [redacted] DA25234, at '249-50 (Bernheim Dep. 152-153).

"some years" different defendants "increased capacity while others reduced capacity," and concluding that "the evidence regarding parallel conduct . . . is not so 'one-sided' in favor of [defendants] that they must prevail as a matter of law"); *see also supra* Sec. II.B.4. Defendants' cited cases do not suggest otherwise. For instance, the court in *In re Baby Food Antitrust Litigation*, "recognize[d] that parallel pricing does not require 'uniform prices,'" but was faced with evidence the defendants were raising and lowering prices throughout the alleged conspiracy such that, unlike here, they "priced their products differently" "84.5% of the time." 166 F.3d 112, 128, 132 (3d Cir. 1999). Likewise, the issue in *Chocolate Confectionary* was that there was no evidence the defendants' behavior had actually changed materially during the alleged conspiracy. 801 F.3d at 410. Here, the evidence shows that Defendants aligned their intermodal FSC programs and policies and successfully applied FSCs on their intermodal customers to increase rates.[52]

#### 5. Defendants' other arguments are inconsistent with the law and evidence

##### (a) The existence of individual contract negotiations does not undermine the conspiracy

As discussed in more detail below, *infra*, as to those contracts that reflected non-standard FSCs, the presence of individual contract negotiations is not—as Defendants assert—inconsistent with the existence of a conspiracy. When "there are some large and some small buyers, which is

[52] Defendants' remaining authorities are similarly distinguishable. In *Anderson News*, the plaintiff's main allegation of parallel conduct "was that all of the publisher and distributer defendants ceased doing business with Anderson . . . within a span of three business days," but the summary judgment evidence actually showed that the defendants' responses were not uniform and the tight timeframe was not the result of an unlawful agreement. 899 F.3d at 105. In *Text Messaging*, the conspiracy allegations hinged on defendants agreeing to raise their prices simultaneously, which the evidence did not support. 782 F.3d at 877. And in *Kleen*, the existence of precisely simultaneous price increases was key to the plaintiffs' conspiracy claim. 910 F.3d at 936. In contrast, the evidence in this case supports Plaintiffs' allegations that, over the course of the Conspiracy Period, Defendants implemented their goal of harmonizing intermodal FSC programs and policies and applying them across their contracts.

the situation here, this need not prevent price fixing; it may simply cause the price fixers to engage in price discrimination" by charging different, but still higher prices, to different sets of customers. *High Fructose*, 295 F.3d at 656. Defendants' contrary argument conflicts with these well-recognized antitrust principles.

Defendants' argument further runs counter to the evidence that their Conspiracy Period FSCs served as the starting point for negotiations with customers and affected the entire distribution of FSC payments. *Supra* Sec. I.E. For instance, [redacted] in August 2003, and during negotiations, BNSF [redacted] and, despite [redacted] vigorous efforts, in the end offered only [redacted], stating that [redacted] *See* COF ¶ 255; PX0897, Marx ([redacted]) MDL II Rpt. ¶ 284; PX0898, BNSF_II_03982949, at '951; PX0933, YML-00024484, at '484-85; PX0899, YML-00029769, at '769.

As a result, even shippers that received "non-standard" FSC provisions were impacted by Defendants' conspiracy. PX0770, Bernheim MDL II Rpt. ¶ 97; PX0984, Leitzinger MDL II Reply Rpt. ¶ 110.

Defendants nonetheless contend (Defs. Br. 81) that the existence of nonstandard intermodal FSCs renders the conspiracy "pointless," referencing *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.* and *Valspar*. Both cases are inapposite.[53] In *Reserve Supply*, the court was faced with an "industry practice of providing discounts to individual customers" and seemingly no contrary evidence of how the list price facilitated coordinated increases in prices. 971 F.2d 37,

[53] As detailed above, *Valspar* is distinguishable and an outlier decision. *Supra* Sec. I.J.1.

53-54 (7th Cir. 1992).[54] Here, there is ample evidence that Defendants' new FSC formulas and policies led to higher prices for their customers. For instance, while BNSF initially charged many of the intermodal shippers, including [redacted] based on a discounted FSC program or the customer's own FSC programs, BNSF eventually switched these intermodal shippers to BNSF's standard, more aggressive FSC during the Conspiracy Period. *See* PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 101-07. And, in late 2006, when [redacted] BNSF explained that the [redacted] *See* COF ¶ 252; PX0897, Marx ([redacted]) MDL II Rpt. ¶ 287; PX0900, Lee ([redacted]) Dep. 47-48, 50. This is further corroborated by expert economic analysis that took into account the existence of individual negotiations on intermodal contracts and demonstrated that individual intermodal Plaintiff shippers were impacted by the conspiracy. *See, e.g.*, COF ¶ 254; PX1083, Marx (Crowley) MDL II Reply Rpt. ¶¶ 48-50; PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 111-13.

Finally, Defendants vastly overstate how commonly Conspiracy Period intermodal shipments were be subject to no FSC or a non-standard FSC. Relying primarily on price authorities used for "one off" and irregular shipments, Defendants misleadingly claim that "more than 60%" of the price authorities the eleven intermodal shipper Plaintiffs entered into or amended during the Conspiracy Period "had either a non-standard fuel surcharge or no fuel surcharge." Defs. Br. 77 (apparently compiling figures reflected in DA24614, at '737-48 (Tucker Rpt. Scheds. 8.1 & 10.1)).

---

[54] In fact, and unlike here, the district court observed that two levels of discounting were common: "across-the-board, discounts off list price to all customers" and "discounts on a customer-by-customer basis." *Rsrv. Supply Corp. v. Owens-Corning Fiberglass Corp.*, 799 F. Supp. 840, 843 (N.D. Ill. 1990), *aff'd*, 971 F.2d 37 (7th Cir. 1992).

In fact, even assuming Defendants' classifications are accurate, only 0.2% of all Conspiracy Period revenue for the eleven intermodal Plaintiffs was not subject to a fuel surcharge, and only 5.7% was subject to a non-standard fuel surcharge. *See* Tucker Rpt. Schedules 2.8, 8, 10.2 & backup data.[55]

**(b) Defendants' conduct was not a response to rising fuel costs**

Defendants' argument that their intermodal FSCs were a non-conspiratorial, rational response to rising fuel costs, Defs. Br. 92, fails for all the reasons stated above, *supra* Sec. II.E. In addition, intermodal-specific evidence shows that Defendants steadfastly maintained to Plaintiffs the false pretext that their intermodal FSCs were merely a vehicle to recover fuel costs. For example, after [redacted] told BNSF at a November 2, 2006 meeting that, [redacted] BNSF [redacted] about [redacted] COF ¶ 256; PX0886, [redacted], at '939; PX0887, [redacted] Dep. 130. Similarly, after [redacted] shared its views with BNSF that [redacted] COF ¶ 257; PX0889, Marx [redacted] MDL II Rpt. ¶ 286; PX0893, Keller [redacted] Dep. 41-56, 65-66; PX0895, BNSF-0648897, at '904.

**(c) Defendants' trucking-related defense is misplaced**

Lastly, Defendants argue that alleged conspiracy is "economically nonsensical" because it

[55] This information is reflected in the data file underlying Tucker's schedules. Given the size of the file, Plaintiffs have not included it as an exhibit but can provide it if requested by the Court.

did not include trucks who could supposedly take business away from the railroads. Defs. Br. 80-81. But trucks are not a meaningful substitute for intermodal shipping for at least three reasons.

*First*, rail freight is the only viable method for transporting international liners' cargo from ports to the vast majority of inland destinations.[56] Trucks are more expensive and there are not enough of them to service the volume of cargo coming off the ships. COF ¶¶ 263-67, 595-98. For example, NYK's Payne testified that [redacted] COF ¶ 263; PX0812, Payne (NYK) Dep. 20; PX0934, Kleijn (Maersk) Dep. 48 [redacted] To underscore the point, Central Transport—a trucking company—is among the Plaintiffs here, seeking damages on shipments that it made using the Defendant railroads rather than trucking the shipments itself.

*Second*, competition from trucking was limited to shorter-haul (and lower weight) movements. As described by the American Association of State Highway and Transportation Officials, "Railroads handle the long-haul movement of large quantities of containers and trailers between major hubs such as seaports and major population centers, while truckers handle the short-haul movement to/from the customer's 'front door.'" COF ¶ 265; PX0935, AAR-E-00076582, at '617; *see also* PX0769, Leitzinger MDL II Rpt. ¶¶ 49, 53-54; ("rail transportation also is often the preferred mode of transport—even over relatively short distances—for" heavier shipments);

[56] Defendants rely on *Anderson News* and *AD/SAT, Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216 (2d Cir. 1999), to argue that courts have rejected "irrational" conspiracies, but they are inapposite. Defs. Br. 80-81. Neither of those cases involved an assertion that the conspiracy would only make sense if others (*i.e.*, non-defendants) were part of it. And here, there is ample evidence that trucking services were not a realistic alternative to rail for the vast majority of intermodal shipments, making Defendants' conspiracy wholly rational.

PX0984, Leitzinger MDL II Reply Rpt. ¶ 16; *cf.* PX1167, Bernheim (Central Transport) MDL II Reply Rpt. ¶ 558 & n.541 (discussing how Defendants' expert Dr. Israel "does not assess the extent to which trucking actually provides an option on any given route"). This is consistent with the experience of the intermodal shipping Plaintiffs.[57] Trying to avoid these realities, Defendants misleadingly cite Plaintiff ABF Freight to suggest that intermodal traffic can [redacted] be serviced by truck, when the witness actually testified that [redacted] limited trucking competition. Defs. Br. 71; *see* DA15134, Vicary (ABF Freight) Dep. 70.

*Third*, expert analysis shows that the already limited competition from trucking *decreased* during the Conspiracy Period. Due to highway congestion, "during the Conspiracy Period there was not enough trucking capacity available to take meaningful share from Defendants. . . . All in all, there was little chance that any significant portion of Defendants' intermodal traffic along these [long-distance intermodal] routes would be diverted to trucks during the Conspiracy Period." COF ¶ 267; PX0984, Leitzinger MDL II Reply Rpt. ¶¶ 25-27 & fig.2.

For all of these reasons, Defendants' assertions about trucking competition fall well short of warranting summary judgment. At most, "this is an issue of 'professional judgment,' in which 'reasonable experts may differ' as to whether" one industry competes with another. *Air Cargo*, 2014 WL 7882100, at *51 (assessing defendants' arguments that the air cargo industry "faces strong competition from substitutes such as rail and truck transportation").

---

[57] *See* COF ¶ 267; PX0816, Nielsen (Maersk) Dep. 21-23 [redacted] PX1085, Pan (Yang Ming) Dep. 22-23 [redacted]

### F. Section 10706 Presents a Narrow Evidentiary Bar, and Does Not Preclude Inferences That Plaintiffs Present Here

Above, Plaintiffs rely on evidence admitted by Judge Friedman or evidence to which Defendants have not objected. Because conspiracy may be inferred from that evidence, Plaintiffs anticipate no further disputes on Section 10706. Defendants, however, have (1) used Section 10706 improperly to justify mischaracterizations of the evidence; and (2) misstated Section 10706's rule on the inferences allowable from certain interline-related evidence.

#### 1. Section 10706's history

Congress enacted 49 U.S.C. § 10706 in the Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895. The Staggers Act was part of a sustained effort to *curb* railroads' long history of price fixing, and allow competition rather than regulation to determine reasonable prices. *See id.* § 101(a) (codified at 49 U.S.C. § 10101(1)); *id.* §§ 2(4), 2(9), 3(1), 94 Stat. at 1896-97; H.R. CONF. REP. 96-1430, at 89. As the AAR's then-President explained, the Staggers Act "sharply curtail[ed] antitrust immunity for collective ratemaking" by prohibiting discussions of single-line (single railroad) rates and requiring "separate negotiations with each set of [interline] partners over each route," when a shipment travels over two or more railroads' tracks. William H. Dempsey, *Antitrust and Deregulation: A Railroad Perspective*, 50 ANTITRUST L.J. 363, 377 (1981). Anticompetitive coordination and improper discussions under the auspices of interline activity remained illegal. *See, e.g.*, *Canadian Nat'l Ry. Co.*, 1999 WL 336285, at *14 ("[A]ny collusive efforts that the participants might undertake under the auspices of this [alliance] agreement to . . . diminish competition where they compete with each other . . . would subject these carriers and their management personnel to severe criminal and civil penalties under the antitrust laws."); *id.* at *16 n.79 ("Any attempts at price-signaling activities for competitive traffic under the guise of interline ratemaking will continue to remain subject to the antitrust laws.").

Defendants assert that Congress intended to protect them from liability for "communications necessary to make jointly provided rail service a reality." Defs. Br. 8. Assuming arguendo that was the legislative intent, communication and agreement over FSCs are not among the logistical aspects necessary for interline service. As discussed above, *supra* Sec. I.A, Rule 11 shipping involves *no* carrier-to-carrier discussion of price, let alone FSCs, COF ¶¶ 36-37, 42-45. And even joint-rate interline shipping does not necessarily require discussion of *FSCs*. Technical specialists had already developed best practices for implementation of FSCs among carriers with a simple "yes/no" question, and made clear that even this was not necessary. If an interlining railroad answered "no," the requesting railroad could implement a unilateral FSC without any agreement by connecting carriers. And, in the absence of an agreement, default rules divided revenue from FSCs on the same basis as the linehaul rate.

**2. Section 10706's evidentiary rule**

The Staggers Act included Section 10706's "statutory rule of evidence." *Rail Freight*, 34 F.4th at 5-6. That rule provides that "'evidence of a discussion or agreement between or among' rail carriers 'shall not be admissible if the discussion or agreement . . . concerned an interline movement of the rail carrier' and 'would not, considered by itself, violate the [antitrust] laws.'" *Id.* at 5 (quoting 49 U.S.C. § 10706(a)(3)(B)(ii)(II)). The opponent of the evidence must show that the discussion or agreement *exclusively* concerned the interline partners' shared interline movements or, if not, that the "focus" of the discussion or agreement "did not change . . . away from" shared interline movements. *Id.* at 9-10. Any discussion of other traffic (*e.g.*, local traffic, traffic generally, interline traffic with or of any other carriers) does not exclusively concern the interline partners' shared interline movements, and is therefore not excluded unless the reference was "*de minimis*." *Id.* The "plain statutory text" of Section 10706 applies "without regard to which party is offering or relying upon the evidence." *MDL II* Dkt. No. 967 at 3 (quoting

49 U.S.C. § 10706(a)(3)(B)(ii)). That is, if evidence is subject to Section 10706, *neither* Plaintiffs *nor* Defendants may submit it to the jury.

Section 10706's evidentiary rule is not a license for Defendants to offer facts or arguments that are contradicted by the evidence they excluded, as Defendants seek to do here. For example, Defendants cannot claim that their communications were "procompetitive and essential to railroads' ability to compete" when evidence of those communications has been excluded. Defs. Br. 1, 66. The evidence was not excluded because the communications "procompetitive and essential" to competition—an issue about which neither Judge Friedman nor the D.C. Circuit made any findings—it was excluded under a "blunt statutory evidentiary rule," *MDL II* Dkt. No. 967, at 3, that does not ask such questions.

Defendants cannot have it both ways when it comes to evidence excluded under Section 10706. They cannot, on the one hand, claim that there is "evidence of fuel surcharge discussions" between senior executives that were "routine meetings," Defs. Br. 1, 66, while demanding the *exclusion* of the evidence, particularly because Defendants admit that their senior executives had never discussed the subject of FSCs prior to the Conspiracy Period, COF ¶¶ 29-31, 94. Likewise, it is improper for: (1) CSX to claim that "no witness or document contradicts" that there were no discussions "with any other railroad" about CSX's 2003 FSC modification before the decision was made, CSX Br. 8; (2) UP to say that its understanding and quick adoption of CSX's FSC methodology was informed only by public announcements from CSX, UP Br. 5-6; or (3) BNSF to assert that there is "no evidence" that it "engaged in improper communications with other railroads," BNSF Br. 8, when Defendants obtained exclusion of evidence contradicting all of these assertions. Defendants could have simply remained silent as to each of these, but if they instead rely on or contradict the evidence they sought to exclude, Defendants would waive the protections

of Section 10706's evidentiary rule and, in any event, open their witnesses up to straightforward impeachment at any trial.[58] Plaintiffs reserve the right to assert waiver if Defendants similarly open the door at trial.

### 3. Section 10706's narrow preclusion on inferences to be drawn from admissible evidence is inapplicable to the evidence presented here

The Staggers Act also included Section 10706's narrow inferential rule, which limits the inference of conspiracy that may be drawn "from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic." 49 U.S.C. § 10706(a)(3)(B)(ii). Defendants overstate the scope of the rule. It does not mean that "parallelism between interline rates or rules and single-line rates or rules counts for nothing as a matter of law." Defs. Br. 28. Nor does it "refuse[] to infer a conspiracy" from *any and all* interline communications and meetings (even ones *not subject* to the evidentiary exclusion). *Id.* at 30.

Instead, "[f]or an inference to be barred under this provision, . . . there must be an action and a similar action." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 520 F. Supp. 3d 1, 36 (D.D.C. 2021), *aff'd in part, vacated in part, rev'd in part, on other grounds*, 34 F.4th 1 (D.C. Cir. 2022). "The first action . . . must be of two or more rail carriers 'act[ing] together with respect to an interline rate or related matter'" like "setting a rate for a shared interline movement." *Id.* at 36-37. But "[a] discussion or agreement [to take action] is not an action within the meaning of the statute." *Id.* at 37. Nor can a discussion or agreement constitute a "similar action" with respect to another route or traffic. *Id.* Section 10706 "therefore does not bar inferences from

[58] *Cf. United States v. Mezzanatto*, 513 U.S.196 (1995) (evidentiary protections are subject to waiver); *Walder v. United States*, 347 U.S. 62 (1954) (party making false claims opens the door and waives evidentiary protections).

discussions or agreements to take action." *Id.* Among other things, the inferential bar does not apply to discussions and agreements (which are not actions), non-interline ratemaking that precedes interline ratemaking (which are improperly sequenced), or simultaneous interline and non-interline ratemaking (which are not sequenced).

Plaintiffs have not tried to infer anything barred by Section 10706, and Defendants have not even attempted to map evidence onto the framework or explain why it would apply. Plaintiffs do not argue that Defendants took any particular action with respect to an interline rate or related matter *and then* took a similar action with respect to a non-interline rate or related matter, let alone seek an inference of conspiracy from the narrow, sequenced parallelism described by Section 10706. In sum, conspiracy may be inferred from all of Plaintiffs' admissible evidence.

## III. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE ENDING DATE OF THEIR CONSPIRACY

Defendants' illicit agreement continued undisturbed for years, with Plaintiffs paying supracompetitive rates attributable to Defendants' FSC programs through (and even after) 2008. Defendants now argue that the conspiracy ended either (1) by January 25, 2007, when the STB condemned Defendants' rate-based FSCs on regulated traffic as a "misleading and ultimately unreasonable practice" (but before Defendants even began to comply with that decision), or (2) when the first *MDL I* plaintiff filed suit on May 14, 2007. Defendants brazenly seek to lop off the most profitable years of their conspiracy, when they took steps to *entrench* their gains, not withdraw from their conspiracy.

In general, where "the entirety of the evidence is sufficient to create a question of fact concerning the existence of a price-fixing conspiracy," then "its duration is a question of fact for the jury." *Urethane I*, 913 F. Supp. 2d at 1157-58. To avoid trial, Defendants must typically prevail on the affirmative defense of withdrawal. But Defendants have not proven any Defendant

ended or affirmatively withdrew from the conspiracy at any point before December 31, 2008, as required. Defendants' contrary arguments (Defs. Br. 99-105) do not apply the correct standard, and ignore or mischaracterize facts that preclude summary judgment on the affirmative defense.

### A. Plaintiffs Need Only Show a Reasonable Inference that the Conspiracy Was Ongoing

Defendants bear the heavy burden of establishing that evidence allows for *no* reasonable inference that their conspiracy was ongoing at the intervals they identify. *See Urethane I*, 913 F. Supp. 2d at 1157 (denying summary judgment where evidence "at least allows for the reasonable inference that the conspiracy was ongoing at that point"). Where, as here, "the entirety of the evidence is sufficient to create a question of fact concerning the existence of a price-fixing conspiracy," Plaintiffs receive the benefit of all inferences even if evidence from the challenged period might not on its own be "sufficient to support the existence of a conspiracy." *Id.* The Court must look at the entire alleged conspiracy—dating back to early 2003—rather than conducting "a wholly-distinct analysis of evidence of conspiracy in [the challenged] year alone." *Urethane II*, 2013 WL 65988, at *2. Where there is sufficient evidence to "create a question of fact concerning the *existence* of a price-fixing conspiracy," then "its duration is a question of fact for the jury." *Urethane I*, 913 F. Supp. 2d at 1157-58 (emphasis added).

Defendants cite Areeda and Hovenkamp's treatise for the policy proposition that "a conspiracy should not 'be presumed to continue' when 'the surrounding circumstances have changed significantly.'" Defs. Br. 100 (quoting AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1421b3). But even Areeda and Hovenkamp note that the change in circumstances must be "*very* significant" and cite to a case expressly rejecting the same purportedly changed circumstances that Defendants proffer here: "***[Defendants] have failed to establish that the initiation of the lawsuit in 2008 alone constitutes a sufficiently changed circumstance in order***

***to justify holding that the conspiracy necessarily terminated at that point*.**" *In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 410279, at *4 (E.D. Pa. Feb. 3, 2016) (emphasis added); *see also id.* ("The simple fact that the conspiracy was uncovered in 2008 would not prevent the Court from finding that the conspiracy continued post-2008.").[59]

Defendants' citations to *Panache Broadcasting of Pennsylvania v. Richardson Electronics*, *Domestic Drywall*, and *In re Corrugated Container Antitrust Litigation* are not remotely applicable, underscoring what Defendants cannot show. *Panache* involved a consent decree that "effectively ceased operation[s]" of one defendant and led to its dissolution, as well as another defendant exiting the market altogether. 2001 WL 290408, at *3 (N.D. Ill. Mar. 22, 2001). Moreover, the court *rejected* the proposition that those actions "create[d] a presumption that all antitrust activity end[ed]," instead merely finding that the events created a Rule 23 predominance issue that does not exist in these individual cases. *Id.* at *5. *Domestic Drywall* was decided on a motion to dismiss, because plaintiffs alleged "*no* [non-conclusory] facts" about the new, purportedly collusive price hikes after intervening litigation. 2016 WL 3453147, at *3 (E.D. Pa. June 22, 2016) (emphasis added). And the grand jury subpoenas in *Corrugated Container*, part of a criminal investigation with "widespread notoriety," would have a "natural tendency to terminate whatever conspiratorial activities were then going on" that would not exist here. 1981 WL 2093, at *9 (S.D. Tex. June 4, 1981).

---

[59] Areeda and Hovenkamp also present a hypothetical in which ten years had passed since defendants' agreement, the statute of limitations had run, relevant personnel had changed, and it was no longer possible to differentiate tacit price coordination from interdependence. ANTITRUST LAW ¶ 1421b3. The authors acknowledge that *even defendants in their inapplicable hypothetical* would not prevail under the law. *Id.* (citing *Basle Theatres v. Warner Bros. Pictures*, 168 F. Supp. 553 (W.D. Pa. 1959), as "requir[ing] the wrongdoers to take affirmative steps to undo or at least to disclaim unlawful collusion").

### B. Defendants Bear the Burden of Proving Withdrawal From Their Conspiracy

Further, it is not *Plaintiffs' burden* to prove that each Defendant continued to pursue the conspiracy after the STB's January 2007 decision or after a handful of Plaintiffs brought suit in *MDL I*, Defs. Br. 99-100, but rather *Defendants' burden* to prove withdrawal as an affirmative defense. "Proof that the conspiracy was ongoing is unnecessary because conspiracies presumptively are ongoing until the participants achieve their objective." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011); *see also United States v. Moore*, 651 F.3d 30, 90 (D.C. Cir. 2011), *aff'd sub nom. Smith v. United States*, 568 U.S. 106 (2013) ("Conspiracy is a crime that presumes continuity until accomplishment or termination; once a defendant becomes a member of a conspiracy, [it] remains a member until [it] affirmatively withdraws or the conspiracy ends."); *Moore*, 651 F.3d at 90; *United States v. Fantroy*, 146 F. App'x 808, 818 (6th Cir. 2005) (same).

To prevail, Defendants "must show that [they] took affirmative action to defeat or disavow the purpose of the conspiracy . . . . Without such action, liability continues for all actions in furtherance of the conspiracy by other conspirators." *United States v. Brown*, 332 F.3d 363, 374 (6th Cir. 2003). That is a high bar—especially on summary judgment. As one leading treatise explains, "the burden is heavy. Under the general law of conspiracy, once a person is shown to have joined a conspiracy, it is presumed that person participated throughout the course of the conspiracy." ANTITRUST LAW DEVELOPMENTS § 1B-1-c (9th ed. 2022).

In Defendants' *MDL I* summary judgment brief, they asserted that their conspiracy could not be presumed to continue into 2007 and 2008 because "its goals . . . have been affirmatively abandoned." *MDL I* Dkt. No. 1034 at 67. Recognizing a woeful lack of evidence of abandonment, Defendants now claim their conspiracy ended (somehow) without affirmative abandonment while still citing affirmative withdrawal cases. *See, e.g., Precision Assocs. v. Panalpina World Transp.*

*(Holding) Ltd.*, 2015 WL 4987751, at *3 (E.D.N.Y Aug. 19, 2015) (requiring "uncontroverted, affirmative evidence of abandonment," which was satisfied by a defendant's confession to prosecutors and cooperation against co-conspirators).

Defendants also attempt to rewrite the law with a decontextualized quotation from this Court, which denied Defendants' motion to dismiss certain complaints in *MDL II* as partially or wholly time-barred. *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, 2020 WL 5016922, at *1 (D.D.C. Aug. 25, 2020). In that ruling, the Court addressed whether the *MDL I* allegations "provided defendants with fair notice" that the conspiracy continued *after* 2008 and "through the present." *Id*. at *17, 25. But because the moving plaintiffs admitted that "the conspiratorial conduct" they alleged for "the post 2008 period . . . was 'differentiated' from defendants' 2003-2008 conduct," the Court found those post-2008 claims time barred, "***regardless of whether defendants withdrew from the conspiracy***." *Id*. at *26 (emphasis added). The Court said nothing at all about whether the conspiracy continued in 2007 or 2008.

Defendants' other cases confirm that summary judgment on the affirmative defense of withdrawal is not appropriate. In *Precision Associates*, the court granted summary judgment to a defendant who had *turned itself in to antitrust regulators*. 2015 WL 4987751, at *1.[60] And in *United States v. Nippon Paper Indus. Co., Ltd.*, withdrawal was found where the defendants announced an intent to "no longer . . . coordinate any prices with other members of the conspiracy." 62 F. Supp. 2d 173, 190 (D. Mass. 1999). No Defendant has confessed or done anything remotely similar here—to the contrary, each has denied wrongdoing to this day.

The *Nippon Paper* court also distinguished the *existence of a conspiracy* (which is

---

[60] *Id.* at *3 ("A conspiracy is presumed to continue until the last overt act by any of the coconspirators, unless a defendant can prove that the conspiracy terminated or that he took affirmative steps to withdraw.").

presumed to continue) from *its effect on commerce* (which does not get the same treatment). *Id.* at 195. Thus, the ruling rejects Defendants' argument that Plaintiffs must prove subjective intent at all relevant times, including every week in which Plaintiffs were damaged.

Defendants' invocation of *Blood Reagents* (Defs. Br. 100) is likewise misplaced. There, plaintiffs alleged "that Ortho and Immucor conspired to raise prices on TBRs three [separate] times" over seven years, and thus the court considered whether there was sufficient evidence of coordination on each of those three independent price increases. 266 F. Supp. 3d at 768-69. Plaintiffs here, on the other hand, allege a single, continuous conspiracy to use coordinated fuel-surcharge programs and policies to increase the all-in prices of rail freight transportation.

Defendants' citations make clear that it falls *to them* to provide "uncontroverted, affirmative evidence of abandonment." *Precision Assocs.*, 2015 WL 4987751, at *4. There is no such evidence—and certainly none of an undisputed nature.

### C. Defendants' Pre-STB Ruling Fuel Surcharge Programs Are Not Evidence of Withdrawal

Oddly, Defendants argue that there is no triable issue of fact about whether the conspiracy continued beyond the STB's 2007 decision condemning Defendants' rate-based FSCs by pointing to BNSF's and UP's adoption of coal FSCs in 2004, the much-delayed announcement of BNSF's mileage-based FSC program in 2005, and NS's 2006 decision to "rebase" its FSC to "bake in" conspiratorial gains. Defs. Br. 101-102. But, obviously, and for the evidence-backed reasons outlined in detail above, *supra* Secs. I.D, II.3, those *past* events do not eliminate the factual dispute about whether Defendants have satisfied their burden to show that "conspiracy terminated or that [they] took affirmative steps to withdraw" from the conspiracy *in 2007*, *Precision Assocs.*, 2015 WL 4987751, at *3.

### D. The Conspiracy Did Not Suddenly End with the January 25, 2007 STB Decision or When the First *MDL I* Plaintiff Filed a Lawsuit on May 14, 2007

Defendants also argue that the conspiracy cannot be shown to have "continued beyond January 25, 2007, or, at the very latest, May 14, 2007." Defs. Br. 105. That argument fails because Defendants do not suggest any change in conduct as to unregulated shipments at that time, do not identify ***any*** difference in their conduct on January 26 and May 15 that would distinguish it from January 24 or May 13, and cannot avoid the evidence that through rebasing (before and after the STB decision) they locked in the earlier gains of the conspiracy. COF ¶¶ 559-87.

The STB decision and the first *MDL I* complaints were *external* events and were not, in and of themselves, changes in Defendants' behaviors (let alone withdrawals from the conspiracy). The STB decision did not posit a conspiracy and merely condemned the Defendants' rate-based FSCs on *regulated* traffic. It is not evidence that Defendants ended their conspiracy or terminated its effects on rate-*unregulated* shipments on that date, much less uncontroverted evidence sufficient to demonstrate withdrawal as a matter of law. The STB did not order Defendants to cease their unreasonable practices with respect to any traffic at issue here. And Defendants' reaction to the first *MDL I* complaints was to deny liability and seek to dismiss them (as they continue to do today), not to change their behavior in response to them. Tellingly, ***Defendants do not and cannot claim they stopped charging rate-based FSCs in the wake of either event***. BNSF complied with the STB decision *only for rate-regulated traffic* (that is not the subject of this litigation) in 2007 and continued charging its rate-based FSCs on most unregulated traffic until 2009. DA04950; DA04939, at '941. And UP "announced its new mileage-based fuel surcharge *for regulated carload traffic*, effective April 26, 2007," Defs. Br. 103, with an intent to roll it out for unregulated business "at a later date" and only "as [contracts] expire." PX0498, UPFSC 0068712, at '712-13; *see also* COF ¶¶ 579-81. NS did not change a thing, sticking with its $64

WTI rebased FSC (and 16.4% rate increase) while refusing requests for refunds when the WTI price fell below $64. COF ¶¶ 559-71, 578; Defs. Br. 103.

Consistent with this, following the STB decision and the first MDL *I* plaintiff's lawsuit, Plaintiffs continue to pay the same anticompetitive rates that they paid before those events, and when their contracts came up for renegotiation, Defendants' rebasing efforts continued to extract supracompetitive prices. COF ¶¶ 554-87. This is not withdrawal by any stretch of the word. *See Precision Assocs.*, 2015 WL 4987751, at *4.

### E. Defendants' Reactions to the STB Decision Support an Inference of Collusion

Seeking to distract from the above, Defendants claim their "varied" reactions to the STB decision "make clear" the conspiracy did not survive the STB decision. Defs. Br. 103. But the evidence shows that from 2006 to 2007 (surrounding the STB proceedings and decision) that Defendants' FSC modifications simply sought to extend their conspiratorial gains, including by locking in their conspiratorial gains by rebasing their FSCs to be "revenue neutral" with respect to their rate-based FSCs. *See* COF ¶¶ 554-87; *supra* Sec. I.I.3.

**NS's Re-basing:** NS, in particular, used this rebasing scheme to misleadingly tell the STB that NS had "deci[ded] to reduce its fuel surcharge percentage." COF ¶¶ 562-63; PX0761, NS 001001195 at '207. When NS issued a press release publicly announcing the change three days before its STB testimony, it omitted that base rate increases were being used to offset the purely cosmetic change to FSC rates. COF ¶ 564. But the evidence shows that NS recognized contemporaneously that the change was "***a wash***" and was "***neutral from a revenue standpoint***." COF ¶ 565; PX0230, DON018705, at '705; PX0630, Moorman (NS) Dep. 187 (emphasis added); *supra* Sec. I.I.3. Whatever shippers "saved" in FSCs, they would now pay—permanently—in higher base rates, because NS's 16.4% rate increase embodied the previous NS FSC up to $64 WTI. COF ¶¶ 561, 567. Indeed, BNSF's analysis of NS's rebasing confirms that it had no revenue

impact, and the effect was that "[y]ou basically swap approximately $1.1B of FSC into your rates." COF ¶ 572; PX0098, BNSF-0367622, at '622; *see also* PX0063, BNSF-0033442.

**UP and CSX's Rebasing:** CSX and UP adopted the same tactic following the STB decision, with each modifying or "rebasing" their FSCs amid growing regulatory scrutiny, always with a view to preserving the same revenue as before. Following NS's announcement, UP began preparing to "recalibrate and rebase the fuel surcharge to just roll some of the money into a new base and reduce the size of the fuel surcharge." COF ¶ 576; PX0404, UPFSC 0185789, at '789. UP's efforts were guided by Koraleski, who "***[did] not want to leave any money on the table after re-basing***." COF ¶ 577; PX0527, UPFSC 0404052, at '052 (emphasis added). Ultimately, in early 2007, UP rolled out a "rebased" mileage-based FSC, that would have no "negative revenue impact to Union Pacific." COF ¶ 580; PX0498, UPFSC 0068712, at '713. This program was designed to be revenue neutral for UP, *id.*, but all-in rates would actually *increase* for certain shippers, and UP warned its employees "NOT [to] forward this" information to customers, COF ¶ 581; PX0417, UPFSC 0331506, at p.5.

CSX took similar action in early 2007. Recognizing that NS's rebased FSC "effectively 'lock[s] in' the fuel surcharge between $23 and $64" and "convert[s] a large-portion of the expected 2007 – 2008 ***over-recovery*** into price," CSX migrated to a mileage-based FSC beginning in April 2007 "to ***make sure that no value erosion is incurred as we rebase***." COF ¶¶ 583-84, PX0175, CSXFSC000002658, at '663, '666, '673 (emphasis added). As before, there would be "no exceptions" to CSX's mileage-based program. COF ¶ 584; PX0174, CSXFSC000002351, at '356. Thus, by April 2007, CSX, NS, and UP had all "rebased" their FSCs. PX0069, BNSF-0042424, at '428; DA04662 (2007 talking points for BNSF CEO Rose stating that all three competitor railroads were rebasing "to a higher strike price for fuel . . . [with a] freight rate increase

to offset the lower fuel surcharge" or had "imbedded" the FSC in their higher rates).

**BNSF's "Revenue Neutral" FSC program**: As discussed above, *supra* Sec. I.D, BNSF delayed the announcement of *mileage-based FSC would have been competitively advantageous* and then designed the program to be revenue neutral to its rate-based program and only applied to limited traffic, COF ¶¶ 236, 555. This conduct was against BNSF's interest and supports a finding of collusion. And contrary to BNSF's assertion that "[a]fter the STB's 2007 decision," it "extended its mileage-based surcharge to all regulated traffic and to some additional interline carload traffic," BNSF Br. 12, it was not until January 2009—two years after the STB decision and six years after BNSF started considering a mileage-based FSC program—that it extended the program to all of its rate-unregulated traffic, COF ¶¶ 236-37; DA04950; DA04939, at '941.

In sum, Defendants efforts to eschew competition and instead lock in the conspiratorial gains of their rate-based FSCs—both before and after an adverse regulatory ruling—is the type of conduct that no reasonable firm would not undertake without an agreement. *Domestic Airline Travel*, 691 F. Supp. 3d at 212.[61] Indeed, following the STB decision, Defendants did not stop applying the coordinated rate-based surcharges when they were included in existing contracts, nor did their actions hasten these changes for unregulated traffic (at issue in this litigation) beyond the purview of the STB. Defendants instead deferred application of mileage-based FSCs on existing contracts until after those contracts expired. *See* COF ¶ 435; PX0498, UPFSC 0068712, at '713 ("It is Union Pacific's intention to eventually roll all business, including contracts as they expire, to a mileage-based FSC program."); PX0222, CSXFSC000385966, at '969 ("When your contract

---

[61] NS suggests that it considered rebasing unilaterally, in 2005. NS Br. 12. NS did so only in response to *BNSF's* "proposed fuel adjustment" to a mileage-based FSC for certain traffic. COF ¶¶ 572-73; DA05563. And NS decided *not* to take action in 2005, in favor of the status quo (and record FSC revenue). NS acted only after STB scrutiny peaked, which hardly supports independence.

expires, your rates will adjust to the new fuel surcharge plus any market-based rate adjustment.").

**F. Defendants Continued FSC Discussions Following the STB Decision**

Also supporting an inference of ongoing collusion, ***Defendants kept discussing FSCs with one another after the STB Decision*** even while stating in talking points that "[n]o industry level discussions were or are allowed on" the FSCs. DA01692-98, at '97. For example, UP's Koraleski reported internally in February 2007 that he had discussed FSCs with his counterparts at the other Defendants. PX0511, UPFSC0169555, at '555 ("CSX is going down the PC Miler approach. . . . NS is planning to do away with the fuel surcharge altogether an[d] just change rates when they need to."). Two days later, CSX CMO Gooden scheduled a late-evening Friday "Discussion w/BNSF re: Fuel Surcharge." PX0730, CSXFSC000258350, at '350. CSX did so despite its recognition around the same time that "***Anti-trust laws require each railroad to establish its FSC program independently***." PX0179, CSXFSC000006567, at '571 (emphasis added).

In addition, following the STB's ruling and the first lawsuits, Defendants' CMOs continued to meet regularly under the auspices of AAR's NEMC that, notably, was not dissolved ***until September 2009*** on the advice of counsel, after this litigation brought to light Defendants' conduct in that forum. COF ¶ 419. This hardly reflects "*independent action*" in the wake of the STB decision or the first *MDL I* lawsuit. Defs. Br. 105 (emphasis added).

And none of this was known to Plaintiffs and other shippers who need to transport their goods on Defendants' trains. Defendants nonetheless assert that the first lawsuits filed in May 2007 put Plaintiffs "on notice . . . that their agreements with defendants might contain artificially high rate-based fuel surcharges." Defs. Br. 104 (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, 2021 WL 1909777, at *10 (D.D.C. May 12, 2021) ("*Tolling II*")). But they make no attempt to prove on an undisputed basis that any or all *MDL II* Plaintiffs knew about those filings at the time or that, armed with the *MDL I* allegations (which did not reflect the breadth

of evidence summarized above), they successfully resisted (or could have successfully resisted) Defendants' artificially high rate-based FSCs. At best, this is an individualized jury issue that has to be resolved on a Plaintiff-by-Plaintiff basis, as *Tolling II* suggested. 2021 WL 1909777, at *10 (identifying individualized questions like "why plaintiffs, after being put on notice of the alleged conspiracy, did not, for example, object to an allegedly conspiratorial fuel surcharge term, terminate an agreement without a fixed end date, refuse to renew a conspiracy-period agreement, or decline to purchase rail-freight transportation from defendants under an allegedly tainted open price authority").

**G. The Effects of Defendants' Conspiracy Extended Beyond January 25, 2007**

Defendants' lingering effects arguments are predicated upon this Court finding that Defendants' conspiracy undisputedly ended on January 25 or May 14, 2007, which, as explained above, it should not do. Defendants' conclusory and unsupported assertion that Plaintiffs "can present no evidence . . . of the continuing effects of a Section 1 violation," Defs. Br. 106, is belied by documentary and expert evidence cited above, as well as the law.

As this Court has acknowledged, it is black letter antitrust law that a plaintiff may recover damages for the "lingering effects of a completed conspiracy." *Rail Freight*, 2020 WL 5016922, at *24. Thus, even if Defendants ceased conspiring on January 25 or May 14, 2007, Plaintiffs can "recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971). Plaintiffs' overpayments after those dates are easily traceable to Defendants' earlier concerted efforts to adopt, broadly impose, and sustain their FSCs, and their amounts are provable and quantifiable in the manners that Plaintiffs' experts have demonstrated.

Defendants cite only distinguishable cases. Defs. Br. 105. In *Service Merchandise Co. v. Boyd Corp.*, "[t]he question . . . when the damages caused by [defendant] Boyd ceased" was easily

answered as January 1, 1978, because the defendant had that day entered into a legitimate agreement providing that it "could no longer sell ovens to [plaintiff] SMC, even if it wanted to." 722 F.2d 945, 952 (1st Cir. 1983). "The effect on SMC was the same as if Boyd had gone out of business," so damages ceased that day. *Id.* And in *In re London Silver Fixing, Ltd. Antitrust Litigation*, the court discussed the "role any . . . lingering [price] suppression played in the losses suffered" only in the context of *Plaintiffs' standing*, in light of the court's "concern[] that at least some . . . alleged injuries are highly speculative." 213 F. Supp. 3d 530, 556-57 (S.D.N.Y. 2016).

And even if the Court were to somehow find that Defendants' conspiracy ended on January 25, 2007, there would be lingering effects in all three categories that Defendants identify. *First*, Plaintiffs' shipments under contracts entered into *before* January 25, 2007, but amended in some capacity after that date would still show lingering effects of Defendants' conspiracy. Defendants offer no evidence for their assertion that "[a]ny opportunity to negotiate an amendment to an existing contract was an opportunity" to escape the effects of Defendants' conspiracy and any amendment that retained a conspiratorial FSC constituted a "decision by a Plaintiff to keep" it. Defs. Br. 106 n.41. To the contrary, most of the amendments that Defendants identify in Attachment D to the Bryan Declaration are clerical, nonsubstantive amendments that were not overarching renegotiations of the contracts' financial terms or FSC provisions. Pls. Resp. to Defs. Stmt. of Facts No. 55.[62] For example, NS seeks to avoid [redacted] of damages claimed by Plaintiff [redacted] on the basis of a March 1, 2007 amendment that merely [redacted]

DA25626 (citing BNSF_II_04086774 as "supporting evidence"); PX0937, NS-MDLII-00514420

---

[62] As referenced above, Plaintiffs have filed a Motion to Strike the Bryan Declaration and its Attachments contemporaneously with this brief.

(amendment to NS-Duke price authority NS 9289). It is no wonder that Defendants elected not to submit to the Court the backup material for their appendices. DA25423.

*Second*, Plaintiffs' shipments under contracts entered into after January 25, 2007, would still show lingering effects of Defendants' conspiracy. Defendants did not reset their supracompetitive prices to pre-Conspiracy Period levels or otherwise cede the gains of their conspiracy. In fact, as outlined above, they specifically sought to do the opposite. Defendants negotiated these rate-unregulated contracts—which were not subject to the STB's ruling on rate-regulated shipments—with the express intent of maintaining the revenues they had spent years inflating to supracompetitive levels. COF ¶¶ 559-87. To take a simple example, Defendants bizarrely claim that NS's pretextual rebasing scheme, which *entrenched* the gains of its conspiratorial FSC, actually *ended* NS's participation in the conspiracy and *stanched all* damage to Plaintiffs. Defendants did not abandon these gains and negotiate from scratch.

*Third*, Defendants have made no effort to explain how shipments under "open offer" spot contracts entered into after January 25, 2007—which charged their conspiratorial fuel surcharges on one-off spot shipments where individual negotiation was inefficient for all parties—were not affected by Defendants' conspiracy. As the Court previously explained, resolution of issues pertaining to this type of contract requires litigation of why a Plaintiff decided to ship under an open offer *and* "defendants' decision not to modify the terms of the open offer," *Tolling II*, 2021 WL 1909777, at *12, issues about which Defendants have offered no evidence, let alone undisputed evidence entitling them to summary judgment.

## IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON IMPACT, DAMAGES, AND CAUSATION

Finally Defendants argue that no Plaintiff in this case can demonstrate impact, damages, or causation. Defs. Br. 84-99. This argument, too, fails on all counts, including for the reasons

set forth in Plaintiffs' contemporaneously-filed Response to Defendants' Motion Under Federal Rules of Evidence 702 and 403 To Exclude Average Damages Opinions.

### A. The *MDL I* Appeals Court Did Not Reject the Use Of Regressions As Evidence

Defendants' motion begins with the assertion that the appeals court in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 934 F.3d 619 (D.C. Cir. 2019) ("*D.C. Cir. II*"), deemed Dr. Rausser's *MDL I* regression-based damages model, prepared for purposes of class certification, incapable of proving classwide causation, injury or damages. Defs. Br. 84. As an initial matter, no Plaintiff is relying on Dr. Rausser's model in this case. And that is not what the D.C. Circuit did in any event.

The *D.C. Cir. II* panel did not question whether Dr. Rausser's model was reliable, admissible evidence under Rule 702; on the contrary, the court explicitly stated it was "assuming ***the model can reliably show injury and causation***" for those 14,028 class members the model found were damaged. *D.C. Cir. II*, 934 F.3d at 623-24 (emphasis added). But the appeals court held that because the remaining 2,037 class members (for whom Dr. Rausser's regression model found no damages) would not be able to use the regression-based evidence to prove damages, they would need individualized proof of injury and damages—and those individual issues would predominate over common issues. *Id.* at 624-25.

At no point did the *D.C. Cir. II* panel suggest that Dr. Rausser's regression-based model could be disregarded as evidence of injury and damages. Indeed, it would have been stunning if the *D.C. Cir. II* panel had rejected regression modeling altogether as evidence of injury and damages, against the entire weight of authority on this issue. As explained in the *Daubert* response, regression-based techniques are widely recognized by courts, experts, and academics as an accepted and indeed preferred method of assessing impact, causation, and damages. Pls. Resp. to Mot. re Average Damages § II-B.

### B. Defendants' Arguments Against "Averages"-Based Evidence Misconstrue the Cases and Do Not Apply to Plaintiffs' Regression Models

Defendants next blend regressions, other types of statistical evidence, and any kind of evidence based on "averages" into a single evidentiary bogeyman that they contend the Court should disregard. Defs. Br. 86-97. Defendants misconstrue the case authorities, which have nothing to say about regression modeling of the kind advanced by Plaintiffs. As explained in the *Daubert* response, Defendants' cases on statistical proofs do not reject the use of regression model outputs in antitrust cases or treat them as some kind of novel type of evidence requiring special justification. Pls. Resp. to Mot. re Average Damages §§ II-C, II-E. And the cases Defendants cite expressing hostility to "averages" deal with entirely different approaches—not to the use of regression modeling to isolate the impact of a conspiracy from conflating factors, but the averaging of data *before* regression analysis is performed. *Id.* § II-D.

Equally inexplicable is Defendants' attempt to criticize regression modeling as an impermissible "averaging" that ignores differences between shippers or conflates conspiratorial harms with other causes. As Defendants' own expert stated in his published writings, regression models are used in antitrust cases precisely because they are "uniquely suited to isolating the effect" of a given factor "while property accounting for other relevant factors." *Id.* § II-B (quoting ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES (3d ed. 2017) ch. 6).

Defendants' attempt to sweep regression modeling writ large into some kind of suspect class of evidence is at odds with the case law. The correct standard of proof for antitrust harm, causation, and damages is the "just and reasonable inference" standard. As described in the accompanying *Daubert* Response, that standard is flexible and pragmatic, in keeping with the reality that antitrust damages must be determined with reference to a hypothetical competitive environment. *Id.* § II-A. Courts uniformly find that a properly-specified regression model can be

a valid means of demonstrating impact,[63] damages,[64] and causation.[65]

Defendants cite to not a single case in which a court treated regression modeling as categorically incapable of demonstrating causation, injury, or damages in an individual antitrust case. Defendants instead rely on *class certification* decisions under Rule 23, in which courts consider *not* whether the expert opinion is reliable, but whether common questions predominate over individual ones, such that there would be no need for the use of individual evidence of class members' impact or damages. Pls. Resp. to Mot. re Average Damages § I-B (explaining that Defendants rely on class action decisions in which courts do not reject regression-based evidence, but rather find that class treatment may not be possible where individual damages evidence would *also* be relevant). That question is not at issue here, since these are individual cases in which all parties—Plaintiffs and Defendants—will be entitled to present evidence relating to the individual Plaintiff at issue as well.

### C. As Defendants' Own Arguments Suggest, There Is Substantial Evidence that Each Individual Plaintiff Was Harmed, Both Statistical and Otherwise

Next, Defendants argue that "this industry and the alleged conspiracy demand individualized assessments of the alleged conspiracy's effect on each Plaintiff," and recite various

---

[63] *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 676 (9th Cir.), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022) (antitrust impact could be established using pooled regression model).

[64] *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1242 (7th Cir. 1982), *aff'd*, 465 U.S. 752 (1984) (market analyst's regression analysis admissible *even where* various factors were omitted in his damages projections); *see also In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18, 29-30 (N.D. Ga. 1997) (permitting class certification in an antitrust price-fixing case where the plaintiffs proposed to use regression analysis to estimate class members' damages).

[65] *High Fructose*, 295 F.3d at 660–61 (permitting use of regression modeling to show causation in antitrust case); *see also Times–Picayune Pub. Co. v. United States*, 345 U.S. 594, 621 (1953) (looking to "economic statistics" to determine whether "demonstrably deleterious effects on competition may be inferred" in antitrust case).

types of individual evidence they think ought to be considered with respect to each Plaintiff, such as their negotiation history, available substitutes of rail for each shipper, the risks of transporting each shipper's particular commodities, and so on. Defs. Br. 90-93. But Defendants' argument is misdirection; these cases are not class actions, and evidence specific to individual Plaintiffs can and will be considered at trial, in addition to any econometric analyses.

Defendants' claim that "no single average could possibly represent" all Plaintiffs and their attempt to contrast International Paper ("IP") and Old World Industries ("Old World") to exemplify their argument is unavailing. Defs. Mot. re Average Damages 16; Defs. Br. 93. First, different Plaintiffs' experts assessed the damages for IP (Drs. Bernheim and Marx) and Old World (Drs. Leitzinger and McClave), so Defendants' suggestion that the same "averages" model was improperly applied to two supposedly separately situated Plaintiffs is wrong. Second, IP and Old World filed as separate, individual Plaintiffs; each has its own evidence of causation, impact, and damages. And Defendants, like those two Plaintiffs, are free to bring to bear evidence specific to each of them at their individual trials. Econometric models will hardly be the only evidence at issue in each of those two cases. For example, when IP issued its 2003 [redacted] *See* PX1068, Salvino (IP) Dep. 47-49, 61-64. Then, [redacted] *Id.* at 64; *see also* PX0938, UPFSC 0556366, at '367, '370; PX0939, NS-MDLII-00212508. Defendants claim that IP [redacted] Defs. Br. 93, but IP was, in fact, [redacted]

*See* PX0940, NS_010058821, at '823; PX0941, NS_010061670, at '671; PX0942, NS_003041868, at '868; PX0943, UPFSC_II_00031042; PX0944, UPFSC_II_00023674; PX0945, UPFSC_II_00527808; PX0947, BNSF_II_00014177.

Defendants prove that there is a rich record of individualized evidence relating to injury and damages that they themselves intend to advance at trial. They give the Court more than two dozen examples of specific Plaintiffs as to which they intend to dispute injury using evidence of individual circumstances obtained in discovery. *See* Defs. Mot. re Average Damages 16-23 & nn.8-9, 11-13. There is no basis for this Court taking up a blanket summary judgment motion suggesting that *each Plaintiff* has *zero* evidence of damage.

Rather than explaining why any given Plaintiff's evidence that it paid increased prices after the railroads drastically and uniformly changed their FSC strategies would be insufficient to raise a fact issue as to that Plaintiff, Defendants' make the naked, conclusory assertion that *no Plaintiffs* in any of these cases has evidence of impact, damages, or causation. Defendants make no attempt to grapple with the admittedly "large discovery record" as to *each* Plaintiff, Defs. Br. 94, so they cannot prevail against *all* Plaintiffs on the "mere incantation . . . of 'summary judgment.'" *Higgins v. Scherr*, 837 F.2d 155, 157 (4th Cir. 1988); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) (White, J., concurring) ("a conclusory assertion that the plaintiff has no evidence to prove his case" is "not enough").

### D. Plaintiffs' Econometric Models Are Sufficient Evidence of Impact, Damages, And Causation

Finally, as explained in Plaintiffs' accompanying Response to Defendants' *Daubert* motion, regression modeling is accepted as evidence for impact, damages, and causation, and Plaintiffs' experts have developed well-specified models that can be used to prove Plaintiffs were harmed by Defendants' conduct. Pls. Resp. to Mot. re Average Damages §§ II-B, III. Defendants

claim these models are "averages" that blend shippers and their unique characteristics in undifferentiated fashion, but that misstates what Plaintiffs' experts have done. A regression is a statistical analysis designed to *isolate* the impact of the conspiracy from other factors, both at the macro level (cost, demand) and the micro level (individual route and shipper characteristics). *See id.* Defendants cite no authority—not in case opinions, not in academic writings, not even in their own experts' reports—for their bold proposition that regression "models are averages, full stop." Defs. Br. 96. In fact, they are regarded as the "world standard" for proving cartel damages. Pls. Resp. to Mot. re Average Damages § II-B (quoting JM Connor, *Forensic Economics: An Introduction with Special Emphasis on Price Fixing*, 4 J. COMPETITION L. & ECON. 53-54 (2008)).

Defendants ask the Court to simply pretend this econometric evidence does not exist because Defendants believe "better evidence" is available. Defs. Br. 97. Specifically, Defendants contend that each Plaintiff should be forced to rely only on "Plaintiff-specific factors" in proving damages. *Id.* at 98. But that simply demonstrates there is a disputed issue for trial. Defendants argue, for example, that prices paid by Plaintiffs on specific routes may be affected by variations in demand, or by shippers' ability to negotiate on specific routes, or by the commodity being transported. *Id.* at 92-93. Plaintiffs' experts already account for these Plaintiff-specific variations in their models, including through the use of controls based on specific routes at issue, the specific shipper on each route, and the specific commodity on the route.[66] Defendants are free to argue

[66] *See* PX0769, Leitzinger MDL II Rpt. ¶ 242 (describing use of various "explanatory variables designed to capture market conditions outside of the alleged conspiracy"); PX0985, McClave MDL II Rpt. 14-18 (describing use of "explanatory variables," which are a "combination of supply and demand factors, and other factors closely related to the specific characteristics of the industry"); PX0819, Jacobs Rpt. ¶¶ 477-78 (describing use of fixed-effects variables for each combination of a shipper, commodity, and origin-destination pair); PX0948, Jacobs Dep. 240, 251-53 (explaining that the difference-in-differences model itself controls for other factors that differentiate routes from one another and isolates the effect of the conspiracy).

that their experts' approaches to evaluating individual effects are "better evidence" or deserve more weight than Plaintiffs' experts' approaches, or to submit at trial evidence specific to individual Plaintiffs that they believe is "better" than modeling. But that is an argument about which of the parties' approaches to isolating and quantifying the pricing impact of specific conduct is more persuasive. When each approach is grounded in sound economic theory, it is for the fact finder to decide which approach is more persuasive; it is not a matter for summary judgment. Pls. Resp. to Mot. re Average Damages §§ I-A(2), II-C.

Defendants argue no one "could quantify exactly" what "Plaintiffs would have paid in the but-for world," but say "that is no license to ignore the significant evidence that exists." Defs. Br. 98. On that point, there is no dispute. Plaintiffs offer a rich record of facts along with carefully-developed, rigorously-controlled economic studies. It is only Defendants who ask the court to ignore widely-accepted evidence.

**Conclusion**

For all of the foregoing reasons, Plaintiffs respectfully submit that the Court should deny Defendants' motions for summary judgment.

Respectfully submitted,

Dated: November 12, 2024

*/s/ Michael D. Hausfeld*

Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo
James Hamilton
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com
jhamilton@hausfeld.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell Recycling Southeast, LLC; Peabody*

*/s/ Sami H. Rashid*

Sami H. Rashid
Richard I. Werder, Jr.
Alexandre J. Tschumi
Alexandria ("Alexee") Deep Conroy
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com
rickwerder@quinnemanuel.com
alextschumi@quinnemanuel.com
alexeeconroy@quinnemanuel.com

Alicia Cobb
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, WA 98101
Telephone: (206) 905-7000
Facsimile: (206) 905-7100
aliciacobb@quinnemanuel.com

Viola Trebicka
Jennifer English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com

Paul M. Donovan
LAROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue, N.W. Suite 700
Washington, DC 20036
Telephone: (202) 298-8100

*Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*/s/ William J. Blechman*

Richard Alan Arnold
William J. Blechman
Douglas H. Patton
Michael A. Ponzoli
Joshua B. Gray
KENNY NACHWALTER, P.A.

Facsimile: (202) 298-8200
paul.donovan@laroelaw.com

*Attorneys for Plaintiffs Dust Pro, Inc., Olin Corporation, U.S. Magnesium, Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.;*

1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Heidelberg Materials US, Inc. (f.k.a. Lehigh Hanson, Inc.), PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

*/s/ Jason M. Powers*
Jason M. Powers
VINSON & ELKINS L.L.P.
845 Texas Avenue, Suite 4700
Houston, Texas 77002
(713) 758-2522
(713) 615-5809 (Facsimile)
jpowers@velaw.com

Craig P. Seebald (D.C. Bar No. 438968)
VINSON & ELKINS L.L.P.
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com

*/s/ John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854)
Daniel M. Jaffe (D.C. Bar No. 461185)
SLOVER & LOFTUS LLP
1828 L Street, NW
Suite 1000
Washington, D.C. 20036

*Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars (KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC; PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC;*

(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining, LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Constellation Energy Generation, LLC, f/k/a Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company*

*/s/ David C. Eddy*
David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC; WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

Paul M. Donovan
LAROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue, N.W. Suite 700
Washington, DC 20036
Telephone: (202) 298-8100
Facsimile: (202) 298-8200
paul.donovan@laroelaw.com

*Attorney for Plaintiffs Dust Pro, Inc., Olin Corporation, U.S. Magnesium,*

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Anheuser-Busch, LLC; Anheuser-Busch Companies, LLC; Nestlé Purina PetCare Company; and Nestlé USA, Inc.*

*/s/ Joseph M. Vanek*
Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (admitted *pro hac vice*)
SPERLING & SLATER, LLC
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiff Mitsubishi Motors North America, Inc.*

*/s/ Raj Mathur*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Raj Mathur
Scott Glass
SUSMAN GODFREY, L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: 212-336-8330
rmathur@susmangodfrey.com
sglass@susmangodfrey.com

*Attorneys for Donnelly Commodities Incorporated, Strates Shows, Inc., Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West,*

*/s/ Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
Caitlin R. Thomas
THOMPSON HINE LLP
127 Public Square, Suite 3900
Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com
caitlin.thomas@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern*

*Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co. Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

*/s/ Kristopher S. Davis*

Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

*/s/ Kirk T. May*
Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

*Attorneys for Plaintiffs Lansing Ethanol Services, LLC, et al.*

*/s/ David J. Lender*
David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com
luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

*/s/ Benjamin D. Brown*
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
Sabrina Merold (D.C. Bar No. 1738065)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

*/s/ Michael Schaper*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

*/s/ James P. Denvir*

*/s/ Nathan P. Eimer*

James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)
James Grippando (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

*Attorneys for Plaintiff The General Electric Company*

*/s/ Michael C. Dell'Angelo*
Michael C. Dell'Angelo (Bar No. PA0090)
Michael J. Kane
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600

Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
dbirk@eimerstahl.com
srazzano@eimerstahl.com
bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management, LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

*/s/ Daniel B. Goldman*
Daniel B. Goldman
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036

Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
mwallin@bm.net

Daniel J. Walker (Bar No. 219439)
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, D.C. 20001
(202) 559-9740
dwalker@bm.net

Sophia Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd.
La Mesa, CA 91942
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

*/s/ Leo D. Caseria*
Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu

Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company, Tronox Inc., and Tronox US Holdings Inc.*

*/s/ Ronald J. Aranoff*
Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

*/s/ Conte C. Cicala*
Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

*/s/ Roman M. Silberfeld*
Roman M. Silberfeld
D.D.C. Bar ID: CA00002
ROBINS KAPLAN LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

*/s/ Kayleigh T. Keilty*
Kayleigh T. Keilty (Bar No. 18969)
Austin G. Strine (Bar No. 20637)
SAUL EWING LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-4359
(410) 332-8603 (telephone)
(410) 332-8081 (facsimile)
kayleigh.keilty@saul.com
austin.strine@saul.com

James A. Morsch
Casey T. Grabenstein
SAUL EWING LLP
161 N. Clark St., Suite 4200
Chicago, Illinois 60601
jim.morsch@saul.com
casey.grabenstein@saul.com

*Attorneys for Plaintiff Environmental Protection & Improvement Company, LLC*

Telephone: (310) 552-0130
Facsimile: (310) 229-5800
Email: rsilberfeld@robinskaplan.com

Stephen P. Safranski (admitted *pro hac vice*)
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
Email: ssafranski@robinskaplan.com

*Attorneys for Plaintiffs Oxbow Carbon & Minerals LLC, Oxbow Mining, LLC, Oxbow Midwest Calcining LLC, Oxbow Calcining LLC, and Terror Creek LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of Plaintiffs' Memorandum in Opposition to Defendants' Joint and Individual Motions for Summary Judgment to be served by email on counsel for Defendants and to be filed electronically with the United States District Court for the District of Columbia through the Court's ECF System on November 12, 2024.

*/s/ Raj Mathur*